23-cv-02171

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

In re Voyager Digital Holdings, Inc., et al., Debtors.

UNITED STATES OF AMERICA, ET AL., Appellants,

v.

VOYAGER DIGITAL HOLDINGS, INC., ET AL., Appellees.

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**MEMORANDUM IN SUPPORT OF
APPELLANTS' EMERGENCY MOTION FOR STAY**

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

LAWRENCE H. FOGELMAN
JEAN-DAVID BARNEA
PETER ARONOFF
Assistant United States Attorneys

United States Attorney's Office
Southern District of New York
86 Chambers Street, Third Floor
New York, NY 10007

WILLIAM K. HARRINGTON
United States Trustee, Region 2
LINDA A. RIFFKIN
Assistant United States Trustee

Department of Justice
Office of the United States Trustee
One Bowling Green
New York, NY 10004

RAMONA D. ELLIOTT
Deputy Director/General Counsel
P. MATTHEW SUTKO
Associate General Counsel
BETH A. LEVENE
ANDREW BEYER
SUMI K. SAKATA
Trial Attorneys

Department of Justice
Executive Office for United States Trustees
441 G Street, N.W., Suite 6150
Washington, DC 20530

# Table of Contents

Table of Authorities ............................................................................................................ ii

INTRODUCTION ................................................................................................................ 1

STATEMENT OF THE CASE............................................................................................ 6

    I.      Statutory Framework ............................................................................................ 6

    II.     Statement of the Facts ......................................................................................... 7

        A.      Voyager Files for Bankruptcy and Proposes Several Versions of Its Plan of
Reorganization. ........................................................................................................... 7

        B.      The Evolution of the Plan and Confirmation Order ................................. 8

        C.      Confirmation Hearing............................................................................... 12

        D.      Post-Confirmation Stay Efforts ............................................................... 15

ARGUMENT ..................................................................................................................... 16

    I.      The Government Has a Likelihood of Success on the Merits. .......................... 17

        A.      The Exculpation Provision Improperly Immunizes Against the Government's
Exercise of Police and Regulatory Powers. .............................................................. 17

        B.      The Exculpation Provision Far Exceeds the Limited Scope of Defenses Other
Courts Have Recognized for Certain Conduct............................................................ 25

        C.      The Exculpation Provision Is Impermissibly Overbroad Because It Exculpates
Non-Fiduciaries, Even Those Who Do Not Yet Exist, and Exculpates for Acts that
Have Not Even Happened Yet. ................................................................................... 29

    II.     The Balance of Harms Weighs in Favor of a Stay of the Exculpation Clause and, as
Necessary, the Entire Confirmation Order.............................................................. 31

CONCLUSION.................................................................................................................. 37

## Table of Authorities

**Page(s)**

**Cases**

*ACC Bondholder Grp. v. Adelphia Commc'n Corp. (In re Adelphia Commc'n Corp.)*,
    361 B.R. 337 (S.D.N.Y. 2007) ................................................................. 17, 35, 36, 37

*Adams v. Zarnel (In re Zarnel)*,
    691 F.3d 156 (2d Cir. 2010) ................................................................. 32

*In re Aegean Marine Petroleum Network*,
    18-13374-mew, Confirmation Order, Mar. 29, 2019, ECF No 503, ¶ 92(a) ................ 23, 31

*In re Aegean Marine Petroleum Network Inc.*,
    No. 18-13374-mew, Dkt. No. 503 ................................................................. 31

*In re Aiken County*,
    725 F.3d 255 (D.C. Cir. 2013) (Kavanaugh, J.) ................................................ 34

*Ass'n v. Gibbons*,
    455 U.S. 457 (1982) ................................................................. 18

*Beneficial Homeowner Serv. Corp. v. Moreau (In re Moreau)*,
    135 B.R. 209 (N.D.N.Y. 1992) ................................................................. 36

*Boullion v. McClanahan*,
    639 F.2d 213 (5th Cir. 1981) ................................................................. 28

*Bradford Audio Corp. v. Pious*,
    392 F.2d 67 (2d Cir. 1968) ................................................................. 28

*In re Cenveo*,
    18-22178-rdd ................................................................. 23

*In re Charter Commc'ns*,
    419 B.R. 221 (Bankr. S.D.N.Y. 2009) ................................................................. 7

*In re Chemtura Corp.*,
    439 B.R. 561 (Bankr. S.D.N.Y. 2010) ................................................................. 20

*In re Cheney*,
    406 F.3d 723 (D.C. Cir. 2005) (en banc) ................................................................. 33

*Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*,
    598 F.3d 30 (2d Cir. 2010) ................................................................. 17

*City of New York v. New York, N.H. & H.R. Co.*,
344 U.S. 293 (1953)........................................................................25

*Country Squire Assocs. of Carle Place, L.P. v. Rochester Cmty. Sav. Bank*,
203 B.R. 182 (B.A.P. 2d Cir. 1996)................................................36

*In re Dairy Mart Convenience Stores, Inc.*,
351 F.3d 86 (2d Cir. 2003)............................................................22

*Dana Commercial Credit Corp. v. Center Teleproductions, Inc. (In re Center Teleproductions, Inc.*,
112 B.R. 567, 580 (Bankr. S.D.N.Y. 1990)...................................27

*Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*,
416 F.3d 136 (2d Cir. 2005)......................................................3, 21

*In re Fraser's Boiler Serv., Inc.*,
593 B.R. ......................................................................................30

*In re FTX Trading Ltd.*.
No. 22-11068-JTD .........................................................................7

*In re Grabis*,
No. 13-10669 (JLG), 2020 WL 7346467 (Bankr. S.D.N.Y. Dec. 11, 2020)..........................23

*In re J & S Properties, LLC*,
545 B.R. 91, 105 (Bankr. W.D. Pa. 2015). ....................................29

*Imbler v. Pachtman*,
424 U.S. 409 (1976)......................................................................27

*In re Johns-Manville Corp.*,
600 F.3d 135 (2d Cir. 2010)..........................................................24

*Kelly v. Honeywell Int'l, Inc.*,
933 F.3d 173 (2d Cir. 2019)..........................................................17

*In re LATAM Airlines Grp. S.A.*,
No. 20-11254 (JLG), 2022 WL 2206829 (S.D.N.Y. June 18, 2022) (Stay Decision )..............................23

*Law v. Siegel*,
571 U.S. 415 (2014)......................................................................21

*Luedke v. Delta Air Lines, Inc.*,
159 B.R. 385 (S.D.N.Y. 1993)........................................................27

*Lutin v. United States Bankr. Court (In re Advanced Mining Sys., Inc.)*,
  173 B.R. 467 (S.D.N.Y. 1994).............................................................................36

*Mohamed v. Reno*,
  309 F.3d 95 (2d Cir. 2002)................................................................................17

*In re Murray Metallurgical Coal Holdsings, LLC*,
  623 B.R. 444 (Bankr. S.D. Ohio 2021)........................................................21, 23

*Nken v. Holder*,
  556 U.S. 418 (2009)....................................................................17, 31, 32, 34

*O'Loghlin v. Cnty. of Orange*,
  229 F.3d 871 (9th Cir. 2000) ............................................................................18

*Pan Am Corp. v. Delta Air Lines, Inc.*,
  175 B.R. 438 (S.D.N.Y. 1994)..........................................................................27

*Phoenician Mediterranean Villa, LLC v. Swope (In re J&S Props., LLC)*,
  545 B.R. 91 (Bankr. W.D. Pa. 2015) ...........................................................28, 29

*In re Purdue Pharma, L.P.*,
  No. 21 Civ. 7532 (CM), 2021 WL 5979108 (S.D.N.Y. Dec. 16, 2021).........21, 22

*In re PWS Holding Corp.*,
  228 F.3d 224 (3d Cir. 2000)..............................................................................30

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
  566 U.S. 639 (2012)...................................................................................18, 21

*In re Rae*,
  436 B.R. 266 (Bankr. D. Conn. 2010) ..............................................................23

*Ryan v. U.S. Immigr. & Customs Enf't*,
  974 F.3d 9 (1st Cir. 2020)................................................................................34

*SEC v. Nishad Singh*,
  No. 1:23-cv-01691 (S.D.N.Y. filed Feb. 28, 2023) ............................................8

*SEC v. Universal Exp., Inc.*,
  475 F. Supp. 2d 412 (S.D.N.Y. 2007) (Lynch, J.) ..............................................26

*Seila Law LLC v. CFPB*,
  140 S. Ct. 2183 (2020)....................................................................................34

*In re St. Johnsbury Trucking Co.*,
  185 B.R. 689-90 ..............................................................................................36

iv

*Stellwagen v. Clum*,
    245 U.S. 605 (1918)..............................................................................................18

*Stewart v. Lattanzi*,
    832 F.2d 12, 13 (2d Cir. 1987)..........................................................................27

*In re SunEdison*,
    16-10992 (SMB) ................................................................................................24

*T&W Inv. Co. v. Kurtz*,
    588 F.2d 801 (10th Cir. 1978) ..........................................................................28

*Trump v. Deutsche Bank AG*,
    943 F.3d 627 (2d Cir. 2019), vacated on other grounds by *Trump v. Mazars
    USA, LLP*, 140 S. Ct. 2019 (2020).................................................................17

*Trump v. Int'l Refugee Assistance Project*,
    137 S. Ct. 2080 (2017)......................................................................................17

*In re Tucker Freight Lines, Inc.*,
    62 B.R. 213 (Bankr. W.D. Mich. 1986).............................................................27

*In re U.S.*,
    463 F.3d 1328 (Fed. Cir. 2006).........................................................................33

*United States Aid Funds, Inc. v. Espinosa*,
    559 U.S. 260 (2010)............................................................................................7

*United States v. Cardinal Mine Supply*,
    916 F.2d 1087 (6th Cir. 1990) ..........................................................................24

*United States v. Nixon*,
    418 U.S. 683 (1974)..........................................................................................34

*United States v. Security Indus. Bank*,
    459 U.S. 70 (1982)............................................................................................25

