1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 22-10943-mew

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

5    In the Matter of:

6    VOYAGER DIGITAL HOLDINGS,

7              Debtor.

8    - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

9    Adv. Case No. 22-01133-mew

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

11   VOYAGER DIGITAL HOLDINGS, INC.,

12                 Plaintiff,

13          v.

14   DESOUSA,

15                 Defendant.

16   - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

17   Adv. Case No. 22-01170-mew

18   - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

19   THE AD HOC GROUP OF EQUITY INTEREST HOLDERS OF VOYAGER OF

20   VOYAGER DIGITAL LTD.,

21                 Plaintiff,

22          v.

23   VOYAGER DIGITAL HOLDINGS, INC., et al.,

24                 Defendants.

25   - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

1               United States Bankruptcy Court

2               One Bowling Green

3               New York, NY  10004

4

5               March 3, 2023

6               10:08 AM

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21   B E F O R E :

22   HON MICHAEL E. WILES

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  F. FERGUSON

Page 3

1   HEARING re Adversary proceeding: 22-01133-mew Voyager

2   Digital Holdings, Inc. v. De Sousa Motion to extend

3   automatic stay or, in the alternative, for injunctive relief

4   enjoining prosecution of certain pending litigation against

5   the debtors, directors and officers

6

7   HEARING re Adversary proceeding: 22-01170-mew The Ad Hoc

8   Group of Equity Interest Holders of Voy v. Voyager Digital

9   Holdings, Inc. et al

10   Pre-trial Conference

11

12   HEARING re Motion to hold the directors personally liable

13

14   HEARING re Joinder to motion by David Stephenson

15

16   HEARING re Motion for an equity committee

17

18   HEARING re Joinder to motion by David Stephenson

19

20   HEARING re Motion by Michelle D. DiVita to appoint a chapter

21   11 trustee

22   Objections filed

23

24

25

Page 4

1    HEARING re Motion by Tracy Hendershott to convert case to

2    chapter 7

3    Objection filed

4

5    HEARING re Motions by Alah Shehadeh

6    Objection filed

7

8    HEARING re Objection of the Official Committee of Unsecured

9    Creditors to proofs of claim nos. 11206, 11209 and 11213

10

11    HEARING re Combined hearing RE: to consider approval of the

12    disclosure statement and confirmation of the chapter 11 plan

13    Objections filed

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

```
1     A P P E A R A N C E S :

2

3     LATHAM & WATKINS

4          Attorneys for Binance.US

5          1271 Avenue of the Americas

6          New York, NY 10020

7

8     BY:  ADAM J. GOLDBERG

9          ROBERT J. MALIONEK

10

11    KIRKLAND & ELLIS LLP

12         Attorneys for the Debtors

13         601 Lexington Avenue

14         New York, NY 10022

15

16    BY:  CHRISTINE OKIKE

17         MIKE SLADE

18

19    SECURITIES AND EXCHANGE COMMISSION

20         Attorneys for the Securities and Exchange Commission

21         950 East Paces Ferry Road, N.E., Suite 900

22         Atlanta, GA 30326

23

24    BY:  WILLIAM MATTHEW UPTEGROVE

25
```

Page 6

1    TEXAS OFFICE OF ATTORNEY GENERAL

2            Attorneys for TX State Securities

3            Board TX Dept. of Banking

4            300 W. 15th Street

5            Austin, TX 78701

6

7    BY:  ABIGAIL RYAN

8

9    UNITED STATES DEPARTMENT OF JUSTICE

10           Attorneys for the U.S. Trustee

11           Alexander Hamilton Custom House

12           New York, NY 10004

13

14   BY:  MARK BRUH

15

16   MCDERMOTT, WILL & EMERY

17           Attorneys for Special Committee

18           One Vanderbilt Avenue

19           New York, NY 10017

20

21   BY:  JOHN CALANDRA

22           JOSEPH (JOE) B. EVANS

23           DARREN AZMAN

24

25

Page 7

1    Kilpatrick Townsend & Stockton LLP

2         Attorneys for Ad Hoc Group of Equity Interest Holders

3         1114 Avenue of the Americas

4         New York, NY 10036

5

6    BY:  DAVID M. POSNER

7

8    TRACY HENDERSHOTT

9         Pro Se Creditor

10

11   ANDREW RIZK

12        Pro Se Creditor

13

14   GINA DiRESTA

15        Pro Se Creditor

16

17   DANIEL NEWSOM

18        Pro Se Creditor

19

20   SETH JONES

21        Pro Se Creditor

22

23   LISA TREVINO

24        Pro Se Creditor

25

Page 8

I N D E X

| WITNESSES: | DIRECT: | CROSS: | REDIRECT: | RECROSS: |
|---|---|---|---|---|
| BRIAN TICHENOR | 24 | 41/99/111 | | |
| | | 115/146 | | |
| PAUL HAGE | 233 | 247 | | |

| EXHIBITS: | PAGE: |
|---|---|
| Exhibit 6 | 22 |
| Exhibit 7 | 22 |
| Exhibit 8 | 22 |
| Exhibit 9 | 22 |
| Exhibit 11 | 22 |
| Exhibit 15 | 22 |
| Exhibit 16 | 22 |
| Exhibit 20 | 22 |
| Exhibit 21 | 22 |
| Exhibit 22 | 22 |
| Exhibit 23 | 22 |
| Exhibit 1109-2 | 236 |

1                   P R O C E E D I N G S

2              THE COURT:  Please be seated.  All right, are we

3      ready to continue?

4              MR. SLADE:  Yes, Your Honor.

5              THE COURT:  Let me just log into my computer

6      screen.  We'll be all set.

7              MR. SLADE:  Sure.

8              THE COURT:  Okay.  Can I ask a question about the

9      evidentiary presentations?

10             MR. SLADE:  Certainly.

11             THE COURT:  A number of the objections have

12     criticized the selection of the proposed plan administrator.

13     Do you have any witnesses who are going to address that?

14             MR. SLADE:  We do intend to introduce his resume

15     into evidence, and that was one of the things I was going to

16     cover right now.

17             THE COURT:  All right.  And do you anticipate any

18     testimony from anybody from Binance?

19             MR. SLADE:  We do not.

20             THE COURT:  So --

21             MR. SLADE:  We have asked them to provide a

22     witness, and they declined.

23             THE COURT:  That seems odd, doesn't it?

24             MR. SLADE:  Not in my experience, Your Honor.  I

25     mean, I've done a lot of these where the buyer, we ask the

1    buyer to testify and the buyer declines to testify.  So in

2    that respect -- I mean, this is an unusual case which is why

3    we made the request, but I understand the question.  We

4    asked it as well.

5             THE COURT:  Well, I have a host of objections

6    asking me, based on what's happened in the industry in

7    general, to try to be careful about Binance and about how it

8    treats customers and how it segregates customer payments,

9    and essentially you're asking me to rely entirely on unsworn

10   hearsay on those points.

11            MR. SLADE:  We are going to -- Mr. Tichenor is

12   going to testify about the additional diligence that we did

13   and --

14            THE COURT:  But in the end, his diligence is

15   largely hearsay, right?  It's what Binance tells him.

16            MR. SLADE:  Is it largely hearsay.  We have some

17   evidence, some of which was provided confidentially that I

18   would want to confirm that I'm allowed to disclose.

19            THE COURT:  Yeah.

20            MR. SLADE:  But I understand Your Honor's

21   questions and concerns and we are asking the same questions.

22            THE COURT:  Okay.  I had mentioned yesterday, and

23   these are things for you to discuss with Binance because

24   they're things I'm thinking about and maybe there are issues

25   that are easy modifications that would make points go away,

Page 11

```
 1    but I had mentioned the length of the custody trust

 2    relationship to make sure that it continues until somebody's

 3    had an actual meaningful opportunity to withdraw their

 4    crypto, if that's what they choose to do.

 5              I'm still unclear in the unsupported

 6    jurisdictions, if somebody does not want to be a Binance

 7    customer, do they have to wait six months or can they get

 8    cash in three months like people in other states can get?

 9              MR. GOLDBERG:  Your Honor, Adam Goldberg of Latham

10    and Watkins on behalf of Binance.US.  The terms of the deal

11    are that customers in unsupported jurisdictions would be --

12    their cryptocurrency would be held by the Debtors for six

13    months from the closing date until there is a solution with

14    any of the unsupported jurisdictions.  As I think Your Honor

15    is aware, Binance.US, the Debtors, and the State of Vermont

16    have reached an agreement on the terms of distributions to

17    Vermonters and we're working earnestly to achieve similar

18    resolutions with other unsupported jurisdictions and I'm

19    hopeful we'll be able to do so.

20              THE COURT:  I understand the reasons why the

21    parties say that as to people who want crypto in-kind

22    distributions, why you can't do it in violation of law, why

23    you want six months try to work it out.  I understand all

24    that.  But as to people in the unsupported jurisdictions, if

25    I'm using the correct phrase here, who don't want in-kind
```

1    distributions and don't want to be Binance customers, why do

2    they have to wait six months?  Why can't they get the same

3    three-month treatment that people in other states get?

4              MR. GOLDBERG:  Well, Your Honor, essentially the

5    business deal that was struck between Binance and the Debtor

6    --

7              THE COURT:  I don't care what the business deal

8    is.  From the bankruptcy point of view, why can't they have

9    the same terms as people in other states?  Why, just because

10   I live in Texas, if I am absolutely sure that I don't want

11   to be a Binance customer, why can't I do the same thing as

12   somebody who's in Ohio and just get cashed out in three

13   months?  Why do I have to wait six months?

14             MR. GOLDBERG:  The objective with that provision,

15   Your Honor, is to attempt to reach a solution that complies

16   with applicable regulations to permit distributions in kind,

17   which is the goal of creditors.

18             THE COURT:  But if I don't want an in-kind

19   distribution, I live in Texas and I say I'd rather get my

20   cash in three months, I don't want in-kind distributions,

21   why do I have to wait six months?

22             MR. GOLDBERG:  Well, Your Honor, the -- Binance's

23   transactions to acquire all of the customers onto the

24   platform and serve as distribution agent to --

25             THE COURT:  But you know you're not acquiring all

1    of the customers in Ohio.  You know, those people don't have

2    to go to Binance.  They have a right to just be cashed out

3    in three months if that's what they want.  So if I'm in

4    Texas and I similarly don't want to be a Binance customer,

5    why don't I get the exact same opportunity?  I don't

6    understand it.

7            MR. GOLDBERG:  Essentially the goal there was to

8    align the terms for all other customers which was to provide

9    custom -- Binance with the ability to acquire all of the

10   customers and deliver the crypto to customers as quickly as

11   possible for those who want to be part of the Binance

12   platform.  That transaction enabled the Debtors to receive

13   the maximum amount of value available for Binance to benefit

14   the estate as a whole and --

15           THE COURT:  You know -- but look.  I understand

16   that you want to give everybody a chance to get in-kind

17   distributions.  I understand that you want on behalf of

18   Binance to get customers if you can.  But obviously, we

19   can't force customers to go to you.  And as to customers in

20   48 states, you have recognized that they don't have to open

21   Binance accounts and if they don't, within three months,

22   that they get cash distributions.

23           My question is, why can't somebody in Texas, New

24   York, Vermont, Hawaii, whatever your unsupported

25   jurisdictions still are, why can't they say in that same

1    three-month period, I don't want to go to Binance?  This --

2    you know, why do you get longer to try to convince them to

3    be Binance customers than you get with respect to people in

4    Ohio?  Don't get it.

5              MR. GOLDBERG:  Well --

6              THE COURT:  Why can't they have the affirmative

7    right to tell you, I don't want this, I want my cash, so

8    that I can have -- so that I can have the same rights that

9    somebody in Ohio has?  I can't give them the same rights to

10   in-kind distributions because there are state laws in

11   effect.  I understand that.  I can give them the same right

12   to get cash distributions as the same time as people in

13   other states have and I'm having a lot of trouble

14   understanding why I'm not -- why I shouldn't do that, in

15   fact, why I'm not required to do that.

16             MR. GOLDBERG:  I understand Your Honor's point.  I

17   think our position there is, Your Honor, that the creditors

18   do have the same opportunity to recover value from the

19   estate as quickly as possible in accordance with applicable

20   law and that part of the value proposition that is

21   benefiting the estate and that was voted on by creditors, is

22   to provide that opportunity for Binance, the Debtors, and

23   each of the unsupported jurisdictions to seek to achieve a

24   resolution that enables distributions to customers within

25   that time period.  And once the resolutions occur, as was

1   the case with Vermont, the -- those states will no longer be

2   considered a unsupported jurisdiction.

3            THE COURT:  That's fine.  And I have no problem

4   with your trying to work that out, but you may not be able

5   to work it out.  You've got, at least New York seems to be

6   an obstacle for you.  So my -- I'm left with this problem,

7   right, that I understand all your explanations about how you

8   can't change the past.  You can't give yourself a regulatory

9   approval that you don't have.  You can't distribute crypto

10  in kind in New York like you can elsewhere because New York

11  says you can't.

12           I understand all that, but none of that explains

13  why you can't give New York customers the same right to a

14  cash distribution in three months as you give to people in

15  other states.  There's no explanation for that other than, I

16  suppose, your desire to market Binance to people in New

17  York.  But why people in New York then have to take an extra

18  three months than people in Ohio if they don't want to go to

19  Binance is a mystery to me.

20           It's easily solvable.  All you have to say is that

21  people -- customers can tell you if they elect not to go to

22  Binance.  You don't have to wait this three months.  They

23  should be able to just make an election not to go to Binance

24  and if they do that, they get their cash distribution in the

25  three-month period that you've specified.  Why is that so

1    hard?

2              WOMAN 1:  Your Honor, we just got a notification

3    that people on the phone can't hear.

4              THE COURT:  My microphone is supposedly on, I

5    think.  Can anybody hear me now?

6              MAN 1:  We have the same as you, Your Honor.

7    (indiscernible) the whole Court Solutions system is not --

8    is down.

9              THE COURT:  Is down?

10             MAN 1:  For this hearing.  (indiscernible) certain

11   hearings (indiscernible).

12             THE COURT:   I see.  So it's not this microphone.

13   It's Court Solutions.  Great.  I don't want to have to

14   repeat all that.

15             MR. GOLDBERG:  I hear you loud and clear, Your

16   Honor.

17             MAN 1:  (indiscernible).

18             THE COURT:  Yeah, would you -- thanks.

19             AUTOMATED VOICE:  Thank you.  Your personal

20   identification number has been accepted.  Welcome to your

21   telephonic courtroom.  Your line is live.  To access the

22   Court Solutions advanced call features, go to Court-

23   Solutions.com and open the hearing dashboard.  You are

24   entering the courtroom.

25             THE COURT:  I apologize for those who were

Page 17

1    unknowingly to me kind of bounced off the call here with the

2    Court Solutions connection going down.  I don't know how

3    much you heard and didn't hear.  Does anybody here have any

4    idea when the connection stopped?

5                 WOMAN 1:  We lost four minutes and 20 seconds.

6                 THE COURT:  Thanks.  Okay.  Unfortunately, I can't

7    rewind in my head that precise amount of time.  I was asking

8    some questions about the evidence that's going to come in

9    today.  You probably heard that.  And then I was identifying

10   -- in the process of identifying three issues that I would

11   like the Debtors to be discussing with Binance because they

12   seem to me to be relatively small changes in the

13   arrangements here that might go a long way to eliminating

14   some of the objections.

15                 The first was that I have previously said in the

16   order approving the Binance agreement that any assets

17   transferred to Binance were absolutely held by Binance

18   nominally only and were held in trust and in custody for

19   either the Debtors or the customers until the distributions

20   were completed.  I had said that in the order that we

21   entered that approved the Binance transactions subject to

22   this hearing.

23                 But I also yesterday indicated that it seemed to

24   me that maybe we ought to make clear that that custody

25   provision continues for -- I'll let people tell me -- a

1    reasonable time so that we don't find that we've sort of had

2    it end instantaneously upon the crediting to a customer's

3    account so that if somebody actually wants to make a

4    withdrawal, which was the whole point, somebody wants to

5    actually make a withdrawal without having subjected

6    themselves to undue risk, they can actually do so.

7         Doesn't have to be a real long period of time, but

8    it shouldn't be a second and it shouldn't be a minute.  It

9    should be something that's meaningful so that people can

10   actually act to get what they want within this time period

11   that this custody and trust provision applies.

12        Another issue I was raising here is that I still

13   will hear argument of course, from the states and the

14   unsupported jurisdictions about whether there is unfair

15   discrimination, but I do understand at least the contrary

16   argument that as to in-kind distributions, we can't change

17   the past.  We can't undo the failure to have regulatory

18   approvals and we can't do what regulations in different

19   jurisdictions do not allow us to do.

20        And you know, the only way to have equal treatment

21   as a result of that is to make 48 states wait just because

22   we can't do everything in all 52 states, which seems like a

23   not very perfect solution.  But at the same time, it seems

24   to me that the whole program is set up so that people in 48

25   states who do not want to be Binance customers get cashed

1   out in three months; whereas, people in the unsupported

2   states have to wait six months even -- not just because

3   we're trying to solve the ability to give them crypto, but

4   even if they don't want in-kind distributions, even if they

5   would prefer to be cashed out, they nevertheless still have

6   to wait six months.

7           And I don't -- I am having a lot more trouble

8   understanding a proper basis for that different treatment.

9   And I'm suggesting that perhaps the agreement could easily

10  be changed so that if somebody in the unsupported

11  jurisdictions simply makes an election in a form that the

12  parties can designate, that they too can get their cash

13  within three months.  I think that would go a very long way

14  towards resolving the arguments about unequal treatment of

15  the creditors and of the customers.

16          And the other provision I wanted to address that

17  came up a lot yesterday was the transfer of customer

18  information.  And I understand the argument about the

19  Debtors' rights to sell the information.  I understand that

20  at least part of what's going on here is an effort to give

21  Binance the chance to market itself to customers.  I

22  understand that.  And I understand for that reason that you

23  want -- I certainly understand why you want to contact

24  information with the customers' email addresses, addresses,

25  so you can try to convince them to be part of your platform.

1           But do you need to transfer all information that

2    you have about a customer, all of the know your customer and

3    other data you have, bank account records and whatever

4    information it amounts to, do you need to transfer all of

5    that up front?  Isn't it easy, relatively, to modify this so

6    that that information, other than the contact information,

7    only gets transferred when the customer elects to be a

8    Binance customer?

9           Is there any reason why Binance needs all of that

10   other information for people who don't elect to be Binance

11   customers?  Isn't it a little safer and better protection

12   for those customers if we do the transfer of that kind of

13   data in stages and in pieces?  I'm not asking you to give me

14   a definitive answer.  I'm just suggesting to you that these

15   are things that seem relatively easy to change to me.  They

16   may not be as perfect as you would like, but they don't

17   really seem to me to have an impact on your business deal

18   and they'll go a long way towards addressing a lot of the

19   concerns that people have expressed.  Okay?

20           MR. GOLDBERG:  Thank you, Your Honor.  I hear you

21   loud and clear on those issues and we'll work with my

22   clients to --

23           THE COURT:  Great.

24           MR. GOLDBERG:  -- endeavor to respond.  I would --

25   I can definitively answer the first question, however --

1            THE COURT:  Yeah.

2            MR. GOLDBERG:  -- which was we included language

3    in the confirmation order which is at the end of Paragraph

4    99 to make clear that the -- any cryptocurrency that is

5    delivered to Binance remains property of the Debtors and

6    remains property of the customers to which those coins

7    should be allocated.  And we are happy to include any

8    language that provides comfort on that issue.

9            THE COURT:  Very good.

10           MR. GOLDBERG:  That is absolutely the intent.

11           THE COURT:  Very good.  I appreciate that.  Thank

12    you.

13           MR. GOLDBERG:  Thank you, Your Honor.

14           MR. SLADE:  Good morning, Your Honor.

15           THE COURT:  Good morning.

16           MR. SLADE:  Mike Slade for the Debtors.  Before --

17    we have one more witness, but I want to offer a number of

18    the, what I'm hoping will be noncontroversial exhibits into

19    evidence first.  Is that okay?

20           THE COURT:  Yes.  Please.

21           MR. SLADE:  First, I would like to offer Docket

22    No. 1125, which is the most recent version of the plan of

23    reorganization.

24           THE COURT:  All right.  It seems to me I have to

25    have that in evidence as it's what we're debating today, so

Page 22

```
1    I will admit that into evidence.

2              MR. SLADE:  And then from our exhibit list, which

3    was filed at Docket No. 1129, I first want to offer the

4    exhibits related to the purchase agreements so that's

5    Exhibits 7, 6, 8, and 9, Docket No. 248, 748, 775, and 835.

6    And those are the asset purchase agreement and the first

7    amendment and the notice of successful bidder and also

8    Exhibit 11, Docket No. 860, which is, Your Honor, order

9    approving our entry into the asset purchase agreement.

10             THE COURT:  All right.  I think I can take

11   judicial notice of those documents and I will do so and they

12   are admitted into evidence.

13             (Exhibits 6, 7, 8, 9, 11 entered into evidence)

14             MR. SLADE:  Thank you.  I would like to offer the

15   plan supplement documents, so that again, off of our exhibit

16   list, Exhibit 15, 16, and 20 through 23.  Those are Docket

17   Nos. 943, 951, 986, 1006, 1035, and 1115.

18             THE COURT:  Once again, these are documents for

19   which approval is being sought.  I can take judicial notice

20   of them and I do so.  They are in evidence for this

21   proceeding.

22             (Exhibits 15, 16, 20 through 23 entered into

23   evidence)

24             MR. SLADE:  Thank you, Your Honor.  I offer the

25   customer agreement, which is Exhibit 19, also Docket No.
```

Page 23

1       1074 at Pages 16 through 55.

2                THE COURT:  This is -- okay.  That's not a

3       document that's presented for my approval.  Is there

4       somebody who can verify that that's the true and correct

5       copy of the customer agreement?

6                MR. SLADE:  I can ask Mr. Tichenor who's our last

7       witness.

8                THE COURT:  Okay.

9                MR. SLADE:  Sure.  And the other document I

10      mentioned earlier, Docket No. 1109-2, which is the resume of

11      proposed plan administrator.

12               THE COURT:  Somebody's going to need to testify

13      and verify that, I think.

14               MR. SLADE:  Fair enough.  We'll --

15               THE COURT:  Okay.

16               MR. SLADE:  -- work with the Committee and figure

17      that out.

18               THE COURT:  Great.  Thanks.

19               MR. SLADE:  And our last witness, Your Honor, is

20      Mr. Tichenor.

21               THE COURT:  Mr. Tichenor, do you swear that the

22      testimony you're about to give will be the truth, the whole

23      truth, and nothing but the truth so help you God?

24               THE WITNESS:  I do, Your Honor.

25               THE COURT:  Thank you.  State your full name for

1    the record, please.

2                    THE WITNESS:  Brian Tichenor.

3                    THE COURT:  All right.  Counsel, you may proceed.

4                    MR. SLADE:  Thank you, Your Honor.

5                        DIRECT EXAMINATION OF BRIAN TICHENOR

6    BY MR. SLADE:

7    Q    Just to finish this up quickly, I'm handing you a copy

8    of what is Exhibit 19 which was also on the docket at Docket

9    1074 at Pages 16 to 55.  That's the Voyager customer

10   agreement.  Are you familiar with that document, Mr.

11   Tichenor?

12   A    In a limited capacity, yes.

13   Q    Have you reviewed it before?

14   A    Yes.

15   Q    And have you served as investment banker to the Debtors

16   since the petition date?

17   A    I have.

18                    MR. SLADE:  Your Honor, I offer Exhibit 19.

19                    THE COURT:  All right, is there any objection or

20   any desire to voir dire the witnesses to that exhibit?

21   Okay.  The exhibit is admitted.

22                    (Exhibit 19 entered into evidence)

23                    MR. SLADE:  Thank you, Your Honor.  I do have some

24   supplemental direct for Mr. Tichenor, but before I get

25   there, I would like to offer his declaration which is on the

1    docket at Docket No. 1113.  It's also Exhibit 3 on our

2    exhibit list which was, again, back at 1129.

3              THE COURT:  Are there any objections to the

4    admission of Mr. Tichenor's declaration into evidence?  All

5    right.  Anybody will have the right to cross examine him.

6    The declaration is admitted.

7              (Declaration of Brian Tichenor entered into

8    evidence)

9              MR. SLADE:  Thank you.

10   BY MR. SLADE:

11   Q    Okay.  Mr. Tichenor, I want to get into a number of the

12   issues that we talked about during the hearing yesterday.

13   First, I think you heard it, some of the regulators and some

14   customers have expressed concerns and reservations about

15   Binance.US; would you agree?

16   A    I would.

17   Q    Now, I want to discuss exactly why the Debtors decided

18   to go through the complexity of having a Binance deal as

19   plan A and the toggle as plan B.  Okay?

20   A    Okay.

21   Q    How much value leakage would there be if the Debtors

22   decide to exercise their fiduciary out and move away from

23   Binance towards the toggle plan?

24   A    We would estimate that the differential would be $100

25   million, approximately.

1    Q    Can you describe for the Court what the $100 million of

2    value leakage consists of?

3    A    So of the $100 million of value leakage, 20 million of

4    that would relate to the differential from the purchase

5    price perspective relating to Binance's upfront purchase

6    price consideration of $20 million.  The remaining $80

7    million relates primarily to value leakage associated with

8    two components.

9         One would be estimated incremental value reduction

10   associated with VGX token and the lack of support from

11   Binance.US perspective and inability to potentially create

12   additional value for that token.  That is a relatively small

13   component of the estimated $80 million.  The remaining

14   component relates to additional discounts that would likely

15   be associated with the liquidation of the 35 unsupported

16   tokens on Voyager platform.

17   Q    Okay.  I want to provide the Court with some more

18   detail on that than we received yesterday.  So there was

19   discussion about what it meant for there to be 35

20   unsupported coins.  Can you describe for the Court what that

21   means?

22   A    Yeah.  So the unsupported coins -- and again, this is

23   based on my understanding and discussions with the

24   management team of Voyager is that there are 35 tokens for

25   which the company's Bedrock code which is the foundation for

1    which the company uses in order to facilitate the withdrawal

2    and transfer of cryptocurrencies for customers, does not

3    support the protocols for those 35 tokens.  So there's not a

4    an ability for that Bedrock code to be used in order to be

5    able to execute and facilitate the withdrawal of those

6    tokens into customers' wallets.

7         Historically, the company has never offered an ability

8    to withdraw those 35 tokens.  They've always been done on a

9    basis whereby a customer would use cash on the platform to

10   acquire the token.  Voyager would, through market maker

11   arrangements, acquire the token from market makers.  It

12   would hold them in its own wallets and then to the extent of

13   a customer sought to withdraw, they would need to sell those

14   tokens into cash and the subsequent trade would occur on the

15   other end.

16        In addition to that, there are limitations from, for

17   example, an AML and KYC perspective that also enable the

18   ability for Voyager to appropriately comply with AML and KYT

19   procedures around the withdrawal of tokens and they utilize

20   third-party providers such as chain analysis to verify the

21   party and wallet address that that token is being sent to.

22   That functionality is not integrated into the platform

23   related to those 35 as well.

24   Q    Can you describe for us what KYT is?

25   A    Yeah, so it's a -- and I believe it's know your

1       transfer.  It might be transaction, so I apologize if I have

2       that backwards.  But generally, when people think of AML and

3       KYC, it relates to an onboarding process.  KYT relates to

4       the sending of funds and so what that really ultimately

5       relates to is that the party, which is sending the funds, in

6       this case Voyager, knows the counterparty on the other end

7       of that transaction.

8            And the primary purpose of that is to make sure that

9       you're complying with federal regulations related to, for

10      example, not sending funds to North Korean wallets or

11      Iranian wallets.  And so generally, what happens for

12      cryptocurrency platforms, given the ecosystem more broadly

13      and the ability to easily transfer funds to third-party

14      wallets is that there's a list of blacklisted wallets

15      effectively, through FinCEN for example, that publishes

16      that.

17           And so what these third party providers do is they

18      allow Voyager to make sure that they are not sending crypto

19      to parties that are banned in the United States from an AML

20      and KYC perspective.  So it allows them to continue to

21      comply with federal law relating to the transfer of funds.

22      Q    And is what you were saying that the -- with respect to

23      the unsupported coins, Voyager doesn't have the services in

24      place to do the KYT process?

25      A    That is my understanding, and in part that relates to

Page 29

1    the functionality of those third-party providers.  Not all

2    of them support all of the tokens.  So there are inherently

3    limitations around that and we understand that there are

4    limitations with the primary third-party verification

5    provider for those tokens that Voyager uses.  They don't --

6    they are not supported.

7    Q    So one of the customers asked us yesterday, what would

8    be necessary for Voyager to develop the internal capability

9    to be able to support the 35 unsupported tokens?

10   A    So based on my discussions with management, my

11   understanding is that it would require developers to be

12   brought in in order to rewrite a large portion of the

13   Bedrock code to enable that system to be able to support

14   from a protocol perspective the actual ability to facilitate

15   those withdrawals.

16       It would also require the company to engage with other

17   third-party providers related to KYT wallet verification,

18   onboard those, integrate those into its platform.

19   Generally, my understanding is that it would take about 6 to

20   9 months -- this is what's been described to me -- to revise

21   the Bedrock code per protocol.  I do imagine that some of

22   that could be done in parallel, but we do understand it to

23   be a lengthy process.

24       And what is not surprising in our minds, given the fact

25   that you would, you know, generally for a code update like

Page 30

1   that want to do things like verifications and test

2   transactions, so it is -- we understand to be a very lengthy

3   and likely expensive procedure in order to be able to do

4   that.

5   Q    Okay.  Can you give us an order of magnitude of the

6   additional cost?

7   A    I would imagine that it would likely be in easily the

8   single-digit millions, if not tens of millions.  I don't

9   have a specific number, though.

10   Q    Okay.  So given this, in your opinion, is it realistic

11   if Voyager were to toggle to plan B and do the self-

12   liquidation for Voyager to also develop the capabilities to

13   distribute the 35 currently unsupported coins directly to

14   customers?

15   A    I do not.  I believe that the cost and time delay would

16   not merit the decision to pursue that.

17   Q    Okay, so what happens to the 35 unsupported coins in

18   the toggle scenario?

19   A    In the toggle scenario, the Debtor would in its best

20   efforts seek to liquidate those coins into cash and it would

21   liquidate those coins into cash using best efforts in order

22   to minimize any potential value leakage associated with it,

23   but it would likely involve the sale of that coin into the

24   market or via block trade transactions with third-party OTC

25   market makers.

1   Q    And has the company gone out and gotten quotes for what

2   it would receive for those 35 unsupported tokens in that

3   scenario?

4   A    It has  We spoke with multiple market makers when

5   evaluating the toggle scenario in order to validate what we

6   believed appropriate discounts would ultimately be relating

7   to those tokens.

8   Q    And what were the quotes that you got?

9   A    They were very large.  In many instances, they were 50

10  percent plus and we did speak with what we believe to be a

11  number of the largest market makers in both the traditional

12  finance as well as crypto market making capacity.  In some

13  instances, they do both.  But we did seek and receive quotes

14  from multiple parties.

15  Q    Just so we're clear, you're talking about a 50 percent

16  discount?

17  A    Fifty percent discount relative to the current prices,

18  yes.

19  Q    Okay.  So is the potential $100 million in leakage

20  caused by a potential toggle the reason that the Debtors

21  have the Binance transaction as option A?

22  A    Yes, among other things.

23  Q    Okay.  Has Voyager decided definitively today that it

24  will close the Binance transaction?

25  A    No.

1    Q    When will that decision be made?

2    A    It would likely be made at a time three to four weeks

3    from approval of the plan in advance of a closing.  We would

4    confer with our board of directors from an advisory

5    perspective.  The advisors would also work together with the

6    UCC in consultation to make a determination and

7    recommendation on which path to ultimately move forward

8    with.

9    Q    Okay.  And I just want to be absolutely clear to all

10   the customers that are listening on the phone.  Are you

11   ready, sitting here today, to tell the Court and customers

12   that for sure, if the Court confirms the plan, we're going

13   to be selling to Binance?

14   A    Do you mind repeating the question again?  Sorry.

15   Q    Sure.  I want -- sorry, maybe it was even unclear.  I

16   just want to be absolutely clear for all the people that are

17   listening.  Okay?  Are you sitting here today telling the

18   Court and all of these customers that if the plan is

19   confirmed, we're going to be selling to Binance?

20   A    No.

21             THE COURT:  Just to be clear, Mr. Tichenor, that's

22   the current intent, but you have the right to change your

23   mind; is that essentially what you're saying?

24             THE WITNESS:  What I'm saying, Your Honor, is that

25   we are continuing to do due diligence on Binance.  At this

1    point in time, we would feel comfortable with the toggle

2    scenario.  That obviously is a path that the Debtor has an

3    ability to fully control.  But we do continue to do work

4    around Binance and there are, you know, for example,

5    allegations that are occurring in real time as early as this

6    morning that we continue to evaluate.  We would continue to

7    evaluate in advance of any closing.

8    BY MR. SLADE:

9    Q    Okay.  So I want to step back and just describe for the

10   Court the diligence that you've done.  And so can you just

11   describe for the Court what diligence have you done on

12   Binance.US?

13   A    Yeah, so as outlined in my declaration, we have

14   reviewed audited financial statements from their 2021 audit.

15   We reviewed interim unaudited financial statements.  We

16   reviewed their available liquidity.  We reviewed various

17   party services agreements.  We've reviewed their AML and KYC

18   procedures.  We've had multiple discussions with them

19   relating to --

20            THE COURT:  Slow down and repeat all those things.

21            THE WITNESS:  Yes.

22            THE COURT:  The 2021 audited financials, 2022

23   unaudited, did you say?

24            THE WITNESS:  Yes, that's correct, Your Honor.

25            THE COURT:  What else?

1            THE WITNESS:  We also reviewed their available

2    funds and liquidity including a proof of funds.

3            THE COURT:  Okay.

4            THE WITNESS:  We reviewed related party services

5    agreements.

6            THE COURT:  Okay.

7            THE WITNESS:  We have reviewed their wallet

8    infrastructure.  We had discussions with them relating to

9    that.  And by saying reviewed, we have had discussions

10   relating to their wallet infrastructure and representations

11   have been made to us about it.

12           THE COURT:  Okay.

13           THE WITNESS:  Additionally, we reviewed their AML

14   and KYC procedures and manuals.

15           THE COURT:  Okay.

16           THE WITNESS:  Their money transmitter licensing

17   status.

18           THE COURT:  Okay.

19           THE WITNESS:  Business plans that they had

20   submitted to selected states in connection with MTL

21   approvals.

22           THE COURT:  Okay.

23           THE WITNESS:  Additionally, above and beyond that,

24   we have reviewed information independently relating to some

25   of their public wallets and we continue to have discussions

1      with them relating to a range of factors around risks

2      associated with Binance.US as a potential counterparty.

3                      THE COURT:   Thank you.

4      BY MR. SLADE:

5      Q    Can you tell the Court just approximately how many

6      meetings and phone calls you have doing diligence about

7      Binance.US?

8      A     It would be dozens over a multi-month period.

9      Q     You said you reviewed proof of funds.  What was that

10     specifically that you received from them?

11     A     We received a bank statement from them.

12     Q     This -- you mentioned you got audited financial

13     statements from 2021.  This also came up in hearing

14     yesterday.  Do you know if Binance has an auditor?

15     A     They've made representations to us that they do have a

16     new auditor.  Yes.

17     Q     Okay.  This also came up yesterday.  Does Binance to

18     your knowledge have a fiat banking relationship?

19     A     Yes.

20     Q     Okay.  So I want to ask you this question for your

21     understanding based on the diligence you've done of

22     Binance.US, okay?  It's a series of questions with that

23     premise.  Okay?  Does Binance.US maintain digital assets on

24     a one-to-one reserve basis?

25     A     Yes.

1   Q    Does Binance.US hold customer assets solely in a

2   custodial capacity?

3   A    Yes.

4   Q    Who can move and transfer crypto assets away from the

5   Binance.US platform?

6   A    Only Binance.com -- excuse me, Binance.US employees.

7   Q    Got it.  All right.  Does Binance.US lend or

8   rehypothecate customer asset?

9   A    No.

10  Q    Have you seen Binance.US organizational charts?

11  A    I have.

12  Q    Where is Binance.US incorporated?

13  A    In Delaware with a headquarters in Palo Alto.

14  Q    Who owns Binance.US?

15  A    We understand it to be 20 percent owned by Series A

16  seen investors and 80 percent owned through an ultimate

17  owner CZ.

18  Q    Do you have an understanding of Binance.US' security

19  protocols?

20  A    Yes.

21  Q    Can you just describe that as a high level for the

22  Court?

23  A    Yes.  So we reviewed security protocols relating to

24  documents that were provided to us, for example, relating to

25  their ISO 27001 standards which relate to general IT

```
 1   security protocols.  We also reviewed a third-party audit
 2   relating to SOC 2 compliance, which relates to protection of
 3   underlying customer funds from an IT security perspective.
 4   And then from a wallet infrastructure perspective, we've had
 5   multiple discussions with them relating to where, for
 6   example, private keys are stored, the ability to move funds,
 7   who has authorization to be able to move funds, how
 8   transfers work.  So we've had a number of discussions with
 9   them relating to that.
10   Q    Okay.  And the Court asked this question yesterday.  I
11   just want to pose it directly to you.  Are their safeguards
12   to prevent crypto from being taken off the Binance.US
13   platform?
14   A    That is my understanding, yes.
15   Q    Okay.  Do you understand where the keys to crypto at
16   Binance.US are held?
17   A    I do.
18   Q    And what can you say publicly about that?
19   A    So we are bound by confidentiality.  We do take some of
20   the key elements very seriously relating to privacy concerns
21   around that.  We understand the keys to be held at
22   enterprise grade cloud storage facilities that in -- for the
23   majority of those keys are at a level that would meet
24   military grade standards.
25   Q    Are you familiar with the facilities at which these
```

```
 1    keys are held?

 2    A     I'm aware of the facilities, yes.

 3    Q     Okay, just so we're clear, have you visited that?

 4    A     I have not.

 5    Q     All right.  So all that said, are there aspects of

 6    Binance.US' business that you are still doing diligence on?

 7    A     Yes.

 8    Q     What are the issues you continue to track?

 9    A     So for example, you know, as I think we outlined in our

10    -- in the declaration, we have had discussions with

11    Binance.US as early as Wednesday.  There was a large meeting

12    with both Moelis and various other advisors relating to

13    Binance.US' relationship with Merit Peak and allegations

14    that were made relating to a Reuters article that was

15    published.

16          For example, our understanding based on information

17    that was provided to us relating to that, we don't believe

18    that for example, there was any comingling of customer

19    funds.  So for example, we understood that deposits relative

20    to withdrawals were effectively on one-for-one basis and so

21    therefore there wasn't any inappropriate withdrawals of

22    underlying customer funds.  But that is an item, for

23    example, that we continue to do due diligence on.

24    Q     Okay.  Are there any other items you're tracking?

25    A     Yes.  So after the hearing yesterday, we became aware
```

Page 39

```
 1    of a letter that was sent to Binance.US and CZ from three

 2    senators including Elizabeth Warren relating to allegations

 3    that, you know, would largely seemed to reflect articles

 4    from Reuters.  That said, this came out last night and we

 5    are actively engaging in and having discussions and we had

 6    discussions minutes leading up to the hearing this morning

 7    with Binance around that and we'll continue to have

 8    discussions with them post this hearing relating to that.

 9    Q    And speaking of this morning, did you see CZ's tweet

10    from this morning?

11    A    I did.

12    Q    All right.  What was your reaction?

13              THE COURT:  Somebody tell me what it is.

14              MR. SLADE:  We can provide it to the Court.  There

15    were -- there are --

16              THE COURT:  -- the witness first, tell me what it

17    is.

18              MR. SLADE:  Sure.

19              THE COURT:  Tell me his reaction.

20              MR. SLADE:  I apologize.

21              THE COURT:  His reaction's going to mean nothing

22    to me if I don't know what it was.

23              MR. SLADE:  Totally fair, Your Honor.

24    BY MR. SLADE:

25    Q    Just describe the tweet for the Court.
```

1   A    I don't recall the exact words that were used, but CZ

2   had tweeted in a reply to an article relating to this exact

3   hearing around the Voyager, Binance.US transaction what

4   seemed to be concerns around potentially pulling out of

5   either the U.S. or the transaction more broadly.

6   Q    Okay.  And was there a follow-up tweet?

7   A    There was.  That's my understanding, yes.

8   Q    And what was the follow-up tweet?

9   A    That they were still very interested in moving forward

10  with the deal as is and that the tweet didn't relate to the

11  specific transaction.

12  Q    Okay.  So just so we're clear, Mr. Tichenor, if the

13  Court confirms the plan, how will the decision be made

14  between closing of the -- between either closing the Binance

15  transaction or toggling to the self-liquidation option?

16  A    So the decision will be made among the advisors

17  ultimately making a recommendation, and that would include

18  Moelis, Kirkland, BRG on the Debtors' side having a

19  discussion ultimately with the board of directors and the

20  special committee to determine which appropriate path would

21  be made on a go-forward basis.  We would make that

22  recommendation in consultation with the UCC and its various

23  advisors including McDermott and FTI.  And ultimately, the

24  determination would likely be made relating to whether it

25  was the appropriate path on a risk adjusted basis to

Page 41

1    continue to move forward with.

2    Q    Okay.  Well, wherever we are, Mr. Tichenor, why not

3    just toggle now, given what you are talking about, the

4    concerns of the regulators and the Merit Peak issue and the

5    issues you're still dealing with and the media reports and

6    congressional letters and the tweets?  Why not just toggle

7    now?

8    A    Because based on our analysis, the Binance transaction

9    potentially provides up to an incremental $100 million of

10   additional value for customers which we view as being

11   material.  In addition, you know, we do believe that it's

12   like a potentially faster path for customers being able to

13   recover funds as well, just given logistical and operational

14   elements of executing on a self-liquidating toggle.

15            MR. SLADE:  That's all, Your Honor.  Thank you.

16   Pass the witness.

17            THE COURT:  All right.  Is there anybody here in

18   the courtroom who wishes to cross examine Mr. Tichenor?

19            MR. BRUH:  Your Honor.

20            THE COURT:  Yes, Mr. Bruh.

21            MR. BRUH:  Thank you.  Mark Bruh for the United

22   States Trustee.

23              CROSS EXAMINATION OF BRIAN TICHENOR

24   BY MR. BRUH:

25   Q    Good morning, Mr. Tichenor.  I just have a couple of

1   quick questions for you.  You spoke about the letter by the

2   three U.S. senators to Changpeng Zhao -- CZ, that is -- and

3   Binance.US and you kind of gave a broad brush as to what

4   that letter is about.  Isn't it correct that the letter

5   deals with respect to potential sanctions evasion, money

6   laundering, and unlicensed money transmission?

7   A    I don't recall the exact specifics.  I apologize.  We

8   were reading this very late last night.  But that's my

9   understanding, yes.

10  Q    Okay.  And did you or your team look into this at all,

11  those issues?

12  A    We looked into a number of issues as I think I outlined

13  relating to Binance.US' specific AML and KYC procedures.

14  For example, we have had multiple discussions with them.  We

15  have performed extensive diligence in part relating to a lot

16  of the allegations that were outlined in various Reuters

17  articles, but I can't speak to, for example, elements of

18  Binance.com as a counterparty.  That would not be within our

19  scope of diligence.

20  Q    Today, you spoke about that the -- in the event the

21  Debtors toggle, that the plan -- the sale to Binance, it

22  would be $100 million difference; is that right?

23  A    That was the estimate, yes.

24  Q    Yes.  But yesterday, Mr. Renzi testified that the $20

25  million infusion by Binance would only be about a 1 percent

Page 43

1    increase to customers and then -- isn't that right?

2    A    That's my recollection, Mr. Renzi's testimony

3    yesterday, yes.

4    Q    And then he further testified based upon certain

5    questions by the pro se customers than in actuality, that 1

6    percent would be less when you take into account the

7    administrative costs incurred by the estate; isn't that

8    right?

9              MR. SLADE:  Your Honor, I would object.  I don't

10   think that's what he said.

11             THE COURT:  I don't think it is either, so I'll

12   sustain the objection.

13   BY MR. BRUH:

14   Q    Can you just explain how you come to the $100 million

15   number as opposed to the 1 percent number for me?

16             MR. SLADE:  I object.  I don't think those are the

17   same things.  You can answer the question.

18   BY MR. BRUH:

19   A    Yesh, so as I think I previously stated, the components

20   of the $100 million -- approximate, again, $100 million

21   differential because it does move in real time --

22   Q    I understand.

23   A    -- were that it was $20 million relating to the up-

24   front purchase price consideration with the remaining 80

25   million, so out of 100, you know, less the 20, of the

1   remaining 80 million, my recollection was that approximately

2   20 million of that was relating to an estimated incremental

3   reduction in value associated with VGX as a specific token

4   with the remaining portion of that being 60 million relating

5   to liquidity discounts associated with the full liquidation

6   of 35 tokens which cannot be returned to customers on an in-

7   kind basis through the Voyager platform.

8          MR. BRUH:  Okay.  I have no further questions.

9   Thank you.

10         THE COURT:  Anybody else who's here who wishes to

11  cross examine Mr. Tichenor?

12         MR. EVANS:  Your Honor, Joe Evans from the UCC.

13  If possible, if the creditors on the line have questions,

14  I'd like them to go first so we can follow up, or we can go

15  now if you prefer.

16         THE COURT:  All right, well before we go to the

17  people on the line, is there anybody other than the

18  Committee who has questions that they wish to ask.

19         MR. UPTEGROVE:  Yes, Your Honor.

20         THE COURT:  Hang on one second.  We have not quite

21  --

22         MR. UPTEGROVE:  Yes, Your Honor.

23         THE COURT:  -- the telephone yet.  Anybody else

24  here in the courtroom?  All right, anybody on the telephone

25  who wishes to ask questions?

1           MR. UPTEGROVE:  Yes, Your Honor.  William

2    Uptegrove on behalf of the United States Securities and

3    Exchange Commission.

4           THE COURT:  Okay.

5              CROSS EXAMINATION OF BRIAN TICHENOR

6    BY MR. UPTEGROVE:

7    Q    Good morning, Mr. Tichenor.  I'd like to ask you some

8    questions about the safeguards for protecting customer

9    assets once those assets have been transferred to the

10   Binance.US platform.  You've already testified some about

11   that.  What specific role did you have in the Debtors' due

12   diligence of Binance.US?

13   A    So I'm an investment banker to Voyager and my specific

14   involvement was participation in various discussions and

15   meetings with Binance.US relating to the diligence.  I was

16   also involved in, for example, preparation of diligence

17   questions in connection with that work.

18   Q    Anything else?

19   A    I'm not sure I follow the question.

20   Q    Any other part -- with respect to your role, is there

21   anything else that you did in connection with the due

22   diligence of Binance.US?

23   A    I believe we outlined the work that we had done

24   previously.  You know, we've had multiple discussions with

25   them.  No.  I mean, I think I stated previously the work

1    that we have performed.

2    Q    Presumably it was part of a team.  Who overall was

3    responsible for conducting the Debtors' due diligence?

4    A    It would be -- I am a member of our team at Moelis.

5    I'm one of several individuals, so it would include myself

6    and many others that are also on the Moelis team in addition

7    to myself.  It also included K&E, for example, as counsel to

8    the Debtor.  It included BRG who is the financial advisor to

9    the Debtor.  You know, we have done this diligence in

10   connection with the UCC's advisors, for example.

11        So as I mentioned, I think previously, for example, the

12   Merit Peak review that we had on Wednesday, I was unable to

13   physically participate in that.  We did have representatives

14   from Moelis at that meeting, but it included representatives

15   from all of the firms that I listed, including, you know,

16   the UCC's advisors.  So it's not just a Moelis-specific

17   diligence effort.

18   Q    Is there anybody on the Moelis team that has a

19   background in crypto asset security?

20   A    In which context?  From a legal perspective?  I'm

21   sorry.  I don't follow the nature of the question.

22   Q    No, in a technical capacity.  So you know, whether or

23   not the crypto assets are safely custodied on the platform

24   and access issues and keys all of that stuff, in a technical

25   way.  Is there somebody on the Moelis team that had that

1    type of expertise?

2    A     We have individuals on the team that for example, focus

3    specifically on the cryptocurrency sector.  That is an

4    industry group that from a firm perspective we do coverage

5    work on.  But to be clear, Moelis is an investment bank.  We

6    are not a consultancy group relating to, for example, you

7    know, what would be appropriate from an IT or custody

8    protocol perspective.  We don't do code reviews, for

9    example.  We do work that is in line with what scope and

10   services investment bankers typically perform.

11   Q     So the answer is no?

12   A     Yeah, I would say the answer would be no.

13   Q     Is there anyone else on the Debtors' due diligence team

14   that has that type of technical expertise?

15   A     Not to my knowledge.

16   Q     With respect to the nature of the wallet infrastructure

17   and safeguards, did you personally review any specific

18   documents?

19   A     I personally reviewed, I would say, several documents.

20   The two documents that I think I previously mentioned, which

21   were the ISO 27001 certificate and audit report.  That's a

22   certification that's performed by a third-party firm.  We

23   also reviewed their SOC 2 compliance report.  Additionally,

24   too, we did receive sworn statements from company officers

25   relating to a number of these elements from a consideration

1    perspective that we would view as being critical and kind of

2    foundational from a safeguard perspective.

3    Q    I'm sorry, said there was the ISO certificate and then

4    what was the next thing that you reviewed?

5    A    A SOC 2 audit.

6    Q    That like sock, like you put on your feet?

7    A    It's S as in Sam, O as in orange, and C as in car.

8    Q    And then, so is the ISO certificate, the SOC 2

9    compliance, there was an audit, too, right, a third-party

10   audit?

11   A    We did.  We reviewed their third-party 2021 audit --

12   audited financials.

13   Q    So the third-party audit was of financials.  Was there

14   an audit done of the internal controls and safeguards over

15   crypto assets?

16   A    I don't recall personally reviewing any documents

17   relating to, for example, like an internal control report.

18   I do know we received representations relating to, you know,

19   internal controls and procedures, you know, being in line

20   with leading industry standards, for example, but I didn't

21   personally review any documents related to that, no.

22   Q    So just to be clear, when you say that you reviewed a

23   third-party audit, you're talking about the audit of the

24   financials:  balance sheet, income statement, statement of

25   cash flows?

1    A    So when I was speaking of the audits, there were three

2    types of audits.  One would be the financial audit, which is

3    one that you would be referring to.  Additionally, the ISO

4    and SOC 2 reports are both technically audits.  They're

5    audits from a information security perspective and they are

6    performed by third-party firms.

7    Q    Got you.  So that leads to my next question.  Can you

8    elaborate a little bit more about what ISO is, who performs

9    it, what it entails, what the steps are, and what would be -

10   - well, break that down.  First, who conducted the ISO

11   audit?

12   A    I don't recall the exact firm.

13   Q    Do you recall whether it's a household name or somebody

14   you'd have to google?

15   A    It was not a name that I'm familiar with, but I'm not

16   as familiar with reviewing ISO audits generally speaking, so

17   I can't speak to the nature of whether that's a well-known

18   firm, for example, that performs that type of audit.

19   Q    Do you have a sense of their technical capacity and

20   certification and experience in this area?

21   A    I think I answered that.  I can't speak to that.

22   Q    Do you know whether it has two employees or two hundred

23   employees?

24   A    I don't recall.

25   Q    What was the main finding of the ISO report?

Page 50

```
1    A    That they were in compliance with the ISO 27001
2    standards which I understand to relate to ISO being a third-
3    party International Standards Organization and my
4    understanding -- and again, this is -- you know, we are
5    investment bankers.  This is outside of our normal scope of
6    services.  My understanding is that they were in compliance
7    with these standards which relate primarily to IT security
8    protocols and best practices, procedures.
9    Q    Yeah.  I'm a lawyer, so if someone gave me a ISO
10   certificate, I wouldn't know, you know, heads or tails of
11   it.  Who did -- so I understand, who did the Debtor give it
12   to that -- let me rephrase that.  Who on the Debtors' team
13   reviewed the ISO certificate that had adequate industry and
14   technical expertise to opine on whether it was a sufficient
15   and adequate review of the Binance security protocols?
16   A    I don't believe that there was any -- I don't know the
17   answer.
18   Q    So as far as you know, no one with adequate knowledge
19   on the Debtors' team reviewed ISO report?
20   A    I can't speak to, for example, whether there was an
21   individual at BRG, which would be appropriate, you know,
22   from that perspective.  But from the Moelis perspective, I
23   can speak to what I know from us as a firm.
24   Q    What does this SOC 2 -- is it a report?
25   A    It's similar to a compliance certificate from a third-
```

1    party auditor relating to their compliance with SOC 2

2    standards.

3    Q    How is it different than the ISO certificate?

4    A    My understanding is that ISO is a separate

5    organization.  SOC, I believe, relates to ISCPA standards

6    relating to the privacy or the custody and protection of

7    customer privacy information as a financial services banker.

8    For example, this is something that typically comes up in

9    the context of M&A transactions when dealing with financial

10   services organizations that deal with the protection of

11   customer PII.

12        It's -- my understanding is it's an industry and

13   worldwide recognized standard relating to the protection of

14   customer PII and the safeguarding of such.

15   Q    You might have said it there and I apologize, but are

16   there differences between the ISO and SOC 2 reports or

17   certification?

18   A    I believe there are.

19   Q    What are they?

20   A    Excuse me, I didn't hear that.

21            THE COURT:   What are they?

22   BY MR. UPTEGROVE:

23   A    Oh, what are they?  My recollection is that one relates

24   to general IT security protocols and standards.  The other

25   relates specifically to safeguards relating to the

1       protection of customer PII specifically.

2       Q    What was the conclusion of the SOC 2 report?

3       A    That they met the standards.

4       Q    Were there any exceptions?

5       A    I don't recall.

6       Q    (indiscernible).  How long is the SOC 2 report?

7       A    I don't recall.  I read it a couple weeks ago.

8       Q    Two pages, 200 pages?

9       A    I don't know.  I don't recall it being --

10      Q    Who on the Debtor --

11      A    -- two pages.  I remember it being longer than that,

12      but I don't know how long.

13      Q    Do you remember how long it took you to review it?

14      A    I read it an afternoon.  I don't recall it being 200

15      pages.  I don't recall it being two pages.

16      Q    You read it in an afternoon, as you read it during the

17      afternoon or you read it, it took you (audio drops)

18      afternoon?

19      A    I read it during an afternoon.

20      Q    Was there anyone on the Debtors' team who reviewed the

21      SOC 2 report that had adequate technical experience and

22      expertise to verify what was in the report?

23      A    I can't speak to that, and candidly, I don't even think

24      as an investment banker I would be in a position to

25      determine who even would be, given my knowledge of, you

Page 53

1    know, these reports and industry standards.

2    Q    You mentioned previously in your testimony that there

3    were multiple discussions with people at Binance, correct?

4    A    Correct.

5    Q    And those discussions touched on the issues of asset

6    security and wallet infrastructure, right?

7    A    That's correct.

8    Q    And did those discussions involve people on the

9    Debtors' side other than Moelis people?

10   A    I believe so.  I don't --

11   Q    Who were those people?

12   A    -- specifically.  I believe BRG --

13   Q    -- a financial -- was that a financial advisor, right?

14   I'm sorry.

15   A    Go ahead.  I know I recall at least one discussion that

16   involved K&E.  We also had discussions with, for example,

17   management relating to, you know, what we learned during

18   those discussions to determine at least in their judgment

19   whether or not what was being presented to us made sense and

20   met industry standards, for example.

21   Q    And in those discussions with people from management

22   and other advisors to the Debtor, was there anyone in those

23   meetings who had adequate technical expertise and experience

24   to opine or ask questions about the SOC 2 or ISO

25   certificates or reports?

1          THE COURT:  That's the third or fourth time you

2     vaguely asked about people with adequate technical

3     experience.  I'm going to stop it because I don't know what

4     it means.  You know, presumably you get an audited report

5     from somebody who has adequate technical experience, so what

6     are you asking?  Did you have another auditor review this

7     audit?  Or are you saying, you know, like did you have

8     another financial auditor review the financial audited

9     statements?  So I don't really know what you're asking.  So

10    you've got to be more clear, because otherwise it's not

11    helpful to me.

12          MR. UPTEGROVE:  Understood.

13    BY MR. UPTEGROVE:

14    Q    Mr. Tichenor, you had previously testified that there

15    was -- strike that.  So when there was discussions among

16    management and the Debtors' advisors regarding crypto asset

17    security and wallet infrastructure issues, how many of those

18    meetings have there been?  Let me rephrase that.  Sorry,

19    strike that.  How many meetings have there been regarding

20    issues of asset security and wallet infrastructure at

21    Binance.US --

22    A    I would say --

23    Q    -- among the Debtor and its advisors?

24    A    Numerous.  I can't give you an exact number, but it's

25    something that in light of everything going on from a market

Page 55

1    perspective was top of mind for us from a diligence

2    perspective.

3    Q    From the Debtors' perspective, who is typically present

4    at those meetings (audio drops) typical?

5            MR. SLADE:  Your Honor, can I lodge a brief

6    objection?  I guess I'm concerned that these questions are

7    not being asked as being relevant to this proceeding, as

8    opposed to additional proceedings that the questioner is

9    anticipating bringing later.  Seems -- this seems

10   irrelevant.

11           THE COURT:  Overruled.  You can answer.

12   BY MR. UPTEGROVE:

13   A    My -- excuse me, do you mind repeating the question

14   again?

15   Q    Sure.  Just to the extent there was a typical

16   representation, what was the typical representation on the

17   Debtors' side for the meetings relating to discussions on

18   crypto assets, security, and wallet infrastructure?

19   A    Generally, I believe it involved myself, others from

20   Moelis, and then in certain instances, other advisors that

21   have been advising both the Debtor and the UCC.  And I know

22   we've had discussions with the UCC for -- the UCC's

23   advisors, for example, relating to these dynamics.  We also

24   had discussions with our board of directors relating to this

25   and presented findings under confidentiality relating to

1    what we had learned during those discussions and discussions

2    with our board.

3    Q    At those discussions, was there anyone that you would

4    term a technical expert on issues of wallet infrastructure

5    or the security of crypto assets?

6    A    There would be members from, for example, the Voyager

7    management team that operate a crypto exchange and would be

8    familiar with those.

9    Q    What about the advisors?

10   A    If you're asking if we had any specific technical

11   advisors relating to these dynamics that focus specifically

12   on code reviews or technical elements, we did not hire an

13   additional external advisor relating to that, no.  Or the

14   Debtor did not engage on.

15   Q    And you said -- I'm sorry.

16   A    If that's the question that you're asking.

17   Q    When you say, who were the Voyager management people

18   you're referring to in this instance?

19   A    So for example, the CEO Steve Ehrlich.

20   Q    Anyone else?

21   A    I'm sure that there were others on those meetings.  I

22   don't recall specifically, at any specific instance.

23   Q    Do you happen to know whether Mr. Ehrlich has technical

24   expertise in wallet infrastructure and crypto asset

25   security?

1    A    I think he's familiar with what our industry protocols

2    and standards, which was the basis for the discussion

3    largely relating to the ability of any single individual,

4    for example, to move funds or how structurally, for example,

5    like a hot wallet/cold wallet structure would work.

6    Q    Was Moelis engaged by the Debtor to assess the

7    safeguards Binance.US has in place for crypto assets?

8    A    No.

9    Q    In Paragraph 23 of your declaration, you state Moelis

10   is not a technical expert on matters relating to the

11   appropriateness of information security or other custody

12   protocols.  Can you explain what you mean by that?

13   A    Moelis is a investment bank.  The work that we

14   generally perform is consistent with investment banks.  It

15   relates to financial analysis.  It relates to the financial

16   capacity generally of the counterparty.  It would relate to

17   valuation, for example, but as an investment bank, we are

18   not technical experts in the sense of a third-party

19   consultancy group, for example, that oftentimes, you know,

20   we'll see engaged in certain situations M&A situations that

21   we'll perform, for example, technical reviews.  That's not

22   inside of the scope of services of Moelis and I don't

23   pretend to be an expert on a code review, for example.

24   Q    Did anyone at Moelis conduct any assessment or audit of

25   the safeguards Binance.US has in place over customer crypto

Page 58

1    assets?

2    A    I think I just answered that question.  I -- you know,

3    as an investment bank, look, we sought to perform

4    incremental reviews on things that we believed would be

5    important from a counterparty perspective.  We sought to get

6    assurances from the counterparty relating to such, including

7    sworn statements around those facts.  But, you know, I

8    wouldn't characterize anybody at Moelis as being an expert

9    in that sense.  It's not what we do as a firm.

10   Q    Are you familiar with something called Binance.com?

11   A    I am.

12   Q    What's the relationship between Binance.US and

13   Binance.com?

14   A    My understanding is, and representations have been made

15   to us, are that there are several commercial agreements

16   between the two entities and that they share a common UBL in

17   CZ.

18   Q    Does anyone -- I think you testified about this, but I

19   just want to make it clear.  Does anyone from Binance.com or

20   its affiliates have access to the wallets or keys of

21   Binance.US customers?

22   A    What's been represented to us is that only Binance.US

23   employees are able to move or transfer crypto and that

24   Binance.com employees don't have the ability to access keys.

25   Q    A famous President once said, "Trust but verify."  Or I

Page 59

1    should say, a President famously said once, "Trust but

2    verify."  What did -- what if anything did Moelis do to

3    verify those representations?

4    A    We had discussions with them.  We've had numerous

5    discussions with them.  We sought to get sworn statements

6    relating to that.  You know, but again, like we don't do,

7    for example, like a code review as I think Mr. Slade

8    mentioned.  You know, we didn't visit on site, for example,

9    the enterprise storage facility that the keys are hosted at.

10   We sought to get assurances above and beyond typically what

11   we would do in a transaction like this, perform counterparty

12   due indulgence, but it would be difficult for me to even say

13   how to perform a independent verification the way that

14   you're describing.

15   Q    I think you previously testified that it's your

16   understanding that Binance.com or affiliates of Binance.US

17   do not have the ability to transfer crypto assets on the

18   Binance.US platform; is that right?

19   A    Yes, I believe they don't have the ability to move or

20   transfer funds.  That's my understanding.

21   Q    Did Moelis or the Debtor do anything to verify that

22   other than getting representation?

23   A    Are you asking if we did like tests, for example, or

24   internal reviews?  I'm not sure I understand the nature --

25   Q    Any -- just anything.  Just anything other than

Page 60

1    representations.

2    A    We sought to get representations.  That was the work

3    that we did.

4    Q    There was an earlier purchase agreement in this case

5    with FTX, correct?

6    A    There was.

7    Q    And you stated in your declaration that FTX and its

8    affiliates unexpectedly collapsed shortly after the Court

9    approved the purchase agreement; is that right?

10   A    That's correct.

11   Q    What did you mean by unexpected there?

12   A    I believe everybody found the FTX bankruptcy to be

13   unexpected.  It occurred over a very short period of time

14   and it subsequently turned out to be, from what we

15   understand, a fraud of historical proportions.

16   Q    The Debtors conducted due diligence in connection with

17   the FTX transaction, correct?

18           MR. SLADE:  Your Honor, can I object?  Again, this

19   is not relevant.  This is the past and not relevant to

20   what's happening today.

21           THE COURT:  I'll allow it.  Go ahead.

22   BY MR. UPTEGROVE:

23   A    So we conducted diligence that is traditional in nature

24   relating to entering into a transaction in a bankruptcy

25   proceeding that includes, for example, reviews of their

Page 61

1     ability and financial capacity to be able to close a

2     transaction.  We had multiple discussions with management.

3     We received assurances from their advisors including their

4     counsel, S&C.  We were aware and listened to, for example,

5     testimony that their CEO made in front of Congressional

6     hearings attesting to the fact that they safeguarded assets

7     and that customers have rights and title to assets.  We

8     reviewed, for example, their terms of service related to

9     such.  So, you know, that was the nature of diligence that

10    we performed.  And we were aware of many of the investors

11    that were in their business as well and had discussions with

12    them about FTX.

13    Q   As part of its due diligence, did the Debtor identify

14    any of the problems that ultimately led to FTX's, as you

15    characterized it, collapse?

16              MR. SLADE:  Your Honor, I'll object.  That's not

17    relevant here.

18              THE COURT:  I'll allow it.

19    BY MR. UPTEGROVE:

20    A   So generally speaking, to the extent that somebody is

21    performing a fraud that, let's say, is $50 million, there's

22    a balance sheet gap of something of that size, that's

23    something that can be, you know, oftentimes potentially a

24    failure from a diligence perspective.  As we understand it,

25    the balance sheet hole and theft of funds relating to FTX is

1    close to $9 billion.  The only way to perpetuate a fraud of

2    that scale is through widespread and consistent failure from

3    a primary perspective to provide false statements and

4    assurances.  You can't perpetuate fraud of that scale just

5    by you know, a one-off issue, for example.  It inherently

6    has to be widespread.

7    Q    So the answer is no.

8    A    In that instance, no.  Yeah.

9    Q    What if anything has the Debtor done -- the Debtors

10   done differently during the due diligence in the Binance.US

11   transaction?

12   A    So in light of what happened with FTX and generally,

13   what was going on with the industry more broadly and

14   concerns relating to any counterparty -- and to be clear,

15   this isn't just a Binance.US specific issue.  This related

16   to work that we were performing on various parties that

17   sought to engage with the Debtor post the collapse of FTX

18   around a potential transaction.  We sought to review their

19   financial capacity and ability to operate as an ongoing

20   business.

21        We asked some questions around the nature of their

22   operations and assurances that they had previously given to

23   us around the fact that they hold, for example, reserves

24   only on one-for-one basis.  We asked for additional

25   verification relating to the fact that they don't

1  rehypothecate any assets.  We looked at their website.  We

2  asked numerous questions.

3      We performed multiple, multiple meetings and diligence

4  sessions with them to understand and seek to understand

5  facts around the way that they operate their business to

6  identify areas that we understood to have caused issues in

7  other crypto-related bankruptcy situations and that tend to

8  be cause for you know, these types of failures.

9  Q   So I'm not clear, Mr. Tichenor.  Did you not look at

10  the website and have multiple meetings in the FTX

11  transaction?  What's different -- let me let you answer that

12  question, sorry.  I'll rephrase it.  Strike that.  So the

13  Debtors not have some of those things like meetings and

14  review websites in the FTX transaction?

15  A    We did.  I would characterize the scope of the

16  diligence as being broader in this instance.  We, you know,

17  had multiple meetings with them.  We -- and we had multiple

18  meetings with FTX as well, right?  But I would just

19  characterize the breadth and duration and scope of the

20  diligence as being much higher.

21  Q    How so?

22  A    So we asked for walk throughs, for example, of wallet

23  infrastructure relating to how assets are custodied and, you

24  know, seeking additional assurances.  We sought a sworn

25  statement from the company relating to this.  We didn't do

1    that in FTX.

2    Q    That's what I'm looking for.  So you got in the context

3    of Binance.US, you got sworn statements from Binance.US

4    personnel; is that right?

5    A    That's correct.

6    Q    You didn't previously do that in FTX.   That right?

7    A    That's correct and that's uncommon in the context of

8    any M&A or restructuring related situation to get those

9    types of sworn statements.  Be highly --

10   Q    What other --

11   A    -- unusual.

12   Q    Understood.  Other than that, what other specific steps

13   did the Debtor take that it didn't previously take in the

14   FTX transaction?

15   A    I think the other incremental steps that we took were

16   to ensure from, for example, an APA perspective that to the

17   extent that there were transfers of crypto that we were

18   ensuring that customers, for example, were already signed up

19   to the Binance.US platform.  They would already be customers

20   of it.  You know, we were not planning to, for example,

21   transfer the crypto in a manner and you know, the

22   protections that were built in around this, to ensure that

23   to the extent there was, you know, widescale fraud, for

24   example, that was being perpetuated that the Debtor itself

25   wasn't exposed on that interim basis in a way that it would

1    have been in the FTX transaction.

2    Q   Any other, you called them incremental steps that the

3    Debtor took in connection with the due diligence of

4    Binance.US that it didn't take with FTX?

5    A   I -- we've discussed a lot of them.  I don't recall

6    anything else.  I'm sure there was.  I just don't recall

7    anything else off the top of my head.

8    Q   So slightly pivoting to a related subject, in Paragraph

9    32 of your declaration, you discuss certain supplemental

10    diligence and I think you sort of seem to -- well, you

11    touched on it a little bit today.  When did the supplemental

12    due diligence begin?

13    A   I would characterize the -- so do you mind, I'm going

14    to turn to this.  This relates to the Merit Peak work.

15    Q   Okay.

16    A   Is that the right paragraph?

17          THE COURT:  Yes.

18    BY MR. UPTEGROVE:

19    Q   All right, I don't -- turn to it.  Paragraph -- it's

20    Paragraph 32.

21    A   So yes, I'm looking at that now.  So the supplemental

22    due diligence related to, you know, upon the publication of

23    the Reuters article relating to, you know, a perceived

24    relationship between Merit Peak and Binance, in particular

25    Binance.com and CZ and Binance.US, upon seeing that, we

Page 66

1    reached out to Binance.US and its advisors.  We scheduled

2    diligence conversations to engage with them and a better

3    understanding of the nature of the allegations, as I think

4    outlined -- and that included multiple telephonic and Zoom

5    meetings as well as in person meetings relating to reviews

6    of trade data.

7         And to be clear, this was not a -- just a Moelis set of

8    supplemental diligence.  This included meetings of Moelis,

9    Kirkland, BRG, FTI, McDermott all participated in to review

10   enhanced documentation around the nature of the relationship

11   and in particular with regards to the allegations that were

12   made, you know, the concern would be that to the extent that

13   there was a withdrawal of, for example, customer funds that

14   would obviously be very concerning from the Debtors'

15   perspective.

16        And so the diligence that we performed and information

17   that we received, you know, largely seemed to indicate that

18   the flow of funds relating to these transactions were on

19   offsetting basis.  So in this context, it would be, you

20   know, a market maker depositing value on a platform and then

21   withdrawing cash on the back end.  We understand that to be

22   in the typical scope of what market makers do.  But I want

23   to be clear, this isn't a -- you know, we're not done with

24   our diligence on this.  We continue to do diligence.  We had

25   a meeting with them Wednesday and had the hearing Thursday.

1       We'll continue to have discussions with them and as I

2    think I said, we have a plan that allows for a toggle

3    approach.  We will not -- we will confer and seek to review

4    and make sure that parties are comfortable prior to

5    executing any transaction and to the extent that we're not,

6    we would seek to execute the toggle that the plan allows

7    for.

8    Q    When did that Merit Peak article come out?  Do you

9    remember roughly?

10   A    I don't.  I think it was February 16th, is what it

11   seems to be.

12   Q    The -- what's dubbed in your declaration as the

13   supplemental due diligence would have started February 16th

14   or shortly thereafter?

15   A    Yeah, as it relates to the specific item, that's

16   correct.

17   Q    Was there something else that -- was there other

18   ongoing due diligence at that time?

19   A    We were performing and can continue to have

20   conversations with Binance over the course of -- from when

21   we began in discussions with them post the collapse of FTX

22   through as early as I think 9:55 this morning.

23   Q    As of February 16th, or thereabouts -- or excuse me,

24   let me rephrase that.  Before February 16th, what was left

25   in regard to the due diligence in the -- for the Binance

```
 1    transaction?
 2    A    Are you asking, is there specific open due diligence
 3    items prior to February 16th? I'm not sure I understand --
 4    Q    Correct.
 5    A    I don't recall specifics.  I know that there were, I
 6    just don't recall specific items.
 7    Q    Regarding the supplemental -- excuse me, the
 8    supplemental due diligence that's now ongoing, what's the
 9    scope of that due diligence?
10    A    I think it would largely relate to, for example, you
11    know, continued work relating to the Merit Peak allegations.
12    We need to receive, I think we're still waiting on the
13    audited year-end financial statements, for example.  We will
14    continue to and are seeking to have a discussion with the
15    company relating to the letter that was put forward
16    yesterday by the three senators.
17         We will need to have additional discussions relating to
18    the tweets that were put out this morning by CZ and we will
19    continue to evaluate various articles and news publications.
20    And you know, any allegations that remain with -- to the
21    extent that there are additional allegations, we'll continue
22    to make sure that we get assurances relating to any
23    allegations that are made around the nature of the
24    operations.  And then I think we would also seek --
25    Q    What about current ongoing due diligence --
```

Page 69

1    A    -- to do kind of bring-down due diligence session ahead

2    of any closing.

3    Q    I'm sorry, what is a bring-down due diligence or

4    whatever -- what'd' you call it?

5    A    A bring-down due diligence.  So this is oftentimes an

6    analysis that is done in connection with, for example,

7    public M&A transaction or a general M&A transaction where

8    the advisors will have a discussion with the counterparty

9    relating to assurances of a range of factors, for example.

10        So oftentimes the bring-down due diligence will include

11   basically a update and verification of prior diligence

12   assurances that have been made by the counterparty to assure

13   that they are currently still in compliance with that.  So

14   for example, oftentimes a bring-down due diligence session

15   will seek to get assurances from a counterparty relating to

16   the fact that they're not having any issues relating to

17   being a going concerns from their auditor.  That's a very

18   common bring-down due diligence item.

19   Q    Does the current diligence include a review of

20   procedures and controls relating to the security and custody

21   of crypto asset?

22   A    I think we've answered that question.

23   Q    I'm sorry, I apologize.  I missed it.  Could you answer

24   the question?

25   A    So I think we'll continue to perform work relating to

Page 70

1    the nature and protocols that Binance.US uses relating to

2    the custody and wallet infrastructure, to the extent that's

3    the question, and we would seek assurances in advance of any

4    close relating to such, even prior sworn statements that we

5    received.

6    Q    Could the current diligence impact the date of the

7    closing?

8    A    Excuse me, I wasn't able to hear you.

9    Q    Could the current due diligence impact the date of the

10   closing?

11   A    Absolutely.

12   Q    How so?

13   A    We -- so as I think we mentioned, we would anticipate

14   closing probably in the range of three to four weeks from

15   approval of the plan.  There's still work that needs to be

16   done from the Debtors' perspective in order to be able to

17   prepare for the closing of the transaction, that includes

18   its ability to, for example, meet the requirements under the

19   rebalancing ratio and work that needs to be done around

20   that.  There's operational work that would still need to be

21   done from an integration and transfer perspective.

22       So there's a lot of work that obviously needs to be

23   performed in advance of a closing.  So that's not something

24   that would occur immediately.  We plan to continue to

25   perform due diligence in advance of a closing and to the

1    extent that there were issues that were raised in -- prior

2    to that period, in advance of closing that caused concern,

3    we would have two options.  We would either -- and we would

4    do this in consultation with the UCC, to be clear.  This

5    would not be just a Moelis decision.

6         We would confer with our board of directors.  We would

7    confer with various professionals.  We would confer with the

8    UCC and advisors.  And to the extent that parties felt that

9    it was worth, for example, delaying a close by a week to

10   understand whether or not it made sense to run down and get

11   assurances relating to any new issues that arose during that

12   period, we would evaluate that relative to the self-

13   liquidating transaction and whether it would make sense to

14   pivot towards a toggle in that instance.

15   Q    In the case that the Debtor had to pivot to the toggle,

16   what would be the consequences for customers and creditors?

17   A    So the consequences in that instance, as I think we

18   outlined in the declaration, are that there would be an

19   estimated reduction of value of approximately $100 million.

20   Additionally, in that instance, it would likely result in a

21   delay relating to the implementation of such a plan.  So

22   operationally, there's just some additional work that would

23   ultimately need to be done before the platform would be in a

24   position to be able to reopen and make sure that we had all

25   of that work in place.

1       Additionally, the other consequence would really be

2   around the ability for certain creditors to receive in-kind

3   distributions relating to the 35 tokens that are

4   unsupported, and so there may be, for example, adverse tax

5   consequences associated with those 35 coins which would need

6   to be returned in cash as opposed to on an in-kind basis.

7   Q    Turning back to your declaration, in Paragraph 42, you

8   state that you're not in a position to vouch for the bona

9   fides of Binance.US.  What did you mean by that?

10  A    So what I mean by that is that we have received

11  assurances from Binance.US.  We've received sworn testimony

12  from them.  But you know, as an organization, for example,

13  we're don't do forensic audits from a detailed books and

14  records perspective, right.  To the extent -- and I think

15  what we were getting at is to the extent that they were

16  perpetuating a fraud, I don't think we would be in a

17  position to be able to say such.

18  Q    At the end of that paragraph, you state, "And if events

19  since May 2022 have taught us anything, it is that the

20  benefits of having a decentralized and largely unregulated

21  cryptocurrency business are counterbalanced by the

22  challenges in identifying and preventing fraud."  What did

23  you mean by that?

24  A    So what I meant by that is specifically as it relates

25  to items like what happened with FTX.  So from a

Page 73

1    decentralized perspective with regards to cryptocurrencies,

2    one of the benefits is the ability to track and validate

3    transactions as they occur on the blockchain.  It's -- the

4    primary use case for it is that you see exactly what is

5    occurring from a transfer perspective and it's public and

6    anybody can see that.

7        That said, you know, with the emergency of additional

8    exchanges and the way that, for example, omnibus wallets

9    work and inherently have to work in a lot of ways on these

10   exchanges, you know, it's difficult to see what activity is

11   occurring within the exchange itself and, you know, I would

12   also say the industry itself is evolving in real time in a

13   lot of ways.  So, you know, for example there aren't really

14   clear industry standards relating to what appropriate due

15   diligence is for these types of businesses.

16       Federal regulators haven't put forward views and we do

17   understand that they are coming out in real time and we do

18   follow this, but you know, there is not a set of legal

19   standards, for example, that firms need to operate in that

20   operate in the space around, for example, like federal

21   banking, safety, and soundness standards.  It's not a

22   concept that, you know, we would be able to rely on.  So

23   that presents unique challenges when diligencing any

24   business in the cryptocurrency ecosystem, whether that's

25   Binance.US or any other party, just given the lack of

1    standards and how new the ecosystem itself generally is.

2    Q    Why should the Court confirm the plan before the

3    Debtors finish ongoing due diligence?

4    A    So the plan allows for an option for the Debtor to be

5    able to pivot to a toggle transaction to the extent that

6    that's in the best interest.  The Debtors would take that

7    very seriously, as I think I said at the beginning.  You

8    know, at this point, I wouldn't say, you know, we are fully

9    in a position to say that we would move forward with

10   Binance.US.

11        We're still continuing to perform due diligence.  We

12   take the allegations in public information that's out there

13   very seriously and this is not a decision that we would take

14   lightly.  We would continue to perform work and up until the

15   point where we push a button to try and close, we would

16   continue to perform work in the best of our abilities around

17   those dynamics.

18   Q    Are there any external constraints that are causing the

19   Debtor to need to confirm the plan now as opposed to waiting

20   to see if everything works out in due diligence?

21   A    So as it stands now, we have a plan that has

22   overwhelming support from creditors who are looking to get

23   their cryptocurrency back as expeditiously as possible.  You

24   know, I understand and I'm not a lawyer.  My understanding

25   is that to the extent that we were to, for example, delay a

Page 75

1    plan confirmation, irrespective of whether it's a toggle

2    plan or not, it would further delay the ability of these

3    customers to be able to receive their funds.  It would have

4    incremental costs associated with it.

5         And in our minds, you know, this provides for that

6    optionality and the decision would be made, and again, not

7    just by Moelis, but by the -- a range of parties ultimately,

8    in their judgment around the ability to feel comfortable

9    moving forward under those facts and circumstances.  So we

10   have a plan that we believe is confirmable today.  It has

11   overwhelming support of creditors.

12        It allows for a backup option and that's a critical

13   component.  That was something that we attempted to

14   negotiate for in FTX and were ultimately blocked.  It was a

15   very contentious negotiation.  So we believe, you know,

16   those safeguards are critical to this plan and the ability

17   to move it forward as is.

18   Q    I don't think that answered my question.  Are there any

19   external factors that necessitate the Debtor confirming the

20   plan on the current timeline?

21            MR. SLADE:  Your Honor, I object.  He just

22   answered it, to the extent he didn't it's because the

23   question is vague.

24            THE COURT:  I'll allow the question.  Go ahead.

25   BY MR. UPTEGROVE:

1    A    So do you mind repeating that again?  I apologize,

2    because I may not follow it.

3              THE COURT:  He's asking --

4    BY MR. UPTEGROVE:

5    Q    Sure.  Are there --

6              THE COURT:  -- is there anything forcing the

7    confirmation to happen on the current timeline?  Are there

8    any external factors; why do it now?  That's what he's

9    asking.

10   BY MR. UPTEGROVE:

11   A    I think that's a legal question.  I'm not sure I'd be

12   in a position to answer it.  I'm not an expert on how plan

13   confirmation worked in timing of such.  You know, we have a

14   plan today that we believe is, in my mind, has overwhelming

15   support and we would seek to, you know, get it approved to

16   allow for these options.

17   Q    There's no issue of the Debtor running out of money in

18   the next three or four weeks?

19   A    Given the rebalancing transactions that have occurred

20   to date, I don't believe that there would be any monetary

21   constraints.  You know, that -- it does result in a real

22   cost, though, to creditors from a potential recovery

23   perspective to the extent there are delays.  It was a very

24   important point from our perspective to be able to try and

25   move a case forward, to be able to move and allow for

1   distributions of funds back to creditors as quickly as

2   possible.  It's been a very key consideration from our

3   perspective, from the onset of the bankruptcy proceedings.

4   Q    What would cost be -- delay it?

5   A    So I don't know the exact answer.  I think it would

6   depend on the facts and circumstances of how long the delay

7   is.  I'm generally aware of what the cost is from the estate

8   perspective, kind of approximately $10 million dollars a

9   month, but I can't speak to the exact specifics based on the

10  nature of the questions.  And I think it would also depend

11  on, you know, if the concern is, how long would it take to

12  ultimately feel comfortable with Binance before moving

13  forward, I think it depends on what happens at that future

14  point in time.  Like, it's in part asking about a future

15  unknown, depending on what information is learned or what

16  happens over that time period.

17  Q    But you haven't done any analysis to determine the

18  exact cost of two-week delay, a three-week delay, a four-

19  week delay?

20  A    I think a multi-week delay, as I mentioned, it's, you

21  know, from an estate perspective, it's approximately $10

22  million a month.  I can't speak to, you know, specifics

23  based on that analysis.  I'd have to -- I'd have to run the

24  numbers, to be candid.  I don't know.

25  Q    That's the question.  You didn't run the numbers.

1   A    I -- so we've run analysis relating to this specific

2   plan.  You're asking about a hypothetical scenario that I'm

3   not in a position to be able to answer right now.

4   Q    Are you aware of any covenants that would be breached

5   or be noncompliant with if the Debtor didn't close on the

6   current timeline?

7   A    So I would need to review the specifics in the APA.  I

8   do know that there are outside dates, for example.  I know

9   that there are, you know, requirements from the Debtors'

10  perspective to be able to try to and move expeditiously.  I

11  don't recall the exact dates, though, based on the specifics

12  of the APA.

13          THE COURT:  Can I just ask, counsel must know

14  this.  There is a requirement that the Debtors move as

15  expeditiously as they reasonably can to get confirmation,

16  isn't there?

17          MR. SLADE:  Yes, there's a milestone specifically

18  of March 6th for entry of the confirmation order.  That's

19  Monday.  That's Section --

20          MR. UPTEGROVE:  What happens if --

21          MR. SLADE:  That's Section 8.1(i)(iv) of Exhibit

22  9.

23          THE COURT:  That's a requirement that in Binance -

24  - does the deal end automatically or Binance has the right

25  to terminate if that's not --

```
 1              MS. OKIKE:  Right to terminate.

 2              MR. SLADE:  That's it.  correct.  Right to --

 3              MS. OKIKE:  Right to terminate.

 4              THE COURT:  Binance has the right to terminate if

 5     that isn't done?

 6              MS. OKIKE:  And I believe it triggers their

 7     expense reimbursement.  Yes --

 8              MR. UPTEGROVE:  May I proceed, Your Honor?

 9              MS. OKIKE:  It does trigger their expense --

10              THE COURT:  Go ahead.  Continue with your

11     questions, please.

12              MR. UPTEGROVE:  Thank you, Your Honor.

13     BY MR. UPTEGROVE:

14     Q    Mr. Tichenor, I'm going to move on to a new subject

15     which is user withdrawals and customer access.  Under the

16     plan and APA, when will users to be able to access their

17     assets? My understanding is that users will be able to

18     access their assets?

19     A    My understanding is that users would be able to access

20     their assets upon signing up and going through KYC

21     procedures to become a customer of Binance.US.  Upon closing

22     and in subsequent one-week intervals, crypto would transfer

23     as users migrate and sign up.  Upon crypto having been

24     transferred, I believe the APA requires that it be deposited

25     into customers' accounts within a five-day period and as, I
```

1   think, previously discussed in the hearings, the APA does

2   provide for the crypto to be treated in a trust and custody

3   relationship upon its transfer to Binance.US in -- during

4   each of those interval periods.

5   Q    You mentioned the KYC requirements.  Are there any

6   other steps that users need to take to access their assets

7   on Binance platform?

8   A    I don't know.

9   Q    Is there anywhere users can go to read about what they

10  need to do to access their assets?

11  A    I believe it's outlined in the customer migration

12  protocol and I know that there have been communications that

13  the Debtor has sent to creditors, but I can't speak to the

14  specifics of those.

15  Q    Do you know if there's a place right now, if creditors

16  on the line, that you could tell them where they need to go

17  to find that information?

18  A    I don't recall.

19  Q    Under Section 6.12 of the APA, if users do not satisfy

20  certain requirements within three months, then Binance.US

21  can convert those users acquired coins into U.S. dollars at

22  the then then prevailing rate; is that right?

23  A    I don't have the APA in front of me, but what you're

24  describing is -- sounds consistent with my understanding of

25  how that works.

1    Q    Would somebody would be able to give you a copy, just

2    because I have a couple questions about that.  It might be

3    helpful to have it in front of you as we talk.

4              MR. SLADE:  You want the amendments of the

5    original APA?

6              MR. UPTEGROVE:  The original.

7              THE COURT:  You can give him that, but we're going

8    to take a ten-minute recess at the moment, and then you can

9    continue your questions after our ten minutes.

10             (Recess)

11             THE COURT:  Please be seated.  Okay.  Does the SEC

12   wish to continue with its cross examination?

13             MR. UPTEGROVE:  Yes, Your Honor.  Thank you.

14   BY MR. UPTEGROVE:

15   Q    Mr. Tichenor, I believe we left off speaking about the

16   APA, in particular Section 6.12 of the APA which I think

17   provides if users do not satisfy certain requirements within

18   three months, then Binance.US can convert the user's

19   acquired coins into U.S. dollars at the then prevailing

20   rate.  Is that correct?

21   A    That's correct.

22   Q    What happens to the value of the users accounts if the

23   price of the crypto assets in those accounts declines during

24   the three-month period?

25   A    So the way that the plan works is that the distribution

1    is effectively made at the time of closing, which relates to

2    the amount of crypto that a customer would get under their

3    pro rata share relative to the rebalancing ratio and the

4    size of the initial distribution versus their claims on a

5    prepetition basis.  So in this instance, we would view the

6    distribution as effectively having occurred at the time of

7    closing of a transaction, regardless of whether that

8    customer is ultimately migrated to the Binance.US platform.

9    And so whether the period is after the three-month period or

10   even any period post the rebalancing date, those users are

11   exposed to potential fluctuations in the price of

12   cryptocurrencies to the extent that they wish to monetize

13   them.

14   Q    How will creditors learn about the closing when it

15   happens?

16   A    So I believe under the customer migration protocol

17   that's addressed.  We actually have some outstanding

18   questions around that relating to whether or not there would

19   be, for example, like an automatic email that would be sent

20   to customers through the Binance.US platform once the crypto

21   has been deposited into the account.  It's currently an

22   outstanding question.

23   Q    If Binance.US were to send a notice out, would that

24   also apply to creditors or users who haven't yet registered

25   on the Binance.US platform?

1    A    I don't know.

2    Q    If there's something else that, material event happened

3    during the course of post-closing or you know, through

4    closing, before closing, if there's a material event that

5    happened, is there a way to communicate that to creditors?

6    A    I don't know.

7    Q    The Committee on Foreign Investments in the United

8    States, AKA CFIUS, is conducting a review of the Binance

9    transaction.  Is that right?

10    A    That's my understanding.

11    Q    And the review remains ongoing?

12    A    That's my understanding.

13    Q    Does the Debtor know what the outcome of that review

14    will be?

15    A    I personally do not know.

16    Q    What if CFIUS denies approval of the Binance

17    transaction?  What would happen?

18          MR. SLADE:  Your Honor, I object.  That calls for

19    a legal conclusion.

20          THE COURT:  Well, do you know the answer to the

21    question?

22    BY MR. UPTEGROVE:

23    A    To the -- I guess the question would be, to the extent

24    that CFIUS blocks the transaction prior to closing?  Is that

25    correct?

1   Q    Yes.

2   A    so --

3   Q    Yes.

4   A    My understanding is that to the extent that CFIUS

5   blocks a transaction prior to closing, we would be unable to

6   close with Binance.US and in that instance, presumably, we

7   would pivot to a self-liquidating toggle scenario at that

8   point.

9   Q    What happens if it denies the approval after closing?

10  A    I don't know the answer to that.  That's a legal

11  question.

12  Q    You haven't been party to conversations in which that's

13  been discussed?

14  A    CFIUS is a very technical legal element.  I'm not a

15  CFIUS expert.

16  Q    So then you wouldn't know the impact on creditors if

17  CFIUS was to deny approval of the transaction after closing?

18  A    I do not.

19  Q    Are you familiar with the term user asset migration

20  date as it's used in the APA?

21  A    I may need to refamiliarize myself.  Do you mind?

22  Q    Sure.  I think -- it is on Page 85 of the document.

23  It's four U's and it refers back to user migration

24  preparation on a previous page.  You see that?

25  A    I see that.

1    Q    Can you explain what the user asset migration date does

2    in connection with the APA?

3              THE COURT:  What does this have to do with any

4    objection that's been filed?  I mean, you're asking him an

5    awful lot of questions and taking up a lot of our time to

6    get information that if you'd read the documents on file,

7    you'd already know the answers to.  So what is the point of

8    this?

9              MR. UPTEGROVE:  The point is, I think it's

10   Paragraph 7 of our objection, is what economic benefit this

11   has, the transaction has to creditors and this issue goes to

12   whether or not there's an economic benefit for the creditors

13   at the timing of the transaction when people will be -- the

14   assets will be available, when they won't be available,

15   whether people will be paid, how they will be paid.

16             THE COURT:  But we've already had testimony and

17   we've already had descriptions in the disclosure statement

18   that we'll have a closing.  There'll be a migration.  When

19   people are ready on the Binance platform, they get

20   distributions.  If they're not ready within three months,

21   they get cash.  What else do you need?  What do you want him

22   to try to pinpoint it to nanosecond?

23             MR. UPTEGROVE:  I'm not at all clear that's the

24   case, Your Honor.  If you -- so the question is, all I

25   really wanted to know from him is what -- I don't understand

```
 1    it, Your Honor, but the user asset migration date, I've
 2    heard a lot of people talk about the five days.  I don't
 3    understand how this -- I have read it, Your Honor, and I
 4    haven't understood how this user asset migration date
 5    corresponds to the five day and the rollout, the weekly
 6    rollout.
 7              And so all I wanted to get from this witness is
 8    how if at all does this asset migration date impact the
 9    user's ability to withdraw and what's already been on --
10    people have testified about.
11              MR. SLADE:  Your Honor, perhaps I could --
12              MR. UPTEGROVE:  That's all I want to do.
13              MR. SLADE:  We would've been happy to field
14    questions about this from the SEC had they asked us before
15    this hearing.  If they look at the amendment, that
16    definition, user asset migration date actually has been
17    deleted and it's been replaced by a separate definition
18    called asset migration date which describes it in some
19    detail.  So if you look at the exhibits that are online that
20    we uploaded, you'll be able to answer that question.  I'm
21    not sure if the witness can.
22              MR. UPTEGROVE:  That's helpful.  Thank you.  So we
23    can move on.
24    BY MR. UPTEGROVE:
25    Q    Mr. Tichenor, are you familiar with the terms of use
```

1    for the Binance.US trading platform?

2    A    The terms of use?  Excuse me, I just couldn't hear you.

3    Q    Yes.  Yes, the terms of use for the Binance.US trading

4    platform.

5    A    I'm broadly familiar with it.  We -- I have read it.

6    That's an item, too, where you know, we're discussed that in

7    connection with counsel which is better situated to be able

8    to opine on any legal matters associated with terms of use

9    than I would be.  But yes, I have read it.

10   Q    Are you aware that pursuant to the trading portion of

11   the terms of use, Binance.US in its sole and absolute

12   discretion may halt trading or restrict access to the

13   trading platform?

14   A    I don't recall that specific provision.

15   Q    So you wouldn't recall, you don't know if there's

16   anything in the APA that would limit that discretion.

17   A    I don't recall.  I know in the APA we have protections,

18   for example, around to the extent that there is a halting of

19   trading on the Binance.US platform, that it allows the

20   Debtor to, for example, not send funds or provides the

21   liquidating trust, I believe, the option to not use them for

22   purposes of distributions.  And broadly speaking, and again,

23   I don't recall the exact specific sections.

24        I recall that there was discussion around, for example,

25   you know, halting of trading and concerns that would have.

1    I think obviously to the extent that there was a halting of

2    trading, that would be a material event from the debtor's

3    perspective in determining whether or not it would send

4    funds to Binance.US.

5    Q    I guess the question was, since you're -- you don't

6    recall that specific provision in the terms of use, you're

7    not aware of any specific provision that would limit the

8    discretion or halting trading or access to the platform?

9    A    I'm not.

10   Q    Different subject --

11   A    I would say that, look, that is something that we

12   track.  If we were aware that there was halting of trading

13   on the platform, as I said, that would be a very material

14   concern from Debtors' perspective with their willingness to

15   move forward with this counterparty.

16   Q    Are you going to track it after the deal closes?

17   A    I -- prior to each subsequent distribution, I believe

18   that there will be parties that will be looking at that,

19   yes.  I mean, it -- and by the way, that's not just Moelis.

20   That would be the liquidating trustee who would be executing

21   transfers, management team.  There's, you know, each bulk

22   transfer that occurs is not a simple process.  It's manual

23   in a lot of ways.  And so, you know, there's an expectation

24   of in-depth material coordination between the Debtor and

25   Binance.US post any closing in order to, again, continue to

1       migrate on the weekly basis.

2            And so to the extent that parties were aware, for

3       example, of a halting of trading prior to any of those

4       subsequent migrations, I would be -- I would highly, highly

5       doubt that parties would move forward with continuing to

6       transfer subsequent funds in that instance, for example.

7       But look, it's a fact and circumstance specific, too, so.

8       Q    Just to be clear, so if after the closing, there's a,

9       you know, shortly after the closing, there's a run on the

10      bank so to speak, and Binance in its discretion halts

11      trading, what if anything could the Debtors do?

12      A    Well, I think at that point -- and I think there are a

13      couple of points in there, to be clear.

14           One, one of the important elements, you know, from the

15      Debtors' perspective when performing the diligence was

16      assurances, for example, around the fact that they have one-

17      to-one reserves.  And so one of the things that we had

18      thought about was, you know, the ability to, for example,

19      support a run on the bank.  Theoretically can't have a run

20      on the bank for a business that's only has one-for-one, you

21      know, kind of -- I'll call it, acts as like a cashbox to a

22      degree, right, in custody capacity like that.  So that was

23      an important element.

24           Two, you know, there could be reasons that are

25      explainable that I can't think of right now relating to why

Page 90

1     there could be theoretically a justification for halting of

2     training that would still justify people feeling comfortable

3     moving forward.  You know, if there was a technical glitch

4     with a cloud provider that resulted in an issue that was

5     only temporary for a very short period of time.  Like there

6     are countless hypotheticals I that can't necessarily speak

7     to, but to the extent there was a halting of trading, it

8     would be a very important element for purposes of the Debtor

9     at that point.

10         And I think that would they continue to transfer funds

11     over?  In all likelihood no, if there was a real concern

12     around what the basis for that was, and that's a pretty low

13     threshold for what that concern level would ultimately be to

14     the extent you're talking about something as severe as a

15     halting of trading on a platform.

16    Q    Switching gears a little bit, if Binance.US was

17     determined to operate as an unregistered securities

18     exchange, what impact would that have on the Voyager

19     customers who moved over from the Binance -- or excuse me,

20     yeah, the Voyager customers who moved over from to the

21     Binance platform?

22              MR. SLADE:  Your Honor, I object.  That calls for

23     a legal conclusion.

24              THE COURT:  Do you have any ability to answer that

25     question?

Page 91

```
 1                 THE WITNESS:  I do not.

 2                 THE COURT:  Okay.

 3      BY MR. UPTEGROVE:

 4      Q     Mr. Tichenor, can you go to paragraph -- or Section 4.7

 5      of the APA, please?

 6      A     Is this -- this is the nonamended version?  No

 7      litigation?

 8      Q     Yeah.  Is there an amended portion of this?

 9      A     No, I'm just making sure I'm referencing the right

10      exhibit.

11      Q     Do you see that provision?

12      A     The knowledge qualifier?

13      Q     Well, just to make sure we're looking at the same

14      thing, on my 4.7 it says, "No litigation.  There are no

15      actions pending or to the knowledge of purchaser threatened

16      against or affecting purchaser that will materially and

17      adversely affect purchaser's performance under this

18      agreement or purchaser's ability to consummate the

19      transaction."  Are we looking at the same thing?

20      A     I see that paragraph, yes.

21      Q     During the course of due diligence, has Binance

22      disclosed to the Debtors or have the Debtors learned of any

23      material or any actions pending against Binance.US?

24      A     To the extent the question relates to -- excuse me.  To

25      the extent the question relates to whether or not the Debtor
```

1    asked whether or not, for example, there are pending

2    litigations or investigations relating to Binance.US, the

3    answer to that is yes.  We did ask.  We had a number of

4    conversations relating to various pending investigations for

5    the -- relating to the purchaser.  If that's the extent of

6    the question.

7    Q    What did they disclose?

8         MR. SLADE:  Your Honor, I object.  This is not

9    relevant and it seems like --

10        THE COURT:  Overruled.

11   BY MR. UPTEGROVE:

12   A    So they disclosed that there were investigations

13   ongoing from several various federal agencies.  They

14   disclosed to us that they had provided, for example, written

15   documentation to those the parties relating to requests and

16   inquiries made in connection with those investigations.  We

17   were not aware of any actions that were ongoing relating to

18   Binance.US, but I can't speak for anything beyond that.  I'm

19   not aware of any, you know, pending for example, lawsuits

20   against Binance.US by a federal agency./

21   Q    With respect to the government investigations, what did

22   they disclose?

23   A    That was subject to confidentiality.  I'm not sure I

24   can discuss that.  I mean they -- I think I tried to mention

25   what I could, which was that they provided us information

Page 93

1    relating to the nature of the injuries.  They provided us

2    disclosure.  And these were discussions that we had, that we

3    participated in with multiple sets of counsel including

4    Binance.US' counsel on various matters.  We're aware that

5    they had provided information to various agencies in

6    connection with those requests.  And that's what we're aware

7    of.

8    Q    So your understanding is that the identity of the

9    governmental agencies investigating Binance.US is covered by

10   a confidentiality agreement?

11   A    I'm aware of various federal agencies doing

12   investigations.  I -- speaking to every single one of them

13   right now, trying to recall them off the top of my head, I

14   have difficulty, but I'm aware of some major financial

15   agencies such as, you know, the SEC and other parties that I

16   think are public information around the nature

17   investigations, you know, and when we deal with financial

18   companies, generally speaking, it's not uncommon for us to

19   see situations where, you know, there are various inquiries

20   that various federal regulators and state regulators may

21   make in connection with parties that they regulate.

22   Q    You said that they disclosed that the SEC had an

23   investigation relating to Binance?

24   A    They did.

25   Q    What did they say?

Page 94

```
 1   A    That they had received requests relating to information

 2   on relationships, for example, with third parties and

 3   certain affiliates.

 4   Q    Anything else?

 5   A    I don't recall.  That conversation took place a while -

 6   - long enough ago that I just don't recall the exact

 7   specifics.  I'd have to reference my notes.

 8   Q    When did it happen?

 9   A    Probably in -- I would say it was -- I know it was

10   prior to the signing of the APA and I think we've had some

11   continued ongoing discussions with them relating to these

12   members.  It's not a static element, but I just don't recall

13   the exact dates.

14   Q    So you knew prior to entering into the APA that there

15   was investigation by the SEC of Binance?

16   A    We were aware that they had requested information and

17   that they -- that there was an investigation, yes.

18   Q    Have they updated you on the status of the

19   investigation?

20   A    I don't believe probably within the last couple weeks,

21   but I just don't recall, candidly.

22   Q    The Debtor, do the Debtors view that, those

23   governmental investigations as important matters?

24   A    We did.

25   Q    Did the Debtor understand the nature of the
```

1    governmental investigation?

2    A    We understood the nature of what the requests related

3    to.  We asked questions relating to -- and follow-up

4    questions relating to the nature of what the inquiries were,

5    what information was provided, what the status of those

6    pending discussions were, whether or not there were follow-

7    up requests, for example, compliance.  So we asked a number

8    of questions relating to any -- relating to those

9    investigations and proceedings, yes.

10   Q    Did Binance.US share any documentation with the Debtors

11   concerning those governmental investigations?

12   A    They may have with counsel.  It's highly unusual for

13   investment bankers to ever receive information relating to

14   communications between a regulator and a counterparty.

15   Worked on a number of financial institution related

16   situations and generally those reviews being privileged, so

17   it's highly atypical for us to see primary documents

18   relating to those investigations, as non-lawyers.

19   Q    How did those -- understood.  How did those

20   investigations relate to the Debtors' ongoing due diligence?

21   Is that anything that the Debtors are considering?

22   A    Yeah, we -- yes.  We would obviously consider any

23   changes relating to ongoing investigations that we became

24   aware of from a federal agency as material facts potentially

25   in assessing the counterparty and the risks associated with

1      moving forward with them.  As we evaluate -- to the extent

2      that we moved forward with the plan, we got approval for it,

3      and prior to closing we were evaluating the risk adjusted

4      elements of moving forward with a transaction with

5      Binance.US relative to the tradeoff and the costs associated

6      with self-liquidating toggle.  That would be one of the

7      potential considerations.  Absolutely.  If there was a

8      material change, for example, that would obviously be a

9      consideration.  It's very hard to say what that will look

10     like in three to four weeks.

11     Q    At any time since the entry into the APA has Binance.US

12     informed the Debtor that there's been some material change

13     in any of the government regulatory investigation?

14     A    Not to my knowledge, but counsel may have participated

15     in calls that I wasn't on.

16     Q    What if anything have the Debtors disclosed about any

17     of the investigations that it has learned during the course

18     of due diligence?

19     A    Do you mind repeating the question?

20     Q    Yes.  What if anything have the Debtors disclosed about

21     the government investigations that it has learned about

22     during the diligence?

23     A    I don't recall what the disclosure in the plan

24     disclosure statement is relating to any of that.

25     Q    Do you think that the status of government

1    investigations is a relevant consideration for creditors in

2    voting on the plan?

3            MR. SLADE:  Your Honor, I would object.  Lack of

4    foundation.

5            THE COURT:  He can answer.

6    BY MR. UPTEGROVE:

7    A    To the extent that I think it would depend on what the

8    nature of those investigations are and whether or not those

9    relate to, for example, normal course investigations or

10   they're criminal proceeding investigations, for example,

11   against the company, I think it's a bit of a question that

12   depends a lot on the nature of what the facts and

13   circumstances are.  I think it's hard to say in the absence

14   of -- it's a very broad question.

15   Q    Do you believe that the Debtors have disclosed all

16   material facts to creditors about ongoing investigations and

17   litigation?

18           MR. SLADE:  Yeah, Your Honor, I object.  That --

19   his opinion on that is not relevant and also the SEC did not

20   object on this basis.

21           THE COURT:  Well, it would be troubling if his

22   opinion was no, but, you know, he's obviously not being

23   asked as a lawyer or as an ultimate fact finder, but do you

24   think the Debtors have failed to comply with their

25   disclosure obligations?

1              THE WITNESS:  I hope that the Debtors have not

2       failed to comply with disclosure obligations, Your Honor.

3       We have spent countless hours working with counsel to make

4       sure that, you know, we're properly disclosing key

5       considerations related to the plan.  Again, it's a very long

6       document and so for me to reference a very specific element

7       of it in a very specific question, I just don't recall the

8       specifics of it, but yes, I mean, I believe that the Debtors

9       have sought to disclose important information in connection

10      with the plan.  And I don't think --

11              MR. UPTEGROVE:  That's all the questions I have.

12              THE WITNESS:  -- we would be here today looking

13      for approval on that basis, to the extent that we felt like

14      there were any deficiencies.

15              MR. UPTEGROVE:   Thank you, Mr. Tichenor.  That's

16      all I have.  Thank you.

17              THE COURT:  All right.  Is there anybody else on

18      the telephone who would like to cross examine --

19              MS. RYAN:  Yes.

20              THE COURT:  Okay.

21              MS. RYAN:  Good afternoon, Your Honor.  This is

22      Abigail Ryan with the State of Texas Attorney General's

23      Office on behalf of the State Securities Board and the Texas

24      Department of Banking.

25                  CROSS EXAMINATION OF BRIAN TICHENOR

1    BY MS. RYAN:

2    Q    Good afternoon, Mr. Tichenor.  And one thing, I've

3    heard your name said Tichenor and Tichenor.  What is the

4    correct pronunciation?

5    A    It's Tichenor.  Thank you.

6    Q    Okay.  That's important.

7    A    A lot of times, people say Tichenor which is not a --

8    Q    Thank you for letting me know.  Names are important.

9    So good afternoon, Mr. Tichenor.  I just have a few (audio

10   drops) and I want to clear up a couple of things.  In your

11   declaration that was filed, it stated that if you went to

12   the toggle plan, Binance would help in liquidating the

13   coins, but earlier you testified Voyager would liquidate it?

14   who would be liquidating it under the toggle plan?

15   A    Liquidation of the 35 unsupported coins?

16   Q    Just all the coins.  So if somebody else is doing the

17   35 and somebody else is doing the remainder who are those

18   companies?

19   A    Well, I don't believe that there would be any other

20   companies that would do the remainder.  I think -- are you

21   referring to, like, a seven situation where there would be

22   like --

23   Q    Oh, no.  I can be more clear.  Under the toggle plan

24   who liquidates the 35 coins?

25   A    Who what?

Page 100

1    Q    Who would liquidate 35 coins --

2    A    Yeah.

3    Q    -- that aren't supported?

4    A    Look, I think that is a -- it's an unknown at this

5    point.  As I was saying, I think the Debtor would seek to

6    maximize value for the estate in connection with any

7    transactions that would need to occur on those coins.  It

8    would be at the Debtors' discretion.

9              THE COURT:  There's a bit of confusion built into

10   the question when you ask who would liquidate.  Are you

11   asking who would decide how to sell and to whom or are you

12   asking to whom coins would be sold?  There's a difference.

13             MS. RYAN:  I'm asking who would do the selling.

14             THE COURT:  Okay.  So would voyager do the selling

15   or would it ask somebody else to do it?

16             THE WITNESS:  Yeah, so -- and I think this relates

17   more broadly to the rebalancing transactions.  We have

18   worked hand-in-hand with the UCC in connection with the

19   rebalancing transaction and have been in full agreement with

20   them to date around the nature of various third-party

21   proposals that we received, for example.  And I mention this

22   because it's broadly consistent with how a liquidation of

23   those 35 coins would ultimately work, is that it would be in

24   consultation with the UCC.  We would in all likelihood, is

25   the Debtor would seek to get third-party potential

1    proposals.  It may seek to liquidate them itself using its

2    existing smart order router or third party systems that it

3    has access to.  So I don't know the full answer yet.  I

4    think it would depend on the specific facts and

5    circumstances of the situation and what the collective

6    agreement was between both parties to move forward on that

7    basis.

8                THE COURT:  But there's no plan to say --

9                MS. RYAN:  Okay, so --

10                THE COURT:  There's no -- for example, you're not

11    planning in the event of the toggle plan to say, here

12    Binance, here's all our crypto, sell it for us?

13                THE WITNESS:  Absolutely not, Your Honor.  Yeah.

14                THE COURT:  Okay.  That's what I think the

15    implication of the question was.  got it.

16                MS. RYAN:  Thank you, Your Honor.  That was

17    exactly right.

18    BY MS. RYAN:

19    Q    So in Paragraph 37 of your declaration it says that the

20    asset purchase agreement provides that in the event Debtors

21    pivot to a liquidation transaction, Binance.US will provide

22    certain services to facilitate the liquidation transaction

23    to ensure the Debtors can rely on the Binance.US platform to

24    minimize leakage with cybersecurity risks when returning

25    cryptocurrency to creditors.  So in the toggle transaction,

1    what are these services that Binance.US would provide?

2    A    So I think what they have indicated is that they would

3    be helpful in supporting services and facilitating and

4    assisting in the transaction to the extent that it was

5    possible.  I think the specifics around what exact services

6    they would provide, we haven't fully fleshed out in

7    connection with them and I think that is, in our minds an

8    add-on, right.  It's not something that we necessarily have

9    to do.  It would be that they would offer services

10   potentially to the Debtor, but it doesn't mean that the

11   Debtor has to use those services.

12   Q    Under the toggle transaction, would all (audio drops)?

13   A    Sorry, I -- you were breaking up there.  I apologize.

14           THE COURT:  Somebody is bumping against a

15   microphone.  I don't know who it is, but anybody who's not

16   actually asking questions right now, please mute your line.

17   Please go ahead, Ms. Ryan.

18           MS. RYAN:  Thank you.  Can you hear me better now?

19           THE COURT:  Yes, we can.

20           MS. RYAN:  Thank you.

21   BY MS. RYAN:

22   Q    So it's my understanding under the toggle transaction,

23   all Bitcoin would be sold and reduced to U.S. dollars; is

24   that right?

25   A    Under the toggle transaction?  No.  I don't believe

1     that's the way the toggle transaction would work.

2     Q     Can you explain to me how it would work?

3     A     Yeah.  So the toggle transaction is in many ways

4     analogous to a transaction with Binance.US, but it has

5     certain key differences and considerations and I would

6     characterize those as being really relating to the fact that

7     there are 35 tokens, for example, that cannot be distributed

8     back to customers on an in-kind basis through the Voyager

9     platform given the technical limitations that I think we

10    discussed at the beginning of my testimony.  And I'd be

11    happy to discuss those further.

12         The other difference is that it would occur through the

13    Voyager platform and would only be made available for

14    withdraws over a limited period of time such that customers

15    would have an ability to access and transfer that crypto

16    from Voyager to a third party or a third-party digital

17    wallet or self-custody wallet, for example.  And then after

18    a certain period of time, the platform would liquidate

19    whatever had not been moved.

20         It would use the cash proceeds from those liquidations

21    to distribute funds and then would effectively, you know,

22    shut down for all intents and purposes.  But those are the

23    key differences.  And so when you think about a liquidation

24    transaction in this context, there is a big and materially

25    key difference between a self-liquidating toggle transaction

1    relative to what people may think of as a liquidation in the

2    context of a Chapter 7 liquidation which is, insofar as in

3    that instance, the majority of cryptocurrencies being the

4    non-35 tokens that are unsupported from being distributed in

5    kind would be distributed in kind.

6         So it's the same construct from a rebalancing

7    perspective except the difference is that for the 35 that we

8    can't distribute back, we need to distribute cash to those

9    creditors instead on an equivalent value basis under the

10   same construct.  But the concept is still the same with

11   regards to the way the rebalancing would work, so for

12   example, for example, BTC is not liquidated.  ETH is not

13   liquidated.  SHIB is not liquidated.  Anything that is a

14   supported token would not be liquidated.  It would be

15   rebalanced under the construct of the plan in a similar

16   manner to Binance, the Binance.US deal.

17   Q    That was really helpful.  Thank you for that

18   explanation.  So it sounds like under the toggle

19   transaction, unsupported jurisdiction customers could

20   actually move theirs off and into a third-party wallet; is

21   that right?

22   A    That would be correct, yes.  I believe -- to the extent

23   --

24   Q    Okay.

25   A    -- they're allowed to (indiscernible) for Voyager as a

1    platform, yes.

2    Q    Right.  That -- fair enough.  So under -- making the

3    decision as to whether you go with Binance or do the toggle

4    transaction, is that a unilateral decision on behalf of the

5    Debtor?

6    A    So I believe it would be a decision that ultimately

7    would be made by the board of directors of the Debtor, but

8    it would be in consultation and discussion with, for

9    example, the UCC and, you know, presumably the advisors

10   would be providing a recommendation for example, to the

11   board.  But it would ultimately, I believe, be a decision of

12   the board of the Debtor.

13   Q    Okay, thank you.  Moving to the audited financials from

14   2021, were you able to get any audited financials from 2020?

15   A    I believe their audit covered two years, but I just

16   don't recall.  I apologize.

17   Q    That's okay.  Do you remember who the auditing firm was

18   that did their financials?

19   A    I do.

20   Q    Who are they?

21   A    I believe we're subject to confidentiality, but it's a

22   large known audit firm in the techs ecosystem.  I mean, I

23   can answer it to the extent --

24   Q    Okay.  Do you know -- I'm sorry, I didn't catch that

25   last part.

1    A    I was saying, I could answer that to the extent the

2    judge wanted me to, but we were subject to confidentiality.

3    Q    Okay.

4    A    I don't know if Binance is okay with that.

5    Q    I understand.  Do you know if Binance currently has an

6    accounting auditing firm?

7    A    Yes, they made a representation to us that they have a

8    new auditor and we understood that their relationship with

9    their prior auditor, that they had been in the process of

10   transitioning to a new auditor in advance of the collapse of

11   FTX.  So the change in auditor was not something that was

12   specifically triggered, for example, by that -- as we

13   understand it, was not triggered by that audit firm, for

14   example, seeking to terminate them.  It was a mutually

15   agreed decision where Binance.US was seeking to transition

16   to a new auditor.

17   Q    Okay, thank you.  When reviewing their audit, their

18   books, their records, did you review whether Binance has

19   made loans to any other cryptocurrency companies?

20   A    So one of the key considerations that we looked at, and

21   again, the audited financials that we reviewed related to

22   Binance.US.  I want to be clear on that.  One of the items

23   that we reviewed was an overview of the assets as outlined

24   in the audit relating to -- which, you know, is where loans

25   to third parties would ultimately show up, we were not aware

1    of any loans based on that audit review that had been made

2    to third parties.

3        That was an important element from our perspective in

4    understanding, you know, the dynamic around whether or not

5    they had an ability to, for example, you know, rehypothecate

6    crypto for, you know, for example.

7            THE COURT:  You just said third parties.   What

8    about affiliates?

9    BY MS. RYAN:

10   Q    Did you see if loans made to -- I'm sorry.

11           THE WITNESS:  To affiliates?  That would include

12   affiliates as well, Your Honor.

13           THE COURT:  I'm sorry, Ms. Ryan.  I kind of spoke

14   over you because I wanted to ask a question before I forgot

15   as time went on.  He had said third parties and I asked if

16   that included affiliates.  And he said, yes.

17           THE WITNESS:  I would say more broadly, Your

18   Honor, it included all loans that would be made to -- it was

19   a big concern of ours in light of, obviously, what's

20   happened in ecosystem.

21           THE COURT:  Thanks.  Thanks for the clarification.

22   I'm sorry --

23           MS. RYAN:  That was going to be my next question,

24   Your Honor, so thank you.

25           THE COURT:  Okay.

```
 1    BY MS. RYAN:

 2    Q    So I know that the gentleman with SEC was asking about

 3    reviewing Binance legal matters and things and I understand

 4    that's not your wheelhouse.  Who does review them to decide

 5    whether a legal matter is material?

 6    A    You know, we have active discussions with the counsel,

 7    with our counsel K&E -- or the Debtors' counsel, excuse me,

 8    which is Kirkland.  I know that they're in active dialog

 9    with the UCC's counsel, which is McDermott, for example.

10    There's active dialog with the company which also has

11    independent counsel and it would also include, I think,

12    discussions with Binance's U.S. counsel, so I mean, there's

13    a lot of professionals.  Our lawyers that have been engaged

14    by various parties in the situation and I'd say to date

15    people have worked in a very collaborative manner.

16    Q    Thank you.  How did you verify that -- and I'm going to

17    get this wrong.  I am not an expert in crypto by any

18    stretch, but how did you verify the one-to-one ability of

19    Binance, to (indiscernible) the coins?

20    A    That's a great question.  So we did look at, for

21    example, wallet -- a list of wallets that was provided to us

22    from the company and looked at, you know, balances in those

23    wallets.  We then compared them to our understanding of what

24    had been disclosed in the financial statements.  To say that

25    we did a thorough, you know, for example, like a proof of
```

1    reserves on Binance.US' reserve ratio, though, you know,

2    that is well beyond the scope of what a firm like Moelis

3    performs.

4         There are generally third party auditors, for example,

5    that perform those types of scopes of service.  One thing

6    that we did look at, though, and was an important

7    consideration is that that dynamic is discussed and

8    disclosed in their audited financials and treatment of

9    customer crypto in the audited financials, the structure is

10   such that it was determined to be a custody relationship,

11   that there was no, you know, rehypothecation, for example,

12   and those elements.

13        And then on top of that, excuse me, we did receive

14   obviously sworn statements from Binance, and this wasn't an

15   area where it is -- it was a key consideration for us, so as

16   part of diligence, for example, we would ask for information

17   on a primary, a document basis.  We would ask questions in

18   different ways in order to make sure that we understood and

19   didn't have inconsistencies with what information was

20   provided to us.  But I would say, you know, look, we did not

21   do a, for example, like a proof of reserves to the extent

22   that's the nature of the question.

23   Q    No, that's a perfect answer.  Thank you.  Did -- in

24   reviewing the financial documents, were you able to tell

25   what Binance entity actually keeps custody of U.S.

Page 110

```
 1    customers' electronic wallets?

 2    A     My recollection -- I don't recall.

 3    Q     Are you aware that in 2019 it was a Binance Cayman

 4    Island company that purportedly held the electronic wallets

 5    for U.S. customers?

 6    A     I'm not aware of that, no.

 7    Q     Do you know if Binance.US has the technical

 8    infrastructure to run its business without dependence on

 9    Binance.com?

10    A      It has been represented to us that they would.  Our

11    understanding of the way that they operate is that there are

12    certain commercial services and licensing ingredients, for

13    example, relating to technology that they license from

14    Binance.com, but you know, similar to -- and again, this is

15    my understanding, right?

16          Similar to, for example, if I were to receive a copy of

17    Windows, I may not need to be able to rely on Microsoft as a

18    firm continuing to operate.  So my understanding is that the

19    services that are provided by Binance.com are limited to

20    functions that would allow Binance.US to continue to operate

21    to the extent that Binance.com no longer existed.  That was

22    something that we specifically asked about during our

23    diligence.

24    Q     Okay.  So for instance, if Binance.com technical

25    infrastructure were to crash, Binance.US would not be
```

1    affected?

2    A    So that is a representation that has been made to us.

3    It was a question that we asked.  It was an important

4    element.  I can't specifically represent whether or not

5    there's some piece of code that results in a callback

6    function to a server that's -- there's a lot of elements

7    that could cause that to be the case.  What has been

8    represented to us is that it's not, and that's as much as I

9    can say.

10   Q    Okay.  When you say it's been represented to you, in

11   what manner was it represented?  Was it orally, in writing?

12   A    Both.  We've had multiple calls.  We've had in-person

13   meetings.  We've had physical document reviews.  Received

14   sworn statements around items like this.

15            MS. RYAN:  Thank (indiscernible) finished.  I pass

16   the witness.  Have a good afternoon.

17            THE WITNESS:  Thank you.  You, too.

18            THE COURT:  Thank you, Ms. Ryan.  Is there anybody

19   else on the phone who would like to cross examine the

20   witness?

21            MR. NEWSOM:  Yes, Your Honor.  Dan Newsom, pro se

22   creditor.  Just a few questions.

23            THE COURT:  Okay.

24               CROSS EXAMINATION OF BRIAN TICHENOR

25   BY MR. NEWSOM:

1    Q    Mr. Tichenor, good afternoon.  You stated that a toggle

2    would diminish the value or the return of value on VGX.  You

3    also stated that Binance doesn't intend to create value for

4    VGX.  Can you explain why there's a difference in the value

5    of VGX in a toggle versus a sale?

6    A    Yeah.  So the difference was relating to the fact that

7    Binance.US was agreeing to seek to try to list the token on

8    their platform.  Our view, and again in discussion with

9    various people at the company around VGX and other, you know

10   -- who are more familiar with specifics around, for example,

11   specific cryptocurrency assets, the view was that the

12   ability to create value and utility, for example, relating

13   to a sale of the smart contracts in that instance, was

14   likely greater to the extent that the token was listed.

15        There was a perception of support for it on a go-

16   forward basis, but it was an estimate and you know, what we

17   would say is that ultimately, I don't think that would

18   change the conclusion, which is an important element.  We

19   would still view under those facts and circumstances if that

20   element was normalized between those two, that the Binance

21   plan still provides for potentially higher recovery value.

22        But you know, it was an important element for us to

23   also include relative to this, you know, self-liquidation.

24   But I wouldn't say it was a determining factor, if that's

25   part of the question.

1  Q    Thank you.   Would a toggle transaction not also

2  contemplates the sale of VGX smart contracts?

3  A    It likely would, yes.

4  Q    So in your opinion, in either case, the value or

5  utility of VGX is ultimately dependent on the sale of the

6  smart contract?

7  A    In part.  I think the likelihood of finding a, for

8  example, high quality party that is seeking to get, you

9  know, the -- and has an interest in the smart contract

10  utility on a go-forward basis, one of the factors that we

11  understand based on discussions with, you know, the parties

12  that we've engaged with is the forums that that smart

13  contract is listed on, a lot of the value from their

14  perspective in a number of ways, if somebody was to take

15  over that smart contract and seek to turn it into more of

16  utility on a go-forward basis, is in part reliant on the

17  fact that VGX is a known commodity for all intents and

18  purposes.

19      It's out there.  It's listed on a number of exchanges.

20  It trades.  People know it from the case.  And so that has

21  value for people.  And so part of the view I think was that

22  to the extent that a party like Binance.US listed it, one,

23  it shows support from this plan and two, the likelihood of

24  attracting that type of party is arguably better in that

25  circumstance.  But again, I do want to be clear that the

Page 114

```
 1   calculation around VGX was not the determining factor in the
 2   comparison.
 3   Q    Sure.  Understood.  So when will we know whether
 4   Binance.US intends to list VGX or not?
 5   A    I can't speak to what their internal review process
 6   looks like, unfortunately.
 7             MR. NEWSOM:  Okay.  No further questions, Your
 8   Honor.
 9             THE COURT:  Thank you.  Is there anybody else on
10   the phone who wishes to cross examine the witness?
11             MR. HENDERSHOTT:  Yes, Your Honor.  Tracy
12   Hendershott, pro se creditor.  Ladies first.  Is that Gina?
13   Gina?  Okay, I guess I'll go, with Your Honor's permission.
14             MS. DiRESTA:  I was trying to unmute.  You want to
15   go, Tracy?  I don't mind.
16             MR. HENDERSHOTT:  Yeah, sure.
17             THE COURT:  Let me ask you --
18             MR. HENDERSHOTT:  With Your Honor's permission.
19             THE COURT:  Let me ask.  We're pretty much at our
20   lunchtime.  Do you have -- how many questions do you have?
21             MR. HENDERSHOTT:  I'm sorry, Your Honor, you were
22   breaking up.  You said something about lunchtime?
23             THE COURT:  We're pretty much at our lunchtime,
24   but how many questions do you have, do you think?
25             MR. HENDERSHOTT:  I have eight questions
```

1    currently, but depending on the answers, it may extend.

2              THE COURT:  Eight questions.  Let's do your eight

3    questions.

4              MR. HENDERSHOTT:  Okay.  Thank you, sir.

5                   CROSS EXAMINATION OF BRIAN TICHENOR

6    BY MR. HENDERSHOTT:

7    Q    Good afternoon, Mr. Tichenor.  I'm a pro se creditor in

8    this case.  I'd like to go back to -- thank you.  I'd like

9    to go back to your opening statements when you highlighted

10   obstacles and called out that this was one of the rationale

11   of why the Binance deal is better than the toggle or even a

12   liquidation.  And I just want to confirm, did I hear you

13   correctly that in relation to the liquidation, the illiquid

14   coins would result up to a 50 percent slippage commission

15   structure; is that correct?

16   A    Yeah, it would be up to.  The analysis was done on a

17   coin-by-coin basis and it was based on a number of factors.

18   So it was -- and I would call it an educated estimate that

19   was done in connection with management and individuals at

20   the company that, you know, have experience in trading

21   crypto currencies.  We solicited as I think I mentioned

22   multiple proposals from various different OTC market makers,

23   for example, and collected all of those facts together in

24   determining and working, you know, collaboratively again,

25   you know, not just Moelis, BRG, the company management,

1    others, in assessing what those discounts could be.  I

2    mentioned the 50 percent number in that I would have to go

3    back, but I don't believe the estimate for purposes of the

4    discount was exactly 50 percent on those coins.  I do recall

5    that we received a number of bids, though, that were at 50

6    percent, if not greater.

7    Q    So -- and I guess that's where my confusion is, and so

8    do I recall correctly that you said 100 million would be the

9    slippage for the process of liquidation in total due to

10   these illiquid coins?

11   A    In total, yes.  I think the estimate for those specific

12   coins, if I'm not mistaken, is like 60 million specifically.

13   I'd have to check --

14   Q    Okay --

15   A    -- the numbers, though.

16   Q    Okay, so you're saying the slippage is 50 million, not

17   100 million?

18   A    Correct.  The 100 million also includes foregone

19   proceeds that we would receive from Binance.US to the extent

20   that we didn't close with them, which is, you know,

21   obviously the purchase price and then I think I mentioned

22   the VGX element.

23   Q    Okay, but let's stick with the liquidation.  $60

24   million of damage due to slippage because of the illiquid

25   nature of 35 coins; is that your statement?

1   A    That's my recollection of the numbers, yes.

2   Q    Okay.  Thank you, sir.  So this is where my confusion

3   is.  The day before the Debtors turned off access to our

4   investments or even today, you know, go to Coinbase, go to

5   Binance, I go anywhere, I can make a $5 million transaction

6   at a 5 percent commission.  So I'm struggling to understand

7   how, Moelis, you know, the rainmaker, dealmaker, why are you

8   being faced with 50 percent haircut when I can make a $5 to

9   $10 million transaction with a 5 percent commission rate?

10  A    So I think even to the extent that we're talking about

11  a $5 million trade, I think, you know, what happened last

12  night is a good example of what market depth means within

13  crypto, in the cryptocurrency space.  We saw a very

14  precipitous drop in the price of Bitcoin and all other --

15  all coins as a result of what I understood based on what

16  I've seen publicly, to be relatively small trading volume in

17  Bitcoin.

18       It's -- you know, just even training a $5 million block

19  of Bitcoin is very, very different than the estate trying to

20  liquidate a large portion if not a majority portion in some

21  instances of very illiquid tokens.  And liquidity has a lot

22  of different elements to it.  It can be trading volume

23  that's being reported, but ultimately, you know, as we think

24  about market depth, it really relates more to, you know,

25  what the marginal buyers are at various prices.

1         And so to the extent you have in some instances,

2    highly, highly concentrated ownership in some of these

3    tokens, the ability to be able to trade out of those and

4    find marginal buyers in certain instances can be very

5    difficult.

6              THE COURT:  The 50 percent or up to 50 percent

7    you're talking about is not a commission.  It's what you

8    think --

9              THE WITNESS:  Correct --

10             THE COURT:  -- the effect would be on what people

11   are willing to pay?

12             THE WITNESS:  That's exactly right, Your Honor.

13   We -- there were no -- there would not be a condition, for

14   example, on the block trade.  It's already embedded.

15   They're taking the risk in that instance.  When the estate

16   does transactions, it uses a range of exchanges, for

17   example, OTC desk, if it were to just sell into the market

18   on its own over a long period of time and the transaction

19   fees on that -- and that's similar to we're doing on the

20   rebalancing.  We've negotiated very, very low fees, on a fee

21   basis.  To the extent you're talking about a commission, so

22   in comparison to like a 5 percent commission, you know, for

23   illiquid tokens it's, you know, sub 25 basis points.

24   BY MR. HENDERSHOTT:

25   Q    Could you give us an example, because yesterday and the

1    same conversation came up with (indiscernible) BRG, the

2    example that was presented yesterday which I've heard you

3    contradict today was Shiba Inu as one of the illiquid coins,

4    but earlier today in your testimony, you highlighted the

5    Shiba Inu is not illiquid.

6    A    So --

7    Q    Is that correct?

8    A    I don't believe that's what I said.  I said that Shiba

9    Inu was a supported token, I believe.

10   Q    Okay.  So could you give us an example of a token where

11   we would expect this 50 percent haircut due to, you know,

12   this liquidation process?

13   A    So from what I understand, and again, this is not just

14   (indiscernible).  This is based on, you know, discussions

15   with a lot of parties analyzing a range of these factors.  A

16   couple examples would be BTT, VET, and StormX, all of which

17   would fit in that category.

18   Q    Thank you.  And can you tell me what the value of BTT,

19   VET, and StormX is on Voyager currently as part of your

20   estate, the total assets for those particular coins?

21   A    I don't have the specific numbers in front of me.  I

22   know they're in the tens of millions each.

23   Q    Each or total?

24   A    No, each.  And to be clear, the 35

25   Q    Okay.  (indiscernible) exercise --

1    A    Sorry.  The 35 tokens that we were talking about, you

2    know, as Mr. Renzi put in his declaration, they represent

3    around 17 percent of the total assets on the platform today.

4    They do represent a number of tokens that happen to be more

5    illiquid.  The large, well-known tokens like Bitcoin and

6    Ethereum or USDC, for example, are all supported.  The 35,

7    based on the distribution, happen to fit in a bit of an odd,

8    sweet spot between being sizeable from a dollar value

9    perspective, but also being illiquid.

10    Q    Okay.  If there is a decision made to go to the toggle

11    and any of the estate assets are being sold at a 50 percent

12    discount, would any of the creditors have the first

13    opportunity to buy such discounted assets at that discount

14    price?

15    A    Theoretically, they would have an ability to buy

16    anything that they want in the market.  You know, the estate

17    --

18    Q    No, no.  The market's not offering the 50 percent.

19    A    Well, there's a big difference, though, between buying

20    a small trade at a 50 percent discount and buying a very

21    large block trade for tens of millions or hundreds of

22    millions of dollars at those levels, so if there are

23    creditors that would like to have discussion around multi-

24    hundred million dollar block trades, I think we'd be happy

25    to have those conversations.

1    Q    But we're not talking about hundreds of millions,

2    right?  You said only 17 percent of the total value across

3    all 35 coins, (indiscernible) 75 -- 17 percent.

4    A    Seventeen percent across all of the crypto currency of

5    the estate.  It's across 1.2 to 1.3 billion.

6    Q    So it's about 130 million, divided by 35 coins?  Thank

7    you, sir.  You also brought up as an example the illiquidity

8    caused the volatility that we experienced in the overall

9    market last night.  Would you associate that with some event

10   of illiquidity or more of the revelation of the Congress

11   issuing the letter that they did last night to Binance

12   raising, you know, significant red flag?

13   A    I can't --

14   Q    It would be more credible for --

15   A    I can't speak to exactly what drove the decline in the

16   market last night.  The point that I was trying to highlight

17   is that within these markets and a big reason why you see

18   these big discounts in certain coins is that cryptocurrency

19   markets have historically been more volatile than what we

20   see in a lot of traditional markets, and these are markets

21   where you have a -- the largest token being Bitcoin with a

22   multi-hundred billion dollar market cap that trades tens of

23   billions of dollars a day that declined very material amount

24   of value in the course of minutes, and so, you know, as

25   market makers, for example, are looking at doing block

1    trades and quoting risk, for example, that's risk that they

2    then assume and they price for that.

3        And so you know, what they're pricing for in large part

4    -- and again, you know, what you see in a lot of instances

5    is there's higher beta, for example, between these illiquid

6    tokens relative to something like a Bitcoin.  And so what

7    they're trying to work through is a dynamic of not being in

8    a position where, you know, they may acquire a block trade

9    and it could be down 20 percent after they've acquired it,

10   as a result of the trade.

11       And so that's part of what, you know, we've seen when

12   pricing these and to be clear, this is why we reached out to

13   multiple parties with very significant financial capacity to

14   be able to execute on these types of transactions.  We did

15   not reach out to just regular parties.  We reached out what

16   we understood based on discussions with people in the space,

17   to be, you know, some of the largest participants in this

18   ecosystem for doing these types of transactions.  And we

19   received multiple ones --

20   Q    So, thank you, sir --

21   A    -- which also, you know, they weren't aware of what was

22   going on.  They weren't talking to each other

23   (indiscernible) companies.

24   Q    Thank you.  You keep referring to the danger in

25   slippage of block trades going back to the (indiscernible)

1    just because we went through these numbers yesterday, I

2    believe the number was 91 million of SS for that particular

3    coin currently (indiscernible) Voyager.  And you are tasked

4    with either liquidating, rebalancing or liquidation, you

5    know, action for this case.

6         Would you market the whole $91 million as one block or

7    would you break it out, you know, 10, 20 different

8    transactions over a defined period of time?

9    A    So I don't want to speak to specifics of exactly how

10   the estate is currently executing the transactions related

11   to the rebalancing, in part because what we don't want to do

12   is telegraph at this hearing anything that may adversely

13   impact creditor returns from parties who may be listening in

14   and trying to front run any of those transactions.

15        What I can tell you is that the Debtors and their

16   advisors -- and again, this is multiple advisors, not just

17   Moelis -- as well as the UCC's advisors in this instance,

18   M3, have been in complete coordination around the nature of

19   the transactions, the forum that we're doing them in, the

20   way that they are being executed, and it is being done in a

21   manner that allows for, you know, an attempt to obfuscate as

22   much as possible the nature of the trades that the Debtor is

23   doing in order to try and maximize value.

24        And it is doing it over, you know, what we're trying to

25   do is over a long enough period of time and this is why the

1    Debtor has been executing these trades upon, you know,

2    getting the ability to do such from the judge, over a long

3    period of time to try and minimize any of that negative

4    impact it may have on prices.

5    Q    Yes, that sounds absolutely prudent to me.  And so I

6    guess when you are taking such a thorough process of

7    breaking it out to where it does not move the market on any

8    given day or any given exchange, I still struggle to

9    understand how you come up with a 50 percent loss on that

10   transaction.

11   A    So to be clear, you know as I was saying, we do

12   obfuscate trades and there are tokens that from what we

13   understand and what's been communicated to us, you know, the

14   levels that they're trading at today and what would be

15   required may already be pushing down prices potentially in

16   some of those, and so, you know, there would be a concern.

17        There's a big difference between doing, for example,

18   you know, a million-dollar or $2 million trade on any one of

19   those tokens versus trying to be in a position where, you

20   know -- and so in that instance, let's say you moved from,

21   you know owning -- and these are all purely hypotheticals,

22   right?  If, to the extent that the state owned 40 percent of

23   an individual token and it needed to own 30 percent post

24   rebalancing, that means it needs to sell 10 percent interest

25   over potentially a multi-week period.

1        To the extent that needs to go from 40 to 0, that's a

2    very different transaction.  And in some instances, that's,

3    you know, what the estate is dealing with.  Again, you know,

4    these are hypotheticals but it's the basis for the analysis

5    that was being done.

6    Q    Okay, thanks for that.  And -- sorry.  I like to move

7    on to the other obstacle which is a new term for me.  In

8    instead of KYC, it was KYT for the transaction.  You said

9    that that prohibited, you know, the toggle or at least was

10   an obstacle to the toggle and would require liquidation of

11   all of these illiquid coins on Voyager.  And (audio drops)

12   option or what was the other option there?

13   A    So there were two primary issues.  One is, the platform

14   itself, the code base, doesn't work to be able to distribute

15   those token in kind.  And so, you know, to the extent that

16   you're familiar with different protocols and coins, right,

17   every coin is a little bit different and not all of them are

18   ERC-20s, right, and so in this instance, we have 35 tokens.

19   The code itself, the code base, does not have an ability to

20   distribute those tokens through the Bedrock code, which is

21   my understanding of how they -- they're able to distribute

22   those tokens back to the customers.  It doesn't support

23   them.

24        And so it would require a rewrite of the code base,

25   with subsequent upgrades to be able to bring on additional

1    protocols to allow those tokens to be withdrawn.  So that's

2    one leg of the issue.  The second leg of the issue is the

3    KYT issue, which relates to the ability to actually validate

4    the party and the wallet address that you're sending funds

5    to and that has two elements to it.

6         One relates to, for example, the inability to

7    distribute those 35 tokens.  The other also in part relates

8    to potentially unsupported jurisdictions and the ability to,

9    for example, return coins if the company didn't have a

10    platform to be able to return coins through.

11    Q    So two elements.  You said the technical foundation,

12    Bedrock and then the other one is, you know, the other

13    controls of understanding where the transaction is

14    occurring.  And let's start with the first one, Bedrock.

15    Has anyone reached out to actually the originators, the

16    developers, the designers of Bedrock, which would be the

17    Ethos organization to be able to overcome this obstacle?

18    A    The company has developers.  It has acquired the

19    Bedrock code.  It has maintained it.  The people that we

20    talked were the management team of the company that operates

21    the code base today.  This was made -- this was based on

22    representations that were made us, you know, by them and,

23    you know, our understanding is it would take some time to

24    potentially allow for that, to do those upgrades.  And on a

25    prudent basis --

1    Q    Yeah --

2    A    -- to the extent that you're upgrading code base that

3    relates to a distribution, potentially, of a billion

4    dollars, I don't think that anybody would take a code

5    upgrade lightly to the extent that it could have, for

6    example, negative impacts.  I mean, with debugging and you

7    never know what the follow-on impact could be, right?

8    Q    So I'm not clear.  Is the (audio drops) not originate

9    the code or is the challenge that the engineers who made

10   Bedrock refuse to collaborate with (audio drops) in

11   possession?

12   A    That feels very leading.  I don't think I said anything

13   about the developer is not willing to work on it.  I was

14   making a statement around what we understood the timeline to

15   be for implementing that and what I was trying -- and I

16   apologize if I wasn't clear on this.  What I was getting at

17   was more that implementing a code upgrade in the context of

18   the situation that we're in and the negative impacts that

19   getting that wrong could have, mean that the Debtor would

20   want to make sure that it's being very thoughtful.

21        The last thing that we would want, given the fact that

22   this a, you know, final distribution for all intents and

23   purposes for certain parties, would be in a situation where

24   somebody put in a bug and all of a sudden a creditor

25   received five times the amount of coins that they should

Page 128

1   have because there was a follow-on impact.  So this would be

2   something where to the extent that the company were to do an

3   upgrade on the code base like that, to allow for support of

4   additional tokens, it's not something that I think people

5   would take lightly in this specific instance.

6   Q   Yes, security concerns, but still I haven't heard an

7   answer to my question if anyone reached out to the

8   developers (audio drops).

9            MR. SLADE:  I object.  Lack of foundation.

10            THE COURT:  Overruled.  Go ahead.

11   BY MR. HENDERSHOTT:

12   A   I'm not aware of the company having reached out to the

13   original developers of the code base that the company

14   currently maintains.

15   Q   Okay.  Thank you.  And then the second part of your

16   obstacle (indiscernible) was having to know the recipient of

17   the wallet.  So I can go, the day before they blocked my

18   access, I can go in and transfer any of the supported coins

19   to my wallet.  It's a single address.  It doesn't vary as a

20   wallet address based on the coin.

21        So I'm not clear on how the Debtors in Possession can

22   actually buy the asset, put -- transfer it to their wallet,

23   and then find a third party when I enter a sell order,

24   transfer that asset to a other third wallet, or that they've

25   already validated the KYT for me whenever I want to do any

1    of the supported wallets.   So can you highlight where the

2    obstacle is there?

3    A     Yeah, it's a good question.   So that the company has

4    historically operated, and this was the basis for why the --

5    again, this is my understanding.   I can't, you know, purport

6    to have done a code review on this -- is that for those

7    unsupported tokens that can't be withdrawn and have never

8    been able to be withdrawn, the issue is that, and the way

9    that the company historically worked is that it works with

10   OTC market makers, for example, to do all sorts of

11   transactions, right?

12        And so the -- what would occur if you were to try and

13   buy one of these unsupported tokens historically would be

14   that you would put cash fiat into your account.   You would

15   seek to by that token.   Voyager would have quoted you a

16   price for where that transaction would occur at.   Voyager

17   then through it's smart order router would do a trade with a

18   market maker on the other side.

19        They would do daily settlements at the end of the day

20   to actually settle dollar funds relative to coin, with the

21   coin in those instances for those unsupported wallets -- for

22   those unsupported tokens being transferred from a white

23   listed OTC market maker wallet to Voyager's wallet that is

24   held on fire blocks in that instance.   So because they are

25   transacting with a white labeled OTC market maker with a

1    known wallet address, the trades are only occurring between

2    a handful of parties.  The token, the coin transfer in those

3    instances is only between a limited subset of wallets and it

4    occurs once a day, effectively.  It's not occurring on an

5    ongoing basis.

6    Q    Right.

7    A    So when you're removing coins, what the Bedrock code is

8    doing is -- and again, my understanding is that it's

9    validating every single transaction as it's happening in

10   small amounts and it has to be automated to do that, given

11   the number of customers and the number of coins that it

12   supports.  There would be no way to do that manually.

13   Q    Got it.

14   A    Yeah.

15   Q    So it's Bedrock that is the limitation?  It's not

16   really about knowing --

17   A    No, I wouldn't --

18   Q    -- confirmation of the wallet because they've already -

19   - excuse me, sir, if they've already validated my wallet

20   address when they transferred the coin in Ethereum.

21   A    That -- so that's not my understanding.  My

22   understanding is that -- and I know, I understand this to be

23   the case, right.  Not every wallet supports every type of

24   token, right?  If I have an Exodus wallet, it doesn't

25   support every type of token.  If I -- Binance doesn't

1    support -- or excuse me, Coinbase support every type of

2    token, right?  So to say that you could just transfer to any

3    wallet, you know, I don't believe that to be the case, based

4    on my knowledge of how cryptocurrency works.

5         And my understanding as has been represented to me is

6    that a number of these tokens, for example, the third-party

7    provider that the company uses for that KYT validation on

8    the wallet that the funds are being transferred to does not

9    support all of those tokens, and so that party has to run

10   its own set of procedures.  It's a third-party service

11   provider.  I can't represent what those look like, but at

12   least what has been told to me is that they do not support

13   all of those tokens.

14        And so what it would require is potentially then

15   integrating new third parties that do this or other systems.

16   I don't know what that would ultimately look like but, you

17   know, I would imagine, for example, doing an API upgrade to

18   allow for a multi-party API authentication check between a

19   new third party that's being integrated for these purposes,

20   it's not a small task.  At a minimum, I imagine it would

21   take months.

22   Q    Yes, we've had nine months and so that -- would have

23   fit into the schedule.  So thank you.  If I can move on, I

24   know we want to move on to lunch break here.  So just some

25   block and tackle type questions about your role as an

1    investment banker.  What was the guiding document that you

2    were obligated to follow for, you know, the auction process?

3    A    I'm not sure I follow.  Are you talking about the bid

4    order or the auction procedures?

5    Q    Yeah, the bidding (indiscernible).  This was a real

6    guiding document that you had to follow that was approved by

7    the Court.

8    A    Yes.  There were -- and I apologize for forgetting the

9    exact name of the documents, but there were procedures that

10   were filed with the Court relating to bidding procedures in

11   -- and the auction procedures in connection with the

12   auction.

13   Q    And when we have that guidance document approved by the

14   Court, did that dictate the terms of the action or are

15   bidders allowed to dictate their own terms in the auction?

16   A    Auctions can be very complicated and so while the bid

17   procedures outline what a qualified bid would ultimately be,

18   it doesn't mean that parties that participate in the auction

19   will follow necessarily, all of those rules.  The fact that

20   they may not follow all those rules does not necessarily

21   preclude us from potentially selecting the highest

22   alternative to the extent that that's the one that presents

23   itself.  It's -- to a degree, there is a judgment call.

24   Q    Right.  Well, I mean, how far can you deviate from what

25   the Court approved bidding plan is?  Of course, there's some

1    judgment.  The Court approved the bidding plan intentionally

2    to protect the process, protect the estate; is that correct?

3    A    I don't recall the exact specifics of the -- of what

4    was allowed under the bid procedures, but I would imagine

5    that it provides for that type of flexibility.  I just don't

6    know.  I don't know.

7    Q    (indiscernible) the bid process?

8    A    Yes, but this occurred months ago.

9    Q    Okay.  And so as part of the bidding plan approved by

10   the Court, was a backup bidder element, you know, standard

11   in that plan or not?

12           MR. SLADE:  Your Honor, I object.  This is not

13   relevant.  We discussed this yesterday.

14           THE COURT:  I'll allow --

15           MR. HENDERSHOTT:  Yesterday, Your Honor, BRG could

16   --

17           THE COURT:  I'll allow a few questions on it.  Go

18   ahead.

19   BY MR. HENDERSHOTT:

20   A    So the --

21           MR. HENDERSHOTT:  Thank you, sir.

22   BY MR. HENDERSHOTT:

23   A    -- bid procedures did my recollection is that the bid

24   procedures did require qualified bids to act as a backup

25   bidder to the extent that they were to be viewed as a

Page 134

1   qualified bid.  That's my recollection.

2   Q    And so can you share with us who overrode that

3   critical, pretty standard -- well, first of all, isn't that

4   a standard element of an auction bidding process?

5   A    It's something that is often asked for.  It's not

6   always actually abided by.

7   Q    We just -- as Mr. Slade just said, we did discuss this

8   yesterday but we couldn't get confirmation.  We were told

9   that Binance refused to comply with the bidding plan.  We

10  couldn't get confirmation on the other four bidders.  Do you

11  have a better recollection of the FTX auction and the four

12  other bidders, what their refusal or acceptance as a backup

13  bidder was?

14  A    At the end of the auction, there was no party that was

15  willing to be a backup bidder that conformed with the

16  requirements of an order entry.  So there was no ability to

17  --

18  Q    So --

19  A    -- appoint a backup bidder at the end of the auction.

20  Q    Being professionals in a corporate auction

21  (indiscernible) activity which I've sat across your team

22  many times, is there an attempt for a backup bidder to

23  introduce competitive tension to ensure that the best bid

24  and the most efficient bidding process is concluded with the

25  first round of bidding and the competitive tension forcing

Page 135

1    each bidder to give the best offer at the first round of

2    bidding?

3    A    It's one of many factors.  The reason we ran an eleven-

4    day auction which is unprecedented as far as auctions occur

5    was to maximize that competitive tension and I can at least

6    represent from the beginning of where the auction started to

7    the value that was ascribed to the winning bid, it was

8    increased in many multiples on a dollar value basis.  We ran

9    a, you know, in our judgment, a very competitive, long, hard

10   auction option to try and drive as much value as possible.

11   Q    Well, I'm confused, though, because if compliance with

12   the written plan was actually followed, the original bid of

13   Binance was 50 million would have returned more creditor

14   value than the follow-on bidding cycle of 20 million.  Do

15   you see that differently, sir?

16          MR. SLADE:  Your Honor, I object.  This is not

17   relevant.

18          THE COURT:  Go ahead and explain.

19          MR. HENDERSHOTT:  It is relevant, sir and --

20          THE COURT:  No, no, no, no -- I've overruled the

21   objection.  I'm ask -- I'm telling the witness to go ahead

22   and explain just what happened.  Why did we not have a

23   backup bid from Binance at that time?  Did they --

24          THE WITNESS:  We did not have a backup bid from

25   Binance at that time because their final bid included a

Page 136

1    provision to the extent that they were a backup bidder, that

2    would have required an expense reimbursement that did not

3    conform with the bid procedures.  And so they were not

4    selected as a backup bidder at that time because it was not

5    a bid that confirmed with a ability to actually enter to the

6    extent that we were to select them.  In hindsight, we wish

7    that we had them as a backup bidder and had paid for it, of

8    course, and in light of what happened with FTX, of course,

9    we wish that we weren't in this situation.

10            THE COURT:  So in other words, they said to you,

11   were not willing to make a qualified bid.  We'll make a bid

12   on different terms.

13            THE WITNESS:  And we want to be paid.  Basically,

14   they said that they want to be paid to be a backup bidder

15   which is not something that is standard in the auction

16   process.

17            THE COURT:  Right.  So they gave you the option to

18   seek a variation from the bid terms and try to entice you

19   with a deal, but it wasn't actually something that you had

20   the ability to accept and make them an automatic backup

21   bidder; is that right?

22            THE WITNESS:  That's correct, Your Honor.

23            THE COURT:  Okay.  Does that explain things, Mr.

24   Hendershott?

25            MR. HENDERSHOTT:  It does, thank you.  Thank you

1    both for that.

2    BY MR. HENDERSHOTT:

3    Q    So what I'm hearing then is there's no qualified

4    bidders, backup bidders, at the FTX round.

5    A    Well --

6    Q    Is that correct?

7    A    I think there's a difference -- I mean, obviously, the

8    bid that we accepted we viewed as being a qualified bid

9    because we ultimately entered it, but it was viewed as the

10   highest and best at that point in time, based on facts and

11   circumstances at that point in time.

12   Q    But not in compliance with the bid plan.

13   A    Excuse me, I couldn't hear that.

14   Q    Is that correct?

15   A    I'm sorry, I --

16   Q    Bids were not in compliance -- yeah, not in compliance

17   with the bid plan which calls for backup bids.

18   A    Well, if that were the case, we wouldn't have an

19   auction at all.

20   Q    Right, because there was no qualified bidders according

21   to the bid plan.   Then would that logically then lead the

22   discussion to go into the toggle option at that point when

23   there is no qualified bidders?

24   A    Well -- and again, I want to be clear.  When, you know,

25   the focus is very much on the backup bid right now.  We went

1    into an auction.  We had received bids.  They had

2    qualifications relating to parties acting as backup bidders

3    or not.  I can represent that this was a very much discussed

4    topic at the auction.  Again, we ran an eleven-day auction.

5    It was not something that was missed by parties.  The view

6    was, you know, while people were expressly unwilling to do

7    this despite every attempt from the Debtor to try and

8    actually get also a party to act as a backup bidder and we

9    tried a number of different strategies in order to try and

10   have that happen.

11       We ultimately drove the price up.  We, you know, had

12   the situation that we did, which was we appointed FTX based

13   on the facts and circumstances at the time, the nature of

14   their bid, and decided to move forward with that and did not

15   have any other parties that were backup bids because they

16   would have required, for example, the expensive

17   reimbursement.

18       So we were unable to select one.  But with that said,

19   said because of the dynamics at the auction and the

20   competitive tension, again, we drove up the purchase price

21   at that auction multiple, multiple times over where the

22   auction value started at.

23   Q    Okay.  I mean, (indiscernible).  I appreciate that

24   clarification, the insight.  Again, block and tackle, how is

25   the contract between the Debtor in Possession and yourselves

1    structured, you know, from a -- is the payment and

2    compensation a time and materials or is it a event-based

3    payment structure?

4    A    I believe our engagement letter is publicly filed, so

5    it depends.  We have a --

6    Q    I --

7    A    From Moelis' perspective, we have a monthly retainer

8    fee that we are paid and then there are different types of

9    transaction-based fees.

10   Q    Okay.  So I guess I'll be more specific.  I've heard,

11   and I don't recall reading your specific contract that the

12   transaction is a combination of an acquisition

13   (indiscernible) $12 million payout; is that correct?

14   A    In a sale transaction?  I --

15   Q    Yes, for a transaction payout --

16   A    I believe that's correct.

17   Q    Okay, thank you.  Is that transaction payout still in

18   effect if the Binance deal does not go through and we move

19   to a toggle?

20   A    There is a, I believe, a different feature, to the

21   extent that that would occur, be a restructuring

22   transaction.

23   Q    And forgive me for having you repeat.  You said it was

24   public information, could you just share with me what that

25   alternative transaction structure is?

Page 140

1    A    I believe our fee declines by a million dollars.  It's

2    a $12 million to an $11 million fee.

3    Q    Okay, so 12 million if a purchaser is achieved, $11

4    million if we go to a toggle.

5    A    That would be my understanding, yes.

6    Q    Okay.  So -- and thank you for that.  So is there an

7    estimate -- there's only $1 million difference there, so --

8    and I'm not saying what the outcome is going to be, but with

9    the monthly retainer fees and the transaction fees

10   cumulatively, do you just have a round estimate of what the

11   total value of your contract is going to be with the Debtors

12   in Possession?

13   A    I apologize.  I don't off the top of my head.

14   Q    Well, you know, we can start with 12 and 11 then, as a

15   base.  Is there -- can you share what the monthly retainer

16   is?

17   A    I don't recall what the monthly retainer fee is.  I

18   don't.  I know --

19   Q    Is there other transaction --

20   A    Excuse me?

21   Q    Is there other transaction fees besides the 11 or 12

22   million?

23   A    Not transaction success based fees.  My recollection of

24   our engagement letter, which is tradition and, look, was

25   negotiated on arm's length basis as well with the UCC and,

1    you know, other parties, is traditional and market based for

2    situations like this.  And typically, you know, in this

3    instance, the, for example, oftentimes fees are negotiated

4    relating to things like DIP facilities or an ability to

5    raise equity capital.  Obviously, in this instance, none of

6    those transactions would contemplate that.

7    Q    Safe to say it's 15 million cumulative?

8    A    That feels high based on the number of months and

9    crediting features, but I -- again, I don't have our

10    engagement letter in front of me so I apologize.  Like,

11    speaking to the exact numbers, I just can't.  I can't speak

12    to that.

13    Q    So the reason why I'm asking is you presented that the

14    Binance deal is the best one for the creditor class because

15    of the guaranteed $20 million payout and (audio drops)

16    another $80 million (audio drops) value.  But (audio drops)

17    $20 million if $60 million of that is going from the

18    wallets, including my calculations that's a 75 percent cost.

19         You know, on ROI I'm receiving 20 million.  I've

20    (indiscernible) frequently.  I never recall paying 75

21    compensation for any deal we engaged in and I'm curious. Can

22    you tell me what, you know, percentage-wise, how frequently

23    your clients ever accepting a 75 percent cost to any deal

24    they negotiate with you?

25              THE COURT:  I will -- I see an objection coming

Page 142

1     and I'll overrule it.  You completely misstated his

2     testimony, Mr. Hendershott.

3              MR. HENDERSHOTT:  I'm sorry, I misstated it?

4              THE COURT:  Yes, you did.

5              MR. HENDERSHOTT:  Okay, can -- help me if you

6     would, $20 million payout from Binance is --

7              THE COURT:  You've misstated it to suggest that

8     the $20 million goes entirely to his fee as though that fee

9     wouldn't otherwise be there anyway, which is wrong.  Okay?

10    You've suggested that --

11             MR. HENDERSHOTT:  No --

12             THE COURT:  -- there's only a $5 million

13    incremental value which is flatly contrary to what he's

14    testified.  His fee is there, whether there's that $20

15    million or not.  It's a $1 million difference, is what he

16    testified to.  So if you go to the toggle, his fee is $1

17    million less.  So if you go to the Binance deal, essentially

18    what he's testified to is since his fee would be slightly

19    higher, there'd be a $99 million advantage instead of $100

20    million.  That's what he's testified to.

21             MR. HENDERSHOTT:  Okay.  Thank you for the

22    clarification, sir.  Thank you, Mr. Tichenor.  I cede the

23    podium.

24             THE COURT:  Okay, before we have any other

25    questions, we'll take our luncheon break and we'll resume at

1    2:45.

2              (Recess)

3              THE COURT:  Before we continue with the witness

4    examination, I have a question for the Debtors' attorneys

5    and for Binance's attorneys.  We've had an awful lot of

6    questions about due diligence matters and about Binance's

7    practices in certain regards and it sounds like from what

8    the witness is saying, Binance has been willing to give

9    sworn statements to the Debtors on some of these points, but

10   I don't have them.  I don't have any declaration.  I have no

11   Binance witness.  I don't even have copies of what Binance

12   has given to the Debtors.

13             What would be so hard about filing a declaration

14   on behalf of Binance that simply says that that with respect

15   to customers, Binance maintains assets on a one-to-one ratio

16   with respect to customer deposits and intends to continue to

17   do so; that it keeps customer cryptocurrency in separate

18   wallets segregated from other cryptocurrencies, that it does

19   not lend or rehypothecate customers' cryptocurrencies; that

20   no one outside Binance.US has access to the keys for the

21   customer wallets; and that Binance.US intends or its current

22   practice and its intended future practice is to transfer or

23   use customer cryptocurrency only as directed by the

24   customers themselves?

25             I mean, I've had repeated testimony that that's

1    how it's done, that Binance has said that's how it's done.

2    That's what everybody here seems to want to have some

3    verification of.  What's so hard about putting that in a

4    declaration and filing it?

5              MR. SLADE:  So Your Honor, Mike Slade for the

6    Debtors.  Obviously, that's up to Binance.  It would be

7    great if they did that. In our discussions, I mean -- and I

8    think some of the cross examination has borne that out that

9    I think if their witness was -- were to swear to this, were

10   to be subject to cross examination, which would be as broad

11   in scope as some of the cross examination that has occurred

12   during the past couple of days --

13             THE COURT:  Well, you know, I've allowed an awful

14   lot of questions and I think that the kind of questions and

15   torment that the witnesses have gone through would probably

16   scare anybody off on willing to say anything, but I'm not

17   asking for that.  I'm just asking for a sworn declaration

18   for what presently is just hearsay, something I can rely on

19   that is by way of verifying what they have already told the

20   Debtors.

21             MR. SLADE:  We understand the request.

22             MR. GOLDBERG:  Your Honor, Adam Goldberg of Latham

23   and Watkins on behalf of Binance.US.  So may I just ask Your

24   Honor a question?  Because I understand that -- I'm just

25   confused as to whether it's just a statement to the Court

Page 145

1    for the Court's benefit or whether the -- whoever the

2    declarant, would be exposed to cross examination?

3              THE COURT:  I'm not anticipating cross

4    examination, I'm just, for my own comfort, asking for a

5    sworn statement to verify what has already been told to the

6    Debtors.

7              MR. GOLDBERG:  Thank you for that clarification,

8    Your Honor.  Please allow me to consult with my client.

9              THE COURT:  Okay.

10             MR. GOLDBERG:  Thank you.

11             THE COURT:  All right.  It would give -- it would

12   help me a lot because I'm -- it's odd.  It strikes me as

13   extremely odd to have so many questions raised about

14   relatively straightforward business practices and to have

15   nothing but hearsay and no Binance witness or a kind of

16   verification at all, seems odd to me.

17             MR. SLADE:  Completely at their request, Your

18   Honor.  We made it prior to hearing and I think the

19   reluctance is for the reason that I stated, that you never

20   know how broad the cross examination would get.

21             THE COURT:  Right.  Okay.  All right, back to Mr.

22   Tichenor.  Is there anybody else on the phone now who wishes

23   to cross examine?

24             MR. RIZK:  I do, Your Honor.

25             THE COURT:  Who is this?

1          MR. RIZK:  My name is Andrew Rizk.  I'm a

2     creditor.

3          THE COURT:  Okay, please proceed.

4          MR. RIZK:  Okay, I just got two -- I just have two

5     really quick questions.

6               CROSS EXAMINATION OF BRIAN TICHENOR

7     BY MR. RIZK:

8     Q    One, you know, if you were in kind of our shoes as a

9     creditor and had the knowledge that you have of this

10    potential sale transaction, what would be your personal

11    concerns or fears, if any, of this going through?

12    A    I think, you know, things that we believe and

13    understand the creditors care about are items -- you know,

14    threefold, I would say.  One, you know, we understood from

15    the onset of the case that speed and the ability to return

16    funds to people as quickly as possible was paramount.  It

17    was a focus that we had.  It was very much -- I think we

18    were aligned with the UCC around that.  We sought to do

19    everything possible from the very, very beginning of this

20    case to try and do that.

21         Unfortunately, obviously, there were things that

22    happened with FTX that set that back, but we do understand

23    speed is an important dynamic.  I think, you know, our

24    understanding is that the ability to get in-kind recoveries

25    is very important.  There are people that have very low tax

1    bases, for example, in these assets and we do understand the

2    nature of a lot of the underlying.  They bought the crypto

3    with the understanding that that was what they were going to

4    get back.

5        I personally would think if I -- I'm a customer of E-

6    trade, right, and if I had a share of GE and there was a

7    problem with E-trade, I wouldn't want something different

8    than that back.  That's, you know, what I thought was mine

9    at that point in time.  And so, you know, we are trying to

10   do that in the contours of the Bankruptcy Code and I think

11   the other thing in it was recovery value.  We've -- you

12   know, I personally listen to a lot of Twitter spaces

13   including the UCC's ones.

14       I listen to a lot of the other ones.  You know, we

15   follow social media channels like -- you know, we do

16   understand and hear from creditors that people have faced

17   pain associated with this situation.   This has not been

18   easy for people.  And we do care about trying to maximize

19   value and that's something that we've been focused on.  And

20   that's part of the reason why we're presenting these two

21   options.

22       We believe one of them potentially provides for a

23   higher recovery value, but we understand that there may be

24   potential risks associated with that relative to a self-

25   liquidation.  But what we did not do during this was run a

```
 1    long process and try and restart everything upon the failure
 2    of FTX.  We engaged immediately in discussions with people
 3    that we knew were aware.  We had additional inbounds.  We
 4    ran that down as fast as possible and we -- I would say too,
 5    I don't believe that the timeline that we're working off of
 6    is any different than what would have happened if we had
 7    also chosen to potentially pivot to a self-liquidating
 8    toggle post that collapse.
 9         There was a lot of work that was even done post that,
10    around what self-liquidations could even look like with all
11    these factors in mind.  So, look, to me, those were things
12    that I think, you know, I would be thinking about and I
13    appreciate, too, the counterparty elements are going to be
14    important, which is why we have also tried to engage in
15    diligence on the nature of the counterparty asking
16    questions, asking important questions around safety and
17    soundness.  Those are all things that I would imagine
18    creditors care about in this situation.
19    Q    Right.  So you mentioned the potential, you know, with
20    this, with the sale, the potential sale, there's potential
21    risks.  You know, just from a layman, not really
22    understanding all the lingo in the disclosure statement,
23    what are some of those risks with the sale transaction?
24    A    Look, I think --
25    Q    In your opinion.
```

1    A    -- that's the basis for a lot of the discussions that

2    we're hearing today.  I think that the primary risk would be

3    around comfort levels with moving forward with the

4    counterparty and having sufficient diligence being completed

5    that on a risk-adjusted basis, the value associated moving

6    forward with the sale relative to pursuing the self-

7    liquidating toggle is ultimately worth it.

8         And that's something that, you know, that decision

9    isn't going to be made today, but will be several weeks from

10   now and is not something that I think we would take lightly.

11   I think there will be a lot of consultation with the UCC,

12   other advisors that are involved in this process, and

13   obviously, ultimately, the board of directors of Voyager

14   Digital LLC.

15   Q    That's understood.  Thank you for that response.  The

16   last question I have, I wasn't understanding yesterday when

17   I was listening in, so the 73 percent recovery that was

18   mentioned on the call would be the potential recovery if the

19   sale goes through, but Alameda is not successful in clawing

20   back whatever they're trying to claw back.  But if they are

21   if they are successful, I heard 24, 26, 48 percent.  What is

22   it?  What's that going to be if they're successful in

23   clawing back the 400 million or 75 million or combined or

24   whatever it is they're trying to claw?

25   A    Yeah, and I apologize, because I don't remember the

1    exact number that was quoted at the hearing yesterday and I

2    apologize for that.  My recollection is that it's in the

3    mid-40s.  I want -- believe it was 44 percent, I'm not

4    mistaken.

5    Q    So if they're successful with that -- I saw online

6    initially it was 26 percent, but --

7    A    Yeah.

8    Q    -- I think you guys liquidated or gave some money back

9    during your selloffs, recent selloffs.  So that 24 percent

10   is now -- so if this sale goes through as a creditor, worst

11   case I'm getting 48 percent of my money, best case I'm

12   getting 73 percent?

13   A    Well, so there are a number of factors, right?  And so

14   I think one of the big differences is that in the initial

15   disclosure statement as people were looking at the

16   recoveries and the basis for that mid-twenties number which,

17   you know, we did see and I followed that closely on Twitter,

18   for example, because I know it's been quoted a lot.  The

19   basis for that is based on the 1.002 billion of estimated

20   crypto value owned by Voyager based on -- I believe it's a

21   30-day market average on December 18th.

22        And so from a market value perspective what has

23   happened is that the price of cryptocurrency fortunately has

24   increased quite a bit over the period.  And so when we look

25   at the recoveries today, those are based on current market

1    prices as well.  That mid-40 is now adjusted real time as

2    well leading up to ultimately a distribution.  We don't

3    really know what that number is ultimately going to be

4    because the prices used for determining those values will be

5    based on future market prices that we don't have yet.  So it

6    could move up, it could move down.  It depends on what

7    happens with crypto.

8    Q    Okay.  But as of yesterday, whatever it was when we

9    were talking, it was worst-case 44, best case 73?

10   A    Those numbers sound correct.  But again, I don't have

11   the exact numbers in front of me.

12   Q    Yeah, that's fine.  I'm just trying to understand.  I

13   saw the formula and I get how it's calculated.  And then I

14   think that's pretty much the questions that I had.  Thank

15   you for your time.  Thank you, Your Honor, for letting me

16   speak.

17           THE COURT:  Just to make sure -- thanks.  Just to

18   make sure everybody who is listening understands Mr.

19   Tichenor, we're not saying that the initial distributions,

20   the first distributions would be 73 percent.  There have to

21   be reserves while these issues are discussed so that the

22   first distributions would be more in line with what the

23   minimums are that we've been talking about, right?

24           THE WITNESS:  That's absolutely correct, Your

25   Honor.  And so the way that it would work under the plan is

1    based on the proposed settlement with FTX around these

2    matters would be that of the crypto broadly speaking that

3    the estate has, it would need to sell effectively an

4    additional 445 million in volume to cash holdbacks to

5    potentially deal with FTX-related clawback issues.  To the

6    extent the estate succeeds on that basis, those funds then

7    would be subsequently distributed on a cash basis and we

8    could discuss if there was a new accounting ability to do

9    that.  But I think the operating plan would be that it would

10   be a cash -- future cash distribution to creditors of that

11   value.  So you should think of it as that mid-40s under any

12   scenario is likely what's going to be distributed up front.

13   Again, dependent on market movement.  And then there would

14   be a subsequent cash distribution to the extent the estate

15   wins around those ultimate points.

16            THE COURT:  Thank you.  All right.  Is there

17   anyone else on the phone who would like to ask questions of

18   Mr. Tichenor?

19            MS. DIRESTA:  Yes, Your Honor.  My name is Gina

20   DiResta.  I am a pro se creditor.  I would like to speak.

21            THE COURT:  Yes.  Do you have questions or are

22   you...

23            MS. DIRESTA:  Yes, yes.  I'm sorry, I'm just

24   pulling up my notes.

25   BY MS. DIRESTA:

1    Q    So yesterday when the BRG gentleman was the witness, I

2    had asked him some questions and he said something different

3    from this witness today.  I am a creditor who does not want

4    to open a Binance account and I just want to get cashed out.

5    And I also don't want my KYC or any other kind of

6    information to go to Binance.  But unfortunately, yesterday

7    it was said that I don't have a choice in that, that all of

8    my information is going to go to Binance anyway.

9        But then I had asked if I'm getting cashed out, does

10   that mean that I am just -- that -- will my assets get

11   transferred to Binance and then Binance cashes it out and

12   then gives it back to Voyager and then Voyager cuts me a

13   check?

14       And the BRG gentleman said that my assets would stay at

15   Voyager and then Voyager would cash me out and then I would

16   get a check that way.  But then today when you were being

17   asked a question, you said the opposite.  You said that my

18   assets would get transferred to Binance nonetheless and then

19   they would cash out my assets and I'm assuming then give it

20   back to Voyager and then they cut me a check, which just

21   seems so time-consuming and ridiculous.  I just don't

22   understand why I can't just keep my private information, all

23   of my KYC, my banking information, my driver's license

24   picture, all that stuff.  I don't see why that has to be

25   transferred to Binance.  I don't see why my assets have to

1    be transferred to Binance if I just want to get cashed out

2    and I want absolutely nothing to do with Binance.

3    A    I appreciate the concern.  The terms that we negotiated

4    in the APA with Binance were ultimately that they deeply

5    cared about the ability to potentially market to customers

6    is the primary consideration from their perspective.  There

7    were a number of items within the APA that were hard fought.

8    There is no situation ever from an M&A negotiation

9    perspective where you get everything that you want.  So

10   there were tradeoffs that were made.  And so under the

11   proposal and terms of service that Voyager has, it has an

12   ability to sell customer information.  That was critically

13   important we understood from a value perspective for

14   Binance.  Do I wish we could potentially have something

15   different?  Of course.  But this was the deal that we

16   ultimately negotiated and agreed on with them that provides

17   for both of those elements.  The estate has the ability to

18   sell the information under the terms of service.  It was

19   something that they were seeking, and that was the deal that

20   ultimately -- you know, we felt like this was a value-

21   maximizing potential alternative that would provide for

22   enhanced recoveries.  And those were some of the tradeoffs

23   that we had to make.

24   Q    So then for me, what is the process since, like I said,

25   everything is going to Binance whether I want it to or not.

1    Do I just sit around for three months and then after the

2    three-month period Binance cashes me out?  And then who

3    sends me the check?  Or do I have to do anything to express

4    that I want to be cashed out?

5    A    On your last point first, maybe I'll address that.  I

6    don't know the answer to whether or not you have to do

7    anything to be cashed out or not.  I would have to review

8    how that's contemplated under the plan.  I imagine that

9    there's a mechanism that wouldn't require you to necessarily

10   do anything.  But I do want to be honest, I don't know the

11   answer to that.  So I would recommend reviewing the plan.  I

12   think there's a customer migration protocol that's been

13   published.  So I would look at the Stretto website for

14   additional information on that.

15        With regards to the mechanics of how the crypto

16   transfers would work in the instance that a customer chooses

17   not to migrate.  So -- and maybe I'll start with how the

18   migration works for customers that do sign up.

19        So if a customer does sign up, they would go through

20   KYC procedures on Binance.US  Upon that customer being

21   validated as a Voyager customer, Voyager at closing or at a

22   period thereafter, at least one week, Binance.US would

23   transfer that user's crypto associated with that account to

24   Binance, who would then distribute that to the customer's

25   account directly.  So at that point, you know, inherently

1    you would have been a Binance.US customer prior to any of

2    the funds being transferred to Binance.US associated with

3    your account.

4        To the extent you choose not to and you don't want to

5    migrate, you don't open an account, the crypto associated

6    with that does not leave Voyager for that three-month

7    period.  Voyager will continue to hold that crypto on fire

8    blocks in its other third-party services or exchanges to the

9    extent that's the case.  It will not migrate to Binance.

10   And at the end of the three-month period for those parties

11   that are in supported jurisdictions under the existing APA

12   or proposed plan, the way that that would work is that user

13   base's crypto would then transfer to Binance and would be --

14   Binance would ultimately sell that crypto on behalf of the

15   Debtor effectively and then transfer back the cash proceeds

16   associated with it.

17       And then Voyager would ultimately cut checks.  I can't

18   speak to the party that would be acting in that regard.  I

19   just don't know.

20   Q    Okay.  Got it.  So my next question.  So on March 1st

21   the U.S. Senate Office, they issued a letter addressed to

22   both Binance and Binance.US.  And I'm just going to read one

23   sentence from that letter.  And it says, "Binance now faces

24   investigations into criminal sanctions evasion, money

25   laundering conspiracy, unlicensed money transmission,

1    questions about its financial health and increased scrutiny

2    over its intentionally-opaque corporate structure.  So

3    within that letter -- so that's -- you know, that's pretty

4    heavy allegations.  And in that letter, they asked for a

5    bunch of production of documents with a deadline of March

6    16th, which is just about two weeks away.  So let's say

7    March 16th comes and Binance does not provide those

8    documents.  How does that affect the Voyager deal?

9    A    So the letter was news to use yesterday, too.  So after

10   I left the courtroom yesterday, we found out about it last

11   night.  Obviously in light of that, there were a number of

12   discussions in the evening as well as this morning.

13        To be clear, we are still digesting that as well.  It's

14   new information from our perspective.  Look, I think it

15   relates to statements that we had made this morning around -

16   - you know at this point in time, are we ready to move

17   forward with Binance?  No.  There is still incremental due

18   diligence that would need to be done in order for us

19   ultimately to feel comfortable moving forward on that basis.

20        The plan now, which has the support of 97 percent of

21   the creditors, provides for this backup option, which we

22   think is greatly important.  And so ultimately that

23   determination around whether or not we'll move forward with

24   them is likely to be several weeks down the road.  I in my

25   personal view don't see a scenario where we likely would be

1    able to close ahead of the 16th.  And so would that

2    potentially be a factor and it goes into our decision?  Of

3    course it would.  But there is additional work that we need

4    to do.  We plan on having conversations with them.  We had a

5    conversation with them this morning about it.  But there is

6    more work to do there.  And at this point in time, I'm not

7    in a position to say exactly how that is going to play out

8    at a future point.  But I can tell you we're going to do

9    work.  I know the other parties that are advisors in this

10   case are going to continue to do work as well.  We'll work

11   in consultation with the UCC and ultimately it will be a

12   recommendation and a determination by the Board at that

13   point in time, which is likely to be after the 16th.

14   Q    Okay.  And then assuming that -- I heard said earlier

15   that if an order isn't entered into by Monday, which is

16   March 6th, that Binance can pull out of the deal and it

17   triggers the reimbursements.  I don't understand what that

18   is.  Can you explain that to me?

19   A    I'm not as familiar with the specifics of that.  I

20   would have to ask counsel on the exact timing.

21             THE COURT:  Can one of the Debtor's counsel just

22   explain that provision to deal with that question?

23             MS. OKIKE:  Yes.  So there is what's known as a

24   milestone in the APA and it requires us to have the order

25   confirming the plan entered and approved by the Court by

1    March 6th.  To clarify one of my prior statements, taking a

2    look at it over the break, it's unclear whether that

3    actually -- the failure of the entry of an order by that

4    date would trigger the expense reimbursement.  There is a

5    requirement under the APA to have that order entered by

6    Monday.

7              MS. DIRESTA:  And can you explain to me what it

8    means by expense reimbursements?

9              MS. OKIKE:  Yes.  So there is a provision in the

10   APA which was approved when we got authority to enter into

11   the APA which provides for reimbursement of Binance's

12   expenses up to $5 million in certain circumstances where the

13   APA is terminated.

14             MS. DIRESTA:  Okay.  Thank you.

15   BY MS. DIRESTA:

16   Q    So now back to Mr. Tichenor.  Earlier I think I heard

17   you correctly, so correct me if I'm wrong.  But it seemed

18   like you said when the topic was about the toggle plan, it

19   seemed like you said Binance offered their services to help

20   with the Toggle plan.  Is that correct?

21   A    They have agreed to offer services to assist in the

22   toggle plan.  That's correct.

23   Q    Okay.  So if that's the case, then instead of -- if we

24   do the Binance deal, then all of the coins and tokens are --

25   can be transferred, right?  That's what everyone keeps

```
 1    saying, that that's one of the benefits of the Binance deal,

 2    that with the toggle option, there are 25 unsupported

 3    tokens.  And if Voyager went through the time and effort to

 4    make them supported, it would take six to nine months and,

 5    you know, cost millions of dollars.  And if it was

 6    liquidated instead of becoming supported, if it was

 7    liquidated, then it's like we're moving about $60 million,

 8    about $100 million loss that you were talking about earlier

 9    with the toggle option.

10         But instead of cashing it out, if Binance is offering

11    to help with the toggle option and they have the ability to

12    deal with the unsupported coins, couldn't they then just

13    help out with that portion?

14    A    So that's not something that we have specifically

15    discussed with them.  So I would have to ask around their

16    willingness or desire to do something like that.

17    Additionally, candidly, I think we'd have to do some

18    additional work on our side to understand what the financial

19    implications and operational logistics of that kind of

20    construct would ultimately look like.  The plan construct

21    that we put forward was relating to either we feel

22    comfortable with Binance as a counterparty and we would

23    potentially pursue a deal with them in the context of that

24    being a value-maximizing solution or we don't.  To the

25    extent that we don't, to me it would on the surface feel
```

1    potentially a little unfair to those customers to say, well,

2    for those 35 unsupported coins, we're uncomfortable moving

3    forward with that counterparty to do the X, Y, and Z factors

4    for everybody else.  But for you, you have to.  You know,

5    that to me also feels like an unfair tradeoff or unfair

6    treatment potentially of those customers relative to

7    everybody.  To me, it's more of probably a binary decision.

8    Either there's enhanced recoveries or there are not enhanced

9    recoveries.

10   Q    Okay.  I understand your point.  But is it something

11   that you guys would look into?  And not even just Binance.

12   Because, you know, there might be other exchanges out there

13   who would support those 35 unsupported coins.  Would you at

14   least look into that option as well?

15   A    I can take this back and have a discussion internally

16   around that.  I would have to --

17   Q    Okay.  Okay, great.  Thank you.  Okay.  Give me a

18   second as I go through my notes here.

19        During your due diligence with Binance, did you guys --

20   did Binance provide documentation showing both assets and

21   liabilities?

22   A    So we reviewed the -- excuse me?

23   Q    I didn't say anything.

24   A    Okay.  Apologies.  I thought I heard something.  So

25   during our due diligence with Binance, we reviewed the

1   audited and unaudited financial statements which would

2   include both their assets and their liabilities from a BAM

3   Trading Services perspective.  One thing to note is because

4   of the way that they treat their customer crypto, for

5   example, for audited financial statements, the way that it

6   works is that to the extent that you view something as a

7   custody relationship let's say, to the extent that you don't

8   view yourself as having ownership rights over underlying

9   crypto as an example, right?  The audit standards would say

10  that that is not property of that business and so therefore

11  those assets don't get consolidated in.  That said, they are

12  disclosed via footnotes.  And so to the extent the question

13  relates really to one element from a reserve perspective on

14  crypto, that's not something that would be disclosed as a

15  separate set of information, audited financial statements.

16  And I'm not aware of the standards requiring that.  But we

17  did review the assets and liabilities of the business as

18  (indiscernible).

19  Q    Okay.  My next question is earlier in this hearing, the

20  SEC was asking a bunch of questions.  And the first line of

21  questions was about the due diligence that you guys did with

22  the crypto security protocols and all the different meetings

23  that you guys had, the wallets and the transfers and all

24  that stuff.  And when he was asking who all was part of the

25  meeting, you said that people at Moelis and some of the

```
1    attorneys and other advisors were there.  And when he asked

2    who from Voyager attended, the only name you provided was

3    the CEO's name, Steve Ehrlich.  Can you remember any other

4    employees from Voyager attending those cryptosecurity

5    protocol meetings?

6    A    Well, I want to be clear.  I want to make sure from

7    Steve's perspective with regards to attending the meetings.

8    I would have to go back -- I don't know if he attended the

9    meetings directly.  It's not uncommon, right?  And from a

10   confidentiality perspective it would not be uncommon for

11   something where a counterparty relating to something with

12   this level of potential concern would want to limit it to a

13   professionalized-only basis.  And so oftentimes what that

14   means is that it's limited just to parties that operate in -

15   - and if you're familiar with -- like this is part of our

16   core business, is maintaining confidentiality.

17        And so what I want to be clear on is we had discussions

18   with the management team around information that we learned

19   around those discussions.  We've had discussions with a

20   number of parties.  You know, as I said, the company -- we

21   discussed at the board level, we discussed it with other

22   professionals.  We compared it to how we understand other

23   organizations to work.  So it's not like this is just

24   something we're -- you know, we left it at that level.  We

25   went out and compared that to how we understand other crypto
```

1    businesses and plans to operate and be able to compare that

2    and say, look, is this standard?  Do they feel like they

3    have more (indiscernible) or less (indiscernible), right?

4    There's dynamics there too that we wanted to make sure we

5    were also independently checking and verifying beyond

6    discussion with management and the consortium of

7    professionals involved in this situation.

8    Q    Okay.  Because during the SEC's lines of questioning,

9    it seemed like they were trying to determine if you guys

10   basically had had any crypto experts that was able to verify

11   all of the information that Binance was giving you.

12   Because, you know, he was asking questions like, you know,

13   what is this certificate versus that certificate and how do

14   you know that, you know, it's good and that kind of stuff.

15   And he was kind of asking kind of the same stuff I'm

16   wondering too.  If you guys had crypto experts, and you said

17   you guys didn't hire any crypto experts.  So I'm just

18   wondering, like, who really reviewed all of the

19   cryptosecurity protocols if you guys didn't hire any

20   experts.  And let's say the chief technology officer of

21   Voyager was not a part of the meetings and stuff like that.

22   A    So it's a good question.  What I would say is we -- and

23   to be clear too, we did this work as an investment bank and

24   this is generally well outside the scope of things that are

25   covered from a diligence perspective that we do.  But, you

1    know, we sought to try to confirm these elements because it

2    was important to us from a counterparty due diligence

3    perspective to be able to say that we were doing the work.

4    We've continued to have conversations with them around these

5    elements.  There are generally a lot of concerns that people

6    have around sharing of this type of information too from a

7    security perspective.  And I say this because even to the

8    extent that we did hire let's say a third party firm, it's

9    not clear to me that they -- that the counterparty would

10   have necessarily allowed for a third party to have done an

11   independent code review and on-site forensic diligence

12   session and, you know, potentially a multi-month process in

13   order to be able to verify all of those elements.  That's

14   highly, highly atypical in these types of situations from a

15   transaction perspective.  But in addition to that, it does -

16   - and we do understand this to be the case -- does create

17   potential security concerns for them.  They do operate a

18   business on a day-to-day basis, and the more people that you

19   let under the tent around what those security protocols look

20   like, the more risk that that potentially presents to them

21   as an organization.  So what we did do and sought to do is

22   also seek sworn assurances around these elements from

23   executives at the company where we at least would be able to

24   rely on that as an enhanced level relative to even just

25   statements that they're making on calls or Zoom, or even

1    based on documents that they may have received.  It's just a

2    heightened standard.  And so that was something that was

3    also very, very important from our perspective to be able to

4    get.

5              THE COURT:  Just to interrupt you for a second.

6    The ISO and SOC 2 documents that you had described, those

7    are not Binance people telling you things.  Those are

8    outside people reviewing what Binance does and telling you

9    that it complies with certain standards, right?

10             THE WITNESS:  That is correct, yes.  For the SOC 2

11   and the ISO statements, that's correct.

12             THE COURT:  And Binance paid those people to do

13   those reviews, but those reviews were provided to you.

14             THE WITNESS:  And they were provided to us by

15   Binance.  So...

16             THE COURT:  Yeah.

17             THE WITNESS:  Yeah.

18             THE COURT:  But the reviews themselves are by

19   other people certifying that they've looked at it and it

20   complies with whatever the standards are that

21   (indiscernible) described.

22             THE WITNESS:  With standards and -- like, I think

23   beyond those, I haven't received the report, but we've been

24   told that they also comply with PCI, DSS standards, which

25   relate to requirements under credit card transfers and

Page 167

1     what's needed.  So I mentioned those two because those are

2     the two reports that we received.  But I am --

3               THE COURT:  Okay.

4               THE WITNESS:  I've at least been told that there

5     are additional standards above and beyond that.

6               THE COURT:  Very Good.  Sorry to interrupt your

7     questions.  I just -- sometimes I have to interrupt or I'll

8     never remember all my own questions at the end.  Please

9     proceed.

10    BY MS. DIRESTA:

11    Q    Did you have anything else to add, Mr. Tichenor?

12    A    I don't believe so on those points.  Hopefully I

13    answered your questions.

14    Q    Okay.  Okay.  And then earlier someone was asking how

15    much you guys were going to get.  So I believe you confirmed

16    that if you guys make a sale, you would get $12 million.

17    But if it's the toggle option, you guys get the $11 million.

18    Is that correct?

19    A    That is correct.

20    Q    What do you guys get if it's a Chapter 7 liquidation?

21    A    I would need to go through.  I believe it's still

22    covered under -- I don't know the answer.  I would have to

23    go back through our engagement letter.

24    Q    Okay.  Yesterday the BRG witness confirmed for me that

25    for every $20 million in recovery, it pretty much only

1     equates to one percent of recovery for the creditors.  So

2     with the toggle option, you said we would leave about $100

3     million.  So that equals about five percent recovery lost.

4     Is that correct considering what the BRG value confirmed

5     with the math?

6     A     That's correct.

7     Q     So yesterday the percentage that was given was as of

8     February 27th, the recovery would be 73 percent if the

9     Alameda loan -- I'm sorry, Alameda clawback does not go

10    through.  If the Alameda clawback does go through, then that

11    73 percent gets reduced to 38 percent.  So assuming the

12    clawback does not go through with the 73 percent, we would

13    lose five percent with the toggle option, making it about 68

14    percent as of the date of yesterday if we did the toggle

15    option approximately, right?

16    A     So based on those numbers, my recollection is it's a

17    five to six percent differential between the two.  So

18    between the plan option with Binance relative to a self-

19    liquidation of recoveries.

20    Q     Okay.  Give me one second.

21    A     And to your point yesterday, it's beginning to think of

22    the recoveries associated with Alameda as either succeeding

23    or not succeeding.  So it's a parallel shift depending on

24    ultimately what happens.

25    Q     Okay.  So jumping to my last question.  I don't really

1  want to spend a lot of time on, you know, asking you too

2  many questions about the past.  But I know that I and

3  several creditors are curious, did you guys entertain bids -

4  - because it seemed like you guys attempted to entertain

5  bids that were heavy cash up front bids versus long-term

6  plans even if they weren't heavy cash upfront.  But in say a

7  year or two, in the long term, the creditors would be able

8  to recover like a hundred percent of their assets because

9  the company let's say providing the long-term plan, you

10  know, maybe they're getting, like, 60 percent of our assets

11  now, but then they provide incentives to stay on the

12  platform because they're actually saving the Voyager app

13  versus killing it, they're actually saving VGX versus it

14  dying off.  It's saving all of these things.  And then they

15  have all these upsides so that in say a year or two, we

16  would have made whole.  Did you guys, one, have those kinds

17  of bids, and two, did you seriously entertain them?

18  A    We had a range of different types of proposals.  We did

19  receive certain proposals including, for example, equity

20  components to them.  But I want to be clear, with proposals

21  that also included equity components, it wasn't like in that

22  instance the parties were getting a hundred percent of the

23  equity in that business.  Right?  And I think that's

24  something that sometimes may be missed.

25        And so the short answer is yes, we did entertain

1    proposals like that.  We evaluated them.  We evaluated a

2    number of different types and forms of proposals.  We had

3    some with earnouts, we had some with up-front cash

4    considerations.  We had some with trading credits.  You

5    know, every form and flavor.

6         And so one of the things that we did -- and again, in

7    agreement and in consultation also with the UCC and their

8    advisors around this is, you know, sought to evaluate and

9    compare those.  And one of the things that doesn't always

10   necessarily come up is as we were evaluating those, we were

11   also factoring in dynamics of counterparty risk and

12   feasibility as well.  You know, if you're establishing a new

13   newco, for example and we were to transfer all the assets

14   over there, we wouldn't want to be in a situation where that

15   business wasn't appropriately capitalized, right?  And so

16   one of the things relating to that is that, well, people may

17   think I would have an ability to, for example, participate

18   in potential upside of the platform, you know, we also

19   evaluated what does that platform look like, what are the

20   business lines associated with that, do you think that that

21   would be compliant from a regulatory perspective in light of

22   what's going on with the underlying industry.  What is their

23   business plan associated with it?  We didn't want to do a

24   transaction with a party we didn't think necessarily had

25   fully fleshed out and thought through all of the really

Page 171

1    critical dynamics of overhead, staffing, employees.  There's

2    a lot of factors, right?  Do they have an exchange that they

3    operate, do they not?

4         And so we took all of that, we evaluated it.  We sought

5    to place value on equity components, for example, in

6    valuating bids.  You know, the firm, we have a structure

7    around what that looks like.  But these are things that we

8    thought through.  They were key considerations.  There were

9    very long debates and discussions around it.  And ultimately

10   the plan that we put forward was one that was focused on

11   what we thought was a value-maximizing proposal that

12   provided the best outcome for people that also didn't take

13   money out of their pockets either, right?  And that's what I

14   was getting at with the capitalization element, is to the

15   extent that let's say we have a billion of crypto, we needed

16   to hold back, I don't know, $150 million in order to

17   capitalize that entity, that's money that you don't receive

18   today.  Right?  And you would get in the equity and

19   hopefully that succeeds.  But there's always a risk that it

20   doesn't.  And so these were all things that we thought long

21   and hard and had very extensive debates with our board

22   about, we had very extensive debates with the advisors

23   about.

24        So to answer your question in a longwinded way, we were

25   not dismissive of anything that came forward.

1   Q    Okay.  And earlier when you were answering a question

2   regarding backup bids, was I correct in hearing that you

3   said that there weren't any other companies -- so we

4   determined that Binance was the second-highest bid, but they

5   did not want to be considered a backup bidder.  But say the

6   third-highest bidder and so on, were they asked to be a

7   backup bidder and they also refused?

8   A    That's correct.

9   Q    I was trying to understand how you were answering that

10  question.

11  A    You are correct.  And there were extensive negotiations

12  around these exact points at the auction.  This is one why

13  we had an 11-day auction in part because of these exact

14  types of dynamics.  But that's correct.  There was no party

15  that was willing to be a backup bidder.

16  Q    Okay.  So you did ask, and they all refused is what

17  you're saying.

18  A    Yes, correct.  And I want to be clear on the Binance

19  one, there was a contingency that would not have qualified

20  them to be a backup bidder.  So you had a backup bidder

21  proposal, but it would require the estate paying an expense

22  associated with that that was not approved under bid order

23  and is highly, highly atypical.  And so it was not accepted

24  as a backup bid at that point.

25  Q    Yeah.  And I guess --

Page 173

```
 1    A    that was the only one that was --

 2    Q    Okay, now you confused me by saying that's the only one

 3    that was available.

 4    A    Well, to the extent that --

 5    Q    I thought we just --

 6    A    So to the extent that the Debtor would have tried to

 7    have accepted that backup bid or plan, there would have been

 8    additional proceedings relating to trying to pay an expense

 9    reimbursement, for example, that was not approved.  And as I

10    said, it is highly, highly atypical to that type of a

11    feature.  So at that point in time based on the facts and

12    circumstances, we didn't seek to try and move forward on

13    that basis.

14    Q    Oh, okay.  I think I understand what you're saying.

15    What you're saying is let's just say five, we asked five of

16    the bidders do you want to be a backup bidder.  All of them

17    said no except for Binance.  Binance said yes, but only

18    contingent upon if you pay us to be a backup bidder.  And

19    you guys are like no, we don't want to do that.  And so

20    that's why they were not chosen to be a backup bidder.  Is

21    that correct, how I understand --

22    A    That is a fair characterization, yes.

23    Q    Okay.

24    A    And the number of parties is a little off, but yes,

25    that's a fair characterization.
```

1  Q    Yeah.  I just threw an easy number out there.  Okay.

2  I'm just looking at my notes real quick to make sure I got

3  all my questions. I think I do.  Okay, yes.  Thank you.  I'm

4  done.

5          THE COURT:  Thank you very much.  Is there anybody

6  else on the phone who desires to cross-examine the witness?

7          All right.  Did the Committee have questions --

8          MR. JONES:  Yes.  Seth Jones.

9          THE COURT:  I'm sorry, who is that?

10          MR. JONES:  Seth Jones.  I have a few questions.

11          THE COURT:  All right.  Go ahead, Mr. Jones.

12  BY MR. JONES:

13  Q    So you negotiated a $12 million contract with Voyager.

14  What value did you expect to bring back to the estate in the

15  bankruptcy process?

16  A    I'm sorry, could you repeat that?  I wasn't able to

17  hear this voice.

18  Q    When you negotiated a $12 million contract with

19  Voyager, what value did you expect to bring back to the

20  estate in this bankruptcy process?

21  A    We negotiated what we viewed was an arms length fee.  I

22  know that there were also discussions with the UCC around

23  that.  We looked at comparable situations.

24      You know, I think one thing to remember here too,

25  right, is that there's upfront consideration and there's

1    also value in other forms.  Right?  And so when we think of

2    the value pot, we understand that there is a view around the

3    upfront consideration from the purchase price perspective

4    being, you know, in this case $20 million.  But there's --

5    it's not really a $20 million purchase.  And I think the way

6    that we have always viewed this is that it's a billion-

7    point-zero-two-two -- it's 1.022 billion from a

8    consideration perspective because we have to figure out what

9    to do with the crypto and we have to figure out how to

10   operate the business and we have to figure out how to

11   maximize value.  And so we ran a gauntlet of different

12   scenarios and processes and ran everything down in order to

13   try and make sure that we were maximizing value.

14        Because for example, you know, you could see a

15   situation where somebody would say, well, why don't I just

16   do a block trade on the crypto portfolio and run it like a

17   Chapter 7 liquidating trustee would.  Well, you know, we had

18   discussions with market makers who actually literally

19   participated in some of the U.S. Marshal auctions relating

20   to liquidations of crypto portfolios that they received in

21   connection with seized assets, for example, like Silk Road.

22   And they gave us views on where the discounts were that they

23   participated in those deals.  And so we ran down everything

24   and tried to run down various structures, various proposals.

25        Obviously I think in light of what happened with FTX,

1    obviously things changed and there was a lot that evolved

2    over the course of this case.  Would I have, in hindsight

3    looking back in June, expected that in the interim, FTX was

4    the second-largest exchange and an individual would get in

5    front of congress and testify to the nature of the business

6    to collapse?  No.  But, you know, we sought to maximize

7    value throughout.  And again, I think the foregone value in

8    a lot of ways is also what we think is a really important

9    element to the plan.  It's been a very key consideration

10   from our perspective.

11   Q    (indiscernible) granted permission to start rebalancing

12   the coin from January 10th.  One of the professionals I

13   believe was BRG during the first APA disclosure hearing.

14   But they estimated it would cost $30 million in slippage

15   fees and one month to rebalance the portfolio.  And they

16   said they planned on starting in early February.  Why has

17   this process not started right away to start breaking down

18   the liquid assets into smaller blocks and not disrupt the

19   markets?

20   A    So we have sought to not disrupt the market.  We wanted

21   to make sure that we were fully coordinated with the UCC on

22   what the options were going to be for purposes of

23   rebalancing.  We engaged with carious market makers, we

24   solicited a number of different proposals.  We compared

25   those.  We have obligations even under the APA relating to

Page 177

```
1    (indiscernible) that Binance had negotiated for in
2    connection with some of those transactions.
3         And to be clear, the fees that are being paid from a
4    commission perspective are in our minds likely to be very,
5    very low here.  And I say that in the sense that based on
6    the way that we are doing the rebalancing, based on the way
7    that the trades are occurring, you know, they are likely to
8    be in the very, very, very low single digits from a
9    commission --
10   Q    So single digits?  This slippage is not going to be $30
11   million?
12   A    If we have to pivot to, for example, a toggle plan,
13   they could be more based on the liquidation of the
14   alternative -- or the unsupported coins to the extent they
15   need to be done in block trades.  The strategy that the
16   Debtor is pursuing right now is one that we believe would
17   reduce the level of commissions and would optimize around
18   the outcome to try to limit any movements that the
19   transactions would ultimately have on the market itself.
20   Q    So is that inaccurate, the $30 million?
21   A    Excuse me?
22   Q    Is it -- was the number -- is the $30 million
23   inaccurate?
24   A    So I think the $30 million was initially for and may
25   have been a bit of a misrepresentation.  I think that that
```

```
1    was meant to not be necessarily commissions.  It was meant

2    to include other elements --

3    Q    Slippage fees.

4    A    Excuse me?

5    Q    I said slippage fees.

6    A    Yeah, that's right.  And slippage is different than

7    commissions though.

8    Q    Slippage fee for illiquid coin.  (indiscernible).  No,

9    it's not including commission.  (indiscernible) my slippage

10   fees (indiscernible) illiquid assets.

11   A    Yes.  And slippage though is different than commission,

12   right?  And so when I talk --

13   Q    Yeah, absolutely.

14   A    Yeah.  And so when -- you know, I believe the numbers

15   that were reported yesterday had been based on just the

16   market prices in all crypto to the extent that effectively

17   let's say the rebalancing has already occurred, right?  It

18   hasn't fully completed yet, but there's still --

19   Q    Yeah.  I'm not talking about the (indiscernible).  I'm

20   talking about how much will it cost in slippage fees.  Is it

21   $30 million?

22   A    Well, we don't know what the slippage is ultimately

23   going to be.  It's a bit of a -- the one difficulty with

24   slippage is that it's kind of a counterfactual, right, in

25   the sense that there's no way to measure the impact of just
```

1    slippage in the sales of any individual token relative to

2    broader price movements in the underlying market.  And so

3    what we try to do is by doing the transactions over a

4    prolonged period of time and being very careful and managed

5    in how much individual trades are occurring in given day and

6    any given token, in any given market at any given exchange

7    is to make sure that by doing it over such a long period,

8    our view is that it is likely to inherently limit any

9    ability of individual trades to likely have an impact.  But

10   it's an unknown.  It's --

11   Q    So one month was inaccurate too.  Are you saying?

12   A    No, I'm not saying that it's an inaccurate statement.

13   I am saying that it's an estimate, and there continue to be

14   estimates around figures relating to unknowns based on where

15   the market is moving.  Just like the recovery is an

16   estimate.  We do not know ultimately what the value would be

17   of the portfolio at the time that the rebalancing finishes.

18   The percentage recoveries are still going to move.  They're

19   going to move based on --

20   Q    Absolutely.

21   A    -- (indiscernible) that we know happened last night.

22   Q    Absolutely.  All right.  You talk about $135 million in

23   the 35 unsupported coins.  Is that number before or after

24   the 445 million holdback in FTX and the $135 million

25   winddown trust that has to be liquidated into U.S. dollars,

1    which is, what $580 million, that those 35 coins will be

2    paid out in pro rata, the difference.

3    A    I'm sorry, do you mind repeating that?

4    Q    (indiscernible).

5    A    I just couldn't hear you.  Do you mind repeating that?

6    Q    You talked about the 135 million in the 35 unsupported

7    coins.  Is that number before or after you have to liquidate

8    the $445 million FTX holdback and the $135 million winddown

9    that has to be liquidated to U.S. dollars?

10   A    Yeah, I think I understand your question.  I don't know

11   the answer to that.  I would have to check the exact

12   figures.  I understand the nature of your question.  I don't

13   know the specific answer.

14   Q    So it could be a lot less to liquidate you're saying

15   (indiscernible).

16   A    I don't -- look, I don't believe so, but I don't know

17   the answer.  I would have to check.

18   Q    You talked about maximizing value.  Why have the

19   partners been forced into a high stakes casino in this

20   volatile market instead of giving their assets back

21   immediately?  Waiting nine months.  Creditors have lost the

22   right to appreciation of a specific asset they originally

23   invested in.

24   A    So I think --

25   Q    I believe it was a lie (indiscernible) was wiling to

Page 181

```
 1    help you out with that.

 2    A    Sorry, are you talking about in July or at the FTX

 3    proposal?

 4    Q    Yeah, or any time.  Yeah.

 5    A    Well, I think in hindsight we're pretty happy that we

 6    didn't go forward with FTX in July.

 7    Q    Well, absolutely.  But that's not decision-making

 8    correctly, obviously.

 9    A    At the time --

10    Q    You want to talk about hindsight, what about the

11    Binance deal?  Are we going to be saying the same thing in

12    the future?

13             MR. SLADE:  Your Honor, object.  We're getting

14    speeches, not questions.

15             THE COURT:  I'm sorry, Mr. Jones.  I'm not sure

16    what your question is.

17             MR. JONES:  He wants to talk about hindsight

18    saying thank god we didn't (indiscernible) the FTX deal or

19    didn't (indiscernible).  But now he wants to talk about

20    Binance is okay.  Are we going to be saying the same thing

21    in the future?

22             THE COURT:  Well, okay.  I can sense from your

23    tone and from your question that you have your own point of

24    view of that situation.  But remember, please, what we're

25    doing right now is we're taking evidence.  We're asking
```

Page 182

```
 1    questions of the witness about the proposals that are in

 2    front of us.  So let's try to focus on that.  Okay?  Do you

 3    have another question for this witness?

 4              MR. JONES:  No, that's it for now.  I appreciate

 5    it, Judge.  Thank you.

 6              MS. TREVINO:  I have a question.

 7              THE COURT:  All right.  Who is this?  I'm sorry?

 8              MS. TREVINO:  My name is Lisa Trevino.  I am pro

 9    se.  I have a few questions, please.

10              THE COURT:  Yes, please.  Go ahead.

11    BY MS. TREVINO:

12    Q    Mr. Tichenor, I just have a few questions for you,

13    please.  And then maybe one follow-up depending on your

14    answer.

15         What happens if the part two of the claims that we

16    received from Stretto, the email, the claims email, what

17    happens if the part two of the claims amount are found to be

18    inaccurate in any way?  How would those affect recovery

19    rates?

20    A    I don't know exactly what the part two claims are.

21    Q    Okay.  So just to clarify, the Judge, before this

22    hearing that started yesterday, the last hearing, he

23    discussed that specifically.  I asked the Judge this and he

24    said part one is for voting and part two is --

25              THE COURT:  Oh, I think I know what you mean.  You
```

1    mean the objections to the substance of the claims.  Yeah.

2    The percentage results are based on the Debtor's estimates

3    of where that will turn out.  If the allowed claims are

4    higher than the Debtor estimates, then the recovery

5    percentages will go down.  But that will be true

6    proportionally no matter what we do.  Right?  Because it

7    will just be -- the allowed claims will be the same as they

8    would be in Chapter 7 as they would be under a toggle plan,

9    as they would be under a Binance proposal.

10           MS. TREVINO:  Okay.  So I guess the follow-up

11   question to that, Your Honor, would be are there any other

12   situations or any other than what has been discussed over

13   the past two days that would affect the recovery rates that

14   we have not heard?

15   BY MS. TREVINO:

16   A    That's a good question.  There are factors potentially

17   from timing perspectives.  I mean, it's always very

18   difficult to know exactly what's going to happen in the

19   future.  I think we tried to outline the key elements.  And

20   I think probably the biggest one is just volatility in

21   cryptocurrency prices.  Effectively the estate

22   (indiscernible) a very large pool of cryptocurrency.  We are

23   seeking to distribute that obviously in kind and do the

24   rebalancing trades in connection with that.  But it creates

25   volatility in recoveries and it's a large part of why, for

1    example, we are aware of the  mid-20 percent numbers that

2    are being quoted relative to where we are now in light of --

3    you know, to the extent that the Alameda claims end up being

4    valid. And so I think that's probably the biggest one.  But

5    in truth, I don't entirely know.  But in some instances, I

6    would say probably time is going to be the biggest one.  So,

7    for example, to the extent that we continue to perform due

8    diligence moving forward, end up selecting to move to a

9    toggle, and it's several weeks from now.  And then if

10   operationally things weren't in place to be able to properly

11   execute it, it may result in a delay.  But that to me is

12   probably the biggest one if I were to think of

13   (indiscernible) outside the crypto portfolio value.   But,

14   look, it's tough to know.  It's an unknown, right?

15   Q    Okay.  My second question would go to Mr. Tichenor.

16   What is your opinion specifically, like we asked the other

17   witnesses yesterday, your own opinion of the 445 million

18   clawback (indiscernible), do you feel that this is a right

19   and just situation?

20           MR. SLADE:  Your Honor, I would object.

21           THE COURT:  Yeah.  First of all, that's a legal

22   question.  Second, I'm not sure that it's in anybody's

23   interest to ask the Debtors officially in sworn testimony

24   whether they think their litigation adversary is going to

25   win or lose.  They probably will want to continue to put

1    forward the strongest defense that they can without being

2    put to that kind of testimony under oath any more than

3    Alameda would want to testify as to what it thinks its risks

4    are.  So I think I'll have to sustain the objection to that

5    question.  I hope you understand why.

6              MS. TREVINO:  I do.  Thank you very much, Your

7    Honor.

8              THE COURT:  All right.

9              MS. TREVINO:  That's all for now from me.

10             MS. RYAN:  Your Honor, I may.  This is Ms. Ryan

11   from the State of Texas.  I have one question that I just

12   thought of.

13             THE COURT:  I think you -- I think you had your

14   chance.  But does anybody object to Ms. Ryan asking another

15   question?

16             MR. SLADE:  If it's just one, it's okay, Your

17   Honor.

18             THE COURT:  Okay.  You've got permission to do

19   just one, so choose it carefully.

20             MS. RYAN:  Thank you.  I will.

21   BY MS. RYAN:

22   Q    Mr. Tichenor, in doing due diligence into Binance, did

23   you come across any company agreement between Binance.US and

24   Binance.com that could affect Binance.US's performance?

25   A    And by performance -- so I just want to make sure I

1    understand the question.  We reviewed the agreements between

2    them that we were of the commercial agreements in nature.

3    You know, I can always think of hypotheticals that could

4    impact things.  But we did review the nature of those

5    agreements and the ability, for example, of -- and we asked

6    this question very point blank, the ability of Binance.US to

7    continue to operate as a standalone business to the extent

8    that Binance.com didn't exist.

9    Q    Thank you.  That was all.

10              THE COURT:  Okay.  Anybody else on the phone who

11   has questions for Mr. Tichenor?  All right.

12              Does the Committee counsel have questions?

13              MR. EVANS:  Yes, Your Honor.  This is Joseph Evans

14   from McDermott Emery on behalf of the committee of unsecured

15   creditors.

16   BY MR. EVANS:

17   Q    Good afternoon, Mr. Tichenor.

18   A    Good afternoon.

19   Q    There's been a lot of discussion today about whether

20   the Binance deal closes.  Do you recall that?

21   A    I do.

22   Q    And you referred to something called a fiduciary out.

23   A    I hope I did.

24   Q    What's a fiduciary out?

25   A    So a fiduciary out is that as structure of the APA, we

```
 1    have an agreement to move forward with Binance.US to
 2    consummate a transaction.  A fiduciary out allows for the
 3    Debtor, to the extent that there is a proposal, even in the
 4    interim prior to any closing, to evaluate and potentially
 5    move forward with that party to the extent that that
 6    transaction is viewed as being higher or otherwise better
 7    than the existing Binance.US deal.
 8         So up until the point where the transaction closes, you
 9    could theoretically still move forward with a different
10    alternative?
11    Q    Suppose there wasn't another alternative.  But suppose
12    you found out something bad about Binance that made the
13    Debtors uncomfortable with the deal.  Is there a method by
14    which the Debtors could not close the deal?
15    A    We would exercise the fiduciary out and pivot to the
16    self-liquidating toggle at that point because on that basis,
17    the Debtor would argue that on a risk-adjusted basis, that
18    transaction would be higher or otherwise better than the
19    Binance.US transaction.
20    Q    Only if whatever was found out about Binance rose to
21    the level that the professionals and the Debtors believed it
22    was in their fiduciary capacity to not go forward with the
23    deal.  Is that right?
24    A    I believe we have quite a bit of flexibility around
25    ultimately what that would look like and the business
```

Page 188

1    judgement of the Debtor to make that kind of determination.

2    Q    Okay.  And are you familiar with the amended APA?

3    A    I am.

4    Q    Okay.  You don't recall what 8.1(g) says I'm sure.

5    A    I don't recall specifically 81.(g).

6    Q    Do you happen to have it in front of you?  I have a

7    copy here.

8    A    Is it Exhibit 9?

9         MR. EVANS:  Your Honor, to refresh the witness's

10   recollection, I would like a copy of the amended APA.  It's

11   Document Number 835.

12        THE COURT:  Go right ahead.

13        MR. SLADE:  It's Exhibit 9.

14   BY MR. EVANS:

15   A    Which specific provision?

16   Q    This is the second blue tab.  It is 8.1(g).

17   A    8.1(g).  Yeah.

18   Q    So if you turn to the page right before it, which is

19   Page 63 of the contract.  Article 8 is labeled Termination.

20   Do you see that?

21   A    Yes.

22   Q    Okay.  And it says this agreement may be terminated

23   only in accordance with this Section 8.1  Do you see that?

24   A    I do.

25   Q    Turn to the next page, subsection G.  It states, "By

1    written notice from seller to purchaser, which may be

2    revocable in the sole discretion of seller by written notice

3    of seller to purchaser within five business days of seller

4    or the board of directors or similar governing body of

5    seller determine in good faith and after consultation with

6    legal and other advisors that proceeding with the

7    transactions or failing to terminate this agreement will be

8    inconsistent with its or such persons or body's fiduciary

9    duties.  Do you see that?

10   A    I do.

11   Q    And is that the fiduciary out that you were

12   referencing?

13   A    That is.

14   Q    Okay.  You can put it down for now.  There was a lot of

15   discussion today about the diligence that Moelis and other

16   professionals performed on Binance.US.  Isn't that right?

17   A    There has been a little bit, yeah.

18   Q    And there was also some discussions about

19   representations made by Binance.US to you and the other

20   professionals.  Isn't that right?

21   A    That's correct.

22   Q    And you did other due diligence, but in part you relied

23   on some of those representations, didn't you?

24   A    Absolutely.

25   Q    Okay.  One of those representations was that Binance.US

Page 190

1    holds the digital assets deposited by its customers on

2    Binance.US's platform solely in a custodial capacity and on

3    a one-to-one reserve basis.  Do you remember that?

4    A    I do.

5    Q    What's a one-to-one reserve basis?

6    A    So a one-to-one reserve basis is that to the extent

7    that have one bitcoin due to a customer, they had one

8    bitcoin that was held in custody on the platform.  So

9    effectively you could never have a quote, unquote, run on

10   the bank because effectively all that would happen is people

11   would just withdraw the crypto.  It would be very similar to

12   if a bank only had cash and the parties were seeking to

13   withdraw all the cash.

14   Q    And so if Binance is stating to you that crypto was not

15   held on the one-to-one reserve basis, would that materially

16   change -- if it was false, would that materially change your

17   opinion on whether this transaction should go forward?

18   A    To the extent it was lower, absolutely.  If it were

19   higher and for some reason they chose to overcapitalize

20   customers' accounts, I'd feel pretty good about that.  But

21   to the extent that it was lower, absolutely.  It would

22   materially impact our view.

23   Q    And there were some discussions yesterday about, well,

24   how is Binance.US holding crypto any different than Voyager

25   did.  If you know, did Voyager hold crypto on a one-to-one

1    reserve basis?

2    A   Not to my knowledge.  Or they rehypothecated it and

3    that's why we're in the situation that we're in today.

4    Q   Let's talk about that word, rehypothecate, for a

5    second.  What's rehypothecate?

6    A   So rehypothecation is the ability to take collateral

7    that a party may have posted on a platform.  It's very

8    common in the traditional securities sense where if you have

9    a margin account at an equity trading platform,

10    rehypothecation is the ability to use those funds and to be

11    able to lend them out to somebody that is seeking to borrow

12    them.

13    So in the sense of Voyager, as people think about their

14    crypto, it's why all of the crypto is property of the

15    estate, is so that they can rehypothecate it and lend it to

16    other parties.

17    Q   And it's your understanding based on representations

18    made to you on diligence you performed that Binance.US does

19    not rehypothecate customer crypto.  Isn't that right?

20    A   That's correct.

21    Q   And just to be clear, that means Binance.US does not

22    lend customer crypto to anyone.

23    A   That is my understanding.

24    Q   No lending, no staking, nothing.  Right?

25    A   So customers I understand can elect to stake through

Page 192

1    the Binance platform under their terms of service subject to

2    their staking provisions.  But from the lending perspective,

3    to be clear, yes, my understanding is they expressly

4    prohibit that.

5    Q    Okay.  There was some discussion today and yesterday

6    about BAM Trading Service Inc., DBA Binance.US, the Delaware

7    Corp., versus what's known as Binance Global.  Do you

8    remember that?

9    A    I do.

10   Q    the purchaser is the U.S. entity, BAM Trading Services.

11   Isn't that right?

12   A    That's correct.

13   Q    When you were evaluating the ability to close the

14   transaction, were you evaluating the finances of BAM Trading

15   Services Inc, or were you evaluating the finances of the

16   overall Binance?

17   A    We were evaluating the finances of BAM Trading Services

18   Inc., which is a standalone business as we understand it

19   separate and apart and away from Binance Global, which is a

20   separate company from our understanding.

21   Q    When you reviewed the audited financial statements and

22   the unaudited financial statements of BAM Trading Services

23   Inc., those were BAM Trading Services Inc. only, not --

24   A    That's correct.

25   Q    And there was some discussion about the corporate

Page 193

1   structure.  Is Binance global the sole shareholder of BAM

2   Trading Services Inc.?

3   A    No.  And it is opposite of representations that have

4   been made to us based on our understanding of the

5   organization chart and ownership interests of the business.

6   Q    Let me just make sure -- because the representations I

7   didn't get.  So what you're saying is Binance Global is not

8   the sole shareholder of BAM Trading Service Inc., right?

9   A    Correct.

10   Q    Okay.  But in determining whether BAM Trading Services

11   Inc. had the financial capability to close, you didn't just

12   take their word for it, right?  You looked at information?

13   A    We did.  We requested a proof of funds, which is a bank

14   statement that they provided from their bank.  And we even

15   reviewed the nature of the bank to make sure that we felt

16   comfortable with that.

17   Q    So you actually looked at a bank account statement that

18   said we have enough cash to close?

19   A    We did.

20   Q    Who is Changpeng Zhao?

21   A    He is the founder of Binance.com and he is the UBO of

22   both Binance Global as well as Binance.US.

23   Q    Okay.  There were some questions about the ability of

24   Binance Global to make decisions concerning the customer

25   assets held at BAM Trading Services Inc., Binance.US.    Do

1    you recall those questions?

2    A    I do.

3    Q    There was representation made to you, was there not,

4    that only employees of Binance.US., not Binance Global, are

5    able to move or withdraw customer crypto from Binance.US's

6    platform.  Do you remember that representation?

7    A    I do.

8    Q    Now, when they made that representation, you also asked

9    some follow-up questions about this representation, didn't

10   you?

11   A    Of course we did.

12   Q    And it was over the course of multiple sessions, right?

13   A    Many, many sessions.

14   Q    And did you ask, for example, does CZ have the power to

15   take customer crypto out of BAM Trading Services Inc?

16   A    We did.

17   Q    And what was the response?

18   A    No.

19   Q    Separate from the responses, you've viewed policies,

20   procedures, and protocols?  Have you asked questions about

21   how the information security works?

22   A    We did.

23   Q    Did anything in your view call into question whether CZ

24   had the power to take customer crypto from Binance.US and

25   move it to Binance Global?

1   A    We were always concerned about the ability of somebody

2   that was associated with Binance Global to be able to remove

3   crypto out or assets from Binance.US..  And it came up in

4   multiple discussions.

5   Q    So you were concerned as it was a topic of diligence,

6   correct?

7   A    Yes.

8   Q    When you do all this diligence and you did these

9   interviews and you reviewed the policies, did you see

10  anything that indicated to you that CZ had the power to take

11  customer crypto out of BAM Trading Services Inc. and move it

12  over to Binance Global?

13  A    No.  And if anything, what we understand to be the case

14  is that no individual has an ability to move -- no specific

15  individual can move crypto out.

16  Q    Okay.  There was a couple of questions -- and let me

17  just ask the same question for Binance Global generally

18  based on your review of the policies and procedures, your

19  interviews.  Do you have any reason to believe that Binance

20  Global can direct Binance.US to take customer crypto out of

21  Binance.US and send it to Binance Global?

22  A    Based on the representations that were made to us, I

23  have no basis to believe that's the case.

24  Q    Earlier today, the SEC raised some questions about

25  security protocols and how you know stuff like what you just

Page 196

1    said.  Do you recall that?

2    A    I do.

3    Q    Okay.  So along with the policies and procedures, you

4    also received two security reports from independent third

5    parties.  Isn't that right?

6    A    That's correct.

7    Q    And I just want to clarify the record because there was

8    a question that was asked to you by the SEC, and it was --

9    there was a bunch of questions.  But one of the things you

10   said was when you sought to get representations, that was

11   the work that we did.  That wasn't all the work that you

12   guys did, right?

13   A    No, that's correct.  We did more work than just seeking

14   to get representations.

15   Q    Okay.  Like, for example, you reviewed the security

16   report from December of 2022, isn't that right?

17   A    I did.

18   Q    And you reviewed another security report from June 1st,

19   2022.

20   A    That's correct.

21   Q    and those reports were all issued by independent third

22   parties, not  Binance.  Isn't that right?

23   A    That's correct.

24   Q    On February 16th, 2023, there was an article issued by

25   Reuters about Binance concerning an entity called Merit

1    Peak.  Do you remember that media report?

2    A    I do.

3    Q    And in that media report, there was an allegation that

4    $400 million was withdrawn from a bank account at Binance.US

5    to Merit Peak.  Do you remember that?

6    A    I do.

7    Q    When you saw that article, what did you do?

8    A    We immediately reached out to Binance.US to ask them

9    about the nature of the article, to immediately schedule

10   diligence discussions.  And I believe the next day we were

11   beginning to have conversations with them about it.

12   Q    And it wasn't just Moelis, right?

13   A    Not just Moelis, yeah.

14   Q    It was Moelis and a variety of other professionals that

15   were asking.  Each of them had different questions, right?

16   A    That's correct, yeah.  I mean, I know for a fact on

17   that specific item, it did involve Moelis, it involved

18   Kirkland, McDermott, FTI, BRG.  All of the advisors.

19   Q    In connection with I'll call it the Merit Peak

20   diligence, there were a number of meetings with Binance

21   executives, wasn't there?

22   A    There have been, yes.

23   Q    And document requests?

24   A    Yes.

25   Q    And ultimately there was an in-person meeting the day

```
 1    before the first hearing where two Binance executives went

 2    through all the Merit Peak information.  Isn't that right?

 3    A    That's my understanding.  I wasn't in attendance at the

 4    meeting.

 5    Q    You didn't attend, but people on your team did attend.

 6    A    Correct.  There were individuals from Moelis who

 7    attended, yes.

 8    Q    And in that meeting based on what you know from your

 9    team, transaction data was shown to us.

10    A    That's my understanding, yes.

11    Q    And there was analysis done of deposits versus

12    withdrawals.  Isn't that right?

13    A    That's my understanding, yes.

14    Q    And there were representations by Binance that

15    everything that they showed us was accurate.  Is that right?

16    A    That would be an important one, yes.

17    Q    Okay.  And there were three critical representations in

18    my view, but also you have to say.  One, Merit Peak --

19              THE COURT:  Counsel, there haven't been any

20    objections, but I think just the form of that question

21    without going further I am going to have an objection to.

22              MR. EVANS:  Okay.  I'll ask this -- withdrawn.

23    Sorry, Your Honor.

24    BY MR. EVANS:

25    Q    Did Binance represent that Merit Peak did not withdraw
```

1    customer fiat or crypto?

2    A    They did.

3    Q    Did Binance represent that Merit Peak nor any other

4    market maker had the ability to withdraw customer fiat or

5    crypto from the Binance.US platform?

6    A    They did.

7    Q    Did Binance represent that Merit Peak no longer

8    conducts any activity at Binance.US?

9    A    They did.

10   Q    There were some questions raised about FTX, the FTX

11   deal versus Binance.  Do you recall those?

12   A    I do.

13   Q    When the Binance deal was getting negotiated, it was

14   substantially different than what it is now, isn't it?

15   A    It evolved over many, many months.  Yes.

16   Q    Okay.  And in fact at first the deal was all of the

17   customer crypto would go over to Binance.US and they would

18   hold it until the customer was on board with Binance.US and

19   then get released to them.  Isn't that right?

20   A    That's correct.

21   Q    Okay.  And the committee and other professionals

22   objected and pushed for a different way to distribute the

23   assets.  Isn't that right?

24   A    That's my recollection, yes.

25   Q    And so the plan now is that once customers get

1   onboarded with Binance.US, crypto gets released on a weekly

2   basis.  Isn't that right?

3   A    That's correct.  So my understanding is that a customer

4   would have to be a customer of Binance.US  They would have

5   signed up.  They would have done their KYC.  At that point

6   in time, on a weekly basis crypto would be transferred in

7   bulk transactions.  And part of that is to also minimize

8   friction costs.  We're aware of things like gas fees, for

9   example, that could occur on a one-off basis.  And so upon

10  that customer signing up, they are allocated crypto on a

11  weekly batch, would be transferred over, and then

12  subsequently deposited into their account.

13  Q    Why is that safer for customers than the original deal

14  that was proposed?

15  A    It's safer for the customers that choose not to migrate

16  to Binance.US, for example, or who have yet to establish

17  accounts.  And so in the context of let's say a bankruptcy

18  to the extent there was fraud or theft of funds, for

19  example, and there were issues that we were unaware of or

20  unable to diligence, in that instance, the customers would

21  have signed up for the account.  We probably have the

22  ability to monitor or we planned to monitor the transactions

23  as they were coming.  But it limits the Debtor as the estate

24  and their exposure to a counterparty until the point where

25  the sale should have occurred and the transfer should have

Page 201

1   occurred and they are a customer of that entity.

2   Q    Is that because customers want to withdraw their crypto

3   from Binance as quickly as possible, that customer's crypto

4   is only exposed to Binance for a short period of time?

5   A    In part, yes.  Yeah.

6   Q    You became aware of the letter issued by a couple of

7   congresspeople in the United States Senate.

8   A    Three senators, yes.

9   Q    Three senators.  That's right.  When did you become

10  aware of that?

11  A    Late last night, around 10:00.

12  Q    And you've read it I presume?

13  A    I have.

14  Q    Okay.  Would you describe the diligence on this senate

15  letter as ongoing?

16  A    I would.

17  Q    Did you talk to Binance about the senator letter?

18  A    We spoke this morning with them.  Not just Moelis, but

19  all of the professionals in the case.

20       THE COURT:  Does anyone want to put that letter in

21  evidence so that we have some context about what all this

22  testimony is about?

23       MR. SLADE:  Certainly, Your Honor.  We would offer

24  the letter as Exhibit 25.

25       MR. EVANS:  Your Honor, I have a hard copy for you

Page 202

1    if you're interested.

2              MR. SLADE:  Obviously, Your Honor, not for the

3    truth of any of the matters asserted.

4              THE COURT:  Obviously not for the truth of what's

5    asserted, but just to put in context what the testimony has

6    been about.

7              MR. BRUH:  Your Honor, Mark Bruh for the United

8    States Trustee.  Could we just get some clarification?  Is

9    this the Committee's witness or is this the Debtor's

10   witness?  Because the line of questioning seems a bit

11   leading to us.

12             THE COURT:  It's the Debtor's witness.

13             MR. BRUH:  Okay.

14             THE COURT:  If you have objections to questions,

15   just speak up.  Can I see this senate letter that we've

16   introduced?

17             MR. EVANS:  Yes, Your Honor.  May I approach?

18             THE COURT:  Yes.

19   BY MR. EVANS:

20   Q    Based on your conversations with Binance this morning,

21   is your understanding that they're willing to provide more

22   diligence concerning this letter?

23   A    They have represented that they are willing to continue

24   to engage in diligence relating to allegations in the

25   letter.

1   Q    Okay.  And if they don't have responses that are in

2   your view sufficient concerning these allegations, would

3   that be one of the things that may factor into your decision

4   to say, well, maybe we should execute our fiduciary out?

5   A    There were a number of documents that would ultimately

6   determine our ability -- or in the determination to exercise

7   the fiduciary out.  There are very serious allegations that

8   are being made in that letter that obviously caused concern

9   from our perspectives that would need to be addressed.  And

10  to the extent that we don't feel like they are sufficiently

11  addressed, it would be one of many factors that would go

12  into a determination to assess on a risk-adjusted basis

13  whether or not that is a transaction that is worth pursuing

14  and moving forward with or exercising the toggle, which the

15  plan allows for.

16  Q    Along with the United States Senate letter, there was

17  another development this morning, wasn't there?

18  A    There was.

19  Q    What was that?

20  A    CZ, Changpeng Zhao, who is the UBO of both Binance.US

21  as well as Binance Global, sent a tweet this morning as a

22  reply to another tweet relating to the Voyager Binance deal

23  that seemed to have referenced the SEC.  It appeared based

24  on that tweet that they may have been pulling out of the

25  deal.  And obviously that is extremely concerning.

1    Q    And the tweet said maybe we should pull out.  Isn't

2    that right?

3    A    That's -- I didn't remember the exact words, but that's

4    my recollection, yes.

5    Q    And it was a link to an article about the SEC's

6    argument yesterday at this hearing.  Isn't that right?

7    A    I believe so.  There was a lot happening this morning,

8    and I've been on the stand for quite a while today.  So yes,

9    that's my recollection.

10   Q    And then there was a call this morning, wasn't there?

11   A    Yes.  There were several calls this morning.

12   Q    And during that call, a text message was read to you,

13   wasn't it?

14   A    There was a text message that was read to me by a

15   Binance.US representative around their interests and still

16   moving forward with the transaction.  We also had another

17   call with the Binance CEO directly this morning in advance

18   of the hearing relating to the same tweets and making sure

19   that we have assurances from him as well prior to walking

20   into the courtroom today around that interest.

21   Q    The text message that was read during the call was from

22   Binance.US's CEO, Brian Shroder, wasn't it?

23   A    That's correct.

24   Q    And the text message said, "We are not going anywhere.

25   Binance.US is committed to completing this deal."  Is that

1    correct?

2    A    That's my recollection, yes.  And that's consistent

3    with the statements that he then subsequently made to us

4    directly on another conversation involving all of the

5    professionals.

6    Q    So there was a text message, then there was a phone

7    call.  And during the phone call, Brian said what?

8    A    So there were two things.  So we had a conversation

9    with individuals at -- an individual, excuse me, at

10   Binance.US who had in the first instance read a -- I think

11   it was either a Slack message or a text message from the

12   CEO.  We then subsequently had a conversation directly with

13   the CEO, Brian Shroder, given the fact that we wanted to

14   speak directly about it versus hearsay from one of his

15   employees.

16   Q    And when you spoke to Brian Schroder, did he say the

17   same thing, that we are not going anywhere, Binance.US is

18   committed to completing this deal?

19   A    He did.

20   Q    And was there a request for a sworn statement or

21   appearance or someone from Binance to say something about

22   this statement?

23   A    My recollection is yes, there was a lot of discussion

24   this morning, yes.

25   Q    Right before this hearing, there was another tweet,

1    wasn't there?

2    A    That's my understanding.  I was about to get on the

3    stand when it came out.

4    Q    Based on your understanding, if you know.  You might

5    now know.  But if you know.  CZ tweets, "We are still in

6    support of the deal and helping returning funds to users as

7    quickly as possible if allowed to do so."

8    A    That's my understanding of the tweet.

9    Q    So these representations made to you by Binance.US in

10   connection with one-to-one reserve basis asset segregation,

11   the inability of assets to be -- customer assets be moved

12   off the Binance.US platform at the direction of others,

13   statements like they want to go forward with the deal,

14   notwithstanding the CZ tweet.  In part you're relying on

15   those in coming to your recommendations about this plan,

16   aren't you?

17   A    Those are statements that are important for us for

18   recommending moving forward with the plan.  But I do want to

19   be clear as I said at the beginning of my testimony, there

20   is still outstanding diligence.  I mean, to be very clear,

21   we would not say that we are in a position to necessarily

22   until we would feel comfortable around the nature of all the

23   diligence and the additional allegations.  Are those facts

24   helpful?  Of course they are.  And the representations that

25   were made to us by them were critical and even signing an

1    ADA with them in the first instance.  So they will be

2    critical factors to the extent that we do choose to move

3    forward with Binance.  And again, there is still work to be

4    done.  And that decision will not be made for several weeks

5    and would not be made just by Moelis, to be clear.

6    Q    Is it fair to say that you still have questions that

7    need answers until you're comfortable supporting --

8    A    Absolutely.  That said, the plan provides for these

9    options and the plan provides for options, which we think is

10   critically important.  And our understanding that it has the

11   resounding support of creditors both on the voting as well

12   as the number of individuals that we understand who have

13   already pre-emptively signed up for Binance.US, and we're

14   going to try and get their distributions, which we view as

15   kind of a quasi vote of support, but...

16   Q    Along with the representations made to you either

17   orally, in writing, or during meetings, there are also

18   certain representations that are built directly into the

19   asset purchase agreement, aren't there?

20   A    There are.

21   Q    Okay.  And deciding and evaluating whether the asset

22   purchase agreement is a good idea or a bad idea, those

23   representations are important to you, aren't they?

24   A    They are important.  And I would say during the

25   negotiation and discussions with Binance around the APA, we

Page 208

1    requested and required that there were additional

2    representations that are uncommon in the context of normal

3    APAs around the nature of the operations and their business,

4    that these are not things that people normally rep to in

5    APAs, but were critically important for us during those

6    discussions.

7    Q    So I have a pretty basic question.  You have a lot of

8    questions for Binance, still need answers.  So do some other

9    professionals.  Why do you support the plan with all these

10   ambiguities?

11   A    So I support the plan with the ambiguities because it

12   provides us optionality and a path to potentially maximizing

13   value for creditors.  We view this as providing two options

14   at this point in time.  There's plan A which would be an

15   ability to continue to move forward with the Binance.US

16   transaction at a future date and time based on additional

17   work that still needs to be done.  And as we said, the

18   Debtor is not in a position still to be able to close even

19   if it wanted to tomorrow.  There's still rebalancing trades

20   that need to occur over a multi-week period.  Like,

21   logistically it just will not happen for multiple weeks.  So

22   it provides for that option, which we believe provides for

23   potentially higher recoveries, and it also provides for a

24   self-liquidating toggle, which, while a lower recover is

25   obviously an option that the Debtor could control and

1    exercise on its own.  So it's the ability to have an

2    embedded backup plan in connection with the highest and best

3    offer with an embedded backup plan which is the basis for us

4    feeling comfortable to move forward.

5    Q    Let's talk really, really quickly about benefits to

6    customers.  You said that the Binance deal gives about $100

7    million more value than the toggle.  Isn't that right?

8    Something like that?

9    A    That's correct, yeah.

10   Q    What are those -- where does that increase come from?

11           THE COURT:  We've done this two or three times

12   already.  Are you about -- are you trying to elicit some

13   error in the prior testimony?

14           MR. EVANS:  No.  I'll do it a different way then.

15   BY MR. EVANS:

16   Q    You say in your declaration that the sales transaction

17   provides the highest value currently available under the

18   circumstances to the Debtor's creditors.

19   A    I believe that's what my declaration says, yes.

20   Q    Okay.  Based on the numbers, do you still believe that

21   today?

22   A    So I believe that based on he numbers, it would provide

23   the highest path.  But I would say that absent clearing

24   sufficient diligence to feel comfortable moving forward with

25   that counterparty, that's what we think of as a threshold

Page 210

1    matter.

2              MR. EVANS:  I have nothing further.

3              THE COURT:  Okay.  The United States Trustee?

4              MR. MORRISSEY:  Yes, Your Honor.

5              THE COURT:  Actually, let's just take five

6    minutes.  Okay?

7              MR. SLADE:  I'm sorry.  You guys already

8    questioned the witness.

9              MR. MORRISSEY:  Your Honor, I stand for two

10   things.  One is I want, without objection of course,  the

11   opportunity to ask one question, plus perhaps a couple of

12   follow ups, of the witness.  And based on something the

13   witness just said a few minutes ago.  And also, I had a

14   question, Your Honor, about the declaration that you asked

15   for just after the break.

16             THE COURT:  You have a question for me about the

17   declaration I asked for?

18             MR. MORRISSEY:  Well, obviously with inviting

19   comments from others as well.  What I wanted to do --

20             THE COURT:  During our break, why don't you talk

21   to the Debtor's counsel about the questions you want to ask

22   and see if they object.  Because you have already had a

23   chance at the witness.  Okay?

24             MR. MORRISSEY:  Thank you, Your Honor.

25             (Recess)

```
 1              THE COURT:  Please be seated.  I think the
 2     official court rule is that I'm not supposed to have this
 3     coffee in the courtroom.  So you are ordered not to rat me
 4     out.
 5              MR. SLADE:  Your Honor, I did give Mr. Morrissey
 6     at least my permission, if he has yours, to ask his one
 7     question.
 8              THE COURT:  Go ahead, Mr. Morrissey.
 9              MR. MORRISSEY:  Thank you, Your Honor.
10     BY MR. MORRISSEY:
11     Q    Good afternoon, Mr. Tichenor.  Richard Morrissey for
12     the U.S. Trustee.  As I said before the break, I just have
13     one question for you.  You had an exchange with counsel for
14     the committee a little while ago about the back and forth
15     with social media messages about people at Binance
16     threatening to back out and saying no, we're not backing
17     out.  Do you recall that?
18     A    I do.
19     Q    Is it your understanding that Binance Global, or CZ
20     himself, either has the power to decide the fate of this
21     deal at all?
22     A    That's a great question.  It's one that we asked this
23     morning.  I don't think we've actually come to a full
24     conclusion on that at this point in time.  Where is the
25     chairman of that entity, I don't know.  But I imagine that
```

1    statements along those lines -- I don't know actually is the

2    answer.

3    Q     Thank you.

4              MR. MORRISSEY:  Your Honor, that's my only

5    question for the witness.

6              THE COURT:  Okay.

7              MR. MORRISSEY:  I didn't know if you wanted to

8    take my request or recommendation for the declaration that

9    Your Honor discussed just after the previous break.

10             THE COURT:  What is your suggestion?

11             MR. MORRISSEY:  Your Honor, as you will recall,

12   you gave a list of statements that should appear in the

13   declaration.  And I have a request or recommendation that

14   one be added to it.  I discussed it with Mr. Slade.

15             THE COURT:  Is the Binance counsel here?

16             MR. SLADE:  They are not, Your Honor.  I explained

17   to Mr. Morrissey that what they had asked their client for

18   authority to make public was in the existing document that

19   was already a sworn statement.  So I'm not sure whether

20   adding it -- what happens.

21             THE COURT:  does the existing document cover the

22   five points that I mentioned?

23             MR. SLADE:  I believe it does, Your Honor.

24             THE COURT:  What is the additional point you were

25   going to ask about, Mr. Morrissey?

1          MR. MORRISSEY:  Your Honor, it's actually related

2     to one of Your Honor's points.  One of Your Honor's points

3     was that crypto could be transferred only as directed by

4     customers.

5          THE COURT:  Yeah.

6          MR. MORRISSEY:  What I was going to suggest, Your

7     Honor, was a statement as to whether Binance Global has the

8     power to take customer crypto out of Binance, out of

9     Binance.US and transfer it to BAM Trading.

10          MS. OKIKE:  That's addressed in the...

11          THE COURT:  Isn't that covered by saying nobody

12     outside of Binance.US can access the customer crypto?

13          MR. MORRISSEY:  Your Honor, I think that would.  I

14     didn't hear -- I guess I didn't hear Your Honor say

15     Binance.US when you said that.

16          THE COURT:  Yeah.

17          MR. MORRISSEY:  That's fine.  And again, as Ms.

18     Okike just said, perhaps that's already in the pre-existing

19     statement.  Thank you, Your Honor.

20          THE COURT:  All right, thank you.

21          Any other questions?  I think we've -- yes?

22          MR. SLADE:  I have no more questions for the

23     witness, Your Honor.  Thank you.

24          MR. GOLDBERG:  Your Honor, Adam Goldberg of Latham

25     and Watkins on behalf of Binance.US  I do have one question

1    for the witness, and I would like to request a chambers

2    conference regarding Your Honor's request for a statement

3    from Binance.US

4              THE COURT:  I'm not inclined to have a chambers

5    conference I don't think without a really special, good

6    reason.  There are so many people interested in this

7    proceeding.  Is there really nothing we can talk about on

8    the record?

9              MR. GOLDBERG:  As I think Your Honor is aware,

10   this is a sensitive issue.  This is a matter that the SEC is

11   actively looking at as we've seen in this proceeding.  And I

12   think the SEC would be welcome to join in this chambers

13   conference with other parties or a sidebar conversation.

14   But that would be our request, Your Honor.

15             THE COURT:  But it's not just the SEC, right?

16   Everybody on the telephone is interested in this.  The

17   questions you want to raise with me, you can't do that in a

18   public proceeding?  I don't understand.

19             MR. GOLDBERG:  We will do so, Your Honor, if

20   that's what's required.  We would request it be discussed in

21   confidence.

22             THE COURT:  Yeah, I don't think I can do that.

23   You know, we are in the middle of a court hearing.  So I

24   asked for something in public, so I'm not sure -- my

25   proceedings are supposed to be public.  Occasionally if

1    there's a settlement issue or something and everybody who is

2    affected by it is present, then I understand having a

3    chambers conference.  But I don't think we have that

4    situation here.

5              MR. GOLDBERG:  Yes, Your Honor.  I think the idea

6    of a chambers conference was to have -- explain our

7    rationale for our proposal and how to address the

8    certificate that you've requested and then come on the

9    record and discuss it.

10             MR. UPTEGROVE:  Your Honor, William Uptegrove with

11   the SEC.  May I be heard?

12             THE COURT:  Yeah.

13             MR. UPTEGROVE:  Thank you, Your Honor.  I only

14   raised my hand because we actually have a similar request

15   that wanted to make of Your Honor.  And if I may have a

16   moment to sort of update you on what we've been working on

17   and issues we wanted to update you about.  Because it goes

18   along with counsel for Binance's request.

19             THE COURT:  You wanted to update me privately on

20   what you've been working on?

21             MR. UPTEGROVE:  Oh no, no, Your Honor.  I wanted

22   to update you publicly right now.  But it relates to a

23   similar type of issue as was just being discussed.  What I'm

24   going to say -- I am proposing to put this on the record,

25   Your Honor.

Page 216

1              THE COURT:  I see.

2              MR. MALIONEK:  Good afternoon, Your Honor.  Robert

3     Malionek of Latham & Watkins, sorry to double team, for

4     Binance.US.

5              I think because of what counsel for the SEC is

6     raising right now, we had anticipated exactly that and the

7     need for that not to go onto the record.  We wanted to be

8     able to talk about what we think is the solution to the

9     question that you asked, Your Honor, which is that there

10    have been references to representations that have been made

11    by Binance.US.  We would like for those to be able to --

12    they've already been put into an officer's certificate.  Mr.

13    Tichenor has already talked about the fact that the Debtors

14    and the professionals have relied on it.  The UCC has asked

15    questions about it.  And we simply want to be able to put

16    that into the record, but we want to be able to discuss that

17    with Your Honor first.  And I think the issues that counsel

18    for the SEC want to raise before the SEC raises it as part

19    of the proceedings.

20             So we would invite them into the chambers

21    conference, but we do believe that we actually would need

22    that for purposes of security.

23             THE COURT:  But is that an evidentiary issue that

24    you wish to discuss with me?

25             MR. MALIONEK:  Yes, it is.

1        THE COURT:  This seems highly irregular.  You

2   know, if there is an evidentiary issue and I need to rule on

3   it by only hearing from a few of the parties, then I will do

4   so.  But I really don't want to have any presentations of

5   facts at all, or argument at all, or explanations at all.

6   I'll just hear the evidentiary issue.  That's the only thing

7   that I can think of that it would be appropriate to step

8   aside separately for.

9        And who are you suggesting being included in this?

10   The SEC...

11        MR. MALIONEK:  The Committee, the Debtors.

12        THE COURT:  U.S. Trustee?

13        MR. MALIONEK:  U.S. Trustee.  And yes, Your Honor,

14   we would simply outline for you our proposal to deal with

15   the evidentiary issue.  And then we would expect that

16   afterwards we would come back into the courtroom so that,

17   Your Honor, we could make public what your determination is

18   from the sidebar in conference.  In other words, we don't

19   want to hide anything from the public, we simply want to be

20   able to explain the rationale for it in chambers.

21        MR. MORRISSEY:  Your Honor, Richard Morrissey for

22   the U.S. Trustee.  I would just raise a general objection on

23   the record for the reasons Your Honor already stated.  But

24   obviously if Your Honor rules, we would be happy to

25   participate.  Thank you.

1          MS. RYAN:  Your Honor, this is Ms. Ryan from the

2     State of Texas.  We join in that objection.

3          UNIDENTIFIED SPEAKER:  Your Honor, Kevin

4     (indiscernible) on behalf of New York (indiscernible).  As

5     do we.

6          THE COURT:  Okay.  I've got --

7          MR. UPTEGROVE:  Your Honor.

8          THE COURT:  Yeah.

9          MR. UPTEGROVE:  William Uptegrove for the SEC.

10    Irrespective of whether or not you were to grant Binance's

11    request -- if I may, I was already going to address an issue

12    that I mentioned, which was first, I just want to apologize

13    for any frustration Your Honor had yesterday with our

14    position.  We heard your concern.  We --

15         THE COURT:  Hang on one second.  Are we finished

16    with the witness?  Yes?

17         MR. SLADE:  Yes, Your Honor.

18         THE COURT:  Okay.  Did you have a question for

19    him?

20         MR. GOLDBERG:  I had one question.  And I think

21    depending upon Your Honor's ruling regarding our proposal,

22    it may be helpful to have the witness on the stand.

23         THE COURT:  Well, let's finish with him subject to

24    recall if we need to deal with whatever this other issue is.

25    Okay?

Page 219

```
 1            MR. GOLDBERG:  Okay.  Thank you, Your Honor.

 2            THE COURT:  Do you have a question with him in

 3    that context?

 4            MR. GOLDBERG:  Yes.

 5            THE COURT:  Go ahead.

 6    BY MR. GOLDBERG:

 7    Q    Mr. Tichenor, you testified that the sale transaction

 8    would be roughly $100 million better for the estate than the

 9    toggle.  Does that $100 million include any potential tax

10    benefits or savings that customers may receive by virtue of

11    an in-kind distribution?

12    A    No, it does not.

13    Q    Thank you.

14            MR. GOLDBERG:  That's all, Your Honor.

15            THE COURT:  Okay.  All right.  Thank you, Mr.

16    Tichenor, you are excused.

17            There's so much mystery here that it is difficult

18    for me to figure out if I have any proper grounds to have a

19    separate conference when I have objections that are pending

20    to the idea of having a separate conference.

21            MR. UPTEGROVE:  Your Honor, William Uptegrove for

22    the SEC.  If I may just continue with what I see as sort of

23    a completely separate request.

24            MR. MALIONEK:  Your Honor, Robert Malionek again.

25    I do not want to be in the habit of cutting off another
```

1    counsel while they're in the middle of speaking about

2    something.  My only concern is that, you know, I'm not sure

3    since we're in the phase of the trial where we're putting on

4    evidence, is counsel for the SEC ready to put on evidence or

5    call a witness?  Because otherwise, if it's to give a speech

6    or to give an update or anything along those lines, I'm not

7    sure that this is the proper time to do that.  That's part

8    of why we want to able to have the conference, Your Honor.

9             MR. UPTEGROVE:  Your Honor, I simply have a simple

10   request.  If I can just have a minute to make a request.

11            THE COURT:  Okay.

12            MR. UPTEGROVE:  I'm not going to make a speech.

13   I'm not going to make an argument.

14            THE COURT:  Okay.  Go ahead.

15            MR. UPTEGROVE:  So Your Honor had concerns

16   yesterday about the SEC's position.  We would like to be

17   able to address them.  And I'm not going to go into that to

18   address it.  I'm going to propose how we think that might be

19   able to be addressed, at least as best as we can address it

20   under the circumstances.

21            As I indicated yesterday, unlike other parties,

22   there are statutory restrictions on our ability to share

23   non-public information.  As I'm sure Your Honor can

24   appreciate, there are also other practical considerations as

25   well.  We do, however, want to do our best to address the

1    concerns being raised.

2         What we would request is that when it's convenient

3    for the Court -- I think Binance would like to do it right

4    now for us because the timing is not important -- either

5    later today or Monday -- if the Court would like to do it

6    now, that is fine.  Whenever it's convenient for Your Honor

7    and the other parties, we would request that we be allowed

8    to have an in-camera conference with the Debtors, Binance,

9    and the U.S. Trustee.  And we'll defer to the Debtors and

10   Binance with regard to whether the Committee should attend.

11   We would prefer to do it on our part, the SEC,

12   telephonically.  But if the hearing is continued to Monday,

13   we're willing to come to New York and be there Monday

14   morning for the in-camera conference.

15        And what we would like to do there is to be able

16   to address the concern you raised and the grounds for doing

17   that are that we are statutorily limited to what we do in

18   public.  There are issues with us disclosing things in

19   public.  And we might be able to address some of your

20   concerns in-camera, and then hopefully that's an acceptable

21   way to move forward.

22        MR. SLADE:  Your Honor, Mike Slade for the

23   Debtors.  We object to that.  Okay?  If the SEC wants to put

24   on evidence, they can put on evidence.  This is a continual,

25   frustrating issue for us.  We don't want the SEC to have the

1    opportunity to go to chambers and tell Your Honor something

2    that they're not actually willing to put in evidence and,

3    you know, perhaps that would influence the result.  That's

4    our concern.  So we object.

5                MR. AZMAN:  Your Honor, Darren Azman for the

6    Committee.  To the extent there is an in-camera conference,

7    obviously the Committee would like to participate.  I don't

8    believe the gentleman from the SEC invited us.  But I would

9    like to be invited, obviously.

10               MR. MALIONEK:  Your Honor, Robert Malionek, if I

11   may.  I know you're taking notes.  If I may add on.

12               It seems like we may have some joint support for a

13   request to have this chambers conference with you.  From our

14   perspective, it's only for purposes of explaining an

15   evidentiary issue and how to resolve it so that there's

16   perhaps one additional question for Mr. Tichenor that we

17   could ask and then put something into the record for Your

18   Honor.  We just want to be able to explain what it is.  I

19   think it's -- if the SEC wants to be able to participate in

20   that, we welcome that and welcome obviously the UCC and the

21   Trustee, Debtors to join as well.

22               THE COURT:  Well, if the purpose of a conference

23   is to give me information that might address questions I

24   have raised regarding this transaction and to influence how

25   I might decide things, it seems very awkward and unusual to

1    suggest that that be done in private.  It's an evidentiary

2    proceeding.  There are times when evidence involves trade

3    secrets or other reasons why it cannot be disclosed

4    publicly, but those are very rare.  And this is a peculiar

5    situation, because usually if that's the case, I have some

6    indication, some evidentiary indication of what it is that

7    is going to be offered so that I can decide whether it's

8    something that is so sensitive that it can be considered as

9    evidence, but people can -- some people otherwise can be

10   excluded.  It seems particularly hard for me to say that it

11   can be considered in evidence and not only can the public be

12   excluded, but even people who are other objectors on similar

13   grounds could be excluded.  That bothers me immensely.  And

14   at least some of those people, including the state

15   regulators, have issued their objections.

16          So having expressed that concern, what can you say

17   to me?

18          MR. MALIONEK:  Your Honor, Robert Malionek again

19   just because so many people have been talking, I want to

20   make sure I'm clear for the record.  W absolutely agree,

21   Your Honor, and join in the objection of the Debtors that

22   the chambers conference should not be a place to offer

23   evidence.  That's not what we're asking for.  This is to

24   explain the evidentiary basis for how we're going to get

25   through one rule of evidence that will allow us to put the

Page 224

```
1     evidence before you, Your Honor, that you asked for.  But

2     there are issues that we need to be able to speak to you in

3     private about, Your Honor.

4              We don't agree with the SEC that they should be

5     able to come back into chambers and put in evidence behind

6     the scenes.  We don't think that that's appropriate.

7              MR. UPTEGROVE:  Your Honor, William Uptegrove for

8     the record.

9              THE COURT:  Just before --

10             MR. UPTEGROVE:  We're not proposing to -- I just

11    want to be clear.

12             THE COURT:  Go ahead.

13             MR. UPTEGROVE:  I'm sorry.

14             THE COURT:  No, go ahead.

15             MR. UPTEGROVE:  I'm sorry, Your Honor.  So we just

16    wanted to be clear about what the proposal is.  Because

17    everyone has said -- not everyone, but the objectors have

18    said that we were proposing to put in evidence.  That's not

19    the case.  What we wanted to do is you had specific

20    questions that related to the impossibility because the SEC

21    wouldn't take a position, it wouldn't give you guidelines

22    about what the SEC thought.  So it's not really argument.

23    I'm not going to -- what we would propose is actually

24    relatively brief.  If we have authority to provide the Court

25    with information, our strong preference is that we would do
```

1    it in a way that is narrowly-tailored as possible.  And the

2    other parties may actually want that.

3         But the point is we are not trying to put on

4    argument.  It's not going to be an argument that we're

5    intending to make.  We're not trying to put on any evidence.

6    But we wanted to answer Your Honor's questions because Your

7    Honor had what I would characterize as understandable

8    frustration that, you know, that we couched things in May

9    and wanted a little more certainty.  And so we were

10   proposing to provide you with the best answers that we can.

11   And doing it in-camera would be highly preferential.

12         MR. MALIONEK:  Your Honor, I'm confused.  Because

13   counsel for the SEC spoke up just now while we're in the

14   middle of putting on evidence, or hopefully towards the tail

15   end of putting on evidence, to say that they wanted to

16   provide you with some information and an update on what

17   they're working on.  I think those are direct quotes.  That

18   sounds like evidence.  That's not what we want to get into,

19   Your Honor, in a chambers conference.

20         We spoke up because we want to be able to -- it's

21   not put on evidence, but we do want to explain the rationale

22   for our argument regarding an evidentiary issue so that we

23   can ask one further question of the witness.  That's all.

24         MR. AZMAN:  Your Honor, Darren Azman for the

25   Committee again.  I don't know what we're talking about.  I

1    really don't.  And I don't know whether to object or not.

2    It sounds like there's sensitive information that Binance

3    and there's sensitive information that the SEC has.  But I

4    have a lot of concerns.  You've heard all the creditors in

5    the past two days raising issues with the lack of

6    transparency in this case.  So I would have concerns about

7    that.  But I want to be respectful of whatever it is that

8    they don't want to talk about in court.

9             And so perhaps one solution is we could have an

10   in-camera conference to talk about whether a discussion

11   should be held in-camera or not because I don't know what

12   they're talking about.

13            MR. MALIONEK:  That sounds like a fine solution.

14   We're not trying to hide evidence or information.  We simply

15   have that evidentiary and legal argument to make, Your

16   Honor.

17            UNIDENTIFIED SPEAKER:  Your Honor, pro se

18   creditor.  Would like to be involved in that discussion.

19            THE COURT:  I think the suggestion is that I have

20   a conference just to address the issue of whether it's

21   appropriate not to allow you to be in on that discussion.

22            I can in my head imagine things that you would

23   want to discuss and reveal to me that you would not want to

24   put on the public record and that also may not have any

25   bearing on this proceeding.  I have no idea if that's what

Page 227

 1    this is about or whether there's some other reason why you

 2    are concerned.

 3              I think what I can -- the best I can do if I'm

 4    being told that there is good reason and not an evidentiary

 5    submission to have a private discussion just of the issue of

 6    whether other information should be submitted in private,

 7    that I can do that.  But if in the course of that anybody

 8    says anything that I think needs to be on the public record,

 9    I'm putting it on the public record.  And you ought to be on

10    notice of that.

11              MR. MALIONEK:  Yes, Your Honor.  We understand.

12    We do think there is good reason.

13              THE COURT:  All right.

14              MR. UPTEGROVE:  William Uptegrove for the SEC.

15    Understood, Your Honor.

16              THE COURT:  Okay.  So now how do we do this?

17    We've got the SEC by telephone.  I guess the U.S. Trustee,

18    the Committee, Binance, the Debtor, come with me to my

19    chambers and we'll -- what's the number we can reach you at

20    at the SEC?

21              MR. UPTEGROVE:  404 -- well, actually -- yeah, we

22    can do that.  404-842-5765.

23              THE COURT:  Five seven what?

24              MR. UPTEGROVE:  Six-five.

25              THE COURT:  Is that a direct to where you are?

1           MR. UPTEGROVE:  It is.

2           THE COURT:  Okay.

3           MR. UPTEGROVE:  I'll have to get off the line

4     though and --

5           THE COURT:  Okay.

6           UNIDENTIFIED SPEAKER:  Your Honor?

7           THE COURT:  Yeah.

8           UNIDENTIFIED SPEAKER:  Your Honor, (indiscernible)

9     New York (indiscernible).  Is there a reason that can be

10    articulated as to why (indiscernible) cannot attend the

11    chambers conference?

12          THE COURT:  Well, you know, I guess that's what

13    I'm going to be told, that apparently I have to be told in

14    private.  That's one of the issues that I'll ask about.

15    Okay?

16          (Recess)

17          THE COURT:  -- worry or misapprehension about what

18    happened in our private little conference right now, I am

19    going to say what happened.

20          There were two issues, neither of which were

21    evidentiary.  One was that Binance is willing to free the

22    Debtors from their confidentiality limitations and is to

23    allow the Debtors to submit the sworn statements that

24    Binance has previously given to the Debtors and I think was

25    concerned as to whether that amounted to a tendering by

Page 229

1    Binance of a witness, which I don't believe it does.  I

2    don't think anybody here has subpoenaed a Binance witness or

3    called a Binance witness.  And so if the Debtors want to

4    offer those certificates, I would appreciate it.  That's the

5    first issue that was discussed.

6            The second issue was that the SEC wished to try to

7    answer questions that I had posed at the beginning of the

8    hearing as to what the SEC's position is on some of these

9    issues.  But I gather that in the first instance they were

10   asked to find out if they could tell that to me separately

11   rather than in public.  I responded that I am not

12   comfortable hearing that explanation in private.  This is a

13   public court proceeding.  I made very public what my

14   questions were.  The SEC has made objections.  Other people

15   have made objections.  Anything that further explains the

16   basis for the SEC's position it seems to me is something

17   that everybody is entitled to hear.  So if the SEC has an

18   explanation, I ask that that be put on the public record and

19   not done privately.  Okay?

20           So don't think we're officially closed the

21   evidentiary record, but I do have quite a bit of authority

22   over the order of proceedings.  And so if the SEC wishes to

23   make a clarifying statement as to its position, I welcome

24   them to do so.

25           MR. UPTEGROVE:  Thank you, Your Honor.  William

1    Uptegrove for the United States Securities and Exchange

2    Commission.  Again, Your Honor, just to be clear, when Your

3    Honor raised the issue yesterday, we went back internally

4    within the SEC and worked as diligently as possible all

5    throughout the SEC to try our best to answer your questions.

6    And I have been authorized to provide the following

7    additional information.  I don't think it satisfies all of

8    your questions, but under the circumstances, this is what I

9    have authority to provide.

10           So, Your Honor, this is a complicated situation,

11   in part because seeking relief against a defunct entity is

12   often not productive and given the nature of our enforcement

13   investigation, which are non-public.  Additionally opinions

14   of the staff do not reflect the views of the Commission,

15   which has not taken a position with respect to Voyager or

16   Binance.  With that being said, the staff believes based

17   solely on the facts and circumstances currently known to the

18   staff that the offering and sale of BGX tokens have the

19   attributes of a securities transaction -- securities

20   transactions.  Staff also believes that Binance.US is

21   operating an unregistered security exchange in the United

22   States.  The Commission has not made any determination on

23   either of these issues.  The staff beliefs do not represent

24   the position of the Commission.  And that's all I wanted to

25   provide, Your Honor.  Thank you.

1          MR. MALIONEK:  Your Honor, Robert Malionek.  My

2     understanding -- correct me if I'm wrong -- was that there

3     would be no information or evidence that would be offered.

4     That sounded to me to be different than what my

5     understanding was anyway.  And so we would move to strike.

6          THE COURT:  It's not evidence.  Right?  It's a

7     statement of position.  Yesterday, the SEC said that it

8     wasn't taking a position one way or the other.  Today, it's

9     saying that the staff is informing me of what it believes,

10    but that the Commission as a whole is still taking no

11    position.  That just essentially tells me what a contention

12    is.  Okay?

13          So at least I know that the SEC isn't just saying

14    maybe, that it's saying it thinks that there are issues.

15    But I still don't have evidence and I still don't have very

16    much clarity as to exactly why they think there are issues

17    or how they would affect this transaction.  But I guess I

18    appreciate the limited clarification you have been able to

19    provide.  Okay?

20          Is there any other evidence that anybody wishes to

21    offer?  To turn back to the evidentiary record.

22          MS. RYAN:  Your Honor, this is Ms. Ryan from

23    Texas.  The statements or affidavits being submitted by

24    Binance, we would object to those as hearsay.  And once they

25    are submitted, will they be available to everyone, I

1    suppose, all the interested parties?

2              THE COURT:  Well, I'll ask them to be put on the

3    public record.  But I think they're being offered by way of

4    explaining the Debtor's due diligence, in which case they're

5    not hearsay, they're evidence of things that the Debtors

6    looked at and relied upon.

7              MR. SLADE:  Your Honor, Mike Slade for the

8    Debtors.  We would offer the Binance officer certificate

9    that Mr. Tichenor testified to extensively as Debtor's

10   Exhibit 26.  And if you admit it, we will put it on the

11   public docket tonight.  Or maybe tomorrow.

12             THE COURT:  Do you have them here, by the way?

13             MR. SLADE:  I do have -- yes.  We have one copy

14   with a one underline on it.

15             THE COURT:  Well, just put it on the docket and

16   I'll download it from there.

17             MR. SLADE:  Yes, sir.  We will.

18             THE COURT:  So to the extent there's a hearsay

19   objection, I overrule it.

20             MR. SLADE:  Thank you, Your Honor.  The Debtors do

21   not have any more witnesses.

22             THE COURT:  What about the objections we have as

23   to the selection of the plan administrator.  Is anybody

24   going to address that?

25             MR. SLADE:  Yes, Your Honor.  The Committee is

Page 233

1    going to put on a witness, right, or whenever Your Honor

2    would like, to testify about that.

3                THE COURT:  Let's go there.

4                MR. CALANDRA:  Your Honor, John Calandra from

5    McDermott Will & Emery on behalf of the Committee.  We would

6    like to call Paul Hage, who would be plan administrator,

7    Your Honor.

8                THE COURT:  Okay.

9                Mr. Hage, do you promise and swear that the

10   testimony you are about to give will be the truth, the whole

11   truth, and nothing but the truth, so help you God?

12               MR. HAGE:  I do.

13               THE COURT:  State your full name for the record,

14   please.

15               MR. HAGE:  Paul Robert Hage.

16               THE COURT:  Okay.  Please proceed, Counsel.

17               MR. CALANDRA:  Thank you.

18                    DIRECT EXAMINATION OF PAUL HAGE

19   BY MR. CALANDRA:

20   Q    Mr. Hage, what is your current occupation and

21   employment?

22   A    I am a partner and co-chair of the bankruptcy and

23   restructuring group at Taft, Stettinius & Hollister.  And I

24   am based in Detroit, Michigan.

25   Q    And how large is your firm, Taft?

1    A    Taft has roughly 850 attorneys, located primarily in

2    the Midwest.

3    Q    Where are you admitted, sir?

4    A    I am admitted in the state of Michigan, the Eastern and

5    Western District of Michigan District and Bankruptcy Courts,

6    the Sixth Circuit Court of Appeals, and the United States

7    Supreme Court.

8    Q    Okay. You are aware that the Committee has selected you

9    to serve as plan administrator of the winddown entity

10   pending the Court's approval?

11   A    I am.

12   Q    And you are willing to do so?

13   A    I am.

14   Q    Can you briefly describe for us your background?  Let's

15   just quickly start with your education and then we'll move

16   on.

17   A    Sure.  I graduated with a bachelor's degree from

18   Michigan State University.  I have a law degree from Loyola

19   University Chicago.  And I have a master's of laws, or an

20   LLM degree, in bankruptcy law from St. John's University

21   School of Law here in New York.

22        Additionally, during law school, I interned with the

23   Honorable George Steeh, a U.S. district court judge in the

24   Eastern District of Michigan, and with the Honorable

25   Elizabeth Stong, United States Bankruptcy Court Judge from

Page 235

```
 1    the Eastern District of New York.

 2    Q     And what did you do after graduation and you got your

 3    LLM, what was your employment?

 4    A     So upon graduating from St. John's, I moved back to

 5    Michigan, which is where I grew up.  And I have a bankruptcy

 6    attorney.  It's substantially all that I do is practice

 7    bankruptcy law for the last 16 or 17 years.  My practice

 8    primarily consists of representing unsecured creditors and

 9    creditors' committees and post-confirmation fiduciaries, be

10    it a liquidating trustee type position or Chapter 7

11    bankruptcy trustees.

12    Q     And now you are the co-head of the bankruptcy practice

13    at your firm?

14    A     I am co-chair of the bankruptcy practice at Taft, yes.

15              MR. CALANDRA:  Your Honor, may I approach the

16    witness?  I would like to hand him his resume.

17              THE COURT:  Yes.  You don't need permission to

18    approach the witness.

19              MR. CALANDRA:  Would Your Honor like a copy?

20              THE COURT:  Yes, please.  Thank you.

21    BY MR. CALANDRA:

22    Q     Okay.  I've showed you what is on the docket for the

23    record as Docket Number 1109-2.  Do you have that in front

24    of you, sir?

25    A     I do.
```

Page 236

1    Q    Okay.

2    A    I see I'm wearing the exact same tie in this picture

3    that I am wearing today.

4    Q    That's good.  You're frugal.  What is the document,

5    sir, that is 1109-2?

6    A    The document is my resume.

7    Q    Okay.  Did you prepare this document?

8    A    I did.

9    Q    Is it a true and correct copy of your resume, sir?

10   A    It is.

11           MR. CALANDRA:  Your Honor, we would like to move

12   the admission of this document into evidence as 1109-2.

13           THE COURT:  Any objections?  All right, the

14   Exhibit is admitted.

15           (Exhibit 1109-2 entered into evidence)

16   BY MR. CALANDRA:

17   Q    Let's just take a quick look.  We're not going to spend

18   too much time on this, but I have a few questions about your

19   resume that I'd like to elicit testimony on.  Let's start

20   with -- I see you say that you've been twice selected by the

21   Sixth Circuit Court of Appeals for a finalist for bankruptcy

22   judgeship.  Could you explain that a little bit?

23   A    Sure.  Those people who know me know that my career

24   goal is to be a federal bankruptcy judge.

25           THE COURT:  Has this hearing changed your mind?

BY MR. CALANDRA:

A     It has not.  This is what I do.  And so I have applied on a few occasions from fairly early on my career to be a judge.  It's a pretty rigorous application process.  There is an expansive application that asks just about every type of question about somebody's professional experience and also their character.  And I have applied and gone through that process a couple of times in the Sixth Circuit.  It's done differently in each judicial circuit.

     But in the Sixth Circuit, the Sixth Circuit Court of Appeals appoints a merit selection panel consisting of members of the local bar to conduct interviews and an initial background check of each candidate.  And then there's a fairly fulsome interview process that is conducted.  From that process, the merit selection panel recommends to the Court of Appeals three to five finalists for the position.  Usually it's three to five.  I'm not sure it's a hard and fast rule, but that's normally what they do.  And I have twice been selected as a finalist, in 2018 and more recently in 2021.

     As a finalist then, there is additional sort of interview and background process and the interview with judges on the Sixth Circuit Court of Appeals.  I've done that twice.

Q     Okay.  Thank you for the explanation.  You also said

1    that you were co-director of the Conrad Duberstein National

2    Bankruptcy Moot Court Competition.  Is that why you're in

3    town this week?

4    A    That is actually why I'm in town this week, is that I

5    run the -- it's the bankruptcy court competition.  It's run

6    in conjunction with the American Bankruptcy Institute in St.

7    John's University School of Law.  I help to run it.  I serve

8    as a judge at the competition and I write the problem.  And

9    I've done that with a judge in Grand Rapids for the last six

10   years.

11   Q    That's great.  Let's just focus a little bit on your

12   professional associations and memberships, starting with the

13   American Bankruptcy Institute.  For those who are on the

14   phone who are not aware of that, can you explain what that

15   is?

16   A    Sure.  The American Bankruptcy Institute I think is the

17   largest organization of bankruptcy and insolvency

18   professionals and judges in the country.  I think it's a

19   highly -- it's a well-recognized organization.  I've been

20   very involved with it since even before starting practice,

21   writing articles, speaking at conferences, attending

22   conferences.

23        In 2019, I was selected to be a member of the ABI's

24   board of directors, and I have served in that capacity for

25   the last three or four years.  In 2022, I was selected from

```
 1    the Board to be the ABI secretary and a member of its

 2    executive committee.  So it's an organization that I'm very

 3    active with.

 4    Q    Okay.  And I see your professional associations span a

 5    couple of pages, and there are maybe about 20.  And I don't

 6    want to spend the time to go through that, but I was -- it

 7    did catch  my attention the American College of Bankruptcy

 8    fellow.  Could you explain that?

 9    A    Yeah.  The American College of Bankruptcy is an

10    honorary organization that recognizes people who have done a

11    lot and are held in high character, high regard, have done a

12    lot in the bankruptcy community.  A nigh standard of

13    practice and focused on sort of the right types of things.

14    And I was honored to be selected as a fellow last year.

15    Q    On the top of Page 3, it lists honors and awards.  And

16    you have a number of them.  They all relate to bankruptcy.

17    Am I right?

18    A    That's correct.  Again, 99 percent of my practice

19    really is bankruptcy law.

20    Q    And then under books, it seems that you're an author or

21    co-author of six books relating to bankruptcy.

22    A    That's correct.

23    Q    And publications goes on from Page 3 to Page 4, Page 5,

24    Page 6, Page 7, to the top of Page 8.  Am I correct?

25    A    That's correct.
```

1     Q     Largely on what subjects?

2     A     I do a lot of writing.

3     Q     On what subjects?

4     A     Entirely on bankruptcy law.

5     Q     Okay.  And then if I'm correct, your speaking

6     engagements go on from pages 8, pages 9, and pages 10,

7     largely on bankruptcy subjects?

8     A     Exclusively on bankruptcy subjects, yes.

9     Q     Okay.

10    A     Or other insolvency-type issues.

11    Q     I know you said you're here this week because of the

12    Duberstein Bankruptcy Moot Court.  But were you in court

13    yesterday?

14    A     I was.

15    Q     Okay.

16    A     And to clarify, given the importance of these hearings,

17    I likely would have been here anyway.  Perhaps

18    telephonically, but certainly I recognize the importance of

19    these hearings.

20    Q     Have you been involved at all in any connection in the

21    Voyager bankruptcy since it started?

22    A     I have.

23    Q     Okay.

24    A     I represent Jason Raznick.

25    Q     And who is that?

1   A     Jason Raznick is the chair of the Creditors' Committee.

2   Q     Okay.  And what have you been doing in terms of your

3   representation of him related to Voyager?

4   A     In my capacity representing him, I have been actively

5   involved with the Creditors' Committee.  The Committee

6   communicates regularly as throughout this case, meets

7   weekly, frequently more often than weekly to discuss the

8   very difficult issues in this case.  And I have participated

9   in not all, but probably the majority of those calls over

10  the last seven months.  I have reviewed the pleadings in the

11  case.  So I am very familiar with the case and have

12  participated in that capacity.

13  Q     For those who are on the phone who might be wondering,

14  when did you first meet Mr. Raznick, when would that be?

15  A     I was first introduced to Mr. Raznick in July of 2022,

16  shortly after the commencement of these bankruptcy cases.

17  Q     So prior to the commencement of these bankruptcy cases,

18  you did not know him?

19  A     I did not.

20  Q     Have you actually ever met him in person?

21  A     I have not actually met Mr. Raznick in person.  We've

22  talked regularly of course on the phone and on Zoom.  In

23  2022, that's a lot of how we communicate.

24  Q     Okay.  And how did you come to meet Mr. Raznick and

25  work with him?

Page 242

1    A    Right.  Well, Mr. Raznick was one of the largest retail

2    customers in this case.  His brother is a partner at my law

3    firm.  And so when the bankruptcy case was commenced and he

4    needed bankruptcy counsel, he was referred to me.

5    Q    As the co-head of bankruptcy practice for your firm?

6    A    That's correct.

7    Q    What about McDermott Will & Emery?  Have we ever worked

8    together, McDermott Will & Emery and you?

9    A    I have not worked with McDermott Will & Emery prior to

10   this case.

11   Q    Okay.  And when was the first time you ever met Mr.

12   Azman?

13   A    In person, yesterday.  We have been on Zoom many, many

14   times.

15   Q    What about me?  When was the first time we met?

16   A    Same.

17   Q    Okay.  And you said you've attended the committee

18   meetings.  Is that right?

19   A    Yes.  And attended many of the hearings in this case as

20   well.

21   Q    Approximately how many committee meetings have you

22   attended?

23   A    I would estimate maybe 30.  As I said, there's weekly

24   committee calls that have been held to talk about the very

25   difficult issues in this case.  And at different points,

Page 243

1    they may be more frequently than weekly.  So I would say 30

2    or 40 meetings maybe.

3    Q    Do you feel you are familiar with the Committee's work

4    in the matters in this case?

5    A    Very.

6    Q    Okay.  Do you think that will help you should you be

7    appointed as plan administrator?

8    A    I do.  There's a lot to get up to speed with here, and

9    I'm up to speed with a lot of it already.

10   Q    Is there in place any recusal process should in the

11   future you have any conflict of any kind?  What happens

12   then?  What is the process under the plan as you understand

13   it?

14   A    There is.  At my request, there is a provision in the

15   plan administrator agreement that is in one of the plan

16   supplements that contemplates that in the event there is any

17   potential conflict of interest that might arise, that I

18   would recuse myself from that matter.  And of course as an

19   attorney and as a fiduciary, I take issues of conflicts of

20   interest and ethical responsibilities very, very seriously.

21       And so in the event that I or anybody else involved

22   with the plan -- because there's a Plan Administrator

23   Oversight Committee.  If I or any of the members of the Plan

24   Administrator Oversight Committee believed that there was a

25   potential conflict of interest there, then I would recuse

1    myself from that under that provision of the plan

2    administrator agreement and one of the three members of the

3    oversight committee would serve as the plan administrator in

4    that capacity.  To be clear, I'm not aware of any conflicts

5    that might exist, but that's a protective measure that is a

6    common thing that I see in fiduciary agreements like this,

7    liquidating trust agreements, to address issues.  Because

8    you just never know what's going to come up down the road.

9    Q    Understood.  And my question was only prophylactic.  Is

10   Mr. Raznick on the Oversight Committee?

11   A    He is not.

12   Q    Now, did you attend the meeting -- I'm going to ask a

13   series of questions because I know there's an objection that

14   related to Mr. Raznick.  And I think the allegation was

15   that, quote, "Mr. Ehrlich may have influenced Mr. Raznick's

16   decisions to not pursue third party causes of action more

17   decisively, and the UCC chair, that he may have influenced

18   other UCC members to do the same."

19        Now, were you at the committee meeting on October 16th,

20   2022 where the vote was taken to support the settlement, the

21   D&O settlement?

22   A    I was.

23   Q    Okay.  Did Mr. Raznick speak out in favor of that

24   settlement at that meeting or against it?

25   A    He aggressively opposed at that time.

Page 245

1    Q    Did he vote for the settlement?

2    A    He was the last committee member to vote, and he

3    abstained.

4    Q    Okay.  So to the extent there's an allegation that he

5    was influencing folks on the Committee to support the

6    settlement, what have you to say about that?

7    A    That is absolutely not true to my knowledge.

8    Q    Okay.  One last question.  What -- can you describe to

9    the Court, what is your experience in dealing with post-

10   confirmation fiduciaries?

11   A    Substantial.  It's a substantial part of my practice.

12   I have on many occasions represented, as I noted earlier,

13   post-confirmation in Chapter 11 cases, liquidating trustee-

14   type fiduciaries.  I have also on multiple occasions

15   represented Chapter 7 trustees.  And frequently the role in

16   those cases has been very similar to the role here.  It is

17   investigating and pursuing causes of action for the benefit

18   usually of unsecured creditors.  Causes of action like the

19   causes of action that can and should be investigated here,

20   claims involving breaches of fiduciary duties, claims

21   against insurance companies, fraudulent transfer-type

22   claims, the types of things that you determined that was

23   used earlier today, the blocking and talking of sort of

24   bankruptcy post-confirmation litigation.  I am very, very

25   familiar with that law.  I am very, very familiar with the

1    different wrinkles, the legal issues that come up with those

2    cases, the defenses that are asserted.  I've negotiated with

3    insurance companies before.  It's what I do.

4    Q    Okay.

5              MR. CALANDRA:  Your Honor, I have no further

6    questions.

7              THE COURT:  All right.  Any cross-examination of

8    Mr. Hage?  First start with anybody in the room who has a

9    question.  I see we have one taker.

10             MR. POSNER:  Your Honor, for the record, David

11   Posner from Patrick Townsend, Kilpatrick, Townsend &

12   Stockton.  I am counsel for the Ad Hoc Group of Equity

13   Interest Holders of Voyager Digital Limited.

14             So for the record, I am not objecting the

15   appointment of Mr. Hage as the plan administrator.  We did

16   have objections to the plan, which we have resolved, Your

17   Honor.  But subsequent to the resolution of them, when the

18   second amended plan was filed and when the third amended

19   plan was filed, there was some language in that plan which

20   concerned us, which I've been here for the last two days

21   hoping to address with the Court.  That's more in the nature

22   of argument.

23             Now that Mr. Hage is on the stand, I have some

24   questions for him that are relevant to that language in the

25   plan that concerns us.  So if I might, I would like to ask

1    him a couple of questions.

2              THE COURT:  Go ahead.

3              MR. POSNER:  Okay.  Thank you.

4                   CROSS EXAMINATION OF PAUL HAGE

5    BY MR. POSNER:

6    Q    Mr. Hage, you testified just before that you were

7    actively involved in the Committee and all the meetings and

8    the deliberations, correct?

9    A    I wouldn't say all of the deliberations, but

10   substantially all, yes.

11   Q    You actively participated in committee meetings,

12   correct?

13   A    I did.

14   Q    And so you are generally familiar with the issues in

15   the Debtor's Chapter 11 cases from the perspective of the

16   Committee?

17   A    I am.

18   Q    Are you familiar with --

19   A    And from the perspective of other parties based on the

20   pleadings and the arguments made in the case.  I am very

21   familiar with all of the issues.

22   Q    Thank you.

23   A    Well, many of the issues.

24   Q    Have you reviewed the plan? In particular the second-

25   amended plan or the third amended plan?  I know they were

1    both filed within the last two or three days.

2    Q    I have reviewed various versions of the plan, including

3    I believe the most recent version that's on file.  It's

4    hard, as it has been amended.  But yes, I am generally

5    familiar with the concepts with respect to the plan.

6    Q    There's sections in the plan that deal with the

7    appointment of the plan administrator, correct?

8    A    There are.

9    Q    And you probably don't have the plan in front of you.

10   I unfortunately don't have a third amended plan with me, but

11   I do have the second amended plan.  And the provisions with

12   respect to the -- I need my glasses to read it.  Docket

13   Entry 1117 is the Second Amended Plan.  And the provision

14   dealing with the appointment of a plan administrator start

15   at Page 36.  Are you familiar with those provisions of the

16   plan generally?

17             MR. CALANDRA:  Your Honor, may I object?  If

18   you're going to ask him questions about something that

19   changed, are you representing there are no changes to this?

20             MR. POSNER:  I haven't compared the Third Amended

21   and the Second Amended.  I don't think these provisions

22   changed.

23             MR. CALANDRA:  Why don't you give him the Third

24   Amended so that we're asking him about the plan that's

25   before the Court?

Page 249

```
 1              MR. POSNER:  I don't have the Third Amended with
 2      me.
 3              THE COURT:  Why don't we first cut out and excise
 4      all the beginning of the question and just ask him if he's
 5      familiar with the provisions of the plan regarding the
 6      selection of a plan administrator.
 7              Are you?
 8              THE WITNESS:  I am.
 9              THE COURT:  Okay.
10              MR. CALANDRA:  Your Honor, I don't mind a little
11      latitude, but this is well outside the scope of my direct.
12              THE COURT:  It's okay.  Unless you want me to
13      recall the witness again later, we will do it all now.
14      BY MR. POSNER:
15      Q    So you're generally familiar with the provisions with
16      respect to the appointment of a plan administrator?
17      A    Generally, yes.
18      Q    And there's a laundry list in the plan that's entitled
19      responsibilities of the plan administrator, correct?
20      A    That's correct.
21      Q    And there's one winddown debtor for all of the
22      entities, correct?
23      A    I believe that is correct, yes.
24      Q    And so you would be the plan administrator for all of
25      the debtor entities, correct?
```

1    A    I believe that is correct.  That is my understanding.

2    Q    And some of the responsibilities of a plan

3    administrator, or one of the responsibilities of a plan

4    administrator, it's in 5C, is appointing an independent

5    director at each debtor to act as a fiduciary for such

6    debtor entity in connection with the resolution of

7    intercompany claims.

8    A    Well, let me just say it would be helpful to have that

9    document to look at.

10   Q    Okay.

11   A    I can't confirm what that says.  But I will say in the

12   interest of trying to shortcut this, that I am familiar that

13   that is a provision in the plan.

14   Q    Okay.

15   A    I don't have the specific language or any -- you know,

16   I know that's one of the...

17   Q    But you're familiar with the provision that empowers

18   the plan administrator to --

19   A    I am generally familiar with the powers of the plan

20   administrator, yes.

21   Q    To appoint independent -- an independent director at

22   each debtor entity?

23   A    Correct, yes.

24   Q    Are you familiar that there is a dispute involving

25   intercompany claims in the debtor's bankruptcy cases?

1    A    I am.

2    Q    And what's your knowledge of that dispute?

3    A    That a dispute exists on that and that my understanding

4    is at a very high level that the settlement that has been

5    reached, subject to the revision I think that you just

6    mentioned at the beginning of your questioning, is that

7    those issues will be addressed going forward.

8    Q    Okay.  So it's your understanding that the intercompany

9    claim dispute hasn't been resolved, that it's going to be

10   resolved at some later date.

11   A    Well, let me just say that -- yeah, that is my

12   understanding.  I am not yet the plan administrator.  I have

13   not been involved in negotiations about those issues.  But

14   generally speaking, I have -- from what I have been able to

15   glean from reading from the documents, that is my

16   understanding, yes.

17   Q    You are aware that there are currently independent

18   directors at each one of the Debtor entities?

19   A    Certainly.

20   Q    Are you aware that there has been ongoing discussions

21   and negotiations among the independent directors at the

22   debtor entities regarding the intercompany claims?

23   A    I don't have any specific knowledge about that.  It

24   would surprise me if there weren't ongoing discussions.

25   Because, as I noted earlier, I know this has been an issue

Page 252

1   in the case that you've prosecuted on behalf of your

2   clients.

3   Q    Are you familiar with the Debtor's schedules and

4   statements?

5   A    I read them months ago.

6   Q    Okay.  Are you aware that when the schedules and

7   statements were initially filed, they listed the

8   intercompany claims as not disputed or contention they're

9   unliquidated?

10              MR. SLADE:  Your Honor, I would object.  This is

11   not relevant.

12              THE COURT:  Are we litigating the merits now?

13              MR. POSNER:  No, I'm just...

14              MR. SLADE:  I think we are, Your Honor.

15              THE COURT:  What's the point of that?

16              MR. POSNER:  I was just asking if he was familiar

17   with it.

18              THE COURT:  Why?

19              MR. POSNER:  Because, Your Honor, two nights ago

20   they amended the schedules to change that.  And he is going

21   to be the plan administrator, and presumably he is going to

22   end up dealing with -- potentially dealing with those

23   issues.

24              THE COURT:  So what?

25              MR. POSNER:  Well, because he is going to be the

1    plan administrator for all of the entities.  What I wanted

2    to ask him was should the intercompany disputes continue, is

3    he going to handle them or is he going to recuse himself and

4    allow independent directors that he is going to appoint

5    handle them?

6            THE COURT:  Well, you can ask him that.  What does

7    that have to do with the schedules?

8            MR. POSNER:  It doesn't.  I was just trying to lay

9    a foundation to see if he was familiar with the topic, Your

10   Honor.

11   BY MR. POSNER:

12   Q    So, Mr. Hage, you are going to be the plan

13   administrator for all the Debtor entities. The intercompany

14   claims have to be resolved.  You're going to appoint

15   independent directors.  Is it going to be the independent

16   directors who are going to handle that since as the plan

17   administrator for all of the entities, you couldn't

18   represent all of the entities in a dispute over intercompany

19   claims, correct?

20   A    So what I would say to that is that that's an issue

21   that I have not investigated yet, as again, I am not yet the

22   plan administrator.  And so it would be an issue that I

23   would look at with professionals.  As all fiduciaries do,

24   they rely on the advice of professionals.  It's something we

25   would look at and make a determination at that time.  But I

1   am not prepared to make any statements here today about how

2   any future litigation would be dealt with, nor do I think

3   that would be appropriate.

4   Q    Okay.  But you would agree as the plan administrator

5   for all the entities that there was a dispute amongst the

6   entities, you couldn't be on both sides of the dispute.

7           MR. SLADE:  Your Honor, I object.  That is not an

8   appropriate question for this proceeding.

9           MR. AZMAN:  Your Honor, the Committee agrees.

10  This is highly inappropriate.  He's trying to box the

11  witness in a future role where he hasn't even been approved

12  to be a plan administrator.  I don't understand what the

13  line of questioning is designed to get at given what the

14  purpose of this hearing is.

15          THE COURT:  Well, I understand.  But it seems to

16  me that it's focused more on an objection to a plan

17  provision rather than to the qualifications of this

18  individual to serve as the plan administrator.  And it's not

19  clear to me that we even have a plan objection or that the

20  witness's opinion on that subject means anything.  It's my

21  opinion about whether it's appropriate or not.  So do you

22  really need to pursue that?

23          MR. POSNER:  I don't, Your Honor.

24          THE COURT:  Okay.

25          MR. POSNER:  I don't have any more questions for

Page 255

```
 1      the witness then, Your Honor.

 2               THE COURT:  Thank you.  Is there anybody else here

 3      who wishes to cross-examine this witness?

 4               How about anybody on the telephone?  Does anybody

 5      wish to cross-examine Mr. Hage?

 6               Yes, Your Honor.  I am a pro se creditor.  My name

 7      is (indiscernible).

 8               THE COURT:  Okay.  Please proceed.

 9      BY UNIDENTIFIED SPEAKER:

10      Q    Hi, Mr. Hage.  I just want to make sure I heard you

11      correctly.  Did you say that Jason Raznick's brother works

12      at your law firm?

13      A    I did.  That is correct.

14      Q    Okay.  And so I just want to confirm, is his name Brian

15      Raznick?

16      A    Yes.

17      Q    Okay.  How is it -- because one of the things that I

18      know within my -- you know, amongst us creditors, because we

19      all are part of a community and we all talk pretty much on a

20      daily basis.  And I know that one of the biggest themes or

21      concerns in this case has been this person knows this

22      person, this person does this person a favor, and everyone

23      is just, you know, kind of scratching each other's backs.

24               You are the attorney for Jason Raznick.  His brother

25      works at your law firm.  You've been dealing with McDermott,
```

1   and now you are nominated to be the administrator for the

2   winddown entity.  How does none of all of that constitute

3   some kind of conflict of interest?

4   A    As I said earlier, I take attorney ethical rules

5   regarding conflicts of interest very seriously.  I don't

6   believe there is any conflict of interest here.  I was not -

7   - I pitched for this position to serve as the plan

8   administrator.  The Creditors' Committee, which consists of

9   seven retail customers, each of whom have their own very

10  strong opinions about this case, the history of the Debtors.

11  And not all on the same page.  And I pitched amongst

12  multiple candidates for this role and was selected

13  unanimously to serve.  I have at my own insistence asked

14  that in the plan administrator agreement which would govern

15  my conduct going forward, the provision that I mentioned

16  earlier that would require me to recuse myself if I or any

17  member of the Plan Administrator Oversight Committee

18  believed that there was any potential conflict of interest,

19  that's what we would do.  Of course all of my conduct in

20  that capacity is subject to the supervision of the

21  bankruptcy judge.

22       And in terms of Mr. Raznick and McDermott Will & Emery,

23  as noted in the questioning that was asked to me, I don't

24  have any -- I am not beholden to them.  I don't have a long-

25  term relationship with them.  My relationship has been

1    exclusively in the context of this case.

2    Q    Okay.  So I just want to make sure I heard you

3    correctly.  Are you saying that all seven members of the UCC

4    voted to have you be the administrator of the winddown

5    entity?

6    A    Well, to be clear, because I was one of multiple people

7    who had applied for the job, so to speak, I was not present

8    for the deliberations.  That is my understanding though, is

9    that that's how it turned out.  That was the way the vote

10   came out.

11   Q    Okay.  Because I thought I heard you say unanimously,

12   you were voted unanimously.  So I guess I took that to mean

13   that every member, all seven members voted for you.  Is

14   there a way to find out how many members voted to have you

15   and how many members did not?

16   A    I'm not sure I can answer that question.  Again, I

17   wasn't present for the vote.  That is my understanding of

18   how the vote turned out.

19         UNIDENTIFIED SPEAKER:  Your Honor, would someone

20   at McDermott be able to answer that question since they

21   represent the UCC?

22         MR. AZMAN:  We're happy to look back at the

23   minutes to confirm.  I don't remember off the top of my head

24   if it was unanimous.  It was certainly the majority.  That

25   was the vote.

```
 1            THE WITNESS:  Well, that's what I was going to
 2      add.
 3            MR. AZMAN:  I'm also not testifying to
 4      (indiscernible).
 5      BY MR. POSNER:
 6      A    If it was -- it may -- I believe it was a unanimous
 7      vote to my understanding.  But in any event, it was a
 8      majority of the vote because I was the person elected and
 9      identified in the plan.
10      Q    Yeah, I understand that.  I guess I'm just trying to --
11      like, it's just if it's unanimous meaning all seven, then
12      that makes me think, wow, like, they all don't see any
13      conflict of interest in having you?  But if say, you know,
14      two or three, because four would be the majority, you know,
15      objected to it, then at least I see that there are people
16      there -- you know, the UCC members who represent us
17      creditors, that they are along the same lines of thinking
18      that I am, that how does this not seem like they have a
19      conflict?  It's like Jason Raznick's brother is a partner at
20      your law firm.  So he needed a lawyer.  He goes to his
21      brother, who works at your law firm.  And then you are the
22      one representing Jason.  Jason is the chair of the UCC.  The
23      UCC is represented by McDermott.  And there was already a
24      lot of talk about how Jason knew Steve Ehrlich and knew Sam
25      Bankman-Fried and, you know, we're all friends and we're all
```

1    buddies and we're all just, you know, handing each other

2    money.  And we're all just keeping it in this tight-knit

3    circle.  You know, I just don't see how that -- people are

4    benefiting from people knowing each other . And that's what

5    I mean.  It's like one person scratches the other person's

6    back and we're all in cahoots, which a lot of us creditors

7    feel like we were never properly represented and that the

8    money expenditures and the decisions that have been made

9    throughout this entire case have been completely against us

10   because it's part of the boys club of let's scratch each

11   other's backs.  Do you see where I'm getting?

12            THE COURT:  Yeah.  It's not a question.

13            MR. SLADE:  I object.  That was argument.  The

14   facts are in evidence.  And I object.  That was not a

15   question.

16            MR. CALANDRA:  I join, Your Honor.

17            THE COURT:  To the extent that there's a question

18   in there, I think it is for you to explain, Mr. Hage.  Do

19   you think that your partner's connection with -- as being a

20   brother of Mr. Raznick and the fact that that led to your

21   appointment gives rise to a conflict in the performance of

22   your duties as plan administrator?  And if you don't think

23   it does, please explain why it does not.

24            THE WITNESS:  I do not think it does.  First of

25   all, the plan administrator is Paul Hage, not my law firm,

Page 260

```
 1      not Jason Raznick.  As I noted, I do not have a long-term

 2      relationship with Jason Raznick.

 3              The theories alleged -- raised in some of the

 4      objections about the relationship between Mr. Raznick and

 5      Mr. Ehrlich, as I noted earlier, are not accurate.  He

 6      argued against the proposed releases initially that are now

 7      incorporated into the plan.  And while it is true that there

 8      was a professional and maybe a friendly even relationship

 9      that existed between Mr. Raznick and Mr. Ehrlich prior to

10      the bk filing, Mr. Raznick was one of the largest retail

11      customers in this case.  That's why he was appointed to the

12      Creditors' Committee by the Office of the United States

13      Trustee.  And any cordial relationship that existed

14      previously with Mr. Ehrlich certainly ended at the point

15      where Mr. Raznick's significant funds were locked up, just

16      like all the retail customers.  His goal and my goal

17      throughout this case has been singular; to get creditors,

18      retail customers, as much of their money back as possible as

19      soon as possible.

20              UNIDENTIFIED SPEAKER:  So the person, anyone at

21      McDermott, would it be possible for you guys, whenever you

22      get a chance, to send out a tweet from the official Voyager

23      UCC account letting us know -- obviously you do not have to

24      divulge who it is, but -- and know you guys have given

25      numbers before -- but letting us know how many members voted
```

Page 261

1    yes and how many members voted no of Mr. Hage.

2              MR. AZMAN:  This is Darren Azman from McDermott

3    for the Committee.  I'll just tell you right now.  I have

4    the minutes from the meeting.  And again, this is not

5    evidence.  I wouldn't be able to introduce it through this

6    witness because he was not there.

7              There are -- just a moment.  There are four

8    individual committee members who voted to appoint Mr. Hage

9    as the plan administrator.  And at the time we thought it

10   would be a liquidating trustee, but same role.  There are

11   three individuals -- we had discussed -- just a moment, Your

12   Honor.

13             I just wanted to make sure we weren't waiving any

14   attorney-client privilege.

15             There are three committee members who voted to

16   appoint two co-trustees together.  Mr. Hage would have been

17   one.  And so I don't know whether you would call that

18   unanimous or not, but that's what the vote was.  Again, four

19   that voted to appoint Mr. Hage only, three who voted to

20   appoint two co-trustees, one of whom would be Mr. Hage.

21             UNIDENTIFIED SPEAKER:  Okay.  I just want to make

22   sure I understand this correctly.  So four people just voted

23   for Mr. Hage and then three people voted for Mr. Hage plus

24   one other person to be co-trustees with Mr. Hage?

25             MR. AZMAN:  Yes.

Page 262

1           UNIDENTIFIED SPEAKER:  Okay.  And since it's four

2     against three -- so I can see why it's unanimous in the

3     sense that all seven said Mr. Hage.  But three of the seven

4     at least wanted a secondary person almost an oversight,

5     someone to check over Mr. Hage to make sure that he's doing

6     his job properly.  So there's a tiebreaker there because

7     it's four against three.  Would you be allowed to say if one

8     of the people that's on the four side was Jason Raznick,

9     giving an advantage to just having Mr. Hage by himself

10    versus having the co-trustee, of having that oversight over

11    Mr. Hage?

12           THE COURT:  I don't think that's -- first, I don't

13    think it's a question for the witness.  But also, I didn't

14    hear the Committee counsel say that three people wanted an

15    additional person as an oversight of Mr. Hage.  They just

16    said that they thought that there should be two trustees

17    instead of one.

18           UNIDENTIFIED SPEAKER:  You're right, Your Honor.

19    He didn't use the word oversight.  I am interpreting it that

20    way, that that might have been the intention --

21           MR. AZMAN:  Let me further clarify.  I'm just

22    reading the minutes more closely.  Just to be clear, of the

23    three who said Mr. Hage plus one -- and I did not say that

24    they would be in an oversight role.  There's two co-

25    trustees.  Of those three, one voted for Mr. Hage to appoint

1    Mr. Hage with potentially one more trustee depending on the

2    total price.  I don't -- yeah.  That's just what the minutes

3    reflect.  That's all.

4            THE WITNESS:  Well, and let me add to that.  I

5    know that that was part of the consideration in that it is

6    no secret that the professional fees have been significant

7    in this case.  It's a complex case and it's been

8    professional-intensive.  And I do believe that a factor that

9    the Creditors' Committee considered was the expense of

10    having multiple trustees.  It is not uncommon to have

11    multiple trustees.  It's also not uncommon to have a single

12    trustee.  It is not uncommon -- in fact, I would say in my

13    experience representing committees and trusts, it is not at

14    all uncommon for the Committee to negotiate as part of the

15    Chapter 11 case that there will be a post-confirmation

16    trustee.  And it is not uncommon for the selection of that

17    trustee to be done by the creditors' committee, and it is

18    not uncommon even for members of the creditors' committee to

19    serve in that capacity.  And so that is all part of the

20    deliberation that went into this.  One of my selling points,

21    because I'm very mindful of the professional fees and that

22    every dollar that is spent is a dollar that's not available

23    for customers, is my rate, and that I am located in Michigan

24    and not in New York.  And therefore, my rate is

25    substantially less than New York rates.  And I'm sure that

Page 264

1     that was part of the consideration that was given by the

2     Committee.

3                 UNIDENTIFIED SPEAKER:  And to my question, would

4     we be allowed to know which way Jason Raznick voted?

5                 MR. AZMAN:  Is that a question for the witness or

6     --

7                 THE COURT:  I think it's a question to you as

8     counsel, not to the witness.  Because you're the only one

9     that has the information.

10                MR. AZMAN:  Sure.  Mr. Raznick voted for Mr. Hage

11    only.

12                UNIDENTIFIED SPEAKER:  So Jason Raznick voted so

13    that Mr. Hage got all of the business versus it being split

14    with somebody else is kind of how I see that.  Okay.

15                Other than asking questions, it's not like I

16    really have any power in this case.  But I do for the record

17    want to state that I object to Mr. Hage.  Nothing against

18    him personally.  I'm sure he does his job well.  But

19    considering everything that has surrounded this -- that has

20    been -- this case being surrounded by so much non-

21    transparency and just, like I already said, the whole let's

22    scratch each other's backs and let's do each other favors.

23    So for the record, I object to Mr. Hage being a plan

24    administrator and I would prefer that someone else be

25    chosen.

Page 265

1                    THE COURT:  Okay, I understand that.  Do you have

2       any more questions for Mr. Hage?

3                    UNIDENTIFIED SPEAKER:  No.  Thank you so much,

4       Your Honor.

5                    THE COURT:  Okay.  Anybody else who wishes to

6       question Mr. Hage?

7                    MR. NEWSOM:  Your Honor, this is Dan Newsom, pro

8       se creditor.

9                    THE COURT:  Okay.  Please proceed, Mr. Newsom.

10      BY MR. NEWSOM:

11      Q    Good evening, Mr. Hage.  In your representation of Mr.

12      Raznick, did you advise him on how to act in the best

13      interest of creditors (indiscernible)?

14                   MR. CALANDRA:  Your Honor, I am going to object

15      that we're invading the client privilege here.  I don't mind

16      him just answering yes or no, but any further than that, I

17      would object.

18                   THE COURT:  It seems to me you can answer yes or

19      no to that question without breaching the privilege.

20      BY MR. NEWSOM:

21      A    Yes.

22      Q    Did you unofficially advise other members of the UCC on

23      (indiscernible) during the meetings?

24                   MR. CALANDRA:  Objection.  Don't even understand

25      what unofficially means.

Page 266

```
 1              THE COURT:  I don't, either.  Objection sustained.
 2    BY MR. NEWSOM:
 3    Q    Do you agree that one of the roles of the UCC is to
 4    monitor fees (indiscernible) bankruptcy (indiscernible)?
 5    A    I'm sorry.  I am having a hard time hearing the
 6    question.
 7              THE COURT:  Do you agree that one of the roles of
 8    the UCC is to monitor fees was the question.
 9    BY MR. NEWSOM:
10    A    I do.
11    Q    I believe in one of the objections, Mr. Raznick stated
12    he has no control over fees.  Did you advise him not to
13    raise objections or concerns to the fees?
14              MR. CALANDRA:  Now we're getting into the
15    privilege, Your Honor.  I object.
16              THE COURT:  Did you have any non-privileged
17    communications with Mr. Raznick on that subject?
18              THE WITNESS:  No.
19              THE COURT:  Okay.
20              THE WITNESS:  Not that I recall.
21              THE COURT:  All right.  The privilege belongs to
22    Mr. Raznick.  I can't let the witness violate his
23    professional obligations and testify about matters that are
24    privileged.
25              MR. NEWSOM:  Understood.
```

1    BY MR. NEWSOM:

2    Q    If I might ask, what was the final result of the vote

3    in the meeting regarding the settlement?

4    A    I'm very sorry.  I -- could you ask the question again?

5              THE COURT:  What was the final vote on the motion

6    to approve the settlement?  The one that you said Mr.

7    Raznick opposed.

8    BY MR. NEWSOM:

9    A    I believe it was four in favor of not objecting to the

10   settlement, two who were voting in favor of objecting to the

11   settlement, and one, Mr. Raznick, who abstained.

12   Q    To the best of your belief, that abstention did not

13   affect the outcome, correct?

14             MR. CALANDRA:  I'm sorry, I didn't hear the

15   question.

16             THE COURT:  The abstention then did not affect the

17   outcome of the vote.  Is that right?

18   BY MR. NEWSOM:

19   A    That is correct.  Mr. Raznick voted last.  And at that

20   point, the outcome of the vote had been determined.

21   Q    Okay.  And I'm not sure if this is attorney-client

22   privilege, but I'll ask and allow the Court to decide.

23        (indiscernible) corporation have any holdings on the

24   platform that were withdrawn within the 90 days prior to the

25   petition?

```
 1              MR. CALANDRA:  I'm sorry, I didn't even hear the

 2      question.  Could you repeat the question, please?

 3              THE COURT:  It was something about whether there

 4      was somebody who had withdrawals in the 90 days before the

 5      petition.

 6              MR. SLADE:  (indiscernible) money on the platform

 7      that was withdrawn within the 90 days.

 8      BY MR. NEWSOM:

 9      A    I do not know.

10      Q    Did Mr. Raznick have any holdings that were withdrawn

11      in that same timeframe?

12      A    I believe he did, although I don't know the amounts or

13      dates.  He wasn't treated any differently than any other

14      retail customer in that regard.

15      Q    Has the Committee -- strike that.  It's your

16      representation Mr. Raznick prevents you from advising the

17      Committee to contemplate pursuing insider clawbacks or other

18      preferential clawbacks of those with insider knowledge?

19              MR. CALANDRA:  Objection.  I'm not sure if he's --

20      was advising the Committee.  He was advising Mr. Raznick.

21              THE COURT:  What was the question?

22      BY MR. NEWSOM:

23      Q    I'll rephrase.  It's your representation that Mr.

24      Raznick prevents you from advising him to contemplate

25      pursuing insider clawbacks for those within insider
```

Page 269

1    knowledge?

2            THE COURT:  Did your representation of Mr. Raznick

3    prevent you from advising the Committee?  Is that what your

4    question was?

5            MR. NEWSOM:  Mr. Raznick specifically.

6            THE COURT:  Mr. Raznick specifically.

7            MR. AZMAN:  Objection.  Mr. Raznick wouldn't have

8    the ability to pursue.  I think it's a misunderstanding of

9    the function of the Committee and Mr. Raznick's role, Your

10   Honor.  I think the witness can answer because I think he

11   understands.

12   BY MR. NEWSOM:

13   A    I'm sorry, I don't understand the question.

14   Q    I believe the objection -- the question sort of was

15   answered.  So at this point I will pass the stand.

16           THE COURT:  Okay.  Anybody else on the phone who

17   wishes to question Mr. Hage?

18           MR. HENDERSHOTT:  Yes, Your Honor.  Tracy

19   Hendershott, pro se creditor.

20           THE COURT:  Okay.

21           MR. HENDERSHOTT:  Thank you.

22   BY MR. HENDERSHOTT:

23   Q    Good evening, Mr. Hage.

24   A    Good evening.

25   Q    Sorry?

Page 270

1          THE COURT:  He said good evening.

2     BY MR. HENDERSHOTT:

3     Q    You can hear me fine?

4     A    I can.

5     Q    Yes, thank you.  Excellent.  So just to clarify, you

6     know, the creditors have filed the objection.  It's not

7     necessarily against you, Mr. Hage.  We don't even know you.

8     Our objection is overall the conduct of this trial what we

9     feel is the inappropriate status of Chapter 11.  We feel

10    that there's fraud and dishonesty (indiscernible) gross

11    mismanagement.  We feel that when the Texas Attorney

12    Generals brought this up back in October as well as

13    creditors bringing it up in January, this case should have

14    been converted to a Chapter 7.

15         You've extensively highlighted your credentials and

16    expertise in bankruptcy.  Textbooks, articles, education,

17    experience.  I'm curious if you could share with us your

18    beliefs on the status of this case remaining in Chapter 11

19    when numerous cases and United States Code (indiscernible)

20    United States Trustee that the primary role of Chapter 11 is

21    to (indiscernible) comprehensive reorganization according to

22    the United States Code (indiscernible), one of the paramount

23    objectives of a Chapter 11 is reorganization, iso to

24    rehabilitate, none of that which is happening in this trial.

25         So I'm curious, as the plan administrator going

Page 271

```
 1     forward, what is your viewpoint on the status of whether

 2     this should have been Chapter 7 or Chapter 11.

 3                MR. CALANDRA:  Your Honor, I object to this

 4     question.  It's not even relevant what his view is on this.

 5                THE COURT:  Do you really object?

 6                MR. HENDERSHOTT:  It's going to be (indiscernible)

 7     as we ask follow-on questions.  You know, his methodology,

 8     his pursuit of clawbacks, releases, communication style

 9     (indiscernible) appointed to the role of administration.

10                THE COURT:  I actually don't think it has anything

11     to do with those points, but I will allow him to answer the

12     question.

13     BY MR. HENDERSHOTT:

14     A    It was a long question, but what I would say is that

15     Chapter 11 of the Bankruptcy Code is used to reorganize

16     businesses, it's frequently used to sell businesses, and it

17     can be used to liquidate businesses.  The purpose and the

18     goal of every Chapter 11 case is to maximize value for the

19     benefit of creditors.

20          In this case, I believe that the plan that is before

21     the Court is the best method of what I've been aiming to

22     achieve throughout this case, which is to get the most

23     amount of money back to creditors as soon as possible.

24          And in terms of -- there was some reference to claims

25     and causes of action.  That is the work that continues to be
```

1    done.  Again, with an eye towards maximizing the return to

2    all creditors.

3    Q    Thank you for that response and insight.  So let's talk

4    about the specifics of when you (indiscernible) to get

5    appointed as the administrator (indiscernible).  Clawbacks

6    (indiscernible) just recently after voting was completed,

7    unfortunately.  The claw backs proposed for retail clients,

8    customers, creditors only with a limit of 20 days between

9    the point of petition (indiscernible).  My understanding is

10   that for retail customers, the standard clawback period is

11   90 days with one year for insiders.  As a potential

12   administrator on a go-forward basis, are you abiding by that

13   20-day limitation only for retail customers, no clawbacks

14   for insiders?

15             THE COURT:  What is this 20-day period?

16             MR. AZMAN:  Your Honor, Mr. Hendershott is

17   referring to an amendment to the APA that was filed I think

18   a few days ago.  What I think Mr. Hendershott -- I'm going

19   to try to help Mr. Hendershott with the question here.  What

20   Mr. Hendershott may not realize is that -- yeah.  What Mr.

21   Hendershott may not realize is that as part of the

22   transaction with Binance, Binance specifically negotiated to

23   acquire all claims that the estate has against customers.

24   Of course the idea being that they're basically buying

25   Voyager's customers.  They don't want the estate to turn

1    around and sue the customers they just bought.  Very common

2    in bankruptcy.

3            We have, however, a provision in the APA that

4    allowed the Committee to go to Binance and show them certain

5    transactions that we would request that they allow to be

6    carved out so that they could be preserved for the benefit

7    of creditors.  They had no obligation to agree if we came to

8    them.  But we did to go them with certain criteria.  And

9    there were really two criteria that we came to them with.

10   One was former customers who were not creditors as of the

11   petition date.  And the idea behind carving those customer

12   claims out is that they're not creditors.  They don't even

13   have an opportunity to vote on the plan, by the way.  But

14   there should be no reason that Binance would care if the

15   estate were to investigate and pursue former customers who

16   do not move over to Binance, nor could they.  Because,

17   again, they don't have anything on the platform.

18           There are 32,000 customers that fall into that

19   bucket.  We call them former customers.  Binance agreed to

20   amend the APA in that manner.  In addition to that -- and

21   it's approximately 32,000.  I think it's like 32,800 or so.

22           In addition to that, the second criteria -- and

23   there were 92 creditors that satisfied the second criteria.

24   Essentially what we were looking for were indicia of

25   customers who may have had advanced notice of the freeze or

1    the withdrawal limits that were getting ready to be imposed

2    on customers and thus got their money out before others did.

3    And that is what we went to Binance with.  And we thought

4    that that would be justifiable to Binance, and it was.  And

5    I don't think that they would have accepted anything else

6    for the reasons that I stated earlier.

7              Mr. Hage, as counsel to Mr. Raznick, has nothing

8    to do with whether that negotiation ended up in the place it

9    did, of course.  Mr. Raznick will have to live with whatever

10   the plan and the APA say, and that is what is before Your

11   Honor.  I hope that's helpful, and I'm sorry to bring an

12   argument to this, but I thought it would be helpful to

13   clarify for Mr. Hendershott.

14             MR. HENDERSHOTT:  I do appreciate that, Mr. Azman.

15   So the question is --

16             THE COURT:  Hang on, Mr. Hendershott.  We've got

17   to -- because of the timing, we have to probably terminate

18   and re-log in.  Is that it, Jackie?  Does everybody need to

19   dial back in or do you just need to do it?

20             CLERK:  No, I just need to do it.  That's all.

21             THE COURT:  We'll take five minutes.

22             (Recess)

23             THE COURT:  All right.  Please be seated.  I think

24   we've reconnected to Court Solutions.  It is quarter to

25   seven.  I would say that -- I'm not sure everybody

1    appreciates it, but in light of the number of pro se people

2    who are interested, I have been much more lenient than usual

3    in terms of the questions I have allowed.  I have tried to

4    do that to try to make sure that everybody feels like

5    they've had their questions addressed, even if not totally

6    to their satisfaction, even where we've frequently strayed

7    off the issues that are actually before us today.  But given

8    how late it already is, I will just make a plea that we

9    focus on what's left of relevance to Mr. Hage himself, which

10   is whether he has any conflicts of interest and whether he

11   is appropriate for the choice as plan administrator.

12            So, Mr. Hendershott, I think you were asking

13   questions.  Would you like to continue?

14            MR. HENDERSHOTT:  Yes, Your Honor.  Thank you.

15   BY MR. HENDERSHOTT:

16   Q    So, Mr. Hage, we left off on clawbacks, which is going

17   to be a primary role of your position.  Is that correct?

18   A    Did you say clawbacks?

19   Q    That's correct.

20   A    I wouldn't characterize that as the primary role here.

21   As Mr. Azman noted, the Committee was able to negotiate to

22   retain some of the -- by clawbacks I assume you mean

23   bankruptcy preference actions -- was able to negotiate that

24   some of those be preserved.  But, look, there's a wide

25   variety of potential claims and causes of action that may

1    exist here.  I think that the primary focus in this case has

2    been on specifically trying to exercise, execute a

3    transaction quickly that would get money back to creditors.

4    And so other than as necessary and appropriate for purposes

5    of dealing with the release issues that are in the plan, I

6    would say a comprehensive investigation of all of the

7    potential claims and causes of action that may be pursued by

8    me as the plan administrator has not yet been conducted.

9    But it will be conducted.  And if we conclude that there is

10   merit to those claims and that there are collectable

11   entities that are pursued such that it's a good use of

12   creditors' money to pursue them, we will pursue them.

13   Q    That's great.  (indiscernible).  Under the current

14   manner of clawbacks, instead of the standard 90 day for

15   retail and one year for insiders -- and Mr. Azman can

16   correct me if I'm wrong.  My understanding is it's 20 days

17   for retail, a defined subset that Mr. Azman clearly

18   articulated, and zero clawbacks for insiders.  Am I

19   misunderstanding that?

20          THE COURT:  I think if I understand it correct,

21   it's 90 days unless somebody has become a Binance customer,

22   in which case part of the sale agreement and the exchange

23   for the $20 million and other consideration was that claims

24   against that person would be released except that the

25   release would not apply as to those persons if they had

Page 277

1    advance knowledge of the closing of the platform and if they

2    withdrew within -- that's where the 20 days comes in.  Am I

3    right about that?

4              MR. AZMAN:  Yeah.  I don't remember the exact

5    number of days.  It might be 20 days.  But yes, exactly what

6    you said, Your Honor.

7              THE COURT:  Okay.  And is there any proposed

8    limitation of the one-year insider preference period?  Not

9    that I recall.

10             MR. SLADE:  I'm sorry, what was the question?

11             THE COURT:  Is there any proposed limitation of

12   the one-year insider preference period?

13             MR. SLADE:  No, but if they're covered by the

14   release -- that was --

15             THE COURT:  Okay.  I see.  That's right.  Yes.

16   There is in the sense that they're released.  That's right.

17   Okay.

18             MR. HENDERSHOTT:  So I'm correct.  It was zero

19   clawbacks for insiders, 20 days for retail.

20             THE COURT:  No.  No, that's not -- when you say 20

21   days for retail, 90 days for retail unless you are customer

22   who has gone to Binance, in which case the claim preference

23   clawback claims are released except that those people will

24   not be released if they knew about the closing of the

25   platform in advance and made withdrawals within the 20 days

Page 278

1    before the platform was closed down.  Have I stated that

2    correctly, Counsel?

3              MR. AZMAN:  The only slight clarification is it's

4    not that they knew about it, because we don't know yet if

5    they knew about it.  They're being preserved based on

6    indicia that we've developed, and they will be investigated.

7    They may not even be pursued.  This is nothing about whether

8    or not --

9              THE COURT:  so It's 90 days for retail unless

10   you're a Binance -- become a Binance customer, in which case

11   it may be narrower.  Okay?

12             MR. HENDERSHOTT:  Okay.

13   BY MR. HENDERSHOTT:

14   Q   So, Mr. Hage, I've spoken to numerous bankruptcy

15   lawyers.  This is the first time I've ever heard of any

16   retail being clawed back and no action taken -- that's the

17   other for the insiders.  And actually, the law extends the

18   timeline for insiders specifically because they have more

19   responsibility, more insight, more knowledge than the

20   typical retail customer.  So can you justify how all

21   insiders are let off the hook from this very painful process

22   (indiscernible)?

23             THE COURT:  I'm sorry, Mr. Hendershott, that's not

24   Mr. Hage's decision.  That's a provision of the plan.  And I

25   will hear your argument as to whether that should happen.

```
1    That's a function of the releases that have been proposed.

2    But whoever is -- if I confirm the plan, whoever turns out

3    to be the plan administrator will live with whatever the

4    terms of the plan are.  It's not going to be that person's

5    decision as to whether those insiders were already released

6    or were not already released.  That's an issue that's

7    separate from anything that Mr. Hage would have any possible

8    control over.  It will either have happened because the

9    releases are approved, or it won't happen because the

10   releases won't be approved, and you can make your arguments

11   when we talk about releases later.  But it really has

12   nothing to do with what Mr. Hage is going to do.  He'll have

13   to live with whatever --

14            MR. HENDERSHOTT:  (indiscernible).

15            THE WITNESS:  Whatever claims or --

16            MR. HENDERSHOTT:  (indiscernible).

17            THE WITNESS:  (indiscernible) assigned to the

18   trust, I will investigate and pursue as any proper fiduciary

19   would do.

20   BY MR. HENDERSHOTT:

21   Q    Great.  (indiscernible).  I'm not an expert by any

22   means.  I thought you had more autonomy to make those

23   decisions.

24        So as the plan administrator, once it's approved by

25   Judge Wiles, do you have the ability to make amendments to
```

1    it after the winddown trust entity is in effect?

2              THE COURT:  Make amendments to what?

3              MR. HENDERSHOTT:  The plan that you just mentioned

4    he has to comply with after your ruling, which

5    (indiscernible) of the plan (indiscernible) couple of days.

6    I'm curious if the administrator is authorized to continue

7    revising the plans post conclusion of the case and during

8    the lifespan, which could be years, of the windown entity.

9              THE COURT:  There are specific code provisions

10   that apply to request to modify a plan after it has been

11   confirmed.  It is not impossible, but you have to satisfy

12   certain standards and you have to come back to me to get

13   approval to make those modifications.  So I don't know if

14   that answers your question, Mr. Hendershott.  But again,

15   whatever powers there are in general are really not

16   functions of this plan or of what's been proposed to

17   delegate to Mr. Hage.

18             MR. HENDERSHOTT:  I feel that you've answered my

19   question.  There is a process (indiscernible) potentially by

20   the administrator, but it's a court internal process of

21   amendments.  Is that correct?

22             THE COURT:  Yes, there is.  There is a provision

23   in the Code --

24             MR. HENDERSHOTT:  Thank you, sir.

25             THE COURT:  Well, let me actually check that.

1     Maybe I just misquoted it.  There is a provision for changes

2     to a time after confirmation and before substantial

3     consummation.  Okay?  In other words, if something changes

4     between the substantial consummation of the -- the

5     confirmation and substantial consummation, it can be

6     changed.  And I don't want --

7               MR. HENDERSHOTT:  Okay.  And then after that, Your

8     Honor, there's no ability to amend?

9               THE COURT:  Well, at some point it's done and

10    there's nothing to amend.  I really -- you know, I can't

11    give you legal advice, and that's about as far as I can talk

12    to you about just -- you know, I'm not going to give you a

13    treatise on plan amendments, unfortunately.  I can't.  I'm

14    not allowed.

15              MR. HENDERSHOTT:  Sure.  I understand.

16    BY MR. HENDERSHOTT:

17    Q    Okay.  So, Mr. Hage, releases.  Currently every single

18    entity that's touched this case, from the Debtors

19    (indiscernible) officers, employees, every single

20    professional, everyone except for the creditors are

21    receiving releases in this case.  Can you (indiscernible)

22    that that is appropriate, especially under the recent

23    rulings of Purdue and even the Supreme Court just came out

24    with a ruling last week (indiscernible).  Is that

25    appropriate in your opinion?

1          MR. SLADE:  I object Your Honor.  I don't know how

2     the witness is supposed to answer that question.

3          THE COURT:  He's not the one -- he is not the one

4     proposing the releases.  Do you understand that?

5          MR. HENDERSHOTT:  He provided consult to the

6     chairman of the UCC (indiscernible).  Am I wrong?

7          MR. SLADE:  That is privileged, Your Honor.

8          THE COURT:  Well, he can't testify about advice he

9     gave to Mr. Raznick.

10         MR. HENDERSHOTT:  I'm not asking for his

11    discussion with Mr. Raznick.  I'm asking for his opinion.

12         MR. AZMAN:  I don't even know that he did

13    (indiscernible).

14         THE COURT:  Yeah.  I will sustain the objection.

15    BY MR. HENDERSHOTT:

16    Q    Okay.  Moving on.  There was a lot of discussion, Mr.

17    Hage, about your experience, and it was very impressive.

18    (indiscernible) and may have just missed it, is your

19    experience in this particular role as a plan administrator.

20    Could you -- forgive me if you have to repeat it.  But could

21    you expand on that, please?

22    A    I have not personally served as a plan administrator

23    before.  I have on multiple cases represented post-

24    confirmation fiduciaries.  So I am very -- it's a

25    significant part of my practice.  And so I am very familiar

1    with the duties that exist for post-confirmation

2    fiduciaries, the legal issues that come up with the types of

3    claims and causes of action that are frequently pursued and

4    I expect will be investigated here in the process.

5    Q    Okay.  So I didn't miss it.  There is no direct

6    experience as a plan administrator before.  And you

7    (indiscernible) about being a bankruptcy judge.  I don't

8    know if that was purely (indiscernible) or maybe a

9    combination of both.  But would being a plan administrator

10   be on the pathway for you to achieve being a bankruptcy

11   judge (indiscernible)?

12   A    I think when bankruptcy judges are selected, that the

13   respective court of appeals looks at a variety of factors.

14   An applicant's professional experience, an applicant's

15   personal integrity, his reputation within the community,

16   both locally and beyond that.  His empathy, his or her

17   empathy for creditors, his judicial temperament.  These are

18   all things they look at in deciding who to select for a

19   judgeship.  And so in terms of relevant experience, I think

20   that having experience serving as a fiduciary would probably

21   be something that a court would look at and view as a

22   positive thing so long as the fiduciary acted as a

23   fiduciary, which certainly is my intention.

24   Q    That makes sense.  So (indiscernible) the motivation

25   (indiscernible).  That's a very admirable path that you're

1    on (indiscernible).  But my only concern is this is the

2    first major crypto bankruptcy.  It's a mega case.  The first

3    thought that comes to my mind, Mr. Hage, is maybe your first

4    role as plan administrator could be on a less-complex,

5    smaller size, not with all the novel complexity that is

6    found in this case.

7              MR. AZMAN:  Is that a question?

8              THE COURT:  Yes, it's a question.

9              MR. HENDERSHOTT:  It is a question.

10             THE COURT:  What do you think?

11   BY MR. HENDERSHOTT:

12   A    I would say that because the plan contemplates a

13   transaction where much of the crypto assets will be

14   transferred prior to my taking the position, I think that

15   crypto, while an important part of this case, in many ways

16   the role of the plan administrator will be similar to the

17   role of the plan administrator in every Chapter 11 case,

18   which is to investigate and pursue causes of action.  And

19   there aren't a lot of cryptocurrency in bankruptcy experts

20   in the world because this is a very fairly new experience

21   with the crypto bankruptcy cases that have been filed over

22   the last eight months.  I would say that I have quite a bit

23   of knowledge and experience about the intersection of

24   cryptocurrency and bankruptcy as a result of my involvement

25   in these cases.

1    Q    Interesting.  You talk about the (indiscernible) with

2    the previous creditor.  Have you seen the objection to the

3    motion for approval of the plan that was submitted with the

4    survey results, that was submitted to them through a third

5    party, independent, SurveyMonkey, about the creditor class

6    satisfaction with the representation, the letter of

7    communication that was provided from your client to the

8    creditor class?

9            MR. CALANDRA:  It's not in evidence, Your Honor.

10           THE COURT:  I'm sorry?

11           MR. CALANDRA:  The survey results are not in

12    evidence.  They're hearsay.

13           THE COURT:  The only question so far is --

14           MR. HENDERSHOTT:  They are in evidence.

15           THE COURT:  The objection --

16           MR. HENDERSHOTT:  You submitted them --

17           THE COURT:  The objection is overruled.  You've

18    asked him if he's seen them.  I'll let him testify.

19    BY MR. HENDERSHOTT:

20    A    I did read that objection, as I've tried to read all of

21    the objections to the plan that have been filed.

22    Q    And did you see that 97 percent of the creditors that

23    responded voted that the UCC representation has been a

24    failure to the creditor class?

25    A    I remember the survey.  I don't remember the details of

1   the survey.

2   Q    Okay.  And so it's on the docket.  It's document number

3   161.  And if you trust me, I can read the results to you.

4   It's 97 percent of the creditors responding perception of

5   failure of UCC representation.  94 percent of the creditors

6   responding Jason Raznick in his role as UCC chairman failed

7   the creditor class.

8        You were directly responsible for providing guidance to

9   Mr. Raznick as that chairman of the UCC committee.  Do you

10  find these findings concerning, significant?  Is there any

11  lessons learned (indiscernible) your own behavior and

12  engagement between yourself as administrator and the

13  creditors that you would take away from these survey results

14  on a go-forward basis?

15  A    What I take from those results is that there is a group

16  of creditors in this case who are dissatisfied with the

17  committee representation.  I will say that -- I was not the

18  committee.  I did not represent the committee.  I

19  represented a member of the committee.  But I know that in

20  terms of communications with creditors, there were I believe

21  four town halls that the committee professionals -- I was

22  not one of them -- participated in and answered questions

23  for lengthy periods of time from creditors in the case.  I

24  know that they have maintained a Twitter link to provide

25  updates on the case.  And I believe that this committee

1  tried very hard to communicate as much as possible when you

2  have a creditor body of this size.  But I was not personally

3  involved in those discussions.

4  Q    Well, that's my concern.  So I'm not hearing that you

5  would do anything different.  And actually, as part of the

6  objection, (indiscernible).  Pardon?

7            THE COURT:  What was the question?

8            MR. HENDERSHOTT:  Can you hear me?

9            THE COURT:  We can hear you.  But what was the

10  question?

11            MR. HENDERSHOTT:  I haven't finished asking it

12  yet.  Proceed?

13            THE COURT:  If you have a question, proceed.  Yes.

14  BY MR. HENDERSHOTT:

15  Q    Yes.  So as part of that same objection, Mr. Hage,

16  (indiscernible) with the creditors that your direct

17  communication expressly stating that it was not the

18  responsibility of the UCC to communicate.  And that is a

19  direct result (indiscernible) to the 90-plus precent

20  dissatisfaction rate.  So it's very concerning to hear that

21  you wouldn't change anything and that you feel that the

22  level of communication (indiscernible) in this case.

23  (indiscernible) and I will pass on the podium at this point.

24  Thank you, Mr. Hage, for your time.

25            THE COURT: Okay.  Are there any other questions

Page 288

1    for Mr. Hage?

2            MR. JONES:  Seth Jones, pro se, Your Honor.

3            THE COURT:  Okay, Mr. Jones.

4            MR. JONES:  I've got some questions.

5    BY MR. JONES:

6    Q    Jason Raznick in the past has said that he had to hire

7    a (indiscernible) lawyer before the UCC professionals were

8    hired.  How much work did you do for the UCC members

9    (indiscernible) in this case?

10           THE COURT:  Can you answer that question?

11           MR. AZMAN:  Could I -- I'm not sure I heard.

12           THE COURT:  The question was how much work did you

13   do for Mr. Raznick before McDermott was hired to --

14           MR. JONES:  No, no.  the group.  By the group.

15           THE COURT:  I'm sorry?

16           MR. JONES:  By the group.

17           MR. AZMAN:  He didn't represent the Committee.

18           THE COURT:  He didn't represent the Committee, so

19   I'm not sure what your question is.

20           MR. JONES:  No.  Jason Raznick in the past has

21   said that he hired a personal lawyer which helped

22   (indiscernible) that a lot of work had to go in to figure

23   things out.  How much work was he involved with the other

24   members of the UCC before McDermott was hired?

25           THE COURT:  Were you -- were you involved in any

Page 289

1    work with the other members of the Committee before

2    McDermott was hired?

3              THE WITNESS:  I was.

4              THE COURT:  Okay.

5    BY MR. JONES:

6    A    I met -- I spoke with Mr. Raznick for the first time

7    sometime in mid-July.  I believe the creditors' committee

8    selected McDermott in late July.  It is common in the -- I

9    don't remember exactly the date when the creditors'

10   committee was formed, but it was sometime in the middle

11   there.  It is not uncommon when there are appointed for them

12   to have their attorneys participate in that process.  That

13   was I think particularly important in this case because,

14   whereas in many cases the creditors' committee consists of

15   usually seven trade creditors, some of whom have familiarity

16   with the bankruptcy process.

17        In this case, the diverse committee that was appointed

18   by the Office of the United States Trustee consisted all of

19   retail customers of Voyager who, to my knowledge, none of

20   whom -- no, I believe actually one of them may have served

21   on a creditors' committee before, but most of them had no

22   experience with the bankruptcy process at all.

23        And so as an attorney representing one of the members

24   of the Committee for that week or so period before McDermott

25   was hired as the counsel for the Committee, I took efforts

1   to help organize the Committee in terms of helping to deal

2   with a deluge of pitch packages that Committee members

3   received and coming up with an organized process of

4   identifying who we wanted to interview, who they wanted to

5   interview, and who they -- not me -- wanted to select.

6   Q    Do you think in that week process, that gave you a leg-

7   up on getting appointed by the winddown trust?

8   A    No.

9   Q    How many applied and how many interviewed for the

10  winddown trust?

11  A    I cannot speak to how many applied.  I believe that the

12  Creditors' Committee interviewed three individuals.  I say

13  that because it was in a pleading, I believe, that the

14  Committee filed.  But I don't know how many people expressed

15  interest in it.

16  Q    what is the voting procedures for the UCC when voting?

17  Is it one-by-one or is it a blind vote or what?

18  A    As is customary for creditors' committees -- and I have

19  a lot of experience working with creditors' committees, as

20  do many of the other attorneys in the room here, it is -- I

21  have never seen a committee where it wasn't true that each

22  committee member -- again, it's usually seven members --

23  each committee member gets one vote.  No one member's vote

24  carries more weight than any other committee member.  The

25  chair does not have veto power or a more weighted vote.

1    It's not done proportionate based on the size of a

2    creditors' claim.  Each of the usually seven members gets

3    one vote, and it's majority rule with the exception that to

4    the extent there is any sort of conflict issue that comes

5    up, that somebody recuses themselves.

6    Q    What was the voting procedures when they vote?

7    A    What was the voting procedures?

8    Q    Yeah, how did the voting procedures work?  Is it a one-

9    by-one vote?

10   A    Yes.  Well, I've seen it done different ways.  Usually

11   committee meetings are going to be run by the professionals

12   for the committee.  In this case, that would be McDermott

13   and FTI.  When an issue is presented for a vote, each

14   creditor votes.  And usually they just roll through the

15   roster, vote yea or nay.

16   Q    So one by one.

17   A    That's correct.

18   Q    Okay.  So -- all right.  Why didn't Jason Raznick vote

19   no if he claimed that (indiscernible).  You said abstain is

20   the same method as voting no.

21            THE COURT:  I think there were two questions

22   there.  Which one do you want to ask?

23   BY MR. JONES:

24   Q    Okay.  Do you think abstaining is the same method as

25   voting no?

Page 292

```
 1            THE COURT:  Was abstaining the same as voting no?
 2     Is that what you are asking?
 3            MR. JONES:  Abstain.  Abstaining.
 4            THE COURT:  Yeah.
 5            MR. JONES:  Abstaining to a vote.
 6     BY MR. JONES:
 7     A    I know that at the time Mr. Raznick voted, the decision
 8     had already been determined because the requisite majority
 9     of committee members had already voted not to object to the
10     settlement.  Why Mr. Raznick -- and this was a heavily
11     debated thing.  This was not an easy decision.  It was not
12     an easy decision for any of the committee members.  It was
13     heavily debated and deliberated on.  Because those committee
14     members are all retail customers, just like you, sir.  And
15     those -- so anyway, he was the last to vote.  The decision
16     had already been made at that point.  And why he abstained
17     as -- instead of simply voting no or joining the pack, I
18     can't answer that.  Joining the majority I should say.
19     Q    When did the vote take place to appoint a plan
20     administrator?
21     A    I don't recall the exact date, but I would -- I think
22     it was probably in late October or early November.
23     Q    You said this is a complex case.  Do you think one
24     trustee should have the power to control $135 million
25     (indiscernible) recovering a billion dollars?
```

1   A    Well, keep in mind that there is a three-person plan

2   administrator governing board.  There is one plan

3   administrator.  And the plan administrator in this case will

4   need to and will -- I will hire competent, experienced,

5   capable professionals to help fulfill that duty.  So yes, I

6   do think it's good, it's sufficient.

7        And the alternative of having multiple trustees just

8   means more professional fees, which at the end of the day

9   will eat away at the recovery for customers and creditors.

10  All creditors, not just customers.

11  Q    Is this true?  The plan administrator shall have the

12  exclusive right, power, and interest to review, reconcile,

13  enforce, elect, compromise, settle, or elect not to pursue

14  the vested actions -- causes of actions, including, without

15  limitation, FTX, Alameda, and 3AC?

16  A    There are provisions that deal with the plan

17  administrator's authority.  And there's a generally broad

18  provision like that.  There are some caveats to that I

19  believe where the amount at issue is subject to above a

20  certain threshold.  I don't remember what those thresholds

21  are.  But generally that's right.  The plan administrator is

22  a fiduciary whose job is to decide which claims to pursue or

23  not to pursue, when to settle or not to settle, when to

24  litigate or not to litigate.  And of course any fiduciary

25  would do that based on discussing and deliberating with the

Page 294

1      professionals who that fiduciary has retained.  And of

2      course in this case, like most cases, because there is a

3      trust or plan administrator governing board, in consultation

4      with them as well.

5           And in some cases, settlements are frequently done by

6      filing a motion with the bankruptcy court for approval of

7      settlements.  And so in some cases, that may be something

8      that we would do as well.

9      Q    Thank you for your time.  I appreciate it.

10     A    You're welcome.

11     Q    That's all.

12          THE COURT:  All right.  Is there anybody else on

13     the phone who wishes to cross-examine Mr. Hage?  Okay.

14          In that case, is there anybody here, any redirect

15     for the Debtors or any -- excuse me, examination by the

16     Debtors?

17          MR. SLADE:  No, Your Honor.  Thank you.

18          THE COURT:  No?  Redirect by the Committee?

19          MR. CALANDRA:  No, Your Honor.

20          THE COURT:  Mr. Hage, just very briefly.  If you

21     uncovered circumstances that called -- that you thought

22     suggested that you ought to criticize the work that the

23     prior committee had done or that McDermott Will & Emery had

24     done, would you feel any hesitation or limitation on your

25     ability to make those criticisms?

Page 295

1            THE WITNESS:  No.

2            THE COURT:  If you had to object to a claim by Mr.

3    Raznick, would you have the ability to do that, or would you

4    need to have conflicts counsel?

5            THE WITNESS:  I think if there was an objection to

6    a claim of Mr. Raznick -- and that is precisely the reason

7    that I requested that there be that conflict provision

8    there, because ethically I don't think that that would be

9    something I could or should do.

10           THE COURT:  Somebody else would handle that then.

11           THE WITNESS:  That's correct.

12           THE COURT:  So any decision about his proof of

13   claim or about preference actions against him, somebody else

14   would decide?

15           THE WITNESS:  Absolutely.

16           THE COURT:  Okay.  All right.  You are excused.

17   Thank you very much.

18           THE WITNESS:  Thank you, Your Honor.

19           MR. SLADE:  I know it's late, Your Honor.  Mike

20   Slade for the Debtors.  Before we close the evidentiary

21   record, there was just one thing that the Debtors wanted to

22   tell the Court.

23           I think we're just kind of struggling with what to

24   do with what the SEC said, you know, an hour or two ago.

25   You know, after years of doing nothing, now we have a

Page 296

1    statement that the SEC staff thinks maybe the VGX token is a

2    security.  It's kind of irrelevant because it's like

3    Kirkland & Ellis saying something, our client is not

4    allowing us to say it on behalf of our client.  So I'm not

5    sure how relevant it is, but it may have an impact on what

6    the Debtors need to do with our plan.  And I think we need

7    some time to think about it.  Just as an example.  We might

8    need to amend the plan to add an 1145 exclusion into it if

9    the SEC might take this position.

10            And so what I would ask Your Honor to do is leave

11   the evidentiary record open to allow us to do that if we

12   decide that the debtors want to amend the plan.  And, Your

13   Honor --

14            THE COURT:  We can reopen the evidentiary record

15   if the plan is amended.  Would that serve your purpose?  Do

16   we need to leave it open at this stage?

17            MR. SLADE:  I would ask that you leave it open,

18   because I'm just not sure how we're going to handle it.

19            THE COURT:  All right.

20            MR. SLADE:  I mean, in some respects the position

21   they took this afternoon was even weirder than the kind of

22   nothingburger that they gave the Court yesterday.  So I just

23   don't know what to do with it.  But I do know that the

24   Debtor professionals and the committee professionals need to

25   talk about it.

1          THE COURT:  Okay.  On timing.  We're not going to

2    have argument tonight because it's already 7:20.  And I

3    would like to be able to understand the arguments,

4    participate in them.  Monday I am committed to judge one of

5    the quarterfinal rounds at the moot court competition that

6    Mr. Hage has organized.  So that would make it difficult for

7    us to continue on Monday, unless you wanted to start

8    argument on Monday afternoon.  Or we can resume Tuesday.

9          But in either event, I would think that you're

10   going to have to have agreement by Binance to move that

11   milestone about the entry of the confirmation order.

12   Because I won't have enough time to hear argument even if we

13   do it on Monday and to make sure that we get something

14   entered even if I were to rule that way.

15          MR. GOLDBERG:  Your Honor, Adam Goldberg.  I'm

16   asking my client right now.

17          THE COURT:  Okay.

18          MR. SLADE:  Mr. Azman was mentioning he may have a

19   scheduling conflict.  If we can work it out, does the Court

20   have availability on Wednesday?

21          MR. AZMAN:  Well, actually, I don't think it works

22   for Debtors.  So don't -- are we going to be in-person for

23   argument?  I guess that's the question I had.  Is there any

24   --

25          THE COURT:  I would prefer that, yeah.  Tuesday I

Page 298

1    have some hearings at 10:00 that should not take an

2    extraordinary amount of time.  And I have the rest of the

3    day Tuesday.  On Monday, I cannot remember what time my

4    round starts at St. John's.  I just don't remember.  But I

5    would only have -- whatever time I could give back here, I

6    would only have a few hours in the afternoon.

7                MR. SLADE:  As long as we can get relief from the

8    milestone, that --

9                THE COURT:  Resuming Tuesday would be best.

10               CLERK:  Your Honor, if we start on Tuesday, it

11   would have to be Tuesday at 11:00 a.m.  And I would ask that

12   the parties -- is this going to be Court Solutions or is it

13   going to be a hybrid hearing?

14               THE COURT:  It will be the same way we've done the

15   hearing itself.

16               CLERK:  I would ask those parties who are going to

17   participate through Court Solutions to please register your

18   appearance before the hearing and register at 11:00 a.m.

19   Please don't make all different times.  Today I have to

20   download 15 participation lists.

21               THE COURT:  Okay.  But let's make sure that that

22   is our time before we ask everybody to do that.  We've still

23   got a lot of shuffling in the courtroom here.

24               MR. SLADE:  Sorry, Your Honor, just reviewing

25   schedules.

Page 299

```
 1              THE COURT:  I understand.

 2              UNIDENTIFIED SPEAKER:  Your Honor, while that's

 3     happening in the background, may I just speak for a minute

 4     to thank you?

 5              THE COURT:  Well, I'll never turn anybody down who

 6     wants to do that.

 7              UNIDENTIFIED SPEAKER:  So I have 15 years of legal

 8     experience, and I've been in a lot of courtrooms.  And so

 9     I've seen a lot of judges.  And this whole confirmation

10     hearing is the first time I've actually participated in a

11     hearing.  And lo and behold (indiscernible).  But there have

12     been other creditors who have participated in the hearing,

13     and there has been mixed reviews.  Some people saying, you

14     know, you seem like a good judge, some people saying that

15     they would prefer a different judge.

16              But I just want to say from what I've seen, you,

17     compared to other judges I've seen in my lifetime, are

18     actually very patient, very understanding, very helpful, and

19     very accommodating of us creditors.  And I just want to say

20     that I really do appreciate that, and I hope you have a

21     great weekend, and I will see you Tuesday.

22              THE COURT:  Thank you.  On that patient,

23     understanding, and helpful stuff, can I get you to send that

24     to my son?

25              UNIDENTIFIED SPEAKER:  (indiscernible).
```

 1            MR. SLADE:  Your Honor, the preference of the

 2    parties is Monday afternoon if you can accommodate.

 3            THE COURT:  Sorry?

 4            MR. SLADE:  The preference of the parties, if you

 5    can accommodate, is Monday afternoon.

 6            THE COURT:  Okay.  We'll never finish Monday

 7    afternoon, you realize that.  Okay.  We'll --

 8            MR. AZMAN:  Your Honor, I think the parties

 9    collectively have scheduling conflict basically for the rest

10    of the week next week.

11            THE COURT:  We will resume on Monday at -- Mr.

12    Hage, what time are the quarterfinal rounds?  Do you have

13    any idea what my schedule is on Monday?

14            MR. HAGE:  I don't.  I think you're right.  I

15    think that the judges in the Eastern District and the

16    Southern District of New York are right after lunch.  But I

17    also know that you (indiscernible) St. John's, they could be

18    moved to the morning though.

19            THE COURT:  Well, is it just after lunch or just

20    before lunch?  I can't -- I thought it was just before

21    lunch, but I could be wrong.

22            MR. HAGE:  I don't have -- I'm not involved -- for

23    the record, I'm not involved in the selection

24    (indiscernible).

25            THE COURT:  Everybody is going to have to wait

Page 301

1    while I call up my schedule here.

2              MR. HAGE:  The first round (indiscernible) and

3    then (indiscernible).

4              THE COURT:  Yeah, I know it's the second round.  I

5    just can't remember if it's before or after lunch.  I

6    thought it was just before lunch.

7              MS. TREVINO:  Your Honor?

8              THE COURT:  Yeah.

9              MS. TREVINO:  This is Lisa Trevino, pro se

10   creditor.  I just wanted to quickly ask you something.  I

11   reached out to Kirkland & Ellis from our last hearing, not

12   this confirmation hearing.  And I still don't have the

13   information that I had asked for.  And it is the third, and

14   we have to get our information done by the 16th.  Apparently

15   that's 13 days away.  And seeing that I've been on these

16   confirmation hearings, I will have to work (indiscernible).

17   I am trying to get an answer on when I'm going to get that

18   information.  I've sent emails, calls.  I've spoken only

19   with one person.  The gentleman called me back

20   (indiscernible).  He said they were going to go back to

21   Voyager to get that information.

22             MS. SMITH:  Your Honor, this is Allison Smith at

23   Kirkland.  I actually corresponded with Mr. Trevino this

24   week and did relay to her that Voyager is pulling that data

25   and would send it as soon as they have it available and

Page 302

1    offered to set up a call to walk through it with her.  So

2    it's all in process and we are trying to get to her as

3    quickly as possible.

4              MR. TREVINO:  I understand.  But what I'm trying

5    to say is 13 days is not going to be enough time.  And

6    that's going to be an issue.  And, Your Honor, I would

7    really ask that you would move that back seeing that I have

8    asked for this information for quite some time and there is

9    a problem with my claim and I am really asking you to do

10   that, to move it back a little bit.

11             THE COURT:  Let me just ask you.  Work with the

12   Debtors.  See what information you get.  If for some reason

13   you need an extension of the deadline, you can ask then for

14   an extension of the deadline.  But let's first just see if

15   they can get you information and see if it requires anything

16   else at that point.  Okay?

17             MS. TREVINO:  I think I missed what you said, sir.

18   It was too low.  I couldn't heave you very well.  I'm sorry.

19             THE COURT:  What I was saying was just talk to the

20   Debtors.  Get the information when they have it.  If you

21   find at that point that you need an extension, you can ask

22   for it.  But let's take it a step at a time.  First get the

23   information and then see how much of an issue there is and

24   whether we really need any more time.  Okay?

25             MS. TREVINO:  Okay, Your Honor.  I appreciate

Page 303

```
 1    that.  I will be updating you.  Thank you very much.
 2              THE COURT:  All right.  I've finally gotten to my
 3    schedule.  And I am completely wrong.  I am not judging the
 4    quarterfinal round, I am judging the semi-final round, which
 5    starts at 1:00 on Monday and ends sometime around 3:00 or
 6    3:15.
 7              MR. HAGE:  I suspect that if you contacted the
 8    (indiscernible), they could reschedule you for morning or
 9    find a substitute.
10              THE COURT:  Well, they might.  But it's already
11    7:30 on Friday.  How are they going to do that?
12              MR. HAGE:  I can make a call (indiscernible).  I
13    know, for example, that there (indiscernible) who has
14    volunteered to do a fill-in if necessary.  And I suspect
15    that there are other judges in the preliminary round session
16    who would be willing to switch to make the accommodation.
17              THE COURT:  Well, if it's a fill-in, then I can
18    just give you the entire day.  And with apologies to St.
19    John's and the Duberstein competition just let myself be
20    replaced.  Are you sure you have a replacement?
21              MR. HAGE:  (indiscernible).
22              THE COURT:  All right.  In that case, we will
23    resume Monday at 10:00.
24              So notwithstanding what Lorraine said earlier, if
25    you're calling in for Court Solutions, Monday at 10:00.  Not
```

Page 304

1     a different time Monday.  10:00 Monday.  Okay?

2                 UNIDENTIFIED SPEAKER:  Your Honor, I intend to

3     argue, but I have to travel to Ohio for another matter on

4     Tuesday morning.  So can I do it by telephone?

5                 THE COURT:  Yes, you may.

6                 UNIDENTIFIED SPEAKER:  Thank you.

7                 THE COURT:  All right.  Anything else before we

8     adjourn for the day?  Okay.  Thank you very much.

9                 (Whereupon these proceedings were concluded at

10    7:31 PM)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 305

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  March 8, 2023

| & | | | |
|---|---|---|---|

**&**   5:3,11 6:16
7:1 216:3
233:5,23 242:7
242:8,9 246:11
256:22 294:23
296:3 301:11

**0**

**0**   125:1

**1**

**1**   16:2,6,10,17
17:5 42:25
43:5,15 140:7
142:15,16
**1.002**   150:19
**1.022**   175:7
**1.2**   121:5
**1.3**   121:5
**10**   77:8,21
117:9 123:7
124:24 240:6
**100**   25:24 26:1
26:3 31:19
41:9 42:22
43:14,20,20,25
71:19 116:8,17
116:18 142:19
160:8 168:2
209:6 219:8,9
**10004**   2:3 6:12
**10017**   6:19
**10020**   5:6
**10022**   5:14
**10036**   7:4
**1006**   22:17

**1035**   22:17
**1074**   23:1 24:9
**10:00**   201:11
298:1 303:23
303:25 304:1
**10:08**   2:6
**10th**   176:12
**11**   3:21 4:12
8:14 22:8,13
140:2,3,14,21
167:17 172:13
245:13 247:15
263:15 270:9
270:18,20,23
271:2,15,18
284:17
**1109-2**   8:21
23:10 235:23
236:5,12,15
**1113**   25:1
**1114**   7:3
**1115**   22:17
**1117**   248:13
**11206**   4:9
**11209**   4:9
**11213**   4:9
**1125**   21:22
**1129**   22:3 25:2
**1145**   296:8
**115/146**   8:5
**11501**   305:23
**11:00**   298:11
298:18
**12**   139:13
140:2,3,14,21
167:16 174:13
174:18

**12151**   305:7
**1271**   5:5
**13**   301:15
302:5
**130**   121:6
**135**   179:22,24
180:6,8 292:24
**15**   8:15 22:16
22:22 141:7
298:20 299:7
**150**   171:16
**15th**   6:4
**16**   8:16 22:16
22:22 23:1
24:9 235:7
**161**   286:3
**16th**   67:10,13
67:23,24 68:3
157:6,7 158:1
158:13 196:24
244:19 301:14
**17**   120:3 121:2
121:3 235:7
**18th**   150:21
**19**   22:25 24:8
24:18,22
**1:00**   303:5
**1st**   156:20
196:18

| 2 | | | |
|---|---|---|---|

**2**   37:2 47:23
48:5,8 49:4
50:24 51:1,16
52:2,6,21
53:24 124:18
166:6,10

**20**   8:17 17:5
22:16,22 26:3
26:6 36:15
42:24 43:23,25
44:2 122:9
123:7 135:14
141:15,17,19
142:6,8,14
167:25 175:4,5
184:1 239:5
272:8,13,15
276:16,23
277:2,5,19,20
277:25
**200**   52:8,14
**2018**   237:19
**2019**   110:3
238:23
**2020**   105:14
**2021**   33:14,22
35:13 48:11
105:14 237:20
**2022**   33:22
72:19 196:16
196:19 238:25
241:15,23
244:20
**2023**   2:5
196:24 305:25
**20s**   125:18
**21**   8:18
**22**   8:10,11,12
8:13,14,15,16
8:17,18,19,19
8:20
**22-01133**   1:9
3:1

**22-01170**   1:17
   3:7
**22-10943**   1:3
**23**   8:20 22:16
   22:22 57:9
**233**   8:6
**236**   8:21
**24**   8:4 149:21
   150:9
**247**   8:6
**248**   22:5
**25**   118:23
   160:2 201:24
**26**   149:21
   150:6 232:10
**27001**   36:25
   47:21 50:1
**27th**   168:8
**2:45**   143:1

**3**

**3**   2:5 25:1
   239:15,23
**30**   124:23
   150:21 176:14
   177:10,20,22
   177:24 178:21
   242:23 243:1
**300**   6:4 305:22
**30326**   5:22
**32**   65:9,20
**32,000**   273:18
   273:21
**32,800**   273:21
**330**   305:21
**35**   26:15,19,24
   27:3,8,23 29:9
   30:13,17 31:2

44:6 72:3,5
99:15,17,24
100:1,23 103:7
104:4,7 116:25
119:24 120:1,6
121:3,6 125:18
126:7 161:2,13
179:23 180:1,6
**36**   248:15
**37**   101:19
**38**   168:11
**3:00**   303:5
**3:15**   303:6
**3ac**   293:15

**4**

**4**   239:23
**4.7**   91:4,14
**40**   124:22
   125:1 151:1
   243:2
**400**   149:23
   197:4
**404**   227:21
**404-842-5765**
   227:22
**40s**   150:3
   152:11
**41/99/111**   8:4
**42**   72:7
**44**   150:3 151:9
**445**   152:4
   179:24 180:8
   184:17
**48**   13:20 18:21
   18:24 149:21
   150:11

**5**

**5**   117:5,6,8,9
   117:11,18
   118:22 142:12
   159:12 239:23
**50**   31:9,15
   61:21 115:14
   116:2,4,5,16
   117:8 118:6,6
   119:11 120:11
   120:18,20
   124:9 135:13
**52**   18:22
**55**   23:1 24:9
**580**   180:1
**5c**   250:4

**6**

**6**   8:10 22:5,13
   29:19 239:24
**6.12**   80:19
   81:16
**60**   44:4 116:12
   116:23 141:17
   160:7 169:10
**601**   5:13
**63**   188:19
**68**   168:13
**6th**   78:18
   158:16 159:1

**7**

**7**   4:2 8:11 22:5
   22:13 85:10
   104:2 167:20
   175:17 183:8
   235:10 239:24
   245:15 270:14

271:2
**73**   149:17
   150:12 151:9
   151:20 168:8
   168:11,12
**748**   22:5
**75**   121:3
   141:18,20,23
   149:23
**775**   22:5
**78701**   6:5
**7:20**   297:2
**7:30**   303:11
**7:31**   304:10

**8**

**8**   8:12 22:5,13
   188:19 239:24
   240:6 305:25
**8.1**   78:21 188:4
   188:16,17,23
**80**   26:6,13
   36:16 43:24
   44:1 141:16
**81**   188:5
**835**   22:5
   188:11
**85**   84:22
**850**   234:1
**860**   22:8

**9**

**9**   8:13 22:5,13
   29:20 62:1
   78:22 188:8,13
   240:6
**90**   267:24
   268:4,7 272:11

276:14,21
277:21 278:9
287:19
**900** 5:21
**91** 123:2,6
**92** 273:23
**94** 286:5
**943** 22:17
**950** 5:21
**951** 22:17
**97** 157:20
285:22 286:4
**986** 22:17
**99** 21:4 142:19
239:18
**9:55** 67:22

**a**

**a.m.** 298:11,18
**abi** 239:1
**abided** 134:6
**abiding** 272:12
**abigail** 6:7
98:22
**abilities** 74:16
**ability** 13:9
19:3 27:4,7,18
28:13 29:14
33:3 37:6 57:3
58:24 59:17,19
61:1 62:19
70:18 72:2
73:2 75:2,8,16
86:9 89:18
90:24 91:18
103:15 107:5
108:18 112:12
118:3 120:15

124:2 125:19
126:3,8 134:16
136:5,20 141:4
146:15,24
152:8 154:5,12
154:17 160:11
170:17 179:9
186:5,6 191:6
191:10 192:13
193:23 195:1
195:14 199:4
200:22 203:6
208:15 209:1
220:22 269:8
279:25 281:8
294:25 295:3
**abi's** 238:23
**able** 11:19 15:4
15:23 27:5
29:9,13 30:3
37:7 41:12
58:23 61:1
70:8,16 71:24
72:17 73:22
74:5 75:3
76:24,25 78:3
78:10 79:16,17
79:19 81:1
86:20 87:7
105:14 109:24
110:17 118:3
122:14 125:14
125:21,25
126:10,17
129:8 158:1
164:1,10 165:3
165:13,23

166:3 169:7
174:16 184:10
191:11 194:5
195:2 208:18
216:8,11,15,16
217:20 220:8
220:17,19
221:15,19
222:18,19
224:2,5 225:20
231:18 251:14
257:20 261:5
275:21,23
297:3
**above** 34:23
59:10 167:5
293:19
**absence** 97:13
**absent** 209:23
**absolute** 87:11
**absolutely**
12:10 17:17
21:10 32:9,16
70:11 96:7
101:13 124:5
151:24 154:2
178:13 179:20
179:22 181:7
189:24 190:18
190:21 207:8
223:20 245:7
295:15
**abstain** 291:19
292:3
**abstained**
245:3 267:11
292:16

**abstaining**
291:24 292:1,3
292:5
**abstention**
267:12,16
**accept** 136:20
**acceptable**
221:20
**acceptance**
134:12
**accepted** 16:20
137:8 172:23
173:7 274:5
**accepting**
141:23
**access** 16:21
46:24 58:20,24
79:15,16,18,19
80:6,10 87:12
88:8 101:3
103:15 117:3
128:18 143:20
213:12
**accommodate**
300:2,5
**accommodat...**
299:19
**accommodat...**
303:16
**accordance**
14:19 188:23
**account** 18:3
20:3 43:6
82:21 129:14
153:4 155:23
155:25 156:3,5
191:9 193:17

197:4 200:12
200:21 260:23
**accounting**
106:6 152:8
**accounts**  13:21
79:25 81:22,23
190:20 200:17
**accurate**
198:15 260:5
305:4
**achieve**  11:17
14:23 271:22
283:10
**achieved**  140:3
**acquire**  12:23
13:9 27:10,11
122:8 272:23
**acquired**  80:21
81:19 122:9
126:18
**acquiring**
12:25
**acquisition**
139:12
**act**  18:10
133:24 138:8
250:5 265:12
**acted**  283:22
**acting**  138:2
156:18
**action**  123:5
132:14 244:16
245:17,18,19
271:25 275:25
276:7 278:16
283:3 284:18

**actions**  91:15
91:23 92:17
275:23 293:14
293:14 295:13
**active**  108:6,8
108:10 239:3
**actively**  39:5
214:11 241:4
247:7,11
**activity**  73:10
134:21 199:8
**acts**  89:21
**actual**  11:3
29:14
**actuality**  43:5
**actually**  18:3,5
18:6,10 82:17
86:16 102:16
104:20 109:25
126:3,15
128:22 129:20
134:6 135:12
136:5,19 138:8
159:3 169:12
169:13 175:18
193:17 210:5
211:23 212:1
213:1 215:14
216:21 222:2
224:23 225:2
227:21 238:4
241:20,21
271:10 275:7
278:17 280:25
287:5 289:20
297:21 299:10
299:18 301:23

**ad**  1:19 3:7 7:2
246:12
**ada**  207:1
**adam**  5:8 11:9
144:22 213:24
297:15
**add**  102:8
167:11 222:11
258:2 263:4
296:8
**added**  212:14
**adding**  212:20
**addition**  27:16
41:11 46:6
165:15 273:20
273:22
**additional**
10:12 26:12,14
30:6 41:10
55:8 56:13
62:24 63:24
68:17,21 71:22
73:7 125:25
128:4 148:3
152:4 155:14
158:3 160:18
167:5 173:8
206:23 208:1
208:16 212:24
222:16 230:7
237:21 262:15
**additionally**
34:13,23 47:23
49:3 71:20
72:1 160:17
230:13 234:22

**address**  9:13
19:16 27:21
126:4 128:19
128:20 130:1
130:20 155:5
215:7 218:11
220:17,18,19
220:25 221:16
221:19 222:23
226:20 232:24
244:7 246:21
**addressed**
82:17 156:21
203:9,11
213:10 220:19
251:7 275:5
**addresses**
19:24,24
**addressing**
20:18
**adequate**
50:13,15,18
52:21 53:23
54:2,5
**adjourn**  304:8
**adjusted**  40:25
96:3 149:5
151:1 187:17
203:12
**administration**
271:9
**administrative**
43:7
**administrator**
9:12 23:11
232:23 233:6
234:9 243:7,15

243:22,24
244:2,3 246:15
248:7,14 249:6
249:16,19,24
250:3,4,18,20
251:12 252:21
253:1,13,17,22
254:4,12,18
256:1,8,14,17
257:4 259:22
259:25 261:9
264:24 270:25
272:5,12
275:11 276:8
279:3,24 280:6
280:20 282:19
282:22 283:6,9
284:4,16,17
286:12 292:20
293:2,3,3,11
293:21 294:3
**administrator's**
293:17
**admirable**
283:25
**admission**   25:4
236:12
**admit**   22:1
232:10
**admitted**   22:12
24:21 25:6
234:3,4 236:14
**adv**   1:9,17
**advance**   32:3
33:7 70:3,23
70:25 71:2
106:10 204:17

277:1,25
**advanced**
16:22 273:25
**advantage**
142:19 262:9
**adversary**   3:1
3:7 184:24
**adverse**   72:4
**adversely**
91:17 123:12
**advice**   253:24
281:11 282:8
**advise**   265:12
265:22 266:12
**advising**   55:21
268:16,20,20
268:24 269:3
**advisor**   46:8
53:13 56:13
**advisors**   32:5
38:12 40:16,23
46:10,16 53:22
54:16,23 55:20
55:23 56:9,11
61:3 66:1 69:8
71:8 105:9
123:16,16,17
149:12 158:9
163:1 170:8
171:22 189:6
197:18
**advisory**   32:4
**affect**   91:17
157:8 182:18
183:13 185:24
231:17 267:13
267:16

**affected**   111:1
215:2
**affecting**   91:16
**affidavits**
231:23
**affiliates**   58:20
59:16 60:8
94:3 107:8,11
107:12,16
**affirmative**
14:6
**afternoon**
52:14,16,17,18
52:19 98:21
99:2,9 111:16
112:1 115:7
186:17,18
211:11 216:2
296:21 297:8
298:6 300:2,5
300:7
**agencies**   92:13
93:5,9,11,15
**agency**   92:20
95:24
**agent**   12:24
**aggressively**
244:25
**ago**   52:7 94:6
133:8 210:13
211:14 252:5
252:19 272:18
295:24
**agree**   25:15
223:20 224:4
254:4 266:3,7
273:7

**agreed**   106:15
154:16 159:21
273:19
**agreeing**   112:7
**agreement**
11:16 17:16
19:9 22:6,9,25
23:5 24:10
60:4,9 91:18
93:10 100:19
101:6,20 170:7
185:23 187:1
188:22 189:7
207:19,22
243:15 244:2
256:14 276:22
297:10
**agreements**
22:4 33:17
34:5 58:15
186:1,2,5
244:6,7
**agrees**   254:9
**ahead**   53:15
60:21 69:1
75:24 79:10
102:17 128:10
133:18 135:18
135:21 158:1
174:11 182:10
188:12 211:8
219:5 220:14
224:12,14
247:2
**aiming**   271:21
**aka**   83:8

**al** 1:23 3:9
**alah** 4:5
**alameda**
  149:19 168:9,9
  168:10,22
  184:3 185:3
  293:15
**alexander** 6:11
**align** 13:8
**aligned** 146:18
**allegation**
  197:3 244:14
  245:4
**allegations**
  33:5 38:13
  39:2 42:16
  66:3,11 68:11
  68:20,21,23
  74:12 157:4
  202:24 203:2,7
  206:23
**alleged** 260:3
**allison** 301:22
**allocated** 21:7
  200:10
**allow** 18:19
  28:18 60:21
  61:18 75:24
  76:16,25
  110:20 126:1
  126:24 128:3
  131:18 133:14
  133:17 145:8
  223:25 226:21
  228:23 253:4
  267:22 271:11
  273:5 296:11

**allowed** 10:18
  104:25 132:15
  133:4 144:13
  165:10 183:3,7
  206:7 221:7
  262:7 264:4
  273:4 275:3
  281:14
**allowing** 296:4
**allows** 28:20
  67:2,6 74:4
  75:12 87:19
  123:21 187:2
  203:15
**alternative** 3:3
  132:22 139:25
  154:21 177:14
  187:10,11
  293:7
**alto** 36:13
**ambiguities**
  208:10,11
**amend** 273:20
  281:8,10 296:8
  296:12
**amended** 91:8
  188:2,10
  246:18,18
  247:25,25
  248:4,10,11,13
  248:20,21,24
  249:1 252:20
  296:15
**amendment**
  22:7 86:15
  272:17

**amendments**
  81:4 279:25
  280:2,21
  281:13
**american**
  238:6,13,16
  239:7,9
**americas** 5:5
  7:3
**aml** 27:17,18
  28:2,19 33:17
  34:13 42:13
**amount** 13:13
  17:7 82:2
  121:23 127:25
  182:17 271:23
  293:19 298:2
**amounted**
  228:25
**amounts** 20:4
  130:10 268:12
**analogous**
  103:4
**analysis** 27:20
  41:8 57:15
  69:6 77:17,23
  78:1 115:16
  125:4 198:11
**analyzing**
  119:15
**andrew** 7:11
  146:1
**answer** 20:14
  20:25 43:17
  47:11,12 50:17
  55:11 62:7
  63:11 69:23

76:12 77:5
  78:3 83:20
  84:10 86:20
  90:24 92:3
  97:5 101:3
  105:23 106:1
  109:23 128:7
  155:6,11
  167:22 169:25
  171:24 180:11
  180:13,17
  182:14 212:2
  225:6 229:7
  230:5 257:16
  257:20 265:18
  269:10 271:11
  282:2 288:10
  292:18 301:17
**answered**
  49:21 58:2
  69:22 75:18,22
  167:13 269:15
  280:18 286:22
**answering**
  172:1,9 265:16
**answers** 85:7
  115:1 207:7
  208:8 225:10
  280:14
**anticipate** 9:17
  70:13
**anticipated**
  216:6
**anticipating**
  55:9 145:3
**anybody** 9:18
  16:5 17:3 25:5

| | | | |
|---|---|---|---|
| 41:17 44:10,17 | apas 208:3,5 | appoint 3:20 | 254:3,8,21 |
| 44:23,24 46:18 | api 131:17,18 | 134:19 250:21 | 275:11 276:4 |
| 58:8 73:6 | apologies | 253:4,14 261:8 | 281:22,25 |
| 98:17 102:15 | 161:24 303:18 | 261:16,19,20 | appropriately |
| 111:18 114:9 | apologize | 262:25 292:19 | 27:18 170:15 |
| 127:4 144:16 | 16:25 28:1 | appointed | appropriaten... |
| 145:22 174:5 | 39:20 42:7 | 138:12 243:7 | 57:11 |
| 185:14 186:10 | 51:15 69:23 | 260:11 271:9 | approval 4:11 |
| 227:7 229:2 | 76:1 102:13 | 272:5 289:11 | 15:9 22:19 |
| 231:20 232:23 | 105:16 127:16 | 289:17 290:7 | 23:3 32:3 |
| 243:21 246:8 | 132:8 140:13 | appointing | 70:15 83:16 |
| 255:2,4,4 | 141:10 149:25 | 250:4 | 84:9,17 96:2 |
| 265:5 269:16 | 150:2 218:12 | appointment | 98:13 234:10 |
| 294:12,14 | app 169:12 | 246:15 248:7 | 280:13 285:3 |
| 299:5 | apparently | 248:14 249:16 | 294:6 |
| anybody's | 228:13 301:14 | 259:21 | approvals |
| 184:22 | appeals 234:6 | appoints | 18:18 34:21 |
| anyway 142:9 | 236:21 237:11 | 237:11 | approve 267:6 |
| 153:8 231:5 | 237:16,23 | appreciate | approved |
| 240:17 292:15 | 283:13 | 21:11 138:23 | 17:21 60:9 |
| apa 64:16 78:7 | appear 212:12 | 148:13 154:3 | 76:15 132:6,13 |
| 78:12 79:16,24 | appearance | 182:4 220:24 | 132:25 133:1,9 |
| 80:1,19,23 | 205:21 298:18 | 229:4 231:18 | 158:25 159:10 |
| 81:5,16,16 | appeared | 274:14 294:9 | 172:22 173:9 |
| 84:20 85:2 | 203:23 | 299:20 302:25 | 254:11 279:9 |
| 87:16,17 91:5 | applicable | appreciates | 279:10,24 |
| 94:10,14 96:11 | 12:16 14:19 | 275:1 | approving |
| 154:4,7 156:11 | applicant's | appreciation | 17:16 22:9 |
| 158:24 159:5 | 283:14,14 | 180:22 | approximate |
| 159:10,11,13 | application | approach 67:3 | 43:20 |
| 176:13,25 | 237:4,5 | 202:17 235:15 | approximately |
| 186:25 188:2 | applied 237:2 | 235:18 | 25:25 35:5 |
| 188:10 207:25 | 237:7 257:7 | appropriate | 44:1 71:19 |
| 272:17 273:3 | 290:9,11 | 31:6 40:20,25 | 77:8,21 168:15 |
| 273:20 274:10 | applies 18:11 | 47:7 50:21 | 242:21 273:21 |
| apart 192:19 | apply 82:24 | 73:14 217:7 | area 49:20 |
| | 276:25 280:10 | 224:6 226:21 | 109:15 |

areas   63:6
aren't   206:16
  207:19,23
  284:19
arguably
  113:24
argue   187:17
  304:3
argued   260:6
argument
  18:13,16 19:18
  204:6 217:5
  220:13 224:22
  225:4,4,22
  226:15 246:22
  259:13 274:12
  278:25 297:2,8
  297:12,23
arguments
  19:14 247:20
  279:10 297:3
arm's   140:25
arms   174:21
arose   71:11
arrangements
  17:13 27:11
article   38:14
  40:2 65:23
  67:8 188:19
  196:24 197:7,9
  204:5
articles   39:3
  42:17 68:19
  238:21 270:16
articulated
  228:10 276:18

ascribed   135:7
aside   217:8
asked   9:21
  10:4 29:7
  37:10 54:2
  55:7 62:21,24
  63:2,22 86:14
  92:1 95:3,7
  97:23 107:15
  110:22 111:3
  134:5 153:2,9
  153:17 157:4
  163:1 172:6
  173:15 182:23
  184:16 186:5
  194:8,20 196:8
  210:14,17
  211:22 212:17
  214:24 216:9
  216:14 224:1
  229:10 256:13
  256:23 285:18
  301:13 302:8
asking   10:6,9
  10:21 17:7
  20:13 54:6,9
  56:10,16 59:23
  68:2 76:3,9
  77:14 78:2
  85:4 100:11,12
  100:13 102:16
  108:2 141:13
  144:17,17
  145:4 148:15
  148:16 162:20
  162:24 164:12
  164:15 167:14

169:1 181:25
  185:14 197:15
  223:23 248:24
  252:16 264:15
  275:12 282:10
  282:11 287:11
  292:2 297:16
  302:9
asks   237:5
aspects   38:5
asserted   202:3
  202:5 246:2
assess   57:6
  203:12
assessing   95:25
  116:1
assessment
  57:24
asset   22:6,9
  36:8 46:19
  53:5 54:16,20
  56:24 69:21
  84:19 85:1
  86:1,4,8,16,18
  101:20 128:22
  128:24 180:22
  206:10 207:19
  207:21
assets   17:16
  35:23 36:1,4
  45:9,9 46:23
  48:15 55:18
  56:5 57:7 58:1
  59:17 61:6,7
  63:1,23 79:17
  79:18,20 80:6
  80:10 81:23

85:14 106:23
  112:11 119:20
  120:3,11,13
  143:15 147:1
  153:10,14,18
  153:19,25
  161:20 162:2
  162:11,17
  169:8,10
  170:13 175:21
  176:18 178:10
  180:20 190:1
  193:25 195:3
  199:23 206:11
  206:11 284:13
assigned
  279:17
assist   159:21
assisting   102:4
associate   121:9
associated   26:7
  26:10,15 30:22
  35:2 44:3,5
  72:5 75:4 87:8
  95:25 96:5
  147:17,24
  149:5 155:23
  156:2,5,16
  168:22 170:20
  170:23 172:22
  195:2
associations
  238:12 239:4
assume   122:2
  275:22
assuming
  153:19 158:14

168:11
**assurances**
58:6 59:10
61:3 62:4,22
63:24 68:22
69:9,12,15
70:3 71:11
72:11 89:16
165:22 204:19
**assure** 69:12
**atlanta** 5:22
**attempt** 12:15
123:21 134:22
138:7
**attempted**
75:13 169:4
**attend** 198:5,5
221:10 228:10
244:12
**attendance**
198:3
**attended** 163:2
163:8 198:7
242:17,19,22
**attending**
163:4,7 238:21
**attention** 239:7
**attesting** 61:6
**attorney** 6:1
98:22 235:6
243:19 255:24
256:4 261:14
267:21 270:11
289:23
**attorneys** 5:4
5:12,20 6:2,10
6:17 7:2 143:4

143:5 163:1
234:1 289:12
290:20
**attracting**
113:24
**attributes**
230:19
**atypical** 95:17
165:14 172:23
173:10
**auction** 132:2
132:4,11,12,15
132:18 134:4
134:11,14,19
134:20 135:4,6
135:10 136:15
137:19 138:1,4
138:4,19,21,22
172:12,13
**auctions**
132:16 135:4
175:19
**audio** 52:17
55:4 99:9
102:12 125:11
127:8,10 128:8
141:15,16,16
**audit** 33:14
37:1 47:21
48:5,9,10,11
48:13,14,23,23
49:2,11,18
54:7 57:24
105:15,22
106:13,17,24
107:1 162:9

**audited** 33:14
33:22 35:12
48:12 54:4,8
68:13 105:13
105:14 106:21
109:8,9 162:1
162:5,15
192:21
**auditing**
105:17 106:6
**auditor** 35:14
35:16 51:1
54:6,8 69:17
106:8,9,10,11
106:16
**auditors** 109:4
**audits** 49:1,2,4
49:5,16 72:13
**austin** 6:5
**authentication**
131:18
**author** 239:20
239:21
**authority**
159:10 212:18
224:24 229:21
230:9 293:17
**authorization**
37:7
**authorized**
230:6 280:6
**automated**
16:19 130:10
**automatic** 3:3
82:19 136:20
**automatically**
78:24

**autonomy**
279:22
**availability**
297:20
**available** 13:13
33:16 34:1
85:14,14
103:13 173:3
209:17 231:25
263:22 301:25
**avenue** 5:5,13
6:18 7:3
**average** 150:21
**awards** 239:15
**aware** 11:15
38:2,25 61:4
61:10 77:7
78:4 87:10
88:7,12 89:2
92:17,19 93:4
93:6,11,14
94:16 95:24
106:25 110:3,6
122:21 128:12
148:3 162:16
184:1 200:8
201:6,10 214:9
234:8 238:14
244:4 251:17
251:20 252:6
**awful** 85:5
143:5 144:13
**awkward**
222:25
**azman** 6:23
222:5,5 225:24
225:24 242:12

254:9 257:22
258:3 261:2,2
261:25 262:21
264:5,10 269:7
272:16 274:14
275:21 276:15
276:17 277:4
278:3 282:12
284:7 288:11
288:17 297:18
297:21 300:8

**b**

**b** 2:21 6:22
25:19 30:11
**bachelor's**
234:17
**back** 25:2 33:9
66:21 72:7
74:23 77:1
84:23 103:8
104:8 115:8,9
116:3 122:25
125:22 145:21
146:22 147:4,8
149:20,20,23
150:8 153:12
153:20 156:15
159:16 161:15
163:8 167:23
171:16 174:14
174:19 176:3
180:20 211:14
211:16 217:16
224:5 230:3
231:21 235:4
257:22 259:6
260:18 270:12

271:23 274:19
276:3 278:16
280:12 298:5
301:19,20
302:7,10
**background**
46:19 234:14
237:13,22
299:3
**backing**
211:16
**backs** 255:23
259:11 264:22
272:7
**backup** 75:12
133:10,24
134:12,15,19
134:22 135:23
135:24 136:1,4
136:7,14,20
137:4,17,25
138:2,8,15
157:21 172:2,5
172:7,15,20,20
172:24 173:7
173:16,18,20
209:2,3
**backwards**
28:2
**bad** 187:12
207:22
**balance** 48:24
61:22,25
**balances**
108:22
**bam** 162:2
192:6,10,14,17

192:22,23
193:1,8,10,25
194:15 195:11
213:9
**bank** 20:3
35:11 47:5
57:13,17 58:3
89:10,19,20
164:23 190:10
190:12 193:13
193:14,15,17
197:4
**banker** 24:15
45:13 51:7
52:24 132:1
**bankers** 47:10
50:5 95:13
**banking** 6:3
35:18 73:21
98:24 153:23
**bankman**
258:25
**bankruptcy**
1:1 2:1,23 12:8
60:12,24 63:7
77:3 147:10
174:15,20
200:17 233:22
234:5,20,25
235:5,7,11,12
235:14 236:21
236:24 238:2,5
238:6,13,16,17
239:7,9,12,16
239:19,21
240:4,7,8,12
240:21 241:16

241:17 242:3,4
242:5 245:24
250:25 256:21
266:4 270:16
271:15 273:2
275:23 278:14
283:7,10,12
284:2,19,21,24
289:16,22
294:6
**banks** 57:14
**banned** 28:19
**bar** 237:12
**base** 125:14,19
125:24 126:21
127:2 128:3,13
140:15
**based** 10:6
26:23 29:10
35:21 38:16
41:8 43:4 77:9
77:23 78:11
107:1 113:11
115:17 117:15
119:14 120:7
122:16 126:21
128:20 131:3
137:10 138:12
139:2,9 140:23
141:1,8 150:19
150:20,25
151:5 152:1
166:1 168:16
173:11 177:5,6
177:13 178:15
179:14,19
183:2 191:17

193:4 195:18
195:22 198:8
202:20 203:23
206:4 208:16
209:20,22
210:12 230:16
233:24 247:19
278:5 291:1
293:25
**bases**  147:1
**base's**  156:13
**basic**  208:7
**basically**  69:11
136:13 164:10
272:24 300:9
**basis**  19:8 27:9
35:24 38:20
40:21,25 44:7
57:2 62:24
64:25 66:19
72:6 82:5 89:1
90:12 97:20
98:13 101:7
103:8 104:9
109:17 112:16
113:10,16
115:17 118:21
118:23 125:4
126:25 129:4
130:5 135:8
140:25 149:1,5
150:16,19
152:6,7 157:19
163:13 165:18
173:13 187:16
187:17 190:3,5
190:6,15 191:1

195:23 200:2,6
200:9 203:12
206:10 209:3
223:24 229:16
255:20 272:12
286:14
**batch**  200:11
**bearing**  226:25
**becoming**
160:6
**bedrock**  26:25
27:4 29:13,21
125:20 126:12
126:14,16,19
127:10 130:7
130:15
**began**  67:21
**beginning**  74:7
103:10 135:6
146:19 168:21
197:11 206:19
229:7 249:4
251:6
**behalf**  11:10
13:17 45:2
98:23 105:4
143:14 144:23
156:14 186:14
213:25 218:4
233:5 252:1
296:4
**behavior**
286:11
**behold**  299:11
**beholden**
256:24

**belief**  267:12
**beliefs**  230:23
270:18
**believe**  27:25
30:15 31:10
38:17 41:11
45:23 50:16
51:5,18 53:10
53:12 55:19
59:19 60:12
75:10,15 76:14
76:20 79:6,24
80:11 81:15
82:16 87:21
88:17 94:20
97:15 98:8
99:19 102:25
104:22 105:6
105:11,15,21
116:3 119:8,9
123:2 131:3
139:4,16,20
140:1 146:12
147:22 148:5
150:3,20
167:12,15,21
176:13 177:16
178:14 180:16
180:25 187:24
195:19,23
197:10 204:7
208:22 209:19
209:20,22
212:23 216:21
222:8 229:1
248:3 249:23
250:1 256:6

258:6 263:8
266:11 267:9
268:12 269:14
271:20 286:20
286:25 289:7
289:20 290:11
290:13 293:19
**believed**  31:6
58:4 187:21
243:24 256:18
**believes**  230:16
230:20 231:9
**belongs**  266:21
**benefit**  13:13
85:10,12 145:1
245:17 271:19
273:6
**benefiting**
14:21 259:4
**benefits**  72:20
73:2 160:1
209:5 219:10
**best**  30:19,21
50:8 74:6,16
134:23 135:1
137:10 141:14
150:11 151:9
171:12 209:2
220:19,25
225:10 227:3
230:5 265:12
267:12 271:21
298:9
**beta**  122:5
**better**  20:11
66:2 87:7
102:18 113:24

115:11 134:11
187:6,18 219:8
**beyond**   34:23
59:10 92:18
109:2 164:5
166:23 167:5
283:16
**bgx**   230:18
**bid**   132:3,16
132:17 133:4,7
133:23,23
134:1,23 135:7
135:12,23,24
135:25 136:3,5
136:11,11,18
137:8,8,12,17
137:21,25
138:14 172:4
172:22,24
173:7
**bidder**   22:7
133:10,25
134:13,15,19
134:22 135:1
136:1,4,7,14
136:21 138:8
172:5,6,7,15
172:20,20
173:16,18,20
**bidders**   132:15
134:10,12
137:4,4,20,23
138:2 173:16
**bidding**   132:5
132:10,25
133:1,9 134:4
134:9,24,25

135:2,14
**bids**   116:5
133:24 137:16
137:17 138:1
138:15 169:3,5
169:5,17 171:6
172:2
**big**   103:24
107:19 120:19
121:17,18
124:17 150:14
**biggest**   183:20
184:4,6,12
255:20
**billion**   62:1
121:5,22 127:3
150:19 171:15
175:6,7 292:25
**billions**   121:23
**binance**   9:18
10:7,15,23
11:6 12:1,5,11
13:2,4,9,11,13
13:18,21 14:1
14:3,22 15:16
15:19,22,23
17:11,16,17,17
17:21 18:25
19:21 20:8,9
20:10 21:5
25:18,23 31:21
31:24 32:13,19
32:25 33:4
35:14,17 39:7
40:14 41:8
42:21,25 50:15
53:3 65:24

67:20,25 77:12
78:23,24 79:4
80:7 83:8,16
85:19 89:10
90:19,21 91:21
93:23 94:15
99:12 101:12
104:16 105:3
106:4,5,18
108:3,19
109:14,25
110:3 112:3,20
115:11 117:5
121:11 130:25
134:9 135:13
135:23,25
139:18 141:14
142:6,17 143:8
143:11,11,14
143:15 144:1,6
145:15 153:4,6
153:8,11,11,18
153:25 154:1,2
154:4,14,25
155:2,24 156:9
156:13,14,22
156:23 157:7
157:17 158:16
159:19,24
160:1,10,22
161:11,19,20
161:25 164:11
166:7,8,12,15
168:18 172:4
172:18 173:17
173:17 177:1
181:11,20

183:9 185:22
186:20 187:12
187:20 190:14
192:1,7,16,19
193:1,7,22,24
194:4,25 195:2
195:12,17,19
195:21 196:22
196:25 197:20
198:1,14,25
199:3,7,11,13
201:3,4,17
202:20 203:21
203:22 204:17
205:21 207:3
207:25 208:8
209:6 211:15
211:19 212:15
213:7,8 221:3
221:8,10 226:2
227:18 228:21
228:24 229:1,2
229:3 230:16
231:24 232:8
272:22,22
273:4,14,16,19
274:3,4 276:21
277:22 278:10
278:10 297:10
**binance's**
12:22 26:5
108:12 143:5,6
**binance.com**
36:6 42:18
58:10,13,19,24
59:16 65:25
110:9,14,19,21

110:24 185:24
186:8 193:21
**binance.us**   5:4
11:15 25:15
26:11 33:12
35:2,7,22,23
36:1,5,6,7,10
36:12,14,18
37:12,16 38:6
38:11,13 39:1
40:3 42:3,13
45:10,12,15,22
54:21 57:7,25
58:12,21,22
59:16,18 62:10
62:15 64:3,3
64:19 65:4,25
66:1 70:1
73:25 80:3,20
81:18 82:8,20
82:23,25 84:6
87:1,3,11,19
88:25 90:16
91:23 92:2,18
92:20 93:4,9
95:10 96:5,11
101:21,23
102:1 103:4
104:16 106:15
109:1 110:7,20
110:25 112:7
113:22 114:4
116:19 143:20
143:21 155:20
155:22 156:1,2
185:23 186:6
187:1,7,19

189:19,25
190:24 191:18
191:21 192:6
194:24 195:20
195:21 197:4,8
199:5,8,17,18
200:1,4,16
203:20 204:15
204:25 205:10
205:17 206:9
206:12 207:13
208:15 213:9
213:12,15,25
214:3 230:20
**binance.us.**
11:10 72:9,11
74:10 79:21
88:4 106:22
144:23 156:22
189:16 193:22
193:25 194:4
216:4,11
**binance.us..**
195:3
**binance.us's**
185:24 190:2
194:5 204:22
**binance's**
159:11 215:18
218:10
**binary**   161:7
**bit**   49:8 65:11
90:16 97:11
100:9 120:7
125:17 150:24
177:25 178:23
187:24 189:17

202:10 229:21
236:22 238:11
284:22 302:10
**bitcoin**   102:23
117:14,17,19
120:5 121:21
122:6 190:7,8
**bk**   260:10
**blacklisted**
28:14
**blank**   186:6
**blind**   290:17
**block**   30:24
117:18 118:14
120:21,24
121:25 122:8
122:25 123:6
131:25 138:24
175:16 177:15
**blockchain**
73:3
**blocked**   75:14
128:17
**blocking**
245:23
**blocks**   83:24
84:5 129:24
156:8 176:18
**blue**   188:16
**board**   6:3 32:4
40:19 55:24
56:2 71:6
98:23 105:7,11
105:12 149:13
158:12 163:21
171:21 189:4
199:18 238:24

239:1 293:2
294:3
**body**   189:4
287:2
**body's**   189:8
**bona**   72:8
**books**   72:13
106:18 239:20
239:21
**borne**   144:8
**borrow**   191:11
**bothers**   223:13
**bought**   147:2
273:1
**bounced**   17:1
**bound**   37:19
**bowling**   2:2
**box**   254:10
**boys**   259:10
**breached**   78:4
**breaches**
245:20
**breaching**
265:19
**breadth**   63:19
**break**   49:10
123:7 131:24
142:25 159:2
210:15,20
211:12 212:9
**breaking**
102:13 114:22
124:7 176:17
**brg**   40:18 46:8
50:21 53:12
66:9 115:25
119:1 133:15

153:1,14
167:24 168:4
176:13 197:18
**brian**  8:4 24:2
24:5 25:7
41:23 45:5
98:25 111:24
115:5 146:6
204:22 205:7
205:13,16
255:14
**brief**  55:5
224:24
**briefly**  234:14
294:20
**bring**  69:1,3,5
69:10,14,18
125:25 174:14
174:19 274:11
**bringing**  55:9
270:13
**broad**  42:3
97:14 144:10
145:20 293:17
**broader**  63:16
179:2
**broadly**  28:12
40:5 62:13
87:5,22 100:17
100:22 107:17
152:2
**brother**  242:2
255:11,24
258:19,21
259:20
**brought**  29:12
121:7 270:12

**bruh**  6:14
41:19,20,21,21
41:24 43:13,18
44:8 202:7,7
202:13
**brush**  42:3
**btc**  104:12
**btt**  119:16,18
**bucket**  273:19
**buddies**  259:1
**bug**  127:24
**built**  64:22
100:9 207:18
**bulk**  88:21
200:7
**bumping**
102:14
**bunch**  157:5
162:20 196:9
**business**  12:5,7
20:17 34:19
38:6 61:11
62:20 63:5
72:21 73:24
89:20 110:8
145:14 162:10
162:17 163:16
165:18 169:23
170:15,20,23
175:10 176:5
186:7 187:25
189:3 192:18
193:5 208:3
264:13
**businesses**
73:15 164:1
271:16,16,17

**button**  74:15
**buy**  120:13,15
128:22 129:13
**buyer**  9:25
10:1,1
**buyers**  117:25
118:4
**buying**  120:19
120:20 272:24

**c**

**c**  5:1 9:1 48:7
305:1,1
**cahoots**  259:6
**calandra**  6:21
233:4,4,17,19
235:15,19,21
236:11,16
237:1 246:5
248:17,23
249:10 259:16
265:14,24
266:14 267:14
268:1,19 271:3
285:9,11
294:19
**calculated**
151:13
**calculation**
114:1
**calculations**
141:18
**call**  16:22 17:1
69:4 89:21
115:18 132:23
149:18 194:23
197:19 204:10
204:12,17,21

205:7,7 220:5
233:6 261:17
273:19 301:1
302:1 303:12
**callback**  111:5
**called**  58:10
65:2 86:18
115:10 186:22
196:25 229:3
294:21 301:19
**calling**  303:25
**calls**  35:6
83:18 90:22
96:15 111:12
137:17 165:25
204:11 241:9
242:24 301:18
**camera**  221:8
221:14,20
222:6 225:11
226:10,11
**candid**  77:24
**candidate**
237:13
**candidates**
256:12
**candidly**  52:23
94:21 160:17
**can't**  153:22
156:17 214:17
250:11 266:22
281:10,13
282:8 292:18
300:20 301:5
**cap**  121:22
**capabilities**
30:12

**capability** 29:8
  193:11
**capable** 293:5
**capacity** 24:12
  31:12 36:2
  46:22 49:19
  57:16 61:1
  62:19 89:22
  122:13 187:22
  190:2 238:24
  241:4,12 244:4
  256:20 263:19
**capital** 141:5
**capitalization**
  171:14
**capitalize**
  171:17
**capitalized**
  170:15
**car** 48:7
**card** 166:25
**care** 12:7
  146:13 147:18
  148:18 273:14
**cared** 154:5
**career** 236:23
  237:3
**careful** 10:7
  179:4
**carefully**
  185:19
**carious** 176:23
**carries** 290:24
**carved** 273:6
**carving** 273:11
**case** 1:3,9,17
  4:1 10:2 15:1

28:6 60:4
71:15 73:4
76:25 85:24
111:7 113:4,20
115:8 123:5
130:23 131:3
137:18 146:15
146:20 150:11
150:11 151:9,9
156:9 158:10
159:23 165:16
175:4 176:2
195:13,23
201:19 223:5
224:19 226:6
232:4 241:6,8
241:11,11
242:2,3,10,19
242:25 243:4
247:20 252:1
255:21 256:10
257:1 259:9
260:11,17
263:7,7,15
264:16,20
270:13,18
271:18,20,22
276:1,22
277:22 278:10
280:7 281:18
281:21 284:2,6
284:15,17
286:16,23,25
287:22 288:9
289:13,17
291:12 292:23
293:3 294:2,14

303:22
**cases** 241:16
  241:17 245:13
  245:16 246:2
  247:15 250:25
  270:19 282:23
  284:21,25
  289:14 294:2,5
  294:7
**cash** 11:8
  12:20 13:22
  14:7,12 15:14
  15:24 19:12
  27:9,14 30:20
  30:21 48:25
  66:21 72:6
  85:21 103:20
  104:8 129:14
  152:4,7,10,10
  152:14 153:15
  153:19 156:15
  169:5,6 170:3
  190:12,13
  193:18
**cashbox** 89:21
**cashed** 12:12
  13:2 18:25
  19:5 153:4,9
  154:1 155:4,7
**cashes** 153:11
  155:2
**cashing** 160:10
**casino** 180:19
**catch** 105:24
  239:7
**category**
  119:17

**cause** 63:8
  111:7
**caused** 31:20
  63:6 71:2
  121:8 203:8
**causes** 244:16
  245:17,18,19
  271:25 275:25
  276:7 283:3
  284:18 293:14
**causing** 74:18
**caveats** 293:18
**cayman** 110:3
**cede** 142:22
**ceo** 56:19 61:5
  204:17,22
  205:12,13
**ceo's** 163:3
**certain** 3:4
  16:10 43:4
  55:20 57:20
  65:9 72:2
  80:20 81:17
  94:3 101:22
  103:5,18
  110:12 118:4
  121:18 127:23
  143:7 159:12
  166:9 169:19
  207:18 273:4,8
  280:12 293:20
**certainly** 9:10
  19:23 201:23
  240:18 251:19
  257:24 260:14
  283:23

certainty 225:9
certificate
  47:21 48:3,8
  50:10,13,25
  51:3 164:13,13
  215:8 216:12
  232:8
certificates
  53:25 229:4
certification
  47:22 49:20
  51:17
certified 305:3
certifying
  166:19
cfius 83:8,16
  83:24 84:4,14
  84:15,17
chain 27:20
chair 233:22
  235:14 241:1
  244:17 258:22
  290:25
chairman
  211:25 282:6
  286:6,9
challenge
  127:9
challenges
  72:22 73:23
chambers
  214:1,4,12
  215:3,6 216:20
  217:20 222:1
  222:13 223:22
  224:5 225:19
  227:19 228:11

chance 13:16
  19:21 185:14
  210:23 260:22
change 15:8
  18:16 20:15
  32:22 96:8,12
  106:11 112:18
  190:16,16
  252:20 287:21
changed 19:10
  176:1 236:25
  248:19,22
  281:6
changes 17:12
  95:23 248:19
  281:1,3
changpeng
  42:2 193:20
  203:20
channels
  147:15
chapter 3:20
  4:2,12 104:2
  167:20 175:17
  183:8 235:10
  245:13,15
  247:15 263:15
  270:9,14,18,20
  270:23 271:2,2
  271:15,18
  284:17
character
  237:7 239:11
characterizat...
  173:22,25
characterize
  58:8 63:15,19

65:13 103:6
  225:7 275:20
characterized
  61:15
chart 193:5
charts 36:10
check 116:13
  131:18 153:13
  153:16,20
  155:3 180:11
  180:17 237:13
  262:5 280:25
checking 164:5
checks 156:17
chicago 234:19
chief 164:20
choice 153:7
  275:11
choose 11:4
  156:4 185:19
  200:15 207:2
chooses 155:16
chose 190:19
chosen 148:7
  173:20 264:25
christine 5:16
circle 259:3
circuit 234:6
  236:21 237:8,9
  237:10,10,23
circumstance
  89:7 113:25
circumstances
  75:9 77:6
  97:13 101:5
  112:19 137:11
  138:13 159:12

173:12 209:18
  220:20 230:8
  230:17 294:21
claim 4:9 251:9
  277:22 291:2
  295:2,6,13
  302:9
claimed 291:19
claims 82:4
  182:15,16,17
  182:20 183:1,3
  183:7 184:3
  245:20,20,22
  250:7,25
  251:22 252:8
  253:14,19
  271:24 272:23
  273:12 275:25
  276:7,10,23
  277:23 279:15
  283:3 293:22
clarification
  107:21 138:24
  142:22 145:7
  202:8 231:18
  278:3
clarify 159:1
  182:21 196:7
  240:16 262:21
  270:5 274:13
clarifying
  229:23
clarity 231:16
class 141:14
  285:5,8,24
  286:7

**claw** 149:20,24
272:7
**clawback**
152:5 168:9,10
168:12 184:18
272:10 277:23
**clawbacks**
268:17,18,25
271:8 272:5,13
275:16,18,22
276:14,18
277:19
**clawed** 278:16
**clawing** 149:19
149:23
**clear** 16:15
17:24 20:21
21:4 31:15
32:9,16,21
38:3 40:12
47:5 48:22
54:10 58:19
62:14 63:9
66:7,23 71:4
73:14 85:23
89:8,13 99:10
99:23 106:22
113:25 119:24
122:12 124:11
127:8,16
128:21 137:24
157:13 163:6
163:17 164:23
165:9 169:20
172:18 177:3
191:21 192:3
206:19,20

207:5 223:20
224:11,16
230:2 244:4
254:19 257:6
262:22
**clearing**
209:23
**clearly** 276:17
**clerk** 274:20
298:10,16
**client** 145:8
212:17 261:14
265:15 267:21
285:7 296:3,4
297:16
**clients** 20:22
141:23 252:2
272:7
**close** 31:24
61:1 62:1 70:4
71:9 74:15
78:5 84:6
116:20 158:1
187:14 192:13
193:11,18
208:18 295:20
**closed** 229:20
278:1
**closely** 150:17
262:22
**closes** 88:16
186:20 187:8
**closing** 11:13
32:3 33:7
40:14,14 69:2
70:7,10,14,17
70:23,25 71:2

79:21 82:1,7
82:14 83:3,4,4
83:24 84:5,9
84:17 85:18
88:25 89:8,9
96:3 155:21
187:4 277:1,24
**cloud** 37:22
90:4
**club** 259:10
**code** 26:25
27:4 29:13,21
29:25 47:8
56:12 57:23
59:7 111:5
125:14,19,19
125:20,24
126:19,21
127:2,4,9,17
128:3,13 129:6
130:7 147:10
165:11 270:19
270:22 271:15
280:9,23
**coffee** 211:3
**coin** 30:23
115:17,17
123:3 125:17
128:20 129:20
129:21 130:2
130:20 176:12
178:8
**coinbase** 117:4
131:1
**coins** 21:6
26:20,22 28:23
30:13,17,20,21

72:5 80:21
81:19 99:13,15
99:16,24 100:1
100:7,12,23
108:19 115:14
116:4,10,12,25
117:15 119:3
119:20 121:3,6
121:18 125:11
125:16 126:9
126:10 127:25
128:18 130:7
130:11 159:24
160:12 161:2
161:13 177:14
179:23 180:1,7
**cold** 57:5
**collaborate**
127:10
**collaborative**
108:15
**collaboratively**
115:24
**collapse** 61:15
62:17 67:21
106:10 148:8
176:6
**collapsed** 60:8
**collateral**
191:6
**collectable**
276:10
**collected**
115:23
**collective**
101:5

collectively
  300:9
college  239:7,9
combination
  139:12 283:9
combined  4:11
  149:23
come  17:8
  43:14 67:8
  124:9 170:10
  185:23 209:10
  211:23 215:8
  217:16 221:13
  224:5 227:18
  241:24 244:8
  246:1 280:12
  283:2
comes  51:8
  157:7 277:2
  284:3 291:4
comfort  21:8
  145:4 149:3
comfortable
  33:1 67:4 75:8
  77:12 90:2
  157:19 160:22
  193:16 206:22
  207:7 209:4,24
  229:12
coming  73:17
  141:25 200:23
  206:15 290:3
comingling
  38:18
commenced
  242:3

commencem...
  241:16,17
comments
  210:19
commercial
  58:15 110:12
  186:2
commission
  5:19,20 45:3
  115:14 117:6,9
  118:7,21,22
  177:4,9 178:9
  178:11 230:2
  230:14,22,24
  231:10
commissions
  177:17 178:1,7
committed
  204:25 205:18
  297:4
committee
  3:16 4:8 6:17
  23:16 40:20
  44:18 83:7
  174:7 186:12
  186:14 199:21
  211:14 217:11
  221:10 222:6,7
  225:25 227:18
  232:25 233:5
  234:8 239:2
  241:1,5,5
  242:17,21,24
  243:23,24
  244:3,10,19
  245:2,5 247:7
  247:11,16

254:9 256:8,17
  260:12 261:3,8
  261:15 262:14
  263:9,14,17,18
  264:2 268:15
  268:17,20
  269:3,9 273:4
  275:21 286:9
  286:17,18,18
  286:19,21,25
  288:17,18
  289:1,7,10,14
  289:17,21,24
  289:25 290:1,2
  290:12,14,21
  290:22,23,24
  291:11,12
  292:9,12,13
  294:18,23
  296:24
committees
  235:9 263:13
  290:18,19
committee's
  202:9 243:3
commodity
  113:17
common  58:16
  69:18 191:8
  244:6 273:1
  289:8
communicate
  83:5 241:23
  287:1,18
communicated
  124:13

communicates
  241:6
communicati...
  271:8 285:7
  287:17,22
communicati...
  80:12 95:14
  266:17 286:20
community
  239:12 255:19
  283:15
companies
  93:18 99:18,20
  106:19 122:23
  172:3 245:21
  246:3
company  27:1
  27:7 29:16
  31:1 47:24
  63:25 68:15
  97:11 108:10
  108:22 110:4
  112:9 115:20
  115:25 126:9
  126:18,20
  128:2,12,13
  129:3,9 131:7
  163:20 165:23
  169:9 185:23
  192:20
company's
  26:25
comparable
  174:23
compare  164:1
  170:9

**compared**
108:23 163:22
163:25 176:24
248:20 299:17
**comparison**
114:2 118:22
**compensation**
139:2 141:21
**competent**
293:4
**competition**
238:2,5,8
297:5 303:19
**competitive**
134:23,25
135:5,9 138:20
**complete**
123:18
**completed**
17:20 149:4
178:18 272:6
**completely**
142:1 145:17
219:23 259:9
303:3
**completing**
204:25 205:18
**complex** 263:7
284:4 292:23
**complexity**
25:18 284:5
**compliance**
37:2 47:23
48:9 50:1,6,25
51:1 69:13
95:7 135:11
137:12,16,16

**compliant**
170:21
**complicated**
132:16 230:10
**complies** 12:15
166:9,20
**comply** 27:18
28:21 97:24
98:2 134:9
166:24 280:4
**complying**
28:9
**component**
26:13,14 75:13
**components**
26:8 43:19
169:20,21
171:5
**comprehensive**
270:21 276:6
**compromise**
293:13
**computer** 9:5
**concentrated**
118:2
**concept** 73:22
104:10
**concepts** 248:5
**concern** 66:12
71:2 77:11
88:14 90:11,13
107:19 124:16
154:3 163:12
203:8 218:14
220:2 221:16
222:4 223:16
284:1 287:4

**concerned** 55:6
195:1,5 227:2
228:25 246:20
**concerning**
66:14 95:11
193:24 196:25
202:22 203:2
203:25 286:10
287:20
**concerns** 10:21
20:19 25:14
37:20 40:4
41:4 62:14
69:17 87:25
128:6 146:11
165:5,17
220:15 221:1
221:20 226:4,6
246:25 255:21
266:13
**conclude** 276:9
**concluded**
134:24 304:9
**conclusion**
52:2 83:19
90:23 112:18
211:24 280:7
**condition**
118:13
**conduct** 57:24
237:12 256:15
256:19 270:8
**conducted**
49:10 60:16,23
237:15 276:8,9
**conducting**
46:3 83:8

**conducts** 199:8
**confer** 32:4
67:3 71:6,7,7
**conference**
3:10 214:2,5
214:13 215:3,6
216:21 217:18
219:19,20
220:8 221:8,14
222:6,13,22
223:22 225:19
226:10,20
228:11,18
**conferences**
238:21,22
**confidence**
214:21
**confidentiality**
37:19 55:25
92:23 93:10
105:21 106:2
163:10,16
228:22
**confidentially**
10:17
**confirm** 10:18
74:2,19 115:12
165:1 250:11
255:14 257:23
279:2
**confirmable**
75:10
**confirmation**
4:12 21:3 75:1
76:7,13 78:15
78:18 130:18
134:8,10 235:9

245:10,13,24
263:15 281:2,5
282:24 283:1
297:11 299:9
301:12,16
**confirmed**
32:19 136:5
167:15,24
168:4 280:11
**confirming**
75:19 158:25
**confirms**  32:12
40:13
**conflict**  243:11
243:17,25
256:3,6,18
258:13,19
259:21 291:4
295:7 297:19
300:9
**conflicts**
243:19 244:4
256:5 275:10
295:4
**conform**  136:3
**conformed**
134:15
**confused**
135:11 144:25
173:2 225:12
**confusion**
100:9 116:7
117:2
**congress**
121:10 176:5
**congressional**
41:6 61:5

**congresspeo...**
201:7
**conjunction**
238:6
**connection**
17:2,4 34:20
45:17,21 46:10
60:16 65:3
69:6 85:2 87:7
92:16 93:6,21
98:9 100:6,18
102:7 115:19
132:11 175:21
177:2 183:24
197:19 206:10
209:2 240:20
250:6 259:19
**conrad**  238:1
**consequence**
72:1
**consequences**
71:16,17 72:5
**consider**  4:11
95:22
**consideration**
26:6 43:24
47:25 77:2
96:9 97:1
109:7,15 154:6
174:25 175:3,8
176:9 263:5
264:1 276:23
**considerations**
96:7 98:5
103:5 106:20
170:4 171:8
220:24

**considered**
15:2 172:5
223:8,11 263:9
**considering**
95:21 168:4
264:19
**consisted**
289:18
**consistent**
57:14 62:2
80:24 100:22
205:2
**consisting**
237:11
**consists**  26:2
235:8 256:8
289:14
**consolidated**
162:11
**consortium**
164:6
**conspiracy**
156:25
**constitute**
256:2
**constraints**
74:18 76:21
**construct**
104:6,10,15
160:20,20
**consult**  145:8
282:5
**consultancy**
47:6 57:19
**consultation**
32:6 40:22
71:4 100:24

105:8 149:11
158:11 170:7
189:5 294:3
**consuming**
153:21
**consummate**
91:18 187:2
**consummation**
281:3,4,5
**contact**  19:23
20:6
**contacted**
303:7
**contemplate**
141:6 268:17
268:24
**contemplated**
155:8
**contemplates**
113:2 243:16
284:12
**contention**
231:11 252:8
**contentious**
75:15
**context**  46:20
51:9 64:2,7
66:19 103:24
104:2 127:17
160:23 200:17
201:21 202:5
208:2 219:3
257:1
**contingency**
172:19
**contingent**
173:18

**continual**
221:24
**continue** 9:3
28:20 33:3,6,6
34:25 38:8,23
39:7 41:1
66:24 67:1,19
68:14,19,21
69:25 70:24
74:14,16 79:10
81:9,12 88:25
90:10 110:20
143:3,16 156:7
158:10 179:13
184:7,25 186:7
202:23 208:15
219:22 253:2
275:13 280:6
297:7
**continued**
68:11 94:11
165:4 221:12
**continues** 11:2
17:25 271:25
**continuing**
32:25 74:11
89:5 110:18
**contours**
147:10
**contract** 113:6
113:9,13,15
138:25 139:11
140:11 174:13
174:18 188:19
**contracts**
112:13 113:2

**contradict**
119:3
**contrary** 18:15
142:13
**control** 33:3
48:17 208:25
266:12 279:8
292:24
**controls** 48:14
48:19 69:20
126:13
**convenient**
221:2,6
**conversation**
94:5 119:1
158:5 205:4,8
205:12 214:13
**conversations**
66:2 67:20
84:12 92:4
120:25 158:4
165:4 197:11
202:20
**convert** 4:1
80:21 81:18
**converted**
270:14
**convince** 14:2
19:25
**coordinated**
176:21
**coordination**
88:24 123:18
**copies** 143:11
**copy** 23:5 24:7
81:1 110:16
188:7,10

201:25 232:13
235:19 236:9
**cordial** 260:13
**core** 163:16
**corp** 192:7
**corporate**
134:20 157:2
192:25
**corporation**
267:23
**correct** 11:25
23:4 33:24
42:4 53:3,4,7
60:5,10,17
64:5,7 67:16
68:4 79:2
81:20,21 83:25
99:4 104:22
115:15 116:18
118:9 119:7
133:2 136:22
137:6,14
139:13,16
151:10,24
159:17,20,22
166:10,11
167:18,19
168:4,6 172:2
172:8,11,14,18
173:21 189:21
191:20 192:12
192:24 193:9
195:6 196:6,13
196:20,23
197:16 198:6
199:20 200:3
204:23 205:1

209:9 231:2
236:9 239:18
239:22,24,25
240:5 242:6
247:8,12 248:7
249:19,20,22
249:23,25
250:1,23
253:19 255:13
267:13,19
275:17,19
276:16,20
277:18 280:21
291:17 295:11
**correctly**
115:13 116:8
159:17 181:8
255:11 257:3
261:22 278:2
**corresponded**
301:23
**corresponds**
86:5
**cost** 30:6,15
76:22 77:4,7
77:18 141:18
141:23 160:5
176:14 178:20
**costs** 43:7 75:4
96:5 200:8
**couched** 225:8
**couldn't**
160:12 180:5
253:17 254:6
302:18
**counsel** 24:3
46:7 61:4

| | | | |
|---|---|---|---|
| 78:13 87:7 | 89:13 94:20 | 33:11,20,22,25 | 152:16,21 |
| 93:3,4 95:12 | 99:10 119:16 | 34:3,6,12,15 | 158:21,25 |
| 96:14 98:3 | 144:12 195:16 | 34:18,22 35:3 | 166:5,12,16,18 |
| 108:6,7,7,9,11 | 201:6 210:11 | 35:5 36:22 | 167:3,6 174:5 |
| 108:12 158:20 | 237:8 239:5 | 37:10 39:13,14 | 174:9,11 |
| 158:21 186:12 | 247:1 280:5 | 39:16,19,21,25 | 181:15,22 |
| 198:19 210:21 | **course**  18:13 | 40:13 41:17,20 | 182:7,10,25 |
| 211:13 212:15 | 67:20 83:3 | 43:11 44:10,16 | 184:21 185:8 |
| 215:18 216:5 | 91:21 96:17 | 44:20,23 45:4 | 185:13,18 |
| 216:17 220:1,4 | 97:9 121:24 | 51:21 54:1 | 186:10 188:12 |
| 225:13 233:16 | 132:25 136:8,8 | 55:11 60:8,21 | 198:19 201:20 |
| 242:4 246:12 | 154:15 158:3 | 61:18 65:17 | 202:4,12,14,18 |
| 262:14 264:8 | 176:2 194:11 | 74:2 75:24 | 209:11 210:3,5 |
| 274:7 278:2 | 194:12 206:24 | 76:3,6 78:13 | 210:16,20 |
| 289:25 295:4 | 210:10 227:7 | 78:23 79:4,10 | 211:1,2,8 |
| **counterbalan...** | 241:22 243:18 | 81:7,11 83:20 | 212:6,10,15,21 |
| 72:21 | 256:19 272:24 | 85:3,16 90:24 | 212:24 213:5 |
| **counterfactual** | 274:9 293:24 | 91:2 92:10 | 213:11,16,20 |
| 178:24 | 294:2 | 97:5,21 98:17 | 214:4,15,22,23 |
| **counterparty** | **court**  1:1 2:1 | 98:20 100:9,14 | 215:12,19 |
| 28:6 35:2 | 9:2,5,8,11,17 | 101:8,10,14 | 216:1,23 217:1 |
| 42:18 57:16 | 9:20,23 10:5 | 102:14,19 | 217:12 218:6,8 |
| 58:5,6 59:11 | 10:14,19,22 | 107:7,13,21,25 | 218:15,18,23 |
| 62:14 69:8,12 | 11:20 12:7,18 | 111:18,23 | 219:2,5,15 |
| 69:15 88:15 | 12:25 13:15 | 114:9,17,19,23 | 220:11,14 |
| 95:14,25 | 14:6 15:3 16:4 | 115:2 118:6,10 | 221:3,5 222:22 |
| 148:13,15 | 16:7,9,12,13 | 128:10 132:7 | 224:9,12,14,24 |
| 149:4 160:22 | 16:18,22,22,25 | 132:10,14,25 | 226:8,19 |
| 161:3 163:11 | 17:2,6 20:23 | 133:1,10,14,17 | 227:13,16,23 |
| 165:2,9 170:11 | 21:1,9,11,15 | 135:18,20 | 227:25 228:2,5 |
| 200:24 209:25 | 21:20,24 22:10 | 136:10,17,23 | 228:7,12,17 |
| **countless**  90:6 | 22:18 23:2,8 | 141:25 142:4,7 | 229:13 231:6 |
| 98:3 | 23:12,15,18,21 | 142:12,24 | 232:2,12,15,18 |
| **country**  238:18 | 23:25 24:3,19 | 143:3 144:13 | 232:22 233:3,8 |
| 305:21 | 25:3 26:1,17 | 144:25 145:3,9 | 233:13,16 |
| **couple**  41:25 | 26:20 32:11,12 | 145:11,21,25 | 234:6,7,23,25 |
| 52:7 81:2 | 32:18,21 33:10 | 146:3 151:17 | 235:17,20 |

236:13,21,25
237:10,16,23
238:2,5 240:12
240:12 245:9
246:7,21 247:2
248:25 249:3,9
249:12 252:12
252:15,18,24
253:6 254:15
254:24 255:2,8
259:12,17
262:12 264:7
265:1,5,9,18
266:1,7,16,19
266:21 267:5
267:16,22
268:3,21 269:2
269:6,16,20
270:1 271:5,10
271:21 272:15
274:16,21,23
274:24 276:20
277:7,11,15,20
278:9,23 280:2
280:9,20,22,25
281:9,23 282:3
282:8,14
283:13,21
284:8,10
285:10,13,15
285:17 287:7,9
287:13,25
288:3,10,12,15
288:18,25
289:4 291:21
292:1,4 294:6
294:12,18,20

295:2,10,12,16
295:22 296:14
296:19,22
297:1,5,17,19
297:25 298:9
298:12,14,17
298:21 299:1,5
299:22 300:3,6
300:11,19,25
301:4,8 302:11
302:19 303:2
303:10,17,22
303:25 304:5,7
**court's** 145:1
**courtroom**
  16:21,24 41:18
  44:24 157:10
  204:20 211:3
  217:16 298:23
**courtrooms**
  299:8
**courts** 234:5
**court's** 234:10
**covenants** 78:4
**cover** 9:16
  212:21
**coverage** 47:4
**covered** 93:9
  105:15 164:25
  167:22 213:11
  277:13
**crash** 110:25
**create** 26:11
  112:3,12
  165:16
**creates** 183:24

**credentials**
  270:15
**credible**
  121:14
**credit** 166:25
**crediting** 18:2
  141:9
**creditor** 7:9,12
  7:15,18,21,24
  111:22 114:12
  115:7 123:13
  127:24 135:13
  141:14 146:2,9
  150:10 152:20
  153:3 226:18
  255:6 265:8
  269:19 285:2,5
  285:8,24 286:7
  287:2 291:14
  301:10
**creditors** 4:9
  12:17 14:17,21
  19:15 44:13
  71:16 72:2
  74:22 75:11
  76:22 77:1
  80:13,15 82:14
  82:24 83:5
  84:16 85:11,12
  97:1,16 101:25
  104:9 120:12
  120:23 146:13
  147:16 148:18
  152:10 157:21
  168:1 169:3,7
  180:21 186:15
  207:11 208:13

209:18 226:4
235:8 245:18
255:18 258:17
259:6 260:17
265:13 270:6
270:13 271:19
271:23 272:2,8
273:7,10,12,23
276:3 281:20
283:17 285:22
286:4,5,13,16
286:20,23
287:16 289:15
293:9,10
299:12,19
**creditors'**
  235:9 241:1,5
  256:8 260:12
  263:9,17,18
  276:12 289:7,9
  289:14,21
  290:12,18,19
  291:2
**credits** 170:4
**criminal** 97:10
  156:24
**criteria** 273:8
  273:9,22,23
**critical** 48:1
  75:12,16 134:3
  171:1 198:17
  206:25 207:2
**critically**
  154:12 207:10
  208:5
**criticisms**
  294:25

**criticize** 294:22
**criticized** 9:12
**cross** 8:3 25:5
  41:18,23 44:11
  45:5 81:12
  98:18,25
  111:19,24
  114:10 115:5
  144:8,10,11
  145:2,3,20,23
  146:6 174:6
  246:7 247:4
  255:3,5 294:13
**crypto** 11:4,21
  13:10 15:9
  19:3 28:18
  31:12 36:4
  37:12,15 46:19
  46:23 48:15
  54:16 55:18
  56:5,7,24 57:7
  57:25 58:23
  59:17 63:7
  64:17,21 69:21
  79:22,23 80:2
  81:23 82:2,20
  101:12 103:15
  107:6 108:17
  109:9 115:21
  117:13 121:4
  147:2 150:20
  151:7 152:2
  155:15,23
  156:5,7,13,14
  162:4,9,14,22
  163:25 164:10
  164:16,17

  171:15 175:9
  175:16,20
  178:16 184:13
  190:11,14,24
  190:25 191:14
  191:14,19,22
  194:5,15,24
  195:3,11,15,20
  199:1,5,17
  200:1,6,10
  201:2,3 213:3
  213:8,12 284:2
  284:13,15,21
**cryptocurren...**
  27:2 73:1
  82:12 104:3
  143:18,19
**cryptocurrency**
  11:12 21:4
  28:12 47:3
  72:21 73:24
  74:23 101:25
  106:19 112:11
  117:13 121:18
  131:4 143:17
  143:23 150:23
  183:21,22
  284:19,24
**cryptosecurity**
  163:4 164:19
**cumulative**
  141:7
**cumulatively**
  140:10
**curious** 141:21
  169:3 270:17
  270:25 280:6

**currencies**
  115:21
**currency** 121:4
**current** 31:17
  32:22 68:25
  69:19 70:6,9
  75:20 76:7
  78:6 143:21
  150:25 233:20
  276:13
**currently**
  30:13 69:13
  82:21 106:5
  115:1 119:19
  123:3,10
  128:14 209:17
  230:17 251:17
  281:17
**custodial** 36:2
  190:2
**custodied**
  46:23 63:23
**custody** 11:1
  17:18,24 18:11
  47:7 51:6
  57:11 69:20
  70:2 80:2
  89:22 103:17
  109:10,25
  162:7 190:8
**custom** 6:11
  13:9
**customary**
  290:18
**customer** 10:8
  11:7 12:11
  13:4 19:17

  20:2,2,7,8
  22:25 23:5
  24:9 27:9,13
  36:1,8 37:3
  38:18,22 45:8
  51:7,11,14
  52:1 57:25
  66:13 79:15,21
  80:11 82:2,8
  82:16 109:9
  143:16,17,21
  143:23 147:5
  154:12 155:12
  155:16,19,20
  155:21 156:1
  162:4 190:7
  191:19,22
  193:24 194:5
  194:15,24
  195:11,20
  199:1,4,17,18
  200:3,4,10
  201:1 206:11
  213:8,12
  268:14 273:11
  276:21 277:21
  278:10,20
**customer's**
  18:2
**customers** 10:8
  11:11 12:1,23
  13:1,8,10,10
  13:18,19,19
  14:3,24 15:13
  15:21 17:19
  18:25 19:15,21
  19:24 20:11,12

21:6 25:14
27:2,6 29:7
30:14 32:10,11
32:18 41:10,12
43:1,5 44:6
58:21 61:7
64:18,19 71:16
75:3 79:25
82:20 90:19,20
103:8,14
104:19 110:1,5
125:22 130:11
143:15,19,24
154:5 155:18
161:1,6 190:1
191:25 199:25
200:13,15,20
201:2 209:6
213:4 219:10
242:2 256:9
260:11,16,18
263:23 272:8
272:10,13,23
272:25 273:1
273:10,15,18
273:19,25
274:2 289:19
292:14 293:9
293:10
**customers'**
190:20
**customer's**
155:24 201:3
**cut** 153:20
156:17 249:3
**cuts** 153:12

**cutting** 219:25
**cybersecurity**
101:24
**cycle** 135:14
**cz** 36:17 39:1
40:1 42:2
58:17 65:25
68:18 194:14
194:23 195:10
203:20 206:5
206:14 211:19
**cz's** 39:9

**d**

**d** 3:20 8:1 9:1
**d&o** 244:21
**daily** 129:19
255:20
**damage** 116:24
**dan** 111:21
265:7
**danger** 122:24
**daniel** 7:17
**darren** 6:23
222:5 225:24
261:2
**dashboard**
16:23
**data** 20:3,13
66:6 198:9
301:24
**date** 11:13
24:16 70:6,9
76:20 82:10
84:20 85:1
86:1,4,8,16,18
100:20 108:14
159:4 168:14

208:16 251:10
273:11 289:9
292:21 305:25
**dates** 78:8,11
94:13 268:13
**david** 3:14,18
7:6 246:10
**day** 79:25 86:5
117:3 121:23
124:8 128:17
129:19 130:4
135:4 138:4
150:21 165:18
165:18 172:13
179:5 197:10
197:25 272:13
272:15 276:14
293:8 298:3
303:18 304:8
**days** 86:2
144:12 183:13
189:3 226:5
246:20 248:1
267:24 268:4,7
272:8,11,18
276:16,21
277:2,5,5,19
277:21,21,25
278:9 280:5
301:15 302:5
**dba** 192:6
**de** 3:2
**deadline** 157:5
302:13,14
**deal** 11:10 12:5
12:7 20:17
25:18 40:10

51:10 78:24
88:16 93:17
104:16 115:11
136:19 139:18
141:14,21,23
142:17 152:5
154:15,19
157:8 158:16
158:22 159:24
160:1,12,23
181:11,18
186:20 187:7
187:13,14,23
199:11,13,16
200:13 203:22
203:25 204:25
205:18 206:6
206:13 209:6
211:21 217:14
218:24 248:6
290:1 293:16
**dealing** 41:5
51:9 125:3
245:9 248:14
252:22,22
255:25 276:5
**dealmaker**
117:7
**deals** 42:5
175:23
**dealt** 254:2
**debated**
292:11,13
**debates** 171:9
171:21,22
**debating** 21:25

**debtor** 1:7 12:5
30:19 33:2
46:8,9 50:11
52:10 53:22
54:23 55:21
56:14 57:6
59:21 61:13
62:9,17 64:13
64:24 65:3
71:15 74:4,19
75:19 76:17
78:5 80:13
83:13 87:20
88:24 90:8
91:25 94:22,25
96:12 100:5,25
102:10,11
105:5,7,12
123:22 124:1
127:19 138:7
138:25 156:15
173:6 177:16
183:4 187:3,17
188:1 200:23
208:18,25
227:18 249:21
249:25 250:5,6
250:22 251:18
251:22 253:13
296:24
**debtor's** 88:2
**debtors** 3:5
5:12 11:12,15
13:12 14:22
17:11,19 19:19
21:5,16 24:15
25:17,21 31:20

40:18 42:21
45:11 46:3
47:13 50:12,19
52:20 53:9
54:16 55:3,17
60:16 62:9
63:13 66:14
70:16 74:3,6
78:9,14 88:14
89:11,15 91:22
91:22 94:22
95:10,20,21
96:16,20 97:15
97:24 98:1,8
100:8 101:20
101:23 108:7
117:3 123:15
128:21 140:11
143:4,9,12
144:6,20 145:6
184:23 187:13
187:14,21
216:13 217:11
221:8,9,23
222:21 223:21
228:22,23,24
229:3 232:5,8
232:20 256:10
281:18 294:15
294:16 295:20
295:21 296:6
296:12 297:22
302:12,20
**debtor's**
158:21 183:2
202:9,12
209:18 210:21

232:4,9 247:15
250:25 252:3
**debugging**
127:6
**december**
150:21 196:16
**decentralized**
72:20 73:1
**decide** 25:22
100:11 108:4
211:20 222:25
223:7 267:22
293:22 295:14
296:12
**decided** 25:17
31:23 138:14
**deciding**
207:21 283:18
**decision** 30:16
32:1 40:13,16
71:5 74:13
75:6 105:3,4,6
105:11 106:15
120:10 149:8
158:2 161:7
181:7 203:3
207:4 278:24
279:5 292:7,11
292:12,15
295:12
**decisions**
193:24 244:16
259:8 279:23
**decisively**
244:17
**declarant**
145:2

**declaration**
24:25 25:4,6,7
33:13 38:10
57:9 60:7 65:9
67:12 71:18
72:7 99:11
101:19 120:2
143:10,13
144:4,17
209:16,19
210:14,17
212:8,13
**decline** 121:15
**declined** 9:22
121:23
**declines** 10:1
81:23 140:1
**deeply** 154:4
**defendant** 1:15
**defendants**
1:24
**defense** 185:1
**defenses** 246:2
**defer** 221:9
**deficiencies**
98:14
**defined** 123:8
276:17
**definition**
86:16,17
**definitive**
20:14
**definitively**
20:25 31:23
**defunct** 230:11
**degree** 89:22
132:23 234:17

234:18,20
delaware
  36:13 192:6
delay  30:15
  71:21 74:25
  75:2 77:4,6,18
  77:18,19,20
  184:11
delaying  71:9
delays  76:23
delegate
  280:17
deleted  86:17
deliberated
  292:13
deliberating
  293:25
deliberation
  263:20
deliberations
  247:8,9 257:8
deliver  13:10
delivered  21:5
deluge  290:2
denies  83:16
  84:9
deny  84:17
department
  6:9 98:24
depend  77:6,10
  97:7 101:4
dependence
  110:8
dependent
  113:5 152:13
depending
  77:15 115:1

168:23 182:13
  218:21 263:1
depends  77:13
  97:12 139:5
  151:6
deposited
  79:24 82:21
  190:1 200:12
depositing
  66:20
deposits  38:19
  143:16 198:11
dept  6:3
depth  88:24
  117:12,24
describe  26:1
  26:20 27:24
  33:9,11 36:21
  39:25 201:14
  234:14 245:8
described
  29:20 166:6,21
describes
  86:18
describing
  59:14 80:24
descriptions
  85:17
designate
  19:12
designed
  254:13
designers
  126:16
desire  15:16
  24:20 160:16

desires  174:6
desk  118:17
desousa  1:14
despite  138:7
detail  26:18
  86:19
detailed  72:13
details  285:25
determination
  32:6 40:24
  157:23 158:12
  188:1 203:6,12
  217:17 230:22
  253:25
determine
  40:20 52:25
  53:18 77:17
  164:9 189:5
  203:6
determined
  90:17 109:10
  172:4 245:22
  267:20 292:8
determining
  88:3 112:24
  114:1 115:24
  151:4 193:10
detroit  233:24
develop  29:8
  30:12
developed
  278:6
developer
  127:13
developers
  29:11 126:16
  126:18 128:8

128:13
development
  203:17
deviate  132:24
dial  274:19
dialog  108:8,10
dictate  132:14
  132:15
didn't  161:23
  164:17,19
  170:23,24
  171:12 173:12
  181:6,18,19
  186:8 189:23
  193:7,11 194:9
  198:5 204:3
  212:7 213:14
  213:14 262:13
  262:19 267:14
  268:1 283:5
  288:17,18
  291:18
difference
  42:22 100:12
  103:12,25
  104:7 112:4,6
  120:19 124:17
  137:7 140:7
  142:15 180:2
differences
  51:16 103:5,23
  150:14
different  18:18
  19:8 51:3
  63:11 88:10
  109:18 115:22
  117:19,22

123:7 125:2,16
125:17 136:12
138:9 139:8,20
147:7 148:6
153:2 154:15
162:22 169:18
170:2 175:11
176:24 178:6
178:11 187:9
190:24 197:15
199:14,22
209:14 231:4
242:25 246:1
287:5 291:10
298:19 299:15
304:1
**differential**
25:24 26:4
43:21 168:17
**differently**
62:10 135:15
237:9 268:13
**difficult**   59:12
73:10 118:5
183:18 219:17
241:8 242:25
297:6
**difficulty**
93:14 178:23
**digesting**
157:13
**digit**   30:8
**digital**   1:6,11
1:20,23 3:2,8
35:23 103:16
149:14 190:1
246:13

**digits**   177:8,10
**diligence**   10:12
10:14 32:25
33:10,11 35:6
35:21 38:6,23
42:15,19 45:12
45:15,16,22
46:3,9,17
47:13 55:1
60:16,23 61:9
61:13,24 62:10
63:3,16,20
65:3,10,12,22
66:2,8,16,24
66:24 67:13,18
67:25 68:2,8,9
68:25 69:1,3,5
69:10,11,14,18
69:19 70:6,9
70:25 73:15
74:3,11,20
89:15 91:21
95:20 96:18,22
109:16 110:23
143:6 148:15
149:4 157:18
161:19,25
162:21 164:25
165:2,11 184:8
185:22 189:15
189:22 191:18
195:5,8 197:10
197:20 200:20
201:14 202:22
202:24 206:20
206:23 209:24
232:4

**diligencing**
73:23
**diligently**
230:4
**diminish**   112:2
**dip**   141:4
**dire**   24:20
**direct**   8:3 24:5
24:24 195:20
225:17 227:25
233:18 249:11
283:5 287:16
287:19
**directed**
143:23 213:3
**direction**
206:12
**directly**   30:13
37:11 155:25
163:9 204:17
205:4,12,14
207:18 286:8
**director**   238:1
250:5,21
**directors**   3:5
3:12 32:4
40:19 55:24
71:6 105:7
149:13 189:4
238:24 251:18
251:21 253:4
253:15,16
**diresta**   7:14
114:14 152:19
152:20,23,25
159:7,14,15
167:10

**disclose**   10:18
92:7,22 98:9
**disclosed**   91:22
92:12,14 93:22
96:16,20 97:15
108:24 109:8
162:12,14
223:3
**disclosing**   98:4
221:18
**disclosure**   4:12
85:17 93:2
96:23,24 97:25
98:2 148:22
150:15 176:13
**discount**   31:16
31:17 116:4
120:12,13,20
**discounted**
120:13
**discounts**
26:14 31:6
44:5 116:1
121:18 175:22
**discretion**
87:12,16 88:8
89:10 100:8
189:2
**discrimination**
18:15
**discuss**   10:23
25:17 65:9
92:24 103:11
134:7 152:8
215:9 216:16
216:24 226:23
241:7

**discussed** 65:5
80:1 84:13
87:6 103:10
109:7 133:13
138:3 151:21
160:15 163:21
163:21 182:23
183:12 212:9
212:14 214:20
215:23 229:5
261:11
**discussing**
17:11 293:25
**discussion**
26:19 40:19
53:15 57:2
68:14 69:8
87:24 105:8
112:8 120:23
137:22 161:15
164:6 186:19
189:15 192:5
192:25 205:23
226:10,18,21
227:5 282:11
282:16
**discussions**
26:23 29:10
33:18 34:8,9
34:25 37:5,8
38:10 39:5,6,8
42:14 45:14,24
53:3,5,8,16,18
53:21 54:15
55:17,22,24
56:1,1,3 59:4,5
61:2,11 67:1

67:21 68:17
93:2 94:11
95:6 108:6,12
113:11 119:14
122:16 144:7
148:2 149:1
157:12 163:17
163:19,19
171:9 174:22
175:18 189:18
190:23 195:4
197:10 207:25
208:6 251:20
251:24 287:3
**dishonesty**
270:10
**dismissive**
171:25
**dispute** 250:24
251:2,3,9
253:18 254:5,6
**disputed** 252:8
**disputes** 253:2
**disrupt** 176:18
176:20
**dissatisfaction**
287:20
**dissatisfied**
286:16
**distribute** 15:9
30:13 103:21
104:8,8 125:14
125:20,21
126:7 155:24
183:23 199:22
**distributed**
103:7 104:4,5

152:7,12
**distribution**
12:19,24 15:14
15:24 81:25
82:4,6 88:17
120:7 127:3,22
151:2 152:10
152:14 219:11
**distributions**
11:16,22 12:1
12:16,20 13:17
13:22 14:10,12
14:24 17:19
18:16 19:4
72:3 77:1
85:20 87:22
151:19,20,22
207:14
**district** 1:2
234:5,5,23,24
235:1 300:15
300:16
**diverse** 289:17
**divided** 121:6
**divita** 3:20
**divulge** 260:24
**docket** 21:21
22:3,5,8,16,25
23:10 24:8,8
25:1,1 232:11
232:15 235:22
235:23 248:12
286:2
**document** 23:3
23:9 24:10
84:22 98:6
109:17 111:13

132:1,6,13
188:11 197:23
212:18,21
236:4,6,7,12
250:9 286:2
**documentation**
66:10 92:15
95:10 161:20
**documents**
22:11,15,18
36:24 47:18,19
47:20 48:16,21
85:6 95:17
109:24 132:9
157:5,8 166:1
166:6 203:5
251:15
**doesn't** 170:9
171:20 253:8
**doing** 35:6
38:6 93:11
99:16,17
118:19 121:25
122:18 123:19
123:23,24
124:17 130:8
131:17 165:3
177:6 179:3,7
181:25 185:22
221:16 225:11
241:2 262:5
295:25
**dollar** 120:8,24
121:22 124:18
129:20 135:8
263:22,22

**dollars** 77:8
80:21 81:19
102:23 120:22
121:23 127:4
140:1 160:5
179:25 180:9
292:25
**don't** 151:2,5
151:10 153:5,7
153:21,24,25
155:6,10 156:4
156:5,19
157:25 158:17
160:24,25
162:7,11 163:8
167:12,22
168:25 171:16
171:17 173:19
175:15 178:22
180:10,12,16
180:16,16
182:20 184:5
188:4,5 203:1
203:10 210:20
211:23,25
212:1 214:5,18
214:22 215:3
217:4,18
221:25 222:7
224:4,6 225:25
226:1,1,8,11
229:1,2,20
230:7 231:15
231:15 235:17
239:5 248:9,10
248:21,23
249:1,3,10

250:15 251:23
254:12,23,25
256:5,23,24
257:23 258:12
259:3,22
261:17 262:12
262:12 263:2
265:15,24
266:1 268:12
269:13 270:7
271:10 272:25
273:12,17
274:5 277:4
278:4 280:13
281:6 282:1,12
283:7 285:25
289:9 290:14
292:21 293:20
295:8 296:23
297:21,22
298:4,19
300:14,22
301:12
**double** 216:3
**doubt** 89:5
**download**
232:16 298:20
**dozens** 35:8
**drive** 135:10
**driver's**
153:23
**drop** 117:14
**drops** 52:17
55:4 99:10
102:12 125:11
127:8,10 128:8
141:15,16,16

**drove** 121:15
138:11,20
**dss** 166:24
**dubbed** 67:12
**duberstein**
238:1 240:12
303:19
**due** 32:25
38:23 45:11,21
46:3 47:13
59:12 60:16
61:13 62:10
65:3,12,22
67:13,18,25
68:2,8,9,25
69:1,3,5,10,14
69:18 70:9,25
73:14 74:3,11
74:20 91:21
95:20 96:18
116:9,24
119:11 143:6
157:17 161:19
161:25 162:21
165:2 184:7
185:22 189:22
190:7 232:4
**duration** 63:19
**duties** 189:9
245:20 259:22
283:1
**duty** 293:5
**dying** 169:14
**dynamic** 107:4
109:7 122:7
146:23

**dynamics**
55:23 56:11
74:17 138:19
164:4 170:11
171:1 172:14

**e**

**e** 2:21,21,22
5:1,1 8:1 9:1,1
147:5,7 305:1
**earlier** 23:10
60:4 99:13
119:4 158:14
159:16 160:8
162:19 167:14
172:1 195:24
245:12,23
251:25 256:4
256:16 260:5
274:6 303:24
**early** 33:5
38:11 67:22
176:16 237:3
292:22
**earnestly**
11:17
**earnouts** 170:3
**easily** 15:20
19:9 28:13
30:7
**east** 5:21
**eastern** 234:4
234:24 235:1
300:15
**easy** 10:25 20:5
20:15 147:18
174:1 292:11
292:12

eat 293:9
economic
  85:10,12
ecosystem
  28:12 73:24
  74:1 105:22
  107:20 122:18
ecro 2:25
educated
  115:18
education
  234:15 270:16
effect 14:11
  118:10 139:18
  280:1
effectively
  28:15 38:20
  82:1,6 103:21
  130:4 152:3
  156:15 178:16
  183:21 190:9
  190:10
efficient
  134:24
effort 19:20
  46:17 160:3
efforts 30:20
  30:21 289:25
ehrlich 56:19
  56:23 163:3
  244:15 258:24
  260:5,9,14
eight 114:25
  115:2,2 284:22
either 17:19
  40:5,14 43:11
  71:3 113:4

123:4 160:21
161:8 168:22
171:13 205:11
207:16 211:20
221:4 230:23
266:1 279:8
297:9
elaborate 49:8
elect 15:21
  20:10 191:25
  293:13,13
elected 258:8
election 15:23
  19:11
electronic
  110:1,4
elects 20:7
element 84:14
  89:23 90:8
  94:12 98:6
  107:3 111:4
  112:18,20,22
  116:22 133:10
  134:4 162:13
  171:14 176:9
elements 37:20
  41:14 42:17
  47:25 56:12
  89:14 96:4
  109:12 111:6
  117:22 126:5
  126:11 148:13
  154:17 165:1,5
  165:13,22
  178:2 183:19
eleven 135:3
  138:4

elicit 209:12
  236:19
eliminating
  17:13
elizabeth 39:2
  234:25
ellis 5:11 296:3
  301:11
email 19:24
  82:19 182:16
  182:16
emails 301:18
embedded
  118:14 209:2,3
emergency
  73:7
emery 6:16
  186:14 233:5
  242:7,8,9
  256:22 294:23
empathy
  283:16,17
employees 36:6
  49:22,23 58:23
  58:24 163:4
  171:1 194:4
  205:15 281:19
employment
  233:21 235:3
empowers
  250:17
emptively
  207:13
enable 27:17
  29:13
enabled 13:12

enables 14:24
endeavor
  20:24
ended 260:14
  274:8
ends 303:5
enforce 293:13
enforcement
  230:12
engage 29:16
  56:14 62:17
  66:2 148:14
  202:24
engaged 57:6
  57:20 108:13
  113:12 141:21
  148:2 176:23
engagement
  139:4 140:24
  141:10 167:23
  286:12
engagements
  240:6
engaging 39:5
engineers
  127:9
enhanced
  66:10 154:22
  161:8,8 165:24
enjoining 3:4
ensure 64:16
  64:22 101:23
  134:23
ensuring 64:18
entails 49:9
enter 128:23
  136:5 159:10

**entered** 17:21 22:13,22 24:22 25:7 137:9 158:15,25 159:5 236:15 297:14

**entering** 16:24 60:24 94:14

**enterprise** 37:22 59:9

**entertain** 169:3,4,17,25

**entice** 136:18

**entire** 259:9 303:18

**entirely** 10:9 142:8 184:5 240:4

**entities** 58:16 249:22,25 251:18,22 253:1,13,17,18 254:5,6 276:11

**entitled** 229:17 249:18

**entity** 109:25 171:17 192:10 196:25 201:1 211:25 230:11 234:9 250:6,22 256:2 257:5 280:1,8 281:18

**entry** 22:9 78:18 96:11 134:16 159:3 248:13 297:11

**equal** 18:20

**equals** 168:3

**equates** 168:1

**equity** 1:19 3:8 3:16 7:2 141:5 169:19,21,23 171:5,18 191:9 246:12

**equivalent** 104:9

**erc** 125:18

**error** 209:13

**especially** 281:22

**essentially** 10:9 12:4 13:7 32:23 142:17 231:11 273:24

**establish** 200:16

**establishing** 170:12

**estate** 13:14 14:19,21 43:7 77:7,21 100:6 117:19 118:15 119:20 120:11 120:16 121:5 123:10 125:3 133:2 152:3,6 152:14 154:17 172:21 174:14 174:20 183:21 191:15 200:23 219:8 272:23 272:25 273:15

**estimate** 25:24 42:23 112:16 115:18 116:3 116:11 140:7 140:10 179:13 179:16 242:23

**estimated** 26:9 26:13 44:2 71:19 150:19 176:14

**estimates** 179:14 183:2,4

**et** 1:23 3:9

**eth** 104:12

**ethereum** 120:6 130:20

**ethical** 243:20 256:4

**ethically** 295:8

**ethos** 126:17

**evaluate** 33:6,7 68:19 71:12 96:1 170:8 187:4

**evaluated** 170:1,1,19 171:4

**evaluating** 31:5 96:3 170:10 192:13 192:14,15,17 207:21

**evans** 6:22 44:12,12 186:13,13,16 188:9,14 198:22,24

201:25 202:17 202:19 209:14 209:15 210:2

**evasion** 42:5 156:24

**evening** 157:12 265:11 269:23 269:24 270:1

**event** 42:20 83:2,4 88:2 101:11,20 121:9 139:2 243:16,21 258:7 297:9

**events** 72:18

**everybody** 13:16 60:12 144:2 151:18 161:4,7 214:16 215:1 229:17 274:18,25 275:4 298:22 300:25

**evidence** 9:15 10:17 17:8 21:19,25 22:1 22:12,13,20,23 24:22 25:4,8 181:25 201:21 220:4,4 221:24 221:24 222:2 223:2,9,11,23 223:25 224:1,5 224:18 225:5 225:14,15,18 225:21 226:14 231:3,6,15,20

232:5 236:12
236:15 259:14
261:5 285:9,12
285:14
**evidentiary**   9:9
216:23 217:2,6
217:15 222:15
223:1,6,24
225:22 226:15
227:4 228:21
229:21 231:21
295:20 296:11
296:14
**evolved**   176:1
199:15
**evolving**   73:12
**exact**   13:5 40:1
40:2 42:7
49:12 54:24
77:5,9,18
78:11 87:23
94:6,13 102:5
132:9 133:3
141:11 150:1
151:11 158:20
172:12,13
180:11 204:3
236:2 277:4
292:21
**exactly**   25:17
73:4 101:17
116:4 118:12
121:15 123:9
158:7 182:20
183:18 216:6
231:16 277:5
289:9

**examination**
24:5 41:23
45:5 81:12
98:25 111:24
115:5 143:4
144:8,10,11
145:2,4,20
146:6 233:18
246:7 247:4
294:15
**examine**   25:5
41:18 44:11
98:18 111:19
114:10 145:23
174:6 255:3,5
294:13
**example**   27:17
28:10,15 33:4
36:24 37:6
38:9,16,18,19
38:23 42:14,17
45:16 46:7,10
46:11 47:2,6,9
48:17,20 49:18
50:20 51:8
53:16,20 55:23
56:6,19 57:4,4
57:17,19,21,23
59:7,8,23
60:25 61:4,8
62:5,23 63:22
64:16,18,20,24
66:13 68:10,13
69:6,9,14
70:18 71:9
72:4,12 73:8
73:13,19,20

74:25 78:8
82:19 87:18,20
87:24 89:3,6
89:16,18 92:1
92:14,19 94:2
95:7 96:8 97:9
97:10 100:21
101:10 103:7
103:17 104:12
104:12 105:9
105:10 106:12
106:14 107:5,6
108:9,21,25
109:4,11,16,21
110:13,16
112:10,12
113:8 115:23
117:12 118:14
118:17,25
119:2,10 120:6
121:7,25 122:1
122:5 124:17
126:6,9 127:6
129:10 131:6
131:17 138:16
141:3 147:1
150:18 162:5,9
169:19 170:13
170:17 171:5
173:9 175:14
175:21 177:12
184:1,7 186:5
194:14 196:15
200:9,16,19
296:7 303:13
**examples**
119:16

**excellent**   270:5
**except**   104:7
173:17 276:24
277:23 281:20
**exception**
291:3
**exceptions**
52:4
**exchange**   5:19
5:20 45:3 56:7
73:11 90:18
124:8 171:2
176:4 179:6
211:13 230:1
230:21 276:22
**exchanges**   73:8
73:10 113:19
118:16 156:8
161:12
**excise**   249:3
**excluded**
223:10,12,13
**exclusion**
296:8
**exclusive**
293:12
**exclusively**
240:8 257:1
**excuse**   36:6
51:20 55:13
67:23 68:7
70:8 87:2
90:19 91:24
108:7 109:13
130:19 131:1
137:13 140:20
161:22 177:21

178:4 205:9
294:15
**excused**  219:16
295:16
**execute**  27:5
67:6 122:14
184:11 203:4
276:2
**executed**
123:20
**executing**
41:14 67:5
88:20 123:10
124:1
**executive**
239:2
**executives**
165:23 197:21
198:1
**exercise**  25:22
119:25 187:15
203:6 209:1
276:2
**exercising**
203:14
**exhibit**  8:10,11
8:12,13,14,15
8:16,17,18,19
8:20,21 22:2,8
22:15,16,25
24:8,18,20,21
24:22 25:1,2
78:21 91:10
188:8,13
201:24 232:10
236:14,15

**exhibits**  8:9
21:18 22:4,5
22:13,22 86:19
**exist**  186:8
244:5 276:1
283:1
**existed**  110:21
260:9,13
**existing**  101:2
156:11 187:7
212:18,21
213:18
**exists**  251:3
**exodus**  130:24
**expand**  282:21
**expansive**
237:5
**expect**  119:11
174:14,19
217:15 283:4
**expectation**
88:23
**expected**  176:3
**expeditiously**
74:23 78:10,15
**expenditures**
259:8
**expense**  79:7,9
136:2 159:4,8
172:21 173:8
263:9
**expenses**
159:12
**expensive**  30:3
138:16
**experience**
9:24 49:20

52:21 53:23
54:3,5 115:20
237:6 245:9
263:13 270:17
282:17,19
283:6,14,19,20
284:20,23
289:22 290:19
299:8
**experienced**
121:8 293:4
**expert**  56:4
57:10,23 58:8
76:12 84:15
108:17 279:21
**expertise**  47:1
47:14 50:14
52:22 53:23
56:24 270:16
**experts**  57:18
164:10,16,17
164:20 284:19
**explain**  43:14
57:12 85:1
103:2 112:4
135:18,22
136:23 158:18
158:22 159:7
215:6 217:20
222:18 223:24
225:21 236:22
238:14 239:8
259:18,23
**explainable**
89:25
**explained**
212:16

**explaining**
222:14 232:4
**explains**  15:12
229:15
**explanation**
15:15 104:18
229:12,18
237:25
**explanations**
15:7 217:5
**exposed**  64:25
82:11 145:2
201:4
**exposure**
200:24
**express**  155:3
**expressed**
20:19 25:14
223:16 290:14
**expressly**
138:6 192:3
287:17
**extend**  3:2
115:1
**extends**  278:17
**extension**
302:13,14,21
**extensive**
42:15 171:21
171:22 172:11
**extensively**
232:9 270:15
**extent**  27:12
55:15 61:20
64:17,23 66:12
67:5 68:21
70:2 71:1,8

72:14,15 74:5
74:25 75:22
76:23 82:12
83:23 84:4
87:18 88:1
89:2 90:7,14
91:24,25 92:5
96:1 97:7
98:13 102:4
104:22 105:23
106:1 109:21
110:21 112:14
113:22 116:19
117:10 118:1
118:21 124:22
125:1,15 127:2
127:5 128:2
132:22 133:25
136:1,6 139:21
152:6,14 156:4
156:9 160:25
162:6,7,12
165:8 171:15
173:4,6 177:14
178:16 184:3,7
186:7 187:3,5
190:6,18,21
200:18 203:10
207:2 222:6
232:18 245:4
259:17 291:4
**external** 56:13
74:18 75:19
76:8
**extra** 15:17
**extraordinary**
298:2

**extremely**
145:13 203:25
**eye** 272:1

**f**

**f** 2:21,25 305:1
**faced** 117:8
147:16
**faces** 156:23
**facilitate** 27:1
27:5 29:14
101:22
**facilitating**
102:3
**facilities** 37:22
37:25 38:2
141:4
**facility** 59:9
**fact** 14:15
29:24 61:6
62:23,25 69:16
89:7,16 97:23
103:6 112:6
113:17 127:21
132:19 197:16
199:16 205:13
216:13 259:20
263:12
**factor** 112:24
114:1 158:2
203:3 263:8
**factoring**
170:11
**factors** 35:1
69:9 75:19
76:8 113:10
115:17 119:15
135:3 148:11

150:13 161:3
171:2 183:16
203:11 207:2
283:13
**facts** 58:7 63:5
75:9 77:6
95:24 97:12,16
101:4 112:19
115:23 137:10
138:13 173:11
206:23 217:5
230:17 259:14
**failed** 97:24
98:2 286:6
**failing** 189:7
**failure** 18:17
61:24 62:2
148:1 159:3
285:24 286:5
**failures** 63:8
**fair** 23:14
39:23 105:2
173:22,25
207:6
**fairly** 237:3,14
284:20
**faith** 189:5
**fall** 273:18
**false** 62:3
190:16
**familiar** 24:10
37:25 49:15,16
56:8 57:1
58:10 84:19
86:25 87:5
112:10 125:16
158:19 163:15

188:2 241:11
243:3 245:25
245:25 247:14
247:18,21
248:5,15 249:5
249:15 250:12
250:17,19,24
252:3,16 253:9
282:25
**familiarity**
289:15
**famous** 58:25
**famously** 59:1
**far** 50:18
132:24 135:4
281:11 285:13
**fast** 148:4
237:18
**faster** 41:12
**fate** 211:20
**favor** 244:23
255:22 267:9
267:10
**favors** 264:22
**fears** 146:11
**feasibility**
170:12
**feature** 139:20
173:11
**features** 16:22
141:9
**february** 67:10
67:13,23,24
68:3 168:8
176:16 196:24
**federal** 28:9,21
73:16,20 92:13

92:20 93:11,20
95:24 236:24
**fee** 118:20
  139:8 140:1,2
  140:17 142:8,8
  142:14,16,18
  174:21 178:8
**feel** 33:1 75:8
  77:12 157:19
  160:21,25
  164:2 184:18
  190:20 203:10
  206:22 209:24
  243:3 259:7
  270:9,9,11
  280:18 287:21
  294:24
**feeling** 90:2
  209:4
**feels** 127:12
  141:8 161:5
  275:4
**fees** 118:19,20
  139:9 140:9,9
  140:21,23
  141:3 176:15
  177:3 178:3,5
  178:10,20
  200:8 263:6,21
  266:4,8,12,13
  293:8
**feet** 48:6
**fellow** 239:8,14
**felt** 71:8 98:13
  154:20 193:15
**ferguson** 2:25

**ferry** 5:21
**fiat** 35:18
  129:14 199:1,4
**fides** 72:9
**fiduciaries**
  235:9 245:10
  245:14 253:23
  282:24 283:2
**fiduciary**
  25:22 186:22
  186:24,25
  187:2,15,22
  189:8,11 203:4
  203:7 243:19
  244:6 245:20
  250:5 279:18
  283:20,22,23
  293:22,24
  294:1
**field** 86:13
**fifty** 31:17
**figure** 23:16
  175:8,9,10
  219:18 288:22
**figures** 179:14
  180:12
**file** 85:6 248:3
**filed** 3:22 4:3,6
  4:13 22:3 85:4
  99:11 132:10
  139:4 246:18
  246:19 248:1
  252:7 270:6
  272:17 284:21
  285:21 290:14
**filing** 143:13
  144:4 260:10

294:6
**fill** 303:14,17
**final** 127:22
  135:25 267:2,5
  303:4
**finalist** 236:21
  237:19,21
**finalists** 237:16
**finally** 303:2
**finance** 31:12
**finances**
  192:14,15,17
**financial** 33:14
  33:15 35:12
  46:8 49:2 51:7
  51:9 53:13,13
  54:8,8 57:15
  57:15 61:1
  62:19 68:13
  93:14,17 95:15
  108:24 109:24
  122:13 157:1
  160:18 162:1,5
  162:15 192:21
  192:22 193:11
**financials**
  33:22 48:12,13
  48:24 105:13
  105:14,18
  106:21 109:8,9
**fincen** 28:15
**find** 18:1 80:17
  118:4 128:23
  229:10 257:14
  286:10 302:21
  303:9

**finder** 97:23
**finding** 49:25
  113:7
**findings** 55:25
  286:10
**fine** 15:3
  151:12 213:17
  221:6 226:13
  270:3
**finish** 24:7
  74:3 218:23
  300:6
**finished**
  111:15 218:15
  287:11
**finishes** 179:17
**fire** 129:24
  156:7
**firm** 47:4,22
  49:12,18 50:23
  58:9 105:17,22
  106:6,13 109:2
  110:18 165:8
  171:6 233:25
  235:13 242:3,5
  255:12,25
  258:20,21
  259:25
**firms** 46:15
  49:6 73:19
**first** 17:15
  20:25 21:19,21
  22:3,6 25:13
  39:16 44:14
  49:10 114:12
  120:12 126:14
  134:3,25 135:1

151:20,22
155:5 162:20
176:13 184:21
198:1 199:16
205:10 207:1
216:17 218:12
229:5,9 241:14
241:15 242:11
242:15 246:8
249:3 259:24
262:12 278:15
284:2,2,3
289:6 299:10
301:2 302:14
302:22

**fit** 119:17
120:7 131:23

**five** 79:25 86:2
86:5 127:25
168:3,13,17
173:15,15
189:3 210:5
212:22 227:23
227:24 237:16
237:17 274:21

**flag** 121:12
**flatly** 142:13
**flavor** 170:5
**fleshed** 102:6
170:25
**flexibility**
133:5 187:24
**flow** 66:18
**flows** 48:25
**fluctuations**
82:11

**focus** 47:2
56:11 137:25
146:17 182:2
238:11 275:9
276:1
**focused** 147:19
171:10 239:13
254:16
**folks** 245:5
**follow** 40:6,8
44:14 45:19
46:21 73:18
76:2 95:3,6
127:7 128:1
132:2,3,6,19
132:20 135:14
147:15 182:13
183:10 194:9
210:12 271:7
**followed**
135:12 150:17
**following**
230:6
**footnotes**
162:12
**force** 13:19
**forced** 180:19
**forcing** 76:6
134:25
**foregoing**
305:3
**foregone**
116:18 176:7
**foreign** 83:7
**forensic** 72:13
165:11

**forgetting**
132:8
**forgive** 139:23
282:20
**forgot** 107:14
**form** 19:11
170:5 198:20
**formed** 289:10
**former** 273:10
273:15,19
**forms** 170:2
175:1
**formula**
151:13
**forth** 211:14
**fortunately**
150:23
**forum** 123:19
**forums** 113:12
**forward** 32:7
40:9,21 41:1
68:15 73:16
74:9 75:9,17
76:25 77:13
88:15 89:5
90:3 96:1,2,4
101:6 112:16
113:10,16
138:14 149:3,6
157:17,19,23
160:21 161:3
171:10,25
173:12 181:6
184:8 185:1
187:1,5,9,22
190:17 203:14
204:16 206:13

206:18 207:3
208:15 209:4
209:24 221:21
251:7 256:15
271:1 272:12
286:14
**fought** 154:7
**found** 60:12
157:10 182:17
187:12,20
284:6
**foundation**
26:25 97:4
126:11 128:9
253:9
**foundational**
48:2
**founder**
193:21
**four** 17:5 32:2
70:14 76:18
77:18 84:23
96:10 134:10
134:11 238:25
258:14 261:7
261:18,22
262:1,7,8
267:9 286:21
**fourth** 54:1
**fraud** 60:15
61:21 62:1,4
64:23 72:16,22
200:18 270:10
**fraudulent**
245:21
**free** 228:21

**freeze** 273:25
**frequently**
141:20,22
241:7 243:1
245:15 271:16
275:6 283:3
294:5
**friction** 200:8
**friday** 303:11
**fried** 258:25
**friendly** 260:8
**friends** 258:25
**front** 20:5
43:24 61:5
80:23 81:3
119:21 123:14
141:10 151:11
152:12 169:5
170:3 176:5
182:2 188:6
235:23 248:9
**frugal** 236:4
**frustrating**
221:25
**frustration**
218:13 225:8
**fti** 40:23 66:9
197:18 291:13
**ftx** 60:5,7,12
60:17 61:12,25
62:12,17 63:10
63:14,18 64:1
64:6,14 65:1,4
67:21 72:25
75:14 106:11
134:11 136:8
137:4 138:12

146:22 148:2
152:1,5 175:25
176:3 179:24
180:8 181:2,6
181:18 199:10
199:10 293:15
**ftx's** 61:14
**fulfill** 293:5
**full** 23:25 44:5
100:19 101:3
211:23 233:13
**fully** 33:3 74:8
102:6 170:25
176:21 178:18
**fulsome** 237:14
**function** 111:6
269:9 279:1
**functionality**
27:22 29:1
**functions**
110:20 280:16
**funds** 28:4,5
28:10,13,21
34:2,2 35:9
37:3,6,7 38:19
38:22 41:13
57:4 59:20
61:25 66:13,18
75:3 77:1
87:20 88:4
89:6 90:10
103:21 126:4
129:20 131:8
146:16 152:6
156:2 191:10
193:13 200:18
206:6 260:15

**further** 43:4
44:8 75:2
103:11 114:7
198:21 210:2
225:23 229:15
246:5 262:21
265:16
**future** 77:13
77:14 143:22
151:5 152:10
158:8 181:12
181:21 183:19
208:16 243:11
254:2,11

**g**

**g** 9:1 188:4,5
188:16,17,25
**ga** 5:22
**gap** 61:22
**gas** 200:8
**gather** 229:9
**gauntlet**
175:11
**ge** 147:6
**gears** 90:16
**general** 6:1
10:7 36:25
51:24 69:7
217:22 280:15
**general's** 98:22
**generally** 28:2
28:11 29:19,25
49:16 55:19
57:14,16 61:20
62:12 74:1
77:7 93:18
95:16 109:4

164:24 165:5
195:17 247:14
248:4,16
249:15,17
250:19 251:14
293:17,21
**generals**
270:12
**gentleman**
108:2 153:1,14
222:8 301:19
**george** 234:23
**getting** 59:22
72:15 124:2
127:16,19
150:11,12
153:9 169:10
169:22 171:14
181:13 199:13
259:11 266:14
274:1 290:7
**gina** 7:14
114:12,13
152:19
**give** 13:16 14:9
14:11 15:8,13
15:14 19:3,20
20:13 23:22
30:5 50:11
54:24 81:1,7
118:25 119:10
135:1 143:8
145:11 153:19
161:17 168:20
211:5 220:5,6
222:23 224:21
233:10 248:23

281:11,12
298:5 303:18
**given** 28:12
29:24 30:10
41:3,13 52:25
62:22 73:25
76:19 103:9
124:8,8 127:21
130:10 143:12
168:7 179:5,6
179:6,6 205:13
228:24 230:12
240:16 254:13
260:24 264:1
275:7
**gives** 153:12
209:6 259:21
**giving** 164:11
180:20 262:9
**glasses** 248:12
**glean** 251:15
**glitch** 90:3
**global** 192:7,19
193:1,7,22,24
194:4,25 195:2
195:12,17,20
195:21 203:21
211:19 213:7
**go** 10:25 13:2
13:19 14:1
15:18,21,23
16:22 17:13
19:13 20:18
25:18 40:21
44:14,14,16
53:15 60:21
75:24 79:10

80:9,16 91:4
102:17 105:3
112:15 113:10
113:16 114:13
114:15 115:8,9
116:2 117:4,4
117:5 120:10
125:1 128:10
128:17,18
133:17 135:18
135:21 137:22
139:18 140:4
142:16,17
153:6,8 155:19
161:18 163:8
167:21,23
168:9,10,12
174:11 181:6
182:10 183:5
184:15 187:22
188:12 190:17
199:17 203:11
206:13 211:8
216:7 219:5
220:14,17
222:1 224:12
224:14 233:3
239:6 240:6
247:2 272:12
273:4,8 286:14
288:22 301:20
**goal** 12:17 13:7
236:24 260:16
260:16 271:18
**god** 23:23
181:18 233:11

**goes** 85:11
142:8 149:19
150:10 158:2
215:17 239:23
258:20
**going** 9:13,15
10:11,12 17:2
17:8 19:20
23:12 32:12,19
39:21 54:3,25
62:13 65:13
69:17 79:14,20
81:7 88:16
107:23 108:16
122:22,25
140:8,11
141:17 146:11
147:3 148:13
149:9,22 151:3
152:12 153:8
154:25 156:22
158:7,8,10
167:15 170:22
176:22 177:10
178:23 179:18
179:19 181:11
181:20 183:18
184:6,24
198:21,21
204:24 205:17
207:14 212:25
213:6 215:24
218:11 220:12
220:13,17,18
223:7,24
224:23 225:4
228:13,19

232:24 233:1
236:17 244:8
244:12 248:18
251:7,9 252:20
252:21,25
253:3,3,4,12
253:14,15,16
256:15 258:1
265:14 270:25
271:6 272:18
275:16 279:4
279:12 281:12
291:11 296:18
297:1,10,22
298:12,13,16
300:25 301:17
301:20 302:5,6
303:11
**goldberg** 5:8
11:9,9 12:4,14
12:22 13:7
14:5,16 16:15
20:20,24 21:2
21:10,13
144:22,22
145:7,10
213:24,24
214:9,19 215:5
218:20 219:1,4
219:6,14
297:15,15
**good** 21:9,11
21:14,15 41:25
45:7 98:21
99:2,9 111:16
112:1 115:7
117:12 129:3

164:14,22
167:6 183:16
186:17,18
189:5 190:20
207:22 211:11
214:5 216:2
227:4,12 236:4
265:11 269:23
269:24 270:1
276:11 293:6
299:14
**google** 49:14
**gotten** 31:1
303:2
**govern** 256:14
**governing**
189:4 293:2
294:3
**government**
92:21 96:13,21
96:25
**governmental**
93:9 94:23
95:1,11
**grade** 37:22,24
**graduated**
234:17
**graduating**
235:4
**graduation**
235:2
**grand** 238:9
**grant** 218:10
**granted** 176:11
**great** 16:13
20:23 23:18
108:20 144:7

161:17 211:22
238:11 276:13
279:21 299:21
**greater** 112:14
116:6
**greatly** 157:22
**green** 2:2
**grew** 235:5
**gross** 270:10
**grounds**
219:18 221:16
223:13
**group** 1:19 3:8
7:2 47:4,6
57:19 233:23
246:12 286:15
288:14,14,16
**guaranteed**
141:15
**guess** 55:6
83:23 88:5
114:13 116:7
124:6 139:10
172:25 183:10
213:14 227:17
228:12 231:17
257:12 258:10
297:23
**guidance**
132:13 286:8
**guidelines**
224:21
**guiding** 132:1
132:6
**guys** 150:8
161:11,19
162:21,23

164:9,16,17,19
167:15,16,17
167:20 169:3,4
169:16 173:19
196:12 210:7
260:21,24

**h**

**habit** 219:25
**hage** 8:6 233:6
233:9,12,15,15
233:18,20
246:8,15,23
247:4,6 253:12
255:5,10
259:18,25
261:1,8,16,19
261:20,23,23
261:24 262:3,5
262:9,11,15,23
262:25 263:1
264:10,13,17
264:23 265:2,6
265:11 269:17
269:23 270:7
274:7 275:9,16
278:14 279:7
279:12 280:17
281:17 282:17
284:3 287:15
287:24 288:1
294:13,20
297:6 300:12
300:14,22
301:2 303:7,12
303:21
**hage's** 278:24

**haircut** 117:8
119:11
**halls** 286:21
**halt** 87:12
**halting** 87:18
87:25 88:1,8
88:12 89:3
90:1,7,15
**halts** 89:10
**hamilton** 6:11
**hand** 100:18
100:18 215:14
235:16
**handful** 130:2
**handing** 24:7
259:1
**handle** 253:3,5
253:16 295:10
296:18
**hang** 44:20
218:15 274:16
**happen** 56:23
76:7 83:17
94:8 120:4,7
138:10 183:18
188:6 190:10
208:21 278:25
279:9
**happened** 10:6
62:12 72:25
83:2,5 107:20
117:11 135:22
136:8 146:22
148:6 150:23
175:25 179:21
228:18,19
279:8

**happening**
60:20 130:9
204:7 270:24
299:3
**happens**  28:11
30:17 77:13,16
78:20 81:22
82:15 84:9
151:7 168:24
182:15,17
212:20 243:11
**happy**  21:7
86:13 103:11
120:24 181:5
217:24 257:22
**hard**  16:1 96:9
97:13 135:9
143:13 144:3
154:7 171:21
201:25 223:10
237:18 248:4
266:5 287:1
**hasn't**  178:18
251:9 254:11
**haven't**  166:23
198:19 248:20
287:11
**hawaii**  13:24
**head**  17:7 65:7
93:13 140:13
226:22 235:12
242:5 257:23
**headquarters**
36:13
**heads**  50:10
**health**  157:1

**hear**  16:3,5,15
17:3 18:13
20:20 51:20
70:8 87:2
102:18 115:12
137:13 147:16
174:17 180:5
213:14,14
217:6 229:17
262:14 267:14
268:1 270:3
278:25 287:8,9
287:20 297:12
**heard**  17:3,9
25:13 86:2
99:3 119:2
128:6 139:10
149:21 158:14
159:16 161:24
183:14 215:11
218:14 226:4
255:10 257:2
257:11 278:15
288:11
**hearing**  3:1,7
3:12,14,16,18
3:20 4:1,5,8,11
4:11 16:10,23
17:22 25:12
35:13 38:25
39:6,8 40:3
66:25 86:15
123:12 137:3
145:18 149:2
150:1 162:19
172:2 176:13
182:22,22

198:1 204:6,18
205:25 214:23
217:3 221:12
229:8,12
236:25 254:14
266:5 287:4
298:13,15,18
299:10,11,12
301:11,12
**hearings**  16:11
61:6 80:1
240:16,19
242:19 298:1
301:16
**hearsay**  10:10
10:15,16
144:18 145:15
205:14 231:24
232:5,18
285:12
**heave**  302:18
**heavily**  292:10
292:13
**heavy**  157:4
169:5,6
**heightened**
166:2
**held**  11:12
17:17,18 37:16
37:21 38:1
110:4 129:24
190:8,15
193:25 226:11
239:11 242:24
**help**  23:23
99:12 142:5
145:12 159:19

160:11,13
181:1 233:11
238:7 243:6
272:19 290:1
293:5
**helped**  288:21
**helpful**  54:11
81:3 86:22
102:3 104:17
206:24 218:22
250:8 274:11
274:12 299:18
299:23
**helping**  206:6
290:1
**hendershott**
4:1 7:8 114:11
114:12,16,18
114:21,25
115:4,6 118:24
128:11 133:15
133:19,21,22
135:19 136:24
136:25 137:2
142:2,3,5,11
142:21 269:18
269:19,21,22
270:2 271:6,13
272:16,18,19
272:20,21
274:13,14,16
275:12,14,15
277:18 278:12
278:13,23
279:14,16,20
280:3,14,18,24
281:7,15,16

282:5,10,15
284:9,11
285:14,16,19
287:8,11,14
**hesitation**
294:24
**he'll**  279:12
**he's**  249:4
254:10 262:5
268:19 282:3
285:18
**hi**  255:10
**hide**  217:19
226:14
**high**  36:21
113:8 141:8
180:19 239:11
239:11 251:4
**higher**  63:20
112:21 122:5
142:19 147:23
183:4 187:6,18
190:19 208:23
**highest**  132:21
137:10 172:4,6
209:2,17,23
**highlight**
121:16 129:1
**highlighted**
115:9 119:4
270:15
**highly**  64:9
89:4,4 95:12
95:17 118:2,2
165:14,14
172:23,23
173:10,10

217:1 225:11
238:19 254:10
**hindsight**
136:6 176:2
181:5,10,17
**hire**  56:12
164:17,19
165:8 288:6
293:4
**hired**  288:8,13
288:21,24
289:2,25
**historical**
60:15
**historically**
27:7 121:19
129:4,9,13
**history**  256:10
**hoc**  1:19 3:7
7:2 246:12
**hold**  3:12
27:12 36:1
62:23 156:7
171:16 190:25
199:18
**holdback**
179:24 180:8
**holdbacks**
152:4
**holders**  1:19
3:8 7:2 246:13
**holding**  190:24
**holdings**  1:6,11
1:23 3:2,9
267:23 268:10
**holds**  190:1

**hole**  61:25
**hollister**
233:23
**hon**  2:22
**honest**  155:10
**honor**  9:4,24
11:9,14 12:4
12:15,22 14:17
16:2,6,16
20:20 21:13,14
22:8,24 23:19
23:24 24:4,18
24:23 32:24
33:24 39:23
41:15,19 43:9
44:12,19,22
45:1 55:5
60:18 61:16
75:21 79:8,12
81:13 83:18
85:24 86:1,3
86:11 90:22
92:8 97:3,18
98:2,21 101:13
101:16 107:12
107:18,24
111:21 114:8
114:11,21
118:12 133:12
133:15 135:16
136:22 144:5
144:22,24
145:8,18,24
151:15,25
152:19 181:13
183:11 184:20
185:7,10,17

186:13 188:9
198:23 201:23
201:25 202:2,7
202:17 210:4,9
210:14,24
211:5,9 212:4
212:9,11,16,23
213:1,7,13,14
213:19,23,24
214:9,14,19
215:5,10,13,15
215:21,25
216:2,9,17
217:13,17,21
217:23,24
218:1,3,7,13
218:17 219:1
219:14,21,24
220:8,9,15,23
221:6,22 222:1
222:5,10,18
223:18,21
224:1,3,7,15
225:7,12,19,24
226:16,17
227:11,15
228:6,8 229:25
230:2,3,10,25
231:1,22 232:7
232:20,25
233:1,4,7
235:15,19
236:11 246:5
246:10,17
248:17 249:10
252:10,14,19
253:10 254:7,9

254:23 255:1,6
257:19 259:16
261:12 262:18
265:4,7,14
266:15 269:10
269:18 271:3
272:16 274:11
275:14 277:6
281:8 282:1,7
285:9 288:2
294:17,19
295:18,19
296:10,13
297:15 298:10
298:24 299:2
300:1,8 301:7
301:22 302:6
302:25 304:2
**honor's**   10:20
14:16 114:13
114:18
**honorable**
234:23,24
**honorary**
239:10
**honored**
239:14
**honors**   239:15
**honor's**   213:2
213:2 214:2
218:21 225:6
**hook**   278:21
**hope**   98:1
185:5 186:23
274:11 299:20
**hopeful**   11:19

**hopefully**
167:12 171:19
221:20 225:14
**hoping**   21:18
246:21
**host**   10:5
**hosted**   59:9
**hot**   57:5
**hour**   295:24
**hours**   98:3
298:6
**house**   6:11
**household**
49:13
**hundred**   49:22
120:24 121:22
169:8,22
**hundreds**
120:21 121:1
**hybrid**   298:13
**hyde**   4:25
305:3,8
**hypothetical**
78:2
**hypotheticals**
90:6 124:21
125:4 186:3

**i**

**idea**   17:4
207:22,22
215:5 219:20
226:25 272:24
273:11 300:13
**identification**
16:20
**identified**
258:9

**identify**   61:13
63:6
**identifying**
17:9,10 72:22
290:4
**identity**   93:8
**illiquid**   115:13
116:10,24
117:21 118:23
119:3,5 120:5
120:9 122:5
125:11 178:8
178:10
**illiquidity**
121:7,10
**imagine**   29:21
30:7 131:17,20
133:4 148:17
155:8 211:25
226:22
**immediately**
70:24 148:2
180:21 197:8,9
**immensely**
223:13
**impact**   20:17
70:6,9 84:16
86:8 90:18
123:13 124:4
127:7 128:1
178:25 179:9
186:4 190:22
296:5
**impacts**   127:6
127:18
**implementati...**
71:21

**implementing**
127:15,17
**implication**
101:15
**implications**
160:19
**importance**
240:16,18
**important**   58:5
76:24 89:14,23
90:8 94:23
98:9 99:6,8
107:3 109:6
111:3 112:18
112:22 146:23
146:25 148:14
148:16 154:13
157:22 165:2
166:3 176:8
198:16 206:17
207:10,23,24
208:5 221:4
284:15 289:13
**imposed**   274:1
**impossibility**
224:20
**impossible**
280:11
**impressive**
282:17
**inability**   26:11
126:6 206:11
**inaccurate**
177:20,23
179:11,12
182:18

**inappropriate**
38:21 254:10
270:9
**inbounds**
148:3
**incentives**
169:11
**inclined**  214:4
**include**  21:7
40:17 46:5
69:10,19
107:11 108:11
112:23 162:2
178:2 219:9
**included**  21:2
46:7,8,14 66:4
66:8 107:16,18
135:25 169:21
217:9
**includes**  60:25
70:17 116:18
**including**  34:2
39:2 40:23
46:15 58:6
61:3 93:3
141:18 147:13
169:19 178:9
223:14 248:2
293:14
**income**  48:24
**inconsistencies**
109:19
**inconsistent**
189:8
**incorporated**
36:12 260:7

**increase**  43:1
209:10
**increased**
135:8 150:24
157:1
**incremental**
26:9 41:9 44:2
58:4 64:15
65:2 75:4
142:13 157:17
**incurred**  43:7
**independent**
59:13 108:11
165:11 196:4
196:21 250:4
250:21,21
251:17,21
253:4,15,15
285:5
**independently**
34:24 164:5
**indicate**  66:17
**indicated**
17:23 102:2
195:10 220:21
**indication**
223:6,6
**indicia**  273:24
278:6
**indiscernible**
16:7,10,11,17
52:6 104:25
108:19 111:15
119:1,14,25
121:3 122:23
122:25 123:3
128:16 132:5

133:7 134:21
138:23 139:13
141:20 162:18
164:3,3 166:21
176:11 177:1
178:8,9,10,19
179:21 180:4
180:15,25
181:18,19
183:22 184:13
184:18 218:4,4
228:8,9,10
255:7 258:4
265:13,23
266:4,4 267:23
268:6 270:10
270:19,21,22
271:6,9 272:4
272:5,6,9
276:13 278:22
279:14,16,17
279:21 280:5,5
280:19 281:19
281:21,24
282:6,13,18
283:7,8,11,24
283:25 284:1
285:1 286:11
287:6,16,19,22
287:23 288:7,9
288:22 291:19
292:25 299:11
299:25 300:17
300:24 301:2,3
301:16,20
303:8,12,13,21

**individual**
50:21 57:3
124:23 176:4
179:1,5,9
195:14,15
205:9 254:18
261:8
**individuals**
46:5 47:2
115:19 198:6
205:9 207:12
261:11 290:12
**indulgence**
59:12
**industry**  10:6
47:4 48:20
50:13 51:12
53:1,20 57:1
62:13 73:12,14
170:22
**influence**
222:3,24
**influenced**
244:15,17
**influencing**
245:5
**information**
19:18,19,24
20:1,4,6,6,10
34:24 38:16
49:5 51:7
57:11 66:16
74:12 77:15
80:17 85:6
92:25 93:5,16
94:1,16 95:5
95:13 98:9

109:16,19
139:24 153:6,8
153:22,23
154:12,18
155:14 157:14
162:15 163:18
164:11 165:6
193:12 194:21
198:2 220:23
222:23 224:25
225:16 226:2,3
226:14 227:6
230:7 231:3
264:9 301:13
301:14,18,21
302:8,12,15,20
302:23
**informed**
96:12
**informing**
231:9
**infrastructure**
34:8,10 37:4
47:16 53:6
54:17,20 55:18
56:4,24 63:23
70:2 110:8,25
**infusion**   42:25
**ingredients**
110:12
**inherently**
29:2 62:5 73:9
155:25 179:8
**initial**   82:4
150:14 151:19
237:13

**initially**   150:6
177:24 252:7
260:6
**injunctive**   3:3
**injuries**   93:1
**inquiries**   92:16
93:19 95:4
**inside**   57:22
**insider**   268:17
268:18,25,25
277:8,12
**insiders**   272:11
272:14 276:15
276:18 277:19
278:17,18,21
279:5
**insight**   138:24
272:3 278:19
**insistence**
256:13
**insofar**   104:2
**insolvency**
238:17 240:10
**instance**   56:18
56:22 62:8
63:16 71:14,17
71:20 82:5
84:6 89:6
104:3 110:24
112:13 118:15
123:17 124:20
125:18 128:5
129:24 141:3,5
155:16 169:22
200:20 205:10
207:1 229:9

**instances**   31:9
31:13 55:20
117:21 118:1,4
122:4 125:2
129:21 130:3
184:5
**instantaneou...**
18:2
**institute**   238:6
238:13,16
**institution**
95:15
**insurance**
245:21 246:3
**integrate**   29:18
**integrated**
27:22 131:19
**integrating**
131:15
**integration**
70:21
**integrity**
283:15
**intend**   9:14
112:3 304:2
**intended**
143:22
**intending**
225:5
**intends**   114:4
143:16,21
**intensive**   263:8
**intent**   21:10
32:22
**intention**
262:20 283:23

**intentionally**
133:1 157:2
**intents**   103:22
113:17 127:22
**intercompany**
250:7,25 251:8
251:22 252:8
253:2,13,18
**interest**   1:19
3:8 7:2 74:6
113:9 124:24
184:23 204:20
243:17,20,25
246:13 250:12
256:3,5,6,18
258:13 265:13
275:10 290:15
293:12
**interested**   40:9
202:1 214:6,16
232:1 275:2
**interesting**
285:1
**interests**   193:5
204:15
**interim**   33:15
64:25 176:3
187:4
**internal**   29:8
48:14,17,19
59:24 114:5
280:20
**internally**
161:15 230:3
**international**
50:3

**interned**
  234:22
**interpreting**
  262:19
**interrupt**
  166:5 167:6,7
**intersection**
  284:23
**interval**  80:4
**intervals**  79:22
**interview**
  237:14,22,22
  290:4,5
**interviewed**
  290:9,12
**interviews**
  195:9,19
  237:12
**introduce**  9:14
  134:23 261:5
**introduced**
  202:16 241:15
**inu**  119:3,5,9
**invading**
  265:15
**invested**
  180:23
**investigate**
  273:15 279:18
  284:18
**investigated**
  245:19 253:21
  278:6 283:4
**investigating**
  93:9 245:17
**investigation**
  93:23 94:15,17

94:19 95:1
96:13 230:13
276:6
**investigations**
  92:2,4,12,16
  92:21 93:12,17
  94:23 95:9,11
  95:18,20,23
  96:17,21 97:1
  97:8,9,10,16
  156:24
**investment**
  24:15 45:13
  47:5,10 50:5
  52:24 57:13,14
  57:17 58:3
  95:13 132:1
  164:23
**investments**
  83:7 117:4
**investors**  36:16
  61:10
**invite**  216:20
**invited**  222:8,9
**inviting**  210:18
**involve**  30:23
  53:8 197:17
**involved**  45:16
  53:16 55:19
  149:12 164:7
  197:17 226:18
  238:20 240:20
  241:5 243:21
  247:7 251:13
  287:3 288:23
  288:25 300:22
  300:23

**involvement**
  45:14 284:24
**involves**  223:2
**involving**
  205:4 245:20
  250:24
**iranian**  28:11
**irregular**  217:1
**irrelevant**
  55:10 296:2
**irrespective**
  75:1 218:10
**is0**  36:25
**iscpa**  51:5
**island**  110:4
**isn't**  158:15
  189:16,20
  191:19 192:11
  196:5,16,22
  198:2,12
  199:14,19,23
  200:2 204:1,6
  209:7 213:11
  231:13
**iso**  47:21 48:3
  48:8 49:3,8,10
  49:16,25 50:1
  50:2,9,13,19
  51:3,4,16
  53:24 166:6,11
  270:23
**issue**  18:12
  21:8 41:4 62:5
  62:15 76:17
  85:11 90:4
  126:2,2,3
  129:8 214:10

215:1,23
216:23 217:2,6
217:15 218:11
218:24 221:25
222:15 225:22
226:20 227:5
229:5,6 230:3
251:25 253:20
253:22 279:6
291:4,13
293:19 302:6
302:23
**issued**  156:21
  196:21,24
  201:6 223:15
**issues**  10:24
  17:10 20:21
  25:12 38:8
  41:5 42:11,12
  46:24 53:5
  54:17,20 56:4
  63:6 69:16
  71:1,11 125:13
  151:21 152:5
  200:19 215:17
  216:17 221:18
  224:2 226:5
  228:14,20
  229:9 230:23
  231:14,16
  240:10 241:8
  242:25 243:19
  244:7 246:1
  247:14,21,23
  251:7,13
  252:23 275:7
  276:5 283:2

issuing 121:11
item 38:22
  67:15 69:18
  87:6 197:17
items 38:24
  68:3,6 72:25
  106:22 111:14
  146:13 154:7
it's 150:18,20
  151:13 157:13
  159:2 160:7
  161:7 163:9,14
  163:23 164:14
  164:22 165:8
  166:1 167:17
  167:20,21
  168:16,21,23
  169:14 175:5,6
  175:7 176:9
  178:9,23,24
  179:10,10,12
  179:13 183:17
  183:25 184:9
  184:14,14,22
  185:16,16
  188:10,13
  191:7,14,17
  200:15 202:12
  209:1 211:22
  213:1 214:15
  220:5 221:2,6
  222:14,19
  223:1,7 224:22
  225:4,20
  226:20 231:6,6
  231:8,14 235:6
  237:4,8,17

238:5,5,18,19
239:2 245:11
246:3 248:3
249:12 250:4
251:8,9 253:24
254:16,18,20
254:21 258:11
258:11,19
259:5,10,12
262:1,2,7,13
263:7,7,11
264:7,15
268:15,23
269:8 270:6
271:4,6,16
273:21,21
276:11,16,21
278:3,9 279:4
279:24 280:20
281:9 282:24
284:2,8 285:9
286:2,2,4
287:20 290:22
291:1,3 293:6
293:6 295:19
296:2,2 297:2
301:4,5 303:10
303:17
iv 78:21
i'd 190:20
  236:19
i'll 155:5,17
  167:7 185:4
  197:19 198:22
  209:14 217:6
  228:3,14 232:2
  232:16 261:3

267:22 268:23
285:18 299:5
i'm 150:11,11
  151:12 152:23
  152:23 153:9
  153:19 156:22
  158:6,19
  159:17 162:16
  164:15,17
  168:9 174:2,3
  174:9,16
  178:19,19
  179:12 180:3
  181:15,15
  182:7 184:22
  188:4 210:7
  211:2 212:19
  214:4,24
  215:23 220:2,6
  220:12,13,17
  220:18,23
  223:20 224:13
  224:15,23
  225:12 227:3,9
  228:13 231:2
  236:2 237:17
  238:4 239:2
  240:5 243:9
  244:4,12
  252:13 257:16
  258:3,10
  259:11 262:21
  263:21,25
  264:18 266:5
  267:4,14,21
  268:1,19
  269:13 270:17

270:25 272:18
274:11,25
276:16 277:10
277:18 278:23
279:21 280:6
281:12,13
282:10,11
285:10 287:4
288:11,15,19
296:4,18
297:15 300:22
300:23 301:17
302:4,18
i've 167:4
  204:8 218:6
  235:22 237:23
  238:9,19 246:2
  246:20 271:21
  278:14,15
  285:20 288:4
  291:10 299:8,9
  299:10,16,17
  301:15,18,18
  303:2

## j

j 5:8,9
jackie 274:18
january
  176:12 270:13
jason 240:24
  241:1 255:11
  255:24 258:19
  258:22,22,24
  260:1,2 262:8
  264:4,12 286:6
  288:6,20
  291:18

**job**  257:7
  262:6 264:18
  293:22
**joe**  6:22 44:12
**john**  6:21
  233:4
**john's**  234:20
  235:4 238:7
  298:4 300:17
  303:19
**join**  214:12
  218:2 222:21
  223:21 259:16
**joinder**  3:14,18
**joining**  292:17
  292:18
**joint**  222:12
**jones**  7:20
  174:8,8,10,10
  174:11,12
  181:15,17
  182:4 288:2,2
  288:3,4,5,14
  288:16,20
  289:5 291:23
  292:3,5,6
**joseph**  6:22
  186:13
**judge**  2:23
  106:2 124:2
  182:5,21,23
  234:23,25
  236:24 237:4
  238:8,9 256:21
  279:25 283:7
  283:11 297:4
  299:14,15

**judgement**
  188:1
**judges**  237:23
  238:18 283:12
  299:9,17
  300:15 303:15
**judgeship**
  236:22 283:19
**judging**  303:3
  303:4
**judgment**
  53:18 75:8
  132:23 133:1
  135:9
**judicial**  22:11
  22:19 237:9
  283:17
**july**  181:2,6
  241:15 289:7,8
**jumping**
  168:25
**june**  176:3
  196:18
**jurisdiction**
  15:2 104:19
**jurisdictions**
  11:6,11,14,18
  11:24 13:25
  14:23 18:14,19
  19:11 126:8
  156:11
**justice**  6:9
**justifiable**
  274:4
**justification**
  90:1

**justify**  90:2
  278:20

**k**

**k&e**  46:7 53:16
  108:7
**keep**  122:24
  153:22 293:1
**keeping**  259:2
**keeps**  109:25
  143:17 159:25
**kevin**  218:3
**key**  37:20 77:2
  98:4 103:5,23
  103:25 106:20
  109:15 171:8
  176:9 183:19
**keys**  37:6,15,21
  37:23 38:1
  46:24 58:20,24
  59:9 143:20
**killing**  169:13
**kilpatrick**  7:1
  246:11
**kind**  11:21,25
  12:16,18,20
  13:16 14:10
  15:10 17:1
  18:16 19:4
  20:12 42:3
  44:7 48:1 69:1
  72:2,6 77:8
  89:21 103:8
  104:5,5 107:13
  125:15 144:14
  145:15 146:8
  146:24 153:5
  160:19 164:14

  164:15,15
  178:24 183:23
  185:2 188:1
  207:15 219:11
  243:11 255:23
  256:3 264:14
  295:23 296:2
  296:21
**kinds**  169:16
**kirkland**  5:11
  40:18 66:9
  108:8 197:18
  296:3 301:11
  301:23
**knew**  94:14
  148:3 258:24
  258:24 277:24
  278:4,5
**knit**  259:2
**know**  12:25
  13:1,15 14:2
  17:2 18:20
  20:2 27:25
  29:25 33:4
  35:14 38:9
  39:3,22 41:11
  43:25 45:24
  46:9,15,22
  47:7 48:18,18
  48:19 49:22
  50:4,10,10,16
  50:18,21,23
  52:9,12 53:1
  53:15,17 54:3
  54:4,7,9 55:21
  56:23 57:19
  58:2,7 59:6,8

61:9,23 62:5
63:8,16,24
64:20,21,23
65:22,23 66:12
66:17,20,23
68:5,11,20
72:12 73:7,10
73:11,13,18,22
74:8,8,24 75:5
75:15 76:13,15
76:21 77:5,11
77:21,22,24
78:8,8,9,13
80:8,12,15
83:1,3,6,13,15
83:20 84:10,16
85:7,25 87:6
87:15,17,25
88:21,23 89:9
89:14,18,21,24
90:3 92:19
93:15,17,19
94:9 97:22
98:4 99:8
101:3 102:15
103:21 105:9
105:24 106:4,5
106:24 107:4,5
107:6 108:2,6
108:8,22,25
109:1,11,20
110:7,14 112:9
112:16,22,23
113:9,11,20
114:3 115:20
115:24,25
116:20 117:4,7

117:11,18,23
117:24 118:22
118:23 119:11
119:14,22
120:2,16
121:12,24
122:3,4,8,11
122:17,21
123:5,7,21,24
124:1,11,13,16
124:18,20,21
125:3,3,9,15
126:12,22,23
127:7,22
128:16 129:5
130:22 131:3
131:16,17,24
132:2 133:6,6
133:10 135:9
137:24 138:6
138:11 139:1
140:14,18
141:1,2,19,22
144:13 145:20
146:8,12,13,14
146:23 147:8,9
147:12,14,15
148:12,19,21
149:8 150:17
150:18 151:3
154:20 155:6
155:10,25
156:19 157:3
157:16 158:9
160:5 161:4,12
163:8,20,24
164:12,12,14

164:14 165:1
165:12 167:22
169:1,2,10
170:5,8,12,18
171:6,16
174:22,24
175:4,14,17
176:6 177:7
178:14,22
179:16,21
180:10,13,16
182:20,25
183:18 184:3,5
184:14 186:3
190:25 195:25
197:16 198:8
206:4,5,5
211:25 212:1,7
214:23 217:2
220:2 222:3,11
225:8,25 226:1
226:11 228:12
231:13 236:23
236:23 240:11
241:18 244:8
244:13 247:25
250:15,16
251:25 255:18
255:18,20,23
258:13,14,16
258:25 259:1,3
260:23,24,25
261:17 263:5
264:4 268:9,12
270:6,7 271:7
278:4 280:13
281:10,12

282:1,12 283:8
286:19,24
290:14 292:7
295:19,24,25
296:23,23
299:14 300:17
301:4 303:13
**knowing**
130:16 259:4
**knowledge**
35:18 47:15
50:18 52:25
91:12,15 96:14
131:4 146:9
191:2 245:7
251:2,23
268:18 269:1
277:1 278:19
284:23 289:19
**known**  49:17
105:22 113:17
120:5 130:1
158:23 192:7
230:17
**knows**  28:6
255:21
**korean**  28:10
**kyc**  27:17 28:3
28:20 33:17
34:14 42:13
79:20 80:5
125:8 153:5,23
155:20 200:5
**kyt**  27:18,24
28:3,24 29:17
125:8 126:3
128:25 131:7

**l**

**labeled**  129:25
  188:19
**lack**  26:10
  73:25 97:3
  128:9 226:5
**ladies**  114:12
**language**  21:2
  21:8 246:19,24
  250:15
**large**  29:12
  31:9 38:11
  105:22 117:20
  120:5,21 122:3
  183:22,25
  233:25
**largely**  10:15
  10:16 39:3
  57:3 66:17
  68:10 72:20
  240:1,7
**largest**  31:11
  121:21 122:17
  176:4 238:17
  242:1 260:10
**late**  42:8
  201:11 275:8
  289:8 292:22
  295:19
**latham**  5:3
  11:9 144:22
  213:24 216:3
**latitude**  249:11
**laundering**
  42:6 156:25
**laundry**
  249:18

**law**  11:22
  14:20 28:21
  234:18,20,21
  234:22 235:7
  238:7 239:19
  240:4 242:2
  245:25 255:12
  255:25 258:20
  258:21 259:25
  278:17
**laws**  14:10
  234:19
**lawsuits**  92:19
**lawyer**  50:9
  74:24 97:23
  258:20 288:7
  288:21
**lawyers**  95:18
  108:13 278:15
**lay**  253:8
**layman**  148:21
**lead**  137:21
**leading**  39:6
  48:20 127:12
  151:2 202:11
**leads**  49:7
**leakage**  25:21
  26:2,3,7 30:22
  31:19 101:24
**learn**  82:14
**learned**  53:17
  56:1 77:15
  91:22 96:17,21
  163:18 286:11
**leave**  156:6
  168:2 296:10
  296:16,17

**led**  61:14
  259:20
**ledanski**  4:25
  305:3,8
**left**  15:6 67:24
  81:15 157:10
  163:24 275:9
  275:16
**leg**  126:2,2
  290:6
**legal**  46:20
  73:18 76:11
  83:19 84:10,14
  87:8 90:23
  108:3,5 184:21
  189:6 226:15
  246:1 281:11
  283:2 299:7
  305:20
**lend**  36:7
  143:19 191:11
  191:15,22
**lending**  191:24
  192:2
**length**  11:1
  140:25 174:21
**lengthy**  29:23
  30:2 286:23
**lenient**  275:2
**lessons**  286:11
**letter**  39:1 42:1
  42:4,4 68:15
  121:11 139:4
  140:24 141:10
  156:21,23
  157:3,4,9
  167:23 201:6

  201:15,17,20
  201:24 202:15
  202:22,25
  203:8,16 285:6
**letters**  41:6
**letting**  99:8
  151:15 260:23
  260:25
**let's**  157:6
  162:7 164:20
  165:8 169:9
  171:15 173:15
  178:17 182:2
  191:4 200:17
  209:5 210:5
  218:23 233:3
  234:14 236:17
  236:19 238:11
  259:10 264:21
  264:22 272:3
  298:21 302:14
  302:22
**level**  36:21
  37:23 90:13
  163:12,21,24
  165:24 177:17
  187:21 251:4
  287:22
**levels**  120:22
  124:14 149:3
**lexington**  5:13
**liabilities**
  161:21 162:2
  162:17
**liable**  3:12
**license**  110:13
  153:23

**licensing**  34:16
  110:12
**lie**  180:25
**lifespan**  280:8
**lifetime**  299:17
**light**  54:25
  62:12 107:19
  136:8 157:11
  170:21 175:25
  184:2 275:1
**lightly**  74:14
  127:5 128:5
  149:10
**likelihood**
  90:11 100:24
  113:7,23
**likely**  26:14
  30:3,7,23 32:2
  40:24 71:20
  112:14 113:3
  152:12 157:24
  157:25 158:13
  177:4,7 179:8
  179:9 240:17
**limit**  87:16
  88:7 163:12
  177:18 179:8
  272:8
**limitation**
  130:15 272:13
  277:8,11
  293:15 294:24
**limitations**
  27:16 29:3,4
  103:9 228:22
**limited**  24:12
  103:14 110:19

130:3 163:14
  221:17 231:18
  246:13
**limits**  200:23
  274:1
**line**  16:21
  44:13,17 47:9
  48:19 80:16
  102:16 151:22
  162:20 202:10
  228:3 254:13
**lines**  164:8
  170:20 212:1
  220:6 258:17
**lingo**  148:22
**link**  204:5
  286:24
**liquid**  176:18
**liquidate**  30:20
  30:21 99:13
  100:1,10 101:1
  103:18 117:20
  180:7,14
  271:17
**liquidated**
  104:12,13,13
  104:14 150:8
  160:6,7 179:25
  180:9
**liquidates**
  99:24
**liquidating**
  41:14 71:13
  84:7 87:21
  88:20 96:6
  99:12,14
  103:25 123:4

148:7 149:7
  175:17 187:16
  208:24 235:10
  244:7 245:13
  261:10
**liquidation**
  26:15 30:12
  40:15 44:5
  99:15 100:22
  101:21,22
  103:23 104:1,2
  112:23 115:12
  115:13 116:9
  116:23 119:12
  123:4 125:10
  147:25 167:20
  168:19 177:13
**liquidations**
  103:20 148:10
  175:20
**liquidity**  33:16
  34:2 44:5
  117:21
**lisa**  7:23 182:8
  301:9
**list**  22:2,16
  25:2 28:14
  108:21 112:7
  114:4 212:12
  249:18
**listed**  46:15
  112:14 113:13
  113:19,22
  129:23 252:7
**listen**  147:12
  147:14

**listened**  61:4
**listening**  32:10
  32:17 123:13
  149:17 151:18
**lists**  239:15
  298:20
**literally**  175:18
**litigate**  293:24
  293:24
**litigating**
  252:12
**litigation**  3:4
  91:7,14 97:17
  184:24 245:24
  254:2
**litigations**  92:2
**little**  20:11
  49:8 65:11
  90:16 125:17
  161:1 173:24
  189:17 211:14
  225:9 228:18
  236:22 238:11
  249:10 302:10
**live**  12:10,19
  16:21 274:9
  279:3,13
**llc**  149:14
**llm**  234:20
  235:3
**llp**  5:11 7:1
**lo**  299:11
**loan**  168:9
**loans**  106:19
  106:24 107:1
  107:10,18

**local** 237:12
**locally** 283:16
**located** 234:1
  263:23
**locked** 260:15
**lodge** 55:5
**log** 9:5 274:18
**logically**
  137:21
**logistical** 41:13
**logistically**
  208:21
**logistics**
  160:19
**long** 17:13 18:7
  19:13 20:18
  52:6,12,13
  77:6,11 94:6
  98:5 118:18
  123:25 124:2
  135:9 148:1
  169:5,7,9
  171:9,20 179:7
  256:24 260:1
  271:14 283:22
  298:7
**longer** 14:2
  15:1 52:11
  110:21 199:7
**longwinded**
  171:24
**look** 13:15
  42:10 58:3
  63:9 86:15,19
  88:11 89:7
  96:9 100:4
  108:20 109:6

109:20 131:11
131:16 140:24
148:10,11,24
150:24 155:13
157:14 159:2
160:20 161:11
161:14 164:2
165:19 170:19
180:16 184:14
187:25 236:17
250:9 253:23
253:25 257:22
275:24 283:18
283:21
**looked** 42:12
  63:1 106:20
  108:22 166:19
  174:23 193:12
  193:17 232:6
**looking** 64:2
  65:21 74:22
  88:18 91:13,19
  98:12 121:25
  150:15 174:2
  176:3 214:11
  273:24
**looks** 114:6
  171:7 283:13
**lorraine**
  303:24
**lose** 168:13
  184:25
**loss** 124:9
  160:8
**lost** 17:5 168:3
  180:21

**lot** 9:25 14:13
  19:7,17 20:18
  42:15 65:5
  70:22 73:9,13
  85:5,5 86:2
  88:23 97:12
  99:7 108:13
  111:6 113:13
  117:21 119:15
  121:20 122:4
  143:5 144:14
  145:12 147:2
  147:12,14
  148:9 149:1,11
  150:18 165:5
  169:1 171:2
  176:1,8 180:14
  186:19 189:14
  204:7 205:23
  208:7 226:4
  239:11,12
  240:2 241:23
  243:8,9 258:24
  259:6 282:16
  284:19 288:22
  290:19 298:23
  299:8,9
**loud** 16:15
  20:21
**low** 90:12
  118:20 146:25
  177:5,8 302:18
**lower** 190:18
  190:21 208:24
**loyola** 234:18
**lunch** 131:24
  300:16,19,20

300:21 301:5,6
**luncheon**
  142:25
**lunchtime**
  114:20,22,23

## m

**m** 7:6
**m&a** 51:9
  57:20 64:8
  69:7,7 154:8
**m3** 123:18
**made** 10:3 32:1
  32:2 34:11
  35:15 38:14
  40:13,16,21,24
  53:19 58:14
  61:5 66:12
  68:23 69:12
  71:10 75:6
  82:1 92:16
  103:13 105:7
  106:7,19 107:1
  107:10,18
  111:2 120:10
  126:21,22
  127:9 145:18
  149:9 154:10
  157:15 169:16
  187:12 189:19
  191:18 193:4
  194:3,8 195:22
  203:8 205:3
  206:9,25 207:4
  207:5,16
  216:10 229:13
  229:14,15
  230:22 247:20

259:8 277:25
292:16
**magnitude**
30:5
**main** 49:25
**maintain** 35:23
**maintained**
126:19 286:24
**maintaining**
163:16
**maintains**
128:14 143:15
**major** 93:14
284:2
**majority** 37:23
104:3 117:20
241:9 257:24
258:8,14 291:3
292:8,18
**make** 10:25
11:2 15:23
17:24 18:3,5
18:21 21:4
28:8,18 32:6
40:21 58:19
67:4 68:22
71:13,24 91:13
93:21 98:3
109:18 117:5,8
127:20 136:11
136:11,20
151:17,18
154:23 160:4
163:6 164:4
167:16 174:2
175:13 176:21
179:7 185:25

188:1 193:6,15
193:24 212:18
215:15 217:17
220:10,12,13
223:20 225:5
226:15 229:23
253:25 254:1
255:10 257:2
261:13,21
262:5 275:4,8
279:10,22,25
280:2,13
294:25 297:6
297:13 298:19
298:21 303:12
303:16
**maker** 27:10
66:20 129:18
129:23,25
199:4
**makers** 27:11
30:25 31:4,11
66:22 115:22
121:25 129:10
175:18 176:23
**makes** 19:11
258:12 283:24
**making** 31:12
40:17 91:9
105:2 127:14
165:25 168:13
181:7 204:18
**malionek** 5:9
216:2,3,25
217:11,13
219:24,24
222:10,10

223:18,18
225:12 226:13
227:11 231:1,1
**man** 16:6,10,17
**managed** 179:4
**management**
26:24 29:10
53:17,21 54:16
56:7,17 61:2
88:21 115:19
115:25 126:20
163:18 164:6
**manner** 64:21
104:16 108:15
111:11 123:21
273:20 276:14
**manual** 88:22
**manually**
130:12
**manuals** 34:14
**march** 2:5
78:18 156:20
157:5,7 158:16
159:1 305:25
**margin** 191:9
**marginal**
117:25 118:4
**mark** 6:14
41:21 202:7
**market** 15:16
19:21 27:10,11
30:24,25 31:4
31:11,12 54:25
66:20,22
115:22 117:12
117:24 118:17
120:16 121:9

121:16,22,25
123:6 124:7
129:10,18,23
129:25 141:1
150:21,22,25
151:5 152:13
154:5 175:18
176:20,23
177:19 178:16
179:2,6,15
180:20 199:4
**market's**
120:18
**markets**
121:17,19,20
121:20 176:19
**marshal**
175:19
**master's**
234:19
**material** 41:11
83:2,4 88:2,13
88:24 91:23
95:24 96:8,12
97:16 108:5
121:23
**materially**
91:16 103:24
190:15,16,22
**materials**
139:2
**math** 168:5
**matter** 1:5
108:5 183:6
210:1 214:10
243:18 304:3

**matters** 57:10
  87:8 93:4
  94:23 108:3
  143:6 152:2
  202:3 243:4
  266:23
**matthew** 5:24
**maximize**
  100:6 123:23
  135:5 147:18
  175:11 176:6
  271:18
**maximizing**
  154:21 160:24
  171:11 175:13
  180:18 208:12
  272:1
**maximum**
  13:13
**mcdermott**
  6:16 40:23
  66:9 108:9
  186:14 197:18
  233:5 242:7,8
  242:9 255:25
  256:22 257:20
  258:23 260:21
  261:2 288:13
  288:24 289:2,8
  289:24 291:12
  294:23
**mean** 9:25 10:2
  39:21 45:25
  57:12 60:11
  72:9,10,23
  85:4 88:19
  92:24 98:8

102:10 105:22
  108:12 127:6
  127:19 132:18
  132:24 137:7
  138:23 143:25
  144:7 153:10
  182:25 183:1
  183:17 197:16
  206:20 257:12
  259:5 275:22
  296:20
**meaning**
  258:11
**meaningful**
  11:3 18:9
**means** 26:21
  54:4 117:12
  124:24 159:8
  163:14 191:21
  254:20 265:25
  279:22 293:8
**meant** 26:19
  72:24 178:1,1
**measure**
  178:25 244:5
**mechanics**
  155:15
**mechanism**
  155:9
**media** 41:5
  147:15 197:1,3
  211:15
**meet** 37:23
  70:18 241:14
  241:24
**meeting** 38:11
  46:14 66:25

162:25 197:25
  198:4,8 244:12
  244:19,24
  261:4 267:3
**meetings** 35:6
  45:15 53:23
  54:18,19 55:4
  55:17 56:21
  63:3,10,13,17
  63:18 66:5,5,8
  111:13 162:22
  163:5,7,9
  164:21 197:20
  207:17 242:18
  242:21 243:2
  247:7,11
  265:23 291:11
**meets** 241:6
**mega** 284:2
**member** 46:4
  238:23 239:1
  245:2 256:17
  257:13 286:19
  290:22,23,24
**members** 56:6
  94:12 237:12
  243:23 244:2
  244:18 257:3
  257:13,14,15
  258:16 260:25
  261:1,8,15
  263:18 265:22
  288:8,24 289:1
  289:23 290:2
  290:22 291:2
  292:9,12,14

**memberships**
  238:12
**member's**
  290:23
**mention** 92:24
  100:21
**mentioned**
  10:22 11:1
  23:10 35:12
  46:11 47:20
  53:2 59:8
  70:13 77:20
  80:5 115:21
  116:2,21
  148:19 149:18
  167:1 212:22
  218:12 251:6
  256:15 280:3
**mentioning**
  297:18
**merit** 30:16
  38:13 41:4
  46:12 65:14,24
  67:8 68:11
  196:25 197:5
  197:19 198:2
  198:18,25
  199:3,7 237:11
  237:15 276:10
**merits** 252:12
**message**
  204:12,14,21
  204:24 205:6
  205:11,11
**messages**
  211:15

**met**   52:3 53:20
   241:20,21
   242:11,15
   289:6
**method**   187:13
   271:21 291:20
   291:24
**methodology**
   271:7
**mew**   1:3,9,17
   3:1,7
**michael**   2:22
**michelle**   3:20
**michigan**
   233:24 234:4,5
   234:18,24
   235:5 263:23
**microphone**
   16:4,12 102:15
**microsoft**
   110:17
**mid**   150:3,16
   151:1 152:11
   184:1 289:7
**middle**   214:23
   220:1 225:14
   289:10
**midwest**   234:2
**migrate**   79:23
   89:1 155:17
   156:5,9 200:15
**migrated**   82:8
**migration**
   80:11 82:16
   84:19,23 85:1
   85:18 86:1,4,8
   86:16,18

   155:12,18
**migrations**
   89:4
**mike**   5:17
   21:16 144:5
   221:22 232:7
   295:19
**milestone**
   78:17 158:24
   297:11 298:8
**military**   37:24
**million**   25:25
   26:1,3,3,6,7,13
   31:19 41:9
   42:22,25 43:14
   43:20,20,23,25
   44:1,2,4 61:21
   71:19 77:8,22
   116:8,12,16,17
   116:18,24
   117:5,9,11,18
   120:24 121:6
   123:2,6 124:18
   124:18 135:13
   135:14 139:13
   140:1,2,2,3,4,7
   140:22 141:7
   141:15,16,17
   141:17,19
   142:6,8,12,15
   142:15,17,19
   142:20 149:23
   149:23 152:4
   159:12 160:7,8
   167:16,17,25
   168:3 171:16
   174:13,18

   175:4,5 176:14
   177:11,20,22
   177:24 178:21
   179:22,24,24
   180:1,6,8,8
   184:17 197:4
   209:7 219:8,9
   276:23 292:24
**millions**   30:8,8
   119:22 120:21
   120:22 121:1
   160:5
**mind**   32:14,23
   55:1,13 65:13
   76:1,14 84:21
   96:19 114:15
   148:11 180:3,5
   236:25 249:10
   265:15 284:3
   293:1
**mindful**
   263:21
**minds**   29:24
   75:5 102:7
   177:4
**mine**   147:8
**mineola**   305:23
**minimize**
   30:22 101:24
   124:3 200:7
**minimum**
   131:20
**minimums**
   151:23
**minute**   18:8
   81:8 220:10
   299:3

**minutes**   17:5
   39:6 81:9
   121:24 210:6
   210:13 257:23
   261:4 262:22
   263:2 274:21
**misapprehen...**
   228:17
**mismanagem...**
   270:11
**misquoted**
   281:1
**misrepresent...**
   177:25
**missed**   69:23
   138:5 169:24
   282:18 302:17
**misstated**
   142:1,3,7
**mistaken**
   116:12 150:4
**misundersta...**
   269:8 276:19
**mixed**   299:13
**modifications**
   10:25 280:13
**modify**   20:5
   280:10
**moelis**   38:12
   40:18 46:4,6
   46:14,16,18,25
   47:5 50:22
   53:9 55:20
   57:6,9,13,22
   57:24 58:8
   59:2,21 66:7,8
   71:5 75:7

88:19 109:2
115:25 117:7
123:17 139:7
162:25 189:15
197:12,13,14
197:17 198:6
201:18 207:5
**moment** 81:8
215:16 261:7
261:11
**monday** 78:19
158:15 159:6
221:5,12,13
297:4,7,8,13
298:3 300:2,5
300:6,11,13
303:5,23,25
304:1,1
**monetary**
76:20
**monetize** 82:12
**money** 34:16
42:5,6 76:17
150:8,11
156:24,25
171:13,17
259:2,8 260:18
268:6 271:23
274:2 276:3,12
**monitor**
200:22,22
266:4,8
**month** 12:3
14:1 15:25
35:8 77:9,22
81:24 82:9
155:2 156:6,10

165:12 176:15
179:11
**monthly** 139:7
140:9,15,17
**months** 11:7,8
11:13,23 12:2
12:13,13,20,21
13:3,21 15:14
15:18,22 19:1
19:2,6,13
29:20 80:20
81:18 85:20
131:21,22
133:8 141:8
155:1 160:4
180:21 199:15
241:10 252:5
284:22
**moot** 238:2
240:12 297:5
**morning** 21:14
21:15 33:6
39:6,9,10
41:25 45:7
67:22 68:18
157:12,15
158:5 201:18
202:20 203:17
203:21 204:7
204:10,11,17
205:24 211:23
221:14 300:18
303:8 304:4
**morrissey**
210:4,9,18,24
211:5,8,9,10
211:11 212:4,7

212:11,17,25
213:1,6,13,17
217:21,21
**motion** 3:2,12
3:14,16,18,20
4:1 267:5
285:3 294:6
**motions** 4:5
**motivation**
283:24
**move** 25:22
32:7 36:4 37:6
37:7 41:1
43:21 57:4
58:23 59:19
74:9 75:17
76:25,25 78:10
78:14 79:14
86:23 88:15
89:5 101:6
104:20 124:7
125:6 131:23
131:24 138:14
139:18 151:6,6
157:16,23
173:12 179:18
179:19 184:8
187:1,5,9
194:5,25
195:11,14,15
207:2 208:15
209:4 221:21
231:5 234:15
236:11 273:16
297:10 302:7
302:10

**moved** 90:19
90:20 96:2
103:19 124:20
206:11 235:4
300:18
**movement**
152:13
**movements**
177:18 179:2
**moving** 40:9
75:9 77:12
90:3 96:1,4
105:13 149:3,5
157:19 160:7
161:2 179:15
184:8 203:14
204:16 206:18
209:24 282:16
**mtl** 34:20
**multi** 35:8
77:20 120:23
121:22 124:25
131:18 165:12
208:20
**multiple** 31:4
31:14 33:18
37:5 42:14
45:24 53:3
61:2 63:3,3,10
63:17,17 66:4
93:3 111:12
115:22 122:13
122:19 123:16
138:21,21
194:12 195:4
208:21 245:14
256:12 257:6

263:10,11
282:23 293:7
**multiples**
135:8
**mute** 102:16
**mutually**
106:14
**mystery** 15:19
219:17

**n**

**n** 5:1 8:1 9:1
305:1
**n.e.** 5:21
**name** 23:25
49:13,15 99:3
132:9 146:1
152:19 163:2,3
182:8 233:13
255:6,14
**names** 99:8
**nanosecond**
85:22
**narrower**
278:11
**narrowly**
225:1
**national** 238:1
**nature** 46:21
47:16 49:17
59:24 60:23
61:9 62:21
66:3,10 68:23
70:1 77:10
93:1,16 94:25
95:2,4 97:8,12
100:20 109:22
116:25 123:18

123:22 138:13
147:2 148:15
176:5 180:12
186:2,4 193:15
197:9 206:22
208:3 230:12
246:21
**nay** 291:15
**necessarily**
90:6 102:8
132:19,20
155:9 165:10
170:10,24
178:1 206:21
270:7
**necessary** 29:8
276:4 303:14
**necessitate**
75:19
**need** 20:1,4
23:12 27:13
68:12,17 70:20
71:23 72:5
73:19 74:19
78:7 80:6,10
80:16 84:21
85:21 100:7
104:8 110:17
152:3 157:18
158:3 167:21
177:15 203:9
207:7 208:8,20
216:7,21 217:2
218:24 224:2
235:17 248:12
254:22 274:18
274:19,20

293:4 295:4
296:6,6,8,16
296:24 302:13
302:21,24
**needed** 124:23
167:1 171:15
242:4 258:20
**needs** 20:9
70:15,19,22
124:24 125:1
208:17 227:8
**negative** 124:3
127:6,18
**negotiate**
75:14 141:24
263:14 275:21
275:23
**negotiated**
118:20 140:25
141:3 154:3,16
174:13,18,21
177:1 199:13
246:2 272:22
**negotiation**
75:15 154:8
207:25 274:8
**negotiations**
172:11 251:13
251:21
**neither** 228:20
**never** 27:7
127:7 129:7
141:20 145:19
167:8 190:9
244:8 259:7
290:21 299:5
300:6

**nevertheless**
19:5
**new** 1:2 2:3 5:6
5:14 6:12,19
7:4 13:23 15:5
15:10,10,13,16
15:17 35:16
71:11 74:1
79:14 106:8,10
106:16 125:7
131:15,19
152:8 157:14
170:12 218:4
221:13 228:9
234:21 235:1
263:24,25
284:20 300:16
**newco** 170:13
**news** 68:19
157:9
**newsom** 7:17
111:21,21,25
114:7 265:7,7
265:9,10,20
266:2,9,25
267:1,8,18
268:8,22 269:5
269:12
**nigh** 239:12
**night** 39:4 42:8
117:12 121:9
121:11,16
157:11 179:21
201:11
**nights** 252:19
**nine** 131:22
160:4 180:21

**nominally**
    17:18
**nominated**
    256:1
**non**   95:18
    104:4 220:23
    230:13 264:20
    266:16
**nonamended**
    91:6
**noncompliant**
    78:5
**noncontrove...**
    21:18
**normal**   50:5
    97:9 208:2
**normalized**
    112:20
**normally**   208:4
    237:18
**north**   28:10
**nos**   4:9 22:17
**note**   162:3
**noted**   245:12
    251:25 256:23
    260:1,5 275:21
**notes**   94:7
    152:24 161:18
    174:2 222:11
**nothingburger**
    296:22
**notice**   22:7,11
    22:19 82:23
    189:1,2 227:10
    273:25
**notification**
    16:2

**notwithstand...**
    206:14 303:24
**novel**   284:5
**november**
    292:22
**number**   9:11
    16:20 21:17
    25:11 30:9
    31:11 37:8
    42:12 43:15,15
    47:25 54:24
    92:3 95:7,15
    113:14,19
    115:17 116:2,5
    120:4 123:2
    130:11,11
    131:6 138:9
    141:8 150:1,13
    150:16 151:3
    154:7 157:11
    163:20 170:2
    173:24 174:1
    176:24 177:22
    179:23 180:7
    188:11 197:20
    203:5 207:12
    227:19 235:23
    239:16 275:1
    277:5 286:2
**numbers**   77:24
    77:25 116:15
    117:1 119:21
    123:1 141:11
    151:10,11
    168:16 178:14
    184:1 209:20
    209:22 260:25

**numerous**
    54:24 59:4
    63:2 270:19
    278:14
**ny**   2:3 5:6,14
    6:12,19 7:4
    305:23

**o**

**o**   2:21 9:1 48:7
    305:1
**oath**   185:2
**obfuscate**
    123:21 124:12
**object**   43:9,16
    60:18 61:16
    75:21 83:18
    90:22 92:8
    97:3,18,20
    128:9 133:12
    135:16 181:13
    184:20 185:14
    210:22 221:23
    222:4 226:1
    231:24 248:17
    252:10 254:7
    259:13,14
    264:17,23
    265:14,17
    266:15 271:3,5
    282:1 292:9
    295:2
**objected**
    199:22 258:15
**objecting**
    246:14 267:9
    267:10

**objection**   4:3,6
    4:8 24:19
    43:12 55:6
    85:4,10 135:21
    141:25 185:4
    198:21 210:10
    217:22 218:2
    223:21 232:19
    244:13 254:16
    254:19 265:24
    266:1 268:19
    269:7,14 270:6
    270:8 282:14
    285:2,15,17,20
    287:6,15 295:5
**objections**   3:22
    4:13 9:11 10:5
    17:14 25:3
    183:1 198:20
    202:14 219:19
    223:15 229:14
    229:15 232:22
    236:13 246:16
    260:4 266:11
    266:13 285:21
**objective**   12:14
**objectives**
    270:23
**objectors**
    223:12 224:17
**obligated**
    132:2
**obligation**
    273:7
**obligations**
    97:25 98:2
    176:25 266:23

obstacle 15:6
125:7,10
126:17 128:16
129:2
obstacles
115:10
obviously
13:18 33:2
66:14 70:22
88:1 95:22
96:8 97:22
107:19 109:14
116:21 137:7
141:5 144:6
146:21 149:13
157:11 175:25
176:1 181:8
183:23 202:2,4
203:8,25
208:25 210:18
217:24 222:7,9
222:20 260:23
occasionally
214:25
occasions
237:3 245:12
245:14
occupation
233:20
occur 14:25
27:14 70:24
73:3 100:7
103:12 129:12
129:16 135:4
139:21 200:9
208:20

occurred 60:13
76:19 82:6
133:8 144:11
178:17 200:25
201:1
occurring 33:5
73:5,11 126:14
130:1,4 177:7
179:5
occurs 88:22
130:4
october 244:19
270:12 292:22
odd 9:23 120:7
145:12,13,16
offer 21:17,21
22:3,14,24
24:18,25 102:9
135:1 159:21
201:23 209:3
223:22 229:4
231:21 232:8
offered 27:7
159:19 223:7
231:3 232:3
302:1
offering
120:18 160:10
230:18
office 6:1 98:23
156:21 260:12
289:18
officer 164:20
232:8
officers 3:5
47:24 281:19

officer's
216:12
official 4:8
211:2 260:22
officially
184:23 229:20
offsetting
66:19
oftentimes
57:19 61:23
69:5,10,14
141:3 163:13
oh 51:23 99:23
173:14 182:25
215:21
ohio 12:12 13:1
14:4,9 15:18
304:3
okay 9:8 10:22
17:6 20:19
21:19 23:2,8
23:15 24:21
25:11,19,20
26:17 30:5,10
30:17 31:19,23
32:9,17 33:9
34:3,6,12,15
34:18,22 35:17
35:20,22,23
37:10,15 38:3
38:24 40:6,12
41:2 42:10
44:8 45:4
65:15 81:11
91:2 98:20
99:6 100:14
101:9,14

104:24 105:13
105:17,24
106:3,4,17
107:25 110:24
111:10,23
114:7,13 115:4
116:14,16,23
117:2 119:10
119:25 120:10
125:6 128:15
133:9 136:23
138:23 139:10
139:17 140:3,6
142:5,9,21,24
145:9,21 146:3
146:4 151:8
156:20 158:14
159:14,23
161:10,17,17
161:17,24
162:19 164:8
167:3,14,14,24
168:20,25
172:1,16 173:2
173:14,23
174:1,3 181:20
181:22 182:2
182:21 183:10
184:15 185:16
185:18 186:10
188:2,4,22
189:14,25
192:5 193:10
193:23 195:16
196:3,15
198:17,22
199:16,21

201:14 202:13
203:1 207:21
209:20 210:3,6
210:23 212:6
218:6,18,25
219:1,15
220:11,14
221:23 227:16
228:2,5,15
229:19 231:12
231:19 233:8
233:16 234:8
235:22 236:1,7
237:25 239:4
240:5,9,15,23
241:2,24
242:11,17
243:6 244:23
245:4,8 246:4
247:3 249:9,12
250:10,14
251:8 252:6
254:4,24 255:8
255:14,17
257:2,11
261:21 262:1
264:14 265:1,5
265:9 266:19
267:21 269:16
269:20 277:7
277:15,17
278:11,12
281:3,7,17
282:16 283:5
286:2 287:25
288:3 289:4
291:18,24

294:13 295:16
297:1,17
298:21 300:6,7
302:16,24,25
304:1,8
**okike**   5:16 79:1
79:3,6,9
158:23 159:9
213:10,18
**old**   305:21
**omnibus**   73:8
**onboard**   29:18
**onboarded**
200:1
**onboarding**
28:3
**once**   14:25
22:18 45:9
58:25 59:1
82:20 130:4
199:25 231:24
279:24
**ones**   122:19
147:13,14
**ongoing**   62:19
67:18 68:8,25
74:3 83:11
92:13,17 94:11
95:20,23 97:16
130:5 201:15
251:20,24
**online**   86:19
150:5
**onset**   77:3
146:15
**opaque**   157:2

**open**   13:20
16:23 68:2
153:4 156:5
296:11,16,17
**opening**   115:9
**operate**   56:7
62:19 63:5
73:19,20 90:17
110:11,18,20
163:14 164:1
165:17 171:3
175:10 186:7
**operated**   129:4
**operates**
126:20
**operating**
152:9 230:21
**operational**
41:13 70:20
160:19
**operationally**
71:22 184:10
**operations**
62:22 68:24
208:3
**opine**   50:14
53:24 87:8
**opinion**   30:10
97:19,22 113:4
148:25 184:16
184:17 190:17
254:20,21
281:25 282:11
**opinions**
230:13 256:10
**opportunity**
11:3 13:5

14:18,22
120:13 210:11
222:1 273:13
**opposed**   43:15
55:8 72:6
74:19 244:25
267:7
**opposite**
153:17 193:3
**optimize**
177:17
**option**   31:21
40:15 74:4
75:12 87:21
125:12,12
135:10 136:17
137:22 157:21
160:2,9,11
161:14 167:17
168:2,13,15,18
208:22,25
**optionality**
75:6 208:12
**options**   71:3
76:16 147:21
176:22 207:9,9
208:13
**orally**   111:11
207:17
**orange**   48:7
**order**   17:16,20
21:3 22:8 27:1
27:4 29:12
30:3,5,21 31:5
70:16 78:18
88:25 101:2
109:18 123:23

128:23 129:17
132:4 134:16
138:9 157:18
158:15,24
159:3,5 165:13
171:16 172:22
175:12 229:22
297:11
**ordered** 211:3
**organization**
50:3 51:5
72:12 126:17
165:21 193:5
238:17,19
239:2,10
**organizational**
36:10
**organizations**
51:10 163:23
**organize** 290:1
**organized**
290:3 297:6
**original** 81:5,6
128:13 135:12
200:13
**originally**
180:22
**originate** 127:8
**originators**
126:15
**otc** 30:24
115:22 118:17
129:10,23,25
**other's** 255:23
259:11 264:22
**ought** 17:24
227:9 294:22

**outcome** 83:13
140:8 171:12
177:18 267:13
267:17,20
**outline** 132:17
183:19 217:14
**outlined** 33:13
38:9 42:12,16
45:23 66:4
71:18 80:11
106:23
**outside** 50:5
78:8 143:20
164:24 166:8
184:13 213:12
249:11
**outstanding**
82:17,22
206:20
**overall** 46:2
121:8 192:16
270:8
**overcapitalize**
190:19
**overcome**
126:17
**overhead**
171:1
**overrode** 134:2
**overrule** 142:1
232:19
**overruled**
55:11 92:10
128:10 135:20
285:17
**oversight**
243:23,24

244:3,10
256:17 262:4
262:10,15,19
262:24
**overview**
106:23
**overwhelming**
74:22 75:11
76:14
**own** 27:12
118:18 124:23
131:10 132:15
145:4 167:8
181:23 184:17
209:1 256:9,13
286:11
**owned** 36:15
36:16 124:22
150:20
**owner** 36:17
**ownership**
118:2 162:8
193:5
**owning** 124:21
**owns** 36:14

**p**

**p** 5:1,1 9:1
**paces** 5:21
**pack** 292:17
**packages** 290:2
**page** 8:9 84:22
84:24 188:18
188:19,25
239:15,23,23
239:23,24,24
239:24 248:15
256:11

**pages** 23:1
24:9 52:8,8,11
52:15,15 239:5
240:6,6,6
**paid** 85:15,15
136:7,13,14
139:8 166:12
177:3 180:2
**pain** 147:17
**painful** 278:21
**palo** 36:13
**panel** 237:11
237:15
**paragraph**
21:3 57:9 65:8
65:16,19,20
72:7,18 85:10
91:4,20 101:19
**parallel** 29:22
168:23
**paramount**
146:16 270:22
**pardon** 287:6
**part** 13:11
14:20 19:20,25
28:25 42:15
45:20 46:2
61:13 77:14
105:25 109:16
112:25 113:7
113:16,21
119:19 122:3
122:11 123:11
126:7 128:15
133:9 147:20
162:24 163:15
164:21 172:13

182:15,17,20
182:24,24
183:25 189:22
200:7 201:5
206:14 216:18
220:7 221:11
230:11 245:11
255:19 259:10
263:5,14,19
264:1 272:21
276:22 282:25
284:15 287:5
287:15
**participants**
122:17
**participate**
46:13 132:18
170:17 217:25
222:7,19
289:12 297:4
298:17
**participated**
66:9 93:3
96:14 175:19
175:23 241:8
241:12 247:11
286:22 299:10
299:12
**participation**
45:14 298:20
**particular**
65:24 66:11
81:16 119:20
123:2 247:24
282:19
**particularly**
223:10 289:13

**parties** 11:21
19:12 28:19
31:14 62:16
67:4 71:8 75:7
88:18 89:2,5
92:15 93:15,21
94:2 101:6
106:25 107:2,7
107:15 108:14
113:11 119:15
122:13,15
123:13 127:23
130:2 131:15
132:18 138:2,5
138:15 141:1
156:10 158:9
163:14,20
169:22 173:24
190:12 191:16
196:5,22
214:13 217:3
220:21 221:7
225:2 232:1
247:19 298:12
298:16 300:2,4
300:8
**partner** 233:22
242:2 258:19
**partners**
180:19
**partner's**
259:19
**party** 27:20,21
28:5,13,17
29:1,4,17
30:24 33:17
34:4 37:1

47:22 48:9,11
48:13,23 49:6
50:3 51:1
57:18 73:25
84:12 100:20
100:25 101:2
103:16,16
104:20 109:4
113:8,22,24
126:4 128:23
131:6,9,10,18
131:19 134:14
138:8 156:8,18
165:8,10
170:24 172:14
187:5 191:7
244:16 285:5
**pass** 41:16
111:15 269:15
287:23
**past** 15:8 18:17
60:19 144:12
169:2 183:13
226:5 288:6,20
**path** 32:7 33:2
40:20,25 41:12
208:12 209:23
283:25
**pathway**
283:10
**patient** 299:18
299:22
**patrick** 246:11
**paul** 8:6 233:6
233:15,18
247:4 259:25

**pay** 118:11
173:8,18
**paying** 141:20
172:21
**payment** 139:1
139:3
**payments** 10:8
**payout** 139:13
139:15,17
141:15 142:6
**pci** 166:24
**peak** 38:13
41:4 46:12
65:14,24 67:8
68:11 197:1,5
197:19 198:2
198:18,25
199:3,7
**peculiar** 223:4
**pending** 3:4
91:15,23 92:1
92:4,19 95:6
219:19 234:10
**people** 11:8,21
11:24 12:3,9
13:1 14:3,12
15:14,16,17,18
15:21 16:3
17:25 18:9,24
19:1 20:10,19
28:2 32:16
44:17 53:3,8,9
53:11,21 54:2
56:17 85:13,15
85:19 86:2,10
90:2 99:7
104:1 108:15

112:9 113:20
113:21 118:10
122:16 126:19
128:4 138:6
146:16,25
147:16,18
148:2 150:15
162:25 165:5
165:18 166:7,8
166:12,19
170:16 171:12
190:10 191:13
198:5 208:4
211:15 214:6
223:9,9,12,14
223:19 229:14
236:23 239:10
257:6 258:15
259:3,4 261:22
261:23 262:8
262:14 275:1
277:23 290:14
299:13,14
**perceived**
65:23
**percent**  31:10
31:15,17 36:15
36:16 42:25
43:6,15 115:14
116:2,4,6
117:6,8,9
118:6,6,22
119:11 120:3
120:11,18,20
121:2,3,4
122:9 124:9,22
124:23,24

141:18,23
149:17,21
150:3,6,9,11
150:12 151:20
157:20 168:1,3
168:8,11,11,12
168:13,14,17
169:8,10,22
184:1 239:18
285:22 286:4,5
**percentage**
141:22 168:7
179:18 183:2
**percentages**
183:5
**perception**
112:15 286:4
**perfect**  18:23
20:16 109:23
**perform**  47:10
57:14,21 58:3
59:11,13 69:25
70:25 74:11,14
74:16 109:5
184:7
**performance**
91:17 185:24
185:25 259:21
**performed**
42:15 46:1
47:22 49:6
61:10 63:3
66:16 70:23
189:16 191:18
**performing**
61:21 62:16
67:19 89:15

**performs**  49:8
49:18 109:3
**period**  14:1,25
15:25 18:7,10
35:8 60:13
71:2,12 77:16
79:25 81:24
82:9,9,10 90:5
103:14,18
118:18 123:8
123:25 124:3
124:25 150:24
155:2,22 156:7
156:10 179:4,7
201:4 208:20
272:10,15
277:8,12
289:24
**periods**  80:4
286:23
**permission**
114:13,18
176:11 185:18
211:6 235:17
**permit**  12:16
**perpetuate**
62:1,4
**perpetuated**
64:24
**perpetuating**
72:16
**person**  66:5
111:12 197:25
241:20,21
242:13 255:21
255:22,22,22
258:8 259:5

260:20 261:24
262:4,15
276:24 293:1
297:22 301:19
**personal**  16:19
146:10 157:25
283:15 288:21
**personally**
3:12 47:17,19
48:16,21 83:15
147:5,12
264:18 282:22
287:2
**personnel**  64:4
**persons**  189:8
276:25
**person's**  259:5
279:4
**perspective**
26:5,11 27:17
28:20 29:14
32:5 37:3,4
46:20 47:4,8
48:1,2 49:5
50:22,22 55:1
55:2,3 58:5
61:24 62:3
64:16 66:15
70:16,21 72:14
73:1,5 76:23
76:24 77:3,8
77:21 78:10
88:3,14 89:15
104:7 107:3
113:14 120:9
139:7 150:22
154:6,9,13

157:14 162:3
162:13 163:7
163:10 164:25
165:3,7,15
166:3 170:21
175:3,8 176:10
177:4 192:2
222:14 247:15
247:19
**perspectives**
183:17 203:9
**petition**   24:16
267:25 268:5
272:9 273:11
**phase**   220:3
**phone**   16:3
32:10 35:6
111:19 114:10
145:22 152:17
174:6 186:10
205:6,7 238:14
241:13,22
269:16 294:13
**phrase**   11:25
**physical**
111:13
**physically**
46:13
**picture**   153:24
236:2
**piece**   111:5
**pieces**   20:13
**pii**   51:11,14
52:1
**pinpoint**   85:22
**pitch**   290:2

**pitched**   256:7
256:11
**pivot**   71:14,15
74:5 84:7
101:21 148:7
177:12 187:15
**pivoting**   65:8
**place**   28:24
57:7,25 71:25
80:15 94:5
171:5 184:10
223:22 243:10
274:8 292:19
**plaintiff**   1:12
1:21
**plan**   4:12 9:12
21:22 22:15
23:11 25:19,19
25:23 30:11
32:3,12,18
40:13 42:21
67:2,6 70:15
70:24 71:21
74:2,4,19,21
75:1,2,10,16
75:20 76:12,14
78:2 79:16
81:25 96:2,23
97:2 98:5,10
99:12,14,23
101:8,11
104:15 112:21
113:23 132:25
133:1,9,11
134:9 135:12
137:12,17,21
151:25 152:9

155:8,11
156:12 157:20
158:4,25
159:18,20,22
160:20 168:18
169:9 170:23
171:10 173:7
176:9 177:12
183:8 199:25
203:15 206:15
206:18 207:8,9
208:9,11,14
209:2,3 232:23
233:6 234:9
243:7,12,15,15
243:22,22,23
244:1,3 246:15
246:16,18,19
246:19,25
247:24,25,25
248:2,5,6,7,9
248:10,11,13
248:14,16,24
249:5,6,16,18
249:19,24
250:2,3,13,18
250:19 251:12
252:21 253:1
253:12,16,22
254:4,12,16,18
254:19 256:7
256:14,17
258:9 259:22
259:25 260:7
261:9 264:23
270:25 271:20
273:13 274:10

275:11 276:5,8
278:24 279:2,3
279:4,24 280:3
280:5,10,16
281:13 282:19
282:22 283:6,9
284:4,12,16,17
285:3,21
292:19 293:1,2
293:3,11,16,21
294:3 296:6,8
296:12,15
**planned**
176:16 200:22
**planning**   64:20
101:11
**plans**   34:19
164:1 169:6
280:7
**platform**   12:24
13:12 19:25
26:16 27:9,22
29:18 36:5
37:13 44:7
45:10 46:23
59:18 64:19
66:20 71:23
80:7 82:8,20
82:25 85:19
87:1,4,13,19
88:8,13 90:15
90:21 101:23
103:9,13,18
105:1 112:8
120:3 125:13
126:10 169:12
170:18,19

190:2,8 191:7
191:9 192:1
194:6 199:5
206:12 267:24
268:6 273:17
277:1,25 278:1
**platforms**
28:12
**play** 158:7
**plea** 275:8
**pleading**
290:13
**pleadings**
241:10 247:20
**please** 9:2
21:20 24:1
79:11 81:11
91:5 102:16,17
145:8 146:3
167:8 181:24
182:9,10,13
211:1 233:14
233:16 235:20
255:8 259:23
265:9 268:2
274:23 282:21
298:17,19
**plus** 31:10
210:11 261:23
262:23 287:19
**pm** 304:10
**pockets** 171:13
**podium** 142:23
287:23
**point** 12:8
14:16 18:4
33:1 74:8,15

76:24 77:14
84:8 85:7,9
89:12 90:9
100:5 121:16
137:10,11,22
147:9 155:5,25
157:16 158:6,8
158:13 161:10
168:21 172:24
173:11 175:7
181:23 186:6
187:8,16 200:5
200:24 208:14
211:24 212:24
225:3 252:15
260:14 267:20
269:15 272:9
281:9 287:23
292:16 302:16
302:21
**points** 10:10,25
89:13 118:23
143:9 152:15
167:12 172:12
212:22 213:2,2
242:25 263:20
271:11
**policies** 194:19
195:9,18 196:3
**pool** 183:22
**portfolio**
175:16 176:15
179:17 184:13
**portfolios**
175:20
**portion** 29:12
44:4 87:10

91:8 117:20,20
160:13
**pose** 37:11
**posed** 229:7
**position** 14:17
52:24 71:24
72:8,17 74:9
76:12 78:3
122:8 124:19
158:7 206:21
208:18 218:14
220:16 224:21
229:8,16,23
230:15,24
231:7,8,11
235:10 237:17
256:7 275:17
284:14 296:9
296:20
**positive** 283:22
**posner** 7:6
246:10,11
247:3,5 248:20
249:1,14
252:13,16,19
252:25 253:8
253:11 254:23
254:25 258:5
**possession**
127:11 128:21
138:25 140:12
**possible** 13:11
14:19 44:13
74:23 77:2
102:5 123:22
135:10 146:16
146:19 148:4

201:3 206:7
225:1 230:4
260:18,19,21
271:23 279:7
287:1 302:3
**post** 39:8 62:17
67:21 82:10
83:3 88:25
124:23 148:8,9
235:9 245:9,13
245:24 263:15
280:7 282:23
283:1
**posted** 191:7
**pot** 175:2
**potential** 30:22
31:19,20 35:2
42:5 62:18
76:22 82:11
96:7 100:25
146:10 147:24
148:19,20,20
149:18 154:21
163:12 165:17
170:18 219:9
243:17,25
256:18 272:11
275:25 276:7
**potentially**
26:11 40:4
41:9,12 61:23
95:24 102:10
112:21 124:15
124:25 126:8
126:24 127:3
131:14 132:21
147:22 148:7

152:5 154:5,14
158:2 160:23
161:1,6 165:12
165:20 183:16
187:4 208:12
208:23 252:22
263:1 280:19
**power** 194:14
194:24 195:10
211:20 213:8
264:16 290:25
292:24 293:12
**powers** 250:19
280:15
**practical**
220:24
**practice**
143:22,22
235:6,7,12,14
238:20 239:13
239:18 242:5
245:11 282:25
**practices** 50:8
143:7 145:14
**pre** 3:10
207:13 213:18
**precent** 287:19
**precipitous**
117:14
**precise** 17:7
**precisely** 295:6
**preclude**
132:21
**prefer** 19:5
44:15 221:11
264:24 297:25
299:15

**preference**
224:25 275:23
277:8,12,22
295:13 300:1,4
**preferential**
225:11 268:18
**preliminary**
303:15
**premise** 35:23
**preparation**
45:16 84:24
**prepare** 70:17
236:7
**prepared**
254:1
**prepetition**
82:5
**present** 55:3
215:2 257:7,17
**presentations**
9:9 217:4
**presented** 23:3
53:19 55:25
119:2 141:13
291:13
**presenting**
147:20
**presently**
144:18
**presents** 73:23
132:22 165:20
**preserved**
273:6 275:24
278:5
**president**
58:25 59:1

**presumably**
46:2 54:4 84:6
105:9 252:21
**presume**
201:12
**pretend** 57:23
**pretty** 90:12
114:19,23
134:3 151:14
157:3 167:25
181:5 190:20
208:7 237:4
255:19
**prevailing**
80:22 81:19
**prevent** 37:12
269:3
**preventing**
72:22
**prevents**
268:16,24
**previous** 84:24
212:9 285:2
**previously**
17:15 43:19
45:24,25 46:11
47:20 53:2
54:14 59:15
62:22 64:6,13
80:1 228:24
260:14
**price** 26:5,6
43:24 81:23
82:11 116:21
117:14 120:14
122:2 129:16
138:11,20

150:23 175:3
179:2 263:2
**prices** 31:17
117:25 124:4
124:15 151:1,4
151:5 178:16
183:21
**pricing** 122:3
122:12
**primarily** 26:7
50:7 234:1
235:8
**primary** 28:8
29:4 62:3 73:4
95:17 109:17
125:13 149:2
154:6 270:20
275:17,20
276:1
**prior** 67:4 68:3
69:11 70:4
71:1 83:24
84:5 88:17
89:3 94:10,14
96:3 106:9
145:18 156:1
159:1 187:4
204:19 209:13
241:17 242:9
260:9 267:24
284:14 294:23
**privacy** 37:20
51:6,7
**private** 37:6
153:22 223:1
224:3 227:5,6
228:14,18

229:12
**privately**
215:19 229:19
**privilege**
261:14 265:15
265:19 266:15
266:21 267:22
**privileged**
95:16 266:16
266:24 282:7
**pro** 7:9,12,15
7:18,21,24
43:5 82:3
111:21 114:12
115:7 152:20
180:2 182:8
226:17 255:6
265:7 269:19
275:1 288:2
301:9
**probably** 17:9
70:14 94:9,20
144:15 161:7
183:20 184:4,6
184:12,25
200:21 241:9
248:9 274:17
283:20 292:22
**problem** 15:3,6
147:7 238:8
302:9
**problems**
61:14
**procedure** 30:3
**procedures**
27:19 33:18
34:14 42:13

48:19 50:8
69:20 79:21
131:10 132:4,9
132:10,11,17
133:4,23,24
136:3 155:20
194:20 195:18
196:3 290:16
291:6,7,8
**proceed** 24:3
79:8 146:3
167:9 233:16
255:8 265:9
287:12,13
**proceeding** 3:1
3:7 22:21 55:7
60:25 97:10
189:6 214:7,11
214:18 223:2
226:25 229:13
254:8
**proceedings**
55:8 77:3 95:9
173:8 214:25
216:19 229:22
304:9 305:4
**proceeds**
103:20 116:19
156:15
**process** 17:10
28:3,24 29:23
88:22 106:9
114:5 116:9
119:12 124:6
132:2 133:2,7
134:4,24
136:16 148:1

149:12 154:24
165:12 174:15
174:20 176:17
237:4,8,14,15
237:22 243:10
243:12 278:21
280:19,20
283:4 289:12
289:16,22
290:3,6 302:2
**processes**
175:12
**production**
157:5
**productive**
230:12
**professional**
237:6 238:12
239:4 260:8
263:6,8,21
266:23 281:20
283:14 293:8
**professionali...**
163:13
**professionals**
71:7 108:13
134:20 163:22
164:7 176:12
187:21 189:16
189:20 197:14
199:21 201:19
205:5 208:9
216:14 238:18
253:23,24
286:21 288:7
291:11 293:5
294:1 296:24

296:24
**program** 18:24
**prohibit** 192:4
**prohibited**
125:9
**prolonged**
179:4
**promise** 233:9
**pronunciation**
99:4
**proof** 34:2 35:9
108:25 109:21
193:13 295:12
**proofs** 4:9
**proper** 19:8
219:18 220:7
279:18
**properly** 98:4
184:10 259:7
262:6
**property** 21:5
21:6 162:10
191:14
**prophylactic**
244:9
**proportionally**
183:6
**proportionate**
291:1
**proportions**
60:15
**proposal**
154:11 171:11
172:21 181:3
183:9 187:3
215:7 217:14
218:21 224:16

proposals
100:21 101:1
115:22 169:18
169:19,20
170:1,2 175:24
176:24 182:1
propose
220:18 224:23
proposed  9:12
23:11 152:1
156:12 200:14
260:6 272:7
277:7,11 279:1
280:16
proposing
215:24 224:10
224:18 225:10
282:4
proposition
14:20
prosecuted
252:1
prosecution
3:4
protect  133:2,2
protecting
45:8
protection
20:11 37:2
51:6,10,13
52:1
protections
64:22 87:17
protective
244:5
protocol  29:14
29:21 47:8

80:12 82:16
155:12 163:5
protocols  27:3
36:19,23 37:1
50:8,15 51:24
57:1,12 70:1
125:16 126:1
162:22 164:19
165:19 194:20
195:25
provide  9:21
13:8 14:22
26:17 39:14
62:3 80:2
101:21 102:1,6
154:21 157:7
161:20 169:11
202:21 209:22
224:24 225:10
225:16 230:6,9
230:25 231:19
286:24
provided  10:17
36:24 38:17
92:14,25 93:1
93:5 95:5
108:21 109:20
110:19 163:2
166:13,14
171:12 193:14
282:5 285:7
provider  29:5
90:4 131:7,11
providers
27:20 28:17
29:1,17

provides  21:8
41:9 75:5
81:17 87:20
101:20 112:21
133:5 147:22
154:16 157:21
159:11 207:8,9
208:12,22,22
208:23 209:17
providing
105:10 169:9
208:13 286:8
provision
12:14 17:25
18:11 19:16
87:14 88:6,7
91:11 136:1
158:22 159:9
188:15 243:14
244:1 248:13
250:13,17
254:17 256:15
273:3 278:24
280:22 281:1
293:18 295:7
provisions
192:2 248:11
248:15,21
249:5,15 280:9
293:16
prudent  124:5
126:25
public  34:25
69:7 73:5
74:12 93:16
139:24 212:18
214:18,24,25

217:17,19
220:23 221:18
221:19 223:11
226:24 227:8,9
229:11,13,13
229:18 230:13
232:3,11
publication
65:22
publications
68:19 239:23
publicly  37:18
117:16 139:4
215:22 223:4
published
38:15 155:13
publishes
28:15
pull  158:16
204:1
pulling  40:4
152:24 203:24
301:24
purchase  22:4
22:6,9 26:4,5
43:24 60:4,9
101:20 116:21
138:20 175:3,5
207:19,22
purchaser
91:15,16 92:5
140:3 189:1,3
192:10
purchaser's
91:17,18
purdue  281:23

**purely** 124:21
283:8
**purport** 129:5
**purportedly**
110:4
**purpose** 28:8
222:22 254:14
271:17 296:15
**purposes** 87:22
90:8 103:22
113:18 116:3
127:23 131:19
176:22 216:22
222:14 276:4
**pursuant**
87:10
**pursue** 30:16
160:23 244:16
254:22 269:8
273:15 276:12
276:12 279:18
284:18 293:13
293:22,23
**pursued** 276:7
276:11 278:7
283:3
**pursuing** 149:6
177:16 203:13
245:17 268:17
268:25
**pursuit** 271:8
**push** 74:15
**pushed** 199:22
**pushing**
124:15
**put** 48:6 68:15
68:18 73:16

120:2 127:24
128:22 129:14
160:21 171:10
184:25 185:2
189:14 201:20
202:5 215:24
216:12,15
220:4 221:23
221:24 222:2
222:17 223:25
224:5,18 225:3
225:5,21
226:24 229:18
232:2,10,15
233:1
**putting** 144:3
220:3 225:14
225:15 227:9

**q**

**qualifications**
138:2 254:17
**qualified**
132:17 133:24
134:1 136:11
137:3,8,20,23
172:19
**qualifier** 91:12
**quality** 113:8
**quarter** 274:24
**quarterfinal**
297:5 300:12
303:4
**quasi** 207:15
**question** 9:8
10:3 13:23
20:25 32:14
35:20 37:10

43:17 45:19
46:21 49:7
55:13 56:16
58:2 63:12
69:22,24 70:3
75:18,23,24
76:11 77:25
82:22 83:21,23
84:11 85:24
86:20 88:5
90:25 91:24,25
92:6 96:19
97:11,14 98:7
100:10 101:15
107:14,23
108:20 109:22
111:3 112:25
128:7 129:3
143:4 144:24
149:16 153:17
156:20 158:22
162:12,19
164:22 168:25
171:24 172:1
172:10 180:10
180:12 181:16
181:23 182:3,6
183:11,16
184:15,22
185:5,11,15
186:1,6 194:23
195:17 196:8
198:20 208:7
210:11,14,16
211:7,13,22
212:5 213:25
216:9 218:18

218:20 219:2
222:16 225:23
237:6 244:9
245:8 246:9
249:4 254:8
257:16,20
259:12,15,17
262:13 264:3,5
264:7 265:6,19
266:6,8 267:4
267:15 268:2,2
268:21 269:4
269:13,14,17
271:4,12,14
272:19 274:15
277:10 280:14
280:19 282:2
284:7,8,9
285:13 287:7
287:10,13
288:10,12,19
297:23
**questioned**
210:8
**questioner**
55:8
**questioning**
164:8 202:10
251:6 254:13
256:23
**questions**
10:21,21 17:8
35:22 42:1
43:5 44:8,13
44:18,25 45:8
45:17 53:24
55:6 62:21

63:2 77:10
79:11 81:2,9
82:18 85:5
86:14 95:3,4,8
98:11 102:16
109:17 111:22
114:7,20,24,25
115:2,3 131:25
133:17 142:25
143:6 144:14
144:14 145:13
146:5 148:16
148:16 151:14
152:17,21
153:2 157:1
162:20,21
164:12 167:7,8
167:13 169:2
174:3,7,10
181:14 182:1,9
182:12 186:11
186:12 193:23
194:1,9,20
195:16,24
196:9 197:15
199:10 202:14
207:6 208:8
210:21 213:21
213:22 214:17
216:15 222:23
224:20 225:6
229:7,14 230:5
230:8 236:18
244:13 246:6
246:24 247:1
248:18 254:25
264:15 265:2

271:7 275:3,5
275:13 286:22
287:25 288:4
291:21
**quick** 42:1
146:5 174:2
236:17
**quickly** 13:10
14:19 24:7
77:1 146:16
201:3 206:7
209:5 234:15
276:3 301:10
302:3
**quite** 44:20
150:24 187:24
204:8 229:21
284:22 302:8
**quote** 190:9
244:15
**quoted** 129:15
150:1,18 184:2
**quotes** 31:1,8
31:13 225:17
**quoting** 122:1

**r**

**r** 2:21 5:1 9:1
305:1
**rainmaker**
117:7
**raise** 141:5
214:17 216:18
217:22 266:13
**raised** 71:1
145:13 195:24
199:10 215:14
221:1,16

222:24 230:3
260:3
**raises** 216:18
**raising** 18:12
121:12 216:6
226:5
**ran** 135:3,8
138:4 148:4
175:11,12,23
**range** 35:1
69:9 70:14
75:7 118:16
119:15 169:18
**rapids** 238:9
**rare** 223:4
**rat** 211:3
**rata** 82:3 180:2
**rate** 80:22
81:20 117:9
263:23,24
287:20
**rates** 182:19
183:13 263:25
**rather** 12:19
229:11 254:17
**ratio** 70:19
82:3 109:1
143:15
**rationale**
115:10 215:7
217:20 225:21
**raznick** 240:24
241:1,14,15,21
241:24 242:1
244:10,14,23
255:15,24
256:22 259:20

260:1,2,4,9,10
262:8 264:4,10
264:12 265:12
266:11,17,22
267:7,11,19
268:10,16,20
268:24 269:2,5
269:6,7 274:7
274:9 282:9,11
286:6,9 288:6
288:13,20
289:6 291:18
292:7,10 295:3
295:6
**raznick's**
244:15 255:11
258:19 260:15
269:9
**reach** 12:15
122:15 227:19
**reached** 11:16
66:1 122:12,15
126:15 128:7
128:12 197:8
251:5 301:11
**reaction** 39:12
39:19
**reaction's**
39:21
**read** 52:7,14
52:16,16,17,19
80:9 85:6 86:3
87:5,9 156:22
201:12 204:12
204:14,21
205:10 248:12
252:5 285:20

285:20 286:3
**reading** 42:8
139:11 251:15
262:22
**ready** 9:3
32:11 85:19,20
157:16 220:4
274:1
**real** 18:7 33:5
43:21 73:12,17
76:21 90:11
132:5 151:1
174:2
**realistic** 30:10
**realize** 272:20
272:21 300:7
**really** 20:17
28:4 54:9 72:1
73:13 85:25
103:6 104:17
117:24 130:16
146:5 148:21
151:3 162:13
164:18 168:25
170:25 175:5
176:8 209:5,5
214:5,7 217:4
224:22 226:1
239:19 254:22
264:16 271:5
273:9 279:11
280:15 281:10
299:20 302:7,9
302:24
**reason** 19:22
20:9 31:20
121:17 135:3

141:13 145:19
147:20 190:19
195:19 214:6
227:1,4,12
228:9 273:14
295:6 302:12
**reasonable**
18:1
**reasonably**
78:15
**reasons** 11:20
89:24 217:23
223:3 274:6
**rebalance**
176:15
**rebalanced**
104:15
**rebalancing**
70:19 76:19
82:3,10 100:17
100:19 104:6
104:11 118:20
123:4,11
124:24 176:11
176:23 177:6
178:17 179:17
183:24 208:19
**recall** 40:1
42:7 48:16
49:12,13,24
52:5,7,9,14,15
53:15 56:22
65:5,6 68:5,6
78:11 80:18
87:14,15,17,23
87:24 88:6
93:13 94:5,6

94:12,21 96:23
98:7 105:16
110:2 116:4,8
133:3 139:11
140:17 141:20
186:20 188:4,5
194:1 196:1
199:11 211:17
212:11 218:24
249:13 266:20
277:9 292:21
**receive** 13:12
31:2,13 47:24
68:12 72:2
75:3 95:13
109:13 110:16
116:19 169:19
171:17 219:10
**received** 26:18
35:10,11 48:18
61:3 66:17
70:5 72:10,11
94:1 100:21
111:13 116:5
122:19 127:25
138:1 166:1,23
167:2 175:20
182:16 196:4
290:3
**receiving**
141:19 281:21
**recent** 21:22
150:9 248:3
281:22
**recently**
237:20 272:6

**recess** 81:8,10
143:2 210:25
228:16 274:22
**recipient**
128:16
**recognize**
240:18
**recognized**
13:20 51:13
238:19
**recognizes**
239:10
**recollection**
43:2 44:1
51:23 110:2
117:1 133:23
134:1,11
140:23 150:2
168:16 188:10
199:24 204:4,9
205:2,23
**recommend**
155:11
**recommenda...**
32:7 40:17,22
105:10 158:12
212:8,13
**recommenda...**
206:15
**recommending**
206:18
**recommends**
237:16
**reconcile**
293:12
**reconnected**
274:24

**record** 24:1
196:7 214:8
215:9,24 216:7
216:16 217:23
222:17 223:20
224:8 226:24
227:8,9 229:18
229:21 231:21
232:3 233:13
235:23 246:10
246:14 264:16
264:23 295:21
296:11,14
300:23 305:4
**records** 20:3
72:14 106:18
**recover** 14:18
41:13 169:8
208:24
**recoveries**
146:24 150:16
150:25 154:22
161:8,9 168:19
168:22 179:18
183:25 208:23
**recovering**
292:25
**recovery** 76:22
112:21 147:11
147:23 149:17
149:18 167:25
168:1,3,8
179:15 182:18
183:4,13 293:9
**recross** 8:3
**recusal** 243:10

**recuse** 243:18
243:25 253:3
256:16
**recuses** 291:5
**red** 121:12
**redirect** 8:3
294:14,18
**reduce** 177:17
**reduced**
102:23 168:11
**reduction** 26:9
44:3 71:19
**refamiliarize**
84:21
**reference** 94:7
98:6 271:24
**referenced**
203:23
**references**
216:10
**referencing**
91:9 189:12
**referred**
186:22 242:4
**referring** 49:3
56:18 99:21
122:24 272:17
**refers** 84:23
**reflect** 39:3
230:14 263:3
**refresh** 188:9
**refusal** 134:12
**refuse** 127:10
**refused** 134:9
172:7,16
**regard** 67:25
156:18 221:10

239:11 268:14
**regarding**
54:16,19 68:7
172:2 214:2
218:21 222:24
225:22 249:5
251:22 256:5
267:3
**regardless** 82:7
**regards** 66:11
73:1 104:11
143:7 155:15
163:7
**register** 298:17
298:18
**registered**
82:24
**regular** 122:15
**regularly**
241:6,22
**regulate** 93:21
**regulations**
12:16 18:18
28:9
**regulator**
95:14
**regulators**
25:13 41:4
73:16 93:20,20
223:15
**regulatory**
15:8 18:17
96:13 170:21
**rehabilitate**
270:24
**rehypothecate**
36:8 63:1

107:5 143:19
191:4,5,15,19
**rehypothecat...**
191:2
**rehypothecat...**
109:11 191:6
191:10
**reimbursement**
79:7 136:2
138:17 159:4
159:11 173:9
**reimburseme...**
158:17 159:8
**relate** 26:4
36:25 40:10
50:2,7 57:16
68:10 95:20
97:9 166:25
239:16
**related** 22:4
27:23 28:9
29:17 34:4
48:21 61:8
62:15 63:7
64:8 65:8,22
95:2,15 98:5
106:21 123:10
152:5 213:1
224:20 241:3
244:14
**relates** 26:7,14
28:3,3,5,25
37:2 51:5,23
51:25 57:15,15
65:14 67:15
72:24 82:1
91:24,25

100:16 117:24
126:3,6,7
127:3 157:15
162:13 215:22
**relating**  26:5
28:21 31:6
33:19 34:8,10
34:24 35:1
36:23,24 37:2
37:5,9,20
38:12,14,17
39:2,8 40:2,24
42:13,15 43:23
44:2,4 45:15
47:6,25 48:17
48:18 51:1,6
51:13,25 53:17
55:17,23,24,25
56:11,13 57:3
57:10 58:6
59:6 60:24
61:25 62:14,25
63:23,25 65:23
66:5,18 68:11
68:15,17,22
69:9,15,16,20
69:25 70:1,4
71:11,21 72:3
73:14 78:1
82:18 89:25
92:2,4,5,15,17
93:1,23 94:1
94:11 95:3,4,8
95:8,13,18,23
96:24 103:6
106:24 110:13
112:6,12

132:10 138:2
141:4 160:21
163:11 170:16
173:8 175:19
176:25 179:14
202:24 203:22
204:18 239:21
**relation**  115:13
**relationship**
11:2 35:18
38:13 58:12
65:24 66:10
80:3 106:8
109:10 162:7
256:25,25
260:2,4,8,13
**relationships**
94:2
**relative**  31:17
38:19 71:12
82:3 96:5
104:1 112:23
122:6 129:20
147:24 149:6
161:6 165:24
168:18 179:1
184:2
**relatively**
17:12 20:5,15
26:12 117:16
145:14 224:24
**relay**  301:24
**release**  276:5
276:25 277:14
**released**
199:19 200:1
276:24 277:16

277:23,24
279:5,6
**releases**  260:6
271:8 279:1,9
279:10,11
281:17,21
282:4
**relevance**
275:9
**relevant**  55:7
60:19,19 61:17
92:9 97:1,19
133:13 135:17
135:19 246:24
252:11 271:4
283:19 296:5
**reliant**  113:16
**relied**  189:22
216:14 232:6
**relief**  3:3
230:11 298:7
**reluctance**
145:19
**rely**  10:9 73:22
101:23 110:17
144:18 165:24
253:24
**relying**  206:14
**remain**  68:20
**remainder**
99:17,20
**remaining**  26:6
26:13 43:24
44:1,4 270:18
**remains**  21:5,6
83:11

**remember**
52:11,13 67:9
105:17 149:25
163:3 167:8
174:24 181:24
190:3 192:8
194:6 197:1,5
204:3 257:23
277:4 285:25
285:25 289:9
293:20 298:3,4
301:5
**remove**  195:2
**removing**
130:7
**renzi**  42:24
120:2
**renzi's**  43:2
**reopen**  71:24
296:14
**reorganization**
21:23 270:21
270:23
**reorganize**
271:15
**rep**  208:4
**repeat**  16:14
33:20 139:23
174:16 268:2
282:20
**repeated**
143:25
**repeating**
32:14 55:13
76:1 96:19
180:3,5

rephrase 50:12
54:18 63:12
67:24 268:23
replaced 86:17
303:20
replacement
303:20
reply 40:2
203:22
report 47:21
47:23 48:17
49:25 50:19,24
52:2,6,21,22
54:4 166:23
196:16,18
197:1,3
reported
117:23 178:15
reports 41:5
49:4 51:16
53:1,25 167:2
196:4,21
represent
111:4 120:2,4
131:11 135:6
138:3 198:25
199:3,7 230:23
240:24 253:18
257:21 258:16
286:18 288:17
288:18
representation
55:16,16 59:22
106:7 111:2
194:3,6,8,9
241:3 265:11
268:16,23

269:2 285:6,23
286:5,17
representations
34:10 35:15
48:18 58:14
59:3 60:1,2
126:22 189:19
189:23,25
191:17 193:3,6
195:22 196:10
196:14 198:14
198:17 206:9
206:24 207:16
207:18,23
208:2 216:10
representative
204:15
representatives
46:13,14
represented
58:22 110:10
111:8,10,11
131:5 202:23
245:12,15
258:23 259:7
282:23 286:19
representing
235:8 241:4
248:19 258:22
263:13 289:23
reputation
283:15
request 10:3
144:21 145:17
205:20 212:8
212:13 214:1,2
214:14,20

215:14,18
218:11 219:23
220:10,10
221:2,7 222:13
243:14 273:5
280:10
requested
94:16 193:13
208:1 215:8
295:7
requests 92:15
93:6 94:1 95:2
95:7 197:23
require 29:11
29:16 125:10
125:24 131:14
133:24 155:9
172:21 256:16
required 14:15
124:15 136:2
138:16 208:1
214:20
requirement
78:14,23 159:5
requirements
70:18 78:9
80:5,20 81:17
134:16 166:25
requires 79:24
158:24 302:15
requiring
162:16
requisite 292:8
reschedule
303:8
reservations
25:14

reserve 35:24
109:1 162:13
190:3,5,6,15
191:1 206:10
reserves 62:23
89:17 109:1,21
151:21
resolution
14:24 246:17
250:6
resolutions
11:18 14:25
resolve 222:15
resolved
246:16 251:9
251:10 253:14
resolving
19:14
resounding
207:11
respect 10:2
14:3 28:22
42:5 45:20
47:16 92:21
143:14,16
230:15 248:5
248:12 249:16
respectful
226:7
respective
283:13
respects
296:20
respond 20:24
responded
229:11 285:23

**responding**
  286:4,6
**response**
  149:15 194:17
  272:3
**responses**
  194:19 203:1
**responsibiliti...**
  243:20 249:19
  250:2,3
**responsibility**
  278:19 287:18
**responsible**
  46:3 286:8
**rest**  298:2
  300:9
**restart**  148:1
**restrict**  87:12
**restrictions**
  220:22
**restructuring**
  64:8 139:21
  233:23
**result**  18:21
  71:20 76:21
  115:14 117:15
  122:10 184:11
  222:3 267:2
  284:24 287:19
**resulted**  90:4
**results**  111:5
  183:2 285:4,11
  286:3,13,15
**resume**  9:14
  23:10 142:25
  235:16 236:6,9
  236:19 297:8

300:11 303:23
**resuming**
  298:9
**retail**  242:1
  256:9 260:10
  260:16,18
  268:14 272:7
  272:10,13
  276:15,17
  277:19,21,21
  278:9,16,20
  289:19 292:14
**retain**  275:22
**retained**  294:1
**retainer**  139:7
  140:9,15,17
**return**  112:2
  126:9,10
  146:15 272:1
**returned**  44:6
  72:6 135:13
**returning**
  101:24 206:6
**returns**  123:13
**reuters**  38:14
  39:4 42:16
  65:23 196:25
**reveal**  226:23
**revelation**
  121:10
**review**  46:12
  47:17 48:21
  50:15 52:13
  54:6,8 57:23
  59:7 62:18
  63:14 66:9
  67:3 69:19

78:7 83:8,11
  83:13 106:18
  107:1 108:4
  114:5 129:6
  155:7 162:17
  165:11 186:4
  195:18 293:12
**reviewed**  24:13
  33:14,15,16,16
  33:17 34:1,4,7
  34:9,13,24
  35:9 36:23
  37:1 47:19,23
  48:4,11,22
  50:13,19 52:20
  61:8 106:21,23
  161:22,25
  164:18 186:1
  192:21 193:15
  195:9 196:15
  196:18 241:10
  247:24 248:2
**reviewing**
  48:16 49:16
  106:17 108:3
  109:24 155:11
  166:8 298:24
**reviews**  47:8
  56:12 57:21
  58:4 59:24
  60:25 66:5
  95:16 111:13
  166:13,13,18
  299:13
**revise**  29:20
**revising**  280:7

**revision**  251:5
**revocable**
  189:2
**rewind**  17:7
**rewrite**  29:12
  125:24
**richard**  211:11
  217:21
**ridiculous**
  153:21
**right**  9:2,16,17
  10:15 13:2
  14:7,11 15:7
  15:13 21:24
  22:10 24:3,19
  25:5,5 32:22
  36:7 38:5
  39:12 41:17
  42:22 43:1,8
  44:16,24 48:9
  53:6,13 59:18
  60:9 63:18
  64:4,6 65:16
  65:19 72:14
  78:3,24 79:1,2
  79:3,4 80:15
  80:22 83:9
  89:22,25 91:9
  93:13 98:17
  101:17 102:8
  102:16,24
  104:21 105:2
  110:15 118:12
  121:2 124:22
  125:16,18
  127:7 129:11
  130:6,23,24

131:2 132:24
136:17,21
137:20,25
145:11,21,21
147:6 148:19
150:13 151:23
152:16 159:25
162:9 163:9
164:3 166:9
168:15 169:23
170:15 171:2
171:13,18
174:7,11,25
175:1 176:17
177:16 178:6
178:12,17,24
179:22 180:22
181:25 182:7
183:6 184:14
184:18 185:8
186:11 187:23
188:12,18
189:16,20
191:19,24
192:11 193:8
193:12 194:12
196:5,12,16,22
197:12,15
198:2,12,15
199:19,23
200:2 201:9
204:2,6 205:25
209:7 213:20
214:15 215:22
216:6 219:15
221:3 227:13
228:18 231:6

233:1 236:13
239:13,17
242:1,18 246:7
261:3 262:18
266:21 267:17
274:23 277:3
277:15,16
291:18 293:12
293:21 294:12
295:16 296:19
297:16 300:14
300:16 303:2
303:22 304:7
**rights**  14:8,9
19:19 61:7
162:8
**rigorous**  237:4
**rise**  259:21
**risk**  18:6 40:25
96:3 118:15
122:1,1 149:2
149:5 165:20
170:11 171:19
187:17 203:12
**risks**  35:1
95:25 101:24
147:24 148:21
148:23 185:3
**rizk**  7:11
145:24 146:1,1
146:4,7
**road**  5:21
157:24 175:21
244:8 305:21
**robert**  5:9
216:2 219:24
222:10 223:18

231:1 233:15
**roi**  141:19
**role**  45:11,20
131:25 245:15
245:16 254:11
256:12 261:10
262:24 269:9
270:20 271:9
275:17,20
282:19 284:4
284:16,17
286:6
**roles**  266:3,7
**roll**  291:14
**rollout**  86:5,6
**room**  246:8
290:20
**rose**  187:20
**roster**  291:15
**roughly**  67:9
219:8 234:1
**round**  134:25
135:1 137:4
140:10 298:4
301:2,4 303:4
303:4,15
**rounds**  297:5
300:12
**router**  101:2
129:17
**rule**  211:2
217:2 223:25
237:18 291:3
297:14
**rules**  132:19,20
217:24 256:4

**ruling**  218:21
280:4 281:24
**rulings**  281:23
**run**  71:10
77:23,25 78:1
89:9,19,19
110:8 123:14
131:9 147:25
175:16,24
190:9 238:5,5
238:7 291:11
**running**  76:17
**ryan**  6:7 98:19
98:21,22 99:1
100:13 101:9
101:16,18
102:17,18,20
102:21 107:9
107:13,23
108:1 111:15
111:18 185:10
185:10,14,20
185:21 218:1,1
231:22,22

|            s            |

**s**  5:1 9:1 48:7
**s&c**  61:4
**safe**  141:7
**safeguard**  48:2
**safeguarded**
61:6
**safeguarding**
51:14
**safeguards**
37:11 45:8
47:17 48:14
51:25 57:7,25

| | | | |
|---|---|---|---|
| 75:16 | 54:7 100:5 | 253:7 298:25 | 196:8 203:23 |
| **safely**  46:23 | 106:1 116:16 | **scheduling** | 214:10,12,15 |
| **safer**  20:11 | 124:11 140:8 | 297:19 300:9 | 215:11 216:5 |
| 200:13,15 | 143:8 151:19 | **school**  234:21 | 216:18,18 |
| **safety**  73:21 | 160:1 172:17 | 234:22 238:7 | 217:10 218:9 |
| 148:16 | 173:2,14,15 | **schroder** | 219:22 220:4 |
| **sale**  30:23 | 179:11,12,13 | 205:16 | 221:11,23,25 |
| 42:21 112:5,13 | 180:14 181:11 | **scope**  42:19 | 222:8,19 224:4 |
| 113:2,5 139:14 | 181:18,20 | 47:9 50:5 | 224:20,22 |
| 146:10 148:20 | 193:7 211:16 | 57:22 63:15,19 | 225:13 226:3 |
| 148:20,23 | 213:11 231:9 | 66:22 68:9 | 227:14,17,20 |
| 149:6,19 | 231:13,14 | 109:2 144:11 | 229:6,14,17,22 |
| 150:10 167:16 | 257:3 296:3 | 164:24 249:11 | 230:4,5 231:7 |
| 200:25 219:7 | 299:13,14 | **scopes**  109:5 | 231:13 295:24 |
| 230:18 276:22 | 302:19 | **scratch**  259:10 | 296:1,9 |
| **sales**  179:1 | **says**  15:11 | 264:22 | **second**  18:8 |
| 209:16 | 91:14 101:19 | **scratches** | 44:20 126:2 |
| **sam**  48:7 | 143:14 156:23 | 259:5 | 128:15 161:18 |
| 258:24 | 188:4,22 | **scratching** | 166:5 168:20 |
| **sanctions**  42:5 | 209:19 227:8 | 255:23 | 172:4 176:4 |
| 156:24 | 250:11 | **screen**  9:6 | 184:15,22 |
| **sat**  134:21 | **scale**  62:2,4 | **scrutiny**  157:1 | 188:16 191:5 |
| **satisfaction** | **scare**  144:16 | **se**  7:9,12,15,18 | 218:15 229:6 |
| 275:6 285:6 | **scenario**  30:18 | 7:21,24 43:5 | 246:18 247:24 |
| **satisfied** | 30:19 31:3,5 | 111:21 114:12 | 248:11,13,21 |
| 273:23 | 33:2 78:2 84:7 | 115:7 152:20 | 273:22,23 |
| **satisfies**  230:7 | 152:12 157:25 | 182:9 226:17 | 301:4 |
| **satisfy**  80:19 | **scenarios** | 255:6 265:8 | **secondary** |
| 81:17 280:11 | 175:12 | 269:19 275:1 | 262:4 |
| **saving**  169:12 | **scenes**  224:6 | 288:2 301:9 | **seconds**  17:5 |
| 169:13,14 | **schedule** | **seated**  9:2 | **secret**  263:6 |
| **savings**  219:10 | 131:23 197:9 | 81:11 211:1 | **secretary** |
| **saw**  117:13 | 300:13 301:1 | 274:23 | 239:1 |
| 150:5 151:13 | 303:3 | **sec**  81:11 86:14 | **secrets**  223:3 |
| 197:7 | **scheduled**  66:1 | 93:15,22 94:15 | **section**  78:19 |
| **saying**  28:22 | **schedules** | 97:19 108:2 | 78:21 80:19 |
| 32:23,24 34:9 | 252:3,6,20 | 162:20 195:24 | 81:16 91:4 |

188:23
sections 87:23
248:6
sector 47:3
securities 5:19
5:20 6:2 45:2
90:17 98:23
191:8 230:1,19
230:19
security 36:18
36:23 37:1,3
46:19 49:5
50:7,15 51:24
53:6 54:17,20
55:18 56:5,25
57:11 69:20
128:6 162:22
165:7,17,19
194:21 195:25
196:4,15,18
216:22 230:21
296:2
sec's 164:8
204:5 220:16
229:8,16
see 16:12 39:9
57:20 73:4,6
73:10 74:20
84:24,25 91:11
91:20 93:19
95:17 107:10
121:17,20
122:4 135:15
141:25 150:17
153:24,25
157:25 175:14
188:20,23

189:9 195:9
202:15 210:22
216:1 219:22
236:2,20 239:4
244:6 246:9
253:9 258:12
258:15 259:3
259:11 262:2
264:14 277:15
285:22 299:21
302:12,14,15
302:23
seeing 65:25
301:15 302:7
seek 14:23
30:20 31:13
63:4 67:3,6
68:24 69:15
70:3 76:15
100:5,25 101:1
112:7 113:15
129:15 136:18
165:22 173:12
seeking 63:24
68:14 106:14
106:15 113:8
154:19 183:23
190:12 191:11
196:13 230:11
seem 17:12
20:15,17 65:10
258:18 299:14
seemed 17:23
39:3 40:4
66:17 159:17
159:19 164:9
169:4 203:23

seems 9:23
15:5 18:22,23
21:24 55:9,9
67:11 92:9
144:2 145:16
153:21 202:10
217:1 222:12
222:25 223:10
229:16 239:20
254:15 265:18
seen 36:10,16
117:16 122:11
214:11 285:2
285:18 290:21
291:10 299:9
299:16,17
segregated
143:18
segregates 10:8
segregation
206:10
seized 175:21
select 136:6
138:18 283:18
290:5
selected 34:20
136:4 234:8
236:20 237:19
238:23,25
239:14 256:12
283:12 289:8
selecting
132:21 184:8
selection 9:12
232:23 237:11
237:15 249:6
263:16 300:23

self 30:11
40:15 41:14
71:12 84:7
96:6 103:17,25
112:23 147:24
148:7,10 149:6
168:18 187:16
208:24
sell 19:19
27:13 100:11
101:12 118:17
124:24 128:23
152:3 154:12
154:18 156:14
271:16
seller 189:1,2,3
189:3,5
selling 32:13
32:19 100:13
100:14 263:20
selloffs 150:9,9
semi 303:4
senate 156:21
201:7,14
202:15 203:16
senator 201:17
senators 39:2
42:2 68:16
201:8,9
send 82:23
87:20 88:3
195:21 260:22
299:23 301:25
sending 28:4,5
28:10,18 126:4
sends 155:3

**sense** 49:19
  53:19 57:18
  58:9 71:10,13
  177:5 178:25
  181:22 191:8
  191:13 262:3
  277:16 283:24
**sensitive**
  214:10 223:8
  226:2,3
**sent** 27:21 39:1
  80:13 82:19
  203:21 301:18
**sentence**
  156:23
**separate** 51:4
  86:17 143:17
  162:15 192:19
  192:20 194:19
  219:19,20,23
  279:7
**separately**
  217:8 229:10
**series** 35:22
  36:15 244:13
**serious** 203:7
**seriously** 37:20
  74:7,13 169:17
  243:20 256:5
**serve** 12:24
  234:9 238:7
  244:3 254:18
  256:7,13
  263:19 296:15
**served** 24:15
  238:24 282:22
  289:20

**server** 111:6
**service** 61:8
  109:5 131:10
  154:11,18
  192:1,6 193:8
**services** 28:23
  33:17 34:4
  47:10 50:6
  51:7,10 57:22
  101:22 102:1,3
  102:5,9,11
  110:12,19
  156:8 159:19
  159:21 162:3
  192:10,15,17
  192:22,23
  193:2,10,25
  194:15 195:11
**serving** 283:20
**session** 69:1,14
  165:12 303:15
**sessions** 63:4
  194:12,13
**set** 9:6 18:24
  66:7 73:18
  131:10 146:22
  162:15 302:1
**seth** 7:20 174:8
  174:10 288:2
**sets** 93:3
**settle** 129:20
  293:13,23,23
**settlement**
  152:1 215:1
  244:20,21,24
  245:1,6 251:4
  267:3,6,10,11

  292:10
**settlements**
  129:19 294:5,7
**seven** 99:21
  227:23 241:10
  256:9 257:3,13
  258:11 262:3,3
  274:25 289:15
  290:22 291:2
**seventeen**
  121:4
**several** 46:5
  47:19 58:15
  92:13 149:9
  157:24 169:3
  184:9 204:11
  207:4
**severe** 90:14
**share** 58:16
  82:3 95:10
  134:2 139:24
  140:15 147:6
  220:22 270:17
**shareholder**
  193:1,8
**sharing** 165:6
**sheet** 48:24
  61:22,25
**shehadeh** 4:5
**shib** 104:13
**shiba** 119:3,5,8
**shift** 168:23
**shoes** 146:8
**short** 60:13
  90:5 169:25
  201:4

**shortcut**
  250:12
**shortly** 60:8
  67:14 89:9
  241:16
**show** 106:25
  273:4
**showed** 198:15
  235:22
**showing**
  161:20
**shown** 198:9
**shows** 113:23
**shroder** 204:22
  205:13
**shuffling**
  298:23
**shut** 103:22
**side** 40:18 53:9
  55:17 129:18
  160:18 262:8
**sidebar** 214:13
  217:18
**sides** 254:6
**sign** 79:23
  155:18,19
**signature**
  305:7
**signed** 64:18
  200:5,21
  207:13
**significant**
  121:12 122:13
  260:15 263:6
  282:25 286:10
**signing** 79:20
  94:10 200:10

206:25
**silk** 175:21
**similar** 11:17
50:25 104:15
110:14,16
118:19 189:4
190:11 215:14
215:23 223:12
245:16 284:16
**similarly** 13:4
**simple** 88:22
220:9
**simply** 19:11
143:14 216:15
217:14,19
220:9 226:14
292:17
**single** 30:8
57:3 93:12
128:19 130:9
177:8,10
263:11 281:17
281:19
**singular**
260:17
**sir** 115:4 117:2
121:7 122:20
130:19 133:21
135:15,19
142:22 232:17
234:3 235:24
236:5,9 280:24
292:14 302:17
**sit** 155:1
**site** 59:8
165:11

**sitting** 32:11
32:17
**situated** 87:7
**situation** 64:8
99:21 101:5
108:14 127:18
127:23 136:9
138:12 147:17
148:18 154:8
164:7 170:14
175:15 181:24
184:19 191:3
215:4 223:5
230:10
**situations**
57:20,20 63:7
93:19 95:16
141:2 165:14
174:23 183:12
**six** 11:7,12,23
12:2,13,21
19:2,6 160:4
168:17 227:24
238:9 239:21
**sixth** 234:6
236:21 237:8
237:10,10,23
**size** 61:22 82:4
284:5 287:2
291:1
**sizeable** 120:8
**slack** 205:11
**slade** 5:17 9:4
9:7,10,14,19
9:21,24 10:11
10:16,20 21:14
21:16,16,21

22:2,14,24
23:6,9,14,16
23:19 24:4,6
24:18,23 25:9
25:10 33:8
35:4 39:14,18
39:20,23,24
41:15 43:9,16
55:5 59:7
60:18 61:16
75:21 78:17,21
79:2 81:4
83:18 86:11,13
90:22 92:8
97:3,18 128:9
133:12 134:7
135:16 144:5,5
144:21 145:17
181:13 184:20
185:16 188:13
201:23 202:2
210:7 211:5
212:14,16,23
213:22 218:17
221:22,22
232:7,7,13,17
232:20,25
252:10,14
254:7 259:13
268:6 277:10
277:13 282:1,7
294:17 295:19
295:20 296:17
296:20 297:18
298:7,24 300:1
300:4

**slight** 278:3
**slightly** 65:8
142:18
**slippage**
115:14 116:9
116:16,24
122:25 176:14
177:10 178:3,5
178:6,8,9,11
178:20,22,24
179:1
**slow** 33:20
**small** 17:12
26:12 117:16
120:20 130:10
131:20
**smaller** 176:18
284:5
**smart** 101:2
112:13 113:2,6
113:9,12,15
129:17
**smith** 301:22
301:22
**soc** 37:2 47:23
48:5,8 49:4
50:24 51:1,5
51:16 52:2,6
52:21 53:24
166:6,10
**social** 147:15
211:15
**sock** 48:6
**sold** 100:12
102:23 120:11
**sole** 87:11
189:2 193:1,8

**solely**  36:1
190:2 230:17
**solicited**
115:21 176:24
**solution**  11:13
12:15 18:23
160:24 216:8
226:9,13
**solutions**  16:7
16:13,22 17:2
274:24 298:12
298:17 303:25
305:20
**solutions.com**
16:23
**solvable**  15:20
**solve**  19:3
**somebody**  11:6
12:12 13:23
14:9 18:3,4
19:10 23:4
39:13 46:25
49:13 54:5
61:20 81:1
99:16,17
100:15 102:14
113:14 127:24
175:15 191:11
195:1 264:14
268:4 276:21
291:5 295:10
295:13
**somebody's**
11:2 23:12
**somebody's**
237:6

**son**  299:24
**sonya**  4:25
305:3,8
**soon**  260:19
271:23 301:25
**sorry**  32:14,15
46:21 48:3
53:14 54:18
56:15 63:12
69:3,23 102:13
105:24 107:10
107:13,22
114:21 120:1
125:6 137:15
142:3 152:23
167:6 168:9
174:9,16 180:3
181:2,15 182:7
198:23 210:7
216:3 224:13
224:15 266:5
267:4,14 268:1
269:13,25
274:11 277:10
278:23 285:10
288:15 298:24
300:3 302:18
**sort**  18:1 65:10
215:16 219:22
237:21 239:13
245:23 269:14
291:4
**sorts**  129:10
**sought**  22:19
27:13 58:3,5
59:5,10 60:2
62:17,18 63:24

98:9 146:18
165:1,21 170:8
171:4 176:6,20
196:10
**sound**  151:10
**sounded**  231:4
**soundness**
73:21 148:17
**sounds**  80:24
104:18 124:5
143:7 225:18
226:2,13
**sousa**  3:2
**southern**  1:2
300:16
**space**  73:20
117:13 122:16
**spaces**  147:12
**span**  239:4
**speak**  31:10
42:17 49:17,21
50:20,23 52:23
77:9,22 80:13
89:10 90:6
92:18 114:5
121:15 123:9
141:11 151:16
152:20 156:18
202:15 205:14
224:2 244:23
257:7 290:11
299:3
**speaker**  218:3
226:17 228:6,8
255:9 257:19
260:20 261:21
262:1,18 264:3

264:12 265:3
299:2,7,25
304:2,6
**speaking**  39:9
49:1,16 61:20
81:15 87:22
93:12,18
141:11 152:2
220:1 238:21
240:5 251:14
**special**  6:17
40:20 214:5
**specific**  30:9
40:11 42:13
44:3 45:11,13
46:16 47:17
56:10,22 62:15
64:12 67:15
68:2,6 78:1
87:14,23 88:6
88:7 89:7 98:6
98:7 101:4
112:11 116:11
119:21 128:5
139:10,11
180:13,22
188:15 195:14
197:17 224:19
250:15 251:23
280:9
**specifically**
35:10 47:3
51:25 52:1
53:12 56:11,22
72:24 78:17
106:12 110:22
111:4 116:12

160:14 182:23
184:16 188:5
269:5,6 272:22
276:2 278:18
**specifics**  42:7
68:5 77:9,22
78:7,11 80:14
94:7 98:8
102:5 112:10
123:9 133:3
158:19 272:4
**specified**  15:25
**speech**  220:5
220:12
**speeches**
181:14
**speed**  146:15
146:23 243:8,9
**spend**  169:1
236:17 239:6
**spent**  98:3
263:22
**split**  264:13
**spoke**  31:4
42:1,20 107:13
201:18 205:16
225:13,20
289:6
**spoken**  278:14
301:18
**spot**  120:8
**ss**  123:2
**st**  234:20 235:4
238:6 298:4
300:17 303:18
**staff**  230:14,16
230:18,20,23

231:9 296:1
**staffing**  171:1
**stage**  296:16
**stages**  20:13
**stake**  191:25
**stakes**  180:19
**staking**  191:24
192:2
**stand**  204:8
206:3 210:9
218:22 246:23
269:15
**standalone**
186:7 192:18
**standard**  51:13
133:10 134:3,4
136:15 164:2
166:2 239:12
272:10 276:14
**standards**
36:25 37:24
48:20 50:2,3,7
51:2,5,24 52:3
53:1,20 57:2
73:14,19,21
74:1 162:9,16
166:9,20,22,24
167:5 280:12
**stands**  74:21
**start**  126:14
140:14 155:17
176:11,17
234:15 236:19
246:8 248:14
297:7 298:10
**started**  67:13
135:6 138:22

176:17 182:22
240:21
**starting**  176:16
238:12,20
**starts**  298:4
303:5
**state**  6:2 11:15
14:10 23:25
57:9 72:8,18
93:20 98:22,23
124:22 185:11
218:2 223:14
233:13 234:4
234:18 264:17
**stated**  43:19
45:25 60:7
99:11 112:1,3
145:19 217:23
266:11 274:6
278:1
**statement**  4:12
35:11 48:24,24
63:25 85:17
96:24 116:25
127:14 144:25
145:5 148:22
150:15 179:12
193:14,17
205:20,22
212:19 213:7
213:19 214:2
229:23 231:7
296:1
**statements**
33:14,15 35:13
47:24 54:9
58:7 59:5 62:3

64:3,9 68:13
70:4 108:24
109:14 111:14
115:9 143:9
157:15 159:1
162:1,5,15
165:25 166:11
192:21,22
205:3 206:13
206:17 212:1
212:12 228:23
231:23 252:4,7
254:1
**states**  1:1 2:1
6:9 11:8 12:3,9
13:20 14:13
15:1,15 18:13
18:21,22,25
19:2 28:19
34:20 41:22
45:2 83:8
188:25 201:7
202:8 203:16
210:3 230:1,22
234:6,25
260:12 270:19
270:20,22
289:18
**static**  94:12
**stating**  190:14
287:17
**status**  34:17
94:18 95:5
96:25 270:9,18
271:1
**statutorily**
221:17

statutory
  220:22
stay   3:3 153:14
  169:11
steeh   234:23
step   33:9 217:7
  302:22
stephenson
  3:14,18
steps   49:9
  64:12,15 65:2
  80:6
stettinius
  233:23
steve   56:19
  163:3 258:24
steve's   163:7
stick   116:23
stockton   7:1
  246:12
stong   234:25
stop   54:3
stopped   17:4
storage   37:22
  59:9
stored   37:6
stormx   119:16
  119:19
straightforw...
  145:14
strategies
  138:9
strategy
  177:15
strayed   275:6
street   6:4

stretch   108:18
stretto   155:13
  182:16
strike   54:15,19
  63:12 231:5
  268:15
strikes   145:12
strong   224:25
  256:10
strongest
  185:1
struck   12:5
structurally
  57:4
structure   57:5
  109:9 115:15
  139:3,25 157:2
  171:6 186:25
  193:1
structured
  139:1
structures
  175:24
struggle   124:8
struggling
  117:6 295:23
stuff   46:24
  153:24 162:24
  164:14,15,21
  195:25 299:23
style   271:8
sub   118:23
subject   17:21
  65:8 79:14
  88:10 92:23
  105:21 106:2
  144:10 192:1

218:23 251:5
254:20 256:20
266:17 293:19
subjected   18:5
subjects   240:1
  240:3,7,8
submission
  227:5
submit   228:23
submitted
  34:20 227:6
  231:23,25
  285:3,4,16
subpoenaed
  229:2
subsection
  188:25
subsequent
  27:14 79:22
  88:17 89:4,6
  125:25 152:14
  246:17
subsequently
  60:14 152:7
  200:12 205:3
  205:12
subset   130:3
  276:17
substance
  183:1
substantial
  245:11,11
  281:2,4,5
substantially
  199:14 235:6
  247:10 263:25

substitute
  303:9
succeeding
  168:22,23
succeeds   152:6
  171:19
success   140:23
successful   22:7
  149:19,21,22
  150:5
sudden   127:24
sue   273:1
sufficient
  50:14 149:4
  203:2 209:24
  293:6
sufficiently
  203:10
suggest   142:7
  213:6 223:1
suggested
  142:10 294:22
suggesting
  19:9 20:14
  217:9
suggestion
  212:10 226:19
suite   5:21
  305:22
supervision
  256:20
supplement
  22:15
supplemental
  24:24 65:9,11
  65:21 66:8
  67:13 68:7,8

| supplements | 32:15 39:18 | surprising | t |
|---|---|---|---|
| 243:16 | 45:19 55:15 | 29:24 | **t** 305:1,1 |
| **support** 26:10 | 56:21 59:24 | **surrounded** | **tab** 188:16 |
| 27:3 29:2,9,13 | 65:6 67:4 68:3 | 264:19,20 | **tackle** 131:25 |
| 74:22 75:11 | 68:22 71:24 | **survey** 285:4 | 138:24 |
| 76:15 89:19 | 76:5,11 84:22 | 285:11,25 | **taft** 233:23,25 |
| 112:15 113:23 | 86:21 91:9,13 | 286:1,13 | 234:1 235:14 |
| 125:22 128:3 | 92:23 98:4 | **surveymonkey** | **tail** 225:14 |
| 130:25 131:1,1 | 109:18 114:3 | 285:5 | **tailored** 225:1 |
| 131:9,12 | 114:16 127:20 | **suspect** 303:7 | **tails** 50:10 |
| 157:20 161:13 | 132:3 151:17 | 303:14 | **take** 15:17 |
| 206:6 207:11 | 151:18 163:6 | **sustain** 43:12 | 22:10,19 29:19 |
| 207:15 208:9 | 164:4 174:2 | 185:4 282:14 | 37:19 43:6 |
| 208:11 222:12 | 175:13 176:21 | **sustained** | 64:13,13 65:4 |
| 244:20 245:5 | 179:7 181:15 | 266:1 | 74:6,12,13 |
| **supported** 29:6 | 184:22 185:25 | **swear** 23:21 | 77:11 80:6 |
| 100:3 104:14 | 188:4 193:6,15 | 144:9 233:9 | 81:8 113:14 |
| 119:9 120:6 | 204:18 212:19 | **sweet** 120:8 | 126:23 127:4 |
| 128:18 129:1 | 214:24 220:2,7 | **switch** 303:16 | 128:5 131:21 |
| 156:11 160:4,6 | 220:23 223:20 | **switching** | 142:25 149:10 |
| **supporting** | 234:17 236:23 | 90:16 | 160:4 161:15 |
| 102:3 207:7 | 237:17 238:16 | **sworn** 47:24 | 171:12 191:6 |
| **supports** | 255:10 257:2 | 58:7 59:5 | 193:12 194:15 |
| 130:12,23 | 257:16 261:13 | 63:24 64:3,9 | 194:24 195:10 |
| **suppose** 15:16 | 261:22 262:5 | 70:4 72:11 | 195:20 210:5 |
| 187:11,11 | 263:25 264:10 | 109:14 111:14 | 212:8 213:8 |
| 232:1 | 264:18 267:21 | 143:9 144:17 | 224:21 236:17 |
| **supposed** | 268:19 274:25 | 145:5 165:22 | 243:19 256:4 |
| 211:2 214:25 | 275:4 281:15 | 184:23 205:20 | 274:21 286:13 |
| 282:2 | 288:11,19 | 212:19 228:23 | 286:15 292:19 |
| **supposedly** | 296:5,18 | **system** 16:7 | 296:9 298:1 |
| 16:4 | 297:13 298:21 | 29:13 | 302:22 |
| **supreme** 234:7 | 303:20 | **systems** 101:2 | **taken** 37:12 |
| 281:23 | **surface** 160:25 | 131:15 | 230:15 244:20 |
| **sure** 9:7 11:2 | **surprise** | | 278:16 |
| 12:10 23:9 | 251:24 | | **taker** 246:9 |
| 28:8,18 32:12 | | | |

**talk**  81:3 86:2
  178:12 179:22
  181:10,17,19
  191:4 201:17
  209:5 210:20
  214:7 216:8
  226:8,10
  242:24 255:19
  258:24 272:3
  279:11 281:11
  285:1 296:25
  302:19
**talked**  25:12
  126:20 180:6
  180:18 216:13
  241:22
**talking**  31:15
  41:3 48:23
  90:14 117:10
  118:7,21 120:1
  121:1 122:22
  132:3 151:9,23
  160:8 178:19
  178:20 181:2
  223:19 225:25
  226:12 245:23
**task**  131:20
**tasked**  123:3
**taught**  72:19
**tax**  72:4 146:25
  219:9
**team**  26:24
  42:10 46:2,4,6
  46:18,25 47:2
  47:13 50:12,19
  52:20 56:7
  88:21 126:20

  134:21 163:18
  198:5,9 216:3
**technical**  46:22
  46:24 47:14
  49:19 50:14
  52:21 53:23
  54:2,5 56:4,10
  56:12,23 57:10
  57:18,21 84:14
  90:3 103:9
  110:7,24
  126:11
**technically**  49:4
**technology**
  110:13 164:20
**techs**  105:22
**telegraph**
  123:12
**telephone**
  44:23,24 98:18
  214:16 227:17
  255:4 304:4
**telephonic**
  16:21 66:4
**telephonically**
  221:12 240:18
**tell**  14:7 15:21
  17:25 32:11
  35:5 39:13,16
  39:19 80:16
  109:24 119:18
  123:15 141:22
  158:8 222:1
  229:10 261:3
  295:22

**telling**  32:17
  135:21 166:7,8
**tells**  10:15
  231:11
**temperament**
  283:17
**temporary**
  90:5
**ten**  81:8,9
**tend**  63:7
**tendering**
  228:25
**tens**  30:8
  119:22 120:21
  121:22
**tension**  134:23
  134:25 135:5
  138:20
**tent**  165:19
**term**  56:4
  84:19 125:7
  169:5,7,9
  256:25 260:1
**terminate**
  78:25 79:1,3,4
  106:14 189:7
  274:17
**terminated**
  159:13 188:22
**termination**
  188:19
**terms**  11:10,16
  12:9 13:8 61:8
  86:25 87:2,3,8
  87:11 88:6
  132:14,15
  136:12,18

  154:3,11,18
  192:1 241:2
  256:22 271:24
  275:3 279:4
  283:19 286:20
  290:1
**test**  30:1
**testified**  42:24
  43:4 45:10
  54:14 58:18
  59:15 86:10
  99:13 142:14
  142:16,18,20
  219:7 232:9
  247:6
**testify**  10:1,1
  10:12 23:12
  176:5 185:3
  233:2 266:23
  282:8 285:18
**testifying**
  258:3
**testimony**  9:18
  23:22 43:2
  53:2 61:5
  72:11 85:16
  103:10 119:4
  142:2 143:25
  184:23 185:2
  201:22 202:5
  206:19 209:13
  233:10 236:19
**tests**  59:23
**texas**  6:1 12:10
  12:19 13:4,23
  98:22,23
  185:11 218:2

231:23 270:11
**text** 204:12,14
204:21,24
205:6,11
**textbooks**
270:16
**thank** 16:19
20:20 21:11,13
22:14,24 23:25
24:4,23 25:9
35:3 41:15,21
44:9 79:12
81:13 86:22
98:15,16 99:5
99:8 101:16
102:18,20
104:17 105:13
106:17 107:24
108:16 109:23
111:15,17,18
113:1 114:9
115:4,8 117:2
119:18 121:6
122:20,24
128:15 131:23
133:21 136:25
136:25 139:17
140:6 142:21
142:22 145:7
145:10 149:15
151:14,15
152:16 159:14
161:17 174:3,5
181:18 182:5
185:6,20 186:9
210:24 211:9
212:3 213:19

213:20,23
215:13 217:25
219:1,13,15
229:25 230:25
232:20 233:17
235:20 237:25
247:3,22 255:2
265:3 269:21
270:5 272:3
275:14 280:24
287:24 294:9
294:17 295:17
295:18 299:4
299:22 303:1
304:6,8
**thanks** 16:18
17:6 23:18
107:21,21
125:6 151:17
**that's** 151:12
151:14,24
155:8,12 156:9
157:3,3 159:22
159:23,25
160:1,14
162:14 165:13
166:11 168:6
169:23 171:13
171:17 172:8
172:14 173:2
173:20,25
178:6 181:7
182:4 183:16
184:4,21 185:9
189:21 191:3
191:20 192:12
192:24 195:23

196:6,13,20,23
197:16 198:3
198:10,13
199:20,24
200:3 201:9
204:3,3,9,23
205:2,2 206:2
206:8 209:9,19
209:25 211:22
212:4 213:10
213:17,18
214:20 217:6
219:14 220:7
221:20 222:3
223:5,23 224:6
224:18 225:18
225:23 226:25
228:12,14
229:4 230:24
236:4 237:18
238:11 239:18
239:22,25
241:23 242:6
244:5 246:21
248:3,24
249:18,20
250:16 253:20
256:19 257:9
258:1 259:4
260:11 261:18
262:8,12 263:2
263:3,22
274:11,20
275:19 276:13
277:2,15,16,20
278:16,23,24
279:1,6,6

281:11,18
283:25 287:4
291:17 293:21
294:11 295:11
297:23 299:2
301:15 302:6
**theft** 61:25
200:18
**theirs** 104:20
**themes** 255:20
**theoretically**
89:19 90:1
120:15 187:9
**theories** 260:3
**thereabouts**
67:23
**there's** 155:9
155:12 161:8
164:4 171:1,19
174:25,25
175:4 178:18
178:25 186:19
208:14,19
215:1 219:17
222:15 226:2,3
227:1 232:18
237:14 242:23
243:8,22
244:13 245:4
248:6 249:18
249:21 259:17
262:6,24
270:10 275:24
281:8,10
293:17
**they're** 165:25
169:10,12,13

179:18 202:21
220:1 222:2
225:17 226:12
232:3,4,5
252:8 272:24
273:12 277:13
277:16 278:5
285:12
**they've** 166:19
216:12 275:5
**thing** 12:11
48:4 91:14,19
99:2 109:5
127:21 147:11
162:3 174:24
181:11,20
205:17 217:6
244:6 283:22
292:11 295:21
**things** 9:15
10:23,24 20:15
30:1 31:22
33:20 43:17
58:4 63:13
89:17 99:10
108:3 136:23
141:4 146:12
146:21 148:11
148:17 164:24
166:7 169:14
170:6,9,16
171:7,20 176:1
184:10 186:4
196:9 200:8
203:3 205:8
208:4 210:10
221:18 222:25

225:8 226:22
232:5 239:13
245:22 255:17
283:18 288:23
**think** 11:14
14:17 16:5
19:13 22:10
23:13 25:13
28:2 38:9
42:12 43:10,11
43:16,19 45:25
46:11 47:20
49:21 52:23
57:1 58:2,18
59:7,15 64:15
65:10 66:3
67:2,10,22
68:10,12,24
69:22,25 70:13
71:17 72:14,16
74:7 75:18
76:11 77:5,10
77:13,20 80:1
81:16 84:22
85:9 88:1
89:12,12,25
90:10 92:24
93:16 94:10
96:25 97:7,11
97:13,24 98:10
99:20 100:4,5
100:16 101:4
101:14 102:2,5
102:7 103:9,23
104:1 108:11
112:17 113:7
113:21 114:24

115:21 116:11
116:21 117:10
117:11,23
118:8 120:24
127:4,12 128:4
137:7 144:8,9
144:14 145:18
146:12,17,23
147:5,10
148:12,24
149:2,10,11
150:8,14
151:14 152:9
152:11 155:12
157:14,22
159:16 160:17
166:22 168:21
169:23 170:17
170:20,24
173:14 174:3
174:24 175:1,5
175:25 176:7,8
177:24,25
180:10,24
181:5 182:25
183:19,20
184:4,12,24
185:4,13,13
186:3 191:13
198:20 205:10
207:9 209:25
211:1,23
213:13,21
214:5,9,12,22
215:3,5 216:5
216:8,17 217:7
218:20 220:18

221:3 222:19
224:6 225:17
226:19 227:3,8
227:12 228:24
229:2,20 230:7
231:16 232:3
238:16,18
243:6 244:14
248:21 251:5
252:14 254:2
258:12 259:18
259:19,22,24
262:12,13
264:7 269:8,10
269:10 271:10
272:17,18
273:21 274:5
274:23 275:12
276:1,20
283:12,19
284:10,14
289:13 290:6
291:21,24
292:21,23
293:6 295:5,8
295:23 296:6,7
297:9,21 300:8
300:14,15
302:17
**thinking** 10:24
148:12 258:17
**thinks** 185:3
231:14 296:1
**third** 27:20
28:13,17 29:1
29:4,17 30:24
37:1 47:22

48:9,11,13,23
49:6 50:2,25
54:1 57:18
94:2 100:20,25
101:2 103:16
103:16 104:20
106:25 107:2,7
107:15 109:4
128:23,24
131:6,10,15,19
156:8 165:8,10
172:6 196:4,21
244:16 246:18
247:25 248:10
248:20,23
249:1 285:4
301:13

**thorough**
108:25 124:6

**thought**  89:18
147:8 161:24
170:25 171:8
171:11,20
173:5 185:12
224:22 257:11
261:9 262:16
274:3,12
279:22 284:3
294:21 300:20
301:6

**thoughtful**
127:20

**threatened**
91:15

**threatening**
211:16

**three**  11:8 12:3
12:12,20 13:3
13:21 14:1
15:14,18,22,25
17:10 19:1,13
32:2 39:1 42:2
49:1 68:16
70:14 76:18
77:18 80:20
81:18,24 82:9
85:20 96:10
155:1,2 156:6
156:10 198:17
201:8,9 209:11
237:16,17
238:25 244:2
248:1 258:14
261:11,15,19
261:23 262:2,3
262:7,14,23,25
290:12 293:1

**threefold**
146:14

**threshold**
90:13 209:25
293:20

**thresholds**
293:20

**threw**  174:1

**throughs**  63:22

**thursday**  66:25

**tichenor**  8:4
10:11 23:6,20
23:21 24:2,5
24:11,24 25:7
25:11 32:21
40:12 41:2,18

41:23,25 44:11
45:5,7 54:14
63:9 79:14
81:15 86:25
91:4 98:15,25
99:2,3,3,5,7,9
111:24 112:1
115:5,7 142:22
145:22 146:6
151:19 152:18
159:16 167:11
182:12 184:15
185:22 186:11
186:17 211:11
216:13 219:7
219:16 222:16
232:9

**tichenor's**  25:4

**tie**  236:2

**tiebreaker**
262:6

**tight**  259:2

**time**  14:12,25
17:7 18:1,7,10
18:23 30:15
32:2 33:1,5
43:21 54:1
60:13 67:18
73:12,17 77:14
77:16 82:1,6
85:5 90:5
96:11 103:14
103:18 107:15
118:18 123:8
123:25 124:3
126:23 135:23
135:25 136:4

137:10,11
138:13 139:2
147:9 151:1,15
153:21 157:16
158:6,13 160:3
169:1 173:11
179:4,17 181:4
181:9 184:6
200:6 201:4
208:14,16
211:24 220:7
236:18 239:6
242:11,15
244:25 253:25
261:9 266:5
278:15 281:2
286:23 287:24
289:6 292:7
294:9 296:7
297:12 298:2,3
298:5,22
299:10 300:12
302:5,8,22,24
304:1

**timeframe**
268:11

**timeline**  75:20
76:7 78:6
127:14 148:5
278:18

**times**  99:7
127:25 134:22
138:21 209:11
223:2 237:8
242:14 298:19

**timing**  76:13
85:13 158:20

183:17 221:4
274:17 297:1
**title** 61:7
**today** 17:9
21:25 31:23
32:11,17 42:20
60:20 65:11
75:10 76:14
98:12 117:4
119:3,4 120:3
124:14 126:21
149:2,9 150:25
153:3,16
171:18 186:19
189:15 191:3
192:5 195:24
204:8,20
209:21 221:5
231:8 236:3
245:23 254:1
275:7 298:19
**together** 32:5
115:23 242:8
261:16
**toggle** 25:19,23
30:11,18,19
31:5,20 33:1
41:3,6,14
42:21 67:2,6
71:14,15 74:5
75:1 84:7 96:6
99:12,14,23
101:11,25
102:12,22,25
103:1,3,25
104:18 105:3
112:1,5 113:1

115:11 120:10
125:9,10
137:22 139:19
140:4 142:16
148:8 149:7
159:18,20,22
160:2,9,11
167:17 168:2
168:13,14
177:12 183:8
184:9 187:16
203:14 208:24
209:7 219:9
**toggling** 40:15
**token** 26:10,12
27:10,11,21
44:3 104:14
112:7,14 119:9
119:10 121:21
124:23 125:15
129:15 130:2
130:24,25
131:2 179:1,6
296:1
**tokens** 26:16
26:24 27:3,6,8
27:14,19 29:2
29:5,9 31:2,7
44:6 72:3
103:7 104:4
117:21 118:3
118:23 120:1,4
120:5 122:6
124:12,19
125:18,20,22
126:1,7 128:4
129:7,13,22

131:6,9,13
159:24 160:3
230:18
**told** 131:12
134:8 144:19
145:5 166:24
167:4 227:4
228:13,13
**tomorrow**
208:19 232:11
**tone** 181:23
**tonight** 232:11
297:2
**took** 52:13,17
64:15 65:3
94:5 171:4
257:12 289:25
296:21
**top** 55:1 65:7
93:13 109:13
140:13 239:15
239:24 257:23
**topic** 138:4
159:18 195:5
253:9
**torment**
144:15
**total** 116:9,11
119:20,23
120:3 121:2
140:11 263:2
**totally** 39:23
275:5
**touched** 53:5
65:11 281:18
**tough** 184:14

**towards** 19:14
20:18 25:23
71:14 225:14
272:1
**town** 238:3,4
286:21
**townsend** 7:1
246:11,11
**track** 38:8 73:2
88:12,16
**tracking** 38:24
**tracy** 4:1 7:8
114:11,15
269:18
**trade** 27:14
30:24 66:6
117:11 118:3
118:14 120:20
120:21 122:8
122:10 124:18
129:17 147:6,7
175:16 223:2
289:15
**tradeoff** 96:5
161:5
**tradeoffs**
154:10,22
**trades** 113:20
120:24 121:22
122:1,25
123:22 124:1
124:12 130:1
177:7,15 179:5
179:9 183:24
208:19
**trading** 87:1,3
87:10,12,13,19

87:25 88:2,8
88:12 89:3,11
90:7,15 115:20
117:16,22
124:14 162:3
170:4 191:9
192:6,10,14,17
192:22,23
193:2,8,10,25
194:15 195:11
213:9

**tradition**
140:24

**traditional**
31:11 60:23
121:20 141:1
191:8

**training**   90:2
117:18

**transacting**
129:25

**transaction**
13:12 28:1,7
31:21,24 40:3
40:5,11,15
41:8 59:11
60:17,24 61:2
62:11,18 63:11
63:14 64:14
65:1 67:5 68:1
69:7,7 70:17
71:13 74:5
82:7 83:9,17
83:24 84:5,17
85:11,13 91:19
96:4 100:19
101:21,22,25

102:4,12,22,25
103:1,3,4,24
103:25 104:19
105:4 113:1
117:5,9 118:18
124:10 125:2,8
126:13 129:16
130:9 139:9,12
139:14,15,17
139:22,25
140:9,19,21,23
146:10 148:23
165:15 170:24
187:2,6,8,18
187:19 190:17
192:14 198:9
203:13 204:16
208:16 209:16
219:7 222:24
230:19 231:17
272:22 276:3
284:13

**transactions**
12:23 17:21
30:2,24 51:9
66:18 73:3
76:19 100:7,17
118:16 122:14
122:18 123:8
123:10,14,19
129:11 141:6
177:2,19 179:3
189:7 200:7,22
230:20 273:5

**transcribed**
4:25

**transcript**
305:4

**transfer**   19:17
20:1,4,12 27:2
28:1,13,21
36:4 58:23
59:17,20 64:21
70:21 73:5
79:22 80:3
88:22 89:6
90:10 103:15
128:18,22,24
130:2 131:2
143:22 155:23
156:13,15
170:13 200:25
213:9 245:21

**transferred**
17:17 20:7
45:9 79:24
129:22 130:20
131:8 153:11
153:18,25
154:1 156:2
159:25 200:6
200:11 213:3
284:14

**transfers**   37:8
64:17 88:21
155:16 162:23
166:25

**transition**
106:15

**transitioning**
106:10

**transmission**
42:6 156:25

**transmitter**
34:16

**transparency**
226:6 264:21

**travel**   304:3

**treat**   162:4

**treated**   80:2
268:13

**treatise**   281:13

**treatment**   12:3
18:20 19:8,14
109:8 161:6

**treats**   10:8

**trevino**   7:23
182:6,8,8,11
183:10,15
185:6,9 301:7
301:9,9,23
302:4,17,25

**trial**   3:10 220:3
270:8,24

**tried**   92:24
138:9 148:14
173:6 175:24
183:19 275:3
285:20 287:1

**trigger**   79:9
159:4

**triggered**
106:12,13

**triggers**   79:6
158:17

**trouble**   14:13
19:7

**troubling**
97:21

| true 23:4 183:5 | try 10:7 11:23 | 299:5 | 210:9 226:5 |
|---|---|---|---|
| 236:9 245:7 | 14:2 19:25 | turned 60:14 | 228:20 246:20 |
| 260:7 290:21 | 74:15 76:24 | 117:3 257:9,18 | 248:1 252:19 |
| 293:11 305:4 | 78:10 85:22 | turning 72:7 | 258:14 261:16 |
| trust 11:1 | 112:7 123:23 | turns 279:2 | 261:20 262:16 |
| 17:18 18:11 | 124:3 129:12 | tweet 39:9,25 | 262:24 267:10 |
| 58:25 59:1 | 135:10 136:18 | 40:6,8,10 | 273:9 291:21 |
| 80:2 87:21 | 138:7,9 146:20 | 203:21,22,24 | 295:24 |
| 179:25 244:7 | 148:1 165:1 | 204:1 205:25 | tx 6:2,3,5 |
| 279:18 280:1 | 173:12 175:13 | 206:8,14 | type 47:1,14 |
| 286:3 290:7,10 | 177:18 179:3 | 260:22 | 49:18 113:24 |
| 294:3 | 182:2 207:14 | tweeted 40:2 | 130:23,25 |
| trustee 3:21 | 229:6 230:5 | tweets 41:6 | 131:1,25 133:5 |
| 6:10 41:22 | 272:19 275:4 | 68:18 204:18 | 165:6 173:10 |
| 88:20 175:17 | trying 15:4 | 206:5 | 215:23 235:10 |
| 202:8 210:3 | 19:3 93:13 | twenties | 237:5 240:10 |
| 211:12 217:12 | 114:14 117:19 | 150:16 | 245:14,21 |
| 217:13,22 | 121:16 122:7 | twice 236:20 | types 49:2 63:8 |
| 221:9 222:21 | 123:14,24 | 237:19,24 | 64:9 73:15 |
| 227:17 235:10 | 124:19 127:15 | twitter 147:12 | 109:5 122:14 |
| 245:13 260:13 | 147:9,18 | 150:17 286:24 | 122:18 139:8 |
| 261:10 262:10 | 149:20,24 | two 26:8 47:20 | 165:14 169:18 |
| 263:1,12,16,17 | 151:12 164:9 | 49:22,22 52:8 | 170:2 172:14 |
| 270:20 289:18 | 172:9 173:8 | 52:11,15 58:16 | 239:13 245:22 |
| 292:24 | 209:12 225:3,5 | 71:3 77:18 | 283:2 |
| trustees 235:11 | 226:14 250:12 | 89:24 105:15 | typical 55:4,15 |
| 245:15 261:16 | 253:8 254:10 | 112:20 113:23 | 55:16 66:22 |
| 261:20,24 | 258:10 276:2 | 125:13 126:5 | 278:20 |
| 262:16,25 | 301:17 302:2,4 | 126:11 146:4,4 | typically 47:10 |
| 263:10,11 | tuesday 297:8 | 147:20 157:6 | 51:8 55:3 |
| 293:7 | 297:25 298:3,9 | 167:1,2 168:17 | 59:10 141:2 |
| trusts 263:13 | 298:10,11 | 169:7,15,17 | |
| truth 23:22,23 | 299:21 304:4 | 175:7,7 182:15 | u |
| 23:23 184:5 | turn 65:14,19 | 182:17,20,24 | u.s. 2:23 6:10 |
| 202:3,4 233:10 | 113:15 183:3 | 183:13 196:4 | 40:5 42:2 |
| 233:11,11 | 188:18,25 | 198:1 205:8 | 80:21 81:19 |
| | 231:21 272:25 | 208:13 209:11 | 102:23 108:12 |
| | | | 109:25 110:5 |

| | | | |
|---|---|---|---|
| 156:21 175:19 | 82:8 90:13 | 163:9,10 208:2 | 19:18,19,22,22 |
| 179:25 180:9 | 100:23 105:6 | 263:10,11,12 | 19:23 29:3,22 |
| 192:10 211:12 | 105:11 106:25 | 263:14,16,18 | 30:2 36:15 |
| 217:12,13,22 | 112:17 113:5 | 289:11 | 37:15,21 43:22 |
| 221:9 227:17 | 117:23 131:16 | **uncovered** | 50:2,11 59:24 |
| 234:23 | 132:17 137:9 | 294:21 | 60:15 61:24 |
| **ubl**  58:16 | 138:11 149:7 | **under**  55:25 | 63:4,4 66:21 |
| **ubo**  193:21 | 149:13 151:2,3 | 70:18 75:9 | 68:3 71:10 |
| 203:20 | 154:4,16,20 | 79:15 80:19 | 73:17 74:24 |
| **ucc**  32:6 40:22 | 156:14,17 | 82:2,16 91:17 | 85:25 86:3 |
| 44:12 55:21,22 | 157:19,22 | 99:14,23 | 94:25 106:5,13 |
| 71:4,8 100:18 | 158:11 160:20 | 102:12,22,25 | 108:3 113:11 |
| 100:24 105:9 | 168:24 171:9 | 104:9,15,18 | 117:6 119:13 |
| 140:25 146:18 | 177:19 178:22 | 105:2 112:19 | 124:9,13 |
| 149:11 158:11 | 179:16 187:25 | 133:4 151:25 | 130:22 144:21 |
| 170:7 174:22 | 197:25 203:5 | 152:11 154:10 | 144:24 146:13 |
| 176:21 216:14 | **unable**  46:12 | 154:18 155:8 | 146:22 147:1 |
| 222:20 244:17 | 84:5 138:18 | 156:11 159:5 | 147:16,23 |
| 244:18 257:3 | 200:20 | 165:19 166:25 | 151:12 153:22 |
| 257:21 258:16 | **unanimous** | 167:22 172:22 | 158:17 160:18 |
| 258:22,23 | 257:24 258:6 | 176:25 183:8,9 | 161:10 163:22 |
| 260:23 265:22 | 258:11 261:18 | 185:2 192:1 | 163:25 165:16 |
| 266:3,8 282:6 | 262:2 | 209:17 220:20 | 172:9 173:14 |
| 285:23 286:5,6 | **unanimously** | 230:8 239:20 | 173:21 175:2 |
| 286:9 287:18 | 256:13 257:11 | 243:12 244:1 | 180:10,12 |
| 288:7,8,24 | 257:12 | 276:13 281:22 | 185:5 186:1 |
| 290:16 | **unaudited** | **underline** | 191:25 192:18 |
| **ucc's**  46:10,16 | 33:15,23 162:1 | 232:14 | 195:13 207:12 |
| 55:22 108:9 | 192:22 | **underlying** | 214:18 215:2 |
| 123:17 147:13 | **unaware** | 37:3 38:22 | 227:11 243:12 |
| **ultimate**  36:16 | 200:19 | 147:2 162:8 | 254:12,15 |
| 97:23 152:15 | **unclear**  11:5 | 170:22 179:2 | 258:10 261:22 |
| **ultimately**  28:4 | 32:15 159:2 | **understand** | 265:1,24 |
| 31:6 32:7 | **uncomfortable** | 10:3,20 11:20 | 269:13 276:20 |
| 40:17,19,23 | 161:2 187:13 | 11:23 13:6,15 | 281:15 282:4 |
| 61:14 71:23 | **uncommon** | 13:17 14:11,16 | 297:3 299:1 |
| 75:7,14 77:12 | 64:7 93:18 | 15:7,12 18:15 | 302:4 |

| understandable | understood | united 1:1 2:1 | unsupported |
|---|---|---|---|
| 225:7 | 38:19 54:12 | 6:9 28:19 | 11:5,11,14,18 |
| **understanding** | 63:6 64:12 | 41:21 45:2 | 11:24 13:24 |
| 14:14 19:8 | 86:4 95:2,19 | 83:7 201:7 | 14:23 15:2 |
| 26:23 28:25 | 106:8 109:18 | 202:7 203:16 | 18:14 19:1,10 |
| 29:11,19 35:21 | 114:3 117:15 | 210:3 230:1,21 | 26:15,20,22 |
| 36:18 37:14 | 122:16 127:14 | 234:6,25 | 28:23 29:9 |
| 38:16 40:7 | 146:14 149:15 | 260:12 270:19 | 30:13,17 31:2 |
| 42:9 50:4,6 | 154:13 227:15 | 270:20,22 | 72:4 99:15 |
| 51:4,12 58:14 | 244:9 266:25 | 289:18 | 104:4,19 126:8 |
| 59:16,20 66:3 | **undo** 18:17 | **university** | 129:7,13,21,22 |
| 74:24 79:17,19 | **undue** 18:6 | 234:18,19,20 | 160:2,12 161:2 |
| 80:24 83:10,12 | **unequal** 19:14 | 238:7 | 161:13 177:14 |
| 84:4 93:8 | **unexpected** | **unknowingly** | 179:23 180:6 |
| 102:22 107:4 | 60:11,13 | 17:1 | **unsworn** 10:9 |
| 108:23 110:11 | **unexpectedly** | **unknown** | **unusual** 10:2 |
| 110:15,18 | 60:8 | 77:15 100:4 | 64:11 95:12 |
| 125:21 126:13 | **unfair** 18:14 | 179:10 184:14 | 222:25 |
| 126:23 129:5 | 161:1,5,5 | **unknowns** | **unwilling** |
| 130:8,21,22 | **unfortunately** | 179:14 | 138:6 |
| 131:5 140:5 | 17:6 114:6 | **unlicensed** | **update** 29:25 |
| 146:24 147:3 | 146:21 153:6 | 42:6 156:25 | 69:11 215:16 |
| 148:22 149:16 | 248:10 272:7 | **unliquidated** | 215:17,19,22 |
| 191:17,23 | 281:13 | 252:9 | 220:6 225:16 |
| 192:3,20 193:4 | **unidentified** | **unmute** 114:14 | **updated** 94:18 |
| 198:3,10,13 | 218:3 226:17 | **unofficially** | **updates** 286:25 |
| 200:3 202:21 | 228:6,8 255:9 | 265:22,25 | **updating** 303:1 |
| 206:2,4,8 | 257:19 260:20 | **unprecedented** | **upfront** 26:5 |
| 207:10 211:19 | 261:21 262:1 | 135:4 | 169:6 174:25 |
| 231:2,5 250:1 | 262:18 264:3 | **unquote** 190:9 | 175:3 |
| 251:3,8,12,16 | 264:12 265:3 | **unregistered** | **upgrade** 127:5 |
| 257:8,17 258:7 | 299:2,7,25 | 90:17 230:21 | 127:17 128:3 |
| 272:9 276:16 | 304:2,6 | **unregulated** | 131:17 |
| 299:18,23 | **unilateral** | 72:20 | **upgrades** |
| **understands** | 105:4 | **unsecured** 4:8 | 125:25 126:24 |
| 151:18 269:11 | **unique** 73:23 | 186:14 235:8 | **upgrading** |
| | | 245:18 | 127:2 |

**uploaded**
  86:20
**ups**  210:12
**upside**  170:18
**upsides**  169:15
**uptegrove**  5:24
  44:19,22 45:1
  45:2,6 51:22
  54:12,13 55:12
  60:22 61:19
  65:18 75:25
  76:4,10 78:20
  79:8,12,13
  81:6,13,14
  83:22 85:9,23
  86:12,22,24
  91:3 92:11
  97:6 98:11,15
  215:10,10,13
  215:21 218:7,9
  218:9 219:21
  219:21 220:9
  220:12,15
  224:7,7,10,13
  224:15 227:14
  227:14,21,24
  228:1,3 229:25
  230:1
**usdc**  120:6
**use**  27:9 73:4
  86:25 87:2,3,8
  87:11,21 88:6
  102:11 103:20
  143:23 157:9
  191:10 262:19
  276:11

**used**  27:4 40:1
  84:20 151:4
  245:23 271:15
  271:16,17
**user**  79:15
  84:19,23 85:1
  86:1,4,16
  156:12
**user's**  81:18
  86:9
**users**  79:16,17
  79:19,23 80:6
  80:9,19,21
  81:17,22 82:10
  82:24 206:6
**user's**  155:23
**uses**  27:1 29:5
  70:1 118:16
  131:7
**using**  11:25
  30:21 101:1
**usual**  275:2
**usually**  223:5
  237:17 245:18
  289:15 290:22
  291:2,10,14
**utility**  112:12
  113:5,10,16
**utilize**  27:19

---
**v**
---

**v**  1:13,22 3:2,8
**vague**  75:23
**vaguely**  54:2
**valid**  184:4
**validate**  31:5
  73:2 126:3

**validated**
  128:25 130:19
  155:21
**validating**
  130:9
**validation**
  131:7
**valuating**
  171:6
**valuation**
  57:17
**value**  13:13
  14:18,20 25:21
  26:2,3,7,9,12
  30:22 41:10
  44:3 66:20
  71:19 81:22
  100:6 104:9
  112:2,2,3,4,12
  112:21 113:4
  113:13,21
  119:18 120:8
  121:2,24
  123:23 135:7,8
  135:10,14
  138:22 140:11
  141:16 142:13
  147:11,19,23
  149:5 150:20
  150:22 152:11
  154:13,20
  160:24 168:4
  171:5,11
  174:14,19
  175:1,2,11,13
  176:7,7 179:16
  180:18 184:13

  208:13 209:7
  209:17 271:18
**values**  151:4
**vanderbilt**
  6:18
**variation**
  136:18
**variety**  197:14
  275:25 283:13
**various**  33:16
  38:12 40:22
  42:16 45:14
  62:16 68:19
  71:7 92:4,13
  93:4,5,11,19
  93:20 100:20
  108:14 112:9
  115:22 117:25
  175:24,24
  248:2
**vary**  128:19
**verification**
  29:4,17 59:13
  62:25 69:11
  144:3 145:16
**verifications**
  30:1
**verify**  23:4,13
  27:20 52:22
  58:25 59:2,3
  59:21 108:16
  108:18 145:5
  164:10 165:13
**verifying**
  144:19 164:5
**veritext**  305:20

**vermont** 11:15
  13:24 15:1
**vermonters**
  11:17
**version** 21:22
  91:6 248:3
**versions** 248:2
**versus** 82:4
  112:5 124:19
  164:13 169:5
  169:13,13
  192:7 198:11
  199:11 205:14
  262:10 264:13
**vested** 293:14
**vet** 119:16,19
**veto** 290:25
**vgx** 26:10 44:3
  112:2,4,5,9
  113:2,5,17
  114:1,4 116:22
  169:13 296:1
**view** 12:8
  41:10 48:1
  82:5 94:22
  112:8,11,19
  113:21 138:5
  157:25 162:6,8
  175:2 179:8
  181:24 190:22
  194:23 198:18
  203:2 207:14
  208:13 271:4
  283:21
**viewed** 133:25
  137:8,9 174:21
  175:6 187:6

194:19
**viewpoint**
  271:1
**views** 73:16
  175:22 230:14
**violate** 266:22
**violation** 11:22
**virtue** 219:10
**visit** 59:8
**visited** 38:3
**voice** 16:19
  174:17
**voir** 24:20
**volatile** 121:19
  180:20
**volatility** 121:8
  183:20,25
**volume** 117:16
  117:22 152:4
**volunteered**
  303:14
**vote** 207:15
  244:20 245:1,2
  257:9,17,18,25
  258:7,8 261:18
  267:2,5,17,20
  273:13 290:17
  290:23,23,25
  291:3,6,9,13
  291:15,18
  292:5,15,19
**voted** 14:21
  257:4,12,13,14
  260:25 261:1,8
  261:15,19,19
  261:22,23
  262:25 264:4

264:10,12
  267:19 285:23
  292:7,9
**votes** 291:14
**voting** 97:2
  182:24 207:11
  267:10 272:6
  290:16,16
  291:6,7,8,20
  291:25 292:1
  292:17
**vouch** 72:8
**voy** 3:8
**voyager** 1:6,11
  1:19,20,23 3:1
  3:8 24:9 26:16
  26:24 27:10,18
  28:6,18,23
  29:5,8 30:11
  30:12 31:23
  40:3 44:7
  45:13 56:6,17
  90:18,20 99:13
  100:14 103:8
  103:13,16
  104:25 119:19
  123:3 125:11
  129:15,16
  149:13 150:20
  153:12,12,15
  153:15,20
  154:11 155:21
  155:21 156:6,7
  156:17 157:8
  160:3 163:2,4
  164:21 169:12
  174:13,19

190:24,25
  191:13 203:22
  230:15 240:21
  241:3 246:13
  260:22 289:19
  301:21,24
**voyager's**
  129:23
**voyager's**
  272:25

**w**

**w** 6:4 223:20
**wait** 11:7 12:2
  12:13,21 15:22
  18:21 19:2,6
  300:25
**waiting** 68:12
  74:19 180:21
**waiving** 261:13
**walk** 63:22
  302:1
**walking**
  204:19
**wallet** 27:21
  29:17 34:7,10
  37:4 47:16
  53:6 54:17,20
  55:18 56:4,24
  57:5,5 63:22
  70:2 103:17,17
  104:20 108:21
  126:4 128:17
  128:19,20,22
  128:24 129:23
  129:23 130:1
  130:18,19,23
  130:24 131:3,8

**wallets**  27:6,12
  28:10,11,14,14
  34:25 58:20
  73:8 108:21,23
  110:1,4 129:1
  129:21 130:3
  141:18 143:18
  143:21 162:23
**want**  10:18
  11:6,21,23,25
  12:1,10,18,20
  13:3,4,11,16
  13:17 14:1,7,7
  15:18 16:13
  18:10,25 19:4
  19:23,23 21:17
  22:3 25:11,17
  26:17 30:1
  32:9,15,16
  33:9 35:20
  37:11 58:19
  66:22 81:4
  85:21 86:12
  99:10 106:22
  113:25 114:14
  115:12 120:16
  123:9,11
  127:20,21
  128:25 131:24
  136:13,14
  137:24 144:2
  147:7 150:3
  153:3,4,5
  154:1,2,9,25
  155:4,10 156:4
  163:6,6,12,17
  169:1,20

170:14,23
172:5,18
173:16,19
181:10 184:25
185:3,25 196:7
201:2,20
206:13,18
210:10,21
214:17 216:15
216:16,18
217:4,19,19
218:12 219:25
220:8,25
221:25 222:18
223:19 224:11
225:2,18,20,21
226:7,8,23,23
229:3 239:6
249:12 255:10
255:14 257:2
261:21 264:17
272:25 281:6
291:22 296:12
299:16,19
**wanted**  19:16
  85:25 86:7
  106:2 107:14
  164:4 176:20
  205:13 208:19
  210:19 212:7
  215:15,17,19
  215:21 216:7
  224:16,19
  225:6,9,15
  230:24 253:1
  261:13 262:4
  262:14 290:4,4

290:5 295:21
297:7 301:10
**wants**  18:3,4
  181:17,19
  221:23 222:19
  299:6
**warren**  39:2
**wasn't**  169:21
  170:15 174:16
  187:11 196:11
  197:12,21
  198:3 203:17
  204:10,13,22
  206:1 231:8
  257:17 268:13
  290:21
**watkins**  5:3
  11:10 144:23
  213:25 216:3
**way**  17:13
  18:20 19:13
  20:18 46:25
  59:13 62:1
  63:5 64:25
  73:8 81:25
  83:5 88:19
  103:1 104:11
  110:11 123:20
  129:8 130:12
  144:19 151:25
  153:16 156:12
  162:4,5 171:24
  175:5 177:6,6
  178:25 182:18
  199:22 209:14
  221:21 225:1
  231:8 232:3,12

257:9,14
262:20 264:4
273:13 297:14
298:14
**ways**  73:9,13
  88:23 103:3
  109:18 113:14
  176:8 284:15
  291:10
**we've**  18:1
  33:17,18 37:4
  37:8 45:24
  55:22 59:4
  65:5 69:22
  72:11 78:1
  85:16,17 94:10
  111:12,12,13
  113:12 118:20
  122:11 131:22
  143:5 147:11
  147:19
**wearing**  236:2
  236:3
**website**  63:1
  63:10 155:13
**websites**  63:14
**wednesday**
  38:11 46:12
  66:25 297:20
**week**  71:9
  77:18,18,19,20
  79:22 124:25
  155:22 208:20
  238:3,4 240:11
  281:24 289:24
  290:6 300:10
  300:10 301:24

**weekend**
299:21
**weekly** 86:5
89:1 200:1,6
200:11 241:7,7
242:23 243:1
**weeks** 32:2
52:7 70:14
76:18 94:20
96:10 149:9
157:6,24 184:9
207:4 208:21
**weight** 290:24
**weighted**
290:25
**weirder** 296:21
**welcome** 16:20
214:12 222:20
222:20 229:23
294:10
**went** 99:11
107:15 123:1
137:25 160:3
163:25 198:1
230:3 263:20
274:3
**weren't** 169:6
172:3 184:10
251:24 261:13
**western** 234:5
**we'd** 160:17
**we'll** 157:23
158:10 221:9
227:19 234:15
274:21 300:6,7
**we're** 151:19
158:8 160:7

161:2 163:24
181:5,13,24,25
181:25 191:3,3
200:8 207:13
211:16 220:3,3
221:13 223:23
223:24 224:10
225:4,5,13,25
226:14 229:20
236:17 248:24
257:22 258:25
258:25 259:1,2
259:6 265:15
266:14 295:23
296:18 297:1
**we've** 151:23
163:19 165:4
166:23 202:15
209:11 211:23
213:21 214:11
215:16 227:17
241:21 274:16
274:24 275:6
278:6 298:14
298:22
**what'd** 69:4
**what's** 152:12
158:23 167:1
170:22 183:18
186:24 190:5
191:5 192:7
202:4 214:20
227:19 244:8
251:2 252:15
275:9 280:16
**wheelhouse**
108:4

**white** 129:22
129:25
**wide** 275:24
**widescale**
64:23
**widespread**
62:2,6
**wiles** 2:22
279:25
**wiling** 180:25
**william** 5:24
45:1 215:10
218:9 219:21
224:7 227:14
229:25
**willing** 118:11
127:13 134:15
136:11 143:8
144:16 172:15
202:21,23
221:13 222:2
228:21 234:12
303:16
**willingness**
88:14 160:16
**win** 184:25
**winddown**
179:25 180:8
234:9 249:21
256:2 257:4
280:1,8 290:7
290:10
**windows**
110:17
**winning** 135:7
**wins** 152:15

**wise** 141:22
**wish** 44:18
81:12 82:12
136:6,9 154:14
216:24 255:5
**wished** 229:6
**wishes** 41:18
44:10,25
114:10 145:22
229:22 231:20
255:3 265:5
269:17 294:13
**withdraw** 11:3
27:8,13 86:9
190:11,13
194:5 198:25
199:4 201:2
**withdrawal**
18:4,5 27:1,5
27:19 66:13
274:1
**withdrawals**
29:15 38:20,21
79:15 198:12
268:4 277:25
**withdrawing**
66:21
**withdrawn**
126:1 129:7,8
197:4 198:22
267:24 268:7
268:10
**withdraws**
103:14
**withdrew**
277:2

**witness** 9:22
21:17 23:7,19
23:24 24:2
32:24 33:21,24
34:1,4,7,13,16
34:19,23 39:16
41:16 86:7,21
91:1 98:1,12
100:16 101:13
107:11,17
111:16,17,20
114:10 118:9
118:12 135:21
135:24 136:13
136:22 143:3,8
143:11 144:9
145:15 151:24
153:1,3 166:10
166:14,17,22
167:4,24 174:6
182:1,3 202:9
202:10,12
210:8,12,13,23
212:5 213:23
214:1 218:16
218:22 220:5
225:23 229:1,2
229:3 233:1
235:16,18
249:8,13
254:11 255:1,3
258:1 259:24
261:6 262:13
263:4 264:5,8
266:18,20,22
269:10 279:15
279:17 282:2

289:3 295:1,5
295:11,15,18
**witnesses** 8:3
9:13 24:20
144:15 184:17
232:21
**witness's** 188:9
254:20
**woman** 16:2
17:5
**wondering**
164:16,18
241:13
**won't** 279:9,10
297:12
**word** 191:4
193:12 262:19
**words** 40:1
136:10 204:3
217:18 281:3
**work** 11:23
15:4,5 20:21
23:16 32:5
33:3 37:8
45:17,23,25
47:5,9 57:5,13
60:2 62:16
65:14 68:11
69:25 70:15,19
70:20,22 71:22
71:25 73:9,9
74:14,16
100:23 103:1,2
104:11 122:7
125:14 127:13
148:9 151:25
155:16 156:12

158:3,6,9,10
158:10 160:18
163:23 164:23
165:3 196:11
196:11,13
207:3 208:17
241:25 243:3
271:25 288:8
288:12,22,23
289:1 291:8
294:22 297:19
301:16 302:11
**worked** 76:13
95:15 100:18
108:15 129:9
230:4 242:7,9
**working** 11:17
98:3 115:24
148:5 215:16
215:20 225:17
290:19
**works** 74:20
80:25 81:25
129:9 131:4
155:18 162:6
194:21 255:11
255:25 258:21
297:21
**world** 284:20
**worldwide**
51:13
**worry** 228:17
**worst** 150:10
151:9
**worth** 71:9
149:7 203:13

**would've** 86:13
**wouldn't** 155:9
170:14 224:21
224:21 247:9
261:5 269:7
275:20 287:21
**wow** 258:12
**wrinkles** 246:1
**write** 238:8
**writing** 111:11
207:17 238:21
240:2
**written** 92:14
135:12 189:1,2
**wrong** 108:17
127:19 142:9
159:17 231:2
276:16 282:6
300:21 303:3

| x |
| --- |

**x** 1:4,8,10,16
1:18,25 8:1
161:3

| y |
| --- |

**y** 161:3
**yea** 291:15
**yeah** 10:19
16:18 21:1
26:22 27:25
33:13 47:12
50:9 62:8
67:15 90:20
91:8 95:22
97:18 100:2,16
101:13 103:3
112:6 114:16

115:16 127:1
129:3 130:14
132:5 137:16
149:25 150:7
151:12 166:16
166:17 172:25
174:1 178:6,13
178:14,19
180:10 181:4,4
183:1 184:21
188:17 189:17
197:13,16
201:5 209:9
213:5,16
214:22 215:12
218:8 227:21
228:7 239:9
251:11 258:10
259:12 263:2
272:20 277:4
282:14 291:8
292:4 297:25
301:4,8
**year** 68:13
169:7,15
239:14 272:11
276:15 277:8
277:12
**years** 105:15
235:7 238:10
238:25 280:8
295:25 299:7
**yesh** 43:19
**yesterday**
10:22 17:23
19:17 25:12
26:18 29:7

35:14,17 37:10
38:25 42:24
43:3 68:16
118:25 119:2
123:1 133:13
133:15 134:8
149:16 150:1
151:8 153:1,6
157:9,10
167:24 168:7
168:14,21
178:15 182:22
184:17 190:23
192:5 204:6
218:13 220:16
220:21 230:3
231:7 240:13
242:13 296:22
**york** 1:2 2:3
5:6,14 6:12,19
7:4 13:24 15:5
15:10,10,13,17
15:17 218:4
221:13 228:9
234:21 235:1
263:24,25
300:16
**you're** 163:15
170:12 172:17
173:14,15
180:14 193:7
202:1 206:14
207:7 222:11
236:4 238:2
239:20 240:11
248:18 249:15
250:17 253:14

262:18 264:8
278:10 283:25
294:10 297:9
300:14 303:25
**you've** 185:18
194:19 201:12
215:8,20 226:4
236:20 242:17
252:1 255:25
270:15 280:18
285:17

**z**

**z** 161:3
**zero** 175:7
276:18 277:18
**zhao** 42:2
193:20 203:20
**zoom** 66:4
165:25 241:22
242:13