# Exhibit 1

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## NOTICE OF FILING OF SECOND AMENDED DISCLOSURE STATEMENT RELATING TO THE THIRD AMENDED JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

**PLEASE TAKE NOTICE** that on August 12, 2022, the Debtors filed the *Disclosure Statement Relating to the First Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 288].

**PLEASE TAKE FURTHER NOTICE** that on October 5, 2022, the Debtors filed the *First Amended Disclosure Statement Relating to the Second Amended Joint Plan of*

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

*Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 498].

> **PLEASE TAKE FURTHER NOTICE** that on October 17, 2022, the Debtors filed the *First Amended Disclosure Statement Relating to the Second Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 540].

> **PLEASE TAKE FURTHER NOTICE** that on October 19, 2022, the Debtors filed the *First Amended Disclosure Statement Relating to the Second Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 565].

> **PLEASE TAKE FURTHER NOTICE** that on October 20, 2022, the Debtors filed the *First Amended Disclosure Statement Relating to the Second Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 585].

> **PLEASE TAKE FURTHER NOTICE** that on October 24, 2022, the Debtors filed the *First Amended Disclosure Statement Relating to the Second Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 591].

> **PLEASE TAKE FURTHER NOTICE** that on December 22, 2022, the Debtors filed the *Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 778].

PLEASE TAKE FURTHER NOTICE that on January 10, 2023, the Debtors filed the *Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 853] (the "Revised Disclosure Statement").

PLEASE TAKE FURTHER NOTICE that the Debtors hereby file the *Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, attached hereto as **Exhibit A** (the "Second Revised Disclosure Statement").

PLEASE TAKE FURTHER NOTICE THAT a comparison between the Revised Disclosure Statement and the Second Revised Disclosure Statement is attached hereto as **Exhibit B**.

PLEASE TAKE FURTHER NOTICE that copies of the Second Revised Disclosure Statement and other pleadings filed in the above-captioned chapter 11 cases may be obtained free of charge by visiting the website of Stretto at http://www.cases.stretto.com/Voyager. You may also obtain copies of any pleadings by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

Dated:  January 13, 2023
New York, New York

/s/ Joshua A. Sussberg
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900
Email:          jsussberg@kirkland.com
               cmarcus@kirkland.com
               christine.okike@kirkland.com
               allyson.smith@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

**<u>Exhibit A</u>**

**Second Revised Disclosure Statement**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

---

**SECOND AMENDED DISCLOSURE STATEMENT RELATING TO**
**THE THIRD AMENDED JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND**
**ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

---

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

---

[1] The debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are:  Voyager Digital Holdings, Inc. (7687); Voyager Digital, Ltd. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

## TABLE OF CONTENTS

                                                                                                           **Page**

**IMPORTANT INFORMATION REGARDING THIS DISCLOSURE STATEMENT** ........................................1

**I.**     **INTRODUCTION** ................................................................................................................................7

**II.**    **PRELIMINARY STATEMENT** ........................................................................................................7

    A.       The Sale Transaction................................................................................................................7
    B.       The FTX Collapse....................................................................................................................9

**III.**   **BACKGROUND** ..............................................................................................................................10

**IV.**    **QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN** ........................................................................................................................................12

    A.       What is chapter 11?................................................................................................................12
    B.       Why are the Debtors sending me this Disclosure Statement?................................................12
    C.       Am I entitled to vote on the Plan?..........................................................................................12
    D.       What will I receive from the Debtors if the Plan is consummated?........................................13
    E.       What will I receive from the Debtors if I hold an Allowed Administrative Claim? .....................19
    F.       What is the "toggle" feature of the Plan?...............................................................................20
    G.       How will my Account be transitioned to Binance.US?............................................................20
    H.       What if I am unable or unwilling to transition my Account to Binance.US?...............................20
    I.       What are the sources of Consideration and other consideration required to fund the Plan? ..........20
    J.       Are any regulatory approvals required to consummate the Sale Transaction and confirm the Plan?................................................................................................................................21
    K.       How will I receive my recovery as an Account Holder if the Sale Transaction is not consummated?........................................................................................................................22
    L.       What happens to my recovery if the Plan is not confirmed or does not go effective?...................22
    M.       If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation"?..................................................................................................................22
    N.       Is there potential litigation related to the Plan?......................................................................22
    O.       Does the Plan provide for the subordination of any Claims?..................................................23
    P.       Will there be releases and exculpation granted to parties in interest as part of the Plan?..............24
    Q.       What is the deadline to vote on the Plan?...............................................................................25
    R.       How do I vote for or against the Plan?....................................................................................25
    S.       Why is the Bankruptcy Court holding a Confirmation Hearing?...........................................25
    T.       When is the Confirmation Hearing set to occur?....................................................................25
    U.       What is the purpose of the Confirmation Hearing?................................................................25
    V.       What is the effect of the Plan on the Debtors' ongoing business? .........................................26
    W.       What steps did the Debtors take to evaluate alternatives to a chapter 11 filing? .........................26
    X.       Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?............................................................................................................................26

**V.**     **THE DEBTORS' PLAN** ..................................................................................................................26

    A.       The Plan.................................................................................................................................26
    B.       The Plan Toggle.....................................................................................................................33
    C.       Means for Implementation of the Plan....................................................................................37

**VI.**    **THE DEBTORS' BUSINESS OPERATIONS AND CAPITAL STRUCTURE**................................40

    A.       The Debtors' Corporate Structure and History. .....................................................................40
    B.       The Debtors' Assets and Operations......................................................................................41
    C.       The Debtors' Capital Structure...............................................................................................44

**VII.**   **EVENTS LEADING TO THESE CHAPTER 11 CASES** .................................................................47

|  | A. | Market and Industry-Specific Challenges. | 47 |
|  | B. | The Alameda Loan. | 55 |
|  | C. | Retention of Restructuring Advisors and Initial Third-Party Outreach. | 56 |
|  | D. | Governance Initiatives. | 56 |
|  | E. | Voyager's Decision to Commence these Chapter 11 Cases. | 56 |
| VIII. | **EVENTS OF THE CHAPTER 11 CASES** | | **57** |
|  | A. | The Stand-Alone Plan. | 57 |
|  | B. | First and Second Day Relief and Other Case Matters. | 57 |
|  | C. | Appointment of Unsecured Creditors' Committee. | 59 |
|  | D. | Schedules and Statements. | 59 |
|  | E. | Bar Date Motion. | 59 |
|  | F. | The FBO Motion. | 60 |
|  | G. | The 3AC Liquidation Proceeding. | 61 |
|  | H. | Litigation Matters. | 61 |
|  | I. | The Coinify Sale. | 64 |
|  | J. | The Key Employee Retention Plan. | 64 |
|  | K. | Canadian Recognition Proceeding. | 64 |
|  | L. | The Unwind Motion. | 65 |
|  | M. | The Request for Appointment of an Equity Committee. | 65 |
|  | N. | The Post-Petition Sale Process and the Collapse of FTX. | 65 |
|  | O. | The Special Committee Investigation. | 68 |
| IX. | **RISK FACTORS** | | **69** |
|  | A. | Risks Related to the Restructuring. | 69 |
|  | B. | Risks Related to Recoveries under the Plan. | 72 |
|  | C. | Disclosure Statement Disclaimer. | 73 |
|  | D. | Miscellaneous Risk Factors and Disclaimers. | 74 |
| X. | **SOLICITATION AND VOTING PROCEDURES** | | **80** |
|  | A. | Classes Entitled to Vote on the Plan. | 80 |
|  | B. | Votes Required for Acceptance by a Class. | 80 |
|  | C. | Certain Factors to Be Considered Prior to Voting. | 80 |
|  | D. | Classes Not Entitled To Vote on the Plan. | 81 |
|  | E. | Solicitation Procedures. | 81 |
|  | F. | Voting Procedures. | 82 |
|  | G. | Voting Tabulation. | 83 |
|  | H. | Ballots Not Counted. | 84 |
| XI. | **CONFIRMATION OF THE PLAN** | | **84** |
|  | A. | Requirements of Section 1129(a) of the Bankruptcy Code. | 84 |
|  | B. | Best Interests of Creditors—Liquidation Analysis. | 85 |
|  | C. | Feasibility. | 86 |
|  | D. | Acceptance by Impaired Classes. | 86 |
|  | E. | Confirmation without Acceptance by All Impaired Classes. | 87 |
| XII. | **CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** | | **88** |
|  | A. | Introduction. | 88 |
|  | B. | Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors. | 89 |
|  | C. | Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims Entitled to Vote. | 90 |
| XIII. | **RECOMMENDATION OF THE DEBTORS** | | **97** |

**EXHIBITS**

EXHIBIT A   Plan

EXHIBIT B   Liquidation Analysis

EXHIBIT C   Frequently Asked Questions & Answers

EXHIBIT D   The Asset Purchase Agreement

### IMPORTANT INFORMATION REGARDING THIS DISCLOSURE STATEMENT

DISCLOSURE STATEMENT, DATED JANUARY 13, 2023

**SOLICITATION OF VOTES TO ACCEPT OR REJECT THE THIRD AMENDED
JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND
ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**YOU ARE RECEIVING THIS DOCUMENT AND THE ACCOMPANYING MATERIALS BECAUSE AS
OF THE VOTING RECORD DATE, YOU HELD A CLAIM AGAINST THE DEBTORS IN ONE OF THE
FOLLOWING CLASSES AND THEREFORE YOU ARE ENTITLED TO VOTE ON THE PLAN:**

| VOTING CLASSES | NAME OF CLASS UNDER THE PLAN |
|---|---|
| 3 | Account Holder Claims |
| 4A | OpCo General Unsecured Claims |
| 4B | HoldCo General Unsecured Claims |
| 4C | TopCo General Unsecured Claims |

| DELIVERY OF BALLOTS |
|---|

1. Ballots must be actually received by Stretto, Inc. ("<u>Stretto</u>" or the "<u>Claims, Noticing, and Solicitation Agent</u>") before the Voting Deadline (<u>4:00 p.m., prevailing Eastern Time, on February 22, 2023</u>).

2. Ballots may be returned by the following methods:

    a) For Holders of Account Holder Claims: via electronic submission through the Claims, Noticing, and Solicitation Agent's online voting portal at <u>https://cases.stretto.com/Voyager/balloting</u>.

    b) For Holders of General Unsecured Claims: (i) via electronic submission through the Claims, Noticing, and Solicitation Agent's online voting portal at <u>https://cases.stretto.com/Voyager/balloting</u>; (ii) in the enclosed pre-paid, pre-addressed return envelope; or (iii) via first class mail, overnight courier, or hand delivery to the address set forth below:

    Voyager Ballot Processing
    c/o Stretto
    410 Exchange, Suite 100
    Irvine, CA 92602

If you have any questions on the procedures for voting on the Plan, as defined herein, please contact the Claims, Noticing, and Solicitation Agent by emailing voyagerinquiries@stretto.com and referencing "In re Voyager – Solicitation Inquiry" in the subject line, or by calling (855) 473-8665 (Toll-Free) or (949) 271-6507 (International).

## IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE THIRD AMENDED JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE IX HEREIN. IN THE EVENT OF ANY INCONSISTENCIES BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE PLAN SHALL GOVERN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE DEBTORS' CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND THEIR FUTURE RESULTS AND OPERATIONS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO

AFFIRMATIVE DUTY TO DO SO AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, THOSE HOLDERS OF CLAIMS WHO VOTE TO REJECT THE PLAN, OR THOSE HOLDERS OF CLAIMS AND INTERESTS WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTION CONTEMPLATED THEREBY.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN. THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY, INCLUDING ARTICLE IX, ENTITLED "RISK FACTORS" BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

SUMMARIES OF THE PLAN AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN. THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS ANNEXED TO THIS DISCLOSURE STATEMENT OR OTHERWISE INCORPORATED HEREIN BY REFERENCE ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THOSE DOCUMENTS. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THERE IS NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE. EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR IN ACCORDANCE WITH APPLICABLE LAW, THE DEBTORS ARE UNDER NO DUTY TO UPDATE OR SUPPLEMENT THIS DISCLOSURE STATEMENT.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING VOTES FOR THE ACCEPTANCES AND CONFIRMATION OF THE PLAN AND MAY NOT BE RELIED ON FOR ANY OTHER PURPOSE. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE DISCLOSURE STATEMENT AND THE PLAN, THE RELEVANT PROVISIONS OF THE PLAN WILL GOVERN.

SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS

NEITHER THIS DISCLOSURE STATEMENT NOR THE PLAN HAS BEEN FILED WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY STATE AUTHORITY. THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC OR ANY STATE SECURITIES COMMISSION, AND NEITHER THE SEC NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR THE MERITS OF THE PLAN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS DISCLOSURE STATEMENT, NOTHING IN THIS DISCLOSURE STATEMENT CONSTITUTES A FINDING UNDER U.S. FEDERAL SECURITIES LAWS, FOREIGN SECURITIES LAWS OR ANY STATE SECURITIES LAWS AS TO WHETHER CRYPTOCURRENCY, INCLUDING THE VOYAGER TOKENS, OR TRANSACTIONS INVOLVING CRYPTOCURRENCY ARE SECURITIES. THE SEC AND ITS STAFF HAVE TAKEN THE POSITION THAT CERTAIN CRYPTOCURRENCY ASSETS AND CERTAIN TRANSACTIONS INVOLVING CRYPTOCURRENCY ASSETS FALL WITHIN THE DEFINITION OF A "SECURITY" UNDER THE U.S. FEDERAL SECURITIES LAWS. THE DETERMINATION AS TO WHETHER A CRYPTOCURRENCY ASSET OR A TRANSACTION INVOLVING CRYPTOCURRENCY MAY CONSTITUTE A "SECURITY" UNDER APPLICABLE LAWS IS A DETERMINATION FOR THE SEC, APPLICABLE STATE AND FOREIGN REGULATORY AUTHORITIES, AND COURTS WITH PROPER JURISDICTION.

THIS DISCLOSURE STATEMENT CONTAINS "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS IN THIS DISCLOSURE STATEMENT ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE BUT ARE SUBJECT TO A WIDE RANGE OF RISKS, INCLUDING RISKS ASSOCIATED WITH THE FOLLOWING:

- THE OVERALL HEALTH OF THE CRYPTOCURRENCY INDUSTRY;

- POPULARITY AND RATE OF ADOPTION OF CRYPTOCURRENCIES;

- THE DEBTORS' REGULATORY LICENSES;

- THE POTENTIAL ADOPTION OF NEW GOVERNMENTAL REGULATIONS;

- THE DEBTORS' TECHNOLOGY AND ABILITY TO ADAPT TO RAPID TECHNOLOGICAL CHANGE;

- THE RELIABILITY, STABILITY, PERFORMANCE AND SCALABILITY OF THE DEBTORS' INFRASTRUCTURE AND TECHNOLOGY;

- THE DEBTORS' FINANCIAL CONDITION, REVENUES, CASH FLOWS, AND EXPENSES;

- THE ADEQUACY OF THE DEBTORS' CAPITAL RESOURCES AND LIQUIDITY;

- THE INTEGRATION AND BENEFITS OF ASSET AND PROPERTY ACQUISITIONS OR THE EFFECTS OF ASSET AND PROPERTY ACQUISITIONS OR DISPOSITIONS ON THE DEBTORS' CASH POSITION AND LEVELS OF INDEBTEDNESS;

- GENERAL ECONOMIC AND BUSINESS CONDITIONS;

- EFFECTIVENESS OF THE DEBTORS' RISK MANAGEMENT ACTIVITIES;

- **COUNTERPARTY CREDIT RISK;**

- **THE OUTCOME OF PENDING AND FUTURE LITIGATION;**

- **EXCHANGE RATE FLUCTUATIONS AND CRYPTOCURRENCY PRICE FLUCTUATIONS;**

- **PLANS, OBJECTIVES, AND EXPECTATIONS;**

- **RISKS IN CONNECTION WITH DISPOSITIONS; AND**

- **RISK OF INFORMATION TECHNOLOGY OR DATA SECURITY BREACHES OR OTHER CYBERATTACKS.**

**STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE DEBTORS' AND THE WIND-DOWN DEBTORS' FUTURE PERFORMANCE. THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE DEBTORS' AND THE WIND-DOWN DEBTORS' ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN OTHER THAN AS REQUIRED BY APPLICABLE LAW. THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE THE FOLLOWING:**

- **THE RISKS AND UNCERTAINTIES ASSOCIATED WITH THE CHAPTER 11 CASES;**

- **THE DEBTORS' ABILITY TO PURSUE THEIR BUSINESS STRATEGIES DURING THE CHAPTER 11 CASES;**

- **THE DEBTORS' ABILITY TO MAINTAIN COMPLIANCE WITH LAWS AND REGULATIONS OR THE INTERPRETATION OR APPLICATION OF SUCH LAWS THAT CURRENTLY APPLY OR MAY BECOME APPLICABLE TO THE DEBTORS' BUSINESS BOTH IN THE UNITED STATES AND INTERNATIONALLY;**

- **CHANGES TO A PARTICULAR CRYPTOCURRENCY ASSET'S OR PRODUCT OFFERING'S STATUS AS A "SECURITY" IN ANY RELEVANT JURISDICTION UNDER RELEVANT LAWS AND REGULATIONS OR REGULATORY INTERPRETATION THEREOF;**

- **LOSS OF CRITICAL BANKING OR INSURANCE RELATIONSHIPS;**

- **THE DIVERSION OF MANAGEMENT'S ATTENTION AS A RESULT OF THE CHAPTER 11 CASES;**

- **INCREASED LEVELS OF EMPLOYEE ATTRITION AS A RESULT OF THE CHAPTER 11 CASES;**

- **CUSTOMER RESPONSES TO THE CHAPTER 11 CASES;**

- **THE IMPACT OF A PROTRACTED RESTRUCTURING ON THE DEBTORS' BUSINESS;**

- **THE DEBTORS' ABILITY TO CONFIRM OR CONSUMMATE THE PLAN;**

- **THE DEBTORS' INABILITY TO PREDICT THEIR LONG-TERM LIQUIDITY REQUIREMENTS AND THE ADEQUACY OF THEIR CAPITAL RESOURCES;**

- **THE AVAILABILITY OF CASH TO MAINTAIN THE DEBTORS' OPERATIONS AND FUND EMERGENCE COSTS;**

- **RISKS ASSOCIATED WITH WEAK OR UNCERTAIN GLOBAL ECONOMIC CONDITIONS AND THEIR IMPACT ON DEMAND FOR DIGITAL ASSETS;**

- **OTHER GENERAL ECONOMIC AND POLITICAL CONDITIONS IN THE UNITED STATES, INCLUDING THOSE RESULTING FROM RECESSIONS, POLITICAL EVENTS, ACTS OR THREATS OF TERRORISM, AND MILITARY CONFLICTS;**

- **INDUSTRY CONDITIONS, INCLUDING COMPETITION AND TECHNOLOGICAL INNOVATION;**

- **FLUCTUATIONS IN OPERATING COSTS;**

- **SHIFTS IN POPULATION AND OTHER DEMOGRAPHICS;**

- **LEGISLATIVE OR REGULATORY REQUIREMENTS; AND**

- **FLUCTUATIONS IN INTEREST RATES, EXCHANGE RATES, AND CURRENCY VALUES.**

**YOU ARE CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE, AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-LOOKING STATEMENTS. THE LIQUIDATION ANALYSIS AND OTHER PROJECTIONS AND FORWARD-LOOKING INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ONLY ESTIMATES, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS, AMONG OTHER THINGS, MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED. ANY ANALYSES, ESTIMATES, OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.**

[*Remainder of page intentionally left blank*]

## I. INTRODUCTION

Voyager Digital Holdings, Inc. (along with its debtor affiliates, the "<u>Debtors</u>," the "<u>Company</u>," or "<u>Voyager</u>") and its debtor affiliates submit this disclosure statement (including all exhibits hereto and as may be supplemented or amended from time to time, the "<u>Disclosure Statement</u>"), pursuant to section 1125 of the Bankruptcy Code, to holders of Claims against and Interests in the Debtors in connection with the solicitation of votes for acceptance of the Debtors' *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 852] (as supplemented or amended from time to time, the "<u>Plan</u>"), which was conditionally approved by the Bankruptcy Court on January 13, 2023 [Docket No. 861]. A copy of the Plan is attached hereto as <u>**Exhibit A**</u> and is incorporated herein by reference. The Plan constitutes a separate chapter 11 plan for each of the Debtors. [2]

THE DEBTORS BELIEVE THAT THE COMPROMISES AND SETTLEMENTS CONTEMPLATED BY THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND MAXIMIZE RECOVERIES TO HOLDERS OF CLAIMS. THE DEBTORS BELIEVE THE PLAN IS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES. THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.

## II. PRELIMINARY STATEMENT

### A. The Sale Transaction.

The Debtors filed these Chapter 11 Cases in response to a short-term "run on the bank" caused by a downturn in the cryptocurrency industry generally and the default of a significant loan made to a third party. Since the Petition Date, the Debtors have worked tirelessly to identify the most value-maximizing transaction for their customers and other creditors on an expedited timeline. Following a two-week competitive auction process, the Debtors selected the bid submitted by West Realm Shires Inc. ("<u>FTX US</u>," and along with its parent entity and affiliates, "<u>FTX</u>") as the winning bid (the transaction contemplated thereby, the "<u>FTX Transaction</u>"). Had it been effectuated, the FTX Transaction would have provided for substantial in-kind recoveries to Holders of Account Holder Claims, the transfer of substantially all of the customer accounts on the Voyager platform to the FTX platform, and the orderly wind down of the Debtors' estates. But after a series of extraordinary events outlined in detail below, FTX, and with it the FTX Transaction, collapsed. While the Debtors were shocked and dismayed by FTX's cataclysmic collapse, the Debtors swiftly reengaged in negotiations with numerous other potential counterparties to evaluate potential third-party transactions that would maximize value for the Debtors and their creditors. Following good-faith, arm's length negotiations with several such alternative transaction parties, the Debtors elected to accept the bid submitted by BAM Trading Services Inc. ("<u>Binance.US</u>" or the "<u>Purchaser</u>"). The Debtors value Binance.US's offer at approximately $1.022 billion, comprising (i) the fair market value of Cryptocurrency on the Voyager platform as of a date to be determined, which as of December 19, 2022, is estimated to be $1.002 billion plus (ii) additional consideration equal to $20 million of incremental value. Importantly, relative to all currently available alternatives, the Binance.US bid can be effectuated quickly, provides meaningfully greater recovery to creditors, and allows the Debtors to facilitate an efficient resolution of these chapter 11 cases, after which Binance.US's market-leading, secured trading platform will enable customers to trade and store cryptocurrency.

Under the Asset Purchase Agreement, Binance.US will accept transfers of certain assets relating to the Debtors' cryptocurrency custody and exchange business and will receive all or substantially all Cryptocurrency on the Voyager platform to hold such assets solely in a custodial capacity in trust and solely for the benefit of Account Holders who each open an account on the Binance.US Platform (subject to certain potential exceptions set forth in the Asset Purchase Agreement with respect to Cryptocurrency withheld for the purpose of satisfying the Debtors' obligations under the Plan) (such Cryptocurrency transfers being referred to as "<u>Acquired Coins</u>") in exchange for Purchaser's payment obligations set forth in Sections 2.1 and 2.2 of the Asset Purchase Agreement and Purchaser's

---

[2] Capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in the Plan or Asset Purchase Agreement, as applicable. Additionally, this Disclosure Statement incorporates the rules of interpretation located in Article I of the Plan. **The summary provided in this Disclosure Statement of any documents attached to this Disclosure Statement, including the Plan, are qualified in their entirety by reference to the Plan and the documents being summarized. In the event of any inconsistencies between the terms of this Disclosure Statement and the Plan, the Plan shall govern.**

commitment to distribute the Acquired Coins to Account Holders and cash to Holders of Opco General Unsecured Claims pursuant to Sections 6.12 and 6.14 of the Asset Purchase Agreement. Additionally, Purchaser shall submit VGX for its standard listing review process in an effort to allow VGX to be traded on the Binance.US Platform. The Debtors will effectuate the transition of Account Holders to the Binance.US Platform as described in Article V.C.6 of this Disclosure Statement. It is currently anticipated that all Account Holders and Holders of OpCo General Unsecured Claims will transition to Binance.US subject to their successful completion of Binance.US's "Know Your Customer" process and other procedural and regulatory requirements. Further information regarding how Account Holders and Holders of OpCo General Unsecured Claims can open accounts on Binance.US are available on the Binance.US Platform Terms of Use (which are available at: https://www.binance.us/terms-of-use) and the Binance.US Privacy Policy (available at: https://binance.us/privacy-policy), and will also be provided to all Holders of such Claims in the Customer Onboarding Protocol.

Below is a chart of estimated recoveries to hypothetical Holders of Account Holder Claims.[3]

**Account**

| | Customer Claim | | | Crypto Recovery | | | | |
|---|---|---|---|---|---|---|---|---|
| Coin | # of Coins Claimed | 7/5 Coin Price | Claim ($) | Recovery Type | Illustrative Crypto Recovery %[4] | 12/18 Coin Price | # of Coins Recovered[5] | Recovery Value |
| BTC | 0.05 | $20,157.69 | $990.50 | BTC | 51% | $16,769.35 | 0.03 | $500.57 |
| ETH | 0.19 | 1,131.60 | 214.41 | ETH | 51% | 1,185.35 | 0.09 | 108.36 |
| DAI | 49.19 | 1.00 | 49.17 | DAI | 51% | 1.00 | 24.86 | 24.85 |
| DOGE | 978.43 | 0.07 | 65.64 | DOGE | 51% | 0.08 | 419.59 | 33.17 |
| ALGO | 123.83 | 0.31 | 38.07 | ALGO | 51% | 0.19 | 100.67 | 19.24 |
| LINK | 0.29 | 6.31 | 1.83 | LINK | 51% | 6.02 | 0.15 | 0.92 |
| XRP | 122.38 | 0.33 | 39.79 | XRP | 51% | 0.35 | 57.24 | 20.11 |
| HBAR | 130.66 | 0.06 | 8.05 | HBAR | 51% | 0.04 | 92.21 | 4.07 |
| BAND | 24.73 | 1.32 | 32.65 | BAND | 51% | 1.73 | 9.54 | 16.50 |
| VGX | 249.05 | 0.24 | 59.32 | VGX | 51% | 0.29 | 101.90 | 29.98 |
| TRAC | 1,471.96 | 0.19 | 286.88 | TRAC | 51% | 0.18 | 785.81 | 144.98 |
| GALA | 2,274.69 | 0.05 | 121.01 | GALA | 51% | 0.02 | 2,978.93 | 61.16 |

**Claim**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Value Claimed | | $1,907.34 | | Value Recovered | | | | $963.91 |
| *Proportion of Total Platform Value* | | *0.0001%* | | *Proportion of Total Platform Recovery* | | | | *0.0001%* |

**Illustrative Recovery**

**Crypto Recovery**

| | |
|---|---|
| Value Recovered (In-Kind) | $1,022.16 |
| Value Recovered (Converted to U.S. Dollars)[6] | - |
| **Crypto Value Recovered** | **$1,022.16** |

---

[3]   Recoveries are for illustrative purposes and may materially differ from the amount portrayed in the chart. Account Holder Claims shall be valued in U.S. dollars as of the Petition Date consistent with section 502(b) of the Bankruptcy Code.

[4]   Illustrative cryptocurrency recovery is shown based on the estimated total fair market value of Voyager's cryptocurrency assets based on coin prices as of December 18, 2022. Actual cryptocurrency recovery will be determined by cryptocurrency prices during the fair market value reference period prior to the Effective Date.

[5]   Illustrative number of coins recovered based on recovery value divided by the coin price as of December 18, 2022. Actual cryptocurrency prices for purposes of denominating initial distributions will be determined by such cryptocurrency's price during the fair market value reference period prior to the Effective Date.

[6]   Assumes hypothetical customer transfers to Binance.US Platform to receive in-kind recoveries; Account Holders that do not transfer to Binance.US will be liquidated at a future date; these non-transferred Account Holders will be subject to portfolio risk, as recoveries will be subject to cryptocurrency market volatility until such time as the estate makes U.S. dollar distributions.

| Other Items | |
|---|---|
| Plus: Binance US Consideration | $20.00 |
| Less: Wind-down Costs, Other Benefits and Other Expenses [7] | (78.24) |
| **Total Other Items** | **($58.24)** |
| **Total Value Recovered** | **$963.91** |
| *% Total Recovery* | *51%* |

### B. The FTX Collapse.

Following an acute liquidity crunch and "run on the bank" at the FTX ecosystem, on November 11, 2022, 130 FTX entities commenced filing for voluntary relief under chapter 11 in the Bankruptcy Court for the District of Delaware (the "FTX Bankruptcy Proceeding").[8] While the FTX Bankruptcy Proceeding is still unfolding, early indications are that Mr. Bankman-Fried and FTX were carrying on one of the largest financial frauds in history. Mr. John Ray III, who was appointed Chief Executive Officer of FTX following the resignation of Mr. Bankman-Fried and who oversaw the restructuring of Enron, commented in an early filing in the FTX Bankruptcy Proceeding that "[n]ever in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information."[9] The full extent of the injury caused by this apparent rampant fraud will likely take years to uncover.

While FTX was collapsing, on November 10th, the Debtors requested that the "No-Shop" provision (Section 5.2) of the FTX Purchase Agreement (as defined herein) be waived. FTX acquiesced. Immediately thereafter, the Debtors swiftly reengaged in negotiations with several other potential transaction counterparties. On December 9, 2022, the Debtors filed with this Court the *Joint Stipulation and Agreed Order Between the Debtors and FTX US* terminating the FTX Purchase Agreement [Docket No. 717]. On December 21, 2022, FTX filed a motion seeking approval of such stipulation by the court overseeing the FTX Bankruptcy Proceeding as well.[10]

The Debtors determined that engaging with third parties to identify an alternative transaction partner was a sound exercise of their business judgment as consummating an alternative transaction would reasonably provide greater recovery to Holders of Claims on a more certain timeline with limited execution risk than if the Debtors pursued a self-liquidating plan. The Sale Transaction is the culmination of that process and provides more value than the Debtors would otherwise be able to distribute to Holders of Claims on a standalone basis. Notably, the Plan includes a toggle that allows the Debtors to return Cryptocurrency, Cash, and other assets to Holders of Claims if the Sale Transaction is unable to close on the timeline contemplated under the Asset Purchase Agreement, as described further in Article V.A.2 herein. Although any "toggle" to a self-liquidating plan may result in less recovery to customers than the Sale Transaction, it would be materially greater and quicker than if the Debtors had to undertake the cost and time necessary to resolicit Holders of Claims to vote on another plan. Accordingly, the Debtors, whose goal is and has always been to maximize returns to Account Holders and other creditors, determined that the most value-maximizing path forward in these chapter 11 cases is to enter into a transaction with Binance.US that also allows

---

[7] "Other Benefits" includes the estimated pro rata distribution to Account Holder Claims from (i) expense reimbursement and (ii) non-buyer proceeds (including sale of investments, tax returns, Directors and Officers insurance settlements, and other inflows); "Other Expenses" includes (iii) projected cash deficit at Effective Date, (iv) rebalancing leakage, (v) wind-down funding leakage and (vi) VGX impact.

[8] *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Nov. 11, 2022).

[9] *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 24], filed in *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Nov. 17, 2022); *see also United States of America v. Samuel Bankman-Fried*, 22-crim-673 (S.D.N.Y. December 9, 2022); *Securities and Exchange Commission v. Samuel Bankman-Fried*, Civil Action. No. 22-cv-10501 (S.D.N.Y. Dec. 13, 2022).

[10] *Motion of Debtors for Entry of an Order (A) Authorizing the Debtors to Enter Into the Stipulation with Voyager Digital, LLC and (B) Granting Related Relief* [Docket No. 283], filed in *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Dec. 21, 2022).

the Debtors to toggle to a plan that returns value to the Debtors' Account Holders and other creditors should the Sale Transaction not be consummated on the timeline contemplated under the Asset Purchase Agreement.

In light of the extraordinary circumstances that precipitated the filing of these Chapter 11 Cases and the equally extraordinary events that transpired thereafter, the Debtors believe that they have achieved a Plan that is fair and equitable, maximizes the value of the Debtors' estates, and maximizes recoveries to Holders of Claims, including, especially, Holders of Account Holder Claims. Importantly, the "toggle" feature under the Plan ensures an outside date by which the Debtors can pivot to a standalone plan and return value to Holders of Claims without any further delay.

Accordingly, the Debtors, in close consultation with Binance.US and other parties in interest, have worked tirelessly to negotiate and formulate a Plan that provides recoveries to Holders of Claims on the quickest timeline and in the most favorable manner in light of the FTX collapse and related industry fallout.

## III. BACKGROUND

Prior to the Petition Date, Voyager operated a cryptocurrency trading platform that allowed customers to buy, sell, and store cryptocurrency on an easy-to-use and "accessible-to-all" platform. Using the Company's mobile application, Voyager's customers could earn rewards on the cryptocurrency assets stored on the Company's platform and trade over 100 unique digital assets. Voyager's mission since inception has been to provide customers with the tools to enter the cryptocurrency industry on their own terms in a way that is tailored to the needs of each customer. Voyager's mobile application has been downloaded millions of times and had over 1.1 million active users as of July 5, 2022 (the "Petition Date"). In 2021, Voyager was one of the top ten most downloaded cryptocurrency mobile applications in the world.

Recent events in the world economy roiled traditional markets and the cryptocurrency markets alike. The lingering effects of the COVID-19 pandemic, coupled with rampant inflation and the adverse effects of the war in the Ukraine on the world economy, contributed to a massive sell-off in traditional assets in early 2022. Total wealth in the United States declined by $5 trillion between January 2022 and May 2022. The cryptocurrency market is not immune to these macroeconomic trends and likewise experienced extreme market volatility in 2022. All major coins and cryptocurrency-focused companies experienced significant declines; in early September 2022, the aggregate value of the cryptocurrency market sank below $1 trillion for the first time since 2020. Several major liquidity events in the cryptocurrency space, including the implosion of Terra LUNA ("Luna") (as discussed in Article VII.A.2 of this Disclosure Statement), accelerated the onset of a "crypto winter" and an industry-wide sell-off to manage risk in 2022.

As described in more detail in Article VII.A.2.b below, in June 2022, it became apparent that the Company's loan to Three Arrows Capital ("3AC" and such loan the "3AC Loan"), a cryptocurrency hedge fund based in Singapore, was in jeopardy of partial or full nonpayment. The Company's loan to 3AC was one of its largest outstanding loans. On June 17, 2022, 3AC announced that it had suffered heavy losses due to massive exposure to Luna. The Company's management team was acutely aware that nonpayment of the loan to 3AC, coupled with severe industry headwinds, would strain the Company's ability to continue operating its trading platform. Accordingly, the Company's management team immediately began to explore potential strategic solutions. The Company retained Kirkland & Ellis LLP ("Kirkland") and Moelis & Company LLC ("Moelis"). The Company subsequently retained Berkeley Research Group ("BRG") on June 30, 2022. The Company engaged in discussions with third parties and potential sources of new liquidity and ultimately obtained an unsecured loan from Alameda Ventures Ltd. ("Alameda"), a major participant in the cryptocurrency space. With the advice and assistance of Moelis, the Company began discussions with a host of third parties about a more long-term solution to the challenges facing the Company. Discussions with these third parties, however, ultimately revealed that an in-court process would be necessary to develop the most value-maximizing alternative available to the Company. Accordingly, the Debtors filed these Chapter 11 Cases on July 5, 2022.

On the first day of these chapter 11 cases, the Debtors filed the *Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 17] (as amended and restated from time to time, the "Standalone Plan"). The Standalone Plan contemplated a restructuring that could be effectuated without a sale and served as a floor for the Debtors' marketing process. To that end, the Debtors, with the assistance of Moelis and their other advisors, continued their prepetition marketing efforts during these Chapter 11 Cases to canvas the market and identify interest in a transaction with a third-party investor

(the "Marketing Process"). Shortly after commencing these chapter 11 cases, the Debtors filed the *Debtors' Motion Seeking Entry of an Order (I) Approving the Bidding Procedures and Related Dates and Deadlines, (II) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation, and (III) Granting Related Relief* [Docket No. 126] (the "Bidding Procedures Motion"), which set a timeline for interested parties to submit bids for an acquisition of the Debtors' assets and procedures for conducting an auction if multiple bids were received. On August 5, 2022, the Bankruptcy Court entered the *Order (I) Approving the Bidding Procedures and Related Dates and Deadlines, (II) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation, and (III) Granting Related Relief* [Docket No. 248] (the procedures approved thereby, the "Bidding Procedures") which, among others, established the Bid Deadline (as defined in the Bidding Procedures) as September 6, 2022 at 12:00 p.m., prevailing Eastern Time and set the Auction (as defined in the Bidding Procedures) for September 13, 2022 at 10:00 a.m., prevailing Eastern Time. Throughout the Marketing Process, the Debtors evaluated Bids received from potential transaction parties in comparison both to other Bids received and the recoveries contemplated by the Stand-Alone Plan as it provided a critical metric in the Debtors' determination of their path forward.[11]

On the Bid Deadline, the Debtors received a number of bids from strategic investors and, accordingly commenced an auction on September 13, 2022, for a sale of the Debtors' business. The two-week Auction featured hard-fought, arms-length negotiations with each participating bidder. At the conclusion of the Auction, the Debtors, in an exercise of their business judgment and in consultation with the Committee, determined that the final bid submitted by FTX US represented the most value-maximizing transaction available to the Debtors. Accordingly, on September 26, 2022, the Debtors announced FTX US as the winning bidder,[12] and on September 27, 2022, the Debtors and FTX US entered into an asset purchase agreement memorializing the terms of the winning bid (as may be amended from time to time in accordance with the terms thereof, the "FTX Purchase Agreement"). On October 20, 2022, the Court entered an order approving the Debtors' entry into the FTX Purchase Agreement.[13] On October 24, 2022, the Debtors filed solicitation versions of their Disclosure Statement and Plan,[14] and began soliciting votes on the Plan.

As set forth in greater detail in Article VIII.N hereof, the Debtors' journey to consummation of the FTX Transaction was derailed over the ensuing weeks. Following a series of extraordinary events, on November 11, 2022, Sam Bankman-Fried resigned from his role as CEO of the FTX enterprise, and FTX announced the chapter 11 filing of approximately 130 of its affiliates. Immediately following announcement of the FTX bankruptcy, the Debtors reengaged in discussions with numerous potential transaction parties interested in consummating a transaction with the Debtors. Following good-faith, arm's-length negotiations with several potential transaction parties regarding a variety of deal structures and terms, the Debtors determined, in an exercise of their business judgment and in consultation with the Committee, that the bid submitted by Binance.US represented the highest or otherwise best offer available to purchase the Debtors' business enterprise. On December 18, 2022, the Debtors and the Purchaser entered into an asset purchase agreement memorializing the terms of the Binance.US bid (as may be amended from time to time in accordance with the terms thereof, the "Asset Purchase Agreement").

The Debtors seek to effectuate the transactions contemplated by the Asset Purchase Agreement (collectively, the "Sale Transaction") pursuant to the Plan. The Plan, among other things:

- contemplates payment in full of Administrative Claims, Secured Tax Claims, Priority Tax Claims, and Other Priority Claims;

- provides for the distribution of Cryptocurrency, Cash, and any remaining assets at OpCo (including any recovery on account of the 3AC Claims, FTX Claims, or Alameda Claims) to Account Holders and Holders of OpCo General Unsecured Claims, subject to the terms of the Asset Purchase Agreement;

---

[11]  Certain dates in the Bidding Procedures were amended by Docket Nos. 328, 343, 365, and 442.

[12]  *See Notice of Successful Bidder* [Docket No. 457].

[13]  Docket No. 581.

[14]  Docket Nos. 590 and 591.

- provides for distribution of Cash and other assets at HoldCo to Holders of HoldCo General Unsecured Claims;

- provides for distribution of Cash and other assets at TopCo to Holders of TopCo General Unsecured Claims;

- provides for the equitable subordination of the Alameda Loan Facility Claims;

- provides for any residual value at TopCo after payment in full of TopCo General Unsecured Claims to be distributed to Holders of Section 510(b) Claims, if any, and Holders of Existing Equity Interests; and

- designates a Wind-Down Entity Trustee to wind down the Debtors' affairs in accordance with the Plan.

The Debtors believe that the Plan maximizes stakeholder recoveries in the Chapter 11 Cases. In particular, the Sale Transaction with Binance.US that the Plan contemplates represents, relative to all currently available alternatives, meaningfully greater and faster recovery to creditors. Accordingly, the Debtors urge all Holders of Claims entitled to vote to accept the Plan by returning their ballots so that Stretto actually receives such ballots by February 22, 2023 at 4:00 p.m. prevailing Eastern Time (the "Voting Deadline"). Assuming the Plan receives the requisite acceptances, the Debtors will seek the Bankruptcy Court's approval of the Plan at a hearing on March 2, 2023 at 10:00 a.m. (prevailing Eastern Time) (the "Confirmation Hearing").

## IV. QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN

### A. What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor (whether or not such creditor or equity interest holder voted to accept the plan), and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B. Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims and interests whose votes on the Plan are being solicited. This Disclosure Statement is being submitted in accordance with these requirements.

### C. Am I entitled to vote on the Plan?

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold. Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to

section 1122(a) of the Bankruptcy Code, is referred to as a "Class." Each Class's respective voting status is set forth below.

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | Account Holder Claims | Impaired | Entitled to Vote |
| 4A | OpCo General Unsecured Claims | Impaired | Entitled to Vote |
| 4B | HoldCo General Unsecured Claims | Impaired | Entitled to Vote |
| 4C | TopCo General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Alameda Loan Facility Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 6 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |
| 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |
| 9 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

**D.      What will I receive from the Debtors if the Plan is consummated?**

The following chart provides a summary of the anticipated recovery to Holders of Claims and Interests under the Plan. Any estimates of Claims and Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court. Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan. Amounts in the far right column under the heading "Liquidation Recovery" are estimates only and are based on certain assumptions described herein and set forth in greater detail in the liquidation analysis attached hereto as **Exhibit B** (the "Liquidation Analysis").

**In a hypothetical liquidation under chapter 7 of the Bankruptcy Code, Holders of Account Holder Claims and General Unsecured Claims would likely receive a significantly reduced recovery relative to what such Holders would receive under the Plan.** In the event of a chapter 7 liquidation, the Bankruptcy Court may appoint a trustee (the "Liquidating Trustee") to oversee and effectuate the liquidation of the Debtors' assets. The Liquidating Trustee's fees and expenses would be paid by the Debtors and would be paid prior to any Account Holder Claims or General Unsecured Claims. Given the novelty and complexity of the Debtors' business and the strong likelihood that any Liquidating Trustee appointed by the Bankruptcy Court may have minimal cryptocurrency experience, the Liquidating Trustee's fees and expenses and the anticipated reduction in value obtained through the monetization of cryptocurrency by the Liquidating Trustee would likely result in Account Holders and Holders of General Unsecured Claims receiving significantly reduced recoveries.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE BASED ON, AMONG OTHER THINGS, ALLOWED CLAIMS ARISING FROM THE REJECTION OF EXECUTORY CONTRACTS OR UNEXPIRED LEASES AND THE RESOLUTION OF DISPUTED CLAIMS. FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[15]**

---

[15]    The recoveries set forth below may change based upon changes in the amount of Claims that are Allowed as well as other factors related to the Debtors' business operations and general economic conditions.

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims (in $mm)[16][17] | Projected Sale Transaction Recovery under the Plan | Projected Liquidation Transaction Recovery under the Plan | Liquidation Recovery |
|---|---|---|---|---|---|---|
| 1 | Secured Tax Claims | Each Holder of an Allowed Secured Tax Claim shall receive, in full and final satisfaction of such Allowed Secured Tax Claim, at the option of the Wind-Down Entity, payment in full in Cash of such Holder's Allowed Secured Tax Claim or such other treatment rendering such Holder's Allowed Secured Tax Claim Unimpaired. | $0.0 | N/A | N/A | N/A |
| 2 | Other Priority Claims | Each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Allowed Other Priority Claim, at the option of the applicable Debtor, payment in full in Cash of such Holder's Allowed Other Priority Claim or such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired. | $1.0 | 100% | 100% | 99% – 99% |
| 3 | Account Holder Claims[18] | Each Holder of an Allowed Account Holder Claim will receive in exchange for such Allowed Account Holder Claim: (i) If the Sale Transaction is consummated by the Outside Date: a. its Net Owed Coins, as provided in and subject to the requirements of Sections 6.10 and 6.12 of the Asset Purchase Agreement; *provided* that for Account Holders in Unsupported Jurisdictions and only to the extent that the Purchaser does not obtain the Unsupported Jurisdiction Approval for the jurisdiction in which such Account Holder resides within 6 months following the Closing Date (as defined in the Asset Purchase Agreement), such Account Holders shall receive, after expiration of such time period, value in Cash at which such Net Owed Coins allocable to such Account Holder are liquidated; b. its Pro Rata share of any Additional Bankruptcy | $1,763.8 | 51% | 45% | 35% – 39% |

---

[16] The lower recovery compared to the FTX Transaction is largely due to fluctuations in the market following the FTX collapse along with the value differential under the Sale Transaction.

[17] **The recoveries included in this Disclosure Statement are for illustrative purposes only and subject to material change particularly due to, among other things, market volatility, the ultimate treatment of the Alameda Loan Facility Claims and the Intercompany Obligations, and whether Alameda prevails on its asserted preference and related administrative claim which could substantially reduce the recoveries projected above.**

[18] Account Holder Claims shall be valued in U.S. dollars as of the Petition Date consistent with section 502(b) of the Bankruptcy Code.

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims (in $mm)[16][17] | Projected Sale Transaction Recovery under the Plan | Projected Liquidation Transaction Recovery under the Plan | Liquidation Recovery |
|---|---|---|---|---|---|---|
| | | Distributions, in Cryptocurrency or Cash as provided in and subject to the requirements of Sections 6.12 and 6.14 of the Asset Purchase Agreement;<br><br>c. its Pro Rata share of Distributable OpCo Cash; and<br><br>d. to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to OpCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims;<br><br>*provided* that distributions made to any Account Holder pursuant to clauses (b), (c), and (d) above shall be made after taking into account the Acquired Coins Value of the Net Owed Coins or the value in Cash at which such Net Owed Coins are liquidated, as applicable, previously allocated to such Account Holder; or<br><br>(ii) If the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated:<br><br>a. its Pro Rata share of Distributable OpCo Cash;<br><br>b. its Pro Rata share of Distributable Cryptocurrency, which such Account Holder shall be able to withdraw in kind, alternative Cryptocurrency, and/or Cash for a period of thirty (30) days after the Effective Date through the Voyager platform or, if elected by Seller pursuant to Section 6.12(d) of the Asset Purchase Agreement, through the Binance.US Platform; *provided* that, if the applicable transfer is made through the Voyager platform and such Account Holder does not | | | | |

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims (in $mm)[16][17] | Projected Sale Transaction Recovery under the Plan | Projected Liquidation Transaction Recovery under the Plan | Liquidation Recovery |
|---|---|---|---|---|---|---|
| | | withdraw its Pro Rata share of Distributable Cryptocurrency available to such Account Holder from the Voyager platform within such thirty (30) day period, such Account Holder will receive Cash in the equivalent value to its Pro Rata share of Distributable Cryptocurrency; and<br><br>c. to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to OpCo; *provided* that any distributions on account of Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims. | | | | |
| 4A | OpCo General Unsecured Claims | Each Holder of an Allowed OpCo General Unsecured Claim will receive in exchange for such Allowed OpCo General Unsecured Claim:<br><br>(i) If the Sale Transaction is consummated by the Outside Date:<br><br>a. its Pro Rata share of Distributable Cryptocurrency in Cash;<br><br>b. its Pro Rata share of Additional Bankruptcy Distributions, in Cryptocurrency or Cash as provided in and subject to the requirements of Section 6.12 and 6.14 of the Asset Purchase Agreement;<br><br>c. its Pro Rata share of Distributable OpCo Cash; and<br><br>d. to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to OpCo; *provided* | $14.0 | 51% | 45% | 35% – 39% |

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims (in $mm)[1617] | Projected Sale Transaction Recovery under the Plan | Projected Liquidation Transaction Recovery under the Plan | Liquidation Recovery |
|---|---|---|---|---|---|---|
| | | that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims; <br><br>(ii) If the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated: <br><br>  a.  its Pro Rata share of Distributable Cryptocurrency in Cash; <br><br>  b.  its Pro Rata share of Distributable OpCo Cash; and <br><br>  c.  to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to OpCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims. | | | | |
| 4B | HoldCo General Unsecured Claims | Each Holder of an Allowed HoldCo General Unsecured Claim will receive in exchange for such Allowed HoldCo General Unsecured Claim: <br><br>(i)  its Pro Rata share of Distributable HoldCo Cash; and <br><br>(ii) to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to HoldCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority | $8.3 | 6% | 6% | 0% – 0% |

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims (in $mm)[16][17] | Projected Sale Transaction Recovery under the Plan | Projected Liquidation Transaction Recovery under the Plan | Liquidation Recovery |
|---|---|---|---|---|---|---|
| | | Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims. | | | | |
| 4C | TopCo General Unsecured Claims | Each Holder of an Allowed TopCo General Unsecured Claim will receive in exchange for such Allowed TopCo General Unsecured Claim: (i) its Pro Rata share of Distributable TopCo Cash; and (ii) to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of the Wind-Down Trust Assets attributable to TopCo; *provided* that any distributions on account of the Wind-Down Entity Assets or the Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims. | $3.0 | 64% | 64% | 65% – 65% |
| 5 | Alameda Loan Facility Claims | Each Holder of an Allowed Alameda Loan Facility Claim will receive in exchange for such Allowed Alameda Loan Facility Claim to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets; *provided* that any distributions on account of Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, all Allowed Claims at OpCo, HoldCo, and TopCo, including, but not limited to, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, Allowed Account Holder Claims, Allowed OpCo General Unsecured Claims, Allowed HoldCo General Unsecured Claims, and Allowed TopCo General Unsecured Claims; *provided*, *however*, if the Bankruptcy Court denies subordination of the Alameda Loan Facility Claims, then such Alameda Loan Facility Claims shall be *pari passu* with General Unsecured Claims at the applicable Debtor entity. | $75.1 | 0% | 0% | 0% – 0% |
| 6 | Section 510(b) Claims | Each Holder of Allowed Section 510(b) Claims against TopCo will receive, to effectuate distributions, if applicable, from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to TopCo; *provided* that any distributions on account of the Wind Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in | $0.0 | N/A | N/A | N/A |

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims (in $mm)[16][17] | Projected Sale Transaction Recovery under the Plan | Projected Liquidation Transaction Recovery under the Plan | Liquidation Recovery |
|---|---|---|---|---|---|---|
| | | full of, or reserve for, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, and Allowed TopCo General Unsecured Claims. | | | | |
| 7 | Intercompany Claims | On the Effective Date, all Intercompany Claims shall be, at the option of the Debtors, either (a) Reinstated or (b) converted to equity, otherwise set off, settled, distributed, contributed, or cancelled, in each case in accordance with the Restructuring Transactions Memorandum. | $0.0 | 0% | 0% | 0% – 0% |
| 8 | Intercompany Interests | On the Effective Date, all Intercompany Interests shall be, at the option of the Debtors, either (a) Reinstated in accordance with Article III.G of the Plan or (b) set off, settled, addressed, distributed, contributed, merged, or cancelled, in each case in accordance with the Restructuring Transactions Memorandum. | $0.0 | 0% | 0% | 0% – 0% |
| 9 | Existing Equity Interests | Each Holder of Existing Equity Interests will receive, to effectuate distributions, if applicable, from the Wind-Down Entity, its Pro Rata share of the Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to TopCo; *provided* that any distributions on account of Wind-Down Trust Units shall only be made following payment in full of, or reserve for, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, and Allowed TopCo General Unsecured Claims. | $0.0 | N/A | N/A | N/A |

**E.** **What will I receive from the Debtors if I hold an Allowed Administrative Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan. The chart below summarizes the various unclassified claims and provides the relevant section of the Plan that addresses their treatment:

22-10943-mew Case 1:23-cv-02631-JHR Doc 2631-1 Filed Document 01/18/23 42 Entered Filed 01/03/23 50:54 Page 29 30 of 420 421

Pg 29 of 420

| Claim | Description of Claim | Plan Section |
|-------|---------------------|--------------|
| Administrative Claims | A Claim against a Debtor for the costs and expenses of administration of the Chapter 11 Cases arising on or after the Petition Date and prior to the Effective Date pursuant to section 503(b) of the Bankruptcy Code and entitled to priority pursuant to sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' business and (b) Allowed Professional Fee Claims. For the avoidance of doubt, any Cryptocurrency inadvertently deposited to the Debtors' account(s) after the Petition Date shall be returned in full to the sender. | Article II, Section A |
| Professional Fee Claims | Any Administrative Claim by a Professional for compensation for services rendered or reimbursement of expenses incurred by such Professional through and including the Effective Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court. | Article II, Section B |
| Priority Tax Claims | Any Claim of a Governmental Unit against a Debtor of the kind specified in section 507(a)(8) of the Bankruptcy Code. | Article II, Section C |

**F.      What is the "toggle" feature of the Plan?**

The "toggle" feature of the Plan provides that, if the Sale Transaction is not consummated by Outside Date or the Asset Purchase Agreement is terminated, the Debtors can pivot to a standalone plan whereby the Debtors will distribute their assets to creditors in accordance with Article IV of the Plan. The "toggle" allows the Debtors to abandon the Sale Transaction and to initiate distributions to Holders of Claims without the need to restart the Disclosure Statement and Plan solicitation process. As a result, Holders of Claims will receive recoveries under the Plan on a much quicker timeline than if the Debtors have to recommence the solicitation process on the standalone plan.

**G.      How will my Account be transitioned to Binance.US?**

The Debtors will transition Account Holders and Holders of OpCo General Unsecured Claims to the Binance.US Platform and effectuate delivery of Plan distributions to such Holders' Binance.US Accounts as set forth in Article V.C.6 of this Disclosure Statement and subject to the terms of the Asset Purchase Agreement based on whether Account Holders and Holders of OpCo General Unsecured Claims are in Supported Jurisdictions or Unsupported Jurisdictions. All Account Holders and Holders of Allowed OpCo General Unsecured Claims should closely review Article V.C.6 of this Disclosure Statement. It is currently anticipated that all Account Holders and Holders of OpCo General Unsecured Claims will transition to Binance.US subject to their successful completion of Binance.US's "Know Your Customer" process and other procedural and regulatory requirements as further described in the Asset Purchase Agreement.

**H.      What if I am unable or unwilling to transition my Account to Binance.US?**

We expect that substantially all Account Holders will be transitioning to Binance.US. In the event that a customer is not successfully transitioned to Binance.US (for instance, in the event such Account Holder resides in an Unsupported Jurisdiction for which Binance.US does not obtain the Unsupported Jurisdiction Approval within six (6) months of the Closing Date (as defined in the Asset Purchase Agreement)), such customer will not receive any distributions in Cryptocurrency form ("in kind"). They will instead receive a Cash distribution from the Debtor's estates as and when such distributions are made pursuant to the Bankruptcy Code.

**I.      What are the sources of Consideration and other consideration required to fund the Plan?**

Distributions under the Plan shall be funded by (i) the proceeds of Purchaser's payment obligations under Sections 2.1 and 2.2 of the Asset Purchase Agreement, (ii) distributions of Acquired Coins pursuant to Sections 6.12

and 6.14 of the Asset Purchase Agreement, and (iii) the Wind-Down Entity or Wind-Down Trust (as applicable) from the Wind-Down Entity Assets or Wind-Down Trust Assets (as applicable); *provided*, *however*, that Allowed Professional Fee Claims shall be paid from the Professional Fee Escrow Account in the first instance. The Wind-Down Trust Entity Assets or Wind-Down Trust Assets (as applicable) shall be used to pay the Wind-Down Trust Entity Expenses (including the compensation of the Wind-Down Trustee and any professionals retained by the Wind-Down Trust), and to satisfy payment of Allowed Claims and Interests as set forth in the Plan.

**J.      Are any regulatory approvals required to consummate the Sale Transaction and confirm the Plan?**

Voyager currently maintains state money transmission licenses or their equivalents (each, a "Money Transmission License") in seventeen (17) states,[19] and has license applications pending[20] in eighteen (18) states.[21]

The Debtors have engaged with the state banking departments throughout the bankruptcy process and will continue to actively do so with the goal of ensuring that the Sale Transaction and the Plan provides for compliance by Voyager and the Purchaser, as applicable, with state money transmission laws as of the consummation of the Sale Transaction. The state banking departments may have broad discretion as to the approvals required in connection with the Sale Transaction, thus it is not possible to predict with certainty the scope of such approvals, whether they will ultimately be granted, and the expected timeframes of the state banking departments' determinations. There are unresolved questions of law with respect to the intersection of state money transmission statutes and the Bankruptcy Code and the answers to those questions may impact the ability of the state banking departments to require certain approvals with respect to consummation of the Sale Transaction and confirmation of the Plan.

As an initial matter, it is important to note that Money Transmission Licenses are not assets that can be purchased or transferred; they are specific to the entity to which they are issued, and thus an acquisition of a licensed entity must be conducted through a stock purchase or merger in which the licensed entity is the surviving entity for the licenses to remain in effect.

Pursuant to the Asset Purchase Agreement, the Purchaser will not acquire Voyager's Money Transmission Licenses; rather, the Asset Purchase Agreement provides for the transfer of the Acquired Coins and Additional Bankruptcy Distributions to the Binance.US Platform for distribution in accordance with the Asset Purchase Agreement and the transition of Account Holders and Holders of OpCo General Unsecured Claims to Binance.US accounts in order to receive the same, subject to the terms and conditions set forth in the Asset Purchase Agreement (which include prohibitions on such transfers and transitions with respect to Account Holders and Holders of OpCo General Unsecured Claims located in Unsupported Jurisdictions).

Following consummation of the Sale Transaction, Voyager will take steps to (i) withdraw those money transmission license applications that are pending with state banking departments and (ii) surrender those Money Transmission Licenses it holds (the "Licensing Wind-Down Process"). Such Licensing Wind-Down Process will require notice to, and in some cases approval by, those state banking departments in states where the Debtors have

---

[19]   The Alaska Division of Banking and Securities suspended Voyager's license on July 6, 2022 and subsequently reversed such suspension on July 14, 2022. There is a risk that one or more additional state banking departments may choose to suspend Voyager's Money Transmission Licenses going forward.

[20]   On July 17, 2022, the North Dakota Department of Financial Institutions notified Voyager that it required Voyager's pending money transmitter license application be withdrawn on grounds that it would not approve an application with an active bankruptcy filing. There is a risk that one or more additional state banking departments with which Voyager has pending applications may impose similar restrictions on Voyager going forward.

      The Debtors have two applications pending in New York: (a) a money transmitter license application and (b) a virtual currency business activity license application or "Bitlicense." Voyager Digital NY, LLC, a non-operational affiliate of the Debtors, filed such applications.

[21]   Voyager also maintains a registration as a "money services business" with the Financial Crimes Enforcement Network ("FinCEN") pursuant to federal money transmission laws. A change in ownership of an entity registered with FinCEN requires notice to FinCEN following consummation of the relevant transaction, but does not require prior regulatory approval.

applications pending or are licensed pursuant to the requirements set forth in each state money transmission statute and as otherwise required by the relevant state banking departments.[22]

In the event that the "toggle" function is triggered, causing a pivot to a self-liquidating plan, Voyager would maintain its Money Transmission Licenses for so long as necessary to effect distribution of recoveries to Holders of Claims and complete the Licensing Wind-Down Process at the appropriate time.

### K. How will I receive my recovery as an Account Holder if the Sale Transaction is not consummated?

In the event that the Sale Transaction is not consummated by the Outside Date, the Debtors will outline the steps necessary for Account Holders to receive Distributable Cryptocurrency on an in-kind basis and will describe the transition process in further detail. It is currently anticipated that all Account Holders will receive the option to receive Distributable Cryptocurrency in certain formats that will render such transfer "in-kind" to allow such distributions to be positioned in the most tax-efficient manner possible for Account Holders.

### L. What happens to my recovery if the Plan is not confirmed or does not go effective?

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to consummate the Restructuring Transactions. It is possible that any alternative transaction may provide Holders of Claims and Interests with less than they would have received pursuant to the Plan. For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* Article XI.B of this Disclosure Statement, titled "Best Interests of Creditors—Liquidation Analysis" and the Liquidation Analysis attached hereto as **Exhibit B**.

### M. If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation"?

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective. Initial distributions to Holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as practicable thereafter, as specified in the Plan. *See* Article IX of the Plan for a description of the conditions precedent to consummation of the Plan.

### N. Is there potential litigation related to the Plan?

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan as well, which could potentially lead to litigation. *See* Article IX.D.2 of this Disclosure Statement titled "The Wind-Down Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases as well as Ongoing Regulatory Investigations" for further discussion on this issue.

As of the Petition Date, the Debtors were parties to certain litigation matters that arose in the ordinary course of operating their business and could become parties to additional litigation in the future. Although the Debtors have disputed, are disputing, or will dispute in the future the amounts asserted by such litigation counterparties, to the extent these parties are ultimately entitled to a higher amount than is reflected in the amounts estimated by the Debtors herein, the value of recoveries to Account Holders and Holders of General Unsecured Claims could change, and such changes could be material.

The Debtors may also reject Executory Contracts and Unexpired Leases, which may result in parties asserting General Unsecured Claims for rejection damages. An increase in the estimated amount of rejection damages claims could result in reduced recoveries for Account Holders and Holders of General Unsecured Claims. Finally, the Debtors may object to certain Proofs of Claim, and any such objections ultimately could cause the total amount of

---

[22] The state approval process for the surrender of a license typically takes several months.

Allowed General Unsecured Claims to change. These changes could affect recoveries to Account Holders and Holders of General Unsecured Claims, and such changes could be material.

**O.    Does the Plan provide for the subordination of any Claims?**

The Plan contemplates that the Class 5 Alameda Loan Facility Claims are subordinated Claims. Section 510(c) of the Bankruptcy Code provides, in relevant part, that the Bankruptcy Court may, "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest." 11 U.S.C. § 510(c)(l). Bankruptcy courts have ruled that equitable subordination is proper where three conditions are met: ( 1) the claimant must have engaged in some type of inequitable conduct; (2) the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must not be inconsistent with the provisions of the federal bankruptcy regime. *See In re LightSquared Inc.*, 511 B.R. 253, 346 (Bankr. S.D.N.Y. 2014) citing *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 699-700 (5th Cir. 1977).

The Debtors believe that the Alameda Loan Facility Claims should be equitably subordinated due to Alameda and its affiliates' inequitable conduct that has harmed the Debtors' creditors in multiple instances. Since the outset of these Chapter 11 Cases, Alameda has sought to undermine and sabotage the Debtors' restructuring efforts at every turn. The Alameda Loan Agreement that was entered into just prior to the filing of these Chapter 11 Cases included a provision that required the Debtors to only engage in lending activities with Alameda.[23] Alameda's effort to front-run the Debtors' marketing process continued when, on July 22, 2022, it issued a press release and low-ball proposal for the Debtors' business while openly disparaging the Debtors. Alameda's attempts to mislead creditors with false statements were so egregious that the Debtors were forced issue a response to correct the record.[24] Alameda's claims, made with full knowledge of their falsity, chilled the Debtors' marketing process and lowered the floor for potential bids in the Auction. Prior to the Auction, the Debtors requested that Alameda unwind all outstanding prepetition loans made by the Debtors to Alameda (some of which were collateralized) to ensure fairness and equal footing for all participants in the Auction.[25] Alameda finally acquiesced to the repayment of the prepetition loans once the Debtors communicated that Alameda's participation in the Auction was contingent on either repaying the prepetition loans or disclosing its financial wherewithal to the other bidders to ensure a level playing field for all Auction participants.

Given the fallout following the discovery of the apparent historic fraud committed by Alameda and FTX, the Debtors and other parties-in-interest now understand that Alameda's behavior in the Chapter 11 Cases was an effort to fill holes on its balance sheet resulting from their apparent fraudulent business operations. Alameda's insistence to skirt the Debtors' robust marketing process was a feigned attempt to acquire the Debtors' cryptocurrency in the quick of night, not to return Cryptocurrency to the Debtors' stakeholders despite Alameda's and FTX's former leadership's adamant contentions.[26] Accordingly, the Debtors believe that such behavior warrants the equitable subordination of the Alameda Loan Facility Claims. The Debtors will further demonstrate the legal and factual bases for subordinating the Alameda Loan Facility Claims prior to or at Confirmation.

Although the Debtors have classified the Alameda Loan Facility Claims as subordinated claims, the Bankruptcy Court may rule that subordination of the Alameda Loan Facility Claims is improper. If the Bankruptcy Court denies subordination of the Alameda Loan Facility Claims, then such Alameda Loan Facility Claims shall be *pari passu* with General Unsecured Claims at the applicable Debtor entity.

---

[23]    *See* Alameda Loan Agreement, Section 4.7.

[24]    *See Notice of Response to Alameda/FTX US Press Release* [Docket No. 137].

[25]    *See* Unwind Motion; Article VIII.L of this Disclosure Statement.

[26]    *See*, *e.g.*, @SBF, TWITTER (July 24, 2022, 8:32 P.M. ET), https://twitter.com/SBF_FTX/status/1551364656085602305?s=20&t=67p5C4w-kxALBYJjQ1UVCg.

P.    **Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes, Article VIII of the Plan proposes to provide certain releases to the Released Parties and also provides for exculpation of the Exculpated Parties. The release, exculpation, and injunction provisions that are contained in the Plan are copied in Article V.A.3 of this Disclosure Statement, entitled "Releases." For the avoidance of doubt, the decision to "opt in" to the releases is voluntary, and the failure to "opt in" does not prejudice any electing creditors' rights.

On the Petition Date, the board of directors of Voyager Digital, LLC voted to appoint two independent directors to the board of Voyager Digital, LLC and to establish a special committee (the "Special Committee"). The Special Committee consists of the newly appointed independent directors and was established to investigate certain historical transactions, including the facts and circumstances related to the Debtors' loan to 3AC (the "Investigation"). On August 4, 2022, the Bankruptcy Court entered an order approving the appointment of Quinn Emmanuel Urquhart & Sullivan, LLP as legal counsel to the Special Committee ("Special Committee Counsel") with the mandate to conduct the Investigation. The Special Committee's investigation, and the settlements reached by the Special Committee that are incorporated into the Plan, are described in more detail in Article VII.A.2(b)(i)-(ii) below. As described in Article VII.A.2(b)(i)-(ii), the potential estate claims the Special Committee identified as colorable are being settled pursuant to the Plan on the terms set forth herein.

The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' chapter 11 process through, among other things, efforts to market and sell the Debtors' assets and negotiate and implement the Plan, which will maximize value for the benefit of all parties in interest. The Debtors' Chief Executive Officer, Mr. Ehrlich ("CEO") and Chief Commercial Officer (and former Chief Financial Officer), Mr. Psaropoulos ("CCO") are also making additional personal contributions to the Plan pursuant to the settlements reached with the Special Committee. Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

The Debtor releases (other than with respect to derivative claims) do not affect the Canadian Class Action. The Debtor releases are releases of the Debtors' claims against third parties. The Canadian Class Action claim against Voyager Digital Ltd. is a Claim against a Debtor, which will be subject to the treatment of Section 510(b) Claims under the Plan. The Canadian Class Action direct claims against the Debtors' directors and officers are not impacted by the Debtor release.

The third-party releases do not release direct claims unless a Holder of such Claim or Interest affirmatively elects to opt into the third-party release. Holders of Claims or Interests may also contribute their third-party claims against Persons other than the Debtors to the Wind-Down Entity pursuant to Article IV.Q of the Plan. If the Holder of a Claim or Interest contributes their Contributed Third-Party Claims to the Wind-Down Entity then they will be barred from pursuing such Contributed Third-Party Claims. However, pursuant to the Plan, Contributed Third-Party Claims do not include (i) any derivative claims of the Debtors, (ii) any direct claims against the Releasing Parties, (iii) any direct Causes of Action that any Contributing Claimant has against Mark Cuban, Dallas Basketball Limited d/b/a Dallas Mavericks, the National Basketball Association, and any of their Related Parties, or (iv) any direct Causes of Action that any Contributing Claimant, in its capacity as an equity holder of Voyager Digital Ltd., has that are asserted in the Canadian Class Action against Voyager Digital Ltd., Stephen Ehrlich, Philip Eytan, Evan Psaropoulos, Lewis Bateman, Krisztian Toth, Jennifer Ackart, Glenn Stevens, and Brian Brooks. The Wind-Down Entity will be able to pursue Contributed Third-Party Claims subject to the terms of the Plan. To the extent the Wind-Down Entity chooses to pursue the contributed Claims, and is successful, additional recovery may be generated as a result, which will be distributed in accordance with the Plan waterfall.

The Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Second Circuit. Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.

**ALL HOLDERS OF CLAIMS THAT (I) VOTE TO ACCEPT THE PLAN AND WHO AFFIRMATIVELY OPT INTO THE RELEASES PROVIDED BY THE PLAN; (II) VOTE TO REJECT THE PLAN AND WHO AFFIRMATIVELY OPT INTO THE RELEASES PROVIDED BY THE PLAN; OR (III) ABSTAIN FROM VOTING ON THE PLAN AND AFFIRMATIVELY OPT INTO TO THE**

RELEASES PROVIDED IN THE PLAN WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY RELEASED AND DISCHARGED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE RELEASED PARTIES, INCLUDING THE DEBTORS OR THE WIND-DOWN DEBTORS, AS APPLICABLE.

**Q.     What is the deadline to vote on the Plan?**

The Voting Deadline is February 22, 2023, at 4:00 p.m. (prevailing Eastern Time).

**R.     How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote on the Plan.  To be counted as votes to accept or reject the Plan, each ballot (a "Ballot") must be properly executed, completed, and delivered in accordance with the instructions provided such that a vote cast is **actually received** before the Voting Deadline by Stretto.  *See* Article X of this Disclosure Statement, entitled "Solicitation and Voting Procedures."

IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE CLAIMS, NOTICING, AND SOLICITATION AGENT.  ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE VOTING INSTRUCTIONS WILL **NOT** BE COUNTED EXCEPT AS DETERMINED BY THE DEBTORS.

**S.     Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on Confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

**T.     When is the Confirmation Hearing set to occur?**

The Debtors will request that the Bankruptcy Court schedule the Confirmation Hearing for March 2, 2023, at 10:00 a.m. (prevailing Eastern Time).  The Confirmation Hearing may be adjourned from time to time without further notice.  The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing.  Subject to section 1127 of the Bankruptcy Code, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Objections to Confirmation of the Plan must be filed and served on the Debtors, and certain other parties, by February 22, 2023, at 4:00 p.m. (prevailing Eastern Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement.

The Debtors will publish the notice of the Confirmation Hearing, which will contain the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in *The New York Times* (national edition) and *Financial Times* to provide notification to those persons who may not receive notice by mail.  The Debtors may also publish the notice of the Confirmation Hearing in such trade or other publications as the Debtors may choose.

**U.     What is the purpose of the Confirmation Hearing?**

The confirmation of a plan by a bankruptcy court binds the debtor, any issuer of securities under a plan, any person acquiring property under a plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.

**V.    What is the effect of the Plan on the Debtors' ongoing business?**

The Debtors are liquidating under chapter 11 of the Bankruptcy Code.  Following Confirmation, the Plan will be consummated on the Effective Date.  On or after the Effective Date, and unless otherwise provided in the Plan, the Wind-Down Trustee will commence the wind down of the Wind-Down Debtors in accordance with the terms of the Plan.  Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

**W.    What steps did the Debtors take to evaluate alternatives to a chapter 11 filing?**

As described in Article VII herein, as well as in the *Declaration of Stephen Ehrlich, Chief Executive Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 15] (the "First Day Declaration"), prior to the Petition Date, the Debtors evaluated numerous potential alternatives, including options relating to mergers, sales, capital raising, and consensual recapitalizations, to provide stability and requisite capitalization to their business enterprise in light of significant market volatility.

**X.    Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Claims, Noticing, and Solicitation Agent:

By electronic mail at:
voyagerinquiries@stretto.com with a reference to "In re Voyager – Solicitation Inquiry" in the subject line.

By telephone at:
(855) 473-8665 (Toll-Free) or (949) 271-6507 (International)

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in these Chapter 11 Cases are available upon written request to the Debtors' Claims, Noticing, and Solicitation Agent at the address above or by downloading the exhibits and documents from the website of the Debtors' Claims, Noticing, and Solicitation Agent at http://cases.stretto.com/Voyager (free of charge) or the Bankruptcy Court's website at https://www.nysb.uscourts.gov/ecf-and-pacer-information (for a fee).

**V.    THE DEBTORS' PLAN**

**A.    The Plan.**

The Plan contemplates, among other things, (a) if the Sale Transaction is consummated by the Outside Date, the Debtors will (i) transfer all Acquired Coins to the Binance.US Platform for distribution in accordance with the Asset Purchase Agreement, (ii) distribute recoveries to Holders of HoldCo General Unsecured Claims and TopCo Unsecured Claims, (iii) transfer all Claims, Interests, and assets to the Wind-Down Reserve, and (iv) liquidate the Debtors' business and remaining assets under chapter 11 of the Bankruptcy Code; or (b) if the Sale Transaction is not consummated by the Outside Date, (i) distribute substantially all of the Cryptocurrency on the Debtors platform to Account Holders and distribute Cash at each Debtor entity to Holders of Claims at such entity, (ii) transfer all Claims, Interests, and assets to the Wind-Down Reserve, and (iii) liquidate the Debtors' business and remaining assets under chapter 11 of the Bankruptcy Code.  The Plan contemplates the following key terms, among others described herein and therein:

**1.    *General Settlement of Claims and Interests***

Pursuant to section 1123 of the Bankruptcy Code, Bankruptcy Rule 9019 (as applicable), and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan.  The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute

the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 of all such Claims, Interests, Causes of Action, and controversies, as well as a finding by the Bankruptcy Court that such compromise and settlement is fair, equitable, reasonable, and in the best interests of the Debtors, their Estates, and Holders of Claims and Interests. Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Interests in any Class are intended to be and shall be final.

The Debtors are working with the Committee (as defined in Article VIII.C hereof) and other parties in interest to resolve certain open issues and controversies, which may result in a settlement or settlements pursuant to Bankruptcy Rule 9019 and may be included in the Plan. The Debtors believe that resolution of these issues or controversies in advance of the Confirmation Hearing will facilitate closure to the Chapter 11 Cases and a more efficient wind down of the Debtors. The Plan may be modified prior to the Confirmation Hearing to incorporate any number of resolutions of the unresolved controversies. Any such resolution will be negotiated at arm's-length with the advisors representing the affected parties.

### 2. *Recoveries to Certain Holders of Claims and Interests*

The recoveries to Holders of Claims and Interests is described in Article IV.D of this Disclosure Statement, entitled "What will I receive from the Debtors if the Plan is consummated?"

### 3. *Releases*

The Plan contains certain releases, as described in Article IV.O of this Disclosure Statement, entitled "Will there be releases and exculpation granted to parties in interest as part of the Plan?" The release, exculpation, and injunction provisions that are contained in the Plan are copied in pertinent part below.

"Related Party" means, with respect to any Entity, in each case in its capacity as such with respect to such Entity, such Entity's current and former directors, managers, officers, investment committee members, special committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and advisors.

"Released Parties" means, collectively, in each case in its capacity as such: (a) the Debtors; (b) the Wind-Down Debtors; (c) the Committee, and each of the members thereof; (d) each of the Released Professionals; (e) Purchaser and each of its Related Parties; and (f) each of the Released Voyager Employees (subject to the limitations contained in Article IV.F and Article IV.G of the Plan); *provided* that if the Asset Purchase Agreement is terminated, Purchaser and each of its Related Parties shall not be "Released Parties" under the Plan.

"Released Professionals" means the following professionals retained by the Debtors, the Committee, or the Purchaser (as applicable): (i) Kirkland & Ellis LLP; (ii) Moelis & Company LLC; (iii) Berkeley Research Group, LLC; (iv) Bankruptcy Management Solutions, Inc. d/b/a Stretto; (v) Quinn Emanuel Urquhart & Sullivan LLP; (vi) Fasken Martineau DuMoulin LLP; (vii) Campbells Legal (BVI); (viii) McDermott Will & Emery LLP; (ix) FTI Consulting, Inc.; (x) Epiq Corporate Restructuring, LLC; (xi) Cassels, Brock & Blackwell LLP; (xii) Paul Hastings LLP; (xiii) Harney Westwood & Riegels LP (BVI); (xiv) Day Pitney LLP (solely in their capacity as counsel to the Debtors); (xv) Jenner & Block LLP; (xvi) Seyfarth Shaw LLP; (xvii) Alvarez & Marsal Canada Inc.; (xviii) Blake, Cassels & Graydon LLP; (xix) Latham & Watkins LLP; (xx) Lowenstein Sandler LLP; (xxi) Kramer Levin LLP and (xxii) Acura Law Firm; *provided* that if the Asset Purchase Agreement is terminated, Latham & Watkins LLP shall not be a "Released Professional" under the Plan.

"Released Voyager Employees" means all directors, officers, and Persons employed by each of the Debtors and their Affiliates serving in such capacity on or after the Petition Date but before the Effective Date (subject to the limitations contained in Article IV.E and Article IV.F of the Plan).

"Releasing Parties" means, collectively, in each case in its capacity as such: (a) the Debtors; (b) the Wind-Down Debtors; (c) the Committee, and each of the members thereof; (d) each of the Released Professionals; (e) each of the Released Voyager Employees; (f) Purchaser and each of its Related Parties to the extent Purchaser is able to bind such Related Parties, (g) all Holders of Claims that vote to accept the Plan and affirmatively opt into the releases provided by the Plan; (h) all Holders of Claims that vote to reject the Plan and affirmatively opt into the releases provided by the Plan; and (i) all Holders of Claims or Interests that abstain from voting (or are otherwise not entitled to vote) on the Plan and affirmatively opt into the releases provided by the Plan; *provided* that if the Asset Purchase Agreement is terminated, Purchaser and each of its Related Parties shall not be "Releasing Parties" under the Plan.

(a)    **Releases by the Debtors.**

**Notwithstanding anything contained in the Plan to the contrary, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Wind-Down Debtors, and their Estates, the Wind-Down Entity, and in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of, the foregoing Entities, from any and all Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Chapter 11 Cases and related adversary proceedings, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, the administration and implementation of the Restructuring Transactions or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019, of the releases described in Article VIII.A of the Plan by the Debtors, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in Article VIII.A of the Plan is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) except to the extent contemplated by Article IV.E and Article IV.F of the Plan, a bar to any of the Debtors or Wind-Down Debtors or their respective Estates or Wind-Down Entity asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.**

**Notwithstanding anything to the contrary contained herein, nothing in the Plan shall release, waive, or otherwise limit the (i) rights, duties, or obligations of the Purchaser under the Asset Purchase Agreement and (ii) the Non-Released D&O Claims, but such Non-Released D&O Claims shall remain subject to the limitations contained in Article IV.E and Article IV.F of the Plan.**

(b)  **Release by Holders of Claims or Interests.**

**Except as expressly set forth in the Plan, effective on the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted or assertable on behalf of any of the Debtors, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, the administration and implementation of the Restructuring Transactions, or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date, _provided_ that nothing in Article VIII.B of the Plan shall be construed to release the Released Parties from actual fraud, willful misconduct, or gross negligence as determined by a Final Order.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in Article VIII.B of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in Article VIII.B of the Plan is:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) except to the extent contemplated by Article IV.E and Article IV.F of the Plan, a bar to any of the Releasing Parties or the Debtors or Wind-Down Debtors or their respective Estates or Wind-Down Entity asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.**

(c)  **Exculpation.**

**Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor release or the third-party release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is exculpated from any Cause of Action for any act or omission arising on or after the Petition Date and prior to the Effective Date based on the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing, or consummation of the Disclosure Statement, the Plan, the Special Committee Investigation, any Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for Causes of Action related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.**

The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

(d)     Injunction.

The assets of the Debtors and of the Wind-Down Entity shall be used for the satisfaction of expense obligations and the payment of Claims and Interests only in the manner set forth in the Plan and shall not be available for any other purpose. All Persons and Entities who have held, hold, or may hold Claims or Interests based upon any act, omission, transaction, or other activity of any kind or nature related to the Debtors, the Wind-Down Entity, or the Debtors' Chapter 11 Cases that occurred prior to the Effective Date, other than as expressly provided in the Plan or the Confirmation Order, shall be precluded and permanently enjoined on and after the Effective Date from interfering with the use and distribution of the Debtors' assets in the manner contemplated by the Plan.

In addition, as of the Effective Date and subject to the occurrence of the Effective Date, except as otherwise specifically provided in the Plan or the Confirmation Order, all Persons and Entities who have held, hold, or may hold Claims or Interests that are fully satisfied pursuant to the Plan or any Claim or Interest that is subject to the releases and exculpations set forth in Article VIII.B and Article VIII.C of the Plan shall be precluded and permanently enjoined on and after the Effective Date from enforcing, pursuing, or seeking any setoff or relief with respect to such Claims or Interests, except for the receipt of the payments or distributions that are contemplated by the Plan.

For more detail, see Article VIII of the Plan, entitled "Effect of Confirmation of the Plan" which is incorporated herein by reference.

### 4.     *Cryptocurrency Rebalancing*

As disclosed in Article VII.A.2 of this Disclosure Statement, the Debtors' loan to 3AC resulted in a hole in the Debtors' Cryptocurrency portfolio and a deficiency of certain Cryptocurrency coins, particularly Bitcoin and USDC. Additionally, given that Account Holder Claims are dollarized as of the Petition Date, variance between Account Holder Claims as of the Petition Date and the Effective Date will exist due to continued fluctuation in cryptocurrency prices. As a result, to effectuate *pro rata* in-kind distributions of the Distributable Cryptocurrency to Account Holders pursuant to Article III.C.3(c) of the Plan, the Debtors must rebalance their Cryptocurrency portfolio through the purchase and sale of Cryptocurrency in a series of transactions (the "Rebalancing Exercise"). The Rebalancing Exercise shall be conducted to ensure that the aggregate value (in U.S. Dollars) for each type of Cryptocurrency coin or token held by the Debtors as a percentage of the aggregate value (in U.S. Dollars) of such type of Cryptocurrency coin or token that was on deposit with the Debtors as of the Petition Date (the "Rebalancing Ratio") is consistent across the Debtors' Cryptocurrency portfolio to process and initiate in-kind distributions.

To effectuate the Rebalancing Exercise, prior to the Effective Date, the Debtors plan to enter into a series of transactions that would result in the buying and selling of Cryptocurrency coins until the Rebalancing Ratio is consistent for each type of Cryptocurrency coin or token held by the Debtors (subject to a 5% variance allowance). The Debtors intend to execute such transactions, particularly for such Cryptocurrency that is less liquid, over a multi-week period in order to minimize the impact any such transactions may have on prevailing market prices for such coins. In order to minimize the impact trades have on prevailing market prices, the Debtors may use varying types of orders including time-weighted average price (TWAPs), market orders, limit orders, stop-limit orders, and other such order types as may be appropriate. Such transactions are likely to include swap transactions (*i.e.*, ETH/BTC) in order to minimize the total number of trades that need to be executed, as well as transactions directly for U.S. Dollars or conversion into equivalent stablecoins of a portion of the Debtors' Cryptocurrency portfolio as is necessary to satisfy their obligations under the Plan. Transactions may be executed directly at prevailing market prices, executed on a bilateral basis through bid list requests or through block trades. At this time, the Debtors do not intend to use any derivatives or other hedging transactions. The Debtors anticipate that executing such transactions through third-party market makers, over-the-counter trading desks, and on third party exchanges where the Debtors maintains institutional

trading accounts. The Debtors may also seek to engage third parties, including Binance.US, to execute such transactions on their behalf. Pursuant to the Purchase Agreement, the Debtors have agreed to execute such transactions on the Binance.US Platform unless they can obtain a better price from another third party. The number of Cryptocurrency coins that need to be bought and sold is unknowable at this time as the target ratio is based on future Cryptocurrency coin prices.

Accordingly, the Rebalancing Exercise is necessary to effectuate both the Sale Transaction and Liquidation Transaction under the Plan to ensure the Debtors can provide in-kind distributions of Distributable Cryptocurrency to Account Holders. In the event that the Sale Transaction is not consummated and the Debtors are proceeding with the Liquidation Transaction, prior to the Effective Date, the Debtors shall, in consultation with the Committee, be authorized to conduct the Rebalancing Exercise.

The Asset Purchase Agreement provides that the Debtors (prior to the transfer of Cryptocurrency or cash to Binance.US) and each transferred creditor (from and after the transfer of Cryptocurrency or cash to Binance.US) will retain all right, title, and interest in and to the Cryptocurrency or cash allocated to it in accordance with the Asset Purchase Agreement through and including such time as such Cryptocurrency or cash is returned to the Debtors or distributed to such transferred creditor. This is so even if transactions related to the Rebalancing Exercise are consummated on the Binance.US Platform, and such Cryptocurrency will be subject to the Debtors' customary security and control protocols while held by the Debtors. Upon the Effective Date, any Cryptocurrency or cash transferred to Binance.US will be held by Binance.US solely for the benefit of the Debtors or the Account Holders or Holders of OpCo General Unsecured Claims, as applicable, until distributions to Account Holders and Holders of OpCo General Unsecured Claims are made. In addition, the Debtors will determine the amount of Cryptocurrency and cash to be allocated to each Account Holder.

### 5. *Management Transition Plan*

Pursuant to the terms of the Plan, the Debtors shall implement the Management Transition Plan, the terms of which shall be reasonably acceptable to Purchaser and the Committee and included in the Plan Supplement. The Management Transition Plan shall help ensure that employees are available to provide transition services to the Debtors and/or the Wind-Down Entity to effectuate the Sale Transaction and to wind down the Debtors' Estates.

### 6. *Employee Transition Plan*

The Asset Purchase Agreement imposes a number of obligations on the Debtors, including obligations related to (a) making regulatory filings and cooperating with regulators; (b) maintaining and transferring data, including Know-Your-Customer data, securely and completely; (c) developing and implementing a user migration plan involving modifications to Voyager's web interface and mobile app; and an electronic process facilitating the acceptance of certain terms and conditions on the Binance.US Platform; (d) being available for a period following close of the Sale Transaction to provide assistance reasonably requested by the Purchaser in connection with the opening of user accounts and the transfer of information and Cryptocurrency in connection with the Sale Transaction; (e) providing the Purchaser with updates on technical support communications with customers; (f) rebalancing the Cryptocurrency on the Debtors' platform to prepare for closing of the Sale Transaction on a timely basis; (g) "unstaking" certain coins and ensuring they are freely transferrable and not subject to restrictions; and (h) from the date of signing through the date that is four months following close of the Sale Transaction, making available technical IT staff to Binance.US to assist it in understanding the Debtors' business software and transition accounts. *See, e.g.*, Asset Purchase Agreement §§ 6.4, 6.6, 6.10, 6.11, 6.15, and 6.16.

The Debtors will require the services of certain employees to fulfill these obligations and, without such employees, may not be able to satisfy the obligations in the Asset Purchase Agreement. Specifically, the Debtors will need certain employees in legal, finance, and compliance to satisfy the obligations in Section 6.4 of the Asset Purchase Agreement; operations, customer service, engineering, and security to satisfy the obligations in Section 6.6 of the Asset Purchase Agreement; operations, finance, and data to satisfy the obligations of Section 6.11 of the Asset Purchase Agreement; operations to satisfy the obligations of Section 6.15 of the Asset Purchase Agreement; and security and engineering to satisfy the obligations of Section 6.16 of the Asset Purchase Agreement. The Debtors will also require the services of those employees in the event they need to "toggle" to a Liquidation Transaction for any reason, which would require the Debtors to, among other things, rebalance the Cryptocurrency in their possession and

reopen the Debtors' platform for a period to permit customers to withdraw Cryptocurrency safely, among other things, while still interacting with, among others, state and federal regulators. The Debtors have created a transition plan for the approximately 35–40 employees necessary to fulfill either of these options, which is part of the Wind-Down Reserve, has the agreement of the Committee, and will be implemented by the Debtors, the Wind-Down Trustee, or both.

### 7. *Non-Released D&O Claims*

Any Claims or Causes of Action held by the Debtors or their respective estates against the Debtors' CEO and/or CCO (regardless of any fiduciary capacity in which such individuals were acting) that are expressly related to approval of the 3AC Loan are not released pursuant to the Plan (collectively, the "Non-Released D&O Claims") and shall be assigned and transferred to the Wind-Down Entity to be pursued, settled, or resolved by the Wind-Down Entity in accordance with the terms of Article IV.F of the Plan and subject to the Wind-Down Reserve. Any claims against the D&O Carriers that the Debtors' insurance transactions within the 90 days prior to the Petition Date are avoidable under the Bankruptcy Code, applicable state law, or both (the "Non-Released Insurance Claims") shall be assigned and transferred to the Wind-Down Entity to be pursued, settled, or resolved solely by the Wind-Down Entity in accordance with the terms of Article IV.F of the Plan. The Wind-Down Entity shall be a successor to the Debtors' rights, title, and interest in any Non-Released D&O Claims and Non-Released Insurance Claims, and the Wind-Down Entity shall have standing to pursue the Non-Released D&O Claims and the Non-Released Insurance Claims in accordance with the terms of Article IV.F of the Plan; *provided that*: (i) any recovery by the Wind-Down Entity (and the beneficiaries thereof) on account of any Non-Released D&O Claim, including in each case by way of settlement or judgment, shall be satisfied solely by and to the extent of the proceeds of the Debtors' available D&O Liability Insurance Policies (and/or from the D&O Carriers directly) after payment from such D&O Liability Insurance Policies of any and all covered costs and expenses incurred in connection with the defense of the Non-Released D&O Claims; (ii) any party, including any trustee or any beneficiary of the Wind-Down Entity, seeking to execute, garnish, or otherwise attempt to collect on any settlement of or judgment in the Non-Released D&O Claims shall do so solely upon available insurance coverage from the Debtors' available D&O Liability Insurance Policies; and (iii) no party shall (a) record any judgment against the CEO or CCO, or (b) otherwise attempt to collect, directly or indirectly, from the personal assets of the CEO or CCO with respect to the Non-Released D&O Claims. For the avoidance of doubt, this provision does not enjoin, limit, or impair direct claims held by third parties against the Debtors' CEO or CCO (if any) other than any direct claims held by Holders of Claims or Interests that opt into the third party release in Article VIII.B of the Plan. Only upon the occurrence of the earlier of (x) a release being given as part of any later settlement of the Non-Released D&O Claims; (y) final resolution of any coverage claims asserted against the Debtors' available D&O Liability Insurance Policies on account of the Non Released D&O Claims; or (z) exhaustion of the available insurance coverage under the D&O Liability Insurance Policies, the Non-Released D&O Claims shall be released and discharged without the need for further action or Bankruptcy Court order. For the avoidance of doubt, any release of the Non-Released D&O Claims shall not become effective until one of the three conditions stated in the preceding sentence above has been met.

The Debtors currently maintain $20 million in total D&O insurance coverage consisting of: (i) a $5 million primary policy with XL Specialty Insurance Company (the "XL Primary Policy"), (ii) a $5 million excess policy issued by Euclid Financial and Relm Insurance Ltd. (the "Euclid/Relm Excess Policy"), and (iii) a $10 million excess policy issued again by XL Specialty Insurance Company (the "XL Excess Policy"). The Debtors' D&O insurance program provides coverage to the directors and officers of Voyager and its subsidiaries and will convert to a six-year tail period upon expiration or a change in control.

### 8. *Corporate Structure Upon Emergence*

On the Effective Date, the Wind-Down Entity shall be formed for the benefit of the Wind-Down Entity Beneficiaries, as determined by the Wind-Down Entity Agreement, to implement distributions of the Wind-Down Entity Assets. The Wind-Down Entity shall have no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the purpose of the Wind-Down Trust. Upon the transfer of the Wind-Down Entity Assets pursuant to the Wind-Down Entity Agreement, the Debtors shall have no reversionary or further interest in or with respect to the Wind-Down Entity Assets. For all federal income tax purposes, the Wind-Down Entity Beneficiaries will be treated as grantors and owners thereof, and it is intended that the Wind-Down Entity be classified as a liquidating trust under Section 301.7701-4 of the Treasury Regulations.

Accordingly, for federal income tax purposes, the transfer of assets to the Wind-Down Entity shall be deemed to occur as (i) a first-step transfer of the Wind-Down Entity Assets to the Holders of Secured Tax Claims, Other Priority Claims, Account Holder Claims, or General Unsecured Claims, as applicable, and (ii) a second-step transfer by such Holders to the Wind-Down Entity. As a result, the beneficiaries of the Wind-Down Entity shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Wind-Down Entity Assets. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

As soon as possible after the transfer of the Wind-Down Entity Assets to the Wind-Down Entity, Wind-Down Trustee shall make a good faith valuation of the Wind-Down Entity Assets. This valuation will be made available from time to time, as relevant for tax reporting purposes. Each of the Debtors, the Wind-Down Trustee, and the Holders of Claims receiving interests in the Wind-Down Entity shall take consistent positions with respect to the valuation of the Wind-Down Entity Assets, and such valuations shall be utilized for all U.S. federal income tax purposes. The Wind-Down Entity shall file annual information tax returns with the IRS as a grantor trust pursuant to Treasury Regulations section 1.671-4(a) that will include information concerning certain items relating to the holding or disposition (or deemed disposition) of the Wind-Down Entity Assets (*e.g.*, income, gain, loss, deduction and credit). Each Wind-Down Entity Beneficiary holding a beneficial interest in the Wind-Down Entity shall receive a copy of the information returns and must report on its federal income tax return its share of all such items. The information provided by the Wind-Down Entity will pertain to Wind-Down Entity Beneficiaries who receive their interests in the Wind-Down Entity in connection with the Plan.

The Wind-Down Entity shall, in an expeditious but orderly manner, make timely distributions to the Wind-Down Entity Beneficiaries pursuant to the Plan and the Confirmation Order and not unduly prolong its duration. The Wind-Down Entity shall be deemed a successor in interest to the Debtors. For the avoidance of doubt, the Wind-Down Entity shall perform no actions other than receiving and distributing the Wind-Down Entity Assets, and not for any other purpose (including conducting any claims reconciliation).

The Wind-Down Trustee shall be the trustee responsible for executing the purpose of the Wind-Down Entity, which shall continue to have all of the rights and powers granted to the Wind-Down Debtors as set forth in the Plan and applicable non-bankruptcy law. The Wind-Down Trustee shall also have the rights, powers, and obligations set forth in the Wind-Down Entity Agreement.

The Restructuring Transactions Memorandum will enumerate the operational steps necessary to, if approved by the Court, effectuate the Plan, the Sale Transaction, and other transactions contemplated thereunder. The Restructuring Transactions Memorandum is a necessary mechanism, particularly for tax purposes, to outline the corporate actions taken. The Restructuring Transactions Memorandum does not alter the substantive rights of Holders of Claims or Interests. The Restructuring Transactions Memorandum will be included in the Plan Supplement.

B.     **The Sale Transaction and the Liquidation Transaction.**

1.     *The Sale Transaction*

The Debtors, led by Moelis, engaged in a thorough marketing process for the sale of all or substantially all of the Debtors' assets in accordance with the Bidding Procedures. Following the two-week Auction, the Debtors entered into the FTX Purchase Agreement to sell substantially all of their assets to FTX US. Following the collapse of the FTX Transaction, the Debtors reengaged with several potential transaction parties and ultimately selected the offer from Binance.US, as described in greater detail in Article VIII.N of this Disclosure Statement, entitled "The Post-Petition Sale Process." The Debtors now seek to effectuate the Sale Transaction as set forth herein and in the Plan. If the Sale Transaction is consummated by the Outside Date, pursuant to the terms of the Asset Purchase Agreement, then the following terms shall govern:

On or prior to the Effective Date, the Debtors shall have consummated the Sale Transaction, and, among other things, the Acquired Assets and Assumed Liabilities shall have transferred to the Purchaser free and clear of all Liens, Claims, Interests, charges, or other encumbrances, and the Purchaser shall pay to the Debtors or Holders of Account Holder Claims and Holders of OpCo General Unsecured Claims, as applicable, the proceeds from the Sale Transaction and the Plan, as and to the extent provided for in the Asset Purchase Agreement and the Plan. The Debtors will have the right to continue to retain custody of Cryptocurrency on behalf of Holders of Account Holder Claims

and cash on behalf of Holders of OpCo General Unsecured Claims pending such Holders' onboarding to the Binance.US Platform, and the Purchaser's obligation to deliver such Cryptocurrency and cash will commence upon Purchaser's receipt of such Cryptocurrency and cash from the Debtors. The Confirmation Order shall authorize the Debtors, the Purchaser, and the Wind-Down Entity, as applicable, to undertake the transactions contemplated by the Asset Purchase Agreement, including pursuant to sections 363, 365, 1123(a)(5)(B), and 1123(a)(5)(D) of the Bankruptcy Code.

The Debtors and Purchaser shall be authorized to take all actions as may be deemed necessary or appropriate to consummate the Sale Transaction pursuant to the terms of the Asset Purchase Agreement, the Customer Onboarding Protocol, and the Plan. The Debtors shall be authorized to sell any Cryptocurrency to satisfy all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims and Allowed Other Priority Claims. On and after the Effective Date, except as otherwise provided in the Plan and the Wind-Down Trust Agreement, the Wind-Down Debtors, the Wind-Down Entity, or the Purchaser, as applicable, may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; provided, that the Bankruptcy Court shall retain jurisdiction to resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with any of the foregoing.

Notwithstanding anything contained in this Disclosure Statement, the Plan, and any Definitive Documents, if the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated, all provisions contained in this Plan and the Definitive Documents governing the Sale Transaction shall have no further force and effect, and the provisions governing the Liquidation Transaction shall govern. The rights and remedies of the Seller and Purchaser under the Asset Purchase Agreement and any related orders of the Bankruptcy Court shall be expressly preserved.

Included below are disclosures regarding certain considerations related to the Sale Transaction, including: (a) Binance.US's financial wherewithal, both in terms of its ability to consummate the Asset Purchase Agreement as well as its ability to meet obligations to Account Holders and Eligible Creditors (as defined in the Asset Purchase Agreement); (b) Binance.US's holding of the Cryptocurrency of the Account Holders following the delivery of such Cryptocurrency to Binance.US, including how such Cryptocurrency is stored and what measures Binance.US has taken to ensure the secure storage of such Cryptocurrency; (c) regulatory considerations; (d) the process of onboarding the Account Holders and Eligible Creditors onto the Binance.US Platform as contemplated under the Asset Purchase Agreement; (e) VGX considerations; (f) data transfer and privacy considerations; and (g) the timing for distributions to Account Holders and Eligible Creditors in Unsupported Jurisdictions.

(a)  **Binance.US's financial wherewithal.**

Binance.US has the requisite financial wherewithal to make the payments contemplated under the Asset Purchase Agreement. The payments that Binance.US is required to make under the Asset Purchase Agreement are (1) a $20 million payment to the Debtors' estates in connection with the Sale Transaction, and (2) reimbursement of up to $15 million of the Debtors' expenses (to the extent any are due pursuant to Section 6.21 of the Asset Purchase Agreement). Binance.US has ample cash on hand (which does not include, for the avoidance of doubt, any customer assets) immediately available to cover such payments without the need for any external financing.

The Asset Purchase Agreement does not require Binance.US to make any cash or other payments in exchange for the Cryptocurrency to be transferred by the Debtors to its platform. Such Cryptocurrency is to be transferred to Binance.US on the basis of Binance.US having the obligation to make distributions to Account Holders in accordance with the Asset Purchase Agreement and the Plan.

Binance.US maintains 100% reserves for all its customers' digital assets (*i.e.*, if a customer has deposited 1 BTC with Binance.US, Binance.US holds 1 BTC on account of such customer's deposit). Binance.US's customer assets are available to be withdrawn at any time, subject to Binance.US's Terms of Use (which are available at: https://www.Binance.US/terms-of-use). Binance.US also has a sizeable and adequately capitalized balance sheet. Even if all of Binance.US's customers withdraw all of their digital assets, Binance.US would have substantial capital remaining on its balance sheet.

Binance.US also does not lend any of its customers' assets or offer margin products on its platform.

**(b)        Binance.US's holding of customer assets.**

The Asset Purchase Agreement, as amended to reflect input from the Committee, contemplates that all beneficial title to Cryptocurrency will remain with the Debtors up until the Effective Date. After that point, such Cryptocurrency will be transferred from the Debtors to Binance.US only as and when relevant creditors become eligible users (*i.e.*, satisfy Binance.US's know-your-customer requirements and accept the Binance.US terms and conditions identified above) on the Binance.US Platform in accordance with the Asset Purchase Agreement and Plan, and upon such transfer, Binance.US will be obligated to make such Cryptocurrency available to the relevant creditors within five (5) business days of receipt. Cryptocurrency that is transferred to Binance.US will be held by Binance.US pursuant to its standard digital asset wallet infrastructure which is stored on Amazon Web Services (AWS) servers located in Northern Virginia and Tokyo.

Binance.US has various security protocols in place to ensure the safe storage of customer assets. Binance.US's security protocols have achieved various third-party expert certifications attesting to their compliance with industry standards, including: (a) Payment Card Industry Data Security Standard (PCI DSS) certification, (b) International Organization for Standardization (ISO) 27001 and 27701 certifications, and (c) Service Organization Control (SOC 2) Type 2 attestation verified by an independent auditor.

**(c)        Regulatory Considerations.**

The Asset Purchase Agreement provides that Binance.US will make distributions to Account Holders and Eligible Creditors following the transfer of Cryptocurrency or cash by the Debtors to Binance.US (subject to and in accordance with the Asset Purchase Agreement and the Plan). Pursuant to Binance.US's Terms of Use and related policies and procedures, Binance.US will not make any distributions in any Unsupported Jurisdictions or allow trading by the accounts of Account Holders located in Unsupported Jurisdictions unless and until Binance.US has received the necessary licenses and/or authorizations. Binance.US has licenses, authorizations, or exemptions (as applicable) in the following Supported Jurisdictions that require such licenses, authorizations, or exemptions: Alabama (Sale of Checks License, SC 814); Alaska (Money Transmitter License, AKMT-012960); Arizona (Money Transmitter, 1009212); Arkansas (Money Transmission License, 119231); Connecticut (Connecticut Money Transmission License, MT-1906829); Delaware (Sale of Checks and Transmission of Money, 030095); Florida (FT230000290); Georgia (Seller of Payment Instruments License, 72019); Guam (Foreign Exchange/Money Transmittal - SRL NO 2316097); Idaho (Idaho Money Transmitters, MTL – 306); Iowa (Money Services License, 2020-0087); Illinois (Transmitter of Money, MT.0000392); Kansas (Kansas Money Transmitter License, MT.0000182); Kentucky (Money Transmitter License, SC723443); Maryland (Money Transmission License, 12-1906829); Maine (Money Transmitter License, NMT2053153); Michigan (Money Transmitter License, MT0022936); Minnesota (Money Transmitter License, MT-1906829); Missouri (Sales of Checks and Money Transmitter, MO-21-8764); Mississippi (Money Transmitter License, MT1906829);Nebraska (Nebraska Money Transmitter License, 1906829); Nevada (FID Money Transmitter License, MT11161); New Hampshire (Money Transmitter, 23528-MT); New Jersey (Money Transmitter, L072139); New Mexico (Money Transmitter License); North Carolina (Money Transmitter License, 190690); North Dakota (North Dakota Money Transmitter License, MT103722); Ohio (Money Transmitter License, OHMT199); Oklahoma (Money Transmitter, OK-DOB-001); Oregon (Money Transmission License, 1906829); Pennsylvania (Pennsylvania Money Transmitter License, 80252); Puerto Rico (Money Transmitter License, TM-137); Rhode Island (Rhode Island Currency Transmitter License, 20224384CT); South Carolina (Money Transmitter License, 1906829); South Dakota (Money Transmitter, MT.2199); Tennessee (Money Transmitter License, 1906829); Virginia (Money Transmitter License, MO-403); Washington (Money Transmitter License, 550-MT-125281); Washington DC (District of Columbia Money Transmission License, MTR1906829); West Virginia (West Virginia Money Transmitter License, 1906829); and Wyoming (Money Transmitter License, 7292).[27]

---

[27]    A comprehensive list of the licenses and authorizations currently held by Binance.US is available at: https://support.Binance.US/hc/en-us/articles/360050532193-Licenses. Note that certain jurisdictions do not require such licenses, authorizations, or exemptions (*e.g.*, California and Montana).

Additionally, Binance.US does not currently intend on engaging in any activities in connection with or related to the Asset Purchase Agreement that require registration with the United States Securities Exchange Commission, the United States Commodity Futures Trading Commission, or any state securities and/or commodities authorities.

Again, Binance.US does not lend any of its customers' assets or offer margin products on its platform.

### (d)     The Binance.US Customer Onboarding Process.

In advance of the Effective Date, and continuing after the Effective Date, Account Holders will be provided with the opportunity to create an account with Binance.US in order to receive an in-kind distribution of their claims in the same types of Cryptocurrency that they deposited with the Debtors.  In connection with that process, such Account Holders will be prompted to accept Binance.US's Terms of Use (which are available at: https://www.Binance.US/terms-of-use) and Privacy Policy (available at: https://Binance.US/privacy-policy) and complete Binance.US's customer onboarding (*i.e.*, KYC) process.  Account Holders will be able to withdraw their in-kind distributions from the Binance.US Platform – no Account Holder is required to continue to use Binance.US on a go-forward basis.  To the extent any such Account Holders do not agree to the Terms of Use and Privacy Policy, or are unable to complete Binance.US's customer onboarding process, within three months of the Effective Date, Binance.US will liquidate the Cryptocurrency that would have been allocated to such Account Holders by selling such Cryptocurrency to other users of the Binance.US Platform at then-current market prices in accordance with Binance.US's trading rules (available at: https://www.Binance.US/trading-rules), and distribute the proceeds of such liquidation to the Debtors for further distribution to such Account Holders pursuant to the Plan.  See also item (g) below with respect to distributions of Cryptocurrency to Account Holders located in Unsupported Jurisdictions.

### (e)     VGX considerations under the Sale Transaction.

The Asset Purchase Agreement does not impose on Binance.US any obligation to list VGX or support trading VGX on its platform.  Binance.US will conduct an internal review process with respect to whether it will support trading of the VGX on its platform.  Such a determination involves myriad factors and may require input from various third-party advisors and experts, including legal counsel.  Accordingly, Binance.US cannot predict with any accuracy the amount of time this analysis will require or its outcome.

Regardless of whether trading of VGX becomes supported on the Binance.US Platform, Account Holders may withdraw such tokens from their accounts on the Binance.US Platform when available to them in accordance with the Asset Purchase Agreement and the Plan, and subject to Binance.US's terms of use.

### (f)     Data Transfer and Privacy Considerations under the Sale Transaction.

The Debtors' customer-facing privacy policy permits transfers of user data to a buyer or other successor in connection with a sale of the Debtors' assets, including as part of a bankruptcy, liquidation, or similar proceeding.[28] Following the transfer of such data, Account Holders' data will be subject to the Binance.US Privacy Policy. However, in order to facilitate quicker customer onboarding in order to enable Account Holders to access their in-kind distributions promptly after the Effective Date, the Asset Purchase Agreement contemplates that Account Holders will be provided with the ability to "opt-in" and consent to the transfer of their user data to Binance.US before the Effective Date occurs.  Users will receive an email notification regarding the transfer of user data that presents the option to opt-in to the pre-closing transfer and provides a link to the Binance.US Privacy Policy.  As described in Article VI.B.7 of this Disclosure Statement, the Debtors will continue to impose its security protocols before, through, and following the closing of the Sale Transaction, as necessary.

### (g)     Unsupported Jurisdictions under the Sale Transaction.

Section 6.12(b) Asset Purchase Agreement contemplates that the Debtors are not required to deliver to Binance.US any assets associated with Account Holders or other creditors located in jurisdictions where Binance.US does not have appropriate licenses, regulatory authorizations or exemptions to provide the Binacnce.US platform and associated services (referred to herein as Unsupported Jurisdictions).  The Unsupported Jurisdictions are Hawaii, New

---

[28]   *See* Voyager Privacy Policy, ¶ 6, available at: https://www.investvoyager.com/privacypolicy/.

York, Texas, and Vermont. Instead of delivering the Cryptocurrency or cash distributions to Account Holders and Holders of OpCo General Unsecured Claims in such Unsupported Jurisdictions, the Debtors will retain control of such assets until Binance.US has received the appropriate license, authorization, or exemption, as applicable. If Binance.US does not receive such license, authorization, or exemption within six months following the Effective Date (*i.e.*, three months longer relative to Account Holders and Holders of OpCo General Unsecured Claims in Supported Jurisdictions), the Debtors will cause such assets to be liquidated (which liquidation may be conducted through Binance.US) and provide the cash proceeds for distribution to Account Holders and Holders of OpCo General Unsecured Claims in such Unsupported Jurisdictions in accordance with the Plan. Binance.US is currently working with state regulators to seek the requisite state licenses, authorizations, exemptions, or other alternative solutions, as applicable, in order to enable distributions to Account Holders and Holders of OpCo General Unsecured Claims in Unsupported Jurisdictions, and will continue to do so following the Effective Date to the extent such approvals or regulatory accommodations have not been granted. For avoidance of doubt, there is no guarantee or assurance that Binance.US will be able to obtain the necessary licenses, authorizations, or exemptions in order to enable it to make Cryptocurrency or cash distributions to Account Holders and Holders of OpCo General Unsecured Claims in Unsupported Jurisdictions. As such, the Debtors may be required to liquidate the Cryptocurrency held by Account Holders in Unsupported Jurisdictions and provide the cash proceeds for distribution to such Account Holders after the expiration of the six-month period following the Effective Date in accordance with the terms of the Plan.

## 2. *The Liquidation Transaction*

If the Sale Transaction is not consummated by the Outside Date, pursuant to the terms of the Asset Purchase Agreement, then the Debtors will "toggle" to the Liquidation Transaction and the following terms shall govern:

On or after the Outside Date, the Debtors will pursue the Liquidation Transaction in accordance with the Liquidation Procedures. Pursuant to the Liquidation Transaction, the Debtors, the Wind-Down Entity, or the Wind-Down Trustee, as applicable, will distribute certain of the Cryptocurrency in-kind to Holders of Account Holder Claims in accordance with Article III.C of the Plan, transfer all Wind-Down Entity Assets or Wind-Down Trust Assets to the Wind-Down Reserve, liquidate certain of the Cryptocurrency, wind down and dissolve the Debtors, and pursue final administration of the Debtors' Estates pursuant to the Bankruptcy Code.

The Debtors, or the Wind-Down Entity, as applicable, shall be authorized to take all actions as may be deemed necessary or appropriate to consummate the Liquidation Transaction pursuant to the Plan. On or before the date that that is twenty-one days prior to the anticipated commencement of the Liquidation Transaction, the Debtors, or the Wind-Down Entity, as applicable, shall file the Liquidation Procedures with the Bankruptcy Court. Parties in interest shall have ten days to object to the Liquidation Procedures, and if no objections are timely filed, the Liquidation Procedures shall be approved. In the event of a timely objection, the Bankruptcy Court shall adjudicate any objection to the Liquidation Procedures.

On and after the Effective Date, except as otherwise provided in the Plan, the Wind-Down Trust Agreement, and the Liquidation Procedures, the Wind-Down Debtors or the Wind-Down Entity as applicable, may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; provided, that the Bankruptcy Court shall retain jurisdiction to resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with any of the foregoing.

## C. Means for Implementation of the Plan.

### 1. *Wind-Down Trust*

On or after the Effective Date, the Wind-Down Trust will be established. The Wind-Down Trust shall be the successor-in-interest to the Debtors, and the Wind-Down Trust shall be a successor to the Debtors' rights, title, and interest to the Wind-Down Trust Assets. The Wind-Down Trust will conduct no business operations and will be charged with winding down the Debtors' Estates. The Wind-Down Trust shall be managed by the Wind-Down Trustee and shall be subject to a Wind-Down Trust Oversight Committee. For the avoidance of doubt, in the event that the Restructuring Transactions Memorandum specifies that the Wind-Down Debtors will be the Wind-Down Entity, the Wind-Down Debtors shall be managed by the Wind-Down Trustee and shall be subject to the Wind-Down Trust

Oversight Committee in the same manner as if the Wind-Down Entity is the Wind-Down Trust. The Wind-Down Trust shall be administered in accordance with the terms of the Wind-Down Trust Agreement and shall be subject to the Wind-Down Reserve and the Non-Released D&O Claim Budget. For the avoidance of doubt, the Wind-Down Trust shall not have any right or interest in any Cause of Action or Claim constituting an Acquired Asset. The Wind-Down Trust shall be administered in a manner consistent with the SEC's published guidance on liquidating trusts.

Prior to the Effective Date, any and all of the Debtors' assets shall remain assets of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and on the Effective Date the Wind-Down Trust Assets shall, subject to the Wind-Down Trust Agreement, be transferred to and vest in the Wind-Down Trust or the Wind-Down Debtors, as applicable. For the avoidance of doubt, to the extent not otherwise waived in writing, released, settled, compromised, assigned or sold pursuant to a prior order or the Plan, the Wind-Down Entity specifically retains and reserves the right to assert, after the Effective Date, any and all of the Vested Causes of Action and related rights, whether or not asserted as of the Effective Date, and all proceeds of the foregoing, subject to the terms of the Plan, including without limitation Article IV.E and Article IV.F.

Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, only the Wind-Down Trust and the Wind-Down Trustee shall have the right to pursue or not to pursue, or, subject to the terms hereof and the Wind-Down Trust Agreement, compromise or settle any Wind-Down Trust Assets transferred to the Wind-Down Trust. On and after the Effective Date, the Wind-Down Trust and the Wind-Down Trustee may, without further Bankruptcy Court approval, commence, litigate, and settle any Vested Causes of Action or Claims relating to any Wind-Down Trust Assets transferred to the Wind-Down Trust or rights to payment or Claims that belong to the Debtors as of the Effective Date or are instituted by the Wind-Down Trust and Wind-Down Trustee on or after the Effective Date, except as otherwise expressly provided herein and in the Wind-Down Trust Agreement. All of the Wind-Down Trust's activities shall be subject to the Wind-Down Reserve and the Non-Released D&O Claim Budget. The Wind-Down Trust shall be entitled to enforce all defenses and counterclaims to all Claims asserted against the Debtors and their Estates, including setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code.

Based on its preliminary investigation of non-released Claims against third parties unaffiliated with the Debtors, the Committee has identified potential Claims against non-released third parties unaffiliated with the Debtors that the Wind-Down Entity will seek to investigate further and may pursue. To ensure that the Wind-Down Entity has sufficient resources to pursue Claims discovered through its investigation, the Committee voted and determined that approximately $60 million should be included in the Wind-Down Reserve for that investigation and potential offensive litigation, and the Committee believes this investment (to the extent ultimately made) will benefit Holders of Claims. All expenses will be reviewed and approved by the appointed Trustee of the Wind-Down Trust who has a fiduciary obligation to ensure that expenses are responsibly spent. The Wind-Down Entity will act responsibly in assessing and pursuing litigation, only pursuing Claims that it believes will create a net benefit for Holders of Claims. The funds obtained in litigation by the Wind-Down Trust and unused funds will be returned to Holders of Claims. The Wind-Down Entity's goal is to obtain and return to Holders of Claims as much Cryptocurrency and fiat as possible.

### 2. Wind-Down Trustee and the Wind-Down Trust Oversight Committee Exculpation, Indemnification, Insurance, and Liability Limitation

The Wind-Down Trustee, the Wind-Down Trust Oversight Committee, and all professionals retained by the Wind-Down Trustee and the Wind-Down Trust Oversight Committee, each in their capacities as such, shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by the Wind-Down Debtors. The Wind-Down Trustee may obtain, on behalf of itself and the Wind-Down Trust Oversight Committee, at the expense of the Wind-Down Debtors, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Wind-Down Debtors. The Wind-Down Trustee and the Wind-Down Trust Oversight Committee may rely upon written information previously generated by the Debtors.

### 3. Tax Returns

After the Effective Date, the Wind-Down Trustee shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Debtors and the Wind-Down Debtors, and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such Debtor or

its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

### 4. *Dissolution of the Wind-Down Debtors*

Upon a certification to be Filed with the Bankruptcy Court by the Wind-Down Trustee of all distributions having been made and completion of all of its duties under the Plan and entry of a final decree closing the last of the Chapter 11 Cases, the Wind-Down Debtors shall be deemed to be dissolved without any further action by the Wind-Down Debtors, including the Filing of any documents with the secretary of state for the state in which the Wind-Down Debtors are formed or any other jurisdiction. The Wind-Down Trustee, however, shall have authority to take all necessary actions to dissolve the Wind-Down Debtors in and withdraw the Wind-Down Debtors from applicable states.

### 5. *Statutory Committee and Cessation of Fee and Expense Payment*

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases, including the Committee, shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases, except for the Filing of applications for compensation. The Wind-Down Debtors shall no longer be responsible for paying any fees or expenses incurred by any statutory committee, including the Committee, after the Effective Date, except in connection with any fees or expenses for services rendered prior to the Effective Date that are Allowed by the Bankruptcy Court.

### 6. *Distributions of Net Owed Coins; Additional Bankruptcy Distributions*

As a general matter, the Purchaser will allocate each Account Holder's Net Owed Coins to its account on the Binance.US Platform, and each Holder of OpCo General Unsecured Claim's Pro Rata share of the Distributable Cryptocurrency (in Cash) to its account on the Binance.US Platform, in each case in accordance with, and subject to, the provisions of Section 6.12 and 6.14 of the Asset Purchase Agreement, as applicable.

As a general matter, the Customer Onboarding Protocol will provide that the Purchaser will make Additional Bankruptcy Distributions to Transferred Creditors corresponding to their Pro Rata shares of such Additional Bankruptcy Distribution (if such Additional Bankruptcy Distribution is in Cryptocurrency, based on the spot market value on the Binance.US Platform of the Cryptocurrency included in such Additional Bankruptcy Distribution), all in accordance with any applicable Post-Bankruptcy Statement (as defined in the Asset Purchase Agreement).

If any Account Holder or Holder of an Allowed OpCo General Unsecured Claim does not become a Transferred Creditor prior to the date that is three (3) months following the later of the Effective Date or the date on which the terms and conditions for the Binance.US Platform are made available for such Person to accept, (as provided in the Customer Onboarding Protocol) then Purchaser shall convert any Cryptocurrency allocable to such Person into U.S. Dollars at the then-prevailing rates (including applicable fees, spreads, costs and expenses) on the Binance.US Platform and deliver such U.S. Dollars, together with any cash or others assets in respect of such Persons, to the Debtors within five (5) Business Days, for further distribution by the Debtors in accordance with the Plan and the Customer Onboarding Protocol.

If any Account Holder or Holder of an Allowed OpCo General Unsecured Claim is located in an Unsupported Jurisdiction (as defined in the Asset Purchase Agreement), then the Net Owed Coins, cash and Additional Bankruptcy Distributions, as applicable, allocable to such Person shall be handled pursuant to Section 6.12(b) or, if applicable, Section 6.14(d) of the Asset Purchase Agreement.

Purchaser shall have no responsibility to make any distributions other than as contemplated by Sections 6.12 and 6.14 of the Asset Purchase Agreement.

### 7. *Election to Contribute Third-Party Claims*

To date, there has not been an investigation into direct claims that can be asserted against third parties. Accordingly, specific claims against third parties, including the Contributed Third-Party Claims are not yet determined. After the Effective Date, the Wind-Down Entity will conduct an investigation into claims that can be asserted against third parties. After that investigation is completed, the Wind-Down Entity will assess the viability and collectability of potential claims before determining whether to pursue them. Because aggregating all Contributed Third-Party Claims may enable the pursuit and settlement of such litigation claims in a more efficient and effective manner, each Holder of a Claim or Interest may agree, by electing on its ballot or opt-in form, to contribute its Contributed Third-Party Claims to the Wind-Down Entity. By electing such option on its ballot or opt-in form, each Contributing Claimant agrees that, subject to the occurrence of the Effective Date and the formation of the Wind-Down Entity, it will be deemed, without further action, (i) to have irrevocably contributed its Contributed Third-Party Claims to the Wind-Down Entity, and (ii) to have agreed to execute any documents reasonably requested by the Debtors or the Wind-Down Entity to memorialize and effectuate such contribution. For the avoidance of doubt, any recoveries by the Wind-Down Entity from the pursuit of Contributed Third-Party Claims shall be for the benefit of all creditors.

On the Effective Date, all Contributed Third-Party Claims will be irrevocably contributed to the Wind-Down Entity and shall thereafter be Wind-Down Trust Assets for all purposes. No Person may rely on the absence of a specific reference in the Plan, the Disclosure Statement, the Confirmation Order, the Wind-Down Trust Agreement, the Plan Supplement, or any other document as any indication that the Wind-Down Trust will or will not pursue any and all available Contributed Third-Party Claims against such Person. The Wind-Down Trust shall have, retain, reserve, and be entitled to assert all Contributed Third-Party Claims fully to the same extent that the Contributing Claimants could have asserted such claims prior to the Effective Date. For the avoidance of doubt, the Contributed Third-Party Claims shall not include the rights of any of the Contributing Claimants to receive the distributions under the Plan on account of their Claims or Interests.

## VI. THE DEBTORS' BUSINESS OPERATIONS AND CAPITAL STRUCTURE

### A. The Debtors' Corporate Structure and History.

Voyager was founded in 2018 by Stephen Ehrlich, Philip Eytan, Gaspard de Dreuzy, and Oscar Salazar, a group of Wall Street and Silicon Valley entrepreneurs with extensive experience in the technology and finance sectors. Voyager was founded to bring choice, transparency, and cost efficiency to cryptocurrency investors and was designed to be "accessible to all" by focusing on the needs of retail customers.

Voyager grew rapidly—in just four years, Voyager's platform evolved from a small startup to an industry-leading trading platform that reached a peak of 3.5 million users and over $5.9 billion of cryptocurrency assets held. Voyager is a public company that began trading on the Toronto Stock Exchange in 2021 under the ticker "VOYG."[29] A simplified version of the Debtors' current corporate structure is as follows:

---

[29] On July 6, 2022, the Toronto Stock Exchange suspended all trading in VOYG.



## B. The Debtors' Assets and Operations.

Voyager's primary operations consist of (i) a trading platform, (ii) custodial services through which customers earn rewards on stored cryptocurrency assets, and (iii) lending and staking programs. All of the Company's services are accessible through a mobile application that users can download on their smartphones and other smart devices.

### 1. The Trading Platform

Traditional trading platforms have largely focused on either retail investors or institutional investors, tailoring features to one group at the exclusion of the other. Voyager's founders understood that, though retail investors do not need the full suite of services that an institutional-focused trading platform provides, retail investors deserve a high-quality trading experience that maximizes their ability to invest in the cryptocurrency sector on an equal playing field with other market participants.

Voyager operates as a cryptocurrency trading platform, matching its customers with counterparties who can facilitate the customer's desired trade. The Company's platform is simple and easy to use, but beneath the retail customer-focused user interface is an institutional-grade trading platform built to provide Voyager's customers with high-quality trade execution across numerous digital currencies. The Company's platform is unique as it surveys more than a dozen exchanges and liquidity providers and executes trades through a proprietary algorithm that evaluates the price, certainty of execution, reliability of the trading venue, and speed of execution to deliver each customer a high-quality execution. Ultimately, Voyager's customers know that they have access to a best-in-class trading platform no matter how big or small their trade.

### 2. *Custodial Services*

Digital currencies deposited by customers are stored on Voyager's platform in omnibus wallets rather than in individualized digital "wallets." In exchange, Voyager customers earn rewards on deposits. Prior to the Petition Date, rewards were primarily paid in three ways: (i) PIK Rewards, as defined below; and (ii) through the VGX Token and the Voyager Loyalty Program, as defined below. To complement its custodial services and the Voyager Loyalty Program, customers can sign up for the Voyager Debit Card.

**PIK Rewards.** Customers who deposit certain currencies with Voyager earn payable-in-kind interest ("PIK Rewards") on their assets through the Voyager Earn Program, provided that such users maintain a minimum monthly balance and keep their assets on the Company's platform.

**Voyager Loyalty Program and VGX Token.** Voyager token ("VGX" or "Voyager Token") is a digital currency issued and administered by the Company. VGX is primarily issued in connection with the Company's loyalty and rewards program (the "Voyager Loyalty Program"). Ownership of VGX entitles users to benefits on their accounts operating through a tiered reward system. VGX is traded on the Coinbase Exchange under the ticker "VGX."

The Voyager Loyalty Program is similar to retail or restaurant loyalty programs where loyal users are rewarded for continued use of the platform. Active users on the Voyager platform can earn a variety of rewards and incentives, including higher referral bonuses, lower transaction fees, prioritized customer support, higher PIK Rewards rates, and access to special events and investment opportunities.

### 3. *Staking*

Staking offers another revenue avenue for Voyager by generating passive income on coins that are staked through staking protocols without needing to sell the underlying cryptocurrency. This process involves committing cryptocurrency assets to a project in exchange for a set rewards rate determined by each staking protocol.

### 4. *Voyager's Lending Program*[30]

Prior to the Petition Date, the Debtors lent cryptocurrency deposited on its platform to third parties. Such third parties paid the Debtors a pre-negotiated interest rate that was payable in payment-in-kind (*i.e.*, a Bitcoin loan accrues interest payable in Bitcoin). During these chapter 11 cases, the Debtors recalled all outstanding loans made to third parties, with the exception of certain loans made to Galaxy Digital LLC. The Debtors expect to unwind the loans made to Galaxy Digital LLC prior to confirmation.

### 5. *Voyager's Investments*

Prior to the Petition Date and in the ordinary course of business, Voyager made equity investments in certain public and private companies primarily focused on venture capital initiatives. Such investments are in an aggregate amount of approximately $9.7 million across 11 companies and yield varied amounts of dividends based on the terms of such equity investments.

### 6. *Using Voyager's Platform*

Customers access the Company's entire suite of services through Voyager's mobile application (the "Voyager App"). Customers sign up for a Voyager account on the Voyager App after digitally executing Voyager's customer agreement and linking their bank account or off-site cryptocurrency wallet to the platform to facilitate the purchase of cryptocurrency or the transfer of the customer's own cryptocurrency to the platform.

The Company does not maintain a separate cryptocurrency wallet for each customer. Instead, all cryptocurrency assets are commingled on an asset-by-asset basis and held in omnibus accounts in the name of Voyager Digital, LLC. When a customer deposits crypto assets, the assets first enter Voyager's self-custody wallet system (such system, "Bedrock"). All deposits of crypto assets are subject to Voyager's transaction monitoring program that uses Chainalysis Pte. Ltd. ("Chainalysis"), a third-party vendor, to conduct blockchain review of crypto assets

---

[30] The Lending Program is described in further detail in the First Day Declaration.

transferred to the Voyager platform. If a customer's external crypto wallet depositing crypto assets is flagged by Chainalysis, Voyager is alerted by Chainalysis and Voyager conducts an investigation and takes appropriate actions, up to and including restricting and offboarding the customer account. If the wallet passes Chainalysis verification, then the relevant crypto assets are swept automatically from Bedrock for transfer to the applicable omnibus account with a third-party custodian or self-custody solution, which Voyager controls.

### 7. *Voyager's Security Processes and Procedures*

Voyager has a defined cybersecurity framework that includes protecting people, technology, and digital assets. The security protocols utilize several strategies and activities, including conducting first and third-party security assessments, multi-party computation ("MPC") and asset protection, and diligent monitoring and proactive hunting for risks. The Debtors use four different custodial solutions to hold and safely store a majority of the Cryptocurrency: Fireblocks Inc. ("Fireblocks"), Copper.co ("Copper"), Anchorage Digital Bank N.A. ("Anchorage"), and Coinbase Trust Company ("Coinbase"), and one self-custodial software solution called Gnosis (collectively, the "Custodians").[31] Specifically, all of the Custodians use MPC, which is one of the primary technologies custodians in the industry utilize to secure Cryptocurrency assets. Through MPC, private keys are never constructed in one place, which minimizes the possibility for a single point of compromise. To set up keys, wallets typically are "multi-signer" wallets that require a threshold of co-signers on behalf of the Custodian and a threshold of co-signers on behalf of Voyager. None of the parties are able to sign a transaction by themselves to setup a key and none of the Custodians hold the entire "private key" for wallets.

Each individual MPC key share is also randomized in a hardware isolated component to mitigate the risk of takeover by an outsider or insider who has access to a threshold device holding the MPC key shares. The process also involves a verification process where each of the co-signers assures that the metadata matches the request it carries. Fireblocks also enables Voyager to back up the set of MPC key shares of a Fireblocks Vault and load them onto a secure offline environment, which may be used to reconstruct a "master private key" of the Fireblocks Vault in the event of loss. Additionally, Voyager's other Custodians have the same or similar procedures (*e.g.*, the Company's agreement with Copper provides a failsafe mechanism through a trusted third-party agreement if Voyager or Copper loses their keys to access wallets).

Under all of the custodial agreements with the Custodians, Voyager must nominate authorized persons to access the custodial platform and give directions on what to do with the digital assets stored on their platform. The Custodians only act through directions provided by the nominated persons. A very limited number of people at the Company are deemed authorized persons who have access to control the custodial accounts. Such people are the only ones who can otherwise authorize the Custodian to move Cryptocurrency out of their "vault." Voyager selects designated persons only after going through a quorum approval process in place at the Company. There is not a single person at Voyager that can execute a transaction without authorization from at least one other person.

The Debtors also have their own robust key management processes in place, including key storage technology and secret managers such as LastPass to store passwords. These security measures have been sufficient to safeguard the Debtors' valuable Cryptocurrency assets and are on par with security measures employed by financial institutions and other sectors that employ military-grade security. To date, Voyager has never had any security issues with the Custodians or run into any issues with lost keys.

The Debtors utilize a combination of cutting-edge technology and top cybersecurity talent to protect their assets as part of a multilevel cybersecurity framework. For example, for any large withdrawals, the Debtors historically engaged in an automated risk assessment that utilized multiple techniques to analyze risk factors. Cases flagged at certain risk levels are first escalated to the Company's customer experience team and then escalated, as necessary, to the Company's anti-fraud operations team to review and investigate.

The Debtors maintain a robust security operations center that is responsible for the monitoring of the Debtors' infrastructure and interfaces to prevent misappropriation and external cyber-attacks with respect to the Cryptocurrency and Cryptocurrency-based transactions. The Debtors also work with leading vendors that are used by institutions

---

[31] The Debtors have approximately $15-20 million worth of Coins held on exchanges that are not supported by the Custodians. The Debtors' Head of Treasury has sole access and control over these Coins to minimize any security breaches.

worldwide to provide the security services needed to protect client assets and data. Importantly, Voyager has also never been subject to a security breach falling directly within Voyager's control (customers may have been susceptible to outside breaches due to weak passwords, for example). Between December 2021 and June 2022 alone, the Company's security team mitigated over six million intrusion attempts.

Due to the digital nature of the Cryptocurrency, they cannot be stored in a traditional bank account, the Debtors believe the security protocols and controls as described in herein and the ongoing collaboration and work with vendors, such as the Custodians, are sufficient to address the bespoke protections the Cryptocurrency require and all Cryptocurrency is secure. For the avoidance of doubt, the Debtors will continue to impose the security protocols defined herein for all Cryptocurrency held on their platform, including before, through, and following the Effective Date and closing of the Sale Transaction, as necessary.

### C. The Debtors' Capital Structure.

#### 1. *The Debtors' Debt Obligations*

On June 22, 2022, Voyager Digital Holdings, Inc. entered into that certain agreement for the revolving credit facility dated June 21, 2022 (the "Loan Agreement," and such facility, the "Loan Facility") with Alameda Ventures Ltd. ("Alameda") as lender, to provide a revolving credit facility of $200 million cash and USD Coin ("USDC," and such loans, the "Cash Loans") and 15,000 Bitcoin ("BTC," and such loans the "BTC Loans") guaranteed by Voyager Digital Ltd. As of the Petition Date, the total value of aggregate consideration available under the Loan Facility was approximately $500 million.[32] However, Debtor Voyager Digital Holdings, Inc. was only able to access 75 million USDC under the Loan Facility due to borrowing restrictions. The aggregate value of the USDC outstanding is $75 million.[33]

The borrowers under the Loan Agreement can draw on the Loan Facility in U.S. dollars or USDC under the Cash Loans or in BTC under the BTC Loans. The Loan Facility accrues interest on the outstanding principal balance at a rate equal to five percent annually. Any accrued interest is due on December 31, 2024, the Loan Facility's maturity date. Repayment of any principal balance is required to be in the currency in which the amount was funded (if in BTC, the repayment must be equal to the amount drawn down and outstanding at the time of repayment).

#### 2. *The Debtors' Intercompany Obligations*

There are six intercompany obligations owed between the Debtors (collectively, the "Intercompany Obligations"). The Intercompany Obligations comprise four Intercompany Obligations owed by OpCo to TopCo, one Intercompany Obligation owed by OpCo to HoldCo, and one Intercompany Obligation owed by HoldCo to TopCo. Additionally, in the ordinary course of business, the Debtors make payments by one Debtor on behalf of another Debtor, resulting in intercompany receivables between the Debtor entities (collectively, the "Intercompany Receivables"). Whether any given Intercompany Obligation or Intercompany Receivable is a valid intercompany loan or a capital contribution depends on the consideration of a number of relevant factors. Based on the Debtors' preliminary analysis, it is likely that at least five of the six Intercompany Obligations are capital contributions because TopCo received third-party equity investments and subsequently pushed down such investments to OpCo to fund the Debtors' operating business. Similarly, based on the Debtors' preliminary analysis, it is likely that the Intercompany Receivables are capital contributions based on a number of factors, including that the Debtors intentionally never settle the Intercompany Receivables. The independent directors at TopCo, HoldCo, and OpCo have engaged independent counsel and are conducting a review to analyze the Intercompany Obligations and their treatment as capital contributions or loans.

In the event that any Intercompany Obligation or Intercompany Receivable owed by OpCo one the one hand to TopCo or HoldCo on the other hand is determined to be a loan, recoveries to Account Holders and Holders of OpCo General Unsecured Claims may be reduced. This Disclosure Statement assumes that the Intercompany Obligations between the Debtors and all Intercompany Receivables between the Debtors will be recharacterized as capital

---

[32] Assuming a Bitcoin price of $20,000.

[33] As a stablecoin, USDC is pegged to $1 per coin.

contributions and will not be entitled to Pro Rata recoveries with other Holders of Claims at the applicable Debtor entity.

Below is a summary of each of the Intercompany Obligations and Intercompany Receivables and the Debtors' conclusions regarding whether such are valid loans or capital contributions. The Ad Hoc Equity Holder Group disputes the Debtors' conclusions regarding the Intercompany Obligations and Intercompany Receivables.

**(a)**          **Intercompany Obligations by OpCo to TopCo.**

         i.          *The Loan Agreement between Voyager Digital Ltd., as Lender, and Voyager Digital, LLC, as Borrower, dated February 12, 2021*

On February 12, 2021, OpCo, as borrower, entered into that certain loan agreement with TopCo, as lender, to document the $70 million unsecured loan previously received by OpCo from TopCo (the "February 2021 Term Loan"). The February 2021 Term Loan matures on February 12, 2024 and accrues interest at a rate equal to LIBOR plus 8.75% annually with interest payments due quarterly. No interest payments have ever been made by OpCo to TopCo on account of the February 2021 Term Loan. The Debtors contemplated and entered into the February 2021 Term Loan after the amount had already been funded to OpCo solely to optimize tax positions in the most efficient manner after TopCo received third-party equity investments and subsequently pushed down such investments to OpCo to fund the Debtors' operating business.

As of the Petition Date, the balance under the February 2021 Term Loan was approximately $78.9 million (including accrued interest).

Based on the totality of the circumstances, the Debtors believe, if litigated, that there is a high likelihood that the February 2021 Term Loan would be determined to be a capital contribution due to (i) the lack of repayment history, (ii) the fact that the February 2021 Term Loan was documented significantly after the amount had already been funded to OpCo, (iii) the fact that the February 2021 Term Loan was entered into solely to optimize tax positions, (iv) OpCo is the primary operating entity for Voyager's entire enterprise and TopCo was providing the necessary capital contribution to allow OpCo to operate, (v) the source of repayment was solely dependent on OpCo's business performance, (vi) the identity of interest between OpCo and TopCo, (vii) the absence of security for the advance, and (viii) the absence of a sinking fund to provide for repayment. Although the February 2021 Term Loan was formally documented, other factors, including those mentioned above, support the conclusion that the February 2021 Term Loan is most likely to be a capital contribution.

         ii.          *The Revolving Credit Agreement between Voyager Digital Ltd., as Lender, and Voyager Digital, LLC, as Borrower, dated February 12, 2021*

On February 12, 2021, OpCo, as borrower, entered into that certain revolving credit agreement with TopCo, as lender, to document the unsecured revolving credit facility with borrowing availability of up to $17.5 million previously provided by TopCo to OpCo (the "February 2021 Revolving Loan"). The February 2021 Revolving Loan matures on February 12, 2024 and accrues interest at a rate equal to LIBOR plus 7.50% annually with interest payments due quarterly. No interest payments on behalf of the February 2021 Revolving Loan have ever been made by OpCo to TopCo. The purpose of the February 2021 Revolving Loan was to provide OpCo with access to ongoing working capital and operate the business for the enterprise. The Debtors contemplated and entered into the February 2021 Revolving Loan after the amount had already been funded to OpCo solely to optimize tax positions in the most efficient manner after TopCo received third-party equity investments and subsequently pushed down such investment to OpCo to fund the Debtors' operating business.

As of the Petition Date, the outstanding amount under the February 2021 Revolving Loan was approximately $1.47 million (consisting of approximately $886,619 of principal borrowings and $590,904 of accrued interest).

Based on the totality of the circumstances, the Debtors believe, if litigated, that there is a high likelihood that the February 2021 Revolving Loan obligation would be determined to be a capital contribution due to (i) the lack of repayment history, (ii) the fact that the February 2021 Revolving Loan was documented after the amount had already been funded to OpCo, (iii) the fact that the February 2021 Revolving Loan was entered into solely to optimize tax positions, (iv) OpCo is the primary operating entity for Voyager's entire enterprise and TopCo was

providing the necessary capital contribution to allow OpCo to operate, (v) the source of repayment was solely dependent on OpCo's business performance, (vi) the identity of interest between OpCo and TopCo, (vii) the absence of security for the advance, and (viii) the absence of a sinking fund to provide for repayment. Although the February 2021 Revolving Loan was formally documented, other factors, including those mentioned above, support the conclusion that the February 2021 Revolving Loan is most likely to be a capital contribution.

iii.      *The November 2021 Intercompany Obligation between Voyager Digital Ltd. and Voyager Digital, LLC*

In November 2021, TopCo received a third-party equity investment in amount of $75 million and pushed such investment down in its entirety to OpCo to fund OpCo's working capital for purposes of its business operations.

As of the Petition Date, the outstanding amount on this November 2021 intercompany obligation was approximately $79.27 million (including any accrued interest).

Based on the totality of the circumstances, the Debtors believe, if litigated, that there is a high likelihood that the November 2021 intercompany obligation would be determined to be a capital contribution due to (i) the absence of instruments of indebtedness, (ii) no existence of a fixed maturity date or schedule of payments, (iii) no existence of a fixed interest rate and interest payments, (iv) the source of repayment was solely dependent on OpCo's business performance, (v) the identity of interest between OpCo and TopCo, (vi) the absence of security for the advance, and (vii) the absence of a sinking fund to provide for repayment.

iv.      *The May 2022 Intercompany Obligation between Voyager Digital Ltd. and Voyager Digital, LLC*

In May 2022, TopCo received a third-party equity investment in amount of $57 million and pushed such investment down in its entirety to OpCo to fund OpCo's working capital for purposes of its business operations.

As of the Petition Date, the outstanding amount on this May 2022 intercompany obligation was approximately $57.8 million (including any accrued interest).

Based on the totality of the circumstances, the Debtors believe, if litigated, that there is a high likelihood that the May 2022 intercompany obligation would be determined to be a capital contribution due to (i) the absence of instruments of indebtedness, (ii) no existence of a fixed maturity date or schedule of payments, (iii) no existence of a fixed interest rate and interest payments, (iv) the source of repayment was solely dependent on OpCo's business performance, (v) the identity of interest between OpCo and TopCo, (vi) the absence of security for the advance, and (vii) the absence of a sinking fund to provide for repayment.

**(b)      Intercompany Obligation by OpCo to HoldCo.**

In June 2022, HoldCo received a loan under the Alameda Loan Facility in the amount of $75 million from Alameda for the purpose of providing funding directly to OpCo in light of the crypto industry downturn described in Article VII.A-B of this Disclosure Statement.  Accordingly, HoldCo pushed the entire investment down to OpCo to fund OpCo's platform.

As of the Petition Date, the outstanding amount on this June 2022 intercompany obligation was approximately $75 million.

Based on the totality of the circumstances, the Debtors believe, if litigated, that there is a high likelihood that the June 2022 intercompany obligation would be a capital contribution due to (i) the absence of instruments of indebtedness, (ii) no existence of a fixed maturity date or schedule of payments, (iii) no existence of a fixed interest rate and interest payments, (iv) the source of repayment was solely dependent on OpCo's business performance, (v) the identity of interest between OpCo and HoldCo, (vi) the absence of security for the advance, and (vii) the absence of a sinking fund to provide for repayment.  Alameda disputes the treatment of this Intercompany Obligation.

**(c)      Intercompany Obligation by HoldCo to TopCo.**

On October 26, 2021, HoldCo, as borrower, entered into that certain promissory note with TopCo, as lender, in the amount of $6 million (the "Promissory Note"). The Promissory Note matures on September 30, 2024 and accrues interest at a rate equal to LIBOR plus 8.75% annually with interest payments due quarterly. To date, no interest payments on behalf of the Promissory Note have been made by HoldCo to TopCo. To comply with certain Canadian laws, TopCo made a third-party investment into a private company and then contributed the acquired shares of the third party company down to HoldCo. In exchange for the contribution of the third-party's shares, TopCo and HoldCo then entered into the Promissory Note.

As of the Petition Date, the outstanding note amount was approximately $6.33 million (consisting of approximately $6 million of principal borrowings and $329,943 of accrued interest).

Based on the totality of the circumstances, the Debtors believe, if litigated, that there is a high likelihood that the Promissory Note would be a capital contribution due to the fact that the Promissory Note was entered into after the amount was already funded to HoldCo to make a third-party equity investment into a privately-held company and then contributed the acquired shares to HoldCo in exchange for the Promissory Note.

### (d)  Intercompany Transactions Between Debtors.

As is customary for a company of the Debtors' size and scope, the Debtors have historically, in the ordinary course of business, engaged in routine business relationships with each other, including making payments by one Debtor on behalf of another (collectively, the "Intercompany Transactions"), resulting in intercompany receivables between the Debtor entities. The Intercompany Transactions are generally allocation payments on account of such things as equity-based employee compensation, non-equity-based employee salaries and benefits, ordinary course professional fees, rent and other ordinary course operating costs.

As of the Petition Date, the following intercompany receivables were outstanding:

- approximately $138,000 owed by OpCo to HoldCo;
- approximately $26.3 million owed by HoldCo to OpCo; and
- approximately $2.1 million owed by HoldCo to TopCo.

Based on the totality of the circumstances, the Debtors believe, if litigated, that there is a high likelihood that the Intercompany Transactions would be capital contributions due to (i) the Debtors' intentionally never settling the balances, (ii) the absence of instruments of indebtedness, (iii) no existence of a fixed maturity date or schedule of payments, (iv) no existence of a fixed interest rate and interest payments, (v) the source of repayment was solely dependent on OpCo's business performance, (vi) the identity of interest between OpCo and HoldCo and TopCo, as applicable, (vii) the absence of security for the advance, and (viii) the absence of a sinking fund to provide for repayment.

### 3.  *The Equity Interests in the Debtors*

As of the Petition Date, the Debtors' ultimate parent, Voyager Digital Ltd., has approximately 196,000,000 shares of common stock outstanding, approximately 9.49 percent of which is held by Alameda and its affiliates with the remainder widely held by investors.

## VII.  EVENTS LEADING TO THESE CHAPTER 11 CASES

### A.  Market and Industry-Specific Challenges.

### 1.  *2020 and 2021 Market Conditions*

The onset of the COVID-19 pandemic was a watershed moment in traditional markets and cryptocurrency markets alike. Between February 12, 2020, and March 23, 2020, the Dow Jones Industrial Average lost 37 percent of its value and the S&P 500 lost 34 percent of its value. The price of Bitcoin fell over 50 percent over the same time period, and most other cryptocurrencies experienced similar declines.

Fear of a lingering pandemic and its effect on the world economy drove many investors to exit the market altogether. Voyager, however, continued to operate its trading platform through the entirety of the 2020 "COVID Crash." Customers were able to use the platform to trade despite extreme volatility in the markets, and interest and rewards were paid out to qualifying customers as well. The Company's response to market headwinds in 2020 solidified its status as a leading cryptocurrency trading platform—between 2020 and 2022, the number of users on the Company's platform grew from 120,000 to over 3.5 million.

After the COVID Crash, traditional markets and cryptocurrency markets saw a short recovery period followed by a period of sustained growth. Central banks and governments around the world (including, in particular, the United States Federal Reserve) enacted relief programs and adopted quantitative easing monetary policies designed to bridge the world economy to the end of the COVID-19 pandemic. Such policies contributed to growth in traditional markets and cryptocurrency markets, and investment into new projects in the cryptocurrency industry skyrocketed. Between its lowest point in 2020 and its highest point in 2021, the price of Bitcoin rose by over 1,000 percent. The S&P 500 rose by nearly 100 percent over the same period.

In traditional markets, fears of new variants of the COVID-19 virus and a potential economic contraction drove a series of sell-offs as equity markets moved sideways through the end of 2021. In the cryptocurrency space, strong sell-offs in "risk-on" assets, like technology and early-stage equities, led to sell-offs in the cryptocurrency sector as investors trimmed exposure. Increased regulatory scrutiny internationally also contributed to market pessimism, and strong spot trading from institutional investors drove most cryptocurrencies to double-digit losses relative to all-time highs.

Ultimately, traditional markets closed 2021 with double-digit growth. On the surface, it seemed like markets were beginning to recover from the COVID-19 pandemic and that the lingering effects of the pandemic would be minimal. But discussions around a potential recession in 2022 began to materialize as inflation rose along with concerns over whether world governments could navigate a "soft landing" into a slower economic period in 2022.

The year 2022, to date, has been marked by historic levels of volatility in the traditional markets and cryptocurrency markets. On February 24, 2022, Russia invaded Ukraine in a major escalation of the conflict between the two countries (the "Ukrainian War"). The Ukrainian War had a swift and profound impact on the world economy. In an effort to weaken Russia's ability to pursue the war, Western countries imposed a series of financial, trade, and travel sanctions against Russia, all of which measures contributed to a rampant increase in global commodity prices. Equity markets were roiled as well. Between January 1, 2022, and the Petition Date, the S&P 500 shed 20 percent of its value while the tech-heavy Nasdaq declined by nearly 30 percent over the same period. Rising inflation and commodity prices contributed to investor pessimism and further sell-offs. In June 2022, market analysts officially labeled 2022 as a bear market.

## 2. Cryptocurrency Industry-Wide Sell-off

The widespread sell-off in traditional markets was mirrored in the cryptocurrency industry. All major cryptocurrencies experienced significant declines in 2022; Bitcoin slumped 37.3 percent in June 2022 alone and was down approximately 56 percent year-to-date as of the Petition Date. Companies in the cryptocurrency industry also experienced significant equity declines as declining cryptocurrency prices pressured margins and investor pessimism grew. In June 2022, the value of the aggregate cryptocurrency market slumped below $1 trillion for the first time since January 2021. The severe distress of two industry participants—Terra and 3AC—exacerbated this "cryptocurrency winter." The eventual implosion of Terra and 3AC, and the resulting fallout, created the "cryptopocalypse."

### (a)      The Terra Luna Collapse.

Terra is an open-source blockchain protocol created by Terraform Labs. Similar to the Ethereum blockchain (which issues Ether for use on its network), Terra issued Luna, a cryptocurrency token that was used to execute transactions on the Terra blockchain. In early May 2022, Luna traded at approximately $86 per token and had a market capitalization of approximately $14 billion.

Terra also issued TerraUSD ("UST"), an algorithmic stablecoin. Historically, UST traded at $1 per token. UST maintained its "peg" to Luna via an arbitrage mechanism. If UST traded above $1, arbitrageurs bought $1 worth

of Luna for $1 and exchanged Luna for one UST worth more than a dollar, netting the difference as profit. If UST traded below $1, arbitrageurs bought one UST for less than a dollar and exchanged it for $1 worth of Luna, netting the difference as profit. These arbitrage trades push the price of UST back to $1 and were intended to keep the two tokens equally scarce and limit oversupply or undersupply of either. To incentivize traders to burn Luna to create UST, Terra allowed owners of UST to stake their UST in exchange for a 19.5 percent yield (payable in UST).

On May 7, 2022, $2 billion of UST was unstaked and immediately sold. The sale moved UST's per share price down to $0.91. UST holders, already sensitive to price movements due to the sell-off in cryptocurrencies generally, saw UST "de-peg" and rushed to unstake and sell their coins. Terra's arbitrage trade was designed to address this type of situation but was not designed to address a situation of this magnitude. Although traders moved quickly to burn Luna and "arbitrage" the price of UST, traders realized that only $100 million of UST could be burned for Luna each day. Due to high trading volume, $100 million of UST was insufficient to "re-peg" UST to $1.

Massive selling pressure led to a downward spiral or, as known in traditional finance, a "death spiral": traders redeemed UST for Luna and sold their Luna, leading to a significant decrease in the price of Luna. Then traders attempted to "re-peg" Luna to UST by burning UST to create Luna, which in turn created an oversupply of Luna that further exacerbated its price decline. Terra allegedly sold $2.2 billion of its Bitcoin reserves to enter the Luna/Terra arbitrage efforts and re-peg the tokens but was unsuccessful. The per-token price of Luna fell from $82.55 to $0.000001 in one week.

The Terra/Luna blockchain protocol was widely viewed as a project with significant promise—Luna had attracted significant interest from institutional investors and retail investors alike. The Luna collapse erased over $18 billion of value and contributed to further sell-offs in the cryptocurrency sector.

(b)    The Making and Recalling of the Three Arrows Capital Loan.

As described above, Voyager's business model contemplated generating revenue in several different ways, including by lending, in its business judgment, a portion of cryptocurrency held on its platform to institutional borrowers.

Voyager's lending business was described and disclosed in Voyager's public securities filings, which stated that "[w]e earn fees from crypto assets lending activities with institutional borrowers," including on "an unsecured … basis," and that "Voyager selects which and how much of its crypto assets are available for such lending activity."[34] Account Holders acknowledged and consented to this activity in the Customer Agreement, as follows:

[P]articipants in the Rewards Program agree to allow Voyager to utilize Cryptocurrency held in the(ir) Account to be loaned to various third parties (each, a "Borrower") determined at Voyager's sole discretion (each, a "Loan"). Loans made to Borrowers may not be secured and the Borrowers may not be required to post collateral either to Voyager, or otherwise.[35]

As of December 31, 2021, Voyager held approximately $5.88 billion in crypto assets on its platform.[36] Of that total, approximately $2.7 billion had been loaned to various counterparties as part of Voyager's lending program. At the time, the largest individual counterparty was Alameda Research, a crypto hedge fund founded by FTX CEO Sam Bankman-Fried, which had borrowed approximately $1.6 billion and represented 61% of Voyager's loan book.[37] These loans were made largely on an unsecured basis in exchange for market-based returns that, in Voyager's judgment, corresponded with acceptable risk.

---

[34]    December 31, 2021 Voyager Digital Ltd. Management Discussion and Analysis at 8, available at https://sedar.com/GetFile.do?lang=EN&docClass=7&issuerNo=00005648&issuerType=03&projectNo=03338405&docId=5 134463.

[35]    August 2021 Customer Agreement at 10; *see also* January 2022 Customer Agreement at 10 (same).

[36]    *Id.* at 6.

[37]    *Id.* 20-21.

In early 2022, Voyager was looking to diversify its available borrowers. 3AC was a well-known, prominent participant in the crypto space.[38] Between 2015 and 2020, 3AC experienced rapid growth and apparent extreme profitability, becoming known as a "behemoth" in the industry.

Given 3AC's profile, Voyager sought out a relationship with the firm. On February 7, 2022, Voyager's then-CFO (now Chief Commercial Officer), Evan Psaropoulos, and Treasury Director Ryan Whooley had an initial call with Tim Lo, an employee of 3AC's over-the-counter trading affiliate. They discussed 3AC generally, including whether its business objectives made it an appropriate counterparty for institutional borrowing. 3AC advised that it had substantial interest given its size and investment philosophy. On February 11, 2022, Voyager and 3AC signed a mutual non-disclosure agreement to permit the exchange of confidential information between the firms as they explored a lending relationship. On February 13, 2022, 3AC provided Voyager with a statement signed by one of its founders, Kyle Davies, containing only a single sentence stating that 3AC's NAV as of January 1, 2022, was $3.729 billion. Unlike other substantial borrowers of Voyager's assets, 3AC did not provide a balance sheet (audited or unaudited). In response to Voyager's formal due diligence questionnaire, 3AC subsequently provided a description of its corporate structure, certificates of good standing and incorporation, and a copy of its Anti-Money Laundering policies and controls.

On February 28, 2022, a Voyager team, including Mr. Psaropoulos, Mr. Whooley, Treasurer Jon Brosnahan and others had a due diligence call with Messrs. Davies and Lo of 3AC. During the call, the Voyager team asked questions about 3AC's business and financial position, and ascertained from Mr. Davies that 3AC: (i) managed only its founders' assets; (ii) was involved in limited higher risk venture capital projects, and its venture activities involved modest sums; (iii) was largely engaged in arbitrage trading, which was delta neutral, and thematic trading; (iv) limits its own borrowing to 1x NAV; and (v) did not own positions larger than 1-3% of circulation of any given alt-coin, to maximize its ability to exit quickly from such volatile assets. In response to requests for greater financial transparency, Mr. Davies explained that 3AC only provided summary NAV statements to its lenders, and that it needed to treat all lenders the same in this regard. When pressed, Messrs. Davies and Lo explained that 3AC previously had a bad

---

[38] *See, e.g.,* The Block, "Three Arrows reports more than $1.2 billion position in Grayscale's GBTC," January 4, 2021, https://www.theblock.co/post/89928/three-arrows-reports-more-than-1-2-billion-position-in-grayscales-gbtc; Bloomberg, "Ex-High School Classmates Are Among the World's Largest Crypto Holders," May 25, 2021, https://www.bloomberg.com/news/articles/2021-05-25/ex-credit-suisse-traders-amass-billions-of-dollars-of-crypto?utm_medium=social&utm_content=business&utm_source=twitter&cmpid=socialflow-twitter-business&utm_campaign=socialflow-organic#xj4y7vzkg (describing Three Arrows Capital as "among the world's biggest crypto holders with a portfolio worth billions of dollars"); Sydney Morning Herald, "School Friends Started Their Own Firm, Now They Are Among The World's Largest Crypto Holders," May 27, 2021, https://www.smh.com.au/business/markets/school-friends-started-their-own-firm-now-they-are-among-the-world-s-largest-crypto-holders-20210526-p57v6b.html (describing "the extent of the firm's influence, when Three Arrows reported it owned a 5.6 per cent stake in the Grayscale Bitcoin Trust, a $US22 billion fund"); Messari Report, "Messari Crypto Thesis For 2022," December 26, 2021, https://messari.io/pdf/messari-report-crypto-theses-for-2022.pdf (describing Three Arrows Capital founder Su Zhu as one of "the big guys" and noting that "Three Arrows Capital has amassed one of the largest funds in Asia, and boasts one of the top performing portfolios in their own right"); Bloomberg, "Fund Manager Who Called End of Last Crypto Winter Remains Bullish," April 7, 2022, https://www.bloomberg.com/news/articles/2022-04-07/three-arrows-capital-s-su-zhu-remains-bullish-on-crypto-investments (noting that Three Arrows Capital's "blockchain holdings alone are worth close to $10 billion"); FTX, Crypto Bahamas 2022 Su Zhu Speaker Profile, April 26, 2022, https://www.cryptobahamas.com/speakers/su-zhu-1 (describing Three Arrows Capital as "a leading investor in the cryptocurrency space"); Benzinga, "The Top 10 DeFi Projects To Watch In The Second Half Of 2020," July 30, 2020, https://www.benzinga.com/markets/cryptocurrency/20/07/16856475/the-top-10-defi-projects-to-watch-in-the-second-half-of-2020 (describing Three Arrows Capital as a "leading investor"); Benzinga, "Crypto Hedge Funds Bought Bitcoin At 'A Reasonable Level' During The Dip," May 21, 2021, https://www.benzinga.com/markets/cryptocurrency/21/05/21239323/crypto-hedge-funds-bought-bitcoin-at-a-reasonable-level-during-the-dip-report (reporting "advice to investors" from 3AC co-founder Kyle Davies); Benzinga, "This Crypto Veteran Has 3 Potential Catalysts That Could Fuel A Bitcoin Market Comeback," May 22, 2022, https://www.benzinga.com/markets/cryptocurrency/22/05/27339698/this-crypto-veteran-lists-potential-catalysts-that-could-push-bitcoin-market (describing Su Zhu as a "crypto veteran"); Benzinga, "What Does Etherium 2.0 Have To Do With The Celsius, 3AC, And Other Insolvencies?" June 15, 2022, https://www.benzinga.com/markets/cryptocurrency/22/06/27724295/what-does-ethereum-2-0-have-to-do-with-the-celsius-3ac-and-other-insolvencies (describing Three Arrows Capital as "a major investment firm"); Benzinga, "What Impact Will A Recession Have On Crypto?" June 16, 2022, https://www.benzinga.com/22/06/27745465/what-impact-will-a-recession-have-on-crypto (describing Three Arrows Capital as "one of the biggest crypto hedge funds").

experience with a counterparty who had been given detailed financial information about 3AC. According to 3AC, the counterparty had mimicked its trading strategy based on holdings information disclosed in those confidential documents, to 3AC's detriment. Given its commercial sensitivity, 3AC therefore only provided the net amount of total assets under management minus total liabilities, without further details.

The next day, on March 1, 2022, Voyager's Risk Committee, which included certain officers and other members of the treasury and legal teams, had a regularly scheduled meeting to discuss, among other matters, Voyager's lending, trading, and staking positions. During this meeting, the Risk Committee considered the merits of entering into a new lending relationship with 3AC, as well as 3AC's position regarding the limited amount of financial information contained in the NAV statement. Those who participated on the due diligence call with Voyager's co-founder explained the rationale given by 3AC, and that this was an explanation that Voyager's finance team and executive leadership understood and found credible. The Risk Committee discussed the fact that 3AC represented itself to have $3.7 billion in net asset value. Ultimately, no member of the Risk Committee objected to entering into a lending relationship with 3AC.[39] The decision to approve the 3AC Loan was ultimately made by the CEO, Stephen Ehrlich, in consultation with Mr. Psaropoulos, as further described below.

On March 4, 2022, Voyager entered into a master loan agreement with 3AC, pursuant to which Voyager made several loans to 3AC between March 8, 2022 and May 5, 2022 in the aggregate amounts of 15,250 Bitcoins and 350 million USDC. The 3AC Loan was unsecured but callable at any time by Voyager, as per the terms of six individual term sheets governing discrete advances from time to time. After Voyager approved 3AC as a borrower on March 1, the Risk Committee was not subsequently consulted about the size or terms of any of the advances that comprised the 3AC Loan. In general, Mr. Whooley would receive an in-bound borrowing request from 3AC and would discuss terms for the specific loan request with Mr. Psaropoulos. Mr. Psaropoulos would obtain Mr. Whooley's recommendations about the size and terms of borrowing, at times consulting with Mr. Brosnahan as to any liquidity concerns. Mr. Psaropoulos would then discuss each advance with Mr. Ehrlich and obtain the CEO's official authorization prior to executing the corresponding term sheet.

As of April 3, 2022, Voyager had assets on platform of approximately of $5.64 billion, of which $3.1 billion was on loan to third parties. At that time, approximately $935 million was on loan to 3AC, making it Voyager's second-largest borrower behind Alameda Research, to which Voyager had loaned approximately $1.23 billion. Approximately two months later, on June 6, 2022, the amount of Voyager's assets on platform had decreased materially (in part due to market decline and in part due to customer withdrawals) to $3.39 billion, of which approximately 25% had been lent to 3AC, and another 25% lent to Alameda Research.

During the approximately three-month period between the start of the parties' lending relationship and 3AC's default, Voyager engaged with 3AC on several occasions to monitor 3AC's financial position, as part of Voyager's regular borrower outreach activity. During this period, Voyager sought and received a revised one-page NAV statement from 3AC on March 23, 2022, again signed by 3AC co-founder Kyle Davies, stating that as of March 1, 2022, 3AC's NAV was $3.218 billion.

On approximately May 9, 2022, Luna de-pegged from UST, causing many investors in the crypto space to suffer losses. Voyager promptly reached out to all of its borrowers to understand the impact (if any) of Luna's unraveling on their respective businesses. Specifically, concerning 3AC, Voyager's Mr. Whooley spoke to Mr. Lo on May 11, and he and Mr. Psaropoulos had dinner with Mr. Lo on May 12. On both occasions, Mr. Lo reported that 3AC was an early investors in LUNA but had limited exposure and therefore 3AC had suffered insignificant losses. In light of this, Voyager did not believe it needed to recall the loans to 3AC.

---

[39]  While no formal vote was taken by the Risk Committee to approve 3AC as a borrower, or the sufficiency of the due diligence conducted, this was not the function of the Risk Committee. The Risk Committee was established in 2021 as a consultative body consisting of members of Voyager management from different departments. The Risk Committee met regularly to discuss, among other things, Voyager's overall financial position and any potential borrowers that members of the finance team believed, following due diligence, to be appropriate counterparties. No decision-making authority was delegated to the Risk Committee, and no votes were taken by the members of the Risk Committee, until May 4, 2022, when a charter for the Risk Committee was finalized and approved.

On May 23, 2022, Voyager requested and received an updated one-page NAV statement from 3AC, again signed by 3AC co-founder Kyle Davies, stating that as of May 23, 2022, 3AC's NAV was $2.574 billion. At this point, Voyager ceased issuing further loans to 3AC despite requests from 3AC to borrow more.

After declining 3AC's request for more borrowing in the second half of May, communications between Voyager and 3AC remained relatively quiet until June 12, the day that Celsius Network LLC ("Celsius") lowered its gates and paused withdrawals.[40] Upon this occurrence, Voyager reached out again to all of its borrowers to inquire about their financial health, including 3AC. On June 13, 2022, Mr. Psaropoulos held a Zoom videoconference with Mr. Lo during which Mr. Lo informed him that 3AC had no exposure to Celsius. The next day, on June 14, 2022, Voyager issued a press release about its lack of exposure to Celsius.[41] Mr. Lo sent a text message to Mr. Psaropoulos later that morning asking for a call "asap." Mr. Psaropoulos called Mr. Lo, who advised him that Voyager should recall all of its loans to 3AC because he was concerned that the founders of 3AC were not responding to requests for information from Mr. Lo and other employees. Mr. Psaropoulos immediately called Mr. Ehrlich to relay this alarming statement. Within hours, Voyager had recalled all outstanding amounts loaned to 3AC.

On June 15, 2022, one of 3AC's founders stated that the fund had incurred significant losses on account of its staked Luna position and had hired legal and financial advisors to explore potential liquidity issues. 3AC did not return any of the loaned assets, and on June 24, 2022, Voyager issued a notice of default and acceleration to 3AC. On June 27, 2022, 3AC was ordered by a court in the British Virgin Islands to commence liquidation proceedings.

i. *The Special Committee Investigation*

On July 5, 2022, OpCo formally created the Special Committee consisting of newly appointed Independent Directors Timothy Pohl and Jill Frizzley. The Special Committee was vested with the authority to, among other things: (a) investigate any historical transactions, public reporting, or regulatory issues undertaken by OpCo that the Special Committee deemed necessary or appropriate, and the facts and circumstances surrounding such transactions; (b) interview and solicit information and views from management, representatives, consultants, advisors, or any other party in connection with any historical transactions undertaken by OpCo that the Special Committee deems necessary or appropriate; (c) request documentation and information regarding OpCo's business, assets, properties, liabilities and business dealings with respect to any historical transactions undertaken by Voyager that the Special Committee deems necessary and appropriate to review; (d) perform any other activities consistent with the matters described herein or as the Special Committee or Voyager's board of directors otherwise deems necessary or appropriate; and (e) conduct an independent investigation with respect to any potential estate claims and causes of action against insiders of Voyager, including any claims arising from loans made to 3AC. The Special Committee was also vested with sole authority to prosecute, settle, or extinguish any and all claims and causes of action arising from the historical transactions investigated by the Special Committee. The Special Committee retained the Special Committee Counsel to provide independent advice to, and act at the exclusive direction of, the Special Committee in connection with the Special Committee's mandate.[42]

On August 23, 2022, the Debtors, the Special Committee, and the Committee entered into the Common Interest Confidentiality Stipulation and Protective Order (the "Protective Order") pursuant to which the parties

---

[40]  *See, e.g.*, Medium, "A Memo to the Celsius Community," June 12, 2022, https://celsiusnetwork.medium.com/a-memo-to-the-celsius-community-59532a06ecc6 ("Due to extreme market conditions, today we are announcing that Celsius is pausing all withdrawals, Swap, and transfers between accounts."); CNBC, "Crypto lender Celsius pauses withdrawals due to 'extreme market conditions,'" June 13, 2022, https://www.cnbc.com/2022/06/13/crypto-lender-celsius-pauses-withdrawals-bitcoin-slides.html; CoinDesk, "The Fall of Celsius Network: A Timeline of the Crypto Lender's Descent Into Insolvency," July 15, 2022, https://www.coindesk.com/markets/2022/07/15/the-fall-of-celsius-network-a-timeline-of-the-crypto-lenders-descent-into-insolvency/ ("Celsius freezes withdrawals, swaps and transfers in response to 'extreme market conditions,' fueling rumors that the platform had become deeply insolvent.").

[41]  Press Release, "Voyager Digital Provides Update on Asset and Risk Management," June 14, 2022, https://www.investvoyager.com/pressreleases/voyager-digital-provides-update-on-asset-and-risk-management.

[42]  *See* Docket No. 125 ¶ 7 (application to employ Quinn Emanuel as counsel to the Special Committee, with authority to "among other things, (a) investigate any historical transactions relating to Voyager LLC, and (b) investigate any estate claims and causes of action against insiders of Voyager LLC, including claims arising from its loan to Three Arrows Capital, and (c) perform any

(the "Common Interest Parties") agreed to the protections afforded to "Confidential" and "Highly Confidential" discovery material.  Given the unique features of the Debtors' Chapter 11 Cases, the Common Interest Parties agreed that the attorney-client privilege and the attorney work-product doctrine would be preserved with respect to privileged documents and information shared among counsel for the Common Interest Parties.  The Bankruptcy Court entered the Protective Order on September 13, 2022.

During the Investigation, Special Committee Counsel sought and received information relating to, among other things:  Voyager's loans to third parties, with a particular focus on the 3AC Loan; the diligence performed in connection with those loans; Voyager's Risk Committee; Voyager's staking of customer cryptocurrency assets; Voyager's regulatory compliance; Voyager's communications with the public; Voyager's pre-petition payments to insiders and certain third parties; and other aspects of Voyager's business.  Voyager collected and provided to the Special Committee responsive documents from its internal hard copy and electronic files, its outside counsel, and various third parties (*e.g.*, cryptocurrency custodians and exchanges).  Among many other things, Voyager collected email, Slack communications, and, in certain cases, Telegram and cell phone data from a dozen Voyager employees, including Voyager's most senior officers and others.  In addition to several voluminous spreadsheets of data, Voyager produced more than 11,000 documents—collectively totaling more than 40,000 pages.

In addition to reviewing the above-referenced documents, Special Committee Counsel also interviewed 12 Voyager employees, including Stephen Ehrlich (CEO), Gerard Hanshe (COO), Evan Psaropoulos (Chief Commercial Officer), Ashwin Prithipaul (CFO), Pamela Kramer (CMO), David Brosgol (General Counsel), Marshall Jensen (Head of Corporate Development), Ryan Whooley (Treasury Director), Jon Brosnahan (Treasurer), Brian Silard (Treasury Team), David Brill (Deputy General Counsel), and Manisha Lalwani (in-house regulatory counsel).  Collectively, the interviews performed during the Special Committee's Investigation lasted more than 55 hours, and covered in great detail the range of topics most relevant to the Special Committee's Investigation.

Throughout the Special Committee's Investigation, Special Committee Counsel was assisted by Kirkland and BRG.  At Special Committee Counsel's request, BRG also hosted information sessions specific to staking with management and the Committee's counsel in order to address questions that would make time spent during the interviews most efficient.  BRG also provided necessary background information about crypto assets and historical financial data to Special Committee Counsel upon request.

Since the appointment of the Committee, Special Committee Counsel coordinated with the Committee's professionals in conducting the Investigation.  Specifically, Special Committee Counsel and the Committee's counsel held several meetings concerning the scope, status, and progress of the Investigation, and Special Committee Counsel permitted the Committee's professionals to sit in on—and ask questions during—the Special Committee's interviews of the witnesses mentioned above.  In light of the protections of the Protective Order, no discovery was withheld from the Committee's counsel on the basis of attorney-client privilege.

Throughout the course of the Investigation, Special Committee Counsel provided regular updates to members of the Special Committee.  In particular, Special Committee Counsel held five formal videoconference meetings with the Special Committee, during which Special Committee Counsel updated the Special Committee on the status of the Investigation, including facts learned, impressions obtained, and relevant legal documents and standards.  The members of the Special Committee were engaged, and asked many questions regarding the facts being developed and potentially applicable legal theories.  These meetings were in addition to the Independent Directors' participation in several Board meetings concerning the Debtors' general business and case trajectory including their sale efforts.

ii.      ***Investigation Report, Conclusions, and Proposed Settlements***

At the conclusion of the Investigation, on October 7, 2022, Special Committee Counsel delivered to the Special Committee its report ("Investigation Report"), setting forth, among other things, the factual record developed over the course of the Investigation, the legal framework of potential estate causes of action, and Special Committee Counsel's legal conclusions and recommendations.

---

other activities consistent with the foregoing that the Special Committee or Voyager LLC's board otherwise deems necessary or appropriate"); Docket No. 242 (Order approving application).

The Special Committee met to discuss the contents of the Investigation Report with Special Committee Counsel on October 10, 2022. The Special Committee found no fraud or theft by any director or officer of any of the Debtors. The Special Committee also concluded that the estate does not have colorable claims against any Voyager director or officer other than potential claims against its CEO and CCO,[43] related to the 3AC Loan. With respect to these claims, while colorable, the standard for successfully prosecuting such claims would be difficult to meet, with any judgment being even more difficult to collect. The Special Committee negotiated independent settlements with each of the CEO and CCO as set forth in the Plan, subject to approval of the Bankruptcy Court as part of Plan confirmation. These settlements are described in the following table:[44]

| Debtors Retain Rights of Recourse to D&O Insurance | Upon receipt of personal financial contributions, described below, the Debtors will retain the right to seek maximum recovery under the Debtors' D&O Liability Insurance Policies, without further recourse to the individuals. |
|---|---|
| Releases and Waivers by the Officers against the Debtors | CEO and CCO agree to release all Causes of Action they may have against the Estates.<br><br>CCO further agrees to subordinate 50% of his Account Holder Claim against the Debtors until all other Holders of Account Holder Claims are paid in full.<br><br>CEO and CCO further agree that, because the Debtors are in bankruptcy, the Debtors are unable to provide advancement or indemnification to CEO and CCO, and CEO's and CCO's recourse is limited to the Management Liability Policy, the Excess Policies, and the Side-A Policy (except as set forth below). CEO and CCO shall be entitled to receive their salary and benefits for as long as they work for the Debtors and/or the Wind-Down Entity and retain the right to assert general unsecured claims for advancement and indemnification up to the limits of any available coverage in the event any of the insurers that issued the Management Liability Policy, the Excess Policy, or the Side-A Policy denies coverage to CEO and/or CCO based upon or arising out of the lack of a formal claim for indemnification.<br><br>CEO and CCO further agree to subordinate any and all rights and entitlements under the Cornerstone A-Side Management Liability Insurance Policy to Voyager Digital Ltd., Policy Number ELU184179-22, to any recovery by the Debtors and/or the Wind Down Entity on account of the Debtors' and/or Wind Down Estate's claims for the avoidance of the premium paid for the policy. For the avoidance of doubt, should coverage continue to be available under the Side-A Policy following resolution of the Debtors' and/or the Wind Down Entity's claims for the avoidance of the premium paid for the policy (whether by judgment or settlement or otherwise), Officer shall be entitled to seek coverage under the Side-A Policy. |
| Reversal of Insider Bonus Payment | CEO agrees to the avoidance/unwinding of the transfer of $1,900,000 that CEO received from the Debtors on or around February 28, 2022, with CEO paying $1,125,000 to the Debtors in cash and assigning the right, if any, to any tax refund for the balance. |

---

[43] Mr. Psaropoulos was CFO of Voyager Digital, LLC when it made all loans to 3AC.

[44] The settlements are subject to definitive documentation and in the event the sworn financial information provided by either CEO or CCO to the Special Committee is materially inaccurate, the Special Committee reserves the right to void the D&O Settlement.

| Commitment to Cooperate | CEO and CCO agree to remain at, and continue performing the responsibilities of, their position(s) with the Debtors and assist with the Debtors' transition for at least thirty (30) days from the date of approval of the settlement; *provided* that the CCO shall have no obligation to remain at his position with the Debtors beyond January 15, 2023 and the CEO shall have the right to pursue and engage in any employment opportunity, business venture, consulting arrangement, or investment that may become available; *provided, further,* that both the CEO and CCO shall be available to the Debtors and/or the Wind-Down Entity for a maximum of five hours per month for the one year following the Effective Date. |

The theoretical loss from the 3AC Loan would be equal to the amounts remaining to be collected from 3AC in the 3AC Liquidation Proceeding, less any amounts actually collected in those proceedings. The amounts to be realized from the proposed settlements (approximately $1.2 million - $2 million of personal assets plus recourse to up to $20 million of D&O insurance) are just a small fraction of such loss. Nevertheless, the Special Committee made the decision to settle, subject to Court approval, based on the fact that the individuals do not have personal assets available to satisfy any potential judgment even if the claims were successfully prosecuted, whereas the cost of prosecuting would likely dissipate the available D&O insurance coverage and the assets that are being paid through the settlement in defense costs.

The rationale for the Special Committee's negotiation and recommendation for the settlements is based on the following factors, among others: the relative strength of these claims, which (if pursued) would sound in breach of fiduciary duty premised on alleged gross negligence on the part of the officers; the challenges involved in litigating loss causation; the costs of litigating these claims, including attorneys' and experts' fees; the financial wherewithal of the officers; and the risk of depletion of substantial portions of available insurance coverage which prioritizes the rights of the officers to utilize the insurance for defense costs. The Special Committee believes, following due diligence and negotiations led by Special Committee Counsel, and after several additional videoconference meetings and written exchanges with Special Committee Counsel, that the settlements embodied in the Plan are in the best interests of the estate. The Special Committee does not believe there are viable causes of action against insiders beyond those potential claims mentioned with respect to CEO and CCO relating to the 3AC Loan.

### B. The Alameda Loan.

Once it appeared that its loan to 3AC might be at risk, Voyager's management team immediately engaged in efforts to identify sources of potential liquidity to stabilize the Company's business and ensure that the Company remained adequately capitalized. On June 22, 2022, HoldCo, as borrower, TopCo., as guarantor, and Alameda Ventures Ltd., as lender, entered into the Alameda Loan Facility, which provided the Company with up to $200 million cash and USDC and 15,000 Bitcoin subject to certain restrictions. OpCo is not a party to the Alameda Loan Agreement. The Alameda Loan Agreement provided that the use of proceeds under the Alameda Loan Facility was to pay Account Holders for cryptocurrency assets that counterparties to the Company's lending and related activities failed to return to the Company.[45] Alameda asserts that OpCo is obligated on the Alameda Loan Facility, which the Debtors dispute. As discussed in Article IV.O of this Disclosure Statement, the Debtors seek to subordinate the Alameda Loan Facility Claims under the Plan due to Alameda's inequitable conduct prior to and throughout these Chapter 11 Cases, including Alameda and its affiliates' apparent fraud that directly harmed the Debtors' creditors and significantly reduced their anticipated recoveries under the Plan. If the Alameda Loan Facility Claims are determined to be valid against OpCo, recoveries to Account Holders and Holders of OpCo General Unsecured Claims would be reduced.

Alameda also asserts that it has an administrative preference action claim against the Debtors in the amount of approximately $445 million pursuant to certain loans made by OpCo to Alameda, which were repaid during the chapter 11 cases. The Debtors dispute Alameda's position, but in the event that Alameda were to prevail on its alleged preference claim, creditor recoveries would be materially reduced. Specifically, recoveries for both Account Holder Claims and OpCo General Unsecured Claims would be reduced to approximately 24% from approximately 51% under

---

[45] *See* Section 2.6 of the Alameda Loan Agreement.

the Sale Transaction if the Alameda Loan Facility Claim is not subordinated and Alameda prevails in its alleged preference claims.

### C. Retention of Restructuring Advisors and Initial Third-Party Outreach.

In June 2022 the Debtors engaged Kirkland and Moelis to advise the Debtors in navigating the recent challenges impacting the cryptocurrency industry. Beginning on or about June 20, 2022, Moelis initiated a dual-track marketing process (the "Prepetition Marketing Process") to solicit interest in two general deal structures: (a) a sale transaction in which the Debtors' entire business would be sold to either a financial sponsor or a strategic company in the cryptocurrency industry and (b) a capital raise whereby a third party (individually or as part of a consortium) would provide a capital infusion into the Debtors' business enterprise (together, a "Transaction") to allow the Debtors to weather the volatility in public equity markets, the decline in cryptocurrency prices, and dislocation in the cryptocurrency industry caused, in part, by the decline of 3AC and the collapse of the Terra Luna ecosystem, as described below. Among the deal structures considered for the financing were additional debt facilities and the issuance of preferred equity in exchange for capital.

To that end, Moelis reached out to 60 potential financial and strategic partners across the globe (collectively, the "Potential Counterparties"), including domestic and international strategic cryptocurrency-related businesses and private equity and other investment firms that currently have crypto-related investments and/or historical experience investing in the cryptocurrency industry. By the Petition Date, over 20 of the Potential Counterparties had entered into confidentiality agreements with the Debtors. Parties who executed a confidentiality agreement received a copy of the Debtors' investor presentation and access to a virtual data room containing thousands of pages with certain information regarding the Debtors' business operations, finances, material contracts, tax information, and incorporation documents. In addition, parties that signed confidentiality agreements were offered the opportunity to participate in telephone conferences with the Debtors' management team as well as to request additional due diligence information.

Simultaneously with their efforts to identify a Potential Counterparty to effectuate a Transaction, the Debtors, Moelis, and the Debtors' other advisors began to analyze potential strategies to effectuate a stand-alone restructuring without the participation of a third-party partner to consummate a Transaction.

While the Debtors' marketing efforts yielded one proposal for an out-of-court financing, the conditions precedent to the proposal and the pro forma capital structure contemplated thereunder were not achievable, and no other Potential Counterparty was willing to participate in an out-of-court Transaction on the timeline required. Among other things, Potential Counterparties expressed concerns regarding current uncertainty in the cryptocurrency market and assumed liabilities on an out-of-court basis. Potential Counterparties were similarly reticent to participate in an out-of-court financing alone, and the Debtors determined that a group investment could not be marshalled among other viable Potential Counterparties on the timeline required to consummate a Transaction on an out-of-court basis.

The Prepetition Marketing Process produced multiple preliminary proposals from parties willing to participate in an in-court Transaction. However, as of the Petition Date, all of the preliminary offers that the Debtors received required more time to fully develop and structure and/or were not more attractive than a potential stand-alone restructuring.

### D. Governance Initiatives.

On July 5, 2022, the Debtors undertook several actions to strengthen the independence and experience of their boards of directors: (i) the board of Voyager Digital Ltd. voted to appoint Matthew Ray as an independent director; (ii) the board of Voyager Digital Holdings, Inc. voted to appoint Scott Vogel as an independent director; (iii) the member of Voyager Digital, LLC ("OpCo") appointed Stephen Ehrlich, CEO of the Voyager Digital Holdings, Inc., as a director and Tim Pohl and Jill Frizzley as independent directors; and (iv) the board of OpCo voted to establish the Special Committee comprised of Mr. Pohl and Ms. Frizzley and tasked the Special Committee with, among other things, investigating the Company's historical lending practices, including the facts and circumstances around the 3AC Loan.

### E. Voyager's Decision to Commence these Chapter 11 Cases.

As the general cryptocurrency market continued to decline, Voyager, like other peer platforms, saw a significant uptick in customer withdrawals—some of which was legitimate—putting additional strain on the Company's business and risking the Company's ability to serve customers who remained on its platform.

On June 23, 2022, Voyager reduced its daily withdrawal maximum from $25,000 to $10,000 per user per day. Putting a cap on withdrawals was necessary to ensure that the Company could effectuate trades for customers on its platform who elected to keep their cryptocurrency assets with Voyager as well as to stabilize the Company's business while it engaged in discussions with potential third-party sponsors. Ultimately, the initial withdrawal limits maximized the Company's ability to continue to provide brokerage services to its customers.[46]

The Debtors hoped that lower withdrawal limits would allow them to stabilize their business. However, as the cryptocurrency markets continued to trend downward, the Debtors realized that further steps were required to preserve customer assets, avoid irreparable damage to the Debtors' business, and ensure that their trading platform operated smoothly for all customers. Accordingly, on July 1, 2022, Voyager froze all withdrawals and trading activity on its platform.

Though Voyager continued to rigorously diligence all potential restructuring transactions, it became clear that a potential strategic transaction would only emerge after the Debtors petitioned for chapter 11 relief.

## VIII.  EVENTS OF THE CHAPTER 11 CASES

### A.  The Stand-Alone Plan.

On July 6, 2022, the Debtors filed the *Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 17]. On August 12, 2022, the Debtors filed the *First Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 287] and accompanying disclosure statement [Docket No. 288] (the "Stand-Alone Plan Disclosure Statement"). The Stand-Alone Plan contemplated, among other things, distributing to Holders of Account Holder Claims their pro rata share of the New Common Stock, available Cash, Coins, the Voyager Tokens, and the 3AC Recovery, each as defined in the Stand-Alone Plan. The Stand-Alone Plan Disclosure Statement, among other things, also made clear that, in parallel to pursuing the Stand-Alone Plan, the Debtors were pursuing a potential transaction to sell the Debtors to a third party either through an asset sale pursuant to section 363 of the Bankruptcy Code or an alternative chapter 11 plan of reorganization.

### B.  First and Second Day Relief and Other Case Matters.

On the Petition Date, the Debtors filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations. A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the First Day Declaration. Following hearings on July 8, 2022, and August 4, 2022 (the "Second Day Hearing"), the Bankruptcy Court entered orders granting certain of the First Day Motions and applications on interim and final bases:

(i)  **The Joint Administration Order** authorizing the Debtors to jointly administer and maintain one docket for the chapter 11 cases of Voyager Digital, LLC and its Debtor affiliates [Docket No. 18];

(ii)  **The Foreign Representative Order** authorizing Debtor Voyager Digital Ltd. to act as "foreign representative" in a parallel insolvency case commenced in Canada under the Companies' Creditors Arrangement Act [Docket No. 52];

(iii)  **The Credit Matrix Order** authorizing the Debtors to (a) file a consolidated list of creditors in lieu of submitting a separate mailing matrix for each Debtor, (b) file a consolidated list of the Debtors' 50 largest unsecured creditors in lieu of filing lists for each Debtor; and (c) redact certain personal identification information [Docket No. 54];

---

[46]  Approximately 97% of customers on Voyager's platform have less than $10,000 in their accounts.

(iv)     **The Automatic Stay Order** restating and enforcing the worldwide automatic stay, anti-discrimination provisions, and ipso facto protections of the Bankruptcy Code and approving the form and manner of notice thereof [Docket No. 55];

(v)      **The Schedules and Statements Order** authorizing the Debtors to extend the deadline by which the Debtors' Schedules and Statements must be filed by thirty (30) days [Docket No. 59];

(vi)     **Order Retaining Stretto as Noticing Agent** authorizing the Debtors to retain Stretto, Inc. as third-party claims and noticing agent [Docket No. 67];

(vii)    **The Wages Order** authorizing the Debtors to continue paying prepetition wages and certain administrative costs related thereto and continue employee benefits programs [Docket No. 233];

(viii)   **The Taxes Order** authorizing the Debtors to pay certain taxes and fees that accrued or arose in the ordinary course of business before the Petition Date [Docket No. 235];

(ix)     **The Interim Cash Management Orders** authorizing the Debtors to continue utilizing the Debtors' prepetition cash management system [Docket Nos. 53 and 237] (the "Cash Management Motion");[47]

(x)      **The NOL Order** approving certain notifications and procedures regarding the transfer of, and declarations of worthlessness with respect to, common stock of Voyager Digital Ltd. [Docket No. 238];

(xi)     **The Insurance Order** authorizing the Debtors to honor existing insurance obligations [Docket No. 239]; and

(xii)    **The Case Management Order** authorizing the Debtors to set the guidelines and requirements for the administration of their Chapter 11 Cases, including for scheduling purposes [Docket No. 240].

The First Day Motions, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at https://cases.stretto.com/Voyager.

The Debtors also filed several other motions subsequent to the Petition Date to facilitate the Debtors' restructuring efforts and ease administrative burdens. Following the Second Day Hearing, the Bankruptcy Court entered orders granting the following relief:

(i)      **The Interim Compensation Order** approving procedures for the compensation of retained professionals in these Chapter 11 Cases [Docket No. 236];

(ii)     **The Ordinary Course Professionals Order** approving procedures for the retention and compensation of certain professionals utilized by the Debtors in the ordinary course operation of their businesses [Docket No. 244]; and

(iii)    **Applications to Retain Professionals** postpetition pursuant to sections 327 and 328 of the Bankruptcy Code, including:

   i.    **Kirkland & Ellis LLP and Kirkland & Ellis International LLP as Attorneys for the Debtors and Debtors in Possession [Docket No. 234];**

   ii.   **Moelis & Company LLC as Investment Banker and Capital Markets Advisor for the Debtors and Debtors in Possession [Docket No. 299];**

---

[47] On July 15, 2022, the Debtors filed a supplement to the Cash Management Motion that sought authorization to pay prepetition amounts owed on their corporate credit cards issued by Brex, Inc. (the "Supplemental Cash Management Motion") [Docket No. 84]. On July 25, 2022, the Bankruptcy Court entered an order granting the Supplemental Cash Management Motion [Docket No. 138].

iii. **Berkeley Research Group, LLC as Financial Advisors for the Debtors and Debtors in Possession [Docket No. 297];**

iv. **Quinn Emanuel Urquhart & Sullivan LLP as Special Counsel to Voyager Digital, LLC [Docket No. 242];**

v. **Stretto, Inc. as administrative advisor [Docket No. 241];**

vi. **Katten Muchin Rosenman LLP as Special Counsel to Voyager Digital Ltd. [Docket No. 732];**

vii. **ArentFox Schiff LLP as Special Counsel to Voyager Digital Holdings, Inc. [Docket No. 740]; and**

viii. **Potter Anderson & Corroon LLP as Delaware counsel to the Debtors [Docket No. 798].**

The foregoing professionals, among others, are each integral to the Debtors' restructuring efforts and ultimate emergence from chapter 11. The postpetition compensation of all of the Debtors' professionals retained pursuant to sections 327 and 328 of the Bankruptcy Code is subject to the approval of the Bankruptcy Court.

### C. Appointment of Unsecured Creditors' Committee.

On July 19, 2022, the U.S. Trustee appointed the official committee of unsecured creditors (the "Committee").[48] The Debtors immediately engaged with the Committee to discuss the Debtors' restructuring efforts, the Plan, and Debtors' proposed case timeline. The seven-member Committee is currently composed of the following members: Russell G. Stewart, Jason Raznick, Brandon Mullenberg, Richard Kiss for Thincan Trust, Christopher Moser, Byron Walker, and Melissa and Adam Freedman. The Committee selected McDermott Will & Emery LLP as legal counsel and FTI Consulting, Inc. as financial advisor.[49]

### D. Schedules and Statements.

On July 8, 2022, the Bankruptcy Court entered the *Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, Statements of Financial Affairs, and Rule 2015.3 Financial Reports, (II) Waiving Requirements to File List of Equity Holders, and (III) Granting Related Relief* [Docket No. 59] extending the deadline by which the Debtors were required to file their schedules of assets and liabilities and statements of financial affairs (the "Schedules and Statements") by an additional thirty (30) days for a total of forty-four (44) days after the Petition Date. Accordingly, the Debtors were required to file the Schedules and Statements by no later than August 18, 2022. This schedule provided creditors with ample time to analyze and evaluate scheduled claims in advance of Solicitation and the General Claims Bar Date.

On August 18, 2022, August 19, 2022, August 22, 2022, September 15, 2022, and November 18, 2022, the Debtors filed their Schedules and Statements [Docket Nos. 311, 312, 321, 429, 430, and 666]. Interested parties may review the Schedules and Statements and any amendments thereto free of charge at https://cases.stretto.com/Voyager.

### E. Bar Date Motion.

On July 18, 2022, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Setting Bar Dates for Submitting Proofs of Claim, (II) Approving Procedures for Submitting Proofs of Claim, and (III) Approving Notice Thereof* [Docket No. 98] (the "Bar Date Motion"). On August 8, 2022, the Bankruptcy Court entered an order granting the relief set forth in the Bar Date Motion [Docket No. 218] (the "Bar Date Order"), which established procedures and set deadlines for filing Proofs of Claim against the Debtors and approved the form and manner of the bar date notice (the "Bar Date Notice"). Pursuant to the Bar Date Order and the Bar Date Notice, the last date for certain persons and

---

[48]   *See Amended Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 106].

[49]   *See* Docket Nos. 403 and 404.

entities to file Proofs of Claim in these Chapter 11 Cases is October 3, 2022, at 5:00 p.m. Eastern Time (the "General Claims Bar Date") and the last date for governmental units to file Proofs of Claim in the Debtors' Chapter 11 Cases is January 3, 2023, at 5:00 p.m. Eastern Time (the "Governmental Bar Date"). The Bar Date Notice was served on August 3, 2022 [Docket No. 226] and published in *The New York Times* (national and international editions) and the *Financial Times* (international edition) on August 10, 2022 [Docket No. 272].

On December 20, 2022, the Debtors filed the *Notice of Presentment and Opportunity for Hearing on Stipulation and Agreed Order Extending the Bar Date for the U.S. Securities and Exchange Commission* [Docket No. 758] thereby agreeing to extend the Governmental Bar Date for the SEC by two weeks to January 17, 2023, at 5:00 p.m. Eastern Time. On December 20, 2022, the Debtors filed the *Notice of Presentment and Opportunity for Hearing on Stipulation and Agreed Order Extending the Bar Date for the States* [Docket No. 792] thereby agreeing to extend the Governmental Bar Date for all states by two weeks to January 17, 2023, at 5:00 p.m. Eastern Time.

F.        **The FBO Motion.**

On July 14, 2022, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (a) Honor Customer Withdrawals from the MC FBO Accounts, (b) Liquidate Cryptocurrency From Customer Accounts With a Negative Balance, (c) Sweep Cash Held in Third-Party Exchanges, (d) Conduct Ordinary Course Reconciliation of Customer Accounts, and (e) Continue to Stake Cryptocurrency; and (II) Granting Related Relief* [Docket No. 73] (the "FBO Motion"). The FBO Motion sought to continue certain ordinary course practices, including (i) honoring customer withdrawals from the "for the benefit of" accounts (the "MC FBO Accounts,") held at Metropolitan Commercial Bank; (ii) liquidating customer accounts that hold a negative U.S. dollar balance and sweeping the resulting cash from third-party exchanges into the Debtors' operating accounts; (iii) engaging in ordinary course reconciliation practices related to customer accounts; and (iv) staking cryptocurrency.

On July 29, 2022, the Debtors filed a supplement to the FBO Motion [Docket No. 173] (the "Supplemental FBO Motion," and together with the FBO Motion, the "FBO Motions"), which provided additional information on the prepetition procedures for processing customer withdrawal requests from the MC FBO Accounts, including, among other things, reconciliation of the MC FBO Accounts and funding of any deficit in the MC FBO Accounts on account of ACH chargebacks. On July 30, 2022, Metropolitan Commercial Bank filed a statement in support of the FBO Motion and Supplement [Docket No. 177]. On August 2, 2022, the Committee filed a statement in support of the FBO Motion [Docket No. 193]. On August 5, 2022, the Bankruptcy Court entered the *Order (I) Authorizing the Debtors to (a) Honor Withdrawals from the MC FBO Accounts, (b) Liquidate Cryptocurrency from Customer Accounts with a Negative Balance, (c) Sweep Cash Held in Third-Party Exchanges, (d) Conduct Ordinary Course Reconciliation of Customer Accounts, and (e) Continue Staking Cryptocurrency; and (II) Granting Related Relief*] [Docket No. 247] (the "FBO Order") approving the FBO Motion. The Debtors worked closely with the Committee regarding the requested relief, and the FBO Order affords the Committee various protections, including the requirement that the Debtors provide the Committee with written notice prior to staking or unstaking cryptocurrency, information sufficient to evaluate staking positions, and Court oversight of staking activities in the absence of agreement between the Committee and the Debtors. On August 11, 2022, the Debtors began returning customer funds in the MC FBO Accounts. To date, the Debtors have returned approximately $245.75 million of customer funds from the MC FBO Accounts.

On December 2, 2022, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Compelling the Release of the Reserve Held by Metropolitan Commercial Bank on Debtors' Bank Account and (II) Granting Related Relief* [Docket No. 690] seeking an order from the Bankruptcy Court compelling the full release of the $24 million reserve held by Metropolitan Commercial Bank given that the reserve is no longer necessary now that ACH chargeback period has expired and is in excess of the aggregate balance of the MC FBO Accounts. On January 5, 2023, the Court entered the *Stipulation and Agreed Order Between the Debtors and Metropolitan Commercial Bank* [Docket No. 821] (the "MC Bank Stipulation"), which provides for, among other things, the release of reserve funds and the process to distribute the remaining customer cash in the MC FBO Accounts to such customers.

As set forth in the FBO Motions, Cash in the MC FBO Accounts is not property of the Debtors' Estates. **Accordingly, customer withdrawals from the MC FBO Accounts are permitted to continue in accordance with the FBO Order, and any such customer withdrawals or distributions from the MC FBO Accounts are not included in the treatment provided for under the Plan. Customers have until February 4, 2023 to withdraw**

**their fiat funds from the MC FBO Accounts or will be sent a check in the amount of the applicable customer's funds in the MC FBO Accounts pursuant to the MC Bank Stipulation.**

### G. The 3AC Liquidation Proceeding.

On June 29, 2022, the Eastern Caribbean Supreme Court in the High Court of Justice Virgin Islands (Commercial Division) (the "BVI Court") entered an order appointing Russell Crumpler and Christopher Farmer of Teneo (BVI) Limited as joint liquidators ("Joint Liquidators") to conduct an orderly and equitable wind-down of 3AC pursuant to Part 6 of the British Virgin Islands Insolvency Act, 2003 ("BVI Insolvency Act"). The liquidation of 3AC (the "3AC Liquidation Proceeding") is currently pending in the BVI Court.[50] On July 1, 2022, 3AC filed a petition with the United States Bankruptcy Court for the Southern District of New York (the "3AC Chapter 15 Court") seeking recognition of the 3AC Liquidation Proceeding as a "foreign main proceeding" pursuant to chapter 15 of the Bankruptcy Code (the "3AC Chapter 15 Proceeding").[51]

On July 18, 2022, in accordance with section 179 of the BVI Insolvency Act, the Joint Liquidators established a committee of creditors to work closely with the Joint Liquidators to support the interests of all creditors in the 3AC Liquidation Proceeding. Voyager was one of the five creditors appointed to the committee.[52] On July 28, 2022, the 3AC Chapter 15 Court entered an order granting recognition of the 3AC Liquidation Proceeding as a foreign main proceeding,[53] and on August 22, 2022, and October 7, 2022, respectively, the 3AC Liquidation Proceeding was recognized as a foreign main proceeding by the High Court of the Republic of Singapore (the "Singapore Court")[54] and the Ontario Superior Court of Justice.[55] Additional petitions for recognition as a foreign main proceeding are pending in the Grand Court of the Cayman Islands, Financial Services Division, and the Supreme Court of Seychelles.[56] At a December 2, 2022 hearing in the 3AC Chapter 15 Proceeding, the Foreign Representatives provided the 3AC Chapter 15 Court with an update regarding their efforts to recover 3AC assets and locate the 3AC founders.[57] Following the hearing, the 3AC Chapter 15 Court entered orders entrusting the distribution of 3AC's assets to the Foreign Representatives; establishing a cross-border cooperation and communication protocol among the BVI Court, the 3AC Chapter 15 Court, and the Singapore Court; and granting the Foreign Representatives authority to issue subpoenas to the co-founders of 3AC.[58] On December 29, 2022, the 3AC Chapter 15 Court entered an order authorizing the Foreign Representatives to subpoena one of the co-founders of 3AC using email and Twitter notifications.[59]

Voyager continues to work diligently to maximize its recovery in the 3AC Liquidation Proceeding on account of the 3AC Loan (the "3AC Recovery"). At this time, the amount of any 3AC Recovery is unknown. As set forth in greater detail in Article IV.D of this Disclosure Statement, the 3AC Recovery, if any, will be among the value distributed to Holders of Account Holder Claims and General Unsecured Claims under the Plan.

### H. Litigation Matters.

---

[50]  See *In re Three Arrows Capital Limited*, Case No. BVIHCOM2022/0119 (June 27, 2022).

[51]  See *In re Three Arrows Capital, Ltd*, Case No. 2210920 (Bankr. S.D.N.Y. July 1, 2022).

[52]  The other members of the 3AC creditors' committee are Blockchain.com, CoinList, Digital Currency Group, and MatrixPort.

[53]  See Docket No. 47, filed in *In re Three Arrows Capital, Ltd*, Case No. 22-10920 (MG) (Bankr. S.D.N.Y. July 28, 2022).

[54]  See *In re Three Arrows Capital Ltd*, Case No. HC/OA 317/2022 (Aug. 22, 2022).

[55]  See Docket No. 68, filed in *In re Three Arrows Capital, Ltd*, Case No. 22-10920 (MG) (Bankr. S.D.N.Y. Dec. 2, 2022).

[56]  See *Id*.

[57]  See *Id*.

[58]  See Docket No. 69, 71, and 72, filed in *In re Three Arrows Capital, Ltd*, Case No. 22-10920 (MG) (Bankr. S.D.N.Y. Dec. 6, 2022).

[59]  See Docket No. 79, filed in *In re Three Arrows Capital, Ltd*, Case No. 22-10920 (MG) (Bankr. S.D.N.Y. Dec, 29, 2022).

### 1. Certain Non-Bankruptcy Litigation Matters

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations. The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims. With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases. The filing of the Chapter 11 Cases likewise generally stays any legal proceedings commenced to obtain possession of, or to exercise control over, the property of the Debtors' bankruptcy estate.

Further, the Debtors are party to various other legal proceedings (including individual, class and putative class actions as well as federal and state governmental investigations) covering a wide range of matters and types of claims including, but not limited to, securities laws, contracts, and trademark disputes. Such matters are subject to uncertainty and the outcome of individual matters is not predictable.

### 2. Certain Adversary Proceedings

#### (a) Voyager Digital Holdings, Inc. v. De Sousa, et al.

On July 6, 2022, a putative class-action litigation was filed in the Ontario Superior Court of Justice (the "Canadian Class Action").[60] The Canadian Class Action alleges claims against Debtor Voyager Digital Ltd. and some of its directors and officers for statutory secondary market liability under Canadian securities law, and common-law negligent misrepresentation. To prove many of the claims against Voyager Digital Ltd. in that suit, the plaintiffs must first establish the underlying liability of the named directors and officers, and then establish that Voyager Digital Ltd. is vicariously liable for their alleged wrongdoing. On August 10, 2022, the Debtors filed a complaint and commenced an adversary proceeding in the Bankruptcy Court to extend the automatic stay, or alternatively, enjoin prosecution of the Canadian Class Action.[61] On August 11, 2022, the Ontario Superior Court of Justice denied the proposed Canadian Class Action plaintiff's motion seeking appointment of an equity committee and funding of representative counsel in the Canadian foreign recognition proceeding.[62]

#### (b) Voyager Digital Holdings, Inc. v. Robertson, et al.

On December 24, 2021, a putative class-action complaint was filed against two of the Debtors, Voyager Digital Ltd. and Voyager Digital, LLC, in the United States District Court for the Southern District of Florida, captioned *Cassidy et al. v. Voyager Digital Ltd. et al*. The named plaintiff was a Voyager customer. His complaint, which is publicly available, generally alleged that "Voyager's practices were deceptive, illegal and were the sale of unregistered securities," *Cassidy v. Voyager*, 1:21-cv-24441-CMA (S.D. Fla. Apr. 28, 2022) (Am. Compl. ¶ 5, ECF No. 46). *Cassidy* asserted causes of action under federal and state securities law, and violations of consumer-protection claims under New Jersey and Florida law.

*Cassidy* was litigated for six months prior to the Petition Date. The defendants filed a motion to dismiss the case, and also a motion to compel arbitration of the case. Those motions were pending on the Petition Date. Upon the Petition Date, the Debtors filed a suggestion of bankruptcy on the docket in *Cassidy*, and the District Court administratively closed the case.

After the *Cassidy* court administratively closed the case, the same lawyers who represent the *Cassidy* plaintiffs filed another putative-class-action proceeding in the United States District Court for the Southern District of Florida, this time naming Mark Cuban (owner of the Dallas Mavericks), Dallas Basketball Limited, d/b/a Dallas Mavericks, and Stephen Ehrlich, the Debtors' CEO and co-founder, as defendants. This action is captioned *Robertson et al. v. Cuban et al.*, No. 1:22-cv-22538-RKA (S.D. Fla. Aug. 10, 2022) (the "Robertson Action"). The plaintiffs are also Voyager customers and, as proposed class representatives, assert claims against Mr. Ehrlich, Mr. Cuban, and the

---

[60]  *De Sousa v. Voyager Digital Ltd., et al.*, No. CV-22-00683699-00CP (Ontario Superior Court of Justice).

[61]  *Voyager Digital Holdings, Inc. v. De Sousa, et al.*, Adv. Pro. No 22-01133 (MEW).

[62]  *In re Voyager Digital Ltd.*, No. CV-22-00683820-00CL (Ontario Superior Court of Justice).

Dallas Mavericks, for allegedly aiding and abetting Voyager's alleged fraud claimed in the *Cassidy* action; aiding and abetting breach of fiduciary duty; civil conspiracy; and alleged violation of several states' consumer-protection and securities laws. The *Robertson* Complaint repeats the allegations made in *Cassidy* and explicitly claims that *Cassidy* "specifically alleged in detail … how Defendants Mark Cuban and Stephen Ehrlich were key players who personally reached out to investors, individually and through [defendant] Dallas Mavericks, to induce them to invest in the Deceptive Voyager Platform." Counsel representing the Plaintiffs in *Robertson* have advised that they intend to amend their complaint, but have not yet provided an amended complaint or described which claims they may attempt to pursue.

Accordingly, on August 10, 2022, the Debtors filed a complaint and commenced an adversary proceeding in the Bankruptcy Court to extend the automatic stay, or alternatively, enjoin prosecution of the Robertson action.[63] The *Robertson* adversary proceeding is pending before the Bankruptcy Court and a hearing is set on the matter for October 19, 2022.

The Debtors do not believe that either *Cassidy* or *Robertson* have merit, but Voyager customers may be within the putative class definition provided in each of the filed complaints. To the extent *Cassidy* or *Robertson* assert "direct" claims by individual customers against non-Debtors, such claims are not released by the proposed Plan and Confirmation Order unless, solely with respect to *Cassidy*, Contributing Claimants elect on their ballots or opt-in forms to contribute such claims to the Wind-Down Entity. To the extent *Cassidy* or *Robertson* assert derivative claims, or otherwise assert claims owned by the Debtors and/or the estates, they are released in and/or treated by the proposed Plan.

The Debtors do not believe that any pursuit of *Cassidy* or *Robertson* would have a material impact on creditor recoveries. But it is unclear what impact, if any, attempts to pursue the *Cassidy* or *Robertson* cases following confirmation of the Plan may have on the Wind-Down Debtors, creditors, or third parties. Creditors should obtain their own legal advice if they have questions concerning the viability of these matters (or lack thereof), likelihood of success, or potential impact on their long-term interests.

(c)     *Giacobbe v. Voyager Digital Holdings, Inc. et al.*

On September 1, 2022, Jon Giacobbe filed a complaint and commenced an adversary proceeding in the Bankruptcy Court alleging that the Debtors have a nondischargeable debt pursuant to section 523(a)(2)(A) of the Bankruptcy Code for money obtained by false pretenses, false representations, or actual fraud.[64] The *Giacobbe* adversary proceeding is pending before the Bankruptcy Court and a pretrial conference is scheduled for November 29, 2022. The Debtors' response to the complaint is due on October 17, 2022, pursuant to the *Stipulation and Order (1) Extending the Debtor Defendants' Time to Respond to the Complaint and Related Deadlines and (2) Adjourning the Pre-Trial Conference* SINE DIE (Adv. Pro. 22-01145 (MWE) [Docket No. 4]. On November 30, 2022, the Bankruptcy Court entered an order dismissing the *Giacobbe* adversary proceeding [Docket No. 13].

(d)     *Voyager Digital Holdings, Inc. v. Adam Lavine and Shingo Lavine.*

On September 27, 2022, the Debtors filed a complaint and commenced an adversary proceeding in the Bankruptcy Court to extend the automatic stay, or alternatively, enjoin the Lavines from terminating the Debtors' access to and use of the Ethos.io DNS servers that they have used for years.[65] On September 30, 2022, the Lavines and the Debtors jointly agreed to a stipulation and agreed order, which fully resolved the matter, and was subsequently entered by the Bankruptcy Court [Docket No. 11].

---

[63]     *Voyager Digital Holdings, Inc. v. Robertson, et al.*, Adv. Pro. No 22-01138 (MEW).

[64]     *Giacobbe v. Voyager Digital Holdings, Inc. et al.*, Adv. Pro. No 22-01145 (MEW).

[65]     *Voyager Digital Holdings, Inc. v. Adam Lavine and Shingo Lavine*, Adv. Pro. No 22-01150 (MEW).

#### I.      The Coinify Sale.

Coinify ApS (along with its subsidiaries, collectively, "Coinify") is a limited liability corporation organized under the laws of Denmark that is a wholly owned subsidiary of Voyager European Holdings ApS ("Voyager Europe"). Voyager Europe is itself a wholly owned subsidiary of Debtor Voyager Digital Ltd. Coinify is a global cryptocurrency payment processor separate and distinct from the Voyager platform that enables buying, selling, and accepting cryptocurrency payment in stores worldwide.

On June 20, 2022, the Debtors engaged Moelis to assist in their exploration of available strategic alternatives, including a sale of the Coinify business. On June 28, 2022, Ascension ApS ("Ascension") submitted an unsolicited offer to purchase Coinify. In the following approximately two weeks, the Debtors and Ascension engaged in arm's-length, robust negotiations. On July 13, 2022, Voyager Europe entered into that certain share purchase agreement by and among Voyager Europe, as seller, and Ascension, as buyer (the "Coinify Purchase Agreement"). The Coinify Purchase Agreement contemplated the sale to Ascension in exchange for $2 million in cash and included an "Earn-Out" payment provision in an amount equal to 12.5% of a subsequent sale transaction of Coinify (capped at $15,000,000), if such sale were to be consummated by Ascension on or before the third anniversary of the Coinify sale closing date. The Coinify Purchase Agreement also contained a standard "fiduciary out" clause that allowed the Debtors to entertain competing offers to purchase Coinify should any such offers emerge. On July 14, 2022, the Debtors filed a motion for entry of an order, among other things, approving the Debtors' entry into the Coinify Purchase Agreement [Docket No. 72] (the "Coinify Motion").

Following the filing of the Coinify Motion the Debtors received indications of interest from several third parties interested in a potential purchase of Coinify. Accordingly, the Debtors adjourned the Coinify Motion while they continued to engage with all interested third parties to achieve a transaction that maximizes the value of the Coinify business. Following good faith, arm's-length negotiations with all potential transaction parties and discussion among the Board and the Debtors' advisors, the Board determined, in its business judgment, that the offer contemplated in the Coinify Purchase Agreement represented the most value maximizing option for the Debtors with respect to the Coinify business. Accordingly, the Debtors scheduled a hearing to approve the Coinify Motion for August 16, 2022. Shortly after the hearing, the Bankruptcy Court entered an order approving the Coinify Motion.

On September 30, 2022, the Debtors received an offer letter from Ascension to convert the "Earn Out" provision of the Coinify Purchase Agreement into a one-time cash payment of $250,000. Ultimately, the Debtors denied the offer because they believe that the "Earn Out" is worth substantially more than the offer received.

#### J.      The Key Employee Retention Plan.

On August 2, 2022, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Approving the Debtors' Key Employee Retention Plan and (II) Granting Related Relief* [Docket No. 212] (the "KERP Motion" and the plan set forth therein, the "KERP"), seeking approval of a key employee retention program.

The proposed KERP provides for payment of cash retention awards to 38 of the Debtors' non-insider employees who perform essential tasks for the Debtors, including accounting, cash and digital asset management, IT infrastructure, legal, human resources, and other critical functions (each, a "KERP Participant"). KERP Participants possess deep institutional knowledge of the Debtors' operations, the cryptocurrency industry generally, or both. Some KERP Participants maintain critical relationships with counterparties that are essential to the Debtors' business. Further, many KERP Participants are long-tenured employees that developed or helped to build the Debtors' platform. The KERP prevents the attrition of the KERP Participants and, by extension, the need to incur significant operational and financial costs to source and hire new employees.

Following a hearing on August 24, 2022, the Bankruptcy Court entered an order approving the KERP Motion [Docket No. 345].

#### K.      Canadian Recognition Proceeding.

On July 12, 2022, the Debtors sought and were granted an Initial Recognition Order and a Supplemental Order by Madam Justice Kimmel of the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") pursuant to a proceeding commended under Part IV of the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c.

C-36 (the "CCAA Recognition Proceedings"). Among other things, the Initial Recognition Order (as amended and restated on August 5, 2022) and the Supplemental Order: (i) recognized the Chapter 11 case of Voyager Digital Ltd. as a foreign main proceeding; (ii) recognized Voyager Digital Ltd. as the Foreign Representative of its Chapter 11 case in Canada; (iii) recognized and gave effect in Canada to certain first-day orders granted by the Bankruptcy Court in Voyager Digital Ltd.'s Chapter 11 case; (iv) granted a stay of proceedings in Canada in respect of Voyager Digital Ltd., its property and business, and its directors and officers; (v) prohibited the commencement of any proceedings against Voyager Digital Ltd. in Canada absent further order of the Canadian Court; and (vi) appointed Alvarez & Marsal Canada Inc. as the Information Officer in respect of the CCAA Recognition Proceedings. On August 11, 2022, the Canadian Court recognized and gave effect in Canada to certain further orders of the Bankruptcy Court made in Voyager Digital Ltd.'s Chapter 11 case.

### L.     The Unwind Motion.

On September 19, 2022, the Debtors filed the *Debtors' Motion Seeking Entry of an Order (I) Authorizing the Debtors to Return Collateral and (II) Granting Related Relief* [Docket No. 402] (the "Unwind Motion"). The Unwind Motion seeks entry of an order authorizing the Debtors to return collateral held on account of certain loans made by Debtor Voyager Digital, LLC and non-Debtor HTC Trading Inc. to Alameda Research Ltd. (the "Alameda Loan"), as part of and upon Alameda's return of lent cryptocurrency back to the Debtors. On September 28, 2022, the Bankruptcy Court entered an order approving the Unwind Motion [Docket No. 470].

### M.     The Request for Appointment of an Equity Committee.

On September 1, 2022, Shikar S. Partab, a self-identified minority shareholder and investor in Voyager Digital Ltd., filed a letter with the Bankruptcy Court (the "Partab Letter") requesting that the Bankruptcy Court grant several motions, including a motion for an order directing that an equity committee "be appointed to protect minority shareholders in Voyager Digital." *See* Letter [Docket No. 373]. According to the *First Amended Verified Statement Pursuant to Bankruptcy Rule 2019*, Mr. Partab joined an *ad hoc* group of Equity Interest Holders [Docket No. 482]. On September 30, 2022, David Stephenson, a self-identified minority shareholder and investor in Voyager Digital Ltd., filed a letter with the Bankruptcy Court in support of the Partab Letter and the relief sought therein, including the appointment of an equity committee [Docket No. 491]. On October 3, 2022, the United States Trustee filed the *Statement of the United States Trustee Regarding Motion for Entry of an Order Directing the United States Trustee to Appoint an Official Equity Committee* noting the legal and statutory framework for appointment of an equity committee and declining to take a position of the appointment of an equity committee in the Debtors' chapter 11 cases. The Debtors intend to object to the request sought in the Partab Letter. Pursuant to the *Notice of Adjournment*, the hearing on the Partab Letter is set for January 24, 2023. [Docket No. 682].

### N.     The Post-Petition Sale Process and the Collapse of FTX.

On July 14, 2022, Moelis distributed a letter to prospective buyers with key information regarding the Debtors' marketing process (the "Process Letter"). Among other things, the Process Letter requested that all parties interested in purchasing the Company submit a non-binding indication of interest (an "Indication of Interest") by no later than 12:00 p.m., prevailing Eastern Time, on Friday, July 29, 2022 (the "IOI Deadline"), and set forth the minimum requirements that any Indication of Interest must meet in order to be considered by the Company.

On July 21, 2022, the Debtors filed the Bidding Procedures Motion. The Bidding Procedures Motion was approved by the Bankruptcy Court on August 5, 2022.

The Bidding Procedures established an open process for the solicitation, receipt, and evaluation of Bids for the Debtors' equity and/or assets pursuant to section 363 of the Bankruptcy Code or Confirmation of a Plan. The Bidding Procedures complemented and continued the Prepetition Marketing Process described in greater detail in Articles II and III herein. The timeline set forth in the Bidding Procedures was calculated to balance the need to provide adequate notice to parties in interest and potential bidders with the need to run an expeditious and efficient sale process. Ultimately, the Bidding Procedures provided the Debtors with a clear and fair process to ascertain interest in the Debtors' assets and facilitate a sale of the Debtors if a value-maximizing bid was received.

As of the Bid Deadline (as defined in the Bidding Procedures), the Debtors had received multiple bids with varying structures and terms. On September 13, 2022, the Debtors commenced the Auction in accordance with the

Bidding Procedures. The Auction spanned two weeks and featured multiple rounds of bids. The Debtors and their advisors, in consultation with the Committee and its advisors, scrutinized each bid closely, analyzing (a) the assets sought to be purchased, (b) the total expected deal consideration, (c) the certainty of each bidder's ability to close a transaction and the timing thereof (including any anticipated delays to closing and the cost to the Debtors of such delays), (d) the expected net benefit to the estates, including recoveries to customers, and (e) other criteria considered by the Debtors in their reasonable, good-faith business judgment. Importantly, the Debtors also analyzed whether each bid would provide greater value to the Debtors' stakeholders than the Standalone Plan. The Debtors consulted closely with the Committee throughout the Auction and these chapter 11 cases more generally.

Ultimately, the Debtors, in consultation with the Committee, determined that the bid received from FTX US was the highest and otherwise best bid available at the Auction and would provide meaningful value to the Debtors' estates and stakeholders. On September 27, 2022, the Debtors and FTX executed the FTX Purchase Agreement memorializing the terms of the FTX bid. The FTX Purchase Agreement contained a "no-shop" provision that the parties later amended at the direction of the Court[66] to provide the Debtors greater flexibility to entertain incoming bids from potential transaction parties if such bids were reasonably likely to lead to a higher and otherwise better offer.[67] On October 20, 2022, the Court entered an order approving the Debtors' entry into the FTX Purchase Agreement[68] with the modified "no-shop" provision. On October 24, 2022, the Debtors filed solicitation versions of their Disclosure Statement and Plan,[69] solicitation of the Plan commenced in earnest shortly thereafter as the Debtors embarked towards confirmation, which, among other things, would have effectuated the FTX Transaction.

The Debtors' journey to consummation of the FTX Transaction and confirmation of the Plan was derailed over the ensuing weeks. Indeed, on November 11, 2022, Mr. Bankman Fried resigned as CEO and FTX announced that FTX and approximately 130 of its affiliates, including FTX US, had commenced filing for chapter 11 protection in the United States Bankruptcy Court for the District of Delaware.[70] Shortly prior to FTX's bankruptcy filing, Kirkland sent a letter on behalf of the Debtors to Sullivan & Cromwell LLP ("S&C"), counsel to FTX, informing S&C that FTX had until 12:00 p.m. Eastern Time on November 11, 2022, to indicate whether it intends to close the FTX Transaction or the Debtors would seek emergency relief from the Court to be released from the "no-shop" provision of the FTX Purchase Agreement. S&C responded shortly thereafter confirming that FTX had released the Debtors from the "no-shop" provision but did not indicate whether FTX intends to pursue or abandon the FTX Transaction. On December 9, 2022, the Debtors filed with this Court the *Joint Stipulation and Agreed Order Between the Debtors and FTX US* terminating the FTX Purchase Agreement [Docket No. 717]. On December 21, 2022, FTX filed a motion seeking approval of such stipulation by the court overseeing the FTX Bankruptcy Proceeding as well.[71]

While the FTX Bankruptcy Proceeding is still unfolding, early indications are that Mr. Bankman-Fried and FTX were carrying on one of the largest financial failures of all time. Mr. John Ray III, who was appointed Chief Executive Officer of FTX following the resignation of Mr. Bankman-Fried and who oversaw the restructuring of Enron, commented in an early filing in the FTX Bankruptcy Proceeding that "[n]ever in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information."[72]

---

[66] *In re Voyager Digital Holdings, Inc.*, No. 22-10943 (MEW) (Bankr. S.D.N.Y. Oct. 19, 2022) Hr'g Tr. 45:21–46:6.

[67] *See* Asset Purchase Agreement, Docket No. 472, Exhibit B, § 5.2.

[68] Docket No. 581.

[69] Docket Nos. 590 and 591.

[70] *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Nov. 11, 2022).

[71] *Motion of Debtors for Entry of an Order (A) Authorizing the Debtors to Enter Into the Stipulation with Voyager Digital, LLC and (B) Granting Related Relief* [Docket No. 283], filed in *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Dec. 21, 2022).

[72] *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 24], filed in *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Nov. 17, 2022); *see also United States of America v. Samuel Bankman-*

The collapse of FTX caused a ripple effect across the broader digital currency industry as cryptocurrency businesses with large outstanding loans to FTX and its affiliates faced the prospect of having to write down hundreds of millions of dollars in balance sheet assets[73] and other businesses saw their value and future prospects crater along with the price of Bitcoin and other cryptocurrencies.[74] In the days and weeks following commencement of the FTX Bankruptcy Proceeding, major cryptocurrency players announced that they had suspended withdrawals.[75]

Following the announcement of the FTX bankruptcy, the Debtors received numerous inbound inquiries from potential transaction parties interested in consummating a transaction with the Debtors, and, following their release from the "no-shop" provision in the FTX Purchase Agreement, the Debtors began proactively to reengage with other potential transaction parties regarding a potential acquisition of the Debtors' business. Over the course of four weeks, the Debtors engaged in good-faith, arm's length negotiations with numerous potential transaction parties regarding a variety of deal structures and terms. Several of the parties had already conducted substantial diligence on the Debtors' businesses during prior marketing processes, and additional parties with whom the Debtors had not previously engaged entered into non-disclosure agreements and gained access to the Debtors' virtual dataroom. The Debtors conducted additional management meetings and responded to dozens of diligence requests from potential transaction parties during this process. Ultimately, following extensive discussions and consultation with their advisors and the Committee, the Debtors determined, in an exercise of their business judgment, that the offer submitted by Binance.US represented the highest and otherwise best offer to purchase the Debtors' business, and on December 18, 2022, the Debtors entered into the Asset Purchase Agreement.

In connection with the evaluation of the Binance.US bid, the Debtors' advisors conducted certain financial and business counterparty due diligence on Binance.US. This due diligence included reviews of certain documentation and discussions with senior management at Binance.US relating to: audited financial statements, interim unaudited financial statements, available liquidity, related party services agreements, wallet infrastructure, AML/KYC procedures, money transmitter licensing status, and business plans submitted to selected state regulators in connection with the issuance of money transmitter licenses.

The Debtors value the Sale Transaction at approximately $1.022 billion, comprising (i) the value of cryptocurrency on the Voyager platform as of a date to be determined, which as of December 19, 2022 at 0:00 UTC, is estimated to be $1.002 billion, plus (ii) additional consideration, which is estimated to provide at least $20 million of incremental value. The Sale Transaction also includes additional benefits, such as it (i) provides the most tax efficient route forward as the Binance.US Platform will provide the means for Account Holders to access 100% of the cryptocurrency types held by Account Holders on the Debtors' platform, (ii) it is the only transaction available to the Debtors that did not require the Debtors to liquidate cryptocurrency for working capital purposes, (iii) includes reimbursement by Binance.US of up to $15 million of Seller's expenses, (iv) provides a $10 million reverse termination fee payable to the Seller by Binance.US to compensate the Debtors' estates in the event that Binance.US cannot consummate the transaction, and (v) in the event that the Debtors pivot to the Liquidation Transaction, provides that Binance.US will provide certain services to facilitate such transaction to ensure that the Debtors can rely on the Binance.US Platform to minimize leakage with and cybersecurity risks when returning cryptocurrency to creditors.

---

*Fried*, 22-crim-673 (S.D.N.Y. December 9, 2022); *Securities and Exchange Commission v. Samuel Bankman-Fried*, Civil Action. No. 22-cv-10501 (S.D.N.Y. Dec. 13, 2022).

[73] Reuters, "Factbox: From Binance to Voyager, Crypto Firms' Exposure to FTX Is Coming to Light," November 14, 2022, https://www.reuters.com/technology/binance-voyager-crypto-firms-exposure-ftx-is-coming-light-2022-11-14.

[74] Cointelegraph, "The FTX Contagion: Which Companies Were Affected by the FTX Collapse?" November 17, 2022, https://cointelegraph.com/news/the-ftx-contagion-which-companies-were-affected-by-the-ftx-collapse.

[75] Press Release, "November 11, 2022 BlockFi Update," November 11, 2022, https://blockfi.com/november-11-2022-blockfi-update; Press Release, "Important Update: Forward Through Adversity," November 13, 2022, https://trends.aax.com/important-update-forward-through-adversity; Press Release, "An Important Message Regarding Gemini Earn," November 16, 2022, https://www.gemini.com/blog/an-important-message-regarding-gemini-earn; Wall Street Journal, "Crypto Lender Genesis Suspends Withdrawals After FTX Collapse," November 16, 2022, https://www.wsj.com/articles/crypto-lender-genesis-suspends-withdrawals-after-ftx-collapse-11668607332; Press Release, "Important Updates on Services at Liquid," November 21, 2022, https://blog.liquid.com/important-updates-on-services-at-liquid.

Importantly, the Asset Purchase Agreement contains a "Fiduciary Out," which provides that the Seller may terminate the Asset Purchase Agreement at any time in the event that not doing so would be inconsistent with the Seller's fiduciary duties. Moreover, the structure of the proposed transaction, including its "Fiduciary Out," permits the Debtors to toggle *either* to a higher and better third-party bid (should one emerge) *or* to the Liquidation Transaction, if the Debtors determine in their business judgment between now and closing that the Sale Transaction is no longer the highest and best option for any reason. Based on the diligence the Debtors have performed to date on their proposed counterparty, they believe the Sale Transaction is the highest and best option. But the Debtors recognize that the cryptocurrency industry is experiencing an extremely volatile period for an already volatile business, and the Debtors continue to monitor what seem to be daily developments in the sector. Not only does the structure of the proposed transaction permit the debtors to pivot to the Liquidation Transaction if they conclude the Asset Purchase Agreement is no longer higher and better due to a development along the way, but the work to prepare to consummate and execute on the Asset Purchase Agreement will better prepare the Debtors to complete the Liquidation Transaction if the toggle becomes necessary.

The Sale Transaction can be effectuated quickly, provides a meaningful recovery to creditors, and allows the Debtors to facilitate an efficient resolution of these Chapter 11 Cases, after which Binance.US's market-leading, secured trading platform will enable customers to trade and store cryptocurrency. The terms of the Purchaser's offer are set forth in greater detail in the Asset Purchase Agreement. Due to this comprehensive marketing process, the robust Auction, and the extensive, arm's length negotiations with multiple potential transaction parties following the collapse of the FTX Transaction, the Debtors believe that the Sale Transaction is the most value-maximizing transaction under the facts and circumstances.

On December 30, 2022, the United States Attorney for the Southern District of New York filed the "Notice of the United States of America Concerning the Review of Certain Transactions by the Committee on Foreign Investment in the United States" ("CFIUS") review on the Sale Transaction [Docket No. 797] (the "CFIUS Notice"). The Sale Transaction is potentially subject to CFIUS review as CFIUS may review certain transactions involving foreign person(s) acquiring control of any business or investment in the United States in order to determine the effect of such transactions on the national security of the United States, and to mitigate risks arising from those transactions. The Debtors and Binance.US have been in discussion with CFIUS and intend to make a voluntary filing with CFIUS regarding the Sale Transaction. As set forth in the CFIUS Notice regarding the Sale transaction, there is risk that CFIUS takes action that could materially affect the Sale Transaction. In the event of any action taken by CFIUS that arises to that level, the Debtors will toggle to the Liquidation Transaction under the Plan as described in Article V.B.2 of this Disclosure Statement.

### O. The Special Committee Investigation.

As described in Article VII.D, on July 5, 2022, OpCo formally formed the Special Committee comprised of disinterested directors Timothy Pohl and Jill Frizzley. The Special Committee was vested with the authority to, among other things: (a) investigate any historical transactions, public reporting, or regulatory issues undertaken by OpCo that the Special Committee deemed necessary or appropriate, and the facts and circumstances surrounding such transactions; (b) interview and solicit information and views from management, representatives, consultants, advisors, or any other party in connection with any historical transactions undertaken by OpCo that the Special Committee deems necessary or appropriate; (c) request documentation and information regarding OpCo's business, assets, properties, liabilities and business dealings with respect to any historical transactions undertaken by Voyager that the Special Committee deems necessary and appropriate to review; (d) perform any other activities consistent with the matters described herein or as the Special Committee or Voyager's board of directors otherwise deems necessary or appropriate; and (e) conduct an independent investigation with respect to any potential estate claims and causes of action against insiders of Voyager, including any claims arising from loans made to 3AC. *Id.* The Special Committee retained the Special Committee Counsel to provide independent advice to, and act at the exclusive direction of, the Special Committee in connection with the Special Committee's mandate.

During its investigation, counsel for the Special Committee sought and received information related to, among other things: Voyager's loans to 3AC, Alameda, Celsius and numerous other borrowers; the diligence performed in connection with those loans; Voyager's staking of customer cryptocurrency assets; Voyager's regulatory compliance; pre-petition payments to insiders and third parties; and numerous other aspects of Voyager's business. The Special Committee drafted and negotiated a protective order, which was later entered by the Bankruptcy Court, to protect the confidentiality of the information sought and received. Voyager collected and provided to the Special

Committee responsive documents from its internal hard copy and electronic files, from its outside counsel, and from various third parties (e.g., cryptocurrency custodians and exchanges). Among many other things, Voyager collected email, Slack communications, and, in certain cases, Telegram and cell phone data—from a dozen Company employees, including all of Voyager's most senior officers and others. In addition to several voluminous spreadsheets of data, Voyager produced over 12,000 documents—collectively totaling over 50,000 pages—related to, among other things: loans between Voyager and its counterparties; the diligence performed by Voyager in connection with those loans; internal and external communications regarding those loans; meetings of Voyager's Risk Committee and board of directors; detailed information regarding Voyager's staking of customer assets; Voyager's applications for money transmitter licenses; audits for compliance with applicable laws and regulations; communications with Voyager's regulators; Voyager's public statements; Voyager's tax filings and financial statements; and detailed information regarding intercompany transfers and payments to insiders. No information was withheld from the Special Committee on privilege grounds.

In addition to reviewing the above-referenced documents, counsel for the Special Committee also interviewed numerous Voyager employees, including Steve Ehrlich (CEO), Gerard Hanshe (COO), Evan Psaropoulos (CCO), Ashwin Prithipaul (CFO), Pamela Kramer (CMO), David Brosgol (General Counsel), Marshall Jensen (Head of Corporate Development), Ryan Whooley (Head of Treasury and Trading), Jon Brosnahan (Treasurer), Brian Silard (Treasury Team), David Brill (Deputy General Counsel), and Manisha Lalwani (in-house regulatory counsel). Collectively, the interviews performed during the Special Committee's investigation lasted over 55 hours, and covered in great detail a wide-range of topics.

## IX.  RISK FACTORS

**BEFORE TAKING ANY ACTION WITH RESPECT TO THE PLAN, HOLDERS OF CLAIMS AGAINST THE DEBTORS WHO ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN, AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO, OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT, INCLUDING OTHER DOCUMENTS FILED WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES.  THE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE RESTRUCTURING AND CONSUMMATION OF THE PLAN.  EACH OF THE RISK FACTORS DISCUSSED IN THIS DISCLOSURE STATEMENT MAY APPLY EQUALLY TO THE DEBTORS AND THE WIND-DOWN DEBTORS, AS APPLICABLE AND AS CONTEXT REQUIRES.**

### A.  Risks Related to the Restructuring.

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan.  Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors or the Plan and its implementation.

#### 1.  *The Debtors Will Consider All Available Restructuring Alternatives if the Restructuring Transactions Are Not Implemented, and Such Alternatives May Result in Lower Recoveries for Holders of Claims Against the Debtors*

If the Restructuring Transactions are not implemented, the Debtors will consider all other restructuring alternatives available, which may include the filing of an alternative chapter 11 plan, conversion to chapter 7, or any other transaction that would maximize the value of the Debtors' estates.  Any alternative restructuring proposal may be on terms less favorable to Holders of Claims against the Debtors than the terms of the Plan as described in this Disclosure Statement.

Any material delay in Confirmation of the Plan, or the Chapter 11 Cases, or the threat of rejection of the Plan by the Bankruptcy Court, would add substantial expense and uncertainty to the process.

The uncertainty surrounding a prolonged restructuring would also have other adverse effects on the Debtors. For example, it would also adversely affect:

- the Debtors' ability to raise additional capital;

- the Debtors' ability to retain key employees;

- the Debtors' ability to retain account holders;

- the Debtors' liquidity;

- how the Debtors' business is viewed by regulators, investors, and lenders; and

- the Debtors' enterprise value.

2.       *Certain Bankruptcy Law Considerations*

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

(a)       **Parties in Interest May Object to the Plan's Classification of Claims and Interests.**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  As provided in the Plan and this Disclosure Statement, the Debtors are not seeking to substantively consolidate and recoveries on account of Claims against or Interests in any Debtor shall be determined on a Debtor-by-Debtor basis.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims and Interests that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

(b)       **The Conditions Precedent to the Effective Date of the Plan May Not Occur.**

As more fully set forth in Article IX of the Plan, the Effective Date is subject to a number of conditions precedent.  If such conditions precedent are not met or waived, the Effective Date will not take place.

(c)       **Failure to Satisfy Vote Requirements.**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.

(d)       **The Debtors May Not Be Able to Secure Confirmation of the Plan.**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan and requires, among other things, a finding by the Bankruptcy Court that:  (i) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (ii) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (iii) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or

whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that this Disclosure Statement, the balloting procedures, and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met. If a chapter 11 plan is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to consummate the Sale and what, if anything, Holders of Allowed Claims against them would ultimately receive with respect to their Claims.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting class of Claims, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

### (e)  Nonconsensual Confirmation.

In the event that any Impaired Class of Claims or Interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one Impaired Class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. The Debtors believe that the Plan satisfies these requirements, and the Debtors will request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the conclusion that the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to Professional Fee Claims.

### (f)  Continued Risk After Consummation.

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as increasing expenses and further industry deterioration or other changes in economic conditions. Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan reflecting the Plan will achieve the Debtors' stated goals.

### (g)  Filing of a Competing Plan.

At the outset of the Chapter 11 cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtors have retained the exclusive right to propose the Plan since filing their chapter 11 petitions. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve Confirmation of the Plan in order to achieve the Debtors' stated goals because creditors and others may propose a plan.

### (h)  The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code.

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

(i)       **The Debtors May Object to the Amount or Classification of a Claim.**

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

(j)       **Risk of Non-Occurrence of the Effective Date.**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will in fact occur.

(k)       **Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan.**

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies could affect distributions available to Holders of Allowed Claims under the Plan but may not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

(l)       **Releases, Injunctions, and Exculpations Provisions May Not Be Approved.**

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including releases by third parties of claims that may otherwise be asserted against the Debtors, Wind-Down Debtors, or Released Parties, as applicable. The releases, injunctions, and exculpations (including, for the avoidance of doubt, the definitions of Released Parties, Releasing Parties, and Exculpated Parties) provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain parties may not be considered Released Parties, Releasing Parties, or Exculpated Parties, and certain Released Parties may withdraw their support for the Plan.

3.       *The Consideration Under the Plan Does Not Reflect any Independent Valuation of Claims against or Interests in the Debtors*

The Debtors have not obtained or requested a fairness opinion from any banking or other firm as to the fairness of the consideration under the Plan.

4.       *Governmental Approvals May Not Be Granted*

Consummation of the Restructuring Transactions may depend on obtaining approvals of certain Governmental Units that may be necessary or advisable. Failure by any Governmental Unit to grant an approval could prevent or impose limitations or restrictions on Consummation of the Restructuring Transactions and Confirmation of the Plan.

B.      **Risks Related to Recoveries under the Plan.**

1.       *The Debtors Cannot Guarantee Recoveries or the Timing of Such Recoveries*

Although the Debtors have made commercially reasonable efforts to estimate Allowed Claims and Allowed Interests, it is possible that the actual amount of such Allowed Claims and Allowed Interests is materially different than the Debtors' estimates. Creditor recoveries could be materially reduced or eliminated in this instance. In addition,

the timing of actual distributions to Holders of Allowed Claims and Allowed Interests may be affected by many factors that cannot be predicted. Therefore, the Debtors cannot guaranty the timing or amount of any recovery on an Allowed Claim or an Allowed Interest.

**2.**      *The Debtors Are Subject to the Volatility of Cryptocurrency*

The volatility of cryptocurrency may adversely affect the fair market value of Voyager's Cryptocurrency, which could result in lower recoveries for creditors than the Debtors' current estimates based on the Fair Market Value as of December 19, 2022.

**3.**      *The Plan May Diminish the Value of VGX*

Upon confirmation of the Plan and approval of the Sale Transaction, Binance.US will review VGX to determine whether VGX meets its standards to be listed for trading on the Binance.US Platform. Regardless of whether VGX meets the standards to be listed for trading on the Binance.US Platform, holders of VGX will be able to receive their VGX tokens in kind and withdraw them from the Binance.US Platform. The Debtors' business operations will be winding down following the Effective Date and consummation of either the Sale Transaction or the Liquidation Transaction. Binance.US is not purchasing the VGX private keys and the Debtors will continue to engage with third parties regarding a sale of the VGX private keys to provide utility to VGX post-consummation of the Sale Transaction or the Liquidation Transaction as applicable. In the event that the VGX private keys are not sold to a third party, VGX will have no utility going forward and may have no value. Voyager will not be able to support commitments to VGX following the Effective Date and, in the event the Sale Transaction is consummated, Binance.US will not otherwise assume such obligations.

**4.**      *The Tax Implications of the Debtors' Bankruptcy and Restructuring Are Highly Complex*

Holders of Allowed Claims and Allowed Interests should carefully review Article XII of this Disclosure Statement, entitled "Certain U.S. Federal Tax Consequences of the Plan," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Debtors.

**5.**      *The Closing Conditions of the Sale Transaction May Not Be Satisfied*

It is possible that the Debtors may not satisfy the closing conditions of the Sale Transaction. A failure to satisfy any of the closing conditions of the Sale Transaction could prevent the Sale Transaction and the Plan from being consummated, which could lead to the Chapter 11 Cases being converted to cases under chapter 7.

**C.**      **Disclosure Statement Disclaimer.**

**1.**      *The Financial Information Is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit Was Performed*

In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to assure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects their financial condition, the Debtors are unable to warrant or represent that the financial information contained in this Disclosure Statement (or any information in any of the exhibits to the Disclosure Statement) is without inaccuracies.

**2.**      *No Legal or Tax Advice Is Provided By This Disclosure Statement*

This Disclosure Statement is not legal advice to any person or Entity. The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each reader should consult their own legal counsel and accountant with regard to any legal, tax, and other matters concerning its Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote to accept or reject the Plan or whether to object to Confirmation of the Plan.

**3.**      *No Admissions Made*

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Wind-Down Debtors, Holders of Allowed Claims or Interests, or any other parties in interest.

### 4. *Failure to Identify Litigation Claims or Projected Objections*

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The Debtors may seek to investigate, file, and prosecute Claims and may object to Claims and Interests after Confirmation and Consummation of the Plan, irrespective of whether this Disclosure Statement identifies such Claims or objections to Claims and Interests.

### 5. *Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors*

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement and the exhibits to the Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement or the information in the exhibits to the Disclosure Statement.

### 6. *Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update*

The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date. While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Furthermore, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

### 7. *No Representations Outside This Disclosure Statement Are Authorized*

**NO REPRESENTATIONS CONCERNING OR RELATING TO THE DEBTORS, THE CHAPTER 11 CASES, OR THE PLAN ARE AUTHORIZED BY THE BANKRUPTCY COURT OR THE BANKRUPTCY CODE, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE VOTING HOLDERS' ACCEPTANCE OR REJECTION OF THE PLAN THAT ARE OTHER THAN AS CONTAINED IN, OR INCLUDED WITH, THIS DISCLOSURE STATEMENT, SHOULD NOT BE RELIED UPON BY VOTING HOLDERS IN ARRIVING AT THEIR DECISION. VOTING HOLDERS SHOULD PROMPTLY REPORT UNAUTHORIZED REPRESENTATIONS OR INDUCEMENTS TO COUNSEL TO THE DEBTORS AND THE OFFICE OF THE UNITED STATES TRUSTEE FOR THE SOUTHERN DISTRICT OF NEW YORK.**

### D. Miscellaneous Risk Factors and Disclaimers.

### 1. *The Debtors are Subject to an Extensive and Highly Evolving Regulatory Landscape and Any Adverse Changes to, or Their Failure to Comply with, any Laws and Regulations Could Adversely Affect Their Brand, Reputation, Business, Assets, Operating Results, and Financial Condition*

The Debtors' business is subject to extensive laws, rules, regulations, policies, orders, determinations, directives, treaties, and legal and regulatory interpretations and guidance in the markets in which the Debtors operate, including those governing money transmission, financial services, banks and trust companies, securities, broker-dealers and alternative trading systems, or ATS, commodities and commodities interests such as derivatives, credit, cryptocurrency asset custody, exchange, and transfer, cross-border and domestic money and cryptocurrency asset transmission, retail and commercial lending, usury, foreign currency exchange, privacy, data governance, data protection, cybersecurity, fraud detection, retail protection, escheatment, antitrust and competition, bankruptcy, tax, anti-bribery, economic and trade sanctions, anti-money laundering, and counter-terrorist financing, among others.

Many of these legal and regulatory regimes were adopted prior to the advent of the internet, mobile technologies, cryptocurrency assets, and related technologies. As a result, some applicable laws and regulations do not contemplate or address unique issues associated with the cryptocurrency economy, are subject to significant uncertainty, and vary widely across U.S. federal, state, and local and international jurisdictions. These legal and regulatory regimes, including the laws, rules, and regulations thereunder, evolve frequently and may be modified, interpreted, and applied in an inconsistent manner from one jurisdiction to another and may conflict with one another. Moreover, the complexity and evolving nature of the Debtors' business and the significant uncertainty surrounding the regulation of the cryptocurrency economy require the Debtors to exercise their judgment as to whether certain laws, rules, and regulations apply to the Debtors, and it is possible that governmental bodies and regulators may disagree with their conclusions. To the extent the Debtors have not complied with such laws, rules, and regulations, the Debtors could be subject to significant fines, revocation of licenses (including Money Transmission Licenses as described in IV.F), limitations on their products and services, cease and desist orders in one or more states, reputational harm, and other regulatory consequences, each of which may be significant and could adversely affect their business, operating results, and financial condition.

Additionally, economic and trade sanctions, anti-money laundering, and anti-terrorism laws in the United States and other jurisdictions may restrict the Debtors' business from engaging in transactions in or relating to certain countries, individuals, and entities. The imposition of sanctions and related restrictions by different jurisdictions have been evolving quickly, including in response to the military conflict between Russia and Ukraine, and the ultimate impact on global economic and commercial activity as well the financial condition and performance of the Debtors' business and assets is difficult to predict.

In order to operate its business, Voyager currently maintains state money transmission licenses or their equivalents (each, a "Money Transmission License") in seventeen (17) states[76] and has license applications pending[77] in eighteen (18) states.[78]

The Debtors have engaged with the state banking departments throughout the bankruptcy process and will continue to actively do so with the goal of ensuring that Plan provides for compliance by Voyager with state money transmission laws. The state banking departments may have broad discretion as to the approvals required in connection with the Plan, thus it is not possible to predict with certainty the scope of such approvals, whether they will ultimately be granted, and the expected timeframes of the state banking departments' determinations. There are unresolved questions of law with respect to the intersection of state money transmission statutes and the Bankruptcy Code, and the answers to those questions may impact the ability of the state banking departments to require certain approvals with respect to confirmation of the Plan.

Following confirmation of the Plan, Voyager will take steps to (i) withdraw those money transmission license applications that are pending with state banking departments and (ii) surrender those Money Transmission Licenses it

---

[76] The Alaska Division of Banking and Securities suspended Voyager's license on July 6, 2022, and subsequently reversed such suspension on July 14, 2022. There is a risk that one or more additional state banking departments may choose to suspend Voyager's Money Transmission Licenses going forward, or that one more states in which Voyager is licensed may decline to renew Voyager's licenses for 2023 based on regulatory concerns and/or the requirements of their money transmission statutes.

[77] On July 17, 2022, the North Dakota Department of Financial Institutions notified Voyager that it required Voyager's pending money transmitter license application be withdrawn on grounds that it would not approve an application with an active bankruptcy filing. Other states have likewise inquired as to whether Voyager will seek to withdraw its pending applications or indicated they may require Voyager to do so. While Voyager is seeking to keep its applications on file with the state banking departments and has not withdrawn any applications, there is a risk that one or more state banking departments with which Voyager has pending applications may require Voyager to do so going forward.

The Debtors have two applications pending in New York: (a) a money transmitter license application and (b) a virtual currency business activity license application or "Bitlicense." Voyager Digital NY, LLC, a non-operational affiliate of the Debtors, filed such applications.

[78] Voyager also maintains a registration as a "money services business" with the Financial Crimes Enforcement Network ("FinCEN") pursuant to federal money transmission laws. A change in ownership of an entity registered with FinCEN requires notice to FinCEN following consummation of the relevant transaction, but does not require prior regulatory approval.

holds (the "Licensing Wind-Down Process"). Such Licensing Wind-Down Process will require notice to, and in some cases approval by, those state banking departments in states where the Debtors have applications pending or are licensed pursuant to the requirements set forth in each state money transmission statute and as otherwise required by the relevant state banking departments.[79]

> **2.    The Wind-Down Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases as well as Ongoing Regulatory Investigations**

The Debtors are currently subject to or interested in certain legal proceedings, some of which may adversely affect the Debtors or the Wind-Down Debtors, as applicable. In the future, the Debtors or the Wind-Down Debtors may become parties to additional litigation, including enforcement actions brought by state banking departments with respect to Voyager's historical compliance with money transmission laws, which could result in significant fines. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect recoveries to creditors in these Chapter 11 cases. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that the Debtors may become party to, nor the final resolution of such litigation. The impact of any such litigation on the Debtors, however, could be material.

On January 5, 2022, Voyager received from the U.S. Securities and Exchange Commission ("SEC") a subpoena requesting certain information and documents. In response, Voyager actively dialogued with and provided the SEC staff with the requested material. The subpoena and dialogue related primarily to two issues: (1) whether the Rewards Program feature of the Voyager Account (also referred to as the "Earn Program" or "Voyager Earn Account") involved a securities offering and (2) whether Voyager or any of its affiliated entities required registration under the Investment Company Act of 1940. As a follow-up, on July 15, 2022, the SEC staff issued a second subpoena with additional requests for information and documents relating to public statements, internal communications, and third-party communications after May 1, 2022, and certain minutes, policies and procedures, internal documentation, loan agreements, due diligence, and June 30, 2022 financial statement information. As it does with most subpoenas, the SEC staff included a cover letter stating, among other things, "The investigation and the subpoena do not mean that we have concluded that your client or anyone else has violated the law. Also, the investigation does not mean that we have a negative opinion of any person, entity or security." Since then, Voyager has produced certain of the requested material and continues to work to provide the SEC with the remaining responsive material. As before, Voyager continues to dialogue with the SEC regarding the Voyager business and document and information requests.

On July 28, 2022, the FDIC and Federal Reserve Board issued a joint letter and a joint press release regarding potential false or misleading representations as to Voyager's deposit insurance status, and demanded immediate corrective action to address any false or misleading statements. While the Debtors disagree with the FDIC and Federal Reserve Board's position, the Debtors nonetheless took immediate steps to ensure that statements made as to the deposit insurance status of funds held through the Voyager platform are accurate. Following receipt of Voyager's responses on August 1, 2022 and August 9, 2022, the FDIC and the Federal Reserve Board requested additional information from Voyager. Voyager responded to those requests on October 28, 2022 and October 31, 2022.

Separate from the matters pertaining to the FDIC and Federal Reserve Board's letter dated July 28, 2022, the Federal Reserve Board on September 29, 2022 requested certain information pertaining to Voyager's operations; Voyager made an initial production in response to such request on November 10, 2022, and anticipates making further productions in satisfaction of the Federal Reserve Board's request.

On August 1, 2022, Voyager received from the Commodity Futures Trading Commission a letter seeking certain information and documents from Voyager on its business, its customers and its lending activities prior to its chapter 11 proceedings. On September 12, 2022, Voyager received a subpoena requesting the same information and documents. Voyager is working to provide the CFTC with information that its responsive to its requests.

On November 23, 2022, the Federal Trade Commission issued a civil investigative demand to Voyager seeking certain information from Voyager regarding its business.

---

[79]    The state approval process for the surrender of a license typically takes several months.

In addition to these federal subpoenas, requests for information, and cease and desist orders, Voyager has also received a number of administrative proceeding inquiries and orders from state securities regulators relating to the Rewards Program. The states have alleged or asserted in a variety of ways that the accounts involved unregistered securities offerings. Below is a brief summary of Voyager's contacts with applicable state regulators concerning the Rewards Program.

Alabama issued a show cause order[80] on March 29, 2022, which required a response within twenty-eight (28) days. Alabama extended the response deadline to January 5, 2023. On July 7, 2022, Alabama also issued a subpoena for information on Voyager customers, board of directors materials and other information related to the chapter 11 proceedings. Voyager has produced all of the requested materials.

Indiana issued a cease and desist order[81] on March 29, 2022. Given that neither the Voyager Account nor the Rewards Program is active, and given Voyager's current status in these Chapter 11 Cases, Voyager has requested an extension with respect to deadlines in connection with responding to Indiana's order.

Kentucky issued an emergency cease and desist order[82] on March 29, 2022. Kentucky denied Voyager's request for a stay of effectiveness of the order on May 27, 2022. Kentucky's order is still in effect. Voyager has the option to request a hearing, but otherwise, there is no pending deadline. Voyager ceased offering Rewards to all customers as of June 1, 2022 pursuant to the order. Separately, on July 6, 2022, Kentucky asked for information in connection with Voyager's Kentucky customers. Voyager produced that information on July 8, 2022.

New Jersey issued a cease and desist order[83] on March 29, 2022 with an effective date of April 29, 2022. Per New Jersey's communications with Voyager and an order issued on June 29, 2022, a version of the order is in effect as of July 31, 2022. Specifically, Voyager has ceased offering Rewards to new customer accounts opted into the Rewards Program feature and has ceased offering Rewards for new assets contributed to existing such accounts. Given that neither the Voyager Account nor Rewards Program is active, and given Voyager's current status in these Chapter 11 Cases, Voyager has requested an extension with respect to deadlines in connection with responding to New Jersey's order.

Oklahoma issued a cease and desist order[84] on March 29, 2022. At Voyager's request, Oklahoma stayed the effectiveness of its order multiple times, but lifted the stay on July 29, 2022. Most recently, given that neither the Voyager Account nor Rewards Program is active, and given Voyager's current status in these Chapter 11 Cases, Voyager has requested an extension with respect to deadlines in connection with responding to Oklahoma's order.

---

[80] Alabama's show cause order required Voyager to show, within a certain period of time, why Voyager should not be directed to cease and desist from selling unregistered securities within the state.

[81] Indiana's order alleged that Voyager Rewards Accounts were securities and required Voyager to cease and desist from: offering and selling securities unregistered/noncompliant under Indiana securities laws/codes; accepting additional assets into existing Voyager Rewards Accounts; and committing any further violations of the Indiana securities laws/codes.

[82] Kentucky's order alleged that Voyager Rewards Accounts were securities and required Voyager to cease and desist from: soliciting or selling any security in Kentucky unregistered with the state's Department of Financial Institutions; and engaging in any other activity that would otherwise violate the Kentucky securities laws.

[83] New Jersey's order alleged that Voyager Rewards Accounts were securities and required Voyager to cease and desist from: offering or selling unregistered/nonexempt securities; accepting additional assets into existing Rewards Accounts; and violating any other provisions of the state's securities laws.

[84] Oklahoma's order alleged that Voyager Rewards Accounts were securities and required Voyager to cease and desist from: offering or selling such accounts to Oklahoma residents; and allowing further deposits into such existing accounts of Oklahoma residents.

South Carolina issued a cease and desist order and notice of opportunity for a hearing[85] on March 29, 2022. South Carolina stayed the effectiveness of its order and extended the applicable response deadlines multiple times. The order went into effect on August 1, 2022, but all response deadlines have been extended until January 31, 2023.

Vermont issued a show cause order on March 29, 2022. At Voyager's request, Vermont extended the deadline to respond to the order multiple times. On July 13, 2022, Vermont issued a subpoena for information on Voyager's Vermont customers and other information related to the chapter 11 proceedings. Voyager has produced some of the requested materials and continues to work with Vermont with the remaining responsive materials. On September 14, 2022, Vermont issued an *ex parte* order to cease and desist, as well as a standstill agreement, under which all deadlines in connection with responding to the order are suspended for ninety (90) days.

Washington issued a statement of charges and notice of opportunity for a hearing[86] on March 29, 2022. In response on April 15, 2022, Voyager submitted its application for an adjudicative hearing. On May 16, 2022, Voyager and Washington confirmed their agreement, in which Voyager would waive its right to a speedy hearing but maintain its right to request a hearing. Washington agreed to extend all applicable response deadlines until October 1, 2022. Given that neither the Voyager Account nor Rewards Program are active, and given Voyager's current status in the bankruptcy proceedings, Voyager has requested an extension with respect to deadlines in connection with responding to Washington's order.

Texas issued a notice of hearing[87] on April 12, 2022. The hearing has been scheduled for January 25, 2023. Prior to this hearing, both Texas and Voyager must pre-file all exhibits they intend to offer at the hearing; provide those exhibits to each other by email; number each exhibit sequentially; paginate or bates stamp multipage documents; and identify witnesses they intend to rely on and file witness statements accordingly.[88]

California issued a desist and refrain order[89] on June 3, 2022. As part of a prior agreement with California, on July 11, 2022, Voyager requested a hearing while waiving its right to have the hearing held within fifteen business days. In exchange, California agreed that it would not petition the superior court to enforce the order on or before July 31, 2022. Per a conversation with the state regulator on August 1, 2022, the department has no reason to go to

---

[85] South Carolina's order alleged that Voyager Rewards Accounts were securities and required Voyager to: cease and desist from transacting business in the state in violation of the states securities laws; pay a civil penalty of $2,149,800.00 if the order becomes effective by operation of law or, if Voyager seeks a hearing, pay a civil penalty not to exceed $10,000 for each violation. The notice of hearing informed Voyager of its right to request a formal hearing to contest the statements and allegations made therein.

[86] Washington's statement of charges notified Voyager that Washington had reason to believe Voyager had violated the state's securities laws and contained a list of tentative findings of fact and conclusions of law. Based on the findings and conclusions alleged therein, the statement issued a notice of intent to order Voyager to cease and desist from certain activities, impose fines, and charge costs. The notice of opportunity of hearing informed Voyager of its right to contest the charges made against it at an adjudicative hearing by making a written request for hearing and filing an answer to the statement of charges. Alternatively, Voyager was given the option to waive the right to a hearing and instead submit a written statement to the Director of the Department of Financial Institutions.

[87] The notice of hearing informed Voyage that a hearing would be held before an administrative law judge to determine whether to issue: (1) an order requiring Voyager to cease and desist from violating various provisions of the state's securities act; and/or (2) a cease publication order requiring Voyager to cease from offering securities via statements that are materially misleading or otherwise likely to deceive the public.

[88] Texas Department of Banking alleged that Voyager Digital, LLC engaged in unlicensed money transmission in violation of Chapter 151 of the Texas Finance Code. While Voyager neither admitted nor denied the Department's conclusions with respect to any factual findings or violations of law, Voyager and the Department agreed to a Consent Order (*In the Matter of Voyager Digital, LLC* (Order No.: 2022-035)) whereby Voyager agreed to cease and desist from engaging in the unauthorized business of money transmission in Texas. The Consent Order does not limit Voyager's ability to (i) hold money and monetary value on behalf of, and return money and monetary value to, existing Account Holders located in Texas during the pendency of Voyager's Chapter 11 Cases, or (ii) otherwise act in accordance with orders of the Bankruptcy Court.

[89] California's order alleged that Voyager Rewards Accounts were securities and required Voyager to desist and refrain from further offers and sale of unregistered/noncompliant securities within the state.

court to enforce the order in light of the bankruptcy proceedings and because Voyager is not currently offering Rewards to customers.  No hearing date has been set.

Washington, D.C. issued a summary cease and desist order[90] on July 26, 2022.  On July 29, 2022, the D.C. regulator agreed to an extension of the deadline by which Voyager had to submit a written answer and request for hearing until September 30, 2022.  Given that neither the Voyager Account nor Rewards Program are active, and given Voyager's current status in the bankruptcy proceedings, Voyager has requested an extension with respect to deadlines in connection with responding to Washington, D.C.'s order.

Alaska issued a cease and desist order[91] and notice of opportunity to request a hearing, on September 3, 2022.  Per the notice, Voyager has thirty (30) days to request a hearing.  Given that neither the Voyager Account nor Rewards Program are active, and given Voyager's current status in the bankruptcy proceedings, Voyager has requested an extension with respect to deadlines in connection with responding to Alaska's order.

In addition to the above-described state securities matters, Voyager has received and continues to respond to various requests from state banking departments in certain states with respect to Voyager's compliance with money transmission laws.

### 3. *The Loss of Key Personnel Could Adversely Affect the Debtors' Ability to Consummate the Sale and Plan*

The Debtors' operations are dependent on a relatively small group of key management personnel and a highly skilled employee base.  The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees.  Because competition for experienced personnel in the cryptocurrency and financial industries can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to consummate the Sale and the Plan.

### 4. *Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition*

Section 1141(d)(3) of the Bankruptcy Code limits a debtor's ability to discharge Claims in certain circumstances.  Any Claims not ultimately discharged through a Plan could be asserted against the Wind-Down Entity and may have an adverse effect on the Debtors' financial condition.

### 5. *Certain State Regulators Have Asserted that the Plan is Unconfirmable due to the Treatment of Account Holders in Unsupported Jurisdictions*

Certain state regulators in the Unsupported Jurisdictions (*i.e.*, New York, Texas, and Vermont (which filed an objection on behalf of Hawaii)) have asserted that the Plan provides for the disparate treatment of Account Holders in their jurisdictions due to the potential delay in distributions to such Account Holders in violation of section 1123(a)(4) of the Bankruptcy Code.  The Debtors believe that the Plan's treatment of Account Holders in the Unsupported Jurisdictions complies with section 1123(a)(4) of the Bankruptcy Code and provides such Account Holders with the best possible path towards receiving an in-kind distribution of their claims in the same types of Cryptocurrency that they deposited with the Debtors, however, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  In the event that the Bankruptcy Court finds that the objections of the state regulators have merit, the Debtors may be required to modify the Plan, prior to or as a result of the Confirmation Hearing, to

---

[90]   Washington D.C.'s summary cease and desist order alleged that Voyager Rewards Accounts were securities and required Voyager to cease and desist from: offering or selling such accounts within D.C., from accepting any additional assets into existing accounts; and from any further violations of securities laws.

[91]   Alaska's cease and desist order alleged that Voyager Rewards Accounts were securities and required Voyager to cease and desist from:  offering or selling such accounts in Alaska; and from accepting any assets into existing accounts.  Alaska assessed a $1,000,000 administrative penalty but acknowledged Voyager's status in bankruptcy proceedings and noted that "so long as the automatic stay is in effect in [Voyager]'s bankruptcy proceedings, [Alaska] will not seek to execute or collect [the penalty] without first approaching the United States Bankruptcy Court . . . ."

provide for (a) the liquidation of the Cryptocurrency held by Account Holders in the Unsupported Jurisdictions on the date that is three months after the Effective Date (i.e., the date when Cryptocurrency for Account Holders who do not fulfill the requirements to access the Binance.US Platform would be converted into U.S. Dollars and distributed), or potentially, on the Effective Date, and (b) the distribution of such cash proceeds resulting from such liquidation to Account Holders in the Unsupported Jurisdictions promptly following three months after the Effective Date, or potentially, on the Effective Date, subject to the terms of the Plan and the Asset Purchase Agreement, including any amendments that may be required in light of the Bankruptcy Court's ruling. For the avoidance of doubt, Binance.US has not agreed to any such modification of the Asset Purchase Agreement and is under no obligation to do so. If the Bankruptcy Court rules in this manner, it is uncertain whether the Sale Transaction would be consummated.

## X.    SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the Holders of Claims in those Classes that are entitled to vote to accept or reject the Plan. The procedures and instructions for voting and related deadlines are set forth in the Solicitation Package.

> ### THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY.
>
> PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ATTACHED HERETO FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

### A.    Classes Entitled to Vote on the Plan.

The following Classes are entitled to vote to accept or reject the Plan (collectively, the "Voting Classes"):

| Class | Claim or Interest | Status |
|-------|-------------------|--------|
| 3 | Account Holder Claims | Impaired |
| 4A | OpCo General Unsecured Claims | Impaired |
| 4B | HoldCo General Unsecured Claims | Impaired |
| 4C | TopCo General Unsecured Claims | Impaired |

If your Claim or Interest is not included in the Voting Classes, you are not entitled to vote and you will not receive a Solicitation Package (as defined below). If you are a Holder of a Claim in one or more of the Voting Classes, you should read your Ballot(s) and carefully follow the instructions included in the Ballot(s). Please use only the Ballot(s) that accompanies this Disclosure Statement or the Ballot(s) that the Debtors, or the Claims, Noticing, and Solicitation Agent on behalf of the Debtors, otherwise provided to you. If you are a Holder of a Claim in more than one of the Voting Classes, you will receive a Ballot for each such Claim.

### B.    Votes Required for Acceptance by a Class.

Under the Bankruptcy Code, acceptance of a chapter 11 plan by a class of claims is determined by calculating the amount and number of allowed claims voting to accept, as a percentage of the allowed claims that have voted. Acceptance of a chapter 11 plan by a class of interests is determined by calculating the amount of allowed interests voting to accept, as a percentage of the allowed interests that have voted. Acceptance by a class of claims requires an affirmative vote of more than one-half in number of total allowed claims that have voted and an affirmative vote of at least two-thirds in dollar amount of the total allowed claims that have voted. Acceptance by a class of interests requires an affirmative vote of at least two-thirds in amount of the total allowed interests that have voted.

### C.    Certain Factors to Be Considered Prior to Voting.

There are a variety of factors that all Holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan. These factors may impact recoveries under the Plan and include, among other things:

- unless otherwise specifically indicated, the financial information contained in the Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and the Disclosure Statement;

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor guarantee that the Bankruptcy Court will confirm the Plan;

- the Debtors may request Confirmation without the acceptance of all Impaired Classes in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims and Professional Fee Claims.

While these factors could affect distributions available to Holders of Allowed Claims under the Plan, the occurrence or impact of such factors will not necessarily affect the validity of the vote of the Voting Classes or necessarily require a resolicitation of the votes of Holders of Claims in the Voting Classes.

For a further discussion of risk factors, please refer to "Risk Factors" described in Article IX of this Disclosure Statement.

### D. Classes Not Entitled To Vote on the Plan.

Under the Bankruptcy Code, holders of claims or interests are not entitled to vote if their contractual rights are unimpaired by the proposed plan or if they will receive no property under the plan. Accordingly, the following Classes of Claims against and Interests in the Debtors are not entitled to vote to accept or reject the Plan:

| Class | Claim or Interest | Status |
|-------|-------------------|--------|
| 1 | Secured Tax Claims | Unimpaired |
| 2 | Other Priority Claims | Unimpaired |
| 5 | Alameda Loan Facility Claims | Impaired |
| 6 | Section 510(b) Claims | Impaired |
| 7 | Intercompany Claims | Unimpaired / Impaired |
| 8 | Intercompany Interests | Unimpaired / Impaired |
| 9 | Existing Equity Interests | Impaired |

### E. Solicitation Procedures.

#### 1. *Claims, Noticing, and Solicitation Agent*

The Debtors have retained Stretto to act, among other things, as Claims, Noticing, and Solicitation Agent in connection with the solicitation of votes to accept or reject the Plan.

#### 2. *Solicitation Package*

The following materials constitute the solicitation package (the "Solicitation Package") distributed to Holders of Claims in the Voting Classes:

- a copy of the Solicitation and Voting Procedures (as defined in the Disclosure Statement Order);

- the applicable form of Ballot, together with detailed voting instructions and instructions on how to submit the Ballot;

- the Cover Letter (as defined in the Disclosure Statement Order);

- this Disclosure Statement (and exhibits thereto, including the Plan);

- the Disclosure Statement Order (without exhibits, except the solicitation and voting procedures);

- the Confirmation Hearing Notice (as defined in the Disclosure Statement Order); and

- such other materials as the Bankruptcy Court may direct.

### 3. *Distribution of the Solicitation Package and Plan Supplement*

The Claims, Noticing, and Solicitation Agent shall distribute the Solicitation Package to Holders of Claims in the Voting Classes by no later than January 25, 2023 (the "Solicitation Launch").

The Solicitation Package (without Ballots, unless you are an eligible voting party) may also be obtained from the Claims, Noticing, and Solicitation Agent by: (a) calling the Claims, Noticing, and Solicitation Agent at (855) 473-8665 (Toll-Free) or (949) 271-6507 (International) and asking for the "Solicitation Group" or (b) emailing the Claims, Noticing, and Solicitation Agent at voyagerinquiries@stretto.com. You may also obtain copies of any pleadings filed with the Bankruptcy Court for free by visiting the Debtors' restructuring website, https://cases.stretto.com/Voyager, or the Bankruptcy Court's website at https://www.nysb.uscourts.gov/ecf-and-pacer-information (for a fee). Holders that have more than one option to return a Ballot should choose only one method to return their Ballot.

No later than fourteen (14) days before the Voting Deadline, the Debtors will file the Customer Onboarding Protocol and Schedule of Retained Causes of Action as part of the Plan Supplement. No later than seven days before the Voting Deadline, or such later date as may be approved by the Bankruptcy Court, the Debtors intend to file all other Plan Supplement documents. If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website. The Debtors will not serve copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement from the Claims, Noticing, and Solicitation Agent by: (a) calling the Claims, Noticing, and Solicitation Agent at the telephone number set forth above; (b) visiting the Debtors' restructuring website, https://cases.stretto.com/Voyager, or (c) emailing the Claims, Noticing, and Solicitation Agent at voyagerinquiries@stretto.com.

### F. **Voting Procedures.**

January 10, 2023 (the "Voting Record Date"), is the date that will be used for determining which Holders of Claims are entitled to vote to accept or reject the Plan and receive the Solicitation Package in accordance with the solicitation procedures. Except as otherwise set forth herein, the Voting Record Date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' creditors and other parties in interest.

In order for the Holder of a Claim in the Voting Classes to have its Ballot counted as a vote to accept or reject the Plan, such Holder's Ballot must be properly completed, executed, and delivered by (i) using the enclosed pre-paid, pre-addressed return envelope or (ii) via first class mail, overnight courier, or hand delivery to Voyager Ballot Processing, c/o Stretto, 410 Exchange, Suite 100, Irvine, CA 92602, so that such Holder's Ballot is actually received by the Claims, Noticing, and Solicitation Agent on or before the Voting Deadline on February 22, 2023, at 4:00 p.m. (prevailing Eastern Time).

If a Holder of a Claim in a Voting Class transfers all of such Claim to one or more parties on or after the Voting Record Date and before the Holder has cast its vote on the Plan, such Claim Holder is automatically deemed to have provided a voting proxy to the purchaser(s) of the Holder's Claim, and such purchaser(s) shall be deemed to be the Holder(s) thereof as of the Voting Record Date for purposes of voting on the Plan, provided that the purchaser provides satisfactory confirmation of the transfer to the Claims, Noticing, and Solicitation Agent.

If you hold Claims in more than one Voting Class under the Plan, you should receive a separate Ballot for each Class of Claims, coded by Class number, and a set of solicitation materials.

IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTORS DETERMINE OTHERWISE.

ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM BUT THAT DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR ANY BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

EACH HOLDER OF A CLAIM MUST VOTE ALL OF ITS CLAIMS WITHIN A PARTICULAR CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES. BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS, SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE PLAN. IF A HOLDER CASTS MULTIPLE BALLOTS WITH RESPECT TO THE SAME CLAIM AND THOSE BALLOTS ARE IN CONFLICT WITH EACH OTHER, SUCH BALLOTS WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

IT IS IMPORTANT THAT THE HOLDER OF A CLAIM IN THE VOTING CLASSES FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON SUCH HOLDER'S BALLOT AND THE ACCOMPANYING INSTRUCTIONS. NO BALLOT MAY BE WITHDRAWN OR MODIFIED AFTER THE VOTING DEADLINE WITHOUT THE DEBTORS' PRIOR CONSENT OR PERMISSION OF THE BANKRUPTCY COURT.

G.      **Voting Tabulation.**

Unless the Debtors decide otherwise, Ballots received after the Voting Deadline may not be counted. A Ballot will be deemed delivered only when the Claims, Noticing, and Solicitation Agent actually receives the executed Ballot as instructed in the applicable voting instructions. No Ballot should be sent to the Debtors, the Debtors' agents (other than the Claims, Noticing, and Solicitation Agent) or the Debtors' financial or legal advisors.

The Bankruptcy Code may require the Debtors to disseminate additional solicitation materials if the Debtors make material changes to the terms of the Plan or if the Debtors waive a material condition to Confirmation of the Plan. In that event, the solicitation will be extended to the extent directed by the Bankruptcy Court.

In the event that a designation of lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Bankruptcy Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected.

The Debtors will file with the Bankruptcy Court, as soon as practicable after the Voting Deadline, the voting report prepared by the Claims, Noticing, and Solicitation Agent (the "Voting Report"). The Voting Report shall, among other things, provide the votes received to accept or reject the Plan and Holders of Claims and Interests that have opted into the third-party releases or Contributed Third-Party Claims, delineate every Ballot that does not conform to the voting instructions or that contains any form of irregularity (each an "Irregular Ballot"), including those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or lacking necessary information, or damaged. The Voting Report also shall indicate the Debtors' intentions with regard to such Irregular Ballots. Neither the Debtors nor any other Person or Entity will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report nor will any of them incur any liability for failure to provide such notification.

### H.    Ballots Not Counted.

No Ballot will be counted toward Confirmation if, among other things:  (1) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (2) it was transmitted by facsimile, email, or other electronic means not specifically approved pursuant to the Disclosure Statement Order; (3) it was cast by an entity that is not entitled to vote on the Plan; (4) it was sent to the Debtors, the Debtors' agents/representatives (other than the Claims, Noticing, and Solicitation Agent), or the Debtors' financial or legal advisors instead of the Claims, Noticing, and Solicitation Agent; (5) it is unsigned; or (6) it is not clearly marked to either accept or reject the Plan or is marked both to accept and reject the Plan.  Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.

> **IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE CLAIMS, NOTICING, AND SOLICITATION AGENT TOLL-FREE NUMBER AT (855) 473-8665.**
>
> **ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE SOLICITATION ORDER WILL <u>NOT</u> BE COUNTED.**

## XI.    CONFIRMATION OF THE PLAN

### A.    Requirements of Section 1129(a) of the Bankruptcy Code.

Among the requirements for Confirmation are the following:  (i) the Plan is accepted by all impaired Classes of Claims and Interests or, if the Plan is rejected by an Impaired Class, at least one Impaired Class of Claims has voted to accept the Plan and a determination that the Plan "does not discriminate unfairly" and is "fair and equitable" as to Holders of Claims or Interests in all rejecting Impaired Classes; (ii) the Plan is feasible; and (iii) the Plan is in the "best interests" of Holders of Impaired Claims or Interests (*i.e.*, Holders of Class 3 Account Holder Claims, Holders of Class 4A OpCo General Unsecured Claims, Holders of Class 4B HoldCo General Unsecured Claims, Holders of Class 4C TopCo General Unsecured Claims, Holders of Class 5 Alameda Loan Facility Claims, Holders of Class 6 Section 510(b) Claims, and Holders of Class 9 Existing Equity Interests).

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that the Plan satisfies or will satisfy all of the necessary requirements of chapter 11 of the Bankruptcy Code.  Specifically, in addition to other applicable requirements, the Debtors believe that the Plan satisfies or will satisfy the applicable Confirmation requirements of section 1129 of the Bankruptcy Code set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the Plan proponents, have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, will be disclosed to the Bankruptcy Court, and any such payment:  (i) made before Confirmation will be reasonable or (ii) will be subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation.

- Either each Holder of an Impaired Claim against or Interest in the Debtors will accept the Plan, or each non-accepting Holder will receive or retain under the Plan on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that the Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim agrees to a different treatment of its Claim, the Plan provides that, to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, Allowed Administrative Claims will be paid in full on the Effective Date or as soon thereafter as is reasonably practicable.

- At least one Class of Impaired Claims will have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

- Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the U.S. Trustee, will be paid as of the Effective Date.

Section 1126(c) of the Bankruptcy Code provides that a class of claims has accepted a plan of reorganization if such plan has been accepted by creditors that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class. Section 1126(d) of the Bankruptcy Code provides that a class of interests has accepted a plan of reorganization if such plan has been accepted by holders of such interests that hold at least two-thirds in amount of the allowed interests of such class.

**B.  Best Interests of Creditors—Liquidation Analysis.**

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an interest in such class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtors liquidated under chapter 7 of the Bankruptcy Code.

To demonstrate compliance with the "best interests" test, the Debtors, with the assistance of their advisors, prepared the Liquidation Analysis, attached hereto as **Exhibit B**, showing that the value of the distributions provided to Holders of Allowed Claims and Interests under the Plan would be the same or greater than under a hypothetical chapter 7 liquidation. As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' business under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Allowed Claims or Interests as compared to distributions contemplated under the Plan. Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Allowed Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

In a typical chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets and to make distributions to creditors in accordance with the priorities established in the Bankruptcy Code. Generally, secured creditors are paid first from the proceeds of sales of their collateral. If any assets remain in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses are next to be paid. Unsecured creditors are paid from any remaining sale proceeds, according to their respective priorities. Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority. Finally, interest holders receive the balance that remains, if any, after all creditors are paid.

All or substantially all of the assets of the Debtors' business will have been liquidated through the Sale Transaction and the Plan effects a wind down of the Debtors' remaining assets not otherwise acquired in the Sale Transaction. Although a chapter 7 liquidation would achieve the same goal, the Debtors believe that the Plan provides a greater recovery to Holders of Allowed Claims than would a chapter 7 liquidation.

The liquidation of the Debtors' assets in chapter 7 would result in substantially less value than the proceeds of the Sale Transaction. Notably, in the context of a chapter 7 liquidation, the Debtors would not receive the upfront cash payment, the earn-out, and other Binance.US Transaction proceeds that provide significantly greater value to Holders of Account Holder Claims and OpCo General Unsecured Claims than in a chapter 7 liquidation scenario. Moreover, the proceeds of the sale of the Debtors' Cryptocurrency would likely be less in a fire sale liquidation than in an orderly sale under the Plan.

Liquidating the Debtors' Estates under the Plan likely provides Holders of Allowed Claims with a larger, more timely recovery in part because of the expenses that would be incurred in a chapter 7 liquidation, including the potential added time (thereby reducing the present value of any recovery for Holders) and expense incurred by the chapter 7 trustee and any retained professionals in familiarizing themselves with the Chapter 11 Cases and the Debtors' Cryptocurrency. *See, e.g.*, 11 U.S.C. § 326(a) (providing for compensation of a chapter 7 trustee); 11 U.S.C. 503(b)(2) (providing administrative expense status for compensation and expenses of a chapter 7 trustee and such trustee's professionals). Additionally, the Debtors' Estates would continue to be obligated to pay all unpaid expenses incurred by the Debtors during the Chapter 11 Cases (such as compensation for Professionals), which may constitute Allowed Claims in any chapter 7 case.

The conversion to chapter 7 would also require entry of a new bar date. *See* Fed. R. Bankr. P. 1019(2); 3002(c). Thus, the amount of Claims ultimately filed and Allowed against the Debtors could materially increase, thereby further reducing creditor recoveries versus those available under the Plan.

In light of the foregoing, the Debtors submit that a chapter 7 liquidation would result in reduced sale proceeds and recoveries, increased expenses, delayed distributions, and the prospect of additional claims that were not asserted in the Chapter 11 Cases. Accordingly, the Debtors believe that distributions under the Plan would provide Holders of Claims and Interests with the same or greater recovery than under a hypothetical chapter 7 liquidation.

## C. Feasibility.

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a chapter 11 plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

The Plan provides for the liquidation and distribution of the Debtors' assets. Accordingly, the Debtors believe that all Plan obligations will be satisfied without the need for further reorganization of the Debtors.

## D. Acceptance by Impaired Classes.

The Bankruptcy Code requires that, except as described in the following section, each impaired class of claims or interests must accept a plan in order for it to be confirmed. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to the class is not required. A class is "impaired" unless the plan: (i) leaves unaltered the legal, equitable, and contractual rights to which the claim or the interest entitles the holder of the claim or interest; (ii) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest; or (c) provides that, on the consummation date, the holder of such claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled or any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims that actually voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number of creditors actually voting cast their ballots in favor of acceptance. For a class of impaired interests to accept a plan, section 1126(d) of the Bankruptcy Code requires acceptance by interest holders that hold at least two-thirds in amount of the allowed interests of such class, counting only those interests that actually voted to accept or reject the plan. Thus, a class of interests will have voted to accept the plan only if two-thirds in amount actually voting cast their ballots in favor of acceptance.

E.        **Confirmation without Acceptance by All Impaired Classes.**

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted the plan, *provided* that the plan has been accepted by at least one impaired class of claims. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

If any Impaired Class of Claims or Interests rejects the Plan, including Classes of Claims or Interests deemed to reject the Plan, the Debtors will request Confirmation of the Plan, as it may be modified from time to time, utilizing the "cramdown" provision under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims to render such Class of Claims Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules or to withdraw the Plan as to such Debtor.  Class 3 Account Holder Claims and Class 4A OpCo General Unsecured Claims are treated the same under the Plan, Class 4B HoldCo General Unsecured Claims and Class 4C TopCo General Unsecured Claims will receive the recovery available at HoldCo or TopCo, and the Debtors will seek to subordinate Class 5 Alameda Loan Facility Claims pursuant to the Plan.  Therefore, the Plan does not discriminate unfairly.

The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the requirements for cramdown and the Debtors will be prepared to meet their burden to establish that the Plan can be Confirmed pursuant to section 1129(b) of the Bankruptcy Code as part of Confirmation of the Plan.

1.        *No Unfair Discrimination*

The "unfair discrimination" test applies with respect to classes of claim or interests that are of equal priority but are receiving different treatment under a proposed plan.  The test does not require that the treatment be the same or equivalent, but that the treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly.  Under certain circumstances, a proposed plan may treat two classes of unsecured creditors differently without unfairly discriminating against either class.

2.        *Fair and Equitable Test*

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in such class.  As to each non-accepting class and as set forth below, the test sets different standards depending on the type of claims or interests in such class.  The Debtors believe that the Plan satisfies the "fair and equitable" requirement, notwithstanding the fact that certain Classes are deemed to reject the Plan.  There is no Class receiving more than a 100 percent recovery and no junior Class is receiving a distribution under the Plan until all senior Classes have received a 100 percent recovery or agreed to receive a different treatment under the Plan.

(a)        **Unsecured Claims.**

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either:  (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date, equal to the allowed amount of such claim; or (ii) the holder of any claim or any interest that is junior to the claims of such class will not receive or retain any property under the plan on account of such junior claim or junior interest, subject to certain exceptions.

(b)        **Interests.**

The condition that a plan be "fair and equitable" to a non-accepting class of interests, includes the requirements that either:  (i) the plan provides that each holder of an interest in that class receives or retains under the plan on account of that interest property of a value, as of the effective date, equal to the greater of:  (a) the allowed

amount of any fixed liquidation preference to which such holder is entitled; (b) any fixed redemption price to which such holder is entitled; or (c) the value of such interest; or (ii) the holder of any interest that is junior to the interests of such class will not receive or retain any property under the plan on account of such junior interest.

## XII.  CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.  Introduction.

The following discussion is an overview of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors, the Wind-Down Debtors, and to Holders entitled to vote to accept or reject the Plan.  This overview is based on the U.S. Internal Revenue Code of 1986, as amended ("IRC"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "IRS"), and other applicable authorities (collectively, "Applicable Tax Law"), all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.

The application of Applicable Tax Law to numerous material aspects of the transactions contemplated by the Plan, and to cryptocurrency in general, is subject to an unusually high level of uncertainty.  No opinion of counsel has been or will be obtained and the Debtors have not requested, and do not expect to seek, a ruling or determination from the IRS as to any of the tax consequences of the Plan.  No portion of this discussion is binding upon the IRS or the courts, and no assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position that the Debtors or Wind-Down Debtors take.

**ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED, IN THE STRONGEST TERMS POSSIBLE, TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN.  THIS DISCUSSION DOES NOT CONSTITUTE TAX OR LEGAL ADVICE TO HOLDERS OF CLAIMS OR INTERESTS.**

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to certain Holders in light of their individual circumstances.  This discussion also does not address tax issues with respect to such Holders that are subject to special treatment under the U.S. federal income tax laws (including, for example, accrual-method U.S. Holders (as defined below) that prepare an "applicable financial statement" (as defined in Section 451 of the IRC), banks, mutual funds, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, U.S. Holders (as defined below) whose functional currency is not the U.S. dollar, U.S. expatriates, broker-dealers, small business investment companies, Persons who are related to the Debtors within the meaning of the IRC, Purchaser, Persons liable for alternative minimum tax, Persons (other than, if applicable, the Debtors) using a mark-to-market method of accounting, Holders who are themselves in bankruptcy, real estate investment companies and regulated investment companies and those holding, or who will hold, consideration received pursuant to the Plan as part of a hedge, straddle, conversion, or other integrated transaction).  No aspect of state, local, non-income, or non-U.S. taxation is addressed (including, for the avoidance of doubt, the application of Canadian tax law to Holders or to the Debtors, which issues are under further review).  Furthermore, this preliminary overview assumes that a Holder holds only Claims or Interests in a single Class and, except as set forth below, holds such Claims or Interests only as "capital assets" (within the meaning of section 1221 of the IRC).  This preliminary overview also assumes that the various debt and other arrangements to which the Debtors and Wind-Down Debtors are or will be a party will be respected for U.S. federal income tax purposes in accordance with their form, and, to the extent relevant, that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the IRC.  This preliminary overview does not discuss differences in tax consequences to Holders that act or receive consideration in a capacity other than any other Holder of a Claim or Interest of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described below.  The U.S. federal income tax consequences of the implementation of the Plan to the Debtors, Wind-Down Debtors, and Holders of Claims and Interests described below also may vary depending on the ultimate nature of any Restructuring Transactions that the Debtors and/or Wind-Down Debtors engage in.  This discussion does not address the U.S. federal income tax consequences to Holders (a) whose Claims are Unimpaired or otherwise entitled to payment in full under the Plan, or (b) that are deemed to reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim or Interest that for U.S. federal income tax purposes is: (1) an individual who is a citizen or resident of the United States; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons (within the meaning of section 7701(a)(30) of the IRC) has authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person (within the meaning of section 7701(a)(30) of the IRC. For purposes of this discussion, a "Non-U.S. Holder" is any Holder that is neither a U.S. Holder nor a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity. Partnerships (or other pass-through entities) and partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders are urged to consult their own respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

The below discussion assumes that the Debtors obtained tax ownership of cryptocurrency deposits when customers made such deposits. The Debtors believe that position is the right one based on, among other things, the fact that the Debtors had the right to transfer, rehypothecate, and otherwise deal in deposited cryptocurrency. If the Debtors were determined to not have tax ownership of the cryptocurrency, the consequences of the Plan to Holders of Claims and the Debtors would vary significantly from the discussion below.

**ACCORDINGLY, THE FOLLOWING DISCUSSION OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER. THIS DISCUSSION DOES NOT CONSTITUTE TAX OR LEGAL ADVICE TO HOLDERS OF CLAIMS OR INTERESTS.**

**B.      Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors.**

The consequences of the Plan to the Debtors will depend, in part, on whether the Plan is structured as a Sale Transaction or a Liquidation Transaction.

In a Sale Transaction, the Debtors expect that the Plan would be structured such that there would be taxable sale of certain assets of the Debtors to the Purchaser (the "Taxable Transaction") and, potentially, a deemed "in-kind" distribution of cryptocurrency to customers in exchange for Claims related to deposits of such cryptocurrency (the "In-Kind Distribution"). As a result and in connection therewith, the Debtors would realize gain or loss in an amount equal to the difference between the value of the consideration received by the Debtors (including, for this purpose, assumption of liabilities) and the Debtors' tax basis in such assets. Gain would be reduced by the amount of tax attributes (if any) available for use by the Debtors, and any remaining gain would be recognized by the Debtors and result in a cash tax obligation. Amounts subject to the In-Kind Distribution may be treated as a non-taxable transaction with respect to the underlying cryptocurrency, combined with incurrence of income or cancellation of indebtedness income related to any difference between the value of what customers receive in exchange for their Claims and the amount of their Claims (determined without regard to "dollarization" of such Claims).

Thus, the U.S. federal income tax consequences of the Taxable Transaction to the Debtors would in large part be a function of the Debtors' tax basis in their assets that the Debtors transfer or are deemed to have transferred, including the Debtors' cryptocurrency. There is generally no direct guidance under Applicable Tax Law on how to treat a customer's transfer of cryptocurrency to a business like the Debtors' (and as a result there is significant (and unusual) uncertainty with respect to the Debtors' tax basis in such cryptocurrency) or the transferee's utilization of the transferred cryptocurrency (for example, and without limitation, holding it and doing nothing more, lending it, staking it, selling it, or using it in a short sale). Accordingly, there is significant uncertainty with respect to the tax consequences of a Taxable Transaction to the Debtors.

It is possible that the IRS or a court could disagree with the Debtors' determination of their basis in their assets, including the Debtors' cryptocurrency. Any such disagreement could lead to a redetermination of the Debtors' basis in their assets and a resultant increase in the Debtors' tax liability from a Taxable Transaction, potentially in a way that would have a materially adverse impact on the Debtors. The Debtors, together with their advisors, continue to study this issue.

Were the Plan instead structured as a Liquidation Transaction, then, generally, subject to any rebalancing of the Debtors' cryptocurrency in order to facilitate distributions under the Plan or to otherwise effectuate the Liquidation Transaction, the Debtors would distribute cash and/or property in satisfaction of Claims. In connection with any rebalancing, the Debtors would realize gain or loss upon the sale of cryptocurrency involved in such rebalancing, with such gain or loss calculated as, and subject to the uncertainty, described above. With respect to the Debtors' distribution of cash and/or property to Holders of Claims, the Debtors would recognize income or cancellation of indebtedness income related to any difference between the value of what a Holder receives in exchange for its Claim and the amount of such Claim (determined without regard to "dollarization" of such Claims).

Whether the Plan is structured as a Sale Transaction or a Liquidation Transaction, the Debtors' tax attributes (if any) will not survive the implementation of the Plan. Accordingly, the rules regarding cancellation of indebtedness income are generally inapplicable and the rules regarding section 382 of the IRC are inapplicable and, in each case, not discussed further.

The Debtors continue to evaluate how "dollarization" of Claims as of the Effective Date may modify the above analysis, either with respect to the implementation of the Plan itself or with respect to any administrative tax period more generally. The Debtors currently cannot say with certainty that there will not be material administrative income tax liabilities that must be satisfied under the Plan.

**C.      Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders[92] of Allowed Claims Entitled to Vote.**

**1.      *Sale Transaction or Liquidation Transaction***

**(a)      U.S. Federal Income Tax Consequences to Certain U.S. Holders of Allowed Class 3 Claims (Account Holder Claims).**

If the Plan is structured as a Sale Transaction, each Holder of an Allowed Account Holder Claim will receive in exchange for such Allowed Account Holder Claim: (i) for Account Holders in Supported Jurisdictions, its Net Owed Coins, as provided in and subject to the requirements of Section 6.12 of the Asset Purchase Agreement; (ii) for Account Holders in Unsupported Jurisdictions, value in Cash at which such Net Owed Coins allocable to such Account Holder are liquidated; provided that to the extent that the Purchaser obtains the Unsupported Jurisdiction Approval for the jurisdiction in which such Account Holder resides and the Debtors and/or Wind-Down Entity has not made such Cash distribution to such Account Holder, then such Account Holder shall receive the treatment in Article III.C.3(c)(i)(A) of the Plan; (iii) its Pro Rata share of any Additional Bankruptcy Distributions, in Cryptocurrency or Cash as provided in and subject to the requirements of Sections 6.12 and 6.14 of the Asset Purchase Agreement; (iv) its Pro Rata share of Distributable OpCo Cash; and (v) to effectuate distributions from the Wind Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to OpCo; provided that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims; *provided* that distributions made to any Account Holder pursuant to clauses (iii), (iv), and (v) above shall be made after taking into account the Acquired Coins Value of the Net Owed Coins or the value in Cash at which such Net Owed Coins are liquidated, as applicable, previously allocated to such Account Holder.

If, alternatively, the Plan is structured as a Liquidation Transaction, each Holder of an Allowed Account Holder Claim will receive in exchange for such Allowed Account Holder Claim: (i) its Pro Rata share of Distributable

---

[92]   Based on the Debtors' understanding of the residence of Holders, the Debtors do not discuss any U.S. federal income tax consequences of the consummation of the Plan to Non-U.S.-Holders.

OpCo Cash; (ii) its Pro Rata share of Distributable Cryptocurrency, which such Account Holder shall be able to withdraw in kind, alternative Cryptocurrency, and/or Cash for a period of thirty (30) days after the Effective Date through the Voyager platform or, if elected by Seller pursuant to Section 6.12(d) of the Asset Purchase Agreement, through the Binance.US Platform; *provided* that, if the applicable transfer is made through the Voyager platform and such Account Holder does not withdraw its Pro Rata share of Distributable Cryptocurrency available to such Account Holder from the Voyager platform within such thirty (30) day period, such Account Holder will receive Cash in the equivalent value to its Pro Rata share of Distributable Cryptocurrency; and (iii) effectuate distributions from the Wind Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to OpCo; *provided* that any distributions on account of Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

Whether the Plan is structured as a Sale Transaction or a Liquidation Transaction, there is a material risk that U.S. Holders of Account Holder Claims will have a taxable event in connection with the consummation of the Plan or the "dollarization" of Claims (or separate taxable events for one or both events). This is the case even though the Sale Transaction contemplates the migration of customers to an acquiring cryptocurrency platform and even though the Liquidation Transaction contemplates that Account Holders can withdraw cryptocurrency from the Voyager platform. To the extent any taxable event occurs, tax liability would be based on the difference between the Holder's tax basis in its Claim compared to the value it receives in respect of such Claim, with such gain or loss generally being capital in nature.

The tax treatment of Holders under the Plan depends significantly on the tax treatment of customer deposits in the first instance. There is uncertainty with respect to whether deposits are taxable when they occur, but the Debtors generally expect that most customers have taken the position that the act of depositing cryptocurrency with the Debtors is not a taxable event. While there is substantial theoretical debate regarding that position, it is a position that has some level of support in the idea that the exchange of cryptocurrency for a contractual right to the return of such cryptocurrency is not a transaction that results in a realization event under section 1001 of the IRC because it does not involve an exchange of property "differing materially either in kind or in extent." Such position relies, among other things, on caselaw that pre-dates the enactment of section 1058 of the IRC and analogies to the treatment afforded to securities lending under section 1058. On the other hand, there is also support for the position that the initial deposit of cryptocurrency is a taxable event because of various provisions in the Terms of Use that narrow a customer's rights with respect to the deposited cryptocurrency (in particular, provisions related to the Debtors' ability to not support "airdropped" cryptocurrency or cryptocurrency issued pursuant to a "hard fork").

To the extent an initial deposit of cryptocurrency was not taxable, there is an argument that the same position could be taken with respect to the return by the Debtors of such cryptocurrency to customers, because the exchange of the contractual right to the return of such cryptocurrency for the underlying cryptocurrency would itself not be an exchange of property "differing materially either in kind or in extent." This argument would be stronger in the case of a Liquidation Transaction than in a Sale Transaction, because the explicit form of the Liquidation Transaction would be that the Account Holder has the ability to withdraw its Pro Rata share of Distributable Cryptocurrency in kind for a period of thirty (30) days after the Effective Date through the Voyager platform; though if the Distributable Cryptocurrency were a different type of cryptocurrency than the cryptocurrency that the Account Holder originally deposited on the Voyager platform (because of, for example, rebalancing), then the ability to rely on such argument would be greatly impaired because the property withdrawn would differ "materially either in kind or in extent," likely leading to a taxable event (and in any event, for the avoidance of doubt, in a Liquidation Transaction, the receipt of cash or property other than cryptocurrency in exchange for deposited cryptocurrency should generally result in a taxable event).

As for a Sale Transaction, under principles that typically apply to determine whether obligations have been meaningfully modified, including principles under section 1.1001-3 of the Treasury Regulations (which are not directly applicable here, but are informative), a transaction that involves an exchange of a contractual right owed by the Debtors for a contractual right owed by a different party is highly likely to be treated as taxable. Nevertheless, the Debtors believe, in the case of a Sale Transaction, that it would be supportable for Holders to take the position that, pursuant to the consummation of the Plan whereby customers may migrate to Purchaser's platform, (a) the Debtors are deemed to transfer cryptocurrency in kind in a non-taxable transaction; and, immediately thereafter, (b) Holders

are deemed to re-deposit cryptocurrency to the new entity, again, in a non-taxable or a partially non-taxable transaction.

The Debtors continue to study whether the above arguments, when combined with a general "bifurcation" approach that separates the recovery Holders receive into multiple components (*i.e.*, the type of cryptocurrency the customer had deposited on the platform, other cryptocurrencies, cash, and recoveries in respect of the Wind-Down Entity), may permit Holders to take the position that Holders retain the portion of their recovery taking the form of the type of cryptocurrency that the customer had deposited on the platform even if the receipt of other consideration constitutes a taxable exchange as to such other cash and/or property. The Debtors emphasize that these positions are unclear.

The ability to take the position that an In-Kind Distribution (in the case of a Sale Transaction) or the withdrawal of Distributable Cryptocurrency from the Voyager platform (in the case of a Liquidation Transaction) is not taxable to Holders is subject to increased risk as a result of the "dollarization" of Claims. As noted above, it may be the case that "dollarization" resulted, or will result, in a taxable event to customers, either as of the Petition Date or as of the Confirmation Date. If such a taxable event were determined to have occurred, it would be because the contract to receive particular cryptocurrency was modified, as a result of dollarization, to have an economic "cap." In light of this, it is unclear whether the arguments described above that support tax-free treatment with respect to the receipt of cryptocurrency under the Plan could still apply. Such a "capped" contract arguably "differ[s] materially either in kind or in extent" from the underlying cryptocurrency. However, the Debtors also believe it would be reasonable to assert that this is not a material enough change to customers' underlying entitlements.

**The Debtors emphasize in the strongest possible terms that the law applicable to deposits and withdrawals of cryptocurrency from the Debtors, "dollarization," and the consummation of the Plan is subject to extreme uncertainty. There is effectively no "controlling" authority on any of these issues. Accordingly, there is a material risk that the positions described above may not be sustained. The concepts of a non-taxable in-kind distribution (in the case of a Sale transaction) or withdrawal (in the case of a Liquidation Transaction) of cryptocurrency referred to above rest in large part on the theory that the property that the Debtors would distribute in-kind to a Holder (in the case of a Sale Transaction) or that the Holder would withdraw (in the case of a Liquidation Transaction) would be in respect of an obligation that does not differ "materially either in kind or in extent" from the obligation that arose when the Holder deposited property with the Debtors. Given the structure of the Plan, and in particular the way in which the Debtors have valued Claims as of the Petition Date, there is a significant risk that the Claim that a Holder has against the Debtors as of the Petition Date is with respect to property that differs "materially either in kind or in extent" from the property that the Holder previously deposited with the Debtors, such that the Debtors would be distributing property in respect of an obligation that differs "materially either in kind or in extent" from the one that existed when the Holder deposited property with the Debtors (and thus tax-free treatment would likely be unavailable).**

Very generally, to the extent any form of transaction is taxable to a Holder (which, for the avoidance of doubt, would include any Holder who receives only Cash and/or Wind-Down Trust Units under the Plan), each such U.S. Holder would recognize gain or loss in an amount equal to the difference between the fair market value of the consideration (be it Cash, Cryptocurrency, and/or Wind-Down Trust Units)[93] received under the Plan and such U.S. Holder's adjusted tax basis in the Claim exchanged therefor. The character of any such gain or loss as capital or ordinary would be determined by a number of factors including the tax status of the U.S. Holder, whether the Claim constituted a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim. If any such recognized gain or loss were capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange. Such Holder's tax basis in the Wind-Down Trust Units and any Cryptocurrency received in a taxable exchange should equal the fair market value of such property as of the Effective Date, and such Holder's holding period in any such consideration should begin on the day after the Effective Date.

---

[93]  The Debtors generally do not expect that the right to become a Transferred Creditor would be ascribed independent value for U.S. federal income tax purposes.

A U.S. Holder should not recognize gain or loss in connection with any distribution from a Wind-Down Debtor (if any) until such Wind-Down Debtor makes such distribution.

As noted repeatedly herein, nothing in this disclosure constitutes tax or legal advice to Holders. However, the Debtors wish to highlight one area of tax consideration that has been the subject of significant speculation in online resources and similar. The above language indicates that customers may be able to take a loss in connection with the consummation of the Plan. The Debtors generally expect such loss would arise *when the Plan is consummated*, and not before. There has been significant speculation in various sources with respect to whether a customer can take a loss, potentially under section 166 of the Tax Code (related to bad debts, including non-business bad debts). There are significant timing limitations on the ability to claim a loss under section 166 of the Tax Code. In particular, other than with respect to certain types of taxpayers that can take partial bad debt deductions in connection with a "charge-off" under section 166(a)(2) of the Tax Code, most taxpayers can only take a deduction under section 166 when a debt has become entirely worthless. As set forth in the Plan, the Debtors do not believe customer claims will ever be entirely worthless, as all transactions under contemplation by the Debtors contemplate that there will be some form of recovery received by customers in respect of their claims. Accordingly, the Debtors are of the view that the overwhelming majority of customers are not able to take a section 166 loss with respect to their claims prior to the consummation of the Plan. However, in the event "dollarization" of Claims results in a taxable event to customers, customers likely can claim a loss in connection with such "dollarization."

**(b)      U.S. Federal Income Tax Consequences to Certain U.S. Holders of Allowed Class 4A Claims.**

If the Sale Transaction is consummated by the Outside Date, each Holder of an Allowed OpCo General Unsecured Claim will receive in exchange for such Allowed OpCo General Unsecured Claim: (i) its Pro Rata share of Distributable Cryptocurrency in Cash; (ii) its Pro Rata share of Additional Bankruptcy Distributions, in Cryptocurrency or Cash as provided in and subject to the requirements of Section 6.12 and 6.14 of the Asset Purchase Agreement; (iii) its Pro Rata share of Distributable OpCo Cash; and (iv) to effectuate distributions from the Wind Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to OpCo; provided that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

If, alternatively, the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated, each Holder of an Allowed OpCo General Unsecured Claim will receive in exchange for such Allowed OpCo General Unsecured Claim: (i) its Pro Rata share of Distributable Cryptocurrency in Cash; (ii) its Pro Rata share of Distributable OpCo Cash; and (iii) to effectuate distributions from the Wind Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to OpCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

Each such U.S. Holder should recognize gain or loss in an amount equal to the difference between the fair market value of the consideration (be it Cash, Cryptocurrency, and/or Wind-Down Trust Units) received under the Plan and such U.S. Holder's adjusted tax basis in the Claim exchanged therefor. The character of any such gain or loss as capital or ordinary would be determined by a number of factors including the tax status of the U.S. Holder, whether the Claim constituted a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim. If any such recognized gain or loss were capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange. Such Holder's tax basis in the Wind-Down Trust Units and any Cryptocurrency received in a taxable exchange should equal the fair market value of such property as of the Effective Date, and such Holder's holding period in any such consideration should begin on the day after the Effective Date.

A U.S. Holder should not recognize gain or loss in connection with any distribution from a Wind-Down Debtor (if any) until such Wind-Down Debtor makes such distribution.

The foregoing assumes that no Allowed Class 4A Claim is in respect of Cryptocurrency deposited with the Debtors. If any such Allowed Class 4A Claim were in respect of Cryptocurrency deposited with the Debtors, the considerations described in "U.S. Federal Income Tax Consequences to Certain U.S. Holders of Allowed Class 3 Claims (Account Holder Claims)" would apply.

        **(c)**        **U.S. Federal Income Tax Consequences to Certain U.S. Holders of Allowed Class 4B and 4C Claims.**

Each Holder of an Allowed HoldCo General Unsecured Claim will receive in exchange for such Allowed HoldCo General Unsecured Claim: (i) its Pro Rata share of Distributable HoldCo Cash; and (ii) its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to HoldCo; *provided* that any distributions on account of Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

Similarly, each Holder of an Allowed TopCo General Unsecured Claim will receive in exchange for such Allowed TopCo General Unsecured Claim: (i) its Pro Rata share of Distributable TopCo Cash; and (ii) its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of the Wind-Down Trust Assets attributable to TopCo; *provided* that any distributions on account of Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

Each such U.S. Holder should recognize gain or loss in an amount equal to the difference between the fair market value of the consideration (be it Cash and/or Wind-Down Trust Units) received under the Plan and such U.S. Holder's adjusted tax basis in the Claim exchanged therefor. The character of any such gain or loss as capital or ordinary would be determined by a number of factors including the tax status of the U.S. Holder, whether the Claim constituted a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim. If any such recognized gain or loss were capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange. Such Holder's tax basis in the Wind-Down Trust Units received in a taxable exchange should equal the fair market value of such property as of the Effective Date, and such Holder's holding period in any such consideration should begin on the day after the Effective Date.

A U.S. Holder should not recognize gain or loss in connection with any distribution from a Wind-Down Debtor (if any) until such Wind-Down Debtor makes such distribution.

        **(d)**        **Net Investment Income Tax.**

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8 percent tax on, among other things, gains from the sale or other disposition of capital assets. U.S. Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Plan.

        **(e)**        **Limitations on Use of Capital Losses.**

U.S. Holders who recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses. For non-corporate U.S. Holders, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains. Non-corporate U.S. Holders may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years. For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. Corporate U.S. Holders who have more capital losses than can be used

in a tax year may be allowed to carry over the excess capital losses for use in the five years following the capital loss year, and are allowed to carry back unused capital losses to the three years preceding the capital loss year.

**2.** ***Certain U.S. Federal Income Tax Consequences to U.S. Holders of Owning and Disposing of Cryptocurrency Received Under the Plan***

The U.S. federal income tax consequences to a U.S. Holder of owning and disposing of Cryptocurrency received under the Plan will depend upon a variety of factors outside of the control and/or knowledge of the Debtors, including , (x) if the Plan is structured as a Sale Transaction, (i) the U.S. federal income tax characterization of the relationship between such Holder and Purchaser, and (ii) the activities that such Holder and/or Purchaser pursue with respect to such Cryptocurrency on Purchaser's platform, and (y) if the Plan is structured as a Liquidation Transaction, the activities that such Holder pursues with respect to such Cryptocurrency. In the event of a Sale Transaction, U.S. Holders are urged to consult their own tax advisors regarding the proper characterization of such relationship and the tax consequences that may result therefrom.

**3.** ***The Wind-Down Entity***

The Plan provides that on the Effective Date and thereafter if additional Wind-Down Entity Assets become available, the Wind-Down Entity Assets shall automatically vest in the Wind-Down Entity. Thereupon, the Debtors shall have no interest in or with respect to the Wind-Down Entity Assets or the Wind-Down Entity.

**(a)** **Liquidating Trust Treatment.**

Although not free from doubt, other than with respect to any assets that are subject to potential disputed claims of ownership or uncertain distributions, a Wind-Down Trust (if any) may be classified as a "liquidating trust" under section 301.7701-4(d) of the Treasury Regulations and qualify as a "grantor trust" under section 671 of the Tax Code. It may be that such treatment does not apply given the structure of the Plan. If such treatment did apply to any assets of the Wind-Down Trust, any beneficiaries of the Wind-Down Trust would be treated as grantors and deemed owners thereof and, for all U.S. federal income tax purposes, any beneficiaries would be treated as if they had received a distribution of an undivided interest in the assets of the Wind-Down Trust and then contributed such undivided interest to the Wind-Down Trust. Other than with respect to any assets of the Wind-Down Trust that are subject to potential disputed claims of ownership or uncertain distributions, the treatment of the deemed transfer of assets to applicable Holders of Claims prior to the contribution of such assets to the Wind-Down Trust should generally be consistent with the treatment described above with respect to the receipt of the applicable assets directly. Other than with respect to any assets of the Wind-Down Trust that are subject to potential disputed claims of ownership or uncertain distributions, no entity-level tax should be imposed on the Wind-Down Trust with respect to earnings generated by the assets held by it. Each beneficiary must report on its federal income tax return its allocable share of income, gain, loss, deduction and credit, if any, recognized or incurred by the Wind-Down Trust, even if no distributions are made.

**(b)** **Disputed Ownership Fund treatment.**

With respect to any of the assets of a Wind-Down Trust that are subject to potential disputed claims of ownership or uncertain distributions, *or* to the extent "liquidating trust" treatment is otherwise unavailable, the Debtors anticipate that such assets will be subject to disputed ownership fund treatment under Section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes. Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account. Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes). To the extent property is not distributed to U.S. Holders of applicable Claims on the Effective Date but, instead, is transferred to any such account, although not free from doubt, U.S. Holders should not recognize any gain or loss with respect to such property on the date that the property is so transferred. Instead, gain or loss should be recognized when and to the extent property is actually distributed to such U.S. Holders.

4.      *U.S. Information Reporting and Withholding*

The Debtors and the Wind-Down Entity, as applicable, intend to withhold all amounts required under the IRC with respect to distributions made under the Plan and to comply with all applicable reporting requirements of the IRC. In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim or Interest under the Plan, as well as future payments made with respect to consideration received under the Plan.

Backup withholding is not an additional tax.  Any amounts withheld under the backup withholding rules may be credited against a Holder's U.S. federal income tax liability, and a Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a U.S. federal income tax return).

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

---

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.   THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED, IN THE STRONGEST TERMS POSSIBLE, TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR NON-U.S. TAX LAWS AND OF ANY CHANGE IN APPLICABLE TAX LAWS.  THE FOREGOING SUMMARY DOES NOT CONSTITUTE TAX OR LEGAL ADVICE TO HOLDERS OF CLAIMS OR INTERESTS.**

---

\* \* \* \* \*

## XIII.    RECOMMENDATION OF THE DEBTORS

In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to Holders of Allowed Claims than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code.  In addition, any alternative other than Confirmation could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims than proposed under the Plan.  Accordingly, the Debtors recommend that Holders of Claims entitled to vote to accept or reject the Plan support Confirmation and vote to accept the Plan.

Voyager Digital Holdings, Inc. on behalf of itself and each of the other Debtors

By:     _/s/ Stephen Ehrlich_

Name:    Stephen Ehrlich

Title:    Co-Founder and Chief Executive Officer Voyager Digital Ltd.

Prepared By:

Dated:  January 13, 2023          /s/ Joshua A. Sussberg
New York, New York                **KIRKLAND & ELLIS LLP**
                                  **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                  Joshua A. Sussberg, P.C.
                                  Christopher Marcus, P.C.
                                  Christine A. Okike, P.C.
                                  Allyson B. Smith (admitted *pro hac vice*)
                                  601 Lexington Avenue
                                  New York, New York 10022
                                  Telephone:  (212) 446-4800
                                  Facsimile:  (212) 446-4900

                                  *Counsel to the Debtors and Debtors in Possession*

**Exhibit A**

**Plan**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| VOYAGER DIGITAL HOLDINGS, INC. *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**THIRD AMENDED JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND**
**ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900

---

**NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN OFFER, ACCEPTANCE,
COMMITMENT, OR LEGALLY BINDING OBLIGATION OF THE DEBTORS OR ANY
OTHER PARTY IN INTEREST, AND THIS PLAN IS SUBJECT TO APPROVAL BY THE
BANKRUPTCY COURT AND OTHER CUSTOMARY CONDITIONS.  THIS PLAN IS NOT AN
OFFER WITH RESPECT TO ANY SECURITIES.**

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Voyager Digital Holdings, Inc. (7687); Voyager Digital, LTD. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

**TABLE OF CONTENTS**

Page

Introduction ..................................................................................................................1

Article I. Defined Terms, Rules of Interpretation, Computation of Time, Governing Law, and
   Other References...................................................................................................1
   A.    Defined Terms ................................................................................................1
   B.    Rules of Interpretation ................................................................................17
   C.    Computation of Time...................................................................................17
   D.    Governing Law .............................................................................................17
   E.    Reference to Monetary Figures....................................................................18
   F.    Reference to the Debtors or the Wind-Down Debtors................................18
   G.    Nonconsolidated Plan .................................................................................18

Article II. Administrative and Priority Claims ........................................................18
   A.    Administrative Claims ..................................................................................18
   B.    Professional Fee Claims ..............................................................................19
   C.    Priority Tax Claims......................................................................................20

Article III. Classification, Treatment, and Voting of Claims and Interests ...........20
   A.    Classification of Claims and Interests ........................................................20
   B.    Summary of Classification...........................................................................21
   C.    Treatment of Classes of Claims and Interests.............................................22
   D.    Special Provision Governing Unimpaired Claims.......................................28
   E.    Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes ..28
   F.    Subordinated Claims ....................................................................................28
   G.    Intercompany Interests.................................................................................28
   H.    Controversy Concerning Impairment ..........................................................29
   I.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy
         Code..............................................................................................................29

Article IV. Provisions for Implementation of the Plan............................................29
   A.    General Settlement of Claims and Interests.................................................29
   B.    Restructuring Transactions ..........................................................................29
   C.    The Sale Transaction ...................................................................................30
   D.    The Liquidation Transaction........................................................................31
   E.    Management and Employee Transition Plans ..............................................31
   F.    Non-Released D&O Claims..........................................................................32
   G.    The D&O Settlement ...................................................................................32
   H.    Wind-Down Trust .......................................................................................34
   I.    Sources of Consideration for Plan Distributions ........................................39
   J.    Corporate Existence and Dissolution...........................................................39
   K.    Corporate Action..........................................................................................40
   L.    Vesting of Assets in the Wind-Down Entity ...............................................41
   M.    Cancellation of Notes, Instruments, Certificates, and Other Documents ............41
   N.    Effectuating Documents; Further Transactions ...........................................41
   O.    Section 1146(a) Exemption .........................................................................41

P.      Preservation of Rights of Action ................................................42
Q.      Election to Contribute Third-Party Claims .................................43
R.      Contribution of Contributed Third-Party Claims ........................43
S.      Closing the Chapter 11 Cases ...................................................43

**Article V. Treatment of Executory Contracts and Unexpired Leases ....................................44**

A.      Assumption and Rejection of Executory Contracts and Unexpired Leases .........44
B.      Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases ............................................................44
C.      Claims Based on Rejection of Executory Contracts or Unexpired Leases ...........44
D.      Cure of Defaults for Executory Contracts and Unexpired Leases Assumed ........45
E.      Insurance Policies and Surety Bonds ..........................................46
F.      Reservation of Rights ...............................................................47
G.      Nonoccurrence of Effective Date ...............................................47
H.      Contracts and Leases Entered into After the Petition Date .................47

**Article VI. Provisions Governing Distributions ...........................................................47**

A.      Timing and Calculation of Amounts to Be Distributed ....................47
B.      Rights and Powers of Distribution Agent ....................................48
C.      Delivery of Distributions and Undeliverable or Unclaimed Distributions ...........48
D.      Compliance Matters ...............................................................50
E.      Foreign Currency Exchange Rate ...............................................50
F.      Claims Paid or Payable by Third Parties ....................................51
G.      Setoffs and Recoupment .........................................................51
H.      Allocation between Principal and Accrued Interest ........................52

**Article VII. Procedures for Resolving Disputed, Contingent, and Unliquidated Claims and Interests ...............................................................52**

A.      Disputed Claims Process .........................................................52
B.      Objections to Claims or Interests ...............................................53
C.      Estimation of Claims ...............................................................53
D.      No Distributions Pending Allowance ..........................................54
E.      Distributions After Allowance ...................................................54
F.      No Interest ............................................................................54
G.      Adjustment to Claims and Interests without Objection ...................54
H.      Time to File Objections to Claims ..............................................55
I.      Disallowance of Claims or Interests ...........................................55
J.      Amendments to Proofs of Claim ................................................55

**Article VIII. Effect of Confirmation of the Plan .........................................................55**

A.      Releases by the Debtors ...........................................................55
B.      Releases by Holders of Claims and Interests ...............................56
C.      Exculpation ............................................................................57
D.      Injunction .............................................................................58
E.      Release of Liens .....................................................................58
F.      OSC and SEC .........................................................................58
G.      Protection against Discriminatory Treatment ..............................58
H.      Document Retention ...............................................................59
I.      Reimbursement or Contribution ................................................59

J.      Term of Injunctions or Stays ..................................................................59

**Article IX. Conditions Precedent to the Effective Date** ..............................................**59**

A.      Conditions Precedent to the Effective Date ..........................................59
B.      Waiver of Conditions Precedent ............................................................60
C.      Effect of Non-Occurrence of Conditions to Consummation ...............60

**Article X. Modification, Revocation, or Withdrawal of the Plan** .............................**61**

A.      Modification of Plan ...............................................................................61
B.      Effect of Confirmation on Modifications ...............................................61
C.      Revocation or Withdrawal of Plan.........................................................61

**Article XI. Retention of Jurisdiction** ......................................................................**61**

**Article XII. Miscellaneous Provisions** ...................................................................**63**

A.      Immediate Binding Effect.......................................................................63
B.      Additional Documents ............................................................................64
C.      Payment of Statutory Fees .....................................................................64
D.      Dissolution of Statutory Committees .....................................................64
E.      Reservation of Rights..............................................................................64
F.      Successors and Assigns ..........................................................................64
G.      Service of Documents .............................................................................64
H.      Entire Agreement; Controlling Document..............................................65
I.      Plan Supplement .....................................................................................65
J.      Non-Severability.....................................................................................66
K.      Votes Solicited in Good Faith.................................................................66
L.      Waiver or Estoppel .................................................................................66

## INTRODUCTION

Voyager Digital Holdings, Inc. and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (each a "Debtor" and, collectively, the "Debtors") propose this third amended joint plan (the "Plan") for the resolution of the outstanding Claims against and Interests in the Debtors pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used in the Plan and not otherwise defined shall have the meanings set forth in Article I.A of the Plan. Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The classifications of Claims and Interests set forth in Article III of the Plan shall be deemed to apply separately with respect to each Plan proposed by each Debtor, as applicable. The Plan does not contemplate substantive consolidation of any of the Debtors. Reference is made to the Disclosure Statement for a discussion of the Debtors' history, business, properties and operations, projections, risk factors, a summary and analysis of this Plan, and certain related matters.

ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE I.

## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES

### A. Defined Terms

Capitalized terms used in this Plan have the meanings ascribed to them below.

1. "*3AC*" means Three Arrows Capital, Ltd and any of its Affiliates or subsidiaries.

2. "*3AC Claims*" means the claims or causes of action asserted or assertable by the Debtors against 3AC, whether in the 3AC Liquidation Proceeding or otherwise.

3. "*3AC Liquidation Proceeding*" means that certain liquidation proceeding captioned *In the Matter of Three Arrows Capital Ltd. and in the Matter of Sections 159(1) and 162(1)(a) and (b) of the Insolvency Act 2003*, Claim No. BVIHC(COM)2022/0119 before the Eastern Caribbean Supreme Court in the High Court of Justice in the British Virgin Islands and the chapter 15 foreign recognition proceeding captioned *In re Three Arrows Capital, Ltd.*, No. 22-10920 (Bankr. S.D.N.Y. Jul. 1, 2022).

4. "*3AC Loan*" means that loan of 15,250 Bitcoins and 350 million USDC to 3AC pursuant to that certain master loan agreement dated March 4, 2022 by and between 3AC, as borrower, and OpCo and HTC Trading, Inc., as lenders.

5. "*3AC Recovery*" means the recovery, if any, of the Debtors from 3AC on account of the 3AC Claims.

6. "*Account*" means any account at OpCo held by an Account Holder relating to Cryptocurrency, which Account is identified in the Debtors' books and records as holding Cryptocurrency as of the Petition Date.

7.  "*Account Holder*" means any Person or Entity who holds an Account with OpCo as of the Petition Date.

8.  "*Account Holder Claim*" means any Claim against the Debtors that is held by an Account Holder on account of such Holder's Account.

9.  "*Acquired Assets*" has the meaning ascribed to it in the Asset Purchase Agreement.

10. "*Acquired Coins*" has the meaning ascribed to it in the Asset Purchase Agreement.

11. "*Acquired Coins Value*" has the meaning ascribed to it in the Asset Purchase Agreement.

12. "*Additional Bankruptcy Distribution*" has the meaning ascribed to it in the Asset Purchase Agreement.

13. "*Administrative Claim*" means a Claim against a Debtor for the costs and expenses of administration of the Chapter 11 Cases arising on or after the Petition Date and prior to the Effective Date pursuant to section 503(b) of the Bankruptcy Code and entitled to priority pursuant to sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' business and (b) Allowed Professional Fee Claims.

14. "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims (other than requests for payment of Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code), which: (a) with respect to Administrative Claims other than Professional Fee Claims, shall be thirty days after the Effective Date; and (b) with respect to Professional Fee Claims, shall be forty-five days after the Effective Date.

15. "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code. With respect to any Person that is not a Debtor, the term "Affiliate" shall apply to such Person as if the Person were a Debtor.

16. "*Alameda*" means Alameda Ventures Ltd., along with its Affiliates and subsidiaries.

17. "*Alameda Claims*" means the claims or causes of action asserted or assertable by the Debtors against Alameda, whether in the FTX Bankruptcy Proceeding or otherwise.

18. "*Alameda Loan Agreement*" means that certain unsecured loan agreement, dated as of June 21, 2022, as amended, restated, amended and restated, modified, or supplemented from time to time, by and among Voyager Digital Holdings, Inc., as the borrower, Voyager, as the guarantor, and Alameda, as the lender thereto.

19. "*Alameda Loan Facility*" means that certain unsecured loan facility provided for under the Alameda Loan Agreement.

20. "*Alameda Loan Facility Claims*" means any Claim against any Debtor derived from, based upon, or arising under the Alameda Loan Agreement and any fees, costs, and expenses that are reimbursable by any Debtor pursuant to the Alameda Loan Agreement.

21. "*Alameda Recovery*" means the recovery, if any, of the Debtors from Alameda on account of the Alameda Claims.

22.     "*Allowed*" means, with respect to any Claim or Interest, except as otherwise provided herein:  (a) a Claim or Interest that is evidenced by a Proof of Claim timely Filed by the Bar Date or a request for payment of Administrative Claim timely Filed by the Administrative Claims Bar Date (or for which Claim or Interest under the Plan, the Bankruptcy Code, or a Final Order of the Bankruptcy Court a Proof of Claim or a request for payment of Administrative Claim is not or shall not be required to be Filed); (b) a Claim or Interest that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely Filed; (c) a Claim or Interest Allowed pursuant to the Plan, any stipulation approved by the Bankruptcy Court, any contract, instrument, indenture, or other agreement entered into or assumed in connection with the Plan, or a Final Order of the Bankruptcy Court, or (d) a Claim or Interest as to which the liability of the Debtors and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court; *provided* that, with respect to a Claim or Interest described in clauses (a) and (b) above, such Claim or Interest shall be considered Allowed only if and to the extent that with respect to such Claim or Interest no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or if such an objection is so interposed, such Claim or Interest shall have been Allowed by a Final Order.  Any Claim or Interest that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes. A Proof of Claim Filed after and subject to the Bar Date or a request for payment of an Administrative Claim Filed after and subject to the Administrative Claims Bar Date, as applicable, shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim.  "Allow" and "Allowing" shall have correlative meanings.

23.     "*Asset Purchase Agreement*" means that certain asset purchase agreement dated as of December 18, 2022 by and between BAM Trading Services Inc. (d/b/a Binance.US) as Purchaser and Voyager Digital, LLC as Seller.

24.     "*Assumed Liabilities*" has the meaning ascribed to it in the Asset Purchase Agreement.

25.     "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or hereafter amended.

26.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York, or any other court having jurisdiction over the Chapter 11 Cases, including to the extent of the withdrawal of reference under section 157 of the Judicial Code, the United States District Court for the Southern District of New York.

27.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated by the United States Supreme Court under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

28.     "*Bar Date*" means the applicable deadline by which Proofs of Claim must be Filed, as established by:  (a) the Bar Date Order; (b) a Final Order of the Bankruptcy Court; or (c) the Plan.

29.     "*Bar Date Order*" means the *Order (I) Setting Deadlines for Submitting Proofs of Claims, (II) Approving Procedures for Submitting Proofs of Claim, and (III) Approving Notice Thereof* [Docket No. 218].

30.     "*Binance.US Platform*" has the meaning ascribed to it in the Asset Purchase Agreement.

31.     "*Binance US*" means BAM Trading Services Inc. (d/b/a Binance.US).

32.     "*Binance US Account*" means a customer account opened with the Purchaser by an Account Holder or a Holder of an Allowed OpCo General Unsecured Claim.

33.     "*Business Day*" means any day, other than a Saturday, Sunday, or a "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

34.     "*Cash*" or "*$*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

35.     "*Causes of Action*" mean any action, Claim, cross-claim, third-party claim, damage, judgment, cause of action, controversy, demand, right, suit, obligation, liability, debt, account, defense, offset, power, privilege, license, Lien, indemnity, interest, guaranty, or franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, matured or unmatured, suspected or unsuspected, in contract or in tort, at law or in equity, or pursuant to any other theory of law or otherwise.  For the avoidance of doubt, "Causes of Action" includes:  (a) any right of setoff, counterclaim, or recoupment and any claim arising from any contract or for breach of duties imposed by law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of local, state, federal, or foreign law, or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) any right to object to or otherwise contest Claims or Interests; (d) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; and (e) any claim or defense, including fraud, mistake, duress, usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

36.     "*CCO*" means Evan Psaropoulos.

37.     "*CEO*" means Stephen Ehrlich.

38.     "*Certificate*" means any instrument evidencing a Claim or an Interest.

39.     "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor in the Bankruptcy Court under chapter 11 of the Bankruptcy Code and (b) when used with reference to all Debtors, the procedurally consolidated cases filed for the Debtors in the Bankruptcy Court under chapter 11 of the Bankruptcy Code.

40.     "*Claim*" has the meaning set forth in section 101(5) of the Bankruptcy Code.

41.     "*Claims Objection Bar Date*" means the deadline for objecting to a Claim, which shall be on the date that is the later of (a) (i) with respect to Administrative Claims (other than Professional Fee Claims and Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code), sixty days after the Administrative Claims Bar Date or (ii) with respect to all other Claims (other than Professional Fee Claims), 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by the Debtors or the Wind-Down Trust, as applicable, as approved by an order of the Bankruptcy Court for objecting to such Claims.

42.     "*Claims Register*" means the official register of Claims against and Interests in the Debtors maintained by the Clerk of the Bankruptcy Court or the Claims, Noticing, and Solicitation Agent.

43. "*Claims, Noticing, and Solicitation Agent*" means Bankruptcy Management Solutions, Inc. d/b/a Stretto, in its capacity as the claims, noticing, and solicitation agent in the Chapter 11 Cases for the Debtors and any successors appointed by an order of the Bankruptcy Court.

44. "*Class*" means a class of Claims against or Interests in the Debtors as set forth in Article III of the Plan in accordance with section 1122(a) of the Bankruptcy Code.

45. "*Committee*" means the Official Committee of Unsecured Creditors appointed in these Chapter 11 Cases.

46. "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

47. "*Confirmation Date*" means the date on which Confirmation occurs.

48. "*Confirmation Hearing*" means the hearing before the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code at which the Debtors will seek Confirmation of the Plan.

49. "*Confirmation Order*" has the meaning ascribed to it in the Asset Purchase Agreement.

50. "*Consummation*" means the occurrence of the Effective Date.

51. "*Contributed Third-Party Claims*" means all direct Causes of Action that any Contributing Claimant has against any Person (other than a Debtor) that had a direct relationship with the Debtors, their predecessors, or respective affiliates and that harmed such Contributing Claimant in the claimant's capacity as a creditor of Voyager, including (a) all Causes of Action based on, arising out of, or related to the marketing, sale, and issuance of Cryptocurrency that at any point was held or offered on Voyager's platform; (b) all Causes of Action based on, arising out of, or related to the alleged misrepresentation of any of the Debtors' financial information, business operations, or related internal controls; and (c) all Causes of Action based on, arising out of, or related to any alleged failure to disclose, or actual or attempted cover up or obfuscation of, any of the Debtors' conduct prior to the Petition Date; *provided*, *however*, that Contributed Third-Party Claims do not include (i) any derivative claims of the Debtors; (ii) any direct claims against the Released Parties; (iii) any direct Causes of Action that any Contributing Claimant has against Mark Cuban, Dallas Basketball Limited d/b/a Dallas Mavericks, the National Basketball Association, and any of their Related Parties; or (iv) any direct Causes of Action that any Contributing Claimant, in its capacity as an equity holder of Voyager Digital Ltd., has that are asserted in the currently filed complaint, dated as of July 6, 2022, in the Ontario Superior Court of Justice by Francine De Sousa, against Voyager Digital Ltd., Stephen Ehrlich, Philip Eytan, Evan Psaropoulos, Lewis Bateman, Krisztian Toth, Jennifer Ackart, Glenn Stevens, and Brian Brooks.

52. "*Contributing Claimants*" means any Holders of Claims or Interests that elect on their ballots or opt-in forms to contribute their Contributed Third-Party Claims to the Wind-Down Entity.

53. "*Cryptocurrency*" means a digital currency or crypto asset in which transactions are verified and records maintained by a decentralized system using cryptography, rather than by a centralized authority, including stablecoins, digital coins and tokens, such as security tokens, utility tokens and governance tokens.

54. "*Cure*" or "*Cure Claim*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's default under an Executory Contract or an Unexpired Lease assumed

by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

55.    "*Customer Onboarding Protocol*" means the protocol describing the process of onboarding Account Holders and Holders of OpCo General Unsecured Claims onto the Binance.US Platform, the form of which shall be included in the Plan Supplement and filed no later than by February 8, 2023, and which shall be in a form acceptable to the Purchaser.

56.    "*D&O Carriers*" means the insurance carriers of the D&O Liability Insurance Policies.

57.    "*D&O Liability Insurance Policies*" means all unexpired insurance policies maintained by the Debtors, the Wind-Down Debtors, or the Estates as of the Effective Date that have been issued (or provide coverage) regarding directors', managers', officers', members', and trustees' liability (including any "tail policy"), including but not limited to the Management Liability Policy, the Excess Policies, and the Side-A Policy, and all agreements, documents, or instruments relating thereto.

58.    "*D&O Settlement*" means the settlement between the Debtors and CEO and CCO as set forth in Article IV.G of the Plan.

59.    "*Debtors*" means, collectively, each of the following:  Voyager Digital Holdings, Inc.; Voyager Digital Ltd.; and Voyager Digital, LLC.

60.    "*Definitive Documents*" means:  (a) the Plan (and any and all exhibits, annexes, and schedules thereto); (b) the Confirmation Order; (c) the Disclosure Statement and the other Solicitation Materials; (d) the Disclosure Statement Order; (e) all pleadings filed by the Debtors in connection with the Chapter 11 Cases (or related orders); (f) the Plan Supplement; (g) the Management Transition Plan; (h) any new material employment, consulting, or similar agreements entered into between the Wind-Down Trust and any of the Debtors' employees, if any; (i) the Asset Purchase Agreement; (j) the Customer Onboarding Protocol; and (k) any and all other deeds, agreements, filings, notifications, pleadings, orders, certificates, letters, instruments or other documents reasonably desired or necessary to consummate and document the transactions contemplated by the Restructuring Transactions (including any exhibits, amendments, modifications, or supplements made from time to time thereto).

61.    "*Disclosure Statement*" means the *Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, as may be amended, supplemented, or otherwise modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan.

62.    "*Disclosure Statement Order*" means the order entered by the Bankruptcy Court approving the Disclosure Statement.

63.    "*Disputed*" means a Claim or an Interest or any portion thereof:  (a) that is not Allowed; (b) that is not disallowed under the Plan, the Bankruptcy Code, or a Final Order; and (c) with respect to which a party in interest has Filed a Proof of Claim, a Proof of Interest, or otherwise made a written request to a Debtor for payment.

64.    "*Disputed Claims Reserve*" means an appropriate reserve in an amount to be determined by the Wind-Down Trust for distributions on account of Disputed Claims that are subsequently Allowed after the Effective Date, in accordance with Article VII.D hereof.

65.     "*Distributable Cryptocurrency*" means all Cryptocurrency held on the Voyager platform or that is otherwise property of any Debtor on the Effective Date after payment in full of, or reserve for, all Allowed Administrative Claims, Priority Tax Claims, Secured Tax Claims, and Other Priority Claims.

66.     "*Distributable HoldCo Cash*" means HoldCo's Cash, less (x) any Cash necessary to satisfy Allowed Administrative Claims, Priority Tax Claims, Secured Tax Claims, and Other Priority Claims at HoldCo in full; and (y) to fund HoldCo's Pro Rata share of the Wind-Down Reserve.

67.     "*Distributable OpCo Cash*" means OpCo's Cash, including the Purchase Price Cash, less (x) any Cash necessary to satisfy Allowed Administrative Claims, Priority Tax Claims, Secured Tax Claims, and Other Priority Claims at OpCo in full; and (y) to fund OpCo's Pro Rata share of the Wind-Down Reserve.

68.     "*Distributable TopCo Cash*" means TopCo's Cash, less (x) any Cash necessary to satisfy Allowed Administrative Claims, Priority Tax Claims, Secured Tax Claims, and Other Priority Claims at TopCo in full; and (y) to fund TopCo's Pro Rata share of the Wind-Down Reserve.

69.     "*Distribution Agent*" means, as applicable, the Purchaser, Wind-Down Debtors, Wind-Down Trust or any Entity or Entities designated by the Purchaser, Wind-Down Debtors, or the Wind-Down Trust (as applicable) to make or to facilitate distributions that are to be made pursuant to the Plan, Definitive Documents, and Asset Purchase Agreement.

70.     "*Distribution Date*" means, except as otherwise set forth herein, the date or dates determined by the Wind-Down Trust, on or after the Effective Date, upon which the Distribution Agent shall make distributions to Holders of Allowed Claims entitled to receive distributions under the Plan.

71.     "*Distribution Record Date*" means the record date for purposes of determining which Holders of Allowed Claims and Interests against the Debtors are eligible to receive distributions under the Plan, which date shall be the Effective Date, or such other date as is determined by the Debtors or designated by an order of the Bankruptcy Court.

72.     "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which (a) all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of the Plan have been satisfied or waived in accordance with Article IX.B of the Plan, (b) no stay of the Confirmation Order is in effect, and (c) the Debtors declare the Plan effective.

73.     "*Employee Transition Plan*" has the meaning set forth in Article IV.E of the Plan, and which shall be in form and substance reasonably acceptable to the Committee.

74.     "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

75.     "*Estate*" means, as to each Debtor, the estate created on the Petition Date for the Debtor in its Chapter 11 Case pursuant to sections 301 and 541 of the Bankruptcy Code and all property (as defined in section 541 of the Bankruptcy Code) acquired by the Debtor after the Petition Date through and including the Effective Date.

76.     "*Excess Policies*" means, collectively, the Excess Insurance Policy, No. EFI1203041-01, issued by Euclid Financial on behalf of Certain Underwriters of Lloyd's, London, the Excess Insurance Policy, No. RILEDOA3392022, issued by Relm Insurance Ltd., both for the February 22, 2022 to February 22, 2023 period, and the Excess Policy, No. ELU184180-23, issued by XL Specialty Insurance Company, for the February 22, 2022 to July 1, 2023 period.

77.     "*Exculpated Parties*" means, collectively, and in each case in its capacity as such:  (a) each of the Debtors; (b) the Committee, and each of the members thereof, solely in their capacity as such; (c) each of the Released Professionals; (d) each of the Released Voyager Employees; and (e) the Distribution Agent.

78.     "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

79.     "*Existing Equity Interests*" means any Interest in TopCo existing immediately prior to the occurrence of the Effective Date.

80.     "*Extended Outside Date*" has the meaning set forth in the Asset Purchase Agreement.

81.     "*Federal Judgment Rate*" means the federal judgment interest rate in effect as of the Petition Date calculated as set forth in section 1961 of the Judicial Code.

82.     "*File*," "*Filed*," or "*Filing*" means file, filed, or filing, respectively, in the Chapter 11 Cases with the Bankruptcy Court or its authorized designee, or, with respect to the filing of a Proof of Claim or Proof of Interest, file, filed, or filing, respectively, with the Claims, Noticing, and Solicitation Agent.

83.     "*Final Decree*" means the decree contemplated under Bankruptcy Rule 3022.

84.     "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, petition for certiorari, or move for a new trial, reargument, reconsideration, or rehearing has expired and no appeal, petition for certiorari, or motion for a new trial, reargument, reconsideration, or rehearing has been timely taken or filed, or as to which any appeal that has been or may be taken or any petition for certiorari or any motion for a new trial, reargument, reconsideration, or rehearing that has been or may be made or filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the motion for a new trial, reargument, reconsideration, or rehearing shall have been denied, resulted in no modification of such order (if any such motion has been or may be granted), or have otherwise been dismissed with prejudice; *provided* that the possibility that a motion under rule 60 of the Federal Rules of Civil Procedure or any comparable Bankruptcy Rule may be filed relating to such order or judgment shall not cause such order or judgment to not be a Final Order.

85.     "*FTX*" means FTX Trading, Ltd. and any of its Affiliates or subsidiaries, including West Realm Shires Inc (d/b/a "FTX.US").

86.     "*FTX Bankruptcy Proceeding*" means that certain chapter 11 proceeding captioned *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Nov. 11, 2022).

87.     "*FTX Claims*" means the claims or causes of action asserted or assertable by the Debtors against FTX, whether in the FTX Bankruptcy Proceeding or otherwise.

88.     "*FTX Recovery*" means the recovery, if any, of the Debtors from FTX on account of the FTX Claims.

89.     "*General Unsecured Claim*" means, collectively, any HoldCo General Unsecured Claim, OpCo General Unsecured Claim, or TopCo General Unsecured Claim.

90.     "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

91.     "*Government Bar Date*" means the applicable deadline by which Proofs of Claim by a Governmental Unit must be Filed, as established by:  (a) the Bar Date Order; (b) a Final Order of the Bankruptcy Court; or (c) the Plan.

92.     "*HoldCo*" means Voyager Digital Holdings, Inc.

93.     "*HoldCo General Unsecured Claim*" means any Claim against HoldCo that is not Secured and is not:  (a) paid in full prior to the Effective Date pursuant to an order of the Bankruptcy Court; (b) an Administrative Claim; (c) a Secured Tax Claim; (d) a Priority Tax Claim; (e) an Other Priority Claim; (f) a Professional Fee Claim; (g) an Alameda Loan Facility Claim; or (h) an Intercompany Claim.  For the avoidance of doubt, all (i) Claims resulting from the rejection of Executory Contracts and Unexpired Leases, and (ii) Claims that are not Secured resulting from litigation, against HoldCo are HoldCo General Unsecured Claims.

94.     "*Holder*" means an Entity holding a Claim against or an Interest in any Debtor.

95.     "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

96.     "*Insurance Policies*" means any and all insurance policies entered into by the Debtors, including the D&O Insurance Policies.

97.     "*Intercompany Claim*" means any Claim held by a Debtor or a Debtor's Affiliate against a Debtor.

98.     "*Intercompany Interest*" means, other than an Interest in Voyager, an Interest in one Debtor held by another Debtor or a Debtor's Affiliate.

99.     "*Interest*" means any equity security (as such term is defined in section 101(16) of the Bankruptcy Code) including all issued, unissued, authorized, or outstanding shares of capital stock and any other common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profit interests of an Entity, including all options, warrants, rights, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable, or exchangeable securities, or other agreements, arrangements, or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in an Entity whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security, and including any Claim against the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to the foregoing.

100.     "*Interim Compensation Order*" means the *Order (I) Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals and (II) Granting Related Relief* [Docket No. 236].

101.     "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001 and the rules and regulations promulgated thereunder, as applicable to the Chapter 11 Cases.

102.     "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

103.     "*Liquidation Procedures*" means, in the event the Sale Transaction is not consummated by the Outside Date, such procedures filed by the Wind-Down Entity identifying the mechanics and procedures to effectuate the Liquidation Transaction.

104.     "*Liquidation Transaction*" means, in the event the Sale Transaction is not consummated by the Outside Date, the distribution of the Debtors' Cryptocurrency, Cash and other assets pursuant to Article IV.D of this Plan.

105.     "*Management Liability Policy*" means the Executive and Corporate Securities Liability Insurance Policy, No. ELU181214-22, issued by XL Specialty Insurance Company for the February 22, 2022 to February 22, 2023 period.

106.     "*Management Transition Plan*" has the meaning set forth in Article IV.E of the Plan, and which shall be in form and substance reasonably acceptable to the Committee.

107.     "*Net Owed Coins*" has the meaning ascribed to it in the Asset Purchase Agreement.

108.     "*Non-Released D&O Claims*" has the meaning set forth in Article IV.F of the Plan.

109.     "*Non-Released D&O Claim Budget*" means the amount allocated to pursue the Non-Released D&O Claims and the Non-Released Insurance Claims, which amount shall be agreed upon between the Debtors and the Committee prior to the Confirmation Hearing.

110.     "*Non-Released Insurance Claims*" has the meaning set forth in Article IV.F of the Plan.

111.     "*OpCo*" means Voyager Digital, LLC.

112.     "*OpCo General Unsecured Claim*" means any Claim against OpCo that is not Secured and is not: (a) paid in full prior to the Effective Date pursuant to an order of the Bankruptcy Court; (b) an Administrative Claim; (c) a Secured Tax Claim; (d) a Priority Tax Claim; (e) an Other Priority Claim; (f) a Professional Fee Claim; (g) an Account Holder Claim; or (h) an Intercompany Claim.  For the avoidance of doubt, all (i) Claims resulting from the rejection of Executory Contracts and Unexpired Leases, and (ii) Claims that are not Secured resulting from litigation against OpCo are OpCo General Unsecured Claims.

113.     "*OSC*" means the Ontario Securities Commission.

114.     "*Other Priority Claim*" means any Claim against a Debtor, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

115.     "*Outside Date*" has the meaning set forth in the Asset Purchase Agreement.  All references herein to the "Outside Date" shall be deemed to include the "Extended Outside Date" to the extent the Outside Date is extended in accordance with Section 8.1(c) of the Asset Purchase Agreement.

116.     "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

117.     "*Petition Date*" means July 5, 2022.

118.     "*Plan*" means this joint chapter 11 plan and all exhibits, supplements, appendices, and schedules hereto, as may be altered, amended, supplemented, or otherwise modified from time to time in

accordance with Article X.A hereof, including the Plan Supplement (as altered, amended, supplemented, or otherwise modified from time to time), which is incorporated herein by reference and made part of the Plan as if set forth herein.

119. "*Plan Supplement*" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (in each case, as may thereafter be amended, supplemented, or otherwise modified from time to time in accordance with the terms of the Plan, the Bankruptcy Code, the Bankruptcy Rules, and applicable law), to be Filed by the Debtors no later than seven days before the Voting Deadline or such later date as may be approved by the Bankruptcy Court, and additional documents Filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement. The Plan Supplement may include the following, as applicable: (a) the Schedule of Assumed Executory Contracts and Unexpired Leases; (b) the Schedule of Retained Causes of Action; (c) the Schedule of Assumed and Assigned Executory Contracts and Unexpired Leases; (d) the Customer Onboarding Protocol; (e) the Restructuring Transactions Memorandum; (f) the Wind-Down Trust Agreement; and (g) any additional documents necessary to effectuate or that is contemplated by the Plan, including any compensation program for any of the Debtors' employees to be established as contemplated in the Plan and the Definitive Documents to facilitate the transfer of Acquired Assets pursuant to the Asset Purchase Agreement and the wind-down of the Debtors' Estates; *provided* that the Schedule of Retained Causes of Action shall be filed no later than 14 days before the Voting Deadline. The Plan Supplement (and the contents thereof) shall be (x) subject to Purchaser's consent rights solely to the extent set forth under the Asset Purchase Agreement (and shall otherwise be consistent with the Asset Purchase Agreement) and (y) reasonably acceptable to the Committee.

120. "*Priority Tax Claim*" means any Claim of a Governmental Unit against a Debtor of the kind specified in section 507(a)(8) of the Bankruptcy Code.

121. "*Pro Rata*" means the proportion that (i) an Allowed Claim or an Allowed Interest in a particular Class bears to (ii) the aggregate amount of Allowed Claims or Allowed Interests in that Class and, solely with respect to Claims in Classes 3 and 4(a), the proportion that an Allowed Claim in either such Class bears to the aggregate amount of Allowed Claims in Classes 3 and 4(a) in the aggregate, unless otherwise indicated. For purposes of calculating Pro Rata distributions if the Sale Transaction is consummated by the Outside Date, the Pro Rata shares of all Holders of Allowed Claims or Allowed Interests shall be calculated taking into account the Acquired Coins Value of the Net Owed Coins distributed to each of the Account Holders.

122. "*Professional*" means an Entity: (a) employed in the Chapter 11 Cases pursuant to an order of the Bankruptcy Court in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered and expenses incurred pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code or (b) for which compensation and reimbursement has been Allowed by Final Order of the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

123. "*Professional Fee Claim*" means any Administrative Claim by a Professional for compensation for services rendered or reimbursement of expenses incurred by such Professional through and including the Effective Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court. To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

124. "*Professional Fee Escrow Account*" means an escrow account funded by the Debtors with Cash no later than the Effective Date in an amount equal to the Professional Fee Escrow Amount.

125. "*Professional Fee Escrow Amount*" means the aggregate amount of quarterly U.S. Trustee fees, Professional Fee Claims, and other unpaid fees and expenses the Professionals have incurred or will incur in rendering services in connection with the Chapter 11 Cases prior to and as of the Confirmation Date projected to be outstanding as of the anticipated Effective Date, which shall be estimated pursuant to the method set forth in Article II.B of the Plan.

126. "*Proof of Claim*" means a written proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

127. "*Proof of Interest*" means a written proof of Interest Filed against any of the Debtors in the Chapter 11 Cases.

128. "*Purchase Price Cash*" means the Cash paid by the Purchaser to OpCo pursuant to the Asset Purchase Agreement.

129. "*Purchaser*" means Binance US.

130. "*Reinstated*" or "*Reinstatement*" means, with respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

131. "*Related Party*" means, with respect to any Entity, in each case in its capacity as such with respect to such Entity, such Entity's current and former directors, managers, officers, investment committee members, special committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and advisors.

132. "*Released Parties*" means, collectively, in each case in its capacity as such: (a) the Debtors; (b) the Wind-Down Debtors; (c) the Committee, and each of the members thereof; (d) each of the Released Professionals; (e) Purchaser and each of its Related Parties; and (f) each of the Released Voyager Employees (subject to the limitations contained in Article IV.F and Article IV.G of the Plan); *provided* that if the Asset Purchase Agreement is terminated, Purchaser and each of its Related Parties shall not be "Released Parties" under the Plan.

133. "*Released Professionals*" means the following professionals retained by the Debtors, the Committee, or the Purchaser (as applicable): (i) Kirkland & Ellis LLP; (ii) Moelis & Company LLC; (iii) Berkeley Research Group, LLC; (iv) Bankruptcy Management Solutions, Inc. d/b/a Stretto; (v) Quinn Emanuel Urquhart & Sullivan LLP; (vi) Fasken Martineau DuMoulin LLP; (vii) Campbells Legal (BVI); (viii) McDermott Will & Emery LLP; (ix) FTI Consulting, Inc.; (x) Epiq Corporate Restructuring, LLC; (xi) Cassels, Brock & Blackwell LLP; (xii) Paul Hastings LLP; (xiii) Harney Westwood & Riegels LP (BVI); (xiv) Day Pitney LLP (solely in their capacity as counsel to the Debtors); (xv) Jenner & Block LLP; (xvi) Seyfarth Shaw LLP; (xvii) Alvarez & Marsal Canada Inc.; (xviii) Blake, Cassels & Graydon LLP; (xix) Jaffe Raitt Heuer & Weiss; (xx) Latham & Watkins LLP; (xxi) Lowenstein Sandler LLP; (xxii) Kramer Levin LLP; and (xxiii) Acura Law Firm; *provided* that if the Asset Purchase Agreement is terminated, Latham & Watkins LLP shall not be a "Released Professional" under the Plan.

134. "*Released Voyager Employees*" means all directors, officers, and Persons employed by each of the Debtors and their Affiliates serving in such capacity on or after the Petition Date but before the Effective Date (subject to the limitations contained in Article IV.F and Article IV.G of the Plan).

135.    "*Releasing Parties*" means, collectively, in each case in its capacity as such: (a) the Debtors; (b) the Wind-Down Debtors; (c) the Committee, and each of the members thereof; (d) each of the Released Professionals; (e) each of the Released Voyager Employees; (f) Purchaser and each of its Related Parties to the extent Purchaser is able to bind such Related Parties; (g) all Holders of Claims that vote to accept the Plan and affirmatively opt into the releases provided by the Plan; (h) all Holders of Claims that vote to reject the Plan and affirmatively opt into the releases provided by the Plan; and (i) all Holders of Claims or Interests that abstain from voting (or are otherwise not entitled to vote) on the Plan and affirmatively opt into the releases provided by the Plan; *provided* that if the Asset Purchase Agreement is terminated, Purchaser and each of its Related Parties shall not be "Releasing Parties" under the Plan.

136.    " *Restructuring Transactions* " means those mergers, amalgamations, consolidations, reorganizations, arrangements, continuances, restructurings, transfers, conversions, dispositions, liquidations, dissolutions, or other corporate transactions that the Debtors and the Committee jointly determine to be necessary to implement the transactions described in this Plan, as described in more detail in Article IV.B herein and the Restructuring Transactions Memorandum.

137.    "*Restructuring Transactions Memorandum*" means that certain memorandum as may be amended, supplemented, or otherwise modified from time to time, describing the steps to be carried out to effectuate the Restructuring Transactions, the form of which shall be included in the Plan Supplement, and which shall be in a form reasonably acceptable to the Committee.

138.    "*Robertson Class Action*" means that certain putative class action litigation filed in the United States District Court for the Southern District of Florida, captioned *Robertson, et al. v. Cuban, et al.*, No. 1:22-cv-22538-RKA (S.D. Fla. Aug. 10, 2022).

139.    "*Sale Transaction*" means the sale of certain of the Debtors' assets and all other transactions pursuant to the Asset Purchase Agreement.

140.    "*Schedule of Assumed and Assigned Executory Contracts and Unexpired Leases*" means a schedule that may be Filed as part of the Plan Supplement, which shall be in form and substance acceptable to the Purchaser and in all respects consistent with the terms of the Asset Purchase Agreement, of certain Executory Contracts and Unexpired Leases to be assumed by the Debtors and assigned to the Purchaser pursuant to the Plan and Asset Purchase Agreement, as the same may be amended, modified, or supplemented from time to time by the Debtors or Wind-Down Trust, as applicable, in accordance with the Plan.

141.    "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means a schedule that may be Filed as part of the Plan Supplement, which shall be in form and substance reasonably acceptable to the Committee, of certain Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time by the Debtors or Wind-Down Trust, as applicable, in accordance with the Plan.

142.    "*Schedule of Retained Causes of Action*" means the schedule of certain Causes of Action of the Debtors that are not released, waived, settled, compromised, or transferred pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time by the Debtors and/or the Wind-Down Entity, which shall be included in the Plan Supplement. For the avoidance of doubt, any failure to specifically list any Causes of Action on the Schedule of Retained Causes of Action shall not be deemed a waiver or admission that any such Cause of Action does not constitute Vested Causes of Action.

143.    "*Schedules*" means, collectively, the schedules of assets and liabilities, Schedule of Assumed Executory Contracts and Unexpired Leases, Schedule of Assumed and Assigned Executory

13

Contracts and Unexpired Leases, and statements of financial affairs Filed by each of the Debtors pursuant to section 521 of the Bankruptcy Code, as such schedules and statements may have been or may be amended, modified, or supplemented from time to time.

144.    "*SEC*" means the United States Securities and Exchange Commission.

145.    "*Section 510(b) Claim*" means any Claim against a Debtor subject to subordination under section 510(b) of the Bankruptcy Code.

146.    "*Secured*" means, when referring to a Claim:  (a) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) Allowed pursuant to the Plan as a secured Claim.

147.    "*Secured Tax Claim*" means any Secured Claim against a Debtor that, absent its Secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

148.    "*Securities Act*" means the U.S. Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

149.    "*Security*" has the meaning set forth in section 2(a)(1) of the Securities Act.

150.    "*Side-A Policy*" means the Cornerstone A-Side Management Liability Policy, ELU184179-22, issued by XL Specialty Insurance Company, for the July 1, 2022 to July 1, 2023 period.

151.    "*Solicitation Materials*" means all solicitation materials with respect to the Plan.

152.    "*Special Committee*" means the special committee established at OpCo, comprised of two independent directors, to conduct the Special Committee Investigation.

153.    "*Special Committee Investigation*" means that certain investigation undertaken by the Special Committee into certain historical transactions, as more fully described in the Disclosure Statement.

154.    "*Supported Jurisdiction*" has the meaning ascribed to it in the Asset Purchase Agreement.

155.    "*TopCo*" means Voyager Digital Ltd., a Canadian corporation that is publicly traded on the Toronto Stock Exchange.

156.    "*TopCo General Unsecured Claim*" means any Claim against TopCo that is not Secured and is not: (a) paid in full prior to the Effective Date pursuant to an order of the Bankruptcy Court; (b) an Administrative Claim; (c) a Secured Tax Claim; (d) a Priority Tax Claim; (e) an Other Priority Claim; (f) a Professional Fee Claim; (g) an Alameda Loan Facility Claim; (h) an Intercompany Claim; or (i) a Section 510(b) Claim.  For the avoidance of doubt, all (i) Claims resulting from the rejection of Executory Contracts and Unexpired Leases, and (ii) Claims that are not Secured resulting from litigation, other than 510(b) Claims, against TopCo are TopCo General Unsecured Claims.

157.  "*Transferred Creditors*" means Account Holders and Holders of Allowed OpCo General Unsecured Claims who have completed all documentation and "KYC" processes reasonably required by Purchaser in the ordinary course of Purchaser's business with respect to similarly situated clients and who have opened a Binance US Account as of the date that is three (3) months following the later of the Closing Date (as defined in the Asset Purchase Agreement) or such later date as may be specified in the Customer Onboarding Protocol, and the successors and assigns of such Holders.

158.  "*Transferred Cryptocurrency Value*" means the aggregate VWAP of any Cryptocurrency that is the subject of an Additional Bankruptcy Distribution as of the date that is two Business Days prior to such Additional Bankruptcy Distribution.

159.  "*U.S. Trustee*" means the Office of the United States Trustee for Region 2.

160.  "*Unclaimed Distribution*" means any distribution under the Plan on account of an Allowed Claim or Allowed Interest to a Holder that, after the expiration of six months after the Effective Date, has not:  (a) accepted a distribution, (b) given notice to the Wind-Down Trust of an intent to accept a particular distribution, (c) responded to the Debtors' or Wind-Down Trust's requests for information necessary to facilitate a particular distribution, or (d) taken any other action necessary to facilitate such distribution.

161.  "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or section 1123 of the Bankruptcy Code.

162.  "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

163.  "*Unsupported Jurisdiction*" has the meaning ascribed to it in the Asset Purchase Agreement.

164.  "*Unsupported Jurisdiction Approval*" has the meaning ascribed to it in the Asset Purchase Agreement.

165.  "*Vested Causes of Action*" means the Causes of Action vesting in the Wind-Down Entity pursuant to Article IV.L of the Plan, including, but not limited to, those Causes of Action enumerated on the Schedule of Retained Causes of Action, which shall be included in the Plan Supplement and in all respects consistent with the terms of the Asset Purchase Agreement.

166.  "*VGX*" means Voyager Token, that certain Cryptocurrency issued by the Debtors.

167.  "*Voting Deadline*" means February 22, 2023.

168.  "*Voyager*" means Voyager Digital Ltd. and its direct and indirect Affiliates.

169.  "*VWAP*" means, with respect to any type of Cryptocurrency and as of any date of determination, an amount equal to the volume weighted average price in U.S. dollars for such type of Cryptocurrency for the consecutive 24-hour period immediately prior to 8:00 a.m. New York Time on such date of determination, as reported on https://coinmarketcap.com.

170.  "*Wind-Down Debtor*" means a Debtor, or any successor or assign thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Effective Date.

171. "*Wind-Down Entity*" means the Wind-Down Debtor or the Wind-Down Trust, as applicable, pursuant to the Restructuring Transactions Memorandum.

172. "*Wind-Down Entity Assets*" means the Wind-Down Trust Assets or any assets transferred to the Wind-Down Debtor, as applicable.

173. "*Wind-Down Reserve*" means an amount, which shall be agreed upon between the Debtors and the Committee prior to the Confirmation Hearing.

174. "*Wind-Down Trust*" means the trust established on the Effective Date and described in Article IV.H to be established under Delaware trust law that, among other things, shall effectuate the wind-down of the Wind-Down Debtors, commence, litigate and settle the Vested Causes of Action that are not released, waived, settled, compromised, or transferred under the Plan and make distributions pursuant to the terms of the Plan and the Wind-Down Trust Agreement; *provided* that, for the avoidance of doubt, the Wind-Down Trust shall not conduct any business operations or continue the Debtors' business operations after the Effective Date.

175. "*Wind-Down Trust Agreement*" means that certain trust agreement by and among the Debtors, the Committee, and the Wind-Down Trust, which shall be included in the Plan Supplement in a form reasonably acceptable to the Committee.

176. "*Wind-Down Trust Assets*" means all of the Debtors' assets transferred to, and vesting in, the Wind-Down Trust pursuant to the Wind-Down Trust Agreement, which, in the event the Sale Transaction is consummated, shall exclude the Acquired Assets, and which shall include, without limitation but only to the extent the following are not Acquired Assets, (a) the Wind-Down Reserve, (b) the Net-Owed Coins to be distributed to Account Holders in Unsupported Jurisdictions to the extent the Purchaser has not obtained the applicable Unsupported Jurisdiction Approval in accordance with Section 6.12 of the Asset Purchase Agreement, (c) any distributions to Account Holders or Holders of OpCo General Unsecured Claims that are returned to the Wind-Down Entity pursuant to Section 6.12(e) of the Asset Purchase Agreement, (d) 3AC Claims and 3AC Recovery, (e) FTX Claims and FTX Recovery, (f) Alameda Claims and Alameda Recovery, (g) the Non-Released D&O Claims, and (h) the Vested Causes of Action.

177. "*Wind-Down Trust Beneficiaries*" means the Holders of Allowed Claims or Allowed Interests that are entitled to receive distributions pursuant to the terms of the Plan, whether or not such Claims or Interests are Allowed as of the Effective Date.

178. "*Wind-Down Trust Expenses*" means all actual and necessary costs and expenses incurred by the Wind-Down Trustee in connection with carrying out the obligations of the Wind-Down Trust pursuant to the terms of the Plan and the Wind-Down Trust Agreement.

179. "*Wind-Down Trust Oversight Committee*" means the oversight committee tasked with overseeing the Wind-Down Trust in accordance with the Plan and the Wind-Down Trust Agreement.

180. "*Wind-Down Trust Units*" means the beneficial interests in the Wind-Down Trust as more fully set forth in the Wind-Down Trust Agreement.

181. "*Wind-Down Trustee*" means the Person or Persons selected by the Committee, after consultation with the Debtors, subject to the approval of the Bankruptcy Court and identified in the Plan Supplement, to serve as the trustee(s) of the Wind-Down Trust, and any successor thereto, appointed pursuant to the Wind-Down Trust Agreement.

## B.    Rules of Interpretation

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter gender; (2) capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form; (3) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (4) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed, or to be Filed, shall mean that document, schedule, or exhibit, as it may thereafter have been or may thereafter be validly amended, amended and restated, supplemented, or otherwise modified; (5) unless otherwise specified, any reference to an Entity as a Holder of a Claim or Interest, includes that Entity's successors and assigns; (6) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (7) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (8) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) unless otherwise specified, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (12) references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (13) unless otherwise specified, all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases; (14) any effectuating provisions may be interpreted by the Debtors or the Wind-Down Trust in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; (15) any references herein to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter; (16) all references herein to consent, acceptance, or approval shall be deemed to include the requirement that such consent, acceptance, or approval be evidenced by a writing, which may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail; (17) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; and (18) the use of "include" or "including" is without limitation unless otherwise stated.

## C.    Computation of Time

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

## D.    Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan and any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, documents, instruments,

or contracts, in which case the governing law of such agreement shall control); *provided* that corporate, limited liability company, or partnership governance matters relating to the Debtors or the Wind-Down Debtors, as applicable, shall be governed by the laws of the jurisdiction of incorporation or formation of the relevant Debtor or Wind-Down Debtor, as applicable.

**E.      Reference to Monetary Figures**

All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

**F.      Reference to the Debtors or the Wind-Down Debtors**

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Wind-Down Debtors mean the Debtors and the Wind-Down Debtors, as applicable, to the extent the context requires.

**G.      Nonconsolidated Plan**

Although for purposes of administrative convenience and efficiency the Plan has been filed as a joint plan for each of the Debtors and presents together Classes of Claims against and Interests in the Debtors, the Plan does not provide for the substantive consolidation of any of the Debtors.

## ARTICLE II.

## ADMINISTRATIVE AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

**A.      Administrative Claims**

Except as otherwise provided in this Article II.A and except with respect to Administrative Claims that are Professional Fee Claims or subject to 11 U.S.C. § 503(b)(1)(D), unless previously Filed, requests for payment of Allowed Administrative Claims (other than Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code) must be Filed and served on the Wind-Down Entity pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date. Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property, and such Administrative Claims shall be deemed satisfied as of the Effective Date without the need for any objection from the Wind-Down Entity or any notice to or action, order, or approval of the Bankruptcy Court or any other Entity. Objections to such requests, if any, must be Filed and served on the Wind-Down Entity and the requesting party by the Claims Objection Bar Date for Administrative Claims. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed by Final Order of the Bankruptcy Court.

Except with respect to Administrative Claims that are Professional Fee Claims, and except to the extent that an Administrative Claim or Priority Tax Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall receive an amount of Cash equal to the

amount of the unpaid or unsatisfied portion of such Allowed Administrative Claim in accordance with the following:  (1) if such Administrative Claim is Allowed on or prior to the Effective Date, no later than thirty (30) days after the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction or course of business giving rise to such Allowed Administrative Claim, without any further action by the Holder of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtors or the Wind-Down Entity, as applicable; or (5) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.  Any Cryptocurrency inadvertently deposited to the Debtors' account(s) after the Petition Date shall be returned to the sender in full.

Objections to requests for payment of such Administrative Claims, if any, must be Filed with the Bankruptcy Court and served on the Wind-Down Entity and the requesting Holder no later than the Claims Objection Bar Date for Administrative Claims.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with, an order that becomes a Final Order of the Bankruptcy Court.

**B.     Professional Fee Claims**

1.     Final Fee Applications and Payment of Professional Fee Claims

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five (45) days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code and Bankruptcy Rules.  The Wind-Down Entity shall pay Professional Fee Claims in Cash to such Professionals in the amount the Bankruptcy Court allows, including from funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court; *provided* that the Debtors' and the Wind-Down Entity's obligations to pay Allowed Professional Fee Claims shall not be limited or deemed limited to funds held in the Professional Fee Escrow Account.

2.     Professional Fee Escrow Account

No later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and the U.S. Trustee and for no other Entities until all quarterly U.S. Trustee fees and all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the U.S. Trustee or to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court.  No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way.  No funds held in the Professional Fee Escrow Account shall be property of the Estates of the Debtors or the Wind-Down Entity.  When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, and all U.S. Trustee quarterly fees plus statutory interest, if any, have been paid in full, any remaining funds held in the Professional Fee

Escrow Account shall be turned over to the Wind-Down Entity without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

3.    <u>Professional Fee Escrow Amount</u>

The Professionals shall deliver to the Debtors a reasonable and good-faith estimate of their unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Confirmation Date projected to be outstanding as of the anticipated Effective Date, and shall deliver such estimate no later than five Business Days prior to the anticipated Effective Date. For the avoidance of doubt, no such estimate shall be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that are the subject of a Professional's final request for payment of Professional Fee Claims Filed with the Bankruptcy Court, and such Professionals are not bound to any extent by the estimates. If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional. The total aggregate amount so estimated to be outstanding as of the anticipated Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account; *provided* that the Wind-Down Entity shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are Filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

4.    <u>Post-Confirmation Date Fees and Expenses</u>

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors and/or the Wind-Down Entity, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Wind-Down Entity. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Wind-Down Entity may employ and pay any Professional in the ordinary course of business for the period after the Confirmation Date without any further notice to or action, order, or approval of the Bankruptcy Court.

For the avoidance of doubt, no Administrative Claims, Professional Fee Claims, or any other post-confirmation fees and expenses shall be paid prior to payment of any quarterly fees due and outstanding to the U.S. Trustee.

**C.    Priority Tax Claims**

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

**ARTICLE III.**

**CLASSIFICATION, TREATMENT,
AND VOTING OF CLAIMS AND INTERESTS**

**A.    Classification of Claims and Interests**

Except for the Claims addressed in Article II of the Plan, all Claims against and Interests in the Debtors are classified in the Classes set forth in this Article III for all purposes, including voting,

Confirmation, and distributions pursuant to the Plan and in accordance with section 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

**B.**     **Summary of Classification**

A summary of the classification of Claims against and Interests in each Debtor pursuant to the Plan is set forth in the following chart. The Plan constitutes a separate chapter 11 plan for each of the Debtors, and accordingly, the classification of Claims and Interests set forth below applies separately to each of the Debtors. All of the potential Classes for the Debtors are set forth herein. Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Claims or Interests shall be treated as set forth in Article III.E hereof. Voting tabulations for recording acceptances or rejections of the Plan will be conducted on a Debtor-by-Debtor basis as set forth above.[1]

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | Account Holder Claims | Impaired | Entitled to Vote |
| 4A | OpCo General Unsecured Claims | Impaired | Entitled to Vote |
| 4B | HoldCo General Unsecured Claims | Impaired | Entitled to Vote |
| 4C | TopCo General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Alameda Loan Facility Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 6 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |
| 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |

---

[1]     The Debtors reserve the right to separately classify Claims or Interests to the extent necessary to comply with any requirements under the Bankruptcy Code or applicable law.

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 9 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

## C.   Treatment of Classes of Claims and Interests

Subject to Article VI hereof, each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors or Wind-Down Entity, as applicable, and the Holder of such Allowed Claim or Allowed Interest, as applicable.  In no event shall any Holder of a Claim receive more than such Holder's Allowed amount on account of such Claim.

1.   Class 1 —Secured Tax Claims

(a)   *Classification*:  Class 1 consists of all Secured Tax Claims.

(b)   *Treatment*:  Each Holder of an Allowed Secured Tax Claim shall receive, in full and final satisfaction of such Allowed Secured Tax Claim, at the option of the Wind-Down Entity, payment in full in Cash of such Holder's Allowed Secured Tax Claim or such other treatment rendering such Holder's Allowed Secured Tax Claim Unimpaired.

(c)   *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Allowed Secured Tax Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Secured Tax Claims are not entitled to vote to accept or reject the Plan.

2.   Class 2 — Other Priority Claims

(a)   *Classification*:  Class 2 consists of all Other Priority Claims.

(b)   *Treatment*:  Each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Allowed Other Priority Claim, at the option of the applicable Debtor, payment in full in Cash of such Holder's Allowed Other Priority Claim or such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired.

(c)   *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan.

3.   Class 3 — Account Holder Claims

(a)   *Classification*:  Class 3 consists of all Account Holder Claims.

(b)   *Allowance*: Account Holder Claims shall be conclusively Allowed in the amount listed on OpCos's *Amended Schedules of Assets and Liabilities* (Case No. 22-10945) [Docket No. 18]; *provided* that the rights of any Holder of an

Account Holder Claim to object to the scheduled amount shall be preserved. To the extent an Account Holder Claim is Allowed in a greater amount than the scheduled amount of such Account Holder Claim, such Holder shall be entitled to a subsequent distribution such that it will receive its Pro Rata share of recoveries to Holders of Allowed Account Holder Claims. Account Holder Claims shall be valued in U.S. dollars as of the Petition Date consistent with section 502(b) of the Bankruptcy Code.

(c)     *Treatment*:  Each Holder of an Allowed Account Holder Claim will receive in exchange for such Allowed Account Holder Claim:

(i)     If the Sale Transaction is consummated by the Outside Date:

A.     its Net Owed Coins, as provided in and subject to the requirements of Sections 6.10 and 6.12 of the Asset Purchase Agreement; *provided* that for Account Holders in Unsupported Jurisdictions and only to the extent that the Purchaser does not obtain the Unsupported Jurisdiction Approval for the jurisdiction in which such Account Holder resides within 6 months following the Closing Date (as defined in the Asset Purchase Agreement), such Account Holders shall receive, after expiration of such time period, value in Cash at which such Net Owed Coins allocable to such Account Holder are liquidated;

B.     its Pro Rata share of any Additional Bankruptcy Distributions, in Cryptocurrency or Cash as provided in and subject to the requirements of Sections 6.12 and 6.14 of the Asset Purchase Agreement;

C.     its Pro Rata share of Distributable OpCo Cash; and

D.     to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to OpCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims;

*provided* that distributions made to any Account Holder pursuant to clauses (B), (C), and (D) above shall be made after taking into account the Acquired Coins Value of the Net Owed Coins or the value in Cash at which such Net Owed Coins are liquidated, as applicable, previously allocated to such Account Holder; or

(ii)     If the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated:

A.     its Pro Rata share of Distributable OpCo Cash;

B. its Pro Rata share of Distributable Cryptocurrency, which such Account Holder shall be able to withdraw in kind, alternative Cryptocurrency, and/or Cash for a period of thirty (30) days after the Effective Date through the Voyager platform or, if elected by Seller pursuant to Section 6.12(d) of the Asset Purchase Agreement, through the Binance.US Platform; *provided* that if the applicable transfer is made through the Voyager platform and such Account Holder does not withdraw its Pro Rata share of Distributable Cryptocurrency available to such Account Holder from the Voyager platform within such thirty (30) day period, such Account Holder will receive Cash in the equivalent value to its Pro Rata share of Distributable Cryptocurrency; and

C. to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to OpCo; *provided* that any distributions on account of Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

(d) *Voting:* Class 3 is Impaired under the Plan. Holders of Allowed Account Holder Claims are entitled to vote to accept or reject the Plan.

4. Class 4A — OpCo General Unsecured Claims

(a) *Classification*: Class 4A consists of all OpCo General Unsecured Claims.

(b) *Treatment*: Each Holder of an Allowed OpCo General Unsecured Claim will receive in exchange for such Allowed OpCo General Unsecured Claim:

(i) If the Sale Transaction is consummated by the Outside Date:

A. its Pro Rata share of Distributable Cryptocurrency in Cash;

B. its Pro Rata share of Additional Bankruptcy Distributions, in Cryptocurrency or Cash as provided in and subject to the requirements of Sections 6.12 and 6.14 of the Asset Purchase Agreement;

C. its Pro Rata share of Distributable OpCo Cash; and

D. to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to OpCo; *provided* that any distributions on account of the Wind-Down Entity Assets or

24

Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims; or

(ii) If the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated:

A. its Pro Rata share of Distributable Cryptocurrency in Cash;

B. its Pro Rata share of Distributable OpCo Cash; and

C. to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to OpCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

(c) *Voting*: Class 4A is Impaired under the Plan. Holders of Allowed OpCo General Unsecured Claims are entitled to vote to accept or reject the Plan.

5. Class 4B — HoldCo General Unsecured Claims

(a) *Classification*: Class 4B consists of all HoldCo General Unsecured Claims.

(b) *Treatment*: Each Holder of an Allowed HoldCo General Unsecured Claim will receive in exchange for such Allowed HoldCo General Unsecured Claim:

(i) its Pro Rata share of Distributable HoldCo Cash; and

(ii) to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to HoldCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

(c) *Voting*: Class 4B is Impaired under the Plan. Holders of Allowed HoldCo General Unsecured Claims are entitled to vote to accept or reject the Plan.

6. <u>Class 4C — TopCo General Unsecured Claims</u>

(a) *Classification*: Class 4C consists of all TopCo General Unsecured Claims.

(b) *Treatment*: Each Holder of an Allowed TopCo General Unsecured Claim will receive in exchange for such Allowed TopCo General Unsecured Claim:

(i) its Pro Rata share of Distributable TopCo Cash; and

(ii) to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of the Wind-Down Trust Assets attributable to TopCo; *provided* that any distributions on account of the Wind-Down Entity Assets or the Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

(c) *Voting*: Class 4C is Impaired under the Plan. Holders of Allowed TopCo General Unsecured Claims are entitled to vote to accept or reject the Plan.

7. <u>Class 5 — Alameda Loan Facility Claims</u>

(a) *Classification*: Class 5 consists of all Alameda Loan Facility Claims.

(b) *Treatment*: Each Holder of an Allowed Alameda Loan Facility Claim will receive in exchange for such Allowed Alameda Loan Facility Claim to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets; *provided* that any distributions on account of Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, all Allowed Claims at OpCo, HoldCo, and TopCo, including, but not limited to, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, Allowed Account Holder Claims, Allowed OpCo General Unsecured Claims, Allowed HoldCo General Unsecured Claims, and Allowed TopCo General Unsecured Claims; *provided*, *however*, if the Bankruptcy Court denies subordination of the Alameda Loan Facility Claims, then such Alameda Loan Facility Claims shall be *pari passu* with General Unsecured Claims at the applicable Debtor entity.

(c) *Voting*: Class 5 is Impaired under the Plan. Holders of Allowed Alameda Loan Facility Claims are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. Therefore, Holders of Allowed Alameda Loan Facility Claims are not entitled to vote to accept or reject the Plan.

8.     <u>Class 6 — Section 510(b) Claims</u>

    (a)     *Classification*: Class 6 consists of all Section 510(b) Claims against TopCo.

    (b)     *Allowance*: Notwithstanding anything to the contrary herein, a Section 510(b) Claim against TopCo, if any such Section 510(b) Claim exists, may only become Allowed by Final Order of the Bankruptcy Court.

    (c)     *Treatment*: Each Holder of Allowed Section 510(b) Claims against TopCo will receive, to effectuate distributions, if applicable, from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to TopCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, and Allowed TopCo General Unsecured Claims.

    (d)     *Voting*: Class 6 is Impaired under the Plan. Holders (if any) of Allowed Section 510(b) Claims against TopCo are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. Therefore, Holders (if any) of Allowed Section 510(b) Claims against TopCo are not entitled to vote to accept or reject the Plan.

9.     <u>Class 7 — Intercompany Claims</u>

    (a)     *Classification*: Class 7 consists of all Intercompany Claims.

    (b)     *Treatment*: On the Effective Date, all Intercompany Claims shall be, at the option of the Debtors, either (a) Reinstated or (b) converted to equity, otherwise set off, settled, distributed, contributed, or cancelled, in each case in accordance with the Restructuring Transactions Memorandum.

    (c)     *Voting*: Holders of Intercompany Claims are either Unimpaired or Impaired, and such Holders of Intercompany Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Therefore, Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

10.     <u>Class 8 — Intercompany Interests</u>

    (a)     *Classification*: Class 8 consists of all Intercompany Interests.

    (b)     *Treatment*: On the Effective Date, all Intercompany Interests shall be, at the option of the Debtors, either (a) Reinstated in accordance with Article III.G of the Plan or (b) set off, settled, addressed, distributed, contributed, merged, or cancelled, in each case in accordance with the Restructuring Transactions Memorandum.

    (c)     *Voting*: Holders of Intercompany Interests are either Unimpaired or Impaired, and such Holders of Intercompany Interests are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Therefore,

Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

11. Class 9 — Existing Equity Interests

(a) *Classification*: Class 9 consists of all Existing Equity Interests.

(b) *Treatment*: Each Holder of Existing Equity Interests will receive, to effectuate distributions, if applicable, from the Wind-Down Entity, its Pro Rata share of the Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to TopCo; *provided* that any distributions on account of Wind-Down Trust Units shall only be made following payment in full of, or reserve for, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, and Allowed TopCo General Unsecured Claims.

(c) *Voting*: Class 9 is Impaired under the Plan. Holders of Existing Equity Interests are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. Therefore, Holders of Existing Equity Interests are not entitled to vote to accept or reject the Plan.

**D.    Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Wind-Down Entity's rights in respect of any Unimpaired Claim, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

**E.    Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes**

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

**F.    Subordinated Claims**

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims against and Allowed Interests in the Debtors and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors and the Wind-Down Entity reserve the right to reclassify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

**G.    Intercompany Interests**

To the extent Reinstated under the Plan, distributions (if any) on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the corporate

structure given the existing intercompany systems connecting the Debtors and their Affiliates, and in exchange for the Debtors' and Wind-Down Entity's agreement under the Plan to make certain distributions to the Holders of Allowed Claims.

**H.      Controversy Concerning Impairment**

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**I.      Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code**

Section 1129(a)(10) of the Bankruptcy Code is satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims or Interests.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

<br>

**ARTICLE IV.**

**PROVISIONS FOR IMPLEMENTATION OF THE PLAN**

**A.      General Settlement of Claims and Interests**

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan.  The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 of all such Claims, Interests, Causes of Action, and controversies, as well as a finding by the Bankruptcy Court that such compromise and settlement is fair, equitable, reasonable, and in the best interests of the Debtors, their Estates, and Holders of Claims and Interests.  Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Interests in any Class are intended to be and shall be final.

**B.      Restructuring Transactions**

On or before the Effective Date, the applicable Debtors will take any action as may be necessary or advisable to effectuate the Restructuring Transactions described in the Plan, the Restructuring Transactions Memorandum, and the Customer Onboarding Protocol, including:  (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (3) the filing of appropriate

certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (4) the transfer or distribution of any Cryptocurrency or Cash pursuant to the Asset Purchase Agreement, or the Liquidation Procedures, as applicable; (5) the execution and delivery of the Wind-Down Trust Agreement; (6) any transactions necessary or appropriate to form the Wind-Down Entity; (7) such other transactions that are required to effectuate the Restructuring Transactions, including any sales, mergers, consolidations, restructurings, conversions, dispositions, transfers, formations, organizations, dissolutions, or liquidations; (8) all transactions necessary to provide for the purchase of the Acquired Assets by Purchaser under the Asset Purchase Agreement; and (9) all other actions that the applicable Entities determine to be necessary or appropriate, or that are reasonably requested by the Purchaser in accordance with the Asset Purchase Agreement, including making filings or recordings that may be required by applicable law.

The Confirmation Order shall, and shall be deemed to, pursuant to sections 1123 and 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions.

## C.      The Sale Transaction

If the Sale Transaction is consummated by the Outside Date, pursuant to the terms of the Asset Purchase Agreement, then the following terms shall govern:

On or prior to the Effective Date, the Debtors shall have consummated the Sale Transaction, and, among other things, the Acquired Assets and Assumed Liabilities shall have transferred to the Purchaser free and clear of all Liens, Claims, Interests, charges, or other encumbrances, and the Purchaser shall pay to the Debtors or Holders of Account Holder Claims and Holders of OpCo General Unsecured Claims, as applicable, the proceeds from the Sale Transaction, as and to the extent provided for in the Asset Purchase Agreement, and this Plan. The Confirmation Order shall authorize the Debtors, the Purchaser, and the Wind-Down Entity, as applicable, to undertake the transactions contemplated by the Asset Purchase Agreement, including pursuant to sections 363, 365, 1123(a)(5)(B), and 1123(a)(5)(D) of the Bankruptcy Code.

The Debtors and Purchaser shall be authorized to take all actions as may be deemed necessary or appropriate to consummate the Sale Transaction pursuant to the terms of the Asset Purchase Agreement the Customer Onboarding Protocol, and this Plan. The Debtors shall be authorized to sell any Cryptocurrency to satisfy all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims. On and after the Effective Date, except as otherwise provided in the Plan and the Wind-Down Trust Agreement, the Wind-Down Debtors, the Wind-Down Entity, or the Purchaser, as applicable, may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; provided, that the Bankruptcy Court shall retain jurisdiction to resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with any of the foregoing.

Notwithstanding anything contained in this Plan and any Definitive Documents, if the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated, all provisions contained in this Plan and the Definitive Documents governing the Sale Transaction shall have no further force and effect, and the provisions governing the Liquidation Transaction shall govern. The rights and remedies of the Seller and Purchaser under the Asset Purchase Agreement and any related orders of the Bankruptcy Court shall be expressly preserved.

**D.     The Liquidation Transaction**

If the Sale Transaction is not consummated by the Outside Date, pursuant to the Asset Purchase Agreement, then the following terms shall govern:

1.     *The Liquidation Transaction*

On or after the Outside Date, the Debtors will pursue the Liquidation Transaction in accordance with the Liquidation Procedures.  Pursuant to the Liquidation Transaction, the Debtors, the Wind-Down Entity, or the Wind-Down Trustee, as applicable, will distribute certain of the Cryptocurrency in-kind to Holders of Account Holder Claims in accordance with Article III.C of the Plan, transfer all Wind-Down Entity Assets or Wind-Down Trust Assets to the Wind-Down Reserve, liquidate certain of the Cryptocurrency, distribute Cash to Holders of Claims, wind down and dissolve the Debtors, and pursue final administration of the Debtors' Estates pursuant to the Bankruptcy Code.

The Debtors, or the Wind-Down Entity, as applicable, shall be authorized to take all actions as may be deemed necessary or appropriate to consummate the Liquidation Transaction pursuant to this Plan.  On or before the date that is twenty-one days prior to the anticipated commencement of the Liquidation Transaction, the Debtors, or the Wind-Down Entity, as applicable, shall file the Liquidation Procedures with the Bankruptcy Court.  Parties in interest shall have ten days to object to the Liquidation Procedures, and if no objections are timely filed, the Liquidation Procedures shall be approved.  In the event of a timely objection, the Bankruptcy Court shall adjudicate any objection to the Liquidation Procedures.

On and after the Effective Date, except as otherwise provided in the Plan, the Wind-Down Trust Agreement, and the Liquidation Procedures, the Wind-Down Debtors or the Wind-Down Entity as applicable, may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; provided, that the Bankruptcy Court shall retain jurisdiction to resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with any of the foregoing.

2.     *Cryptocurrency Rebalancing*

Prior to the Effective Date the Debtors shall, in consultation with the Committee, be authorized to rebalance their Cryptocurrency portfolio to ensure that the Debtors can effectuate *pro rata* in-kind distributions of the Distributable Cryptocurrency according to Article III.C.3(c) of this Plan, *provided* that such rebalancing shall be in accordance with the Asset Purchase Agreement (if the Asset Purchase Agreement has not been terminated).  The Debtors may effectuate such rebalancing by (i) selling such Cryptocurrency that cannot be distributed to Account Holders, (ii) purchasing Cryptocurrency supported by Voyager's or Purchaser's platform (as provided by the Asset Purchase Agreement) that shall be distributed to Account Holders, and (iii) engaging in any other transaction, including the execution of trades of Cryptocurrency, necessary or appropriate to effectuate distributions of the Distributable Cryptocurrency to Holders of Allowed Account Holder Claims.

**E.     Management and Employee Transition Plans**

The Debtors shall be authorized to implement the Management Transition Plan and Employee Transition Plan, the terms of which shall be reasonably acceptable to Purchaser and the Committee and included in the Plan Supplement.  The Management Transition Plan and Employee Transition Plan shall help ensure that employees are available to provide transition services to the Debtors and/or the Wind-Down Entity to effectuate the Sale Transaction and to wind down the Debtors' Estates.

F.    **Non-Released D&O Claims**

Any Claims or Causes of Action held by the Debtors or their respective estates against the Debtors' CEO and/or CCO (regardless of any fiduciary capacity in which such individuals were acting) that are expressly related to approval of the 3AC Loan are not released pursuant to the Plan (collectively, the "Non-Released D&O Claims"), and shall be assigned and transferred to the Wind-Down Entity to be pursued, settled, or resolved by the Wind-Down Entity in accordance with the terms of Article IV.G of this Plan and subject to the Wind-Down Reserve. Any claims against the D&O Carriers that the Debtors' insurance transactions within the 90 days prior to the Petition Date are avoidable under the Bankruptcy Code, applicable state law, or both (the "Non-Released Insurance Claims") shall be assigned and transferred to the Wind-Down Entity to be pursued, settled, or resolved solely by the Wind-Down Entity in accordance with the terms of Article IV.G of this Plan. The Wind-Down Entity shall be a successor to the Debtors' rights, title, and interest in any Non-Released D&O Claims and Non-Released Insurance Claims, and the Wind-Down Entity shall have standing to pursue the Non-Released D&O Claims and the Non-Released Insurance Claims in accordance with the terms of Article IV.G of this Plan; *provided* that: (i) any recovery by the Wind-Down Entity (and the beneficiaries thereof) on account of any Non-Released D&O Claim, including in each case by way of settlement or judgment, shall be satisfied solely by and to the extent of the proceeds of the Debtors' available D&O Liability Insurance Policies (and/or from the D&O Carriers directly) after payment from such D&O Liability Insurance Policies of any and all covered costs and expenses incurred in connection with the defense of the Non-Released D&O Claims; (ii) any party, including any trustee or any beneficiary of the Wind-Down Entity, seeking to execute, garnish, or otherwise attempt to collect on any settlement of or judgment in the Non-Released D&O Claims shall do so solely upon available insurance coverage from the Debtors' available D&O Liability Insurance Policies; and (iii) no party shall (a) record any judgment against the CEO or CCO, or (b) otherwise attempt to collect, directly or indirectly, from the personal assets of the CEO or CCO with respect to the Non-Released D&O Claims. For the avoidance of doubt, this provision does not enjoin, limit, or impair direct claims held by third parties against the Debtors' CEO or CCO (if any) other than any direct claims held by Holders of Claims or Interests that opt into the third party release in Article VIII.B of this Plan. Only upon the occurrence of the earlier of (x) a release being given as part of any later settlement of the Non-Released D&O Claims; (y) final resolution of any coverage claims asserted against the Debtors' available D&O Liability Insurance Policies on account of the Non-Released D&O Claims; or (z) exhaustion of the available insurance coverage under the D&O Liability Insurance Policies, the Non-Released D&O Claims shall be released and discharged without the need for further action or Bankruptcy Court order. For the avoidance of doubt, any release of the Non-Released D&O Claims shall not become effective until one of the three conditions stated in the preceding sentence above has been met.

G.    **The D&O Settlement**

On the Effective Date, the terms of the D&O Settlement shall be effectuated as provided in this Article IV.G.

Pursuant to the D&O Settlement, CEO shall repay the $1,900,000 received from the Debtors on or around February 28, 2022, by paying the after-tax amount of such transfer (approximately $1,125,000) to OpCo in cash and assigning the right, if any, to any tax refund for the balance to the Wind-Down Entity. CEO shall subordinate any Claims (including any indemnification claims asserted under this Art. IV.F) he holds against the Debtors until all other Holders of Claims are paid in full. CCO shall subordinate 50 percent of any Claims he holds other than indemnification claims (and 100% of any indemnification claims asserted under this Art. IV.F) against the Debtors until all other Holders of Claims are paid in full; *provided*, *however*, that in the event the D&O Carriers deny coverage to CEO or CCO under the D&O Insurance Policies on account of such subordination of any indemnification claim, then any indemnification claims by CEO or CCO shall not be so subordinated, but may be filed as an OpCo General Unsecured Claim.

CEO and CCO, each as insureds, under the D&O Liability Insurance Policies agree: (i) not to draw down on the Side-A Policy; *provided*, *however*, that should coverage continue to be available under the Side-A Policy following resolution of the Debtors' and/or the Wind-Down Entity's claims for the avoidance of the premium paid for the policy (whether by judgment or settlement or otherwise) such officer shall be entitled to seek coverage under the Side-A Policy to the extent any such coverage remains; and (ii) not to object to any settlement by the Debtors or Wind Down Entity of avoidance claims under the Side-A Policy, even if such settlement results in termination of benefits under the Side-A Policy. For the avoidance of doubt, this agreement is not intended to and shall not alter or amend each of the insureds' duties under the D&O Liability Insurance Policies. In the event that any insurer under the D&O Liability Insurance Policies denies coverage for any reason, the Wind-Down Entity shall have the right to bring a coverage claim against the insurer(s) in the name of the insured, the insureds shall reasonably cooperate with respect to any such claim, and the insured may participate at their election (and at their sole cost). For the avoidance of doubt, nothing contained in this Plan is intended as a waiver or release of the Debtors' and/or Wind-Down Entity's right to assert any Non-Released D&O Claim, but rather limits such recovery in the manner set forth above.

CEO and CCO shall be entitled to receive their salary and benefits for as long as they work for the Debtors and/or the Wind-Down Entity and retain the right to assert claims for advancement and indemnification up to the limits of any available coverage in the event any of the insurers that issued the Management Liability Policy, the Excess Policy, or the Side-A Policy denies coverage to CEO and/or CCO based upon or arising out of the lack of a formal claim for indemnification; *provided*, *however*, that any such indemnification or advancement claims shall be subordinated in full unless and until all other Holders of Claims are paid in full; *provided*, *further*, that in the event that any of the D&O Carriers deny coverage to CEO or CCO under the D&O Insurance Policies on account of such subordination of any indemnification claim, then any indemnification claims by CEO or CCO shall not be so subordinated, but may be filed as an OpCo General Unsecured Claim.

CEO and CCO shall subordinate any and all rights and entitlements under the Cornerstone A-Side Management Liability Insurance Policy to Voyager Digital Ltd., Policy Number ELU184179-22, to any recovery by the Debtors and/or the Wind-Down Entity on account of the Debtors' and/or Wind-Down Entity's claims for the avoidance of the premium paid for the policy. For the avoidance of doubt, should coverage continue to be available under the Side-A Policy following resolution of the Debtors' and/or the Wind-Down Entity's claims for the avoidance of the premium paid for the policy (whether by judgment or settlement or otherwise), CEO and/or CCO shall be entitled to seek coverage under the Side-A Policy. CEO and CCO shall remain at, and continue performing the responsibilities of, their respective position(s) with the Debtors and assist with the Debtors' transition for at least 30 days from entry of the Confirmation Order; *provided* that CCO shall have no obligation to remain at his position with the Debtors beyond January 15, 2023 and the CEO shall have the right to pursue and engage in any employment opportunity, business venture, consulting arrangement, or investment that may become available; *provided*, *further*, that both the CEO and CCO shall be available to the Debtors and/or the Wind-Down Entity for a maximum of five hours per month for the one year following the Effective Date.

In the event that the sworn financial disclosure statements under penalty of perjury provided to the Debtors, the Special Committee and the Committee by CEO and CCO are later determined at any time by Final Order of the Bankruptcy Court or other court of competent jurisdiction to be materially inaccurate, (a) the limitations on recovery by the Wind-Down Entity under this Article IV.G shall no longer apply, (b) any and all release, exculpation and injunction provisions in Article VIII of this Plan with respect to CEO and/or CCO (as applicable) shall be deemed null and void, (c) all Releasing Parties' rights with respect to the CEO and/or CCO (as applicable) shall be fully intact and preserved, (d) amounts paid by CEO shall not be repaid by the Wind-Down Entity, and (e) any applicable statute of limitations shall be deemed tolled from the Petition Date to the date of entry of the order referenced above. The Wind-Down Trust, as successor to the Debtors, shall have standing to bring a motion seeking relief pursuant to this Article IV.G.

Entry of the Confirmation Order shall be deemed approval of the D&O Settlement and, to the extent not already approved by the Bankruptcy Court, the Debtors or the Wind-Down Debtors, as applicable, are authorized to negotiate, execute, and deliver those documents necessary or appropriate to effectuate the D&O Settlement, without further notice or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors, the Wind-Down Debtors, the Committee, and the Special Committee may deem to be necessary to effectuate the D&O Settlement.

**H.     Wind-Down Trust**

On the Effective Date, the Wind-Down Trust shall be formed for the benefit of the Wind-Down Trust Beneficiaries and each of the Debtors shall transfer the Wind-Down Trust Assets for distribution in accordance with the terms of the Plan. The Confirmation Order shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

1.     Establishment of a Wind-Down Trust

Pursuant to the Wind-Down Trust Agreement, the Wind-Down Trust will be established. The Wind-Down Trust shall be the successor-in-interest to the Debtors, and the Wind-Down Trust shall be a successor to the Debtors' rights, title, and interest to the Wind-Down Trust Assets. The Wind-Down Trust will conduct no business operations and will be charged with winding down the Debtors' Estates. The Wind-Down Trust shall be managed by the Wind-Down Trustee and shall be subject to a Wind-Down Trust Oversight Committee. For the avoidance of doubt, in the event that the Restructuring Transactions Memorandum specifies that the Wind-Down Debtors will be the Wind-Down Entity, the Wind-Down Debtors shall be managed by the Wind-Down Trustee and shall be subject to the Wind-Down Trust Oversight Committee in the same manner as if the Wind-Down Entity is the Wind-Down Trust. The Wind-Down Trust shall be administered in accordance with the terms of the Wind-Down Trust Agreement and shall be subject to the Wind-Down Reserve and the Non-Released D&O Claim Budget. For the avoidance of doubt, the Wind-Down Trust shall not have any right or interest in any Cause of Action or Claim constituting an Acquired Asset. The Wind-Down Trust shall be administered in a manner consistent with the SEC's published guidance on liquidating trusts.

Prior to the Effective Date, any and all of the Debtors' assets shall remain assets of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and on the Effective Date the Wind-Down Trust Assets shall, subject to the Wind-Down Trust Agreement, be transferred to and vest in the Wind-Down Trust or the Wind-Down Debtors, as applicable. For the avoidance of doubt, to the extent not otherwise waived in writing, released, settled, compromised, assigned or sold pursuant to a prior order or the Plan, the Wind-Down Entity specifically retains and reserves the right to assert, after the Effective Date, any and all of the Vested Causes of Action and related rights, whether or not asserted as of the Effective Date, and all proceeds of the foregoing, subject to the terms of the Plan, including without limitation Article IV.F and Article IV.G.

Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, only the Wind-Down Trust and the Wind-Down Trustee shall have the right to pursue or not to pursue, or, subject to the terms hereof and the Wind-Down Trust Agreement, compromise or settle any Wind-Down Trust Assets transferred to the Wind-Down Trust. On and after the Effective Date, the Wind-Down Trust and the Wind-Down Trustee may, without further Bankruptcy Court approval, commence, litigate, and settle any Vested Causes of Action or Claims relating to any Wind-Down Trust Assets transferred to the Wind-Down Trust or rights to payment or Claims that belong to the Debtors as of the Effective Date or are instituted by the Wind-Down Trust or

the Wind-Down Trustee on or after the Effective Date, except as otherwise expressly provided herein and in the Wind-Down Trust Agreement. All of the Wind-Down Trust's activities shall be subject to the Wind-Down Reserve and the Non-Released D&O Claim Budget. The Wind-Down Trust shall be entitled to enforce all defenses and counterclaims to all Claims asserted against the Debtors and their Estates, including setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code.

The Wind-Down Trustee shall be deemed hereby substituted as plaintiff, defendant, or in any other capacity for the Debtors in any Causes of Action pending before the Bankruptcy Court or any other court that relates to a Wind-Down Trust Asset without the need for filing any motion for such relief. On the Effective Date, the Debtors and the Wind-Down Trustee shall execute the Wind-Down Trust Agreement and shall have established the Wind-Down Trust pursuant hereto. In the event of any conflict between the terms of this Article IV.H and the terms of the Wind-Down Trust Agreement, the terms of the Wind-Down Trust Agreement shall control.

## 2. Wind-Down Entity Assets

Notwithstanding any prohibition on assignability under applicable non-bankruptcy law, on the Effective Date and thereafter if additional Wind-Down Entity Assets become available, the Debtors shall be deemed, subject to the Wind-Down Trust Agreement, to have automatically transferred to the applicable Wind-Down Entity all of their right, title, and interest in and to all of the Wind-Down Trust Assets, in accordance with section 1141 of the Bankruptcy Code. All such assets shall automatically vest in the Wind-Down Entity free and clear of all Claims, Liens, and other interests, subject only to the Allowed Claims and Interests as set forth herein and the expenses of the Wind-Down Trust as set forth herein and in the Wind-Down Trust Agreement. Thereupon, the Debtors shall have no interest in or with respect to the Wind-Down Entity Assets or the Wind-Down Trust.

## 3. Treatment of Wind-Down Trust for Federal Income Tax Purposes; No Successor-in-Interest

The Wind-Down Trust shall be established for the primary purpose of liquidating and distributing the Wind-Down Trust Assets transferred to it, in accordance with Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Wind-Down Trust. Accordingly, the Wind-Down Trustee may, in an expeditious but orderly manner, liquidate the Wind-Down Trust Assets, make timely distributions to the Wind-Down Trust Beneficiaries and not unduly prolong its duration. The Wind-Down Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth herein or in the Wind-Down Trust Agreement. The record holders of beneficial interests shall be recorded and set forth in a register maintained by the Wind-Down Trustee expressly for such purpose.

The Wind-Down Trust is intended to qualify as a "grantor trust" for federal income tax purposes to the extent reasonably practicable, with the Wind-Down Trust Beneficiaries treated as grantors and owners of the Wind-Down Trust. However, with respect to any of the assets of the Wind-Down Trust that are subject to potential disputed claims of ownership or uncertain distributions, *or* to the extent "liquidating trust" treatment is otherwise unavailable, the Debtors anticipate that such assets will be subject to disputed ownership fund treatment under Section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes. Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account. Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account

35

(and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

4.      Appointment of Wind-Down Trustee

The Wind-Down Trustee shall be selected by the Committee, in consultation with the Debtors, and shall be identified in the Plan Supplement. The appointment of the Wind-Down Trustee shall be approved in the Confirmation Order, and the Wind-Down Trustee's duties shall commence as of the Effective Date. The Wind-Down Trustee shall administer the distributions to the Wind-Down Trust Beneficiaries and shall serve as a representative of the Estates under section 1123(b) of the Bankruptcy Code for the purpose of enforcing Vested Causes of Action belonging to the Estates that are not released, waived, settled, compromised, or transferred pursuant to the Plan and subject to the limitations set forth in the Plan, including Article IV.F and Article IV.G.

In accordance with the Wind-Down Trust Agreement, the Wind-Down Trustee shall serve in such capacity through the earlier of (i) the date on which the Wind-Down Trust is dissolved in accordance with the Wind-Down Trust Agreement, and (ii) the date on which a Wind-Down Trustee resigns, is terminated, or is otherwise unable to serve; *provided, however*, that, in the event that a Wind-Down Trustee resigns, is terminated, or is otherwise unable to serve, the Wind-Down Trust Oversight Committee shall appoint a successor to serve as a Wind-Down Trustee in accordance with the Wind-Down Trust Agreement. If the Wind-Down Trust Oversight Committee does not appoint a successor within the time periods specified in the Wind-Down Trust Agreement, then the Bankruptcy Court, upon the motion of any party-in-interest, including counsel to the Wind-Down Trust, shall approve a successor to serve as a Wind-Down Trustee.

5.      Responsibilities of Wind-Down Trustee

Responsibilities of the Wind-Down Trustee shall be as identified in the Wind-Down Trust Agreement and shall include, but are not limited to:

(a)      Implementing the Wind-Down Trust, and making the distributions contemplated by the Plan;

(b)      Marshalling, marketing for sale, and wind-down of any of the Debtors' assets constituting Wind-Down Trust Assets;

(c)      Filing and prosecuting any objections to Claims or Interests or settling or otherwise compromising such Claims and Interests, if necessary and appropriate, in accordance with the Plan hereof;

(d)      Commencing, prosecuting, or settling claims and Vested Causes of Action;

(e)      Recovering and compelling turnover of the Debtors' property;

(f)      Prosecuting and settling the 3AC Claims, FTX Claims, and Alameda Claims;

(g)      Paying Wind-Down Trust Expenses;

(h)      Abandoning any Debtor assets that cannot be sold or otherwise disposed of for value and where a distribution to Holders of Allowed Claims or Interests would not be feasible or cost-effective in the Wind-Down Trustee's reasonable judgment;

      (i)      Preparing and filing post-Effective Date operating reports (including the month in which the Effective Date occurs);

      (j)      Filing appropriate tax returns in the exercise of the Wind-Down Trustee's fiduciary obligations;

      (k)      Retaining such Professionals as are necessary and appropriate in furtherance of the Wind-Down Trustee's fiduciary obligations; and

      (l)      Taking such actions as are necessary and reasonable to carry out the purposes of the Wind-Down Trust, including winding down the Debtors' business affairs.

6.      <u>The Wind-Down Trust Oversight Committee</u>

The Wind-Down Trust Oversight Committee shall consist of those parties selected by the Committee and identified in the Plan Supplement, and which, at no time shall consist of greater than seven members.

The Wind-Down Trust Oversight Committee shall have the responsibility to review and advise the Wind-Down Trustee with respect to the liquidation and distribution of the Wind-Down Entity Assets transferred to the Wind-Down Trust in accordance herewith and the Wind-Down Trust Agreement. For the avoidance of doubt, in advising the Wind-Down Trustee, the Wind-Down Trust Oversight Committee shall maintain the same fiduciary responsibilities as the Wind-Down Trustee. Vacancies on the Wind-Down Trust Oversight Committee shall be filled by a Person designated by the remaining member or members of the Wind-Down Trust Oversight Committee from among the Holders of Account Holder Claims. The Wind-Down Trustee shall have the authority to seek an order from the Bankruptcy Court removing or replacing members of the Wind-Down Trust Oversight Committee for cause.

7.      <u>Expenses of Wind-Down Trustee</u>

The Wind-Down Trust Expenses shall be paid from the Wind-Down Trust Assets subject to the Wind-Down Reserve and the Non-Released D&O Claim Budget.

8.      <u>Insurance; Bond</u>

The Wind-Down Trustee may obtain insurance coverage (in the form of an errors and omissions policy or otherwise) with respect to the liabilities and obligations of the Wind-Down Trustee and the Wind-Down Trust Oversight Committee under the Wind-Down Trust Agreement. Unless otherwise agreed to by the Wind-Down Trust Oversight Committee, the Wind-Down Trustee shall serve with a bond, the terms of which shall be agreed to by the Wind-Down Trust Oversight Committee, and the cost and expense of which shall be paid by the Wind-Down Trust.

9.     Fiduciary Duties of the Wind-Down Trustee

Pursuant hereto and the Wind-Down Trust Agreement and the Wind-Down Trustee shall act in a fiduciary capacity on behalf of the interests of all Holders of Claims and Interests that will receive distributions pursuant to Plan.

10.     Termination of the Wind-Down Trust

The Wind-Down Trust will terminate on the earlier of: (a) (i) the final liquidation, administration and distribution of the Wind-Down Trust Assets in accordance with the terms of the Wind-Down Trust Agreement and the Plan, and its full performance of all other duties and functions as set forth herein or in the Wind-Down Trust Agreement and (ii) the Chapter 11 Cases of the Debtors have been closed; or (b) the Wind-Down Trustee determines in its reasonable judgment that the Wind-Down Trust lacks sufficient assets and financial resources, after reasonable collection efforts, to complete the duties and powers assigned to him or her under the Plan, the Confirmation Order and/or the Wind-Down Trust Agreement. After (x) the final distributions pursuant hereto, (y) the Filing by or on behalf of the Wind-Down Trust of a certification of dissolution with the Bankruptcy Court, and (z) any other action deemed appropriate by the Wind-Down Trustee, the Wind-Down Trust shall be deemed dissolved for all purposes without the necessity for any other or further actions.

11.     Liability of Wind-Down Trustee; Indemnification

Neither the Wind-Down Trustee, the Wind-Down Trust Oversight Committee, their respective members, employees, employers, designees or professionals, or any of their duly designated agents or representatives (each, a "Wind-Down Trust Party" and collectively, the "Wind-Down Trust Parties") shall be liable for losses, claims, damages, liabilities or expenses in connection with the affairs of the Wind-Down Trust or for the act or omission of any other Wind-Down Trust Party, nor shall the Wind-Down Trust Parties be liable for any act or omission taken or omitted to be taken pursuant to the discretion, powers and authority conferred, or in good faith believed to be conferred by the Wind-Down Trust Agreement or the Plan other than for specific acts or omissions resulting from such Wind-Down Trust Party's willful misconduct, gross negligence or actual fraud. Subject to the Wind-Down Trust Agreement, the Wind-Down Trustee shall be entitled to enjoy all of the rights, powers, immunities and privileges applicable to a chapter 7 trustee, and the Wind-Down Trust Oversight Committee shall be entitled to enjoy all of the rights, powers, immunities and privileges of an official committee of unsecured creditors. The Wind-Down Trustee or the Wind-Down Trust Oversight Committee may, in connection with the performance of its functions, and in its sole and absolute discretion, consult with its attorneys, accountants, financial advisors and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such persons, regardless of whether such advice or opinions are provided in writing. Notwithstanding such authority, neither the Wind-Down Trustee nor the Wind-Down Trust Oversight Committee shall be under any obligation to consult with its attorneys, accountants, financial advisors or agents, and their determination not to do so shall not result in the imposition of liability on the Wind-Down Trustee, the Wind-Down Trust Oversight Committee, or their respective members and/or designees, unless such determination is based on willful misconduct, gross negligence, or actual fraud. The Wind-Down Trust shall indemnify and hold harmless the Wind-Down Trust Parties (in their capacity as such), from and against and in respect of all liabilities, losses, damages, claims, costs and expenses (including, without limitation, reasonable attorneys' fees, disbursements, and related expenses) that such parties may incur or to which such parties may become subject in connection with any action, suit, proceeding or investigation brought by or threatened against such parties arising out of or due to their acts or omissions, or consequences of such acts or omissions, with respect to the implementation or administration of the Wind-Down Trust or the Plan or the discharge of their duties hereunder; *provided*, *however*, that no such indemnification will be made to such Persons for actions or omissions as a result of willful misconduct, gross negligence, or actual

fraud. Persons dealing or having any relationship with the Wind-Down Trustee shall have recourse only to the Wind-Down Trust Assets and shall look only to the Wind-Down Trust Assets to satisfy any liability or other obligations incurred by the Wind-Down Trustee or the Wind-Down Trust Oversight Committee to such Person in carrying out the terms of the Wind-Down Trust Agreement, and neither the Wind-Down Trustee nor the Wind-Down Trust Oversight Committee, shall have any personal obligation to satisfy any such liability. The Wind-Down Trustee and/or the Wind-Down Trust Oversight Committee members shall not be liable whatsoever except for the performance of such duties and obligations as are specifically set forth herein, and no implied covenants or obligations shall be read into the Wind-Down Trust Agreement against any of them. The Wind-Down Trust shall promptly pay expenses reasonably incurred by any Wind-Down Trust Party in defending, participating in, or settling any action, proceeding or investigation in which such Wind-Down Trust Party is a party or is threatened to be made a party or otherwise is participating in connection with the Wind-Down Trust Agreement or the duties, acts or omissions of the Wind-Down Trustee or otherwise in connection with the affairs of the Wind-Down Trust, upon submission of invoices therefor, whether in advance of the final disposition of such action, proceeding, or investigation or otherwise. Each Wind-Down Trust Party hereby undertakes, and the Wind-Down Trust hereby accepts his or her undertaking, to repay any and all such amounts so advanced if it shall ultimately be determined that such exculpated party is not entitled to be indemnified therefor under the Wind-Down Trust Agreement. The foregoing indemnity in respect of any Wind-Down Trust Party shall survive the termination of such Wind-Down Trust Party from the capacity for which they are indemnified.

      12.    <u>No Liability of the Wind-Down Trust.</u>

On and after the Effective Date, the Wind-Down Trust shall have no liability on account of any Claims or Interests except as set forth herein and in the Wind-Down Trust Agreement. All payments and all distributions made by the Wind-Down Trustee hereunder shall be in exchange for all Claims or Interests against the Debtors.

**I.**      **Sources of Consideration for Plan Distributions**

Distributions under the Plan shall be funded by (i) the proceeds of Purchaser's payment obligations under Sections 2.1 and 2.2 of the Asset Purchase Agreement and distributions of Acquired Coins pursuant to Sections 6.12, and 6.14 of the Asset Purchase Agreement, (ii) the Wind-Down Entity or Wind-Down Trust (as applicable) from the Wind-Down Entity Assets or Wind-Down Trust Assets (as applicable); *provided*, *however*, that Allowed Professional Fee Claims shall be paid from the Professional Fee Escrow Account in the first instance. The Wind-Down Entity Assets or Wind-Down Trust Assets (as applicable) shall be used to pay the Wind-Down Entity Expenses (including the compensation of the Wind-Down Trustee and any professionals retained by the Wind-Down Trust), and to satisfy payment of Allowed Claims and Interests as set forth in the Plan.

**J.**      **Corporate Existence and Dissolution**

Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificates or articles of incorporation, certificates of formation, certificates of organization, or certificates of limited partnership and bylaws, operating agreements, limited liability company agreements, or limited partnership agreements (or other formation documents) in effect prior to the Effective Date, except to the extent such certificates or articles of incorporation, certificates of formation, certificates of organization, or certificates of limited partnership and bylaws, operating agreements, limited liability company agreements, or limited partnership agreements (or other formation

documents) are amended pursuant to the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings under applicable state or federal law).

On and after the Effective Date, the Wind-Down Entity will be authorized and directed to implement the Plan and any applicable orders of the Bankruptcy Court, and the Wind-Down Entity shall have the power and authority to take any action necessary to wind down and dissolve the Debtors' Estates.

Upon a certification to be Filed with the Bankruptcy Court by the Wind-Down Trustee of all distributions having been made and completion of all of its duties under the Plan and entry of a final decree closing the last of the Chapter 11 Cases, the Wind-Down Debtors shall be deemed to be dissolved without any further action by the Wind-Down Debtors, including the Filing of any documents with the secretary of state for the state in which the Wind-Down Debtors are formed or any other jurisdiction. The Wind-Down Trustee, however, shall have authority to take all necessary actions to dissolve the Wind-Down Debtors in and withdraw the Wind-Down Debtors from applicable states.

As soon as practicable after the Effective Date, the Wind-Down Entity shall take such actions as the Wind-Down Entity may determine to be necessary or desirable to carry out the purposes of the Plan. Any certificate of dissolution or equivalent document may be executed by the Wind-Down Entity on behalf of any Wind-Down Debtor without need for any action or approval by the shareholders or board of directors or managers of such Debtor. On and after the Effective Date, the Wind-Down Debtors (1) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (2) shall be deemed to have cancelled pursuant to this Plan all Interests, and (3) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date. Notwithstanding such Debtors' dissolution, such Debtors shall be deemed to remain intact solely with respect to the preparation, filing, review, and resolution of applications for Professional Fee Claims.

**K.     Corporate Action**

Upon the Effective Date, all actions contemplated under the Plan, Definitive Documents, and Asset Purchase Agreement shall be deemed authorized and approved in all respects, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, directors, managers, managing-members, limited or general partners, or officers of the Debtors, the Wind-Down Debtors, the Wind-Down Trust or any other Entity, including: (1) appointment of the directors, managers, members, and officers for the Wind-Down Debtors as provided herein; (2) the issuances, transfer, and distribution of the Wind-Down Trust Units; (3) the formation of the Wind-Down Trust and appointment of the Wind-Down Trustee and Wind-Down Trust Oversight Committee; (4) the formation of any entities pursuant to and the implementation of the Plan and performance of all actions and transactions contemplated hereby and thereby; (5) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; and (6) all other acts or actions contemplated by the Plan, Definitive Documents, and Asset Purchase Agreement or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions (including effectuating the Restructuring Transactions Memorandum and the Customer Onboarding Protocol) (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan, Definitive Documents, and Asset Purchase Agreement involving the corporate structure of the Debtors or the Wind-Down Debtors, as applicable, and any corporate action required by the Debtors or the Wind-Down Debtors, as applicable, in connection with the Plan shall be deemed to have occurred on, and shall be in effect as of, the Effective Date, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the

Wind-Down Debtors, as applicable. On or, as applicable, prior to the Effective Date, the appropriate officers of the Debtors or the Wind-Down Debtors or the Wind-Down Trust, as applicable, shall be authorized and, as applicable, directed to issue, execute, and deliver the agreements, documents, Securities, certificates of incorporation, certificates of formation, bylaws, operating agreements, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Wind-Down Debtors, and any and all other agreements, documents, Securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this Article IV.K shall be effective notwithstanding any requirements under non-bankruptcy law.

## L.     Vesting of Assets in the Wind-Down Entity

Except as otherwise provided in the Plan, or in any agreement, instrument, or other document incorporated in the Plan, notwithstanding any prohibition of assignability under applicable non-bankruptcy law and in accordance with section 1141 of the Bankruptcy Code, on the Effective Date, all property constituting Wind-Down Trust Assets, including all Vested Causes of Action of the Debtors (unless otherwise released, waived, compromised, settled, transferred, or discharged pursuant to the Plan), and any property acquired by any of the Debtors under the Plan shall vest in the Wind-Down Entity, free and clear of all Liens, Claims, charges, or other encumbrances.

## M.     Cancellation of Notes, Instruments, Certificates, and Other Documents

On the later of the Effective Date and the date on which distributions are made pursuant to the Plan (if not made on the Effective Date), except for the purpose of evidencing a right to and allowing Holders of Claims and Interests to receive a distribution under the Plan or to the extent otherwise specifically provided for in the Plan, the Confirmation Order, or any agreement, instrument, or other document entered into in connection with or pursuant to the Plan or the Restructuring Transactions (including, without limitation, the Definitive Documents and the Asset Purchase Agreement), all notes, bonds, indentures, certificates, Securities, shares, purchase rights, options, warrants, collateral agreements, subordination agreements, intercreditor agreements, or other instruments or documents directly or indirectly evidencing, creating, or relating to any indebtedness or obligations of, or ownership interest in, the Debtors, giving rise to any Claims against or Interests in the Debtors or to any rights or obligations relating to any Claims against or Interests in the Debtors shall be deemed cancelled without any need for a Holder to take further action with respect thereto.

## N.     Effectuating Documents; Further Transactions

On and after the Effective Date, the Wind-Down Debtors, and its directors, managers, partners, officers, authorized persons, and members thereof, and the Wind-Down Trust and Wind-Down Trustee are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, Definitive Documents, and Asset Purchase Agreement, in the name of and on behalf of the Wind-Down Debtors, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

## O.     Section 1146(a) Exemption

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Wind-Down Debtor, the Wind-Down Trust, the Purchaser, or to any other Entity) of property under the Plan, Definitive Documents, and Asset Purchase Agreement or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or

the Wind-Down Debtors; (2) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, including the Asset Purchase Agreement, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, sales or use tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forgo the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**P.      Preservation of Rights of Action**

In accordance with section 1123(b) of the Bankruptcy Code, the Wind-Down Entity shall succeed to all rights to commence and pursue any and all Vested Causes of Action of the Debtors, whether arising before or after the Petition Date, including, without limitation, any actions specifically enumerated in the Schedule of Retained Causes of Action other than Causes of Action released, waived, settled, compromised, or transferred. Such rights shall be preserved by the Debtors and Wind-Down Debtors and shall vest in the Wind-Down Entity, with the Wind-Down Entity's rights to commence, prosecute, or settle such Causes of Action preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action expressly released, waived, settled, compromised, or transferred by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan or pursuant to the Asset Purchase Agreement, which shall be deemed released and waived by the Debtors and Wind-Down Debtors as of the Effective Date.

The Wind-Down Trust may pursue such Causes of Action, as appropriate, in accordance with the best interests of the beneficiaries of the Wind-Down Trust and in accordance with the Wind-Down Trust Agreement and the Plan. **No Entity may rely on the absence of a specific reference in the Schedules of Assets and Liabilities or Statement of Financial Affairs, the Plan, the Plan Supplement, the Disclosure Statement, or the Schedule of Retained Causes of Action to any Cause of Action against it as any indication that the Debtors, the Wind-Down Debtors or the Wind-Down Trust, as applicable, will not pursue any and all available Causes of Action of the Debtors against it. The Wind-Down Trust, on behalf of the Debtors and the Wind-Down Debtors, expressly reserves all rights to prosecute any and all Causes of Action against any Entity, except as otherwise provided in the Plan, including Article VIII of the Plan.** Unless any Cause of Action of the Debtors is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or pursuant to a Final Order, the Wind-Down Trust, on behalf of the Debtors and Wind-Down Debtors and in accordance with the Wind-Down Trust Agreement, expressly reserves all such Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or Consummation.

The Wind-Down Trust, on behalf of the Debtors and Wind-Down Debtors, reserves and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Cause of Action that a Debtor may hold against any Entity shall vest in the Wind-Down Trust, except as otherwise provided in the Plan, including Article VIII of the Plan. The Wind-Down Trust, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Wind-Down Trust shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court in accordance with the Plan.

## Q.    Election to Contribute Third-Party Claims

Because aggregating all Contributed Third-Party Claims may enable the pursuit and settlement of such litigation claims in a more efficient and effective manner, each Holder of a Claim or Interest may agree, by electing on its ballot or opt-in form, to contribute its Contributed Third-Party Claims to the Wind-Down Entity. By electing such option on its ballot or opt-in form, each Contributing Claimant agrees that, subject to the occurrence of the Effective Date and the formation of the Wind-Down Entity, it will be deemed, without further action, (i) to have irrevocably contributed its Contributed Third-Party Claims to the Wind-Down Entity, and (ii) to have agreed to execute any documents reasonably requested by the Debtors or the Wind-Down Entity to memorialize and effectuate such contribution.

## R.    Contribution of Contributed Third-Party Claims

On the Effective Date, all Contributed Third-Party Claims will be irrevocably contributed to the Wind-Down Entity and shall thereafter be Wind-Down Trust Assets for all purposes. No Person may rely on the absence of a specific reference in the Plan, the Disclosure Statement, the Confirmation Order, the Wind-Down Trust Agreement, the Plan Supplement, or any other document as any indication that the Wind-Down Trust will or will not pursue any and all available Contributed Third-Party Claims against such Person. The Wind-Down Trust shall have, retain, reserve, and be entitled to assert all Contributed Third-Party Claims fully to the same extent that the Contributing Claimants could have asserted such claims prior to the Effective Date. For the avoidance of doubt, the Contributed Third-Party Claims shall not include the rights of any of the Contributing Claimants to receive the distributions under the Plan on account of their Claims or Interests.

## S.    Closing the Chapter 11 Cases

On and after the Effective Date, the Wind-Down Entity shall be permitted to classify all of the Chapter 11 Cases of the Debtors except for the Chapter 11 Case of Voyager Digital, LLC, or any other Debtor identified in the Restructuring Transactions Memorandum as having its Chapter 11 Case remain open following the Effective Date, as closed, and all contested matters relating to any of the Debtors, including objections to Claims or Interests and any adversary proceedings, may be administered and heard in the Chapter 11 Case of Voyager Digital, LLC, or any other Debtor identified in the Restructuring Transactions Memorandum as having its Chapter 11 Case remain open following the Effective Date,

irrespective of whether such Claims or Interests were Filed or such adversary proceeding was commenced against a Debtor whose Chapter 11 Case was closed.

## ARTICLE V.

### TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

#### A. Assumption and Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, except as otherwise provided herein, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (1) is specifically described in the Plan as to be assumed in connection with confirmation of the Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement; (2) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Effective Date; (3) is to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, in connection with the Sale Transaction; (4) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; or (5) is a D&O Liability Insurance Policy other than the Side-A Policy. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, assignments, and rejections, including the assumption of the Executory Contracts or Unexpired Leases as provided in the Plan Supplement, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

#### B. Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Wind-Down Debtors, as applicable, under such Executory Contract or Unexpired Lease. Without limiting the general nature of the foregoing, and notwithstanding any non-bankruptcy law to the contrary, the Debtors and Wind-Down Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the Debtors contracting from non-Debtor counterparties to any rejected Executory Contract or Unexpired Lease.

#### C. Claims Based on Rejection of Executory Contracts or Unexpired Leases

Counterparties to Executory Contracts or Unexpired Leases listed subject to rejection under the Plan shall be served with a notice of rejection of Executory Contracts and Unexpired Leases with the Plan Supplement. Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Claims, Noticing, and Solicitation Agent and served on the Debtors or Wind-Down Entity, as applicable, no later than thirty days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, or the Wind-Down Entity, the Estates, or their property without the need for any objection by the Wind-Down Entity or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed released, and be subject to the permanent injunction set forth in Article VIII.D of the Plan, including any Claims against any**

44

**Debtor listed on the Debtors' schedules as unliquidated, contingent, or disputed.** All Allowed Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease shall be treated as General Unsecured Claims in accordance with Article III.C of the Plan.

**D.     Cure of Defaults for Executory Contracts and Unexpired Leases Assumed**

The Debtors, the Wind-Down Entity, or the Purchaser, as applicable pursuant to the Asset Purchase Agreement, shall pay Cures, if any, on the Effective Date. The Debtors shall provide notice of the amount and timing of payment of any such Cure to the parties to the applicable assumed Executory Contracts or Unexpired Leases as part of the Plan Supplement. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure that differ from the ordinary course amounts paid or proposed to be paid by the Debtors, the Wind-Down Entity, or the Purchaser shall be dealt with in the ordinary course of business and, if needed, shall be Filed with the Claims, Noticing, and Solicitation Agent on or before thirty days after the Effective Date. **If any counterparty to an Executory Contract or Unexpired Lease does not receive a notice of assumption and applicable cure amount, such counterparty shall have until on or before thirty days after the Effective Date to bring forth and File a request for payment of Cure.** Any such request that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Wind-Down Debtor or the Wind-Down Entity, without the need for any objection by the Wind-Down Entity or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure shall be deemed fully satisfied and released upon payment by the Debtors or the Wind-Down Entity or the Purchaser of the Cure in the ordinary course of business or upon and in accordance with any resolution of a Cure dispute (whether by order of the Bankruptcy Court or through settlement with the applicable Executory Contract or Unexpired Lease counterparty); *provided, however*, that nothing herein shall prevent the Wind-Down Entity or the Purchaser, as applicable, from paying any Cure Claim despite the failure of the relevant counterparty to File such request for payment of such Cure. The Wind-Down Entity or the Purchaser may also settle any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court. In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be Filed with the Bankruptcy Court on or before thirty days after the Effective Date. Any such objection will be scheduled to be heard by the Bankruptcy Court at the Debtors' first scheduled omnibus hearing for which such objection is timely Filed. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

In the event of a dispute regarding: (1) the amount of any Cure Claim, (2) the ability of the Wind-Down Debtors, Purchaser, or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed (or assumed and assigned, as applicable), or (3) any other matter pertaining to assumption or assignment, then any disputed Cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made as soon as reasonably practicable following, and in accordance with, the entry of a Final Order of the Bankruptcy Court resolving such dispute or as may be agreed upon by the Debtors, the Wind-Down Entity, or Purchaser, as applicable, and the counterparty to the Executory Contract or Unexpired Lease, and any such unresolved dispute shall not prevent or delay implementation of the Plan or the occurrence of the Effective Date.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise or assignment of any Executory Contract or Unexpired Lease to the Purchaser and full payment of any applicable Cure pursuant to this Article V.D, or upon and in accordance with any resolution of a Cure dispute (whether by order of the Bankruptcy Court or through settlement with the applicable Executory Contract or Unexpired Lease counterparty), shall result in the full release and satisfaction of any Cures,

Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed or assumed and assigned in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to this Article V.D, in the amount and at the time in the ordinary course of business or upon and in accordance with any resolution of a Cure dispute (whether by order of the Bankruptcy Court or through settlement with the applicable Executory Contract or Unexpired Lease counterparty), shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court. For the avoidance of doubt, in the event that any counterparty to an Executory Contract or Unexpired Lease receives a notice of assumption and applicable proposed Cure amount, and disputes the Debtors' proposed Cure amount, such party shall not be required to File a Proof of Claim with respect to such dispute. Any counterparty to an Executory Contract or Unexpired Lease that does not receive a notice or applicable proposed Cure amount, and believes a Cure amount is owed, shall have thirty days after the Effective Date to File a Proof of Claim with respect to such alleged Cure amount, which Claim shall not be expunged until such Cure dispute is resolved.**

E.      **Insurance Policies and Surety Bonds**

Each D&O Liability Insurance Policy (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto) other than the Side-A Policy shall be assumed, in their entirety, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date, pursuant to sections 105 and 365 of the Bankruptcy Code with the Wind-Down Entity being authorized to pursue any proceeds thereof on behalf of the Debtors or the Wind-Down Entity. The Side-A Policy shall ride through these Chapter 11 Cases with the Debtors, and the Wind-Down Entity preserves all avoidance and other actions in connection with the premium paid thereunder. All beneficiaries under the D&O Insurance Policies reserve their rights under such D&O Insurance Policies subject to the limitations set forth in this Plan.

The Debtors or the Wind-Down Entity, as applicable, shall not terminate or otherwise reduce the coverage under any D&O Liability Insurance Policy (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto) in effect prior to the Effective Date, and any current and former directors, officers, managers, and employees of the Debtors who served in such capacity at any time before or after the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy subject to the terms thereof regardless of whether such directors, officers, managers, and employees remain in such positions after the Effective Date. Notwithstanding anything to the contrary in the Plan, the Debtors or the Wind-Down Entity shall retain the ability to supplement such D&O Liability Insurance Policy as the Debtors or Wind-Down Entity may deem necessary, subject to the prior written consent of the Wind-Down Entity. Notwithstanding anything to the contrary contained in the Plan, the Wind-Down Trust shall be entitled to pursue avoidance of the premium paid for the XL Specialty Insurance Company Cornerstone A-Side Management Liability Insurance Policy No. ELU184179-22, and nothing in this Plan shall be deemed a waiver or abrogation of any such rights.

The Debtors shall continue to satisfy their obligations under their surety bonds and insurance policies in full and continue such programs in the ordinary course of business. Each of the Debtors' surety bonds and insurance policies, and any agreements, documents, or instruments relating thereto shall be treated as Executory Contracts under the Plan. On the Effective Date: (a) the Debtors shall be deemed to have assumed all such surety bonds and insurance policies and any agreements, documents, and instruments relating thereto in their entirety; *provided* that the Debtors have assumed all indemnity agreements and cash

collateral agreements related to the surety bonds and (b) such surety bonds and insurance policies and any agreements, documents, or instruments relating thereto shall revest in the applicable Wind-Down Debtor(s) unaltered.

## F.   Reservation of Rights

Nothing contained in the Plan or the Plan Supplement (unless otherwise explicitly provided) shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Wind-Down Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Wind-Down Entity, as applicable, shall have forty-five days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, including by rejecting such contract or lease effective as of the Confirmation Date.

## G.   Nonoccurrence of Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## H.   Contracts and Leases Entered into After the Petition Date

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed under section 365 of the Bankruptcy Code, will be performed by the applicable Debtor or Wind-Down Debtor liable thereunder in the ordinary course of its business. Such contracts and leases that are not rejected under the Plan shall survive and remain unaffected by entry of the Confirmation Order.

**ARTICLE VI.**

**PROVISIONS GOVERNING DISTRIBUTIONS**

## A.   Timing and Calculation of Amounts to Be Distributed

Except (1) as otherwise provided herein, (2) upon a Final Order, or (3) as otherwise agreed to by the Debtors, the Purchaser, or the Wind-Down Entity, as the case may be, and the Holder of the applicable Claim, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the next Distribution Date after such Claim becomes, as applicable, an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive the full amount of distributions that the Plan provides for Allowed Claims in the applicable Class from the Distribution Agent. In the event that any payment or distribution under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or distribution may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. Except as specifically provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

B.    **Rights and Powers of Distribution Agent**

1.    Powers of the Distribution Agent

The Distribution Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties and exercise its rights under the Plan; (b) make all distributions contemplated under the Plan; (c) employ professionals to represent it with respect to its responsibilities and powers; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions of the Plan.

2.    Expenses Incurred on or after the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Distribution Agent on or after the Effective Date and any reasonable compensation and expense reimbursement claims (including reasonable attorney and/or other professional fees and expenses) made by such Distribution Agent shall be paid in Cash by the Wind-Down Entity.

C.    **Delivery of Distributions and Undeliverable or Unclaimed Distributions**

1.    Distributions Generally

Except as otherwise provided in the Plan (including in paragraph 8 below), the Distribution Agent shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the applicable register or in the Debtors' records as of the date of any such distribution (as applicable), including the address set forth in any Proof of Claim filed by that Holder.

2.    Distributions on Account of Obligations of Multiple Debtors

For all purposes associated with distributions under the Plan, all guarantees by any Debtor of the obligations of any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor, shall be deemed eliminated so that any obligation that could otherwise be asserted against more than one Debtor shall result in a single distribution under the Plan.  Any such Claims shall be subject to all potential objections, defenses, and counterclaims, and to estimation pursuant to section 502(c) of the Bankruptcy Code.

3.    Record Date of Distributions

On the Distribution Record Date, the various transfer registers for each Class of Claims or Interests as maintained by the Debtors or their respective agents shall be deemed closed, and there shall be no further changes in the record Holders of any Claims or Interests.  The Distribution Agent shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date. In addition, with respect to payment of any Cure amounts or disputes over any Cure amounts, neither the Debtors nor the Distribution Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the Effective Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure amount.

4.    Special Rules for Distributions to Holders of Disputed Claims and Interests

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the Wind-Down Entity, on the one hand, and the Holder of a Disputed Claim or Interest, on the other hand, or

as set forth in a Final Order, no partial payments and no partial distributions shall be made with respect to a Disputed Claim or Interest until all of the Disputed Claim or Interest has become an Allowed Claim or Interest or has otherwise been resolved by settlement or Final Order; *provided* that, if the Wind-Down Entity does not dispute a portion of an amount asserted pursuant to an otherwise Disputed Claim or Interest, the Distribution Agent may make a partial distribution on account of such portion of such Claim or Interest that is not Disputed at the time and in the manner that the Distribution Agent makes distributions to similarly situated Holders of Allowed Claims or Interests pursuant to the Plan. Any dividends or other distributions arising from property distributed to Holders of Allowed Claims or Interests, as applicable, in a Class and paid to such Holders under the Plan shall also be paid, in the applicable amounts, to any Holder of a Disputed Claim or Interest, as applicable, in such Class that becomes an Allowed Claim or Interest after the date or dates that such dividends or other distributions were earlier paid to Holders of Allowed Claims or Interests in such Class.

     5.      <u>De Minimis Distributions; Minimum Distributions</u>

The Distribution Agent shall not make any Cash distributions to any Holder of an Allowed Claim or Interest pursuant to Article III.C.1-11 of this Plan on account of such Allowed Claim or Interest if such distribution is valued, in the reasonable discretion of the Distribution Agent, at less than $1.00, and each Holder of an Allowed Claim or Interest to which this limitation applies shall not be entitled to any distributions under the Plan. Notwithstanding anything to the contrary in this Plan, there shall be no minimum distribution threshold on account of distributions of any Cryptocurrency to Holders of Allowed Account Holder Claims and Allowed OpCo General Unsecured Claims.

     6.      <u>Undeliverable Distributions and Unclaimed Property</u>

In the event that either (a) a distribution to any Holder is returned as undeliverable or (b) the Holder of an Allowed Claim or Interest does not respond to a request by the Debtors or the Distribution Agent for information necessary to facilitate a particular distribution, no distribution to such Holder shall be made unless and until the Distribution Agent has determined the then-current address of such Holder or received the necessary information to facilitate a particular distribution, at which time such distribution shall be made to such Holder without interest, dividends, or other accruals of any kind; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code on the date that is one year after the Effective Date. After such date, all unclaimed property or interests in property shall revert to the Wind-Down Entity automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable local, state, federal, or foreign escheat, abandoned, or unclaimed property laws to the contrary), and the Claim or Interest of any Holder to such property or interest in property shall not be entitled to any distributions under the Plan.

     7.      <u>Manner of Payment Pursuant to the Plan</u>

At the option of the Distribution Agent, any Cash payment to be made hereunder may be made by check, wire transfer, automated clearing house, credit card, or as otherwise provided in applicable agreements.

     8.      <u>Distributions of Net Owed Coins; Additional Bankruptcy Distributions</u>

As a general matter, the Purchaser will allocate each Account Holder's Net Owed Coins to its account on the Binance.US Platform, and each Holder of OpCo General Unsecured Claim's Pro Rata share of the Distributable Cryptocurrency (in Cash) to its account on the Binance.US Platform in accordance with, and subject to, the provisions of Section 6.12 of the Asset Purchase Agreement.

As a general matter, the Customer Onboarding Protocol will provide that Purchaser will make Additional Bankruptcy Distributions to Transferred Creditors corresponding to their Pro Rata shares of such Additional Bankruptcy Distribution (if such Additional Bankruptcy Distribution is in Cryptocurrency, based on the Transferred Cryptocurrency Value of the Cryptocurrency included in such Additional Bankruptcy Distribution), all in accordance with any applicable Post-Bankruptcy Statement (as defined in the Asset Purchase Agreement).

If any Account Holder or Holder of an Allowed OpCo General Unsecured Claim does not become a Transferred Creditor prior to the date that is three (3) months following the later of the Closing Date or the date on which the terms and conditions for the Binance.US Platform are made available for such Person to accept (as provided in the Customer Onboarding Protocol), then Purchaser shall convert any Cryptocurrency allocable to such Person into U.S. Dollars at the then-prevailing rates (including applicable fees, spreads, costs and expenses) on the Binance.US Platform and deliver such U.S. Dollars, together with any cash or others assets in respect of such Persons, to the Debtors within five (5) Business Days, for further distribution by the Debtors in accordance with this Plan and the Customer Onboarding Protocol.

If any Account Holder or Holder of an Allowed OpCo General Unsecured Claim is located in an Unsupported Jurisdiction (as defined in the Asset Purchase Agreement), then the Net Owed Coins, if applicable, and Additional Bankruptcy Distributions allocable to such Person shall be handled pursuant to Section 6.12(b) or, if applicable, Section 6.14(d) of the Asset Purchase Agreement.

Purchaser shall have no responsibility to make any distributions other than as contemplated by Sections 6.12 and 6.14 of the Asset Purchase Agreement.

**D.      Compliance Matters**

In connection with the Plan, to the extent applicable, the Debtors, the Wind-Down Entity, any Distribution Agent, and any other applicable withholding and reporting agents shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Debtors, the Wind-Down Entity, the Distribution Agent, and any other applicable withholding and reporting agents shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including wind-down a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms that are reasonable and appropriate; *provided* that the Wind-Down Entity and the Distribution Agent, as applicable, shall request appropriate documentation from the applicable distributees and allow such distributees a reasonable amount of time to respond.  The Debtors, the Wind-Down Entity, the Distribution Agent, and any other applicable withholding and reporting agents reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

**E.      Foreign Currency Exchange Rate**

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim, asserted in government issued currency (for the avoidance of doubt, not including any Cryptocurrency) other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using

the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Effective Date.

## F. Claims Paid or Payable by Third Parties

### 1. Claims Paid by Third Parties

The Debtors or the Wind-Down Entity, as applicable, shall reduce a Claim or Interest, and such Claim or Interest (or portion thereof) shall be disallowed without an objection to such Claim or Interest having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim or Interest receives a payment on account of such Claim or Interest from a party that is not a Debtor or Wind-Down Debtor (or other Distribution Agent), as applicable, including any payments made in connection with the Sale Transaction. To the extent a Holder of a Claim or Interest receives a distribution on account of such Claim or Interest and receives payment from a party that is not a Debtor or a Wind-Down Debtor (or other Distribution Agent), including payments made in connection with the Sale Transaction, as applicable, on account of such Claim or Interest, such Holder shall, within ten Business Days of receipt thereof, repay, return, or deliver any distribution held by or transferred to the Holder to the applicable Wind-Down Debtor to the extent the Holder's total recovery on account of such Claim or Interest from the third party and under the Plan exceeds the amount of such Claim or Interest as of the date of any such distribution under the Plan. The failure of such Holder to timely repay, return, or deliver such distribution shall result in the Holder owing the applicable Wind-Down Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the ten-Business Day grace period specified above until the amount is repaid.

### 2. Claims Payable by Third Parties

No distributions under the Plan shall be made on account of an Allowed Claim or Interest that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim or Interest has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim or Interest (if and to the extent adjudicated by a court of competent jurisdiction or otherwise settled), then immediately upon such payment, such Claim or Interest may be expunged or reduced on the Claims Register by the Claims, Noticing, and Solicitation Agent to the extent of any such payment without an objection to such Claim or Interest having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

### 3. Applicability of Insurance Policies

Except as otherwise provided herein, payments to Holders of Claims or Interests shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any rights, defenses, or Cause of Action that the Debtors, the Wind-Down Entity or any other Entity may hold against any other Entity, including insurers, under any policies of insurance, agreements related thereto, or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any rights or defenses, including coverage defenses, held by such insurers under the applicable insurance policies, agreements related thereto, and applicable non-bankruptcy law.

## G. Setoffs and Recoupment

Except as otherwise expressly provided for herein, each Debtor, Wind-Down Debtor, the Wind-Down Entity, or such Entity's designee as instructed by such Debtor, Wind-Down Entity, as applicable, may, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code),

applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, set off against or recoup from an Allowed Claim and any distributions to be made pursuant to the Plan on account of such Allowed Claim, any Claims, rights, and Causes of Action of any nature whatsoever that the Debtor, Wind-Down Debtor or Wind-Down Entity, as applicable, may have against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action have not been otherwise compromised, settled, or released on or prior to the Effective Date (whether pursuant to the Plan or otherwise). Notwithstanding the foregoing, except as expressly stated in Article VIII of this Plan, neither the failure to effect such a setoff or recoupment nor the non-allowance of any Claim pursuant to the Plan shall constitute a waiver or release by the Debtors or the Wind-Down Entity of any such Claims, rights, or Causes of Action the Debtors or the Wind-Down Entity may possess against such Holder.

## H.    Allocation between Principal and Accrued Interest

Except as otherwise provided herein, the aggregate consideration paid to Holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof and as determined for federal income tax purposes) and second, to the extent the consideration exceeds the principal amount of the Allowed Claims, to the remaining portion of such Allowed Claim if any.

## ARTICLE VII.

## PROCEDURES FOR RESOLVING DISPUTED,
## CONTINGENT, AND UNLIQUIDATED CLAIMS AND INTERESTS

## A.    Disputed Claims Process

After the Effective Date, the Wind-Down Entity, and any party-in-interest, shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim or Interest immediately before the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim or Interest shall become an Allowed Claim or Interest unless and until such Claim or Interest is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim or Interest. If a Holder of a Claim or Interest in Class disputes the amount of their Claim or Interest as listed in the Schedules, the Holder should notify the Debtors or the Wind-Down Entity of such dispute. If the Debtors and the Holder agree to an amended Claim amount prior to the Effective Date, the Debtors shall file amended Schedules prior to the Effective Date. If between the Confirmation Date and the Effective Date, the dispute cannot be consensually resolved, the Holder may seek (by letter to the Court) to have the claim or interest dispute resolved before the Bankruptcy Court (and, with the consent of the Debtors, before any other court or tribunal with jurisdiction over the parties). After the Effective Date, the creditor may seek to have the claim dispute resolved before the Bankruptcy Court or any other court or tribunal with jurisdiction over the parties.

Unless relating to a Claim or Interest expressly Allowed pursuant to the Plan, all Proofs of Claim filed in these Chapter 11 Cases shall be considered objected to and Disputed without further action by the Debtors. Upon the Effective Date, all Proofs of Claim filed against the Debtors, regardless of the time of filing, and including Proofs of Claim filed after the Effective Date, shall be deemed withdrawn and expunged, other than as provided below. Notwithstanding anything in this Plan to the contrary: (1) all Claims against the Debtors that result from the Debtors' rejection of an Executory Contract or Unexpired Lease; (2) Claims filed to dispute the amount of any proposed Cure pursuant to section 365 of the Bankruptcy Code; and (3) Claims that the Debtors seek to have determined by the Bankruptcy Court, shall

in all cases be determined by the Bankruptcy Court, if not otherwise resolved through settlement with the applicable claimant.

Notwithstanding any provision herein to the contrary, nothing in the Disclosure Statement, Plan, or Confirmation Order grants the Bankruptcy Court with jurisdiction over any police and regulatory actions by the SEC, and the SEC shall retain the power and authority to commence and continue any such actions against any person or entity, including without limitation, the Debtors, in any forum with jurisdiction, provided, however, that enforcement of any money judgment against the Debtors must be in accordance with the Plan. In addition, the SEC may file any proof of claim by the Government Bar Date or such later date as ordered by the Bankruptcy Court and amend its proof of claim upon determination of liability on its claims. Any objection to such claim shall be in accordance with Bankruptcy Rule 3007, and such claim shall not automatically be deemed objected to, withdrawn, or expunged.

On the Effective Date, the Debtors or Wind-Down Trustee, as applicable, may establish one or more accounts or funds to hold and dispose of certain assets, pursue certain litigation (including the Causes of Action preserved under the Plan or otherwise vesting in the Wind-Down Trust), and/or satisfy certain Claims (including Claims that are contingent or have not yet been Allowed). For any such account or fund, the Debtors or the Wind-Down Trustee, as applicable, may take the position that grantor trust treatment applies in whole or in part. To the extent such treatment applies to any such account or fund, for all U.S. federal income tax purposes, the beneficiaries of any such account or fund would be treated as grantors and owners thereof, and it is intended, to the extent reasonably practicable, that any such account or fund would be classified as a liquidating trust under section 301.7701-4 of the Treasury Regulations. Alternatively, any such account or fund may be subject to the tax rules that apply to "disputed ownership funds" under 26 C.F.R. 1.468B–9. If such rules apply, such assets would be subject to entity-level taxation, and the Debtors and Wind-Down Trustee would be required to comply with the relevant rules.

## B.      Objections to Claims or Interests

Except as otherwise specifically provided in the Plan, after the Effective Date, the Wind-Down Entity shall have the sole authority to:  (1) File, withdraw, or litigate to judgment, any objections to Claims or Interests; and (2) settle or compromise any Disputed Claim or Interest without any further notice to or action, order, or approval by the Bankruptcy Court. For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, the Wind-Down Entity shall have and retain any and all rights and defenses each such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to Article IV.P of the Plan.

Any objections to Claims or Interests shall be Filed on or before the Claims Objection Bar Date. For the avoidance of doubt, the Bankruptcy Court may extend the time period to object to Claims or Interests set forth in this paragraph at any time, including before or after the expiration of one hundred eighty days after the Effective Date, in its discretion or upon request by the Debtors or any party in interest.

## C.      Estimation of Claims

Before or after the Effective Date, the Debtors or the Wind-Down Entity, as applicable, may (but are not required to), at any time, request that the Bankruptcy Court estimate any Disputed Claim or Interest that is contingent or unliquidated pursuant to applicable law, including pursuant to section 502(c) of the Bankruptcy Code, for any reason, regardless of whether any party previously has objected to such Disputed Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under sections 157 and 1334 of the Judicial Code to estimate any such Disputed Claim or Interest, including during the litigation of any objection to any Disputed Claim or Interest or during the pendency of any appeal relating to such objection. Notwithstanding any provision

otherwise in the Plan, a Disputed Claim or Interest that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions) and may be used as evidence in any supplemental proceedings, and the Debtors or the Wind-Down Entity may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Disputed Claim or Interest that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before fourteen days after the date on which such Disputed Claim or Interest is estimated.

## D.    No Distributions Pending Allowance

Notwithstanding any other provision of the Plan, if any portion of a Claim or Interest is a Disputed Claim or Interest, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest; *provided* that if only a portion of a Claim or Interest is Disputed, such Claim or Interest shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount.

## E.    Distributions After Allowance

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim or Interest in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court Allowing any Disputed Claim or Interest becomes a Final Order, the Distribution Agent shall provide to the Holder of such Allowed Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest, dividends, or accruals to be paid on account of such Allowed Claim or Interest unless required under applicable bankruptcy law.

## F.    No Interest

Unless otherwise specifically provided for herein or by Final Order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on Claims against the Debtors, and no Holder of a Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such Claim. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

## G.    Adjustment to Claims and Interests without Objection

Any Claim or Interest that has been paid, satisfied, amended, superseded, cancelled, or otherwise expunged (including pursuant to the Plan) may be adjusted or expunged on the Claims Register at the direction of the Wind-Down Entity without the Wind-Down Entity having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court. Additionally, any Claim or Interest that is duplicative or redundant with another Claim or Interest against the same Debtor may be adjusted or expunged on the Claims Register at the direction of the Wind-Down Entity without the Wind-Down Entity having to File an application, motion, complaint, objection, or any other legal proceeding

seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

**H.      Time to File Objections to Claims**

Any objections to Claims shall be Filed on or before the Claims Objection Bar Date.

**I.      Disallowance of Claims or Interests**

Any Claims or Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims or Interests until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Wind-Down Entity, as applicable.

**Except as otherwise provided herein or as agreed to by the Debtors or the Wind-Down Entity, any and all Proofs of Claim Filed after the Bar Date shall be deemed disallowed and expunged as of the Effective Date without any further notice to, or action, order, or approval of, the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order.**

**J.      Amendments to Proofs of Claim**

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Proof of Claim or Proof of Interest may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Wind-Down Entity, and any such new or amended Proof of Claim or Proof of Interest Filed shall be deemed disallowed in full and expunged without any further action, order, or approval of the Bankruptcy Court.

## ARTICLE VIII.

## EFFECT OF CONFIRMATION OF THE PLAN

**A.      Releases by the Debtors**

**Notwithstanding anything contained in the Plan to the contrary, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Wind-Down Debtors, and their Estates, the Wind-Down Entity, and in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of, the foregoing Entities, from any and all Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their**

capital structure, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Chapter 11 Cases and related adversary proceedings, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, the administration and implementation of the Restructuring Transactions or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019, of the releases described in this Article VIII.A by the Debtors, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article VIII.A is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) except to the extent contemplated by Article IV.E and Article IV.F of the Plan, a bar to any of the Debtors or Wind-Down Debtors or their respective Estates or Wind-Down Entity asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

Notwithstanding anything to the contrary contained herein, nothing in this Plan shall release, waive, or otherwise limit the (i) rights, duties, or obligations of the Purchaser under the Asset Purchase Agreement or the Definitive Documents and (ii) the Non-Released D&O Claims, but such Non-Released D&O Claims shall remain subject to the limitations contained in Article IV.E and Article IV.F of this Plan.

B.      Releases by Holders of Claims and Interests

Except as expressly set forth in the Plan, effective on the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted or assertable on behalf of any of the Debtors, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the

pursuit of consummation of the Plan, the administration and implementation of the Restructuring Transactions, or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date, *provided* that nothing in this Article VIII.B shall be construed to release the Released Parties from actual fraud, willful misconduct, or gross negligence as determined by a Final Order.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII.B, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article VIII.B is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) except to the extent contemplated by Article IV.F and Article IV.G of the Plan, a bar to any of the Releasing Parties or the Debtors or Wind-Down Debtors or their respective Estates or Wind-Down Entity asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

## C. Exculpation

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor release or the third-party release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is exculpated from any Cause of Action for any act or omission arising on or after the Petition Date and prior to the Effective Date based on the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing, or consummation of the Disclosure Statement, the Plan, the Special Committee Investigation, any Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for Causes of Action related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan

D.    **Injunction**

      **The assets of the Debtors and of the Wind-Down Entity shall be used for the satisfaction of expense obligations and the payment of Claims and Interests only in the manner set forth in this Plan and shall not be available for any other purpose.  All Persons and Entities who have held, hold, or may hold Claims or Interests based upon any act, omission, transaction, or other activity of any kind or nature related to the Debtors, the Wind-Down Entity, or the Debtors' Chapter 11 Cases that occurred prior to the Effective Date, other than as expressly provided in the Plan or the Confirmation Order, shall be precluded and permanently enjoined on and after the Effective Date from interfering with the use and distribution of the Debtors' assets in the manner contemplated by the Plan.**

      **In addition, as of the Effective Date and subject to the occurrence of the Effective Date, except as otherwise specifically provided in this Plan or the Confirmation Order, all Persons and Entities who have held, hold, or may hold Claims or Interests that are fully satisfied pursuant to the Plan or any Claim or Interest that is subject to the releases and exculpations set forth in Article VIII.B and Article VIII.C of this Plan shall be precluded and permanently enjoined on and after the Effective Date from enforcing, pursuing, or seeking any setoff or relief with respect to such Claims or Interests, except for the receipt of the payments or distributions that are contemplated by this Plan.**

E.    **Release of Liens**

      Except as otherwise provided in the Plan, the Plan Supplement, or any contract, instrument, release, or other agreement or document created pursuant to the Plan or Confirmation Order on the Effective Date, and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, compromised, and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Debtors shall automatically revert to the applicable Debtor or Wind-Down Debtor, as applicable, and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors.  Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as requested by the Debtors or Wind-Down Entity to evidence the release of such Lien, including the execution, delivery, and filing or recording of such documents evidencing such releases.  The presentation or filing of the Confirmation Order to or with any local, state, federal, or foreign agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

F.    **OSC and SEC**

      Notwithstanding any language to the contrary herein, no provision shall (a) preclude the OSC or the SEC from enforcing its police or regulatory powers; or (b) enjoin, limit, impair or delay the OSC or SEC from commencing or continuing any claims, causes of action, proceeding, or investigations against any non-Debtor person or non-Debtor entity in any forum.

G.    **Protection against Discriminatory Treatment**

      As provided by section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Entity, including Governmental Units, shall discriminate against any Wind-Down Debtor or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, or discriminate with respect to such a grant against, any

Wind-Down Debtor, or any Entity with which a Wind-Down Debtor has been or is associated, solely because such Wind-Down Debtor was a debtor under chapter 11 of the Bankruptcy Code, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

## H.     Document Retention

Upon the occurrence of the Effective Date, the Debtors' books and records shall be transferred to the Wind-Down Entity, which shall continue to preserve all financial books and records, emails, and other financial documents relating to the Debtors' business that are currently in the Debtors' possession.  The Wind-Down Trust shall not destroy or otherwise abandon any such documents or records without providing advance notice to the U.S. Securities and Exchange Commission (c/o Therese Scheuer, U.S. Securities and Exchange Commission, 100 F Street, NE, Washington, DC 20549, ScheuerT@SEC.GOV) and seeking further authorization from this Court.  Nothing in this Plan or the Confirmation Order shall affect the obligations of the pre-Effective Date Debtors, the Wind-Down Entity, and/or any transferee or custodian to maintain all books and records that are subject to any governmental subpoena, document preservation letter, or other investigative request from a governmental agency.

## I.     Reimbursement or Contribution

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (1) such Claim has been adjudicated as non-contingent; or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

## J.     Term of Injunctions or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code, or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.  **All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.**

## ARTICLE IX.

## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

## A.     Conditions Precedent to the Effective Date

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article IX.B of the Plan:

1. The Bankruptcy Court shall have entered the Confirmation Order, which shall be in a form and substance reasonably satisfactory to the Debtors and the Committee, and subject to the consent rights of Purchaser under the Asset Purchase Agreement, and such order shall be a Final Order and in full force and effect.

2. The Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan, Definitive Documents, and the Asset Purchase Agreement.

3. Each Definitive Document and each other document contained in any supplement to the Plan, including the Plan Supplement and any exhibits, schedules, amendments, modifications or supplements thereto or other documents contained therein, shall have been executed or Filed, as applicable, in form and substance consistent in all respects with the Plan, and subject to the Purchaser's consent rights under the Asset Purchase Agreement, and shall not have been modified in a manner inconsistent therewith;

4. The Professional Fee Escrow Account shall have been established and funded with Cash in accordance with Article II.B.2 of the Plan.

5. The Wind-Down Reserve shall have been established and funded with Cash in accordance with the Plan.

6. If prior to the Outside Date, the Asset Purchase Agreement shall be in full force and effect and the Sale Transaction shall have been consummated.

7. The Restructuring Transactions shall have been consummated or shall be anticipated to be consummated concurrently with the occurrence of the Effective Date in a manner consistent with the Plan, the Customer Onboarding Protocol, the other Definitive Documents, and the Asset Purchase Agreement, and the Plan shall have been substantially consummated or shall be anticipated to be substantially consummated concurrently with the occurrence of the Effective Date.

**B.     Waiver of Conditions Precedent**

The Debtors, with the consent of the Committee and, solely to the extent related to the Asset Purchase Agreement and the Sale Transaction, prior to the Outside Date, the consent of Purchaser, may waive any of the conditions to the Effective Date set forth in Article IX.A of the Plan at any time, without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm and consummate the Plan.

**C.     Effect of Non-Occurrence of Conditions to Consummation**

If the Effective Date does not occur within 120 days after the Confirmation Date, then the Plan will be null and void in all respects, any and all compromises or settlements not previously approved by Final Order of the Bankruptcy Court embodied in the Plan (including with respect to the fixing, limiting, or treatment of any Claim or Interest, including, without limitation, the Alameda Loan Facility Claims), shall be deemed null and void, and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any Claims, Interests, or Causes of Action held by any Debtor or any other Entity; (2) prejudice in any manner the rights of any Debtor or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity in any respect.

## ARTICLE X.

## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

**A.     Modification of Plan**

Subject to the limitations and terms contained in the Plan and Purchaser's consent rights under the Asset Purchase Agreement, the Debtors, with the consent of the Committee, reserve the right to (1) amend or modify the Plan before the entry of the Confirmation Order, in accordance with the Bankruptcy Code and the Bankruptcy Rules and (2) after the entry of the Confirmation Order, the Debtors or the Wind-Down Entity, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, to remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan consistent with the terms set forth herein.

**B.     Effect of Confirmation on Modifications**

Entry of the Confirmation Order shall constitute approval of all modifications or amendments to the Plan occurring after the solicitation thereof pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

**C.     Revocation or Withdrawal of Plan**

The Debtors reserve the right, with the consent of the Committee, to revoke or withdraw the Plan with respect to any or all Debtors before the Confirmation Date and to File subsequent chapter 11 plans.  If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then: (1) the Plan will be null and void in all respects; (2) any settlement or compromise not previously approved by Final Order of the Bankruptcy Court embodied in the Plan (including the fixing or limiting to an amount certain of the Claims or Classes of Claims), assumption or rejection of Executory Contracts or Unexpired Leases effectuated by the Plan, and any document or agreement executed pursuant to the Plan will be null and void in all respects; and (3) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims, Interests, or Causes of Action by any Entity, (b) prejudice in any manner the rights of any Debtor or any other Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

## ARTICLE XI.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.     Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.        decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.        resolve any matters related to Executory Contracts or Unexpired Leases, including: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure Claims or other Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed or assumed and assigned; and (c) any dispute regarding whether a contract or lease is or was executory, expired, or terminated;

4.        ensure that distributions to Holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

5.        adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor or the Estates that may be pending on the Effective Date;

6.        enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of (a) contracts, instruments, releases, and other agreements or documents approved by Final Order in the Chapter 11 Cases and (b) the Plan, the Confirmation Order, and contracts, instruments, releases, and other agreements or documents created in connection with the Plan; *provided* that the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection, or dispute resolution clause that refers disputes to a different court;

7.        enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

8.        grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

9.        issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

10.        hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Cases, including: (a) with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or an Interest for amounts not timely repaid pursuant to Article VI of the Plan; (b) with respect to the releases, injunctions, and other provisions contained in Article VIII of the Plan, including entry of such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions; (c) anything that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan and the Confirmation Order; or (d) related to section 1141 of the Bankruptcy Code;

11.        enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

12.     adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

13.     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

14.     enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases with respect to any Entity, and resolve any cases, controversies, suits, or disputes that may arise in connection with any Entity's rights arising from or obligations incurred in connection with the Plan;

15.     hear and determine matters concerning local, state, federal, and foreign taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

16.     enter an order or Final Decree concluding or closing the Chapter 11 Cases;

17.     enforce all orders previously entered by the Bankruptcy Court; and

18.     hear and determine any other matters related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code or the Judicial Code.

Nothing herein limits the jurisdiction of the Bankruptcy Court to interpret and enforce the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, or the Disclosure Statement, without regard to whether the controversy with respect to which such interpretation or enforcement relates may be pending in any state or other federal court of competent jurisdiction.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in this Article XI, the provisions of this Article XI shall have no effect on and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

Unless otherwise specifically provided herein or in a prior order of the Bankruptcy Court, the Bankruptcy Court shall have exclusive jurisdiction to hear and determine disputes concerning Claims against or Interests in the Debtors that arose prior to the Effective Date.

## ARTICLE XII.

## MISCELLANEOUS PROVISIONS

A.     **Immediate Binding Effect**

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtors, the Wind-Down Entity, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, exculpations, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims against and Interests in the Debtors shall be

as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or Interest has voted on the Plan.

**B.      Additional Documents**

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors, the Wind-Down Entity, and all Holders of Claims and Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

**C.      Payment of Statutory Fees**

All fees and applicable interest payable pursuant to section 1930 of the Judicial Code and 31 U.S.C. § 3717, as applicable, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the Wind-Down Debtors (or the Distribution Agent on behalf of the Wind-Down Entity) for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or a Final Decree is issued, whichever occurs first.

**D.      Dissolution of Statutory Committees**

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases; *provided*, however, that such committees will remain in existence for the limited purposes of (a) pursuing, supporting, or otherwise participating in, any outstanding appeals in the Chapter 11 Cases; and (b) filing, objecting, or otherwise participating in, any final fee applications of Professionals.

**E.      Reservation of Rights**

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests, unless and until the Effective Date has occurred.

**F.      Successors and Assigns**

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiary, or guardian, if any, of each such Entity.

**G.      Service of Documents**

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Wind-Down Debtors shall be served on:

| Wind-Down Debtors | **Voyager Digital Holdings, Inc.** |
| | 33 Irving Place |
| | New York, New York 10003 |
| | Attention: David Brosgol |
| | General Counsel, |
| | E-mail address: dbrosgol@investvoyager.com |
| | |
| | with copies for information only (which shall not constitute notice) to: |
| | |
| Counsel to the Debtors | **Kirkland & Ellis LLP** |
| | **Kirkland & Ellis International LLP** |
| | 601 Lexington Avenue |
| | New York, New York 10022 |
| | Attention: Joshua A. Sussberg, P.C., Christopher Marcus, P.C., Christine A. Okike, P.C., and Allyson B. Smith |
| | |
| Counsel to the Committee | **McDermott Will & Emery LLP** |
| | One Vanderbilt Avenue |
| | New York, New York 10017 |
| | Attention: Darren Azman |

## H. Entire Agreement; Controlling Document

Except as otherwise indicated, on the Effective Date, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations with respect to the subject matter of the Plan, all of which will have become merged and integrated into the Plan; *provided, however*, that notwithstanding the foregoing or anything to the contrary herein, to the extent there is any conflict between the Plan and the Confirmation Order, on the one hand, and the Asset Purchase Agreement, on the other hand, the Asset Purchase Agreement shall govern solely in the event the Sale Transaction is consummated. Except as set forth in the Plan, in the event that any provision of the Disclosure Statement, the Plan Supplement, or any order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control. In the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall control.

## I. Plan Supplement

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the website of the Claims, Noticing, and Solicitation Agent at https://cases.stretto.com/Voyager or the Bankruptcy Court's website at http://www.nysb.uscourts.gov. Unless otherwise ordered by the Bankruptcy Court, to the extent any exhibit or document in the Plan Supplement is inconsistent with the terms of any part of the Plan that does not constitute the Plan Supplement, such part of the Plan that does not constitute the Plan Supplement shall control.

**J.    Non-Severability**

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, subject to the Purchaser's consent rights under the Asset Purchase Agreement prior to the Outside Date, shall have the power to alter and interpret such term or provision to make it valid or enforceable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is:  (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent, consistent with the terms set forth herein; and (3) non-severable and mutually dependent.

**K.    Votes Solicited in Good Faith**

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors, and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties nor individuals or the Wind-Down Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan or any previous plan.

**L.    Waiver or Estoppel**

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed prior to the Confirmation Date.

Dated:  January 10, 2023

VOYAGER DIGITAL HOLDINGS, INC.
on behalf of itself and all other Debtors


*/s/ Stephen Ehrlich*
Stephen Ehrlich
Co-Founder and Chief Executive Officer
Voyager Digital Holdings, Inc.

**Exhibit B**

**Liquidation Analysis**

## LIQUIDATION ANALYSIS FOR VOYAGER DIGITAL HOLDINGS, INC., *et al.*[1]

I.  **INTRODUCTION**

Under the "best interests of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code, a bankruptcy court may not confirm a plan under chapter 11 of the Bankruptcy Code unless each holder of an allowed claim or interest in an impaired class either: (a) accepts the plan; or (b) will receive or retain property on account of such claim or interest of a value, as of the effective date of the plan, that is not less than the amount such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To demonstrate that the proposed plan satisfies the "best interests of creditors" test, the Debtors, with the assistance of their advisors, have prepared the following hypothetical liquidation analysis presenting recoveries available assuming a hypothetical liquidation (the "Liquidation Analysis"), which is based upon certain assumptions discussed in the Disclosure Statement and in the accompanying notes to this Liquidation Analysis.

This Liquidation Analysis sets forth an estimated range of recovery values for each Class of Claims and Interests that may be realizable upon the disposition of assets pursuant to a hypothetical chapter 7 liquidation of the Debtors' estates.  As illustrated by this Liquidation Analysis, Holders of Claims in certain Unimpaired Classes that would receive a full recovery under either the Plan or Plan Toggle scenarios would receive less than a full recovery in a hypothetical liquidation.  Additionally, Holders of Claims or Interests in Impaired Classes would receive a lower recovery in a hypothetical liquidation than they would under either the Plan or Plan Toggle scenario.  Further, no Holder of a Claim or Interest would receive or retain property under the Plan or Plan Toggle scenario of a value that is less than such Holder would receive in a hypothetical chapter 7 liquidation.  Accordingly, and as set forth in greater detail below, the Debtors believe that both the Plan and Plan Toggle scenarios satisfy the "best interests of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code.

**Statement of Limitations**

The preparation of a liquidation analysis is an uncertain process involving the extensive use of significant estimates and assumptions that, although considered reasonable by the Debtors based upon their business judgment and input from their advisors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors, their management, and their advisors.  Inevitably, some assumptions in this Liquidation Analysis would not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could materially affect the ultimate results in an actual chapter 7 liquidation.  This Liquidation Analysis was prepared for the sole purpose of generating a reasonable, good faith estimate of the proceeds that would be generated if the Debtors' assets were liquidated in accordance with chapter 7 of the Bankruptcy Code.  This Liquidation Analysis is not intended and should not be used for any other purpose.  The underlying financial information in this Liquidation Analysis and values stated herein have not been subject to any review, compilation, or audit by any independent accounting firm.  In addition, various liquidation decisions upon which certain assumptions are based are subject to change.  As a result, the actual amount of Claims that would ultimately be Allowed against the Debtors' estates could vary significantly from the estimates stated herein, depending on the nature and amount of Claims asserted during the pendency of the hypothetical chapter 7 cases.  Similarly, the value of the Debtors' assets in a liquidation scenario is uncertain and could vary significantly from the values set forth in this Liquidation Analysis.

NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS OF A CHAPTER 7 LIQUIDATION OF THE DEBTORS' ESTATES WOULD OR WOULD NOT, IN WHOLE OR IN PART, APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THIS LIQUIDATION ANALYSIS.  THE ACTUAL LIQUIDATION VALUE

---

[1]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the *First Amended Disclosure Statement Relating to the Second Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Disclosure Statement").

OF THE DEBTORS' ESTATES IS SPECULATIVE AND RESULTS COULD VARY MATERIALLY FROM ESTIMATES PROVIDED IN THIS LIQUIDATION ANALYSIS.

THE RECOVERIES SHOWN DO NOT CONTEMPLATE A SALE OR SALES OF THE DEBTORS' BUSINESS UNITS ON A GOING CONCERN BASIS. WHILE THE DEBTORS MAKE NO ASSURANCES, IT IS POSSIBLE THAT PROCEEDS RECEIVED FROM SUCH GOING CONCERN SALE(S) WOULD BE MORE THAN IN THE HYPOTHETICAL LIQUIDATION, THE COSTS ASSOCIATED WITH THE SALE(S) WOULD BE LESS, FEWER CLAIMS WOULD BE ASSERTED AGAINST THE BANKRUPTCY ESTATES AND/OR CERTAIN ORDINARY COURSE CLAIMS WOULD BE ASSUMED BY THE BUYER(S) OF SUCH BUSINESS(ES).

THIS LIQUIDATION ANALYSIS IS A HYPOTHETICAL EXERCISE THAT HAS BEEN PREPARED FOR THE SOLE PURPOSE OF PRESENTING A REASONABLE, GOOD FAITH ESTIMATE OF THE PROCEEDS THAT WOULD BE REALIZED IF THE DEBTORS WERE LIQUIDATED IN ACCORDANCE WITH CHAPTER 7 OF THE BANKRUPTCY CODE AS OF THE PLAN EFFECTIVE DATE. THIS LIQUIDATION ANALYSIS IS NOT INTENDED AND SHOULD NOT BE USED FOR ANY OTHER PURPOSE. THIS LIQUIDATION ANALYSIS DOES NOT PURPORT TO BE A VALUATION OF THE DEBTORS' ASSETS AS A GOING CONCERN, AND THERE MAY BE A SIGNIFICANT DIFFERENCE BETWEEN THIS LIQUIDATION ANALYSIS AND THE VALUES THAT MAY BE REALIZED OR CLAIMS GENERATED IN AN ACTUAL LIQUIDATION. NOTHING CONTAINED IN THIS LIQUIDATION ANALYSIS IS INTENDED TO BE, OR CONSTITUTES, A CONCESSION, ADMISSION, OR ALLOWANCE OF ANY CLAIM AGAINST OR INTEREST IN THE DEBTORS. THE ACTUAL AMOUNT OR PRIORITY OF ALLOWED CLAIMS AND INTERESTS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH AND USED IN THIS LIQUIDATION ANALYSIS. THE DEBTORS RESERVE ALL RIGHTS TO SUPPLEMENT, MODIFY, OR AMEND THE ANALYSIS SET FORTH HEREIN.

**Basis of Presentation**

This Liquidation Analysis has been prepared assuming that the Debtors convert their current chapter 11 cases to cases under chapter 7 of the Bankruptcy Code on or about April 18, 2023 (the "Conversion Date"). Except as otherwise noted herein, this Liquidation Analysis is based upon the unaudited balance sheets of the Debtors as of October 31, 2022, and those values, in total, are assumed to be representative of the Debtors' assets and liabilities as of the Conversion Date. Certain balances, including cash and cryptocurrency, and certain receipts and expenses have been projected forward or estimated as of the Conversion Date. As noted above, the assets available to the Debtors in an actual liquidation may differ from the assets assumed to be available pursuant to this Liquidation Analysis.

In preparing this Liquidation Analysis, the Debtors estimated Allowed Claims based upon a review of the Debtors' financial statements. In addition, this Liquidation Analysis includes estimates for Claims not currently asserted in the chapter 11 cases, but which could be asserted and Allowed in a chapter 7 liquidation, including unpaid chapter 11 Administrative Claims, chapter 7 Administrative Claims such as liquidation and wind-down expenses, trustee fees, tax liabilities, and professional fees attributable to the liquidation and wind-down. To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims that were used for purposes of preparing this Liquidation Analysis. Therefore, the Debtors' estimate of Allowed Claims set forth in this Liquidation Analysis should not be relied on for any other purpose, including determining the value of any distributions to be made on account of Allowed Claims and Interests under the Plan or Plan Toggle scenario.

**Conversion Date and Appointment of a Chapter 7 Trustee**

This Liquidation Analysis assumes that on the Conversion Date, the Bankruptcy Court would appoint a chapter 7 trustee to oversee the liquidation of the Debtors' estates, during which time all of the Debtors' assets would be sold or surrendered and the cash proceeds, net of liquidation-related costs, would then be distributed to creditors in accordance with applicable law. There can be no assurance, however, that the liquidation would be completed within a certain timeframe, nor is there any assurance that the recoveries assigned to the assets would in fact be realized. In accordance with section 704 of the Bankruptcy Code, a trustee must, among other duties, collect and convert the property of the estate as expeditiously (generally at distressed prices) as is compatible with the best interests of parties in interest.

**Deconsolidated Liquidations**

This Liquidation Analysis assumes that the Debtors would be liquidated in a jointly administered, but not substantively consolidated proceeding, and takes into account the administrative priority status of intercompany claims arising post-petition. The results of this analysis have been consolidated for convenience.

**Additional Global Notes and Assumptions**

This Liquidation Analysis should be read in conjunction with the following global notes and assumptions:

1. <u>Unaudited Financial Statements</u>. This Liquidation Analysis contains numerous estimates. Except as otherwise noted herein, available recoveries are based upon the unaudited financial statements and balance sheets of the Debtors as projected as of the Conversion Date.

2. <u>Chapter 7 Liquidation Costs</u>. The Debtors have assumed that a hypothetical chapter 7 liquidation would last approximately 12 months, in order to pursue sales of substantially all remaining assets and collect receivables as well as to arrange distributions and otherwise administer and close the estates. In an actual liquidation, the length of the wind-down process could vary significantly, thereby impacting recoveries. Accordingly, there can be no assurance that the values reflected in this Liquidation Analysis would be realized if the Debtors were, in fact, to undergo such a liquidation.

3. <u>Distribution of Net Proceeds</u>. Pursuant to section 726 of the Bankruptcy Code, Allowed Administrative Claims incurred by the chapter 7 trustee, including expenses affiliated with selling the Debtors' assets, are entitled to payment in full prior to any distribution to chapter 11 Administrative Claims or Other Priority Claims. The estimates used in this Liquidation Analysis for these expenses includes estimates for operational expenses and certain legal, accounting, and other professionals, as well as an assumed 3.0% fee based upon liquidated assets payable to the chapter 7 trustee. Any remaining net Cash would then be distributed to creditors in accordance with applicable law in the following priority: (a) first to pay the Allowed Secured Tax Claims, (b) second to pay any Allowed Administrative Claims, Priority Tax Claims, and Other Priority Claims; and (c) third to creditors holding Account Holder Claims and General Unsecured Claims.

   Under the absolute priority rule, no junior creditor at a given entity would receive any distribution until all senior creditors are paid in full at such entity, and no equity holder at such entity would receive any distribution until all creditors at such entity are paid in full. The assumed distributions to creditors as reflected in this Liquidation Analysis are estimated in accordance with the absolute priority rule.

4. <u>Certain Exclusions and Assumptions</u>. This Liquidation Analysis does not include detailed estimates for the tax consequences that may be triggered upon the liquidation and sale events included in the analysis. Such tax consequences may be material.

## II.   CONCLUSIONS

> **THE DEBTORS HAVE DETERMINED, AS SUMMARIZED IN THE FOLLOWING ANALYSIS, THAT CONFIRMATION OF THE PLAN WILL PROVIDE CREDITORS WITH A RECOVERY THAT IS GREATER THAN OR EQUAL TO WHAT THEY WOULD OTHERWISE RECEIVE IN CONNECTION WITH A LIQUIDATION OF THE DEBTORS UNDER CHAPTER 7 OF THE BANKRUPTCY CODE.**

### SUMMARY OF ESTIMATED RECOVERIES FOR CLAIMS AND INTERESTS

| Class | Name of Class Under Plan | Status Under the Plan | Estimated Percentage Recovery Under the Plan | Estimated Percentage Recovery Under the Plan Toggle | Recovery Under Hypothetical Liquidation (Low) | Recovery Under Hypothetical Liquidation (High) |
|---|---|---|---|---|---|---|
| Unclassified | Administrative Claims | Unimpaired | 100% | 100% | 100% | 100% |
| Unclassified | Priority Tax Claims | Unimpaired | 100% | 100% | 47% | 48% |
| 1 | Secured Tax Claims | Unimpaired | NA | NA | NA | NA |
| 2 | Other Priority Claims | Unimpaired | 100% | 100% | 99% | 99% |
| 3 | Account Holder Claims | Impaired | 51% | 45% | 35% | 39% |
| 4A | OpCo General Unsecured Claims | Impaired | 51% | 45% | 35% | 39% |
| 4B | HoldCo General Unsecured Claims | Impaired | 6% | 6% | 0% | 0% |
| 4C | TopCo General Unsecured Claims | Impaired | 64% | 64% | 65% | 65% |
| 5 | Alameda Loan Facility Claims | Impaired | 0% | 0% | 0% | 0% |
| 6 | Section 510(b) Claims | Impaired | NA | NA | NA | NA |
| 7 | Intercompany Claims[1] | Unimpaired | 0% | 0% | 0% | 0% |

| 8 | Intercompany Interests | Unimpaired | 0% | 0% | 0% | 0% |
| 9 | Existing Equity Interests | Impaired | 0% | NA | N/A | N/A |

*1) For purposes of this Liquidation Analysis, Intercompany Claims are assumed to be recharacterized as capital contributions.*

### III.   **NOTES FOR PROCEEDS AVAILABLE FOR DISTRIBUTION**

**A.**   ***Gross Liquidation Proceeds***

1.  Cash and Cash Equivalents:  This Liquidation Analysis projects the level of cash balances on hand from December 30, 2022 and represents the Debtor's best estimate of balances on hand at the Conversion Date. Balances are assumed to be recoverable at 100%. The cash balance does not reflect any cash proceeds or transaction fees from the Sale Transaction contemplated under the Plan.

2.  Cryptocurrency Assets Held:  Estimated cryptocurrency values at Conversion Date are based on spot prices as of December 18, 2022 and assumes certain illiquid cryptocurrencies are liquidated at a discount to account for the impact of market depth constraints, including an inherently volatile market and significant industry disruption as a result of recent filings from major players. This discount also reflects the impact of transaction fees.

3.  Other Assets / Investments (Non-Debtor): The Debtors have prepaid certain expenses, including but not limited to, professional fee retainers, licenses, engineering, software, marketing and various other contractual obligations. This Liquidation Analysis assumes that prepaid amounts will continue to be consumed during the liquidation period to offset against potential liabilities. The Debtors furthermore own equity investments in various private and public companies. The Liquidation Analysis reflects proceeds from the sale of these investments and assumes recovery rates between 0% and 100% across these positions depending on the liquidity of the investment.

4.  Claims against 3AC Estate: The Debtors have a claim against 3AC related to a cryptocurrency loan of 15,250 BTC and 350,000,000 USDC made in 2022. The value of the claim is based on prices as of October 31, 2022. This Liquidation Analysis makes no assumption regarding recovery on account of this claim and is reflected as a 0% recovery for purposes of this Liquidation Analysis.

5.  Intangible Assets:  Intellectual property owned by the Debtors is comprised of goodwill, favorable leasehold interests, trademarks, patents, license agreements, and e-commerce registered domain names (collectively, the "Debtors' IP"). The Liquidation Analysis assumes no recovery value for the Debtors' IP.

6.  Litigation Claims: Litigation claim recoveries are assumed to be the same under both the Plan, Plan Toggle and a Chapter 7 Liquidation and are not included for comparative purposes of this presentation.

**B.**   ***Liquidation Costs***

7.  Chapter 7 Professional Fees:  Professional fees include costs for financial advisors, attorneys, accountants, and other professionals retained by the chapter 7 trustee.  Professional fees were estimated to be approximately $18.2 million for the liquidation period, based on an estimate of approximately $0.1 million to $3.0 million per month with approximately 77% of the fees incurred in the first 6 months.

8.  Chapter 7 Trustee Fees:  In a Chapter 7 liquidation, the Bankruptcy Court may allow reasonable compensation for the trustee's services not to exceed a certain percentage of such proceeds greater than a set amount upon all proceeds disbursed or turned over in the case by the trustee to parties in interest.  Chapter 7 trustee fees were estimated at 3% of proceeds from liquidation, excluding recoveries related to cash and cash equivalents.

9. <u>Chapter 7 Estate Wind-Down Costs</u>:  During the chapter 7 liquidation period, the trustee will incur certain costs necessary to wind-down the estates.  Such expenses include the cost of the Debtors' operating personnel to liquidate customer accounts, technology and platform operating costs. For the entirety of the wind-down process, these costs have been estimated to be $ 16.9 million.

10. <u>3AC Litigation Pursuit:</u> The Debtors have a claim against 3AC related to a cryptocurrency loan of 15,250 BTC and 350,000,000 USDC made in 2022. This Liquidation Analysis makes no assumption regarding the cost of pursuit of recovery of this claim and therefore does not reflect the cost of any related litigation.

11. <u>Other Fees:</u> During the chapter 7 liquidation period the trustee with incur miscellaneous expenses including temporary labor costs, insurance, document management costs and banking fees, among others.  For the entirety of the chapter 7 process, these costs have been estimated to be approximately $8.4 million.

### *C.    Claims*

12. <u>Secured Tax Claims</u>:  Based on the December 6, 2022 claims register, no Secured Tax Claims have been identified and scheduled. To the extent that Secured Tax Claim amounts are later identified, a recovery of 100% is expected.

13. <u>Administrative, Priority Tax Claims and Other Priority Claims</u>:

- <u>Administrative Claims</u>:  Administrative Claims include unpaid post-petition accounts payable, accrued operating expenses, unpaid post-petition taxes, and Professional Fee Claims among others.  This Liquidation Analysis estimates Administrative Claims to be approximately $ 39.1 million on the Conversion Date.

- <u>Priority Tax Claims</u>: Based on the December 6, 2022 claims register, federal and state tax claims are estimated to be $3.0M.

- <u>Other Priority Claims</u>:  Total Other Priority Claims are estimated to be $1.0.

14. <u>Account Holder Claims</u>:  Account Holder Claims are estimated to be approximately $1.764 billion as of the Conversion Date based on the number of customer coins and coin prices as of the Petition Date.

15. <u>Alameda Loan Facility Claims</u>:  Alameda Loan Facility Claims are estimated to be approximately $75.1 million as of the Conversion Date.

16. <u>General Unsecured Claims</u>:  Based on the December 6, 2022 claims register, General Unsecured Claims are estimated to total approximately $25.3 million on the Conversion Date.

- General Unsecured Claims at OpCo are estimated to be $14.0 million.

- General Unsecured Claims at HoldCo are estimated to be $8.3 million.

- General Unsecured Claims at TopCo are estimated to be $3.0 million.

## IV. LIQUIDATION ANALYSIS RESULTS

The following pages present the results for the hypothetical liquidation of the Debtors. This Liquidation Analysis is presented on a consolidated basis for all Debtors and is compared against recoveries under the Plan and Plan Toggle scenarios.

| | Claims All Scenarios | Binance Plan | Recovery | Toggle Plan | Recovery | High Case Liquidation | Recovery | Low Case Liquidation | Recovery |
|---|---|---|---|---|---|---|---|---|---|
| | 4/18/2023 | 4/18/2023 | | 6/18/2023 | | 4/18/2023 | | 4/18/2023 | |
| **TOTAL ESTIMATED PROCEEDS (NET)** [3, 4, 5, 6] | | 943.9 | | 849.8 | | 734.4 | | 669.6 | |
| Administrative Claims [7] | 39.1 | 39.1 | 100% | 39.1 | 100% | 39.1 | 100% | 39.1 | 100% |
| Priority Tax Claims | 3.0 | 3.0 | 100% | 3.0 | 100% | 1.4 | 48% | 1.4 | 47% |
| Secured Tax Claims | - | - | 0% | - | 0% | - | 0% | - | 0% |
| Other Priority Claims | 1.0 | 1.0 | 100% | 1.0 | 100% | 1.0 | 99% | 1.0 | 99% |
| Account Holder Claims [8] | 1,763.8 | 891.4 | 51% | 797.9 | 45% | 685.5 | 39% | 621.2 | 35% |
| OpCo General Unsecured Claims [9] | 14.0 | 7.1 | 51% | 6.3 | 45% | 5.4 | 39% | 4.9 | 35% |
| HoldCo General Unsecured Claims [9] | 8.3 | 0.5 | 6% | 0.5 | 6% | - | 0% | - | 0% |
| TopCo General Unsecured Claims [9] | 3.0 | 1.9 | 64% | 1.9 | 64% | 2.0 | 65% | 2.0 | 65% |
| Alameda Loan Facility Claims | 75.1 | - | 0% | - | 0% | - | 0% | - | 0% |
| Section 510(b) Claims | - | - | 0% | - | 0% | - | 0% | - | 0% |
| Intercompany Claims [10] | - | - | 0% | - | 0% | - | 0% | - | 0% |
| Intercompany Interests | - | - | 0% | - | 0% | - | 0% | - | 0% |
| Existing Equity Interests | - | - | 0% | - | 0% | - | 0% | - | 0% |
| **TOTAL RECOVERIES** | 1,907.3 | 943.9 | 49% | 849.8 | 45% | 734.4 | 39% | 669.6 | 35% |

Footnotes to Analysis

(1) Assumes Binance sale transaction does not occur in a liquidation scenario and that the conversion to a chapter 7 liquidation occurs at April 18, 2023.

(2) For the purposes of this presentation, the Plan and Liquidation Analysis do not assume any recovery on the 3AC loan.

(3) Total Estimated Proceeds (Net): primarily includes (x) (i) Binance Transaction Proceeds including Expense Reimbursements (Binance/Toggle only), (ii) Estimated Value of Cryptocurrency Portfolio, (iii) Cash & Cash Equivalents and (iv) proceeds from other assets of the estate; and (y) net estimated wind down costs.

(4) Estimated value of cryptocurrency portfolio under all scenarios is based on spot prices as of December 18, 2022.

(5) Estimated value of cryptocurrency portfolio in the liquidation scenario is discounted based on the estimated impact of market depth constraints, including an inherently volatile market and significant industry disruption as a result of recent filings from major players, as well as transaction fees.

(6) Analysis assumes that the Company is able to retain the necessary employees with experience and expertise required to execute a rebalance and distribution. To the extent the company is unable to retain the personnel necessary to perform these actions, recoveries would likely be significantly negatively impacted.

(7) Administrative claims include estimated unpaid accrued payables, and chapter 11 professional fees incurred through hypothetical conversion date of April 18, 2023. OpEx and professional fees related to the extension of time in the Toggle scenario are assumed to be effectively on a cash basis and assumed to have no impact on administrative claims for illustrative purposes.

(8) Estimated value of Account Holders Claims is based on the dollarization of the customer portfolio based on asset prices as of the Petition Date (July 5, 2022).

(9) OpCo, HoldCo, and TopCo GUCs estimated based off of December 6, 2022 Claims registry and are subject to further reconciliation and objections.

(10) For purposes of this Liquidation Analysis, Intercompany Claims are assumed to be recharacterized as capital contributions.

Note: Litigation claim recoveries are assumed to be the same under both the Plan and a Chapter 7 Liquidation and ignored for comparative purposes of this presentation

**Exhibit C**

**Frequently Asked Questions & Answers**

## Exhibit C

### FREQUENTLY ASKED QUESTIONS & ANSWERS

**About the Plan**

1. **How are my Account Holder Claims calculated? Can I receive recoveries greater than my Account Holder Claim amount?**

As is required by the U.S. Bankruptcy Code, each Account Holder's Claim is determined by the fair market value of the cryptocurrency (based in U.S. Dollars) held by the Account Holder at Voyager Digital, LLC as of July 5th, 2022 at 00:00 UTC. This process is generally referred to as a "dollarization." Dollarization allows the Debtors to put all Account Holders' Claims on equal footing to calculate recoveries in accordance with the requirements of the U.S. Bankruptcy Code.

For example, if an Account Holder's portfolio consisted of 0.5 ETH, 30 USDC, 20 APE and 100 ALGO on July 5, 2022, the Account Holder would have a total claim against OpCo of $724.81 (see illustrative example below). All Account Holder Claims will be calculated in an identical manner, regardless of whether such claims are denominated in BTC, ETH, VGX or USDC or in any other cryptocurrency.

Keep in mind, the U.S. Bankruptcy Code requires that all creditors of the same class receive "equal treatment", so the value that is available for distribution to Account Holders is equitably distributed amongst all Account Holders (i.e., no Account Holder can have a greater opportunity to recover on their claim than another Account Holder). (See Question 6 below.)

| Coin | Customer Claim | | |
| | # of Coins Claimed | 7/5 Coin Price | Claim ($) |
|---|---|---|---|
| ETH | 0.50 | $1,131.60 | $565.80 |
| USDC | 30.00 | 1.00 | 30.00 |
| APE | 20.00 | 4.91 | 98.27 |
| ALGO | 100.00 | 0.31 | 30.74 |
| **Total** | | | **$724.81** |

In accordance with the U.S. Bankruptcy Code and applicable bankruptcy law, a creditor is not eligible to receive consideration exceeding 100% of the value of their claim. Additionally, until Account Holders and Holders of OpCo General Unsecured Claims receive 100% of their claims against OpCo, no consideration is allowed to be distributed to creditors holding interests and/or lower priority claims against OpCo in accordance with the absolute priority rule.

2. **How is the Initial Distribution calculated?**

The total Initial Distribution to Holders of Account Holder Claims and Holders of OpCo General Unsecured Claims consists of a pro rata amount to be determined by the Debtors that will be informed by:

(i) the upfront cash payment of $20.0 million,

(ii) all cash and cash equivalents held at OpCo (net of any cash and cash equivalents necessary (x) to satisfy those claims at OpCo senior to Account Holder Claims and OpCo General Unsecured Claims and (y) to fund a wind-down reserve),

(iii)    any expense reimbursement received from BAM Trading Services Inc. d/b/a Binance.US ("Binance.US") pursuant to the Binance.US asset purchase agreement for reasonable expenses incurred by Voyager Digital between March 18, 2023 and Closing, subject to a $15mm cap, and

(iv)    the fair market value of all cryptocurrency held at OpCo.

Each Account Holder's Initial Distribution will be calculated based on their pro rata share of the total Account Holder Claims and OpCo General Unsecured Claims. For example, to the extent the fair market value of all cryptocurrency held at OpCo was transferred to Binance.US at prices as of approximately UTC 20:30 on December 18, 2022, the estimated Initial Distribution would be equal to 51% of the total dollarized claims of all Account Holders and Holders of Opco General Unsecured Claims.

Account Holders located in Supported Jurisdictions who are current Binance.US users or who are able to satisfy onboarding requirements at Binance.US within three months of Closing will receive their share of the Initial Distribution on an in-kind basis within four weeks following the later of the Closing or the completion of the transfer of user data to Binance.US.  All Account Holders in Supported Jurisdictions who do not complete such onboarding requirements within three months following the later of the Closing or the completion of the transfer of user data to Binance.US will have their in-kind cryptocurrency distribution converted into U.S. Dollars at then prevailing market prices which will be distributed to such Account Holders by OpCo.

For any Account Holders located in jurisdictions where Binance.US does not have required regulatory approvals as of the Closing ("Unsupported Jurisdictions" which as of the date hereof are Hawaii, New York, Texas, and Vermont), Binance. US will have until six (6) months following the Closing to obtain approvals to make distributions to Account Holders in such jurisdictions on a provisional basis. If Binance.US is unable to make distributions to Account Holders in an Unsupported Jurisdiction at the conclusion of the six (6) month period, the Account Holders in such Unsupported Jurisdiction will have their in-kind cryptocurrency distribution converted into U.S. Dollars at then prevailing market prices, which will be distributed to such Account Holders by OpCo.

Under the Plan, the cryptocurrency shall be subject to a rebalancing exercise, which shall occur no more than one business day prior to the Closing Date. As such, the size of the Initial Distribution and ultimate recoveries relative to each Account Holder's dollarized claim as of July 5th, 2022, is unknowable at this time and will be impacted by the price performance of OpCo's cryptocurrency portfolio during such reference period.

After the completion of the rebalancing exercise, to the extent the estate has a shortfall in any specific cryptocurrency relative to the implied required distribution amount, the implied dollar amount of the shortfall will made through a distribution of USDC or U.S. Dollars.

**3.    When, and how, will I receive value from 3AC recoveries?**

Voyager continues to work diligently to maximize its recovery in the 3AC Liquidation Proceeding on account of the 3AC Loan and the recovery from the 3AC Loan, if any, will be distributed to Holders of Account Holder Claims and OpCo General Unsecured Claims as soon as commercially reasonable. However, the timing of actual distributions to Holders of Account Holder Claims and OpCo General Unsecured Claims may be affected by many factors that cannot be predicted.  Therefore, the estate cannot guarantee the timing or amount of the 3AC recovery.

Upon receipt of a 3AC recovery, the Distribution Agent shall make distributions to Holders of Account Holder Claims and OpCo General Unsecured Claims at the address for each such Holder as indicated on the applicable register or in the Voyager records as of the date of any such distribution (as applicable).  Any 3AC recovery distributions shall be dependent upon the form in which received (token or U.S. Dollars) and the transition status of each respective Account Holder.  For users onboarded onto the Binance.US platform, any distributions will be done through such platform.

**4.    Why do the implied recoveries move up or down based on cryptocurrency prices? Don't Account Holders just receive a fixed percentage?**

As previously discussed (see Question 1 above), claims are fixed based on an Account Holder's tokens and cryptocurrency prices as of the Petition Date. Since the Petition Date, the Debtor has been "long" the entire cryptocurrency portfolio. This exposes implied dollar value recoveries to movements in cryptocurrency prices between the Petition Date and the rebalancing date, given the distribution values are also based on volume-weighted dollar prices of cryptocurrency as of two days prior to the rebalancing date.

As such, an individual Account Holder's implied recoveries are impacted by (i) **_gross_** movements in U.S. Dollar-denominated cryptocurrency prices relative to the Petition Date, and (ii) **_relative_** movements in cryptocurrency prices (e.g., BTC vs. ETH).

Voyager has a relatively high percentage of altcoins, which have underperformed in the market relative to BTC / ETH and stablecoins. These cryptocurrency movements are the primary driver of any changes to an Account Holder's recovery value, as evidenced by the charts below.



**5.    The cryptocurrencies in my account have gone up since July 5th, are my recoveries then based on price of those cryptocurrencies at the time of the Initial Distribution?**

**_No_**, in order for all creditors, Account Holders or otherwise, to be treated in an equal and fair manner, as required by the U.S. Bankruptcy Code, the value of each creditor's claims is "dollarized" as of July 5th, 2022. (See Question 1)

At the time of the Initial Distribution, all Holders of Allowed Account Holder Claims and Allowed OpCo General Unsecured Claims will receive an equal pro rata recovery relative to their dollarized July 5th, 2022 claim, regardless of the price performance of the underlying cryptocurrencies in such Account Holder's account.

---

[1]    Implied Binance.US recovery values leave all assumptions (including Binance.US consideration, wind-down costs, other benefits (expense reimbursement and non-buyer proceeds) and other expenses (rebalancing leakage, wind-down funding leakage and VGX impact)) constant except for the difference in cryptocurrency prices on the specified dates / date ranges.

All cryptocurrencies at OpCo, including VGX, are property of OpCo's estate and the value of such cryptocurrencies at the time of the rebalancing exercise will be a key factor in determining the size of the Initial Distribution.

***Under the Plan, all Holders of Account Holder Claims and OpCo General Unsecured Claims are effectively "long" OpCo's entire cryptocurrency portfolio through the date at which the fair market value is determined under the Binance.US asset purchase agreement, regardless of the specific cryptocurrencies held by any individual Account Holder, with any upside limited by the amount of such Account Holder's or OpCo General Unsecured Creditor's Allowed Claim.***

***In the event of a wind down, liquidation, or an alternative plan construct (even to the extent it supported 100% of the same cryptocurrencies as those available on the Voyager platform), claims and distributions would be treated in an identical manner with Account Holder Claims being dollarized as of July 5th, 2022 and distributions to Holders of Account Holder Claims and OpCo General Unsecured Claims being based on the value of consideration at the time of such distribution relative to such creditors' dollarized claim value.***

***Under a wind-down or liquidation, all cryptocurrency would be immediately sold into the market and distributions would not be made in-kind, but in cash in U.S. Dollars which may result in adverse tax impacts for Account Holders.***

For example, under the Binance.US transaction, to the extent an Account Holder had a claim for $1,000 based on the dollarized value of their cryptocurrencies as of July 5, 2022, and the sale price of the cryptocurrency held at OpCo implied an Initial Distribution of 51%, such Account Holder would receive an Initial Distribution with value equal to $510. Such value may be in a mix of in-kind cryptocurrencies or U.S. Dollars depending on whether such Account Holder transitioned to Binance.US in a timely manner.

Such Account Holder would then have a deficiency claim of $490 which could be satisfied through subsequent distributions from the liquidating trust relating to cash hold backs, 3AC recoveries, and other retained value at OpCo after any claims at OpCo that are senior to Account Holder Claims and OpCo General Unsecured Claims, such as priority and administrative claims, have been satisfied.

A deficiency claim in this case is simply the difference between the Initial Distribution and the Account Holder Claim (dollarized value of cryptocurrencies as of July 5, 2022). It is the amount necessary to achieve 100% recovery vs. total (cumulative) recoveries received at any point in time. (See Question 16)

| | Illustrative July 5, 2022 Claim Value | | | | | | |
|---|---|---|---|---|---|---|---|
| $ actual | $10.0 | $100.0 | $1,000.0 | $10,000.0 | $100,000.0 | $1,000,000.0 | $10,000,000.0 |
| **Initial Distribution Value @ Illustrative Initial Distribution % of Claim Value** | | | | | | | |
| @ 43.0% | $4.3 | $43.0 | $430.0 | $4,300.0 | $43,000.0 | $430,000.0 | $4,300,000.0 |
| @ 45.0% | $4.5 | $45.0 | $450.0 | $4,500.0 | $45,000.0 | $450,000.0 | $4,500,000.0 |
| @ 47.0% | $4.7 | $47.0 | $470.0 | $4,700.0 | $47,000.0 | $470,000.0 | $4,700,000.0 |
| @ 49.0% | $4.9 | $49.0 | $490.0 | $4,900.0 | $49,000.0 | $490,000.0 | $4,900,000.0 |
| @ 51.0% | $5.1 | $51.0 | $510.0 | $5,100.0 | $51,000.0 | $510,000.0 | $5,100,000.0 |
| @ 53.0% | $5.3 | $53.0 | $530.0 | $5,300.0 | $53,000.0 | $530,000.0 | $5,300,000.0 |
| @ 55.0% | $5.5 | $55.0 | $550.0 | $5,500.0 | $55,000.0 | $550,000.0 | $5,500,000.0 |
| @ 57.0% | $5.7 | $57.0 | $570.0 | $5,700.0 | $57,000.0 | $570,000.0 | $5,700,000.0 |
| @ 59.0% | $5.9 | $59.0 | $590.0 | $5,900.0 | $59,000.0 | $590,000.0 | $5,900,000.0 |
| **Implied Deficiency Claim @ Illustrative Initial Distribution % of Claim Value** | | | | | | | |
| @ 43.0% | $5.7 | $57.0 | $570.0 | $5,700.0 | $57,000.0 | $570,000.0 | $5,700,000.0 |
| @ 45.0% | $5.5 | $55.0 | $550.0 | $5,500.0 | $55,000.0 | $550,000.0 | $5,500,000.0 |
| @ 47.0% | $5.3 | $53.0 | $530.0 | $5,300.0 | $53,000.0 | $530,000.0 | $5,300,000.0 |
| @ 49.0% | $5.1 | $51.0 | $510.0 | $5,100.0 | $51,000.0 | $510,000.0 | $5,100,000.0 |
| @ 51.0% | $4.9 | $49.0 | $490.0 | $4,900.0 | $49,000.0 | $490,000.0 | $4,900,000.0 |
| @ 53.0% | $4.7 | $47.0 | $470.0 | $4,700.0 | $47,000.0 | $470,000.0 | $4,700,000.0 |
| @ 55.0% | $4.5 | $45.0 | $450.0 | $4,500.0 | $45,000.0 | $450,000.0 | $4,500,000.0 |
| @ 57.0% | $4.3 | $43.0 | $430.0 | $4,300.0 | $43,000.0 | $430,000.0 | $4,300,000.0 |
| @ 59.0% | $4.1 | $41.0 | $410.0 | $4,100.0 | $41,000.0 | $410,000.0 | $4,100,000.0 |

**6. Can't recoveries be 'tiered' based on account size? Some accounts had less than $100, but mine had $100,000, shouldn't I receive a higher percentage recovery if I'm losing more in dollar terms?**

_No_, the U.S. Bankruptcy Code requires that all creditors of the same class receive "equal treatment." A Debtor is not permitted to favor some creditors within the same class over others. Account Holders are the same class of creditors regardless of account size. As such, all Account Holder recoveries need to be treated in the same manner, whether such distributions were made under a plan, wind down, liquidation, or otherwise. This does not mean that all Account Holders will receive the same amount of distribution, but rather that each Account Holder will receive the same treatment under the Plan, the same opportunities in connection with the distributions contemplated under the Plan, and the same percentage recovery on their claims (i.e., each Account Holder will receive a recovery of approximately 51% of their claim).

**7. Will VGX be supported? How is the value of my VGX being treated?**

Account Holders that held VGX will be receiving their pro rata share of their VGX claim similar to all other cryptocurrency claims. All Account Holder Claims and recoveries will be treated in an identical manner. All Account Holder Claims will be "dollarized" as of July 5th, 2022 with Account Holders receiving the same proportional amount of value in recoveries relative to such claims, regardless of whether an Account Holder had BTC, ETH, USDC, VGX, or any other cryptocurrency in their account.

In connection with their proposal, Binance.US has agreed to initiate and undertake an internal review process to determine whether VGX tokens can be listed for trading on the Binance.US platform. In the event Binance.US's review process does not deem VGX eligible for trading on the Binance.US platform, Account Holders will still receive their pro rata share of their VGX claim and will have the ability to hold their VGX in custody at Binance.US or transfer their VGX tokens off the Binance.US platform.

Under the Plan, for Account Holders with VGX in their accounts on the Petition Date, the VGX portion of such claims will be determined based on the U.S. Dollar price of VGX on the Petition Date of $0.2382. To Dollarize the VGX portion of a claim an Account Holder would multiply the U.S. Dollar price of VGX on the Petition Date of $0.2382 by the amount of VGX coins held as of the Petition Date.

*For illustrative purposes, to the extent that the implied Cryptocurrency Initial Distribution under the Plan is 51% of claim value, an Account Holder would receive an Initial Distribution in VGX based on (x) their VGX claim value multiplied by (y) the Initial Distribution percentage.*

As outlined in the table below, if an Account Holder has a 1,000 VGX token claim, the associated dollar value of such claim would be $238.19. If the Initial Distribution is 51% of claim value, the Account Holder would receive an Initial Distribution equal to $121.47.

| | [A] | [B] | [A] x [B] = [C] | [B] x Token Holdings | | | | [C] x Token Holdings | | | |
| | | | | Implied Claim @ VGX Token Holdings | | | | Illustrative Initial Distribution @ VGX Token Holdin | | | |
| | Illustrative Initial Distribution % | 7/5 VGX Token Price | Implied VGX Recovery Price / Token | 100 | 1,000 | 10,000 | 100,000 | 100 | 1,000 | 10,000 | 100,000 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1.) | 43.0% | $0.2382 | $0.1024 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $10.24 | $102.42 | $1,024.22 | $10,242.29 |
| 2.) | 45.0% | $0.2382 | $0.1072 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $10.71 | $107.18 | $1,071.86 | $10,718.67 |
| 3.) | 47.0% | $0.2382 | $0.1120 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $11.19 | $111.95 | $1,119.50 | $11,195.06 |
| 4.) | 49.0% | $0.2382 | $0.1167 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $11.67 | $116.71 | $1,167.14 | $11,671.44 |
| 5.) | 51.0% | $0.2382 | $0.1215 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $12.14 | $121.47 | $1,214.78 | $12,147.83 |
| 6.) | 53.0% | $0.2382 | $0.1262 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $12.62 | $126.24 | $1,262.42 | $12,624.21 |
| 7.) | 55.0% | $0.2382 | $0.1310 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $13.10 | $131.00 | $1,310.06 | $13,100.60 |
| 8.) | 57.0% | $0.2382 | $0.1358 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $13.57 | $135.76 | $1,357.69 | $13,576.99 |
| 9.) | 59.0% | $0.2382 | $0.1405 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $14.05 | $140.53 | $1,405.33 | $14,053.37 |

The Account Holder will then have a deficiency claim against OpCo in an amount of $116.72 ($238.19 claim value less $121.47 Initial Distribution), which may be satisfied through (i) recoveries on OpCo's loan to 3AC and (ii) any residual cash proceeds attributable to OpCo from the liquidation trust after the full satisfaction of claims at OpCo that are senior to Account Holder Claims.

**8. What will happen to the VGX token going forward under the Plan?**

The VGX Token Smart Contracts (including any private keys related solely to such smart contracts) are excluded from the transaction scope for the Binance.US proposal. The Debtors continue to work with third parties in an effort to identify a solution to support the ongoing utility of VGX. If the Debtors are unable to identify a solution for VGX's ongoing utility, VGX may decline in value and may have no value post-consummation of the Plan.

Similar to all other Voyager tokens, Binance.US has agreed to support custody of the VGX token on the Binance.US platform. In connection with their proposal, Binance.US has also agreed to initiate and undertake an internal review process to determine whether VGX tokens can be listed for trading on the Binance.US platform. The sale of the VGX Token Smart Contracts could adversely affect such review process and may result in VGX being ineligible to be listed for trading on the Binance.US platform. In the event Binance.US's review process does not deem VGX eligible for trading on the Binance.US platform, Account Holders will still receive their pro rata share of their VGX claim and will have the ability to hold their VGX tokens on the Binance.US platform or transfer their VGX tokens off the Binance.US platform to a third-party wallet.

**9. Do I still have access to my tokens on Binance.US if they are not supported for trading?**

*Yes*, upon successfully migrating to Binance.US each Account Holder will have access to the entirety of their pro rata share of the Initial Distribution (which will be made in-kind as described above). At this time, Binance.US supports trading for 82 tokens that were available on the Voyager platform. These 82 tokens represent approximately 93.2% of the dollar value of cryptocurrency denominated claims as of July 5th, 2022. Regardless of whether a token is supported or not supported for trading, Account Holders will have the ability to withdrawal and transfer their cryptocurrencies to a third-party wallet upon their receipt of a distribution should they so choose post-closing.

Binance.US has also indicated to the Debtors that other tokens currently unsupported for trading are likely to become supported by the time of Closing. For tokens that are not currently supported for trading on the Binance.US platform, Account Holders will have the ability to hold those tokens on the Binance.US platform or transfer off the platform into a third-party wallet.

For example, if an Account Holder held BTC, ETH and XRP in its account, for purposes of the Initial Distribution, the BTC portion of such recovery will be made in BTC, the ETH portion will be made in ETH and the XRP portion will be made in XRP. The Account Holder would be able to immediately trade the BTC and ETH received; however, the Account Holder would not be able to trade XRP on the Binance.US platform as XRP is currently unsupported for trading purposes. To the extent such Account Holder wishes to sell their XRP for U.S. Dollars, the Account Holder will be able to transfer their XRP to a third-party wallet that supports trading in XRP.

### *Voyager Tokens Currently Supported for Trading on Binance.US Platform*

| | | | |
|---|---|---|---|
| AAVE | ADA | ALGO | ALICE |
| ANKR | APE | ATOM | AUDIO |
| AVAX | AXS | BAND | BAT |
| BCH | BICO | BNT | BTC |
| CELO | CHZ | COMP | CRV |
| DAI | DASH | DGB | DOGE |
| DOT | EGLD | ENJ | ENS |
| EOS | ETC | ETH | FET |
| FIL | FLOW | FTM | GALA |
| GLM | GRT | HBAR | ICP |
| ICX | JASMY | KAVA | KNC |
| KSM | LINK | LPT | LRC |
| LTC | MANA | MATIC | MKR |
| NEO | OCEAN | OMG | ONT |
| OP | OXT | QNT | QTUM |
| REN | ROSE | SAND | SHIB |
| SKL | SOL | SPELL | SUSHI |
| TRX | TUSD | UNI | USDC |
| USDT | VET | WAVES | WBTC |
| XLM | XTZ | YFI | ZEC |
| ZEN | ZRX | | |

**10. If a token in my Voyager account was listed as being unsupported for trading at Binance.US, can I select a different supported token to receive my distribution?**

<u>No</u>, the in-kind distribution will be made in the same token(s) currently in each Account Holder's Voyager account. In order to provide Account Holders with their pro rata share of the original tokens in their account and limit any potential adverse tax implications related to liquidating or converting tokens, Binance.US has agreed to provide in-kind distributions for Account Holders on all tokens, including tokens currently unsupported for trading. However, if the estate has a shortfall in any specific cryptocurrency relative to the implied required distribution amount, the implied dollar amount of the shortfall will made through a distribution of USDC or U.S. Dollars.

**11. If my account only had BTC, will all of my distributions be made in BTC?**

<u>Maybe</u>, the Initial Distribution will be made in-kind for all tokens for Account Holders who successfully transition to the Binance.US. platform. Any future recoveries received in token form may be distributed in-kind to successfully

transitioned Account Holders through the Binance.US platform. If any future recoveries are received in U.S. Dollars or an Account Holder has not successfully transitioned to the Binance.US platform, such distributions will be made in U.S. Dollars based on the respective U.S. Dollar denominated claim amount.

**12. Why can't I receive my recovery under the Plan from the Voyager platform?**

Binance.US offers users the ability to withdraw an additional 35 cryptocurrency tokens (approximately 20% of the Debtors' cryptocurrency portfolio based on equivalent USD value) on the Debtors' platform that cannot be transferred directly to individual wallets due to technical limitations associated with the Debtors' platform. Historically, users of the Debtors' platform have exited from their positions in such tokens by selling such tokens for cash, transactions that previously required close interaction with market makers to effectuate. Accordingly, the only way for the Debtors to distribute the value associated with these non-transferable tokens to creditors in Unsupported Jurisdictions is to liquidate the tokens and distribute the resulting cash. The Binance.US platform allows users to freely transfer such tokens to their individual wallets.

Further, the Debtors would not only need to significantly increase their engineering, regulatory, compliance and other operational staff and resources, but would also require additional money transmitter licenses, authorizations, or exemptions which they currently lack. The aforementioned additional staff and resources would also be necessary to facilitate manual transfers to individual customer wallets that they otherwise would not have to do if transfers to customers were made through the Binance.US platform. The Debtors would also need to revive certain dormant contracts with third-party vendors to process distributions to creditors in this manner. This would result in increased administrative costs as compared to the costs of liquidating the cryptocurrency associated with creditors in Unsupported Jurisdictions and distributing the equivalent value in cash.

Finally, there are risks associated with the Debtors' distribution of cryptocurrency to individual creditor wallets as opposed to effectuating such distributions through the Binance.US platform. The Debtors must comply with anti-money laundering ("AML") and know your customer ("KYC") laws when sending cryptocurrency to individual wallets. Historically, the Debtors used Chainalysis for automated verification of certain user generated cryptocurrency transfer requests. However, Chainalysis does not support all of the tokens listed on the Voyager platform (*e.g.*, non-transferable tokens). While AML/KYC compliance is easy when transferring cryptocurrency to Binance.US wallets, it poses substantial risk to the Debtors as it relates to the manual transfer of cryptocurrency to individual wallets for over 120,000 creditors. Binance.US has represented to the Debtors that it has existing infrastructure in place that would allow it to perform AML/KYC compliance checks in connection with transferring all cryptocurrency to customer accounts on its platform. Unlike ACH transfers which can be reversed, cryptocurrency sent to the wrong wallet cannot, which is why parties will often send a small "test" transaction to a wallet address prior to initiating a large transfer.

**13. Are my recoveries capped at the value I receive in the Initial Distribution?**

*No*, in addition to recoveries associated with the Initial Distribution, Holders of Account Holder Claims and OpCo General Unsecured Claims are entitled to receive additional recoveries, net of any OpCo administrative and priority claims and wind-down expenses up to their total dollarized claim amount, including with respect to (i) any recoveries on account of the 3AC loan, (ii) value associated with the sale of any other OpCo assets, and (iii) residual cash distributions attributable to OpCo from the liquidating trust.

However, in accordance with the U.S. Bankruptcy Code, a creditor is not eligible to receive consideration exceeding 100% of the amount of their claim.

**14. How will the amount of my distribution of cryptocurrency be determined?**

Under the Plan, the rebalancing exercise, and as a result each creditor's distribution of cryptocurrency, will be determined based on fair market value of such cryptocurrency as of two business days prior to the completion of the rebalancing exercise. As such, actual Initial Distributions will be dependent on the future price performance of OpCo's

cryptocurrency portfolio and will be subject to increases or decreases relative to the estimated 51% based on actual cryptocurrency prices during such reference period.

Prior to Closing, OpCo will undergo a rebalancing exercise such that the aggregate value (in U.S. Dollars) for each token to held by OpCo as a percentage of the aggregate value (in U.S. Dollars) of such token that was on deposit with Voyager as of July 5th, 2022 is consistent across OpCo's entire token portfolio, subject to a 5% variance allowance. To the extent a rebalancing delta exists for any specific token, Account Holders may receive a portion of their initial distribution in USDC or U.S. Dollars based on any implied shortfall between the value of the cryptocurrency deposited into their account relative to the dollar value of their Initial Distribution. In order to aid in the facilitation of the rebalancing exercise, OpCo has agreed to execute such exercise on the Binance.US Platform unless they can obtain a better price from another third party..

**15.  Is the $20 million of cash Binance.US is paying to the estate above and beyond the value that Binance.US will distribute for the cryptocurrency on the Voyager platform? Do I get a portion of that $20 million?**

_Yes_, the $20 million of upfront consideration is _in addition to_ the fair market value of the cryptocurrency Binance.US is distributing under the Plan. Under the Plan, such cash value directly and indirectly accrues to the benefit of OpCo's creditors.

**16.  Who is eligible to join Binance.US under the Plan in order to receive an in-kind Initial Distribution?**

Holders of Account Holder Claims and OpCo General Unsecured Claims in Supported Jurisdictions are eligible to join Binance.US.

Only Account Holders in Supported Jurisdictions who timely transfer their Accounts to Binance.US within three months after the later of the Closing or the completion of the transfer of user data to Binance.US will receive their share of the Initial Distribution on an in-kind basis (as further detailed in Question 2 above).  Account Holders who are located in Unsupported Jurisdictions six (6) months following the Closing, in addition to Account Holders in Supported Jurisdictions who do not successfully transition to Binance.US within the timeframe specified above, will receive their share of the Initial Distribution in the form of U.S. Dollars.

Holders of OpCo General Unsecured Claims in Supported Jurisdictions will receive their Initial Distribution in cash on the Binance.US platform if they successfully open an account on the Binance.US platform within three months of the Closing.  Otherwise such Holders of OpCo General Unsecured Claims will receive their Initial Distribution in cash from OpCo.

Future distributions will be dependent upon several factors including form of consideration recovered (as further detailed in Question 10 above).

**17.  What is a "deficiency claim"?**

A deficiency claim means the difference between a creditor's total dollarized claim value as of July 5th, 2022 and the dollar value of recoveries distributed to such creditor at any point in time pursuant to the Plan. In effect, it represents the difference between the cumulative value returned to a creditor relative to their total claim value at any point in time.

**18.  What does an "in-kind" distribution mean?**

An "in-kind distribution" means a Holder of an Account Holder Claim may be eligible to receive value in the same type of cryptocurrency that their initial claim was denominated in.

All cryptocurrency tokens regardless of whether supported for trading on the Binance.US platform will be eligible for an in-kind distribution and in-kind distributions will only be made available through Binance.US. As such, Account Holders in Supported Jurisdictions are required to sign up for a Binance.US account to the extent they wish to receive

an in-kind distribution. The number of in-kind cryptocurrency tokens received will depend on (i) the Initial Distribution and (ii) the volume weighted average price of such cryptocurrency on the reference date.

For any specific cryptocurrency, an Account Holder in a Supported Jurisdiction can determine the number of tokens that it will receive at Binance.US for that specific cryptocurrency based on the following formula:

$$Claim\ Value = \#\ of\ prepetition\ tokens * 7/5\ coin\ price$$

$$\#\ of\ in\ kind\ tokens\ received = \frac{Claim\ Value * Initial\ Distribution\ Percentage}{2\ day\ volume\ weighted\ average\ reference\ price}$$

For example, to the extent an Account Holder has a claim for 1.0 BTC, the dollarized value of such claim as of July 5, 2022 would be $20,157.69. To the extent the Account Holder signs up for a Binance.US account, the Initial Distribution is 51%, and the volume weighted average reference price of BTC is $16,816.20, such Account Holder would receive an Initial Distribution consisting of (a) 0.6113 BTC (equal to (i) (x) $20,157.69 claim multiplied by (y) 51% Initial Distribution divided by (ii) $16,816.20 volume weighted average reference price).

### 19. Who is responsible for calculating the Initial Distribution and subsequent distributions?

As is required by the Plan, the Debtors will calculate the number of tokens and the amount of cash that is distributable to each Account Holder and each Holder of an OpCo General Unsecured Claim. To the extent distributions are to be made through the Binance.US platform, Binance.US will rely on these calculations.

### 20. What is the administrative claim asserted by Alameda, and how does this impact my recovery?

On January 4, 2023, Alameda Research Ltd. filed an objection to the Conditional Disclosure Statement Motion, claiming that they have a $445mm administrative expense claim against the Debtors, due to the loan payment that was made to the Debtors within the 90-day period prior to Alameda filing for bankruptcy protection. The Debtors dispute this claim and do not view it as valid. However, if Alameda were to prevail on its asserted administrative claim, recoveries to Account Holders and Holders of OpCo General Unsecured Claims would be materially impacted, potentially reducing illustrative recoveries to approximately 26% from 51%.

**Exhibit D**

**Asset Purchase Agreement**

**Execution Version**

# FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT

January 8, 2023

This FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT (this "Amendment") is made and entered into as of the date first above written, by and between BAM Trading Services Inc. d/b/a Binance.us, a Delaware corporation ("Purchaser") and Voyager Digital, LLC, a Delaware limited liability company ("Seller"). Purchaser and Seller are each referred to herein individually as a "Party" and collectively as the "Parties." Capitalized terms used but not otherwise defined herein have the respective meanings ascribed to such terms in the Purchase Agreement (as defined below).

WHEREAS, the Parties entered into that certain Asset Purchase Agreement (the "Purchase Agreement"), dated as of December 18, 2022 (the "Signing Date");

WHEREAS, the Parties wish to amend the Purchase Agreement in accordance with the terms of the Purchase Agreement and this Amendment; and

WHEREAS, Section 10.5 (Amendment and Waiver) of the Purchase Agreement provides that the Purchase Agreement be amended only in a writing signed by Purchaser and Seller.

NOW, THEREFORE, in consideration of premises, and of the representations, warranties, covenants and agreements contained herein, the value, receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.      Amendment. The Purchase Agreement is hereby amended by making the additions in blue or green underlined text (indicated textually in the same manner as the following example: **underlined text** or **underlined text**) and deletions in green or red stricken text (indicated textually in the same manner as the following example: ~~stricken text~~ or ~~stricken text~~) as set forth in Exhibit A attached hereto.

2.      Effect of Amendment. Each Party represents that such Party has all necessary power and authority to enter into and perform the obligations of this Amendment and that there are no consents or approvals required to be obtained by such Party for such Party to enter into and perform its obligations under this Amendment that have not been obtained. This Amendment shall be deemed incorporated into, and form a part of, the Purchase Agreement and have the same legal validity and effect as the Purchase Agreement. Except as expressly and specifically amended hereby, all terms and provisions of the Purchase Agreement are and shall remain in full force and effect, and all references to the Purchase Agreement in this Amendment and in any ancillary agreements or documents delivered in connection with the Purchase Agreement shall hereafter refer to the Purchase Agreement as amended by this Amendment, and as it may hereafter be further amended or restated. Each reference in the Purchase Agreement to "this Agreement," "herein," "hereof," "hereunder" or words of similar import shall hereafter be deemed to refer to the Purchase Agreement as amended hereby (except that references in the Purchase Agreement to the "date hereof" or "date of this Agreement" or words or phrases of similar import shall continue to mean the Signing Date).

3.     <u>Inconsistency or Conflict</u>.  In the event of any inconsistency or conflict between the terms and provisions of the Purchase Agreement, on the one hand, and this Amendment, on the other hand, the terms and provisions of this Amendment shall govern and control.

4.     <u>Additional Provisions</u>.  The provisions contained in Section 6.19 (Confidentiality), Article VIII (Termination), Sections 10.1 (Non-Survival or Representations and Warranties and Certain Covenants; Certain Waivers), 10.2 (Expenses), 10.3 (Notices), 10.4 (Binding Effect; Assignment), 10.5 (Amendment and Waiver), 10.6 (Third Party Beneficiaries), 10.7 (Non-Recourse), 10.8 (Severability), 10.9 (Construction), 10.11 (Complete Agreement), 10.13 (Jurisdiction and Exclusive Venue), 10.14 (Governing Law; Waiver of Jury Trial) and 10.16 (Counterparts and PDF) of the Purchase Agreement are hereby incorporated by reference into this Amendment, *mutatis mutandis*, and made a part of this Amendment as if set forth fully herein.

(*Signature pages follow*)

IN WITNESS WHEREOF, each of the Parties has caused this Amendment to be duly executed and delivered as of the date first above written.

**BAM TRADING SERVICES INC. D/B/A BINANCE.US**

By: *Brian Shroder*

Name: Brian Shroder
Title: Chief Executive Officer

IN WITNESS WHEREOF, each of the Parties has caused this Amendment to be duly executed and delivered as of the date first above written.

**VOYAGER DIGITAL, LLC**

By: _Stephen Ehrlich_

Name: Stephen Ehrlich

Title:   Chief Executive Officer

**Exhibit A**

(See attached)

**ASSET PURCHASE AGREEMENT**

**DATED AS OF DECEMBER 18, 2022**

**BY AND BETWEEN**

**BAM TRADING SERVICES INC. D/B/A BINANCE.US, AS PURCHASER,**

**AND**

**VOYAGER DIGITAL, LLC, AS SELLER.**

# TABLE OF CONTENTS

Page

**ARTICLE I PURCHASE AND SALE OF THE ACQUIRED ASSETS; ASSUMPTION OF ASSUMED LIABILITIES** ...... 1

1.1    Purchase and Sale of the Acquired Assets ...... 1
1.2    Excluded Assets ...... 3
1.3    Assumption of Certain Liabilities ...... 5
1.4    Excluded Liabilities ...... 6
1.5    Assumption/Rejection of Certain Contracts ...... 6

**ARTICLE II CONSIDERATION; PAYMENT; CLOSING** ...... 8

2.1    Consideration; Payment ...... 8
2.2    Deposit ...... 9
2.3    Closing ...... 9
2.4    Closing Deliveries by Seller ...... 10
2.5    Closing Deliveries by Purchaser ...... ~~10~~11
2.6    Withholding ...... 11

**ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLER** ...... ~~11~~12

3.1    Organization and Qualification ...... ~~11~~12
3.2    Authorization of Agreement ...... 12
3.3    Conflicts; Consents ...... ~~12~~13
3.4    Financial Statements ...... 13
3.5    Cryptocurrency; Loans; Customer Accounts ...... ~~13~~14
3.6    Title to Acquired Assets; Staked Coins; Exclusive Ownership; Sufficiency of Assets ...... ~~14~~15
3.7    Title to Properties ...... ~~14~~15
3.8    Contracts ...... 15
3.9    Permits; Compliance with Laws ...... ~~16~~17
3.10   Environmental Matters ...... 18
3.11   Intellectual Property; Data Privacy ...... ~~18~~19
3.12   Tax Matters ...... ~~19~~20
3.13   Affiliate Transactions ...... ~~20~~21
3.14   Brokers ...... 21
3.15   Litigation ...... 21
3.16   Absence of Changes ...... ~~21~~22
3.17   No Other Representations or Warranties ...... ~~21~~22
3.18   No Outside Reliance ...... ~~21~~22

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PURCHASER** ...... ~~22~~23

4.1    Organization and Qualification ...... ~~22~~23
4.2    Authorization of Agreement ...... ~~22~~23
4.3    Conflicts; Consents ...... ~~22~~23
4.4    Financing ...... ~~23~~24
4.5    Permits ...... ~~23~~24
4.6    Brokers ...... ~~23~~24

## TABLE OF CONTENTS

| | | Page |
|---|---|---|
| 4.7 | No Litigation | 2324 |
| 4.8 | Certain Arrangements | 24 |
| 4.9 | Solvency | 2425 |
| 4.10 | No Additional Representations or Warranties | 2425 |
| 4.11 | No Outside Reliance | 2425 |

**ARTICLE V BANKRUPTCY COURT MATTERS** — 2526

| | | |
|---|---|---|
| 5.1 | Selection of Successful Bid and Winning Bidder and Sale Approval | 2526 |
| 5.2 | No-Shop | 26 |
| 5.3 | Bankruptcy Actions | 2728 |
| 5.4 | Cure Costs | 29 |
| 5.5 | Approval | 2930 |
| 5.6 | No Successor Liability | 2930 |
| 5.7 | Filings | 2930 |
| 5.8 | Waiver of Conflicts | 29 |

**ARTICLE VI COVENANTS AND AGREEMENTS** — 30

| | | |
|---|---|---|
| 6.1 | Conduct of Seller | 30 |
| 6.2 | Access to Information | 3233 |
| 6.3 | Employee Matters | 34 |
| 6.4 | Regulatory Matters | 36 |
| 6.5 | Reasonable Best Efforts; Cooperation | 38 |
| 6.6 | Data Transfer Matters | 3839 |
| 6.7 | Use of Name | 39; Voyager Platform 40 |
| 6.8 | Further Assurances | 4041 |
| 6.9 | Insurance Matters | 4041 |
| 6.10 | User Migration | 4142 |
| 6.11 | Rebalancing Exercise; Seller Statement | 4344 |
| 6.12 | Crediting of Accounts; Unsupported Jurisdictions, Transfer of Coins to Seller; Liquidations or Distributions by Seller | 4546 |
| 6.13 | VGX Token Listing Review Process | 4850 |
| 6.14 | Additional Bankruptcy Distributions | 4850 |
| 6.15 | Unstaking | 4952 |
| 6.16 | Receipt of Misdirected Assets; Liabilities | 5053 |
| 6.17 | Acknowledgment by Purchaser | 5053 |
| 6.18 | IT Migration | 5254 |
| 6.19 | Confidentiality | 5255 |
| 6.20 | Acquired Assets Owned by Non-Debtors | 5356 |
| 6.21 | Seller Expenses | 5356 |
| 6.22 | Purchaser Expenses | 5457 |

**ARTICLE VII CONDITIONS TO CLOSING** — 5558

| | | |
|---|---|---|
| 7.1 | Conditions Precedent to the Obligations of Purchaser and Seller | 5558 |
| 7.2 | Conditions Precedent to the Obligations of Purchaser | 5558 |
| 7.3 | Conditions Precedent to the Obligations of Seller | 5659 |

# TABLE OF CONTENTS

|  |  | **Page** |
|---|---|---|
| 7.4 | Waiver of Conditions | ~~56~~59 |
| **ARTICLE VIII TERMINATION** | | ~~57~~60 |
| 8.1 | Termination of Agreement | ~~57~~60 |
| 8.2 | Effect of Termination | ~~59~~62 |
| 8.3 | Reverse Termination Fee | ~~60~~63 |
| 8.4 | Further Effect of Termination | ~~60~~63 |
| **ARTICLE IX TAXES** | | ~~61~~64 |
| 9.1 | Transfer Taxes | ~~61~~64 |
| 9.2 | Cooperation | ~~61~~65 |
| 9.3 | Preparation of Tax Returns and Payment of Taxes | ~~62~~65 |
| **ARTICLE X MISCELLANEOUS** | | ~~63~~66 |
| 10.1 | Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers | ~~63~~66 |
| 10.2 | Expenses | ~~63~~67 |
| 10.3 | Notices | ~~64~~67 |
| 10.4 | Binding Effect; Assignment | ~~65~~68 |
| 10.5 | Amendment and Waiver | ~~65~~68 |
| 10.6 | Third Party Beneficiaries | ~~65~~69 |
| 10.7 | Non-Recourse | ~~66~~69 |
| 10.8 | Severability | ~~66~~69 |
| 10.9 | Construction | ~~66~~69 |
| 10.10 | Schedules | ~~66~~69 |
| 10.11 | Complete Agreement | ~~67~~70 |
| 10.12 | Specific Performance | ~~67~~70 |
| 10.13 | Jurisdiction and Exclusive Venue | ~~67~~71 |
| 10.14 | Governing Law; Waiver of Jury Trial | ~~68~~71 |
| 10.15 | No Right of Set-Off | ~~69~~72 |
| 10.16 | Counterparts and PDF | ~~69~~72 |
| 10.17 | Publicity | ~~69~~72 |
| 10.18 | Bulk Sales Laws | ~~70~~73 |
| 10.19 | Fiduciary Obligations | ~~70~~73 |
| 10.20 | No Solicitation | ~~70~~73 |
| 10.21 | Acknowledgment | ~~70~~73 |
| **ARTICLE XI ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS** | | ~~70~~74 |
| 11.1 | Certain Definitions | ~~70~~74 |
| 11.2 | Index of Defined Terms | ~~85~~88 |
| 11.3 | Rules of Interpretation | ~~86~~89 |

## INDEX OF EXHIBITS

EXHIBIT A     FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION
AGREEMENT

EXHIBIT B     FORM OF TRADEMARK AND DOMAIN NAME ASSIGNMENT
AGREEMENT

i

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement"), dated as of December 18, 2022, is made by and between BAM Trading Services Inc. d/b/a Binance.us, a Delaware corporation ("Purchaser"), and Voyager Digital, LLC, a Delaware limited liability company ("Seller"). Purchaser and Seller are each referred to herein individually as a "Party" and collectively as the "Parties." Capitalized terms used herein shall have the meanings set forth herein or in Article XI.

WHEREAS, on July 5, 2022 (the "Petition Date"), Seller, together with Voyager Digital Ltd., a Canadian corporation and Seller's indirect equityholder ("Parent"), and Voyager Digital Holdings, Inc., a Delaware corporation and Seller's direct equityholder ("Holdings" and, collectively with Seller and Parent, the "Debtors"), filed voluntary petitions for relief (collectively, the "Petitions") under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), to be jointly administered for procedural purposes (collectively, the "Bankruptcy Case"); and

WHEREAS, Purchaser desires to purchase the Acquired Assets and assume the Assumed Liabilities from Seller, and Seller desires to sell, convey, assign, and transfer to Purchaser the Acquired Assets together with the Assumed Liabilities, in a sale authorized by the Bankruptcy Court pursuant to, inter alia, sections 105, 363, 365, 1129, 1141 and 1142 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this Agreement, the Agreement Order, the Plan and the Confirmation Order.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants, and agreements set forth herein, intending to be legally bound hereby, Purchaser and Seller hereby agree as follows.

## ARTICLE I

## PURCHASE AND SALE OF THE ACQUIRED ASSETS; ASSUMPTION OF ASSUMED LIABILITIES

1.1    Purchase and Sale of the Acquired Assets. Pursuant to sections 105, 363, 365, 1129, 1141 and 1142 of the Bankruptcy Code, on the terms and subject to the conditions set forth herein and in the Agreement Order, the Plan and the Confirmation Order, at the Closing, Seller shall sell, transfer, assign, convey, and deliver to Purchaser, and Purchaser shall purchase, acquire, and accept from Seller, all of Seller's right, title and interest in and to, as of the Closing, the Acquired Assets, free and clear of all Encumbrances other than Permitted Post-Closing Liens; provided, in respect of the Acquired Coins, Purchaser shall acquire all of Seller's right, title and interest in and to the Acquired Coins free and clear of all Encumbrances (including Encumbrances implemented through "smart contracts" or other technological means), except that with respect to any ETH Coins that are Staked Coins as of the date hereof and cannot be unstaked as of the **later of the** Closing **and the Delivery Date of such ETH Coins**, such ETH Coins shall be subject to such staking. "Acquired Assets" means all of the properties, rights and

interests in and to only the following assets of Seller as of the Closing, wherever located and whether or not required to be reflected on a balance sheet prepared in accordance with IFRS, including any such properties, rights and interests in any assets of the following types acquired by Seller after the date hereof and prior to the Closing:

(a)  all Acquired Coins, together with all information regarding the underlying networks and smart contracts to which such Acquired Coins are subject;

(b)  to the extent permissible under applicable Law, (1) all (i) information and Personal Information (including, for the avoidance of doubt, names, account numbers, social security numbers, passports (including passport numbers), drivers licenses (including driver license numbers), "liveness check" selfies, email addresses, mailing addresses, phone numbers, contact information, usernames, user IDs, passwords, and any Personal Information collected for purposes of KYC Procedures) related to (A) all active and inactive accounts of Users ("Voyager User Accounts") and (B) any other consumers located or having a home address in the United States from whom Personal Information was collected by Seller; (ii) information that has been anonymized, pseudonymized, or otherwise de-identified; (iii) data contained in the Seller Statement or the Post-Bankruptcy Statement; (iv) information relating to Voyager User Accounts that must be obtained and retained by Purchaser or any of its Affiliates for regulatory or legal purposes; and (v) any encryption key, passcode or cypher required to access any of the foregoing (collectively, the "Acquired User Data"), and (2) all other information and data relating to the other categories of Acquired Assets, the Voyager Platform, other than Acquired User Data (clauses (1) and (2), collectively, "Acquired Information");

(c)  all rights, causes of action, claims (including, for the avoidance of doubt, any claims and causes of action arising under Chapter 5 of the Bankruptcy Code), counterclaims, defenses, credits, rebates, demands, allowances, refunds (other than Tax refunds or Tax attributes, in each case, to the extent enumerated in Section 1.2(i)), causes of action, rights of set off, rights of recovery, rights of recoupment or rights under or with respect to express or implied guarantees, warranties, representations, covenants or indemnities of any kind, in each case that Seller may have against any User located or having a home address in the United States solely to the extent that such claim or cause of action is against a User in such Person's capacity as a User (in each case, excluding (i) Retained Avoidance Actions, (ii) claims, causes of action or other rights against Seller or any of its Affiliates, or (iii) any of the foregoing to the extent relating to any Credit Matter) (collectively, "Acquired Voyager Claims");

(d)  other than VGX Token Smart Contracts, all Intellectual Property owned by Seller or otherwise used or held for use by or on behalf of Seller in connection with the operation of its businesses, including all Business Software (in source code and object code form), any Bedrock source code and other IT Systems owned by Seller and required to operate the Voyager Platform, all Business Accounts (provided that Purchaser may elect, by written notice to Seller until two (2) Business Days prior to the Closing Date, to designate any Business Account(s) as Excluded Asset(s)), all rights to collect royalties and proceeds in connection therewith with respect to the period from and after the Closing, all rights, claims and causes of action to sue and recover for past, present and future infringements, dilutions, misappropriations

2

of, or other conflicts with, such Intellectual Property and any and all corresponding rights that, now or hereafter, may be secured throughout the world;

(e)    all rights to continue the customer relationships with customers of Seller and its Affiliates to the extent pertaining to savings and trading services related to Cryptocurrency;

(f)    all Contracts listed on <u>Schedule 1.1(f)</u> (the "<u>Assigned Contracts</u>") (for the avoidance of doubt, not including the 3AC Loan); and

(g)    other than the Excluded Documents, all Documents, goodwill, payment intangibles and general intangible assets and rights of or otherwise used or held for use by or on behalf of Seller and its Affiliates, in each case in connection with or related to any of the foregoing categories of Acquired Assets; <u>provided</u> that Seller shall be entitled to retain copies of Documents (subject to <u>Section 6.19</u>).

1.2    <u>Excluded Assets</u>. Notwithstanding anything to the contrary in this Agreement, in no event shall Seller be deemed to sell, transfer, assign, convey or deliver, and Seller shall retain all right, title and interest to all other properties, rights, interests and other assets of Seller that are not Acquired Assets, including the following (collectively, the "<u>Excluded Assets</u>"):

(a)    all Cash and Cash Equivalents, all bank accounts, and all deposits (including maintenance deposits and security deposits for rent, electricity, telephone or otherwise) or prepaid or deferred charges and expenses, including all lease and rental payments, that have been prepaid by Seller, and any retainers or similar amounts paid to Advisors or other professional service providers, in each case, other than the Acquired Coins;

(b)    all Contracts of Seller other than the Assigned Contracts, including the Contracts listed on <u>Schedule 1.2(b)</u> (the "<u>Excluded Contracts</u>");

(c)    all Documents, in each case, (i) to the extent they are primarily used in, or primarily relate to, any of the Excluded Assets or Excluded Liabilities (including information stored on the computer systems, data networks or servers of Seller, other than Voyager User Accounts), (ii) to the extent that such Documents constitute Seller's financial accounting Documents, all minute books, organizational documents, stock registers and such other books and records of Seller to the extent pertaining to the ownership, organization or existence of Seller, Tax Returns (and any related work papers), corporate seals, checkbooks, and canceled checks, in each case to the extent not primarily relating to the Acquired Assets or Assumed Liabilities or (iii) that Seller is required by Law to retain; <u>provided</u> that, to the extent not prohibited by applicable Law, Purchaser shall have the right to make copies of any portions of such Documents;

(d)    all Documents to the extent prepared or received by Seller or any of its Affiliates in connection with the sale of the Acquired Assets, this Agreement, or the Transactions, including (i) all records and reports prepared or received by Seller or any of its Affiliates or Advisors in connection with the sale of the Acquired Assets and the Transactions, including all analyses relating to the business of Purchaser or its Affiliates so prepared or received in connection therewith, (ii) all bids and expressions of interest received from third

3

parties with respect to the acquisition of Seller's business or assets, and (iii) all privileged materials, documents and records of Seller or any of its Affiliates (together with the Documents specified in Sections 1.2(c) and 1.2(h), the "Excluded Documents");

       (e)     all current and prior insurance policies of Seller, including for the avoidance or doubt all director and officer insurance policies, and all rights and benefits of any nature of Seller with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries, in each case, other than Acquired Voyager Claims;

       (f)     all membership interests or other equity interests of Seller or any of its Affiliates or securities convertible into, exchangeable, or exercisable for any such membership interests or other equity interests;

       (g)     (i) all Retained Avoidance Actions, (ii) all preference or avoidance claims or actions arising under the Bankruptcy Code or applicable Law, (iii) all other rights, claims, causes of action, rights of recovery, rights of set-off, and rights of recoupment as of the Closing of Seller or any of its Affiliates, in each case, either (A) arising out of or relating to events occurring on or prior to the Closing Date, except as set forth in Section 1.1, or (B) related to any Credit Matter, and (iv) all claims that Seller or any of its Affiliates may have against any Person with respect to any other Excluded Assets or any Excluded Liabilities, in each case other than Acquired Voyager Claims;

       (h)     Seller's claims or other rights under this Agreement, including the Purchase Price hereunder, or any agreement, certificate, instrument, or other document executed and delivered between Seller and Purchaser or their respective Affiliates in connection with the Transactions, or any other agreement between Seller and Purchaser or their respective Affiliates entered into on or after the date hereof;

       (i)     (x) all Tax attributes of Seller or its Affiliates (including refunds of income Taxes of Seller or its Affiliates, but excluding any Tax refunds or Tax attributes with respect to Taxes in respect of the Acquired Assets for any taxable period (or portion thereof) beginning after the Closing Date allocable to Purchaser in accordance with Section 9.3(d) or with respect to Transfer Taxes), (y) all Tax refunds and Tax attributes with respect to Taxes in respect of the Acquired Assets (i) for any Pre-Closing Tax Period or (ii) that are Excluded Liabilities, and (z) all Tax refunds and Tax attributes with respect to Taxes in respect of the Excluded Assets;

       (j)     every asset of Seller that would otherwise constitute an Acquired Asset (if owned immediately prior to the Closing) if conveyed or otherwise disposed of during the period from the date hereof until the Closing Date (i) at the direction of the Bankruptcy Court or (ii) as otherwise permitted under Section 6.1(b);

       (k)     all demands, allowances, refunds, rebates (including any vendor or supplier rebates), rights (including under or with respect to express or implied guarantees, warranties, representations, covenants and indemnities), claims, counterclaims, defenses, credits, causes of action, rights of set off, rights of recovery or rights of recoupment relating to or arising

4

against suppliers, vendors, merchants, manufacturers and counterparties to leases, licenses or any Contract, arising out of or relating to events occurring on or prior to the Closing Date, in each case other than Acquired Voyager Claims;

(l)     the properties, rights, interests, equity and assets of Coinify ApS and its direct and indirect subsidiaries;

(m)     all Money Transmitter Licenses;

(n)     Seller's accounts receivable, and other amounts or Liabilities owing, from its Affiliates;

(o)     (i) all Seller Plans and assets of all Seller Plans that do not constitute Acquired Coins and (ii) personnel records relating to employees of Seller and Holdings;

(p)     all information and Personal Information related to individual consumers that is not Acquired User Data, including any Personal Information that is subject to the GDPR or collected from natural persons with addresses outside of the United States;

(q)     the 3AC Loan;

(r)     all VGX Token Smart Contracts; and

(s)     the properties, rights, interests and assets set forth on <u>Schedule 1.2(s)</u>.

1.3     <u>Assumption of Certain Liabilities</u>. On the terms and subject to the conditions set forth herein and in the Agreement Order, the Plan and the Confirmation Order, effective as of the Closing, in addition to the other components of the Purchase Price described in <u>Section 2.1(a)</u>, Purchaser shall irrevocably assume from Seller (or with respect to Taxes, if applicable, from Seller's applicable Affiliate) (and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and Seller shall (or with respect to Taxes, if applicable, cause Seller's applicable Affiliate to) irrevocably transfer, assign, convey, and deliver to Purchaser, only the following Liabilities, without duplication and only to the extent not paid prior to the Closing (collectively, the "<u>Assumed Liabilities</u>"):

(a)     all Liabilities and obligations of Seller under the Assigned Contracts to the extent such Liabilities arise from and after the Closing or relate to events, facts and circumstances first existing after the Closing;

(b)     all cure costs required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts (the "<u>Cure Costs</u>");

(c)     all Liabilities arising out of the conduct of the business or the ownership of the Acquired Assets, in each case, solely by Purchaser from and after the Closing Date **or, with respect to any Delayed Acquired Coin, the Delivery Date with respect to such Delayed Acquired Coin,** and to the extent such Liabilities arise from events, facts and circumstances first

existing after the Closing Date **or, with respect to any Delayed Acquired Coin, the Delivery Date with respect to such Delayed Acquired Coin**;

(d)  all Liabilities for Taxes with respect to the Acquired Assets for any taxable period (or portion thereof) beginning after the Closing Date allocable to Purchaser in accordance with Section 9.3(d);

(e)  all Liabilities relating to all Transfer Taxes; and

(f)  all Liabilities set forth on Schedule 1.3(f);

provided, however, that whether or not any Liability for Taxes is an Assumed Liability shall be governed solely by Section 1.3(d) and Section 1.3(e).

1.4  Excluded Liabilities. Notwithstanding anything herein to the contrary, Purchaser shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, Seller or any of its Affiliates or relating to the Acquired Assets, the Excluded Assets or the business and operations of Seller and its Affiliates, of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on or prior to the Closing Date or arising thereafter, including as a result of any act, omission, or circumstances taking place prior to the Closing, other than the Assumed Liabilities (all such Liabilities that are not Assumed Liabilities being referred to collectively herein as the "Excluded Liabilities"). For the avoidance of doubt, and without limiting the foregoing, Purchaser shall not be obligated to assume, and does not assume, and hereby disclaims, all of the following Liabilities of Seller and its Affiliates (each of which shall constitute an Excluded Liability hereunder):

(a)  all Liabilities (i) existing prior to the filing of the Bankruptcy Case that are subject to compromise under the Bankruptcy Code and (ii) to the extent not otherwise expressly assumed herein (including in the Commercial Covenants), incurred subsequent to the filing of the Bankruptcy Case and prior to the Closing;

(b)  all Liabilities related to (i) customer accounts of Seller or its Affiliates (including Voyager User Accounts), except for those obligations of Purchaser expressly set forth in the Commercial Covenants and (ii) commercial payables or amounts owing by Seller or its Affiliates, including to any software vendors;

(c)  all Liabilities for Taxes (i) with respect to the Acquired Assets for any Pre-Closing Tax Period allocable to Seller in accordance with Section 9.3(d); (ii) of Seller and their Affiliates for any taxable period; or (iii) arising from or in connection with an Excluded Asset; and

(d)  all Liabilities resulting from Seller's or any of its Affiliates' breach of, violation of, or non-compliance with the provisions of any Laws relating to the ownership or operation of their respective businesses, the Acquired Assets and the Excluded Assets or the

6

Transactions, including any bulk transfer Laws or similar Laws of any jurisdiction in connection with the Transactions; and

(e)     all Successor Liabilities, including with respect to any investigation or other Action against, concerning or otherwise with respect to Seller, its business or its assets.

1.5     Assumption/Rejection of Certain Contracts.

(a)     Assumption and Assignment of Executory Contracts. Seller shall, and shall cause its Affiliates to, provide timely and proper written notice of the Seller's request for entry of the Confirmation Order to all parties to any executory Contracts or unexpired leases to which Seller is a party that are Assigned Contracts and take all other actions reasonably necessary to cause such Contracts to be assumed by Seller and assigned to Purchaser pursuant to section 365 of the Bankruptcy Code to the extent that such Contracts are Assigned Contracts at Closing. The Confirmation Order shall provide that as of and conditioned on the occurrence of the Closing, Seller shall assign or cause to be assigned to Purchaser, as applicable, the Assigned Contracts, each of which shall be identified by the name or appropriate description and date of the Assigned Contract (if available), the other party to the Assigned Contract and the address of such party for notice purposes, all included on an exhibit attached to either the Plan Supplement, a notice filed in connection with the motion for approval of the Confirmation Order or a separate motion for authority to assume and assign such Assigned Contracts. Such exhibit shall also set forth Seller's good faith estimate of the amounts necessary to cure any defaults under each of the Assigned Contracts as determined by Seller based on Seller's books and records or as otherwise determined by the Bankruptcy Court. At the Closing, Seller shall, pursuant to the Agreement Order, the Confirmation Order and the Assignment and Assumption Agreement(s), assume and assign to Purchaser (the consideration for which is included in the Purchase Price), all Assigned Contracts that may be assigned by Seller to Purchaser pursuant to sections 363 and 365 of the Bankruptcy Code, subject to adjustment pursuant to Section 1.5(b). At the Closing, Purchaser shall (i) pay all Cure Costs and (ii) assume, and thereafter in due course and in accordance with its respective terms pay, fully satisfy, discharge and perform all of the obligations under each Assigned Contract pursuant to section 365 of the Bankruptcy Code.

(b)     Excluding or Adding Assigned Contracts Prior to Closing. Purchaser shall have the right to notify Seller in writing of any Assigned Contract that it does not wish to assume or a Contract to which Seller is a party that Purchaser wishes to add as an Assigned Contract up to five (5) Business Days prior to the Closing Date, and (i) any such previously considered Assigned Contract that Purchaser no longer wishes to assume shall be automatically deemed removed from the Schedules related to Assigned Contracts and automatically deemed to be an Excluded Contract, in each case, without any adjustment to the Purchase Price, and (ii) any such previously considered Excluded Contract that Purchaser wishes to assume as an Assigned Contract shall be automatically deemed added to the Schedules related to Assigned Contracts, automatically deemed removed from the Schedules related to Excluded Contracts, and assumed by Seller to sell and assign to Purchaser, in each case, without any adjustment to the Purchase Price. Purchaser shall be solely responsible for the payment, performance and discharge when due of the Liabilities under the Assigned Contracts arising or that are otherwise payable from the

7

time of and after the Closing. No Contract set forth on <u>Schedule 1.2(s)</u> shall be subject to the terms of this <u>Section 1.5(b)</u>.

          (c)    <u>Non-Assignment</u>.

          (i)    Notwithstanding anything to the contrary in this Agreement but subject to <u>Section 6.1</u>, a Contract shall not be an Assigned Contract hereunder and shall not be assigned to, or assumed by, Purchaser to the extent that such Contract is rejected by Seller or terminated by Seller or any other party thereto, or terminates or expires by its terms, on or prior to such time as it is to be assumed by Purchaser as an Assigned Contract hereunder and is not continued or otherwise extended upon assumption; <u>provided</u> that Seller shall obtain Purchaser's consent prior to seeking to reject or terminate, or rejecting or terminating, any Assigned Contract or any Contract assumed by Purchaser pursuant to <u>Section 1.5(a)</u> or <u>Section 1.5(b)</u> from and after the date of this Agreement.

          (ii)    Notwithstanding anything to the contrary in this Agreement, to the extent an Acquired Asset requires a Consent or Governmental Authorization (other than, and in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to Purchaser of Seller's rights over such asset, and such Consent or Governmental Authorization has not been obtained prior to such time as it is to be transferred by Purchaser as an Acquired Asset hereunder, such asset shall not be an Acquired Asset hereunder and shall not be transferred to, or received by, Purchaser. In the event that any Acquired Asset is deemed not to be assigned pursuant to this <u>clause (ii)</u>, the Closing shall nonetheless take place subject to the terms and conditions set forth herein and, thereafter, through the earlier of such time as such Consent or Governmental Authorization is obtained and the closing of the Bankruptcy Case, Seller and Purchaser shall (A) use reasonable best efforts to secure such Consent or Governmental Authorization as promptly as practicable after the Closing and (B) enter into a commercially reasonable arrangement reasonably proposed by Purchaser, including subcontracting, licensing, or sublicensing to Purchaser any or all of Seller's rights and obligations with respect to any such Acquired Asset, under which (1) Purchaser shall obtain (without materially infringing upon the legal rights of such third party or violating any Law) the economic rights and benefits (net of the amount of any related Tax costs actually incurred by Seller or its Affiliates or any direct reasonable and documented out-of-pocket costs actually incurred by Seller or its Affiliates resulting from the retention and maintenance by Seller or its Affiliates) with respect to such Acquired Asset with respect to which the Consent or Governmental Authorization has not been obtained and (2) Purchaser shall assume any related burden and obligation with respect to such Acquired Asset to the extent such burden and obligation would constitute an Assumed Liability if such Acquired Asset was transferred at Closing. Upon satisfying any requisite Consent or Governmental Authorization requirement applicable to such Acquired Asset after the Closing, such Acquired Asset shall promptly be transferred and assigned to Purchaser in accordance with the terms of this Agreement, the Agreement Order, the Plan and Confirmation Order, and the Bankruptcy Code. Notwithstanding anything herein to the contrary, the

US-DOCS-137411268.27138346099.6

provisions of this Section 1.5(c) shall not apply to any consent or approval that is not required to be obtained by operation of the Bankruptcy Code (including section 365(f)).

## ARTICLE II

### Consideration; Payment; Closing

2.1     Consideration; Payment.

(a)     Subject to the terms and conditions herein, the aggregate consideration (collectively, the "Purchase Price") to be paid by Purchaser for the purchase of the Acquired Assets shall be: (i) (A) the assumption of Assumed Liabilities, (B) a cash payment of $20,000,000 (the "Cash Payment"), (C) the Seller Expenses, if any, payable pursuant to Section 6.21, and (D) Purchaser's obligations to make the payments set forth in Section 6.12 and Section 6.14.

(b)     Subject to the terms and conditions herein, at the Closing, Purchaser shall deliver, or cause to be delivered, to Seller (i) the Cash Payment, plus (ii) the Seller Expenses, if any, payable pursuant to Section 6.21, less (iii) the Deposit, together with all received investment income, if any (the "Closing Date Payment"). Any payment required to be made pursuant to this Agreement in cash (including the Closing Date Payment) shall be made by wire transfer of immediately available funds to such bank account as shall be designated in writing by the applicable Party to the other Party at least two (2) Business Days prior to the date such payment is to be made.

(c)     Upon reasonable advance written notice to Purchaser (in any event delivered to Purchaser no less than five Business Days prior to the Closing Date) Seller shall be entitled to withhold such portion of the Seller Held Coins as is necessary to satisfy Seller's obligations under the Plan (the "Withheld Coins"), and Seller shall distribute, or take such other action with respect to, the Withheld Coins only in accordance with the Plan and the provisions of this Agreement. To the extent there are any Withheld Coins, the provisions of this Agreement shall be read accordingly to give effect to the withholding and subsequent transfer, distribution or other action with respect to any such Withheld Coins, *mutatis mutandis*.

2.2     Deposit.

(a)     Purchaser has made, on the date hereof or will make on the first Business Day following the date hereof, an earnest money deposit with Acquiom Clearing House LLC (the "Escrow Agent") in the amount equal to $10,000,000 (the "Deposit"), by wire transfer of immediately available funds for deposit into an escrow account (the "Escrow Account"). Subject to Section 2.2(b) and Section 2.2(c), the Deposit and any received investment income, if any, shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of Seller or Purchaser and shall be applied against payment of the Purchase Price on the Closing Date. Seller hereby acknowledges and agrees that the Deposit qualifies as the deposit required pursuant to the Bidding Procedures Order.

9

(b)     If this Agreement has been validly terminated (i) by Seller pursuant to Section 8.1(d) or Section 8.1(f), (ii)  by Purchaser pursuant to Section 8.1(c), in circumstances where Seller would be entitled to terminate this Agreement pursuant to Section 8.1(d) or Section 8.1(f), or (iii) by Seller pursuant to Section 8.1(g) in connection with and following any Purchaser Development and not in connection with a Higher and Better Offer (each of (i), (ii), and (iii), a "Purchaser Default Termination"), then within three (3) Business Days after the date of such termination, the Parties shall execute any instructions necessary to permit the Escrow Agent to disburse the Deposit together with all received investment income, if any, to Seller.

(c)     If this Agreement has been validly terminated by either Party, other than as contemplated by Section 2.2(b), then the Deposit, together with all received investment income, if any, shall be returned to Purchaser within three (3) Business Days after such termination, and, at Purchaser's request, Seller shall execute any instructions necessary to permit the Escrow Agent to disburse the Deposit together with all received investment income, if any, to Purchaser.

(d)     If the Closing occurs, the Deposit shall be transferred to Seller.

2.3     Closing. Subject to the terms and on the conditions set forth in this Agreement, the closing of the purchase and sale of the Acquired Assets, the delivery of the Purchase Price, the assumption of the Assumed Liabilities and the consummation of the other transactions contemplated by this Agreement at and in connection with such closing (the "Closing") will take place by telephone conference and electronic exchange of documents (or, if the Parties agree to hold a physical closing, at the offices of Kirkland & Ellis LLP, located at 601 Lexington Avenue, New York, New York 10022) at 10:00 a.m. Eastern Time on the third (3rd) Business Day following full satisfaction or due waiver (by the Party entitled to the benefit of such condition) of the closing conditions set forth in Article VII (other than conditions that by their terms or nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions), or at such other place and time as the Parties may agree in writing. The date on which the Closing actually occurs in accordance with the provisions hereof is referred to herein as the "Closing Date."

2.4     Closing Deliveries by Seller. At the Closing, Seller shall deliver to Purchaser:

(a)     a bill of sale and assignment and assumption agreement substantially in the form of Exhibit A (the "Assignment and Assumption Agreement") duly executed by Seller;

(b)     each of the Acquired Coins to the wallet address designated by Purchaser for the relevant Acquired Coins of such type; and prior to transferring any Acquired Coins in full, Seller shall send a test transaction of a *de minimis* amount and shall immediately deliver the remainder of the relevant Acquired Coins, following Purchaser's confirmation that the *de minimis* amount was properly delivered; provided that ~~such transfers of the Acquired Coins~~ :

(i)     Seller shall delay the delivery pursuant to this Section 2.4 of Acquired Coins allocable to a particular User or Eligible Creditor until Purchaser has confirmed in writing that such User or Eligible Creditor has satisfied the requirements set forth in Section 6.10(c), Section 6.10(e) and Section 6.12(b) for

10

**onboarding to the Binance.US Platform (any Acquired Coins so delayed, "Delayed Acquired Coins"), in which case Seller shall deliver such Delayed Acquired Coins to Purchaser on a weekly basis to the extent Purchaser has notified Seller at least five (5) Business Days in advance of such weekly delivery that such User or Eligible Creditor has satisfied such requirements (with such Delayed Acquired Coins being custodied by Seller or an entity on behalf of Seller that is selected by Seller in accordance with the other provisions of this Agreement); provided that (A) with respect to each such weekly transfer, Seller shall be responsible for all gas or other transaction fees incurred in connection with transferring such Coins to Purchaser and (B) with respect to any transfer of Delayed Acquired Coins to Purchaser (I) for subsequent liquidation and distribution of cash under the last sentence of Section 6.12(a) or (II) pursuant to Section 6.12(b), such Delayed Acquired Coins will be transferred by Seller to Purchaser on the date specified in such provisions;**

(ii) **transfers of Acquired Coins not held on the Binance.US Platform prior to such transfer** shall be deemed complete when each transfer is publicly confirmed on the blockchain for the related Coin at least the number of times set forth on https://support.kraken.com/hc/en-us/articles/203325283-Cryptocurrency-deposit-processing-times (or a successor site agreed by Seller and Purchaser); ~~provided further that~~

(iii) ~~(i) for~~**transfers of** Acquired Coins held on the Binance.US Platform as of the Closing Date**, shall be deemed complete when** such Acquired Coins ~~shall be~~**are** transferred to the Binance.US Platform account designated by Purchaser**;** and

(iv) ~~(ii)~~ in the case of ETH Coins that are Staked Coins as of the date hereof **and cannot be unstaked as of the later of the Closing Date and the Delivery Date with respect to such ETH Coins,** such staked ETH Coins shall be delivered pursuant to the means mutually agreed between Purchaser and Seller acting reasonably;

(c)     a short-form trademark and domain name assignment agreement substantially in the form of Exhibit B (the "Trademark and Domain Name Assignment Agreement"), duly executed by Seller;

(d)     an IRS Form W-9 properly completed and duly executed by Seller or Seller's regarded owner for U.S. federal income Tax purposes;

(e)     an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Seller certifying that the conditions set forth in Sections 7.2(a) and 7.2(b) have been satisfied; and

(f)     the Seller Statement pursuant to Section 6.11(c).

2.5     Closing Deliveries by Purchaser. At the Closing, Purchaser shall deliver to (or at the direction of) Seller:

(a)     without duplication, the Closing Date Payment pursuant to Section 2.1(b);

(b)     the Assignment and Assumption Agreement, duly executed by Purchaser;

(c)     the Trademark and Domain Name Assignment Agreement, duly executed by Purchaser; and

(d)     an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Purchaser certifying that the conditions set forth in Sections 7.3(a) and 7.3(b) have been satisfied.

2.6     <u>Withholding</u>. Purchaser and its Affiliates shall be entitled to deduct and withhold from any amounts otherwise payable pursuant to this Agreement such amounts as are required to be deducted or withheld under applicable tax Law. Prior to making any such deduction or withholding, Purchaser or its applicable Affiliate shall use reasonable best efforts to (x) notify the person in respect of which such withholding or deduction is proposed to be made of such deduction or withholding and (y) give such person a reasonable amount of time to demonstrate that no or reduced withholding is required under applicable tax Law. To the extent that amounts are so deducted or withheld and paid to the appropriate Governmental Body, such amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction and withholding was made.

## ARTICLE III

### REPRESENTATIONS AND WARRANTIES OF SELLER

Except as (i) disclosed in the forms, reports, schedules, statements, exhibits and other documents filed with (or furnished to) the Canadian Securities Administrators ("CSA") by Parent in respect of Seller and its business during the two-year period prior to the date hereof to the extent publicly available at least one (1) Business Day prior to the date hereof on the CSA's System for Electronic Document Analysis and Retrieval, excluding (x) any disclosures set forth or referred to in any risk factor or similar section that do not constitute statements of fact, (y) any disclosures in any forward-looking statements disclaimer, and (z) any other disclosures that are generally cautionary, predictive or forward-looking in nature (the "Filed CSA Documents") (it being acknowledged that nothing disclosed in the Filed CSA Documents will be deemed to modify or qualify the Fundamental Representations), (ii) disclosed in any forms, statements or other documents filed by any of the Debtors with the Bankruptcy Court in the Bankruptcy Case as of one (1) Business Day prior to the date hereof, or (iii) set forth in the Schedules delivered by Seller concurrently herewith and subject to Section 10.10, Seller represents and warrants to Purchaser as follows as of the date hereof and as of the Closing Date **(except where, and solely to the extent that, any of the following are made with respect to any Delivery Date, in which case, such representations and warranties, solely to such extent, are made only as of such Delivery Date)**:

3.1     <u>Organization and Qualification</u>.

(a)     Except as set forth on Schedule ~~3.1~~3.1, Seller is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware and has all requisite limited liability company power and authority necessary to own,

lease and operate its properties and assets and to carry on its business as it is now being conducted, except (other than with respect to Seller's due formation and valid existence) as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)     Except as set forth on <u>Schedule 3.1</u>, Seller is duly qualified to do business and is in good standing (where such concept is recognized under applicable Law) in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets owned, leased or operated by it makes such qualification necessary, except where the failure to be so qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.2     <u>Authorization of Agreement</u>. Subject to requisite Bankruptcy Court approvals:

(a)     Seller has all necessary power and authority to execute and deliver this Agreement and to perform its obligations hereunder and to consummate the Transactions;

(b)     the execution, delivery and performance by Seller of this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement to which it is a party or to be executed by it in connection with the consummation of the Transactions (the "<u>Seller Documents</u>"), and the consummation by Seller of the Transactions, have been duly authorized by all requisite limited liability company action and no other limited liability company proceedings on its part are necessary to authorize the execution, delivery and performance by Seller of this Agreement and the Seller Documents and the consummation by it of the Transactions; and

(c)     this Agreement has been, and the Seller Documents will be, when delivered pursuant to the terms hereof, duly executed and delivered by Seller and, assuming due authorization, execution and delivery hereof by the other Party, constitutes a legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, except that such enforceability (i) may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other similar Laws of general application affecting or relating to the enforcement of creditors' rights generally and (ii) is subject to general principles of equity, whether considered in a proceeding at law or in equity (collectively, the "<u>Enforceability Exceptions</u>").

3.3     <u>Conflicts; Consents</u>.

(a)     Assuming that (x) requisite Bankruptcy Court approvals are obtained, and (y) the notices, authorizations, approvals, Orders, permits or consents set forth on <u>Schedule 3.3(a)</u> are made, given or obtained (as applicable), neither the execution and delivery by Seller of this Agreement, nor the consummation by Seller of the Transactions, nor performance or compliance by Seller with any of the terms or provisions hereof, will (i) conflict with or violate any provision of Seller's certificate of formation or limited liability company agreement, (ii) violate any Law or Order applicable to Seller, the Acquired Assets or the Assumed Liabilities, (iii) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancellation

13

of any obligation or to the loss of any benefit, any of the terms or provisions of any Material Contract or accelerate Seller's obligations under any such Material Contract, (iv) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any properties or assets of Seller or (v) violate, contravene or conflict with, result in termination or lapse of, or in any way affect any permit, except, in the case of <u>clauses (ii)</u> through <u>(v)</u>, as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b) Except as set forth on <u>Schedule 3.3(a)</u>, Seller is not required to file, seek or obtain any notice, authorization, approval, Order, permit or consent of or with any Governmental Body in connection with the execution, delivery and performance by Seller of this Agreement or the consummation by Seller of the Transactions, except (i) any requisite Bankruptcy Court approvals, or (ii) where failure to file, seek or obtain such notice, authorization, approval, Order, permit or consent would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.4 <u>Financial Statements</u>. Attached to <u>Schedule 3.4</u> are Parent's unaudited statements of financial position as of June 30, 2022 (the "<u>Balance Sheet Date</u>") and audited statements of financial position as of June 30, 2021, and the related statements of loss and cash flows for each fiscal year then ended, in each case (collectively, the "<u>Financial Statements</u>"). Except as set forth on <u>Schedule 3.4</u>, the Financial Statements have been prepared, in each case, in conformity in all material respects with IFRS consistently applied, except for the absence of footnote disclosure and any customary year-end adjustments and except, in the case of the unaudited statements as of June 30, 2020 or the fiscal year then ended, with respect to any Tax matters or any impact or effect thereof. The Financial Statements are prepared based on the books and records of Parent and its Subsidiaries and present fairly in all material respects, in accordance with IFRS consistently applied, the consolidated financial condition and results of operations of Parent as of the dates and for the periods referred to therein, except as may be indicated in the notes thereto.

3.5 <u>Cryptocurrency; Loans; Customer Accounts</u>.

(a) <u>Schedule 3.5(a)</u> sets forth a list of all Cryptocurrency held by Seller as of a date within three (3) Business Days of the date hereof, the means through which Seller as of such date controls such Cryptocurrency (*e.g.*, "private keys," custody agreements or agreements with parties performing validation services), whether or not such Cryptocurrency is attributable to User accounts on the Voyager Platform, and whether such Cryptocurrency constitutes collateral under any Loan (including, solely for this purpose, the 3AC Loan), which <u>Schedule 3.5(a)</u> shall be provided to Purchaser no later than December 18, 2022. **As of the date hereof, as of the Closing Date and, with respect to any Delayed Acquired Coin, as of the applicable Delivery Date with respect to such Acquired Coin,** Seller has the exclusive ability to control, including by use of "private keys" or other equivalent means or through custody arrangements or other equivalent means, all such Cryptocurrency set forth on <u>Schedule 3.5(a)</u> (other than, solely to the extent of any staking contract, Staked Coins), and owns such Cryptocurrency (other than Cryptocurrency that constitutes collateral under any Loan (including, solely for this purpose, the 3AC Loan) and, solely to the extent of any staking contract, Staked Coins) free and clear of all Encumbrances (other than Encumbrances that will be removed or released by operation of the Confirmation Order or the Plan); <u>provided</u> that such ownership and exclusive ability to control

14

Cryptocurrency is subject to the continued existence, validity, legality, governance and public availability of the relevant blockchains.

(b)    Schedule 3.5(b) sets forth a true, correct and complete list of all amounts (including any principal, interest, fees, expenses or penalties) outstanding or unpaid under any Loan.

(c)    Schedule 3.5(c) sets forth a list of all Users (excluding Users with addresses in the United Kingdom, European Union or European Economic Area) as of the Petition Date and a date within three (3) Business Days of the date hereof and the account position (including type and amount of Cryptocurrency) that such User held as of immediately prior to the Petition Date and as of the date hereof, which Schedule 3.5(c) shall be provided to Purchaser no later than December 18, 2022.

(d)    **As of the date hereof, as of the Closing Date and, with respect to any Delayed Acquired Coin, as of the applicable Delivery Date with respect to such Delayed Acquired Coin,** Seller has implemented procedures and controls regarding management of authentication credentials such as private keys and means for instructing third party custodians ("Authentication Credentials") for Cryptocurrencies, including limitation of access to Authentication Credentials to employees who need to have such access and requiring multiple individuals to sign off on transactions. Where Authentication Credentials are not held by employees of Seller, such Authentication Credentials are held by reputable third-party custodians or wallet providers whose security procedures have been evaluated by Seller and found to be fit for purpose.

(e)    Schedule 3.5(e) sets forth a true, correct and complete list of the number and type of Post-Petition Coins, on a User-by-User basis, which Schedule 3.5(e) shall be provided to Purchaser no later than December 18, 2022.

3.6    Title to Acquired Assets; Staked Coins; Exclusive Ownership; Sufficiency of Assets.

(a)    Seller has good and valid title to all Acquired Assets (other than Coins pledged by a borrower as collateral in respect of any Loans and, solely to the extent of any staking contract, Staked Coins), free and clear of all Encumbrances (other than Permitted Encumbrances) and, at the Closing, subject to Section 1.5(c), Purchaser will be vested with good and valid title to all such Acquired Assets, free and clear of all Encumbrances (other than Permitted Post-Closing Liens) and Excluded Liabilities, to the fullest extent permissible under Law, including section 363(f) of the Bankruptcy Code; provided, in respect of the Acquired Coins, Purchaser will be vested with good and valid title thereto free and clear of all Encumbrances (including Encumbrances implemented through "smart contracts" or other technological means), except that with respect to any staked ETH Coins that cannot be unstaked as of the Closing, such ETH Coins shall be subject to such staking **and except that, with respect to any Delayed Acquired Coins, such title will vest with Purchaser on the applicable Delivery Date**. Schedule 3.6(a) sets forth a true, correct and complete list of all Seller Held Coins that are subject to staking ("Staked Coins").

15

(b)     Seller is the sole owner of all Coins relating to the ~~exchange~~brokerage and custody business of the Voyager Platform and has good and valid title to such Coins, free and clear of all Encumbrances (except to the extent such Coin constitutes collateral under any Loan (including, solely for this purpose, the 3AC Loan) and, solely to the extent of any staking contract, Staked Coins).

3.7     <u>Title to Properties</u>.

(a)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, Seller has a good and valid leasehold interest to all real property leased by Seller (the "<u>Leased Real Property</u>"), free and clear of all Encumbrances (other than Permitted Encumbrances). Seller does not own any real property.

(b)     Subject to requisite Bankruptcy Court approvals, and assumption by Seller of the applicable Contract in accordance with applicable Law (including satisfaction of any applicable Cure Costs) and except as a result of the commencement of the Bankruptcy Case, Seller holds good title to, or holds a valid leasehold interest in, all of the material tangible property necessary in the conduct of its business as now conducted, free and clear of all Encumbrances, except for Permitted Encumbrances, other than any failure to own or hold such tangible property that is not material to Seller.

3.8     <u>Contracts</u>.

(a)     <u>Schedule 3.8</u> sets forth a list of each Material Contract as of the date of this Agreement. For purposes of this Agreement, "<u>Material Contract</u>" means (x) any Assigned Contract, and (y) any other Contract to which Seller is a party or by which it is bound (in each case, excluding any Seller Plan) that in the case of this clause (y):

(i)     relates to the formation, creation, governance, economics, or control of any joint venture, partnership or other similar arrangement, other than for the avoidance of doubt, marketing and licensing Contracts entered into in the Ordinary Course;

(ii)    provides for indebtedness for borrowed money of Seller having an outstanding or committed amount in excess of $1,000,000, other than letters of credit;

(iii)   relates to the acquisition or disposition of any material business (whether by merger, sale of stock, sale of assets or otherwise) pursuant to which any earn-out or deferred or contingent payment obligations remain outstanding that would reasonably be expected to involve payments by or to Seller of more than $1,000,000 after the date hereof (in each case, excluding for the avoidance of doubt, acquisitions or dispositions of Equipment, Cryptocurrency, properties or other assets in the Ordinary Course or of Equipment, properties or other assets that are obsolete, worn out, surplus or no longer used or useful in the conduct of the business of Seller);

(iv)    involves the license of material Seller Intellectual Property to third parties (other than (x) Contracts with end users of Seller's products and services entered into in the ordinary course of business or (y) non-exclusive licenses granted to service

16

providers, suppliers and other third parties in connection with the provision of goods or services to Seller; provided such licenses are ancillary to, and not the primary purpose of, such Contract);

(v)     is a Contract (other than purchase orders or Contracts with respect to the acquisition of Cryptocurrency in the Ordinary Course) for the purchase of materials, supplies, goods, services, Equipment, or other assets pursuant to which Seller would reasonably be expected to make payments of more than $3,000,000 during any fiscal year;

(vi)     contains any provision (A) limiting, in any material respect, the right of Seller to engage in any business, make use of any Seller Intellectual Property that is material to Seller, compete with any Person, or operate anywhere in the world, or (B) granting any exclusivity right to any third party or containing a "most favored nation" provision in favor of any third party, in each case of (A) and (B), other than (x) a Contract that can be terminated on ninety (90) days' notice or less without resulting in a breach or violation of, or any acceleration of any rights or obligations or the payment of any penalty under, such Contract, (y) customer Contracts entered into in the Ordinary Course granting exclusive rights to certain of Seller's services or containing "most favored nation" provisions with respect to certain of Seller's products or (z) any provision in any license agreements for third party Intellectual Property being licensed to Seller that limits Seller's use of such licensed Intellectual Property to specified fields of use or specified territories;

(vii)     evidences or relates to a Loan, including security or collateral agreements;

(viii)     is a custody agreement or agreement with any Person performing validation or staking services with respect to any Cryptocurrency;

(ix)     each Contract evidencing or governing financial or commodity hedging or similar trading activities (including with respect to Cryptocurrency), including any master agreements or confirmations governing swaps, options or other derivatives, or futures account agreements and/or brokerage statements or similar Contract; and

(x)     any Contracts with any Governmental Body, regulatory service providers or self-regulatory organizations in connection with Seller's business or the Voyager Platform.

(b)     Subject to requisite Bankruptcy Court approvals, and assumption by Seller of the applicable Contract in accordance with applicable Law (including satisfaction by Purchaser of any applicable Cure Costs) and except (i) as a result of the commencement of the Bankruptcy Case and (ii) with respect to any Contract that has previously expired in accordance with its terms, been terminated, restated, or replaced, (A) each Material Contract is valid and binding on Seller and, to the Knowledge of Seller, each other party thereto, and is in full force and effect, subject to the Enforceability Exceptions, (B) Seller, and, to the Knowledge of Seller, any other party thereto, have performed all obligations required to be performed by it under each

17

Material Contract, (C) Seller has not received a written notice of the existence of any breach or default on the part of Seller under any Material Contract, (D) there are no events or conditions which constitute, or, after notice or lapse of time or both, will constitute a default on the part of Seller, or to the Knowledge of Seller, any counterparty under such Material Contract and (E) to the Knowledge of Seller, Seller has not received any written notice from any Person that such Person intends to terminate, or not renew, any Material Contract, except in each case of (A) through (E), as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

       3.9    <u>Permits; Compliance with Laws</u>.

       (a)    Except as set forth on <u>Schedule 3.9</u>, (i) Seller is not in violation of any Laws, Orders or any Money Transmitter Requirement, applicable to the Acquired Assets and (ii) Seller holds, and is in compliance with, all licenses, permits, registrations and authorizations, including Money Transmitter Licenses, necessary for the lawful ownership and operation of the Acquired Assets and Seller's business, except in each case as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

       (b)    Seller and each of its directors, officers and employees acting in such capacity are and have in the past three (3) years been in compliance with the Foreign Corrupt Practices Act of 1977, as amended (the "<u>FCPA</u>"), and any other U.S. or foreign Law concerning anti-corruption or anti-bribery applicable to its business, and Seller is not, to the Knowledge of Seller, being investigated by any Governmental Body with respect to, or been given notice in writing by a Governmental Body of, any violation by Seller of the FCPA or any other U.S. or foreign Law concerning anti-corruption or anti-bribery applicable to its business, in each case, except to the extent such non-compliance, investigation or notice of violation would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

       (c)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (i) neither Seller nor any director or officer of Seller, or any employee, agent or representative or other Person who performs or has performed services on behalf of Seller in the past three (3) years, is a Person that is the subject or target of economic sanctions administered by the Office of Foreign Assets Control of the United States Department of Treasury ("<u>OFAC</u>") (including the designation as a "Specially Designated National or Blocked Person" thereunder), the United Nations Security Council, His Majesty's Treasury, the European Union, the Bureau of Industry Security of the U.S. Department of Commerce, the U.S. Department of State, or any sanctions measures under the U.S. International Emergency Economic Powers Act, the U.S. Trading with the Enemy Act, the U.S. Iran Sanctions Act, the U.S. Comprehensive Iran Sanctions, Accountability and Divestment Act of 2010, the U.S. Iran Threat Reduction and Syria Human Rights Act of 2012, the U.S. National Defense Authorization Act of 2012 or the U.S. National Defense Authorization Act of 2013, or any executive order, directive or regulation pursuant to the authority of any of the foregoing, including the regulations of the United States Department of the Treasury set forth under 31 CFR, Subtitle B, Chapter V, or any orders or licenses issued thereunder (collectively, "<u>Sanctions</u>"), nor any Sanctioned Person; (ii) to the Knowledge of Seller, the Acquired Assets are not the property or interests in

18

property of a Sanctioned Person, and are not otherwise the subject or target of Sanctions; and (iii) Seller has not in the past three (3) years been in violation of applicable Sanctions.

(d)     Seller and each of its directors, officers and employees acting in such capacity are and have in the past three (3) years been in compliance with all anti-money laundering and financial recordkeeping and reporting Laws to which it is subject, including the related rules, regulations or guidelines issued, administered or enforced by any Governmental Body (collectively, the "Anti-Money Laundering Laws"), and no Action by or before any Governmental Body involving Seller (or, in respect of the dealings of Seller, involving any of Seller's directors, officers or employees) with respect to the Anti-Money Laundering Laws is pending, or, to the Knowledge of Seller, threatened, in each case, except to the extent such non-compliance or Action would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(e)     Seller does not (i) have assets located outside the United States, or (ii) derive revenue from users located outside the United States.

(f)     Seller does not engage in (a) the design, fabrication, development, testing, production, or manufacture of one or more "critical technologies" within the meaning of Section 721 of the Defense Production Act of 1950, as amended, including all implementing regulations thereof (the "DPA"), or (b) the ownership, operation, maintenance, supply, manufacture, or servicing of "covered investment critical infrastructure" within the meaning of the DPA (where such activities are covered by column 2 of Appendix A to 31 C.F.R. Part 800).

3.10     Environmental Matters. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (a) Seller is, and has been since January 1, 2021, in compliance with all applicable Environmental Laws, (b) since January 1, 2021, Seller has not received any written notice alleging that Seller is in violation of or liable under, any Environmental Law that is unresolved, (c) Seller possesses and is in compliance with all permits required under Environmental Laws for the operation of its business as currently conducted ("Environmental Permits"), (d) there is no Action under or pursuant to any Environmental Law or Environmental Permit that is pending or, to the Knowledge of Seller, threatened in writing against Seller, (e) Seller is not subject to any Order imposed by any Governmental Body pursuant to Environmental Laws under which there are uncompleted, outstanding or unresolved obligations on the part of Seller and (f) Seller has not released any Hazardous Substances at the Leased Real Property in quantities or concentrations that currently require Seller to conduct remedial activities, or that have given rise to any Action against Seller, under Environmental Laws.

3.11     Intellectual Property; Data Privacy.

(a)     Schedule 3.11(a)(i) sets forth as of the date hereof a true, correct and complete list of all registrations and applications included in the Seller Intellectual Property (the "Seller Registered IP"), indicating for each item the owner, registration or application number, registration or application date and the applicable filing jurisdiction or domain name registrar, as applicable. Except as otherwise indicated on Schedule 3.11(a), all Seller Registered IP is owned exclusively by Seller, and is subsisting, and to the Knowledge of Seller, valid and enforceable.

There is no outstanding Action or Order challenging or adversely affecting the validity or enforceability of any material Seller Registered IP, or Seller's ownership of or rights in any material Seller Intellectual Property.

(b)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, Seller owns all of the rights, title and interest in and to the Seller Intellectual Property (other than Intellectual Property licensed to Seller), free and clear of all Encumbrances (other than Permitted Encumbrances). Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, all of the Seller Intellectual Property (other than Intellectual Property licensed to Seller) is subsisting, valid and enforceable.

(c)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (i) Seller owns or has legally enforceable and sufficient rights to use all Intellectual Property necessary to the conduct of the business of Seller as currently conducted free and clear of all Encumbrances (other than Permitted Encumbrances) and (ii) Seller has taken commercially reasonable steps in accordance with industry practice to maintain the confidentiality of non-public Intellectual Property; provided that nothing in this Section 3.11(c) shall be interpreted or construed as a representation or warranty with respect to whether there is any infringement, misappropriation, or violation of any Intellectual Property, which is the subject of Section 3.11(e).

(d)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, no Actions are pending or, to the Knowledge of Seller, threatened against Seller, and since January 1, 2021, Seller has not received any written notice or claim, (i) challenging the ownership, validity, enforceability or use by Seller of any Intellectual Property owned by or exclusively licensed to Seller or (ii) alleging that Seller is infringing, misappropriating or otherwise violating the Intellectual Property of any Person.

(e)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, since January 1, 2021, (i) no Person has infringed, misappropriated or otherwise violated the rights of Seller with respect to any Intellectual Property owned by or exclusively licensed to Seller and (ii) the operation of the business of Seller has not violated, misappropriated or infringed the Intellectual Property of any other Person.

(f)    The consummation of the Transactions will not result in the grant of any right or license to any third party of any material Seller Intellectual Property (other than Intellectual Property licensed to Seller).

(g)    Seller has complied in the past three (3) years in all material respects with all applicable Privacy Laws, privacy policies and notices, and contractual commitments related to the Processing of Personal Information (collectively, "Privacy Requirements"), and the consummation of the Transactions will not cause Seller to breach, in any material respect, any Privacy Requirements.

(h)    Seller has established and implemented and maintains a written information security program that contains commercially reasonable safeguards designed to protect Personal Information and against any Security Incident.

(i)    Except as would not, individually or in the aggregate, reasonably be expected to have a material impact on the Acquired Assets, taken as a whole, there have been no Security Incidents involving Personal Information in Seller's custody, possession or control or for which Seller is otherwise responsible. Except as set forth on <u>Schedule 3.11(i)</u>, Seller has not in the past three (3) years: (i) notified or been legally required to notify any affected individuals, Governmental Body or other parties in connection with any Security Incident pursuant to Privacy Requirements; (ii) been the subject of any Action with respect to any unauthorized Processing of Personal Information or violation of any Privacy Laws by any Person; (iii) received any written inquiry, notice, request, claim, complaint, correspondence, or other communication from any Governmental Body or other Person relating to any Security Incident or alleged violation of any Privacy Laws; or (iv) made any ransomware or similar payment in connection with any Security Incident.

3.12    <u>Tax Matters</u>.

(a)    To the Knowledge of Seller, except with respect to income Tax and information Tax Returns, Seller has prepared (or caused to be prepared) and duly and timely filed (taking into account valid extensions of time within which to file) all material Tax Returns in respect of the Acquired Assets or otherwise required to be filed by it, and all such Tax Returns (taking into account all amendments filed in respect thereto) are true, correct and complete in all material respects.

(b)    To the Knowledge of Seller, all material Taxes in respect of the Acquired Assets, other than income Taxes or Taxes attributable to information Tax Returns, or otherwise required to be paid by Seller (whether or not shown on any Tax Return) have been duly and timely paid.

(c)    To the Knowledge of Seller, there are no Encumbrances for Taxes on the Acquired Assets or any other assets of Seller other than for Taxes not yet due or payable.

(d)    Seller has not, within the past five (5) years, been a member of an affiliated group of corporations filing a consolidated federal income Tax Return (other than a group the common parent of which is Parent or one of its Subsidiaries).

(e)    Seller has not waived any statute of limitations in respect of material Taxes or agreed to any extension of time with respect to an assessment or deficiency for material Taxes (other than pursuant to extensions of time to file Tax Returns obtained in the Ordinary Course), including, for the avoidance of doubt, with respect to Taxes in respect of the Acquired Assets.

(f)    Seller has not participated in any "listed transaction" within the meaning of U.S. Treasury Regulation Section 1.6011-4(b)(2).

21

(g)     Except as set forth on <u>Schedule 3.12(g)</u>, solely as of the date hereof, (x) Seller has not received a written notice from a Governmental Body of any proposed adjustment, deficiency or underpayment of material amounts of Taxes with respect to the Acquired Assets, and (y) there are no pending or threatened audits or other Actions for or relating to any Liability for Taxes with respect to the Acquired Assets, except for, in each case of clause (x) and (y), those that have been fully satisfied, resolved or finally withdrawn.

(h)     Seller has not received a claim from a Governmental Body that Tax Returns are required to be filed in relation to the Acquired Assets or the Assumed Liabilities in a jurisdiction where no such Tax Returns have been filed or are currently filed.

(i)     Notwithstanding anything in this Agreement to the contrary, the representations and warranties in this <u>Section 3.12</u> shall constitute the sole representations and warranties with respect to Taxes and no representation or warranty is made with respect to the validity of any Tax position or the availability of any Tax attribute for any Tax period (or any portion thereof) following the Closing.

3.13   <u>Affiliate Transactions</u>. Except as set forth on <u>Schedule 3.13</u> or in the "Interest Of Management And Others In Material Transactions" disclosure in the Filed CSA Documents or customer accounts of officers or directors, to the Knowledge of Seller, no Affiliate of Seller, or any officer or director of Parent or Seller, (a) is a party to any agreement that constitutes an Acquired Asset having a potential or actual value or a contingent or actual Liability exceeding $500,000, other than (i) loans and other extensions of credit to directors and officers of Seller for travel, business or relocation expenses or other employment-related purposes in the Ordinary Course, (ii) employment arrangements in the Ordinary Course and (iii) the Seller Plans or (b) has any material interest in any Acquired Asset.

3.14   <u>Brokers</u>. Except for Moelis, the fees and expenses of which will be paid by Seller, no broker, investment banker, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses in connection therewith, in connection with the Transactions based upon arrangements made by or on behalf of Seller or any of its Affiliates for which Purchaser or its Affiliates shall be liable.

3.15   <u>Litigation</u>. Except for the general pendency of the Bankruptcy Case, Actions that would not reasonably be expected to have a Material Adverse Effect or as set forth <u>Schedule 3.15</u>, there are no filed actions, claims, complains, summons, suits, litigations, arbitrations pending or threatened in writing against Seller.

3.16   <u>Absence of Changes</u>. Since the Balance Sheet Date, (a) there has not been any Material Adverse Effect and i) no action has been taken with respect to the Acquired Assets that would have required the consent of Purchaser under <u>Section 6.1</u> if undertaken after the date hereof.

3.17   <u>No Other Representations or Warranties</u>. Except for the representations and warranties expressly contained in this <u>Article III</u> (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement)

US-DOCS-~~137411268.27~~138346099.6

or in the certificate to be delivered pursuant to <u>Section 2.4(e)</u> (the "<u>Express Seller Representations</u>") (<u>it</u> <u>being</u> <u>understood</u> that Purchaser has relied only on the Express Seller Representations), Purchaser acknowledges and agrees that neither Seller nor any other Person on behalf of Seller makes, and Purchaser has not relied on, is not relying on, and will not rely on the accuracy or completeness of any express or implied representation or warranty with respect to Seller, the Acquired Assets or the Assumed Liabilities or with respect to any information, statements, disclosures, documents, projections, forecasts or other material of any nature made available or provided by any Person (including in any presentations or other materials prepared by Moelis) (the "<u>Information Presentation</u>") or in that certain datasite administered by Datasite (the "<u>Dataroom</u>") or elsewhere to Purchaser or any of its Affiliates or their respective Advisors by or on behalf of Seller or any of its Affiliates. Without limiting the foregoing, except for the Express Seller Representations, neither Seller nor any other Person will have or be subject to any Liability whatsoever to Purchaser, or any other Person, resulting from the distribution to Purchaser or any of its Affiliates or their respective Advisors, or Purchaser's or any of its Affiliates' or Advisors' use of or reliance on, any such information, including the Information Presentation, any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom or otherwise in expectation of the Transactions or any discussions with respect to any of the foregoing information.

3.18    <u>No Outside Reliance</u>. Notwithstanding anything contained in this <u>Article III</u> or any other provision of this Agreement to the contrary, Seller acknowledges and agrees that the Express Purchaser Representations are the sole and exclusive representations, warranties and statements of any kind made to Seller and on which Seller may rely in connection with the Transactions. Seller acknowledges and agrees that all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Purchaser Representations), including in any meetings, calls or correspondence with management of Purchaser or any other Person on behalf of Purchaser or any of its Affiliates or Advisors, are, in each case, specifically disclaimed by Purchaser and that Seller has not relied on any such representations, warranties or statements.

## ARTICLE IV

### REPRESENTATIONS AND WARRANTIES OF PURCHASER

Except as set forth in the Schedules delivered by Purchaser concurrently herewith and subject to <u>Section 10.10</u>, Purchaser represents and warrants to Seller as follows as of the date hereof and as of the Closing Date.

4.1    <u>Organization and Qualification</u>. Purchaser is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware and has all requisite power and authority necessary to carry on its business as it is now being conducted, except (other than with respect to Purchaser's due incorporation and valid existence) as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the Transactions. Purchaser is duly licensed or qualified to do

business and is in good standing (or its equivalent) in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets leased by it makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the Transactions.

4.2     <u>Authorization of Agreement</u>. Purchaser has all necessary power and authority to execute and deliver this Agreement and to perform its obligations hereunder and to consummate the Transactions. The execution, delivery and performance by Purchaser of this Agreement, and the consummation by Purchaser of the Transactions, subject to requisite Bankruptcy Court approvals, have been duly authorized by all requisite corporate or similar organizational action and no other corporate or similar organizational proceedings on its part are necessary to authorize the execution, delivery and performance by Purchaser of this Agreement and the consummation by it of the Transactions. Subject to requisite Bankruptcy Court approvals, this Agreement has been duly executed and delivered by Purchaser and, assuming due authorization, execution and delivery hereof by the other Party, constitutes a legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, except that such enforceability may be limited by the Enforceability Exceptions.

4.3     <u>Conflicts; Consents</u>.

(a)     Except for the consents, licenses, waivers, exemptions, authorizations, approvals, filings, notifications or registrations required under any Money Transmitter Requirements in any Unsupported Jurisdiction applicable to Purchaser and the Binance.US Platform (the "<u>Unsupported Jurisdiction Approvals</u>"), assuming that (i) requisite Bankruptcy Court approvals are obtained, and (ii) the notices, authorizations, approvals, Orders, permits or consents set forth on <u>Schedule 4.3</u> are made, given or obtained (as applicable), neither the execution and delivery by Purchaser of this Agreement, nor the consummation by Purchaser of the Transactions, nor performance or compliance by Purchaser with any of the terms or provisions hereof, will (A) conflict with or violate any provision of Purchaser's articles of incorporation or bylaws or similar organizational documents, (B) violate any Law or Order applicable to Purchaser, (C) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancelation of any obligation or to the loss of any benefit, any of the terms or provisions of any loan or credit agreement or other Contract to which Purchaser is a party or accelerate Purchaser's obligations under any such Contract, or (D) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any properties or assets of Purchaser or any of its Subsidiaries, except, in the case of <u>clauses (B)</u> through <u>(D)</u>, as would not, individually or in the aggregate, reasonably be expected to prevent or materially impair or delay the ability of Purchaser to consummate the Transactions.

(b)     Except for the Unsupported Jurisdiction Approvals, Purchaser is not required to file, seek or obtain any notice, authorization, approval, Order, permit or consent of or with any Governmental Body in connection with the execution, delivery and performance by Purchaser of this Agreement or the consummation by Purchaser of the Transactions, except where failure to obtain such consent, approval, authorization or action, or to make such filing or

notification, would not, individually or in the aggregate, reasonably be expected to prevent or materially impair or delay the ability of Purchaser to consummate the Transactions.

4.4    _Financing_. Purchaser has, as of the date hereof, and will have at the Closing, sufficient funds in cash in an aggregate amount necessary to (a) pay the Closing Date Payment pursuant to Section 2.1(b) and any Seller Expenses to the extent payable by Purchaser pursuant to Section 6.21, and (b) pay all fees and expenses of Purchaser in connection with the Closing. Purchaser is and shall be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assigned Contracts and the related Assumed Liabilities.

4.5    _Permits_. Purchaser has Money Transmitter Licenses in all States of the United States of America, other than the Unsupported Jurisdictions and any States in which the operation of Purchaser's business does not require a Money Transmitter License. Assuming the accuracy in all material respects of the representations and warranties set forth on Sections 3.9(a), 3.9(d) and 3.9(e) (in each case, as qualified by the Schedules) and Seller's compliance in all material respects with the covenants set forth in Sections 6.4, 6.6, 6.10 and the other Commercial Covenants, except for the Unsupported Jurisdiction Approvals, Purchaser holds all licenses, franchises, permits, certificates, approvals, and authorizations from Governmental Bodies necessary for the ownership and use of the Acquired Assets.

4.6    _Brokers_. There is no investment banker, broker, finder, or other intermediary which has been retained by or is authorized to act on behalf of Purchaser that might be entitled to any fee or commission in connection with the Transactions.

4.7    _No Litigation_. There are no Actions pending or, to the Knowledge of Purchaser, threatened against or affecting Purchaser that will materially and adversely affect Purchaser's performance under this Agreement or Purchaser's ability to consummate the Transactions.

4.8    _Certain Arrangements_. As of the date hereof, there are no Contracts, undertakings, commitments, agreements or obligations, whether written or oral, between any member of the Purchaser Group, on the one hand, and any member of the management of Seller or its board of managers (or applicable governing body of any Affiliate of Seller), any holder of equity or debt securities of Seller, or any lender or creditor of Seller or any of its Affiliates, on the other hand, (a) relating in any way to the acquisition of the Acquired Assets or the Transactions or (b) that would be reasonably likely to prevent, restrict, impede or affect adversely the ability of Seller or any of its Affiliates to entertain, negotiate or participate in any of the Transactions.

4.9    _Solvency_. As of the date hereof Purchaser is and, assuming (x) that the representations and warranties made by Seller herein are true and connect, (y) Seller has complied in all material respects with its covenants and other agreements hereunder, and (z) the conditions set forth in Section 7.1 and Section 7.2 have been satisfied, then immediately after giving effect to the transactions contemplated hereby Purchaser shall be, Solvent. "Solvent" means, with respect to any Person, such Person (a) is able to pay its debts as they become due; (b) owns property that has a fair saleable value greater than the amounts required to pay its debt (including a reasonable estimate of the amount of all contingent liabilities) and (c) has adequate capital to carry on its business. In connection with the Transactions, Purchaser is not incurring,

25

has not incurred, and does not plan to incur, debts beyond its ability to pay as they become absolute and matured.

4.10   No Additional Representations or Warranties. Except for the representations and warranties expressly contained in this Article IV (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) or in the certificate to be delivered pursuant to Section 2.5(d) (the "Express Purchaser Representations") (it being understood that Seller has relied only on the Express Purchaser Representations), Seller acknowledges and agrees that neither Purchaser nor any other Person on behalf of Purchaser makes, and Seller has not relied on, is not relying on, and will not rely on the accuracy or completeness of any express or implied representation or warranty with respect to Purchaser or with respect to any information, statements, disclosures, documents, projections, forecasts or other material of any nature made available or provided by any Person to Seller or any of its Affiliates or their respective Advisors on behalf of Purchaser. Without limiting the foregoing, except for the Express Purchaser Representations, neither Purchaser nor any other Person will have or be subject to any Liability whatsoever to Seller, or any other Person, resulting from the distribution to Seller, its Affiliates or their respective Advisors, or Seller's, its Affiliates' or their respective Advisors' use of or reliance on, any such information, statements, disclosures, documents, projections, forecasts or other material made available to them in expectation of the Transactions or any discussions with respect to any of the foregoing information.

4.11   No Outside Reliance. Notwithstanding anything contained in this Article IV or any other provision of this Agreement to the contrary, Purchaser acknowledges and agrees that the Express Seller Representations are the sole and exclusive representations, warranties and statements of any kind made to Purchaser and on which Purchaser may rely in connection with the Transactions. Purchaser acknowledges and agrees that all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (a) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Seller Representations), including in the Information Presentation, the Dataroom, any projections or in any meetings, calls or correspondence with management of Seller or any other Person on behalf of Seller or any of its Affiliates or Advisors and (b) any other statement relating to the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental compliance, employee matters, regulatory compliance, business risks and prospects of Seller, or the quality, quantity or condition of Seller's assets, are, in each case specifically disclaimed by Seller and Purchaser has not relied on any such representations, warranties or statements. Purchaser acknowledges that it has conducted to its full satisfaction an independent investigation and verification of the business including its financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental compliance, employee matters, regulatory compliance, business risks and prospects of Seller, and, in making its determination to proceed with the Transactions, Purchaser has relied solely on the results of the Purchaser Group's own independent investigation and verification, and has not relied on, is not relying on, and will not rely on, Seller, the Information Presentation, any projections or any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom or otherwise, in each case, whether written or oral, made or provided by, or as part of, any of the

US-DOCS-~~137411268.27~~138346099.6

foregoing or Seller or any of its Affiliates or Advisors, or any failure of any of the foregoing to disclose or contain any information, except for the Express Seller Representations (it being understood that Purchaser has relied only on the Express Seller Representations).

## ARTICLE V

## BANKRUPTCY COURT MATTERS

5.1     Selection of Successful Bid and Winning Bidder and Sale Approval.

(a)     Pursuant to the Bidding Procedures Order, by execution and delivery of its counterpart signature page hereto, Seller hereby confirms that Purchaser has made the highest or otherwise best bid pursuant to the Bidding Procedures Order and has selected the Transactions as the Successful Bid and Purchaser as the Winning Bidder (each, as defined in the Bidding Procedures Order).

(b)     (i) Promptly, and in any event no later than December 21, 2022 (subject to Bankruptcy Court approval where indicated), Seller shall: publicly announce that the Transactions have been selected as the Successful Bid and Purchaser has been selected as the Winning Bidder; and (ii) promptly, and in any event no later than December 21, 2022 (subject to Bankruptcy Court approval where indicated), Seller shall file a motion with the Bankruptcy Court attaching the form of an order approving the execution, delivery and performance of this Agreement by Seller (including payment of the Purchaser Expenses pursuant to Section 6.21(b) and the provisions of this Article V contemplating certain performance by Seller prior to Closing), other than the performance of those obligations to be performed at or after the Closing (the "Agreement Order"), which Agreement Order shall be in form and substance acceptable to Purchaser. Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining Bankruptcy Court approval of the Agreement Order.

5.2     No-Shop.

(a)     From and following the execution and delivery of this Agreement by Seller, Seller and its Affiliates shall not, and shall not permit their respective Advisors or Affiliates to, (i) initiate contact with, or solicit or encourage submission of any inquiries, proposals or offers by, any Person (other than Purchaser, its Affiliates and its and their respective Advisors) with respect to an Alternative Transaction, (ii) engage in, continue or otherwise participate in any discussions or negotiations regarding an Alternative Transaction or that could reasonably be expected to lead to an Alternative Transaction, (iii) enter into any confidentiality agreement with respect to, or provide any non-public information or data to any Person relating to, any Alternative Transaction, or (iv) otherwise agree, authorize or commit to do any of the foregoing; provided that, notwithstanding the foregoing, from and after entry of the Agreement Order, Seller may take the actions set forth in clauses (ii) and (iii) above if (A) Seller has received a written, bona fide offer, proposal or indication of interest to engage in an Alternative Transaction (an "Acquisition Proposal") from any Person after the date of this Agreement that did not result from Seller's breach of this Section 5.2(a), and (B) the board of directors (or similar governing body) of Seller determines in good faith, after consultation with its financial advisor and outside legal counsel, that such Acquisition Proposal constitutes or is reasonably

27

likely to lead to a Higher and Better Offer and that failure to take such actions would violate the directors' fiduciary duties under applicable Law; provided further that if the Closing has not occurred prior to the Outside Date unless the failure of the Closing to have occurred by the Outside Date was caused by Seller's failure to perform any of its obligations under this Agreement, and there is no Back-up Bidder (as defined in the Bidding Procedures Order) or the agreement with the Back-up Bidder has terminated in accordance with its terms, then this Section 5.2(a) shall automatically terminate and be of no further force and effect as of such date. Until entry of the Agreement Order, Seller shall promptly (but in any event within twenty-four (24) hours) provide written notice to Purchaser of any breach of this Section 5.2(a).

(b)     Seller shall promptly (but in any event within twenty-four (24) hours) give written notice to Purchaser if (i) any inquiries, proposals or offers with respect to an Alternative Transaction or that could reasonably be expected to lead to an Alternative Transaction are received, (ii) any non-public information or data concerning Seller or its Affiliates or access to Seller's or its Affiliates' properties, books or records in connection with any Alternative Transaction or any inquiry, proposal or offer that could reasonably be expected to lead to an Alternative Transaction is requested, or (iii) any discussions or negotiations relating to an Alternative Transaction or any inquiry, proposal or offer that could reasonably be expected to lead to an Alternative Transaction are sought to be engaged in or continued by, from or with Seller, its Affiliates or any of its or their respective Advisors, as the case may be. Such notice shall set forth the name of the applicable Person making such inquiry, the material terms and conditions of any proposed Alternative Transaction (including, if applicable, correct and complete copies of any proposed agreements, inquiries, proposals or offers or, where no such copies are available, a reasonably detailed written description thereof) and the status of any such discussions or negotiations. Seller shall thereafter keep Purchaser reasonably informed, on a reasonably prompt basis, of the status of any discussions or negotiations with respect thereto. Until entry of the Agreement Order, Seller shall promptly (but in any event within twenty-four (24) hours) provide written notice to Purchaser of any breach of this Section 5.2(b).

(c)     Seller (i) shall promptly (and in any event within twenty-four (24) hours) give notice to Purchaser upon a determination by Seller or its board of directors (or comparable governing body) that any Acquisition Proposal received from any Person after the date of this Agreement that did not result from Seller's breach of Section 5.2(a) constitutes a Higher and Better Offer (a "Higher Offer Determination Notice") and (ii) may cause or permit Seller or any of the other Debtors to enter into a definitive agreement with respect to such Acquisition Proposal; provided that (A) Seller and its board of directors (or comparable governing body) may only make such determination described in clause (i) of this Section 5.2(c) if, prior to the determination that such Acquisition Proposal constitutes a Higher and Better Offer, Seller negotiates, and causes its representatives to negotiate, with Purchaser in good faith (to the extent Purchaser and its representatives desire to negotiate) during such three (3) Business Day period to amend the terms and conditions of this Agreement and, no earlier than the end of such three (3) Business Day period, the board of directors (or comparable governing body) of Seller determines in good faith (after consultation with its financial advisor(s) and outside legal counsel), after giving effect to such proposed amendments to the terms and conditions of this Agreement, that such Acquisition Proposal still constitutes a Higher and Better Offer (provided further that if any material amendment is made to such Acquisition Proposal, such Acquisition Proposal shall be subject again (but only once again) to the foregoing, except that references to

28

three (3) Business Days shall be deemed to be two (2) Business Days, and whatever the result of the second instance of the foregoing, Seller shall not be required to undertake the foregoing again before making a determination that such Acquisition Proposal constitutes a Higher and Better Offer and, if applicable, terminating this Agreement), and (B) Seller and its board of directors (or comparable governing body) may only take such action described in clause (ii) of this Section 5.2(c) if the board of directors (or comparable governing body) of Seller determines in good faith (after consultation with its outside legal counsel) that the failure to take such action would violate with its fiduciary duties under applicable Law.

    5.3    <u>Bankruptcy Actions</u>.

    (a)    No later than December 21, 2022, Seller shall file with the Bankruptcy Court an amended Disclosure Statement (the "<u>Amended Disclosure Statement</u>" ) containing such amendments as may be necessary or appropriate to reflect the Seller's entry into this Agreement and pursuit of the Transactions, which, solely with respect to matters relating to this Agreement and the Transactions, shall be in a form and substance reasonably acceptable to Purchaser. Concurrently with the filing of such Amended Disclosure Statement (*i.e.*, no later than December 21, 2022), Seller shall file the Plan Solicitation Motion which, solely with respect to matters relating to this Agreement and the Transactions, shall be in form and substance reasonably acceptable to Purchaser; provided that Seller may modify the Plan Solicitation Motion, the Plan, and the Confirmation Order pursuant to discussions with the United States Trustee assigned to the Bankruptcy Case, the Bankruptcy Court, any creditor or committee representing a group of creditors in the Bankruptcy Case, or any other party in interest, in each case, with the consent of Purchaser solely as it pertains to matters relating to this Agreement and Transactions (such consent not to be unreasonably withheld, conditioned or delayed).

    (b)    From the date hereof until the earlier of (i) the termination of this Agreement in accordance with <u>Article VIII</u> and (ii) the Closing Date, Seller shall use reasonable best efforts to obtain entry by the Bankruptcy Court of the Agreement Order and the Confirmation Order.

    (c)    The Parties shall use their respective reasonable best efforts to (i) obtain entry by the Bankruptcy Court of the Agreement Order, (ii) obtain entry by the Bankruptcy Court of the Plan Solicitation Order, (iii) commence solicitation of the Plan, and (iv) (A) facilitate the solicitation, confirmation, and consummation of the Plan and the transactions contemplated thereby and hereby, (B) obtain entry of the Confirmation Order, and (C) and consummate the Plan and the Transactions on the timeline set forth in the Plan Solicitation Motion and in any case prior to the Outside Date.

    (d)    Purchaser shall promptly take all actions as are reasonably requested by Seller to assist in obtaining the Bankruptcy Court's entry of the Agreement Order, the Plan Solicitation Order, the Confirmation Order, and any other Order reasonably necessary in connection with the Transactions as promptly as practicable, including furnishing affidavits, financial information, or other documents or information for filing with the Bankruptcy Court and making such employees and Advisors of Purchaser and its Affiliates reasonably available to testify before the Bankruptcy Court for the purposes of, among other things providing necessary assurances of performance by Purchaser under this Agreement, and demonstrating that Purchaser

is a "good faith" purchaser under section 363(m) of the Bankruptcy Code, as well as demonstrating Purchaser's ability to pay and perform or otherwise satisfy any Assumed Liabilities following the Closing.

(e)     Any documents filed by Seller with the Bankruptcy Court in connection with obtaining approval of effectuating the Closing shall be reasonably acceptable to Purchaser.

(f)     Each of Seller and Purchaser shall (i) appear formally or informally in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the Transactions and the Plan solely with respect to matters relating to this Agreement and (ii) keep the other reasonably apprised of the status of material matters related to the Agreement and the Plan solely as it pertains to matters relating to this Agreement and Transactions, including, upon reasonable request promptly furnishing the other with copies of notices or other communications received by Seller from the Bankruptcy Court with respect to the Transactions or the Plan solely as it pertains to matters relating to this Agreement and Transactions.

(g)     Seller and Purchaser acknowledge that this Agreement and the sale of the Acquired Assets are subject to Bankruptcy Court approval. Purchaser acknowledges that Seller and the other Debtors must take reasonable steps to demonstrate that they have sought to obtain the highest or otherwise best price for the Acquired Assets, including giving notice thereof to the creditors of the Debtors and other interested parties, providing information about Seller to prospective bidders, entertaining higher and better offers from such prospective bidders.

(h)     Purchaser shall provide adequate assurance of future performance as required under section 365 of the Bankruptcy Code for the Assigned Contracts. Purchaser agrees that it will take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assigned Contracts, such as furnishing affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Purchaser's Advisors reasonably available to testify before the Bankruptcy Court.

5.4     Cure Costs. Subject to entry of the Agreement Order and the Confirmation Order, Purchaser shall, on or prior to the Closing (or, in the case of any Contract that is to be assigned following the Closing pursuant to Section 1.5, on or prior to the date of such assignment), pay the Cure Costs and cure any and all other defaults and breaches under the Assigned Contracts so that such Contracts may be assumed by Seller and assigned to Purchaser in accordance with the provisions of section 365 of the Bankruptcy Code and this Agreement.

5.5     Approval. Seller's and Purchaser's obligations under this Agreement and in connection with the Transactions are subject to entry of and, to the extent entered, the terms of any Orders of the Bankruptcy Court (including entry of the Agreement Order and the Confirmation Order). Nothing in this Agreement shall require Seller or its Affiliates to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

5.6    No Successor Liability. The Parties intend that upon the Closing the Purchaser Group shall not and shall not be deemed to: (a) be a successor (or other such similarly situated party), or otherwise be deemed a successor, to Seller, including, a "successor employer" for the purposes of the Code, ERISA, or other applicable Laws; (b) have Liability or responsibility for any Liability or other obligation of Seller arising under or related to the Acquired Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor, or transferee Liability, labor law, de facto merger, or substantial continuity (including under applicable Money Transmitter Requirements or securities Laws of any Governmental Body); (c) have, de facto or otherwise, merged with or into Seller; (d) be an alter ego or a mere continuation or substantial continuation of any of Seller (and there is no continuity of enterprise between Purchaser and Seller), including, within the meaning of any foreign, federal, state or local revenue, pension, ERISA, COBRA, Tax, labor, employment, environmental, or other Law, rule or regulation (including filing requirements under any such Laws, rules or regulations), or under any products liability Law or doctrine with respect to Seller's Liability under such Law, rule or regulation or doctrine; or (e) be holding itself out to the public as a continuation of Seller or its estate (the foregoing clauses (a) through (e), collectively, "Successor Liabilities").

5.7    Filings. Seller shall, and shall cause the other Debtors to, give Purchaser reasonable advance notice of, and opportunity to review and approve, any motions, pleadings, notices and other documents to be filed during the Bankruptcy Case that would reasonably be expected to be material and adverse to the Transactions (such approval not to be unreasonably withheld, conditioned or delayed, provided that Purchaser may withhold their approval in their sole discretion to the extent such motions, pleadings, notices and other documents would be inconsistent with the consummation of the Transactions in accordance herewith).

5.8    Waiver of Conflicts. Notwithstanding anything to the contrary herein or otherwise, Seller acknowledges that Paul Hastings LLP ("Paul Hastings" ) may have represented and may currently represent the Purchaser or one or more of its Affiliates in connection with the Transactions (including the negotiation, preparation, execution and delivery of this Agreement and related agreements, and the consummation of the Transactions) as well as other past and ongoing regulatory matters generally (the "Covered Matters" ). Accordingly, Seller hereby irrevocably consents and agrees, on its behalf and on behalf of its Affiliates, to Paul Hastings representing the Purchaser and its Affiliates from and after the Closing in connection with any matter arising out of or related to the Covered Matters. Seller (i) hereby irrevocably waives and will not assert, and will cause each of its Affiliates to waive and not assert, any actual or potential conflict of interest which has or may arise as a result of Paul Hasting's representation of the Purchaser or one or more of its Affiliates, including in any Action, in a Covered Matter, (ii) hereby consents, and will cause each of its Affiliates to consent to, any such representation, even though, in each case, (x) the interests of the Purchaser or such Affiliates may be directly adverse to Seller or its Affiliates, (y) Paul Hastings may have represented Seller or its Affiliates in a substantially related matter, or (z) Paul Hastings may be handling other ongoing matters for Seller or its Affiliates, and (iii) shall cooperate, and shall cause each of its Affiliates to cooperate, with the Purchaser in effectuating the foregoing waiver (including with respect to any objections raised by or before the Bankruptcy Court or the

31

~~United States Trustee assigned to the Bankruptcy Case in respect of such waiver or representation).~~

**ARTICLE VI**

**COVENANTS AND AGREEMENTS**

6.1     Conduct of Seller.

(a)     Except (i) as required by applicable Law, Order or a Governmental Body, (ii) any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code, (iii) as expressly contemplated or required by this Agreement, (iv) to the extent related to an Excluded Asset or an Excluded Liability or (v) as set forth on Schedule 6.1, during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to Article VIII), unless Purchaser otherwise consents in writing, Seller shall use its reasonable best efforts to carry on its business in the Ordinary Course in all material respects; provided that no action by Seller with respect to matters specifically addressed by Section 6.1(b) shall be deemed to be a breach of this Section 6.1(a) unless such action would constitute a breach of Section 6.1(b).

(b)     Except (i) as required by applicable Law, Order or a Governmental Body, (ii) any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code, (iii) as expressly contemplated, required or permitted by this Agreement, (iv) to the extent related to an Excluded Asset or an Excluded Liability or (v) as set forth on Schedule 6.1, during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to Article VIII) and, in the case of Sections 6.1(b)(ii), 6.1(b)(iii), 6.1(b)(vi), and 6.1(b)(xi) below, solely with respect to any Delayed Acquired Coins, through and including the applicable Delivery Date with respect to any such Delayed Acquired Coin, unless Purchaser otherwise consents in writing, Seller shall not:

(i)     (A) incur, assume or otherwise become liable for any indebtedness for borrowed money, issue or sell any debt securities or warrants or other rights to acquire any debt securities of Seller, guarantee any such indebtedness or any debt securities of another Person or enter into any "keep well" or other agreement to maintain any financial statement condition of another Person (collectively, "Indebtedness"), except (1) for letters of credit, bank guarantees, security or performance bonds or similar credit support instruments, overdraft facilities or cash management programs, in each case issued, made or entered into in the Ordinary Course, (2) for Indebtedness incurred under existing arrangements (including in respect of letters of credit) in an amount not to exceed $5,000,000 in the aggregate outstanding at any time and (3) Indebtedness incurred in connection with the refinancing of any Indebtedness existing on the date of this Agreement or permitted to be incurred, assumed or otherwise entered into hereunder; provided that no such refinancing Indebtedness shall have a principal amount greater than the principal amount of the Indebtedness being refinanced (plus any applicable premiums, defeasance costs, accrued interest, fees and expenses) and shall not include any greater prepayment premiums or restrictions on prepayment than the Indebtedness being refinanced, in each case of this clause (A), other than Excluded Liabilities,

32

(B) enter into any swap or hedging transaction or other derivative agreements or (C) make any loans, capital contributions or advances to, or investments in, any Person;

(ii)     sell or transfer to any Person, in a single transaction or series of related transactions, any of the Acquired Assets, other than the sale or transfer of Withheld Coins;

(iii)     perform or offer to perform any staking that is not unstaked prior to the Rebalancing Date;

(iv)     enter into referral agreements with a third party with respect to Users and any Documents with respect to Users or account information with respect thereto;

(v)     make any changes in financial accounting methods, principles or practices affecting the consolidated assets, Liabilities or results of operations of Seller, except (x) insofar as may be required (A) by IFRS (or any interpretation thereof), (B) by any applicable Law or (C) by any Governmental Body or quasi-governmental authority (including the International Accounting Standards Board or any similar organization) or (y) as necessary or desirable to accommodate reasonable tax positions, to the extent such tax positions would not adversely affect the Acquired Assets or Purchaser in a taxable period (or portion thereof) beginning after the Closing Date;

(vi)     (x) grant any Encumbrance (other than Permitted Encumbrances) on any of its material Acquired Assets (other than Acquired Coins, which, for the avoidance of doubt, are addressed in subclause (y) of this item (vi)) other than to secure Indebtedness and other obligations in existence at the date of this Agreement (and required to be so secured by their terms), or (y) grant any Encumbrance (other than any Encumbrances that will be removed or released by operation of the Confirmation Order or the Plan) on Acquired Coins, including by submitting any Cryptocurrency to any staking contract or otherwise causing any Seller Held Coins that are not currently Staked Coins to become Staked Coins;

(vii)     except, in each case, with respect to income Taxes or information Tax Returns: make, change or revoke any material Tax election; change an annual accounting period for material Taxes; adopt or change any material accounting method with respect to material Taxes; file any amended material Tax Return; enter into any closing agreement for material Taxes; settle or compromise any material Tax claim or assessment; or consent to any extension or waiver of the limitation period applicable to any claim or assessment with respect to material Taxes; in each case to the extent such action would adversely affect the Acquired Assets or Purchaser in a taxable period (or portion thereof) beginning after the Closing Date;

(viii)     waive, release, assign, settle or compromise any pending or threatened Action against Seller to the extent that such wavier, release, assignment, settlement or compromise would (A) result in an Assumed Liability in an amount in

33

excess of $1,000,000, individually or in the aggregate, or (B) waive or release any material rights or claims that would constitute Acquired Assets;

(ix)     enter into any referral agreement with a third party with respect to Users;

(x)     terminate or transfer any Business Accounts (other than any such Business Accounts that are not necessary to the operation of the Voyager Platform, with the Parties to cooperate in good faith to determine which Business Accounts are not necessary and may be terminated or transferred);

(xi)     lend any Cryptocurrency to any Person, or engage in purchases or sales of any Cryptocurrency (other than Withheld Coins) other than in connection with the Rebalancing Exercise; or

(xii)     authorize any of, or commit or agree, in writing or otherwise, to take any of, the foregoing actions.

(c)     Nothing contained in this Agreement is intended to give Purchaser or its Affiliates, directly or indirectly, the right to control or direct Seller's operations or business prior to the Closing, and nothing contained in this Agreement is intended to give Seller, directly or indirectly, the right to control or direct Purchaser's or its Subsidiaries' operations. Notwithstanding anything to the contrary contained herein, (i) any action taken, or omitted to be taken, by Seller pursuant to any Law, Order, directive, pronouncement or guideline issued by any Governmental Body or industry group providing for business closures, "sheltering-in-place" or other restrictions that relates to, or arises out of, any pandemic, epidemic or disease outbreak shall in no event be deemed to constitute a breach of this <u>Section 6.1</u> and (ii) any action taken, or omitted to be taken, by Seller to protect the business of Seller that is responsive to any pandemic, epidemic or disease outbreak, as determined by Seller in its reasonable discretion, shall in no event be deemed to constitute a breach of this <u>Section 6.1</u>.

6.2     <u>Access to Information</u>.

(a)     From the date hereof until the Closing (or the earlier termination of this Agreement pursuant to <u>Article VIII</u>), Seller will (x) provide Purchaser and its authorized Advisors with reasonable access to, upon reasonable advance notice and during regular business hours, Seller's officers, employees, Advisors, properties, systems, offices, and data, documents, and information of the Seller Parties regarding the Acquired Assets, the Assumed Liabilities, the Users, Voyager User Accounts and the Voyager Platform (including, for the avoidance of doubt any of the foregoing that constitutes Acquired Information), including such financial, operating and other data and information related to the Transactions, the Acquired Assets, the Assumed Liabilities, the Users, Voyager User Accounts, or the Voyager Platform (including, for the avoidance of doubt any of the foregoing that constitutes Acquired Information) as Purchaser or any of its representatives may reasonably request and (y) instruct the representatives of Seller to cooperate to provide such access; <u>provided</u> that (i) such access will occur in such a manner reasonably appropriate to protect the confidentiality of the Transactions, (ii) all requests for access will be directed to Moelis or such other Person(s) as Seller may designate in writing from

34

time to time and (iii) nothing herein will require Seller to provide access to, or to disclose any information to, Purchaser if such access or disclosure (A) would waive any legal privilege or (B) would be in violation of applicable Laws or would violate any fiduciary duty under applicable Law with respect to Seller; provided that, in the event that Seller withholds access or information in reliance on the foregoing clause (A) or (B), Seller shall provide (to the extent possible without waiving or violating the applicable agreement, legal privilege, Law or fiduciary duty under applicable Law with respect to Seller) notice to Purchaser that such access or information is being so withheld and shall use reasonable best efforts to provide such access or information in a way that would not risk waiver of such legal privilege, applicable Law, or fiduciary duty.

(b)     The information provided pursuant to this Section 6.2 will be governed by the Confidentiality Agreement and the confidentiality provisions in Section 6.19. Each Party will, and will cause its Advisors to, abide by the terms of the Confidentiality Agreement with respect to such access and any information furnished to such Party or any of its Advisors. Neither Party makes any representation or warranty as to the accuracy of any information, if any, provided pursuant to this Section 6.2, and the other Party may not rely on the accuracy of any such information, in each case, other than, with respect to Purchaser, the Express Seller Representations and, with respect to Seller, the Express Purchaser Representations.

(c)     From and after the Closing for a period of three (3) years following the Closing Date (or, if later, the closing of the Bankruptcy Case), Purchaser will, following Seller's good faith written request, and solely to the extent necessary for Seller to (i) comply with Tax reporting obligations, (ii) consummate the closing of the Bankruptcy Case, (iii) prepare annual audited financial statements, (iv) submit a filing pursuant to applicable securities laws and regulations or (v) conduct the wind down of the estate (including reconciliation, investigation, and pursuit of claims) and dissolution of Seller and its Affiliates, provide Seller and its Advisors with reasonable access, during normal business hours, and upon reasonable advance notice, to the books and records in Purchaser's custody or control, including work papers, schedules, memoranda, Tax Returns, Tax schedules, Tax rulings, and other documents (for the purpose of examining and copying), in each case to the extent relating to the Acquired Assets, the Excluded Assets, the Assumed Liabilities or the Excluded Liabilities with respect to periods or occurrences prior to the Closing Date, and reasonable access, during normal business hours, and upon reasonable advance notice, to employees, officers, Advisors, accountants, offices and properties of Purchaser, in each case at no cost or expense to Purchaser; provided that (i) such access does not unreasonably interfere with the normal operations of Purchaser and (ii) nothing herein will require Purchaser to provide access to, or to disclose any information to, Seller or its Advisors if such access or disclosure (A) would waive any legal privilege or (B) would be in violation of applicable Laws or would violate any fiduciary duty; provided that, in the event that Purchaser withholds access or information in reliance on the foregoing clause (A) or (B), Purchaser shall provide (to the extent possible without violating the applicable agreement, legal privilege, Law or fiduciary duty) notice to Seller that such access or information is being so withheld and shall use reasonable best efforts to provide such access or information in a way that would not risk waiver of such legal privilege, applicable Law, or fiduciary duty. Unless otherwise consented to in writing by Seller, Purchaser will not, for a period of three (3) years following the Closing Date, destroy, alter or otherwise dispose of any of such books and records

35

without first offering to surrender to Seller such books and records or any portion thereof that Purchaser may intend to destroy, alter or dispose of.

(d)     Except as expressly contemplated by this Agreement (including in connection with the Commercial Covenants, <u>Section 6.3</u>, <u>Section 6.10(b)</u> and <u>Section 6.18</u>), Purchaser will not, and will not permit any member of the Purchaser Group to, contact any officer, manager, director, employee, customer, supplier, lessee, lessor, lender, licensee, licensor, distributor, noteholder or other material business relation of Seller prior to the Closing with respect to Seller, their business or the Transactions without the prior written consent of Seller for each such contact.

6.3     <u>Employee Matters</u>.

(a)     From and after the date hereof (and, if applicable, following the Closing until the winddown or dissolution of Seller), subject to applicable Laws, Seller shall deliver to Purchaser such information and documents regarding employees of Holdings (the "<u>Seller Employees</u>") and independent contractors of Seller or Holdings (the "<u>Seller Contractors</u>"), in each case, as Purchaser shall reasonably request. Prior to the date hereof, Seller has provided Purchaser a true, correct and complete list of the Seller Employees and Seller Contractors identified by name, if applicable, department, and (subject to applicable Laws) true, correct and complete copies of all talent assessment reports for each such Seller Employee and Seller Contractor. From and after the date hereof (and, if applicable, following the Closing until the winddown or dissolution of Seller), Seller shall use reasonable best efforts to make such Seller Employees who remain employed by Holdings and Seller Contractors who remain engaged by Seller or Holdings, in each case, reasonably available to Purchaser or its Affiliates and Purchaser will work in good faith with Seller to identify top performing Seller Employees and Seller Contractors and will determine whether to make offers of employment or other services to any such Seller Employee or Seller Contractors (including by prioritizing review of Seller Employees for applicable open positions of Purchaser and its Affiliates, if any). Purchaser (or an Affiliate of Purchaser) may, in its sole discretion, make offers of employment, consulting or other services to such Seller Employees or Seller Contractors (if any) as Purchaser shall determine, on such terms and conditions as Purchaser shall determine in its sole and absolute discretion. In the event that Purchaser (or an Affiliate of Purchaser) makes such an offer of employment or services and such Seller Employee or Seller Contractor accepts, Seller hereby agrees not to enforce against Purchaser (or its Affiliate) or such Seller Employee or independent contractor the terms and conditions of any agreement to refrain from competing, directly or indirectly, with the business of Seller or any of its Affiliates or to refrain from soliciting employees, customers or suppliers of Seller or any of its Affiliates that may be applicable to such Seller Employee or Seller Contractor. Seller shall not take any action that would reasonably be expected to materially and adversely affect Purchaser's hiring or engagement of such Seller Employee(s) or Seller Contractor(s) in accordance with this <u>Section 6.3</u>; <u>provided</u> that the announcement and implementation of any Seller Plans (including any retention programs or post-Closing treatment of Seller Employees), in each case, in a manner consistent with the provisions of this Agreement, shall not be deemed to be a breach of this sentence. Notwithstanding anything to the contrary herein or otherwise, nothing herein shall require or obligate Purchaser or any of its Affiliates to

36

employ or make offers of employment to any Person, or make any such offers of employment on any particular terms, each of which decisions shall be made in Purchaser's sole discretion.

(b)     Prior to and following the Closing Date, Seller, Holdings and each of their Affiliates shall not communicate, and shall ensure that no representative of Seller, Holdings or their respective Affiliates communicates, with any Seller Employee or other service provider of Seller regarding post-Closing employment matters (including post-Closing employee benefit plans and compensation) with Purchaser without the prior written consent of Purchaser; provided that Seller, Holdings, and their Affiliates shall be permitted to communicate regarding their employment and termination plans and related matters.

(c)     Purchaser shall not assume any Seller Plans or any Liability to or in respect of any employees or former employees of Holdings and Seller and which relates to such employees' employment with Holdings or Seller, including (i) any employment agreement, whether or not written, between Seller and any person, (ii) any Liability under any Seller Plan, or (iii) Liability arising out of any claim of an unfair labor practice, or any claim under any state unemployment compensation or worker's compensation law or regulation or under any federal or state employment discrimination law or regulation as a result of an action taken by Seller or Holdings, and all such Liabilities shall be Excluded Liabilities hereunder.

(d)     Seller will, or will cause its Affiliates to, comply in all material respects with the Worker Adjustment and Retraining Notification Act of 1988 or any similar Laws ("WARN Act") with respect to any "plant closing" or "mass layoff" or group termination or similar event under the WARN Act affecting employees of Debtors (including as a result of the consummation of Transactions) whether occurring prior to or on the Closing. Subject to the terms of this Agreement, Seller and its Affiliates (including Holdings) reserve the right to (i) terminate any of their employees at any time, and otherwise reduce employee work hours, benefits and compensation, and (ii) issue termination and/or WARN Act notices relating to their employees at any time.

(e)     For any employees who are principally based outside the United States, the provisions of this Section 6.3 shall apply to such employees *mutatis mutandis* to the maximum extent permitted by applicable Law.

(f)     The provisions of this Section 6.3 are for the sole benefit of the Parties and nothing herein, express or implied, is intended or shall be construed to confer upon or give any Person (including for the avoidance of doubt any employees of Seller or Holdings), other than the Parties and their respective permitted successors and assigns, any legal or equitable or other rights or remedies (with respect to the matters provided for in this Section 6.3 or under or by reason of any provision of this Agreement). Nothing contained herein, express or implied: (i) shall be construed to establish, amend, or modify any benefit plan, program, agreement or arrangement; (ii) shall, subject to compliance with the other provisions of this Section 6.3, alter or limit Purchaser's, Seller's or Holdings' ability to amend, modify or terminate any particular benefit plan, program, agreement or arrangement; or (iii) is intended to confer upon any current or former employee any right to an offer of employment or service, employment or continued

37

employment or service for any period of time by reason of this Agreement, or any right to a particular term or condition of employment or service.

6.4    <u>Regulatory Matters</u>.

(a)    From time to time from and after the date hereof until the Closing (or the valid termination of this Agreement in accordance with its terms, if earlier), subject to the other provisions of this <u>Section 6.4</u>, Seller will, and will cause its Affiliates and its and their respective employees, representatives, advisors and agents to, (i) make or cause to be made all filings and submissions to the extent required to be made by Seller or any of its Affiliates under any applicable Laws for the consummation of the Transactions, if any, (ii) cooperate with Purchaser, its Affiliates and its and their respective representatives in exchanging such information and providing such assistance as Purchaser may reasonably request in connection with any filings or submissions to be made by any member of the Purchaser Group under any applicable Laws in connection with the Transactions, (iii) supply promptly any additional information and documentary material that may be requested in connection with such filings or submissions and (iv) use reasonable best efforts to take any actions necessary to obtain all approvals or clearances from any relevant Governmental Body that are required to be obtained by Seller or its Affiliates under applicable Law for the consummation of the Transactions.

(b)    From time to time from and after the date hereof until the Closing (or the valid termination of this Agreement in accordance with its terms, if earlier), subject to the other provisions of this <u>Section 6.4</u>, Purchaser will, and will cause its respective employees, representatives, advisors and agents to, (i) make or cause to be made all filings and submissions to the extent required to be made by Purchaser under any applicable Laws for the consummation of the Transactions, if any, (ii) cooperate with Seller, its Affiliates and its and their respective representatives in exchanging such information and providing such assistance as Seller may reasonably request in connection with any filings or submissions to be made by Seller or any of its Affiliates under any applicable Laws in connection with the Transactions, (iii) supply promptly any additional information and documentary material that may be requested in connection with such filings or submissions, and (iv) use reasonable best efforts to take any actions necessary to obtain all approvals or clearances from any relevant Governmental Body that are required to be obtained by Purchaser under applicable Law for the consummation of the Transactions.

(c)    From time to time from and after the date hereof until the Closing (or the valid termination of this Agreement in accordance with its terms, if earlier), the Parties commit to instruct their respective counsel to cooperate with each other to respond to any reasonable inquiries and use reasonable best efforts to seek to resolve any objections raised by any Governmental Body as promptly as practicable and for greater certainty, each Party and its respective counsel undertake to (i) promptly notify the other Party or its counsel of, and, if in writing, furnish such other Party or its counsel with copies of (or, in the case of oral communications, advise such other Party or its counsel of the contents of), any substantive communication received by such Person from a Governmental Body and (ii) keep the other Party or its counsel informed with respect to the status of any applicable submissions and filings to or inquiries by any Governmental Body in connection with this Agreement and the Transactions and any developments, meetings or discussions with any Governmental Body in respect thereof,

including with respect to (A) the commencement or proposed or threatened commencement of any investigation or other Action, and (B) the nature and status of any inquiries or objections raised or proposed or threatened to be raised by any Governmental Body with respect to this Agreement and the Transactions. From and after the date hereof until the Closing (or the valid termination of this Agreement in accordance with its terms, if earlier), none of Seller or any of its Affiliates, on the one hand, or Purchaser, on the other hand, will participate in any substantive meeting or discussion with any Governmental Body with respect of any such filings, applications, investigation or other inquiry without giving the other Party reasonable prior notice of the meeting or discussion and, to the extent permitted by the relevant Governmental Body, a reasonable opportunity to attend and participate in such meeting or discussion, and each Party will have a reasonable opportunity to review and provide comments (which shall be considered in good faith by the other Party) on the content of any filing, submission or other written communication (and any analyses, memoranda, presentations, white papers, correspondence or other written materials submitted therewith) to be submitted by the other Party or any of its Affiliates to any Governmental Body in advance of any such submission. Each Party acknowledges that, with respect to any non-public information provided by a Party to the other under this <u>Section 6.4</u>, each Party may (1) designate such material as restricted to "outside counsel only" and any such material shall not be shared with employees, officers or directors or their equivalents of the receiving Party without approval of the disclosing Party and (2) make appropriately limited redactions necessary to satisfy contractual confidentiality obligations, preserve attorney-client privilege or protect material relating to the valuation of the Acquired Assets. Notwithstanding anything to the contrary herein or otherwise, Purchaser will control and have final decision making authority on all regulatory strategy, submissions and procedures, after considering in good faith any reasonable advice provided by Seller in good faith.

(d)  Notwithstanding anything to the contrary in this Agreement, nothing shall require or be construed to require any member of the Purchaser Group to (i) oppose any motion or Action for a temporary, preliminary or permanent Order against, or preventing or delaying, the consummation of the Transactions, or exhaust all avenues of appeal, including any proper appeal of any adverse decision or Order by any Governmental Body, (ii) enter into a consent decree, consent agreement, settlement or other agreement or arrangement (including any ancillary agreements) to hold separate, license, sell, transfer, dispose or divest (pursuant to such terms as may be required by any Governmental Body) any asset (whether tangible or intangible), (iii) agree to the termination, modification, or assignment of any relationships, joint ventures, contracts, assets, liabilities or obligations, (iv) agree to any limitations on governance, conduct, or actions of members of the Purchaser Group or operations of their respective businesses or with respect to the Acquired Assets or Assumed Liabilities, or (v) enter into any national security agreement, letter of assurance, or other mitigation agreement with the Committee on Foreign Investment in the United States or any member agency thereof acting in that capacity.

(e)  From and after the date hereof until the Closing (or the valid termination of this Agreement in accordance with its terms, if earlier), **<u>and, solely with respect to Delayed Acquired Coins, through and including the applicable Delivery Date with respect to any such Delayed Acquired Coin,</u>** Seller will not, and will not permit any of its Affiliates to, knowingly take any action, engage in any conduct or enter into any transaction that would reasonably be expected to (i) materially increase the risk of any Governmental Body entering an

Order prohibiting or materially delaying the consummation of the Transactions or (ii) materially delay the consummation of the Transactions.

(f)     Subject to Section 6.4(d), from and after the date hereof until the Closing (or the valid termination of this Agreement in accordance with its terms, if earlier, **and, solely with respect to Delayed Acquired Coins, through and including the applicable Delivery Date with respect to any such Delayed Acquired Coin,** each Party will use reasonable best efforts to (i) cooperate with and (ii) seek to secure approvals or authorizations from, any relevant Governmental Body, including state banking departments enforcing money transmission laws, in order to permit consummation of the Transactions in a timely manner in compliance with applicable Laws.

6.5     Reasonable Best Efforts; Cooperation.

(a)     Subject to the other terms of this Agreement, and without limiting, affecting or modifying the Parties' obligations under Section 6.4, or any of the Commercial Covenants, each Party shall, and shall cause its Advisors to, use its reasonable best efforts to perform its obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things necessary under applicable Law to cause the transactions contemplated herein to be effected as soon as practicable and the closing conditions set forth in Article VII to be satisfied, but in any event on or prior to the Outside Date, in accordance with the terms hereof and to cooperate with the other Party, its Affiliates and its and their respective Advisors in connection with any step required to be taken as a part of its obligations hereunder. The "reasonable best efforts" of Seller will not require Seller or any of its Affiliates or Advisors to expend any money to remedy any breach of any representation or warranty, to commence any Action, to waive or surrender any right, to modify any Contract or to waive or forgo any right, remedy or condition hereunder. Notwithstanding anything to the contrary herein, in the event of a conflict between this Section 6.5(a) and Section 6.4, the provisions of Section 6.4 shall control with respect to such conflict.

(b)     The obligations of Seller and Purchaser pursuant to this Agreement, including this Section 6.5, shall be subject to any Orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code (including in connection with the Bankruptcy Case), Seller's debtor-in-possession financing, if any, and Seller's obligations as a debtor-in-possession to comply with any Order of the Bankruptcy Court (including the Bidding Procedures Order, the Agreement Order, and the Confirmation Order) and Seller's duty to seek and obtain the highest or otherwise best price for the Acquired Assets as required by the Bankruptcy Code.

6.6     Data Transfer Matters.

(a)     Seller shall, and shall cause its Affiliates to, (i) within 30 days (with the Parties using their reasonable best efforts to do so within five (5) Business Days) following the later of the date hereof and the date Purchaser provides the form of such notification, distribute an initial email notification, in the form provided by Purchaser, to all Users and any other consumers located or having a home address in the United States from whom Seller has collected Personal Information regarding the Transactions (including the Rebalancing Exercise)

40

and the transfer of such individuals' Personal Information or accounts (including the ability to opt in to a pre-Closing transfer of such User's Acquired User Data to Purchaser), and prominently post a notice, in the form provided by Purchaser, to Seller's and its Affiliates' (as applicable) primary customer-facing website regarding the same; (ii) on a weekly basis, upon the expiration of any opt in period provided in the email notification distributed by Seller, but no earlier than the later of January 3, 2023 and entry of the Agreement Order, deliver to Purchaser the respective Acquired User Data for Users who have opted into the pre-Closing data transfer pursuant to the foregoing item (i) and whose Acquired User Data has not previously been transferred (the "Pre-Closing Data Transfer"); (iii) following the date of the initial email notification until the Closing Date, continue distributing additional email notifications, in the form provided by Purchaser, to such individuals, as Purchaser reasonably requires; and (iv) on the Closing Date, deliver to Purchaser all other Acquired User Data. All notifications contemplated by the foregoing shall be subject to Purchaser's consideration of any comments thereto proposed in good faith by Seller or counsel to the committee of unsecured creditors in the Bankruptcy Case and subject to applicable Law.

(b)     From and after the date hereof and through and following the Closing, Seller shall, and shall cause its Affiliates to, maintain or maintain with a third party data management and retention firm, for the entirety of the applicable retention period and at least ninety (90) days thereafter, all information required to be maintained pursuant to, or to comply with, applicable Money Transmitter Requirements or Laws related to Sanctions.

(c)     Seller shall, and shall cause its Affiliates to, use reasonable best efforts to procure that all information and documentation requested in connection with the KYC Procedures meets the standards set forth in such KYC Procedures (including moving files located in storage repositories (*e.g.*, Google Drive or Box) to the appropriate files associated with the applicable User **or Eligible Creditor** and associating such information and documentation with the applicable User **or Eligible Creditor**), as determined by Purchaser in its reasonable discretion, prior to the ~~User Asset Migration Date~~**earlier of (x) the Closing Date and (y) with respect to such User or Eligible Creditor who has opted into the pre-Closing data transfer pursuant to Section 6.6(a)(i), the fifth (5th) Business Day following such opt in**, but in each case in no event prior to the applicable timing contemplated by clauses (i) through (iv) of Section 6.6(a).

6.7     Use of Name**; Voyager Platform**.

(a)     Seller agrees that: (i) within ninety (90) days from the Closing Date, Seller shall (and shall cause its Affiliates to) cause an amendment to the governing documents of Seller and its Affiliates (as applicable) to be filed with the appropriate Governmental Body and shall take all other reasonable actions necessary to change Seller's and such Affiliate's legal, name to a name or names not containing "Voyager," any other trade mark or trade name set forth in Schedule 6.7(a) or any name confusingly similar to the foregoing; (ii) after the Closing Date neither Seller nor any of its Affiliates shall have any ownership rights in or to the name "Voyager," any other trade mark or trade name set forth in Schedule 6.7(a) or any service marks, trademarks, trade names, identifying symbols, logos, emblems, signs or insignia related thereto or containing or comprising the foregoing, including any name or mark confusingly similar thereto (collectively, the "Seller Marks"); and (iii) except as set forth in Section ~~6.7(a)~~**6.7(b)**,

41

Seller and its Affiliates shall, within ninety (90) days of the Closing Date, cease to make any use of the Seller Marks, including in any corporate or other legal name.

(b)     Notwithstanding <u>Section 6.7(a)</u>, for a period of ninety (90) days after the closing of the Bankruptcy Case, unless extended by mutual agreement of Purchaser and Seller, Purchaser hereby grants to Seller and its Affiliates (including, for the avoidance of doubt, any wind-down or similar administrator in the Bankruptcy Case or under the Plan) a non-exclusive, limited, non-transferable, non-sublicensable and revocable license to use the Seller Marks for the sole purposes of unwinding Seller's businesses **and,** assisting Purchaser with all migrations, integrations and Transactions**, and consummating transfers of Coins, cash or other assets to Purchaser contemplated by this Agreement**.

**(c)     From and after the date hereof until the earlier of the Closing and the termination of this Agreement in accordance with its terms, Seller and Purchaser shall negotiate in good faith the terms and conditions of, and enter into at the Closing, a mutually agreed transition services agreement or other arrangements on commercially reasonable terms pursuant to which Seller shall have such access to and operation of the Voyager Platform and information acquired by Purchaser hereunder as are reasonably necessary for the sole purposes of Seller (w) holding Delayed Acquired Coins in accordance herewith, (x) assisting Purchaser with all migrations, integrations and Transactions contemplated by this Agreement, (y) consummating transfers of Coins, cash or other assets to Purchaser, Users, and Eligible Creditors contemplated by this Agreement and the Plan and (z) providing any related Tax reporting to Users required by applicable Law for periods prior to and including the Closing Date.  Such access and operation contemplated by clause (w) of this Section 6.7(c) shall cease upon the conversion of such Delayed Acquired Coins into fiat currency or, if earlier, upon the transfer to Purchaser of such Delayed Acquired Coins, in each case in accordance with this Agreement.  Such access and operation contemplated by clauses (x) and (y) of this Section 6.7(c) shall cease upon the completion of such assistance or transfers, as applicable.  Such access and operation contemplated by clause (z) of this Section 6.7(c) shall cease upon the completion of any such Tax reporting. Notwithstanding anything to the contrary herein, (i) Seller shall bear responsibility for the operation and administration (including by providing, at its expense, personnel to conduct such operation and administration), and the documented out-of-pocket third party costs and expenses, of the Voyager Platform following the Closing pursuant to the preceding provisions of this Section 6.7(c) and (ii) in no event will Seller (and Seller will cause its employees, contractors and other personnel not to) (A) use the Voyager Platform for purposes of (I) distributing any Coins to Users or Eligible Creditors or (II) performing any conversion of Coins to cash or other liquidation of Coins hereunder (provided that this clause (A)(II) shall not prevent Seller from using the software and functionality of the Voyager Platform solely for executing any conversion or liquidation transaction  permitted hereunder on other third party platforms), or (B) allow Users to (I) withdraw Coins through the Voyager Platform or (II) make any sale or other trading transaction through the Voyager Platform.**

42

6.8 **Further Assurances**.

(a) From time to time from and after the date hereof through and following the Closing (in the case of Seller, until the winddown or dissolution of Seller), as and when requested by either Party, the other Party will execute and deliver, or cause to be executed and delivered, all such further conveyances, notices, assumptions, assignments, documents and other instruments and will take, or cause to be taken, all such further or other actions as such requesting Party may reasonably deem necessary or desirable to evidence and effectuate the Transactions (including for the avoidance of doubt, the transfer and conveyance of any Acquired Assets that may be in the possession of Seller's Affiliates to Purchaser); provided that nothing in this Section 6.8 shall require Purchaser or the Purchaser Group to assume any Liabilities of Seller or any of its Affiliates other than the Assumed Liabilities or Seller or any of its Affiliates to transfer any assets other than Acquired Assets. In addition, from time to time following the Closing Date (in the case of Seller, until the winddown or dissolution of Seller), each Party shall, and shall cause its Affiliates to, promptly execute, acknowledge and deliver such further documents and perform such further acts as are reasonably requested by the other Party and as may be reasonably necessary to transfer and convey to Purchaser, or make available to Purchaser the Acquired Assets or the Assumed Liabilities pursuant to this Section 6.8.

(b) Without limiting Section 6.8(a), Seller will use reasonable best efforts to evidence and effectuate the transfer and conveyance of all Seller Held Coins (solely for purposes of this Section 6.8(b)), deeming the phrase "who are Debtors" in the definition of Seller Held Coins to instead read as "who are not Debtors" in accordance with Section 6.8(a), *mutatis mutandis*.

6.9 **Insurance Matters**. Purchaser acknowledges that, upon Closing, all nontransferable insurance coverage provided in relation to Seller and the Acquired Assets that is maintained by Seller or its Affiliates (whether such policies are maintained with third party insurers or with Seller or its Affiliates) shall cease to provide any coverage to Purchaser and the Acquired Assets and no further coverage shall be available to Purchaser or the Acquired Assets under any such policies; provided that to the extent such insurance coverage is available with respect to any Acquired Assets or Assumed Liabilities, after the Closing, (a) Seller shall, and shall cause its applicable Affiliates to, use reasonable best efforts to report in good faith to the applicable third-party insurance provider, if applicable, all events, acts, errors, accidents, omissions, incidents, injuries or other forms of occurrences to the extent relating to any Acquired Assets or Assumed Liabilities that, in each case, occurred at or prior to the Closing as reasonably requested by Purchaser to be so reported the extent covered by an occurrence-based insurance policy, (b) Purchaser shall use its reasonable best efforts to comply with the terms of any such insurance policy and (c) Seller shall, and shall cause its applicable Affiliates to, (i) use reasonable best efforts to obtain the benefit of the applicable insurance coverage under any such insurance policy and (ii) pay such benefit to Purchaser, net of (A) any deductibles, co-payment or self-insured amounts payable by Seller or any of its Affiliates or other out-of-pocket costs and expenses (including reasonable legal fees and expenses, if any) actually and reasonably incurred by Seller or any of its Affiliates in seeking such insurance proceeds and (B) any Taxes imposed on Seller or any of its Affiliates in respect of the receipt or accrual of such insurance proceeds.

6.10 <u>User Migration</u>.

(a) Following the date hereof, Seller shall, and shall cause its Affiliates to cooperate with Purchaser to, develop (and each Party shall use reasonable best efforts to develop within 15 Business Days following the date hereof) a mutually agreed upon integration plan that sets forth all technology integrations that Purchaser deems reasonably necessary to enable all migrations of User accounts on the Voyager Platform to the Binance.US Platform as contemplated by this Agreement (the "<u>Integration Plan</u>"). The Integration Plan will include among other things: (i) directing customers on the Voyager Platform (including through links on the home screen for the web interface and mobile app for the Voyager Platform) to the Binance.US Platform log-in webpage or mobile app, (ii) migrating all Acquired User Data (subject to <u>Section 6.6(a)</u>) reasonably necessary for Purchaser to validate whether Users qualify as Existing Users and (iii) developing a process whereby any User that is not an Existing User can affirmatively accept terms and conditions to provide such User with access to their Net Owed Coins in a new Binance.US Platform account from directly within the Voyager Platform and related app in accordance with the provisions of this Agreement. Each Party shall, and shall cause its Affiliates and its and their respective employees and representatives to, comply with and implement the Integration Plan. From and after the date hereof (and following the Closing, if applicable, until the date that is six (6) months following the Closing Date), Seller shall, and shall cause its Affiliates and its and their respective employees and representatives to provide to Purchaser, its Affiliates and its and their respective employees and representatives (x) any assistance reasonably requested or required by Purchaser, its Affiliates and its and their respective employees and representatives in connection with the opening of User accounts on the Binance.US Platform, the transfer of information and Net Owed Coins from the Voyager Platform to the Binance.US Platform (including in connection with customer queries and troubleshooting with respect thereto), and the actions contemplated by this <u>Section 6.10</u> and the Integration Plan and (y) subject to <u>Section 6.6</u> and applicable Law, all necessary Acquired User Data in Seller's or its Affiliates' possession required to effectuate the Integration Plan. Purchaser shall bear the reasonable and documented out-of-pocket expenses incurred by Seller in connection with the provision of such assistance following the Closing pursuant to the immediately preceding sentence.**; provided that prior to incurring any such expenses in excess of $250,000, individually or in the aggregate, Seller shall obtain Purchaser's consent (which shall not be unreasonably withheld, conditioned or delayed) in such expenses.**

(b) Notwithstanding the provisions of <u>Section 6.2(c)</u> or <u>Section 10.17</u>, following entry of the Agreement Order, Purchaser and its Affiliates shall, at their sole cost and expense, be entitled to issue communications directed to Users on the Binance.US Platform and through other means of Purchaser's choosing in connection with the Transactions or the opening of accounts on the Binance.US Platform; <u>provided</u> that such communications are consistent with this Agreement and applicable Law; <u>provided</u> that Purchaser shall not issue any such communications prior to the Closing Date without Seller's prior written consent (which shall not be unreasonably withheld, conditioned or delayed) and subject to reasonable consultation with counsel to the committee of unsecured creditors in the Bankruptcy Case. Except as required by <u>Section 6.11(d)</u>, Seller shall not, and Seller shall cause its Affiliates not to, issue any communication to Users, whether on the Voyager Platform or otherwise, except to the extent the form and substance of such communication has been previously approved by Purchaser or is required by applicable Law; <u>provided</u> that the foregoing shall not prohibit Seller from responding

44

on an individual basis to technical support queries from Users or answering questions related to the amount of Coins such User has deposited on the Voyager Platform or communicating with customers regarding withdrawal of cash from the "for benefit of" customer accounts at Metropolitan Commercial Bank; provided further that Seller shall, and shall cause its Affiliates to, provide Purchaser and counsel to the committee of unsecured creditors in the Bankruptcy Case with regular updates on the timing and content of such communications and shall cooperate with Purchaser in addressing any concerns related thereto. The Parties will work in good faith to (i) develop a set of talking points or FAQs for Users and Eligible Creditors with respect to the Transactions, the Bankruptcy Cases, and related matters and (ii) continue to review and revise such talking points or FAQs as other inquiries from Users and Eligible Creditors or other circumstances arise.

(c)     Subject to Seller's providing the Acquired User Data in accordance with Section 6.6, and such Acquired User Data meeting the standards set forth in the KYC Procedures, as determined by Purchaser in its reasonable discretion, Purchaser shall cause an account to be opened for each User on the Binance.US Platform on or before the ~~User~~ Asset Migration Date. In addition to the foregoing, if Seller has not provided or does not have Acquired User Data meeting such standards with respect to a particular User, if such User provides such information and documentation meeting the standards set forth in such KYC Procedures, as determined by Purchaser in its reasonable discretion, Purchaser shall cause an account to be opened for such User in accordance with its standard account opening procedures following its receipt of such information and documentation.

(d)     Seller and Purchaser shall offer (i) each eligible creditor pursuant to the Plan that is not a User (each, an "Eligible Creditor" ) and (ii) each User the opportunity, subject to the consummation of the Closing and such User and Eligible Creditor meeting the requirements of the KYC Procedures and accepting the terms and conditions of the Binance.US Platform, to receive its Net Owed Coins or other Plan distribution through the Binance.US Platform in accordance with Section 6.12 and the Plan. Within three (3) Business Days following the request of Purchaser (which request for the sake of clarity may be offered multiple times), Seller shall send to each User and Eligible Creditor a communication in the form provided by Purchaser notifying them of such offer.

(e)     For the sake of clarity and notwithstanding anything to the contrary herein or otherwise, (i) none of Purchaser or any of its Affiliates shall be required to (A) activate an account or pay or credit any amount, whether in Coins, cash or otherwise, to any User or Eligible Creditor (or its account) that does not meet the requirements of the KYC Procedures and accept the terms and conditions of the Binance.US Platform, (B) pay or credit any amount, whether in Coins, cash or otherwise, to any User or Eligible Creditor or its account except in accordance with the Plan, or (C) credit the account of any User or Eligible Creditor with respect to Coins that have not actually been delivered to Purchaser in accordance with the provisions of Section 2.4(b), (ii) neither Purchaser nor any of its Affiliates is assuming any Liabilities of Seller or any of its Affiliates with respect to Users' accounts on the Voyager Platform or any Eligible Creditor, all of which Liabilities shall constitute Excluded Liabilities, and (iii) neither Purchaser nor any of its Affiliates shall be required to provide trading services on the Binance.US Platform or otherwise in respect of any Unsupported Coins.

6.11    Rebalancing Exercise; Seller Statement.

(a)    Following the date hereof and prior to the Closing (or the earlier termination of this Agreement pursuant to Article VIII), (i) Seller shall purchase and sell Cryptocurrency through one or more transactions such that, following the completion of such transactions, the ~~number of~~Acquired Coins Value of all Acquired Coins of each type is equal to the ~~aggregate number of~~Deposited Coins Value of all Deposited Coins of such type multiplied by the Rebalancing Ratio (subject to a Rebalancing Exercise Delta with respect to each Acquired Coin of no more than five percent (5%) or, if after conducting such transactions and using reasonable best efforts to meet the Rebalancing Exercise Delta of five percent (5%), Seller reasonably and in good faith determines that it will not be able to meet such Rebalancing Exercise Delta, then such other amount as Purchaser and Seller consent to, such consent not to be unreasonably withheld, conditioned or delayed), the purpose of which transactions the Parties acknowledge and agree is to ensure that there are sufficient Acquired Coins of each type to pay to each User's account on the Binance.US Platform a number of Post-Rebalancing Coins of such type in accordance with the provisions of this Agreement (such transactions, the "Rebalancing Exercise"), and (ii) Seller shall, and shall cause its employees, accountants, advisors and representatives to, consult with, and keep reasonably informed, Purchaser, its Affiliates and their respective employees, accountants, advisors and representatives with respect to the Rebalancing Exercise and all actions taken in connection therewith, including by providing Purchaser with regular updates regarding the status of the Rebalancing Exercise. For the sake of clarity, the Parties agree that for purposes of the Rebalancing Exercise, if ETH Coins that are Staked Coins cannot be unstaked by the Rebalancing Date, or if there are Coins that Seller is otherwise unable to access due to such Coins being custodied with providers that have entered insolvency proceedings prior to the date hereof, then the Parties will agree on appropriate modifications to the Rebalancing Exercise and the process for distributing Net Owed Coins to Users in light of the foregoing. The Parties agree that the Rebalancing Exercise shall be completed in accordance with the provisions of this Agreement by no later than the date that is one (1) Business Day prior to the Closing Date (such date, the "Rebalancing Date").

(b)    In order to facilitate the Rebalancing Exercise, Seller shall, promptly following the date hereof, to the extent not already created prior to the date hereof, create an institutional account in Seller's name on the Binance.US Platform, and Seller may, but shall not be required to, transfer any or all Seller Held Coins to such institutional account in order to facilitate the Rebalancing Exercise (and, for the avoidance of doubt, the Binance.US Platform shall serve merely as an exchange agent in connection with the Rebalancing Exercise). Prior to engaging in any Subject Transaction outside the Binance.US Platform, Seller shall provide Purchaser with a written notice describing the parameters of such Subject Transaction, including the proposed number of Seller Held Coins of each type to be transferred in connection with such Subject Transaction (each, a "Transaction Notice") and Purchaser shall be entitled to make, by written notice (each, a "Transaction Offer Notice") to Seller within three (3) Business Days following receipt of such Transaction Notice, an offer to conduct such Subject Transaction on the Binance.US Platform, including a description of the estimated numbers of Acquired Coins that would result from the consummation of such Subject Transaction. If Seller receives any proposal to conduct such Subject Transaction from any third party which would result in a number of Acquired Coins in excess of that set forth in the Transaction Notice, Seller shall inform Purchaser of the same, and Seller shall not conduct such Subject Transaction with or

46

through other Person(s) unless Seller provides written notice to Purchaser that Seller has determined in good faith that the terms offered by such other Person(s) with respect to such Subject Transaction (which such terms shall be set forth in such notice) are more favorable (in terms of the best interests of Seller and its estate) than the terms set forth in the Transaction Offer Notice and Purchaser does not provide an updated Transaction Offer Notice within one (1) Business Day following receipt of such notice from Seller with terms as or more favorable (in terms of the best interests of Seller and its estate) than those set forth in Seller's notice. If Purchaser does so provide such an updated Transaction Offer Notice, Seller conduct such applicable Subject Transaction on the Binance.US Platform in accordance with such updated Transaction Offer Notice. In addition to the foregoing, Seller may request that Purchaser facilitate all or part of the Rebalancing Exercise, in which case all or such portion of the Rebalancing Exercise shall be conducted on the Binance.US Platform. Seller's use of the Binance.US Platform for the Rebalancing Exercise shall be subject in all respects to the standard terms and conditions of the Binance.US Platform (including applicable fees, spreads, costs and expenses except as set forth in the applicable Transaction Offer Notice). For the sake of clarity, Seller may withdraw any Coins from the Binance.US Platform prior to the Closing and Seller shall not be required to maintain Coins on the Binance.US Platform in connection with the Rebalancing Exercise or otherwise (except as otherwise expressly contemplated hereunder from and after the Closing and acknowledging that this sentence is not intended to and shall not preclude transactions in the Rebalancing Exercise being undertaken on the Binance.US Platform in accordance with the provisions hereof).

(c)     At least one (1) Business Day prior to the Closing Date and following completion of the Rebalancing Exercise in accordance with Section 6.11(a), Seller will deliver to Purchaser a ledger in a form reasonably specified by Purchaser as far in advance of the Rebalancing Date as is reasonably practicable (the "Seller Statement") setting forth in reasonable detail, in each case as of the Rebalancing Date and following the completion of the Rebalancing Exercise in accordance with Section 6.11(a), (i) each User's user identification number, (ii) the Rebalancing Ratio and the calculation thereof, (iii) the number of each User's Deposited Coins of each type (including the name and relevant ticker symbol used on the Voyager Platform for such Deposited Coins, together with all information regarding the underlying networks and smart contracts to which such Coins are subject) **and the Deposited Coins Value thereof (by type of Coin)**, (iv) the number of each User's Post-Rebalancing Coins of each type (including the name and relevant ticker symbol used on the Voyager Platform for such Post-Rebalancing Coins, together with all information regarding the underlying networks and smart contracts to which such Coins are subject) **and the Acquired Coins Value thereof (by type of Coin)**, (v) the total number of Seller Held Coins and Acquired Coins of each type (including the name and relevant ticker symbol used on the Voyager Platform for such Seller Held Coins and Acquired Coins, together with all information regarding the underlying networks and smart contracts to which such Coins are subject)~~, (vi) the total amount of gas fees that Seller will pay in connection with the transfer of each~~ **and the Acquired Coins Value thereof (by** type of ~~Acquired~~ Coin ~~to Purchaser in accordance with Section 2.4)~~**)**, and (~~vii~~**vi**) the amount of cash~~, Coins~~ or other property ~~(including the name and relevant ticker symbol used on the Voyager Platform for such Coins, together with all information regarding the underlying networks and smart contracts to which such Coins are subject)~~ payable to each Eligible Creditor, *after taking into account gas or other transaction fees incurred and paid by Seller* ~~in connection with transferring such Coins to Purchaser,~~ and any identifying information and information

required to make such payments to such Eligible Creditor under the Plan, in each case together with reasonably detailed supporting information and documentation and prepared by Seller based on Seller's and its Affiliates' books and records. Notwithstanding anything to the contrary herein, Seller hereby acknowledges and agrees that (A) Purchaser and its Affiliates shall be entitled to fully rely on the Seller Statement and any data, information or calculation set forth therein for purposes of Section 6.11(d), and (B) in no event shall Purchaser of any of its Affiliates be responsible (x) to any Person for the Seller Statement, any data, information or calculation set forth therein or any error or inaccuracy with respect thereto or (y) for any losses, liabilities or damages in respect thereof, in each case, to the extent Purchaser takes any action in reliance thereon.

(d) Promptly following the completion of the Rebalancing Exercise, Seller shall send to each User a communication notifying such User of the Rebalancing Exercise, such User's Deposited Coins, and the Net Owed Coins attributable to such User's account on the Voyager Platform following the Rebalancing Exercise and any gas fees incurred in **by Seller** connection with the transfer of Coins to Purchaser pursuant to Section 2.4. Seller will, upon Purchaser's request, deliver to each Eligible Creditor a communication relating to the Transactions, any payments to be made by Purchaser or any of its Affiliates to such Eligible Creditor and any matters relating to opening an account on the Binance.US Platform, in each case that is in form and substance reasonably acceptable to Purchaser.

6.12 Crediting of Accounts; Unsupported Jurisdictions, Transfer of Coins to Seller; Liquidations or Distributions by Seller.

(a) Subject to the provisions of Section 6.10, ~~on the User~~**with respect to a particular User's Net Owed Coins or Eligible Creditor's cash, on the applicable** Asset Migration Date, Purchaser shall credit, or cause to be credited, (i) to the Binance.US Platform account of each User, such User's Net Owed Coins**; provided that such number of Coins to be credited shall be reduced by any gas or other transaction fees incurred in connection with transferring such Coins to Purchaser,** and (ii) to the Binance.US Platform account of each Eligible Creditor, the applicable amount payable to such Eligible Creditor as set forth in the Seller Statement. For the avoidance of doubt, Coins credited to any User's ~~or Eligible Creditor's~~ accounts on the Binance.US Platform may be made from any Coins held by or on behalf of Purchaser or any of its Affiliates. As a condition precedent to any User or Eligible Creditor accessing its account or Coins **or cash** on the Binance.US Platform, such User or Eligible Creditor must satisfy the requirements set forth in Section 6.10. ~~Following such User's or Eligible Creditor's satisfaction of such requirements~~**As promptly as practicable (using commercially reasonable efforts to do so within forty-eight (48) hours following receipt by Purchaser of the applicable Coins or cash hereunder), and in any event by the applicable Asset Migration Date**, Purchaser shall allow such User or Eligible Creditor, as applicable, to access trading services with respect to its Coins **or cash** subject to the Binance.US Platform's customary terms and conditions (including any transaction fees, spreads, costs and expenses). Notwithstanding anything to the contrary herein, with respect to any User or Eligible Creditor that does not satisfy such requirements prior to the date that is three (3) months following the later of the Closing Date ~~or~~**and** the date on which such terms and conditions are made available for such User or Eligible Creditor to accept, ~~then Purchaser shall convert any~~**Seller shall deliver all Delayed Acquired Coins in respect of such User or Eligible Creditor (other than**

48

**any Delayed** Acquired Coins with respect to ~~such Users~~**any User** or Eligible ~~Creditors~~**Creditor located in a jurisdiction that is an Unsupported Jurisdiction as of the Closing, which such Delayed Acquired Coins are addressed in Section 6.12(b)) to Purchaser in accordance with Section 2.4(b), Purchaser shall convert all such Delayed Acquired Coins** into United States Dollars at the then-prevailing rates (~~including~~**net of all** applicable fees, spreads, costs and expenses **(including any gas or other transaction fees incurred in connection with transferring such Coins to Purchaser)**) on the Binance.US Platform and deliver such United States Dollars, ~~together with any cash or others assets~~ in respect of such Users or Eligible Creditors to Seller within five (5) Business Days **following receipt thereof from Seller**, for further distribution by Seller in accordance with the Plan. **Purchaser shall make available to Seller, upon reasonable written request from Seller to Purchaser from time to time during Purchaser's regular business hours and at Seller's expense, books and records and related information, in each case, solely with respect to the transactions (including all applicable fees, spreads, costs and expenses) to effect such conversion described in the immediately preceding sentence.**

(b)     Notwithstanding anything to the contrary herein or otherwise, **(i)** for any Person (including any User or Eligible Creditor) that is located in Hawaii, New York, Texas or Vermont, to the extent that Purchaser does not have a Money Transmitter License or similar license in such jurisdiction or in any other jurisdiction where the applicable Governmental Body asserts after the date of this Agreement that Purchaser or any of its Affiliates requires a Money Transmitter License or similar license in order to consummate the Transactions or perform its obligations hereunder (each, an "Unsupported Jurisdiction"), Purchaser and its Affiliates shall not be required to (i**A**) credit or make any payment (with any Coins, cash or otherwise) to any account of such Person (including any User or Eligible Creditor) on the Binance.US Platform, or (ii**B**) permit any such Person or account of such Person on the Binance.US Platform to be active or conduct any trading or investing in Coins. ~~Notwithstanding anything herein to the contrary, prior to the Closing, Seller have the option to elect (upon consultation with professionals representing the committee of unsecured creditors in the Bankruptcy Case) that either (i), and (ii)~~ Seller shall not deliver to Purchaser any Coins, cash, or other asset with respect to any User or Eligible Creditor located in **a jurisdiction that is** an Unsupported Jurisdiction ~~or (ii)~~**as of the Closing (and** Seller shall ~~deliver such Coins to Purchaser at Closing. Upon receipt by Purchaser of any Unsupported Jurisdiction Approvals with respect to any Unsupported Jurisdiction(s), which Unsupported Jurisdiction Approvals permit Purchaser to perform its obligations under Section 6.12(a) in such Unsupported Jurisdiction, then Purchaser shall promptly notify Seller of receipt of such Unsupported Jurisdiction Approval and, if Seller has not previously delivered applicable~~**retain and hold such** Coins, cash, or other asset with respect to ~~any~~**such** User or Eligible Creditor ~~located in such~~**(including in accordance with Section 6.12(f))) until the relevant** Unsupported Jurisdiction ~~then Seller shall so deliver such assets to Purchaser within five (5) Business Days of such notification, and Purchaser~~**Approval is received and Purchaser has confirmed in writing that the relevant User or Eligible Creditor has satisfied the requirements set forth in Section 6.10 for onboarding to the Binance.US Platform, in which case, Purchaser** shall (following receipt of any applicable assets if required) ~~consummate~~**take** the actions **described in Section 6.12(a) and clauses (i)(A) and (i)(B) of this Section 6.12(b), as applicable, and Seller shall take the actions described in clause (ii) of this Section 6.12(b),** in such Unsupported Jurisdiction that were **otherwise** restricted **or not required** by this

Section 6.12(b); provided that to the extent Purchaser does not receive such Unsupported Jurisdiction Approval(s) with respect to any Unsupported Jurisdiction prior to the date that is six (6) months following the Closing Date, then ~~to the extent Purchaser is holding any Acquired Coins~~instead of delivering such Coins, cash or other assets with respect to such Users or Eligible Creditors ~~in such Unsupported Jurisdictions,~~to Purchaser hereunder, Seller shall convert such ~~Acquired~~ Coins into United States Dollars ~~at the then-prevailing rates (including~~and deliver such United States Dollars (and such other cash or other assets) in respect of such Users or Eligible Creditors in accordance with the Plan. Notwithstanding anything to the contrary herein, in undertaking any transaction to effectuate such conversion, Seller shall provide Purchaser the opportunity to participate in such transaction as follows (or on such other terms as the Parties may agree in writing): (A) if Seller solicits terms for such transaction from any other Person, then Seller will substantially contemporaneously solicit terms for such transaction from Purchaser and (B) the Parties shall establish procedures pursuant to which, if Seller intends to execute such transaction based on terms that are available to Seller without soliciting such terms from any Person (e.g., based on information made available to participants in Cryptocurrency exchanges through an app or website), Seller shall be obligated to contact a designated contact through a designated form of contact at Purchaser for a significantly limited period of time that is appropriate under the circumstances of executing such transaction for Purchaser to propose terms for such transaction, and, in either case of (A) or (B), if Purchaser's terms (if Purchaser proposes any), including all applicable fees, spreads, costs and expenses~~)~~, represent the best execution for such transaction, Seller shall execute such transaction on the Binance.US Platform ~~and deliver such United States Dollars, together with any cash or others assets in respect of such Users or Eligible Creditors to Seller within five (5) Business Days, for further distribution by Seller in accordance with the Plan.~~on such terms proposed by Purchaser; provided that, in the case of clause (B), if Purchaser is unresponsive via such designated means of contact, or fails or declines to propose terms, during such period of time, Purchaser shall be deemed to have provided terms that do not represent the best execution for such transaction.

(c)     From and after the Closing, or if this Agreement is terminated in accordance with its terms (other than in connection with a Purchaser Default Termination), then from and after such termination, if Seller or any of its Affiliates intends to consummate a transaction or series of related transactions pursuant to which it will purchase, sell or liquidate any Coins or distribute the proceeds thereof to any User or Eligible Creditor, in each case other than any Additional Bankruptcy Distributions (but including any purchase, sale or liquidation of any Coins prior to making any Additional Bankruptcy Distributions) or any of the transactions provided for in the preceding provisions of this Section 6.12 then (i) Seller may, but shall not be required to, utilize the Binance.US Platform, or other service offerings of Purchaser or its Affiliates, to consummate such transaction or series of related transactions (including any purchase, sale, liquidation or distribution described above) on Purchaser's and its Affiliates' standard terms and conditions (including any transaction fees, spreads, costs and expenses) and (ii) if this Agreement is terminated in accordance with its terms (other than in connection with a Purchaser Default Termination), then Seller may, but shall not be required to, elect that Purchaser and Seller will (and Seller will cause its Affiliates and any other Person with whom Seller or its Affiliates is consummating any such transaction or transactions to) cooperate in good faith to develop and facilitate any transaction similar to the Rebalancing Exercise required

50

by Seller, any of its Affiliates, and any other Person with whom Seller or its Affiliates is consummating any such transaction or transactions, in order to consummate any such transaction or series of related transactions; provided that in no event will Purchaser or any of its Affiliates be required to make any distribution or facilitate or consummate any transaction under this Section 6.12(c) with respect to any User located in an Unsupported Jurisdiction. In connection with any distribution made by Purchaser or its Affiliates pursuant to this Section 6.12(c), all right, title and interest in and to any property so distributed (including any Coins) shall be made or transferred to Purchaser or its Affiliates free and clear of any Encumbrances prior to any such distribution by Purchaser or its Affiliates and such distributions will be made on Purchaser's and its Affiliates' standard terms and conditions (including any transaction fees, spreads, costs and expenses).

(d)     The provisions of Sections 6.10, 6.11, 6.12, and 6.14 shall be subject to such protocols, if any, as the Parties may agree in writing after the date hereof with respect to the transfer of information, migration of users, migration or transfer of Coins, and any matters related to the foregoing or such Sections.

(e)     Notwithstanding anything to the contrary herein, but subject to the last sentence of this Section 6.12(e), (i) Seller (prior to the Closing) and each User and Eligible Creditor (from and after the Closing) shall retain all right, title, and interest in and to Coins allocated to it in accordance with this Agreement on the Binance.US Platform (notwithstanding any terms and conditions of the Binance.US Platform) through and including such time as such Coins are returned or distributed to Seller or such User and Eligible Creditor, as applicable, hereunder, and such Coins shall be held by Purchaser solely in a custodial capacity in trust and solely for the benefit of Seller or the applicable User or Eligible Creditor; provided that in the case of Coins allocable to Users or Eligible Creditors located in Unsupported Jurisdictions, to the extent, if any, that such Coins are transferred to Purchaser pursuant to Section 6.12(b), from and after the Closing until the applicable Unsupported Jurisdiction Approval is obtained or such Coins are liquidated in accordance with Section 6.12(b) hereunder, such Coins shall be held by Purchaser in a custodial capacity on behalf of Seller and not the applicable User or Eligible Creditor; (ii) any and all cash or cash equivalents to be transferred at any time to Purchaser hereunder for further distribution to Seller or any User or Eligible Creditor (and not for Purchaser's own account (e.g., Purchaser Expenses)) shall at all times (until transferred by Purchaser to Seller or the applicable User or Eligible Creditor, as applicable, hereunder) be held solely in a third party bank account of a FDIC-insured financial institution solely for the benefit of or "fbo" Seller or such User or Eligible Creditor, as applicable; (iii) Purchaser shall not, after the date hereof, introduce any further conditions to the withdrawal of cash from accounts on the Binance.US Platform that are not in effect as of the date hereof that would apply to any User's or Eligible Creditor's account on the Binance.US Platform; (iv) Purchaser shall not at any time halt (temporarily or permanently) withdrawals of cash or such Coins from any User's or Eligible Creditor's account on the Binance.US Platform; (v) Purchaser shall not halt trading of such Coins on the Binance.US Platform at any point during the 30 days following any distribution to any User's or Eligible Creditor's account on the Binance.US Platform hereunder, except, in the case of each of the foregoing clauses (iii), (iv) and (v), (A) as required by applicable Law or any Order or Governmental Body, (B) as may be permitted pursuant to Purchaser's terms and conditions in effect on the Closing Date (including for purposes of halting fraud or illegal activity), (C) as necessary to complete any system, account, wallet, security or exchange

maintenance, patching, repair, upgrade or to the extent any withdrawal or trading is unable to be processed due to any act or omission by, or any Event related to, any third party (*e.g.*, a bank closure or a third party ceasing to support any Cryptocurrency), (D) in order to avoid any legal, compliance or regulatory issue or in order to ensure market stability, or (E) in order to avoid any information security risk; (vi) Purchaser shall not take, permit to be taken, or omit to take any action that would reasonably be expected to (A) result in the insolvency of Purchaser or (B) prevent or materially impair or materially delay the ability of Purchaser to perform the Commercial Covenants in accordance herewith; (vii) Purchaser shall comply in all material respects with all provisions of the Plan applicable to Purchaser or the Distribution Agent (as defined in the Plan) to the extent Purchaser is acting as a distribution agent in connection with the Plan; and (viii) Purchaser shall not pledge, repledge, hypothecate, rehypothecate, sell, lend, stake, arrange for staking, or otherwise transfer or use any amount of such Coins, separately or together with other property, with all attendant rights of ownership, and for any period of time and without retaining a like amount of Coins, or invest such Coins (except as otherwise directed by Seller or any User or Eligible Creditor, as applicable). Notwithstanding the foregoing, Purchaser's obligations under this Section 6.12(e) shall terminate and be of no further force or effect on the earlier of (x) the date that Purchaser's obligations under Section 6.10, Section 6.11, Section 6.12, and Section 6.14 have been performed in full or Purchaser otherwise ceases to have any obligations thereunder, and (y) the date on which this Agreement is terminated in accordance with is terms.

**(f)** **Notwithstanding anything to the contrary herein, to the extent Seller retains any Delayed Acquired Coins following the Closing, (i) such Coins shall be held by Seller solely in a custodial capacity in trust and solely for the benefit of the applicable User or Eligible Creditor; (ii) Seller shall not pledge, repledge, hypothecate, rehypothecate, sell, lend, stake, arrange for staking, invest or otherwise transfer or use any amount of such Coins; (iii) Seller shall retain exclusive control, including by use of "private keys" or other equivalent means or through custody arrangements consistent in all material respects with Seller's practices as of the date hereof, of all such Coins (other than, solely to the extent of any staking contract, Staked Coins); provided that such ownership and exclusive ability to control Coins is subject to the continued existence, validity, legality, governance and public availability of the relevant blockchains; and (iv) Seller shall continue to comply with all procedures and controls in effect as of the Closing Date regarding management of Authentication Credentials, including limitation of access to Authentication Credentials to employees who need to have such access and requiring multiple individuals to sign off on transactions. For the sake of clarity, in the event any such Delayed Acquired Coins are unable to be delivered to Purchaser within the timeframes specified in this Agreement, Purchaser shall be entitled to notify Users and Eligible Creditors of the same or to require Seller to provide such a notice in the form provided by Purchaser, and Seller shall not issue any denial or other contradictory statement with respect thereto. The foregoing provisions of this Section 6.12(f) shall apply to Seller's Affiliates, *mutatis mutandis*, and Seller shall cause its Affiliates to comply with the foregoing provisions of this Section 6.12(f). Following the Closing, Seller agrees to use commercially reasonable efforts to keep Purchaser reasonably informed of any unauthorized acquisition, impairment, access, use, theft, destruction, alteration or disclosure of any "private key" or Authentication Credential or instance of any IT System used by Seller or any custodian of Seller to secure any Acquired**

Coins or loss of Seller's exclusive control of any Acquired Coins and consult with Purchaser in connection with remedying any of the foregoing.

6.13 <u>VGX Token Listing Review Process</u>. Following the entry of the Agreement Order, Purchaser will initiate and undertake consistent with its policies and past practices an internal review process to determine whether VGX tokens can be listed for trading on the Binance.US Platform, which review process will include submitting the VGX token to Purchaser's listing committee for consideration consistent with its policies and past practices.

6.14 <u>Additional Bankruptcy Distributions</u>. The provisions of this <u>Section 6.14</u> shall cease to apply and be of no further force and effect upon the soonest to occur of (a) Purchaser ceasing to provide the services necessary to comply with this <u>Section 6.14</u>, (b) Purchaser's bankruptcy or insolvency, (c) the issuance of a final, non-appealable Order by a Governmental Body prohibiting the consummation of the transactions contemplated by this <u>Section 6.14</u>, (d) any Purchaser Development (disregarding for the purposes of this <u>Section 6.14</u> the language "prior to the Closing"), and (e) Purchaser's material breach of <u>Section 6.12(e)</u> or this <u>Section 6.14</u> which remains uncured for 30 days following Purchaser's receipt of Seller's written notice of such material breach.

(a) ~~Any~~Seller will make or transfer to Purchaser any Additional Bankruptcy Distributions made on account of Users' or Eligible Creditors' claims against the Debtors and all right, title and interest therein and thereto ~~shall be made or transferred to Purchaser~~ free and clear of any Encumbrances promptly following (but in any event within five (5) Business Days of) delivery of the applicable Post-Bankruptcy Statement to Purchaser pursuant to Section 6.14(b). Any such transfers in Coins shall be deemed complete when each transfer is publicly confirmed on the blockchain for the related Coin at least the number of times set forth on https://support.kraken.com/hc/en-us/articles/203325283-Cryptocurrency-deposit-processing-times (or a successor site mutually agreed by Seller and Purchaser), or, for any Coins held in Seller's account on the Binance.US Platform, transferred to the Binance.US Platform account designated by Purchaser, or in the case of staked ETH Coins, such staked ETH Coins shall be delivered pursuant to the means reasonably specified by Purchaser. Any Additional Bankruptcy Distributions made by Purchaser in the form of Coins shall be net of any gas or other transaction fees incurred in connection with transferring such Coins to Purchaser.

(b) Upon the Bankruptcy Court's approval of any Additional Bankruptcy Distributions (including through the Confirmation Order) and (x) the determination by Seller to make any such Additional Bankruptcy Distribution or (y) Seller is required by the Plan to make any such Additional Bankruptcy Distribution, Seller shall deliver to Purchaser a statement setting forth (i) the amount of such Additional Bankruptcy Distributions to be made to each User ~~or Eligible Creditor, as applicable, as approved by the Bankruptcy Court~~ in Coins (including the name and relevant ticker symbol used on the Voyager Platform for such Coins, together with all information regarding the underlying networks and smart contracts to which such Coins are subject) after taking into account gas or other transaction fees incurred and paid by Seller in connection with transferring such Coins to Purchaser in accordance with this <u>Section 6.14</u>, (ii) the amount of Additional Bankruptcy Distributions to be made to each User or Eligible Creditor, as applicable, ~~as approved by the Bankruptcy Court~~ in cash or other assets,

53

and (iii) the user identification number of each such User or other identifying or account information of any Eligible Creditor, as applicable (such statement, the "Post-Bankruptcy Statement"). The provisions set forth in the last sentence of Section ~~6.11(a)~~6.11(c) shall apply to the Post-Bankruptcy Statement, *mutatis mutandis*.

(c)  Promptly following Purchaser's receipt of any Additional Bankruptcy Distributions (but no later than five (5) Business Days following receipt of any Additional Bankruptcy Distributions), Purchaser shall credit such Additional Bankruptcy Distributions to each User's and Eligible Creditor's accounts, if any, on the Binance.US Platform in such amounts set forth on, and in accordance with, the Post-Bankruptcy Statement **and in the same form (*i.e.*, Coins, cash, or other assets, as provided by Seller to Purchaser)**. The Additional Bankruptcy Distributions credited to each User and Eligible Creditor in accordance with this Section 6.14(a) are referred to herein as "Credited Additional Bankruptcy Distributions".

(d)  If any Additional Bankruptcy Distribution is to be received by Purchaser pursuant to Section 6.14(a), prior to the crediting of the applicable Credited Additional Bankruptcy Distribution pursuant to Section 6.14(a), Seller shall reduce such Credited Additional Bankruptcy Distribution by and shall retain (i) the number of Coins allocated in the applicable Post-Bankruptcy Statement to each User or Eligible Creditor located in an Unsupported Jurisdiction in which Purchaser or its applicable Affiliate(s) have not received the necessary Money Transmitter License, and (ii) the amount of cash allocated in the applicable Post-Bankruptcy Statement to each User or Eligible Creditor located in an Unsupported Jurisdiction in which Purchaser or its applicable Affiliate(s) have not received the necessary Money Transmitter License, and, in either case, such amounts shall be distributed by Seller in accordance with the Plan.

(e)  There shall be no transaction fees, spreads, costs or expenses charged to or payable by Seller, any User, or any Eligible Creditor with respect to any Additional Bankruptcy Distributions to the account of Seller, such User or such Eligible Creditor, as applicable, on the Binance.US Platform contemplated by this Section 6.14.  With respect to any User or Eligible Creditor that does not meet the requirements of the KYC Procedures and accept the terms and conditions of the Binance.US Platform (or otherwise is not or no longer is a user with an active account on the Binance.US Platform) as of or prior to the date of such Post-Bankruptcy Statement, Purchaser shall convert all Coins allocable to such User or Eligible Creditor in such Additional Bankruptcy Distribution into United States Dollars at the then-prevailing rates (including applicable fees, spreads, costs and expenses) on the Binance.US Platform and deliver such United States Dollars, together with any cash or others assets in respect of such Users or Eligible Creditors, to Seller within five (5) Business Days, for further distribution by Seller in accordance with the Plan.

**(f)  Seller shall have the option but not the obligation to terminate Purchaser's role as Distribution Agent in connection with the Plan if one or more of the following has occurred and is continuing as of the time of exercise of such option and, in each case, such event would reasonably be expected to materially and adversely affect the Users, Eligible Creditors or the Acquired Coins (each, a "Distribution Agent Termination Event"): (i) Binance Holdings Limited or any of its Subsidiaries voluntarily files for bankruptcy protection in any jurisdiction and such filing would reasonably be expected to**

**prevent Purchaser from performing its obligations under this Section 6.14 or otherwise following the Closing; (ii) following a criminal complaint, indictment, or federal complaint filed by any U.S. federal law enforcement agency, a final and unappealable judgment is entered by a U.S. Federal Court of competent jurisdiction against Purchaser or any of Purchaser's executives officers or "C-Suite" officers; (iii) following a criminal complaint, indictment, or federal complaint filed by any U.S. federal law enforcement agency, a final and unappealable judgment is entered by a U.S. Federal Court of competent jurisdiction against any of Purchaser's Affiliates and such judgment would reasonably be expected to prevent Purchaser from performing its obligations under Section 6.14 or otherwise following the Closing; and (iv) a state regulator suspends or terminates Purchaser's Money Transmitter License or similar license or otherwise restricts in a manner that is final and binding under applicable Law; provided, however, that, with respect to this clause (iv), Seller shall have the option to terminate Purchaser's role as Distribution Agent with respect to only the state or states that have taken the adverse action described in this clause (iv).**

**Upon the occurrence of any Distribution Agent Termination Event, Seller is permitted to exercise the option to terminate Purchaser's role as Distribution Agent by providing written notice to Purchaser in accordance with Section 10.3 (a "Distribution Agent Termination Notice"). Purchaser's termination as Distribution Agent in connection with the Plan shall be effective on the tenth (10th) day following Purchaser's receipt of such Distribution Agent Termination Notice, unless such Distribution Agent Termination Event is cured prior to the expiration of such 10-day period. To the extent that Purchaser is in possession of any of Seller's fiat or Cryptocurrency at the time of the Distribution Agent Termination Notice, Purchaser shall transfer such fiat or cryptocurrency to Seller upon the effectiveness of such Distribution Agent Termination Notice.**

6.15    Unstaking. Promptly following the date hereof (until the **later of (A) the** Closing ~~or~~**and (B) the applicable Delivery Date, or, in any case,** the earlier termination of this Agreement pursuant to Article VIII) but without limiting what is permitted by Section 6.1(b)(iii), Seller shall, and shall cause its Affiliates to, (a) ensure that all Seller Held Coins (other than ETH Coins that are Staked Coins as of the date hereof) are freely transferable and not subject to any restrictions on transfer (including restrictions on transfer implemented through "smart contracts" or other technological means), (b) without limiting the foregoing, ensure that all Seller Held Coins (other than ETH Coins that are Staked Coins as of the date hereof) are unstaked prior to the Rebalancing Date, and (c) consult with Purchaser and its representatives, keep Purchaser and its representatives reasonably informed, and provide Purchaser and its representatives with draft documents reasonably in advance of execution or delivery thereof and incorporate any comments therein proposed in good faith by Purchaser or its representatives, in each case, in connection with any of the foregoing.

6.16    Receipt of Misdirected Assets; Liabilities. From and after the Closing, if Purchaser or Seller becomes aware that Seller or any of its Affiliates is in possession of any right, property or asset that is an Acquired Asset, such Party shall promptly inform the other Party of that fact. Thereafter, at the request of Purchaser, Seller shall promptly transfer or cause such of its Affiliates to transfer such right, property or asset (and shall promptly endorse and deliver any such asset that is received in the form of cash, checks or other documents) to

55

Purchaser or any other entities nominated by Purchaser for no consideration, and such asset will be deemed the property of Purchaser of any such nominees held in trust by Seller for Purchaser or any such nominees until so transferred. From and after the Closing, if Purchaser or Seller becomes aware that Purchaser or any of its Affiliates is in possession of any right, property or asset that is an Excluded Asset, such Party shall promptly inform the other Party of that fact. Thereafter, at the request of Seller, Purchaser shall promptly transfer or cause such of its Affiliates to transfer such right, property or asset (and shall promptly endorse and deliver any such asset that is received in the form of cash, checks or other documents) to Seller or any other entities nominated by Seller for no consideration, and such asset will be deemed the property of Seller of any such nominees held in trust by Purchaser for Seller or any such nominees until so transferred; provided that if Purchaser discovers any items (or portions thereof) that would be Documents but for the fact that they relate to Excluded Assets, Purchaser shall use reasonable best efforts to destroy such items. Notwithstanding anything to the contrary herein or otherwise, if any amount (including any principal, interest, fees, expenses or penalties) is outstanding or unpaid under any Loan from or after the Closing, then such Loan, any agreements or documents entered into in connection therewith and any collateral posted in respect thereof shall be deemed Acquired Assets for all purposes under this Agreement and any other agreements or documents entered into in connection herewith, and Seller shall, and shall cause its Affiliates to, sell, transfer, assign, convey and deliver to Purchaser all of its and their right, title and interest in and to the foregoing, free and clear of all Encumbrances in the same manner as the other Acquired Assets under Section 1.1, *mutatis mutandis*, for no additional consideration and at no cost or expense to Purchaser or its Affiliates.

6.17    Acknowledgment by Purchaser.

(a)    Purchaser acknowledges and agrees that it has conducted to its full satisfaction an independent investigation and verification of the business, including its financial condition, results of operations, assets, Liabilities, properties, Contracts, regulatory compliance, business risks and prospects of Seller and the Acquired Assets and the Assumed Liabilities, and, in making its determination to proceed with the Transactions, Purchaser and the Purchaser Group have relied solely on the results of the Purchaser Group's own independent investigation and verification and have not relied on, are not relying on, and will not rely on, Seller, any information, statements, disclosures, documents, Projections, forecasts or other material made available to Purchaser or any of its Affiliates or their respective Advisors in the Dataroom, the Information Presentation, or the Projections or any information, statements, disclosures or materials, in each case, whether written or oral, made or provided by, or as part of, any of the foregoing or any other Seller Party, or any failure of any of the foregoing to disclose or contain any information, except for the Express Seller Representations (it being understood that Purchaser and the Purchaser Group have relied only on the Express Seller Representations). Purchaser acknowledges and agrees that (i) the Express Seller Representations are the sole and exclusive representations, warranties and statements of any kind made to Purchaser or any member of the Purchaser Group and on which Purchaser or any member of the Purchaser Group may rely in connection with the Transactions and (ii) all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (A) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Seller Representations) including in the Dataroom, Information Presentation, Projections, meetings,

56

calls or correspondence with management of Seller, any of the Seller Parties or any other Person on behalf of Seller or any of the Seller Parties or any of their respective Affiliates or Advisors and (B) any other statement relating to the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, Contracts, regulatory compliance, business risks and prospects of Seller, or the quality, quantity or condition of Seller's assets, are, in each case, specifically disclaimed by Seller, on its behalf and on behalf of the Seller Parties. Purchaser: (x) disclaims reliance on the items in <u>clause (ii)</u> in the immediately preceding sentence (which, for the avoidance of doubt, do not include any Express Seller Representations); and (y) acknowledges and agrees that it has relied on, is relying on and will rely on only the items in <u>clause (i)</u> in the immediately preceding sentence. Without limiting the generality of the foregoing, Purchaser acknowledges and agrees that neither Seller or any other Person (including the Seller Parties), has made, is making or is authorized to make, any representations or warranties, whether in written, electronic or oral form, express or implied with respect to, (1) any potentially material information regarding Seller or any of its assets (including the Acquired Assets), Liabilities (including the Assumed Liabilities) or operations and (2) as to the quality, merchantability, fitness for a particular purpose, or condition of Seller's business, operations, assets, Liabilities, Contracts, regulatory compliance, business risks and prospects or any portion thereof, except, in each case, solely to the extent set forth in the Express Seller Representations.

(b)     Without limiting the generality of the foregoing, in connection with the investigation by the Purchaser Group of Seller, Purchaser and the members of the Purchaser Group, and the Advisors of each of the foregoing, have received or may receive, from or on behalf of Seller, certain projections, forward-looking statements and other forecasts (whether in written, electronic, or oral form, and including in the Information Presentation, Dataroom, management meetings, etc.) (collectively, "<u>Projections</u>"). Purchaser acknowledges and agrees that (i) such Projections are being provided solely for the convenience of Purchaser to facilitate its own independent investigation of Seller, (ii) there are uncertainties inherent in attempting to make such Projections, (iii) Purchaser is familiar with such uncertainties, and (iv) Purchaser is taking full responsibility for making its own evaluation of the adequacy and accuracy of all Projections (including the reasonableness of the assumptions underlying such Projections).

6.18    <u>IT Migration</u>. From and after the date hereof until one hundred twenty (120) days after the Closing Date, upon Purchaser's request, Seller shall, and shall cause its Affiliates to, use reasonable best efforts to make available all relevant technical staff, employees and representatives of Seller and its Affiliates, including the Chief Technology Officer of Seller and its Affiliates, to Purchaser and its Affiliates, to (a) assist Purchaser and its Affiliates in understanding all Business Software and Business Accounts, (b) assist with the Integration Plan, (c) transition of all accounts with third party sites necessary to support the Voyager Platform and its associated mobile applications, (d) address the logistics of transferring the Business Software and Business Accounts to Purchaser, including providing Purchaser with access to all credentials to GitHub accounts and other repositories for storage of source code for the Business Software, and (e) any other technical assistance that Purchaser or any of its Affiliates deems reasonably necessary to enable all migrations, integrations and Transactions. Purchaser hereby grants Seller a limited, non-exclusive, non-transferable, non-sublicensable and revocable license to access and use the Business Software for the sole purpose of providing the support to Purchaser as contemplated in this <u>Section 6.18</u>. Seller and its Affiliates may not use, modify, share, disclose or revise such Business Software for any other purpose. Seller shall bear all costs and expenses

associated with the provision of such services on or prior to the Closing Date pursuant to this Section 6.18. Purchaser shall bear the reasonable and documented costs and expenses incurred by Seller in connection with the provision of such services during the 120-day period after the Closing Date pursuant to this Section 6.18. Seller can provide no assurance that Seller 's employees will elect to remain employed by Seller prior to or following the Closing and Seller will not be required to replace any such resigning employees.

6.19    Confidentiality.

(a)    Each Party acknowledges that Confidential Information has been, and in the future will be, provided to it in connection with this Agreement and the Transactions, including under Section 6.2.

(b)    Seller acknowledges that from and after the Closing, all non-public information relating to the Acquired Assets and the Assumed Liabilities will be valuable and proprietary to Purchaser and its Affiliates. Seller agrees that, from and after the Closing, Seller will not, and will cause their Affiliates and Advisors not to, directly or indirectly, without the prior consent of Purchaser, disclose to any Person any Confidential Information relating to Purchaser and its Affiliates, the Acquired Assets or the Assumed Liabilities.

(c)    Notwithstanding anything to the contrary herein, the provisions of this Section 6.19 will not prohibit any disclosure (i) required by applicable Law, Order or the rules of a securities exchange to which it is subject, (ii) in connection with a regulatory inquiry by a Governmental Body or self-regulatory organization, (iii) as necessary in connection with Seller's bankruptcy process or (iv) to each Party's Advisors who have been informed of the confidential nature of the information and have been instructed to keep such information confidential. Purchaser acknowledges and understands that this Agreement may be publicly filed in the Bankruptcy Court and further made available by Seller to prospective bidders and that, except as prohibited herein, such disclosure will not be deemed to violate any confidentiality obligations owing to Purchaser, whether pursuant to this Agreement or otherwise. Each Party agrees that such Party will be responsible for any breach or violation of the provisions of this Section 6.19 by any of such Party's Affiliates. Each Party acknowledges and agrees that the remedies at law for any breach or threatened breach of this Section 6.19 by Seller or Purchaser are inadequate to protect Purchaser or Seller and its Affiliates, as applicable, and that the damages resulting from any such breach are not readily susceptible to being measured in monetary terms. Accordingly, without prejudice to any other rights or remedies otherwise available to either Party or its Affiliates, each Party acknowledges and agrees that upon any breach or threatened breach by a Party of the terms and conditions of this Section 6.19, the other Party and its Affiliates, as applicable will be entitled to immediate injunctive relief and to seek an order restraining any threatened or future breach from any court of competent jurisdiction without proof of actual damages or posting of any bond in connection with any such remedy. The provisions of this Section 6.19 will survive the Closing and terminate two (2) years after the Closing Date.

6.20    Acquired Assets Owned by Non-Debtors. To the extent any item set forth in Schedule 6.20 or any other asset used in or relating to the Cryptocurrency custody and trading business of Seller constitutes property of Voyager IP, LLC, and, but for this Section 6.20, is of a type that would constitute an Acquired Asset (disregarding solely for this purpose any reference

to "of Seller" or other reference indicating ownership, licensing, holding, leasing or use of any type of Acquired Asset by Seller), Seller shall cause Voyager IP, LLC's right, title and interest in and to such item or asset to be transferred (for no additional consideration) to Purchaser reasonably promptly after Closing as an Acquired Asset as if transferred at the Closing in accordance with the other provisions of this Agreement, including by designating Voyager IP, LLC as an additional assignor under the Trademark and Domain Name Assignment Agreement.

6.21   <u>Seller Expenses</u>.

(a)   Purchaser shall (i) at the Closing bear as a component of the Purchase Price pursuant to <u>Section 2.1(a)</u>, without duplication, the Seller Expenses or (ii) if this Agreement is validly terminated in accordance with its terms, pay to Seller, within three (3) Business Days following such termination, cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by Seller in an amount equal to the Seller Expenses; provided that notwithstanding anything to the contrary herein, (A) in no event shall the aggregate amount of Seller Expenses payable by Purchaser hereunder exceed the Seller Expense Cap, (B) any fees and expenses (including reasonable and documented out-of-pocket financial advisor and legal fees, expenses and disbursements) incurred by Seller or any of its Affiliates, or otherwise relating to the activities or operations of Seller or any of its Affiliates, on or prior to the Seller Expense Start Date shall not constitute Seller Expenses, and (C) (x) if the Closing or the termination of this Agreement occurs on or prior to the Seller Expense Start Date, (y) if this Agreement is terminated pursuant to (1) <u>Section 8.1(b)</u> or <u>Section 8.1(c)</u> by Purchaser, or by Seller in circumstances where Purchaser would be entitled to terminate this Agreement pursuant to <u>Section 8.1(e)</u>, or (2) <u>Section 8.1(e)</u>, <u>Section 8.1(g)</u>, <u>Section 8.1(h)</u> or <u>Section 8.1(i)</u>, or (z) the Closing does not occur on or prior to the Seller Expense Start Date due to any act or omission by Seller or any of its Affiliates or any material breach of this Agreement by Seller, then in each case the Seller Expenses shall be zero (0).

(b)   For purposes of this Agreement, "<u>Seller Expenses</u>" means all reasonable and documented costs, fees, and expenses (including reasonable and documented out-of-pocket financial advisor and legal fees, expenses and disbursements) incurred by or behalf of any Debtor during the period beginning on the Seller Expense Start Date and ending on the earlier of (i) the Closing Date and (ii) the date on which this Agreement is validly terminated in accordance with its terms, in each case (A) solely in connection with maintaining its operations in the Ordinary Course or by professionals in connection with the Bankruptcy Case, (B) that Seller would not have otherwise incurred if the Closing had occurred on or prior to the Seller Expense Start Date, and (C) which fees and expenses of such professional are approved by the Bankruptcy Court.

6.22   <u>Purchaser Expenses</u>.

(a)   If this Agreement is terminated (i) by Seller pursuant to <u>Section 8.1(c)</u>, in circumstances where Purchaser would be entitled to terminate this Agreement pursuant to <u>Section 8.1(e)</u>, or (ii) pursuant to <u>Section 8.1(e)</u>, <u>Section 8.1(g)</u>, <u>Section 8.1(h)</u> or <u>Section 8.1(i)(ix)</u>, then Seller shall pay to Purchaser, within three (3) Business Days following such termination, cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by Purchaser in an amount equal to the Purchaser Expenses; provided that notwithstanding anything to the contrary herein, in no event shall the aggregate amount of

Purchaser Expenses payable by Seller hereunder exceed $5,000,000; provided further that if this Agreement is validly terminated by Seller pursuant to Section 8.1(g) (x) in order for Seller to pursue a Liquidation as a result of and following any Effect with respect to Purchaser's business, financial condition, operations, assets, management, employees, compliance, or liabilities, taken as a whole, or any Effect with respect to Purchaser's Affiliates that has an Effect on Purchaser's business, financial condition, operations, assets, management, employees, compliance, or liabilities, taken as a whole, that, individually or in the aggregate with all other such Effects, would reasonably be expected to (1) prevent or materially impair or materially delay the ability of Purchaser to consummate the Transactions in accordance herewith or (2) materially and adversely affect the Users, Eligible Creditors, or the Acquired Coins on the Binance.US Platform, including following the Closing, as compared to users and Coins on the Binance.US Platform as of the date hereof, and (y) such termination was not effected (1) in connection with a Higher and Better Offer or (2) because the estimated proceeds from such Liquidation are or would reasonably be expected to be greater than the Closing Date Payment (plus the fair market value of any Acquired Coins or any proceeds therefrom, in each case, as determined at the time Seller commences such Liquidation), then no Purchaser Expenses shall be payable.

(b)     For purposes of this Agreement, "Liquidation" means any combination of one or more of the following:  (i) a plan under chapter 11 of the Bankruptcy Code that provides for sales or liquidation of the Debtors' assets through a transaction (other than a sale of substantially all of the Debtors' assets to one purchaser on a going concern basis), including the Plan, (ii) one or more sales of assets pursuant to section 363 of the Bankruptcy Code other than a sale of substantially all of the Debtors' assets to one purchaser on a going concern basis, (iii) conversion of the Bankruptcy Case to cases under chapter 7 of the Bankruptcy Code, (iv) foreclosure or other exercise of remedies (including a deed in lieu of foreclosure) by or in favor of one or more creditors, (v) abandonment of the Debtors' assets to a creditor, or (vi) a dismissal of the Bankruptcy Cases.

(c)     For the purposes of this Agreement, "Purchaser Expenses" means all reasonable and documented fees and expenses (including reasonable and documented out-of-pocket legal fees, expenses and disbursements) incurred by Purchaser since August 5, 2022, in connection with, arising from or related to efforts to purchase the Acquired Assets (as defined in the Bidding Procedures Order), which, for the avoidance of doubt, includes its evaluation, negotiation and pursuit of the Transactions, this Agreement and the other documents and agreements contemplated hereby (the "Purchaser Bid Process").

(d)     All amounts payable to Purchaser pursuant to Section 6.22(a) upon termination of this Agreement shall be payable in cash by wire transfer of immediately available funds to such bank account as shall be designated by Purchaser in writing, and without the requirement of any notice or demand from Purchaser or any application to or order of the Bankruptcy Court other than the Agreement Order.

60

## ARTICLE VII
## CONDITIONS TO CLOSING

7.1    Conditions Precedent to the Obligations of Purchaser and Seller. The respective obligations of each Party to consummate the Transactions are subject to the satisfaction (or to the extent permitted by Law, written waiver by Seller and Purchaser) on or prior to the Closing Date, of each of the following conditions:

(a)    there shall be no Law or Order (including any temporary restraining order or preliminary or permanent injunction) in effect restraining, enjoining, making illegal or otherwise prohibiting the Transactions;

(b)    the Bankruptcy Court shall have entered the Agreement Order, which Agreement Order shall (i) be in form and substance reasonably acceptable to Purchaser, (ii) comply in all respects with Section 5.1(b), and (iii) be a Final Order; and

(c)    the Bankruptcy Court shall have entered the Confirmation Order, in form and substance, solely with respect to matters relating to this Agreement or the Transactions, reasonably acceptable to Purchaser, confirming a Plan in form and substance, solely with respect to matters relating to this Agreement or the Transactions, reasonably acceptable to Purchaser, and the Confirmation Order shall be a Final Order.

7.2    Conditions Precedent to the Obligations of Purchaser. The obligations of Purchaser to consummate the Transactions are subject to the satisfaction (or to the extent permitted by Law, written waiver by Purchaser in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)    (i) the representations and warranties of Seller set forth in Article III (in each case, other than the Fundamental Representations and the representations and warranties set forth in Section 3.16(a)) shall be true and correct in all respects as of the Closing Date as though made on and as of the Closing Date, except (x) that representations and warranties that are made as of a specified date need be so true and correct only as of such date **and; provided that any representations and warranties that are made as of any Delivery Date (solely to the extent made as of any Delivery Date) shall be excluded from this Section 7.2(a) altogether, and** (y) to the extent the failure of such representations and warranties to be true and correct as of such dates has not had, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; provided that for purposes of the immediately preceding clause (i), the qualifications as to materiality and Material Adverse Effect contained in such representations and warranties shall not be given effect; (ii) the representations and warranties set forth in Section 3.1(a) (*Organization and Qualification*), Section 3.2 (*Authorization of Agreement*), Section 3.3(a)(i) (*Conflicts; Consents*), Section 3.6(a) (*Exclusive Ownership*), and Section 3.14 (*Brokers*) (collectively, the "Fundamental Representations") shall be true and correct in all but *de minimis* respects as of the Closing Date as though made on and as of the Closing Date, except that such Fundamental Representations that are made as of a specified date need be true and correct in all but *de minimis* respects only as of such date; and (iii) the

61

representations and warranties set forth in <u>Section 3.16(a)</u> shall be true and correct in all respects as of the date hereof and as of the Closing Date as though made on and as of the Closing Date;

(b)     Seller shall not have materially breached any of the covenants required to be performed or complied with by Seller under this Agreement on or prior to the Closing; <u>provided</u> that notwithstanding the foregoing, Seller shall have performed or caused to be performed, in all respects, all of the obligations and covenants required by <u>Section 6.15(a)</u> and <u>(b)</u>; and

(c)     Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in <u>Section 2.4</u>.

7.3     <u>Conditions Precedent to the Obligations of Seller</u>. The obligations of Seller to consummate the Transactions are subject to the satisfaction (or to the extent permitted by Law, written waiver by Seller in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)     the representations and warranties made by Purchaser in <u>Article IV</u> shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except (x) that representations and warranties that are made as of a specified date need be so true and correct only as of such date and (y) where the failure of such representations or warranties to be so true and correct has not and would not, individually or in the aggregate, reasonably be expected to prevent or materially impair or delay the ability of Purchaser to consummate the Transactions; <u>provided</u> that for purposes of this <u>Section 7.3(a)</u>, the qualifications as to materiality, material adverse effect and words of similar import contained in such representations and warranties shall not be given effect;

(b)     Purchaser shall not have materially breached any of the covenants required to be performed or complied with by Purchaser under this Agreement on or prior to the Closing; and

(c)     Purchaser shall have delivered, or caused to be delivered, to Seller all of the items set forth in <u>Section 2.5</u>.

7.4     <u>Waiver of Conditions</u>.  Upon the occurrence of the Closing, any condition set forth in this <u>Article VII</u> that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing. Neither Purchaser nor Seller may rely on the failure of any condition set forth in this <u>Article VII</u>, as applicable, to be satisfied if such failure was caused by such Party's material breach of any covenant, representation or warranty hereunder.

US-DOCS-~~137411268.27~~138346099.6

**ARTICLE VIII**

**TERMINATION**

8.1     <u>Termination of Agreement</u>. This Agreement may be terminated only in accordance with this <u>Section 8.1</u>. This Agreement may be terminated at any time prior to the Closing:

(a)     by the mutual written consent of Seller and Purchaser;

(b)     by written notice of either Purchaser or Seller, upon the issuance of an Order by a Governmental Body restraining, enjoining or otherwise prohibiting the consummation of the Transactions or declaring unlawful the Transactions, and such Order having become final, binding and non-appealable; <u>provided</u> that no termination may be made by a Party under this <u>Section 8.1(b)</u> if the issuance of such Order was caused by such Party's material breach of any of its representation, warranties, covenants or agreements hereunder;

(c)     by written notice of either Purchaser or Seller, if the Closing shall not have occurred on or before the date that is four (4) months following the date hereof (the "<u>Outside Date</u>"); <u>provided</u> that Purchaser may, at its election and upon written notice to Seller, elect to extend the Outside Date for an additional thirty (30) days (such extended date, the "<u>Extended Outside Date</u>"); <u>provided</u> <u>further</u> that a Party shall not be permitted to terminate this Agreement, or extend the Outside Date, pursuant to this <u>Section 8.1(c)</u> if the failure of the Closing to have occurred by the Outside Date or Extended Outside Date, as applicable, was caused by such Party's material breach of any of its representation, warranties, covenants or agreements;

(d)     by written notice from Seller to Purchaser, upon a breach of any covenant or agreement on the part of Purchaser, or if any representation or warranty of Purchaser is or will have become untrue, in each case, such that the conditions set forth in <u>Section 7.1</u> or <u>Section 7.3</u> would not be satisfied, including a breach of Purchaser's obligation to consummate the Closing; <u>provided</u> that (i) if such breach is curable by Purchaser then Seller may not terminate this Agreement under this <u>Section 8.1(d)</u> unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date or Extended Outside Date, if any, and (B) thirty (30) days after Seller notifies Purchaser of such breach and (ii) the right to terminate this Agreement pursuant to this <u>Section 8.1(d)</u> will not be available to Seller at any time that Seller is in material breach of, any covenant, representation or warranty hereunder;

(e)     by written notice from Purchaser to Seller, upon a breach of any covenant or agreement on the part of Seller, or if any representation or warranty of Seller is or will have become untrue, in each case, such that the conditions set forth in <u>Section 7.2(a)</u> or <u>Section 7.2(b)</u> would not be satisfied; <u>provided</u> that (i) if such breach is curable by Seller then Purchaser may not terminate this Agreement under this <u>Section 8.1(e)</u> unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date or Extended Outside Date, if any, and (B) thirty (30) days after Purchaser notifies Seller of such breach and (ii) the right to terminate this Agreement pursuant to this <u>Section 8.1(e)</u> will not be available to

63

Purchaser at any time that Purchaser is in material breach of, any covenant, representation or warranty hereunder;

(f)     by written notice from Seller to Purchaser, if (A) all of the conditions set forth in Sections 7.1 and 7.2 have been and continue to be satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived, (B) Seller has confirmed in writing to Purchaser that all of the conditions set forth in Sections 7.1 and 7.2 have been and continue to be satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived and Seller stands ready, willing and able to consummate the Closing so, and (C) Purchaser fails to consummate the Closing within three (3) Business Days of its receipt of such written notice from Seller;

(g)     by written notice from Seller to Purchaser, which may be revocable in the sole discretion of Seller by written notice from Seller to Purchaser within five (5) Business Days, if Seller or the board of directors (or similar governing body) of Seller determine, in good faith and after consultation with its legal and other advisors, that proceeding with the Transactions or failing to terminate this Agreement would be inconsistent with its or such Person's or body's fiduciary duties; provided that if such determination is in connection with an Acquisition Proposal, Seller may only terminate this Agreement pursuant to this Section 8.1(g) upon compliance with the provisions set forth in Section 5.2(c);

(h)     by written notice from Purchaser to Seller, if (A) Seller seeks or otherwise take material steps in furtherance of, or do not use reasonable best efforts to oppose any other Person in seeking, an order of the Bankruptcy Court dismissing the Bankruptcy Case or converting the Bankruptcy Case to a petition for relief under Chapter 7 of the Bankruptcy Code, (B) the Bankruptcy Case is dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of Seller is appointed in the Bankruptcy Case or (C) the Bankruptcy Court enters an order pursuant to section 362 of the Bankruptcy Code lifting the automatic stay with respect to any Acquired Assets; or

(i)     by written notice from Purchaser to Seller, if:

(i)     the Agreement Order is not entered by January 6 11, 2023;

(ii)     the Plan Solicitation Motion and the Amended Disclosure Statement are not filed with the Bankruptcy Court by December 21, 2022;

(iii)     the Plan Solicitation Order is not entered by January 6 11, 2023;

(iv)     the Confirmation Order is not entered by March 1 6, 2023;

(v)     Seller or any of the other Debtors file any motions, pleadings, notices or other documents with the Bankruptcy Court in material breach of Section 5.7;

64

(vi)     Seller enters into one or more Alternative Transactions with one or more Persons other than Purchaser, or the Bankruptcy Court approves an Alternative Transaction other than with Purchaser;

(vii)    Seller has delivered a Higher Offer Determination Notice to Purchaser;

(viii)   Seller or its Affiliates or Advisors have committed a breach of Section 5.1(a); or

(ix)     Seller or its Affiliates or Advisors have committed a breach of, Section 5.2; provided that (without modifying Purchaser's rights to terminate this Agreement under any other Section of this Agreement) Purchaser shall not be entitled to terminate this Agreement pursuant to this Section 8.1(i)(ix) following entry of the Agreement Order by the Bankruptcy Court.

8.2     Effect of Termination.

(a)     In the event of termination of this Agreement pursuant to Section 8.1, this Agreement shall forthwith become void and there shall be no Liability on the part of either Party or any of its partners, officers, directors or shareholders; provided that Section 2.2, Section 6.2(b), Section 6.12(c), Section 6.19, Section 6.21, Section 6.22, this Section 8.2, Section 8.3, Section 8.4 and Article X (other than Section 10.12 with respect to the availability of an injunction or injunctions, specific performance or other equitable relief to cause the Closing to occur, which shall terminate upon any termination of this Agreement) and the definitions referenced in such Sections and Articles, even if not included in such Sections and Articles, and, for the avoidance of doubt, the Confidentiality Agreement, shall survive any such termination; provided further that, subject to Section 8.3, no termination will relieve either Party from any Liability for damages (including damages based on the loss of the economic benefits of the Transactions, including the Purchase Price, to Seller), losses, costs, or expenses (including reasonable legal fees and expenses) resulting from any willful breach of this Agreement by such Party prior to any such termination or Fraud by such Party. For purposes of this Agreement, "willful breach" means with respect to any breaches or failures to perform any of the covenants or other agreements contained herein, a material breach that is a consequence of an act or failure to act undertaken by the breaching Person with actual knowledge (which shall not be deemed to include knowledge of facts that a Person acting reasonably should have, based on reasonable due inquiry) that such Person's act or failure to act would, or would reasonably be expected to, result in or constitute a material breach of this Agreement.

(b)     If this Agreement is terminated prior to the Closing, at any time following such termination, promptly following the written request of Seller, Purchaser shall, as soon as practicable, return, destroy or permanently erase (on all forms of physical and electronic media) all Acquired User Data transferred to Purchaser prior to the Closing in accordance with Section 6.6(a) or otherwise in connection with the KYC Procedures and permanently close and remove any account established with or with reference to any Acquired User Data, and, upon written request from Seller following any destruction or erasure of data, provide an officer's certificate certifying as to such destruction or erasure. Such destruction or erasure shall be in

US-DOCS 137411268.27138346099.6

accordance with all Laws regarding data disposal, and the eradication and destruction technique used will be appropriate for the storage medium and format. Notwithstanding the foregoing, Purchaser shall have the right to retain a copy of the Acquired User Data to the extent required for legal, regulatory or compliance purposes, so long as such Acquired User Data is kept confidential as required under this Agreement and the Confidentiality Agreement and is used for no other purpose.

8.3     Reverse Termination Fee. In the event that (a) the conditions set forth in Sections 7.1(b), 7.1(c), and 7.2 have been satisfied or duly waived and (b) (i) this Agreement is validly terminated in accordance with Section 8.1(b) or Section 8.1(c), (ii) Purchaser fails to consummate the Closing by the Outside Date or the Extended Outside Date, as applicable, as a result of the failure of the conditions set forth in Section 7.1(a), or (iii) this Agreement is terminated pursuant to Section 8.1(g) in connection with and following a Purchaser Development and not in connection with a Higher and Better Offer, then, in any such case, within three (3) Business Days following such valid termination the Deposit (including all received investment income, if any) shall be released to Seller (such release, which, for the avoidance of doubt, shall be equal to and shall not exceed $10,000,000 in the aggregate, the "Reverse Termination Fee").

8.4     Further Effect of Termination. Notwithstanding anything to the contrary in this Agreement, the Confidentiality Agreement or any other document or instrument delivered by either Party in connection with the Transactions, but subject in all respects to the other provisions of this Section 8.4:

(a)     Seller, on behalf of itself and the Seller Parties, acknowledges and agrees that any disbursement of the Deposit to Seller pursuant to Section 2.2(b), payment of any Seller Expenses to Seller pursuant to Section 6.21 or payment of the Reverse Termination Fee pursuant to Section 8.3 shall be deemed liquidated damages and shall be the sole and exclusive recourse of Seller and the Seller Parties against Purchaser and the Purchaser Group for any loss or damage suffered in connection with, relating to or arising out of this Agreement or the Transactions (including circumstances giving rise to any termination of this Agreement) and including losses or damages suffered as a result of any breach of this Agreement or any representation, warranty, covenant or agreement contained herein by Purchaser or the failure of the Transactions to be consummated (whether or not for intentional, unintentional or willful breach or otherwise), except in the event Seller is entitled to elect specific performance of Purchaser's obligations (including to consummate the Transactions) pursuant to Section 10.12.

(b)     In the event of a valid termination of this Agreement pursuant to Section 8.1, if Seller is entitled to receive the Deposit pursuant to Section 2.2, payment of any Seller Expenses pursuant to Section 6.21, or payment of the Reverse Termination Fee pursuant to Section 8.3, then, upon release of the Deposit to Seller in accordance with Section 2.2(b), payment of such Seller Expenses pursuant to Section 6.21 or payment of the Reverse Termination Fee pursuant to Section 8.3, as applicable, (i) Purchaser and the Purchaser Group shall not have any further liability or obligation relating to or arising out of this Agreement or the Transactions (including any liability or obligation for monetary damages) and (ii) neither Seller nor any of the Seller Parties will have any right of recovery, whether arising under contract Law, tort Law or any other theory of Law, against, and no personal liability shall attach to Purchaser or any other member of the Purchaser Group, whether by or through attempted piercing of the

66

corporate, limited partnership or limited liability company veil, by the enforcement of any assessment or by any legal or equitable Action, by virtue of any statute, regulation or applicable Law, or otherwise.

(c)    **In the event that the Closing does not occur:** (i) The maximum aggregate liability of Purchaser and the Purchaser Group in connection with this Agreement and the Transactions shall be limited to the sum of (x) (1) solely where and to the extent the Deposit is forfeited by Purchaser in accordance with Section 2.2(b), the Deposit or (2) without duplication of any forfeiture of the Deposit pursuant to Section 2.2(b) and solely where and to the extent the Reverse Termination Fee is payable in accordance with Section 8.3, the Reverse Termination Fee, plus (y) solely where and to extent the Seller Expenses are payable in accordance with Section 6.21, the Seller Expenses; (ii) in no event shall Purchaser be obligated to pay any of the Deposit, the Seller Expenses or the Reverse Termination Fee on more than one occasion and (iii) under no circumstances will any of Seller or any of the Seller Parties seek, obtain or accept, monetary damages or losses of any kind (including damages for the loss of the benefit of the bargain, opportunity cost, loss of premium, time value of money or otherwise, or any consequential, special, expectancy, indirect or punitive damages or any losses or damages based on a multiple or multiplier) in connection with, relating to or arising out of the termination of this Agreement in excess of the sum of (A) (1) solely where and to the extent the Deposit is forfeited in accordance with Section 2.2(b), the Deposit or (2) without duplication of any forfeiture of the Deposit pursuant to Section 2.2(b) and solely where and to the extent the Reverse Termination Fee is payable in accordance with Section 8.3, the Reverse Termination Fee, plus (B) solely where and to the extent the Seller Expenses are payable in accordance with Section 6.21, the Seller Expenses; provided, however, that the foregoing shall not been interpreted to limit in any way Seller's right to require specific performance of Purchaser's obligations (including to consummate the Transactions) pursuant to Section 10.12 in the event this Agreement has not been terminated and to the extent such specific performance is available to Seller under Section 10.12. Notwithstanding anything to the contrary herein or otherwise, in no event shall Seller be entitled to receive both (1) the forfeiture of the Deposit together with all received investment income, if any, pursuant to Section 2.2(b) and (2) the payment of the Reverse Termination Fee pursuant to Section 8.3 (it being acknowledged that the payment of the Reverse Termination Fee pursuant to Section 8.3 includes forfeiture of the Deposit together with all received investment income, if any).

(d)    Seller may seek both payment of monetary damages (including the Reverse Termination Fee, the Deposit or the Seller Expenses) in accordance with this Agreement, on the one hand, and specific performance of Purchaser's obligation to consummate the Closing pursuant to Section 10.12; provided that in no event shall Seller be entitled to receive both (1) payment of monetary damages (including the Reverse Termination Fee, the Deposit or the Seller Expenses) in accordance with this Agreement (and for the avoidance of doubt, subject to the other limitations thereon set forth in this Section 8.4) and (2) such specific performance pursuant to Section 10.12.

67

# ARTICLE IX

## TAXES

9.1     Transfer Taxes. Any sales, use, purchase, transfer, deed, stamp, documentary or other similar Taxes and recording charges (but excluding any such Taxes or charges that are based in whole or in part upon income, profits or gains) payable by reason of the sale of the Acquired Assets or the assumption of the Assumed Liabilities under this Agreement or the Transactions (the "Transfer Taxes") shall be borne and timely paid by Purchaser, and Purchaser shall timely file all Tax Returns related to any Transfer Taxes.

9.2     Cooperation. Purchaser and Seller shall reasonably cooperate, as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns and any Action, audit, litigation, or other proceeding with respect to Taxes. In furtherance thereof, Purchaser and Seller shall reasonably cooperate in good faith to determine and agree to the tax treatment to each of them and to the Users of the Transactions, provided that agreeing on consistent tax treatment shall not be a closing condition and neither Party shall have any liability under this Agreement if the Parties are unable to so agree.

9.3     Preparation of Tax Returns and Payment of Taxes.

(a)     Except as otherwise provided by Section 9.1, Seller shall prepare and timely file (i) all Tax Returns with respect to the Acquired Assets for any Tax period ending on or before the Closing Date and (ii) all Tax Returns of Seller (including, for the avoidance of doubt, for any Straddle Period, but not including, for the avoidance of doubt, information returns). With respect to any such Tax Return that reflects any Tax that is an Assumed Liability (not including, for the avoidance of doubt, any income Tax Return of Seller or Seller's Affiliates for any tax period and not including any information Tax Return), Seller shall use reasonable best efforts to (x) prepare such Tax Returns consistent with past practice, except as otherwise required by applicable Law, (y) provide Purchaser with a draft of such Tax Returns at least ten (10) days prior to the filing of any such Tax Return, and (z) incorporate any changes reasonably requested by Purchaser with respect to such Tax Returns prior to filing. Except to the extent any Tax reflected on a return required to be prepared and filed by Seller pursuant to this Section 9.3 constitutes an Assumed Liability, Seller shall be responsible for paying any Taxes reflected on any Tax Return that Seller is obligated to prepare and file under this Section 9.3(a). Notwithstanding anything herein to the contrary: (i) nothing in this Agreement shall give Purchaser or its Affiliates any rights with respect to or control over any income Tax Return of Seller or Seller's Affiliates for any tax period (any such Tax Return, a "Seller Income Tax Return"), and (ii) if any Governmental Body approaches (including by way of initiating any audit, investigation, or other proceeding) either Party with respect to the income Tax characterization of the Transactions (any such action, a "Transaction-Related Action"), then the Party in receipt of such notice shall reasonably promptly inform the other Party of such Transaction-Related Action.

(b)     Purchaser shall prepare and timely file all Tax Returns with respect to the Acquired Assets that are not addressed by Section 9.3(a) (including, for the avoidance of doubt, all Tax Returns with respect to the Acquired Assets for any taxable period beginning after the

Closing Date). With respect to any such Tax Return for any Straddle Period that reflects any Tax that is an Excluded Liability (each, a "Relevant Tax Return"), Purchaser shall prepare such Relevant Tax Returns and shall provide Seller with a draft of such Relevant Tax Returns at least ten (10) days prior to the filing of any such Tax Return. Purchaser shall incorporate any changes reasonably requested by Seller with respect to such Tax Returns. Seller shall be responsible for paying any Taxes reflected on any Tax Return that Purchaser is obligated to prepare and file under this Section 9.3(b) to the extent such Taxes constitute Excluded Liabilities.

(c)     Purchaser shall not file any amendment to any previously filed Tax Return with respect to the Acquired Assets for any Pre-Closing Tax Period that would have the effect of increasing any Tax due for a Pre-Closing Tax Period or portion of a Straddle Period ending on the Closing Date, in each case, that is an Excluded Liability, unless Purchaser receives an opinion from a nationally recognized accounting firm or law firm that there is no adequate "reporting position" with respect to any previously-asserted position with respect to Taxes. Upon such determination, Purchaser shall provide no less than forty-five (45) days' notice of such position before filing any such Tax Return. In the event Seller disagrees with such Tax position, and the dispute cannot be resolved between the Parties, such dispute shall be submitted to an independent national accounting firm or law firm for resolution, with the costs of such resolution to be evenly split by Purchaser and Seller. The determination of such independent national accounting firm or law firm shall be binding on both Parties and any Tax Return shall be filed consistently with such resolution.

(d)     For all purposes under this Agreement, in respect of any Straddle Period, the portion of Taxes that are allocable to the portion of the Straddle Period ending on the Closing Date will be: (i) in the case of any Taxes other than those described in clause (ii) below, deemed to include the amount that would be payable if the relevant Straddle Period ended on and included the Closing Date; and (ii) in the case of any property Taxes and other similar Taxes, deemed to include the amount of such Tax for the entire Straddle Period multiplied by a fraction the numerator of which is the number of days in the Straddle Period ending on and including the Closing Date and the denominator of which is the number of days in the entire Straddle Period.

(e)     Notwithstanding anything herein to the contrary, prior to the Closing, Seller and its Affiliates may contribute, assign or otherwise transfer the 3AC Loan to any third-party purchaser, trust or other entity.

## ARTICLE X

### MISCELLANEOUS

10.1     Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers. Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such Party prior to the Closing) of the Parties set forth in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought with respect thereto after the Closing. Each covenant and

agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms, and if no term is specified, then for five (5) years following the Closing Date, and nothing in this <u>Section 10.1</u> will be deemed to limit any rights or remedies of any Person for breach of any such surviving covenant or agreement. Purchaser and Seller acknowledge and agree, on their own behalf and on behalf of the Purchaser Group or the Seller Parties, as the case may be, that the agreements contained in this <u>Section 10.1</u> (a) require performance after the Closing to the maximum extent permitted by applicable Law and will survive the Closing for five (5) years and (b) are an integral part of the Transactions and that, without the agreements set forth in this <u>Section 10.1</u>, neither of the Parties would enter into this Agreement.

     10.2   <u>Expenses</u>. Whether or not the Closing takes place, except as otherwise provided herein (including, for the avoidance of doubt, <u>Section 8.2</u>), all fees, costs and expenses (including fees, costs and expenses of Advisors) incurred in connection with the negotiation of this Agreement and the other agreements contemplated hereby, the performance of this Agreement and the other agreements contemplated hereby and the consummation of the transactions contemplated hereby and thereby will be paid by the Party incurring such fees, costs and expenses; it being acknowledged and agreed that all Transfer Taxes will be allocated pursuant to <u>Section 9.1</u> and (c) all Cure Costs will be allocated pursuant to <u>Section 5.4</u>.

     10.3   <u>Notices</u>. Except as otherwise expressly provided herein, all notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given (a) when personally delivered, (b) when transmitted by electronic mail, (c) the day following the day on which the same has been delivered prepaid to a reputable national overnight air courier service or (d) the third (3rd) Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case, to the respective Party at the number, electronic mail address or street address, as applicable, set forth below, or at such other number, electronic mail address or street address as such Party may specify by written notice to the other Party.

               <u>Notices to Purchaser</u>:

               BAM Trading Services, Inc. d/b/a Binance.us
               611 Cowper Street, Suite 400
               Palo Alto, CA 94301
               Attention:   Norman Reed, General Counsel
               Email:       norman.reed@binance.us;
                              legal@binance.us

US-DOCS\~~137411268.27~~138346099.6

with a copy to (which shall not constitute notice):

Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020

| | |
|---|---|
| Attention: | Robert M. Katz |
| | Daniel Mun |
| | Adam J. Goldberg |
| | Andrew D. Sorkin |
| | **Jenny Cieplak** |
| Email: | Robert.Katz@lw.com |
| | Daniel.Mun@lw.com |
| | Adam.Goldberg@lw.com |
| | ~~Andrew.Sorkin~~**Andrew.Sorkin@lw.com** |
| | **Jenny.Cieplak**@lw.com |

<u>Notices to Seller</u>:

Voyager Digital, LLC
33 Irving Place, 3rd Floor
New York, NY 10003

| | |
|---|---|
| Attention: | Stephen Ehrlich |
| | David Brosgol |
| Email: | sehrlich@investvoyager.com |
| | dbrosgol@investvoyager.com |

with a copy to (which shall not constitute notice):

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022

| | |
|---|---|
| Attention: | Joshua A. Sussberg, P.C. |
| | Christine A. Okike, P.C. |
| | Christopher Marcus, P.C. |
| | Jonathan L. Davis, P.C. |
| | Steve Toth |
| | Eduardo M. Leal |
| | Allyson B. Smith |
| Email: | joshua.sussberg@kirkland.com |
| | christine.okike@kirkland.com |
| | cmarcus@kirkland.com |
| | jonathan.davis@kirkland.com |
| | steve.toth@kirkland.com |
| | eduardo.leal@kirkland.com |
| | allyson.smith@kirkland.com |

10.4    Binding Effect; Assignment. This Agreement shall be binding upon Purchaser and, subject to the terms of the Bidding Procedures Order (with respect to the matters covered thereby) and the entry and terms of the Agreement Order, the Plan and the Confirmation Order, Seller, and shall inure to the benefit of and be so binding on the Parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Bankruptcy Case or any successor Chapter 7 case; provided that neither this Agreement nor any of the rights or obligations hereunder may be assigned or delegated without the prior written consent of Purchaser and Seller, and any attempted assignment or delegation without such prior written consent shall be null and void; provided further that Purchaser shall be entitled to assign or delegate this Agreement or all or any part of its rights or obligations hereunder to any of its Affiliates; provided further that in each case no such assignment or delegation shall relieve Purchaser of any of its obligations hereunder.

10.5    Amendment and Waiver. Any provision of this Agreement or the Schedules or exhibits hereto may be (a) amended only in a writing signed by Purchaser and Seller or (b) waived only in a writing executed by the Person against which enforcement of such waiver is sought. No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any way any other provision or prior or subsequent breach or default. Except where a specific period for action or inaction is provided herein, no delay on the part of either Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

10.6    Third Party Beneficiaries. Except as otherwise expressly provided herein, nothing expressed or referred to in this Agreement is intended or will be construed to give any Person other than the Parties any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.

10.7    Non-Recourse. This Agreement may only be enforced against, and any Action based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement. Except to the extent named as a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present or future direct or indirect equityholder, shareholder, member, partner, manager, director, officer, employee, Affiliate, agent or Advisor of either Party will have any Liability (whether in contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or Liabilities of any of the parties to this Agreement or for any Action based upon, arising out of or related to this Agreement.

10.8    Severability. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable Law in any jurisdiction, such provision will be ineffective only to the extent of such prohibition or invalidity in such jurisdiction, without invalidating the remainder of such provision or the remaining provisions of this Agreement or in any other jurisdiction. To the extent permitted by applicable Law, each Party waives any provision of Law that renders any provision of this Agreement invalid or unenforceable in any respect.

10.9    Construction. The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction

72

will be applied against any Person. The table of contents and headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and will in no way restrict or otherwise modify any of the terms or provisions hereof.

10.10 <u>Schedules</u>. The Schedules have been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement; <u>however</u>, each section of the Schedules will be deemed to incorporate by reference all information disclosed in any other section of the Schedules, to the extent it is readily apparent on its face without the need for a cross-reference. Capitalized terms used in the Schedules and not otherwise defined therein have the meanings given to them in this Agreement. The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Schedules or the attached exhibits is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course, and neither Party will use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement, the Schedules or exhibits in any dispute or controversy between the Parties as to whether any obligation, item or matter not set forth or included in this Agreement, the Schedules or exhibits is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course. In addition, matters reflected in the Schedules are not necessarily limited to matters required by this Agreement to be reflected in the Schedules. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. Any description of any agreement, document, instrument, plan, arrangement or other item set forth on any Schedule is a summary only and is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement, or item. The information contained in this Agreement, in the Schedules and exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by either Party to any third party of any matter whatsoever, including any violation of Law or breach of Contract.

10.11 <u>Complete Agreement</u>. This Agreement, together with the Confidentiality Agreement and any other agreements expressly referred to herein or therein, contains the entire agreement of the parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the Transactions and supersedes all prior agreements between the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the Transactions. In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts of this Agreement and the documents referenced herein will not be considered or analyzed for any purpose (including in support of parol evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions hereof or the intent of the Parties with respect hereto and will be deemed joint work product of the Parties.

10.12 <u>Specific Performance</u>. The Parties agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if either of the Parties fails to take any action required of it

US-DOCS\137411268.27138346099.6

hereunder to consummate the Transactions. It is accordingly agreed that (a) the Parties will be entitled to an injunction or injunctions, specific performance or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in the courts described in <u>Section 10.13</u> without proof of damages or otherwise, this being in addition to any other remedy to which they are entitled under this Agreement, and (b) the right of specific performance and other equitable relief is an integral part of the Transactions and without that right, neither Seller nor Purchaser would have entered into this Agreement. The Parties acknowledge and agree that either Party pursuing an injunction or injunctions or other Order to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this <u>Section 10.12</u> will not be required to provide any bond or other security in connection with any such Order. Except as limited by <u>Section 8.4(d)</u>, (i) the remedies available to Seller pursuant to this <u>Section 10.12</u> will be in addition to any other remedy to which they were entitled at law or in equity, and (ii) the election to pursue an injunction or specific performance will not restrict, impair or otherwise limit Seller from seeking to collect or collecting damages. If, prior to the Outside Date or Extended Outside Date, if any, either Party brings any action, in each case in accordance with <u>Section 10.13</u>, to enforce specifically the performance of the terms and provisions hereof by any other Party, the Outside Date or Extended Outside Date, if any, will automatically be extended (y) for the period during which such action is pending, <u>plus</u> ten (10) Business Days or (z) by such other time period established by the court presiding over such action, as the case may be.

      10.13   <u>Jurisdiction and Exclusive Venue</u>. Each of the Parties irrevocably agrees that any Action that may be based upon, arising out of, or related to this Agreement or the negotiation, execution or performance of this Agreement and the Transactions brought by any other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) if the Bankruptcy Court is unwilling or unable to hear such Action, in the Delaware Chancery Court and any state court sitting in the State of Delaware to which an appeal from the Delaware Chancery Court may be validly taken (or, if the Delaware Chancery Court declines to accept jurisdiction over a particular matter, any state or federal court within the state of Delaware) ((a) and (b), the "<u>Chosen Courts</u>"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any such Action arising out of or relating to this Agreement and the Transactions. Each of the Parties agrees not to commence any Action relating thereto except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any Order, decree or award rendered by any Chosen Court, and no Party will file a motion to dismiss any Action filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of *forum non-conveniens*. The Parties irrevocably agree that venue would be proper in any of the Chosen Courts, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of such Action. Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in <u>Section 10.3</u>. Nothing in this Agreement will affect the right of either Party to serve process in any other manner permitted by Law.

10.14    Governing Law; Waiver of Jury Trial.

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement, and any Action that may be based upon, arising out of or related to this Agreement or the negotiation, execution or performance of this Agreement or the Transactions will be governed by and construed in accordance with the internal Laws of the State of Delaware applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

(b)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT, THE DOCUMENTS AND AGREEMENTS CONTEMPLATED HEREBY AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY ACTION BASED ON, ARISING OUT OF OR RELATED TO THIS AGREEMENT, ANY DOCUMENT OR AGREEMENT CONTEMPLATED HEREBY OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY. EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH ACTION WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

10.15    No Right of Set-Off. Purchaser, on its own behalf and on behalf the Purchaser Group and its and their respective successors and permitted assigns, hereby waives any rights of set-off, netting, offset, recoupment or similar rights that Purchaser, any member of the Purchaser Group or any of its or their respective successors and permitted assigns has or may have with respect to the payment of the Purchase Price or any other payments to be made by Purchaser pursuant to this Agreement or any other document or instrument delivered by Purchaser in connection herewith.

10.16    Counterparts and PDF. This Agreement and any other agreements referred to herein or therein, and any amendments hereto or thereto, may be executed in multiple counterparts, any one of which need not contain the signature of more than one party hereto or thereto, but all such counterparts taken together will constitute one and the same instrument. Any counterpart, to the extent signed and delivered by means of a .PDF or other electronic transmission, will be treated in all manner and respects as an original Contract and will be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. Minor variations in the form of the signature page to this Agreement or any

US-DOCS\137411268.27138346099.6

agreement or instrument contemplated hereby, including footers from earlier versions of this Agreement or any such other document, will be disregarded in determining the effectiveness of such signature. At the request of any party or pursuant to any such Contract, each other party hereto or thereto will re-execute original forms thereof and deliver them to all other parties. No party hereto or to any such Contract will raise the use of a .PDF or other electronic transmission to deliver a signature or the fact that any signature or Contract was transmitted or communicated through the use of PDF or other electronic transmission as a defense to the formation of a Contract and each such party forever waives any such defense.

10.17 <u>Publicity</u>. The initial press release regarding this Agreement and the Transactions (the "<u>Press Release</u>") shall be made promptly following the execution and delivery of this Agreement and shall be in such form as the Parties mutually agree. Except as contemplated by the Commercial Covenants, and subject in all respects to <u>Section 10.19</u>, none of Seller and the Seller Parties shall issue any press release or public announcement (directly or indirectly) concerning this Agreement, the Transactions, the Acquired Assets, the Assumed Liabilities, the Purchaser Bid Process or any other matters related thereto or arising in connection therewith without obtaining the prior written approval of Purchaser (which approval will not be unreasonably withheld, conditioned or delayed) unless, (a) in the reasonable judgment of Seller after consultation with counsel (who may be in-house counsel), disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or the Plan or (b) to correct any misstatement of fact made by Purchaser in any communication pursuant to the immediate next sentence; <u>provided</u> that Seller shall use its reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with Purchaser with respect to the disclosure thereof. Following the publication of the Press Release, Purchaser shall be permitted to make one or more public statements or issue one or more press releases, in each case, regarding the Acquired Assets and the Assumed Liabilities, this Agreement, the Transactions and the Purchaser Bid Process or any other matter related thereto or arising therefrom or otherwise in connection therewith to the extent not in violation of the Confidentiality Agreement and not in disparagement of Seller or any Seller Party; <u>provided</u> that Purchaser shall use its reasonable best efforts (considered in light of the circumstances in which such disclosure is to be made) to consult in good faith with Seller prior to making any such disclosure.

10.18 <u>Bulk Sales Laws</u>. The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any Encumbrances in the Acquired Assets including any liens or claims arising out of the bulk transfer laws except Permitted Encumbrances, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Confirmation Order. In furtherance of the foregoing, to the extent permitted by applicable Laws, each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the Transactions.

10.19 <u>Fiduciary Obligations</u>. Nothing in this Agreement, or any document related to the Transactions, will require Seller or any of its managers, officers or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations; <u>provided</u>, <u>however</u>, that no such action or inaction

shall be deemed to prevent Purchaser from exercising any termination rights it may have hereunder as a result of such action or inaction.

10.20   No Solicitation. This Agreement, the Plan and the transactions contemplated herein and therein are the product of negotiations between the Parties. Notwithstanding anything herein to the contrary, this Agreement is not, and shall not be deemed to be, (a) a solicitation of votes for the acceptance of the Plan or any other plan of reorganization for the purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise or (b) an offer for the issuance, purchase, sale, exchange, hypothecation, or other transfer of securities or a solicitation of an offer to purchase or otherwise acquire securities for purposes of the Securities Act or the Exchange Act and Seller will not solicit acceptances of the Plan from any party until such party has been provided with copies of a disclosure statement containing adequate information as required by section 1125 of the Bankruptcy Code.

10.21   Acknowledgment. Notwithstanding anything in this Agreement to the contrary (including Section 3.17, Section 3.18, Section 4.10, Section 4.11, Section 6.17 and Section 10.1), nothing herein shall relieve any Person from any Liability on account of Fraud.

## ARTICLE XI

### ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS

11.1   Certain Definitions.

(a)   "3AC Loan" means that certain Master Loan Agreement, dated March 4, 2022, by and between Three Arrows Capital, Ltd., as borrower, and Seller and HTC Trading, Inc., as lenders, and Seller in its capacity as administrative agent for the lenders.

(b)   "Acquired Coins" means, collectively, all Seller Held Coins (other than Withheld Coins) as of the Rebalancing Date and following the completion of the Rebalancing Exercise in accordance with this Agreement, and after taking into account gas or other transaction fees incurred and paid by Seller in connection with transferring such Coins to Purchaser in accordance with Section 2.4(b).

(c)   "Acquired Coins Value" means, with respect to any Acquired Coin of any type, the VWAP of such Coin determined as of two Business Days prior to the Rebalancing Date, *after taking into account gas or other transaction fees incurred and paid by Seller* **or any of its Affiliates in connection with transferring such Coins to Purchaser in accordance with Section 2.4(b)**.

(d)   "Action" means any action, claim (including a counterclaim, cross-claim, or defense), complaint, summons, suit, litigation, arbitration, third-party mediation, audit, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, hearing, inquiry, inquest, audit, examination, assessment, notice of violation, citation or investigation, of any kind whatsoever (civil, criminal, administrative, regulatory, investigative, appellate or otherwise), regardless of the legal theory under which such Liability or obligation may be sought to be imposed, whether sounding in contract or tort, or

whether at law or in equity, or otherwise under any legal or equitable theory, commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Body.

(e)     "Additional Bankruptcy Distributions" means any distributions proposed to be made by the Debtors or any successor thereto to Users or Eligible Creditors after the Closing Date, whether made pursuant to the Plan (including distributions in cash or Coins) or otherwise.

(f)     "Advisors" means, with respect to any Person, any directors, officers, employees, investment bankers, financial advisors, accountants, agents, attorneys, consultants, or other representatives of such Person.

(g)     "Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

(h)     "Alternative Transaction" means any transaction (or series of transactions), whether direct or indirect, concerning a sale, merger, acquisition, issuance, financing, recapitalization, reorganization, liquidation or disposition of Seller or any of its Affiliates or any portion of the equity interests or any material portion of the assets thereof (in any form of transaction, whether by merger, sale of assets or equity or otherwise).

(i)     **"Asset Migration Date" means, with respect to any User or Eligible Creditor, as applicable, who has satisfied the requirements set forth in Section 6.10 and Section 6.12(b) for onboarding to the Binnace.US Platform, the date that is five (5) Business Days following the date on which Seller has delivered to Purchaser the Acquired Coins or cash to be distributed by Purchaser to such User or Eligible Creditor, as applicable, pursuant to this Agreement.**

(j)     (i)  "Bidding Procedures Order" means the *Order (I) Approving the Bidding Procedures, (II) Scheduling the Bid Deadlines and the Auction, (III) Approving the Form and Manner of Notice Thereof, (IV) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation and (V) Granting Related Relief* [Docket No. 248].

(k)     (j)  "Binance.US Platform" means Purchaser's and its Affiliates' Binance.US Cryptocurrency savings and trading platform or any successor platform thereto.

(l)     **"BUSD" means a Binance branded stablecoin issued by Paxos Trust Company, approved and regulated by the New York State Department of Financial Services.**

    **(m)** ~~(k)~~ "Business Accounts" means any and all accounts or registries that Seller owns, maintains or controls with third party vendors, software providers, service providers and other similar third parties that is related to the businesses of Seller.

    **(n)** ~~(l)~~ "Business Day" means any day other than a Saturday, Sunday or other day on which banks in New York City, New York are authorized or required by Law to be closed.

    **(o)** ~~(m)~~ "Business Software" means any and all proprietary Software owned by (or purported to be owned by) Seller that is related to the businesses of Seller, other than the VGX Token Smart Contracts.

    **(p)** ~~(n)~~ "Cash and Cash Equivalents" means all of Seller's cash (including deposits in transit, demand deposits, money markets or similar accounts), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, security entitlements, securities accounts, commodity Contracts, commodity accounts, government securities, or any other cash equivalents, whether on hand, in transit, in banks or other financial institutions, or otherwise held.

    **(q)** ~~(o)~~ "Code" means the United States Internal Revenue Code of 1986.

    **(r)** ~~(p)~~ "Coin" means, with respect to any type of Cryptocurrency, one coin or token or full unit of such Cryptocurrency (*e.g.*, one (1) Bitcoin; provided that, notwithstanding anything to the contrary herein, for purposes of this Agreement, (i) references to "Coins" shall mean more than one Coin and may include fractional Coins in excess of one (1) Coin, and (ii) as the context requires, "Coin" may refer to a fraction of one (1) Coin.

    **(s)** ~~(q)~~ "Commercial Covenants" means, collectively, Sections 6.6, 6.10, 6.11, 6.12, ~~6.13~~6.12(f), 6.14 and 6.15.

    **(t)** ~~(r)~~ "Confidential Information" means any information relating to the business, financial or other affairs (including future plans and targets) of either Party or any of its Affiliates; provided, however, that "Confidential Information" will not include any information that (i) is or becomes (other than as a result of disclosure by either Party or any of its Affiliates in violation of this Agreement) generally available to, or known by, the public, (ii) is independently developed by a Party or any of its Affiliates without use of or reference to information that would be "Confidential Information" but for the exclusions set forth in this proviso or (iii) is received by a Party or any of its Affiliates from a third party not known by such receiving Party or any of its Affiliates after reasonable inquiry to be bound by a duty of confidentiality to such other Party or any of its Affiliates with respect to such information.

    **(u)** ~~(s)~~ "Confidentiality Agreement" means that certain letter agreement, dated as of August 2, 2022, by and between Parent and BAM Management US Holdings, Inc.

    **(v)** ~~(t)~~ "Confirmation Order" means an Order of the Bankruptcy Court reasonably acceptable to the Parties pursuant to section 1129 of the Bankruptcy Code, which Order shall, among other things and without limitation, (A) confirm the Plan in a form reasonably acceptable to, solely to the extent related to this Agreement and the Transactions (but

not with respect to the matters contemplated by <u>Section 6.11(c)</u>), Purchaser and Seller, as may have been amended, supplemented or otherwise modified, solely to the extent related to this Agreement and the Transactions (but not with respect to the matters contemplated by <u>Section 6.11(c)</u>), with the consent of Purchaser (such consent not to be unreasonably withheld, delayed or conditioned), (B) approve, pursuant to sections 105, 363, 365, 1129, 1141 and 1142 of the Bankruptcy Code, (i) the execution, delivery and performance by Seller of this Agreement, (ii) the sale of the Acquired Assets to Purchaser on the terms set forth herein and free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances), and (iii) the performance by Seller of its obligations under this Agreement, (C) authorize and empower Seller to assume and assign to Purchaser the Assigned Contracts, (D) find that Purchaser is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code, find that Purchaser is not a successor to Seller, and grant Purchaser the protections of section 363(m) of the Bankruptcy Code, (E) find that Purchaser shall have no Liability or responsibility for any Liability or other obligation of Seller arising under or related to the Acquired Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor, or transferee Liability, labor law, de facto merger, or substantial continuity (including under applicable Money Transmitter Requirements or any securities or commodities Laws of any Governmental Body), (F) find that Purchaser has provided adequate assurance (as that term is used in section 365 of the Bankruptcy Code) of future performance in connection with the assumption of the Assigned Contracts, (G) find that Purchaser shall have no Liability for any Excluded Liability, and (H) find that Seller has title to, and the ability to sell, transfer and assign, Acquired Coins and Additional Bankruptcy Distributions, in each case, in accordance with the terms and conditions hereof.

(w) (u) "Consent" means any approval, consent, ratification, permission, waiver or authorization, or an Order of the Bankruptcy Court that deems or renders unnecessary the same.

(x) (v) "Contract" means any contract, indenture, note, bond, lease, sublease, mortgage, agreement, guarantee, or other agreement that is binding upon a Person or its property, in each case, other than a purchase order, service order, sales order or Money Transmitter License.

(y) (w) "Credit Matter" means any loan or other type of credit exposure or loan-like instrument.

(z) (x) "Cryptocurrency" means a digital or crypto currency, asset, token or coin in which transactions are verified and records are maintained by a decentralized system using cryptography, rather than by a centralized authority.

(aa) "Delivery Date" means, with respect to any Delayed Acquired Coin, the date, if any, on which such Delayed Acquired Coin is delivered to Purchaser in accordance with (i) Section 2.4(b)(i), (ii) the last sentence of Section 6.12(a) or (iii) Section 6.12(b), as applicable.

US-DOCS\137411268.27138346099.6

    **(bb)** ~~(y)~~ "Deposited Coins" means, with respect to each User as of the Petition Date, the total number of Coins of each type owed to such User with respect to such User's ~~deposits~~**Coins deposited** on the Voyager Platform as of the Petition Date, as set forth on the Seller Statement.

    **(cc)** ~~(z)~~ "Deposited Coins Value" means, with respect to any Deposited Coin of any type, the ~~VWAP~~**price** of such Coin ~~determined~~ as of **0:00 U.T.C. on** the Petition Date~~.~~**, as set forth under Section 4(m) of the "Global Notes and Overview of Methodology" included in the *Schedule of Assets and Liabilities of Voyager Digital, LLC (Case No. 22-10945)* [Docket No. 7] as filed in the Bankruptcy Court on the docket in the Bankruptcy Case.**

    **(dd)** ~~(aa)~~ "Disclosure Statement" means the disclosure statement for the Plan approved by the Bankruptcy Court pursuant to the Plan Solicitation Order (including all exhibits and schedules thereto).

    **(ee)** ~~(bb)~~ "Documents" means all of Seller's written files, documents, instruments, papers, books, reports, records, accounts, accounting records, financial statements, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies, and documents, Tax Returns, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form.

    **(ff)** ~~(cc)~~ "Encumbrance" means any lien (as defined in section 101(37) of the Bankruptcy Code), encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), charge, mortgage, deed of trust, option, pledge, security interest or similar interests, title defects, hypothecations, easements, servitudes, restrictive covenants, rights of way, rights of use or possession, rights of first offer or first refusal, third party interest, encroachments, Orders, conditional sale or other title retention agreements and other similar impositions, imperfections or defects of title or restrictions on transfer or use.

    **(gg)** ~~(dd)~~ "Environmental Laws" means all applicable Laws concerning pollution or protection of the environment.

    **(hh)** ~~(ee)~~ "Equipment" means any and all equipment, computers, furniture, furnishings, fixtures, office supplies, vehicles and all other fixed assets.

    **(ii)** ~~(ff)~~ "ERISA" means the Employee Retirement Income Security Act of 1974.

    **(jj)** ~~(gg)~~ "ETH Coins" means Ether Coins, being the native Cryptocurrency of the Ethereum Network (symbol: ETH).

US-DOCS\~~137411268.27~~138346099.6

**(kk)**  ~~(hh)~~ "Existing User" means as of a particular date any User for which Seller has provided on or prior to such date all data and information reasonably necessary for Purchaser to validate that such User or any Affiliate of such User has a Cryptocurrency account on the Binance.US Platform.

**(ll)**  ~~(ii)~~ "Exchange Act" means the Exchange Act of 1934 and the rules and regulations promulgated thereunder.

**(mm)**  ~~(jj)~~ "Final Order" means a judgment or Order of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Bankruptcy Case (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending; or (ii) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument, or rehearing shall have expired; <u>provided</u> that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

**(nn)**  ~~(kk)~~ "Fraud" means an act committed by (a) Seller, in the making to Purchaser of the Express Seller Representations and (b) Purchaser, in the making to Seller of the Express Purchaser Representations, in any such case, with intent to (x) deceive the other Party or (y) induce such other party hereto to enter into this Agreement and requires (i) a false representation or warranty of material fact made in such representation; (ii) with knowledge that such representation or warranty is false; (iii) with an intention to induce the party to whom such representation or warranty is made to act or refrain from acting in reliance upon it; (iv) causing that party, in justifiable reliance upon such false representation or warranty, to take or refrain from taking action; and (v) causing such party to suffer damage by reason of such reliance, which together constitutes common law fraud under Delaware Law (and does not include any fraud claim based on constructive knowledge, negligent misrepresentation, recklessness or a similar theory).

**(oo)**  ~~(ll)~~ "GDPR" means the EU General Data Protection Regulation (and any European Union member states' laws and regulations implementing it), and the EU General Data Protection Regulation as it forms part of the United Kingdom ("<u>UK</u>") law by virtue of section 3 of the European Union (Withdrawal) Act 2018 and any applicable implementing or supplementary legislation of the UK (including the UK Data Protection Act 2018).

**(pp)**  ~~(mm)~~ "Governmental Authorization" means any permit, license, certificate, approval, consent, permission, clearance, designation, qualification or authorization

82

issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Law.

(qq) (nn) "Governmental Body" means any government, quasi-governmental entity, or other governmental or regulatory body, commission, agency or political subdivision thereof of any nature, whether foreign, federal, state or local, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court or arbitrator (public or private) of applicable jurisdiction.

(rr) (oo) "Hazardous Substance" means any toxic or hazardous material, substance or waste regulated under any Environmental Laws.

(ss) (pp) "Higher and Better Offer" means a bona fide, written Acquisition Proposal that did not result from Seller's breach of Section 5.1(a) for an Alternative Transaction on terms that the board of directors (or comparable governing body) of Seller determines in good faith, after consultation with its financial advisor and outside legal counsel, (i) constitutes a higher and otherwise better offer for the Debtors' assets and (ii) is reasonably likely to be consummated in accordance with its terms.

(tt) (qq) "IFRS" means the International Financial Reporting Standards.

(uu) (rr) "Intellectual Property" means all intellectual property rights in any jurisdiction throughout the world, including all: (i) patents and patent applications and patent disclosures (including any provisional applications, patents of addition, continuations, continuations-in-part, substitutions, additions, divisionals, confirmations, re-examinations, reissues, revisions and extensions); (ii) trademarks, service marks, trade dress, logos, brand names, corporate names, social media handles, Internet domain names and other indicia of origin, together with all goodwill associated with each of the foregoing; (iii) copyrights and mask works, whether or not registered; (iv) registrations and applications for any of the foregoing; (v) trade secrets; (vi) Software; (vii) drawings, schematics and other technical plans; (viii) rights in data, data collections and databases; (ix) all other intellectual property; and (x) all legal rights arising from items (i) through (ix), including the right to prosecute, enforce and perfect such interests and rights to sue, oppose, cancel, interfere, enjoin and collect damages based upon such interests.

(vv) (ss) "IT Systems" means all of the computer systems, servers, hardware, firmware, middleware, networks, workstations, routers, hubs, switches, circuits, servers, data communications lines and all other information technology equipment, and all associated documentation, in each case, only as necessary to use or operate the Voyager Platform.

(ww) (tt) "Knowledge of Seller" means the actual knowledge without independent verification (and which in no event encompasses constructive, imputed or similar concepts of knowledge) of Stephen Ehrlich, Gerard Hanashe, and Rakesh Gidwani, none of whom, for the sake of clarity and avoidance of doubt, shall have any personal liability or obligations regarding such knowledge.

(xx) (uu) "Knowledge of Purchaser" means the actual knowledge without independent verification (and which in no event encompasses constructive, imputed or similar

US-DOCS\137411268.27138346099.6

concepts of knowledge) of Brian Shroder, Krishna Juvvadi and Abhishek Baid, none of whom, for the sake of clarity and avoidance of doubt, shall have any personal liability or obligations regarding such knowledge.

**(yy)** ~~(vv)~~ "KYC Procedures" means the "know your customer" and "Customer Identification Program" policies, procedures and processes of Purchaser and its Affiliates as in effect from time to time and any equivalent procedures required under, or to comply with, applicable Law, in each case, including with respect to FCPA and any other applicable U.S. or foreign Law concerning anti-corruption, anti-bribery or anti-money laundering and consistent with the same applicable to other customers and users of Binance.US Platform.

**(zz)** ~~(ww)~~ "Law" means any federal, state, provincial, local, municipal, foreign or international, multinational or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, ruling, directive, pronouncement, determination, decision, opinion or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body.

**(aaa)** ~~(xx)~~ "Liability" means, as to any Person, any debt, adverse claim, liability (including any liability that results from, relates to or arises out of tort or any other product liability claim), duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether known or unknown, perfected or unperfected, determined or determinable, disputed or undisputed, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed, at law or in equity or otherwise, including any claims or liability based on successor liability theories or otherwise under any theory of Law or equity, and including all costs and expenses related thereto.

**(bbb)** ~~(yy)~~ "Loan" means any loan made by Seller in the form of Cryptocurrency to counterparties in the cryptocurrency sector; _provided_ that the 3AC Loan shall not be deemed a Loan.

**(ccc)** ~~(zz)~~ "Loan Documents" means all agreements and documents relating to Loans and the 3AC Loan, including security agreements, pledge or collateral agreements, loan agreements, loan policies and manuals.

**(ddd)** ~~(aaa)~~ "Material Adverse Effect" means any matter, event, change, development, occurrence, circumstance, condition, occurrence or effect (each, an "Effect") that, individually or in the aggregate with all other Effects, (x) has had or would reasonably be expected to have a material adverse effect on the Acquired Assets and Assumed Liabilities, taken as whole or (y) has had or would reasonably be expected to have a material adverse effect on the ability of Seller to perform its obligations under this Agreement or any of the Seller Documents or to consummate the Transactions; _provided_ that with respect to clause (x) none of the following shall constitute, or be taken into account in determining whether or not there has been, a Material Adverse Effect: (i) Effects in, arising from or relating to general business or

84

economic conditions affecting the industry in which Seller and its Affiliates operate; (ii) Effects in, arising from or relating to national or international political or social conditions, including tariffs, riots, protests, the engagement by the United States or other country in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military, cyber or terrorist (whether or not state-sponsored) attack upon the United States or any other country, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, asset, Equipment or personnel of the United States or of any other country; (iii) Effects in, arising from or relating to any fire, flood, hurricane, earthquake, tornado, windstorm, other calamity or act of God, global or national health concern, epidemic, pandemic (whether or not declared as such by any Governmental Body), viral outbreak (including "Coronavirus" or "COVID-19" or the worsening thereof) or any quarantine or trade restrictions related thereto or any other *force majeure*; (iv) Effects in, arising from or relating to financial, banking, securities or Cryptocurrency markets (including (A) any disruption of any of the foregoing markets, (B) any change in currency exchange rates, (C) any decline or rise in the price of any security, commodity, Contract, Cryptocurrency or index and (D) any increased cost, or decreased availability, of capital or pricing or terms related to any financing for the Transactions); (v) Effects in, arising from or relating to changes in, IFRS or the interpretation thereof; (vi) Effects in, arising from or relating to changes in, Laws or other binding directives or determinations issued or made by or agreements with or consents of any Governmental Body; (vii) Effects in, arising from or relating to (A) the taking of any action contemplated by this Agreement or at the written request of Purchaser or its Affiliates, (B) the failure to take any action if such action is expressly prohibited by this Agreement, (C) Purchaser's failure to consent to any of the actions restricted in Section 6.1, (D) the negotiation, announcement or pendency of this Agreement or the Transactions, the identity, nature or ownership of Purchaser or Purchaser's plans with respect to the Acquired Assets and Assumed Liabilities, including the impact thereof on the relationships, contractual or otherwise, of the business of Seller with employees, customers, lessors, suppliers, vendors or other commercial partners or litigation arising from or relating to this Agreement or the Transactions; (viii) any failure, in and of itself, to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items (whether or not shared with Purchaser or its Affiliates or Advisors) (but, for the avoidance of doubt, not the underlying causes of any such failure to the extent such underlying causes is not otherwise excluded from the definition of Material Adverse Effect); (ix) the Effect of any action taken by Purchaser or its Affiliates with respect to the Transactions or any breach by Purchaser of this Agreement or the matters set forth on Schedule ~~11.1(aaa)~~11.1(aaa); or (x)(A) the commencement or pendency of the Bankruptcy Case, (B) any objections in the Bankruptcy Court to (1) this Agreement or any of the Transactions or thereby, (2) the Agreement Order, the Confirmation Order, the Plan, or the reorganization of Seller, (3) the Bidding Procedures Order or (4) the assumption or rejection of any Assigned Contract, or (C) any Order of the Bankruptcy Court or any actions or omissions of Seller in compliance therewith; except in the case of clauses (i), (ii), (iii), (iv), (v) and (vi), to the extent such Effects have a materially disproportionate impact on the Acquired Assets and Assumed Liabilities, taken as a whole, as compared to other participants engaged in the business in which Seller operates.

(eee) ~~(bbb)~~ "Moelis" means Moelis & Company LLC, a Delaware limited liability company.

(fff) (ccc) "Money Transmitter License" means any consent, license, certificate, franchise, permission, variance, clearance, registration, qualification, authorization, waiver, exemption or other permit issued, granted, given or otherwise made available by or under the authority of any Governmental Body pursuant to state money transmission or similar Laws.

(ggg) (ddd) "Money Transmitter Requirements" shall mean any and all Law or Contract with a Governmental Body relating or pertaining to the business of transmitting or remitting money, monetary value or virtual currency, electronic funds transfers, remittances, issuing or selling stored value, prepaid access or the like, issuing or selling payment instruments, the custody, transfer or exchange of money, monetary value or virtual currency, or any similar payment or money services, including those related to money, monetary value, or Cryptocurrency.

(hhh) (eee) "Net Owed Coins" means, with respect to each User and each type of such User's Post-Rebalancing Coins, a number of Coins of such type equal to the total number of such User's Post-Rebalancing Coins of such type. For the avoidance of doubt, except as the context may otherwise require, references to Net Owed Coins in this Agreement relating to payments to any User or credits thereof to any User shall be deemed to be the sum of all Net Owed Coins with respect to each type of Post-Rebalancing Coin of such User. Notwithstanding the foregoing, in the event that there is a Rebalancing Exercise Delta for any type of Coin, then (i) Purchaser shall convert any excess Acquired Coins of any type into USDC or United States Dollars at the then-prevailing rates (including applicable fees, spreads, costs and expenses) on the Binance.US Platform, and (ii) Purchaser shall distribute the amounts resulting from such conversions to User accounts with respect to Net Owed Coins where the aggregate number of Net Owed Coins exceeds the number of Acquired Coins, pro rata based on the then-prevailing prices (including applicable fees, spreads, costs and expenses) for all such Net Owed Coins on the Binance.US Platform owed to any such User.

(iii) (fff) "Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body, whether preliminary, interim, temporary or final, including any order entered by the Bankruptcy Court in the Bankruptcy Case (including the Confirmation Order) or any other court.

(jjj) (ggg) "Ordinary Course" means the ordinary and usual course of operations of the business of Seller consistent with past practice and taking into account the contemplation, commencement and pendency of the Bankruptcy Case.

(kkk) (hhh) "Permitted Encumbrances" means (i) Encumbrances for utilities and Taxes not yet due and payable, being contested in good faith, or the nonpayment of which is permitted or required by the Bankruptcy Code, (ii) customary easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the Acquired Assets which do not, individually or in the aggregate, adversely affect the use, ownership or operation of the Acquired Assets, (iii) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens incurred in the Ordinary Course for amounts not yet due and payable, being contested in good faith, (iv) licenses granted on a non-exclusive basis, (v) such other Encumbrances or title

86

exceptions which do not, individually or in the aggregate, materially affect the operation, value or condition of the Acquired Assets, (vi) any Encumbrances set forth on Schedule ~~11.1(hhh)~~11.1(hhh), or (viii) any Encumbrances that will be removed or released by operation of the Confirmation Order or the Plan.

       **(lll)**   ~~(iii)~~ "Permitted Post-Closing Lien" means, with respect to the Acquired Assets (a) Encumbrances described in clause (ii) in the definition of "Permitted Encumbrances" and any non-monetary encumbrances not in fact released upon Closing pursuant to Confirmation Order or Plan, as applicable; provided that with respect to all Encumbrances that are "Permitted Post-Closing Liens" pursuant to this clause (a), such Encumbrances do not materially detract from the use or value of the applicable property as it is currently being used, and (b) other Permitted Encumbrances described in clauses (i), (iii), (iv) and (v) in the definition of "Permitted Encumbrances" securing monetary obligations which, individually or in the aggregate with all other Permitted Encumbrances treated as Permitted Post-Closing Liens pursuant to this clause (b), do not exceed $10,000.

       **(mmm)**   ~~(jjj)~~ "Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, organization, estate, Governmental Body or other entity or group.

       **(nnn)**   ~~(kkk)~~ "Personal Information" means information, in any form, that identifies, relates to, describes, could be used to locate or contact, is capable of being associated with, or could be linked, directly or indirectly, to, a natural Person, device or household, or is otherwise considered "personally identifiable information," "personal information," "personal data," "nonpublic personal information," or any similar term by any applicable Laws or Privacy Law.

       **(ooo)**   ~~(lll)~~ "Plan" means a plan of reorganization prepared by Seller and solely to the extent related to this Agreement (but not with respect to the matters contemplated by Section 6.11(c)) and the Transactions, approved by Purchaser in its reasonable discretion, and attached as an Exhibit to this Agreement by amendment hereto as promptly as practicable, implementing the Transactions.

       **(ppp)**   ~~(mmm)~~ "Plan Solicitation Motion" means Seller's motion for an Order (which solely with respect to matters relating to this Agreement and the Transactions, shall be in form and substance reasonably acceptable to Purchaser), (i) approving the Disclosure Statement (including approving the Disclosure Statement as containing "adequate information" (as that term is used by section 1125 of the Bankruptcy Code)), (ii) establishing a voting record date for the Plan, (iii) approving solicitation packages and procedures for the distribution thereof, (iv) approving the forms of ballots, (v) establishing procedures for voting on the Plan, (vi) establishing notice and objection procedures for the confirmation of the Plan and (vii) establishing procedures for the assumption or assignment of executory contracts and unexpired leases under the Plan.

       **(qqq)**   ~~(nnn)~~ "Plan Solicitation Order" means an Order entered by the Bankruptcy Court, substantially in the form attached to the Plan Solicitation Motion, which Order shall, among other things, (A) be in form and substance reasonably acceptable to

87

Purchaser (solely with respect to matters relating to this Agreement and the Transaction), and (B) approve the relief sought in the Plan Solicitation Motion, including approving of (i) the Disclosure Statement on a conditional basis and (ii) the procedures for solicitation of votes to accept or reject the Plan.

(rrr) (ooo) "Plan Supplement" has the meaning set forth in the Plan.

(sss) (ppp) "Post-Petition Coins" means Coins that were deposited with the Debtors following the Petition Date.

(ttt) (qqq) "Post-Rebalancing Coins" means, with respect to each User as of the Rebalancing Date and each type of such User's Deposited Coins, (i) the total a number of such User's Deposited Coins of such type, multiplied by (ii) such that the Acquired Coins Value of such Coins divided by the Deposited Coins Value of such Coins is equal to the Rebalancing Ratio, as set forth on the Seller Statement.

(uuu) (rrr) "Pre-Closing Tax Period" means any taxable period ending on or before the Closing Date and the portion of any Straddle Period ending on the Closing Date.

(vvv) (sss) "Privacy Laws" means all applicable Laws and legally binding self-regulatory guidelines or standards, in each case as amended, consolidated, re-enacted or replaced from time to time, relating to the privacy, security, or Processing of Personal Information, data breach notification, website and mobile application privacy policies and practices, Processing and security of payment card information, and email, text message, or telephone communications, including (to the extent applicable to the business of Seller): the Federal Trade Commission Act; the Gramm-Leach-Bliley Act; the Telephone Consumer Protection Act; the Telemarketing and Consumer Fraud and Abuse Prevention Act; the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003; the California Consumer Privacy Act; the Computer Fraud and Abuse Act; the Payment Card Industry Data Security Standards; the GDPR; and the EU e-Privacy Directive 2002/58/EC as amended by Directive 2009/136/EC (and any European Union member states' laws and regulations implementing it).

(www) (ttt) "Process", "Processed" or "Processing" means any operation or set of operations which is performed on Personal Information, such as the use, collection, processing, storage, recording, organization, adaption, alteration, transfer, retrieval, consultation, disclosure, dissemination or combination of such Personal Information, or is otherwise considering "processing" by any applicable Privacy Laws.

(xxx) (uuu) "Purchaser Development" means any of the following, first occurring after the date hereof and prior to the Closing: (i) the filing of a criminal complaint against, or indictment of, Purchaser or any of its executive officers or "C-suite" officers (including any chief risk officer or chief compliance officer) by the United States Department of Justice, (ii) the filing of a criminal complaint against, or indictment of, any of Purchaser's Affiliates or any of their executive officers or "C-suite" officers (including any chief risk officer or chief compliance officer) by the United States Department of Justice or (iii) the commencement of any criminal or regulatory (including at the appellate level) suit, litigation,

legal proceeding or prosecution by the United States Department of Justice against any of the Persons described in clauses (i) and (ii), (A) in each case of clauses (i), (ii) and (iii) that relate to the operation of the Binance.US platform and wallet custody business of Purchaser and its Subsidiaries or the business of such Affiliate or the ability of such Affiliate to provide Purchaser and its Subsidiaries with the licensed software and support services necessary to operate the Binance.US Platform; and (B) in each case of clauses (ii) and (iii), that, individually or in the aggregate, would reasonably be expected to (1) prevent or materially impair or materially delay the ability of Purchaser to consummate the Transactions in accordance herewith or (2) materially and adversely affect the Users, Eligible Creditors or the Acquired Coins, in each case in a manner that would prevent Purchaser from performing its obligations under Section 6.12 or otherwise following the Closing.

(yyy) ~~(vvv)~~ "Purchaser Group" means Purchaser, any former, current or future Affiliate of Purchaser and each of their respective former, current or future Affiliates, officers, directors, employees, partners, members, managers, agents, Advisors, successors or permitted assigns.

(zzz) ~~(www)~~ "Rebalancing Exercise Delta" means, with respect to any Acquired Coin, the percentage by which the number of Acquired Coins is higher or lower than the number of Acquired Coins which would be required to cause the number of Acquired Coins to be in full compliance with the Rebalancing Ratio.

(aaaa) ~~(xxx)~~ "Rebalancing Ratio" means, with respect to any type of Acquired Coin, a fraction, expressed as a percentage, (i) the numerator of which is the Total Acquired Coins Value, and (ii) the denominator of which is the Total Deposited Coins Value; provided that in no event will the Rebalancing Ratio be greater than 100% and for the avoidance of doubt, the Rebalancing Ratio shall be calculated following the completion of the Rebalancing Exercise and after taking into account gas or other transaction fees incurred and paid by Seller in connection with transferring Coins to Purchaser in accordance with Section 2.4(b).

(bbbb)~~(yyy)~~ "Retained Avoidance Action" means any preference or avoidance claim, right or cause of action under Chapter 5 of the Bankruptcy Code or any analogous state law claim against (i) Three Arrows Capital, Ltd. or any of its Affiliates, (ii) any insider as defined in the Bankruptcy Code, (iii) any other such claim, right or cause of action that Purchaser agrees in writing prior to the Closing may be retained by the Debtors, (iv) any person for an actual fraudulent transfer, and (v) West Realm Shires Inc., Alameda Ventures Ltd., or any of their Affiliates.

(cccc) ~~(zzz)~~ "Sanctioned Person" means any Person that is the target of Sanctions, including (a) any Person listed in any Sanctions-related list of designated Persons maintained by the OFAC or the U.S. Department of State, the United Nations Security Council, the European Union, any Member State of the European Union, or the United Kingdom (irrespective of its status vis-à-vis the European Union); (b) any Person operating, organized, or resident in a country or territory that is itself the target of comprehensive Sanctions (as of the date of this Agreement, Cuba, Iran, North Korea, Syria, the Crimea region of Ukraine, the so-called Donetsk People's Republic, and the so-called Luhansk People's Republic) ("Sanctioned Country"); (c) the government of a Sanctioned Country or the Government of

89

Venezuela; or (d) any Person 50% or more owned or controlled by any such Person or Persons or acting for or on behalf of such Person or Persons.

**(dddd)** ~~(aaaa)~~ "Securities Act" means the Securities Act of 1933 and the rules and regulations promulgated thereunder.

**(eeee)** ~~(bbbb)~~ "Security Incident" means any actual or suspected unauthorized access to, or acquisition, modification, use, destruction, loss or disclosure of any Personal Information maintained by or on behalf of Seller or its Affiliates.

**(ffff)** ~~(cccc)~~ "Seller Expense Cap" means an amount equal to either (a) if Purchaser elects to extend the Outside Date to the Extended Outside Date pursuant to Section 8.1(c), $15,000,000 or (b) if Purchaser does not so elect to extend the Outside Date, $10,000,000.

**(gggg)** ~~(dddd)~~ "Seller Expense Start Date" means the date that is three months following the date of this Agreement.

**(hhhh)** ~~(eeee)~~ "Seller Held Coins" means, without duplication, as of any date of determination, all Coins that are directly or indirectly owned or held by, or attributable to, Seller or any of its Affiliates who are Debtors (including, for the avoidance of doubt, all Coins repaid to Seller or any of its Affiliates who are Debtors at or prior to the Closing in respect of Loans (including in respect of any principal, interest, fees, expenses and penalties thereunder and including for this purpose, the 3AC Loan), including all Coins held by or on behalf of Seller or any of its Affiliates who are Debtors in respect of User accounts on the Voyager Platform), except for any Coins constituting collateral under the 3AC Loan and except any Post-Petition Coins, which for the avoidance of doubt, shall not be included in the Rebalancing Exercise or any other Transactions.

**(iiii)** ~~(ffff)~~ "Seller Intellectual Property" means all Intellectual Property owned or purported to be owned by Seller that is an Acquired Asset.

**(jjjj)** ~~(gggg)~~ "Seller Parties" means Seller, its former, current, or future Affiliates and the former, current or future officers, directors, employees, partners, members, equityholders, controlling or controlled Persons, managers, agents, Advisors, successors or permitted assigns of the foregoing.

**(kkkk)** ~~(hhhh)~~ "Seller Plan" means each (i) employee welfare benefit plan within the meaning of Section 3(1) of ERISA (whether or not subject to ERISA), (ii) employee pension benefit plan within the meaning of Section 3(2) of ERISA (whether or not subject to ERISA), (iii) stock option, stock purchase, stock appreciation right or other equity or equity-based agreement, program or plan, (iv) employment, individual consulting, severance or retention agreement or (v) bonus, incentive, deferred compensation, profit-sharing, retirement, post-termination health or welfare, vacation, severance or termination pay, fringe or any other compensation or benefit plan, program, policy, Contract, agreement or other arrangement, in each case that is sponsored, maintained or contributed to by Seller or Holdings or to which Seller

US-DOCS\~~137411268.27~~138346099.6

or Holdings is obligated to contribute or with respect to which Seller or Holdings has any Liability.

(llll) (iiii) "Software" means any and all computer programs and other software in any form or format, including firmware, middleware, software implementations of algorithms, models and methodologies, whether in source code, object code or other form, including libraries, frameworks, software development kits (SDKs), application programming interfaces (APIs), subroutines, toolsets, procedures, and other components thereof.

(mmmm) (jjjj) "Straddle Period" means any taxable period that includes but does not end on the Closing Date.

(nnnn)(kkkk) "Subsidiary" or "Subsidiaries" means, with respect to any Person, any corporation of which a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person or a combination thereof or any partnership, association or other business entity of which a majority of the partnership or other similar ownership interest is at the time owned or controlled, directly or indirectly, by such Person or one or more Subsidiaries of such Person or a combination thereof.

(oooo)(llll) "Subject Transaction" means (a) a transaction or series of transactions with respect to the Rebalancing Exercise that involves a series of transactions or other actions that are (or are to be) executed with a Person or group of coordinated Persons that are intended to effectuate the Rebalancing Exercise or (b) the planning or negotiation of such transaction or series of transactions, or consulting with respect thereto and, for the avoidance of doubt, does not include individual trades of Coins by Seller that are not intended to effectuate the Rebalancing Exercise or that are components of Subject Transactions that are the subject of a Transaction Notice or any such transactions with respect to Coins that do not trade on the Binance.US Platform as of the date of the proposed Subject Transaction.

(pppp)(mmmm) "Tax" or "Taxes" means any federal, state, local, foreign or other taxes, charges, fees or other assessments, including income, gross receipts, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, escheat and unclaimed property, ad valorem, personal property, stamp, excise, occupation, sales, use, transfer, value added, import, export, alternative or add-on minimum or estimated tax, charge or assessment of any kind in the nature of (or similar to) taxes, including any interest, penalty or addition thereto, whether disputed or not.

(qqqq)(nnnn) "Tax Return" means any return, claim for refund, report, statement or information return relating to Taxes filed or required to be filed with a Governmental Body, including any schedule or attachment thereto, and including any amendments thereof.

(rrrr) (oooo) "Total Acquired Coins Value" means the aggregate Acquired Coins Value with respect to all Acquired Coins of each type (excluding Withheld Coins).

US-DOCS\137411268.27138346099.6

(ssss) ~~(pppp)~~ "Total Deposited Coins Value" means the aggregate Deposited Coins Value with respect to all Deposited Coins of each type.

(tttt) ~~(qqqq)~~ "Transactions" means the transactions contemplated by this Agreement or the Plan, as applicable.

(uuuu) ~~(rrrr)~~ "Unsupported Coin" means any Coin, for which Purchaser or its Affiliates does not provide trading services on the Binance.US Platform.

(vvvv) ~~(ssss)~~ "User" means any Person located and having a home address in the United States that had a Cryptocurrency account on the Voyager Platform as of the Petition Date; provided that, if a Person has multiple Cryptocurrency accounts on the Voyager Platform, such Person shall constitute a single User and all accounts of such User shall be aggregated for purposes of this Agreement.

~~(tttt) "User Migration Preparation" means, collectively, (i) the completion of the transfer of all Acquired User Data (including, for the avoidance of doubt, any "know your customer" information of the Users) and integration thereof on Purchaser's and its Affiliates' information technology systems and the Binance.US Platform, and (ii) the completion of the other items identified in the Integration Plan as being required for accounts to be opened for Users on the Binance.US Platform.~~

~~(uuuu) "User Asset Migration Date" means the date that is four (4) weeks following the date of completion of the User Migration Preparation; provided that the completion of the User Migration Preparation shall not occur prior to the Closing Date.~~

(wwww) ~~(vvvv)~~ "VGX Token Smart Contracts" means any "smart contracts" related to the VGX token, together with any private keys related solely to such "smart contracts."

(xxxx) ~~(wwww)~~ "Voyager Platform" means Seller's proprietary Cryptocurrency savings and trading platform (including any website or desktop or mobile application with respect thereto).

(yyyy) ~~(xxxx)~~ "VWAP" means, with respect to any type of Coin and as of any date of determination, an amount equal to the volume weighted average price in U.S. dollars for such type of Coin for the consecutive 24-hour period immediately prior to 8:00 a.m. New York Time on such date of determination, as reported on https://coinmarketcap.com.

11.2    Index of Defined Terms.

| | |
|---|---|
| Acquired Assets ... 1 | Amended Disclosure Statement ... ~~27~~28 |
| Acquired Information ... 2 | Anti-Money Laundering Laws ... ~~17~~18 |
| Acquired User Data ... 2 | Assigned Contracts ... 3 |
| Acquired Voyager Claims ... 2 | Assignment and Assumption |
| Acquisition Proposal ... ~~26~~27 | Agreement ... 10 |
| Agreement ... 1 | Assumed Liabilities ... 5 |
| Agreement Order ... ~~25~~26 | Authentication Credentials ... 14 |

US-DOCS\~~137411268.27~~138346099.6

Balance Sheet Date 13
Bankruptcy Case 1
Bankruptcy Code 1
Bankruptcy Court 1
Cash Payment 8
Chosen Courts ~~68~~70
Closing ~~9~~10
Closing Date 10
Closing Date Payment ~~8~~9

**Covered Matters** ~~2~~9

Credited Additional Bankruptcy
  Distributions ~~49~~50
CSA ~~11~~12
Cure Costs 5
Dataroom ~~21~~22
Debtors 1
**Delayed Acquired Coins** **10**
Deposit 9
**Distribution Agent Termination
  Event** **51**
**Distribution Agent Termination
  Notice** **51**
DPA 18
Eligible Creditor ~~42~~43
Enforceability Exceptions ~~12~~13
Environmental Permits ~~18~~19
Escrow Account 9
Escrow Agent 9
Excluded Assets 3
Excluded Contracts 3
Excluded Documents 3
Excluded Liabilities 6
Express Purchaser Representations ~~24~~25
Express Seller Representations ~~21~~22
Extended Outside Date ~~57~~59
FCPA 17
Filed CSA Documents ~~11~~12
Financial Statements 13
Fundamental Representations ~~56~~58
Higher Offer Determination Notice 27
Holdings 1
Indebtedness ~~30~~31
Information Presentation ~~21~~22
Integration Plan ~~41~~42
Leased Real Property 15

Liquidation ~~54~~56
Material Contract 15
OFAC ~~17~~18
Outside Date ~~57~~59
Parent 1
Parties 1
Party 1

**Paul Hastings** ~~29~~

Petition Date 1
Petitions 1
Post-Bankruptcy Statement ~~49~~50
Pre-Closing Data Transfer ~~38~~39
Press Release ~~69~~72
Privacy Requirements ~~19~~20
Projections ~~51~~54
Purchase Price 8
Purchaser 1
Purchaser Bid Process ~~55~~57
Purchaser Default Termination 9
Purchaser Expenses ~~54~~57
Rebalancing Date ~~43~~44
Rebalancing Exercise ~~43~~44
Relevant Tax Return ~~62~~65
Reverse Termination Fee ~~60~~62
Sanctions ~~17~~18
Seller 1
Seller Contractors 34
Seller Documents 12
Seller Employees 34
Seller Expenses ~~53~~56
Seller Income Tax Return ~~62~~64
Seller Marks ~~39~~40
Seller Registered IP ~~18~~19
Seller Statement ~~44~~45
Solvent ~~24~~25
Staked Coins ~~14~~15
Successor Liabilities ~~29~~30
Trademark and Domain Name
  Assignment Agreement ~~10~~11
Transaction Notice ~~43~~44
Transaction Offer Notice ~~43~~44
Transaction-Related Action ~~62~~64
Transfer Taxes ~~61~~64
Unsupported Jurisdiction ~~45~~47
Unsupported Jurisdiction Approvals ~~22~~23

US-DOCS\~~137411268.27~~138346099.6

Voyager User Accounts................................2   WARN Act................................35
                                                     Withheld Coins...........................9

11.3    Rules of Interpretation. Unless otherwise expressly provided in this Agreement, the following will apply to this Agreement, the Schedules and any other certificate, instrument, agreement or other document contemplated hereby or delivered hereunder.

(a)    Accounting terms which are used but not otherwise defined in this Agreement have the respective meanings given to them under IFRS as in effect on the date hereof or for the period with respect to which such principles are applied, consistently applied. To the extent that the definition of an accounting term defined in this Agreement is inconsistent with the meaning of such term under IFRS, the definition set forth in this Agreement will control.

(b)    The terms "hereof," "herein" and "hereunder" and terms of similar import are references to this Agreement as a whole and not to any particular provision of this Agreement. Section, clause, schedule and exhibit references contained in this Agreement are references to sections, clauses, schedules and exhibits in or to this Agreement, unless otherwise specified. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(c)    Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." Where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or."

(d)    The words "to the extent" shall mean "the degree by which" and not "if."

(e)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day.

(f)    Words denoting any gender will include all genders, including the neutral gender. Where a word is defined herein, references to the singular will include references to the plural and vice versa.

(g)    The word "will" will be construed to have the same meaning and effect as the word "shall". The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive.

(h)    All references to "$" and dollars will be deemed to refer to United States currency unless otherwise specifically provided.

US-DOCS\137411268.27138346099.6

(i)        All references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(j)        Any document or item will be deemed "delivered," "provided" or "made available" by Seller, within the meaning of this Agreement, if such document or item is included in the Dataroom at least one (1) Business Day prior to the date hereof.

(k)        Any reference to any agreement or Contract will be a reference to such agreement or Contract, as amended, modified, supplemented or waived.

(l)        Any reference to any particular Code section or any Law will be interpreted to include any amendment to, revision of or successor to that section or Law regardless of how it is numbered or classified; underlined provided that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance, with any Code section or Law, the reference to such Code section or Law means such Code section or Law as in effect at the time of such violation or non-compliance or alleged violation or non-compliance.

(m)        A reference to any party to this Agreement or any other agreement or document shall include such party's successors and permitted assigns. **References to Seller after the Plan Effective Date (as defined in the Plan) shall be deemed to include the Wind-Down Trust (as defined in the Plan) and the Wind-Down Debtor (as defined in the Plan) in respect of Seller.**

*(Signature pages follow.)*

US-DOCS\137411268.27138346099.6

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**BAM TRADING SERVICES INC. D/B/A BINANCE.US**

By: _____
Name:
Title:

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**VOYAGER DIGITAL, LLC**

By: _____

Name:

Title:

## EXHIBIT A

**FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

(See attached.)

## EXHIBIT B

**FORM OF TRADEMARK AND DOMAIN NAME ASSIGNMENT AGREEMENT**

(See attached.)

**Exhibit B**

**Redline**

THE DEBTORS ARE NOT CURRENTLY SOLICITING VOTES ON A CHAPTER 11 PLAN.  THIS DISCLOSURE STATEMENT REMAINS SUBJECT TO APPROVAL BY THE BANKRUPTCY COURT.

THE DEBTORS WILL SEEK APPROVAL OF THE DISCLOSURE STATEMENT AT A HEARING ON JANUARY 10, 2023, OR SUCH OTHER DATE AS DETERMINED BY THE BANKRUPTCY COURT.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**SECOND AMENDED DISCLOSURE STATEMENT RELATING TO**
**THE THIRD AMENDED JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND**

**ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:       (212) 446-4900

---

[1]    The debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital, Ltd. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

## TABLE OF CONTENTS

| | | | Page |
|---|---|---|---|
| **IMPORTANT INFORMATION REGARDING THIS DISCLOSURE STATEMENT** | | | 1 |
| **I.** | **INTRODUCTION** | | 7 |
| **II.** | **PRELIMINARY STATEMENT** | | 7 |
| | A. | The Sale Transaction. | 7 |
| | B. | The FTX Collapse. | 9 |
| **III.** | **BACKGROUND** | | 10 |
| **IV.** | **QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN** | | 12 |
| | A. | What is chapter 11? | 12 |
| | B. | Why are the Debtors sending me this Disclosure Statement? | 12 |
| | C. | Am I entitled to vote on the Plan? | 12 |
| | D. | What will I receive from the Debtors if the Plan is consummated? | 13 |
| | E. | What will I receive from the Debtors if I hold an Allowed Administrative Claim? | 19 |
| | F. | What is the "toggle" feature of the Plan? | 20 |
| | G. | How will my Account be transitioned to Binance.US? | 20 |
| | H. | What if I am unable or unwilling to transition my Account to Binance.US? | 20 |
| | I. | What are the sources of Consideration and other consideration required to fund the Plan? | 20 |
| | J. | Are any regulatory approvals required to consummate the Sale Transaction and confirm the Plan? | 21 |
| | K. | How will I receive my recovery as an Account Holder if the Sale Transaction is not consummated? | 22 |
| | L. | What happens to my recovery if the Plan is not confirmed or does not go effective? | 22 |
| | M. | If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation"? | 22 |
| | N. | Is there potential litigation related to the Plan? | 22 |
| | O. | Does the Plan provide for the subordination of any Claims? | 22 |
| | P. | Will there be releases and exculpation granted to parties in interest as part of the Plan? | 23 |
| | Q. | What is the deadline to vote on the Plan? | 24 |
| | R. | How do I vote for or against the Plan? | 25 |
| | S. | Why is the Bankruptcy Court holding a Confirmation Hearing? | 25 |
| | T. | When is the Confirmation Hearing set to occur? | 25 |
| | U. | What is the purpose of the Confirmation Hearing? | 25 |
| | V. | What is the effect of the Plan on the Debtors' ongoing business? | 25 |
| | W. | What steps did the Debtors take to evaluate alternatives to a chapter 11 filing? | 25 |
| | X. | Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan? | 26 |
| **V.** | **THE DEBTORS' PLAN** | | 26 |
| | A. | The Plan. | 26 |
| | B. | The Plan Toggle. | 33 |
| | C. | Means for Implementation of the Plan. | 37 |
| **VI.** | **THE DEBTORS' BUSINESS OPERATIONS AND CAPITAL STRUCTURE** | | 40 |
| | A. | The Debtors' Corporate Structure and History. | 40 |
| | B. | The Debtors' Assets and Operations. | 41 |
| | C. | The Debtors' Capital Structure. | 44 |

| VII. | EVENTS LEADING TO THESE CHAPTER 11 CASES | 47 |
|---|---|---|
| | A. Market and Industry-Specific Challenges. | 47 |
| | B. The Alameda Loan. | 55 |
| | C. Retention of Restructuring Advisors and Initial Third-Party Outreach. | 56 |
| | D. Governance Initiatives. | 56 |
| | E. Voyager's Decision to Commence these Chapter 11 Cases. | 56 |
| VIII. | EVENTS OF THE CHAPTER 11 CASES | 57 |
| | A. The Stand-Alone Plan. | 57 |
| | B. First and Second Day Relief and Other Case Matters. | 57 |
| | C. Appointment of Unsecured Creditors' Committee. | 59 |
| | D. Schedules and Statements. | 59 |
| | E. Bar Date Motion. | 59 |
| | F. The FBO Motion. | 60 |
| | G. The 3AC Liquidation Proceeding. | 61 |
| | H. Litigation Matters. | 61 |
| | I. The Coinify Sale. | 64 |
| | J. The Key Employee Retention Plan. | 64 |
| | K. Canadian Recognition Proceeding. | 64 |
| | L. The Unwind Motion. | 65 |
| | M. The Request for Appointment of an Equity Committee. | 65 |
| | N. The Post-Petition Sale Process and the Collapse of FTX. | 65 |
| | O. The Special Committee Investigation. | 68 |
| IX. | RISK FACTORS | 69 |
| | A. Risks Related to the Restructuring. | 69 |
| | B. Risks Related to Recoveries under the Plan. | 72 |
| | C. Disclosure Statement Disclaimer. | 73 |
| | D. Miscellaneous Risk Factors and Disclaimers. | 74 |
| X. | SOLICITATION AND VOTING PROCEDURES | 80 |
| | A. Classes Entitled to Vote on the Plan. | 80 |
| | B. Votes Required for Acceptance by a Class. | 80 |
| | C. Certain Factors to Be Considered Prior to Voting. | 80 |
| | D. Classes Not Entitled To Vote on the Plan. | 81 |
| | E. Solicitation Procedures. | 81 |
| | F. Voting Procedures. | 82 |
| | G. Voting Tabulation. | 83 |
| | H. Ballots Not Counted. | 84 |
| XI. | CONFIRMATION OF THE PLAN | 84 |
| | A. Requirements of Section 1129(a) of the Bankruptcy Code. | 84 |
| | B. Best Interests of Creditors—Liquidation Analysis. | 85 |
| | C. Feasibility. | 86 |
| | D. Acceptance by Impaired Classes. | 86 |
| | E. Confirmation without Acceptance by All Impaired Classes. | 87 |
| XII. | CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN | 88 |
| | A. Introduction. | 88 |
| | B. Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors. | 89 |
| | C. Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims Entitled to Vote. | 90 |

**XIII.    RECOMMENDATION OF THE DEBTORS**................................................................................**97**

**EXHIBITS**

EXHIBIT A      Plan

EXHIBIT B      Liquidation Analysis

EXHIBIT C      Frequently Asked Questions & Answers

EXHIBIT D      The Asset Purchase Agreement

**IMPORTANT INFORMATION REGARDING THIS DISCLOSURE STATEMENT**

DISCLOSURE STATEMENT, DATED JANUARY 1~~0~~3, 2023

**SOLICITATION OF VOTES TO ACCEPT OR REJECT THE THIRD AMENDED
JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND
ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**YOU ARE RECEIVING THIS DOCUMENT AND THE ACCOMPANYING MATERIALS BECAUSE AS
OF THE VOTING RECORD DATE, YOU HELD A CLAIM AGAINST THE DEBTORS IN ONE OF THE
FOLLOWING VOTING CLASSES AND THEREFORE YOU ARE ENTITLED TO VOTE ON THE PLAN:**

| VOTING CLASSES | NAME OF CLASS UNDER THE PLAN |
|:---:|:---:|
| 3 | Account Holder Claims |
| 4A | OpCo General Unsecured Claims |
| 4B | HoldCo General Unsecured Claims |
| 4C | TopCo General Unsecured Claims |

| DELIVERY OF BALLOTS |
|---|
| 1.     Ballots must be actually received by Stretto, Inc. ("Stretto" or the "Claims, Noticing, and Solicitation Agent") before the Voting Deadline (4:00 p.m., prevailing Eastern Time, on February 22, 2023). |
| 2.     Ballots may be returned by the following methods:<br><br>     a)   For Holders of Account Holder Claims: via electronic submission through the Claims, Noticing, and Solicitation Agent's online voting portal at https://cases.stretto.com/Voyager/balloting.<br><br>     b)   For Holders of General Unsecured Claims: (i) via electronic submission through the Claims, Noticing, and Solicitation Agent's online voting portal at https://cases.stretto.com/Voyager/balloting; (ii) in the enclosed pre-paid, pre-addressed return envelope; or (iii) via first class mail, overnight courier, or hand delivery to the address set forth below:<br><br> Voyager Ballot Processing<br>c/o Stretto<br>410 Exchange, Suite 100<br>Irvine, CA 92602 <br><br>If you have any questions on the procedures for voting on the Plan, as defined herein, please contact the Claims, Noticing, and Solicitation Agent by emailing voyagerinquiries@stretto.com and referencing "In re Voyager – Solicitation Inquiry" in the subject line, or by calling (855) 473-8665 (Toll-Free) or (949) 271-6507 (International). |

**IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT**

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE THIRD AMENDED JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE IX HEREIN. IN THE EVENT OF ANY INCONSISTENCIES BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE PLAN SHALL GOVERN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE DEBTORS' CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND THEIR FUTURE RESULTS AND OPERATIONS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY

2

SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.  HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED.  INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT.  THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, THOSE HOLDERS OF CLAIMS WHO VOTE TO REJECT THE PLAN, OR THOSE HOLDERS OF CLAIMS AND INTERESTS WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTION CONTEMPLATED THEREBY.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN.  THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY, INCLUDING ARTICLE IX, ENTITLED "RISK FACTORS" BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

SUMMARIES OF THE PLAN AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN.  THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS ANNEXED TO THIS DISCLOSURE STATEMENT OR OTHERWISE INCORPORATED HEREIN BY REFERENCE ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THOSE DOCUMENTS.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THERE IS NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE.  EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR IN ACCORDANCE WITH APPLICABLE LAW, THE DEBTORS ARE UNDER NO DUTY TO UPDATE OR SUPPLEMENT THIS DISCLOSURE STATEMENT.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING VOTES FOR THE ACCEPTANCES AND CONFIRMATION OF THE PLAN AND MAY NOT BE RELIED ON FOR ANY OTHER PURPOSE.  IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE DISCLOSURE STATEMENT AND THE PLAN, THE RELEVANT PROVISIONS OF THE PLAN WILL GOVERN.

3

**SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS**

NEITHER THIS DISCLOSURE STATEMENT NOR THE PLAN HAS BEEN FILED WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY STATE AUTHORITY. THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC OR ANY STATE SECURITIES COMMISSION, AND NEITHER THE SEC NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR THE MERITS OF THE PLAN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS DISCLOSURE STATEMENT, NOTHING IN THIS DISCLOSURE STATEMENT CONSTITUTES A FINDING UNDER U.S. FEDERAL SECURITIES LAWS, FOREIGN SECURITIES LAWS OR ANY STATE SECURITIES LAWS AS TO WHETHER CRYPTOCURRENCY, INCLUDING THE VOYAGER TOKENS, OR TRANSACTIONS INVOLVING CRYPTOCURRENCY ARE SECURITIES. THE SEC AND ITS STAFF HAVE TAKEN THE POSITION THAT CERTAIN CRYPTOCURRENCY ASSETS AND CERTAIN TRANSACTIONS INVOLVING CRYPTOCURRENCY ASSETS FALL WITHIN THE DEFINITION OF A "SECURITY" UNDER THE U.S. FEDERAL SECURITIES LAWS. THE DETERMINATION AS TO WHETHER A CRYPTOCURRENCY ASSET OR A TRANSACTION INVOLVING CRYPTOCURRENCY MAY CONSTITUTE A "SECURITY" UNDER APPLICABLE LAWS IS A DETERMINATION FOR THE SEC, APPLICABLE STATE AND FOREIGN REGULATORY AUTHORITIES, AND COURTS WITH PROPER JURISDICTION.

THIS DISCLOSURE STATEMENT CONTAINS "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS IN THIS DISCLOSURE STATEMENT ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE BUT ARE SUBJECT TO A WIDE RANGE OF RISKS, INCLUDING RISKS ASSOCIATED WITH THE FOLLOWING:

- THE OVERALL HEALTH OF THE CRYPTOCURRENCY INDUSTRY;

- POPULARITY AND RATE OF ADOPTION OF CRYPTOCURRENCIES;

- THE DEBTORS' REGULATORY LICENSES;

- THE POTENTIAL ADOPTION OF NEW GOVERNMENTAL REGULATIONS;

- THE DEBTORS' TECHNOLOGY AND ABILITY TO ADAPT TO RAPID TECHNOLOGICAL CHANGE;

- THE RELIABILITY, STABILITY, PERFORMANCE AND SCALABILITY OF THE DEBTORS' INFRASTRUCTURE AND TECHNOLOGY;

- THE DEBTORS' FINANCIAL CONDITION, REVENUES, CASH FLOWS, AND EXPENSES;

- THE ADEQUACY OF THE DEBTORS' CAPITAL RESOURCES AND LIQUIDITY;

- THE INTEGRATION AND BENEFITS OF ASSET AND PROPERTY ACQUISITIONS OR THE EFFECTS OF ASSET AND PROPERTY ACQUISITIONS OR DISPOSITIONS ON THE DEBTORS' CASH POSITION AND LEVELS OF INDEBTEDNESS;

- GENERAL ECONOMIC AND BUSINESS CONDITIONS;

4

- **EFFECTIVENESS OF THE DEBTORS' RISK MANAGEMENT ACTIVITIES;**

- **COUNTERPARTY CREDIT RISK;**

- **THE OUTCOME OF PENDING AND FUTURE LITIGATION;**

- **EXCHANGE RATE FLUCTUATIONS AND CRYPTOCURRENCY PRICE FLUCTUATIONS;**

- **PLANS, OBJECTIVES, AND EXPECTATIONS;**

- **RISKS IN CONNECTION WITH DISPOSITIONS; AND**

- **RISK OF INFORMATION TECHNOLOGY OR DATA SECURITY BREACHES OR OTHER CYBERATTACKS.**

**STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE DEBTORS' AND THE WIND-DOWN DEBTORS' FUTURE PERFORMANCE. THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE DEBTORS' AND THE WIND-DOWN DEBTORS' ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN OTHER THAN AS REQUIRED BY APPLICABLE LAW. THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE THE FOLLOWING:**

- **THE RISKS AND UNCERTAINTIES ASSOCIATED WITH THE CHAPTER 11 CASES;**

- **THE DEBTORS' ABILITY TO PURSUE THEIR BUSINESS STRATEGIES DURING THE CHAPTER 11 CASES;**

- **THE DEBTORS' ABILITY TO MAINTAIN COMPLIANCE WITH LAWS AND REGULATIONS OR THE INTERPRETATION OR APPLICATION OF SUCH LAWS THAT CURRENTLY APPLY OR MAY BECOME APPLICABLE TO THE DEBTORS' BUSINESS BOTH IN THE UNITED STATES AND INTERNATIONALLY;**

- **CHANGES TO A PARTICULAR CRYPTOCURRENCY ASSET'S OR PRODUCT OFFERING'S STATUS AS A "SECURITY" IN ANY RELEVANT JURISDICTION UNDER RELEVANT LAWS AND REGULATIONS OR REGULATORY INTERPRETATION THEREOF;**

- **LOSS OF CRITICAL BANKING OR INSURANCE RELATIONSHIPS;**

- **THE DIVERSION OF MANAGEMENT'S ATTENTION AS A RESULT OF THE CHAPTER 11 CASES;**

- **INCREASED LEVELS OF EMPLOYEE ATTRITION AS A RESULT OF THE CHAPTER 11 CASES;**

- **CUSTOMER RESPONSES TO THE CHAPTER 11 CASES;**

- **THE IMPACT OF A PROTRACTED RESTRUCTURING ON THE DEBTORS' BUSINESS;**

- **THE DEBTORS' ABILITY TO CONFIRM OR CONSUMMATE THE PLAN;**

- **THE DEBTORS' INABILITY TO PREDICT THEIR LONG-TERM LIQUIDITY REQUIREMENTS AND THE ADEQUACY OF THEIR CAPITAL RESOURCES;**

- **THE AVAILABILITY OF CASH TO MAINTAIN THE DEBTORS' OPERATIONS AND FUND EMERGENCE COSTS;**

- **RISKS ASSOCIATED WITH WEAK OR UNCERTAIN GLOBAL ECONOMIC CONDITIONS AND THEIR IMPACT ON DEMAND FOR DIGITAL ASSETS;**

- **OTHER GENERAL ECONOMIC AND POLITICAL CONDITIONS IN THE UNITED STATES, INCLUDING THOSE RESULTING FROM RECESSIONS, POLITICAL EVENTS, ACTS OR THREATS OF TERRORISM, AND MILITARY CONFLICTS;**

- **INDUSTRY CONDITIONS, INCLUDING COMPETITION AND TECHNOLOGICAL INNOVATION;**

- **FLUCTUATIONS IN OPERATING COSTS;**

- **SHIFTS IN POPULATION AND OTHER DEMOGRAPHICS;**

- **LEGISLATIVE OR REGULATORY REQUIREMENTS; AND**

- **FLUCTUATIONS IN INTEREST RATES, EXCHANGE RATES, AND CURRENCY VALUES.**

**YOU ARE CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE, AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-LOOKING STATEMENTS. THE LIQUIDATION ANALYSIS AND OTHER PROJECTIONS AND FORWARD-LOOKING INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ONLY ESTIMATES, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS, AMONG OTHER THINGS, MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED. ANY ANALYSES, ESTIMATES, OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.**

[*Remainder of page intentionally left blank*]

## I.     INTRODUCTION

Voyager Digital Holdings, Inc. (along with its debtor affiliates, the "<u>Debtors</u>," the "<u>Company</u>," or "<u>Voyager</u>") and its debtor affiliates submit this disclosure statement (including all exhibits hereto and as may be supplemented or amended from time to time, the "<u>Disclosure Statement</u>"), pursuant to section 1125 of the Bankruptcy Code, to holders of Claims against and Interests in the Debtors in connection with the solicitation of votes for acceptance of the Debtors' *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. [●]852] (as supplemented or amended from time to time, the "<u>Plan</u>"), which was conditionally approved by the Bankruptcy Court on January [●]13, 2023 [Docket No. [●]861].  A copy of the Plan is attached hereto as **Exhibit A** and is incorporated herein by reference. The Plan constitutes a separate chapter 11 plan for each of the Debtors. [2]

**THE DEBTORS BELIEVE THAT THE COMPROMISES AND SETTLEMENTS CONTEMPLATED BY THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND MAXIMIZE RECOVERIES TO HOLDERS OF CLAIMS.  THE DEBTORS BELIEVE THE PLAN IS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES.  THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.    PRELIMINARY STATEMENT

### A.     The Sale Transaction.

The Debtors filed these Chapter 11 Cases in response to a short-term "run on the bank" caused by a downturn in the cryptocurrency industry generally and the default of a significant loan made to a third party.  Since the Petition Date, the Debtors have worked tirelessly to identify the most value-maximizing transaction for their customers and other creditors on an expedited timeline.  Following a two-week competitive auction process, the Debtors selected the bid submitted by West Realm Shires Inc. ("<u>FTX US</u>," and along with its parent entity and affiliates, "<u>FTX</u>") as the winning bid (the transaction contemplated thereby, the "<u>FTX Transaction</u>").  Had it been effectuated, the FTX Transaction would have provided for substantial in-kind recoveries to Holders of Account Holder Claims, the transfer of substantially all of the customer accounts on the Voyager platform to the FTX platform, and the orderly wind down of the Debtors' estates.  But after a series of extraordinary events outlined in detail below, FTX, and with it the FTX Transaction, collapsed.  While the Debtors were shocked and dismayed by FTX's cataclysmic collapse, the Debtors swiftly reengaged in negotiations with numerous other potential counterparties to evaluate potential third-party transactions that would maximize value for the Debtors and their creditors.  Following good-faith, arm's length negotiations with several such alternative transaction parties, the Debtors elected to accept the bid submitted by BAM Trading Services Inc. ("<u>Binance.US</u>" or the "<u>Purchaser</u>").  The Debtors value Binance.US's offer at approximately $1.022 billion, comprising (i) the fair market value of Cryptocurrency on the Voyager platform as of a date to be determined, which as of December 19, 2022, is estimated to be $1.002 billion plus (ii) additional consideration equal to $20 million of incremental value. Importantly, relative to all currently available alternatives, the Binance.US bid can be effectuated quickly, provides meaningfully greater recovery to creditors, and allows the Debtors to facilitate an efficient resolution of these chapter 11 cases, after which Binance.US's market-leading, secured trading platform will enable customers to trade and store cryptocurrency.

Under the Asset Purchase Agreement, Binance.US will ~~acquire~~accept transfers of certain assets relating to the Debtors' cryptocurrency custody and exchange business and will receive all or substantially all Cryptocurrency on the Voyager platform ~~for distribution to~~to hold such assets solely in a custodial capacity in trust and solely for the benefit of Account Holders who each open an account on the Binance.US Platform (subject to certain potential exceptions set forth in the Asset Purchase Agreement with respect to Cryptocurrency withheld for the purpose of

---

[2]   Capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in the Plan or Asset Purchase Agreement, as applicable.  Additionally, this Disclosure Statement incorporates the rules of interpretation located in Article I of the Plan.  **The summary provided in this Disclosure Statement of any documents attached to this Disclosure Statement, including the Plan, are qualified in their entirety by reference to the Plan and the documents being summarized.  In the event of any inconsistencies between the terms of this Disclosure Statement and the Plan, the Plan shall govern.**

satisfying the Debtors' obligations under the Plan) (such Cryptocurrency, transfers being referred to as "Acquired Coins") in exchange for Purchaser's payment obligations set forth in Sections 2.1 and 2.2 of the Asset Purchase Agreement and Purchaser's commitment to distribute the Acquired Coins to Account Holders and cash to Holders of Opco General Unsecured Claims pursuant to Sections 6.12 and 6.14 of the Asset Purchase Agreement. Additionally, Purchaser shall submit VGX for its standard listing review process in an effort to allow VGX to be traded on the Binance.US Platform.  The Debtors will effectuate the transition of Account Holders to the Binance.US Platform as described in Article V.C.6 of this Disclosure Statement.  It is currently anticipated that all Account Holders and Holders of OpCo General Unsecured Claims will transition to Binance.US subject to their successful completion of Binance.US's "Know Your Customer" process and other procedural and regulatory requirements.  Further information regarding how Account Holders and Holders of OpCo General Unsecured Claims can open accounts on Binance.US are available on the Binance.US Platform Terms of Use (which are available at:  https://www.binance.us/terms-of-use) and the Binance.US Privacy Policy (available at: https://binance.us/privacy-policy), and will also be provided to all Holders of such Claims in the Customer Onboarding Protocol.

Below is a chart of estimated recoveries to hypothetical Holders of Account Holder Claims.[3]

---

[3]    Recoveries are for illustrative purposes and may materially differ from the amount portrayed in the chart. Account Holder Claims shall be valued in U.S. dollars as of the Petition Date consistent with section 502(b) of the Bankruptcy Code.

8

| Account | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Customer Claim | | | Crypto Recovery | | | | |
| Coin | # of Coins Claimed | 7/5 Coin Price | Claim ($) | Recovery Type | Illustrative Crypto Recovery %[4] | 12/18 Coin Price | # of Coins Recovered[5] | Recovery Value |
| BTC | 0.05 | $20,157.69 | $990.50 | BTC | 51% | $16,769.35 | 0.03 | $500.57 |
| ETH | 0.19 | 1,131.60 | 214.41 | ETH | 51% | 1,185.35 | 0.09 | 108.36 |
| DAI | 49.19 | 1.00 | 49.17 | DAI | 51% | 1.00 | 24.86 | 24.85 |
| DOGE | 978.43 | 0.07 | 65.64 | DOGE | 51% | 0.08 | 419.59 | 33.17 |
| ALGO | 123.83 | 0.31 | 38.07 | ALGO | 51% | 0.19 | 100.67 | 19.24 |
| LINK | 0.29 | 6.31 | 1.83 | LINK | 51% | 6.02 | 0.15 | 0.92 |
| XRP | 122.38 | 0.33 | 39.79 | XRP | 51% | 0.35 | 57.24 | 20.11 |
| HBAR | 130.66 | 0.06 | 8.05 | HBAR | 51% | 0.04 | 92.21 | 4.07 |
| BAND | 24.73 | 1.32 | 32.65 | BAND | 51% | 1.73 | 9.54 | 16.50 |
| VGX | 249.05 | 0.24 | 59.32 | VGX | 51% | 0.29 | 101.90 | 29.98 |
| TRAC | 1,471.96 | 0.19 | 286.88 | TRAC | 51% | 0.18 | 785.81 | 144.98 |
| GALA | 2,274.69 | 0.05 | 121.01 | GALA | 51% | 0.02 | 2,978.93 | 61.16 |

| Claim | | | | | | |
|---|---|---|---|---|---|---|
| Value Claimed | | $1,907.34 | | Value Recovered | | $963.91 |
| *Proportion of Total Platform Value* | | *0.0001%* | | *Proportion of Total Platform Recovery* | | *0.0001%* |

**Illustrative Recovery**

**Crypto Recovery**

| | |
|---|---|
| Value Recovered (In-Kind) | $1,022.16 |
| Value Recovered (Converted to U.S. Dollars)[6] | - |
| **Crypto Value Recovered** | **$1,022.16** |

**Other Items**

| | |
|---|---|
| Plus: Binance US Consideration | $20.00 |
| Less: Wind-down Costs, Other Benefits and Other Expenses[7] | (78.24) |
| **Total Other Items** | **($58.24)** |

[4]  Illustrative cryptocurrency recovery is shown based on the estimated total fair market value of Voyager's cryptocurrency assets based on coin prices as of December 18, 2022. Actual cryptocurrency recovery will be determined by cryptocurrency prices during the fair market value reference period prior to the Effective Date.

[5]  Illustrative number of coins recovered based on recovery value divided by the coin price as of December 18, 2022. Actual cryptocurrency prices for purposes of denominating initial distributions will be determined by such cryptocurrency's price during the fair market value reference period prior to the Effective Date.

[6]  Assumes hypothetical customer transfers to Binance.US Platform to receive in-kind recoveries; Account Holders that do not transfer to Binance.US will be liquidated at a future date; these non-transferred Account Holders will be subject to portfolio risk, as recoveries will be subject to cryptocurrency market volatility until such time as the estate makes U.S. dollar distributions.

[7]  "Other Benefits" includes the estimated pro rata distribution to Account Holder Claims from (i) expense reimbursement and (ii) non-buyer proceeds (including sale of investments, tax returns, Directors and Officers insurance settlements, and other inflows); "Other Expenses" includes (iii) projected cash deficit at Effective Date, (iv) rebalancing leakage, (v) wind-down funding leakage and (vi) VGX impact.

9

| | |
|---|---|
| **Total Value Recovered** | **$963.91** |
| *% Total Recovery* | *51%* |

### B.    The FTX Collapse.

Following an acute liquidity crunch and "run on the bank" at the FTX ecosystem, on November 11, 2022, 130 FTX entities commenced filing for voluntary relief under chapter 11 in the Bankruptcy Court for the District of Delaware (the "FTX Bankruptcy Proceeding").[8]  While the FTX Bankruptcy Proceeding is still unfolding, early indications are that Mr. Bankman-Fried and FTX were carrying on one of the largest financial frauds in history.  Mr. John Ray III, who was appointed Chief Executive Officer of FTX following the resignation of Mr. Bankman-Fried and who oversaw the restructuring of Enron, commented in an early filing in the FTX Bankruptcy Proceeding that "[n]ever in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information."[9]  The full extent of the injury caused by this apparent rampant fraud will likely take years to uncover.

While FTX was collapsing, on November 10th, the Debtors requested that the "No-Shop" provision (Section 5.2) of the FTX Purchase Agreement (as defined herein) be waived.  FTX acquiesced.  Immediately thereafter, the Debtors swiftly reengaged in negotiations with several other potential transaction counterparties.  On December 9, 2022, the Debtors filed with this Court the *Joint Stipulation and Agreed Order Between the Debtors and FTX US* terminating the FTX Purchase Agreement [Docket No. 717].  On December 21, 2022, FTX filed a motion seeking approval of such stipulation by the court overseeing the FTX Bankruptcy Proceeding as well.[10]

The Debtors determined that engaging with third parties to identify an alternative transaction partner was a sound exercise of their business judgment as consummating an alternative transaction would reasonably provide greater recovery to Holders of Claims on a more certain timeline with limited execution risk than if the Debtors pursued a self-liquidating plan.  The Sale Transaction is the culmination of that process and provides more value than the Debtors would otherwise be able to distribute to Holders of Claims on a standalone basis.  Notably, the Plan includes a toggle that allows the Debtors to return Cryptocurrency, Cash, and other assets to Holders of Claims if the Sale Transaction is unable to close on the timeline contemplated under the Asset Purchase Agreement, as described further in Article V.A.2 herein.  Although any "toggle" to a self-liquidating plan may result in less recovery to customers than the Sale Transaction, it would be materially greater and quicker than if the Debtors had to undertake the cost and time necessary to resolicit Holders of Claims to vote on another plan.  Accordingly, the Debtors, whose goal is and has always been to maximize returns to Account Holders and other creditors, determined that the most value-maximizing path forward in these chapter 11 cases is to enter into a transaction with Binance.US that also allows the Debtors to toggle to a plan that returns value to the Debtors' Account Holders and other creditors should the Sale Transaction not be consummated on the timeline contemplated under the Asset Purchase Agreement.

In light of the extraordinary circumstances that precipitated the filing of these Chapter 11 Cases and the equally extraordinary events that transpired thereafter, the Debtors believe that they have achieved a Plan that is fair and equitable, maximizes the value of the Debtors' estates, and maximizes recoveries to Holders of Claims, including, especially, Holders of Account Holder Claims.  Importantly, the "toggle" feature under the Plan ensures an outside date by which the Debtors can pivot to a standalone plan and return value to Holders of Claims without any further delay.

---

[8]    *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Nov. 11, 2022).

[9]    *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 24], filed in *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Nov. 17, 2022); *see also United States of America v. Samuel Bankman-Fried*, 22-crim-673 (S.D.N.Y. December 9, 2022); *Securities and Exchange Commission v. Samuel Bankman-Fried*, Civil Action. No. 22-cv-10501 (S.D.N.Y. Dec. 13, 2022).

[10]   *Motion of Debtors for Entry of an Order (A) Authorizing the Debtors to Enter Into the Stipulation with Voyager Digital, LLC and (B) Granting Related Relief* [Docket No. 283], filed in *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Dec. 21, 2022).

Accordingly, the Debtors, in close consultation with Binance.US and other parties in interest, have worked tirelessly to negotiate and formulate a Plan that provides recoveries to Holders of Claims on the quickest timeline and in the most favorable manner in light of the FTX collapse and related industry fallout.

## III.    BACKGROUND

Prior to the Petition Date, Voyager operated a cryptocurrency trading platform that allowed customers to buy, sell, and store cryptocurrency on an easy-to-use and "accessible-to-all" platform. Using the Company's mobile application, Voyager's customers could earn rewards on the cryptocurrency assets stored on the Company's platform and trade over 100 unique digital assets. Voyager's mission since inception has been to provide customers with the tools to enter the cryptocurrency industry on their own terms in a way that is tailored to the needs of each customer. Voyager's mobile application has been downloaded millions of times and had over 1.1 million active users as of July 5, 2022 (the "Petition Date"). In 2021, Voyager was one of the top ten most downloaded cryptocurrency mobile applications in the world.

Recent events in the world economy roiled traditional markets and the cryptocurrency markets alike. The lingering effects of the COVID-19 pandemic, coupled with rampant inflation and the adverse effects of the war in the Ukraine on the world economy, contributed to a massive sell-off of traditional assets in early 2022. Total wealth in the United States declined by $5 trillion between January 2022 and May 2022. The cryptocurrency market is not immune to these macroeconomic trends and likewise experienced extreme market volatility in 2022. All major coins and cryptocurrency-focused companies experienced significant declines; in early September 2022, the aggregate value of the cryptocurrency market sank below $1 trillion for the first time since 2020. Several major liquidity events in the cryptocurrency space, including the implosion of Terra LUNA ("Luna") (as discussed in Article VII.A.2 of this Disclosure Statement), accelerated the onset of a "crypto winter" and an industry-wide sell-off to manage risk in 2022.

As described in more detail in Article VII.A.2.b below, in June 2022, it became apparent that the Company's loan to Three Arrows Capital ("3AC" and such loan the "3AC Loan"), a cryptocurrency hedge fund based in Singapore, was in jeopardy of partial or full nonpayment. The Company's loan to 3AC was one of its largest outstanding loans. On June 17, 2022, 3AC announced that it had suffered heavy losses due to massive exposure to Luna. The Company's management team was acutely aware that nonpayment of the loan to 3AC, coupled with severe industry headwinds, would strain the Company's ability to continue operating its trading platform. Accordingly, the Company's management team immediately began to explore potential strategic solutions. The Company retained Kirkland & Ellis LLP ("Kirkland") and Moelis & Company LLC ("Moelis"). The Company subsequently retained Berkeley Research Group ("BRG") on June 30, 2022. The Company engaged in discussions with third parties and potential sources of new liquidity and ultimately obtained an unsecured loan from Alameda Ventures Ltd. ("Alameda"), a major participant in the cryptocurrency space. With the advice and assistance of Moelis, the Company began discussions with a host of third parties about a more long-term solution to the challenges facing the Company. Discussions with these third parties, however, ultimately revealed that an in-court process would be necessary to develop the most value-maximizing alternative available to the Company. Accordingly, the Debtors filed these Chapter 11 Cases on July 5, 2022.

On the first day of these chapter 11 cases, the Debtors filed the *Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 17] (as amended and restated from time to time, the "Standalone Plan"). The Standalone Plan contemplated a restructuring that could be effectuated without a sale and served as a floor for the Debtors' marketing process. To that end, the Debtors, with the assistance of Moelis and their other advisors, continued their prepetition marketing efforts during these Chapter 11 Cases to canvas the market and identify interest in a transaction with a third-party investor (the "Marketing Process"). Shortly after commencing these chapter 11 cases, the Debtors filed the *Debtors' Motion Seeking Entry of an Order (I) Approving the Bidding Procedures and Related Dates and Deadlines, (II) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation, and (III) Granting Related Relief* [Docket No. 126] (the "Bidding Procedures Motion"), which set a timeline for interested parties to submit bids for an acquisition of the Debtors' assets and procedures for conducting an auction if multiple bids were received. On August 5, 2022, the Bankruptcy Court entered the *Order (I) Approving the Bidding Procedures and Related Dates and Deadlines, (II) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation, and (III) Granting*

*Related Relief* [Docket No. 248] (the procedures approved thereby, the "<u>Bidding Procedures</u>") which, among others, established the Bid Deadline (as defined in the Bidding Procedures) as September 6, 2022 at 12:00 p.m., prevailing Eastern Time and set the Auction (as defined in the Bidding Procedures) for September 13, 2022 at 10:00 a.m., prevailing Eastern Time. Throughout the Marketing Process, the Debtors evaluated Bids received from potential transaction parties in comparison both to other Bids received and the recoveries contemplated by the Stand-Alone Plan as it provided a critical metric in the Debtors' determination of their path forward.[11]

On the Bid Deadline, the Debtors received a number of bids from strategic investors and, accordingly commenced an auction on September 13, 2022, for a sale of the Debtors' business. The two-week Auction featured hard-fought, arms-length negotiations with each participating bidder. At the conclusion of the Auction, the Debtors, in an exercise of their business judgment and in consultation with the Committee, determined that the final bid submitted by FTX US represented the most value-maximizing transaction available to the Debtors. Accordingly, on September 26, 2022, the Debtors announced FTX US as the winning bidder,[12] and on September 27, 2022, the Debtors and FTX US entered into an asset purchase agreement memorializing the terms of the winning bid (as may be amended from time to time in accordance with the terms thereof, the "<u>FTX Purchase Agreement</u>"). On October 20, 2022, the Court entered an order approving the Debtors' entry into the FTX Purchase Agreement.[13] On October 24, 2022, the Debtors filed solicitation versions of their Disclosure Statement and Plan,[14] and began soliciting votes on the Plan.

As set forth in greater detail in Article VIII.N hereof, the Debtors' journey to consummation of the FTX Transaction was derailed over the ensuing weeks. Following a series of extraordinary events, on November 11, 2022, Sam Bankman-Fried resigned from his role as CEO of the FTX enterprise, and FTX announced the chapter 11 filing of approximately 130 of its affiliates. Immediately following announcement of the FTX bankruptcy, the Debtors reengaged in discussions with numerous potential transaction parties interested in consummating a transaction with the Debtors. Following good-faith, arm's-length negotiations with several potential transaction parties regarding a variety of deal structures and terms, the Debtors determined, in an exercise of their business judgment and in consultation with the Committee, that the bid submitted by Binance.US represented the highest or otherwise best offer available to purchase the Debtors' business enterprise. On December 18, 2022, the Debtors and the Purchaser entered into an asset purchase agreement memorializing the terms of the Binance.US bid (as may be amended from time to time in accordance with the terms thereof, the "<u>Asset Purchase Agreement</u>").

The Debtors seek to effectuate the transactions contemplated by the Asset Purchase Agreement (collectively, the "<u>Sale Transaction</u>") pursuant to the Plan. The Plan, among other things:

- contemplates payment in full of Administrative Claims, Secured Tax Claims, Priority Tax Claims, and Other Priority Claims;

- provides for the distribution of Cryptocurrency, Cash, and any remaining assets at OpCo (including any recovery on account of the 3AC Claims, FTX Claims, or Alameda Claims) to Account Holders and Holders of OpCo General Unsecured Claims, subject to the terms of the Asset Purchase Agreement;

- provides for distribution of Cash and other assets at HoldCo to Holders of HoldCo General Unsecured Claims;

- provides for distribution of Cash and other assets at TopCo to Holders of TopCo General Unsecured Claims;

- provides for the equitable subordination of the Alameda Loan Facility Claims;

---

[11] Certain dates in the Bidding Procedures were amended by Docket Nos. 328, 343, 365, and 442.

[12] *See Notice of Successful Bidder* [Docket No. 457].

[13] Docket No. 581.

[14] Docket Nos. 590 and 591.

- provides for any residual value at TopCo after payment in full of TopCo General Unsecured Claims to be distributed to Holders of Section 510(b) Claims, if any, and Holders of Existing Equity Interests; and

- designates a Wind-Down Entity Trustee to wind down the Debtors' affairs in accordance with the Plan.

The Debtors believe that the Plan maximizes stakeholder recoveries in the Chapter 11 Cases. In particular, the Sale Transaction with Binance.US that the Plan contemplates represents, relative to all currently available alternatives, meaningfully greater and faster recovery to creditors. Accordingly, the Debtors urge all Holders of Claims entitled to vote to accept the Plan by returning their ballots so that Stretto actually receives such ballots by February 22, 2023 at 4:00 p.m. prevailing Eastern Time (the "Voting Deadline"). Assuming the Plan receives the requisite acceptances, the Debtors will seek the Bankruptcy Court's approval of the Plan at a hearing on March 2, 2023 at [●]:00 [a/p.m.]10:00 a.m. (prevailing Eastern Time) (the "Confirmation Hearing").

## IV. QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN

### A. What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor (whether or not such creditor or equity interest holder voted to accept the plan), and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B. Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims and interests whose votes on the Plan are being solicited. This Disclosure Statement is being submitted in accordance with these requirements.

### C. Am I entitled to vote on the Plan?

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold. Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class." Each Class's respective voting status is set forth below.

| | | | |
|---|---|---|---|
| 1 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | Account Holder Claims | Impaired | Entitled to Vote |

| | | | |
|---|---|---|---|
| 4A | OpCo General Unsecured Claims | Impaired | Entitled to Vote |
| 4B | HoldCo General Unsecured Claims | Impaired | Entitled to Vote |
| 4C | TopCo General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Alameda Loan Facility Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 6 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |
| 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |
| 9 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

**D. What will I receive from the Debtors if the Plan is consummated?**

The following chart provides a summary of the anticipated recovery to Holders of Claims and Interests under the Plan. Any estimates of Claims and Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court. Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan. Amounts in the far right column under the heading "Liquidation Recovery" are estimates only and are based on certain assumptions described herein and set forth in greater detail in the liquidation analysis attached hereto as **Exhibit B** (the "Liquidation Analysis").

**In a hypothetical liquidation under chapter 7 of the Bankruptcy Code, Holders of Account Holder Claims and General Unsecured Claims would likely receive a significantly reduced recovery relative to what such Holders would receive under the Plan**. In the event of a chapter 7 liquidation, the Bankruptcy Court may appoint a trustee (the "Liquidating Trustee") to oversee and effectuate the liquidation of the Debtors' assets. The Liquidating Trustee's fees and expenses would be paid by the Debtors and would be paid prior to any Account Holder Claims or General Unsecured Claims. Given the novelty and complexity of the Debtors' business and the strong likelihood that any Liquidating Trustee appointed by the Bankruptcy Court may have minimal cryptocurrency experience, the Liquidating Trustee's fees and expenses and the anticipated reduction in value obtained through the monetization of cryptocurrency by the Liquidating Trustee would likely result in Account Holders and Holders of General Unsecured Claims receiving significantly reduced recoveries.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE BASED ON, AMONG OTHER THINGS, ALLOWED CLAIMS ARISING FROM THE REJECTION OF EXECUTORY CONTRACTS OR UNEXPIRED LEASES AND THE RESOLUTION OF DISPUTED CLAIMS. FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[15]**

---

[15] The recoveries set forth below may change based upon changes in the amount of Claims that are Allowed as well as other factors related to the Debtors' business operations and general economic conditions.

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims (in $mm)[16][17] | Projected Sale Transaction Recovery under the Plan | Projected Liquidation Transaction Recovery under the Plan | Liquidation Recovery |
|---|---|---|---|---|---|---|
| 1 | Secured Tax Claims | Each Holder of an Allowed Secured Tax Claim shall receive, in full and final satisfaction of such Allowed Secured Tax Claim, at the option of the Wind-Down Entity, payment in full in Cash of such Holder's Allowed Secured Tax Claim or such other treatment rendering such Holder's Allowed Secured Tax Claim Unimpaired. | $0.0 | N/A | N/A | N/A |
| 2 | Other Priority Claims | Each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Allowed Other Priority Claim, at the option of the applicable Debtor, payment in full in Cash of such Holder's Allowed Other Priority Claim or such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired. | $1.0 | 100% | 100% | 99% – 99% |
| 3 | Account Holder Claims[18] | Each Holder of an Allowed Account Holder Claim will receive in exchange for such Allowed Account Holder Claim: <br><br> (i) If the Sale Transaction is consummated by the Outside Date: <br><br> a. its Net Owed Coins, as provided in and subject to the requirements of Sections 6.10 and 6.12 of the Asset Purchase Agreement; *provided* that for Account Holders in Unsupported Jurisdictions and only to the extent that the Purchaser does not obtain the Unsupported Jurisdiction Approval for the jurisdiction in | $1,763.8 | 51% | 45% | 35% – 39% |

---

[16] The lower recovery compared to the FTX Transaction is largely due to fluctuations in the market following the FTX collapse along with the value differential under the Sale Transaction.

[17] **The recoveries included in this Disclosure Statement are for illustrative purposes only and subject to material change particularly due to, among other things, market volatility, the ultimate treatment of the Alameda Loan Facility Claims and the Intercompany Obligations, and whether Alameda prevails on its asserted preference and related administrative claim which could substantially reduce the recoveries projected above.**

[18] Account Holder Claims shall be valued in U.S. dollars as of the Petition Date consistent with section 502(b) of the Bankruptcy Code.

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims (in $mm)[16][17] | Projected Sale Transaction Recovery under the Plan | Projected Liquidation Transaction Recovery under the Plan | Liquidation Recovery |
|---|---|---|---|---|---|---|
| | | which such Account Holder resides within 6 months following the Closing Date (as defined in the Asset Purchase Agreement), such Account Holders shall receive, after expiration of such time period, value in Cash at which such Net Owed Coins allocable to such Account Holder are liquidated; | | | | |

b. its Pro Rata share of any Additional Bankruptcy Distributions, in Cryptocurrency or Cash as provided in and subject to the requirements of Sections 6.12 and 6.14 of the Asset Purchase Agreement;

c. its Pro Rata share of Distributable OpCo Cash; and

d. to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to OpCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims;

*provided* that distributions made to any Account Holder pursuant to clauses (b), (c), and (d) above shall be made after taking into account the Acquired Coins Value of the Net Owed Coins or the value in Cash at which such Net Owed Coins are liquidated, as applicable, previously allocated to such Account Holder; or

(ii) If the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated:

a. its Pro Rata share of Distributable OpCo Cash;

b. its Pro Rata share of Distributable Cryptocurrency, which such Account Holder

16

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims (in $mm)[1617] | Projected Sale Transaction Recovery under the Plan | Projected Liquidation Transaction Recovery under the Plan | Liquidation Recovery |
|---|---|---|---|---|---|---|
| | | shall be able to withdraw in kind, alternative Cryptocurrency, and/or Cash for a period of thirty (30) days after the Effective Date through the Voyager platform or, if elected by Seller pursuant to Section 6.12(d) of the Asset Purchase Agreement, through the Binance.US Platform; *provided* that, if the applicable transfer is made through the Voyager platform and such Account Holder does not withdraw its Pro Rata share of Distributable Cryptocurrency available to such Account Holder from the Voyager platform within such thirty (30) day period, such Account Holder will receive Cash in the equivalent value to its Pro Rata share of Distributable Cryptocurrency; and<br><br>c.  to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to OpCo; *provided* that any distributions on account of Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims. | | | | |
| 4A | OpCo General Unsecured Claims | Each Holder of an Allowed OpCo General Unsecured Claim will receive in exchange for such Allowed OpCo General Unsecured Claim:<br><br>(i)  If the Sale Transaction is consummated by the Outside Date:<br><br>a.  its Pro Rata share of Distributable Cryptocurrency in Cash;<br><br>b.  its Pro Rata share of Additional Bankruptcy Distributions, in Cryptocurrency or Cash as | $14.0 | 51% | 45% | 35% – 39% |

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims (in $mm)[16][17] | Projected Sale Transaction Recovery under the Plan | Projected Liquidation Transaction Recovery under the Plan | Liquidation Recovery |
|---|---|---|---|---|---|---|
| | | provided in and subject to the requirements of Section 6.12 and 6.14 of the Asset Purchase Agreement;<br><br>c.    its Pro Rata share of Distributable OpCo Cash; and<br><br>d.    to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to OpCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims;<br><br>(ii) If the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated:<br><br>a.    its Pro Rata share of Distributable Cryptocurrency in Cash;<br><br>b.    its Pro Rata share of Distributable OpCo Cash; and<br><br>c.    to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to OpCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims. | | | | |
| 4B | HoldCo General | Each Holder of an Allowed HoldCo General Unsecured Claim will receive in exchange for such | $8.3 | 6% | 6% | 0% – 0% |

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims (in $mm)[1617] | Projected Sale Transaction Recovery under the Plan | Projected Liquidation Transaction Recovery under the Plan | Liquidation Recovery |
|---|---|---|---|---|---|---|
| | Unsecured Claims | Allowed HoldCo General Unsecured Claim:<br>(i) its Pro Rata share of Distributable HoldCo Cash; and<br>(ii) to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to HoldCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims. | | | | |
| 4C | TopCo General Unsecured Claims | Each Holder of an Allowed TopCo General Unsecured Claim will receive in exchange for such Allowed TopCo General Unsecured Claim:<br>(i) its Pro Rata share of Distributable TopCo Cash; and<br>(ii) to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of the Wind-Down Trust Assets attributable to TopCo; *provided* that any distributions on account of the Wind-Down Entity Assets or the Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims. | $3.0 | 64% | 64% | 65% – 65% |
| 5 | Alameda Loan Facility Claims | Each Holder of an Allowed Alameda Loan Facility Claim will receive in exchange for such Allowed Alameda Loan Facility Claim to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets; *provided* that any distributions on account of Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, all Allowed Claims at OpCo, HoldCo, and TopCo, including, but not limited to, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, Allowed Account Holder Claims, Allowed | $75.1 | 0% | 0% | 0% – 0% |

19

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims (in $mm)[16][17] | Projected Sale Transaction Recovery under the Plan | Projected Liquidation Transaction Recovery under the Plan | Liquidation Recovery |
|---|---|---|---|---|---|---|
| | | OpCo General Unsecured Claims, Allowed HoldCo General Unsecured Claims, and Allowed TopCo General Unsecured Claims; *provided*, *however*, if the Bankruptcy Court denies subordination of the Alameda Loan Facility Claims, then such Alameda Loan Facility Claims shall be *pari passu* with General Unsecured Claims at the applicable Debtor entity. | | | | |
| 6 | Section 510(b) Claims | Each Holder of Allowed Section 510(b) Claims against TopCo will receive, to effectuate distributions, if applicable, from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to TopCo; *provided* that any distributions on account of the Wind Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, and Allowed TopCo General Unsecured Claims. | $0.0 | N/A | N/A | N/A |
| 7 | Intercompany Claims | On the Effective Date, all Intercompany Claims shall be, at the option of the Debtors, either (a) Reinstated or (b) converted to equity, otherwise set off, settled, distributed, contributed, or cancelled, in each case in accordance with the Restructuring Transactions Memorandum. | $0.0 | 0% | 0% | 0% – 0% |
| 8 | Intercompany Interests | On the Effective Date, all Intercompany Interests shall be, at the option of the Debtors, either (a) Reinstated in accordance with Article III.G of the Plan or (b) set off, settled, addressed, distributed, contributed, merged, or cancelled, in each case in accordance with the Restructuring Transactions Memorandum. | $0.0 | 0% | 0% | 0% – 0% |
| 9 | Existing Equity Interests | Each Holder of Existing Equity Interests will receive, to effectuate distributions, if applicable, from the Wind-Down Entity, its Pro Rata share of the Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to TopCo; *provided* that any distributions on account of Wind-Down Trust Units shall only be made following payment in full of, or reserve for, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, and Allowed TopCo General Unsecured Claims. | $0.0 | N/A | N/A | N/A |

E.     **What will I receive from the Debtors if I hold an Allowed Administrative Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.  The chart below summarizes the various unclassified claims and provides the relevant section of the Plan that addresses their treatment:

| Claim | Description of Claim | Plan Section |
|---|---|---|
| Administrative Claims | A Claim against a Debtor for the costs and expenses of administration of the Chapter 11 Cases arising on or after the Petition Date and prior to the Effective Date pursuant to section 503(b) of the Bankruptcy Code and entitled to priority pursuant to sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' business and (b) Allowed Professional Fee Claims.  For the avoidance of doubt, any Cryptocurrency inadvertently deposited to the Debtors' account(s) after the Petition Date shall be returned in full to the sender. | Article II, Section A |
| Professional Fee Claims | Any Administrative Claim by a Professional for compensation for services rendered or reimbursement of expenses incurred by such Professional through and including the Effective Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court. | Article II, Section B |
| Priority Tax Claims | Any Claim of a Governmental Unit against a Debtor of the kind specified in section 507(a)(8) of the Bankruptcy Code. | Article II, Section C |

F.     **What is the "toggle" feature of the Plan?**

The "toggle" feature of the Plan provides that, if the Sale Transaction is not consummated by Outside Date or the Asset Purchase Agreement is terminated, the Debtors can pivot to a standalone plan whereby the Debtors will distribute their assets to creditors in accordance with Article IV of the Plan.  The "toggle" allows the Debtors to abandon the Sale Transaction and to initiate distributions to Holders of Claims without the need to restart the Disclosure Statement and Plan solicitation process.  As a result, Holders of Claims will receive recoveries under the Plan on a much quicker timeline than if the Debtors have to recommence the solicitation process on the standalone plan.

G.     **How will my Account be transitioned to Binance.US?**

The Debtors will transition Account Holders and Holders of OpCo General Unsecured Claims to the Binance.US Platform and effectuate delivery of Plan distributions to such Holders' Binance.US Accounts as set forth in Article V.C.6 of this Disclosure Statement and subject to the terms of the Asset Purchase Agreement based on whether Account Holders and Holders of OpCo General Unsecured Claims are in Supported Jurisdictions or Unsupported Jurisdictions.  All Account Holders and Holders of Allowed OpCo General Unsecured Claims should closely review Article V.C.6 of this Disclosure Statement.  It is currently anticipated that all Account Holders and Holders of OpCo General Unsecured Claims will transition to Binance.US subject to their successful completion of Binance.US's "Know Your Customer" process and other procedural and regulatory requirements as further described in the Asset Purchase Agreement.

H.     **What if I am unable or unwilling to transition my Account to Binance.US?**

We expect that substantially all Account Holders will be transitioning to Binance.US.  In the event that a customer is not successfully transitioned to Binance.US (for instance, in the event such Account Holder resides in an Unsupported Jurisdiction for which Binance.US does not obtain the Unsupported Jurisdiction Approval within

six (6) months of the Closing Date (as defined in the Asset Purchase Agreement)), such customer will not receive any distributions in Cryptocurrency form ("in kind"). They will instead receive a Cash distribution from the Debtor's estates as and when such distributions are made pursuant to the Bankruptcy Code.

I.      **What are the sources of Consideration and other consideration required to fund the Plan?**

Distributions under the Plan shall be funded by (i) the proceeds of Purchaser's payment obligations under Sections 2.1 and 2.2 of the Asset Purchase Agreement, (ii) distributions of Acquired Coins pursuant to Sections 6.12 and 6.14 of the Asset Purchase Agreement, and (iii) the Wind-Down Entity or Wind-Down Trust (as applicable) from the Wind-Down Entity Assets or Wind-Down Trust Assets (as applicable); *provided*, *however*, that Allowed Professional Fee Claims shall be paid from the Professional Fee Escrow Account in the first instance. The Wind-Down Trust Entity Assets or Wind-Down Trust Assets (as applicable) shall be used to pay the Wind-Down Trust Entity Expenses (including the compensation of the Wind-Down Trustee and any professionals retained by the Wind-Down Trust), and to satisfy payment of Allowed Claims and Interests as set forth in the Plan.

J.      **Are any regulatory approvals required to consummate the Sale Transaction and confirm the Plan?**

Voyager currently maintains state money transmission licenses or their equivalents (each, a "Money Transmission License") in seventeen (17) states,[19] and has license applications pending[20] in eighteen (18) states.[21]

The Debtors have engaged with the state banking departments throughout the bankruptcy process and will continue to actively do so with the goal of ensuring that the Sale Transaction and the Plan provides for compliance by Voyager and the Purchaser, as applicable, with state money transmission laws as of the consummation of the Sale Transaction. The state banking departments may have broad discretion as to the approvals required in connection with the Sale Transaction, thus it is not possible to predict with certainty the scope of such approvals, whether they will ultimately be granted, and the expected timeframes of the state banking departments' determinations. There are unresolved questions of law with respect to the intersection of state money transmission statutes and the Bankruptcy Code and the answers to those questions may impact the ability of the state banking departments to require certain approvals with respect to consummation of the Sale Transaction and confirmation of the Plan.

As an initial matter, it is important to note that Money Transmission Licenses are not assets that can be purchased or transferred; they are specific to the entity to which they are issued, and thus an acquisition of a licensed entity must be conducted through a stock purchase or merger in which the licensed entity is the surviving entity for the licenses to remain in effect.

Pursuant to the Asset Purchase Agreement, the Purchaser will not acquire Voyager's Money Transmission Licenses; rather, the Asset Purchase Agreement provides for the transfer of the Acquired Coins and Additional Bankruptcy Distributions to the Binance.US Platform for distribution in accordance with the Asset Purchase

---

[19]   The Alaska Division of Banking and Securities suspended Voyager's license on July 6, 2022 and subsequently reversed such suspension on July 14, 2022. There is a risk that one or more additional state banking departments may choose to suspend Voyager's Money Transmission Licenses going forward.

[20]   On July 17, 2022, the North Dakota Department of Financial Institutions notified Voyager that it required Voyager's pending money transmitter license application be withdrawn on grounds that it would not approve an application with an active bankruptcy filing. There is a risk that one or more additional state banking departments with which Voyager has pending applications may impose similar restrictions on Voyager going forward.

The Debtors have two applications pending in New York: (a) a money transmitter license application and (b) a virtual currency business activity license application or "Bitlicense." Voyager Digital NY, LLC, a non-operational affiliate of the Debtors, filed such applications.

[21]   Voyager also maintains a registration as a "money services business" with the Financial Crimes Enforcement Network ("FinCEN") pursuant to federal money transmission laws. A change in ownership of an entity registered with FinCEN requires notice to FinCEN following consummation of the relevant transaction, but does not require prior regulatory approval.

Agreement and the transition of Account Holders and Holders of OpCo General Unsecured Claims to Binance.US accounts in order to receive the same, subject to the terms and conditions set forth in the Asset Purchase Agreement (which include prohibitions on such transfers and transitions with respect to Account Holders and Holders of OpCo General Unsecured Claims located in Unsupported Jurisdictions).

Following consummation of the Sale Transaction, Voyager will take steps to (i) withdraw those money transmission license applications that are pending with state banking departments and (ii) surrender those Money Transmission Licenses it holds (the "Licensing Wind-Down Process"). Such Licensing Wind-Down Process will require notice to, and in some cases approval by, those state banking departments in states where the Debtors have applications pending or are licensed pursuant to the requirements set forth in each state money transmission statute and as otherwise required by the relevant state banking departments.[22]

In the event that the "toggle" function is triggered, causing a pivot to a self-liquidating plan, Voyager would maintain its Money Transmission Licenses for so long as necessary to effect distribution of recoveries to Holders of Claims and complete the Licensing Wind-Down Process at the appropriate time.

**K.     How will I receive my recovery as an Account Holder if the Sale Transaction is not consummated?**

In the event that the Sale Transaction is not consummated by the Outside Date, the Debtors will outline the steps necessary for Account Holders to receive Distributable Cryptocurrency on an in-kind basis and will describe the transition process in further detail. It is currently anticipated that all Account Holders will receive the option to receive Distributable Cryptocurrency in certain formats that will render such transfer "in-kind" to allow such distributions to be positioned in the most tax-efficient manner possible for Account Holders.

**L.     What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to consummate the Restructuring Transactions. It is possible that any alternative transaction may provide Holders of Claims and Interests with less than they would have received pursuant to the Plan. For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* Article XI.B of this Disclosure Statement, titled "Best Interests of Creditors—Liquidation Analysis" and the Liquidation Analysis attached hereto as **Exhibit B**.

**M.     If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation"?**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective. Initial distributions to Holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as practicable thereafter, as specified in the Plan. *See* Article IX of the Plan for a description of the conditions precedent to consummation of the Plan.

**N.     Is there potential litigation related to the Plan?**

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan as well, which could potentially lead to litigation. *See* Article IX.D.2 of this Disclosure Statement titled "The Wind-Down Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases as well as Ongoing Regulatory Investigations" for further discussion on this issue.

As of the Petition Date, the Debtors were parties to certain litigation matters that arose in the ordinary course of operating their business and could become parties to additional litigation in the future. Although the Debtors have disputed, are disputing, or will dispute in the future the amounts asserted by such litigation

---

[22]   The state approval process for the surrender of a license typically takes several months.

counterparties, to the extent these parties are ultimately entitled to a higher amount than is reflected in the amounts estimated by the Debtors herein, the value of recoveries to Account Holders and Holders of General Unsecured Claims could change, and such changes could be material.

The Debtors may also reject Executory Contracts and Unexpired Leases, which may result in parties asserting General Unsecured Claims for rejection damages.  An increase in the estimated amount of rejection damages claims could result in reduced recoveries for Account Holders and Holders of General Unsecured Claims. Finally, the Debtors may object to certain Proofs of Claim, and any such objections ultimately could cause the total amount of Allowed General Unsecured Claims to change.  These changes could affect recoveries to Account Holders and Holders of General Unsecured Claims, and such changes could be material.

### O. Does the Plan provide for the subordination of any Claims?

The Plan contemplates that the Class 5 Alameda Loan Facility Claims are subordinated Claims.  Section 510(c) of the Bankruptcy Code provides, in relevant part, that the Bankruptcy Court may, "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest."  11 U.S.C. § 510(c)(l). Bankruptcy courts have ruled that equitable subordination is proper where three conditions are met: ( 1) the claimant must have engaged in some type of inequitable conduct; (2) the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must not be inconsistent with the provisions of the federal bankruptcy regime.  *See In re LightSquared Inc.*, 511 B.R. 253, 346 (Bankr. S.D.N.Y. 2014) citing *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 699-700 (5th Cir. 1977).

The Debtors believe that the Alameda Loan Facility Claims should be equitably subordinated due to Alameda and its affiliates' inequitable conduct that has harmed the Debtors' creditors in multiple instances.  Since the outset of these Chapter 11 Cases, Alameda has sought to undermine and sabotage the Debtors' restructuring efforts at every turn.  The Alameda Loan Agreement that was entered into just prior to the filing of these Chapter 11 Cases included a provision that required the Debtors to only engage in lending activities with Alameda.[23] Alameda's effort to front-run the Debtors' marketing process continued when, on July 22, 2022, it issued a press release and low-ball proposal for the Debtors' business while openly disparaging the Debtors.  Alameda's attempts to mislead creditors with false statements were so egregious that the Debtors were forced issue a response to correct the record.[24]  Alameda's claims, made with full knowledge of their falsity, chilled the Debtors' marketing process and lowered the floor for potential bids in the Auction.  Prior to the Auction, the Debtors requested that Alameda unwind all outstanding prepetition loans made by the Debtors to Alameda (some of which were collateralized) to ensure fairness and equal footing for all participants in the Auction.[25]  Alameda finally acquiesced to the repayment of the prepetition loans once the Debtors communicated that Alameda's participation in the Auction was contingent on either repaying the prepetition loans or disclosing its financial wherewithal to the other bidders to ensure a level playing field for all Auction participants.

Given the fallout following the discovery of the apparent historic fraud committed by Alameda and FTX, the Debtors and other parties-in-interest now understand that Alameda's behavior in the Chapter 11 Cases was an effort to fill holes on its balance sheet resulting from their apparent fraudulent business operations.  Alameda's insistence to skirt the Debtors' robust marketing process was a feigned attempt to acquire the Debtors' cryptocurrency in the quick of night, not to return Cryptocurrency to the Debtors' stakeholders despite Alameda's and FTX's former leadership's adamant contentions.[26]  Accordingly, the Debtors believe that such behavior

---

[23]   *See* Alameda Loan Agreement, Section 4.7.

[24]   *See Notice of Response to Alameda/FTX US Press Release* [Docket No. 137].

[25]   *See* Unwind Motion; Article VIII.L of this Disclosure Statement.

[26]   *See, e.g.*, @SBF, Twitter (July 24, 2022, 8:32 P.M. ET),
       https://twitter.com/SBF_FTX/status/1551364656085602305?s=20&t=67p5C4w-kxALBYJjQ1UVCg.

warrants the equitable subordination of the Alameda Loan Facility Claims. The Debtors will further demonstrate the legal and factual bases for subordinating the Alameda Loan Facility Claims prior to or at Confirmation.

Although the Debtors have classified the Alameda Loan Facility Claims as subordinated claims, the Bankruptcy Court may rule that subordination of the Alameda Loan Facility Claims is improper. If the Bankruptcy Court denies subordination of the Alameda Loan Facility Claims, then such Alameda Loan Facility Claims shall be *pari passu* with General Unsecured Claims at the applicable Debtor entity.

**P.      Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes, Article VIII of the Plan proposes to provide certain releases to the Released Parties and also provides for exculpation of the Exculpated Parties. The release, exculpation, and injunction provisions that are contained in the Plan are copied in Article V.A.3 of this Disclosure Statement, entitled "Releases." For the avoidance of doubt, the decision to "opt in" to the releases is voluntary, and the failure to "opt in" does not prejudice any electing creditors' rights.

On the Petition Date, the board of directors of Voyager Digital, LLC voted to appoint two independent directors to the board of Voyager Digital, LLC and to establish a special committee (the "Special Committee"). The Special Committee consists of the newly appointed independent directors and was established to investigate certain historical transactions, including the facts and circumstances related to the Debtors' loan to 3AC (the "Investigation"). On August 4, 2022, the Bankruptcy Court entered an order approving the appointment of Quinn Emmanuel Urquhart & Sullivan, LLP as legal counsel to the Special Committee ("Special Committee Counsel") with the mandate to conduct the Investigation. The Special Committee's investigation, and the settlements reached by the Special Committee that are incorporated into the Plan, are described in more detail in Article VII.A.2(b)(i)-(ii) below. As described in Article VII.A.2(b)(i)-(ii), the potential estate claims the Special Committee identified as colorable are being settled pursuant to the Plan on the terms set forth herein.

The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' chapter 11 process through, among other things, efforts to market and sell the Debtors' assets and negotiate and implement the Plan, which will maximize value for the benefit of all parties in interest. The Debtors' Chief Executive Officer, Mr. Ehrlich ("CEO") and Chief Commercial Officer (and former Chief Financial Officer), Mr. Psaropoulos ("CCO") are also making additional personal contributions to the Plan pursuant to the settlements reached with the Special Committee. Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

The Debtor releases (other than with respect to derivative claims) do not affect the Canadian Class Action. The Debtor releases are releases of the Debtors' claims against third parties. The Canadian Class Action claim against Voyager Digital Ltd. is a Claim against a Debtor, which will be subject to the treatment of Section 510(b) Claims under the Plan. The Canadian Class Action direct claims against the Debtors' directors and officers are not impacted by the Debtor release.

The third-party releases do not release direct claims unless a Holder of such Claim or Interest affirmatively elects to opt into the third-party release. Holders of Claims or Interests may also contribute their third-party claims against Persons other than the Debtors to the Wind-Down Entity pursuant to Article IV.Q of the Plan. If the Holder of a Claim or Interest contributes their Contributed Third-Party Claims to the Wind-Down Entity then they will be barred from pursuing such Contributed Third-Party Claims. However, pursuant to the Plan, Contributed Third-Party Claims do not include (i) any derivative claims of the Debtors, (ii) any direct claims against the Releasing Parties, (iii) any direct Causes of Action that any Contributing Claimant has against Mark Cuban, Dallas Basketball Limited d/b/a Dallas Mavericks, the National Basketball Association, and any of their Related Parties, or (iv) any direct Causes of Action that any Contributing Claimant, in its capacity as an equity holder of Voyager Digital Ltd., has that are asserted in the Canadian Class Action against Voyager Digital Ltd., Stephen Ehrlich, Philip Eytan, Evan Psaropoulos, Lewis Bateman, Krisztian Toth, Jennifer Ackart, Glenn Stevens, and Brian Brooks. The Wind-Down Entity will be able to pursue Contributed Third-Party Claims subject to the terms of the Plan. To the extent the Wind-Down Entity chooses to pursue the contributed Claims, and is successful, additional recovery may be generated as a result, which will be distributed in accordance with the Plan waterfall.

25

The Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Second Circuit. Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.

**ALL HOLDERS OF CLAIMS THAT (I) VOTE TO ACCEPT THE PLAN AND WHO AFFIRMATIVELY OPT INTO THE RELEASES PROVIDED BY THE PLAN; (II) VOTE TO REJECT THE PLAN AND WHO AFFIRMATIVELY OPT INTO THE RELEASES PROVIDED BY THE PLAN; OR (III) ABSTAIN FROM VOTING ON THE PLAN AND AFFIRMATIVELY OPT INTO TO THE RELEASES PROVIDED IN THE PLAN WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY RELEASED AND DISCHARGED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE RELEASED PARTIES, INCLUDING THE DEBTORS OR THE WIND-DOWN DEBTORS, AS APPLICABLE.**

**Q.      What is the deadline to vote on the Plan?**

The Voting Deadline is February 22, 2023, at 4:00 p.m. (prevailing Eastern Time).

**R.      How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote on the Plan. To be counted as votes to accept or reject the Plan, each ballot (a "Ballot") must be properly executed, completed, and delivered in accordance with the instructions provided such that a vote cast is **actually received** before the Voting Deadline by Stretto. *See* Article X of this Disclosure Statement, entitled "Solicitation and Voting Procedures."

> **IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE CLAIMS, NOTICING, AND SOLICITATION AGENT. ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE VOTING INSTRUCTIONS WILL NOT BE COUNTED EXCEPT AS DETERMINED BY THE DEBTORS.**

**S.      Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on Confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

**T.      When is the Confirmation Hearing set to occur?**

The Debtors will request that the Bankruptcy Court schedule the Confirmation Hearing for March 2, 2023, at [●] [a/p].m 10:00 a.m. (prevailing Eastern Time). The Confirmation Hearing may be adjourned from time to time without further notice. The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing. Subject to section 1127 of the Bankruptcy Code, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Objections to Confirmation of the Plan must be filed and served on the Debtors, and certain other parties, by February 22, 2023, at 4:00 p.m. (prevailing Eastern Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement.

The Debtors will publish the notice of the Confirmation Hearing, which will contain the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in *The New York Times* (national edition) and *Financial Times* to provide notification to those persons who may not receive notice by mail. The Debtors may also publish the notice of the Confirmation Hearing in such trade or other publications as the Debtors may choose.

**U.      What is the purpose of the Confirmation Hearing?**

The confirmation of a plan by a bankruptcy court binds the debtor, any issuer of securities under a plan, any person acquiring property under a plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.

**V.      What is the effect of the Plan on the Debtors' ongoing business?**

The Debtors are liquidating under chapter 11 of the Bankruptcy Code.  Following Confirmation, the Plan will be consummated on the Effective Date.  On or after the Effective Date, and unless otherwise provided in the Plan, the Wind-Down Trustee will commence the wind down of the Wind-Down Debtors in accordance with the terms of the Plan.  Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

**W.      What steps did the Debtors take to evaluate alternatives to a chapter 11 filing?**

As described in Article VII herein, as well as in the *Declaration of Stephen Ehrlich, Chief Executive Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 15] (the "First Day Declaration"), prior to the Petition Date, the Debtors evaluated numerous potential alternatives, including options relating to mergers, sales, capital raising, and consensual recapitalizations, to provide stability and requisite capitalization to their business enterprise in light of significant market volatility.

**X.      Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Claims, Noticing, and Solicitation Agent:

By electronic mail at:
voyagerinquiries@stretto.com with a reference to "In re Voyager – Solicitation Inquiry" in the subject line.

By telephone at:
(855) 473-8665 (Toll-Free) or (949) 271-6507 (International)

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in these Chapter 11 Cases are available upon written request to the Debtors' Claims, Noticing, and Solicitation Agent at the address above or by downloading the exhibits and documents from the website of the Debtors' Claims, Noticing, and Solicitation Agent at http://cases.stretto.com/Voyager (free of charge) or the Bankruptcy Court's website at https://www.nysb.uscourts.gov/ecf-and-pacer-information (for a fee).

**V.      THE DEBTORS' PLAN**

**A.      The Plan.**

The Plan contemplates, among other things, (a) if the Sale Transaction is consummated by the Outside Date, the Debtors will (i) transfer all Acquired Coins to the Binance.US Platform for distribution in accordance with the Asset Purchase Agreement, (ii) distribute recoveries to Holders of HoldCo General Unsecured Claims and TopCo Unsecured Claims, (iii) transfer all Claims, Interests, and assets to the Wind-Down Reserve, and (iv) liquidate the Debtors' business and remaining assets under chapter 11 of the Bankruptcy Code; or (b) if the Sale Transaction is not consummated by the Outside Date, (i) distribute substantially all of the Cryptocurrency on the Debtors platform to Account Holders and distribute Cash at each Debtor entity to Holders of Claims at such entity, (ii) transfer all Claims, Interests, and assets to the Wind-Down Reserve, and (iii) liquidate the Debtors' business and remaining assets under chapter 11 of the Bankruptcy Code.  The Plan contemplates the following key terms, among others described herein and therein:

**1.      *General Settlement of Claims and Interests***

Pursuant to section 1123 of the Bankruptcy Code, Bankruptcy Rule 9019 (as applicable), and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan. The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 of all such Claims, Interests, Causes of Action, and controversies, as well as a finding by the Bankruptcy Court that such compromise and settlement is fair, equitable, reasonable, and in the best interests of the Debtors, their Estates, and Holders of Claims and Interests. Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Interests in any Class are intended to be and shall be final.

The Debtors are working with the Committee (as defined in Article VIII.C hereof) and other parties in interest to resolve certain open issues and controversies, which may result in a settlement or settlements pursuant to Bankruptcy Rule 9019 and may be included in the Plan. The Debtors believe that resolution of these issues or controversies in advance of the Confirmation Hearing will facilitate closure to the Chapter 11 Cases and a more efficient wind down of the Debtors. The Plan may be modified prior to the Confirmation Hearing to incorporate any number of resolutions of the unresolved controversies. Any such resolution will be negotiated at arm's-length with the advisors representing the affected parties.

### 2. *Recoveries to Certain Holders of Claims and Interests*

The recoveries to Holders of Claims and Interests is described in Article IV.D of this Disclosure Statement, entitled "What will I receive from the Debtors if the Plan is consummated?"

### 3. *Releases*

The Plan contains certain releases, as described in Article IV.O of this Disclosure Statement, entitled "Will there be releases and exculpation granted to parties in interest as part of the Plan?" The release, exculpation, and injunction provisions that are contained in the Plan are copied in pertinent part below.

"Related Party" means, with respect to any Entity, in each case in its capacity as such with respect to such Entity, such Entity's current and former directors, managers, officers, investment committee members, special committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and advisors.

"Released Parties" means, collectively, in each case in its capacity as such: (a) the Debtors; (b) the Wind-Down Debtors; (c) the Committee, and each of the members thereof; (d) each of the Released Professionals; (e) Purchaser and each of its Related Parties; and (f) each of the Released Voyager Employees (subject to the limitations contained in Article IV.F and Article IV.G of the Plan); *provided* that if the Asset Purchase Agreement is terminated, Purchaser and each of its Related Parties shall not be "Released Parties" under the Plan.

"Released Professionals" means the following professionals retained by the Debtors, the Committee, or the Purchaser (as applicable): (i) Kirkland & Ellis LLP; (ii) Moelis & Company LLC; (iii) Berkeley Research Group, LLC; (iv) Bankruptcy Management Solutions, Inc. d/b/a Stretto; (v) Quinn Emanuel Urquhart & Sullivan LLP; (vi) Fasken Martineau DuMoulin LLP; (vii) Campbells Legal (BVI); (viii) McDermott Will & Emery LLP; (ix) FTI Consulting, Inc.; (x) Epiq Corporate Restructuring, LLC; (xi) Cassels, Brock & Blackwell LLP; (xii) Paul Hastings LLP; (xiii) Harney Westwood & Riegels LP (BVI); (xiv) Day Pitney LLP (solely in their capacity as counsel to the Debtors); (xv) Jenner & Block LLP; (xvi) Seyfarth Shaw LLP; (xvii) Alvarez & Marsal Canada Inc.; (xviii) Blake, Cassels & Graydon LLP; (xix) Latham &

Watkins LLP; (xx) Lowenstein Sandler LLP; (xxi) Kramer Levin LLP and (xxii) Acura Law Firm; *provided* that if the Asset Purchase Agreement is terminated, Latham & Watkins LLP shall not be a "Released Professional" under the Plan.

"Released Voyager Employees" means all directors, officers, and Persons employed by each of the Debtors and their Affiliates serving in such capacity on or after the Petition Date but before the Effective Date (subject to the limitations contained in Article IV.E and Article IV.F of the Plan).

"Releasing Parties" means, collectively, in each case in its capacity as such: (a) the Debtors; (b) the Wind-Down Debtors; (c) the Committee, and each of the members thereof; (d) each of the Released Professionals; (e) each of the Released Voyager Employees; (f) Purchaser and each of its Related Parties to the extent Purchaser is able to bind such Related Parties, (g) all Holders of Claims that vote to accept the Plan and affirmatively opt into the releases provided by the Plan; (h) all Holders of Claims that vote to reject the Plan and affirmatively opt into the releases provided by the Plan; and (i) all Holders of Claims or Interests that abstain from voting (or are otherwise not entitled to vote) on the Plan and affirmatively opt into the releases provided by the Plan; *provided* that if the Asset Purchase Agreement is terminated, Purchaser and each of its Related Parties shall not be "Releasing Parties" under the Plan.

(a)      **Releases by the Debtors.**

**Notwithstanding anything contained in the Plan to the contrary, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Wind-Down Debtors, and their Estates, the Wind-Down Entity, and in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of, the foregoing Entities, from any and all Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Chapter 11 Cases and related adversary proceedings, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, the administration and implementation of the Restructuring Transactions or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019, of the releases described in Article VIII.A of the Plan by the Debtors, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in Article VIII.A of the Plan is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) except to the extent contemplated by Article IV.E and Article IV.F of the Plan, a bar to any of the Debtors or Wind-Down Debtors or their respective Estates or Wind-Down Entity asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.**

**Notwithstanding anything to the contrary contained herein, nothing in the Plan shall release, waive, or otherwise limit the (i) rights, duties, or obligations of the Purchaser under the Asset Purchase Agreement**

and (ii) the Non-Released D&O Claims, but such Non-Released D&O Claims shall remain subject to the limitations contained in Article IV.E and Article IV.F of the Plan.

(b)        **Release by Holders of Claims or Interests.**

**Except as expressly set forth in the Plan, effective on the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted or assertable on behalf of any of the Debtors, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, the administration and implementation of the Restructuring Transactions, or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date, *provided* that nothing in Article VIII.B of the Plan shall be construed to release the Released Parties from actual fraud, willful misconduct, or gross negligence as determined by a Final Order.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in Article VIII.B of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in Article VIII.B of the Plan is:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) except to the extent contemplated by Article IV.E and Article IV.F of the Plan, a bar to any of the Releasing Parties or the Debtors or Wind-Down Debtors or their respective Estates or Wind-Down Entity asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.**

(c)        **Exculpation.**

**Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor release or the third-party release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is exculpated from any Cause of Action for any act or omission arising on or after the Petition Date and prior to the Effective Date based on the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing, or consummation of the Disclosure Statement, the Plan, the Special Committee Investigation, any Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for Causes of Action related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud,**

willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

(d)     Injunction.

The assets of the Debtors and of the Wind-Down Entity shall be used for the satisfaction of expense obligations and the payment of Claims and Interests only in the manner set forth in the Plan and shall not be available for any other purpose. All Persons and Entities who have held, hold, or may hold Claims or Interests based upon any act, omission, transaction, or other activity of any kind or nature related to the Debtors, the Wind-Down Entity, or the Debtors' Chapter 11 Cases that occurred prior to the Effective Date, other than as expressly provided in the Plan or the Confirmation Order, shall be precluded and permanently enjoined on and after the Effective Date from interfering with the use and distribution of the Debtors' assets in the manner contemplated by the Plan.

In addition, as of the Effective Date and subject to the occurrence of the Effective Date, except as otherwise specifically provided in the Plan or the Confirmation Order, all Persons and Entities who have held, hold, or may hold Claims or Interests that are fully satisfied pursuant to the Plan or any Claim or Interest that is subject to the releases and exculpations set forth in Article VIII.B and Article VIII.C of the Plan shall be precluded and permanently enjoined on and after the Effective Date from enforcing, pursuing, or seeking any setoff or relief with respect to such Claims or Interests, except for the receipt of the payments or distributions that are contemplated by the Plan.

For more detail, see Article VIII of the Plan, entitled "Effect of Confirmation of the Plan" which is incorporated herein by reference.

4.     *Cryptocurrency Rebalancing*

As disclosed in Article VII.A.2 of this Disclosure Statement, the Debtors' loan to 3AC resulted in a hole in the Debtors' Cryptocurrency portfolio and a deficiency of certain Cryptocurrency coins, particularly Bitcoin and USDC. Additionally, given that Account Holder Claims are dollarized as of the Petition Date, variance between Account Holder Claims as of the Petition Date and the Effective Date will exist due to continued fluctuation in cryptocurrency prices. As a result, to effectuate *pro rata* in-kind distributions of the Distributable Cryptocurrency to Account Holders pursuant to Article III.C.3(c) of the Plan, the Debtors must rebalance their Cryptocurrency portfolio through the purchase and sale of Cryptocurrency in a series of transactions (the "Rebalancing Exercise"). The Rebalancing Exercise shall be conducted to ensure that the aggregate value (in U.S. Dollars) for each type of Cryptocurrency coin or token held by the Debtors as a percentage of the aggregate value (in U.S. Dollars) of such type of Cryptocurrency coin or token that was on deposit with the Debtors as of the Petition Date (the "Rebalancing Ratio") is consistent across the Debtors' Cryptocurrency portfolio to process and initiate in-kind distributions.

To effectuate the Rebalancing Exercise, prior to the Effective Date, the Debtors plan to enter into a series of transactions that would result in the buying and selling of Cryptocurrency coins until the Rebalancing Ratio is consistent for each type of Cryptocurrency coin or token held by the Debtors (subject to a 5% variance allowance). The Debtors intend to execute such transactions, particularly for such Cryptocurrency that is less liquid, over a multi-week period in order to minimize the impact any such transactions may have on prevailing market prices for such coins. In order to minimize the impact trades have on prevailing market prices, the Debtors may use varying types of orders including time-weighted average price (TWAPs), market orders, limit orders, stop-limit orders, and other such order types as may be appropriate. Such transactions are likely to include swap transactions (*i.e.*, ETH/BTC) in order to minimize the total number of trades that need to be executed, as well as transactions directly for U.S. Dollars or conversion into equivalent stablecoins of a portion of the Debtors' Cryptocurrency portfolio as is

31

necessary to satisfy their obligations under the Plan. Transactions may be executed directly at prevailing market prices, executed on a bilateral basis through bid list requests or through block trades. At this time, the Debtors do not intend to use any derivatives or other hedging transactions. The Debtors anticipate that executing such transactions through third-party market makers, over-the-counter trading desks, and on third party exchanges where the Debtors maintains institutional trading accounts. The Debtors may also seek to engage third parties, including Binance.US, to execute such transactions on their behalf. Pursuant to the Purchase Agreement, the Debtors have agreed to execute such transactions on the Binance.US Platform unless they can obtain a better price from another third party. The number of Cryptocurrency coins that need to be bought and sold is unknowable at this time as the target ratio is based on future Cryptocurrency coin prices.

Accordingly, the Rebalancing Exercise is necessary to effectuate both the Sale Transaction and Liquidation Transaction under the Plan to ensure the Debtors can provide in-kind distributions of Distributable Cryptocurrency to Account Holders. In the event that the Sale Transaction is not consummated and the Debtors are proceeding with the Liquidation Transaction, prior to the Effective Date, the Debtors shall, in consultation with the Committee, be authorized to conduct the Rebalancing Exercise.

The Asset Purchase Agreement provides that the Debtors (prior to the transfer of Cryptocurrency or cash to Binance.US) and each transferred creditor (from and after the transfer of Cryptocurrency or cash to Binance.US) will retain all right, title, and interest in and to the Cryptocurrency or cash allocated to it in accordance with the Asset Purchase Agreement through and including such time as such Cryptocurrency or cash is returned to the Debtors or distributed to such transferred creditor. This is so even if transactions related to the Rebalancing Exercise are consummated on the Binance.US Platform, and such Cryptocurrency will be subject to the Debtors' customary security and control protocols while held by the Debtors. Upon the Effective Date, any Cryptocurrency or cash transferred to Binance.US will be held by Binance.US solely for the benefit of the Debtors or the Account Holders or Holders of OpCo General Unsecured Claims, as applicable, until distributions to Account Holders and Holders of OpCo General Unsecured Claims are made. In addition, the Debtors will determine the amount of Cryptocurrency and cash to be allocated to each Account Holder.

### 5. *Management Transition Plan*

Pursuant to the terms of the Plan, the Debtors shall implement the Management Transition Plan, the terms of which shall be reasonably acceptable to Purchaser and the Committee and included in the Plan Supplement. The Management Transition Plan shall help ensure that employees are available to provide transition services to the Debtors and/or the Wind-Down Entity to effectuate the Sale Transaction and to wind down the Debtors' Estates.

### 6. *Employee Transition Plan*

The Asset Purchase Agreement imposes a number of obligations on the Debtors, including obligations related to (a) making regulatory filings and cooperating with regulators; (b) maintaining and transferring data, including Know-Your-Customer data, securely and completely; (c) developing and implementing a user migration plan involving modifications to Voyager's web interface and mobile app; and an electronic process facilitating the acceptance of certain terms and conditions on the Binance.US Platform; (d) being available for a period following close of the Sale Transaction to provide assistance reasonably requested by the Purchaser in connection with the opening of user accounts and the transfer of information and Cryptocurrency in connection with the Sale Transaction; (e) providing the Purchaser with updates on technical support communications with customers; (f) rebalancing the Cryptocurrency on the Debtors' platform to prepare for closing of the Sale Transaction on a timely basis; (g) "unstaking" certain coins and ensuring they are freely transferrable and not subject to restrictions; and (h) from the date of signing through the date that is four months following close of the Sale Transaction, making available technical IT staff to Binance.US to assist it in understanding the Debtors' business software and transition accounts. *See, e.g.*, Asset Purchase Agreement §§ 6.4, 6.6, 6.10, 6.11, 6.15, and 6.16.

The Debtors will require the services of certain employees to fulfill these obligations and, without such employees, may not be able to satisfy the obligations in the Asset Purchase Agreement. Specifically, the Debtors will need certain employees in legal, finance, and compliance to satisfy the obligations in Section 6.4 of the Asset Purchase Agreement; operations, customer service, engineering, and security to satisfy the obligations in Section 6.6 of the Asset Purchase Agreement; operations, finance, and data to satisfy the obligations of Section 6.11 of the

Asset Purchase Agreement; operations to satisfy the obligations of Section 6.15 of the Asset Purchase Agreement; and security and engineering to satisfy the obligations of Section 6.16 of the Asset Purchase Agreement. The Debtors will also require the services of those employees in the event they need to "toggle" to a Liquidation Transaction for any reason, which would require the Debtors to, among other things, rebalance the Cryptocurrency in their possession and reopen the Debtors' platform for a period to permit customers to withdraw Cryptocurrency safely, among other things, while still interacting with, among others, state and federal regulators. The Debtors have created a transition plan for the approximately 35–40 employees necessary to fulfill either of these options, which is part of the Wind-Down Reserve, has the agreement of the Committee, and will be implemented by the Debtors, the Wind-Down Trustee, or both.

### 7. *Non-Released D&O Claims*

Any Claims or Causes of Action held by the Debtors or their respective estates against the Debtors' CEO and/or CCO (regardless of any fiduciary capacity in which such individuals were acting) that are expressly related to approval of the 3AC Loan are not released pursuant to the Plan (collectively, the "Non-Released D&O Claims") and shall be assigned and transferred to the Wind-Down Entity to be pursued, settled, or resolved by the Wind-Down Entity in accordance with the terms of Article IV.F of the Plan and subject to the Wind-Down Reserve. Any claims against the D&O Carriers that the Debtors' insurance transactions within the 90 days prior to the Petition Date are avoidable under the Bankruptcy Code, applicable state law, or both (the "Non-Released Insurance Claims") shall be assigned and transferred to the Wind-Down Entity to be pursued, settled, or resolved solely by the Wind-Down Entity in accordance with the terms of Article IV.F of the Plan. The Wind-Down Entity shall be a successor to the Debtors' rights, title, and interest in any Non-Released D&O Claims and Non-Released Insurance Claims, and the Wind-Down Entity shall have standing to pursue the Non-Released D&O Claims and the Non-Released Insurance Claims in accordance with the terms of Article IV.F of the Plan; *provided that*: (i) any recovery by the Wind-Down Entity (and the beneficiaries thereof) on account of any Non-Released D&O Claim, including in each case by way of settlement or judgment, shall be satisfied solely by and to the extent of the proceeds of the Debtors' available D&O Liability Insurance Policies (and/or from the D&O Carriers directly) after payment from such D&O Liability Insurance Policies of any and all covered costs and expenses incurred in connection with the defense of the Non-Released D&O Claims; (ii) any party, including any trustee or any beneficiary of the Wind-Down Entity, seeking to execute, garnish, or otherwise attempt to collect on any settlement of or judgment in the Non-Released D&O Claims shall do so solely upon available insurance coverage from the Debtors' available D&O Liability Insurance Policies; and (iii) no party shall (a) record any judgment against the CEO or CCO, or (b) otherwise attempt to collect, directly or indirectly, from the personal assets of the CEO or CCO with respect to the Non-Released D&O Claims. For the avoidance of doubt, this provision does not enjoin, limit, or impair direct claims held by third parties against the Debtors' CEO or CCO (if any) other than any direct claims held by Holders of Claims or Interests that opt into the third party release in Article VIII.B of the Plan. Only upon the occurrence of the earlier of (x) a release being given as part of any later settlement of the Non-Released D&O Claims; (y) final resolution of any coverage claims asserted against the Debtors' available D&O Liability Insurance Policies on account of the Non Released D&O Claims; or (z) exhaustion of the available insurance coverage under the D&O Liability Insurance Policies, the Non-Released D&O Claims shall be released and discharged without the need for further action or Bankruptcy Court order. For the avoidance of doubt, any release of the Non-Released D&O Claims shall not become effective until one of the three conditions stated in the preceding sentence above has been met.

The Debtors currently maintain $20 million in total D&O insurance coverage consisting of: (i) a $5 million primary policy with XL Specialty Insurance Company (the "XL Primary Policy"), (ii) a $5 million excess policy issued by Euclid Financial and Relm Insurance Ltd. (the "Euclid/Relm Excess Policy"), and (iii) a $10 million excess policy issued again by XL Specialty Insurance Company (the "XL Excess Policy"). The Debtors' D&O insurance program provides coverage to the directors and officers of Voyager and its subsidiaries and will convert to a six-year tail period upon expiration or a change in control.

### 8. *Corporate Structure Upon Emergence*

On the Effective Date, the Wind-Down Entity shall be formed for the benefit of the Wind-Down Entity Beneficiaries, as determined by the Wind-Down Entity Agreement, to implement distributions of the Wind-Down Entity Assets. The Wind-Down Entity shall have no objective to continue or engage in the conduct of a trade or

33

business, except to the extent reasonably necessary to, and consistent with, the purpose of the Wind-Down Trust. Upon the transfer of the Wind-Down Entity Assets pursuant to the Wind-Down Entity Agreement, the Debtors shall have no reversionary or further interest in or with respect to the Wind-Down Entity Assets. For all federal income tax purposes, the Wind-Down Entity Beneficiaries will be treated as grantors and owners thereof, and it is intended that the Wind-Down Entity be classified as a liquidating trust under Section 301.7701-4 of the Treasury Regulations. Accordingly, for federal income tax purposes, the transfer of assets to the Wind-Down Entity shall be deemed to occur as (i) a first-step transfer of the Wind-Down Entity Assets to the Holders of Secured Tax Claims, Other Priority Claims, Account Holder Claims, or General Unsecured Claims, as applicable, and (ii) a second-step transfer by such Holders to the Wind-Down Entity. As a result, the beneficiaries of the Wind-Down Entity shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Wind-Down Entity Assets. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

As soon as possible after the transfer of the Wind-Down Entity Assets to the Wind-Down Entity, Wind-Down Entity Trustee shall make a good faith valuation of the Wind-Down Entity Assets. This valuation will be made available from time to time, as relevant for tax reporting purposes. Each of the Debtors, the Wind-Down Entity Trustee, and the Holders of Claims receiving interests in the Wind-Down Entity shall take consistent positions with respect to the valuation of the Wind-Down Entity Assets, and such valuations shall be utilized for all U.S. federal income tax purposes. The Wind-Down Entity shall file annual information tax returns with the IRS as a grantor trust pursuant to Treasury Regulations section 1.671-4(a) that will include information concerning certain items relating to the holding or disposition (or deemed disposition) of the Wind-Down Entity Assets (*e.g.*, income, gain, loss, deduction and credit). Each Wind-Down Entity Beneficiary holding a beneficial interest in the Wind-Down Entity shall receive a copy of the information returns and must report on its federal income tax return its share of all such items. The information provided by the Wind-Down Entity will pertain to Wind-Down Entity Beneficiaries who receive their interests in the Wind-Down Entity in connection with the Plan.

The Wind-Down Entity shall, in an expeditious but orderly manner, make timely distributions to the Wind-Down Entity Beneficiaries pursuant to the Plan and the Confirmation Order and not unduly prolong its duration. The Wind-Down Entity shall be deemed a successor in interest to the Debtors. For the avoidance of doubt, the Wind-Down Entity shall perform no actions other than receiving and distributing the Wind-Down Entity Assets, and not for any other purpose (including conducting any claims reconciliation).

The Wind-Down Trustee shall be the trustee responsible for executing the purpose of the Wind-Down Entity, which shall continue to have all of the rights and powers granted to the Wind-Down Debtors as set forth in the Plan and applicable non-bankruptcy law. The Wind-Down Trustee shall also have the rights, powers, and obligations set forth in the Wind-Down Entity Agreement.

The Restructuring Transactions Memorandum will enumerate the operational steps necessary to, if approved by the Court, effectuate the Plan, the Sale Transaction, and other transactions contemplated thereunder. The Restructuring Transactions Memorandum is a necessary mechanism, particularly for tax purposes, to outline the corporate actions taken. The Restructuring Transactions Memorandum does not alter the substantive rights of Holders of Claims or Interests. The Restructuring Transactions Memorandum will be included in the Plan Supplement.

**B.** **The ~~Plan Toggle~~Sale Transaction and the Liquidation Transaction.**

1.    *The Sale Transaction*

The Debtors, led by Moelis, engaged in a thorough marketing process for the sale of all or substantially all of the Debtors' assets in accordance with the Bidding Procedures. Following the two-week Auction, the Debtors entered into the FTX Purchase Agreement to sell substantially all of their assets to FTX US. Following the collapse of the FTX Transaction, the Debtors reengaged with several potential transaction parties and ultimately selected the offer from Binance.US, as described in greater detail in Article VIII.N of this Disclosure Statement, entitled "The Post-Petition Sale Process." The Debtors now seek to effectuate the Sale Transaction as set forth herein and in the Plan.  If the Sale Transaction is consummated by the Outside Date, pursuant to the terms of the Asset Purchase Agreement, then the following terms shall govern:

On or prior to the Effective Date, the Debtors shall have consummated the Sale Transaction, and, among other things, the Acquired Assets and Assumed Liabilities shall have transferred to the Purchaser free and clear of all Liens, Claims, Interests, charges, or other encumbrances, and the Purchaser shall pay to the Debtors or Holders of Account Holder Claims and Holders of OpCo General Unsecured Claims, as applicable, the proceeds from the Sale Transaction and the Plan, as and to the extent provided for in the Asset Purchase Agreement and the Plan.  The Debtors will have the right to continue to retain custody of Cryptocurrency on behalf of Holders of Account Holder Claims and cash on behalf of Holders of OpCo General Unsecured Claims pending such Holders' onboarding to the Binance.US Platform, and the Purchaser's obligation to deliver such Cryptocurrency and cash will commence upon Purchaser's receipt of such Cryptocurrency and cash from the Debtors.  The Confirmation Order shall authorize the Debtors, the Purchaser, and the Wind-Down Entity, as applicable, to undertake the transactions contemplated by the Asset Purchase Agreement, including pursuant to sections 363, 365, 1123(a)(5)(B), and 1123(a)(5)(D) of the Bankruptcy Code.

The Debtors and Purchaser shall be authorized to take all actions as may be deemed necessary or appropriate to consummate the Sale Transaction pursuant to the terms of the Asset Purchase Agreement, the Customer Onboarding Protocol, and the Plan.  The Debtors shall be authorized to sell any Cryptocurrency to satisfy all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims and Allowed Other Priority Claims.  On and after the Effective Date, except as otherwise provided in the Plan and the Wind-Down Trust Agreement, the Wind-Down Debtors, the Wind-Down Entity, or the Purchaser, as applicable, may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; provided, that the Bankruptcy Court shall retain jurisdiction to resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with any of the foregoing.

Notwithstanding anything contained in this Disclosure Statement, the Plan, and any Definitive Documents, if the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated, all provisions contained in this Plan and the Definitive Documents governing the Sale Transaction shall have no further force and effect, and the provisions governing the Liquidation Transaction shall govern.  The rights and remedies of the Seller and Purchaser under the Asset Purchase Agreement and any related orders of the Bankruptcy Court shall be expressly preserved.

Included below are disclosures regarding certain considerations related to the Sale Transaction, including: (a) Binance.US's financial wherewithal, both in terms of its ability to consummate the Asset Purchase Agreement as well as its ability to meet obligations to Account Holders and Eligible Creditors (as defined in the Asset Purchase Agreement); (b) Binance.US's holding of the Cryptocurrency of the Account Holders following the delivery of such Cryptocurrency to Binance.US, including how such Cryptocurrency is stored and what measures Binance.US has taken to ensure the secure storage of such Cryptocurrency; (c) regulatory considerations; (d) the process of onboarding the Account Holders and Eligible Creditors onto the Binance.US Platform as contemplated under the Asset Purchase Agreement; (e) VGX considerations; (f) data transfer and privacy considerations; and (g) the timing for distributions to Account Holders and Eligible Creditors in Unsupported Jurisdictions.

(a)     **Binance.US's financial wherewithal.**

Binance.US has the requisite financial wherewithal to make the payments contemplated under the Asset Purchase Agreement. The payments that Binance.US is required to make under the Asset Purchase Agreement are (1) a $20 million payment to the Debtors' estates in connection with the Sale Transaction, and (2) reimbursement of up to $15 million of the Debtors' expenses (to the extent any are due pursuant to Section 6.21 of the Asset Purchase Agreement). Binance.US has ample cash on hand (which does not include, for the avoidance of doubt, any customer assets) immediately available to cover such payments without the need for any external financing.

The Asset Purchase Agreement does not require Binance.US to make any cash or other payments in exchange for the Cryptocurrency to be transferred by the Debtors to its platform. Such Cryptocurrency is to be transferred to Binance.US on the basis of Binance.US having the obligation to make distributions to Account Holders in accordance with the Asset Purchase Agreement and the Plan.

Binance.US maintains 100% reserves for all its customers' digital assets (*i.e.*, if a customer has deposited 1 BTC with Binance.US, Binance.US holds 1 BTC on account of such customer's deposit). Binance.US's customer assets are available to be withdrawn at any time, subject to Binance.US's Terms of Use (which are available at: https://www.Binance.US/terms-of-use). Binance.US also has a sizeable and adequately capitalized balance sheet. Even if all of Binance.US's customers withdraw all of their digital assets, Binance.US would have substantial capital remaining on its balance sheet.

Binance.US also does not lend any of its customers' assets or offer margin products on its platform.

(b) **Binance.US's holding of customer assets.**

The Asset Purchase Agreement, as amended to reflect input from the Committee, contemplates that all beneficial title to Cryptocurrency will remain with the Debtors up until the Effective Date. After that point, such Cryptocurrency will be transferred from the Debtors to Binance.US only as and when relevant creditors become eligible users (*i.e.*, satisfy Binance.US's know-your-customer requirements and accept the Binance.US terms and conditions identified above) on the Binance.US Platform in accordance with the Asset Purchase Agreement and Plan, and upon such transfer, Binance.US will be obligated to make such Cryptocurrency available to the relevant creditors within five (5) business days of receipt. Cryptocurrency that is transferred to Binance.US will be held by Binance.US pursuant to its standard digital asset wallet infrastructure which is stored on Amazon Web Services (AWS) servers located in Northern Virginia and Tokyo.

Binance.US has various security protocols in place to ensure the safe storage of customer assets. Binance.US's security protocols have achieved various third-party expert certifications attesting to their compliance with industry standards, including: (a) Payment Card Industry Data Security Standard (PCI DSS) certification, (b) International Organization for Standardization (ISO) 27001 and 27701 certifications, and (c) Service Organization Control (SOC 2) Type 2 attestation verified by an independent auditor.

(c) **Regulatory Considerations.**

The Asset Purchase Agreement provides that Binance.US will make distributions to Account Holders and Eligible Creditors following the transfer of Cryptocurrency or cash by the Debtors to Binance.US (subject to and in accordance with the Asset Purchase Agreement and the Plan). Pursuant to Binance.US's Terms of Use and related policies and procedures, Binance.US will not make any distributions in any Unsupported Jurisdictions or allow trading by the accounts of Account Holders located in Unsupported Jurisdictions unless and until Binance.US has received the necessary licenses and/or authorizations. Binance.US has licenses, authorizations, or exemptions (as applicable) in the following Supported Jurisdictions that require such licenses, authorizations, or exemptions: Alabama (Sale of Checks License, SC 814); Alaska (Money Transmitter License, AKMT-012960); Arizona (Money Transmitter, 1009212); Arkansas (Money Transmission License, 119231); Connecticut (Connecticut Money Transmission License, MT-1906829); Delaware (Sale of Checks and Transmission of Money, 030095); Florida (FT230000290); Georgia (Seller of Payment Instruments License, 72019); Guam (Foreign Exchange/Money Transmittal - SRL NO 2316097); Idaho (Idaho Money Transmitters, MTL – 306); Iowa (Money Services License, 2020-0087); Illinois (Transmitter of Money, MT.0000392); Kansas (Kansas Money Transmitter License, MT.0000182); Kentucky (Money Transmitter License, SC723443); Maryland (Money Transmission License, 12-1906829); Maine (Money Transmitter License, NMT2053153); Michigan (Money Transmitter License,

MT0022936); Minnesota (Money Transmitter License, MT-1906829); Missouri (Sales of Checks and Money Transmitter, MO-21-8764); Mississippi (Money Transmitter License, MT1906829);Nebraska (Nebraska Money Transmitter License, 1906829); Nevada (FID Money Transmitter License, MT11161); New Hampshire (Money Transmitter, 23528-MT); New Jersey (Money Transmitter, L072139); New Mexico (Money Transmitter License); North Carolina (Money Transmitter License, 190690); North Dakota (North Dakota Money Transmitter License, MT103722); Ohio (Money Transmitter License, OHMT199); Oklahoma (Money Transmitter, OK-DOB-001); Oregon (Money Transmission License, 1906829); Pennsylvania (Pennsylvania Money Transmitter License, 80252); Puerto Rico (Money Transmitter License, TM-137); Rhode Island (Rhode Island Currency Transmitter License, 20224384CT); South Carolina (Money Transmitter License, 1906829); South Dakota (Money Transmitter, MT.2199); Tennessee (Money Transmitter License, 1906829); Virginia (Money Transmitter License, MO-403); Washington (Money Transmitter License, 550-MT-125281); Washington DC (District of Columbia Money Transmission License, MTR1906829); West Virginia (West Virginia Money Transmitter License, 1906829); and Wyoming (Money Transmitter License, 7292).[27]

Additionally, Binance.US does not currently intend on engaging in any activities in connection with or related to the Asset Purchase Agreement that require registration with the United States Securities Exchange Commission, the United States Commodity Futures Trading Commission, or any state securities and/or commodities authorities.

Again, Binance.US does not lend any of its customers' assets or offer margin products on its platform.

**(d)    The Binance.US Customer Onboarding Process.**

In advance of the Effective Date, and continuing after the Effective Date, Account Holders will be provided with the opportunity to create an account with Binance.US in order to receive an in-kind distribution of their claims in the same types of Cryptocurrency that they deposited with the Debtors.  In connection with that process, such Account Holders will be prompted to accept Binance.US's Terms of Use (which are available at: https://www.Binance.US/terms-of-use) and Privacy Policy (available at: https://Binance.US/privacy-policy) and complete Binance.US's customer onboarding (*i.e.*, KYC) process.  Account Holders will be able to withdraw their in-kind distributions from the Binance.US Platform – no Account Holder is required to continue to use Binance.US on a go-forward basis.  To the extent any such Account Holders do not agree to the Terms of Use and Privacy Policy, or are unable to complete Binance.US's customer onboarding process, within three months of the Effective Date, Binance.US will liquidate the Cryptocurrency that would have been allocated to such Account Holders by selling such Cryptocurrency to other users of the Binance.US Platform at then-current market prices in accordance with Binance.US's trading rules (available at: https://www.Binance.US/trading-rules), and distribute the proceeds of such liquidation to the Debtors for further distribution to such Account Holders pursuant to the Plan.  See also item (g) below with respect to distributions of Cryptocurrency to Account Holders located in Unsupported Jurisdictions.

**(e)    VGX considerations under the Sale Transaction.**

The Asset Purchase Agreement does not impose on Binance.US any obligation to list VGX or support trading VGX on its platform.  Binance.US will conduct an internal review process with respect to whether it will support trading of the VGX on its platform.  Such a determination involves myriad factors and may require input from various third-party advisors and experts, including legal counsel.  Accordingly, Binance.US cannot predict with any accuracy the amount of time this analysis will require or its outcome.

Regardless of whether trading of VGX becomes supported on the Binance.US Platform, Account Holders may withdraw such tokens from their accounts on the Binance.US Platform when available to them in accordance with the Asset Purchase Agreement and the Plan, and subject to Binance.US's terms of use.

**(f)    Data Transfer and Privacy Considerations under the Sale Transaction.**

---

[27]  A comprehensive list of the licenses and authorizations currently held by Binance.US is available at: https://support.Binance.US/hc/en-us/articles/360050502193-Licenses.  Note that certain jurisdictions do not require such licenses, authorizations, or exemptions (*e.g.*, California and Montana).

The Debtors' customer-facing privacy policy permits transfers of user data to a buyer or other successor in connection with a sale of the Debtors' assets, including as part of a bankruptcy, liquidation, or similar proceeding.[28] Following the transfer of such data, Account Holders' data will be subject to the Binance.US Privacy Policy. However, in order to facilitate quicker customer onboarding in order to enable Account Holders to access their in-kind distributions promptly after the Effective Date, the Asset Purchase Agreement contemplates that Account Holders will be provided with the ability to "opt-in" and consent to the transfer of their user data to Binance.US before the Effective Date occurs. Users will receive an email notification regarding the transfer of user data that presents the option to opt-in to the pre-closing transfer and provides a link to the Binance.US Privacy Policy. As described in Article VI.B.7 of this Disclosure Statement, the Debtors will continue to impose its security protocols before, through, and following the closing of the Sale Transaction, as necessary.

### (g) Unsupported Jurisdictions under the Sale Transaction.

Section 6.12(b) Asset Purchase Agreement contemplates that the Debtors are not required to deliver to Binance.US any assets associated with Account Holders or other creditors located in jurisdictions where Binance.US does not have appropriate licenses, regulatory authorizations or exemptions to provide the Binacnce.US platform and associated services (referred to herein as Unsupported Jurisdictions). The Unsupported Jurisdictions are Hawaii, New York, Texas, and Vermont. Instead of delivering the Cryptocurrency or cash distributions to Account Holders and Holders of OpCo General Unsecured Claims in such Unsupported Jurisdictions, the Debtors will retain control of such assets until Binance.US has received the appropriate license, authorization, or exemption, as applicable. If Binance.US does not receive such license, authorization, or exemption within six months following the Effective Date (*i.e.*, three months longer relative to Account Holders and Holders of OpCo General Unsecured Claims in Supported Jurisdictions), the Debtors will cause such assets to be liquidated (which liquidation may be conducted through Binance.US) and provide the cash proceeds for distribution to Account Holders and Holders of OpCo General Unsecured Claims in such Unsupported Jurisdictions in accordance with the Plan. Binance.US is currently working with state regulators to seek the requisite state licenses, authorizations, exemptions, or other alternative solutions, as applicable, in order to enable distributions to Account Holders and Holders of OpCo General Unsecured Claims in Unsupported Jurisdictions, and will continue to do so following the Effective Date to the extent such approvals or regulatory accommodations have not been granted. For avoidance of doubt, there is no guarantee or assurance that Binance.US will be able to obtain the necessary licenses, authorizations, or exemptions in order to enable it to make Cryptocurrency or cash distributions to Account Holders and Holders of OpCo General Unsecured Claims in Unsupported Jurisdictions. As such, the Debtors may be required to liquidate the Cryptocurrency held by Account Holders in Unsupported Jurisdictions and provide the cash proceeds for distribution to such Account Holders after the expiration of the six-month period following the Effective Date in accordance with the terms of the Plan.

### 2. *The Liquidation Transaction*

If the Sale Transaction is not consummated by the Outside Date, pursuant to the terms of the Asset Purchase Agreement, then the Debtors will "toggle" to the Liquidation Transaction and the following terms shall govern:

---

[28] *See* Voyager Privacy Policy, ¶ 6, available at: https://www.investvoyager.com/privacypolicy/.

On or after the Outside Date, the Debtors will pursue the Liquidation Transaction in accordance with the Liquidation Procedures. Pursuant to the Liquidation Transaction, the Debtors, the Wind-Down Entity, or the Wind-Down Trustee, as applicable, will distribute certain of the Cryptocurrency in-kind to Holders of Account Holder Claims in accordance with Article III.C of the Plan, transfer all Wind-Down Entity Assets or Wind-Down Trust Assets to the Wind-Down Reserve, liquidate certain of the Cryptocurrency, wind down and dissolve the Debtors, and pursue final administration of the Debtors' Estates pursuant to the Bankruptcy Code.

The Debtors, or the Wind-Down Entity, as applicable, shall be authorized to take all actions as may be deemed necessary or appropriate to consummate the Liquidation Transaction pursuant to the Plan. On or before the date that that is twenty-one days prior to the anticipated commencement of the Liquidation Transaction, the Debtors, or the Wind-Down Entity, as applicable, shall file the Liquidation Procedures with the Bankruptcy Court. Parties in interest shall have ten days to object to the Liquidation Procedures, and if no objections are timely filed, the Liquidation Procedures shall be approved. In the event of a timely objection, the Bankruptcy Court shall adjudicate any objection to the Liquidation Procedures.

On and after the Effective Date, except as otherwise provided in the Plan, the Wind-Down Trust Agreement, and the Liquidation Procedures, the Wind-Down Debtors or the Wind-Down Entity as applicable, may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; provided, that the Bankruptcy Court shall retain jurisdiction to resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with any of the foregoing.

### C. Means for Implementation of the Plan.

#### 1. *Wind-Down Trust*

On or after the Effective Date, the Wind-Down Trust will be established. The Wind-Down Trust shall be the successor-in-interest to the Debtors, and the Wind-Down Trust shall be a successor to the Debtors' rights, title, and interest to the Wind-Down Trust Assets. The Wind-Down Trust will conduct no business operations and will be charged with winding down the Debtors' Estates. The Wind-Down Trust shall be managed by the Wind-Down Trustee and shall be subject to a Wind-Down Trust Oversight Committee. For the avoidance of doubt, in the event that the Restructuring Transactions Memorandum specifies that the Wind-Down Debtors will be the Wind-Down Entity, the Wind-Down Debtors shall be managed by the Wind-Down Trustee and shall be subject to the Wind-Down Trust Oversight Committee in the same manner as if the Wind-Down Entity is the Wind-Down Trust. The Wind-Down Trust shall be administered in accordance with the terms of the Wind-Down Trust Agreement and shall be subject to the Wind-Down Reserve and the Non-Released D&O Claim Budget. For the avoidance of doubt, the Wind-Down Trust shall not have any right or interest in any Cause of Action or Claim constituting an Acquired Asset. The Wind-Down Trust shall be administered in a manner consistent with the SEC's published guidance on liquidating trusts.

Prior to the Effective Date, any and all of the Debtors' assets shall remain assets of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and on the Effective Date the Wind-Down Trust Assets shall, subject to the Wind-Down Trust Agreement, be transferred to and vest in the Wind-Down Trust or the Wind-Down Debtors, as applicable. For the avoidance of doubt, to the extent not otherwise waived in writing, released, settled, compromised, assigned or sold pursuant to a prior order or the Plan, the Wind-Down Entity specifically retains and reserves the right to assert, after the Effective Date, any and all of the Vested Causes of Action and related rights, whether or not asserted as of the Effective Date, and all proceeds of the foregoing, subject to the terms of the Plan, including without limitation Article IV.E and Article IV.F.

Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, only the Wind-Down Trust and the Wind-Down Trustee shall have the right to pursue or not to pursue, or, subject to the terms hereof and the Wind-Down Trust Agreement, compromise or settle any Wind-Down Trust Assets transferred to the Wind-Down Trust. On and after the Effective Date, the Wind-Down Trust and the Wind-Down Trustee may, without further Bankruptcy Court approval, commence, litigate, and settle any Vested Causes of Action or Claims relating to any Wind-Down Trust Assets transferred to the Wind-Down Trust or rights to payment or Claims that belong to the

Debtors as of the Effective Date or are instituted by the Wind-Down Trust and Wind-Down Trustee on or after the Effective Date, except as otherwise expressly provided herein and in the Wind-Down Trust Agreement. All of the Wind-Down Trust's activities shall be subject to the Wind-Down Reserve and the Non-Released D&O Claim Budget. The Wind-Down Trust shall be entitled to enforce all defenses and counterclaims to all Claims asserted against the Debtors and their Estates, including setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code.

Based on its preliminary investigation of non-released Claims against third parties unaffiliated with the Debtors, the Committee has identified potential Claims against non-released third parties unaffiliated with the Debtors that the Wind-Down Entity will seek to investigate further and may pursue. To ensure that the Wind-Down Entity has sufficient resources to pursue Claims discovered through its investigation, the Committee voted and determined that approximately $60 million should be included in the Wind-Down Reserve for that investigation and potential offensive litigation, and the Committee believes this investment (to the extent ultimately made) will benefit Holders of Claims. All expenses will be reviewed and approved by the appointed Trustee of the Wind-Down Trust who has a fiduciary obligation to ensure that expenses are responsibly spent. The Wind-Down Entity will act responsibly in assessing and pursuing litigation, only pursuing Claims that it believes will create a net benefit for Holders of Claims. The funds obtained in litigation by the Wind-Down Trust and unused funds will be returned to Holders of Claims. The Wind-Down Entity's goal is to obtain and return to Holders of Claims as much Cryptocurrency and fiat as possible.

### 2. *Wind-Down Trustee and the Wind-Down Trust Oversight Committee Exculpation, Indemnification, Insurance, and Liability Limitation*

The Wind-Down Trustee, the Wind-Down Trust Oversight Committee, and all professionals retained by the Wind-Down Trustee and the Wind-Down Trust Oversight Committee, each in their capacities as such, shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by the Wind-Down Debtors. The Wind-Down Trustee may obtain, on behalf of itself and the Wind-Down Trust Oversight Committee, at the expense of the Wind-Down Debtors, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Wind-Down Debtors. The Wind-Down Trustee and the Wind-Down Trust Oversight Committee may rely upon written information previously generated by the Debtors.

### 3. *Tax Returns*

After the Effective Date, the Wind-Down Trustee shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Debtors and the Wind-Down Debtors, and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

### 4. *Dissolution of the Wind-Down Debtors*

Upon a certification to be Filed with the Bankruptcy Court by the Wind-Down Trustee of all distributions having been made and completion of all of its duties under the Plan and entry of a final decree closing the last of the Chapter 11 Cases, the Wind-Down Debtors shall be deemed to be dissolved without any further action by the Wind-Down Debtors, including the Filing of any documents with the secretary of state for the state in which the Wind-Down Debtors are formed or any other jurisdiction. The Wind-Down Trustee, however, shall have authority to take all necessary actions to dissolve the Wind-Down Debtors in and withdraw the Wind-Down Debtors from applicable states.

### 5. *Statutory Committee and Cessation of Fee and Expense Payment*

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases, including the Committee, shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases, except for the Filing of applications for compensation. The Wind-Down Debtors shall no longer be responsible for paying any fees or expenses incurred by any statutory committee, including the

40

Committee, after the Effective Date, except in connection with any fees or expenses for services rendered prior to the Effective Date that are Allowed by the Bankruptcy Court.

### 6. *Distributions of Net Owed Coins; Additional Bankruptcy Distributions*

As a general matter, the Purchaser will allocate each Account Holder's Net Owed Coins to its account on the Binance.US Platform, and each Holder of OpCo General Unsecured Claim's Pro Rata share of the Distributable Cryptocurrency (in Cash) to its account on the Binance.US Platform, in each case in accordance with, and subject to, the provisions of Section 6.12 and 6.14 of the Asset Purchase Agreement, as applicable.

As a general matter, the Customer Onboarding Protocol will provide that the Purchaser will make Additional Bankruptcy Distributions to Transferred Creditors corresponding to their Pro Rata shares of such Additional Bankruptcy Distribution (if such Additional Bankruptcy Distribution is in Cryptocurrency, based on the spot market value on the Binance.US Platform of the Cryptocurrency included in such Additional Bankruptcy Distribution), all in accordance with any applicable Post-Bankruptcy Statement (as defined in the Asset Purchase Agreement).

If any Account Holder or Holder of an Allowed OpCo General Unsecured Claim does not become a Transferred Creditor prior to the date that is three (3) months following the later of the Effective Date or the date on which the terms and conditions for the Binance.US Platform are made available for such Person to accept, (as provided in the Customer Onboarding Protocol) then Purchaser shall convert any Cryptocurrency allocable to such Person into U.S. Dollars at the then-prevailing rates (including applicable fees, spreads, costs and expenses) on the Binance.US Platform and deliver such U.S. Dollars, together with any cash or others assets in respect of such Persons, to the Debtors within five (5) Business Days, for further distribution by the Debtors in accordance with the Plan and the Customer Onboarding Protocol.

If any Account Holder or Holder of an Allowed OpCo General Unsecured Claim is located in an Unsupported Jurisdiction (as defined in the Asset Purchase Agreement), then the Net Owed Coins, cash and Additional Bankruptcy Distributions, as applicable, allocable to such Person shall be handled pursuant to Section 6.12(b) or, if applicable, Section 6.14(d) of the Asset Purchase Agreement.

Purchaser shall have no responsibility to make any distributions other than as contemplated by Sections 6.12 and 6.14 of the Asset Purchase Agreement.

### 7. *Election to Contribute Third-Party Claims*

To date, there has not been an investigation into direct claims that can be asserted against third parties. Accordingly, specific claims against third parties, including the Contributed Third-Party Claims are not yet determined. After the Effective Date, the Wind-Down Entity will conduct an investigation into claims that can be asserted against third parties. After that investigation is completed, the Wind-Down Entity will assess the viability and collectability of potential claims before determining whether to pursue them. Because aggregating all Contributed Third-Party Claims may enable the pursuit and settlement of such litigation claims in a more efficient and effective manner, each Holder of a Claim or Interest may agree, by electing on its ballot or opt-in form, to contribute its Contributed Third-Party Claims to the Wind-Down Entity. By electing such option on its ballot or opt-in form, each Contributing Claimant agrees that, subject to the occurrence of the Effective Date and the formation of the Wind-Down Entity, it will be deemed, without further action, (i) to have irrevocably contributed its Contributed Third-Party Claims to the Wind-Down Entity, and (ii) to have agreed to execute any documents reasonably requested by the Debtors or the Wind-Down Entity to memorialize and effectuate such contribution. For the avoidance of doubt, any recoveries by the Wind-Down Entity from the pursuit of Contributed Third-Party Claims shall be for the benefit of all creditors.

On the Effective Date, all Contributed Third-Party Claims will be irrevocably contributed to the Wind-Down Entity and shall thereafter be Wind-Down Trust Assets for all purposes. No Person may rely on the absence of a specific reference in the Plan, the Disclosure Statement, the Confirmation Order, the Wind-Down Trust Agreement, the Plan Supplement, or any other document as any indication that the Wind-Down Trust will or will not pursue any and all available Contributed Third-Party Claims against such Person. The Wind-Down Trust shall

have, retain, reserve, and be entitled to assert all Contributed Third-Party Claims fully to the same extent that the Contributing Claimants could have asserted such claims prior to the Effective Date. For the avoidance of doubt, the Contributed Third-Party Claims shall not include the rights of any of the Contributing Claimants to receive the distributions under the Plan on account of their Claims or Interests.

## VI. THE DEBTORS' BUSINESS OPERATIONS AND CAPITAL STRUCTURE

### A. The Debtors' Corporate Structure and History.

Voyager was founded in 2018 by Stephen Ehrlich, Philip Eytan, Gaspard de Dreuzy, and Oscar Salazar, a group of Wall Street and Silicon Valley entrepreneurs with extensive experience in the technology and finance sectors. Voyager was founded to bring choice, transparency, and cost efficiency to cryptocurrency investors and was designed to be "accessible to all" by focusing on the needs of retail customers.

Voyager grew rapidly—in just four years, Voyager's platform evolved from a small startup to an industry-leading trading platform that reached a peak of 3.5 million users and over $5.9 billion of cryptocurrency assets held. Voyager is a public company that began trading on the Toronto Stock Exchange in 2021 under the ticker "VOYG."[29] A simplified version of the Debtors' current corporate structure is as follows:



### B. The Debtors' Assets and Operations.

Voyager's primary operations consist of (i) a trading platform, (ii) custodial services through which customers earn rewards on stored cryptocurrency assets, and (iii) lending and staking programs. All of the

---

[29]  On July 6, 2022, the Toronto Stock Exchange suspended all trading in VOYG.

Company's services are accessible through a mobile application that users can download on their smartphones and other smart devices.

### 1. The Trading Platform

Traditional trading platforms have largely focused on either retail investors or institutional investors, tailoring features to one group at the exclusion of the other. Voyager's founders understood that, though retail investors do not need the full suite of services that an institutional-focused trading platform provides, retail investors deserve a high-quality trading experience that maximizes their ability to invest in the cryptocurrency sector on an equal playing field with other market participants.

Voyager operates as a cryptocurrency trading platform, matching its customers with counterparties who can facilitate the customer's desired trade. The Company's platform is simple and easy to use, but beneath the retail customer-focused user interface is an institutional-grade trading platform built to provide Voyager's customers with high-quality trade execution across numerous digital currencies. The Company's platform is unique as it surveys more than a dozen exchanges and liquidity providers and executes trades through a proprietary algorithm that evaluates the price, certainty of execution, reliability of the trading venue, and speed of execution to deliver each customer a high-quality execution. Ultimately, Voyager's customers know that they have access to a best-in-class trading platform no matter how big or small their trade.

### 2. Custodial Services

Digital currencies deposited by customers are stored on Voyager's platform in omnibus wallets rather than in individualized digital "wallets." In exchange, Voyager customers earn rewards on deposits. Prior to the Petition Date, rewards were primarily paid in three ways: (i) PIK Rewards, as defined below; and (ii) through the VGX Token and the Voyager Loyalty Program, as defined below. To complement its custodial services and the Voyager Loyalty Program, customers can sign up for the Voyager Debit Card.

*PIK Rewards*. Customers who deposit certain currencies with Voyager earn payable-in-kind interest ("PIK Rewards") on their assets through the Voyager Earn Program, provided that such users maintain a minimum monthly balance and keep their assets on the Company's platform.

*Voyager Loyalty Program and VGX Token*. Voyager token ("VGX" or "Voyager Token") is a digital currency issued and administered by the Company. VGX is primarily issued in connection with the Company's loyalty and rewards program (the "Voyager Loyalty Program"). Ownership of VGX entitles users to benefits on their accounts operating through a tiered reward system. VGX is traded on the Coinbase Exchange under the ticker "VGX."

The Voyager Loyalty Program is similar to retail or restaurant loyalty programs where loyal users are rewarded for continued use of the platform. Active users on the Voyager platform can earn a variety of rewards and incentives, including higher referral bonuses, lower transaction fees, prioritized customer support, higher PIK Rewards rates, and access to special events and investment opportunities.

### 3. Staking

Staking offers another revenue avenue for Voyager by generating passive income on coins that are staked through staking protocols without needing to sell the underlying cryptocurrency. This process involves committing cryptocurrency assets to a project in exchange for a set rewards rate determined by each staking protocol.

### 4. Voyager's Lending Program[30]

Prior to the Petition Date, the Debtors lent cryptocurrency deposited on its platform to third parties. Such third parties paid the Debtors a pre-negotiated interest rate that was payable in payment-in-kind (*i.e.*, a Bitcoin loan accrues interest payable in Bitcoin). During these chapter 11 cases, the Debtors recalled all outstanding loans made

---

[30] The Lending Program is described in further detail in the First Day Declaration.

to third parties, with the exception of certain loans made to Galaxy Digital LLC. The Debtors expect to unwind the loans made to Galaxy Digital LLC prior to confirmation.

### 5. *Voyager's Investments*

Prior to the Petition Date and in the ordinary course of business, Voyager made equity investments in certain public and private companies primarily focused on venture capital initiatives. Such investments are in an aggregate amount of approximately $9.7 million across 11 companies and yield varied amounts of dividends based on the terms of such equity investments.

### 6. *Using Voyager's Platform*

Customers access the Company's entire suite of services through Voyager's mobile application (the "Voyager App"). Customers sign up for a Voyager account on the Voyager App after digitally executing Voyager's customer agreement and linking their bank account or off-site cryptocurrency wallet to the platform to facilitate the purchase of cryptocurrency or the transfer of the customer's own cryptocurrency to the platform.

The Company does not maintain a separate cryptocurrency wallet for each customer. Instead, all cryptocurrency assets are commingled on an asset-by-asset basis and held in omnibus accounts in the name of Voyager Digital, LLC. When a customer deposits crypto assets, the assets first enter Voyager's self-custody wallet system (such system, "Bedrock"). All deposits of crypto assets are subject to Voyager's transaction monitoring program that uses Chainalysis Pte. Ltd. ("Chainalysis"), a third-party vendor, to conduct blockchain review of crypto assets transferred to the Voyager platform. If a customer's external crypto wallet depositing crypto assets is flagged by Chainalysis, Voyager is alerted by Chainalysis and Voyager conducts an investigation and takes appropriate actions, up to and including restricting and offboarding the customer account. If the wallet passes Chainalysis verification, then the relevant crypto assets are swept automatically from Bedrock for transfer to the applicable omnibus account with a third-party custodian or self-custody solution, which Voyager controls.

### 7. *Voyager's Security Processes and Procedures*

Voyager has a defined cybersecurity framework that includes protecting people, technology, and digital assets. The security protocols utilize several strategies and activities, including conducting first and third-party security assessments, multi-party computation ("MPC") and asset protection, and diligent monitoring and proactive hunting for risks. The Debtors use four different custodial solutions to hold and safely store a majority of the Cryptocurrency: Fireblocks Inc. ("Fireblocks"), Copper.co ("Copper"), Anchorage Digital Bank N.A. ("Anchorage"), and Coinbase Trust Company ("Coinbase"), and one self-custodial software solution called Gnosis (collectively, the "Custodians").[31] Specifically, all of the Custodians use MPC, which is one of the primary technologies custodians in the industry utilize to secure Cryptocurrency assets. Through MPC, private keys are never constructed in one place, which minimizes the possibility for a single point of compromise. To set up keys, wallets typically are "multi-signer" wallets that require a threshold of co-signers on behalf of the Custodian and a threshold of co-signers on behalf of Voyager. None of the parties are able to sign a transaction by themselves to setup a key and none of the Custodians hold the entire "private key" for wallets.

Each individual MPC key share is also randomized in a hardware isolated component to mitigate the risk of takeover by an outsider or insider who has access to a threshold device holding the MPC key shares. The process also involves a verification process where each of the co-signers assures that the metadata matches the request it carries. Fireblocks also enables Voyager to back up the set of MPC key shares of a Fireblocks Vault and load them onto a secure offline environment, which may be used to reconstruct a "master private key" of the Fireblocks Vault in the event of loss. Additionally, Voyager's other Custodians have the same or similar procedures (*e.g.*, the Company's agreement with Copper provides a failsafe mechanism through a trusted third-party agreement if Voyager or Copper loses their keys to access wallets).

---

[31] The Debtors have approximately $15-20 million worth of Coins held on exchanges that are not supported by the Custodians. The Debtors' Head of Treasury has sole access and control over these Coins to minimize any security breaches.

Under all of the custodial agreements with the Custodians, Voyager must nominate authorized persons to access the custodial platform and give directions on what to do with the digital assets stored on their platform. The Custodians only act through directions provided by the nominated persons. A very limited number of people at the Company are deemed authorized persons who have access to control the custodial accounts. Such people are the only ones who can otherwise authorize the Custodian to move Cryptocurrency out of their "vault." Voyager selects designated persons only after going through a quorum approval process in place at the Company. There is not a single person at Voyager that can execute a transaction without authorization from at least one other person.

The Debtors also have their own robust key management processes in place, including key storage technology and secret managers such as LastPass to store passwords. These security measures have been sufficient to safeguard the Debtors' valuable Cryptocurrency assets and are on par with security measures employed by financial institutions and other sectors that employ military-grade security. To date, Voyager has never had any security issues with the Custodians or run into any issues with lost keys.

The Debtors utilize a combination of cutting-edge technology and top cybersecurity talent to protect their assets as part of a multilevel cybersecurity framework. For example, for any large withdrawals, the Debtors historically engaged in an automated risk assessment that utilized multiple techniques to analyze risk factors. Cases flagged at certain risk levels are first escalated to the Company's customer experience team and then escalated, as necessary, to the Company's anti-fraud operations team to review and investigate.

The Debtors maintain a robust security operations center that is responsible for the monitoring of the Debtors' infrastructure and interfaces to prevent misappropriation and external cyber-attacks with respect to the Cryptocurrency and Cryptocurrency-based transactions. The Debtors also work with leading vendors that are used by institutions worldwide to provide the security services needed to protect client assets and data. Importantly, Voyager has also never been subject to a security breach falling directly within Voyager's control (customers may have been susceptible to outside breaches due to weak passwords, for example). Between December 2021 and June 2022 alone, the Company's security team mitigated over six million intrusion attempts.

Due to the digital nature of the Cryptocurrency, they cannot be stored in a traditional bank account, the Debtors believe the security protocols and controls as described in herein and the ongoing collaboration and work with vendors, such as the Custodians, are sufficient to address the bespoke protections the Cryptocurrency require and all Cryptocurrency is secure. For the avoidance of doubt, the Debtors will continue to impose the security protocols defined herein for all Cryptocurrency held on their platform, including before, through, and following the Effective Date and closing of the Sale Transaction, as necessary.

**C.**      **The Debtors' Capital Structure.**

     **1.**      *The Debtors' Debt Obligations*

On June 22, 2022, Voyager Digital Holdings, Inc. entered into that certain agreement for the revolving credit facility dated June 21, 2022 (the "Loan Agreement," and such facility, the "Loan Facility") with Alameda Ventures Ltd. ("Alameda") as lender, to provide a revolving credit facility of $200 million cash and USD Coin ("USDC," and such loans, the "Cash Loans") and 15,000 Bitcoin ("BTC," and such loans the "BTC Loans") guaranteed by Voyager Digital Ltd. As of the Petition Date, the total value of aggregate consideration available under the Loan Facility was approximately $500 million.[32] However, Debtor Voyager Digital Holdings, Inc. was only able to access 75 million USDC under the Loan Facility due to borrowing restrictions. The aggregate value of the USDC outstanding is $75 million.[33]

The borrowers under the Loan Agreement can draw on the Loan Facility in U.S. dollars or USDC under the Cash Loans or in BTC under the BTC Loans. The Loan Facility accrues interest on the outstanding principal balance at a rate equal to five percent annually. Any accrued interest is due on December 31, 2024, the Loan Facility's maturity date. Repayment of any principal balance is required to be in the currency in which the amount

---

[32]      Assuming a Bitcoin price of $20,000.

[33]      As a stablecoin, USDC is pegged to $1 per coin.

was funded (if in BTC, the repayment must be equal to the amount drawn down and outstanding at the time of repayment).

### 2. The Debtors' Intercompany Obligations

There are six intercompany obligations owed between the Debtors (collectively, the "Intercompany Obligations"). The Intercompany Obligations comprise four Intercompany Obligations owed by OpCo to TopCo, one Intercompany Obligation owed by OpCo to HoldCo, and one Intercompany Obligation owed by HoldCo to TopCo. Additionally, in the ordinary course of business, the Debtors make payments by one Debtor on behalf of another Debtor, resulting in intercompany receivables between the Debtor entities (collectively, the "Intercompany Receivables"). Whether any given Intercompany Obligation or Intercompany Receivable is a valid intercompany loan or a capital contribution depends on the consideration of a number of relevant factors. Based on the Debtors' preliminary analysis, it is likely that at least five of the six Intercompany Obligations are capital contributions because TopCo received third-party equity investments and subsequently pushed down such investments to OpCo to fund the Debtors' operating business. Similarly, based on the Debtors' preliminary analysis, it is likely that the Intercompany Receivables are capital contributions based on a number of factors, including that the Debtors intentionally never settle the Intercompany Receivables. The independent directors at TopCo, HoldCo, and OpCo have engaged independent counsel and are conducting a review to analyze the Intercompany Obligations and their treatment as capital contributions or loans.

In the event that any Intercompany Obligation or Intercompany Receivable owed by OpCo one the one hand to TopCo or HoldCo on the other hand is determined to be a loan, recoveries to Account Holders and Holders of OpCo General Unsecured Claims may be reduced. This Disclosure Statement assumes that the Intercompany Obligations between the Debtors and all Intercompany Receivables between the Debtors will be recharacterized as capital contributions and will not be entitled to Pro Rata recoveries with other Holders of Claims at the applicable Debtor entity.

Below is a summary of each of the Intercompany Obligations and Intercompany Receivables and the Debtors' conclusions regarding whether such are valid loans or capital contributions. The Ad Hoc Equity Holder Group disputes the Debtors' conclusions regarding the Intercompany Obligations and Intercompany Receivables.

### (a) Intercompany Obligations by OpCo to TopCo.

#### i. The Loan Agreement between Voyager Digital Ltd., as Lender, and Voyager Digital, LLC, as Borrower, dated February 12, 2021

On February 12, 2021, OpCo, as borrower, entered into that certain loan agreement with TopCo, as lender, to document the $70 million unsecured loan previously received by OpCo from TopCo (the "February 2021 Term Loan"). The February 2021 Term Loan matures on February 12, 2024 and accrues interest at a rate equal to LIBOR plus 8.75% annually with interest payments due quarterly. No interest payments have ever been made by OpCo to TopCo on account of the February 2021 Term Loan. The Debtors contemplated and entered into the February 2021 Term Loan after the amount had already been funded to OpCo solely to optimize tax positions in the most efficient manner after TopCo received third-party equity investments and subsequently pushed down such investments to OpCo to fund the Debtors' operating business.

As of the Petition Date, the balance under the February 2021 Term Loan was approximately $78.9 million (including accrued interest).

Based on the totality of the circumstances, the Debtors believe, if litigated, that there is a high likelihood that the February 2021 Term Loan would be determined to be a capital contribution due to (i) the lack of repayment history, (ii) the fact that the February 2021 Term Loan was documented significantly after the amount had already been funded to OpCo, (iii) the fact that the February 2021 Term Loan was entered into solely to optimize tax positions, (iv) OpCo is the primary operating entity for Voyager's entire enterprise and TopCo was providing the necessary capital contribution to allow OpCo to operate, (v) the source of repayment was solely dependent on OpCo's business performance, (vi) the identity of interest between OpCo and TopCo, (vii) the absence of security for the advance, and (viii) the absence of a sinking fund to provide for repayment. Although the February 2021

Term Loan was formally documented, other factors, including those mentioned above, support the conclusion that the February 2021 Term Loan is most likely to be a capital contribution.

ii.     **The Revolving Credit Agreement between Voyager Digital Ltd., as Lender, and Voyager Digital, LLC, as Borrower, dated February 12, 2021**

On February 12, 2021, OpCo, as borrower, entered into that certain revolving credit agreement with TopCo, as lender, to document the unsecured revolving credit facility with borrowing availability of up to $17.5 million previously provided by TopCo to OpCo (the "February 2021 Revolving Loan"). The February 2021 Revolving Loan matures on February 12, 2024 and accrues interest at a rate equal to LIBOR plus 7.50% annually with interest payments due quarterly. No interest payments on behalf of the February 2021 Revolving Loan have ever been made by OpCo to TopCo. The purpose of the February 2021 Revolving Loan was to provide OpCo with access to ongoing working capital and operate the business for the enterprise. The Debtors contemplated and entered into the February 2021 Revolving Loan after the amount had already been funded to OpCo solely to optimize tax positions in the most efficient manner after TopCo received third-party equity investments and subsequently pushed down such investment to OpCo to fund the Debtors' operating business.

As of the Petition Date, the outstanding amount under the February 2021 Revolving Loan was approximately $1.47 million (consisting of approximately $886,619 of principal borrowings and $590,904 of accrued interest).

Based on the totality of the circumstances, the Debtors believe, if litigated, that there is a high likelihood that the February 2021 Revolving Loan obligation would be determined to be a capital contribution due to (i) the lack of repayment history, (ii) the fact that the February 2021 Revolving Loan was documented significantly after the amount had already been funded to OpCo, (iii) the fact that the February 2021 Revolving Loan was entered into solely to optimize tax positions, (iv) OpCo is the primary operating entity for Voyager's entire enterprise and TopCo was providing the necessary capital contribution to allow OpCo to operate, (v) the source of repayment was solely dependent on OpCo's business performance, (vi) the identity of interest between OpCo and TopCo, (vii) the absence of security for the advance, and (viii) the absence of a sinking fund to provide for repayment. Although the February 2021 Revolving Loan was formally documented, other factors, including those mentioned above, support the conclusion that the February 2021 Revolving Loan is most likely to be a capital contribution.

iii.     **The November 2021 Intercompany Obligation between Voyager Digital Ltd. and Voyager Digital, LLC**

In November 2021, TopCo received a third-party equity investment in amount of $75 million and pushed such investment down in its entirety to OpCo to fund OpCo's working capital for purposes of its business operations.

As of the Petition Date, the outstanding amount on this November 2021 intercompany obligation was approximately $79.27 million (including any accrued interest).

Based on the totality of the circumstances, the Debtors believe, if litigated, that there is a high likelihood that the November 2021 intercompany obligation would be determined to be a capital contribution due to (i) the absence of instruments of indebtedness, (ii) no existence of a fixed maturity date or schedule of payments, (iii) no existence of a fixed interest rate and interest payments, (iv) the source of repayment was solely dependent on OpCo's business performance, (v) the identity of interest between OpCo and TopCo, (vi) the absence of security for the advance, and (vii) the absence of a sinking fund to provide for repayment.

iv.     **The May 2022 Intercompany Obligation between Voyager Digital Ltd. and Voyager Digital, LLC**

In May 2022, TopCo received a third-party equity investment in amount of $57 million and pushed such investment down in its entirety to OpCo to fund OpCo's working capital for purposes of its business operations.

47

As of the Petition Date, the outstanding amount on this May 2022 intercompany obligation was approximately $57.8 million (including any accrued interest).

Based on the totality of the circumstances, the Debtors believe, if litigated, that there is a high likelihood that the May 2022 intercompany obligation would be a capital contribution due to (i) the absence of instruments of indebtedness, (ii) no existence of a fixed maturity date or schedule of payments, (iii) no existence of a fixed interest rate and interest payments, (iv) the source of repayment was solely dependent on OpCo's business performance, (v) the identity of interest between OpCo and TopCo, (vi) the absence of security for the advance, and (vii) the absence of a sinking fund to provide for repayment.

**(b)      Intercompany Obligation by OpCo to HoldCo.**

In June 2022, HoldCo received a loan under the Alameda Loan Facility in the amount of $75 million from Alameda for the purpose of providing funding directly to OpCo in light of the crypto industry downturn described in Article VII.A-B of this Disclosure Statement.  Accordingly, HoldCo pushed the entire investment down to OpCo to fund OpCo's platform.

As of the Petition Date, the outstanding amount on this June 2022 intercompany obligation was approximately $75 million.

Based on the totality of the circumstances, the Debtors believe, if litigated, that there is a high likelihood that the June 2022 intercompany obligation would be a capital contribution due to (i) the absence of instruments of indebtedness, (ii) no existence of a fixed maturity date or schedule of payments, (iii) no existence of a fixed interest rate and interest payments, (iv) the source of repayment was solely dependent on OpCo's business performance, (v) the identity of interest between OpCo and HoldCo, (vi) the absence of security for the advance, and (vii) the absence of a sinking fund to provide for repayment.  Alameda disputes the treatment of this Intercompany Obligation.

**(c)      Intercompany Obligation by HoldCo to TopCo.**

On October 26, 2021, HoldCo, as borrower, entered into that certain promissory note with TopCo, as lender, in the amount of $6 million (the "Promissory Note").  The Promissory Note matures on September 30, 2024 and accrues interest at a rate equal to LIBOR plus 8.75% annually with interest payments due quarterly.  To date, no interest payments on behalf of the Promissory Note have been made by HoldCo to TopCo.  To comply with certain Canadian laws, TopCo made a third-party investment into a private company and then contributed the acquired shares of the third party company down to HoldCo.  In exchange for the contribution of the third-party's shares, TopCo and HoldCo then entered into the Promissory note.

As of the Petition Date, the outstanding note amount was approximately $6.33 million (consisting of approximately $6 million of principal borrowings and $329,943 of accrued interest).

Based on the totality of the circumstances, the Debtors believe, if litigated, that there is a high likelihood that the Promissory Note would be a capital contribution due to the fact that the Promissory Note was entered into after the amount was already funded to HoldCoto make a third-party equity investment into a privately-held company and then contributed the acquired shares to HoldCo in exchange for the Promissory Note.

**(d)      Intercompany Transactions Between Debtors.**

As is customary for a company of the Debtors' size and scope, the Debtors have historically, in the ordinary course of business, engaged in routine business relationships with each other, including making payments by one Debtor on behalf of another (collectively, the "Intercompany Transactions"), resulting in intercompany receivables between the Debtor entities.  The Intercompany Transactions are generally allocation payments on account of such things as equity-based employee compensation, non-equity-based employee salaries and benefits, ordinary course professional fees, rent and other ordinary course operating costs.

As of the Petition Date, the following intercompany receivables were outstanding:

48

- approximately $138,000 owed by OpCo to HoldCo;
- approximately $26.3 million owed by HoldCo to OpCo; and
- approximately $2.1 million owed by HoldCo to TopCo.

Based on the totality of the circumstances, the Debtors believe, if litigated, that there is a high likelihood that the Intercompany Transactions would be capital contributions due to (i) the Debtors' intentionally never settling the balances, (ii) the absence of instruments of indebtedness, (iii) no existence of a fixed maturity date or schedule of payments, (iv) no existence of a fixed interest rate and interest payments, (v) the source of repayment was solely dependent on OpCo's business performance, (vi) the identity of interest between OpCo and HoldCo and TopCo, as applicable, (vii) the absence of security for the advance, and (viii) the absence of a sinking fund to provide for repayment.

### 3. *The Equity Interests in the Debtors*

As of the Petition Date, the Debtors' ultimate parent, Voyager Digital Ltd., has approximately 196,000,000 shares of common stock outstanding, approximately 9.49 percent of which is held by Alameda and its affiliates with the remainder widely held by investors.

## VII. EVENTS LEADING TO THESE CHAPTER 11 CASES

### A. Market and Industry-Specific Challenges.

#### 1. *2020 and 2021 Market Conditions*

The onset of the COVID-19 pandemic was a watershed moment in traditional markets and cryptocurrency markets alike. Between February 12, 2020, and March 23, 2020, the Dow Jones Industrial Average lost 37 percent of its value and the S&P 500 lost 34 percent of its value. The price of Bitcoin fell over 50 percent over the same time period, and most other cryptocurrencies experienced similar declines.

Fear of a lingering pandemic and its effect on the world economy drove many investors to exit the market altogether. Voyager, however, continued to operate its trading platform through the entirety of the 2020 "COVID Crash." Customers were able to use the platform to trade despite extreme volatility in the markets, and interest and rewards were paid out to qualifying customers as well. The Company's response to market headwinds in 2020 solidified its status as a leading cryptocurrency trading platform—between 2020 and 2022, the number of users on the Company's platform grew from 120,000 to over 3.5 million.

After the COVID Crash, traditional markets and cryptocurrency markets saw a short recovery period followed by a period of sustained growth. Central banks and governments around the world (including, in particular, the United States Federal Reserve) enacted relief programs and adopted quantitative easing monetary policies designed to bridge the world economy to the end of the COVID-19 pandemic. Such policies contributed to growth in traditional markets and cryptocurrency markets, and investment into new projects in the cryptocurrency industry skyrocketed. Between its lowest point in 2020 and its highest point in 2021, the price of Bitcoin rose by over 1,000 percent. The S&P 500 rose by nearly 100 percent over the same period.

In traditional markets, fears of new variants of the COVID-19 virus and a potential economic contraction drove a series of sell-offs as equity markets moved sideways through the end of 2021. In the cryptocurrency space, strong sell-offs in "risk-on" assets, like technology and early-stage equities, led to sell-offs in the cryptocurrency sector as investors trimmed exposure. Increased regulatory scrutiny internationally also contributed to market pessimism, and strong spot trading from institutional investors drove most cryptocurrencies to double-digit losses relative to all-time highs.

Ultimately, traditional markets closed 2021 with double-digit growth. On the surface, it seemed like markets were beginning to recover from the COVID-19 pandemic and that the lingering effects of the pandemic would be minimal. But discussions around a potential recession in 2022 began to materialize as inflation rose along with concerns over whether world governments could navigate a "soft landing" into a slower economic period in 2022.

49

The year 2022, to date, has been marked by historic levels of volatility in the traditional markets and cryptocurrency markets. On February 24, 2022, Russia invaded Ukraine in a major escalation of the conflict between the two countries (the "Ukrainian War"). The Ukrainian War had a swift and profound impact on the world economy. In an effort to weaken Russia's ability to pursue the war, Western countries imposed a series of financial, trade, and travel sanctions against Russia, all of which measures contributed to a rampant increase in global commodity prices. Equity markets were roiled as well. Between January 1, 2022, and the Petition Date, the S&P 500 shed 20 percent of its value while the tech-heavy Nasdaq declined by nearly 30 percent over the same period. Rising inflation and commodity prices contributed to investor pessimism and further sell-offs. In June 2022, market analysts officially labeled 2022 as a bear market.

### 2. Cryptocurrency Industry-Wide Sell-off

The widespread sell-off in traditional markets was mirrored in the cryptocurrency industry. All major cryptocurrencies experienced significant declines in 2022; Bitcoin slumped 37.3 percent in June 2022 alone and was down approximately 56 percent year-to-date as of the Petition Date. Companies in the cryptocurrency industry also experienced significant equity declines as declining cryptocurrency prices pressured margins and investor pessimism grew. In June 2022, the value of the aggregate cryptocurrency market slumped below $1 trillion for the first time since January 2021. The severe distress of two industry participants—Terra and 3AC—exacerbated this "cryptocurrency winter." The eventual implosion of Terra and 3AC, and the resulting fallout, created the "cryptopocalypse."

### (a) The Terra Luna Collapse.

Terra is an open-source blockchain protocol created by Terraform Labs. Similar to the Ethereum blockchain (which issues Ether for use on its network), Terra issued Luna, a cryptocurrency token that was used to execute transactions on the Terra blockchain. In early May 2022, Luna traded at approximately $86 per token and had a market capitalization of approximately $14 billion.

Terra also issued TerraUSD ("UST"), an algorithmic stablecoin. Historically, UST traded at $1 per token. UST maintained its "peg" to Luna via an arbitrage mechanism. If UST traded above $1, arbitrageurs bought $1 worth of Luna for $1 and exchanged Luna for one UST worth more than a dollar, netting the difference as profit. If UST traded below $1, arbitrageurs bought one UST for less than a dollar and exchanged it for $1 worth of Luna, netting the difference as profit. These arbitrage trades push the price of UST back to $1 and were intended to keep the two tokens equally scarce and limit oversupply or undersupply of either. To incentivize traders to burn Luna to create UST, Terra allowed owners of UST to stake their UST in exchange for a 19.5 percent yield (payable in UST).

On May 7, 2022, $2 billion of UST was unstaked and immediately sold. The sale moved UST's per share price down to $0.91. UST holders, already sensitive to price movements due to the sell-off in cryptocurrencies generally, saw UST "de-peg" and rushed to unstake and sell their coins. Terra's arbitrage trade was designed to address this type of situation but was not designed to address a situation of this magnitude. Although traders moved quickly to burn Luna and "arbitrage" the price of UST, traders realized that only $100 million of UST could be burned for Luna each day. Due to high trading volume, $100 million of UST was insufficient to "re-peg" UST to $1.

Massive selling pressure led to a downward spiral or, as known in traditional finance, a "death spiral": traders redeemed UST for Luna and sold their Luna, leading to a significant decrease in the price of Luna. Then traders attempted to "re-peg" Luna to UST by burning UST to create Luna, which in turn created an oversupply of Luna that further exacerbated its price decline. Terra allegedly sold $2.2 billion of its Bitcoin reserves to enter the Luna/Terra arbitrage efforts and re-peg the tokens but was unsuccessful. The per-token price of Luna fell from $82.55 to $0.000001 in one week.

The Terra/Luna blockchain protocol was widely viewed as a project with significant promise—Luna had attracted significant interest from institutional investors and retail investors alike. The Luna collapse erased over $18 billion of value and contributed to further sell-offs in the cryptocurrency sector.

**(b)**        **The Making and Recalling of the Three Arrows Capital Loan.**

As described above, Voyager's business model contemplated generating revenue in several different ways, including by lending, in its business judgment, a portion of cryptocurrency held on its platform to institutional borrowers.

Voyager's lending business was described and disclosed in Voyager's public securities filings, which stated that "[w]e earn fees from crypto assets lending activities with institutional borrowers," including on "an unsecured … basis," and that "Voyager selects which and how much of its crypto assets are available for such lending activity."[34]  Account Holders acknowledged and consented to this activity in the Customer Agreement, as follows:

> [P]articipants in the Rewards Program agree to allow Voyager to utilize Cryptocurrency held in the(ir) Account to be loaned to various third parties (each, a "Borrower") determined at Voyager's sole discretion (each, a "Loan"). Loans made to Borrowers may not be secured and the Borrowers may not be required to post collateral either to Voyager, or otherwise.[35]

As of December 31, 2021, Voyager held approximately $5.88 billion in crypto assets on its platform.[36]  Of that total, approximately $2.7 billion had been loaned to various counterparties as part of Voyager's lending program.  At the time, the largest individual counterparty was Alameda Research, a crypto hedge fund founded by FTX CEO Sam Bankman-Fried, which had borrowed approximately $1.6 billion and represented 61% of Voyager's loan book.[37]  These loans were made largely on an unsecured basis in exchange for market-based returns that, in Voyager's judgment, corresponded with acceptable risk.

---

[34]    December 31, 2021 Voyager Digital Ltd. Management Discussion and Analysis at 8, available at https://sedar.com/GetFile.do?lang=EN&docClass=7&issuerNo=00005648&issuerType=03&projectNo=033384 05&docId=5134463.

[35]    August 2021 Customer Agreement at 10; *see also* January 2022 Customer Agreement at 10 (same).

[36]    *Id.* at 6.

[37]    *Id.* 20-21.

In early 2022, Voyager was looking to diversify its available borrowers. 3AC was a well-known, prominent participant in the crypto space.[38] Between 2015 and 2020, 3AC experienced rapid growth and apparent extreme profitability, becoming known as a "behemoth" in the industry.

Given 3AC's profile, Voyager sought out a relationship with the firm. On February 7, 2022, Voyager's then-CFO (now Chief Commercial Officer), Evan Psaropoulos, and Treasury Director Ryan Whooley had an initial call with Tim Lo, an employee of 3AC's over-the-counter trading affiliate. They discussed 3AC generally, including whether its business objectives made it an appropriate counterparty for institutional borrowing. 3AC advised that it had substantial interest given its size and investment philosophy. On February 11, 2022, Voyager and 3AC signed a mutual non-disclosure agreement to permit the exchange of confidential information between the firms as they explored a lending relationship. On February 13, 2022, 3AC provided Voyager with a statement signed by one of its founders, Kyle Davies, containing only a single sentence stating that 3AC's NAV as of January 1, 2022, was $3.729 billion. Unlike other substantial borrowers of Voyager's assets, 3AC did not provide a balance sheet (audited or unaudited). In response to Voyager's formal due diligence questionnaire, 3AC subsequently provided a description of its corporate structure, certificates of good standing and incorporation, and a copy of its Anti-Money Laundering policies and controls.

On February 28, 2022, a Voyager team, including Mr. Psaropoulos, Mr. Whooley, Treasurer Jon Brosnahan and others had a due diligence call with Messrs. Davies and Lo of 3AC. During the call, the Voyager team asked questions about 3AC's business and financial position, and ascertained from Mr. Davies that 3AC: (i) managed only its founders' assets; (ii) was involved in limited higher risk venture capital projects, and its venture activities involved modest sums; (iii) was largely engaged in arbitrage trading, which was delta neutral, and

---

[38]  *See, e.g.,* The Block, "Three Arrows reports more than $1.2 billion position in Grayscale's GBTC," January 4, 2021, https://www.theblock.co/post/89928/three-arrows-reports-more-than-1-2-billion-position-in-grayscales-gbtc; Bloomberg, "Ex-High School Classmates Are Among the World's Largest Crypto Holders," May 25, 2021, https://www.bloomberg.com/news/articles/2021-05-25/ex-credit-suisse-traders-amass-billions-of-dollars-of-crypto?utm_medium=social&utm_content=business&utm_source=twitter&cmpid=socialflow-twitter-business&utm_campaign=socialflow-organic#xj4y7vzkg (describing Three Arrows Capital as "among the world's biggest crypto holders with a portfolio worth billions of dollars"); Sydney Morning Herald, "School Friends Started Their Own Firm, Now They Are Among The World's Largest Crypto Holders," May 27, 2021, https://www.smh.com.au/business/markets/school-friends-started-their-own-firm-now-they-are-among-the-world-s-largest-crypto-holders-20210526-p57v6b.html (describing "the extent of the firm's influence, when Three Arrows reported it owned a 5.6 per cent stake in the Grayscale Bitcoin Trust, a $US22 billion fund"); Messari Report, "Messari Crypto Thesis For 2022," December 26, 2021, https://messari.io/pdf/messari-report-crypto-theses-for-2022.pdf (describing Three Arrows Capital founder Su Zhu as one of "the big guys" and noting that "Three Arrows Capital has amassed one of the largest funds in Asia, and boasts one of the top performing portfolios in their own right"); Bloomberg, "Fund Manager Who Called End of Last Crypto Winter Remains Bullish," April 7, 2022, https://www.bloomberg.com/news/articles/2022-04-07/three-arrows-capital-s-su-zhu-remains-bullish-on-crypto-investments (noting that Three Arrows Capital's "blockchain holdings alone are worth close to $10 billion"); FTX, Crypto Bahamas 2022 Su Zhu Speaker Profile, April 26, 2022, https://www.cryptobahamas.com/speakers/su-zhu-1 (describing Three Arrows Capital as "a leading investor in the cryptocurrency space"); Benzinga, "The Top 10 DeFi Projects To Watch In The Second Half Of 2020," July 30, 2020, https://www.benzinga.com/markets/cryptocurrency/20/07/16856475/the-top-10-defi-projects-to-watch-in-the-second-half-of-2020 (describing Three Arrows Capital as a "leading investor"); Benzinga, "Crypto Hedge Funds Bought Bitcoin At 'A Reasonable Level' During The Dip," May 21, 2021, https://www.benzinga.com/markets/cryptocurrency/21/05/21239323/crypto-hedge-funds-bought-bitcoin-at-a-reasonable-level-during-the-dip-report (reporting "advice to investors" from 3AC co-founder Kyle Davies); Benzinga, "This Crypto Veteran Has 3 Potential Catalysts That Could Fuel A Bitcoin Market Comeback," May 22, 2022, https://www.benzinga.com/markets/cryptocurrency/22/05/27339698/this-crypto-veteran-lists-potential-catalysts-that-could-push-bitcoin-market (describing Su Zhu as a "crypto veteran"); Benzinga, "What Does Etherium 2.0 Have To Do With The Celsius, 3AC, And Other Insolvencies?" June 15, 2022, https://www.benzinga.com/markets/cryptocurrency/22/06/27724295/what-does-ethereum-2-0-have-to-do-with-the-celsius-3ac-and-other-insolvencies (describing Three Arrows Capital as "a major investment firm"); Benzinga, "What Impact Will A Recession Have On Crypto?" June 16, 2022, https://www.benzinga.com/22/06/27745465/what-impact-will-a-recession-have-on-crypto (describing Three Arrows Capital as "one of the biggest crypto hedge funds").

52

thematic trading; (iv) limits its own borrowing to 1x NAV; and (v) did not own positions larger than 1-3% of circulation of any given alt-coin, to maximize its ability to exit quickly from such volatile assets. In response to requests for greater financial transparency, Mr. Davies explained that 3AC only provided summary NAV statements to its lenders, and that it needed to treat all lenders the same in this regard. When pressed, Messrs. Davies and Lo explained that 3AC previously had a bad experience with a counterparty who had been given detailed financial information about 3AC. According to 3AC, the counterparty had mimicked its trading strategy based on holdings information disclosed in those confidential documents, to 3AC's detriment. Given its commercial sensitivity, 3AC therefore only provided the net amount of total assets under management minus total liabilities, without further details.

The next day, on March 1, 2022, Voyager's Risk Committee, which included certain officers and other members of the treasury and legal teams, had a regularly scheduled meeting to discuss, among other matters, Voyager's lending, trading, and staking positions. During this meeting, the Risk Committee considered the merits of entering into a new lending relationship with 3AC, as well as 3AC's position regarding the limited amount of financial information contained in the NAV statement. Those who participated on the due diligence call with Voyager's co-founder explained the rationale given by 3AC, and that this was an explanation that Voyager's finance team and executive leadership understood and found credible. The Risk Committee discussed the fact that 3AC represented itself to have $3.7 billion in net asset value. Ultimately, no member of the Risk Committee objected to entering into a lending relationship with 3AC.[39] The decision to approve the 3AC Loan was ultimately made by the CEO, Stephen Ehrlich, in consultation with Mr. Psaropoulos, as further described below.

On March 4, 2022, Voyager entered into a master loan agreement with 3AC, pursuant to which Voyager made several loans to 3AC between March 8, 2022 and May 5, 2022 in the aggregate amounts of 15,250 Bitcoins and 350 million USDC. The 3AC Loan was unsecured but callable at any time by Voyager, as per the terms of six individual term sheets governing discrete advances from time to time. After Voyager approved 3AC as a borrower on March 1, the Risk Committee was not subsequently consulted about the size or terms of any of the advances that comprised the 3AC Loan. In general, Mr. Whooley would receive an in-bound borrowing request from 3AC and would discuss terms for the specific loan request with Mr. Psaropoulos. Mr. Psaropoulos would obtain Mr. Whooley's recommendations about the size and terms of borrowing, at times consulting with Mr. Brosnahan as to any liquidity concerns. Mr. Psaropoulos would then discuss each advance with Mr. Ehrlich and obtain the CEO's official authorization prior to executing the corresponding term sheet.

As of April 3, 2022, Voyager had assets on platform of approximately of $5.64 billion, of which $3.1 billion was on loan to third parties. At that time, approximately $935 million was on loan to 3AC, making it Voyager's second-largest borrower behind Alameda Research, to which Voyager had loaned approximately $1.23 billion. Approximately two months later, on June 6, 2022, the amount of Voyager's assets on platform had decreased materially (in part due to market decline and in part due to customer withdrawals) to $3.39 billion, of which approximately 25% had been lent to 3AC, and another 25% lent to Alameda Research.

During the approximately three-month period between the start of the parties' lending relationship and 3AC's default, Voyager engaged with 3AC on several occasions to monitor 3AC's financial position, as part of Voyager's regular borrower outreach activity. During this period, Voyager sought and received a revised one-page NAV statement from 3AC on March 23, 2022, again signed by 3AC co-founder Kyle Davies, stating that as of March 1, 2022, 3AC's NAV was $3.218 billion.

On approximately May 9, 2022, Luna de-pegged from UST, causing many investors in the crypto space to suffer losses. Voyager promptly reached out to all of its borrowers to understand the impact (if any) of Luna's unraveling on their respective businesses. Specifically, concerning 3AC, Voyager's Mr. Whooley spoke to Mr. Lo

---

[39] While no formal vote was taken by the Risk Committee to approve 3AC as a borrower, or the sufficiency of the due diligence conducted, this was not the function of the Risk Committee. The Risk Committee was established in 2021 as a consultative body consisting of members of Voyager management from different departments. The Risk Committee met regularly to discuss, among other things, Voyager's overall financial position and any potential borrowers that members of the finance team believed, following due diligence, to be appropriate counterparties. No decision-making authority was delegated to the Risk Committee, and no votes were taken by the members of the Risk Committee, until May 4, 2022, when a charter for the Risk Committee was finalized and approved.

on May 11, and he and Mr. Psaropoulos had dinner with Mr. Lo on May 12.  On both occasions, Mr. Lo reported that 3AC was an early investors in LUNA but had limited exposure and therefore 3AC had suffered insignificant losses.  In light of this, Voyager did not believe it needed to recall the loans to 3AC.

On May 23, 2022, Voyager requested and received an updated one-page NAV statement from 3AC, again signed by 3AC co-founder Kyle Davies, stating that as of May 23, 2022, 3AC's NAV was $2.574 billion.  At this point, Voyager ceased issuing further loans to 3AC despite requests from 3AC to borrow more.

After declining 3AC's request for more borrowing in the second half of May, communications between Voyager and 3AC remained relatively quiet until June 12, the day that Celsius Network LLC ("Celsius") lowered its gates and paused withdrawals.[40]  Upon this occurrence, Voyager reached out again to all of its borrowers to inquire about their financial health, including 3AC.  On June 13, 2022, Mr. Psaropoulos held a Zoom videoconference with Mr. Lo during which Mr. Lo informed him that 3AC had no exposure to Celsius.  The next day, on June 14, 2022, Voyager issued a press release about its lack of exposure to Celsius.[41]  Mr. Lo sent a text message to Mr. Psaropoulos later that morning asking for a call "asap."  Mr. Psaropoulos called Mr. Lo, who advised him that Voyager should recall all of its loans to 3AC because he was concerned that the founders of 3AC were not responding to requests for information from Mr. Lo and other employees.  Mr. Psaropoulos immediately called Mr. Ehrlich to relay this alarming statement.  Within hours, Voyager had recalled all outstanding amounts loaned to 3AC.

On June 15, 2022, one of 3AC's founders stated that the fund had incurred significant losses on account of its staked Luna position and had hired legal and financial advisors to explore potential liquidity solutions.  3AC did not return any of the loaned assets, and on June 24, 2022, Voyager issued a notice of default and acceleration to 3AC.  On June 27, 2022, 3AC was ordered by a court in the British Virgin Islands to commence liquidation proceedings.

       i.       ***The Special Committee Investigation***

---

[40] *See, e.g.,* Medium, "A Memo to the Celsius Community," June 12, 2022, https://celsiusnetwork.medium.com/a-memo-to-the-celsius-community-59532a06ecc6 ("Due to extreme market conditions, today we are announcing that Celsius is pausing all withdrawals, Swap, and transfers between accounts."); CNBC, "Crypto lender Celsius pauses withdrawals due to 'extreme market conditions,'" June 13, 2022, https://www.cnbc.com/2022/06/13/crypto-lender-celsius-pauses-withdrawals-bitcoin-slides.html; CoinDesk, "The Fall of Celsius Network: A Timeline of the Crypto Lender's Descent Into Insolvency," July 15, 2022, https://www.coindesk.com/markets/2022/07/15/the-fall-of-celsius-network-a-timeline-of-the-crypto-lenders-descent-into-insolvency/ ("Celsius freezes withdrawals, swaps and transfers in response to 'extreme market conditions,' fueling rumors that the platform had become deeply insolvent.").

[41] Press Release, "Voyager Digital Provides Update on Asset and Risk Management," June 14, 2022, https://www.investvoyager.com/pressreleases/voyager-digital-provides-update-on-asset-and-risk-management.

54

On July 5, 2022, OpCo formally created the Special Committee consisting of newly appointed Independent Directors Timothy Pohl and Jill Frizzley. The Special Committee was vested with the authority to, among other things: (a) investigate any historical transactions, public reporting, or regulatory issues undertaken by OpCo that the Special Committee deemed necessary or appropriate, and the facts and circumstances surrounding such transactions; (b) interview and solicit information and views from management, representatives, consultants, advisors, or any other party in connection with any historical transactions undertaken by OpCo that the Special Committee deems necessary or appropriate; (c) request documentation and information regarding OpCo's business, assets, properties, liabilities and business dealings with respect to any historical transactions undertaken by Voyager that the Special Committee deems necessary and appropriate to review; (d) perform any other activities consistent with the matters described herein or as the Special Committee or Voyager's board of directors otherwise deems necessary or appropriate; and (e) conduct an independent investigation with respect to any potential estate claims and causes of action against insiders of Voyager, including any claims arising from loans made to 3AC. The Special Committee was also vested with sole authority to prosecute, settle, or extinguish any and all claims and causes of action arising from the historical transactions investigated by the Special Committee. The Special Committee retained the Special Committee Counsel to provide independent advice to, and act at the exclusive direction of, the Special Committee in connection with the Special Committee's mandate.[42]

On August 23, 2022, the Debtors, the Special Committee, and the Committee entered into the Common Interest Confidentiality Stipulation and Protective Order (the "Protective Order") pursuant to which the parties (the "Common Interest Parties") agreed to the protections afforded to "Confidential" and "Highly Confidential" discovery material. Given the unique features of the Debtors' Chapter 11 Cases, the Common Interest Parties agreed that the attorney-client privilege and the attorney work-product doctrine would be preserved with respect to privileged documents and information shared among counsel for the Common Interest Parties. The Bankruptcy Court entered the Protective Order on September 13, 2022.

During the Investigation, Special Committee Counsel sought and received information relating to, among other things: Voyager's loans to third parties, with a particular focus on the 3AC Loan; the diligence performed in connection with those loans; Voyager's Risk Committee; Voyager's staking of customer cryptocurrency assets; Voyager's regulatory compliance; Voyager's communications with the public; Voyager's pre-petition payments to insiders and certain third parties; and other aspects of Voyager's business. Voyager collected and provided to the Special Committee responsive documents from its internal hard copy and electronic files, its outside counsel, and various third parties (e.g., cryptocurrency custodians and exchanges). Among many other things, Voyager collected email, Slack communications, and, in certain cases, Telegram and cell phone data from a dozen Voyager employees, including Voyager's most senior officers and others. In addition to several voluminous spreadsheets of data, Voyager produced more than 11,000 documents—collectively totaling more than 40,000 pages.

In addition to reviewing the above-referenced documents, Special Committee Counsel also interviewed 12 Voyager employees, including Stephen Ehrlich (CEO), Gerard Hanshe (COO), Evan Psaropoulos (Chief Commercial Officer), Ashwin Prithipaul (CFO), Pamela Kramer (CMO), David Brosgol (General Counsel), Marshall Jensen (Head of Corporate Development), Ryan Whooley (Treasury Director), Jon Brosnahan (Treasurer), Brian Silard (Treasury Team), David Brill (Deputy General Counsel), and Manisha Lalwani (in-house regulatory counsel). Collectively, the interviews performed during the Special Committee's Investigation lasted more than 55 hours, and covered in great detail the range of topics most relevant to the Special Committee's Investigation.

Throughout the Special Committee's Investigation, Special Committee Counsel was assisted by Kirkland and BRG. At Special Committee Counsel's request, BRG also hosted information sessions specific to staking with management and the Committee's counsel in order to address questions that would make time spent during the interviews most efficient. BRG also provided necessary background information about crypto assets and historical financial data to Special Committee Counsel upon request.

---

[42] See Docket No. 125 ¶ 7 (application to employ Quinn Emanuel as counsel to the Special Committee, with authority to "among other things, (a) investigate any historical transactions relating to Voyager LLC, and (b) investigate any estate claims and causes of action against insiders of Voyager LLC, including claims arising from its loan to Three Arrows Capital, and (c) perform any other activities consistent with the foregoing that the Special Committee or Voyager LLC's board otherwise deems necessary or appropriate"); Docket No. 242 (Order approving application).

Since the appointment of the Committee, Special Committee Counsel coordinated with the Committee's professionals in conducting the Investigation. Specifically, Special Committee Counsel and the Committee's counsel held several meetings concerning the scope, status, and progress of the Investigation, and Special Committee Counsel permitted the Committee's professionals to sit in on—and ask questions during—the Special Committee's interviews of the witnesses mentioned above. In light of the protections of the Protective Order, no discovery was withheld from the Committee's counsel on the basis of attorney-client privilege.

Throughout the course of the Investigation, Special Committee Counsel provided regular updates to members of the Special Committee. In particular, Special Committee Counsel held five formal videoconference meetings with the Special Committee, during which Special Committee Counsel updated the Special Committee on the status of the Investigation, including facts learned, impressions obtained, and relevant legal documents and standards. The members of the Special Committee were engaged, and asked many questions regarding the facts being developed and potentially applicable legal theories. These meetings were in addition to the Independent Directors' participation in several Board meetings concerning the Debtors' general business and case trajectory including their sale efforts.

ii.    ***Investigation Report, Conclusions, and Proposed Settlements***

At the conclusion of the Investigation, on October 7, 2022, Special Committee Counsel delivered to the Special Committee its report ("Investigation Report"), setting forth, among other things, the factual record developed over the course of the Investigation, the legal framework of potential estate causes of action, and Special Committee Counsel's legal conclusions and recommendations.

The Special Committee met to discuss the contents of the Investigation Report with Special Committee Counsel on October 10, 2022. The Special Committee found no fraud or theft by any director or officer of any of the Debtors. The Special Committee also concluded that the estate does not have colorable claims against any Voyager director or officer other than potential claims against its CEO and CCO,[43] related to the 3AC Loan. With respect to these claims, while colorable, the standard for successfully prosecuting such claims would be difficult to meet, with any judgment being even more difficult to collect. The Special Committee negotiated independent settlements with each of the CEO and CCO as set forth in the Plan, subject to approval of the Bankruptcy Court as part of Plan confirmation. These settlements are described in the following table:[44]

| | |
|---|---|
| **Debtors Retain Rights of Recourse to D&O Insurance** | Upon receipt of personal financial contributions, described below, the Debtors will retain the right to seek maximum recovery under the Debtors' D&O Liability Insurance Policies, without further recourse to the individuals. |
| **Releases and Waivers by the Officers against the Debtors** | CEO and CCO agree to release all Causes of Action they may have against the Estates.<br><br>CCO further agrees to subordinate 50% of his Account Holder Claim against the Debtors until all other Holders of Account Holder Claims are paid in full.<br><br>CEO and CCO further agree that, because the Debtors are in bankruptcy, the Debtors are unable to provide advancement or indemnification to CEO and CCO, and CEO's and CCO's recourse is limited to the Management Liability Policy, the Excess Policies, and the Side-A Policy (except as set forth below). CEO and CCO shall be entitled to receive their salary and benefits for as long as they work for the Debtors and/or the Wind-Down Entity and retain the right to assert general unsecured claims for advancement and indemnification up to the limits of |

---

[43]   Mr. Psaropoulos was CFO of Voyager Digital, LLC when it made all loans to 3AC.

[44]   The settlements are subject to definitive documentation and in the event the sworn financial information provided by either CEO or CCO to the Special Committee is materially inaccurate, the Special Committee reserves the right to void the D&O Settlement.

| | any available coverage in the event any of the insurers that issued the Management Liability Policy, the Excess Policy, or the Side-A Policy denies coverage to CEO and/or CCO based upon or arising out of the lack of a formal claim for indemnification. |
| | CEO and CCO further agree to subordinate any and all rights and entitlements under the Cornerstone A-Side Management Liability Insurance Policy to Voyager Digital Ltd., Policy Number ELU184179-22, to any recovery by the Debtors and/or the Wind Down Entity on account of the Debtors' and/or Wind Down Estate's claims for the avoidance of the premium paid for the policy. For the avoidance of doubt, should coverage continue to be available under the Side-A Policy following resolution of the Debtors' and/or the Wind Down Entity's claims for the avoidance of the premium paid for the policy (whether by judgment or settlement or otherwise), Officer shall be entitled to seek coverage under the Side-A Policy. |
| **Reversal of Insider Bonus Payment** | CEO agrees to the avoidance/unwinding of the transfer of $1,900,000 that CEO received from the Debtors on or around February 28, 2022, with CEO paying $1,125,000 to the Debtors in cash and assigning the right, if any, to any tax refund for the balance. |
| **Commitment to Cooperate** | CEO and CCO agree to remain at, and continue performing the responsibilities of, their position(s) with the Debtors and assist with the Debtors' transition for at least thirty (30) days from the date of approval of the settlement; *provided* that the CCO shall have no obligation to remain at his position with the Debtors beyond January 15, 2023 and the CEO shall have the right to pursue and engage in any employment opportunity, business venture, consulting arrangement, or investment that may become available; *provided*, *further*, that both the CEO and CCO shall be available to the Debtors and/or the Wind-Down Entity for a maximum of five hours per month for the one year following the Effective Date. |

The theoretical loss from the 3AC Loan would be equal to the amounts remaining to be collected from 3AC in the 3AC Liquidation Proceeding, less any amounts actually collected in those proceedings. The amounts to be realized from the proposed settlements (approximately $1.2 million - $2 million of personal assets plus recourse to up to $20 million of D&O insurance) are just a small fraction of such loss. Nevertheless, the Special Committee made the decision to settle, subject to Court approval, based on the fact that the individuals do not have personal assets available to satisfy any potential judgment even if the claims were successfully prosecuted, whereas the cost of prosecuting would likely dissipate the available D&O insurance coverage and the assets that are being paid through the settlement in defense costs.

The rationale for the Special Committee's negotiation and recommendation for the settlements is based on the following factors, among others: the relative strength of these claims, which (if pursued) would sound in breach of fiduciary duty premised on alleged gross negligence on the part of the officers; the challenges involved in litigating loss causation; the costs of litigating these claims, including attorneys' and experts' fees; the financial wherewithal of the officers; and the risk of depletion of substantial portions of available insurance coverage which prioritizes the rights of the officers to utilize the insurance for defense costs. The Special Committee believes, following due diligence and negotiations led by Special Committee Counsel, and after several additional videoconference meetings and written exchanges with Special Committee Counsel, that the settlements embodied in the Plan are in the best interests of the estate. The Special Committee does not believe there are viable causes of action against insiders beyond those potential claims mentioned with respect to CEO and CCO relating to the 3AC Loan.

    **B.**    **The Alameda Loan.**

57

Once it appeared that its loan to 3AC might be at risk, Voyager's management team immediately engaged in efforts to identify sources of potential liquidity to stabilize the Company's business and ensure that the Company remained adequately capitalized. On June 22, 2022, HoldCo, as borrower, TopCo., as guarantor, and Alameda Ventures Ltd., as lender, entered into the Alameda Loan Facility, which provided the Company with up to $200 million cash and USDC and 15,000 Bitcoin subject to certain restrictions. OpCo is not a party to the Alameda Loan Agreement. The Alameda Loan Agreement provided that the use of proceeds under the Alameda Loan Facility was to pay Account Holders for cryptocurrency assets that counterparties to the Company's lending and related activities failed to return to the Company.[45] Alameda asserts that OpCo is obligated on the Alameda Loan Facility, which the Debtors dispute. As discussed in Article IV.O of this Disclosure Statement, the Debtors seek to subordinate the Alameda Loan Facility Claims under the Plan due to Alameda's inequitable conduct prior to and throughout these Chapter 11 Cases, including Alameda and its affiliates' apparent fraud that directly harmed the Debtors' creditors and significantly reduced their anticipated recoveries under the Plan. If the Alameda Loan Facility Claims are determined to be valid against OpCo, recoveries to Account Holders and Holders of OpCo General Unsecured Claims would be reduced.

Alameda also asserts that it has an administrative preference action claim against the Debtors in the amount of approximately $445 million pursuant to certain loans made by OpCo to Alameda, which were repaid during the chapter 11 cases. The Debtors dispute Alameda's position, but in the event that Alameda were to prevail on its alleged preference claim, creditor recoveries would be materially reduced. Specifically, recoveries for both Account Holder Claims and OpCo General Unsecured Claims would be reduced to approximately 24% from approximately 51% under the Sale Transaction if the Alameda Loan Facility Claim is not subordinated and Alameda prevails in its alleged preference claims.

## C. Retention of Restructuring Advisors and Initial Third-Party Outreach.

In June 2022 the Debtors engaged Kirkland and Moelis to advise the Debtors in navigating the recent challenges impacting the cryptocurrency industry. Beginning on or about June 20, 2022, Moelis initiated a dual-track marketing process (the "Prepetition Marketing Process") to solicit interest in two general deal structures: (a) a sale transaction in which the Debtors' entire business would be sold to either a financial sponsor or a strategic company in the cryptocurrency industry and (b) a capital raise whereby a third party (individually or as part of a consortium) would provide a capital infusion into the Debtors' business enterprise (together, a "Transaction") to allow the Debtors to weather the volatility in public equity markets, the decline in cryptocurrency prices, and dislocation in the cryptocurrency industry caused, in part, by the decline of 3AC and the collapse of the Terra Luna ecosystem, as described below. Among the deal structures considered for the financing were additional debt facilities and the issuance of preferred equity in exchange for capital.

To that end, Moelis reached out to 60 potential financial and strategic partners across the globe (collectively, the "Potential Counterparties"), including domestic and international strategic cryptocurrency-related businesses and private equity and other investment firms that currently have crypto-related investments and/or historical experience investing in the cryptocurrency industry. By the Petition Date, over 20 of the Potential Counterparties had entered into confidentiality agreements with the Debtors. Parties who executed a confidentiality agreement received a copy of the Debtors' investor presentation and access to a virtual data room containing thousands of pages with certain information regarding the Debtors' business operations, finances, material contracts, tax information, and incorporation documents. In addition, parties that signed confidentiality agreements were offered the opportunity to participate in telephone conferences with the Debtors' management team as well as to request additional due diligence information.

Simultaneously with their efforts to identify a Potential Counterparty to effectuate a Transaction, the Debtors, Moelis, and the Debtors' other advisors began to analyze potential strategies to effectuate a stand-alone restructuring without the participation of a third-party partner to consummate a Transaction.

While the Debtors' marketing efforts yielded one proposal for an out-of-court financing, the conditions precedent to the proposal and the pro forma capital structure contemplated thereunder were not achievable, and no other Potential Counterparty was willing to participate in an out-of-court Transaction on the timeline required.

---

[45]   *See* Section 2.6 of the Alameda Loan Agreement.

Among other things, Potential Counterparties expressed concerns regarding current uncertainty in the cryptocurrency market and assumed liabilities on an out-of-court basis.  Potential Counterparties were similarly reticent to participate in an out-of-court financing alone, and the Debtors determined that a group investment could not be marshalled among other viable Potential Counterparties on the timeline required to consummate a Transaction on an out-of-court basis.

The Prepetition Marketing Process produced multiple preliminary proposals from parties willing to participate in an in-court Transaction.  However, as of the Petition Date, all of the preliminary offers that the Debtors received required more time to fully develop and structure and/or were not more attractive than a potential stand-alone restructuring.

### D. Governance Initiatives.

On July 5, 2022, the Debtors undertook several actions to strengthen the independence and experience of their boards of directors:  (i) the board of Voyager Digital Ltd. voted to appoint Matthew Ray as an independent director; (ii) the board of Voyager Digital Holdings, Inc. voted to appoint Scott Vogel as an independent director; (iii) the member of Voyager Digital, LLC ("OpCo") appointed Stephen Ehrlich, CEO of the Voyager Digital Holdings, Inc., as a director  and Tim Pohl and Jill Frizzley as independent directors; and (iv) the board of OpCo voted to establish the Special Committee comprised of Mr. Pohl and Ms. Frizzley and tasked the Special Committee with, among other things, investigating the Company's historical lending practices, including the facts and circumstances around the 3AC Loan.

### E. Voyager's Decision to Commence these Chapter 11 Cases.

As the general cryptocurrency market continued to decline, Voyager, like other peer platforms, saw a significant uptick in customer withdrawals—some of which was legitimate—putting additional strain on the Company's business and risking the Company's ability to serve customers who remained on its platform.

On June 23, 2022, Voyager reduced its daily withdrawal maximum from $25,000 to $10,000 per user per day.  Putting a cap on withdrawals was necessary to ensure that the Company could effectuate trades for customers on its platform who elected to keep their cryptocurrency assets with Voyager as well as to stabilize the Company's business while it engaged in discussions with potential third-party sponsors.  Ultimately, the initial withdrawal limits maximized the Company's ability to continue to provide brokerage services to its customers.[46]

The Debtors hoped that lower withdrawal limits would allow them to stabilize their business.  However, as the cryptocurrency markets continued to trend downward, the Debtors realized that further steps were required to preserve customer assets, avoid irreparable damage to the Debtors' business, and ensure that their trading platform operated smoothly for all customers.  Accordingly, on July 1, 2022, Voyager froze all withdrawals and trading activity on its platform.

Though Voyager continued to rigorously diligence all potential restructuring transactions, it became clear that a potential strategic transaction would only emerge after the Debtors petitioned for chapter 11 relief.

## VIII. EVENTS OF THE CHAPTER 11 CASES

### A. The Stand-Alone Plan.

On July 6, 2022, the Debtors filed the *Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 17].  On August 12, 2022, the Debtors filed the *First Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 287] and accompanying disclosure statement [Docket No. 288] (the "Stand-Alone Plan Disclosure Statement").  The Stand-Alone Plan contemplated, among other things, distributing to Holders of Account Holder Claims their pro rata share of the New Common Stock, available Cash, Coins, the Voyager Tokens, and the 3AC Recovery, each as defined in the Stand-Alone Plan.  The

---

[46]   Approximately 97% of customers on Voyager's platform have less than $10,000 in their accounts.

59

Stand-Alone Plan Disclosure Statement, among other things, also made clear that, in parallel to pursuing the Stand-Alone Plan, the Debtors were pursuing a potential transaction to sell the Debtors to a third party either through an asset sale pursuant to section 363 of the Bankruptcy Code or an alternative chapter 11 plan of reorganization.

### B. First and Second Day Relief and Other Case Matters.

On the Petition Date, the Debtors filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations. A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the First Day Declaration. Following hearings on July 8, 2022, and August 4, 2022 (the "Second Day Hearing"), the Bankruptcy Court entered orders granting certain of the First Day Motions and applications on interim and final bases:

(i) *The Joint Administration Order* authorizing the Debtors to jointly administer and maintain one docket for the chapter 11 cases of Voyager Digital, LLC and its Debtor affiliates [Docket No. 18];

(ii) *The Foreign Representative Order* authorizing Debtor Voyager Digital Ltd. to act as "foreign representative" in a parallel insolvency case commenced in Canada under the Companies' Creditors Arrangement Act [Docket No. 52];

(iii) *The Credit Matrix Order* authorizing the Debtors to (a) file a consolidated list of creditors in lieu of submitting a separate mailing matrix for each Debtor, (b) file a consolidated list of the Debtors' 50 largest unsecured creditors in lieu of filing lists for each Debtor; and (c) redact certain personal identification information [Docket No. 54];

(iv) *The Automatic Stay Order* restating and enforcing the worldwide automatic stay, anti-discrimination provisions, and ipso facto protections of the Bankruptcy Code and approving the form and manner of notice thereof [Docket No. 55];

(v) *The Schedules and Statements Order* authorizing the Debtors to extend the deadline by which the Debtors' Schedules and Statements must be filed by thirty (30) days [Docket No. 59];

(vi) *Order Retaining Stretto as Noticing Agent* authorizing the Debtors to retain Stretto, Inc. as third-party claims and noticing agent [Docket No. 67];

(vii) *The Wages Order* authorizing the Debtors to continue paying prepetition wages and certain administrative costs related thereto and continue employee benefits programs [Docket No. 233];

(viii) *The Taxes Order* authorizing the Debtors to pay certain taxes and fees that accrued or arose in the ordinary course of business before the Petition Date [Docket No. 235];

(ix) *The Interim Cash Management Orders* authorizing the Debtors to continue utilizing the Debtors' prepetition cash management system [Docket Nos. 53 and 237] (the "Cash Management Motion");[47]

(x) *The NOL Order* approving certain notifications and procedures regarding the transfer of, and declarations of worthlessness with respect to, common stock of Voyager Digital Ltd. [Docket No. 238];

(xi) *The Insurance Order* authorizing the Debtors to honor existing insurance obligations [Docket No. 239]; and

---

[47] On July 15, 2022, the Debtors filed a supplement to the Cash Management Motion that sought authorization to pay prepetition amounts owed on their corporate credit cards issued by Brex, Inc. (the "Supplemental Cash Management Motion") [Docket No. 84]. On July 25, 2022, the Bankruptcy Court entered an order granting the Supplemental Cash Management Motion [Docket No. 138].

(xii)     **The Case Management Order** authorizing the Debtors to set the guidelines and requirements for the administration of their Chapter 11 Cases, including for scheduling purposes [Docket No. 240].

The First Day Motions, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at https://cases.stretto.com/Voyager.

The Debtors also filed several other motions subsequent to the Petition Date to facilitate the Debtors' restructuring efforts and ease administrative burdens. Following the Second Day Hearing, the Bankruptcy Court entered orders granting the following relief:

(i)     **The Interim Compensation Order** approving procedures for the compensation of retained professionals in these Chapter 11 Cases [Docket No. 236].

(ii)    **The Ordinary Course Professionals Order** approving procedures for the retention and compensation of certain professionals utilized by the Debtors in the ordinary course operation of their businesses [Docket No. 244]; and

(iii)   **Applications to Retain Professionals** postpetition pursuant to sections 327 and 328 of the Bankruptcy Code, including:

    i.     **Kirkland & Ellis LLP and Kirkland & Ellis International LLP as Attorneys for the Debtors and Debtors in Possession [Docket No. 234]**;

    ii.    **Moelis & Company LLC as Investment Banker and Capital Markets Advisor for the Debtors and Debtors in Possession [Docket No. 299]**;

    iii.   **Berkeley Research Group, LLC as Financial Advisors for the Debtors and Debtors in Possession [Docket No. 297]**;

    iv.    **Quinn Emanuel Urquhart & Sullivan LLP as Special Counsel to Voyager Digital, LLC [Docket No. 242]**;

    v.     **Stretto, Inc. as administrative advisor [Docket No. 241]**;

    vi.    **Katten Muchin Rosenman LLP as Special Counsel to Voyager Digital Ltd. [Docket No. 732]**;

    vii.   **ArentFox Schiff LLP as Special Counsel to Voyager Digital Holdings, Inc. [Docket No. 740]; and**

    viii.  **Potter Anderson & Corroon LLP as Delaware counsel to the Debtors [Docket No. 798].**

The foregoing professionals, among others, are each integral to the Debtors' restructuring efforts and ultimate emergence from chapter 11. The postpetition compensation of all of the Debtors' professionals retained pursuant to sections 327 and 328 of the Bankruptcy Code is subject to the approval of the Bankruptcy Court.

**C.     Appointment of Unsecured Creditors' Committee.**

On July 19, 2022, the U.S. Trustee appointed the official committee of unsecured creditors (the "Committee").[48] The Debtors immediately engaged with the Committee to discuss the Debtors' restructuring efforts, the Plan, and Debtors' proposed case timeline. The seven-member Committee is currently composed of the following members: Russell G. Stewart, Jason Raznick, Brandon Mullenberg, Richard Kiss for Thincan Trust,

---

[48]   *See Amended Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 106].

Christopher Moser, Byron Walker, and Melissa and Adam Freedman. The Committee selected McDermott Will & Emery LLP as legal counsel and FTI Consulting, Inc. as financial advisor.[49]

### D. Schedules and Statements.

On July 8, 2022, the Bankruptcy Court entered the *Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, Statements of Financial Affairs, and Rule 2015.3 Financial Reports, (II) Waiving Requirements to File List of Equity Holders, and (III) Granting Related Relief* [Docket No. 59] extending the deadline by which the Debtors were required to file their schedules of assets and liabilities and statements of financial affairs (the "Schedules and Statements") by an additional thirty (30) days for a total of forty-four (44) days after the Petition Date. Accordingly, the Debtors were required to file the Schedules and Statements by no later than August 18, 2022. This schedule provided creditors with ample time to analyze and evaluate scheduled claims in advance of Solicitation and the General Claims Bar Date.

On August 18, 2022, August 19, 2022, August 22, 2022, September 15, 2022, and November 18, 2022, the Debtors filed their Schedules and Statements [Docket Nos. 311, 312, 321, 429, 430, and 666]. Interested parties may review the Schedules and Statements and any amendments thereto free of charge at https://cases.stretto.com/Voyager.

### E. Bar Date Motion.

On July 18, 2022, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Setting Bar Dates for Submitting Proofs of Claim, (II) Approving Procedures for Submitting Proofs of Claim, and (III) Approving Notice Thereof* [Docket No. 98] (the "Bar Date Motion"). On August 8, 2022, the Bankruptcy Court entered an order granting the relief set forth in the Bar Date Motion [Docket No. 218] (the "Bar Date Order"), which established procedures and set deadlines for filing Proofs of Claim against the Debtors and approved the form and manner of the bar date notice (the "Bar Date Notice"). Pursuant to the Bar Date Order and the Bar Date Notice, the last date for certain persons and entities to file Proofs of Claim in these Chapter 11 Cases is October 3, 2022, at 5:00 p.m. Eastern Time (the "General Claims Bar Date") and the last date for governmental units to file Proofs of Claim in the Debtors' Chapter 11 Cases is January 3, 2023, at 5:00 p.m. Eastern Time (the "Governmental Bar Date"). The Bar Date Notice was served on August 3, 2022 [Docket No. 226] and published in *The New York Times* (national and international editions) and the *Financial Times* (international edition) on August 10, 2022 [Docket No. 272].

On December 20, 2022, the Debtors filed the *Notice of Presentment and Opportunity for Hearing on Stipulation and Agreed Order Extending the Bar Date for the U.S. Securities and Exchange Commission* [Docket No. 758] thereby agreeing to extend the Governmental Bar Date for the SEC by two weeks to January 17, 2023, at 5:00 p.m. Eastern Time. On December 20, 2022, the Debtors filed the *Notice of Presentment and Opportunity for Hearing on Stipulation and Agreed Order Extending the Bar Date for the States* [Docket No. 792] thereby agreeing to extend the Governmental Bar Date for all states by two weeks to January 17, 2023, at 5:00 p.m. Eastern Time.

---

[49]  *See* Docket Nos. 403 and 404.

F.     The FBO Motion.

On July 14, 2022, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (a) Honor Customer Withdrawals from the MC FBO Accounts, (b) Liquidate Cryptocurrency From Customer Accounts With a Negative Balance, (c) Sweep Cash Held in Third-Party Exchanges, (d) Conduct Ordinary Course Reconciliation of Customer Accounts, and (e) Continue to Stake Cryptocurrency; and (II) Granting Related Relief* [Docket No. 73] (the "FBO Motion").  The FBO Motion sought to continue certain ordinary course practices, including (i) honoring customer withdrawals from the "for the benefit of" accounts (the "MC FBO Accounts,") held at Metropolitan Commercial Bank; (ii) liquidating customer accounts that hold a negative U.S. dollar balance and sweeping the resulting cash from third-party exchanges into the Debtors' operating accounts; (iii) engaging in ordinary course reconciliation practices related to customer accounts; and (iv) staking cryptocurrency.

On July 29, 2022, the Debtors filed a supplement to the FBO Motion [Docket No. 173] (the "Supplemental FBO Motion," and together with the FBO Motion, the "FBO Motions"), which provided additional information on the prepetition procedures for processing customer withdrawal requests from the MC FBO Accounts, including, among other things, reconciliation of the MC FBO Accounts and funding of any deficit in the MC FBO Accounts on account of ACH chargebacks.  On July 30, 2022, Metropolitan Commercial Bank filed a statement in support of the FBO Motion and Supplement [Docket No. 177].  On August 2, 2022, the Committee filed a statement in support of the FBO Motion [Docket No. 193].  On August 5, 2022, the Bankruptcy Court entered the *Order (I) Authorizing the Debtors to (a) Honor Withdrawals from the MC FBO Accounts, (b) Liquidate Cryptocurrency from Customer Accounts with a Negative Balance, (c) Sweep Cash Held in Third-Party Exchanges, (d) Conduct Ordinary Course Reconciliation of Customer Accounts, and (e) Continue Staking Cryptocurrency; and (II) Granting Related Relief*] [Docket No. 247] (the "FBO Order") approving the FBO Motion.  The Debtors worked closely with the Committee regarding the requested relief, and the FBO Order affords the Committee various protections, including the requirement that the Debtors provide the Committee with written notice prior to staking or unstaking cryptocurrency, information sufficient to evaluate staking positions, and Court oversight of staking activities in the absence of agreement between the Committee and the Debtors.  On August 11, 2022, the Debtors began returning customer funds in the MC FBO Accounts.  To date, the Debtors have returned approximately $245.75 million of customer funds from the MC FBO Accounts.

On December 2, 2022, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Compelling the Release of the Reserve Held by Metropolitan Commercial Bank on Debtors' Bank Account and (II) Granting Related Relief* [Docket No. 690] seeking an order from the Bankruptcy Court compelling the full release of the $24 million reserve held by Metropolitan Commercial Bank given that the reserve is no longer necessary now that ACH chargeback period has expired and is in excess of the aggregate balance of the MC FBO Accounts.  On January 5, 2023, the Court entered the *Stipulation and Agreed Order Between the Debtors and Metropolitan Commercial Bank* [Docket No. 821] (the "MC Bank Stipulation"), which provides for, among other things, the release of reserve funds and the process to distribute the remaining customer cash in the MC FBO Accounts to such customers.

As set forth in the FBO Motions, Cash in the MC FBO Accounts is not property of the Debtors' Estates.  **Accordingly, customer withdrawals from the MC FBO Accounts are permitted to continue in accordance with the FBO Order, and any such customer withdrawals or distributions from the MC FBO Accounts are not included in the treatment provided for under the Plan.  Customers have until February 4, 2023 to withdraw their fiat funds from the MC FBO Accounts or will be sent a check in the amount of the applicable customer's funds in the MC FBO Accounts pursuant to the MC Bank Stipulation.**

G.     The 3AC Liquidation Proceeding.

On June 29, 2022, the Eastern Caribbean Supreme Court in the High Court of Justice Virgin Islands (Commercial Division) (the "BVI Court") entered an order appointing Russell Crumpler and Christopher Farmer of Teneo (BVI) Limited as joint liquidators ("Joint Liquidators") to conduct an orderly and equitable wind-down of 3AC pursuant to Part 6 of the British Virgin Islands Insolvency Act, 2003 ("BVI Insolvency Act").  The liquidation of 3AC (the "3AC Liquidation Proceeding") is currently pending in the BVI Court.[50]  On July 1, 2022, 3AC filed a petition with the United States Bankruptcy Court for the Southern District of New York (the "3AC Chapter 15

---

[50]     *See In re Three Arrows Capital Limited*, Case No. BVIHCOM2022/0119 (June 27, 2022).

Court") seeking recognition of the 3AC Liquidation Proceeding as a "foreign main proceeding" pursuant to chapter 15 of the Bankruptcy Code (the "3AC Chapter 15 Proceeding").[51]

On July 18, 2022, in accordance with section 179 of the BVI Insolvency Act, the Joint Liquidators established a committee of creditors to work closely with the Joint Liquidators to support the interests of all creditors in the 3AC Liquidation Proceeding. Voyager was one of the five creditors appointed to the committee.[52] On July 28, 2022, the 3AC Chapter 15 Court entered an order granting recognition of the 3AC Liquidation Proceeding as a foreign main proceeding,[53] and on August 22, 2022, and October 7, 2022, respectively, the 3AC Liquidation Proceeding was recognized as a foreign main proceeding by the High Court of the Republic of Singapore (the "Singapore Court")[54] and the Ontario Superior Court of Justice.[55] Additional petitions for recognition as a foreign main proceeding are pending in the Grand Court of the Cayman Islands, Financial Services Division, and the Supreme Court of Seychelles.[56] At a December 2, 2022 hearing in the 3AC Chapter 15 Proceeding, the Foreign Representatives provided the 3AC Chapter 15 Court with an update regarding their efforts to recover 3AC assets and locate the 3AC founders.[57] Following the hearing, the 3AC Chapter 15 Court entered orders entrusting the distribution of 3AC's assets to the Foreign Representatives; establishing a cross-border cooperation and communication protocol among the BVI Court, the 3AC Chapter 15 Court, and the Singapore Court; and granting the Foreign Representatives authority to issue subpoenas to the co-founders of 3AC.[58] On December 29, 2022, the 3AC Chapter 15 Court entered an order authorizing the Foreign Representatives to subpoena one of the co-founders of 3AC using email and Twitter notifications.[59]

Voyager continues to work diligently to maximize its recovery in the 3AC Liquidation Proceeding on account of the 3AC Loan (the "3AC Recovery"). At this time, the amount of any 3AC Recovery is unknown. As set forth in greater detail in Article IV.D of this Disclosure Statement, the 3AC Recovery, if any, will be among the value distributed to Holders of Account Holder Claims and General Unsecured Claims under the Plan.

**H.** **Litigation Matters.**

1. *Certain Non-Bankruptcy Litigation Matters*

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations. The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims. With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases. The filing of the Chapter 11 Cases likewise generally stays any legal proceedings commenced to obtain possession of, or to exercise control over, the property of the Debtors' bankruptcy estate.

Further, the Debtors are party to various other legal proceedings (including individual, class and putative class actions as well as federal and state governmental investigations) covering a wide range of matters and types of

---

[51]   *See In re Three Arrows Capital, Ltd*, Case No. 2210920 (Bankr. S.D.N.Y. July 1, 2022).

[52]   The other members of the 3AC creditors' committee are Blockchain.com, CoinList, Digital Currency Group, and MatrixPort.

[53]   *See* Docket No. 47, filed in *In re Three Arrows Capital, Ltd*, Case No. 22-10920 (MG) (Bankr. S.D.N.Y. July 28, 2022).

[54]   *See In re Three Arrows Capital Ltd*, Case No. HC/OA 317/2022 (Aug. 22, 2022).

[55]   *See* Docket No. 68, filed in *In re Three Arrows Capital, Ltd*, Case No. 22-10920 (MG) (Bankr. S.D.N.Y. Dec. 2, 2022).

[56]   *See Id.*

[57]   *See Id.*

[58]   *See* Docket No. 69, 71, and 72, filed in *In re Three Arrows Capital, Ltd*, Case No. 22-10920 (MG) (Bankr. S.D.N.Y. Dec. 6, 2022).

[59]   *See* Docket No. 79, filed in *In re Three Arrows Capital, Ltd*, Case No. 22-10920 (MG) (Bankr. S.D.N.Y. Dec, 29, 2022).

claims including, but not limited to, securities laws, contracts, and trademark disputes.  Such matters are subject to uncertainty and the outcome of individual matters is not predictable.

   **2.**  *Certain Adversary Proceedings*

    **(a)**  *Voyager Digital Holdings, Inc. v. De Sousa, et al.*

  On July 6, 2022, a putative class-action litigation was filed in the Ontario Superior Court of Justice (the "Canadian Class Action").[60]  The Canadian Class Action alleges claims against Debtor Voyager Digital Ltd. and some of its directors and officers for statutory secondary market liability under Canadian securities law, and common-law negligent misrepresentation.  To prove many of the claims against Voyager Digital Ltd. in that suit, the plaintiffs must first establish the underlying liability of the named directors and officers, and then establish that Voyager Digital Ltd. is vicariously liable for their alleged wrongdoing.  On August 10, 2022, the Debtors filed a complaint and commenced an adversary proceeding in the Bankruptcy Court to extend the automatic stay, or alternatively, enjoin prosecution of the Canadian Class Action.[61]  On August 11, 2022, the Ontario Superior Court of Justice denied the proposed Canadian Class Action plaintiff's motion seeking appointment of an equity committee and funding of representative counsel in the Canadian foreign recognition proceeding.[62]

    **(b)**  *Voyager Digital Holdings, Inc. v. Robertson, et al.*

  On December 24, 2021, a putative class-action complaint was filed against two of the Debtors, Voyager Digital Ltd. and Voyager Digital, LLC, in the United States District Court for the Southern District of Florida, captioned *Cassidy et al. v. Voyager Digital Ltd. et al*.  The named plaintiff was a Voyager customer.  His complaint, which is publicly available, generally alleged that "Voyager's practices were deceptive, illegal and were the sale of unregistered securities," *Cassidy v. Voyager*, 1:21-cv-24441-CMA (S.D. Fla. Apr. 28, 2022) (Am. Compl. ¶ 5, ECF No. 46).  *Cassidy* asserted causes of action under federal and state securities law, and violations of consumer-protection claims under New Jersey and Florida law.

  *Cassidy* was litigated for six months prior to the Petition Date.  The defendants filed a motion to dismiss the case, and also a motion to compel arbitration of the case.  Those motions were pending on the Petition Date. Upon the Petition Date, the Debtors filed a suggestion of bankruptcy on the docket in *Cassidy*, and the District Court administratively closed the case.

  After the *Cassidy* court administratively closed the case, the same lawyers who represent the *Cassidy* plaintiffs filed another putative-class-action proceeding in the United States District Court for the Southern District of Florida, this time naming Mark Cuban (owner of the Dallas Mavericks), Dallas Basketball Limited, d/b/a Dallas Mavericks, and Stephen Ehrlich, the Debtors' CEO and co-founder, as defendants. This action is captioned *Robertson et al. v. Cuban et al.*, No. 1:22-cv-22538-RKA (S.D. Fla. Aug. 10, 2022) (the "Robertson Action").  The plaintiffs are also Voyager customers and, as proposed class representatives, assert claims against Mr. Ehrlich, Mr. Cuban, and the Dallas Mavericks, for allegedly aiding and abetting Voyager's alleged fraud claimed in the *Cassidy* action; aiding and abetting breach of fiduciary duty; civil conspiracy; and alleged violation of several states' consumer-protection and securities laws.  The *Robertson* Complaint repeats the allegations made in *Cassidy* and explicitly claims that *Cassidy* "specifically alleged in detail … how Defendants Mark Cuban and Stephen Ehrlich were key players who personally reached out to investors, individually and through [defendant] Dallas Mavericks, to induce them to invest in the Deceptive Voyager Platform."  Counsel representing the Plaintiffs in *Robertson* have advised that they intend to amend their complaint, but have not yet provided an amended complaint or described which claims they may attempt to pursue.

---

[60] *De Sousa v. Voyager Digital Ltd., et al.*, No. CV-22-00683699-00CP (Ontario Superior Court of Justice).

[61] *Voyager Digital Holdings, Inc. v. De Sousa, et al.*, Adv. Pro. No 22-01133 (MEW).

[62] *In re Voyager Digital Ltd.*, No. CV-22-00683820-00CL (Ontario Superior Court of Justice).

Accordingly, on August 10, 2022, the Debtors filed a complaint and commenced an adversary proceeding in the Bankruptcy Court to extend the automatic stay, or alternatively, enjoin prosecution of the Robertson action.[63] The *Robertson* adversary proceeding is pending before the Bankruptcy Court and a hearing is set on the matter for October 19, 2022.

The Debtors do not believe that either *Cassidy* or *Robertson* have merit, but Voyager customers may be within the putative class definition provided in each of the filed complaints. To the extent *Cassidy* or *Robertson* assert "direct" claims by individual customers against non-Debtors, such claims are not released by the proposed Plan and Confirmation Order unless, solely with respect to *Cassidy*, Contributing Claimants elect on their ballots or opt-in forms to contribute such claims to the Wind-Down Entity. To the extent *Cassidy* or *Robertson* assert derivative claims, or otherwise assert claims owned by the Debtors and/or the estates, they are released in and/or treated by the proposed Plan.

The Debtors do not believe that any pursuit of *Cassidy* or *Robertson* would have a material impact on creditor recoveries. But it is unclear what impact, if any, attempts to pursue the *Cassidy* or *Robertson* cases following confirmation of the Plan may have on the Wind-Down Debtors, creditors, or third parties. Creditors should obtain their own legal advice if they have questions concerning the viability of these matters (or lack thereof), likelihood of success, or potential impact on their long-term interests.

### (c) *Giacobbe v. Voyager Digital Holdings, Inc. et al.*

On September 1, 2022, Jon Giacobbe filed a complaint and commenced an adversary proceeding in the Bankruptcy Court alleging that the Debtors have a nondischargeable debt pursuant to section 523(a)(2)(A) of the Bankruptcy Code for money obtained by false pretenses, false representations, or actual fraud.[64] The *Giacobbe* adversary proceeding is pending before the Bankruptcy Court and a pretrial conference is scheduled for November 29, 2022. The Debtors' response to the complaint is due on October 17, 2022, pursuant to the *Stipulation and Order (1) Extending the Debtor Defendants' Time to Respond to the Complaint and Related Deadlines and (2) Adjourning the Pre-Trial Conference* SINE DIE (Adv. Pro. 22-01145 (MWE) [Docket No. 4]. On November 30, 2022, the Bankruptcy Court entered an order dismissing the *Giacobbe* adversary proceeding [Docket No. 13].

### (d) *Voyager Digital Holdings, Inc. v. Adam Lavine and Shingo Lavine.*

On September 27, 2022, the Debtors filed a complaint and commenced an adversary proceeding in the Bankruptcy Court to extend the automatic stay, or alternatively, enjoin the Lavines from terminating the Debtors' access to and use of the Ethos.io DNS servers that they have used for years.[65] On September 30, 2022, the Lavines and the Debtors jointly agreed to a stipulation and agreed order, which fully resolved the matter, and was subsequently entered by the Bankruptcy Court [Docket No. 11].

### I. The Coinify Sale.

Coinify ApS (along with its subsidiaries, collectively, "Coinify") is a limited liability corporation organized under the laws of Denmark that is a wholly owned subsidiary of Voyager European Holdings ApS ("Voyager Europe"). Voyager Europe is itself a wholly owned subsidiary of Debtor Voyager Digital Ltd. Coinify is a global cryptocurrency payment processor separate and distinct from the Voyager platform that enables buying, selling, and accepting cryptocurrency payment in stores worldwide.

On June 20, 2022, the Debtors engaged Moelis to assist in their exploration of available strategic alternatives, including a sale of the Coinify business. On June 28, 2022, Ascension ApS ("Ascension") submitted an unsolicited offer to purchase Coinify. In the following approximately two weeks, the Debtors and Ascension engaged in arm's-length, robust negotiations. On July 13, 2022, Voyager Europe entered into that certain share purchase agreement by and among Voyager Europe, as seller, and Ascension, as buyer (the "Coinify Purchase

---

[63] *Voyager Digital Holdings, Inc. v. Robertson, et al.*, Adv. Pro. No 22-01138 (MEW).

[64] *Giacobbe v. Voyager Digital Holdings, Inc. et al.*, Adv. Pro. No 22-01145 (MEW).

[65] *Voyager Digital Holdings, Inc. v. Adam Lavine and Shingo Lavine*, Adv. Pro. No 22-01150 (MEW).

Agreement"). The Coinify Purchase Agreement contemplated the sale to Ascension in exchange for $2 million in cash and included an "Earn-Out" payment provision in an amount equal to 12.5% of a subsequent sale transaction of Coinify (capped at $15,000,000), if such sale were to be consummated by Ascension on or before the third anniversary of the Coinify sale closing date. The Coinify Purchase Agreement also contained a standard "fiduciary out" clause that allowed the Debtors to entertain competing offers to purchase Coinify should any such offers emerge. On July 14, 2022, the Debtors filed a motion for entry of an order, among other things, approving the Debtors' entry into the Coinify Purchase Agreement [Docket No. 72] (the "Coinify Motion").

Following the filing of the Coinify Motion the Debtors received indications of interest from several third parties interested in a potential purchase of Coinify. Accordingly, the Debtors adjourned the Coinify Motion while they continued to engage with all interested third parties to achieve a transaction that maximizes the value of the Coinify business. Following good faith, arm's-length negotiations with all potential transaction parties and discussion among the Board and the Debtors' advisors, the Board determined, in its business judgment, that the offer contemplated in the Coinify Purchase Agreement represented the most value maximizing option for the Debtors with respect to the Coinify business. Accordingly, the Debtors scheduled a hearing to approve the Coinify Motion for August 16, 2022. Shortly after the hearing, the Bankruptcy Court entered an order approving the Coinify Motion.

On September 30, 2022, the Debtors received an offer letter from Ascension to convert the "Earn Out" provision of the Coinify Purchase Agreement into a one-time cash payment of $250,000. Ultimately, the Debtors denied the offer because they believe that the "Earn Out" is worth substantially more than the offer received.

### J. The Key Employee Retention Plan.

On August 2, 2022, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Approving the Debtors' Key Employee Retention Plan and (II) Granting Related Relief* [Docket No. 212] (the "KERP Motion" and the plan set forth therein, the "KERP"), seeking approval of a key employee retention program.

The proposed KERP provides for payment of cash retention awards to 38 of the Debtors' non-insider employees who perform essential tasks for the Debtors, including accounting, cash and digital asset management, IT infrastructure, legal, human resources, and other critical functions (each, a "KERP Participant"). KERP Participants possess deep institutional knowledge of the Debtors' operations, the cryptocurrency industry generally, or both. Some KERP Participants maintain critical relationships with counterparties that are essential to the Debtors' business. Further, many KERP Participants are long-tenured employees that developed or helped to build the Debtors' platform. The KERP prevents the attrition of the KERP Participants and, by extension, the need to incur significant operational and financial costs to source and hire new employees.

Following a hearing on August 24, 2022, the Bankruptcy Court entered an order approving the KERP Motion [Docket No. 345].

### K. Canadian Recognition Proceeding.

On July 12, 2022, the Debtors sought and were granted an Initial Recognition Order and a Supplemental Order by Madam Justice Kimmel of the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") pursuant to a proceeding commenced under Part IV of the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 (the "CCAA Recognition Proceedings"). Among other things, the Initial Recognition Order (as amended and restated on August 5, 2022) and the Supplemental Order: (i) recognized the Chapter 11 case of Voyager Digital Ltd. as a foreign main proceeding; (ii) recognized Voyager Digital Ltd. as the Foreign Representative of its Chapter 11 case in Canada; (iii) recognized and gave effect in Canada to certain first-day orders granted by the Bankruptcy Court in Voyager Digital Ltd.'s Chapter 11 case; (iv) granted a stay of proceedings in Canada in respect of Voyager Digital Ltd., its property and business, and its directors and officers; (v) prohibited the commencement of any proceedings against Voyager Digital Ltd. in Canada absent further order of the Canadian Court; and (vi) appointed Alvarez & Marsal Canada Inc. as the Information Officer in respect of the CCAA Recognition Proceedings. On August 11, 2022, the Canadian Court recognized and gave effect in Canada to certain further orders of the Bankruptcy Court made in Voyager Digital Ltd.'s Chapter 11 case.

### L. The Unwind Motion.

On September 19, 2022, the Debtors filed the *Debtors' Motion Seeking Entry of an Order (I) Authorizing the Debtors to Return Collateral and (II) Granting Related Relief* [Docket No. 402] (the "Unwind Motion"). The Unwind Motion seeks entry of an order authorizing the Debtors to return collateral held on account of certain loans made by Debtor Voyager Digital, LLC and non-Debtor HTC Trading Inc. to Alameda Research Ltd. (the "Alameda Loan"), as part of and upon Alameda's return of lent cryptocurrency back to the Debtors. On September 28, 2022, the Bankruptcy Court entered an order approving the Unwind Motion [Docket No. 470].

### M. The Request for Appointment of an Equity Committee.

On September 1, 2022, Shikar S. Partab, a self-identified minority shareholder and investor in Voyager Digital Ltd., filed a letter with the Bankruptcy Court (the "Partab Letter") requesting that the Bankruptcy Court grant several motions, including a motion for an order directing that an equity committee "be appointed to protect minority shareholders in Voyager Digital." *See* Letter [Docket No. 373]. According to the *First Amended Verified Statement Pursuant to Bankruptcy Rule 2019*, Mr. Partab joined an *ad hoc* group of Equity Interest Holders [Docket No. 482]. On September 30, 2022, David Stephenson, a self-identified minority shareholder and investor in Voyager Digital Ltd., filed a letter with the Bankruptcy Court in support of the Partab Letter and the relief sought therein, including the appointment of an equity committee [Docket No. 491]. On October 3, 2022, the United States Trustee filed the *Statement of the United States Trustee Regarding Motion for Entry of an Order Directing the United States Trustee to Appoint an Official Equity Committee* noting the legal and statutory framework for appointment of an equity committee and declining to take a position of the appointment of an equity committee in the Debtors' chapter 11 cases. The Debtors intend to object to the request sought in the Partab Letter. Pursuant to the *Notice of Adjournment*, the hearing on the Partab Letter is set for January 24, 2023. [Docket No. 682].

### N. The Post-Petition Sale Process and the Collapse of FTX.

On July 14, 2022, Moelis distributed a letter to prospective buyers with key information regarding the Debtors' marketing process (the "Process Letter"). Among other things, the Process Letter requested that all parties interested in purchasing the Company submit a non-binding indication of interest (an "Indication of Interest") by no later than 12:00 p.m., prevailing Eastern Time, on Friday, July 29, 2022 (the "IOI Deadline"), and set forth the minimum requirements that any Indication of Interest must meet in order to be considered by the Company.

On July 21, 2022, the Debtors filed the Bidding Procedures Motion. The Bidding Procedures Motion was approved by the Bankruptcy Court on August 5, 2022.

The Bidding Procedures established an open process for the solicitation, receipt, and evaluation of Bids for the Debtors' equity and/or assets pursuant to section 363 of the Bankruptcy Code or Confirmation of a Plan. The Bidding Procedures complemented and continued the Prepetition Marketing Process described in greater detail in Articles II and III herein. The timeline set forth in the Bidding Procedures was calculated to balance the need to

provide adequate notice to parties in interest and potential bidders with the need to run an expeditious and efficient sale process. Ultimately, the Bidding Procedures provided the Debtors with a clear and fair process to ascertain interest in the Debtors' assets and facilitate a sale of the Debtors if a value-maximizing bid was received.

As of the Bid Deadline (as defined in the Bidding Procedures), the Debtors had received multiple bids with varying structures and terms. On September 13, 2022, the Debtors commenced the Auction in accordance with the Bidding Procedures. The Auction spanned two weeks and featured multiple rounds of bids. The Debtors and their advisors, in consultation with the Committee and its advisors, scrutinized each bid closely, analyzing (a) the assets sought to be purchased, (b) the total expected deal consideration, (c) the certainty of each bidder's ability to close a transaction and the timing thereof (including any anticipated delays to closing and the cost to the Debtors of such delays), (d) the expected net benefit to the estates, including recoveries to customers, and (e) other criteria considered by the Debtors in their reasonable, good-faith business judgment. Importantly, the Debtors also analyzed whether each bid would provide greater value to the Debtors' stakeholders than the Standalone Plan. The Debtors consulted closely with the Committee throughout the Auction and these chapter 11 cases more generally.

Ultimately, the Debtors, in consultation with the Committee, determined that the bid received from FTX US was the highest and otherwise best bid available at the Auction and would provide meaningful value to the Debtors' estates and stakeholders. On September 27, 2022, the Debtors and FTX executed the FTX Purchase Agreement memorializing the terms of the FTX bid. The FTX Purchase Agreement contained a "no-shop" provision that the parties later amended at the direction of the Court[66] to provide the Debtors greater flexibility to entertain incoming bids from potential transaction parties if such bids were reasonably likely to lead to a higher and otherwise better offer.[67] On October 20, 2022, the Court entered an order approving the Debtors' entry into the FTX Purchase Agreement[68] with the modified "no-shop" provision. On October 24, 2022, the Debtors filed solicitation versions of their Disclosure Statement and Plan,[69] solicitation of the Plan commenced in earnest shortly thereafter as the Debtors embarked towards confirmation, which, among other things, would have effectuated the FTX Transaction.

The Debtors' journey to consummation of the FTX Transaction and confirmation of the Plan was derailed over the ensuing weeks. Indeed, on November 11, 2022, Mr. Bankman Fried resigned as CEO and FTX announced that FTX and approximately 130 of its affiliates, including FTX US, had commenced filing for chapter 11 protection in the United States Bankruptcy Court for the District of Delaware.[70] Shortly prior to FTX's bankruptcy filing, Kirkland sent a letter on behalf of the Debtors to Sullivan & Cromwell LLP ("S&C"), counsel to FTX, informing S&C that FTX had until 12:00 p.m. Eastern Time on November 11, 2022, to indicate whether it intends to close the FTX Transaction or the Debtors would seek emergency relief from the Court to be released from the "no-shop" provision of the FTX Purchase Agreement. S&C responded shortly thereafter confirming that FTX had released the Debtors from the "no-shop" provision but did not indicate whether FTX intends to pursue or abandon the FTX Transaction. On December 9, 2022, the Debtors filed with this Court the *Joint Stipulation and Agreed Order Between the Debtors and FTX US* terminating the FTX Purchase Agreement [Docket No. 717]. On December 21, 2022, FTX filed a motion seeking approval of such stipulation by the court overseeing the FTX Bankruptcy Proceeding as well.[71]

---

[66] *In re Voyager Digital Holdings, Inc.*, No. 22-10943 (MEW) (Bankr. S.D.N.Y. Oct. 19, 2022) Hr'g Tr. 45:21–46:6.

[67] *See* Asset Purchase Agreement, Docket No. 472, Exhibit B, § 5.2.

[68] Docket No. 581.

[69] Docket Nos. 590 and 591.

[70] *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Nov. 11, 2022).

[71] *Motion of Debtors for Entry of an Order (A) Authorizing the Debtors to Enter Into the Stipulation with Voyager Digital, LLC and (B) Granting Related Relief* [Docket No. 283], filed in *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Dec. 21, 2022).

While the FTX Bankruptcy Proceeding is still unfolding, early indications are that Mr. Bankman-Fried and FTX were carrying on one of the largest financial failures of all time. Mr. John Ray III, who was appointed Chief Executive Officer of FTX following the resignation of Mr. Bankman-Fried and who oversaw the restructuring of Enron, commented in an early filing in the FTX Bankruptcy Proceeding that "[n]ever in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information."[72]

The collapse of FTX caused a ripple effect across the broader digital currency industry as cryptocurrency businesses with large outstanding loans to FTX and its affiliates faced the prospect of having to write down hundreds of millions of dollars in balance sheet assets[73] and other businesses saw their value and future prospects crater along with the price of Bitcoin and other cryptocurrencies.[74] In the days and weeks following commencement of the FTX Bankruptcy Proceeding, major cryptocurrency players announced that they had suspended withdrawals.[75]

Following the announcement of the FTX bankruptcy, the Debtors received numerous inbound inquiries from potential transaction parties interested in consummating a transaction with the Debtors, and, following their release from the "no-shop" provision in the FTX Purchase Agreement, the Debtors began proactively to reengage with other potential transaction parties regarding a potential acquisition of the Debtors' business. Over the course of four weeks, the Debtors engaged in good-faith, arm's length negotiations with numerous potential transaction parties regarding a variety of deal structures and terms. Several of the parties had already conducted substantial diligence on the Debtors' businesses during prior marketing processes, and additional parties with whom the Debtors had not previously engaged entered into non-disclosure agreements and gained access to the Debtors' virtual dataroom. The Debtors conducted additional management meetings and responded to dozens of diligence requests from potential transaction parties during this process. Ultimately, following extensive discussions and consultation with their advisors and the Committee, the Debtors determined, in an exercise of their business judgment, that the offer submitted by Binance.US represented the highest and otherwise best offer to purchase the Debtors' business, and on December 18, 2022, the Debtors entered into the Asset Purchase Agreement.

In connection with the evaluation of the Binance.US bid, the Debtors' advisors conducted certain financial and business counterparty due diligence on Binance.US. This due diligence included reviews of certain documentation and discussions with senior management at Binance.US relating to: audited financial statements, interim unaudited financial statements, available liquidity, related party services agreements, wallet infrastructure, AML/KYC procedures, money transmitter licensing status, and business plans submitted to selected state regulators in connection with the issuance of money transmitter licenses.

---

[72] *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 24], filed in *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Nov. 17, 2022); *see also United States of America v. Samuel Bankman-Fried*, 22-crim-673 (S.D.N.Y. December 9, 2022); *Securities and Exchange Commission v. Samuel Bankman-Fried*, Civil Action. No. 22-cv-10501 (S.D.N.Y. Dec. 13, 2022).

[73] Reuters, "Factbox: From Binance to Voyager, Crypto Firms' Exposure to FTX Is Coming to Light," November 14, 2022, https://www.reuters.com/technology/binance-voyager-crypto-firms-exposure-ftx-is-coming-light-2022-11-14.

[74] Cointelegraph, "The FTX Contagion: Which Companies Were Affected by the FTX Collapse?" November 17, 2022, https://cointelegraph.com/news/the-ftx-contagion-which-companies-were-affected-by-the-ftx-collapse.

[75] Press Release, "November 11, 2022 BlockFi Update," November 11, 2022, https://blockfi.com/november-11-2022-blockfi-update; Press Release, "Important Update: Forward Through Adversity," November 13, 2022, https://trends.aax.com/important-update-forward-through-adversity; Press Release, "An Important Message Regarding Gemini Earn," November 16, 2022, https://www.gemini.com/blog/an-important-message-regarding-gemini-earn; Wall Street Journal, "Crypto Lender Genesis Suspends Withdrawals After FTX Collapse," November 16, 2022, https://www.wsj.com/articles/crypto-lender-genesis-suspends-withdrawals-after-ftx-collapse-11668607332; Press Release, "Important Updates on Services at Liquid," November 21, 2022, https://blog.liquid.com/important-updates-on-services-at-liquid.

The Debtors value the Sale Transaction at approximately $1.022 billion, comprising (i) the value of cryptocurrency on the Voyager platform as of a date to be determined, which as of December 19, 2022 at 0:00 UTC, is estimated to be $1.002 billion, plus (ii) additional consideration, which is estimated to provide at least $20 million of incremental value. The Sale Transaction also includes additional benefits, such as it (i) provides the most tax efficient route forward as the Binance.US Platform will provide the means for Account Holders to access 100% of the cryptocurrency types held by Account Holders on the Debtors' platform, (ii) it is the only transaction available to the Debtors that did not require the Debtors to liquidate cryptocurrency for working capital purposes, (iii) includes reimbursement by Binance.US of up to $15 million of Seller's expenses, (iv) provides a $10 million reverse termination fee payable to the Seller by Binance.US to compensate the Debtors' estates in the event that Binance.US cannot consummate the transaction, and (v) in the event that the Debtors pivot to the Liquidation Transaction, provides that Binance.US will provide certain services to facilitate such transaction to ensure that the Debtors can rely on the Binance.US Platform to minimize leakage with and cybersecurity risks when returning cryptocurrency to creditors.

Importantly, the Asset Purchase Agreement contains a "Fiduciary Out," which provides that the Seller may terminate the Asset Purchase Agreement at any time in the event that not doing so would be inconsistent with the Seller's fiduciary duties. Moreover, the structure of the proposed transaction, including its "Fiduciary Out," permits the Debtors to toggle *either* to a higher and better third-party bid (should one emerge) *or* to the Liquidation Transaction, if the Debtors determine in their business judgment between now and closing that the Sale Transaction is no longer the highest and best option for any reason. Based on the diligence the Debtors have performed to date on their proposed counterparty, they believe the Sale Transaction is the highest and best option. But the Debtors recognize that the cryptocurrency industry is experiencing an extremely volatile period for an already volatile business, and the Debtors continue to monitor what seem to be daily developments in the sector. Not only does the structure of the proposed transaction permit the debtors to pivot to the Liquidation Transaction if they conclude the Asset Purchase Agreement is no longer higher and better due to a development along the way, but the work to prepare to consummate and execute on the Asset Purchase Agreement will better prepare the Debtors to complete the Liquidation Transaction if the toggle becomes necessary.

The Sale Transaction can be effectuated quickly, provides a meaningful recovery to creditors, and allows the Debtors to facilitate an efficient resolution of these Chapter 11 Cases, after which Binance.US's market-leading, secured trading platform will enable customers to trade and store cryptocurrency. The terms of the Purchaser's offer are set forth in greater detail in the Asset Purchase Agreement. Due to this comprehensive marketing process, the robust Auction, and the extensive, arm's length negotiations with multiple potential transaction parties following the collapse of the FTX Transaction, the Debtors believe that the Sale Transaction is the most value-maximizing transaction under the facts and circumstances.

On December 30, 2022, the United States Attorney for the Southern District of New York filed the "Notice of the United States of America Concerning the Review of Certain Transactions by the Committee on Foreign Investment in the United States" ("CFIUS") review on the Sale Transaction [Docket No. 797] (the "CFIUS Notice"). The Sale Transaction is potentially subject to CFIUS review as CFIUS may review certain transactions involving foreign person(s) acquiring control of any business or investment in the United States in order to determine the effect of such transactions on the national security of the United States, and to mitigate risks arising from those transactions. The Debtors and Binance.US have been in discussion with CFIUS and intend to make a voluntary filing with CFIUS regarding the Sale Transaction. As set forth in the CFIUS Notice regarding the Sale transaction, there is risk that CFIUS takes action that could materially affect the Sale Transaction. In the event of any action taken by CFIUS that arises to that level, the Debtors will toggle to the Liquidation Transaction under the Plan as described in Article V.B.2 of this Disclosure Statement.

### O.     The Special Committee Investigation.

As described in Article VII.D, on July 5, 2022, OpCo formally formed the Special Committee comprised of disinterested directors Timothy Pohl and Jill Frizzley. The Special Committee was vested with the authority to, among other things: (a) investigate any historical transactions, public reporting, or regulatory issues undertaken by OpCo that the Special Committee deemed necessary or appropriate, and the facts and circumstances surrounding such transactions; (b) interview and solicit information and views from management, representatives, consultants, advisors, or any other party in connection with any historical transactions undertaken by OpCo that the Special

Committee deems necessary or appropriate; (c) request documentation and information regarding OpCo's business, assets, properties, liabilities and business dealings with respect to any historical transactions undertaken by Voyager that the Special Committee deems necessary and appropriate to review; (d) perform any other activities consistent with the matters described herein or as the Special Committee or Voyager's board of directors otherwise deems necessary or appropriate; and (e) conduct an independent investigation with respect to any potential estate claims and causes of action against insiders of Voyager, including any claims arising from loans made to 3AC. *Id.* The Special Committee retained the Special Committee Counsel to provide independent advice to, and act at the exclusive direction of, the Special Committee in connection with the Special Committee's mandate.

During its investigation, counsel for the Special Committee sought and received information related to, among other things: Voyager's loans to 3AC, Alameda, Celsius and numerous other borrowers; the diligence performed in connection with those loans; Voyager's staking of customer cryptocurrency assets; Voyager's regulatory compliance; pre-petition payments to insiders and third parties; and numerous other aspects of Voyager's business. The Special Committee drafted and negotiated a protective order, which was later entered by the Bankruptcy Court, to protect the confidentiality of the information sought and received. Voyager collected and provided to the Special Committee responsive documents from its internal hard copy and electronic files, from its outside counsel, and from various third parties (e.g., cryptocurrency custodians and exchanges). Among many other things, Voyager collected email, Slack communications, and, in certain cases, Telegram and cell phone data—from a dozen Company employees, including all of Voyager's most senior officers and others. In addition to several voluminous spreadsheets of data, Voyager produced over 12,000 documents—collectively totaling over 50,000 pages—related to, among other things: loans between Voyager and its counterparties; the diligence performed by Voyager in connection with those loans; internal and external communications regarding those loans; meetings of Voyager's Risk Committee and board of directors; detailed information regarding Voyager's staking of customer assets; Voyager's applications for money transmitter licenses; audits for compliance with applicable laws and regulations; communications with Voyager's regulators; Voyager's public statements; Voyager's tax filings and financial statements; and detailed information regarding intercompany transfers and payments to insiders. No information was withheld from the Special Committee on privilege grounds.

In addition to reviewing the above-referenced documents, counsel for the Special Committee also interviewed numerous Voyager employees, including Steve Ehrlich (CEO), Gerard Hanshe (COO), Evan Psaropoulos (CCO), Ashwin Prithipaul (CFO), Pamela Kramer (CMO), David Brosgol (General Counsel), Marshall Jensen (Head of Corporate Development), Ryan Whooley (Head of Treasury and Trading), Jon Brosnahan (Treasurer), Brian Silard (Treasury Team), David Brill (Deputy General Counsel), and Manisha Lalwani (in-house regulatory counsel). Collectively, the interviews performed during the Special Committee's investigation lasted more than 55 hours, and covered in great detail a wide-range of topics.

## IX. RISK FACTORS

**BEFORE TAKING ANY ACTION WITH RESPECT TO THE PLAN, HOLDERS OF CLAIMS AGAINST THE DEBTORS WHO ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN, AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO, OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT, INCLUDING OTHER DOCUMENTS FILED WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES. THE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE RESTRUCTURING AND CONSUMMATION OF THE PLAN. EACH OF THE RISK FACTORS DISCUSSED IN THIS DISCLOSURE STATEMENT MAY APPLY EQUALLY TO THE DEBTORS AND THE WIND-DOWN DEBTORS, AS APPLICABLE AND AS CONTEXT REQUIRES.**

72

A.      **Risks Related to the Restructuring.**

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan.  Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors or the Plan and its implementation.

1.      *The Debtors Will Consider All Available Restructuring Alternatives if the Restructuring Transactions Are Not Implemented, and Such Alternatives May Result in Lower Recoveries for Holders of Claims Against the Debtors*

If the Restructuring Transactions are not implemented, the Debtors will consider all other restructuring alternatives available, which may include the filing of an alternative chapter 11 plan, conversion to chapter 7, or any other transaction that would maximize the value of the Debtors' estates.  Any alternative restructuring proposal may be on terms less favorable to Holders of Claims against the Debtors than the terms of the Plan as described in this Disclosure Statement.

Any material delay in Confirmation of the Plan, or the Chapter 11 Cases, or the threat of rejection of the Plan by the Bankruptcy Court, would add substantial expense and uncertainty to the process.

The uncertainty surrounding a prolonged restructuring would also have other adverse effects on the Debtors.  For example, it would also adversely affect:

- the Debtors' ability to raise additional capital;

- the Debtors' ability to retain key employees;

- the Debtors' ability to retain account holders;

- the Debtors' liquidity;

- how the Debtors' business is viewed by regulators, investors, and lenders; and

- the Debtors' enterprise value.

2.      *Certain Bankruptcy Law Considerations*

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

(a)      **Parties in Interest May Object to the Plan's Classification of Claims and Interests.**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  As provided in the Plan and this Disclosure Statement, the Debtors are not seeking to substantively consolidate and recoveries on account of Claims against or Interests in any Debtor shall be determined on a Debtor-by-Debtor basis.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims and Interests that are substantially similar to the other Claims and Interests in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

(b)      **The Conditions Precedent to the Effective Date of the Plan May Not Occur.**

As more fully set forth in Article IX of the Plan, the Effective Date is subject to a number of conditions precedent. If such conditions precedent are not met or waived, the Effective Date will not take place.

(c)      **Failure to Satisfy Vote Requirements.**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.

(d)      **The Debtors May Not Be Able to Secure Confirmation of the Plan.**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan and requires, among other things, a finding by the Bankruptcy Court that: (i) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (ii) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (iii) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that this Disclosure Statement, the balloting procedures, and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met. If a chapter 11 plan is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to consummate the Sale and what, if anything, Holders of Allowed Claims against them would ultimately receive with respect to their Claims.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting class of Claims, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

(e)      **Nonconsensual Confirmation.**

In the event that any Impaired Class of Claims or Interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one Impaired Class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. The Debtors believe that the Plan satisfies these requirements, and the Debtors will request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the conclusion that the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to Professional Fee Claims.

(f)      **Continued Risk After Consummation.**

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as increasing expenses and further industry deterioration or other changes in economic conditions. Some of these concerns and effects typically become more acute when a case under the

74

Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan reflecting the Plan will achieve the Debtors' stated goals.

       **(g)**        **Filing of a Competing Plan.**

At the outset of the Chapter 11 cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtors have retained the exclusive right to propose the Plan since filing their chapter 11 petitions. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve Confirmation of the Plan in order to achieve the Debtors' stated goals because creditors and others may propose a plan.

       **(h)**        **The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code.**

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

       **(i)**        **The Debtors May Object to the Amount or Classification of a Claim.**

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

       **(j)**        **Risk of Non-Occurrence of the Effective Date.**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will in fact occur.

       **(k)**        **Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan.**

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies could affect distributions available to Holders of Allowed Claims under the Plan but may not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

(l)        **Releases, Injunctions, and Exculpations Provisions May Not Be Approved.**

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including releases by third parties of claims that may otherwise be asserted against the Debtors, Wind-Down Debtors, or Released Parties, as applicable.  The releases, injunctions, and exculpations (including, for the avoidance of doubt, the definitions of Released Parties, Releasing Parties, and Exculpated Parties) provided in the Plan are subject to objection by parties in interest and may not be approved.  If the releases are not approved, certain parties may not be considered Released Parties, Releasing Parties, or Exculpated Parties, and certain Released Parties may withdraw their support for the Plan.

3.        *The Consideration Under the Plan Does Not Reflect any Independent Valuation of Claims against or Interests in the Debtors*

The Debtors have not obtained or requested a fairness opinion from any banking or other firm as to the fairness of the consideration under the Plan.

4.        *Governmental Approvals May Not Be Granted*

Consummation of the Restructuring Transactions may depend on obtaining approvals of certain Governmental Units that may be necessary or advisable.  Failure by any Governmental Unit to grant an approval could prevent or impose limitations or restrictions on Consummation of the Restructuring Transactions and Confirmation of the Plan.

**B.        Risks Related to Recoveries under the Plan.**

1.        *The Debtors Cannot Guarantee Recoveries or the Timing of Such Recoveries*

Although the Debtors have made commercially reasonable efforts to estimate Allowed Claims and Allowed Interests, it is possible that the actual amount of such Allowed Claims and Allowed Interests is materially different than the Debtors' estimates.  Creditor recoveries could be materially reduced or eliminated in this instance. In addition, the timing of actual distributions to Holders of Allowed Claims and Allowed Interests may be affected by many factors that cannot be predicted.  Therefore, the Debtors cannot guaranty the timing or amount of any recovery on an Allowed Claim or an Allowed Interest.

2.        *The Debtors Are Subject to the Volatility of Cryptocurrency*

The volatility of cryptocurrency may adversely affect the fair market value of Voyager's Cryptocurrency, which could result in lower recoveries for creditors than the Debtors' current estimates based on the Fair Market Value as of December 19, 2022.

3.        *The Plan May Diminish the Value of VGX*

Upon confirmation of the Plan and approval of the Sale Transaction, Binance.US will review VGX to determine whether VGX meets its standards to be listed for trading on the Binance.US Platform.  Regardless of whether VGX meets the standards to be listed for trading on the Binance.US Platform, holders of VGX will be able to receive their VGX tokens in kind and withdraw them from the Binance.US Platform.  The Debtors' business operations will be winding down following the Effective Date and consummation of either the Sale Transaction or the Liquidation Transaction. Binance.US is not purchasing the VGX private keys and the Debtors will continue to engage with third parties regarding a sale of the VGX private keys to provide utility to VGX post-consummation of the Sale Transaction or the Liquidation Transaction as applicable. In the event that the VGX private keys are not sold to a third party, VGX will have no utility going forward and may have no value. Voyager will not be able to support commitments to VGX following the Effective Date and, in the event the Sale Transaction is consummated, Binance.US will not otherwise assume such obligations.

        **4.**      *The Tax Implications of the Debtors' Bankruptcy and Restructuring Are Highly Complex*

Holders of Allowed Claims and Allowed Interests should carefully review Article XII of this Disclosure Statement, entitled "Certain U.S. Federal Tax Consequences of the Plan," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Debtors.

        **5.**      *The Closing Conditions of the Sale Transaction May Not Be Satisfied*

It is possible that the Debtors may not satisfy the closing conditions of the Sale Transaction. A failure to satisfy any of the closing conditions of the Sale Transaction could prevent the Sale Transaction and the Plan from being consummated, which could lead to the Chapter 11 Cases being converted to cases under chapter 7.

    **C.**    **Disclosure Statement Disclaimer.**

        **1.**      *The Financial Information Is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit Was Performed*

In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to assure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects their financial condition, the Debtors are unable to warrant or represent that the financial information contained in this Disclosure Statement (or any information in any of the exhibits to the Disclosure Statement) is without inaccuracies.

        **2.**      *No Legal or Tax Advice Is Provided By This Disclosure Statement*

This Disclosure Statement is not legal advice to any person or Entity. The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each reader should consult their own legal counsel and accountant with regard to any legal, tax, and other matters concerning its Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote to accept or reject the Plan or whether to object to Confirmation of the Plan.

        **3.**      *No Admissions Made*

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Wind-Down Debtors, Holders of Allowed Claims or Interests, or any other parties in interest.

        **4.**      *Failure to Identify Litigation Claims or Projected Objections*

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The Debtors may seek to investigate, file, and prosecute Claims and may object to Claims and Interests after Confirmation and Consummation of the Plan, irrespective of whether this Disclosure Statement identifies such Claims or objections to Claims and Interests.

        **5.**      *Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors*

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement and the exhibits to the Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement or the information in the exhibits to the Disclosure Statement.

6.        *Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update*

    The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date.  While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.  Furthermore, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

7.        *No Representations Outside This Disclosure Statement Are Authorized*

**NO REPRESENTATIONS CONCERNING OR RELATING TO THE DEBTORS, THE CHAPTER 11 CASES, OR THE PLAN ARE AUTHORIZED BY THE BANKRUPTCY COURT OR THE BANKRUPTCY CODE, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.    ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE VOTING HOLDERS' ACCEPTANCE OR REJECTION OF THE PLAN THAT ARE OTHER THAN AS CONTAINED IN, OR INCLUDED WITH, THIS DISCLOSURE STATEMENT, SHOULD NOT BE RELIED UPON BY VOTING HOLDERS IN ARRIVING AT THEIR DECISION.    VOTING HOLDERS SHOULD PROMPTLY REPORT UNAUTHORIZED REPRESENTATIONS OR INDUCEMENTS TO COUNSEL TO THE DEBTORS AND THE OFFICE OF THE UNITED STATES TRUSTEE FOR THE SOUTHERN DISTRICT OF NEW YORK.**

D.        Miscellaneous Risk Factors and Disclaimers.

1.        *The Debtors are Subject to an Extensive and Highly Evolving Regulatory Landscape and Any Adverse Changes to, or Their Failure to Comply with, any Laws and Regulations Could Adversely Affect Their Brand, Reputation, Business, Assets, Operating Results, and Financial Condition*

    The Debtors' business is subject to extensive laws, rules, regulations, policies, orders, determinations, directives, treaties, and legal and regulatory interpretations and guidance in the markets in which the Debtors operate, including those governing money transmission, financial services, banks and trust companies, securities, broker-dealers and alternative trading systems, or ATS, commodities and commodities interests such as derivatives, credit, cryptocurrency asset custody, exchange, and transfer, cross-border and domestic money and cryptocurrency asset transmission, retail and commercial lending, usury, foreign currency exchange, privacy, data governance, data protection, cybersecurity, fraud detection, retail protection, escheatment, antitrust and competition, bankruptcy, tax, anti-bribery, economic and trade sanctions, anti-money laundering, and counter-terrorist financing, among others.  Many of these legal and regulatory regimes were adopted prior to the advent of the internet, mobile technologies, cryptocurrency assets, and related technologies.  As a result, some applicable laws and regulations do not contemplate or address unique issues associated with the cryptocurrency economy, are subject to significant uncertainty, and vary widely across U.S. federal, state, and local and international jurisdictions.  These legal and regulatory regimes, including the laws, rules, and regulations thereunder, evolve frequently and may be modified, interpreted, and applied in an inconsistent manner from one jurisdiction to another and may conflict with one another.  Moreover, the complexity and evolving nature of the Debtors' business and the significant uncertainty surrounding the regulation of the cryptocurrency economy require the Debtors to exercise their judgment as to whether certain laws, rules, and regulations apply to the Debtors, and it is possible that governmental bodies and regulators may disagree with their conclusions.  To the extent the Debtors have not complied with such laws, rules, and regulations, the Debtors could be subject to significant fines, revocation of licenses (including Money Transmission Licenses as described in IV.F), limitations on their products and services, cease and desist orders in one or more states, reputational harm, and other regulatory consequences, each of which may be significant and could adversely affect their business, operating results, and financial condition.

    Additionally, economic and trade sanctions, anti-money laundering, and anti-terrorism laws in the United States and other jurisdictions may restrict the Debtors' business from engaging in transactions in or relating to

certain countries, individuals, and entities. The imposition of sanctions and related restrictions by different jurisdictions have been evolving quickly, including in response to the military conflict between Russia and Ukraine, and the ultimate impact on global economic and commercial activity as well the financial condition and performance of the Debtors' business and assets is difficult to predict.

In order to operate its business, Voyager currently maintains state money transmission licenses or their equivalents (each, a "Money Transmission License") in seventeen (17) states[76] and has license applications pending[77] in eighteen (18) states.[78]

The Debtors have engaged with the state banking departments throughout the bankruptcy process and will continue to actively do so with the goal of ensuring that Plan provides for compliance by Voyager with state money transmission laws. The state banking departments may have broad discretion as to the approvals required in connection with the Plan, thus it is not possible to predict with certainty the scope of such approvals, whether they will ultimately be granted, and the expected timeframes of the state banking departments' determinations. There are unresolved questions of law with respect to the intersection of state money transmission statutes and the Bankruptcy Code, and the answers to those questions may impact the ability of the state banking departments to require certain approvals with respect to confirmation of the Plan.

Following confirmation of the Plan, Voyager will take steps to (i) withdraw those money transmission license applications that are pending with state banking departments and (ii) surrender those Money Transmission Licenses it holds (the "Licensing Wind-Down Process"). Such Licensing Wind-Down Process will require notice to, and in some cases approval by, those state banking departments in states where the Debtors have applications pending or are licensed pursuant to the requirements set forth in each state money transmission statute and as otherwise required by the relevant state banking departments.[79]

### 2. The Wind-Down Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases as well as Ongoing Regulatory Investigations

The Debtors are currently subject to or interested in certain legal proceedings, some of which may adversely affect the Debtors or the Wind-Down Debtors, as applicable. In the future, the Debtors or the Wind-Down Debtors may become parties to additional litigation, including enforcement actions brought by state banking departments with respect to Voyager's historical compliance with money transmission laws, which could result in significant fines. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect recoveries to creditors in these

---

[76] The Alaska Division of Banking and Securities suspended Voyager's license on July 6, 2022, and subsequently reversed such suspension on July 14, 2022. There is a risk that one or more additional state banking departments may choose to suspend Voyager's Money Transmission Licenses going forward, or that one more states in which Voyager is licensed may decline to renew Voyager's licenses for 2023 based on regulatory concerns and/or the requirements of their money transmission statutes.

[77] On July 17, 2022, the North Dakota Department of Financial Institutions notified Voyager that it required Voyager's pending money transmitter license application be withdrawn on grounds that it would not approve an application with an active bankruptcy filing. Other states have likewise inquired as to whether Voyager will seek to withdraw its pending applications or indicated they may require Voyager to do so. While Voyager is seeking to keep its applications on file with the state banking departments and has not withdrawn any applications, there is a risk that one or more state banking departments with which Voyager has pending applications may require Voyager to do so going forward.

The Debtors have two applications pending in New York: (a) a money transmitter license application and (b) a virtual currency business activity license application or "Bitlicense." Voyager Digital NY, LLC, a non-operational affiliate of the Debtors, filed such applications.

[78] Voyager also maintains a registration as a "money services business" with the Financial Crimes Enforcement Network ("FinCEN") pursuant to federal money transmission laws. A change in ownership of an entity registered with FinCEN requires notice to FinCEN following consummation of the relevant transaction, but does not require prior regulatory approval.

[79] The state approval process for the surrender of a license typically takes several months.

79

Chapter 11 cases.  It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan.  It is not possible to predict the potential litigation that the Debtors may become party to, nor the final resolution of such litigation.  The impact of any such litigation on the Debtors, however, could be material.

On January 5, 2022, Voyager received from the U.S. Securities and Exchange Commission ("SEC") a subpoena requesting certain information and documents.  In response, Voyager actively dialogued with and provided the SEC staff with the requested material.  The subpoena and dialogue related primarily to two issues: (1) whether the Rewards Program feature of the Voyager Account (also referred to as the "Earn Program" or "Voyager Earn Account") involved a securities offering and (2) whether Voyager or any of its affiliated entities required registration under the Investment Company Act of 1940.  As a follow-up, on July 15, 2022, the SEC staff issued a second subpoena with additional requests for information and documents relating to public statements, internal communications, and third-party communications after May 1, 2022, and certain minutes, policies and procedures, internal documentation, loan agreements, due diligence, and June 30, 2022 financial statement information.  As it does with most subpoenas, the SEC staff included a cover letter stating, among other things, "The investigation and the subpoena do not mean that we have concluded that your client or anyone else has violated the law. Also, the investigation does not mean that we have a negative opinion of any person, entity or security." Since then, Voyager has produced certain of the requested material and continues to work to provide the SEC with the remaining responsive material.  As before, Voyager continues to dialogue with the SEC regarding the Voyager business and document and information requests.

On July 28, 2022, the FDIC and Federal Reserve Board issued a joint letter and a joint press release regarding potential false or misleading representations as to Voyager's deposit insurance status, and demanded immediate corrective action to address any false or misleading statements.  While the Debtors disagree with the FDIC and Federal Reserve Board's position, the Debtors nonetheless took immediate steps to ensure that statements made as to the deposit insurance status of funds held through the Voyager platform are accurate.  Following receipt of Voyager's responses on August 1, 2022 and August 9, 2022, the FDIC and the Federal Reserve Board requested additional information from Voyager.  Voyager responded to those requests on October 28, 2022 and October 31, 2022.

Separate from the matters pertaining to the FDIC and Federal Reserve Board's letter dated July 28, 2022, the Federal Reserve Board on September 29, 2022 requested certain information pertaining to Voyager's operations; Voyager made an initial production in response to such request on November 10, 2022, and anticipates making further productions in satisfaction of the Federal Reserve Board's request.

On August 1, 2022, Voyager received from the Commodity Futures Trading Commission a letter seeking certain information and documents from Voyager on its business, its customers and its lending activities prior to its chapter 11 proceedings.  On September 12, 2022, Voyager received a subpoena requesting the same information and documents.  Voyager is working to provide the CFTC with information that its responsive to its requests.

On November 23, 2022, the Federal Trade Commission issued a civil investigative demand to Voyager seeking certain information from Voyager regarding its business.

In addition to these federal subpoenas, requests for information, and cease and desist orders, Voyager has also received a number of administrative proceeding inquiries and orders from state securities regulators relating to the Rewards Program.  The states have alleged or asserted in a variety of ways that the accounts involved unregistered securities offerings.  Below is a brief summary of Voyager's contacts with applicable state regulators concerning the Rewards Program.

Alabama issued a show cause order[80] on March 29, 2022, which required a response within twenty-eight (28) days.  Alabama extended the response deadline to January 5, 2023.  On July 7, 2022, Alabama also issued a

---

[80]  Alabama's show cause order required Voyager to show, within a certain period of time, why Voyager should not be directed to cease and desist from selling unregistered securities within the state.

subpoena for information on Voyager customers, board of directors materials and other information related to the chapter 11 proceedings. Voyager has produced all of the requested materials.

Indiana issued a cease and desist order[81] on March 29, 2022. Given that neither the Voyager Account nor the Rewards Program is active, and given Voyager's current status in these Chapter 11 Cases, Voyager has requested an extension with respect to deadlines in connection with responding to Indiana's order.

Kentucky issued an emergency cease and desist order[82] on March 29, 2022. Kentucky denied Voyager's request for a stay of effectiveness of the order on May 27, 2022. Kentucky's order is still in effect. Voyager has the option to request a hearing, but otherwise, there is no pending deadline. Voyager ceased offering Rewards to all customers as of June 1, 2022 pursuant to the order. Separately, on July 6, 2022, Kentucky asked for information in connection with Voyager's Kentucky customers. Voyager produced that information on July 8, 2022.

New Jersey issued a cease and desist order[83] on March 29, 2022 with an effective date of April 29, 2022. Per New Jersey's communications with Voyager and an order issued on June 29, 2022, a version of the order is in effect as of July 31, 2022. Specifically, Voyager has ceased offering Rewards to new customer accounts opted into the Rewards Program feature and has ceased offering Rewards for new assets contributed to existing such accounts. Given that neither the Voyager Account nor Rewards Program is active, and given Voyager's current status in these Chapter 11 Cases, Voyager has requested an extension with respect to deadlines in connection with responding to New Jersey's order.

Oklahoma issued a cease and desist order[84] on March 29, 2022. At Voyager's request, Oklahoma stayed the effectiveness of its order multiple times, but lifted the stay on July 29, 2022. Most recently, given that neither the Voyager Account nor Rewards Program is active, and given Voyager's current status in these Chapter 11 Cases, Voyager has requested an extension with respect to deadlines in connection with responding to Oklahoma's order.

South Carolina issued a cease and desist order and notice of opportunity for a hearing[85] on March 29, 2022. South Carolina stayed the effectiveness of its order and extended the applicable response deadlines multiple times. The order went into effect on August 1, 2022, but all response deadlines have been extended until January 31, 2023.

Vermont issued a show cause order on March 29, 2022. At Voyager's request, Vermont extended the deadline to respond to the order multiple times. On July 13, 2022, Vermont issued a subpoena for information on Voyager's Vermont customers and other information related to the chapter 11 proceedings. Voyager has produced some of the requested materials and continues to work with Vermont with the remaining responsive materials. On

---

[81]  Indiana's order alleged that Voyager Rewards Accounts were securities and required Voyager to cease and desist from: offering and selling securities unregistered/noncompliant under Indiana securities laws/codes; accepting additional assets into existing Voyager Rewards Accounts; and committing any further violations of the Indiana securities laws/codes.

[82]  Kentucky's order alleged that Voyager Rewards Accounts were securities and required Voyager to cease and desist from: soliciting or selling any security in Kentucky unregistered with the state's Department of Financial Institutions; and engaging in any other activity that would otherwise violate the Kentucky securities laws.

[83]  New Jersey's order alleged that Voyager Rewards Accounts were securities and required Voyager to cease and desist from: offering or selling unregistered/nonexempt securities; accepting additional assets into existing Rewards Accounts; and violating any other provisions of the state's securities laws.

[84]  Oklahoma's order alleged that Voyager Rewards Accounts were securities and required Voyager to cease and desist from: offering or selling such accounts to Oklahoma residents; and allowing further deposits into such existing accounts of Oklahoma residents.

[85]  South Carolina's order alleged that Voyager Rewards Accounts were securities and required Voyager to: cease and desist from transacting business in the state in violation of the states securities laws; pay a civil penalty of $2,149,800.00 if the order becomes effective by operation of law or, if Voyager seeks a hearing, pay a civil penalty not to exceed $10,000 for each violation. The notice of hearing informed Voyager of its right to request a formal hearing to contest the statements and allegations made therein.

September 14, 2022, Vermont issued an *ex parte* order to cease and desist, as well as a standstill agreement, under which all deadlines in connection with responding to the order are suspended for ninety (90) days.

Washington issued a statement of charges and notice of opportunity for a hearing[86] on March 29, 2022. In response on April 15, 2022, Voyager submitted its application for an adjudicative hearing. On May 16, 2022, Voyager and Washington confirmed their agreement, in which Voyager would waive its right to a speedy hearing but maintain its right to request a hearing. Washington agreed to extend all applicable response deadlines until October 1, 2022. Given that neither the Voyager Account nor Rewards Program are active, and given Voyager's current status in the bankruptcy proceedings, Voyager has requested an extension with respect to deadlines in connection with responding to Washington's order.

Texas issued a notice of hearing[87] on April 12, 2022. The hearing has been scheduled for January 25, 2023. Prior to this hearing, both Texas and Voyager must pre-file all exhibits they intend to offer at the hearing; provide those exhibits to each other by email; number each exhibit sequentially; paginate or bates stamp multipage documents; and identify witnesses they intend to rely on and file witness statements accordingly.[88]

California issued a desist and refrain order[89] on June 3, 2022. As part of a prior agreement with California, on July 11, 2022, Voyager requested a hearing while waiving its right to have the hearing held within fifteen business days. In exchange, California agreed that it would not petition the superior court to enforce the order on or before July 31, 2022. Per a conversation with the state regulator on August 1, 2022, the department has no reason to go to court to enforce the order in light of the bankruptcy proceedings and because Voyager is not currently offering Rewards to customers. No hearing date has been set.

Washington, D.C. issued a summary cease and desist order[90] on July 26, 2022. On July 29, 2022, the D.C. regulator agreed to an extension of the deadline by which Voyager had to submit a written answer and request for hearing until September 30, 2022. Given that neither the Voyager Account nor Rewards Program are active, and given Voyager's current status in the bankruptcy proceedings, Voyager has requested an extension with respect to deadlines in connection with responding to Washington, D.C.'s order.

---

[86]  Washington's statement of charges notified Voyager that Washington had reason to believe Voyager had violated the state's securities laws and contained a list of tentative findings of fact and conclusions of law. Based on the findings and conclusions alleged therein, the statement issued a notice of intent to order Voyager to cease and desist from certain activities, impose fines, and charge costs. The notice of opportunity of hearing informed Voyager of its right to contest the charges made against it at an adjudicative hearing by making a written request for hearing and filing an answer to the statement of charges. Alternatively, Voyager was given the option to waive the right to a hearing and instead submit a written statement to the Director of the Department of Financial Institutions.

[87]  The notice of hearing informed Voyage that a hearing would be held before an administrative law judge to determine whether to issue: (1) an order requiring Voyager to cease and desist from violating various provisions of the state's securities act; and/or (2) a cease publication order requiring Voyager to cease from offering securities via statements that are materially misleading or otherwise likely to deceive the public.

[88]  Texas Department of Banking alleged that Voyager Digital, LLC engaged in unlicensed money transmission in violation of Chapter 151 of the Texas Finance Code. While Voyager neither admitted nor denied the Department's conclusions with respect to any factual findings or violations of law, Voyager and the Department agreed to a Consent Order (*In the Matter of Voyager Digital, LLC* (Order No.: 2022-035)) whereby Voyager agreed to cease and desist from engaging in the unauthorized business of money transmission in Texas. The Consent Order does not limit Voyager's ability to (i) hold money and monetary value on behalf of, and return money and monetary value to, existing Account Holders located in Texas during the pendency of Voyager's Chapter 11 Cases, or (ii) otherwise act in accordance with orders of the Bankruptcy Court.

[89]  California's order alleged that Voyager Rewards Accounts were securities and required Voyager to desist and refrain from further offers and sale of unregistered/noncompliant securities within the state.

[90]  Washington D.C.'s summary cease and desist order alleged that Voyager Rewards Accounts were securities and required Voyager to cease and desist from: offering or selling such accounts within D.C., from accepting any additional assets into existing accounts; and from any further violations of securities laws.

Alaska issued a cease and desist order[91] and notice of opportunity to request a hearing, on September 3, 2022. Per the notice, Voyager has thirty (30) days to request a hearing. Given that neither the Voyager Account nor Rewards Program are active, and given Voyager's current status in the bankruptcy proceedings, Voyager has requested an extension with respect to deadlines in connection with responding to Alaska's order.

In addition to the above-described state securities matters, Voyager has received and continues to respond to various requests from state banking departments in certain states with respect to Voyager's compliance with money transmission laws.

### 3. The Loss of Key Personnel Could Adversely Affect the Debtors' Ability to Consummate the Sale and Plan

The Debtors' operations are dependent on a relatively small group of key management personnel and a highly skilled employee base. The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees. Because competition for experienced personnel in the cryptocurrency and financial industries can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to consummate the Sale and the Plan.

### 4. Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition

Section 1141(d)(3) of the Bankruptcy Code limits a debtor's ability to discharge Claims in certain circumstances. Any Claims not ultimately discharged through a Plan could be asserted against the Wind-Down Entity and may have an adverse effect on the Debtors' financial condition.

### 5. Certain State Regulators Have Asserted that the Plan is Unconfirmable due to the Treatment of Account Holders in Unsupported Jurisdictions

Certain state regulators in the Unsupported Jurisdictions (i.e., New York, Texas, and Vermont (which filed an objection on behalf of Hawaii)) have asserted that the Plan provides for the disparate treatment of Account Holders in their jurisdictions due to the potential delay in distributions to such Account Holders in violation of section 1123(a)(4) of the Bankruptcy Code. The Debtors believe that the Plan's treatment of Account Holders in the Unsupported Jurisdictions complies with section 1123(a)(4) of the Bankruptcy Code and provides such Account Holders with the best possible path towards receiving an in-kind distribution of their claims in the same types of Cryptocurrency that they deposited with the Debtors, however, there can be no assurance that the Bankruptcy Court will reach the same conclusion. In the event that the Bankruptcy Court finds that the objections of the state regulators have merit, the Debtors may be required to modify the Plan, prior to or as a result of the Confirmation Hearing, to provide for (a) the liquidation of the Cryptocurrency held by Account Holders in the Unsupported Jurisdictions on the date that is three months after the Effective Date (i.e., the date when Cryptocurrency for Account Holders who do not fulfill the requirements to access the Binance.US Platform would be converted into U.S. Dollars and distributed), or potentially, on the Effective Date, and (b) the distribution of such cash proceeds resulting from such liquidation to Account Holders in the Unsupported Jurisdictions promptly following three months after the Effective Date, or potentially, on the Effective Date, subject to the terms of the Plan and the Asset Purchase Agreement, including any amendments that may be required in light of the Bankruptcy Court's ruling. For the avoidance of doubt, Binance.US has not agreed to any such modification of the Asset Purchase Agreement and is under no obligation to do so. If the Bankruptcy Court rules in this manner, it is uncertain whether the Sale Transaction would be consummated.

---

[91] Alaska's cease and desist order alleged that Voyager Rewards Accounts were securities and required Voyager to cease and desist from: offering or selling such accounts in Alaska; and from accepting any assets into existing accounts. Alaska assessed a $1,000,000 administrative penalty but acknowledged Voyager's status in bankruptcy proceedings and noted that "so long as the automatic stay is in effect in [Voyager]'s bankruptcy proceedings, [Alaska] will not seek to execute or collect [the penalty] without first approaching the United States Bankruptcy Court . . . ."

## X.     SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the Holders of Claims in those Classes that are entitled to vote to accept or reject the Plan. The procedures and instructions for voting and related deadlines are set forth in the Solicitation Package.

> ### THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY.
>
> PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ATTACHED HERETO FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

### A.     Classes Entitled to Vote on the Plan.

The following Classes are entitled to vote to accept or reject the Plan (collectively, the "Voting Classes"):

| Class | Claim or Interest | Status |
|-------|-------------------|--------|
| 3 | Account Holder Claims | Impaired |
| 4A | OpCo General Unsecured Claims | Impaired |
| 4B | HoldCo General Unsecured Claims | Impaired |
| 4C | TopCo General Unsecured Claims | Impaired |

If your Claim or Interest is not included in the Voting Classes, you are not entitled to vote and you will not receive a Solicitation Package (as defined below). If you are a Holder of a Claim in one or more of the Voting Classes, you should read your Ballot(s) and carefully follow the instructions included in the Ballot(s). Please use only the Ballot(s) that accompanies this Disclosure Statement or the Ballot(s) that the Debtors, or the Claims, Noticing, and Solicitation Agent on behalf of the Debtors, otherwise provided to you. If you are a Holder of a Claim in more than one of the Voting Classes, you will receive a Ballot for each such Claim.

### B.     Votes Required for Acceptance by a Class.

Under the Bankruptcy Code, acceptance of a chapter 11 plan by a class of claims is determined by calculating the amount and number of allowed claims voting to accept, as a percentage of the allowed claims that have voted. Acceptance of a chapter 11 plan by a class of interests is determined by calculating the amount of allowed interests voting to accept, as a percentage of the allowed interests that have voted. Acceptance by a class of claims requires an affirmative vote of more than one-half in number of total allowed claims that have voted and an affirmative vote of at least two-thirds in dollar amount of the total allowed claims that have voted. Acceptance by a class of interests requires an affirmative vote of at least two-thirds in amount of the total allowed interests that have voted.

### C.     Certain Factors to Be Considered Prior to Voting.

There are a variety of factors that all Holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan. These factors may impact recoveries under the Plan and include, among other things:

- unless otherwise specifically indicated, the financial information contained in the Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and the Disclosure Statement;

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor guarantee that the Bankruptcy Court will confirm the Plan;

- the Debtors may request Confirmation without the acceptance of all Impaired Classes in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims and Professional Fee Claims.

While these factors could affect distributions available to Holders of Allowed Claims under the Plan, the occurrence or impact of such factors will not necessarily affect the validity of the vote of the Voting Classes or necessarily require a resolicitation of the votes of Holders of Claims in the Voting Classes.

For a further discussion of risk factors, please refer to "Risk Factors" described in Article IX of this Disclosure Statement.

**D.     Classes Not Entitled To Vote on the Plan.**

Under the Bankruptcy Code, holders of claims or interests are not entitled to vote if their contractual rights are unimpaired by the proposed plan or if they will receive no property under the plan. Accordingly, the following Classes of Claims against and Interests in the Debtors are not entitled to vote to accept or reject the Plan:

| Class | Claim or Interest | Status |
|---|---|---|
| 1 | Secured Tax Claims | Unimpaired |
| 2 | Other Priority Claims | Unimpaired |
| 5 | Alameda Loan Facility Claims | Impaired |
| 6 | Section 510(b) Claims | Impaired |
| 7 | Intercompany Claims | Unimpaired / Impaired |
| 8 | Intercompany Interests | Unimpaired / Impaired |
| 9 | Existing Equity Interests | Impaired |

**E.     Solicitation Procedures.**

**1.     *Claims, Noticing, and Solicitation Agent***

The Debtors have retained Stretto to act, among other things, as Claims, Noticing, and Solicitation Agent in connection with the solicitation of votes to accept or reject the Plan.

**2.     *Solicitation Package***

The following materials constitute the solicitation package (the "Solicitation Package") distributed to Holders of Claims in the Voting Classes:

- a copy of the Solicitation and Voting Procedures (as defined in the Disclosure Statement Order);

- the applicable form of Ballot, together with detailed voting instructions and instructions on how to submit the Ballot;

- the Cover Letter (as defined in the Disclosure Statement Order);

- this Disclosure Statement (and exhibits thereto, including the Plan);

- the Disclosure Statement Order (without exhibits, except the solicitation and voting procedures);

- the Confirmation Hearing Notice (as defined in the Disclosure Statement Order); and

- such other materials as the Bankruptcy Court may direct.

3.        *Distribution of the Solicitation Package and Plan Supplement*

The Claims, Noticing, and Solicitation Agent shall distribute the Solicitation Package to Holders of Claims in the Voting Classes by no later than January 25, 2023 (the "Solicitation Launch").

The Solicitation Package (without Ballots, unless you are an eligible voting party) may also be obtained from the Claims, Noticing, and Solicitation Agent by:  (a) calling the Claims, Noticing, and Solicitation Agent at (855) 473-8665 (Toll-Free) or (949) 271-6507 (International) and asking for the "Solicitation Group" or (b) emailing the Claims, Noticing, and Solicitation Agent at voyagerinquiries@stretto.com.  You may also obtain copies of any pleadings filed with the Bankruptcy Court for free by visiting the Debtors' restructuring website, https://cases.stretto.com/Voyager, or the Bankruptcy Court's website at https://www.nysb.uscourts.gov/ecf-and-pacer-information (for a fee).  Holders that have more than one option to return a Ballot should choose only one method to return their Ballot.

No later than fourteen (14) days before the Voting Deadline, the Debtors will file the Customer Onboarding Protocol and Schedule of Retained Causes of Action as part of the Plan Supplement.  No later than seven days before the Voting Deadline, or such later date as may be approved by the Bankruptcy Court, the Debtors intend to file all other Plan Supplement documents.  If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website.  The Debtors will not serve copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement from the Claims, Noticing, and Solicitation Agent by:  (a) calling the Claims, Noticing, and Solicitation Agent at the telephone number set forth above; (b) visiting the Debtors' restructuring website, https://cases.stretto.com/Voyager, or (c) emailing the Claims, Noticing, and Solicitation Agent at voyagerinquiries@stretto.com.

F.        **Voting Procedures.**

January 10, 2023 (the "Voting Record Date"), is the date that will be used for determining which Holders of Claims are entitled to vote to accept or reject the Plan and receive the Solicitation Package in accordance with the solicitation procedures.  Except as otherwise set forth herein, the Voting Record Date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' creditors and other parties in interest.

In order for the Holder of a Claim in the Voting Classes to have its Ballot counted as a vote to accept or reject the Plan, such Holder's Ballot must be properly completed, executed, and delivered by (i) using the enclosed pre-paid, pre-addressed return envelope or (ii) via first class mail, overnight courier, or hand delivery to Voyager Ballot Processing, c/o Stretto, 410 Exchange, Suite 100, Irvine, CA 92602, so that such Holder's Ballot is actually received by the Claims, Noticing, and Solicitation Agent on or before the Voting Deadline on February 22, 2023, at 4:00 p.m. (prevailing Eastern Time).

If a Holder of a Claim in a Voting Class transfers all of such Claim to one or more parties on or after the Voting Record Date and before the Holder has cast its vote on the Plan, such Claim Holder is automatically deemed to have provided a voting proxy to the purchaser(s) of the Holder's Claim, and such purchaser(s) shall be deemed to be the Holder(s) thereof as of the Voting Record Date for purposes of voting on the Plan, provided that the purchaser provides satisfactory confirmation of the transfer to the Claims, Noticing, and Solicitation Agent.

If you hold Claims in more than one Voting Class under the Plan, you should receive a separate Ballot for each Class of Claims, coded by Class number, and a set of solicitation materials.

IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTORS DETERMINE OTHERWISE.

ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM BUT THAT DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR ANY BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

EACH HOLDER OF A CLAIM MUST VOTE ALL OF ITS CLAIMS WITHIN A PARTICULAR CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES.  BY SIGNING

AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS, SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE PLAN. IF A HOLDER CASTS MULTIPLE BALLOTS WITH RESPECT TO THE SAME CLAIM AND THOSE BALLOTS ARE IN CONFLICT WITH EACH OTHER, SUCH BALLOTS WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

IT IS IMPORTANT THAT THE HOLDER OF A CLAIM IN THE VOTING CLASSES FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON SUCH HOLDER'S BALLOT AND THE ACCOMPANYING INSTRUCTIONS. NO BALLOT MAY BE WITHDRAWN OR MODIFIED AFTER THE VOTING DEADLINE WITHOUT THE DEBTORS' PRIOR CONSENT OR PERMISSION OF THE BANKRUPTCY COURT.

### G. Voting Tabulation.

Unless the Debtors decide otherwise, Ballots received after the Voting Deadline may not be counted. A Ballot will be deemed delivered only when the Claims, Noticing, and Solicitation Agent actually receives the executed Ballot as instructed in the applicable voting instructions. No Ballot should be sent to the Debtors, the Debtors' agents (other than the Claims, Noticing, and Solicitation Agent) or the Debtors' financial or legal advisors.

The Bankruptcy Code may require the Debtors to disseminate additional solicitation materials if the Debtors make material changes to the terms of the Plan or if the Debtors waive a material condition to Confirmation of the Plan. In that event, the solicitation will be extended to the extent directed by the Bankruptcy Court.

In the event that a designation of lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Bankruptcy Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected.

The Debtors will file with the Bankruptcy Court, as soon as practicable after the Voting Deadline, the voting report prepared by the Claims, Noticing, and Solicitation Agent (the "Voting Report"). The Voting Report shall, among other things, provide the votes received to accept or reject the Plan and Holders of Claims and Interests that have opted into the third-party releases or Contributed Third-Party Claims, delineate every Ballot that does not conform to the voting instructions or that contains any form of irregularity (each an "Irregular Ballot"), including those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or lacking necessary information, or damaged. The Voting Report also shall indicate the Debtors' intentions with regard to such Irregular Ballots. Neither the Debtors nor any other Person or Entity will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report nor will any of them incur any liability for failure to provide such notification.

### H. Ballots Not Counted.

No Ballot will be counted toward Confirmation if, among other things: (1) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (2) it was transmitted by facsimile, email, or other electronic means not specifically approved pursuant to the Disclosure Statement Order; (3) it was cast by an entity that is not entitled to vote on the Plan; (4) it was sent to the Debtors, the Debtors' agents/representatives (other than the Claims, Noticing, and Solicitation Agent), or the Debtors' financial or legal advisors instead of the Claims, Noticing, and Solicitation Agent; (5) it is unsigned; or (6) it is not clearly marked to either accept or reject the Plan or is marked both to accept and reject the Plan. Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.

---

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE CLAIMS, NOTICING, AND SOLICITATION AGENT TOLL-FREE NUMBER AT (855) 473-8665.**

---

> **ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT
> IN COMPLIANCE WITH THE SOLICITATION ORDER WILL <u>NOT</u> BE COUNTED.**

## XI.     CONFIRMATION OF THE PLAN

### A.     Requirements of Section 1129(a) of the Bankruptcy Code.

Among the requirements for Confirmation are the following:  (i) the Plan is accepted by all impaired Classes of Claims and Interests or, if the Plan is rejected by an Impaired Class, at least one Impaired Class of Claims has voted to accept the Plan and a determination that the Plan "does not discriminate unfairly" and is "fair and equitable" as to Holders of Claims or Interests in all rejecting Impaired Classes; (ii) the Plan is feasible; and (iii) the Plan is in the "best interests" of Holders of Impaired Claims or Interests (*i.e.*, Holders of Class 3 Account Holder Claims, Holders of Class 4A OpCo General Unsecured Claims, Holders of Class 4B HoldCo General Unsecured Claims, Holders of Class 4C TopCo General Unsecured Claims, Holders of Class 5 Alameda Loan Facility Claims, Holders of Class 6 Section 510(b) Claims, and Holders of Class 9 Existing Equity Interests).

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that the Plan satisfies or will satisfy all of the necessary requirements of chapter 11 of the Bankruptcy Code.  Specifically, in addition to other applicable requirements, the Debtors believe that the Plan satisfies or will satisfy the applicable Confirmation requirements of section 1129 of the Bankruptcy Code set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the Plan proponents, have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, will be disclosed to the Bankruptcy Court, and any such payment:  (i) made before Confirmation will be reasonable or (ii) will be subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation.

- Either each Holder of an Impaired Claim against or Interest in the Debtors will accept the Plan, or each non-accepting Holder will receive or retain under the Plan on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that the Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim agrees to a different treatment of its Claim, the Plan provides that, to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, Allowed Administrative Claims will be paid in full on the Effective Date or as soon thereafter as is reasonably practicable.

- At least one Class of Impaired Claims will have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

- Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the U.S. Trustee, will be paid as of the Effective Date.

Section 1126(c) of the Bankruptcy Code provides that a class of claims has accepted a plan of reorganization if such plan has been accepted by creditors that hold at least two-thirds in amount and more than

one-half in number of the allowed claims of such class. Section 1126(d) of the Bankruptcy Code provides that a class of interests has accepted a plan of reorganization if such plan has been accepted by holders of such interests that hold at least two-thirds in amount of the allowed interests of such class.

**B.      Best Interests of Creditors—Liquidation Analysis.**

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an interest in such class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtors liquidated under chapter 7 of the Bankruptcy Code.

To demonstrate compliance with the "best interests" test, the Debtors, with the assistance of their advisors, prepared the Liquidation Analysis, attached hereto as **Exhibit B**, showing that the value of the distributions provided to Holders of Allowed Claims and Interests under the Plan would be the same or greater than under a hypothetical chapter 7 liquidation. As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' business under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Allowed Claims or Interests as compared to distributions contemplated under the Plan. Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Allowed Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

In a typical chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets and to make distributions to creditors in accordance with the priorities established in the Bankruptcy Code. Generally, secured creditors are paid first from the proceeds of sales of their collateral. If any assets remain in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses are next to be paid. Unsecured creditors are paid from any remaining sale proceeds, according to their respective priorities. Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority. Finally, interest holders receive the balance that remains, if any, after all creditors are paid.

All or substantially all of the assets of the Debtors' business will have been liquidated through the Sale Transaction and the Plan effects a wind down of the Debtors' remaining assets not otherwise acquired in the Sale Transaction. Although a chapter 7 liquidation would achieve the same goal, the Debtors believe that the Plan provides a greater recovery to Holders of Allowed Claims than would a chapter 7 liquidation.

The liquidation of the Debtors' assets in chapter 7 would result in substantially less value than the proceeds of the Sale Transaction. Notably, in the context of a chapter 7 liquidation, the Debtors would not receive the upfront cash payment, the earn-out, and other Binance.US Transaction proceeds that provide significantly greater value to Holders of Account Holder Claims and OpCo General Unsecured Claims than in a chapter 7 liquidation scenario. Moreover, the proceeds of the sale of the Debtors' Cryptocurrency would likely be less in a fire sale liquidation than in an orderly sale under the Plan.

Liquidating the Debtors' Estates under the Plan likely provides Holders of Allowed Claims with a larger, more timely recovery in part because of the expenses that would be incurred in a chapter 7 liquidation, including the potential added time (thereby reducing the present value of any recovery for Holders) and expense incurred by the chapter 7 trustee and any retained professionals in familiarizing themselves with the Chapter 11 Cases and the Debtors' Cryptocurrency. *See, e.g.*, 11 U.S.C. § 326(a) (providing for compensation of a chapter 7 trustee); 11 U.S.C. 503(b)(2) (providing administrative expense status for compensation and expenses of a chapter 7 trustee and such trustee's professionals). Additionally, the Debtors' Estates would continue to be obligated to pay all unpaid expenses incurred by the Debtors during the Chapter 11 Cases (such as compensation for Professionals), which may constitute Allowed Claims in any chapter 7 case.

The conversion to chapter 7 would also require entry of a new bar date. *See* Fed. R. Bankr. P. 1019(2); 3002(c). Thus, the amount of Claims ultimately filed and Allowed against the Debtors could materially increase, thereby further reducing creditor recoveries versus those available under the Plan.

89

In light of the foregoing, the Debtors submit that a chapter 7 liquidation would result in reduced sale proceeds and recoveries, increased expenses, delayed distributions, and the prospect of additional claims that were not asserted in the Chapter 11 Cases. Accordingly, the Debtors believe that distributions under the Plan would provide Holders of Claims and Interests with the same or greater recovery than under a hypothetical chapter 7 liquidation.

### C.  Feasibility.

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a chapter 11 plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

The Plan provides for the liquidation and distribution of the Debtors' assets. Accordingly, the Debtors believe that all Plan obligations will be satisfied without the need for further reorganization of the Debtors.

### D.  Acceptance by Impaired Classes.

The Bankruptcy Code requires that, except as described in the following section, each impaired class of claims or interests must accept a plan in order for it to be confirmed. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to the class is not required. A class is "impaired" unless the plan: (i) leaves unaltered the legal, equitable, and contractual rights to which the claim or the interest entitles the holder of the claim or interest; (ii) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest; or (c) provides that, on the consummation date, the holder of such claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled or any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims that actually voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number of creditors actually voting cast their ballots in favor of acceptance. For a class of impaired interests to accept a plan, section 1126(d) of the Bankruptcy Code requires acceptance by interest holders that hold at least two-thirds in amount of the allowed interests of such class, counting only those interests that actually voted to accept or reject the plan. Thus, a class of interests will have voted to accept the plan only if two-thirds in amount actually voting cast their ballots in favor of acceptance.

### E.  Confirmation without Acceptance by All Impaired Classes.

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted the plan, *provided* that the plan has been accepted by at least one impaired class of claims. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

If any Impaired Class of Claims or Interests rejects the Plan, including Classes of Claims or Interests deemed to reject the Plan, the Debtors will request Confirmation of the Plan, as it may be modified from time to time, utilizing the "cramdown" provision under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims to render such Class of Claims Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules or to withdraw the Plan as to such Debtor. Class 3 Account Holder Claims and Class 4A OpCo General Unsecured Claims are treated the same under the Plan, Class 4B HoldCo General Unsecured Claims and Class 4C TopCo General Unsecured Claims will receive the recovery available at HoldCo or TopCo, and the

Debtors will seek to subordinate Class 5 Alameda Loan Facility Claims pursuant to the Plan.  Therefore, the Plan does not discriminate unfairly.

The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the requirements for cramdown and the Debtors will be prepared to meet their burden to establish that the Plan can be Confirmed pursuant to section 1129(b) of the Bankruptcy Code as part of Confirmation of the Plan.

### 1. *No Unfair Discrimination*

The "unfair discrimination" test applies with respect to classes of claim or interests that are of equal priority but are receiving different treatment under a proposed plan.  The test does not require that the treatment be the same or equivalent, but that the treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly.  Under certain circumstances, a proposed plan may treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2. *Fair and Equitable Test*

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in such class.  As to each non-accepting class and as set forth below, the test sets different standards depending on the type of claims or interests in such class.  The Debtors believe that the Plan satisfies the "fair and equitable" requirement, notwithstanding the fact that certain Classes are deemed to reject the Plan.  There is no Class receiving more than a 100 percent recovery and no junior Class is receiving a distribution under the Plan until all senior Classes have received a 100 percent recovery or agreed to receive a different treatment under the Plan.

### (a) Unsecured Claims.

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either:  (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date, equal to the allowed amount of such claim; or (ii) the holder of any claim or any interest that is junior to the claims of such class will not receive or retain any property under the plan on account of such junior claim or junior interest, subject to certain exceptions.

### (b) Interests.

The condition that a plan be "fair and equitable" to a non-accepting class of interests, includes the requirements that either:  (i) the plan provides that each holder of an interest in that class receives or retains under the plan on account of that interest property of a value, as of the effective date, equal to the greater of: (a) the allowed amount of any fixed liquidation preference to which such holder is entitled; (b) any fixed redemption price to which such holder is entitled; or (c) the value of such interest; or (ii) the holder of any interest that is junior to the interests of such class will not receive or retain any property under the plan on account of such junior interest.

## XII.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.    Introduction.

The following discussion is an overview of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors, the Wind-Down Debtors, and to Holders entitled to vote to accept or reject the Plan.  This overview is based on the U.S. Internal Revenue Code of 1986, as amended ("IRC"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "IRS"), and other applicable authorities (collectively, "Applicable Tax Law"), all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.

The application of Applicable Tax Law to numerous material aspects of the transactions contemplated by the Plan, and to cryptocurrency in general, is subject to an unusually high level of uncertainty.  No opinion of counsel has been or will be obtained and the Debtors have not requested, and do not expect to seek, a ruling or determination from the IRS as to any of the tax consequences of the Plan.  No portion of this discussion is binding upon the IRS or the courts, and no assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position that the Debtors or Wind-Down Debtors take.

**ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED, IN THE STRONGEST TERMS POSSIBLE, TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN.  THIS DISCUSSION DOES NOT CONSTITUTE TAX OR LEGAL ADVICE TO HOLDERS OF CLAIMS OR INTERESTS.**

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to certain Holders in light of their individual circumstances.  This discussion also does not address tax issues with respect to such Holders that are subject to special treatment under the U.S. federal income tax laws (including, for example, accrual-method U.S. Holders (as defined below) that prepare an "applicable financial statement" (as defined in Section 451 of the IRC), banks, mutual funds, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, U.S. Holders (as defined below) whose functional currency is not the U.S. dollar, U.S. expatriates, broker-dealers, small business investment companies, Persons who are related to the Debtors within the meaning of the IRC, Purchaser, Persons liable for alternative minimum tax, Persons (other than, if applicable, the Debtors) using a mark-to-market method of accounting, Holders who are themselves in bankruptcy, real estate investment companies and regulated investment companies and those holding, or who will hold, consideration received pursuant to the Plan as part of a hedge, straddle, conversion, or other integrated transaction). No aspect of state, local, non-income, or non-U.S. taxation is addressed (including, for the avoidance of doubt, the application of Canadian tax law to Holders or to the Debtors, which issues are under further review).  Furthermore, this preliminary overview assumes that a Holder holds only Claims or Interests in a single Class and, except as set forth below, holds such Claims or Interests only as "capital assets" (within the meaning of section 1221 of the IRC). This preliminary overview also assumes that the various debt and other arrangements to which the Debtors and Wind-Down Debtors are or will be a party will be respected for U.S. federal income tax purposes in accordance with their form, and, to the extent relevant, that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the IRC.  This preliminary overview does not discuss differences in tax consequences to Holders that act or receive consideration in a capacity other than any other Holder of a Claim or Interest of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described below. The U.S. federal income tax consequences of the implementation of the Plan to the Debtors, Wind-Down Debtors, and Holders of Claims and Interests described below also may vary depending on the ultimate nature of any Restructuring Transactions that the Debtors and/or Wind-Down Debtors engage in.  This discussion does not address the U.S. federal income tax consequences to Holders (a) whose Claims are Unimpaired or otherwise entitled to payment in full under the Plan, or (b) that are deemed to reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim or Interest that for U.S. federal income tax purposes is:  (1) an individual who is a citizen or resident of the United States; (2) a corporation (or

other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons (within the meaning of section 7701(a)(30) of the IRC) has authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person (within the meaning of section 7701(a)(30) of the IRC). For purposes of this discussion, a "Non-U.S. Holder" is any Holder that is neither a U.S. Holder nor a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity. Partnerships (or other pass-through entities) and partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders are urged to consult their own respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

The below discussion assumes that the Debtors obtained tax ownership of cryptocurrency deposits when customers made such deposits. The Debtors believe that position is the right one based on, among other things, the fact that the Debtors had the right to transfer, rehypothecate, and otherwise deal in deposited cryptocurrency. If the Debtors were determined to not have tax ownership of the cryptocurrency, the consequences of the Plan to Holders of Claims and the Debtors would vary significantly from the discussion below.

**ACCORDINGLY, THE FOLLOWING DISCUSSION OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER. THIS DISCUSSION DOES NOT CONSTITUTE TAX OR LEGAL ADVICE TO HOLDERS OF CLAIMS OR INTERESTS.**

B.    **Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors.**

The consequences of the Plan to the Debtors will depend, in part, on whether the Plan is structured as a Sale Transaction or a Liquidation Transaction.

In a Sale Transaction, the Debtors expect that the Plan would be structured such that there would be taxable sale of certain assets of the Debtors to the Purchaser (the "Taxable Transaction") and, potentially, a deemed "in-kind" distribution of cryptocurrency to customers in exchange for Claims related to deposits of such cryptocurrency (the "In-Kind Distribution"). As a result and in connection therewith, the Debtors would realize gain or loss in an amount equal to the difference between the value of the consideration received by the Debtors (including, for this purpose, assumption of liabilities) and the Debtors' tax basis in such assets. Gain would be reduced by the amount of tax attributes (if any) available for use by the Debtors, and any remaining gain would be recognized by the Debtors and result in a cash tax obligation. Amounts subject to the In-Kind Distribution may be treated as a non-taxable transaction with respect to the underlying cryptocurrency, combined with incurrence of income or cancellation of indebtedness income related to any difference between the value of what customers receive in exchange for their Claims and the amount of their Claims (determined without regard to "dollarization" of such Claims).

Thus, the U.S. federal income tax consequences of the Taxable Transaction to the Debtors would in large part be a function of the Debtors' tax basis in their assets that the Debtors transfer or are deemed to have transferred, including the Debtors' cryptocurrency. There is generally no direct guidance under Applicable Tax Law on how to treat a customer's transfer of cryptocurrency to a business like the Debtors' (and as a result there is significant (and unusual) uncertainty with respect to the Debtors' tax basis in such cryptocurrency) or the transferee's utilization of the transferred cryptocurrency (for example, and without limitation, holding it and doing nothing more, lending it, staking it, selling it, or using it in a short sale). Accordingly, there is significant uncertainty with respect to the tax consequences of a Taxable Transaction to the Debtors.

It is possible that the IRS or a court could disagree with the Debtors' determination of their basis in their assets, including the Debtors' cryptocurrency. Any such disagreement could lead to a redetermination of the Debtors' basis in their assets and a resultant increase in the Debtors' tax liability from a Taxable Transaction, potentially in a way that would have a materially adverse impact on the Debtors. The Debtors, together with their advisors, continue to study this issue.

Were the Plan instead structured as a Liquidation Transaction, then, generally, subject to any rebalancing of the Debtors' cryptocurrency in order to facilitate distributions under the Plan or to otherwise effectuate the Liquidation Transaction, the Debtors would distribute cash and/or property in satisfaction of Claims. In connection with any rebalancing, the Debtors would realize gain or loss upon the sale of cryptocurrency involved in such rebalancing, with such gain or loss calculated as, and subject to the uncertainty, described above. With respect to the Debtors' distribution of cash and/or property to Holders of Claims, the Debtors would recognize income or cancellation of indebtedness income related to any difference between the value of what a Holder receives in exchange for its Claim and the amount of such Claim (determined without regard to "dollarization" of such Claims).

Whether the Plan is structured as a Sale Transaction or a Liquidation Transaction, the Debtors' tax attributes (if any) will not survive the implementation of the Plan. Accordingly, the rules regarding cancellation of indebtedness income are generally inapplicable and the rules regarding section 382 of the IRC are inapplicable and, in each case, not discussed further.

The Debtors continue to evaluate how "dollarization" of Claims as of the Effective Date may modify the above analysis, either with respect to the implementation of the Plan itself or with respect to any administrative tax period more generally. The Debtors currently cannot say with certainty that there will not be material administrative income tax liabilities that must be satisfied under the Plan.

### C. Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders[92] of Allowed Claims Entitled to Vote.

#### 1. *Sale Transaction or Liquidation Transaction*

##### (a) U.S. Federal Income Tax Consequences to Certain U.S. Holders of Allowed Class 3 Claims (Account Holder Claims).

If the Plan is structured as a Sale Transaction, each Holder of an Allowed Account Holder Claim will receive in exchange for such Allowed Account Holder Claim: (i) for Account Holders in Supported Jurisdictions, its Net Owed Coins, as provided in and subject to the requirements of Section 6.12 of the Asset Purchase Agreement; (ii) for Account Holders in Unsupported Jurisdictions, value in Cash at which such Net Owed Coins allocable to such Account Holder are liquidated; provided that to the extent that the Purchaser obtains the Unsupported Jurisdiction Approval for the jurisdiction in which such Account Holder resides and the Debtors and/or Wind-Down Entity has not made such Cash distribution to such Account Holder, then such Account Holder shall receive the treatment in Article III.C.3(c)(i)(A) of the Plan; (iii) its Pro Rata share of any Additional Bankruptcy Distributions, in Cryptocurrency or Cash as provided in and subject to the requirements of Sections 6.12 and 6.14 of the Asset Purchase Agreement; (iv) its Pro Rata share of Distributable OpCo Cash; and (v) to effectuate distributions from the Wind Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to OpCo; provided that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims; *provided* that distributions made to any Account Holder pursuant to clauses (iii), (iv), and (v) above shall be made after taking into account the Acquired Coins Value of the Net Owed Coins or the value in Cash at which such Net Owed Coins are liquidated, as applicable, previously allocated to such Account Holder.

---

[92] Based on the Debtors' understanding of the residence of Holders, the Debtors do not discuss any U.S. federal income tax consequences of the consummation of the Plan to Non-U.S.-Holders.

If, alternatively, the Plan is structured as a Liquidation Transaction, each Holder of an Allowed Account Holder Claim will receive in exchange for such Allowed Account Holder Claim: (i) its Pro Rata share of Distributable OpCo Cash; (ii) its Pro Rata share of Distributable Cryptocurrency, which such Account Holder shall be able to withdraw in kind, alternative Cryptocurrency, and/or Cash for a period of thirty (30) days after the Effective Date through the Voyager platform or, if elected by Seller pursuant to Section 6.12(d) of the Asset Purchase Agreement, through the Binance.US Platform; *provided* that, if the applicable transfer is made through the Voyager platform and such Account Holder does not withdraw its Pro Rata share of Distributable Cryptocurrency available to such Account Holder from the Voyager platform within such thirty (30) day period, such Account Holder will receive Cash in the equivalent value to its Pro Rata share of Distributable Cryptocurrency; and (iii) effectuate distributions from the Wind Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to OpCo; *provided* that any distributions on account of Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

Whether the Plan is structured as a Sale Transaction or a Liquidation Transaction, there is a material risk that U.S. Holders of Account Holder Claims will have a taxable event in connection with the consummation of the Plan or the "dollarization" of Claims (or separate taxable events for one or both events). This is the case even though the Sale Transaction contemplates the migration of customers to an acquiring cryptocurrency platform and even though the Liquidation Transaction contemplates that Account Holders can withdraw cryptocurrency from the Voyager platform. To the extent any taxable event occurs, tax liability would be based on the difference between the Holder's tax basis in its Claim compared to the value it receives in respect of such Claim, with such gain or loss generally being capital in nature.

The tax treatment of Holders under the Plan depends significantly on the tax treatment of customer deposits in the first instance. There is uncertainty with respect to whether deposits are taxable when they occur, but the Debtors generally expect that most customers have taken the position that the act of depositing cryptocurrency with the Debtors is not a taxable event. While there is substantial theoretical debate regarding that position, it is a position that has some level of support in the idea that the exchange of cryptocurrency for a contractual right to the return of such cryptocurrency is not a transaction that results in a realization event under section 1001 of the IRC because it does not involve an exchange of property "differing materially either in kind or in extent." Such position relies, among other things, on caselaw that pre-dates the enactment of section 1058 of the IRC and analogies to the treatment afforded to securities lending under section 1058. On the other hand, there is also support for the position that the initial deposit of cryptocurrency is a taxable event because of various provisions in the Terms of Use that narrow a customer's rights with respect to the deposited cryptocurrency (in particular, provisions related to the Debtors' ability to not support "airdropped" cryptocurrency or cryptocurrency issued pursuant to a "hard fork").

To the extent an initial deposit of cryptocurrency was not taxable, there is an argument that the same position could be taken with respect to the return by the Debtors of such cryptocurrency to customers, because the exchange of the contractual right to the return of such cryptocurrency for the underlying cryptocurrency would itself not be an exchange of property "differing materially either in kind or in extent." This argument would be stronger in the case of a Liquidation Transaction than in a Sale Transaction, because the explicit form of the Liquidation Transaction would be that the Account Holder has the ability to withdraw its Pro Rata share of Distributable Cryptocurrency in kind for a period of thirty (30) days after the Effective Date through the Voyager platform; though if the Distributable Cryptocurrency were a different type of cryptocurrency than the cryptocurrency that the Account Holder originally deposited on the Voyager platform (because of, for example, rebalancing), then the ability to rely on such argument would be greatly impaired because the property withdrawn would differ "materially either in kind or in extent," likely leading to a taxable event (and in any event, for the avoidance of doubt, in a Liquidation Transaction, the receipt of cash or property other than cryptocurrency in exchange for deposited cryptocurrency should generally result in a taxable event).

As for a Sale Transaction, under principles that typically apply to determine whether obligations have been meaningfully modified, including principles under section 1.1001-3 of the Treasury Regulations (which are not directly applicable here, but are informative), a transaction that involves an exchange of a contractual right owed by the Debtors for a contractual right owed by a different party is highly likely to be treated as taxable. Nevertheless, the Debtors believe, in the case of a Sale Transaction, that it would be supportable for Holders to take the position

that, pursuant to the consummation of the Plan whereby customers may migrate to Purchaser's platform, (a) the Debtors are deemed to transfer cryptocurrency in kind in a non-taxable transaction; and, immediately thereafter, (b) Holders are deemed to re-deposit cryptocurrency to the new entity, again, in a non-taxable or a partially non-taxable transaction.

The Debtors continue to study whether the above arguments, when combined with a general "bifurcation" approach that separates the recovery Holders receive into multiple components (*i.e.*, the type of cryptocurrency the customer had deposited on the platform, other cryptocurrencies, cash, and recoveries in respect of the Wind-Down Entity), may permit Holders to take the position that Holders retain the portion of their recovery taking the form of the type of cryptocurrency that the customer had deposited on the platform even if the receipt of other consideration constitutes a taxable exchange as to such other cash and/or property. The Debtors emphasize that these positions are unclear.

The ability to take the position that an In-Kind Distribution (in the case of a Sale Transaction) or the withdrawal of Distributable Cryptocurrency from the Voyager platform (in the case of a Liquidation Transaction) is not taxable to Holders is subject to increased risk as a result of the "dollarization" of Claims. As noted above, it may be the case that "dollarization" resulted, or will result, in a taxable event to customers, either as of the Petition Date or as of the Confirmation Date. If such a taxable event were determined to have occurred, it would be because the contract to receive particular cryptocurrency was modified, as a result of dollarization, to have an economic "cap." In light of this, it is unclear whether the arguments described above that support tax-free treatment with respect to the receipt of cryptocurrency under the Plan could still apply. Such a "capped" contract arguably "differ[s] materially either in kind or in extent" from the underlying cryptocurrency. However, the Debtors also believe it would be reasonable to assert that this is not a material enough change to customers' underlying entitlements.

**The Debtors emphasize in the strongest possible terms that the law applicable to deposits and withdrawals of cryptocurrency from the Debtors, "dollarization," and the consummation of the Plan is subject to extreme uncertainty. There is effectively no "controlling" authority on any of these issues. Accordingly, there is a material risk that the positions described above may not be sustained. The concepts of a non-taxable in-kind distribution (in the case of a Sale transaction) or withdrawal (in the case of a Liquidation Transaction) of cryptocurrency referred to above rest in large part on the theory that the property that the Debtors would distribute in-kind to a Holder (in the case of a Sale Transaction) or that the Holder would withdraw (in the case of a Liquidation Transaction) would be in respect of an obligation that does not differ "materially either in kind or in extent" from the obligation that arose when the Holder deposited property with the Debtors. Given the structure of the Plan, and in particular the way in which the Debtors have valued Claims as of the Petition Date, there is a significant risk that the Claim that a Holder has against the Debtors as of the Petition Date is with respect to property that differs "materially either in kind or in extent" from the property that the Holder previously deposited with the Debtors, such that the Debtors would be distributing property in respect of an obligation that differs "materially either in kind or in extent" from the one that existed when the Holder deposited property with the Debtors (and thus tax-free treatment would likely be unavailable)**.

Very generally, to the extent any form of transaction is taxable to a Holder (which, for the avoidance of doubt, would include any Holder who receives only Cash and/or Wind-Down Trust Units under the Plan), each such U.S. Holder would recognize gain or loss in an amount equal to the difference between the fair market value of the consideration (be it Cash, Cryptocurrency, and/or Wind-Down Trust Units)[93] received under the Plan and such U.S. Holder's adjusted tax basis in the Claim exchanged therefor. The character of any such gain or loss as capital or ordinary would be determined by a number of factors including the tax status of the U.S. Holder, whether the Claim constituted a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim. If any such recognized gain or loss were capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange. Such Holder's tax basis in the Wind-Down Trust Units and any Cryptocurrency

---

[93]   The Debtors generally do not expect that the right to become a Transferred Creditor would be ascribed independent value for U.S. federal income tax purposes.

received in a taxable exchange should equal the fair market value of such property as of the Effective Date, and such Holder's holding period in any such consideration should begin on the day after the Effective Date.

A U.S. Holder should not recognize gain or loss in connection with any distribution from a Wind-Down Debtor (if any) until such Wind-Down Debtor makes such distribution.

As noted repeatedly herein, nothing in this disclosure constitutes tax or legal advice to Holders. However, the Debtors wish to highlight one area of tax consideration that has been the subject of significant speculation in online resources and similar. The above language indicates that customers may be able to take a loss in connection with the consummation of the Plan. The Debtors generally expect such loss would arise *when the Plan is consummated*, and not before. There has been significant speculation in various sources with respect to whether a customer can take a loss, potentially under section 166 of the Tax Code (related to bad debts, including non-business bad debts). There are significant timing limitations on the ability to claim a loss under section 166 of the Tax Code. In particular, other than with respect to certain types of taxpayers that can take partial bad debt deductions in connection with a "charge-off" under section 166(a)(2) of the Tax Code, most taxpayers can only take a deduction under 166 when a debt has become entirely worthless. As set forth in the Plan, the Debtors do not believe customer claims will ever be entirely worthless, as all transactions under contemplation by the Debtors contemplate that there will be some form of recovery received by customers in respect of their claims. Accordingly, the Debtors are of the view that the overwhelming majority of customers are not able to take a section 166 loss with respect to their claims prior to the consummation of the Plan. However, in the event "dollarization" of Claims results in a taxable event to customers, customers likely can claim a loss in connection with such "dollarization."

### (b)   U.S. Federal Income Tax Consequences to Certain U.S. Holders of Allowed Class 4A Claims.

If the Sale Transaction is consummated by the Outside Date, each Holder of an Allowed OpCo General Unsecured Claim will receive in exchange for such Allowed OpCo General Unsecured Claim: (i) its Pro Rata share of Distributable Cryptocurrency in Cash; (ii) its Pro Rata share of Additional Bankruptcy Distributions, in Cryptocurrency or Cash as provided in and subject to the requirements of Section 6.12 and 6.14 of the Asset Purchase Agreement; (iii) its Pro Rata share of Distributable OpCo Cash; and (iv) to effectuate distributions from the Wind Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to OpCo; provided that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

If, alternatively, the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated, each Holder of an Allowed OpCo General Unsecured Claim will receive in exchange for such Allowed OpCo General Unsecured Claim: (i) its Pro Rata share of Distributable Cryptocurrency in Cash; (ii) its Pro Rata share of Distributable OpCo Cash; and (iii) to effectuate distributions from the Wind Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to OpCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

Each such U.S. Holder should recognize gain or loss in an amount equal to the difference between the fair market value of the consideration (be it Cash, Cryptocurrency, and/or Wind-Down Trust Units) received under the Plan and such U.S. Holder's adjusted tax basis in the Claim exchanged therefor. The character of any such gain or loss as capital or ordinary would be determined by a number of factors including the tax status of the U.S. Holder, whether the Claim constituted a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim. If any such recognized gain or loss were capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange. Such Holder's tax basis in the Wind-Down Trust Units and any Cryptocurrency received in a taxable exchange should equal the fair market value of such property as of the

Effective Date, and such Holder's holding period in any such consideration should begin on the day after the Effective Date.

A U.S. Holder should not recognize gain or loss in connection with any distribution from a Wind-Down Debtor (if any) until such Wind-Down Debtor makes such distribution.

The foregoing assumes that no Allowed Class 4A Claim is in respect of Cryptocurrency deposited with the Debtors. If any such Allowed Class 4A Claim were in respect of Cryptocurrency deposited with the Debtors, the considerations described in "U.S. Federal Income Tax Consequences to Certain U.S. Holders of Allowed Class 3 Claims (Account Holder Claims)" would apply.

      **(c)**      **U.S. Federal Income Tax Consequences to Certain U.S. Holders of Allowed Class 4B and 4C Claims.**

Each Holder of an Allowed HoldCo General Unsecured Claim will receive in exchange for such Allowed HoldCo General Unsecured Claim: (i) its Pro Rata share of Distributable HoldCo Cash; and (ii) its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to HoldCo; *provided* that any distributions on account of Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

Similarly, each Holder of an Allowed TopCo General Unsecured Claim will receive in exchange for such Allowed TopCo General Unsecured Claim: (i) its Pro Rata share of Distributable TopCo Cash; and (ii) its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of the Wind-Down Trust Assets attributable to TopCo; *provided* that any distributions on account of Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

Each such U.S. Holder should recognize gain or loss in an amount equal to the difference between the fair market value of the consideration (be it Cash and/or Wind-Down Trust Units) received under the Plan and such U.S. Holder's adjusted tax basis in the Claim exchanged therefor. The character of any such gain or loss as capital or ordinary would be determined by a number of factors including the tax status of the U.S. Holder, whether the Claim constituted a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim. If any such recognized gain or loss were capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange. Such Holder's tax basis in the Wind-Down Trust Units received in a taxable exchange should equal the fair market value of such property as of the Effective Date, and such Holder's holding period in any such consideration should begin on the day after the Effective Date.

A U.S. Holder should not recognize gain or loss in connection with any distribution from a Wind-Down Debtor (if any) until such Wind-Down Debtor makes such distribution.

(d)        **Net Investment Income Tax.**

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8 percent tax on, among other things, gains from the sale or other disposition of capital assets. U.S. Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Plan.

(e)        **Limitations on Use of Capital Losses.**

U.S. Holders who recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses. For non-corporate U.S. Holders, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains. Non-corporate U.S. Holders may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years. For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. Corporate U.S. Holders who have more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in the five years following the capital loss year, and are allowed to carry back unused capital losses to the three years preceding the capital loss year.

**2.        *Certain U.S. Federal Income Tax Consequences to U.S. Holders of Owning and Disposing of Cryptocurrency Received Under the Plan***

The U.S. federal income tax consequences to a U.S. Holder of owning and disposing of Cryptocurrency received under the Plan will depend upon a variety of factors outside of the control and/or knowledge of the Debtors, including , (x) if the Plan is structured as a Sale Transaction, (i) the U.S. federal income tax characterization of the relationship between Holder and Purchaser, and (ii) the activities that such Holder and/or Purchaser pursue with respect to such Cryptocurrency on Purchaser's platform, and (y) if the Plan is structured as a Liquidation Transaction, the activities that such Holder pursues with respect to such Cryptocurrency. In the event of a Sale Transaction, U.S. Holders are urged to consult their own tax advisors regarding the proper characterization of such relationship and the tax consequences that may result therefrom.

**3.        *The Wind-Down Entity***

The Plan provides that on the Effective Date and thereafter if additional Wind-Down Entity Assets become available, the Wind-Down Entity Assets shall automatically vest in the Wind-Down Entity. Thereupon, the Debtors shall have no interest in or with respect to the Wind-Down Entity Assets or the Wind-Down Entity.

(a)        **Liquidating Trust Treatment.**

Although not free from doubt, other than with respect to any assets that are subject to potential disputed claims of ownership or uncertain distributions, a Wind-Down Trust (if any) may be classified as a "liquidating trust" under section 301.7701-4(d) of the Treasury Regulations and qualify as a "grantor trust" under section 671 of the Tax Code. It may be that such treatment does not apply given the structure of the Plan. If such treatment did apply to any assets of the Wind-Down Trust, any beneficiaries of the Wind-Down Trust would be treated as grantors and deemed owners thereof and, for all U.S. federal income tax purposes, any beneficiaries would be treated as if they had received a distribution of an undivided interest in the assets of the Wind-Down Trust and then contributed such undivided interest to the Wind-Down Trust. Other than with respect to any assets of the Wind-Down Trust that are subject to potential disputed claims of ownership or uncertain distributions, the treatment of the deemed transfer of assets to applicable Holders of Claims prior to the contribution of such assets to the Wind-Down Trust should generally be consistent with the treatment described above with respect to the receipt of the applicable assets directly. Other than with respect to any assets of the Wind-Down Trust that are subject to potential disputed claims of ownership or uncertain distributions, no entity-level tax should be imposed on the Wind-Down Trust with respect to earnings generated by the assets held by it. Each beneficiary must report on its

federal income tax return its allocable share of income, gain, loss, deduction and credit, if any, recognized or incurred by the Wind-Down Trust, even if no distributions are made.

**(b)      Disputed Ownership Fund treatment.**

With respect to any of the assets of a Wind-Down Trust that are subject to potential disputed claims of ownership or uncertain distributions, *or* to the extent "liquidating trust" treatment is otherwise unavailable, the Debtors anticipate that such assets will be subject to disputed ownership fund treatment under Section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes. Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account. Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes). To the extent property is not distributed to U.S. Holders of applicable Claims on the Effective Date but, instead, is transferred to any such account, although not free from doubt, U.S. Holders should not recognize any gain or loss with respect to such property on the date that the property is so transferred. Instead, gain or loss should be recognized when and to the extent property is actually distributed to such U.S. Holders.

**4.      *U.S. Information Reporting and Withholding***

The Debtors and the Wind-Down Entity, as applicable, intend to withhold all amounts required under the IRC with respect to distributions made under the Plan and to comply with all applicable reporting requirements of the IRC. In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim or Interest under the Plan, as well as future payments made with respect to consideration received under the Plan.

Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules may be credited against a Holder's U.S. federal income tax liability, and a Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a U.S. federal income tax return).

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

---

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED, IN THE STRONGEST TERMS POSSIBLE, TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR NON-U.S. TAX LAWS AND OF ANY CHANGE IN APPLICABLE TAX LAWS. THE FOREGOING SUMMARY DOES NOT CONSTITUTE TAX OR LEGAL ADVICE TO HOLDERS OF CLAIMS OR INTERESTS.

---

* * * * *

### XIII.    RECOMMENDATION OF THE DEBTORS

In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to Holders of Allowed Claims than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code.  In addition, any alternative other than Confirmation could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims than proposed under the Plan.  Accordingly, the Debtors recommend that Holders of Claims entitled to vote to accept or reject the Plan support Confirmation and vote to accept the Plan.

Voyager Digital Holdings, Inc. on behalf of itself and each of the other Debtors

By:     /s/ Stephen Ehrlich

Name:   Stephen Ehrlich
Title:   Co-Founder and Chief Executive Officer
        Voyager Digital Ltd.

Prepared By:

| | |
|---|---|
| Dated:  January 103, 2023 | */s/ Joshua A. Sussberg* |
| New York, New York | **KIRKLAND & ELLIS LLP** |
| | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| | Joshua A. Sussberg, P.C. |
| | Christopher Marcus, P.C. |
| | Christine A. Okike, P.C. |
| | Allyson B. Smith (admitted *pro hac vice*) |
| | 601 Lexington Avenue |
| | New York, New York 10022 |
| | Telephone:  (212) 446-4800 |
| | Facsimile:  (212) 446-4900 |
| | |
| | *Counsel to the Debtors and Debtors in Possession* |

**Exhibit A**

**Plan**

[INTENTIONALLY OMITTED.  AVAILABLE AT DOCKET NO.  ]

**Exhibit B**

**Liquidation Analysis**

**Exhibit C**

**Frequently Asked Questions & Answers**

**Exhibit D**

**Asset Purchase Agreement**

[INTENTIONALLY OMITTED.  AVAILABLE AT DOCKET NO. 835]