# Exhibit 4

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
:
In re: : Chapter 11
:
VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] : Case No. 22-10943 (MEW)
:
Debtors. : (Jointly Administered)
:
------------------------------------------------------------------x

**DECLARATION OF TIMOTHY R. POHL, INDEPENDENT DIRECTOR AND MEMBER OF THE SPECIAL COMMITTEE OF THE BOARD OF DIRECTORS OF VOYAGER DIGITAL, LLC, IN SUPPORT OF CONFIRMATION OF THE THIRD AMENDED JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013). The location of the Voyager Digital Holdings, Inc.'s and Voyager Digital Ltd.'s principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003. Voyager Digital, LLC's principal place of business is 701 S Miami Ave, 8th Floor, Miami, FL 33131.

1

I, Timothy R. Pohl, hereby declare under penalty of perjury to the best of my knowledge, information, and belief as follows:

1. I submit this declaration in conjunction with the Debtors' memorandum of law in support of confirmation of the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (as the same may be supplemented, amended, or modified from time to time, the "Plan") filed contemporaneously herewith.[2]

2. Except as otherwise noted, I have personal knowledge of the matters set forth herein.

## Professional Experience and Background

3. My professional experience helped me to fulfill my role as an independent director and member of the board of directors of Voyager Digital, LLC ("Board"), and informed my business judgment with respect to the D&O Settlement (defined below).

4. My experience as a corporate restructuring professional spans the last 30 years. After graduating with a J.D. from the University of Chicago Law School in 1991, I was an associate at the law firm of Jones Day in the firm's business restructuring & reorganization group until 1999. From 1999 to 2008, I was an attorney at the law firm of Skadden, Arps, Slate, Meagher & Flom LLP where I ultimately was a partner and served as the co-head of the corporate restructuring practice. In 2009, I joined the Restructuring and Capital Solutions Group at Lazard Freres & Co. LLC, where I was a Managing Director until I retired in 2019. In 2019, I founded TRP Advisors, LLC, where I provide strategic advice to a number of companies, financial institutions, and private

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan.

equity firms with respect to distressed situations, troubled portfolio companies, and acquisition opportunities.

5. I have also served as an independent director for a number of entities, including: GT USA Wilmington, LLC (The Port of Wilmington) (Chair); Libbey Inc.; Forma Brands (f/k/a Morphe Cosmetics); K&N Engineering, Inc.; Dunn Paper Holdings, Inc.; Petrochoice Holdings, Inc.; Genera Energy, Inc.; Unical Aviation, Inc.; Steak 'n Shake Company; Hawkwood Energy LLC; Delonex Energy Limited; CorePower Yoga, LLC; and Qapital, Inc.

6. I have no connection with any potential party that was within the Special Committee's mandate to investigate, as further described below.

## Appointment to Special Committee

7. On July 5, 2022, the Board of Voyager Digital, LLC ("Voyager LLC") appointed Jill Frizzley and me to serve as independent directors ("Independent Directors") of the Board and to serve as initial members of the special committee of the Board (the "Special Committee"), pursuant to unanimous written consent. I had not previously worked with Ms. Frizzley, but observed her capabilities and qualifications while serving as an Independent Director. It is my understanding that she was formerly a restructuring attorney at Weil Gotshal & Manges, LLP and has diverse experiences from mine in various governance, investigations, and restructuring situations. I believe Ms. Frizzley's independent experience and training enhanced the proper functioning of the Special Committee.

8. The Special Committee was vested with the authority to, among other things, conduct an independent investigation (the "Investigation") with respect to any potential estate claims and causes of action against insiders, including any claims arising from loans made to Three Arrow Capital Ltd. ("3AC"). The Special Committee was also vested with sole authority to

3

prosecute, settle, or extinguish any and all claims and causes of action arising from the historical transactions investigated by the Special Committee.

9. Ms. Frizzley and I retained Quinn Emanuel Urquhart & Sullivan LLP ("Quinn Emanuel") to provide independent advice to, and at act at the exclusive direction of, the Special Committee in connection with the Special Committee's mandate. We believe Quinn Emanuel's experience made them an appropriate choice for this role.

