# Exhibit 5

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## DECLARATION OF BRIAN TICHENOR
## IN SUPPORT OF CONFIRMATION OF THE THIRD AMENDED
## JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND ITS DEBTOR
## AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

I, Brian Tichenor, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury as follows:

1.    I am a Managing Director in the Financial Institutions Group at Moelis & Company LLC ("Moelis") and have served as an investment banker to the Debtors since June 2022.

2.    I submit this declaration in support of confirmation of the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

*Bankruptcy Code* (as may be amended, supplemented, or otherwise modified from time to time, the "Plan")[2] [Docket No. 852] and the *Debtors' Memorandum of Law in Support of (I) Final Approval of the Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code and (II) an Order Confirming the Debtors' Third Amended Joint Chapter 11 Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates* (the "Confirmation Brief"), filed contemporaneously herewith.

3.     The statements in this declaration are, except where specifically noted, based on (a) my personal knowledge or opinion of the Debtors' operations and finances, (b) my personal knowledge, belief, or opinion, (c) information I have received from the Debtors' employees or advisors and/or other employees of Moelis, or (d) from the Debtors' records maintained in the ordinary course of their business.  If called to testify, I could and would testify competently to the facts set forth herein.

## QUALIFICATIONS

4.     Moelis is an investment banking firm with its principal office located in New York, New York.  Moelis is a registered broker-dealer with the United States Securities and Exchange Commission and is a member of the Financial Industry Regulatory Authority.  Moelis was founded in 2007 and is a wholly-owned subsidiary of Moelis & Company Group LP.  Moelis & Company Group LP, together with its subsidiaries, has approximately 1,000 employees in offices in North

---

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan, the Asset Purchase Agreement, the Confirmation Brief, or Confirmation Order as applicable.

America, South America, Europe, the Middle East, and Asia. Moelis & Company Group LP is a subsidiary of Moelis & Company, a public company listed on the New York Stock Exchange.

5. Moelis provides a broad range of financial advisory and investment banking services to its clients, including: (a) general corporate finance; (b) mergers, acquisitions, and divestitures; (c) corporate restructurings; (d) special committee assignments; and (e) capital raising. Moelis and its senior professionals have extensive experience in the reorganization and restructuring of distressed companies, both out-of-court and in chapter 11 cases. Moelis' business reorganization professionals have served as financial advisors and/or investment bankers in numerous cases, including: *In re Knotel, Inc.*, No. 21-10146 (MFW) (Bankr. D. Del. Mar. 12, 2021); *In re CBL & Assocs. Props., Inc.*, No. 20-35226 (DRJ) (Bankr. S.D. Tex. Dec. 30, 2020); *In re Energy Alloys Holdings, LLC*, No. 20-12088 (MFW) (Bankr. D. Del. Nov. 23, 2020); *In re Jason Indus., Inc.*, No. 20-22766 (RDD) (Bankr. S.D.N.Y. Aug. 27, 2020); *In re The Hertz Corp.*, No. 20-11218 (MFW) (Bankr. D. Del. July 30, 2020); *In re Extraction Oil & Gas, Inc.*, No. 20-11548 (CSS) (Bankr. D. Del. Aug. 11, 2020); *In re The McClatchy Co.*, No. 20-10418 (MEW) (Bankr. S.D.N.Y. May 18, 2020); *In re Internap Technology Solutions Inc.*, No. 20-22393 (RDD) (Bankr. S.D.N.Y. May 5, 2020); *In re Rentpath Holdings, Inc.*, No. 20-10312 (BLS) (Bankr. D. Del. Mar. 10, 2020); *In re Sanchez Energy Corp.*, No. 19-34508 (MI) (Bankr. S.D. Tex. Oct. 21, 2019); *In re Monitronics Int'l, Inc.*, No. 19-33650 (DRJ) (Bankr. S. D. Tex. Aug. 1, 2019); *In re Aegerion Pharmaceuticals, Inc.*, No. 19-11632 (MG) (Bankr. S.D.N.Y. July 10, 2019); *In re Joerns WoundCo Holdings, Inc.*, No. 19-11401 (JTD) (Bankr. D. Del. July 25, 2019); *In re FTD Cos.*, No. 19-11240 (LSS) (Bankr. D. Del. July 2, 2019); *In re Hexion Holdings LLC*, No. 19-10684 (KG) (Bankr. D. Del. May 15, 2019); *In re Parker Drilling Company, Inc.*, No. 18-36958 (MI) (Bankr. S.D. Tex. Jan. 15, 2019); *In re Aralez Pharmaceuticals US Inc.*, No. 18-12425 (MG)

