# Exhibit 6

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DECLARATION OF MARK A. RENZI**
**IN SUPPORT OF CONFIRMATION OF THE THIRD**
**AMENDED JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND ITS**
**DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

I, Mark. A. Renzi, hereby declare under penalty of perjury, as follows:

1.      I submit this Declaration in support of confirmation of the *Third Amended Joint Chapter 11 Plan of Voyager Digital Holdings, Inc., and Its Debtor Affiliates* [Docket No. 852] (as may be amended, supplemented, or otherwise modified from time to time, the "Plan"), and the *Debtors' Memorandum of Law In Support of (I) Final Approval of the Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code and (II) an Order Confirming the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Confirmation Brief")[2], filed contemporaneously herewith.  I am a Managing Director with Berkeley Research Group, LLC ("BRG") and have served as a financial advisor to Voyager Digital Holdings, Inc. since July 5, 2022.

2.      The statements in this declaration are, except where specifically noted, based on (a) my personal knowledge or opinion of the Debtors' operations and finances, (b) my personal knowledge, belief, or opinion, (c) information I have received from the Debtors' employees or advisors and/or other employees of BRG, or (d) from the Debtors' records maintained in the ordinary course of their business.  If called to testify, I could and would testify competently to the facts set forth herein.

3.      I am not being specifically compensated for this testimony other than through payments that may be received by BRG as a professional retained by the Debtors.

---

[2] Capitalized terms used but not defined herein shall have the meanings given to such terms in the Plan or Confirmation Brief, as applicable.

## I.    Qualifications

4.    I am a Managing Director and the Head of the Corporate Finance Financial Institutions Group for BRG, the financial advisor to the Debtors.

5.    BRG's corporate finance practice consists of senior financial, management consulting, accounting, and other professionals who specialize in providing financial, business, and strategic assistance typically in distressed business settings.  BRG has a wealth of experience in providing financial advisory services in in- and out-of-court restructuring, sale, and wind down scenarios, and enjoys an excellent reputation for services it has rendered in large and complex chapter 11 cases on behalf of debtors and creditors throughout the United States. BRG professionals have significant restructuring and industry experience assisting distressed companies with financial and operational challenges and working with management teams and boards of directors of large companies facing financial challenges similar to those of the Debtors. BRG regularly assists large and complex businesses similar to the Debtors.

6.    BRG has acted as financial advisor, crisis manager, and corporate officer in middle market to large multinational companies in crisis or those in need of performance improvement in specific financial and operational areas across a wide array of industries.  Moreover, the professionals at BRG have assisted and advised debtors, creditors, creditors' committees, bondholders, investors, and others in numerous bankruptcy cases, including the bankruptcy cases of *Intelsat S.A.; Liberty Power Holdings, LLC; The Collected Group, LLC; CBL & Associates Properties, Inc.; Hospital Acquisition LLC (d/b/a LifeCare); rue21, inc.; Sports Authority Holdings, Inc.*; *Specialty Retail Shops Holding Corp. (a.k.a. Shopko); Brookstone Holding Corp.; American Apparel LLC; Rentpath Holdings, Inc.; MF Global Holdings, Ltd.; Le Tote, Inc.; Chrysler (a.k.a. Old Carco LLC); Southern Foods Group; Speedcast International Limited; The*

*Hertz Corporation, LLC; Borden Dairy Company; Nine West Holdings, Inc.; Verity Health System of California, Inc.; Real Industry, Inc.; M & G USA Corporation; Peabody Energy Corporation; Sabine Oil & Gas Corporation; Molycorp Inc.; Refco, Inc.; Spiegel Inc.; W.R. Grace; Penson Worldwide; Dynegy Holdings, LLC; Calpine Generating Company;* and *Nortel Networks Inc.*[3] Currently, in addition to serving as financial advisor to the Debtors in these chapter 11 cases, I am the Chief Restructuring Officer of BlockFi and its related debtors and debtors in possession,[4] and I am one of the leaders of the team advising the Official Committee of Unsecured Creditors in the Genesis Global HoldCo, LLC, chapter 11 proceedings.[5]

7.      I am a member of the Association of Insolvency and Restructuring Advisors, as well as the Turnaround Management Association. I have more than twenty-five (25) years of business experience, with approximately twenty (20) years of financial consulting experience, including liquidity and capital structure assessment, debt and equity restructuring advice, and identification of reorganization alternatives. During the course of my career, I have personally provided restructuring services on more than thirty-five (35) engagements in both out-of-court workout situations and in-court reorganizations. Further, I have served in interim management positions and advised distressed companies with day-to-day management activities, including development of pro forma financials, cash flow management, cost rationalization, and identification of liquidity enhancing activities. In addition to operational turnarounds, I have assisted in financial restructurings, including refinancings, recapitalizations, debt-for-equity swaps, and strategic mergers and acquisitions.

---

[3] The professionals were employed in certain of these engagements prior to joining BRG.

[4] In re BlockFi Inc., No. 22-19361 (MBK), U.S.B.C., D.N.J.

[5] In re Genesis General HoldCo LLC, No. 23-10063 (SHL), U.S.B.C., S.D.N.Y.

4

8. Prior to joining BRG, I was a Senior Managing Director at a global business advisory firm with a 15-year tenure. I also worked at a boutique money management firm in New York evaluating equity and commodity derivative portfolios, and held various positions in FP&A, business plan development, treasury, and global cash management. I received a B.A. in Economics from Washington College and an M.S. in Finance from Boston College.

9. Since the Debtors engaged BRG in July 2022, I have worked closely with the Debtors' management and other professionals on the Debtors' restructuring efforts, including assisting the Debtors in preparing cash flow projects, budgets, and other reports, as well as assisting with strategic operations including, most recently, the rebalancing of the Debtors' cryptocurrency portfolio and preparation for execution on the proposed Plan, whether that ultimately be through a Sale Transaction with Binance.US or the Liquidation Transaction. I lead the BRG team advising the Debtors. In this capacity I have become well-acquainted with the Debtors' restructuring efforts. I am also familiar with the terms and provisions of the Plan, as well as all previously submitted plans—I participated directly in the due diligence, discussions, and analysis related to the Plan, as well as all previously submitted plans.

10. The Debtors requested that I address for the Court and parties-in-interest, among other things described in more detail below: (1) the purpose of the Plan; (2) the ability of the Plan, including the Sale Transaction or the Liquidation Transaction to satisfy the "best interests test" as defined in section 1129(a)(7) of the bankruptcy code; (3) the feasibility of the Plan, including the Sale Transaction or the Liquidation Transaction as applicable, under section 1129(a)(11) of the bankruptcy code; (4) the need for key Debtor employees to continue providing services to the Debtors (and the Wind-Down Estate) in order to successfully effectuate the Plan, including the

Sale Transaction or the Liquidation Transaction; and (5) whether or not appointment of a trustee in these chapter 11 cases is warranted under the circumstances.

## II.  Background

11.     To understand why I reach the opinions described below, it is necessary to understand Voyager's operational history as well as the history of these chapter 11 cases.

### A. Operations

12.     Voyager's primary operations consist of (i) brokerage services, (ii) custodial services through which customers earn interest and other rewards, and (iii) lending programs.  All of Voyager's services are accessible through a mobile application that users can download on their smartphones and other smart devices.

13.     **Brokerage Services**. Voyager operates as a cryptocurrency "agency broker," matching its customers with counterparties who can facilitate the customers' desired trades. The Company's platform surveys approximately a dozen exchanges and liquidity providers and executes trades through a proprietary algorithm that evaluates the price, certainty of execution, reliability of the trading venue, and speed of execution.

14.     **Custodial Services.**  Customers store their digital assets on the Voyager platform and, unless they "opted out" of the rewards program (which all customers had the opportunity to do), earned interests on deposits which, prior to the Petition Date, were primarily paid in three ways: (i) PIK Interest; (ii) through VGX and the Voyager Loyalty Program; and (iii) through "staking" programs. Customers could also sign up for a Voyager Debit Card.

