# Exhibit 8

```
                                                         Page 1

 1   UNITED STATES BANKRUPTCY COURT

 2   SOUTHERN DISTRICT OF NEW YORK

 3   Case No. 22-10943-mew

 4   Adv. Case No. 22-01133-mew

 5   - - - - - - - - - - - - - - - - - - - - - - - - - - x

 6   In the Matter of:

 7   VOYAGER DIGITAL HOLDINGS,

 8             Debtor.

 9   - - - - - - - - - - - - - - - - - - - - - - - - - - x

10   VOYAGER DIGITAL HOLDINGS, INC.,

11                  Plaintiff,

12          v.

13   DESOUSA,

14                  Defendant.

15   - - - - - - - - - - - - - - - - - - - - - - - - - - x

16   Adv. Case No. 22-01170-mew

17   - - - - - - - - - - - - - - - - - - - - - - - - - - x

18   THE AD HOC GROUP OF EQUITY INTEREST HOLDERS OF VOYAGER OF

19   VOYAGER DIGITAL LTD.,

20                  Plaintiff,

21          v.

22   VOYAGER DIGITAL HOLDINGS, INC., et al.,

23                  Defendants.

24   - - - - - - - - - - - - - - - - - - - - - - - - - - x

25
```

1           United States Bankruptcy Court

2           One Bowling Green

3           New York, NY  10004

4

5           March 2, 2023

6           9:58 AM

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21  B E F O R E :

22  HON MICHAEL E. WILES

23  U.S. BANKRUPTCY JUDGE

24

25  ECRO:  JONATHAN

Page 3

1    HEARING re Adversary proceeding: 22-01133-mew Voyager

2    Digital Holdings, Inc. v. De Sousa Motion to extend

3    automatic stay or, in the alternative, for injunctive relief

4    enjoining prosecution of certain pending litigation against

5    the debtors, directors and officers

6

7    HEARING re Adversary proceeding: 22-01170-mew The Ad Hoc

8    Group of Equity Interest Holders

9    of Voy v. Voyager Digital Holdings, Inc. et al

10

11    HEARING re Pre-trial Conference

12

13    HEARING re Motion to hold the directors personally liable

14

15    HEARING re Joinder to motion by David Stephenson

16

17    HEARING re Objection of the Official Committee of Unsecured

18    Creditors to proofs of claim nos. 11206, 11209 and 11213

19

20    HEARING re Motion for an equity committee

21

22    HEARING re Joinder to motion by David Stephenson

23

24    HEARING re Motions by Alah Shehadeh

25    Transcribed by:  Sonya Ledanski Hyde

Page 4

```
1   A P P E A R A N C E S :

2

3   KIRKLAND & ELLIS LLP

4        Attorneys for the Debtors

5        601 Lexington Avenue

6        New York, NY 10022

7

8   BY:  CHRISTINE OKIKE

9        MIKE SLADE

10

11  SECURITIES AND EXCHANGE COMMISSION

12       Attorneys for the Securities and Exchange Commission

13       950 East Paces Ferry Road, N.E., Suite 900

14       Atlanta, GA 30326

15

16  BY:  WILLIAM MATTHEW UPTEGROVE

17

18  SECURITIES AND EXCHANGE COMMISSION

19       Attorneys for the Securities and Exchange Commission

20       100 F Street, NE

21       Washington, DC 20549

22

23  BY:  THERESE SCHEUER

24

25
```

Page 5

1   UNITED STATES DEPARTMENT OF JUSTICE

2        Attorneys for the U.S. Trustee

3        One Bowling Greet, Room 534

4        New York, NY 10004

5

6   BY:  RICHARD C. MORRISSEY

7

8   TEXAS OFFICE OF ATTORNEY GENERAL

9        Attorneys for TX State Securities

10       Board TX Dept. of Banking

11       300 W. 15th Street

12       Austin, TX 78701

13

14  BY:  ABIGAIL RYAN

15

16  NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES

17       Attorneys for the New York State Department

18       One State Street, 20th Floor

19       New York, NY 10004

20

21  BY:  JASON DAVID ST. JOHN

22

23

24

25

Page 6

1   UNITED STATES DEPARTMENT OF JUSTICE

2        Attorneys for the U.S. Trustee

3        Alexander Hamilton Custom House

4        New York, NY 10004

5

6   BY:  MARK BRUH

7

8   QUINN EMANUEL URQUHART SULLIVAN HEARING OFFICER PARIS

9        Attorneys for Special Committee

10       51 Madison Avenue

11       New York, NY 10010

12

13  BY:  SUSHEEL KIRPALANI

14

15  MCDERMOTT, WILL & EMERY

16       Attorneys for Special Committee

17       One Vanderbilt Avenue

18       New York, NY 10017

19

20  BY:  JOHN CALANDRA

21

22  TRACY HENDERSHOTT

23       Pro Se Creditor

24

25

1    MICHELLE DIVITA

2          Pro Se Creditor

3

4    GINA DIRESTA

5          Pro Se Creditor

6

7    JON WARREN

8          Pro Se Creditor

9

10   DANIEL NEWSOM

11          Pro Se Creditor

12

13   ALAH SHEHADEH

14          Pro Se Creditor

15

16   SETH JONES

17          Pro Se Creditor

18

19   STACEY COWEN

20          Pro Se Creditor

21

22

23

24

25

Page 8

```
 1                      I N D E X

 2

 3    WITNESSES:           DIRECT:    CROSS:    REDIRECT: RECROSS:

 4

 5    MARK RENZI           53

 6                                    70, 88

 7                                    90, 101

 8                                    112, 129

 9                                    141, 154

10                                    159, 189

11                                    204, 212

12

13    TIM POHL             221

14                                    238, 246

15                                    248, 254

16                                    279, 280

17                                    297, 311

18                                    312, 313

19

20    EXHIBITS:                                        PAGE:

21    12   Order Scheduling Hearing with Disclosure

22         Statement, Docket 861                        78

23    13   Disclosure Statement, Docket 863             78

24

25
```

Page 9

1                    P R O C E E D I N G S

2              THE COURT:  Sorry for the delay.

3              MS. OKIKE:  Good morning, Your Honor.  Christine

4    Okike of Kirkland & Ellis on behalf of the Debtors.

5              THE COURT:  Good morning.

6              MS. OKIKE:  Your Honor, I'm pleased to be before

7    you on behalf of Voyager seeking confirmation of its Chapter

8    11 plan.  Just as a matter of process, Your Honor, with the

9    Court's permission, I'd like to lay out how we'd like to

10   proceed today.

11             We propose starting with plan confirmation,

12   followed by the various motions filed by pro se creditors,

13   and Your Honor, in terms of the combined hearing I'd like to

14   make a few opening remarks if you permit me and will save

15   time for both the legal argument after presenting evidence.

16             THE COURT:  Okay.

17             MS. OKIKE:  After opening remarks, I propose then

18   to move to the evidence.  We would seek to admit the four

19   declarations we filed in support of confirmation of the plan

20   and will offer up the witnesses for cross and then we would

21   move into argument if that's okay with Your Honor.

22             THE COURT:  Okay.  I have a number of questions

23   for the parties and the objectors before we have evidence,

24   just to clarify what it is we are going to need evidence on

25   so that we're -- make sure that to the extent we need

Page 10

1    evidence, we get it.  I also think before we do anything

2    else, I do have a pending motion for me to recuse myself.  I

3    ought to deal with that first, I think.

4                MS. OKIKE:  Understood, Your Honor.

5                THE COURT:  Is Mr. Shehadeh on the phone?

6                All right.  He doesn't appear to be on the phone.

7    I've reviewed the motion which essentially says somewhat

8    correctly as a legal matter that if I have some reason that

9    gives rise to bias or lack of impartiality on my part that I

10   should recuse myself.  I don't disagree with that legal

11   principle, but I don't believe that I have anything that

12   amounts to bias or a lack of impartiality in dealing with

13   this matter.

14               I understand Mr. Shehadeh is unhappy with one or

15   maybe more of my prior rulings in the case, but that's not

16   an indication of bias or lack of impartiality.  So I'll deny

17   the motion to recuse myself and we can proceed with the rest

18   of the hearing.

19               MS. OKIKE:  Thank you, Your Honor.  Your Honor,

20   I'd just like to highlight a few points at the outset.  Your

21   Honor, the plan has garnered overwhelming support from all

22   of the voting classes.  Customers voted to approve the plan

23   with 97 percent in number or 59,183 customers out of 61,300

24   customers voting and 98 percent in amount representing

25   approximately 541 million out of 552 million of those

Page 11

1    actually voting.

2          And the plan has the support of the Committee of

3    Unsecured Creditors.  General Unsecured Creditors also voted

4    overwhelmingly to accept the plan with approximately 75

5    percent in number and 100 percent in amount of OpCo general

6    unsecured claims, approximately 80 percent in number and 100

7    percent in amount of HoldCo general unsecured claims and

8    approximately 90 percent in number and 100 percent in amount

9    of TopCo general unsecured claims actually voting, voting in

10   favor.

11         Your Honor, the estimated recoveries are detailed

12   in the disclosure statement which was based off of crypto

13   prices as of December 19th, 2022, and the value of the

14   Debtors' crypto portfolio has increased significantly since

15   that time.  As of February 27th, we anticipate that

16   customers will receive an estimated 73 percent recovery

17   under the sale transaction before accounting for any

18   recoveries on account of valuable claims that will remain

19   with the estate including claims against 3AC, Alameda, and

20   FTX.

21         THE COURT:  And if Alameda and FTX were to succeed

22   on their preference, what would the recovery be?

23         MS. OKIKE:  Your Honor, if Alameda, FTX were to

24   succeed on their preference, the recovery would be reduced,

25   I believe to 48 percent under the sale transaction.

Page 12

1            THE COURT:  Am I remembering right that that's --

2            MS. OKIKE:  And Your Honor, that --

3            THE COURT:  That's higher than what you projected

4    as the recovery originally --

5            MS. OKIKE:  We projected 51 percent under the

6    disclosure statement.

7            THE COURT:  Okay.

8            MS. OKIKE:  We also obviously have cross claims

9    against Alameda and release --

10           THE COURT:  Right.

11           MS. OKIKE:  -- substantial amount of collateral in

12   connection with the repayment of those loans, and so we

13   don't believe the full amount, even if they were successful,

14   would be an administrative claim.

15           THE COURT:  I understand.  Okay, sorry, I

16   interrupted you.

17           MS. OKIKE:  No.  So Your Honor, there's almost

18   $1.4 billion of value that is proposed to be distributed

19   under the Debtors' plan and there is much at stake for the

20   company and their customers today.  Your Honor, our

21   understanding for Binance.US is that over 167,000 customers

22   which represent approximately 75 percent of the value on the

23   Debtors' platform have already signed up for the Binance.US

24   platform, representing approximately 1.2 billion in customer

25   claims.

1            Your Honor, we understand there has been a lot of

2      frustration expressed by a handful of customers, but having

3      lived with the company through this process, I can tell you

4      that the management team and employees have steadfastly

5      sought to do right by customers throughout these cases.

6      Your Honor, I won't recite the past but suffice it to say

7      that the Debtors were poised to exit Chapter 11 and

8      distribute value to stakeholders in early December, just

9      five months after commencing these cases, before FTX's

10     catastrophic collapse.

11           While we were shocked to witness FTX's collapse

12     and to subsequently learn that FTX appears to have been a

13     massive fraud, the Debtors and their advisors quickly

14     pivoted to evaluate alternative third-party transactions as

15     well as the liquidation transaction whereby the Debtors

16     would distribute crypto and cash to creditors on their own.

17           We spent about a month negotiating with parties

18     who expressed interest in the Debtors' assets and ultimately

19     determined that the bid put forth by BAM Trading Services

20     Inc. or Biance.US represented the best path forward to

21     maximize value.  Your Honor, the Debtors' value the sale

22     transaction as of February 27th at approximately $1.363

23     billion, which is comprised of $1.34 billion of

24     cryptocurrency on the Debtors' platform plus an additional

25     $20 million of up-front consideration paid by Binance.US.

```
 1              Your Honor, the Debtors believe that the sale
 2      transaction provides the most value currently available for
 3      the Debtors' assets and ultimately their stakeholders and
 4      the fastest route to distributing such value to customers.
 5      The sale transaction also provides the most tax efficient
 6      path forward as Binance.US will enable users to access 100
 7      percent of cryptocurrency coins on the Debtors' platform.
 8              It includes the reimbursement by Binance.US of up
 9      to 15 million of the Debtors' expenses in certain
10      circumstances and provides a 10 million reverse termination
11      fee payable to the Debtors by Binance.US to compensate the
12      Debtors' estates in the event they cannot consummate the
13      transaction.  The sale transaction also provides for certain
14      other protections which are designed to minimize risk and to
15      protect customer distributions.
16              Your Honor, the sale transaction will effectuate
17      the expeditious sale of the Debtors' customer accounts to
18      Binance.US, provide a meaningful in-kind recovery to
19      creditors on the shortest timeline practical, and allow for
20      an efficient resolution to these Chapter 11 cases.
21      Following consummations of the sale transaction, the plan
22      provides for the orderly winddown of the debtor's estates.
23      Importantly, Your Honor, the plan allows the Debtors to
24      toggle to the liquidation transaction if the Debtors
25      determine in their business judgment that the sale
```

Page 15

```
 1    transaction no longer is the best option.

 2            Your Honor, the plan is a significant achievement.

 3    It consensually resolves a number of highly complex issues

 4    in a manner that is overwhelmingly supported by the voting

 5    classes.  The plan is in the best interests of the Debtors'

 6    estates, is the best alternative for stakeholders, and

 7    should be confirmed.

 8            Your Honor, we believe we have resolved the

 9    objections of the FTC, the Ad Hoc Group of Equity Holders,

10    and the Bank of New York Mellon.  Only eight customers out

11    of more than one million and whose claims in aggregate total

12    approximately 500,000, objected to the plan and we will

13    address those objections in turn, but our view is that they

14    do not present obstacles to confirmation.

15            The remaining objections, Your Honor, are the SEC,

16    New York, Texas, New Jersey, and the U.S. Trustee.  Your

17    Honor, it's pretty unusual in my experience to have

18    objectors that are not going to put forth any evidence.  We

19    have a number of governmental entities -- the SEC, New York,

20    Texas, and New Jersey -- that have been complaining about

21    Binance.US and the sale transaction since the conditional

22    disclosure statement hearing back in January, but they have

23    taken no discovery and put forth no evidence in support of

24    their statements.

25            Uncontroverted evidence will be submitted today
```

```
1    that the sale transaction or liquidation transaction if

2    applicable is in the best interests of the estate; that

3    creditors will receive more under the plan in either the

4    sale transaction or the liquidation transaction than in a

5    Chapter 7 liquidation; that customers in supported

6    jurisdictions and unsupported jurisdictions are receiving

7    equal treatment; and that the Debtors' releases are a sound

8    exercise of their business judgment; and importantly, Your

9    Honor, that the plan is feasible.

10           You'll have the testimony of Mr. Mark Renzi, a

11   managing director of Berkeley Research Group and financial

12   advisor to the Debtors regarding the primary confirmation

13   requirements for the plan, the Debtors' liquidation

14   analysis, the plan's feasibility, and the limitations,

15   risks, and costs with endeavoring to make in-kind

16   distributions to customers in unsupported jurisdictions.

17           The Debtors will put forth the testimony of Mr.

18   Brian Tichenor, a managing director of Moelis and Company

19   who will speak to the Debtors' sale process, the sale

20   transaction and liquidation transaction, and that the plan

21   was proposed in good faith.

22           The Debtors will offer in evidence the testimony

23   of Mr. Timothy Pohl, independent director and member of the

24   special committee of the board of Voyager Digital LLC,

25   regarding the special committee investigation, the special
```

1   committee's conclusions, and the D&O settlement and in

2   support of the Debtor releases.  And the Debtors will also

3   offer into testimony, the testimony of Mr. -- sorry -- Ms.

4   Leticia Sanchez, a director at Stretto, who will speak to

5   the voting report.

6           Your Honor, while we expect some of the objectors

7   to cross the witnesses, there's absolutely no evidence in

8   support of their objections.  So what are they asking the

9   Court to do?  They're asking you to pick apart the plan

10  including the sale transaction to say let's just modify some

11  parts they don't like and we'll go with the rest of them.

12  But that's not the plan the Debtors are prosecuting.  The

13  Debtors have exclusivity.

14          We've proposed this plan in good faith and it has

15  been resoundingly accepted by creditors and the objectors

16  can't pull out specific parts they don't like, especially in

17  this case where we have a highly complex transaction that

18  will need to be executed in either the sale transaction or

19  the liquidation transaction scenarios.

20          Your Honor, we'll have much more legal arguments

21  at the back at the end of the hearing, but wanted to just

22  provide these preliminary comments.

23          THE COURT:  Okay.  Can I just ask for some

24  clarifications of some things before I ask some other

25  questions?  I see that you filed stipulations with FTX and

1   Alameda and also last night, a stipulation with various

2   governmental entities.  Are approvals of those contemplated

3   today or at a different time and are they conditions to

4   confirmation or not?

5              MS. OKIKE:  Your Honor, they -- we are not seeking

6   approval of either of those today.  The stipulation with the

7   governmental entities is purely consensual.  They are

8   agreeing to two things.  They're agreeing, one, at the --

9   their claims that they had to the extent that they are

10  allowed at the OpCo entity, will be subordinated to those

11  general unsecured creditors at that entity and also account

12  holders.  And they're also agreeing that the claims that

13  they filed at the Top entity and the HoldCo entity, to the

14  extent that they are allowed and they receive a recovery on

15  account of those claims, will be contributed to the benefit

16  customers.

17             THE COURT:  Isn't that gifting or a Jevic issue to

18  contribute them only to that particular class, resulting in

19  different recoveries for that class and the general

20  unsecureds?

21             MS. OKIKE:  Your Honor, they're entitled to those

22  recoveries and I think they're entitled post effective date

23  to give the recoveries to whoever they would like to.

24             THE COURT:  Second Circuit says no.  It says no

25  gifting, doesn't it?  Says if it's given up for the benefit

Page 19

1    of the estate, it's got to be distributed in accordance with

2    the bankruptcy priorities.  If you think otherwise, just

3    alerting you to --  I'm not going to rule on it today, but

4    you need to address that as an issue for me.

5              MS. OKIKE:  Understood, Your Honor.

6              THE COURT:  Okay.  So the -- I saw that there's an

7    amendment to the asset purchase agreement to preserve more

8    preference claims and also as I understand it to make clear

9    that Vermont is not going to be treated as an unsupported

10   jurisdiction; is that correct?

11             MS. OKIKE:  That's correct, Your Honor.  We have

12   reached an agreement with Vermont and we are hopeful that

13   there may be other states as well of the remaining

14   unsupported states who sign on to that, but Vermont will not

15   be considered an unsupported jurisdiction.

16             THE COURT:  You continue to treat Texas as having

17   objected, but I thought from reading the Texas submission

18   that they thought that you didn't need any more regulatory

19   approval to do the -- at least the additional distributions

20   that you contemplate.

21             MS. OKIKE:  Your Honor, that's not exactly true.

22   In Texas, they believe that stable coins are securities and

23   so they would, I believe to the extent that stable coins

24   were traded, which would potentially happen to the extent

25   that people receive distributions, they consider that to be

Page 20

1   a violation.  And so, although they have said you can make

2   the distributions, there's not the ability, my understanding

3   is on the Binance.US platform, to restrict trading to

4   specific types of cryptocurrency and so there is not the

5   ability to effectuate what Texas was requesting.

6           Although we're still in discussions with them and

7   hopefully to get to a conceptual resolution similar to

8   Vermont, it's going to require a more creative solution than

9   what they had proposed.

10          THE COURT:  And where does Hawaii stand in all of

11  this?  They were unsupported jurisdiction.  I haven't heard

12  anything from them.

13          MS. OKIKE:  Your Honor, our understanding is that

14  Hawaii, there have been productive discussions with Hawaii

15  and they are likely to follow Vermont.  They were waiting to

16  kind of, my understanding, is to see the resolution with

17  Vermont, but we anticipate and I know Binance can speak to

18  this a little bit better.  We anticipate that they will sign

19  on to that same structure.

20          THE COURT:  Okay.  And where do things stand as to

21  how the VGX token will be treated?

22          MS. OKIKE:  So Your Honor, the VGX token will be

23  treated like all of our coins on the Debtors' platform.

24  Those holders will be entitled to their pro rata

25  distribution of VGX which they will be able to, you know,

Page 21

```
 1    withdraw from the Binance platform.  Binance.US has agreed

 2    to submit the VGX token through it's, you know, internal

 3    processes to see if it's approved to be listed on the

 4    exchange.  We obviously don't know what the outcome of that

 5    will be, but just like any other customer, VGX holders will

 6    receive their pro rate distribution, will be able to remove

 7    that distribution from the platform.

 8              THE COURT:  So if I -- and I always want to double

 9    check my understanding of how this works.  Customers' claims

10    are based on values of tokens as of the filing date.

11              MS. OKIKE:  Correct.

12              THE COURT:  Customers' distributions will be in

13    kind, but based on current dollar values of the various

14    coins.

15              MS. OKIKE:  Correct.

16              THE COURT:  And so that everybody -- what

17    everybody receives may be in different form, will be

18    calculated as being the same proportion of their prepetition

19    claim.  So how will VGX be valued for purposes of

20    distribution?

21              MS. OKIKE:  It will be valued the same as all

22    other coins.  So it has a price.  It's traded.

23              THE COURT:  What is the current VGX price?

24              MS. OKIKE:  Thirty-three cents, Your Honor.

25              THE COURT:  And if Binance does not -- what's
```

1   that?

2          MS. OKIKE:  Thirty-nine cents, Your Honor.

3   Apologies.

4          THE COURT:  It's all right.  If Binance does not

5   do what you hope it does to allow for the trading of VGX on

6   its platform, what happens to VGX?

7          MS. OKIKE:  Yes.  So there are smart contracts,

8   Your Honor, which underline the token and is really what

9   provides utility to the token.  Those are not being sold to

10  Binance.US in the transaction.  We are actively speaking

11  with third parties who are interested in purchasing the

12  smart contracts and I anticipate we likely will have a

13  transaction at some point for somebody who intends to

14  provide utility to the token going forward.

15         And so the value of the VGX token post-closing

16  will really be, you know, determined by the utility of the

17  token.  I will say, you know, some of this stuff isn't

18  intuitive.  I mean, we've seen huge rises in the price of

19  VGX over the past month or so, so you know, utility or no,

20  we don't really know what the price will be going forward.

21         THE COURT:  Okay.  I see there are changes that

22  have been made over the last week or so.  Winddown entity

23  has been changed to the winddown Debtor.  You'll have a plan

24  administrator now, and I see the winddown Debtor is actually

25  going to be HoldCo, not OpCo?

1          MS. OKIKE:  That's correct, Your Honor.  I mean,

2     these are changes that are really designed to preserve tax

3     attributes and make sure that the structure is as tax

4     efficient as possible.  It's not designed to kind of change

5     the rights of any creditors with respect to distributions or

6     with respect to the intercompany claims disputes that are

7     unresolved.

8          THE COURT:  Okay.

9          MS. OKIKE:  And Your Honor, I didn't answer your

10    question with respect to FTX Alameda.  We're not going

11    forward with that today.  We filed that motion, I believe

12    it's -- don't know the date it's set for hearing, but in

13    accordance with the rules, we provided the appropriate

14    notice.  We don't believe that's a bar to confirmation.  It

15    really just deals with the value of distributions under the

16    plan.

17         THE COURT:  Okay.  All right.  Thank you very much

18    for those clarifications.  Before we actually get to

19    evidence, I just have some questions for some of the

20    objectors, okay?

21         MS. OKIKE:  Yes, Your Honor.

22         THE COURT:  I want to start with the SEC.  Are

23    they here?

24         MR. WARREN:  Your Honor, this is Jon Warren, pro

25    se creditor.  Had a quick question for you.

1              THE COURT:  Go ahead.  What is your question?  I'm

2    sorry, whoever just said they wanted to ask a question, what

3    is your question?

4              Okay.  We'll go back to my questions for the SEC.

5    You are?

6              MR. UPTEGROVE:  Good morning, Your Honor.  William

7    Uptegrove on behalf of the United States Securities and

8    Exchange Commission and with me is my colleague Therese

9    Scheuer.

10             THE COURT:  Good morning.  You've submitted an

11   objection that has a couple of parts and one part is that

12   you think that the contemplated transfers of

13   cryptocurrencies by Voyager may be illegal.  I'm sort of

14   unaccustomed to getting objections that something may be

15   wrong as opposed to either is or isn't.  So what exactly is

16   your position here?  Are you saying that it is wrong or that

17   you don't know?

18             MR. UPTEGROVE:  We're saying, Your Honor, that

19   there are risks inherent in transactions in any crypto asset

20   transactions.  There are fact specific issues that go into

21   that.  They're highly complex.  And those risks are always

22   going to be apparent.  On the issue of the securities laws,

23   the SEC is not taking a position on whether any of the

24   transactions in the plan are violative of the federal

25   security laws.  We can't take a position at this point.

```
 1              The SEC is a deliberative body, Your Honor and its
 2      processes a nonpublic one by federal law.  And that process
 3      is protected by a number of statutes.  Just because private
 4      litigation --
 5              THE COURT:  Deliberative is one thing.  Absent is
 6      another.  I mean, how long has Voyager been around?  How
 7      long has it been selling the tokens that it's been selling?
 8      How long has Binance been around?  Come here and tell me
 9      that you don't have any idea, but that I should stop
10      everybody in their tracks because you might have an issue
11      that you haven't gotten around to looking at; it's kind of a
12      weird objection, isn't it?
13              MR. UPTEGROVE:  I don't think so, Your Honor.  I
14      think that this happens.  There's also the CFIUS review,
15      which is something similar, Your Honor.  Do all regulatory
16      bodies have to stop everything they're doing when a private
17      party enters into a lawsuit or files a bankruptcy plan and
18      have to come to Court --
19              THE COURT:  Well, it's hardly the bankruptcy
20      that's triggered your potential review of this, isn't it?
21      You're claiming that there might be things going on here for
22      years that may be in violation of the securities laws.
23      Deliberative is one thing.  What have you done?  Have you
24      looked at any of this?  You're not willing to take a
25      position on any of it?
```

```
 1              MR. UPTEGROVE:  No, Your Honor, we're not taking
 2    any position on whether or not any transaction -- there are
 3    lots of transactions.  There's the rebalancing transactions
 4    and there's the sale transactions and then there's going to
 5    be transactions after that.  They all have, I think -- I
 6    don't recall the exact number, but there's something like
 7    over 100 cryptocurrencies or crypto assets, I believe on the
 8    -- were on the Voyager exchange.
 9              All of those have different attributes, they all
10    have to be viewed independently.  And so whether something
11    is a security or not is a complex issue.  There's no facts
12    before the Court today about any of those issues, nor does
13    there need to be because it's not, you know, whether or
14    something is a compliant, whether the plan or transactions
15    contemplated in the plan are compliant with non-bankruptcy
16    law is not the issue that needs to be decided today.  At
17    least the SEC doesn't need to provide a position.  It's the
18    -- and disclose its deliberative process in an open Court.
19              The issue today is whether or not the plan is
20    confirmable.  That's a burden that the Debtor has and we at
21    the very least seek full disclosure about possible risks
22    attendant to the transactions contemplated under the plan.
23              THE COURT:  But you've also argued that the Debtor
24    has to somehow prove a negative here, has to prove that
25    every one of the transactions, every one of the
```

1    cryptocurrencies that it might be selling do not involve

2    transactions in securities with no guidance from you at all

3    as to what might constitute a security, which coins they

4    have to do that proof on, why you think any of them are

5    securities, and no indication at all of what legal or

6    factual issues the testimony and argument today ought to

7    address.  How is that a proper objection?

8              MR. UPTEGROVE:  Again, Your Honor, we are raising

9    the issues.  There are risks attendant to the transactions

10   in the plan.  We are in no position to be able to provide

11   the facts you just talked about or issue an advisory opinion

12   on whether or not any particular transaction complies with

13   the security laws.

14             THE COURT:  I'm not asking for your -- an advisory

15   opinion.  I'm asking you to either object or not object.

16   What you've said is not really an objection.  It's sort of

17   like, hey, Judge, we don't know, so you shouldn't do

18   anything.  That's essentially what you've said.

19             MR. UPTEGROVE:  And it's incumbent upon the

20   Debtors to explain and disclose the potential risks of what

21   would happen.

22             THE COURT:  You know, when I have a regulator

23   who's charged with protecting investors, they either think

24   there's an issue or there's not.  I expect them to come in

25   and tell me there is or there isn't.  I don't expect them to

1    come in here and say the Debtor should prove the impossible.

2          The Debtor should somehow, without any guidance

3    from you as to what issues you think the Debtor needs to

4    prove, the Debtor should somehow prove that nothing that's

5    going on here raises an issue under the securities laws

6    without even a contention by anybody in the room, or at

7    least not from you, that what the Debtor is doing does

8    violate the securities laws.  I just don't get how that's

9    proper or how you would expect anybody to be able to comply

10   with what you're asking.

11         What is it you -- how is the Debtor supposed to do

12   what you're asking them to do?  Are they supposed to give me

13   a tutorial on all aspects of every coin that -- in which the

14   Debtors -- that the Debtors might be selling here and try to

15   think about every single possible argument you might make as

16   to each individual coin, even though you don't have

17   arguments about those coins?  Is that what you're asking us

18   to do today?

19         MR. UPTEGROVE:  No, Your Honor, but we do believe

20   there should be more disclosure than there is in the current

21   disclosure statement and plan.

22         THE COURT:  There is disclosure about regulatory

23   risks, you know, and so, I don't know, you haven't been

24   specific.  All you've said vaguely is that there might be an

25   issue.  Well, that's pretty much what the Debtor said.  I

Page 29

```
1    don't know how they can be any more specific when you're

2    standing here and you're not willing to be any more

3    specific.

4              MR. UPTEGROVE:  Your Honor, again, we can't take a

5    position on whether or not a specific transaction is

6    violative of the security laws.  As we said, there may be

7    risks.  There are risks for sure and there may be violations

8    of the securities laws.  It's just not something that we

9    believe is, you know, we need to opine on here.

10             THE COURT:  But you've --

11             MR. UPTEGROVE:  The burden is not on us.

12             THE COURT:  But you have not just raised this as a

13   disclosure issue.  You have said that this somehow affects

14   the feasibility of the plan and that I should deny

15   confirmation.  I should deny confirmation essentially

16   because you might have some unspecified issue about which

17   you cannot take any position today.  That's essentially what

18   you've asked me to do.  How does that make sense?

19             MR. UPTEGROVE:  We've also said the same thing

20   about the CFIUS review is that's another thing that's out

21   there that is very much like the potential violation of the

22   securities laws that could impact the plan, the consummation

23   of the plan.  There's no disclosure about what will happen

24   if there's a negative -- I have not seen disclosure, what

25   would happen if the plan closed or the -- excuse me, the
```

1    deal closed and there was a subsequent negative finding by

2    CFIUS.  I think it's a similar thing.

3              THE COURT:  I don't think it's similar at all.

4    CFIUS review is triggered by this specific transaction.

5    Your objection is based on stuff Voyager has been doing for

6    years and stuff that Binance has been doing for years.  I

7    mean, are you standing here telling me that the SEC is going

8    to challenge whether the Debtor is selling securities?

9              MR. UPTEGROVE:  Not today, Your Honor, but there's

10   --

11             THE COURT:  Are you telling me that you're going

12   to challenge whether Binance is acting as a securities

13   broker?

14             MR. UPTEGROVE:  Your Honor, with respect to

15   Voyager, the Voyager entities, we've disclosed that there is

16   an ongoing investigation involving Voyager.  So that's an

17   issue that has yet to be determined.  Again, we're a

18   deliberative body.  There's no reason, no law that would

19   require us to -- in fact, there's laws to the contrary that

20   you know, that's a nonpublic process.

21             And as to other entities, you know, that's just

22   not before the Court.  That's not one of the issues that

23   needs to be, you know, that the government has the burden to

24   show.

25             THE COURT:  Well, but you've said in your papers,

Page 31

1     it's an issue that has to be proved.  And yet at the same

2     time, you want to just say the government takes no position.

3              MR. UPTEGROVE:  Your Honor, we're not in a

4     position to -- you said earlier that, you know, what could

5     the Debtor say.  They could say all types of things to prove

6     or to show that notwithstanding whether there is a violation

7     or there is not, that the plan is feasible.  You could put

8     on evidence about how you would exactly do it, what

9     witnesses and what those witnesses would say and what

10    exhibits.  I cannot tell you that's not the SEC's role.

11    That's the role of the Debtor to come in and say, Your

12    Honor, this is the test for feasibility.

13              On the one hand, if there's no action by the SEC

14    in the future, then there's no action by the SEC in the

15    future.  If there is one, this would be the possible

16    ramifications and notwithstanding that, the plan is

17    feasible.

18              THE COURT: The argument about whether transactions

19    in particular cryptocurrencies are transactions in

20    securities, are you making that argument only as to the

21    rebalancing trades or as to the distributions that the

22    Debtor would make under the plan?

23              MR. UPTEGROVE:  I think that that's to be

24    determined and any transaction in an asset that is a

25    security, you know, would fall under the ambit of the

```
 1   securities laws.
 2              THE COURT:  Why wouldn't Section 1145 of the
 3   Bankruptcy Code apply to the distributions contemplated
 4   under the plan?
 5              MR. UPTEGROVE:  I don't think that Debtor is
 6   invoking 1145.  I don't think it would be -- they're not
 7   issuances.  I don't believe 1145 applies, Your Honor.
 8              THE COURT:  You don't think any of these are --
 9   the Debtor would be the issuer of the security?
10              MR. UPTEGROVE:  I don't think they are.  No, Your
11   Honor.  I think these are --
12              THE COURT:  But in your footnote, that's exactly
13   what you suggested as to VGX.  My colleague, Therese Scheuer
14   may want to address that.
15              MS. SCHEUER:  Good morning, Your Honor.  For the
16   record, Therese Scheuer for the Securities and Exchange
17   Commission.  Your Honor, I don't believe the Debtors are
18   seeking 1145 treatment for any of the distributions for the
19   rebalancing.  It has not been cited in their papers and it
20   has not been briefed, to my knowledge.
21              THE COURT:  Well, do the Debtors have to invoke
22   it?  Doesn't it just automatically apply?
23              MS. SCHEUER:  There has to be showing it is a
24   limited exemption from registration and there are particular
25   requirements that must be met.
```

1           THE COURT:  Well, that's exactly the argument you

2     made, that VGX was somehow an unregistered security of the

3     Debtors.  So why wouldn't 1145 apply to that?

4           MS. SCHEUER:  Your Honor, it hasn't been briefed

5     and I don't believe that ----

6           THE COURT:  What hasn't been briefed?

7           MS. SCHEUER:  The 1145 issue has not been briefed.

8     It's not -- I don't believe it's ripe for discussion today

9     and I don't believe the Debtors included it in their papers.

10          THE COURT:  All right.  As to whether Binance is

11    operating as a securities broker, are you saying that in

12    performing the transactions contemplated by this plan,

13    Binance might be operating as a securities broker or are you

14    saying that it might be engaged in other activities that

15    make it a securities broker?

16          MR. UPTEGROVE:  Your Honor, other than what we

17    said in our papers, we're not in position to expound upon

18    what a particular entity, you know, may or may not have done

19    and what the consequences legally are regarding that

20    conduct.

21          THE COURT:  Even if Binance were engaged in some

22    other activity in some other context that arguably made it a

23    securities broker, why would that affect its ability to do

24    what we're contemplating here?

25          MR. UPTEGROVE:  You know, as a hypothetical, Your

1    Honor, if it were found to be a unregistered exchange, there

2    would be consequences to -- I'm not familiar with all the

3    consequences, but it would -- you know, potentially there's

4    registration.  I mean, there's -- and I don't know the

5    answer to that because I'm -- although I work for the SEC, I

6    am not an expert in that area.  I think that the Debtor has

7    hired legions of lawyers and they probably do have experts

8    in that area and they could address the issue as if, Binance

9    worst case scenario, Binance is found to be a unregistered

10   exchange, these would be the consequences and it wouldn't

11   have an impact on the plan.

12           THE COURT:  Those people would just be opining

13   about what you would likely do and what you would likely

14   insist on.  How can they know more than you do about that?

15           MR. UPTEGROVE:  I don't think it's a matter of

16   knowing, Your Honor.  It is facts and circumstances and I

17   mean, I would think, you would do the same thing -- and you

18   know, the tax realm is, you know, the Debtor makes

19   determinations about tax issues and then, you know, post

20   plan, the IRS or a Court may have different views than the

21   Debtor, but that doesn't preclude the Debtor to the extent

22   there is an issue that relates to the code or confirmation

23   of addressing potential tax issues.  We just addressed tax

24   issues --

25           MR. SHEHADEH:  Judge Wiles, I'm here to ask

Page 35

1    (indiscernible), Your Honor.

2              THE COURT:  Who was talking there?

3              MR. SHEHADEH:  I believe, Your Honor, you

4    addressed me at 10:01.  I was having technical issues.  Now

5    I'm able to speak.

6              THE COURT:  Okay, but just wait.  We're in the

7    middle of something else at the moment, okay?  All right,

8    we're talking to the attorney for the SEC.  So you couched

9    these objections in terms of feasibility.  Feasibility is

10   just a shorthand way of referring to the provisions of

11   Section 1129(a)(11) which requires a showing that the plan

12   is not likely to be followed by the liquidation or the need

13   for further financial reorganization of the Debtor unless

14   such liquidation or reorganization is proposed in the plan.

15             So in this case, there is a toggle feature in the

16   plan under which the Debtors will switch to another approach

17   if the Binance deal can't close within four months.  So even

18   if you're right about all your objections and you surprise

19   us all with regulatory actions that after confirming a deal,

20   we suddenly can't close by -- that wouldn't actually be a

21   feasibility issue, would it?  It would just mean the Debtor

22   would talk to the other plan.

23             MR. UPTEGROVE:  It may, Your Honor, but I think

24   there would still need to be at this juncture disclosure

25   about the inherent risks of the transaction.  And to the

```
 1    extend -- and these issues would not go away.  Obviously

 2    that's the point I just made, but as to feasibility, you

 3    know, except to the extent there were parts of the self-

 4    degradation plan that were, you know, potentially violative

 5    of the law and the --

 6            THE COURT:  Well, on disclosure, I read -- reread

 7    the disclosure statement and it does say that there are

 8    risks that we don't know what's going to happen with

 9    regulation, that there is increasing regulation that could

10    affect the ability to close the deal.  I don't see how I

11    could in hindsight, say that the Debtors had to be more

12    specific about those risks given what you're telling me

13    today.

14            MR. UPTEGROVE:  It also may be the case, Your

15    Honor, that the plans confirm, you know, in a hypothetical

16    world, plan is confirmed, the deal closes, and then, you

17    know, again, we're not in a position to just to say this is

18    hypothetical, but then there's some action by the SEC or

19    another regulator or government body that has some impact

20    that would -- so the toggles over feature is over.

21            They've toggled -- it toggles to the restructuring

22    plan and then some action happens that requires the, you

23    know, an additional reorganization and additional

24    liquidation because of the place the Debtor finds itself.

25    So the toggle, you know, I'm not saying that -- I think part
```

1    of our point is, it's not as if this all goes away at

2    confirmation.  These are things that will continue and they

3    may continue after the toggle feature is no longer an

4    option.

5               THE COURT:  Well, if the toggle feature is no

6    longer an option, it would only mean that the Binance deal

7    had already closed.  So how does any of that affect the

8    feasibility of the plan if something were to come up at a

9    later stage?

10              MR. UPTEGROVE:  I think at the very least, it

11   would have ramifications for creditors.  And I think the

12   test is -- maybe I'm misremembering it -- but it's that,

13   that under 1129, that for feasibility that the restructuring

14   will not be followed by, you know a further need for

15   liquidation.  That could still happen after the closing.

16              THE COURT:  Of this Debtor?

17              MR. UPTEGROVE:  Potentially, if --

18              THE COURT:  This debtor will have already

19   liquidated.  Okay.  You also asked about whether the

20   disclosure statement has sufficient information about

21   Binance's controls, custody arrangements, and finances.  The

22   SEC, the U.S. Trustee, Texas, and New York all made similar

23   arguments in that regard.  And you argued that you think we

24   need to know if third parties have access to the keys, what

25   safeguards there are to stop assets from being transferred

1    off the Binance.US platform, and a declaration from Binance

2    about its internal controls.  Are the Debtors going to offer

3    evidence on any of these points today?  Yes?

4              MR. UPTEGROVE:  We intend to, Your Honor, yes.

5              THE COURT:  Do you have any evidence on these

6    points that you want -- or plan to offer today?

7              MR. SLADE:  No, Your Honor, but it's not our

8    burden.

9              THE COURT:  You know, maybe not, but it's a

10   disclosure issue and I'm absolutely shocked, I have to say,

11   that a regulator would come in and say, I'm charged with

12   regulatory authority over these things.  These are reasons

13   that I have concerns because they're within my regulatory

14   jurisdiction, but I've done nothing.  I have nothing to

15   offer to you except questions, and my excuse for that is

16   that it's somebody else's burden in the context of

17   confirmation.  That's incredible.  Absolutely incredible.

18             So I'll hear whatever evidence the Debtor has, but

19   you know, I get the feeling that this objection has been

20   made as a kind of cover yourself, so you can say later that

21   well see, we raised these issues, but you haven't really.

22   You've done nothing.  You know, I'm trying to do the right

23   thing here.  I would like to do the right thing.  I don't

24   want to subject customers to any risks.  They've already

25   been through a bankruptcy.  I don't want to put them through

```
 1    any more issues.

 2            But to stand here and tell me, Judge, you know,

 3    I'm not going to tell you what we're going to do, but it's

 4    your job and the Debtors' job to kind of guess and to make

 5    predictions, and you know, you better be right about it;

 6    that's really not helpful.

 7            Okay.  All right.  So I'll hear whatever evidence

 8    we have on that.  I have to say that the disclosure

 9    objections on this point, I'll hear argument later, but they

10    don't really strike me as really disclosure issues.  They

11    strike me as substantive objections kind of masquerading as

12    disclosure issues.  They are more in the lines of not so

13    much that the Debtor knows something that the Debtor didn't

14    reveal as that well, the Debtor should be getting more

15    information from Binance and should be getting more control

16    information from Binance, and then should be disclosing it.

17            Well, that's really not so much an issue about the

18    disclosures the Debtors have made as a question of, should

19    the Debtors be doing more in the interests of customers

20    before we go forward with the transaction.  So I'll hear

21    what people have to say about it.  I'm concerned about these

22    points, too.  Anybody who's been following what's happening

23    in this industry, who sees what happened with FTX, who sees

24    the examiner's report about what was going on in Celsius,

25    you have to be worried.
```

Page 40

1           Okay?  I understand the concerns, but at the same

2     time, I'm in a position where we don't usually assume that

3     buyers are bad actors.  We don't usually assume that people

4     are bad just because other people in an industry are bad.

5     So if there are reasons to be concerned here and worried, I

6     need to know specifics.  So kind of telling me, gosh,

7     there's lots of problems in this industry, so you better

8     figure it out, Judge, without offering any help, is really

9     disappointing.

10          Okay.  So as to the United States Trustee, I just

11    want to make -- thank you.  As to the United States Trustee,

12    you had an objection on disclosure about how the

13    cryptocurrencies will be held before they're distributed.

14    The Debtors, I thought we had resolved this when I -- at the

15    time we approved the asset purchase agreement and the

16    Debtors have made responses at Pages 78 through 79 with

17    their memorandum in support of confirmation.  Does that

18    answer your questions or do we need anything further on

19    that?

20          MR. MORRISSEY:  Your Honor, Richard Morrissey for

21    the U.S. Trustee, and before I begin, it's nice to see Your

22    Honor in person after three years.  The U.S. Trustee's

23    objection generally had to do with disclosure in the

24    disclosure statement itself so that the creditors could be

25    fully informed about what they were signing onto with the

Page 41

1    Binance transaction.

2            One of those aspects as Your Honor mentioned had

3    to do with the protection of the cryptocurrency.  What the

4    disclosure statement said was essentially, it's protected.

5    They -- I believe there was a link to a website and the

6    creditors were invited to sort of look it up.  And the

7    Debtors did more than that.  They also did their due

8    diligence.  Mr. Tichenor's declaration filed the other day

9    went into the fact that they had done their due diligence

10   and I believe the Committee did due diligence as well.

11           But the information should have been, the U.S.

12   Trustee believes, should have been in the disclosure

13   statement itself so that they could evaluate it.  And we

14   have a contrast, Your Honor, between this and what Voyager

15   itself did in terms of describing the measures it took to

16   protect the cryptocurrency.

17           As Your Honor will recall undoubtedly I know

18   counsel for the Debtor will definitely recall, we had a long

19   cash management process.  A lot of time elapsed between the

20   time the motion was originally filed and the time we finally

21   got a final order on that, but the logjam was cleared by the

22   declaration submitted by Voyager describing exactly what it

23   was that the -- that Voyager was doing to protect the

24   cryptocurrency.

25           And then the Committee, for its part, filed a

Page 42

```
 1   statement basically supporting what they did.  That stands
 2   in marked contrast to what the disclosure statement did.  So
 3   I don't know what's going to be put forth today, Your Honor,
 4   on that and other disclosure issues but our argument was
 5   simply that if the creditors were going to be fully informed
 6   what it was that they were signing up for by voting in favor
 7   of the plan, there should have been more disclosure right
 8   there in the disclosure statement.
 9            Your Honor, I know this is a little apart from the
10   question and I can bring this up later if you want, just to
11   add -- just a comment about the voting and the effect of
12   certain things on recovery.  If you'd like to hear it now,
13   it's about one or two sentences on each thing.
14            THE COURT:  About the voting?
15            MR. MORRISSEY:  Yes.  Your Honor, as Ms. Okike
16   said, the voting was 97 percent number, et cetera, voted yes
17   and that is true and that is also what is relevant in
18   determining whether there is sufficient voting in favor of a
19   plan for a plan to be confirmed.  But to put the matter in
20   some perspective, I believe -- and Ms. Okike can correct me
21   if I'm wrong on this, but of the eligible creditors only 6
22   percent of them voted.  So it's a small segment, but again,
23   I understand of course, that under the Bankruptcy Code, the
24   97 percent number is the relevant number.
25            The other issue, Your Honor, has to do with what
```

1   may affect recoveries.  I believe Ms. Okike explained how

2   the disposition of the Alameda issue may affect recoveries,

3   but I believe there's something else which is intercompany

4   transactions.  And we have counsel here on that, not only

5   Ms. Okike but Mr. Kirpalani as well and the result of the

6   litigation concerning the intercompany transactions, I

7   believe, can affect the distributions to creditors under the

8   plan as well.

9              I don't know the numbers.  Perhaps Ms. Okike does,

10  but I just wanted to point those things out to the Court.

11             THE COURT:  Okay.

12             MR. MORRISSEY:  Anything further, Your Honor?

13             THE COURT:  Not at this stage.  I may have

14  questions for you later.

15             MR. MORRISSEY:  Thank you, Your Honor.

16             THE COURT:  All right.  I think we have an idea of

17  what we need to do with the evidence, so unless there's

18  further points that people want to raise before we go to the

19  witnesses, we'll take the evidentiary submissions.

20             MS. RYAN:  Your Honor, this is Abigail Ryan with

21  the Texas Attorney General's Office.  If I may be heard

22  briefly?

23             THE COURT:  Yes.

24             MS. RYAN:  Thank you, Your Honor.  Again for the

25  record, Abigail Ryan with the Texas Attorney General's

Page 44

```
1    Office on behalf of the Texas State Securities Board and the

2    Texas Department of Banking.  Your Honor, we are continuing

3    to work with the Debtor and Binance to see if we can find a

4    way that Texas citizens will not be treated as a

5    nonconsenting jurisdiction.  We're not there yet.  We are

6    continuing those discussions in good faith and we'll

7    continue to do so.

8            Before we get started though, one thing I wanted

9    to clarify is that the language that has been inserted at

10   Paragraph 141 through 142, we are not in agreement with that

11   language, Your Honor, the State of Texas isn't, but we are

12   continuing through this hearing to discuss language that

13   could be agreeable.  I just wanted Your Honor to be aware of

14   that.  Thank you, Your Honor.

15           THE COURT:  Paragraphs 142 of what, the

16   confirmation order?  Is that what you're talking about?

17           MS. RYAN:  Yes.  Yes, Your Honor, the confirmation

18   order.

19           THE COURT:  Okay.  Well, as I've said many times,

20   I tried to read everything, but I didn't get to the

21   confirmation order because I ran out of gas.  I did read

22   everything else, but --

23           MS. RYAN:  I understand running out of gas, Your

24   Honor.  And again, we'll continue to discuss this language

25   with the Debtor throughout the hearing and hopefully we'll
```

Page 45

1    reach an agreement, but that's the status with Texas as of

2    right now.

3              THE COURT:  All right, thank you.

4              MS. RYAN:  Thank you.

5              MR. SLADE:  Good morning, Your Honor.  Mike Slade,

6    Kirkland & Ellis, for the Debtors.  We filed our witness and

7    exhibit list at Docket No. 1129 because we thought it would

8    make it easier for people to follow the hearing and all of

9    the exhibits that might be used are on the docket as well.

10             Our first witness just to get just out of the way,

11   I would just like to offer our voting declaration, which is

12   the declaration of Letty Sanchez, Exhibit 4 on our witness

13   list.  It's also on the docket at Docket No. 1127 and I

14   would offer that declaration into evidence and Ms. Sanchez

15   is here and available to cross examine.

16             THE COURT:  This is the amended declaration?

17             MR. SLADE:  That's correct, Your Honor.

18             THE COURT:  All right.  Are there any objections

19   to the admission of the amended voting declaration into

20   evidence?  Does anyone wish to cross examine the declarant

21   as to the substance of that declaration?  Okay.

22             MR. NEWSOM:  I would, Your Honor.  Can I elaborate

23   more on that amended, whatever, declaration?  What is that

24   basically saying?

25             THE COURT:  I couldn't understand what you just

```
 1    said, I'm sorry.
 2              MR. NEWSOM:  Can they elaborate more on that, like
 3    what is that explain, they're doing for us.
 4              THE COURT:  This is the declaration as to what the
 5    ballot results were, how many people voted in favor of the
 6    plan, how many people voted against the plan.
 7              MR. NEWSOM:  What about when -- what about the
 8    people who didn't vote?  Is that -- the people that didn't
 9    vote, is that considered a yes in favor of it if they didn't
10    vote at all or --
11              THE COURT:  Under the Bankruptcy Code, the plan is
12    deemed to be accepted if it is accepted by certain
13    percentage of the people who actually vote one way or the
14    other.  Okay?  So we only look at the people who actually
15    voted for or against, and if among those people, the plan
16    was accepted by the requisite percentages in number and
17    amount, then the plan is deemed to be accepted by that
18    class.  Okay?  So the fact that some people don't vote at
19    all under the Bankruptcy Code is a fact that's ignored.
20    Okay?
21              MR. NEWSOM:  I don't find that to be -- I don't
22    find that to be fair voting, Your Honor.
23              THE COURT:  Well --
24              MR. NEWSOM:  -- the plan have to do -- what did
25    the plan have to do -- the opt-out release and what does it
```

1    have to do with releasing third parties from any type of,

2    like, you know, charges or anything that would come about

3    later on?

4              THE COURT:  Well, it actually has nothing to do --

5              MR. NEWSOM:  Why --

6              THE COURT:  It has nothing to do with the opt-out,

7    with the opt-in release.  If somebody didn't vote, they're

8    not releasing their own claims unless they have separately

9    affirmatively elected to do so.  And as to whether this way

10   of doing the voting is fair, I'm afraid you'll have to take

11   that up with Congress.  It's not something I have any

12   control over.  It's a very clear provision in the Bankruptcy

13   Code itself.

14             MR. NEWSOM:  Are you going to (indiscernible) once

15   the plan, a voting plan (indiscernible)?

16             THE COURT:  I'm sorry?

17             MR. NEWSOM:  Why was there a plan when FTX

18   (indiscernible) and if that didn't go through, why was there

19   a winddown effect at that time?

20             THE COURT:  Well, that's not really -- right now,

21   you know, right now we're not just kind of opening the floor

22   to general question.  Right now, the question is whether

23   there's any objection to the admission of the declaration as

24   to what the voting results were.  Okay?  extra. I'm sorry.

25   Well, is there a plan when they're -- and go through, wasn't

1   winddown in effect at that time?  That's not really right

2   now, you know, right now we --

3           MR. NEWSOM:  Yeah, I would like to see a report if

4   they can revise a report as who voted yes and who voted no

5   and who didn't vote, if that's possible.

6           THE COURT:  You want to see by name who voted?

7           MR. NEWSOM:  I mean, they can redact that

8   information.  They can say creditor one, creditor two,

9   creditor three, yes, no, yes, no (indiscernible).

10          THE COURT:  It's actually already on --

11          MR. NEWSOM:  (indiscernible).

12          THE COURT:  It's already on file on the public

13  docket.  There's a lengthy attachment --

14          MR. NEWSOM:  Yeah, which was done by the Debtors.

15  Which was done by the Debtor, which we know we don't trust,

16  because, you know.

17          THE COURT:  Okay.  All right.  I've heard your

18  objection.  I'll admit the declaration into evidence.  Is

19  there any cross examination of the declarant that anybody

20  wishes to do?  Okay.  Do you have other evidence from that

21  witness that you wish to offer?

22          (Declaration of Leticia Sanchez entered into

23  evidence)

24          MR. SLADE:  No, Your Honor.

25          THE COURT:  Okay.  Very good.

```
 1              MR. SLADE:  Your Honor, our next witness, we would
 2    call Mark Renzi.  He's the financial advisor to the Debtors.
 3    His declaration is Exhibit 1 on our witness list and we
 4    would offer that.  It's also on the docket at Docket No. 111
 5    -- it's on the docket at 1119.  We would offer that.  Mr.
 6    Renzi is here and available for cross examination.
 7              THE COURT:  All right.  Are there any objection to
 8    the admission of Mr. Renzi's declaration into evidence?  All
 9    right.
10              MR. HENDERSHOTT:  Your Honor, Tracy Hendershott,
11    Your Honor, pro se creditor.  Is there any way we can get a
12    continuation to be able to review all of these declarations?
13    There's literally hundreds of pages of documents that were
14    just submitted within 48 hours, unlike the professional
15    organizations, us creditors do not have an army of lawyers
16    to review all of this stuff and I thought the standards were
17    that we needed a week before any hearing of submission of
18    any type of documentation for us to digest, review, and
19    actually formulate questions and whether that's with
20    testimony or against the filings themselves.
21              MR. NEWSOM:  I'm in support of that.
22              THE COURT:  All right.
23              MR. HENDERSHOTT:  This has been actually a trend,
24    Your Honor.  Excuse me.  Sorry.  It's hard without visuals
25    of us being in person, but I don't intentionally mean
```

1   interrupt in any means, but this has actually been a trend

2   throughout this entire case starting right with the first

3   plan and disclosure meeting where the Debtors in Possession

4   submit almost 1,000 pages the day before.  There's no way

5   that us as pro se creditors are able to digest that in any

6   form whatsoever.  And that continues to this very day.

7           THE COURT:   Counsel?

8           MR. NEWSOM:  (indiscernible).

9           MR. SLADE:  Your Honor, we did file Mr. Renzi's

10  declaration two days ago along with our reply, consistent

11  with the deadlines that were set by the Court on Tuesday and

12  if Mr. Renzi's declaration weren't admitted, we would be

13  calling him to testify and he would say the same things that

14  are in his declaration.  So I don't think that's an

15  objection to the admission of the actual document, so we

16  would ask Your Honor to overrule the objection and admit the

17  declaration.  And any questions they can ask of Mr. Renzi on

18  cross examination.

19          MR. HENDERSHOTT:  Your Honor, I disagree.  I've

20  had absolutely no time or ability within the 48 hours of

21  being flooded with, you know, numerous submissions to be

22  able to review and even intelligently ask a question.  I

23  guess the question I'm asking, is there not a standard that

24  one week before the hearing is the cutoff for submission of

25  documentation to be discussed at that hearing?

1              THE COURT:  No, there isn't.  And most of the --

2      most of these declarations were filed in response to the

3      objections that were filed only a week before the hearing.

4              MR. HENDERSHOTT:  Right, so there's no ability for

5      us to be able to review them and digest them and, you know,

6      be able to have a valid exchange of questions and answers

7      during this hearing.  Again, we do not have an army of

8      professional lawyers to digest all these multiple

9      submissions.  It puts the credits at a disadvantage and I'm

10     sure that's part of the strategy.

11             MR. NEWSOM:  I agree.  I'm in support of that

12     objection.

13             THE COURT:  Okay.  True. Okay. Why don't you put

14     Mr. Renzi on the stand, but you know, an awful lot of what's

15     in his declaration is about compliance with various

16     provisions of the Bankruptcy Code that is pretty obvious on

17     its face and that hasn't been contested.  Don't really think

18     we need further evidence on that.  So if there's points that

19     you wish to argue with Mr. Renzi based on disputed issues,

20     objected issues, let's offer that.

21             As to other points, to the extent that his

22     declaration is just a kind of confirmation of compliance

23     with provisions of the code that are not in dispute, I will

24     admit it on those points.  But to the extent that is

25     anything in his declaration that deals with any of the

1    objected matters, let's just go ahead and do that live.

2    Okay?

3              MR. SLADE:  Happy to give it a shot, Your Honor.

4    I think one of the struggles as Your Honor experienced with

5    the two objectors that you spoke to, it's not entirely clear

6    what disputed issues are, but we will certainly give it a

7    shot.

8              THE COURT:  Okay, so the declaration is admitted

9    as to compliance with various provisions of the Bankruptcy

10   Code that haven't been contested and to the extent that Mr.

11   Renzi has any testimony to offer on subjects of -- to which

12   objections have been posed, we'll hear that testimony.

13   Okay?

14             MR. NEWSOM:  Your Honor, Dan Newsom, pro se

15   creditor.  If you want to hear objections (indiscernible)

16   right now or are we doing that at a later time?

17             THE COURT:  I'm sorry?  Well, the objections --

18             MR. NEWSOM:  Are you wanting to hear --

19             THE COURT:  Objections have been filed.  We're

20   taking evidence now.  Mr. Renzi is about to testify.

21             MR. NEWSOM:  Okay.

22             THE COURT:  Okay?  Mr. Renzi, do you swear that

23   the testimony you are about to give will be the truth, the

24   whole truth, and nothing but the truth, so help you God?

25             THE WITNESS:  Yes.

```
 1                THE COURT:  All right.  State your full name for

 2    the record.

 3                THE WITNESS:  Mark Anthony Renzi.

 4                THE COURT:  Thank you.  You may sit.

 5                MR. SLADE:  Your Honor, may I approach the witness

 6    --

 7                THE COURT:  Yes.  You don't need permission.  You

 8    can go ahead.

 9                DIRECT EXAMINATION OF MARK RENZI

10    BY MR. SLADE:

11    Q    Good morning, Mr. Renzi.

12    A    Good morning.

13    Q    Can you tell the Court and the folks on the phone what

14    you do and what your role is for the Debtors?

15    A    So Mark Renzi.  I'm a financial advisor to the Debtors.

16    I lead our financial institutions group at BRG.  I've been

17    working with the company since the beginning of this

18    bankruptcy process.

19    Q    Okay.  I want to try to hit the, what I understand to

20    be contested issues as directed by the Court.  The first one

21    I want to talk about is feasibility.  Okay?  Can you just

22    tell the Court what the plan does?

23    A    Yep.  The plan demonstrates that, number one, that we

24    have gone out and solicited all of our customers to vote on

25    the plan.  It's -- demonstrates that it's in the best
```

1    interests of creditors and it demonstrates that we have

2    overwhelming support based on my understanding that was just

3    admitted in terms of -- from Stretto.

4    Q    Okay, can you just describe generally what are the

5    transactions that are contemplated by the plan?

6    A    The transaction contemplated by the plan is the sale of

7    the assets to Binance.US and effectively doing that, you

8    know, in short order by April.  And that has been a

9    maximizing value transaction that we've worked through with

10   the company and the Unsecured Creditors Committee.

11   Q    And if the transaction with Binance does not close,

12   what happens under the plan?

13   A    Under the plan, there's a provision for a toggle and

14   that toggle into liquidation.  And that has been heavily

15   negotiated and it is a provision in case there are any

16   contingencies.  And most importantly, what I think the

17   toggle does is it helps expedite any process to get

18   cryptocurrency and assets back to customers.

19   Q    Okay.  So let's take each one of those in turn.  I want

20   to start with the Binance transaction.  What role has your

21   team played in diligencing the Binance transaction?

22   A    You know, our team has worked alongside with the

23   Debtors, our investment bank Moelis, and the company to make

24   sure that we understand how the transaction works.  We've

25   worked specifically with Binance and their counsel to make

1    sure that we had an opportunity to diligence how it would

2    go, how it would work, and then we also solicited third-

3    party information, made sure we had incredibly good detail

4    about the markets in cryptocurrency to make sure that this

5    transaction made sense.

6    Q    Okay.  And based on your review, do you believe the

7    transaction with Binance makes sense?

8    A    I do.

9    Q    Sitting here, based on what you know today, do you have

10   any reservations about the Binance transaction?

11              MR. SHEHADEH:  Objection.

12              THE COURT:  What is the objection?

13              MR. SHEHADEH:  I object that the plan makes no

14   sense, Your Honor.  It's not a better plan.  There was no

15   toggle liquidation in the beginning when there was

16   supposedly a bidding war.

17              THE COURT:  Okay.

18              MR. SHEHADEH:  -- between FTX and other companies.

19              THE COURT:  All right, let me --

20              MR. SHEHADEH:  If that -- if they want the best

21   interest in the creditors, they should've just released our

22   money when the FTX bid didn't go through.  They would've

23   saved millions and millions of dollars --

24              THE COURT:  Let me --

25              MR. SHEHADEH:  -- on counsel --

1        THE COURT:  Let me interrupt --

2        MR. SHEHADEH:  -- third parties.

3        THE COURT:  Let me interrupt you, please.  Who is

4    making the objection?  Whenever you speak, you need to

5    identify yourselves or we won't have a record.  Who is

6    making the --MR. SHEHADEH:  I'm sorry, Your Honor.  Alah

7    Shehadeh.  Alah Shehadeh for the record, pro se creditor.

8        THE COURT:  Just to be clear, when the witness is

9    testifying, you can object on evidentiary grounds, right, if

10   there's some reason under the rules of evidence why there's

11   something wrong.  But the fact that you disagree with what

12   the witness says is not a ground for objection.  That's a

13   ground for argument at the end of the day.  It's not a

14   ground for objection to the witness's testimony.  Okay?

15       MR. SHEHADEH:  Well, I'm objecting, Your Honor,

16   and there's facts behind my objection.  It's not just my

17   opinion.

18       THE COURT:  But, okay, you'll have your chance to

19   make your argument and if you have evidence you want to

20   offer, to offer it.  But to object to the witness' testimony

21   is really something you can only do on evidentiary grounds.

22   If the Debtor disagrees with you, they're entitled to put on

23   their case and you can put your case on later, but it's not

24   a ground to object to their evidence just that you disagree

25   with it.  Okay?  Go ahead.

Page 57

```
 1              MR. SLADE:   Thank you, Your Honor.
 2              THE COURT:   The objection is overruled.
 3              MR. SLADE:   Thank you.
 4   BY MR. SLADE:
 5   Q    Please describe for the Court why you're comfortable
 6   going forward with the Binance transaction based on what we
 7   know today?
 8   A    I'm comfortable with this transaction because number
 9   one, our team BRG has spent a significant amount of time
10   diligencing this transaction.  Number two, Moelis has got
11   the same, they've diligenced this transaction extensively.
12   Number three, the advisors Kirkland & Ellis has also
13   diligenced a tremendous amount.  Number four, FTI Consulting
14   has also diligenced this transaction and then pressure
15   tested this and they represent the Unsecured Creditor
16   Committee and McDermott, Will and Emery has also done the
17   same.  So with the objectivity of counterparties that are
18   protecting the customers and with the objectivity of
19   independent parties that are representing the Debtors, I
20   believe based on everything that I've seen that this is a
21   fair plan and it's been well documented.
22   Q    So you heard a couple of the regulators before you got
23   on the stand testify about hypothetical potential regulatory
24   options.  Are you aware of those?
25   A    I am.  I've actually written about some of the
```

1    regulations in cryptocurrency.

2    Q    Okay.  And in spite of those, do you still believe this

3    is in the best interests of the estate to go forward sitting

4    here today?

5    A    Yes, I do.

6    Q    Can you describe why?

7    A    I think cryptocurrencies is an evolving asset class.

8    The regulatory overlay is still developing.  I heard some of

9    the remarks that were made earlier in the Court here, but

10   there's nothing that I understand based on advice from and

11   counsel that precludes this transaction from going through.

12   Q    Okay.  Now I want to move to the toggle transaction.

13   Why is that part of the plan?

14   A    I think the -- what we're trying to do, the Debtors,

15   the company, as well as its advisors, is to make sure that

16   to the extent that there's any reason that we're

17   uncomfortable with the transaction being consummated with

18   Binance.US, we have optionality to go convert it into a

19   toggle plan.  And most importantly, it provides a path to

20   get crypto back to its customers as quickly as possible.

21   And we believe that that's very important.

22   Q    Does the company currently have personnel on hand to do

23   the work needed for the toggle transaction if we decide to

24   toggle?

25   A    Yes, it does.

```
 1   Q    Okay. And can you just describe for the Court what will

 2   happen if we have to toggle to the toggle transaction?

 3   A    I mean, if we have to toggle from the Binance

 4   transaction, the company is prepared and its personnel are

 5   prepared to execute on the transaction to distribute

 6   cryptocurrency to customers.  It's important to do this.  It

 7   would be unfortunate because it would be a little less in

 8   proceeds as I'm testifying here, but nonetheless, we have

 9   the ability to do it and the personnel's ready to do it and

10   a plan to do it, if we had to.

11   Q    Mr. Renzi, is the only reason to believe that if the

12   plan is confirmed, it's likely to be followed by further

13   liquidation or reorganization of the Debtors?

14   A    Do you mind asking that question again?

15   Q    Sure.  Is there any reason to believe that if this plan

16   is confirmed there's going to be a likelihood of a need to

17   further reorganize or liquidate the Debtors --

18   A    No.

19   Q    -- in a way other than is described in the plan?

20   A    No.  I think the way it's described in the plan is

21   appropriate.

22   Q    Thank you.

23          MR. SLADE:  Your Honor, a clarification for you.

24   Do you view the liquidation analysis best interest test as a

25   matter that's in dispute and I need to inquire the witness
```

1    about?

2            THE COURT:  Is the State of Texas still raising a

3    best interests issue or have they been satisfied on that

4    point?  Is the -- are the state's attorneys on the phone?

5    Is anybody on the phone --

6            MS. RYAN:  Your Honor?

7            THE COURT:  Thank you.

8            MS. RYAN:  Your Honor, I apologize.  This is Mrs.

9    Ryan with the State of Texas.  I was having problems getting

10   unmuted.  Could you repeat your question, Your Honor?

11           THE COURT:  The question was, does -- Texas had

12   raised an issue about whether under the disclosure

13   statement, liquidation was a better option than the plan,

14   which is essentially a question of best interests as we call

15   it under the Bankruptcy Code.  I understand the Debtors'

16   response was that if the -- if an Alameda or other event

17   changes the plan recoveries, it would have the same

18   proportionate effect on Chapter 7 recoveries.

19           My question is, do you still have an objection on

20   that point?  Do we need any evidence on it or have you been

21   satisfied?

22           MS. RYAN:  Your Honor, I do still have some

23   questions on that point to get some clarification.  And so

24   when the time is appropriate, I can ask those.

25           THE COURT:  Okay, why don't you go ahead, put your

Page 61

1    best interests case on.

2              MR. SLADE:   Sure, Your Honor.

3    BY MR. SLADE:

4    Q    Mr. Renzi -- and I want to talk about the best interest

5    test and liquidation analysis that your team did, okay?

6    A    Sure.

7    Q    You just describe for the Court what you did to

8    evaluate the plan versus a hypothetical Chapter 7

9    liquidation?

10   A    So number one, the declaration is quite extensive on

11   this, but I'll do the short version.  Essentially, what we

12   did is evaluate all of the assets that we have, so the

13   coins, and make sure that we understood, you know, what kind

14   of proceeds we could get for rebalancing the portfolio.  We

15   looked at that systematically.  We looked at that with, you

16   know, being able to test and call market participants in the

17   market and understand how to monetize these assets to

18   rebalance, to make distributions in kind.

19        That is a complicated process based on the way the

20   markets work in cryptocurrency.  And so, having the ability

21   to do that is very important in the plan for the Binance

22   plan.  If we have to do it for the toggle, it would -- we

23   also considered that under the toggle and both of those are

24   key for the plan.  And then we evaluated how those proceeds

25   will flow through the waterfall of creditors, you know,

Page 62

1   through the priority waterfall, and then down to account

2   holders.  And so -- and then we juxtaposed that analysis,

3   that those two analyses against the liquidation.  In a

4   liquidation, we believe that the ability to monetize these

5   assets is a little bit more problematic because these

6   markets are particularly complicated.

7       There are unsupported coins and monetizing unsupported

8   coins quickly is likely to have a very heavy discount.  And

9   because of those factors, we believe that the proceeds that

10  we get under an immediate liquidation under a Chapter 7

11  would yield lower recoveries for customers.  So I think in

12  general, to summarize at a high level that the plan has

13  higher recoveries for all three entities, legal entities,

14  versus a liquidation, a Chapter 7 liquidation, and that

15  satisfies the best interests of creditors test.

16  Q    Is that true for all creditors?

17  A    Yes.

18  Q    Does it doesn't matter whether or not FTX prevails in

19  its litigation that it has initiated against the Debtors?

20  Does that make a difference for purposes of liquidation

21  analysis?

22  A    No.

23  Q    I want to turn now to the unsupported jurisdictions.

24  What does the plan provide with respect to the 4 out of 50

25  states that have not licensed Binance.US?

1  A    I was under the impression now it's three, but wanted

2  to confirm that, Your Honor.

3  Q    So what does the plan provide for those customers?

4  A    So the plan provides for a period of time for the three

5  states that remain to be able to have distributions in kind

6  for customers.  I think effectively all customers are

7  treated on a pari passu basis with equal footing and they

8  will all get the same amount of recovery based on their

9  class.  So that's the most important thing.  And regardless

10  of state.  However, there are some technicalities within the

11  states, three states that I'm aware of, that I don't really

12  fully understand the technicalities within those states, but

13  I understand that there's some problems for distribution.

14  However, there's a six-month hold period, you know, to

15  address that, to provide enough time for the states to get

16  comfortable with distributions to customers.

17  Q    Just so we're clear, do the customers in the

18  unsupported jurisdictions get the same recovery as the

19  customers in the supported jurisdictions?

20  A    Yes, they do.

21  Q    Okay.  Can you describe for the Court, whether it's

22  possible for Voyager to facilitate distributions in kind to

23  creditors in the unsupported jurisdictions and do the

24  Binance transaction at the same time?

25  A    I mean, the Binance transaction effectively sells the

Page 64

1   entire platform over the Binance, so in order for Voyager to

2   distribute to the three remaining states, they would have to

3   do it manually.  In my opinion, 120,000 customers with over,

4   I believe, it's 106 coins, is incredibly problematic and

5   fraught with -- to do it manually.  So I would be very

6   concerned if that was the path that we would have to take.

7   Q    Can you just describe for the Court what some of the

8   risks would be?

9   A    The risks, I mean, when you have a very well-developed

10  platform such as Binance.US, they have the ability to

11  understand, you know, KYC and AML issues to make sure that

12  there's a good record keeping.  That platform can be -- you

13  know, track all of that very well.  I think a manual process

14  is very labor intensive.  I don't think it's easy to check,

15  KYC and AML issues for making distributions.  Those are some

16  of the issues that I would have if it had to be done

17  manually.

18           MR. SHEHADEH:  Your Honor, I'd like to object to

19  that because if you look at Binance's asset shuffling, it's

20  very similar to FTX and this is by (indiscernible), Your

21  Honor.  Summarizing Binance's, ongoing lies and deception

22  with the (indiscernible) financial transparency, comingling

23  customers' funds, (indiscernible) assets.  So you wanted to

24  (indiscernible), then they have liquidity issues and then

25  they file for bankruptcy.  Then what happens next?  Is that

1    the best interest in the creditors?

2            THE COURT:  I --

3            MR. SHEHADEH: I feel like if (indiscernible)

4    really have the best interest in the creditors, the moment -

5    - first of all, they wouldn't even have filed Chapter 11 --

6            THE COURT:  Mr. Shehadeh --

7            MR. SHEHADEH:  -- because they want --

8            THE COURT:  Mr. Shehadeh --

9            MR. SHEHADEH:  -- organization plan --

10           THE COURT:  Stop, please.

11           MR. SHEHADEH:  -- had no plan to reorganize the to

12   reorganize the company.  They want to sell it.

13           THE COURT:  Please.  Please stop.

14           MR. SHEHADEH:  They want to liquidate it and milk

15   as much money --

16           THE COURT:  Please stop for a moment.  Stop for a

17   moment, please.  You need to understand, disagreeing with

18   the witness' conclusion is not a ground to interrupt the

19   witness' testimony.  You have your own arguments, you may

20   have your own evidence, but that's not a basis on which to

21   interrupt the witness' testimony.  It is not a proper

22   objection to what the witness has said.  If you have

23   questions of the witness, then you can ask them when the

24   direct examination is finished.  If you have evidence, you

25   will have a chance to offer it after the Debtors have

Page 66

1    finished their case, but I know you're not a lawyer, but

2    please listen to me.  You cannot interrupt a witness'

3    testimony or object to it on the ground that you disagree

4    with it.  That is not a proper objection.  Okay?  It is only

5    a proper objection if there's something wrong under the

6    rules of evidence with what is being offered.  And if you

7    disagree, that's a point either for argument or for cross

8    examination or for the presentation of your own evidence.

9    Okay?

10              MR. SHEHADEH:  Yes, Your Honor, I understand that

11   but I'm not arguing on it.  I'm just stating the facts.  I

12   objected to the fact that the witness is saying that that is

13   the best --

14              THE COURT:  That is arguing.

15              MR. SHEHADEH:  -- thing for the creditors --

16              THE COURT:  Stating what you believe are contrary

17   facts is argument.  So you have to wait.  Okay?  That's not

18   a basis to interrupt --

19              MR. SHEHADEH:  It's not what I believe --

20              THE COURT:  -- this witness' testimony.

21              MR. SHEHADEH:  -- are facts, what I understand.

22              THE COURT:  Okay.  Please don't interrupt the

23   witness' testimony and -- with that kind of issue again,

24   okay?  All right.  Had you finished your prior answer?

25              THE WITNESS:  Yes, Your Honor.  Thank you.

```
 1              THE COURT:  Okay.
 2    BY MR. SLADE:
 3    Q    Just a few more questions, Mr. Renzi.  I want to talk
 4    about the remaining personnel at the company.  Okay?  Can
 5    you describe the role of the remaining personnel at Voyager
 6    in executing on either the sale to Binance or the toggle
 7    transaction?
 8    A    The remaining personnel have, you know, in-depth
 9    knowledge of cryptocurrency markets, how the operations
10    work, how to do things, you know, within the constructs of
11    legal entities that they have, and they're experts within
12    Voyager.  So they'll help facilitate rebalancing, which is a
13    major transaction to get done and it is very, very
14    complicated.  They'll also help with, you know, making sure
15    the records are maintained properly and any other things
16    that are required by the trust.
17    Q    What would be the impact on for -- just as an example,
18    the security risks to these transactions if the employees
19    were to leave?
20    A    I would be very concerned if the employees had to
21    leave.  They were -- have been protecting these assets
22    during the bankruptcy case.  They understand how to address
23    security issues and they have intimate knowledge of how to
24    transact within the cryptocurrency marketplace.
25    Q    So can you just describe for the Court like some of the
```

1    risks involved in these transactions from a security

2    perspective for the customers?

3    A    Well, rebalancing is very -- is complicated.  So making

4    sure you have the right counterparties, making sure that

5    they can transfer money in and out within accounts in an

6    appropriate fashion is imperative.  I believe that those are

7    among the things that they're doing to address risks.

8    Q    And how about the actual transaction where we're

9    transferring the money either to Binance in the Binance deal

10   or directly to customers in the toggle?

11   A    Absolutely.  The transaction and distribution of funds

12   or coins in kind is incredibly important to get done.  I

13   think you can't reverse a wire in crypto.  It's what you

14   distribute to a wallet.  It's permanent, and undoing that

15   is, to the best of my knowledge, I don't think you can undo

16   a mistake.  And in a bank context, you can reverse a wire,

17   as -- by way of example.

18   Q    And can you describe for the Court whether the risks

19   are higher or lower of those transactions, if the employees

20   that are still at the company leave?

21   A    My opinion is it's much higher if the employees at the

22   company leave.  They're experts in the space.  I believe

23   that it's hard to find people like them.  I think if it was

24   to be someone independent, by way of a Chapter 7 Trustee, I

25   think it would be much more complicated and obviously, in my

1    expert opinion, I believe it would cost -- it would be not

2    value maximizing under those scenarios.

3    Q    Okay.  That's actually the last topic I wanted to

4    cover, which is the possibility of the appointment of a

5    Trustee.  Do you believe an appointment of a Trustee would

6    be good or bad for creditors?

7    A    It would be bad.

8    Q    Can you describe why?

9    A    I think the most important thing we've heard from some

10   of the customers on the phone is to get their cryptocurrency

11   back.  So timing is very important.  We believe that if

12   there was a Trustee, it would extend the timeline for

13   customers to get their cryptocurrency back.

14        We also believe that there's a higher probability of a

15   conversion to a seven, and right now, we already have 97

16   percent of customers voting in favor of this plan.  And then

17   lastly, we've been doing this in a transparent and

18   collaborative way with the Unsecured Creditors Committee and

19   advisors.  So I'm not -- really don't understand, other than

20   the downside of appointing a Trustee.

21             MR. SLADE:  Thank you, Your Honor.  Pass the

22   witness.

23             THE COURT:  All right.  Is there anybody in the

24   room -- start with the people who are present in the room --

25   who wishes to cross examine Mr. Renzi?

1          CROSS EXAMINATION OF MARK RENZI

2     BY MS. SCHEUER:

3     Q    Good morning, Mr. Renzi.  For the record, Therese

4     Scheuer for the Securities and Exchange Commission.

5     A    Morning.

6     Q    Mr. Renzi, what are market constraints?

7     A    I think simply put, and I know this is a newer asset

8     class, but simply put, market constraints really mean by way

9     of example, Bitcoin and ETH have a very deep market trading

10    volume.  And there are others that have, you know, a large

11    market cap.  But there are a number of less common, more

12    obscure coins that don't have as much of market depth.

13         And so as I in my decoration, I used to be -- I used to

14    be a trader a long, long time ago and understand markets

15    very well.  And if you are selling coins that don't have a

16    lot of market depth, there's a tremendous amount of concern

17    that it will move in the market.  I think Bitcoin and ETH

18    have a much larger market, so by way of example, it's harder

19    to move that market unless there's very large blocks, but

20    that's the general concept of -- that you were asking about.

21    Q    Thank you.  And I'm going to paraphrase, but I think

22    Paragraph 76 of your declaration provides that a mass sale

23    of coins in illiquid markets is expected to move the market

24    significantly.  Do you agree with that?

25    A    Yes, I agree with that.

1   Q     Okay. And in a Chapter 7 case, you assume that a

2   Chapter 7 Trustee would liquidate coins immediately, which

3   would move the market lower and your declaration provides it

4   would reduce distributions by 20 to 26 percent; is that

5   correct?

6   A     Yes.  That's correct.

7   Q     But the market depth constraints were not as

8   significant for a sale or toggle plan, correct?

9   A     That's correct.

10  Q     And why was that?

11  A     Well, under -- number one, you know, having the ability

12  to rebalance with time, you know, maximizes value and that's

13  important.  I think to the -- and we also have verified that

14  if we had to do this quickly, there'll be tremendous

15  pressure on the market.  So I think if you're going into a

16  liquidation, straight liquidation, without a prescribed

17  plan, so a Chapter 7 liquidation, there'd be a tremendous

18  amount of pressure on the market, and that's also validated

19  by market makers in the industry, Moelis, BRG, and also in

20  consultation with the UCC advisors.

21  Q     And are those -- are the market constraints what

22  accounts for the difference in recoveries and the different

23  scenarios, the sale toggle, the liquidation?  Is that the

24  primary difference?

25  A     That is a primary difference.  I mean, I think the

1    issue is that there are unsupported coins.  Unsupported

2    coins are much easier to address if you're distributing them

3    in kind versus trying to liquidate those coins.  We went to

4    market makers to understand what that would look like if we

5    had to transact quickly and were given rates of decrease,

6    you know, in the market.  And then then lastly, I'll say my

7    expert opinion from having to trade derivatives, if you try

8    to move trading derivatives quickly, people will generally

9    try to take advantage of that and then it will be a much

10   worse outcome.

11   Q    Okay.  Are you familiar with the stipulation that

12   Voyager recently filed with the FTX debtors?

13   A    I'm familiar, but I would like a refresher if somebody

14   has a copy of that for me.

15   Q    This stipulation regarding FTX's preference actions.

16   Does that refresh your recollection at all that Ms. Okike

17   mentioned at the beginning of the hearing?

18   A    Yes.

19   Q    Broad brush, what is your understanding of what

20   settlement provides?

21          MR. SLADE:  I'll object to the relevance of this

22   question.

23          THE COURT:  Well, I don't know if it's relevant or

24   not.  It seems to be not what this witness is testifying

25   about.  Is there a different witness that you plan to offer

Page 73

```
 1    on the -- as to the FTX stipulation?
 2              MR. SLADE:  That's not up for today, so no.
 3              MS. SCHEUER:  Your Honor, I don't plan to question
 4    in depth regarding that stipulation. It just goes to the
 5    effect that might have on distributions.
 6              THE COURT:  The stipulation or the underlying
 7    claim.
 8              MS. SCHEUER:  The stipulation.
 9              THE COURT:  You can answer to the extent you know.
10    BY MS. SCHEUER:
11    A    I think that I'd like to look at the continent before I
12    answer you in depth, but in general, I understand that if we
13    have to reserve more funds for FTX Alameda, that it would
14    apply across all scenarios equally, so it would reduce
15    recoveries equally in general.  But that's --
16    Q    Is your understanding that four -- over $400 million
17    would be set aside in connection with those preference
18    actions?  Is that --
19    A    Under a hypothetical scenario, yes.  It would have to
20    be set aside, but I don't -- I can't opine as to how, why.
21    And I just understand the math.
22    Q    Is that your understanding of what the general
23    settlement currently provides?  That --
24    A    I understand --
25    Q    -- $400 million would be set aside.
```

1    A    -- 400-plus million.  Yes.  Sorry.  Sorry to interrupt

2    you.

3    Q    That's quite all right.  I'm sorry if I was talking

4    over you.  But that 400 million, 445 million, would that be

5    set aside in coins or is it being set aside in cash?

6    A    Your Honor, I'm not sure I know the answer to that.

7    Q    If it had, if $445 million worth of coins had to be

8    liquidated now and set aside in cash, would there be market

9    depth constraints in liquidating those coins?

10   A    I mean, I think the same issue applies.  If you -- to

11   the extent that you had to set aside funds, we would work

12   with the Unsecured Creditors Committee and also the company

13   and our advisors to find out what's the optimal way to set

14   aside funds so that we don't have the market constraint

15   issues that I described earlier.  But we had to set aside

16   them, it would certainly be a significant amount of money.

17   And if we have to liquidate coins, it's subject to all of

18   the issues that I just formerly testified to.

19   Q    And the 445 million is almost half of the coins on the

20   value of the coins on the Debtors' platform?  Is that right?

21   A    The value has gone up, so it's a little less than half

22   now.

23   Q    Okay.  And what steps would you take to mitigate

24   against those market depth constraints?

25            MR. SLADE:  Your Honor, I would object.  I'm just

1    having a hard time connecting any of these questions to the

2    SEC's objection.

3         MS. SCHEUER:  Our Paragraph 7 of the SEC's

4    objections noted that creditors and stakeholders are

5    entitled to know what the sale transaction provides.

6    They're entitled to know the benefit of the sale transaction

7    versus the toggle or a liquidation.  I'm paraphrasing.

8         THE COURT:  This isn't really a feature of the

9    sale transaction.  The -- you know, the Bankruptcy Code says

10   that administrative claims have to be paid in full.  The FTX

11   preference, Alameda preference claim is asserted as an

12   administrative claim.  The only way you can comply with the

13   Bankruptcy Code requirement is to reserve the amount that's

14   in dispute until such time as the claim is resolved.  I

15   think, no matter what, that the Debtors are selling coins to

16   Binance and holding cash -- but you can correct me if I'm

17   wrong -- but that Binance will be, whether it's -- whether

18   Binance -- anything that Binance will not be distributing

19   directly to customers as their original distributions is my

20   understanding, is being converted to cash; is that right?

21   I'll ask the Debtors.

22        MS. OKIKE:  That's correct, Your Honor.

23        THE COURT:  Okay.  I think that's been stated in

24   the plan.  So what's been held in reserve, am I right, is

25   just cash?

1          MS. OKIKE:  Yes.

2          THE COURT:  Okay.

3    BY MS. SCHEUER:

4    Q    Mr. Renzi, was part of your assumption that 450 million

5    would be converted into cash immediately or --

6    A    I --

7    Q    Your assumptions in the sale toggle or liquidation

8    analyses, did you assume that 455 million would be converted

9    into cash immediately?

10   A    I don't think my declaration addresses the 455 -- 445

11   million.

12   Q    But your declaration does provide that if you had to

13   liquidate those coins immediately it would be a significant

14   depreciation in a Chapter 7 case between 20 to 26 percent

15   for liquidating all of the coins; is that correct?

16   A    Your Honor, I don't follow the -- I don't understand

17   the question.

18          THE COURT:  Explain --

19          MR. SHEHADEH:  I don't think (indiscernible)

20   question was clear.

21          THE COURT:  How -- explain how the value of the

22   coins is being determined under the Binance deal.

23          THE WITNESS:  Well, the issue that we're getting

24   at is a math issue.  So if we have to do it under any

25   circumstance, it's going to affect them all equally.  So to

1    the extent that you have to do it under a Binance plan or a

2    toggle plan or even a liquidation plan, it still

3    demonstrates that the plan, under a Binance plan or a toggle

4    plan, is still better than a Chapter 7.  So to the extent

5    that it's just simple math, to the extent that you have to

6    liquidate a portion, into cash immediately, it's going to

7    affect all plans relatively equally in terms of the math.

8    It's -- it'll be -- it'll decrease the recoveries overall.

9              THE COURT:  Ms. Okike, under the Binance deal, is

10   there a particular date as of which the values of the coins

11   will be measured?

12             MS. OKIKE:  The value of the coins?

13             THE COURT:  Yes.

14             MS. OKIKE:  Yes, Your Honor.

15             THE COURT:  And what is that date?

16             We're going to take a ten-minute break while you

17   figure that out.  I thought I remembered that under the

18   Binance deal, the value of the coins would be determined as

19   of market prices on a particular date.  In other words, they

20   wouldn't just be whatever they happen to be actually sold at

21   when the transfers happened.

22             MS. OKIKE:  Yes, Your Honor.

23             THE COURT:  It would be fixed based on other

24   market terms.

25             MS. OKIKE:  So it's no later than the date that is

```
 1    one business day prior to the closing.

 2              THE COURT:  Okay.  All right.

 3              MS. OKIKE:  It's a moving target.

 4              THE COURT:  So in other words, they'll be based on

 5    a market that will be -- that won't be affected by these

 6    particular coin transfers.

 7              MS. OKIKE:  Correct.

 8              THE COURT:  It'll be fixed at that market price.

 9              MS. OKIKE:  Correct.

10              THE COURT:  All rights.  Let's just take ten

11    minutes, okay?  We are in recess for ten minutes.

12              (Recess)

13              THE COURT:  Please be seated.  By the way, I'm not

14    sure that the disclosure statement is officially in

15    evidence.  I think it ought to be.

16              MR. SLADE:  Yes.  Your Honor, we move to -- we

17    offer Exhibit 12 and 13 off of our exhibit list, which are

18    the order scheduling the hearing with the disclosure

19    statement and the actual disclosure statement.  Those are at

20    Dockets No. 861 and 863.

21              THE COURT:  I'll admit those into evidence.  So

22    they need to be in evidence, because that's what some of the

23    objections are addressed.  Please proceed.

24              (Exhibits 12 and 13 entered into evidence)

25              MS. SCHEUER:  Thank you, Your Honor.  For the
```

Page 79

1    record, Therese Scheuer for the Securities and Exchange

2    Commission.

3    BY MS. SCHEUER:

4    Q    Hello again, Mr. Renzi.  Mr. Renzi, just before the

5    break, I think we heard that the value of coins would be

6    fixed two days prior to the closing of that, correct?

7    A    I believe so, yes.

8    Q    And when will closing occur?

9    A    I think that it's -- I understand it's a moving, a

10   little bit of a moving target, but sometime in April

11   hopefully.

12   Q    So could the -- could liquidating $445 million worth of

13   coins affect the value of coins when they're fixed at that

14   date?

15   MR. SLADE:  Your Honor, I would object to relevance, and

16   it's also outside the scope.

17   THE COURT:  You can answer.  I'll overrule the objection.

18   You can answer.

19   BY MS. SCHEUER:

20   A    You mind asking again?  Thank you.

21   Q    Sure.  So could liquidating the $445 million worth of

22   coins in connection with the FTX settlement, could

23   liquidating that amount of coins affect the value of the

24   coins when they're fixed two days prior to closing?

25               THE COURT:  Can I just make sure I understand?

Page 80

1    Are you asking him if they will be liquidated before the

2    closing or are you asking him, would it have such a effect?

3              MS. SCHEUER:  Would it have such an effect.

4              THE COURT:  If it happened.

5    BY MS. SCHEUER:

6    A    I think the goal is to do as much rebalancing as

7    possible, you know, before closing.  So to the extent that

8    that's done, it -- the answer is, it depends.  I mean, if

9    you're not able to do a sufficient amount of rebalancing

10   between now and then and then you have to do immediately,

11   then it's certainly very problematic but right now, we're

12   trying to avoid having that problem.

13   Q    So is liquidating $445 million worth of coin, that

14   would be -- that's part of your rebalancing transaction?

15   A    I believe it is part.  It's part of it.  we're trying

16   to rebalance.  We're rebalancing every day, throughout the

17   day, right now.

18   Q    And so you're trying to balance as much as you can

19   prior to closing; is that correct?

20   A    We're trying to rebalance as much as we can prior to

21   closing.

22   Q    I think your --

23   A    And hopefully, we'll be -- we'll meet that goal.

24   Q    I think your prior testimony was that the major delta

25   between the sale transaction and a Chapter 7 liquidation or

1  the toggle transaction but primarily the Chapter 7

2  liquidation was having to sell all of those coins by April

3  18th; is that correct?

4  A    Well, the issue is, and I think I spell it out in my

5  declaration, is if we have to convert, there's a period of

6  time that you have to convert and it will take more time to

7  address any issues that the Chapter 7 Trustee would have and

8  monetize into cash to the extent that we have it.  And then

9  furthermore, there are unsupported coins that aren't going

10 to be able to be addressed easily in a Chapter 7.

11 Q    But your prior testimony was that the market depth

12 constraints were the -- I think the significant reason for

13 the difference between the sale transaction and the Chapter

14 7 transaction because in Chapter 7, you assumed the Trustee

15 would liquidate the coins immediately by April 18th.

16 A    To the extent that, I mean, if any of the rebalancing

17 hasn't been done or we have to monetize any other coins and

18 convert it into cash, there is going to be a significant

19 amount of issues in terms of market constraints and it will

20 lower recovery.

21 Q    Do you -- is it your view that liquidating $445 million

22 worth of coins now would it impact the liquidation analysis

23 that we've set forth?

24 A    If you have to liquidate coins immediately, right now,

25 it will decrease the amount of recoveries across all

1    scenarios.

2    Q    But in the sale transaction, your assumption was that

3    they would all be liquidated immediately.  So isn't the

4    impact really on the sale transaction or the toggle in

5    decreasing the recovery so that the delta between the sale

6    and Chapter 7 is much smaller than is in your liquidation

7    analysis?

8    A    I don't think you stated my testimony correctly.

9    Q    How so?

10   A    You just said, I think what -- number one, I think you

11   had made a statement.  I'm not sure I follow all of your

12   statement, but I think the issue is that, you know, under a

13   transaction, a sale, you're maximizing value.  You are

14   rebalancing these coins.  You are getting proceeds from the

15   Binance transaction and there's less of a market discount

16   because you're doing it in an orderly fashion.

17        To the extent that you don't do it in an orderly

18   fashion and it has to convert, it's left to people that are

19   less familiar with cryptocurrencies.  There's going to be a

20   diminution in value.

21   Q    Okay.  All right, I think we can move on.  Thank you.

22   Mr. Renzi, how do you assess the impact of pending

23   regulatory actions and investigations?  Did you assess what

24   that impact would be on investor recovery or could be on

25   investor recovery?  Was that included in your analysis?

1   A    I discussed any regulatory issues with counsel, make

2   sure that I understood them.

3   Q    Was that modeled in your analysis, included in your

4   numbers?

5   A    It is included.

6   Q    How so?

7   A    There -- to my understanding and actually in the

8   discussion earlier today in Court, there are issues that are

9   still unresolved by regulators.  And so as far as I know,

10  everything that we're doing in terms of rebalancing has been

11  improved -- approved by the Court to do so.  And we're

12  following the Court rules and what's been approved to do by

13  the Court.

14       And we've done that in a transparent fashion with the

15  approval of the UCC and their advisors and I don't think

16  that that speaks to your question in terms of how that is

17  addressed from a regulatory environment that's evolving and

18  we're trying to comply with whatever -- all the rules that

19  we -- have been set out for us by this Court.

20  Q    But there was no kind of risk or a some kind of

21  percentage in your numbers that could -- that kind of covers

22  regulatory risks?

23  A    No.

24  Q    Whether CFIUS approves the transaction impacts whether

25  stakeholders get paid; is that right?

1    A    I think -- are you asking -- I don't understand the

2    question.  Are you asking if CFIUS prevents the transaction?

3    Q    Mm hmm.

4    A    Yes, there -- we would have to go into a toggle plan.

5    Q    And what happens if CFIUS decided to deny approval

6    after the sale had closed?  What would happen to investors?

7    A    I would defer to counsel.

8    Q    But that wasn't included in your numbers, your

9    estimates?

10   A    If we need to toggle, we have the provision to toggle

11   into a toggle liquidation plan.

12   Q    But if CFIUS denies approval after closing, the toggle

13   plan is no longer possible.  That wasn't included in your

14   numbers; is that correct?

15   A    I don't think there's any numerical quantification of

16   --

17   Q    Okay.

18   A    -- CFIUS.

19   Q    Okay.  Why do you think this is a good deal for

20   investors?

21   A    This deal is -- satisfies the best interest test.  It's

22   approved by 97 percent of our customers.  It is maximizing

23   value, as proven by the analysis that's provided in my

24   declaration.  Those are among the most -- the reasons.

25   Q    It is approved by 97 percent of your customers --

1           MR. SHEHADEH:  I'm going to object to that,

2     please.  It's approved 97 percent of the customers at a

3     certain level.  (indiscernible) based on how much money each

4     creditor has, so that's 97 percent of maybe like the top

5     five creditors (indiscernible) on the plan.

6           THE COURT:  Okay, who is speaking right now?

7           MR. SHEHADEH:  Alah Shehadeh, Your Honor, for the

8     record.

9           THE COURT:  Mr. Shehadeh, you cannot interrupt

10    questions and answers to argue over the answer.  Okay?  You

11    can only speak when it is your turn to question a witness or

12    when it is your turn to offer evidence or if you have an

13    objection that is based on a rule of evidence as to the form

14    of a question.  I've said this now, I think, three times.

15    You cannot interrupt just to disagree with the witness.  It

16    is not appropriate and you have to stop doing it, okay?

17           Please proceed, counsel.

18           THE WITNESS:  Your Honor, I'm happy to rephrase my

19    statement.

20    BY MS. SCHEUER:

21    A    So of the people voting, 97 have voted in favor.

22    Q    Thank you.  So of the 6 percent voting, 97 percent of

23    those 6 percent.  Is that --

24    A    I just want to say, of -- I think my testimony stands

25    on its face.

1    Q    Thank you, Mr. Renzi.  Wouldn't account holders be just

2    as well off if they could get their -- if they could get

3    coins back into their own wallets without this uncertainty?

4    A    I'm sorry, can you repeat the question, please?

5    Q    Wouldn't account holders be just as well off if they

6    could get coins back into their own wallets without this

7    uncertainty?

8    A    I believe that this transaction provides incremental

9    value for customers and is overwhelmingly voted in favor and

10   the customers that are voting believe this, too.  So I

11   believe that what we're doing is value maximizing.

12   Q    And that incremental value is that the 20 million

13   that's being paid by Binance?

14   A    It's at least 20 million, for sure, but also we believe

15   that the amount of recoveries is going to be higher based on

16   the construct of the Binance plan.

17   Q    Mr. Renzi, I just have a couple of questions left.

18   What is the Debtors' current cash position?

19   A    Your Honor, can I ask one of my associates the current

20   cash position?

21   THE COURT:  Do you know what it is?

22   THE WITNESS:  I don't have it in front of me.

23   THE COURT:  Do you have a range, rough approximation?

24   MR. SLADE:  I apologize.  I didn't hear the question.

25   THE COURT:  What is the Debtors' current cash position?

1     BY MS. SCHEUER:

2     Q    Do you have a ball park, Mr. Renzi, more or less than

3     10 million?

4     A    It's more than 10 million.

5     Q    More than 10 million.  More than 20 million?

6     A    It -- they have more than $20 million of cash.

7     Q    More than 40 million?

8     A    Yes, they have more than $40 million of cash.

9     Q    And what will that cash be used for under the plan?

10    A    It's spelled out in the plan in terms of, to the extent

11    that administrative costs need to be paid and priority costs

12    need to be paid, the cash will be used to be paying

13    administrative and priority claims.

14    Q    What is the amount of professional fees that remain

15    outstanding?

16    A    I don't have that in front of me.

17    Q    Will the money that Binance is providing as part of the

18    transaction, will that 20 million go to professional fees?

19    A    The 20 million will -- is fungible and goes into the

20    entire estate so --

21    Q    So it could go to professional fees?

22    A    I view the cash as fungible for the estate.

23    Q    Okay.  Would it -- is there any provisions that it

24    would, the $20 million that's being paid would go to account

25    holders?

1  A    I think I answered the question.  It's fungible --

2  Q    Okay.

3  A    -- for the estate.

4  Q    Okay.  All right.  Thank you, Mr. Renzi.  I have no

5  more questions.

6           THE COURT:  All right, is there anybody else in

7  the courtroom who has questions for Mr. Renzi?

8           MR. SHEHADEH:  Your Honor -- yes, I have

9  questions, Your Honor.

10           THE COURT:  No, you -- let me deal with the people

11  who are present in the courtroom first, okay?  Counsel, who

12  -- you are?

13           MR. ST. JOHN:  Yes, Your Honor.  For the record,

14  Jason St. John on behalf of the New York State Department of

15  Financial Services.

16           THE COURT:  Okay.

17              CROSS EXAMINATION OF MARK RENZI

18  BY MR. ST. JOHN:

19  Q    Morning, Mr. Renzi.  Just a few questions.

20  A    Good morning.  Afternoon.

21  Q    You're correct.  Good afternoon.  If I understood your

22  direct testimony correctly, Voyager currently has the

23  personnel to toggle to the liquidation plan under the plan,

24  correct?

25  A    Do you mind bringing the microphone up?

Page 89

1    Q     I apologize.

2    A     Yeah, thank you.

3    Q     If I understood your direct testimony correctly,

4    Voyager has the personnel and ability to toggle to

5    liquidation under the plan, correct?

6    A     They have the ability to execute under a  Binance plan

7    and a toggle plan.

8    Q     Okay.  And under a toggle plan, cryptocurrency will be

9    returned to account holders, correct?

10   A     Yes.

11   Q     Okay.  Should the sale transaction go forward,

12   customers in supported jurisdictions have the option to

13   become customers of Binance.US; is that correct?

14   A     Yes.

15   Q     Okay.  And if a person in a supported jurisdiction

16   chooses not to become a customer of Binance.US, their claims

17   will be liquidated and paid out in cash three months after

18   closing; is that correct?

19   A     Believe so.

20   Q     Okay.  And if an account holder in an unsupported

21   jurisdiction -- let me rephrase.  An account holder in

22   unsupported jurisdiction in the circumstances Binance.US

23   does not attain licensure, has to wait for six months after

24   closing for their claims to be liquidated, correct?

25   A     Yes.  To the extent that there are unsupported states

Page 90

1    and that it does not -- and then Binance is not able to get

2    the supported states to work with customers, it'll take

3    another six months.

4    Q    Okay.  And that additional time is so that Binance.US

5    has the opportunity to become licensed in unsupported

6    jurisdictions?

7    A    Yes.  I think they do have the opportunity to become

8    licensed in unsupported jurisdictions.

9              MR. ST. JOHN:  That's all.  Thank you, Your Honor.

10             MR. BRUH:  Your Honor, Mark Bruh for the United

11   States Trustee.  While we didn't formally object to a

12   liquidation, I would like to ask the witness a few questions

13   if the Court would allow.

14             THE COURT:  Go ahead.

15             MR. BRUH:  Thank you.

16                  CROSS EXAMINATION OF MARK RENZI

17   BY MR. BRUH:

18   Q    Mr. Renzi, my name is Mark Bruh.  I'm an attorney for

19   the United States Trustee and I just have a few questions

20   regarding liquidation, specifically Chapter 7 analysis from

21   your affidavit and declaration that's admitted into

22   evidence.  But before I start that, I just wanted to ask a

23   background question, kind of pivot -- I guess piggybacking

24   on the question from Ms. Scheuer and the SEC.  You said the

25   cash position of the Debtors is in excess of $40 million; is

Page 91

1    that right?

2    A    I did.

3    Q    Okay.  Do you know how the crypto holdings are broken

4    down by the Debtor as of today?

5    A    In terms of the coin balances?

6    Q    Or for example, when the plan was submitted, there was

7    -- it said there was about $1.1 billion of assets, not

8    including the infusion from Binance, and today we heard that

9    it's about 1.34 billion, so there's been an increase because

10   there's cryptocurrency and it's gone up in value.

11   A    Yes.

12   Q    Do you know how much stable coin the Debtors hold today

13   that's pegged one to one with the U.S. dollar?

14   A    I have supporting schedule, not in front of me, but I

15   would have to refer to that schedule.

16   Q    Can you refer to it?  Was it attached to your

17   declaration?

18   A    I don't believe it was attached to my declaration.

19   Q    Do you know how much Bitcoin the Debtors are holding

20   today?

21   A    I believe it's over 8,000 Bitcoin, but --

22   Q    Eight thousand.  Okay.  And do you know how much

23   Ethereum they're holding today?

24   A    I don't have that in front of me.

25   Q    Okay.  And then the rest --

1    A    The issue, Your Honor, is that we're rebalancing coins

2    every day.  And so to the extent that those have been

3    rebalanced, I don't have those numbers in front of me.

4    Q    Okay.

5    A    But it's happening --

6    Q    The -- my questions were going to the FTX settlement

7    because it's my understanding under the proposed settlement

8    which hasn't been approved by the Court yet that $445

9    million worth of crypto would be converted to fiat currency.

10   And do you know which crypto will be converted?

11                MR. SLADE:  Your Honor, I object again.  This is

12   not in front of the Court.  I don't see how this is

13   relevant.

14                THE COURT:  Can I -- there's an awful lot of

15   confusion reflected in the questions here.  Let me just --

16   let me just ask something.  As I understand the Binance

17   deal, all of the Debtors' cryptocurrency will be transferred

18   to Binance.  It will be designated -- or there will be

19   designations as to what will be distributed to customers.

20   But other than what is distributed to customers, it'll just

21   be bought by Binance; is that correct?

22                MS. OKIKE:  Your Honor, the plan is actually set

23   up that crypto will only move to Binance as customers sign

24   up for --

25                THE COURT:  As and when they need it.  Okay.

1            MS. OKIKE:  So it will transfer on a weekly basis

2    for the customers that have signed up during, you know, the

3    prior week.

4            THE COURT:  And what crypto that the Debtors hold

5    that is not necessary or not part of those initial

6    distributions to customers?

7            MS. OKIKE:  The Debtors will continue to hold that

8    cryptocurrency as customers sign up and it'll be transferred

9    on a weekly basis.

10           THE COURT:  But I thought I understood that, you

11   know, the Debtors will make initial distributions.  There

12   are all kinds of reserves that need to be established, so

13   people will get their initial distributions.  I thought

14   otherwise, the Debtors were liquidating their cryptocurrency

15   holdings; is that right?

16           MS. OKIKE:  Your Honor, we will be liquidating,

17   but we have the opportunity for customers in supported

18   jurisdictions, they have three months post closure to sign

19   up.  If they don't want to sign up for the Binance platform

20   at that time, their distributions are liquidated into cash.

21   They'll be sent back to the company and the company will

22   make those distributions.  Same for customers in unsupported

23   jurisdictions.  We're hopeful, again, that approvals are

24   reached, you know, five or six months, but if they're not,

25   that cash will be liquidated either by --

1          THE COURT:  So whatever cash you need to set up

2     this reserve for FTX Alameda will be obtained by market

3     liquidations or by sale to Binance?

4          MS. OKIKE:  Market liquidations, Your Honor, and

5     Binance may be a counterparty to that.

6          THE COURT:  Okay.

7          MS. OKIKE:  But over time.  We've already

8     obviously begun the rebalancing exercise and we are doing it

9     with the understanding that we are going to likely have to

10    hold back 445 million, given the asserted administrative

11    priority claim.

12         THE COURT:  But when you say that the Debtor has

13    1.3 billion of cryptocurrencies and that the Binance deal is

14    therefore 1.32, from what you're telling me now, Binance

15    isn't buying all of that.

16         MS. OKIKE:  They're not purchasing crypto, yes,

17    Your Honor.  The crypto -- they're really serving as a

18    distribution agent for customers under the plan.  They are

19    providing incremental value both in terms of the up-front

20    cash consideration as well as the expense reimbursement and

21    the transaction structure really provides over 100 million

22    of incremental value than the toggle transaction because of

23    the feasibility of --

24         THE COURT:  Yeah, I understand the arguments about

25    why it results in more, but it's just -- so in other words,

1    Binance is not buying all of your crypto.  Some of it will

2    be liquidated in the market.

3                MS. OKIKE:  Correct.  We actually don't view them

4    as buying the crypto.  We view them as a distribution agent

5    who's facilitating distribution under the plan through their

6    platform.

7                THE COURT:  So the only thing they will take

8    custody of is what they distribute to people who become

9    customers --

10               MS. OKIKE:  Correct.

11               THE COURT:  -- or if in the market you sell them

12   something?

13               MS. OKIKE:  Correct.

14               THE COURT:  Okay.

15   BY MR. BRUH:

16   Q    My concern with the -- talking about FTX was that the

17   conversion to fiat currency, if that's going to happen

18   sooner than later, the settlement is approved, would then

19   your 2 percent projection of transaction fees under a -- for

20   the sale of cryptocurrency, would that be affected by that

21   transaction?

22   A    I don't think the 2 percent would be affected, no.  I

23   think it's just the estimate for the friction cost to

24   transact in cryptocurrency.

25   Q    Now, isn't it -- doesn't transactions of USDC, aren't

1    those transaction fees de minimis?

2    A    They are.   That's on average, 2 percent.

3    Q    But so --

4    A    They -- sorry.   It's on average 2 percent from my

5    testimony, but you're right, for stable coin, it is less.

6    Q    So that's what I was getting at was trying to figure

7    out, because I haven't really seen the coin report as to how

8    much the Debtors' holding is in USDS as opposed to Bitcoin,

9    which I understand has a higher transaction cost, or

10   Ethereum and piggybacking on that, the liquidation under the

11   FTX deal or the transaction, we don't know what coins are

12   going to be sold to convert the crypto to fiat currency; is

13   that right?

14   A    I mean, it depends on what scenario we're under, but I

15   think one thing to just clean up is that there is the 2

16   percent friction cost, but then there's a market depth

17   issue, so --

18   Q    Right.

19   A    The market depth issue and speed also matter.   So to

20   the extent that you have to move and liquidate, you know,

21   crypto quickly, you're going to have issues in terms of the

22   market depth, even in Bitcoin and Ethereum.

23   Q    And is that the 20 percent number that you had in

24   Paragraph 88 of your declaration?

25   A    I can't speak to exact paragraph because it's not in

```
 1    front of me --

 2    Q    Right.

 3    A    -- if I had that, but I -- yes, there are discounts, I

 4    because of those issues in terms of market depth.  So I'm

 5    sure you're referencing the right paragraphs.

 6    Q    I mean, I don't have it in front me, but --

 7    A    But nonetheless, around --

 8    Q    But it's the 20 percent number.

 9    A    There's a 20 percent and then a 26 percent.

10    Q    Right.  And does that take into account, because on

11    September 2nd of 2022, Bitcoin was trading at about, just

12    under 20,000 and today it's trading in excess of 23,000.  So

13    is that 20 percent number still accurate?

14    A    It is and more importantly is that it wasn't just done

15    by -- it wasn't done in aggregate.  It was done by coin and

16    then it was done with market makers and Moelis and the UCC

17    advisors to make sure that we had the appropriate

18    comprehensive set of information to make sure that we

19    understood what would happen relative to market depth and

20    moving coin quickly or slowly in a rebalancing transaction.

21    So it was very well informed, well analyzed, you know, not

22    only with the advisors here but also with market

23    participants that are market makers.

24    Q    What is your basis that a Chapter 7 Trustee cannot make

25    in-kind distributions to creditors if the case is converted?
```

1    A    Basis is based on discussions with counsel and that the

2    understanding is that in my assumptions that would need to

3    be done quicker and that in-kind distributions would be

4    quite challenging.  You know, if a U.S. Trustee -- excuse

5    me, if a Chapter 7 Trustee was to do that.

6    Q    So for Chapter 11, if -- strike that.  If the Debtor

7    toggles to a liquidation, the Binance deal doesn't go

8    through and the Debtor has to make distributions to its

9    customer base, can Voyager do that or will it have to go out

10   to a third party platform to make those distributions?

11   A    Under what scenario?  I'm sorry.

12   Q    Under liquidation, if the Binance deal doesn't go

13   through.

14   A    So under a toggle plan --

15   Q    Right.

16   A    -- you can use the Voyager platform to make

17   distributions.

18   Q    So Voyager would have to be restarted and then it would

19   start making distributions to its customer base; is that

20   right?

21   A    Yes.  It would -- they would make distributions.

22   Q    And it's your opinion that under a conversion to

23   Chapter 7, a Chapter 7 Trustee doesn't have a platform to

24   make these distributions, so there would be some sort of

25   costs associated with it; is that right?

1    A    There is a cost associated with it.  There -- we

2    believe that also it's a timing issue, too.

3    Q    Can you explain the timing issue to me a little more,

4    elaborate on that?

5    A    My understanding is you have to set a new bar date.

6    You have to restart part of the process.  It would take

7    quite a bit of time to effectively get cryptocurrency to

8    clients.  And then, furthermore, I would be very concerned

9    about the employees under a Chapter 7 plan if they would be

10   participants in a Chapter 7 plan.

11   Q    Yeah.  Okay.  There's -- but a Chapter 7 Trustee can

12   make interim distributions to creditors, right?

13   A    Yes.  I believe so.  But they would -- if we had to

14   make distributions it would be in cash, is my understanding.

15   Q    But there's no -- what is your -- what is that based on

16   that it has to be in cash?  Why can't a Chapter 7 Trustee

17   make in-kind distributions on an interim basis to the

18   customers?

19   A    You can't deposit cryptocurrency into a bank account.

20   Q    Correct.

21   A    That's why.

22   Q    But it's being held --

23              MR. SHEHADEH:  (indiscernible).

24              THE COURT:  Don't interrupt.  I'm tired of telling

25   you.  Do not interrupt.  All right?

```
                                            Page 100
 1              MR. SHEHADEH:  (indiscernible).

 2              THE COURT:  Don't speak over the witness.  Don't

 3    interrupt just because you disagree.  I'm tired of giving

 4    you the same warning.  Go ahead, Mr. Bruh.

 5              MR. BRUH:  Thank you, Your Honor.

 6    BY MR. BRUH:

 7    Q    And I understand that, because the crypto today is not

 8    being held in a bank account; isn't that right?

 9              THE COURT:  Mr. Bruh, Section 704(a) of the

10    Bankruptcy Code says "the Trustee shall collect and reduce

11    to money, property of the estate."  Are you saying that's

12    not what the Trustee has to do in the Chapter 7 case?

13              MR. BRUH:  No, Your Honor.

14              THE COURT:  Then what's the point of these

15    questions?

16              MR. BRUH:  Okay, I'll move on, Your Honor.

17              THE COURT:  Go ahead.

18    BY MR. BRUH:

19    Q    I guess my last question to you is what's your

20    experience in Chapter 7 bankruptcies?

21    A    Limited.

22    Q    Okay.

23              MR. BRUH:  I have no further questions, Your

24    Honor.

25              THE COURT:  Okay.  Anybody else in the courtroom
```

Page 101

1    who wishes to cross examine the witness?  Okay.  Is there

2    anybody on the line who wishes to cross examine the witness?

3              MS. RYAN:  Good afternoon, Your Honor.  This is

4    Abigail Ryan with the State of Texas and I have some

5    questions for the witness.

6              THE COURT:  Okay, Ms. Ryan, please proceed.

7              MS. RYAN:  Thank you, Your Honor.

8                   CROSS EXAMINATION OF MARK RENZI

9    BY MS. RYAN:

10   Q    Good afternoon, Mr. Renzi.  I'm going to kind of shift

11   to a more basic question for you.  You're aware that Alameda

12   has a loan facility claim for $75 million, right?

13   A    I am.

14   Q    And is it the Debtors' plan to subordinate that claim?

15   A    Yes.

16   Q    And do you have an estimated likelihood of success that

17   it will be subordinated?

18             MR. SLADE:  Your Honor, I object.  That's not

19   relevant.  It's also outside the scope of this witness'

20   testimony.

21             THE COURT:  I'm not sure how this ties into your

22   objection or as to the issues, Ms. Ryan.  Could you explain

23   to me where you're going with this?

24             MS. RYAN:  Absolutely, Your Honor.  My objection

25   is that the account holders weren't given enough disclosures

1   as to the percentage that their recovery could drop down to

2   in different situations.  Mr. Renzi in his affidavit

3   testified that his numbers are based upon the Debtors

4   getting the $75 million at Alameda loan facility

5   subordinated, but there's no mention in his declaration what

6   the numbers would be under the Binance plan or toggle plan -

7   -

8             THE COURT:  Okay.

9             MS. RYAN:  -- if they weren't successful in

10  subordinating.

11            THE COURT:  Do you know the answer, Mr. Renzi?

12            THE WITNESS:  It would be the amount of recovery

13  on the $75 million, the percentage recovery there, and then

14  it would dilute the rest of the claims pool.  I'd have to

15  spend a little bit of time running that number.

16            THE COURT:  Ms. Ryan, are you asking the witness

17  what would happen if the loan was not subordinated at the

18  holding company and TopCo level or are you asking him what

19  would happen if the operating company were found to be

20  liable on the loan?

21            MS. RYAN:  Well, they'll be -- I have two

22  questions, Your Honor.  One is, as to the --

23            THE COURT:  You do understand --

24            MS. RYAN:  -- subordination of the loan facility

25            THE COURT:  You do understand, don't you, that

1    under the terms of the loan documents, the named borrower is

2    not the operating company where the customers are.  Alameda

3    has asserted that the named company, that the operating

4    company should be liable.  So are you asking what would

5    happen if the operating company were found liable on that

6    loan or are you asking about what would happen at the parent

7    company levels, because subordination at the parent company

8    levels really doesn't mean anything for the recoveries of

9    the customers.

10           MS. RYAN:  So I'll explain this in a different way

11   and maybe you'll see where I'm going, Your Honor.

12           THE COURT:  Okay.

13           MS. RYAN:  In the disclosure statement on Page 55,

14   it states that recovery for both account holders' claims and

15   OpCo General Unsecured Claims would be reduced to

16   approximately 24 percent from 51 percent under the sale

17   transaction if the Alameda loan facility claim is not

18   subordinated and Alameda prevails in its alleged preference

19   claim.

20           And so they're asserting in the disclosure

21   statement that both would have an effect on distribution.

22   And so what I'm wondering is, that was not mentioned in Mr.

23   Renzi's declaration, but it is something that creditors have

24   the right to know.  What would happen to the recovery if

25   one, as they say, the subordination isn't successful; and

Page 104

1    two, this $445 million preference claim, Alameda wins on.

2            THE COURT:  But you just told me that creditors

3    were entitled to know it, but didn't you just read the

4    answer from the disclosure statement?

5            MS. RYAN:  So one would think that would be the

6    answer, Your Honor; however, the disclosure statement and

7    the affidavit submitted by Mr. Renzi, they kind of conflict

8    in this regard.  Under a Chapter 7 in the disclosure

9    statement, the creditors would actually do better than the

10   toggle plan and that's not discussed in Mr. Renzi's

11   affidavit that under the toggle plan if the two Alameda

12   issues were successful in Alameda's favor, toggle plan, sale

13   plan both, it's going to drop to 24 to 26 percent, depending

14   on which paragraph you read in the disclosure statement.

15           THE COURT: Aren't you assuming that the Alameda

16   issues only affect recoveries under the Chapter 11 plan and

17   would not also affect recoveries under a Chapter 7

18   liquidation?

19           MS. RYAN:  No, Your Honor.  I think it would

20   affect recoveries under a Chapter 7 liquidation, too.  And

21   so what I would like Mr. Renzi to explain to me is if

22   Alameda is successful on both of those counts as they set

23   out in the disclosure statement, what percentage of recovery

24   or range -- because I know we have moving parts here --

25   would account holders receive under the Binance plan, under

1  the toggle plan, and under a plan of liquidation, because

2  it's not clear from the disclosure statement or Mr. Renzi's

3  affidavit.

4           THE COURT:  Do you know the answer, Mr. Renzi?

5           THE WITNESS:  Your Honor, it would take some time

6  to do that, but it would decrease the recovery across all

7  scenarios but still under the plan and under the toggle

8  plan, it would still be greater than under a liquidation

9  scenario.

10  BY MS. RYAN:

11  Q    Mr. Renzi, in the disclosure statement itself, it

12  specifically says on Page 55 under Item B, the Alameda loan,

13  that underneath the toggle transaction and in the Chapter 11

14  cases, the recoveries would be reduced to approximately 24

15  percent.  And likewise, in the disclosure statement, it says

16  that under Chapter 7, the possible return would be a 35 to

17  39 percent.  So doesn't that show that a Chapter 7 would

18  actually be more beneficial than the toggle plan for the

19  sale?

20           THE COURT:  You can answer the question.  Go

21  ahead.

22  BY MS. RYAN:

23  A    Yeah.  So number on, I don't follow your math.  It's

24  just -- it's very simple.  You can't just pick and choose

25  whether or not -- it only works whether or not the 75

1    million is subordinated only in the liquid -- under the

2    Binance plan and then not in the liquidation.  I mean, I

3    think you have to use it uniformly, in my expert opinion,

4    across all plans.

5    Q    I agree with you.

6    A    So the issue --

7    Q    I completely agree with you.

8              THE COURT:  Does the 39 --

9    BY MS. RYAN:

10   Q    But in the disclosure statement --

11             THE COURT:  Does the 39 percent number that was

12   quoted by counsel assume that there is no Alameda claim in a

13   Chapter 7 liquidation?

14             THE WITNESS:  In my declaration, it highlights and

15   if I could have my declaration, that'd be great so I can

16   answer you directly, Your Honor.  It highlights the

17   recoveries you have under a subordination of the $75 million

18   claim.

19             THE COURT:  Okay.

20             THE WITNESS:  Under all four --

21   BY MS. RYAN:

22   Q    And does your affidavit include a scenario if Alameda's

23   $445 million preference claim is successful?

24   A    It would further -- it would be a further reduction,

25   yes, under all four scenarios.

1    Q    But is that in your affidavit?  Did you discuss the

2    $445 million preference claim?

3    A    I'm testifying to that now.

4    Q    Okay, so it wasn't in your affidavit, right?

5              THE COURT:  Ms. Ryan -- Ms. Ryan, just, I'm

6    confused by all this because isn't this basic mathematics

7    that if you calculate percentage recoveries in three

8    scenarios and you conclude certain amounts and then you

9    calculate what the percentages would be if you add

10   additional unsecured claim amounts in each of the same three

11   scenarios, as long as you're doing apples to apples

12   comparison, you still find out that the -- if under the

13   original calculation, the Binance came out highest, it still

14   would.  If the toggle came in second, it still would.  And

15   if the Chapter 7 calculation came in third, it still would.

16             That's just indisputable.

17             MS. RYAN:  Your Honor, I agree.

18             THE COURT:  It's indisputable mathematics.

19             MS. RYAN:  It is simple.  It's very simple

20   mathematics.  However, this information wasn't presented to

21   any of the creditors in the disclosure statement and this is

22   something that I believe should have been disclosed so that

23   they can have a fair reading of these percentages and what

24   could possibly happen.  When reading the disclosure

25   statement, you know, and specifically in the Paragraph 55,

Page 108

1    it makes it look like the toggle plan would be worse than

2    the Chapter 7 and I don't believe there was adequate

3    information in Mr. Renzi's affidavit to show, okay, let's do

4    the math.   If Alameda's successful, how much do they all

5    decrease by?  And I think that that should have been

6    disclosed and it's not.

7              THE COURT:  Are you saying that you think

8    customers were misled into thinking that the Chapter 11 plan

9    was a bad deal?  I mean, 97 percent of them voted in favor

10   of it.

11             MS. RYAN:  I'm saying --

12             MR. SHEHADEH:  Yes.

13             MS. RYAN:  Your Honor, I'm saying that I don't

14   believe they were given adequate information as to what

15   would happen if this Alameda $75 million loan facility claim

16   and the preference claim of $445 million was successful in

17   Alameda's favor and what that would look like for them.

18             I believe that regardless of whether it's

19   stretched out across Binance plan, toggle plan, liquidation

20   plan is that we all decrease by that amount, meaning the

21   Binance plan would still be higher under simple math; they

22   still should have been given those numbers because, yes, the

23   disclosure statement is a bit misleading when you read a

24   portion of it and it says under the Chapter 7 scenarios,

25   you'll get 34 to 39 percent back, but if Alameda is

1    successful under the plan and under the toggle, you're only

2    going to get 24 percent back.  And in another section, it

3    says 26 percent back.  I don't think that our accountholders

4    have actual numbers that they can hang their hat on.

5              THE COURT:  Okay.  So do we need more evidence on

6    this point or is the rest of that for argument as to whether

7    the disclosure was sufficient?

8              MS. RYAN:  Your Honor, I would appreciate, if

9    there is more evidence, I think the percentages would be

10   very helpful in that regard.  The witness doesn't -- witness

11   said he'd have to sit down and try to figure them all out.

12   So it's not something that he actually has right now.  So it

13   wasn't in the disclosure statement.  It's not something we

14   have available at the moment.

15             So I'm not sure what other evidence -- we can save

16   it (indiscernible) Your Honor.

17             THE COURT:  I'm sorry --

18             MS. RYAN:  We can save it for argument, Your

19   Honor, and I'll change my subject of questioning.

20             THE COURT:  Okay.

21             MS. RYAN:  Thank you.

22   BY MS. RYAN:

23   Q    So when you were determining if the Binance deal, Mr.

24   Renzi, was in the best interests of the creditors, did you

25   read the Binance terms of use?

Page 110

1    A     Members of my team did.

2    Q     And were you made aware, since it's your team, of the

3    possibility that the accountholder's information can be

4    stored anywhere in the world that Binance.US sees fit?

5              MR. SLADE:  Your Honor, I object.  That assumes

6    facts not in evidence.

7              THE COURT:  All right.  I guess that's right,

8    technically.  I don't have the Binance terms of use on file.

9    Is there a dispute as to what they say?

10             MR. SLADE:  Actually --

11             MS. RYAN:  I can re-ask --

12             MR. SLADE:  -- a problem.

13             MS. RYAN:  I can re-ask that question, Your Honor.

14   BY MS. RYAN:

15   Q     So under -- the terms of use were ready by people on

16   your team, correct?

17   A     Yes, I believe so.

18   Q     And did they bring any concerns to your attention

19   regarding those terms of use?

20   A     They're not lawyers.  I think they just brought up the

21   fact that to the extent that the Binance plan does not work,

22   we have a toggle plan, and if the terms of use become so

23   problematic as you're highlighting, we do have an option to

24   go to the toggle plan.

25   Q     And are you an expert in regulatory issues?

Page 111

1   A     No.  I'm not.

2   Q     Did you have anyone on your team who was reviewing the

3   terms of use that was an expert in regulatory issues?

4   A     No.

5   Q     Do you know under the Binance plan, is it possible for

6   Binance to make a one-time distribution to creditors?

7   A     I understand that the Binance plan that those weekly

8   distributions to -- through the Binance platform and to the

9   extent that someone elects to have an account with them and

10  they would like to take the crypto off of the exchange, that

11  would be the methodology for -- to do that.

12  Q     Okay.  And so it's my understanding the six-month

13  waiting period for the nonconsenting jurisdictions is to

14  give Binance the ability to get licensed in those

15  jurisdictions; is that right?

16  A     Yes, that's my understanding.

17  Q     And do you know or do you have knowledge that Binance

18  has yet to file a request for licensure with the Texas State

19  Securities Board or the Department of Banking?

20  A     My understanding is they're working with your

21  jurisdiction.  I don't know the extent, where that lies

22  right now.

23  Q     And are you aware that it is virtually impossible for a

24  license to be approved, whether it be for Binance or anyone

25  else with the Securities Board or the Department of Banking

Page 112

1    in a six-month period?

2           MR. SLADE:  Your Honor, I object.  That assumes

3    facts not in evidence.

4           THE COURT:  Well, the question was, do you know

5    that to be a fact.  Do you?  Do you have any idea?

6           THE WITNESS:  No.

7           THE COURT:  Okay.

8           MS. RYAN:  Okay, Your Honor, I will pass the

9    witness.  Thank you very much.

10          THE COURT:  Okay.  There anybody else on the line

11   who wishes to cross examine the witness?

12          MR. SHEHADEH:  I'd like to cross examine, Your

13   Honor.

14          THE COURT:  Okay.  Is that Mr. Shehadeh?

15          MR. SHEHADEH:  Yes, Your Honor.

16          THE COURT:  Okay, go ahead.

17          MR. SHEHADEH:  Your Honor, I'd just like to ask

18   him about the plan.

19                CROSS EXAMINATION OF MARK RENZI

20   BY MR. SHEHADEH:

21   Q    When they made that deal with FTX, like (indiscernible)

22   go through or why wasn't there a toggle done then?  There

23   would've been more return for the creditors.  And I see that

24   both sides have disclosed critical information

25   (indiscernible) the voting and they said in an email that

1    was sent out to customers, they said that if we agree with

2    the deal, we would get a higher return than we would if we

3    did the toggle down effect, which was defective.  Don't you

4    agree?  Because (indiscernible) not true.

5              MR. SLADE:  Your Honor, it's a compound question -

6    -

7              MR. SHEHADEH:  And what is --

8              THE COURT:  Let's break your question down.  Let's

9    break your question down.  I think you asked, why was there

10   no toggle at the time of the FTX deal?

11             MR. SHEHADEH:  Yes.

12             MR. SLADE:  Your Honor, I would object to

13   relevance.

14             THE COURT:  Well, go -- let's go ahead.

15             THE WITNESS:  Happy to answer, Your Honor.

16   BY MR. SHEHADEH:

17   A    So number one, we -- when we were initially, you know,

18   the initial --

19   Q    When you say we, who are you referring to?

20             THE COURT:  Don't interrupt, please.  Let the

21   witness talk.  Go ahead.

22             THE COURT:  Thank you.

23   BY MR. SHEHADEH:

24   A    When we initially were analyzing the transaction with

25   FPs, we worked in consultation with a number of people

1    including the Unsecured Creditors Committee advisors, the

2    company, the Moelis and the rest of the advisors and we all

3    agreed as well as did many of the states and other -- in

4    congress believed that FTX was a viable entity.

5    Unfortunately, what's been proven to all of us on the Wall

6    Street Journal every day is that it was a fraud.

7         So our belief at the time, based on the information

8    that we had that FTX was a viable transaction, it was vetted

9    by multiple parties, both the Unsecured Creditors Committee

10   advisors and the company advisors, in terms of the

11   transaction and the toggle plan was not needed.

12        However, based on the facts that we saw unfold over the

13   past few months, we believe that we don't want to see

14   another issue where to the extent that we are uncomfortable

15   with the transaction with Binance for whatever reason, that

16   our main objective was to get crypto back to our customers

17   as quickly as possible, and thus a toggle plan was warranted

18   to make sure that we could do that.

19   Q    So to get the crypto back to customers as fast as

20   possible, wouldn't it have just made more sense to just open

21   up the exchange and allow customers to (indiscernible) their

22   crypto off the platform?  Isn't that the whole reason behind

23   the Chapter 11 organization?  You guys, (indiscernible) the

24   company so you guys would've filed Chapter 7, then Chapter

25   11.  And the money that you guys (indiscernible) to Coinbase

Page 115

```
 1   every day, what is going on with that money?  What is that

 2   money used for?

 3            THE COURT:  Okay, you have to ask one question at

 4   a time, Mr. Shehadeh.

 5   BY MR. SHEHADEH:

 6   A    Mr. Shehadeh, I think there are a number of assumptions

 7   that you would have to make that -- where you would be

 8   correct.  So the assumption would be, is that there was no

 9   bankruptcy laws, and that we could just take assets and move

10   them as quickly as possible.  The issue with that assumption

11   is number one, you have to make sure that you're doing

12   things in a fair, transparent way and that is well

13   documented.

14        There is a process of checks and balances in our Court

15   system, in the Bankruptcy Court system.  That's imperative

16   and that is to make sure that the company is working through

17   to maximize value in consultation with the Unsecured

18   Creditors Committee and that all customers have the ability

19   to vote for this.  And unfortunately --

20   Q    (indiscernible).

21            THE COURT:  Don't interrupt the answer, please.

22   Go ahead.

23   BY MR. SHEHADEH:

24   A    Unfortunately, the construct that you have provided

25   does not provide the provision for voting, nor does it
```

```
1    comply with the laws of this country.  So I'm trying to do

2    that.

3    Q    Object.  There's no relevance.  We're talking

4    Bankruptcy Court.  We're not talking about laws of this

5    country.  If you want to talk about laws of this country

6    then everybody in Voyager would be charged with criminal

7    charges right now.  So let's not really get into that right

8    there.  Anyway, back to my point.

9        Like I said, you guys made a public statement stating

10   that assets were fine, the company was fine, and they are

11   still operable.  Five days later, the company filed for

12   bankruptcy.  (indiscernible).  So instead, you guys

13   (indiscernible) find somebody to buy the company, which is

14   not reorganization, but so when the FTX deal didn't go

15   through, there was a bidding war and I quote -- and this is

16   on Forbes and you can look it up, on Wall Street, there was

17   a bidding war for Voyager and there was a good faith deposit

18   from each one of these companies that wanted to buy Voyager.

19   Where is the good faith deposit and why wasn't it sold to

20   second-highest bidder?

21       And if that didn't work out, why wasn't there a

22   winddown or whatever you guys call it done then?  Why was is

23   more months of delegation, litigation, and moving

24   (indiscernible) going to pay Moelis and Kirkland exorbitant

25   fees, that I might add, because they didn't charge Celsius
```

Page 117

1    the same fees that they were charging us.  Well, we're not

2    going to get into that.  It's a whole other subject.  But I

3    just want to know, toggle down now with the Binance deal.

4              MR. SLADE:  Your Honor --

5    BY MR. SHEHADEH:

6    Q    And the SEC objected to.  Go ahead.

7              MR. SLADE:  Your Honor, I object.  To the extent

8    what was a question, he already answered.

9              THE COURT:  I think he --

10             MR. SHEHADEH:  That was a completely different

11   question.  He can answer it.

12             THE COURT:  I think the only question I heard

13   there was why was there not a toggle deal, but also why was

14   there not a backup bidder at the time of FTX.  I don't think

15   he asked about the backup bidder at the time of FTX before,

16   so you can answer that question.

17   BY MR. SHEHADEH:

18   A    We tried to have a backup bidder during the transaction

19   and we were not successful in having one that we could turn

20   to right away.

21   Q    So the whole bidding war, that was just all media

22   propaganda?  That was a lie?

23   A    Your Honor, I don't know how to answer that question.

24   It's talking about --

25             MR. SLADE:  It's talking about -- it assumes facts

Page 118

```
 1    not in evidence again.

 2              THE COURT:  So you --

 3              MR. SHEHADEH:  You don't know how to answer a lot

 4    of questions.

 5              THE COURT:  The question is, is the reason why you

 6    didn't have a backup bidder, that there wasn't anybody else

 7    interested and that the statements that there were other

 8    people who were bidding was a lie.

 9              THE WITNESS:  The statements that I understand are

10    not a lie, Your Honor.

11              THE COURT:  Okay.

12    BY MR. SHEHADEH:

13    Q    (indiscernible) when FTX bidded for Voyager, only FTX

14    submitted a bid for Voyager?

15    A    No, I'm not saying that.

16    Q    Okay, then.  So there obviously was other bidders.  Do

17    you have the name of those other companies

18    A    Your Honor, is that a question for me, Your Honor?

19              THE COURT:  Mr. Shehadeh, he said there were other

20    bidders.  He said they didn't have one who was willing to be

21    --

22              MR. SHEHADEH:  Right, which just proves that he

23    just lied and contradicted himself.

24    BY MR. SHEHADEH:

25    Q    But anyway, can you name me the other bidders, sir,
```

Page 119

1    please?  Do you know?

2    A    Binance was one of the other bidders.

3    Q    So Binance was another bidder.  Let's include all the

4    other companies.  Binance was -- when we seen that FTX, they

5    (indiscernible) with you guys, was wasn't the deal sent to

6    Binance?  And on top of that, why was Binance's deal and

7    incentive lower than what it what it would have been to

8    Celsius?  Because Binance (indiscernible) Celsius' people a

9    $50 incentive.  We didn't get nothing like that.

10   A    Your Honor --

11   Q    So if FTX fell through, why would (indiscernible).

12             THE COURT:  I don't understand where --

13             MR. SHEHADEH:  That's my question.

14             THE COURT:  I don't understand.  You know, you've

15   got to stop making speeches and just ask questions, Mr.

16   Shehadeh.  We're trying to give you an awful lot of leeway

17   because I know you're not an attorney, but there are rules

18   to how this proceeding goes.  It is not time for you to just

19   make argument or complaints, particularly about things in

20   the past that aren't really in front of us today.

21             MR. SHEHADEH:  I understand that, Your Honor, and

22   I apologize.  You're right.  I'm not attorney, Your Honor,

23   but what I'm stating is simple fact and creditors deserve

24   answer so.  My money is not a toy to be played with.  And

25   this is different situation.  We're not dealing with fiat

1    here, we're dealing with crypto.  You know, it's a different

2    situation than giving regular money.

3              THE COURT:  You have to ask --

4              MR. SHEHADEH:  (indiscernible).

5              THE COURT:  You -- let me finish.  You have to ask

6    questions on matters that relate to what's actually in front

7    of me today.  It's not an open mic.  It's not a town hall.

8    It's not a gripe session.  It's not a radio call in-show for

9    sports news or crypto news.  It's not a forum for everybody

10   to air every complaint they have --

11             MR. SHEHADEH:  Yes, I understand that, Your Honor.

12             THE COURT:  -- about everything that's happened in

13   the past.

14             MR. SHEHADEH:  It's not a podcast, it's not

15   (indiscernible).  I understand that.

16             THE COURT:  Okay, so we have --

17             MR. SHEHADEH:  I'm asking a question, Your Honor,

18   I just want an answer to.

19             THE COURT:  We have issues in front of us today

20   that don't include why things weren't -- you know, things

21   that weren't done at the time of FTX.  Those -- I don't see

22   how that's at all relevant to any of the issues.

23             MR. SHEHADEH:  Well, the relevance today, Your

24   Honor, which I'm saying is because had they just did that

25   before, there would've been more money for the creditors.

Page 121

```
 1   We would've never had that clawback and I don't even see how
 2   there is a clawback when we give Alameda $650 million loan.
 3   Isn't that the whole reason why we went into bankruptcy,
 4   because they defaulted on that loan?  So how do we owe them
 5   $455 million?  That's my question.
 6              THE COURT:  We are where we are.  So how does any
 7   of that have anything, any bearing on what we ought to do
 8   today?
 9              MR. SHEHADEH:  I'm sorry, can you repeat that,
10   please?
11              THE COURT:  I said, we are where we are.  We can't
12   undo the past, so how do your questions on those points
13   other than you're being angry about them, how do they have
14   any bearing on what we ought to do?
15              MR. SHEHADEH:  Yes, Your Honor.  I'm very angry
16   because I have had over $100,000 in Voyager and they want to
17   give me back 12,000, 13,000 (indiscernible).  And my
18   portfolio balance, let's say 18, 19, 25 (indiscernible).  So
19   what happened to that extra money?  Does that make any
20   sense?  I give -- Your Honor, I give you -- you want to buy
21   a hot dog and I give you a hamburger.
22              THE COURT:  You have to ask questions.
23              MR. SHEHADEH:  (indiscernible).
24              THE COURT:  You have to ask questions that are
25   focused on the transactions and proposals that are in front
```

```
 1    of us today.  Okay?  I know you're angry about these things,

 2    but I don't know how many times I can explain to you that

 3    you have to calm down about them and focus on --

 4             MR. SHEHADEH:  I understand that, Your Honor.

 5             THE COURT:  -- what we're trying --

 6             MR. SHEHADEH:  I understand --

 7             THE COURT:  You also have to -- you also have to

 8    not interrupt me when I'm speaking to you.  Okay?  That's a

 9    cardinal rule.

10             MR. SHEHADEH:  Your Honor, last time --

11             THE COURT:  Stop.

12             MR. SHEHADEH:  -- allow me to speak and you cut me

13    off the courtroom --

14             THE COURT:  Stop it, stop it, stop it, until I am

15    finished.  All right?  My patience is wearing thin with you,

16    Mr. Shehadeh.  You are not listening to me.  You want to

17    conduct the hearing in the manner that you want to conduct

18    it.  You have to listen to me.  There are issues in front of

19    us today that I am trying to give you the chance to address

20    and I am bending over backwards to tolerate multiple

21    interruptions and refusals to abide by my instructions.

22             But you have to listen to my instructions.  You

23    have to abide by them.  It's a Court proceeding.  I cannot

24    let you hijack it to deal with other gripes that you have

25    about the past.  You must understand that and you must
```

1    accept it and you must calm down and listen to my

2    instructions.  And if you have questions, please ask

3    questions about the merits of what we are trying to do today

4    and whether it makes sense to do this today.  But all your

5    complaints about other things that happened in the past, I

6    can't change those things.  They don't affect what we're

7    doing today.  You have to focus on what we're doing today.

8    And if you have objections to what we're doing today, you

9    have to ask to the extent you want evidence and then you

10   have to make objections and arguments based on what we're

11   doing today.  But there's an order in which these things

12   have to be done.  I can't let you continue to just interrupt

13   the proceedings with gripes about the past.  That's not what

14   we're here to do today.  It's not what the business of the

15   Court is today.  All right?  Do you understand that?

16             MR. SHEHADEH:  I understand that, Your Honor.

17             THE COURT:  Can you follow --

18             MR. SHEHADEH:  So can you explain to me --

19             THE COURT:  Can you follow those --

20             MR. SHEHADEH:  -- what the business of the Court

21   is?

22             THE COURT:  Will you -- can you follow those

23   instructions?  Are you capable of following them?

24             MR. SHEHADEH:  Yes.  Yes, I am, Your Honor.

25             THE COURT:  All right.  Then if you have a

1    question for the witness about what we're dealing with

2    today, please ask it.

3    BY MR. SHEHADEH:

4    Q    Okay.  Back to with the FTX and (indiscernible).  Why

5    wasn't Binance considered a valid backup bidder when FTX

6    deal didn't go through and when that didn't go through, why

7    was there not a winddown then?  (indiscernible) that answer.

8              THE COURT:  Go ahead.

9    BY MR. SHEHADEH:

10   A    They didn't agree to be a backup bidder.

11   Q    I'm sorry?

12   A    Binance did not agree to be a backup bidder.

13             MR. SHEHADEH:  Your Honor, did you hear what he

14   just said?

15             THE COURT:  Yes.  He said back in the time of the

16   FTX deal, Binance did not agree to be a backup bidder.

17   BY MR. SHEHADEH:

18   Q    So if I'm dealing on something and I was bidder one and

19   then he decided not to, wouldn't I be the next step in mind

20   to be a bidder?  So if they didn't want to be a backup

21   bidder, that does not make any sense.

22   A    I don't understand the rationale for -- Binance is an

23   organization that's well advised.  They can make their own

24   decisions.  The process for auctioning the assets was well

25   documented and marketed by Moelis.  There are multiple

Page 125

1   participants and it was done in a fair and transparent way,

2   and when you're trying to sell the business to, at that

3   point in time, FTX was the highest bidder, it was done with

4   a number of representatives from the Unsecured Creditors

5   Committee, their advisors, as well as the company and the

6   company's advisors.  So it was done completely transparent

7   in my opinion.

8   Q    Again, like Judge Wiles said, we're not here about

9   opinions.  We're here about facts.  So what facts do you

10  have on that?

11  A    I believe what I said is a fact.

12  Q    In your opinion.  We're not here for your belief, sir,

13  we're here for facts.  You have any documentation that shows

14  that?

15  A    Your Honor, I --

16  Q    (indiscernible).

17  A    Your Honor, I participated directly in the auction.  I

18  can state for a fact that what I said is true.

19  Q    Is there any type of information stating about the

20  purchase agreement and what terms it was?

21            MR. SLADE:  Your Honor, I object.  He answered

22  this question.

23            THE COURT:  Sustained.  Sustained.  We've spent

24  enough time on the -- on last fall.  We're here to talk

25  about the deal that's in front of us today.  So the

Page 126

```
 1   objection is sustained.  MR. SHEHADEH:  Which is what, Your

 2   Honor?  Can you explain?

 3              THE COURT:  The objection is that questions about

 4   what happened at the time of the FTX deal had nothing to do

 5   with what we're doing here today and so they are irrelevant

 6   to our proceedings.

 7              MR. SHEHADEH:  I understand.

 8              THE COURT:  So I have sustained the objection to

 9   your question.

10              MR. SHEHADEH:  Okay.  So what are we talking about

11   today, this hearing?  What does this hearing pertaining to?

12              THE COURT:  The hearing today is whether we

13   confirm the plan that is currently proposed, which is to

14   sell to Binance and in the event that transaction doesn't go

15   through, to toggle to the toggle plan under which Voyager

16   will to the extent it can distribute assets.  Although the

17   testimony so far is that it -- there are certain kinds of

18   coins that I guess could be distributed through Binance that

19   Voyager would not be able to transfer.

20              The question is whether we are going to confirm

21   that plan.  That's the issue we have today.

22              MR. SHEHADEH:  Okay, I understand that, Your

23   Honor.

24              MR. SHEHADEH:  Binance has liquidity some and they

25   become (indiscernible) Your Honor.
```

1          THE COURT:  I'm sorry, I couldn't understand you.

2          MR. SHEHADEH:  In case that Binance does become --

3     has liquidity issues and then goes bankrupt or files for

4     Chapter 11 or whatever, and then what happens?

5          THE COURT:  Then you'd be -- then if you elect to

6     become a Binance customer and Binance goes into bankruptcy,

7     then you would be in another bankruptcy proceeding.  But --

8          MR. SHEHADEH:  So is that in the best interest of

9     the creditors, you think, Your Honor?

10          THE COURT:  Well, I'm not -- you know, I'm not the

11    one to answer your questions.  I'm the one top hear argument

12    and to make a decision, but so far, most of the people who

13    have actually taken the time to vote, have voted in favor of

14    this.  I understand, you know --

15          MR. SHEHADEH:  Yes, but --

16          THE COURT:  I understand your questions but, you

17    know, I don't know if Binance is in -- you and a few other

18    people and to some extent the regulators have sort of said,

19    well, gosh, we have questions.  But I'm looking for some

20    evidence.  I don't want to do anything that's going to hurt

21    customers.  I want to do what's best for customers.  I think

22    if the Debtors had reason to believe Binance was going to go

23    into bankruptcy, they wouldn't want to do business with

24    Binance.  Nobody wants to do that.

25          MR. SHEHADEH:  (indiscernible) FTX.

Page 128

```
 1                  THE COURT:  The question is, what evidence do we
 2       have on any of these points?  The proposal --
 3                  MR. SHEHADEH:  I mean --
 4                  THE COURT:  It's not up to me.
 5                  MR. SHEHADEH:  -- there's plenty of evidence, Your
 6       Honor.
 7                  THE COURT:  It's not up to me to formulate a plan.
 8       I have a proposed plan in front of me that proposes the sale
 9       to Binance and most of the people who will be affected by
10       that have voted in favor of it.  So you don't like it, but
11       the question is, is there evidence --
12                  MR. SHEHADEH:  (indiscernible) Your Honor, you
13       know what I mean?
14                  THE COURT:  What's that?
15                  MR. SHEHADEH:  Robbed of their hard earned money.
16                  THE COURT:  Okay, do you have questions about --
17       for this witness on these subjects?
18                  MR. SHEHADEH:  I'll pass the witness, Your Honor.
19                  THE COURT:  Okay.
20                  MR. SHEHADEH:  There's other people
21       (indiscernible).
22                  THE COURT:  Thank you.  Is there anybody else on
23       the phone who wishes to cross examine the witness?
24                  MS. DIRESTA:  Hi, Your Honor, I would.  Can you
25       hear me?
```

Page 129

1                THE COURT:  Who is it?

2                MS. DIRESTA:  My name is Gina DiResta.  Can you

3      hear me?

4                THE COURT:  I can, but who do you represent?

5                MS. DIRESTA:  I am a pro se creditor.  I represent

6      myself.

7                THE COURT:  Okay.

8                MS. DIRESTA:  So, before I ask the witness the

9      question, just so you know because I do a good amount of the

10     creditors that's on this call, I received some text messages

11     saying that we can't really hear you well.  So if you maybe

12     -- I don't know whether the mic is positioned, so we do have

13     a hard time hearing you, just so you know.

14               THE COURT:  Okay.

15               MS. DIRESTA:  And then as for my question for the

16     witness.

17                    CROSS EXAMINATION OF MARK RENZI

18     BY MS. DIRESTA:

19     Q    For the people -- for the creditors who do not want to

20     move over to Binance in order to get their assets and they

21     would rather just wait out their three months and get

22     liquidated, would those creditors' KYC information still be

23     transferred over to Binance?

24     A    I don't know the answer to that specific question for

25     KYC information.  I believe that if you're going to open an

Page 130

```
 1    account at Binance, then they will make sure that you comply
 2    with KYC as AML.
 3    Q    Yes, but my question isn't if I'm going to open an
 4    account with Binance because that makes sense.  You would
 5    need the KYC information.  My question was, if I do not want
 6    to open an account with Binance and I want to wait the
 7    three-month period and get cash out, which is an option,
 8    will my KYC information still be transferred over to
 9    Binance.
10             MR. SLADE:  Your Honor, I object.  He already said
11    he didn't know, but the -- I'm not -- didn't get this
12    creditor's name, but I don't think she filed an objection.
13             THE COURT:  That's okay. I'm going to hear her.  I
14    think as I understand --
15             MS. DIRESTA:  No, I did not.
16             THE COURT:  -- the submissions -- if I understand
17    the submissions that were made, the information would be
18    transferred to Binance; isn't that right?
19             MS. OKIKE:  Yes, that's correct, Your Honor.
20             THE COURT:  Okay.  Even if --
21    BY MS. DIRESTA:
22    Q    Is that information --
23             THE COURT:  Even if this customer doesn't want
24    anything to do with Binance, Binance would get her
25    information?
```

Page 131

1           MS. OKIKE:  Correct, Your Honor.

2           THE COURT:  Okay.

3    BY MS. DIRESTA:

4    Q    And is that information provided in the disclosure

5    statement?

6           MS. OKIKE:  Your Honor, we can check it.  It's in

7    the APA but we'll double check.  We did send out our

8    customer migration protocol which sort of laid this all out.

9           THE COURT:  I believe it is, if that's your

10   question.  You may not have seen it or not, but I believe it

11   is.

12   BY MS. DIRESTA:

13   Q    Okay, and then if we're getting cashed out, the

14   creditors want to get cashed out, what would be the process

15   for that?  And to be more specific, could it be a situation

16   where we would just get a check directly from Voyager or is

17   it a situation where all of my assets would still then

18   technically go to Binance, my crypto assets would go to

19   Binance, then they convert that to cash and then send that

20   back over to Voyager and then I get a check from Voyager or

21   I get a check from Binance?  Like, how would that exactly

22   work?

23           THE COURT: To your knowledge the answer?

24           THE WITNESS:  I think I know most of it, but there

25   was a lot of if this then that.

1    BY MS. DIRESTA:

2    A     So I believe that if you elect to go over to Binance,

3    we already discussed how that would work.  I think your

4    question is if you don't.  I believe that the funds stay at

5    Voyager and you get cashed out at Voyager, if that's what

6    you elect to do.  And then the way it's transmitted, I

7    believe you can do an ACH or a check, but I would need to

8    confirm that.

9    Q     Okay.  So it would be simply everything would stay at

10   Voyager and then a check would get cut to me directly from

11   Voyager. There would be no transfer of assets to Binance;

12   however, there will be a transfer of my KYC information

13   regardless to Binance.  Is that correct?

14   A     I think I was just informed by counsel that yes, the

15   KYC information will be at -- they'll be provided to

16   Binance, but under the scenario that you're highlighting, I

17   think, you know, Binance would not be the distribution agent

18   in that case that (indiscernible).

19   Q     Okay.  So my next question is the UCC held a Twitter

20   Spaces Town Hall on November 4th.  And during that town

21   hall, the subject matter was the FTX deal because FTX had

22   not gone bankrupt yet.  And during that town hall, someone

23   had asked a question about the percentage of distribution

24   that people were going to get and I can't remember who on

25   the panel answered the question.  I think it was someone

Page 133

1   from FTI, but they basically said that for every $20 million

2   dollars that FTX was giving Voyager as part of the sale, for

3   every $20 million, it only equated to about 1 percent of the

4   creditors' recovery.  So with that information, since

5   Binance is only offering $20 million, which is way less than

6   what FTX was offering, then doesn't the same logic hold true

7   that we're only getting about 1 percent additional recovery

8   with the Binance deal?

9   A    Roughly.  Yes.  You're correct.  And it's -- but it is,

10  $20 million is a significant amount of money in general, but

11  there is a large claim pool so that just gets to the math

12  that you're highlighting.  But I --

13  Q    Okay --

14  A    -- can't speak for FTI, but I can speak to the math.

15  Q    Okay.  So then earlier in the hearing, someone asked

16  you the question of the $20 million that Binance is

17  offering.  Is that all going to be going to the creditors or

18  would some of that be spent on some administrative cost, and

19  you didn't really answer the question.  You just said that

20  the cash is, you know, fungible, which means it can really

21  go anywhere, right?  Like there's no guarantee that all of

22  that cash is going to go to the creditors.  So even if all

23  of the cash did go to the creditors, it's only 1 percent of

24  our recovery and if, say, only $10 million of it goes to the

25  creditors because the other $10 million is spent elsewhere,

Page 134

1    then that drops down to like 0.5 percent or maybe none of it

2    goes to us and it drops down to 0 percent.

3        So I set this up to ask this question.  How is it then

4    that the Binance deal is actually a better option than the

5    toggle option, when the lawyers are constantly saying that

6    you guys are trying to get the most amount of recovery in

7    the shortest period of time, when the recovery seems to be

8    the same with the Binance deal and the toggle option and

9    then the shortest period of time is the toggle option?  So

10   how is the Binance deal better than toggle option, given

11   everything I just laid out?

12            MR. SLADE:  Your Honor, I object.  That was a

13   speech, not a question and he answered it when it was asked

14   the first time.

15            THE COURT:  Well, I'll sustain the objection, in

16   part, because the -- there's a false premise in the

17   question, which is that somehow if $20 million more is paid

18   by Binance, that it's not really $20 million more.  Whatever

19   the professional fees are, whatever other expenses there are

20   of the estate, they have to be paid and they have to be paid

21   if there's a toggle deal or if there's a Binance deal.  It

22   actually makes no sense to ask where the $20 million will

23   go, because all of the expenses will be the same but in the

24   Binance transaction, there will be $20 million more.

25            Now I understand that you don't think that that's

1   much in terms of how -- as a percentage matter it affects

2   recoveries.  That I understand.  But the premise of your

3   question that somehow it will be used for some other

4   expenses and therefore not available, well, money is

5   fungible.  Those expenses have to be paid from somewhere.

6   Necessarily, if there's $20 million more, then there's $20

7   million more for creditors.  There's no other way to do the

8   math.

9           Now, if you want to ask him, why are we doing this

10  just for a 1 percent increase in creditor recoveries, that's

11  fine.  Go ahead and ask him that.

12          MS. DIRESTA:  Okay.  Thank you, Your Honor.

13  BY MS. DIRESTA:

14  Q   So why are we going through all of this struggle and

15  spending all of this time and money for a 1 percent recovery

16  to creditors when the toggle option is obviously faster and

17  almost equivalent?

18  A   So 1 percent is $20 million, as you already just

19  generally agreed on.  I think that's number one.  Number

20  two, Binance supports all of these coins, so there are

21  roughly 35 coins that are unsupported and our concern is

22  that in an unsupported format that you're going to get, you

23  will get to the best of my knowledge and market experts, you

24  will get less money.  So to the extent that you can

25  effectuate this transaction, $20 million in my opinion is --

Page 136

```
 1   and I understand that percent is not a significant number, 1

 2   percent, but it is higher.  It is better.  And $20 million

 3   in general is a lot of money.  And then furthermore, the

 4   support of the coins is very important.  So those are two

 5   reasons, at least two reasons.

 6   Q    Okay, you're saying the support of the coins and I'm

 7   kind of confused because my understanding is with the toggle

 8   option, is just the Voyager app opens up and then people can

 9   attach their wallet and withdraw their crypto and then now

10   it's theirs.  They have it.  It's been distributed to them

11   or if they choose to cash out, then they can, you know, get

12   the cash.

13        So how is that not a better option than going through

14   all this trouble of, you know, moving over to Binance,

15   especially when someone else said, I can't remember if it

16   was someone at Kirkland just earlier in this hearing that

17   Binance is essentially just a distribution agent.  Why can't

18   Voyager act as its own distribution agent with the toggle

19   option and just open up the app, let people plug in their

20   wallets so that they don't lose their coins or if they want

21   to cash out, give them that option?  Why can't we do that?

22             THE COURT:  You can answer.

23   BY MS. DIRESTA:

24   A    Yeah, you're asking my opinion on which one is better.

25   The Binance transaction is better than the toggle plan.  The
```

Page 137

```
 1      toggle plan is a contingency plan.

 2                THE COURT:  I think the question was, the coins

 3      that will be made available through the Binance plan.  Can't

 4      they all, all of them, be made available through the toggle

 5      plan?  And if that's right, why don't we just do the toggle

 6      plan?  I think that -- you think you said they can't --

 7                MS. DIRESTA: Thank you, Your Honor.

 8                THE COURT:  -- you need to explain what you mean

 9      when you talk about unsupported coins --

10                THE WITNESS:  My --

11                THE COURT:  -- and what the difference would be in

12      the in-kind distributions that you could do under the toggle

13      plan versus the Binance plan.

14                THE WITNESS:  Yes.  Thank you, Your Honor.  So my

15      understanding is that there are 35 coins that are

16      unsupported that do create problems for distribution through

17      the Voyager platform.  So that's the first answer.  And then

18      secondly, I think the question is, you know, why are we

19      doing this.  I think the answer is that it is mathematically

20      better and I think we had that discussion earlier.

21                THE COURT:  What do you mean when you say they're

22      unsupported?

23                THE WITNESS:  My understanding is that on the

24      Voyager platform, you have issues in terms of distribution

25      and support of 35 coins.  It's just what's been represented
```

1    to me in terms of distribution and I think the benefit of

2    the Binance plan is that all coins are supported.  And not

3    all coins are -- it's not as if they're all on one universal

4    exchange.  It's, there are multiple exchanges.  So there's

5    some exchanges where some coins are more obscure and

6    unfortunately, it would not be equal footing to the extent

7    that one customer who is pari passu with another customer

8    but has different coins may be adversely affected.

9              THE COURT:  So in other words, under the Binance

10   deal, people who want in-kind distributions can get them no

11   matter what their coins are.  Under the toggle deal, there

12   are certain kinds of coins you would not be able to do an

13   in-kind transfer on?

14             THE WITNESS:  That's right, Your Honor.

15             THE COURT:  Okay.

16   BY MS. DIRESTA:

17   Q    Okay, so as a follow-up question to the unsupported

18   coins on Voyager, I'm sure, given all of the developers that

19   not only Voyager has or that, you know, out there in the

20   industry, that there is a very simple way to make this

21   unsupported crypto become supported, because if Binance is

22   doing it, right, they have the capability to do it, then I'm

23   sure Voyager should be able to have the capability of doing

24   it.  So why doesn't Voyager just support the unsupported

25   coins?  What is the problem there?  Why can't we do that?

1    A    Your Honor, this -- I'm sorry, this doesn't just

2    magically happen.  You'd have to have developers.  You'd

3    have to spend more time.  You'd have to figure out a

4    methodology that everybody would agree to, to do that, and

5    in my opinion, that delay is -- will further delay

6    distribution to unsecured creditors.

7    Q    Is there a way for us creditors or for you guys to

8    provide exactly what those steps would be and how long it

9    would take to make something unsupported become supported?

10   A    I'm sure I (indiscernible).

11            THE COURT:  Are you capable of answering that

12   question or would somebody else has to answer?

13            THE WITNESS:  I'm not capable of answering all the

14   technical abilities to change from supported to unsupported

15   coins, but I have a general understanding that it will take

16   some time, effort, and money.

17   BY MS. DIRESTA:

18   Q    And the thing about those vague answers is that, like,

19   anybody can give a vague answer and I'm just supposed to be

20   satisfied with it and trust you on that, but I would really

21   like to see the evidence laid out, you know, kind of like

22   how crypto has white paper that lays out the plan of how

23   it's going to function, how it's going to work.  So I'd like

24   to see what that plan is and what the timeframe is and how

25   much it's supposedly going to cost to see if what you guys

Page 140

1   are saying is accurate.

2            MR. SLADE:  Your Honor --

3   BY MS. DIRESTA:

4   Q    So is there a way for us to get information like that?

5            MR. SLADE:  Your Honor, I object.  That's not a

6   question.  And every creditor had the option to take

7   discovery and did not.

8            THE COURT:  Well, let me ask you, are you planning

9   to offer any testimony from anybody else that can explain in

10  more detail what the problems are in terms of the

11  unsupported coins?  It is after all, one of the bases on

12  which you kind of touted the Binance deal as being better.

13           MR. SLADE:  So we have one other witness that

14  could probably speak to that in some degree, but it's a, I

15  mean, it's a highly complicated process and it's probably

16  different by coin.  There's 35 separate coins, so I don't

17  think we have anybody here today that can explain for each

18  of the 35 coins what would have to happen for the Voyager

19  platform to support it.

20           THE COURT:  All right.  Well, we'll see what your

21  other witnesses can do, but it sounds like this witness has

22  exhausted his own technical ability to explain the issue.

23  Am I right about that?

24           THE WITNESS:  Yes, Your Honor.

25           THE COURT:  Okay.

Page 141

```
 1              THE WITNESS:  Thank you, Your Honor.  I'm done.
 2              THE COURT:  Okay.  Anybody else on the phone?
 3              MS. DIVITA:  Good afternoon --
 4              MAN 1:  Your Honor -- ladies first.
 5              MS. DIVITA:  Thank you.  Good afternoon, Your
 6    Honor.  This is Michelle DiVita and like to ask some
 7    questions related to some trustee comments made by the
 8    witness.
 9              THE COURT:  Okay.
10                   CROSS EXAMINATION OF MARK RENZI
11    BY MS. DIVITA:
12    Q    First question, did your due diligence related to the
13    Binance transaction include any data privacy considerations?
14    A    I do not personally conduct any data privacy due
15    diligence.
16    Q    Are you aware that there is a provision for Binance to
17    purchase customer selfies from Voyager?
18    A    Could you ask the question again, please?  Thank you.
19    Q    Yeah.  So as part of the Binance transaction, there's a
20    specific provision that allows Binance to also purchase
21    customers' selfies so something, you know, take a picture of
22    your face.  That is explicitly enumerated in the purchase
23    agreement.  Were you aware that that was a component when
24    you conducted your due diligence?
25    A    I knew that Binance was trying to acquire you know, the
```

1    possibility of having new customers that they would have a

2    good experience on that platform and that that hopefully the

3    customers would elect to go over the platform and that there

4    were conditions in doing that.  So, yes, I'm generally aware

5    of it.

6    Q    Okay, but you did not identify any risk as part of the

7    transfer of customer biometric data, correct?

8    A    My understanding is that it's laid out in, you know, in

9    the documents that have been presented here and I can't

10   speak to whether or not it was biometric or not.  I just

11   can't.

12   Q    So generally, the -- your analysis in terms of whether

13   or not the plan of reorganization is a better option for

14   creditors versus a liquidation plan, does that analysis or

15   that model does not contemplate any data privacy risk for

16   customers, correct?

17   A    I think the analysis stands on its face and it's been

18   voted by 97 percent of customers that did vote, that they

19   accept the terms and conditions of the plan.  And then

20   furthermore, I'm not a data security expert.  So I, you

21   know, I can't speak to any questions about that.

22   Q    Okay.  You mentioned the 97 percent of customers that

23   did vote.  Based on just your professional experience, 6

24   percent -- is a 6 percent voter turnout for a large customer

25   class typical?

```
 1   A    I can tell you that 97 percent is a very high

 2   percentage of voting in favor of a plan in something as

 3   complicated as this.  And since this is the first large

 4   cryptocurrency case in this country, you know, 6 percent

 5   turnout is what it is on its face.  I would have liked to

 6   see a larger turnout but people all have the ability to turn

 7   out.

 8   Q    Do you think or do you have any thoughts in terms of

 9   why, believe someone previously mentioned 175K customers

10   have opted in to use the Binance platform; whereas, think

11   only like 60,000 voted in favor of the plan?

12   A    I don't understand.  I can't understand -- I don't

13   understand your question.  Can you say it again?  It's not

14   very clear what --

15   Q    Yeah.

16   A    -- asking.

17             THE COURT:  She says it sounds like more people --

18             MS. DIVITA:  So --

19             THE COURT:  More people signed up for the Binance

20   platform than actually voted on the plan.  Can you explain

21   why that might be?

22             THE WITNESS:  More people -- Your Honor, could you

23   -- I just don't follow.

24             THE COURT:  Based on the numbers Ms. Okike said at

25   the beginning of the hearing about the number of customers
```

Page 144

1    who signed up already in the Binance plan, she says it

2    sounds like more people have done that than have actually

3    voted on the plan.  Do you have any idea why that would be?

4              THE WITNESS:  No.

5    BY MS. DIVITA:

6    Q    Okay.  So it sounds like maybe more than 6 percent of

7    customers are interested in, you know, doing this Binance

8    transaction, but when you say a majority of customers have

9    voted in support of plan that contemplates the discrepancy

10   between the number of customers who signed up versus those

11   that have voted.

12   A    Well, I think --

13   Q    Right?

14   A    I think people have the ability to elect to vote or to

15   not to vote and in our country, I believe that's one of our

16   rights.  So -- and you know, to the extent that somebody

17   didn't vote but elects to go to Binance that seems to make -

18   - that makes sense from a math perspective.  So if you don't

19   vote and you want to go to Binance, that can be

20   mathematically true.  So I see no logic flaw there.

21   Q    Okay.  So in terms of customers that aren't signing up

22   for this Binance, then and there's about 700,000 people in

23   (indiscernible), is that (indiscernible) roughly correct?

24   THE COURT:  She's asking you if there are something like

25   700,000 customers who have not yet signed up for Binance.

Page 145

```
 1    BY MS. DIVITA:

 2    A    I believe there's a period of time in which customers

 3    can continue to sign up, but the numbers obviously will

 4    continue to change over the coming weeks.

 5    Q    So as of today, then, assuming those customers don't

 6    sign up or sign up and some sort of gathered basis, at least

 7    -- what's the minimum timeframe that those 700,000 customers

 8    could receive a distribution if they did not opt in or sign

 9    up for Binance?

10    A    The minimum amount of time to come over, is the

11    question?

12    Q    Sorry, for the cash distribution from Voyager.

13              THE COURT:  I'm sorry, we're having trouble

14    hearing you clearly enough to understand the question.

15              MS. DIVITA:  I know, I'm sorry.  One second.  Is

16    this better?

17              THE COURT:  Try again.

18              MS. DIVITA:  Is this better?

19              THE COURT:  I won't know until you try the

20    question again.

21              THE WITNESS:  And slower, please.

22              MS. DIVITA:  Okay --

23              THE COURT:  Maybe a little slower.

24              MS. DIVITA:  I'm sorry.

25    BY MS. DIVITA:
```

1  Q    So this is in the context of the timeline of creditor

2  customer recovery.  If 700,000 people today have not signed

3  up for Binance and I understand that they have three months

4  to sign up, assuming no one signed up for those 700

5  customers, what is the soonest they can receive a cash

6  distribution from Voyager?

7  A    The difference in time?  I believe that the Binance,

8  the Binance plan is the most expedient way for distribution

9  to customers, if you elect to go to Binance.  I think the

10 toggle will take longer, but hopefully not much longer.

11           THE COURT:  I think she's saying --

12 BY MS. DIVITA:

13 Q    So if you elect to go to Binance.

14           THE COURT:  I think she's asking if you don't sign

15 up for Binance, when do you get your cash?

16 BY MS. DIVITA:

17 A    I believe it's before June under a toggle plan, so --

18 but in a Binance transaction, hopefully it's effective, goes

19 effective in the middle of April.

20 Q    So is there a way to opt out of the Binance plan?  So

21 for example, I'm not signing up for Binance.  If I -- so I

22 have three months to sign up.  I know that I don't want to

23 sign up.  Am I receiving a distribution three months from

24 April or is it -- is there an option for me to receive a

25 distribution sooner?

```
 1   A     I believe the timing is before June, so -- the exact
 2   amount of time, I don't have in front of me.
 3   Q     I'm just trying to get to, you know, extending the
 4   timeline for creditors when we have 700 creditors that
 5   aren't opting in to an expedited timeline.  And this is in
 6   comparison between the plan of reorganization and the
 7   liquidation.
 8   A     Your Honor --
 9               THE COURT:  I'm not sure that's a question.  Let
10   me ask Ms. DiVita, what exactly is your question?
11               MS. DIVITA:  I am just trying to clarify the
12   timing.  So, one of the assumptions in why this plan of
13   reorganization is preferable for creditors is because it
14   expedites the timeline for recovery.  But based on the
15   numbers as they are presented today, it sounds like this 175
16   (indiscernible) people, that's not a large portion and
17   doesn't necessarily support the contention that a majority
18   of creditors are looking at or interested in an expedited
19   timeline.  And to just kind of further maybe drill down on
20   that point.  But I don't know --
21               THE COURT:  So, if I understand the question for
22   the witness, it is if customers who don't want to go to
23   Finance have to wait three months to get cash, is that
24   longer than it would take to get cash if we didn't have a
25   plan?
```

Page 148

```
 1              MS. DIVITA:  That is well said.  That is my
 2    question.
 3              THE COURT:  In other words, if you converted to
 4    Chapter 7, would people get cash sooner than what they would
 5    get -- sooner than three months?
 6    BY MS. DIVITA:
 7    A    I think the issue if you convert to a Chapter 7 is not
 8    -- number one, I think it does take longer than the Binance
 9    plan.  Number two is that if you immediately -- and as Your
10    Honor read (indiscernible), if you have to distribute in
11    cash, that really will have issues in terms of the current
12    market and it will have a significantly lower recovery.
13         So, it's an issue of timing and overall recovery.  So,
14    I am certain that if you have to monetize obscure
15    cryptocurrency assets quickly, that the performance on that
16    recovery is going to be significantly diminished and in some
17    cases, you know, over 50 percent reduction.  And that's from
18    market makers.
19         So, the concern is that as you think through all
20    customers being treated equally, ones that have more obscure
21    cryptocurrency certainly bear the brunt of (indiscernible)
22    transactions, monetization.
23    Q    Got it.  That's actually very helpful and kind of
24    segues me into my next question.  So, you're saying that the
25    rebalancing approach is the same under the Binance
```

1    transaction and the Chapter 7 liquidation with the trustee?

2    A    No.

3    Q    Okay, so it's different.

4    A    I'm not saying that.  I'm saying that the rebalancing

5    is optimizing what's going on in the market right now,

6    trying to do it in the least disruptive way.  That is what

7    we're doing right now.  I think under a liquidation, Chapter

8    7 liquidation, the timeline to monetize those assets has to

9    be quicker to monetize that and you will have a

10   significantly lower recovery.

11   Q    Because --

12   A    Because you have to convert into cash.

13   Q    Got it.  So, you're talking about the marketability of

14   the assets.

15   A    Right.  I mean, bitcoin has --

16   Q    Okay.

17   A    Sorry.  Go ahead.

18   Q    Oh no, go ahead.

19   A    As we testified earlier and as a fact, Bitcoin has a

20   much deeper market in market (indiscernible) second largest

21   market (indiscernible), my understanding, for

22   cryptocurrencies.

23   Q    So, I guess I don't exactly follow how marketability

24   differs between Binance and liquidation.  Is it because

25   Binance is just getting a transfer of these more volatile or

```
1    less widely held cryptocurrencies?

2              THE COURT:  I think what the witness has said is

3    that under the rebalancing approach, the Debtors can spread

4    transactions over time to avoid the kinds of immediate

5    impacts on the market that you would have if you had to sell

6    everything all at once.  Is that right?

7              THE WITNESS:  Yes, Your Honor.

8    BY MS. DIVITA:

9    Q    Okay, that is very helpful.  So, then in terms of the I

10   guess sale or rebalancing act, couldn't -- I guess since the

11   assets aren't one to one, like this is an exercise that

12   could have been started well before the Binance transaction,

13   correct?  And the marketability risk isn't specific to

14   Binance, kind of been known from the beginning, right?

15   A    Well, I can't answer all of your questions the same

16   way.  So, the first question is could we do it during the

17   pendency of the case.  We were not authorized to do it.  It

18   took some time to get authorized.  There are certain

19   protocols to do it.  There are safety procedures that needed

20   to be done.  We have to make sure that we are in compliance

21   with the APA.  So, rebalancing is a very regimented process

22   to be the least disruptive that we can be to the marketplace

23   to monetize assets in a way where you can receive those

24   coins in kind and then be the least disruptive to the

25   marketplace.  So, that process is ongoing.  And you're
```

```
 1    right, it is not created to be one to one.  There are some

 2    coins that we have too much of them and we will sell them,

 3    and then we will buy other coins to rebalance the entire

 4    portfolio.

 5    Q    Got it.  So, the rebalancing is not -- it's required

 6    for both -- I guess both methods.  But one has to be

 7    effectuated quicker?

 8    A    I'm not sure of the exact question.  But I think

 9    rebalancing is important because for, among other things

10    that I've heard on the town halls is that receiving, pulling

11    in kind is one of the preferences of the majority of

12    customers instead of cash because it might have adverse tax

13    consequences.  And I don't know what those numbers would be,

14    but that's been expressed by multiple customers.  And we

15    designed the plan in concert with the unsecured creditors'

16    committee advisors to make sure that we were thinking about

17    issues such as that to make sure we can do distribution in

18    kind to the best of our ability.  And that's what the

19    Binance plan calls for.  And it supports all the coins.

20    Q    So, that --

21    A    So, it's not just one factor for this plan.

22    Q    Yeah.

23    A    The plan is to try to do the best.  One is to do the

24    best in terms of maximizing value.  It's at least $20

25    million better just on the face of it.  The execution is
```

1    even better in terms of the recovery because of the way it's

2    being done, which is being done in a very regimented process

3    and to be the least disruptive for the market.

4    Q    Got it.  So, the tax benefits under a distribution in

5    kind offsets any really purchaser or buyer risk I guess kind

6    of in -- so there are securities risks, there are regulatory

7    risks, you know, as we've seen from the FTX transaction.

8    There's liquidity risk.  And so, you're saying that the

9    preference of customers to get their cryptocurrency in kind,

10   which is predominantly driven by a tax benefit -- which I

11   don't know what -- we'll say 35 percent -- that offsets any

12   quantified risks, transaction risks?

13   A    I wouldn't characterize my testimony as I understand

14   everybody's tax basis.  All I can say is that there is a

15   preference for crypto in kind and that does have the

16   advantageous aspect for some that have a tax basis that

17   would prefer to receive it in kind.  There are, as you

18   pointed out, over 700,000 customers.  I can't speak for all

19   of them, but we have taken into consideration the issues

20   that have been brought before us, and the preference is in

21   kind.  That's one.

22        And then two, because of market conditions, if we had

23   to liquidate all crypto in due cash, we think that the

24   recovery levels would be significantly lower, at least 20

25   percent lower, because of the items that I've already

Page 153

1   testified to.

2   Q    Okay.  This is my last question then.

3   A    If you can understand, like, you're not flooding the

4   market with coins if you rebalance it.

5   Q    Right.

6   A    You're selling all into cash, you're flooding the

7   market with more coins.

8   Q    Got it.  So, you have to flood the market under Chapter

9   7.

10       So, then I guess this is my last question.  In terms of

11  -- you mentioned that when you did your quantification, your

12  accounting for all these various marketability, rebalancing,

13  et cetera, but you also mentioned that this analysis didn't

14  include any quantification of data privacy risks.  Did it

15  include any other adjustments for risks such as securities,

16  solvency, anything like that in your calculation?

17  A    I think I already testified to that in terms of

18  regulatory bodies and that risk.  That's not been quantified

19  mathematically, but it's described that obviously there are

20  -- you know, the regiment for regulation for cryptocurrency

21  continues to be worked on right now by governmental

22  agencies.  So, it's hard for me to opine on that because I

23  don't know the outcome and I don't think many do know the

24  outcome at this point.

25  Q    So, risks inherent to a cryptocurrency transaction were

1     not quantified even though they don't exist in a liquidation

2     context?  But only -- I guess they do, but only in a bad

3     way.  And that's because you're flooding the market.

4     A     (indiscernible).  My testimony stands on its face.  I

5     can't -- the way you just described things, I was confused

6     by it, honestly.

7     Q     Okay, that's fine.  I'm done.  Yeah.  Thank you.

8                  THE COURT:  All right.  Is there anybody else --

9                  MS. WALL:  Hi, this is Jennifer Wall.

10                 THE COURT:  Who is it?

11                 MS. WALL:  This is Jennifer Wall.  I am a creditor

12    and wish to speak.

13                 THE COURT:  Okay.

14                 MS. WALL:  May I speak, Judge Wiles?

15                 THE COURT:  Yes.  You can ask questions.

16                 MS. WALL:  Okay.  Thank you very much.

17                      CROSS-EXAMINATION OF MARK RENZI

18    BY MS. WALL:

19    Q     I have heard about the in-kind and that that is the

20    majority for the base of the Voyager creditors.  However, I

21    am in the state of Texas and I want my claims to be in kind,

22    but Binance does not support Texas and I have not heard from

23    Texas if it's allowed.  And what I have gleaned is that

24    (indiscernible) probably won't be allowed.

25         So, from a toggle perspective, wouldn't it be better

```
 1    for those individuals that are in the state of Texas and the
 2    other three non-supported states to be able to receive their
 3    coins in kind through the toggle perspective and not have
 4    that tax issue being cashed out?
 5    A     Number one, I think that there is a period of time for
 6    Binance to get the proper authorization to distribute in
 7    kind.  I believe that's up to six months.  So, -- and
 8    hopefully there will be a quick resolution to that.  But I
 9    can't speak to the regulatory authorities in Texas in
10    regards to allowing Binance to do that for you in Texas.
11    A     Okay.  (indiscernible).
12              THE COURT:  Would Voyager -- would Voyager itself
13    be under the same restrictions as Binance in Texas in terms
14    of the ability to distribute to customers?
15              THE WITNESS:  (indiscernible).
16              THE COURT:  Okay.
17              MS. WALL:  Okay.  I appreciate that statement,
18    Your Honor.  Thank you for that.  Because that is another
19    question I've had, is why can't, for those states that are
20    not supported -- and I understand that there were issues
21    late in the game, if you will, with Voyager that none of us
22    -- none of the residents in Texas knew about.  We thought
23    all the license was there.  And now we're being penalized.
24    It would be appreciative if the State of Texas and Voyager
25    could come to an agreement to allow those customers to get
```

1    their coins off of Voyager.

2           Another question that I have -- and I didn't know

3    if you've been speaking or testifying -- you made somewhat

4    of I think an absolute statement as saying that by going

5    with Binance, it's the most efficient and everybody receives

6    their coins in kind (indiscernible) or their cash, but you

7    just said that it's going to be six months for Texas

8    residents and the other three unsupported states to

9    potentially get their money back or their coins.  And the

10   odds of giving all of the regulations (indiscernible) not

11   only from a national perspective but also from a state

12   perspective, I kind of see that highly unlikely.  So, I

13   guess I'm just saying that I don't think that you're really

14   speaking in the four states that are not going to be

15   supported by Binance.  I don't believe I'll really be

16   equally represented here.  Okay.  Sorry about that.

17           THE COURT:  Okay.  That's not really a question.

18   That's more an argument.  And we --

19           MS. WALL:  Okay.

20           THE COURT:  We'll have argument at a different

21   point in the proceeding.  Right now --

22           MS. WALL:  Oh, sorry about that.

23           THE COURT:  Okay.

24   BY MS. WALL:

25   Q    Okay.  My other question will my KYC information be

```
 1    sent to Binance even though I'm in Texas?

 2    A     I'm not sure, Your Honor.

 3             THE COURT:  The witness doesn't know the answer.

 4             MS. WALL:  Okay.  So, can that be (indiscernible)?

 5             THE COURT:  So, what?

 6             MS. WALL:  Could that be -- can that be verified,

 7    if my KYC information will be sent to Binance?  Because I

 8    would prefer if we're not allowed to use Binance, that that

 9    type of information not be sent to Binance.

10             MR. SLADE:  We'll answer her question, Your Honor.

11    We'll get to the answer.

12             THE COURT:  What is the answer?

13             MS. OKIKE:  Your Honor, all customer information

14    is transferred to Binance under the purchase agreement.

15    Under the customer agreement, we do have the right

16    (indiscernible) customer information.  And that's what we're

17    relying on with respect to that transfer.

18             UNIDENTIFIED SPEAKER:  Isn't that Delaware,

19    California data privacy code with consumers --

20             THE COURT:  Whoever is -- you can make your

21    arguments later, but don't interrupt witness testimony with

22    argument.  Okay?

23    BY MS. WALL:

24    Q    Okay.  So, my last question.  So, what I'm hearing is

25    that that will be verified, or that that is what's going to
```

1    happen.  My personal information will be sent to a company

2    that I will not be able to transact with.  Is that correct?

3                MR. SLADE:  Just to clarify, the APA provides that

4    that information will be provided to the extent permissible

5    under applicable law.  That's Docket Number 835 if you look

6    at Page 16.  That's that part of the APA.

7                MS. WALL:  Okay.  And my last question -- and

8    thank you very much for the time to speak today.

9    BY MS. WALL:

10   Q    My last question is from the tax perspective, for all

11   of us that have invested X amount of money and we're

12   certainly not getting that out, are we going to be able to

13   use those amounts for a tax loss over the coming years?

14   A    I'm not an expert in tax basis, and it's hard for me to

15   answer that for all of the customers.

16   Q    Is there a way that that question can be taken back and

17   looked at?  Because I am hearing different things of yes, we

18   will be, no, we won't.  And if there's anything -- and

19   realizing that through Judge Wiles' statement, this is the

20   first cryptocurrency case, so it would be nice to know that

21   we're -- we're victims of what has occurred, and we would

22   not be able to use this as a tax loss would be the second

23   impact on us.

24                THE COURT: There are disclosures in the disclosure

25   statement about tax issues.  But in the end, the taxing

Page 159

1   authorities will take their own positions on these things,

2   and the Debtors aren't really in a position to kind of make

3   any assurances or guarantees as to how any individual

4   customer's taxes will work, I'm afraid.

5               MS. WALL:  Well, those are all my questions.

6   Thank you very much.

7               THE COURT:  We're nearing our lunch break.  We

8   probably passed on.  I would have preferred a lunch break.

9   Is there anybody else on the phone that has questions that

10  have not already been asked of this witness?

11              MR. HENDERSHOTT:  I do, Your Honor.

12              THE COURT:  Who was that?

13              MR. HENDERSHOTT:  Tracy Hendershott, pro se

14  creditor.

15              THE COURT:  Okay.  Go ahead, Mr. Hendershott.

16              MR. HENDERSHOTT:  Thank you.

17                  CROSS-EXAMINATION OF MARK RENZI

18  BY MR. HENDERSHOTT:

19  Q    Mr. Renzi, I thank you for this time.  I know this is

20  quite painful for all of us (indiscernible).  So, I do want

21  to extend my gratitude.

22       But when we first started, I had missed what your role

23  is and who you work for.

24  A    I lead BRG in financial advising for the company.

25  Q    All right.  Thank you, sir.  So, your testimony is

1   (indiscernible) that the Binance is the best deal here for

2   the creditors.  And some of these questions of the risks of

3   pushing all of the creditors over to Binance have not been

4   answered to my satisfaction.  Has anyone evaluated whether

5   Binance comingles all user funds, which was significant

6   because of why we're all suffering currently under the

7   Voyager model of the same action.

8   A    I believe they have the ability to (indiscernible) the

9   assets and then also rehypothecate assets.  Yes.

10  Q    So, all user funds, are they individualized to where

11  the users have ownership of it, or are they comingled in the

12  same manner that Voyager did?

13              MR. SLADE:  I'll object for lack of foundation,

14  Your Honor.

15              THE COURT:  Overruled.  Do you know the answer to

16  the question?

17              MR. HENDERSHOTT:  Well, they should --

18              THE COURT:  The objection is overruled.  Do you

19  know the answer to the question?

20  BY MR. HENDERSHOTT:

21  A    I believe that the funds are going to be in effect a

22  custody -- you know when they're transferred over into

23  custody.  But to the ability -- to the extent that there is

24  a wallet that's a broader wallet, I suspect it could be

25  comingled in a broader wallet, but still in the custody

Page 161

1     perspective.  I don't know -- I don't think it's going to be

2     in individual wallets (indiscernible).

3                 CLERK:  Judge, I believe the parties are falling

4     off the line.  I believe Mr. Hendershott will probably call

5     back if you want to conclude with the witnesses before you

6     take the break.

7                 THE COURT:  We've reached out four-hour time limit

8     on Court Solutions.  Well, that's a good time to take a

9     lunch break then.  And we'll resume at 2:40.  Okay?

10                UNIDENTIFIED SPEAKER:  Why won't you guys let the

11    --

12                (Recess)

13                THE COURT:  All right, please be seated.  Mr.

14    Renzi, please retake the stand.  You are still under oath.

15    Do you understand that?

16                THE WITNESS:  yes.

17                THE COURT:  Okay.  I believe before the automated

18    telephone system cut you off, Mr. Hendershott, I believe you

19    were in the middle of asking your questions.

20                MR. HENDERSHOTT:  Yes, sir.  Thank you.  And I was

21    glad to hear it was automated.  (indiscernible) that got

22    booted out, but (indiscernible) clarified that for me, so I

23    was happy to hear that.  Hope everyone had a good lunch.

24    BY MR. HENDERSHOTT:

25    Q    So, picking up, Mr. Renzi.  When we left off, we were

```
1    talking about your beliefs and testimony about Binance as

2    (indiscernible) for all of us creditors.  And by the way,

3    are you perchance a creditor yourself, Mr. Renzi?

4    A     No.

5    Q     Yeah.  I mean, that's frustrating when we keep getting

6    told over and over again by others (indiscernible).  But I'm

7    glad that (indiscernible) pick your brain and utilize your

8    expertise here.  But let's move along.

9         So, we ended with the comingling of user funds that put

10   us in this precarious situation right now with Voyager  just

11   exactly over at Binance.  I'm asking (indiscernible)

12   questions that differentiate between Binance and Voyager in

13   (indiscernible) environment.  And with Binance, my

14   understanding is the sole shareholder of Binance U.S. is

15   Binance Global.  Is that your understanding as well?

16   A     It's my understanding.

17   Q     Yeah.  So, if you were to take any legal action against

18   the parent company, the holding company, my understanding is

19   Binance refuses to give any global domicile to be able to

20   initiate any legal action against.  Is that your

21   understanding doing your due diligence as well?

22   A     I'm not an expert on their legal structure.

23   Q     So if you wanted to write a letter then just

24   congratulating (indiscernible) on this acquisition.  Is

25   there a legal headquarters or domicile that you would have
```

Page 163

1   identified during your due diligence that you would --

2   that's the parent company?

3   A    I know that we've met with individuals from Binance, at

4   least my team, in New York City.  Or Binance --

5   Q    That would be Binance U.S. I'm assuming.  Yeah.  I'm

6   talking about the parent company, the single shareholder,

7   the parent company.

8   A    I have not met with the parent company of Binance U.S.,

9   no.

10   Q    So, I didn't ask if you met with them.  I asked where

11   would you send any type of legal or just pleasantry

12   communication to the parent company for their global

13   domicile address.

14   A    I don't know.  I would ask.  Happy to look it up.

15   Q    That's concerning.  One, that the creditors have

16   expended significant funds on their due diligence, and two,

17   that you are sitting here testifying to Judge Wiles and the

18   rest of us that this is the best solution for us.

19          MR. SLADE:  Your Honor, I would object.  Can we

20   just have questions and not speeches?

21          THE COURT:  Objection sustained.  Just ask

22   questions, Mr. Hendershott.

23   BY MR. HENDERSHOTT:

24   Q    Okay, moving on.  So, that puts us in a worse scenario

25   than Voyager, which actually does have a domicile address

 1   where we can take legal (indiscernible).

 2       How about comingling the funds between the affiliates,

 3   between Binance U.S. and the global affiliate, which I

 4   believe has even been confirmed by (indiscernible) publicly

 5   and stated that was in the past, but they have better

 6   controls in place now.  Are you aware of that, sir?

 7   A    I believe they're separate legal entities.  I can't

 8   speak to all of the innerworkings of Binance between its

 9   legal entities.

10   Q    So, during your due diligence, you never came up with

11   any discussions about comingling between the U.S. entity and

12   the global entity that has no legal address?

13   A    I don't agree with your statement that they have no

14   legal address.  I just don't know the legal address.  But

15   I'm sure you can find it.

16   Q    I would have hoped that you would have done that

17   previous to this call in due diligence.  But I'm asking

18   about the comingling of funds between the U.S. --

19              THE COURT:  Mr. Hendershott.  Mr. Hendershott.

20   Mr. Hendershott.

21              MR. HENDERSHOTT:  yes.

22              THE COURT:  You've got to stop making comments

23   after the answers.  Just ask questions and get answers.

24   Okay?  You can make your arguments later.

25              MR. HENDERSHOTT:  Sure.  Can we also have the

Page 165

1   witness just answer the questions instead of putting his

2   comments in?

3           THE COURT:  I think the witness has been fine.

4   So, just ask your questions and the witness will answer your

5   questions.

6           MR. HENDERSHOTT:  Okay.

7   BY MR. HENDERSHOTT:

8   Q    So, again, I haven't received an answer.  The

9   comingling of funds between the U.S. entity and the global

10  entity.

11  A    I don't know if they are comingling funds between the

12  U.S. entity and global entity.

13  Q    That did not arise in your due diligence efforts?

14  A    We have discussed many things with many different

15  people.  I am not the sole person doing due diligence on

16  Binance.

17  Q    But you are the leader and the chosen representative to

18  answer our questions.  Moving on.

19      No declarations --

20          THE COURT:  Mr. Hendershott.  Mr. Hendershott.

21  Stop making comments after the witness testifies.  Ask

22  questions and just get answers.  Okay?

23          MR. HENDERSHOTT:  Okay.  Sorry, sir.

24  BY MR. HENDERSHOTT:

25  Q    So, moving on.  No declarations have been

1    (indiscernible) practices, which we already heard from the

2    State of Texas.  We've already seen several, numerous

3    agencies state this as their concerns of Binance.  And we

4    also heard from the attorney general's office in Texas that

5    Binance hasn't even attempted to file any type of

6    documentation highlighting their internal controls or

7    practices.

8         In your due diligence, sir, have you been able to

9    identify the internal controls and practices of Binance?

10             MR. SLADE:  Your Honor, I object to numerous parts

11    of the preface of that question (indiscernible).  No facts

12    in evidence to support those.

13             THE COURT:  Well, let me also ask --

14             MR. HENDERSHOTT:  We have the attorney general

15    (indiscernible).  Can you maybe clarify with her?

16             THE COURT:  No.  I want you to not interrupt me

17    when I'm speaking.

18             MR. HENDERSHOTT:  I'm sorry, sir.

19             THE COURT:  Let me ask the Debtor's counsel.  In

20    terms of due diligence, is this your primary or your only

21    witness on this point?

22             MR. SLADE:  No, Your Honor.  Mr. Tichenor will

23    also be testifying about due diligence.

24             THE COURT:  Okay.

25             MR. SLADE:  They serve different roles.  Mr.

1    Tichenor is the investment banker.  Mr. Renzi is the manager

2    advisory.  They work together.

3              THE COURT:  Okay.  So, Mr. Hendershott, when you

4    ask a question, it's not proper to kind of first make an

5    argument and then ask your question.  It's not proper to

6    kind of state what you believe to be facts and then ask a

7    different question.  Just ask questions.  Okay?  Ask him

8    what he knows and what he did.  And if you think it was

9    deficient --

10             MR. HENDERSHOTT:  Sure.  I'll --

11             THE COURT:  If you think it was deficient later,

12   you can make arguments about what you think is deficient.

13   You can ask him what he found out and what he checked and

14   what he knows.

15             MR. HENDERSHOTT:  Okay.  Thank you, sir.  Thank

16   you for the guidance.

17   BY MR. HENDERSHOTT:

18   Q    Okay.  Going back to why Binance is better than Voyager

19   question.  So, the next one, no financial auditors for the

20   parent company, is that your understanding as well, sir?

21   A    I have not reviewed financial audited statements.

22   Q    Is that because Binance has no financial auditors?

23   A    I can't answer the question, Your Honor.  I think they

24   have auditors.  I just don't know specifically.  They have

25   accounting functions for sure.

Page 168

1          MR. HENDERSHOTT:  Can I ask follow-up questions

2     for that, Your Honor?

3          THE COURT:  You can ask follow-up questions.

4     BY MR. HENDERSHOTT:

5     Q    Mr. Renzi, I find your statement that you think they

6     have auditors as defective and concerning, that you are

7     sitting her unequivocally testifying that Binance is the

8     best solution for us, but you think that they might have

9     financial auditors, which is --

10         THE COURT:  Okay.  That's not a follow-up

11    question.  That's a follow-up argument.  Please try to keep

12    the difference in mind.  Ask him what he knows.  If you

13    don't like what he knows or if you don't think he's done

14    enough, you can argue about it later.  But just ask him what

15    he knows and what he did.

16         MR. HENDERSHOTT:  Okay.  Thank you, sir.

17    BY MR. HENDERSHOTT:

18    Q    So, Binance.  How about USD dollar banking relationship

19    for onboarding and offboarding of fiat?  Is Binance global,

20    parent company, sole shareholder of Binance U.S.

21    (indiscernible) that relationship currently?

22         THE COURT:  Do you understand the question?

23         THE WITNESS:  I -- I don't know the answer.

24         MR. HENDERSHOTT:  Should I move on or is this

25    going to be the response for all the questions with Binance?

1            THE COURT:  I don't know how to predict that.

2            MR. HENDERSHOTT:  Okay, well how about just one

3     last one.

4     BY MR. HENDERSHOTT:

5     Q    You are aware, Mr. Renzi, that Binance is actually

6     paying (indiscernible) for the various national -- possibly

7     with some states, I'm not clear on that one.  Certainly, at

8     the national level for regulatory noncompliance settlements.

9     A    If the question is am I aware that they're trying to be

10    in compliance with state regulations, I think that they are

11    trying.  And to the extent that there's anything that's

12    deficient, I'm sure they're going to try to cure that.  But

13    to be specific about it, I don't know specifically any state

14    fines that they're addressing right now.  I'm sure that it's

15    an ongoing thing in all cryptocurrency to make sure that

16    they're addressing any new (indiscernible).

17    Q    Okay.  So, you're sure that they are collaborating with

18    state regulatory agencies.  Were you in the courtroom or

19    available when the attorney generals of Texas stated that

20    they have taken no action of filing regulatory

21    documentation?

22    A    Well, in discussions with the company and their

23    advisors, my understanding is that Binance is trying to

24    cooperate to the best of their ability.  I was not in the

25    courtroom in regards to what they heard in the Texas

Page 170

```
1   courtroom that you referenced.  But I believe they --

2   Q    (indiscernible).

3   A    -- were operating as a company in the United States

4   appropriately.

5   Q    I was talking about this courtroom, sir.  Earlier when

6   the Texas attorney general's representative clarified

7   (indiscernible) they had not filed any documentation with

8   Texas.  In the courtroom, did you hear that portion of the

9   trial?

10  A    I didn't hear his question, Your Honor.

11            THE COURT:  He's asking if you heard the question

12  asked by the Texas attorney, which question asserted that

13  Binance had not made any filings in Texas.

14            THE WITNESS:  No.

15  BY MR. HENDERSHOTT:

16  Q    Okay.  So, after identifying probably six very

17  significant regulatory concerns of noncompliance worse than

18  with Voyager, all of those questions I asked you previously,

19  Voyager could comply with, yes.  Six of them Binance could

20  not.  Can you please reiterate again why you feel Binance is

21  a safe and the best methodology to be pushing all of those

22  creditors into?

23            MR. SLADE:  Again, I object.  That's a speech and

24  it assumes facts not in evidence.

25            THE COURT:  Just answer the question.  Why you
```

1    think Binance is the safe and better alternative?

2    BY MR. HENDERSHOTT:

3    A    I believe that Binance provides the maximum recovery.

4    The Binance transaction provides the maximum recovery to all

5    unsecured creditors.  To the extent that that recovery or we

6    have any doubts in Binance, we have the ability to toggle.

7    And then (indiscernible) is the second-best option that we

8    have.  So, to the extent that there's a disagreement in

9    construct, I believe that the construct that's set up

10   maximizes recovery for unsecured creditors as demonstrated

11   in my declaration and provides optionality to the extent

12   that there are concerns.

13   Q    Okay.  So, still you believe Binance is the best

14   solution for creditors is your testimony, is that correct?

15   A    I just testified, Your Honor.

16   Q    Yeah.  Okay.  Moving on.  Yes, sir?

17   A    I was coughing.  Excuse me.

18             THE COURT:  Go ahead, Mr. Hendershott.

19   BY MR. HENDERSHOTT:

20   Q    Moving on.  Earlier, there's been fairly extensive

21   conversations about the backup bidding process

22   (indiscernible).  You stated that Binance at the FTX round

23   was a backup bidder that they had no interest to be a backup

24   bidder.  You did not clarify how many other bidders were

25   there.  And we respect NDAs, we don't need to know their

Page 172

1   names.  But I think just a numerical number would be

2   beneficial.  And the follow-up question is did each one of

3   the backup bidders refuse to be -- did each one of the other

4   bidders beyond FTX and Binance, did they all refuse to be

5   backup bidders?

6            MR. SLADE:  Your Honor, I'm going to object to

7   relevance.  It's not relevant to what's before the Court

8   today.

9            THE COURT:  Well, I agree.  But go ahead and

10   answer the question.  Did all of the other bidders decline

11   to be backup bidders?

12            THE WITNESS:  I knew that FTX was the best bid and

13   that we did not have a backup bidder and that we had an

14   extensive auction.  I believe it was over a week.  It may

15   have been up to two weeks for someone to come in as a backup

16   bidder.  But we did not achieve that.  So, FTX was the

17   highest bid at that point in time.

18   BY MR. HENDERSHOTT:

19   Q    Yes.  And (indiscernible).  I was curious about all the

20   other bidders that participated in that auction. Did all of

21   them refuse to be a backup bidder?

22   A    I think I answered the question.

23            THE COURT:  I think you did answer the question.

24            MR. HENDERSHOTT:  I'm sorry, Your Honor, I didn't

25   hear the answer.  I heard that FTX was the number one

Page 173

```
 1    bidder. I didn't hear that all the bidders refused to be a

 2    backup bidder.  Because that's a critical element, Your

 3    Honor.  You approved the bidding plan.  The backup bidder

 4    was included from the beginning, that would have shaved six

 5    months off this trial, probably hundreds of millions of

 6    dollars if it was (indiscernible).  And Your Honor --

 7                 THE COURT:  Stop.

 8                 MR. HENDERSHOTT:  -- a person that's been involved

 9    in the (indiscernible) would have been --

10                 THE COURT:  Just stop.  Whether you think that's

11    true or whether it is true makes no difference to what we're

12    doing here today.  Right?  They didn't have a backup bidder

13    --

14                 MR. HENDERSHOTT:  It was --

15                 THE COURT:  Let me finish.  Whether that was right

16    or wrong doesn't change the situation we are standing in

17    today and doesn't change in one iota the question of whether

18    we should or shouldn't confirm the plan that is currently in

19    front of us.

20                 Today is not about recriminations for plans,

21    different plans that maybe could have been pursued in the

22    past.  I don't know what you think is accomplished by any of

23    that, but I promise you it's nothing.  You might be upset,

24    but it doesn't have any bearing at all, none, on what we

25    should to today.  They could have made the worst mistake --
```

1            MR. HENDERSHOTT:  (indiscernible).

2            THE COURT:  They could have made the worst mistake

3     in the history of bidding to have picked FTX and/or not to

4     have had a toggle plan at that time, but it doesn't matter.

5     I can't change the past.  Nobody can.  We are where we are.

6     And so, your fixated anchor on these points is of no help.

7     Okay?  You've got to move on and you've got to address the

8     issues that we're dealing with today.

9            MR. HENDERSHOTT:  From that perspective, Your

10    Honor, just to respond to you.  I believe it is relevant.  I

11    believe there is no accountability for their actions is your

12    proposal, that we ignore everything that happened in the

13    past.  I mean, there was material damages to the creditor

14    class because they failed to follow the bid plan.  It's

15    standard practice.  And there is a monetary value that can

16    be associated with it.  As well as there should be some

17    accountability for their failure to follow it.

18            THE COURT:  There is no issue in front of me

19    today, none, about whether they did something in the past

20    that caused damage for which they should be held

21    accountable.  Absolutely that is not an issue in front of me

22    today.  It's just simply not.

23            Now, if you want to say that there's some

24    dishonesty as opposed to a mistake and that it somehow means

25    that even at this stage of the proceedings I should appoint

```
 1    a trustee, that's fine.  But I know you're not lawyers, but
 2    you have to understand every court hearing is not an open
 3    invitation for you to ask for every single thing that you
 4    might want without a pending motion, without justification,
 5    and without evidence.  It is not how a court hearing works.
 6    We have specific motions in front of me today.  And the
 7    primary one is for confirmation of a plan that has been
 8    accepted by the voting classes.  If there is an objection to
 9    that confirmation that is based on the criteria I need to
10    consider in the bankruptcy code, I am more than willing to
11    hear it.  But I promise you, recriminations over the FTX
12    negotiations last fall have zero to do -- zero -- with
13    whether or not this particular plan should be confirmed.
14              If you want to argue that they made a mistake
15    before, therefore I should assume that they're making a
16    mistake again, you can make that argument.  But just beating
17    up the witness about why he didn't have a backup bidder is
18    pointless.  Do you under?
19              MR. HENDERSHOTT:  I hear you, Your Honor.  But you
20    do have an objection or a motion in front of you from the
21    creditors explicitly stating that for cause removal for
22    fraud, dishonesty, and competence and gross management.  I
23    believe establishing the sequence of incompetence, gross
24    mismanagement, potentially fraud and dishonesty right from
25    the very beginning for this date is part of the objection
```

1    that you have sitting in front of you that's on the agenda

2    for today.

3              THE COURT:  He's testified -- he's testified that

4    they didn't have a backup bidder.  You want to ask him that

5    same question ten times.  You're accomplishing nothing.

6    They didn't have a backup bidder, and they didn't have a

7    toggle plan at the time of FTX.  You can ask him that same

8    question a hundred times, and it's the same thing.  You're

9    not showing me anything that's relevant to anything I need

10   to do today.

11             MR. HENDERSHOTT:  Yes, Your Honor.  I understand.

12   Moving on.

13   BY MR. HENDERSHOTT:

14   Q    So, again, for the various reasons, that, Mr. Renzi,

15   you highlighted whether Binance is the best bid, you called

16   out that KYC would be required for a liquidation for the

17   release of tokens to the individual creditors and that would

18   only be possible by going through (indiscernible)

19   organization like Binance.  So, my question for you, sir, is

20   Voyager has KYC has -- has already been mentioned on this

21   trial.  People are concerned about it being shared with

22   Binance.  And so, every single creditor -- so could you

23   expand on where is the challenge of Voyager with the

24   preexisting KYC?

25             MR. SLADE:  Your Honor, I object.  I don't

1    understand the question.  I don't know how the witness

2    could.

3            THE COURT:  I understand the question.  He's

4    talked about the provisions in the witness's prior

5    declaration that talked about KYC issues and why the Debtor

6    isn't equipped to pursue them.  And he's asking you why not.

7    So, go ahead.

8    BY MR. HENDERSHOTT:

9    A    Effectively the transaction with Binance is -- they're

10   paying us for those transactions.  It's over $20 million.

11   So, in order to do that, they want to make sure that they

12   have the ability to do, you know, KYC information and make

13   sure there isn't any money laundering or making sure that

14   things are done appropriately.

15        So, in terms of Voyager, Voyager, if we have to go to

16   the toggle plan does have the ability to distribute some of

17   the (indiscernible).  However, not all.  And I think I

18   testified to that.  And I do think that they have a

19   tremendous amount of information about their customers.

20   Q    So, just so I am clear, Voyager has full KYC

21   documentation that would allow them to liquidate and return

22   assets directly back to customers?

23   A    I believe they have --

24   Q    Is that correct?

25   A    I'm not a hundred percent certain, but I believe they

```
 1    have -- I believe they have a significant amount of
 2    information.
 3    Q    Okay.  I must have misheard you earlier when you said
 4    that was an obstacle then.  So, that's great to know they
 5    have the ability to do that.
 6         Next question.  You -- sorry?
 7    A    I think -- I want to make sure we're clear because I
 8    don't want to recharacterize my testimony.  I think what I'm
 9    saying is that we have the ability to move to a toggle plan.
10    However, there are -- the Binance plan, there's a hundred
11    percent support on coins.  The toggle plan, we obviously
12    have some unsupported coins.
13    Q    So, I'm curious on that.  When you say unsupported,
14    Voyager was never an exchange.  So, Voyager bought coins
15    from true exchanges.  What is the obstacle again?  I heard a
16    statement earlier that all of this programming and
17    complexity involved with it, they already had the
18    programming to receive the code, to buy the coins from the
19    exchange, to allocate that to the client base.  And forgive
20    my ignorance, I don't understand why it is challenging to
21    then take those digital keys and coins and put them back to
22    the exchange that they bought them from.
23    A    They have to invest time and money to make sure that
24    those coins are supported.  And that is not one of the
25    things that's contemplated right now.
```

1    Q    Supported by the exchange that they bought them from?

2    A    For them to make distributions in those coins.

3    Q    I'm not saying distributions back to the customers.

4    I'm saying about (indiscernible) from.  I recall that you

5    said that that was a significant obstacle for the

6    liquidation process.  And I'm confused on why.  The bottom,

7    it's one way, from the exchange to Voyager.  Why isn't it

8    not possible for it to go back from Voyager to the exchange?

9    A    So, the distribution would be made to customers, not to

10   an exchange, correct?

11   Q    We're talking about a liquidation.  You said that's why

12   (indiscernible) liquidate (indiscernible).  I'm sorry, go

13   on.

14   A    I don't know what the question is.  I'm sorry.

15   Q    We're talking about a liquidation.  You said that that

16   was problematic because there is (indiscernible) for the

17   coins to be liquidated.

18            MR. SLADE:  Yeah, I object, Your Honor.  I think

19   it's --

20            THE COURT:  The question is if Voyager was -- if

21   people were able to buy these coins in the first place

22   through Voyager, why can't they be put in their names by

23   Voyager?

24            THE WITNESS:  The issue, Your Honor, is that

25   distribution of these coins by Voyager, they have 35 that

1   are unsupported.  So, in order to address them, they would

2   have to liquidate them.

3            And so, because we understand that customers would

4   prefer to have coins in kind, this is an issue.  Binance

5   wants all the coins.

6            THE COURT:  And I guess the problem is we're

7   having some trouble understanding what being unsupported

8   means.

9            THE WITNESS:  The issue is for the company; they

10  cannot make those distributions in kind for those 35

11  unsupported ones.  That's the simple version of it.

12           THE COURT:  Okay.

13           THE WITNESS:  The technical repercussions are

14  beyond what I can testify here today.

15           THE COURT:  Okay.

16  BY MR. HENDERSHOTT:

17  Q    Thank you for that clarification.  That was helpful.

18  But just so I understand, you can liquidate them as part of

19  a rebalancing to U.S. dollars.  And so, is that occurring

20  actually right now with the $445 million liquidation that's

21  ongoing?  These coins are being liquidated to dollars?

22  A    The company is rebalancing coins now.  And to the

23  extent that they need to set aside funds (indiscernible) for

24  cash, they will be doing so.

25  Q    And as a liquidator (indiscernible) unsecured --

1    unsupported claims?

2    A     I am not -- I don't think so.

3    Q     Okay.  All right.  So, talking about the liquidation,

4    you said that the problem of the toggle -- or actually of

5    Chapter 7 liquidation is the risk of collapsing the market.

6    You indicate that a trustee would try to dump the entire

7    treasury within a day or two, which I have never heard Judge

8    Wiles or anyone say that that would be the plan going

9    forward.  So, I'm very curious why your strong belief is a

10   liquidation would collapse the global market of any coin,

11   even one with less market liquidity than bitcoin or

12   Ethereum.  And I am curious (indiscernible) a coin that is

13   on Voyager that you would collapse the global market by

14   doing a thoughtful and strategic liquidation over a period

15   of say two months.

16   A     I never testified that this would collapse the global

17   market of cryptocurrencies, Your Honor.

18   Q     On a specific coin, sir.  You said that it would

19   collapse it down in I believe 30 -- I've heard 26 percent, I

20   believe.  I heard 35 percent.  But that would be the

21   slippage damage caused by a liquidation or a trustee coming

22   in and liquidating because the global market for that

23   specific coin could not handle the influx of Voyager's

24   volume.  So, I'm curious, called out by name, but this is

25   not effective for bitcoin or Ethereum.  I am curious if you

Page 182

1   can identify a coin where this would collapse a given market

2   in that specific coin.

3              MR. SLADE:  Your Honor, I object again.  We're

4   hearing speeches, not questions.

5              THE COURT:  Can you identify a particular coin for

6   which the market would suffer the effects that you had

7   previously discussed?

8   BY MR. HENDERSHOTT:

9   A    There are a number of coins that -- like Shiba Inu that

10  coin, VGX, if you had to just sell it all immediately into

11  cash, these coins don't have the deep market, and that's an

12  issue.  Those are the examples.

13  Q    Thank you, Sir.  Shiba and -- can you tell me how much

14  --

15  A    I would say to you I never testified that it would

16  collapse the market.  What's important to understand is that

17  the market liquidity is a differentiator.  And because

18  bitcoin and eth have a significant amount more market cap

19  and liquidity, it's easier to sell those coins and sell or

20  buy those coins.  So, the more obscure coins are difficult

21  to monetize quickly.

22  Q    That's what I'm questioning if you could give examples.

23  And you gave Sheba as an example of that.  Do you know what

24  the global market cap is for Shiba Inu?

25  A    I don't have that in front of me.

Page 183

```
 1    Q    I have it open.  You know whether I can introduce this

 2    right now and it -- I have it open right now.  It's 6.7

 3    billion.  So, is the volume that Voyager has, even if you

 4    liquidated it in a matter of days versus doing it

 5    responsibly, or the months, would the volume of Voyager

 6    Shiba Inu collapse or significantly drive down the price

 7    point of $6.7 billion market cap?

 8              THE WITNESS:  So, how did I testify before, Your

 9    Honor?  A number of these coins may have significantly

10    larger market caps.  By way of example, Bitcoin has a

11    significantly larger market cap.  Same with eth.  The issue

12    that we're bringing up is that this is not just my opinion,

13    this is the opinion of market makers that, you know, deal

14    with these coins day in and day out.  They may have a high

15    market cap, but it's hard to trade them.  And those are

16    issues that we've seen throughout in cryptocurrency.  And

17    the issue that you have is that if you have to liquidate

18    coins quickly, even more obscure coins, that it will move

19    the market.  It will not collapse the market, hopefully will

20    not collapse the market, but it will move the market

21    (indiscernible).  That's not only -- that's diligence that's

22    been done by myself, it's been done by their investment

23    banker, Moelis, it's been done by the unsecured creditor

24    committee advisors.

25              And so, when we talk about the discount to
```

Page 184

1    monetizing collateral that's harder to -- that has a smaller

2    market cap than the two biggest ones that we've discussed,

3    yes, that's absolutely true.  Not only from the -- but more

4    than a dozen advisors and market participants have validated

5    this information.

6              THE COURT:  In terms of the one you identified.

7    Not VGX, the other one.  Shiba...

8              THE WITNESS:  There are many -- there's 106 coins,

9    Your Honor.

10             THE COURT:  What is the volume that Voyager holds,

11   and are you aware of any statistics as to what the ordinary

12   trading volume is as to that?

13             THE WITNESS:  I have a chart.  It's not in front

14   of me.  So, I could answer that, Your Honor, if I can get

15   the chart.

16             THE COURT:  Any objection to him consulting his

17   chart?

18             MR. HENDERSHOTT:  None from me, sir.

19             THE COURT:  Well, let's go ahead.

20             MR. SLADE:  Your Honor, (indiscernible) print a

21   copy.

22             THE COURT:  And if he has any idea what the

23   ordinary trading...

24             MR. SLADE:  Apologize, Your Honor.  We're trying

25   to --

Page 185

```
 1              THE COURT:  I understand.

 2              MR. SLADE:  Your Honor, could I have a five-minute

 3    recess to find the right files?

 4              THE COURT:  Okay.  We'll take five minutes.

 5              (Recess)

 6              THE COURT:  All right, please be seated.

 7              Mr. Renzi, you are still under oath.  Have you had

 8    a chance to look up the answer of the question?

 9              THE WITNESS:  I have, Your Honor.  Thank you for

10    the five minutes.

11              So, other examples besides VGX of issues in terms

12    of relative market cap and trading issues, BET would be an

13    example, (indiscernible) would be an example, BTT would be

14    an example.  STMX would be an example.  CKB would be an

15    example, DGB.  Those are other examples, to answer Mr.

16    Hendershott's question directly (indiscernible).

17              THE COURT:  And as to Shiba, have you been able to

18    figure out what does Voyager hold and how does that compare

19    to ordinary trading volumes?

20              THE WITNESS:  I think Mr. Hendershott is right,

21    there is still an issue in terms of relative volume.  But I

22    am looking at the amount of claims that's $93 million that I

23    have in this schedule on a dollarized basis.  And so, Shiba

24    is less of an issue than the other ones that I just

25    mentioned.
```

Page 186

```
 1              THE COURT:  Okay.

 2              THE WITNESS:  But still an issue.

 3              THE COURT:  Okay.

 4    BY MR. HENDERSHOTT:

 5    Q    So, what's the daily trading volume for Shiba against

 6    the Voyager $93 million Shiba -- assets under management for

 7    Shiba specifically?

 8    A    I don't have daily.  I have seven-day average, $243

 9    million is their seven-day average volume.

10    Q    Right, average per day.  So, a quarter of a billion

11    dollars traded with only $93 million on voyager, that could

12    be distributed over the course of a month or two.  So, did I

13    mishear earlier when you said that the reason why a trustee

14    could not handle this is because it would collapse or reduce

15    --

16              THE COURT:  Are you saying that what Voyager has

17    is more than a third what the average daily trading volume

18    is?

19              MR. HENDERSHOTT:  That's correct.  $93 million

20    total.  I'm sorry, I'm not sure who that question was for.

21              THE WITNESS:  To answer your question, Your Honor,

22    they have a claim of $93 million.  And the position is $70

23    million approximately.  And the average daily trading seven-

24    day average volume is $243 million.  And so, I am not saying

25    that this would collapse the market.  I am saying that they
```

Page 187

```
 1    will move the market.  Especially if it needs to be done
 2    quickly.
 3    BY MR. HENDERSHOTT:
 4    Q    So, that's -- and thank you for that.  I don't see how
 5    $93 million spread out over a month or two can move the
 6    market when it's doing a quarter of a billion every day.
 7    But I keep hearing that if you have to do it quickly -- am I
 8    missing something that a trustee being appointed would have
 9    to liquidate everything in a day or two?  Did they not have
10    the same courtesy to be able to distribute this over the
11    course of a month or two like we're doing with the
12    rebalancing right now?
13              MR. SLADE:  Your Honor, I object.  That's a
14    speech, and it was already asked and answered by this
15    witness.
16              THE COURT:  Yeah.  We've covered this, Mr.
17    Hendershott.
18              UNIDENTIFIED SPEAKER:  That's not an objection.
19              MR. HENDERSHOTT:  I don't remember the answer.  He
20    just (indiscernible) that I would have to be done quickly.
21    And I am questioning why he keeps making that statement.
22    There's nothing that would have to instill a two-day
23    liquidation with the assignment of a trustee.
24              MR. SLADE:  (indiscernible).
25              THE COURT:  Yeah.  What he said, you know, a
```

1    trustee would a statutory obligation to convert to cash.  I

2    don't know of any trustee that would sit around and take

3    market risk and try to figure out how to time those kinds of

4    sales.  And what the witness has basically said is that he

5    thinks that the kind of imperative that a trustee would face

6    to sell would be very different from the sort of being able

7    to do it as you think fit in the rebalancing exercise in

8    that there would therefore be a much stronger market effect

9    if were in Chapter 7 than in Chapter 11.  That's what I

10   understand that he's testified to so far.

11             THE WITNESS:  Your Honor, I just (indiscernible).

12   Thank you.

13             MR. HENDERSHOTT:  Great.  Thank you.  And thank

14   you, Mr. Renzi.  I will cede the podium.  Thank you, sir.

15             THE COURT:  Okay.  Is there anybody else on the

16   phone that wishes to cross-examine the witness?

17             CLERK:  Your Honor, there's no one else on the

18   phone (indiscernible).

19             MR. LOREN:  I would like to (indiscernible), Your

20   Honor.

21             THE COURT:  Who is speaking now on the phone?

22             MR. LOREN:  This is John Loren, pro se creditor.

23   Can you hear me?

24             THE COURT:  What was your name again?

25             MR. LOREN:  John Loren.

1             THE COURT:  Okay, Mr. Loren.

2                  CROSS-EXAMINATION OF MARK RENZI

3   BY MR. LOREN:

4   Q    To the witness (indiscernible) rebalancing the

5   portfolio, that a big selloff would (indiscernible) the

6   market lower.  Did you do any research on the VGX token?

7             THE COURT:  What is it you want to know about the

8   BTX did you say?

9             MR. LOREN:  VGX token.  I'm curious what analysis

10   was done on that in regards to the rebalancing of the

11   portfolio.

12             THE WITNESS:  Could I just confirm that he said V

13   as in Victor, G as in good, X as in x-ray?  Is that correct?

14             MR. LOREN:  Correct.  VGX Voyager token.

15             THE WITNESS:  Yes, we have done research on the

16   VGX token.  We have been careful to make sure that we have

17   been opportunistic in selling some of the token in terms of

18   the rebalance.  The amount of holdings is relatively

19   significant relative to the market cap for VGX with the

20   company.  And so, yes, the answer is yes.

21             MR. LOREN:  What percentage of VGX is currently

22   locked on the Voyager app?

23             THE WITNESS:  Your Honor, I have a procedural

24   question in terms of being discrete about rebalancing versus

25   answering this question.  Because I'm afraid that it will

Page 190

```
1    have an effect on the market.  So, I'm --

2              MR. SLADE:  Let me object to the relevance of

3    (indiscernible).

4              THE COURT:  I had trouble hearing the question.

5    What was it exactly?

6              MR. LOREN:  My question is what is the rough

7    percentage of VGX on the Voyager app.

8              MR. SLADE:  Yeah.  I object, Your Honor.  It's not

9    relevant.  I'm worried that he might be asking questions

10   that (indiscernible) rather than get information that's

11   relevant to this --

12             THE COURT:  Okay.  I will sustain the objection.

13   BY MR. LOREN:

14   Q    So, this is exactly why I wanted to ask the question.

15   Let's say roughly 80 percent of VGX is locked on the app.  I

16   would to know your price analysis of VGX when 80 percent of

17   this token gets locked all at once on Binance.

18             MR. SLADE:  Yeah.  I have the same objection.

19             THE COURT:  Yeah.  Objection sustained.

20   BY MR. LOREN:

21   Q    (indiscernible) the price of VGX would plummet to zero.

22   How would you combat this?

23   A    Your Honor, the whole idea of rebalancing is to do it

24   in a way that is opportunistic and make sure that the

25   trading is done in an appropriate manner and also consistent
```

1   with the APA.  And so, what we're trying to do is spread out

2   trading at times that are opportunities so that we don't

3   flood the market, as this gentleman is highlighting.  And we

4   are trying to do that in a way that is being transparent

5   with the Unsecured Creditors' Committee and believe that our

6   methodology is working thus far.

7   Q    So, aside from the -- aside from rebalancing, I am

8   referring to once the VGX token, which I believe that's

9   roughly 80 percent of VGX currently locked on the app, then

10  80 percent of supply is released to (indiscernible) Binance,

11  what will happen to the price?  One could easily determine

12  there would be a bloodbath and the price would plummet to

13  zero.  How is that fair in regards to the recent 80 percent

14  of the market (indiscernible) at once?

15  A    We're rebalancing.  We're not releasing all of the

16  coins into the market.  So, what's important is we're

17  distributing -- let me -- just let me finish for a second.

18  We are trying to rebalance to the right proportionality so

19  we don't have to sell it all down and then we can provide it

20  and return it in kind.

21       So, to the extent that we were under a scenario of a

22  liquidation, I actually a hundred percent agree with you

23  that it would be a very challenging situation in terms of

24  recovery if you had to sell it all immediately or in very

25  short order into cash.  But we are not doing that because we

1    have a plan.  The plan does highlight a rebalancing

2    transaction, and that rebalancing will eliminate the concern

3    that you exactly have in my opinion.

4    Q    So, that may help during the rebalancing portion.  But

5    once the tokens VGX has sent to Binance and users have

6    access to their VGX tokens, 80 percent of supply being

7    released at once is going to plummet the price.  We were

8    given a claim that (indiscernible) but we won't be able to

9    actually get that (indiscernible) value from VGX

10   (indiscernible).  Reason being is, like I said, it would be

11   a bloodbath.  It would be a huge selloff even mention that

12   if you do have a big selloff, the price will tank.  So, what

13   would be used to combat this selloff?

14            MR. SLADE:  Your Honor, I object to the extent

15   that was the question he just answered.

16            THE COURT:  I don't think so.  As I understand the

17   question, the question is will VGX in the real world have

18   the value that's being ascribed to it for distribution

19   purposes.

20            THE WITNESS:  Your Honor, I understand the

21   question.  I think the ultimate decision of each account

22   holder is up to each account holder.  So, each accountholder

23   decides as soon as they have access to VGX and they just

24   want to sell it, yes, I suspect it will go down more than it

25   would otherwise go down.  However, I think that some of the

1    -- I think the customers are sophisticated.  They understand

2    that this would move markets significantly.  And we'll take

3    that into consideration before deciding all at once to sell

4    down their assets and do it in a timely fashion.  Just as,

5    for example, if you have an unusual commodity, I think that

6    you would look to try to address it in the market in the

7    right way and not just sell it down immediately.  So, there

8    are scenarios that if everybody was coordinated and all

9    agreed to sell at once, I think you're right.  It would

10   massively reduce the value of VGX in total.  But that's a

11   coordinated effort.  And I don't see that happening

12   initially, but it's possible.

13   BY MR. LOREN:

14   Q    I do not believe that at all.  80 percent supply being

15   released into the market in a single day.  You know what

16   will happen.  People will sell.  (indiscernible).

17            THE COURT:  Mr. Loren, I'll have to tell you the

18   same thing I've been telling other people.  I know you're

19   not an attorney, but cross-examination is for the purpose of

20   asking questions, not stating your opinion, not arguing with

21   the witness.  For purposes of asking questions and eliciting

22   evidence.  Okay?

23            MR. LOREN:  Thank you for that, Your Honor.

24   BY MR. LOREN:

25   Q    My next question relates to Binance. During your

1    research in due diligence, what would you find on how

2    Binance is more credible than FTX.  As we know, FTX is a

3    fraudulent company.  So, why is Binance more credible?  What

4    was your research?

5    A    Binance is one of the largest exchanges in the U.S.

6    They also try to hold one-for-one reserves on their

7    exchange.  They have a tremendous amount of volume and

8    capacity on their exchange.  And then lastly, one thing that

9    I feel is confirmatory diligence that 97 percent of

10   customers that have voted also believe that this transaction

11   makes the most sense for them.  So, besides our own

12   diligence that has been done by Moelis and BRG and the

13   company as well as by the unsecured creditors' advisors, we

14   believe that this is a value-maximizing transaction with a

15   company that is one of the largest players if not the

16   largest player in the U.S.

17        And to the extent that we feel as if -- that there are

18   issues that arise between now and closing, we have the

19   option to move into a toggle plan.

20   Q    You state that Binance have good recordkeeping.  Can

21   you tell us what research you completed in order to come to

22   this conclusion?

23   A    My team as well as the Moelis team had the opportunity

24   to interview Binance and its management team as well as its

25   advisors to go through a number of concerns that they had as

Page 195

```
1    well as the Unsecured Creditors' Committee advisors.  And

2    those diligence meetings did not deter having this hearing

3    today with the current trajectory that we're on.

4    Q    Great.  Did you do the same meetings with FTX?

5           MR. SLADE:  Your Honor, can I object?  This

6    inquiry is about the past.  It's not relevant.

7           THE COURT:  Overruled.

8           MR. LOREN:  It's very relevant.

9           THE COURT:  The objection was overruled.  The

10   witness can answer the question.

11   BY MR. LOREN:

12   A    We did due diligence on FTX.  As we all know, FTX is a

13   fraud.  They defrauded not only millions of customers, but

14   also a number of regulatory bodies in the United States.

15   They were vetted by the same constituents.  We believe that

16   we're fortunate that we did not get wrapped up in that

17   transaction and we believe that this transaction with

18   Binance is significantly better.

19   Q    If you did the same due diligence with FTX in these

20   meetings, why would we trust you and say that you are

21   credible when you had the same meetings with Binance?

22   What's the difference?

23   A    We didn't do the same diligence.  We did more diligence

24   on Binance.  And the reason being is that we are more

25   informed about the issues about FTX.  Every day we all are.
```

1    And we continue to learn from the issues that FTX had.  And

2    that is part of the questions that we had are addressed by

3    the meetings that we had even this week in terms of our

4    diligence in regards to Binance.  So, the diligence was more

5    rigorous.

6    Q    Okay.  So, you believe that Binance (indiscernible)

7    solvent company (indiscernible) analysis and research.  What

8    happens when we transfer our claims over and Binance goes

9    kaput, they go bankrupt?  What's the next step?

10             MR. SLADE:  I'll object.  It's a hypothetical

11   question that assumes facts not in evidence.

12             THE COURT:  Do you know the answer?

13   BY MR. LOREN:

14   A    I think you're asking if to the extent that unforeseen

15   circumstances occur and Binance goes bankrupt?  Is that

16   correct?  Is that what you're asking of me?

17   Q    That's correct.  I am referring to claw backs, et

18   cetera.  What would happen with our claims is Binance goes

19   under?

20   A    I do not have full access to all the financials of

21   Binance to answer your question completely.  But you would

22   be an unsecured creditor or a creditor of the Binance estate

23   to the extent that there was a bankruptcy of Binance.  But I

24   don't know if you would be unsecured or secured depending on

25   what you elect to do during the hypothetical period between

1    when you become a customer and when that hypothetical

2    bankruptcy could occur.

3    Q    Okay.  I'm curious if there's any way to get any claw

4    back protection from Voyager funds being transferred to

5    Binance if Binance goes under.

6              THE COURT:  What was the question?

7    BY MR. LOREN:

8    Q    Do we have any claw back protections if let's say we

9    transfer the money from Voyager to Binance.  Binance then

10   goes bankrupt, and then (indiscernible) money from Binance.

11   Would Binance be able to claw back our funds or can we have

12   protection from Voyager-specific funds?

13             THE COURT:  The modifications to the sale

14   agreement that were made in January after I raised some of

15   these very same issues and the order that I entered that

16   approved the sale agreement are very clear that until such

17   time as the distributions are made to the customers, Binance

18   will hold anything that it holds strictly in trust.  It will

19   not be considered Binance's property.

20             Once a customer keeps items in its account -- and

21   I think the customer is going to be in whatever boat other

22   Binance customers are going to be in.  But for purposes of

23   the initial distributions, we I believe changed the terms of

24   the deal to make it clear that nothing would get stuck.  So,

25   if you want your crypto and you withdraw it from Binance

Page 198

```
 1    right after it's distributed to you, my understanding -- and
 2    I'll ask the Debtors and the Binance people here to correct
 3    me if that's wrong.  But my understanding is that it would
 4    never be considered property of Binance and that it would
 5    have been distributed to you by Binance solely in its
 6    capacity as a distribution agent and couldn't get stuck in a
 7    Binance bankruptcy.  Is that right?
 8              THE WITNESS:  Yes, Your Honor.
 9              THE COURT:  And is there -- did we set it up so
10    that there's a period of time within which customers can
11    make those withdrawals before we have any issues?  I can't
12    recall.
13              MS. OKIKE:  Your Honor, the way the plan -- sorry,
14    the transaction works is we will send crypt to Binance on a
15    weekly basis as customers sign off.  That crypto has to be
16    put in the customer's account within five business days.
17    And upon that time, they can immediately withdraw
18    (indiscernible).
19              THE COURT:  And did we put in the trust provisions
20    and the custody provisions that that custody arrangement
21    lasts up until a certain amount of time after items are put
22    into customer's accounts so that customers who want to take
23    it out right away will know that they're not at risk from
24    doing so?
25              MS. OKIKE:  Sorry.  I couldn't hear the last part,
```

1      Your Honor.

2              THE COURT:  I don't want there to be an argument

3      that the trust relationship or the custody relationship

4      ended the nanosecond that something hit an account and

5      before a customer actually meaningfully could withdraw it.

6      So, it seems to me that provision about custody and trust

7      needs to be in effect for some period of time after it's

8      nominally credited to a customer's account so that if there

9      is a customer out there who wants to take it out right away,

10     that customer can do it without being told that, contrary to

11     our expectations, they've been made potentially an unsecured

12     creditor of Binance.

13             MS. OKIKE:  Understood, Your Honor.  I don't

14     believe that we addressed timing with respect to that, but

15     we can of course discuss with Binance (indiscernible).

16             THE COURT:  Okay.

17             MR. LOREN:  That is all my questions.  Thank you

18     for your time.

19             THE COURT:  Thank you.

20             MR. LOREN:  Thank you for your time.

21             THE COURT:  Thank you.  Is there anybody else on

22     the phone who wishes to question the witness?

23             MR. SHEHADEH:  I would like to, Your Honor.  I

24     just want to know why (indiscernible) open up the Voyager

25     app and release that crypt from there.  Binance -- whenever

Page 200

1    you want to put money or crypto to Binance (indiscernible) -

2    - this is Alah Shehadeh for the record, Your Honor.

3              THE COURT:  Who is speaking?

4              MR. SHEHADEH:  Any time you put money or crypto to

5    Binance --

6              THE COURT:  Who is speaking now?

7              MR. SHEHADEH:  Alah Shehadeh.

8              THE COURT:  No, you've asked your questions.  I'm

9    sorry.  You've had your chance.

10             Is there anybody who hasn't already done so --

11             MR. SHEHADEH:  I'm asking another question.

12             THE COURT:  You --

13             MR. SHEHADEH:  Your Honor, I wrote you a letter

14   about this.  You have to allow me to speak.  I want to ask a

15   question.  I am a pro se creditor.  I want to ask a

16   question.

17             THE COURT:  You've asked --

18             MR. SHEHADEH:  You were answering a question for a

19   witness and you were not allowing them to answer.  You were

20   answering for them.

21             THE COURT:  You've --

22             MR. SHEHADEH:  I'm asking a simple question.  How

23   is --

24             THE COURT:  You've had -- Mr. Shehadeh, be quiet.

25             MR. SHEHADEH:  (indiscernible).

Page 201

```
1              THE COURT:  Be quiet.  Be quiet.  Be quiet.
2              MR. SHEHADEH:  Why are you (indiscernible) our
3    money?
4              THE COURT:  Lorraine, cut him off.
5              MR. SHEHADEH:  (indiscernible)
6              THE COURT:  Cut him off.
7              MR. SHEHADEH:  (indiscernible) steal our money.
8    We've got to pay a fee --
9              THE COURT:  Lorraine, cut him off.
10             MR. SHEHADEH:  -- to transfer our money out of
11   there.
12             THE COURT:  Cut him off.  You've lost your right
13   to participate.  You're not listening.  Cut him off.
14             MR. SHEHADEH:  (indiscernible) questions.  You're
15   answering the questions for the witness.  You are not for
16   the creditor.  You are helping yourself.  None of you are.
17             THE COURT:  Lorraine, cut him off.
18             MR. SHEHADEH:  (indiscernible).  It's a crime.
19   It's a crime.  You guys are committing fraud.
20             THE COURT:  We are going to adjourn until Mr.
21   Shehadeh is not only excluded, but barred from rejoining.
22   You have forfeited any right to participate in this
23   proceeding both by your contemptuous conduct and your
24   refusal to listen to ordinary court rules and the fact that
25   you continue to desire to treat this as a podium for you to
```

Page 202

```
 1   scream about your grievances instead of to participate in

 2   the court hearing.  You are barred from participating.  We

 3   will resume when you are excluded.

 4             (Recess)

 5             THE COURT:  All right.  We will resume.  I would

 6   like to let any other accountholders on the phone know it

 7   appears that Mr. Shehadeh, even after we cut him off, may

 8   have been speaking through somebody else's line.  He is

 9   barred.  If you let him speak through your line, you will be

10   barred as well.  And you are under my direct instruction not

11   to allow him to speak indirectly through your line.  Is that

12   understood?  Okay.

13             Now, is there anybody on the phone who hasn't

14   already questioned the witness who would like to question

15   the witness?

16             MR. JONES:  Yes, Your Honor.  Seth Jones.

17             THE COURT:  Who is this?

18             MR. JONES:  Seth Jones.

19             THE COURT:  Seth Jones?  Okay.

20             MR. JONES:  I have a question.  Earlier, the

21   witness said that the toggle wasn't needed in the FTX deal.

22   But contrary to that, UCC said that FTX wouldn't allow

23   (indiscernible).  So, which is it?

24             THE WITNESS:  I couldn't hear the question.

25             THE COURT:  I'm afraid I couldn't hear you clearly
```

1    enough.  You said that the UCC earlier --

2            MR. JONES:  The toggle.  You said the toggle

3    wasn't needed for the FTX deal, but the UCC said that FTX

4    would allow them to add the toggle to the plan.

5            THE WITNESS:  I understand.

6            THE COURT:  Okay.

7            MR. JONES:  So, which is it?

8            THE WITNESS:  Sir, let me try to paraphrase your

9    question.  You're asking -- and just if you could tell me if

10   I've got it right.  You're asking if we had a toggle plan

11   when there was the FTX initial bid.  Is that correct?

12           MR. JONES:  No, yeah.  You said that -- earlier

13   you said that the toggle wasn't needed in the FTX deal

14   because FTX was a vibrant company.  But the UCC in the court

15   documents said that FTX wouldn't allow them to add the

16   toggle to the plan.

17           THE WITNESS:  I think at that point in time, we

18   believed that the FTX deal was appropriate.  We did not have

19   a toggle; I think as you correctly stated.  I think -- and

20   what we've learned from that situation and the fraud that

21   FTX has perpetrated upon you and all of us and many other

22   citizens, we made sure that there's a toggle to address the

23   fact that there wasn't a toggle.

24           MR. JONES:  I understand.  But UCC wanted the

25   toggle.  But the UCC said that they wanted the toggle, but

Page 204

1    they weren't allowed to have it.  So, I mean, which is it?

2              MR. SLADE:  Your Honor, I object to the relevance

3    of that.

4              THE COURT:  Well, I am not sure what statement by

5    the UCC are you referring to, Mr. Jones?

6              MR. JONES:  UCC said that FTX, they wanted to have

7    a toggle, a backup toggle.  And FTX refused to allow them to

8    have a toggle in the first APA of FTX.

9              MS. OKIKE:  Your Honor, I'm happy to answer the

10   question.

11             THE COURT:  Yeah, go ahead, Ms. Okike.

12             MS. OKIKE:  So, it is correct that we requested a

13   toggle from the FTX plan, and FTX refused.  And it was

14   removed from (indiscernible).

15             MR. JONES:  Thank you.  I just wanted to clarify

16   that.

17             THE COURT:  Okay.

18             MR. JONES:  Thank you.

19                  CROSS-EXAMINATION OF MARK RENZI

20   BY MR. JONES:

21   Q    Next question.  (indiscernible) detailed investigation

22   by Forbes has raised significant questions about the

23   management and custody of customer assets at Binance.  Can

24   you address those concerns?

25             MR. SLADE:   I object.  It assumes facts not in

Page 205

1    evidence.  I'm not sure what he's talking to.

2            THE COURT:  Are you aware of the Forbes article

3    about Binance and do you have any knowledge about any of the

4    issues that are raised there?

5            THE WITNESS:  I have not read the Forbes article.

6    BY MR. JONES:

7    Q    (indiscernible) there's a lot of them that -- coming

8    out just like with FTX raising significant concerns

9    (indiscernible).  I just wanted to -- the due diligence you

10   did in the Binance deal (indiscernible) the FTX deal.

11   A    Yeah.  We've spent more time doing due diligence on

12   Binance, including this week.  We have met with the company

13   and its advisors to make sure that a number of the questions

14   have been addressed to the best of our ability.  We've also

15   been in coordination with the UCC advisors to make sure that

16   all of their questions were addressed.  They were also

17   present in those meetings and we believe that we have a

18   construct in hand and in place to address the fact that if

19   the Binance deal does not work, we have a toggle plan.  So,

20   yes, we feel as if the diligence has been more robust, it's

21   been ongoing.  I believe that it occurred this week, earlier

22   this week, on top of other days prior to this week.  And we

23   believe that it's been more robust than what it was with

24   FTX.

25   Q    You said that Binance holds a one-to-one ratio of

Page 206

1    coins, but you also said the same thing about FTX saying

2    that they held one-to-one assets in coins.  So, how do we

3    know it was not (indiscernible) deal?

4    A    I don't think I testified that FTX holds one-to-one.

5    Q    I got confused with the (indiscernible).  Sorry about

6    that.

7    A    No problem.  No problem.

8    Q    All right.  That's all my questions for now.  Thank

9    you.

10             THE COURT:  All right.  Thank you.  Anybody else

11   on the phone?

12             UNIDENTIFIED SPEAKER:  Yes, Your Honor, I have a

13   few questions.

14             THE COURT:  Who is this?

15             UNIDENTIFIED SPEAKER:  This Andre (indiscernible),

16   pro se creditor.

17             THE COURT:  Okay.  Please proceed.

18             UNIDENTIFIED SPEAKER:  So, can you -- Mr. Renzi,

19   can you tell me again once again what the estimated recovery

20   would be if the Binance deal does go through, the

21   percentage?

22             THE WITNESS:  Excuse me.  The estimated recovery

23   for the Binance deal I believe in my declaration is

24   approximately 50 percent as of the 12/18 prices that are

25   represented in my declaration.  I know --

```
 1              UNIDENTIFIED SPEAKER:  Okay.  And if the deal

 2    doesn't go through?

 3              THE WITNESS:  I also know that the prices have

 4    appreciated in your favor and that the recovery levels are

 5    in the 70 percent range.  I've been on the stand most of the

 6    day, so I am not sure what's happening in the markets, but I

 7    think it's roughly in the 70 percent range now.

 8              UNIDENTIFIED SPEAKER:  Okay.  So, in December --

 9    as of December 18th, it was roughly 50 percent.  But you're

10    saying as of today it's potentially roughly 70 percent?

11              THE WITNESS:  In the seventies, that's correct.

12              UNIDENTIFIED SPEAKER:  Is that correct?

13              THE WITNESS:  Yes.

14              UNIDENTIFIED SPEAKER:  Okay.  And if the deal

15    doesn't go through, what would the recovery percentage be?

16    Or is it the same?

17              THE WITNESS:  So, I can -- so I can -- I'm happy

18    to do it, I would like to grab my declaration just so I can

19    remind myself of my chart if you would give me a second.

20              THE COURT:  You have to clarify the question.  Are

21    you asking what would happen if we did the toggle plan

22    instead of the Binance deal, or are you asking what would

23    happen if we had no plan and went to Chapter 7?

24              UNIDENTIFIED SPEAKER:  No, if we went to the

25    toggle plan, what would the recovery percentage be.  Yeah.
```

1          THE WITNESS:  Just once second.  I'll turn to it.

2          UNIDENTIFIED SPEAKER:  Okay.

3          THE WITNESS:  So, again, my declaration -- I'll

4    just go left to right if that's okay, if it helps you.  If I

5    look at accountholder claims and recovery under the Binance

6    plan, it's roughly 50 percent.  Under the toggle plan it's

7    roughly 45 percent.  In the high case scenario and in a

8    liquidation, it's 38 percent.  In the low case scenario,

9    it's 35 percent.  Hopefully, that answers your question.

10          UNIDENTIFIED SPEAKER:  Okay.  Thank you for that.

11          THE WITNESS:  Hopefully, that answers your

12    question.

13          UNIDENTIFIED SPEAKER:  Yeah, it does.  And now

14    earlier you had mentioned an issue with unsupported coins.

15    If I understand right, why Voyager couldn't just distribute

16    whatever assets are remaining because of these unsupported

17    coins.  What percentage of the total crypto assets are in

18    unsupported coins?

19          THE WITNESS:  I believe I -- if you give me one

20    second, I have it also in my declaration.  So, sir, on

21    Paragraph 120 -- I'll just read this to you in case we don't

22    have it.  There are technical limitations that would prevent

23    the Debtors from making in-kind distributions on certain

24    types of cryptocurrency on the Debtor's platform.  There are

25    35 cryptocurrency tokens for approximately 17 percent of the

1    debtor's cryptocurrency portfolio based on equivalent USD

2    value.  Hopefully, that answers it.  That is Paragraph 120.

3    BY UNIDENTIFIED SPEAKER:

4    Q    I'm sorry, so that's 70 percent of the (indiscernible)

5    on these unsupported coins?

6    A    No, you probably misheard me.  It's 17, one, seven.

7    Seventeen.

8    Q    Seventeen.

9    A    Yes.

10   Q    Seventeen percent.  Okay.  Okay.  So, roughly 83

11   percent --

12   A    Yeah.  Let me just do the numbers one more time to be

13   helpful.  So, it's 35 coins.  And the USD representation of

14   that is 17 percent overall.  So, it's obviously -- those

15   coins are of lower overall value, but it's still 17 percent,

16   which is meaningful.  That's Paragraph 120 if you're looking

17   for it.

18   Q    Right.  Roughly -- let's just say $200 million out of

19   the $1.3 billion, right?

20   A    Mm-hmm.

21   Q    Okay.  The majority of crypto assets could be returned

22   to the Voyager platforms if need be.

23   A    Yes.  And I think that's right.  And that's certainly a

24   majority, especially if you do the math if there's -- let's

25   just keep it simple.  If there's a hundred coins, it's 65 --

```
 1    you know, 65 percent.  Or if you do it on a dollar-weighted
 2    basis, you're right, it's 83 percent as of the time that
 3    this analysis was done, which was around 12/18.  That
 4    proportionately should be roughly the same.  So, you're
 5    absolutely right.  They can do most of it on a proportionate
 6    basis or on a dollar proportion basis also.
 7    Q    Okay, great.  Great.  And if I understand right
 8    (indiscernible) with the Binance deal, the assets would be
 9    basically placed in a trust, in some kind of trust.  And
10    Binance would just essentially be the distribution medium
11    for us to get our funds back.  Is that correct?
12    A    I think you said that well.
13    Q    Okay.  Okay.  So, is there really any risk then -- I
14    mean, what -- maybe I'm not thinking about this correctly,
15    but what is the risk then of going to Binance if our assets
16    will be held in trust and they're just going to just be the
17    distribution medium.  Is it really just post...
18    A    Yeah.  You were hearing from my testimony that we
19    acknowledge that some have different views of risk than
20    others.  That's the first premise.  The second premise is
21    that we try to take into consideration some due diligence
22    and make sure that we understood the bid, we think that
23    Binance is the highest and best value, and that to the
24    extent that we feel uncomfortable with that transaction in
25    any way, we have a toggle.  But to your question
```

```
1   specifically, I think you may have a different risk

2   tolerance than others obviously based on my testimony today

3   and questions today.  Others perhaps don't see it the same

4   way you do.  But nonetheless, we think the way -- the

5   construct and process that we've laid out could get

6   cryptocurrency back in kind.  We think it is very well

7   thought out, and we have a toggle plan if the Binance plan

8   doesn't work.  Hopefully, I answer your question.

9   Q    Yeah.  And just to be clear, I'm definitely not in

10  support or not in support.  I'm just trying to understand

11  what the actual risk is, where is my risk by going to the

12  Binance deal.  And from what I'm seeing, if all our assets

13  are being (indiscernible) in a trust okay, which will not be

14  Binance property and, you know, we'll have a period of time,

15  as the Judge was saying earlier, there's not going to be an

16  a-ha after they transfer our funds to the Binance

17  (indiscernible), well, now it's ours or now, you know,

18  whatever.  So, if there's no risk of that and they're just a

19  distribution mechanism, then really -- again I might be

20  seeing this wrong.  Maybe the risk is contained, I guess.  I

21  might have just answered my own question.  No problem.

22       One last question.  In your due diligence with Binance,

23  have you seen their books?  Has anyone really dug into their

24  books?

25  A    We've reviewed numerous documents with the company.  I
```

1   know that members of my team were on site with their

2   advisors and some of the company members.  And I believe

3   that they've gone through a number of books and records to

4   make sure that we're comfortable.

5        And furthermore, because there's checks and balance,

6   the unsecured creditors' committee advisors also were preset

7   at that meeting.  So, it's not just the Debtor's advisors,

8   but it's also your representatives were also in the room,

9   too.

10  Q    Okay.  That doesn't hold much value anyway.  Okay.

11  That is all my questions.  Thank you.

12  A    Thank you.

13           THE COURT:  Okay.  Is there anybody else on the

14  telephone who wishes to cross-examine the witness?  All

15  right.  Committee counsel?

16           MR. KIRPALANI:  Yes, Your Honor.  Thank you.

17              CROSS-EXAMINATION OF MARK RENZI

18  BY MR. KIRPALANI:

19  Q    Mr. Renzi, good afternoon.  So, you testified that you

20  conducted diligence on Binance, correct?

21  A    Yes, my team has.

22  Q    And in connection with that diligence, Binance made a

23  number of representations to you and others?

24  A    Yes, they ha.

25  Q    And do you recall the question from one of the

Page 213

1    questions about the comingling of cryptocurrency?

2    A    I did.

3    Q    And didn't Binance represent to you and other

4    professionals that Binance U.S. segregates customer crypto

5    from Binance U.S.'s cryptocurrency?

6    A    I believe so.  I checked my notes.  I believe that's

7    right.

8    Q    Okay.  There were a series of questions about the

9    relationship between Binance U.S. and Binance Global.  Do

10   you recall that?

11   A    I do.

12   Q    The purchasing entity here is BAM Trading Services

13   Inc., DBA Binance U.S.  Isn't that right?

14   A    Yes.

15   Q    And they are a Delaware corporation?

16   A    I believe they're a Delaware corporation.

17   Q    And in connection with the diligence that you did and

18   the other professionals, did you look into the financial

19   capabilities of BAM Trading Services Inc., DBA Binance U.S.?

20   A    We reviewed numerous documents about their books and

21   records.

22   Q    Based on the diligence of BAM Trading Service Inc., DBA

23   Binance U.S. on their finances, are you comfortable that

24   they have the financial wherewithal to close?

25   A    As of today, yes.

1   Q    Another representation made to you by Binance was that

2   only employees of Binance U.S., not Binance Global, are able

3   to move or withdraw customer cryptocurrency over Binance

4   U.S.'s platform?  Isn't that right?

5   A    I believe it's only Binance U.S. employees.

6   Q    Okay.

7   A    Correct.

8   Q    There was a question asked to you about the difference

9   between how Binance U.S. holds customer crypto versus how

10  Voyager held customer crypto.  Do you remember that?

11  A    I do.

12  Q    Another representation made to you was that Binance

13  U.S. does not lend or rehypothecate customer crypto.  Do you

14  remember that?

15  A    I do.

16  Q    There were some comparisons being drawn between the

17  deal with FTX and the deal with Binance.  Do you recall

18  those questions?

19  A    There were many.

20  Q    One of the protections that was put in place in the

21  Binance deal is that customer crypto go through Binance over

22  time.  Is that right?

23  A    Yes.  Over -- in succession and over weeks.

24  Q    In succession.  And so, customer crypto will only go to

25  Binance U.S. once that customer has (indiscernible) with

1    Binance U.S.  Isn't that right?

2    A    That's my understanding.

3    Q    And that limits the time period that customer crypto

4    will be on Binance U.S. if they choose to get

5    (indiscernible).  Isn't that right?

6    A    Yes.

7    Q    So, what protections does that give?  Why is that more

8    protectorate of customer crypto than the FTX deal?

9    A    Well, the FTX deal is going to be transferred quickly

10   and in bulk.  This is over time and more protective, make

11   sure that it's done ratably and slowly to determine if there

12   are any problems as we are doing it.  So, I think it's much

13   more conservative than the way we are approaching it.

14   Q    So, to put it plainly, all the crypto doesn't go to

15   Binance U.S. right away, right?

16   A    Correct.

17   Q    It goes on a weekly basis and only for those customers

18   that have onboarded with Binance U.S., right?

19   A    Correct.

20   Q    So, if something were to happen with Binance U.S., it's

21   only the customer crypto that went over (indiscernible),

22   isn't that right?

23   A    That's right.

24   Q    You submitted a declaration in support of the plan

25   which includes this Binance deal?

Page 216

1   A    Yes.

2   Q    Based on the diligence that you've done to date, are

3   you still supportive of the Binance deal?

4   A    Yes, I am.

5              MR. KIRPALANI:  I pass the witness, Your Honor.

6              THE COURT:  All right.  Any redirect by the

7   Debtors?

8              MR. SLADE:  No, Your Honor.

9              THE COURT:  Okay.  Just briefly, Mr. Renzi, you

10  just said that you -- that Binance represented that it

11  doesn't lend or rehypothecate.  Maybe I misheard you, but I

12  thought you said earlier in your testimony that they do

13  rehypothecate?

14             THE WITNESS:  Yes, Your Honor.  I think I was

15  mistaken.  I went back and checked my notes.  They do not

16  rehypothecate.  They hold it one for one.  I think that's a

17  correction.

18             THE COURT:  Okay.  Now, in some of the objections,

19  there have been questions about specific matters.  One was

20  whether you have any knowledge of safeguards that exist to

21  stop assets from being transferred off the Binance U.S.

22  platform, I assume at the direction of the parent or

23  somebody else.  What safeguards are in place to prevent that

24  from happening to your knowledge?

25             THE WITNESS:  Your Honor, do you mean Binance

1    itself or just from the customer perspective?  Which

2    perspective?  Sorry.

3              THE COURT:  Well, I know you said that they

4    represented to you that only the U.S. employees have access

5    to the keys.  What procedures are safeguards are in place to

6    prevent the parent from telling the U.S. employees to just

7    transfer things off to the parent?

8              THE WITNESS:  I believe they are separate legal

9    entities with separate management teams that they

10   specifically hold them differently.  I can't anticipate if

11   there's malfeasance.  But to my understanding, they will try

12   to do everything they can to protect it.  But I can't

13   survive how far an entity might redirect a U.S. entity.

14             THE COURT:  Is that a possibility you discussed

15   with them or did you get any assurances from them on that

16   point?

17             THE WITNESS:  Other than what I've already

18   represented, they said that they wouldn't.  But I don't know

19   any other procedures that they have in place to do that.

20             THE COURT:  This might be more of a question for

21   Mr. Tichenor.  But in his declaration, he says as part of

22   the due diligence that in response to news reports about the

23   transfers of $400 million to Merit Peak Limited, that the

24   Debtors have done supplemental due diligence.  And it was a

25   little vague about what questions were asked and what the

1    answers were and whether that loop has really been closed or

2    whether it's still a point of discussion.  Do you have any

3    knowledge of that?

4              THE WITNESS:  I would defer to Mr. Tichenor on

5    that subject, Your Honor.

6              THE COURT:  I'm sure he appreciates that.

7              THE WITNESS:  I spent quite a lot of time with you

8    this afternoon, Your Honor.

9              THE COURT:  Okay.  Let's (indiscernible) next.

10   All right.  Thank you very much.  You are excused.

11             All right.  It is 4:30.  Do you want to begin with

12   another witness or continue tomorrow?

13             MR. SLADE:  We would like to try to finish.  I

14   think our next witness, Mr. Kirpalani (indiscernible).

15             MR. KIRPALANI:  Good afternoon, Your Honor.

16   Susheel Kirpalani for Quinn Emanuel on behalf of the

17   Debtors.  And more specifically speaking through the special

18   committee of independent directors of Voyager Digital LLC.

19             The next witness that we'd like to call is Mr.

20   Timothy Pohl, who is one of the two independent directors of

21   Voyager Digital LLC.  Mr. Pohl, who doesn't live in New

22   York, just has some restrictions on his availability

23   tomorrow.  And so, we would like to attempt to get his

24   testimony done today if that's at all possible.

25             THE COURT:  We can try, but my guess is we're not

Page 219

```
 1    going to be able to.  I mean, he's testifying about the
 2    releases, right?
 3              MR. KIRPALANI:  The estate releases, yes.
 4              THE COURT:  Yeah.  I suspect based on how many
 5    questions we had on Mr. Renzi's issues, that we're probably
 6    going to have a lot on Mr. Pohl's issues, too.
 7              MR. KIRPALANI:  Can I confer with co-counsel?
 8              THE COURT:  Sure.
 9              MR. KIRPALANI:  Thank you.
10              MR. SLADE:  Your Honor, just briefly, if we were
11    to continue, how long would Your Honor be prepared to go
12    today?
13              THE COURT:  I haven't asked the court staff how
14    long they are set up to go.  I mean, it's usually not an
15    issue for me.  I don't know if you have any issue.  You're
16    okay?  Certainly, we could go -- you're all right, Danny?
17    Certainly, we can go to 6:00 or a little later.  I mean, I
18    don't have any personal issue.
19              MR. KIRPALANI:  Yeah, we'd like to plow ahead,
20    Your Honor, if possible.
21              THE COURT:  Okay.  Let's do what we can do.
22              MR. KIRPALANI:  Thank you, Your Honor.  Again, for
23    the record, Susheel Kirpalani of Quinn Emanuel on behalf of
24    the Debtors.  We would like to call Timothy Pohl to the
25    witness stand.
```

```
 1              THE COURT:  Mr. Pohl, do you swear that the
 2     testimony you are about to give will be the truth, the whole
 3     truth, and nothing but the truth, so help you God?
 4              MR. POHL:  I do.
 5              THE COURT:  State your full name for the record,
 6     please.
 7              MR. POHL:  Timothy Pohl.
 8              THE COURT:  All right.  Counsel, please proceed.
 9              MR. KIRPALANI:  Thank you, Your Honor.  Your
10     Honor, we filed -- it's Exhibit 3 for the trial record
11     today, the Declaration of Timothy Pohl, as his direct
12     testimony.  It's Docket Number 1111.  I understand the prior
13     declaration received objections as to being admitted as
14     direct.  We would like to ask for this witness that his
15     declaration be deemed admitted for his direct.  He is
16     available for cross-examination.  And in particular, I would
17     like to point out that much of his direct testimony relates
18     to the special committee's independent investigation and
19     report which has been on the docket since February 14th,
20     2023 for all parties in interest to review.  And to my
21     knowledge, no specific objections at confirmation related to
22     any of the particular findings therein.  But he is here and
23     available to answer cross-examination.  But I will proceed
24     any way Your Honor thinks appropriate.
25              THE COURT:  On the first stance, are there any
```

Page 221

1    objections to the admission of Mr. Pohl's declaration into

2    evidence?   All right.

3              Anybody who desires it will have an opportunity to

4    cross-examine him.  But there are no objections, so his

5    declaration is admitted into evidence.

6              MR. KIRPALANI:  Thank you, Your Honor.

7                   DIRECT EXAMINATION OF TIMOTHY POHL

8    BY MR. KIRPALANI:

9    Q    Mr. Pohl, I will just ask you briefly.  Have you had a

10   chance to review your declaration since it was filed two

11   days ago?

12   A    I have.

13   Q    Do you have any changes that you would make to the

14   declaration?

15   A    No.

16   Q    Okay.

17             MR. KIRPALANI:  We have nothing further on direct,

18   Your Honor.

19             THE COURT:  All right.  Is there anybody in the

20   courtroom who wishes to cross-examine Mr. Pohl?

21             Hang on a second.  I'll get to the telephone

22   people in a minute.  I just want to start with the people

23   who are here in the courtroom.  Is there anybody here in the

24   courtroom who wishes to cross-examine Mr. Pohl?  Okay.  How

25   about on the telephone?  Is there anybody on the telephone

1    that wishes to ask questions of Mr. Pohl?

2          MR. HENDERSHOTT:  Your Honor, this is Tracy

3    Hendershott, pro se creditor.  Again, Your Honor, I haven't

4    even seen this submission, so hard to ask questions.  Can we

5    get a summary of it from him verbally?  Is that possible?

6          THE COURT:  Sure.

7          MR. KIRPALANI:  Absolutely, Mr. Hendershott.  This

8    is Susheel Kirpalani from Quinn Emanuel.  And we will

9    definitely give a summary of his testimony and then we can

10   pass the witness to the extent you've got questions.

11         MR. HENDERSHOTT:  (Indiscernible) --

12   BY MR. KIRPALANI:

13   Q    Very briefly, Mr. Pohl, can you describe your

14   background and experience for the Court?

15   A    Sure.  I've been in restructuring business for a little

16   over 30 years.  I started as an attorney at Jones Day where

17   I had been an associate for about seven years and then

18   became a lawyer at Skadden Arps in 1999 where I stayed until

19   2008.  By the time I left, I was the co-head of Skadden's

20   worldwide restructuring practice.  In 2008, I left to become

21   a managing partner at Lazard Freres where I was an

22   investment banker in restructuring for the next decade.  I

23   retired from Lazard in the summer of -- or the fall of 2019.

24   And I have been doing a variety of things ever since,

25   including sitting on some boards of distressed companies as

Page 223

```
 1   an independent director.

 2   Q    Thinking about boards of distressed companies that

 3   you've sat on, are any of those companies, companies that

 4   Kirkland & Ellis has been counsel to?

 5   A    Voyager is the only company I have been asked by

 6   Kirkland and nominated by Kirkland to be a director on.  I

 7   was asked in one other instance to be a director by

 8   creditors.  Kirkland represented the company.

 9   Q    Okay.  And what about my firm, Quinn Emanuel?  Have we

10   represented you as an independent director in any other

11   engagements?

12   A    (indiscernible).

13   Q    Do you have any connections with any potential party

14   that you've been investigating in the course of your duties

15   as a member of the independent special committee here?

16   A    No.

17   Q    How did you come to serve on the board of Voyager

18   Digital LLC and can you tell us when that happened?

19   A    I think fight before the July 4th (indiscernible)

20   called me and asked me if I would be interested in being an

21   independent director, and specifically being on the special

22   committee that was going to be charged with conducting an

23   internal investigation (indiscernible) conducting.  I said

24   that I would.  (indiscernible) that's the only time I have

25   been asked by Kirkland to be on a board (indiscernible).
```

1   Q    Are there any other members of the special committee at

2   Voyager Digital LLC?

3   A    Yes.  Ms. Jill Frizzley is the other (indiscernible).

4   Q    Did you know Ms. Frizzley before serving on the board

5   with her?

6   A    I do of her.  She was an attorney for I want to say

7   around 20 years.  I know by the end I think at Weil Gotshal.

8   Or maybe the whole time.  I'm not sure.  I'm not I've had --

9   I've cross paths with her from time to time, but I didn't

10  know (indiscernible).

11  Q    Did you ever serve on a board with her before?

12  A    No.

13  Q    In your review, how did the board function?  Well,

14  poorly, acrimony, consensus?

15  A    Well, I mean, the two of us were the two independent

16  directors at Voyager LLC.  You know, we were there for a

17  particular purpose, which was to conduct this investigation.

18  We hired counsel and we moved on from there.

19  Q    Okay.  And what did you consider the primary role for

20  the special committee?

21  A    Our primary role was to investigate historical

22  transactions, really mostly about the -- the real impetus

23  for the special committee I think was to look into the

24  lending practices around the (indiscernible) capital loans

25  that the company made.  But as part of that, we looked at

1    (indiscernible) transactions and regulatory issues, we

2    looked at the company's lending practices, the company's

3    risk management practices.  We sort of looked at everything

4    to determine (indiscernible) with the assistance of counsel

5    of course to whether or not there were any viable causes of

6    action owned by the estate.

7         We specifically did not look at and were not charged

8    with looking at individual causes of action, customer causes

9    of action, regulatory causes of action, but estate-only

10   causes of action arising out of historical transactions and

11   practices.

12   Q    Did the special committee consult with the statutory

13   unsecured creditors' committed in the course of its work?

14   A    We did extensively.  One of the first things that we

15   determined, particularly in light of the nature of the

16   company's balance sheet with the creditors were and there

17   was a creditor's committee, and that they were going to

18   conduct their own investigation as it were.  There was no

19   reason not to be completely cooperative and hand-in-glove

20   with them in that exercise, and that's what we set out to

21   do.

22   Q    And you said there was no reason not to be cooperative

23   with them.  Was there a reason to be cooperative with them

24   in your view?

25   A    Yeah.  They're the primary fiduciary constituent

1   representing really the only real creditor class in this

2   case.

3   Q    So, did you consider their views important to you?

4   A    Very important.

5   Q    What did the special committee do in terms of an

6   investigation?  You hear that word investigation, what does

7   it actually mean?

8   A    So, the first thing you do of course is hire counsel.

9   And we hired you.  And we then set out to -- I just call it

10  discovery phase where we talked about the types of

11  information that we would like to review and to have you

12  review from the Debtor.  And so, there were a series of --

13  I'm doing this from memory, but 25 or 30 separate

14  information requests that were (indiscernible) over the

15  course of the investigation asking for documents.  There

16  were phone conversations and then there were a series of

17  interviews that were conducted.  I think there were 12

18  separate interviews that people conducted of company

19  officers and employees.  And that was how we conducted the

20  investigation.

21  Q    And did the special committee have any financial

22  advisor available to it?

23  A    We didn't hire our own, but we were -- we had complete

24  access to BRG and Mr. Renzi and his whole team.  And we in

25  fact availed ourselves of that and we had information

1    sessions, Ms. Frizzley and myself with you, in order to

2    understand things better things that we didn't understand.

3    I think (indiscernible) at the beginning of the case we were

4    crypto neophytes.  So, we had a lot to learn.  So, we

5    availed ourselves as that.  And I (indiscernible) as well

6    separate and apart from Ms. Frizzley and myself.  We

7    certainly had access to Kirkland & Ellis (indiscernible) any

8    conversations as part of the investigation.

9    Q    Did the special committee's investigation culminate in

10   any written report?

11   A    There was a written report.  So, the investigation

12   lasted approximately two months.  I think it was July and

13   August.  A little longer than two months.  And in early fall

14   your firm prepared a draft.  We reviewed it, we discussed

15   it, and I think the culmination of that work was a -- I want

16   to say about a 60-page, single spaced report that was

17   finalized I think it was in early October if I remember

18   right.  That was the report.

19   Q    And just so that we have it in the record, to your

20   knowledge was that report filed publicly on the docket in a

21   redacted form?

22   A    It was.  Not at that time, but it was filed I think in

23   redacted form I want to say in February.  Does that sound

24   right?

25   Q    Docket Number 1000, yes.  And what was the ultimate

Page 228

1    conclusion of the special committee as to whether the estate

2    had any causes of action against insiders of Voyager?

3    A    Our ultimate conclusion was that there may be

4    cognizable claims for breaches of fiduciary duty to care

5    against two of the company's senior officers, Mr. Ehrlich

6    and Mr. Psaropoulos.

7    Q    And what did the special committee do with those

8    findings or with that conclusion?

9    A    Well, we did a number of things.  So, first of all, I

10   think our conclusion was that there may be cognizable causes

11   of action, non-frivolous causes of action.  That's not the

12   same thing as concluding that there would be -- that they

13   were wonderful causes of action or slam-dunk winning causes

14   of action, but cognizable causes of action that -- number

15   one.    Number two, we concluded that they would be pretty

16   hard to prosecute successfully, which we talk about.  And

17   three, we spent some time determining whether or not those

18   two individuals had the financial wherewithal to pay

19   significant judgement.  And then number four, we were sort

20   of very cognizant of the fact that this director and officer

21   liability insurance that remains intact and is staying and

22   could be available to satisfy potential judgements or

23   (indiscernible).

24        So, with all of those things in mind, we thought that

25   the best course of action and judgement was to see if we

1    could put together a settlement that would include

2    protecting the D&O policy for the benefit of the creditors

3    to the best of our ability as well as to obtain some

4    monetary judgement from the monetary contribution from those

5    two potential parties.  Keeping in mind, you know, what

6    their financial wherewithal was.

7    Q    You said a lot there.  But rather than me home in on

8    each element of your testimony, perhaps I can ask you to

9    just summarize the terms of the settlement reached with Mr.

10   Ehrlich and Mr. Psaropoulos.  And if you need to refer to

11   your declaration, it is in evidence.  You can do that.  And

12   then perhaps we can pass the witness in the interest of

13   time.

14            THE COURT:  Let me just ask.  Somebody on the

15   telephone, we've got some noise coming over your line.

16   Please mute yourselves unless you are asking questions or

17   unless you have an evidentiary objection to a question.

18   Okay?  Thanks.

19   BY MR. KIRPALANI:

20   A    Let me do the easy parts first (indiscernible) there's

21   some more complicated legal parts which I might refer to my

22   declaration to make sure I say it right.  But in essence,

23   the settlement -- let's do them one at a time.

24       With respect to Mr. Ehrlich, the settlement is for him

25   to pay to the estate -- he had received a bonus prior to

Page 230

1    filing the bankruptcy (indiscernible) the filing of the

2    bankruptcy.  He receive a bonus in the ordinary course of

3    business in our view of about $1.9 million.  And he paid

4    taxes on that.  So, his net bonus net of taxes was

5    approximately $1.12 or $1.13 million.  And we as part of our

6    settlement negotiated for him to return those funds, all of

7    them, to the estate, as well as to have the ability to, if

8    it's available, if there is a tax refund that is applicable

9    to the unwinding of that bonus, if you will, then the estate

10   would get the benefit of that as well.

11        That amount of money was a pretty significant amount of

12   money relative to what his ability to pay.  But that's what

13   we got from him as part of the settlement.

14   Q    And let me just interrupt you there.  You said it was a

15   pretty significant part relative to his ability to pay.  How

16   do you know what his ability to pay was?

17   A    So, before we were willing to consider what settlement

18   we would be willing to support, we asked -- we required that

19   there be disclosure of his personal financial assets and

20   liabilities and we required that those be provided under

21   oath, if you will.  There was both a -- I don't think it was

22   an affidavit, but there was a sworn statement.  And then he

23   was deposed.

24   Q    Thank you.  And were there any other elements to the

25   Ehrlich settlement before we move on?

```
 1   A     Yes.  A couple.  And now it gets a little harder to

 2   describe (indiscernible).  So, (indiscernible)

 3   subordinating.  He has rights to indemnification for the

 4   company if he is sued -- I just want to back up for a

 5   second.  The estate's claims against those two individuals

 6   are not being released.  So, part of the settlement was that

 7   those claims are not released so that the claims against

 8   them can continue to be prosecuted.  And to the extent that

 9   there's a judgment or a settlement, the estate can look to

10   the D&O coverage with respect to (indiscernible).

11        On top of -- but as a result of monetary payment, there

12   is no more recourse against his personal assets.  And the

13   reason I said it that way is because he has the right to be

14   (indiscernible) for both and (indiscernible) and he also has

15   the right (indiscernible).  And he also has the right to be

16   indemnified for defense costs, which (indiscernible).

17        So, with respect to the settlement indemnification

18   rights, he has waived his rights essentially to receive

19   indemnification from the estate.

20        The next thing if we're going to do it person-by-

21   person, there's a little bit of complexity around the

22   insurance policies.  So, I think it's probably easier just

23   to go and stay with the monetary pieces between the two

24   people and then talk about the insurance.

25   Q     Sure.
```

1    A    To me it's easier to think about it that way.  And then

2    with respect to Mr. Psaropoulos, where I think we thought

3    that the relative strength of the claims were different and

4    not exactly the same -- still not frivolous.  We had a

5    similar approach.  We insisted on gaining information under

6    oath and through depositions about his personal financial

7    situation.  And the settlement with him is that he is -- has

8    some crypto on the exchange.  Right?  So, he is essentially

9    subordinating 50 percent of his rights to receive whatever

10   he would receive under the plan as -- that's how he is

11   contributing financially.  That value of that is

12   approximately -- I think the last time we calculated fell at

13   $60,000.  And then he is also waiving his rights to

14   indemnification (indiscernible).  And then there is for both

15   of them the more complicated piece with respect to the

16   (indiscernible) insurance policy.

17   Q    Okay.  You mentioned that the estate was not actually

18   releasing the claims against them, but just agreeing not to

19   seek recourse against their personal assets beyond what they

20   were contributing.  Did I get that correct?

21   A    You did.

22   Q    What about customers who have claims against the Debtor

23   or claims that they believe they have against individuals?

24   Are those being released under the settlement that we

25   reached with them?

Page 233

1    A    They're not being released.  So, the only releases

2    (indiscernible) that are being released under the plan are

3    (indiscernible).  The only releases with respect to them are

4    releases of estate causes of action.  So, individual

5    customers who believe that they have claims against either

6    of them or any other officer and director, those claims are

7    not being released.  Same with (indiscernible).  They're not

8    released.

9    Q    Do you recall there was a time in the internal

10   investigation when you became aware of an insurance policy

11   that was obtained by the debtors shortly before the filing?

12   A    Yes.

13   Q    And what was your reaction to learning that

14   information?

15   A    Here's what we learned.  So, the company had a policy

16   or a number of policies that essentially amounted to

17   (indiscernible).  Shortly before (indiscernible) filing,

18   getting ready for the filing, the company procured a second

19   policy as part of a larger improvement in their overall D&O

20   insurance situation.  So, what we came to learn was that the

21   company paid -- I think it was around $15 million for a

22   basket of goodies.  One of those goodies, but not the only

23   goody, was another $10 million called the (indiscernible)

24   policy, another $10 million of D&O coverage.  So, ten plus

25   ten is 20.  That wasn't the only thing that the company

Page 234

1    obtained in exchange for that.

2    Q    Do you recall what else the company obtained?

3    A    I do.  The company also obtained six-year tail coverage

4    under both policies.  So, the original $10 million policy

5    and (indiscernible) purchased and I think, though I'm not a

6    hundred percent sure, but I don't think they had the

7    contractual right -- they had to negotiate with the

8    insurance carrier to obtain six years of tail coverage under

9    both policies, and there was money associated obtaining that

10   benefit.

11       And then the other was the original policy was as I

12   understand it excluded coverage for customer and regulatory

13   claims.  Those exclusions were removed from both the

14   original policies and they did not apply to the new policy.

15   And so, those were all the things that happened at once for

16   a sum of fifteen-point-something-million dollars.

17   Q    Despite that, it sounds like from your testimony there

18   was a basket, to use your phrase, of goodies, meaning

19   benefits to the debtor.  Is that what you mean when you say

20   that?

21   A    Yes.

22   Q    Okay.  Despite that, did you have a reaction given your

23   experience as a restructuring professional as to whether the

24   transfers to the insurance company on the eve of filing

25   might be avoidable for the benefit of the estate?

1    A    I think one of the things that stuck out to us was that

2    it appeared that despite the way I just described it, it

3    appeared in the paperwork as it was reported to us that the

4    $10 million new (indiscernible) policy cost the company $10

5    million.  Whether that's the (indiscernible) described or

6    not, (indiscernible) of the greater sum that was paid for

7    the basket of goodies in some sense I think the insurance

8    company (indiscernible) sort of the thought behind it is $10

9    million of new coverage for $10 million.  I don't know

10   whether that's accurate or not.  But when we observed that,

11   our reaction to that was, huh, that seems unusual and

12   (indiscernible) there could be a fraudulent conveyance claim

13   against the insurance company for whether or not they

14   provided the estate with (indiscernible) in exchange for the

15   $10 million that they received.

16   Q    Did you do anything with that thought, that it may be

17   an avoidable transaction?

18   A    We did.  As part of the overall settlement, we

19   preserved that cause of action, did not release

20   (indiscernible) and that cause of action, along with the

21   causes of action against the two individuals, are being

22   transferred to (indiscernible).

23   Q    Okay.  Do you have a view as to whether the settlement

24   reached with Mr. Ehrlich and Mr. Psaropoulos is in the best

25   interest of the estate?

1    A    I do.

2    Q    Why do you think that it is?

3    A    Well, we conducted a pretty thorough investigation.  We

4    looked at the company's risk management practices around --

5    particularly around (indiscernible).  We concluded that

6    there were risk management practices in place.  They were

7    not perfect.  They were a work in progress at that phase and

8    time.  But there was some level of diligence done.  There

9    were decisions made for reasons that made sense.  There was

10   an absence, a notable absence of any indicia of self-

11   dealing, improper motives.  There was nothing in it for

12   these executives other than their genuine belief that making

13   those loans was good for the company.  They were investors.

14   They had currency on the platform.  Didn't find any of the

15   red flags that you sometimes find in other types of

16   situations.  And so, whether or not there were breach of

17   duty of care claims based on criticism of the depth and the

18   detail around the risk management practices and how they

19   went into business with (indiscernible).  We thought there

20   were some good facts and there were some bad facts.  And

21   under the law as I remember it and as I have certainly been

22   reeducated by counsel, really you would have to find for

23   there to be a breach in duty of care.  That's a gross

24   negligence standard.  You would have to find that they were

25   grossly negligent (indiscernible), grossly negligent in

1    probably going about doing the things that I just talked

2    about and making decisions (indiscernible).

3         And while we thought that there were colorable claims,

4    we thought that there were also pretty colorable

5    counterpoints.  So, when we coupled that with the fact that

6    you can't get water from a stone.  If you see somebody

7    (indiscernible) anybody can sue anybody for anything.  They

8    not only might not win, but they're not going to have

9    anything to give you if you do win.  And we looked at their

10   financial assets, and we thought that (indiscernible) in our

11   business judgment and in the best interest of the estate

12   would be negotiate the best deal that we could from them,

13   obtain some positive value, and really maintain the source

14   of recovery that is (indiscernible), which is the $20

15   million (indiscernible).  And so, we thought that taking all

16   that into account, that that was extremely beneficial for

17   the estate and we were -- we felt good about our business

18   judgement.  Not that we relied on the judgment of others,

19   but it supported our belief that that was a good settlement

20   under the circumstances that the creditor's committee

21   reached the same conclusion.

22              MR. KIRPALANI:  I have nothing further, Your

23   Honor, for the witness.

24              THE COURT:  Okay.  Anybody in the courtroom who

25   now wishes to question the witness?  Yes?

```
 1                UNIDENTIFIED SPEAKER:  Your Honor, I have only one

 2    question.

 3                THE COURT:  You have one behind you who I

 4    acknowledged first there.

 5                MS. COWEN:  I am Stacey Cowen.  I am a creditor.

 6    (indiscernible).  I am an investor.  I have had 177,000

 7    shares of Voyager that I bought from 2020 until May of 2022

 8    that at high was three-and-a-half million.  Now it's zero.

 9    And I -- you know, followed investor relations, press

10    releases, interviewed Mr. Ehrlich, had correspondence with

11    Mr. Ehrlich in text about the company.  And I actually had a

12    question.  I guess when was he paid off that bonus and when

13    was that additional insurance taken out?

14                    CROSS-EXAMINATION OF TIMOTHY POHL

15    BY MS. COWEN:

16    A    So, I think I can refresh my recollection and give you

17    exact dates if you want.  But I believe that the bonus was

18    in February of 2022, before there was any lending made to

19    (indiscernible), by the way.

20    Q    Okay.

21    A    And then the insurance policy was procured in July of

22    2022, right before the filing.  The additional insurance.

23    Q    Okay.  And (indiscernible) correspondence.  I didn't

24    say what the texts were, but (indiscernible).  I said, "Is

25    Voyager in trouble?  I have almost all my savings and my
```

1    kids' wrapped up in your company.  And since the equity

2    (indiscernible) customer assets".

3         He writes back, "Who said we were in trouble?"

4         I said, "It's just the stock has been down so much and

5    that's been blocked by Celsius while that stuff is going

6    on".

7         He said, "Every fin-tech company that's public is

8    getting slaughtered in the market".

9         And I said, "Totally aware.  Just wanted to make sure,

10   again.  I have my entire retirement savings gone at this

11   point".

12        And then June 22nd, when the (indiscernible) Capital

13   news came out, Voyager Digital (indiscernible) the article.

14   (indiscernible).  He writes, "Nope".

15        I say, "Great.  Thanks".  And that's June 22nd, right

16   before the bankruptcy was filed.

17        Not just me.  Other equity investors relied on

18   (indiscernible) about (indiscernible) and adding stocks to

19   the platform about the (indiscernible) to uplift in terms of

20   price.  You know, so it wasn't just (indiscernible) Capital

21   (indiscernible) falling it was, you know, additional

22   information that was being transmitted by the CEO saying

23   that the company was healthy.  And that's why I held on.

24   So, I think there is some personal liability for the

25   executives of the company.

Page 240

```
 1        And also, I have a question about the equity, whether
 2   the intercompany claims that are in question at Topco, if
 3   there's going to be an independent committee that is going
 4   to be appointed to oversee that.  It's not related to either
 5   management, the group here.  There's going to be someone
 6   independent to look at these intercompany claims and see if
 7   the equity holders can get an answer --
 8             THE COURT:  Okay.  That's quite a mouthful, and
 9   it's -- a lot of it's not really a question, I guess.
10             MS. COWEN:  Well, intercompany I guess
11   (indiscernible).
12             THE COURT:  It's okay.
13             MR. SLADE:  Your Honor, we would be happy to
14   answer her questions.
15             THE COURT:  Yeah.  As I understand it, the first
16   part of your question relates to your personal
17   communications and communications Mr. Ehrlich may have had
18   with others that you think were misleading.  And that
19   perhaps gave rise to liability to you or to other investors.
20   It's important, and I think there's been a lot of confusion
21   about this, none of those claims are affected by this plan.
22   Your claims against the Debtor had to be asserted in a proof
23   of claim, but if you have claims against individuals who
24   allegedly committed fraud, the only way they would be
25   affected is if you voluntarily executed the opt-in form to
```

1    agree to give those releases.  Otherwise -- and somebody

2    correct me on the Debtor's side if I'm misstating this --

3    otherwise, your claims against him if you have claims

4    against him are totally unaffected.  Totally left in place.

5    Okay?  I did want to make sure you understand that.

6              MR. SLADE:  That's correct, Your Honor.  Unless

7    they (indiscernible).

8              THE COURT:  Right.

9              MS. COWEN:  That's assuming I have money to pay

10   legal fees if (indiscernible).

11             THE COURT:  I understand.  One of the unfortunate

12   things as a bankruptcy judge is I am accustomed to seeing

13   people who have suffered financial losses.  Sometimes people

14   who can endure the, and sometimes not.  And we can't always

15   do anything about it.  And I do sympathize with your

16   situation, I really do.  But if you have a claim, I can at

17   least assure you that that hasn't been extinguished by the

18   bankruptcy.  The stock may turn out to be worthless.

19   There's nothing I can do to resurrect that.

20             MS. COWEN:  Will there be that independent

21   committee for the intercompany claims that are --

22             THE COURT:  On the intercompany, this may not be

23   the witness, but let's let the Debtor answer your question.

24             MR. SLADE:  Yes.  We could direct you to the

25   lawyers who are representing the Topco individually after

```
 1    this hearing.

 2              MS. COWEN:  Okay.  It would be an independent, not

 3    part of the committee --

 4              MR. SLADE:  There is a different independent

 5    director at the Topco who is not Mr. Pohl.  And he has

 6    separate counsel.

 7              THE COURT:  So, in other words, the intercompany

 8    issues will be debated.  They will be followed by an

 9    independent director at Topco.  And I believe, if I read

10    correctly the latest amended version of the plan that was

11    filed, there is an agreement that even if there's a

12    settlement of intercompany issues, if it's over a certain

13    dollar amount, that it has to be presented to me for

14    approval, at which time if Topco doesn't like it, it can

15    object.

16              MS. COWEN:  And would the equity be subordinated

17    to claims let's say of all the estates, $60 billion or

18    whatever it ends up being, by all the estates that are

19    claiming --

20              THE COURT:  I am afraid that would be the case.

21    Because their claims, whether subordinated or not -- first

22    of all, to the extent that they have claims against the

23    subsidiaries, they would have to be paid before any of the

24    subsidiaries could pay any money up to their equity owners.

25    So, any claims against opco and holdco would have to be paid
```

Page 243

```
1    before any of their money went up to, by way of dividend

2    anyway, up to Topco.  Now, Topco may have, if it wins on the

3    intercompany claims, they just have direct recoveries.  And

4    then if the regulators have valid claims against Topco,

5    those would have to be paid before equity could be paid

6    because creditor claims have to come first.  I don't know if

7    they have -- one way or the other if they have any claims

8    against Topco, to tell you the truth.

9              MS. COWEN:  I have another question.  Market

10   Rebellion, did they receive any payments or ability to

11   exercise any options right before the bankruptcy?  Were they

12   able to get any money out of their deal with them?  Market

13   Rebellion is the company that is going to list stocks on

14   their platform in addition to crypto and they never

15   delivered on that, and they said starting at the beginning

16   of 2022 that was going to happen.  Is there any exercising

17   of any (indiscernible) options, anything like that with

18   Market Rebellion before the bankruptcy was filed that could

19   be clawed back?

20             MR. SLADE:  I believe the answer is no, but I

21   would be happy to talk to you about that after the hearing.

22             THE COURT:  Okay.

23             MS. COWEN:  (indiscernible) others.  And my last

24   question was Particle Foundation.  All of the executives of

25   Voyager are also on Particle Foundation, which bought a 12-
```

Page 244

1    and-a-half-million-dollar (indiscernible) before bankruptcy

2    as well that they then sold another 12-and-a-half-million-

3    dollars in the form of NFTs.  All of the executives are

4    still part of Particle Foundation.  Is there any ability to

5    claw back any of that in terms of either the artwork,

6    priceless artwork I see, Love Is In The Air, or the NFT sale

7    commissions that (indiscernible), Steve Ehrlich, all those

8    people that are on the board of Particle Foundation

9    Collective.  It's a non-profit.

10          MR. SLADE:  Well, I'm not sure this is going to

11   answer your question, but I can tell you that we looked at

12   Mr. Ehrlich's assets, what he owns that was available.  And

13   none of that was there.

14          MS. COWEN:  The assets you looked at, were they

15   U.S. bank statements, were they blockchain?  Because

16   obviously someone could (indiscernible) blockchain and

17   (indiscernible) that's not in a U.S. bank statement.

18          MR. SLADE:  All I can say is that he testified

19   under oath essentially that what we saw was all that he had.

20          MS. COWEN:  What happened to his $30 million of

21   stock that he sold less than a year ago?

22          MR. SLADE:  Most of it was not his.  Family,

23   friends.  Not his.

24          MS. COWEN:  Okay.  But Madoff, they clawed back

25   from family, friends.  I mean, that's a way to...

Page 245

```
 1                MR. SLADE:  We looked at whether or not as a legal
 2     matter there was any basis to, and there wasn't any.
 3                MS. COWEN:  Okay.  And May 12th when he texted me
 4     about -- you know, I said all my assets are tied up, you
 5     know, is there anything to worry about.  He said no.  I
 6     think within a day of that, Francine Ehrlich took out a home
 7     equity loan and bought a $2.3 million property in Nashville
 8     in her name.  It's a bankruptcy homestead protected state.
 9     I don't know if you looked into that.
10                MR. SLADE:  We know she had some of her own
11     assets, yes.  And we asked whether or not there was any
12     legal way to pull those into his -- you know, for settlement
13     purposes or (indiscernible) settlement if that would be
14     available to (indiscernible) and the legal answer was no.
15                MS. COWEN:  Okay.  Even though the timing happened
16     to correspond with the bankruptcy right after that?
17                MR. SLADE:  (indiscernible).
18                MS. COWEN:  Okay.  I would be curious about Market
19     Rebellion, because (indiscernible).  So, that's all.  Thank
20     you.
21                THE COURT:  All right.  You're very welcome.  Yes.
22                MS. CALANDRA:  Thank you, Your Honor.  John
23     Calandra from McDermott Will & Emery on behalf of the
24     Committee, Your Honor.
25                     CROSS-EXAMINATION OF TIMOTHY POHL
```

Page 246

1    BY MR. CALANDRA:

2    Q    Mr. Pohl, I just have one question.  It's been a long

3    day.  I just wanted to clarify something you said about the

4    scope of the investigation.  I think -- I believe you said

5    that you investigated the estate's claims that it may have,

6    but I wanted to be clear that that was against only the

7    insiders, not against anyone and everyone.

8    A    Correct.

9              MR. CALANDRA:  No further questions, Your Honor.

10             THE COURT:  Who do you mean by insiders?

11             THE WITNESS:  Officers and directors.

12             THE COURT:  Okay.

13             THE WITNESS:  I'm thinking to myself whether there

14   were (indiscernible), but I can't think of any.

15             THE COURT:  All right.  Anybody else in the

16   courtroom who wants to question the witness?

17             Is there anybody on the telephone --

18             UNIDENTIFIED SPEAKER:  Your Honor, I am a pro se

19   creditor.

20             THE COURT:  Yes.  What is your name?

21             UNIDENTIFIED SPEAKER:  My name is (indiscernible).

22   I had a couple of questions for the witness regarding Mr.

23   Psaropoulos.

24             THE COURT:  Okay, please proceed.

25   BY UNIDENTIFIED SPEAKER:

1   Q    I heard in your earlier testimony that half of his

2   claim on Voyager he was contributing is worth roughly

3   $60,000.  I also noticed in the filing that his net worth is

4   redacted.  Just for the creditors, could we know how much

5   money is there, so we know there's nothing to pursue or give

6   us a ballpark figure for that net worth for Mr. Psaropoulos?

7          MR. KIRPALANI:  I would just caution the witness

8   that we do have a confidentiality obligation with respect to

9   Mr. Psaropoulos and his counsel.  You can answer the

10  question with that instruction.

11  BY UNIDENTIFIED SPEAKER:

12  A    Sure.  I'll try to follow that.  He does have some

13  other assets.  He has a house.  He has some money in a 401K

14  plan.  And he has some money in a bank account.  They are

15  not what I would describe as significant amounts of money

16  (indiscernible).  And certainly not anywhere close to what

17  is available under the D&O policies.  Not remotely close.

18  And so, when we thought about settling -- and nobody settles

19  by giving up every single penny that they have -- we did not

20  -- he had one house.  I was about to say we didn't -- we

21  thought it was not -- we would never get settlement offer

22  going after a person's house.  If a person had owned 14

23  houses, that would be different.  But he owned one house,

24  owns one house.

25         So, we looked at his house, we looked at his value.

Page 248

1    There was nothing significant there.  We looked at how much

2    he has in his bank accounts.  There was nothing significant

3    there.  He has a retirement account that's relatively

4    modest.  And so, there wasn't a lot to get.  And so, if you

5    didn't settle and you sued him and you won, you would be

6    depleting (indiscernible) entitled to have the D&O policy

7    advance his costs to defend himself.  It eats into the $20

8    million policy.  He has the right to be indemnified if you

9    settle the one, you have that claim against the company.

10   And when we put all of that together, we thought let's

11   preserve the D&O policy assets, let's get the dollars that

12   he can afford to pay without it being in his interest to

13   fight it.  And that's how we thought about the settlement

14   with -- really with both of them.  But they had different

15   financial profiles, so we didn't reach the same outcome.

16   Q    Thank you.  No further questions.

17          THE COURT:  Okay.  Anybody else on the telephone

18   who has questions for Mr. Pohl?

19          MR. HENDERSHOTT:  Yes, Your Honor.  Thank you.

20   It's Tracy Hendershott, pro se creditor.

21          THE COURT:  Okay.  Go ahead, Mr. Hendershott.

22          MR. HENDERSHOTT:  Thank you, sir.

23               CROSS-EXAMINATION OF TIMOTHY POHL

24   BY MR. HENDERSHOTT:

25   Q    Mr. Pohl, I appreciate your time.  I especially

1    appreciate you and counsel from Quinn Emanuel of starting

2    off with the nice summary.  That was very helpful.

3         Your focus was exclusively -- I believe you stated with

4    (indiscernible) activity and series of events leading up to

5    that loan.  Did I hear that correctly?

6    A    No, not quite.  It wasn't our exclusive focus.  I think

7    when this case started, everybody understood that that was a

8    big part of what had gone wrong here.  And so, that was at

9    the top of everybody's mind that ought to be looked --

10   Q    Okay.  A primary focus.  So, what I'm asking is not

11   necessarily whether you have a lot of details of how that

12   whole sequence of events went.  I'm curious if you are aware

13   of whether the executives of voyager were personally aware

14   of the collapse of 3AC specifically if they were notified by

15   3AC that the founders were on the run, nonresponsive, and

16   were recommended to immediately call back all of the loans.

17   A    Yes, I am.  In fact, we spent a lot of time staring at

18   the timeline of the events, culminating in a -- I am doing

19   this from memory without refreshing my recollection.  I

20   think that was in mid-June.  It was around the 13th or 14th

21   or 12th, one of those dates where they were told for the

22   first time that they've got to try to recall the loans.  And

23   that it was because they were on the run, the 3AC founders.

24   Q    So, in the filing of the investigation that the UCC

25   counsel performed, it does state June 14th.  So, that

1    recollects with your memory as well it sounds like.

2    A    Good.  I'm glad to hear that.

3    Q    And at that -- or also in the filing from the UCC

4    counsel, they state Mr. Psaropoulos, Mr. Ehrlich were in

5    direct communication with 3AC.  That's when they were told

6    the founders are on the run.  I think in quotes here it says

7    they are (indiscernible) and the suggestion is that you

8    recall of its loans immediately.  And the testimony in your

9    investigation (indiscernible) states Mr. Psaropoulos and Mr.

10   Ehrlich (indiscernible) to that knowledge.  Does that

11   correlate with your memory?

12   A    It does.

13   Q    Great.  Also, did you look at any of the communications

14   that was released?  I know we just heard the other creditors

15   saying how they have materially false statements coming from

16   their executives.  Was that part of your investigation on

17   the larger scale specifically with press releases

18   (indiscernible) on a large-scale basis?

19   A    Well, you broke up there a little bit, so I missed some

20   of those words, but I think I get the gist, which is -- and

21   again, so we had counsel review -- ask for and then review -

22   - as I said, there were 30 information requests.  I'm sure

23   it included all communications that were relevant to this.

24   There were, I don't know about, 10,000, 11,000 documents,

25   40,000 pages that were reviewed, something like that.  You

1    know, Ms. Frizzley and myself didn't manually review those

2    ourselves.  We had counsel review that and write a report

3    for us and flag issues for us that they thought were worth

4    flagging.  I can't -- (indiscernible) specific communication

5    one by one that I can tell you for sure was looked at.

6    Q    Would you say that you looked at all of the press

7    releases which, you know, very significant loss distribution

8    intended to (indiscernible) customers?

9    A    Yes.

10    Q    So, do you recall that there was a press release on the

11    very same day that the executives of Voyager found out that

12    basically there was (indiscernible) fifty percent of their

13    assets under management at the time, by being directly

14    (indiscernible) by 3AC, that the very same day they released

15    the press release -- and I can I quote this to you, or do

16    you recall it?

17    A    You can quote it to me.

18    Q    So, one sentence on this press release specifically

19    attributed to Mr. Ehrlich, chief executive officer and

20    founder.  And I quote, "The company is well-capitalized and

21    in a good position to weather this market cycle and protect

22    customer assets."

23         On the very same day, they were notified by 3AC

24    basically that they were headed towards bankruptcy.  Do you

25    recall investigating that press release as part of the

Page 252

1    larger investigation?

2    A    I recall knowing that there was (indiscernible).

3    Q    And so, release of that information on the exact same

4    day that they notified that we're headed towards the path of

5    bankruptcy, would you quantify that as materially false?

6              MR. KIRPALANI:  I'm going to object, Your Honor.

7    It calls for a legal conclusion.

8              THE COURT:  that's true.  It does.  Sustained.

9              MR. HENDERSHOTT:  We can't get the opinion of the

10   lead director for the investigation what their consideration

11   of facts?  He talked earlier that he didn't feel that the

12   actions (indiscernible), so I think it's relevant to

13   understand his --

14             THE COURT:  Just let me be clear.  The exact words

15   you used called for a legal opinion.  You can ask him if he

16   considered that it gave rise to any claims on behalf of the

17   company and if so, how he evaluated and whether he pursued

18   them.

19   BY MR. HENDERSHOTT:

20   Q    Okay.  So, Mr. Pohl, did this action give rise to

21   claims against the company that would warrant actions

22   (indiscernible) --

23   A    I think not.  Right?  I think whether or not they were

24   false at the time they were made, highly unclear.  Things

25   were moving very, very quickly.  3AC turned out to be a

Page 253

1    gigantic fraud.  Nobody understood, appreciated.  And with

2    the benefit of hindsight, things were moving with extreme

3    rapidity.  They were doing the best they could.  Did they

4    (indiscernible) --

5    Q    But just to clarify, you said you thought they were not

6    false?

7    A    No.  I said I don't know whether they were false at the

8    time that they were made.  I don't know.  But what I do know

9    is --

10   Q    You thought that press release was not false?

11   A    I said I don't know if it was false at the time that it

12   was made.  But what I do know is that whether or not --

13   Q    So, --

14   A    Could I finish?

15            THE COURT:  You have to let him finish, Mr.

16   Hendershott.

17   BY MR. HENDERSHOTT:

18   A    What I do know is that whether or not there is an

19   estate cause of action or breach of a fiduciary duty in the

20   middle of a crisis --

21   Q    Hello?

22   A    Yes.  Can you hear me?  Okay.  We're trying to, at a

23   time when we believed that things were going to be

24   relatively controllable.  Turned out to be wrong about that;

25   doesn't mean he didn't believe it.  You know, did that rise

Page 254

```
1    to gross negligence or bad faith, sufficient to give rise to

2    an estate cause of action for a breach of his fiduciary

3    duties?  We didn't think so.  A claim that you could

4    prosecute and win?  We didn't think so.

5              THE COURT:  Are you still there, Mr. Hendershott?

6              MR. JONES:  Your Honor, I think Tracy fell off the

7    line.

8              THE COURT:  What happened?

9              MR. JONES:  Seth Jones here.  Tracy got

10   disconnected somehow, I think, but can I ask a few questions

11   until he gets back?

12             THE COURT:  Sure.

13                  CROSS-EXAMINATION OF TIMOTHY POHL

14   BY MR. JONES:

15   Q    I have a question.  Is taking out a $10 million

16   insurance policy the day before filing for bankruptcy

17   standard practice?

18   A    Actually, it is.  It depends on, you know, whether it's

19   standard practice or not -- let me answer it this way, every

20   case is different.  Depending on what the current company's

21   state of their D&O insurance is, it is not at all uncommon

22   headed into a restructuring to need to bulk up -- sometimes

23   that means obtaining new insurance, sometimes it means

24   adding to insurance that you have, but to end up -- and it

25   costs money to do this if you need to do it -- to have a
```

Page 255

1    complement of insurance coverage for your officers and

2    directors who you need to be willing to stay with the

3    company in the bankruptcy proceeding, as well as to attract

4    independent directors, such as myself, to be willing to get

5    involved in a distressed situation, so it is very common to

6    obtain policies.

7    Q    Okay.  But as the judge has said before, it was

8    basically an escrow of this fee because it's a $10 million

9    policy just to pay out $10 million.  So, where's the benefit

10   for the creditors?

11   A    I think what you're saying -- again, it was hard to

12   hear -- is that there seems something odd on the surface

13   about paying $10 million for $10 million of coverage.  We

14   agree with that if that's the right way to describe it.  We

15   agree with that, which is why we preserved the ability to go

16   after the insurance company for doing -- to see if we can

17   recover, the estate can recover the $10 million that was

18   paid from the party that got the money, the insurance

19   company.

20            Whether there's a good claim there or not, it

21   seemed to us it was a good enough potential --

22   Q    But that's not ethical to do what they did.  It's for a

23   $10 million payout, but $10 million of creditor money on the

24   board; is that not ethical?

25   A    Well, I think they didn't only do that.  So, what I

1    said before was that they did a number of things with

2    respect to their insurance; that was only a part of the

3    package.  And the officers and directors were doing that on

4    the advice of counsel and they're entitled to rely on that,

5    so they did.  It's not uncommon.  It was expensive.

6            And again, whether or not if you thought an

7    officer or director did something wrong by approving it,

8    they still -- I'll use the same phrase again -- you still

9    can't get blood from a stone.  They did not have the

10   financial wherewithal personally to pay a significant

11   judgment, so we preserved the ability to go after for these

12   things the party that does have the financial wherewithal to

13   pay a significant judgment, which is the insurance

14   companies, including with respect to that $10 million that

15   was paid.

16   Q    What about loaning out 208 million three days before

17   the platform froze while the platform had a cap on

18   withdrawal limits; is that standard practice?

19   A    I don't know what you're talking about.

20   Q    The Alameda loan, 50,000 Ethereum and 6500 Bitcoin was

21   loaned out on June 27 and the 28th to Alameda and the

22   platform froze on July 1st.  And obviously we had a big hole

23   already, so they give out 208 million just to freeze the

24   platform on July 1st.

25   A    Well, if you're asking me about loans that they made to

1    Alameda in the month of June, Alameda at that time was

2    certainly not believed to be -- it wasn't Three Arrows.  It

3    was not believed to have any financial distress.  It was

4    viewed everywhere in the marketplace as an excellent

5    counterparty.  Everybody wanted to do business with Alameda

6    and the company, Voyager, made money for its customers by

7    making its loans; it was an integral part of its business.

8    Q    I understand, but --

9    A    So that was -- look, in hindsight, the fact that

10   Alameda turned out to be Alameda, you know, hindsight is

11   20/20, nobody at the time that those loans were made thought

12   that there was anything wrong with making money and being

13   paid -- by being paid for loaning assets to Alameda.  That

14   was not the --

15   Q    Is that the right thing to do when you have a goal, you

16   know, so you give out 208 million and then you close down

17   the shop three days later.  That money could have gone to

18   other customers or made the hole smaller in hindsight.

19   Obviously, you have issues.  Why are you lending out $208

20   million after you just lost 650 million on an

21   uncollateralized loan?  Is that not lack of due diligence or

22   what, negligence, anything?

23   A    Well, it wasn't a lack of due diligence with respect to

24   the counterparty in that transaction.

25   Q    If they would have held onto that money, maybe they

1    could keep going longer, right, the business?

2    A    Well, again, if Alameda was a creditworthy

3    counterparty, then they were obligated to pay you back that

4    money with interest.  That was a business to pay --

5    Q    Yeah, and that would have paid back --

6    A    That was a core part of the business that Voyager was

7    in.  So, if your questioning is suggesting that once the

8    Three Arrows situation unfolded that the only thing Voyager

9    should have done was shut down its business and if they did

10   anything short of that, they were somehow doing the wrong

11   thing, I guess I would have to say we wouldn't agree with

12   that.

13   Q    I mean, but they knew how much they were going through.

14   They blew through that 35 million that quickly, right, so

15   what happened in those three days; did they have a bad bank

16   run or what?

17            MR. KIRPALANI:  Objection, Your Honor.  I think

18   this question has been asked and answered.

19            THE COURT:  I'll let him go just this one.

20            THE WITNESS:  I'm not sure what the question is.

21            THE COURT:  I'm not sure either.  What exactly are

22   you asking, Mr. Jones?  There was a loan you say on the

23   27th.

24            MR. JONES:  It's a --

25            THE COURT:  A loan is not a gift, right?  A loan

1    is not a gift.  A loan --

2              MR. JONES:  Right, right, right.

3              THE COURT:  So, what issue --

4              MR. JONES:  They already knew that -- they knew

5    they had a $650 million hole on June 18th.

6              THE COURT:  Right.

7              MR. JONES:  So, they had a big hole and they

8    decided, oh, let's keep lending out money with an unstable

9    market, maybe they would have helped the business to go a

10   little longer instead of giving away $208 million to FTX.

11             THE COURT:  Mr. Pohl, did you examine that

12   transaction and did you and the special committee reach any

13   conclusions about it, whether the company had any claims

14   based on?

15             THE WITNESS:  We looked at all of the transactions

16   and we did not believe that there were any viable claims

17   with respect to that transaction.

18             THE COURT:  Why in respect to this -- was the loan

19   repaid?  Is this the loan that's the subject of the

20   preference action now?

21             THE WITNESS:  This loan ultimately, in fact, was

22   repaid, number one.  And again, number two, at that time,

23   even after we filed for bankruptcy, there was no indication

24   at that time that Alameda and FTX were anything other than

25   completely credible.  In fact, that was so much the case,

Page 260

1    that we entered into a sales transaction with them, which

2    was the plan that was originally filed.  The whole world was

3    defrauded by FTX and Alameda blowing up and nobody

4    understood it and I think people still don't understand it.

5            But certainly, in June of 2022, trying to stay in

6    business in the business that you were in, making a loan to

7    what everybody believed was a completely credible as a

8    party.  And then, in fact, actually having loan repaid, in

9    fact, and you made interest in the meantime certainly didn't

10   suggest to us that there was anything inappropriate about

11   that transaction.

12           THE COURT:  Okay.

13   BY MR. JONES:

14   Q   Steve Ehrlich said that pre-bankruptcy, they had one

15   offer proposal, but it was too low of a -- a lowball offer

16   to swallow, so to speak.  Can you speak on that one offer?

17   A    I think what -- again, our job was to look to see if we

18   thought there were estate causes of action against insiders.

19   The observation that you just made, which we're aware of, is

20   consistent with appreciating that there were no improper

21   motives here; they were on the same side.  They believed

22   that the business was able to be rehabilitated and they did

23   not have contrary interests that would give rise to sort of,

24   you know, violation of their duty of loyalty, which is in

25   legal terms, what you're sort of getting at; it was an

1    indicia of just the opposite.  They were believers that the

2    company was healthy and had value, so much so and they were

3    stockholders, that they did not pursue a transaction that

4    I'm sure today everybody wishes had happened.  It wasn't

5    really a transaction; it was an offer, but you get my point.

6    Q    Can you tell me how fast they blew through that $35

7    million from FTX?

8    A    I don't recall, as I sit here, when they got it back.

9    I know that when we filed the case, there was discussion

10   about that was the plan was to go get those monies back and

11   eventually they were gotten back.

12   Q    I mean FTX gave it to Voyager.  Now it's subordinated,

13   right, the plan?

14           MR. KIRPALANI:  I'm sorry.  Is the question --

15   just one clarification.  Is the question asking about money

16   that FTX loaned to Voyager or that assets that Voyager

17   loaned to FTX?

18           MR. JONES:  FTX gave it to Voyager.

19           MR. KIRPALANI:  And what's the question with

20   respect to the $75 million?

21   BY MR. JONES:

22   Q    75 million.  I believe they're, what, allowed to claim

23   that once a month; was it 500 million originally.  FTX told

24   them you can only send, what, 75 million a month?

25   A    Well, I'm trying if I'm following your question.  We

Page 262

1   were certainly aware that FTX had agreed to loan money to

2   Voyager in installments.  I don't remember as I sit here

3   today what the rules were.  They couldn't borrow it all at

4   once.  They borrowed what they were allowed to borrow, which

5   was the initial 75 million, and then I don't think they were

6   ever allowed under the terms of that loan to borrow anymore,

7   but that's what they borrowed.

8               MR. JONES:  That's all I have.  Thank you.

9               THE COURT:  Mr. Hendershott, are you back on the

10  line?

11              MR. HENDERSHOTT:  I am, sir, thank you.  I've been

12  having a little bit of technical challenges.  Appreciate

13  (sound drops).  Hello?

14              THE COURT:  Yes, we're here.  You may proceed.

15  You may ask your questions.

16              MR. HENDERSHOTT:  All right, thank you.

17              CROSS-EXAMINATION OF TIMOTHY POHL (CONT.)

18  BY MR. HENDERSHOTT:

19  Q    So, thank you, Mr. Pohl, for letting me jump back in

20  here.  Before I got disconnected, we were talking about the

21  press release with the statement that the company is well

22  capitalized in a good position to weather the market cycle

23  and I couldn't understand if you were saying that that was

24  false or not.

25  A    I don't know whether it was false or not.

1    Q    You do not.

2    A    No.  At the time the statement was made, I don't really

3    know if it was false.  I don't know what -- more

4    importantly, I don't know whether he thought it was false.

5    Q    Did we not just clarify on the same day that 3AC

6    notified them that their founders were on the run and it's

7    really bad and we have to recall our loans?  I'm struggling

8    to understand the dichotomy of the facts here.  You're

9    agreeing that both are coming to a conclusion that you think

10   that it might be truthful.

11   A    All I'm saying is the loans to 3AC were not the only

12   loans that they had.  They had a credit facility with

13   Alameda.  They have a lot of other -- that was one part of

14   their business, it was significant, but what was happening

15   with 3AC was evolving in real time.  Nobody completely

16   understood it other than with the benefit of hindsight, and

17   he was I think in good faith trying to keep things as calm

18   as possible and figure out what to do next, that's all.

19   Q    So $1 billion hole from 3AC is you feel there was other

20   root causes for the bankruptcy?

21            MR. KIRPALANI:  Objection.  Lacks foundation with

22   that $1 billion reference.

23            THE COURT:  Not really.  I think I can't count the

24   number of papers I've read about this $1 billion hole.

25            THE WITNESS:  I think we all think that the loss

Page 264

1    of $650 million to 3AC was the precipitating event for the

2    bankruptcy, but it precipitated people wanting to withdraw,

3    they had to raise the gets.  It set off a chain reaction

4    that ultimately led to the bankruptcy, I think that's right.

5    BY MR. HENDERSHOTT:

6    Q    Okay.  (Indiscernible) thank you for the clarification.

7    So, at one point did the executives at Voyager know

8    definitively they were filing bankruptcy?

9    A    You know, I'm not a hundred percent sure.  We were

10   appointed on the eve of the filing or the day before the

11   filing, so certainly by then they knew because we were

12   appointed as part of the filing process.  How many days

13   before that, it was a foregone conclusion; I could only

14   speculate.

15   Q    You can only speculate.  There was no review of

16   internal communications?  You know, I would assume that that

17   was a critical element you identify as part of a thorough

18   investigation.

19   A    I mean, not really.  The exact date that they --

20            THE COURT:  Mr. Hendershott, let me just interrupt

21   to explain something here.  What the witness was charged

22   with doing was figuring out if the estate -- in other words,

23   Voyager itself -- had claims to pursue against officers and

24   directors.

25            Your claims are all about whether the officers and

1   directors issues public statements that were misleading to

2   customers or to investors, in which case the injured parties

3   would have been the customers or investors, not Voyager

4   itself, in which case it wouldn't be a claim belonging to

5   the estate; it would be a claim belonging to the account

6   holders and the investors.

7          So, when you're asking this witness whether he

8   thought these events, you know, were problems and the

9   witness is trying to I think tell you he's trying to

10  evaluate whether the estate had anything to pursue on those

11  points.  Do you understand the difference there?

12          MR. HENDERSHOTT:  I do, but I'm still a little

13  confused.  Would you be the one that determines whether it's

14  gross mismanagement, fraud, dishonesty, because the witness

15  is actually throwing out legal terms and I thought that that

16  was the point of his investigation is to determine causes of

17  action that results in potential claw backs or penalties.

18          I'm confused, Your Honor.  I'm not sure who

19  determines whether these actions are material faults,

20  whether there is harm, whether there's dishonesty.  Is that

21  you, sir, Judge?

22          THE COURT:  Well, let me just -- I only rule on

23  lawsuits and motions that are in front of me.  I don't have

24  any free reigning authority to just make rulings on things

25  that aren't actually brought properly in front of me.

Page 266

```
 1              But as to whether false statements were made about
 2     Voyager's financial condition, it's hard for me to see how
 3     that would give rise to a claim by Voyager against its own
 4     officers because Voyager wouldn't be the injured party;
 5     arguably, it would be the perpetrator through its officers.
 6              So, what kinds of claims Voyager might have is if
 7     there were things that were done recklessly, carelessly, in
 8     breach of fiduciary duty that injured Voyager itself, okay?
 9              MR. HENDERSHOTT:  Correct.
10              THE COURT:  Not so much whether there was anything
11     wrong of any kind that was done with respect to any human
12     being, but rather whether Voyager, either by virtue of the
13     bankruptcy laws or other state law, had rights of its own to
14     pursue, and if it did, whether they should be pursued or
15     resolved.
16              So, claims based on misrepresentations about
17     financial statements would not ordinarily, and I doubt here,
18     be thought of as claims that belonged to Voyager to be
19     evaluated by Voyager or investigated by Voyager really.
20              If customers, creditors, you know, account holders
21     think that they were misled as to the financial statements,
22     then they may or may not have claims based on that.  If they
23     wish to assert such claims against Voyager itself, it should
24     have been part of the proofs of claim.  If they think they
25     have claims against the officers, I can't express any
```

1    opinion about whether they are or are not valid, but they

2    probably wouldn't be in my court because I'm a bankruptcy

3    court and they would probably be in some other court against

4    the other individuals.

5              There's nothing about the bankruptcy process or

6    the fact that the estate is evaluating its claims they would

7    really bring here the issue of whether somebody defrauded

8    you about the financial condition, for example.  Does that

9    help?

10             MR. HENDERSHOTT:  It sounds very -- you know, a

11   huge disparity of in favor of the Debtors.  But, yes, thank

12   you for the clarification.

13   BY MR. HENDERSHOTT:

14   Q    Okay, Mr. (indiscernible) very long.  So, can you share

15   who is currently on your board and when were they appointed

16   to their board position?

17   A    Well, there's more than one board, right.  At the

18   Voyager LLC, which is the board that I'm on which is the

19   operating company, it's myself, it is Jill Frizzley, and I

20   think we're the only -- oh, and Steve Ehrlich I think is

21   also a board member, but he's not a member of the special

22   committee, so there are three board members at Voyager LLC,

23   the operating company.

24   Q    Are you the chairman of that board?

25   A    I'm not even sure we have a chairman.  It's really not

1    a relevant concept.  We have three members of the board: two

2    of us are independent and we're newly appointed and we're

3    two of the three members of that board.

4    Q    And is this standard procedure that the person that's

5    being investigated for their actions would actually be the

6    board member that you are a member of with no leadership?

7    A    Well, all powers to investigate and dispose of, through

8    settlement or release or otherwise, of Voyager LLC causes of

9    action against any officer or director, including Mr.

10   Ehrlich, would delegate it to the special committee that he

11   is not on.  So, he doesn't have any authority over, even as

12   a board member, over the subject matter that we're talking

13   about, not even the little authority that he would have if

14   it wasn't delegated and the two of us as independents could

15   outvote him two to one on any topic.  So, he doesn't have

16   any authority as a board member over the subject matter that

17   we're discussing.

18   Q    Interesting, thank you.  So, who appointed you to this

19   special committee and this board?

20   A    I think Miss Frizzley and myself were recommended to

21   the full board of the parent company by Kirkland & Ellis.

22   We were interviewed by -- I can't say the whole parent

23   company board, but I remember being interviewed by some

24   people.  And then we were -- and I don't think we were the

25   only people who were interviewed, not that I know that for

1   sure but that's not common -- and then we were selected.

2   So, the board of the parent company advised by

3   recommendations from their advisors recommended us.

4   Q    And that would be the (indiscernible) of the holding

5   company; is that correct?

6   A    I think it was the board of the holding company, that's

7   right, and I couldn't remember, unless my recollection was

8   refreshed, the name of every member of that board.

9   Q    And who's the chairman of the holding company?

10  A    I want to say I think it's Mr. Ehrlich, but I'm not 100

11  percent sure.  It's really, the reason I'm not 100 percent

12  sure is that it's really not relevant to what we did.

13  Q    And relevant to me, sir.

14  A    No, I know.  I'm just explaining why I don't know the

15  answer off the top of my head.

16  Q    So the holding company chairman of the board created

17  and hired you specifically to investigate itself.  And who

18  paid for your services, sir?

19  A    Voyager LLC.

20  Q    Pardon?

21  A    Voyager LLC, the company of the board that I'm on.

22  Q    I got it.  Just for my knowledge, per chance, you know,

23  Steve Ehrlich sign your check and paid for your services?

24  A    I don't think he signs my check.  Actually, I don't get

25  a check; I get an ACH, so I don't know.  I do know that

1    everything that we do --

2    Q    So as chairman of the board -- go ahead.

3    A    No, no, go ahead.

4    Q    I was going to say as chairman of the board, he would

5    be -- ultimately, so he selected you.  The investigation of

6    (indiscernible), he's the one that compensates you, as he

7    does all board members.  Am I understanding this correct?

8    A    Again --

9             MR. KIRPALANI:  Objection.  Mischaracterizes

10   the...

11            THE WITNESS:  Yeah.  The company pays us --

12            THE COURT:  He can answer.

13            THE WITNESS:  -- like everybody else.

14            THE COURT:  The company pays.  You're not saying

15   Mr. Ehrlich paid out of his own pocket, are you, Mr.

16   Hendershott?

17            MR. HENDERSHOTT:  No, no.  I said he has the final

18   authority to compensate all board members, including Mr.

19   Pohl, and there's no one above the board or Mr. Ehrlich as

20   chairman of the board that would compensate the board if

21   it's not a treasurer that's compensated.

22            THE COURT:  He's chairman of the board; he's not

23   God.

24            MR. HENDERSHOTT:  He's chairman of the board

25   that's making that decision.

```
 1              THE COURT:  You know, Mr. Hendershott, he's
 2     chairman of the board; he's not God.  It's not like he
 3     doesn't answer to anybody else.  He answers to the rest of
 4     the board.
 5              MR. HENDERSHOTT:  And that's a good question.
 6     BY MR. HENDERSHOTT:
 7     Q    So when I first asked you, Mr. Pohl, who are the
 8     members of the board, I was referring to the holding company
 9     board.  Could you just -- do you know all the members of the
10     board?
11     A    Not off the top of my head, no.  You'd have to refresh
12     my rec- -- it's public information.  You'd have to refresh
13     my recollection.  I didn't report -- I don't report to the
14     holding company board, so that's not why it's not relevant
15     information to me.  I don't report to them.  Nothing that I
16     was tasked with doing is sort of in their purview.  I don't
17     believe that they actually have the power to fire me,
18     although some days, I wish they would; that's a joke.  And
19     so, that's why it's not really relevant, which is why I
20     don't remember all the names of all the people on that
21     board.
22     Q    Could you just say how many members are on the holding
23     company board?
24     A    Nine, is it up to?  There's an independent director at
25     the holding company also.  Is it eight, nine members in
```

Page 272

1   total, something like that, seven?  Again, you'd have to

2   refresh my recollection.

3   Q    So, yeah, typically, it's an odd number.  I'm not sure,

4   so that's why I'm asking.  But I have been made aware that

5   six weeks before filing bankruptcy, there was significant

6   revision to the holding company boards by Mr. Ehrlich, the

7   chairman, replacing and appointing board members and I

8   believe even expanding it at that point.  Are you aware of

9   that significant transition?

10  A    No.

11  Q    Okay.  All right, so do you know -- and I believe you

12  already covered (indiscernible) and forgive me, I did lose

13  connection for a while.  So, you said that the $15 million,

14  there was a basket of other services that out of that

15  carveout of the $15 million, there was a dollar-for-dollar

16  transfer 24 hours before filing bankruptcy.  Then the

17  potential recovery for the creditors, there was an exclusive

18  legal defense policy for the officers.  Did I hear that

19  correct?

20  A    Not quite, that's not quite what I said.  I think there

21  was $15 some odd million dollars paid for a combination of

22  things.  One of those things was an incremental $10 million

23  D&O policy.  Whether or not one would characterize that $10

24  million policy as having been paid for with 10 million of

25  the $15 million dollar for dollar is probably a matter

Page 273

1   that's going to get litigated.  But because it could be

2   characterized that way, we identified that there is a

3   potential fraudulent conveyance claim against the insurer

4   and we preserved it.

5   Q    I'm sorry.  Preserve it means what?

6   A    It means that the winddown estate for the benefit of

7   creditors has the right to sue the D&O carrier who received

8   the $10 million to return that $10 million on -- I'll do

9   this at a super plain English level -- on the theory that

10  the company, Voyager, didn't really get any benefit from

11  paying $10 million for a $10 million policy.  I'm not

12  opining as to whether that's a meritorious claim or not, but

13  that's the type of claim that, in some form or fashion,

14  might have merit and has not been released under the plan.

15  Q    Okay.  Thank you for that clarification.  Speaking

16  about releases, are you part of the decision making to grant

17  releases to all of the executives, officers, and employees

18  of Voyager?

19  A    No, we weren't part of the decision making.  What we

20  did do was make our own business judgment as to whether

21  there was anything inappropriate about those releases.  As a

22  result of all of the things that we investigated and with

23  respect to, as I've testified, with respect to Mr. Ehrlich

24  and Mr. Psaropoulos, we were not comfortable with them being

25  released from certain claims and causes of action as a

Page 274

1    result of our investigation, and so we preserved those

2    claims.  We preserved the ability for the winddown estate to

3    sue them for those things.  We limited the recovery to the

4    D&O policy, and we settled with the two of them by having

5    them actually pay into the estate as part of the

6    (indiscernible).  We did not find --

7    Q    So you did make the decision on releases.

8    A    We did not find that there were any other Voyager

9    company estate causes of action that had any merit against

10   other officers and directors, and so, we support the

11   releases with respect to other people.  And I would note

12   that there was an important estate benefit from obtaining

13   those releases, which is that those parties have, at least

14   the senior officers, have rights to be indemnified and they

15   have rights to be reimbursed if they are sued from the D&O

16   policies which would deplete them.

17          So, the idea that we wanted to preserve the $20

18   million potential D&O recovery for the claims that we

19   thought did have merit and not see that potential pool of

20   assets that could be settled going forward or litigated to

21   conclusion depleted by having other officers and directors

22   against whom frivolous claims could be brought have the

23   right to deplete that by having their expenses reimbursed.

24   So, in the cost-benefit analysis of the whole package

25   because we didn't think that there were good claims against

1    the other officers and directors and because we wanted to

2    preserve the maximum amount of the D&O policy to be

3    available for where the claims might be good; that's why we

4    supported them.

5    Q    Okay.  So going back to the $20 million D&O policy, the

6    $10 million was taken from the creditor recovery pool 24

7    hours before filing bankruptcy.  Could you share what the

8    cost was for the previous historical $10 million that

9    preceded that one; is that  dollar for dollar?  You don't

10   know.

11   A    I don't know, but I doubt it.

12   Q    Right.  What would be standard in that (indiscernible)

13   experience?

14   A    I'm not an insurance expert, but D&O insurance is

15   expensive.  I don't know how long those policies were in

16   place.  I think it's actually not one policy, it's a number

17   of policies, so I don't know the answer.

18   Q    Would you assume that they were dollar for dollar?

19   Typically, with insurance in my experience, you get a higher

20   potential payout when the claims or the --

21   A    Yes.

22   Q    -- fees that you incur?

23   A    I would assume that they were not dollar for dollar,

24   which is why the later one that could be construed as dollar

25   for dollar is one that raised a red flag to us, so I agree

1    with you.

2    Q    So we're keeping faith in that one as a benefit, but

3    your perspective is that was not taken from the credit

4    recovery pool inappropriately?

5    A    Well, I don't know, but I know that the ability to

6    probably get it back from the only person that has the

7    wherewithal to give it back has been preserved.  And I also

8    know that the officers and directors who, when the board

9    approved spending the money to get that policy, they were

10   doing so on the advice of counsel.

11   Q    Okay.  All right, well, thank you, sir.  One last

12   question.  Going back to the person that's being

13   investigated being the chairman of the board that selects

14   you and ultimately is responsible for your compensation, how

15   do you as a professional -- and thank you for being one --

16   how do you as a professional distance yourself from the

17   influence of the individual that is financially supporting

18   you?

19   A    I think that's a fair question honestly.  I'm

20   completely distanced from it.  So maybe you -- so, look,

21   I've been retired for the last three or four years, right?

22   I don't get paid a significant sum of money relative to the

23   amount of money that I made when I was working to take on

24   these assignments, not even close, number one.

25          Number two, I am independent.  I don't have any

1    relationship with any of these people.  I didn't work at

2    Kirkland & Ellis.  I didn't work at any of these other

3    firms.  None of these people used to work for me.  They

4    don't put me on their boards of directors.  This is the one

5    and only time I've ever been put on a board or recommended

6    to be put on a board by this law firm.  I had never heard of

7    any of these people before.  I had never heard of Voyager

8    before.  I could barely spell Bitcoin before.

9         So, I am completely independent and it doesn't

10   really make much difference to me, you know, whether or not

11   I find that they did something wrong or whether I find that

12   they didn't do anything wrong.  I don't have any skin in the

13   game.  I don't have any stake.  I am as independent as it --

14   I don't know how you could be more independent than that, at

15   least as I understand what the word independent means.

16        The can't fire me.  I guess they could fire me,

17   but they'd probably have to deal with the judge.  So once

18   this process begins and you form a special committee and you

19   retain people who are, in fact, independent and you set out

20   to have a special committee investigation, I suppose if Mr.

21   Ehrlich --  not that he would ever do this -- but if he

22   wanted to, if he didn't like where it was going and he tried

23   to fire, you know, the people who are investigating him, I

24   think that probably wouldn't come out that way; that's not

25   how it works.

1   Q    So, you know, we would hope not.  Absolutely, that's

2   how it works.  So, is it possible that by you having, you

3   know, a reputation in this small niche market that you're

4   providing being hired by the person that's being

5   investigated and binding releases and a lot of other, you

6   know, kind of softball penalties for the investigation,

7   would that not put you in kind of a higher echelon of

8   getting hired by the next bankruptcy CEO who's being

9   investigated; would there be a financial incentive?

10  A    I'm not sure I understand your question, although I'll

11  resist the temptation that I think you're insinuating

12  something.

13  Q    Well, I'm asking, you know, just in this small niche

14  market that you're in of being an independent investigator,

15  wouldn't a favorable outcome of prohibiting releases and

16  findings, would that be favorable for your next assignment?

17  A    I'm not in a niche market.  This is the only

18  investigation that I have ever done as an independent

19  director.  I did some -- I led some when I was a lawyer and

20  I was involved in some when I was a banker, but I'm not out

21  there looking for board seats.  People call me from time to

22  time and if I think I can help and it interests me for

23  whatever perverse reason, sometimes I say yes because I can

24  only play so much golf, but I don't -- I'm not thinking

25  about the next deal.  I'm not in the business of doing

 1   investigations.

 2   Q    Got it, great, and I certainly didn't mean to assume

 3   anything.  I'm just trying to learn more about, you know,

 4   all these case rules I've never been exposed to.

 5             MR. HENDERSHOTT:  So, thank you, sir, for your

 6   time and I can cede the podium.  Thank you.

 7             THE COURT:  Very good.  Anybody else on the phone

 8   who wishes to cross-examine Mr. Pohl?

 9             MAN 1:  I have one question.

10                  CROSS-EXAMINATION OF TIMOTHY POHL

11   BY MAN 1:

12   Q    For the avoidance of doubt, I know you sort of

13   clarified this earlier, Mr. Pohl, but when you state

14   insiders were the primary focus of your investigation, that

15   does not include business partners such as Market Rebellion?

16   A    No, it does not.

17             MAN 1:  Okay, thank you.

18             THE COURT:  Anybody else?

19             MS. DIVITA:  This is Michelle DiVita.  I have some

20   questions as well.

21             THE COURT:  I'm sorry, who was it again?

22             MS. DIVITA:  Michelle DiVita.

23             THE COURT:  Okay, Ms. DiVita.

24             MS. DIVITA:  Sorry, take it off speakerphone.

25             THE COURT:  Go ahead.

Page 280

1          MS. DIVITA:  Okay.

2               CROSS-EXAMINATION OF TIMOTHY POHL

3     BY MS. DIVITA:

4     Q    My first question here is, do you mind clarifying who

5     exactly was responsible for conducting the financial review

6     portion of the special committee's investigation?  I believe

7     you mentioned there was no financial advisor appointed.

8     A    Well, no.  I think when the special committee hired

9     expert outside, they did the primary legwork factually with

10    respect the factual underpinnings of our conclusions; that's

11    the meat of the investigation.  We did not retain, and we

12    don't think we needed to retain, a financial advisor to

13    assist us.

14              If we had financial advisor type questions about

15    the business or about something historical that was sort of

16    beyond the purview of what lawyers could answer or were

17    qualified to answer, we from time to time availed ourselves

18    of the Debtors' professional financial advisors at BRG.

19    There wasn't really a lot of that.  The only thing financial

20    with respect to our investigation per se was, you know,

21    looking at the financial information of Mr. Ehrlich and Mr.

22    Psaropoulos, which we did, and we didn't need a lot of

23    financial expertise to understand the information that they

24    provided to us.

25    Q    Okay.  So, you didn't see anything at least unique in

1    the financial statements that would have independently

2    warranted an expert beyond outside counsel or professionals

3    already retained by the Debtor, correct?

4    A    No, we did not.

5    Q    And then does the Debtors' current financial advisor

6    have experience in cryptocurrency advising and/or the

7    banking industry?

8    A    Yes, they do.

9    Q    So you mentioned that the financial investigation was

10   submitted to the statements provided by the CEO and COO.  Do

11   you mind clarifying why financial or counterparty exposure

12   is not part of a financial review?

13   A    Not sure I'm following your question.  The company --

14   we were investigating the company's practices around the

15   loans and related activities that they were undertaking, and

16   so we certainly obtained information from the company about

17   the analyses that they did at the time that they made loans

18   and decided to enter into business relationships with the

19   parties that they entered into their relationships with.  We

20   didn't need independent financial advisors to understand

21   what that information was that they provided to us.

22   Q    Okay.  So, to clarify then, you were examining the

23   initial loan agreement, not necessarily the viability or

24   risk management related to subsequent term sheets provided

25   thereafter.

1   A    We were looking into whether we thought that the

2   totality of the diligence that they performed before

3   deciding whether to make loans to Three Arrows Capital,

4   whether there was anything sufficiently unusual about how

5   they went about their business that it was so widely off the

6   mark that it would give rise to a claim that satisfied the

7   legal requirement for a breach of fiduciary duty claim,

8   which is very strict, very high.

9   Q    Got it.  So, you did or did not find a breach of

10   fiduciary claim then related to the 3AC loan?

11   A    We found that there might be a claim that has merit

12   related to the risk management practices around that

13   transaction, and we preserved the claim for the benefit of

14   the estate.  We limited who the estate could get money from

15   to, number one, the $20 million of officer and director D&O

16   coverage and, two, we settled the exposure, the personal

17   exposure, of Mr. Ehrlich and Mr. Psaropoulos by entering

18   into settlements with them where they paid some money.

19          So, the claims against them are preserved, they're

20   not released, they can be sued.  And, if that lawsuit has

21   merit, which it might, it certainly is a non-frivolous legal

22   theory based on the facts and the law as we analyzed it in

23   our business judgment and if the winddown estate, which is

24   going to own the right to prosecute that litigation, they

25   can do what they want with it.  They can sue them, they can

1    settle with the D&O carriers, and they can get paid either

2    through settlement or by litigating and winning if they do

3    from the officer and director liability carriers up to $20

4    million, minus however much is depleted defending the

5    lawsuit.

6    Q    Okay.

7    A    And as to the individual, while they will be sued, they

8    have already will have paid in settlement the amounts of

9    money that I went through before.

10   Q    Got it.  So then was there anything unique about the

11   3AC due diligence?  It was my understanding that it was the

12   risk management policies in general that allowed or maybe

13   warranted this potentially colorable claims.

14   A    Yeah, there were a few things about 3AC that were, I

15   think in our judgment, a little lax relative to other

16   counterparties.  There were some things that, in our

17   judgment -- by the way, the officers and directors wouldn't

18   agree with this, but that's why their claims that we're

19   preserving -- we did think that there were some specific

20   things or the absences of some specific things around the

21   decision to make loans to Three Arrows Capital that were

22   different than the decisions to make loans to other parties

23   that they made loans to, less diligence.

24   Q    Was that, like -- okay.

25   A    Less diligence and less of the diligence that we would

Page 284

1    have expected.

2    Q    I'm sorry, can you repeat that?

3    A    Less diligence and less of the kind of diligence that

4    we would have expected.

5    Q    So what information was provided then that gave you

6    confidence that the Debtors would heighten its standard of

7    due diligence in its administration or management of the

8    estate during bankruptcy?

9    A    I'm sorry.  I didn't hear the last part of what you

10   said.

11   Q    So what additional I guess, like, change gave you

12   confidence that the amount of due diligence performed after

13   3AC would not give rise to another breach of duty of care in

14   the Debtors' management or directors' and officers'

15   management of the Debtors' estate in bankruptcy?

16   A    I still am not following your question.  You analyzed

17   specific transactions that they did to see if there's

18   anything actionable as a result of them.  They did the Three

19   Arrows transactions between March and May of 2022, the world

20   blew up in June, and they were in bankruptcy by July.  There

21   weren't -- right, so things happened very quickly.  Those

22   transactions weren't in 2021 or 2020; they were in March,

23   April, and May of 2022, and this company was in bankruptcy

24   by the time fireworks were over on July Fourth.

25   Q    So I guess what additional information provided in the

```
1    special committee's report gave you confidence that, you

2    know, things were good in March when, you know, this lax due

3    diligence occurred that when things are, you know, under

4    pressure, the Debtors and their directors and officers would

5    be able to perform adequate due diligence in the

6    administration and management of the bankruptcy proceeding?

7    A     Well, again, I'm going to try my best to answer that

8    question as I can understand it.  We're not investigating

9    generically whether or not they have risk management

10   practices that were good.  What we're investigating is

11   whether there were transactions that they did that they

12   shouldn't have done because their risk management practices

13   were deficient in some way.

14            So, it's not a theory -- you have to have a thing

15   that they did that they shouldn't have done that blew up in

16   their face, to use a colloquialism, that you're looking

17   into.  What were the circumstances around that and as a

18   result of what they did or didn't do in a specific area,

19   transaction that damaged the company, whether or not you

20   think that they breached their fiduciary duties.

21   Q     Got it.  So, a company that is in the business of, you

22   know, taking customers' deposits and, you know, managing

23   this -- we'll call it an offering or I don't know if that's

24   the right word, but this kind of business relationship here.

25   And you're saying that that business that could -- you were
```

1   only looking at transactions rather than the business

2   activity as a whole, correct?  I just want to make sure I'm

3   following.

4   A    I think so.  Again, it's hard to really understand the

5   question, but we were not evaluating the business as a

6   whole.  We were evaluating whether anybody did anything

7   wrong with respect to the transactions that didn't work out

8   for the company.

9   Q    Got it.  So, is it normal in your (indiscernible)

10  experience to have a single transaction take down a

11  multibillion-dollar company?

12  A    Well, having 25 percent of your assets that were on

13  loan that you thought that you could get back any time, you

14  know, having that suddenly not be true because you were

15  defrauded in the context of the industry having its own

16  macro issues, for lack of a better way to say it, those are

17  the types of circumstances that put companies in bankruptcy

18  in lots of industries; that's what happens.  You don't just

19  find yourself in bankruptcy.  Something precipitous often

20  happens that leads to a chain of events that puts you in a

21  position where you end up bankrupt.

22  Q    And precipitous then doesn't include the I guess

23  counterparty or financial risk management of the Debtors,

24  correct?

25  A    I'm not sure I'm following what your question is.

```
 1    Q    So if a 25 percent, you know, of -- that's what this
 2    transaction represents of the Debtors' assets?  What you're
 3    saying is that the reason that a 25 percent transaction
 4    could justify a bankruptcy filing can only occur because of
 5    some, like, outside source, not because of how the Debtor
 6    has managed its internal financial affairs to address
 7    adequately counterparty risk and loans and things like that.
 8    A    I don't know if I'm saying that.  I'm saying that if
 9    they had loaned 25 percent of their assets to Warren
10    Buffett, we all wouldn't be here.  I'm not trying to be
11    glib.
12    Q    Got it.  Okay, that's helpful.
13    A    I'm trying to make the point that it's because of what
14    happened to the counterparty that we're here.  And the
15    question is whether they should have been in business with
16    the counterparty and the other question is whether, as they
17    went into business with the counterparty, did they do
18    anything so grossly unusual or inappropriate that those
19    individuals who participated in that have personal
20    liability; that's the question.
21    Q    Okay.  That actually is very helpful for me to
22    understand, so I like your Warren Buffett example.  In the
23    case of -- I don't know how to phrase this.  I'll skip that
24    question for now.
25            So, you only identified, or I guess at least in
```

1    the filing, only the CEO and COO were identified as parties

2    responsible for entering into this 3AC loan; is that

3    correct?

4    A    They were the decision makers and it was really

5    predominantly the CEO.

6    Q    Okay.  And since your investigation didn't look into

7    the general risk management policies, nothing, there was no

8    red flag there, you know, two people, only two people

9    had decision-making authority in this matter.

10   A    No, I didn't say that.  That's a good question.  We

11   looked at the whole risk management process, all the people

12   that were involved, as I said, I think much earlier now,

13   today.  We conducted a dozen interviews, not two interviews.

14   We interviewed everybody, almost everybody in the group of

15   people that they called the risk management committee that

16   in some way touched the thinking around or the vetting of a

17   potential counterparty.

18           But the way that their process worked, the buck

19   stopped with two people and really mostly the CEO, and they

20   were the only ones that had real authority.  They were the

21   only ones that made decisions.  There were no votes taken by

22   any larger group.  There was just information provided and

23   the terms and conditions of the actual loans that were made,

24   as opposed to the decision that it's okay to enter into

25   loans with the counterparty conceptually.

Page 289

1          Once the group decided, okay, we're going to do

2     business with counterparty X, how much money to lend and on

3     what terms was the decision, that information didn't even

4     make it to the rest of the group that those things were

5     decided and only decided by Mr. Ehrlich and, to a lesser

6     degree, Mr. Psaropoulos.  And that's why we believe that

7     they are the two people against whom there are cognizable

8     potential claims, not the other people.

9     Q    Got it.  So, if the CEO or COO, it sounds like they

10    kind of really managed the counterparty exposure, financial

11    element of this, would the estate have any claims against

12    either of those two for making statements that were not

13    consistent with the company's risk management policies?  So

14    maybe -- here's an example -- if an officer is representing

15    that a company's financial exposure, counterparty exposure,

16    is X, but in reality it's Y, the estate wouldn't have any --

17    that's not a cause of action or is it?

18    A    Well, again, you're giving me sort of a hypothetical.

19    But again, we didn't -- we looked at all of the facts and we

20    did not think that there was anything in those facts that

21    gave rise to an estate, as opposed to an individual

22    customer, an estate, a company cause of action against

23    officers and directors.

24          Now, if an individual customer thinks that they

25    were misled in some way, whatever that way is, and they

Page 290

1    think that they have a claim against an officer or director

2    for whatever they think the basis is of that claim, we

3    didn't investigate that and, most importantly, it's not

4    released under this plan.  Those claims are free to be

5    brought.

6    Q    Okay, and then just a few more.  So, is this

7    profitability analysis for a director and officer conduct

8    claims, like, typical in bankruptcy?

9    A    I don't even know what that means.  Profitability --

10   Q    So when you're examining the personal assets of the CEO

11   and COO --

12   A    I'm sorry, now I understand.

13   Q    -- you know, is that typical?

14   A    I'm sorry, now I -- I think what you mean is was it

15   typical for us to have looked at whether -- I'll use Mr.

16   Ehrlich as an example.  Is it typical for us to have looked

17   at whether -- at his personal financial situation; is that

18   your question?

19   Q    Yes, exactly.

20   A    Okay.  Well, I would say -- let me rephrase your

21   question for you because it's a good point and we did look

22   at it and we looked at it for a reason.  We looked at it

23   because we were trying to, in our business judgment, obtain

24   the best possible result for the estate that we could as a

25   legal and as a practical matter.  And so, while on the one

Page 291

```
1    hand we thought that there might be good claims against him

2    for the reasons I've articulated, and while it's true it's

3    America, anybody can sue anybody for anything, it doesn't

4    mean you can get something from somebody even if you win;

5    they have to have something to get.

6              So, we wanted to know what there was to get from

7    them so that we could figure out what would be, in light of

8    that, a good settlement.  And so, a settlement from him for

9    $10 would not have been a good settlement; he had more to

10   five than that.  A settlement from suing him, not settling,

11   a settlement where you got a million dollars from him, we

12   thought was a good settlement because you could sue him for

13   $10 million but he doesn't have $10 million, he doesn't have

14   $5 million.

15             So, we were trying to assess, doing the best that

16   we could -- we didn't have any reason to want to do anything

17   other than that -- we didn't have to settle with him.  We

18   thought it was a good idea to settle with him on the terms

19   that we settled for in part because we looked at what does

20   he have to give and it wasn't very much.  So, we got, in

21   relation to that, what we thought was a reasonable and a

22   fair amount, better than getting nothing from him,

23   especially when coupled with we didn't actually have to

24   release him so that we could go after the $20 million pool

25   of money that's potentially available from the D&O carrier.
```

Page 292

1            So, if you're settling with somebody -- I'm

2       rephrasing your question -- is it typical in a bankruptcy to

3       look at every individual officer and director's personal

4       assets?  No.  If you're trying to figure out what a good

5       settlement is from an individual, that's probably something

6       you want to look at, and so we did.

7       Q    Got it.  As part of that settlement analysis or I think

8       part of the justification of agreeing to a settlement at all

9       with someone who doesn't have any assets, it's this

10      indemnification and D&O insurance policy issue, right?

11      Like, those are the two kind of reasons that a settlement

12      was favorable in this instance?

13      A    Yeah.  I think to answer to your question is we

14      reasoned that the D&O policy was a bigger pool of money by a

15      lot than the pool of money that these individuals had.  We

16      preserved it 100 percent, and we got from them what we

17      thought was a reason- -- in our judgment, in our business

18      judgment, that's what it was based on the facts and we

19      uncovered all the facts, including about what they're worth,

20      we thought that that was a good settlement for the benefit

21      of the creditors, which are really the customers.  Better

22      than the alternative, which is not to settle with them, not

23      to get the money, and not be able to get anything from them

24      anyhow if you could win litigation that if it was brought is

25      going to be hard to win anyhow because the standards are

Page 293

1    tough.

2    Q    Yeah.  So then for this D&O insurance piece, especially

3    a Side A policy, the premium, that's a risk calculation,

4    right?  It sounds like the premium on that Side A policy was

5    $10 million and then the payout max -- I don't know if it's

6    a maximum -- was also $10 million, correct?

7    A    We didn't make any -- we didn't write the policy.

8    We're not the insurers.  I'm not sure I know what your

9    question is.  Insurance companies --

10   Q    Did you review the policy?

11   A    -- decide what they'll charge for the coverage that

12   they offer.

13   Q    Correct.  And so, insurance companies, they're charging

14   for risk, correct?  That's my understanding.

15   A    Well, I don't know what goes into their calculation.  I

16   mean, conceptually, that's what they're doing, but it's not

17   a simple business.

18   Q    Oh, I'm well aware.  So, this would at least imply that

19   the person it's insuring is risky enough to justify a 100

20   percent premium amount.  Is that a reasonable statement to

21   you?

22   A    No, I really don't know what they were thinking.

23   Q    I mean, because the insurers are probably coming out

24   ahead of you if there isn't much risk if your premium is 100

25   percent the policy amount.  I think you previously mentioned

Page 294

1    that, you know, it was counsel's recommendation to enter

2    into this policy.  But in terms of, like, special or

3    investigation, there wasn't any additional, you know,

4    inquiry into why this amount equaled the payout.  Like, it's

5    a weird insurance term, right?  You don't buy insurance for

6    the same amount or you pay a premium for the same amount a

7    policy is.  So, I guess clarifying that there was not any

8    additional investigation there, right, into why the CEO

9    or...

10   A    Well, again, the investigation was -- investigation is

11   a strange word for that.  We understand what the facts were.

12   We preserved the ability to go try to get that money back

13   from the only party that has the ability to pay that money

14   back and we thought it was important to preserve that.  We

15   found that.  Nobody came to us and said, hey, good idea,

16   don't you want to make sure we can go after the insurance

17   policy, you know, on a fraudulent conveyance claim for the

18   $10 million because something seems odd, you know, all this

19   money was paid for that much coverage.

20          We flagged that issue because we uncovered it --

21   not uncovered, no one was hiding it from us.  We read all

22   the documents, we asked for information, we talked to

23   people, and we said, just like you just said, huh, that

24   seems unusual.  We're not going to let that just go away.

25   We're going to make sure that it gets preserved so that it

Page 295

1   could potentially be unwound if legally there's a basis to

2   do that, and we suspect that there might be.

3            Now, sure, the insurance company doesn't think so,

4   and I'm sure other people don't think so, but we've

5   preserved it.  We didn't litigate it to conclusion, we

6   didn't let it go; we preserved it.  I would preserve it for

7   the same -- based on the same observation that you are

8   making.

9   Q    Okay.  So, did you identify any colorable claim from

10  the D&O insurer that may justify avoiding paying out any

11  insurance claims?

12  A    Are you asking me whether we think that the D&O carrier

13  has any basis to deny coverage; is that what you're asking

14  me?

15  Q    Correct, yes.

16  A    I don't.  I'm not aware of any, but it wasn't -- we

17  certainly investigate that, but nothing that we did

18  investigate stands out as a red flag.

19  Q    Got it.  One more question.  Alameda was an insider

20  shortly before it canceled shares I think a few weeks, maybe

21  a few days leading up to bankruptcy.  Is there a reason they

22  were excluded from the investigation as insiders?

23  A    I don't understand your question.  Who is --

24  Q    So Alameda --

25            THE COURT:  Who?  Oh, Alameda.

Page 296

```
 1                MS. DIVITA:  Yes.
 2                THE WITNESS:  I'm sorry, ask me that -- what are
 3    you asking me?  That's just because it's hard to hear.
 4    BY MS. DIVITA:
 5    Q    Oh, sorry.  They were an insider based on the number of
 6    shares they held shortly before bankruptcy and the canceled
 7    a certain subset of those shares and no longer, I think at
 8    least Canadian public filing standards, qualified as an
 9    insider shareholder.  Is there a reason that Alameda, who
10    was a shareholder -- or I'm sorry -- insider shortly before
11    bankruptcy was not included in the investigation of other
12    insiders?
13    A    Yeah.  I mean, whether they're an insider or not, I'm
14    not 100 percent sure.  But assuming that they are, it never
15    occurred to us that they would ever be released, so we
16    didn't need to investigate them; there's no release for
17    Alameda.  We were investigating officers and directors
18    because of the possibility that releases would be proposed
19    and we would be asked about whether or not we thought that
20    was appropriate.  There was never any idea that Alameda
21    would be released from anything, so there was nothing to
22    investigate.  The estate can sue Alameda until the cows come
23    home if they want to.
24                MS. DIVITA:  Okay, that's all I have.  Thank you.
25                THE COURT:  Okay.
```

1           ANDRE:  I'm sorry, Your Honor.  I have some

2      questions too.

3           THE COURT:  Who is that?

4           ANDRE:  This is Andre (indiscernible), pro se

5      creditor.

6           THE COURT:  Okay.

7                CROSS-EXAMINATION OF TIMOTHY POHL

8      BY ANDRE:

9      Q    Okay.  Mr. Pohl, your committee was basically tasked to

10     investigate the company's policies to see if they did their

11     -- investigate the company's practices on their due

12     diligence.  In your opinion, did they perform sufficient due

13     diligence against 3AC?

14     A    No.

15     Q    And what would -- why not?

16     A    Well, I think they did conduct some due diligence.

17     They had a process.  They did have a series of phone calls.

18     They asked for certain information and they got some of the

19     information they asked for, but not all of it.  They were

20     aware importantly that there was another company that was

21     making loans to 3AC that was known to have a very rigorous

22     due diligence process of their own, so they took comfort in

23     the fact that --

24           ANDRE:  I'm sorry.  There's some background noise.

25     I can't hear you.

1              THE COURT:  Somebody else has got an open

2      telephone line; they need to mute it.

3              THE WITNESS:  Okay.  So, they got a whole bunch of

4      different kinds of information in different ways.  They

5      conducted interviews.  They asked for certain information.

6      They got some public information.  They had knowledge of

7      other companies --

8      BY ANDRE:

9      Q    Did they investigate the --

10     A    Can I --

11     Q    I'm sorry.  Did they investigate the company's books?

12     A    That's what I'm -- let me answer --

13             THE COURT:  Who is speaking?  Who asked that

14     question?

15             ANDRE:  I'm sorry.

16             THE COURT:  Who asked that question?

17             ANDRE:  Oh, I did.  Andre (indiscernible).

18             THE COURT:  Okay.  You got to let the witness

19     finish.  You can't interrupt him.

20             THE WITNESS:  So, they did a whole number of

21     things, including asking for financial statements from Three

22     Arrows.  They did not get financial statements from Three

23     Arrows in the conventional sense.  They got a very short

24     what's called an NAV statement, it was signed, that said

25     from Three Arrows that they had a net asset value in the

```
 1   multiple, multiple billions of dollars.  That was part of

 2   the group of things that they relied upon, not the only

 3   thing, but it was part of it.  It was not very robust.  We

 4   did not think that that was very sufficient.  That was one

 5   of the things that we thought was deficient.

 6          But it wasn't the only thing that they relied

 7   upon, so we can't sort of point only to one factor.  We

 8   reviewed what they did, what they looked at, and we did not

 9   think that it was as robust as it should have been.  And

10   that's why we did not believe that -- that's why we did

11   believe and do believe that there are potential claims for

12   violation of the duty of care against the two individuals

13   that ultimately decided to make those loans anyhow.

14          Now it's not a clearcut winner.  They did do some

15   due diligence.  Other people were doing business.  It's not

16   even clear that, even if they had done better -- in my view,

17   better due diligence, that the answer would have been any

18   different.  They were defrauded.  They were defrauded, they

19   were being lied to.

20   BY ANDRE:

21   Q    Yes, I'm sorry.  So, what other due diligence did they

22   do then?

23   A    I just described it.

24   Q    Exactly, like, what other?

25   A    I just described it.  They had a series of phone calls.
```

1   They had a series of interviews.  They looked at -- let me

2   finish.

3   Q    Series of phone calls with who?

4   A    People at --

5   Q    Be more specific please.

6   A    People at Three Arrows, including one of the two

7   founders.

8   Q    Okay.

9   A    So they conducted interviews.  They looked at the

10  documents that they were provided.  They looked at public

11  information.  They knew that --

12  Q    What documents were those?

13  A    They knew that there were other people doing business

14  that had their own rigorous -- their own due diligence

15  processes which were believed to be rigorous.  Three Arrows

16  Capital at the time they did business with them was a

17  marketplace darling, much like Alameda.  There was -- we

18  weren't the only -- Voyager wasn't the only company doing

19  business with Three Arrows, just the opposite.  All of those

20  things in total combined was the diligence they did.  They

21  did that diligence over a roughly a one-month period.

22  Q    This is, like, more like pseudo due diligence because

23  at the very least, they didn't look at the company's books,

24  they didn't look at their financial statements.  They didn't

25  ensure that they were capitalized.

1    A    They did -- all I can say is they did the diligence

2    they did and we did not find that the result of that

3    diligence was so robust that there was no potential claim.

4    That's why we preserve the claims and entered into the

5    settlements that we did.

6    Q    And you believe that that was after the risk

7    management...

8    A    I think I just said the opposite.

9    Q    Okay.  Well, that's what I'm actually getting to, is

10   that you have a company here that has, let's just say, 1.3

11   billion in assets that are ready and willing to lend out

12   half of their business to another party because they told

13   them we have 3.7 billion of net assets that you can go in

14   with, you can do business with us.  What I'm trying to get

15   here is that I think this is just more than, oh yeah, we

16   found some negligence.  We found that, you know, they didn't

17   really the do less diligence; they didn't do any diligence,

18   yeah?

19   A    What's the question?

20   Q    Is that the -- that's the question.  It sounds like

21   they didn't do any diligence and you're saying they did some

22   diligence.

23   A    I just described the diligence.

24   Q    And the --

25   A    I just described the diligence.

1    Q    Right.  But ultimately, these actions caused the

2    downfall of the entire company.  In one month, it caused 3.5

3    million customers, you know -- all right, I'm going to move

4    on from that.

5              What was Stephen Ehrlich's net worth or what did

6    Stephen Ehrlich have?  You said, oh, he didn't have much.

7    What did he have?

8    A    I'm a little handicapped by confidentiality agreement,

9    so I'll try to answer it, again, the way I answered it

10   before.  He has a house; he has some money in a retirement

11   account and he had some money in a bank account.  Can I --

12   Q    This is Stephen Ehrlich's?

13   A    Yes.  I'm answering your question, yes.

14   Q    Okay.

15   A    The house, he had some money in a retirement account,

16   and he had some money in a bank account.  The lion's share

17   of the money in the bank account he's giving back to us.

18   The retirement account was smaller and the value of the

19   house I think is smaller too.  It's right around the same.

20   I can't remember the exact...

21   Q    And that --

22   A    So we did not take his house.  If we had insisted on

23   taking his house and his IRA, there would have been no

24   settlement because he would not have agreed to it.

25   Q    Okay.  And what did you recover from Mr. Ehrlich?

Page 303

```
 1    A     $1.25 or $1.125, one of those two numbers, $1.125

 2    million plus, to the extent that as a result of giving us

 3    that money, he is entitled to a refund from the IRS, which

 4    he might be, we get that also.

 5    Q     Okay.  And then from Mr. Psaropoulos, what -- again, so

 6    can you answer, does Stephen Ehrlich have a network of more

 7    than 5 million?

 8    A     No.

 9    Q     No, you can't answer or no, he doesn't.

10    A     No, he doesn't.

11    Q     Does he have a net worth of more than a million?

12              MR. KIRPALANI:  I'm just going to object, Your

13    Honor, on the basis of confidentiality and I don't want my

14    witness to be sued for violating a confidentiality

15    agreement.  I think he's answered the questions about this

16    and the scope of the assets.

17              THE COURT:  Is there anything else?

18              ANDRE:  I'm trying to --

19              THE COURT:  Is there anything else you can say

20    about the range of Mr. Ehrlich's net worth within the limits

21    of your confidentiality agreement?  I presume it was over a

22    million or he wouldn't have paid a million.

23              MR. KIRPALANI:  Yes.  I think you can -- I think

24    you've tried, but please, Mr. Pohl.  And please also answer

25    because it was referred to earlier and just in the interest
```

Page 304

1    of time, did you consider whether these individuals lived in

2    community property states, such that their wives assets

3    might be available to satisfy a judgment against them

4    because there was references to that earlier too.

5              THE WITNESS:  So, let me start with him and then

6    I'll go to his community property so that it's clear.  Try

7    it again, maybe I wasn't clear.  I think you can think about

8    what he has in three buckets: he has a house, that's one

9    bucket; he has some money in an retirement account, that's

10   the second bucket; and then he had some money in his bank

11   account.

12             We have most of the money from his bank account

13   coming back to us, the estate.  We did not get his house and

14   we did not get his retirement account.  If we had insisted

15   on either of those two things, there would be no settlement

16   and we would not have had the $1.125 million.

17             With respect to his wife -- with respect to his

18   wife, his wife has assets.  We looked at legally whether or

19   not if he were sued, would there be an ability to get at his

20   wife's assets, and the legal answer in the state that he

21   lives in or that she lives in is no, there is no legal

22   recourse to her assets.  So, it may be the amount of her

23   assets are not relevant because there's no way to get to

24   them.  We looked.

25   BY ANDRE:

Page 305

```
 1   Q    And that they would be Connecticut?

 2   A    I think he's Connecticut, right.  I might confuse

 3   between the two of them who lives where, but one of them is

 4   Connecticut, and that was legally --

 5   Q    And the house is -- and this house of his is in

 6   Greenwich?

 7   A    I don't know where his house is.

 8              MR. KIRPALANI:  Your Honor, I'm advised -- sorry

 9   to interrupt the question, but if I could just try to

10   clarify something -- advised by counsel to the creditors'

11   committee that filed on the Docket 112-1 was the committee's

12   own report where it was disclosed that Mr. Ehrlich reported

13   his net worth as approximately $2.57 million.  Mr.

14   Psaropoulos declined to allow his net worth to be disclosed,

15   so that's the number.

16              THE WITNESS:  Okay.  I didn't know that.  I knew

17   what the number was; I didn't know it had been disclosed.

18   So, I think you can see that we did settle with him for a

19   very significant percentage of his net worth and,

20   importantly, the net worth of his that we did not obtain is

21   not the same; it's in different categories, it's a house and

22   it's a retirement account.

23              ANDRE:  I'm sorry (indiscernible).  Say it again.

24              THE WITNESS:  I didn't understand --

25              ANDRE:  Can you hear me?
```

Page 306

```
 1              THE WITNESS:  Yeah.  Say that again please?

 2              ANDRE:  Just saying I got dropped from the call,

 3     so I'm letting you know that I'm back on.

 4              THE COURT:  Oh, all right.  Well, I don't know if

 5     you were on, but Mr. Kirpalani pointed out that it's been

 6     previously revealed in a filing on the docket that Mr.

 7     Ehrlich's reported net worth was $2.75 million.

 8              MR. KIRPALANI:  $2.57.

 9              THE COURT:  $2.57, excuse me.  I'm getting

10     dyslexic as I get tired.  And that the witness then said he

11     believed that they had settled for a significant percentage

12     of the total net worth and for most of the cash that was had

13     and that he considered it a good settlement in light of the

14     fact that he couldn't get at -- or unlikely to get at the

15     house and the IRA.

16              THE WITNESS:  Okay.  I also said that we did look

17     at his wife's assets.  We were trying to -- we were looking

18     to get everything that we could reasonably get, and we

19     concluded based on legal advice that we would be unable to

20     get to his wife's assets.  If someone didn't settle and sued

21     and won -- a lot of ifs there -- but if you didn't settle

22     and you sued and you won, could you get at her assets?  No,

23     you couldn't.

24     BY ANDRE:

25     Q    Right, okay.  I don't want to deflect too much from the
```

1    main course here.  What were the -- how much did you recover

2    from Mr. Psaropoulos?

3    A    Much less.  Mr. Psaropoulos is subordinating his right

4    to 50 percent of his crypto assets, but not in the Voyager--

5    Q    Right, okay.

6    A    So the value is about, at the time that we calculated

7    it -- and I know the price is moved every day, but the day

8    that we calculated it, it's worth about $60,000; it's not

9    nearly as much.  His net worth is significantly less, number

10   one, and number two, he was not as culpable.  We thought the

11   claims against him were weaker because it was really Mr.

12   Ehrlich who was the decider with respect to making the loans

13   to Three Arrows and in what amounts, so the strength of the

14   claims wasn't the same.

15   Q    So if I can just synthesize this correctly.  Stephen

16   Ehrlich's and Evan Psaropoulos, the main culprits in

17   decision making, you know, with regard to the loan to Three

18   Arrows, which ultimately brought down the company and caused

19   a lot of harm to all of Voyager's customers.  And your

20   committee, instead of going after everything that they had

21   and basically potentially making them poor, you agreed to

22   settle on a smaller amount because maybe that was better

23   than getting nothing.  Does that sound about right?

24   A    No, I wouldn't describe it that way.  I think we

25   thought that it was better than not settling.  Again, I

1    don't want to be misconstrued.  The fact that there may be

2    claims against them is not the same thing as saying that

3    those are slam dunk winners; they're not slam dunk winners,

4    legally, they are not slam dunk winners.  There's a lot of

5    uncertainty about whether you could sue them and succeed,

6    and so, that had to be factored into account.

7              And our goal wasn't to make them poor.  The goal

8    was to get the most for the estate that we reasonably could

9    under the circumstances and that's what we did.

10   Q    Well, by my comment of making them poor, I mean taking

11   everything they have from them and putting it into the

12   estate so that all the other creditors can at least get a

13   little bit more.  And, quite frankly, I mean, they should

14   have nothing after their decision.

15             One last question.  If you do not opt in --

16             THE COURT:  Did you look at exemptions available

17   under Connecticut law?

18             THE WITNESS:  You mean on the marital property,

19   Your Honor?

20             THE COURT:  On the house and on the IRA or in the

21   event that Mr. Ehrlich declared his own bankruptcy?

22             THE WITNESS:  No.  We were really focused on her

23   property because it was more.  And when we -- the house and

24   the IRA, again, those amounts are smaller even comb- -- you

25   know, were not as significant as the cash.  So, you know, in

```
 1    negotiating, when we could get the cash and get almost all
 2    of the cash, we thought relative it was total assets that
 3    was a fair deal compared to not settling at all and suing
 4    them and maybe getting nothing.
 5             And we knew that -- no, we just didn't know, it
 6    was a settlement, it was a negotiations, but that he was not
 7    going to agree to give up his house and his IRA.
 8    Fortunately, the values of those things was not so
 9    significant that it made just getting at the cash not a good
10    deal, all in.  It made it a good deal.  It was still a good
11    deal all in.
12    BY ANDRE:
13    Q    Okay.  I have actually two more questions.  One was if
14    you do not opt-in to the finance deal, then you -- or
15    rather, if you do opt-in to the finance deal, then you
16    basically give up any rights to sue Mr. Ehrlich, yeah?
17             MR. KIRPALANI:  Objection.  Exceeds the scope of
18    direct.  But if you understand, if you know the answer to
19    this question.
20             THE WITNESS:  Are you asking me about under the
21    plan if somebody opts-in to the finance, if they keep their
22    asset --
23    BY ANDRE:
24    Q    Right, they give up their rights to sue?
25    A    If they keep their asset on the finance --
```

Page 310

```
 1              THE COURT:  No.  My understanding is if you voted

 2    in favor of the plan or if you executed an affirmative opt-

 3    in to the releases, you would --

 4              THE WITNESS:  Just an affirmative opt-in, even for

 5    people who voted yes?

 6              THE COURT:  I thought you were binding people who

 7    voted -- so people who voted for the plan are not bound by

 8    the releases, okay.

 9              THE WITNESS:  Of the individual claims.

10              THE COURT:  Okay.  It's just they're only -- okay,

11    so the only people who have released claims are people who

12    have affirmatively opted in.  That's people who checked the

13    opt-in box on a ballot, not people who elect to become

14    finance customers.

15    BY ANDRE:

16    Q    So on the Voyager app, when it asks you do you want to

17    transfer your data now and opt-in, that has nothing to do

18    with giving up your rights to sue them personally or does

19    that?

20    A    That's correct.

21              ANDRE:  Okay.  I don't have any more questions.

22    Thank you.

23              THE COURT:  Okay.  Anybody else on the phone?

24              MS. DIRESTA:  Hi, Your Honor.  This is Gina

25    DiResta again, and I have a question for the witness.
```

Page 311

1           THE COURT:  Okay.

2               CROSS-EXAMINATION OF TIMOTHY POHL

3     BY MS. DIRESTA:

4     Q    Hi, Mr. Pohl.  I heard a bunch of rumors that Voyager

5     employees and even some of the customers were supposedly

6     tipped off that the Voyager platform was going to get shut

7     down and told to take their assets off the platform before

8     it got shut down.  Did you do any kind of investigations

9     along these lines?

10    A    I am not aware that we saw anything consistent with

11    that.

12    Q    Did you hear any kind of rumors around those lines at

13    least?

14    A    No, I'm not -- I for sure did not hear any rumors and

15    no one else has told me that they heard those rumors either.

16    Q    Okay.  Because it's actually, like, a lot of people say

17    it and, like, then, you know, it doesn't necessarily mean

18    it's true, but a lot of people have been spreading that on

19    different social media platforms.  So, I didn't know if it's

20    something that -- I'm surprised you haven't heard of it just

21    because it's, like, rampant out there, and then I wanted to

22    know if you guys did any kind of investigation along those

23    lines.

24               And since you guys didn't do any investigations

25    and I just now got to your attention that there were a lot

Page 312

1    of rumors about it, is there a way to investigate that after

2    the fact?  I know you guys have already done your

3    investigation, but is there a way to do that now?

4    A    I don't think we would be investigating social media

5    rumors, but...

6              MS. DIRESTA:  Okay, thank you.  That's all.

7              THE COURT:  Okay.

8              MR. LOREN:  Your Honor, this is John Loren, pro se

9    day creditor.  Can you hear me?

10             THE COURT:  I can.

11                CROSS-EXAMINATION OF TIMOTHY POHL

12   BY MR. LOREN:

13   Q    For the witness, I was curious if you investigated any

14   of Steve's, like, shell companies, holdings, and/or trusts?

15   A    Well, we requested and received sworn statements where

16   he was required to disclose to us all of his assets and then

17   he was deposed, so he would have been required to disclose

18   those things to us and there was no disclosure of any other

19   assets other than the ones we've talked about.

20   Q    So if Steve Ehrlich votes, owns, or has a participation

21   in shell companies, holdings, or trusts and he told he that

22   he didn't, that's something we can potentially investigate.

23   Am I hearing that correctly?

24   A    I guess.  If you're asking what the legal ramifications

25   are of it were to turn out that he lied in his sworn

```
1    testimony to us, I'll defer to the lawyer to answer that
2    question, but I'm sure there would be some.
3    Q    Wonderful, okay.  And then there's a new article that
4    came out, basically there's a new fund coming out in Tampa,
5    Florida, and Steve Ehrlich is actually one of the employees
6    or, I guess, one of the partners in this fund; it's called
7    Druid.  Have you heard anything about this?
8    A    I have not.
9                 MR. LOREN:  Okay.  That's all I have.  Thank you.
10               THE COURT:  Okay.  Anybody else?  Okay.
11               MAN 3:  Your Honor, could I (indiscernible), one
12   of the creditors (indiscernible) because I'm not in this
13   because I came in a bit late.
14                    CROSS-EXAMINATION OF TIMOTHY POHL
15   BY MAN 3:
16   Q    (Indiscernible).  What is the timeframe out and do we
17   know the limits; is that a weekly limit of withdrawals from
18   the balance (indiscernible) implementing to distribute daily
19   without leaving the market to suffer?  How is that
20   (indiscernible); is that two-month timetable so it fully
21   distribute or a shorter timeframe?
22               THE COURT:  Okay.  That's not an appropriate
23   question at this time.  We're in the middle of taking
24   evidence, so the issue is whether you have a question about
25   the subject of this witness's testimony.  We'll be resuming
```

Page 314

1    tomorrow and you can get clarification of your issues then.

2    In fact, you could probably also talk to the Debtors

3    overnight and get a clarification.  Okay?

4              MAN 3:  Thank you.

5              THE COURT:  Anybody else with questions for this

6    witness?  All right, the witness is excused and we'll

7    adjourn for the evening.  We'll resume tomorrow at 10:00.

8              MAN 4:  (Indiscernible), Your Honor?

9              THE COURT:  Yes.  Did you have questions for the

10   witness?

11             MAN 4:  No.

12             THE COURT:  Okay.  Yes.

13             MR. UPTEGROVE:  William Uptegrove on behalf of the

14   United States Securities and Exchange Commission.  Your

15   Honor, today's hearing went longer than we anticipated and

16   neither Miss Scheuer or I made accommodations for tonight

17   and we have travel arrangements back out of state.  We'd

18   like to request to participate in tomorrow's hearing through

19   Court Solutions.

20             THE COURT:  All right.  I'll grant that request.

21             MR. UPTEGROVE:  And just one --

22             THE COURT:  You have no evidence to offer, right?

23             MR. UPTEGROVE:  No, Your Honor.  And just one

24   other logistical point is that we should be able to make --

25   just to confirm, we should be able to make same day Court

Page 315

1    Solution arrangements tomorrow?

2              THE COURT:  I sure understand you can, and if you

3    have any difficulties, speak to our chamber staff and I'm

4    sure we can give you the assistance you need.  Thank you.

5              All right, we'll see everybody tomorrow.

6              (Whereupon these proceedings were concluded at

7    6:53 PM)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 316

1                                    **I N D E X**

2

3                                    RULINGS

4                                                              Page        Line

5      Motion to Recuse, DENIED                                 10          16

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 317

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4                                        cord of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  March 6, 2023

**&**

**&**   4:3 6:15 9:4
45:6 57:12
223:4 227:7
245:23 268:21
277:2

**0**

**0**   134:2
**0.5**   134:1

**1**

**1**   49:3 133:3,7
133:23 135:10
135:15,18
136:1 141:4
263:19,22,24
279:9,11,17
**1,000**   50:4
**1.1**   91:7
**1.12**   230:5
**1.125**   303:1,1
304:16
**1.13**   230:5
**1.2**   12:24
**1.25**   303:1
**1.3**   94:13
209:19 301:10
**1.32**   94:14
**1.34**   13:23 91:9
**1.363**   13:22
**1.4**   12:18
**1.9**   230:3
**10**   14:10 87:3,4
87:5 133:24,25
233:23,24
234:4 235:4,4
235:8,9,15

254:15 255:8,9
255:13,13,17
255:23,23
256:14 272:22
272:23,24
273:8,8,11,11
275:6,8 291:9
291:13,13
293:5,6 294:18
316:5
**10,000**   250:24
**100**   4:20 11:5,6
11:8 14:6 26:7
94:21 269:10
269:11 292:16
293:19,24
296:14
**100,000**   121:16
**1000**   227:25
**10004**   2:3 5:4
5:19 6:4
**10010**   6:11
**10017**   6:18
**10022**   4:6
**101**   8:7
**106**   64:4 184:8
**10:00**   314:7
**10:01**   35:4
**11**   9:8 13:7
14:20 35:11
65:5 98:6
104:16 105:13
108:8 114:23
114:25 127:4
188:9
**11,000**   250:24

**111**   49:4
**1111**   220:12
**1119**   49:5
**112**   8:8
**112-1**   305:11
**11206**   3:18
**11209**   3:18
**11213**   3:18
**1127**   45:13
**1129**   35:11
37:13 45:7
**1145**   32:2,6,7
32:18 33:3,7
**11501**   317:23
**12**   8:21 78:17
78:24 226:17
243:25 244:2
**12,000**   121:17
**12/18**   206:24
210:3
**120**   208:21
209:2,16
**120,000**   64:3
**12151**   317:5
**129**   8:8
**12th**   245:3
249:21
**13**   8:23 78:17
78:24
**13,000**   121:17
**13th**   249:20
**14**   247:22
**141**   8:9 44:10
**142**   44:10,15
**14th**   220:19
249:20,25

**15**   14:9 233:21
272:13,15,21
272:25
**154**   8:9
**159**   8:10
**15th**   5:11
**16**   158:6 316:5
**167,000**   12:21
**17**   208:25
209:6,14,15
**175**   147:15
**175k**   143:9
**177,000**   238:6
**18**   121:18
**189**   8:10
**18th**   81:3,15
207:9 259:5
**19**   121:18
**1999**   222:18
**19th**   11:13
**1st**   256:22,24

**2**

**2**   2:5 95:19,22
96:2,4,15
**2.3**   245:7
**2.57**   305:13
306:9
**2.57.**   306:8
**2.75**   306:7
**20**   13:25 71:4
76:14 86:12,14
87:5,6,18,19
87:24 96:23
97:8,9,13
133:1,3,5,10
133:16 134:17
134:18,22,24

135:6,6,18,25
136:2 151:24
152:24 177:10
224:7 233:25
237:14 248:7
274:17 275:5
282:15 283:3
291:24
**20,000**  97:12
**20/20**  257:11
**200**  209:18
**2008**  222:19,20
**2019**  222:23
**2020**  238:7
284:22
**2021**  284:22
**2022**  11:13
97:11 238:7,18
238:22 243:16
260:5 284:19
284:23
**2023**  2:5
220:20 317:25
**204**  8:11
**20549**  4:21
**208**  256:16,23
257:16,19
259:10
**20th**  5:18
**212**  8:11
**22-01133**  1:4
3:1
**22-01170**  1:16
3:7
**22-10943**  1:3
**221**  8:13

**22nd**  239:12,15
**23,000**  97:12
**238**  8:14
**24**  103:16
104:13 105:14
109:2 272:16
275:6
**243**  186:8,24
**246**  8:14
**248**  8:15
**25**  121:18
226:13 286:12
287:1,3,9
**254**  8:15
**26**  71:4 76:14
97:9 104:13
109:3 181:19
**27**  256:21
**279**  8:16
**27th**  11:15
13:22 258:23
**280**  8:16
**28th**  256:21
**297**  8:17
**2:40**  161:9
**2nd**  97:11

**3**

**3**  220:10
313:11,15
314:4
**3.5**  302:2
**3.7**  301:13
**30**  181:19
222:16 226:13
244:20 250:22
**300**  5:11
317:22

**30326**  4:14
**311**  8:17
**312**  8:18
**313**  8:18
**330**  317:21
**34**  108:25
**35**  105:16
135:21 137:15
137:25 140:16
140:18 152:11
179:25 180:10
181:20 208:9
208:25 209:13
258:14 261:6
**38**  208:8
**39**  105:17
106:8,11
108:25
**3ac**  11:19
249:14,15,23
250:5 251:14
251:23 252:25
263:5,11,15,19
264:1 282:10
283:11,14
284:13 288:2
297:13,21

**4**

**4**  45:12 62:24
314:8,11
**40**  87:7,8 90:25
**40,000**  250:25
**400**  73:16,25
74:1,4 217:23
**401k**  247:13
**445**  74:4,7,19
76:10 79:12,21

80:13 81:21
92:8 94:10
104:1 106:23
107:2 108:16
180:20
**45**  208:7
**450**  76:4
**455**  76:8,10
121:5
**48**  11:25 49:14
50:20
**4:30**  218:11
**4th**  132:20
223:19

**5**

**5**  291:14 303:7
**50**  62:24 119:9
148:17 206:24
207:9 208:6
232:9 307:4
**50,000**  256:20
**500**  261:23
**500,000**  15:12
**51**  6:10 12:5
103:16
**53**  8:5
**534**  5:3
**541**  10:25
**55**  103:13
105:12 107:25
**552**  10:25
**59,183**  10:23

**6**

**6**  42:21 85:22
85:23 142:23
142:24 143:4

**[6 - absolutely]**

144:6 317:25
**6.7**  183:2,7
**60**  227:16
242:17
**60,000**  143:11
232:13 247:3
307:8
**601**  4:5
**61,300**  10:23
**65**  209:25
210:1
**650**  121:2
257:20 259:5
264:1
**6500**  256:20
**6:00**  219:17
**6:53**  315:7

**7**

**7**  16:5 60:18
61:8 62:10,14
68:24 71:1,2
71:17 75:3
76:14 77:4
80:25 81:1,7
81:10,14,14
82:6 90:20
97:24 98:5,23
98:23 99:9,10
99:11,16
100:12,20
104:8,17,20
105:16,17
106:13 107:15
108:2,24
114:24 148:4,7
149:1,8 153:9
181:5 188:9

207:23
**70**  8:6 186:22
207:5,7,10
209:4
**700**  146:4
147:4
**700,000**  144:22
144:25 145:7
146:2 152:18
**704**  100:9
**73**  11:16
**75**  11:4 12:22
101:12 102:4
102:13 105:25
106:17 108:15
261:20,22,24
262:5
**76**  70:22
**78**  8:22,23
40:16
**78701**  5:12
**79**  40:16

**8**

**8,000**  91:21
**80**  11:6 190:15
190:16 191:9
191:10,13
192:6 193:14
**83**  209:10
210:2
**835**  158:5
**861**  8:22 78:20
**863**  8:23 78:20
**88**  8:6 96:24

**9**

**90**  8:7 11:8
**900**  4:13
**93**  185:22
186:6,11,19,22
187:5
**950**  4:13
**97**  10:23 42:16
42:24 69:15
84:22,25 85:2
85:4,21,22
108:9 142:18
142:22 143:1
194:9
**98**  10:24
**9:58**  2:6

**a**

**abide**  122:21
122:23
**abigail**  5:14
43:20,25 101:4
**abilities**  139:14
**ability**  20:2,5
33:23 36:10
50:20 51:4
59:9 61:20
62:4 64:10
71:11 89:4,6
111:14 115:18
140:22 143:6
144:14 151:18
155:14 160:8
160:23 169:24
171:6 177:12
177:16 178:5,9
205:14 229:3

230:7,12,15,16
243:10 244:4
255:15 256:11
274:2 276:5
294:12,13
304:19
**able**  20:25 21:6
27:10 28:9
35:5 49:12
50:5,22 51:5,6
61:16 63:5
80:9 81:10
90:1 126:19
138:12,23
155:2 158:2,12
158:22 162:19
166:8 179:21
185:17 187:10
188:6 192:8
197:11 214:2
219:1 243:12
260:22 285:5
292:23 314:24
314:25
**above**  270:19
**absence**  236:10
236:10
**absences**
283:20
**absent**  25:5
**absolute**  156:4
**absolutely**  17:7
38:10,17 50:20
68:11 101:24
174:21 184:3
210:5 222:7
278:1

| | | | |
|---|---|---|---|
| **accept** 11:4 123:1 142:19 | **accountable** 174:21 | **action** 31:13,14 36:18,22 160:7 162:17,20 169:20 225:6,8 225:9,9,10 228:2,11,11,13 228:14,14,25 233:4 235:19 235:20,21 252:20 253:19 254:2 259:20 260:18 265:17 268:9 273:25 274:9 289:17 289:22 | 49:19,23 50:1 57:25 69:3 77:20 83:7 92:22 95:3 104:9 105:18 109:12 110:10 120:6 127:13 134:4,22 143:20 144:2 148:23 163:25 169:5 180:20 181:4 191:22 192:9 199:5 226:7 232:17 238:11 254:18 260:8 265:15 265:25 268:5 269:24 271:17 274:5 275:16 287:21 291:23 301:9 309:13 311:16 313:5 |
| **accepted** 17:15 46:12,12,16,17 175:8 | **accountholder** 192:22 208:5 |
| **access** 14:6 37:24 192:6,23 196:20 217:4 226:24 227:7 | **accounthold...** 110:3 |
| | **accountholders** 109:3 202:6 |
| **accommodat...** 314:16 | **accounting** 11:17 153:12 167:25 |
| **accomplished** 173:22 | **accounts** 14:17 68:5 71:22 198:22 248:2 |
| **accomplishing** 176:5 | **accurate** 97:13 140:1 235:10 317:4 |
| **accordance** 19:1 23:13 | |
| **account** 11:18 18:11,15 62:1 86:1,5 87:24 89:9,20,21 97:10 99:19 100:8 101:25 103:14 104:25 111:9 130:1,4 130:6 192:21 192:22 197:20 198:16 199:4,8 237:16 247:14 248:3 265:5 266:20 302:11 302:11,15,16 302:17,18 304:9,11,12,14 305:22 308:6 | **accustomed** 241:12 | **actionable** 284:18 | **ad** 1:18 3:7 15:9 |
| | **ach** 132:7 269:25 | **actions** 35:19 72:15 73:18 82:23 174:11 252:12,21 265:19 268:5 302:1 | **add** 42:11 107:9 116:25 203:4,15 |
| | **achieve** 172:16 | | **adding** 239:18 254:24 |
| | **achievement** 15:2 | **actively** 22:10 | **addition** 243:14 |
| | **acknowledge** 210:19 | **activities** 33:14 281:15 | |
| | **acknowledged** 238:4 | **activity** 33:22 249:4 286:2 | **additional** 13:24 19:19 36:23,23 90:4 107:10 133:7 238:13,22 239:21 284:11 |
| | **acquire** 141:25 | **actors** 40:3 | |
| | **acquisition** 162:24 | **actual** 50:15 68:8 78:19 109:4 211:11 288:23 | |
| | **acrimony** 224:14 | | |
| **accountability** 174:11,17 | **act** 136:18 150:10 | **actually** 11:1,9 22:24 23:18 35:20 46:13,14 47:4 48:10 | |
| | **acting** 30:12 | | |

284:25 294:3,8
address 15:13
19:4 27:7
32:14 34:8
63:15 67:22
68:7 72:2 81:7
122:19 163:13
163:25 164:12
164:14,14
174:7 180:1
193:6 203:22
204:24 205:18
287:6
addressed
34:23 35:4
78:23 81:10
83:17 196:2
199:14 205:14
205:16
addresses
76:10
addressing
34:23 169:14
169:16
adequate 108:2
108:14 285:5
adequately
287:7
adjourn
201:20 314:7
adjustments
153:15
administration
284:7 285:6
administrative
12:14 75:10,12
87:11,13 94:10

133:18
administrator
22:24
admission
45:19 47:23
49:8 50:15
221:1
admit 9:18
48:18 50:16
51:24 78:21
admitted 50:12
52:8 54:3
90:21 220:13
220:15 221:5
adv 1:4,16
advance 248:7
advantage 72:9
advantageous
152:16
adversary 3:1
3:7
adverse 151:12
adversely
138:8
advice 58:10
256:4 276:10
306:19
advised 124:23
269:2 305:8,10
advising
159:24 281:6
advisor 16:12
49:2 53:15
226:22 280:7
280:12,14
281:5

advisors 13:13
57:12 58:15
69:19 71:20
74:13 83:15
97:17,22 114:1
114:2,10,10
125:5,6 151:16
169:23 183:24
184:4 194:13
194:25 195:1
205:13,15
212:2,6,7
269:3 280:18
281:20
advisory 27:11
27:14 167:2
affairs 287:6
affect 33:23
36:10 37:7
43:1,2,7 76:25
77:7 79:13,23
104:16,17,20
123:6
affected 78:5
95:20,22 128:9
138:8 240:21
240:25
affects 29:13
135:1
affidavit 90:21
102:2 104:7,11
105:3 106:22
107:1,4 108:3
230:22
affiliate 164:3
affiliates 164:2

affirmative
310:2,4
affirmatively
47:9 310:12
afford 248:12
afraid 47:10
159:4 189:25
202:25 242:20
afternoon
88:20,21 101:3
101:10 141:3,5
212:19 218:8
218:15
agencies
153:22 166:3
169:18
agenda 176:1
agent 94:18
95:4 132:17
136:17,18
198:6
aggregate
15:11 97:15
ago 50:10
70:14 221:11
244:21
agree 51:11
70:24,25 106:5
106:7 107:17
113:1,4 124:10
124:12,16
139:4 164:13
172:9 191:22
241:1 255:14
255:15 258:11
275:25 283:18
309:7

**agreeable**
44:13
**agreed** 21:1
114:3 135:19
193:9 262:1
302:24 307:21
**agreeing** 18:8
18:8,12 232:18
263:9 292:8
**agreement**
19:7,12 40:15
44:10 45:1
125:20 141:23
155:25 157:14
157:15 197:14
197:16 242:11
281:23 302:8
303:15,21
**ahead** 24:1
52:1 53:8
56:25 60:25
90:14 100:4,17
105:21 112:16
113:14,21
115:22 117:6
124:8 135:11
149:17,18
159:15 171:18
172:9 177:7
184:19 204:11
219:19 248:21
270:2,3 279:25
293:24
**air** 120:10
244:6
**al** 1:22 3:9

**alah** 3:24 7:13
56:6,7 85:7
200:2,7
**alameda** 11:19
11:21,23 12:9
18:1 23:10
43:2 60:16
73:13 75:11
94:2 101:11
102:4 103:2,17
103:18 104:1
104:11,15,22
105:12 106:12
108:15,25
121:2 256:20
256:21 257:1,1
257:5,10,10,13
258:2 259:24
260:3 263:13
295:19,24,25
296:9,17,20,22
300:17
**alameda's**
104:12 106:22
108:4,17
**alerting** 19:3
**alexander** 6:3
**alleged** 103:18
**allegedly**
240:24
**allocate** 178:19
**allow** 14:19
22:5 90:13
114:21 122:12
155:25 177:21
200:14 202:11
202:22 203:4

203:15 204:7
305:14
**allowed** 18:10
18:14 154:23
154:24 157:8
204:1 261:22
262:4,6 283:12
**allowing**
155:10 200:19
**allows** 14:23
141:20
**alongside**
54:22
**alternative** 3:3
13:14 15:6
171:1 292:22
**ambit** 31:25
**amended** 45:16
45:19,23
242:10
**amendment**
19:7
**america** 291:3
**aml** 64:11,15
130:2
**amount** 10:24
11:5,7,8 12:11
12:13 46:17
57:9,13 63:8
70:16 71:18
74:16 75:13
79:23 80:9
81:19,25 86:15
87:14 102:12
108:20 129:9
133:10 134:6
145:10 147:2

158:11 177:19
178:1 182:18
185:22 189:18
194:7 198:21
230:11,11
242:13 275:2
276:23 284:12
291:22 293:20
293:25 294:4,6
294:6 304:22
307:22
**amounted**
233:16
**amounts** 10:12
107:8,10
158:13 247:15
283:8 307:13
308:24
**analyses** 62:3
76:8 281:17
**analysis** 16:14
59:24 61:5
62:2,21 81:22
82:7,25 83:3
84:23 90:20
142:12,14,17
153:13 189:9
190:16 196:7
210:3 274:24
290:7 292:7
**analyzed** 97:21
282:22 284:16
**analyzing**
113:24
**anchor** 174:6
**andre** 206:15
297:1,4,4,8,24

298:8,15,17,17
299:20 303:18
304:25 305:23
305:25 306:2
306:24 309:12
309:23 310:15
310:21
**angry** 121:13
121:15 122:1
**answer** 23:9
34:5 40:18
66:24 73:9,12
74:6 79:17,18
80:8 85:10
102:11 104:4,6
105:4,20
106:16 113:15
115:21 117:11
117:16,23
118:3 119:24
120:18 124:7
127:11 129:24
131:23 133:19
136:22 137:17
137:19 139:12
139:19 150:15
157:3,10,11,12
158:15 160:15
160:19 165:1,4
165:8,18
167:23 168:23
170:25 172:10
172:23,25
184:14 185:8
185:15 186:21
187:19 189:20
195:10 196:12

196:21 200:19
204:9 211:8
220:23 240:7
240:14 241:23
243:20 244:11
245:14 247:9
254:19 269:15
270:12 271:3
275:17 280:16
280:17 285:7
292:13 298:12
299:17 302:9
303:6,9,24
304:20 309:18
313:1
**answered** 88:1
117:8 125:21
132:25 134:13
160:4 172:22
187:14 192:15
211:21 258:18
302:9 303:15
**answering**
139:11,13
189:25 200:18
200:20 201:15
302:13
**answers** 51:6
85:10 139:18
164:23,23
165:22 208:9
208:11 209:2
218:1 271:3
**anthony** 53:3
**anticipate**
11:15 20:17,18
22:12 217:10

**anticipated**
314:15
**anybody** 28:6
28:9 39:22
48:19 60:5
69:23 88:6
100:25 101:2
112:10 118:6
128:22 139:19
140:9,17 141:2
154:8 159:9
188:15 199:21
200:10 202:13
206:10 212:13
221:3,19,23,25
237:7,7,24
246:15,17
248:17 271:3
279:7,18 286:6
291:3,3 310:23
313:10 314:5
**anymore** 262:6
**anyway** 116:8
118:25 212:10
243:2
**apa** 131:7
150:21 158:3,6
191:1 204:8
**apart** 17:9 42:9
227:6
**apologies** 22:3
**apologize** 60:8
86:24 89:1
119:22 184:24
**app** 136:8,19
189:22 190:7
190:15 191:9

199:25 310:16
**apparent** 24:22
**appear** 10:6
**appeared**
235:2,3
**appears** 13:12
202:7
**apples** 107:11
107:11
**applicable** 16:2
158:5 230:8
**applies** 32:7
74:10
**apply** 32:3,22
33:3 73:14
234:14
**appoint** 174:25
**appointed**
187:8 240:4
264:10,12
267:15 268:2
268:18 280:7
**appointing**
69:20 272:7
**appointment**
69:4,5
**appreciate**
109:8 155:17
248:25 249:1
262:12
**appreciated**
207:4 253:1
**appreciates**
218:6
**appreciating**
260:20

**appreciative**
155:24
**approach**
35:16 53:5
148:25 150:3
232:5
**approaching**
215:13
**appropriate**
23:13 59:21
60:24 68:6
85:16 97:17
190:25 203:18
220:24 296:20
313:22
**appropriately**
170:4 177:14
**approval** 18:6
19:19 83:15
84:5,12 242:14
**approvals** 18:2
93:23
**approve** 10:22
**approved** 21:3
40:15 83:11,12
84:22,25 85:2
92:8 95:18
111:24 173:3
197:16 276:9
**approves** 83:24
**approving**
256:7
**approximately**
10:25 11:4,6,8
12:22,24 13:22
15:12 103:16
105:14 186:23

206:24 208:25
227:12 230:5
232:12 305:13
**approximation**
86:23
**april** 54:8
79:10 81:2,15
146:19,24
284:23
**area** 34:6,8
285:18
**arguably** 33:22
266:5
**argue** 51:19
85:10 168:14
175:14
**argued** 26:23
37:23
**arguing** 66:11
66:14 193:20
**argument** 9:15
9:21 27:6
28:15 31:18,20
33:1 39:9 42:4
56:13,19 66:7
66:17 109:6,18
119:19 127:11
156:18,20
157:22 167:5
168:11 175:16
199:2
**arguments**
17:20 28:17
37:23 65:19
94:24 123:10
157:21 164:24
167:12

**arising** 225:10
**army** 49:15
51:7
**arps** 222:18
**arrangement**
198:20
**arrangements**
37:21 314:17
315:1
**arrows** 257:2
258:8 282:3
283:21 284:19
298:22,23,25
300:6,15,19
307:13,18
**article** 205:2,5
239:13 313:3
**articulated**
291:2
**artwork** 244:5
244:6
**ascribed**
192:18
**aside** 73:17,20
73:25 74:5,5,8
74:11,14,15
180:23 191:7,7
**asked** 29:18
37:19 113:9
117:15 132:23
133:15 134:13
159:10 163:10
170:12,18
187:14 200:8
200:17 214:8
217:25 219:13
223:5,7,20,25

230:18 245:11
258:18 271:7
294:22 296:19
297:18,19
298:5,13,16
**asking** 17:8,9
27:14,15 28:10
28:12,17 50:23
59:14 70:20
79:20 80:1,2
84:1,2 102:16
102:18 103:4,6
120:17 136:24
143:16 144:24
146:14 161:19
162:11 164:17
170:11 177:6
190:9 193:20
193:21 196:14
196:16 200:11
200:22 203:9
203:10 207:21
207:22 226:15
229:16 249:10
256:25 258:22
261:15 265:7
272:4 278:13
295:12,13
296:3 298:21
309:20 312:24
**asks** 310:16
**aspect** 152:16
**aspects** 28:13
41:2
**assert** 266:23
**asserted** 75:11
94:10 103:3

170:12 240:22
**asserting**
103:20
**assess** 82:22,23
291:15
**asset** 19:7
24:19 31:24
40:15 58:7
64:19 70:7
298:25 309:22
309:25
**assets** 13:18
14:3 26:7
37:25 54:7,18
61:12,17 62:5
64:23 67:21
91:7 115:9
116:10 124:24
126:16 129:20
131:17,18
132:11 148:15
149:8,14
150:11,23
160:9,9 177:22
186:6 193:4
204:23 206:2
208:16,17
209:21 210:8
210:15 211:12
216:21 230:19
231:12 232:19
237:10 239:2
244:12,14
245:4,11
247:13 248:11
251:13,22
257:13 261:16

274:20 286:12
287:2,9 290:10
292:4,9 301:11
301:13 303:16
304:2,18,20,22
304:23 306:17
306:20,22
307:4 309:2
311:7 312:16
312:19
**assignment**
187:23 278:16
**assignments**
276:24
**assist** 280:13
**assistance**
225:4 315:4
**associate**
222:17
**associated**
98:25 99:1
174:16 234:9
**associates**
86:19
**assume** 40:2,3
71:1 76:8
106:12 175:15
216:22 264:16
275:18,23
279:2
**assumed** 81:14
**assumes** 110:5
112:2 117:25
170:24 196:11
204:25
**assuming**
104:15 145:5

146:4 163:5
241:9 296:14
**assumption**
76:4 82:2
115:8,10
**assumptions**
76:7 98:2
115:6 147:12
**assurances**
159:3 217:15
**assure** 241:17
**atlanta** 4:14
**attach** 136:9
**attached** 91:16
91:18
**attachment**
48:13
**attain** 89:23
**attempt** 218:23
**attempted**
166:5
**attendant**
26:22 27:9
**attention**
110:18 311:25
**attorney** 5:8
35:8 43:21,25
90:18 119:17
119:22 166:4
166:14 169:19
170:6,12
193:19 222:16
224:6
**attorneys** 4:4
4:12,19 5:2,9
5:17 6:2,9,16
60:4

**attract** 255:3
**attributed**
251:19
**attributes** 23:3
26:9
**auction** 125:17
172:14,20
**auctioning**
124:24
**audited** 167:21
**auditors**
167:19,22,24
168:6,9
**august** 227:13
**austin** 5:12
**authorities**
155:9 159:1
**authority**
38:12 265:24
268:11,13,16
270:18 288:9
288:20
**authorization**
155:6
**authorized**
150:17,18
**automated**
161:17,21
**automatic** 3:3
**automatically**
32:22
**availability**
218:22
**available** 14:2
45:15 49:6
109:14 135:4
137:3,4 169:19

220:16,23
226:22 228:22
230:8 244:12
245:14 247:17
275:3 291:25
304:3 308:16
**availed**  226:25
227:5 280:17
**avenue**  4:5
6:10,17
**average**  96:2,4
186:8,9,10,17
186:23,24
**avoid**  80:12
150:4
**avoidable**
234:25 235:17
**avoidance**
279:12
**avoiding**
295:10
**aware**  44:13
57:24 63:11
101:11 110:2
111:23 141:16
141:23 142:4
164:6 169:5,9
184:11 205:2
233:10 239:9
249:12,13
260:19 262:1
272:4,8 293:18
295:16 297:20
311:10
**awful**  51:14
92:14 119:16

**b**

**b**  2:21 105:12
**back**  15:22
17:21 24:4
54:18 58:20
69:11,13 86:3
86:6 93:21
94:10 108:25
109:2,3 114:16
114:19 116:8
121:17 124:4
124:15 131:20
156:9 158:16
161:5 167:18
177:22 178:21
179:3,8 197:4
197:8,11
210:11 211:6
216:15 231:4
239:3 243:19
244:5,24
249:16 254:11
258:3,5 261:8
261:10,11
262:9,19 275:5
276:6,7,12
286:13 294:12
294:14 302:17
304:13 306:3
314:17
**background**
90:23 222:14
297:24
**backs**  196:17
265:17
**backup**  117:14
117:15,18

118:6 124:5,10
124:12,16,20
171:21,23,23
172:3,5,11,13
172:15,21
173:2,3,12
175:17 176:4,6
204:7
**backwards**
122:20
**bad**  40:3,4,4
69:6,7 108:9
154:2 236:20
254:1 258:15
263:7
**balance**  80:18
121:18 212:5
225:16 313:18
**balances**  91:5
115:14
**ball**  87:2
**ballot**  46:5
310:13
**ballpark**  247:6
**bam**  13:19
213:12,19,22
**bank**  15:10
54:23 68:16
99:19 100:8
244:15,17
247:14 248:2
258:15 302:11
302:16,17
304:10,12
**banker**  167:1
183:23 222:22
278:20

**banking**  5:10
44:2 111:19,25
168:18 281:7
**bankrupt**
127:3 132:22
196:9,15
197:10 286:21
**bankruptcies**
100:20
**bankruptcy**
1:1 2:1,23 19:2
25:17,19 26:15
32:3 38:25
42:23 46:11,19
47:12 51:16
52:9 53:18
60:15 64:25
67:22 75:9,13
100:10 115:9
115:15 116:4
116:12 121:3
127:6,7,23
175:10 196:23
197:2 198:7
230:1,2 239:16
241:12,18
243:11,18
244:1 245:8,16
251:24 252:5
254:16 255:3
259:23 260:14
263:20 264:2,4
264:8 266:13
267:2,5 272:5
272:16 275:7
278:8 284:8,15
284:20,23

285:6 286:17
286:19 287:4
290:8 292:2
295:21 296:6
296:11 308:21
**bar**   23:14 99:5
**barely**   277:8
**barred**   201:21
202:2,9,10
**base**   98:9,19
154:20 178:19
**based**   11:12
21:10,13 30:5
51:19 54:2
55:6,9 57:6,20
58:10 61:19
63:8 77:23
78:4 85:3,13
86:15 98:1
99:15 102:3
114:7,12
123:10 142:23
143:24 147:14
175:9 209:1
211:2 213:22
216:2 219:4
236:17 259:14
266:16,22
282:22 292:18
295:7 296:5
306:19
**bases**   140:11
**basic**   101:11
107:6
**basically**   42:1
45:24 133:1
188:4 210:9

251:12,24
255:8 297:9
307:21 309:16
313:4
**basis**   63:7
65:20 66:18
93:1,9 97:24
98:1 99:17
145:6 152:14
152:16 158:14
185:23 198:15
210:2,6,6
215:17 245:2
250:18 290:2
295:1,13
303:13
**basket**   233:22
234:18 235:7
272:14
**bear**   148:21
**bearing**   121:7
121:14 173:24
**beating**   175:16
**beginning**
53:17 55:15
72:17 143:25
150:14 173:4
175:25 227:3
243:15
**begins**   277:18
**begun**   94:8
**behalf**   9:4,7
24:7 44:1
88:14 218:16
219:23 245:23
252:16 314:13

**belief**   114:7
125:12 181:9
236:12 237:19
**beliefs**   162:1
**believe**   10:11
11:25 12:13
14:1 15:8
19:22,23 23:11
23:14 26:7
28:19 29:9
32:7,17 33:5,8
33:9 35:3 41:5
41:10 42:20
43:1,3,7 55:6
57:20 58:2,21
59:11,15 62:4
62:9 64:4
66:16,19 68:6
68:22 69:1,5
69:11,14 79:7
80:15 86:8,10
86:11,14 89:19
91:18,21 99:2
99:13 107:22
108:2,14,18
110:17 114:13
125:11 127:22
129:25 131:9
131:10 132:2,4
132:7 143:9
144:15 145:2
146:7,17 147:1
155:7 156:15
160:8,21 161:3
161:4,17,18
164:4,7 167:6
170:1 171:3,9

171:13 172:14
174:10,11
175:23 177:23
177:25 178:1
181:19,20
191:5,8 193:14
194:10,14
195:15,17
196:6 197:23
199:14 205:17
205:21,23
206:23 208:19
212:2 213:6,6
213:16 214:5
217:8 232:23
233:5 238:17
242:9 243:20
246:4 249:3
253:25 259:16
261:22 271:17
272:8,11 280:6
289:6 299:10
299:11,11
301:6
**believed**   114:4
203:18 253:23
257:2,3 260:7
260:21 300:15
306:11
**believers**   261:1
**believes**   41:12
**belonged**
266:18
**belonging**
265:4,5
**bending**
122:20

**beneficial**
105:18 172:2
237:16
**benefit** 18:15
18:25 75:6
138:1 152:10
229:2 230:10
234:10,25
253:2 255:9
263:16 273:6
273:10 274:12
274:24 276:2
282:13 292:20
**benefits** 152:4
234:19
**berkeley** 16:11
**best** 13:20 15:1
15:5,6 16:2
53:25 55:20
58:3 59:24
60:3,14 61:1,4
62:15 65:1,4
66:13 68:15
84:21 109:24
127:8,21
135:23 151:18
151:23,24
160:1 163:18
168:8 169:24
170:21 171:7
171:13 172:12
176:15 205:14
210:23 228:25
229:3 235:24
237:11,12
253:3 285:7
290:24 291:15

**bet** 185:12
**better** 20:18
39:5 40:7
55:14 60:13
77:4 104:9
134:4,10 136:2
136:13,24,25
137:20 140:12
142:13 145:16
145:18 151:25
152:1 154:25
164:5 167:18
171:1 195:18
227:2 286:16
291:22 292:21
299:16,17
307:22,25
**beyond** 172:4
180:14 232:19
280:16 281:2
**biance.us**
13:20
**bias** 10:9,12,16
**bid** 13:19
55:22 118:14
172:12,17
174:14 176:15
203:11 210:22
**bidded** 118:13
**bidder** 116:20
117:14,15,18
118:6 119:3
124:5,10,12,16
124:18,20,21
125:3 171:23
171:24 172:13
172:16,21

173:1,2,3,12
175:17 176:4,6
**bidders** 118:16
118:20,25
119:2 171:24
172:3,4,5,10
172:11,20
173:1
**bidding** 55:16
116:15,17
117:21 118:8
171:21 173:3
174:3
**big** 189:5
192:12 249:8
256:22 259:7
**bigger** 292:14
**biggest** 184:2
**billion** 12:18
12:24 13:23,23
91:7,9 94:13
183:3,7 186:10
187:6 209:19
242:17 263:19
263:22,24
301:11,13
**billions** 299:1
**binance** 20:17
21:1,25 22:4
25:8 30:6,12
33:10,13,21
34:8,9 35:17
37:6 38:1
39:15,16 41:1
44:3 54:11,20
54:21,25 55:7
55:10 57:6

59:3 61:21
63:24,25 64:1
67:6 68:9,9
75:16,17,18,18
76:22 77:1,3,9
77:18 82:15
86:13,16 87:17
89:6 90:1 91:8
92:16,18,21,23
93:19 94:3,5
94:13,14 95:1
98:7,12 102:6
104:25 106:2
107:13 108:19
108:21 109:23
109:25 110:8
110:21 111:5,6
111:7,8,14,17
111:24 114:15
117:3 119:2,3
119:4,6,8
124:5,12,16,22
126:14,18,24
127:2,6,6,17
127:22,24
128:9 129:20
129:23 130:1,4
130:6,9,18,24
130:24 131:18
131:19,21
132:2,11,13,16
132:17 133:5,8
133:16 134:4,8
134:10,18,21
134:24 135:20
136:14,17,25
137:3,13 138:2

138:9,21
140:12 141:13
141:16,19,20
141:25 143:10
143:19 144:1,7
144:17,19,22
144:25 145:9
146:3,7,8,9,13
146:15,18,20
146:21 148:8
148:25 149:24
149:25 150:12
150:14 151:19
154:22 155:6
155:10,13
156:5,15 157:1
157:7,8,9,14
160:1,3,5
162:1,11,12,13
162:14,15,19
163:3,4,5,8
164:3,8 165:16
166:3,5,9
167:18,22
168:7,18,19,20
168:25 169:5
169:23 170:13
170:19,20
171:1,3,4,6,13
171:22 172:4
176:15,19,22
177:9 178:10
180:4 190:17
191:10 192:5
193:25 194:2,3
194:5,20,24
195:18,21,24

196:4,6,8,15
196:18,21,22
196:23 197:5,5
197:9,9,10,11
197:17,22,25
198:2,4,5,7,14
199:12,15,25
200:1,5 204:23
205:3,10,12,19
205:25 206:20
206:23 207:22
208:5 210:8,10
210:15,23
211:7,12,14,16
211:22 212:20
212:22 213:3,4
213:5,9,9,13
213:19,23
214:1,2,2,3,5,9
214:12,17,21
214:21,25
215:1,4,15,18
215:20,25
216:3,10,21,25
**binance's**
37:21 64:19,21
119:6 197:19
**binance.us**
12:21,23 14:6
14:8,11,18
15:21 20:3
21:1 22:10
38:1 54:7
58:18 62:25
64:10 89:13,16
89:22 90:4
110:4

**binance.us.**
13:25
**binding**   278:5
310:6
**biometric**
142:7,10
**bit**   20:18 62:5
79:10 99:7
102:15 108:23
231:21 250:19
262:12 308:13
313:13
**bitcoin**   70:9,17
91:19,21 96:8
96:22 97:11
149:15,19
181:11,25
182:18 183:10
256:20 277:8
**blew**   258:14
261:6 284:20
285:15
**blockchain**
244:15,16
**blocked**   239:5
**blocks**   70:19
**blood**   256:9
**bloodbath**
191:12 192:11
**blowing**   260:3
**board**   5:10
16:24 44:1
111:19,25
223:17,25
224:4,11,13
244:8 255:24
267:15,16,17

267:18,21,22
267:24 268:1,3
268:6,12,16,19
268:21,23
269:2,6,8,16
269:21 270:2,4
270:7,18,19,20
270:20,22,24
271:2,4,8,9,10
271:14,21,23
272:7 276:8,13
277:5,6 278:21
**boards**   222:25
223:2 272:6
277:4
**boat**   197:21
**bodies**   25:16
153:18 195:14
**body**   25:1
30:18 36:19
**bonus**   229:25
230:2,4,9
238:12,17
**books**   211:23
211:24 212:3
213:20 298:11
300:23
**booted**   161:22
**borrow**   262:3
262:4,6
**borrowed**
262:4,7
**borrower**
103:1
**bottom**   179:6
**bought**   92:21
178:14,22

179:1 238:7
243:25 245:7
**bound** 310:7
**bowling** 2:2
5:3
**box** 310:13
**brain** 162:7
**breach** 236:16
236:23 253:19
254:2 266:8
282:7,9 284:13
**breached**
285:20
**breaches** 228:4
**break** 77:16
79:5 113:8,9
159:7,8 161:6
161:9
**brg** 53:16 57:9
71:19 159:24
194:12 226:24
280:18
**brian** 16:18
**briefed** 32:20
33:4,6,7
**briefly** 43:22
216:9 219:10
221:9 222:13
**bring** 42:10
110:18 267:7
**bringing** 88:25
183:12
**broad** 72:19
**broader**
160:24,25
**broke** 250:19

**broken** 91:3
**broker** 30:13
33:11,13,15,23
**brought**
110:20 152:20
265:25 274:22
290:5 292:24
307:18
**bruh** 6:6 90:10
90:10,15,17,18
95:15 100:4,5
100:6,9,13,16
100:18,23
**brunt** 148:21
**brush** 72:19
**btt** 185:13
**btx** 189:8
**buck** 288:18
**bucket** 304:9
304:10
**buckets** 304:8
**buffett** 287:10
287:22
**bulk** 215:10
254:22
**bunch** 298:3
311:4
**burden** 26:20
29:11 30:23
38:8,16
**business** 14:25
16:8 78:1
123:14,20
125:2 127:23
198:16 222:15
230:3 236:19
237:11,17

257:5,7 258:1
258:4,6,9
259:9 260:6,6
260:22 263:14
273:20 278:25
279:15 280:15
281:18 282:5
282:23 285:21
285:24,25
286:1,5 287:15
287:17 289:2
290:23 292:17
293:17 299:15
300:13,16,19
301:12,14
**buy** 116:13,18
121:20 151:3
178:18 179:21
182:20 294:5
**buyer** 152:5
**buyers** 40:3
**buying** 94:15
95:1,4

**c**

**c** 4:1 5:6 9:1
317:1,1
**calandra** 6:20
245:22,23
246:1,9
**calculate** 107:7
107:9
**calculated**
21:18 232:12
307:6,8
**calculation**
107:13,15
153:16 293:3

293:15
**california**
157:19
**call** 49:2 60:14
61:16 116:22
120:8 129:10
161:4 164:17
218:19 219:24
226:9 249:16
278:21 285:23
306:2
**called** 176:15
181:24 223:20
233:23 252:15
288:15 298:24
313:6
**calling** 50:13
**calls** 151:19
252:7 297:17
299:25 300:3
**calm** 122:3
123:1 263:17
**canadian** 296:8
**canceled**
295:20 296:6
**cap** 70:11
182:18,24
183:7,11,15
184:2 185:12
189:19 256:17
**capabilities**
213:19
**capability**
138:22,23
**capable** 123:23
139:11,13

**capacity** 194:8
198:6
**capital** 224:24
239:12,20
282:3 283:21
300:16
**capitalized**
251:20 262:22
300:25
**caps** 183:10
**cardinal** 122:9
**care** 228:4
236:17,23
284:13 299:12
**careful** 189:16
**carelessly**
266:7
**carrier** 234:8
273:7 291:25
295:12
**carriers** 283:1
283:3
**carveout**
272:15
**case** 1:3,4,16
10:15 17:17
34:9 35:15
36:14 50:2
54:15 56:23,23
61:1 66:1
67:22 71:1
76:14 97:25
100:12 127:2
132:18 143:4
150:17 158:20
208:7,8,21
226:2 227:3

242:20 249:7
254:20 259:25
261:9 265:2,4
279:4 287:23
**cases** 13:5,9
14:20 105:14
148:17
**cash** 13:16
41:19 74:5,8
75:16,20,25
76:5,9 77:6
81:8,18 86:18
86:20,25 87:6
87:8,9,12,22
89:17 90:25
93:20,25 94:1
94:20 99:14,16
130:7 131:19
133:20,22,23
136:11,12,21
145:12 146:5
146:15 147:23
147:24 148:4
148:11 149:12
151:12 152:23
153:6 156:6
180:24 182:11
188:1 191:25
306:12 308:25
309:1,2,9
**cashed** 131:13
131:14 132:5
155:4
**catastrophic**
13:10
**categories**
305:21

**cause** 175:21
235:19,20
253:19 254:2
289:17,22
**caused** 174:20
181:21 302:1,2
307:18
**causes** 225:5,8
225:8,9,10
228:2,10,11,13
228:13,14
233:4 235:21
260:18 263:20
265:16 268:8
273:25 274:9
**caution** 247:7
**cede** 188:14
279:6
**celsius** 39:24
116:25 119:8,8
239:5
**cents** 21:24
22:2
**ceo** 239:22
278:8 281:10
288:1,5,19
289:9 290:10
294:8
**certain** 3:4
14:9,13 42:12
46:12 85:3
107:8 126:17
138:12 148:14
150:18 177:25
198:21 208:23
242:12 273:25
296:7 297:18

298:5
**certainly** 52:6
74:16 80:11
148:21 158:12
169:7 209:23
219:16,17
227:7 236:21
247:16 257:2
260:5,9 262:1
264:11 279:2
281:16 282:21
295:17
**certified** 317:3
**cetera** 42:16
153:13 196:18
**cfius** 25:14
29:20 30:2,4
83:24 84:2,5
84:12,18
**chain** 264:3
286:20
**chairman**
267:24,25
269:9,16 270:2
270:4,20,22,24
271:2 272:7
276:13
**challenge** 30:8
30:12 176:23
**challenges**
262:12
**challenging**
98:4 178:20
191:23
**chamber** 315:3
**chance** 56:18
65:25 122:19

185:8 200:9
221:10 269:22
**change** 23:4
109:19 123:6
139:14 145:4
173:16,17
174:5 284:11
**changed** 22:23
197:23
**changes** 22:21
23:2 60:17
221:13
**chapter** 9:7
13:7 14:20
16:5 60:18
61:8 62:10,14
65:5 68:24
71:1,2,17
76:14 77:4
80:25 81:1,7
81:10,13,14
82:6 90:20
97:24 98:5,6
98:23,23 99:9
99:10,11,16
100:12,20
104:8,16,17,20
105:13,16,17
106:13 107:15
108:2,8,24
114:23,24,24
127:4 148:4,7
149:1,7 153:8
181:5 188:9,9
207:23
**characterize**
152:13 272:23

**characterized**
273:2
**charge** 116:25
293:11
**charged** 27:23
38:11 116:6
223:22 225:7
264:21
**charges** 47:2
116:7
**charging** 117:1
293:13
**chart** 184:13
184:15,17
207:19
**check** 21:9
64:14 131:6,7
131:16,20,21
132:7,10
269:23,24,25
**checked**
167:13 213:6
216:15 310:12
**checks** 115:14
212:5
**chief** 251:19
**choose** 105:24
136:11 215:4
**chooses** 89:16
**chosen** 165:17
**christine** 4:8
9:3
**circuit** 18:24
**circumstance**
76:25
**circumstances**
14:10 34:16

89:22 196:15
237:20 285:17
286:17 308:9
**cited** 32:19
**citizens** 44:4
203:22
**city** 163:4
**ckb** 185:14
**claim** 3:18
12:14 21:19
73:7 75:11,12
75:14 94:11
101:12,14
103:17,19
104:1 106:12
106:18,23
107:2,10
108:15,16
133:11 186:22
192:8 235:12
240:23 241:16
247:2 248:9
254:3 255:20
261:22 265:4,5
266:3,24 273:3
273:12,13
282:6,7,10,11
282:13 290:1,2
294:17 295:9
301:3
**claiming** 25:21
242:19
**claims** 11:6,7,9
11:18,19 12:8
12:25 15:11
18:9,12,15
19:8 21:9 23:6

47:8 75:10
87:13 89:16,24
102:14 103:14
103:15 154:21
181:1 185:22
196:8,18 208:5
228:4 231:5,7
231:7 232:3,18
232:22,23
233:5,6 234:13
236:17 237:3
240:2,6,21,22
240:23 241:3,3
241:21 242:17
242:21,22,25
243:3,4,6,7
246:5 252:16
252:21 259:13
259:16 264:23
264:25 266:6
266:16,18,22
266:23,25
267:6 273:25
274:2,18,22,25
275:3,20
282:19 283:13
283:18 289:8
289:11 290:4,8
291:1 295:11
299:11 301:4
307:11,14
308:2 310:9,11
**clarification**
59:23 60:23
180:17 261:15
264:6 267:12
273:15 314:1,3

**clarifications**
17:24 23:18
**clarified**
161:22 170:6
279:13
**clarify** 9:24
44:9 147:11
158:3 166:15
171:24 204:15
207:20 246:3
253:5 263:5
281:22 305:10
**clarifying**
280:4 281:11
294:7
**class** 18:18,19
46:18 58:7
63:9 70:8
142:25 174:14
226:1
**classes** 10:22
15:5 175:8
**claw** 196:17
197:3,8,11
244:5 265:17
**clawback**
121:1,2
**clawed** 243:19
244:24
**clean** 96:15
**clear** 19:8
47:12 52:5
56:8 63:17
76:20 105:2
143:14 169:7
177:20 178:7
197:16,24

211:9 246:6
252:14 299:16
304:6,7
**clearcut**
299:14
**cleared** 41:21
**clearly** 145:14
202:25
**clerk** 161:3
188:17
**client** 178:19
**clients** 99:8
**close** 35:17,20
36:10 54:11
213:24 247:16
247:17 257:16
276:24
**closed** 29:25
30:1 37:7 84:6
218:1
**closes** 36:16
**closing** 22:15
37:15 78:1
79:6,8,24 80:2
80:7,19,21
84:12 89:18,24
194:18
**closure** 93:18
**code** 32:3
34:22 42:23
46:11,19 47:13
51:16,23 52:10
60:15 75:9,13
100:10 157:19
175:10 178:18
**cognizable**
228:4,10,14

289:7
**cognizant**
228:20
**coin** 28:13,16
78:6 80:13
91:5,12 96:5,7
97:15,20
140:16 181:10
181:12,18,23
182:1,2,5,10
**coinbase**
114:25
**coins** 14:7
19:22,23 20:23
21:14,22 27:3
28:17 61:13
62:7,8 64:4
68:12 70:12,15
70:23 71:2
72:1,2,3 74:5,7
74:9,17,19,20
75:15 76:13,15
76:22 77:10,12
77:18 79:5,13
79:13,22,23,24
81:2,9,15,17
81:22,24 82:14
86:3,6 92:1
96:11 126:18
135:20,21
136:4,6,20
137:2,9,15,25
138:2,3,5,8,11
138:12,18,25
139:15 140:11
140:16,18
150:24 151:2,3

151:19 153:4,7
155:3 156:1,6
156:9 178:11
178:12,14,18
178:21,24
179:2,17,21,25
180:4,5,21,22
182:9,11,19,20
182:20 183:9
183:14,18,18
184:8 191:16
206:1,2 208:14
208:17,18
209:5,13,15,25
**collaborating**
169:17
**collaborative**
69:18
**collapse** 13:10
13:11 181:10
181:13,16,19
182:1,16 183:6
183:19,20
186:14,25
249:14
**collapsing**
181:5
**collateral**
12:11 184:1
**colleague** 24:8
32:13
**collect** 100:10
**collective**
244:9
**colloquialism**
285:16

**colorable**
237:3,4 283:13
295:9
**comb** 308:24
**combat** 190:22
192:13
**combination**
272:21
**combined** 9:13
300:20
**come** 25:8,18
27:24 28:1
31:11 37:8
38:11 47:2
145:10 155:25
172:15 194:21
223:17 243:6
277:24 296:22
**comfort** 297:22
**comfortable**
57:5,8 63:16
212:4 213:23
273:24
**coming** 145:4
158:13 181:21
205:7 229:15
250:15 263:9
293:23 304:13
313:4
**comingled**
160:11,25
**comingles**
160:5
**comingling**
64:22 162:9
164:2,11,18
165:9,11 213:1

**commencing**
13:9
**comment**
42:11 308:10
**comments**
17:22 141:7
164:22 165:2
165:21
**commission**
4:11,12,18,19
24:8 32:17
70:4 79:2
314:14
**commissions**
244:7
**committed**
225:13 240:24
**committee**
3:17,20 6:9,16
11:2 16:24,25
41:10,25 54:10
57:16 69:18
74:12 114:1,9
115:18 125:5
151:16 183:24
191:5 195:1
212:6,15
218:18 223:15
223:22 224:1
224:20,23
225:12,17
226:5,21 228:1
228:7 237:20
240:3 241:21
242:3 245:24
259:12 267:22
268:10,19

277:18,20
280:8 288:15
297:9 305:11
307:20
**committee's**
17:1 220:18
227:9 280:6
285:1 305:11
**committing**
201:19
**commodity**
193:5
**common** 70:11
255:5 269:1
**communicati...**
163:12 250:5
251:4
**communicati...**
240:17,17
250:13,23
264:16
**community**
304:2,6
**companies**
55:18 116:18
118:17 119:4
222:25 223:2,3
223:3 256:14
286:17 293:9
293:13 298:7
312:14,21
**company** 12:20
13:3 16:18
53:17 54:10,23
58:15,22 59:4
65:12 67:4
68:20,22 74:12

93:21,21
102:18,19
103:2,3,4,5,7,7
114:2,10,24
115:16 116:10
116:11,13
125:5 158:1
159:24 162:18
162:18 163:2,6
163:7,8,12
167:20 168:20
169:22 170:3
180:9,22
189:20 194:3
194:13,15
196:7 203:14
205:12 211:25
212:2 223:5,8
224:25 226:18
231:4 233:15
233:18,21,25
234:2,3,24
235:4,8,13
236:13 238:11
239:1,7,23,25
243:13 248:9
251:20 252:17
252:21 255:3
255:16,19
257:6 259:13
261:2 262:21
267:19,23
268:21,23
269:2,5,6,9,16
269:21 270:11
270:14 271:8
271:14,23,25

272:6 273:10
274:9 281:13
281:16 284:23
285:19,21
286:8,11
289:22 295:3
297:20 300:18
301:10 302:2
307:18
**company's**
125:6 225:2,2
225:16 228:5
236:4 254:20
281:14 289:13
289:15 297:10
297:11 298:11
300:23
**compare**
185:18
**compared**
309:3
**comparison**
107:12 147:6
**comparisons**
214:16
**compensate**
14:11 270:18
270:20
**compensated**
270:21
**compensates**
270:6
**compensation**
276:14
**competence**
175:22

**complaining**
15:20
**complaint**
120:10
**complaints**
119:19 123:5
**complement**
255:1
**complete**
226:23
**completed**
194:21
**completely**
106:7 117:10
125:6 196:21
225:19 259:25
260:7 263:15
276:20 277:9
**complex**  15:3
17:17 24:21
26:11
**complexity**
178:17 231:21
**compliance**
51:15,22 52:9
150:20 169:10
**compliant**
26:14,15
**complicated**
61:19 62:6
67:14 68:3,25
140:15 143:3
229:21 232:15
**complies**  27:12
**comply**  28:9
75:12 83:18
116:1 130:1

170:19
**component**
141:23
**compound**
113:5
**comprehensive**
97:18
**comprised**
13:23
**concept**  70:20
268:1
**conceptual**
20:7
**conceptually**
288:25 293:16
**concern**  70:16
95:16 135:21
148:19 192:2
**concerned**
39:21 40:5
64:6 67:20
99:8 176:21
**concerning**
43:6 163:15
168:6
**concerns**  38:13
40:1 110:18
166:3 170:17
171:12 194:25
204:24 205:8
**concert**  151:15
**conclude**  107:8
161:5
**concluded**
228:15 236:5
306:19 315:6

**concluding**
228:12
**conclusion**
65:18 194:22
228:1,3,8,10
237:21 252:7
263:9 264:13
274:21 295:5
**conclusions**
17:1 259:13
280:10
**condition**
266:2 267:8
**conditional**
15:21
**conditions**  18:3
142:4,19
152:22 288:23
**conduct**  33:20
122:17,17
141:14 201:23
224:17 225:18
290:7 297:16
**conducted**
141:24 212:20
226:17,18,19
236:3 288:13
298:5 300:9
**conducting**
223:22,23
280:5
**confer**  219:7
**conference**
3:11
**confidence**
284:6,12 285:1

**confidentiality**
247:8 302:8
303:13,14,21
**confirm** 36:15
63:2 126:13,20
132:8 173:18
189:12 314:25
**confirmable**
26:20
**confirmation**
9:7,11,19
15:14 16:12
18:4 23:14
29:15,15 34:22
37:2 38:17
40:17 44:16,17
44:21 51:22
175:7,9 220:21
**confirmatory**
194:9
**confirmed** 15:7
36:16 42:19
59:12,16 164:4
175:13
**confirming**
35:19
**conflict** 104:7
**confuse** 305:2
**confused** 107:6
136:7 154:5
179:6 206:5
265:13,18
**confusion**
92:15 240:20
**congratulating**
162:24

**congress** 47:11
114:4
**connecticut**
305:1,2,4
308:17
**connecting**
75:1
**connection**
12:12 73:17
79:22 212:22
213:17 272:13
**connections**
223:13
**consensual**
18:7
**consensually**
15:3
**consensus**
224:14
**consequences**
33:19 34:2,3
34:10 151:13
**conservative**
215:13
**consider** 19:25
175:10 224:19
226:3 230:17
304:1
**consideration**
13:25 94:20
152:19 193:3
210:21 252:10
**considerations**
141:13
**considered**
19:15 46:9
61:23 124:5

197:19 198:4
252:16 306:13
**consistent**
50:10 190:25
260:20 289:13
311:10
**constantly**
134:5
**constituent**
225:25
**constituents**
195:15
**constitute** 27:3
**constraint**
74:14
**constraints**
70:6,8 71:7,21
74:9,24 81:12
81:19
**construct**
86:16 115:24
171:9,9 205:18
211:5
**constructs**
67:10
**construed**
275:24
**consult** 225:12
**consultation**
71:20 113:25
115:17
**consulting**
57:13 184:16
**consumers**
157:19
**consummate**
14:12

**consummated**
58:17
**consummation**
29:22
**consummati...**
14:21
**cont** 262:17
**contained**
211:20
**contemplate**
19:20 142:15
**contemplated**
18:2 24:12
26:15,22 32:3
33:12 54:5,6
178:25
**contemplates**
144:9
**contemplating**
33:24
**contemptuous**
201:23
**contention**
28:6 147:17
**contested**
51:17 52:10
53:20
**context** 33:22
38:16 68:16
146:1 154:2
286:15
**continent**
73:11
**contingencies**
54:16
**contingency**
137:1

**continuation**
49:12
**continue** 19:16
37:2,3 44:7,24
93:7 123:12
145:3,4 196:1
201:25 218:12
219:11 231:8
**continues** 50:6
153:21
**continuing**
44:2,6,12
**contracts** 22:7
22:12
**contractual**
234:7
**contradicted**
118:23
**contrary** 30:19
66:16 199:10
202:22 260:23
**contrast** 41:14
42:2
**contribute**
18:18
**contributed**
18:15
**contributing**
232:11,20
247:2
**contribution**
229:4
**control** 39:15
47:12
**controllable**
253:24

**controls** 37:21
38:2 164:6
166:6,9
**conventional**
298:23
**conversations**
171:21 226:16
227:8
**conversion**
69:15 95:17
98:22
**convert** 58:18
81:5,6,18
82:18 96:12
131:19 148:7
149:12 188:1
**converted**
75:20 76:5,8
92:9,10 97:25
148:3
**conveyance**
235:12 273:3
294:17
**coo** 281:10
288:1 289:9
290:11
**cooperate**
169:24
**cooperative**
225:19,22,23
**coordinated**
193:8,11
**coordination**
205:15
**copy** 72:14
184:21

**core** 258:6
**corporation**
213:15,16
**correct** 19:10
19:11 21:11,15
23:1 42:20
45:17 71:5,6,8
71:9 75:16,22
76:15 78:7,9
79:6 80:19
81:3 84:14
88:21,24 89:5
89:9,13,18,24
92:21 95:3,10
95:13 99:20
110:16 115:8
130:19 131:1
132:13 133:9
142:7,16
144:23 150:13
158:2 171:14
177:24 179:10
186:19 189:13
189:14 196:16
196:17 198:2
203:11 204:12
207:11,12
210:11 212:20
214:7 215:16
215:19 232:20
241:2,6 246:8
266:9 269:5
270:7 272:19
281:3 286:2,24
288:3 293:6,13
293:14 295:15
310:20

**correction**
216:17
**correctly** 10:8
82:8 88:22
89:3 203:19
210:14 242:10
249:5 307:15
312:23
**correlate**
250:11
**correspond**
245:16
**corresponde...**
238:10,23
**cost** 69:1 95:23
96:9,16 99:1
133:18 139:25
235:4 274:24
275:8
**costs** 16:15
87:11,11 98:25
231:16 248:7
254:25
**couched** 35:8
**coughing**
171:17
**counsel** 41:18
43:4 50:7
54:25 55:25
58:11 83:1
84:7 85:17
88:11 98:1
106:12 132:14
166:19 212:15
219:7 220:8
223:4 224:18
225:4 226:8

| | | | |
|---|---|---|---|
| 236:22 242:6 | 12:1,3,7,10,15 | 65:10,13,16 | 120:19 121:6 |
| 247:9 249:1,25 | 17:9,23 18:17 | 66:14,16,20,22 | 121:11,22,24 |
| 250:4,21 251:2 | 18:24 19:6,16 | 67:1,25 68:18 | 122:5,7,11,14 |
| 256:4 276:10 | 20:10,20 21:8 | 69:23 72:23 | 122:23 123:15 |
| 281:2 305:10 | 21:12,16,23,25 | 73:6,9 75:8,23 | 123:17,19,20 |
| **counsel's**  294:1 | 22:4,21 23:8 | 76:2,18,21 | 123:22,25 |
| **count**  263:23 | 23:17,22 24:1 | 77:9,13,15,23 | 124:8,15 |
| **counterparties** | 24:10 25:5,18 | 78:2,4,8,10,13 | 125:23 126:3,8 |
| 57:17 68:4 | 25:19 26:12,18 | 78:21 79:17,25 | 126:12 127:1,5 |
| 283:16 | 26:23 27:14,22 | 80:4 83:8,11 | 127:10,16 |
| **counterparty** | 28:22 29:10,12 | 83:12,13,19 | 128:1,4,7,14 |
| 94:5 257:5,24 | 30:3,11,22,25 | 85:6,9 86:21 | 128:16,19,22 |
| 258:3 281:11 | 31:18 32:2,8 | 86:23,25 88:6 | 129:1,4,7,14 |
| 286:23 287:7 | 32:12,21 33:1 | 88:10,16 90:13 | 130:13,16,20 |
| 287:14,16,17 | 33:6,10,21 | 90:14 92:8,12 | 130:23 131:2,9 |
| 288:17,25 | 34:12,20 35:2 | 92:14,25 93:4 | 131:23 134:15 |
| 289:2,10,15 | 35:6 36:6 37:5 | 93:10 94:1,6 | 136:22 137:2,8 |
| **counterpoints** | 37:16,18 38:5 | 94:12,24 95:7 | 137:11,21 |
| 237:5 | 38:9 42:14 | 95:11,14 99:24 | 138:9,15 |
| **country**  116:1 | 43:10,11,13,16 | 100:2,9,14,17 | 139:11 140:8 |
| 116:5,5 143:4 | 43:23 44:15,19 | 100:25 101:6 | 140:20,25 |
| 144:15 317:21 | 45:3,16,18,25 | 101:21 102:8 | 141:2,9 143:17 |
| **counts**  104:22 | 46:4,11,23 | 102:11,16,23 | 143:19,24 |
| **couple**  24:11 | 47:4,6,16,20 | 102:25 103:12 | 144:24 145:13 |
| 57:22 86:17 | 48:6,10,12,17 | 104:2,15 105:4 | 145:17,19,23 |
| 231:1 246:22 | 48:25 49:7,22 | 105:20 106:8 | 146:11,14 |
| **coupled**  237:5 | 50:7,11 51:1 | 106:11,19 | 147:9,21 148:3 |
| 291:23 | 51:13 52:8,17 | 107:5,18 108:7 | 150:2 154:8,10 |
| **course**  42:23 | 52:19,22 53:1 | 109:5,17,20 | 154:13,15 |
| 186:12 187:11 | 53:4,7,13,20 | 110:7 112:4,7 | 155:12,16 |
| 199:15 223:14 | 53:22 55:12,17 | 112:10,14,16 | 156:17,20,23 |
| 225:5,13 226:8 | 55:19,24 56:1 | 113:8,14,20,22 | 157:3,5,12,20 |
| 226:15 228:25 | 56:3,8,18 57:2 | 115:3,14,15,21 | 158:24 159:7 |
| 230:2 307:1 | 57:5 58:9 59:1 | 116:4 117:9,12 | 159:12,15 |
| **court**  1:1 2:1 | 60:2,7,11,25 | 118:2,5,11,19 | 160:15,18 |
| 9:2,5,16,22 | 61:7 63:21 | 119:12,14 | 161:7,8,13,17 |
| 10:5 11:21 | 64:7 65:2,6,8 | 120:3,5,12,16 | 163:21 164:19 |

| | | | |
|---|---|---|---|
| 164:22 165:3 | 216:6,9,18 | 313:10,22 | **creative** 20:8 |
| 165:20 166:13 | 217:3,14,20 | 314:5,9,12,19 | **credible** 194:2 |
| 166:16,19,24 | 218:6,9,25 | 314:20,22,25 | 194:3 195:21 |
| 167:3,11 168:3 | 219:4,8,13,13 | 315:2 | 259:25 260:7 |
| 168:10,22 | 219:21 220:1,5 | **court's** 9:9 | **credit** 263:12 |
| 169:1 170:11 | 220:8,25 | **courtesy** | 276:3 |
| 170:25 171:18 | 221:19 222:6 | 187:10 | **credited** 199:8 |
| 172:7,9,23 | 222:14 229:14 | **courtroom** | **creditor** 6:23 |
| 173:7,10,15 | 237:24 238:3 | 88:7,11 100:25 | 7:2,5,8,11,14 |
| 174:2,18 175:2 | 240:8,12,15 | 122:13 169:18 | 7:17,20 23:25 |
| 175:5 176:3 | 241:8,11,22 | 169:25 170:1,5 | 48:8,8,9 49:11 |
| 177:3 179:20 | 242:7,20 | 170:8 221:20 | 52:15 56:7 |
| 180:6,12,15 | 243:22 245:21 | 221:23,24 | 57:15 85:4 |
| 182:5 184:6,10 | 246:10,12,15 | 237:24 246:16 | 129:5 135:10 |
| 184:16,19,22 | 246:20,24 | **cover** 38:20 | 140:6 146:1 |
| 185:1,4,6,17 | 248:17,21 | 69:4 | 154:11 159:14 |
| 186:1,3,16 | 252:8,14 | **coverage** | 162:3 174:13 |
| 187:16,25 | 253:15 254:5,8 | 231:10 233:24 | 176:22 183:23 |
| 188:15,21,24 | 254:12 258:19 | 234:3,8,12 | 188:22 196:22 |
| 189:1,7 190:4 | 258:21,25 | 235:9 255:1,13 | 196:22 199:12 |
| 190:12,19 | 259:3,6,11,18 | 282:16 293:11 | 200:15 201:16 |
| 192:16 193:17 | 260:12 262:9 | 294:19 295:13 | 206:16 222:3 |
| 195:7,9 196:12 | 262:14 263:23 | **covered** 187:16 | 226:1 238:5 |
| 197:6,13 198:9 | 264:20 265:22 | 272:12 | 243:6 246:19 |
| 198:19 199:2 | 266:10 267:2,3 | **covers** 83:21 | 248:20 255:23 |
| 199:16,19,21 | 267:3 270:12 | **cowen** 7:19 | 275:6 297:5 |
| 200:3,6,8,12 | 270:14,22 | 238:5,5,15 | 312:9 |
| 200:17,21,24 | 271:1 279:7,18 | 240:10 241:9 | **creditor's** |
| 201:1,4,6,9,12 | 279:21,23,25 | 241:20 242:2 | 130:12 225:17 |
| 201:17,20,24 | 295:25 296:25 | 242:16 243:9 | 237:20 |
| 202:2,5,17,19 | 297:3,6 298:1 | 243:23 244:14 | **creditors** 3:18 |
| 202:25 203:6 | 298:13,16,18 | 244:20,24 | 9:12 11:3,3 |
| 203:14 204:4 | 303:17,19 | 245:3,15,18 | 13:16 14:19 |
| 204:11,17 | 306:4,9 308:16 | **cows** 296:22 | 16:3 17:15 |
| 205:2 206:10 | 308:20 310:1,6 | **create** 137:16 | 18:11 23:5 |
| 206:14,17 | 310:10,23 | **created** 151:1 | 37:11 40:24 |
| 207:20 212:13 | 311:1 312:7,10 | 269:16 | 41:6 42:5,21 |

43:7 49:15
50:5 54:1,10
55:21 61:25
62:15,16 63:23
65:1,4 66:15
69:6,18 74:12
75:4 85:5
97:25 99:12
103:23 104:2,9
107:21 109:24
111:6 112:23
114:1,9 115:18
119:23 120:25
125:4 127:9
129:10,19,22
131:14 133:4
133:17,22,23
133:25 135:7
135:16 139:6,7
142:14 147:4,4
147:13,18
151:15 154:20
160:2,3 162:2
163:15 170:22
171:5,10,14
175:21 176:17
191:5 194:13
195:1 212:6
223:8 225:13
225:16 229:2
247:4 250:14
255:10 266:20
272:17 273:7
292:21 305:10
308:12 313:12
**credits**  51:9

**creditworthy**
  258:2
**crime**  201:18
  201:19
**criminal**  116:6
**crisis**  253:20
**criteria**  175:9
**critical**  112:24
  173:2 264:17
**criticism**
  236:17
**cross**  8:3 9:20
  12:8 17:7
  45:15,20 48:19
  49:6 50:18
  66:7 69:25
  70:1 88:17
  90:16 101:1,2
  101:8 112:11
  112:12,19
  128:23 129:17
  141:10 154:17
  159:17 188:16
  189:2 193:19
  204:19 212:14
  212:17 220:16
  220:23 221:4
  221:20,24
  224:9 238:14
  245:25 248:23
  254:13 262:17
  279:8,10 280:2
  297:7 311:2
  312:11 313:14
**crypt**  198:14
  199:25

**crypto**  11:12
  11:14 13:16
  24:19 26:7
  58:20 68:13
  91:3 92:9,10
  92:23 93:4
  94:16,17 95:1
  95:4 96:12,21
  100:7 111:10
  114:16,19,22
  120:1,9 131:18
  136:9 138:21
  139:22 152:15
  152:23 197:25
  198:15 200:1,4
  208:17 209:21
  213:4 214:9,10
  214:13,21,24
  215:3,8,14,21
  227:4 232:8
  243:14 307:4
**cryptocurren...**
  24:13 26:7
  27:1 31:19
  40:13 58:7
  82:19 94:13
  149:22 150:1
  181:17
**cryptocurrency**
  13:24 14:7
  20:4 41:3,16
  41:24 54:18
  55:4 58:1 59:6
  61:20 67:9,24
  69:10,13 89:8
  91:10 92:17
  93:8,14 95:20

95:24 99:7,19
  143:4 148:15
  148:21 152:9
  153:20,25
  158:20 169:15
  183:16 208:24
  208:25 209:1
  211:6 213:1,5
  214:3 281:6
**culminate**
  227:9
**culminating**
  249:18
**culmination**
  227:15
**culpable**
  307:10
**culprits**  307:16
**cure**  169:12
**curious**  172:19
  178:13 181:9
  181:12,24,25
  189:9 197:3
  245:18 249:12
  312:13
**currency**  92:9
  95:17 96:12
  236:14
**current**  21:13
  21:23 28:20
  86:18,19,25
  148:11 195:3
  254:20 281:5
**currently**  14:2
  58:22 73:23
  88:22 126:13
  160:6 168:21

173:18 189:21
191:9 267:15
**custody** 37:21
95:8 160:22,23
160:25 198:20
198:20 199:3,6
204:23
**custom** 6:3
**customer**
12:24 14:15,17
21:5 89:16
98:9,19 127:6
130:23 131:8
138:7,7 141:17
142:7,24 146:2
157:13,15,16
197:1,20,21
199:5,9,10
204:23 213:4
214:3,9,10,13
214:21,24,25
215:3,8,21
217:1 225:8
234:12 239:2
251:22 289:22
289:24
**customer's**
159:4 198:16
198:22 199:8
**customers**
10:22,23,24
11:16 12:20,21
13:2,5 14:4
15:10 16:5,16
18:16 21:9,12
38:24 39:19
53:24 54:18

57:18 58:20
59:6 62:11
63:3,6,6,16,17
63:19 64:3,23
68:2,10 69:10
69:13,16 75:19
84:22,25 85:2
86:9,10 89:12
89:13 90:2
92:19,20,23
93:2,6,8,17,22
94:18 95:9
99:18 103:2,9
108:8 113:1
114:16,19,21
115:18 127:21
127:21 141:21
142:1,3,16,18
142:22 143:9
143:25 144:7,8
144:10,21,25
145:2,5,7
146:5,9 147:22
148:20 151:12
151:14 152:9
152:18 155:14
155:25 158:15
177:19,22
179:3,9 180:3
193:1 194:10
195:13 197:17
197:22 198:10
198:15,22
215:17 232:22
233:5 251:8
257:6,18 265:2
265:3 266:20

285:22 292:21
302:3 307:19
310:14 311:5
**cut** 122:12
132:10 161:18
201:4,6,9,12
201:13,17
202:7
**cutoff** 50:24
**cycle** 251:21
262:22

**d**

**d** 8:1 9:1 316:1
**d&o** 17:1
229:2 231:10
233:19,24
247:17 248:6
248:11 254:21
272:23 273:7
274:4,15,18
275:2,5,14
282:15 283:1
291:25 292:10
292:14 293:2
295:10,12
**daily** 186:5,8
186:17,23
313:18
**damage** 174:20
181:21
**damaged**
285:19
**damages**
174:13
**dan** 52:14
**daniel** 7:10

**danny** 219:16
**darling** 300:17
**data** 141:13,14
142:7,15,20
153:14 157:19
310:17
**date** 18:22
21:10 23:12
77:10,15,19,25
79:14 99:5
175:25 216:2
264:19 317:25
**dates** 238:17
249:21
**david** 3:15,22
5:21
**day** 41:8 50:4,6
56:13 78:1
80:16,17 92:2
114:6 115:1
181:7 183:14
183:14 186:8,9
186:10,24
187:6,9,22
193:15 195:25
207:6 222:16
245:6 246:3
251:11,14,23
252:4 254:16
263:5 264:10
307:7,7 312:9
314:25
**days** 50:10
79:6,24 116:11
183:4 198:16
205:22 221:11
256:16 257:17

258:15 264:12
271:18 295:21
**dba**   213:13,19
213:22
**dc**   4:21
**de**   3:2 96:1
**deadlines**
50:11
**deal**   10:3 30:1
35:17,19 36:10
36:16 37:6
68:9 76:22
77:9,18 84:19
84:21 88:10
92:17 94:13
96:11 98:7,12
108:9 109:23
112:21 113:2
113:10 116:14
117:3,13 119:5
119:6 122:24
124:6,16
125:25 126:4
132:21 133:8
134:4,8,10,21
134:21 138:10
138:11 140:12
160:1 183:13
197:24 202:21
203:3,13,18
205:10,10,19
206:3,20,23
207:1,14,22
210:8 211:12
214:17,17,21
215:8,9,25
216:3 237:12

243:12 277:17
278:25 309:3
309:10,10,11
309:14,15
**dealing**   10:12
119:25 120:1
124:1,18 174:8
236:11
**deals**   23:15
51:25
**debated**   242:8
**debtor**   1:8 17:2
22:23,24 26:20
26:23 28:1,2,3
28:4,7,11,25
30:8 31:5,11
31:22 32:5,9
34:6,18,21,21
35:13,21 36:24
37:16,18 38:18
39:13,13,14
41:18 44:3,25
48:15 56:22
91:4 94:12
98:6,8 177:5
226:12 232:22
234:19 240:22
241:23 281:3
287:5
**debtor's**   14:22
166:19 208:24
209:1 212:7
241:2
**debtors**   3:5 4:4
9:4 11:14
12:19,23 13:7
13:13,15,18,21

13:24 14:1,3,7
14:9,11,12,17
14:23,24 15:5
16:7,12,13,17
16:19,22 17:2
17:12,13 20:23
27:20 28:14,14
32:17,21 33:3
33:9 35:16
36:11 38:2
39:4,18,19
40:14,16 41:7
45:6 48:14
49:2 50:3
53:14,15 54:23
57:19 58:14
59:13,17 60:15
62:19 65:25
72:12 74:20
75:15,21 86:18
86:25 90:25
91:12,19 92:17
93:4,7,11,14
96:8 101:14
102:3 127:22
150:3 159:2
198:2 208:23
216:7 217:24
218:17 219:24
233:11 267:11
280:18 281:5
284:6,14,15
285:4 286:23
287:2 314:2
**decade**   222:22
**december**
11:13 13:8

207:8,9
**deception**
64:21
**decide**   58:23
293:11
**decided**   26:16
84:5 124:19
259:8 281:18
289:1,5,5
299:13
**decider**   307:12
**decides**   192:23
**deciding**   193:3
282:3
**decision**
127:12 192:21
270:25 273:16
273:19 274:7
283:21 288:4,9
288:24 289:3
307:17 308:14
**decisions**
124:24 236:9
237:2 283:22
288:21
**declarant**
45:20 48:19
**declaration**
38:1 41:8,22
45:11,12,14,16
45:19,21,23
46:4 47:23
48:18,22 49:3
49:8 50:10,12
50:14,17 51:15
51:22,25 52:8
61:10 70:22

71:3 76:10,12
81:5 84:24
90:21 91:17,18
96:24 102:5
103:23 106:14
106:15 171:11
177:5 206:23
206:25 207:18
208:3,20
215:24 217:21
220:11,13,15
221:1,5,10,14
229:11,22
**declarations**
9:19 49:12
51:2 165:19,25
**declared**
308:21
**decline** 172:10
**declined**
305:14
**decoration**
70:13
**decrease** 72:5
77:8 81:25
105:6 108:5,20
**decreasing**
82:5
**deemed** 46:12
46:17 220:15
**deep** 70:9
182:11
**deeper** 149:20
**defaulted**
121:4
**defective** 113:3
168:6

**defend** 248:7
**defendant** 1:14
**defendants**
1:23
**defending**
283:4
**defense** 231:16
272:18
**defer** 84:7
218:4 313:1
**deficient** 167:9
167:11,12
169:12 285:13
299:5
**definitely**
41:18 211:9
222:9
**definitively**
264:8
**deflect** 306:25
**defrauded**
195:13 260:3
267:7 286:15
299:18,18
**degradation**
36:4
**degree** 140:14
289:6
**delaware**
157:18 213:15
213:16
**delay** 9:2 139:5
139:5
**delegate**
268:10
**delegated**
268:14

**delegation**
116:23
**deliberative**
25:1,5,23
26:18 30:18
**delivered**
243:15
**delta** 80:24
82:5
**demonstrated**
171:10
**demonstrates**
53:23,25 54:1
77:3
**denied** 316:5
**denies** 84:12
**deny** 10:16
29:14,15 84:5
295:13
**department**
5:1,16,17 6:1
44:2 88:14
111:19,25
**depending**
104:13 196:24
254:20
**depends** 80:8
96:14 254:18
**deplete** 274:16
274:23
**depleted**
274:21 283:4
**depleting**
248:6
**deposed**
230:23 312:17

**deposit** 99:19
116:17,19
**depositions**
232:6
**deposits**
285:22
**depreciation**
76:14
**dept** 5:10
**depth** 67:8
70:12,16 71:7
73:4,12 74:9
74:24 81:11
96:16,19,22
97:4,19 236:17
**derivatives**
72:7,8
**describe** 54:4
57:5 58:6 59:1
61:7 63:21
64:7 67:5,25
68:18 69:8
222:13 231:2
247:15 255:14
307:24
**described**
59:19,20 74:15
153:19 154:5
235:2,5 299:23
299:25 301:23
301:25
**describing**
41:15,22
**deserve** 119:23
**designated**
92:18

designations
  92:19
designed  14:14
  23:2,4 151:15
desire  201:25
desires  221:3
desousa  1:13
despite  234:17
  234:22 235:2
detail  55:3
  140:10 236:18
detailed  11:11
  204:21
details  249:11
deter  195:2
determinations
  34:19
determine
  14:25 191:11
  215:11 225:4
  265:16
determined
  13:19 22:16
  30:17 31:24
  76:22 77:18
  225:15
determines
  265:13,19
determining
  42:18 109:23
  228:17
developed  64:9
developers
  138:18 139:2
developing
  58:8

dgb  185:15
dichotomy
  263:8
difference
  62:20 71:22,24
  71:25 81:13
  137:11 146:7
  168:12 173:11
  195:22 214:8
  265:11 277:10
different  18:3
  18:19 21:17
  26:9 34:20
  71:22 72:25
  102:2 103:10
  117:10 119:25
  120:1 138:8
  140:16 149:3
  156:20 158:17
  165:14 166:25
  167:7 173:21
  188:6 210:19
  211:1 232:3
  242:4 247:23
  248:14 254:20
  283:22 298:4,4
  299:18 305:21
  311:19
differentiate
  162:12
differentiator
  182:17
differently
  217:10
differs  149:24
difficult  182:20

difficulties
  315:3
digest  49:18
  50:5 51:5,8
digital  1:7,10
  1:19,22 3:2,9
  16:24 178:21
  218:18,21
  223:18 224:2
  239:13
diligence  41:8
  41:9,10 55:1
  141:12,15,24
  162:21 163:1
  163:16 164:10
  164:17 165:13
  165:15 166:8
  166:20,23
  183:21 194:1,9
  194:12 195:2
  195:12,19,23
  195:23 196:4,4
  205:9,11,20
  210:21 211:22
  212:20,22
  213:17,22
  216:2 217:22
  217:24 236:8
  257:21,23
  282:2 283:11
  283:23,25,25
  284:3,3,7,12
  285:3,5 297:12
  297:13,16,22
  299:15,17,21
  300:14,20,21
  300:22 301:1,3

301:17,17,21
  301:22,23,25
diligenced
  57:11,13,14
diligencing
  54:21 57:10
dilute  102:14
diminished
  148:16
diminution
  82:20
direct  8:3 53:9
  65:24 88:22
  89:3 202:10
  220:11,14,15
  220:17 221:7
  221:17 241:24
  243:3 250:5
  309:18
directed  53:20
direction
  216:22
directly  68:10
  75:19 106:16
  125:17 131:16
  132:10 177:22
  185:16 251:13
director  16:11
  16:18,23 17:4
  223:1,6,7,10
  223:21 228:20
  233:6 242:5,9
  252:10 256:7
  268:9 271:24
  278:19 282:15
  283:3 290:1,7

**director's**
292:3
**directors**  3:5
3:13 218:18,20
224:16 246:11
255:2,4 256:3
264:24 265:1
274:10,21
275:1 276:8
277:4 283:17
284:14 285:4
289:23 296:17
**diresta**  7:4
128:24 129:2,2
129:5,8,15,18
130:15,21
131:3,12 132:1
135:12,13
136:23 137:7
138:16 139:17
140:3 310:24
310:25 311:3
312:6
**disadvantage**
51:9
**disagree**  10:10
50:19 56:11,24
66:3,7 85:15
100:3
**disagreeing**
65:17
**disagreement**
171:8
**disagrees**
56:22
**disappointing**
40:9

**disclose**  26:18
27:20 312:16
312:17
**disclosed**  30:15
107:22 108:6
112:24 305:12
305:14,17
**disclosing**
39:16
**disclosure**  8:21
8:23 11:12
12:6 15:22
26:21 28:20,21
28:22 29:13,23
29:24 35:24
36:6,7 37:20
38:10 39:8,10
39:12 40:12,23
40:24 41:4,12
42:2,4,7,8 50:3
60:12 78:14,18
78:19 103:13
103:20 104:4,6
104:8,14,23
105:2,11,15
106:10 107:21
107:24 108:23
109:7,13 131:4
158:24 230:19
312:18
**disclosures**
39:18 101:25
158:24
**disconnected**
254:10 262:20
**discount**  62:8
82:15 183:25

**discounts**  97:3
**discovery**
15:23 140:7
226:10
**discrepancy**
144:9
**discrete**  189:24
**discuss**  44:12
44:24 107:1
199:15
**discussed**
50:25 83:1
104:10 132:3
165:14 182:7
184:2 217:14
227:14
**discussing**
268:17
**discussion**  33:8
83:8 137:20
218:2 261:9
**discussions**
20:6,14 44:6
98:1 164:11
169:22
**dishonesty**
174:24 175:22
175:24 265:14
265:20
**disparity**
267:11
**dispose**  268:7
**disposition**
43:2
**dispute**  51:23
59:25 75:14
110:9

**disputed**  51:19
52:6
**disputes**  23:6
**disruptive**
149:6 150:22
150:24 152:3
**distance**
276:16
**distanced**
276:20
**distress**  257:3
**distressed**
222:25 223:2
255:5
**distribute**  13:8
13:16 59:5
64:2 68:14
95:8 126:16
148:10 155:6
155:14 177:16
187:10 208:15
313:18,21
**distributed**
12:18 19:1
40:13 92:19,20
126:18 136:10
186:12 198:1,5
**distributing**
14:4 72:2
75:18 191:17
**distribution**
20:25 21:6,7
21:20 63:13
68:11 94:18
95:4,5 103:21
111:6 132:17
132:23 136:17

| | | | |
|---|---|---|---|
| 136:18 137:16 | 279:19,19,22 | 85:16 86:11 | 272:21 291:11 |
| 137:24 138:1 | 279:22,23,24 | 94:8 107:11 | 299:1 |
| 139:6 145:8,12 | 280:1,3 296:1 | 115:11 123:7,7 | **domicile** |
| 146:6,8,23,25 | 296:4,24 | 123:8,11 126:5 | 162:19,25 |
| 151:17 152:4 | **docket**  8:22,23 | 135:9 137:19 | 163:13,25 |
| 179:9,25 | 45:7,9,13,13 | 138:22,23 | **double**  21:8 |
| 192:18 198:6 | 48:13 49:4,4,5 | 142:4 144:7 | 131:7 |
| 210:10,17 | 158:5 220:12 | 149:7 162:21 | **doubt**  266:17 |
| 211:19 251:7 | 220:19 227:20 | 165:15 173:12 | 275:11 279:12 |
| **distributions** | 227:25 305:11 | 180:24 181:14 | **doubts**  171:6 |
| 14:15 16:16 | 306:6 | 183:4 187:6,11 | **downfall**  302:2 |
| 19:19,25 20:2 | **dockets**  78:20 | 191:25 198:24 | **downside** |
| 21:12 23:5,15 | **document** | 205:11 215:12 | 69:20 |
| 31:21 32:3,18 | 50:15 | 222:24 226:13 | **dozen**  184:4 |
| 43:7 61:18 | **documentation** | 237:1 249:18 | 288:13 |
| 63:5,16,22 | 49:18 50:25 | 253:3 255:16 | **draft**  227:14 |
| 64:15 71:4 | 125:13 166:6 | 256:3 258:10 | **drawn**  214:16 |
| 73:5 75:19 | 169:21 170:7 | 264:22 271:16 | **drill**  147:19 |
| 93:6,11,13,20 | 177:21 | 276:10 278:25 | **drive**  183:6 |
| 93:22 97:25 | **documented** | 291:15 293:16 | **driven**  152:10 |
| 98:3,8,10,17 | 57:21 115:13 | 299:15 300:13 | **drop**  102:1 |
| 98:19,21,24 | 124:25 | 300:18 | 104:13 |
| 99:12,14,17 | **documents** | **dollar**  21:13 | **dropped**  306:2 |
| 111:8 137:12 | 49:13 103:1 | 91:13 168:18 | **drops**  134:1,2 |
| 138:10 179:2,3 | 142:9 203:15 | 210:1,6 242:13 | 262:13 |
| 180:10 197:17 | 211:25 213:20 | 244:1 272:15 | **druid**  313:7 |
| 197:23 208:23 | 226:15 250:24 | 272:15,25,25 | **due**  41:7,9,10 |
| **district**  1:2 | 294:22 300:10 | 275:9,9,18,18 | 141:12,14,24 |
| **dividend**  243:1 | 300:12 | 275:23,23,24 | 152:23 162:21 |
| **divita**  7:1 | **dog**  121:21 | 275:25 286:11 | 163:1,16 |
| 141:3,5,6,11 | **doing**  25:16 | **dollarized** | 164:10,17 |
| 143:18 144:5 | 28:7 30:5,6 | 185:23 | 165:13,15 |
| 145:1,15,18,22 | 39:19 41:23 | **dollars**  55:23 | 166:8,20,23 |
| 145:24,25 | 46:3 47:10 | 133:2 173:6 | 194:1 195:12 |
| 146:12,16 | 52:16 54:7 | 180:19,21 | 195:19 205:9 |
| 147:10,11 | 68:7 69:17 | 186:11 234:16 | 205:11 210:21 |
| 148:1,6 150:8 | 82:16 83:10 | 244:3 248:11 | 211:22 217:22 |

217:24 257:21
257:23 283:11
284:7,12 285:2
285:5 297:11
297:12,16,22
299:15,17,21
300:14,22
**dug** 211:23
**dump** 181:6
**dunk** 228:13
308:3,3,4
**duties** 223:14
254:3 285:20
**duty** 228:4
236:17,23
253:19 260:24
266:8 282:7
284:13 299:12
**dyslexic** 306:10

**e**

**e** 2:21,21,22
4:1,1 8:1 9:1,1
316:1 317:1
**earlier** 31:4
58:9 74:15
83:8 133:15
136:16 137:20
149:19 170:5
171:20 178:3
178:16 186:13
202:20 203:1
203:12 205:21
208:14 211:15
216:12 247:1
252:11 279:13
288:12 303:25
304:4

**early** 13:8
227:13,17
**earned** 128:15
**easier** 45:8
72:2 182:19
231:22 232:1
**easily** 81:10
191:11
**east** 4:13
**easy** 64:14
229:20
**eats** 248:7
**echelon** 278:7
**ecro** 2:25
**effect** 42:11
47:19 48:1
60:18 73:5
80:2,3 103:21
113:3 160:21
188:8 190:1
199:7
**effective** 18:22
146:18,19
181:25
**effectively** 54:7
63:6,25 99:7
177:9
**effects** 182:6
**effectuate**
14:16 20:5
135:25
**effectuated**
151:7
**efficient** 14:5
14:20 23:4
156:5

**effort** 139:16
193:11
**efforts** 165:13
**ehrlich** 228:5
229:10,24
230:25 235:24
238:10,11
240:17 244:7
245:6 250:4,10
251:19 260:14
267:20 268:10
269:10,23
270:15,19
272:6 273:23
277:21 280:21
282:17 289:5
290:16 302:6
302:25 303:6
305:12 307:12
308:21 309:16
312:20 313:5
**ehrlich's**
244:12 302:5
302:12 303:20
306:7 307:16
**eight** 15:10
91:22 271:25
**either** 16:3
17:18 18:6
24:15 27:15,23
66:7 67:6 68:9
93:25 233:5
240:4 244:5
258:21 266:12
283:1 289:12
304:15 311:15

**elaborate**
45:22 46:2
99:4
**elapsed** 41:19
**elect** 127:5
132:2,6 142:3
144:14 146:9
146:13 196:25
310:13
**elected** 47:9
**elects** 111:9
144:17
**element** 173:2
229:8 264:17
289:11
**elements**
230:24
**eliciting** 193:21
**eligible** 42:21
**eliminate**
192:2
**ellis** 4:3 9:4
45:6 57:12
223:4 227:7
268:21 277:2
**else's** 38:16
202:8
**email** 112:25
**emanuel** 6:8
218:16 219:23
222:8 223:9
249:1
**emery** 6:15
57:16 245:23
**employees** 13:4
67:18,20 68:19
68:21 99:9

214:2,5 217:4
217:6 226:19
273:17 311:5
313:5
**enable** 14:6
**endeavoring**
16:15
**ended** 162:9
199:4
**ends** 242:18
**endure** 241:14
**engaged** 33:14
33:21
**engagements**
223:11
**english** 273:9
**enjoining** 3:4
**ensure** 300:25
**enter** 281:18
288:24 294:1
**entered** 48:22
78:24 197:15
260:1 281:19
301:4
**entering**
282:17 288:2
**enters** 25:17
**entire** 50:2
64:1 87:20
151:3 181:6
239:10 302:2
**entirely** 52:5
**entities** 15:19
18:2,7 30:15
30:21 62:13,13
67:11 164:7,9
217:9

**entitled** 18:21
18:22 20:24
56:22 75:5,6
104:3 248:6
256:4 303:3
**entity** 18:10,11
18:13,13 22:22
33:18 114:4
164:11,12
165:9,10,12,12
213:12 217:13
217:13
**enumerated**
141:22
**environment**
83:17 162:13
**equal** 16:7 63:7
138:6
**equaled** 294:4
**equally** 73:14
73:15 76:25
77:7 148:20
156:16
**equated** 133:3
**equipped**
177:6
**equity** 1:18 3:8
3:20 15:9
239:1,17 240:1
240:7 242:16
242:24 243:5
245:7
**equivalent**
135:17 209:1
**escrow** 255:8
**especially**
17:16 136:15

187:1 209:24
248:25 291:23
293:2
**essence** 229:22
**essentially** 10:7
27:18 29:15,17
41:4 60:14
61:11 136:17
210:10 231:18
232:8 233:16
244:19
**established**
93:12
**establishing**
175:23
**estate** 11:19
16:2 19:1 58:3
87:20,22 88:3
100:11 134:20
196:22 219:3
225:6,9 228:1
229:25 230:7,9
231:9,19
232:17 233:4
234:25 235:14
235:25 237:11
237:17 253:19
254:2 255:17
260:18 264:22
265:5,10 267:6
273:6 274:2,5
274:9,12
282:14,14,23
284:8,15
289:11,16,21
289:22 290:24
296:22 304:13

308:8,12
**estate's** 231:5
246:5
**estates** 14:12
14:22 15:6
242:17,18
**estimate** 95:23
**estimated**
11:11,16
101:16 206:19
206:22
**estimates** 84:9
**et** 1:22 3:9
42:16 153:13
196:17
**eth** 70:9,17
182:18 183:11
**ethereum**
91:23 96:10,22
181:12,25
256:20
**ethical** 255:22
255:24
**evaluate** 13:14
41:13 61:8,12
265:10
**evaluated**
61:24 160:4
252:17 266:19
**evaluating**
267:6 286:5,6
**evan** 307:16
**eve** 234:24
264:10
**evening** 314:7
**event** 14:12
60:16 126:14

264:1 308:21
**events**   249:4
249:12,18
265:8 286:20
**eventually**
261:11
**everybody**
21:16,17 25:10
116:6 120:9
139:4 156:5
193:8 249:7
257:5 260:7
261:4 270:13
288:14,14
315:5
**everybody's**
152:14 249:9
**evidence**   9:15
9:18,23,24
10:1 15:18,23
15:25 16:22
17:7 23:19
31:8 38:3,5,18
39:7 43:17
45:14,20 48:18
48:20,23 49:8
51:18 52:20
56:10,19,24
60:20 65:20,24
66:6,8 78:15
78:21,22,24
85:12,13 90:22
109:5,9,15
110:6 112:3
118:1 123:9
127:20 128:1,5
128:11 139:21

166:12 170:24
175:5 193:22
196:11 205:1
221:2,5 229:11
313:24 314:22
**evidentiary**
43:19 56:9,21
229:17
**evolving**   58:7
83:17 263:15
**exact**   26:6
96:25 147:1
151:8 238:17
252:3,14
264:19 302:20
**exactly**   19:21
24:15 31:8
32:12 33:1
41:22 131:21
139:8 147:10
149:23 162:11
190:5,14 192:3
232:4 258:21
280:5 290:19
299:24
**examination**
48:19 49:6
50:18 53:9
65:24 66:8
70:1 88:17
90:16 101:8
112:19 129:17
141:10 154:17
159:17 189:2
193:19 204:19
212:17 220:16
220:23 221:7

238:14 245:25
248:23 254:13
262:17 279:10
280:2 297:7
311:2 312:11
313:14
**examine**   45:15
45:20 69:25
101:1,2 112:11
112:12 128:23
188:16 212:14
221:4,20,24
259:11 279:8
**examiner's**
39:24
**examining**
281:22 290:10
**example**   67:17
68:17 70:9,18
91:6 146:21
182:23 183:10
185:13,13,14
185:14,15
193:5 267:8
287:22 289:14
290:16
**examples**
182:12,22
185:11,15
**exceeds**   309:17
**excellent**   257:4
**except**   36:3
38:15
**excess**   90:25
97:12
**exchange**   4:11
4:12,18,19

21:4 24:8 26:8
32:16 34:1,10
51:6 70:4 79:1
111:10 114:21
138:4 178:14
178:19,22
179:1,7,8,10
194:7,8 232:8
234:1 235:14
314:14
**exchanges**
138:4,5 178:15
194:5
**excluded**
201:21 202:3
234:12 295:22
**exclusions**
234:13
**exclusive**   249:6
272:17
**exclusively**
249:3
**exclusivity**
17:13
**excuse**   29:25
38:15 49:24
98:4 171:17
206:22 306:9
**excused**   218:10
314:6
**execute**   59:5
89:6
**executed**   17:18
240:25 310:2
**executing**   67:6
**execution**
151:25

executive
  251:19
executives
  236:12 239:25
  243:24 244:3
  249:13 250:16
  251:11 264:7
  273:17
exemption
  32:24
exemptions
  308:16
exercise  16:8
  94:8 150:11
  188:7 225:20
  243:11
exercising
  243:16
exhausted
  140:22
exhibit  45:7,12
  49:3 78:17,17
  220:10
exhibits  8:20
  31:10 45:9
  78:24
exist  154:1
  216:20
exit  13:7
exorbitant
  116:24
expand  176:23
expanding
  272:8
expect  17:6
  27:24,25 28:9

expectations
  199:11
expected  70:23
  284:1,4
expedient
  146:8
expedite  54:17
expedited
  147:5,18
expedites
  147:14
expeditious
  14:17
expended
  163:16
expense  94:20
expenses  14:9
  134:19,23
  135:4,5 274:23
expensive
  256:5 275:15
experience
  15:17 100:20
  142:2,23
  222:14 234:23
  275:13,19
  281:6 286:10
experienced
  52:4
expert  34:6
  69:1 72:7
  106:3 110:25
  111:3 142:20
  158:14 162:22
  275:14 280:9
  281:2

expertise  162:8
  280:23
experts  34:7
  67:11 68:22
  135:23
explain  27:20
  46:3 76:18,21
  99:3 101:22
  103:10 104:21
  122:2 123:18
  126:2 137:8
  140:9,17,22
  143:20 264:21
explained  43:1
explaining
  269:14
explicitly
  141:22 175:21
exposed  279:4
exposure
  281:11 282:16
  282:17 289:10
  289:15,15
expound  33:17
express  266:25
expressed  13:2
  13:18 151:14
extend  3:2 36:1
  69:12 159:21
extending
  147:3
extensive  61:10
  171:20 172:14
extensively
  57:11 225:14
extent  9:25
  18:9,14 19:23

  19:24 34:21
  36:3 51:21,24
  52:10 58:16
  73:9 74:11
  77:1,4,5 80:7
  81:8,16 82:17
  87:10 89:25
  92:2 96:20
  110:21 111:9
  111:21 114:14
  117:7 123:9
  126:16 127:18
  135:24 138:6
  144:16 158:4
  160:23 169:11
  171:5,8,11
  180:23 191:21
  192:14 194:17
  196:14,23
  210:24 222:10
  231:8 242:22
  303:2
extinguished
  241:17
extra  47:24
  121:19
extreme  253:2
extremely
  237:16

f

f  2:21 4:20
  317:1
face  51:17
  85:25 141:22
  142:17 143:5
  151:25 154:4
  188:5 285:16

facilitate 63:22
67:12
facilitating
95:5
facility 101:12
102:4,24
103:17 108:15
263:12
fact 24:20
30:19 41:9
46:18,19 56:11
66:12 110:21
112:5 119:23
125:11,18
149:19 201:24
203:23 205:18
226:25 228:20
237:5 249:17
257:9 259:21
259:25 260:8,9
267:6 277:19
297:23 306:14
308:1 312:2
314:2
factor 151:21
299:7
factored 308:6
factors 62:9
facts 26:11
27:11 34:16
56:16 66:11,17
66:21 110:6
112:3 114:12
117:25 125:9,9
125:13 166:11
167:6 170:24
196:11 204:25

236:20,20
252:11 263:8
282:22 289:19
289:20 292:18
292:19 294:11
factual 27:6
280:10
factually 280:9
failed 174:14
failure 174:17
fair 46:22
47:10 57:21
107:23 115:12
125:1 191:13
276:19 291:22
309:3
fairly 171:20
faith 16:21
17:14 44:6
116:17,19
254:1 263:17
276:2
fall 31:25
125:24 175:12
222:23 227:13
falling 161:3
239:21
false 134:16
250:15 252:5
252:24 253:6,7
253:10,11
262:24,25
263:3,4 266:1
familiar 34:2
72:11,13 82:19
family 244:22
244:25

far 83:9 126:17
127:12 188:10
191:6 217:13
fashion 68:6
82:16,18 83:14
193:4 273:13
fast 114:19
261:6
faster 135:16
fastest 14:4
faults 265:19
favor 11:10
42:6,18 46:5,9
69:16 85:21
86:9 104:12
108:9,17
127:13 128:10
143:2,11 207:4
267:11 310:2
favorable
278:15,16
292:12
feasibility
16:14 29:14
31:12 35:9,9
35:21 36:2
37:8,13 53:21
94:23
feasible 16:9
31:7,17
feature 35:15
36:20 37:3,5
75:8
february 11:15
13:22 220:19
227:23 238:18

federal 24:24
25:2
fee 14:11 201:8
255:8
feel 65:3
170:20 194:9
194:17 205:20
210:24 252:11
263:19
feeling 38:19
fees 87:14,18
87:21 95:19
96:1 116:25
117:1 134:19
241:10 275:22
fell 119:11
232:12 254:6
felt 237:17
ferry 4:13
fiat 92:9 95:17
96:12 119:25
168:19
fiduciary
225:25 228:4
253:19 254:2
266:8 282:7,10
285:20
fifteen 234:16
fifty 251:12
fight 223:19
248:13
figure 40:8
77:17 96:6
109:11 139:3
185:18 188:3
247:6 263:18
291:7 292:4

**figuring**
264:22
**file** 48:12 50:9
64:25 110:8
111:18 166:5
**filed** 9:12,19
17:25 18:13
23:11 41:8,20
41:25 45:6
51:2,3 52:19
65:5 72:12
114:24 116:11
130:12 170:7
220:10 221:10
227:20,22
239:16 242:11
243:18 259:23
260:2 261:9
305:11
**files** 25:17
127:3 185:3
**filing** 21:10
169:20 230:1,1
233:11,17,18
234:24 238:22
247:3 249:24
250:3 254:16
264:8,10,11,12
272:5,16 275:7
287:4 288:1
296:8 306:6
**filings** 49:20
170:13
**fin** 239:7
**final** 41:21
270:17

**finalized**
227:17
**finally** 41:20
**finance** 147:23
309:14,15,21
309:25 310:14
**finances** 37:21
213:23
**financial** 5:16
16:11 35:13
49:2 53:15,16
64:22 88:15
159:24 167:19
167:21,22
168:9 213:18
213:24 226:21
228:18 229:6
230:19 232:6
237:10 241:13
248:15 256:10
256:12 257:3
266:2,17,21
267:8 278:9
280:5,7,12,14
280:18,19,21
280:23 281:1,5
281:9,11,12,20
286:23 287:6
289:10,15
290:17 298:21
298:22 300:24
**financially**
232:11 276:17
**financials**
196:20
**find** 44:3 46:21
46:22 68:23

74:13 107:12
116:13 164:15
168:5 185:3
194:1 236:14
236:15,22,24
274:6,8 277:11
277:11 282:9
286:19 301:2
**finding** 30:1
**findings**
220:22 228:8
278:16
**finds** 36:24
**fine** 116:10,10
135:11 154:7
165:3 175:1
**fines** 169:14
**finish** 120:5
173:15 191:17
218:13 253:14
253:15 298:19
300:2
**finished** 65:24
66:1,24 122:15
**fire** 271:17
277:16,16,23
**fireworks**
284:24
**firm** 223:9
227:14 277:6
**firms** 277:3
**first** 10:3 45:10
50:2 53:20
65:5 88:11
134:14 137:17
141:4,12 143:3
150:16 158:20

159:22 167:4
179:21 204:8
210:20 220:25
225:14 226:8
228:9 229:20
238:4 240:15
242:21 243:6
249:22 271:7
280:4
**fit** 110:4 188:7
**five** 13:9 85:5
93:24 116:11
185:2,4,10
198:16 291:10
**fixated** 174:6
**fixed** 77:23
78:8 79:6,13
79:24
**flag** 251:3
275:25 288:8
295:18
**flagged** 294:20
**flagging** 251:4
**flags** 236:15
**flaw** 144:20
**flood** 153:8
191:3
**flooded** 50:21
**flooding** 153:3
153:6 154:3
**floor** 5:18
47:21
**florida** 313:5
**flow** 61:25
**focus** 122:3
123:7 249:3,6
249:10 279:14

focused   121:25
308:22
folks   53:13
follow   20:15
45:8 76:16
82:11 105:23
123:17,19,22
138:17 143:23
149:23 168:1,3
168:10,11
172:2 174:14
174:17 247:12
followed   9:12
35:12 37:14
59:12 238:9
242:8
following   
14:21 39:22
83:12 123:23
261:25 281:13
284:16 286:3
286:25
footing   63:7
138:6
footnote   32:12
forbes   116:16
204:22 205:2,5
foregoing   
317:3
foregone   
264:13
forfeited   
201:22
forgive   178:19
272:12
form   21:17
50:6 85:13

227:21,23
240:25 244:3
273:13 277:18
formally   90:11
format   135:22
formerly   74:18
formulate   
49:19 128:7
forth   13:19
15:18,23 16:17
42:3 81:23
fortunate   
195:16
fortunately   
309:8
forum   120:9
forward   13:20
14:6 22:14,20
23:11 39:20
57:6 58:3
89:11 181:9
274:20
found   34:1,9
102:19 103:5
167:13 251:11
282:11 294:15
301:16,16
foundation   
160:13 243:24
243:25 244:4,8
263:21
founder   251:20
founders   
249:15,23
250:6 263:6
300:7

four   9:18 35:17
57:13 73:16
106:20,25
156:14 161:7
228:19 276:21
fourth   284:24
fps   113:25
francine   245:6
frankly   308:13
fraud   13:13
114:6 175:22
175:24 195:13
201:19 203:20
240:24 253:1
265:14
fraudulent   
194:3 235:12
273:3 294:17
fraught   64:5
free   265:24
290:4
freeze   256:23
freres   222:21
friction   95:23
96:16
friends   244:23
244:25
frivolous   
228:11 232:4
274:22 282:21
frizzley   224:3,4
227:1,6 251:1
267:19 268:20
front   13:25
86:22 87:16
91:14,24 92:3
92:12 94:19

97:1,6 119:20
120:6,19
121:25 122:18
125:25 128:8
147:2 173:19
174:18,21
175:6,20 176:1
182:25 184:13
265:23,25
froze   256:17
256:22
frustrating   
162:5
frustration   
13:2
ftc   15:9
fti   57:13 133:1
133:14
ftx   11:20,21,23
13:12 17:25
23:10 39:23
47:17 55:18,22
62:18 64:20
72:12 73:1,13
75:10 79:22
92:6 94:2
95:16 96:11
112:21 113:10
114:4,8 116:14
117:14,15
118:13,13
119:4,11
120:21 124:4,5
124:16 125:3
126:4 127:25
132:21,21
133:2,6 152:7

171:22 172:4
172:12,16,25
174:3 175:11
176:7 194:2,2
195:4,12,12,19
195:25 196:1
202:21,22
203:3,3,11,13
203:14,15,18
203:21 204:6,7
204:8,13,13
205:8,10,24
206:1,4 214:17
215:8,9 259:10
259:24 260:3
261:7,12,16,17
261:18,23
262:1
**ftx's** 13:9,11
72:15
**full** 12:13
26:21 53:1
75:10 177:20
196:20 220:5
268:21
**fully** 40:25
42:5 63:12
313:20
**function**
139:23 224:13
**functions**
167:25
**fund** 313:4,6
**funds** 64:23
68:11 73:13
74:11,14 132:4
160:5,10,21

162:9 163:16
164:2,18 165:9
165:11 180:23
197:4,11,12
210:11 211:16
230:6
**fungible** 87:19
87:22 88:1
133:20 135:5
**further** 35:13
37:14 40:18
43:12,18 51:18
59:12,17
100:23 106:24
106:24 139:5
147:19 221:17
237:22 246:9
248:16
**furthermore**
81:9 99:8
136:3 142:20
212:5
**future** 31:14
31:15

**g**

**g** 9:1 189:13
**ga** 4:14
**gaining** 232:5
**game** 155:21
277:13
**garnered** 10:21
**gas** 44:21,23
**gathered** 145:6
**general** 5:8
11:3,5,7,9
18:11,19 47:22
62:12 70:20

73:12,15,22
103:15 133:10
136:3 139:15
166:14 283:12
288:7
**general's** 43:21
43:25 166:4
170:6
**generally**
40:23 54:4
72:8 135:19
142:4,12
**generals**
169:19
**generically**
285:9
**gentleman**
191:3
**genuine** 236:12
**getting** 24:14
39:14,15 60:9
76:23 82:14
96:6 102:4
131:13 133:7
149:25 158:12
162:5 233:18
239:8 260:25
278:8 291:22
301:9 306:9
307:23 309:4,9
**gift** 258:25
259:1
**gifting** 18:17
18:25
**gigantic** 253:1
**gina** 7:4 129:2
310:24

**gist** 250:20
**give** 18:23
28:12 52:3,6
52:23 111:14
119:16 121:2
121:17,20,20
121:21 122:19
136:21 139:19
162:19 182:22
207:19 208:19
215:7 220:2
222:9 237:9
238:16 241:1
247:5 252:20
254:1 256:23
257:16 260:23
266:3 276:7
282:6 284:13
291:20 309:7
309:16,24
315:4
**given** 18:25
36:12 72:5
94:10 101:25
108:14,22
134:10 138:18
182:1 192:8
234:22
**gives** 10:9
**giving** 100:3
120:2 133:2
156:10 247:19
259:10 289:18
302:17 303:2
310:18
**glad** 161:21
162:7 250:2

**gleaned** 154:23
**glib** 287:11
**global** 162:15
162:19 163:12
164:3,12 165:9
165:12 168:19
181:10,13,16
181:22 182:24
213:9 214:2
**glove** 225:19
**go** 17:11 24:1,4
24:20 36:1
39:20 43:18
47:18,25 52:1
53:8 55:2,22
56:25 58:3,18
60:25 84:4
87:18,21,24
89:11 90:14
98:7,9,12
100:4,17
105:20 110:24
112:16,22
113:14,14,21
115:22 116:14
117:6 124:6,6
124:8 126:14
127:22 131:18
131:18 132:2
133:21,22,23
134:23 135:11
142:3 144:17
144:19 146:9
146:13 147:22
149:17,18
159:15 171:18
172:9 177:7,15

179:8,12
184:19 192:24
192:25 194:25
196:9 204:11
206:20 207:2
207:15 208:4
214:21,24
215:14 219:11
219:14,16,17
231:23 248:21
255:15 256:11
258:19 259:9
261:10 270:2,3
279:25 291:24
294:12,16,24
295:6 301:13
304:6
**goal** 80:6,23
257:15 308:7,7
**god** 52:24
220:3 270:23
271:2
**goes** 37:1 73:4
87:19 119:18
127:3,6 133:24
134:2 146:18
196:8,15,18
197:5,10
215:17 293:15
**going** 9:24
15:18 19:3,9
20:8 22:14,20
22:25 23:10
24:22 25:21
26:4 28:5 30:7
30:11 36:8
38:2 39:3,3,24

42:3,5 47:14
57:6 58:11
59:16 70:21
71:15 76:25
77:6,16 81:9
81:18 82:19
85:1 86:15
92:6 94:9
95:17 96:12,21
101:10,23
103:11 104:13
109:2 115:1
116:24 117:2
126:20 127:20
127:22 129:25
130:3,13
132:24 133:17
133:17,22
135:14,22
136:13 139:23
139:23,25
148:16 149:5
156:4,7,14
157:25 158:12
160:21 161:1
167:18 168:25
169:12 172:6
176:18 181:8
192:7 197:21
197:22 201:20
210:15,16
211:11,15
215:9 219:1,6
223:22 225:17
231:20 237:1,8
239:5 240:3,3
240:5 243:13

243:16 244:10
247:22 252:6
253:23 258:1
258:13 270:4
273:1 274:20
275:5 276:12
277:22 282:24
285:7 289:1
292:25 294:24
294:25 302:3
303:12 307:20
309:7 311:6
**golf** 278:24
**good** 9:3,5
16:21 17:14
24:6,10 32:15
44:6 45:5
48:25 53:11,12
55:3 64:12
69:6 70:3
84:19 88:20,21
101:3,10
116:17,19
129:9 141:3,5
142:2 161:8,23
189:13 194:20
212:19 218:15
236:13,20
237:17,19
250:2 251:21
255:20,21
262:22 263:17
271:5 274:25
275:3 279:7
285:2,10
288:10 290:21
291:1,8,9,12

291:18 292:4
292:20 294:15
306:13 309:9
309:10,10
**goodies** 233:22
233:22 234:18
235:7
**goody** 233:23
**gosh** 40:6
127:19
**gotshal** 224:7
**gotten** 25:11
261:11
**government**
30:23 31:2
36:19
**governmental**
15:19 18:2,7
153:21
**grab** 207:18
**grant** 273:16
314:20
**gratitude**
159:21
**great** 106:15
178:4 188:13
195:4 210:7,7
239:15 250:13
279:2
**greater** 105:8
235:6
**green** 2:2
**greenwich**
305:6
**greet** 5:3
**grievances**
202:1

**gripe** 120:8
**gripes** 122:24
123:13
**gross** 175:22
175:23 236:23
254:1 265:14
**grossly** 236:25
236:25 287:18
**ground** 56:12
56:13,14,24
65:18 66:3
**grounds** 56:9
56:21
**group** 1:18 3:8
15:9 16:11
53:16 240:5
288:14,22
289:1,4 299:2
**guarantee**
133:21
**guarantees**
159:3
**guess** 39:4
50:23 90:23
100:19 110:7
126:18 149:23
150:10,10
151:6 152:5
153:10 154:2
156:13 180:6
211:20 218:25
238:12 240:9
240:10 258:11
277:16 284:11
284:25 286:22
287:25 294:7
312:24 313:6

**guidance** 27:2
28:2 167:16
**guys** 114:23,24
114:25 116:9
116:12,22
119:5 134:6
139:7,25
161:10 201:19
311:22,24
312:2

**h**

**ha** 211:16
212:24
**half** 74:19,21
238:8 244:1,2
247:1 301:12
**hall** 120:7
132:20,21,22
**halls** 151:10
**hamburger**
121:21
**hamilton** 6:3
**hand** 31:13
58:22 205:18
225:19 291:1
**handful** 13:2
**handicapped**
302:8
**handle** 181:23
186:14
**hang** 109:4
221:21
**happen** 19:24
27:21 29:23,25
36:8 37:15
59:2 77:20
84:6 95:17

97:19 102:17
102:19 103:5,6
103:24 107:24
108:15 139:2
140:18 158:1
191:11 193:16
196:18 207:21
207:23 215:20
243:16
**happened**
39:23 77:21
80:4 120:12
121:19 123:5
126:4 174:12
223:18 234:15
244:20 245:15
254:8 258:15
261:4 284:21
287:14
**happening**
39:22 92:5
193:11 207:6
216:24 263:14
**happens** 22:6
25:14 36:22
54:12 64:25
84:5 127:4
196:8 286:18
286:20
**happy** 52:3
85:18 113:15
161:23 163:14
204:9 207:17
240:13 243:21
**hard** 49:24
68:23 75:1
128:15 129:13

153:22 158:14
183:15 222:4
228:16 255:11
266:2 286:4
292:25 296:3
**harder** 70:18
184:1 231:1
**harm** 265:20
307:19
**hat** 109:4
**hawaii** 20:10
20:14,14
**head** 222:19
269:15 271:11
**headed** 251:24
252:4 254:22
**headquarters**
162:25
**healthy** 239:23
261:2
**hear** 38:18
39:7,9,20
42:12 52:12,15
52:18 86:24
124:13 127:11
128:25 129:3
129:11 130:13
161:21,23
170:8,10
172:25 173:1
175:11,19
188:23 198:25
202:24,25
226:6 249:5
250:2 253:22
255:12 272:18
284:9 296:3

297:25 305:25
311:12,14
312:9
**heard** 20:11
43:21 48:17
57:22 58:8
69:9 79:5 91:8
117:12 151:10
154:19,22
166:1,4 169:25
170:11 172:25
178:15 181:7
181:19,20
247:1 250:14
277:6,7 311:4
311:15,20
313:7
**hearing** 3:1,7
3:11,13,15,17
3:20,22,24 6:8
8:21 9:13
10:18 15:22
17:21 23:12
44:12,25 45:8
49:17 50:24,25
51:3,7 72:17
78:18 122:17
126:11,11,12
129:13 133:15
136:16 143:25
145:14 157:24
158:17 175:2,5
182:4 187:7
190:4 195:2
202:2 210:18
242:1 243:21
312:23 314:15

314:18
**heavily** 54:14
**heavy** 62:8
**heighten** 284:6
**held** 40:13
75:24 99:22
100:8 132:19
150:1 174:20
206:2 210:16
214:10 239:23
257:25 296:6
**hello** 79:4
253:21 262:13
**help** 40:8 52:24
67:12,14 174:6
192:4 220:3
267:9 278:22
**helped** 259:9
**helpful** 39:6
109:10 148:23
150:9 180:17
209:13 249:2
287:12,21
**helping** 201:16
**helps** 54:17
208:4
**hendershott**
6:22 49:10,10
49:23 50:19
51:4 159:11,13
159:13,15,16
159:18 160:17
160:20 161:4
161:18,20,24
163:22,23
164:19,19,20
164:21,25

165:6,7,20,20
165:23,24
166:14,18
167:3,10,15,17
168:1,4,16,17
168:24 169:2,4
170:15 171:2
171:18,19
172:18,24
173:8,14 174:1
174:9 175:19
176:11,13
177:8 180:16
182:8 184:18
185:20 186:4
186:19 187:3
187:17,19
188:13 222:2,3
222:7,11
248:19,20,21
248:22,24
252:9,19
253:16,17
254:5 262:9,11
262:16,18
264:5,20
265:12 266:9
267:10,13
270:16,17,24
271:1,5,6
279:5
**hendershott's**
185:16
**hey** 27:17
294:15
**hi** 128:24 154:9
310:24 311:4

hiding  294:21
high  62:12
  143:1 183:14
  208:7 238:8
  282:8
higher  12:3
  62:13 68:19,21
  69:14 86:15
  96:9 108:21
  113:2 136:2
  275:19 278:7
highest  107:13
  116:20 125:3
  172:17 210:23
highlight  10:20
  192:1
highlighted
  176:15
highlighting
  110:23 132:16
  133:12 166:6
  191:3
highlights
  106:14,16
highly  15:3
  17:17 24:21
  140:15 156:12
  252:24
hijack  122:24
hindsight
  36:11 253:2
  257:9,10,18
  263:16
hire  226:8,23
hired  34:7
  224:18 226:9
  269:17 278:4,8

280:8
historical
  224:21 225:10
  275:8 280:15
history  174:3
hit  53:19 199:4
hmm  84:3
  209:20
hoc  1:18 3:7
  15:9
hold  3:13
  63:14 91:12
  93:4,7 94:10
  133:6 185:18
  194:6 197:18
  212:10 216:16
  217:10
holdco  11:7
  18:13 22:25
  242:25
holder  89:20
  89:21 192:22
  192:22
holders  1:18
  3:8 15:9 18:12
  20:24 21:5
  62:2 86:1,5
  87:25 89:9
  101:25 103:14
  104:25 240:7
  265:6 266:20
holding  75:16
  91:19,23 96:8
  102:18 162:18
  269:4,6,9,16
  271:8,14,22,25
  272:6

holdings  1:7,10
  1:22 3:2,9 91:3
  93:15 189:18
  312:14,21
holds  184:10
  197:18 205:25
  206:4 214:9
hole  256:22
  257:18 259:5,7
  263:19,24
home  229:7
  245:6 296:23
homestead
  245:8
hon  2:22
honestly  154:6
  276:19
honor  9:3,6,8
  9:13,21 10:4
  10:19,19,21
  11:11,23 12:2
  12:17,20 13:1
  13:6,21 14:1
  14:16,23 15:2
  15:8,15,17
  16:9 17:6,20
  18:5,21 19:5
  19:11,21 20:13
  20:22 21:24
  22:2,8 23:1,9
  23:21,24 24:6
  24:18 25:1,13
  25:15 26:1
  27:8 28:19
  29:4 30:9,14
  31:3,12 32:7
  32:11,15,17

33:4,16 34:1
  34:16 35:1,3
  35:23 36:15
  38:4,7 40:20
  40:22 41:2,14
  41:17 42:3,9
  42:15,25 43:12
  43:15,20,24
  44:2,11,13,14
  44:17,24 45:5
  45:17,22 46:22
  48:24 49:1,10
  49:11,24 50:9
  50:16,19 52:3
  52:4,14 53:5
  55:14 56:6,15
  57:1 59:23
  60:6,8,10,22
  61:2 63:2
  64:18,21 66:10
  66:25 69:21
  73:3 74:6,25
  75:22 76:16
  77:14,22 78:16
  78:25 79:15
  85:7,18 86:19
  88:8,9,13 90:9
  90:10 92:1,11
  92:22 93:16
  94:4,17 100:5
  100:13,16,24
  101:3,7,18,24
  102:22 103:11
  104:6,19 105:5
  106:16 107:17
  108:13 109:8
  109:16,19

110:5,13 112:2
112:8,13,15,17
113:5,12,15
117:4,7,23
118:10,18,18
119:10,21,22
120:11,17,24
121:15,20
122:4,10
123:16,24
124:13 125:15
125:17,21
126:2,23,25
127:9 128:6,12
128:18,24
130:10,19
131:1,6 134:12
135:12 137:7
137:14 138:14
139:1 140:2,5
140:24 141:1,4
141:6 143:22
147:8 148:10
150:7 155:18
157:2,10,13
159:11 160:14
163:19 166:10
166:22 167:23
168:2 170:10
171:15 172:6
172:24 173:3,6
174:10 175:19
176:11,25
179:18,24
181:17 182:3
183:9 184:9,14
184:20,24

185:2,9 186:21
187:13 188:11
188:17,20
189:23 190:8
190:23 192:14
192:20 193:23
195:5 198:8,13
199:1,13,23
200:2,13
202:16 204:2,9
206:12 212:16
216:5,8,14,25
218:5,8,15
219:10,11,20
219:22 220:9
220:10,24
221:6,18 222:2
222:3 237:23
238:1 240:13
241:6 245:22
245:24 246:9
246:18 248:19
252:6 254:6
258:17 265:18
297:1 303:13
305:8 308:19
310:24 312:8
313:11 314:8
314:15,23
**hope** 22:5
161:23 278:1
**hoped** 164:16
**hopeful** 19:12
93:23
**hopefully** 20:7
44:25 79:11
80:23 142:2

146:10,18
155:8 183:19
208:9,11 209:2
211:8
**hot** 121:21
**hour** 161:7
**hours** 49:14
50:20 272:16
275:7
**house** 6:3
247:13,20,22
247:23,24,25
302:10,15,19
302:22,23
304:8,13 305:5
305:5,7,21
306:15 308:20
308:23 309:7
**houses** 247:23
**huge** 22:18
192:11 267:11
**huh** 235:11
294:23
**human** 266:11
**hundred** 176:8
177:25 178:10
191:22 209:25
234:6 264:9
**hundreds**
49:13 173:5
**hurt** 127:20
**hyde** 3:25
317:3,8
**hypothetical**
33:25 36:15,18
57:23 61:8
73:19 196:10

196:25 197:1
289:18

**i**

**idea** 25:9 43:16
112:5 144:3
184:22 190:23
274:17 291:18
294:15 296:20
**identified**
163:1 184:6
273:2 287:25
288:1
**identify** 56:5
142:6 166:9
182:1,5 264:17
295:9
**identifying**
170:16
**ifs** 306:21
**ignorance**
178:20
**ignore** 174:12
**ignored** 46:19
**illegal** 24:13
**illiquid** 70:23
**immediate**
62:10 150:4
**immediately**
71:2 76:5,9,13
77:6 80:10
81:15,24 82:3
148:9 182:10
191:24 193:7
198:17 249:16
250:8
**impact** 29:22
34:11 36:19

67:17 81:22
82:4,22,24
158:23
**impacts**  83:24
150:5
**impartiality**
10:9,12,16
**imperative**
68:6 115:15
188:5
**impetus**  224:22
**implementing**
313:18
**imply**  293:18
**important**
58:21 59:6
61:21 63:9
68:12 69:9,11
71:13 136:4
151:9 182:16
191:16 226:3,4
240:20 274:12
294:14
**importantly**
14:23 16:8
54:16 58:19
97:14 263:4
290:3 297:20
305:20
**impossible**
28:1 111:23
**impression**
63:1
**improper**
236:11 260:20
**improved**
83:11

**improvement**
233:19
**inappropriate**
260:10 273:21
287:18
**inappropriat...**
276:4
**incentive**  119:7
119:9 278:9
**include**  106:22
119:3 120:20
141:13 153:14
153:15 229:1
279:15 286:22
**included**  33:9
82:25 83:3,5
84:8,13 173:4
250:23 296:11
**includes**  14:8
215:25
**including**
11:19 17:10
91:8 114:1
205:12 222:25
256:14 268:9
270:18 292:19
298:21 300:6
**incompetence**
175:23
**increase**  91:9
135:10
**increased**
11:14
**increasing**  36:9
**incredible**
38:17,17

**incredibly**  55:3
64:4 68:12
**incremental**
86:8,12 94:19
94:22 272:22
**incumbent**
27:19
**incur**  275:22
**indemnificat...**
231:3,17,19
232:14 292:10
**indemnified**
231:16 248:8
274:14
**independent**
16:23 57:19
68:24 218:18
218:20 220:18
223:1,10,15,21
224:15 240:3,6
241:20 242:2,4
242:9 255:4
268:2 271:24
276:25 277:9
277:13,14,15
277:19 278:14
278:18 281:20
**independently**
26:10 281:1
**independents**
268:14
**indicate**  181:6
**indication**
10:16 27:5
259:23
**indicia**  236:10
261:1

**indirectly**
202:11
**indiscernible**
35:1 47:14,15
47:18 48:9,11
50:8 52:15
64:20,22,23,24
65:3 76:19
85:3,5 99:23
100:1 109:16
112:21,25
113:4 114:21
114:23,25
115:20 116:12
116:13,24
118:13 119:5,8
119:11 120:4
120:15 121:17
121:18,23
124:4,7 125:16
126:25 127:25
128:12,21
132:18 139:10
144:23,23
147:16 148:10
148:21 149:20
149:21 154:4
154:24 155:11
155:15 156:6
156:10 157:4
157:16 159:20
160:1,8 161:2
161:21,22
162:2,6,7,11
162:13,24
164:1,4 166:1
166:11,15

168:21 169:6
169:16 170:2,7
171:7,22
172:19 173:6,9
174:1 176:18
177:17 179:4
179:12,12,16
180:23,25
181:12 183:21
184:20 185:13
185:16 187:20
187:24 188:11
188:18,19
189:4,5 190:3
190:10,21
191:10,14
192:8,9,10
193:16 196:6,7
197:10 198:18
199:15,24
200:1,25 201:2
201:5,7,14,18
202:23 204:14
204:21 205:7,9
205:10 206:3,5
206:15 209:4
210:8 211:13
211:17 214:25
215:5,21 218:9
218:14 222:11
223:12,19,23
223:24,25
224:3,10,24
225:1,4 226:14
227:3,5,7
228:23 229:20
230:1 231:2,2

231:10,14,14
231:15,16
232:14,16
233:2,3,7,17
233:17,23
234:5 235:4,5
235:6,8,12,14
235:20,22
236:5,19,25
237:2,7,10,14
237:15 238:6
238:19,23,24
239:2,12,13,14
239:18,18,19
239:20,21
240:11 241:7
241:10 243:17
243:23 244:1,7
244:16,17
245:13,14,17
245:19 246:14
246:21 247:16
248:6 249:4
250:7,9,10,18
251:4,8,12,14
252:2,12,22
253:4 264:6
267:14 269:4
270:6 272:12
274:6 275:12
286:9 297:4
298:17 305:23
313:11,12,16
313:18,20
314:8

**indisputable**
107:16,18

**individual**
28:16 159:3
161:2 176:17
225:8 233:4
276:17 283:7
289:21,24
292:3,5 310:9

**individualized**
160:10

**individually**
241:25

**individuals**
155:1 163:3
228:18 231:5
232:23 235:21
240:23 267:4
287:19 292:15
299:12 304:1

**industries**
286:18

**industry**   39:23
40:4,7 71:19
138:20 281:7
286:15

**influence**
276:17

**influx**   181:23

**information**
37:20 39:15,16
41:11 48:8
55:3 97:18
107:20 108:3
108:14 110:3
112:24 114:7
125:19 129:22
129:25 130:5,8
130:17,22,25

131:4 132:12
132:15 133:4
140:4 156:25
157:7,9,13,16
158:1,4 177:12
177:19 178:2
184:5 190:10
226:11,14,25
232:5 233:14
239:22 250:22
252:3 271:12
271:15 280:21
280:23 281:16
281:21 284:5
284:25 288:22
289:3 294:22
297:18,19
298:4,5,6
300:11

**informed**
40:25 42:5
97:21 132:14
195:25

**infusion**   91:8

**inherent**   24:19
35:25 153:25

**initial**   93:5,11
93:13 113:18
197:23 203:11
262:5 281:23

**initially**   113:17
113:24 193:12

**initiate**   162:20

**initiated**   62:19

**injunctive**   3:3

**injured**   265:2
266:4,8

**innerworkings**
  164:8
**inquire**   59:25
**inquiry**   195:6
  294:4
**inserted**   44:9
**insider**   295:19
  296:5,9,10,13
**insiders**   228:2
  246:7,10
  260:18 279:14
  295:22 296:12
**insinuating**
  278:11
**insist**   34:14
**insisted**   232:5
  302:22 304:14
**installments**
  262:2
**instance**   223:7
  292:12
**instill**   187:22
**institutions**
  53:16
**instruction**
  202:10 247:10
**instructions**
  122:21,22
  123:2,23
**insurance**
  228:21 231:22
  231:24 232:16
  233:10,20
  234:8,24 235:7
  235:13 238:13
  238:21,22
  254:16,21,23

254:24 255:1
  255:16,18
  256:2,13
  275:14,14,19
  292:10 293:2,9
  293:13 294:5,5
  294:16 295:3
  295:11
**insurer**   273:3
  295:10
**insurers**   293:8
  293:23
**insuring**
  293:19
**intact**   228:21
**integral**   257:7
**intelligently**
  50:22
**intend**   38:4
**intended**   251:8
**intends**   22:13
**intensive**   64:14
**intentionally**
  49:25
**intercompany**
  23:6 43:3,6
  240:2,6,10
  241:21,22
  242:7,12 243:3
**interest**   1:18
  3:8 13:18
  55:21 59:24
  61:4 65:1,4
  84:21 127:8
  171:23 220:20
  229:12 235:25
  237:11 248:12

258:4 260:9
  303:25
**interested**
  22:11 118:7
  144:7 147:18
  223:20
**interesting**
  268:18
**interests**   15:5
  16:2 39:19
  54:1 58:3 60:3
  60:14 61:1
  62:15 109:24
  260:23 278:22
**interim**   99:12
  99:17
**internal**   21:2
  38:2 166:6,9
  223:23 233:9
  264:16 287:6
**interrupt**   50:1
  56:1,3 65:18
  65:21 66:2,18
  66:22 74:1
  85:9,15 99:24
  99:25 100:3
  113:20 115:21
  122:8 123:12
  157:21 166:16
  230:14 264:20
  298:19 305:9
**interrupted**
  12:16
**interruptions**
  122:21
**interview**
  194:24

**interviewed**
  238:10 268:22
  268:23,25
  288:14
**interviews**
  226:17,18
  288:13,13
  298:5 300:1,9
**intimate**   67:23
**introduce**
  183:1
**intuitive**   22:18
**inu**   182:9,24
  183:6
**invest**   178:23
**invested**
  158:11
**investigate**
  224:21 268:7
  269:17 290:3
  295:17,18
  296:16,22
  297:10,11
  298:9,11 312:1
  312:22
**investigated**
  246:5 266:19
  268:5 273:22
  276:13 278:5,9
  312:13
**investigating**
  223:14 251:25
  277:23 281:14
  285:8,10
  296:17 312:4
**investigation**
  16:25 30:16

204:21 220:18
223:23 224:17
225:18 226:6,6
226:15,20
227:8,9,11
233:10 236:3
246:4 249:24
250:9,16 252:1
252:10 264:18
265:16 270:5
274:1 277:20
278:6,18
279:14 280:6
280:11,20
281:9 288:6
294:3,8,10,10
295:22 296:11
311:22 312:3
**investigations**
82:23 279:1
311:8,24
**investigator**
278:14
**investment**
54:23 167:1
183:22 222:22
**investor** 82:24
82:25 238:6,9
**investors** 27:23
84:6,20 236:13
239:17 240:19
265:2,3,6
**invitation**
175:3
**invited** 41:6
**invoke** 32:21

**invoking** 32:6
**involve** 27:1
**involved** 68:1
173:8 178:17
255:5 278:20
288:12
**involving**
30:16
**iota** 173:17
**ira** 302:23
306:15 308:20
308:24 309:7
**irrelevant**
126:5
**irs** 34:20 303:3
**issuances** 32:7
**issue** 18:17
19:4 24:22
25:10 26:11,16
26:19 27:11,24
28:5,25 29:13
29:16 30:17
31:1 33:7 34:8
34:22 35:21
38:10 39:17
42:25 43:2
60:3,12 66:23
72:1 74:10
76:23,24 81:4
82:12 92:1
96:17,19 99:2
99:3 106:6
114:14 115:10
126:21 140:22
148:7,13 155:4
174:18,21
179:24 180:4,9

182:12 183:11
183:17 185:21
185:24 186:2
208:14 219:15
219:15,18
259:3 267:7
292:10 294:20
313:24
**issuer** 32:9
**issues** 15:3
24:20 26:12
27:6,9 28:3
30:22 34:19,23
34:24 35:4
36:1 38:21
39:1,10,12
42:4 51:19,20
52:6 53:20
64:11,15,16,24
67:23 74:15,18
81:7,19 83:1,8
96:21 97:4
101:22 104:12
104:16 110:25
111:3 120:19
120:22 122:18
127:3 137:24
148:11 151:17
152:19 155:20
158:25 174:8
177:5 183:16
185:11,12
194:18 195:25
196:1 197:15
198:11 205:4
219:5,6 225:1
242:8,12 251:3

257:19 265:1
286:16 314:1
**it'll** 77:8,8 78:8
90:2 92:20
93:8
**item** 105:12
**items** 152:25
197:20 198:21

## j

**january** 15:22
197:14
**jason** 5:21
88:14
**jennifer** 154:9
154:11
**jersey** 15:16,20
**jevic** 18:17
**jill** 224:3
267:19
**job** 39:4,4
260:17
**john** 5:21 6:20
88:13,14,18
90:9 188:22,25
245:22 312:8
**joinder** 3:15,22
**joke** 271:18
**jon** 7:7 23:24
**jonathan** 2:25
**jones** 7:16
202:16,16,18
202:18,19,20
203:2,7,12,24
204:5,6,15,18
204:20 205:6
222:16 254:6,9
254:9,14

258:22,24
259:2,4,7
260:13 261:18
261:21 262:8
**journal** 114:6
**judge** 2:23
27:17 34:25
39:2 40:8
125:8 154:14
158:19 161:3
163:17 181:7
211:15 241:12
255:7 265:21
277:17
**judgement**
228:19,25
229:4 237:18
**judgements**
228:22
**judgment**
14:25 16:8
231:9 237:11
237:18 256:11
256:13 273:20
282:23 283:15
283:17 290:23
292:17,18
304:3
**july** 223:19
227:12 238:21
256:22,24
284:20,24
**jump** 262:19
**juncture** 35:24
**june** 146:17
147:1 239:12
239:15 249:20

249:25 256:21
257:1 259:5
260:5 284:20
**jurisdiction**
19:10,15 20:11
38:14 44:5
89:15,21,22
111:21
**jurisdictions**
16:6,6,16
62:23 63:18,19
63:23 89:12
90:6,8 93:18
93:23 111:13
111:15
**justice** 5:1 6:1
**justification**
175:4 292:8
**justify** 287:4
293:19 295:10
**juxtaposed**
62:2

**k**

**kaput** 196:9
**keep** 162:5
168:11 187:7
209:25 258:1
259:8 263:17
309:21,25
**keeping** 64:12
229:5 276:2
**keeps** 187:21
197:20
**key** 61:24
**keys** 37:24
178:21 217:5

**kids** 239:1
**kind** 14:18
16:15 20:16
21:13 23:4
25:11 38:20
39:4,11 40:6
47:21 51:22
61:13,18 63:5
63:22 66:23
68:12 72:3
83:20,20,21
90:23 97:25
98:3 99:17
101:10 104:7
136:7 137:12
138:10,13
139:21 140:12
147:19 148:23
150:14,24
151:11,18
152:5,5,9,15
152:17,21
154:19,21
155:3,7 156:6
156:12 159:2
167:4,6 180:4
180:10 188:5
191:20 208:23
210:9 211:6
266:11 278:6,7
284:3 285:24
289:10 292:11
311:8,12,22
**kinds** 93:12
126:17 138:12
150:4 188:3
266:6 298:4

**kirkland** 4:3
9:4 45:6 57:12
116:24 136:16
223:4,6,6,8,25
227:7 268:21
277:2
**kirpalani** 6:13
43:5 212:16,18
216:5 218:14
218:15,16
219:3,7,9,19
219:22,23
220:9 221:6,8
221:17 222:7,8
222:12 229:19
237:22 247:7
252:6 258:17
261:14,19
263:21 270:9
303:12,23
305:8 306:5,8
309:17
**knew** 141:25
155:22 172:12
258:13 259:4,4
264:11 300:11
300:13 305:16
309:5
**know** 20:17,25
21:2,4 22:16
22:17,19,20
23:12 24:17
26:13 27:17,22
28:23,23 29:1
29:9 30:20,21
30:23 31:4,25
33:18,25 34:3

| | | | |
|---|---|---|---|
| 34:4,14,18,18 | 130:11 131:24 | 224:10,16 | 308:25 309:5 |
| 34:19 36:3,4,8 | 132:17 133:20 | 229:5 230:16 | 309:18 311:17 |
| 36:15,17,23,25 | 136:11,14 | 235:9 238:9 | 311:19,22 |
| 37:14,24 38:9 | 137:18 138:19 | 239:20,21 | 312:2 313:17 |
| 38:19,22 39:2 | 139:21 141:21 | 243:6 245:4,5 | **knowing** 34:16 |
| 39:5 40:6 | 141:25 142:8 | 245:9,10,12 | 252:2 |
| 41:17 42:3,9 | 142:21 143:4 | 247:4,5 250:14 | **knowledge** |
| 43:9 47:2,21 | 144:7,16 | 250:24 251:1,7 | 32:20 67:9,23 |
| 48:2,15,16 | 145:15,19 | 253:7,8,8,11 | 68:15 111:17 |
| 50:21 51:5,14 | 146:22 147:3 | 253:12,18,25 | 131:23 135:23 |
| 54:8,22 55:9 | 147:20 148:17 | 254:18 256:19 | 205:3 216:20 |
| 57:7 61:13,16 | 151:13 152:7 | 257:10,16 | 216:24 218:3 |
| 61:25 63:14 | 152:11 153:20 | 260:24 261:9 | 220:21 227:20 |
| 64:11,13 66:1 | 153:23,23 | 262:25 263:3,3 | 250:10 269:22 |
| 67:8,10,14 | 156:2 157:3 | 263:4 264:7,9 | 298:6 |
| 70:7,10 71:11 | 158:20 159:19 | 264:16 265:8 | **known** 150:14 |
| 71:12 72:6,23 | 160:15,19,22 | 266:20 267:10 | 297:21 |
| 73:9 74:6 75:5 | 161:1 163:3,14 | 268:25 269:14 | **knows** 39:13 |
| 75:6,9 80:7 | 164:14 165:11 | 269:14,22,25 | 167:8,14 |
| 82:12 83:9 | 167:24 168:23 | 269:25 271:1,9 | 168:12,13,15 |
| 86:21 91:3,12 | 169:1,13 | 272:11 275:10 | **kyc** 64:11,15 |
| 91:19,22 92:10 | 171:25 173:22 | 275:11,15,17 | 129:22,25 |
| 93:2,11,24 | 175:1 177:1,12 | 276:5,5,8 | 130:2,5,8 |
| 96:11,20 97:21 | 178:4 179:14 | 277:10,14,23 | 132:12,15 |
| 98:4 102:11 | 182:23 183:1 | 278:1,3,6,13 | 156:25 157:7 |
| 103:24 104:3 | 183:13 187:25 | 279:3,12 | 176:16,20,24 |
| 104:24 105:4 | 188:2 189:7 | 280:20 285:2,2 | 177:5,12,20 |
| 107:25 111:5 | 190:16 193:15 | 285:3,22,22,23 | |
| 111:17,21 | 193:18 194:2 | 286:14 287:1,8 | **l** |
| 112:4 113:17 | 195:12 196:12 | 287:23 288:8 | **labor** 64:14 |
| 117:3,23 118:3 | 196:24 198:23 | 290:9,13 291:6 | **lack** 10:9,12,16 |
| 119:1,14,17 | 199:24 202:6 | 293:5,8,15,22 | 160:13 257:21 |
| 120:1,20 122:1 | 206:3,25 207:3 | 294:1,3,17,18 | 257:23 286:16 |
| 122:2 127:10 | 210:1 211:14 | 301:16 302:3 | **lacks** 263:21 |
| 127:14,17,17 | 211:17 212:1 | 305:7,16,17 | **ladies** 141:4 |
| 128:13 129:9 | 217:3,18 | 306:3,4 307:7 | **laid** 131:8 |
| 129:12,13,24 | 219:15 224:4,7 | 307:17 308:25 | 134:11 139:21 |
| | | | 142:8 211:5 |

**language** 44:9
44:11,12,24
**large** 70:10,19
133:11 142:24
143:3 147:16
250:18
**larger** 70:18
143:6 183:10
183:11 233:19
250:17 252:1
288:22
**largest** 149:20
194:5,15,16
**lasted** 227:12
**lastly** 69:17
72:6 194:8
**lasts** 198:21
**late** 155:21
313:13
**latest** 242:10
**laundering**
177:13
**law** 25:2 26:16
30:18 36:5
158:5 236:21
266:13 277:6
282:22 308:17
**laws** 24:22,25
25:22 27:13
28:5,8 29:6,8
29:22 30:19
32:1 115:9
116:1,4,5
266:13
**lawsuit** 25:17
282:20 283:5

**lawsuits**
265:23
**lawyer** 66:1
222:18 278:19
313:1
**lawyers** 34:7
49:15 51:8
110:20 134:5
175:1 241:25
280:16
**lax** 283:15
285:2
**lay** 9:9
**lays** 139:22
**lazard** 222:21
222:23
**lead** 53:16
159:24 252:10
**leader** 165:17
**leadership**
268:6
**leading** 249:4
295:21
**leads** 286:20
**learn** 13:12
196:1 227:4
233:20 279:3
**learned** 203:20
233:15
**learning**
233:13
**leave** 67:19,21
68:20,22
**leaving** 313:19
**led** 264:4
278:19

**ledanski** 3:25
317:3,8
**leeway** 119:16
**left** 82:18
86:17 161:25
208:4 222:19
222:20 241:4
**legal** 9:15 10:8
10:10 17:20
27:5 62:13
67:11 162:17
162:20,22,25
163:11 164:1,7
164:9,12,14,14
217:8 229:21
241:10 245:1
245:12,14
252:7,15
260:25 265:15
272:18 282:7
282:21 290:25
304:20,21
306:19 312:24
317:20
**legally** 33:19
295:1 304:18
305:4 308:4
**legions** 34:7
**legwork** 280:9
**lend** 214:13
216:11 289:2
301:11
**lending** 224:24
225:2 238:18
257:19 259:8
**lengthy** 48:13

**lesser** 289:5
**leticia** 17:4
48:22
**letter** 162:23
200:13
**letting** 262:19
306:3
**letty** 45:12
**level** 62:12
85:3 102:18
169:8 236:8
273:9
**levels** 103:7,8
152:24 207:4
**lexington** 4:5
**liabilities**
230:20
**liability** 228:21
239:24 240:19
283:3 287:20
**liable** 3:13
102:20 103:4,5
**license** 111:24
155:23
**licensed** 62:25
90:5,8 111:14
**licensure** 89:23
111:18
**lie** 117:22
118:8,10
**lied** 118:23
299:19 312:25
**lies** 64:21
111:21
**light** 225:15
291:7 306:13

**liked** 143:5
**likelihood**
  59:16 101:16
**likely** 20:15
  22:12 34:13,13
  35:12 59:12
  62:8 94:9
**likewise** 105:15
**limit** 161:7
  313:17
**limitations**
  16:14 208:22
**limited** 32:24
  100:21 217:23
  274:3 282:14
**limits** 215:3
  256:18 303:20
  313:17
**line** 101:2
  112:10 161:4
  202:8,9,11
  229:15 254:7
  262:10 298:2
  316:4
**lines** 39:12
  311:9,12,23
**link** 41:5
**lion's** 302:16
**liquid** 106:1
**liquidate** 59:17
  65:14 71:2
  72:3 74:17
  76:13 77:6
  81:15,24 96:20
  152:23 177:21
  179:12 180:2
  180:18 183:17

187:9
**liquidated**
  37:19 74:8
  80:1 82:3
  89:17,24 93:20
  93:25 95:2
  129:22 179:17
  180:21 183:4
**liquidating**
  74:9 76:15
  79:12,21,23
  80:13 81:21
  93:14,16
  181:22
**liquidation**
  13:15 14:24
  16:1,4,5,13,20
  17:19 35:12,14
  36:24 37:15
  54:14 55:15
  59:13,24 60:13
  61:5,9 62:3,4
  62:10,14,14,20
  71:16,16,17,23
  75:7 76:7 77:2
  80:25 81:2,22
  82:6 84:11
  88:23 89:5
  90:12,20 96:10
  98:7,12 104:18
  104:20 105:1,8
  106:2,13
  108:19 142:14
  147:7 149:1,7
  149:8,24 154:1
  176:16 179:6
  179:11,15

180:20 181:3,5
  181:10,14,21
  187:23 191:22
  208:8
**liquidations**
  94:3,4
**liquidator**
  180:25
**liquidity** 64:24
  126:24 127:3
  152:8 181:11
  182:17,19
**list** 45:7,13
  49:3 78:17
  243:13
**listed** 21:3
**listen** 66:2
  122:18,22
  123:1 201:24
**listening**
  122:16 201:13
**literally** 49:13
**litigate** 295:5
**litigated** 273:1
  274:20
**litigating** 283:2
**litigation** 3:4
  25:4 43:6
  62:19 116:23
  282:24 292:24
**little** 20:18
  42:9 59:7 62:5
  74:21 79:10
  99:3 102:15
  145:23 217:25
  219:17 222:15
  227:13 231:1

231:21 250:19
  259:10 262:12
  265:12 268:13
  283:15 302:8
  308:13
**live** 52:1
  218:21
**lived** 13:3
  304:1
**lives** 304:21,21
  305:3
**llc** 16:24
  218:18,21
  223:18 224:2
  224:16 267:18
  267:22 268:8
  269:19,21
**llp** 4:3
**loan** 101:12
  102:4,17,20,24
  103:1,6,17
  105:12 108:15
  121:2,4 245:7
  249:5 256:20
  257:21 258:22
  258:25,25
  259:1,18,19,21
  260:6,8 262:1
  262:6 281:23
  282:10 286:13
  288:2 307:17
**loaned** 256:21
  261:16,17
  287:9
**loaning** 256:16
  257:13

**loans** 12:12
224:24 236:13
249:16,22
250:8 256:25
257:7,11 263:7
263:11,12
281:15,17
282:3 283:21
283:22,23
287:7 288:23
288:25 297:21
299:13 307:12
**locked** 189:22
190:15,17
191:9
**logic** 133:6
144:20
**logistical**
314:24
**logjam** 41:21
**long** 25:6,7,8
41:18 70:14,14
107:11 139:8
219:11,14
246:2 267:14
275:15
**longer** 15:1
37:3,6 84:13
146:10,10
147:24 148:8
227:13 258:1
259:10 296:7
314:15
**look** 41:6 46:14
64:19 72:4
73:11 108:1,17
116:16 158:5

163:14 185:8
193:6 208:5
213:18 224:23
225:7 231:9
240:6 250:13
257:9 260:17
276:20 288:6
290:21 292:3,6
300:23,24
306:16 308:16
**looked** 25:24
61:15,15
158:17 224:25
225:2,3 236:4
237:9 244:11
244:14 245:1,9
247:25,25
248:1 249:9
251:5,6 259:15
288:11 289:19
290:15,16,22
290:22 291:19
299:8 300:1,9
300:10 304:18
304:24
**looking** 25:11
127:19 147:18
185:22 209:16
225:8 278:21
280:21 282:1
285:16 286:1
306:17
**loop** 218:1
**loren** 188:19
188:22,22,25
188:25 189:1,3
189:9,14,21

190:6,13,20
193:13,17,23
193:24 195:8
195:11 196:13
197:7 199:17
199:20 312:8,8
312:12 313:9
**lorraine** 201:4
201:9,17
**lose** 136:20
272:12
**loss** 158:13,22
251:7 263:25
**losses** 241:13
**lost** 201:12
257:20
**lot** 13:1 41:19
51:14 70:16
92:14 118:3
119:16 131:25
136:3 205:7
218:7 219:6
227:4 229:7
240:9,20 248:4
249:11,17
263:13 278:5
280:19,22
292:15 306:21
307:19 308:4
311:16,18,25
**lots** 26:3 40:7
286:18
**love** 244:6
**low** 208:8
260:15
**lowball** 260:15

**lower** 62:11
68:19 71:3
81:20 119:7
148:12 149:10
152:24,25
189:6 209:15
**loyalty** 260:24
**lunch** 159:7,8
161:9,23

**m**

**macro** 286:16
**made** 22:22
33:2,22 36:2
37:22 38:20
39:18 40:16
55:3,5 58:9
82:11 110:2
112:21 114:20
116:9 130:17
137:3,4 141:7
156:3 170:13
173:25 174:2
175:14 179:9
197:14,17
199:11 203:22
212:22 214:1
214:12 224:25
236:9,9 238:18
252:24 253:8
253:12 256:25
257:6,11,18
260:9,19 263:2
266:1 272:4
276:23 281:17
283:23 288:21
288:23 309:9
309:10 314:16

madison 6:10
madoff 244:24
magically
139:2
main 114:16
307:1,16
maintain
237:13
maintained
67:15
major 67:13
80:24
majority 144:8
147:17 151:11
154:20 209:21
209:24
make 9:14,25
16:15 19:8
20:1 23:3
28:15 29:18
31:22 33:15
39:4 40:11
45:8 54:23,25
55:4 56:19
58:15 61:13,18
62:20 64:11
79:25 83:1
93:11,22 97:17
97:18,24 98:8
98:10,16,21,24
99:12,14,17
111:6 114:18
115:7,11,16
119:19 121:19
123:10 124:21
124:23 127:12
130:1 138:20

139:9 144:17
150:20 151:16
151:17 157:20
159:2 164:24
167:4,12
169:15 175:16
177:11,12
178:7,23 179:2
180:10 189:16
190:24 197:24
198:11 205:13
205:15 210:22
212:4 215:10
221:13 229:22
239:9 241:5
265:24 273:20
274:7 277:10
282:3 283:21
283:22 286:2
287:13 289:4
293:7 294:16
294:25 299:13
308:7 314:24
314:25
makers 71:19
72:4 97:16,23
148:18 183:13
288:4
makes 34:18
55:7,13 108:1
123:4 130:4
134:22 144:18
173:11 194:11
making 31:20
56:4,6 64:15
67:14 68:3,4
98:19 119:15

164:22 165:21
175:15 177:13
187:21 208:23
236:12 237:2
257:7,12 260:6
270:25 273:16
273:19 288:9
289:12 295:8
297:21 307:12
307:17,21
308:10
malfeasance
217:11
man 141:4
279:9,11,17
313:11,15
314:4,8,11
managed 287:6
289:10
management
13:4 41:19
175:22 186:6
194:24 204:23
217:9 225:3
236:4,6,18
240:5 251:13
281:24 282:12
283:12 284:7
284:14,15
285:6,9,12
286:23 288:7
288:11,15
289:13 301:7
manager 167:1
managing
16:11,18
222:21 285:22

manner 15:4
122:17 160:12
190:25
manual 64:13
manually 64:3
64:5,17 251:1
march 2:5
284:19,22
285:2 317:25
marital 308:18
mark 6:6 8:5
16:10 49:2
53:3,9,15 70:1
88:17 90:10,16
90:18 101:8
112:19 129:17
141:10 154:17
159:17 189:2
204:19 212:17
282:6
marked 42:2
market 61:16
61:17 70:6,8,9
70:11,12,16,17
70:18,19,23
71:3,7,15,18
71:19,21 72:4
72:6 74:8,14
74:24 77:19,24
78:5,8 81:11
81:19 82:15
94:2,4 95:2,11
96:16,19,22
97:4,16,19,22
97:23 135:23
148:12,18
149:5,20,20,21

150:5 152:3,22
153:4,7,8
154:3 181:5,10
181:11,13,17
181:22 182:1,6
182:11,16,17
182:18,24
183:7,10,11,13
183:15,19,19
183:20,20
184:2,4 185:12
186:25 187:1,6
188:3,8 189:6
189:19 190:1
191:3,14,16
193:6,15 239:8
243:9,12,18
245:18 251:21
259:9 262:22
278:3,14,17
279:15 313:19
**marketability**
149:13,23
150:13 153:12
**marketed**
124:25
**marketplace**
67:24 150:22
150:25 257:4
300:17
**markets**  55:4
61:20 62:6
67:9 70:14,23
193:2 207:6
**masquerading**
39:11

**mass**  70:22
**massive**  13:13
**massively**
193:10
**material**
174:13 265:19
**materially**
250:15 252:5
**math**  73:21
76:24 77:5,7
105:23 108:4
108:21 133:11
133:14 135:8
144:18 209:24
**mathematica...**
137:19 144:20
153:19
**mathematics**
107:6,18,20
**matter**  1:6 9:8
10:8,13 34:15
42:19 59:25
62:18 75:15
96:19 132:21
135:1 138:11
174:4 183:4
245:2 268:12
268:16 272:25
288:9 290:25
**matters**  52:1
120:6 216:19
**matthew**  4:16
**max**  293:5
**maximize**
13:21 115:17
**maximizes**
71:12 171:10

**maximizing**
54:9 69:2
82:13 84:22
86:11 151:24
194:14
**maximum**
171:3,4 275:2
293:6
**mcdermott**
6:15 57:16
245:23
**mean**  22:18
23:1 25:6 30:7
34:4,17 35:21
37:6 48:7
49:25 59:3
63:25 64:9
70:8 71:25
74:10 80:8
81:16 96:14
97:6 103:8
106:2 108:9
128:3,13 137:8
137:21 140:15
149:15 162:5
174:13 204:1
210:14 216:25
219:1,14,17
224:15 226:7
234:19 244:25
246:10 253:25
258:13 261:12
264:19 279:2
290:14 291:4
293:16,23
296:13 308:10
308:13,18

311:17
**meaning**
108:20 234:18
**meaningful**
14:18 209:16
**meaningfully**
199:5
**means**  50:1
133:20 174:24
180:8 254:23
254:23 273:5,6
277:15 290:9
**measured**
77:11
**measures**
41:15
**meat**  280:11
**mechanism**
211:19
**media**  117:21
311:19 312:4
**medium**
210:10,17
**meet**  80:23
**meeting**  50:3
212:7
**meetings**  195:2
195:4,20,21
196:3 205:17
**mellon**  15:10
**member**  16:23
223:15 267:21
267:21 268:6,6
268:12,16
269:8
**members**
110:1 212:1,2

| | | | |
|---|---|---|---|
| 224:1 267:22 | **mew**  1:3,4,16 | 134:17,18,22 | 305:13 306:7 |
| 268:1,3 270:7 | 3:1,7 | 134:24 135:6,7 | **millions**  55:23 |
| 270:18 271:8,9 | **mic**  120:7 | 135:18,25 | 55:23 173:5 |
| 271:22,25 | 129:12 | 136:2 151:25 | 195:13 |
| 272:7 | **michael**  2:22 | 177:10 180:20 | **mind**  59:14 |
| **memorandum** | **michelle**  7:1 | 185:22 186:6,9 | 79:20 88:25 |
| 40:17 | 141:6 279:19 | 186:11,19,22 | 124:19 168:12 |
| **memory** | 279:22 | 186:23,24 | 228:24 229:5 |
| 226:13 249:19 | **microphone** | 187:5 209:18 | 249:9 280:4 |
| 250:1,11 | 88:25 | 217:23 230:3,5 | 281:11 |
| **mention**  102:5 | **mid**  249:20 | 233:21,23,24 | **mineola**  317:23 |
| 192:11 | **middle**  35:7 | 234:4,16 235:4 | **minimis**  96:1 |
| **mentioned** | 146:19 161:19 | 235:5,9,9,15 | **minimize** |
| 41:2 72:17 | 253:20 313:23 | 237:15 238:8 | 14:14 |
| 103:22 142:22 | **migration** | 244:1,2,20 | **minimum** |
| 143:9 153:11 | 131:8 | 245:7 248:8 | 145:7,10 |
| 153:13 176:20 | **mike**  4:9 45:5 | 254:15 255:8,9 | **minus**  283:4 |
| 185:25 208:14 | **milk**  65:14 | 255:13,13,17 | **minute**  77:16 |
| 232:17 280:7 | **million**  10:25 | 255:23,23 | 185:2 221:22 |
| 281:9 293:25 | 10:25 13:25 | 256:14,16,23 | **minutes**  78:11 |
| **merit**  217:23 | 14:9,10 15:11 | 257:16,20,20 | 78:11 185:4,10 |
| 273:14 274:9 | 73:16,25 74:1 | 258:14 259:5 | **mischaracter...** |
| 274:19 282:11 | 74:4,4,7,19 | 259:10 261:7 | 270:9 |
| 282:21 | 76:4,8,11 | 261:20,22,23 | **misconstrued** |
| **meritorious** | 79:12,21 80:13 | 261:24 262:5 | 308:1 |
| 273:12 | 81:21 86:12,14 | 264:1 272:13 | **mishear** |
| **merits**  123:3 | 87:3,4,5,5,6,7 | 272:15,21,22 | 186:13 |
| **messages** | 87:8,18,19,24 | 272:24,24,25 | **misheard** |
| 129:10 | 90:25 92:9 | 273:8,8,11,11 | 178:3 209:6 |
| **met**  32:25 | 94:10,21 | 274:18 275:5,6 | 216:11 |
| 163:3,8,10 | 101:12 102:4 | 275:8 282:15 | **misleading** |
| 205:12 | 102:13 104:1 | 283:4 291:11 | 108:23 240:18 |
| **methodology** | 106:1,17,23 | 291:13,13,14 | 265:1 |
| 111:11 139:4 | 107:2 108:15 | 291:24 293:5,6 | **misled**  108:8 |
| 170:21 191:6 | 108:16 121:2,5 | 294:18 302:3 | 266:21 289:25 |
| **methods**  151:6 | 133:1,3,5,10 | 303:2,7,11,22 | **mismanage...** |
| | 133:16,24,25 | 303:22 304:16 | 175:24 265:14 |

misremembe...
  37:12
misrepresent...
  266:16
missed   159:22
  250:19
missing   187:8
misstating
  241:2
mistake   68:16
  173:25 174:2
  174:24 175:14
  175:16
mistaken
  216:15
mitigate   74:23
mm   84:3
  209:20
model   142:15
  160:7
modeled   83:3
modest   248:4
modifications
  197:13
modify   17:10
moelis   16:18
  54:23 57:10
  71:19 97:16
  114:2 116:24
  124:25 183:23
  194:12,23
moment   35:7
  65:4,16,17
  109:14
monetary
  174:15 229:4,4
  231:11,23

monetization
  148:22
monetize   61:17
  62:4 81:8,17
  148:14 149:8,9
  150:23 182:21
monetizing
  62:7 184:1
money   55:22
  65:15 68:5,9
  74:16 85:3
  87:17 100:11
  114:25 115:1,2
  119:24 120:2
  120:25 121:19
  128:15 133:10
  135:4,15,24
  136:3 139:16
  156:9 158:11
  177:13 178:23
  197:9,10 200:1
  200:4 201:3,7
  201:10 230:11
  230:12 234:9
  241:9 242:24
  243:1,12 247:5
  247:13,14,15
  254:25 255:18
  255:23 257:6
  257:12,17,25
  258:4 259:8
  261:15 262:1
  276:9,22,23
  282:14,18
  283:9 289:2
  291:25 292:14
  292:15,23

294:12,13,19
  302:10,11,15
  302:16,17
  303:3 304:9,10
  304:12
monies   261:10
month   13:17
  22:19 63:14
  111:12 112:1
  130:7 186:12
  187:5,11 257:1
  261:23,24
  300:21 302:2
  313:20
months   13:9
  35:17 89:17,23
  90:3 93:18,24
  114:13 116:23
  129:21 146:3
  146:22,23
  147:23 148:5
  155:7 156:7
  173:5 181:15
  183:5 227:12
  227:13
morning   9:3,5
  24:6,10 32:15
  45:5 53:11,12
  70:3,5 88:19
  88:20
morrissey   5:6
  40:20,20 42:15
  43:12,15
motion   3:2,13
  3:15,20,22
  10:2,7,17
  23:11 41:20

175:4,20 316:5
motions   3:24
  9:12 175:6
  265:23
motives   236:11
  260:21
mouthful
  240:8
move   9:18,21
  58:12 70:17,19
  70:23 71:3
  72:8 78:16
  82:21 92:23
  96:20 100:16
  115:9 129:20
  162:8 168:24
  174:7 178:9
  183:18,20
  187:1,5 193:2
  194:19 214:3
  230:25 302:3
moved   224:18
  307:7
moving   78:3
  79:9,10 97:20
  104:24 116:23
  136:14 163:24
  165:18,25
  171:16,20
  176:12 252:25
  253:2
multibillion
  286:11
multiple   51:8
  114:9 122:20
  124:25 138:4
  151:14 299:1,1

**mute** 229:16
298:2

**n**

**n** 4:1 8:1 9:1
316:1 317:1
**n.e.** 4:13
**name** 48:6 53:1
90:18 118:17
118:25 129:2
130:12 181:24
188:24 220:5
245:8 246:20
246:21 269:8
**named** 103:1,3
**names** 172:1
179:22 271:20
**nanosecond**
199:4
**nashville** 245:7
**national**
156:11 169:6,8
**nature** 225:15
**nav** 298:24
**ndas** 171:25
**ne** 4:20
**nearing** 159:7
**nearly** 307:9
**necessarily**
135:6 147:17
249:11 281:23
311:17
**necessary** 93:5
**need** 9:24,25
17:18 19:4,18
26:13,17 29:9
35:12,24 37:14
37:24 40:6,18

43:17 51:18
53:7 56:4
59:16,25 60:20
65:17 78:22
84:10 87:11,12
92:25 93:12
94:1 98:2
109:5 130:5
132:7 137:8
171:25 175:9
176:9 180:23
209:22 229:10
254:22,25
255:2 280:22
281:20 296:16
298:2 315:4
**needed** 49:17
58:23 114:11
150:19 202:21
203:3,13
280:12
**needs** 26:16
28:3 30:23
187:1 199:7
**negative** 26:24
29:24 30:1
**negligence**
236:24 254:1
257:22 301:16
**negligent**
236:25,25
**negotiate** 234:7
237:12
**negotiated**
54:15 230:6
**negotiating**
13:17 309:1

**negotiations**
175:12 309:6
**neither** 314:16
**neophytes**
227:4
**net** 230:4,4
247:3,6 298:25
301:13 302:5
303:11,20
305:13,14,19
305:20 306:7
306:12 307:9
**network** 303:6
**never** 121:1
164:10 178:14
181:7,16
182:15 198:4
243:14 247:21
277:6,7 279:4
296:14,20
**new** 1:2 2:3 4:6
5:4,16,17,19
6:4,11,18
15:10,16,16,19
15:20 37:22
88:14 99:5
142:1 163:4
169:16 218:21
234:14 235:4,9
254:23 313:3,4
**newer** 70:7
**newly** 268:2
**news** 120:9,9
217:22 239:13
**newsom** 7:10
45:22 46:2,7
46:21,24 47:5

47:14,17 48:3
48:7,11,14
49:21 50:8
51:11 52:14,14
52:18,21
**nft** 244:6
**nfts** 244:3
**nice** 40:21
158:20 249:2
**niche** 278:3,13
278:17
**night** 18:1
**nine** 22:2
271:24,25
**noise** 229:15
297:24
**nominally**
199:8
**nominated**
223:6
**non** 26:15
155:2 228:11
244:9 282:21
**noncomplian...**
169:8 170:17
**nonconsenting**
44:5 111:13
**nonpublic** 25:2
30:20
**nonresponsive**
249:15
**nope** 239:14
**normal** 286:9
**nos** 3:18
**notable** 236:10
**note** 274:11

noted   75:4
notes   213:6
  216:15
notice   23:14
noticed   247:3
notified   249:14
  251:23 252:4
  263:6
notwithstand...
  31:6,16
november
  132:20
number   9:22
  10:23 11:5,6,8
  15:3,19 25:3
  26:6 42:16,24
  42:24 46:16
  53:23 57:8,10
  57:12,13 61:10
  70:11 71:11
  82:10 96:23
  97:8,13 102:15
  105:23 106:11
  113:17,25
  115:6,11 125:4
  135:19,19
  136:1 143:25
  144:10 148:8,9
  155:5 158:5
  172:1,25 182:9
  183:9 194:25
  195:14 205:13
  212:3,23
  220:12 227:25
  228:9,14,15,19
  233:16 256:1
  259:22,22

263:24 272:3
275:16 276:24
276:25 282:15
296:5 298:20
305:15,17
307:9,10
numbers   43:9
  83:4,21 84:8
  84:14 92:3
  102:3,6 108:22
  109:4 143:24
  145:3 147:15
  151:13 209:12
  303:1
numerical
  84:15 172:1
numerous
  50:21 166:2,10
  211:25 213:20
ny   2:3 4:6 5:4
  5:19 6:4,11,18
  317:23

**o**

o   2:21 9:1
  317:1
oath   161:14
  185:7 230:21
  232:6 244:19
object   27:15,15
  55:13 56:9,20
  56:24 64:18
  66:3 72:21
  74:25 79:15
  85:1 90:11
  92:11 101:18
  110:5 112:2
  113:12 116:3

117:7 125:21
130:10 134:12
140:5 160:13
163:19 166:10
170:23 172:6
176:25 179:18
182:3 187:13
190:2,8 192:14
195:5 196:10
204:2,25
242:15 252:6
303:12
objected   15:12
  19:17 51:20
  52:1 66:12
  117:6
objecting
  56:15
objection   3:17
  24:11 25:12
  27:7,16 30:5
  38:19 40:12,23
  47:23 48:18
  49:7 50:15,16
  51:12 55:11,12
  56:4,12,14,16
  57:2 60:19
  65:22 66:4,5
  75:2 79:17
  85:13 101:22
  101:24 126:1,3
  126:8 130:12
  134:15 160:18
  163:21 175:8
  175:20,25
  184:16 187:18
  190:12,18,19

195:9 229:17
258:17 263:21
270:9 309:17
objections   15:9
  15:13,15 17:8
  24:14 35:9,18
  39:9,11 45:18
  51:3 52:12,15
  52:17,19 75:4
  78:23 123:8,10
  216:18 220:13
  220:21 221:1,4
objective
  114:16
objectivity
  57:17,18
objectors   9:23
  15:18 17:6,15
  23:20 52:5
obligated
  258:3
obligation
  188:1 247:8
obscure   70:12
  138:5 148:14
  148:20 182:20
  183:18
observation
  260:19 295:7
observed
  235:10
obstacle   178:4
  178:15 179:5
obstacles   15:14
obtain   229:3
  234:8 237:13
  255:6 290:23

| | | | |
|---|---|---|---|
| 305:20 | 65:25 72:25 | 295:25 296:5 | 101:1,6 102:8 |
| **obtained** 94:2 | 78:17 85:12 | 298:17 301:15 | 103:12 106:19 |
| 233:11 234:1,2 | 140:9 247:21 | 302:6 306:4 | 107:4 108:3 |
| 234:3 281:16 | 260:15,15,16 | **okay** 9:16,21 | 109:5,20 |
| **obtaining** | 261:5 293:12 | 9:22 12:7,15 | 111:12 112:7,8 |
| 234:9 254:23 | 314:22 | 17:23 19:6 | 112:10,14,16 |
| 274:12 | **offered** 66:6 | 20:20 22:21 | 115:3 118:11 |
| **obvious** 51:16 | **offering** 40:8 | 23:8,17,20 | 118:16 120:16 |
| **obviously** 12:8 | 133:5,6,17 | 24:4 35:6,7 | 122:1,8 124:4 |
| 21:4 36:1 | 285:23 | 37:19 39:7 | 126:10,22 |
| 68:25 94:8 | **office** 5:8 43:21 | 40:1,10 43:11 | 128:16,19 |
| 118:16 135:16 | 44:1 166:4 | 44:19 45:21 | 129:7,14 |
| 145:3 153:19 | **officer** 6:8 | 46:14,18,20 | 130:13,20 |
| 178:11 209:14 | 228:20 233:6 | 47:24 48:17,20 | 131:2,13 132:9 |
| 211:2 244:16 | 251:19 256:7 | 48:25 51:13,13 | 132:19 133:13 |
| 256:22 257:19 | 268:9 282:15 | 52:2,8,13,21 | 133:15 135:12 |
| **occur** 79:8 | 283:3 289:14 | 52:22 53:19,21 | 136:6 138:15 |
| 196:15 197:2 | 290:1,7 292:3 | 54:4,19 55:6 | 138:17 140:25 |
| 287:4 | **officers** 3:5 | 55:17 56:14,18 | 141:2,9 142:6 |
| **occurred** | 226:19 228:5 | 56:25 58:2,12 | 142:22 144:6 |
| 158:21 205:21 | 246:11 255:1 | 59:1 60:25 | 144:21 145:22 |
| 285:3 296:15 | 256:3 264:23 | 61:5 63:21 | 149:3,16 150:9 |
| **occurring** | 264:25 266:4,5 | 66:4,9,17,22 | 153:2 154:7,13 |
| 180:19 | 266:25 272:18 | 66:24 67:1,4 | 154:16 155:11 |
| **october** 227:17 | 273:17 274:10 | 69:3 71:1 | 155:16,17 |
| **odd** 255:12 | 274:14,21 | 72:11 74:23 | 156:16,17,19 |
| 272:3,21 | 275:1 276:8 | 75:23 76:2 | 156:23,25 |
| 294:18 | 283:17 284:14 | 78:2,11 82:21 | 157:4,22,24 |
| **odds** 156:10 | 285:4 289:23 | 84:17,19 85:6 | 158:7 159:15 |
| **offboarding** | 296:17 | 85:10,16 87:23 | 161:9,17 |
| 168:19 | **official** 3:17 | 88:2,4,11,16 | 163:24 164:24 |
| **offer** 9:20 | **officially** 78:14 | 89:8,11,15,20 | 165:6,22,23 |
| 16:22 17:3 | **offsets** 152:5 | 90:4 91:3,22 | 166:24 167:3,7 |
| 38:2,6,15 | 152:11 | 91:25 92:4,25 | 167:15,18 |
| 45:11,14 48:21 | **oh** 149:18 | 94:6 95:14 | 168:10,16 |
| 49:4,5 51:20 | 156:22 259:8 | 99:11 100:16 | 169:2,17 |
| 52:11 56:20,20 | 267:20 293:18 | 100:22,25 | 170:16 171:13 |

| | | | |
|---|---|---|---|
| 171:16 174:7 | 279:17,23 | 95:13 130:19 | **opening**   9:14 |
| 178:3 180:12 | 280:1,25 | 131:1,6 143:24 | 9:17 47:21 |
| 180:15 181:3 | 281:22 283:6 | 157:13 198:13 | **opens**   136:8 |
| 185:4 186:1,3 | 283:24 287:12 | 198:25 199:13 | **operable** |
| 188:15 189:1 | 287:21 288:6 | 204:9,11,12 | 116:11 |
| 190:12 193:22 | 288:24 289:1 | **old**   317:21 | **operating** |
| 196:6 197:3 | 290:6,20 295:9 | **onboarded** | 33:11,13 |
| 199:16 202:12 | 296:24,25 | 215:18 | 102:19 103:2,3 |
| 202:19 203:6 | 297:6,9 298:3 | **onboarding** | 103:5 170:3 |
| 204:17 206:17 | 298:18 300:8 | 168:19 | 267:19,23 |
| 207:1,8,14 | 301:9 302:14 | **once**   47:14 | **operations** |
| 208:2,4,10 | 302:25 303:5 | 150:6 190:17 | 67:9 |
| 209:10,10,21 | 305:16 306:16 | 191:8,14 192:5 | **opine**   29:9 |
| 210:7,13,13 | 306:25 307:5 | 192:7 193:3,9 | 73:20 153:22 |
| 211:13 212:10 | 309:13 310:8 | 197:20 206:19 | **opining**   34:12 |
| 212:10,13 | 310:10,10,21 | 208:1 214:25 | 273:12 |
| 213:8 214:6 | 310:23 311:1 | 234:15 258:7 | **opinion**   27:11 |
| 216:9,18 218:9 | 311:16 312:6,7 | 261:23 262:4 | 27:15 56:17 |
| 219:16,21 | 313:3,9,10,10 | 277:17 289:1 | 64:3 68:21 |
| 221:16,24 | 313:22 314:3 | **ones**   148:20 | 69:1 72:7 |
| 223:9 224:19 | 314:12 | 180:11 184:2 | 98:22 106:3 |
| 229:18 232:17 | **okike**   4:8 9:3,4 | 185:24 288:20 | 125:7,12 |
| 234:22 235:23 | 9:6,17 10:4,19 | 288:21 312:19 | 135:25 136:24 |
| 237:24 238:20 | 11:23 12:2,5,8 | **ongoing**   30:16 | 139:5 183:12 |
| 238:23 240:8 | 12:11,17 18:5 | 64:21 150:25 | 183:13 192:3 |
| 240:12 241:5 | 18:21 19:5,11 | 169:15 180:21 | 193:20 252:9 |
| 242:2 243:22 | 19:21 20:13,22 | 205:21 | 252:15 267:1 |
| 244:24 245:3 | 21:11,15,21,24 | **opco**   11:5 | 297:12 |
| 245:15,18 | 22:2,7 23:1,9 | 18:10 22:25 | **opinions**   125:9 |
| 246:12,24 | 23:21 42:15,20 | 103:15 242:25 | **opportunistic** |
| 248:17,21 | 43:1,5,9 72:16 | **open**   26:18 | 189:17 190:24 |
| 249:10 252:20 | 75:22 76:1 | 114:20 120:7 | **opportunities** |
| 253:22 255:7 | 77:9,12,14,22 | 129:25 130:3,6 | 191:2 |
| 260:12 264:6 | 77:25 78:3,7,9 | 136:19 175:2 | **opportunity** |
| 266:8 267:14 | 92:22 93:1,7 | 183:1,2 199:24 | 55:1 90:5,7 |
| 272:11 273:15 | 93:16 94:4,7 | 298:1 | 93:17 194:23 |
| 275:5 276:11 | 94:16 95:3,10 | | 221:3 |

**opposed**  24:15
96:8 174:24
288:24 289:21
**opposite**  261:1
300:19 301:8
**opt**  46:25 47:6
47:7 145:8
146:20 240:25
308:15 309:14
309:15 310:2,4
310:13,17
**opted**  143:10
310:12
**optimal**  74:13
**optimizing**
149:5
**opting**  147:5
**option**  15:1
37:4,6 60:13
89:12 110:23
130:7 134:4,5
134:8,9,10
135:16 136:8
136:13,19,21
140:6 142:13
146:24 171:7
194:19
**optionality**
58:18 171:11
**options**  57:24
243:11,17
**opts**  309:21
**order**  8:21
41:21 44:16,18
44:21 54:8
64:1 78:18
123:11 129:20

177:11 180:1
191:25 194:21
197:15 227:1
**orderly**  14:22
82:16,17
**ordinarily**
266:17
**ordinary**
184:11,23
185:19 201:24
230:2
**organization**
65:9 114:23
124:23 176:19
**organizations**
49:15
**original**  75:19
107:13 234:4
234:11,14
**originally**  12:4
41:20 260:2
261:23
**ought**  10:3
27:6 78:15
121:7,14 249:9
**outcome**  21:4
72:10 153:23
153:24 248:15
278:15
**outset**  10:20
**outside**  79:16
101:19 280:9
281:2 287:5
**outstanding**
87:15
**outvote**  268:15

**overall**  77:8
148:13 209:14
209:15 233:19
235:18
**overlay**  58:8
**overnight**
314:3
**overrule**  50:16
79:17
**overruled**  57:2
160:15,18
195:7,9
**oversee**  240:4
**overwhelming**
10:21 54:2
**overwhelmin...**
11:4 15:4 86:9
**owe**  121:4
**own**  13:16 47:8
65:19,20 66:8
86:3,6 124:23
136:18 140:22
159:1 194:11
211:21 225:18
226:23 245:10
266:3,13
270:15 273:20
282:24 286:15
297:22 300:14
300:14 305:12
308:21
**owned**  225:6
247:22,23
**owners**  242:24
**ownership**
160:11

**owns**  244:12
247:24 312:20

**p**

**p**  4:1,1 9:1
**paces**  4:13
**package**  256:3
274:24
**page**  8:20
103:13 105:12
158:6 227:16
316:4
**pages**  40:16
49:13 50:4
250:25
**paid**  13:25
75:10 83:25
86:13 87:11,12
87:24 89:17
134:17,20,20
135:5 230:3
233:21 235:6
238:12 242:23
242:25 243:5,5
255:18 256:15
257:13,13
258:5 269:18
269:23 270:15
272:21,24
276:22 282:18
283:1,8 294:19
303:22
**painful**  159:20
**panel**  132:25
**paper**  139:22
**papers**  30:25
32:19 33:9,17
263:24

paperwork
235:3
paragraph
44:10 70:22
75:3 96:24,25
104:14 107:25
208:21 209:2
209:16
paragraphs
44:15 97:5
paraphrase
70:21 203:8
paraphrasing
75:7
pardon 269:20
parent 103:6,7
162:18 163:2,6
163:7,8,12
167:20 168:20
216:22 217:6,7
268:21,22
269:2
pari 63:7 138:7
paris 6:8
park 87:2
part 10:9 24:11
36:25 41:25
51:10 58:13
76:4 80:14,15
80:15 87:17
93:5 99:6
133:2 134:16
141:19 142:6
158:6 175:25
180:18 196:2
198:25 217:21
224:25 227:8

230:5,13,15
231:6 233:19
235:18 240:16
242:3 244:4
249:8 250:16
251:25 256:2
257:7 258:6
263:13 264:12
264:17 266:24
273:16,19
274:5 281:12
284:9 291:19
292:7,8 299:1
299:3
participants
61:16 97:23
99:10 125:1
184:4
participate
201:13,22
202:1 314:18
participated
125:17 172:20
287:19
participating
202:2
participation
312:20
particle 243:24
243:25 244:4,8
particular
18:18 27:12
31:19 32:24
33:18 77:10,19
78:6 175:13
182:5 220:16
220:22 224:17

particularly
62:6 119:19
225:15 236:5
parties 9:23
13:17 22:11
37:24 47:1
56:2 57:19
114:9 161:3
220:20 229:5
265:2 274:13
281:19 283:22
288:1
partner 222:21
partners
279:15 313:6
parts 17:11,16
24:11 36:3
104:24 166:10
229:20,21
party 13:14
25:17 55:3
98:10 223:13
255:18 256:12
260:8 266:4
294:13 301:12
pass 69:21
112:8 128:18
216:5 222:10
229:12
passed 159:8
passu 63:7
138:7
past 13:6 22:19
114:13 119:20
120:13 121:12
122:25 123:5
123:13 164:5

173:22 174:5
174:13,19
195:6
path 13:20
14:6 58:19
64:6 252:4
paths 224:9
patience
122:15
pay 116:24
201:8 228:18
229:25 230:12
230:15,16
241:9 242:24
248:12 255:9
256:10,13
258:3,4 274:5
294:6,13
payable 14:11
paying 87:12
169:6 177:10
255:13 273:11
295:10
payment
231:11
payments
243:10
payout 255:23
275:20 293:5
294:4
pays 270:11,14
peak 217:23
pegged 91:13
penalized
155:23
penalties
265:17 278:6

**pendency**
  150:17
**pending** 3:4
  10:2 82:22
  175:4
**penny** 247:19
**people** 19:25
  34:12 39:21
  40:3,4 43:18
  45:8 46:5,6,8,8
  46:13,14,15,18
  68:23 69:24
  72:8 82:18
  85:21 88:10
  93:13 95:8
  110:15 113:25
  118:8 119:8
  127:12,18
  128:9,20
  129:19 132:24
  136:8,19
  138:10 143:6
  143:17,19,22
  144:2,14,22
  146:2 147:16
  148:4 165:15
  176:21 179:21
  193:16,18
  198:2 221:22
  221:22 226:18
  231:24 241:13
  241:13 244:8
  260:4 264:2
  268:24,25
  271:20 274:11
  277:1,3,7,19
  277:23 278:21

288:8,8,11,15
288:19 289:7,8
294:23 295:4
299:15 300:4,6
300:13 310:5,6
310:7,11,11,12
310:13 311:16
311:18
**percent** 10:23
  10:24 11:5,5,6
  11:7,8,8,16,25
  12:5,22 14:7
  42:16,22,24
  69:16 71:4
  76:14 84:22,25
  85:2,4,22,22
  85:23 95:19,22
  96:2,4,16,23
  97:8,9,9,13
  103:16,16
  104:13 105:15
  105:17 106:11
  108:9,25 109:2
  109:3 133:3,7
  133:23 134:1,2
  135:10,15,18
  136:1,2 142:18
  142:22,24,24
  143:1,4 144:6
  148:17 152:11
  152:25 177:25
  178:11 181:19
  181:20 190:15
  190:16 191:9
  191:10,13,22
  192:6 193:14
  194:9 206:24

207:5,7,9,10
208:6,7,8,9,25
209:4,10,11,14
209:15 210:1,2
232:9 234:6
251:12 264:9
269:11,11
286:12 287:1,3
287:9 292:16
293:20,25
296:14 307:4
**percentage**
  46:13 83:21
  102:1,13
  104:23 107:7
  132:23 135:1
  143:2 189:21
  190:7 206:21
  207:15,25
  208:17 305:19
  306:11
**percentages**
  46:16 107:9,23
  109:9
**perchance**
  162:3
**perfect** 236:7
**perform** 285:5
  297:12
**performance**
  148:15
**performed**
  249:25 282:2
  284:12
**performing**
  33:12

**period** 63:4,14
  81:5 111:13
  112:1 130:7
  134:7,9 145:2
  155:5 181:14
  196:25 198:10
  199:7 211:14
  215:3 300:21
**permanent**
  68:14
**permissible**
  158:4
**permission** 9:9
  53:7
**permit** 9:14
**perpetrated**
  203:21
**perpetrator**
  266:5
**person** 40:22
  49:25 89:15
  165:15 173:8
  231:20,21
  247:22 268:4
  276:6,12 278:4
  293:19
**person's**
  247:22
**personal** 158:1
  219:18 230:19
  231:12 232:6
  232:19 239:24
  240:16 282:16
  287:19 290:10
  290:17 292:3
**personally**
  3:13 141:14

| | | | |
|---|---|---|---|
| 249:13 256:10 | **picking** 161:25 | 42:19,19 43:8 | 137:1,1,3,5,6 |
| 310:18 | **picture** 141:21 | 46:6,6,11,15 | 137:13,13 |
| **personnel** | **piece** 232:15 | 46:17,24,25 | 138:2 139:22 |
| 58:22 59:4 | 293:2 | 47:15,15,17,25 | 139:24 142:13 |
| 67:4,5,8 88:23 | **pieces** 231:23 | 50:3 53:22,23 | 142:14,19 |
| 89:4 | **piggybacking** | 53:25 54:5,6 | 143:2,11,20 |
| **personnel's** | 90:23 96:10 | 54:12,13 55:13 | 144:1,3,9 |
| 59:9 | **pivot** 90:23 | 55:14 57:21 | 146:8,17,20 |
| **perspective** | **pivoted** 13:14 | 58:13,19 59:10 | 147:6,12,25 |
| 42:20 68:2 | **place** 36:24 | 59:12,15,19,20 | 148:9 151:15 |
| 144:18 154:25 | 164:6 179:21 | 60:13,17 61:8 | 151:19,21,23 |
| 155:3 156:11 | 205:18 214:20 | 61:21,22,24 | 173:3,18 174:4 |
| 156:12 158:10 | 216:23 217:5 | 62:12,24 63:3 | 174:14 175:7 |
| 161:1 174:9 | 217:19 236:6 | 63:4 65:9,11 | 175:13 176:7 |
| 217:1,2 276:3 | 241:4 275:16 | 69:16 71:8,17 | 177:16 178:9 |
| **pertaining** | **placed** 210:9 | 72:25 73:3 | 178:10,11 |
| 126:11 | **plain** 273:9 | 75:24 77:1,2,2 | 181:8 192:1,1 |
| **perverse** | **plainly** 215:14 | 77:3,3,4 84:4 | 194:19 198:13 |
| 278:23 | **plaintiff** 1:11 | 84:11,13 85:5 | 203:4,10,16 |
| **phase** 226:10 | 1:20 | 86:16 87:9,10 | 204:13 205:19 |
| 236:7 | **plan** 9:8,11,19 | 88:23,23 89:5 | 207:21,23,25 |
| **phone** 10:5,6 | 10:21,22 11:2 | 89:6,7,8 91:6 | 208:6,6 211:7 |
| 53:13 60:4,5 | 11:4 12:19 | 92:22 94:18 | 211:7 215:24 |
| 69:10 128:23 | 14:21,23 15:2 | 95:5 98:14 | 232:10 233:2 |
| 141:2 159:9 | 15:5,12 16:3,9 | 99:9,10 101:14 | 240:21 242:10 |
| 188:16,18,21 | 16:13,20 17:9 | 102:6,6 104:10 | 247:14 260:2 |
| 199:22 202:6 | 17:12,14 22:23 | 104:11,12,13 | 261:10,13 |
| 202:13 206:11 | 23:16 24:24 | 104:16,25 | 273:14 290:4 |
| 226:16 279:7 | 25:17 26:14,15 | 105:1,1,7,8,18 | 309:21 310:2,7 |
| 297:17 299:25 | 26:19,22 27:10 | 106:2 108:1,8 | **plan's** 16:14 |
| 300:3 310:23 | 28:21 29:14,22 | 108:19,19,20 | **planning** 140:8 |
| **phrase** 234:18 | 29:23,25 31:7 | 108:21 109:1 | **plans** 36:15 |
| 256:8 287:23 | 31:16,22 32:4 | 110:21,22,24 | 77:7 106:4 |
| **pick** 17:9 | 33:12 34:11,20 | 111:5,7 112:18 | 173:20,21 |
| 105:24 162:7 | 35:11,14,16,22 | 114:11,17 | **platform** 12:23 |
| **picked** 174:3 | 36:4,16,22 | 126:13,15,21 | 12:24 13:24 |
| | 37:8 38:6 42:7 | 128:7,8 136:25 | 14:7 20:3,23 |

21:1,7 22:6
38:1 64:1,10
64:12 74:20
93:19 95:6
98:10,16,23
111:8 114:22
137:17,24
140:19 142:2,3
143:10,20
208:24 214:4
216:22 236:14
239:19 243:14
256:17,17,22
256:24 311:6,7
**platforms**
209:22 311:19
**play** 278:24
**played** 54:21
119:24
**player** 194:16
**players** 194:15
**pleasantry**
163:11
**please** 56:3
57:5 65:10,13
65:13,16,17
66:2,22 78:13
78:23 85:2,17
86:4 101:6
113:20 115:21
119:1 121:10
123:2 124:2
141:18 145:21
161:13,14
168:11 170:20
185:6 206:17
220:6,8 229:16

246:24 300:5
303:24,24
306:1
**pleased** 9:6
**plenty** 128:5
**plow** 219:19
**plug** 136:19
**plummet**
190:21 191:12
192:7
**plus** 13:24 74:1
233:24 303:2
**pm** 315:7
**pocket** 270:15
**podcast** 120:14
**podium** 188:14
201:25 279:6
**pohl** 8:13
16:23 218:20
218:21 219:24
220:1,4,7,7,11
221:7,9,20,24
222:1,13
238:14 242:5
245:25 246:2
248:18,23,25
252:20 254:13
259:11 262:17
262:19 270:19
271:7 279:8,10
279:13 280:2
297:7,9 303:24
311:2,4 312:11
313:14
**pohl's** 219:6
221:1

**point** 22:13
24:25 36:2
37:1 39:9
43:10 60:4,20
60:23 66:7
100:14 109:6
116:8 125:3
147:20 153:24
156:21 166:21
172:17 183:7
203:17 217:16
218:2 220:17
234:16 239:11
261:5 264:7
265:16 272:8
287:13 290:21
299:7 314:24
**pointed** 152:18
306:5
**pointless**
175:18
**points** 10:20
38:3,6 39:22
43:18 51:18,21
51:24 121:12
128:2 174:6
265:11
**poised** 13:7
**policies** 231:22
233:16 234:4,9
234:14 247:17
255:6 274:16
275:15,17
283:12 288:7
289:13 297:10
**policy** 229:2
232:16 233:10

233:15,19,24
234:4,11,14
235:4 238:21
248:6,8,11
254:16 255:9
272:18,23,24
273:11 274:4
275:2,5,16
276:9 292:10
292:14 293:3,4
293:7,10,25
294:2,7,17
**pool** 102:14
133:11 274:19
275:6 276:4
291:24 292:14
292:15
**poor** 307:21
308:7,10
**poorly** 224:14
**portfolio** 11:14
61:14 121:18
151:4 189:5,11
209:1
**portion** 77:6
108:24 147:16
170:8 192:4
280:6
**posed** 52:12
**position** 24:16
24:23,25 25:25
26:2,17 27:10
29:5,17 31:2,4
33:17 36:17
40:2 86:18,20
86:25 90:25
159:2 186:22

251:21 262:22
267:16 286:21
**positioned**
129:12
**positions**   159:1
**positive**   237:13
**possession**   50:3
**possibility**   69:4
110:3 142:1
217:14 296:18
**possible**   23:4
26:21 28:15
31:15 48:5
58:20 63:22
80:7 84:13
105:16 111:5
114:17,20
115:10 176:18
179:8 193:12
218:24 219:20
222:5 263:18
278:2 290:24
**possibly**
107:24 169:6
**post**   18:22
22:15 34:19
93:18 210:17
**potential**   25:20
27:20 29:21
34:23 57:23
223:13 228:22
229:5 255:21
265:17 272:17
273:3 274:18
274:19 275:20
288:17 289:8
299:11 301:3

**potentially**
19:24 34:3
36:4 37:17
156:9 175:24
199:11 207:10
283:13 291:25
295:1 307:21
312:22
**power**   271:17
**powers**   268:7
**practical**   14:19
290:25
**practice**
174:15 222:20
254:17,19
256:18
**practices**   166:1
166:7,9 224:24
225:2,3,11
236:4,6,18
281:14 282:12
285:10,12
297:11
**pre**   3:11
260:14
**precarious**
162:10
**preceded**   275:9
**precipitated**
264:2
**precipitating**
264:1
**precipitous**
286:19,22
**preclude**   34:21
**precludes**
58:11

**predict**   169:1
**predictions**
39:5
**predominantly**
152:10 288:5
**preexisting**
176:24
**preface**   166:11
**prefer**   152:17
157:8 180:4
**preferable**
147:13
**preference**
11:22,24 19:8
72:15 73:17
75:11,11
103:18 104:1
106:23 107:2
108:16 152:9
152:15,20
259:20
**preferences**
151:11
**preferred**
159:8
**preliminary**
17:22
**premise**   134:16
135:2 210:20
210:20
**premium**
293:3,4,20,24
294:6
**prepared**   59:4
59:5 219:11
227:14

**prepetition**
21:18
**prescribed**
71:16
**present**   15:14
69:24 88:11
205:17
**presentation**
66:8
**presented**
107:20 142:9
147:15 242:13
**presenting**
9:15
**preserve**   19:7
23:2 248:11
273:5 274:17
275:2 294:14
295:6 301:4
**preserved**
235:19 255:15
256:11 273:4
274:1,2 276:7
282:13,19
292:16 294:12
294:25 295:5,6
**preserving**
283:19
**preset**   212:6
**press**   238:9
250:17 251:6
251:10,15,18
251:25 253:10
262:21
**pressure**   57:14
71:15,18 285:4

presume
 303:21
pretty  15:17
 28:25 51:16
 228:15 230:11
 230:15 236:3
 237:4
prevails  62:18
 103:18
prevent  208:22
 216:23 217:6
prevents  84:2
previous
 164:17 275:8
previously
 143:9 170:18
 182:7 293:25
 306:6
price  21:22,23
 22:18,20 78:8
 183:6 190:16
 190:21 191:11
 191:12 192:7
 192:12 239:20
 307:7
priceless  244:6
prices  11:13
 77:19 206:24
 207:3
primarily  81:1
primary  16:12
 71:24,25
 166:20 175:7
 224:19,21
 225:25 249:10
 279:14 280:9

principle  10:11
print  184:20
prior  10:15
 66:24 78:1
 79:6,24 80:19
 80:20,24 81:11
 93:3 177:4
 205:22 220:12
 229:25
priorities  19:2
priority  62:1
 87:11,13 94:11
privacy  141:13
 141:14 142:15
 153:14 157:19
private  25:3,16
pro  6:23 7:2,5
 7:8,11,14,17
 7:20 9:12
 20:24 21:6
 23:24 49:11
 50:5 52:14
 56:7 129:5
 159:13 188:22
 200:15 206:16
 222:3 246:18
 248:20 297:4
 312:8
probability
 69:14
probably  34:7
 140:14,15
 154:24 159:8
 161:4 170:16
 173:5 209:6
 219:5 231:22
 237:1 267:2,3

272:25 276:6
 277:17,24
 292:5 293:23
 314:2
problem  80:12
 110:12 138:25
 180:6 181:4
 206:7,7 211:21
problematic
 62:5 64:4
 80:11 110:23
 179:16
problems  40:7
 60:9 63:13
 137:16 140:10
 215:12 265:8
procedural
 189:23
procedure
 268:4
procedures
 150:19 217:5
 217:19
proceed  9:10
 10:17 78:23
 85:17 101:6
 206:17 220:8
 220:23 246:24
 262:14
proceeding  3:1
 3:7 119:18
 122:23 127:7
 156:21 201:23
 255:3 285:6
proceedings
 123:13 126:6
 174:25 315:6

317:4
proceeds  59:8
 61:14,24 62:9
 82:14
process  9:8
 13:3 16:19
 25:2 26:18
 30:20 41:19
 53:18 54:17
 61:19 64:13
 99:6 115:14
 124:24 131:14
 140:15 150:21
 150:25 152:2
 171:21 179:6
 211:5 264:12
 267:5 277:18
 288:11,18
 297:17,22
processes  21:3
 25:2 300:15
procured
 233:18 238:21
productive
 20:14
professional
 49:14 51:8
 87:14,18,21
 134:19 142:23
 234:23 276:15
 276:16 280:18
professionals
 213:4,18 281:2
profiles  248:15
profit  244:9
profitability
 290:7,9

**programming**
178:16,18
**progress** 236:7
**prohibiting**
278:15
**projected** 12:3
12:5
**projection**
95:19
**promise**
173:23 175:11
**proof** 27:4
240:22
**proofs** 3:18
266:24
**propaganda**
117:22
**proper** 27:7
28:9 65:21
66:4,5 155:6
167:4,5
**properly** 67:15
265:25
**property**
100:11 197:19
198:4 211:14
245:7 304:2,6
308:18,23
**proportion**
21:18 210:6
**proportionality**
191:18
**proportionate**
60:18 210:5
**proportionat...**
210:4

**proposal** 128:2
174:12 260:15
**proposals**
121:25
**propose** 9:11
9:17
**proposed**
12:18 16:21
17:14 20:9
35:14 92:7
126:13 128:8
296:18
**proposes** 128:8
**prosecute**
228:16 254:4
282:24
**prosecuted**
231:8
**prosecuting**
17:12
**prosecution**
3:4
**protect** 14:15
41:16,23
217:12 251:21
**protected** 25:3
41:4 245:8
**protecting**
27:23 57:18
67:21 229:2
**protection** 41:3
197:4,12
**protections**
14:14 197:8
214:20 215:7
**protective**
215:10

**protectorate**
215:8
**protocol** 131:8
**protocols**
150:19
**prove** 26:24,24
28:1,4,4 31:5
**proved** 31:1
**proven** 84:23
114:5
**proves** 118:22
**provide** 14:18
17:22 22:14
26:17 27:10
62:24 63:3,15
76:12 115:25
139:8 191:19
**provided** 23:13
84:23 115:24
131:4 132:15
158:4 230:20
235:14 280:24
281:10,21,24
284:5,25
288:22 300:10
**provides** 14:2
14:5,10,13,22
22:9 58:19
63:4 70:22
71:3 72:20
73:23 75:5
86:8 94:21
158:3 171:3,4
171:11
**providing**
87:17 94:19
278:4

**provision**
47:12 54:13,15
84:10 115:25
141:16,20
199:6
**provisions**
35:10 51:16,23
52:9 87:23
177:4 198:19
198:20
**psaropoulos**
228:6 229:10
232:2 235:24
246:23 247:6,9
250:4,9 273:24
280:22 282:17
289:6 303:5
305:14 307:2,3
307:16
**pseudo** 300:22
**public** 48:12
116:9 239:7
265:1 271:12
296:8 298:6
300:10
**publicly** 164:4
227:20
**pull** 17:16
245:12
**pulling** 151:10
**purchase** 19:7
40:15 125:20
141:17,20,22
157:14
**purchased**
234:5

**purchaser**
  152:5
**purchasing**
  22:11 94:16
  213:12
**purely**  18:7
**purpose**
  193:19 224:17
**purposes**  21:19
  62:20 192:19
  193:21 197:22
  245:13
**pursue**  177:6
  247:5 261:3
  264:23 265:10
  266:14
**pursued**
  173:21 252:17
  266:14
**purview**
  271:16 280:16
**pushing**  160:3
  170:21
**put**  13:19
  15:18,23 16:17
  31:7 38:25
  42:3,19 51:13
  56:22,23 60:25
  70:7,8 162:9
  178:21 179:22
  198:16,19,21
  200:1,4 214:20
  215:14 229:1
  248:10 277:4,5
  277:6 278:7
  286:17

**puts**  51:9
  163:24 286:20
**putting**  165:1
  308:11

**q**

**qualified**
  280:17 296:8
**quantification**
  84:15 153:11
  153:14
**quantified**
  152:12 153:18
  154:1
**quantify**  252:5
**quarter**  186:10
  187:6
**question**  23:10
  23:25 24:1,2,3
  39:18 42:10
  47:22,22 50:22
  50:23 59:14
  60:10,11,14,19
  72:22 73:3
  76:17,20 83:16
  84:2 85:11,14
  86:4,24 88:1
  90:23,24
  100:19 101:11
  105:20 110:13
  112:4 113:5,8
  113:9 115:3
  117:8,11,12,16
  117:23 118:5
  118:18 119:13
  120:17 121:5
  124:1 125:22
  126:9,20 128:1

128:11 129:9
129:15,24
130:3,5 131:10
132:4,19,23,25
133:16,19
134:3,13,17
135:3 137:2,18
138:17 139:12
140:6 141:12
141:18 143:13
145:11,14,20
147:9,10,21
148:2,24
150:16 151:8
153:2,10
155:19 156:2
156:17,25
157:10,24
158:7,10,16
160:16,19
166:11 167:4,5
167:7,19,23
168:11,22
169:9 170:10
170:11,12,25
172:2,10,22,23
173:17 176:5,8
176:19 177:1,3
178:6 179:14
179:20 185:8
185:16 186:20
186:21 189:24
189:25 190:4,6
190:14 192:15
192:17,17,21
193:25 195:10
196:11,21

197:6 199:22
200:11,15,16
200:18,22
202:14,20,24
203:9 204:10
204:21 207:20
208:9,12
210:25 211:8
211:21,22
212:25 214:8
217:20 229:17
237:25 238:2
238:12 240:1,2
240:9,16
241:23 243:9
243:24 244:11
246:2,16
247:10 254:15
258:18,20
261:14,15,19
261:25 271:5
276:12,19
278:10 279:9
280:4 281:13
284:16 285:8
286:5,25
287:15,16,20
287:24 288:10
290:18,21
292:2,13 293:9
295:19,23
298:14,16
301:19,20
302:13 305:9
308:15 309:19
310:25 313:2
313:23,24

**questioned**
  202:14
**questioning**
  109:19 182:22
  187:21 258:7
**questions** 9:22
  17:25 23:19
  24:4 38:15
  40:18 43:14
  49:19 50:17
  51:6 60:23
  65:23 67:3
  75:1 85:10
  86:17 88:5,7,9
  88:19 90:12,19
  92:6,15 100:15
  100:23 101:5
  102:22 118:4
  119:15 120:6
  121:12,22,24
  123:2,3 126:3
  127:11,16,19
  128:16 141:7
  142:21 150:15
  154:15 159:5,9
  160:2 161:19
  162:12 163:20
  163:22 164:23
  165:1,4,5,18
  165:22 167:7
  168:1,3,25
  170:18 182:4
  190:9 193:20
  193:21 196:2
  199:17 200:8
  201:14,15
  204:22 205:13

  205:16 206:8
  206:13 211:3
  212:11 213:1,8
  214:18 216:19
  217:25 219:5
  222:1,4,10
  229:16 240:14
  246:9,22
  248:16,18
  254:10 262:15
  279:20 280:14
  297:2 303:15
  309:13 310:21
  314:5,9
**quick** 23:25
  155:8
**quicker** 98:3
  149:9 151:7
**quickly** 13:13
  58:20 62:8
  71:14 72:5,8
  96:21 97:20
  114:17 115:10
  148:15 182:21
  183:18 187:2,7
  187:20 215:9
  252:25 258:14
  284:21
**quiet** 200:24
  201:1,1,1
**quinn** 6:8
  218:16 219:23
  222:8 223:9
  249:1
**quite** 61:10
  74:3 98:4 99:7
  159:20 218:7

  240:8 249:6
  272:20,20
  308:13
**quote** 116:15
  251:15,17,20
**quoted** 106:12
**quotes** 250:6

**r**

**r** 2:21 4:1 9:1
  317:1
**radio** 120:8
**raise** 43:18
  264:3
**raised** 29:12
  38:21 60:12
  197:14 204:22
  205:4 275:25
**raises** 28:5
**raising** 27:8
  60:2 205:8
**ramifications**
  31:16 37:11
  312:24
**rampant**
  311:21
**ran** 44:21
**range** 86:23
  104:24 207:5,7
  303:20
**rapidity** 253:3
**rata** 20:24
**ratably** 215:11
**rate** 21:6
**rates** 72:5
**rather** 129:21
  190:10 229:7
  266:12 286:1

  309:15
**ratio** 205:25
**rationale**
  124:22
**ray** 189:13
**reach** 45:1
  248:15 259:12
**reached** 19:12
  93:24 161:7
  229:9 232:25
  235:24 237:21
**reaction**
  233:13 234:22
  235:11 264:3
**read** 36:6
  44:20,21 104:3
  104:14 108:23
  109:25 148:10
  205:5 208:21
  242:9 263:24
  294:21
**reading** 19:17
  107:23,24
**ready** 59:9
  110:15 233:18
  301:11
**real** 192:17
  224:22 226:1
  263:15 288:20
**reality** 289:16
**realizing**
  158:19
**really** 22:8,16
  22:20 23:2,15
  27:16 38:21
  39:6,10,10,17
  40:8 47:20

48:1 51:17
56:21 63:11
65:4 69:19
70:8 75:8 82:4
94:17,21 96:7
103:8 116:7
119:20 129:11
133:19,20
134:18 139:20
148:11 152:5
156:13,15,17
159:2 210:13
210:17 211:19
211:23 218:1
224:22 226:1
236:22 237:13
240:9 241:16
248:14 261:5
263:2,7,23
264:19 266:19
267:7,25
269:11,12
271:19 273:10
277:10 280:19
286:4 288:4,19
289:10 292:21
293:22 301:17
307:11 308:22
**realm** 34:18
**reason** 10:8
30:18 56:10
58:16 59:11,15
81:12 114:15
114:22 118:5
121:3 127:22
186:13 192:10
195:24 225:19

225:22,23
231:13 269:11
278:23 287:3
290:22 291:16
292:17 295:21
296:9
**reasonable**
291:21 293:20
**reasonably**
306:18 308:8
**reasoned**
292:14
**reasons** 38:12
40:5 84:24
136:5,5 176:14
236:9 291:2
292:11
**rebalance**
61:18 71:12
80:16,20 151:3
153:4 189:18
191:18
**rebalanced**
92:3
**rebalancing**
26:3 31:21
32:19 61:14
67:12 68:3
80:6,9,14,16
81:16 82:14
83:10 92:1
94:8 97:20
148:25 149:4
150:3,10,21
151:5,9 153:12
180:19,22
187:12 188:7

189:4,10,24
190:23 191:7
191:15 192:1,2
192:4
**rebellion**
243:10,13,18
245:19 279:15
**rec** 271:12
**recall** 26:6
41:17,18 179:4
198:12 212:25
213:10 214:17
233:9 234:2
249:22 250:8
251:10,16,25
252:2 261:8
263:7
**receive** 11:16
16:3 18:14
19:25 21:6
104:25 145:8
146:5,24
150:23 152:17
155:2 178:18
230:2 231:18
232:9,10
243:10
**received**
129:10 165:8
220:13 229:25
235:15 273:7
312:15
**receives** 21:17
156:5
**receiving** 16:6
146:23 151:10

**recent** 191:13
**recently** 72:12
**recess** 78:11,12
161:12 185:3,5
202:4
**recharacterize**
178:8
**recite** 13:6
**recklessly**
266:7
**recollection**
72:16 238:16
249:19 269:7
271:13 272:2
**recollects**
250:1
**recommenda...**
294:1
**recommenda...**
269:3
**recommended**
249:16 268:20
269:3 277:5
**record** 32:16
43:25 53:2
56:5,7 64:12
70:3 79:1 85:8
88:13 200:2
219:23 220:5
220:10 227:19
317:4
**recordkeeping**
194:20
**records** 67:15
212:3 213:21
**recourse**
231:12 232:19

304:22
**recover** 255:17
255:17 302:25
307:1
**recoveries**
11:11,18 18:19
18:22,23 43:1
43:2 60:17,18
62:11,13 71:22
73:15 77:8
81:25 86:15
103:8 104:16
104:17,20
105:14 106:17
107:7 135:2,10
243:3
**recovery** 11:16
11:22,24 12:4
14:18 18:14
42:12 63:8,18
81:20 82:5,24
82:25 102:1,12
102:13 103:14
103:24 104:23
105:6 133:4,7
133:24 134:6,7
135:15 146:2
147:14 148:12
148:13,16
149:10 152:1
152:24 171:3,4
171:5,10
191:24 206:19
206:22 207:4
207:15,25
208:5 237:14
272:17 274:3

274:18 275:6
276:4
**recriminations**
173:20 175:11
**recross** 8:3
**recuse** 10:2,10
10:17 316:5
**red** 236:15
275:25 288:8
295:18
**redact** 48:7
**redacted**
227:21,23
247:4
**redirect** 8:3
216:6 217:13
**reduce** 71:4
73:14 100:10
186:14 193:10
**reduced** 11:24
103:15 105:14
**reduction**
106:24 148:17
**reeducated**
236:22
**refer** 91:15,16
229:10,21
**reference**
263:22
**referenced**
170:1
**references**
304:4
**referencing**
97:5
**referred**
303:25

**referring** 35:10
113:19 191:8
196:17 204:5
271:8
**reflected** 92:15
**refresh** 72:16
238:16 271:11
271:12 272:2
**refreshed**
269:8
**refresher**
72:13
**refreshing**
249:19
**refund** 230:8
303:3
**refusal** 201:24
**refusals** 122:21
**refuse** 172:3,4
172:21
**refused** 173:1
204:7,13
**refuses** 162:19
**regard** 37:23
104:8 109:10
307:17
**regarding**
16:12,25 33:19
72:15 73:4
90:20 110:19
246:22
**regardless** 63:9
108:18 132:13
**regards** 155:10
169:25 189:10
191:13 196:4

**regiment**
153:20
**regimented**
150:21 152:2
**registration**
32:24 34:4
**regular** 120:2
**regulation** 36:9
36:9 153:20
**regulations**
58:1 156:10
169:10
**regulator**
27:22 36:19
38:11
**regulators**
57:22 83:9
127:18 243:4
**regulatory**
19:18 25:15
28:22 35:19
38:12,13 57:23
58:8 82:23
83:1,17,22
110:25 111:3
152:6 153:18
155:9 169:8,18
169:20 170:17
195:14 225:1,9
234:12
**rehabilitated**
260:22
**rehypothecate**
160:9 214:13
216:11,13,16
**reigning**
265:24

**reimbursed**
274:15,23
**reimbursement**
14:8 94:20
**reiterate**
170:20
**rejoining**
201:21
**relate** 120:6
**related** 141:7
141:12 220:21
240:4 281:15
281:24 282:10
282:12
**relates** 34:22
193:25 220:17
240:16
**relation** 291:21
**relations** 238:9
**relationship**
168:18,21
199:3,3 213:9
277:1 285:24
**relationships**
281:18,19
**relative** 97:19
185:12,21
189:19 230:12
230:15 232:3
276:22 283:15
309:2
**relatively** 77:7
189:18 248:3
253:24
**release** 12:9
46:25 47:7
176:17 199:25

235:19 251:10
251:15,18,25
252:3 253:10
262:21 268:8
291:24 296:16
**released** 55:21
191:10 192:7
193:15 231:6,7
232:24 233:1,2
233:7,8 250:14
251:14 273:14
273:25 282:20
290:4 296:15
296:21 310:11
**releases** 16:7
17:2 219:2,3
233:1,3,4
238:10 241:1
250:17 251:7
273:16,17,21
274:7,11,13
278:5,15
296:18 310:3,8
**releasing** 47:1
47:8 191:15
232:18
**relevance**
72:21 79:15
113:13 116:3
120:23 172:7
190:2 204:2
**relevant** 42:17
42:24 72:23
92:13 101:19
120:22 172:7
174:10 176:9
190:9,11 195:6

195:8 250:23
252:12 268:1
269:12,13
271:14,19
304:23
**relied** 237:18
239:17 299:2,6
**relief** 3:3
**rely** 256:4
**relying** 157:17
**remain** 11:18
63:5 87:14
**remaining**
15:15 19:13
64:2 67:4,5,8
208:16
**remains**
228:21
**remarks** 9:14
9:17 58:9
**remember**
132:24 136:15
187:19 214:10
214:14 227:17
236:21 262:2
268:23 269:7
271:20 302:20
**remembered**
77:17
**remembering**
12:1
**remind** 207:19
**remotely**
247:17
**removal**
175:21

**remove** 21:6
**removed**
204:14 234:13
**renzi** 8:5 16:10
49:2,6 50:17
51:14,19 52:11
52:20,22 53:3
53:9,11,15
59:11 61:4
67:3 69:25
70:1,3,6 76:4
79:4,4 82:22
86:1,17 87:2
88:4,7,17,19
90:16,18 101:8
101:10 102:2
102:11 104:7
104:21 105:4
105:11 109:24
112:19 129:17
141:10 154:17
159:17,19
161:14,25
162:3 167:1
168:5 169:5
176:14 185:7
188:14 189:2
204:19 206:18
212:17,19
216:9 226:24
**renzi's** 49:8
50:9,12 103:23
104:10 105:2
108:3 219:5
**reorganization**
35:13,14 36:23
59:13 116:14

142:13 147:6
147:13
**reorganize**
59:17 65:11,12
**repaid** 259:19
259:22 260:8
**repayment**
12:12
**repeat** 60:10
86:4 121:9
284:2
**repercussions**
180:13
**rephrase** 85:18
89:21 290:20
**rephrasing**
292:2
**replacing**
272:7
**reply** 50:10
**report** 17:5
39:24 48:3,4
96:7 220:19
227:10,11,16
227:18,20
251:2 271:13
271:13,15
285:1 305:12
**reported** 235:3
305:12 306:7
**reports** 217:22
**represent**
12:22 57:15
129:4,5 213:3
**representation**
209:13 214:1
214:12

**representations**
212:23
**representative**
165:17 170:6
**representatives**
125:4 212:8
**represented**
13:20 137:25
156:16 206:25
216:10 217:4
217:18 223:8
223:10
**representing**
10:24 12:24
57:19 226:1
241:25 289:14
**represents**
287:2
**reputation**
278:3
**request** 111:18
314:18,20
**requested**
204:12 312:15
**requesting**
20:5
**requests**
226:14 250:22
**require** 20:8
30:19
**required** 67:16
151:5 176:16
230:18,20
312:16,17
**requirement**
75:13 282:7

**requirements**
16:13 32:25
**requires** 35:11
36:22
**requisite** 46:16
**reread** 36:6
**research** 16:11
189:6,15 194:1
194:4,21 196:7
**reservations**
55:10
**reserve** 73:13
75:13,24 94:2
**reserves** 93:12
194:6
**residents**
155:22 156:8
**resist** 278:11
**resolution**
14:20 20:7,16
155:8
**resolved** 15:8
40:14 75:14
266:15
**resolves** 15:3
**resoundingly**
17:15
**respect** 23:5,6
23:10 30:14
62:24 157:17
171:25 199:14
229:24 231:10
231:17 232:2
232:15 233:3
247:8 256:2,14
257:23 259:17
259:18 261:20

266:11 273:23
273:23 274:11
280:10,20
286:7 304:17
304:17 307:12
**respond**
174:10
**response** 51:2
60:16 168:25
217:22
**responses**
40:16
**responsible**
276:14 280:5
288:2
**responsibly**
183:5
**rest** 10:17
17:11 91:25
102:14 109:6
114:2 163:18
271:3 289:4
**restart** 99:6
**restarted** 98:18
**restrict** 20:3
**restrictions**
155:13 218:22
**restructuring**
36:21 37:13
222:15,20,22
234:23 254:22
**result** 43:5
231:11 273:22
274:1 284:18
285:18 290:24
301:2 303:2

| | | | |
|---|---|---|---|
| **resulting** 18:18 | 224:13 226:11 | 97:2,5,10 | 214:22 215:1,5 |
| **results** 46:5 | 226:12 250:21 | 98:15,20,25 | 215:15,15,18 |
| 47:24 94:25 | 250:21 251:1,2 | 99:12,25 100:8 | 215:22,23 |
| 265:17 | 264:15 280:5 | 101:12 103:24 | 216:6 218:10 |
| **resume** 161:9 | 281:12 293:10 | 107:4 109:12 | 218:11 219:2 |
| 202:3,5 314:7 | **reviewed** 10:7 | 110:7,7 111:15 | 219:16 220:8 |
| **resuming** | 167:21 211:25 | 111:22 116:7,7 | 221:2,19 |
| 313:25 | 213:20 227:14 | 117:20 118:22 | 227:18,24 |
| **resurrect** | 250:25 299:8 | 119:22 122:15 | 229:22 231:13 |
| 241:19 | **reviewing** | 123:15,25 | 231:15,15 |
| **retain** 277:19 | 111:2 | 130:18 133:21 | 232:8 234:7 |
| 280:11,12 | **revise** 48:4 | 137:5 138:14 | 238:22 239:15 |
| **retained** 281:3 | **revision** 272:6 | 138:22 140:20 | 241:8 243:11 |
| **retake** 161:14 | **richard** 5:6 | 140:23 144:13 | 245:16,21 |
| **retired** 222:23 | 40:20 | 149:5,7,15 | 246:15 248:8 |
| 276:21 | **right** 10:6 12:1 | 150:6,14 151:1 | 252:23 255:14 |
| **retirement** | 12:10 13:5 | 153:5,21 154:8 | 257:15 258:1 |
| 239:10 248:3 | 22:4 23:17 | 156:21 157:15 | 258:14,25 |
| 302:10,15,18 | 33:10 35:7,18 | 159:25 161:13 | 259:2,2,2,6 |
| 304:9,14 | 38:22,23 39:5 | 162:10 169:14 | 261:13 262:16 |
| 305:22 | 39:7 42:7 | 173:12,15 | 264:4 267:17 |
| **return** 105:16 | 43:16 45:2,3 | 175:24 178:25 | 269:7 272:11 |
| 112:23 113:2 | 45:18 47:20,21 | 180:20 181:3 | 273:7 274:23 |
| 177:21 191:20 | 47:22 48:1,2 | 183:2,2 185:3 | 275:12 276:11 |
| 230:6 273:8 | 48:17 49:7,9 | 185:6,20 | 276:21 282:24 |
| **returned** 89:9 | 49:22 50:2 | 186:10 187:12 | 284:21 285:24 |
| 209:21 | 51:4 52:16 | 191:18 193:7,9 | 292:10 293:4 |
| **reveal** 39:14 | 53:1 55:19 | 198:1,7,23 | 294:5,8 302:1 |
| **revealed** 306:6 | 56:9 66:24 | 199:9 201:12 | 302:3,19 305:2 |
| **reverse** 14:10 | 68:4 69:15,23 | 201:22 202:5 | 306:4,25 307:3 |
| 68:13,16 | 74:3,20 75:20 | 203:10 206:8 | 307:5,23 |
| **review** 25:14 | 75:24 78:2 | 206:10 208:4 | 309:24 314:6 |
| 25:20 29:20 | 80:11,17 81:24 | 208:15 209:18 | 314:20,22 |
| 30:4 49:12,16 | 82:21 83:25 | 209:19,23 | 315:5 |
| 49:18 50:22 | 85:6 88:4,6 | 210:2,5,7 | **rights** 23:5 |
| 51:5 55:6 | 91:1 93:15 | 212:15 213:7 | 78:10 144:16 |
| 220:20 221:10 | 96:5,13,18 | 213:13 214:4 | 231:3,18,18 |

232:9,13
266:13 274:14
274:15 309:16
309:24 310:18
**rigorous** 196:5
297:21 300:14
300:15
**ripe** 33:8
**rise** 10:9
240:19 252:16
252:20 253:25
254:1 260:23
266:3 282:6
284:13 289:21
**rises** 22:18
**risk** 14:14
83:20 142:6,15
150:13 152:5,8
153:18 181:5
188:3 198:23
210:13,15,19
211:1,11,11,18
211:20 225:3
236:4,6,18
281:24 282:12
283:12 285:9
285:12 286:23
287:7 288:7,11
288:15 289:13
293:3,14,24
301:6
**risks** 16:15
24:19,21 26:21
27:9,20 28:23
29:7,7 35:25
36:8,12 38:24
64:8,9 67:18

68:1,7,18
83:22 152:6,7
152:12,12
153:14,15,25
160:2
**risky** 293:19
**road** 4:13
317:21
**robbed** 128:15
**robust** 205:20
205:23 299:3,9
301:3
**role** 31:10,11
53:14 54:20
67:5 159:22
224:19,21
**roles** 166:25
**room** 5:3 28:6
69:24,24 212:8
**root** 263:20
**rough** 86:23
190:6
**roughly** 133:9
135:21 144:23
190:15 191:9
207:7,9,10
208:6,7 209:10
209:18 210:4
247:2 300:21
**round** 171:22
**route** 14:4
**rule** 19:3 85:13
122:9 265:22
**rules** 23:13
56:10 66:6
83:12,18
119:17 201:24

262:3 279:4
**rulings** 10:15
265:24 316:3
**rumors** 311:4
311:12,14,15
312:1,5
**run** 249:15,23
250:6 258:16
263:6
**running** 44:23
102:15
**ryan** 5:14
43:20,20,24,25
44:17,23 45:4
60:6,8,9,22
101:3,4,6,7,9
101:22,24
102:9,16,21,24
103:10,13
104:5,19
105:10,22
106:9,21 107:5
107:5,17,19
108:11,13
109:8,18,21,22
110:11,13,14
112:8

---

**s**

**s** 4:1 9:1
**safe** 170:21
171:1
**safeguards**
37:25 216:20
216:23 217:5
**safety** 150:19
**sale** 11:17,25
13:21 14:1,5

14:13,16,17,21
14:25 15:21
16:1,4,19,19
17:10,18 26:4
54:6 67:6
70:22 71:8,23
75:5,6,9 76:7
80:25 81:13
82:2,4,5,13
84:6 89:11
94:3 95:20
103:16 104:12
105:19 128:8
133:2 150:10
197:13,16
244:6
**sales** 188:4
260:1
**sanchez** 17:4
45:12,14 48:22
**sat** 223:3
**satisfaction**
160:4
**satisfied** 60:3
60:21 139:20
282:6
**satisfies** 62:15
84:21
**satisfy** 228:22
304:3
**save** 9:14
109:15,18
**saved** 55:23
**savings** 238:25
239:10
**saw** 19:6
114:12 244:19

311:10
**saying** 24:16
24:18 33:11,14
36:25 45:24
66:12 100:11
108:7,11,13
118:15 120:24
129:11 134:5
136:6 140:1
146:11 148:24
149:4,4 152:8
156:4,13 178:9
179:3,4 186:16
186:24,25
206:1 207:10
211:15 239:22
250:15 255:11
262:23 263:11
270:14 285:25
287:3,8,8
301:21 306:2
308:2
**says** 10:7 18:24
18:24,25 56:12
75:9 100:10
105:12,15
108:24 109:3
143:17 144:1
217:21 250:6
**scale** 250:17,18
**scenario** 34:9
73:19 96:14
98:11 105:9
106:22 132:16
163:24 191:21
208:7,8

**scenarios**
17:19 69:2
71:23 73:14
82:1 105:7
106:25 107:8
107:11 108:24
193:8
**schedule** 91:14
91:15 185:23
**scheduling**
8:21 78:18
**scheuer** 4:23
24:9 32:13,15
32:16,23 33:4
33:7 70:2,4
73:3,8,10 75:3
76:3 78:25
79:1,3,19 80:3
80:5 85:20
87:1 90:24
314:16
**scope** 79:16
101:19 246:4
303:16 309:17
**scream** 202:1
**se** 6:23 7:2,5,8
7:11,14,17,20
9:12 23:25
49:11 50:5
52:14 56:7
129:5 159:13
188:22 200:15
206:16 222:3
246:18 248:20
280:20 297:4
312:8

**seated** 78:13
161:13 185:6
**seats** 278:21
**sec** 15:15,19
23:22 24:4,23
25:1 26:17
30:7 31:13,14
34:5 35:8
36:18 37:22
90:24 117:6
**sec's** 31:10
75:2,3
**second** 18:24
107:14 116:20
145:15 149:20
158:22 171:7
191:17 207:19
208:1,20
210:20 221:21
231:5 233:18
304:10
**secondly**
137:18
**section** 32:2
35:11 100:9
109:2
**secured** 196:24
**securities** 4:11
4:12,18,19 5:9
19:22 24:7,22
25:22 27:2,5
28:5,8 29:8,22
30:8,12 31:20
32:1,16 33:11
33:13,15,23
44:1 70:4 79:1
111:19,25

152:6 153:15
314:14
**security** 24:25
26:11 27:3,13
29:6 31:25
32:9 33:2
67:18,23 68:1
142:20
**see** 17:25 20:16
21:3 22:21,24
36:10 38:21
40:21 44:3
48:3,6 92:12
103:11 112:23
114:13 120:21
121:1 139:21
139:24,25
140:20 143:6
144:20 156:12
187:4 193:11
211:3 228:25
237:6 240:6
244:6 255:16
260:17 266:2
274:19 280:25
284:17 297:10
305:18 315:5
**seeing** 211:12
211:20 241:12
**seek** 9:18 26:21
232:19
**seeking** 9:7
18:5 32:18
**seemed** 255:21
**seems** 72:24
134:7 144:17
199:6 235:11

255:12 294:18
294:24
**seen** 22:18
29:24 57:20
96:7 119:4
131:10 152:7
166:2 183:16
211:23 222:4
**sees** 39:23,23
110:4
**segment** 42:22
**segregates**
213:4
**segues** 148:24
**selected** 269:1
270:5
**selects** 276:13
**self** 36:3
236:10
**selfies** 141:17
141:21
**sell** 65:12 81:2
95:11 125:2
126:14 150:5
151:2 182:10
182:19,19
188:6 191:19
191:24 192:24
193:3,7,9,16
**selling** 25:7,7
27:1 28:14
30:8 70:15
75:15 153:6
189:17
**selloff** 189:5
192:11,12,13

**sells** 63:25
**send** 131:7,19
163:11 198:14
261:24
**senior** 228:5
274:14
**sense** 29:18
55:5,7,14
114:20 121:20
123:4 124:21
130:4 134:22
144:18 194:11
235:7 236:9
298:23
**sent** 93:21
113:1 119:5
157:1,7,9
158:1 192:5
**sentence**
251:18
**sentences**
42:13
**separate**
140:16 164:7
217:8,9 226:13
226:18 227:6
242:6
**separately** 47:8
**september**
97:11
**sequence**
175:23 249:12
**series** 213:8
226:12,16
249:4 297:17
299:25 300:1,3

**serve** 166:25
223:17 224:11
**service** 213:22
**services** 5:16
13:19 88:15
213:12,19
269:18,23
272:14
**serving** 94:17
224:4
**session** 120:8
**sessions** 227:1
**set** 23:12 50:11
73:17,20,25
74:5,5,8,11,13
74:15 81:23
83:19 92:22
94:1 97:18
99:5 104:22
134:3 171:9
180:23 198:9
219:14 225:20
226:9 264:3
277:19
**seth** 7:16
202:16,18,19
254:9
**settle** 248:5,9
283:1 291:17
291:18 292:22
305:18 306:20
306:21 307:22
**settled** 274:4
274:20 282:16
291:19 306:11
**settlement** 17:1
72:20 73:23

79:22 92:6,7
95:18 229:1,9
229:23,24
230:6,13,17,25
231:6,9,17
232:7,24
235:18,23
237:19 242:12
245:12,13
247:21 248:13
268:8 283:2,8
291:8,8,9,10
291:11,12
292:5,7,8,11
292:20 302:24
304:15 306:13
309:6
**settlements**
169:8 282:18
301:5
**settles** 247:18
**settling** 247:18
291:10 292:1
307:25 309:3
**seven** 69:15
186:8,9,23
209:6 222:17
272:1
**seventeen**
209:7,8,10
**seventies**
207:11
**several** 166:2
**share** 267:14
275:7 302:16
**shared** 176:21

**shareholder**
162:14 163:6
168:20 296:9
296:10
**shares** 238:7
295:20 296:6,7
**shaved** 173:4
**sheba** 182:23
**sheet** 225:16
**sheets** 281:24
**shehadeh** 3:24
7:13 10:5,14
34:25 35:3
55:11,13,18,20
55:25 56:2,6,7
56:7,15 64:18
65:3,6,7,8,9,11
65:14 66:10,15
66:19,21 76:19
85:1,7,7,9 88:8
99:23 100:1
108:12 112:12
112:14,15,17
112:20 113:7
113:11,16,23
115:4,5,6,23
117:5,10,17
118:3,12,19,22
118:24 119:13
119:16,21
120:4,11,14,17
120:23 121:9
121:15,23
122:4,6,10,12
122:16 123:16
123:18,20,24
124:3,9,13,17

126:1,7,10,22
126:24 127:2,8
127:15,25
128:3,5,12,15
128:18,20
199:23 200:2,4
200:7,7,11,13
200:18,22,24
200:25 201:2,5
201:7,10,14,18
201:21 202:7
**shell** 312:14,21
**shiba** 182:9,13
182:24 183:6
184:7 185:17
185:23 186:5,6
186:7
**shift** 101:10
**shocked** 13:11
38:10
**shop** 257:17
**short** 54:8
61:11 191:25
258:10 298:23
**shorter** 313:21
**shortest** 14:19
134:7,9
**shorthand**
35:10
**shortly** 233:11
233:17 295:20
296:6,10
**shot** 52:3,7
**should've**
55:21
**show** 30:24
31:6 105:17

108:3 120:8
**showing** 32:23
35:11 176:9
**shows** 125:13
**shuffling** 64:19
**shut** 258:9
311:6,8
**side** 241:2
260:21 293:3,4
**sides** 112:24
**sign** 19:14
20:18 92:23
93:8,18,19
145:3,6,6,8
146:4,14,22,23
198:15 269:23
**signature**
317:5
**signed** 12:23
93:2 143:19
144:1,10,25
146:2,4 298:24
**significant**
15:2 57:9 71:8
74:16 76:13
81:12,18
133:10 136:1
160:5 163:16
170:17 178:1
179:5 182:18
189:19 204:22
205:8 228:19
230:11,15
247:15 248:1,2
251:7 256:10
256:13 263:14
272:5,9 276:22

305:19 306:11
308:25 309:9
**significantly**
11:14 70:24
148:12,16
149:10 152:24
183:6,9,11
193:2 195:18
307:9
**signing** 40:25
42:6 144:21
146:21
**signs** 269:24
**similar** 20:7
25:15 30:2,3
37:22 64:20
232:5
**simple** 77:5
105:24 107:19
107:19 108:21
119:23 138:20
180:11 200:22
209:25 293:17
**simply** 42:5
70:7,8 132:9
174:22
**single** 28:15
163:6 175:3
176:22 193:15
227:16 247:19
286:10
**sir** 118:25
125:12 159:25
161:20 164:6
165:23 166:8
166:18 167:15
167:20 168:16

170:5 171:16
176:19 181:18
182:13 184:18
188:14 203:8
208:20 248:22
262:11 265:21
269:13,18
276:11 279:5
**sit** 53:4 109:11
188:2 261:8
262:2
**site** 212:1
**sitting** 55:9
58:3 163:17
168:7 176:1
222:25
**situation**
119:25 120:2
131:15,17
162:10 173:16
191:23 203:20
232:7 233:20
241:16 255:5
258:8 290:17
**situations**
102:2 236:16
**six** 63:14 89:23
90:3 93:24
111:12 112:1
155:7 156:7
170:16,19
173:4 234:3,8
272:5
**skadden**
222:18
**skadden's**
222:19

**skin** 277:12
**skip** 287:23
**slade** 4:9 38:7
45:5,5,17
48:24 49:1
50:9 52:3 53:5
53:10 57:1,3,4
59:23 61:2,3
67:2 69:21
72:21 73:2
74:25 78:16
79:15 86:24
92:11 101:18
110:5,10,12
112:2 113:5,12
117:4,7,25
125:21 130:10
134:12 140:2,5
140:13 157:10
158:3 160:13
163:19 166:10
166:22,25
170:23 172:6
176:25 179:18
182:3 184:20
184:24 185:2
187:13,24
190:2,8,18
192:14 195:5
196:10 204:2
204:25 216:8
218:13 219:10
240:13 241:6
241:24 242:4
243:20 244:10
244:18,22
245:1,10,17

**slam** 228:13
308:3,3,4
**slaughtered**
239:8
**slippage**
181:21
**slower** 145:21
145:23
**slowly** 97:20
215:11
**small** 42:22
278:3,13
**smaller** 82:6
184:1 257:18
302:18,19
307:22 308:24
**smart** 22:7,12
**social** 311:19
312:4
**softball** 278:6
**sold** 22:9 77:20
96:12 116:19
244:2,21
**sole** 162:14
165:15 168:20
**solely** 198:5
**solicited** 53:24
55:2
**solution** 20:8
163:18 168:8
171:14 315:1
**solutions** 161:8
314:19 317:20
**solvency**
153:16
**solvent** 196:7

**somebody**
22:13 38:16
47:7 72:13
116:13 139:12
144:16 202:8
216:23 229:14
237:6 241:1
267:7 291:4
292:1 298:1
309:21
**somewhat** 10:7
156:3
**sonya** 3:25
317:3,8
**soon** 192:23
**sooner** 95:18
146:25 148:4,5
**soonest** 146:5
**sophisticated**
193:1
**sorry** 9:2 12:15
17:3 24:2 46:1
47:16,24 49:24
52:17 56:6
74:1,1,3 86:4
96:4 98:11
109:17 121:9
124:11 127:1
139:1 145:12
145:13,15,24
149:17 156:16
156:22 165:23
166:18 172:24
178:6 179:12
179:14 186:20
198:13,25
200:9 206:5

209:4 217:2
261:14 273:5
279:21,24
284:2,9 290:12
290:14 296:2,5
296:10 297:1
297:24 298:11
298:15 299:21
305:8,23
**sort** 24:13
27:16 41:6
98:24 127:18
131:8 145:6
188:6 225:3
228:19 235:8
260:23,25
271:16 279:12
280:15 289:18
299:7
**sought** 13:5
**sound** 16:7
227:23 262:13
307:23
**sounds** 140:21
143:17 144:2,6
147:15 234:17
250:1 267:10
289:9 293:4
301:20
**source** 237:13
287:5
**sousa** 3:2
**southern** 1:2
**space** 68:22
**spaced** 227:16
**spaces** 132:20

**speak** 16:19
17:4 20:17
35:5 56:4
85:11 96:25
100:2 122:12
133:14,14
140:14 142:10
142:21 152:18
154:12,14
155:9 158:8
164:8 200:14
202:9,11
260:16,16
315:3
**speaker** 157:18
161:10 187:18
206:12,15,18
207:1,8,12,14
207:24 208:2
208:10,13
209:3 238:1
246:18,21,25
247:11
**speakerphone**
279:24
**speaking** 22:10
85:6 122:8
156:3,14
166:17 188:21
200:3,6 202:8
218:17 273:15
298:13
**speaks** 83:16
**special** 6:9,16
16:24,25,25
218:17 220:18
223:15,21

224:1,20,23
225:12 226:5
226:21 227:9
228:1,7 259:12
267:21 268:10
268:19 277:18
277:20 280:6,8
285:1 294:2
**specific** 17:16
20:4 24:20
28:24 29:1,3,5
30:4 36:12
129:24 131:15
141:20 150:13
169:13 175:6
181:18,23
182:2 197:12
216:19 220:21
251:4 283:19
283:20 284:17
285:18 300:5
**specifically**
54:25 90:20
105:12 107:25
167:24 169:13
186:7 211:1
217:10 218:17
223:21 225:7
249:14 250:17
251:18 269:17
**specifics** 40:6
**speculate**
264:14,15
**speech** 134:13
170:23 187:14
**speeches**
119:15 163:20

182:4
**speed** 96:19
**spell** 81:4
277:8
**spelled** 87:10
**spend** 102:15
139:3
**spending**
135:15 276:9
**spent** 13:17
57:9 125:23
133:18,25
205:11 218:7
228:17 249:17
**spite** 58:2
**spoke** 52:5
**sports** 120:9
**spread** 150:3
187:5 191:1
**spreading**
311:18
**st** 5:21 88:13
88:14,18 90:9
**stable** 19:22,23
91:12 96:5
**stacey** 7:19
238:5
**staff** 219:13
315:3
**stage** 37:9
43:13 174:25
**stake** 12:19
277:13
**stakeholders**
13:8 14:3 15:6
75:4 83:25

**stance** 220:25
**stand** 20:10,20
  39:2 51:14
  57:23 161:14
  207:5 219:25
**standard** 50:23
  174:15 236:24
  254:17,19
  256:18 268:4
  275:12 284:6
**standards**
  49:16 292:25
  296:8
**standing** 29:2
  30:7 173:16
**stands** 42:1
  85:24 142:17
  154:4 295:18
**staring** 249:17
**start** 23:22
  54:20 69:24
  90:22 98:19
  221:22 304:5
**started** 44:8
  150:12 159:22
  222:16 249:7
**starting** 9:11
  50:2 243:15
  249:1
**state** 5:9,16,17
  5:18 44:1,11
  53:1 60:2,9
  63:10 88:14
  101:4 111:18
  125:18 154:21
  155:1,24
  156:11 166:2,3

167:6 169:10
169:13,18
194:20 220:5
245:8 249:25
250:4 254:21
266:13 279:13
304:20 314:17
**state's** 60:4
**stated** 75:23
  82:8 164:5
  169:19 171:22
  203:19 249:3
**statement** 8:22
  8:23 11:12
  12:6 15:22
  28:21 36:7
  37:20 40:24
  41:4,13 42:1,2
  42:8 60:13
  78:14,19,19
  82:11,12 85:19
  103:13,21
  104:4,6,9,14
  104:23 105:2
  105:11,15
  106:10 107:21
  107:25 108:23
  109:13 116:9
  131:5 155:17
  156:4 158:19
  158:25 164:13
  168:5 178:16
  187:21 204:4
  230:22 244:17
  262:21 263:2
  293:20 298:24

**statements**
  15:24 118:7,9
  167:21 244:15
  250:15 265:1
  266:1,17,21
  281:1,10
  289:12 298:21
  298:22 300:24
  312:15
**states** 1:1 2:1
  5:1 6:1 19:13
  19:14 24:7
  40:10,11 62:25
  63:5,11,11,12
  63:15 64:2
  89:25 90:2,11
  90:19 103:14
  114:3 155:2,19
  156:8,14 169:7
  170:3 195:14
  250:9 304:2
  314:14
**stating** 66:11
  66:16 116:9
  119:23 125:19
  175:21 193:20
**statistics**
  184:11
**status** 45:1
**statutes** 25:3
**statutory** 188:1
  225:12
**stay** 3:3 132:4
  132:9 231:23
  255:2 260:5
**stayed** 222:18

**staying** 228:21
**steadfastly**
  13:4
**steal** 201:7
**step** 124:19
  196:9
**stephen** 302:5
  302:6,12 303:6
  307:15
**stephenson**
  3:15,22
**steps** 74:23
  139:8
**steve** 244:7
  260:14 267:20
  269:23 312:20
  313:5
**steve's** 312:14
**stipulation**
  18:1,6 72:11
  72:15 73:1,4,6
  73:8
**stipulations**
  17:25
**stmx** 185:14
**stock** 239:4
  241:18 244:21
**stockholders**
  261:3
**stocks** 239:18
  243:13
**stone** 237:6
  256:9
**stop** 25:9,16
  37:25 65:10,13
  65:16,16 85:16
  119:15 122:11

122:14,14,14
164:22 165:21
173:7,10
216:21
**stopped** 288:19
**stored** 110:4
**straight** 71:16
**strange** 294:11
**strategic**
181:14
**strategy** 51:10
**street** 4:20
5:11,18 114:6
116:16
**strength** 232:3
307:13
**stretched**
108:19
**stretto** 17:4
54:3
**strict** 282:8
**strictly** 197:18
**strike** 39:10,11
98:6
**strong** 181:9
**stronger** 188:8
**structure**
20:19 23:3
94:21 162:22
**struggle**
135:14
**struggles** 52:4
**struggling**
263:7
**stuck** 197:24
198:6 235:1

**stuff** 22:17
30:5,6 49:16
239:5
**subject** 38:24
74:17 109:19
117:2 132:21
218:5 259:19
268:12,16
313:25
**subjects** 52:11
128:17
**submission**
19:17 49:17
50:24 222:4
**submissions**
43:19 50:21
51:9 130:16,17
**submit** 21:2
50:4
**submitted**
15:25 24:10
41:22 49:14
91:6 104:7
118:14 215:24
281:10
**subordinate**
101:14
**subordinated**
18:10 101:17
102:5,17
103:18 106:1
242:16,21
261:12
**subordinating**
102:10 231:3
232:9 307:3

**subordination**
102:24 103:7
103:25 106:17
**subsequent**
30:1 281:24
**subsequently**
13:12
**subset** 296:7
**subsidiaries**
242:23,24
**substance**
45:21
**substantial**
12:11
**substantive**
39:11
**succeed** 11:21
11:24 308:5
**success** 101:16
**successful**
12:13 102:9
103:25 104:12
104:22 106:23
108:4,16 109:1
117:19
**successfully**
228:16
**succession**
214:23,24
**suddenly** 35:20
286:14
**sue** 237:7
273:7 274:3
282:25 291:3
291:12 296:22
308:5 309:16
309:24 310:18

**sued** 231:4
248:5 274:15
282:20 283:7
303:14 304:19
306:20,22
**suffer** 182:6
313:19
**suffered**
241:13
**suffering** 160:6
**suffice** 13:6
**sufficient**
37:20 42:18
80:9 109:7
254:1 297:12
299:4
**sufficiently**
282:4
**suggest** 260:10
**suggested**
32:13
**suggesting**
258:7
**suggestion**
250:7
**suing** 291:10
309:3
**suite** 4:13
317:22
**sullivan** 6:8
**sum** 234:16
235:6 276:22
**summarize**
62:12 229:9
**summarizing**
64:21

**summary**
222:5,9 249:2
**summer**
222:23
**super** 273:9
**supplemental**
217:24
**supply** 191:10
192:6 193:14
**support** 9:19
10:21 11:2
15:23 17:2,8
40:17 49:21
51:11 54:2
136:4,6 137:25
138:24 140:19
144:9 147:17
154:22 166:12
178:11 211:10
211:10 215:24
230:18 274:10
**supported** 15:4
16:5 63:19
89:12,15 90:2
93:17 138:2,21
139:9,14 155:2
155:20 156:15
178:24 179:1
237:19 275:4
**supporting**
42:1 91:14
276:17
**supportive**
216:3
**supports**
135:20 151:19

**suppose** 277:20
**supposed**
28:11,12
139:19
**supposedly**
55:16 139:25
311:5
**sure** 9:25 23:3
29:7 51:10
54:24 55:1,3,4
58:15 59:15
61:2,6,13
64:11 67:14
68:4,4 74:6
78:14 79:21,25
82:11 83:2
86:14 97:5,17
97:18 101:21
109:15 114:18
115:11,16
130:1 138:18
138:23 139:10
147:9 150:20
151:8,16,17
157:2 164:15
164:25 167:10
167:25 169:12
169:14,15,17
177:11,13,13
178:7,23
186:20 189:16
190:24 203:22
204:4 205:1,13
205:15 207:6
210:22 212:4
215:11 218:6
219:8 222:6,15

224:8 229:22
231:25 234:6
239:9 241:5
244:10 247:12
250:22 251:5
254:12 258:20
258:21 261:4
264:9 265:18
267:25 269:1
269:11,12
272:3 278:10
281:13 286:2
286:25 293:8
294:16,25
295:3,4 296:14
311:14 313:2
315:2,4
**surface** 255:12
**surprise** 35:18
**surprised**
311:20
**survive** 217:13
**susheel** 6:13
218:16 219:23
222:8
**suspect** 160:24
192:24 219:4
295:2
**sustain** 134:15
190:12
**sustained**
125:23,23
126:1,8 163:21
190:19 252:8
**swallow** 260:16
**swear** 52:22
220:1

**switch** 35:16
**sworn** 230:22
312:15,25
**sympathize**
241:15
**synthesize**
307:15
**system** 115:15
115:15 161:18
**systematically**
61:15

**t**

**t** 317:1,1
**tail** 234:3,8
**take** 24:25
25:24 29:4,17
43:19 47:10
54:19 64:6
72:9 74:23
77:16 78:10
81:6 90:2 95:7
97:10 99:6
105:5 111:10
115:9 139:9,15
140:6 141:21
146:10 147:24
148:8 159:1
161:6,8 162:17
164:1 178:21
185:4 188:2
193:2 198:22
199:9 210:21
276:23 279:24
286:10 302:22
311:7
**taken** 15:23
127:13 152:19

158:16 169:20
238:13 275:6
276:3 288:21
**takes** 31:2
**talk** 35:22
53:21 61:4
67:3 113:21
116:5 125:24
137:9 183:25
228:16 231:24
243:21 314:2
**talked** 27:11
177:4,5 226:10
237:1 252:11
294:22 312:19
**talking** 35:2,8
44:16 74:3
95:16 116:3,4
117:24,25
126:10 149:13
162:1 163:6
170:5 179:11
179:15 181:3
205:1 256:19
262:20 268:12
**tampa** 313:4
**tank** 192:12
**target** 78:3
79:10
**tasked** 271:16
297:9
**tax** 14:5 23:2,3
34:18,19,23,23
151:12 152:4
152:10,14,16
155:4 158:10
158:13,14,22

158:25 230:8
**taxes** 159:4
230:4,4
**taxing** 158:25
**team** 13:4
54:21,22 57:9
61:5 110:1,2
110:16 111:2
163:4 194:23
194:23,24
212:1,21
226:24
**teams** 217:9
**tech** 239:7
**technical** 35:4
139:14 140:22
180:13 208:22
262:12
**technicalities**
63:10,12
**technically**
110:8 131:18
**telephone**
161:18 212:14
221:21,25,25
229:15 246:17
248:17 298:2
**tell** 13:3 25:8
27:25 31:10
39:2,3 53:13
53:22 143:1
182:13 193:17
194:21 203:9
206:19 223:18
243:8 244:11
251:5 261:6
265:9

**telling** 30:7,11
36:12 40:6
94:14 99:24
193:18 217:6
**temptation**
278:11
**ten** 77:16 78:10
78:11 176:5
233:24,25
**term** 281:24
294:5
**termination**
14:10
**terms** 9:13
35:9 41:15
54:3 77:7,24
81:19 83:10,16
87:10 91:5
94:19 96:21
97:4 103:1
109:25 110:8
110:15,19,22
111:3 114:10
125:20 135:1
137:24 138:1
140:10 142:12
142:19 143:8
144:21 148:11
150:9 151:24
152:1 153:10
153:17 155:13
166:20 177:15
184:6 185:11
185:21 189:17
189:24 191:23
196:3 197:23
226:5 229:9

239:19 244:5
260:25 262:6
265:15 288:23
289:3 291:18
294:2
**test** 31:12
37:12 59:24
61:5,16 62:15
84:21
**tested** 57:15
**testified** 74:18
102:3 149:19
153:1,17
171:15 176:3,3
177:18 181:16
182:15 188:10
206:4 212:19
244:18 273:23
**testifies** 165:21
**testify** 50:13
52:20 57:23
180:14 183:8
**testifying** 56:9
59:8 72:24
107:3 156:3
163:17 166:23
168:7 219:1
**testimony**
16:10,17,22
17:3,3 27:6
49:20 52:11,12
52:23 56:14,20
65:19,21 66:3
66:20,23 80:24
81:11 82:8
85:24 88:22
89:3 96:5

101:20 126:17
140:9 152:13
154:4 157:21
159:25 162:1
171:14 178:8
210:18 211:2
216:12 218:24
220:2,12,17
222:9 229:8
234:17 247:1
250:8 313:1,25

**texas**  5:8 15:16
15:20 19:16,17
19:22 20:5
37:22 43:21,25
44:1,2,4,11
45:1 60:2,9,11
101:4 111:18
154:21,22,23
155:1,9,10,13
155:22,24
156:7 157:1
166:2,4 169:19
169:25 170:6,8
170:12,13

**text**  129:10
238:11

**texted**  245:3

**texts**  238:24

**thank**  10:19
23:17 40:11
43:15,24 44:14
45:3,4 53:4
57:1,3 59:22
60:7 66:25
69:21 70:21
78:25 79:20

82:21 85:22
86:1 88:4 89:2
90:9,15 100:5
101:7 109:21
112:9 113:22
128:22 135:12
137:7,14 141:1
141:5,18 154:7
154:16 155:18
158:8 159:6,16
159:19,25
161:20 167:15
167:15 168:16
180:17 182:13
185:9 187:4
188:12,13,13
188:14 193:23
199:17,19,20
199:21 204:15
204:18 206:8
206:10 208:10
212:11,12,16
218:10 219:9
219:22 220:9
221:6 230:24
245:19,22
248:16,19,22
262:8,11,16,19
264:6 267:11
268:18 273:15
276:11,15
279:5,6,17
296:24 310:22
312:6 313:9
314:4 315:4

**thanks**  229:18
239:15

**that'd**  106:15

**theirs**  136:10

**theory**  273:9
282:22 285:14

**therese**  4:23
24:8 32:13,16
70:3 79:1

**thin**  122:15

**thing**  25:5,23
29:19,20 30:2
34:17 38:23,23
42:13 44:8
63:9 66:15
69:9 95:7
96:15 139:18
169:15 175:3
176:8 193:18
194:8 206:1
226:8 228:12
231:20 233:25
257:15 258:8
258:11 280:19
285:14 299:3,6
308:2

**things**  17:24
18:8 20:20
25:21 31:5
37:2 38:12
42:12 43:10
50:13 67:10,15
68:7 115:12
119:19 120:20
120:20 122:1
123:5,6,11
151:9 154:5
158:17 159:1
165:14 177:14

178:25 217:7
222:24 225:14
227:2,2 228:9
228:24 234:15
235:1 237:1
241:12 252:24
253:2,23 256:1
256:12 263:17
265:24 266:7
272:22,22
273:22 274:3
283:14,16,20
283:20 284:21
285:2,3 287:7
289:4 298:21
299:2,5 300:20
304:15 309:8
312:18

**think**  10:1,3
18:22 19:2
24:12 25:13,14
26:5 27:4,23
28:3,15 30:2,3
31:23 32:5,6,8
32:10,11 34:6
34:15,17 35:23
36:25 37:10,11
37:23 43:16
50:14 51:17
52:4 54:16
58:7,14 59:20
62:11 63:6
64:13,14 68:13
68:15,23,25
69:9 70:7,17
70:21 71:13,15
71:25 73:11

74:10 75:15,23
76:10,19 78:15
79:5,9 80:6,22
80:24 81:4,12
82:8,10,10,12
82:21 83:15
84:1,15,19
85:14,24 88:1
90:7 95:22,23
96:15 104:5,19
106:3 108:5,7
109:3,9 110:20
113:9 115:6
117:9,12,14
127:9,21
130:12,14
131:24 132:3
132:14,17,25
134:25 135:19
137:2,6,6,18
137:19,20
138:1 140:17
142:17 143:8
143:10 144:12
144:14 146:9
146:11,14
148:7,8,19
149:7 150:2
151:8 152:23
153:17,23
155:5 156:4,13
161:1 165:3
167:8,11,12,23
168:5,8,13
169:10 171:1
172:1,22,23
173:10,22

177:17,18
178:7,8 179:18
181:2 185:20
188:7 192:16
192:21,25
193:1,5,9
196:14 197:21
203:17,19,19
206:4 207:7
209:23 210:12
210:22 211:1,4
211:6 215:12
216:14,16
218:14 223:19
224:7,23
226:17 227:3
227:12,15,17
227:22 228:10
230:21 231:22
232:1,2,12
233:21 234:5,6
235:1,7 236:2
238:16 239:24
240:18,20
245:6 246:4,14
249:6,20 250:6
250:20 252:12
252:23,23
254:3,4,6,10
255:11,25
258:17 260:4
260:17 262:5
263:9,17,23,25
263:25 264:4
265:9 266:21
266:24 267:20
267:20 268:20

268:24 269:6
269:10,24
272:20 274:25
275:16 276:19
277:24 278:11
278:22 280:8
280:12 283:15
283:19 285:20
286:4 288:12
289:20 290:1,2
290:14 292:7
292:13 293:25
295:3,4,12,20
296:7 297:16
299:4,9 301:8
301:15 302:19
303:15,23,23
304:7,7 305:2
305:18 307:24
312:4
**thinking**   108:8
151:16 210:14
223:2 246:13
278:24 288:16
293:22
**thinks**   188:5
220:24 289:24
**third**   13:14
22:11 37:24
47:1 55:2 56:2
98:10 107:15
186:17
**thirty**   21:24
22:2
**thorough**
236:3 264:17

**thought**   19:17
19:18 40:14
45:7 49:16
77:17 93:10,13
155:22 211:7
216:12 228:24
232:2 235:8,16
236:19 237:3,4
237:10,15
247:18,21
248:10,13
251:3 253:5,10
256:6 257:11
260:18 263:4
265:8,15
266:18 274:19
282:1 286:13
291:1,12,18,21
292:17,20
294:14 296:19
299:5 307:10
307:25 309:2
310:6
**thoughtful**
181:14
**thoughts**   143:8
**thousand**
91:22
**three**   21:24
40:22 48:9
57:12 62:13
63:1,4,11 64:2
85:14 89:17
93:18 107:7,10
129:21 130:7
146:3,22,23
147:23 148:5

155:2 156:8
228:17 238:8
256:16 257:2
257:17 258:8
258:15 267:22
268:1,3 276:21
282:3 283:21
284:18 298:21
298:22,25
300:6,15,19
304:8 307:13
307:17

**throwing**
265:15

**tichenor**   16:18
166:22 167:1
217:21 218:4

**tichenor's**   41:8

**tied**   245:4

**ties**   101:21

**tim**   8:13

**time**   9:15
11:15 18:3
31:2 40:2,15
41:19,20,20
47:19 48:1
50:20 52:16
57:9 60:24
63:4,15,24
70:14 71:12
75:1,14 81:6,6
90:4 93:20
94:7 99:7
102:15 105:5
111:6 113:10
114:7 115:4
117:14,15

119:18 120:21
122:10 124:15
125:3,24 126:4
127:13 129:13
134:7,9,14
135:15 139:3
139:16 145:2
145:10 146:7
147:2 150:4,18
155:5 158:8
159:19 161:7,8
172:17 174:4
176:7 178:23
188:3 197:17
198:10,17,21
199:7,18,20
200:4 203:17
205:11 209:12
210:2 211:14
214:22 215:3
215:10 218:7
222:19 223:24
224:8,9,9
227:22 228:17
229:13,23
232:12 233:9
236:8 242:14
248:25 249:17
249:22 251:13
252:24 253:8
253:11,23
257:1,11
259:22,24
263:2,15 277:5
278:21,22
279:6 280:17
280:17 281:17

284:24 286:13
300:16 304:1
307:6 313:23

**timeframe**
139:24 145:7
313:16,21

**timeline**   14:19
69:12 146:1
147:4,5,14,19
149:8 249:18

**timely**   193:4

**times**   44:19
85:14 122:2
176:5,8 191:2

**timetable**
313:20

**timing**   69:11
99:2,3 147:1
147:12 148:13
199:14 245:15

**timothy**   16:23
218:20 219:24
220:7,11 221:7
238:14 245:25
248:23 254:13
262:17 279:10
280:2 297:7
311:2 312:11
313:14

**tipped**   311:6

**tired**   99:24
100:3 306:10

**today**   9:10
12:20 15:25
18:3,6 19:3
23:11 26:12,16
26:19 27:6

28:18 29:17
30:9 33:8
36:13 38:3,6
42:3 55:9 57:7
58:4 73:2 83:8
91:4,8,12,20
91:23 97:12
100:7 119:20
120:7,19,23
121:8 122:1,19
123:3,4,7,7,8
123:11,14,15
124:2 125:25
126:5,11,12,21
140:17 145:5
146:2 147:15
158:8 172:8
173:12,17,20
173:25 174:8
174:19,22
175:6 176:2,10
180:14 195:3
207:10 211:2,3
213:25 218:24
219:12 220:11
261:4 262:3
288:13

**today's**   314:15

**together**   167:2
229:1 248:10

**toggle**   14:24
35:15 36:25
37:3,5 54:13
54:14,17 55:15
58:12,19,23,24
59:2,2,3 61:22
61:23 67:6

| | | | |
|---|---|---|---|
| 68:10 71:8,23 | **toggled** 36:21 | 241:25 242:5,9 | 184:12,23 |
| 75:7 76:7 77:2 | **toggles** 36:20 | 242:14 243:2,2 | 185:12,19 |
| 77:3 81:1 82:4 | 36:21 98:7 | 243:4,8 | 186:5,17,23 |
| 84:4,10,10,11 | **token** 20:21,22 | **topic** 69:3 | 190:25 191:2 |
| 84:12 88:23 | 21:2 22:8,9,14 | 268:15 | 213:12,19,22 |
| 89:4,7,8 94:22 | 22:15,17 189:6 | **total** 15:11 | **trajectory** |
| 98:14 102:6 | 189:9,14,16,17 | 186:20 193:10 | 195:3 |
| 104:10,11,12 | 190:17 191:8 | 208:17 272:1 | **transact** 67:24 |
| 105:1,7,13,18 | **tokens** 21:10 | 300:20 306:12 | 72:5 95:24 |
| 107:14 108:1 | 25:7 176:17 | 309:2 | 158:2 |
| 108:19 109:1 | 192:5,6 208:25 | **totality** 282:2 | **transaction** |
| 110:22,24 | **told** 104:2 | **totally** 239:9 | 11:17,25 13:15 |
| 112:22 113:3 | 162:6 199:10 | 241:4,4 | 13:22 14:2,5 |
| 113:10 114:11 | 249:21 250:5 | **touched** 288:16 | 14:13,13,16,21 |
| 114:17 117:3 | 261:23 301:12 | **tough** 293:1 | 14:24 15:1,21 |
| 117:13 126:15 | 311:7,15 | **touted** 140:12 | 16:1,1,4,4,20 |
| 126:15 134:5,8 | 312:21 | **towards** | 16:20 17:10,17 |
| 134:9,10,21 | **tolerance** | 251:24 252:4 | 17:18,19 22:10 |
| 135:16 136:7 | 211:2 | **town** 120:7 | 22:13 26:2 |
| 136:18,25 | **tolerate** 122:20 | 132:20,20,22 | 27:12 29:5 |
| 137:1,4,5,12 | **tomorrow** | 151:10 | 30:4 31:24 |
| 138:11 146:10 | 218:12,23 | **toy** 119:24 | 35:25 39:20 |
| 146:17 154:25 | 314:1,7 315:1 | **track** 64:13 | 41:1 54:6,9,11 |
| 155:3 171:6 | 315:5 | **tracks** 25:10 | 54:20,21,24 |
| 174:4 176:7 | **tomorrow's** | **tracy** 6:22 | 55:5,7,10 57:6 |
| 177:16 178:9 | 314:18 | 49:10 159:13 | 57:8,10,11,14 |
| 178:11 181:4 | **tonight** 314:16 | 222:2 248:20 | 58:11,12,17,23 |
| 194:19 202:21 | **took** 41:15 | 254:6,9 | 59:2,4,5 63:24 |
| 203:2,2,4,10 | 150:18 245:6 | **trade** 72:7 | 63:25 67:7,13 |
| 203:13,16,19 | 297:22 | 183:15 | 68:8,11 75:5,6 |
| 203:22,23,25 | **top** 18:13 85:4 | **traded** 19:24 | 75:9 80:14,25 |
| 203:25 204:7,7 | 119:6 127:11 | 21:22 186:11 | 81:1,13,14 |
| 204:8,13 | 205:22 231:11 | **trader** 70:14 | 82:2,4,13,15 |
| 205:19 207:21 | 249:9 269:15 | **trades** 31:21 | 83:24 84:2 |
| 207:25 208:6 | 271:11 | **trading** 13:19 | 86:8 87:18 |
| 210:25 211:7 | **topco** 11:9 | 20:3 22:5 70:9 | 89:11 94:21,22 |
| | 102:18 240:2 | 72:8 97:11,12 | 95:19,21 96:1 |

| | | | |
|---|---|---|---|
| 96:9,11 97:20 | **transcribed** | **treasurer** | **trust** 48:15 |
| 103:17 105:13 | 3:25 | 270:21 | 67:16 139:20 |
| 113:24 114:8 | **transcript** | **treasury** 181:7 | 195:20 197:18 |
| 114:11,15 | 317:4 | **treat** 19:16 | 198:19 199:3,6 |
| 117:18 126:14 | **transfer** 68:5 | 201:25 | 210:9,9,16 |
| 134:24 135:25 | 93:1 126:19 | **treated** 19:9 | 211:13 |
| 136:25 141:13 | 132:11,12 | 20:21,23 44:4 | **trustee** 5:2 6:2 |
| 141:19 144:8 | 138:13 142:7 | 63:7 148:20 | 15:16 37:22 |
| 146:18 149:1 | 149:25 157:17 | **treatment** 16:7 | 40:10,11,21 |
| 150:12 152:7 | 196:8 197:9 | 32:18 | 41:12 68:24 |
| 152:12 153:25 | 201:10 211:16 | **tremendous** | 69:5,5,12,20 |
| 171:4 177:9 | 217:7 272:16 | 57:13 70:16 | 71:2 81:7,14 |
| 192:2 194:10 | 310:17 | 71:14,17 | 90:11,19 97:24 |
| 194:14 195:17 | **transferred** | 177:19 194:7 | 98:4,5,23 |
| 195:17 198:14 | 37:25 92:17 | **trend** 49:23 | 99:11,16 |
| 210:24 235:17 | 93:8 129:23 | 50:1 | 100:10,12 |
| 257:24 259:12 | 130:8,18 | **trial** 3:11 170:9 | 141:7 149:1 |
| 259:17 260:1 | 157:14 160:22 | 173:5 176:21 | 175:1 181:6,21 |
| 260:11 261:3,5 | 197:4 215:9 | 220:10 | 186:13 187:8 |
| 282:13 285:19 | 216:21 235:22 | **tried** 44:20 | 187:23 188:1,2 |
| 286:10 287:2,3 | **transferring** | 117:18 277:22 | 188:5 |
| **transactions** | 68:9 | 303:24 | **trustee's** 40:22 |
| 13:14 24:19,20 | **transfers** 24:12 | **triggered** | **trusts** 312:14 |
| 24:24 26:3,3,4 | 77:21 78:6 | 25:20 30:4 | 312:21 |
| 26:5,14,22,25 | 217:23 234:24 | **trouble** 136:14 | **truth** 52:23,24 |
| 27:2,9 31:18 | **transition** | 145:13 180:7 | 52:24 220:2,3 |
| 31:19 33:12 | 272:9 | 190:4 238:25 | 220:3 243:8 |
| 43:4,6 54:5 | **transmitted** | 239:3 | **truthful** 263:10 |
| 67:18 68:1,19 | 132:6 239:22 | **true** 19:21 | **try** 28:14 53:19 |
| 95:25 121:25 | **transparency** | 42:17 51:13 | 72:7,9 109:11 |
| 148:22 150:4 | 64:22 | 62:16 113:4 | 145:17,19 |
| 177:10 224:22 | **transparent** | 125:18 133:6 | 151:23 168:11 |
| 225:1,10 | 69:17 83:14 | 144:20 173:11 | 169:12 181:6 |
| 259:15 284:17 | 115:12 125:1,6 | 173:11 178:15 | 188:3 193:6 |
| 284:19,22 | 191:4 | 184:3 252:8 | 194:6 203:8 |
| 285:11 286:1,7 | **travel** 314:17 | 286:14 291:2 | 210:21 217:11 |
| | | 311:18 317:4 | 218:13,25 |

247:12 249:22
285:7 294:12
302:9 304:6
305:9
**trying** 38:22
58:14 72:3
80:12,15,18,20
83:18 96:6
116:1 119:16
122:5,19 123:3
125:2 134:6
141:25 147:3
147:11 149:6
169:9,11,23
184:24 191:1,4
191:18 211:10
253:22 260:5
261:25 263:17
265:9,9 279:3
287:10,13
290:23 291:15
292:4 301:14
303:18 306:17
**tuesday** 50:11
**turn** 15:13
54:19 62:23
85:11,12
117:19 143:6
208:1 241:18
312:25
**turned** 252:25
253:24 257:10
**turnout** 142:24
143:5,6
**tutorial** 28:13
**twitter** 132:19

**two** 18:8 42:13
48:8 50:10
52:5 57:10
62:3 79:6,24
102:21 104:1
104:11 135:20
136:4,5 148:9
152:22 163:16
172:15 181:7
181:15 184:2
186:12 187:5,9
187:11,22
218:20 221:10
224:15,15
227:12,13
228:5,15,18
229:5 231:5,23
235:21 259:22
268:1,3,14,15
274:4 276:25
282:16 288:8,8
288:13,19
289:7,12
292:11 299:12
300:6 303:1
304:15 305:3
307:10 309:13
313:20
**tx** 5:9,10,12
**type** 47:1 49:18
125:19 157:9
163:11 166:5
273:13 280:14
**types** 20:4 31:5
208:24 226:10
236:15 286:17

**typical** 142:25
290:8,13,15,16
292:2
**typically** 272:3
275:19

| u |
| --- |

**u.s.** 2:23 5:2
6:2 15:16
37:22 40:21,22
41:11 91:13
98:4 162:14
163:5,8 164:3
164:11,18
165:9,12
168:20 180:19
194:5,16 213:4
213:9,13,19,23
214:2,5,9,13
214:25 215:1,4
215:15,18,20
216:21 217:4,6
217:13 244:15
244:17
**u.s.'s** 213:5
214:4
**ucc** 71:20
83:15 97:16
132:19 202:22
203:1,3,14,24
203:25 204:5,6
205:15 249:24
250:3
**ultimate**
192:21 227:25
228:3
**ultimately**
13:18 14:3

259:21 264:4
270:5 276:14
299:13 302:1
307:18
**unable** 306:19
**unaccustomed**
24:14
**unaffected**
241:4
**uncertainty**
86:3,7 308:5
**unclear** 252:24
**uncollaterali...**
257:21
**uncomfortable**
58:17 114:14
210:24
**uncommon**
254:21 256:5
**uncontroverted**
15:25
**uncovered**
292:19 294:20
294:21
**under** 11:17,25
12:5,19 16:3
23:15 26:22
28:5 31:22,25
32:4 35:16
37:13 42:23
43:7 46:11,19
54:12,13 56:10
60:12,15 61:23
62:10,10 63:1
66:5 69:2
71:11 73:19
76:22,24 77:1

77:3,9,17
82:12 87:9
88:23 89:5,6,8
92:7 94:18
95:5,19 96:10
96:14 97:12
98:11,12,14,22
99:9 102:6
103:1,16 104:8
104:11,16,17
104:20,25,25
105:1,7,7,8,12
105:16 106:1
106:17,20,25
107:12 108:21
108:24 109:1,1
110:15 111:5
126:15 132:16
137:12 138:9
138:11 146:17
148:25 149:7
150:3 152:4
153:8 155:13
157:14,15
158:5 160:6
161:14 175:18
185:7 186:6
191:21 196:19
197:5 202:10
208:5,6 230:20
232:5,10,24
233:2 234:4,8
236:21 237:20
244:19 247:17
251:13 262:6
273:14 285:3
290:4 308:9,17

309:20
**underline** 22:8
**underlying**
73:6
**underneath**
105:13
**underpinnings**
280:10
**understand**
10:14 12:15
13:1 19:8 40:1
42:23 44:23
45:25 53:19
54:24 58:10
60:15 61:17
63:12,13 64:11
65:17 66:10,21
67:22 69:19
70:14 72:4
73:12,21,24
76:16 79:9,25
84:1 92:16
94:24 96:9
100:7 102:23
102:25 111:7
118:9 119:12
119:14,21
120:11,15
122:4,6,25
123:15,16
124:22 126:7
126:22 127:1
127:14,16
130:14,16
134:25 135:2
136:1 143:12
143:12,13

145:14 146:3
147:21 152:13
153:3 155:20
161:15 168:22
175:2 176:11
177:1,3 178:20
180:3,18
182:16 185:1
188:10 192:16
192:20 193:1
203:5,24
208:15 210:7
211:10 220:12
227:2,2 234:12
240:15 241:5
241:11 252:13
257:8 260:4
262:23 263:8
265:11 277:15
278:10 280:23
281:20 285:8
286:4 287:22
290:12 294:11
295:23 305:24
309:18 315:2
**understanding**
12:21 20:2,13
20:16 21:9
54:2 72:19
73:16,22 75:20
83:7 92:7 94:9
98:2 99:5,14
111:12,16,20
136:7 137:15
137:23 139:15
142:8 149:21
162:14,15,16

162:18,21
167:20 169:23
180:7 198:1,3
215:2 217:11
270:7 283:11
293:14 310:1
**understood**
10:4 19:5
61:13 83:2
88:21 89:3
93:10 97:19
199:13 202:12
210:22 249:7
253:1 260:4
263:16
**undertaking**
281:15
**undo** 68:15
121:12
**undoing** 68:14
**undoubtedly**
41:17
**unequivocally**
168:7
**unfold** 114:12
**unfolded** 258:8
**unforeseen**
196:14
**unfortunate**
59:7 241:11
**unfortunately**
114:5 115:19
115:24 138:6
**unhappy** 10:14
**unidentified**
157:18 161:10
187:18 206:12

206:15,18
207:1,8,12,14
207:24 208:2
208:10,13
209:3 238:1
246:18,21,25
247:11
**uniformly**
106:3
**unique** 280:25
283:10
**united** 1:1 2:1
5:1 6:1 24:7
40:10,11 90:10
90:19 170:3
195:14 314:14
**universal**
138:3
**unmuted** 60:10
**unregistered**
33:2 34:1,9
**unresolved**
23:7 83:9
**unsecured** 3:17
11:3,3,6,7,9
18:11 54:10
57:15 69:18
74:12 103:15
107:10 114:1,9
115:17 125:4
139:6 151:15
171:5,10
180:25 183:23
191:5 194:13
195:1 196:22
196:24 199:11
212:6 225:13

**unsecureds**
18:20
**unspecified**
29:16
**unstable** 259:8
**unsupported**
16:6,16 19:9
19:14,15 20:11
62:7,7,23
63:18,23 72:1
72:1 81:9
89:20,22,25
90:5,8 93:22
135:21,22
137:9,16,22
138:17,21,24
139:9,14
140:11 156:8
178:12,13
180:1,7,11
181:1 208:14
208:16,18
209:5
**unusual** 15:17
193:5 235:11
282:4 287:18
294:24
**unwinding**
230:9
**unwound**
295:1
**uplift** 239:19
**upset** 173:23
**uptegrove** 4:16
24:6,7,18
25:13 26:1
27:8,19 28:19

29:4,11,19
30:9,14 31:3
31:23 32:5,10
33:16,25 34:15
35:23 36:14
37:10,17 38:4
314:13,13,21
314:23
**urquhart** 6:8
**usd** 168:18
209:1,13
**usdc** 95:25
**usds** 96:8
**use** 98:16
106:3 109:25
110:8,15,19,22
111:3 143:10
157:8 158:13
158:22 234:18
256:8 285:16
290:15
**used** 45:9
70:13,13 87:9
87:12 115:2
135:3 192:13
252:15 277:3
**user** 160:5,10
162:9
**users** 14:6
160:11 192:5
**usually** 40:2,3
219:14
**utility** 22:9,14
22:16,19
**utilize** 162:7

**v**

**v** 1:12,21 3:2,9
189:12
**vague** 139:18
139:19 217:25
**vaguely** 28:24
**valid** 51:6
124:5 243:4
267:1
**validated**
71:18 184:4
**valuable** 11:18
**value** 11:13
12:18,22 13:8
13:21,21 14:2
14:4 22:15
23:15 54:9
69:2 71:12
74:20,21 76:21
77:12,18 79:5
79:13,23 82:13
82:20 84:23
86:9,11,12
91:10 94:19,22
115:17 151:24
174:15 192:9
192:18 193:10
194:14 209:2
209:15 210:23
212:10 232:11
237:13 247:25
261:2 298:25
302:18 307:6
**valued** 21:19
21:21
**values** 21:10
21:13 77:10

309:8
**vanderbilt**
6:17
**variety** 222:24
**various** 9:12
18:1 21:13
51:15 52:9
153:12 169:6
176:14
**verbally** 222:5
**verified** 71:13
157:6,25
**veritext** 317:20
**vermont** 19:9
19:12,14 20:8
20:15,17
**version** 61:11
180:11 242:10
**versus** 61:8
62:14 72:3
75:7 137:13
142:14 144:10
183:4 189:24
214:9
**vetted** 114:8
195:15
**vetting** 288:16
**vgx** 20:21,22
20:25 21:2,5
21:19,23 22:5
22:6,15,19
32:13 33:2
182:10 184:7
185:11 189:6,9
189:14,16,19
189:21 190:7
190:15,16,21

191:8,9 192:5
192:6,9,17,23
193:10
**viability**
281:23
**viable** 114:4,8
225:5 259:16
**vibrant** 203:14
**victims** 158:21
**victor** 189:13
**view** 15:13
59:24 81:21
87:22 95:3,4
225:24 230:3
235:23 299:16
**viewed** 26:10
257:4
**views** 34:20
210:19 226:3
**violate** 28:8
**violating**
303:14
**violation** 20:1
25:22 29:21
31:6 260:24
299:12
**violations** 29:7
**violative** 24:24
29:6 36:4
**virtually**
111:23
**virtue** 266:12
**visuals** 49:24
**volatile** 149:25
**volume** 70:10
181:24 183:3,5
184:10,12

185:21 186:5,9
186:17,24
194:7
**volumes**
185:19
**voluntarily**
240:25
**vote** 46:8,9,10
46:13,18 47:7
48:5 53:24
115:19 127:13
142:18,23
144:14,15,17
144:19
**voted** 10:22
11:3 42:16,22
46:5,6,15 48:4
48:4,6 85:21
86:9 108:9
127:13 128:10
142:18 143:11
143:20 144:3,9
144:11 194:10
310:1,5,7,7
**voter** 142:24
**votes** 288:21
312:20
**voting** 10:22
10:24 11:1,9,9
15:4 17:5 42:6
42:11,14,16,18
45:11,19 46:22
47:10,15,24
69:16 85:21,22
86:10 112:25
115:25 143:2
175:8

**voy** 3:9
**voyager** 1:7,10
1:18,19,22 3:1
3:9 9:7 16:24
24:13 25:6
26:8 30:5,15
30:15,16 41:14
41:22,23 63:22
64:1 67:5,12
72:12 88:22
89:4 98:9,16
98:18 116:6,17
116:18 118:13
118:14 121:16
126:15,19
131:16,20,20
132:5,5,10,11
133:2 136:8,18
137:17,24
138:18,19,23
138:24 140:18
141:17 145:12
146:6 154:20
155:12,12,21
155:24 156:1
160:7,12
162:10,12
163:25 167:18
170:18,19
176:20,23
177:15,15,20
178:14,14
179:7,8,20,22
179:23,25
181:13 183:3,5
184:10 185:18
186:6,11,16

189:14,22
190:7 197:4,9
197:12 199:24
208:15 209:22
214:10 218:18
218:21 223:5
223:17 224:2
224:16 228:2
238:7,25
239:13 243:25
247:2 249:13
251:11 257:6
258:6,8 261:12
261:16,16,18
262:2 264:7,23
265:3 266:3,4
266:6,8,12,18
266:19,19,23
267:18,22
268:8 269:19
269:21 273:10
273:18 274:8
277:7 300:18
307:4 310:16
311:4,6
**voyager's**
181:23 266:2
307:19

**w**

**w** 5:11
**wait** 35:6 66:17
89:23 129:21
130:6 147:23
**waiting** 20:15
111:13
**waived** 231:18

**waiving** 232:13
**wall** 114:5
116:16 154:9,9
154:11,11,14
154:16,18
155:17 156:19
156:22,24
157:4,6,23
158:7,9 159:5
**wallet** 68:14
136:9 160:24
160:24,25
**wallets** 86:3,6
136:20 161:2
**want** 21:8
23:22 31:2
32:14 38:6,24
38:25 40:11
42:10 43:18
48:6 52:15
53:19,21 54:19
55:20 56:19
58:12 61:4
62:23 65:7,12
65:14 67:3
85:24 93:19
114:13 116:5
117:3 120:18
121:16,20
122:16,17
123:9 124:20
127:20,21,23
129:19 130:5,6
130:23 131:14
135:9 136:20
138:10 144:19
146:22 147:22

154:21 159:20
161:5 166:16
174:23 175:4
175:14 176:4
177:11 178:7,8
189:7 192:24
197:25 198:22
199:2,24 200:1
200:14,15
218:11 221:22
224:6 227:15
227:23 231:4
238:17 241:5
269:10 282:25
286:2 291:16
292:6 294:16
296:23 303:13
306:25 308:1
310:16
**wanted** 17:21
24:2 43:10
44:8,13 63:1
64:23 69:3
90:22 116:18
162:23 190:14
203:24,25
204:6,15 205:9
239:9 246:3,6
257:5 274:17
275:1 277:22
291:6 311:21
**wanting** 52:18
264:2
**wants** 127:24
180:5 199:9
246:16

**war** 55:16
116:15,17
117:21
**warning** 100:4
**warrant**
252:21
**warranted**
114:17 281:2
283:13
**warren** 7:7
23:24,24 287:9
287:22
**washington**
4:21
**water** 237:6
**waterfall** 61:25
62:1
**way** 35:10 44:4
45:10 46:13
47:9 49:11
50:4 59:19,20
61:19 68:17,24
69:18 70:8,18
74:13 75:12
78:13 103:10
115:12 125:1
132:6 133:5
135:7 138:20
139:7 140:4
146:8,20 149:6
150:16,23
152:1 154:3,5
158:16 162:2
179:7 183:10
190:24 191:4
193:7 197:3
198:13 210:25

211:4,4 215:13
220:24 231:13
232:1 235:2
238:19 240:24
243:1,7 244:25
245:12 254:19
255:14 273:2
277:24 283:17
285:13 286:16
288:16,18
289:25,25
302:9 304:23
307:24 312:1,3
**ways** 298:4
**we've** 17:14
22:18 29:19
30:15 54:9,24
69:9,17 81:23
83:14 94:7
125:23 152:7
161:7 163:3
166:2 183:16
184:2 187:16
201:8 203:20
205:11,14
211:5,25
229:15 295:4
312:19
**weaker** 307:11
**wearing**
122:15
**weather**
251:21 262:22
**website** 41:5
**week** 22:22
49:17 50:24
51:3 93:3

172:14 196:3
205:12,21,22
205:22
**weekly** 93:1,9
111:7 198:15
215:17 313:17
**weeks** 145:4
172:15 214:23
272:5 295:20
**weighted** 210:1
**weil** 224:7
**weird** 25:12
294:5
**welcome**
245:21
**went** 41:9 72:3
121:3 207:23
207:24 215:21
216:15 236:19
243:1 249:12
282:5 283:9
287:17 314:15
**whatsoever**
50:6
**wherewithal**
213:24 228:18
229:6 256:10
256:12 276:7
**white** 139:22
**widely** 150:1
282:5
**wife** 304:17,18
304:18
**wife's** 304:20
306:17,20
**wiles** 2:22
34:25 125:8

154:14 158:19
163:17 181:8
**william** 4:16
24:6 314:13
**willing** 25:24
29:2 118:20
175:10 230:17
230:18 255:2,4
301:11
**win** 237:8,9
254:4 291:4
292:24,25
**winddown**
14:22 22:22,23
22:24 47:19
48:1 116:22
124:7 273:6
274:2 282:23
**winner** 299:14
**winners** 308:3
308:3,4
**winning**
228:13 283:2
**wins** 104:1
243:2
**wire** 68:13,16
**wish** 45:20
48:21 51:19
154:12 266:23
271:18
**wishes** 48:20
69:25 101:1,2
112:11 128:23
188:16 199:22
212:14 221:20
221:24 222:1
237:25 261:4

279:8
**withdraw** 21:1
136:9 197:25
198:17 199:5
214:3 264:2
**withdrawal**
256:18
**withdrawals**
198:11 313:17
**witness** 13:11
45:6,10,12
48:21 49:1,3
52:25 53:3,5
56:8,12,20
59:25 65:18,19
65:21,22,23
66:2,12,20,23
66:25 69:22
72:24,25 76:23
85:11,15,18
86:22 90:12
100:2 101:1,2
101:5,19
102:12,16
105:5 106:14
106:20 109:10
109:10 112:6,9
112:11 113:15
113:21 118:9
124:1 128:17
128:18,23
129:8,16
131:24 137:10
137:14,23
138:14 139:13
140:13,21,24
141:1,8 143:22

144:4 145:21
147:22 150:2,7
155:15 157:3
157:21 159:10
161:16 165:1,3
165:4,21
166:21 168:23
170:14 172:12
175:17 177:1
179:24 180:9
180:13 183:8
184:8,13 185:9
185:20 186:2
186:21 187:15
188:4,11,16
189:4,12,15,23
192:20 193:21
195:10 198:8
199:22 200:19
201:15 202:14
202:15,21,24
203:5,8,17
205:5 206:22
207:3,11,13,17
208:1,3,11,19
212:14 216:5
216:14,25
217:8,17 218:4
218:7,12,14,19
219:25 220:14
222:10 229:12
237:23,25
241:23 246:11
246:13,16,22
247:7 258:20
259:15,21
263:25 264:21

265:7,9,14
270:11,13
296:2 298:3,18
298:20 303:14
304:5 305:16
305:24 306:1
306:10,16
308:18,22
309:20 310:4,9
310:25 312:13
314:6,6,10
**witness's** 56:14
177:4 313:25
**witnesses** 8:3
9:20 17:7 31:9
31:9 43:19
140:21 161:5
**wives** 304:2
**won** 248:5
306:21,22
**wonderful**
228:13 313:3
**wondering**
103:22
**word** 226:6
277:15 285:24
294:11
**words** 77:19
78:4 94:25
138:9 148:3
242:7 250:20
252:14 264:22
**work** 34:5 44:3
55:2 58:23
61:20 67:10
74:11 90:2
110:21 116:21

131:22 132:3
139:23 159:4
159:23 167:2
205:19 211:8
225:13 227:15
236:7 277:1,2
277:3 286:7
**worked** 54:9
54:22,25
113:25 153:21
288:18
**working** 53:17
111:20 115:16
191:6 276:23
**works** 21:9
54:24 105:25
175:5 198:14
277:25 278:2
**world** 36:16
110:4 192:17
260:2 284:19
**worldwide**
222:20
**worried** 39:25
40:5 190:9
**worry** 245:5
**worse** 72:10
108:1 163:24
170:17
**worst** 34:9
173:25 174:2
**worth** 74:7
79:12,21 80:13
81:22 92:9
247:2,3,6
251:3 292:19
302:5 303:11

303:20 305:13
305:14,19,20
306:7,12 307:8
307:9
**worthless**
241:18
**would've** 55:22
112:23 114:24
120:25 121:1
**wrapped**
195:16 239:1
**write** 162:23
251:2 293:7
**writes** 239:3,14
**written** 57:25
227:10,11
**wrong** 24:15
24:16 42:21
56:11 66:5
75:17 173:16
198:3 211:20
249:8 253:24
256:7 257:12
258:10 266:11
277:11,12
286:7
**wrote** 200:13

**x**

**x** 1:5,9,15,17
1:24 8:1
158:11 189:13
189:13 289:2
289:16 316:1

**y**

**y** 289:16

| yeah 48:3,14 | z |
|---|---|
| 89:2 94:24 | zero 175:12,12 |
| 99:11 105:23 | 190:21 191:13 |
| 136:24 141:19 | 238:8 |
| 143:15 151:22 | |
| 154:7 162:5,17 | |
| 163:5 171:16 | |
| 179:18 187:16 | |
| 187:25 190:8 | |
| 190:18,19 | |
| 203:12 204:11 | |
| 205:11 207:25 | |
| 208:13 209:12 | |
| 210:18 211:9 | |
| 219:4,19 | |
| 225:25 240:15 | |
| 258:5 270:11 | |
| 272:3 283:14 | |
| 292:13 293:2 | |
| 296:13 301:15 | |
| 301:18 306:1 | |
| 309:16 | |
| year 234:3 | |
| 244:21 | |
| years 25:22 | |
| 30:6,6 40:22 | |
| 158:13 222:16 | |
| 222:17 224:7 | |
| 234:8 276:21 | |
| yep 53:23 | |
| yield 62:11 | |
| york 1:2 2:3 | |
| 4:6 5:4,16,17 | |
| 5:19 6:4,11,18 | |
| 15:10,16,19 | |
| 37:22 88:14 | |
| 163:4 218:22 | |