Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

Michael B. Slade (*pro hac vice* pending)
Richard U.S. Howell (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 N. LaSalle
Chicago, Illinois  60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*, | ) | Case No. 23-cv-2171 |
| | ) | 22-bk-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES BANKRUPTCY COURT |
| | ) | FOR THE SOUTHERN DISTRICT |
| | ) | OF NEW YORK |

---

**DEBTORS' MEMORANDUM OF LAW IN OPPOSITION**
**TO THE GOVERNMENT'S MOTION TO STAY**

---

# **TABLE OF CONTENTS**

**Page(s)**

Introduction ............................................................................................................... 1

Background ................................................................................................................ 6

Legal Standard ........................................................................................................ 16

Argument ................................................................................................................ 17

I.     The Government Has No Chance of Success On the Merits. ........................... 17

    A.     It is Well-Established that exculpation provisions Are Proper in This
        Circuit. ................................................................................................. 18

    B.     The exculpation provision Does Not Constrain the Government's Police
        Power. .................................................................................................. 23

    C.     The Bankruptcy Code Grants the Statutory Authority for the Bankruptcy
        Court to Affirm the Exculpation Clause. .............................................. 27

    D.     None of the Government's Remaining Arguments Actually Challenge the
        Long-Held Permissibility of exculpation provisions. ........................... 31

II.    The Government Cannot Identify Let Alone Prove Irreparable Injury Absent a
    Stay. ................................................................................................................. 32

III.   The Balance of Harms Requires the Government's Stay Request Be Denied. ... 36

Conclusion .............................................................................................................. 40

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re 461 7th Avenue Mkt., Inc.*,
2021 WL 5917775 (2d Cir. Dec. 15, 2021) ........................................................................17

*In re Adelphia Commc'ns Corp.*,
333 B.R. 649 (S.D.N.Y. 2005) ....................................................................17, 35, 36

*In re Aegean Marine Pet. Network*,
No. 18-13374-mew, Docket. 503 ........................................................................22

*In re Aegean Marine Petroleum Network Inc.*,
599 B.R. 717 (S.D.N.Y. 2019) ....................................................19, 22, 28, 30

*In re Airadigm Commc'ns, Inc.*,
519 F.3d 640 (7th Cir. 2008) ........................................................................20

*Amadeo v. Zant*,
486 U.S. 214 (1988) ........................................................................16

*In re AMR Corp.*,
2021 WL 5016606 (Bankr. S.D.N.Y. Oct. 28, 2021) ......................................37, 38

*In re Barneys New York, Inc.*,
No. 19-36300 (CGM) (Bankr. S.D.N.Y. Feb. 5, 2020) ............................................26

*Blixseth v. Credit Suisse*,
961 F.3d 1074 (9th Cir. 2020) ........................................................................20

*In re Brown*,
2020 WL 3264057 (Bankr. S.D.N.Y. June 10, 2020) ............................................17

*In re Calpine Corp.*,
2008 WL 207841 (Bankr. S.D.N.Y. Jan. 24, 2008) ............................................33

*In re Cenveo, Inc.*,
No. 18-22178 (RDD) (Bankr. S.D.N.Y. Aug. 21, 2018) ......................................26

*In re Charter Commc'ns, Inc.*,
691 F.3d 476 (2d Cir. 2012) ........................................................................16

*Country Squire Assoc. of Carle Place, L.P. v. Rochester Cmty Sav. Bank*,
203 B.R. 182 (B.A.P. 2d Cir. 1996) ........................................................................35

*In re Dairy Mart Convenience Stores, Inc.*,
    351 F.3d 86 (2d Cir. 2003)................................................................................28

*In re Deluxe Entertainment Services Group Inc.*,
    No. 19-23774 (RDD) (Bankr. S.D.N.Y. Oct. 25, 2019) ........................................26

*In re Ditech Holding Corp.*,
    2021 WL 3716398 (Bankr. S.D.N.Y. Aug. 20, 2021) ......................................20, 22

*In re DJK Residential, LLC*,
    2008 WL 650389 (S.D.N.Y. March 7, 2008) ............................................33, 35, 36

*In re Enron Corp.*,
    326 B.R. 497 (S.D.N.Y. 2005)....................................................................18, 19, 22

*In re FGIC Corp.*,
    No. 10-14215 (SMB) (Bankr. S.D.N.Y. Apr. 23, 2012)......................................26

*In re Fullbeauty Brands Holdings Corp.*,
    No. 19-22185 (RDD) (Bankr. S.D.N.Y. Feb. 5, 2019)........................................26

*In re Granite Broad. Corp.*,
    369 B.R. 120 (S.D.N.Y. 2007)...........................................................................19

*Green Point Bank v. Treston*,
    188 B.R. 9 (S.D.N.Y. 1996)...............................................................................17

*Matter of Highland Cap. Mgmt., L.P.*,
    48 F.4th 419 (5th Cir. 2022)..............................................................................21

*In re Hollander Sleep Products, LLC*,
    No. 19-11608 (MEW) (Bankr. S.D.N.Y. Sep. 5, 2019)........................................26

*In re Johns-Manville Corp.*,
    517 F.3d 52 (2d Cir. 2008)................................................................................31

*In re Lakeland Tours, LLC*,
    No. 20-11647 (JLG) (Bankr. S.D.N.Y. Sept. 15, 2020) ......................................25

*LaRouche v. Kezer*,
    20 F.3d 68 (2d Cir. 1994) .................................................................................17

*In re LATAM Airlines Group S.A.*,
    2022 WL 2811904 (Bankr. S.D.N.Y. July 16, 2022) ...........................17, 20, 33, 40

*In re LATAM Airlines Grp. S.A.*,
    2022 WL 2541298 (Bankr. S.D.N.Y. July 7, 2022) .............................................19

*In re LATAM Airlines Grp., S.A.*,
   2022 WL 2657345 (Bankr. S.D.N.Y. July 8, 2022) ........................................................36, 38

*In re LATAM Airlines Grp. S.A.*,
   2022 WL 2962948 (Bankr. S.D.N.Y. July 26, 2022) ..............................................................20

*In re Latam Airlines Grp. S.A.*,
   2022 WL 2206829 (Bankr. S.D.N.Y. June 18, 2022)................................................19, 22, 23

*Lutin v. United States Bankr. Court (In re Advanced Mining Sys., Inc.)*,
   173 B.R. 467 (S.D.N.Y. 1994) ...............................................................................................35

*In re Markus*,
   620 B.R. 31 (S.D.N.Y. 2020)..................................................................................................24

*In re Metromedia Fiber Network, Inc.*,
   416 F.3d 136 (2d Cir. 2005)...................................................................................................21

*In re Moreau*,
   135 B.R. 209 (N.D.N.Y. 1992) ..............................................................................................33

*In re Motors Liquidation Co.*,
   829 F.3d 135 (2d Cir. 2016)...................................................................................................16

*Nken v. Holder*,
   556 U.S. 418 (2009)................................................................................................................32

*In re Olinda Star Ltd.*,
   614 B.R. 28 (S.D.N.Y. 2020)..................................................................................................20

*In re Oneida Ltd.*,
   351 B.R. 79 (S.D.N.Y. 2006)............................................................................................19, 22

*In re Purdue Pharma, L.P.*,
   635 B.R. 26 (S.D.N.Y. 2021)..................................................................................................30

*In re PWS Holding Corp.*,
   228 F.3d 224 (3d Cir. 2000)...................................................................................................20

*In re Sabine*,
   548 B.R. 674 (S.D.N.Y. 2016)...........................................................................................33, 37

*In re Sbarro LLC*,
   No. 14-10557 (MG) (Bankr. S.D.N.Y. May 19, 2014)] ........................................................26

*In re Seaside Eng'g & Surveying, Inc.*,
   780 F.3d 1070 (11th Cir. 2015) .............................................................................................21

iv

*Turner v. Citizens Nat'l Bank of Hammond* (*In re Turner*),
    207 B.R. 373 (2d Cir. B.A.P. 1997)............................................................................17

*In re United Retail Group, Inc.*,
    No 12-10405 (SMB) (Bankr. S.D.N.Y. Sept. 18 2012)..............................................26

*In re World Trade Ctr. Disaster Site Litig.*,
    503 F.3d 167 (2d Cir. 2007).......................................................................................17

**Statutes**

11 U.S.C. § 101(5)..............................................................................................................14

11 U.S.C. § 101(27)............................................................................................................14

11 U.S.C. § 105............................................................................................................27, 30

11 U.S.C. § 524..................................................................................................................30

11 U.S.C. § 1125(e)............................................................................................................29

11 U.S.C. § 1129(a)(3)................................................................................................. *passim*

11 U.S.C. § 1141(d)............................................................................................................29

11 U.S.C. § 1142..........................................................................................................16, 28

**Rules**

N.Y. Comp. Codes R. & Regs.
    tit. 22 § 1200.08 Rule 1.8(h)(1) (2009)..............................................................11, 12, 13

Rule 1.8(h)(1)...............................................................................................................12, 13

**Other Authorities**

U.S. Const., Art. I § VIII....................................................................................................31

Voyager Digital Holdings, Inc. and its affiliated Debtors ("Voyager" or the "Debtors") respectfully submit this memorandum in opposition to the Motion for Stay Pending Appeal [Dkt. No. 3] (the "Motion") and Memorandum of Law [Dkt. No. 4] (the "Mem.") filed on Friday, March 17, 2023, at 4:00 pm EST by the United States Attorney for the Southern District of New York (the "USAO") and the United States Trustee (together, the "Government").

## Introduction

Voyager, a cryptocurrency company with over one million customers, commenced voluntary chapter 11 cases on July 5, 2022 (the "Petition Date"). After highly complex and challenging proceedings, Voyager proposed a Plan of Reorganization,[1] and its Official Committee of Unsecured Creditors (the "Committee") and 97% of voting creditors voted to approve the Plan. Following a four-day trial, the Bankruptcy Court confirmed Voyager's Plan consistent with 11 U.S.C. § 1129.[2] Among other things, in its Confirmation Decision, the Bankruptcy Court found that the Plan was proposed in good faith and not by any means forbidden by law, and it ordered Bankruptcy Court-approved individuals to implement the Plan. See 11 U.S.C. §§ 1129 & 1142.

The Government now appeals the Confirmation Decision and asks this Court to stay it and implementation of the Plan indefinitely pending appeal. The relief the Government seeks would: (a) be catastrophic for all Voyager creditors; (b) benefit *no one*, not even the Government; and (c) fundamentally upend settled chapter 11 practice. The Government's Motion is irresponsible and frivolous; there is no need for a hearing, and the Motion should be denied out of hand.

---

[1]    *Declaration of Michael B. Slade in Support of the Debtors' Response in Opposition to the Government's Emergency Motion for a Stay Pending Appeal* (the "Slade Decl."), Ex. 2, *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [BK Dkt. No. 1161-1] (as amended, modified, or supplemented, the "Plan").

