Darren Azman
Joseph B. Evans
**MᴄDᴇʀᴍᴏᴛᴛ Wɪʟʟ & Eᴍᴇʀʏ LLP**
One Vanderbilt Avenue
New York, New York 10017-3852
Telephone:      (212) 547-5400
Facsimile:      (212) 547-5444

Charles R. Gibbs (*pro hac vice* forthcoming)
Grayson Williams (*pro hac vice* forthcoming)
**MᴄDᴇʀᴍᴏᴛᴛ Wɪʟʟ & Eᴍᴇʀʏ LLP**
2501 North Harwood Street
Dallas, Texas 75201-1664
Telephone:      (214) 295-8000
Facsimile:      (972) 232-3098

Gregg Steinmann (*pro hac vice* forthcoming)
**MᴄDᴇʀᴍᴏᴛᴛ Wɪʟʟ & Eᴍᴇʀʏ LLP**
333 SE 2nd Avenue, Suite 4500
Miami, Florida 33131-2184
Telephone:      (305) 329-4473
Facsimile:      (305) 503-8805

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | Case No. 23-cv-2171 (JHR) |
| | 22-bk-10943 (MEW) |
| Debtors. | (Jointly Administered) |
| | ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK |

**OPPOSITION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
TO THE GOVERNMENT'S MOTION TO STAY PENDING APPEAL**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

## <u>TABLE OF CONTENTS</u>

**TABLE OF AUTHORITIES** .................................................................................. **III**

**PRELIMINARY STATEMENT** ....................................................................... **2**

**BACKGROUND** ................................................................................................. **8**

**ARGUMENT** ....................................................................................................... **19**

**I.   PARTIES SEEKING A STAY PENDING APPEAL FACE A HEAVY BURDEN** ..**19**

**II.  THE GOVERNMENT FAILED TO SATISFY ANY OF THE FOUR REQUISITE FACTORS FOR A STAY PENDING APPEAL** ............................................ **21**

**CONCLUSION** .................................................................................................... **39**

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                      **Pages**

*In re 29 Brooklyn Ave. LLC*, No. 12-40279-CEC, 2015 Bankr. LEXIS 4192 (Bankr. E.D.N.Y. 2015) ...................................................................................................................29

*In re 461 7th Ave. Mkt., Inc.*, 623 B.R. 681, 691 (S.D.N.Y. 2020), *aff'd*, No. 20-3555, 2021 WL 5917775 (2d Cir. Dec. 15, 2021)………………………………………………20, 34

*In re Adelphia Commc'ns Corp.*, 333 B.R. 649 (S.D.N.Y. 2005) .........................................21

*In re Adelphia*, 361 B.R. at 347 n.39 ...................................................................................24

*In re Aegean Marine Petroleum Network Inc.*, 599 B.R. 717 (Bankr. S.D.N.Y. 2019) ........36

*Agudath Israel of Am. v. Cuomo*, 980 F.3d 222 (2d Cir. 2020)...............................................35

*In re Almatis B.V.*, No. 10-12308 (MG), 2010 Bankr. LEXIS 5875 (Bankr. S.D.N.Y. 2010) ........................................................................................................................35

*In re AMR Corp.*, No. 11-15463 (SHL), 2021 WL 5016606 (Bankr. S.D.N.Y. Oct. 28, 2021) ........................................................................................................................21

*BEPCO, L.P. v. 15375 Mem'l Corp. (In re 15375 Mem'l Corp.)*, Nos. 08-313-SLR, 08-314, 08-318, 08-319, 08-321, 08-322, 08-325, 08-326, 2009 WL 393948 (D. Del. Feb. 18, 2009) ..........................................................................................................................24

*Blixseth v. Credit Suisse*, 961 F.3d 1074 (9th Cir. 2020).......................................................35

*In re Brown*, No. 18-10617 (JLG), 2020 WL 3264057 (Bankr. S.D.N.Y. June 10, 2020)………………………………………………………………… 20, 24, 28

*In re Calpine Corp.*, No. 05-60200 (BRL), 2008 WL 207841 (Bankr. S.D.N.Y. Jan. 24, 2008) ........................................................................................................................24

*Compagnie Noga D'Importation et D'Exportation S.A. v. The Russian Fed'n*, 361 F.3d 676 (2d Cir. 2004)..............................................................................................................36

*Curry v. Baker*, 479 U.S. 1301 (1986)..................................................................................21

*In re Ditech Holding Corp.*, No. 19-10412 (JLG), 2021 WL 3716398, (Bankr. S.D.N.Y. Aug. 20, 2021)………………………………………………………………………36, 37

*In re DJK Residential, LLC*, No. 08-10375 (JMP), 2008 WL 650389 (S.D.N.Y. Mar. 7, 2008) ........................................................................................................................21

*In re Fairmont Commc'ns Corp.*, No. 92 B 44861, 1993 WL 428710 (Bankr. S.D.N.Y. Oct. 12, 1993) ...................................................................................................................29

*In re Finlay Enters., Inc.*, No. 09-14873, 2010 Bankr. LEXIS 5584 (Bankr. S.D.N.Y. 2010) ................................................................................................................35

*In re Frantz*, 534 B.R. 378 (Bankr. D. Idaho 2015) .............................................29

*In re Gen. Growth Props., Inc.*, No. 09-11977, 2010 Bankr. LEXIS 5943, at *38 (Bankr. S.D.N.Y. 2010) ..........................................................................................36

*In re Gen. Motors Corp.*, 409 B.R. 24 (Bankr. S.D.N.Y. 2009)............................20

*In re Health Diagnostic Lab'y, Inc.*, No. 15-3219-KRH, 2015 WL 4915621 (Bankr. E.D. Va. Aug. 17, 2015) ...............................................................................33

*In re Innovative Commun. Co., LLC*, Nos. 2007-106, 2007-105, 2007-156, 2008 U.S. Dist. LEXIS 107853 (D.V.I. 2008) ................................................................29

*In re LATAM Airlines Grp. S.A.*, No. 20-11254 (JLG), 2022 WL 2206829, at *49–50 (Bankr. S.D.N.Y. June 18, 2022), *corrected*, 2022 WL 2541298 (Bankr. S.D.N.Y. July 7, 2022), and *motion to certify appeal denied*, 2022 WL 2962948 (Bankr. S.D.N.Y. July 26, 2022), and *aff'd sub nom. In re Latam Airlines Grp.*, S.A., 643 B.R. 756 (S.D.N.Y. 2022), and *aff'd sub nom. In re Latam Airlines Grp., S.A.*, 643 B.R. 741 (S.D.N.Y. 2022), *aff'd sub nom. In re Latam Airlines Grp. S.A.*, 55 F.4th 377 (2d Cir. 2022)...............24, 25, 36

*In re LATAM Airlines Grp. S.A.*, No. 20-11254 (JLG), 2022 WL 2657345 (Bankr. S.D.N.Y. July 8, 2022)..........................................................................................36

*Ledesma v. Garland*, 850 F. App'x 84 (2d Cir. 2021)...........................................21

*Mohammed v. Reno*, 309 F.3d 95 (2d Cir. 2002)...................................................35

*In re Moreau*, 135 B.R. 209 (N.D.N.Y. 1992)......................................................24

*In re Motors Liquidation Co.*, 555 B.R. 355 (Bankr. S.D.N.Y. 2016) ..................33

*In re MPM Silicones, LLC, et al.*, No. 14-22503 (Bankr. S.D.N.Y. Sept. 17, 2014)............20

*Nat. Res. Defense Council, Inc. v. U.S. Food & Drug Admin.*, 884 F. Supp. 2d 108 (S.D.N.Y. 2012)…………………………………………………………………………….. 20, 24

*Nken v. Holder*, 556 U.S. 418 (2009)…………………………………… 5, 20, 21, 22, 24, 35

*In re Olinda Star Ltd.*, 614 B.R. 28 (Bankr. S.D.N.Y. 2020) ...............................36

*In re PWS Holding Corp.*, 228 F.3d 224 (3d Cir. 2000)…………………………...35, 38

*Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9 (1st Cir. 2020) .....................34

*In re Sabine Oil & Gas Corp.*, No. 15-11835 (SCC), 2016 Bankr. LEXIS 4753 (Bankr. S.D.N.Y. 2016) ................................................................................................35

*In re Sabine Oil & Gas Corp.*, 551 B.R. 132 (Bankr. S.D.N.Y. 2016) ...............................24

*In re Sabine Oil & Gas Corp.*, 548 B.R. 674 (Bankr. S.D.N.Y. 2016) ...............................24

*In re Savage & Assocs., P.C.*, No. 05 CIV 2072 (SAS), 2005 WL 488643 (S.D.N.Y. Feb. 28, 2005) ........................................................................................................................33

*Securities and Exchange Commission v. Ripple Labs, Inc., et al.*, No. 20-cv-10832, Docket No. 440 at 1 (S.D.N.Y. Mar. 11, 2022)............................................................................23

*In re Stearns Holdings, LLC*, 607 B.R. 781 (Bankr. S.D.N.Y. 2019) ..................................36

*In re Taub*, 470 B.R. 273 (E.D.N.Y. 2012).........................................................................35

*In re Terrestar Corp.*, No. 11-10612 (SHL), 2012 WL 1028218 (Bankr. S.D.N.Y. Mar. 26, 2012) ........................................................................................................................21

*In re Trans World Airlines, Inc.*, No. 01-0056 (PJW), 2001 WL 1820325 (Bankr. D. Del. Mar. 27, 2001)..................................................................................................................25

*Trump v. Deutsche Bank AG*, 943 F.3d 627 (2d Cir. 2019)...................................................20

*In re Turner*, 207 B.R. 373 (2d Cir. B.A.P. 1997)................................................................21

*Turner v. Frascella Enters., Inc. (In re Frascella Enters., Inc.)*, 388 B.R. 619 (Bankr. E.D. Pa. 2008) ..................................................................................................................24

*In re TWA*, No. 01-0056 (PJW), 2001 Bankr. LEXIS 723 (Bankr. D. Del. 2001) ...............29

*Uniformed Fire Officers Ass'n v. de Blasio*, 973 F.3d 41 (2d Cir. 2020)............................21

*Virginian Ry. Co. v. United States*, 272 U.S. 658 (1926)……………………………21, 22

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005) ...............................33

*In re Windstream Holdings, Inc.*, Nos. 20 CV 4276 (VB), 20 CV 5440 (VB), 20 CV 5529 (VB), 2020 WL 4481933 (S.D.N.Y. Aug. 3, 2020).......................................................24

## Statutes

11 U.S.C. § 105(a)…………………………………………………………35, 36

11 U.S.C. § 1123……………………………………………………………35, 36

11 U.S.C. § 1142……………………………………………………………...4, 23, 31

## Other Authorities

Jay Clayton, *Statement Regarding SEC Staff Views*, SEC.gov (Sept. 13, 2018),

https://www.sec.gov/news/public-statement/statement-clayton-091318#_ftn2 ..............26

*Toward a Federal Common Law of Bankruptcy: Judicial Lawmaking in a Statutory Regime*,
    80 Am. Bankr. L.J. 1, 4..................................................................................................36

The Official Committee of Unsecured Creditors (the "Committee") appointed in the above-captioned chapter 11 cases (the "Chapter 11 Cases")[1] of Voyager Digital Holdings, Inc., *et al.* (collectively, the "Debtors") hereby submits this opposition (the "Opposition")[2] to: (i) the *Notice of Emergency Motion and Motion by Appellants United States of America, et al., for a Stay Pending Appeal* (the "Emergency Motion") and (ii) the *Memorandum in Support of Appellants' Emergency Motion for Stay* (the "Stay Memorandum" and together with the Expedited Motion, the "Motion").[3] By the Motion, the United States of America (the "United States") and the Office of the United States Trustee for Region 2 (the "U.S. Trustee" and, together with the United States, the "Government") seek the imposition of a stay pending their appeal of the Bankruptcy Court's *Corrected and Amended Order (I) Approving the Second Amended Disclosure Statement and (II) Confirming the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Bankr. Docket No. 1166] (the "Confirmation Order"), which (i) confirmed the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Bankr. Docket No. 1138] (as subsequently amended, modified, or supplemented, the "Plan") and (ii) approved, on a final basis, the *Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Bankr. Docket No. 863] (as amended, modified, or supplemented from time to time, the "Disclosure Statement").[4] In support of this Opposition, the Committee submits the *Declaration of Joseph B. Evans in Support of the Opposition of the Official Committee of Unsecured Creditors to the*

---

[1]    The docket for the Chapter 11 Cases is publicly available at https://cases.stretto.com/Voyager/court-docket/.

[2]    In connection with the Government's similar request for relief in the Bankruptcy Court, the Committee filed its *Opposition of the Official Committee of Unsecured Creditors to Motion for Stay Pending Appeal* [Bankr. Docket No. 1187].

[3]    Contemporaneously herewith, the Committee filed *The Official Committee of Unsecured Creditors' Motion for Leave to Intervene in Appeal* and *The Official Committee of Unsecured Creditors' Memorandum in Support of its Motion for Leave to Intervene in Appeal.*

[4]    Capitalized terms used but not otherwise defined have the meaning ascribed to them in the Plan.

*Government's Motion for Stay Pending Appeal* (the "Evans Declaration"), filed contemporaneously herewith, and respectfully states as follows:

### PRELIMINARY STATEMENT

In an obvious act of overreach, the Motion is the Government's third attempt to delay a Bankruptcy Court-ordered distribution of over a billion dollars' worth of the same cryptocurrencies that Voyager customers held (and lost) on the platform. While refusing to point to anything in the Confirmation Order that calls for an illegal transaction, the Government insists on seeking to eliminate an exculpation clause that would expose the Debtors and other professionals to liability simply for complying with the Confirmation Order. And although the Government claims that its efforts are designed to protect the "public," the Government's Motion would in fact harm individual retail customers not only delaying recoveries, but also reducing the total pool of assets available for distribution by approximately $100 million. The Government's unwillingness to reveal how it intends to regulate certain cryptocurrencies or a particular crypto exchange should not cost retail customers $100 million. As Judge Wiles noted, the Government cannot "lay in wait," hoping to try out a new theory of crypto criminality for mere compliance with the Confirmation Order. Voyager creditors have waited long enough. For the reasons that follow, we submit that this Court should follow the well-reasoned opinion of Judge Wiles and deny the Government's Motion.

