UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re: VOYAGER DIGITAL HOLDINGS, INC., *et al.*,

                    Debtors.

UNITED STATES OF AMERICA, *et al.*,

                    Appellants,

           -v.-

VOYAGER DIGITAL HOLDINGS, INC., *et al.*,

                  Appellees.

23 Civ. 02171 (JHR)

OPINION & ORDER

JENNIFER H. REARDEN, District Judge:

Before the Court is the March 17, 2023 emergency motion of the United States of America and the United States Trustee for Region 2 (the "U.S. Trustee") (collectively, the "Government") for a stay pending appeal of the Bankruptcy Court's confirmation order. *See* ECF No. 3.[1] Voyager Digital Holdings, Inc. and its affiliated debtors (collectively, the "Debtors")[2] and the Official Committee of Unsecured Creditors (the "Committee") oppose the Government's motion. *See* ECF Nos. 16, 19.

For the reasons set forth below, the Government's motion is GRANTED.

---

[1] "ECF No." refers to the docket numbers in the instant action. "Bankr. Dkt. No." refers to the docket numbers in the underlying bankruptcy proceedings, Case No. 22-B-10943(MEW). Cited page numbers are to the ECF pagination at the top of the referenced document.

[2] The Debtors in this action are Voyager Digital Holdings, Inc.; Voyager Digital Ltd.; and Voyager Digital, LLC. ECF No. 12 at 1 n.1.

## I. BACKGROUND

### A. The Chapter 11 Cases and Sale Process

On July 5, 2022, each of the Debtors filed a voluntary petition for relief under chapter 11, title 11 of the United States Code (the "Bankruptcy Code"). The next day, the Debtors filed a plan of reorganization, in which they proposed to market their assets for sale. Bankr. Dkt. 17. On July 19, 2022, the U.S. Trustee appointed the Committee pursuant to section 1102(a) of the Bankruptcy Code. *See* Bankr. Dkt. No. 106.

In the ensuing months, the Debtors marketed their assets for sale through a Bankruptcy Court-ordered auction process. Bankr. Dkt. No. 472. The now infamous crypto exchange FTX won the auction. On October 20, 2022, the Bankruptcy Court authorized the Debtors to enter into an asset purchase agreement with FTX, under which FTX would "acquire substantially all of the Debtors' assets, including substantially all of the cryptocurrency held by the Debtors and the Debtors' customer accounts." Bankr. Dkt. No. 476 ¶ 19; Bankr Dkt. No. 581. The asset purchase agreement contemplated that these transactions would be effectuated through a chapter 11 plan. *Id.* Weeks later, however, FTX's "massive fraud" came to light, the company filed for bankruptcy, and the parties terminated the agreement. *See* Bankr. Dkt. No. 848; *see, e.g.*, Bankr. Dkt. No. 1110 ¶ 2 ("FTX's new CEO publicly announced that the proposed purchaser was a fraud of historic proportions, sending shockwaves through the entire cryptocurrency industry. Senior FTX executives were charged with federal felonies and at least three have pled guilty, admitting that FTX and its affiliates defrauded many, including its own customers and commercial counterparties like the Debtors.").

After the collapse of FTX "derailed . . . the Debtors' journey to consummation" of their purchase agreement with that entity, the Debtors explored alternative options. Bankr. Dkt. No.

2

863 at 20.  On December 18, 2022, Voyager Digital, LLC entered into a new asset purchase agreement with cryptocurrency exchange BAM Trading Services Inc. d/b/a Binance.US ("Binance.US").  The agreement provides for the transfer of "substantially all of" the Debtors' cryptocurrency and certain other assets to Binance.US pursuant to a chapter 11 plan.  *See* ECF No. 12-5.  The agreement further contemplates making in-kind distributions to creditors, such that each individual will receive a recovery in the type of cryptocurrency held in that person's account.  ECF No. 12-5 ¶ 14.

On January 13, 2023, the Bankruptcy Court authorized the Debtors to enter into the agreement.  *See* Bankr. Dkt. No. 860.  The order further authorized the Debtors "to rebalance their cryptocurrency portfolio."  *Id.*  The then-extant version of the agreement provided for an outside effective date of May 8, 2023 for the closing of the sale to Binance.US, with a possible thirty-day extension.  *Id.*

B. **The Plan and Confirmation Order**

On December 22, 2022, the Debtors filed the original version of the Plan.[3]  *See* Bankr. Dkt. No. 777.  As relevant here, that version of the Plan contained an "Exculpation Provision" providing as follows:

> Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor release or the third-party release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and **each Exculpated Party is exculpated from any Cause of Action for any act or omission arising on or after the Petition Date and prior to the Effective Date** based on the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing, or consummation of the Disclosure Statement, the Plan, the Special Committee Investigation, any Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit

---

[3] Revised versions of the Plan were subsequently filed on January 10, 2023, February 28, 2023, March 1, 2023, and March 5, 2023.  *See* Bankr. Dkt. Nos. 852, 1117, 1125, 1138.

