N3N3VOYM

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   In Re:  VOYAGER DIGITAL
     HOLDINGS, INC.,
 4
               v.                           23 Civ. 2171 (JHR)
 5
                                            Remote Conference
 6   ------------------------------x
                                            New York, N.Y.
 7                                          March 23, 2023
                                            2:30 p.m.
 8
     Before:
 9
                       HON. JENNIFER H. REARDEN,
10
                                            District Judge
11
                             APPEARANCES
12
     DAMIAN WILLIAMS
13   United States Attorney for the
     Southern District of New York
14        Attorneys for Appellant United States of America
     BY:  LAWRENCE H. FOGELMAN
15        JEAN-DAVID BARNEA
          PETER M. ARONOFF
16
     UNITED STATES
17   DEPARTMENT OF JUSTICE
       Executive Office for United States Trustees
18   BY:  BETH A. LEVENE
            LINDA A. RIFFKIN
19          RICHARD C. MORRISSEY

20   KIRKLAND & ELLIS LLP
          Attorneys for Debtor Voyager Digital Holdings, Inc.
21   BY:  RUSH HOWELL
          CHRISTINE A. OKIKE
22        ALLYSON SMITH

23   MCDERMOTT, WILL & EMERY, LLP
          Attorneys for Official Committee of Unsecured Debtors
24   BY:  DARREN T. AZMAN
            JOSEPH B. EVANS
25
```

N3N3VOYM

| | |
|---|---|
| 1 | (All participants appearing via Microsoft Teams) |
| 2 | THE COURT:  Hello, everyone.  Good afternoon. |
| 3 | Ms. Williams, do you have a statement for the record? |
| 4 | THE DEPUTY CLERK:  Yes, Judge. |
| 5 | In the case of 23 CV 2171, Voyager Digital Holdings, |
| 6 | Inc.  This is a reminder this is a public proceeding.  Members |
| 7 | of the public and press are able to access the proceeding with |
| 8 | the public dial-in number.  All participants are reminded that |
| 9 | any recording or rebroadcasting of this proceeding is strictly |
| 10 | prohibited. |
| 11 | THE COURT:  Thank you, Ms. Williams.  Let's have |
| 12 | appearances.  Ms. Forman, I know you have names, but we'll go |
| 13 | through this process anyway. |
| 14 | Why don't you tell me who you are and who you |
| 15 | represent. |
| 16 | MR. FOGELMAN:  This is Larry Fogelman with the United |
| 17 | States Attorney's Office for the Southern District of New York. |
| 18 | I represent the United States. |
| 19 | THE COURT:  Good afternoon. |
| 20 | MS. LEVENE:  This is Beth Levene, I'm with the |
| 21 | Department of Justice.  I represent the United States Trustee. |
| 22 | And I'm here with Linda Riffkin and Richard Morrissey. |
| 23 | THE COURT:  Hello. |
| 24 | MR. HOWELL:  Good afternoon, your Honor.  Rush Howell |
| 25 | from Kirkland & Ellis.  I represent the debtor. And with me on |

N3N3VOYM

1    the line are Christine Okike and Allyson Smith.

2              THE COURT:  Okay.

3              MR. EVANS:  Good afternoon.  Joseph Evans from

4    McDermott Will & Emery, and I'm here with my colleague Darren

5    Azman.

6              THE COURT:  Okay.  Is that everybody?  I have so many

7    windows open and whatnot.  I think that was everybody, right?

8    Okay.

9              MR. BARNEA:  I'm J.D. Barnea, along with Peter

10   Aronoff.  I'm with the government.

11             THE COURT:  Thank you.  I have a number of questions

12   but I want to give everybody a chance to be heard on whatever

13   they would like to be heard on at the outset.

14             So, Mr. Fogelman, it's your motion.  Do you want to

15   start us off?

16             MR. FOGELMAN:  Yes, thank you.  Larry Fogelman on

17   behalf of the United States.

18             Your Honor, the government is likely to prevail on

19   this appeal and is entitled to a stay because the bankruptcy

20   court exceeded its constitutional and statutory authority in

21   approving the exculpation provision in this case.

22             The only relief we are seeking today, your Honor, is a

23   stay of the exculpation provision, or the entire order if

24   necessary, but we think probably just staying the exculpation

25   provision would be sufficient to allow the parties to the deal

N3N3VOYM

| | |
|---|---|
| 1 | to move forward, while at the same time preserving the |
| 2 | government's ability to litigate the merits of this very |
| 3 | important appeal. |
| 4 | THE COURT:  Mr. Fogelman, I am going to stop you |
| 5 | there.  Because I saw that.  I saw that argument. |
| 6 | And what is your authority for staying a single |
| 7 | provision in a confirmation order? |
| 8 | MR. FOGELMAN:  Your Honor, I can't point to a specific |
| 9 | case, but we're simply trying to offer a pragmatic solution. |
| 10 | If it is not possible, then the entire order would need to be |
| 11 | stayed.  But, all we're trying to make clear is the government |
| 12 | should be able to proceed to the merits of this appeal.  And |
| 13 | the debtors have been quite clear, your Honor, that's exactly |
| 14 | what they don't want. |
| 15 | They've said to the bankruptcy court, and this is a |
| 16 | quote:  Our position is once your Honor gives us authority to |
| 17 | go forward with the transaction, we are going to do that.  Then |
| 18 | we are going to argue that appeals are equitably moot. |
| 19 | That's the game.  That's what the debtors are trying |
| 20 | to do.  To prevent a stay, and then execute the deal and try to |
| 21 | argue that, notwithstanding really important constitutional and |
| 22 | statutory questions, the government can't have its day in |
| 23 | court. |
| 24 | We vigorously oppose that, but that's the argument |
| 25 | that they advanced. |

1          THE COURT:  You oppose it or you disagree with it?

2          Could this clause be collaterally attacked in some

3     attempted enforcement action down the line?  What if the SEC

4     took the position that some illegal conduct took place in

5     carrying out the confirmation order.  Binance would hold up the

6     confirmation order, they would point to the exculpation

7     provision, and the government would then make its arguments

8     about unconstitutionality.

9          What about that scenario?

10         MR. FOGELMAN:  Well, your Honor, I mean, look, we

11    don't believe that equitable mootness is warranted here, even

12    if no stay is granted, and we would argue against that.

13         But we know that the debtors, and presumably others,

14    would argue that they are entitled to it, and that the fact

15    that the government didn't have an opportunity to be heard now

16    here, would foreclose exactly the argument that your Honor has

17    suggested.  That enforcement branch make the argument down the

18    road that this order should be collaterally attacked as your

19    Honor had said.

20         Because of this critical importance of these issues,

21    we need them to be heard on the merits, and the government

22    shouldn't be forced to take its chances that maybe down the

23    road if there is a subsequent enforcement proceeding, a court

24    might allow the government, notwithstanding arguments of

25    equitable mootness or the finality of the confirmation order

N3N3VOYM

1    to -- we wouldn't want someone to preclude the government from

2    enforcing the law.

3              So we do think it's critical that these issues be

4    heard now, and not leave it to circumstance and who knows what

5    may happen down the road in the subsequent enforcement

6    proceeding that your Honor has posited.

7              Your Honor, the reason this is so important is that

8    what the Court has really done here is arrogated the power of

9    the executive branch and the judicial branch to itself.  The

10   Court has said if the government doesn't come into court in the

11   mere four months between December and March, when this business

12   deal was first announced, December 2022, and planned

13   confirmation, March 2023, that the government is essentially

14   foreclosed from enforcing the law.

15             Now, if the executive branch that has the authority to

16   enforce the law, to evaluate the facts and circumstances, to

17   determine if wrongdoing has occurred, and if so, to bring

18   civil, criminal, or regulatory action.  But the Court has

19   foreclosed that, and thus usurped the power of the executive

20   branch.

21             He's also usurped the legislative branch, your Honor,

22   because Congress has clearly said that there are statutes of

23   limitations that describe in detail how long the government has

24   to conduct its investigations.  Example they gave is the False

25   Claims Act the government has six years to investigate the

False Claims Act violation.  And this Court has said, no, no,
if you don't come in within these four months, anything you
want to bring about this rebalancing transaction, you can't do
it.

