23-cv-02171

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

In re Voyager Digital Holdings, Inc., et al., Debtors

United States of America, et al., Appellants,

v.

Voyager Digital Holdings, Inc., et al., Appellees.

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR THE APPELLANTS

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
LAWRENCE H. FOGELMAN
JEAN-DAVID BARNEA
PETER ARONOFF
Assistant United States Attorneys

United States Attorney's Office
Southern District of New York
86 Chambers Street, Third Floor
New York, NY 10007

WILLIAM K. HARRINGTON
United States Trustee, Region 2
LINDA A. RIFFKIN
Assistant United States Trustee

Department of Justice
Office of the United States Trustee
One Bowling Green
New York, NY 10004

RAMONA D. ELLIOTT
Deputy Director/General Counsel
P. MATTHEW SUTKO
Associate General Counsel
BETH A. LEVENE
ANDREW BEYER
FREDERICK GASTON HALL
Trial Attorneys

Department of Justice
Executive Office for United States Trustees
441 G Street, N.W., Suite 6150
Washington, DC 20530

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT .................................................................1

STATEMENT OF APPELLATE JURISDICTION .................................5

STATEMENT OF THE ISSUE ..............................................................6

STANDARD OF REVIEW .....................................................................6

STATEMENT OF THE CASE ................................................................7

    A.    Voyager's Bankruptcy ..........................................................7

    B.    The Exculpation Provision ...................................................9

    C.    Prior Proceedings in this Court...........................................16

SUMMARY OF THE ARGUMENT ......................................................19

ARGUMENT ..........................................................................................20

I.    The Bankruptcy Code Does Not Authorize Exculpation to Bar Law Enforcement.................................................................20

    A.    The Bankruptcy Code Principally Concerns the Relationship Between Debtors and Creditors, Not Police and Regulatory Liabilities to the Government .................................................20

    B.    No Provision of the Bankruptcy Code Authorizes the Exculpation Provision ........................................................23

    C.    The Bankruptcy Code Permits the Government to Enforce Its Police and Regulatory Powers During and After a Bankruptcy Case.............29

II.    The Bankruptcy Court's Construction of the Code Raises Serious Constitutional Concerns .................................................31

    A.    The Bankruptcy Court's Interpretation Is at Odds with Fundamental Separation-of-Powers Principles ...................31

    B.    The Exculpation Provision Is at Odds with Fundamental Due-Process Principles ................................................................34

III.    The Exculpation Provision Is Independently Barred by Sovereign Immunity..................................................................35

IV.    No Court Has Approved Exculpation Against the Government over the Constitutional Objections Raised Here ...........................................39

V.     To the Extent Parties Following Bankruptcy Court Orders Are Entitled
       to Any Immunity, It Is an Affirmative Defense ..............................................44

VI.    The Bankruptcy Court's Justification for the Exculpation as Merely
       Protecting Those Who Follow Court Orders Fails ........................................50

CONCLUSION ...........................................................................................................53

CERTIFICATE OF COMPLIANCE ........................................................................55

# TABLE OF AUTHORITIES

Page(s)

*Cases*

*Andrus v. Glover Constr. Co.*,
  446 U.S. 608 (1980) ..................................................................................26
*Ariz. Christian School Tuition Organization v. Winn*,
  563 U.S. 125 (2011) ..................................................................................39
*Barrett v. United States*,
  689 F.2d 324 (2d Cir. 1982) .......................................................................34
*Blixseth v. Credit Suisse*,
  961 F.3d 1074 (9th Cir. 2020) ....................................................................42
*Boullion v. McClanahan*,
  639 F.2d 213 (5th Cir. 1981) ................................................................. 47, 48
*Bradford Audio Corp. v. Pious*,
  392 F.2d 67 (2d Cir. 1968) .................................................................... 47, 48
*Bullard v. Blue Hills Bank*,
  575 U.S. 496 (2015) ....................................................................................5
*City of New York v. New York, N.H. & H.R. Co.*,
  344 U.S. 293 (1953) ..................................................................................35
*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ..................................................................................34
*Czyzewski v. Jevic Holding Corp.*,
  580 U.S. 451 (2017) ..................................................................................23
*Dana Commercial Credit Corp. v. Center Teleproductions, Inc.*
  *(In re Center Teleproductions, Inc.)*,
  112 B.R. 567 (Bankr. S.D.N.Y. 1990) ..................................................... 46, 48
*FDIC v. Meyer*,
  510 U.S. 471 (1994) ..................................................................................36
*Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding*
  *Am., Inc.*, 873 F.3d 85 (2d Cir. 2017) ............................................................6
*Garvin v. Cook Investments NW, SPNWY, LLC*,
  922 F.3d 1031 (9th Cir. 2019) ............................................................... 39, 43
*Gertskis v. EEOC*,
  No. 11 Civ. 5830 (JMF), 2013 WL 1148924 (S.D.N.Y. Mar. 20, 2013) ............36
*Heckler v. Chaney*,
  470 U.S. 821 (1985) ..................................................................................33

*Huebner v. Midland Credit Mgmt., Inc.*,
  897 F.3d 42 (2d Cir. 2018)....................................................................7

*In re Aiken County*,
  725 F.3d 255 (D.C. Cir. 2013).............................................................33

*In re Airadigm Commc'ns, Inc.*,
  519 F.3d 640 (7th Cir. 2008) ...............................................................43

*In re Am. Coastal Energy Inc.*,
  399 B.R. 805 (Bankr. S.D. Tex. 2009) .................................................30

*In re CMC Heartland Partners*,
  966 F.2d 1143 (7th Cir. 1992) .............................................................30

*In re Dairy Mart Convenience Stores, Inc.*,
  351 F.3d 86 (2d Cir. 2003)...................................................................26

*In re Enron Corp.*,
  326 B.R. 497 (S.D.N.Y. 2005).............................................................43

*In re Food City, Inc.*,
  110 B.R. 808 (Bankr. W.D. Tex. 1990).......................................... 28, 29

*In re Fraser's Boiler Serv., Inc.*,
  593 B.R. 636 (Bankr. W.D. Wash. 2018)..............................................51

*In re Grabis*,
  No. 13-10669 (JLG), 2020 WL 7346467
  (Bankr. S.D.N.Y. Dec. 11, 2020)........................................................38

*In re Granite Broad. Corp.*,
  369 B.R. 120 (Bankr. S.D.N.Y. 2007)..................................................43

*In re Highland Cap. Mgmt., LP*,
  48 F.4th 419 (5th Cir. 2022) ................................................. 41, 46, 50

*In re LATAM Airlines Grp. S.A.*,
  No. 20-11254 (JLG), 2022 WL 2206829
  (Bankr. S.D.N.Y. June 18, 2022).........................................................42

*In re Marshall*,
  721 F.3d 1032 (9th Cir. 2013) ...............................................................6

*In re Metromedia Fiber Network, Inc.*,
  416 F.3d 136 (2d Cir. 2005).................................................................26

*In re Oneida Ltd.*,
  351 B.R. 79 (Bankr. S.D.N.Y. 2006).....................................................43

*In re Purdue Pharma, L.P.*,
  635 B.R. 26 (S.D.N.Y. 2021)..................................... 23, 25, 27, 28

*In re PWS Holding Corp.*,
  228 F.3d 224 (3d Cir. 2000).................................................................42

*In re Rae*,
  436 B.R. 266 (Bankr. D. Conn. 2010) ..................................................39

iv

*In re Tucker Freight Lines, Inc.*,
   62 B.R. 213 (Bankr. W.D. Mich. 1986)..............................................................45
*In re W. Real Est. Fund, Inc.*,
   922 F.2d 592 (10th Cir. 1990) .........................................................................41
*In re Washington Mutual, Inc.*,
   442 B.R. 314 (Bankr. D. Del. 2011) .................................................................50
*In re XRX, Inc.*,
   77 B.R. 797 (Bankr. D. Nev. 1987) ........................................................... 47, 48
*Katchen v. Landy*,
   382 U.S. 323 (1966).........................................................................................21
*Lane v. Pena*,
   518 U.S. 187 (1996).........................................................................................37
*Law v. Siegel*,
   571 U.S. 415 (2014).............................................................................. 23, 24, 25
*Library of Congress v. Shaw*,
   478 U.S. 310 (1986).........................................................................................37
*Logan v. Zimmerman Brush Co.*,
   455 U.S. 422 (1982).........................................................................................34
*Luedke v. Delta Air Lines, Inc.*,
   159 B.R. 385 (S.D.N.Y. 1993)..........................................................................45
*McGuire v. United States*,
   550 F.3d 903 (9th Cir. 2008) ...........................................................................36
*Mercury Cap. Corp. v. Milford Connecticut Assocs., L.P.*,
   354 B.R. 1 (D. Conn. 2006)...............................................................................6
*Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*,
   474 U.S. 494 (1986).........................................................................................30
*Millares v. United States*,
   137 F.3d 715 (2d Cir. 1998).............................................................................36
*Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*,
   458 U.S. 50 (1982)...........................................................................................20
*O'Loghlin v. County of Orange*,
   229 F.3d 871 (9th Cir. 2000) ...........................................................................30
*Pan Am Corp. v. Delta Air Lines, Inc.*,
   175 B.R. 438 (S.D.N.Y. 1994)..........................................................................45
*Phoenician Mediterranean Villa, LLC v. Swope (In re J&S Props., LLC)*,
   545 B.R. 91 (Bankr. W.D. Pa. 2015)...................................................... 47, 48, 49
*RadLAX Gateway Hotel LLC v. Amalgamated Bank*,
   566 U.S. 639 (2012).........................................................................................25
*Railway Labor Execs.' Ass'n v. Gibbons*,
   455 U.S. 457 (1982).................................................................................. 20, 21

*Raines v. Byrd*,
    521 U.S. 811 (1997)....................................................................................33
*SEC v. Universal Exp., Inc.*,
    475 F. Supp. 2d 412 (S.D.N.Y. 2007) ...................................... 22, 23, 45
*Seila Law LLC v. CFPB*,
    140 S. Ct. 2183 (2020).............................................................................32
*Six W. Retail Acquisition, Inc. v. Loews Cineplex Ent. Corp.*,
    286 B.R. 239 (S.D.N.Y. 2002)...................................................................6
*Stellwagen v. Clum*,
    245 U.S. 605 (1918)..................................................................................21
*Stern v. Marshall*,
    564 U.S. 462 (2011)..................................................................................40
*Stewart v. Lattanzi*,
    832 F.2d 12 (2d Cir. 1987)........................................................................46
*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014)..................................................................................33
*T&W Inv. Co. v. Kurtz*,
    588 F.2d 801 (10th Cir. 1978) .......................................................... 47, 48
*Tenn. Student Assistance Corp. v. Hood*,
    541 U.S. 440 (2004)..................................................................................22
*United States v. Booker*,
    543 U.S. 220 (2005)..................................................................................40
*United States v. Cardinal Mine Supply*,
    916 F.2d 1087 (6th Cir. 1990) .................................................................34
*United States v. Dalm*,
    494 U.S. 596 (1990)..................................................................................36
*United States v. Nixon*,
    418 U.S. 683 (1974)..................................................................................33
*United States v. Nordic Vill. Inc.*,
    503 U.S. 30 (1992)....................................................................................36
*United States v. Portillo*,
    981 F.3d 181 (2d Cir. 2020)......................................................................40
*United States v. Security Indus. Bank*,
    459 U.S. 70 (1982)....................................................................................31
*United States v. Sherwood*,
    312 U.S. 584 (1941)..................................................................................38
*United States v. Testan*,
    424 U.S. 392 (1976)..................................................................................37
*Webster v. Fall*,
    266 U.S. 507 (1925)..................................................................................40

