as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or Interest has voted on the Plan.

**B.      Additional Documents**

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors, the Wind-Down Entity, and all Holders of Claims and Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

**C.      Payment of Statutory Fees**

All fees and applicable interest payable pursuant to section 1930 of the Judicial Code and 31 U.S.C. § 3717, as applicable, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the Wind-Down Debtors (or the Distribution Agent on behalf of the Wind-Down Entity) for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or a Final Decree is issued, whichever occurs first.

**D.      Dissolution of Statutory Committees**

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases; *provided*, however, that such committees will remain in existence for the limited purposes of (a) pursuing, supporting, or otherwise participating in, any outstanding appeals in the Chapter 11 Cases; and (b) filing, objecting, or otherwise participating in, any final fee applications of Professionals.

**E.      Reservation of Rights**

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests, unless and until the Effective Date has occurred.

**F.      Successors and Assigns**

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiary, or guardian, if any, of each such Entity.

**G.      Service of Documents**

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Wind-Down Debtors shall be served on:

Appellant Appendix ER - 456

|                           |                                                                                                                                                                                              |
|---------------------------|----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| Wind-Down Debtors         | **Voyager Digital Holdings, Inc.**<br>33 Irving Place<br>New York, New York 10003<br>Attention: David Brosgol<br>General Counsel,<br>E-mail address: dbrosgol@investvoyager.com               |
|                           | with copies for information only (which shall not constitute notice) to:                                                                                                                      |
| Counsel to the Debtors    | **Kirkland & Ellis LLP**<br>**Kirkland & Ellis International LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br>Attention: Joshua A. Sussberg, P.C., Christopher Marcus, P.C., Christine A. Okike, P.C., and Allyson B. Smith |
| Counsel to the Committee  | **McDermott Will & Emery LLP**<br>One Vanderbilt Avenue<br>New York, New York 10017<br>Attention: Darren Azman                                                                                 |

## H.      Entire Agreement; Controlling Document

Except as otherwise indicated, on the Effective Date, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations with respect to the subject matter of the Plan, all of which will have become merged and integrated into the Plan; *provided, however,* that notwithstanding the foregoing or anything to the contrary herein, to the extent there is any conflict between the Plan and the Confirmation Order, on the one hand, and the Asset Purchase Agreement, on the other hand, the Asset Purchase Agreement shall govern solely in the event the Sale Transaction is consummated.  Except as set forth in the Plan, in the event that any provision of the Disclosure Statement, the Plan Supplement, or any order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control. In the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall control.

## I.      Plan Supplement

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the website of the Claims, Noticing, and Solicitation Agent at  https://cases.stretto.com/Voyager  or the Bankruptcy Court's website at http://www.nysb.uscourts.gov.  Unless otherwise ordered by the Bankruptcy Court, to the extent any exhibit or document in the Plan Supplement is inconsistent with the terms of any part of the Plan that does not constitute the Plan Supplement, such part of the Plan that does not constitute the Plan Supplement shall control.

Appellant Appendix ER - 457

**J.      Non-Severability**

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, subject to the Purchaser's consent rights under the Asset Purchase Agreement prior to the Outside Date, shall have the power to alter and interpret such term or provision to make it valid or enforceable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is:  (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent, consistent with the terms set forth herein; and (3) non-severable and mutually dependent.

**K.      Votes Solicited in Good Faith**

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors, and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties nor individuals or the Wind-Down Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan or any previous plan.

**L.      Waiver or Estoppel**

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed prior to the Confirmation Date.

Appellant Appendix ER - 458

Dated:  January 10, 2023

VOYAGER DIGITAL HOLDINGS, INC.
on behalf of itself and all other Debtors


*/s/ Stephen Ehrlich*

Stephen Ehrlich
Co-Founder and Chief Executive Officer
Voyager Digital Holdings, Inc.

**Exhibit B**

**Liquidation Analysis**

## LIQUIDATION ANALYSIS FOR VOYAGER DIGITAL HOLDINGS, INC., *et al.*[1]

### I.   INTRODUCTION

Under the "best interests of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code, a bankruptcy court may not confirm a plan under chapter 11 of the Bankruptcy Code unless each holder of an allowed claim or interest in an impaired class either:  (a) accepts the plan; or (b) will receive or retain property on account of such claim or interest of a value, as of the effective date of the plan, that is not less than the amount such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To demonstrate that the proposed plan satisfies the "best interests of creditors" test, the Debtors, with the assistance of their advisors, have prepared the following hypothetical liquidation analysis presenting recoveries available assuming a hypothetical liquidation (the "Liquidation Analysis"), which is based upon certain assumptions discussed in the Disclosure Statement and in the accompanying notes to this Liquidation Analysis.

This Liquidation Analysis sets forth an estimated range of recovery values for each Class of Claims and Interests that may be realizable upon the disposition of assets pursuant to a hypothetical chapter 7 liquidation of the Debtors' estates.  As illustrated by this Liquidation Analysis, Holders of Claims in certain Unimpaired Classes that would receive a full recovery under either the Plan or Plan Toggle scenarios would receive less than a full recovery in a hypothetical liquidation.  Additionally, Holders of Claims or Interests in Impaired Classes would receive a lower recovery in a hypothetical liquidation than they would under either the Plan or Plan Toggle scenario.  Further, no Holder of a Claim or Interest would receive or retain property under the Plan or Plan Toggle scenario of a value that is less than such Holder would receive in a hypothetical chapter 7 liquidation.  Accordingly, and as set forth in greater detail below, the Debtors believe that both the Plan and Plan Toggle scenarios satisfy the "best interests of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code.

### Statement of Limitations

The preparation of a liquidation analysis is an uncertain process involving the extensive use of significant estimates and assumptions that, although considered reasonable by the Debtors based upon their business judgment and input from their advisors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors, their management, and their advisors.  Inevitably, some assumptions in this Liquidation Analysis would not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could materially affect the ultimate results in an actual chapter 7 liquidation.  This Liquidation Analysis was prepared for the sole purpose of generating a reasonable, good faith estimate of the proceeds that would be generated if the Debtors' assets were liquidated in accordance with chapter 7 of the Bankruptcy Code.  This Liquidation Analysis is not intended and should not be used for any other purpose.  The underlying financial information in this Liquidation Analysis and values stated herein have not been subject to any review, compilation, or audit by any independent accounting firm.  In addition, various liquidation decisions upon which certain assumptions are based are subject to change.  As a result, the actual amount of Claims that would ultimately be Allowed against the Debtors' estates could vary significantly from the estimates stated herein, depending on the nature and amount of Claims asserted during the pendency of the hypothetical chapter 7 cases.  Similarly, the value of the Debtors' assets in a liquidation scenario is uncertain and could vary significantly from the values set forth in this Liquidation Analysis.

NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS OF A CHAPTER 7 LIQUIDATION OF THE DEBTORS' ESTATES WOULD OR WOULD NOT, IN WHOLE OR IN PART, APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THIS LIQUIDATION ANALYSIS. THE ACTUAL LIQUIDATION VALUE

---

[1]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the *First Amended Disclosure Statement Relating to the Second Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Disclosure Statement").

OF THE DEBTORS' ESTATES IS SPECULATIVE AND RESULTS COULD VARY MATERIALLY FROM ESTIMATES PROVIDED IN THIS LIQUIDATION ANALYSIS.

THE RECOVERIES SHOWN DO NOT CONTEMPLATE A SALE OR SALES OF THE DEBTORS' BUSINESS UNITS ON A GOING CONCERN BASIS. WHILE THE DEBTORS MAKE NO ASSURANCES, IT IS POSSIBLE THAT PROCEEDS RECEIVED FROM SUCH GOING CONCERN SALE(S) WOULD BE MORE THAN IN THE HYPOTHETICAL LIQUIDATION, THE COSTS ASSOCIATED WITH THE SALE(S) WOULD BE LESS, FEWER CLAIMS WOULD BE ASSERTED AGAINST THE BANKRUPTCY ESTATES AND/OR CERTAIN ORDINARY COURSE CLAIMS WOULD BE ASSUMED BY THE BUYER(S) OF SUCH BUSINESS(ES).

THIS LIQUIDATION ANALYSIS IS A HYPOTHETICAL EXERCISE THAT HAS BEEN PREPARED FOR THE SOLE PURPOSE OF PRESENTING A REASONABLE, GOOD FAITH ESTIMATE OF THE PROCEEDS THAT WOULD BE REALIZED IF THE DEBTORS WERE LIQUIDATED IN ACCORDANCE WITH CHAPTER 7 OF THE BANKRUPTCY CODE AS OF THE PLAN EFFECTIVE DATE. THIS LIQUIDATION ANALYSIS IS NOT INTENDED AND SHOULD NOT BE USED FOR ANY OTHER PURPOSE. THIS LIQUIDATION ANALYSIS DOES NOT PURPORT TO BE A VALUATION OF THE DEBTORS' ASSETS AS A GOING CONCERN, AND THERE MAY BE A SIGNIFICANT DIFFERENCE BETWEEN THIS LIQUIDATION ANALYSIS AND THE VALUES THAT MAY BE REALIZED OR CLAIMS GENERATED IN AN ACTUAL LIQUIDATION. NOTHING CONTAINED IN THIS LIQUIDATION ANALYSIS IS INTENDED TO BE, OR CONSTITUTES, A CONCESSION, ADMISSION, OR ALLOWANCE OF ANY CLAIM AGAINST OR INTEREST IN THE DEBTORS. THE ACTUAL AMOUNT OR PRIORITY OF ALLOWED CLAIMS AND INTERESTS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH AND USED IN THIS LIQUIDATION ANALYSIS. THE DEBTORS RESERVE ALL RIGHTS TO SUPPLEMENT, MODIFY, OR AMEND THE ANALYSIS SET FORTH HEREIN.

**Basis of Presentation**

This Liquidation Analysis has been prepared assuming that the Debtors convert their current chapter 11 cases to cases under chapter 7 of the Bankruptcy Code on or about April 18, 2023 (the "Conversion Date"). Except as otherwise noted herein, this Liquidation Analysis is based upon the unaudited balance sheets of the Debtors as of October 31, 2022, and those values, in total, are assumed to be representative of the Debtors' assets and liabilities as of the Conversion Date. Certain balances, including cash and cryptocurrency, and certain receipts and expenses have been projected forward or estimated as of the Conversion Date. As noted above, the assets available to the Debtors in an actual liquidation may differ from the assets assumed to be available pursuant to this Liquidation Analysis.

In preparing this Liquidation Analysis, the Debtors estimated Allowed Claims based upon a review of the Debtors' financial statements. In addition, this Liquidation Analysis includes estimates for Claims not currently asserted in the chapter 11 cases, but which could be asserted and Allowed in a chapter 7 liquidation, including unpaid chapter 11 Administrative Claims, chapter 7 Administrative Claims such as liquidation and wind-down expenses, trustee fees, tax liabilities, and professional fees attributable to the liquidation and wind-down. To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims that were used for purposes of preparing this Liquidation Analysis. Therefore, the Debtors' estimate of Allowed Claims set forth in this Liquidation Analysis should not be relied on for any other purpose, including determining the value of any distributions to be made on account of Allowed Claims and Interests under the Plan or Plan Toggle scenario.

**Conversion Date and Appointment of a Chapter 7 Trustee**

This Liquidation Analysis assumes that on the Conversion Date, the Bankruptcy Court would appoint a chapter 7 trustee to oversee the liquidation of the Debtors' estates, during which time all of the Debtors' assets would be sold or surrendered and the cash proceeds, net of liquidation-related costs, would then be distributed to creditors in accordance with applicable law. There can be no assurance, however, that the liquidation would be completed within a certain timeframe, nor is there any assurance that the recoveries assigned to the assets would in fact be realized. In accordance with section 704 of the Bankruptcy Code, a trustee must, among other duties, collect and convert the property of the estate as expeditiously (generally at distressed prices) as is compatible with the best interests of parties in interest.

Appellant Appendix ER - 462

**Deconsolidated Liquidations**

This Liquidation Analysis assumes that the Debtors would be liquidated in a jointly administered, but not substantively consolidated proceeding, and takes into account the administrative priority status of intercompany claims arising post-petition. The results of this analysis have been consolidated for convenience.

**Additional Global Notes and Assumptions**

This Liquidation Analysis should be read in conjunction with the following global notes and assumptions:

1. Unaudited Financial Statements. This Liquidation Analysis contains numerous estimates. Except as otherwise noted herein, available recoveries are based upon the unaudited financial statements and balance sheets of the Debtors as projected as of the Conversion Date.

2. Chapter 7 Liquidation Costs. The Debtors have assumed that a hypothetical chapter 7 liquidation would last approximately 12 months, in order to pursue sales of substantially all remaining assets and collect receivables as well as to arrange distributions and otherwise administer and close the estates. In an actual liquidation, the length of the wind-down process could vary significantly, thereby impacting recoveries. Accordingly, there can be no assurance that the values reflected in this Liquidation Analysis would be realized if the Debtors were, in fact, to undergo such a liquidation.

3. Distribution of Net Proceeds. Pursuant to section 726 of the Bankruptcy Code, Allowed Administrative Claims incurred by the chapter 7 trustee, including expenses affiliated with selling the Debtors' assets, are entitled to payment in full prior to any distribution to chapter 11 Administrative Claims or Other Priority Claims. The estimates used in this Liquidation Analysis for these expenses includes estimates for operational expenses and certain legal, accounting, and other professionals, as well as an assumed 3.0% fee based upon liquidated assets payable to the chapter 7 trustee. Any remaining net Cash would then be distributed to creditors in accordance with applicable law in the following priority: (a) first to pay the Allowed Secured Tax Claims, (b) second to pay any Allowed Administrative Claims, Priority Tax Claims, and Other Priority Claims; and (c) third to creditors holding Account Holder Claims and General Unsecured Claims.

Under the absolute priority rule, no junior creditor at a given entity would receive any distribution until all senior creditors are paid in full at such entity, and no equity holder at such entity would receive any distribution until all creditors at such entity are paid in full. The assumed distributions to creditors as reflected in this Liquidation Analysis are estimated in accordance with the absolute priority rule.

4. Certain Exclusions and Assumptions. This Liquidation Analysis does not include detailed estimates for the tax consequences that may be triggered upon the liquidation and sale events included in the analysis. Such tax consequences may be material.

Appellant Appendix ER - 463

## II.    <u>CONCLUSIONS</u>

**THE DEBTORS HAVE DETERMINED, AS SUMMARIZED IN THE FOLLOWING ANALYSIS, THAT CONFIRMATION OF THE PLAN WILL PROVIDE CREDITORS WITH A RECOVERY THAT IS GREATER THAN OR EQUAL TO WHAT THEY WOULD OTHERWISE RECEIVE IN CONNECTION WITH A LIQUIDATION OF THE DEBTORS UNDER CHAPTER 7 OF THE BANKRUPTCY CODE.**

### <u>SUMMARY OF ESTIMATED RECOVERIES FOR CLAIMS AND INTERESTS</u>

| Class | Name of Class Under Plan | Status Under the Plan | Estimated Percentage Recovery Under the Plan | Estimated Percentage Recovery Under the Plan Toggle | Recovery Under Hypothetical Liquidation (Low) | Recovery Under Hypothetical Liquidation (High) |
|---|---|---|---|---|---|---|
| Unclassified | Administrative Claims | Unimpaired | 100% | 100% | 100% | 100% |
| Unclassified | Priority Tax Claims | Unimpaired | 100% | 100% | 47% | 48% |
| 1 | Secured Tax Claims | Unimpaired | NA | NA | NA | NA |
| 2 | Other Priority Claims | Unimpaired | 100% | 100% | 99% | 99% |
| 3 | Account Holder Claims | Impaired | 51% | 45% | 35% | 39% |
| 4A | OpCo General Unsecured Claims | Impaired | 51% | 45% | 35% | 39% |
| 4B | HoldCo General Unsecured Claims | Impaired | 6% | 6% | 0% | 0% |
| 4C | TopCo General Unsecured Claims | Impaired | 64% | 64% | 65% | 65% |
| 5 | Alameda Loan Facility Claims | Impaired | 0% | 0% | 0% | 0% |
| 6 | Section 510(b) Claims | Impaired | NA | NA | NA | NA |
| 7 | Intercompany Claims[1] | Unimpaired | 0% | 0% | 0% | 0% |

Appellant Appendix ER - 464

| 8 | Intercompany Interests | Unimpaired | 0% | 0% | 0% | 0% |
| 9 | Existing Equity Interests | Impaired | 0% | NA | N/A | N/A |

*1) For purposes of this Liquidation Analysis, Intercompany Claims are assumed to be recharacterized as capital contributions.*

## III.  NOTES FOR PROCEEDS AVAILABLE FOR DISTRIBUTION

### A.  *Gross Liquidation Proceeds*

1. <u>Cash and Cash Equivalents</u>:  This Liquidation Analysis projects the level of cash balances on hand from December 30, 2022 and represents the Debtor's best estimate of balances on hand at the Conversion Date. Balances are assumed to be recoverable at 100%. The cash balance does not reflect any cash proceeds or transaction fees from the Sale Transaction contemplated under the Plan.

2. <u>Cryptocurrency Assets Held</u>:  Estimated cryptocurrency values at Conversion Date are based on spot prices as of December 18, 2022 and assumes certain illiquid cryptocurrencies are liquidated at a discount to account for the impact of market depth constraints, including an inherently volatile market and significant industry disruption as a result of recent filings from major players. This discount also reflects the impact of transaction fees.

3. <u>Other Assets / Investments (Non-Debtor)</u>: The Debtors have prepaid certain expenses, including but not limited to, professional fee retainers, licenses, engineering, software, marketing and various other contractual obligations. This Liquidation Analysis assumes that prepaid amounts will continue to be consumed during the liquidation period to offset against potential liabilities. The Debtors furthermore own equity investments in various private and public companies. The Liquidation Analysis reflects proceeds from the sale of these investments and assumes recovery rates between 0% and 100% across these positions depending on the liquidity of the investment.

4. <u>Claims against 3AC Estate:</u> The Debtors have a claim against 3AC related to a cryptocurrency loan of 15,250 BTC and 350,000,000 USDC made in 2022. The value of the claim is based on prices as of October 31, 2022. This Liquidation Analysis makes no assumption regarding recovery on account of this claim and is reflected as a 0% recovery for purposes of this Liquidation Analysis.

5. <u>Intangible Assets</u>:  Intellectual property owned by the Debtors is comprised of goodwill, favorable leasehold interests, trademarks, patents, license agreements, and e-commerce registered domain names (collectively, the "<u>Debtors' IP</u>"). The Liquidation Analysis assumes no recovery value for the Debtors' IP.

6. <u>Litigation Claims:</u> Litigation claim recoveries are assumed to be the same under both the Plan, Plan Toggle and a Chapter 7 Liquidation and are not included for comparative purposes of this presentation.

### B.  *Liquidation Costs*

7. <u>Chapter 7 Professional Fees</u>:  Professional fees include costs for financial advisors, attorneys, accountants, and other professionals retained by the chapter 7 trustee.  Professional fees were estimated to be approximately $18.2 million for the liquidation period, based on an estimate of approximately $0.1 million to $3.0 million per month with approximately 77% of the fees incurred in the first 6 months.

8. <u>Chapter 7 Trustee Fees</u>:  In a Chapter 7 liquidation, the Bankruptcy Court may allow reasonable compensation for the trustee's services not to exceed a certain percentage of such proceeds greater than a set amount upon all proceeds disbursed or turned over in the case by the trustee to parties in interest.  Chapter 7 trustee fees were estimated at 3% of proceeds from Debtor, excluding recoveries related to cash and cash equivalents.

Appellant Appendix ER - 465

9. <u>Chapter 7 Estate Wind-Down Costs</u>:  During the chapter 7 liquidation period, the trustee will incur certain costs necessary to wind-down the estates.  Such expenses include the cost of the Debtors' operating personnel to liquidate customer accounts, technology and platform operating costs. For the entirety of the wind-down process, these costs have been estimated to be $ 16.9 million.

10. <u>3AC Litigation Pursuit:</u> The Debtors have a claim against 3AC related to a cryptocurrency loan of 15,250 BTC and 350,000,000 USDC made in 2022. This Liquidation Analysis makes no assumption regarding the cost of pursuit of recovery of this claim and therefore does not reflect the cost of any related litigation.

11. <u>Other Fees:</u> During the chapter 7 liquidation period the trustee with incur miscellaneous expenses including temporary labor costs, insurance, document management costs and banking fees, among others.  For the entirety of the chapter 7 process, these costs have been estimated to be approximately $8.4 million.

### C.    Claims

12. <u>Secured Tax Claims</u>:  Based on the December 6, 2022 claims register, no Secured Tax Claims have been identified and scheduled. To the extent that Secured Tax Claim amounts are later identified, a recovery of 100% is expected.

13. <u>Administrative, Priority Tax Claims and Other Priority Claims</u>:

- <u>Administrative Claims</u>:  Administrative Claims include unpaid post-petition accounts payable, accrued operating expenses, unpaid post-petition taxes, and Professional Fee Claims among others.  This Liquidation Analysis estimates Administrative Claims to be approximately $ 39.1 million on the Conversion Date.

- <u>Priority Tax Claims</u>:  Based on the December 6, 2022 claims register, federal and state tax claims are estimated to be $3.0M.

- <u>Other Priority Claims</u>:  Total Other Priority Claims are estimated to be $1.0.

14. <u>Account Holder Claims</u>:  Account Holder Claims are estimated to be approximately $1.764 billion as of the Conversion Date based on the number of customer coins and coin prices as of the Petition Date.

15. <u>Alameda Loan Facility Claims</u>:  Alameda Loan Facility Claims are estimated to be approximately $75.1 million as of the Conversion Date.

16. <u>General Unsecured Claims</u>:  Based on the December 6, 2022 claims register, General Unsecured Claims are estimated to total approximately $25.3 million on the Conversion Date.

- General Unsecured Claims at OpCo are estimated to be $14.0 million.

- General Unsecured Claims at HoldCo are estimated to be $8.3 million.

- General Unsecured Claims at TopCo are estimated to be $3.0 million.

Appellant Appendix ER - 466

## IV.  LIQUIDATION ANALYSIS RESULTS

The following pages present the results for the hypothetical liquidation of the Debtors. This Liquidation Analysis is presented on a consolidated basis for all Debtors and is compared against recoveries under the Plan and Plan Toggle scenarios.

| | Claims All Scenarios | Binance Plan | Recovery | Toggle Plan | Recovery | High Case Liquidation | Recovery | Low Case Liquidation | Recovery |
|---|---|---|---|---|---|---|---|---|---|
| | 4/18/2023 | 4/18/2023 | | 6/18/2023 | | 4/18/2023 | | 4/18/2023 | |
| **TOTAL ESTIMATED PROCEEDS (NET)** [3,4,5,6] | | 943.9 | | 849.8 | | 734.4 | | 669.6 | |
| Administrative Claims[7] | 39.1 | 39.1 | 100% | 39.1 | 100% | 39.1 | 100% | 39.1 | 100% |
| Priority Tax Claims | 3.0 | 3.0 | 100% | 3.0 | 100% | 1.4 | 48% | 1.4 | 47% |
| Secured Tax Claims | - | - | 0% | - | 0% | - | 0% | - | 0% |
| Other Priority Claims | 1.0 | 1.0 | 100% | 1.0 | 100% | 1.0 | 99% | 1.0 | 99% |
| Account Holder Claims[8] | 1,763.8 | 891.4 | 51% | 797.9 | 45% | 685.5 | 39% | 621.2 | 35% |
| OpCo General Unsecured Claims [9] | 14.0 | 7.1 | 51% | 6.3 | 45% | 5.4 | 39% | 4.9 | 35% |
| HoldCo General Unsecured Claims [9] | 8.3 | 0.5 | 6% | 0.5 | 6% | - | 0% | - | 0% |
| TopCo General Unsecured Claims [9] | 3.0 | 1.9 | 64% | 1.9 | 64% | 2.0 | 65% | 2.0 | 65% |
| Alameda Loan Facility Claims | 75.1 | - | 0% | - | 0% | - | 0% | - | 0% |
| Section 510(b) Claims | - | - | 0% | - | 0% | - | 0% | - | 0% |
| Intercompany Claims [10] | - | - | 0% | - | 0% | - | 0% | - | 0% |
| Intercompany Interests | - | - | 0% | - | 0% | - | 0% | - | 0% |
| Existing Equity Interests | - | - | 0% | - | 0% | - | 0% | - | 0% |
| **TOTAL RECOVERIES** | 1,907.3 | 943.9 | 49% | 849.8 | 45% | 734.4 | 39% | 669.6 | 35% |

Footnotes to Analysis
(1) Assumes Binance sale transaction does not occur in a liquidation scenario and that the conversion to a chapter 7 liquidation occurs at April 18, 2023.
(2) For the purposes of this presentation, the Plan and Liquidation Analysis do not assume any recovery on the 3AC loan.
(3) Total Estimated Proceeds (Net): primarily includes (x) (i) Binance Transaction Proceeds including Expense Reimbursements (Binance/Toggle only), (ii) Estimated Value of Cryptocurrency Portfolio, (iii) Cash & Cash Equivalents and (iv) proceeds from other assets of the estate; and (y) net estimated wind down costs.
(4) Estimated value of cryptocurrency portfolio under all scenarios is based on spot prices as of December 18, 2022.
(5) Estimated value of cryptocurrency portfolio in the liquidation scenario is discounted based on the estimated impact of market depth constraints, including an inherently volatile market and significant industry disruption as a result of recent filings from major players, as well as transaction fees.
(6) Analysis assumes that the Company is able to retain the necessary employees with experience and expertise required to execute a rebalance and distribution. To the extent the company is unable to retain the personnel necessary to perform these actions, recoveries would likely be significantly negatively impacted.
(7) Administrative claims include estimated unpaid accrued payables, and chapter 11 professional fees incurred through hypothetical conversion date of April 18, 2023.
  OpEx and professional fees related to the extension of time in the Toggle scenario are assumed to be effectively on a cash basis and assumed to have no impact on administrative claims for illustrative purposes.
(8) Estimated value of Account Holders Claims is based on the dollarization of the customer portfolio based on asset prices as of the Petition Date (July 5, 2022).
(9) OpCo, HoldCo, and TopCo GUCs estimated based off of December 6, 2022 Claims registry and are subject to further reconciliation and objections.
(10) For purposes of this Liquidation Analysis, Intercompany Claims are assumed to be recharacterized as capital contributions.