*In re Washington Mutual, Inc.*,
    442 B.R. 314 (Bankr. D. Del. 2011) ..................................................................29

*Williams v. U.S. Fid. & Guar. Co.*,
    236 U.S. 549 (1915)..........................................................................................18

*Wright v. Union Cent. Life Ins. Co.*,
    304 U.S. 502 (1938)..........................................................................................18

*In re XRX, Inc.*,
    77 B.R. 797 (Bankr. D. Nev. 1987) ...................................................................28

## Statutes

11 U.S.C. § 105(a) ..................................................................................21, 22

11 U.S.C. § 106 ............................................................................................24

11 U.S.C. § 362(b)(4) ...................................................................................22

11 U.S.C. § 524 ............................................................................................21

11 U.S.C. § 1103(c) ......................................................................................27

11 U.S.C. § 1123(b)(6) .................................................................................22

11 U.S.C. § 1124(e) ......................................................................................21

11 U.S.C. § 1125(e) ................................................................................. *passim*

11 U.S.C. § 1129(a)(3) ............................................................................6, 22

11 U.S.C. § 1141(d) ................................................................................6, 18

11 U.S.C. § 1141(d)(3) ...........................................................................6, 19

11 U.S.C. § 1142(a) ..............................................................................16, 20

18 U.S.C. § 3613 ..........................................................................................23

31 U.S.C. § 3731(b)(1) .................................................................................26

## Other Authorities

Fed. R. Bankr. P. 3020(e) .............................................................................15

Fed. R. Bankr. P. 8007(b)(2)(B) .....................................................................3

H.R. Rep. No. 95-595 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963 ..........32

https://www.whitehouse.gov/briefing-room/statements-releases/2022/09/16/fact-
    sheet-white-house-releases-first-ever-comprehensive-framework-for-
    responsible-development-of-digital-assets/ .......................................5, 33

## INTRODUCTION

The United States of America, (the "United States"), by its attorney Damian Williams, United States Attorney for the Southern District of New York; and Justice Department official William K. Harrington, the United States Trustee for Region 2 (the "United States Trustee") (together, the "Government"), have appealed[1] the bankruptcy court's March 8, 2023 order (the "Confirmation Order") confirming the chapter 11 plan of Voyager Digital Holdings, Inc. and its affiliated Debtors (collectively, "Voyager" or the "Debtors"), Ex.[2] A.

The crux of the bankruptcy plan that the Bankruptcy Court confirmed is a commercial deal between Voyager and Binance.U.S. that will result in Binance.U.S. acquiring the assets of Voyager. The parties filed a proposed plan outlining the deal on December 18, 2022. [Dkt. No. 863, at 20 of 420]. Less than four months later, on March 8, 2023, the Court entered an order confirming the plan.

The plan included an "exculpation clause" that would relieve various parties of liability based on the negotiation, execution, and implementation of any transactions or actions approved by the bankruptcy court, except for certain causes of action premised on actual fraud, willful misconduct or gross negligence. The exculpation provision also made clear that no exculpated parties may be liable for distributing cryptocurrencies in the manner provided in the plan. According to the order, the Government's only remedy would be to seek prospective relief to enjoin any ongoing transactions that it comes to believe are illegal.

---

[1] *See* Notice of Appeal of United States and U.S. Trustee Region 2 of Order Confirming Debtors' Chapter 11 Plan. Case No. 22-B-10943(MEW), Dkt. No. 1165.

[2] Exhibits cited are the exhibits to the Declaration of Lawrence H. Fogelman, submitted with this Motion. "Dkt." refers to the docket numbers in bankruptcy court, Case No. 22-B-10943(MEW). Where applicable, cited page numbers are to the ECF pagination at the top of the referenced document.

The exculpation clause should be struck in this appeal. The Executive Branch of the federal government has the obligation to evaluate violations of federal law and bring enforcement actions within its prosecutorial discretion. Those determinations are made within the bounds of laws enacted by the Legislative Branch, including statutes of limitations that determine how long the Government has to evaluate if wrongdoing has occurred and to pursue the action. In approving the exculpation cause and absolving exculpated parties from their liabilities for engaging in prospective transactions of which the Government has had only a few months' notice, the bankruptcy court improperly arrogated legislative powers to itself by foreclosing the Government's ability to pursue claims of misconduct unless the Government could identify any illegality in the transactions in advance. Notwithstanding the short time since the transaction had been proposed and without regard to any statute of limitations, the bankruptcy court concluded that "the SEC and all other Government agencies have had a full and fair opportunity to argue to me that the proposed transactions are illegal in any way and have not made any such contentions." Decision at 36. And just as the bankruptcy court cannot rewrite federal statutes of limitations, it cannot determine that the United States may only enforce its laws so long as those causes of action sound in actual fraud, willful misconduct, or gross negligence.

While we are mindful of the bankruptcy court's concern that parties it orders to engage in certain transactions should ordinarily not be held liable for following its orders, such a protection may be afforded by its factual findings and conclusions of law, on which the parties who will carry out these transactions may rely as an affirmative defense to any enforcement action to the extent applicable, if brought. Many courts, including those cited by the bankruptcy court, have addressed affirmative defenses premised on following court orders in deciding, after conducting a factual inquiry, whether such a defense is warranted. We thus ask this Court to correct the bankruptcy

court's overreach and restore the appropriate balance between the judicial and executive branches by striking the exculpation provision in the plan, at least insofar as it applies to the Government.

The Government seeks a stay pending appeal to preserve its right to appellate review given the doctrine of "equitable mootness," under which some courts dismiss as moot appeals of bankruptcy court confirmation orders if those orders are not stayed pending appeal. *See, e.g.*, *Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 144-45 (2d Cir. 2005). While the Government disagrees with the application of this doctrine in circumstances such as these, it must—to protect its rights—seek an immediate stay of the Confirmation Order to avoid potential dismissal of its appeal.[3] The bankruptcy court has stayed the effect of its Confirmation Order until Monday, March 20, at 5:00 pm to facilitate this Court's consideration of the appeal, but has refused to stay it further. Should this Court not act before the current stay expires on Monday, the Government may suffer the ultimate prejudice, the inability to pursue this appeal to vindicate its constitutional interests. We thus respectfully ask this Court to immediately stay the Confirmation Order (or, at a minimum, the exculpation provision) until the Court can consider and decide this stay motion (and any response thereto by the debtors), and ultimately, stay the Confirmation Order until the court decides the appeal itself, which the Government is prepared to brief on an expedited basis. If this Court grants no other relief, the Government requests at least a two-week administrative stay to allow it to determine if it will seek relief in the Second Circuit and for the Second Circuit to consider any stay motion.

---

[3] This Court may stay a bankruptcy court order pending appeal if such a stay was first sought from the bankruptcy court, but it has either denied the stay or not yet ruled. Fed. R. Bankr. P. 8007(b)(2)(B). That is the case here. The Government moved for a stay on March 14, 2023. On March 15, 2023, the bankruptcy court denied the Government's motion, and instead postponed the effective date of its order to March 20, 2023, in order to "afford [this] Court a reasonable opportunity to read the relevant papers and to make its own ruling." Ex. B, Decision and Order Denying the Government's Motion for Stay of the Confirmation Order Pending Appeal, Dkt. No. 1190 at 3.

This Court should stay the Confirmation Order because the Government is likely to succeed on the merits in its appeal and the balance of harms weighs in favor of granting a stay. The Government is likely to prevail because there is no Congressional authorization for an exculpation clause of the breadth imposed by the bankruptcy court. This is not surprising. The Government is not aware of any federal district court orders, including those approving settlements that require future actions by the parties, that affirmatively prevent the Government from enforcing the law except in cases of actual fraud, willful misconduct, or gross negligence—because there is no statutory authority allowing any federal court to issue such an order. And even though exculpation clauses are often used in bankruptcy plans, the *only* provision in the Bankruptcy Code that expressly defines conduct for which parties will not be liable is 11 U.S.C. § 1125(e), which exculpates only certain parties' actions in soliciting votes in favor of bankruptcy plans. There is thus no statutory authorization for the bankruptcy court's order depriving the Government of its ability to enforce criminal law, civil law and federal regulations.

Moreover, exculpation clauses are generally used in bankruptcies not to prevent governments from enforcing their laws, but to prevent commercial participants in a bankruptcy from later collaterally attacking bankruptcy court decisions and proceedings. But the exculpation clause here addresses not just actions that have already happened during the bankruptcy, but it also applies to transactions that will take place after the plan's effective date. For such future transactions, it is impossible to know in advance what the parties will actually do, and whether they will engage in any misconduct. The devil is in the details, and it is in the details where parties may violate the laws and regulations that the Government is charged with enforcing. While the bankruptcy court indicated at the stay hearing on March 15, 2023, that it did not intend its exculpation provision to cover misconduct that could occur in connection with the execution of

the transactions at issue, *see* Ex. E, March 15, 2023 Transcript, at 25:3-6, the court left intact the language in its order that appears to do just that. This leaves the parties—and future courts—to guess and disagree as to how to read the order.

The balance of harms also weighs in favor of a stay. It is the function of the Executive Branch, not an Article I bankruptcy court, to determine whether wrongdoing has occurred and whether a timely action can be brought. The bankruptcy court improperly cut off the Government's prosecutorial discretion to enforce the law, at least unless and until the Government affirmatively enjoins these transactions (which may conclude shortly after the plan goes effective). The Government thus has suffered harm from the court's arrogation of the Executive function to itself in limiting the Government's ability to enforce the law.