### Special Committee Investigation

10. At the Special Committee's direction, Quinn Emanuel conducted a thorough investigation, appropriate to the size and complexity of this case. I understand that, consistent with the mandate of Special Committee, Quinn Emanuel requested and received information relating to, among other things: Voyager LLC's loans to third parties, with a particular focus on the troubled loans to 3AC (the "3AC Loans"); the diligence performed in connection with those loans; the formation and function of Voyager LLC's Risk Committee; Voyager LLC's staking of customer cryptocurrency assets; Voyager LLC's regulatory compliance; Voyager LLC's communications with the public; Voyager LLC's pre-petition payments to insiders and certain third parties; and other aspects of Voyager LLC's business.

11. It was reported to me that Voyager LLC collected and provided to the Special Committee's counsel responsive documents from its internal hard copy and electronic files, from its outside counsel, and from various third parties (*e.g.*, cryptocurrency custodians and exchanges). Among other things, the productions included emails, Slack communications, and, in certain cases, Telegram and cell phone data from Voyager LLC's employees, including Voyager LLC's most senior officers and others. It is my understanding that no information was withheld from the Special Committee on privilege grounds.

12.     Early in the Investigation, Quinn Emanuel, on the Special Committee's behalf, proposed and negotiated a common interest confidentiality agreement and protective order (the "Protective Order") with primary bankruptcy counsel for the Debtors, Kirkland & Ellis, LLP, and McDermott Will & Emery ("MWE"), the law firm representing the Official Committee of Unsecured Creditors (the "UCC").  The Protective Order, which was entered by the Court, enabled Voyager LLC to make the same productions to MWE as it did to Quinn Emanuel while protecting the estate against any waivers of privilege.  At the direction of the Special Committee, Quinn Emanuel cooperated and coordinated with MWE throughout the course of the Investigation.

13.     In addition to document and information review, Quinn Emanuel conducted interviews of twelve members of Voyager LLC management, including Stephen Ehrlich (CEO), Evan Psaropoulos (COO and former CFO), David Brosgol (General Counsel), Gerard Hanshe (COO), Ashwin Prithipaul (then-CFO), Pamela Cramer (Chief Marketing Officer), Marshall Jensen (Head of Corporate Development), Ryan Whooley (Treasury Director), Jon Brosnahan (Treasurer), Brian Silard (member of Treasury team), David Brill (Deputy General Counsel), and Manisha Lalwani (in-house regulatory counsel).  It was reported to me that lawyers from MWE also attended and asked questions at these interviews.

14.     The Debtors' financial advisor, Berkely Research Group, LLC ("BRG") provided assistance and information to Quinn Emanuel and the Special Committee throughout the Investigation.

15.     Throughout the course of the Investigation, Quinn Emanuel provided regular updates to Ms. Frizzley and me on the status of the Investigation, including facts learned, impressions obtained, and relevant legal theories and conclusions, both through formal videoconference meetings and emails.  During these videoconference meetings, Ms. Frizzley and

5

I were engaged and asked questions based on our respective experience regarding the facts being developed and potentially applicable legal theories. The Special Committee's meetings were in addition to Ms. Frizzley's and my participation in several Board meetings concerning the Debtors' general business and case trajectory.

### Investigation Report and Special Committee's Conclusions

16. The Investigation culminated in a more than 60-page single-spaced report (the "Investigation Report") provided by Quinn Emanuel to Ms. Frizzley and me on October 7, 2022, which detailed the factual findings uncovered in the Investigation and contained attorney impressions and advice concerning, among other things, applicable fiduciary duty and other legal standards, the exculpation provisions in Voyager LLC's operating agreement, the availability of director and officer ("D&O") insurance, and issues relating to the potential costs of litigation, potential enforcement matters if litigation was brought and was successful, and other relevant issues. In connection with confirmation of the Plan, certain parties in interest requested to see a public version of the Investigation Report. The Special Committee agreed to voluntarily disclose a public version of the Investigation Report, redacted to protect privileged and other material protected by the Protective Order, and that version was filed on the Court's docket on February 14, 2023, and can be found at docket number 1000 in the above-captioned case.