(Bankr. S.D.N.Y. Oct. 31, 2018); *In re iHeartMedia, Inc.*, No. 18-31274 (MI) (Bankr. S.D. Tex. July 24, 2018); *In re Global A&T Electronics Ltd.*, No. 17-23931 (RDD) (Bankr. S.D.N.Y. Feb. 26, 2018); *In re Toys "R" US, Inc.*, No. 17-34665 (KLP) (Bankr. E.D. Va. Nov. 21, 2017); *In re TK Holdings, Inc.*, No. 17-11375 (BLS) (Bankr. D. Del. Aug. 30, 2017); *In re Basic Energy Services, Inc.*, No. 16-12320 (KJC) (Bankr. D. Del. Nov. 17, 2016); *In re UCI International, LLC*, No. 16-11354 (MFW) (Bankr. D. Del. July 12, 2016); *In re AOG Ent., Inc.*, No. 16-11090 (SMB) (Bankr. S.D.N.Y. June 8, 2016); *In re SFX Entertainment, Inc.*, No. 16-10238 (MFW) (Bankr. D. Del. Mar. 21, 2016); *In re American Apparel, Inc.*, No. 15-12055 (BLS) (Bankr. D. Del. Nov. 30, 2015); *In re Allied Nevada Gold Corp.*, No. 15-10503 (MFW) (Bankr. D. Del. Apr. 15, 2015); *In re GSE Envt'l, Inc.*, No. 14-11126 (MFW) (Bankr. D. Del. May 30, 2014); *In re MACH Gen, LLC*, No. 14-10461 (MFW) (Bankr. D. Del. Apr. 11, 2014); *In re MPM Silicones, LLC*, No. 14-22503 (RDD) (Bankr. S.D.N.Y. May 16, 2014).

6.     I have over 10 years of investment banking experience advising companies, equity investors, financial vehicles, and creditors across a broad range of industries and geographies in a full suite of corporate transactions.  Prior to joining Moelis, I was in the corporate and investment banking group at Citigroup Inc. where I focused on investment banking advisory transactions in the Financial Institutions Group.  I hold a Bachelor of Science degrees in finance and computer science from Boston College and have a Master of Business Administration degree from Georgetown University.

7.     I have been involved in several notable chapter 11 cases and restructuring assignments, including as advisor to the ad hoc group of senior unsecured noteholders in Walter Investment Management Corporation's $4.1 billion restructuring; and as advisor to New Residential Investment Corporation's $1.2 billion acquisition of select assets from Ditech Holding