15.     **Lending Program.** As part of providing customers with PIK Interest, Voyager lent cryptocurrency deposited on its platform to third parties, sometimes on a collateralized basis but often on an uncollateralized basis.  Customers were advised of this through clear language in the

Customer Agreement. Such third parties paid Voyager a pre-negotiated interest rate that is payable in either cash or payment-in-kind (*i.e.*, a Bitcoin loan accrues interest payable in Bitcoin). Voyager's lending program was an integral part of its business and necessary to provide customers with a meaningful return on their assets. Loans made by the Company that were outstanding as of the Petition Date were as follows:

| Loan Counterparty | Borrowing Rates | Amount Outstanding (in thousands) |
|---|---|---|
| Alameda Research Ltd. | 1% - 11.5% | $376,784 |
| Three Arrows Capital | 3% - 10% | $654,195 |
| Genesis Global Capital, LLC | 4% - 13.5% | $17,556 |
| Wintermute Trading Ltd | 1% - 14% | $27,342 |
| Galaxy Digital LLC | 1% - 30% | $34,427 |
| Tai Mo Shan Limited | 10% | $13,770 |
| Other | 4% - 8% | $751 |
| **Total Loan Obligations** | | **$1,124,825** |

### B. The Market Crashes and Voyager Seeks Chapter 11 Protection

16. Cryptocurrency is inherently volatile, and prices vacillate by the second due to constant trading occurring 24 hours a day, seven days a week. 2022 saw historic levels of volatility in the markets generally, and the cryptocurrency markets were not immune. Bitcoin slumped over 65% from January 1, 2022 to year-end:



17.     Crypto's 2022 pullback began with the collapse of LUNA, a cryptocurrency issued by Terra, an open-source blockchain protocol. Terra issued LUNA to execute transactions on the Terra blockchain. In early May 2022, LUNA was trading at $86 per token and had a market capitalization of approximately $14 billion. Along with LUNA, Terra issued TerraUSD ("UST"), an algorithmic stablecoin that was pegged at $1.

18.     On May 7, 2022, $2 billion of UST was unstaked and immediately sold. This dropped UST's price to $0.91. UST holders saw the "de-peg" and rushed to unstake and sell their coins.

19.     Traders redeemed UST for LUNA and sold their LUNA, leading to a significant decrease in its price. Simultaneously, other traders attempted to repeg LUNA to UST by burning UST to create LUNA, which in turn created an oversupply of LUNA and further exacerbated its price decline. In one week, LUNA's price fell from $82.55 to $0.000001 per token, eliminating $18 billion of value in the cryptocurrency sector.

20.      Many cryptocurrency-focused hedge funds, and other cryptocurrency companies, owned LUNA. Some were unable to sell their LUNA under staking agreements and were forced to incur up to a 99% loss on their investment. And in mid-June, reportedly due in part to the collapse of LUNA, Three Arrows Capital ("3AC"), a major player in the space, collapsed.

21.      On June 15, 2022, 3AC confirmed that it had suffered at least some loss from the LUNA collapse and that it had hired legal and financial advisors to explore potential liquidity solutions. Shortly thereafter, on June 27, 2022, 3AC was ordered by a court in the British Virgin Islands to commence liquidation proceedings.

22.      Voyager was a victim of 3AC's collapse. As stated above and as disclosed to customers, to provide customers with a yield on the assets they store with Voyager, Voyager loans out a portion of its cryptocurrency reserves to third parties. One such loan was to 3AC. In March 2022, the Company entered into a master loan agreement with 3AC (the "3AC Loan"). Pursuant to the 3AC Loan, the Company agreed to lend 15,250 Bitcoins and 350 million USDC to 3AC. The 3AC Loan was callable at any time by the Company. 3AC fully drew down on the 15,250 Bitcoins and 350 million USDC.

23.      After the LUNA crash in 2022, Voyager began to assess 3AC's downside exposure and the likelihood of repayment under the 3AC Loan. Voyager then made an initial request for a repayment by 3AC of $25 million of USDC by June 24, 2022, and subsequently requested repayment of the entire outstanding balance of Bitcoin and USDC by June 27, 2022. 3AC did not repay either requested amount. Accordingly, on June 27, 2022, Voyager issued a notice of default to 3AC for failure to make the required payments under the 3AC Loan.

24.      Once it became clear that 3AC had significant exposure to the crash, Voyager's management team swiftly took action to identify potential sources of liquidity to stabilize

Voyager's business and remain adequately capitalized, and it ultimately became necessary that Voyager begin marketing its business and enter these chapter 11 proceedings.

### C. Voyager Markets a Sale, AlamedaFTX Implodes

25.     Beginning on or about June 20, 2022, the Debtors commenced a marketing process to solicit interest in a sale to a third-party investor. However, discussions with interested parties revealed that an in-court process for the Debtors' assets would be necessary to consummate the most value-maximizing transaction for stakeholders. Accordingly, the Debtors commenced these chapter 11 cases on July 5, 2022 (the "Petition Date"), and continued their marketing efforts.

26.     As discussed in greater detail in the *Declaration of Brian Tichenor in Support of Confirmation of the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, filed contemporaneously herewith (the "Moelis Declaration"), the Debtors' multi-month marketing process culminated in an auction process on September 13, 2022, to identify the highest and best bid from interested parties. The Debtors' financial advisor, Moelis, scrutinized the bids along with me and my team at BRG, the Debtors' legal advisors, and the Debtors' management team, Board of Directors, and independent directors, and ultimately concluded AlamedaFTX was the best option because all believed—based on what is now known to be fraud—that AlamedaFTX could timely close and effectuate the sales process and had the wherewithal to do so. The Court approved the Debtors' entry into a purchase agreement with AlamedaFTX on October 20, 2022. Confirmation was originally set for December 8, 2022.

27.     On November 2, 2022, public reports began to circulate citing leaked, internal financial statements and questioning the health and liquidity of both FTX and Alameda Research

10

LLC (and their various affiliates, none of which appear to have operated independently). That and other public reporting began a death spiral for AlamedaFTX.

28.     On November 8, 2022, FTX's CEO stated publicly that FTX was experiencing a "liquidity crunch" due to user withdrawals.[6]  The Debtors and their advisors inquired with FTX and its advisors, who either could not or would not share any material information about what was happening.  On November 11, 2022, AlamedaFTX began the process of filing for bankruptcy.[7]  The counterparty to the APA with the Debtors, West Realm Shires d/b/a FTX US, did not file until November 14, 2022.

**D.     Voyager Markets a Sale Again, Reaches Agreement with Binance.US**

29.     On November 10, 2022, the day before AlamedaFTX publicly filed for bankruptcy, AlamedaFTX agreed to waive the "no shop" provision of the AlamedaFTX Purchase Agreement. The Debtors promptly restarted their sales process, and engaged in extensive negotiations with the interested parties over the course of approximately one month.

30.     Ultimately, on December 18, 2022, Debtor Voyager Digital, LLC (the "Seller") executed an asset purchase agreement (the "Asset Purchase Agreement") with BAM Trading Services Inc. ("Binance.US" or "Purchaser" and the transaction, "Sale Transaction"). The Asset Purchase Agreement provided that the Sale Transaction would be consummated through the Plan.

31.     The Debtors value the Sale Transaction at approximately $1.022 billion, comprising (a) the value of cryptocurrency on the Voyager platform as of a date to be determined, which as of December 18, 2022, is estimated to be $1.002 billion, plus (b) additional consideration, which is estimated to provide at least $20 million of incremental value. The Sale Transaction

---

[6] @SBF_FTX, Twitter (Nov. 8, 2022).

[7] @SBF_FTX, Twitter (Nov 11, 2022).

includes reimbursement by Binance.US of up to $15 million of Seller's expenses, and provides a $10 million reverse termination fee payable to the Seller by Binance.US to compensate the Debtors' estates in the event that Binance.US cannot consummate the transaction.

32.     The Plan also allows the Debtors to toggle to either a higher and better third-party bid (should one emerge) or to a self-liquidation if the Debtors determine, in their business judgment, that the Sale Transaction is no longer the best path forward for the Debtors' creditors (the "Liquidation Transaction"). The Plan was negotiated heavily between many parties, including the Debtors and the Official Committee of Unsecured Creditors (the "Committee"). Thousands of hours have been invested in creating as good of an outcome for creditors as is possible under the circumstances and the Plan (if confirmed) does exactly that.

## III.   The Plan Satisfies the Confirmation Requirements

33.     For the reasons detailed below, I believe that the Plan satisfies the applicable bankruptcy code requirements for confirmation of a plan of reorganization. I set forth the reasons for such belief below, except where such compliance is apparent on the face of the Plan, the Plan Supplement, and the related documents or where it will be the subject of other evidence introduced at the Combined Hearing.

### A.   The Plan Fully Complies with the Applicable Provisions of the Bankruptcy Code — § 1129(a)(1).

34.     I understand that section 1129(a)(1) of the bankruptcy code requires a chapter 11 plan to comply with all applicable provisions of the bankruptcy code.

#### 1.   Proper Classification of Claims and Interests — § 1122 and § 1123(a)(1).

35.     I understand that sections 1122 and 1123(a)(1) of the bankruptcy code govern the manner in which a debtor may classify claims and interests. I believe that the Plan's classification of Claims and Interests satisfies the requirements of section 1122 of the bankruptcy code because

the Plan places Claims and Interests into eleven separate Classes, with the Claims and Interests in each Class differing from the Claims and Interests in each other Class in a legal or factual nature or based on other relevant criteria.