[2]    Ex. 11 to Slade Decl., *Decision Regarding (1) Approval of the Debtors' Disclosure Statement, (2) Confirmation of the Debtors' Plan of Reorganization, (3) Motions Seeking the Appointment of a Trustee, (4) Motions Requesting Full Customer Access to Account Holdings, and (5) Related Matters* [BK Dkt. No. 1170] (the "Confirmation Decision").

*First*, as the first significant cryptocurrency restructuring, these chapter 11 cases featured several questions of first impression.  But the issues the Government appeals are not among them. Instead, the Government seeks to stay implementation of the Plan to challenge an exculpation provision that is both narrow and ordinary.  The provision at issue only protects *court*-approved individuals ordered to implement the *court*-approved Plan.  The provision is standard in the Second Circuit, has been approved by *many* courts (and upheld by the majority of federal circuit courts), and has bound the Government **many** times before.  In other words, as the Bankruptcy Court explained in its opinion denying the Government's motion to stay,[3] exculpation provisions are supported by "a long line of authority [agreeing that] parties should not be liable for things that [a bankruptcy] order will require them to do." (Ex. B to Fogelman Decl., Stay Opinion at 3.)  The Government's opposition to that commonsense proposition is both puzzling and frightening.

The Bankruptcy Court held that, as required by 11 U.S.C. § 1129(a)(3), the Plan does not contemplate any activity prohibited by law.  (Ex. 11 to Slade Decl., Conf. Decision at 13, 49).  The Government did not challenge that finding below and does not do so here.  And the exculpation provision does little more than implement that finding, providing that court-approved parties ordered to implement the Plan will not face criminal or civil liability for taking the court-approved steps necessary to do so, unless they commit fraud, willful misconduct, or gross negligence.  (Ex. 2 to Slade Decl., Plan, Art. VIII.C.)  Indeed, the Government has never identified **anything** that the Plan prevents it from doing that it actually intends to do.  Thus, the logical first reaction to the Government's position might be that it lacks standing, given its inability to articulate any substantive action it wants to take but cannot, and the logical second reaction should be that the Government cannot possibly assert irreparable harm where it cannot identify **any** actual harm.

---

[3]   *Declaration of Lawrence H. Fogelman in Support of the Government's Emergency Motion for a Stay Pending Appeal* (the "Fogelman Decl."), [Dkt. 5], Ex. B, (the "Stay Opinion").

*Second*, the fact that the Government has appealed and sought a stay, combined with the history of Government action (mostly inaction) in the cryptocurrency sector, emphasizes the clear need for exculpation here.  As the Bankruptcy Court observed during a four-day trial highlighted by the Government's refusal to take any substantive positions, the Government has refused to provide guidance on any germane cryptocurrency issue **for years**,[4] and the sector today is a political football where enforcement has nothing to do with the law.  Even after the Confirmation Order was entered, government officials issued vague threats to take unidentified actions based on standards they refused to articulate to the Bankruptcy Court,[5] but somehow claim are clear enough to follow.  Fear that the Government will try to make something up after the fact and retroactively penalize transactions it declined to dispute on the front end is palpable and clearly justified.

To reiterate what happened below, Voyager and the Bankruptcy Court asked the Government for *months* to identify what, if anything, is legally amiss about the Plan.  (Ex. B. to Fogelman Decl., Stay Opinion, at 16; Ex. 11 to Slade Decl., Confirmation Decision at 34).  In response, *none* of the *numerous* federal agencies involved identified *anything*; at the Confirmation Hearing, the officials refused to say.[6]  Even on appeal, the Government does not say what (if

---

[4]   Ex. D to Fogelman Decl., Transcript, *In re Voyager Digital Holdings*, No. 22-10943 at 39:25–41:4 (Mar. 7, 2023) ("There are firms that operate as cryptocurrency brokers or exchanges and have done so for several years without being subject to clearer and well-defined regulatory requirements.  The regulators themselves cannot seem to agree[.]"); Ex. 8 to Slade Decl., Transcript, *In re Voyager Digital Holdings*, No. 22-10943 at 24:18–25 (Mar. 2, 2023) (Mr. Uptegrove (on behalf of the SEC): "On the issue of the securities laws, the SEC is not taking a position on whether any of the transactions in the plan are violative of the federal security laws.")

[5]   *See, e.g.,* Gary Gensler, Opinion, https://thehill.com/opinion/congress-blog/3891970-getting-crypto-firms-to-do-their-work-within-the-bounds-of-the-law/ ("I find the talking point that there's a lack of clarity in the securities laws unpersuasive.  Some crypto companies might message that the laws are unclear rather than admitting that their platforms don't have sufficient investor protection.").

[6]   Ex. 8 to Slade Decl., Transcript, *In re Voyager Digital Holdings*, No. 22-10943 at 24:18–25 (Mar. 2, 2023); *see also* Ex. 11 to Slade Decl., Confirmation Decision ("All of the government entities . . .had every opportunity to tell me if they believed that anything contemplated by the Plan would violate any applicable statute, rule, or regulation.  Four States have taken the position that Binance.US cannot open customer accounts in those States without additional approvals, and the Plan specifically takes account of that fact.  No other regulator has contended during the confirmation hearing that there is anything illegal in what the plan contemplates.")

anything) the challenged exculpation provision prevents it from doing that it actually plans to do. Instead, what the Government seeks is the ultimate reservation of rights—it wants to be free to punish those charged with implementing the Plan and Confirmation Order even after they do so in reliance on the Bankruptcy Court's directions.

If the Government's position is correct, there is no way for Voyager to return value to its customers—the fundamental goal of chapter 11 proceedings.  As explained in the Confirmation Decision and further below, the Plan provides for two scenarios: a transaction where Voyager sells its assets to Binance.US, and—in the event that transaction no longer appears to be in the best interest of creditors—a self-liquidation executed by Voyager.  Both scenarios involve a court-sanctioned rebalancing and redistribution of cryptocurrency by court-approved individuals.  But without the protection of the exculpation provision ensuring those court-appointed individuals that their court-ordered actions taken in consummation of the Plan are protected, no one will take the risk and perform the rebalancing and redistribution, and the fate of customers' assets is uncertain.

For this reason (which is a good reason), the Government's appeal has implications far broader than just this case.  What the Government is asking for here—a reservation of rights so that it may prosecute court-ordered individuals later for their court-ordered conduct to consummate a restructuring plan, based on rules the Government refuses to articulate now—would upend chapter 11 practice as we know it.  Court-approved individuals ordered by a bankruptcy court to take actions in consummation of a court-entered plan of restructuring simply cannot do so if their actions (provided they act without fraud, gross negligence, or willful misconduct) are not protected from future government prosecution.  Even a chapter 7 trustee likely would not be willing to take on the risk of distributing assets without the protection that the trustee's court-ordered actions taken to carry out a chapter 7 liquidation would be protected from liability.

4

The Government's hyperbole about potential alleged downstream effects of the exculpation provision stretch the provision far beyond its plain language.  To be clear, the Bankruptcy Court *repeatedly* made clear that nothing in the exculpation provision immunizes anyone from liability for violations of the law unrelated to the transactions necessary to implement the Plan (*e.g*, violations of tax or environmental laws) or otherwise sanctions fraud, willful misconduct, or gross negligence (Ex. B to Fogelman Decl., Stay Opinion at 7).  And the limited relief in the exculpation provision does literally nothing to prevent the Government from exercising any real police power.  The Government knows this, but has intentionally chosen on appeal to double-down on theories the Bankruptcy Court found fabricated.

The Government may think cryptocurrency regulation is a game.  It is not.  And the stakes are high for 1 million Voyager customers.  The Government asks this Court to halt all customer recoveries in their tracks, and impose *still more* harm on Voyager customers, for no identified purpose.  Even in its Motion for Stay, the Government still says *nothing* about what it intends to do that the Plan prevents—because it either does not know or will not say.  That position should terrify any fair arbiter of the law.  And this Court should see the Government's dogged pursuit of a doomed appeal for what it is:  a transparent attempt to delay consummation of the Plan while the Government finally sorts out its cryptocurrency priorities and legal theories.  But every day the Government is permitted to stall consummation of the Plan is another day of delayed distributions to Voyager customers—the very people the Government should be serving.  Stepping back for a moment, the Bankruptcy Court already found that the Plan was proposed in good faith and not by means forbidden in law, and it directed all exculpated parties to implement the Plan.  If they cannot do so free from reprisal, there is little point to the Plan (or the Bankruptcy Code in general), and Voyager will need to start over.

## **Background**

Prior to bankruptcy, Voyager operated a cryptocurrency trading platform that allowed customers to buy, sell, and store cryptocurrency on an easy-to-use, "accessible-to-all" platform. The Voyager platform was accessible through a mobile application that users could download on their smartphones and other smart devices.   Voyager's mobile application was downloaded millions of times and had over 1.1 million active users as of the Petition Date.[7]

Voyager also operated a lending business, and Three Arrows Capital ("3AC") was one of Voyager's largest borrowers.[8]  Following 3AC's highly publicized collapse, Voyager explored strategic alternatives to preserve the ongoing value of its business.[9]  After consideration of various alternatives, on July 5, 2022, Voyager filed voluntary chapter 11 petitions in the Bankruptcy Court.

On August 3, 2022, the Bankruptcy Court set a deadline for governmental parties to file claims against the Debtors:  January 3, 2023 [BK Dkt. No. 218] (the "Bar Date Order").   On December 20, 2022, the Debtors filed the *Stipulation and Agreed Order Extending Governmental Bar Date for the [SEC]* [BK Dkt. No. 758], whereby Voyager agreed to extend the deadline for the Securities and Exchange Commission (the "SEC") to file a proof of claim to January 17, 2023. But the SEC did not ultimately file a proof of claim prior to or following the extended deadline. Nor did the USAO, the US Trustee, the Commodities Futures Trading Commission ("CFTC"), or the Federal Deposit Insurance Corporation (the "FDIC").  Accordingly, per the Bar Date Order, none of these federal agencies—including both appellants—can receive ***any*** assets from the Voyager estate (and there are no other assets at issue here).  (*See* Bar Date Order ¶ 3.)

---

[7]   Ex. 5 to Slade Decl., *Declaration of Brian Tichenor in Support of Confirmation of the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates,* ¶ 9 [BK Dkt. No. 1113]. (the "Tichenor Decl.").

[8]   Ex. 6 to Slade Decl., *Declaration of Mark A. Renzi in Support of Confirmation of the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates,* ¶ 15 [BK Dkt. No. 1119]. (the "Renzi Decl.").

[9]   Ex. 5 to Slade Decl., Tichenor Decl. ¶ 11.