If instead the Stay is granted, it would jeopardize the Debtors' sale to BAM Trading Services Inc. ("Binance.US"), which would erase approximately $100 million of creditor recoveries. The Debtors' creditors are not financial institutions or hedge funds that can withstand delays and drops in value of recovery. The creditors are primarily individual retail customers, some of whom desperately need to recover their cryptocurrency to pay for basic living expenses. The Government has had every opportunity in the Bankruptcy Cases to assert that the "Restructuring Transactions" required under the Plan would somehow violate criminal

or regulatory laws. Yet it has refused to do so. Beyond the activity in the Bankruptcy Court that has been going on since July 2022, the transactions and parties at issue are not new. BAM Trading Services, Inc. was formed in 2019 and has obtained forty money transmitter licenses across the United States. Similarly, Voyager facilitated trading in the VGX token and 105 other cryptocurrencies since 2019, many of which were also traded on dozens of cryptocurrency exchanges. Accordingly, the Government has had plenty of time to determine that any such activities violate the law, but has declined to do so. In the absence of any articulated violation of law and the admittedly "hypothetical" risk to the Government, the Motion should be denied in favor of protecting unsecured creditors.

Without any decisional authority on its side, the Government seeks to unwind years of well-settled chapter 11 jurisprudence. The Government claims it is harmed by not being able to prosecute individuals who will be legally bound to comply with the Plan—a harm the Government admits is "hypothetical."[5] By seeking to stay the Exculpation Provision but allowing the rest of the Plan to go effective, the Government is presenting the following options to the Debtors and others, neither of which are viable: (a) the Debtors and estate fiduciaries implementing the Plan must violate a federal court order and refuse to take actions required under the Confirmation Order; or (b) they can take the actions required under the Confirmation Order but run the risk of facing future criminal prosecution.[6]

---

[5]  *See* Hr'g Tr. 26:7-10, *In re Voyager Digital Holdings, Inc.*, Case No. 22-10943 (MEW) (Bankr. S.D.N.Y. Mar. 15, 2023) (GOVERNMENT ATTORNEY: "I mean, it's a hypothetical to say that the Government would actually go in and take that position in the face of this record and in the face of findings of fact that this Court made[.]"); Stay Decision, at 16 ("Curiously, though, during argument today the Government stated that it would not likely seek to impose penalties upon people for things they had already done in reliance on my order, and that any suggestion to the contrary was merely hypothetical. If that is so, then the Government's entire argument about the 'equitable mootness' risk is merely hypothetical, because the Government cannot identify anything that it actually would want to do, or should be allowed to do, that would be rendered equitably moot in the absence of a stay.").

[6]  Effectively, the Government seeks either (a) a stay of the Confirmation Order, or at a minimum the Exculpation Provision, as defined herein, while the Court considers the instant requested relief and, if granted, continue the stay pending its appeal or (b) a two-week stay of the Confirmation Order while the Government seeks similar relief from the Second Circuit.

As the Bankruptcy Court correctly recognized, the Government's position represents a "serious misunderstanding of just what it means when a court confirms a chapter 11 plan."[7] The confirmed Plan is not a suggestion—the Bankruptcy Code requires the Debtors and others to "carry out the plan" and "comply with any orders of the court."[8] The Exculpation Provision simply protects those individuals from liability for doing what the Bankruptcy Court is requiring them to do.

As the Bankruptcy Court noted on multiple occasions, the Government has had every opportunity to argue that the Plan should be denied or amended because certain of the cryptocurrency transactions required by the Plan may be illegal.  The Government could also have appealed the actual merits of the Confirmation Order, arguing that the Binance.US transaction or sales of a particular cryptocurrency constitute violations of law. It has done neither. This is because if the Government attacked the legality of the crypto transactions directly, it would then be required to establish that certain of the crypto transactions are illegal. To avoid being put to its proof, the Government launched this collateral attack on an exculpation clause, betting that the professionals and others will be intimidated and will not execute the transactions required under the Plan if they are not exculpated from personal liability. If the Government truly believes that the Plan requires illegal crypto transactions, then it should attack the crypto transactions directly. Harming creditors because the Government refuses to take a firm position on these crypto transactions serves no just purpose.

---

[7]   *Decision Regarding (1) Approval of the Debtors' Disclosure Statement, (2) Confirmation of the Debtors' Plan of Reorganization, (3) Motions Seeking the Appointment of a Trustee, (4) Motions Requesting Full Customer Access to Account Holdings, and (5) Related Matters* [Bankr. Docket No. 1170] (the "Confirmation Decision"), at 33. A copy of the Confirmation Decision is attached as Exhibit 3 to the Evans Declaration; *see Decision and Order Denying the Government's Motion for a Stay of the Confirmation Order Pending Appeal* [Bankr. Docket No. 1190] (the "Stay Decision"), at 4 ("[I]f one were to read the Government's papers without having first read my Decision, one could have little to no idea of what I had actually ordered, or the bases on which I had done so. The Government has not even discussed the actual theory upon which I relied in support of the exculpation provision that I approved. Nor has it even discussed the many court decisions (including Second Circuit authorities) that I cited in support of the relief that I ordered."). A copy of the Stay Decision is attached as Exhibit 1 to the Evans Declaration.

[8]   11 U.S.C. § 1142(a).

The Government has failed to satisfy its heavy burden of meeting any of the four requisite factors set forth by the Supreme Court in *Nken v. Holder*,[9] thereby mandating denial of its stay request.

First, the Government admits that the harm it would suffer absent a stay is **hypothetical**—a far cry from the "imminent" and "actual" harm necessary to satisfy this factor.[10] The one-sided decisional authority in this district dictates that the Government's fear that a Court in the future may rule that its appeal is moot is an insufficient basis to find "irreparable harm." As Judge Wiles noted, "the Government did not actually contend that any of the transactions required by the plan would be illegal in any way,"[11] and its hypothetical harms fall short of being "irreparable."

Second, a stay of the Confirmation Order would impose immediate harm on the Debtors and its creditors, which substantially outweighs the purported harm to the Government. The Debtors' customers are primarily individual retail customers and, as countless letters to the Bankruptcy Court reflect, such customers depend on cryptocurrency to support their livelihoods.[12]  A stay may also make it impossible for the Debtors to comply with the provisions

---

[9]   *See Nken v. Holder*, 556 U.S. 418, 434 (2009) (holding that courts must consider (i) whether the stay applicant has made a strong showing of likelihood of success on the merits; (ii) whether the applicant will be irreparably injured absent a stay; (iii) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (iv) where the public interest lies).

[10]   *See* Stay Decision, at 15 ("The Government has not contended that it faces an 'irreparable injury' in the absence of a stay except for the risk that an appeal might be rendered equitably moot if a stay were not granted. It is not entirely clear to me that this would be the case.").

[11]   *See* Stay Decision, at 13; *see also* Hr'g Tr. 314:22-23, *In re Voyager Digital Holdings, Inc.*, Case No. 22-10943 (MEW) (Bankr. S.D.N.Y. Mar. 2, 2023) (THE COURT: "You have no evidence to offer, right?" MR. UPTEGROVE: "No, Your Honor."); *see id.* at 38:5-17 (THE COURT: "You know, maybe not, but it's a disclosure issue and I'm absolutely shocked, I have to say, that a regulator would come in and say, I'm charged with regulatory authority over these things. These are reasons that I have concerns because they're within my regulatory jurisdiction, but I've done nothing. I have nothing to offer to you except questions, and my excuse for that is that it's somebody else's burden in the context of confirmation. That's incredible. Absolutely incredible."); *see* Hr'g Tr. 231:6-19, *In re Voyager Digital Holdings, Inc.*, Case No. 22-10943 (MEW) (Bankr. S.D.N.Y. Mar. 3, 2023) ("So at least I know that the SEC isn't just saying maybe, that it's saying it thinks that there are issues. But I still don't have evidence and I still don't have very much clarity as to exactly why they think there are issues or how they would affect this transaction.").

[12]   *See, e.g.*, Bankr. Docket Nos. 63, 69, 75, 76, 77, 90, 92, 93, 100, 101, 105, 108, 109, 111, 114, 122 (among others).

of the APA (as defined herein) with Binance.US.[13] The evidence at the Confirmation Hearing

reflects that the estimated differential between creditor recoveries in a self-liquidation under

the toggle Plan and the recoveries under the Binance.US sale would be approximately $100

million.[14] The Debtors will also incur substantial additional operating costs and professional

fees while the Appeal (as defined herein) is litigated. Based on these factors, Judge Wiles

correctly held, "I am compelled to conclude that the harm that the Debtors and their constituents

would suffer if a stay were to be granted exceeds any harm that the Government might incur

due to the absence of a stay."[15]

Third, granting the relief requested in the Motion is contrary to the public interest.[16]

The Government again argues that a stay is needed to preserve its rights to protect the public

health, welfare, and safety of American citizens, citing generalized wrongdoing in the

cryptocurrency industry. However, the Government has not explained how a hypothetical

violation of law that the Government itself has yet to identify relates to or impacts the protection

of those public policy considerations.[17] The Government is merely seeking to "lie in wait" to

see whether it determines at a later date that there was some violation of law for the transactions

---

[13]   *See* Stay Decision, at 17 ("The stay the Government seeks would also postpone the Debtors' ability to implement their 'toggle' plan, and would further delay distributions to customers.").

[14]   *See* Hr'g Tr. 25:24-25, 26:3-16, *In re Voyager Digital Holdings, Inc.*, Case No. 22-10943 (MEW) (Bankr. S.D.N.Y. Mar. 3, 2023); *see* Stay Decision, at 17 ("[T]he uncontroverted evidence before me at the confirmation hearing is that a loss of the Binance.US transaction would lead to a reduction of approximately $100 million in the assets available for distribution to creditors."). The Government clearly considers such delays and the potential loss of $100 million in distributable value to creditors to be of little significance— for some reason, it cannot seem to appreciate the severity of these real and concrete harms to creditors, yet remains all too concerned about its own hypothetical injuries that have not materialized into actual harm due to the Government's inability or refusal to crystallize its position on the legality of cryptocurrency transactions. Unfortunately, it remains patently obvious that the Government either does not comprehend or is actively disregarding the purpose of chapter 11 and the balance of equities that exists therein.

[15]   *See* Stay Decision, at 17.

[16]   *See* Stay Decision, at 18 ("Finally, the public interest does not favor a stay.").

[17]   *See* Stay Decision, at 16 ("During argument today the Government similarly argued that my Order will somehow prevent the Government from taking action to protect the public health, safety, and welfare. These arguments are sheer hyperbole. I could not have said any more clearly that the Government is free at any time to take action to stop the Debtors' cryptocurrency trades and/or cryptocurrency distributions if the Government decides that those activities should be stopped. My Order just says that in the meantime the people and entities who do what my order requires will not themselves be liable for having done so. I fail to see how that possibly threatens the public health, safety or welfare, or how it ties the Government's hands in any way.").

required under the Plan.[18] The Government's focus is clearly misguided and has strayed away from what really matters to the public interest here—ensuring the expedient administration of chapter 11 cases and prompt distribution of funds to creditors, particularly creditors who have suffered so deeply as Voyager creditors have. If the Government's position is accepted, it would discourage debtors and estate professionals from the simple act of consummating chapter 11 plans. Accordingly, the public interest lies squarely against granting the requested stay.

Finally, the Government cannot establish a substantial possibility of success on the merits of its Appeal.[19] The Government has introduced absolutely no evidence to date with respect to the purported illegality of the transactions proposed in the Plan.[20]  As highlighted by the Bankruptcy Court at the Confirmation Hearing, in its Confirmation Decision, and in its Stay Decision (as defined herein), the arguments made by the Government, particularly the United

---

[18]  *Id.* ("If the Government has not already taken regulatory actions with respect to cryptocurrencies, or if it delays in taking any further regulatory actions, those delays will certainly not be attributable to my order.").

[19]  *See* Stay Decision, at 4 ("The Government contends that it will likely win on appeal, but in making its arguments the Government has not even discussed any of the authorities that I cited, or the actual theory on which I relied. Instead, the Government's papers exaggerate and in some places mischaracterize what I have done and the authorities on which I have relied, and in other instances rely on hyperbole or 'straw man' arguments.").

[20]  *See* Stay Decision, at 5 ("[T]he federal authorities made clear during the confirmation hearing that they do not actually contend that the contemplated rebalancing activities or proposed distributions of cryptocurrencies would violate any applicable laws. As I explained in my Decision, the evidence and argument before me during the confirmation hearing did not suggest there were any illegalities in what the plan contemplated, and compelled a conclusion that the transactions could and should proceed."); *id.* at 13 ("As I explained in the Decision, the Government did not actually contend that any of the transactions required by the plan would be illegal in any way.").

States, are "complete red herrings"[21] and "mostly straw men"[22] that (a) take issue with irrelevant purported legal justifications that are "absolutely not" the legal justifications for inclusion of the Exculpation Provision in the Plan and (b) fail to discuss any of the case law that is relevant to the permissibility of exculpation provisions in the Second Circuit, choosing instead to misconstrue inapplicable cases to weigh in its favor.[23] The Government's vague, aspirational assertions of wrongdoing, without more, certainly do not demonstrate a "substantial likelihood" of success on the merits of the Appeal, further weighing against granting the requested stay.

Accordingly, because the Government falls well short of its burden to demonstrate that each of the requisite four factors to grant a stay pending appeal, the Court should deny the relief requested in the Motion.