3

> of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for Causes of Action related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

*See* Dkt. No. 852 at 66 (emphasis added). The bolded language was later removed by the Debtors. The original Plan further provided that:

> The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

*Id.* The "Exculpated Parties" includes key participants in these cases, including "(a) each of the Debtors; (b) the Committee [of Unsecured Creditors], and each of the members thereof, solely in their capacity as such; (c) each of the Released Professionals; (d) each of the Released Voyager Employees; and (e) the Distribution Agent." *Id*. at 17. The "Distribution Agent" is defined to include the purchaser, Binance.US. *Id.* at 7, 12.

On February 22 and February 24, 2023, certain federal and state governmental agencies filed objections to the Plan, including the United States Securities and Exchange Commission and the U.S. Trustee. *See* Bankr. Dkt. Nos. 1047, 1085. The U.S. Trustee objected to the Plan's Exculpation Provision, arguing that the non-debtor releases were unconstitutional, violated the Bankruptcy Code, and were inconsistent with Second Circuit law. *See* Bankr. Dkt. No. 1085 at

4

3, 17-18.  The United States Attorney's Office did not object to the Exculpation Provision at this juncture.

On February 28, 2023, the Debtors filed their first proposed order confirming the plan. *See* Bankr. Dkt. No. 1120.  The proposed order included language that expressly carved the Government out of any exculpation or releases in the Plan:

> Nothing in this Confirmation Order or the Plan shall effect a release of any claim by the United States or any of its agencies arising under the Internal Revenue Code, the environmental laws or any civil or criminal laws of the United States, or under any rules or regulations enforced by the United States or any of its agencies against the Released Parties, nor shall anything in the Confirmation Order or the Plan enjoin the United States from bringing any claim, suit, action or other proceedings against the Released Parties for any liability for any claim, suit or action arising under the Internal Revenue Code, the environmental laws or any civil or criminal laws of the United States, or under any rules or regulations enforced by the United States or any of its agencies, nor shall anything in the Confirmation Order or the Plan exculpate any such party from any liability to the United States or any of its agencies, arising under the Internal Revenue Code, the environmental laws or any civil or criminal laws of the United States, or under any rules or regulations enforced by the United States or any of its agencies; *provided*, however, that nothing in this Confirmation Order or the Plan shall modify in any respect the relief previously granted in the Bar Date Order and thus no person or entity, including the United States or any of its agencies, can seek or receive a direct or indirect distribution of any property of the Debtors' estates unless they filed a Proof of Claim prior to the Governmental Bar Date.

*Id.* at 64-65.  On March 2, 2023, however, the Debtors added language that, *inter alia*, would effectively undo the Government carve-out they had previously proposed:

> Nothing in this Confirmation Order or the Plan shall effect a release by the United States, the States or any of their agencies of any claim arising under the Internal Revenue Code, the environmental laws or any civil or criminal laws of the United States or the States, or under any rules or regulations enforced by the United States, the States or any of their agencies against the Released Parties, nor shall anything in the Confirmation Order or the Plan enjoin the United States or the States from bringing any claim, suit, action or other proceedings against the Released Parties for any liability for any claim, suit or action arising under the Internal Revenue Code, the environmental laws or any civil or criminal laws of the United States or the States, or under any rules or regulations enforced by the United States, the States or any of their agencies, nor shall anything in the Confirmation Order or the Plan exculpate any such party from any liability to the United States, the States or any

5

>of their agencies, arising under the Internal Revenue Code, the environmental laws or any civil or criminal laws of the United States or the States, or under any rules or regulations enforced by the United States, the States or any of their agencies; *provided*, however, that nothing in this Confirmation Order or the Plan shall modify in any respect the relief previously granted in the Bar Date Order and thus no person or entity, including the United States, the States or any of their agencies, can seek or receive a direct or indirect distribution of any property of the Debtors' estates unless they filed a Proof of Claim prior to the Governmental Bar Date; ***provided, further, that the United States, the States, and their agencies may not, and will not, allege that the Restructuring Transactions are a violation of any rules or regulations enforced by the United States, the States or any of their agencies, nor will they bring any claim against any Person on account of or relating to the Restructuring Transactions. . . .***

*See* Bankr. Dkt. No. 1130 at 65-66 (emphasis added). The March 2 version of the Plan further qualified the carve-out as follows:

>**[N]o Governmental Unit will allege that the Restructuring Transactions are a violation of any rules or regulations enforced by the United States, the States or any of their agencies, nor will they bring any claim against any Person on account of or relating to the Restructuring Transactions.**

*Id.* (emphasis added). "Restructuring Transactions" is defined, in turn, to include:

>those mergers, amalgamations, consolidations, reorganizations, arrangements, continuances, restructurings, transfers, conversions, dispositions, liquidations, dissolutions, or other corporate transactions that the Debtors and the Committee jointly determine to be necessary to implement the transactions described in this Plan[.]