He did leave an out.  He said we can come in and seek
some forward-looking relief.  The debtors have already made
clear these transactions are going to close imminently.  The
Court has essentially said you've got four months, you've got
to let me know if there is some type of unknown civil,
criminal, regulatory problem, and if you don't, then you have
to suffer the exculpation provision.  And that is in direct
contrast to the statutes of limitations passed by Congress.
Not only statute of limitations, your Honor, but even liability
standards.

Now, for the rebalancing transactions, it looks like
the government's barred from doing anything whatsoever.  There
is not an exception for actual fraud, willful misconduct, or
gross negligence.  But for the restructuring transactions, what
the Court has done here is said, notwithstanding that Congress
has decided what causes of action the government can bring, and
the standards the government has to meet, they may just be a
negligent standard in some circumstances or strict liability.
This Court has said not so.  The government can only bring
claims if they -- for restructuring transactions that
constitute actual fraud, willful misconduct, or gross

N3N3VOYM

1    negligence.

2          Let's take a step back.  That is language that one

3    often hears about or sees when it comes to trust agreements or

4    what a trustee is going to do and what their powers are and

5    whether they can be challenged.  But the idea of using that

6    language to superimpose on the government what causes of action

7    it can bring makes no sense.  And so, the Court has exceeded

8    its constitutional authority, and taken for itself the powers

9    of the executive and legislative branches, in promulgating its

10   exculpation provision.

11         And not only that, it exceeds the statutory authority

12   of the court to do so.  There is no provision in the bankruptcy

13   court that says the court can prevent the government from

14   enforcing the law.  What is in the bankruptcy code is the

15   provision under 362(b)(4), that actually says the government

16   may continue to proceed to investigate, conduct its police and

17   regulatory powers, even though in a bankruptcy, basically

18   almost all litigation against a debtor has to stop.

19         Your Honor, the bankruptcy code is a highly

20   articulated scheme that addresses the relationship between a

21   debtor and its creditors.  It's primarily focused on

22   distributing the res of the bankruptcy estate to its creditors

23   and determining who gets what.

24         And at the end of the day, most debtors or

25   non-liquidating debtors are entitled to a discharge.  All of

N3N3VOYM

1    your pre-petition claims against you are essentially released.

2              And that is, so, that's the basic scheme of the

3    bankruptcy code.  But the bankruptcy code also provides two

4    provisions where a limited power beyond that is descended, and

5    that is 1125(e).  Congress has clearly said when it comes to

6    soliciting a plan persons "are not liable."

7              And with regard to 524(g), the Congress has allowed

8    certain releases for non-debtors, but only in the context of

9    asbestos cases.

10              Given the highly articulated nature of the bankruptcy

11    code and the quite specific provisions that allow, in very

12    limited situations, for non-debtor releases, is well beyond the

13    bankruptcy court's statutory authority to have imposed the

14    extremely broad exculpation provision, which is essentially

15    limitless in preventing government from bringing, in terms of

16    any criminal and civil, any regulatory violations.

17              And while the debtors have relied on certain general

18    statutes, first of all, I'm happy to go through them if it's

19    helpful, but in a nutshell, none of them deal with the

20    specifics of allowing a court to grant a release from liability

21    to the government.

22              And in the case *Law v. Siegel*, the Supreme Court has

23    said that the Code's meticulous -- not to say mind-numbingly

24    detailed -- enumeration of exemptions and exceptions to those

25    exemptions confirms that courts are not authorized to create

1      additional exceptions.

2            But that's what the Court did here, your Honor.  The

3      Court went well beyond anything in the bankruptcy code and

4      granted this exceedingly broad release.

5            THE COURT:  Mr. Fogelman, you have on the subject of

6      exculpation clauses and releases, you have said that

7      exculpation clauses are really just a subgenre of

8      non-consensual third-party releases.  But exculpation clauses

9      do not release unrelated claim.  They do the exact opposite.

10     They release claims stemming from actions taken in support of

11     the reorganization.

12            How do you reconcile that?

13            MR. FOGELMAN:  Well, your Honor, a release is

14     something that says a person is not liable for certain things.

15     The discharge is a release as to the debtors themselves.  But

16     when one looks to giving a release to others, non-debtors, what

17     an exculpation clause does is, and as it says here, a party is

18     not liable for certain actions.  And admittedly, it could be a

19     different set from a third-party release like in the *Purdue*

20     case where it was the pre-petition conduct that was at issue.

21            It is still a release.  A release is the power to

22     absolve somebody of liability.  And that is what the

23     exculpation provision does.  Whatever you call it.  It is

24     saying that parties are not liable to the government for

25     violations that they might -- that they might engage in, in the

N3N3VOYM

1    context of carrying out the rebalancing transactions and the

2    restructuring transactions.

3            So no matter how you slice it, it is a release of

4    liability.

5            Does that answer your Honor's question?

6            THE COURT:  Yes.  Yes, it does.

7            I want to talk a little bit about the government's

8    actual concrete concern with this transaction.  Judge Wiles,

9    and I'm paraphrasing here, but he seemed to characterize the

10   government's position as you're taking issue with trading in

11   cryptocurrency, which he has said that the reorganization here

12   requires purchases or sales of cryptocurrency.

13           And I believe that he thinks that that is what you

14   might be taking issue with, which is the very trading in

15   cryptocurrency.

16           And you have provided a laundry list of other types of

17   illegal conduct that could take place in connection with the

18   trading of cryptocurrency.  For example, you mentioned

19   violation of anti-money laundering laws, KYC, tax evasion, etc.

20           Which is it?  Are you concerned with those possible

21   illegal activities that could occur during rebalancing

22   transactions that are not necessarily related to crypto?  Or

23   are you concerned about the government's position now or in the

24   future relating to the actual trading in crypto?

25           MR. FOGELMAN:  Your Honor, I'm here to preserve the

N3N3VOYM

government's right to enforce the law.  And that applies both

to the transactions, whether it's regarding trading crypto

or -- I'm no expert in the crypto field.  It is obviously a

heavily regulated space.  There has been a lot of scrutiny,

given all the fraud that has been ripe in that sector.

        And so, you know, it's both, your Honor.  There may be

transactions that are contemplated in the plan that may be

illegal.  If the Court orders a party to do it, that doesn't

make the transaction legal.  And the government cannot be

hauled into court by the bankruptcy court and be forced to

opine within a four-month time frame that's helpful for the

business realities of the deal, that not what the Congress has

said the government's to do, which is to regulate, and to

enforce the law.

        I can't say one way or the other.  I'm no expert in

cryptocurrency itself.  But I can say that it is absolutely

improper for the bankruptcy court to, in advance, tell the

parties -- I'm sorry -- tell the government that it can't

enforce its laws.  And that can be the thing itself or that can

be anything to do with the carrying out of the thing itself.

The conduct that one engages in.

        And that's where, frankly, I am trying to come up with

hypotheticals, because this is future conduct.  That's part of

the whole problem here.  We don't know what's going to happen

or what the parties are going to do.  It's very possible that

N3N3VOYM

1   even if a party it (background noise) may be illegal or -- the

2   debtors take a lot of shots saying you haven't said what the

3   specific --

4           THE COURT:  Wait a second.

5           Mr. Fogelman, we are having a sound issue.  I can't --

6   I didn't hear your last few words, and I also think that we may

7   have been picking up on conversations not having anything to do

8   with this proceeding.  So people who are not speaking, please

9   mute your devices.

10          And Mr. Fogelman, why don't you back up a sentence.

11  Oh no.  We are not hearing you.

12          THE DEPUTY CLERK:  You have to unmute your phone,

13  Mr. Fogelman.

14          THE COURT:  Who can we help him?  Mr. Barnea, can you

15  e-mail or text Mr. Fogelman?  There you go.