*Williams v. U.S. Fid. & Guar. Co.*,
  236 U.S. 549 (1915)................................................................................21
*Williams v. United States*,
  947 F.2d 37 (2d Cir. 1991)...................................................................38
*Wright v. Union Central Life Ins. Co.*,
  304 U.S. 502 (1938)................................................................................20
*Yukos Cap. S.A.R.L. v. Feldman*,
  977 F.3d 216 (2d Cir. 2020)...................................................................7
*Zellner v. Summerlin*,
  494 F.3d 344 (2d Cir. 2007)...................................................................45
*Zemel v. Rusk*,
  381 U.S. 1 (1965)................................................................................27

*Statutes*

11 U.S.C. § 105(a) ........................................................................ 25, 26, 28
11 U.S.C. § 106(a) ........................................................................ 36, 37
11 U.S.C. § 106(a)(4).................................................................................38
11 U.S.C. § 106(a)(5).................................................................................38
11 U.S.C. § 106(b) ........................................................................ 36, 37
11 U.S.C. § 106(c) ........................................................................ 36, 37
11 U.S.C. § 362(b)(1).................................................................................30
11 U.S.C. § 362(b)(4).................................................................................27
11 U.S.C. § 521 .............................................................................21
11 U.S.C. § 524(g) .............................................................................23
11 U.S.C. § 1103(c) ........................................................................ 41, 45, 46
11 U.S.C. § 1125(e) .............................................................................22
11 U.S.C. § 1129 .............................................................................5
11 U.S.C. § 1129(a)(3).................................................................................28
11 U.S.C. § 1141(d) .............................................................................22
11 U.S.C. § 1142(a) .............................................................................24
18 U.S.C. § 3613 .............................................................................39
28 U.S.C. § 157(a) .............................................................................5
28 U.S.C. § 157(b) .............................................................................5
28 U.S.C. § 158(a)(1) .............................................................................5
28 U.S.C. § 158(c)(2) .............................................................................6
28 U.S.C. § 959(b) .............................................................................30
28 U.S.C. § 1334 .............................................................................5

*Rules*

Fed. R. Bankr. P. 3020(e) ......................................................................16

Fed. R. Bankr. P. 8002(a)(3)...................................................................6

Fed. R. Bankr. P. 8018(b) .......................................................................1

The United States of America (the "United States"), by its attorney Damian Williams, United States Attorney for the Southern District of New York, and Justice Department official William K. Harrington, the United States Trustee for Region 2 (the "United States Trustee") (together, the "Government"), have appealed the bankruptcy court's March 8, 2023, order (the "Confirmation Order"), Dkt. 1166 (ER1050-1104), confirming the chapter 11 plan (the "Plan"), Dkt. 1166-1 (ER1105-1178), of Voyager Digital Holdings, Inc. and its affiliated Debtors (collectively, "Voyager" or the "Debtors").[1] For the reasons set forth herein, the Government respectfully requests that the Court strike the Exculpation Provision, as set forth in the Confirmation Order, from the Plan.[2]

## PRELIMINARY STATEMENT

This case involves an unprecedented assertion of authority by a bankruptcy court to extinguish (among other things) post-petition claims against debtors and non-debtors for both civil and criminal liability—pretermitting even the assertion of the United States' police and regulatory powers. No statutory authority permits this overreach. Nor can the bankruptcy court's decision be rationalized as merely

---

[1] "Dkt." refers to docket entries in the bankruptcy court, *In re Voyager Holdings, Inc.*, No. 22-10943 (Bankr. S.D.N.Y.). "Dist. Ct. Dkt." refers to docket entries in this proceeding. Excerpts of record submitted in Appellants' Appendix in compliance with Fed. R. Bankr. P. 8018(b) are cited as ER[page#].

[2] Capitalized terms have the same definitions as used in the Government's emergency motion for a stay. Dist. Ct. Dkt. 4.

protecting parties that follow its orders; the Exculpation Provision does far more. Having blessed the Plan's contemplated transactions in broad terms, the bankruptcy court through the Exculpation Provision provides releases for myriad future and vaguely defined actions to implement those transactions. This Exculpation Provision flouts fundamental separation-of-powers principles as it infringes both the Executive Branch's law enforcement authority and the Legislative Branch's power to define liability standards and statutes of limitation. It also raises serious due process concerns for private parties and fundamental notice concerns for the Government. While the Debtors assert that exculpation clauses are commonplace in bankruptcy cases, rarely if ever has a debtor expressly targeted the Government's ability to enforce its police and regulatory powers through exculpation as the Debtors have done here, and the Government is aware of no case in which a court has granted such sweeping relief.

The bankruptcy court confirmed a commercial deal in which BAM Trading Services (d/b/a Binance.US) ("Binance.US"), a cryptocurrency company, will acquire Voyager's assets—less than four months after the deal was first proposed. The final Plan includes an Exculpation Provision that would relieve various parties of liability based on the negotiation, execution, and implementation of all transactions or actions contemplated by the Plan, except for certain causes of action premised on actual fraud, willful misconduct or gross negligence. The

Exculpation Provision also releases certain parties from liability (including civil and criminal liability to the Government) for rebalancing and distributing cryptocurrencies in the manner provided in the Plan—with no carve out for fraud, misconduct or gross negligence. According to the Confirmation Order, the Government's only remedy would be to attempt to enjoin any ongoing transactions it comes to believe are illegal, though such relief may be illusory given that the transactions at issue will likely conclude shortly after the Plan is consummated.

The Exculpation Provision is unlawful. It has no basis in the Bankruptcy Code and disregards fundamental constitutional principles. The bankruptcy court erred in approving the Exculpation Provision because no court, let alone an Article I court, may involuntarily extinguish parties' rights—and particularly not the United States' police and regulatory powers—in the absence of any statute expressly authorizing it to take such an unprecedented step.

The Bankruptcy Code contains no provision, express or otherwise, authorizing the Exculpation Provision. Nor has any court approved such a sweeping exculpation clause over the objections the Government raises herein. Even those courts that have allowed some types of exculpation clauses typically ground them in concerns about finality and avoiding sour-grapes litigation between commercial parties to the bankruptcy, which cannot plausibly justify barring future law-enforcement actions. To the contrary, Congress and the courts have repeatedly

recognized that debtors in bankruptcy must comply with the law during and after a case, just like everyone else. That concern is amplified because this bankruptcy case concerns the cryptocurrency industry, which has been rife with claims of fraud and abuse, and provides all the more reason not to prospectively limit the Government's enforcement authority.

In the face of statutory text that is, at most, silent, this Court should not adopt a reading that offends basic constitutional principles. First, the Constitution gives the Executive Branch the power and duty to enforce the laws duly enacted by the legislature. No court, let alone an Article I bankruptcy court, may put law enforcement on an artificial timeline in service of a commercial deal. In addition, the Exculpation Provision, which excuses conduct that has not yet even occurred, disregards fundamental principles of notice and due process. Moreover, Congress did not waive the Government's sovereign immunity for such truly extraordinary relief in bankruptcy cases, and thus the bankruptcy court lacked subject matter jurisdiction to enter the Exculpation Provision.

The Government is mindful of the bankruptcy court's concern that parties it orders to engage in transactions should ordinarily not be held liable for following its orders, but there is no need for a broad exculpation clause to accomplish that goal. A party who in fact acts pursuant to court authority may raise that fact as an affirmative defense (or related defenses such as collateral estoppel) in a future

proceeding. But courts have no authority to enact complete bars against potential liability in cases not yet brought—and certainly cannot preclude government and regulatory authorities from enforcing the law.

We thus ask this Court to correct the bankruptcy court's overreach and restore the appropriate balance between the judicial, legislative, and executive branches by striking the Exculpation Provision from the Plan.

## STATEMENT OF APPELLATE JURISDICTION

This Court has jurisdiction to hear this appeal under 28 U.S.C. § 158(a)(1), which grants district courts jurisdiction to hear appeals from final judgments, orders, and decrees of bankruptcy judges.

The bankruptcy court had jurisdiction over Voyager's chapter 11 bankruptcy case under 28 U.S.C. §§ 157(a) and (b), and 1334(a). The bankruptcy court's final order confirming Voyager's Third Amended Joint Plan of Reorganization under 11 U.S.C. § 1129 was entered on March 8, 2023. Dkt. 1159; *see Bullard v. Blue Hills Bank*, 575 U.S. 496, 502 (2015) (holding that plan confirmation "alters the status quo and fixes the rights and obligations of the parties" for purposes of finality analysis). On March 10, 2023, after the entry of the Confirmation Order and the filing of the Government's notice of appeal, the bankruptcy court entered a Corrected and Amended Order. Dkt. 1166 (ER1150-1104).

The Government timely filed notices of appeal of the bankruptcy court's order under 28 U.S.C. § 158(c)(2) and Fed. R. Bankr. P. 8002(a)(3) on March 9, 2023, Dkt. 1165 (ER915-1049), and filed an amended notice of appeal of the amended confirmation order on March 22, 2023. Dkt. 1216 (ER1247-1250).

## STATEMENT OF THE ISSUE

Whether the bankruptcy court erred in approving the Exculpation Provision—which prospectively immunizes the Debtors and non-debtors from civil and criminal liability relating to transactions approved in the Plan—because it lacked the statutory authority to do so and because the Exculpation Provision interferes with the Government's police and regulatory powers, flouts core constitutional principles, and violates the Government's sovereign immunity.

## STANDARD OF REVIEW

This Court reviews the bankruptcy court's "findings of fact for clear error and conclusions of law de novo." *Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85, 138 n.54 (2d Cir. 2017). A bankruptcy court's order confirming a chapter 11 plan is reviewed for abuse of discretion. *See In re Marshall*, 721 F.3d 1032, 1045 (9th Cir. 2013); *Mercury Cap. Corp. v. Milford Connecticut Assocs., L.P.*, 354 B.R. 1, 7 (D. Conn. 2006); *Six W. Retail Acquisition, Inc. v. Loews Cineplex Ent. Corp.*, 286 B.R. 239, 247-49 (S.D.N.Y. 2002). "'An abuse of discretion occurs when a [trial] court bases its

ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence, or renders a decision that cannot be located within the range of permissible decisions.'" *Yukos Cap. S.A.R.L. v. Feldman*, 977 F.3d 216, 234 (2d Cir. 2020) (quoting *Huebner v. Midland Credit Mgmt., Inc.*, 897 F.3d 42, 53 (2d Cir. 2018)).