Note: Litigation claim recoveries are assumed to be the same under both the Plan and a Chapter 7 Liquidation and ignored for comparative purposes of this presentation

Appellant Appendix ER - 467

**Exhibit C**

**Frequently Asked Questions & Answers**

Appellant Appendix ER - 468

## Exhibit C

### FREQUENTLY ASKED QUESTIONS & ANSWERS

**About the Plan**

**1.  How are my Account Holder Claims calculated? Can I receive recoveries greater than my Account Holder Claim amount?**

As is required by the U.S. Bankruptcy Code, each Account Holder's Claim is determined by the fair market value of the cryptocurrency (based in U.S. Dollars) held by the Account Holder at Voyager Digital, LLC as of July 5th, 2022 at 00:00 UTC. This process is generally referred to as a "dollarization." Dollarization allows the Debtors to put all Account Holders' Claims on equal footing to calculate recoveries in accordance with the requirements of the U.S. Bankruptcy Code.

For example, if an Account Holder's portfolio consisted of 0.5 ETH, 30 USDC, 20 APE and 100 ALGO on July 5, 2022, the Account Holder would have a total claim against OpCo of $724.81 (see illustrative example below). All Account Holder Claims will be calculated in an identical manner, regardless of whether such claims are denominated in BTC, ETH, VGX or USDC or in any other cryptocurrency.

Keep in mind, the U.S. Bankruptcy Code requires that all creditors of the same class receive "equal treatment", so the value that is available for distribution to Account Holders is equitably distributed amongst all Account Holders (i.e., no Account Holder can have a greater opportunity to recover on their claim than another Account Holder). (See Question 6 below.)

| Coin | Customer Claim | | |
|------|----------------|----------------|-----------|
| | # of Coins Claimed | 7/5 Coin Price | Claim ($) |
| ETH | 0.50 | $1,131.60 | $565.80 |
| USDC | 30.00 | 1.00 | 30.00 |
| APE | 20.00 | 4.91 | 98.27 |
| ALGO | 100.00 | 0.31 | 30.74 |
| **Total** | | | **$724.81** |

In accordance with the U.S. Bankruptcy Code and applicable bankruptcy law, a creditor is not eligible to receive consideration exceeding 100% of the value of their claim. Additionally, until Account Holders and Holders of OpCo General Unsecured Claims receive 100% of their claims against OpCo, no consideration is allowed to be distributed to creditors holding interests and/or lower priority claims against OpCo in accordance with the absolute priority rule.

**2.  How is the Initial Distribution calculated?**

The total Initial Distribution to Holders of Account Holder Claims and Holders of OpCo General Unsecured Claims consists of a pro rata amount to be determined by the Debtors that will be informed by:

(i)      the upfront cash payment of $20.0 million,

(ii)     all cash and cash equivalents held at OpCo (net of any cash and cash equivalents necessary (x) to satisfy those claims at OpCo senior to Account Holder Claims and OpCo General Unsecured Claims and (y) to fund a wind-down reserve),

1

Appellant Appendix ER - 469

(iii)    any expense reimbursement received from BAM Trading Services Inc. d/b/a Binance.US ("Binance.US") pursuant to the Binance.US asset purchase agreement for reasonable expenses incurred by Voyager Digital between March 18, 2023 and Closing, subject to a $15mm cap, and

(iv)    the fair market value of all cryptocurrency held at OpCo.

Each Account Holder's Initial Distribution will be calculated based on their pro rata share of the total Account Holder Claims and OpCo General Unsecured Claims. For example, to the extent the fair market value of all cryptocurrency held at OpCo was transferred to Binance.US at prices as of approximately UTC 20:30 on December 18, 2022, the estimated Initial Distribution would be equal to 51% of the total dollarized claims of all Account Holders and Holders of Opco General Unsecured Claims.

Account Holders located in Supported Jurisdictions who are current Binance.US users or who are able to satisfy onboarding requirements at Binance.US within three months of Closing will receive their share of the Initial Distribution on an in-kind basis within four weeks following the later of the Closing or the completion of the transfer of user data to Binance.US.  All Account Holders in Supported Jurisdictions who do not complete such onboarding requirements within three months following the later of the Closing or the completion of the transfer of user data to Binance.US will have their in-kind cryptocurrency distribution converted into U.S. Dollars at then prevailing market prices which will be distributed to such Account Holders by OpCo.

For any Account Holders located in jurisdictions where Binance.US does not have required regulatory approvals as of the Closing ("Unsupported Jurisdictions" which as of the date hereof are Hawaii, New York, Texas, and Vermont), Binance. US will have until six (6) months following the Closing to obtain approvals to make distributions to Account Holders in such jurisdictions on a provisional basis. If Binance.US is unable to make distributions to Account Holders in an Unsupported Jurisdiction at the conclusion of the six (6) month period, the Account Holders in such Unsupported Jurisdiction will have their in-kind cryptocurrency distribution converted into U.S. Dollars at then prevailing market prices, which will be distributed to such Account Holders by OpCo.

Under the Plan, the cryptocurrency shall be subject to a rebalancing exercise, which shall occur no more than one business day prior to the Closing Date. As such, the size of the Initial Distribution and ultimate recoveries relative to each Account Holder's dollarized claim as of July 5th, 2022, is unknowable at this time and will be impacted by the price performance of OpCo's cryptocurrency portfolio during such reference period.

After the completion of the rebalancing exercise, to the extent the estate has a shortfall in any specific cryptocurrency relative to the implied required distribution amount, the implied dollar amount of the shortfall will made through a distribution of USDC or U.S. Dollars.

**3.    When, and how, will I receive value from 3AC recoveries?**

Voyager continues to work diligently to maximize its recovery in the 3AC Liquidation Proceeding on account of the 3AC Loan and the recovery from the 3AC Loan, if any, will be distributed to Holders of Account Holder Claims and OpCo General Unsecured Claims as soon as commercially reasonable. However, the timing of actual distributions to Holders of Account Holder Claims and OpCo General Unsecured Claims may be affected by many factors that cannot be predicted.  Therefore, the estate cannot guarantee the timing or amount of the 3AC recovery.

Upon receipt of a 3AC recovery, the Distribution Agent shall make distributions to Holders of Account Holder Claims and OpCo General Unsecured Claims at the address for each such Holder as indicated on the applicable register or in the Voyager records as of the date of any such distribution (as applicable).  Any 3AC recovery distributions shall be dependent upon the form in which received (token or U.S. Dollars) and the transition status of each respective Account Holder.  For users onboarded onto the Binance.US platform, any distributions will be done through such platform.

**4. Why do the implied recoveries move up or down based on cryptocurrency prices? Don't Account Holders just receive a fixed percentage?**

As previously discussed (see Question 1 above), claims are fixed based on an Account Holder's tokens and cryptocurrency prices as of the Petition Date. Since the Petition Date, the Debtor has been "long" the entire cryptocurrency portfolio. This exposes implied dollar value recoveries to movements in cryptocurrency prices between the Petition Date and the rebalancing date, given the distribution values are also based on volume-weighted dollar prices of cryptocurrency as of two days prior to the rebalancing date.

As such, an individual Account Holder's implied recoveries are impacted by (i) **_gross_** movements in U.S. Dollar-denominated cryptocurrency prices relative to the Petition Date, and (ii) **_relative_** movements in cryptocurrency prices (e.g., BTC vs. ETH).

Voyager has a relatively high percentage of altcoins, which have underperformed in the market relative to BTC / ETH and stablecoins. These cryptocurrency movements are the primary driver of any changes to an Account Holder's recovery value, as evidenced by the charts below.



Implied Binance.US Recovery Values at Various Crypto Prices[1]

Relative Underperformance of Altcoins Compared to BTC and ETH

**5. The cryptocurrencies in my account have gone up since July 5th, are my recoveries then based on price of those cryptocurrencies at the time of the Initial Distribution?**

**_No_**, in order for all creditors, Account Holders or otherwise, to be treated in an equal and fair manner, as required by the U.S. Bankruptcy Code, the value of each creditor's claims is "dollarized" as of July 5th, 2022. (See Question 1)

At the time of the Initial Distribution, all Holders of Allowed Account Holder Claims and Allowed OpCo General Unsecured Claims will receive an equal pro rata recovery relative to their dollarized July 5th, 2022 claim, regardless of the price performance of the underlying cryptocurrencies in such Account Holder's account.

---

[1]     Implied Binance.US recovery values leave all assumptions (including Binance.US consideration, wind-down costs, other benefits (expense reimbursement and non-buyer proceeds) and other expenses (rebalancing leakage, wind-down funding leakage and VGX impact)) constant except for the difference in cryptocurrency prices on the specified dates / date ranges.

Appellant Appendix ER - 471

All cryptocurrencies at OpCo, including VGX, are property of OpCo's estate and the value of such cryptocurrencies at the time of the rebalancing exercise will be a key factor in determining the size of the Initial Distribution.

***Under the Plan, all Holders of Account Holder Claims and OpCo General Unsecured Claims are effectively "long" OpCo's entire cryptocurrency portfolio through the date at which the fair market value is determined under the Binance.US asset purchase agreement, regardless of the specific cryptocurrencies held by any individual Account Holder, with any upside limited by the amount of such Account Holder's or OpCo General Unsecured Creditor's Allowed Claim.***

***In the event of a wind down, liquidation, or an alternative plan construct (even to the extent it supported 100% of the same cryptocurrencies as those available on the Voyager platform), claims and distributions would be treated in an identical manner with Account Holder Claims being dollarized as of July 5th, 2022 and distributions to Holders of Account Holder Claims and OpCo General Unsecured Claims being based on the value of consideration at the time of such distribution relative to such creditors' dollarized claim value.***

***Under a wind-down or liquidation, all cryptocurrency would be immediately sold into the market and distributions would not be made in-kind, but in cash in U.S. Dollars which may result in adverse tax impacts for Account Holders.***

For example, under the Binance.US transaction, to the extent an Account Holder had a claim for $1,000 based on the dollarized value of their cryptocurrencies as of July 5, 2022, and the sale price of the cryptocurrency held at OpCo implied an Initial Distribution of 51%, such Account Holder would receive an Initial Distribution with value equal to $510. Such value may be in a mix of in-kind cryptocurrencies or U.S. Dollars depending on whether such Account Holder transitioned to Binance.US in a timely manner.

Such Account Holder would then have a deficiency claim of $490 which could be satisfied through subsequent distributions from the liquidating trust relating to cash hold backs, 3AC recoveries, and other retained value at OpCo after any claims at OpCo that are senior to Account Holder Claims and OpCo General Unsecured Claims, such as priority and administrative claims, have been satisfied.

A deficiency claim in this case is simply the difference between the Initial Distribution and the Account Holder Claim (dollarized value of cryptocurrencies as of July 5, 2022). It is the amount necessary to achieve 100% recovery vs. total (cumulative) recoveries received at any point in time. (See Question 16)

4

| $ actual | \$10.0 | \$100.0 | \$1,000.0 | \$10,000.0 | \$100,000.0 | \$1,000,000.0 | \$10,000,000.0 |
|---|---|---|---|---|---|---|---|
| **Illustrative July 5, 2022 Claim Value** | | | | | | | |

**Initial Distribution Value @ Illustrative Initial Distribution % of Claim Value**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| @ 43.0% | \$4.3 | \$43.0 | \$430.0 | \$4,300.0 | \$43,000.0 | \$430,000.0 | \$4,300,000.0 |
| @ 45.0% | \$4.5 | \$45.0 | \$450.0 | \$4,500.0 | \$45,000.0 | \$450,000.0 | \$4,500,000.0 |
| @ 47.0% | \$4.7 | \$47.0 | \$470.0 | \$4,700.0 | \$47,000.0 | \$470,000.0 | \$4,700,000.0 |
| @ 49.0% | \$4.9 | \$49.0 | \$490.0 | \$4,900.0 | \$49,000.0 | \$490,000.0 | \$4,900,000.0 |
| @ 51.0% | \$5.1 | \$51.0 | \$510.0 | \$5,100.0 | \$51,000.0 | \$510,000.0 | \$5,100,000.0 |
| @ 53.0% | \$5.3 | \$53.0 | \$530.0 | \$5,300.0 | \$53,000.0 | \$530,000.0 | \$5,300,000.0 |
| @ 55.0% | \$5.5 | \$55.0 | \$550.0 | \$5,500.0 | \$55,000.0 | \$550,000.0 | \$5,500,000.0 |
| @ 57.0% | \$5.7 | \$57.0 | \$570.0 | \$5,700.0 | \$57,000.0 | \$570,000.0 | \$5,700,000.0 |
| @ 59.0% | \$5.9 | \$59.0 | \$590.0 | \$5,900.0 | \$59,000.0 | \$590,000.0 | \$5,900,000.0 |

**Implied Deficiency Claim @ Illustrative Initial Distribution % of Claim Value**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| @ 43.0% | \$5.7 | \$57.0 | \$570.0 | \$5,700.0 | \$57,000.0 | \$570,000.0 | \$5,700,000.0 |
| @ 45.0% | \$5.5 | \$55.0 | \$550.0 | \$5,500.0 | \$55,000.0 | \$550,000.0 | \$5,500,000.0 |
| @ 47.0% | \$5.3 | \$53.0 | \$530.0 | \$5,300.0 | \$53,000.0 | \$530,000.0 | \$5,300,000.0 |
| @ 49.0% | \$5.1 | \$51.0 | \$510.0 | \$5,100.0 | \$51,000.0 | \$510,000.0 | \$5,100,000.0 |
| @ 51.0% | \$4.9 | \$49.0 | \$490.0 | \$4,900.0 | \$49,000.0 | \$490,000.0 | \$4,900,000.0 |
| @ 53.0% | \$4.7 | \$47.0 | \$470.0 | \$4,700.0 | \$47,000.0 | \$470,000.0 | \$4,700,000.0 |
| @ 55.0% | \$4.5 | \$45.0 | \$450.0 | \$4,500.0 | \$45,000.0 | \$450,000.0 | \$4,500,000.0 |
| @ 57.0% | \$4.3 | \$43.0 | \$430.0 | \$4,300.0 | \$43,000.0 | \$430,000.0 | \$4,300,000.0 |
| @ 59.0% | \$4.1 | \$41.0 | \$410.0 | \$4,100.0 | \$41,000.0 | \$410,000.0 | \$4,100,000.0 |

**6. Can't recoveries be 'tiered' based on account size? Some accounts had less than \$100, but mine had \$100,000, shouldn't I receive a higher percentage recovery if I'm losing more in dollar terms?**

<u>No</u>, the U.S. Bankruptcy Code requires that all creditors of the same class receive "equal treatment." A Debtor is not permitted to favor some creditors within the same class over others. Account Holders are the same class of creditors regardless of account size. As such, all Account Holder recoveries need to be treated in the same manner, whether such distributions were made under a plan, wind down, liquidation, or otherwise. This does not mean that all Account Holders will receive the same amount of distribution, but rather that each Account Holder will receive the same treatment under the Plan, the same opportunities in connection with the distributions contemplated under the Plan, and the same percentage recovery on their claims (i.e., each Account Holder will receive a recovery of approximately 51% of their claim).

**7. Will VGX be supported? How is the value of my VGX being treated?**

Account Holders that held VGX will be receiving their pro rata share of their VGX claim similar to all other cryptocurrency claims. All Account Holder Claims and recoveries will be treated in an identical manner. All Account Holder Claims will be "dollarized" as of July 5th, 2022 with Account Holders receiving the same proportional amount of value in recoveries relative to such claims, regardless of whether an Account Holder had BTC, ETH, USDC, VGX, or any other cryptocurrency in their account.

In connection with their proposal, Binance.US has agreed to initiate and undertake an internal review process to determine whether VGX tokens can be listed for trading on the Binance.US platform. In the event Binance.US's review process does not deem VGX eligible for trading on the Binance.US platform, Account Holders will still receive their pro rata share of their VGX claim and will have the ability to hold their VGX in custody at Binance.US or transfer their VGX tokens off the Binance.US platform.

Appellant Appendix ER - 473

Under the Plan, for Account Holders with VGX in their accounts on the Petition Date, the VGX portion of such claims will be determined based on the U.S. Dollar price of VGX on the Petition Date of $0.2382. To Dollarize the VGX portion of a claim an Account Holder would multiply the U.S. Dollar price of VGX on the Petition Date of $0.2382 by the amount of VGX coins held as of the Petition Date.

***For illustrative purposes, to the extent that the implied Cryptocurrency Initial Distribution under the Plan is 51% of claim value, an Account Holder would receive an Initial Distribution in VGX based on (x) their VGX claim value multiplied by (y) the Initial Distribution percentage.***

As outlined in the table below, if an Account Holder has a 1,000 VGX token claim, the associated dollar value of such claim would be $238.19. If the Initial Distribution is 51% of claim value, the Account Holder would receive an Initial Distribution equal to $121.47.

| | [A] | [B] | [A] x [B] = [C] | [B] x Token Holdings | | | | [C] x Token Holdings | | | |
| | | | | Implied Claim @ VGX Token Holdings | | | | Illustrative Initial Distribution @ VGX Token Holdings | | | |
| | Illustrative Initial Distribution % | 7/5 VGX Token Price | Implied VGX Recovery Price / Token | 100 | 1,000 | 10,000 | 100,000 | 100 | 1,000 | 10,000 | 100,000 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1.) | 43.0% | $0.2382 | $0.1024 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $10.24 | $102.42 | $1,024.22 | $10,242.29 |
| 2.) | 45.0% | $0.2382 | $0.1072 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $10.71 | $107.18 | $1,071.86 | $10,718.67 |
| 3.) | 47.0% | $0.2382 | $0.1120 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $11.19 | $111.95 | $1,119.50 | $11,195.06 |
| 4.) | 49.0% | $0.2382 | $0.1167 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $11.67 | $116.71 | $1,167.14 | $11,671.44 |
| 5.) | 51.0% | $0.2382 | $0.1215 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $12.14 | $121.47 | $1,214.78 | $12,147.83 |
| 6.) | 53.0% | $0.2382 | $0.1262 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $12.62 | $126.24 | $1,262.42 | $12,624.21 |
| 7.) | 55.0% | $0.2382 | $0.1310 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $13.10 | $131.00 | $1,310.06 | $13,100.60 |
| 8.) | 57.0% | $0.2382 | $0.1358 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $13.57 | $135.76 | $1,357.69 | $13,576.99 |
| 9.) | 59.0% | $0.2382 | $0.1405 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $14.05 | $140.53 | $1,405.33 | $14,053.37 |

The Account Holder will then have a deficiency claim against OpCo in an amount of $116.72 ($238.19 claim value less $121.47 Initial Distribution), which may be satisfied through (i) recoveries on OpCo's loan to 3AC and (ii) any residual cash proceeds attributable to OpCo from the liquidation trust after the full satisfaction of claims at OpCo that are senior to Account Holder Claims.

**8.  What will happen to the VGX token going forward under the Plan?**

The VGX Token Smart Contracts (including any private keys related solely to such smart contracts) are excluded from the transaction scope for the Binance.US proposal. The Debtors continue to work with third parties in an effort to identify a solution to support the ongoing utility of VGX.  If the Debtors are unable to identify a solution for VGX's ongoing utility, VGX may decline in value and may have no value post-consummation of the Plan.

Similar to all other Voyager tokens, Binance.US has agreed to support custody of the VGX token on the Binance.US platform.  In connection with their proposal, Binance.US has also agreed to initiate and undertake an internal review process to determine whether VGX tokens can be listed for trading on the Binance.US platform. The sale of the VGX Token Smart Contracts could adversely affect such review process and may result in VGX being ineligible to be listed for trading on the Binance.US platform. In the event Binance.US's review process does not deem VGX eligible for trading on the Binance.US platform, Account Holders will still receive their pro rata share of their VGX claim and will have the ability to hold their VGX tokens on the Binance.US platform or transfer their VGX tokens off the Binance.US platform to a third-party wallet.

**9.  Do I still have access to my tokens on Binance.US if they are not supported for trading?**

***Yes***, upon successfully migrating to Binance.US each Account Holder will have access to the entirety of their pro rata share of the Initial Distribution (which will be made in-kind as described above). At this time, Binance.US supports trading for 82 tokens that were available on the Voyager platform. These 82 tokens represent approximately 93.2% of the dollar value of cryptocurrency denominated claims as of July 5th, 2022. Regardless of whether a token is supported or not supported for trading, Account Holders will have the ability to withdrawal and transfer their cryptocurrencies to a third-party wallet upon their receipt of a distribution should they so choose post-closing.

Appellant Appendix ER - 474

Binance.US has also indicated to the Debtors that other tokens currently unsupported for trading are likely to become supported by the time of Closing. For tokens that are not currently supported for trading on the Binance.US platform, Account Holders will have the ability to hold those tokens on the Binance.US platform or transfer off the platform into a third-party wallet.

For example, if an Account Holder held BTC, ETH and XRP in its account, for purposes of the Initial Distribution, the BTC portion of such recovery will be made in BTC, the ETH portion will be made in ETH and the XRP portion will be made in XRP. The Account Holder would be able to immediately trade the BTC and ETH received; however, the Account Holder would not be able to trade XRP on the Binance.US platform as XRP is currently unsupported for trading purposes. To the extent such Account Holder wishes to sell their XRP for U.S. Dollars, the Account Holder will be able to transfer their XRP to a third-party wallet that supports trading in XRP.

### _Voyager Tokens Currently Supported for Trading on Binance.US Platform_

| AAVE | ADA | ALGO | ALICE |
|------|------|-------|--------|
| ANKR | APE | ATOM | AUDIO |
| AVAX | AXS | BAND | BAT |
| BCH | BICO | BNT | BTC |
| CELO | CHZ | COMP | CRV |
| DAI | DASH | DGB | DOGE |
| DOT | EGLD | ENJ | ENS |
| EOS | ETC | ETH | FET |
| FIL | FLOW | FTM | GALA |
| GLM | GRT | HBAR | ICP |
| ICX | JASMY | KAVA | KNC |
| KSM | LINK | LPT | LRC |
| LTC | MANA | MATIC | MKR |
| NEO | OCEAN | OMG | ONT |
| OP | OXT | QNT | QTUM |
| REN | ROSE | SAND | SHIB |
| SKL | SOL | SPELL | SUSHI |
| TRX | TUSD | UNI | USDC |
| USDT | VET | WAVES | WBTC |
| XLM | XTZ | YFI | ZEC |
| ZEN | ZRX | | |

**10. If a token in my Voyager account was listed as being unsupported for trading at Binance.US, can I select a different supported token to receive my distribution?**

_No_, the in-kind distribution will be made in the same token(s) currently in each Account Holder's Voyager account. In order to provide Account Holders with their pro rata share of the original tokens in their account and limit any potential adverse tax implications related to liquidating or converting tokens, Binance.US has agreed to provide in-kind distributions for Account Holders on all tokens, including tokens currently unsupported for trading. However, if the estate has a shortfall in any specific cryptocurrency relative to the implied required distribution amount, the implied dollar amount of the shortfall will made through a distribution of USDC or U.S. Dollars.