The need for the Government to maintain all the tools at its disposal is particularly important in evaluating and litigating over cryptocurrency violations. Even a casual reader of the news is aware that the cryptocurrency space is rife with regulatory concerns, underscored by the massive fraud relating to FTX. *See, e.g.*, Debtors' Memorandum of Law in Support of the Second Amended Disclosure Statement (the "2/28 Memo in Support"), Dkt. No. 1110, ¶ 2 ("FTX's new CEO publicly announced that the proposed purchaser was a fraud of historic proportions, sending shockwaves through the entire cryptocurrency industry. Senior FTX executives were charged with federal felonies and at least three have pled guilty, admitting that FTX and its affiliates defrauded many, including its own customers and commercial counterparties like the Debtors."). "Outright fraud, scams, and theft in digital asset markets are on the rise: according to FBI statistics, reported monetary losses from digital asset scams were nearly 600 percent higher in 2021 than the year before."[4] The Government has been critically involved in the efforts to identify and prosecute

---

[4]   https://www.whitehouse.gov/briefing-room/statements-releases/2022/09/16/fact-sheet-white-house-releases-first-ever-comprehensive-framework-for-responsible-development-of-digital-assets/

frauds and abuse that stems from cryptocurrency. *See id.* ("Since taking office, the Biden-Harris Administration and independent regulators have worked to protect consumers and ensure fair play in digital assets markets by issuing guidance, increasing enforcement resources, and aggressively pursuing fraudulent actors.").

The exculpation provision harms both the Government's enforcement rights and the public by extinguishing the ability of governmental entities to pursue wrongdoing by exculpated parties. It would preemptively foreclose the United States and the states from enforcing all federal and state laws that protect public health, safety, and welfare if the Government cannot show actual fraud, willful misconduct or gross negligence. And it would preclude the Government and private claimants from pursuing claims that may arise based on conduct that has not yet occurred. Moreover, absent a stay, the Debtors may attempt to evade appellate review altogether by arguing that the Government's appeal has become equitably moot.

## STATEMENT OF THE CASE

### I.     Statutory Framework

A debtor in a Chapter 11 bankruptcy may reorganize its affairs by proposing a plan, and if it successfully does so, receives a discharge that releases it from liability for most debts that arose before that time. 11 U.S.C. § 1141(d). Such a discharge may be granted only after a debtor complies with a detailed set of statutory procedures and requirements, *see, e.g., id.* §§ 727, 1328, 1129, 1141, and only as part of a public judicial process in which all creditors can participate, see id. §§ 341, 1109. However, a debtor such as Voyager is not entitled to a discharge if its chapter 11 plan is a liquidating plan. 11 U.S.C. § 1141(d)(3).

A bankruptcy court may "confirm a plan only if it complies with all" of the requirements of section 1129(a), which include that "[t]he Plan complies with the applicable provisions of [the Bankruptcy Code]." *Id*. § 1129(a). The plan proponent bears the burden to prove that it met the

requirements for confirmation by a preponderance of the evidence. *In re Charter Commc'ns*, 419 B.R. 221, 243 (Bankr. S.D.N.Y. 2009) (*citing Heartland Fed. Savs. & Loan, Ass'n v. Briscoe Enters. (In re Briscoe Enters*.), 994 F.2d 1160, 1165 (5th Cir. 1993)). Bankruptcy judges have an independent duty to inspect and disapprove improper plans. *See United States Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 277 (2010).

## II.    Statement of the Facts

### A. Voyager Files for Bankruptcy and Proposes Several Versions of Its Plan of Reorganization.

The Debtors commenced voluntary cases under chapter 11 of the Bankruptcy Code on July 5, 2022 (the "Petition Date"). The next day, they filed a plan of reorganization, in which they proposed to market their assets for sale. [Dkt. No. 17].

On September 28, 2022, the Debtors filed a motion seeking authority to enter an asset purchase agreement with FTX US for the sale of substantially all of the Debtors' assets [Dkt. No. 472], which the bankruptcy court approved on October 20, 2022 [Dkt. No. 581]. Before this arrangement could be consummated, FTX collapsed in November 2022. *See In re FTX Trading Ltd..* No. 22-11068-JTD, *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [Dkt. No. 24] (Bankr. D. Del. Filed Nov. 17, 2022); *see* 2/28 Memo in Support ¶ 2 ("The Debtors were weeks away from consummating a sale when their proposed purchaser, *FTX, epically collapsed*." (emphasis added)). On November 11, 2022, FTX and its affiliates filed for bankruptcy in Delaware. *In re FTX Trading Ltd.*, No. 22-11068-JTD [Dkt. No. 1] (Bankr. D. Del. filed Nov. 11, 2022). Moreover, "FTX's new CEO publicly announced that the proposed purchaser was a fraud of historic proportions, sending shockwaves through the entire cryptocurrency industry. Senior FTX executives were charged with federal felonies and at least three have pled guilty, admitting that FTX and its affiliates defrauded many, including its own

customers and commercial counterparties like the Debtors." 2/28 Memo in Support ¶ 2; *see also SEC v. Nishad Singh*, No. 1:23-cv-01691 (S.D.N.Y. filed Feb. 28, 2023).

After the collapse of FTX US (and its affiliated entities) had "derailed . . . the Debtors' journey to consummation" of its Asset Purchase Agreement with that entity, the Debtors entered into a new Asset Purchase Agreement (the "APA"), this time with BAM Trading Services Inc. ("Binance.US" or the "Purchaser") on December 18, 2022. [Dkt. No. 863, at 20 of 420].

On December 22, 2022, the Debtors filed an amended plan to effectuate the asset sale to Binance.US [Dkt. No. 777]. On December 30, 2022, the Government filed a Notice Concerning the Review of Certain Transactions by the Committee of Foreign Investment in the United States (CFIUS) [Dkt. No. 797]. It stated that CFIUS review of the proposed transaction "could affect the ability of the parties to complete the transactions, the timing of completion, or relevant terms. Bankruptcy courts have previously acknowledged that potential national security concerns (including CFIUS review) are relevant factors in bankruptcy proceedings, and specifically in determining whether bidders are qualified." *Id*. at 1.

### B. The Evolution of the Plan and Confirmation Order

An early version of the Plan contained the following exculpation provision:

Exculpation Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor release or the third-party release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and **each Exculpated Party is exculpated from any Cause of Action for any act or omission arising on or after the Petition Date and prior to the Effective Date** based on the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing, or consummation of the Disclosure Statement, the Plan, the Special Committee Investigation, any Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by

any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for Causes of Action related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

January 10 Plan, Article VIII.C., Dkt. No. 852, pg. 66 of 151 (emphasis added). The bolded language was later removed by the Debtors. It also stated that:

The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

The "Exculpated Parties" include major participants in these cases, including "(a) each of the Debtors; (b) the Committee [of Unsecured Creditors], and each of the members thereof, solely in their capacity as such; (c) each of the Released Professionals; (d) each of the Released Voyager Employees; and (e) the Distribution Agent." *Id*. at Art. I(A)(77), pg. 17 of 151. The Distribution Agent is defined to include the purchaser, Binance.U.S. *Id.* at pp. 7, 12.

Both the United States Securities and Exchange Commission and the United States Trustee, on February 22 and 24, 2023, respectively, filed objections. [Dkt. No. 1047, 1085]. Among other grounds, the United States Trustee objected to the Plan's exculpation provision, arguing that the non-debtor releases are unconstitutional, violate the Bankruptcy Code, and are inconsistent with Second Circuit law. [Dkt. No. 1085 pg. 3, 17-18 of 22]. Moreover, he argued that the Plan inappropriately provides prospective releases to entities that do not yet exist, such as the Wind-Down Debtors and the Plan Administrator, among others.

9

On February 28, 2023, the Debtors filed a revised plan [Dkt. No. 1117], that first introduced the concept of a "Plan Administrator":

> 120. "Plan Administrator" means the Person or Persons selected by the Committee, after consultation with the Debtors, subject to the approval of the Bankruptcy Court and identified in the Plan Supplement, to serve as the administrator(s) of the Wind-Down Debtor, and any successor thereto, appointed pursuant to the Plan Administrator Agreement.

> 121. "Plan Administrator Agreement" means that certain agreement by and among the Debtors, the Committee, the Plan Administrator and the Wind-Down Debtor, which shall be included in the Plan Supplement in a form reasonably acceptable to the Committee.

[*Id.* ¶¶ 120, 121, pg. 20 of 157]. However, the Debtors did not provide the court or interested parties a copy of any proposed or executed administrator plan agreement at the time.

The same day, the Debtors filed their first proposed order confirming the plan [Dkt. No. 1120]. It included language that would have principally—and appropriately—carved the Government out of any exculpation or releases in the plan. [*Id.* ¶ 141, pg. 64-65].

However, on March 2, 2023, during the Confirmation Hearing (defined below) and weeks after the voting deadline and objections were due and without providing notice to anyone, the Debtors for the first time added language that would expressly undo the government carve-out they had previously proposed [Dkt. No. 1130, Amended Proposed Order], providing that:

> **that the United States, the States, and their agencies may not, and will not, allege that the Restructuring Transactions are a violation of any rules or regulations enforced by the United States, the States or any of their agencies, nor will they bring any claim against any Person on account of or relating to the Restructuring Transactions**.

[Dkt. 1130, Amended Proposed Order, ¶¶ 142 and 143]. It further qualified the carve out, stating:

> **no Governmental Unit will allege that the Restructuring Transactions are a violation of any rules or regulations enforced by the United States, the States**

> **or any of their agencies, nor will they bring any claim against any Person on account of or relating to the Restructuring Transactions.**

*Id*. ¶ 143.

> The Plan [Dkt. No. 1138] defines the Restructuring Transactions as

> those mergers, amalgamations, consolidations, reorganizations, arrangements, continuances, restructurings, transfers, conversions, dispositions, liquidations, dissolutions, or other corporate transactions that the Debtors and the Committee jointly determine to be necessary to implement the transactions described in this Plan, as described in more detail in Article IV.B herein and the Restructuring Transactions Memorandum.

Plan, Article I(A)(140). By definition, then, each of these Restructuring Transactions will not occur until after the plan's effective date and in furtherance of the goals set forth in the plan. They include whatever transactions "Debtors and the Committee jointly determine to be necessary to implement the transactions described in the Plan." *Id.; see also* Plan, Article IV(B).