17. On October 10, 2022 the Special Committee held a videoconference meeting with Quinn Emanuel to discuss the findings, conclusions, and recommendations in the Investigation Report, as well as to update the Special Committee on potential additional matters that were the subject of ongoing review. The Special Committee determined that the estate has colorable claims against Voyager LLC's CEO, Stephen Ehrlich, and former CFO (now CCO), Evan Psaropoulos, for breach of fiduciary duty relating to their decision to make the 3AC Loans (the "Potential Claims"). Because Messrs. Ehrlich and Psaropoulos were the two potential ultimate decision-

6

makers with respect to the 3AC Loans (including the amounts and terms on which to lend), the Special Committee concluded that the estate does not have viable claims against other insiders with respect to the 3AC Loans. Other than the Potential Claims, the Special Committee concluded that the estate does not have any other viable claims against insiders. For example, the Investigation did not uncover evidence that would lead the Special Committee to conclude that there was any conflict of interest or motives other than the success of the company.

18. Based on our respective experience, Ms. Frizzley and I also realized that, while the estate may have colorable claims against Messrs. Ehrlich and Psaropoulos, the standard for successfully prosecuting the Potential Claims would be difficult to meet, and any judgment would be difficult to collect. With respect to the former, while I do not believe Messrs. Ehrlich and Psaropoulos conducted sufficient due diligence when making the 3AC Loans, there are several additional determinations that would need to be established in connection with litigation—including, for example, the applicability of Voyager LLC operating agreement's exculpation provision to the alleged acts/omissions, whether their actions rise to the level of "gross" negligence, and whether their negligence, even if "gross," was the cause of losses to the estate—each of which is uncertain and likely to be hotly contested. Important to my judgment is that there was no theft or fraud, nor was there any evidence to suggest that Messrs. Ehrlich and Psaropoulos had any motive to take improper risks with the company's assets, other than wanting the company to generate revenues and succeed.

19. With respect to collection risks, and as noted in more detail below, my understanding was that neither Mr. Ehrlich nor Mr. Psaropoulos had significant personal assets available to satisfy any potential judgment even if the claims were successfully prosecuted.

7

Therefore, I believe that the best source of recoveries from any litigation against them (if pursued) would be from the available D&O insurance coverage.

20. For these reasons, the Special Committee sought to negotiate a settlement whereby the estate would not release the Potential Claims, obtain what it could consensually from Messrs. Ehrlich and Psaropoulos's personal assets, and preserve as much of the D&O insurance as possible to enable the Wind-Down Entity, on behalf of the estate to pursue litigation and/or settlement from the policy limits.

21. In addition to the Potential Claims, I learned that one of the policies (the Cornerstone A-Side Management Liability Insurance Policy to Voyager Digital Ltd.) was obtained on the eve of the Debtors' bankruptcy filing (the "Side-A Policy"). While I understood the Side-A Policy was obtained in furtherance of the Debtors' efforts to bolster protections for its directors and officers and as part of a broader D&O insurance transaction involving a series of interrelated amendments for which an aggregate $15.6 million was paid, the documentation for the Side-A Policy indicates that it a $10 million premium was paid for that $10 million in coverage. I accordingly instructed Quinn Emanuel to preserve any estate claims against the insurer for potential avoidance actions and return of the premium paid by the Debtors. However, I did not believe that the purchase of the Side-A Policy gave rise to estate claims against insiders because, among other reasons, it was purchased with the guidance of counsel in connection with the negotiation of, and agreement to, important enhancements to the existing D&O policies that resulted in material improvements to coverage terms as well as run-off coverage to go effective upon the company's emergence from bankruptcy.

### D&O Settlement

22. In light the foregoing considerations, the Special Committee authorized Quinn Emanuel to explore a settlement of the Potential Claims which would maximize the estate's access

8

to the D&O insurance proceeds and potentially, depending on the financial wherewithal of Mr. Ehrlich and Mr. Psaropoulos, some amount beyond that. With respect to the latter, Quinn Emanuel requested, and received, a sworn accounting of each of Mr. Ehrlich's and Mr. Psaropoulos's assets, including joint marital assets (the "Financial Statements").