Corporation pursuant to a section 363 asset sale. I have also been involved in numerous restructuring transactions outside of the chapter 11 context, including advising New Residential Investment Corporation in its $600 million recapitalization and restructuring, Ambac Financial Group in its $18 billion restructuring of Puerto Rico's sales tax financing corporation (COFINA), Syncora Guarantee Inc. in its $13.5 billion reinsurance of financial guarantee policies to Assured Guarantee Corporation and other liability management including the sale of its operating business to GoldenTree Asset Management, Ambac Financial Group on its $557 million exchange offer of its Auction Market Preferred Shares, Ambac Financial Group on its $538 million exchange of Corolla Trust obligations and Junior Surplus Notes, an approximately $10 billion ad hoc group of non-litigating preferred shareholders in a proposed $6.9 trillion restructuring of Fannie Mae and Freddie Mac, secured lenders of AG Mortgage Investment Trust in its $3.0 billion restructuring of its repurchase agreement portfolio, and secured lenders of MFA Financial, Inc. in its $5.8 billion restructuring of its repurchase agreement portfolio. And in addition to these chapter 11 cases, I am currently part of the Moelis teams serving as investment bankers to the debtors and debtors-in-possession in *In re BlockFi Inc.,* No. 22-19361 (MBK) (Bankr. D. N.J.) and *In re Genesis General HoldCo LLC*, No. 23-10063 (SHL) (Bankr. S.D.N.Y.).

8. In June 2022, Moelis was engaged to advise the Debtors as to strategic alternatives in light of the Debtors' efforts to navigate the challenges then impacting the cryptocurrency industry. I have been involved as a senior member of the Moelis team throughout our engagement, including participating in the Debtors' sales and auction processes in these chapter 11 cases.

## EVENTS LEADING UP TO CONFIRMATION

9. Prior to these chapter 11 cases, Voyager operated a cryptocurrency trading platform that allowed customers to buy, sell, and store cryptocurrency on an easy-to-use and "accessible-to-all" platform. Voyager's primary operations consisted of (i) brokerage services, (ii) custodial

services through which customers earned interest and other rewards on stored cryptocurrency assets, and (iii) lending programs. All of Voyager's services were accessible through a mobile application that users could download on their smartphones and other smart devices. Voyager's mobile application was downloaded millions of times and had over 1.1 million active users as of the Petition Date. In 2021, Voyager was one of the top ten most downloaded cryptocurrency mobile applications in the world.

10.     Cryptocurrency has been volatile, and prices vacillate by the second due to constant trading occurring 24 hours a day, seven days a week globally. 2022 saw historic levels of volatility in the markets at large, and the cryptocurrency markets were not immune. Bitcoin and Ethereum slumped by over 65% and 68%, respectively, from January 1, 2022 to year-end:[3]



11.     In June 2022, the Debtors engaged Moelis to advise the Debtors as to strategic alternatives in light of this market volatility and the broader challenges plaguing the

---

[3]     CoinDesk; February 18, 2023, 6:03 p.m. ET.

cryptocurrency sector.  Beginning on or about June 20, 2022, Moelis initiated a process to solicit interest in possible deal structures.  By early-July 2022, and after evaluating market support for an out-of-court restructuring, the Debtors determined that filing for chapter 11 would improve their chances of effectuating a transaction to help stabilize the Debtors' business and preserve the value of the Debtors' enterprise, in the best interests of the Debtors and their estates as well as the Debtors' creditors, customers, employees, and all other parties in interest.

12.     On July 5, 2022, the Debtors filed these chapter 11 cases.  Soon thereafter, on July 21, 2022, the Debtors commenced a formal sale process led by Moelis and filed the *Motion Seeking Entry of an Order (I) Approving the Bidding Procedures and Related Dates and Deadlines, (II) Scheduling Hearings and Objection Deadlines With Respect To the Debtors' Sale, and (III) Granting Related Relief* [Docket No. 126].

13.     On September 13, 2022, the Debtors commenced a two-week auction (the "Auction").  The Auction included multiple rounds of bidding and featured extensive arm's-length negotiations with each participating bidder. I was one of the people at Moelis responsible for and participating in the Auction.

14.     The Debtors, in coordination with the Official Committee of Unsecured Creditors (the "Committee"), ultimately selected the bid from West Realm Shires Inc. ("FTX US," and along with its parent entity and affiliates, "FTX") and closed the Auction.  On September 27, 2022, the Debtors and FTX US executed an asset purchase agreement (as amended, the "FTX Purchase Agreement") memorializing the terms of the FTX US bid.  Following the conclusion of the Auction, the Debtors sought, and obtained, this Court's approval to enter into the FTX Purchase Agreement.  The Debtors then proceeded to commence solicitation of votes on a prior version of the Plan that contemplated the effectuation of the FTX Purchase Agreement.