36.     I believe that valid business, legal, and factual reasons justify the separate classification of the particular Claims or Interests into the Classes created under the Plan, and no unfair discrimination exists between or among Holders of Claims and Interests.  In particular, I understand that general unsecured claims are broken into three classes, OpCo General Unsecured Claims, HoldCo General Unsecured Claims, and TopCo General Unsecured Claims to comport with certain requirements of the bankruptcy code and to account for the fact that Holders of such claims have legal recourse against only specific Debtors.  Holders of Account Holder Claims are classified separately from Holders of other General Unsecured Claims due to the unique nature and basis for the Account Holder Claims, which are made up of claims held by customers on the Voyager platform.  Further, Alameda Loan Facility Claims are properly classified separately as such Claims are asserted against multiple Debtor entities and are Claims on account of an unsecured loan.

### 2.   Specification of Unimpaired Classes — § 1123(a)(2).

37.     I understand that Article III.B of the Plan identifies each Class that is Unimpaired.

### 3.   Treatment of Impaired Classes — § 1123(a)(3).

38.     I understand that Article III.B of the Plan identifies each Class that is Impaired and describes the treatment thereof.

### 4.   Equal Treatment of Similarly Situated Claims and Interests — § 1123(a)(4).

39.     I understand that section 1123(a)(4) of the bankruptcy code requires that the Plan provide the same rights and treatment to each holder of claims or interests as other holders of

allowed claims or interests within such holders' respective class. I believe that the Plan satisfies this requirement, as all Holders of Allowed Claims or Interests will receive the same rights and treatment as other Holders of Allowed Claims or Interests within such Holders' respective Class. In particular, all Account Holder Claims will be "dollarized" as of the Petition Date, and the Holders thereof will receive recoveries proportional to the "dollarized" value of their account holdings relative to the aggregate dollarized value of all customer accounts. The form such distributions take will be a function of the laws and regulations of jurisdictions in which Account Holders reside.

### 5. Adequate Means for Implementation — § 1123(a)(5).

40. I understand that section 1123(a)(5) of the bankruptcy code requires that a chapter 11 plan provide adequate means for a plan's implementation. I believe that the Plan provides adequate means for implementation as required under section 1123(a)(5) of the bankruptcy code. Among other things, Article IV of the Plan:

    i.    constitutes a good faith compromise and settlement of all Claims, Interests, Causes of Action and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan;

    ii.    authorizes the applicable Debtors to take all actions necessary or appropriate to effectuate the Plan, including those actions necessary to effectuate the Restructuring Transactions, as set forth in the Plan Supplement, as the same may be modified or amended (in accordance with the terms of the Plan) from time to time prior to the Effective Date;

    iii.    authorizes the Debtors to consummate the Restructuring Transactions, including (i) all transactions necessary to provide for the purchase of the Acquired Assets by

Purchaser under the Asset Purchase Agreement, if applicable, (ii) the distribution of Cryptocurrency or Cash pursuant to the Asset Purchase Agreement, as applicable; (iii) the execution of the Plan Administrator Agreement and any transactions necessary or appropriate to form the Wind-Down Debtor; and (iv) the transfer of the Wind-Down Debtor assets to the Wind-Down Debtor;

iv. provides for consummation of the Sale Transaction or the Liquidation Transaction, as applicable;

v. effectuates the Employee Transition Plan;

vi. provides for the retention of certain Non-Released D&O Claims to be pursued, settled, or resolved by the Wind-Down Debtor;

vii. implements the D&O Settlement;

viii. creates the Wind-Down Debtor and appoints the Plan Administrator and Wind-Down Debtor Oversight Committee;

ix. provides sources of consideration for Plan distributions;

x. effectuates the cancellation of certain notes, instruments, certificates and other documents; and

xi. preserves certain Vested Causes of Action.

41.    On the Effective Date, the Wind-Down Debtor Assets shall, subject to the Plan Administer Agreement, be transferred to and vest in the Wind-Down Debtor.  The Wind-Down Debtor will be charged with winding down the Debtors' estates and will be the successor-in-interest to the Debtors, and a successor to the Debtors' rights, title and interest to the Wind-Down Debtor Assets.  The Wind-Down Debtor will be managed by the Plan Administrator and will be subject to a Wind-Down Debtor Oversight Committee.

### 6. Prohibition of Issuance of Non-Voting Stock — § 1123(a)(6).

42.     I understand that section 1123(a)(6) of the bankruptcy code requires that a debtor's organizational documents prohibit the issuance of nonvoting equity securities. The Debtors are winding down, and there will not be any issuance of nonvoting equity securities or preferred stock. Accordingly, I believe section 1123(a)(6) of the bankruptcy code is inapplicable to the Plan.

### 7. Selection of Officers and Directors — § 1123(a)(7).

43.     I understand that section 1123(a)(7) of the bankruptcy code requires that any provisions in the Plan with respect to the manner of selection of any director, officer, or trustee be consistent with the interests of creditors, equity holders, and public policy. I believe that the Plan satisfies this requirement by providing that, on the Effective Date, the authority, power, and incumbency of the persons acting as directors and officers of the Debtors will be deemed to have resigned, solely in their capacities as such, and the Plan Administrator will be appointed by the Debtors as the sole director and the sole officer of the Wind-Down Debtor and will succeed to the powers of the Debtors' directors and officers. The Debtors filed the Plan Administrator Agreement with the Plan Supplement, which provides the identity of the Plan Administrator and Wind-Down Oversight Committee.

### 8. Discretionary Contents of the Plan — § 1123(b).

44.     I understand that section 1123(b) of the bankruptcy code sets forth various discretionary provisions that may be incorporated into a chapter 11 plan. I understand that pursuant to section 1123(b) of the bankruptcy code, among other things, a plan may: (a) impair or leave unimpaired any class of claims or interests; (b) provide for the assumption or rejection of executory contracts or unexpired leases not previously rejected; (c) provide for the settlement or adjustment

of any claim or interest belonging to a debtor; or (d) include any other provision not inconsistent with applicable provisions of chapter 11.

45.     I believe that the Plan is consistent with section 1123(b) of the bankruptcy code. *First,* the treatment of Classes under the Plan renders such Classes either Impaired or Unimpaired. Class 1 (Secured Tax Claims) and Class 2 (Other Priority Claims) are Unimpaired, and Class 3 (Account Holder Claims), Class 4A (OpCo General Unsecured Claims), Class 4B (HoldCo General Unsecured Claims), Class 4C (TopCo General Unsecured Claims), Class 5 (Alameda Loan Facility Claims), Class 6 (Section 510(b) Claims), and Class 9 (Existing Equity Interests) are Impaired under the Plan.  Class 7 (Intercompany Claims) and Class 8 (Intercompany Interests) may be Impaired or Unimpaired under the Plan.  *Second,* Article V of the Plan satisfies section 1123(b)(2) because it provides that, on the Effective Date, all Executory Contracts and Unexpired Leases, including any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, that, as of the Effective Date, were not previously rejected, assumed, or assumed and assigned, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the bankruptcy code, except to the extent set forth in the plan.  *Third,* for the reasons set forth in Section II below, I believe that the Plan's release, exculpation, and injunction provisions are consistent with section 1123(b) of the bankruptcy code. *Finally,* the Plan also effectuates the Sale Transaction contemplated by the Asset Purchase Agreement or the Liquidation Transaction as applicable.

46.     I submit that each of these provisions are appropriate because, among other things, they are (a) the product of arm's-length negotiations, (b) given for valuable consideration, (c) fair and equitable and in the best interests of the Debtors, their estates, and these chapter 11 cases, and

17

(d) consistent with the relevant provisions of the bankruptcy code and Second Circuit law as explained to me.

### 9. The Debtors Will Cure Monetary Defaults of Any Assumed Executory Contracts or Unexpired Leases — § 1123(d).

47.     I understand that section 1123(d) of the bankruptcy code requires that cure amounts be determined in accordance with the underlying agreement and nonbankruptcy law.

48.     I believe that the Plan complies with section 1123(d) of the bankruptcy code.  The Plan provides for the satisfaction of cure costs under each Executory Contract and Unexpired Lease to be assumed under the Plan on the Effective Date or in the ordinary course of business, subject to the limitations described in Article V of the Plan, and that the Wind-Down Debtor or the Purchaser, as applicable, shall pay any Cure Amounts on the Effective Date.

### 10. The Debtors Complied with the Solicitation Requirements of the Bankruptcy Code — § 1129(a)(2).

49.     I understand that section 1129(a)(2) of the bankruptcy code requires that plan proponents comply with the applicable provisions of the bankruptcy code and, in that regard, is specifically intended to ensure compliance with the disclosure and solicitation requirements set forth in sections 1125 and 1126 of the bankruptcy code.  Based on my review of information provided by the Debtors and their advisors, along with the Voting Report, I believe that the Debtors have complied with sections 1125 and 1126 of the bankruptcy code.