Voyager initially pursued a chapter 11 plan that contemplated a transaction with FTX.[10] Following the exposure of FTX's massive fraud (of which Voyager was a *victim*, as the Government knows), Voyager began exploring alternative transactions.  *Id.* ¶ 15.  On December 18, 2022, Voyager Digital, LLC entered into an asset purchase agreement with BAM Trading Services Inc. d/b/a Binance.US ("Binance.US") to transfer substantially all of the Debtors' cryptocurrency and certain other assets to Binance.US pursuant to a chapter 11 plan.  *Id.* ¶ 19.  On December 21, 2022, the Debtors filed their *Motion for Entry of An Order (I) Authorizing Entry Into the Binance US Purchase Agreement and (II) Granting Related Relief* [BK Dkt. No. 775].

The Binance.US transaction contemplates making in-kind distributions to creditors, such that each individual will receive their recovery in the type of cryptocurrency held in their account.[11] In order to make such distributions, the Debtors' must rebalance their holdings to ensure they possess the proper volume of each type of cryptocurrency.[12]  Accordingly, in its December 21 motion, among other things, Voyager expressly requested Bankruptcy Court approval to commence a "rebalancing" exercise to buy and sell cryptocurrency in preparation for making in-kind distributions to creditors following confirmation of a plan.[13]  At the hearing on that motion, Voyager's counsel described the rebalancing process that Voyager intended to pursue *in detail*.[14] Despite being on notice, the Government did not object or suggest there was anything illegal being pursued, and the Bankruptcy Court authorized Voyager to consummate the rebalancing process.

---

[10]   Ex. 5 to Slade Decl., Tichenor Decl. ¶ 14.

[11]   *Id.* ¶ 30.

[12]   Ex. 2 to Slade Decl., Plan at 32.

[13]   *Motion for Entry of An Order (I) Authorizing Entry Into the Binance US Purchase Agreement and (II) Granting Related Relief* [BK Dkt. No. 775] ¶ 29.

[14]   Transcript, *In re Voyager Digital Holdings*, No. 22-10943 at 75:16–76:10 (Jan. 10, 2023).

On January 13, 2023, the Bankruptcy Court entered the *Order (I) Authorizing Entry into the Asset Purchase Agreement and (II) Granting Related Relief* [BK Dkt. No. 860], authorizing the Debtors' entry into the Binance.US asset purchase agreement and providing that "[t]he Debtors are authorized to rebalance their cryptocurrency portfolio subject to the terms of the Binance US Purchase Agreement."  At no point since has the Government or any other party objected to or otherwise opposed the rebalancing provisions included in the Binance asset purchase agreement. More generally, to date, the Government has not articulated any laws, rules, or regulations that any of the restructuring transactions contravene, nor do they do so in their Motion or Memorandum.

On January 13, 2023, the Debtors filed the Plan and the *Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [BK Dkt. No. 863] (as amended or supplemented from time to time, the "Disclosure Statement", Ex. 1 to Slade Decl.).  The Bankruptcy Court then entered the *Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Conditionally Approving the Adequacy of the Debtors' Disclosure Statement, (III) Approving (A) Procedures for Solicitation, (B) Forms of Ballots and Notices, (C) Procedures for Tabulation of Votes and (D) Procedures for Objections* [BK Dkt. No. 861] (the "Conditional Disclosure Statement Order") conditionally approving the Disclosure Statement, establishing February 22, 2023 as the deadline to file an objection to the Disclosure Statement or to confirmation of the Plan, and approving solicitation materials, including notices, forms, and ballots (collectively, the "Solicitation Packages").  The Solicitation Packages included the Disclosure Statement, the proposed Plan, and all other materials necessary for creditors (and regulators) to, among other things, make an informed decision on whether to accept or reject the Plan and/or to object to the confirmation of the Plan.

The Solicitation Packages and the deadline for objecting to the Disclosure Statement and the Plan were served on all recipients before January 25, 2023. *See Affidavit of Service* [BK Dkt. No. 926] and the *Supplemental Affidavit of Service* [BK Dkt. Nos. 927 and 1016].   The proposed Plan circulated to all in the Solicitation Packages provided in bold-face type as follows:

**C.      Exculpation**

> **Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor release or the third-party release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is exculpated from any Cause of Action for any act or omission arising on or after the Petition Date and prior to the Effective Date based on the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing, or consummation of the Disclosure Statement, the Plan, the Special Committee Investigation, any Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for Causes of Action related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.**
>
> **The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan**

(Ex. 2 to Slade Decl., Plan at 66.) While the proposed Plan included a provision saying that the SEC could enforce its police powers (*see id.* at 58), there was no general governmental "carve out" from the broad exculpation included in the Plan.[15]

---

[15]   The exact same exculpation provision was included in the previous Disclosure Statement and Plan filed in accordance with the FTX US transaction in October 2022.   The Government made no challenge to the exculpation provision in at the time of solicitation of the Disclosure Statement in connection with the FTX US transaction.  (*See* BK Dkt. Nos. 590 – 592.)

On February 15, 2023, the Debtors filed their Plan Administrator Agreement, which introduced the Plan Administrator and his role in retaining, preserving, and distributing assets of the Voyager estate [BK Dkt. No. 1006].  On February 22, 2023, certain federal and state agencies filed objections to approval of the Disclosure Statement and confirmation of the Plan in advance of the Objection Deadline [BK Dkt. Nos. 1042, 1047, 1051].  But **none** of the objections included opposition to the broad exculpation provision contained in Article VIII.C of the Plan.

On February 24, 2023, after the Debtors granted an extension of the Objection Deadline for certain parties.  The U.S. Trustee, the Texas State Securities Board and Department of Banking, and the New Jersey Bureau of Securities filed objections to the Disclosure Statement and the Plan [BK Dkt. Nos. 1085, 1086, 1087].  The U.S. Trustee's objection to the exculpation provision contained in Article VIII.C of the Plan took the position that the provision went broader than the Bankruptcy Court's previous rulings, but the U.S. Trustee agreed some exculpation was proper. For its part, the USAO did not object to the exculpation provision in the proposed Plan formally or informally—and its deadline to do so passed.  The Debtors thereafter continued to engage with all objectors up and through the entry of the Confirmation Order in an effort to minimize disputes.[16]

On March 2, 2023, the Bankruptcy Court commenced the joint hearing to consider the adequacy of the Debtors' Disclosure Statement and confirmation of the Plan (the "Combined Hearing").  On March 5, 2023, the Debtors filed the revised version of the Plan [BK Dkt. No. 1138], which included the below exculpation provision as Article VIII.C of the Plan:

---

[16]   On February 28, 2022, the Debtors filed an initial proposed Confirmation Order [BK Dkt. No. 1120] which included proposed language in an attempt to resolve the FTC's objection and to make clear that any cause of action brought by the FTC would not be discharged by the Plan (despite the Plan not including a discharge provision), but the terms of the Bar Date Order would remain in effect.

Following the inclusion of the Bar Date Order, provision, a dispute over the proposed exculpation provision began when the SEC and certain other regulators began to argue with Debtors' counsel over the meaning of the Bar Date Order and began to dispute the consequences of their failure to file a proof of claim, arguing for an indefinite "reservation of rights" that effectively exempted them from these chapter 11 cases forever.

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor release or the third-party release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is exculpated from any Cause of Action for any act or omission arising on or after the Petition Date and prior to the Effective Date based on the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing, or consummation of the Disclosure Statement, the Plan, the Special Committee Investigation, any Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for Causes of Action related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan; *provided* that nothing in the Plan shall limit the liability of professionals to their clients pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8 Rule 1.8(h)(1) (2009).

To the extent that any Cryptocurrency is deemed to be a "security" by the SEC or any Governmental Unit, distribution of such Cryptocurrency shall have been done in good faith and in compliance with all applicable laws, rules, and regulations and the Exculpated Parties shall not be liable at any time for the violation of any applicable law, rule, or regulation governing the distribution of Cryptocurrency whether such Cryptocurrency is deemed to be a "security" or otherwise.

The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

On March 2, 2023, the USAO filed it first objection related to these chapter 11 cases. The USAO's objection challenged certain provisions contained in the proposed Confirmation Order [BK Dkt. No. 1132]. The Debtors continued to engage with all parties in an effort to reach resolution on outstanding issues, including with respect to the absolutely critical exculpation of parties who would be required to carry out the "Restructuring Transactions" under the Plan.

11

On March 6, 2023, the USAO filed a lengthy second objection to confirmation of the Plan, alleging that the Plan and Confirmation Order "contain improperly broad exculpation language that purports to bind the Government from exercising its police and regulatory powers against the Debtors and various third parties." [BK Dkt. No. 1144].

Following a four day trial, the Bankruptcy Court entered the *Corrected and Amended Order (I) Approving the Second Amended Disclosure Statement and (II) Confirming the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [BK Dkt. No. 1166] (the "Confirmation Order," Ex. 10 to Slade Decl.) The Confirmation Order modified certain provisions of the Plan, including Article VIII.C of the Plan, which was stricken in its entirety and replaced by the language in section A of the Confirmation Order (the "exculpation provision"):

- Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor release or the third-party release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby exculpated from, any liability for damages based on the negotiation, execution and implementation of any transactions or actions approved by the Bankruptcy Court in the Chapter 11 Cases, except for Causes of Action related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence; *provided* that nothing in the Plan shall limit the liability of professionals to their clients pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8 Rule 1.8(h)(1) (2009).

- The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes.

- In addition, the Plan contemplates certain rebalancing transactions and the completion of distributions of cryptocurrencies to creditors. The Exculpated Parties shall have no liability for, and are exculpated from, any claim for fines, penalties, damages, or other liabilities based on their execution and completion of the rebalancing transactions and the distribution of cryptocurrencies to creditors in the manner provided in the Plan.

- For the avoidance of doubt, the foregoing paragraph reflects the fact that Confirmation of the Plan requires the Exculpated Parties to engage in certain rebalancing transactions and distributions of cryptocurrencies and the fact that no regulatory authority has taken the position during the Combined Hearing that such conduct would violate applicable laws or regulations. Nothing in this provision shall limit in any way the powers of any Governmental Unit to

contend that any rebalancing transaction should be stopped or prevented, or that any other action contemplated by the Plan should be enjoined or prevented from proceeding further.  Nor does anything in this provision limit the enforcement of any future regulatory or court order that requires that such activities either cease or be modified, or limit the penalties that may be applicable if such a future regulatory or court order is issued and is violated.  Similarly, nothing herein shall limit the authority of the Committee on Foreign Investment of the United States to bar any of the contemplated transactions.  Nor does anything in this provision alter the terms of the Plan regarding the compliance of the Purchaser with applicable laws in the Unsupported Jurisdictions before distributions of cryptocurrency occur in those Unsupported Jurisdictions.

(Ex. 11 to Slade Decl., Confirmation Order, § A.)  The Confirmation Order also included the below

language regarding the exculpation provision:

97.    Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor release or the third-party release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby exculpated from, any liability for damages based on the negotiation, execution and implementation of any transactions or actions approved by the Bankruptcy Court in the Chapter 11 Cases, except for Causes of Action related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence; *provided* that nothing in the Plan shall limit the liability of professionals to their clients pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8 Rule 1.8(h)(1) (2009).