## BACKGROUND

### A.    The Chapter 11 Cases

On July 5, 2022 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as

---

[21]   *See* Hr'g Tr. 92:1-11, *In re Voyager Digital Holdings, Inc.*, Case No. 22-10943 (MEW) (Bankr. S.D.N.Y. Mar. 7, 2023) ("I think most of the arguments that the government has made in that regard are complete red herrings. They pose reasons and explanations and legal justifications for what I am doing that are absolutely not the actual justifications for what I am doing and then rebut those irrelevant purported legal justifications. The actual authorities on which I have relied, including my own *Aegean* decision and the decisions that I cited in there are not even discussed in the objections and supplemental submissions that the government authorities made to me."); *see also* Stay Decision, at 8 ("Those contentions are red herrings; I do not believe that the Government actually thinks that my Order has such effect, or that anyone could reasonably contend that it has such effect."); *see id.*, at 15 ("I believe, as explained above, that the Government's arguments in that regard are red herrings, and I do not believe there is any actual ambiguity in how the exculpation will be applied with respect to cryptocurrency sales and distributions, or that further clarifications actually are required.").

[22]   Confirmation Decision, at 39; *see also* Stay Decision, at 4 ("Instead, the Government's papers exaggerate and in some places mischaracterize what I have done and the authorities on which I have relied, and in other instances rely on hyperbole or on "straw man" arguments.").

[23]   *See* Stay Decision, at 4 ("The Government contends that it will likely win on appeal, but in making its arguments the Government has not even discussed any of the authorities that I cited, or the actual theory on which I relied.").

debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108. On July 19, 2022, the U.S. Trustee appointed the Committee pursuant to Bankruptcy Code section 1102(a).[24]

### B.    The Debtors' Sale Processes

To maximize recovery to creditors, the Debtors sought to sell their assets at a premium to a number of potential purchasers through a Bankruptcy Court ordered auction process. The now infamous crypto exchange FTX won the auction and entered into an asset purchase agreement with the Debtors on September 28, 2022 (the "FTX APA"), which was subsequently amended (the "Amended FTX APA").[25]  Between solicitation and the anticipated closing of the FTX transaction, FTX filed for bankruptcy on November 11, 2022.[26]

Accordingly, the Debtors sought to find a new qualified purchaser. After Debtors considered a number of options, on December 18, 2022, the Debtors and Binance.US entered into an asset purchase agreement (the "APA")[27] and, on December 21, 2022, the parties sought Bankruptcy Court authorization of the APA.[28] On January 9, 2023, the Debtors filed an amended version of the APA (the "First Amended APA"),[29] reflecting certain modifications including, among other things, extensions of certain milestones contained therein. On January 13, 2023, the Bankruptcy Court entered an order authorizing the Debtors' entry into the First

---

[24]  *See Amended Appointment of Official Creditors' Committee* [Bankr. Docket No. 106]. The Committee's seven members include the following customers of the Debtors: Russell G. Stewart; Jason Raznick; Brandon Mullenberg; Richard Kiss for Thincat Trust; Christopher Moser; Byron Walker; and Melissa and Adam Freedman.

[25]  *See* Bankr. Docket No. 582.

[26]  On January 10, 2023, FTX and the Debtors agreed to terminate the Amended FTX APA. *See* Bankr. Docket No. 848.

[27]  Between the filing of the FTX APA and December 18, 2022, the Debtors were forced to spend approximately $4 to $5 million in professional fees and solicitation costs, further dissipating the estate.

[28]  *See Motion for Entry of an Order (I) Authorizing Entry into the Binance US Purchase Agreement and (II) Granting Related Relief* [Bankr. Docket No. 775] (the "Sale Motion").

[29]  *See Notice of Filing of First Amendment to Asset Purchase Agreement* [Bankr. Docket No. 835]. On March 1, 2023, the Debtors filed that certain *Side Letter to the First Amended Asset Purchase Agreement* [Bankr. Docket No. 1126].

Amended APA.[30] Under the First Amended APA, the outside effective date for the closing of the sale to Binance.US is May 8, 2023, with a possible 30-day extension.[31]

### C.    Plan & Disclosure Statement

On December 22, 2022, the Debtors filed the Disclosure Statement[32] and original version of the Plan.[33] Revised versions of the Plan were subsequently filed on January 10, 2023,[34] February 28, 2023,[35] March 1, 2023,[36] and March 5, 2023.[37] On January 13, 2023, the Bankruptcy Court conditionally approved the Disclosure Statement.[38]

The Plan as proposed provided in bolded type as follows:

### C.    Exculpation

**Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor release or the third-party release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is exculpated from any Cause of Action for any act or omission arising on or after the Petition Date and prior to the Effective Date based on the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing, or consummation of the Disclosure Statement, the Plan, the Special Committee Investigation, any Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract,**

---

[30]    *See Order (I) Authorizing Entry into the Binance US Purchase Agreement and (II) Granting Related Relief* [Bankr. Docket No. 860] (the "APA Order").

[31]    *See* First Amended APA, § 8.1(i). Notably, if Binance.US is ready to close the sale by April 1, 2023 (approximately two weeks from now) but the Debtors are not prepared to do so because the Plan has yet to go effective due to a stay pending the Appeal, then the Debtors risk losing their expense reimbursement rights under the First Amended APA (as amended by the Confirmation Order). *See* Confirmation Order, ¶ L.

[32]    *See Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Bankr. Docket No. 778].

[33]    *See Third Amended Joint Plan of Voyager Digital Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Bankr. Docket No. 777].

[34]    *See* Bankr. Docket No. 852.

[35]    *See* Bankr. Docket No. 1117.

[36]    *See* Bankr. Docket No. 1125.

[37]    *See* Bankr. Docket No. 1138.

[38]    *See* Bankr. Docket No. 861.

> **instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for Causes of Action related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.**
>
> **The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**[39]

Contrary to the Government's assertions, there was never a general governmental "carve out" from exculpation in any version of the Plan.[40] Moreover, this proposed language is ***much broader*** than the language of the Exculpation Provision (as defined below) that the Bankruptcy Court ultimately approved through the Confirmation Order.[41]

On February 15, 2023, the Debtors filed the Second Amended Plan Supplement,[42] which included the identities of the Plan Administrator and Oversight Committee as Exhibit E thereto and included a copy of the Plan Administrator Agreement as Exhibit F. On February 28, 2023, the Debtors filed the Fourth Amended Plan Supplement,[43] which included an updated

---

[39]   *See* Plan, at 66.

[40]   *See* Hr'g Tr. 12:8-10, *In re Voyager Digital Holdings, Inc.*, Case No. 22-22-10943 (MEW) (Bankr. S.D.N.Y. Mar. 15, 2023) ("[A]ll of the filed versions of the plan had no exclusions for the government.").

[41]   *See* Stay Decision, at 7 (describing the language in the approved Exculpation Provision as being "much narrower than the provision that the Debtors had originally proposed"). The first draft of the proposed confirmation order, submitted on February 28, 2023, included a paragraph that would have exempted the Government from the proposed exculpation provision. *See* Bankr. Docket No. 1120, ¶ 141; *see* Stay Decision, at 11 ("It appears that this language was included in the first draft of the confirmation order as a possible resolution of a separate objection that the FTC had filed regarding the FTC's ability to pursue claims based on pre-petition business activities of the Debtors and their personnel."). However, no such exemption was included in the Plan itself, the draft of the proposed confirmation order was filed well after the confirmation objection period had already passed, and the Debtors subsequently removed this provision in the subsequently filed version of the proposed confirmation order. *See* Bankr. Docket No. 1130.

[42]   *See* Bankr. Docket No. 1006 (the "<u>Second Amended Plan Supplement</u>").

[43]   *See* Bankr. Docket No. 1115 (the "<u>Fourth Amended Plan Supplement</u>").

version of the Plan Administrator Agreement as Exhibit F, which included a redline against the version filed with the Second Amended Plan Supplement as Exhibit F-1.[44]

On February 22, 2023, certain federal and state governmental agencies filed objections to approval of the Disclosure Statement and confirmation of the Plan in advance of the Objection Deadline.[45] None of the objections included opposition to the exculpation provision contained in Article VIII.C of the Plan, except for the objection filed by the United States Trustee, which only sought to narrow the exculpation, not eliminate it.[46]

On March 2, 2023, the Government filed an objection to certain provisions contained in the proposed Confirmation Order.[47]

Beginning on March 2, 2023 and continuing on March 3, 2023, March 6, 2023, and March 7, 2023, the Bankruptcy Court held a combined hearing (the "Confirmation Hearing") to consider approval of the Disclosure Statement on a final basis and confirmation of the Plan, which included multiple days of witness testimony and oral argument.

On March 5, 2023, the Debtors filed the revised version of the Plan,[48] which added the below paragraph to the existing exculpation provision in Article VIII.C:

> To the extent that any Cryptocurrency is deemed to be a "security" by the SEC or any Governmental Unit, distribution of such Cryptocurrency shall have been done in good faith and in compliance with all applicable laws, rules, and regulations and the Exculpated Parties shall not be liable at any time for the violation of any applicable law,

---

[44] In the Motion, the Government states that "the Debtors did not provide the court or interested parties a copy of any proposed or executed administrator plan agreement[.]" Motion, at 10. This is simply not true—the Debtors filed and served not one but two versions of the Plan Administrator Agreement prior to the Confirmation Hearing (as defined herein). Nor was the appointment of a fiduciary who would undertake certain designated Restructuring Transactions (as defined in the Plan), a novel concept. The version of the Plan filed on December 22, 2022 described the appointment of a "Wind-Down Trustee." *See* Bankr. Docket No. 777, at Art. I.A.180, Art. IV.H. This version of the Plan indicated that, as is customary in chapter 11 plans, the "Wind-Down Trust Agreement" would be included in the "Plan Supplement" (*see id.*, at Art. I.A.118(f) and 174), as would the identity of the "Wind-Down Trustee" (*see id.*, at Art. I.A.180.). The version of the Plan that was filed on February 28, 2023 merely switched out the term "Wind-Down Trustee" with "Plan Administrator" and the term "Wind-Down Trust Agreement" with "Plan Administrator Agreement." *See* Bankr. Docket No. 1117. In other words, there were no substantive changes.

[45] *See* Bankr. Docket Nos. 1042, 1047, 1051.

[46] *See* Bankr. Docket No. 1085.

[47] *See* Bankr. Docket No. 1132.

[48] *See* Bankr. Docket No. 1138.

rule, or regulation governing the distribution of Cryptocurrency whether such Cryptocurrency is deemed to be a "security" or otherwise.

On March 6, 2023, the Government filed an objection to confirmation of the Plan alleging that the Plan and Confirmation Order "contain improperly broad exculpation language that purports to bind the Government from exercising its police and regulatory powers against the Debtors and various third parties."[49] The Government, however, presented no evidence, called no witnesses, and did not cross-examine any witnesses during the Confirmation Hearing.

On March 7, 2023, the Bankruptcy Court issued a bench ruling approving the Disclosure Statement on a final basis and confirming the Plan (subject to certain modifications to the proposed confirmation order), which was subsequently memorialized in a written opinion issued by the Bankruptcy Court on March 11, 2023.[50] On March 8, 2023, the Bankruptcy Court entered the Confirmation Order,[51] which was subsequently corrected and amended on March 10, 2023 and March 11, 2023.[52]

### D.     The Exculpation Provision

The Confirmation Order modified certain provisions of the Plan, including Article VIII.C of the Plan, which was replaced in its entirety by the following exculpation provision (the "Exculpation Provision"):[53]

> Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor release or the third-party release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby exculpated from, any liability for damages based on the negotiation, execution and implementation of any transactions or actions approved by the Bankruptcy Court in the Chapter 11 Cases, except for Causes of Action related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence; provided that nothing in the Plan

---

[49]   *See* Bankr. Docket No. 1144.

[50]   *See generally* Confirmation Decision.

[51]   *See Order (I) Approving the Second Amended Disclosure Statement and (II) Confirming the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Bankr. Docket No. 1157].

[52]   *See* Bankr. Docket Nos. 1159, 1166. A copy of the Confirmation Order is attached as Exhibit 4 to the Evans Declaration.

[53]   Confirmation Order, § A.

shall limit the liability of professionals to their clients pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8 Rule 1.8(h)(1) (2009).[54]

The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes.[55]

In addition, the Plan contemplates certain rebalancing transactions and the completion of distributions of cryptocurrencies to creditors.  The Exculpated Parties shall have no liability for, and are exculpated from, any claim for fines, penalties, damages, or other liabilities based on their execution and completion of the rebalancing transactions and the distribution of cryptocurrencies to creditors in the manner provided in the Plan.

For the avoidance of doubt, the foregoing paragraph reflects the fact that Confirmation of the Plan requires the Exculpated Parties to engage in certain rebalancing transactions and distributions of cryptocurrencies and the fact that no regulatory authority has taken the position during the Combined Hearing that such conduct would violate applicable laws or regulations.  Nothing in this provision shall limit in any way the powers of any Governmental Unit to contend that any rebalancing transaction should be stopped or prevented, or that any other action contemplated by the Plan should be enjoined or prevented from proceeding further.  Nor does anything in this provision limit the enforcement of any future regulatory or court order that requires that such activities either cease or be modified, or limit the penalties that may be applicable if such a future regulatory or court order is issued and is violated.  Similarly, nothing herein shall limit the authority of the Committee on Foreign Investment of the United States to bar any of the contemplated transactions.  Nor does anything in this provision alter the terms of the Plan regarding the compliance of the Purchaser with applicable laws in the Unsupported Jurisdictions before distributions of cryptocurrency occur in those Unsupported Jurisdictions.[56]

---

[54] The Bankruptcy Court described the meaning of this first paragraph in its Stay Decision as follows: "The first paragraph of this exculpation provision states that parties are exculpated from liability for things that I authorized during the course of the bankruptcy case, with an explicit exclusion for fraud, willful misconduct or gross negligence. This language is much narrower than the provision that the Debtors had originally proposed. More importantly, the language describing the matters that are covered (*i.e.*, liability for damages based on the negotiation, execution and implementation of transactions or actions approved by the Bankruptcy Court) is precisely the modification that the United States Trustee suggested in the objection that it filed. As the Debtors have pointed out, the language also is comparable to (if anything, it is narrower than) the language that has been approved in countless other bankruptcy cases, usually without any objection by the Government and without any suggestion that it has been misinterpreted or misapplied." Stay Decision, at 7.