*See* Bankr. Dkt. No. 1138 at 22. By definition, then, these Restructuring Transactions will occur until after the Plan's effective date.

On March 2, 2023, the United States Attorney's Office filed a letter objecting to the Debtors' change to the Exculpation Provision removing the governmental carve-out. The United States Attorney's Office took the position that the exculpation language improperly barred the Government from enforcing its laws and regulations in the ordinary course against the Debtors and third parties in connection with the Restructuring Transactions. *See* Bankr. Dkt. No. 1132. This objection was joined by the Federal Trade Commission and the New Jersey Bureau of

Securities. *See* Bankr. Dkt. Nos. 1134, 1135. On March 3, 2023, the Texas State Securities Board filed its objection to the plan and disclosure statement, arguing, *inter alia*, that the government should be excluded from the broad exculpation language. *See* Bankr. Dkt. No. 1136.

On March 6, 2023, the United States Attorney's Office submitted a brief objecting to the latest iteration of the Exculpation Provision. It again argued, *inter alia*, that the proposed exculpation language improperly barred the Government from enforcing its laws and regulations in the ordinary course against the Debtors and third parties in connection with the Restructuring Transactions. *See* Bankr. Dkt. No. 1144.

C. **Confirmation Hearing**

From March 2 through March 7, 2023, the Bankruptcy Court held a hearing to consider final approval of the Amended Disclosure Statement and confirmation of the Third Amended Joint Plan (the "Confirmation Hearing"). On March 6, the court held oral argument on the Government's objection. During argument, the Bankruptcy Court stated it would approve an Exculpation Provision insulating Debtors and others from prospective governmental liability in connection with their consummation of the transactions contemplated in the Plan and related documents. Along the way, the Bankruptcy Court expressly rejected the Government's argument that the court did not have the authority to release criminal liability.[4]

---

[4] *See* ECF No. 5-4 at 25:12-26:2 ("[Government attorney]: It would certainly not be appropriate for this Court to enjoin a criminal prosecution of any person for any reason. THE COURT: Well, if what you're saying is that having sat on the sidelines and said nothing to me to indicate that there's anything illegal about what these people are going to do, that you want to reserve the right to put somebody in jail for doing a rebalancing transaction that they will have no choice but to do under the order that I entered, then I disagree with you. I think the very suggestion offends me to no end. I can't believe that you would even take the position in front of me that you should have that right. It's preposterous. It's absolutely preposterous. If you think something's

7

At the end of the Confirmation Hearing, the Court entered an Order Approving the Second Amended Disclosure Statement and Confirming the March 5 Plan (the "Confirmation Order"). It revised the Debtors' proposed Exculpation Provision by striking in its entirety the language from prior drafts and replacing it with the following:

> Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor release or the third-party release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby exculpated from, any liability for damages based on the negotiation, execution and implementation of any transactions or actions approved by the Bankruptcy Court in the Chapter 11 Cases, except for Causes of Action related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence; provided that nothing in the Plan shall limit the liability of professionals to their clients pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8 Rule 1.8(h)(1) (2009).
>
> The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes.
>
> In addition, the Plan contemplates certain rebalancing transactions and the completion of distributions of cryptocurrencies to creditors. The Exculpated Parties shall have no liability for, and are exculpated from, any claim for fines, penalties, damages, or other liabilities based on their execution and completion of the rebalancing transactions and the distribution of cryptocurrencies to creditors in the manner provided in the Plan.
>
> For the avoidance of doubt, the foregoing paragraph reflects the fact that Confirmation of the Plan requires the Exculpated Parties to engage in certain rebalancing transactions and distributions of cryptocurrencies and the fact that no regulatory authority has taken the position during the Combined Hearing that such conduct would violate applicable laws or regulations. Nothing in this provision shall limit in any way the powers of any Governmental Unit to contend that any rebalancing transaction should be stopped or prevented, or that any other action contemplated by the Plan should be enjoined or prevented from proceeding further. Nor does anything in this provision limit the enforcement of any future regulatory or court order that requires that such activities either cease or be modified, or limit the penalties that may be applicable if such a future regulatory or court order is issued and is violated. Similarly, nothing herein shall limit the authority of the

---

that illegal, speak up, but don't dare tell me that you kind of want to reserve that right to do that to somebody.").