16          MR. FOGELMAN:  I was on the phone.  I am going to hang

17  up because I know there is an echo.  I am trying to do this

18  through the computer audio now.  Can you hear me okay?

19          THE COURT:  Yes, we can.  If you can remember where

20  you were before that happened, I'll be impressed.

21          MR. FOGELMAN:  I wish I could.  I was answering your

22  Honor's question.

23          THE COURT:  What do you take issue with.

24          MR. FOGELMAN:  It's both, your Honor.  I'm not

25  prepared to say -- we can't opine.  It's been just a few months

N3N3VOYM

1    and for the Court to bring the government in and say you better

2    tell us now if this is illegal or not, and if you can't tell

3    us, you are going to be subject to this exculpation proceeding.

4    That is an abrogation of the executive function and of the

5    legislative function as we've argued before.

6              And does that answer your Honor's question?

7              THE COURT:  It does, it does, it does.  I'm going to

8    turn now to the debtors.

9              MR. FOGELMAN:  Okay.

10             THE COURT:  Who is going to speak for the debtors?

11             MR. HOWELL:  This is Rush Howell.

12             I don't know who that is.

13             THE COURT:  All right.  Go ahead, Mr. Howell.

14             MR. HOWELL:  Well, with that help from the background,

15   so, Rush Howell from Kirkland & Ellis on behalf of the debtors.

16   I want to thank the Court very much for your time and attention

17   for working through a lot of papers on short notice here.  It's

18   a very important issue for the debtors and for our creditors.

19   In fact, I think it's fair to say we do not see a path to

20   returning value to Voyager's customers if a stay is granted

21   here.  In other words, and I'll talk more about this shortly,

22   the exculpation provision is truly critical here.

23             I do want to address a couple of the questions that

24   you went over with Mr. Fogelman, and talk just a little bit

25   about some high-level points from our briefing.  But I do think

N3N3VOYM

it's important to take a brief step back and talk about how

these provisions works in the context of a Chapter 11 case.

Because a lot of concepts are being conflated here I think,

including that of third-party release versus exculpation, and

that can cause unnecessary confusion.

At a basic level, and I'm sorry if this is too basic a

level.  But as a Chapter 11 debtor in possession, we are tasked

with developing a plan of reorganization that will maximize the

value of the estate and allow for distributions to creditors.

And here, those distributions are going to be overwhelmingly to

the customers of Voyager.

And I've been involved in a lot of these processes.

Sometimes it's challenging, sometimes it's simpler.  But this

one was a uniquely challenging case.  As was well-publicized,

we had a deal with FTX before FTX's massive and shocking fraud

caught us up along with other victims.  That deal was hard to

get to, and it was even harder once FTX blew up.

But we pivoted to the current plan here, one that

contemplates a deal with Binance, with a toggle to a

self-liquidation, if necessary.

And preparing, executing, soliciting this plan took an

incredible amount of work, and implementing this plan will as

well.  And always at the core of that was an effort to get the

largest possible in kind distribution back to Voyager's

customers.  Because, for a number of reasons, those customers

N3N3VOYM

1    want to receive cryptocurrency back in the same form that they

2    had put it into Voyager.  And that required a ton of

3    negotiation, very long auctions, etc.  It took many months

4    dealing with many constituents.  We engaged with the government

5    throughout the process, many different governmental entities

6    made information requests and so forth.

7            None of those government entities have ever come

8    forward and said the plan as it's contemplated now is illegal,

9    doesn't fit within the bankruptcy code.

10           And critically, any plan will require both rebalancing

11   and distributions.  The rebalancing is simply we have to get

12   the right distribution of cryptocurrency, like, we have a

13   little bit too much on a relative scale of Bitcoin and a little

14   too little of Ethereum.  We need to make trades to rebalance

15   that to effectively make distributions.  And of course, any

16   plan will require those distributions.  And that rebalancing

17   and that distribution, that's not optional.  It's necessary for

18   the plan to be effective, and it is in fact ordered to be

19   performed by the Court.

20           And those orders are not given lightly.  It was only

21   after the Court assessed the plan, heard multiple objections,

22   took four days of testimony, and determined that we could go

23   forward.  And that's why having an exculpation here for

24   implementation of the plan, for that rebalancing and

25   distribution, is appropriate and critical.

N3N3VOYM

1          The government likes to lump the third-party releases

2     and exculpation together.  They are distinct concepts.

3     Exculpation generally insulates professionals and estate

4     fiduciaries and sometimes others.  It proclaims relating to the

5     plan, including frequently implementation of the plan.

6          Exculpation encourages robust participation in the

7     Chapter 11 process.  It's focused on post-petition conduct, and

8     it's not generally controversial.

9          Now, often there will be objections, including

10    objections by United States Trustees Office about the scope of

11    the provisions.  But, you know, that's not unusual, and often

12    they're overruled, and these types of provisions are

13    commonplace.

14         I think Judge Wiles said at one point, in one of the

15    arguments, said he had seen hundreds or thousands of them.

16         And exculpation is not controversial precisely because

17    you cannot task people to develop and negotiate a plan of

18    reorganization, then order those same people to implement that

19    plan, and say, yeah, but, you know, look, you may face civil

20    fines or criminal liability for doing what I found to be

21    appropriate, and am now ordering you to do.

22         THE COURT:  Mr. Howell, I don't believe I've seen

23    anyone argue that the entire value of the deal would be lost

24    without the exculpation provision.

25         Is that your position?  Can't that be priced in?

N3N3VOYM

1          MR. HOWELL:  We don't think so, your Honor.  Because

2     if you think about this specific process, what happens with an

3     exculpation.

4          If a stay is granted, then the Court has found that

5     it's substantially likely that the government's going to

6     prevail on the merits, and there is not going to be an

7     exculpation.  And the government, although they will not

8     specifically articulate or enumerate what they think actually

9     might happen that's going to be wrong, they've nonetheless made

10    quite a stink about it, saying, look, we need the right to sue

11    criminally, civilly, etc.

12         So, if we don't have the exculpation, and if there is

13    a stay, then we don't think that the folks that have to do that

14    work in a Binance deal are very likely at all to say we'll take

15    the risk.  We'll subject ourselves to potential criminal

16    liability, and go forward with the distributions to the

17    creditors.

18         THE COURT:  So you're giving me your speculation.

19    There is no evidence that the purchasers, first going back to

20    late last year, FTX, and now Binance, would not have entered

21    into this transaction but for the exculpation clause.

22         MR. HOWELL:  We don't have a record on that, your

23    Honor, because the issues weren't brought up.  They weren't

24    cross-examined.  The government never raised the issues until

25    the end of the confirmation where we might have put on somebody

N3N3VOYM

1    from Binance or what have you to say that.

2            But we see that the government is making those

3    threats.  And if the Binance deal goes away, it pivots to a

4    self-liquidation.  And we as advisors would not advise the

5    estate professionals to engage in the actions necessary to

6    rebalance and distribute, with this sort of risk of liability

7    overhanging.

8            So now you are in a Chapter 11 where you have that

9    problem where we don't think anybody would be willing to take

10   on these actions.

11           THE COURT:  Don't crypto companies buy and sell each

12   other all the time without exculpation clauses?  Binance was

13   set to purchase FTX in November of last year, without the

14   protections of an exculpation clause, only to refrain from

15   proceeding, at least as stated publicly, due to concerns about

16   the investigation and potential fraud on FTX's part, and not

17   due to the nature of the transaction itself.

18           MR. HOWELL:  Well, at that time, the anticipation

19   would be an exculpation associated with any distribution made

20   associated with that transaction the FTX.

21           The exculpation provision listed at that point in time

22   was broader than the one that's at issue here.  There would

23   have been an expectation of that protection.  And generally

24   speaking, the fact there may be transactions out in the

25   marketplace, this is different.  This is something where it's

N3N3VOYM

1    not option forward.  It is ordering these professionals to

2    follow along.