## STATEMENT OF THE CASE

### A. Voyager's Bankruptcy

Voyager is a cryptocurrency firm that filed for chapter 11 bankruptcy on July 5, 2022. Dkt. 1. Its initial bankruptcy plan was to sell its assets to FTX US, but that plan collapsed in November 2022, with FTX's implosion. Dkt. 1110, ¶ 2 (ER738). Under a revised plan, Voyager agreed to sell its assets to Binance.US under an Asset Purchase Agreement ("APA"), or "toggle" and itself distribute the cryptocurrency it holds to its customers if the sale to Binance.US does not go through. Dkt. 863 at 29 (ER309). In the sale scenario, Binance.US will receive the cryptocurrency that is currently on the Voyager platform to hold in a custodial capacity for Voyager's customers, and distribute it to the customers. Plan at 30-31 (ER1138-39); Dkt. 863 at 16-17, 42-46 (ER296-97, 322-26). In addition, Voyager was authorized to engage in "rebalancing" transactions which consist of "(i) selling such Cryptocurrency that cannot be distributed to Account Holders, (ii) purchasing Cryptocurrency supported by Voyager's or Binance.US's Platform (as provided by

7

the Asset Purchase Agreement) that shall be distributed to Account Holders, and (iii) engaging in any other transaction, including the execution of trades of Cryptocurrency, necessary or appropriate to effectuate distributions." Plan at 32 (ER1140). Accounts that cannot be transferred to Binance.US will be administered by a newly created entity, the Wind-Down Debtor (administered by a newly established Plan Administrator). *Id.* at 16, 35 (ER1124, 1143).

Binance.US and the Wind-Down Debtor will be authorized to operate their businesses and use and dispose of property "without supervision or approval" of the bankruptcy court, *id*. at 31 (ER1139), and the Plan Administrator will be empowered to make distributions, sell assets, oversee accounts, prosecute and settle claims, retain professionals, pay expenses, including taxes, and "tak[e] all other actions consistent with the provisions of the Plan and the Plan Administrator Agreement," *id.* at 37-40 (ER1145-48).

If the sale to Binance.US is not consummated within four months after the date of the APA, Voyager will liquidate, *id.* at 11, 31-32 (ER1119, 1139-40); Dkt. 835 at 77 (ER244), and will be authorized to "take all actions as may be deemed necessary or appropriate" to consummate the liquidation. Plan at 32 (ER1140). Further operations in this scenario may occur "without supervision or approval" of the bankruptcy court. *Id.*

## B. The Exculpation Provision

The first iteration of a plan proposing a sale to Binance.US was filed on

December 22, 2022, less than four months before the bankruptcy court ultimately

entered the Confirmation Order. Earlier versions of the plan contained broad

exculpation provisions. *E.g.*, Dkt. 852 at 57. The Securities and Exchange

Commission ("SEC") and the U.S. Trustee objected. Dkt. 1047, 1085 (ER701-22).

Among other grounds, the U.S. Trustee argued that the plan would inappropriately

provide prospective releases to entities that do not yet exist, such as the Wind-

Down Debtor and the Plan Administrator. Dkt. 1085 at 3, 16-17 (ER703, 716-17).

On February 28, 2023, Voyager added language to a proposed confirmation order

that would have principally—and appropriately—carved the Government out of

any exculpation or releases in the plan. Dkt. 1120 at 64-65.

However, on March 2, 2023, during the Confirmation Hearing and weeks

after the voting deadline and objections were due, the Debtors for the first time

added language that would expressly undo the government carve-out they had

previously proposed, providing that:

> the United States, the States, and their agencies may not, and will not,
> allege that the Restructuring Transactions are a violation of any rules
> or regulations enforced by the United States, the States or any of their
> agencies, nor will they bring any claim against any Person on account
> of or relating to the Restructuring Transactions. . . . [N]o Governmental
> Unit will allege that the Restructuring Transactions are a violation of
> any rules or regulations enforced by the United States, the States or any

9

of their agencies, nor will they bring any claim against any Person on account of or relating to the Restructuring Transactions.

Dkt. 1130, ¶¶ 142-43.

The Government objected immediately to the removal of the governmental carve-out because the exculpation language improperly barred the Government from enforcing its laws and regulations, including criminal laws. Dkt. 1132 (ER858-59). Other federal and state entities also objected, Dkt. 1134, 1135, 1136, and the Government filed a further objection. Dkt. 1144 (ER860-93).

The bankruptcy court nevertheless stated it would approve an exculpation provision insulating Voyager, Binance.US, and others from civil and criminal liability for past and future acts taken in connection with their consummation of the transactions contemplated by the Plan. Dist. Ct. Dkt. 5, Ex. D, at 19-22 (ER897-900). The court rejected the Government's argument that it did not have the authority to release criminal liability or "enjoin a criminal prosecution of any person for any reason." *Id*. at 25-26 (ER903-04). The court responded:

> if what you're saying is that having sat on the sidelines and said nothing to me to indicate that there's anything illegal about what these people are going to do, that you want to reserve the right to put somebody in jail for doing a rebalancing transaction that they will have no choice but to do under the order that I entered, then I disagree with you. I think the very suggestion offends me to no end. I can't believe that you would even take the position in front of me that you should have that right. It's preposterous. It's absolutely preposterous. If you think something's that illegal, speak up, but don't dare tell me that you kind of want to reserve that right to do that to somebody.

10

*Id*. The court also later explained that the short period between the filing of the

proposed plan in December 2022 and the confirmation hearing in March 2023

provided the Government a "full and fair opportunity" to challenge the transaction:

"The SEC and all other government agencies have had a full and fair opportunity

to object if they believe that the rebalancing transactions that I have previously

approved and that are contemplated by the plan are illegal in any way, or if they

believe that the distributions of cryptocurrencies and cash that are contemplated by

the plan are violative in any way of any applicable statute, rule or regulation." Dkt.

1170 ("Confirmation Decision") at 13 (ER1191).

On March 8, 2023, the court entered the Confirmation Order (which it

amended on March 10),[3] which included the revised Exculpation Provision quoted

below. Dkt. 1159, 1166 (ER1050-1104). The Government filed its notice of appeal

to the district court the next day. Dkt. 1165 (ER915-1104); *see* Dkt. 1216

(ER1247-50) (amended notice of appeal).

The court's modifications to the Exculpation Provision did not cure its

impermissible overbreadth. The confirmed Plan defines the "Exculpated Parties"

as including Voyager, the Committee of Unsecured Creditors (the "Committee"),

the Distribution Agent (i.e., Binance.US, Voyager, and the Wind-Down Debtor),

---

[3] The amendments have no bearing on this appeal.

11

certain professionals retained by those entities, certain Voyager employees, and the

Plan Administrator. Confirmation Order at 9 (ER1058).

The Confirmation Order revised the Plan's Exculpation Provision to the

following:

> Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor release or the third-party release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and **each Exculpated Party is hereby exculpated from, any liability for damages based on the negotiation, execution and implementation of any transactions or actions approved by the Bankruptcy Court in the Chapter 11 Cases, except for Causes of Action related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence**; provided that nothing in the Plan shall limit the liability of professionals to their clients pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8 Rule 1.8(h)(1) (2009).
>
> The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes.
>
> In addition, the Plan contemplates certain rebalancing transactions and the completion of distributions of cryptocurrencies to creditors. **The Exculpated Parties shall have no liability for, and are exculpated from, any claim for fines, penalties, damages, or other liabilities based on their execution and completion of the rebalancing transactions and the distribution of cryptocurrencies to creditors in the manner provided in the Plan.**

Confirmation Order at 7-8 (ER1056-57) (emphasis added). Thus, the Confirmation

Order broadly exculpates for "the negotiation, execution and implementation of

any transactions or actions" approved by the bankruptcy court, with an exception if

12

there is final order finding that the cause of action is based on "actual fraud, willful misconduct, or gross negligence." Confirmation Order at 7 (ER1056).

But that is not all it does. The Confirmation Order additionally exculpates— with no exception for actual fraud, willful misconduct, or gross negligence—for "any claim for fines, penalties, damages, or other liabilities based on [the Exculpated Parties'] execution and completion of the rebalancing transactions and the distribution of cryptocurrencies to creditors in the manner provided in the Plan." *Id.* at 8 (ER1057). This is not a narrow provision. Distribution of cryptocurrencies, for example, is not as simple as sending a check to creditors. As explained in the Plan and the APA, under the sale transaction, distribution of cryptocurrencies will occur through the Binance.US platform and will require, *inter alia*:

- a transfer of the Voyager customers' personal data to Binance.US, Dkt. 835 at 54-55 (ER221-22);

- negotiation of a transition services agreement between Voyager and Binance.US to allow Binance.US to access and operate the Voyager platform for purposes of accomplishing several of the transactions contemplated in the APA, *id.* at 56 (ER223);

- development of an "integration plan" by Voyager and Binance.US to enable the user migration to the Binance.US platform, *id.* at 58 (ER225);

- crediting each user's Binance.US account with the coins owed under the Plan, which credits "may be made from any Coins held by or on behalf of [Binance.US] or any of its Affiliates,"[4] *id.* at 62 (ER229); and

- for customers who are in "Unsupported Jurisdictions" where Binance.US does not acquire the necessary license to operate within six months, Voyager will convert coins to dollars for distribution to the users, *id.* at 63-64 (ER230-31).

The provision states that the Government may seek to enjoin certain

transactions or effectuate new regulations but does not carve out from the

Exculpation Provision any other form of government action, such as criminal

prosecutions.

> For the avoidance of doubt, the foregoing paragraph reflects the fact that Confirmation of the Plan requires the Exculpated Parties to engage in certain rebalancing transactions and distributions of cryptocurrencies and the fact that no regulatory authority has taken the position during the Combined Hearing that such conduct would violate applicable laws or regulations. **Nothing in this provision shall limit in any way the powers of any Governmental Unit to contend that any rebalancing transaction should be stopped or prevented, or that any other action contemplated by the Plan should be enjoined or prevented from proceeding further. Nor does anything in this provision limit the enforcement of any future regulatory or court order that requires that such activities either cease or be modified, or limit the penalties that may be applicable if such a future regulatory or court order is issued and is violated**. Similarly, nothing herein shall limit the authority of the Committee on Foreign Investment of the United States to bar any of the contemplated transactions. Nor does anything in this provision alter the terms of the Plan regarding the compliance of the Purchaser with applicable laws in the Unsupported Jurisdictions

---

[4] Some of those affiliates have been sued by the CFTC for, among other things, inadequate know-your-customer rules designed to prevent money laundering. *See* Complaint, *CFTC v. Zhao, et al.*, No. 23-cv-01887 (N.D. Ill. Mar. 27, 2023).

before distributions of cryptocurrency occur in those Unsupported Jurisdictions.