**11. If my account only had BTC, will all of my distributions be made in BTC?**

_Maybe_, the Initial Distribution will be made in-kind for all tokens for Account Holders who successfully transition to the Binance.US. platform. Any future recoveries received in token form may be distributed in-kind to successfully

7

Appellant Appendix ER - 475

transitioned Account Holders through the Binance.US platform. If any future recoveries are received in U.S. Dollars or an Account Holder has not successfully transitioned to the Binance.US platform, such distributions will be made in U.S. Dollars based on the respective U.S. Dollar denominated claim amount.

**12.  Why can't I receive my recovery under the Plan from the Voyager platform?**

Binance.US offers users the ability to withdraw an additional 35 cryptocurrency tokens (approximately 20% of the Debtors' cryptocurrency portfolio based on equivalent USD value) on the Debtors' platform that cannot be transferred directly to individual wallets due to technical limitations associated with the Debtors' platform. Historically, users of the Debtors' platform have exited from their positions in such tokens by selling such tokens for cash, transactions that previously required close interaction with market makers to effectuate. Accordingly, the only way for the Debtors to distribute the value associated with these non-transferable tokens to creditors in Unsupported Jurisdictions is to liquidate the tokens and distribute the resulting cash. The Binance.US platform allows users to freely transfer such tokens to their individual wallets.

Further, the Debtors would not only need to significantly increase their engineering, regulatory, compliance and other operational staff and resources, but would also require additional money transmitter licenses, authorizations, or exemptions which they currently lack. The aforementioned additional staff and resources would also be necessary to facilitate manual transfers to individual customer wallets that they otherwise would not have to do if transfers to customers were made through the Binance.US platform. The Debtors would also need to revive certain dormant contracts with third-party vendors to process distributions to creditors in this manner. This would result in increased administrative costs as compared to the costs of liquidating the cryptocurrency associated with creditors in Unsupported Jurisdictions and distributing the equivalent value in cash.

Finally, there are risks associated with the Debtors' distribution of cryptocurrency to individual creditor wallets as opposed to effectuating such distributions through the Binance.US platform. The Debtors must comply with anti-money laundering ("AML") and know your customer ("KYC") laws when sending cryptocurrency to individual wallets. Historically, the Debtors used Chainanalysis for automated verification of certain user generated cryptocurrency transfer requests. However, Chainalysis does not support all of the tokens listed on the Voyager platform (*e.g.*, non-transferable tokens). While AML/KYC compliance is easy when transferring cryptocurrency to Binance.US wallets, it poses substantial risk to the Debtors as it relates to the manual transfer of cryptocurrency to individual wallets for over 120,000 creditors. Binance.US has represented to the Debtors that it has existing infrastructure in place that would allow it to perform AML/KYC compliance checks in connection with transferring all cryptocurrency to customer accounts on its platform. Unlike ACH transfers which can be reversed, cryptocurrency sent to the wrong wallet cannot, which is why parties will often send a small "test" transaction to a wallet address prior to initiating a large transfer.

**13.  Are my recoveries capped at the value I receive in the Initial Distribution?**

*No*, in addition to recoveries associated with the Initial Distribution, Holders of Account Holder Claims and OpCo General Unsecured Claims are entitled to receive additional recoveries, net of any OpCo administrative and priority claims and wind-down expenses up to their total dollarized claim amount, including with respect to (i) any recoveries on account of the 3AC loan, (ii) value associated with the sale of any other OpCo assets, and (iii) residual cash distributions attributable to OpCo from the liquidating trust.

However, in accordance with the U.S. Bankruptcy Code, a creditor is not eligible to receive consideration exceeding 100% of the amount of their claim.

**14.  How will the amount of my distribution of cryptocurrency be determined?**

Under the Plan, the rebalancing exercise, and as a result each creditor's distribution of cryptocurrency, will be determined based on fair market value of such cryptocurrency as of two business days prior to the completion of the rebalancing exercise. As such, actual Initial Distributions will be dependent on the future price performance of OpCo's

Appellant Appendix ER - 476

cryptocurrency portfolio and will be subject to increases or decreases relative to the estimated 51% based on actual cryptocurrency prices during such reference period.

Prior to Closing, OpCo will undergo a rebalancing exercise such that the aggregate value (in U.S. Dollars) for each token to held by OpCo as a percentage of the aggregate value (in U.S. Dollars) of such token that was on deposit with Voyager as of July 5th, 2022 is consistent across OpCo's entire token portfolio, subject to a 5% variance allowance. To the extent a rebalancing delta exists for any specific token, Account Holders may receive a portion of their initial distribution in USDC or U.S. Dollars based on any implied shortfall between the value of the cryptocurrency deposited into their account relative to the dollar value of their Initial Distribution. In order to aid in the facilitation of the rebalancing exercise, OpCo has agreed to execute such exercise on the Binance.US Platform unless they can obtain a better price from another third party..

**15. Is the $20 million of cash Binance.US is paying to the estate above and beyond the value that Binance.US will distribute for the cryptocurrency on the Voyager platform? Do I get a portion of that $20 million?**

_Yes_, the $20 million of upfront consideration is _in addition to_ the fair market value of the cryptocurrency Binance.US is distributing under the Plan. Under the Plan, such cash value directly and indirectly accrues to the benefit of OpCo's creditors.

**16. Who is eligible to join Binance.US under the Plan in order to receive an in-kind Initial Distribution?**

Holders of Account Holder Claims and OpCo General Unsecured Claims in Supported Jurisdictions are eligible to join Binance.US.

Only Account Holders in Supported Jurisdictions who timely transfer their Accounts to Binance.US within three months after the later of the Closing or the completion of the transfer of user data to Binance.US will receive their share of the Initial Distribution on an in-kind basis (as further detailed in Question 2 above). Account Holders who are located in Unsupported Jurisdictions six (6) months following the Closing, in addition to Account Holders in Supported Jurisdictions who do not successfully transition to Binance.US within the timeframe specified above, will receive their share of the Initial Distribution in the form of U.S. Dollars.

Holders of OpCo General Unsecured Claims in Supported Jurisdictions will receive their Initial Distribution in cash on the Binance.US platform if they successfully open an account on the Binance.US platform within three months of the Closing. Otherwise such Holders of OpCo General Unsecured Claims will receive their Initial Distribution in cash from OpCo.

Future distributions will be dependent upon several factors including form of consideration recovered (as further detailed in Question 10 above).

**17. What is a "deficiency claim"?**

A deficiency claim means the difference between a creditor's total dollarized claim value as of July 5th, 2022 and the dollar value of recoveries distributed to such creditor at any point in time pursuant to the Plan. In effect, it represents the difference between the cumulative value returned to a creditor relative to their total claim value at any point in time.

**18. What does an "in-kind" distribution mean?**

An "in-kind distribution" means a Holder of an Account Holder Claim may be eligible to receive value in the same type of cryptocurrency that their initial claim was denominated in.

All cryptocurrency tokens regardless of whether supported for trading on the Binance.US platform will be eligible for an in-kind distribution and in-kind distributions will only be made available through Binance.US. As such, Account Holders in Supported Jurisdictions are required to sign up for a Binance.US account to the extent they wish to receive

Appellant Appendix ER - 477

an in-kind distribution. The number of in-kind cryptocurrency tokens received will depend on (i) the Initial Distribution and (ii) the volume weighted average price of such cryptocurrency on the reference date.

For any specific cryptocurrency, an Account Holder in a Supported Jurisdiction can determine the number of tokens that it will receive at Binance.US for that specific cryptocurrency based on the following formula:

$$Claim\ Value = \#\ of\ prepetition\ tokens * 7/5\ coin\ price$$

$$\#\ of\ in\ kind\ tokens\ received = \frac{Claim\ Value * Initial\ Distribution\ Percentage}{2\ day\ volume\ weighted\ average\ reference\ price}$$

For example, to the extent an Account Holder has a claim for 1.0 BTC, the dollarized value of such claim as of July 5, 2022 would be $20,157.69. To the extent the Account Holder signs up for a Binance.US account, the Initial Distribution is 51%, and the volume weighted average reference price of BTC is $16,816.20, such Account Holder would receive an Initial Distribution consisting of (a) 0.6113 BTC (equal to (i) (x) $20,157.69 claim multiplied by (y) 51% Initial Distribution divided by (ii) $16,816.20 volume weighted average reference price).

### 19. Who is responsible for calculating the Initial Distribution and subsequent distributions?

As is required by the Plan, the Debtors will calculate the number of tokens and the amount of cash that is distributable to each Account Holder and each Holder of an OpCo General Unsecured Claim. To the extent distributions are to be made through the Binance.US platform, Binance.US will rely on these calculations.

### 20. What is the administrative claim asserted by Alameda, and how does this impact my recovery?

On January 4, 2023, Alameda Research Ltd. filed an objection to the Conditional Disclosure Statement Motion, claiming that they have a $445mm administrative expense claim against the Debtors, due to the loan payment that was made to the Debtors within the 90-day period prior to Alameda filing for bankruptcy protection. The Debtors dispute this claim and do not view it as valid. However, if Alameda were to prevail on its asserted administrative claim, recoveries to Account Holders and Holders of OpCo General Unsecured Claims would be materially impacted, potentially reducing illustrative recoveries to approximately 26% from 51%.

**Exhibit D**

**Asset Purchase Agreement**

Appellant Appendix ER - 479

**Execution Version**

# FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT

January 8, 2023

This FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT (this "Amendment") is made and entered into as of the date first above written, by and between BAM Trading Services Inc. d/b/a Binance.us, a Delaware corporation ("Purchaser") and Voyager Digital, LLC, a Delaware limited liability company ("Seller"). Purchaser and Seller are each referred to herein individually as a "Party" and collectively as the "Parties." Capitalized terms used but not otherwise defined herein have the respective meanings ascribed to such terms in the Purchase Agreement (as defined below).

WHEREAS, the Parties entered into that certain Asset Purchase Agreement (the "Purchase Agreement"), dated as of December 18, 2022 (the "Signing Date");

WHEREAS, the Parties wish to amend the Purchase Agreement in accordance with the terms of the Purchase Agreement and this Amendment; and

WHEREAS, Section 10.5 (Amendment and Waiver) of the Purchase Agreement provides that the Purchase Agreement be amended only in a writing signed by Purchaser and Seller.

NOW, THEREFORE, in consideration of premises, and of the representations, warranties, covenants and agreements contained herein, the value, receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.      Amendment.  The Purchase Agreement is hereby amended by making the additions in blue or green underlined text (indicated textually in the same manner as the following example: **underlined text** or **underlined text**) and deletions in green or red stricken text (indicated textually in the same manner as the following example: ~~stricken text~~ or ~~stricken text~~) as set forth in Exhibit A attached hereto.

2.      Effect of Amendment.  Each Party represents that such Party has all necessary power and authority to enter into and perform the obligations of this Amendment and that there are no consents or approvals required to be obtained by such Party for such Party to enter into and perform its obligations under this Amendment that have not been obtained.  This Amendment shall be deemed incorporated into, and form a part of, the Purchase Agreement and have the same legal validity and effect as the Purchase Agreement.  Except as expressly and specifically amended hereby, all terms and provisions of the Purchase Agreement are and shall remain in full force and effect, and all references to the Purchase Agreement in this Amendment and in any ancillary agreements or documents delivered in connection with the Purchase Agreement shall hereafter refer to the Purchase Agreement as amended by this Amendment, and as it may hereafter be further amended or restated.  Each reference in the Purchase Agreement to "this Agreement," "herein," "hereof," "hereunder" or words of similar import shall hereafter be deemed to refer to the Purchase Agreement as amended hereby (except that references in the Purchase Agreement to the "date hereof" or "date of this Agreement" or words or phrases of similar import shall continue to mean the Signing Date).

3.       Inconsistency or Conflict.  In the event of any inconsistency or conflict between the terms and provisions of the Purchase Agreement, on the one hand, and this Amendment, on the other hand, the terms and provisions of this Amendment shall govern and control.

4.       Additional Provisions.  The provisions contained in Section 6.19 (Confidentiality), Article VIII (Termination), Sections 10.1 (Non-Survival or Representations and Warranties and Certain Covenants; Certain Waivers), 10.2 (Expenses), 10.3 (Notices), 10.4 (Binding Effect; Assignment), 10.5 (Amendment and Waiver), 10.6 (Third Party Beneficiaries), 10.7 (Non-Recourse), 10.8 (Severability), 10.9 (Construction), 10.11 (Complete Agreement), 10.13 (Jurisdiction and Exclusive Venue), 10.14 (Governing Law; Waiver of Jury Trial) and 10.16 (Counterparts and PDF) of the Purchase Agreement are hereby incorporated by reference into this Amendment, *mutatis mutandis*, and made a part of this Amendment as if set forth fully herein.

*(Signature pages follow)*

Appellant Appendix ER - 481

IN WITNESS WHEREOF, each of the Parties has caused this Amendment to be duly executed and delivered as of the date first above written.

**BAM TRADING SERVICES INC. D/B/A BINANCE.US**

By: _Brian Shroder_ _____

Name: Brian Shroder

Title: Chief Executive Officer

IN WITNESS WHEREOF, each of the Parties has caused this Amendment to be duly executed and delivered as of the date first above written.

**VOYAGER DIGITAL, LLC**

By: _Stephen Ehrlich_
3724C7E0863B426

Name: Stephen Ehrlich
Title:   Chief Executive Officer

[Signature Page to First Amendment to Asset Purchase Agreement]

**Exhibit A**

(See attached)

**Execution ~~Verion~~ Version**
**~~CONFIDENTIAL~~ CONFIDENTIAL**

**ASSET PURCHASE AGREEMENT**

**DATED AS OF DECEMBER 18, 2022**

**BY AND BETWEEN**

**BAM TRADING SERVICES INC. D/B/A BINANCE.US, AS PURCHASER,**

**AND**

**VOYAGER DIGITAL, LLC, AS SELLER.**

# TABLE OF CONTENTS

**Page**

ARTICLE I PURCHASE AND SALE OF THE ACQUIRED ASSETS; ASSUMPTION OF ASSUMED
LIABILITIES ......................................................................................................... **1**

1.1     Purchase and Sale of the Acquired Assets .................................................. 1
1.2     Excluded Assets ........................................................................................... 3
1.3     Assumption of Certain Liabilities ............................................................... 5
1.4     Excluded Liabilities ..................................................................................... 6
1.5     Assumption/Rejection of Certain Contracts ................................................ 6

ARTICLE II CONSIDERATION; PAYMENT; CLOSING ....................................... **8**

2.1     Consideration; Payment ............................................................................... 8
2.2     Deposit ......................................................................................................... 9
2.3     Closing ......................................................................................................... 9
2.4     Closing Deliveries by Seller ........................................................................ 10
2.5     Closing Deliveries by Purchaser ................................................................. ~~10~~11
2.6     Withholding ................................................................................................. 11

ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLER ................. ~~11~~12

3.1     Organization and Qualification ................................................................... ~~11~~12
3.2     Authorization of Agreement ........................................................................ 12
3.3     Conflicts; Consents ..................................................................................... ~~12~~13
3.4     Financial Statements ................................................................................... 13
3.5     Cryptocurrency; Loans; Customer Accounts ............................................... ~~13~~14
3.6     Title to Acquired Assets; Staked Coins; Exclusive Ownership; Sufficiency
        of Assets ...................................................................................................... ~~14~~15
3.7     Title to Properties ........................................................................................ ~~14~~15
3.8     Contracts ...................................................................................................... 15
3.9     Permits; Compliance with Laws .................................................................. ~~16~~17
3.10    Environmental Matters ................................................................................ 18
3.11    Intellectual Property; Data Privacy ............................................................. ~~18~~19
3.12    Tax Matters .................................................................................................. ~~19~~20
3.13    Affiliate Transactions .................................................................................. ~~20~~21
3.14    Brokers ......................................................................................................... 21
3.15    Litigation ..................................................................................................... 21
3.16    Absence of Changes ..................................................................................... ~~21~~22
3.17    No Other Representations or Warranties ...................................................... ~~21~~22
3.18    No Outside Reliance ..................................................................................... ~~21~~22

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PURCHASER ........ ~~22~~23

4.1     Organization and Qualification ................................................................... ~~22~~23
4.2     Authorization of Agreement ........................................................................ ~~22~~23
4.3     Conflicts; Consents ..................................................................................... ~~22~~23
4.4     Financing ..................................................................................................... ~~23~~24
4.5     Permits ......................................................................................................... ~~23~~24
4.6     Brokers ......................................................................................................... ~~23~~24

## TABLE OF CONTENTS

| | | Page |
|---|---|---|
| 4.7 | No Litigation | 23 24 |
| 4.8 | Certain Arrangements | 24 |
| 4.9 | Solvency | 24 25 |
| 4.10 | No Additional Representations or Warranties | 24 25 |
| 4.11 | No Outside Reliance | 24 25 |
| | | |
| **ARTICLE V BANKRUPTCY COURT MATTERS** | | 25 26 |
| | | |
| 5.1 | Selection of Successful Bid and Winning Bidder and Sale Approval | 25 26 |
| 5.2 | No-Shop | 26 |
| 5.3 | Bankruptcy Actions | 27 28 |
| 5.4 | Cure Costs | 29 |
| 5.5 | Approval | 29 30 |
| 5.6 | No Successor Liability | 29 30 |
| 5.7 | Filings | 29 30 |
| 5.8 | Waiver of Conflicts | 29 |
| | | |
| **ARTICLE VI COVENANTS AND AGREEMENTS** | | 30 |
| | | |
| 6.1 | Conduct of Seller | 30 |
| 6.2 | Access to Information | 32 33 |
| 6.3 | Employee Matters | 34 |
| 6.4 | Regulatory Matters | 36 |
| 6.5 | Reasonable Best Efforts; Cooperation | 38 |
| 6.6 | Data Transfer Matters | 38 39 |
| 6.7 | Use of Name | 39; Voyager Platform 40 |
| 6.8 | Further Assurances | 40 41 |
| 6.9 | Insurance Matters | 40 41 |
| 6.10 | User Migration | 41 42 |
| 6.11 | Rebalancing Exercise; Seller Statement | 43 44 |
| 6.12 | Crediting of Accounts; Unsupported Jurisdictions, Transfer of Coins to Seller; Liquidations or Distributions by Seller | 45 46 |
| 6.13 | VGX Token Listing Review Process | 48 50 |
| 6.14 | Additional Bankruptcy Distributions | 48 50 |
| 6.15 | Unstaking | 49 52 |
| 6.16 | Receipt of Misdirected Assets; Liabilities | 50 53 |
| 6.17 | Acknowledgment by Purchaser | 50 53 |
| 6.18 | IT Migration | 52 54 |
| 6.19 | Confidentiality | 52 55 |
| 6.20 | Acquired Assets Owned by Non-Debtors | 53 56 |
| 6.21 | Seller Expenses | 53 56 |
| 6.22 | Purchaser Expenses | 54 57 |
| | | |
| **ARTICLE VII CONDITIONS TO CLOSING** | | 55 58 |
| | | |
| 7.1 | Conditions Precedent to the Obligations of Purchaser and Seller | 55 58 |
| 7.2 | Conditions Precedent to the Obligations of Purchaser | 55 58 |
| 7.3 | Conditions Precedent to the Obligations of Seller | 56 59 |

# TABLE OF CONTENTS

|  |  |  | **Page** |
|---|---|---|---|
| 7.4 | Waiver of Conditions | | 56 59 |
| **ARTICLE VIII TERMINATION** | | | 57 60 |
| 8.1 | Termination of Agreement | | 57 60 |
| 8.2 | Effect of Termination | | 59 62 |
| 8.3 | Reverse Termination Fee | | 60 63 |
| 8.4 | Further Effect of Termination | | 60 63 |
| **ARTICLE IX TAXES** | | | 61 64 |
| 9.1 | Transfer Taxes | | 61 64 |
| 9.2 | Cooperation | | 61 65 |
| 9.3 | Preparation of Tax Returns and Payment of Taxes | | 62 65 |
| **ARTICLE X MISCELLANEOUS** | | | 63 66 |
| 10.1 | Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers | | 63 66 |
| 10.2 | Expenses | | 63 67 |
| 10.3 | Notices | | 64 67 |
| 10.4 | Binding Effect; Assignment | | 65 68 |
| 10.5 | Amendment and Waiver | | 65 68 |
| 10.6 | Third Party Beneficiaries | | 65 69 |
| 10.7 | Non-Recourse | | 66 69 |
| 10.8 | Severability | | 66 69 |
| 10.9 | Construction | | 66 69 |
| 10.10 | Schedules | | 66 69 |
| 10.11 | Complete Agreement | | 67 70 |
| 10.12 | Specific Performance | | 67 70 |
| 10.13 | Jurisdiction and Exclusive Venue | | 67 71 |
| 10.14 | Governing Law; Waiver of Jury Trial | | 68 71 |
| 10.15 | No Right of Set-Off | | 69 72 |
| 10.16 | Counterparts and PDF | | 69 72 |
| 10.17 | Publicity | | 69 72 |
| 10.18 | Bulk Sales Laws | | 70 73 |
| 10.19 | Fiduciary Obligations | | 70 73 |
| 10.20 | No Solicitation | | 70 73 |
| 10.21 | Acknowledgment | | 70 73 |
| **ARTICLE XI ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS** | | | 70 74 |
| 11.1 | Certain Definitions | | 70 74 |
| 11.2 | Index of Defined Terms | | 85 88 |
| 11.3 | Rules of Interpretation | | 86 89 |

## INDEX OF EXHIBITS

EXHIBIT A      FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION
AGREEMENT

EXHIBIT B      FORM OF TRADEMARK AND DOMAIN NAME ASSIGNMENT
AGREEMENT

i

Appellant Appendix ER - 489

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement"), dated as of December 18, 2022, is made by and between BAM Trading Services Inc. d/b/a Binance.us, a Delaware corporation ("Purchaser"), and Voyager Digital, LLC, a Delaware limited liability company ("Seller"). Purchaser and Seller are each referred to herein individually as a "Party" and collectively as the "Parties." Capitalized terms used herein shall have the meanings set forth herein or in Article XI.

WHEREAS, on July 5, 2022 (the "Petition Date"), Seller, together with Voyager Digital Ltd., a Canadian corporation and Seller's indirect equityholder ("Parent"), and Voyager Digital Holdings, Inc., a Delaware corporation and Seller's direct equityholder ("Holdings" and, collectively with Seller and Parent, the "Debtors"), filed voluntary petitions for relief (collectively, the "Petitions") under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), to be jointly administered for procedural purposes (collectively, the "Bankruptcy Case"); and

WHEREAS, Purchaser desires to purchase the Acquired Assets and assume the Assumed Liabilities from Seller, and Seller desires to sell, convey, assign, and transfer to Purchaser the Acquired Assets together with the Assumed Liabilities, in a sale authorized by the Bankruptcy Court pursuant to, inter alia, sections 105, 363, 365, 1129, 1141 and 1142 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this Agreement, the Agreement Order, the Plan and the Confirmation Order.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants, and agreements set forth herein, intending to be legally bound hereby, Purchaser and Seller hereby agree as follows.