The plan also included a "toggle" feature, whereby if the sale transaction is not consummated by an "Outside Date" [Dkt. No. 1125, pg. 39-40 of 155]—defined as four (4) months after the date of the APA [Dkt. No. 775, pg. 108 of 150]—or if the APA is terminated, the Debtors will pivot to a standalone plan. [Dkt. No. 863, Amended Disclosure Statement, Section IV, at pg. 29 of 420].

On March 2, 2023, the USAO filed a letter objecting to the change that Debtors had just made to the Exculpation Provision removing the governmental carve-out because the exculpation language improperly barred the Government from enforcing its laws and regulations in the ordinary course against the Debtors and third parties in connection with the Restructuring Transactions. Dkt. No. 1132. This objection was joined by the Federal Trade Commission and the New Jersey Bureau of Securities. [Dkt. Nos. 1134, 1135.] On March 3, 2023, the Texas State

Securities Board filed its objection to the plan and disclosure statement, arguing *inter alia*, that the government should be excluded from the broad exculpation language. [Dkt. No. 1136].

On March 6, 2023, the USAO filed a brief objecting to the latest iteration of the Exculpation Provision (the "USAO Objection") again arguing, *inter alia*, that the proposed exculpation language improperly barred the Government from enforcing its laws and regulations in the ordinary course against the Debtors and third parties in connection with the Restructuring Transactions. [Dkt. No. 1144].

### C. Confirmation Hearing

From March 2 through March 7, 2023, the Court held a hearing to consider, *inter alia*, final approval of the Amended Disclosure Statement and confirmation of the Third Amended Joint Plan (the "Confirmation Hearing"). On March 6, 2023, as part of the Confirmation Hearing, the Court held a brief oral argument on the Government's objection. During that argument, the bankruptcy court stated it would approve an exculpation provision insulating Debtors and others from prospective governmental liability in connection with their consummation of the transactions contemplated in the Plan and related documents. The Court expressly and emphatically rejected the Government's argument that the Court did not have the authority to release criminal liability.[5]

At the end of the Confirmation Hearing, on March 8, 2023, the Court entered an Order Approving the Second Amended Disclosure Statement and Confirming the March 5 Plan (the

---

[5] *See* Ex. D, Transcript of Confirmation Hearing, March 7, 2023, at 25-26 ("[Government attorney]: It would certainly not be appropriate for this Court to enjoin a criminal prosecution of any person for any reason. THE COURT: Well, if what you're saying is that having sat on the sidelines and said nothing to me to indicate that there's anything illegal about what these people are going to do, that you want to reserve the right to put somebody in jail for doing a rebalancing transaction that they will have no choice but to do under the order that I entered, then I disagree with you. I think the very suggestion offends me to no end. I can't believe that you would even take the position in front of me that you should have that right. It's preposterous. It's absolutely preposterous. If you think something's that illegal, speak up, but don't dare tell me that you kind of want to reserve that right to do that to somebody.").

"Confirmation Order"), [Dkt. No. 1159]. It revised the exculpation provisions Debtors had

proposed to the following (the "Exculpation Provision"):

> Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor release or the third-party release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby exculpated from, any liability for damages based on the negotiation, execution and implementation of any transactions or actions approved by the Bankruptcy Court in the Chapter 11 Cases, except for Causes of Action related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence; provided that nothing in the Plan shall limit the liability of professionals to their clients pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8 Rule 1.8(h)(1) (2009).

> The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes.

> In addition, the Plan contemplates certain rebalancing transactions and the completion of distributions of cryptocurrencies to creditors. The Exculpated Parties shall have no liability for, and are exculpated from, any claim for fines, penalties, damages, or other liabilities based on their execution and completion of the rebalancing transactions and the distribution of cryptocurrencies to creditors in the manner provided in the Plan.

> For the avoidance of doubt, the foregoing paragraph reflects the fact that Confirmation of the Plan requires the Exculpated Parties to engage in certain rebalancing transactions and distributions of cryptocurrencies and the fact that no regulatory authority has taken the position during the Combined Hearing that such conduct would violate applicable laws or regulations. Nothing in this provision shall limit in any way the powers of any Governmental Unit to contend that any rebalancing transaction should be stopped or prevented, or that any other action contemplated by the Plan should be enjoined or prevented from proceeding further. Nor does anything in this provision limit the enforcement of any future regulatory or court order that requires that such activities either cease or be modified, or limit the penalties that may be applicable if such a future regulatory or court order is issued and is violated. Similarly, nothing herein shall limit the authority of the Committee on Foreign Investment of the United States to bar any of the contemplated transactions. Nor does anything in this provision alter the terms of the Plan regarding the compliance of the Purchaser with applicable laws in the Unsupported Jurisdictions before distributions of cryptocurrency occur in those Unsupported Jurisdictions.

Confirmation Order at 7-8. A governmental carve-out was nominally put back in, but with exceptions that undermine it:

> 101. **Governmental Units**. **Except as set forth in the exculpation provisions set forth in the Plan (including sections VI.B.1 and VIII.C of the Plan)** and in this Confirmation Order, nothing in this Confirmation Order or the Plan shall release or restrict any claim by the United States, the States or any of their agencies of any claim arising under the Internal Revenue Code, the environmental laws or any civil or criminal laws of the United States or the States, or under any rules or regulations enforced by the United States, the States or any of their agencies against the Released Parties, nor shall anything in the Confirmation Order or the Plan enjoin the United States or the States from bringing any claim, suit, action or other proceedings against the Released Parties for any liability for any claim, suit or action arising under the Internal Revenue Code, the environmental laws or any civil or criminal laws of the United States or the States, or under any 22-10943-mew Doc 1166 Filed 03/10/23 Entered 03/10/23 08:17:02 Main Document Pg 45 of 55 46 rules or regulations enforced by the United States, the States or any of their agencies, nor shall anything in the Confirmation Order or the Plan exculpate any such party from any liability to the United States, the States or any of their agencies, arising under the Internal Revenue Code, the environmental laws or any civil or criminal laws of the United States or the States, or under any rules or regulations enforced by the United States, the States or any of their agencies; provided, however, that nothing in this Confirmation Order or the Plan shall modify in any respect the relief previously granted in the Bar Date Order.

> 102. **Except as set forth in the exculpation provisions set forth in the Plan (including sections VI.B.1 and VIII.C of the Plan)** and in this Confirmation Order, nothing in this Confirmation Order, the Disclosure Statement, the Plan, or the Asset Purchase Agreement releases, precludes, or enjoins: (i) any liability to any governmental unit as defined in 11 U.S.C. § 101(27) ("Governmental Unit") that is not a "claim" as defined in 11 U.S.C. § 101(5) ("Claim"); (ii) any Claim of a Governmental Unit arising on or after the Effective Date; or (iii) any liability to a Governmental Unit on the part of any non-Debtor (except to the extent set forth in paragraphs 49 and 56 herein); provided, however, that nothing in this Confirmation Order or the Plan shall modify in any respect the relief previously granted in the Bar Date Order.

Confirmation Order at 44-45 (emphasis added).

The Confirmation Order also provided that "[f]or good cause shown, the stay of this Confirmation Order provided by the Bankruptcy Rules shall terminate at the end of the day on March 13, 2023, and this Confirmation Order shall be effective and enforceable immediately

thereafter." [Dkt. No. 1159, Confirmation Order, ¶ 124]. This time was later extended to March 15, 2023, at 5:00 pm. [Dkt. No. 1169, Order Extending Stay].

On March 9, 2023, after the conclusion of the four-day Confirmation Hearing and entry of the Confirmation Order, and despite having introduced the concept of the Plan Administrator in earlier iterations of the plan, the Debtors filed the Sixth Amended Plan Supplement, which included, for the first time, the Plan Administrator Agreement.[6] [Dkt. No. 1161].

### D.  Post-Confirmation Stay Efforts

At the Confirmation Hearing, the Government objected to the proposed waiver, in paragraph 118 of the Proposed Order, of the rule mandating that the effect of confirmation orders are generally stayed for 14 days under Fed. R. Bankr. P. 3020(e). Ex. D, March 7, 2023 Transcript at 34:9-16 ("the U.S. Trustee would oppose the waiver of the stay."); *see also id*. at 108:11-15, 109:14-21, 117:16-118:2. The Bankruptcy Court refused to abide by the 14-day rule but extended the stay until the following Monday, March 13. *Id*. at 108:16-21. The parties later agreed to an extension of the stay through Wednesday, March 15, as approved by the Bankruptcy Court. *See* Order Extending the Stay of the Confirmation Order, Dkt. No. 1169.

On March 14, 2023, the Government filed its joint Motion for a Stay Pending Appeal in the Bankruptcy Court (the "Bankruptcy Stay Motion"). [Dkt. No. 1182]. On March 15, 2023, the Debtors [Dkt. No. 1186] and the Official Committee of Unsecured Creditors [Dkt. No. 1187] each filed their opposition to the Bankruptcy Stay Motion.

The bankruptcy court held a hearing on the Bankruptcy Stay Motion on March 15, 2023. The Government expressed the concerns that it raises here, including that the bankruptcy court

---

[6] After the entry of the Confirmation Order and the filing of the Government's notice of appeal, the court entered a Corrected and Amended Order. Dkt. No. 1166. The revisions in the Corrected and Amended Order have no bearing on this appeal.

lacks statutory authority to exculpate anyone from future government enforcement. Ex. E, March 15 Transcript at 28. And further, the Government noted that "the exculpation order is so broad and so capacious that it would include things" such as "if the distribution agent doesn't protect customer privacy information and disclose[s] it, or if the distribution agent negligently loses customer money, or if in the course of performing the 'restructuring transactions' there are tax violations which don't require actual fraud, willful misconduct, or gross negligence," or "KYC [know your customer] violations" or "anti-money laundering violations." *Id.* at 27.