23. Quinn Emanuel, on the Special Committee's behalf, engaged in independent negotiations with each of Mr. Ehrlich's legal counsel and Mr. Psaropoulos's legal counsel. The parties exchanged multiple settlement offers the last of which was the following:

| | |
|---|---|
| **Debtors Retain Rights of Recourse to D&O Insurance** | Upon receipt of personal financial contributions, described below, the Debtors will retain the right to pursue claims against the Messrs. Ehrlich and Psaropoulos up to the maximum recovery under the Debtors' D&O Liability Insurance Policies, without further recourse to the individuals' other assets. |
| **Releases and Waivers by the Officers against the Debtors** | Mr. Ehrlich agrees to subordinate any Claims (including any indemnification claims) he holds against the Debtors until all other Holders of Claims are paid in full.<br><br>Mr. Psaropoulos agrees to subordinate 50% of any Claims he holds other than indemnification claims (and 100% of any indemnification claims) against the Debtors until all other Holders of Claims are paid in full.[3]<br><br>Messrs. Ehrlich and Psaropoulos will be entitled to receive their salary and benefits for as long as they work for the Debtors and/or the Wind-Down Entity and retain the right to assert claims for advancement and indemnification up to the limits of any available coverage in the event any of the insurers that issued the Management Liability Policy, the Excess Policy, or the Side-A Policy denies coverage to Mr. Ehrlich and/or Mr. Psaropoulos based upon or arising out of the lack of a formal claim for indemnification; *provided, however*, that any such indemnification or advancement claims will be subordinated in full unless and until all other Holders of Claims |

---

[3] In the event the D&O Carriers deny coverage to Mr. Ehrlich or Mr. Psaropoulos under the D&O Insurance Policies on account of such subordination of any indemnification claim, then any indemnification claims by Mr. Ehrlich or Mr. Psaropoulos will not be so subordinated, but may be filed as an OpCo General Unsecured Claim.

9

|  | are paid in full; *provided*, *further*, that in the event that any of the D&O Carriers deny coverage to Mr. Ehrlich or Mr. Psaropoulos under the D&O Insurance Policies on account of such subordination of any indemnification claim, then any indemnification claims by Mr. Ehrlich or Mr. Psaropoulos will not be so subordinated, but may be filed as an OpCo General Unsecured Claim. |
|---|---|
|  | Messrs. Ehrlich and Psaropoulos further agree to subordinate any and all rights and entitlements under the Side A Policy to any recovery by the Debtors and/or the Wind Down Entity on account of the Debtors' and/or Wind Down Estate's claims for the avoidance of the premium paid for the policy. For the avoidance of doubt, should coverage continue to be available under the Side-A Policy following resolution of the Debtors' and/or the Wind Down Entity's claims for the avoidance of the premium paid for the policy (whether by judgment or settlement or otherwise), Messrs. Ehrlich and/or Psaropoulos shall be entitled to seek coverage under the Side-A Policy. |
| **Reversal of Insider Bonus Payment** | Mr. Ehrlich agrees to the avoidance/unwinding of the transfer of $1,900,000 that Mr. Ehrlich received from the Debtors on or around February 28, 2022, with Mr. Ehrlich paying $1,125,000 to the Debtors in cash and assigning the right, if any, to any tax refund for the balance. |
| **Commitment to Cooperate** | Messrs. Ehrlich and Psaropoulos agree to remain at, and continue performing the responsibilities of, their position(s) with the Debtors and assist with the Debtors' transition for at least 30 days from entry of the Confirmation Order; *provided* that the Mr. Psaropoulos will have no obligation to remain at his position with the Debtors beyond January 15, 2023 and the Mr. Ehrlich will have the right to pursue and engage in any employment opportunity, business venture, consulting arrangement, or investment that may become available; *provided, further*, that both Mr. Ehrlich and Mr. Psaropoulos will be available to the Debtors and/or the Wind-Down Entity for a maximum of five hours per month for the one year following the Effective Date. |

24. After reviewing and analyzing the foregoing settlement terms and conditions, I concluded that the proposal was in the estate's best interest, and we approved the settlement (the "D&O Settlement"). This conclusion was reached after careful consideration of the issues explained above, including the relative strength of the Potential Claims, the challenges involved in litigating loss causation, the costs of litigating the claims, and the financial wherewithal of

10

Messrs. Ehrlich and Psaropoulos to satisfy any judgment. And as I note below, I took into account the UCC's support for the D&O Settlement.