15.     A few weeks after this Court approved the Debtors' entry into the FTX Purchase Agreement, FTX and its affiliates unexpectedly collapsed.  On November 11, 2022, certain FTX US affiliates commenced chapter 11 proceedings.  Three days later, FTX US did the same.  The Debtors restarted their sale process effectively simultaneously with the FTX collapse.

16.     Cryptocurrency market headwinds only grew stronger in the fall of 2022 and the market was thrown into further turmoil due to FTX's historic collapse.  While the Debtors leveraged the groundwork and interest from their first sales process, given the significant market decline, the Debtors were left with fewer opportunities.

17.     As part of the second sales process, the Debtors engaged in extensive month-long negotiations with interested parties that included parties that had previously participated in the Auction as well as new parties that emerged.  Moelis, along with the Debtors' other advisors and the Debtors' management team, evaluated each proposal, and pushed bidders to improve the economic and other terms of their bids.  When analyzing proposals received from interested parties, the Debtors and their advisors considered both the viability and risk factors associated with each proposed transaction, including but not limited to, timing considerations, third-party financing requirements, ability to consummate, cybersecurity risks, regulatory and licensing status, and counterparty risk based on the counterparty due diligence conducted by the Debtors during the first and second sales processes.

18.     Throughout the negotiations, the Debtors, in consultation with the Committee, also considered pursuing a transaction that would allow the Debtors to pivot and distribute cryptocurrency or cash to creditors on their own (the "Liquidation Transaction"), without pivoting to a chapter 7 liquidation.  The Debtors and their advisors ultimately used the Liquidation Transaction as a floor against which to compare third-party bids.  Ultimately, the Debtors

determined that pursuing a sale transaction with a third party could, depending on the structure of the transaction, provide the potential for the best recovery currently available to creditors under the circumstances while also reducing the risk surrounding execution of the transaction and reducing the likely value leakage that would occur in the Liquidation Transaction. Accordingly, the Debtors, in their business judgment, determined to reengage with third parties to identify an alternative transaction partner.

19.     After negotiation and deliberation, on December 18, 2022, Debtor Voyager Digital, LLC (the "Seller") executed that certain asset purchase agreement (the "Asset Purchase Agreement") with BAM Trading Services Inc. ("Binance.US" or "Purchaser," and such transaction thereunder, the "Sale Transaction"). The Court approved the Debtors' entry into the Asset Purchase Agreement on January 13, 2022 [Docket No. 860].

## THE DEBTORS' PLAN SHOULD BE CONFIRMED

## I.     THE PLAN PROVIDES THE HIGHEST AVAILABLE VALUE TO CREDITORS UNDER THE CIRCUMSTANCES.

20.     The Debtors value the Sale Transaction at approximately $1.022 billion, comprising (a) the value of cryptocurrency on the Voyager platform as of a date to be determined, which as of December 16, 2022 at 0:00 UTC, is estimated to be $1.002 billion, plus (b) additional consideration, which is estimated to provide at least $20 million of incremental value. Pursuant to the Asset Purchase Agreement, under the terms and conditions of the Plan and subject to the Debtors' ongoing assessment that the Sale Transaction is higher and better than the Liquidation Transaction, Binance.US will acquire and distribute substantially all of the Debtors' assets to creditors. Either the transaction contemplated by the Asset Purchase Agreement or, if the Debtors toggle, the Liquidation Transaction, will be effectuated through the Plan.