### 11. The Debtors Proposed the Plan in Good Faith — § 1129(a)(3).

50.     I understand that section 1129(a)(3) of the bankruptcy code requires that a chapter 11 plan be proposed in good faith and not by any means forbidden by law.  Here, there is no question in my mind that section 1129(a)(3) has been satisfied.  The Plan was proposed by the Debtors with honesty, good intentions, and a desire to maximize stakeholder recoveries under extraordinarily challenging circumstances.  That is particularly so after the historic FTX collapse

derailed the prior proposed plan, when the Debtors, their employees, their advisors, and the

Committee and its advisors, worked together to find another transaction partner and pivot to the

current Plan—which includes flexibility to toggle to the Liquidation Transaction if necessary—

quickly. Moreover, the Sale Transaction effectuated by the Plan is the product of extensive, arm's-

length negotiations with numerous written and verbal proposals and counterproposals exchanged

among sophisticated parties over the course of several months. Further, the Liquidation

Transaction contemplated under the Plan ensures that Holders of Claims can receive the highest

recoveries available on the shortest timeline in the event that the Sale Transaction is not ultimately

consummated.

### 12. Payment of Professional Fees and Expenses Are Subject to Court Approval — § 1129(a)(4).

51.     I understand that section 1129(a)(4) of the bankruptcy code requires a Court to

approve certain fees and expenses that either a plan proponent, debtor, or person receiving property

distributions under the plan has paid as reasonable. I can confirm that Professional Fee Claims

and corresponding payments are subject to prior Bankruptcy Court approval and the

reasonableness requirements under sections 328 or 330 of the bankruptcy code. Article II.B of the

Plan, moreover, provides that Professionals shall file all final requests for payment of Professional

Fee Claims no later than 45 days after the Effective Date, thereby providing an adequate period of

time for interested parties' to review such Professional Fee Claims.

### 13. The Governance Disclosure Requirements Do Not Apply to the Debtors or Are Satisfied — § 1129(a)(5).

52.     I understand that section 1129(a)(5) of the bankruptcy code requires (a) that a plan

proponent disclose the identity and affiliation of any individual proposed to serve as a director or

officer of the debtor, or a successor thereto, under a chapter 11 plan, (b) that the appointment or

continuance of such officers and directors be consistent with the interests of creditors and equity

security holders and with public policy, and (c) that a plan proponent disclose the identities or affiliations of insiders to be employed or retained by the reorganized debtors as directors and officers and the nature of any compensation for such insider.  Because the Plan provides for the vesting of the Debtors' remaining assets in the Wind-Down Debtor and the subsequent dissolution of the Debtors, I understand that section 1129(a)(5) of the bankruptcy code is not applicable to these chapter 11 cases.  Nevertheless, I believe that Article IV.H of the Plan and the Plan Supplement satisfy the requirements of section 1129(a)(5) of the bankruptcy code, to the extent applicable, as the Debtors disclosed the method of selection, compensation, and affiliations of the Plan Administrator and the Wind-Down Oversight Committee.

### 14. The Plan Does Not Require the Government to Approve Rate Changes — § 1129(a)(6).

53.     I have been advised that the Debtors are not subject to regulations that would invoke section 1129(a)(6)'s requirement that they seek regulatory approval for rate changes provided for under the Plan.  The Plan does not propose any rate changes.  As such, I do not believe that section 1129(a)(6) is applicable to the Plan.

### 15. The Plan Satisfies the Best Interests Test — § 1129(a)(7).

54.     As fulsomely discussed in Section IV, *infra*, I understand that section 1129(a)(7) of the bankruptcy code requires that any chapter 11 plan must satisfy the "best interests of creditors" test, which provides that holders of claims or interests in impaired, non-accepting classes must receive under a chapter 11 plan at least as much as they would in a liquidation.  It is my opinion that it does.

### 16. Acceptance by Impaired Classes — § 1129(a)(8).

55.     I understand that the bankruptcy code generally requires that each class of claims or interests must either accept the plan or be unimpaired under the plan.  I further understand that

if any class of claims or interests rejects the plan, the plan must satisfy the "cram down" requirements with respect to the claims or interests in that class. I understand that Class 3 (Account Holder Claims), Class 4B (HoldCo General Unsecured Claims), and Class 4C (TopCo General Unsecured Claims) voted to accept the Plan and the voting has been overwhelmingly in favor of the Plan. I understand that no holders of OpCo General Unsecured Claims voted on the Plan. However, I understand that because certain Classes are or may be deemed to reject the Plan, the Debtors do not satisfy section 1129(a)(8) of the bankruptcy code. However, even though certain Classes are or may be deemed to reject the Plan, I understand that the Debtors still satisfy section 1129(b) as at least one Impaired Class voted to accept the Plan.

### 17. Priority Cash Payments — § 1129(a)(9).

56.     I understand that the bankruptcy code generally requires that claims entitled to administrative priority must be repaid in full in cash on the effective date or receive certain other specified treatment that the Holder of such claim has agreed to. I understand that the Plan provides that each Holder of an Allowed Administrative Claim allowed on or prior to the Effective Date will receive payment in full in Cash no later than thirty (30) days after the Effective Date or as soon as reasonably practicable thereafter. Article II.A of the Plan generally provides that each Holder of Allowed Administrative Claims shall receive payment in full in Cash or such other treatment as to render such holders unimpaired. Finally, I understand that Allowed Priority Tax Claims will be treated in accordance with the requirements of the bankruptcy code. Accordingly, I believe that the Plan fully complies with and satisfies all of the requirements of section 1129(a)(9) of the bankruptcy code.

### 18. At Least One Impaired Class Voted to Accept the Plan — § 1129(a)(10).

57.     I understand that the bankruptcy code provides that, to the extent there is an impaired class of claims, at least one impaired class of claims must accept the plan "without including any acceptance of the plan by any insider," as an alternative to the requirement under section 1129(a)(8) of the bankruptcy code that each class of claims or interests must either accept the plan or be unimpaired under the plan.  I understand that the following Impaired Classes of Claims entitled to vote on the Plan—Classes 3, 4B, and 4C—voted to accept the Plan, independent of any insiders' votes.

### 19. The Plan is Feasible — § 1129(a)(11).

58.     As fulsomely discussed in Section V, *infra*, I understand that section 1129(a)(11) of the bankruptcy code requires a court to determine that a chapter 11 plan is feasible and that confirmation of such plan is not likely to be followed by the liquidation or further financial reorganization of the Debtors (or any successors thereto) unless such liquidation or reorganization is proposed in the Plan.  Provided that the Plan is confirmed as proposed, without material changes, I believe that consummation of either the Sale Transaction or the Liquidation Transaction is feasible, and I believe the Plan satisfies the feasibility requirements of section 1129(a)(11).

### 20. The Plan Provides for Payment of All Fees — § 1129(a)(12).

59.     I understand that section 1129(a)(12) of the bankruptcy code requires the payment of all fees payable under 28 U.S.C. § 1930.  Article XII.C of the Plan includes an express provision requiring payment of all fees in compliance with the bankruptcy code.  Accordingly, I believe the Plan satisfies the requirements of section 1129(a)(12) of the bankruptcy code.

### 21. The Plan Complies with Section 1129(a)(13) of the Bankruptcy Code.

60.     It is my understanding that section 1129(a)(13) of the bankruptcy code requires that any applicable retiree benefits will continue to be paid post effective date at the level established

by agreement or by court order pursuant to section 1114 of the bankruptcy code at any time prior to confirmation of the Plan, for the duration of the period which the debtor has obligated itself. I do not believe retiree benefits as defined by section 1129(a)(13) are implicated by the Plan.

### 22. Sections 1129(a)(14) through 1129(a)(16) of the Bankruptcy Code Do Not Apply to the Plan.

61.     Based on my knowledge of the Debtors' business and information provided by the Debtors' advisors, I believe that sections 1129(a)(14) through 1129(a)(16) of the bankruptcy code do not apply to the Plan because the Debtors are not subject to domestic support obligations, are not "individuals," and are not nonprofit corporations.

### 23. The Plan Complies with the Other Provisions of Section 1129 of the Bankruptcy Code.

#### i. The Cram Down Provisions are Appropriate — § 1129(b).

62.     I understand that if all applicable requirements of section 1129(a) of the bankruptcy code are satisfied, other than section 1129(a)(8), a plan may still be confirmed so long as the requirements set forth in section 1129(b) are satisfied. I believe that the Debtors satisfied all applicable requirements of section 1129(b) of the bankruptcy code as Impaired Classes 3, 4B, and 4C voted to accept the Plan, thus permitting the Debtors to "cram down" the Plan pursuant to section 1129(b) on any Class deemed to reject the Plan.

#### ii. Only One Plan Is Eligible to Be Confirmed — § 1129(c).

63.     I understand that section 1129(c) of the bankruptcy code prohibits the confirmation of multiple plans. Section 1129(c) of the bankruptcy code is not implicated here because there is only one proposed plan of reorganization.

#### iii. The Principal Purpose of the Plan Is Not the Avoidance of Taxes as Required Under Section 1129(d) of the Bankruptcy Code.