98.    The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes.

99.    In addition, the Plan contemplates certain rebalancing transactions and the completion of distributions of cryptocurrencies to creditors.  The Exculpated Parties shall have no liability for, and are exculpated from, any claim for fines, penalties, damages, or other liabilities based on their execution and completion of the rebalancing transactions and the distribution of cryptocurrencies to creditors in the manner provided in the Plan.  For the avoidance of doubt, this paragraph reflects the fact that Confirmation of the Plan requires the Exculpated Parties to engage in certain rebalancing transactions and distributions of cryptocurrencies and the fact that no regulatory authority has taken the position during the Combined Hearing that such conduct would violate applicable laws or regulations.  Nothing in this provision shall limit in any way the powers of any Governmental Unit to contend that any rebalancing transaction should be stopped or prevented, or that any other action contemplated by the Plan should be enjoined or prevented from proceeding further.  Nor does anything in this provision limit the enforcement of any future regulatory or court order that requires that such activities either cease or be modified, or limit the penalties that may be applicable if such a future regulatory or court order is issued and is violated.  Similarly, nothing herein shall limit the authority of the Committee on Foreign Investment of the United States to bar any of the contemplated transactions.  Nor does anything in this provision alter the terms

of the Plan regarding the compliance of the Purchaser with applicable laws in the Unsupported Jurisdictions before distributions of cryptocurrency occur in those Unsupported Jurisdictions.

101.    Governmental Units.  Except as set forth in the exculpation provisions set forth in the Plan (including sections VI.B.1 and VIII.C of the Plan) and in this Confirmation Order, nothing in this Confirmation Order or the Plan shall release or restrict any claim by the United States, the States or any of their agencies of any claim arising under the Internal Revenue Code, the environmental laws or any civil or criminal laws of the United States or the States, or under any rules or regulations enforced by the United States, the States or any of their agencies against the Released Parties, nor shall anything in the Confirmation Order or the Plan enjoin the United States or the States from bringing any claim, suit, action or other proceedings against the Released Parties for any liability for any claim, suit or action arising under the Internal Revenue Code, the environmental laws or any civil or criminal laws of the United States or the States, or under any rules or regulations enforced by the United States, the States or any of their agencies, nor shall anything in the Confirmation Order or the Plan exculpate any such party from any liability to the United States, the States or any of their agencies, arising under the Internal Revenue Code, the environmental laws or any civil or criminal laws of the United States or the States, or under any rules or regulations enforced by the United States, the States or any of their agencies; *provided*, however, that nothing in this Confirmation Order or the Plan shall modify in any respect the relief previously granted in the Bar Date Order.

102.    Except as set forth in the exculpation provisions set forth in the Plan (including sections VI.B.1 and VIII.C of the Plan) and in this Confirmation Order, nothing in this Confirmation Order, the Disclosure Statement, the Plan, or the Asset Purchase Agreement releases, precludes, or enjoins: (i) any liability to any governmental unit as defined in 11 U.S.C. § 101(27) ("Governmental Unit") that is not a "claim" as defined in 11 U.S.C. § 101(5) ("Claim"); (ii) any Claim of a Governmental Unit arising on or after the Effective Date; or (iii) any liability to a Governmental Unit on the part of any non-Debtor (except to the extent set forth in paragraphs 49 and 56 herein); *provided*, however, that nothing in this Confirmation Order or the Plan shall modify in any respect the relief previously granted in the Bar Date Order.

104.    Notwithstanding any provision herein to the contrary, nothing in this Confirmation Order or the Plan grants this Court jurisdiction over any police and regulatory actions by the SEC, and the SEC shall retain the power and authority to commence and continue any such actions against any person or entity, including without limitation, the Debtors, in any forum with jurisdiction; *provided*, however, that nothing in this Confirmation Order or the Plan shall modify in any respect the relief previously granted in the Bar Date Order.

(Ex. 10 to Slade Decl., Confirmation Order ¶ 97–102, 104.)

On March 11, 2023, the Bankruptcy Court issued the Confirmation Decision, explaining its rationale for confirming the Plan.  As described in detail below, certain of the Bankruptcy Court's findings warrant emphasis.

First, Section 1129(a)(3) of the Bankruptcy Code required the Bankruptcy Court to conclude that the Plan was "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3).  In four days of trial, the Government never argued that the Plan proposed anything forbidden by law.  In its Confirmation Decision, the Bankruptcy Court stated, in part:

> Voyager's case is a high-profile one, and the facts that Voyager has been attempting to sell itself to another firm, and to make "in kind" distributions of cryptocurrencies to account holders, has been known for many months.  The SEC and all other government agencies have had a full and fair opportunity to object if they believe that the rebalancing transactions that I have previously approved and that are contemplated by the plan are illegal in any way, or if they believe that the distributions of cryptocurrencies and cash that are contemplated by the plan are violative in any way of any applicable statute, rule or regulation.  I have no desire or intention to approve anything that runs afoul of legal limits, just as I have no desire to approve anything that will put customers at risk.  The plain fact is, however, that the SEC has not actually made any objection.  It has only vaguely hinted at possible issues that have not even been described in a manner that would permit the Court or the parties to address them.

(Ex. 11 to Slade Decl., Confirmation Decision at 13.)  The Bankruptcy Court also concluded that "[b]ased on the evidence that has actually been offered to me, if I were to make that determination today I would have no choice but to conclude that the transactions are perfectly legal." (*Id.* at 39.)

**Critically, the Government does not contest <u>any</u> of these findings on appeal, nor could it.**

Second, the Confirmation Decision directly addressed the exculpation provision and the Government's position that no exculpation was permitted by the Bankruptcy Code, calling it "unreasonable and wrong" that "any officers or directors or entities who would implement the confirmed plan would just have to 'take their chances' as to whether the Government might contend that their conduct was illegal, and as to whether the Government might seek to punish them for doing what I had authorized and directed them to do." (*Id.* at 33.)  This was particularly appropriate given that the Government sought to just leave its options open, after having years to consider these matters, and was still not "prepared to say . . . that there is anything wrongful about what we are currently contemplating." (*Id.* at 34–35.)

15

Absent a stay, the Plan will be effective at 3:00 PM Eastern Time on March 24, 2023. Unless the Government succeeds in blocking relief to Voyager customers, Voyager would promptly thereafter pursue one of the two paths provided therein: (a) the sale to Binance.US; or (b) a "self-liquidation" pursuant to the confirmed Plan. When that happens, the transaction will close (the Debtors expect by the close of business on Friday), and Voyager and its professionals, along with the Committee and its professionals, will be directed—by the Bankruptcy Court's Order and by the Bankruptcy Code—to implement the Plan. *See* 11 U.S.C. § 1142.

The Government filed its Notice of Appeal on March 14, 2023. [Dkt. No. 1.] The same day the Government filed a motion to stay pending appeal before the Bankruptcy Court [BK Dkt. No. 1181]. The Debtors responded promptly the following morning, March 15, 2023 [BK Dkt. No. 1186] and the Bankruptcy Court held a hearing on the Government's motion for stay that afternoon. The Bankruptcy Court issued its Stay Opinion denying the Government's motion for a stay pending appeal on March 15, 2023, explaining in some detail why a stay was inappropriate. The Government filed the present Motion at the close of business on Friday, March 17, 2023.

### Legal Standard

"The district court reviews the bankruptcy court's factual findings for clear error and its conclusions of law de novo." *In re Charter Commc'ns, Inc.*, 691 F.3d 476, 482-83 (2d Cir. 2012). The "clear error standard is a deferential one, and if the bankruptcy court's account of the evidence is plausible in light of the record viewed in its entirety, the [reviewing court] may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *In re Motors Liquidation Co.*, 829 F.3d 135, 158 (2d Cir. 2016) (internal quotations omitted) (quoting *Amadeo v. Zant*, 486 U.S. 214, 223 (1988)).

## Argument

The Government's Motion and Memorandum do not come remotely close to meeting the stringent requirements for a stay pending appeal.  The Court must consider: "(1) whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *In re 461 7th Avenue Mkt., Inc.*, 2021 WL 5917775 (2d Cir. Dec. 15, 2021) (quoting *In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d 167, 170 (2d Cir. 2007)).  Stays pending appeal are extraordinary forms of relief that "are the exception, not the rule, and are granted only in limited circumstances."  *In re Brown*, 2020 WL 3264057, at *5 (Bankr. S.D.N.Y. June 10, 2020).

Any stay applicant bears a "heavy" burden.  *In re Adelphia Commc'ns Corp.*, 333 B.R. 649, 659 (S.D.N.Y. 2005).  But the "burden is especially heavy" where, as here, the movant "seeks to stay the Confirmation Order." *In re Latam Airlines Group S.A.*, 2022 WL 2811904, at *2 (Bankr. S.D.N.Y. July 16, 2022).  The Government "must show 'satisfactory' evidence on all four criteria." *Turner v. Citizens Nat'l Bank of Hammond* (*In re Turner*), 207 B.R. 373, 375 (2d Cir. B.A.P. 1997).  "Failure to satisfy one prong of the standard for granting a stay pending appeal dooms [the Government's] motion." *Green Point Bank v. Treston*, 188 B.R. 9, 12 (S.D.N.Y. 1996).

Here, the Government has offered **zero** evidence in support of its Motion.  And it fails to satisfy any of the four factors—let alone all of them.  This Court should deny the requested stay.

## I.      The Government Has No Chance of Success On the Merits.

To obtain a stay, the Government must first demonstrate "a substantial possibility" that its appeal will succeed.  *LaRouche v. Kezer*, 20 F.3d 68, 72 (2d Cir. 1994).  No such possibility exists.  To the contrary, courts in this District, throughout the Second Circuit, and the majority of other federal circuits, routinely approve chapter 11 plans containing the same or similar exculpation

17

language the Government challenges here.  The Government offers no reason why this Court should ignore or overturn that precedent.  Instead, the Government distracts the Court with hyperbole and red herrings.  The Government's complete failure to engage with the relevant legal landscape is disappointing, but illustrative—because its argument has no merit.

> **A.      It is Well-Established that exculpation provisions Are Proper in This Circuit.**

As the Bankruptcy Court found, exculpation provisions are well-established and supported by "a long line of authority [agreeing that] parties should not be liable for things that [a bankruptcy] order will require them to do." (Ex. B to Fogelman Decl., Stay Opinion at 3.)  In its Memorandum, the Government dedicates nearly 15 pages to the exculpation provision.  But the Government omits any substantive discussion of the two decades of precedent in this circuit and elsewhere approving the very provision challenged here.  Failure to acknowledge the breadth of these cases and the widespread use of exculpation provisions for decades is telling.