[55] The Bankruptcy Court indicated in its Stay Decision that "[t]he second paragraph of the exculpation language just implements the terms of section 1125(e) of the Bankruptcy Code, and the Government does not challenge that provision." Stay Decision, at 7.

[56] The Bankruptcy Court provided important context with respect to the third and fourth paragraphs of the Exculpation Provision in its Stay Decision: "The third and fourth paragraphs of the exculpation provisions that I approved are specifically limited to the fact that the parties must buy and sell cryptocurrencies as part of the portfolio rebalancing that the plan requires, and must distribute cryptocurrencies to customers. The point is to protect the parties from belated allegations that those very activities are somehow violative of law and that parties should be penalized just for doing what I have ordered them to do. The Government nevertheless has strained to find potential ambiguities in these terms. It theorizes, for example, that my Order might somehow be interpreted as immunizing fraud, or theft, or tax avoidance. Those contentions are red herrings; I do not believe that the Government actually thinks that my Order has such effect, or that anyone could reasonably contend that it has such effect. The last two paragraphs make clear that they protect people

As highlighted by the Bankruptcy Court in its Stay Decision, "[t]his language is much narrower than the provision that the Debtors had originally proposed"[57] (and which the Government never objected to).[58] Specifically, the original language would have immunized "Exculpated Parties" based on any act or omission arising on or after the Petition Date—whether the Bankruptcy Court approved it or not—with exceptions for fraud, willful misconduct, or gross negligence, all of which would have been far broader than the first paragraph of the Exculpation Provision ultimately approved.[59] The Debtors' original language also would have deemed the Exculpated Parties to have acted "in compliance with the applicable laws" with regard to the distributions contemplated by the Plan, and proposed that the Exculpated Parties "shall not be" liable "at any time" for the violation of any applicable law, rule, or regulation governing such distributions, which also was broader than the language contained in the Exculpation Provision that was approved by the Bankruptcy Court.[60] Finally, "the language describing the matters that are covered (*i.e.*, liability for damages based on the negotiation, execution and implementation of transactions or actions approved by the Bankruptcy Court) is precisely the modification that the United States Trustee suggested in the objection that it filed."[61]

The Confirmation Order also included certain provisions relating to the Exculpation Provision, including, among others, the following:

> 97.     Effective as of the Effective Date, to the fullest extent permissible under
> applicable law and without affecting or limiting either the Debtor release or the third-

---

for doing the things that they are required to do under the plan and under my order. Although the plan and the Confirmation Order require the parties to sell cryptocurrencies, they certainly do not require (or permit) anyone to commit fraud in the course of doing so, or to engage in theft in the course of doing so. Similarly, there is nothing in the plan that requires or permits the Debtors to evade their tax obligations, and there is nothing in my Order that reasonably could be construed to mean that the Debtors do not have to pay taxes. Nor is there anything in the plan that requires or permits the parties to violate environmental laws, or that could be reasonably construed as having done so." Stay Decision, at 8.

[57] Stay Decision, at 7.

[58] While the U.S. later objected to confirmation on the basis of exculpation, the U.S. declined to object to the exculpation provisions originally proposed by the Debtors.

[59] Stay Decision, at 10.

[60] *Id.* at 11.

[61] *Id.* at 7.

party release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby exculpated from, any liability for damages based on the negotiation, execution and implementation of any transactions or actions approved by the Bankruptcy Court in the Chapter 11 Cases, except for Causes of Action related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence; provided that nothing in the Plan shall limit the liability of professionals to their clients pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8 Rule 1.8(h)(1) (2009).

99.     In addition, the Plan contemplates certain rebalancing transactions and the completion of distributions of cryptocurrencies to creditors.  The Exculpated Parties shall have no liability for, and are exculpated from, any claim for fines, penalties, damages, or other liabilities based on their execution and completion of the rebalancing transactions and the distribution of cryptocurrencies to creditors in the manner provided in the Plan.  For the avoidance of doubt, this paragraph reflects the fact that Confirmation of the Plan requires the Exculpated Parties to engage in certain rebalancing transactions and distributions of cryptocurrencies and the fact that no regulatory authority has taken the position during the Combined Hearing that such conduct would violate applicable laws or regulations.  Nothing in this provision shall limit in any way the powers of any Governmental Unit to contend that any rebalancing transaction should be stopped or prevented, or that any other action contemplated by the Plan should be enjoined or prevented from proceeding further.  Nor does anything in this provision limit the enforcement of any future regulatory or court order that requires that such activities either cease or be modified, or limit the penalties that may be applicable if such a future regulatory or court order is issued and is violated.  Similarly, nothing herein shall limit the authority of the Committee on Foreign Investment of the United States to bar any of the contemplated transactions.  Nor does anything in this provision alter the terms of the Plan regarding the compliance of the Purchaser with applicable laws in the Unsupported Jurisdictions before distributions of cryptocurrency occur in those Unsupported Jurisdictions.

101.     Governmental Units.  Except as set forth in the exculpation provisions set forth in the Plan (including sections VI.B.1 and VIII.C of the Plan) and in this Confirmation Order, nothing in this Confirmation Order or the Plan shall release or restrict any claim by the United States, the States or any of their agencies of any claim arising under the Internal Revenue Code, the environmental laws or any civil or criminal laws of the United States or the States, or under any rules or regulations enforced by the United States, the States or any of their agencies against the Released Parties, nor shall anything in the Confirmation Order or the Plan enjoin the United States or the States from bringing any claim, suit, action or other proceedings against the Released Parties for any liability for any claim, suit or action arising under the Internal Revenue Code, the environmental laws or any civil or criminal laws of the United States or the States, or under any rules or regulations enforced by the United States, the States or any of their agencies, nor shall anything in the Confirmation Order or the Plan exculpate any such party from any liability to the United States, the States or any of their agencies, arising under the Internal Revenue Code, the environmental laws or any civil or criminal laws of the United States or the States, or under any rules or regulations enforced by the United States, the States or any of their agencies; provided, however, that nothing in this Confirmation Order or the Plan shall modify in any respect the relief previously

granted           in           the           Bar           Date           Order.

102.    Except as set forth in the exculpation provisions set forth in the Plan (including sections VI.B.1 and VIII.C of the Plan) and in this Confirmation Order, nothing in this Confirmation Order, the Disclosure Statement, the Plan, or the Asset Purchase Agreement releases, precludes, or enjoins: (i) any liability to any governmental unit as defined in 11 U.S.C. § 101(27) ("Governmental Unit") that is not a "claim" as defined in 11 U.S.C. § 101(5) ("Claim"); (ii) any Claim of a Governmental Unit arising on or after the Effective Date; or (iii) any liability to a Governmental Unit on the part of any non-Debtor (except to the extent set forth in paragraphs 49 and 56 herein); provided, however, that nothing in this Confirmation Order or the Plan shall modify in any respect the relief previously granted in the Bar Date Order.

104.    Notwithstanding any provision herein to the contrary, nothing in this Confirmation Order or the Plan grants this Court jurisdiction over any police and regulatory actions by the SEC, and the SEC shall retain the power and authority to commence and continue any such actions against any person or entity, including without limitation, the Debtors, in any forum with jurisdiction; provided, however, that nothing in this Confirmation Order or the Plan shall modify in any respect the relief previously granted in the Bar Date Order.[62]

The Plan, as modified by the Confirmation Order, defines "Exculpated Parties" as follows:

(a) each of the Debtors; (b) the Committee, and each of the members thereof, solely in their capacity as such; (c) each of the Released Professionals; (d) each of the Released Voyager Employees; (e) the Plan Administrator;[63] (f) the Distribution Agent;[64] (g) each

---

[62]   Confirmation Order, ¶¶ 97-102, 104.

[63]   The Plan defines "Plan Administrator" as "the Person or Persons selected by the Committee, after consultation with the Debtors, subject to the approval of the Bankruptcy Court and identified in the Plan Supplement, to serve as the administrator(s) of the Wind-Down Debtor, and any successor thereto, appointed pursuant to the Plan Administrator Agreement." Plan, Art. I.A.122. Pursuant to the Plan and Plan Administrator Agreement, the Plan Administrator is empowered, as of the effective date of the Plan, to, among other things, administer claims asserted against the Debtors and make all disbursements and distributions under the Plan, effectuate the transactions beneficial and necessary to wind down the Debtors, oversee the accounts of the Debtors and the Wind-Down Debtor, open and maintain bank accounts for the Wind-Down Debtor, prosecute and settle the Vested Causes of Action, undertake all administrative functions in the Chapter 11 Cases, and implement the transactions contemplated by the Plan, Confirmation Order, and Plan Administrator Agreement. *See* Plan, Art. IV.H.5; *see also* Plan Administrator Agreement, § 3.1 [Bankr. Docket No. 1161]. Though the U.S. Trustee contends that it did not have adequate notice or the opportunity to object to the Plan Administrator's inclusion in the Exculpation Provision, the Plan Administrator "just replaced the original concept of a winddown trustee and the exculpation provision to be applied to the plan administrator is the same as what was proposed for the party that he is replacing." Hr'g Tr. 41:6-10, *In re Voyager Digital Holdings, Inc.*, Case No. 22-10943 (MEW) (Bankr. S.D.N.Y. Mar. 15, 2023); *see id.* at 41:21-23 ("The winddown trustee was just changed to the plan administrator. It was just a change in the title."); *see also supra*, n.60.

[64]   The Plan defines "Distribution Agent" as "the Purchaser, the Debtors, the Wind-Down Debtor or any Entity or Entities designated by the Purchaser, the Debtors, or the Wind-Down Debtor to make or to facilitate distributions that are to be made pursuant to the Plan, Definitive Documents, and Asset Purchase Agreement." Plan, Art. I.A.69. Following the effective date of the Plan, the Distribution Agent is permitted to, among other things, make all distributions contemplated under the Plan and effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties and exercise its rights under the Plan. *See* Plan, Art. VI.B.1; *see also* Stay Decision, at 12 ("[I]n this case, the Debtors plainly are fiduciaries, and the

of the Independent Directors; and (h) any other person acting in a fiduciary capacity on behalf of the Debtors in connection with the negotiation, execution and implementation of any transactions or actions approved by the Bankruptcy Court in the Chapter 11 Cases.[65]

### E.     The Government's Appeals

On March 10, 2023, the Government filed a notice of appeal (the "Appeal") of the Confirmation Order.[66] Pursuant to paragraph 124 of the Confirmation Order, the stay of the Confirmation Order would terminate at the end of the day on March 13, 2023.[67] On March 11, 2023, the Bankruptcy Court entered an order extending the stay of the Confirmation Order to March 15, 2023 at 5:00 p.m. EST.[68]

On March 14, 2023, at 8:58 p.m. EST, the Government filed the Original Stay Motion.[69] On March 15, 2023, the Debtors and the Committee filed their oppositions to the Original Stay Motion.[70] The Court held a hearing on the Original Stay Motion on March 15, 2023.[71] Following the hearing, the Court issued its Stay Decision. As part of the Stay Decision, the parties agreed to extend the stay of the Confirmation Order to Monday, March 20, 2023 at 5:00 p.m. EST.

On March 17, 2023, the Government filed the Motion in the United States District Court for the Southern District of New York (the "Court") and requested that the Motion be heard no

---

persons who implement the rebalancing trades and distributions on behalf of the Debtors will be acting under the authority I have granted to the Debtors. In addition, Binance.US will distribute cryptocurrencies to customers as a distribution agent of the Debtors, and in that capacity Binance.US will receive and distribute cryptocurrencies 'in trust' for the Debtors.").

[65]   Confirmation Order, at 9.

[66]   *See* Bankr. Docket No. 1165.

[67]   *See* Confirmation Order, ¶ 124.

[68]   *See Order Extending the Stay of the Confirmation Order* [Bankr. Docket No. 1169].

[69]   *See Notice of Expedited Motion for Stay Pending Appeal* [Bankr. Docket No. 1181] and the *Memorandum in Support of the United States of America and United States Trustee's Expedited Motion for Stay of Confirmation Order Pending Appeal Pursuant to Federal Rule of Bankruptcy Procedure 8007* [Bankr. Docket No. 1182] (the "Original Stay Motion").

[70]   *Memorandum of Law in Opposition to the Government's Motion to Stay* [Bankr. Docket No. 1186]; *Opposition of the Official Committee of Unsecured Creditors to Motion for Stay Pending Appeal* [Bankr. Docket No. 1187].

[71]   A copy of the transcript of the March 15, 2023 hearing is attached as Exhibit 2 to the Evans Declaration.

later than 5:00 p.m. EST on Monday, March 20, 2023.[72] Contemporaneously therewith, the Government also filed (a) the *Declaration of Lawrence H. Fogelman in Support of the Government's Emergency Motion for a Stay Pending Appeal*; (b) its *Ex Parte Motion for an Order Shortening Notice and Scheduling Hearing with Respect to the Appellants' Emergency Motion for a Stay Pending Appeal Pursuant to Federal Rule of Bankruptcy Procedure 8007*; and (c) a letter requesting leave for the Government to exceed the word limit set forth by Federal Rule of Bankruptcy Procedure 8013(f)(3)(A).