> Committee on Foreign Investment of the United States to bar any of the contemplated transactions. Nor does anything in this provision alter the terms of the Plan regarding the compliance of the Purchaser with applicable laws in the Unsupported Jurisdictions before distributions of cryptocurrency occur in those Unsupported Jurisdictions.

Bankr. Dkt. No. 1159 at 7-8. In addition, the Confirmation Order included the following language regarding the Exculpation Provision:

> 101. **Governmental Units**. **Except as set forth in the Exculpation Provisions set forth in the Plan (including sections VI.B.1 and VIII.C of the Plan)** and in this Confirmation Order, nothing in this Confirmation Order or the Plan shall release or restrict any claim by the United States, the States or any of their agencies of any claim arising under the Internal Revenue Code, the environmental laws or any civil or criminal laws of the United States or the States, or under any rules or regulations enforced by the United States, the States or any of their agencies against the Released Parties, nor shall anything in the Confirmation Order or the Plan enjoin the United States or the States from bringing any claim, suit, action or other proceedings against the Released Parties for any liability for any claim, suit or action arising under the Internal Revenue Code, the environmental laws or any civil or criminal laws of the United States or the States, or under any 22-10943-mew Doc 1166 Filed 03/10/23 Entered 03/10/23 08:17:02 Main Document Pg 45 of 55 46 rules or regulations enforced by the United States, the States or any of their agencies, nor shall anything in the Confirmation Order or the Plan exculpate any such party from any liability to the United States, the States or any of their agencies, arising under the Internal Revenue Code, the environmental laws or any civil or criminal laws of the United States or the States, or under any rules or regulations enforced by the United States, the States or any of their agencies; provided, however, that nothing in this Confirmation Order or the Plan shall modify in any respect the relief previously granted in the Bar Date Order.

> 102. **Except as set forth in the Exculpation Provisions set forth in the Plan (including sections VI.B.1 and VIII.C of the Plan)** and in this Confirmation Order, nothing in this Confirmation Order, the Disclosure Statement, the Plan, or the Asset Purchase Agreement releases, precludes, or enjoins: (i) any liability to any governmental unit as defined in 11 U.S.C. § 101(27) ("Governmental Unit") that is not a "claim" as defined in 11 U.S.C. § 101(5) ("Claim"); (ii) any Claim of a Governmental Unit arising on or after the Effective Date; or (iii) any liability to a Governmental Unit on the part of any non-Debtor (except to the extent set forth in paragraphs 49 and 56 herein); provided, however, that nothing in this Confirmation Order or the Plan shall modify in any respect the relief previously granted in the Bar Date Order.

Confirmation Order at 44-45 (emphases added).

9

The Confirmation Order also provided for a waiver of the Bankruptcy Code rule that the effect of confirmation orders is generally stayed for 14 days. *See* Fed. R. Bankr. P. 3020(e). Specifically, in lieu of the automatic 14-day stay, the Order provided that, "[f]or good cause shown, the stay of this Confirmation Order provided by the Bankruptcy Rules shall terminate at the end of the day on March 13, 2023, and this Confirmation Order shall be effective and enforceable immediately thereafter." Bankr. Dkt. No. 1159 ¶ 124.

The Government objected to the proposed waiver. *See* ECF No. 5-4 at 34:9-16 (noting that "the U.S. Trustee would oppose the waiver of the stay"); *see also id*. at 108:11-15, 109:14-21, 117:16-118:2. The Bankruptcy Court overruled the objection and confirmed that the temporary stay until March 13 would remain in place. *Id*. at 108:16-21. The Bankruptcy Court later extended that time, upon an agreement between the parties, to March 15, 2023, at 5:00 pm. Bankr. Dkt. No. 1169.

### D. Post-Confirmation Stay Efforts

On March 14, 2023, the Government filed a motion for a stay pending appeal in the Bankruptcy Court. *See* Bankr. Dkt. No. 1182. On March 15, 2023, the Debtors and the Official Committee of Unsecured Creditors each filed an opposition to the motion. *See* Bankr. Dkt. Nos. 1186, 1187. That same day, the Bankruptcy Court held a hearing on the motion. The Government asserted that the Bankruptcy Court lacks statutory authority to exculpate anyone from future government enforcement. *See* ECF No. 5-5 at 28. Further, the Government noted that "the exculpation order is so broad and so capacious that it would include things" such as "if the distribution agent doesn't protect customer privacy information and disclose[s] it, or if the distribution agent negligently loses customer money, or if in the course of performing the 'restructuring transactions' there are tax violations which don't require actual fraud, willful

misconduct, or gross negligence," or "KYC [know your customer] violations" or "anti-money laundering violations." *Id.* at 27.