3         These aren't, in many instances, we are not talking

4    about folks who would get the economic benefit of the

5    transaction anyway.  These are folks like a plan administrator

6    or what have you that are going to make these distributions.

7    And the government is saying you could well have a problem.  We

8    can't tell what you it is, but you could well.

9         And we don't think and we wouldn't -- I don't think we

10   could advise to say, no problem, just hold your nose, go

11   forward, and see what happens with respect to the government.

12        If there isn't a stay, and we have the exculpation

13   provision, then I think we're in a totally different risk

14   scenario.  And that's why we truly believe this is a critical

15   issue.

16        THE COURT:  But just to clarify, what would be the

17   harm in lifting the stay, except as to the exculpation clause,

18   and allowing the transaction to close?

19        Why is that not a solution?

20        MR. HOWELL:  Your Honor, I think that has the exact

21   same problem.  Because, if the stay is not lifted as to the

22   exculpation provision, setting aside exactly the operation of

23   how you would do that, then the high burden could be reached to

24   say we think there needs to be a stay with respect to

25   exculpation, so it's likely not to succeed on the merits

N3N3VOYM

1   ultimately.  And we think that would have the exact same

2   chilling effect.

3          We think that even though, yes, we would be allowed to

4   go forward with the transaction.  So if you stay everything, we

5   can't do it.  Right.  It just can't happen.  If we stay just

6   that, we could go forward with the transactions, but that's

7   exactly the circumstance I was describing before, where we

8   would be entirely chilled by risk that civil, criminal

9   liability could associate.

10          THE COURT:  But, so I just want to be clear on this.

11   So do you think that if the stay were lifted, except as to the

12   exculpation clause, and the rest of the transactions were

13   allowed to close, that the parties would back out?  Would they

14   be free to back out?

15          MR. HOWELL:  Yeah, I don't think that we would -- we

16   would see the -- the rebalancing occur.  I don't think that

17   would occur.  I don't think the distributions would be made.  I

18   think Judge Wiles asked that question, and we said we thought

19   it would require discussion to see exactly how it would come

20   about.  And Binance would have the ability to walk away, I

21   think as of April 18, I believe is the date, and we expect they

22   would.  And then we think in the toggle plan we wouldn't go

23   forward with making distributions with that level of risk

24   associated to it.

25          THE COURT:  All right.  I'd like to hear from the

N3N3VOYM

1    committee as well if the committee wants to be heard, but so

2    long you're finished, Mr. Howell.

3         MR. HOWELL:  Your Honor, I'm happy to spend a little

4    bit of time walking through certain points related to some of

5    the elements.  I think I've got some key points, but I'm

6    mindful of the time and the time your Honor has already given.

7    So, I'm happy to do either way.

8         THE COURT:  Why don't you tell me the rest of what you

9    want to tell me.

10        MR. HOWELL:  Sure.  Thank you.

11        So, as I was saying I think this demonstrates why

12   exculpation provisions are the norm.  And it is especially

13   important here where the governmental entities are effectively

14   threatening, we may well come after you for who knows what

15   exactly.  But, you could have a problem.  And that's on

16   transactions that have been found to satisfy the requirements

17   of the bankruptcy code.

18        We don't agree with this concept that, hey, you know,

19   you've had four months, that's enough time to articulate

20   whether or not you think these transactions are appropriate or

21   inappropriate.  They've had ample opportunity, they have been

22   looking at this for far longer than going back to the start of

23   this transaction in last July.  And the idea that, you know,

24   that they just can't -- they get this ultimate reservation of

25   rights is remarkable to us.

N3N3VOYM

1          We heard it again today.  We heard again, this is

2     hypothetical.  We heard again, we want to presolve the

3     government's rights.  So that takes me into irreparable harm.

4          Quickly through the elements with respect to

5     irreparable harm, the government argues that this prong is

6     actually collapsed with the public interest prong.  We

7     disagree.  We think that argument kind of tips the government's

8     hand that they know they're very weak on irreparable harm.  But

9     irreparable harm has to be actual, full, and imminent.  Here

10     the government has admitted in the argument beneath that it's

11     only in a hypothetical world that they might even bring an

12     action against an exculpated party.

13          Hypothetical preservation, those are the furthest

14     things from actual and imminent.

15          And the government really is just saying equitable

16     mootness is our irreparable harm.  But that's a problem because

17     case after case, as we cited, say that equitable mootness is

18     not enough to constitute irreparable harm.  That's all they

19     really have.

20          And I think if you look at the March 15 hearing

21     transcript, I think it's pretty informative on several points.

22     One thing that struck me there is when pressed that equitable

23     mootness is really the harm here, the so-called irreparable

24     injury, the counsel for the government didn't push back on that

25     point.  It's only now we hear this kind of law exam cocktail of

N3N3VOYM

1    the abrogation of the executive function and loss of sovereign

2    immunity.

3              But they can't tell you a single thing that they want

4    to do that they can't because of the exculpation clause, and

5    instead, this is just a reservation of rights.

6              On likelihood of success, I think we have gone into

7    this on plenty of detail in the brief.  But we disagree there

8    is no statutory authority.  Court after court after court has

9    determined in issuing confirmation orders with these

10   exculpation provisions, they say, look, it's only 1125(e)

11   solidification of a plan, or only 524(g).

12             That argument just proves way too much.  We have

13   hundreds, if not thousands of exculpation orders, many over

14   governmental objection, and they don't tangle with that case

15   law.  They say that's all wrong because it doesn't address

16   these constitutional arguments we are raising here.  And they

17   say ah-ha, you don't have a case where these specific

18   constitutional arguments are overruled.  And I say, well, you

19   don't have a single case where these constitutional arguments

20   were used to stop an exculpation clause.

21             Again, it's telling that the U.S. Trustee here, when

22   they saw a much broader exculpation clause, didn't say, your

23   Honor, what are we doing here, we're abrogating the executive

24   branch's role.  They said you need to more narrowly tailor this

25   specific to *Aegean*, which your Honor has ruled on in the past.

N3N3VOYM

1   That's ultimately what the Court did.

2            THE COURT:  Mr. Fogelman, can you respond to that

3   point, please.

4            MR. FOGELMAN:  Your Honor, first of all, I think the

5   debtors are absolutely wrong on the balance of harms.  The

6   government argued that not only is there a risk of equitable

7   mootness, but also that there is a substantial harm to the

8   public if the government is not allowed to regulate and to

9   enforce the law.  And that is a harm that is happening right

10  now, under this order that has not been stayed.  The government

11  is not allowed -- certain parties are released from liability

12  to the government.

13           Your Honor, in the case of *Maryland v. King*, the

14  Supreme Court case, 567 U.S. 1301, the court said that the

15  government will be prevented there from effectuating statutes

16  enacted by representatives of the people, meaning that the

17  government, and by extension the public, will suffer a form of

18  irreparable injury as a result.

19           So your Honor, there is harm to the government and to

20  the public.  There is harm to the public with the government

21  not being able to enforce the law.  There's harm to the

22  government in the abrogation of the separation of powers

23  doctrine, and yes, through equitable mootness as well.

24           The idea we will not be able to have these important

25  constitutional or statutory issues heard on the merits because

1    debtors will try to execute.

2          On the other side of the equation, on their side, it

3    is a little concerning that they keep saying we're worried

4    about doing something illegal here, so we are not going to do

5    the transaction without an exculpation clause.  What does that

6    mean?  Businesses evaluate the risks of transactions all the

7    time.  And it is very concerning that the debtors here are

8    saying we are not going to do anything unless we get a pass

9    that no one can possibly regulate us for what we are doing.

10          And your Honor, respectfully, that is not the type of

11   irreparable harm I don't think that balance is focused on.

12   They're in the crypto space, they're businesses well able to

13   evaluate if this is a transaction they want or should get into.