*Id*. at 8 (ER1057) (emphasis added).

While the bankruptcy court contemplated that the Government could seek to enjoin these transactions after the court approved the Plan, or seek other prospective relief, it forbade the Government from pursuing its civil or criminal remedies relating to these transactions that occur before they are stopped or prevented. *See id.* And because some of these transactions have already occurred, and the Debtors and the Committee now assert (in their Second Circuit motion to vacate the stay) that the transfer of the accounts to Binance.US must begin in less than two weeks, by April 18, 2023, *see* No. 23-467 (2d Cir.), Dkt. 30, at 1-2, 11; Dkt. 24 at 7-8, 44-45 (filed Apr. 3, 2023), even this reservation would not give the Government much time, if any, to take any action. Although the bankruptcy court nominally added a governmental carve-out back to the Plan, it applied only "[e]xcept as set forth in the exculpation provisions . . . and in this Confirmation Order," Confirmation Order at 45-46 (ER1094-95)—leaving the Exculpation Provision's restrictions unaffected.

The Plan further provides that the Distribution Agent (Binance.US, Voyager, and the Wind-Down Debtor) "shall be exculpated" from all liability "arising out of" its "discharge of the powers and duties conferred upon" it by the Plan or any bankruptcy court order, "except for actions or omissions to act arising out of the

15

gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or ultra vires acts of such Distribution Agent." Plan at 51 (ER1159). Although this provision excepts criminal conduct and ultra vires acts, the general Exculpation Provision in the Confirmation Order, which is quoted above, does not. And the Confirmation Order provides that in the case of any conflict with the Plan, the Confirmation Order controls. Confirmation Order at 54 (ER1103).

In addition, the Plan provides that the Plan Administrator and certain related parties shall not be liable:

> for losses, claims, damages, liabilities or expenses in connection with the affairs of the Wind-Down Debtor or for the act or omission of any other Wind-Down Debtor Party, nor . . . for any act or omission taken or omitted to be taken pursuant to the discretion, powers and authority conferred, or in good faith believed to be conferred by the Plan Administrator Agreement or the Plan other than for specific acts or omissions resulting from such Wind-Down Debtor Party's willful misconduct, gross negligence or actual fraud.

Plan at 41-42 (ER1149-50).

On March 11, 2023, the bankruptcy court rendered a written decision explaining its decision to enter the Confirmation Order. Dkt. 1170 (ER1179-1228).

### C. Prior Proceedings in this Court

Ordinarily, a plan confirmation order is automatically stayed for fourteen days. Fed. R. Bankr. P. 3020(e). Here, over the Government's objection, the bankruptcy court shortened that period to four days, until March 13. Confirmation

Order at 54 (ER1103); Dist. Ct. Dkt. 5, Ex. D at 34:9-16 (ER912). At the parties'

request, the bankruptcy court extended the stay through March 15. Dkt. 1169.

The bankruptcy court denied the Government's motion to stay the

Confirmation Order—or alternatively just the Exculpation Provision—pending

appeal. Dkt. 1190 (ER1229-46). The court rejected the notion that the Exculpation

Provision "might somehow be interpreted as immunizing fraud, or theft, or tax

avoidance," *id.* at 8 (ER1236), but did not alter the Confirmation Order itself. The

court further extended the stay through March 20 to permit consideration by this

Court, Dkt. 1188, ¶ 1; the stay was extended by the parties' stipulation to March

24, Dist. Ct. Dkt. 28, then by this Court to March 28, Dist. Ct. Dkt. 41.

On March 27, this Court granted a stay pending appeal, followed by an

opinion dated March 31 and corrected on April 1, 2023. Dist. Ct. Dkt. 45, 51, 53.

This Court concluded that the Government had established that there are "serious

questions going to the merits of the dispute," and "the balance of hardships tips

decidedly in its favor." Dist. Ct. Dkt. 53 ("Stay Order") at 13 (quotation marks

omitted). It found "persuasive[]" the notion that the proper role of exculpation

provisions is to allow parties to engage in "the bankruptcy proceeding" itself

without fear of later litigation over their actions in those proceedings. *Id.* at 13-14.

But the Court concluded that such reasoning cannot apply to "Government

enforcement of the law following confirmation." *Id*. at 14. More generally, this

17

Court acknowledged that bankruptcy deals with "the relations between a debtor and his creditors—not the relations between third-parties and non-stakeholder Government enforcers." *Id*. (quotation marks and alterations omitted). It further noted that "a bankruptcy court has limited, if any, jurisdiction over criminal cases," and that it had seen no authority giving a bankruptcy court the ability to release criminal liability. *Id*. at 14-15.

This Court stated that it "appear[s] likely that some species of quasi-judicial immunity applies to at least some parties executing the rebalancing transactions"— in this case Voyager operates as a bankruptcy trustee would, and bankruptcy trustees "are generally immune to the extent that they are acting with the approval of the court." *Id*. at 15-16 (quotation marks omitted). But it concluded that the Exculpation Provision "appears to go further than the quasi-judicial immunity doctrine allows," as it applies to injunctive relief and criminal prosecution. *Id*. at 16-17. Additionally, the Court noted that immunity is an affirmative defense, not something granted preemptively. *Id*. at 17. And it observed that the Exculpation Provision violated the general rule that equity should not interfere with criminal process, and raised "significant separation of powers concerns" by "rewrite[ing] statutes of limitations" and "preventing the Executive Branch from investigating acts and enforcing the law." *Id*.

18

The Court then concluded that the balance of injuries and the public interest favored a stay. *Id.* at 18-20. It directed expedited briefing of this appeal. *Id.* at 20.

On April 3, the Debtors and the Committee filed emergency motions in the Second Circuit to vacate the stay pending appeal. No. 23-467 (2d Cir.), Dkt. 29-30. Expedited briefing was completed today, *id.* Dkt. 45, 54, 59; No. 23-469, Dkt. No. 44, and the motion will be heard by a motions panel on Tuesday, April 11, No. 23-467, Dkt. 52.

## SUMMARY OF THE ARGUMENT

The Bankruptcy Code contains no provision, express or otherwise, authorizing the Exculpation Provision. That reading of the Code is amplified by principles of statutory construction that require courts to avoid interpretations that would raise serious constitutional questions and that mandate clear language for a waiver of the United States' sovereign immunity. Construing the Bankruptcy Code to *sub silentio* authorize the Exculpation Provision would also violate the fundamental principle that bankruptcy is about restructuring the backward-looking relationship between a debtor and its creditors, rather than a vehicle for obtaining preemptive limitations of liability for a reorganized business, particularly as against the Government. Moreover, no court has approved an exculpation clause over the objections raised here, and the affirmative defenses generally available to parties obeying court orders, including estate fiduciaries, do not preemptively

19

extinguish their liability as the bankruptcy court purported to do here. Finally, even courts that have approved exculpation clauses generally restrict them to preventing relitigation between commercial participants in the bankruptcy over events that took place during the bankruptcy proceeding itself, not with respect to future events and entities, and not to bar the Government from enforcing the law.

## ARGUMENT

## I.   The Bankruptcy Code Does Not Authorize Exculpation to Bar Law Enforcement

The Exculpation Provision purports to preemptively immunize future conduct from civil and criminal law enforcement. But Congress did not grant such vast powers in the Bankruptcy Code, the purpose of which is to "adjust[ ] . . . a failing debtor's obligations" to its creditors. *Railway Labor Execs.' Ass'n v. Gibbons*, 455 U.S. 457, 466 (1982) (quotation marks omitted). No provision of the Bankruptcy Code authorizes this remarkable departure from traditional separation-of-powers principles. Because Congress has not authorized the Exculpation Provision, the bankruptcy court had no authority to impose it.

### A.  The Bankruptcy Code Principally Concerns the Relationship Between Debtors and Creditors, Not Police and Regulatory Liabilities to the Government

Bankruptcy is the "subject of the relations between [a] . . . debtor[ ] and his creditors, extending to his and their relief." *Wright v. Union Central Life Ins. Co.*, 304 U.S. 502, 513-14 (1938) (quotation marks omitted); *accord Northern Pipeline*

*Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 71 (1982) (plurality op.) ("the restructuring of debtor-creditor relations . . . is at the core of the federal bankruptcy power"). Congress enacted the Bankruptcy Code pursuant to the Constitution's Bankruptcy Clause, which allows Congress to "adjust[ ] . . . a failing debtor's obligations," *Gibbons*, 455 U.S. at 466 (quotation marks omitted). The Code's intricate provisions are intended to give the honest but unfortunate debtor a fresh start while ensuring the maximum possible equitable distribution to creditors. *See Stellwagen v. Clum*, 245 U.S. 605, 617 (1918); *Williams v. U.S. Fid. & Guar. Co.*, 236 U.S. 549, 554-55 (1915).

The Bankruptcy Code establishes a highly reticulated scheme for the equitable adjustment of the debtor-creditor relationship. Debtors must comply with a host of requirements, *see, e.g.*, 11 U.S.C. § 521, and apply substantially all of their assets to satisfy their creditors' claims, *see generally id.* §§ 522, 541. A central concern of bankruptcy is the claims process that determines the distribution of the assets in the estate. *See, e.g.*, *Katchen v. Landy*, 382 U.S. 323, 329 (1966) (discussing the allowance, disallowance, and reconsideration of claims as of "basic importance in the administration of a bankruptcy estate" and observing that the "'whole process of proof, allowance, and distribution is, shortly speaking, an adjudication of interests claimed in a res'"). In exchange for distributing the assets of the estate to creditors, debtors are "release[d]" from liability "with respect to

21

any discharged debt." *Tenn. Student Assistance Corp. v. Hood*, 541 U.S. 440, 447 (2004) (citations omitted).

Because the purpose of bankruptcy is to adjust the debtor-creditor relationship, the Code is replete with provisions related to that objective. But no Code provision authorizes bankruptcy courts to grant a release from criminal or civil liability not only to a debtor but to others as well—much less for conduct that has not even occurred by the time a plan is confirmed. Rather, the Code permits the discharge of certain debtors against prepetition claims by creditors, 11 U.S.C. § 1141(d)—though liquidating debtors like Voyager are not even entitled to such a discharge, *id.* § 1141(d)(3).

Only a single Code provision, 11 U.S.C. § 1125(e), remotely contemplates any immunity for post-petition conduct. But Congress limited that provision to "[a] person that solicits acceptance or rejection of a plan," or "that participates . . . in the offer, issuance, sale, or purchase of a security, offered or sold under the plan." *Id*. The provision protects only against liability "on account of such solicitation or participation." *Id*. Further, "[t]he liability shield of § 1125(e) specifically applies to the disclosure and solicitation period *prior* to approval of a reorganization plan." *SEC v. Universal Exp., Inc.*, 475 F. Supp. 2d 412, 425 (S.D.N.Y. 2007) (Lynch, J.) (emphasis added), *aff'd sub nom. SEC v. Altomare*, 300 F. App'x 70, 71 (2d Cir. 2008). And Section 1125(e) does not confer immunity from suit; it simply provides

22

an affirmative defense to a subsequent lawsuit. *See, e.g., Universal Exp., Inc.*, 475

F. Supp. 2d at 425-26 (noting that defendant bears burden of proof on defense

under § 1125(e)). Likewise, the Code allows a bankruptcy court to release claims

against a non-debtor in only one context—pre-petition asbestos-related liabilities.