## ARTICLE I

## PURCHASE AND SALE OF THE ACQUIRED ASSETS;
## ASSUMPTION OF ASSUMED LIABILITIES

1.1     Purchase and Sale of the Acquired Assets. Pursuant to sections 105, 363, 365, 1129, 1141 and 1142 of the Bankruptcy Code, on the terms and subject to the conditions set forth herein and in the Agreement Order, the Plan and the Confirmation Order, at the Closing, Seller shall sell, transfer, assign, convey, and deliver to Purchaser, and Purchaser shall purchase, acquire, and accept from Seller, all of Seller's right, title and interest in and to, as of the Closing, the Acquired Assets, free and clear of all Encumbrances other than Permitted Post-Closing Liens; provided, in respect of the Acquired Coins, Purchaser shall acquire all of Seller's right, title and interest in and to the Acquired Coins free and clear of all Encumbrances (including Encumbrances implemented through "smart contracts" or other technological means), except that with respect to any ETH Coins that are Staked Coins as of the date hereof and cannot be unstaked as of the **later of the** Closing **and the Delivery Date of such ETH Coins**, such ETH Coins shall be subject to such staking. "Acquired Assets" means all of the properties, rights and

interests in and to only the following assets of Seller as of the Closing, wherever located and whether or not required to be reflected on a balance sheet prepared in accordance with IFRS, including any such properties, rights and interests in any assets of the following types acquired by Seller after the date hereof and prior to the Closing:

(a)     all Acquired Coins, together with all information regarding the underlying networks and smart contracts to which such Acquired Coins are subject;

(b)     to the extent permissible under applicable Law, (1) all (i) information and Personal Information (including, for the avoidance of doubt, names, account numbers, social security numbers, passports (including passport numbers), drivers licenses (including driver license numbers), "liveness check" selfies, email addresses, mailing addresses, phone numbers, contact information, usernames, user IDs, passwords, and any Personal Information collected for purposes of KYC Procedures) related to (A) all active and inactive accounts of Users ("Voyager User Accounts") and (B) any other consumers located or having a home address in the United States from whom Personal Information was collected by Seller; (ii) information that has been anonymized, pseudonymized, or otherwise de-identified; (iii) data contained in the Seller Statement or the Post-Bankruptcy Statement; (iv) information relating to Voyager User Accounts that must be obtained and retained by Purchaser or any of its Affiliates for regulatory or legal purposes; and (v) any encryption key, passcode or cypher required to access any of the foregoing (collectively, the "Acquired User Data"), and (2) all other information and data relating to the other categories of Acquired Assets, the Voyager Platform, other than Acquired User Data (clauses (1) and (2), collectively, "Acquired Information");

(c)     all rights, causes of action, claims (including, for the avoidance of doubt, any claims and causes of action arising under Chapter 5 of the Bankruptcy Code), counterclaims, defenses, credits, rebates, demands, allowances, refunds (other than Tax refunds or Tax attributes, in each case, to the extent enumerated in Section 1.2(i)), causes of action, rights of set off, rights of recovery, rights of recoupment or rights under or with respect to express or implied guarantees, warranties, representations, covenants or indemnities of any kind, in each case that Seller may have against any User located or having a home address in the United States solely to the extent that such claim or cause of action is against a User in such Person's capacity as a User (in each case, excluding (i) Retained Avoidance Actions, (ii) claims, causes of action or other rights against Seller or any of its Affiliates, or (iii) any of the foregoing to the extent relating to any Credit Matter) (collectively, "Acquired Voyager Claims");

(d)     other than VGX Token Smart Contracts, all Intellectual Property owned by Seller or otherwise used or held for use by or on behalf of Seller in connection with the operation of its businesses, including all Business Software (in source code and object code form), any Bedrock source code and other IT Systems owned by Seller and required to operate the Voyager Platform, all Business Accounts (provided that Purchaser may elect, by written notice to Seller until two (2) Business Days prior to the Closing Date, to designate any Business Account(s) as Excluded Asset(s)), all rights to collect royalties and proceeds in connection therewith with respect to the period from and after the Closing, all rights, claims and causes of action to sue and recover for past, present and future infringements, dilutions, misappropriations

2

Appellant Appendix ER - 491

of, or other conflicts with, such Intellectual Property and any and all corresponding rights that, now or hereafter, may be secured throughout the world;

(e)     all rights to continue the customer relationships with customers of Seller and its Affiliates to the extent pertaining to savings and trading services related to Cryptocurrency;

(f)     all Contracts listed on <u>Schedule 1.1(f)</u> (the "<u>Assigned Contracts</u>") (for the avoidance of doubt, not including the 3AC Loan); and

(g)     other than the Excluded Documents, all Documents, goodwill, payment intangibles and general intangible assets and rights of or otherwise used or held for use by or on behalf of Seller and its Affiliates, in each case in connection with or related to any of the foregoing categories of Acquired Assets; <u>provided</u> that Seller shall be entitled to retain copies of Documents (subject to <u>Section 6.19</u>).

1.2     <u>Excluded Assets</u>. Notwithstanding anything to the contrary in this Agreement, in no event shall Seller be deemed to sell, transfer, assign, convey or deliver, and Seller shall retain all right, title and interest to all other properties, rights, interests and other assets of Seller that are not Acquired Assets, including the following (collectively, the "<u>Excluded Assets</u>"):

(a)     all Cash and Cash Equivalents, all bank accounts, and all deposits (including maintenance deposits and security deposits for rent, electricity, telephone or otherwise) or prepaid or deferred charges and expenses, including all lease and rental payments, that have been prepaid by Seller, and any retainers or similar amounts paid to Advisors or other professional service providers, in each case, other than the Acquired Coins;

(b)     all Contracts of Seller other than the Assigned Contracts, including the Contracts listed on <u>Schedule 1.2(b)</u> (the "<u>Excluded Contracts</u>");

(c)     all Documents, in each case, (i) to the extent they are primarily used in, or primarily relate to, any of the Excluded Assets or Excluded Liabilities (including information stored on the computer systems, data networks or servers of Seller, other than Voyager User Accounts), (ii) to the extent that such Documents constitute Seller's financial accounting Documents, all minute books, organizational documents, stock registers and such other books and records of Seller to the extent pertaining to the ownership, organization or existence of Seller, Tax Returns (and any related work papers), corporate seals, checkbooks, and canceled checks, in each case to the extent not primarily relating to the Acquired Assets or Assumed Liabilities or (iii) that Seller is required by Law to retain; <u>provided</u> that, to the extent not prohibited by applicable Law, Purchaser shall have the right to make copies of any portions of such Documents;

(d)     all Documents to the extent prepared or received by Seller or any of its Affiliates in connection with the sale of the Acquired Assets, this Agreement, or the Transactions, including (i) all records and reports prepared or received by Seller or any of its Affiliates or Advisors in connection with the sale of the Acquired Assets and the Transactions, including all analyses relating to the business of Purchaser or its Affiliates so prepared or received in connection therewith, (ii) all bids and expressions of interest received from third

3

Appellant Appendix ER - 492

parties with respect to the acquisition of Seller's business or assets, and (iii) all privileged materials, documents and records of Seller or any of its Affiliates (together with the Documents specified in Sections 1.2(c) and 1.2(h), the "Excluded Documents");

(e)     all current and prior insurance policies of Seller, including for the avoidance or doubt all director and officer insurance policies, and all rights and benefits of any nature of Seller with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries, in each case, other than Acquired Voyager Claims;

(f)     all membership interests or other equity interests of Seller or any of its Affiliates or securities convertible into, exchangeable, or exercisable for any such membership interests or other equity interests;

(g)     (i) all Retained Avoidance Actions, (ii) all preference or avoidance claims or actions arising under the Bankruptcy Code or applicable Law, (iii) all other rights, claims, causes of action, rights of recovery, rights of set-off, and rights of recoupment as of the Closing of Seller or any of its Affiliates, in each case, either (A) arising out of or relating to events occurring on or prior to the Closing Date, except as set forth in Section 1.1, or (B) related to any Credit Matter, and (iv) all claims that Seller or any of its Affiliates may have against any Person with respect to any other Excluded Assets or any Excluded Liabilities, in each case other than Acquired Voyager Claims;

(h)     Seller's claims or other rights under this Agreement, including the Purchase Price hereunder, or any agreement, certificate, instrument, or other document executed and delivered between Seller and Purchaser or their respective Affiliates in connection with the Transactions, or any other agreement between Seller and Purchaser or their respective Affiliates entered into on or after the date hereof;

(i)     (x) all Tax attributes of Seller or its Affiliates (including refunds of income Taxes of Seller or its Affiliates, but excluding any Tax refunds or Tax attributes with respect to Taxes in respect of the Acquired Assets for any taxable period (or portion thereof) beginning after the Closing Date allocable to Purchaser in accordance with Section 9.3(d) or with respect to Transfer Taxes), (y) all Tax refunds and Tax attributes with respect to Taxes in respect of the Acquired Assets (i) for any Pre-Closing Tax Period or (ii) that are Excluded Liabilities, and (z) all Tax refunds and Tax attributes with respect to Taxes in respect of the Excluded Assets;

(j)     every asset of Seller that would otherwise constitute an Acquired Asset (if owned immediately prior to the Closing) if conveyed or otherwise disposed of during the period from the date hereof until the Closing Date (i) at the direction of the Bankruptcy Court or (ii) as otherwise permitted under Section 6.1(b);

(k)     all demands, allowances, refunds, rebates (including any vendor or supplier rebates), rights (including under or with respect to express or implied guarantees, warranties, representations, covenants and indemnities), claims, counterclaims, defenses, credits, causes of action, rights of set off, rights of recovery or rights of recoupment relating to or arising

US-DOCS\137411268.27138346099.6

against suppliers, vendors, merchants, manufacturers and counterparties to leases, licenses or any Contract, arising out of or relating to events occurring on or prior to the Closing Date, in each case other than Acquired Voyager Claims;

(l)      the properties, rights, interests, equity and assets of Coinify ApS and its direct and indirect subsidiaries;

(m)     all Money Transmitter Licenses;

(n)     Seller's accounts receivable, and other amounts or Liabilities owing, from its Affiliates;

(o)     (i) all Seller Plans and assets of all Seller Plans that do not constitute Acquired Coins and (ii) personnel records relating to employees of Seller and Holdings;

(p)     all information and Personal Information related to individual consumers that is not Acquired User Data, including any Personal Information that is subject to the GDPR or collected from natural persons with addresses outside of the United States;

(q)     the 3AC Loan;

(r)     all VGX Token Smart Contracts; and

(s)     the properties, rights, interests and assets set forth on <u>Schedule 1.2(s)</u>.

1.3    <u>Assumption of Certain Liabilities</u>. On the terms and subject to the conditions set forth herein and in the Agreement Order, the Plan and the Confirmation Order, effective as of the Closing, in addition to the other components of the Purchase Price described in <u>Section 2.1(a)</u>, Purchaser shall irrevocably assume from Seller (or with respect to Taxes, if applicable, from Seller's applicable Affiliate) (and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and Seller shall (or with respect to Taxes, if applicable, cause Seller's applicable Affiliate to) irrevocably transfer, assign, convey, and deliver to Purchaser, only the following Liabilities, without duplication and only to the extent not paid prior to the Closing (collectively, the "<u>Assumed Liabilities</u>"):

(a)     all Liabilities and obligations of Seller under the Assigned Contracts to the extent such Liabilities arise from and after the Closing or relate to events, facts and circumstances first existing after the Closing;

(b)     all cure costs required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts (the "<u>Cure Costs</u>");

(c)     all Liabilities arising out of the conduct of the business or the ownership of the Acquired Assets, in each case, solely by Purchaser from and after the Closing Date **<u>or, with respect to any Delayed Acquired Coin, the Delivery Date with respect to such Delayed Acquired Coin,</u>** and to the extent such Liabilities arise from events, facts and circumstances first

5

Appellant Appendix ER - 494

existing after the Closing Date **or, with respect to any Delayed Acquired Coin, the Delivery Date with respect to such Delayed Acquired Coin**;

(d)     all Liabilities for Taxes with respect to the Acquired Assets for any taxable period (or portion thereof) beginning after the Closing Date allocable to Purchaser in accordance with Section 9.3(d);

(e)     all Liabilities relating to all Transfer Taxes; and

(f)     all Liabilities set forth on Schedule 1.3(f);

provided, however, that whether or not any Liability for Taxes is an Assumed Liability shall be governed solely by Section 1.3(d) and Section 1.3(e).

1.4     Excluded Liabilities. Notwithstanding anything herein to the contrary, Purchaser shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, Seller or any of its Affiliates or relating to the Acquired Assets, the Excluded Assets or the business and operations of Seller and its Affiliates, of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on or prior to the Closing Date or arising thereafter, including as a result of any act, omission, or circumstances taking place prior to the Closing, other than the Assumed Liabilities (all such Liabilities that are not Assumed Liabilities being referred to collectively herein as the "Excluded Liabilities"). For the avoidance of doubt, and without limiting the foregoing, Purchaser shall not be obligated to assume, and does not assume, and hereby disclaims, all of the following Liabilities of Seller and its Affiliates (each of which shall constitute an Excluded Liability hereunder):

(a)     all Liabilities (i) existing prior to the filing of the Bankruptcy Case that are subject to compromise under the Bankruptcy Code and (ii) to the extent not otherwise expressly assumed herein (including in the Commercial Covenants), incurred subsequent to the filing of the Bankruptcy Case and prior to the Closing;

(b)     all Liabilities related to (i) customer accounts of Seller or its Affiliates (including Voyager User Accounts), except for those obligations of Purchaser expressly set forth in the Commercial Covenants and (ii) commercial payables or amounts owing by Seller or its Affiliates, including to any software vendors;

(c)     all Liabilities for Taxes (i) with respect to the Acquired Assets for any Pre-Closing Tax Period allocable to Seller in accordance with Section 9.3(d); (ii) of Seller and their Affiliates for any taxable period; or (iii) arising from or in connection with an Excluded Asset; and

(d)     all Liabilities resulting from Seller's or any of its Affiliates' breach of, violation of, or non-compliance with the provisions of any Laws relating to the ownership or operation of their respective businesses, the Acquired Assets and the Excluded Assets or the

6

Appellant Appendix ER - 495

Transactions, including any bulk transfer Laws or similar Laws of any jurisdiction in connection with the Transactions; and

(e)     all Successor Liabilities, including with respect to any investigation or other Action against, concerning or otherwise with respect to Seller, its business or its assets.

1.5     <u>Assumption/Rejection of Certain Contracts</u>.

(a)     <u>Assumption and Assignment of Executory Contracts</u>. Seller shall, and shall cause its Affiliates to, provide timely and proper written notice of the Seller's request for entry of the Confirmation Order to all parties to any executory Contracts or unexpired leases to which Seller is a party that are Assigned Contracts and take all other actions reasonably necessary to cause such Contracts to be assumed by Seller and assigned to Purchaser pursuant to section 365 of the Bankruptcy Code to the extent that such Contracts are Assigned Contracts at Closing. The Confirmation Order shall provide that as of and conditioned on the occurrence of the Closing, Seller shall assign or cause to be assigned to Purchaser, as applicable, the Assigned Contracts, each of which shall be identified by the name or appropriate description and date of the Assigned Contract (if available), the other party to the Assigned Contract and the address of such party for notice purposes, all included on an exhibit attached to either the Plan Supplement, a notice filed in connection with the motion for approval of the Confirmation Order or a separate motion for authority to assume and assign such Assigned Contracts. Such exhibit shall also set forth Seller's good faith estimate of the amounts necessary to cure any defaults under each of the Assigned Contracts as determined by Seller based on Seller's books and records or as otherwise determined by the Bankruptcy Court. At the Closing, Seller shall, pursuant to the Agreement Order, the Confirmation Order and the Assignment and Assumption Agreement(s), assume and assign to Purchaser (the consideration for which is included in the Purchase Price), all Assigned Contracts that may be assigned by Seller to Purchaser pursuant to sections 363 and 365 of the Bankruptcy Code, subject to adjustment pursuant to <u>Section 1.5(b)</u>. At the Closing, Purchaser shall (i) pay all Cure Costs and (ii) assume, and thereafter in due course and in accordance with its respective terms pay, fully satisfy, discharge and perform all of the obligations under each Assigned Contract pursuant to section 365 of the Bankruptcy Code.

(b)     <u>Excluding or Adding Assigned Contracts Prior to Closing</u>. Purchaser shall have the right to notify Seller in writing of any Assigned Contract that it does not wish to assume or a Contract to which Seller is a party that Purchaser wishes to add as an Assigned Contract up to five (5) Business Days prior to the Closing Date, and (i) any such previously considered Assigned Contract that Purchaser no longer wishes to assume shall be automatically deemed removed from the Schedules related to Assigned Contracts and automatically deemed to be an Excluded Contract, in each case, without any adjustment to the Purchase Price, and (ii) any such previously considered Excluded Contract that Purchaser wishes to assume as an Assigned Contract shall be automatically deemed added to the Schedules related to Assigned Contracts, automatically deemed removed from the Schedules related to Excluded Contracts, and assumed by Seller to sell and assign to Purchaser, in each case, without any adjustment to the Purchase Price. Purchaser shall be solely responsible for the payment, performance and discharge when due of the Liabilities under the Assigned Contracts arising or that are otherwise payable from the

time of and after the Closing. No Contract set forth on <u>Schedule 1.2(s)</u> shall be subject to the terms of this <u>Section 1.5(b)</u>.

    (c)    <u>Non-Assignment</u>.

    (i)    Notwithstanding anything to the contrary in this Agreement but subject to <u>Section 6.1</u>, a Contract shall not be an Assigned Contract hereunder and shall not be assigned to, or assumed by, Purchaser to the extent that such Contract is rejected by Seller or terminated by Seller or any other party thereto, or terminates or expires by its terms, on or prior to such time as it is to be assumed by Purchaser as an Assigned Contract hereunder and is not continued or otherwise extended upon assumption; <u>provided</u> that Seller shall obtain Purchaser's consent prior to seeking to reject or terminate, or rejecting or terminating, any Assigned Contract or any Contract assumed by Purchaser pursuant to <u>Section 1.5(a)</u> or <u>Section 1.5(b)</u> from and after the date of this Agreement.

    (ii)    Notwithstanding anything to the contrary in this Agreement, to the extent an Acquired Asset requires a Consent or Governmental Authorization (other than, and in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to Purchaser of Seller's rights over such asset, and such Consent or Governmental Authorization has not been obtained prior to such time as it is to be transferred by Purchaser as an Acquired Asset hereunder, such asset shall not be an Acquired Asset hereunder and shall not be transferred to, or received by, Purchaser. In the event that any Acquired Asset is deemed not to be assigned pursuant to this <u>clause (ii)</u>, the Closing shall nonetheless take place subject to the terms and conditions set forth herein and, thereafter, through the earlier of such time as such Consent or Governmental Authorization is obtained and the closing of the Bankruptcy Case, Seller and Purchaser shall (A) use reasonable best efforts to secure such Consent or Governmental Authorization as promptly as practicable after the Closing and (B) enter into a commercially reasonable arrangement reasonably proposed by Purchaser, including subcontracting, licensing, or sublicensing to Purchaser any or all of Seller's rights and obligations with respect to any such Acquired Asset, under which (1) Purchaser shall obtain (without materially infringing upon the legal rights of such third party or violating any Law) the economic rights and benefits (net of the amount of any related Tax costs actually incurred by Seller or its Affiliates or any direct reasonable and documented out-of-pocket costs actually incurred by Seller or its Affiliates resulting from the retention and maintenance by Seller or its Affiliates) with respect to such Acquired Asset with respect to which the Consent or Governmental Authorization has not been obtained and (2) Purchaser shall assume any related burden and obligation with respect to such Acquired Asset to the extent such burden and obligation would constitute an Assumed Liability if such Acquired Asset was transferred at Closing. Upon satisfying any requisite Consent or Governmental Authorization requirement applicable to such Acquired Asset after the Closing, such Acquired Asset shall promptly be transferred and assigned to Purchaser in accordance with the terms of this Agreement, the Agreement Order, the Plan and Confirmation Order, and the Bankruptcy Code. Notwithstanding anything herein to the contrary, the

US-DOCS\~~137411268.27~~138346099.6

provisions of this <u>Section 1.5(c)</u> shall not apply to any consent or approval that is not required to be obtained by operation of the Bankruptcy Code (including section 365(f)).

## ARTICLE II

### CONSIDERATION; PAYMENT; CLOSING

2.1    <u>Consideration; Payment</u>.

(a)    Subject to the terms and conditions herein, the aggregate consideration (collectively, the "<u>Purchase Price</u>") to be paid by Purchaser for the purchase of the Acquired Assets shall be: (i) (A) the assumption of Assumed Liabilities, (B) a cash payment of $20,000,000 (the "<u>Cash Payment</u>"), (C) the Seller Expenses, if any, payable pursuant to <u>Section 6.21</u>, and (D) Purchaser's obligations to make the payments set forth in <u>Section 6.12</u> and <u>Section 6.14</u>.

(b)    Subject to the terms and conditions herein, at the Closing, Purchaser shall deliver, or cause to be delivered, to Seller (i) the Cash Payment, <u>plus</u> (ii) the Seller Expenses, if any, payable pursuant to <u>Section 6.21</u>, <u>less</u> (iii) the Deposit, together with all received investment income, if any (the "<u>Closing Date Payment</u>"). Any payment required to be made pursuant to this Agreement in cash (including the Closing Date Payment) shall be made by wire transfer of immediately available funds to such bank account as shall be designated in writing by the applicable Party to the other Party at least two (2) Business Days prior to the date such payment is to be made.

(c)    Upon reasonable advance written notice to Purchaser (in any event delivered to Purchaser no less than five Business Days prior to the Closing Date) Seller shall be entitled to withhold such portion of the Seller Held Coins as is necessary to satisfy Seller's obligations under the Plan (the "<u>Withheld Coins</u>"), and Seller shall distribute, or take such other action with respect to, the Withheld Coins only in accordance with the Plan and the provisions of this Agreement. To the extent there are any Withheld Coins, the provisions of this Agreement shall be read accordingly to give effect to the withholding and subsequent transfer, distribution or other action with respect to any such Withheld Coins, *mutatis mutandis*.

2.2    <u>Deposit</u>.

(a)    Purchaser has made, on the date hereof or will make on the first Business Day following the date hereof, an earnest money deposit with Acquiom Clearing House LLC (the "<u>Escrow Agent</u>") in the amount equal to $10,000,000 (the "<u>Deposit</u>"), by wire transfer of immediately available funds for deposit into an escrow account (the "<u>Escrow Account</u>"). Subject to <u>Section 2.2(b)</u> and <u>Section 2.2(c)</u>, the Deposit and any received investment income, if any, shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of Seller or Purchaser and shall be applied against payment of the Purchase Price on the Closing Date. Seller hereby acknowledges and agrees that the Deposit qualifies as the deposit required pursuant to the Bidding Procedures Order.

(b)     If this Agreement has been validly terminated (i) by Seller pursuant to Section 8.1(d) or Section 8.1(f), (ii) by Purchaser pursuant to Section 8.1(c), in circumstances where Seller would be entitled to terminate this Agreement pursuant to Section 8.1(d) or Section 8.1(f), or (iii) by Seller pursuant to Section 8.1(g) in connection with and following any Purchaser Development and not in connection with a Higher and Better Offer (each of (i), (ii), and (iii), a "Purchaser Default Termination"), then within three (3) Business Days after the date of such termination, the Parties shall execute any instructions necessary to permit the Escrow Agent to disburse the Deposit together with all received investment income, if any, to Seller.

(c)     If this Agreement has been validly terminated by either Party, other than as contemplated by Section 2.2(b), then the Deposit, together with all received investment income, if any, shall be returned to Purchaser within three (3) Business Days after such termination, and, at Purchaser's request, Seller shall execute any instructions necessary to permit the Escrow Agent to disburse the Deposit together with all received investment income, if any, to Purchaser.

(d)     If the Closing occurs, the Deposit shall be transferred to Seller.

2.3     Closing. Subject to the terms and on the conditions set forth in this Agreement, the closing of the purchase and sale of the Acquired Assets, the delivery of the Purchase Price, the assumption of the Assumed Liabilities and the consummation of the other transactions contemplated by this Agreement at and in connection with such closing (the "Closing") will take place by telephone conference and electronic exchange of documents (or, if the Parties agree to hold a physical closing, at the offices of Kirkland & Ellis LLP, located at 601 Lexington Avenue, New York, New York 10022) at 10:00 a.m. Eastern Time on the third (3rd) Business Day following full satisfaction or due waiver (by the Party entitled to the benefit of such condition) of the closing conditions set forth in Article VII (other than conditions that by their terms or nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions), or at such other place and time as the Parties may agree in writing. The date on which the Closing actually occurs in accordance with the provisions hereof is referred to herein as the "Closing Date."

2.4     Closing Deliveries by Seller. At the Closing, Seller shall deliver to Purchaser:

(a)     a bill of sale and assignment and assumption agreement substantially in the form of Exhibit A (the "Assignment and Assumption Agreement") duly executed by Seller;

(b)     each of the Acquired Coins to the wallet address designated by Purchaser for the relevant Acquired Coins of such type; and prior to transferring any Acquired Coins in full, Seller shall send a test transaction of a *de minimis* amount and shall immediately deliver the remainder of the relevant Acquired Coins, following Purchaser's confirmation that the *de minimis* amount was properly delivered; provided that ~~such transfers of the Acquired Coins~~ :

**(i)     Seller shall delay the delivery pursuant to this Section 2.4 of Acquired Coins allocable to a particular User or Eligible Creditor until Purchaser has confirmed in writing that such User or Eligible Creditor has satisfied the requirements set forth in Section 6.10(c), Section 6.10(e) and Section 6.12(b) for**

10

Appellant Appendix ER - 499

onboarding to the Binance.US Platform (any Acquired Coins so delayed, "Delayed Acquired Coins"), in which case Seller shall deliver such Delayed Acquired Coins to Purchaser on a weekly basis to the extent Purchaser has notified Seller at least five (5) Business Days in advance of such weekly delivery that such User or Eligible Creditor has satisfied such requirements (with such Delayed Acquired Coins being custodied by Seller or an entity on behalf of Seller that is selected by Seller in accordance with the other provisions of this Agreement); provided that (A) with respect to each such weekly transfer, Seller shall be responsible for all gas or other transaction fees incurred in connection with transferring such Coins to Purchaser and (B) with respect to any transfer of Delayed Acquired Coins to Purchaser (I) for subsequent liquidation and distribution of cash under the last sentence of Section 6.12(a) or (II) pursuant to Section 6.12(b), such Delayed Acquired Coins will be transferred by Seller to Purchaser on the date specified in such provisions;

(ii) transfers of Acquired Coins not held on the Binance.US Platform prior to such transfer shall be deemed complete when each transfer is publicly confirmed on the blockchain for the related Coin at least the number of times set forth on https://support.kraken.com/hc/en-us/articles/203325283-Cryptocurrency-deposit-processing-times (or a successor site agreed by Seller and Purchaser); provided further that

(iii) (i) for transfers of Acquired Coins held on the Binance.US Platform as of the Closing Date, shall be deemed complete when such Acquired Coins shall be are transferred to the Binance.US Platform account designated by Purchaser; and

(iv) (ii) in the case of ETH Coins that are Staked Coins as of the date hereof and cannot be unstaked as of the later of the Closing Date and the Delivery Date with respect to such ETH Coins, such staked ETH Coins shall be delivered pursuant to the means mutually agreed between Purchaser and Seller acting reasonably;

(c)     a short-form trademark and domain name assignment agreement substantially in the form of Exhibit B (the "Trademark and Domain Name Assignment Agreement"), duly executed by Seller;

(d)     an IRS Form W-9 properly completed and duly executed by Seller or Seller's regarded owner for U.S. federal income Tax purposes;

(e)     an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Seller certifying that the conditions set forth in Sections 7.2(a) and 7.2(b) have been satisfied; and

(f)     the Seller Statement pursuant to Section 6.11(c).