The same day, the bankruptcy court denied the Stay Motion. Ex. B, Decision and Order Denying the Government's Motion for Stay of the Confirmation Order Pending Appeal (the "Decision") [Dkt. No. 1190]. It rejected as a "red herring" the Government's argument that its exculpation order "might somehow be interpreted as immunizing fraud, or theft, or tax avoidance," *id.* at 8, but made no attempt to clarify the broad language in the order that led to such a reading. And it identified as the supposed statutory basis for its exculpation authority certain language in 11 U.S.C. § 1142(a), which requires certain specific parties to implement a confirmed plan but says nothing about exculpating them from future governmental liabilities. *Id.* at 9-10. The bankruptcy court further extended the stay, as agreed by the parties, through March 20, 2023, to permit consideration by this Court. [Dkt. No. 1188 at ¶ 1].

## ARGUMENT

This Court should grant a stay pending appeal because the Government is likely to prevail on appeal and the balance of the harms weighs in favor of a stay.

To determine whether to grant a stay pending appeal, a court considers: whether the movant is likely to succeed on the merits on appeal; whether the movant will suffer irreparable injury if the stay is denied; whether issuance of the stay will substantially injure the other parties interested

in the proceeding; and where the public interest lies. *Nken v. Holder*, 556 U.S. 418, 426 (2009). Where the government is a party, the injury and public interest factors merge. *Id*.

There is substantial overlap between these factors and those that govern preliminary injunctions. *Id*. at 434. Under Second Circuit law, "[f]or a preliminary injunction to issue, the movant must establish (1) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor, and (2) irreparable harm in the absence of the injunction." *Kelly v. Honeywell Int'l, Inc*., 933 F.3d 173, 183-84 (2d Cir. 2019) (internal quotation marks omitted); *accord Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd*., 598 F.3d 30, 35-38 (2d Cir. 2010); *Mohamed v. Reno*, 309 F.3d 95, 101 (2d Cir. 2002); *ACC Bondholder Grp. v. Adelphia Commc'n Corp. (In re Adelphia Commc'n Corp.)*, 361 B.R. 337, 346-47 (S.D.N.Y. 2007).[7] "Before issuing a stay, it is ultimately necessary to balance the equities—to explore the relative harms to applicant and respondent, as well as the interests of the public at large." *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) (internal alteration and quotation marks omitted). The balance of equities favors granting a stay here.

I.   **The Government Has a Likelihood of Success on the Merits.**

   A. **The Exculpation Provision Improperly Immunizes Against the Government's Exercise of Police and Regulatory Powers.**

The Government is likely to succeed in this appeal because Congress did not afford bankruptcy courts the power to release and immunize from suit debtors' or non-debtors' conduct that falls within the Government's police and regulatory powers. Nor may such a court exculpate

---

[7] The Second Circuit applies a more stringent likelihood-of-success standard when a party is seeking to enjoin government action. *See Trump v. Deutsche Bank AG*, 943 F.3d 627, 637 (2d Cir. 2019), vacated on other grounds by *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019 (2020).

persons who are not estate fiduciaries or exculpate conduct that occurs after a Chapter 11 bankruptcy plan has become effective—in other words, at a minimum, a bankruptcy court cannot exculpate conduct that has not yet occurred. *See O'Loghlin v. Cnty. of Orange*, 229 F.3d 871, 875 (9th Cir. 2000) ("A suit for illegal conduct occurring after discharge threatens neither the letter nor the spirit of the bankruptcy laws. A 'fresh start' means only that; it does not mean a continuing license to violate the law.").

Bankruptcy is the "subject of the relations between a [] . . . debtor[] and his creditors, extending to his and their relief." *Wright v. Union Cent. Life Ins. Co.*, 304 U.S. 502, 513-14 (1938) (quotation omitted). To standardize an "expansive (and sometimes unruly) area of law," *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 649 (2012), Congress enacted the Bankruptcy Code under the Bankruptcy Clause of the U.S. Constitution, which vests Congress with power to "adjust[] . . . a failing debtor's obligations," *Railway Labor Execs.' Ass'n v. Gibbons*, 455 U.S. 457, 466 (1982) (quotation omitted). The Code's intricate provisions are intended to give the honest but unfortunate debtor a fresh start while ensuring the maximum possible equitable distribution to creditors. *See Stellwagen v. Clum*, 245 U.S. 605, 617 (1918); *Williams v. U.S. Fid. & Guar. Co.*, 236 U.S. 549, 554-55 (1915). Because the purpose of bankruptcy is to adjust the debtor-creditor relationship, the Code is replete with provisions related to that objective.

As the focus of the Code is the creditor-debtor relationship, it provides no basis for courts to prospectively immunize debtors and non-debtors from law enforcement and other actions undertaken by the Government. Nor can courts release debtors and non-debtors for acts committed after a plan becomes effective. And courts cannot exculpate entities that do not even exist at plan confirmation. Debtors have cited no Code provision authorizing the court to do those things. Rather, the Code permits a discharge of the debtor against *pre-petition claims* by creditors, *see* 11

18

U.S.C. § 1141(d), not actions that take place *after* the effective date of a plan. Liquidating debtors like Voyager are not even entitled to a discharge. S*ee id.* § 1141(d)(3). The Exculpation Provision here violates all these proscriptions.

Notwithstanding these background principles, the bankruptcy court approved a broad exculpation that would bar the Government from exercising its police and regulatory authority, including its power to prosecute crimes, unless the laws it seeks to enforce sound in actual fraud, willful misconduct, or gross negligence. And it absolves Exculpated Parties not just for conduct that took place during the bankruptcy but also for the "implementation of any transactions" contemplated by the plan that will largely happen after the plan becomes effective.

Nor would the bankruptcy court permit the Government to pursue the Exculpated Parties for liability for their actions pertaining to the "rebalancing transactions and the completion of distribution of cryptocurrencies to creditors." *Id.* While the court contemplated that the Government could seek to enjoin these transactions, or seek other prospective relief, it forbade the Government from pursuing its civil or criminal remedies relating to these transactions that occur before they are stopped or prevented. *Id.* But if these transactions take place relatively quickly, even this reservation would not give the Government much more than the four months between the parties proposed the transaction and the bankruptcy court confirmed the plan to take any action.

Moreover, the plan does not spell out with precision all the steps that the parties must take in accomplishing the restructuring transactions or rebalancing transactions. The definition of "Restructuring Transactions" expressly recognizes that not all of the specific transactions that will be conducted have been defined, as it allows for "corporate transactions that the Debtors and the Committee jointly determine to be necessary to implement the transactions described in the Plan." In other words, the court gave a broad exculpation of liability for conduct that has not yet occurred,

at least in substantial part, with license for certain parties to later determine how to accomplish the transactions.

The court had no statutory authority to grant this broad exculpation. An "exculpation" is merely a subspecies of a release that in this case applies to the Exculpated Parties who follow court orders, including court orders that contemplate future transactions. *See, e.g., In re Chemtura Corp.*, 439 B.R. 561, 610-11 (Bankr. S.D.N.Y. 2010) (explaining that "[w]hether they're called 'exculpation provisions' (principally dealing with the post-petition period) or 'third-party releases' (applying more broadly)," exculpation and third-party releases both generally involve claims by nondebtors against other nondebtors). Only one Code provision—section 1125(e)—explicitly contemplates bankruptcy courts providing any sort of exculpation, and this provision is limited to exculpation for liability under securities laws for certain actions relating to soliciting acceptance of a bankruptcy plan. The challenged Exculpation Provision is far broader, and thus cannot be justified by section 1125(e).

The only statutory authority the bankruptcy court cited to justify the Exculpation Provision is 11 U.S.C. § 1142(a), which provides: "Notwithstanding any otherwise applicable non-bankruptcy law, rule, or regulation relating to financial condition, the debtor and any entity organized or to be organized for the purpose of carrying out the plan shall carry out the plan and shall comply with any orders of the court." *Id.*; Decision at 33-35. The court stated: "Section 1142 thereby imposes an affirmative, statutory obligation on the debtors, other entities and their personnel to do what the plan contemplates. In effect, the confirmation order acts as a court order that the plan be carried out." Decision at 33. But while this statute instructs the debtor and others to "carry out the plan," it does not authorize a bankruptcy court to bar the Government from enforcing its police and regulatory powers, including its power to prosecute criminals, over actions

20

taken during the implementation of the plan, or to shield later conduct from governmental scrutiny. Moreover, this statutory provision only addresses "the debtor and any entity organized or to be organized for the purpose of carrying out the plan," which is a far narrower set of entities than the Exculpated Parties.

Reading section 1142 to authorize a third party-release (including exculpation) would contravene more specific Code sections—which the Supreme Court has repeatedly held is impermissible. *See Law v. Siegel*, 571 U.S. 415, 421 (2014). Section 524 of the Code is the sole, specific provision addressing third-party releases, *see In re Purdue Pharma, L.P.*, No. 21 Civ. 7532 (CM), 2021 WL 5979108, at *49 (S.D.N.Y. Dec. 16, 2021), and section 1125(e) is the sole provision permitting exculpation. But the exculpation language here is not an asbestos-related release which is authorized under Section 524(g), or (solely) a solicitation-related exculpation under Section 1125(e). A general authorization cannot swallow a "more limited, specific authorization" in the Bankruptcy Code. *RadLAX Gateway Hotel*, 566 U.S. at 645-46, 649. As reflected in both Section 1125(e) and Section 524(g), Congress clearly knew how to draft release and exculpation of liability language when it intended to give the Court these powers and did not do so for the broad Exculpation Provision. 11 U.S.C. §§ 524, 1124(e).

One of the exculpation cases the bankruptcy court cited referenced statutory authority for exculpation in sections 105 and 1123(b)(6) of the Bankruptcy Code. *See Murray Mettalurgical Coal Holdings,* LLC, 623 B.R. 444, 500 (S.D. Ohio 2021). Section 105 provides that a "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." *Id.* Section 105, however, does not provide any authority to approve involuntary third-party releases, including exculpation. That is because—as the Second Circuit has acknowledged—section 105(a) does not expand bankruptcy courts' statutory powers. *See In re Metromedia Fiber*

*Network, Inc.*, 416 F.3d at 142; *see also In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 92 (2d Cir. 2003) ("[Section 105(a)] does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity") (quotation marks and citations omitted).