25. In sum, subject to the terms and conditions above (concerning personal contributions and subordination of rights in exchange for limitation on further recourse to personal assets), any claims and causes of action held by the Debtors or their respective estates against Mr. Ehrlich and/or Mr. Psaropoulos that are expressly related to the approval of the 3AC Loans are not being released (the "Non-Released D&O Claims"). Pursuant to the Plan, the Non-Released D&O Claims are being assigned and transferred to the Wind-Down Entity to be pursued, settled, or resolved.[4] In addition, any avoidance actions relating to the Side-A Policy (the "Non-Released Insurance Claims"), will also be assigned and transferred to the Wind-Down Entity to be pursued, settled or resolved.[5] Moreover, Messrs. Ehrlich and Psaropoulos agreed to subordinate any of their rights and entitlements to the Side-A Policy to any recovery by the Debtors and/or the Wind-Down Entity on account of the Non-Released Insurance Claims.

26. And while Financial Statements confirmed that Mr. Ehrlich and Mr. Psaropoulos do not have assets sufficient to satisfy any significant judgment against them, the D&O Settlement does provide for some financial recovery from both Mr. Ehrlich and Mr. Psaropoulos.

---

[4] Pursuant to the Plan, the Debtors and the Wind-Down Debtors also expressly reserve claims for aiding and abetting breach of fiduciary duties against third parties unaffiliated with the Debtors who are not "Released Parties" as defined in the Plan.

[5] Pursuant to the Plan, the Debtors are reserving all causes of action against the D&O insurance carriers based in whole or in part upon any and all insurance contracts and insurance policies to which any Debtor or Wind-Down Debtor is a party or pursuant to which any Debtor or Wind-Down Debtor has any rights whatsoever, including causes of action against insurance carriers, reinsurance carriers, insurance brokers, underwriters, occurrence carriers, or surety bond issuers relating to coverage, indemnity, contribution, reimbursement, or any other matters. These causes of action include, without limitation, the Non-Released D&O Claims and the Non-Released Insurance Claims.

27. As noted above, the UCC's advisors had participated in the Investigation, and Quinn Emanuel promptly informed them of the proposed terms of the D&O Settlement. The UCC ultimately supported the D&O Settlement and encouraged all unsecured creditors to vote in favor of the Plan. *See Letter of the Official Committee of Unsecured Creditors in Support of Joint Chapter 11 Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates* (Dkt. No 566).

28. The D&O Settlement was expressly conditioned on the accuracy of the Financial Statements. To help ensure the accuracy of those Financial Statements, MWE and Quinn Emanuel requested, received, and reviewed documents from Mr. Ehrlich and Mr. Psaropoulos. Mr. Psaropoulos was deposed on February 17, 2023, at which he answered questions relating to his Financial Report and testified that it was accurate. Mr. Ehrlich was deposed today, February 28, 2023, and did the same. If I learned of any material inaccuracies in the Financial Statements, I would revisit the terms of the D&O Settlement.

29. As a result of the D&O Settlement, the estates will receive approximately $1.2 million of Mr. Ehrlich's and Mr. Psaropoulos's personal assets and a potential tax refund, plus recourse to (and preservation of) the available D&O insurance, among other benefits.

30. The Plan also provides for the Debtors' release of their officers, directors, and employees who continued to hold such position after the Petition Date. These individuals enabled the Debtors to continue to operate post-petition during the sale processes and ultimately wind-down their businesses. Because the Investigation led the Special Committee to conclude that the estate does not have any cognizable claims against any of these individuals other than Messrs. Ehrlich and Psaropoulos, I believe, in my business judgment, that the releases contained in the Plan are appropriate. Notably, the Plan does ***not*** purport to release claims against former officers, directors, and employees who did not hold such position at any time post-petition, or any claims

12

against insiders held by third-parties (including customers and regulatory agencies) without such third-party's affirmative consent.

31. Based on the work that I, my fellow Independent Director, Ms. Frizzley, and Quinn Emanuel have undertaken, the Special Committee submits that the D&O Settlement contained in the Plan was negotiated at arm's-length by independent parties, represented by independent counsel, and is fair, reasonable, and in the best interests of Voyager LLC and its stakeholders.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
February 28, 2023

_____
Timothy R. Pohl

13