21.     Based on information in the Debtors' possession to date, the Sale Transaction
(a) is the only transaction currently available to the Debtors that did not contemplate requiring the
Debtors to liquidate cryptocurrency for working capital purposes in the first instance, (b) includes
reimbursement by Binance.US of up to $15 million of Seller's expenses under certain
circumstances set forth in the Asset Purchase Agreement, and (c) provides a $10 million reverse
termination fee payable to the Seller by Binance.US to compensate the Debtors' estates in the
event that Binance.US cannot consummate the transaction under certain circumstances set forth in
the Asset Purchase Agreement.

22.     In addition, the Debtors, the Committee, and their respective advisors negotiated
certain provisions designed to safeguard the Debtors' cryptocurrency in advance of distributions
being made to creditors.  Specifically, the Asset Purchase Agreement provides that, up until the
transfer of cryptocurrency to Binance.US, the Debtors will maintain control of all of the Debtors'
cryptocurrency, including during the rebalancing of the Debtors' cryptocurrency portfolio (that
may include the use of third parties and third-party exchanges to execute the rebalancing
transactions), which is a prerequisite to closing and effectuating distributions to creditors.  I believe
that allowing the Debtors to retain control of all of the Debtors' cryptocurrency until closing is
critical to minimizing risk given the increased volatility in the crypto space.

23.     Further, in connection with the evaluation of the Binance.US proposal, the Debtors
conducted certain financial and business counterparty due diligence on Binance.US.  This due
diligence included reviews of certain documentation provided by Binance.US and discussions with
senior management at Binance.US relating to, among other things: audited financial statements,
interim unaudited financial statements, available liquidity, related party services agreements,
wallet infrastructure, anti-money laundering laws ("AML") and "know your customer" ("KYC")

10

procedures, money transmitter licensing status, and business plans submitted to selected state regulators in connection with the issuance of money transmitter licenses. Such due diligence was based on information provided to the Debtors' and the Committee's financial and legal advisors by Binance.US and representations made by Binance.US senior management. As outlined in Moelis's engagement letter, while Moelis was involved in such discussions and diligence reviews, Moelis is not a technical expert on matters relating to the appropriateness of information security or other custody protocols. *See Application of Debtors and Debtors in Possession For Entry Of An Order Authorizing the Employment and Retention Of Moelis & Company Llc As Investment Banker, Capital Markets Advisor, And Financial Advisor Effective As Of The Petition Date* [Docket No. 117].

24. Moreover, I have been informed by the Debtors' legal advisors that Section 6.12 of the Asset Purchase Agreement provides that the Seller (prior to the transfer of cryptocurrency to Binance.US) and each transferred creditor (from and after the transfer of cryptocurrency to Binance.US) will retain all right, title, and interest in and to the cryptocurrency allocated to it in accordance with the Binance.US Asset Purchase Agreement through and including such time as such cryptocurrency is returned to Seller or distributed to such transferred creditor. It is my understanding that under the Asset Purchase Agreement, the cryptocurrency will be held by Binance.US solely for the benefit of the Seller or transferred creditor, as applicable, until such distributions are made.

25. In addition, under the Asset Purchase Agreement, the Debtors' claims against Three Arrows Capital and other parties will will vest in the Wind-Down Debtor and any recovery thereon will be distributed to creditors.

26. Finally, and most importantly, the Asset Purchase Agreement allows the Debtors to react to changing market conditions. If the Debtors otherwise determine that the Asset Purchase Agreement is not the highest and best available option for creditors under the circumstances and exercise their "fiduciary out," or the Sale Transaction is otherwise not effectuated by the Outside Date, then the Debtors may pivot to the Liquidation Transaction and pursue self-liquidation. This feature of the Asset Purchase Agreement, in my view, is protective of creditors in a volatile market, and provides a more certain timeline for recovery and resolution of Claims. The Debtors will toggle to the Liquidation Transaction if they conclude in their good faith judgment that the Sale Transaction no longer is the highest or otherwise best option for creditors available under the circumstances.