64.     The Plan was not filed for the purpose of avoidance of taxes or the application of section 5 of the Securities Act of 1933, as amended.  Rather, the Debtors filed the Plan to accomplish their objective of efficiently and responsibly effectuating distributions to creditors in the face of unprecedented economic circumstances in a developing market and consummating the most value-maximizing transaction available.  Moreover, I understand that no party that is a governmental unit, or any other entity, requested that the Bankruptcy Court decline to confirm the Plan on the grounds that the principal purpose of the Plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933.  Accordingly, I believe that the Debtors satisfied the requirements of section 1129(d) of the bankruptcy code.

### iv. Section 1129(e) of the Bankruptcy Code Is Inapplicable.

65.     Lastly, I understand that section 1129(e) of the bankruptcy code does not apply to the Plan because none of the Debtors' chapter 11 cases is a "small business case" within the meaning of the bankruptcy code.

## IV. Liquidation Analysis

66.     I performed the Liquidation Analysis to address the ability of the Sale Transaction or Liquidation Transaction to satisfy the "best interests of creditors" test as defined in section 1129(a)(7) of the bankruptcy code, which provides that holders of claims or interests in impaired, non-accepting classes must receive under a chapter 11 plan at least as much as they would in a liquidation.[8]

---

[8] The results of my Liquidation Analysis along with a summary of my assumptions were set forth as Exhibit B to the *Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and its Debtor Affiliates* [Docket No. 863]. In this Declaration, I discuss the Liquidation Analysis in detail.

67.     To prepare this Liquidation Analysis, and working with my team at BRG, the Debtors, and the Debtors' other advisors, along with the advisors to the Committee, I estimated proceeds, costs, and resulting recoveries in three separate scenarios: (1) consummation of the Sale Transaction; (2) consummation of the Liquidation Transaction; and (3) a chapter 7 liquidation. For the chapter 7 liquidation scenario, I estimated both a "high case" and a "low case." As discussed below, the primary difference between the high case and the low case is the estimated proceeds from liquidation of the coin portfolio, which is difficult to estimate given the nature of the cryptocurrency market but which will clearly be more challenging and less successful in the hypothetical chapter 7 scenario.

68.     With respect to the chapter 7 liquidation scenario, I assumed the Debtors would convert their current chapter 11 cases to cases under chapter 7 of the bankruptcy code on or about April 18, 2023 (the "Conversion Date"), absent confirmation of the Plan. I assumed that on the Conversion Date, the Bankruptcy Court would appoint a chapter 7 trustee ("Trustee"), and that the Trustee would immediately sell or surrender all of the Debtors' assets and the cash proceeds of those sales, net of the liquidation-related costs, would then be distributed to creditors in accordance with the applicable law.

69.     More specifically, in order to estimate the creditor recoveries in each scenario, I performed the following four steps:

(i)     **Step 1 - Estimated Gross Proceeds**

70.     For the chapter 7 liquidation scenario, I estimated the cash proceeds that the Trustee would generate if the Debtor's chapter 11 case were converted to a chapter 7 case and the assets of the Debtor's bankruptcy estate were liquidated.

25

71.     For the Sale Transaction and Liquidation Transaction scenarios, I estimated the proceeds that would be generated if each transaction were consummated. For the Sale Transaction scenario, I assumed the Plan would be confirmed on the same date as the hypothetical Conversion Date. I assumed the Liquidation Transaction would be consummated on a later schedule, with a date of June 18, 2023. This is because the Liquidation Transaction assumes that the parties to the Sale Transaction would work to close that deal until April 18, 2023, and the Debtors would toggle to the Liquidation Transaction only after they determined during the course of that process that the Sale Transaction would not produce the highest and best outcome for creditors. After that pivot, the Debtors would need additional time to ramp up vendors, internal infrastructure, and third-party developers necessary to support trading activity (as costs were reduced to the extent possible over the course of the case) and to sell unsupported coins into U.S. dollars in order to effectuate the self-liquidation contemplated in the Liquidation Transaction.

72.     The Debtors consist of three corporate entities, Voyager Digital Ltd. ("TopCo"); Voyager Digital Holdings, Inc. ("HoldCo"); and Voyager Digital, LLC ("OpCo"). The specific assets and claims discussed here originate from one of the three specific entities, which my analysis takes into account. However, for purposes of this discussion, I describe the analysis on a consolidated basis, referring to assets and liabilities belonging to the Debtors more generally.

73.     I calculated the Estimated Gross Proceeds based on the value of assets at each entity as of October 31, 2022[9]—the date of the most recent unaudited financial statements that were available for my analysis. The specific sources of proceeds I estimated are as follows:

74.     *Cash and Cash Equivalents.* I estimated Cash and Cash Equivalents by using the level of cash balance on hand on December 30, 2022, and projecting to the Conversion Date. I

---

[9] With the exception of Cash/Cash Equivalents and Coin Liquidation Value, discussed later.

26

assumed starting cash and cash equivalents to be the same under the chapter 7 liquidation, Sale Transaction, and Liquidation Transaction scenarios.

75.     *Coin Portfolio Liquidation.*   The vast majority of the assets held by the Debtors, from which the majority of proceeds would be generated, are in Voyager's coin portfolio.  That coin portfolio comprises 106 different types of cryptocurrencies.  I valued each cryptocurrency at its December 18, 2022, spot price. I then estimated how that spot price would be discounted due to certain risks discussed below. Given the volatility and ever-changing nature of the cryptocurrency market, the December 18, 2022, spot price is only illustrative, but it is instructive because it can be used to compare how any given spot price would move in a chapter 7 liquidation scenario, versus an organized and Debtor-led sale.



76.     The main reason why the spot price would be discounted under the Sale Transaction, Liquidation Transaction, or chapter 7 liquidation scenarios (but more so in the chapter 7 liquidation, as I discuss below) involves what I refer to as "market-depth constraints." A market-depth constraint refers to the fact that, where a particular token is subject to fewer transactions in the market, a mass sale of that cryptocurrency would "move the market"—that is, would result in a depreciation in cryptocurrency valuation at the time of that sale.  During a hypothetical liquidation, tokens with highly liquid markets, such as Bitcoin or Ethereum, would see less (but still some) market-depth constraint.  On the other hand, tokens in illiquid markets are anticipated to have greater market-depth constraints—that is, a mass sale would move the market more significantly.

27

77.     In addition to market-depth constraints, numerous other risk factors, which I detail

below, could also cause a discount against spot pricing.

78.     *Headline Risk.* Headline Risk refers to how the value of a coin can be influenced

by news and social media.  Given the youth of the cryptocurrency market, coin valuation can be

diminished by even unsubstantiated statements, including commentary regarding planned trades.

79.     *Black Swan Events*. Black Swan Events refer to unpredictable market events that

have severe downward consequences on cryptocurrency values.  Recent examples include the

AlamedaFTX collapse and the LUNA collapse.

80.     *Conditions of Cryptomarket/Volatility*. The cryptomarket itself has recently been

strained, both by mass liquidation events and the numerous cryptofirm bankruptcies.  These events

have removed liquidity from the market and created general uncertainty, exposing any

cryptocurrency sale to greater down-market risk.

81.     *Block Trading*. When engaging in block trades in less regulated markets, such as

cryptocurrencies, there are several risks including, but not limited to, the risk that a bad actor can

front-run a large trade and affect its outcome.

82.     *Number of Supporting Exchanges*.  Unlike more mature trade exchanges,

cryptocurrency platforms offer only discrete trading paths for particular coins.  This limits

exchange options, increasing the risk that a less favorable exchange will occur.

83.     *Asymmetric Information Issues*. Depending on what information is made publicly

available, individual traders could ascertain the Debtors' portfolio position.  If a position is

ascertained during the liquidation process, that trader could potentially drive pricing up or down

on particular coins to the Debtors' disadvantage.

28

84. *Conversion Factors*. In a liquidation event, all trades would be a particular coin for U.S. dollars. This conversion factor can be less favorable than other forms of exchanges (*e.g.*, exchanging of one token for another), and thus, could result in lower returns.

85. *Execution Capabilities*. The company and its experts better know the portfolio than a less familiar liquidator. Lack of expertise could result in sales that do not maximize trade value and result in price impairment.

86. I estimated the discounts from spot prices realistically but conservatively, both with respect to the discount arising from market-depth constraints and the discounts arising from the additional risk factors discussed above. Through discussions with Voyager management and trading experts, my team and I engaged in a multi-step empirical analysis and adopted a largely rules-based approach to estimating the discounts to apply to each of the 106 coin types and in each of the Sale Transaction, Liquidation Transaction, and chapter 7 liquidation scenarios.