The plain language of the exculpation provision is narrow, providing only that *court-approved* parties (and their advisors) tasked with carrying out the Plan will not face criminal or civil liability for taking the *court-approved* steps necessary to implement the Plan, provided their actions do not constitute fraud, willful misconduct or gross negligence.  (Ex. 2 to the Slade Decl., Plan, Art. VIII.C.)  Going back to at least 2006, in *Enron*, another judge in this district affirmed an exculpation clause like the one at-issue here, characterizing it as "***reasonable and customary*** and in the best interests of the estates."  *In re Enron Corp.,* 326 B.R. 497, 504 (S.D.N.Y. 2005) (emphasis added).  Like the provision in Voyager's Plan, the *Enron* clause exculpated the debtors, the creditors' committee, and others involved in the development and implementation of the plan from liability for "any act taken or omitted to be taken in connection with and subsequent to the commencement of the Chapter 11 Cases, the formulation, preparation, dissemination, ***implementation***, confirmation or approval of the Plan or any compromises or settlements

18

contained therein." *Id.* at 500–01 (emphasis added).  As here, the *Enron* court was approving a plan no party had challenged as illegal under the current laws and exculpating parties were directed to implement the plan in good faith.  *Id.*  The *Enron* rationale applies with equal (or greater) force in this case, more than 15 years later.

Shortly thereafter, judges in this district in both *In re Oneida Ltd.* and *In re Granite Broad.* similarly overruled objections to exculpation, concluding the proposed language was "***standard in this district***." 351 B.R. 79, 94 n.22 (S.D.N.Y. 2006) (emphasis added); *see In re Granite Broad. Corp.*, 369 B.R. 120, 139 (S.D.N.Y. 2007) (exculpating parties for "actions in connection, related to, or arising out of the Reorganization Cases . . . exclud[ing] gross negligence and intentional misconduct").  Like the exculpation provision here, the exculpation provisions in *Oneida* covered any "act or omission in connection with, or arising out of, the Disclosure Statement, the Plan or any Plan Document ... the solicitation of votes for and the pursuit of Confirmation of [the] Plan, the Effective Date of [the] Plan, ***or the administration of [the] Plan or the property to be distributed under [the] Plan***." 351 B.R. at 94 (emphasis added).  And as the paragraphs that follow make clear, exculpation provisions like the one in the Plan have continued to be standard here and elsewhere for nearly two decades.

Indeed, four years ago, Judge Wiles recognized the propriety of exculpation provisions "meant to insulate court-supervised fiduciaries and some other parties from claims that are based on actions that relate to the restructuring, with the exception of claims that are based on allegations of fraud, willful misconduct, or gross negligence." *In re Aegean Marine Petroleum Network Inc.*, 599 B.R. 717, 720–21 (S.D.N.Y. 2019).  Many other courts in this district have followed suit since. *See, e.g., In re Latam Airlines Grp. S.A.*, 2022 WL 2206829, at *49–50 (Bankr. S.D.N.Y. June 18, 2022), *corrected*, 2022 WL 2541298 (Bankr. S.D.N.Y. July 7, 2022), and *motion to certify appeal*

*denied*, 2022 WL 2962948 (Bankr. S.D.N.Y. July 26, 2022), and *aff'd sub nom. In re Latam Airlines Grp.*, *S.A.*, 643 B.R. 756 (S.D.N.Y. 2022), and *aff'd sub nom. In re Latam Airlines Grp.*, *S.A.*, 643 B.R. 741 (S.D.N.Y. 2022), *aff'd sub nom. In re Latam Airlines Grp. S.A.*, 55 F.4th 377 (2d Cir. 2022) (overruling the trustee's objection because "[i]t is well settled that an exculpation clause approved at confirmation may exculpate estate fiduciaries like a committee, its members, and estate professionals for their actions in the bankruptcy case except where those actions amount to willful misconduct or gross negligence"); *In re Ditech Holding Corp.*, 2021 WL 3716398, at *9 (Bankr. S.D.N.Y. Aug. 20, 2021) (collecting cases for the proposition that "[i]t is settled that exculpatory provisions are proper to protect those authorized by bankruptcy courts to carry out the bankruptcy process, even after the effective date of a plan"); *In re Olinda Star Ltd.*, 614 B.R. 28, 48 (S.D.N.Y. 2020) ("This Court agrees that [exculpation] is necessary and appropriate to prevent interference with the consummation of the [restructuring].") *In re Stearns Holdings, LLC*, 607 B.R. 781, 790 (S.D.N.Y. 2019) ("the standard of care established by the exculpation provision is entirely consistent with, and appropriate under, applicable law").

Courts across the country agree, and the vast majority of the federal circuit courts (beginning from the Third Circuit's seminal decision in *In re PWS Holding*) have also approved exculpation provisions that are the same as or similar to the one the Government challenges here. *See, e.g., In re PWS Holding Corp.*, 228 F.3d 224, 245-46 (3d Cir. 2000) (approving exculpation clause barring suits against parties related to "the consummation of the Plan or the Administration of the Plan or the property to be distributed under the Plan"); *Blixseth v. Credit Suisse*, 961 F.3d 1074, 1084 (9th Cir. 2020) (bankruptcy court "had the authority to approve an exculpation clause intended to trim subsequent litigation over acts taken during the bankruptcy proceedings and so render the Plan viable"); *In re Airadigm Commc'ns, Inc.*, 519 F.3d 640, 655 (7th Cir. 2008)

(approving exculpation of party involved in plan confirmation and consummation "for any act or omission arising out of or in connection with the Case, the confirmation of this Plan, the consummation of this Plan, *or the administration of this Plan or property to be distributed under this Plan*, except for willful misconduct") (emphasis added); *In re Seaside Eng'g & Surveying, Inc.*, 780 F.3d 1070, 1076 (11th Cir. 2015) (approving exculpation provision barring claims against relevant parties for "any act, omission, transaction or other occurrence in connection with, relating to, or arising out of the Chapter 11 Case, the pursuit of confirmation of the Amended Plan as modified by the Technical Amendment, *or the consummation of the Amended Plan* as modified by this Technical Amendment, except and solely to the extent such liability is based on fraud, gross negligence or willful misconduct") (emphasis added); *but see Matter of Highland Cap. Mgmt., L.P.,* 48 F.4th 419, 436 (5th Cir. 2022) ("Our court along with the Tenth Circuit hold § 524(e) categorically bars third-party exculpations absent express authority in another provision of the Bankruptcy Code.  By contrast, the Ninth Circuit joins the Second, Third, Fourth, Sixth, Seventh, and Eleventh Circuits in reading § 524(e) to allow varying degrees of limited third-party exculpations.") (internal citations omitted).[17]

---

[17]    Because the exculpation provision at issue here is so narrow, the Bankruptcy Court did not feel it necessary to rely on the third-party release caselaw such as *In re Metromedia Fiber Network, Inc.,* 416 F.3d 136, 142 (2d Cir. 2005).  But to the extent *Metromedia* and its third-party release progeny are relevant at all, they support rather than undermine the exculpation provision at issue.  In *Metromedia*, the Second Circuit held that non-debtor releases *are* appropriate under four circumstances: (1) the estate received substantial consideration; (2) the enjoined claims would directly impact the debtors' reorganization; (3) the plan otherwise provided for the full payment of the enjoined claims; or (4) the creditors or claimholders consent.  *Id.* at 142.  In fact, as stated above, the Fifth Circuit, citing *Metromedia*, recently acknowledged that the Second Circuit, as well as the Third, Fourth, Sixth, Seventh, Ninth, and Eleventh Circuits, all "allow varying degrees of limited third-party exculpations." *In re Highland Cap. Mgmt., L.P.*, 48 F.4th at 436.  Here, the exculpation provisions are part of a plan that received 97% creditor support, and the exculpated parties are, by definition, providing substantial consideration to the estate by implementing the Plan and returning cryptocurrency to customers as promptly as possible.  (*See* Ex. 7 to Slade Decl., Sanchez Decl. at 9.)  Indeed, unless the Government somehow succeeds in blocking these transactions without telling anyone what could possibly be wrong with them, given the current state of the cryptocurrency market, recoveries are projected to be quite robust for a chapter 11 case.  The Government's decision to stand in the way of a creditor recovery by threatening to sue or penalize those who work to return assets to customers following confirmation—in order (at best) to pursue a hypothetical future issue—is astonishing, giving new meaning to the phrase "no good deed goes unpunished."

The Government largely ignores this body of law.  All it does is try to differentiate the exculpation provision here from the exculpation provision at issue in *Aegean*.  (Mem. at 29–31.) Specifically, the Government, citing only *Aegean*, claims the challenged exculpation provision is broader than approved by other courts because it covers post-effective conduct and extends to non-fiduciaries.  (*Id.*)  But the Government's argument with respect to *Aegean* is demonstrably false.[18] And moreover, judges in the Southern District of New York in both *Enron* and *Oneida* approved exculpation clauses that explicitly extended beyond the effective date to the implementation and administration of the company's respective plans.  *Enron,* 326 B.R. 497 at 500–01; *Oneida*, 351 B.R. at 94 n.22.  Then, in 2021, the *Ditech* court too concluded that "[i]t is settled that exculpatory provisions are proper to protect those authorized by bankruptcy courts to carry out the bankruptcy process, ***even after the effective date of a plan***." 2021 WL 3716398, at *9 (emphasis added).  And the next year, the *Latam* court reaffirmed that conclusion, while also concluding that "[e]xculpated [p]arties who are not estate fiduciaries are entitled to benefit from a broad exculpation provision. They have been actively involved in all aspects of these Chapter 11 Cases and have made significant contributions to the success of these cases.  In the absence of gross negligence or intentional wrongdoing on their parts, the Court will extend the Exculpation clause to the Exculpated Parties who are not estate fiduciaries." 2022 WL 2206829, at *50.  In short, the distinctions described by the Government are either inaccurate, make no legally operative difference to this Court's analysis of the exculpation provision, or both.

---

[18]  The Government uses an ellipsis within its citation to the exculpation provision in *Aegean*, (*see* Mem. at 31), so it is unclear whether the Government simply misunderstands that provision or is intentionally misstating it.  The provision in *Aegean* exculpated all persons charged with implementing the transactions described in Aegean's plan, but made clear those persons could not breach the written agreements described in Aegean's plan and then claim to have been exculpated for breach.  *See In re Aegean Marine Pet. Network*, No. 18-13374-mew, Docket. 503 at 41.  Accordingly, the Government's assertion in its Memorandum that *Aegean* "expressly did not pertain to transactions that occurred after the effective date of the plan" (Mem. at 31) is flat-out wrong, as Judge Wiles knew because he presided in both *Aegean* and this case.

The Government also cites *Latam* for the proposition that the rationale behind exculpation focuses on private party stakeholders and not the government.  (Mem. at 23.)  That is also incorrect. Indeed, the Government's quoted language comes from *Latam*'s analysis of an exculpation objection brought by the U.S. Trustee—one of the same government appellants here.  2022 WL 2206829, at \*49–\*50.  The Government's attempt to use *Latam* to limit exculpation provisions to private parties is necessarily belied by the fact the court overruled the U.S. Trustee's objection.