## ARGUMENT

### I.   PARTIES SEEKING A STAY PENDING APPEAL FACE A HEAVY BURDEN

Federal Rule of Bankruptcy Procedure 8007 governs stays pending appeals in bankruptcy proceedings.[73] Such stays are an extraordinary form of relief that "are the exception, not the rule, and are granted only in limited circumstances."[74] Indeed, a stay pending appeal is "an intrusion into the ordinary processes of administration and judicial review,"[75] and an "extraordinary remedy" evaluated under "stringent" standards.[76] When seeking a stay pending appeal, "[t]he burden on the movant is a 'heavy' one" and "[t]he decision . . . lies within the sound discretion of the court."[77] The burden is especially heavy where, as here, the Government seeks to stay an order confirming a plan of reorganization.[78]

---

[72] The Emergency Motion requests that argument be heard so this application can be decided "no later than 5:00pm on Monday, March 17, 2023, when the current stay of the Confirmation Order expires." Emergency Motion, at 2. The Committee assumes that this is a scrivener's error and that the Government is requesting argument on Monday, March 20, 2023.

[73] *See* Fed. R. Bankr. Proc. 8007.

[74] *In re Brown*, No. 18-10617 (JLG), 2020 WL 3264057, at *5 (Bankr. S.D.N.Y. June 10, 2020) (internal citation omitted).

[75] *Nken v. Holder*, 556 U.S. 418, 433 (2009) (internal citation omitted).

[76] *Nat. Res. Defense Council, Inc. v. U.S. Food & Drug Admin.*, 884 F. Supp. 2d 108, 122 (S.D.N.Y. 2012); *see also In re 461 7th Ave. Mkt., Inc.*, 623 B.R. 681, 688–89 (S.D.N.Y. 2020), *aff'd*, No. 20-3555, 2021 WL 5917775 (2d Cir. Dec. 15, 2021) (denying stay pending appeal because debtor failed to make the showing required for the "extraordinary relief" sought under Bankruptcy Rule 8007(b)).

[77] *In re Gen. Motors Corp.*, 409 B.R. 24, 30 (Bankr. S.D.N.Y. 2009).

[78] *See In re MPM Silicones, LLC, et al.*, No. 14-22503 (Bankr. S.D.N.Y. Sept. 17, 2014) (Drain, J.) [Docket No. 1036] at 169:6–9 ("The party seeking a stay has what is described as a heavy burden, and that is particularly [] the case where it is seeking a stay of a confirmation order. . .").

In evaluating a request for a stay pending appeal, courts must consider (and the applicant must sufficiently demonstrate) the following four factors:[79] (1) whether the stay applicant has made a strong showing of likelihood of success on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) whether the public interest lies in favor of or against granting a stay.[80]

"The party requesting a stay bears the burden of showing that the circumstances justify an exercise of . . . discretion."[81] While the first two factors in this analysis are the "most critical,"[82] a movant must show "satisfactory evidence on all criteria"[83] to prevail on a stay request. Recent cases in this circuit have "engaged in a balancing process with respect to the four factors, as opposed to adopting a rigid rule."[84] However, where the balance of the equities

---

[79] In the Motion, the Government implies that it is entitled to a friendlier standard by virtue of the fact it is a governmental unit, citing several cases regarding the standard for issuing a preliminary injunction (which is irrelevant to a motion for stay pending appeal). *See* Motion, at 17 n.7. However, the case cited in support of this proposition, *Trump v. Deutsche Bank AG*, 943 F.3d 627, 639 (2d Cir. 2019), is a non-bankruptcy case where a non-governmental party sought to enjoin a governmental party. Accordingly, despite the Government's contentions to the contrary, there is no special consideration afforded here by virtue of the fact that the government is involved.

[80] *Nken v. Holder*, 556 U.S. at 434 (quoting *Hilton v. Braunskill*, 480 U.S. 770, 776 (1987)).

[81] *Uniformed Fire Officers Ass'n v. de Blasio*, 973 F.3d 41, 48 (2d Cir. 2020) (quoting *Nken*, 556 U.S. at 433–34); *In re Terrestar Corp.*, No. 11-10612 (SHL), 2012 WL 1028218, at *2–3 (Bankr. S.D.N.Y. Mar. 26, 2012) (stating that "[t]he moving party faces a heavy burden").

[82] *Nken v. Holder*, 556 U.S. at 434.

[83] *In re Turner*, 207 B.R. 373, 375 (2d Cir. B.A.P. 1997); *see also In re Adelphia Commc'ns Corp.*, 333 B.R. 649, 659 (S.D.N.Y. 2005) ("All four criteria must be satisfied to some extent before a stay is granted."); *Curry v. Baker*, 479 U.S. 1301, 1302 (1986) (Powell, J., in chambers) ("It is no doubt true that, absent [a stay], the applicant here will suffer irreparable injury. This fact alone is not sufficient to justify a stay."); *Virginian Ry. Co. v. United States*, 272 U.S. 658, 672–73 (1926) ("A stay is not a matter of right, even if irreparable injury might otherwise result."); *Uniformed Fire Officers Ass'n*, 973 F.3d at 49 ("With likelihood of success totally lacking, the aggregate assessment of the factors bearing on the issuance of a stay pending appeal cannot possibly support a stay."); *In re DJK Residential, LLC*, No. 08-10375 (JMP), 2008 WL 650389, at *2 (S.D.N.Y. Mar. 7, 2008) ("Failure to satisfy one prong of this standard for granting a stay will doom the motion." (internal quotation marks and citation omitted)).

[84] *In re AMR Corp.*, No. 11-15463 (SHL), 2021 WL 5016606, at *4 (Bankr. S.D.N.Y. Oct. 28, 2021) (internal citations omitted).

(specifically, factors two, three, and four referenced above) weigh against granting relief, a stay pending appeal may be denied outright.[85]

As discussed below, the Government fails to satisfy *any* of the requisite factors—let alone all four of them—and accordingly, the Court should exercise its discretion and deny the relief requested in the Motion.

## II. THE GOVERNMENT FAILED TO SATISFY ANY OF THE FOUR REQUISITE FACTORS FOR A STAY PENDING APPEAL

### A. The Balance of the Equities Does Not Support a Stay

As discussed above, a stay pending appeal may be denied outright if the balance of equities, which include factors two, three, and four enumerated above, weigh against granting the requested relief.[86] As the Supreme Court previously emphasized, a stay "is not a matter of right, even if irreparable injury might otherwise result to the appellant."[87] "[T]he traditional stay inquiry" also "calls for assessing the harm to the opposing party and weighing the public interest."[88] In the end, the decision to grant extraordinary stay relief is committed to judicial discretion.[89]

Here, the Government falls well short of demonstrating that it will suffer irreparable harm in the absence of a stay pending appeal. The Government's claimed harm is that the Exculpation Provision "would bar the Government from exercising its police and regulatory authority, including its power to prosecute crimes, unless the laws it seeks to enforce sound in actual fraud, willful misconduct, or gross negligence."[90] The Government is explicitly prioritizing its own, hypothetical and unmaterialized interests over the very real and vulnerable

---

[85]  *See, e.g.*, *Ledesma v. Garland*, 850 F. App'x 84, 89–90 (2d Cir. 2021) ("[W]e need not resolve whether [movant] has actually met th[e] [merits] factor because, even if he has, his motion still fails on the other remaining *Nken* prongs.").

[86]  *Id.*

[87]  *Nken v. Holder*, 556 U.S. at 427 (quoting *Virginian Ry. Co. v. United States*, 272 U.S. at 672).

[88]  *Id.* at 435.

[89]  *Id.* at 434.

[90]  Motion, at 19.

interests of the Debtors' creditors.  Therefore, as set forth below, the Court need not even reach the likelihood of the merits of the Government's appeal to deny the requested stay relief but can do so based purely on (a) the Government's failure to demonstrate a likelihood of irreparable injury absent a stay; (b) the likely $100 million harm to the Debtors, their estates, and their creditors; and (c) the fact that the public interest weighs heavily against granting a stay of the Confirmation Order.

The Government's Motion would discourage bankruptcy professionals and chapter 11 debtors from executing value-maximizing transactions out of fear that the Government would later accuse them of some violations of law. With respect to the transactions and distributions that will be statutorily mandated under the Plan pursuant to Bankruptcy Code section 1142(a), "[a] fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required."[91] Instead of providing "fair notice of conduct that [the Government claims] is forbidden," the Government is instead seeking to lie in wait while professionals and others comply with the Plan to later decide whether it thinks anything the Plan contemplates is illegal.[92] As noted in the Bankruptcy Court's well-reasoned Confirmation Decision, exculpation provisions are "based on the theory that court-supervised fiduciaries are entitled to a qualified immunity for discretionary actions that they take in their official capacities" and also function as "a protection for court-supervised and court-approved transactions."[93] This supports the notion that "parties should not be liable for doing things that the Court authorizes them to do and that in many instances a court may

---

[91] *Securities and Exchange Commission v. Ripple Labs, Inc., et al.*, No. 20-cv-10832, Doc. No. 440 at 1 (S.D.N.Y. Mar. 11, 2022) (quoting *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012)).

[92] *Id.*

[93] Confirmation Decision, at 31.

direct them to do."[94] Accordingly, the public interest, and the balance of the equities, weighs heavily against granting the Government's request for a stay.

### i.       The Government's Hypothetical Harm is Not "Irreparable"

"'[I]rreparable harm is the single most important prerequisite for the issuance of a preliminary injunction' . . . accordingly, 'the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered.'"[95] This harm "must be neither remote nor speculative, but actual and imminent."[96] As the Supreme Court has explained, simply showing a "possibility of irreparable injury" fails to satisfy this factor, as "the 'possibility' standard is too lenient."[97] Here, the Government contends that it will suffer irreparable harm on the theory that (a) if the Plan goes effective, the Government's arguments on appeal could be deemed equitably moot and (b) the Exculpation Provision unlawfully prevents the Government from asserting some unspecified future causes of action. Both of those theories fail because the Government has not shown that, in the absence of a stay, it will suffer "*probable* irreparable harm" or that the purported harm is anything but "remote []or speculative."[98] By the Government's own admission, its claimed harm is "hypothetical," which falls woefully short of satisfying this factor.[99]

The equitable mootness argument fails because it is well established in the Second Circuit that the potential mootness of an appeal absent a stay does not constitute irreparable

---

[94]     *Id.* at 31–32; *see* Stay Decision, at 10 ("The whole point, in this case, is that the confirmation order will require certain actions to be taken in the future. Parties who act under the direction of that Order are entitled to know that they are not being ordered (in effect) to incur liabilities for having done so.").

[95]     *In re Calpine Corp.*, 2008 WL 207841, at *4 (internal citations omitted); *In re Sabine Oil & Gas Corp.*, 551 B.R. 132, 143 (Bankr. S.D.N.Y. 2016) (indicating that "irreparable harm is the 'principal prerequisite' for the issuance of a stay pursuant to Bankruptcy Rule 8007"); *In re Brown*, No. 18-10617 (JLG), 2020 WL 3264057, at *6.

[96]     *In re Sabine Oil & Gas Corp.*, 548 B.R. 674, 681 (Bankr. S.D.N.Y. 2016) (citations omitted).

[97]     *Nken*, 556 U.S. at 434–35 (quoting *Inter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).

[98]     *In re Sabine Oil & Gas Corp.*, 548 B.R. at 681.

[99]     *See* Stay Decision, at 15 ("The Government has not contended that it faces an 'irreparable injury' in the absence of a stay except for the risk that an appeal might be rendered equitably moot if a stay were not granted. It is not entirely clear to me that this would be the case.").

harm.[100] The weight of authority outside of the Second Circuit also agrees that equitable

mootness does not amount to irreparable harm.[101] Indeed,

> the existence of such harm is no guarantee that an appellant is entitled to a stay pending
> appeal. It is also necessary to go one step further and consider the nature of the
> underlying dispute and the harm that the loss of appellate rights may have on the
> moving party. That harm must then be balanced against the potential harm other parties
> may suffer if the stay is granted.[102]

As set forth by the Bankruptcy Court in its Stay Decision, "the Government's entire

argument about the 'equitable mootness' risk is merely hypothetical, because the Government

cannot identify anything that it would actually want to do, or should be allowed to do, that

would be rendered equitably moot in the absence of a stay."[103]

The Government's other "harm that it would not be able to bring some unspecified

cause of action for compliance with the Confirmation Order, is also not "irreparable." The

Government has had months, specifically since July 2022, to come forward with an actual

determination that VGX or any of the other 105 cryptocurrencies that were listed on Voyager

are securities or that Binance US is acting in violation of laws.[104]   It has not done so. Despite

---

[100]    *See In re LATAM Airlines Grp. S.A.*, No. 20-11254, 2022 WL 2657345, at *5 (Bankr. S.D.N.Y. July 8, 2022) (noting "the mere threat of equitable mootness is not grounds, per se, for granting stay relief"); *In re Windstream Holdings, Inc.*, 2020 WL 4481933, at *3 (S.D.N.Y. Aug. 3, 2020) (finding that a risk of mootness, standing alone, does not constitute irreparable harm); *In re Adelphia Commc'ns Corp.*, 361 B.R. at 34; *In re Sabine Oil & Gas Corp.*, 548 B.R. at 682 (noting "a risk of mootness, standing alone, does not constitute irreparable harm"); *In re Calpine Corp.*, No. 05-60200 (BRL), 2008 WL 207841, at *4 ("[M]erely invoking equitable mootness . . . —a risk that is present in any post-confirmation appeal of a chapter 11 plan—is not sufficient to demonstrate irreparable harm."); *DJK Residential, LLC*, 2008 WL 650389, at *3 (stating "there is no reason why the majority view that the risk of mootness does not constitute irreparable harm should not apply"); *In re Moreau*, 135 B.R. 209, 215 (N.D.N.Y. 1992) ("It is clear that the danger of an appeal becoming moot is by itself never a sufficient ground to justify grant of a stay.").