The Bankruptcy Court denied the Government's motion for a stay. *See* ECF No. 5-2. It rejected as a "red herring" the Government's argument that the Bankruptcy Court's exculpation order "might somehow be interpreted as immunizing fraud, or theft, or tax avoidance." *Id.* at 8. In so doing, the Bankruptcy Court did not attempt to clarify the broad language in the order that led to such a reading. As the supposed statutory basis for its exculpation authority, the Bankruptcy Court identified certain language in 11 U.S.C. § 1142(a), which requires certain specific parties to implement a confirmed plan but says nothing about exculpating them from future governmental liabilities. *Id.* at 9-10. On consent of the parties, the Bankruptcy Court further extended the stay through March 20, 2023 at 5:00 pm, to permit consideration of the Government's motion by this Court. *See* Bankr. Dkt. No. 1188 ¶ 1.

E.  **The Appeal**

On March 14, 2023, the Government filed a Notice of Appeal from the Bankruptcy Court's Confirmation Order. *See* ECF No. 1. At the close of business on Friday, March 17, 2023, the Government filed the present motion to stay pending appeal of the Confirmation Order.

## II.  STANDARD OF REVIEW

A district court "functions as an appellate court in reviewing judgments rendered by Bankruptcy Courts." *In re Adelphia Commc'ns Corp.*, 361 B.R. 337, 346 (S.D.N.Y. 2007) (citing *In re Sanshoe Worldwide Corp.*, 993 F.2d 300, 305 (2d Cir. 1993)). Findings of fact are reviewed for clear error. *See* Fed. R. Bankr. P. 8013 ("Findings of fact . . . shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the Bankruptcy Court to judge the credibility of the witnesses."); *accord In re Cody, Inc.*, 338 F.3d 89, 94 (2d

Cir. 2003). A finding of fact is clearly erroneous if the court is "left with the definite and firm conviction that a mistake has been committed." *In re Manville Forest Prods. Corp.*, 896 F.2d 1384, 1388 (2d Cir. 1990) (citation omitted). In contrast, a Bankruptcy Court's conclusions of law are reviewed de novo. *In re Adelphia Commc'ns Corp.*, 361 B.R. at 346 (citing *In re Cody, Inc.*, 338 F.3d at 94).

### III.  LEGAL STANDARD

The decision as to whether to stay an order pending appeal "lies within the sound discretion of the district court." *In re Adelphia Commc'ns Corp.*, 361 B.R. 337, 346 (S.D.N.Y. 2007). In exercising that discretion, four factors are considered: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure other parties interested in the proceeding; [and] (4) where the public interest lies." *Sailor v. Scully*, 666 F. Supp. 50, 51 (S.D.N.Y. 1987) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 107 (1987)).

"A number of lower courts within the Second Circuit have concluded that the failure of the movant to satisfy any one of the four factors on a motion for a stay pending appeal of a Bankruptcy Court order 'dooms the motion.'" *In re Adelphia Commc'ns Corp.*, 361 B.R. at 346-47 (citation omitted). However, the Second Circuit "has never articulated such a rigid rule of law." *Id.* at 347. To the contrary, "the Second Circuit has consistently treated the inquiry of whether to grant a stay pending appeal as a balancing of factors that must be weighed." *Id.* Accordingly, this Court "will follow the Second Circuit's practice of weighing the factors." *Id.*; *see, e.g.*, *Antonyuk v. Hochul*, No. 22-2908, 2022 WL 18228317, at *1 (2d Cir. Dec. 7, 2022) (granting motion for stay pending appeal after "[h]aving weighed the applicable factors"); *Thapa*

*v. Gonzales*, 460 F.3d 323, 334 (2d Cir. 2006) ("We have treated the[] criteria [governing applications to stay pending appeal] somewhat like a sliding scale[.]"); *accord New York v. U.S. Dep't of Homeland Sec.*, 974 F.3d 210, 214 (2d Cir. 2020). "Where the government is a party, the injury and public interest factors merge." *In re Purdue Pharma L.P.*, 634 B.R. 240, 247 (S.D.N.Y. 2021).

### III.  DISCUSSION

The Court concludes that a stay is warranted because the Government has demonstrated "a substantial case on the merits" and irreparable harm in the absence of a stay.[5]

### A. The Merits of the Appeal

In the Second Circuit, "the 'likelihood of success on the merits' that is required for . . . a stay can be satisfied if there are 'serious questions' going to the merits of the dispute and the applicant is able to establish that the balance of hardships tips decidedly in its favor." *In re A2P SMS Antitrust Litig.*, No. 12-CV-2656, 2014 WL 4247744, at *1-5 (S.D.N.Y. Aug. 27, 2014) (citing *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund, Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010)).[6]  The Government has satisfied that standard.