14   It is their choice, especially if the Court only grants a stay

15   of the exculpation provision.

16          If at the end of the day there are legal violations

17   from what they are doing and this exculpation provision is

18   unwarranted, well the government shouldn't be foreclosed from

19   pursuing civil, criminal, regulatory liabilities.  And just to

20   pivot back one moment --

21          THE COURT:  Mr. Fogelman, I am going to give you an

22   opportunity to do further rebuttal in a moment.  I'm going back

23   to Mr. Howell.

24          Mr. Howell, I'm not sure if I interrupted you.

25          MR. HOWELL:  No problem, your Honor.  Of course.

N3N3VOYM

1          And I don't think that really addressed the point

2     about the U.S. Trustee had the opportunity to and sought to

3     narrow it, not say these things are unconstitutional.

4          But I will just finish on balance of harms and public

5     interest.  And I know Mr. Evans on behalf of the committee will

6     likely speak to these issues as well.  But, we don't think --

7     we don't think it is very close when it comes to the balancing.

8     On the one hand, you have the government that either cannot or

9     will not articulate an actual objection to these transactions.

10    They claim a hypothetical harm they may one day decide to

11    pursue these exculpated parties, which is a very narrow

12    provision, and each time we get into the back and forth we

13    start to hear how we are blocking their ability to regulate and

14    put in their police powers.  We're not.  This is a narrow

15    exculpation clause targeted only to what's been followed in

16    this district time and time again, and in many other circuits

17    as well.

18          And they even say, look, even if we were to bring

19    that, we know that you may well have an immunity, qualified

20    immune response to that.  That's the harm they're protecting

21    against.

22          On the other side, you have a million customers that

23    have been waiting to receive their crypto since last July,

24    crypto that sometimes makes up the bulk of the life savings for

25    some of these customers.  And if the stay is granted, we

N3N3VOYM

1   believe that Binance cannot -- they can't close, and we believe

2   that Binance is very likely to go away, costing $100 million --

3   that is in the record, that is unrebutted, that's the value of

4   the Binance transaction vis-a-vis toggling to the

5   self-liquidation.

6          But even if we go to a self-liquidation, the harm

7   there -- again, unrebutted -- is the fees associated with

8   remaining in this would be tens of millions -- or $10 million a

9   month, roughly, leaking out of the estate due to expenses, to

10   say nothing of the risk associated with fluctuations of the

11   rebalanced crypto, much of which has already been done.

12          And I doubt the government is going to say, hey, we'll

13   post a bond to protect the customers against the fluctuation in

14   crypto while we get to what we think is a clearly losing

15   appeal.  So the estate will dwindle.  That's if the crypto is

16   ever distributed, as I said before.

17          As to the public interest, we think that the public

18   interest is for bankruptcies to be efficient, and for finality,

19   and for distributions to be made.

20          I've already talked about, your Honor, so I won't

21   belabor the point, but we think there is a very real risk that

22   if a stay is granted here, we will not be able to move forward

23   with the transaction.  And we think it will have impact on

24   multiple other bankruptcies.  It may be heightened here where

25   you're talking about a situation where the government has

N3N3VOYM

1    specifically said, hey, you know, we're watching you, we just

2    won't say whether or not you are actually doing anything

3    illegal or improper.  But in other -- it can't be that there is

4    just this asterisk on all future confirmation orders that says,

5    hey, estate professionals, I know you are doing this difficult

6    work to implement the plan, and you think there is exculpation,

7    but there is one party you are not never going to get it from,

8    and that's the government, and they can fine you or put you in

9    jail for something that the Court told you to do.

10          We think that would be chilling, not just on this

11   case, but on other cases in the future.

12          So that's it.  Thank you, your Honor.

13          THE COURT:  I have a question for Mr. Howell, then

14   I'll go to you.

15          Mr. Howell, you said that exculpation provisions are

16   the norm I think you said.  But, provisions that exculpate from

17   liability to the government are not the norm, are they?

18          MR. HOWELL:  Right.  I think we cited multiple cases

19   where there is no specific carve-out for the government.  So I

20   couldn't tell you, your Honor, it is a fair point, I couldn't

21   tell what you percentage of the exculpation provisions in the

22   Southern District of New York over the past 5 or 10 years

23   involve a government carve-out, versus ones that didn't.  We

24   looked at several, and I saw quite a few where there wasn't a

25   government carve-out.  I saw some that did have a government

N3N3VOYM

 1     carve-out.  So it is imprecise for me to say what exactly is

 2     the norm.

 3             But I think it is certainly not uncommon to have

 4     exculpation provisions that do not have a carve-out from the

 5     government in this district, in this circuit, and in other

 6     circuits as well.

 7             THE COURT:  Ms. Levene, I'm mindful of you.  I was

 8     going to go to Mr. Evans next and come back to the government.

 9             MS. LEVENE:  That is fine.  I wanted to make sure I

10     had some remarks on behalf of the United States Trustee, so I

11     wanted to make sure I got my turn.  But I'm happy to wait.

12             THE COURT:  Certainly.  All right.

13             Mr. Evans, would you like to be heard on behalf of the

14     committee?

15             MR. EVANS:  I would.  Thank you, your Honor.  Joseph

16     Evans on behalf of the Official Committee of Unsecured

17     Creditors.

18             Just to give some background.  The committee consists

19     of seven individual customers who are appointed by the U.S.

20     Trustee to represent the interests of all unsecured creditors.

21     And I think it's important to note who our creditors actually

22     are.

23             Our unsecured creditors are over a million retail

24     customers.  They're almost all retail with 64.9 percent losses

25     derived from accounts between 1,000 and $100,000.

1          Since the bankruptcy, our constituents' crypto have

2     been locked up for 261 days.  These individuals have filed

3     letters with the court.  Some can't pay mortgages, some lost

4     college trusts for children, some can't pay basic expenses like

5     car loans.  They badly need their crypto back now.

6          After a lengthy confirmation hearing, the plan was

7     confirmed that in our view represents the best possible option

8     for the creditors.  They'll receive their crypto back, and they

9     would receive an additional $100 million of value if the

10    Binance deal closes.

11         The government had every opportunity to provide

12    evidence of illegality at the hearing.  They didn't do so, and

13    now they are seeking to stay and delay the recovery further.

14         The crypto transactions at issue are pretty

15    straightforward.  The rebalancing is just our effort to give

16    the customers back the crypto they already held in the

17    platform.  So the customer had a particular type of crypto,

18    they want to receive the same type of crypto back.  That's all.

19         The Binance transaction, they'll act as the

20    distribution agent, and customers will be able to log in and

21    withdraw their crypto.  There is not some fancy crypto trade

22    options derivative, or set up a new type of organization.

23    These are straightforward crypto transactions.

24         And I want to be pretty clear on our view what the

25    government is seeking to do.  The government has not that said

N3N3VOYM

1    that any of the transactions are illegal.  Their tactic is to

2    attack the exculpation clause.  They are hoping to scare the

3    professionals, the law firms and the accountant firms and the

4    investment banks, to not do the transactions, because they're

5    scared to do them.

6           We don't have a choice.  We're compelled.  11 U.S.C.

7    1122(a) requires us to do these transactions.  And on your

8    question as to, well, what we do if we didn't get the

9    exculpation clause and why is it so necessary here when others

10   in the market are trading.

11          Judge Wiles held in his confirmation decision that the

12   professionals are entitled to know that they will not incur

13   liability just for doing what I've approved and required,

14   particularly when the SEC and all other government agencies had

15   a full and fair opportunity to argue that the transactions are

16   illegal in any way, and have not made any such contentions.

17          The government claims that the exculpation clause will

18   prevent it from enforcing all federal and state laws to protect

19   the public health, public safety, and welfare.  That's just

20   wrong.  The government has every opportunity to stop illegal

21   transactions.  Its option is to lay in wait and decide months

22   or years later whether some of these transactions are legal or

23   not, and decide whether to pursue a professional individual,

24   individuals who are required to complete these transactions.