11 U.S.C. § 524(g); *see In re Purdue Pharma, L.P.*, 635 B.R. 26, 91 (S.D.N.Y.

2021).

These narrow provisions bear no resemblance to the expansive exculpation

the bankruptcy court approved, which applies to any action taken to implement the

transactions contemplated by the Plan (present or future) and which confers not

merely an affirmative defense but a prospective release from any liability in a civil

or criminal proceeding. *Cf. Law v. Siegel*, 571 U.S. 415, 424 (2014) ("The Code's

meticulous—not to say mind-numbingly detailed—enumeration of exemptions and

exceptions to those exemptions confirms that courts are not authorized to create

additional exceptions."). "[W]ere [Congress] to intend a major departure" from the

fundamental principle that bankruptcy exists to adjust the debtor-creditor

relationship, "more than simple statutory silence" is required. *Czyzewski v. Jevic*

*Holding Corp.*, 580 U.S. 451, 465 (2017).

## B. No Provision of the Bankruptcy Code Authorizes the Exculpation Provision

The bankruptcy court had no statutory authority to grant this broad

exculpation. The only statutory authority that the court cited to justify the

Exculpation Provision was 11 U.S.C. § 1142(a), which provides: "Notwithstanding any otherwise applicable nonbankruptcy law, rule, or regulation relating to financial condition, the debtor and any entity organized or to be organized for the purpose of carrying out the plan shall carry out the plan and shall comply with any orders of the court." *Id.*; Confirmation Decision at 33-35 (ER1211-13). The court stated: "Section 1142 thereby imposes an affirmative, statutory obligation on the debtors, other entities and their personnel to do what the plan contemplates. In effect, the confirmation order acts as a court order that the plan be carried out." Confirmation Decision at 33 (ER1211). But while this statute instructs the debtor and others to "carry out the plan," it does not authorize a bankruptcy court to bar the Government from enforcing its police and regulatory powers, including its power to prosecute criminals, with respect to actions taken during the implementation of a bankruptcy plan, or to shield later conduct from Governmental scrutiny. Moreover, this statutory provision only addresses "the debtor and any entity organized or to be organized for the purpose of carrying out the plan," a far narrower set of entities than the parties that receive exculpation in the Plan.

Reading Section 1142 to authorize a third party-release (including exculpation) would contravene more specific Code sections—which the Supreme Court has repeatedly held is impermissible. *See Law*, 571 U.S. at 421. As discussed above, Section 524(g) of the Code is the sole, specific provision addressing third-

party releases for pre-petition conduct, *see In re Purdue Pharma, L.P.*, 635 B.R. at 91, and Section 1125(e) is the sole provision permitting exculpation for post-petition conduct. But the exculpation language here is not an asbestos-related release under Section 524(g), or (solely) a solicitation-related exculpation under Section 1125(e). A general authorization cannot swallow a "more limited, specific authorization" in the Bankruptcy Code. *RadLAX Gateway Hotel LLC v. Amalgamated Bank*, 566 U.S. 639, 645-46, 649 (2012). As reflected in both Section 1125(e) and Section 524(g), Congress clearly knew how to draft release and exculpation of liability language when it intended to give the court these powers and did not do so for the broad Exculpation Provision.

Nor does Section 105 of the Code provide any authority to approve involuntary third-party releases, including exculpation. It provides that a "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). But as the Supreme Court has concluded, this grant of general authority does not allow bankruptcy courts to enter orders that would contravene the Code. *Law*, 571 U.S. at 421. This conclusion "is simply an application of the axiom that a statute's general permission to take actions of a certain type must yield to a specific prohibition found elsewhere." *Id.* That axiom has special force when a statute contains "carefully calibrated exceptions and limitations," as the Bankruptcy Code does. *Id.* at 424. "Where

Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent." *Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616-17 (1980). Because the Exculpation Provision cannot be reconciled with the Code's text, structure, or purpose, as discussed herein, it is not authorized by Section 105(a). Moreover, the authority conferred in Section 105 is limited to "order[s] . . . necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). If "no provision of the Bankruptcy Code may be successfully invoked . . . , section 105(a) affords . . . no independent relief." *In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 92 (2d Cir. 2003); *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142 (2d Cir. 2005) (same). It is therefore not a freestanding source of authority at all.

Indeed, in granting a stay pending appeal, this Court has appropriately expressed skepticism about the bankruptcy court's reliance on principles of equity to confer immunity: "The Bankruptcy Court relied on 'basic principles of equity and estoppel,' in concluding that those who take 'actions that are specifically approved by a court and/or that have been explicitly required to be taken by court order,' deserve immunity. It is not clear, however, at this stage of the litigation, that this precept applies against Government enforcement." Stay Order at 15 (quoting Confirmation Decision at 35, 38) (citations omitted). This Court also

found that "[u]sing generic equity principles to enjoin a future criminal prosecution violates 'the general rule that equity will not interfere with the criminal processes, by entertaining actions for injunction or declaratory relief in advance of criminal prosecution.'" *Id.* at 17 (quoting *Zemel v. Rusk*, 381 U.S. 1, 19 (1965)).

Likewise, Section 1123(b)(6) does not confer a statutory basis for exculpation, as it merely specifies that plans may only contain provisions that are "not inconsistent with" the Code, but does not grant bankruptcy courts authority to relieve parties of liability to the Government. *See In re Purdue Pharma, L.P.*, 635 B.R. at 106 ("In form, Section 1123(b)(6) is substantively analogous to Section 105(a) . . . . If the latter does not confer any substantive authority on the bankruptcy court—and that proposition is well settled, at least in this Circuit—then the former can in no way be read to do so."). Indeed, exculpating the Government is "inconsistent" with the Code, which expressly recognizes the importance of allowing the Government to enforce its police and regulatory powers irrespective of the automatic stay that prevents nearly all other litigation from proceeding against a debtor during bankruptcy. *See* 11 U.S.C. § 362(b)(4); *see also id.* § 362(b)(1) (permitting the "commencement or continuation of a criminal action or proceeding against the debtor" notwithstanding the automatic stay).

Debtors' stay brief also cited Section 1129(a)(3) of the Code as a possible statutory authority for exculpation. *See* Dist. Ct. Dkt. 19 at 28. But that provision

27

merely addresses the confirmation of a plan and requires that the "plan has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). This requirement does not empower a bankruptcy judge to prospectively release debtors and non-debtors from liability to the Government or preclude the Government from enforcing the law. *See In re Purdue Pharma, L.P.*, 635 B.R. at 109 ("§ 1129(a) confers no substantive right that could be used to undergird a § 105(a) injunction. One highly general provision simply does not confer substantive authority that is required to invoke another highly general provision."). Moreover, the reference to "means forbidden by law" does not mean that a bankruptcy court's confirmation order pre-approves every conceivable regulatory consequence of contemplated transactions. It does not "convert the bankruptcy judge into an ombudsman without portfolio, gratuitously seeking out possible 'illegalities' in every plan." *In re Food City, Inc.*, 110 B.R. 808, 812 (Bankr. W.D. Tex. 1990). That would be impossible, would usurp the law-enforcement and regulatory role of federal and state governments, and would improperly suggest that a bankruptcy court can adjudicate—and resolve—every legal and regulatory issue a complex transaction might raise, all on the compressed timeframe of a bankruptcy case. And it would be disastrous for debtors and regulators:

> Such a rule would place an onerous and unnecessary burden on the debtor, on those charged with enforcing laws and on the court. All

regulatory agencies (and there are thousands) would have to participate in all chapter 11 cases, introducing extraordinary delay into the system and imposing an impossible burden on the agencies. Moreover, a rule which requires a debtor to affirmatively represent in its plan and disclosure statement that the plan does not violate any law imposes an unrealistic due diligence burden upon both the debtor and debtor's counsel.

*Id.* at 813.[5]

Accordingly, nothing in this provision (or any others) permits a bankruptcy court to strip the Government of its police and regulatory responsibilities to enforce the law even with respect to the implementation of transactions contemplated by a plan.

### C. The Bankruptcy Code Permits the Government to Enforce Its Police and Regulatory Powers During and After a Bankruptcy Case

The Exculpation Provision is also inconsistent with provisions of the Bankruptcy Code that *affirmatively protect* the Government's ability to enforce its police and regulatory powers. As mentioned above, while most litigation against a debtor is stayed during a bankruptcy proceeding, the Code expressly exempts criminal prosecutions and governmental regulatory and police proceedings from the automatic stay. *See* 11 U.S.C. § 362(b)(1), (4); Stay Order at 14.

---

[5] That is not to say that a government agency may not object to a plan that it recognizes as contemplating a plainly illegal transaction, just that it cannot be required to do so, and that its decision not to does not justify a sweeping prospective release.

Congress also made clear that debtors are not excused from general regulatory requirements but must comply with the law like everyone else. *See* 28 U.S.C. § 959(b); *In re Am. Coastal Energy Inc.*, 399 B.R. 805, 810 (Bankr. S.D. Tex. 2009) ("Bankrupt debtors are no different from any citizen in that they must comply with state and federal laws."). Congress did not intend debtors to be exempt from regulation, and has "repeatedly expressed its legislative determination that the [bankruptcy] trustee is not to have *carte blanche* to ignore nonbankruptcy law." *Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 502 (1986). And even when a bankruptcy case ends, the status of "[h]aving been a debtor in bankruptcy" does not "authorize a firm to operate a nuisance . . . or otherwise excuse it from complying with laws of general application." *In re CMC Heartland Partners*, 966 F.2d 1143, 1146 (7th Cir. 1992); *see O'Loghlin v. County of Orange*, 229 F.3d 871, 875 (9th Cir. 2000) ("A suit for illegal conduct occurring after discharge threatens neither the letter nor the spirit of the bankruptcy laws. A 'fresh start' means only that; it does not mean a continuing license to violate the law.").

Thus, the bankruptcy court not only lacked the specific statutory authority to approve the Exculpation Clause, but its actions contravene Congress's decision to apply the full panoply of the federal police and regulatory power to debtors in bankruptcy.

## II.     The Bankruptcy Court's Construction of the Code Raises Serious Constitutional Concerns

The text, structure, and purposes of the Bankruptcy Code confirm that Congress did not intend to authorize a bankruptcy judge to interfere with the Executive Branch's prerogative to implement and enforce federal law. But the bankruptcy court's confirmation of the Exculpation Provision cannot be sustained even assuming that the Code were silent on the question. "[I]n the absence of a clear expression of Congress' intent to" permit bankruptcy courts the power to disrupt separation-of-powers principles, law enforcement, due process, and notice rights, this Court should not "construe the [Code] in a manner that could in turn call upon the Court to resolve" those basic constitutional questions. *United States v. Security Indus. Bank*, 459 U.S. 70, 82 (1982) (quotation omitted).