2.5     Closing Deliveries by Purchaser. At the Closing, Purchaser shall deliver to (or at the direction of) Seller:

(a)     without duplication, the Closing Date Payment pursuant to Section 2.1(b);

11

US-DOCS-137411268.27138346099.6

Appellant Appendix ER - 500

(b)　　the Assignment and Assumption Agreement, duly executed by Purchaser;

(c)　　the Trademark and Domain Name Assignment Agreement, duly executed by Purchaser; and

(d)　　an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Purchaser certifying that the conditions set forth in Sections 7.3(a) and 7.3(b) have been satisfied.

2.6　　<u>Withholding</u>. Purchaser and its Affiliates shall be entitled to deduct and withhold from any amounts otherwise payable pursuant to this Agreement such amounts as are required to be deducted or withheld under applicable tax Law. Prior to making any such deduction or withholding, Purchaser or its applicable Affiliate shall use reasonable best efforts to (x) notify the person in respect of which such withholding or deduction is proposed to be made of such deduction or withholding and (y) give such person a reasonable amount of time to demonstrate that no or reduced withholding is required under applicable tax Law. To the extent that amounts are so deducted or withheld and paid to the appropriate Governmental Body, such amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction and withholding was made.

## ARTICLE III

### REPRESENTATIONS AND WARRANTIES OF SELLER

Except as (i) disclosed in the forms, reports, schedules, statements, exhibits and other documents filed with (or furnished to) the Canadian Securities Administrators ("CSA") by Parent in respect of Seller and its business during the two-year period prior to the date hereof to the extent publicly available at least one (1) Business Day prior to the date hereof on the CSA's System for Electronic Document Analysis and Retrieval, excluding (x) any disclosures set forth or referred to in any risk factor or similar section that do not constitute statements of fact, (y) any disclosures in any forward-looking statements disclaimer, and (z) any other disclosures that are generally cautionary, predictive or forward-looking in nature (the "<u>Filed CSA Documents</u>") (it being acknowledged that nothing disclosed in the Filed CSA Documents will be deemed to modify or qualify the Fundamental Representations), (ii) disclosed in any forms, statements or other documents filed by any of the Debtors with the Bankruptcy Court in the Bankruptcy Case as of one (1) Business Day prior to the date hereof, or (iii) set forth in the Schedules delivered by Seller concurrently herewith and subject to Section 10.10, Seller represents and warrants to Purchaser as follows as of the date hereof and as of the Closing Date **(except where, and solely to the extent that, any of the following are made with respect to any Delivery Date, in which case, such representations and warranties, solely to such extent, are made only as of such Delivery Date)**:

3.1　　<u>Organization and Qualification</u>.

(a)　　Except as set forth on Schedule ~~3.1~~3.1, Seller is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware and has all requisite limited liability company power and authority necessary to own,

lease and operate its properties and assets and to carry on its business as it is now being conducted, except (other than with respect to Seller's due formation and valid existence) as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)    Except as set forth on <u>Schedule 3.1</u>, Seller is duly qualified to do business and is in good standing (where such concept is recognized under applicable Law) in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets owned, leased or operated by it makes such qualification necessary, except where the failure to be so qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.2    <u>Authorization of Agreement</u>. Subject to requisite Bankruptcy Court approvals:

(a)    Seller has all necessary power and authority to execute and deliver this Agreement and to perform its obligations hereunder and to consummate the Transactions;

(b)    the execution, delivery and performance by Seller of this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement to which it is a party or to be executed by it in connection with the consummation of the Transactions (the "<u>Seller Documents</u>"), and the consummation by Seller of the Transactions, have been duly authorized by all requisite limited liability company action and no other limited liability company proceedings on its part are necessary to authorize the execution, delivery and performance by Seller of this Agreement and the Seller Documents and the consummation by it of the Transactions; and

(c)    this Agreement has been, and the Seller Documents will be, when delivered pursuant to the terms hereof, duly executed and delivered by Seller and, assuming due authorization, execution and delivery hereof by the other Party, constitutes a legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, except that such enforceability (i) may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other similar Laws of general application affecting or relating to the enforcement of creditors' rights generally and (ii) is subject to general principles of equity, whether considered in a proceeding at law or in equity (collectively, the "<u>Enforceability Exceptions</u>").

3.3    <u>Conflicts; Consents</u>.

(a)    Assuming that (x) requisite Bankruptcy Court approvals are obtained, and (y) the notices, authorizations, approvals, Orders, permits or consents set forth on <u>Schedule 3.3(a)</u> are made, given or obtained (as applicable), neither the execution and delivery by Seller of this Agreement, nor the consummation by Seller of the Transactions, nor performance or compliance by Seller with any of the terms or provisions hereof, will (i) conflict with or violate any provision of Seller's certificate of formation or limited liability company agreement, (ii) violate any Law or Order applicable to Seller, the Acquired Assets or the Assumed Liabilities, (iii) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancellation

13

Appellant Appendix ER - 502

of any obligation or to the loss of any benefit, any of the terms or provisions of any Material Contract or accelerate Seller's obligations under any such Material Contract, (iv) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any properties or assets of Seller or (v) violate, contravene or conflict with, result in termination or lapse of, or in any way affect any permit, except, in the case of <u>clauses (ii)</u> through <u>(v)</u>, as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)     Except as set forth on <u>Schedule 3.3(a)</u>, Seller is not required to file, seek or obtain any notice, authorization, approval, Order, permit or consent of or with any Governmental Body in connection with the execution, delivery and performance by Seller of this Agreement or the consummation by Seller of the Transactions, except (i) any requisite Bankruptcy Court approvals, or (ii) where failure to file, seek or obtain such notice, authorization, approval, Order, permit or consent would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.4     <u>Financial Statements</u>. Attached to <u>Schedule 3.4</u> are Parent's unaudited statements of financial position as of June 30, 2022 (the "<u>Balance Sheet Date</u>") and audited statements of financial position as of June 30, 2021, and the related statements of loss and cash flows for each fiscal year then ended, in each case (collectively, the "<u>Financial Statements</u>"). Except as set forth on <u>Schedule 3.4</u>, the Financial Statements have been prepared, in each case, in conformity in all material respects with IFRS consistently applied, except for the absence of footnote disclosure and any customary year-end adjustments and except, in the case of the unaudited statements as of June 30, 2020 or the fiscal year then ended, with respect to any Tax matters or any impact or effect thereof. The Financial Statements are prepared based on the books and records of Parent and its Subsidiaries and present fairly in all material respects, in accordance with IFRS consistently applied, the consolidated financial condition and results of operations of Parent as of the dates and for the periods referred to therein, except as may be indicated in the notes thereto.

3.5     <u>Cryptocurrency; Loans; Customer Accounts</u>.

(a)     <u>Schedule 3.5(a)</u> sets forth a list of all Cryptocurrency held by Seller as of a date within three (3) Business Days of the date hereof, the means through which Seller as of such date controls such Cryptocurrency (*e.g.*, "private keys," custody agreements or agreements with parties performing validation services), whether or not such Cryptocurrency is attributable to User accounts on the Voyager Platform, and whether such Cryptocurrency constitutes collateral under any Loan (including, solely for this purpose, the 3AC Loan), which <u>Schedule 3.5(a)</u> shall be provided to Purchaser no later than December 18, 2022. **<u>As of the date hereof, as of the Closing Date and, with respect to any Delayed Acquired Coin, as of the applicable Delivery Date with respect to such Acquired Coin,</u>** Seller has the exclusive ability to control, including by use of "private keys" or other equivalent means or through custody arrangements or other equivalent means, all such Cryptocurrency set forth on <u>Schedule 3.5(a)</u> (other than, solely to the extent of any staking contract, Staked Coins), and owns such Cryptocurrency (other than Cryptocurrency that constitutes collateral under any Loan (including, solely for this purpose, the 3AC Loan) and, solely to the extent of any staking contract, Staked Coins) free and clear of all Encumbrances (other than Encumbrances that will be removed or released by operation of the Confirmation Order or the Plan); <u>provided</u> that such ownership and exclusive ability to control

Cryptocurrency is subject to the continued existence, validity, legality, governance and public availability of the relevant blockchains.

(b)    <u>Schedule 3.5(b)</u> sets forth a true, correct and complete list of all amounts (including any principal, interest, fees, expenses or penalties) outstanding or unpaid under any Loan.

(c)    <u>Schedule 3.5(c)</u> sets forth a list of all Users (excluding Users with addresses in the United Kingdom, European Union or European Economic Area) as of the Petition Date and a date within three (3) Business Days of the date hereof and the account position (including type and amount of Cryptocurrency) that such User held as of immediately prior to the Petition Date and as of the date hereof, which <u>Schedule 3.5(c)</u> shall be provided to Purchaser no later than December 18, 2022.

(d)    **As of the date hereof, as of the Closing Date and, with respect to any Delayed Acquired Coin, as of the applicable Delivery Date with respect to such Delayed Acquired Coin,** Seller has implemented procedures and controls regarding management of authentication credentials such as private keys and means for instructing third party custodians ("<u>Authentication Credentials</u>") for Cryptocurrencies, including limitation of access to Authentication Credentials to employees who need to have such access and requiring multiple individuals to sign off on transactions. Where Authentication Credentials are not held by employees of Seller, such Authentication Credentials are held by reputable third-party custodians or wallet providers whose security procedures have been evaluated by Seller and found to be fit for purpose.

(e)    <u>Schedule 3.5(e)</u> sets forth a true, correct and complete list of the number and type of Post-Petition Coins, on a User-by-User basis, which <u>Schedule 3.5(e)</u> shall be provided to Purchaser no later than December 18, 2022.

3.6    <u>Title to Acquired Assets; Staked Coins; Exclusive Ownership; Sufficiency of Assets</u>.

(a)    Seller has good and valid title to all Acquired Assets (other than Coins pledged by a borrower as collateral in respect of any Loans and, solely to the extent of any staking contract, Staked Coins), free and clear of all Encumbrances (other than Permitted Encumbrances) and, at the Closing, subject to <u>Section 1.5(c)</u>, Purchaser will be vested with good and valid title to all such Acquired Assets, free and clear of all Encumbrances (other than Permitted Post-Closing Liens) and Excluded Liabilities, to the fullest extent permissible under Law, including section 363(f) of the Bankruptcy Code; <u>provided</u>, in respect of the Acquired Coins, Purchaser will be vested with good and valid title thereto free and clear of all Encumbrances (including Encumbrances implemented through "smart contracts" or other technological means), except that with respect to any staked ETH Coins that cannot be unstaked as of the Closing, such ETH Coins shall be subject to such staking **and except that, with respect to any Delayed Acquired Coins, such title will vest with Purchaser on the applicable Delivery Date**. <u>Schedule 3.6(a)</u> sets forth a true, correct and complete list of all Seller Held Coins that are subject to staking ("<u>Staked Coins</u>").

15

Appellant Appendix ER - 504

(b)     Seller is the sole owner of all Coins relating to the ~~exchange~~**brokerage** and custody business of the Voyager Platform and has good and valid title to such Coins, free and clear of all Encumbrances (except to the extent such Coin constitutes collateral under any Loan (including, solely for this purpose, the 3AC Loan) and, solely to the extent of any staking contract, Staked Coins).

3.7     <u>Title to Properties</u>.

(a)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, Seller has a good and valid leasehold interest to all real property leased by Seller (the "<u>Leased Real Property</u>"), free and clear of all Encumbrances (other than Permitted Encumbrances). Seller does not own any real property.

(b)     Subject to requisite Bankruptcy Court approvals, and assumption by Seller of the applicable Contract in accordance with applicable Law (including satisfaction of any applicable Cure Costs) and except as a result of the commencement of the Bankruptcy Case, Seller holds good title to, or holds a valid leasehold interest in, all of the material tangible property necessary in the conduct of its business as now conducted, free and clear of all Encumbrances, except for Permitted Encumbrances, other than any failure to own or hold such tangible property that is not material to Seller.

3.8     <u>Contracts</u>.

(a)     <u>Schedule 3.8</u> sets forth a list of each Material Contract as of the date of this Agreement. For purposes of this Agreement, "<u>Material Contract</u>" means (x) any Assigned Contract, and (y) any other Contract to which Seller is a party or by which it is bound (in each case, excluding any Seller Plan) that in the case of this clause (y):

(i)     relates to the formation, creation, governance, economics, or control of any joint venture, partnership or other similar arrangement, other than for the avoidance of doubt, marketing and licensing Contracts entered into in the Ordinary Course;

(ii)     provides for indebtedness for borrowed money of Seller having an outstanding or committed amount in excess of $1,000,000, other than letters of credit;

(iii)     relates to the acquisition or disposition of any material business (whether by merger, sale of stock, sale of assets or otherwise) pursuant to which any earn-out or deferred or contingent payment obligations remain outstanding that would reasonably be expected to involve payments by or to Seller of more than $1,000,000 after the date hereof (in each case, excluding for the avoidance of doubt, acquisitions or dispositions of Equipment, Cryptocurrency, properties or other assets in the Ordinary Course or of Equipment, properties or other assets that are obsolete, worn out, surplus or no longer used or useful in the conduct of the business of Seller);

(iv)     involves the license of material Seller Intellectual Property to third parties (other than (x) Contracts with end users of Seller's products and services entered into in the ordinary course of business or (y) non-exclusive licenses granted to service

16

Appellant Appendix ER - 505

providers, suppliers and other third parties in connection with the provision of goods or services to Seller; provided such licenses are ancillary to, and not the primary purpose of, such Contract);

(v)     is a Contract (other than purchase orders or Contracts with respect to the acquisition of Cryptocurrency in the Ordinary Course) for the purchase of materials, supplies, goods, services, Equipment, or other assets pursuant to which Seller would reasonably be expected to make payments of more than $3,000,000 during any fiscal year;

(vi)     contains any provision (A) limiting, in any material respect, the right of Seller to engage in any business, make use of any Seller Intellectual Property that is material to Seller, compete with any Person, or operate anywhere in the world, or (B) granting any exclusivity right to any third party or containing a "most favored nation" provision in favor of any third party, in each case of (A) and (B), other than (x) a Contract that can be terminated on ninety (90) days' notice or less without resulting in a breach or violation of, or any acceleration of any rights or obligations or the payment of any penalty under, such Contract, (y) customer Contracts entered into in the Ordinary Course granting exclusive rights to certain of Seller's services or containing "most favored nation" provisions with respect to certain of Seller's products or (z) any provision in any license agreements for third party Intellectual Property being licensed to Seller that limits Seller's use of such licensed Intellectual Property to specified fields of use or specified territories;

(vii)     evidences or relates to a Loan, including security or collateral agreements;

(viii)     is a custody agreement or agreement with any Person performing validation or staking services with respect to any Cryptocurrency;

(ix)     each Contract evidencing or governing financial or commodity hedging or similar trading activities (including with respect to Cryptocurrency), including any master agreements or confirmations governing swaps, options or other derivatives, or futures account agreements and/or brokerage statements or similar Contract; and

(x)     any Contracts with any Governmental Body, regulatory service providers or self-regulatory organizations in connection with Seller's business or the Voyager Platform.

(b)     Subject to requisite Bankruptcy Court approvals, and assumption by Seller of the applicable Contract in accordance with applicable Law (including satisfaction by Purchaser of any applicable Cure Costs) and except (i) as a result of the commencement of the Bankruptcy Case and (ii) with respect to any Contract that has previously expired in accordance with its terms, been terminated, restated, or replaced, (A) each Material Contract is valid and binding on Seller and, to the Knowledge of Seller, each other party thereto, and is in full force and effect, subject to the Enforceability Exceptions, (B) Seller, and, to the Knowledge of Seller, any other party thereto, have performed all obligations required to be performed by it under each

US-DOCS\137411268.27138346099.6

Material Contract, (C) Seller has not received a written notice of the existence of any breach or default on the part of Seller under any Material Contract, (D) there are no events or conditions which constitute, or, after notice or lapse of time or both, will constitute a default on the part of Seller, or to the Knowledge of Seller, any counterparty under such Material Contract and (E) to the Knowledge of Seller, Seller has not received any written notice from any Person that such Person intends to terminate, or not renew, any Material Contract, except in each case of (A) through (E), as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

      3.9     <u>Permits; Compliance with Laws</u>.

      (a)     Except as set forth on <u>Schedule 3.9</u>, (i) Seller is not in violation of any Laws, Orders or any Money Transmitter Requirement, applicable to the Acquired Assets and (ii) Seller holds, and is in compliance with, all licenses, permits, registrations and authorizations, including Money Transmitter Licenses, necessary for the lawful ownership and operation of the Acquired Assets and Seller's business, except in each case as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

      (b)     Seller and each of its directors, officers and employees acting in such capacity are and have in the past three (3) years been in compliance with the Foreign Corrupt Practices Act of 1977, as amended (the "<u>FCPA</u>"), and any other U.S. or foreign Law concerning anti-corruption or anti-bribery applicable to its business, and Seller is not, to the Knowledge of Seller, being investigated by any Governmental Body with respect to, or been given notice in writing by a Governmental Body of, any violation by Seller of the FCPA or any other U.S. or foreign Law concerning anti-corruption or anti-bribery applicable to its business, in each case, except to the extent such non-compliance, investigation or notice of violation would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

      (c)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (i) neither Seller nor any director or officer of Seller, or any employee, agent or representative or other Person who performs or has performed services on behalf of Seller in the past three (3) years, is a Person that is the subject or target of economic sanctions administered by the Office of Foreign Assets Control of the United States Department of Treasury ("<u>OFAC</u>") (including the designation as a "Specially Designated National or Blocked Person" thereunder), the United Nations Security Council, His Majesty's Treasury, the European Union, the Bureau of Industry Security of the U.S. Department of Commerce, the U.S. Department of State, or any sanctions measures under the U.S. International Emergency Economic Powers Act, the U.S. Trading with the Enemy Act, the U.S. Iran Sanctions Act, the U.S. Comprehensive Iran Sanctions, Accountability and Divestment Act of 2010, the U.S. Iran Threat Reduction and Syria Human Rights Act of 2012, the U.S. National Defense Authorization Act of 2012 or the U.S. National Defense Authorization Act of 2013, or any executive order, directive or regulation pursuant to the authority of any of the foregoing, including the regulations of the United States Department of the Treasury set forth under 31 CFR, Subtitle B, Chapter V, or any orders or licenses issued thereunder (collectively, "<u>Sanctions</u>"), nor any Sanctioned Person; (ii) to the Knowledge of Seller, the Acquired Assets are not the property or interests in

property of a Sanctioned Person, and are not otherwise the subject or target of Sanctions; and (iii) Seller has not in the past three (3) years been in violation of applicable Sanctions.

(d)     Seller and each of its directors, officers and employees acting in such capacity are and have in the past three (3) years been in compliance with all anti-money laundering and financial recordkeeping and reporting Laws to which it is subject, including the related rules, regulations or guidelines issued, administered or enforced by any Governmental Body (collectively, the "Anti-Money Laundering Laws"), and no Action by or before any Governmental Body involving Seller (or, in respect of the dealings of Seller, involving any of Seller's directors, officers or employees) with respect to the Anti-Money Laundering Laws is pending, or, to the Knowledge of Seller, threatened, in each case, except to the extent such non-compliance or Action would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(e)     Seller does not (i) have assets located outside the United States, or (ii) derive revenue from users located outside the United States.

(f)     Seller does not engage in (a) the design, fabrication, development, testing, production, or manufacture of one or more "critical technologies" within the meaning of Section 721 of the Defense Production Act of 1950, as amended, including all implementing regulations thereof (the "DPA"), or (b) the ownership, operation, maintenance, supply, manufacture, or servicing of "covered investment critical infrastructure" within the meaning of the DPA (where such activities are covered by column 2 of Appendix A to 31 C.F.R. Part 800).

3.10     Environmental Matters. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (a) Seller is, and has been since January 1, 2021, in compliance with all applicable Environmental Laws, (b) since January 1, 2021, Seller has not received any written notice alleging that Seller is in violation of or liable under, any Environmental Law that is unresolved, (c) Seller possesses and is in compliance with all permits required under Environmental Laws for the operation of its business as currently conducted ("Environmental Permits"), (d) there is no Action under or pursuant to any Environmental Law or Environmental Permit that is pending or, to the Knowledge of Seller, threatened in writing against Seller, (e) Seller is not subject to any Order imposed by any Governmental Body pursuant to Environmental Laws under which there are uncompleted, outstanding or unresolved obligations on the part of Seller and (f) Seller has not released any Hazardous Substances at the Leased Real Property in quantities or concentrations that currently require Seller to conduct remedial activities, or that have given rise to any Action against Seller, under Environmental Laws.

3.11     Intellectual Property; Data Privacy.

(a)     Schedule 3.11(a)(i) sets forth as of the date hereof a true, correct and complete list of all registrations and applications included in the Seller Intellectual Property (the "Seller Registered IP"), indicating for each item the owner, registration or application number, registration or application date and the applicable filing jurisdiction or domain name registrar, as applicable. Except as otherwise indicated on Schedule 3.11(a), all Seller Registered IP is owned exclusively by Seller, and is subsisting, and to the Knowledge of Seller, valid and enforceable.

There is no outstanding Action or Order challenging or adversely affecting the validity or enforceability of any material Seller Registered IP, or Seller's ownership of or rights in any material Seller Intellectual Property.

(b)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, Seller owns all of the rights, title and interest in and to the Seller Intellectual Property (other than Intellectual Property licensed to Seller), free and clear of all Encumbrances (other than Permitted Encumbrances). Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, all of the Seller Intellectual Property (other than Intellectual Property licensed to Seller) is subsisting, valid and enforceable.

(c)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (i) Seller owns or has legally enforceable and sufficient rights to use all Intellectual Property necessary to the conduct of the business of Seller as currently conducted free and clear of all Encumbrances (other than Permitted Encumbrances) and (ii) Seller has taken commercially reasonable steps in accordance with industry practice to maintain the confidentiality of non-public Intellectual Property; provided that nothing in this Section 3.11(c) shall be interpreted or construed as a representation or warranty with respect to whether there is any infringement, misappropriation, or violation of any Intellectual Property, which is the subject of Section 3.11(e).

(d)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, no Actions are pending or, to the Knowledge of Seller, threatened against Seller, and since January 1, 2021, Seller has not received any written notice or claim, (i) challenging the ownership, validity, enforceability or use by Seller of any Intellectual Property owned by or exclusively licensed to Seller or (ii) alleging that Seller is infringing, misappropriating or otherwise violating the Intellectual Property of any Person.

(e)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, since January 1, 2021, (i) no Person has infringed, misappropriated or otherwise violated the rights of Seller with respect to any Intellectual Property owned by or exclusively licensed to Seller and (ii) the operation of the business of Seller has not violated, misappropriated or infringed the Intellectual Property of any other Person.

(f)     The consummation of the Transactions will not result in the grant of any right or license to any third party of any material Seller Intellectual Property (other than Intellectual Property licensed to Seller).

(g)     Seller has complied in the past three (3) years in all material respects with all applicable Privacy Laws, privacy policies and notices, and contractual commitments related to the Processing of Personal Information (collectively, "Privacy Requirements"), and the consummation of the Transactions will not cause Seller to breach, in any material respect, any Privacy Requirements.

Appellant Appendix ER - 509

(h)    Seller has established and implemented and maintains a written information security program that contains commercially reasonable safeguards designed to protect Personal Information and against any Security Incident.