Likewise, section 1123(b)(6) merely specifies that plans may only contain provisions that are "not inconsistent with" the Code, but does not grant authority to relieve parties of liability to the Government. Moreover, exculpating the Government is "inconsistent" with the Code, as the Code expressly recognizes the importance of allowing the Government to continue to enforce its police and regulatory powers irrespective of the automatic stay that prevents nearly all other litigation from proceeding against a debtor during bankruptcy. *See* 11 U.S.C. § 362(b)(4) (providing for an exception to the "automatic stay" barring certain actions during bankruptcies for exercises of the government's police and regulatory powers). The district court, on appeal in the *Purdue Pharma* case, thoroughly evaluated each of these statutes and concluded that the Bankruptcy Code does not contain any legislative authority to grant a non-debtor release outside the context of asbestos cases. *See In re Purdue Pharma*, 2021 WL 5979108, at *49.

Debtors' stay brief in the bankruptcy court also relied on section 1129(a)(3) of the Code as a basis for statutory authority for exculpation. *See* Dkt. No. 1186, at 18-19. But that provision merely addresses the confirmation of a plan and requires that the "plan has been proposed in good faith and not by any means forbidden by law." A requirement that a plan must be proposed in good faith and not be illegal says nothing about empowering a bankruptcy judge to strip liability of debtors and non-debtors to the Government.

Nor did the bankruptcy court cite any basis for releasing the Government's potential criminal claims for conduct that has not yet even occurred, when it is beyond cavil that an Article

I bankruptcy court lacks *any* power over criminal matters. *See, e.g.*, *In re Grabis*, No. 13-10669 (JLG), 2020 WL 7346467, at *12 n.71 (Bankr. S.D.N.Y. Dec. 11, 2020) ("The Court lacks subject matter jurisdiction to enforce state or federal criminal laws."); *In re Rae*, 436 B.R. 266, 275 (Bankr. D. Conn. 2010) ("As a matter of law, this Court lacks subject matter jurisdiction over alleged violations of criminal statutes."); *cf.* 18 U.S.C. § 3613 (preventing bankruptcy courts from discharging criminal fines). Since a bankruptcy court has no power to hear a criminal case, it certainly has no power to extinguish one before it is brought and before the relevant conduct has even taken place.

The bankruptcy court also relied on case law that has permitted exculpation clauses in bankruptcy cases. But those cases demonstrate that the rationale courts invoke in granting exculpation clauses is inapplicable to the Government's exercise of its police and regulatory powers: "Exculpation provisions are frequently included in chapter 11 plans, because stakeholders all too often blame others for failures to get the recoveries they desire; seek vengeance against other parties; or simply wish to second guess the decisionmakers in the chapter 11 case." *In re LATAM Airlines Grp. S.A.*, No. 20-11254 (JLG), 2022 WL 2206829 (S.D.N.Y. June 18, 2022) (Stay Decision at 4 n.1) (internal quotation omitted); *In re Murray Metallurgical Coal Holdsings, LLC*, 623 B.R. 444, 501 (Bankr. S.D. Ohio 2021) (citing same rationale). The Government in its capacity as a regulator enforcing police and regulatory powers is not a "stakeholder" in a bankruptcy, and the rationale advanced by courts in support of exculpation of preventing commercial parties from fighting each other over the outcome of a bankruptcy case is inapplicable to the Government's exercise of its police and regulatory powers.[8]

---

[8] The Debtors cite a number of bankruptcy cases where exculpation language has been included in a plan or confirmation order. While the United States Attorney's Office does not have the resources to litigate this issue in every case, it has at its request been carved out from exculpation clauses in multiple cases. *See, e.g., In re Aegean Marine Petroleum Network*, 18-13374-mew, Confirmation Order, Mar. 29, 2019, ECF No 503, ¶ 92(a); *In re Cenveo*, 18-

There are several other jurisdictional and constitutional reasons why the Government is likely to succeed on the merits of its appeal, in addition to the lack of any statutory authority regarding the Exculpation Provision. And as there is no Code provision that expressly authorizes the Exculpation Provision, even if the Code is viewed as ambiguous on this point, the doctrine of constitutional avoidance would dictate construing the Code to avoid these constitutional issues.

First, there is no waiver of sovereign immunity in 11 U.S.C. § 106 that would subject the Government to the bankruptcy court's determination that it cannot bring police and regulatory enforcement actions even for post-effective date conduct. *See* USAO Objection ¶¶ 41-49.

Second, as Debtors have not identified any specific enforcement actions that the Exculpation Provision is intended to enjoin, as none is pending, there was no case or controversy that the court had the power to hear. *See id.* ¶¶ 50-55.

Third, the bankruptcy court lacks jurisdiction to enter the Exculpation Provision, which swept far broader than the *res* of the estate and enjoined potential *in personam* enforcement actions by the Government and others against other non-debtors. *See id.* ¶ 54-59; *In re Johns-Manville Corp.*, 600 F.3d 135, 158 (2d Cir. 2010) (bankruptcy court "was not exercising its *in rem* power when it concluded that [the nondebtor's claims against another non-debtor] were enjoined").

Fourth, and fundamentally, the Exculpation Provision violates basic core principles of due process. *See* USAO Objection ¶¶ 66-72. Although governmental entities have no right to due process under the Fifth Amendment's due process clause, *see United States v. Cardinal Mine Supply*, 916 F.2d 1087, 1089 n.3 (6th Cir. 1990), everyone else subject to the Exculpation Provision's prohibition against suit for post-petition conduct have a right not to be prevented from

---

22178-rdd, Findings of Fact and Conclusions of Law, Aug 21, 2018, Dkt. No. 685 ¶ 117 ("Moreover, nothing in the Plan or this Confirmation Order shall release or exculpate any non-Debtor, including any Released Parties, from any liability to any Governmental Unit…"); *In re SunEdison*, 16-10992 (SMB), Plan, § 11.8, July 28, 2017, Dkt. No. 3735.

recovering for post-effective date conduct. And regarding the Government specifically, the Supreme Court recognized in *City of New York v. New York, N.H. & H.R. Co.*, 344 U.S. 293, 297 (1953), that it is "a basic principle of justice . . . that a reasonable opportunity to be heard must precede judicial denial of a party's claimed rights." The Exculpation Provision violates that requirement as it releases parties from liability to the government for hypothetical enforcement actions that have not yet been brought. The Government thus cannot possibly know what actions are being released by the Exculpation Provision, and would not have an opportunity to be heard on any specific claims that are released. USAO Objection ¶¶ 66-72. "[I]n the absence of a clear expression of Congress' intent to" permit bankruptcy courts to extinguish non-debtors' claims against other non-debtors without consent, this Court should not "construe the [Code] in a manner that could in turn call upon the Court to resolve" the due-process issues presented by this appeal. *United States v. Security Indus. Bank*, 459 U.S. 70, 82 (1982) (quotation omitted).

### B. The Exculpation Provision Far Exceeds the Limited Scope of Defenses Other Courts Have Recognized for Certain Conduct.

The bankruptcy court focuses on the concept of "immunity" as a basis for the Exculpation Provision. This is inapposite. The issue is that the Exculpation Provision insulates third party non-debtors from actions under the Government's police and regulatory powers, including criminal enforcement, not just in the facilitation of the Confirmed Plan, but in a much broader sense. There is no case law, statute, or statutory history, requiring, as the bankruptcy court insisted, that "the SEC and all other Government agencies … argue to [that court] that the proposed transactions are illegal in any way" in the four months between the announcement of the deal and confirmation of the plan. Decision at pp. 36 of 50. Governmental units need not (and in many situations are not permitted) to disclose open investigations. Congress has set time limits for the Government to investigate and prosecute civil and criminal violations—statutes of limitation. These generally

provide the Government several years *after the conduct at issue* to investigate and to decide whether to bring a claim or prosecute an offense. For example, under the False Claims Act, the Government has six years from the submission of a false claim, or three years from when it learns of the fraud (up to ten years from the false claim), whichever is later, to bring a civil fraud claim. 31 U.S.C. § 3731(b)(1).

Government investigations of potential wrongdoing in any area, including cryptocurrency, take time, and involve the development of a complex or extensive factual record. Investigations into wrongdoing almost always occur *after* wrongdoing has taken place, and it is rare for the Government to identify and prevent a civil or criminal violation before it happens or for a party to obtain an advance ruling on the legality of its anticipated conduct. Requiring all governmental units to disclose this highly sensitive information in a timeline that meets the exigencies of a commercial transaction or else be unable to pursue wrongdoing, especially in light of the volatile and sensitive cryptocurrency space, is exceptionally inappropriate.