27. For all the reasons set forth in this Section I, I believe that the Plan is the compilation of months of long, hard-fought negotiations whereby the Debtors worked to negotiate a Plan that provides for distributions to creditors on an expeditious timeline, and it provides the highest value available to creditors under the circumstances.

## II. THE PLAN IS UNLIKELY TO BE FOLLOWED BY A LIQUIDATION OR FURTHER REORGANZIATION

28. I understand that Section 1129(a)(5) of the Bankruptcy Codes requires the Court to determine, in relevant part, whether the Plan provides adequate means for implementation. I also understand that Section 1129(a)(11) of the Bankruptcy Code requires the Court determine, in relevant part, that confirmation is not likely to be followed by the liquidation or further financial reorganization of the Debtors (or any successor thereto), unless such liquidation or reorganization is proposed in the Plan.

29. *First*, I believe that the Sale Transaction, which has an implied value of $1.022 billion, will allow the Debtors to satisfy their obligations under the Plan. The Sale Transaction

provides the highest value currently available under the circumstances to the Debtors' creditors.  I understand that the value created by the Sale Transaction will be sufficient to satisfy all Allowed Priority Claims and Allowed Administrative Claims under the Plan, including all Allowed Professional Fee Claims, in full.  As such, the Debtors have a demonstrated ability to fund distributions required under the Plan, including to taxing authorities, administrative claimants, and other Unimpaired Classes of Claims.

30.     Further, Binance.US has represented to the Debtor and its advisors that it has the legal, operational, financial, and technical capacity to distribute cryptocurrency in-kind to Holders of Allowed Account Holder Claims, including the necessary money transmitter licensing approvals required to facilitate in-kind distributions.  Binance.US has agreed to hold the cryptocurrency solely for the benefit of the Seller or transferred creditor, as applicable, until such distributions are made.  In the Unsupported Jurisdictions,[4] the Debtors will retain custody of the cryptocurrency that would be distributed to those creditors.  In the event that Binance.US is not able to obtain the necessary approvals to make distributions to creditors in Unsupported Jurisdictions within six months following the closing (*i.e.*, an incremental 3 months following distributions to creditors in other jurisdictions), the Debtors would convert the cryptocurrency attributable to such creditors to cash and the Debtors would then distribute the equivalent realized cash value associated with such liquidations to such creditors under the chapter 11 plan.  If

---

[4]     "Unsupported Jurisdictions" refers to Hawaii, New York, Texas, and Vermont, in which Binance.US does not yet have the requisite money transmitter licensing approvals, authorizations, or exemptions (as applicable).

Binance.US is able to obtain the necessary money transmitter licensing approvals within that six-month period, Binance.US would make in-kind distributions to those creditors.

31.     *Second*, Binance.US has represented that it has sufficient cash and other consideration, as applicable, to pay the Purchase Price.  The Debtors requested and received proof satisfactory to them of funds to substantiate that representation.  Pursuant to the Asset Purchase Agreement, I understand the Debtors negotiated additional assurances and value for the benefit of their estates under the Asset Purchase Agreement, including (a) reimbursement by Binance.US of up to $15 million of Seller's expenses in certain circumstances, (b) a $10 million good-faith deposit paid by Binance.US to the Seller, and (c) a $10 million reverse termination fee payable to the Seller by Binance.US, in each case, subject to the terms and conditions set forth in the Asset Purchase Agreement.  I understand, based on Binance.US's representations that Binance.US will have the ability to pay the expense reimbursement and reverse termination fee if and when they become due.  Binance.US paid the $10 million good faith deposit to the Seller, pursuant to the Asset Purchase Agreement, which the Seller shall be entitled to keep, in full, in the event of a Purchaser Default Termination.