87. Our analysis started with an empirical study to understand the market-depth constraints for each coin type. To estimate the discounts for each coin type, we collected historical trade volume data by coin for discreet periods (monthly, weekly, and daily) and compared that liquidity to the notional value of the coins held in Voyager's portfolio. Using a market-based set of rules,[10] I then bucketed coins into distinct categories of liquidity and applied discounts to those categories. I compared my findings against third-party portfolio bid data. Voyager, Moelis, and the Debtors' other advisors also reviewed the resulting analysis for reasonableness; any feedback was taken into consideration and integrated into the analysis where appropriate.

---

[10] Key statistics included: daily volume weighted average coin price; daily $ volume; daily coin volume; monthly average $ volume; monthly average coin volume; daily volatility in $ coin prices; monthly average volatility in $ coin pricing; average volume by coin.

88.     In the chapter 7 liquidation high-case, I concluded that the coin portfolio would be liquidated at an approximately 20% discount, with average trading fees of 2%.  In the chapter 7 liquidation low-case, I concluded that the coin portfolio would be liquidated at an approximately 26% discount, with the same average trading fees of 2%.  As stated, it is my opinion that both these estimates are conservative discounts.

89.     Because a chapter 7 liquidation would impose mass-sale conditions that could be avoided by both the Sale Transaction and Liquidation Transaction scenarios, these discounts are estimated to be materially greater than discounts under the Sale Transaction or Liquidation Transaction.

90.     *Sale Proceeds*. I estimated the sale proceeds of $20 million to occur only under the Sale Transaction, and not under the Liquidation Transaction or the chapter 7 liquidation scenario.

91.     *Other Assets and Investments*. I assumed that during the liquidation period, the Debtors would continue to consume certain prepaid expenses such as professional fee retainers, licenses, engineering, software, marketing, and other similar contractual obligations.  I also assumed that Debtors would sell their equity investments in other private and public companies, and I assumed recovery rates from 0% to 100% across these positions depending on the liquidity of that particular investment.  Recoveries on other assets and investments are identical in the high and low cases, approximating $1.8 million.

92.     *3AC Claims*. The Debtors have a claim against 3AC related to the cryptocurrency loan of 15,250 BTC and 350 million USDC made in 2022.  For purposes of this analysis, I did not make an assumption regarding recovery of this claim and thus it is reflected as 0% recovery in all scenarios.  For the avoidance of doubt, the Debtors and creditors are highly likely to see some 3AC recovery (although the magnitude is unclear at this point).  That recovery will likely be either the

same or lower in the hypothetical liquidation scenario (due to the need to take a discount in that scenario reflecting monetizing that asset earlier, paying fees to do so, or both).

93.     *Intangible Assets.* In the chapter 7 liquidation scenario, I assumed no recovery value for the Debtors' intellectual property, which comprises goodwill, favorable leasehold interests, trademarks, patents, license agreements, and e-commerce registered domain names.

94.     *Litigation Claims.* I excluded litigation claims, which (in a best-case scenario) would be the same under the Sale Transaction, Liquidation Transaction, and chapter 7 liquidation, and thus are not valuable for comparative purposes.  In all likelihood litigation claims would produce a lower recovery in a chapter 7 liquidation given the challenges in financing any such litigation and the likelihood that some litigation would not be pursued at all by a chapter 7 trustee.

(ii)    **Step 2 - Wind-Down Costs**

95.     I next analyzed the estimated costs of the liquidation or wind-down process.  I estimated these costs as follows.

96.     *Professional Fees.* I estimated professional fees, including costs for financial advisors, attorneys, and other professionals retained by the Debtors (in the Sale Transaction or Liquidation Transaction scenario) or the Trustee (in the chapter 7 liquidation scenario). I estimated these fees based on input from the Debtor's retained professionals and analysis of wind-down professional fees from comparable cases. Based on this analysis and previous experience, I estimated lower professional fees in the liquidation scenario (the same in high and low cases) because the Trustee team would be primarily responsible for execution of the wind down. However, given the novelty and complexity of the Debtor's business and the strong likelihood that the Trustee may have minimal cryptocurrency experience, I view this estimate of professional fees as conservative.

31

97.    *Chapter 7 Trustee Fees*.  In the chapter 7 liquidation scenario, I assumed the Trustee would recover a fee equaling 3% of the proceeds of sales excluding recoveries relating to cash and cash equivalents.  In the high case, this would result in an estimated $23.9 million fee; in the low case, $ 21.8 million.

98.    *Wind-Down Operating Costs*.  Winding down the business would require that the Debtors continue to employ key personnel and incur platform operating costs. I determined estimated wind-down operating costs based on discussions with management and analysis of historical operating costs. In the chapter 7 liquidation scenario, these costs would be the same in the high and low cases.

99.    *Other Costs.* The wind-down process would incur other miscellaneous expenses including insurance, document/data retention services, and third-party processing fees for the liquidation of accounts, all of which are assumed to be the same amounts in the Sale Transaction, Liquidation Transaction, and chapter 7 liquidation (high and low) scenarios. The Sale Transaction and Liquidation Transaction scenarios include additional costs in this category, including cure costs for outstanding contract obligations, and a wind-down reserve for unforeseen additional costs.

100.    In sum, for the purposes of this analysis, I estimated total wind down expenses of $75.6 million for the Sale Transaction and Liquidation Transaction and $51.7 million for the chapter 7 high and low scenarios (net of estimated U.S. Trustee fees).

(iii)    **Step 3 - Net Proceeds**

101.    I calculated the Net Proceeds available for distribution by subtracting the Wind-Down Costs from the Estimated Gross Proceeds for each of the scenarios.

(iv)    **Step 4 - Distribution of Net Proceeds**

32

102.     Finally, I estimated the recoveries to creditors at each of the Debtors by running the
Net Proceeds and estimated claims as of the Petition Date through a waterfall recovery model,
which pays claims based on priority until fulfilled, and then "waterfalls" to the next lower priority
claim, until all proceeds are depleted. The distributions to creditors in my analysis reflects
bankruptcy code section 1129's "absolute priority rule" that no junior creditor at a given entity
would receive any distribution until all senior creditors are paid in full at that entity, and no equity
holder would receive any distribution until all creditors at such entity are paid in full.

103.     More specifically, the Net Proceeds would be distributed as follows:

(a)     *Secured Tax Claims*.  Based on the December 6, 2022 claims register, there
are no identified Secured Tax Claims.  My analysis thus assumes zero
payment.  That said, if any are later revealed, a 100% recovery is expected.

(b)     *Administrative, Priority Tax Claims and other Priority Claims*.

(i)     *Administrative Claims*.  Administrative Claims include unpaid-post-
petition accounts payable, accrued operating expenses, unpaid post-petition
taxes, and chapter 11 professional fees incurred through the Conversion
Date. On the Conversion Date, these are anticipated to be approximately
$39.1 million and are the same in the Sale Transaction, Liquidation
Transaction, and chapter 7 liquidation scenarios.

(ii)     *Priority Tax Claims*.  Federal and state tax claims are estimated to
be $3.0 million in all three scenarios.

(iii)     *Other Priority Claims*. Other Priority Claims, namely potential
claims by government agencies, are estimated to be $1.0 million in all three
scenarios.

33

    (c)    *Unsecured Claims: Account Holder Claims and General Unsecured Claims.*

    (i)    Account Holder Claims are estimated to be approximately $1.764 billion as of the Conversion Date in all three scenarios based on the number of customer coins and coin prices as of the Petition Date.

    (ii)    Based on the December 6, 2022 claims register, General Unsecured Claims are estimated to total approximately $25.3 million on the Conversion Date, in all three scenarios.

    (iii)    The remainder of the Debtors' funds would be distributed pro rata across the Account Holder Claims and General Unsecured Claims, as illustrated below.[11]

| | Claims All Scenarios 4/18/2023 | Binance Plan 4/18/2023 | Recovery | Toggle Plan 6/18/2023 | Recovery | High Case Liquidation 4/18/2023 | Recovery | Low Case Liquidation 4/18/2023 | Recovery |
|---|---|---|---|---|---|---|---|---|---|
| **Voyager Digital Consolidated** | | | | | | | | | |
| TOTAL ESTIMATED PROCEEDS (NET) | | 935.7 | | 841.6 | | 726.2 | | 661.4 | |
| Administrative Claims | 39.1 | 39.1 | 100% | 39.1 | 100% | 39.1 | 100% | 39.1 | 100% |
| Priority Tax Claims | 3.0 | 3.0 | 100% | 3.0 | 100% | 1.1 | 36% | 1.0 | 35% |
| Secured Tax Claims | - | - | 0% | - | 0% | - | 0% | - | 0% |
| Other Priority Claims | 1.0 | 1.0 | 100% | 1.0 | 100% | 1.0 | 99% | 1.0 | 99% |
| Account Holder Claims | 1,763.8 | 883.0 | 50% | 789.5 | 45% | 678.1 | 38% | 613.8 | 35% |
| OpCo General Unsecured Claims | 14.0 | 7.0 | 50% | 6.3 | 45% | 5.4 | 38% | 4.9 | 35% |
| HoldCo General Unsecured Claims | 8.3 | 0.9 | 11% | 0.9 | 11% | - | 0% | - | 0% |
| TopCo General Unsecured Claims | 3.0 | 1.7 | 58% | 1.7 | 58% | 1.6 | 53% | 1.6 | 52% |
| Alameda Loan Facility Claims | 75.1 | - | 0% | - | 0% | - | 0% | - | 0% |
| Section 510(b) Claims | - | - | 0% | - | 0% | - | 0% | - | 0% |
| Intercompany Claims | - | - | 0% | - | 0% | - | 0% | - | 0% |
| Intercompany Interests | - | - | 0% | - | 0% | - | 0% | - | 0% |
| Existing Equity Interests | - | - | 0% | - | 0% | - | 0% | - | 0% |
| **TOTAL RECOVERIES** | **1,907.3** | **935.7** | **49%** | **841.6** | **44%** | **726.2** | **38%** | **661.4** | **35%** |