In sum, the Government's failure to meaningfully address, let alone differentiate, the exculpation provision here from the dozens of provisions routinely approved by courts in this district and across the country is fatal.  On that ground alone, the Motion should be denied.

**B.    The exculpation provision Does Not Constrain the Government's Police Power.**

The exculpation provision protects individuals engaged in *court*-ordered transactions that the Bankruptcy Court already found to be lawful and the Government has never argued are not. Indeed, the Government should be estopped from ever arguing the contrary, and it does not and cannot offer support for its argument that this protection interferes with its police power.

Prior to approving a chapter 11 plan, the Bankruptcy Court must and did conclude that the Plan was "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). The Government had ample opportunity to present evidence that the law forbids part of the Plan. It failed.  (*See* Ex. 11 to Slade Decl., Confirmation Decision at 13–14.)  Its Memorandum here is similarly vacant, but vaguely references unidentified "potential criminal claims." (Mem. at 22.) And it should scare every person reading this brief that the Government is willing to threaten the possibility of unidentified criminal sanctions even though it is unwilling to even articulate the applicable legal standards so that law-abiding citizens can conduct themselves accordingly.  But the Government's continued failure to identify even one potentially unlawful act called for by the

Plan concedes the crucial point:  the transactions contemplated by the Plan are legal and do not currently give rise to any civil or criminal liability.[19]

Absent any complaints of potential unlawfulness, the Government resorts to manufactured complaints about interference with an unidentified prospective exercise of police powers because it is not sure (allegedly) what the Plan contemplates.  But the Government's argument is (again) hyperbole.  The transactions to effectuate the return of assets to Voyager customers are well-known to the Government.  Indeed, the "language describing the matters covered . . . is precisely the modification that the United States Trustee suggested in the objection that it filed."  (Ex. B to Fogelman Decl., Stay Opinion at 7.)  The Government cannot now argue that the provision the U.S. Trustee suggested be added to the Disclosure Statement to  describe the transactions that will be consummated pursuant to the Plan is now somehow unclear.

Moreover, the exculpation provision simply does not prevent the Government from taking steps to enjoin conduct sanctioned by the Plan after Confirmation.  Indeed, Judge Wiles "left open the right of the Government to seek to stop the [rebalancing of the cryptocurrency portfolios and the distribution of cryptocurrencies to customers] at any time if the Government believes that they should be stopped."  (*Id.* at 6.)  Thus, the Government's complaint that the parties may consummate the transactions in the Plan before the Government decides to intervene is not an interference with its police powers.  (Mem. at 19.)  If the Government intends to make any aspect of the rebalancing transactions or the distribution of crypto illegal in the near term, it should say that now.  But it has not done so, and reserving the right to pursue liability for court-ordered conduct that the Government did not object to in these proceedings is not an infringement on police powers.

---

[19]   For the first time in the course of these proceedings, the Government contends in its Memorandum on appeal that it could not reveal any ongoing investigation (if there is one), given the sensitivity of such information. Because the Government did not raise this argument with the Bankruptcy Court, it is waived and cannot be considered on appeal.  *In re Markus*, 620 B.R. 31, 36-37 (S.D.N.Y. 2020).

All the exculpation provision does is protect people who act as directed by the Bankruptcy Court and implement the Plan as proposed in good faith.  To the extent a party performs a permitted task in a way that is plainly illegal under the current laws, there is no doubt the Government may pursue legal action for such conduct because it falls outside the scope of the exculpation provision.  (Ex. B to Fogelman Decl., Stay Opinion at 8 (explaining that exculpation "certainly do[es] not require (or permit) anyone to commit fraud . . . or to engage in theft")).  The same is true for conduct that constitutes willful misconduct or gross negligence, which are also carved out from exculpation.  (Ex. 2 to Slade Decl., Plan, Art. VIII.C.)  Indeed, the exculpation provision only functions to protect the individuals who *acted in accordance with the Plan*—and by extension the Bankruptcy Code—prior to future formal government action that signals the court-approved conduct is unlawful.  (Ex. 11 to Slade Decl., Confirmation Decision at 38.)

Dozens of courts have agreed with the logic of this rule, confirming plans with exculpation provisions that make no special provision for the Government and the exercise of its police powers.  *See, e.g.,* Order Confirming Chapter 11 Plan of Reorganization, Ex. A, Plan, Art. VIII.F, *In re Lakeland Tours, LLC*, No. 20-11647 (JLG) (Bankr. S.D.N.Y. Sept. 15, 2020) [Dkt. No. 191-1]; Order Confirming Chapter 11 Plan, Ex. A, Plan, Art. VIII.F, *In re Barneys New York, Inc.*, No. 19-36300 (CGM) (Bankr. S.D.N.Y. Feb. 5, 2020) [Dkt. No. 789-1]; Order Confirming Chapter 11 Plan of Reorganization, Ex. A, Plan § 8.4, *In re Deluxe Entertainment Services Group Inc.*, No. 19-23774 (RDD) (Bankr. S.D.N.Y. Oct. 25, 2019) [Dkt. No. 96]; Order Confirming Chapter 11 Plan, Ex. 1, Plan, Art. VIII.E, I*n re Hollander Sleep Products, LLC*, No. 19-11608 (MEW) (Bankr. S.D.N.Y. Sep. 5, 2019) [Dkt. No. 356]; Order Confirming Chapter 11 Plan of Reorganization, Ex. A, Plan, Art. IX.D, *In re Fullbeauty Brands Holdings Corp.*, No. 19-22185 (RDD) (Bankr. S.D.N.Y. Feb. 5, 2019) [Dkt. No. 39]; Order Confirming Chapter 11 Plan of Reorganization, Ex.

1, Plan, Art. VIII.E, *In re Cenveo, Inc.*, No. 18-22178 (RDD) (Bankr. S.D.N.Y. Aug. 21, 2018) [Dkt. No. 685]; Order Confirming Chapter 11 Plan of Reorganization, Ex. 1, Plan, Art. IX.D, *In re Sbarro LLC*, No. 14-10557 (MG) (Bankr. S.D.N.Y. May 19, 2014) [Dkt. No. 238]; Order Confirming Plan of Liquidation, Ex. A, Plan, Art. IX.F, *In re United Retail Group*, Inc. No 12-10405 (SMB) (Bankr. S.D.N.Y. Sept. 18, 2012) [Dkt. No. 776]; Order Confirming Chapter 11 Plan of Reorganization, Ex. 1, Plan, Art. X.G, *In re FGIC Corp.*, No. 10-14215 (SMB) (Bankr. S.D.N.Y. Apr. 23, 2012) [Dkt. No. 314].  These cases make clear the Government does not need to be carved out of the exculpation provision.  The Government complains that this is the case only because it lacks resources to litigate this issue in every case (*see* Mem. at 23. n.8.),[20] but it was on notice and actually participated in each of the cases referenced above, and there is no basis to offer the Government special treatment even if this were the first time the issue had been presented to a court (which, as described above, is far from the case).

Again, the exculpation provision does little more than ensure the Bankruptcy Court's findings under 11 U.S.C. § 1129(a)(3) are enforced.  Given that provision, the Government's challenge to the Bankruptcy Court's commonsense reasoning would (if accepted) fundamentally undermine ***any*** transaction approved in bankruptcy.  It cannot be the case that the Government retains an indefinite reservation of rights to pursue people years after the fact for implementing transactions confirmed by a Bankruptcy Court after a multi-day evidentiary hearing in which the Government actively participated and identified *no* issue with the proposed transactions.

---

[20]  It is hard to understand the Government's complaints about allegedly having "limited resources" to litigate this issue when *numerous* federal agencies have participated in Voyager's chapter 11 cases and the USAO and U.S. Trustee alone had *at least eight* lawyers who announced themselves on the record at the status conference held by the Court at 9:00 PM ET on Sunday, March 19, 2023.

In its Memorandum, the Government advocates for a world where individuals carrying out an otherwise legal transaction in the context of a chapter 11 plan must proceed with nothing more than a hope and prayer that regulators are not lying-in-wait to prosecute such conduct later. Perhaps that world exists in some countries, but the United States of America is not one of them. Here, the USAO, U.S. Trustee, SEC, FTC, CFTC, FDIC, and other federal and state agencies had ample opportunity to raise concerns about the legality of the contemplated transactions. None did. Some remained silent. Others affirmed their agency's position that the transactions were lawful. Allowing the Government to pursue individuals *after* the legality of the transactions was determined during the bankruptcy proceedings cannot be a legitimate exercise of any police power. And if it is, all Chapter 11 practice as we know it would be upended, and Congress would need either to re-write the Bankruptcy Code or simply repeal it—because there would be little point.

### C.   The Bankruptcy Code Grants the Statutory Authority for the Bankruptcy Court to Affirm the Exculpation Clause.

In lieu of contradicting or even calling into question the mountain of case law supporting the exculpation provision, the Government argues that the Bankruptcy Court exceeded its statutory authority by approving the provision. As evidenced by the decades of case law supporting the Bankruptcy Court's approval, the authority to authorize the exculpation provision is firmly rooted in the broad authority granted by the Bankruptcy Code. Section 105(a) grants the Bankruptcy Court the authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105. While Section 105's authority is limited to that "which must and can only be exercised within the confines of the Bankruptcy Code." *In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 92 (2d Cir. 2003) (internal quotations omitted), that is exactly what is happening here.

27

*First*, as discussed in Section I.B, *supra*, prior to confirmation the Bankruptcy Court must and did conclude the plan was "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3).  For all the reasons set forth above, Judge Wiles made such a conclusion, expressly "reject[ing] and overrul[ing] any contention that the transactions contemplated by the Plan would be illegal." (Ex. 11 to Slade Decl., Confirmation Decision at 14.)

*Second*, as the Bankruptcy Court recognized at the Confirmation Hearing, section 1142 of the Bankruptcy Code makes the exculpation provision particularly essential here.  The Bankruptcy Code commands "the debtor and any entity organized or to be organized for the purpose of carrying out the plan shall carry out the plan and shall comply with any orders of the court."  11 U.S.C. § 1142(a).  The Court may also "direct the debtor and any other necessary party to execute or deliver or to join in the execution or delivery of any instrument required to effect a transfer of property dealt with by a confirmed plan, and to perform any other act … that is necessary for the consummation of the plan."  *Id.* § 1142(b).  That is exactly what the Bankruptcy Court did here.

Those tasked with implementing the Plan have no choice but to follow its mandates.  As Judge Wiles recognized, once the court "has authorized [a] transaction to proceed, [] the parties to those transactions should be not subject to claims that effectively seek to undermine or second-guess this Court's determinations.  In the absence of gross negligence or intentional wrongdoing, parties should not be liable for doing things that the Court authorized them to do and that the Court decided were reasonable things to do." *Aegean*, 599 B.R. at 721.  The Government's position that individuals should instead "'take their chances' as to whether the Government might contend that their conduct was illegal and as to whether the Government might seek to punish them for doing what [Judge Wiles] authorized and directed them to do" defies well-established bankruptcy law in this Circuit and fundamental fairness.  (*See* Ex. 11 to Slade Decl., Confirmation Decision at 33.)