[101]    *See, e.g., BEPCO, L.P. v. 15375 Mem'l Corp. (In re 15375 Mem'l Corp.)*, 2009 WL 393948, at *1 (D. Del. Feb. 18, 2009) ("[E]quitable mootness of an appeal, without more, does not constitute irreparable harm."); *Turner v. Frascella Enters., Inc. (In re Frascella Enters., Inc.)*, 388 B.R. 619, 627 (Bankr. E.D. Pa. 2008) ("[A] majority of courts find the potential of mootness insufficient to demonstrate irreparable harm."); *In re Trans World Airlines, Inc.*, 2001 WL 1820325, at *10 (Bankr. D. Del. Mar. 27, 2001) ("It is well settled that an appeal being rendered moot does not itself constitute irreparable harm." (quoting *In re 203 N LaSalle P'ship*, 190 B.R. 595, 598 (N.D. Ill. 2005))); *In re Adelphia*, 361 B.R. at 347 n.39 (collecting authorities).

[102]    *In re LATAM Airlines Grp. S.A.*, No. 20-11254, 2022 WL 2657345, at *5 (Bankr. S.D.N.Y. July 8, 2022).

[103]    Stay Decision, at 16.

[104]    *See* Hr'g Tr. 30:5-8, *In re Voyager Digital Holdings, Inc.*, Case No. 22-10943 (MEW) (Bankr. S.D.N.Y. Mar. 2, 2023) (THE COURT: "Your objection is based on stuff Voyager has been doing for years and stuff that Binance has been doing for years. I mean, are you standing here telling me that the SEC is going to challenge whether the Debtor is selling securities?").

being asked repeatedly by the Bankruptcy Court to do so throughout the Confirmation Hearing,[105] the Government provided "absolutely no admissible evidence—literally none—that would support a conclusion that Binance.US will misuse customer assets or that Binance.US cannot be trusted."[106] Therefore, the Government failed to demonstrate any bases for carving out purported causes of action that have not yet and may never materialize from the Exculpation Provision.[107]

Through its Motion, the Government seems to imply that it did not receive fair notice of the proposed exculpation terms.[108] However, the initial version of the Plan that was filed on December 22, 2022 included a broad exculpation provision in Article VIII.C, as did every amended version of the Plan that was subsequently filed by the Debtors.[109] Notably, the SEC

---

[105] *See* Hr'g Tr. 314:22-23, *In re Voyager Digital Holdings, Inc.*, Case No. 22-10943 (MEW) (Bankr. S.D.N.Y. Mar. 2, 2023) (THE COURT: "You have no evidence to offer, right?" MR. UPTEGROVE: "No, Your Honor."); *see id.* at 38:5-17 (THE COURT: "You know, maybe not, but it's a disclosure issue and I'm absolutely shocked, I have to say, that a regulator would come in and say, I'm charged with regulatory authority over these things. These are reasons that I have concerns because they're within my regulatory jurisdiction, but I've done nothing. I have nothing to offer to you except questions, and my excuse for that is that it's somebody else's burden in the context of confirmation. That's incredible. Absolutely incredible."); *see* Hr'g Tr. 231:6-19, *In re Voyager Digital Holdings, Inc.*, Case No. 22-10943 (MEW) (Bankr. S.D.N.Y. Mar. 3, 2023) ("So at least I know that the SEC isn't just saying maybe, that it's saying it thinks that there are issues. But I still don't have evidence and I still don't have very much clarity as to exactly why they think there are issues or how they would affect this transaction.").

[106] Confirmation Decision, at 20; *see* Stay Decision, 5 ("[T]he federal authorities made clear during the confirmation hearing that they do not actually contend that the contemplated rebalancing activities or proposed distributions of cryptocurrencies would violate any applicable laws . . . the evidence and argument before me during the confirmation hearing did not suggest there were any illegalities in what the plan contemplated, and compelled a conclusion that the transactions could and should proceed.").

[107] Indeed, as discussed at the Confirmation Hearing, the speculated potential securities law violations came from individual staff members at the SEC, not from the actual Securities & Exchange Commission itself, meaning that a determination as to whether the transactions contemplated under the Plan violate securities law could be months or even years away. *See* Hr'g Tr. 230:16-24, *In re Voyager Digital Holdings, Inc.*, Case No. 22-10943 (MEW) (Bankr. S.D.N.Y. Mar. 3, 2023) ("With that being said, the staff believes based solely on the facts and circumstances currently known to the staff that the offering and sale of [V]GX tokens have the attributes of a securities transaction – securities transactions. Staff also believes that Binance.US is operating an unregistered security exchange in the United States. The Commission has not made any determination on either of these issues. The staff beliefs do not represent the position of the Commission."); *see also* Jay Clayton, *Statement Regarding SEC Staff Views*, SEC.gov (Sept. 13, 2018), https://www.sec.gov/news/public-statement/statement-clayton-091318#_ftn2 (noting that the "Commission's longstanding position is that all staff statements are nonbinding and create no enforceable legal rights or obligations of the Commission or other parties").

[108] *See* Motion, at 10.

[109] Stay Decision, at 10 ("That provision would have immunized the 'Exculpated Parties' based on any act or omission arising on or after the Petition Date – whether I had approved it or not – with exceptions for fraud, willful misconduct or gross negligence. That would have been far broader than the first paragraph of the exculpation provisions that I approved.").

and the U.S. Trustee did not object to any of those provisions—the U.S. Trustee sought for the proposed exculpation to be narrowed, not eliminated.[110] The Government only became interested in this issue when the Debtors filed a revised confirmation order on March 2, 2023 with an expanded exculpation provision that included an explicit bar of the Government's ability to contend that the transactions under the Plan violated any rule or regulation.[111] The Bankruptcy Court agreed that the "extra and expanded" language that the Debtors proposed on March 2, 2023 was "overreaching and was made without adequate notice."[112] However, the Government cannot fairly claim that March 2, 2023 was the first time it received notice of the proposed exculpation provision when every single version of the Plan filed in the Chapter 11 Cases included broader exculpation provisions.[113] Indeed, the Government was on notice of the proposed exculpation terms since December 2022, and the Exculpation Provision that was ultimately approved by the Bankruptcy Court was narrower than the relief that the Plan originally sought.[114] Ultimately, although the Government was on notice of the Plan's provisions and was afforded the opportunity to be heard and object to the transactions proposed therein,[115] the Government failed to demonstrate that there is anything illegal that must be done to execute the "Restructuring Transactions" under the Plan.

---

[110] *See* Stay Decision, at 11.

[111] Hr'g Tr. 15:11-17, *In re Voyager Digital Holdings, Inc.*, Case No. 22-10943 (MEW) (Bankr. S.D.N.Y. Mar. 15, 2023) (THE COURT: "You have implied several times that you've got lack of notice and that it was only because the qualifying language was removed that you acted. I think that's false. I think you did nothing and were doing nothing until the Debtors overreached and asked for additional things on March 2nd. I suspect you didn't even know about this qualifying language."); *see id.*, at 16:11-16 (THE COURT: "I'm just saying that your argument that somehow this was new to you, this entire issue was new to you on March 2nd or that you had previously been relying on what that confirmation order allegedly said, you've suggested both those things, and I don't think they're true.").

[112] Stay Decision, at 12.

[113] Hr'g Tr. 15:11-17, *In re Voyager Digital Holdings, Inc.*, Case No. 22-10943 (MEW) (Bankr. S.D.N.Y. Mar. 15, 2023) (THE COURT: "You have explicitly argued that you didn't get sufficient notice. And I just don't see it.").

[114] *Id.*

[115] Confirmation Decision, at 34 ("All of the relevant governmental entities have been on notice of what the plan proposes. They had every opportunity to tell me if they believed that anything contemplated by the plan would violate any applicable statute, rule or regulation . . . No other regulator has contended during the confirmation hearing that there is anything illegal in what the plan contemplates."); Stay Decision, at 11 ("The Debtors' proposed language appeared in every amended version of the Plan that was filed. Notably, the SEC and the

Furthermore, on January 13, 2023, the Bankruptcy Court approved and authorized the Debtors to undertake the rebalancing steps contemplated under the Plan as part of the APA Order.[116] The Government declined to raise any issues with the contemplated rebalancing transactions[117] approved under the APA Order, choosing instead to wait until the middle of the Confirmation Hearing, with the knowledge that such actions had already taken place,[118] to make the case that the Government should be permitted to pursue the Debtors for operating under the APA Order in addition to the Confirmation Order. Such a result cannot stand, as it would only serve to undercut the impact of an order issued by the Bankruptcy Court.

### ii.    A Stay Would Cause Significant Harm to the Debtors and Their Creditors

The Government cannot satisfy its burden with respect to the second requirement for a stay pending appeal: "that the non-moving party or other parties will not suffer substantial harm if the stay is granted." To the contrary, the issuance of a stay harms Debtors and its creditors by delaying and substantially reducing recoveries to individuals who have been suffering since

---

Office of the United States Attorney did not object to any of those provisions. The Office of the United States Trustee filed an objection, but that objection just asked that the proposed exculpation be narrowed, not eliminated.").

[116] *See* Bankr. Docket No. 860, ¶ 13.

[117] Under the First Amended APA, the rebalancing transactions consist of the following: "(i) Seller shall purchase and sell cryptocurrency through one or more transactions such that, following the completion of such transactions, the Acquired Coins Value of all Acquired Coins of each type is equal to the Deposited Coins Value of all Deposited Coins of such type multiplied by the Rebalancing Ratio (subject to a Rebalancing Exercise Delta with respect to each Acquired Coin of no more than five percent (5%) or, if after conducting such transactions and using reasonable best efforts to meet the Rebalancing Exercise Delta of five percent (5%), Seller reasonably and in good faith determines that it will not be able to meet such Rebalancing Exercise Delta, then such other amount as Purchaser and Seller consent to, such consent not to be unreasonably withheld, conditioned or delayed), the purpose of which transactions the Parties acknowledge and agree is to ensure that there are sufficient Acquired Coins of each type to pay to each User's account on the Binance.US Platform a number of Post-Rebalancing Coins of such type in accordance with the provisions of this Agreement." First Amended APA, § 6.11(a).

[118] *See* Hr'g Tr. 26:17-25, 27:1-2, *In re Voyager Digital Holdings, Inc.*, Case No. 22-10943 (MEW) (Bankr. S.D.N.Y. Mar. 6, 2023) (MR. SLADE: "[A]s an example, Your Honor authorized us to start the rebalancing when Your Honor approved the APA a month or so ago. Then we see in there a filing that they think that might violate the securities laws. It doesn't make any sense for us to come and propose a plan, and for us to get approved and start implementing it because we want to return cryptocurrency to customers as soon as possible, and then for the regulators to come at us after the fact that said, oh, yeah, remember those super vague rules? They meant that was illegal. That is not what's supposed to happen here.").

July 2022.[119] To overcome this potential harm, the Government must prove that "the balance of harms tips in favor of granting the stay."[120] It cannot do so.

> **a.      A Stay Would Indefinitely Delay Distributions to the Debtors' Creditors**

Here, the Debtors' creditors are primarily individuals who lost well over $1 billion of cryptocurrency and have been waiting for distributions since July 2022. If implemented, the requested stay would result in a significant delay in distributions under the Plan. Indeed, it is well settled that delaying distributions to creditors is a significant harm that warrants denial of stay requests.[121]

> **b.      A Stay Will Result in Additional Fees and Costs to the Debtors' Estates**

The Debtors and their estates will incur substantial amounts of additional operating costs and professional fees while the Appeal is pending, all of which will significantly diminish recoveries to the detriment of general unsecured claimants under the Plan. The Debtors previously indicated that they have a current administrative burn rate of $10 million per month.[122] Given that the Government is requesting stay relief in this Court pending potentially multiple rounds of appeals, the Debtors will likely incur millions of dollars of additional fees and costs on top of the already sizeable operational costs and professional fees that serve as yet another obstacle to creditor recoveries.[123]

---

[119]  *See* Stay Decision, at 17 ("The automatic stay and other provisions of the Bankruptcy Code have had the effect of delaying customers' access to their investments since July 2022, and many of those customers invested significant portions of the life savings or retirement savings in cryptocurrencies held by the Debtors. The harm that a stay would pose to the Debtors, and their constituents, is therefore quire significant and immediate.").

[120]  *In re Brown*, 2020 WL 3264057, at *7 (Bankr. S.D.N.Y. June 10, 2020) (quoting *Adelphia*, 361 B.R. at 349).

[121]  *See In re Fairmont Commc'ns Corp.*, No. 92 B 44861, 1993 WL 428710, at *4 (Bankr. S.D.N.Y. Oct. 12, 1993) (internal citations omitted); *see also In re 29 Brooklyn Ave. LLC*, No. 12-40279-CEC, 2015 Bankr. LEXIS 4192, at *5 (Bankr. E.D.N.Y. 2015).

[122]  *See Supplemental Declaration of Mark A. Renzi in Support of Confirmation of the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Bankr. Docket No. 1139], ¶ 5 ("The Debtors are burning more than $10 million a month.").

[123]  *See* Stay Decision, at 17 ("Every delay in these cases means that further administrative expenses will be incurred, which just further reduces creditor recoveries.").

**c.     A Stay May Make it Impossible for the Debtors to Proceed with the Binance.US Sale**

If granted, a stay may make it impossible for the Debtors to comply with the provisions of the First Amended APA. Courts have previously declined to grant a motion for stay pending appeal where the stay would interfere with the proposed sale.[124]

At the Confirmation Hearing, the Debtors offered unrefuted testimony that failing to consummate the Binance.US sale would result in approximately $100 million of value destruction.[125] Accordingly, in addition to general delays regarding distributions, granting the requested stay may also result in a significant decrease in size and type of recoveries to the severe detriment of unsecured creditors.