At bottom, the Government has raised substantial questions concerning the relationship between Bankruptcy Courts, on the one hand, and the Bankruptcy Code, the U.S. Constitution,

---

[5] In view of the time constraints in which this emergency application is being decided, the Court does not engage herein in an extensive analysis of the merits.

[6] To be sure, in recent years, some courts in this District "have questioned whether the Second Circuit's 'sufficiently serious question going to the merits' rule can be relied on any longer." *In re Purdue Pharma L.P.*, 634 B.R. 240, 247 n.4 (S.D.N.Y. 2021). However, as a host of recent Second Circuit decisions underscore, "the Second Circuit has not seen fit to abandon its alternative standard." *Id.*  Furthermore, "no party has questioned its applicability here." *See generally* Debtors' Br.; *see also* Committee Br.  Accordingly, the Court will apply the "sufficiently serious going to the merits" standard. *In re Purdue Pharma L.P.*, 634 B.R. at 247.

and the Government's police and regulatory powers on the other. To begin with, the Government posits that the Bankruptcy Code "provides no basis" for courts to "prospectively immunize debtors and non-debtors from law enforcement and other actions undertaken by the Government." It persuasively contends that the rationale underlying Exculpation Provisions is to "allow the settling parties . . . to engage in the give-and-take *of the bankruptcy proceeding* without fear of subsequent litigation over any potentially negligent actions in those proceedings." *Blixseth v. Credit Suisse*, 961 F.3d 1074, 1084 (9th Cir. 2020) (emphasis added).[7] The Court is hard-pressed to see how that reasoning, which is rooted in the need to settle disputes among different stakeholders engaged in a bankruptcy proceeding, applies to exculpation from Government enforcement of the law following confirmation. This is particularly true given that bankruptcy is meant to deal with "the relations between a [] . . . debtor[] and his creditors"—not the relations between third-parties and non-stakeholder Government enforcers. *Wright v. Union Cent. Life Ins. Co.*, 304 U.S. 502, 513-14 (1938). Of the appellate courts upholding Exculpation Provisions, only the Seventh Circuit did so over a regulatory agency's objection, noting that, unlike here, the clause was "subject to other provisions of the plan, including one that expressly preserve[d] the FCC's regulatory powers." *In re Airadigm Comm'ns, Inc.*, 519 F.3d 640, 657 (7th Cir. 2008).

Moreover, a bankruptcy court has limited, if any, jurisdiction over criminal cases. For example, criminal prosecutions and Government enforcement actions are not subject to the Bankruptcy Code's automatic stay. *See* 11 U.S.C. § 362(b)(1), (4). The Government's argument

---

[7] *See also In re LATAM Airlines Grp. S.A.*, No. 20-11254 (JLG), 2022 WL 2206829, *50 (Bankr. S.D.N.Y. June 18, 2022) ("Exculpation provisions are frequently included in chapter 11 plans, because stakeholders all too often blame others for failures to get the recoveries they desire; seek vengeance against other parties; or simply wish to second guess the decisionmakers in the chapter 11 case." (quoting *In re DBSD N. Am., Inc.*, 419 B.R. 178, 217 (Bankr. S.D.N.Y. 2009)).

that "an Article I bankruptcy court lacks any power over criminal matters," Gov't Br. 22-23 (emphasis omitted), has gone entirely unrebutted by the Debtor and the Committee, neither of which has provided any authority for the proposition that a bankruptcy court can release criminal liability. That "bankruptcy courts [have] routinely approve[d] Exculpation Provisions without a carve out for governmental entities, enforcement actions, or criminal sanctions," Committee Br. 36, fails to show that *this* Exculpation Provision is permissible. The concerns raised by the Government here had, until recently, not been considered. In any event, preventing Government enforcement actions is at odds with the general principle that "confirmation of a plan does not insulate debtors from prosecution for criminal activity, even if that activity is part of the plan itself." *Garvin v. Cook Investments NW, SPNWY, LLC*, 922 F.3d 1031, 1036 (9th Cir. 2019). And permitting exculpation against all Government action might require "[a]ll regulatory agencies (and there are thousands) . . . to participate in all chapter 11 cases, introducing extraordinary delay into the system and imposing an impossible burden on the agencies." *In re Food City, Inc.*, 110 B.R. 808, 812 (Bankr. W.D. Tex. 1990) (rejecting an interpretation of 11 U.S.C. § 1129(a)(3) that would require a plan itself, as opposed to the proposal of the plan, to comply with all laws).