25          And the language in the exculpation clause is pretty

N3N3VOYM

1     clear.  It says nothing in this provision shall limit in any

2     way the power of any governmental unit to determine that any

3     balancing transaction should be stopped or prevented.

4          And Judge Wiles held he could not have said any more

5     clearly that the government is free at any time to take action.

6     So the language, as Judge Wiles made clear, the government can

7     protect the public.  They can seek to stop or enjoin any crypto

8     transaction if it decides to do so.  They are not actually

9     seeking to prevent their right to stop crimes.  The government

10    believed that a particular crypto at Voyager was a security or

11    that it was a product of money laundering, there was some harm

12    to the public for distributing it, they have every opportunity

13    to come and try to stop the transaction.  Judge Wiles told them

14    that any number of times.

15         If the government believes that Binance is some

16    criminal enterprise and just transferring crypto to them harms

17    the public, they can come in and stop that transaction too.

18    They can try, but they haven't.  Why not?  It's because then

19    the government would actually have to do what it has not wanted

20    to do for over a decade, which is take a firm position on what

21    is and what is not legal in crypto.

22         They haven't offered evidence that something is

23    illegal.  It hasn't done it.  And so what their strategy is, is

24    scare the professionals so we won't execute transactions.

25         It matters more in crypto cases, because the

government is not telling us what is legal and what's not.  So

it's scary, to say the least, when the SEC staff, but not the

Commission, comes in and says this may be a security.  Or when

the DoJ comes in and says I want to preserve my right to

prosecute individuals just for doing what the judge told you

you have to do.

That's what it's stopping.  That's why this

exculpation provision is so important.  Judge Wiles referred to

the government's arguments as a strawman, and he's right.  The

government says that there might be tax fraud, securities

fraud, a host of other crimes.  None of those are covered by

the exculpation clause.

And Judge Wiles tells that the government argues that

my order might be somehow interpreted as immunizing fraud or

tax claims.  I do not believe that the government actually

thinks my order has such effect.  Or anyone could basically

contend it has such effect.  We agree.

We have over a million customers who definitely need

their crypto back, and the government is coming in trying to

stop over a billion dollars going to them.  And your Honor

asked them a very good question.  What's the actual issue that

the government has with the transactions.  The government said

he is not prepared to say.  The government also said twice they

are not experts in the crypto field, and don't know what

potential crimes there may be.

N3N3VOYM

1          So they want to stop a billion dollars going to people

2     who desperately need it, in the biggest cryptocurrency

3     bankruptcy plan issued to date.  And they say they are not

4     experts, and they can't articulate what's wrong.

5          That's not very comforting to our constituents who

6     need to make rent and pay their mortgages.

7          On the equitably moot point, the government argues

8     that we are effectively taking away their right to appeal,

9     because it will be equitably moot if there was a ruling that

10    the stay is not issued.

11         They have another option.  They could have took this

12    time that they spent filing this appeal and this motion to

13    stay, and they could have attacked the legality of the

14    transactions.  They can do that now.  They have another option.

15    And the government argues that they didn't have any time to

16    determine what was legal and what's not.

17         These transactions are not unique.  Binance has been

18    around and been a licensed money transmitter since 2019.  It

19    has 40 licenses across the United States.  The cryptocurrency

20    traded at Voyager were traded at many other crypto exchanges,

21    some of them for five, six years.  These are not surprise

22    issues.

23         Judge Wiles noted that the government admitted it was

24    hypothetical they would actually go after anyone who was

25    operating under plan.  That's really odd to us, because they

N3N3VOYM

1    are seeking to withhold the money that our customers

2    desperately need, but it almost seems academic, like a policy

3    driven argue that we want to preserve our right.  We don't know

4    what's wrong here, but maybe something is.

5             The government claims it must be permitted to protect

6    the citizens, but who are we really trying to protect?  It is

7    not the unsecured creditors.  They were the only ones who would

8    be impacted by the distributions.  We can't wait for the

9    government to pick and choose and decide how to regulate

10   crypto.  These are not banks, financial institutions, or hedge

11   funds.  These are people who need to pay the rent and they've

12   waited long enough.

13             THE COURT:  Mr. Evans, did you say that your

14   understanding is the exculpation provision does not cover

15   improper conduct that's not necessarily related to crypto, such

16   as tax evasion, violations of the anti-money laundering laws,

17   violations of KYC?

18             MR. EVANS:  Correct.  My understanding of the

19   exculpation clause, it did not cover willful misconduct, gross

20   negligence, or anything else that's not required to effectuate

21   the transaction under the plan.  I think Judge Wiles was quite

22   clear on that subject.

23             THE COURT:  All right.

24             Ms. Levene.

25             MS. LEVENE:  Thank you, your Honor.  I suspect

N3N3VOYM

1    Mr. Fogelman has some points he wants to make.  Mr. Fogelman,

2    do you have a preference?

3             MR. FOGELMAN:  I am happy to go after you.

4             MS. LEVENE:  May it please the Court, your Honor.

5    Beth Levene with the United States Trustee.

6             I represent the United States Department of Justice

7    official and the United States Trustee's job is to be a neutral

8    watchdog on the bankruptcy system.  And I wanted to talk a

9    little bit about why the United States Trustee objected here.

10            And first of all, I want to be clear, the United

11   States Trustee did object here.  The exculpation clause went

12   through a lot different iterations.  The United States Trustee

13   was consistent in objecting, in particular, because it's

14   overbroad, and include people who are not estate fiduciaries,

15   and because it applied to future conduct, which is really

16   problematic.

17            And here, in particular, it's not just the government

18   that the exculpation clause applies to.  It applies to

19   everyone's claims.  And there is a carve-out for fraud and

20   willful misconduct in one paragraph for some transactions, but

21   there is not that carve-out for another set of transactions.

22            But, whichever way you look at it, and, you know,

23   whether it is a cryptocurrency case or not, the objection is

24   because there is no code authorization, as Mr. Fogelman talked

25   about, there is one code provision, and one code provision

N3N3VOYM

only, that addresses limitations of liability for conduct

post-petition.  That's 1125(e), and it is very specific.  It is

specific as to the conduct, it is specific as to who gets it.

         There is nothing else in the code that provides any

protection for post-petition conduct, particularly not for

post-effective date conduct, conduct occurring after the

supervision of the bankruptcy court ends.  If Congress intended

to allow exculpation of future conduct, you would expected

clear language, particularly if it meant to authorize an

Article I judge to limit the government's right to investigate

and enforce the laws.

         And the exculpation clause here also goes well beyond

what can be justified based on any theory of applied immunity

for estate fiduciaries.  That's because it exculpates more that

just the state fiduciaries, including the purchaser, including

entities that don't exist yet, like the wind-down debtor and

the plan administrator.  And it exculpates for future conduct.

Conduct that's going to occur after the case is no longer under

court supervision.

         And most problematically, it harms the public interest

by interfering with the government's regulatory and police

powers, and all of that is irreparable harm.  And it becomes

irreparable if there is no appellate review.

         Now, we don't think equitableness should apply.  But

the debtors have made it clear that they plan on trying to

N3N3VOYM

1    dismiss this case on that ground.  They want to go so fast that

2    no Article III court can review this.  They said, oh, there are

3    hundreds and thousands of bankruptcy courts that do this.  It

4    is often over the government objection.  But that's all the

5    more reason why it shouldn't evade review.

6         All those cases -- there is no Second Circuit case

7    addressing exculpation clauses.  There is no appellate case

8    that says exculpation clauses like this is are permissible.

9    So, it is even more problematic if this case evades review.

10        Your Honor, we agree that just staying the exculpation

11   clause here would be appropriate.  It would allow the

12   distributions to go forward, if the debtor chooses.  As it's

13   been mentioned, Binance has been acting in this space without

14   any sort of advice from the government, without any advance

15   preclearance or promises they wouldn't be liable.