### A. The Bankruptcy Court's Interpretation Is at Odds with Fundamental Separation-of-Powers Principles

The bankruptcy court's grant of criminal and civil immunity as to certain transactions (some but not all of which excluded conduct that constitutes actual fraud, willful misconduct, or gross negligence) improperly arrogates to itself the powers of the Executive and Legislative Branches in defiance of the Constitution. The bankruptcy court's order effectively replaces all applicable statutes of limitations with that court's own truncated timeline dictated by the commercial terms of an agreement between private parties. Congress's provision of years after

31

the alleged activities take place for the Government to investigate criminal and

other conduct was reduced to scant months—before many of the actions at issue

even occur. And because the Government did not allege in advance that the

transactions approved in the Plan are illegal—including regarding the future, as yet

unknown, specific actions the parties may use to carry out those transactions—the

bankruptcy court preemptively immunized the participants through the Exculpation

Provision. The court concluded that the less than four months between the initial

proposal of the Binance.US deal and the confirmation hearing gave the

Government a "full and fair opportunity" to challenge the transaction.

Confirmation Decision at 13 (ER1191). The bankruptcy court also made clear its

view that the exigencies of approving a commercial cryptocurrency deal trumped

even criminal law. Dist. Ct. Dkt. 5, Ex. D, at 25-26 (ER903-04). But no court—

much less an Article I court—can require the Government to determine whether

and to what extent proposed transactions or their manner of implementation might

violate federal laws on pain of losing the ability to bring future civil or criminal

claims.

The Executive Branch has the authority to evaluate potential violations of

federal law and bring enforcement actions within its prosecutorial discretion: the

Constitution vests in the President, alone, "[t]he entire 'executive Power'" to "'take

Care that the Laws be faithfully executed.'" *Seila Law LLC v. CFPB*, 140 S. Ct.

32

2183, 2197 (2020). The Executive Branch has "exclusive authority and absolute discretion to decide whether to prosecute a case." *United States v. Nixon*, 418 U.S. 683, 693 (1974). This principle covers enforcement of both criminal law, *see id.*, and civil law, *see, e.g.*, *In re Aiken County*, 725 F.3d 255, 264 n.9 (D.C. Cir. 2013) (Kavanaugh, J.); *Heckler v. Chaney*, 470 U.S. 821, 831-35 (1985). Enforcement determinations are made within the bounds of statutes enacted by the Legislative Branch, including relevant liability standards and statutes of limitations that determine how long the Government has to evaluate if wrongdoing has occurred and to pursue the action. And the Judicial Branch holds trials and renders decisions in concrete disputes arising in enforcement actions.

This separation of powers underlies the sharp limits on pre-enforcement challenges in federal courts. To bring such a challenge, a plaintiff must demonstrate "sufficiently imminent" enforcement, "'a credible threat of prosecution,'" or "'an actual and well-founded fear that the law will be enforced against them.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158-61 (2014) (quoting cases). Unless that harm is "certainly impending," a plaintiff lacks standing, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013)—a doctrine that itself is rooted in separation of powers, *Raines v. Byrd*, 521 U.S. 811, 820 (1997). Under the bankruptcy court's view in this case, however, the Exculpated Parties

are entitled to a judicial order exempting them from any number of statutes, well before there is any threat or even possibility of enforcement.

These doctrines recognize that investigations take time and involve the development of complex factual records. Investigations into wrongdoing typically occur after the wrongdoing has taken place; it is rare for the Government to identify a criminal or civil violation before it happens or for a party to obtain an advance ruling on the legality of its anticipated conduct.

### B.  The Exculpation Provision Is at Odds with Fundamental Due-Process Principles

The Exculpation Provision also disregards basic principles of notice and due process. Although governmental entities have no right to due process under the Fifth Amendment's due process clause, *see United States v. Cardinal Mine Supply*, 916 F.2d 1087, 1089 n.3 (6th Cir. 1990), everyone else subject to the Exculpation Provision's prohibition against suit for post-petition conduct has a right not to be prevented from recovering for future claims. Due process protects not only the ability to bring a cause of action, *see, e.g.*, *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982), but specifically, the "[s]tatutory or common law entitlement to be fully compensated through a lawsuit for one's injuries." *Barrett v. United States*, 689 F.2d 324, 332 (2d Cir. 1982). These nongovernmental parties' potential claims are also barred without due process under the Exculpation Provision.

Regarding the Government specifically, the Supreme Court recognized in *City of New York v. New York, N.H. & H.R. Co.*, 344 U.S. 293, 297 (1953), that it is "a basic principle of justice . . . that a reasonable opportunity to be heard must precede judicial denial of a party's claimed rights." The Exculpation Provision runs afoul of that principle as it releases parties from liability to the Government for hypothetical enforcement actions that have not yet been brought, for conduct that may not even have occurred yet. The Government thus cannot possibly know what actions are being released by the Exculpation Provision, and it would not have an opportunity to be heard on any specific claims that are released.

## III.    The Exculpation Provision Is Independently Barred by Sovereign Immunity

The Exculpation Provision cannot be applied to the Government for an independent reason: no waiver of sovereign immunity permits it, and the bankruptcy court thus lacked subject-matter jurisdiction to approve the Exculpation Provision as against the United States. The Exculpation Provision purports to extinguish liability to the entire federal government, preemptively barring enforcement and modifying substantive liability standards in potential enforcement actions, yet no statute waives (let alone clearly and unequivocally) the government's sovereign immunity from such relief.

Courts may exercise jurisdiction over the United States only where Congress has waived its sovereign immunity,[6] *FDIC v. Meyer*, 510 U.S. 471, 475 (1994), which it does only through unequivocal statutory language that may include conditions on such a waiver. *United States v. Dalm*, 494 U.S. 596, 608 (1990). Waivers of sovereign immunity and their conditions—whether substantive, procedural, or temporal—are strictly applied against the claimant. *See Millares v. United States*, 137 F.3d 715, 719 (2d Cir. 1998). Only Congress may waive the Government's sovereign immunity. *Gertskis v. EEOC*, No. 11 Civ. 5830 (JMF), 2013 WL 1148924, at *12 (S.D.N.Y. Mar. 20, 2013) (citing *United States v. Nordic Vill. Inc.*, 503 U.S. 30, 33 (1992)).

Congress has waived the United States' sovereign immunity in bankruptcy proceedings only in three limited circumstances: "(1) where the substantive authority for the cause of action arises from the Bankruptcy Code itself; (2) for compulsory counterclaims against government claims; and (3) for permissive counterclaims capped by a set-off limitation." *McGuire v. United States*, 550 F.3d 903, 912-13 (9th Cir. 2008) (citing 11 U.S.C. §§ 106(a)-(c)). The waiver of

---

[6] Failing to understand this basic proposition, the Debtors argued in their stay opposition that the Government's invocation of sovereign immunity is "puzzling" since "[n]o one is suggesting it plans to sue the Government for anything." Dist. Ct. Dkt. 19 at 31. This misplaced argument simply highlights the fundamental disconnect between what the bankruptcy court purported to do and what the Constitution in fact permits: the adjudication of actual cases and controversies within clearly defined legislative parameters.

sovereign immunity for compulsory and permissive counterclaims is not relevant to the Exculpation Provision, and Sections 106(b) and 106(c) are irrelevant to this case.

Nor does the Exculpation Provision fall within the sovereign immunity waiver in Section 106(a). Section 106(a) enumerates several specific provisions of the Code for which the Government's sovereign immunity is waived. But, as discussed above, none of the statutes relied on by the bankruptcy court or cited by the Debtors confers the authority to immunize parties from the Government's police and regulatory powers. There is nothing in the plain language of these statutes that would confer such a vast power on bankruptcy courts—especially given the requirements that waivers of sovereign immunity must be clear and unequivocal, *see Lane v. Pena*, 518 U.S. 187, 192 (1996); *United States v. Testan*, 424 U.S. 392, 399 (1976), and must be strictly applied against the claimant, *see Library of Congress v. Shaw*, 478 U.S. 310, 314, 318-21 (1986).

Two of the statutes discussed above, Sections 1123(b)(6) and 1129(a)(3) of the Bankruptcy Code, are not even among the provisions for which Section 106 provides a waiver of sovereign immunity. And although Sections 105 and 1142(a) are listed in Section 106, neither of these general statutes empowers bankruptcy courts to exculpate parties from liability to the United States, as discussed. Certainly, they do not provide clear and unequivocal statutory authority permitting

bankruptcy courts to immunize parties from the Government's police and regulatory powers. Accordingly, there is no waiver of sovereign immunity that authorizes the relief against the Government afforded by the Exculpation Provision. As the Government has not waived its sovereign immunity, federal subject matter jurisdiction does not exist to approve the Exculpation Provision. *See United States v. Sherwood*, 312 U.S. 584, 586 (1941); *Williams v. United States*, 947 F.2d 37, 39 (2d Cir. 1991).

Section 106(a) also makes clear that the enforcement of an "order, process, or judgment against any governmental unit shall be consistent with appropriate nonbankruptcy law," 11 U.S.C. § 106(a)(4), and, further, that nothing in that provision "shall create any substantive claim for relief or cause of action not otherwise existing under this title, the Federal Rules of Bankruptcy Procedure, or nonbankruptcy law," *id.* § 106(a)(5). Yet the Exculpation Provision is entirely *inconsistent* with non-bankruptcy law, including applicable statutes of limitations and substantive liability standards. Accordingly, there is no waiver of sovereign immunity under Section 106 for the Exculpation Provision.

Finally, there is no waiver of sovereign immunity that would allow a bankruptcy court to nullify criminal liability to the United States for conduct that violates criminal laws enacted by Congress. Indeed, an Article I bankruptcy court lacks *any* power over criminal matters. *See, e.g.*, *In re Grabis*, No. 13-10669

38

(JLG), 2020 WL 7346467, at *12 n.71 (Bankr. S.D.N.Y. Dec. 11, 2020) ("The

Court lacks subject matter jurisdiction to enforce state or federal criminal laws.");

*In re Rae*, 436 B.R. 266, 275 (Bankr. D. Conn. 2010) ("As a matter of law, this

Court lacks subject matter jurisdiction over alleged violations of criminal

statutes."); *cf.* 18 U.S.C. § 3613 (preventing bankruptcy courts from discharging

criminal fines). Since bankruptcy courts have no power to hear criminal cases, they

certainly have no power to extinguish them before they are brought and before the

relevant conduct has even taken place. As this Court found in granting a stay,

"preventing Government enforcement actions is at odds with the general principle

that 'confirmation of a plan does not insulate debtors from prosecution for criminal

activity, even if that activity is part of the plan itself.'" Stay Order at 15 (quoting

*Garvin v. Cook Investments NW, SPNWY, LLC*, 922 F.3d 1031, 1036 (9th Cir.