(i)    Except as would not, individually or in the aggregate, reasonably be expected to have a material impact on the Acquired Assets, taken as a whole, there have been no Security Incidents involving Personal Information in Seller's custody, possession or control or for which Seller is otherwise responsible. Except as set forth on <u>Schedule 3.11(i)</u>, Seller has not in the past three (3) years: (i) notified or been legally required to notify any affected individuals, Governmental Body or other parties in connection with any Security Incident pursuant to Privacy Requirements; (ii) been the subject of any Action with respect to any unauthorized Processing of Personal Information or violation of any Privacy Laws by any Person; (iii) received any written inquiry, notice, request, claim, complaint, correspondence, or other communication from any Governmental Body or other Person relating to any Security Incident or alleged violation of any Privacy Laws; or (iv) made any ransomware or similar payment in connection with any Security Incident.

3.12    <u>Tax Matters</u>.

(a)    To the Knowledge of Seller, except with respect to income Tax and information Tax Returns, Seller has prepared (or caused to be prepared) and duly and timely filed (taking into account valid extensions of time within which to file) all material Tax Returns in respect of the Acquired Assets or otherwise required to be filed by it, and all such Tax Returns (taking into account all amendments filed in respect thereto) are true, correct and complete in all material respects.

(b)    To the Knowledge of Seller, all material Taxes in respect of the Acquired Assets, other than income Taxes or Taxes attributable to information Tax Returns, or otherwise required to be paid by Seller (whether or not shown on any Tax Return) have been duly and timely paid.

(c)    To the Knowledge of Seller, there are no Encumbrances for Taxes on the Acquired Assets or any other assets of Seller other than for Taxes not yet due or payable.

(d)    Seller has not, within the past five (5) years, been a member of an affiliated group of corporations filing a consolidated federal income Tax Return (other than a group the common parent of which is Parent or one of its Subsidiaries).

(e)    Seller has not waived any statute of limitations in respect of material Taxes or agreed to any extension of time with respect to an assessment or deficiency for material Taxes (other than pursuant to extensions of time to file Tax Returns obtained in the Ordinary Course), including, for the avoidance of doubt, with respect to Taxes in respect of the Acquired Assets.

(f)    Seller has not participated in any "listed transaction" within the meaning of U.S. Treasury Regulation Section 1.6011-4(b)(2).

US-DOCS\137411268.27138346099.6

(g)    Except as set forth on <u>Schedule 3.12(g)</u>, solely as of the date hereof, (x) Seller has not received a written notice from a Governmental Body of any proposed adjustment, deficiency or underpayment of material amounts of Taxes with respect to the Acquired Assets, and (y) there are no pending or threatened audits or other Actions for or relating to any Liability for Taxes with respect to the Acquired Assets, except for, in each case of clause (x) and (y), those that have been fully satisfied, resolved or finally withdrawn.

(h)    Seller has not received a claim from a Governmental Body that Tax Returns are required to be filed in relation to the Acquired Assets or the Assumed Liabilities in a jurisdiction where no such Tax Returns have been filed or are currently filed.

(i)    Notwithstanding anything in this Agreement to the contrary, the representations and warranties in this <u>Section 3.12</u> shall constitute the sole representations and warranties with respect to Taxes and no representation or warranty is made with respect to the validity of any Tax position or the availability of any Tax attribute for any Tax period (or any portion thereof) following the Closing.

3.13    <u>Affiliate Transactions</u>. Except as set forth on <u>Schedule 3.13</u> or in the "Interest Of Management And Others In Material Transactions" disclosure in the Filed CSA Documents or customer accounts of officers or directors, to the Knowledge of Seller, no Affiliate of Seller, or any officer or director of Parent or Seller, (a) is a party to any agreement that constitutes an Acquired Asset having a potential or actual value or a contingent or actual Liability exceeding $500,000, other than (i) loans and other extensions of credit to directors and officers of Seller for travel, business or relocation expenses or other employment-related purposes in the Ordinary Course, (ii) employment arrangements in the Ordinary Course and (iii) the Seller Plans or (b) has any material interest in any Acquired Asset.

3.14    <u>Brokers</u>. Except for Moelis, the fees and expenses of which will be paid by Seller, no broker, investment banker, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses in connection therewith, in connection with the Transactions based upon arrangements made by or on behalf of Seller or any of its Affiliates for which Purchaser or its Affiliates shall be liable.

3.15    <u>Litigation</u>. Except for the general pendency of the Bankruptcy Case, Actions that would not reasonably be expected to have a Material Adverse Effect or as set forth <u>Schedule 3.15</u>, there are no filed actions, claims, complains, summons, suits, litigations, arbitrations pending or threatened in writing against Seller.

3.16    <u>Absence of Changes</u>. Since the Balance Sheet Date, (a) there has not been any Material Adverse Effect and i) no action has been taken with respect to the Acquired Assets that would have required the consent of Purchaser under <u>Section 6.1</u> if undertaken after the date hereof.

3.17    <u>No Other Representations or Warranties</u>. Except for the representations and warranties expressly contained in this <u>Article III</u> (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement)

22

Appellant Appendix ER - 511

or in the certificate to be delivered pursuant to <u>Section 2.4(e)</u> (the "<u>Express Seller Representations</u>") (<u>it</u> <u>being</u> <u>understood</u> that Purchaser has relied only on the Express Seller Representations), Purchaser acknowledges and agrees that neither Seller nor any other Person on behalf of Seller makes, and Purchaser has not relied on, is not relying on, and will not rely on the accuracy or completeness of any express or implied representation or warranty with respect to Seller, the Acquired Assets or the Assumed Liabilities or with respect to any information, statements, disclosures, documents, projections, forecasts or other material of any nature made available or provided by any Person (including in any presentations or other materials prepared by Moelis) (the "<u>Information Presentation</u>") or in that certain datasite administered by Datasite (the "<u>Dataroom</u>") or elsewhere to Purchaser or any of its Affiliates or their respective Advisors by or on behalf of Seller or any of its Affiliates. Without limiting the foregoing, except for the Express Seller Representations, neither Seller nor any other Person will have or be subject to any Liability whatsoever to Purchaser, or any other Person, resulting from the distribution to Purchaser or any of its Affiliates or their respective Advisors, or Purchaser's or any of its Affiliates' or Advisors' use of or reliance on, any such information, including the Information Presentation, any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom or otherwise in expectation of the Transactions or any discussions with respect to any of the foregoing information.

3.18 <u>No Outside Reliance</u>. Notwithstanding anything contained in this <u>Article III</u> or any other provision of this Agreement to the contrary, Seller acknowledges and agrees that the Express Purchaser Representations are the sole and exclusive representations, warranties and statements of any kind made to Seller and on which Seller may rely in connection with the Transactions. Seller acknowledges and agrees that all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Purchaser Representations), including in any meetings, calls or correspondence with management of Purchaser or any other Person on behalf of Purchaser or any of its Affiliates or Advisors, are, in each case, specifically disclaimed by Purchaser and that Seller has not relied on any such representations, warranties or statements.

**ARTICLE IV**

**REPRESENTATIONS AND WARRANTIES OF PURCHASER**

Except as set forth in the Schedules delivered by Purchaser concurrently herewith and subject to <u>Section 10.10</u>, Purchaser represents and warrants to Seller as follows as of the date hereof and as of the Closing Date.

4.1 <u>Organization and Qualification</u>. Purchaser is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware and has all requisite power and authority necessary to carry on its business as it is now being conducted, except (other than with respect to Purchaser's due incorporation and valid existence) as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the Transactions. Purchaser is duly licensed or qualified to do

business and is in good standing (or its equivalent) in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets leased by it makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the Transactions.

4.2     Authorization of Agreement. Purchaser has all necessary power and authority to execute and deliver this Agreement and to perform its obligations hereunder and to consummate the Transactions. The execution, delivery and performance by Purchaser of this Agreement, and the consummation by Purchaser of the Transactions, subject to requisite Bankruptcy Court approvals, have been duly authorized by all requisite corporate or similar organizational action and no other corporate or similar organizational proceedings on its part are necessary to authorize the execution, delivery and performance by Purchaser of this Agreement and the consummation by it of the Transactions. Subject to requisite Bankruptcy Court approvals, this Agreement has been duly executed and delivered by Purchaser and, assuming due authorization, execution and delivery hereof by the other Party, constitutes a legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, except that such enforceability may be limited by the Enforceability Exceptions.

4.3     Conflicts; Consents.

(a)     Except for the consents, licenses, waivers, exemptions, authorizations, approvals, filings, notifications or registrations required under any Money Transmitter Requirements in any Unsupported Jurisdiction applicable to Purchaser and the Binance.US Platform (the "Unsupported Jurisdiction Approvals"), assuming that (i) requisite Bankruptcy Court approvals are obtained, and (ii) the notices, authorizations, approvals, Orders, permits or consents set forth on Schedule 4.3 are made, given or obtained (as applicable), neither the execution and delivery by Purchaser of this Agreement, nor the consummation by Purchaser of the Transactions, nor performance or compliance by Purchaser with any of the terms or provisions hereof, will (A) conflict with or violate any provision of Purchaser's articles of incorporation or bylaws or similar organizational documents, (B) violate any Law or Order applicable to Purchaser, (C) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancelation of any obligation or to the loss of any benefit, any of the terms or provisions of any loan or credit agreement or other Contract to which Purchaser is a party or accelerate Purchaser's obligations under any such Contract, or (D) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any properties or assets of Purchaser or any of its Subsidiaries, except, in the case of clauses (B) through (D), as would not, individually or in the aggregate, reasonably be expected to prevent or materially impair or delay the ability of Purchaser to consummate the Transactions.

(b)     Except for the Unsupported Jurisdiction Approvals, Purchaser is not required to file, seek or obtain any notice, authorization, approval, Order, permit or consent of or with any Governmental Body in connection with the execution, delivery and performance by Purchaser of this Agreement or the consummation by Purchaser of the Transactions, except where failure to obtain such consent, approval, authorization or action, or to make such filing or

notification, would not, individually or in the aggregate, reasonably be expected to prevent or materially impair or delay the ability of Purchaser to consummate the Transactions.

4.4 <u>Financing</u>. Purchaser has, as of the date hereof, and will have at the Closing, sufficient funds in cash in an aggregate amount necessary to (a) pay the Closing Date Payment pursuant to <u>Section 2.1(b)</u> and any Seller Expenses to the extent payable by Purchaser pursuant to <u>Section 6.21</u>, and (b) pay all fees and expenses of Purchaser in connection with the Closing. Purchaser is and shall be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assigned Contracts and the related Assumed Liabilities.

4.5 <u>Permits</u>. Purchaser has Money Transmitter Licenses in all States of the United States of America, other than the Unsupported Jurisdictions and any States in which the operation of Purchaser's business does not require a Money Transmitter License. Assuming the accuracy in all material respects of the representations and warranties set forth on <u>Sections 3.9(a)</u>, <u>3.9(d)</u> and <u>3.9(e)</u> (in each case, as qualified by the Schedules) and Seller's compliance in all material respects with the covenants set forth in <u>Sections 6.4</u>, <u>6.6</u>, <u>6.10</u> and the other Commercial Covenants, except for the Unsupported Jurisdiction Approvals, Purchaser holds all licenses, franchises, permits, certificates, approvals, and authorizations from Governmental Bodies necessary for the ownership and use of the Acquired Assets.

4.6 <u>Brokers</u>. There is no investment banker, broker, finder, or other intermediary which has been retained by or is authorized to act on behalf of Purchaser that might be entitled to any fee or commission in connection with the Transactions.

4.7 <u>No Litigation</u>. There are no Actions pending or, to the Knowledge of Purchaser, threatened against or affecting Purchaser that will materially and adversely affect Purchaser's performance under this Agreement or Purchaser's ability to consummate the Transactions.

4.8 <u>Certain Arrangements</u>. As of the date hereof, there are no Contracts, undertakings, commitments, agreements or obligations, whether written or oral, between any member of the Purchaser Group, on the one hand, and any member of the management of Seller or its board of managers (or applicable governing body of any Affiliate of Seller), any holder of equity or debt securities of Seller, or any lender or creditor of Seller or any of its Affiliates, on the other hand, (a) relating in any way to the acquisition of the Acquired Assets or the Transactions or (b) that would be reasonably likely to prevent, restrict, impede or affect adversely the ability of Seller or any of its Affiliates to entertain, negotiate or participate in any of the Transactions.

4.9 <u>Solvency</u>. As of the date hereof Purchaser is and, assuming (x) that the representations and warranties made by Seller herein are true and connect, (y) Seller has complied in all material respects with its covenants and other agreements hereunder, and (z) the conditions set forth in <u>Section 7.1</u> and <u>Section 7.2</u> have been satisfied, then immediately after giving effect to the transactions contemplated hereby Purchaser shall be, Solvent. "Solvent" means, with respect to any Person, such Person (a) is able to pay its debts as they become due; (b) owns property that has a fair saleable value greater than the amounts required to pay its debt (including a reasonable estimate of the amount of all contingent liabilities) and (c) has adequate capital to carry on its business. In connection with the Transactions, Purchaser is not incurring,

has not incurred, and does not plan to incur, debts beyond its ability to pay as they become absolute and matured.

4.10   No Additional Representations or Warranties. Except for the representations and warranties expressly contained in this Article IV (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) or in the certificate to be delivered pursuant to Section 2.5(d) (the "Express Purchaser Representations") (it being understood that Seller has relied only on the Express Purchaser Representations), Seller acknowledges and agrees that neither Purchaser nor any other Person on behalf of Purchaser makes, and Seller has not relied on, is not relying on, and will not rely on the accuracy or completeness of any express or implied representation or warranty with respect to Purchaser or with respect to any information, statements, disclosures, documents, projections, forecasts or other material of any nature made available or provided by any Person to Seller or any of its Affiliates or their respective Advisors on behalf of Purchaser. Without limiting the foregoing, except for the Express Purchaser Representations, neither Purchaser nor any other Person will have or be subject to any Liability whatsoever to Seller, or any other Person, resulting from the distribution to Seller, its Affiliates or their respective Advisors, or Seller's, its Affiliates' or their respective Advisors' use of or reliance on, any such information, statements, disclosures, documents, projections, forecasts or other material made available to them in expectation of the Transactions or any discussions with respect to any of the foregoing information.

4.11   No Outside Reliance. Notwithstanding anything contained in this Article IV or any other provision of this Agreement to the contrary, Purchaser acknowledges and agrees that the Express Seller Representations are the sole and exclusive representations, warranties and statements of any kind made to Purchaser and on which Purchaser may rely in connection with the Transactions. Purchaser acknowledges and agrees that all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (a) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Seller Representations), including in the Information Presentation, the Dataroom, any projections or in any meetings, calls or correspondence with management of Seller or any other Person on behalf of Seller or any of its Affiliates or Advisors and (b) any other statement relating to the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental compliance, employee matters, regulatory compliance, business risks and prospects of Seller, or the quality, quantity or condition of Seller's assets, are, in each case specifically disclaimed by Seller and Purchaser has not relied on any such representations, warranties or statements. Purchaser acknowledges that it has conducted to its full satisfaction an independent investigation and verification of the business including its financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental compliance, employee matters, regulatory compliance, business risks and prospects of Seller, and, in making its determination to proceed with the Transactions, Purchaser has relied solely on the results of the Purchaser Group's own independent investigation and verification, and has not relied on, is not relying on, and will not rely on, Seller, the Information Presentation, any projections or any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom or otherwise, in each case, whether written or oral, made or provided by, or as part of, any of the

foregoing or Seller or any of its Affiliates or Advisors, or any failure of any of the foregoing to disclose or contain any information, except for the Express Seller Representations (it being understood that Purchaser has relied only on the Express Seller Representations).

## ARTICLE V

### BANKRUPTCY COURT MATTERS

5.1    <u>Selection of Successful Bid and Winning Bidder and Sale Approval</u>.

(a)    Pursuant to the Bidding Procedures Order, by execution and delivery of its counterpart signature page hereto, Seller hereby confirms that Purchaser has made the highest or otherwise best bid pursuant to the Bidding Procedures Order and has selected the Transactions as the Successful Bid and Purchaser as the Winning Bidder (each, as defined in the Bidding Procedures Order).

(b)    (i) Promptly, and in any event no later than December 21, 2022 (subject to Bankruptcy Court approval where indicated), Seller shall: publicly announce that the Transactions have been selected as the Successful Bid and Purchaser has been selected as the Winning Bidder; and (ii) promptly, and in any event no later than December 21, 2022 (subject to Bankruptcy Court approval where indicated), Seller shall file a motion with the Bankruptcy Court attaching the form of an order approving the execution, delivery and performance of this Agreement by Seller (including payment of the Purchaser Expenses pursuant to <u>Section 6.21(b)</u> and the provisions of this <u>Article V</u> contemplating certain performance by Seller prior to Closing), other than the performance of those obligations to be performed at or after the Closing (the "<u>Agreement Order</u>"), which Agreement Order shall be in form and substance acceptable to Purchaser. Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining Bankruptcy Court approval of the Agreement Order.

5.2    <u>No-Shop</u>.

(a)    From and following the execution and delivery of this Agreement by Seller, Seller and its Affiliates shall not, and shall not permit their respective Advisors or Affiliates to, (i) initiate contact with, or solicit or encourage submission of any inquiries, proposals or offers by, any Person (other than Purchaser, its Affiliates and its and their respective Advisors) with respect to an Alternative Transaction, (ii) engage in, continue or otherwise participate in any discussions or negotiations regarding an Alternative Transaction or that could reasonably be expected to lead to an Alternative Transaction, (iii) enter into any confidentiality agreement with respect to, or provide any non-public information or data to any Person relating to, any Alternative Transaction, or (iv) otherwise agree, authorize or commit to do any of the foregoing; <u>provided</u> that, notwithstanding the foregoing, from and after entry of the Agreement Order, Seller may take the actions set forth in clauses (ii) and (iii) above if (A) Seller has received a written, bona fide offer, proposal or indication of interest to engage in an Alternative Transaction (an "<u>Acquisition Proposal</u>") from any Person after the date of this Agreement that did not result from Seller's breach of this <u>Section 5.2(a)</u>, and (B) the board of directors (or similar governing body) of Seller determines in good faith, after consultation with its financial advisor and outside legal counsel, that such Acquisition Proposal constitutes or is reasonably

likely to lead to a Higher and Better Offer and that failure to take such actions would violate the directors' fiduciary duties under applicable Law; provided further that if the Closing has not occurred prior to the Outside Date unless the failure of the Closing to have occurred by the Outside Date was caused by Seller's failure to perform any of its obligations under this Agreement, and there is no Back-up Bidder (as defined in the Bidding Procedures Order) or the agreement with the Back-up Bidder has terminated in accordance with its terms, then this Section 5.2(a) shall automatically terminate and be of no further force and effect as of such date. Until entry of the Agreement Order, Seller shall promptly (but in any event within twenty-four (24) hours) provide written notice to Purchaser of any breach of this Section 5.2(a).

(b)     Seller shall promptly (but in any event within twenty-four (24) hours) give written notice to Purchaser if (i) any inquiries, proposals or offers with respect to an Alternative Transaction or that could reasonably be expected to lead to an Alternative Transaction are received, (ii) any non-public information or data concerning Seller or its Affiliates or access to Seller's or its Affiliates' properties, books or records in connection with any Alternative Transaction or any inquiry, proposal or offer that could reasonably be expected to lead to an Alternative Transaction is requested, or (iii) any discussions or negotiations relating to an Alternative Transaction or any inquiry, proposal or offer that could reasonably be expected to lead to an Alternative Transaction are sought to be engaged in or continued by, from or with Seller, its Affiliates or any of its or their respective Advisors, as the case may be. Such notice shall set forth the name of the applicable Person making such inquiry, the material terms and conditions of any proposed Alternative Transaction (including, if applicable, correct and complete copies of any proposed agreements, inquiries, proposals or offers or, where no such copies are available, a reasonably detailed written description thereof) and the status of any such discussions or negotiations. Seller shall thereafter keep Purchaser reasonably informed, on a reasonably prompt basis, of the status of any discussions or negotiations with respect thereto. Until entry of the Agreement Order, Seller shall promptly (but in any event within twenty-four (24) hours) provide written notice to Purchaser of any breach of this Section 5.2(b).

(c)     Seller (i) shall promptly (and in any event within twenty-four (24) hours) give notice to Purchaser upon a determination by Seller or its board of directors (or comparable governing body) that any Acquisition Proposal received from any Person after the date of this Agreement that did not result from Seller's breach of Section 5.2(a) constitutes a Higher and Better Offer (a "Higher Offer Determination Notice") and (ii) may cause or permit Seller or any of the other Debtors to enter into a definitive agreement with respect to such Acquisition Proposal; provided that (A) Seller and its board of directors (or comparable governing body) may only make such determination described in clause (i) of this Section 5.2(c) if, prior to the determination that such Acquisition Proposal constitutes a Higher and Better Offer, Seller negotiates, and causes its representatives to negotiate, with Purchaser in good faith (to the extent Purchaser and its representatives desire to negotiate) during such three (3) Business Day period to amend the terms and conditions of this Agreement and, no earlier than the end of such three (3) Business Day period, the board of directors (or comparable governing body) of Seller determines in good faith (after consultation with its financial advisor(s) and outside legal counsel), after giving effect to such proposed amendments to the terms and conditions of this Agreement, that such Acquisition Proposal still constitutes a Higher and Better Offer (provided further that if any material amendment is made to such Acquisition Proposal, such Acquisition Proposal shall be subject again (but only once again) to the foregoing, except that references to

28

three (3) Business Days shall be deemed to be two (2) Business Days, and whatever the result of the second instance of the foregoing, Seller shall not be required to undertake the foregoing again before making a determination that such Acquisition Proposal constitutes a Higher and Better Offer and, if applicable, terminating this Agreement), and (B) Seller and its board of directors (or comparable governing body) may only take such action described in clause (ii) of this Section 5.2(c) if the board of directors (or comparable governing body) of Seller determines in good faith (after consultation with its outside legal counsel) that the failure to take such action would violate with its fiduciary duties under applicable Law.

    5.3    <u>Bankruptcy Actions</u>.

    (a)    No later than December 21, 2022, Seller shall file with the Bankruptcy Court an amended Disclosure Statement (the "<u>Amended Disclosure Statement</u>" ) containing such amendments as may be necessary or appropriate to reflect the Seller's entry into this Agreement and pursuit of the Transactions, which, solely with respect to matters relating to this Agreement and the Transactions, shall be in a form and substance reasonably acceptable to Purchaser. Concurrently with the filing of such Amended Disclosure Statement (*i.e.*, no later than December 21, 2022), Seller shall file the Plan Solicitation Motion which, solely with respect to matters relating to this Agreement and the Transactions, shall be in form and substance reasonably acceptable to Purchaser; provided that Seller may modify the Plan Solicitation Motion, the Plan, and the Confirmation Order pursuant to discussions with the United States Trustee assigned to the Bankruptcy Case, the Bankruptcy Court, any creditor or committee representing a group of creditors in the Bankruptcy Case, or any other party in interest, in each case, with the consent of Purchaser solely as it pertains to matters relating to this Agreement and Transactions (such consent not to be unreasonably withheld, conditioned or delayed).

    (b)    From the date hereof until the earlier of (i) the termination of this Agreement in accordance with <u>Article VIII</u> and (ii) the Closing Date, Seller shall use reasonable best efforts to obtain entry by the Bankruptcy Court of the Agreement Order and the Confirmation Order.

    (c)    The Parties shall use their respective reasonable best efforts to (i) obtain entry by the Bankruptcy Court of the Agreement Order, (ii) obtain entry by the Bankruptcy Court of the Plan Solicitation Order, (iii) commence solicitation of the Plan, and (iv) (A) facilitate the solicitation, confirmation, and consummation of the Plan and the transactions contemplated thereby and hereby, (B) obtain entry of the Confirmation Order, and (C) and consummate the Plan and the Transactions on the timeline set forth in the Plan Solicitation Motion and in any case prior to the Outside Date.

    (d)    Purchaser shall promptly take all actions as are reasonably requested by Seller to assist in obtaining the Bankruptcy Court's entry of the Agreement Order, the Plan Solicitation Order, the Confirmation Order, and any other Order reasonably necessary in connection with the Transactions as promptly as practicable, including furnishing affidavits, financial information, or other documents or information for filing with the Bankruptcy Court and making such employees and Advisors of Purchaser and its Affiliates reasonably available to testify before the Bankruptcy Court for the purposes of, among other things providing necessary assurances of performance by Purchaser under this Agreement, and demonstrating that Purchaser

is a "good faith" purchaser under section 363(m) of the Bankruptcy Code, as well as demonstrating Purchaser's ability to pay and perform or otherwise satisfy any Assumed Liabilities following the Closing.

(e) Any documents filed by Seller with the Bankruptcy Court in connection with obtaining approval of effectuating the Closing shall be reasonably acceptable to Purchaser.