To the extent that following a court's order provides immunity or any other defense like res judicata or collateral estoppel, such a defense should be raised affirmatively if and when enforcement proceedings commence regarding the alleged improper activity, and not imposed as a release by the Exculpation Provision. Indeed, section 1125(e)—the only provision of the Code granting exculpation from liability—provides only an affirmative defense to subsequent litigation, not a prospective release from suit. *See, e.g.*, *SEC v. Universal Exp., Inc.,* 475 F. Supp. 2d 412, 425-26 (S.D.N.Y. 2007) (Lynch, J.) (noting that defendant bears burden of proof on a defense under section 1125(e), and denying defendant's summary judgment motion on the defense because, *inter alia*, "no reasonable factfinder could conclude that the securities in question were issued pursuant to the Option Plan and therefore exempted from registration, or even that

defendants have raised a genuine issue of fact about whether they were"). The Exculpation Provision here improperly elevates an affirmative defense that a defendant must prove with specific facts into a release from suit—which is not how section 1125(e) operates, even if it applied.[9]

Instead, the doctrines of absolute and qualified immunity relied on by the court require fact finding for defendants to demonstrate that their challenged actions fell within the protected scope. *See, e.g.*, *Imbler v. Pachtman*, 424 U.S. 409, 419 (1976) ("An absolute immunity defeats a suit at the outset, so long as the official's actions were within the scope of the immunity."). For example, in *Stewart v. Lattanzi*, the Second Circuit reversed and remanded a district court's holding that state parole officers were absolutely immune, because "[s]ome factual inquiry must be made to determine whether the duties of the defendants were judicial or prosecutorial in nature entitling them, or any of them, to absolute immunity." 832 F.2d 12, 13 (2d Cir. 1987). Indeed, the cases the Decision cites note that common-law immunity has its own fact-based exceptions. For example, *Dana Commercial Credit Corp. v. Center Teleproductions, Inc. (In re Center Teleproductions, Inc.)*, the court acknowledged—citing the Supreme Court—that there is no immunity when a party claims that the very court order a trustee purportedly followed was obtained through fraud. 112 B.R. 567, 580 (Bankr. S.D.N.Y. 1990). That court refused to grant a motion to dismiss or summary judgment for most claims in light of questions about the receiver's conduct. *Id.; see also*

---

[9] Some courts have held that 11 U.S.C. § 1103(c) provides a degree of qualified immunity as an affirmative defense to an official committee acting in furtherance of its official duties. *See, e.g., Pan Am Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438, 514 (S.D.N.Y. 1994). As an initial matter, there is nothing in Section 1103(c) that expressly confers such immunity. In any event, the Code does not authorize bankruptcy courts to preemptively extinguish or enjoin claims, including those that might arguably fall within the scope of a bankruptcy participant's qualified immunity. Thus, courts have recognized that this type of qualified immunity is also an affirmative defense. *See, e.g., Luedke v. Delta Air Lines, Inc.*, 159 B.R. 385, 391-94 (S.D.N.Y. 1993); *In re Tucker Freight Lines, Inc.*, 62 B.R. 213, 215, 218 (Bankr. W.D. Mich. 1986) (denying committee members' motion for summary judgment on immunity). Qualified immunity—in this context or any other—is not a basis for a preemptive release against litigation in which it might arguably apply.

*Phoenician Mediterranean Villa, LLC v. Swope* (*In re J&S Props., LLC*), 545 B.R. 91, 103 (Bankr. W.D. Pa. 2015) (Decision at 4 n.2) (undertaking detailed analysis in subsequent proceeding in deciding whether absolute or qualified immunity was the appropriate standard for actions of a trustee for the wrongdoing alleged in the complaint, and evaluating the applicability of immunity to the specific facts of the case); *T&W Inv. Co. v. Kurtz*, 588 F.2d 801, 802 (10th Cir. 1978) (Decision at 4 n.2) (applying doctrine of immunity in *subsequent* action since the Court found that "the receiver was in fact following the orders of the court and complying therewith").

The cases cited by the Bankruptcy Court demonstrate that whatever doctrine of immunity may apply based on following court orders can be appropriately decided not by providing a release or exculpation in advance, but rather through the assertion of an affirmative defense in a subsequent proceeding. The bankruptcy court relies on *Bradford Audio Corp. v. Pious*, 392 F.2d 67, 72-73 (2d Cir. 1968) (Decision at 4 n.2), but in that case the court found a receiver to be immune from lawsuit not prospectively, but rather as an affirmative defense based on the receiver's having followed a court order. *See Boullion v. McClanahan*, 639 F.2d 213, 214 (5th Cir. 1981) (Decision at 4 n.2) (applying absolute immunity of bankruptcy trustee in *subsequent* action challenging conduct during a bankruptcy); *In re XRX, Inc.*, 77 B.R. 797, 798 (Bankr. D. Nev. 1987) (Decision at 4 n.2) (dismissing adversary proceeding against trustee after the court concluded that the trustee's action was pursuant to court order). Notably, most of the cases relied on by the bankruptcy court pertain to actions of court-appointed trustees, not commercial entities that were merely tasked with following court orders, and the decisions apply a long line of cases addressing the immunity of trustees specifically. None addresses a situation where a bankruptcy court prospectively foreclosed the Government from enforcing its police and regulatory powers, including criminal enforcement, against participants in a commercial transaction.

Relatedly, because most of the purportedly exculpated conduct has not even yet occurred, it would be impossible for any court to predetermine that a defendant has *in fact complied* with any court orders and done nothing else. A party could accomplish a court-approved (or court-directed) transaction by illegal means, such as by funding a court-authorized purchase with stolen property. For example, in *In re J & S Properties, LLC*, cited in the Decision, the court noted that even a bankruptcy trustee otherwise afforded immunity "may be sued in his or her individual capacity for wrongful acts which exceed the scope of his or her authority—*i.e.*, a bankruptcy trustee may be personally liable for wrongful acts that are *ultra vires.*" 545 B.R. 91, 105 (Bankr. W.D. Pa. 2015). Determining whether such an exception will apply to a hypothetical future claim is impossible at this time.

### C. The Exculpation Provision Is Impermissibly Overbroad Because It Exculpates Non-Fiduciaries, Even Those Who Do Not Yet Exist, and Exculpates for Acts that Have Not Even Happened Yet.

Even assuming bankruptcy courts had some statutory authority to provide affirmative exculpation (rather than making findings that could be relied upon to support a hypothetical future affirmative defense to liability), the Exculpation Provision here is far broader than those approved by courts permitting some degree of exculpation for fiduciaries of the estate because it both extends to non-fiduciaries and covers conduct that will take place after the plan's effective date.

First, the Exculpated Parties include non-fiduciaries of the estate and people who had no direct involvement with any action taken during the pendency of the bankruptcy proceedings. These include, for example, the Purchaser (Binance.US) and the Plan Administrator. Indeed, the Plan Administrator will not even exist until after the Effective Date of the Plan. *See In re Washington Mutual, Inc.*, 442 B.R. 314, 348 (Bankr. D. Del. 2011) ("[These parties] have not done anything yet for which they need a release. They will not even come into existence until the Plan is confirmed."). In so doing, the Exculpation Provision goes beyond the exculpation clauses that

29

other courts have approved because they simply reiterated the already existing standard of liability for estate fiduciaries, such as members of a creditors' committee. *See In re PWS Holding Corp.*, 228 F.3d 224, 246-47 (3d Cir. 2000) (affirming plan where exculpation clauses "affect[ed] no change in liability" because they merely reflect the "standard that already applies").

Second, because the Exculpation Provision includes actions that post-date the plan's effective date, it provides impermissible prospective immunity from suit. *See, e.g., In re Fraser's Boiler Serv., Inc.*, 593 B.R. at 640 ("Exculpation clauses generally only exculpate those actions taken in connection with a bankruptcy case between the petition date and the effective date of the plan."). This is especially problematic because, after the plan's effective date, the exculpated parties will no longer be acting under the supervision of the bankruptcy court. Thus, while the bankruptcy court has broadly approved certain transactions—and the court's order may be used to defend against any collateral attacks on that approval—there remain many specific but undefined actions that must be taken to implement those transactions. And there are myriad ways the exculpated parties could engage in misconduct for which they should—and otherwise would—be liable but for the Exculpation Provision. One can imagine any number of laws or regulations—tax laws, securities laws, and criminal laws, among others—Debtors and others may violate after the plan's effective date in the course of effectuating the plan. And while the Purchaser's exculpation excludes criminal conduct and other *ultra vires* acts, Ex. A at 110 (Plan at 51), the exculpation of the Plan Administrator and others is not so limited. This exculpation of future conduct is rendered even more problematic by the toggle feature of the plan, which creates even more uncertainty regarding what potential conduct is being exculpated.

Despite the bankruptcy court's reliance on its prior decision in *Aegean*, the Exculpation Provision is importantly different than the provision approved there.[10] The exculpation provision in *Aegean* expressly did not pertain to transactions that occurred after the effective date of the plan:

> Notwithstanding anything to the contrary in the foregoing or in the plan, other than with respect to the reorganized debtors and the non-debtor subsidiaries themselves, the exculpation set forth above **shall not release or be an exculpation with respect to . . . (ii) any post-effective date obligations** of any party or entity under the plan, any transaction, or any document, instrument, or agreement (including those set forth in the plan supplement) executed to implement the plan.

*In re Aegean Marine Petroleum Network Inc.,* No. 18-13374-mew, Dkt. No. 503, at 41 (emphasis added). In contrast to *Aegean*, the Exculpation Provision here purports to prospectively exculpate actions that post-date the plan effective date and that have not yet occurred. The exculpation in *Aegean* also only covered entities that existed at the time the plan went effective, and not entities that did not come into existence until after the effective date of the plan. The exculpation at issue thus far exceeds even what this bankruptcy court permitted in *Aegean*, and accordingly, the Government is likely to prevail on the merits that the Exculpation Provision is impermissible.

## II.     The Balance of Harms Weighs in Favor of a Stay of the Exculpation Clause and, as Necessary, the Entire Confirmation Order.

Not only is the Government likely to succeed on appeal, but the balance of the harms also weighs in favor of a stay. The final three factors—whether there is irreparable injury if the stay is denied, substantial injury to other parties if the stay is issued, or an impact on public interest—require the court to balance these respective harms. *Nken*, 556 U.S. at 426. Here, the balance of the harms weighs in favor of a stay.

---

[10] The United States Trustee does not agree that *Aegean* establishes the correct rule, in particular because it approved the exculpation of the purchaser of the debtors' assets, who was not an estate fiduciary, over the United States Trustee's objection.

As noted, when the Government is a party, the injury and public interest factors merge. *Cf.* *id.* at 426 (holding factors of "assessing the harm to the opposing party and weighing the public interest" "merge when the Government is the opposing party"). That is particularly true here, where the United States Trustee is acting as the congressionally designated "bankruptcy watch-dog[]," H.R. Rep. No. 95-595 at 88 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6049, and fulfilling his "responsibility to represent and protect the public interest," *Adams v. Zarnel (In re Zarnel)*, 691 F.3d 156, 162 (2d Cir. 2010). In ensuring compliance with the law, the United States Trustee is advocating on behalf of the interests of all stakeholders, the integrity of the bankruptcy system, and the public interest.