32.     *Third*, in response to recent media reports that Binance.US allegedly transferred more than $400 million to Merit Peak Ltd., a trading firm managed by Binance CEO Changpeng Zhao, the Debtors have been engaged in an ongoing review of additional supplemental diligence into Binance.US.[5] The Debtor's supplemental diligence is examining the relationship between Binance.US, Merit Peak Ltd., an additional third-party market maker, and Zhao, as well as Binance.US's financial controls, including review of audit results testing the sufficiency of

---

[5]     *See Crypto giant Binance moved $400 million from U.S. partner to firm managed by CEO Zhao*, REUTERS.COM (Feb. 16, 2023), *available at* https://www.reuters.com/technology/crypto-giant-binance-moved-400-million-us-partner-firm-managed-by-ceo-zhao-2023-02-16/

Binance.US's Information Security Management System and Privacy Information Management System. The documents are being provided by Binance.US with the intention of demonstrating Binance.US's ability to consummate the Asset Purchase Agreement, to which the Debtors are conducting an ongoing review. To the extent undisclosed information uncovered during the Debtors' ongoing review reveals Binance.US is unable to consummate the Asset Purchase Agreement, as discussed elsewhere in this Declaration, the Debtors will promptly pivot to the Liquidation Transaction.

33.     *Fourth*, I am aware that, pursuant to the Plan, on the Effective Date, all property constituting Wind-Down Debtor Assets, including all Vested Causes of Action of the Debtors (unless otherwise released, waived, compromised, settled, transferred, or discharged pursuant to the Plan), will vest in the Wind-Down Debtor. It is my understanding that any proceeds acquired from pursuit of the Vested Causes of Action (if any) will inure to the benefit of the Debtors' creditors.

34.     Based on the foregoing, it is unlikely that confirmation of the Plan will be followed by a liquidation or the need for further reorganization except for that disclosed in the Plan.

## III.    The Liquidation Transaction Provides an Alternative Transaction That Will Obviate the Need for Further Reorganization or Chapter 7 Liquidation.

35.     Based on the diligence the Debtors have performed to date, and as discussed above, I believe the Sale Transaction is the highest and best option currently available under the circumstances. But the cryptocurrency industry remains volatile, even for an already volatile business, and Moelis and the Debtors' other advisors continue to closely monitor developments. To that end, the Asset Purchase Agreement permits the Debtors to pivot to a higher and better third-party bid (should one emerge) or the Liquidation Transaction if the Debtors exercise their "fiduciary out" or the Sale Transaction is not effectuated by the outside date included thereunder,

subject to expense reimbursement of Binance.US in certain circumstances set forth in the Asset Purchase Agreement.

36.     Pursuing the Liquidation Transaction would, however, impose costs of its own on the Debtors, take time, and present its own risks.  Among other things, the Liquidation Transaction would involve the Debtors "rebalancing" their cryptocurrency holdings to prepare for distributions to creditors, and then reopening the Voyager platform for approximately a month to allow customers to withdraw their *pro rata* share of cryptocurrency, to the extent it can be withdrawn. The Liquidation Transaction, among other things, would likely lead to incremental value leakage (*e.g.*, the Debtors would likely be forced to realize a discount due to liquidation of sizable positions in the marketplace), over and above that in a third-party transaction, thereby resulting in diminished creditor recoveries, and/or require the Debtors to liquidate additional cryptocurrency to fund working capital requirements to complete the work required (including AML/KYC compliance).  The Debtors and their other advisors have also indicated that the Liquidation Transaction may create additional security risks (particularly if the Debtors are unable to retain critical personnel necessary to perform the Liquidation Transaction), be less tax efficient for customers than a third-party transaction,  strand some coins, which can be withdrawn by customers from certain third-party exchanges (like Binance.US) but not from Voyager, and may severely damage the value of the VGX token, the native token of the Voyager platform.

37.     In light of these risks, the Asset Purchase Agreement provides that in the event Debtors pivot to the Liquidation Transaction, Binance.US will provide certain services to facilitate the Liquidation Transaction to ensure that the Debtors can rely on the Binance.US platform to minimize leakage with, and cybersecurity risks when, returning cryptocurrency to creditors. In addition, the work to prepare to consummate and execute on the Asset Purchase Agreement will

better prepare the Debtors to address the aforementioned self-liquidation challenges and complete the Liquidation Transaction if necessary.