---

[11] Recoveries in Table reflect updated estimates for wind down costs in all scenarios, including costs for the shuttering of foreign entities, additional severance and incremental operating costs, for a total of $8.2M in incremental costs, as reflected in the *Second Amended Plan Supplement* [Docket No. 1006], filed after my Liquidation Analysis provided as Exhibit B to the *Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and its Debtor Affiliates* [Docket No. 863]. Any litigation fund reserves are assumed to recover at minimum the funds utilized to pursue the recoveries.

(d)     *Alameda Loan Facility Claims.*     Alameda Loan Facility Claims are
estimated to be approximately $75.1 million as of the Conversion Date. The
analysis assumes that such claims would be equitably subordinated.
Because there would be no remaining funds after distributing funds for
Account Holder Claims and General Unsecured Claims, the Alameda Loan
Facility Claims Holder would recover nothing.

104.    Based on the above steps, and as illustrated in the chart above, under both the high
and low case, a chapter 7 liquidation results in lower recoveries than either the Sale Transaction
or Liquidation Transaction.  A chapter 7 liquidation would result in inferior recoveries for holders
of Other Priority Claims, Account Holder Claims, and General Unsecured Claims. Taking all
creditor claims together, the Sale Transaction and Liquidation Transaction scenarios provide
higher blended recovery rates than a chapter 7 liquidation.

105.    Accordingly, it is my opinion that confirmation of the Sale Transaction or
Liquidation Transaction will provide creditors with a recovery that is greater than or equal to what
they would otherwise receive in connection with a liquidation of the Debtors under chapter 7 of
the bankruptcy code. Moreover, I believe creditors will receive more value under confirmation of
the Plan, including either the Sale Transaction or Liquidation Transaction, as compared to under a
chapter 7 liquidation for additional reasons. First, I understand that conversion to a chapter 7
liquidation would require entry of a new bar date. Accordingly, the amount of Claims ultimately
filed and allowed against the Debtors could materially increase, thereby further reducing creditor
recoveries versus those available under the Sale Transaction or Liquidation Transaction. Second,
and relatedly, I understand that conversion to a chapter 7 liquidation will result in significantly

delayed recoveries to creditors, versus under confirmation of the Plan, where the Debtors stand ready to consummate a value-maximizing transaction and return cryptocurrency in the near term.

## V.   Plan Feasibility

106.   I understand that section 1129(a)(11) of the bankruptcy code requires a court to determine that a chapter 11 plan is feasible and that confirmation of such plan is not likely to be followed by the liquidation or further financial reorganization of the Debtors (or any successors thereto) unless such liquidation or reorganization is proposed in the plan.

107.   For the reasons outlined below, it is my professional opinion that the Plan is feasible and is not likely to be followed by liquidation or further financial reorganization as contemplated by the Plan.

108.   The Sale Transaction is the culmination of a multi-month marketing process to identify the best possible path forward for the Debtors' creditors.  I was intimately involved, along with the Debtors' other advisors and the management team and working closely with the Committee, in the Debtors' marketing process and the negotiations that, ultimately, led to execution of the Asset Purchase Agreement and development of the Plan.  The Plan maximizes the value of the Debtors' estates, and the proceeds obtained from the Sale Transaction will allow the Debtors to satisfy all Priority and Administrative Claims under the Plan in full.  Further, as the Sale Transaction contemplates a sale of substantially all assets of the Debtors to Binance.US and the subsequent wind-down of the Debtors' estates, I do not believe that consummation of the Sale Transaction will be followed by a liquidation or further reorganization of the Debtors.

109.   As demonstrated in my Liquidation Analysis, the Sale Transaction maximizes the value of the Debtors' estate and will allow the Debtors to satisfy their obligations under the Plan, including satisfying all Priority and Administrative Claims under the Plan in full, and maximizing

recovery to remaining creditors. In addition, the Plan provides customers the most tax efficient route forward as Binance.US supports (or will support) 100% of the cryptocurrency coins on the Debtors' platform.

110. Moreover, if the Sale Transaction cannot be consummated or if the Debtors conclude in their good faith judgment that the Sale Transaction will not produce a value-maximizing outcome for creditors, the Debtors will pursue the Liquidation Transaction and consummate a self-liquidation. I believe that provided the Plan is confirmed without material changes and the strategy set forth in the Plan is pursued in full by the Wind Down Trustee, the Liquidation Transaction is feasible, and that the Debtors will be able to distribute their cryptocurrency assets to customers (i) on a faster timeline than a chapter 7 liquidation and (ii) on a much more cost-effective basis, as the Debtors will not incur the additional administrative costs associated with a chapter 7 liquidation and subsequent distribution or the price leakage associated with a mass-sale event that I describe in my Liquidation Analysis. As I demonstrate in the Liquidation Analysis, in the event that the Debtors' pursue the Liquidation Transaction, I believe that the Debtors will be able to pay all Administrative and Priority Claims in full and satisfy all other obligations under the bankruptcy code.

111. To do this, however, it is necessary that the Debtors maintain the staffing levels and internal expertise necessary to execute both the Sale Transaction and the Liquidation Transaction. The Binance.US Asset Purchase Agreement imposes a number of obligations on the Debtors that will require the services of employees in operations, customer service, engineering, security, finance, and data to fulfill these obligations. Specifically, after the Binance.US Transaction closes, the Debtors retain obligations related to: (a) making regulatory filings and cooperating with regulators; (b) maintaining and transferring data securely; (c) developing and implementing a user

migration plan involving modifications to Voyager's web interface and mobile app, and an electronic process facilitating the acceptance of certain terms and conditions on the Binance.US Platform; (d) being available for a period following close of the Sale Transaction to provide assistance reasonably requested by the Purchaser in connection with the opening of user accounts and transfer of information and Cryptocurrency; (e) rebalancing the Cryptocurrency on the Debtors' platform to prepare for closing of the Sale Transaction on a timely basis; (f) "unstaking" certain coins and ensuring they are freely transferable and not subject to restrictions, and (g) making available technical IT staff to assist Binance.US during the transaction.[12]

112.    The Debtors also must have certain expertise present (as a practical matter) only within certain existing employees in the event the Debtors need to pivot to the Liquidation Transaction. The Liquidation Transaction would require the Debtors to, among other tasks, rebalance the Cryptocurrency in their possession, complete anti-money laundering and know-your-customer compliances and reopen the Debtors' platform for a period of time to permit customers to withdraw Cryptocurrency, while making sure that these transactions can all occur safely, securely and efficiently, with minimum value leakage and risk given the highly sensitive nature of these transactions.  This exercise will be challenging and, without certain key employees who are currently working for the Debtors, likely cannot be done without assuming materially greater risk than we would recommend the Debtors taking.

113.    It is for that reason that a key component of the Debtors' proposed Plan, which was created with input from the Committee, is the Employee Transition Plan, which is described in the Plan Supplement and is accounted for in the Wind-Down Budget.  The personnel responsible for executing the proposed Plan have no incentives to remain associated with the company and

---

[12] Asset Purchase Agreement §§ 6.4, 6.6, 6.10, 6.11, 6.15, 6.16.

complete this work following confirmation given that the Debtors will not exist at the end of the process and they will need to find other jobs. The Employee Transition Plan was created (and approved by the Committee) to ensure the expertise needed to execute the Sale Transaction and the Liquidation Transaction stays with the enterprise in order to complete the process of returning cryptocurrency to customers in the most efficient way possible. Without the employees, however, the Debtors would be unable to honor their obligations in the Sale Transaction and would not be able to do the work needed to consummate the Liquidation Transaction and the likely only option would be conversion to a full liquidation under chapter 7 of the bankruptcy code, which as discussed above in the Liquidation Analysis, would materially reduce and delay customer recoveries. In other words, my opinions with respect to feasibility are informed in part by the fact that the Debtors have taken steps to ensure that the experience and expertise necessary to execute the Sale Transaction and/or the Liquidation Transaction will remain in place until the process runs its course, and the Committee and its advisors have recognized the necessity of the Employee Transition Plan for that to happen.