The Government challenges the Bankruptcy Court's authority by arguing that because the Bankruptcy Code authorizes certain releases, it does not provide the "general authorization" necessary to approve the exculpation provision. (*See* Mem. at 19–21 (discussing Sections 1141(d), 1125(e), and 524(g)).) Again, the Government's theories are a red herring.

To start, the Government makes a passing reference to 11 U.S.C. § 1141(d), which defines when a plan may not discharge a debtor. The Confirmation Order is clear that the Debtors are not getting a discharge (although the Government entities are bound by the Bar Date Order). (Ex. 1 to Slade Decl., Plan ¶ 100.) But the Government fails to explain how a provision setting forth when a debtor may obtain a discharge undermines the Bankruptcy Court's ability to enter an unrelated exculpation provision; among many other things, discharges relate to *pre-petition* acts and the challenge at issue here does not.

The Government also points to 11 U.S.C. § 1125(e), a provision titled "postpetition disclosure and solicitation." Section 1125 protects individuals who in good faith solicit acceptance or rejection of a plan. 11 U.S.C. § 1125(e). According to the Government, Section 1125(e) is the only exculpation allowed under the Bankruptcy Code. This ignores the significant case law to the contrary all over the country. (*See* Section I.A, *supra*.) Likewise, the Government fails to explain how the inclusion of an exculpation provision in the statutory section related to postpetition disclosure and solicitation forecloses similar relief under entirely different circumstances.

Finally, the Government cites 11 U.S.C. § 524. This argument fails at the threshold, because the Government impermissibly conflates exculpation with third party release. Exculpation provisions like the one here are forward looking. By contrast, a third-party release looks backward, discharging claims by non-debtors against other non-debtors, arising out of conduct unrelated to the administration of the bankruptcy proceedings. They are quite different.

In fact, the recent opinion in *In re Purdue Pharma, L.P.* affirms the distinction between exculpation and third party releases.  635 B.R. 26 (S.D.N.Y. 2021).  The *Purdue* plan contemplated releasing the Sackler family and various entities related to the Sackler family (all non-debtors) from thousands of tort and consumer fraud claims brought by states, municipalities and personal injury plaintiffs arising out of opioid manufacturing and marketing.  *Id.* at 67.  On appeal, the district court concluded that Section 105 of the Bankruptcy Code does not, on its own, authorize a bankruptcy court to "order the non-consensual release of third-party claims against non-debtors." *Id.* at 115.  But that is not what is happening here.  The Voyager officers, directors, employees and professionals who will implement the confirmed Plan are not the Sacklers, and *Purdue*'s interpretation of Section 105 does not remotely support overturning the exculpation provision.

Indeed, in *Purdue*, Judge McMahon acknowledged the difference between third-party releases and exculpation and cited Judge Wiles's opinion in *Aegean* for the proposition that involuntary third-party releases are "different . . . from what courts ordinarily do." *Id.* at 110 (quoting *Aegean*, 599 B.R. at 723).  As shown in detail above, courts across the country "ordinarily" exculpate those involved in implementing court-approved confirmation transactions. Given the *Purdue* court's extensive survey of relevant release case law and repeated, favorable discussion of *Aegean*, its failure to criticize or even question Judge Wiles's exculpation holding strongly suggests the district court ***agreed*** with the debtors (and the volumes of cited cases) on the key point:  exculpation and third-party releases are materially different.

In sum, the Government's misplaced reliance on statutory provisions and cases unrelated to this dispute cannot overcome the great weight of authority approving exculpation provisions. For this separate reason, the Court should deny the Motion.

D.      **None of the Government's Remaining Arguments Actually Challenge the Long-Held Permissibility of exculpation provisions.**

The Government also offers a number of half-hearted arguments that the Bankruptcy Court lacked the jurisdiction or authority to confirm the exculpation provision.  None of these arguments has any merit, nor suggests any real possibility that the Government will succeed on appeal.

First, the Government's barely-developed argument that it cannot be not subject to the exculpation provision because it did not waive sovereign immunity is puzzling.  No one is suggesting it plans to sue the Government for anything.

Second, the argument that the Bankruptcy Court lacks constitutional authority to adjudicate claims that have not happened yet (again) misunderstands what is happening here and ignores the volumes of courts that have entered the same relief granted here.  The Government concedes that the Constitution has a Bankruptcy Clause, *see* U.S. Const., Art. I § VIII, and Congress, authorized by the Constitution, passed express provisions that authorize the Bankruptcy Court to make findings, *see* 11 U.S.C. §§ 1129(a)(3) & 1142, which the Court did, holding that the transactions described in the Plan and Disclosure Statement are legal and directing the exculpated parties to implement the Plan that the Court approved.  That already happened.  The Government does not challenge those findings, and the exculpation provision merely implements them.

Third, the exculpation provision does not exceed the Bankruptcy Court's "jurisdiction to enjoin third-party non-debtor claims that directly affect the res of the bankruptcy estate." *In re Johns-Manville Corp.*, 517 F.3d 52, 66 (2d Cir. 2008).  To the contrary, the very purpose of the exculpation provision is to ensure the proper distribution of the estate's res.  Allowing those ordered to administer the Plan to face civil and criminal penalties for their court-ordered conduct would indisputably have a direct effect on the orderly administration of the estate.

Finally, the Government's complaints of lack of notice and fundamental fairness strain credulity.  The Government was on notice of and did not object to the exculpation provision prior to the deadline to object to the Plan.  And now, with a mountain of case law on all fours in favor of the provision at issue, the Government relies on inapposite arguments that prove way too much.  The Government cannot seriously believe that it always has the right to sue, prosecute, or fine parties that implement chapter 11 plans, after the fact—even though all they are doing is what they have been directed to do by court order and the Bankruptcy Code.  To the contrary, if the Bankruptcy Code is to have any effect, the Government cannot be right.  This appeal has no likelihood of success on the merits.  The Government's Motion should be denied.

## II.  The Government Cannot Identify Let Alone Prove Irreparable Injury Absent a Stay.

The Government muddles together the remaining three prongs, suggesting that where the movant is the Government, the injury and public interest factors merge.  (Mem. at 32 (*citing Nken v. Holder*, 556 U.S. 418, 426 (2009)).)  But in *Nken*, the Government was the party opposed to a stay and the Court noted that in that context, the public interest and the injury to the opposing party factors merged—***not the irreparable injury requirement on the movant***.  *Nken,* 556 U.S. at 426.  In any event, the Government's tactic fails to mask its inability to identify irreparable injury here.

The only purported harm the Government postulates is that absent a stay, the Government's appeal will be deemed "equitably moot" and dismissed on that basis.  (Mem. at 6, 33, 35-36.) The Bankruptcy Court recognized the same: "The Government has not contended that it faces an 'irreparable injury' in the absence of a stay except for the risk that an appeal might be rendered equitably moot if a stay were not granted."  (Ex. B to Fogelman Decl., Stay Opinion at 15.)

The Debtors agree that the Government's appeal will likely be equitably moot following substantial consummation of the Plan.  But as a matter of law, that does not suggest the existence

of irreparable harm that is "neither remote nor speculative, but actual and imminent." *Latam Airlines*, 2022 WL 2811904, at *3 (citation omitted); *see also In re Sabine Oil & Gas Corp.*, 548 B.R. 674, 681 (S.D.N.Y. 2016) (irreparable harm must be "probable").

As a threshold matter, despite the Government's protestations, "a majority of courts" have held that the risk of equitable mootness absent a stay **does not constitute irreparable injury**. *Sabine*, 548 B.R. at 682; *see also In re DJK Residential, LLC*, 2008 WL 650389, at *3 (S.D.N.Y. March 7, 2008) (same). Even cases cited by the Government do not support granting a stay here. *See, e.g., In re Moreau*, 135 B.R. 209, 215 (N.D.N.Y. 1992) ("It is clear that the danger of an appeal becoming moot **is by itself never a sufficient ground to justify grant of a stay**.") (emphasis added). The truth is that every appeal from a confirmation order faces a material risk of equitable mootness once the plan becomes effective, and "merely invoking equitable mootness . . . a risk that is present in any post-confirmation appeal of a chapter 11 plan—is not sufficient to demonstrate irreparable harm." *In re Calpine Corp.*, 2008 WL 207841, at *4 (Bankr. S.D.N.Y. Jan. 24, 2008).

The general rule refusing to equate the possibility of equitable mootness with irreparable harm justifying a stay pending appeal apply with extreme force here because the Government has not shown any harm to it from the exculpation provision at all. Again, despite myriad opportunities and filing a 40-page motion for stay, the Government fails to identify anything contemplated by the Plan that the Government believes violates a statute or regulation or is otherwise wrongful. **In other words, the Government does not identify anything specific that it actually wants to do which the exculpation provision stops it from doing.** By definition, therefore, there cannot be "actual and imminent" harm to the Government if a stay is not entered.

As the Bankruptcy Court described: "All of the relevant governmental agencies have been on notice of what the plan proposes.  They had every opportunity to tell me if they believed that anything contemplated by the Plan would violate any applicable statute, rule or regulation."  (Ex. 11 to Slade Decl., Confirmation Decision at 34.)   But no regulator "contended during the confirmation hearing that there is anything illegal in what the plan contemplates."  (*Id.*)   Thus, as the Bankruptcy Court observed, "the Government's entire argument about the 'equitable mootness' risk is merely hypothetical, because the Government cannot identify anything that it actually would want to do or should be allowed to do, that would be rendered equitably moot in the absence of a stay."  (Ex. B to Fogelman Decl., Stay Opinion at 16.)  The Bankruptcy Court's analysis is exactly correct, and the Government cannot seriously assert the contrary.

On appeal, the Government adds new theories, contending the exculpation provision "disrupts the government's enforcement discretion"; limits its "ability to enforce any violations of the law as they relate to the transactions contemplated in the plan"; and allows the Bankruptcy Court to "assume for itself the power of the Executive Branch to decide what laws may be enforced[.]"  (Mem. at 33-34).  But these arguments are hopelessly vague; the Government still cannot point to anything in particular the exculpation provision will prevent it from doing.  As the Bankruptcy Court recognized in response to similar contentions, "the Government argued that my Order will somehow prevent the Government from taking action to protect the public health, safety, and welfare.  These arguments are sheer hyperbole.  I could not have said any more clearly that the Government is free at any time to take action to stop the Debtors' cryptocurrency trades and/or cryptocurrency distributions if the Government decides that those activities should be stopped."  (Ex. B to Fogelman Decl., Stay Opinion at 16.)