Finally, pursuant to paragraph L of the Confirmation Order, the First Amended APA was further amended to provide the following:

---

[124] *See, e.g., In re Frantz*, 534 B.R. 378, 390 (Bankr. D. Idaho 2015) ("Imposing a stay will result in potential harm and prejudice to the creditors of the estate due to the delay in administration of the estate and the potential for loss of the sale to CPI. A stayed sale will also expose the estate to additional costs to secure and maintain the Property for the duration of the appeal. . . if stayed there would be a risk of loss of that sale as well as additional expenses incurred by the estate pending resolution of the appeal . . ."); *In re Innovative Commun. Co., LLC*, Nos. 2007-106, 2007-105, 2007-156, 2008 U.S. Dist. LEXIS 107853, at *13 (D.V.I. 2008) ("To delay asset sales of the bankruptcy estate would not only disrupt the bankruptcy proceedings but also work an injury to the creditors of the bankruptcy estate. As such, the Court finds that this factor disfavors a stay."); *In re TWA*, Case No. 01-0056 (PJW), 2001 Bankr. LEXIS 723, at *30 (Bankr. D. Del. 2001) ("The evidence is overwhelming that TWA cannot be sustained as a viable business enterprise in the face of a material delay in closing the American transaction. Specifically, the uncontroverted testimony at the Sale Hearing was that TWA has a cash burn of $3 million per day. If the sale to American is unduly delayed, there is a very serious risk of losing a sale transaction which materially benefits substantial and diverse creditor constituencies. At the conclusion of the Sale Hearing, I found that there would be an immediate and precipitous decline in the financial affairs of TWA followed by a very high probably, if not certainty, of liquidation if I were to deny or reject the Sale Motion.").

[125] *See* Hr'g Tr. 25:24-25, *In re Voyager Digital Holdings, Inc.*, Case No. 22-10943 (MEW) (Bankr. S.D.N.Y. Mar. 3, 2023) ("How much value leakage would there be if the Debtors decide to exercise their fiduciary out and move away from Binance towards the toggle plan?" "We would estimate that the differential would be $100 million, approximately."); *see id.* at 26:1-16 ("Can you describe for the Court what the $100 million of value leakage consists of?" "So of the $100 million of value leakage, $20 million of that would relate to the differential from the purchase price perspective relating to Binance's upfront purchase price consideration of $20 million. The remaining $80 million relates primarily to value leakage associated with two components. One would be estimated incremental value reduction associated with VGX token and the lack of support from Binance.US perspective and inability to potentially create additional value for that token. That is a relatively small component of the estimated $80 million. The remaining component relates to additional discounts that would likely be associated with the liquidation of the 35 unsupported tokens on Voyager platform."); *see id.* at 72:1-6 ("Additionally, the other consequence would really be around the ability for creditors to receive in-kind distributions relating to the 35 tokens that are unsupported, and so there may be, for example, adverse tax consequences associated with those 35 coins which would need to be returned in cash as opposed to on an in-kind basis.").

> If the Purchaser is ready to close by April 1, 2023 (assuming closing conditions are satisfied or waived by Purchaser) and the Seller is not (including because the Seller declines to waive any Closing conditions, other than breaches or defaults by the Purchaser), then the Seller will cease to have Seller Expense reimbursement protection thereafter[.][126]

As such, if Binance.US is ready to close the sale by April 1, 2023 (approximately two weeks from now) but the Plan has yet to go effective due to a stay pending the Appeal, then the Debtors risk losing their expense reimbursement rights[127] under the First Amended APA (as amended by the Confirmation Order). Judge Wiles correctly held the following:

> A stay could threaten the availability of [the Binance.US] transaction, and the uncontroverted evidence before me at the confirmation hearing is that a loss of the Binance.US transaction would lead to a reduction of approximately $100 million in the assets available for distribution to creditors. The stay the Government seeks would also postpone the Debtors' ability to implement their "toggle" plan, and would further delay distributions to customers.[128]

In sum, the harm to creditors significantly outweighs the amorphous claims of purported harm from the Government, meaning that the second factor also weighs against granting the stay.[129]

### d.   A Stay Will Make it Challenging for the Debtors and Other Estate Professionals to Consummate the Plan and its Contemplated Transactions.

If the Government is successful, the Debtors and other estate professionals will be required to implement the transactions contemplated by the Confirmation Order while simultaneously living in fear of incurring potential future civil and criminal liabilities (that are

---

[126] Confirmation Order, ¶ L.

[127] "Seller Expense Cap" is defined in the First Amended APA as "an amount equal to either (a) if Purchaser elects to extend the Outside Date to the Extended Outside Date pursuant to Section 8.1(c), $15,000,000 or (b) if Purchaser does not so elect to extend the Outside Date, $10,000,000." First Amended APA, at § 11.1(ffff).

[128] *See* Stay Decision, at 17

[129] *See* Stay Decision, at 17 ("I am compelled to conclude that the harm that the Debtors and their constituents would suffer if a stay were to be granted exceeds any harm that the Government might incur due to the absence of a stay.").

not yet known to the public or the SEC) merely for complying with the Confirmation Order.[130]

As correctly recognized by the Bankruptcy Court in its Confirmation Decision,

> [t]he persons and entities who will carry out specific activities that are not only approved by [the] Confirmation Order, but also are required by that Order by virtue of section 1142 of the Bankruptcy Code, are entitled to know that they will not incur liability just for doing what I have approved and required, particularly when the SEC and all other Government agencies have had a full and fair opportunity to argue to me that the proposed transactions are illegal in any way and have not made any such contentions.[131]

Moreover, contrary to the Government's assertions, the Confirmation Order does not "foreclose future arguments by the Government, or the Government's assertion of changing or evolving regulatory views."[132] Rather, the Exculpation Provision is "simply protecting those persons who in the interim will be engaging in transactions that the Government has failed to challenge and that must be carried out under the authority" of the Confirmation Order.[133] Therefore, any such allegation from the Government that its right to prosecute wrongdoing or

---

[130] Counsel to the SEC admitted on the record at the Confirmation Hearing that the SEC was "not in a position to expound upon what a particular entity . . . may or may not have done and what the consequences legally are regarding that conduct." Hr'g Tr. 33:16-20, *In re Voyager Digital Holdings, Inc.*, Case No. 22-10943 (MEW)( Bankr. S.D.N.Y. Mar. 2, 2023).

[131] Confirmation Decision, at 36; *see also id.* at 38 ("[T]he individuals and entities who will be required by my confirmation order to engage in those activities are entitled to know that they have not been sentenced by me to incur statutory and regulatory liabilities just for doing what I have ordered. That is consistent with ordinary practice in bankruptcy cases . . . and with basic principles of equity and estoppel."); *see* Stay Decision, at 6 ("All I have done—based on the authorities I cited and which the Government has not even discussed—is to confirm that, in the meantime, the people who are required to do things pursuant to my confirmation order will not be held liable for having done what I have required."); *see id.*, at 16 ("My Order just says that in the meantime the people and entities who do what my order requires will not themselves be liable for having done so.").

[132] Confirmation Decision, at 39; Stay Decision, at 6 ("I have left open the right of the Government to seek to stop the activities at any time if the Government believes that they should be stopped."); *see id.*, at 13 ("I have not 'enjoined' the Government's exercise of police and regulatory powers, I have not 'prospectively immunized' the parties from enforcement actions, and I have not barred regulatory actions to stop the contemplated transactions. The Government's arguments to the contrary are just hyperbole. I have made it quite clear that the Government can step in at any time if (due to changing or evolving regulatory views) the Government thinks the rebalancing transactions or cryptocurrency distributions should be stopped. My order also made quite clear that I have not purported to limit the liability of any person for anything they have done that I have not explicitly authorized and/or directed them to do. The Order that I have entered is narrow in scope and is limited to the protection of people who, at least for now and in the absence of regulatory action, will have to do what my order requires.").

[133] Confirmation Decision, at 39; *see* Stay Decision, at 8 ("The point is to protect the parties from belated allegations that those very activities are somehow violative of law and that parties should be penalized just for doing what I have ordered them to do.").

police improper behavior is inaccurate and mischaracterizes the intention of the Exculpation Provision.

In the Motion, the Government continues its attempt to analogize to investigation and prosecution of False Claims Act violations claiming that only the statute of limitations dictates the time by which it can bring criminal actions and not the Bankruptcy Court.[134] The Government is missing the point. The Debtors and estate professionals ***are compelled*** to do the acts required by the Confirmation Order. Therefore, if the Government actually believed that any of the crypto transactions required under the Confirmation Order violate the law, the Government has every right to object to the Plan by arguing that the crypto transactions are illegal. But the Government has not done so. Instead, it is seeking to collaterally attack the Confirmation Order by going after the exculpation clause, instead of actually proving that any of the contemplated transactions violate laws or regulations.

### iii.    A Stay is Not in the Public Interest.

The Government has failed to show that a stay pending appeal would be in the public interest.[135] To the contrary, the public interest would be served by denying a stay and distributing cryptocurrencies owed to the Debtors' creditors.

Courts recognize that "the public interest favors the expedient administration of the bankruptcy proceedings."[136] Moreover, the public interest in settlements and finality weighs

---

[134]  *See* Motion, at 26.

[135]  The Bankruptcy Court agreed that "the public interest does not favor a stay." Stay Decision, at 18; *see id.* ("[T]he Government similarly argued that my Order will somehow prevent the Government from taking action to protect the public health, safety and welfare. These arguments are sheer hyperbole. I could not have said any more clearly that the Government is free at any time to take action to stop the Debtors' cryptocurrency trades and/or cryptocurrency distributions if the Government decides that those activities should be stopped. My Order just says that in the meantime the people and entities who do what my order requires will not themselves be liable for having done so. I fail to see how that possible threatens the public health, safety or welfare, or how it ties the Government's hands in any way. If the Government has not already taken regulatory actions with respect to cryptocurrencies, or if it delays in taking any further regulatory actions, those delays will certainly not be attributable in any way to my order.").

[136]  *In re Savage & Assocs., P.C.*, No. 05 CIV 2072 (SAS), 2005 WL 488643, at *2 (S.D.N.Y. Feb. 28, 2005); *see also In re Health Diagnostic Lab'y, Inc.*, No. 15-3219-KRH, 2015 WL 4915621, at *5 (Bankr. E.D. Va. Aug. 17, 2015) (finding that "third parties and the public interest in general will be harmed by imposition of the stay").

against granting a stay pending appeal.[137] The stay could delay distributions indefinitely and cause significant harm to creditors.

The Government invokes its duty to protect the public health, safety, and welfare of its citizens,[138] as well as its job to "enforce the law and prosecute misconduct."[139] There are thousands of citizens who are creditors that stand to be personally harmed by the Government's efforts. It is not exactly clear which citizens the Government is currently seeking to protect, but what is clear is that it is not the Debtors' unsecured creditors that the Government has in mind. Instead, the Government asserts that a stay would serve the public interest by "ensuring that the rights of the state and federal governmental units released under the [ ] Plan through the Exculpation Provision are protected."[140] The Government's focus on those generic considerations and its own self-interests has strayed away from what really matters to the public interest here—ensuring the expedient administration of chapter 11 cases and prompt distribution of funds to creditors following consummation of a chapter 11 plan.[141] Despite its assertions to the contrary, the Government's efforts to stay the Confirmation Order pending appeal are actually working against the public interest. Moreover, the Government cites *Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 27 (1st Cir. 2020) for the proposition that there are "overriding sovereign interests in enforcing the penal laws and protecting the public."[142] However, *Ryan* is distinguishable, as it involved violations of immigration penal laws and courthouse arrests in contrast to the facts of these Chapter 11 Cases in which no actual crime

---

[137] *See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 117 (2d Cir. 2005) ("The compromise of complex litigation is encouraged by the courts and favored by public policy."); *In re Motors Liquidation Co.*, 555 B.R. 355, 364–65 (Bankr. S.D.N.Y. 2016) ("Settlements and compromises are favored in bankruptcy as they minimize costly litigation and further parties' interests in expediting the administration of the bankruptcy estate.").

[138] *See* Motion, at 6.

[139] *See id.*, at 33.

[140] *See id.*

[141] *See* Stay Decision, 18 ("The public interest also favors the timely resolution of bankruptcy cases. As noted above, a stay would adversely affect many thousands of customers.").

[142] Motion, at 34.

has been established or even alleged by the Government against the Debtors or any estate fiduciary.

**B.      The Government Failed to Demonstrate a Strong Likelihood of Success on the Merits.**

Beyond the equities, the Government's inability to satisfy the "likelihood of success" stay factor provides an independent reason to deny relief.[143] Although the Government likened a stay pending appeal to an injunction and otherwise seek to lower the bar for stay relief,[144] the Second Circuit has been clear that "[t]o obtain a stay of a . . . court's order pending appeal, more is required [than in the injunction context], including a strong showing that [the movant] is likely to succeed on the merits."[145] The Supreme Court has also used the same "strong showing" language in reiterating the traditional stay-pending-appeal standard (and distinguishing it from injunctions).[146]

Indeed, in the Second Circuit, "[t]he probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury plaintiff[ ] will suffer absent the stay. Simply stated, more of one excuses less of the other."[147] Because the Government cannot show that it will suffer irreparable harm absent the stay, the Government now bears the burden of establishing that it has a substantial probability of success on appeal.[148] Here, the Government argues, among other things, that the Exculpation Provision is unlawful and contends that the Bankruptcy Court "had no statutory authority to grant this broad exculpation."[149] Not only is this assertion incorrect, but it also blatantly disregards the

---

[143]   *See In re 461 7th Ave. Mkt., Inc.*, 623 B.R. 681, 691 (S.D.N.Y. 2020) ("Here, aside from the fact that the other three factors militate against granting a stay, the [appellant] fails to make the required showing on [the merits].").

[144]   *See* Motion, at 17.

[145]   *Agudath Israel of Am. v. Cuomo*, 980 F.3d 222, 226 (2d Cir. 2020) (second alteration in original).

[146]   *Nken v. Holder*, 556 U.S. at 428–29, 434.