The Bankruptcy Court relied on "basic principles of equity and estoppel," Decision at 38, in concluding that those who take "actions that are specifically approved by a court and/or that have been explicitly required to be taken by court order," Decision at 35, deserve immunity. It is not clear, however, at this stage of the litigation, that this precept applies against Government enforcement. At the very least, applying it here raises significant questions warranting additional briefing. *See Ofosu v. McElroy*, 98 F.3d 694, 701 (2d Cir. 1996) (granting motion to stay where

"[plaintiff's] case d[id] not fit neatly into the" existing authority and where "case present[ed] a factual context in which thorough briefing and argument of the issue is warranted").

It does appear likely that some species of quasi-judicial immunity applies to at least some parties executing the rebalancing transactions. Here, the Debtor operates in much the same capacity as a bankruptcy trustee would, *see* 11 U.S.C. § 1107(a), and "[b]ankruptcy trustees are generally immune to the extent that they are acting with the approval of the court," *Gross v. Rell*, 695 F.3d 211, 216 (2d Cir. 2012) (collecting cases). *See also Boullion v. McClanahan*, 639 F.2d 213, 214 (5th Cir. 1981) ("an arm of the Court [who] sought and obtained court approval of his actions . . . is entitled to derived immunity"). And judicial immunity would extend to other "court appointed officers who represent the estate." *See In re Crown Vantage, Inc.*, 421 F.3d 963, 973 (9th Cir. 2005) (citing *In re DeLorean Motor Co.*, 991 F.2d 1236, 1241 (6th Cir. 1993)). While judicial immunity "attaches to only those functions essential to the authoritative adjudication of private rights to the bankruptcy estate," *In re Castillo*, 297 F. 3d 940, 951 (9th Cir. 2002), "[t]here can be no dispute that a trustee's evaluation and acceptance or rejection of parties' offers to purchase estate assets involves discretionary judgment," *In re Cont'l Coin Corp.*, No. 00-BK-15821-GM, 2009 WL 2589635, at *4 (C.D. Cal. Aug. 21, 2009).

Nonetheless, the Exculpation Clause appears to go further than the quasi-judicial immunity doctrine allows. *Cf. Pierson v. Ray*, 386 U.S. 547, 553-54 (1967) ("Few doctrines were more solidly established at common law than the immunity of judges from liability *for damages* for acts committed within their judicial jurisdiction." (emphasis added)). Judicial immunity often does not, for example, bar injunctive relief. *See Pulliam v. Allen*, 466 U.S. 522, 541-42 (1984) ("We conclude that judicial immunity is not a bar to prospective injunctive relief against a judicial officer acting in her judicial capacity."). But the Exculpation Clause limits

claims for "fines, penalties, damages, or other liabilities." Moreover, only a single federal appellate court has stated that judicial immunity can apply in the criminal context—and it did so in dicta, ultimately rejecting the doctrine as applied to that defendant. *See Braatelien v. United States*, 147 F.2d 888, 895 (8th Cir. 1945); *see also In re Kendall*, 712 F.3d 814, 833-37 (3d Cir. 2013) (Roth, J., concurring) (arguing that judicial immunity should apply to criminal conduct). Even accepting *Braatelien* as correct, the Eighth Circuit would have applied the doctrine only to "erroneous judicial acts one [sic] in good faith." 147 F.2d at 895. Yet a criminal act that was not done in good faith also might fall short of willful misconduct or gross negligence. *See* Gov't Br. 32. Prosecution of such an act would still be barred by the Exculpation Clause.

Finally, neither the Debtors nor the Committee has offered any authority rebutting the proposition that immunity must be raised as an affirmative defense, rather than granted preemptively before any action has even taken place. *See, e.g.*, *Mordkofsky v. Calabresi*, 159 Fed. App'x 938, 939 (11th Cir. 2005) ("judicial immunity is an affirmative defense and does not divest the court of subject matter jurisdiction"). Using generic equity principles to enjoin a future criminal prosecution violates "the general rule that equity will not interfere with the criminal processes, by entertaining actions for injunction or declaratory relief in advance of criminal prosecution." *Zemel v. Rusk*, 381 U.S. 1, 19 (1965). That is not to mention the significant separation of powers concerns that arise when a Bankruptcy Court effectively rewrites statutes of limitations by preventing the Executive Branch from investigating acts and enforcing the law, requiring the Government instead to object to actions that have not yet been taken.

In sum, the Government's application "center[s] on [potentially] novel and 'admittedly difficult legal question[s]." *Id.* Thus, "[the Government] ha[s] made out a 'substantial case on

17

the merits,'" and "the first factor, in turn, weighs in favor of a stay." *See Holiday Tours, Inc.*, 559 F.2d at 844-45.

## B. Injury to the Movant, Injury to Other Parties & the Public Interest

The Court next turns to the injury and public interest factors. *See In re Purdue Pharma L.P.*, 634 B.R. at 247 (noting that these factors "merge" where the Government is a party). The balance of these factors favors a stay.