16        And the argument that the exculpation clause is more

17   limited than the actual words in the exculpation clause, what

18   it actually says, if it is really so limited, if it's really

19   limited to only what limitations of liability already exist in

20   the law, they're not losing anything from that not having that

21   provision.  And if there is so much more to it, then all the

22   more reason to think that it's not authorized.

23        And with respect to the stay, it sounded like -- I

24   heard Mr. Howell say one of the big problems, one of the

25   reasons people won't go forward if there is a stay is because

N3N3VOYM

1    it means the Court thinks there is a likelihood of success.  If

2    the Court thinks there is a likelihood of success, this is a

3    really problematic clause, which we think it is.

4          For those reasons, we would ask this Court for a stay

5    pending appeal.

6          THE COURT:  Thank you.

7          Mr. Fogelman.

8          MR. FOGELMAN:  Thank you, your Honor.  I would like to

9    address a few points.

10          First of all, the government is mindful that if an

11    enforcement proceeding should be brought, that there are still

12    affirmative defenses that individuals may try to raise.  They

13    would cite to, presumably, the findings of fact made by the

14    bankruptcy court in this case, the conclusions of law made by

15    the bankruptcy court.  And they would be free to argue for

16    whatever type of affirmative defense they think may be

17    appropriate, whether it's res judicata or collateral estoppel

18    or some species of qualified immunity, which I don't think has

19    been applied in the context of law enforcement, but that seems

20    to be what they are relying on.

21          And the idea that instead of an affirmative defense,

22    they should be entitled to some type of in advance release, it

23    just flips on its head all the law in this area.  Even when one

24    litigates the doctrine of absolute immunity or qualified

25    immunity, those immunities are based on factual examinations of

N3N3VOYM

1    what happened, an application of facts to the law, and if the

2    immunity defense is appropriate.

3            So for example, think about a police officer who might

4    execute on a search warrant, and maybe get court approval for a

5    search warrant.  You wouldn't expect a court in advance to say,

6    well, because there is a species of qualified immunity

7    associated with what you are doing, I am going to in advance

8    say you are released, I'm going to release you from any

9    liability for the search you are about to conduct.  That's not

10   how it works.

11           It is the obligation of whomever may assert some type

12   of immunity, be it qualified or absolute, to make their case in

13   a subsequent proceeding.  And nothing prevents the defendants

14   here -- I'm sorry, I apologize -- the debtors here from

15   asserting any type of affirmative defenses that they may have.

16           THE COURT:  But, I want to go back to something that

17   we hit earlier in this proceeding, which is my question about

18   whether this issue would evade review if there was a collateral

19   attack, if the government prosecuted.  I'm not clear on what

20   your answer is to that question.

21           MR. FOGELMAN:  Well, your Honor, I think it's -- I

22   can't predict what a future court would do.  But, there is a

23   doctrine of equitable mootness in this district, in this

24   circuit.  And we're very concerned that it may be applied here

25   to bar a consideration of the merits of the arguments we have

N3N3VOYM

1  here.  And that my concern is there could be a later proceeding

2  where we will not have had the chance to have raised these

3  issues here, and we will be barred from doing so.

4       I haven't heard the debtors or the U.C.C. say we'll

5  waive any arguments about equitable mootness.  They are

6  aggressively trying to use it against us.  They've stood up and

7  said we want to get through this stay motion and close this

8  deal and equitably moot the whole thing.  That's what we're up

9  against.

10       I can't say for certain what a subsequent court would

11  do, but there is a substantial risk and there is substantial

12  harm to the government in not being able to enforce the law and

13  protect the public.

14       Your Honor, the idea that a criminal proceeding

15  couldn't be brought because a bankruptcy court said so, and a

16  bankruptcy court has no jurisdiction at all -- period -- over

17  any criminal matter, how could an Article I bankruptcy court

18  tell the government it's barred from bringing a criminal --

19  people are released from criminal liability to the government.

20  When a bankruptcy court has absolutely no power over criminal

21  enforcement matters.  And that gets back to our -- it is

22  assuming the powers of the executive branch that the court

23  doesn't have.

24       And your Honor, I just would like to make this point

25  about exculpation itself.  There is a lot of cases that have

1    been cited.  I've done my best to read all of them, as many as
2    I possibly could.  What comes through in the sense of
3    exculpation, what it seems to be really about, in essence, is
4    this concern over sour grapes as we called it in our brief.  It
5    is about preventing parties from fighting with each other after
6    a bankruptcy case is done, after the judge has made
7    determinations about the res of the estate, and what's going to
8    happen it.  Here is a quote from one of the debtor's favorite
9    cases, *LATAM Airlines*, 2022 WL 2206829.  "exculpation
10   provisions are frequently included in Chapter 11 plans because
11   stakeholders all too often blame others for failures to get the
12   recoveries they desire, seek vengeance against other parties,
13   or simply wish to second guess the decision makers."

14          Likewise, in the *Blixseth* case from the Ninth Circuit,
15   they said that "The purpose of exculpation is to allow the
16   settling parties... to engage in the give and take of the
17   bankruptcy proceeding without fear of subsequent litigation
18   over any potentially negligence actions in those proceedings."

19          I think what's at the heart of this doctrine is not at
20   all about the government's ability to enforce the law.  It is
21   about commercial parties in a case who are having their ability
22   to recover funds from the estate from relitigating those issues
23   after the fact.

24          The idea that this doctrine is going to be used to
25   block the government's law enforcement abilities is crazy.

1          And your Honor, you asked before about a release

2     versus exculpation.  I wanted to point out there are two courts

3     of appeals, the Fifth Circuit and the Tenth Circuit, that have

4     prohibited exculpation outright.  And the reasoning of those

5     cases is similar to the reasoning of cases that find there is

6     no statutory authority in the code for a non-debtor release.

7     Again, no matter how you slice it.  It is exculpation or

8     non-debtor release, there is no authority in the bankruptcy

9     code for that release.

10          THE COURT:  Mr. Fogelman, what is your answer to the

11     question I asked Mr. Howell earlier about whether provisions

12     that exculpate from liability to the government are the norm?

13          MR. FOGELMAN:  I had never seen what the debtors tried

14     to do here.  Which is, on the day the confirmation hearing

15     started, March 2, this is -- let me just back up a moment.

16          Back on February 28, okay, before the confirmation

17     hearing started, there was a proposed order confirming the plan

18     that carved the government out expressly from exculpation or

19     releases.  And I believe we learned during the bankruptcy

20     proceeding that that was requested by the FTC and put in.

21          My office in other cases, sometimes we do, if there is

22     a case where we are involved in, we may ask for similar

23     language that makes clear that there is no -- nothing from the

24     government.

25          But what I've never seen, your Honor, is what they put

N3N3VOYM

1   in on March 2, the day the confirmation hearing started.  Here

2   is what they put in their proposed order.  That the United

3   States, the state, and their agencies, may not, and will not,

4   allege that restructuring transactions are a violation of any

5   rules or regulations enforced by the United States, the states,

6   or any of their agencies, nor will they bring any claim against

7   any person on account of or relating to the restructuring

8   transactions.

9        And it goes on:  No government will allege that the

10   restructuring transactions are a violation of any rules or

11   regulations enforced by the United States, the states, or any

12   of their agencies, nor will they bring any claim against any

13   person on account of or relating to the restructuring

14   transactions.

15        That is incredibly aggressive language expressly

16   telling the government what we can't do.  That's when we took

17   issue and objected right away, your Honor.  Because that is

18   beyond the pale.  That is far different from a, you know, and

19   again we have to pick our battles on these, but sometimes

20   someone may say to the extent applicable by law, blah, blah,

21   blah, and we have to necessarily pick our battles.