2019)); *see id.* (noting that criminal prosecutions are not subject to the bankruptcy

automatic stay).

### IV.    No Court Has Approved Exculpation Against the Government over the Constitutional Objections Raised Here

The Debtors' stay briefing sought to draw sweeping conclusions from the

fact that many chapter 11 plans approved by bankruptcy courts contain exculpation

provisions. But the prevalence of a practice when untested by legal objections does

not make that practice lawful. *See Ariz. Christian School Tuition Organization v.*

*Winn*, 563 U.S. 125, 144 (2011) ("When a potential jurisdictional defect is neither

noted nor discussed in a federal decision, the decision does not stand for the proposition that no defect existed."); *Webster v. Fall*, 266 U.S. 507, 511 (1925) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents."). Litigants and courts alike sometimes operate for years under a set of legal rules that turn out to be infirm or mistaken. Any number of bankruptcy courts decided state-law counterclaims that would not necessarily have been resolved in the claims-adjudication process before the Supreme Court's ruling in *Stern v. Marshall*, 564 U.S. 462 (2011), making clear that such rulings exceeded bankruptcy courts' constitutional authority. This happens outside of bankruptcy as well. Between 1987, when the Federal Sentencing Guidelines became effective, and 2005, when the Supreme Court held that mandatory application of the Guidelines was unconstitutional, *see United States v. Portillo*, 981 F.3d 181, 182 (2d Cir. 2020) (citing *United States v. Booker*, 543 U.S. 220, 260-64 (2005)), tens of thousands of federal defendants were subject to mandatory Guidelines sentences each year. Neither those previous adjudications, nor the Supreme Court's judgment that Congress had not foreseen a potential constitutional issue, dissuaded the Court from its holding. *See Booker*, 543 U.S. at 247 (characterizing the issue as a "legislatively unforeseen constitutional problem"). Importantly, the Debtors cite no

case where the Government challenged an exculpation provision on any of the grounds discussed herein.[7]

And we are aware of no judicial decision allowing exculpation against the Government over such objections. Two courts of appeals prohibit exculpation outright: the Tenth Circuit, *see In re W. Real Est. Fund, Inc.*, 922 F.2d 592, 600 (10th Cir. 1990) (also prohibiting third-party releases), and the Fifth Circuit, which recently reconfirmed its view that broad exculpation of non-debtors is impermissible, as it "runs afoul" of the "statutory bar on non-debtor discharge" in Section 524(e), *In re Highland Cap. Mgmt., LP*, 48 F.4th 419, 435-38 (5th Cir. 2022).[8]

Some other courts of appeals have permitted certain forms of exculpation, but they generally limit such relief to acts the debtor and the creditors' committee undertake during the bankruptcy proceeding itself, based on the notion that the participants in that process should not later sue each other, having already litigated

[7] The Government's objection in this case was triggered by the Debtors' removal of language expressly carving out the Government from exculpation and their proposal of an aggressive provision that directly targeted the Government's ability to enforce the law. *See supra* at 9-10.

[8] The Fifth Circuit is among those that have concluded that 11 U.S.C. § 1103(c) confers a species of qualified immunity on certain estate fiduciaries, *see In re Highland Cap. Mgmt.*, 48 F.4th at 437, as discussed below. However, such qualified immunity, to the extent it exists, is an affirmative defense, limited to the debtor, the creditors' committee, and its members, and covers only conduct within the scope of their respective statutory duties. *See id.* at 437-38.

or settled before the bankruptcy court. *See Blixseth v. Credit Suisse*, 961 F.3d 1074, 1083 (9th Cir. 2020) (allowing exculpation of debtors and members of the creditors' committee for "acts committed during the process of developing and confirming a Chapter 11 plan"); *see id*. at 1084 (purpose of exculpation is to "allow the settling parties . . . to engage in the give-and-take of the bankruptcy proceeding without fear of subsequent litigation over any potentially negligent actions in those proceedings"); *In re PWS Holding Corp*., 228 F.3d 224, 246-47 (3d Cir. 2000) (upholding a provision that limited liability of members of a creditors' committee to willful misconduct or ultra vires acts "in the event that they were sued for their participation in the reorganization"). However, the rationale of preventing bankruptcy participants from relitigating resolved issues after plan confirmation, which has also been cited by lower courts in this district,[9] has no application to the Government enforcing its police and regulatory powers, as the Court recognized in granting a stay. *See* Stay Order at 14 ("The Court is hard-pressed to see how that reasoning, which is rooted in the need to settle disputes among different stakeholders engaged in a bankruptcy proceeding, applies to

---

[9] *See, e.g.*, *In re LATAM Airlines Grp. S.A.*, No. 20-11254 (JLG), 2022 WL 2206829, at *50 (Bankr. S.D.N.Y. June 18, 2022) ("Exculpation provisions are frequently included in chapter 11 plans, because stakeholders all too often blame others for failures to get the recoveries they desire; seek vengeance against other parties; or simply wish to second guess the decisionmakers in the chapter 11 case." (quotation marks omitted)).

exculpation from Government enforcement of the law following confirmation.").

Moreover, as the Ninth Circuit has noted, "confirmation of a plan does not insulate

debtors from prosecution for criminal activity, even if that activity is part of the

plan itself." *Garvin*, 922 F.3d at 1036.[10]

    We are aware of only one case expressly applying exculpation to a

Government agency: *In re Airadigm Commc'ns, Inc.*, 519 F.3d 640, 655 (7th Cir.

2008). Analyzing the question as whether third-party releases were permissible,

that court incorrectly determined that they were, including the exculpation at issue,

which applied to the Federal Communications Commission. *Id.* at 655-58. But the

FCC did not raise the constitutional questions the Government now raises, and the

Seventh Circuit did not consider (much less reject) them, or construe the Code to

---

[10] The courts in this circuit cited in the Debtors' stay briefing that referred to exculpation clauses as "reasonable and customary," or "standard in this district," likewise offer little support for Debtors' position. One of those cases dismissed as equitably moot a challenge to such a provision and merely quoted the bankruptcy court's characterization of the provision, *see In re Enron Corp.*, 326 B.R. 497, 504 (S.D.N.Y. 2005), while the others only briefly if at all considered any objections to the appropriateness of exculpation, and included no statutory or constitutional analysis, *see In re Oneida Ltd.*, 351 B.R. 79, 94 n.22 (Bankr. S.D.N.Y. 2006); *In re Granite Broad. Corp.*, 369 B.R. 120, 139 (Bankr. S.D.N.Y. 2007). Debtors cite no case in this circuit where the Government has been precluded from asserting its police and regulatory powers based on an exculpation clause.

avoid them.[11] And no court has concluded that a bankruptcy court may release

parties from criminal liability.

### V.   To the Extent Parties Following Bankruptcy Court Orders Are Entitled to Any Immunity, It Is an Affirmative Defense

It is uncontested that a party who engages only in conduct expressly

authorized or directed by a bankruptcy court may well have certain affirmative

defenses (including potentially a form of qualified immunity) in a future litigation

or prosecution. Such a party might also argue that, to the extent a scienter

requirement is relevant to the claim at issue, it lacked the requisite *mens rea*

because it was acting consistently with (or at the direction of) a court order. But

any such defenses are appropriately raised if and when an enforcement action is

actually brought, before the tribunal hearing that action, and not by an *ultra vires*

and preemptive grant of a release by the bankruptcy court even before the conduct

takes place.

In their stay briefing, Debtors cited no cases in which courts elevated a

defense such as collateral estoppel, res judicata, or qualified immunity into a

preemptive pre-suit release. That is not how defenses work. For example, in the

only instance where the Bankruptcy Code clearly recognizes a form of

---

[11] Even then, the court expressly found that the provision preserved certain agency non-monetary regulatory authority, since it did not allow for the exculpated party to "use this limitation as a way of skirting the FCC's regulations regarding the use, possession, or transfer of . . . licenses." *Id.* at 657.

exculpation—Section 1125(e), discussed above—courts recognize only an affirmative defense in subsequent litigation, not a prospective release from suit. *See, e.g.*, *SEC v. Universal Exp., Inc.,* 475 F. Supp. 2d at 425-26 (noting that defendant bears burden of proof on a defense under Section 1125(e), and denying defendant's summary judgment motion on the defense).

Likewise, while nothing in 11 U.S.C. § 1103(c) expressly confers immunity, some courts have held that Section 1103(c) provides a degree of qualified immunity as an affirmative defense to official creditors' committees acting in furtherance of their official duties. *See, e.g., Pan Am Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438, 514 (S.D.N.Y. 1994). Courts that have recognized this type of qualified immunity also consider it an affirmative defense rather than a preemptive bar. *See, e.g.*, *Luedke v. Delta Air Lines, Inc.*, 159 B.R. 385, 391-94 (S.D.N.Y. 1993); *In re Tucker Freight Lines, Inc.*, 62 B.R. 213, 215, 218 (Bankr. W.D. Mich. 1986) (denying committee members' summary judgment on immunity).

Indeed, qualified or even absolute immunity doctrines are raised and evaluated as defenses on a case-by-case basis because they require defendants to demonstrate that their challenged actions in a particular factual context fell within the protected scope. *See, e.g.*, *Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007) ("[B]ecause qualified immunity is an affirmative defense, it is incumbent upon the defendant to plead, and adequately develop, a qualified immunity defense

during pretrial proceedings so that the trial court can determine . . . which facts material to the qualified immunity defense must be presented to the jury to determine its applicability once the case has gone to trial." (quotation marks omitted)); *Stewart v. Lattanzi*, 832 F.2d 12, 13 (2d Cir. 1987) ("[s]ome factual inquiry must be made to determine whether the duties . . . were judicial or prosecutorial in nature entitling them, or any of them, to absolute immunity"). That is far different from the preemptive immunity granted by the bankruptcy court.

These principles apply equally to any bankruptcy-related qualified immunity, such as that cited by the bankruptcy court as a basis for the Exculpation Provision. *See* Dkt. 1190 at 4 (ER1232). As an initial matter, such immunity (discussed above), which some courts base on 11 U.S.C. § 1103(c), provides a defense for debtors and creditors' committees in subsequent suits relating to the discharge of their statutory duties during the bankruptcy proceeding, and thus cannot justify the Exculpation Clause here. *See In re Highland Cap. Mgmt.*, 48 F.4th at 437-38.

The cases cited by the bankruptcy court only confirm this proposition. *See* Dkt. 1190 at 4 n.2 (ER1232). For example, in *Dana Commercial Credit Corp. v. Center Teleproductions, Inc. (In re Center Teleproductions, Inc.)*, the bankruptcy court acknowledged that there is no immunity when a party claims that the very court order a trustee purportedly followed was obtained through fraud. 112 B.R.