(f) Each of Seller and Purchaser shall (i) appear formally or informally in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the Transactions and the Plan solely with respect to matters relating to this Agreement and (ii) keep the other reasonably apprised of the status of material matters related to the Agreement and the Plan solely as it pertains to matters relating to this Agreement and Transactions, including, upon reasonable request promptly furnishing the other with copies of notices or other communications received by Seller from the Bankruptcy Court with respect to the Transactions or the Plan solely as it pertains to matters relating to this Agreement and Transactions.

(g) Seller and Purchaser acknowledge that this Agreement and the sale of the Acquired Assets are subject to Bankruptcy Court approval. Purchaser acknowledges that Seller and the other Debtors must take reasonable steps to demonstrate that they have sought to obtain the highest or otherwise best price for the Acquired Assets, including giving notice thereof to the creditors of the Debtors and other interested parties, providing information about Seller to prospective bidders, entertaining higher and better offers from such prospective bidders.

(h) Purchaser shall provide adequate assurance of future performance as required under section 365 of the Bankruptcy Code for the Assigned Contracts. Purchaser agrees that it will take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assigned Contracts, such as furnishing affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Purchaser's Advisors reasonably available to testify before the Bankruptcy Court.

5.4    Cure Costs. Subject to entry of the Agreement Order and the Confirmation Order, Purchaser shall, on or prior to the Closing (or, in the case of any Contract that is to be assigned following the Closing pursuant to Section 1.5, on or prior to the date of such assignment), pay the Cure Costs and cure any and all other defaults and breaches under the Assigned Contracts so that such Contracts may be assumed by Seller and assigned to Purchaser in accordance with the provisions of section 365 of the Bankruptcy Code and this Agreement.

5.5    Approval. Seller's and Purchaser's obligations under this Agreement and in connection with the Transactions are subject to entry of and, to the extent entered, the terms of any Orders of the Bankruptcy Court (including entry of the Agreement Order and the Confirmation Order). Nothing in this Agreement shall require Seller or its Affiliates to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

US-DOCS\137411268.27138346099.6

5.6 <u>No Successor Liability</u>. The Parties intend that upon the Closing the Purchaser Group shall not and shall not be deemed to: (a) be a successor (or other such similarly situated party), or otherwise be deemed a successor, to Seller, including, a "successor employer" for the purposes of the Code, ERISA, or other applicable Laws; (b) have Liability or responsibility for any Liability or other obligation of Seller arising under or related to the Acquired Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor, or transferee Liability, labor law, de facto merger, or substantial continuity (including under applicable Money Transmitter Requirements or securities Laws of any Governmental Body); (c) have, de facto or otherwise, merged with or into Seller; (d) be an alter ego or a mere continuation or substantial continuation of any of Seller (and there is no continuity of enterprise between Purchaser and Seller), including, within the meaning of any foreign, federal, state or local revenue, pension, ERISA, COBRA, Tax, labor, employment, environmental, or other Law, rule or regulation (including filing requirements under any such Laws, rules or regulations), or under any products liability Law or doctrine with respect to Seller's Liability under such Law, rule or regulation or doctrine; or (e) be holding itself out to the public as a continuation of Seller or its estate (the foregoing clauses (a) through (e), collectively, "<u>Successor Liabilities</u>").

5.7 <u>Filings</u>. Seller shall, and shall cause the other Debtors to, give Purchaser reasonable advance notice of, and opportunity to review and approve, any motions, pleadings, notices and other documents to be filed during the Bankruptcy Case that would reasonably be expected to be material and adverse to the Transactions (such approval not to be unreasonably withheld, conditioned or delayed, provided that Purchaser may withhold their approval in their sole discretion to the extent such motions, pleadings, notices and other documents would be inconsistent with the consummation of the Transactions in accordance herewith).

~~5.8 Waiver of Conflicts. Notwithstanding anything to the contrary herein or otherwise, Seller acknowledges that Paul Hastings LLP ("Paul Hastings" ) may have represented and may currently represent the Purchaser or one or more of its Affiliates in connection with the Transactions (including the negotiation, preparation, execution and delivery of this Agreement and related agreements, and the consummation of the Transactions) as well as other past and ongoing regulatory matters generally (the "Covered Matters" ). Accordingly, Seller hereby irrevocably consents and agrees, on its behalf and on behalf of its Affiliates, to Paul Hastings representing the Purchaser and its Affiliates from and after the Closing in connection with any matter arising out of or related to the Covered Matters. Seller (i) hereby irrevocably waives and will not assert, and will cause each of its Affiliates to waive and not assert, any actual or potential conflict of interest which has or may arise as a result of Paul Hasting's representation of the Purchaser or one or more of its Affiliates, including in any Action, in a Covered Matter, (ii) hereby consents, and will cause each of its Affiliates to consent to, any such representation, even though, in each case, (x) the interests of the Purchaser or such Affiliates may be directly adverse to Seller or its Affiliates, (y) Paul Hastings may have represented Seller or its Affiliates in a substantially related matter, or (z) Paul Hastings may be handling other ongoing matters for Seller or its Affiliates, and (iii) shall cooperate, and shall cause each of its Affiliates to cooperate, with the Purchaser in effectuating the foregoing waiver (including with respect to any objections raised by or before the Bankruptcy Court or the~~

31

Appellant Appendix ER - 520

~~United States Trustee assigned to the Bankruptcy Case in respect of such waiver or representation).~~

## ARTICLE VI

### COVENANTS AND AGREEMENTS

6.1    <u>Conduct of Seller</u>.

(a)    Except (i) as required by applicable Law, Order or a Governmental Body, (ii) any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code, (iii) as expressly contemplated or required by this Agreement, (iv) to the extent related to an Excluded Asset or an Excluded Liability or (v) as set forth on <u>Schedule 6.1</u>, during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to <u>Article VIII</u>), unless Purchaser otherwise consents in writing, Seller shall use its reasonable best efforts to carry on its business in the Ordinary Course in all material respects; <u>provided</u> that no action by Seller with respect to matters specifically addressed by <u>Section 6.1(b)</u> shall be deemed to be a breach of this <u>Section 6.1(a)</u> unless such action would constitute a breach of <u>Section 6.1(b)</u>.

(b)    Except (i) as required by applicable Law, Order or a Governmental Body, (ii) any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code, (iii) as expressly contemplated, required or permitted by this Agreement, (iv) to the extent related to an Excluded Asset or an Excluded Liability or (v) as set forth on <u>Schedule 6.1</u>, during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to <u>Article VIII</u>) <u>and, in the case of Sections 6.1(b)(ii), 6.1(b)(iii), 6.1(b)(vi), and 6.1(b)(xi) below, solely with respect to any Delayed Acquired Coins, through and including the applicable Delivery Date with respect to any such Delayed Acquired Coin</u>, unless Purchaser otherwise consents in writing, Seller shall not:

(i)    (A) incur, assume or otherwise become liable for any indebtedness for borrowed money, issue or sell any debt securities or warrants or other rights to acquire any debt securities of Seller, guarantee any such indebtedness or any debt securities of another Person or enter into any "keep well" or other agreement to maintain any financial statement condition of another Person (collectively, "<u>Indebtedness</u>"), except (1) for letters of credit, bank guarantees, security or performance bonds or similar credit support instruments, overdraft facilities or cash management programs, in each case issued, made or entered into in the Ordinary Course, (2) for Indebtedness incurred under existing arrangements (including in respect of letters of credit) in an amount not to exceed $5,000,000 in the aggregate outstanding at any time and (3) Indebtedness incurred in connection with the refinancing of any Indebtedness existing on the date of this Agreement or permitted to be incurred, assumed or otherwise entered into hereunder; <u>provided</u> that no such refinancing Indebtedness shall have a principal amount greater than the principal amount of the Indebtedness being refinanced (plus any applicable premiums, defeasance costs, accrued interest, fees and expenses) and shall not include any greater prepayment premiums or restrictions on prepayment than the Indebtedness being refinanced, in each case of this <u>clause (A)</u>, other than Excluded Liabilities,

(B) enter into any swap or hedging transaction or other derivative agreements or (C) make any loans, capital contributions or advances to, or investments in, any Person;

        (ii)    sell or transfer to any Person, in a single transaction or series of related transactions, any of the Acquired Assets, other than the sale or transfer of Withheld Coins;

        (iii)    perform or offer to perform any staking that is not unstaked prior to the Rebalancing Date;

        (iv)    enter into referral agreements with a third party with respect to Users and any Documents with respect to Users or account information with respect thereto;

        (v)    make any changes in financial accounting methods, principles or practices affecting the consolidated assets, Liabilities or results of operations of Seller, except (x) insofar as may be required (A) by IFRS (or any interpretation thereof), (B) by any applicable Law or (C) by any Governmental Body or quasi-governmental authority (including the International Accounting Standards Board or any similar organization) or (y) as necessary or desirable to accommodate reasonable tax positions, to the extent such tax positions would not adversely affect the Acquired Assets or Purchaser in a taxable period (or portion thereof) beginning after the Closing Date;

        (vi)    (x) grant any Encumbrance (other than Permitted Encumbrances) on any of its material Acquired Assets (other than Acquired Coins, which, for the avoidance of doubt, are addressed in subclause (y) of this item (vi)) other than to secure Indebtedness and other obligations in existence at the date of this Agreement (and required to be so secured by their terms), or (y) grant any Encumbrance (other than any Encumbrances that will be removed or released by operation of the Confirmation Order or the Plan) on Acquired Coins, including by submitting any Cryptocurrency to any staking contract or otherwise causing any Seller Held Coins that are not currently Staked Coins to become Staked Coins;

        (vii)    except, in each case, with respect to income Taxes or information Tax Returns: make, change or revoke any material Tax election; change an annual accounting period for material Taxes; adopt or change any material accounting method with respect to material Taxes; file any amended material Tax Return; enter into any closing agreement for material Taxes; settle or compromise any material Tax claim or assessment; or consent to any extension or waiver of the limitation period applicable to any claim or assessment with respect to material Taxes; in each case to the extent such action would adversely affect the Acquired Assets or Purchaser in a taxable period (or portion thereof) beginning after the Closing Date;

        (viii)    waive, release, assign, settle or compromise any pending or threatened Action against Seller to the extent that such wavier, release, assignment, settlement or compromise would (A) result in an Assumed Liability in an amount in

excess of $1,000,000, individually or in the aggregate, or (B) waive or release any material rights or claims that would constitute Acquired Assets;

(ix)  enter into any referral agreement with a third party with respect to Users;

(x)  terminate or transfer any Business Accounts (other than any such Business Accounts that are not necessary to the operation of the Voyager Platform, with the Parties to cooperate in good faith to determine which Business Accounts are not necessary and may be terminated or transferred);

(xi)  lend any Cryptocurrency to any Person, or engage in purchases or sales of any Cryptocurrency (other than Withheld Coins) other than in connection with the Rebalancing Exercise; or

(xii)  authorize any of, or commit or agree, in writing or otherwise, to take any of, the foregoing actions.

(c)  Nothing contained in this Agreement is intended to give Purchaser or its Affiliates, directly or indirectly, the right to control or direct Seller's operations or business prior to the Closing, and nothing contained in this Agreement is intended to give Seller, directly or indirectly, the right to control or direct Purchaser's or its Subsidiaries' operations. Notwithstanding anything to the contrary contained herein, (i) any action taken, or omitted to be taken, by Seller pursuant to any Law, Order, directive, pronouncement or guideline issued by any Governmental Body or industry group providing for business closures, "sheltering-in-place" or other restrictions that relates to, or arises out of, any pandemic, epidemic or disease outbreak shall in no event be deemed to constitute a breach of this <u>Section 6.1</u> and (ii) any action taken, or omitted to be taken, by Seller to protect the business of Seller that is responsive to any pandemic, epidemic or disease outbreak, as determined by Seller in its reasonable discretion, shall in no event be deemed to constitute a breach of this <u>Section 6.1</u>.

6.2  <u>Access to Information</u>.

(a)  From the date hereof until the Closing (or the earlier termination of this Agreement pursuant to <u>Article VIII</u>), Seller will (x) provide Purchaser and its authorized Advisors with reasonable access to, upon reasonable advance notice and during regular business hours, Seller's officers, employees, Advisors, properties, systems, offices, and data, documents, and information of the Seller Parties regarding the Acquired Assets, the Assumed Liabilities, the Users, Voyager User Accounts and the Voyager Platform (including, for the avoidance of doubt any of the foregoing that constitutes Acquired Information), including such financial, operating and other data and information related to the Transactions, the Acquired Assets, the Assumed Liabilities, the Users, Voyager User Accounts, or the Voyager Platform (including, for the avoidance of doubt any of the foregoing that constitutes Acquired Information) as Purchaser or any of its representatives may reasonably request and (y) instruct the representatives of Seller to cooperate to provide such access; <u>provided</u> that (i) such access will occur in such a manner reasonably appropriate to protect the confidentiality of the Transactions, (ii) all requests for access will be directed to Moelis or such other Person(s) as Seller may designate in writing from

Appellant Appendix ER - 523

time to time and (iii) nothing herein will require Seller to provide access to, or to disclose any information to, Purchaser if such access or disclosure (A)  would waive any legal privilege or (B) would be in violation of applicable Laws or would violate any fiduciary duty under applicable Law with respect to Seller; provided that, in the event that Seller withholds access or information in reliance on the foregoing clause (A) or (B), Seller shall provide (to the extent possible without waiving or violating the applicable agreement, legal privilege, Law or fiduciary duty under applicable Law with respect to Seller) notice to Purchaser that such access or information is being so withheld and shall use reasonable best efforts to provide such access or information in a way that would not risk waiver of such legal privilege, applicable Law, or fiduciary duty.

(b)      The information provided pursuant to this Section 6.2 will be governed by the Confidentiality Agreement and the confidentiality provisions in Section 6.19. Each Party will, and will cause its Advisors to, abide by the terms of the Confidentiality Agreement with respect to such access and any information furnished to such Party or any of its Advisors. Neither Party makes any representation or warranty as to the accuracy of any information, if any, provided pursuant to this Section 6.2, and the other Party may not rely on the accuracy of any such information, in each case, other than, with respect to Purchaser, the Express Seller Representations and, with respect to Seller, the Express Purchaser Representations.

(c)      From and after the Closing for a period of three (3) years following the Closing Date (or, if later, the closing of the Bankruptcy Case), Purchaser will, following Seller's good faith written request, and solely to the extent necessary for Seller to (i) comply with Tax reporting obligations, (ii) consummate the closing of the Bankruptcy Case, (iii) prepare annual audited financial statements, (iv) submit a filing pursuant to applicable securities laws and regulations or (v) conduct the wind down of the estate (including reconciliation, investigation, and pursuit of claims) and dissolution of Seller and its Affiliates, provide Seller and its Advisors with reasonable access, during normal business hours, and upon reasonable advance notice, to the books and records in Purchaser's custody or control, including work papers, schedules, memoranda, Tax Returns, Tax schedules, Tax rulings, and other documents (for the purpose of examining and copying), in each case to the extent relating to the Acquired Assets, the Excluded Assets, the Assumed Liabilities or the Excluded Liabilities with respect to periods or occurrences prior to the Closing Date, and reasonable access, during normal business hours, and upon reasonable advance notice, to employees, officers, Advisors, accountants, offices and properties of Purchaser, in each case at no cost or expense to Purchaser; provided that (i) such access does not unreasonably interfere with the normal operations of Purchaser and (ii) nothing herein will require Purchaser to provide access to, or to disclose any information to, Seller or its Advisors if such access or disclosure (A) would waive any legal privilege or (B) would be in violation of applicable Laws or would violate any fiduciary duty; provided that, in the event that Purchaser withholds access or information in reliance on the foregoing clause (A) or (B), Purchaser shall provide (to the extent possible without waiving or violating the applicable agreement, legal privilege, Law or fiduciary duty) notice to Seller that such access or information is being so withheld and shall use reasonable best efforts to provide such access or information in a way that would not risk waiver of such legal privilege, applicable Law, or fiduciary duty. Unless otherwise consented to in writing by Seller, Purchaser will not, for a period of three (3) years following the Closing Date, destroy, alter or otherwise dispose of any of such books and records

without first offering to surrender to Seller such books and records or any portion thereof that Purchaser may intend to destroy, alter or dispose of.

(d)     Except as expressly contemplated by this Agreement (including in connection with the Commercial Covenants, <u>Section 6.3, Section 6.10(b)</u> and <u>Section 6.18</u>), Purchaser will not, and will not permit any member of the Purchaser Group to, contact any officer, manager, director, employee, customer, supplier, lessee, lessor, lender, licensee, licensor, distributor, noteholder or other material business relation of Seller prior to the Closing with respect to Seller, their business or the Transactions without the prior written consent of Seller for each such contact.

6.3     <u>Employee Matters</u>.

(a)     From and after the date hereof (and, if applicable, following the Closing until the winddown or dissolution of Seller), subject to applicable Laws, Seller shall deliver to Purchaser such information and documents regarding employees of Holdings (the "<u>Seller Employees</u>") and independent contractors of Seller or Holdings (the "<u>Seller Contractors</u>"), in each case, as Purchaser shall reasonably request. Prior to the date hereof, Seller has provided Purchaser a true, correct and complete list of the Seller Employees and Seller Contractors identified by name, if applicable, department, and (subject to applicable Laws) true, correct and complete copies of all talent assessment reports for each such Seller Employee and Seller Contractor. From and after the date hereof (and, if applicable, following the Closing until the winddown or dissolution of Seller), Seller shall use reasonable best efforts to make such Seller Employees who remain employed by Holdings and Seller Contractors who remain engaged by Seller or Holdings, in each case, reasonably available to Purchaser or its Affiliates and Purchaser will work in good faith with Seller to identify top performing Seller Employees and Seller Contractors and will determine whether to make offers of employment or other services to any such Seller Employee or Seller Contractors (including by prioritizing review of Seller Employees for applicable open positions of Purchaser and its Affiliates, if any). Purchaser (or an Affiliate of Purchaser) may, in its sole discretion, make offers of employment, consulting or other services to such Seller Employees or Seller Contractors (if any) as Purchaser shall determine, on such terms and conditions as Purchaser shall determine in its sole and absolute discretion. In the event that Purchaser (or an Affiliate of Purchaser) makes such an offer of employment or services and such Seller Employee or Seller Contractor accepts, Seller hereby agrees not to enforce against Purchaser (or its Affiliate) or such Seller Employee or independent contractor the terms and conditions of any agreement to refrain from competing, directly or indirectly, with the business of Seller or any of its Affiliates or to refrain from soliciting employees, customers or suppliers of Seller or any of its Affiliates that may be applicable to such Seller Employee or Seller Contractor. Seller shall not take any action that would reasonably be expected to materially and adversely affect Purchaser's hiring or engagement of such Seller Employee(s) or Seller Contractor(s) in accordance with this <u>Section 6.3</u>; <u>provided</u> that the announcement and implementation of any Seller Plans (including any retention programs or post-Closing treatment of Seller Employees), in each case, in a manner consistent with the provisions of this Agreement, shall not be deemed to be a breach of this sentence. Notwithstanding anything to the contrary herein or otherwise, nothing herein shall require or obligate Purchaser or any of its Affiliates to

36

employ or make offers of employment to any Person, or make any such offers of employment on any particular terms, each of which decisions shall be made in Purchaser's sole discretion.

(b)     Prior to and following the Closing Date, Seller, Holdings and each of their Affiliates shall not communicate, and shall ensure that no representative of Seller, Holdings or their respective Affiliates communicates, with any Seller Employee or other service provider of Seller regarding post-Closing employment matters (including post-Closing employee benefit plans and compensation) with Purchaser without the prior written consent of Purchaser; provided that Seller, Holdings, and their Affiliates shall be permitted to communicate regarding their employment and termination plans and related matters.

(c)     Purchaser shall not assume any Seller Plans or any Liability to or in respect of any employees or former employees of Holdings and Seller and which relates to such employees' employment with Holdings or Seller, including (i) any employment agreement, whether or not written, between Seller and any person, (ii) any Liability under any Seller Plan, or (iii) Liability arising out of any claim of an unfair labor practice, or any claim under any state unemployment compensation or worker's compensation law or regulation or under any federal or state employment discrimination law or regulation as a result of an action taken by Seller or Holdings, and all such Liabilities shall be Excluded Liabilities hereunder.

(d)     Seller will, or will cause its Affiliates to, comply in all material respects with the Worker Adjustment and Retraining Notification Act of 1988 or any similar Laws ("WARN Act") with respect to any "plant closing" or "mass layoff" or group termination or similar event under the WARN Act affecting employees of Debtors (including as a result of the consummation of Transactions) whether occurring prior to or on the Closing. Subject to the terms of this Agreement, Seller and its Affiliates (including Holdings) reserve the right to (i) terminate any of their employees at any time, and otherwise reduce employee work hours, benefits and compensation, and (ii) issue termination and/or WARN Act notices relating to their employees at any time.

(e)     For any employees who are principally based outside the United States, the provisions of this Section 6.3 shall apply to such employees *mutatis mutandis* to the maximum extent permitted by applicable Law.

(f)     The provisions of this Section 6.3 are for the sole benefit of the Parties and nothing herein, express or implied, is intended or shall be construed to confer upon or give any Person (including for the avoidance of doubt any employees of Seller or Holdings), other than the Parties and their respective permitted successors and assigns, any legal or equitable or other rights or remedies (with respect to the matters provided for in this Section 6.3 or under or by reason of any provision of this Agreement). Nothing contained herein, express or implied: (i) shall be construed to establish, amend, or modify any benefit plan, program, agreement or arrangement; (ii) shall, subject to compliance with the other provisions of this Section 6.3, alter or limit Purchaser's, Seller's or Holdings' ability to amend, modify or terminate any particular benefit plan, program, agreement or arrangement; or (iii) is intended to confer upon any current or former employee any right to an offer of employment or service, employment or continued

US-DOCS\137411268.27138346099.6

employment or service for any period of time by reason of this Agreement, or any right to a
particular term or condition of employment or service.

    6.4    <u>Regulatory Matters</u>.

    (a)    From time to time from and after the date hereof until the Closing (or the
valid termination of this Agreement in accordance with its terms, if earlier), subject to the other
provisions of this <u>Section 6.4</u>, Seller will, and will cause its Affiliates and its and their respective
employees, representatives, advisors and agents to, (i) make or cause to be made all filings and
submissions to the extent required to be made by Seller or any of its Affiliates under any
applicable Laws for the consummation of the Transactions, if any, (ii) cooperate with Purchaser,
its Affiliates and its and their respective representatives in exchanging such information and
providing such assistance as Purchaser may reasonably request in connection with any filings or
submissions to be made by any member of the Purchaser Group under any applicable Laws in
connection with the Transactions, (iii) supply promptly any additional information and
documentary material that may be requested in connection with such filings or submissions and
(iv) use reasonable best efforts to take any actions necessary to obtain all approvals or clearances
from any relevant Governmental Body that are required to be obtained by Seller or its Affiliates
under applicable Law for the consummation of the Transactions.

    (b)    From time to time from and after the date hereof until the Closing (or the
valid termination of this Agreement in accordance with its terms, if earlier), subject to the other
provisions of this <u>Section 6.4</u>, Purchaser will, and will cause its respective employees,
representatives, advisors and agents to, (i) make or cause to be made all filings and submissions
to the extent required to be made by Purchaser under any applicable Laws for the consummation
of the Transactions, if any, (ii) cooperate with Seller, its Affiliates and its and their respective
representatives in exchanging such information and providing such assistance as Seller may
reasonably request in connection with any filings or submissions to be made by Seller or any of
its Affiliates under any applicable Laws in connection with the Transactions, (iii) supply
promptly any additional information and documentary material that may be requested in
connection with such filings or submissions, and (iv) use reasonable best efforts to take any
actions necessary to obtain all approvals or clearances from any relevant Governmental Body
that are required to be obtained by Purchaser under applicable Law for the consummation of the
Transactions.