This case implicates important public interests. It threatens to prospectively absolve the exculpated parties for conduct that occurred both during and after the bankruptcy case. That includes any police and regulatory powers, including criminal, civil, and regulatory, that do not amount to actual fraud, willful misconduct, or gross negligence. One can imagine many areas of conduct that may be associated with the restructuring transactions and rebalancing transactions that could trigger federal and state police and regulatory powers, including, hypothetically (since the conduct at issue is not yet known for future acts) failure to protect customer information, tax violations, Anti-Money Laundering regulations, Know Your Customer requirements, negligence or breach of fiduciaries duties by those handling customers' funds, and consumer protection violations. While the bankruptcy court disclaimed its intent for the language to cover more than the restructuring transactions and the rebalancing transactions, any of these issues could arise as these transactions are pursued.

And, as explained above, the cryptocurrency space has been rife with fraud and abuse. "Outright fraud, scams, and theft in digital asset markets are on the rise: according to FBI statistics,

reported monetary losses from digital asset scams were nearly 600 percent higher in 2021 than the year before."[11] The Government's job is to enforce the law and prosecute misconduct. The release here that unlawfully ties the Government's hands is thus a matter of critical public importance. A stay would serve the public interest by ensuring that the rights of the state and federal governmental units released under the Debtors' plan through the Exculpation Provision are protected.

The bankruptcy court decision irreparably harms the public and the Executive Branch by disrupting the government's enforcement discretion. The decision purports to limit the Executive Branch's ability to enforce any violations of the law as they relate to the transactions contemplated in the plan. As the Government has repeatedly acknowledged, a party may well be able to raise as a defense in a future enforcement proceeding his purported good-faith compliance with a court order. But by prospectively barring such actions, the decision below improperly tramples the government's power and duty to execute the laws.

Because there is a risk (given the doctrine of equitable mootness) that the ordinary course of appeals will not vindicate the Government's interests in enforcing the law, the bankruptcy court's order—which usurps a specific executive power—creates irreparable harm justifying a stay. *See In re Cheney*, 406 F.3d 723, 731 (D.C. Cir. 2005) (en banc) (granting mandamus where district court order could have left the government "with no remedy against a culpable defendant," violating separation of powers); *cf. In re U.S.*, 463 F.3d 1328, 1333 (Fed. Cir. 2006) (mandamus standard satisfied based on, among other things, separation of powers injury of the judicial branch).

The Government also suffers irreparable harm in the absence of a stay by the bankruptcy court's decision to assume for itself the power of the Executive Branch to decide what laws may be enforced, and limiting those laws to those that concern actual fraud, willful misconduct or gross

---

[11]   https://www.whitehouse.gov/briefing-room/statements-releases/2022/09/16/fact-sheet-white-house-releases-first-ever-comprehensive-framework-for-responsible-development-of-digital-assets/

negligence. The Constitution vests in the President, alone, "[t]he entire 'executive Power'" to "take Care that the Laws be faithfully executed." *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2197 (2020). The Executive Branch therefore has "exclusive authority and absolute discretion to decide whether to prosecute a case." *United States v. Nixon*, 418 U.S. 683, 693 (1974). This principle covers enforcement decisions regarding criminal law, *see id.*, but also civil law, *see, e.g.*, *In re Aiken County*, 725 F.3d 255, 264 n.9 (D.C. Cir. 2013) (Kavanaugh, J.) ("Because they are to some extent analogous to criminal prosecution decisions and stem from similar Article II roots ... civil enforcement decisions brought by the Federal Government are presumptively an exclusive Executive power.").

Moreover, there is a strong *public* interest in the Executive Branch's enforcement of the democratically enacted laws of the United States. As the Supreme Court recognized in *Nken v. Holder*, a harm to the government's legitimate functions is a harm to the public interest that satisfies the third and fourth factors for a stay. 556 U.S. at 435. There, the Court specifically recognized a public interest in the "prompt execution of removal orders" and the ongoing harm that continuing violation of United States law that would arise from delayed execution. *Id* at 436. The courts of appeals have likewise noted the "overriding sovereign interests in enforcing the penal laws and protecting the public." *Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 27 (1st Cir. 2020).

By contrast, a stay will not cause any harm that outweighs the harms from denying a stay. Indeed, the parties are not even ready to consummate the transaction. At the Confirmation Hearing, the parties were unable to provide the court with a date for when the transactions at issue will actually close. *See* Ex. C, March 3, 2023 Transcript at 70:13-71:14. Even more critically, the Debtors testified that they would do more due diligence before closing a deal with Binance.US.

*Id.* at 70:24-25 ("We plan to continue to perform due diligence in advance of a closing"); 70:13-21 ("we would anticipate closing probably in the range of three to four weeks from approval of the plan. There's still work that needs to be done from the Debtors' perspective in order to be able to prepare for the closing of the transaction, that includes its ability to, for example, meet the requirements under the rebalancing ratio and work that needs to be done around that. There's operational work that would still need to be done from an integration and transfer perspective"); 74:11-17 ("We're still continuing to perform due diligence"). The confirmed plan itself provides a five month outside date (four months plus an additional 30-day election) for closing with still time to determine if the toggle feature should be implemented. *See* Dkt. No. 775, APA at Art. VII, ¶ 8.1(c).[12] *See also* Ex. C, March 3, 2023 Transcript at 40:12-41:1 (discussing the analysis for initiating the Confirmed Plan's toggle feature).

There is thus no proverbial melting ice cube here. The Debtors and Binance.US can continue their due diligence and other preclosing activities while the Confirmation Order (or just the Exculpation Provision) is stayed and this is appeal is litigated.

A stay pending appeal would also preserve the public's right to meaningful appellate review of the Exculpation Provision. *See Adelphia*, 361 B.R. at 349. Although the Government believes that an equitable mootness argument would not succeed here, the Debtors have refused to waive this argument and indicated that they would assert it when the deal closes. *See* Debtors' Memorandum of Law in Opposition to the Government's Motion to Stay, Dkt. No. 1186 at 25. Accordingly, the Government is moving out of an abundance of caution to stay at least the Exculpation Provision, to prevent Debtors from seeking to moot any appeal and avoid the risk of

---

[12] The confirmed plan states that "'Outside Date' has the meaning set forth in the Asset Purchase Agreement. All references herein to the 'Outside Date' shall be deemed to include the 'Extended Outside Date' to the extent the Outside Date is extended in accordance with Section 8.1(c) of the Asset Purchase Agreement." Confirmed Plan at ¶ 116, pg. 20 of 157.

litigating equitable mootness. Any delay in consummating the plan does not outweigh the potential outright elimination of rights effected by the overly broad Exculpation Provision.

Debtors incorrectly argued that the potential for equitable mootness could not be considered in balancing the harms to the parties. Debtors Stay Opposition at 25. This contention is inaccurate. The ability to appeal "is a substantial and important right" because it is "the guarantee of accountability in our judicial system." *ACC Bondholder Grp. v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, 361 B.R. 337, 342 (S.D.N.Y. 2007). The mooting of an appeal thus is a "'quintessential form of prejudice.'" *Country Squire Assocs. of Carle Place, L.P. v. Rochester Cmty. Sav. Bank*, 203 B.R. 182, 183 (B.A.P. 2d Cir. 1996) (quoting *Lutin v. United States Bankr. Court (In re Advanced Mining Sys., Inc.)*, 173 B.R. 467, 469 (S.D.N.Y. 1994)); *accord Adelphia Commc'ns Corp.*, 361 B.R. at 348.

Courts have found that the irreparable injury from potential equitable mootness warrants a stay when, as here, the appeal involves important issues or when the loss of the ability to appeal is not the only harm from the appeal being mooted. *See Adelphia Commc'ns Corp.*, 361 B.R. at 346-47 (granting stay of confirmation order where equitable mootness threatened denial of review of settlement, incorporated into plan, that eliminated claims without consent); *Beneficial Homeowner Serv. Corp. v. Moreau (In re Moreau)*, 135 B.R. 209, 215 (N.D.N.Y. 1992) (holding $20,000 loss unreviewable on appeal because of mootness would be irreparable harm); *In re St. Johnsbury Trucking Co.*, 185 B.R. 689-90 & n.1 (S.D.N.Y. 1995) (holding risk of equitable mootness of appeal challenging contested release that would cause the government to lose claims against releasees constituted irreparable harm); *Advanced Mining Sys., Inc.*, 173 B.R. at 469 (granting stay where mooting of appeal would deny appellants any recovery).

Accordingly, because the "loss of appellate rights is a quintessential form of prejudice," and the Government's ability to enforce its police and regulatory powers is implicated by the Exculpation Provision, avoiding equitable mootness issues satisfies the irreparable harm requirement. *Adelphia*, 361 B.R. at 348 (internal quotation marks omitted).

## CONCLUSION

WHEREFORE, for these reasons, the Government respectfully asks this Court to enter: (1) an immediate administrative stay pending decision on this motion, and (2) a stay of the Confirmation Order (or, at a minimum, of the Exculpation Provision) pending appeal. If this Court grants no other relief, the Government further requests a two-week administrative stay to allow time to determine whether to seek relief in the Second Circuit and for the Second Circuit to address any such stay motion.


Dated: March 17, 2023
New York, New York

DAMIAN WILLIAMS
United States Attorney
Southern District of New York

By:   /s/ Lawrence H. Fogelman
LAWRENCE H. FOGELMAN
JEAN-DAVID BARNEA
PETER ARONOFF
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.:   (212) 637-2800
E-mail:
Lawrence.Fogelman@usdoj.gov
Jean-David.Barnea@usdoj.gov
Peter.Aronoff@usdoj.gov

By:    /s/ Linda A. Riffkin
WILLIAM K. HARRINGTON
United States Trustee, Region 2
LINDA A. RIFFKIN
Assistant United States Trustee
RICHARD C. MORRISSEY
MARK BRUH
Trial Attorneys

U.S. Department of Justice
Office of the United States Trustee –
NY Office
Alexander Hamilton Custom House
One Bowling Green, Room 534
New York, New York 10004-1408
(212) 510-0500