38.     My understanding, based on my work with the Debtors, is that the Debtors have a plan in place to pivot to and implement the Liquidation Transaction, if necessary.  As a result, in the event the Sale Transaction fails to close, the Debtors have the infrastructure and capability (and, due to the other protections provided in the Plan, including the Employee Transition Plan, the personnel) to proceed with a self-liquidation.  The ability to perform this self-liquidation pursuant to the Liquidation Transaction makes it unlikely that Debtors will need to undergo a court-supervised liquidation or pursue further reorganization other than that provided in the Plan.

## IV.     THE PLAN WAS PROPOSED IN GOOD FAITH

39.     I understand that Section 1129(a)(3) requires that the Plan be proposed in good faith.  I and the other members of the Moelis team, along with the Debtors' other advisors, were intimately involved in the negotiation and execution of the Asset Purchase Agreement and the development of the Plan.  The Plan and Asset Purchase Agreement followed extensive arm's-length negotiations among sophisticated, well-represented parties, including the Debtors, the Committee, and interested counterparties, ensuring that the Debtors' stakeholders realize the highest possible recoveries under the circumstances.[6]

40.     I believe that the Debtors' marketing process with respect to the Sale Transaction afforded a reasonable opportunity for any party to make a higher or otherwise better offer. Following FTX's bankruptcy, no other party or parties offered to purchase the Acquired Assets for greater overall value to the Debtors' estates than Binance.US.  Based on our analysis to date, I

---

[6]     For the avoidance of doubt, Binance.US is not an "insider" or "affiliate" of any of the Debtors, as those terms are defined in the Bankruptcy Code, and no common identity of incorporators, directors, or controlling stakeholders exist between the Purchaser and the Debtors.

believe the Asset Purchase Agreement will provide a greater recovery for the Debtors than would be provided by any other currently available alternative and, if the Debtors ultimately determine that another third-party option (if one emerges) or the Liquidation Transaction will deliver greater value to creditors, they will toggle to that transaction.

41. In my opinion the consideration provided by Binance.US pursuant to the Asset Purchase Agreement constitutes the best offer for the Acquired Assets that is currently available.

42. I am not aware of any side deals or other arrangements that would evidence a lack of good faith. Further, while I recognize that Binance.US has been cooperating with a variety of regulatory bodies internationally, I have no knowledge of Binance.US engaging in any improper action or inaction, which would cause or permit the Asset Purchase Agreement or the Sale Transaction to be avoided or impose any costs or damages. All that said, I am not an authorized representative of Binance.US nor am I in a position to "vouch" for the bona fides of Binance.US. And if events since May 2022 have taught us anything, it is that the benefits of having a decentralized and largely unregulated cryptocurrency business are counterbalanced by the challenges in identifying and preventing fraud.

## CONCLUSION

43. The Plan and the Sale Transaction will provide the greatest currently available recovery to creditors, allow the Debtors to facilitate an efficient resolution of these chapter 11 cases, and give customers the opportunity to migrate to Binance.US's market-leading trading platform to trade and store cryptocurrency upon consummation of the Sale Transaction. Further, in the event that the Debtors determine that the Sale Transaction is not the highest and best option available for their stakeholders under the circumstances, they have the right to, and will, toggle to

Liquidation Transaction provided under the Plan to quickly and efficiently return cryptocurrency to creditors and facilitate the expedient resolution of these chapter 11 cases.

44. For these reasons, I support confirmation of the Debtors' Plan.

*[Remainder of page intentionally left blank.]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: February 28, 2023                    Respectfully submitted,


                                            _/s/ Brian Tichenor_____
                                            Brian Tichenor
                                            Managing Director
                                            Moelis & Company LLC

                                            *Investment Banker for the Debtors*