## VI.   The Releases and Exculpations In the Plan Are Reasonable and Appropriate.

114.    It is my understanding that the Plan contemplates releases of the Debtors' potential claims, subject to the terms of the D&O Settlement, of their directors, officers, and employees who have worked during the course of these chapter 11 cases. For the avoidance of doubt, these debtor releases are of potential ***Debtor*** claims, and do not have any impact on any direct claims that any customer or other third party may have (if any) against any of the directors, officers, and employees.

115.    Given my close involvement with these individuals, I have a firsthand understanding of their involvement and "sweat equity" contributions made to the Debtors and their

estates during the entirety of these chapter 11 cases.  I also know full well the contributions that

we will need those individuals to continue to make as we Wind-Down the estate and return funds

to customers.  It would be massively value-destructive and not helpful to the process, and would

ultimately lead to less value to creditors, if the Debtors and/or the Wind-Down Estate were to

spend capital pursuing such claims that are covered by the Debtor releases.  And it is critical to the

delicate process envisioned by the Plan for those Debtor releases to go into effect.  Again, this has

no impact whatsoever on any direct claims creditors and parties-in-interest may have against

Released Parties, but as far as the Debtors' releases go, I believe such releases are appropriate.

## VII.    Appointment of a Trustee Is Not Warranted In These Chapter 11 Cases.

116.    I understand that certain creditors have sought to appoint a trustee in these chapter

11 cases.  As an industry professional for over 25 years, I can state with certainty that appointment

of a trustee would be an unmitigated disaster.  There is no benefit at all to appointing a trustee and

unwinding the significant work and progress made to date by the Debtors in these chapter 11 cases.

As described herein, my team and I have worked intimately with the Debtors and their management

team, as well as the Debtors' advisors and the advisors to the UCC, and all appear aware of the

significant progress and achievements obtained during these chapter 11 cases to date.  No trustee

could realistically displace management and execute on any of the transactions contemplated by

the Plan (or any comparable transaction), and the only realistic outcome from a trustee's

appointment would be a chapter 7 liquidation in which creditor recoveries would be materially

reduced and materially delayed.  It is my professional opinion that appointing a trustee at this time

would be wholly inappropriate given that the Debtors have completed solicitation and are already

before the Court seeking confirmation of the Plan to move forward with the transactions

contemplated thereunder that provide distributions to Holders of Claims.

**VIII.  The Plan Provides Recovery Options for Creditors in Unsupported Jurisdictions.**

117.    I am aware that Binance.US does not yet have the requisite money transmitter licensing approvals, authorizations, or exemptions (as applicable) in Hawaii, New York, Texas, and Vermont (the "Unsupported Jurisdictions") and understand that, as a result, it will be unable to make cash or cryptocurrency distributions to creditors in those states on the Effective Date of the Plan unless some or all of the Unsupported Jurisdictions choose to follow the lead of the other 46 states and permit Binance.US to make such distributions.  Due to the legal, operational, and technical limitations, set forth below, if the Binance.US Transaction is approved, the Debtors will not be able to distribute cryptocurrency themselves to creditors in Unsupported Jurisdictions.

118.    *First*, the Voyager platform that would be required to facilitate in-kind distributions to creditors is being sold to Binance.US in connection with the transaction.  This means that any in-kind distributions to creditors in Unsupported Jurisdictions would need to be done manually on a transaction-by-transaction basis for approximately 120,000 creditors.  My understanding is that not only would manual distributions outside the Voyager platform be extremely complex, but the Debtors do not have the necessary infrastructure or personnel to accomplish this in a safe and secure manner.

119.    *Second*, my understanding is that there are risks associated with the Debtors' distribution of cryptocurrency to individual creditor wallets as opposed to effectuating such distributions through the Binance.US platform.  The Debtors must comply with AML/KYC laws when sending cryptocurrency to individual wallets.  Historically, the Debtors used Chainanalysis for automated verification of certain user generated cryptocurrency transfer requests.  However, Chainanalysis does not support all of the tokens listed on the Voyager platform.  I have been advised that AML/KYC compliance is straightforward when transferring cryptocurrency to

Binance.US wallets, but it poses substantial risk to the Debtors as it relates to the manual transfer of cryptocurrency to individual wallets for approximately 120,000 creditors. Binance.US has represented to the Debtors that it has existing infrastructure in place that would allow it to perform AML/KYC compliance checks in connection with transferring all cryptocurrency to customer accounts on its platform. Unlike ACH transfers that can be reversed, cryptocurrency sent to the wrong wallet cannot, which is why parties will often send a small "test" transaction to a wallet address prior to initiating a large transfer.

120.    *Third*, there are technical limitations that would prevent the Debtors from making in-kind distributions of certain types of cryptocurrency on the Debtors' platform. There are 35 cryptocurrency tokens (approximately 17% of the Debtors' cryptocurrency portfolio based on equivalent USD value) on the Debtors' platform that cannot be transferred directly to individual wallets due to technical limitations associated with the Debtors' platform. Users can, however, withdraw these tokens using certain third-party exchanges (such as Binance.US). Historically, users of the Debtors' platform have exited from their positions in such tokens by selling such tokens for cash, transactions that previously required close interaction with market makers to effectuate. The only way for the Debtors to distribute the value associated with these non-transferable tokens to creditors in Unsupported Jurisdictions other than through the Binance.US transaction is to liquidate the tokens and distribute the resulting cash.

121.    *Finally*, the Debtors would need to significantly increase the engineering, regulatory, compliance, and other operational staff contemplated under the Plan to facilitate manual transfers to individual customer wallets that they otherwise would not have to do if transfers to customers were made through the Binance.US platform or the Voyager platform (which is being sold to Binance). The Debtors would also need to revive certain dormant contracts

with third-party vendors to process distributions to creditors in this manner. This would result in increased administrative costs as compared to the costs of liquidating the cryptocurrency associated with creditors in Unsupported Jurisdictions and distributing the equivalent value in cash.

122.    In light of these challenges, for creditors in the Unsupported Jurisdictions, the Debtors will retain custody of the cryptocurrency that would be distributed to those creditors until Binance.US obtains the necessary approvals. In the event that Binance.US is unable to obtain those necessary approvals to make distributions to creditors in Unsupported Jurisdictions within six months following the closing (*i.e.*, an incremental three months following distributions to creditors in other jurisdictions), it is my understanding that the Plan calls for the Debtors to convert the cryptocurrency attributable to such creditors to cash and distribute the equivalent realized cash value associated with such liquidations to such creditors. It is my understanding that Binance.US shall have the opportunity to execute in such conversion transactions subject to the agreed-upon protocol between the Debtors and Binance.US set forth in the Binance.US Purchase Agreement. If, however, Binance.US is able to obtain the necessary approvals within that six-month period, Binance.US would make in kind distributions to the creditors in newly approved jurisdictions.

123.    It is also my understanding that the Unsupported Jurisdictions can provide temporary solutions to allow Binance.US to make distributions in kind to creditors. The Debtors do not believe it would be appropriate to jeopardize the Binance.US Transaction—which is in the best interests of their estates as a whole—or take on significant additional risks and costs to endeavor to give in-kind distributions to creditors in Unsupported Jurisdictions if the state banking departments choose not to provide such temporary solutions.

## IX.    The Plan Modifications Are Reasonable, Do Not Require Resolicitation, and Should Be Approved.

124.    I understand that section 1127(a) of the bankruptcy code provides that a plan proponent may modify its plan at any time before confirmation as long as such modified plan meets the requirements of sections 1122 and 1123 of the bankruptcy code.  I have also been advised that under section 1125 of the bankruptcy code, a proposed modification to a previously accepted plan will be deemed accepted where the proposed modification is not material or does not adversely affect the way creditors and stakeholders are treated, unless such affected creditors consent to the treatment.

## X.    Conclusion

125.    In summary, it is my opinion that the Plan satisfies the standards for confirmation applicable under the bankruptcy code.   Among other things, the Sale Transaction or the Liquidation Transaction will provide all holders of claims and interests with a recovery (if any) that is not less than what such holders would receive pursuant to a hypothetical liquidation of the Debtors under chapter 7 of the bankruptcy code.  And given the optionality created by the Plan, it is my opinion that the Plan (provided it is confirmed without material changes and is executed as anticipated) is feasible and will not result in additional liquidation or financial restructuring beyond that contemplated in the Plan.  Finally, as described above, appointment of a trustee in these chapter 11 cases is not warranted.

*[Remainder of page intentionally left blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct to the best of my knowledge, information, and belief.

Dated: February 28, 2023          /s/ *Mark A. Renzi*
Boston, Massachusetts             Mark A. Renzi
                                  Managing Director
                                  Berkley Research Group, LLC