Given the Government's failure to articulate anything *specific* that it will be prevented from doing by the Plan, the cases that the Government cites are inapposite.  The Government relies on *In re Adelphia Commc'n Corp.,* but that court held that "where the denial of a stay pending appeal risks mooting ***any*** appeal of ***significant*** claims of error, the irreparable harm requirement is satisfied."[21]  361 B.R. 337, 348 (S.D.N.Y. 2007) (emphasis in original).  Likewise, the Government cites *Country Squire* and *Lutin* to suggest equitable mootness constitutes irreparable injury (Mem. at 36), but in those cases, the irreparable injury arose from a foreclosure sale of the movant's property (*Country Squire*) and a distribution of assets to which the movants claimed entitlement (*Lutin*), which could not be unwound once completed.  *Country Squire Assoc. of Carle Place, L.P. v. Rochester Cmty Sav. Bank*, 203 B.R. 182, 183 (B.A.P. 2d Cir. 1996); *Lutin v. United States Bankr. Court (In re Advanced Mining Sys., Inc.)*, 173 B.R. 467, 469 (S.D.N.Y. 1994).  Here, in contrast, the Government has utterly failed to articulate anything specific that it will be prevented from doing by the exculpation provision (and thus would be unable to do absent a stay).

Other courts have recognized the qualifying language in *Adelphia* to hold that any risk of equitable mootness is not irreparable harm where the mooted appeal did not present a "significant" claim of error.  For example, the District Court in *In re DJK Residential* explained that in *Adelphia*, "the claims of error related to the 'troubling' failure by the proponents of the confirmation plan to comply with a central order of the Bankruptcy Court and the Bankruptcy Court's failure to enforce that order." 2008 WL 650389, at *3 (S.D.N.Y. March 7, 2008).  The *DJK* Court held that in the case before it, the movant "failed to demonstrate a similarly ***significant claim of error*** such as the

---

[21]   The Government recognizes as much, suggesting that courts follow *Adelphia* and find irreparable injury from potential equitable mootness where "the appeal involves ***important issues*** or when the loss of the ability to appeal is ***not the only harm*** from the appeal being mooted." (Mem. at 36 (emphasis added).)  This alone dictates a finding of no irreparable injury here.  As discussed above, the Government has not identified ***any*** actual error for appeal that will be lost to equitable mootness, let alone an important one.  And the risk of equitable mootness is the only purported irreparable injury the Government identifies.

one that concerned the court in *Adelphia* [] . . . Here, there is no such 'troubling' claim of error, but merely an argument that the Bankruptcy Court was wrong on the merits of two situations.  In this situation, there is no reason why the majority view that the risk of mootness does not constitute irreparable harm should not apply to [movant's] situation." *Id*. (emphasis added).  So too here.[22]

In sum, the Government has not established that the risk of equitable mootness requires a finding of irreparable harm here.  The Government has failed to identify ***any*** error for appeal, let alone a ***significant*** one.  *Adelphia*, 361 B.R. at 348.  Regardless, any purported harm to the Government is substantially outweighed by the harm to Voyager and its creditors, as well as the complete failure of the Government to show a likelihood of success on the merits.  *See, e.g., In re Latam*, 2022 WL 2657345, at *12 (adopting *Adelphia's* presumption of irreparable injury but denying stay after balancing remaining factors).

## III.    The Balance of Harms Requires the Government's Stay Request Be Denied.

While the Government's injury from mootness is hypothetical, the injuries that would be imposed on Voyager customers if a stay were imposed are inevitable and substantial.  It is undisputed that the Government's requested stay would postpone the relief due Voyager customers indefinitely—and may ultimately make any cryptocurrency distribution impossible.  "Courts have recognized numerous harms resulting from the postponement of reorganization proceedings, including (i) lost strategic opportunities; (ii) difficulty in recruiting and retaining talent for the

---

[22]  Even where the risk of equitable mootness has actual substantive impact on a party's identified rights (which the Government does not allege here), courts have taken pains to caveat that such a finding ***does not mean that the movant is entitled to a stay***.  Rather, any such harm is "enough to get on the scoreboard with respect to th[e] issue" of harm.  *General Motors*, 409 B.R. at 31.  But where equitable mootness is the primary harm identified, the balancing of the four factors becomes more critical, and courts place less emphasis on the irreparable injury prong.  *See, e.g., In re Latam*, 2022 WL 2657345, at *5 (accepting presumption of harm from equitable mootness but affording it little weight where "concern [] is speculative and premature"); *Gen Motors*, 409 B.R. 24, 31 (S.D.N.Y. 2009) (assuming without deciding "that the threat of equitable mootness is enough to satisfy the requirement of showing some irreparable injury . . . How much that should be weighed, however—and especially how it should be weighed against different kinds of irreparable injury that others would suffer—is a very different question").

Debtor; (iii) incurrence of administrative and professional expenses; (iv) placing plan settlements in jeopardy; and (v) exposing the equity to be granted to non-moving creditors to market volatility and other risks." *In re Sabine Oil & Gas*, 548 B.R. at 683.  Creditors are harmed where they "have been waiting for [a] distribution to take place." *In re AMR Corp.*, 2021 WL 5016606, at *4 (Bankr. S.D.N.Y. Oct. 28, 2021).  The Government's requested stay would impose all these harms.

Voyager's asset portfolio is comprised almost entirely of cryptocurrencies.  (*See* Ex. 6 to Slade Decl., Renzi Decl. ¶ 75.)  The crypto market is extremely volatile and has only been further strained by recent mass liquidation events and multiple crypto bankruptcies, as the Government notes.  (*Id.* ¶¶ 16, 80.)  To maximize creditor returns, the Debtors' highly skilled experts must execute opportunistic trades and transfers that minimize market disruption.  (*Id.* ¶¶ 75-77.)  The Debtors' team has been working tirelessly to structure these transactions.  The Government's requested stay would lock these assets in place—the creditors would lose out on the benefit of planned trades and the Debtors work would be halted until an uncertain future.

The Government asserts that since there are a few days remaining before closing, a stay will not cause harm.  (Mem. at 35.)  But that assertion is nonsensical.  As the Bankruptcy Court found, "The stay that the Government is actually seeking would extend long past the time when the Binance.U.S deal is scheduled to close.  A stay could threaten the availability of that transaction, and the uncontroverted evidence before me at the confirmation hearing is that a loss of the Binance.U.S. transaction would lead to a reduction of approximately $100 million in the assets available for distribution to the creditors."  (Ex. B to Fogelman Decl., Stay Opinion at 17.) The Government also suggests the Debtors could continue preclosing activities despite the stay of the Confirmation Order.  (Mem. at 35.)  But without exculpation, the Debtors would necessarily

have to halt all preclosing activities, including rebalancing transactions, due to the risks of prosecution by the Government.

Moreover, maintaining the Voyager platform while the stay is pending would require the Debtors to fund engineering, software fees, and other operating costs, including the continued employment of a robust staff to manage operations.  A stay would require that the Debtors extend their retention of advisors and other third-party professionals to protect them during the pendency of these chapter 11 cases, and the Debtors are burning more than $10 million per month.  These expenses cannot be avoided, and the Government's requested stay would significantly expand them.  Every dollar spent on these efforts reduces customer recoveries.

In effect, the Government seeks to hold Voyager hostage and deny account holders' long-awaited distributions while it contemplates potential future action.  *See In re AMR Corp.*, 2021 WL 5016606, at *4.  All the while, the ultimate recovery for creditors would be depleted, which is completely inappropriate.  As the Bankruptcy Court correctly found based on the evidence: "Every delay in these cases means that further expenses will be incurred, which just further reduces creditor recoveries.  The automatic stay and other provisions of the Bankruptcy Code have had the effect of delaying customers' access to their investments since July 2022, and many of those customers invested significant portions of the life savings or retirement savings in cryptocurrencies held by the Debtors.  The harm that a stay would pose to the Debtors, and their constituents, is therefore quite significant and immediate."  (Ex. B to Fogelman Decl., Stay Opinion at 17.)

Public interest factors compound the need to reject the Government's request for a stay.  Generally, "the public interest favors the expedient administration of the bankruptcy proceedings."  *Latam*, 2022 WL 2657345, *11; *Sabine*, 548 B.R. at 685; *Gen. Motors Corp.*, 409 B.R. at 33.  The Government's requested stay would result in the exact opposite of expedient administration.

On the other hand, denying the stay costs the Government nothing. The Government argues that the case "threatens to prospectively absolve the exculpated parties for conduct that occurred both during and after the bankruptcy case," "disrupt[s] the government's enforcement discretion," and reflects "the bankruptcy court's decision to assume for itself the power of the Executive Branch to decide what laws may be enforced" (Mem. 32–34.) But none of that is true. The Bankruptcy Court assured the Government that the relevant exculpation provisions "do not prohibit any regulatory action, including actions to stop the cryptocurrency sales and distributions that the plan contemplates. The only thing [the] order does in that regard is to say that the parties who will engage in those activities under the authority and direction of my order—after the Government stated that it did not contend that the activities were illegal—should not in the interim be liable for doing what my order requires." (Ex. B. to Fogelman Decl., Stay Opinion at 18.)

The Bankruptcy Court's Confirmation Order clearly strikes the proper balance, and any interference with it would send these chapter 11 cases back to the drawing board, with devastating consequences to creditors, for no identified reason. The requested stay would require the continued exhaustion of resources to administer and maintain the Voyager platform at a cost that would be borne by creditors and would sacrifice any chance at a value-maximizing transaction. Account holders would also be forced to stand idly for an indeterminant amount of time, watching their assets sit in a volatile market with no ability to take protective action while the Government continued appealing what *the Government itself characterizes as a hypothetical issue* indefinitely. That is not in the public interest—and is not in ***anyone*'s** interest (including the Government). There is no basis for a stay pending appeal, and the Court should deny the Government's request.

## Conclusion

The Government has failed to satisfy any (let alone all) of the four factors for a stay pending appeal and failed to satisfy its "especially heavy" burden of justifying a stay of the Confirmation Order.  *In re Latam*, 2022 WL 2811904, at *2.  The Court should therefore deny the extraordinary remedy that the Government seeks.


Dated:  March 20, 2023                      /s/ Joshua Sussberg
New York, New York                  **KIRKLAND & ELLIS LLP**
                                    **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                    Joshua A. Sussberg, P.C.
                                    Christopher Marcus, P.C.
                                    Christine A. Okike, P.C.
                                    Allyson B. Smith (*pro hac vice* pending)
                                    601 Lexington Avenue
                                    New York, New York 10022
                                    Telephone:     (212) 446-4800
                                    Facsimile:     (212) 446-4900
                                    Email:         jsussberg@kirkland.com
                                                   cmarcus@kirkland.com
                                                   christine.okike@kirkland.com
                                                   allyson.smith@kirkland.com

                                    Michael B. Slade (*pro hac vice* pending)
                                    Richard U.S. Howell, P.C. (*pro hac vice* pending)
                                    300 N. LaSalle Drive
                                    Chicago, IL 60654
                                    Telephone:     (312) 862-2000
                                    Facsimile:     (312) 862-2200
                                    Email:         mslade@kirkland.com
                                                   rhowell@kirkland.com

                                    *Counsel to the Debtors and Debtors in Possession*

40