[147]   *Mohammed v. Reno*, 309 F.3d 95, 101 (2d Cir. 2002) (internal citations omitted).

[148]   *In re Taub*, 470 B.R. 273, 278 (E.D.N.Y. 2012) ("Because the [appellant] has failed to demonstrate why she will suffer irreparable harm . . ., she must clearly establish a substantial possibility of success on appeal.").

[149]   *See* Motion, at 20.

importance of federal common law as a potential grant of bankruptcy court authority. Indeed, the Court has statutory authority to approve the Exculpation Provision pursuant to Bankruptcy Code sections 105(a) and 1123, as has been recognized by multiple circuit courts.[150] Moreover, Bankruptcy Code section 105(a) is frequently cited as proper statutory authority for approving release and exculpation provisions in this district.[151]

Along with Bankruptcy Code sections 105(a) and 1123, federal common law also supports the Confirmation Order.[152] And it is well-settled Second Circuit law that an exculpation clause approved at confirmation may exculpate estate fiduciaries for their actions related to the restructuring efforts and is designed to be a "protection not only of court-supervised fiduciaries, but also of court-supervised and court-approved transactions."[153] As the

---

[150] *See Blixseth v. Credit Suisse*, 961 F.3d 1074, 1084 (9th Cir. 2020) ("Under 11 U.S.C. § 105(a), which empowers a bankruptcy court to 'issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [Chapter 11],' and 11 U.S.C. § 1123, which establishes the appropriate content of a bankruptcy plan, the bankruptcy court here had the authority to approve an exculpation clause intended to trim subsequent litigation over acts taken during the bankruptcy proceedings and so render the Plan viable" (citations omitted)) (citing *In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000)).

[151] *See, e.g.*, *In re Almatis B.V.*, No. 10-12308 (MG), 2010 Bankr. LEXIS 5875, at *22 (Bankr. S.D.N.Y. 2010) ("In addition, section 105(a) of the Bankruptcy Code permits approval of the releases, approval of the exculpation and issuance of the injunction set forth in Article IX of the Plan …"); *In re Finlay Enters., Inc.*, No. 09-14873, 2010 Bankr. LEXIS 5584, at *24 (Bankr. S.D.N.Y. 2010) ("Section 105 (a) of the Bankruptcy Code permits issuance of the injunction and approval of the releases and exculpations set forth in Article X of the Plan …"); *In re Sabine Oil & Gas Corp.*, No. 15-11835 (SCC), 2016 Bankr. LEXIS 4753, at *50 (Bankr. S.D.N.Y. 2016) ("Sections 105(a) and 1123(b) of the Bankruptcy Code permit issuance of the injunctions and approval of the releases, exculpations, and injunctions set forth in Article VIII of the Plan."); *In re Gen. Growth Props., Inc.*, No. 09-11977, 2010 Bankr. LEXIS 5943, at *38 (Bankr. S.D.N.Y. 2010) ("Sections 105(a) and 1123(b) of the Bankruptcy Code permit issuance of the injunctions and approval of the releases and exculpations set forth in Article 11 of the Plan …").

[152] *See, e.g., Compagnie Noga D'Importation et D'Exportation S.A. v. The Russian Fed'n*, 361 F.3d 676, 688 (2d Cir. 2004) ("we note that an issue similar to the one before us has arisen in the federal common law of bankruptcy and set off"); *see also Toward a Federal Common Law of Bankruptcy: Judicial Lawmaking in a Statutory Regime*, 80 Am. Bankr. L.J. 1, 4 (arguing that federal courts have common lawmaking powers in bankruptcy, as such lawmaking is proper because there is an implicit Congressional authorization of common lawmaking power in the Bankruptcy Code, as indicated by its legislative history and Congressional and judicial ratification of common lawmaking powers).

[153] *In re Aegean Marine Petroleum Network Inc.*, 599 B.R. 717, 720 (Bankr. S.D.N.Y. 2019); *In re LATAM Airlines Grp. S.A.*, 2022 WL 2206829, at *49–50 (Bankr. S.D.N.Y. June 18, 2022), *corrected*, 2022 WL 2541298 (Bankr. S.D.N.Y. July 7, 2022), and *motion to certify appeal denied*, 2022 WL 2962948 (Bankr. S.D.N.Y. July 26, 2022), and *aff'd sub nom. In re Latam Airlines Grp.*, S.A., 643 B.R. 756 (S.D.N.Y. 2022), and *aff'd sub nom. In re Latam Airlines Grp., S.A.*, 643 B.R. 741 (S.D.N.Y. 2022), *aff'd sub nom. In re Latam Airlines Grp. S.A.*, 55 F.4th 377 (2d Cir. 2022) (overruling the trustee's objection because "[i]t is well settled that an exculpation clause approved at confirmation may exculpate estate fiduciaries like a committee, its members, and estate professionals for their actions in the bankruptcy case except where those actions amount to willful misconduct or gross negligence"); *In re Ditech Holding Corp.*, 2021 WL 3716398, at *9 (Bankr. S.D.N.Y. Aug. 20, 2021) (collecting cases for the proposition that "[i]t is settled that exculpatory provisions

35

Bankruptcy Court has explained, if the court approves a transaction as being in the best interests of the estate and has authorized the transaction to proceed, then the parties to those transactions should not be subject to claims that effectively seek to undermine or second-guess such court's determinations.[154] Furthermore, courts in this district have concluded that "[i]t is settled that exculpatory provisions are proper to protect those authorized by bankruptcy courts to carry out the bankruptcy process, even after the effective date of a plan."[155] Contrary to the Government's assertions, bankruptcy courts routinely approve exculpation provisions without a carve out for governmental entities, government, enforcement actions, or criminal sanctions.[156] Here, it is apparent that the Government has misunderstood the breadth and scope

---

are proper to protect those authorized by bankruptcy courts to carry out the bankruptcy process, even after the effective date of a plan"); *In re Olinda Star Ltd.*, 614 B.R. 28, 48 (Bankr. S.D.N.Y. 2020) ("This Court agrees that [exculpation] is necessary and appropriate to prevent interference with the consummation of the [restructuring], and issuance of the New 2024 Notes Guarantee because without such exculpations the ability of the JPLs and their advisors to take action to effectuate the restructuring would be limited."); *In re Stearns Holdings, LLC*, 607 B.R. 781, 790–91 (Bankr. S.D.N.Y. 2019) ("In light of the exculpation provision's carve-out for gross negligence, intentional fraud, and willful misconduct, the Court finds that (i) the standard of care established by the exculpation provision is entirely consistent with, and appropriate under, applicable law and (ii) the protections afforded by the exculpation provision, which represent an integral component of the Global Settlement and the Amended Plan, are reasonable and appropriate.").

[154] *In re Aegean Marine Petroleum Network Inc.*, 599 B.R. at 721; Confirmation Decision, at 30 ("It is routine that bankruptcy plans contain provisions that state that fiduciaries and other parties do not incur liabilities by having engaged in transactions that the Court has approved, or by taking actions that the Court has directed them to take."); Stay Decision, at 10 ("Parties who act under the direction of that Order are entitled to know they are not being ordered (in effect) to incur liabilities for having done so. As the Debtors have pointed out, courts regularly have approved exculpation provisions that cover prospective conduct that will occur during the implementation of a plan.").

[155] *In re Ditech Holding Corp.*, 2021 WL 3716398, at *9 (Bankr. S.D.N.Y. Aug. 20, 2021).

[156] *See, e.g.,* Order Confirming Chapter 11 Plan of Reorganization, Ex. A, Plan, Art. VIII.F, *In re Lakeland Tours, LLC*, No. 20-11647 (JLG) (Bankr. S.D.N.Y. Sept. 15, 2020) [Docket No. 191-1]; Order Confirming Chapter 11 Plan, Ex. A, Plan, Art. VIII.F, *In re Barneys New York, Inc.*, No. 19-36300 (CGM) (Bankr. S.D.N.Y. Feb. 5, 2020) [Docket No.789-1]; Order Confirming Chapter 11 Plan of Reorganization, Ex. A, Plan § 8.4, *In re Deluxe Entertainment Services Group Inc.*, No. 19-23774 (RDD) (Bankr. S.D.N.Y. Oct. 25, 2019) [Docket No. 96]; Order Confirming Chapter 11 Plan, Ex. 1, Plan, Art. VIII.E, I*n re Hollander Sleep Products, LLC*, No. 19-11608 (MEW) (Bankr. S.D.N.Y. Sep. 5, 2019) [Docket No. 356]; Order Confirming Chapter 11 Plan of Reorganization, Ex. A, Plan, Art. IX.D, *In re Fullbeauty Brands Holdings Corp.*, No. 19-22185 (RDD) (Bankr. S.D.N.Y. Feb. 5, 2019) [Docket No. 39]; Order Confirming Chapter 11 Plan of Reorganization, Ex. 1, Plan, Art. VIII.E, *In re Cenveo, Inc.*, No. 18-22178 (RDD) (Bankr. S.D.N.Y. Aug. 21, 2018) [Docket No. 685]; Order Confirming Chapter 11 Plan of Reorganization, Ex. 1, Plan, Art. IX.D, *In re Sbarro LLC*, No. 14-10557 (MG) (Bank. S.D.N.Y. May 19, 2014) [Docket No. 238]; Order Confirming Plan of Liquidation, Ex. A, Plan, Art. IX.F, *In re United Retail Group*, Inc. No 12-10405 (SMB) (Bank. S.D.N.Y. Sept. 18, 2012) [Docket No. 776]; Order Confirming Chapter 11 Plan of Reorganization, Ex. 1, Plan, Art. X.G, *In re FGIC Corp.*, No. 10-14215 (SMB) (Bankr. S.D.N.Y. Apr. 23, 2012) [Docket No. 314].

of the Exculpation Provision in the Plan, and has based its arguments on a "serious misunderstanding of just what it means when a court confirms a plan of reorganization."[157]

The Government also continues to assert that the Exculpated Parties improperly include "non-fiduciaries of the estate and people who had no direct involvement with any action taken during the pendency of the bankruptcy proceedings."[158] In doing so, the Government points to Binance.US and the Plan Administrator as purportedly improper exculpated parties.[159] However, the Government fails to once again appreciate the fact that, as corporate entities, the Debtors rely on the actions of "human beings" to implement various transactions, including those contemplated under the Plan.[160] Moreover, the Government's contention that the Exculpation Provision "goes beyond the exculpation clauses that other courts have approved" is misleading and inaccurate.[161]

In the Motion, the Government also argues that the Exculpation Provision elevates the affirmative defense to subsequent litigation in Bankruptcy Code section 1125(e) into "a release from suit."[162] In the Government's view, the Debtors and estate fiduciaries should first be prosecuted for potential liability without immunity, then may avail themselves of various

---

[157] *See* Confirmation Decision, at 33-35.

[158] Motion, at 29.

[159] *See id.*

[160] *See* Stay Decision, at 12-13 ("The Office of the United States Trustee at one point contended that exculpation provisions in favor of Debtors or other fiduciaries should not exten[d] to employees or other people who act for the Debtors. However, the Debtors are corporate entities; they can only act through human beings. It would make no sense to say that the Debtors themselves are exculpated from liability, but that the human beings through which the Debtors act are not similarly protected.").

[161] Indeed, the Government cites *In re PWS Holding Corp.*, 228 F.3d 224, 246-47 (3d Cir. 2000) for the proposition that the court approved the exculpation clause where it "affect[ed] no change in liability" because it merely reflected the "standard that already applies". Motion, at 30. However, the Government fails to appreciate the fact that "[n]o separate analysis was articulated in *PWS Holding* regarding the standard of liability for the post-petition conduct of officers, directors, employees, advisors, professionals or agents of the debtors, the reorganized debtors or the 'Creditor Representative'", yet "[n]evertheless, the release of all such persons from liability for any post-petition act or omission was approved, except for willful misconduct or gross negligence." *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 606 (Bankr. D. Del. 2001).

[162] Motion, at 27.

applicable affirmative defenses. This argument makes no sense.[163] Rather than using the exculpation provision as an affirmative defense in some later proceeding, removing the Exculpation Provision would have the practical effect of professionals and their respective companies refusing to execute necessary value-maximizing transactions. Many cases make clear that there is a broader immunity for actions that are specifically approved by a court and/or that have been explicitly required to be taken by court order, particularly where government officials or other parties had the opportunity to object to the court's approval of an action and did not do so.[164]

*[Remainder of Page Intentionally Left Blank]*

---

[163]  *See* Stay Decision, at 18 ("I have already explained, in my Decision, why I do not think that makes sense. I see no reason why a future court should have to guess as to just what activities I have authorized and that I thereby intend to be subject to the relevant immunities.")

[164]  Confirmation Decision, at 35 (citing cases).

## CONCLUSION

WHEREFORE, the Committee respectfully requests that this Court deny the Motion and grant such other and further relief as the Court deems just and proper.

Dated:  New York, New York
   March 20, 2023

**MCDERMOTT WILL & EMERY LLP**

*/s/ Darren Azman*
Darren Azman
Joseph B. Evans
One Vanderbilt Avenue
New York, NY 10017-3852
Telephone: (212) 547-5400
Facsimile: (212) 547-5444
E-mail: dazman@mwe.com
   jbevans@mwe.com

- and -

Charles R. Gibbs (admitted *pro hac vice*)
Grayson Williams (admitted *pro hac vice*)
2501 North Harwood Street, Suite 1900
Dallas, TX 75201
Telephone: (214) 295-8000
Facsimile: (972) 232-3098
E-mail: cgribbs@mwe.com
   gwilliams@mwe.com

- and -

Gregg Steinman (admitted *pro hac vice*)
333 SE 2nd Avenue, Suite 4500
Miami, FL 33131-2184
Telephone: (305) 329-4473
Facsimile: (305) 503-8805
E-mail: gsteinman@mwe.com

*Counsel to the Official*
*Committee of Unsecured Creditors*