The Debtors and Committee contend that they would face "inevitable and substantial" harms if a stay were imposed, noting that it would "postpone the relief due Voyager customers indefinitely—and may ultimately make any cryptocurrency distribution impossible." Debtors' Br. 36. They also represent that a stay will "require them to extend their retention of advisors and other third-party professionals to protect them during the pendency of these chapter 11 cases," with the upshot being that they are "burning more than $10 million per month." *Id.* at 37. For the Government's part, it identifies several harms that it allegedly would endure absent a stay: it would be "forbidden from enforcing federal law against parties for conduct that has not yet occurred"; the Bankruptcy Court would "infringe on the powers of the Executive Branch to enforce the law and the Legislative Branch to determine applicable statutes of limitation and liability standards"; and, "if Debtors equitably moot this appeal, it would substantially prejudice the Government's ability to vindicate its right to enforce the law."

The Court concludes that, while all parties would face meaningful injury in the event that a stay were wrongly granted or denied, the balance of hardship lies with the Government. There is a fundamentally strong public interest in the Executive Branch's enforcement of the democratically enacted laws of the United States. As the Supreme Court recognized in *Nken v. Holder*, a harm to the Government's legitimate functions is "a harm to the public interest" that

satisfies the third and fourth factors for a stay. 556 U.S. at 435. There, the Court specifically recognized a public interest in the "prompt execution of removal orders" and the ongoing harm that continuing violation of United States law that would arise from delayed execution. *Id* at 436. Other courts also have highlighted the "overriding sovereign interests in enforcing the penal laws and protecting the public." *See, e.g.*, *Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 27 (1st Cir. 2020).

Furthermore, a stay pending appeal would preserve the Government's—and the public's—right to meaningful appellate review of the Exculpation Provision and the significant issues raised here, as addressed above. *See Adelphia*, 361 B.R. at 349. If a stay pending appeal were denied, the Plan immediately would go into effect. "Under the doctrine of mootness, when an unstayed bankruptcy plan becomes substantially consummated such that no assets remain out of which to satisfy the creditor's claim, the appeal becomes moot and the claim, however meritorious, is lost." *In re Klein Sleep Prod., Inc.*, No. 93 CIV. 7599 (CSH), 1994 WL 652459, at *1 (S.D.N.Y. Nov. 18, 1994); *see also, e.g.*, *In re Chateguay Corp.*, 988 F.2d 322, 326 (2d Cir. 1993) (implementation of unstayed Bankruptcy Court order permitting distribution mooted appeal); *In re Revere Copper and Brass, Inc.*, 78 B.R. 17, 20 (S.D.N.Y.1987) (same). "The inevitable result is that denial of a stay would moot the appeal"—a reality that "even the [Debtor] and the Committee acknowledge." *In re Klein Sleep Prod.*, 1994 WL 652459, at *1.[8] Thus, the risk of mootness in the absence of a stay satisfies this prong. *Id.* at *1-2.

---

[8] *See* ECF No. 17-2 at 34:16-35:1 ("For similar reasons that other confirmations have been -- appeals have been dismissed on equitable mootness grounds because parties are taking action and relies on the Court's order, that's a traditional ground for a finding of equitable mootness, and that's exactly the similar argument that we are going to be making. And I wanted to be very clear in our brief, and I'm just going to say it now. And our position is not wishy-washy at all. Our position is once Your Honor gives us authority to go forward with the transaction, we're going to do that.").

In sum, "while each side is threatened with unquantifiable and irreparable injury in the event a stay is wrongly granted or denied, the Court concludes that the balance of hardship lies with the government." *In re St. Johnsbury Trucking Co., Inc.*, 185 B.R. 687, 691 (S.D.N.Y. 1995); *cf. e.g.*, *id.* (holding that "[t]he loss of any opportunity to challenge on appeal a debatable [confirmation] order purporting to release parties from liability for future violations of the environmental and tax laws outweighs the consequences of a brief additional delay in long overdue wage distributions to former employees").

### IV.  CONCLUSION

For the foregoing reasons, the Government's motion for a stay of the Confirmation Order pending appeal of the Confirmation Order is GRANTED.  In order to minimize delay in consummating the Plan in the event that the Confirmation Order is affirmed, however, the Court will expedite briefing and determination of the appeal.  Absent submission on or before April 4, 2023 of a stipulation proposing a different schedule, the Government shall file its brief no later than April 7, 2023.

The Debtors' and the Committee's brief[9] is due April 14, 2023.  The Government's reply brief, if any, shall be filed no later than April 18, 2023.

SO ORDERED.

Dated: March 31, 2023
      New York, New York

JENNIFER H. REARDEN<br/>
United States District Judge

---

[9] The Debtors and the Committee may jointly brief the appeal, or they may submit individual briefs.