22        But here, where they aggressively are trying to

23   expressly prevent the government from regulating and from

24   enforcing the law, where the bankruptcy judge said,

25   essentially, that if we wanted to bring a criminal case, that

N3N3VOYM

1    was sort of beyond the pale.  That we have to stand up and

2    defend our right to enforce the law.

3            THE COURT:  One second.

4            Mr. Howell, if the exculpation clause is so important

5    to this deal, the case started in July of 2022, how did you get

6    all the way to March 2 with the government carved out?

7            MR. HOWELL:  No, we did not.  Let's be clear about

8    that.  And you can see in the March 15 hearing transcript some

9    of the back and forth related to this.

10           But the exculpation provision did not have a

11   government carve-out.  It was only in one proposed draft of the

12   confirmation order that came much later.  So, in July, on the

13   original plan, and then October, in the followup FTX plan and

14   December, etc., there was a broader exculpation provision than

15   we ultimately have now, that the government -- that the DoJ did

16   not object to.

17           It is true the U.S. Trustee objected to it.  But did

18   not say you ought to eliminate it, this thing is

19   unconstitutional.  And instead they said you ought to narrow it

20   to what you did in *Aegean*.  And that's what they did.

21           When they said they have to pick their battles, they

22   chose not to pick a battle with a much broader exculpation

23   clause than ended up being here.

24           And respectfully to Mr. Fogelman, it doesn't matter

25   what was proposed and not ultimately ordered by the Court in a

N3N3VOYM

1   back and forth in late February and early March.  What matters

2   is the exculpation provision that the Court has ordered here,

3   which is much narrower than what we asked.

4         And frankly, Judge Wiles takes a view that the

5   exculpation provision should be narrow, and he had a narrow one

6   in *Aegean*, and he had a narrow one here.  And the arguments

7   with respect to there is never government carve-outs, that's

8   just not true.

9         THE COURT:  When was the language stating that

10   exculpation would not apply to the government deleted?

11         MR. HOWELL:  Okay.  I believe that -- I believe it was

12   February 26 where there begins to be engagement on further

13   proposed language that included a proviso with respect to the

14   government carve-out, and then I believe it was on March 2nd.

15   So that's the first time I believe -- I'll have to double

16   check, but I believe that's the first time where there is

17   discussion of a government carve-out.  And then that was taken

18   out on March 2nd.

19         It is true on March 2nd we proposed a broader

20   exculpation provision than we had originally, and the Court did

21   not authorize that exculpation provision, and instead narrowed

22   it significantly to what is now before your Honor.

23         THE COURT:  Thank you for that.

24         Mr. Fogelman, let's go back to you.

25         MR. FOGELMAN:  I did want to respond to one point to

N3N3VOYM

1  make sure I'm answering the question clearly.  I think if there

2  was a subsequent enforcement proceeding, the debtors would

3  argue that any arguments we had would be barred by the doctrine

4  of res judicata from what's happening in this proceeding,

5  should we tried to enforce.  And in addition, I believe there

6  are cases that find you can't collaterally attack a bankruptcy

7  court's order.  And so if we tried to, again, bring an

8  enforcement proceeding, I am sure that's the number one

9  argument we are going to hear from the other side, is we're

10 collaterally attacking what the bankruptcy court did.  And that

11 we didn't go through the appeals process, which is exactly what

12 we're trying to do here to forestall any of those arguments.

13         THE COURT:  All right.  Thank you.  Thank you all.

14         Is there anything else anyone would like to be heard

15 on before we adjourn?

16         MR. HOWELL:  I would like to make one short point,

17 your Honor, if that would be okay.

18         THE COURT:  Yes.

19         MR. HOWELL:  And that is, there's been a fair amount

20 of discussion about, hey, what's the purpose of the exculpation

21 provision, and also, hey, these guys like Binance are big boys

22 and they're out there, they make these kind of transactions a

23 lot, etc.

24         And I want to be clear that I think Judge Wiles laid

25 this out in great detail in both his order and in argument.

N3N3VOYM

1    But that at the core of the exculpation provision is protecting

2    people who are required to take action under his court order.

3    Under 1142, they have to do it.  And protecting them from

4    subsequent liability for doing that.

5          And I want to be clear it's not just Binance here.  If

6    it goes to a toggle plan, then you have the plan administrator

7    that's at risk here.  And it's estate professionals, folks like

8    investment bankers who are involved in the rebalancing

9    transaction.  So it's these professionals who have significant

10   risk to them, to want to carry these things out.

11         Even beyond that, if they won't do it, right, and you

12   convert to a Chapter 7, what is -- the government has said the

13   objection would remain in place, whether it's a toggle plan or

14   a conversion to a Chapter 7.  And you have a Chapter 7 trustee,

15   why would the Chapter 7 trustee be willing to take on this risk

16   either.

17         So we really do think this would turn bankruptcy

18   practice on its head.  Because everybody would be worried that

19   the government has this automatic carve-out, and there would be

20   some cases where there is no concern there.  But in many, many

21   cases, certainly including this one, where the government has

22   said we may come after you, there is risk there.

23         So I wanted to be clear it's not just sour grapes

24   litigants, and it's is not just Binance that we are protecting

25   here.  It is professionals involved in doing this sort of work

N3N3VOYM

1   in this case and in others.

2          Thank you, your Honor.

3          THE COURT:  All right.  Thank you all for the details.

4   I have a request which is that I would like you to order the

5   transcript, and it would be very helpful to the Court to have

6   it on an expedited basis.

7          MR. FOGELMAN:  Your Honor, might I ask a question?

8          THE COURT:  Yes.

9          MR. FOGELMAN:  I know the stay is set to expire on

10  Friday at 3 o'clock.  We obviously don't know what the Court is

11  going to do.  But, we would just ask that, to the extent that

12  there is more time that's needed to render a decision, that the

13  Court continue some type of administrative stay so we don't run

14  the risk that the transactions proceed, and then we may be

15  subject to arguments of equitable mootness.  And to the extent

16  the government doesn't prevail here in seeking a stay, we would

17  respectfully request an opportunity to pursue relief in the

18  Second Circuit, and for the Second Circuit to have an

19  opportunity to evaluate and decide the issue as well.  And we

20  requested two weeks in that regard, your Honor.

21         THE COURT:  All right.  Mr. Howell, do you want to

22  respond to that?

23         MR. HOWELL:  Yeah, we're certainly not okay with that,

24  your Honor.  There is risk with each passing day that goes by.

25  Two weeks takes us all the way up to where Binance begins to

1    have the ability to exit the transaction.  And also, as I said,

2    unless the government is interested in posting a bond, we are

3    talking about significant potential fluctuations in crypto

4    value between now and then.  You can just look at the

5    difference between the disclosure statement hearing and today,

6    and we think they have a high burden to meet.  They don't get

7    kind of a second stay or a half stay for two weeks while they

8    wait to get ready to argue to the Second Circuit.

9              So we would adamantly oppose that, and we think it's

10   very necessary that we move forward.

11             We certainly appreciate the Court hearing this on

12   relatively short notice and are respectful of that.  But we

13   think two more weeks is a big problem for us.

14             MR. EVANS:  Joseph Evans.  We object.  Any further

15   delay is going to continue to harm our constituency.

16             THE COURT:  All right.  Mr. Howell, can you point me,

17   please, to somewhere in the papers where it says what the drop

18   dead date is, the date by which Binance must walk away.

19             MR. HOWELL:  I'll have to get –– I'm not sure we have

20   in –– I believe it is April 18, but we can e-mail you, if

21   that's acceptable, with the document that has the dates.

22             THE COURT:  That is acceptable to me.  Is that okay

23   with everybody?  You would all be copied.

24             MR. FOGELMAN:  We have no objection to a communication

25   by e-mail of that nature, your Honor.

N3N3VOYM

1            THE COURT:  All right.  All right.  I think this time

2     we really are adjourned.

3            Thank you all for the specifics this afternoon.  And

4     please order the transcript.

5            Thank you.  We are adjourned.

6            (Adjourned)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25