46

567, 580 (Bankr. S.D.N.Y. 1990) (denying dismissal or summary judgment in light of questions about the receiver's conduct); *see also Phoenician Mediterranean Villa, LLC v. Swope (In re J&S Props., LLC)*, 545 B.R. 91, 103 (Bankr. W.D. Pa. 2015) (analyzing whether absolute or qualified immunity was the appropriate standard for actions of a trustee for the wrongdoing alleged in subsequent complaint, and evaluating the applicability of immunity to the specific facts of the case); *T&W Inv. Co. v. Kurtz*, 588 F.2d 801, 803 (10th Cir. 1978) (applying immunity in *subsequent* action after court concluded that "the receiver was in fact following the orders of the court and complying therewith"). The bankruptcy court also relied on *Bradford Audio Corp. v. Pious*, 392 F.2d 67, 72-73 (2d Cir. 1968), but in that case the court also found a receiver to be immune from lawsuit not prospectively, but rather as an affirmative defense based on the receiver's having followed a court order. *See Boullion v. McClanahan*, 639 F.2d 213, 214 (5th Cir. 1981) (affording absolute immunity to bankruptcy trustee in *subsequent* action challenging conduct during a bankruptcy); *see also In re XRX, Inc.*, 77 B.R. 797, 798 (Bankr. D. Nev. 1987) (dismissing adversary proceeding against trustee after court concluded that the trustee's action was pursuant to court order).

Notably, most of the cases relied on by the bankruptcy court pertain to actions of court-appointed trustees, not commercial entities merely claiming to follow court orders, and the decisions apply a line of cases addressing the

immunity of trustees specifically. *See Bradford Audio Corp.*, 392 F.2d at 73

(receiver was entitled to immunity as an affirmative defense because he was, *inter*

*alia*, "a court-appointed receiver doing no more and no less than to carry out an

explicit order, fair and regular on its face, by the appointing court, which

unquestionably had jurisdiction"); *Dana Commercial Credit Corp.*, 112 B.R. at

569-70, 579-81 (evaluating immunity with regard to trustee); *Boullion*, 639 F.2d at

214 (granting immunity to court-appointed trustee acting pursuant to court orders

on summary judgment); *T&W Inv. Co.*, 588 F.2d at 803 (granting immunity to

court-appointed receiver where court determined he "was in fact following the

orders of the court and complying therewith"); *In re J&S Properties*, 545 B.R. at

104 (carefully distinguishing various types of immunity for bankruptcy trustees

that depend on particular facts, such as whether they followed court orders, noting

that a trustee can be personally liable if she acts outside her appointed capacity,

and ultimately granting a motion to dismiss based on undisputed facts where the

trustee acted reasonably and consistent with her court-appointed capacity); *In re*

*XRX, Inc.*, 77 B.R. at 798 (Bankr. D. Nev. 1987) (bankruptcy trustee acting

pursuant to a court order entitled to immunity).

     In any event, none of the orders cited by the bankruptcy court prospectively

foreclosed the Government from enforcing its police and regulatory powers,

including criminal enforcement, against participants in a commercial transaction

that had yet to be completed. Accordingly, it remains to be seen what affirmative

defenses such parties may assert against future Government enforcement actions,

and specifically whether any type of bankruptcy-specific qualified immunity would

be appropriate or recognized in such an action.

Relatedly, because most of the purportedly exculpated conduct has not even

yet occurred, it would be impossible for any court to predetermine that a person

has *in fact complied* with any court orders and acted within the scope of his

authority. A person could accomplish a court-approved (or court-directed)

transaction by illegal means, such as by funding a court-authorized purchase with

stolen property. For example, in *In re J&S Properties, LLC*, cited by the

bankruptcy court, a court noted that even a bankruptcy trustee otherwise afforded

immunity "may be sued in his or her individual capacity for wrongful acts which

exceed the scope of his or her authority—*i.e.*, a bankruptcy trustee may be

personally liable for wrongful acts that are *ultra vires.*" 545 B.R. 91, 105 (Bankr.

W.D. Pa. 2015). Determining whether such an exception will apply to a

hypothetical future claim is impossible.

In sum, at most, participants in court-approved transactions may be entitled

to raise certain affirmative defenses against subsequent litigation or prosecution

involving specific conduct, and it is inappropriate and illegal for a court to purport

to bar such claims before the fact.

## VI.   The Bankruptcy Court's Justification for the Exculpation as Merely Protecting Those Who Follow Court Orders Fails

The bankruptcy court rationalized the Exculpation Clause as protecting parties that are merely following its orders and because court-supervised fiduciaries are entitled to a qualified immunity. *See, e.g.*, Confirmation Decision at 31-32, 36 (ER1209-10, 1214). But the Exculpation Clause is not nearly so narrow.

First, the Exculpation Provision is not limited to protecting estate fiduciaries for their conduct during the bankruptcy case, which some courts have found permissible, as discussed above. *See In re Highland Cap. Mgmt.*, 48 F.4th at 437-38. Rather, the Exculpation Provision extends beyond estate fiduciaries to exculpate others such as Binance.US and the Plan Administrator. Indeed, the Plan Administrator will not even exist until after the Effective Date of the Plan. Dkt. 1166 at 9 (ER1058); Dkt. 1166-1 at 40 (ER1144); *see In re Washington Mutual, Inc.*, 442 B.R. 314, 348 (Bankr. D. Del. 2011) ("[These parties] have not done anything yet for which they need a release. They will not even come into existence until the Plan is confirmed.").

Second, the Exculpation Provision is not limited to conduct during the bankruptcy case or to particular actions approved by the bankruptcy court, but provides impermissible prospective immunity from suit. *See, e.g., In re Fraser's Boiler Serv., Inc.*, 593 B.R. 636, 640 (Bankr. W.D. Wash. 2018) ("Exculpation clauses generally only exculpate those actions taken in connection with a

bankruptcy case between the petition date and the effective date of the plan."). This is especially problematic because, after the Plan's Effective Date, the Exculpated Parties will no longer be acting under the supervision of the bankruptcy court.

Contrary to the bankruptcy court's suggestion, the Exculpation Provision's broad language extends not just to actions specifically approved by the bankruptcy court. It protects against damages liability for "any transactions" approved by the bankruptcy court, and any liability at all "based on their execution and completion of the rebalancing transactions and the distribution of cryptocurrencies to creditors in the manner provided in the Plan," unless there is gross negligence, fraud, or willful misconduct. Confirmation Order at 7-8 (ER1056-57).

The Plan's definition of "Restructuring Transactions" also makes clear that they involve a broad range of future conduct:

> those mergers, amalgamations, consolidations, reorganizations, arrangements, continuances, restructurings, transfers, conversions, dispositions, liquidations, dissolutions, or other corporate transactions that the Debtors and the Committee jointly determine to be necessary to implement the transactions described in this Plan, as described in more detail in Article IV.B herein and the Restructuring Transactions Memorandum.

Plan at 13-14 (ER1121-22).

The Plan does not spell out with precision all the steps that the parties must take to implement these transactions. To the contrary, the transactions include whatever the "Debtors and the Committee jointly determine to be necessary to

implement the transactions described in the Plan." *Id.*; *see also id.* at 30 (ER1138). Other actions necessary to implement the Plan are left open for further negotiations, such as Voyager and Binance.US developing a "mutually agreed upon integration plan" to enable the migration of Voyager users to the Binance.US platform, which will require, *inter alia*, migrating user data. Dkt. 835 at 58 (ER225). In other words, the court granted a broad exculpation of liability for conduct that (at least in substantial part) has not yet occurred, with license for certain parties to later determine how to accomplish the transactions. The Exculpation Provision does not even exempt *ultra vires* conduct. *See supra* at 16.

Thus, while the bankruptcy court has broadly approved certain transactions—and the court's order may support applicable affirmative defenses relating to the ultimate conduct of those transactions—there remain many specific but undefined actions that must be taken to implement the transactions. And there are myriad ways the Exculpated Parties could engage in misconduct for which they should—and otherwise would—be liable but for the Exculpation Provision. One can imagine any number of laws or regulations—tax laws, securities laws, banking laws, and criminal laws, among others—that the Debtors and others could violate after the Plan's Effective Date in the course of effectuating the Plan. One can also imagine that a customer's cryptocurrency could be mishandled, or his private

information unlawfully disclosed, prior to the return of his funds, for which the Exculpation Provision would bar the customer's potential claim for relief.

The bankruptcy court, in its order denying a stay, appeared unconcerned about the potential mischief its order might cause. *See* Dkt. 1190 at 8 (ER1236) ("The Government . . . has strained to find potential ambiguities in these terms. It theorizes, for example, that my Order might somehow be interpreted as immunizing fraud, or theft, or tax avoidance. Those contentions are red herrings; I do not believe that the Government actually thinks that my Order has such effect, or that anyone could reasonably contend that it has such effect." (citation omitted)). But the plain language of its order improperly places all the interpretive risk in this regard on the Government and other parties with potential claims, rather than on Voyager and the other Exculpated Parties.

## CONCLUSION

For all these reasons, this Court should strike the Exculpation Provision from the Plan and Confirmation Order and remand this case to the Bankruptcy Court for further proceedings.

Dated: April 7, 2023
　　　New York, New York

　　　　　　　　　　　　DAMIAN WILLIAMS
　　　　　　　　　　　　United States Attorney
　　　　　　　　　　　　Southern District of New York

　　　　　　　　　　　　By: */s/* Jean-David Barnea
　　　　　　　　　　　　LAWRENCE H. FOGELMAN

53

JEAN-DAVID BARNEA
PETER ARONOFF
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2800
Lawrence.Fogelman@usdoj.gov
Jean-David.Barnea@usdoj.gov
Peter.Aronoff@usdoj.gov

By: /s/ Beth A. Levene
WILLIAM K. HARRINGTON
United States Trustee, Region 2
LINDA A. RIFFKIN
Assistant United States Trustee
RICHARD C. MORRISSEY
MARK BRUH
Trial Attorneys
U.S. Department of Justice
Office of the United States Trustee –
NY Office
Alexander Hamilton Custom House
One Bowling Green, Room 534
New York, New York 10004-1408
Tel.: (212) 510-0500

RAMONA D. ELLIOTT
Deputy Director/General Counsel
P. MATTHEW SUTKO
Associate General Counsel
BETH A. LEVENE
ANDREW BEYER
FREDERICK GASTON HALL
Trial Attorneys
Department of Justice
Executive Office for United States
Trustees
441 G Street, N.W., Suite 6150
Washington, DC 20530

54

## CERTIFICATE OF COMPLIANCE

I, Jean-David Barnea, counsel of record for Appellants, certify that this brief

was prepared using Microsoft Word, and that this processing program has been

applied to include all text other than what Fed. R. Bankr. P. 8015(g) allows to be

excluded in preparing the following word count. I further certify that this brief

contains 12,657 words.

By:   /s/ Jean-David Barnea_____
      Jean-David Barnea
      Assistant United States Attorney