    (c)    From time to time from and after the date hereof until the Closing (or the
valid termination of this Agreement in accordance with its terms, if earlier), the Parties commit
to instruct their respective counsel to cooperate with each other to respond to any reasonable
inquiries and use reasonable best efforts to seek to resolve any objections raised by any
Governmental Body as promptly as practicable and for greater certainty, each Party and its
respective counsel undertake to (i) promptly notify the other Party or its counsel of, and, if in
writing, furnish such other Party or its counsel with copies of (or, in the case of oral
communications, advise such other Party or its counsel of the contents of), any substantive
communication received by such Person from a Governmental Body and (ii) keep the other Party
or its counsel informed with respect to the status of any applicable submissions and filings to or
inquiries by any Governmental Body in connection with this Agreement and the Transactions
and any developments, meetings or discussions with any Governmental Body in respect thereof,

US-DOCS\137411268.27138346099.6

including with respect to (A) the commencement or proposed or threatened commencement of any investigation or other Action, and (B) the nature and status of any inquiries or objections raised or proposed or threatened to be raised by any Governmental Body with respect to this Agreement and the Transactions. From and after the date hereof until the Closing (or the valid termination of this Agreement in accordance with its terms, if earlier), none of Seller or any of its Affiliates, on the one hand, or Purchaser, on the other hand, will participate in any substantive meeting or discussion with any Governmental Body with respect of any such filings, applications, investigation or other inquiry without giving the other Party reasonable prior notice of the meeting or discussion and, to the extent permitted by the relevant Governmental Body, a reasonable opportunity to attend and participate in such meeting or discussion, and each Party will have a reasonable opportunity to review and provide comments (which shall be considered in good faith by the other Party) on the content of any filing, submission or other written communication (and any analyses, memoranda, presentations, white papers, correspondence or other written materials submitted therewith) to be submitted by the other Party or any of its Affiliates to any Governmental Body in advance of any such submission. Each Party acknowledges that, with respect to any non-public information provided by a Party to the other under this <u>Section 6.4</u>, each Party may (1) designate such material as restricted to "outside counsel only" and any such material shall not be shared with employees, officers or directors or their equivalents of the receiving Party without approval of the disclosing Party and (2) make appropriately limited redactions necessary to satisfy contractual confidentiality obligations, preserve attorney-client privilege or protect material relating to the valuation of the Acquired Assets. Notwithstanding anything to the contrary herein or otherwise, Purchaser will control and have final decision making authority on all regulatory strategy, submissions and procedures, after considering in good faith any reasonable advice provided by Seller in good faith.

(d)     Notwithstanding anything to the contrary in this Agreement, nothing shall require or be construed to require any member of the Purchaser Group to (i) oppose any motion or Action for a temporary, preliminary or permanent Order against, or preventing or delaying, the consummation of the Transactions, or exhaust all avenues of appeal, including any proper appeal of any adverse decision or Order by any Governmental Body, (ii) enter into a consent decree, consent agreement, settlement or other agreement or arrangement (including any ancillary agreements) to hold separate, license, sell, transfer, dispose or divest (pursuant to such terms as may be required by any Governmental Body) any asset (whether tangible or intangible), (iii) agree to the termination, modification, or assignment of any relationships, joint ventures, contracts, assets, liabilities or obligations, (iv) agree to any limitations on governance, conduct, or actions of members of the Purchaser Group or operations of their respective businesses or with respect to the Acquired Assets or Assumed Liabilities, or (v) enter into any national security agreement, letter of assurance, or other mitigation agreement with the Committee on Foreign Investment in the United States or any member agency thereof acting in that capacity.

(e)     From and after the date hereof until the Closing (or the valid termination of this Agreement in accordance with its terms, if earlier), **and, solely with respect to Delayed Acquired Coins, through and including the applicable Delivery Date with respect to any such Delayed Acquired Coin,** Seller will not, and will not permit any of its Affiliates to, knowingly take any action, engage in any conduct or enter into any transaction that would reasonably be expected to (i) materially increase the risk of any Governmental Body entering an

39

Appellant Appendix ER - 528

Order prohibiting or materially delaying the consummation of the Transactions or (ii) materially delay the consummation of the Transactions.

(f)     Subject to Section 6.4(d), from and after the date hereof until the Closing (or the valid termination of this Agreement in accordance with its terms, if earlier), **and, solely with respect to Delayed Acquired Coins, through and including the applicable Delivery Date with respect to any such Delayed Acquired Coin,** each Party will use reasonable best efforts to (i) cooperate with and (ii) seek to secure approvals or authorizations from, any relevant Governmental Body, including state banking departments enforcing money transmission laws, in order to permit consummation of the Transactions in a timely manner in compliance with applicable Laws.

6.5     Reasonable Best Efforts; Cooperation.

(a)     Subject to the other terms of this Agreement, and without limiting, affecting or modifying the Parties' obligations under Section 6.4, or any of the Commercial Covenants, each Party shall, and shall cause its Advisors to, use its reasonable best efforts to perform its obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things necessary under applicable Law to cause the transactions contemplated herein to be effected as soon as practicable and the closing conditions set forth in Article VII to be satisfied, but in any event on or prior to the Outside Date, in accordance with the terms hereof and to cooperate with the other Party, its Affiliates and its and their respective Advisors in connection with any step required to be taken as a part of its obligations hereunder. The "reasonable best efforts" of Seller will not require Seller or any of its Affiliates or Advisors to expend any money to remedy any breach of any representation or warranty, to commence any Action, to waive or surrender any right, to modify any Contract or to waive or forgo any right, remedy or condition hereunder. Notwithstanding anything to the contrary herein, in the event of a conflict between this Section 6.5(a) and Section 6.4, the provisions of Section 6.4 shall control with respect to such conflict.

(b)     The obligations of Seller and Purchaser pursuant to this Agreement, including this Section 6.5, shall be subject to any Orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code (including in connection with the Bankruptcy Case), Seller's debtor-in-possession financing, if any, and Seller's obligations as a debtor-in-possession to comply with any Order of the Bankruptcy Court (including the Bidding Procedures Order, the Agreement Order, and the Confirmation Order) and Seller's duty to seek and obtain the highest or otherwise best price for the Acquired Assets as required by the Bankruptcy Code.

6.6     Data Transfer Matters.

(a)     Seller shall, and shall cause its Affiliates to, (i) within 30 days (with the Parties using their reasonable best efforts to do so within five (5) Business Days) following the later of the date hereof and the date Purchaser provides the form of such notification, distribute an initial email notification, in the form provided by Purchaser, to all Users and any other consumers located or having a home address in the United States from whom Seller has collected Personal Information regarding the Transactions (including the Rebalancing Exercise)

40

Appellant Appendix ER - 529

and the transfer of such individuals' Personal Information or accounts (including the ability to opt in to a pre-Closing transfer of such User's Acquired User Data to Purchaser), and prominently post a notice, in the form provided by Purchaser, to Seller's and its Affiliates' (as applicable) primary customer-facing website regarding the same; (ii) on a weekly basis, upon the expiration of any opt in period provided in the email notification distributed by Seller, but no earlier than the later of January 3, 2023 and entry of the Agreement Order, deliver to Purchaser the respective Acquired User Data for Users who have opted into the pre-Closing data transfer pursuant to the foregoing item (i) and whose Acquired User Data has not previously been transferred (the "Pre-Closing Data Transfer"); (iii) following the date of the initial email notification until the Closing Date, continue distributing additional email notifications, in the form provided by Purchaser, to such individuals, as Purchaser reasonably requires; and (iv) on the Closing Date, deliver to Purchaser all other Acquired User Data. All notifications contemplated by the foregoing shall be subject to Purchaser's consideration of any comments thereto proposed in good faith by Seller or counsel to the committee of unsecured creditors in the Bankruptcy Case and subject to applicable Law.

(b)  From and after the date hereof and through and following the Closing, Seller shall, and shall cause its Affiliates to, maintain or maintain with a third party data management and retention firm, for the entirety of the applicable retention period and at least ninety (90) days thereafter, all information required to be maintained pursuant to, or to comply with, applicable Money Transmitter Requirements or Laws related to Sanctions.

(c)  Seller shall, and shall cause its Affiliates to, use reasonable best efforts to procure that all information and documentation requested in connection with the KYC Procedures meets the standards set forth in such KYC Procedures (including moving files located in storage repositories (*e.g.*, Google Drive or Box) to the appropriate files associated with the applicable User **or Eligible Creditor** and associating such information and documentation with the applicable User **or Eligible Creditor**), as determined by Purchaser in its reasonable discretion, prior to the ~~User Asset Migration Date~~**earlier of (x) the Closing Date and (y) with respect to such User or Eligible Creditor who has opted into the pre-Closing data transfer pursuant to Section 6.6(a)(i), the fifth (5th) Business Day following such opt in**, but in each case in no event prior to the applicable timing contemplated by clauses (i) through (iv) of Section 6.6(a).

6.7  Use of Name**; Voyager Platform**.

(a)  Seller agrees that: (i) within ninety (90) days from the Closing Date, Seller shall (and shall cause its Affiliates to) cause an amendment to the governing documents of Seller and its Affiliates (as applicable) to be filed with the appropriate Governmental Body and shall take all other reasonable actions necessary to change Seller's and such Affiliate's legal, name to a name or names not containing "Voyager," any other trade mark or trade name set forth in Schedule 6.7(a) or any name confusingly similar to the foregoing; (ii) after the Closing Date neither Seller nor any of its Affiliates shall have any ownership rights in or to the name "Voyager," any other trade mark or trade name set forth in Schedule 6.7(a) or any service marks, trademarks, trade names, identifying symbols, logos, emblems, signs or insignia related thereto or containing or comprising the foregoing, including any name or mark confusingly similar thereto (collectively, the "Seller Marks"); and (iii) except as set forth in Section ~~6.7(a)~~**6.7(b)**,

41

Appellant Appendix ER - 530

Seller and its Affiliates shall, within ninety (90) days of the Closing Date, cease to make any use of the Seller Marks, including in any corporate or other legal name.

(b)  Notwithstanding Section 6.7(a), for a period of ninety (90) days after the closing of the Bankruptcy Case, unless extended by mutual agreement of Purchaser and Seller, Purchaser hereby grants to Seller and its Affiliates (including, for the avoidance of doubt, any wind-down or similar administrator in the Bankruptcy Case or under the Plan) a non-exclusive, limited, non-transferable, non-sublicensable and revocable license to use the Seller Marks for the sole purposes of unwinding Seller's businesses **and,** assisting Purchaser with all migrations, integrations and Transactions**, and consummating transfers of Coins, cash or other assets to Purchaser contemplated by this Agreement**.

**(c)  From and after the date hereof until the earlier of the Closing and the termination of this Agreement in accordance with its terms, Seller and Purchaser shall negotiate in good faith the terms and conditions of, and enter into at the Closing, a mutually agreed transition services agreement or other arrangements on commercially reasonable terms pursuant to which Seller shall have such access to and operation of the Voyager Platform and information acquired by Purchaser hereunder as are reasonably necessary for the sole purposes of Seller (w) holding Delayed Acquired Coins in accordance herewith, (x) assisting Purchaser with all migrations, integrations and Transactions contemplated by this Agreement, (y) consummating transfers of Coins, cash or other assets to Purchaser, Users, and Eligible Creditors contemplated by this Agreement and the Plan and (z) providing any related Tax reporting to Users required by applicable Law for periods prior to and including the Closing Date.  Such access and operation contemplated by clause (w) of this Section 6.7(c) shall cease upon the conversion of such Delayed Acquired Coins into fiat currency or, if earlier, upon the transfer to Purchaser of such Delayed Acquired Coins, in each case in accordance with this Agreement.  Such access and operation contemplated by clauses (x) and (y) of this Section 6.7(c) shall cease upon the completion of such assistance or transfers, as applicable.  Such access and operation contemplated by clause (z) of this Section 6.7(c) shall cease upon the completion of any such Tax reporting. Notwithstanding anything to the contrary herein, (i) Seller shall bear responsibility for the operation and administration (including by providing, at its expense, personnel to conduct such operation and administration), and the documented out-of-pocket third party costs and expenses, of the Voyager Platform following the Closing pursuant to the preceding provisions of this Section 6.7(c) and (ii) in no event will Seller (and Seller will cause its employees, contractors and other personnel not to) (A) use the Voyager Platform for purposes of (I) distributing any Coins to Users or Eligible Creditors or (II) performing any conversion of Coins to cash or other liquidation of Coins hereunder (provided that this clause (A)(II) shall not prevent Seller from using the software and functionality of the Voyager Platform solely for executing any conversion or liquidation transaction  permitted hereunder on other third party platforms), or (B) allow Users to (I) withdraw Coins through the Voyager Platform or (II) make any sale or other trading transaction through the Voyager Platform.**

42

Appellant Appendix ER - 531

6.8    Further Assurances.

(a)    From time to time from and after the date hereof through and following the Closing (in the case of Seller, until the winddown or dissolution of Seller), as and when requested by either Party, the other Party will execute and deliver, or cause to be executed and delivered, all such further conveyances, notices, assumptions, assignments, documents and other instruments and will take, or cause to be taken, all such further or other actions as such requesting Party may reasonably deem necessary or desirable to evidence and effectuate the Transactions (including for the avoidance of doubt, the transfer and conveyance of any Acquired Assets that may be in the possession of Seller's Affiliates to Purchaser); provided that nothing in this Section 6.8 shall require Purchaser or the Purchaser Group to assume any Liabilities of Seller or any of its Affiliates other than the Assumed Liabilities or Seller or any of its Affiliates to transfer any assets other than Acquired Assets. In addition, from time to time following the Closing Date (in the case of Seller, until the winddown or dissolution of Seller), each Party shall, and shall cause its Affiliates to, promptly execute, acknowledge and deliver such further documents and perform such further acts as are reasonably requested by the other Party and as may be reasonably necessary to transfer and convey to Purchaser, or make available to Purchaser the Acquired Assets or the Assumed Liabilities pursuant to this Section 6.8.

(b)    Without limiting Section 6.8(a), Seller will use reasonable best efforts to evidence and effectuate the transfer and conveyance of all Seller Held Coins (solely for purposes of this Section 6.8(b)), deeming the phrase "who are Debtors" in the definition of Seller Held Coins to instead read as "who are not Debtors" in accordance with Section 6.8(a), *mutatis mutandis*.

6.9    Insurance Matters.    Purchaser acknowledges that, upon Closing, all nontransferable insurance coverage provided in relation to Seller and the Acquired Assets that is maintained by Seller or its Affiliates (whether such policies are maintained with third party insurers or with Seller or its Affiliates) shall cease to provide any coverage to Purchaser and the Acquired Assets and no further coverage shall be available to Purchaser or the Acquired Assets under any such policies; provided that to the extent such insurance coverage is available with respect to any Acquired Assets or Assumed Liabilities, after the Closing, (a) Seller shall, and shall cause its applicable Affiliates to, use reasonable best efforts to report in good faith to the applicable third-party insurance provider, if applicable, all events, acts, errors, accidents, omissions, incidents, injuries or other forms of occurrences to the extent relating to any Acquired Assets or Assumed Liabilities that, in each case, occurred at or prior to the Closing as reasonably requested by Purchaser to be so reported the extent covered by an occurrence-based insurance policy, (b) Purchaser shall use its reasonable best efforts to comply with the terms of any such insurance policy and (c) Seller shall, and shall cause its applicable Affiliates to, (i) use reasonable best efforts to obtain the benefit of the applicable insurance coverage under any such insurance policy and (ii) pay such benefit to Purchaser, net of (A) any deductibles, co-payment or self-insured amounts payable by Seller or any of its Affiliates or other out-of-pocket costs and expenses (including reasonable legal fees and expenses, if any) actually and reasonably incurred by Seller or any of its Affiliates in seeking such insurance proceeds and (B) any Taxes imposed on Seller or any of its Affiliates in respect of the receipt or accrual of such insurance proceeds.

43

Appellant Appendix ER - 532

6.10 <u>User Migration</u>.

(a)     Following the date hereof, Seller shall, and shall cause its Affiliates to cooperate with Purchaser to, develop (and each Party shall use reasonable best efforts to develop within 15 Business Days following the date hereof) a mutually agreed upon integration plan that sets forth all technology integrations that Purchaser deems reasonably necessary to enable all migrations of User accounts on the Voyager Platform to the Binance.US Platform as contemplated by this Agreement (the "<u>Integration Plan</u>"). The Integration Plan will include among other things: (i) directing customers on the Voyager Platform (including through links on the home screen for the web interface and mobile app for the Voyager Platform) to the Binance.US Platform log-in webpage or mobile app, (ii) migrating all Acquired User Data (subject to <u>Section 6.6(a)</u>) reasonably necessary for Purchaser to validate whether Users qualify as Existing Users and (iii) developing a process whereby any User that is not an Existing User can affirmatively accept terms and conditions to provide such User with access to their Net Owed Coins in a new Binance.US Platform account from directly within the Voyager Platform and related app in accordance with the provisions of this Agreement. Each Party shall, and shall cause its Affiliates and its and their respective employees and representatives to, comply with and implement the Integration Plan. From and after the date hereof (and following the Closing, if applicable, until the date that is six (6) months following the Closing Date), Seller shall, and shall cause its Affiliates and its and their respective employees and representatives to provide to Purchaser, its Affiliates and its and their respective employees and representatives (x) any assistance reasonably requested or required by Purchaser, its Affiliates and its and their respective employees and representatives in connection with the opening of User accounts on the Binance.US Platform, the transfer of information and Net Owed Coins from the Voyager Platform to the Binance.US Platform (including in connection with customer queries and troubleshooting with respect thereto), and the actions contemplated by this <u>Section 6.10</u> and the Integration Plan and (y) subject to <u>Section 6.6</u> and applicable Law, all necessary Acquired User Data in Seller's or its Affiliates' possession required to effectuate the Integration Plan. Purchaser shall bear the reasonable and documented out-of-pocket expenses incurred by Seller in connection with the provision of such assistance following the Closing pursuant to the immediately preceding sentence.**; provided that prior to incurring any such expenses in excess of $250,000, individually or in the aggregate, Seller shall obtain Purchaser's consent (which shall not be unreasonably withheld, conditioned or delayed) to incur such expenses.**

(b)     Notwithstanding the provisions of <u>Section 6.2(c)</u> or <u>Section 10.17</u>, following entry of the Agreement Order, Purchaser and its Affiliates shall, at their sole cost and expense, be entitled to issue communications directed to Users on the Binance.US Platform and through other means of Purchaser's choosing in connection with the Transactions or the opening of accounts on the Binance.US Platform; <u>provided</u> that such communications are consistent with this Agreement and applicable Law; <u>provided</u> that Purchaser shall not issue any such communications prior to the Closing Date without Seller's prior written consent (which shall not be unreasonably withheld, conditioned or delayed) and subject to reasonable consultation with counsel to the committee of unsecured creditors in the Bankruptcy Case. Except as required by <u>Section 6.11(d)</u>, Seller shall not, and Seller shall cause its Affiliates not to, issue any communication to Users, whether on the Voyager Platform or otherwise, except to the extent the form and substance of such communication has been previously approved by Purchaser or is required by applicable Law; <u>provided</u> that the foregoing shall not prohibit Seller from responding

44

Appellant Appendix ER - 533

on an individual basis to technical support queries from Users or answering questions related to the amount of Coins such User has deposited on the Voyager Platform or communicating with customers regarding withdrawal of cash from the "for benefit of" customer accounts at Metropolitan Commercial Bank; provided further that Seller shall, and shall cause its Affiliates to, provide Purchaser and counsel to the committee of unsecured creditors in the Bankruptcy Case with regular updates on the timing and content of such communications and shall cooperate with Purchaser in addressing any concerns related thereto. The Parties will work in good faith to (i) develop a set of talking points or FAQs for Users and Eligible Creditors with respect to the Transactions, the Bankruptcy Cases, and related matters and (ii) continue to review and revise such talking points or FAQs as other inquiries from Users and Eligible Creditors or other circumstances arise.

(c)     Subject to Seller's providing the Acquired User Data in accordance with Section 6.6, and such Acquired User Data meeting the standards set forth in the KYC Procedures, as determined by Purchaser in its reasonable discretion, Purchaser shall cause an account to be opened for each User on the Binance.US Platform on or before the ~~User~~ Asset Migration Date. In addition to the foregoing, if Seller has not provided or does not have Acquired User Data meeting such standards with respect to a particular User, if such User provides such information and documentation meeting the standards set forth in such KYC Procedures, as determined by Purchaser in its reasonable discretion, Purchaser shall cause an account to be opened for such User in accordance with its standard account opening procedures following its receipt of such information and documentation.

(d)     Seller and Purchaser shall offer (i) each eligible creditor pursuant to the Plan that is not a User (each, an "Eligible Creditor" ) and (ii) each User the opportunity, subject to the consummation of the Closing and such User and Eligible Creditor meeting the requirements of the KYC Procedures and accepting the terms and conditions of the Binance.US Platform, to receive its Net Owed Coins or other Plan distribution through the Binance.US Platform in accordance with Section 6.12 and the Plan. Within three (3) Business Days following the request of Purchaser (which request for the sake of clarity may be offered multiple times), Seller shall send to each User and Eligible Creditor a communication in the form provided by Purchaser notifying them of such offer.

(e)     For the sake of clarity and notwithstanding anything to the contrary herein or otherwise, (i) none of Purchaser or any of its Affiliates shall be required to (A) activate an account or pay or credit any amount, whether in Coins, cash or otherwise, to any User or Eligible Creditor (or its account) that does not meet the requirements of the KYC Procedures and accept the terms and conditions of the Binance.US Platform, (B) pay or credit any amount, whether in Coins, cash or otherwise, to any User or Eligible Creditor or its account except in accordance with the Plan, or (C) credit the account of any User or Eligible Creditor with respect to Coins that have not actually been delivered to Purchaser in accordance with the provisions of Section 2.4(b), (ii) neither Purchaser nor any of its Affiliates is assuming any Liabilities of Seller or any of its Affiliates with respect to Users' accounts on the Voyager Platform or any Eligible Creditor, all of which Liabilities shall constitute Excluded Liabilities, and (iii) neither Purchaser nor any of its Affiliates shall be required to provide trading services on the Binance.US Platform or otherwise in respect of any Unsupported Coins.

45

Appellant Appendix ER - 534

6.11    Rebalancing Exercise; Seller Statement.

(a)    Following the date hereof and prior to the Closing (or the earlier termination of this Agreement pursuant to Article VIII), (i) Seller shall purchase and sell Cryptocurrency through one or more transactions such that, following the completion of such transactions, the ~~number of~~Acquired Coins Value of all Acquired Coins of each type is equal to the ~~aggregate number of~~Deposited Coins Value of all Deposited Coins of such type multiplied by the Rebalancing Ratio (subject to a Rebalancing Exercise Delta with respect to each Acquired Coin of no more than five percent (5%) or, if after conducting such transactions and using reasonable best efforts to meet the Rebalancing Exercise Delta of five percent (5%), Seller reasonably and in good faith determines that it will not be able to meet such Rebalancing Exercise Delta, then such other amount as Purchaser and Seller consent to, such consent not to be unreasonably withheld, conditioned or delayed), the purpose of which transactions the Parties acknowledge and agree is to ensure that there are sufficient Acquired Coins of each type to pay to each User's account on the Binance.US Platform a number of Post-Rebalancing Coins of such type in accordance with the provisions of this Agreement (such transactions, the "Rebalancing Exercise"), and (ii) Seller shall, and shall cause its employees, accountants, advisors and representatives to, consult with, and keep reasonably informed, Purchaser, its Affiliates and their respective employees, accountants, advisors and representatives with respect to the Rebalancing Exercise and all actions taken in connection therewith, including by providing Purchaser with regular updates regarding the status of the Rebalancing Exercise. For the sake of clarity, the Parties agree that for purposes of the Rebalancing Exercise, if ETH Coins that are Staked Coins cannot be unstaked by the Rebalancing Date, or if there are Coins that Seller is otherwise unable to access due to such Coins being custodied with providers that have entered insolvency proceedings prior to the date hereof, then the Parties will agree on appropriate modifications to the Rebalancing Exercise and the process for distributing Net Owed Coins to Users in light of the foregoing. The Parties agree that the Rebalancing Exercise shall be completed in accordance with the provisions of this Agreement by no later than the date that is one (1) Business Day prior to the Closing Date (such date, the "Rebalancing Date").

(b)    In order to facilitate the Rebalancing Exercise, Seller shall, promptly following the date hereof, to the extent not already created prior to the date hereof, create an institutional account in Seller's name on the Binance.US Platform, and Seller may, but shall not be required to, transfer any or all Seller Held Coins to such institutional account in order to facilitate the Rebalancing Exercise (and, for the avoidance of doubt, the Binance.US Platform shall serve merely as an exchange agent in connection with the Rebalancing Exercise). Prior to engaging in any Subject Transaction outside the Binance.US Platform, Seller shall provide Purchaser with a written notice describing the parameters of such Subject Transaction, including the proposed number of Seller Held Coins of each type to be transferred in connection with such Subject Transaction (each, a "Transaction Notice") and Purchaser shall be entitled to make, by written notice (each, a "Transaction Offer Notice") to Seller within three (3) Business Days following receipt of such Transaction Notice, an offer to conduct such Subject Transaction on the Binance.US Platform, including a description of the estimated numbers of Acquired Coins that would result from the consummation of such Subject Transaction. If Seller receives any proposal to conduct such Subject Transaction from any third party which would result in a number of Acquired Coins in excess of that set forth in the Transaction Notice, Seller shall inform Purchaser of the same, and Seller shall not conduct such Subject Transaction with or

Appellant Appendix ER - 535