through other Person(s) unless Seller provides written notice to Purchaser that Seller has determined in good faith that the terms offered by such other Person(s) with respect to such Subject Transaction (which such terms shall be set forth in such notice) are more favorable (in terms of the best interests of Seller and its estate) than the terms set forth in the Transaction Offer Notice and Purchaser does not provide an updated Transaction Offer Notice within one (1) Business Day following receipt of such notice from Seller with terms as or more favorable (in terms of the best interests of Seller and its estate) than those set forth in Seller's notice. If Purchaser does so provide such an updated Transaction Offer Notice, Seller conduct such applicable Subject Transaction on the Binance.US Platform in accordance with such updated Transaction Offer Notice. In addition to the foregoing, Seller may request that Purchaser facilitate all or part of the Rebalancing Exercise, in which case all or such portion of the Rebalancing Exercise shall be conducted on the Binance.US Platform. Seller's use of the Binance.US Platform for the Rebalancing Exercise shall be subject in all respects to the standard terms and conditions of the Binance.US Platform (including applicable fees, spreads, costs and expenses except as set forth in the applicable Transaction Offer Notice). For the sake of clarity, Seller may withdraw any Coins from the Binance.US Platform prior to the Closing and Seller shall not be required to maintain Coins on the Binance.US Platform in connection with the Rebalancing Exercise or otherwise (except as otherwise expressly contemplated hereunder from and after the Closing and acknowledging that this sentence is not intended to and shall not preclude transactions in the Rebalancing Exercise being undertaken on the Binance.US Platform in accordance with the provisions hereof).

(c)     At least one (1) Business Day prior to the Closing Date and following completion of the Rebalancing Exercise in accordance with Section 6.11(a), Seller will deliver to Purchaser a ledger in a form reasonably specified by Purchaser as far in advance of the Rebalancing Date as is reasonably practicable (the "Seller Statement") setting forth in reasonable detail, in each case as of the Rebalancing Date and following the completion of the Rebalancing Exercise in accordance with Section 6.11(a), (i) each User's user identification number, (ii) the Rebalancing Ratio and the calculation thereof, (iii) the number of each User's Deposited Coins of each type (including the name and relevant ticker symbol used on the Voyager Platform for such Deposited Coins, together with all information regarding the underlying networks and smart contracts to which such Coins are subject) **and the Deposited Coins Value thereof (by type of Coin)**, (iv) the number of each User's Post-Rebalancing Coins of each type (including the name and relevant ticker symbol used on the Voyager Platform for such Post-Rebalancing Coins, together with all information regarding the underlying networks and smart contracts to which such Coins are subject) **and the Acquired Coins Value thereof (by type of Coin)**, (v) the total number of Seller Held Coins and Acquired Coins of each type (including the name and relevant ticker symbol used on the Voyager Platform for such Seller Held Coins and Acquired Coins, together with all information regarding the underlying networks and smart contracts to which such Coins are subject)~~, (vi) the total amount of gas fees that Seller will pay in connection with the transfer of each~~ **and the Acquired Coins Value thereof (by** type of ~~Acquired~~ Coin ~~to Purchaser in accordance with Section 2.4)~~, and (~~vii~~**vi**) the amount of cash~~, Coins~~ or other property ~~(including the name and relevant ticker symbol used on the Voyager Platform for such Coins, together with all information regarding the underlying networks and smart contracts to which such Coins are subject)~~ payable to each Eligible Creditor, *after taking into account gas or other transaction fees incurred and paid by Seller* ~~in connection with transferring such Coins to Purchaser,~~ and any identifying information and information

required to make such payments to such Eligible Creditor under the Plan, in each case together with reasonably detailed supporting information and documentation and prepared by Seller based on Seller's and its Affiliates' books and records. Notwithstanding anything to the contrary herein, Seller hereby acknowledges and agrees that (A) Purchaser and its Affiliates shall be entitled to fully rely on the Seller Statement and any data, information or calculation set forth therein for purposes of Section 6.11(d), and (B) in no event shall Purchaser of any of its Affiliates be responsible (x) to any Person for the Seller Statement, any data, information or calculation set forth therein or any error or inaccuracy with respect thereto or (y) for any losses, liabilities or damages in respect thereof, in each case, to the extent Purchaser takes any action in reliance thereon.

(d)     Promptly following the completion of the Rebalancing Exercise, Seller shall send to each User a communication notifying such User of the Rebalancing Exercise, such User's Deposited Coins, and the Net Owed Coins attributable to such User's account on the Voyager Platform following the Rebalancing Exercise and any gas fees incurred in **by Seller** connection with the transfer of Coins to Purchaser pursuant to Section 2.4. Seller will, upon Purchaser's request, deliver to each Eligible Creditor a communication relating to the Transactions, any payments to be made by Purchaser or any of its Affiliates to such Eligible Creditor and any matters relating to opening an account on the Binance.US Platform, in each case that is in form and substance reasonably acceptable to Purchaser.

6.12    Crediting of Accounts; Unsupported Jurisdictions, Transfer of Coins to Seller; Liquidations or Distributions by Seller.

(a)     Subject to the provisions of Section 6.10, ~~on the User~~**with respect to a particular User's Net Owed Coins or Eligible Creditor's cash, on the applicable** Asset Migration Date, Purchaser shall credit, or cause to be credited, (i) to the Binance.US Platform account of each User, such User's Net Owed Coins**; provided that such number of Coins to be credited shall be reduced by any gas or other transaction fees incurred in connection with transferring such Coins to Purchaser,** and (ii) to the Binance.US Platform account of each Eligible Creditor, the applicable amount payable to such Eligible Creditor as set forth in the Seller Statement. For the avoidance of doubt, Coins credited to any User's ~~or Eligible Creditor's~~ accounts on the Binance.US Platform may be made from any Coins held by or on behalf of Purchaser or any of its Affiliates. As a condition precedent to any User or Eligible Creditor accessing its account or Coins **or cash** on the Binance.US Platform, such User or Eligible Creditor must satisfy the requirements set forth in Section 6.10. ~~Following such User's or Eligible Creditor's satisfaction of such requirements~~**As promptly as practicable (using commercially reasonable efforts to do so within forty-eight (48) hours following receipt by Purchaser of the applicable Coins or cash hereunder), and in any event by the applicable Asset Migration Date**, Purchaser shall allow such User or Eligible Creditor, as applicable, to access trading services with respect to its Coins **or cash** subject to the Binance.US Platform's customary terms and conditions (including any transaction fees, spreads, costs and expenses). Notwithstanding anything to the contrary herein, with respect to any User or Eligible Creditor that does not satisfy such requirements prior to the date that is three (3) months following the later of the Closing Date ~~or~~**and** the date on which such terms and conditions are made available for such User or Eligible Creditor to accept, ~~then Purchaser shall convert any~~**Seller shall deliver all Delayed Acquired Coins in respect of such User or Eligible Creditor (other than**

Appellant Appendix ER - 537

**any Delayed** Acquired Coins with respect to ~~such Users~~**any User** or Eligible ~~Creditors~~**Creditor located in a jurisdiction that is an Unsupported Jurisdiction as of the Closing, which such Delayed Acquired Coins are addressed in Section 6.12(b)) to Purchaser in accordance with Section 2.4(b), Purchaser shall convert all such Delayed Acquired Coins** into United States Dollars at the then-prevailing rates (~~including~~**net of all** applicable fees, spreads, costs and expenses **(including any gas or other transaction fees incurred in connection with transferring such Coins to Purchaser)**)) on the Binance.US Platform and deliver such United States Dollars~~, together with any cash or others assets~~ in respect of such Users or Eligible Creditors to Seller within five (5) Business Days **following receipt thereof from Seller**, for further distribution by Seller in accordance with the Plan. **Purchaser shall make available to Seller, upon reasonable written request from Seller to Purchaser from time to time during Purchaser's regular business hours and at Seller's expense, books and records and related information, in each case, solely with respect to the transactions (including all applicable fees, spreads, costs and expenses) to effect such conversion described in the immediately preceding sentence.**

(b)     Notwithstanding anything to the contrary herein or otherwise, **(i)** for any Person (including any User or Eligible Creditor) that is located in Hawaii, New York, Texas or Vermont, to the extent that Purchaser does not have a Money Transmitter License or similar license in such jurisdiction or in any other jurisdiction where the applicable Governmental Body asserts after the date of this Agreement that Purchaser or any of its Affiliates requires a Money Transmitter License or similar license in order to consummate the Transactions or perform its obligations hereunder (each, an "Unsupported Jurisdiction"), Purchaser and its Affiliates shall not be required to (~~i~~**A**) credit or make any payment (with any Coins, cash or otherwise) to any account of such Person (including any User or Eligible Creditor) on the Binance.US Platform, or (~~ii~~**B**) permit any such Person or account of such Person on the Binance.US Platform to be active or conduct any trading or investing in Coins. ~~Notwithstanding anything herein to the contrary, prior to the Closing, Seller have the option to elect (upon consultation with professionals representing the committee of unsecured creditors in the Bankruptcy Case) that either (i), and (ii)~~ Seller shall not deliver to Purchaser any Coins, cash, or other asset with respect to any User or Eligible Creditor located in **a jurisdiction that is** an Unsupported Jurisdiction ~~or (ii)~~**as of the Closing (and** Seller shall ~~deliver such Coins to Purchaser at Closing. Upon receipt by Purchaser of any Unsupported Jurisdiction Approvals with respect to any Unsupported Jurisdiction(s), which Unsupported Jurisdiction Approvals permit Purchaser to perform its obligations under~~ Section 6.12(a) ~~in such Unsupported Jurisdiction, then Purchaser shall promptly notify Seller of receipt of such Unsupported Jurisdiction Approval and, if Seller has not previously delivered applicable~~**retain and hold such** Coins, cash, or other asset with respect to ~~any~~**such** User or Eligible Creditor ~~located in such~~**(including in accordance with Section 6.12(f))) until the relevant** Unsupported Jurisdiction ~~then Seller shall so deliver such assets to Purchaser within five (5) Business Days of such notification, and Purchaser~~**Approval is received and Purchaser has confirmed in writing that the relevant User or Eligible Creditor has satisfied the requirements set forth in Section 6.10 for onboarding to the Binance.US Platform, in which case, Purchaser** shall (following receipt of any applicable assets if required) ~~consummate~~**take** the actions **described in Section 6.12(a) and clauses (i)(A) and (i)(B) of this Section 6.12(b), as applicable, and Seller shall take the actions described in clause (ii) of this Section 6.12(b),** in such Unsupported Jurisdiction that were **otherwise** restricted **or not required** by this

Appellant Appendix ER - 538

Section 6.12(b); provided that to the extent Purchaser does not receive such Unsupported Jurisdiction Approval(s) with respect to any Unsupported Jurisdiction prior to the date that is six (6) months following the Closing Date, then ~~to the extent Purchaser is holding any Acquired Coins~~**instead of delivering such Coins, cash or other assets** with respect to **such** Users or Eligible Creditors ~~in such Unsupported Jurisdictions,~~**to** Purchaser **hereunder, Seller** shall convert such ~~Acquired~~ Coins into United States Dollars ~~at the then-prevailing rates (including~~**and deliver such United States Dollars (and such other cash or other assets) in respect of such Users or Eligible Creditors in accordance with the Plan. Notwithstanding anything to the contrary herein, in undertaking any transaction to effectuate such conversion, Seller shall provide Purchaser the opportunity to participate in such transaction as follows (or on such other terms as the Parties may agree in writing): (A) if Seller solicits terms for such transaction from any other Person, then Seller will substantially contemporaneously solicit terms for such transaction from Purchaser and (B) the Parties shall establish procedures pursuant to which, if Seller intends to execute such transaction based on terms that are available to Seller without soliciting such terms from any Person (e.g., based on information made available to participants in Cryptocurrency exchanges through an app or website), Seller shall be obligated to contact a designated contact through a designated form of contact at Purchaser for a significantly limited period of time that is appropriate under the circumstances of executing such transaction for Purchaser to propose terms for such transaction, and, in either case of (A) or (B), if Purchaser's terms (if Purchaser proposes any), including all** applicable fees, spreads, costs and expenses~~)~~**, represent the best execution for such transaction, Seller shall execute such transaction** on the Binance.US Platform ~~and deliver such United States Dollars, together with any cash or others assets in respect of such Users or Eligible Creditors to Seller within five (5) Business Days, for further distribution by Seller in accordance with the Plan.~~**on such terms proposed by Purchaser; provided that, in the case of clause (B), if Purchaser is unresponsive via such designated means of contact, or fails or declines to propose terms, during such period of time, Purchaser shall be deemed to have provided terms that do not represent the best execution for such transaction.**

(c)     From and after the Closing, or if this Agreement is terminated in accordance with its terms (other than in connection with a Purchaser Default Termination), then from and after such termination, if Seller or any of its Affiliates intends to consummate a transaction or series of related transactions pursuant to which it will purchase, sell or liquidate any Coins or distribute the proceeds thereof to any User or Eligible Creditor, in each case other than any Additional Bankruptcy Distributions (but including any purchase, sale or liquidation of any Coins prior to making any Additional Bankruptcy Distributions) or any of the transactions provided for in the preceding provisions of this Section 6.12 then (i) Seller may, but shall not be required to, utilize the Binance.US Platform, or other service offerings of Purchaser or its Affiliates, to consummate such transaction or series of related transactions (including any purchase, sale, liquidation or distribution described above) on Purchaser's and its Affiliates' standard terms and conditions (including any transaction fees, spreads, costs and expenses) and (ii) if this Agreement is terminated in accordance with its terms (other than in connection with a Purchaser Default Termination), then Seller may, but shall not be required to, elect that Purchaser and Seller will (and Seller will cause its Affiliates and any other Person with whom Seller or its Affiliates is consummating any such transaction or transactions to) cooperate in good faith to develop and facilitate any transaction similar to the Rebalancing Exercise required

US-DOCS:~~137411268.27~~138346099.6

by Seller, any of its Affiliates, and any other Person with whom Seller or its Affiliates is consummating any such transaction or transactions, in order to consummate any such transaction or series of related transactions; provided that in no event will Purchaser or any of its Affiliates be required to make any distribution or facilitate or consummate any transaction under this Section 6.12(c) with respect to any User located in an Unsupported Jurisdiction. In connection with any distribution made by Purchaser or its Affiliates pursuant to this Section 6.12(c), all right, title and interest in and to any property so distributed (including any Coins) shall be made or transferred to Purchaser or its Affiliates free and clear of any Encumbrances prior to any such distribution by Purchaser or its Affiliates and such distributions will be made on Purchaser's and its Affiliates' standard terms and conditions (including any transaction fees, spreads, costs and expenses).

(d)     The provisions of Sections 6.10, 6.11, 6.12, and 6.14 shall be subject to such protocols, if any, as the Parties may agree in writing after the date hereof with respect to the transfer of information, migration of users, migration or transfer of Coins, and any matters related to the foregoing or such Sections.

(e)     Notwithstanding anything to the contrary herein, but subject to the last sentence of this Section 6.12(e), (i) Seller (prior to the Closing) and each User and Eligible Creditor (from and after the Closing) shall retain all right, title, and interest in and to Coins allocated to it in accordance with this Agreement on the Binance.US Platform (notwithstanding any terms and conditions of the Binance.US Platform) through and including such time as such Coins are returned or distributed to Seller or such User and Eligible Creditor, as applicable, hereunder, and such Coins shall be held by Purchaser solely in a custodial capacity in trust and solely for the benefit of Seller or the applicable User or Eligible Creditor; provided that in the case of Coins allocable to Users or Eligible Creditors located in Unsupported Jurisdictions, to the extent, if any, that such Coins are transferred to Purchaser pursuant to Section 6.12(b), from and after the Closing until the applicable Unsupported Jurisdiction Approval is obtained or such Coins are liquidated in accordance with Section 6.12(b) hereunder, such Coins shall be held by Purchaser in a custodial capacity on behalf of Seller and not the applicable User or Eligible Creditor; (ii) any and all cash or cash equivalents to be transferred at any time to Purchaser hereunder for further distribution to Seller or any User or Eligible Creditor (and not for Purchaser's own account (e.g., Purchaser Expenses)) shall at all times (until transferred by Purchaser to Seller or the applicable User or Eligible Creditor, as applicable, hereunder) be held solely in a third party bank account of a FDIC-insured financial institution solely for the benefit of or "fbo" Seller or such User or Eligible Creditor, as applicable; (iii) Purchaser shall not, after the date hereof, introduce any further conditions to the withdrawal of cash from accounts on the Binance.US Platform that are not in effect as of the date hereof that would apply to any User's or Eligible Creditor's account on the Binance.US Platform; (iv) Purchaser shall not at any time halt (temporarily or permanently) withdrawals of cash or such Coins from any User's or Eligible Creditor's account on the Binance.US Platform; (v) Purchaser shall not halt trading of such Coins on the Binance.US Platform at any point during the 30 days following any distribution to any User's or Eligible Creditor's account on the Binance.US Platform hereunder, except, in the case of each of the foregoing clauses (iii), (iv) and (v), (A) as required by applicable Law or any Order or Governmental Body, (B) as may be permitted pursuant to Purchaser's terms and conditions in effect on the Closing Date (including for purposes of halting fraud or illegal activity), (C) as necessary to complete any system, account, wallet, security or exchange

51

maintenance, patching, repair, upgrade or to the extent any withdrawal or trading is unable to be processed due to any act or omission by, or any Event related to, any third party (*e.g.*, a bank closure or a third party ceasing to support any Cryptocurrency), (D) in order to avoid any legal, compliance or regulatory issue or in order to ensure market stability, or (E) in order to avoid any information security risk; (vi) Purchaser shall not take, permit to be taken, or omit to take any action that would reasonably be expected to (A) result in the insolvency of Purchaser or (B) prevent or materially impair or materially delay the ability of Purchaser to perform the Commercial Covenants in accordance herewith; (vii) Purchaser shall comply in all material respects with all provisions of the Plan applicable to Purchaser or the Distribution Agent (as defined in the Plan) to the extent Purchaser is acting as a distribution agent in connection with the Plan; and (viii) Purchaser shall not pledge, repledge, hypothecate, rehypothecate, sell, lend, stake, arrange for staking, or otherwise transfer or use any amount of such Coins, separately or together with other property, with all attendant rights of ownership, and for any period of time and without retaining a like amount of Coins, or invest such Coins (except as otherwise directed by Seller or any User or Eligible Creditor, as applicable). Notwithstanding the foregoing, Purchaser's obligations under this Section 6.12(e) shall terminate and be of no further force or effect on the earlier of (x) the date that Purchaser's obligations under Section 6.10, Section 6.11, Section 6.12, and Section 6.14 have been performed in full or Purchaser otherwise ceases to have any obligations thereunder, and (y) the date on which this Agreement is terminated in accordance with is terms.

**(f)** **Notwithstanding anything to the contrary herein, to the extent Seller retains any Delayed Acquired Coins following the Closing, (i) such Coins shall be held by Seller solely in a custodial capacity in trust and solely for the benefit of the applicable User or Eligible Creditor; (ii) Seller shall not pledge, repledge, hypothecate, rehypothecate, sell, lend, stake, arrange for staking, invest or otherwise transfer or use any amount of such Coins; (iii) Seller shall retain exclusive control, including by use of "private keys" or other equivalent means or through custody arrangements consistent in all material respects with Seller's practices as of the date hereof, of all such Coins (other than, solely to the extent of any staking contract, Staked Coins); provided that such ownership and exclusive ability to control Coins is subject to the continued existence, validity, legality, governance and public availability of the relevant blockchains; and (iv) Seller shall continue to comply with all procedures and controls in effect as of the Closing Date regarding management of Authentication Credentials, including limitation of access to Authentication Credentials to employees who need to have such access and requiring multiple individuals to sign off on transactions. For the sake of clarity, in the event any such Delayed Acquired Coins are unable to be delivered to Purchaser within the timeframes specified in this Agreement, Purchaser shall be entitled to notify Users and Eligible Creditors of the same or to require Seller to provide such a notice in the form provided by Purchaser, and Seller shall not issue any denial or other contradictory statement with respect thereto. The foregoing provisions of this Section 6.12(f) shall apply to Seller's Affiliates, *mutatis mutandis*, and Seller shall cause its Affiliates to comply with the foregoing provisions of this Section 6.12(f). Following the Closing, Seller agrees to use commercially reasonable efforts to keep Purchaser reasonably informed of any unauthorized acquisition, impairment, access, use, theft, destruction, alteration or disclosure of any "private key" or Authentication Credential or instance of any IT System used by Seller or any custodian of Seller to secure any Acquired**

**Coins or loss of Seller's exclusive control of any Acquired Coins and consult with Purchaser in connection with remedying any of the foregoing.**

6.13    VGX Token Listing Review Process. Following the entry of the Agreement Order, Purchaser will initiate and undertake consistent with its policies and past practices an internal review process to determine whether VGX tokens can be listed for trading on the Binance.US Platform, which review process will include submitting the VGX token to Purchaser's listing committee for consideration consistent with its policies and past practices.

6.14    Additional Bankruptcy Distributions. The provisions of this Section 6.14 shall cease to apply and be of no further force and effect upon the soonest to occur of (a) Purchaser ceasing to provide the services necessary to comply with this Section 6.14, (b) Purchaser's bankruptcy or insolvency, (c) the issuance of a final, non-appealable Order by a Governmental Body prohibiting the consummation of the transactions contemplated by this Section 6.14, (d) any Purchaser Development (disregarding for the purposes of this Section 6.14 the language "prior to the Closing"), and (e) Purchaser's material breach of Section 6.12(e) or this Section 6.14 which remains uncured for 30 days following Purchaser's receipt of Seller's written notice of such material breach.

(a)    ~~Any~~**Seller will make or transfer to Purchaser any** Additional Bankruptcy Distributions made on account of Users' or Eligible Creditors' claims against the Debtors and all right, title and interest therein and thereto ~~shall be made or transferred to Purchaser~~ free and clear of any Encumbrances **promptly following (but in any event within five (5) Business Days of) delivery of the applicable Post-Bankruptcy Statement to Purchaser pursuant to Section 6.14(b)**. Any such transfers in Coins shall be deemed complete when each transfer is publicly confirmed on the blockchain for the related Coin at least the number of times set forth on https://support.kraken.com/hc/en-us/articles/203325283-Cryptocurrency-deposit-processing-times (or a successor site mutually agreed by Seller and Purchaser), or, for any Coins held in Seller's account on the Binance.US Platform, transferred to the Binance.US Platform account designated by Purchaser, or in the case of staked ETH Coins, such staked ETH Coins shall be delivered pursuant to the means reasonably specified by Purchaser. **Any Additional Bankruptcy Distributions made by Purchaser in the form of Coins shall be net of any gas or other transaction fees incurred in connection with transferring such Coins to Purchaser.**

(b)    Upon the Bankruptcy Court's approval of any Additional Bankruptcy Distributions (including through the Confirmation Order) **and (x) the determination by Seller to make any such Additional Bankruptcy Distribution or (y) Seller is required by the Plan to make any such Additional Bankruptcy Distribution**, Seller shall deliver to Purchaser a statement setting forth (i) the amount of **such** Additional Bankruptcy Distributions to be made to each User ~~or Eligible Creditor, as applicable, as approved by the Bankruptcy Court~~ in Coins (including the name and relevant ticker symbol used on the Voyager Platform for such Coins, together with all information regarding the underlying networks and smart contracts to which such Coins are subject) after taking into account gas or other transaction fees incurred and paid by Seller in connection with transferring such Coins to Purchaser in accordance with this Section 6.14, (ii) the amount of Additional Bankruptcy Distributions to be made to each User or Eligible Creditor, as applicable, ~~as approved by the Bankruptcy Court~~ in cash **or other assets**,

and (iii) the user identification number of each such User or other identifying or account information of any Eligible Creditor, as applicable (such statement, the "Post-Bankruptcy Statement"). The provisions set forth in the last sentence of Section ~~6.11(a)~~6.11(c) shall apply to the Post-Bankruptcy Statement, *mutatis mutandis*.

(c)     Promptly following Purchaser's receipt of any Additional Bankruptcy Distributions (but no later than five (5) Business Days following receipt of any Additional Bankruptcy Distributions), Purchaser shall credit such Additional Bankruptcy Distributions to each User's and Eligible Creditor's accounts, if any, on the Binance.US Platform in such amounts set forth on, and in accordance with, the Post-Bankruptcy Statement **and in the same form (*i.e.*, Coins, cash, or other assets, as provided by Seller to Purchaser)**. The Additional Bankruptcy Distributions credited to each User and Eligible Creditor in accordance with this Section 6.14(a) are referred to herein as "Credited Additional Bankruptcy Distributions".

(d)     If any Additional Bankruptcy Distribution is to be received by Purchaser pursuant to Section 6.14(a), prior to the crediting of the applicable Credited Additional Bankruptcy Distribution pursuant to Section 6.14(a), Seller shall reduce such Credited Additional Bankruptcy Distribution by and shall retain (i) the number of Coins allocated in the applicable Post-Bankruptcy Statement to each User or Eligible Creditor located in an Unsupported Jurisdiction in which Purchaser or its applicable Affiliate(s) have not received the necessary Money Transmitter License, and (ii) the amount of cash allocated in the applicable Post-Bankruptcy Statement to each User or Eligible Creditor located in an Unsupported Jurisdiction in which Purchaser or its applicable Affiliate(s) have not received the necessary Money Transmitter License, and, in either case, such amounts shall be distributed by Seller in accordance with the Plan.

(e)     There shall be no transaction fees, spreads, costs or expenses charged to or payable by Seller, any User, or any Eligible Creditor with respect to any Additional Bankruptcy Distributions to the account of Seller, such User or such Eligible Creditor, as applicable, on the Binance.US Platform contemplated by this Section 6.14. With respect to any User or Eligible Creditor that does not meet the requirements of the KYC Procedures and accept the terms and conditions of the Binance.US Platform (or otherwise is not or no longer is a user with an active account on the Binance.US Platform) as of or prior to the date of such Post-Bankruptcy Statement, Purchaser shall convert all Coins allocable to such User or Eligible Creditor in such Additional Bankruptcy Distribution into United States Dollars at the then-prevailing rates (including applicable fees, spreads, costs and expenses) on the Binance.US Platform and deliver such United States Dollars, together with any cash or others assets in respect of such Users or Eligible Creditors, to Seller within five (5) Business Days, for further distribution by Seller in accordance with the Plan.

**(f)     Seller shall have the option but not the obligation to terminate Purchaser's role as Distribution Agent in connection with the Plan if one or more of the following has occurred and is continuing as of the time of exercise of such option and, in each case, such event would reasonably be expected to materially and adversely affect the Users, Eligible Creditors or the Acquired Coins (each, a "Distribution Agent Termination Event"): (i) Binance Holdings Limited or any of its Subsidiaries voluntarily files for bankruptcy protection in any jurisdiction and such filing would reasonably be expected to**

54

Appellant Appendix ER - 543

**prevent Purchaser from performing its obligations under this Section 6.14 or otherwise following the Closing; (ii) following a criminal complaint, indictment, or federal complaint filed by any U.S. federal law enforcement agency, a final and unappealable judgment is entered by a U.S. Federal Court of competent jurisdiction against Purchaser or any of Purchaser's executives officers or "C-Suite" officers; (iii) following a criminal complaint, indictment, or federal complaint filed by any U.S. federal law enforcement agency, a final and unappealable judgment is entered by a U.S. Federal Court of competent jurisdiction against any of Purchaser's Affiliates and such judgment would reasonably be expected to prevent Purchaser from performing its obligations under Section 6.14 or otherwise following the Closing; and (iv) a state regulator suspends or terminates Purchaser's Money Transmitter License or similar license or otherwise restricts in a manner that is final and binding under applicable Law; provided, however, that, with respect to this clause (iv), Seller shall have the option to terminate Purchaser's role as Distribution Agent with respect to only the state or states that have taken the adverse action described in this clause (iv).**

**Upon the occurrence of any Distribution Agent Termination Event, Seller is permitted to exercise the option to terminate Purchaser's role as Distribution Agent by providing written notice to Purchaser in accordance with Section 10.3 (a "Distribution Agent Termination Notice"). Purchaser's termination as Distribution Agent in connection with the Plan shall be effective on the tenth (10th) day following Purchaser's receipt of such Distribution Agent Termination Notice, unless such Distribution Agent Termination Event is cured prior to the expiration of such 10-day period. To the extent that Purchaser is in possession of any of Seller's fiat or Cryptocurrency at the time of the Distribution Agent Termination Notice, Purchaser shall transfer such fiat or cryptocurrency to Seller upon the effectiveness of such Distribution Agent Termination Notice.**

6.15    Unstaking. Promptly following the date hereof (until the **later of (A) the** Closing ~~or~~**and (B) the applicable Delivery Date, or, in any case,** the earlier termination of this Agreement pursuant to Article VIII) but without limiting what is permitted by Section 6.1(b)(iii), Seller shall, and shall cause its Affiliates to, (a) ensure that all Seller Held Coins (other than ETH Coins that are Staked Coins as of the date hereof) are freely transferable and not subject to any restrictions on transfer (including restrictions on transfer implemented through "smart contracts" or other technological means), (b) without limiting the foregoing, ensure that all Seller Held Coins (other than ETH Coins that are Staked Coins as of the date hereof) are unstaked prior to the Rebalancing Date, and (c) consult with Purchaser and its representatives, keep Purchaser and its representatives reasonably informed, and provide Purchaser and its representatives with draft documents reasonably in advance of execution or delivery thereof and incorporate any comments therein proposed in good faith by Purchaser or its representatives, in each case, in connection with any of the foregoing.

6.16    Receipt of Misdirected Assets; Liabilities. From and after the Closing, if Purchaser or Seller becomes aware that Seller or any of its Affiliates is in possession of any right, property or asset that is an Acquired Asset, such Party shall promptly inform the other Party of that fact. Thereafter, at the request of Purchaser, Seller shall promptly transfer or cause such of its Affiliates to transfer such right, property or asset (and shall promptly endorse and deliver any such asset that is received in the form of cash, checks or other documents) to

US-DOCS-~~137411268.27~~138346099.6

Appellant Appendix ER - 544

Purchaser or any other entities nominated by Purchaser for no consideration, and such asset will be deemed the property of Purchaser of any such nominees held in trust by Seller for Purchaser or any such nominees until so transferred. From and after the Closing, if Purchaser or Seller becomes aware that Purchaser or any of its Affiliates is in possession of any right, property or asset that is an Excluded Asset, such Party shall promptly inform the other Party of that fact. Thereafter, at the request of Seller, Purchaser shall promptly transfer or cause such of its Affiliates to transfer such right, property or asset (and shall promptly endorse and deliver any such asset that is received in the form of cash, checks or other documents) to Seller or any other entities nominated by Seller for no consideration, and such asset will be deemed the property of Seller of any such nominees held in trust by Purchaser for Seller or any such nominees until so transferred; provided that if Purchaser discovers any items (or portions thereof) that would be Documents but for the fact that they relate to Excluded Assets, Purchaser shall use reasonable best efforts to destroy such items. Notwithstanding anything to the contrary herein or otherwise, if any amount (including any principal, interest, fees, expenses or penalties) is outstanding or unpaid under any Loan from or after the Closing, then such Loan, any agreements or documents entered into in connection therewith and any collateral posted in respect thereof shall be deemed Acquired Assets for all purposes under this Agreement and any other agreements or documents entered into in connection herewith, and Seller shall, and shall cause its Affiliates to, sell, transfer, assign, convey and deliver to Purchaser all of its and their right, title and interest in and to the foregoing, free and clear of all Encumbrances in the same manner as the other Acquired Assets under Section 1.1, *mutatis mutandis*, for no additional consideration and at no cost or expense to Purchaser or its Affiliates.

6.17    Acknowledgment by Purchaser.

(a)    Purchaser acknowledges and agrees that it has conducted to its full satisfaction an independent investigation and verification of the business, including its financial condition, results of operations, assets, Liabilities, properties, Contracts, regulatory compliance, business risks and prospects of Seller and the Acquired Assets and the Assumed Liabilities, and, in making its determination to proceed with the Transactions, Purchaser and the Purchaser Group have relied solely on the results of the Purchaser Group's own independent investigation and verification and have not relied on, are not relying on, and will not rely on, Seller, any information, statements, disclosures, documents, Projections, forecasts or other material made available to Purchaser or any of its Affiliates or their respective Advisors in the Dataroom, the Information Presentation, or the Projections or any information, statements, disclosures or materials, in each case, whether written or oral, made or provided by, or as part of, any of the foregoing or any other Seller Party, or any failure of any of the foregoing to disclose or contain any information, except for the Express Seller Representations (it being understood that Purchaser and the Purchaser Group have relied only on the Express Seller Representations). Purchaser acknowledges and agrees that (i) the Express Seller Representations are the sole and exclusive representations, warranties and statements of any kind made to Purchaser or any member of the Purchaser Group and on which Purchaser or any member of the Purchaser Group may rely in connection with the Transactions and (ii) all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (A) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Seller Representations) including in the Dataroom, Information Presentation, Projections, meetings,

calls or correspondence with management of Seller, any of the Seller Parties or any other Person on behalf of Seller or any of the Seller Parties or any of their respective Affiliates or Advisors and (B) any other statement relating to the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, Contracts, regulatory compliance, business risks and prospects of Seller, or the quality, quantity or condition of Seller's assets, are, in each case, specifically disclaimed by Seller, on its behalf and on behalf of the Seller Parties. Purchaser: (x) disclaims reliance on the items in <u>clause (ii)</u> in the immediately preceding sentence (which, for the avoidance of doubt, do not include any Express Seller Representations); and (y) acknowledges and agrees that it has relied on, is relying on and will rely on only the items in <u>clause (i)</u> in the immediately preceding sentence. Without limiting the generality of the foregoing, Purchaser acknowledges and agrees that neither Seller or any other Person (including the Seller Parties), has made, is making or is authorized to make, any representations or warranties, whether in written, electronic or oral form, express or implied with respect to, (1) any potentially material information regarding Seller or any of its assets (including the Acquired Assets), Liabilities (including the Assumed Liabilities) or operations and (2) as to the quality, merchantability, fitness for a particular purpose, or condition of Seller's business, operations, assets, Liabilities, Contracts, regulatory compliance, business risks and prospects or any portion thereof, except, in each case, solely to the extent set forth in the Express Seller Representations.

(b)     Without limiting the generality of the foregoing, in connection with the investigation by the Purchaser Group of Seller, Purchaser and the members of the Purchaser Group, and the Advisors of each of the foregoing, have received or may receive, from or on behalf of Seller, certain projections, forward-looking statements and other forecasts (whether in written, electronic, or oral form, and including in the Information Presentation, Dataroom, management meetings, etc.) (collectively, "<u>Projections</u>"). Purchaser acknowledges and agrees that (i) such Projections are being provided solely for the convenience of Purchaser to facilitate its own independent investigation of Seller, (ii) there are uncertainties inherent in attempting to make such Projections, (iii) Purchaser is familiar with such uncertainties, and (iv) Purchaser is taking full responsibility for making its own evaluation of the adequacy and accuracy of all Projections (including the reasonableness of the assumptions underlying such Projections).

6.18     <u>IT Migration</u>. From and after the date hereof until one hundred twenty (120) days after the Closing Date, upon Purchaser's request, Seller shall, and shall cause its Affiliates to, use reasonable best efforts to make available all relevant technical staff, employees and representatives of Seller and its Affiliates, including the Chief Technology Officer of Seller and its Affiliates, to Purchaser and its Affiliates, to (a) assist Purchaser and its Affiliates in understanding all Business Software and Business Accounts, (b) assist with the Integration Plan, (c) transition of all accounts with third party sites necessary to support the Voyager Platform and its associated mobile applications, (d) address the logistics of transferring the Business Software and Business Accounts to Purchaser, including providing Purchaser with access to all credentials to GitHub accounts and other repositories for storage of source code for the Business Software, and (e) any other technical assistance that Purchaser or any of its Affiliates deems reasonably necessary to enable all migrations, integrations and Transactions. Purchaser hereby grants Seller a limited, non-exclusive, non-transferable, non-sublicensable and revocable license to access and use the Business Software for the sole purpose of providing the support to Purchaser as contemplated in this <u>Section 6.18</u>. Seller and its Affiliates may not use, modify, share, disclose or revise such Business Software for any other purpose. Seller shall bear all costs and expenses

Appellant Appendix ER - 546

associated with the provision of such services on or prior to the Closing Date pursuant to this Section 6.18. Purchaser shall bear the reasonable and documented costs and expenses incurred by Seller in connection with the provision of such services during the 120-day period after the Closing Date pursuant to this Section 6.18. Seller can provide no assurance that Seller 's employees will elect to remain employed by Seller prior to or following the Closing and Seller will not be required to replace any such resigning employees.

6.19    Confidentiality.

(a)    Each Party acknowledges that Confidential Information has been, and in the future will be, provided to it in connection with this Agreement and the Transactions, including under Section 6.2.

(b)    Seller acknowledges that from and after the Closing, all non-public information relating to the Acquired Assets and the Assumed Liabilities will be valuable and proprietary to Purchaser and its Affiliates. Seller agrees that, from and after the Closing, Seller will not, and will cause their Affiliates and Advisors not to, directly or indirectly, without the prior consent of Purchaser, disclose to any Person any Confidential Information relating to Purchaser and its Affiliates, the Acquired Assets or the Assumed Liabilities.

(c)    Notwithstanding anything to the contrary herein, the provisions of this Section 6.19 will not prohibit any disclosure (i) required by applicable Law, Order or the rules of a securities exchange to which it is subject, (ii) in connection with a regulatory inquiry by a Governmental Body or self-regulatory organization, (iii) as necessary in connection with Seller's bankruptcy process or (iv) to each Party's Advisors who have been informed of the confidential nature of the information and have been instructed to keep such information confidential. Purchaser acknowledges and understands that this Agreement may be publicly filed in the Bankruptcy Court and further made available by Seller to prospective bidders and that, except as prohibited herein, such disclosure will not be deemed to violate any confidentiality obligations owing to Purchaser, whether pursuant to this Agreement or otherwise. Each Party agrees that such Party will be responsible for any breach or violation of the provisions of this Section 6.19 by any of such Party's Affiliates. Each Party acknowledges and agrees that the remedies at law for any breach or threatened breach of this Section 6.19 by Seller or Purchaser are inadequate to protect Purchaser or Seller and its Affiliates, as applicable, and that the damages resulting from any such breach are not readily susceptible to being measured in monetary terms. Accordingly, without prejudice to any other rights or remedies otherwise available to either Party or its Affiliates, each Party acknowledges and agrees that upon any breach or threatened breach by a Party of the terms and conditions of this Section 6.19, the other Party and its Affiliates, as applicable will be entitled to immediate injunctive relief and to seek an order restraining any threatened or future breach from any court of competent jurisdiction without proof of actual damages or posting of any bond in connection with any such remedy. The provisions of this Section 6.19 will survive the Closing and terminate two (2) years after the Closing Date.

6.20    Acquired Assets Owned by Non-Debtors. To the extent any item set forth in Schedule 6.20 or any other asset used in or relating to the Cryptocurrency custody and trading business of Seller constitutes property of Voyager IP, LLC, and, but for this Section 6.20, is of a type that would constitute an Acquired Asset (disregarding solely for this purpose any reference

58

Appellant Appendix ER - 547

to "of Seller" or other reference indicating ownership, licensing, holding, leasing or use of any type of Acquired Asset by Seller), Seller shall cause Voyager IP, LLC's right, title and interest in and to such item or asset to be transferred (for no additional consideration) to Purchaser reasonably promptly after Closing as an Acquired Asset as if transferred at the Closing in accordance with the other provisions of this Agreement, including by designating Voyager IP, LLC as an additional assignor under the Trademark and Domain Name Assignment Agreement.

6.21    Seller Expenses.

(a)    Purchaser shall (i) at the Closing bear as a component of the Purchase Price pursuant to Section 2.1(a), without duplication, the Seller Expenses or (ii) if this Agreement is validly terminated in accordance with its terms, pay to Seller, within three (3) Business Days following such termination, cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by Seller in an amount equal to the Seller Expenses; provided that notwithstanding anything to the contrary herein, (A) in no event shall the aggregate amount of Seller Expenses payable by Purchaser hereunder exceed the Seller Expense Cap, (B) any fees and expenses (including reasonable and documented out-of-pocket financial advisor and legal fees, expenses and disbursements) incurred by Seller or any of its Affiliates, or otherwise relating to the activities or operations of Seller or any of its Affiliates, on or prior to the Seller Expense Start Date shall not constitute Seller Expenses, and (C) (x) if the Closing or the termination of this Agreement occurs on or prior to the Seller Expense Start Date, (y) if this Agreement is terminated pursuant to (1) Section 8.1(b) or Section 8.1(c) by Purchaser, or by Seller in circumstances where Purchaser would be entitled to terminate this Agreement pursuant to Section 8.1(e), or (2) Section 8.1(e), Section 8.1(g), Section 8.1(h) or Section 8.1(i), or (z) the Closing does not occur on or prior to the Seller Expense Start Date due to any act or omission by Seller or any of its Affiliates or any material breach of this Agreement by Seller, then in each case the Seller Expenses shall be zero (0).

(b)    For purposes of this Agreement, "Seller Expenses" means all reasonable and documented costs, fees, and expenses (including reasonable and documented out-of-pocket financial advisor and legal fees, expenses and disbursements) incurred by or behalf of any Debtor during the period beginning on the Seller Expense Start Date and ending on the earlier of (i) the Closing Date and (ii) the date on which this Agreement is validly terminated in accordance with its terms, in each case (A) solely in connection with maintaining its operations in the Ordinary Course or by professionals in connection with the Bankruptcy Case, (B) that Seller would not have otherwise incurred if the Closing had occurred on or prior to the Seller Expense Start Date, and (C) which fees and expenses of such professional are approved by the Bankruptcy Court.

6.22    Purchaser Expenses.

(a)    If this Agreement is terminated (i) by Seller pursuant to Section 8.1(c), in circumstances where Purchaser would be entitled to terminate this Agreement pursuant to Section 8.1(e), or (ii) pursuant to Section 8.1(e), Section 8.1(g), Section 8.1(h) or Section 8.1(i)(ix), then Seller shall pay to Purchaser, within three (3) Business Days following such termination, cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by Purchaser in an amount equal to the Purchaser Expenses; provided that notwithstanding anything to the contrary herein, in no event shall the aggregate amount of

Appellant Appendix ER - 548

Purchaser Expenses payable by Seller hereunder exceed $5,000,000; provided further that if this Agreement is validly terminated by Seller pursuant to Section 8.1(g) (x) in order for Seller to pursue a Liquidation as a result of and following any Effect with respect to Purchaser's business, financial condition, operations, assets, management, employees, compliance, or liabilities, taken as a whole, or any Effect with respect to Purchaser's Affiliates that has an Effect on Purchaser's business, financial condition, operations, assets, management, employees, compliance, or liabilities, taken as a whole, that, individually or in the aggregate with all other such Effects, would reasonably be expected to (1) prevent or materially impair or materially delay the ability of Purchaser to consummate the Transactions in accordance herewith or (2) materially and adversely affect the Users, Eligible Creditors, or the Acquired Coins on the Binance.US Platform, including following the Closing, as compared to users and Coins on the Binance.US Platform as of the date hereof, and (y) such termination was not effected (1) in connection with a Higher and Better Offer or (2) because the estimated proceeds from such Liquidation are or would reasonably be expected to be greater than the Closing Date Payment (plus the fair market value of any Acquired Coins or any proceeds therefrom, in each case, as determined at the time Seller commences such Liquidation), then no Purchaser Expenses shall be payable.

(b)     For purposes of this Agreement, "Liquidation" means any combination of one or more of the following:  (i) a plan under chapter 11 of the Bankruptcy Code that provides for sales or liquidation of the Debtors' assets through a transaction (other than a sale of substantially all of the Debtors' assets to one purchaser on a going concern basis), including the Plan, (ii) one or more sales of assets pursuant to section 363 of the Bankruptcy Code other than a sale of substantially all of the Debtors' assets to one purchaser on a going concern basis, (iii) conversion of the Bankruptcy Case to cases under chapter 7 of the Bankruptcy Code, (iv) foreclosure or other exercise of remedies (including a deed in lieu of foreclosure) by or in favor of one or more creditors, (v) abandonment of the Debtors' assets to a creditor, or (vi) a dismissal of the Bankruptcy Cases.

(c)     For the purposes of this Agreement, "Purchaser Expenses" means all reasonable and documented fees and expenses (including reasonable and documented out-of-pocket legal fees, expenses and disbursements) incurred by Purchaser since August 5, 2022, in connection with, arising from or related to efforts to purchase the Acquired Assets (as defined in the Bidding Procedures Order), which, for the avoidance of doubt, includes its evaluation, negotiation and pursuit of the Transactions, this Agreement and the other documents and agreements contemplated hereby (the "Purchaser Bid Process").

(d)     All amounts payable to Purchaser pursuant to Section 6.22(a) upon termination of this Agreement shall be payable in cash by wire transfer of immediately available funds to such bank account as shall be designated by Purchaser in writing, and without the requirement of any notice or demand from Purchaser or any application to or order of the Bankruptcy Court other than the Agreement Order.

60

Appellant Appendix ER - 549

## ARTICLE VII
## CONDITIONS TO CLOSING

7.1     Conditions Precedent to the Obligations of Purchaser and Seller. The respective obligations of each Party to consummate the Transactions are subject to the satisfaction (or to the extent permitted by Law, written waiver by Seller and Purchaser) on or prior to the Closing Date, of each of the following conditions:

(a)     there shall be no Law or Order (including any temporary restraining order or preliminary or permanent injunction) in effect restraining, enjoining, making illegal or otherwise prohibiting the Transactions;

(b)     the Bankruptcy Court shall have entered the Agreement Order, which Agreement Order shall (i) be in form and substance reasonably acceptable to Purchaser, (ii) comply in all respects with Section 5.1(b), and (iii) be a Final Order; and

(c)     the Bankruptcy Court shall have entered the Confirmation Order, in form and substance, solely with respect to matters relating to this Agreement or the Transactions, reasonably acceptable to Purchaser, confirming a Plan in form and substance, solely with respect to matters relating to this Agreement or the Transactions, reasonably acceptable to Purchaser, and the Confirmation Order shall be a Final Order.

7.2     Conditions Precedent to the Obligations of Purchaser. The obligations of Purchaser to consummate the Transactions are subject to the satisfaction (or to the extent permitted by Law, written waiver by Purchaser in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)     (i) the representations and warranties of Seller set forth in Article III (in each case, other than the Fundamental Representations and the representations and warranties set forth in Section 3.16(a)) shall be true and correct in all respects as of the Closing Date as though made on and as of the Closing Date, except (x) that representations and warranties that are made as of a specified date need be so true and correct only as of such date **and; provided that any representations and warranties that are made as of any Delivery Date (solely to the extent made as of any Delivery Date) shall be excluded from this Section 7.2(a) altogether, and** (y) to the extent the failure of such representations and warranties to be true and correct as of such dates has not had, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; provided that for purposes of the immediately preceding clause (i), the qualifications as to materiality and Material Adverse Effect contained in such representations and warranties shall not be given effect; (ii) the representations and warranties set forth in Section 3.1(a) (*Organization and Qualification*), Section 3.2 (*Authorization of Agreement*), Section 3.3(a)(i) (*Conflicts; Consents*), Section 3.6(a) (*Exclusive Ownership*), and Section 3.14 (*Brokers*) (collectively, the "Fundamental Representations") shall be true and correct in all but *de minimis* respects as of the Closing Date as though made on and as of the Closing Date, except that such Fundamental Representations that are made as of a specified date need be true and correct in all but *de minimis* respects only as of such date; and (iii) the

representations and warranties set forth in <u>Section 3.16(a)</u> shall be true and correct in all respects as of the date hereof and as of the Closing Date as though made on and as of the Closing Date;

(b)     Seller shall not have materially breached any of the covenants required to be performed or complied with by Seller under this Agreement on or prior to the Closing; <u>provided</u> that notwithstanding the foregoing, Seller shall have performed or caused to be performed, in all respects, all of the obligations and covenants required by <u>Section 6.15(a)</u> and <u>(b)</u>; and

(c)     Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in <u>Section 2.4</u>.

7.3    <u>Conditions Precedent to the Obligations of Seller</u>. The obligations of Seller to consummate the Transactions are subject to the satisfaction (or to the extent permitted by Law, written waiver by Seller in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)     the representations and warranties made by Purchaser in <u>Article IV</u> shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except (x) that representations and warranties that are made as of a specified date need be so true and correct only as of such date and (y) where the failure of such representations or warranties to be so true and correct has not and would not, individually or in the aggregate, reasonably be expected to prevent or materially impair or delay the ability of Purchaser to consummate the Transactions; <u>provided</u> that for purposes of this <u>Section 7.3(a)</u>, the qualifications as to materiality, material adverse effect and words of similar import contained in such representations and warranties shall not be given effect;

(b)     Purchaser shall not have materially breached any of the covenants required to be performed or complied with by Purchaser under this Agreement on or prior to the Closing; and

(c)     Purchaser shall have delivered, or caused to be delivered, to Seller all of the items set forth in <u>Section 2.5</u>.

7.4    <u>Waiver of Conditions</u>.  Upon the occurrence of the Closing, any condition set forth in this <u>Article VII</u> that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing. Neither Purchaser nor Seller may rely on the failure of any condition set forth in this <u>Article VII</u>, as applicable, to be satisfied if such failure was caused by such Party's material breach of any covenant, representation or warranty hereunder.

US-DOCS\137411268.27138346099.6

**ARTICLE VIII**

**TERMINATION**

8.1    <u>Termination of Agreement</u>. This Agreement may be terminated only in accordance with this <u>Section 8.1</u>. This Agreement may be terminated at any time prior to the Closing:

(a)    by the mutual written consent of Seller and Purchaser;

(b)    by written notice of either Purchaser or Seller, upon the issuance of an Order by a Governmental Body restraining, enjoining or otherwise prohibiting the consummation of the Transactions or declaring unlawful the Transactions, and such Order having become final, binding and non-appealable; <u>provided</u> that no termination may be made by a Party under this <u>Section 8.1(b)</u> if the issuance of such Order was caused by such Party's material breach of any of its representation, warranties, covenants or agreements hereunder;

(c)    by written notice of either Purchaser or Seller, if the Closing shall not have occurred on or before the date that is four (4) months following the date hereof (the "<u>Outside Date</u>"); <u>provided</u> that Purchaser may, at its election and upon written notice to Seller, elect to extend the Outside Date for an additional thirty (30) days (such extended date, the "<u>Extended Outside Date</u>"); <u>provided</u> <u>further</u> that a Party shall not be permitted to terminate this Agreement, or extend the Outside Date, pursuant to this <u>Section 8.1(c)</u> if the failure of the Closing to have occurred by the Outside Date or Extended Outside Date, as applicable, was caused by such Party's material breach of any of its representation, warranties, covenants or agreements;

(d)    by written notice from Seller to Purchaser, upon a breach of any covenant or agreement on the part of Purchaser, or if any representation or warranty of Purchaser is or will have become untrue, in each case, such that the conditions set forth in <u>Section 7.1</u> or <u>Section 7.3</u> would not be satisfied, including a breach of Purchaser's obligation to consummate the Closing; <u>provided</u> that (i) if such breach is curable by Purchaser then Seller may not terminate this Agreement under this <u>Section 8.1(d)</u> unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date or Extended Outside Date, if any, and (B) thirty (30) days after Seller notifies Purchaser of such breach and (ii) the right to terminate this Agreement pursuant to this <u>Section 8.1(d)</u> will not be available to Seller at any time that Seller is in material breach of, any covenant, representation or warranty hereunder;

(e)    by written notice from Purchaser to Seller, upon a breach of any covenant or agreement on the part of Seller, or if any representation or warranty of Seller is or will have become untrue, in each case, such that the conditions set forth in <u>Section 7.2(a)</u> or <u>Section 7.2(b)</u> would not be satisfied; <u>provided</u> that (i) if such breach is curable by Seller then Purchaser may not terminate this Agreement under this <u>Section 8.1(e)</u> unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date or Extended Outside Date, if any, and (B) thirty (30) days after Purchaser notifies Seller of such breach and (ii) the right to terminate this Agreement pursuant to this <u>Section 8.1(e)</u> will not be available to

63

Purchaser at any time that Purchaser is in material breach of, any covenant, representation or warranty hereunder;

(f)     by written notice from Seller to Purchaser, if (A) all of the conditions set forth in Sections 7.1 and 7.2 have been and continue to be satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived, (B) Seller has confirmed in writing to Purchaser that all of the conditions set forth in Sections 7.1 and 7.2 have been and continue to be satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived and Seller stands ready, willing and able to consummate the Closing so, and (C) Purchaser fails to consummate the Closing within three (3) Business Days of its receipt of such written notice from Seller;

(g)     by written notice from Seller to Purchaser, which may be revocable in the sole discretion of Seller by written notice from Seller to Purchaser within five (5) Business Days, if Seller or the board of directors (or similar governing body) of Seller determine, in good faith and after consultation with its legal and other advisors, that proceeding with the Transactions or failing to terminate this Agreement would be inconsistent with its or such Person's or body's fiduciary duties; provided that if such determination is in connection with an Acquisition Proposal, Seller may only terminate this Agreement pursuant to this Section 8.1(g) upon compliance with the provisions set forth in Section 5.2(c);

(h)     by written notice from Purchaser to Seller, if (A) Seller seeks or otherwise take material steps in furtherance of, or do not use reasonable best efforts to oppose any other Person in seeking, an order of the Bankruptcy Court dismissing the Bankruptcy Case or converting the Bankruptcy Case to a petition for relief under Chapter 7 of the Bankruptcy Code, (B) the Bankruptcy Case is dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of Seller is appointed in the Bankruptcy Case or (C) the Bankruptcy Court enters an order pursuant to section 362 of the Bankruptcy Code lifting the automatic stay with respect to any Acquired Assets; or

(i)     by written notice from Purchaser to Seller, if:

(i)     the Agreement Order is not entered by January ~~6~~**11**, 2023;

(ii)     the Plan Solicitation Motion and the Amended Disclosure Statement are not filed with the Bankruptcy Court by December 21, 2022;

(iii)     the Plan Solicitation Order is not entered by January ~~6~~**11**, 2023;

(iv)     the Confirmation Order is not entered by March ~~1~~**6**, 2023;

(v)     Seller or any of the other Debtors file any motions, pleadings, notices or other documents with the Bankruptcy Court in material breach of Section 5.7;

64

Appellant Appendix ER - 553

(vi)     Seller enters into one or more Alternative Transactions with one or more Persons other than Purchaser, or the Bankruptcy Court approves an Alternative Transaction other than with Purchaser;

(vii)     Seller has delivered a Higher Offer Determination Notice to Purchaser;

(viii)     Seller or its Affiliates or Advisors have committed a breach of Section 5.1(a); or

(ix)     Seller or its Affiliates or Advisors have committed a breach of, Section 5.2; provided that (without modifying Purchaser's rights to terminate this Agreement under any other Section of this Agreement) Purchaser shall not be entitled to terminate this Agreement pursuant to this Section 8.1(i)(ix) following entry of the Agreement Order by the Bankruptcy Court.

8.2    Effect of Termination.

(a)     In the event of termination of this Agreement pursuant to Section 8.1, this Agreement shall forthwith become void and there shall be no Liability on the part of either Party or any of its partners, officers, directors or shareholders; provided that Section 2.2, Section 6.2(b), Section 6.12(c), Section 6.19, Section 6.21, Section 6.22, this Section 8.2, Section 8.3, Section 8.4 and Article X (other than Section 10.12 with respect to the availability of an injunction or injunctions, specific performance or other equitable relief to cause the Closing to occur, which shall terminate upon any termination of this Agreement) and the definitions referenced in such Sections and Articles, even if not included in such Sections and Articles, and, for the avoidance of doubt, the Confidentiality Agreement, shall survive any such termination; provided further that, subject to Section 8.3, no termination will relieve either Party from any Liability for damages (including damages based on the loss of the economic benefits of the Transactions, including the Purchase Price, to Seller), losses, costs, or expenses (including reasonable legal fees and expenses) resulting from any willful breach of this Agreement by such Party prior to any such termination or Fraud by such Party. For purposes of this Agreement, "willful breach" means with respect to any breaches or failures to perform any of the covenants or other agreements contained herein, a material breach that is a consequence of an act or failure to act undertaken by the breaching Person with actual knowledge (which shall not be deemed to include knowledge of facts that a Person acting reasonably should have, based on reasonable due inquiry) that such Person's act or failure to act would, or would reasonably be expected to, result in or constitute a material breach of this Agreement.

(b)     If this Agreement is terminated prior to the Closing, at any time following such termination, promptly following the written request of Seller, Purchaser shall, as soon as practicable, return, destroy or permanently erase (on all forms of physical and electronic media) all Acquired User Data transferred to Purchaser prior to the Closing in accordance with Section 6.6(a) or otherwise in connection with the KYC Procedures and permanently close and remove any account established with or with reference to any Acquired User Data, and, upon written request from Seller following any destruction or erasure of data, provide an officer's certificate certifying as to such destruction or erasure. Such destruction or erasure shall be in

US-DOCS\137411268.27138346099.6

accordance with all Laws regarding data disposal, and the eradication and destruction technique used will be appropriate for the storage medium and format. Notwithstanding the foregoing, Purchaser shall have the right to retain a copy of the Acquired User Data to the extent required for legal, regulatory or compliance purposes, so long as such Acquired User Data is kept confidential as required under this Agreement and the Confidentiality Agreement and is used for no other purpose.

8.3     Reverse Termination Fee. In the event that (a) the conditions set forth in Sections 7.1(b), 7.1(c), and 7.2 have been satisfied or duly waived and (b) (i) this Agreement is validly terminated in accordance with Section 8.1(b) or Section 8.1(c), (ii) Purchaser fails to consummate the Closing by the Outside Date or the Extended Outside Date, as applicable, as a result of the failure of the conditions set forth in Section 7.1(a), or (iii) this Agreement is terminated pursuant to Section 8.1(g) in connection with and following a Purchaser Development and not in connection with a Higher and Better Offer, then, in any such case, within three (3) Business Days following such valid termination the Deposit (including all received investment income, if any) shall be released to Seller (such release, which, for the avoidance of doubt, shall be equal to and shall not exceed $10,000,000 in the aggregate, the "Reverse Termination Fee").

8.4     Further Effect of Termination. Notwithstanding anything to the contrary in this Agreement, the Confidentiality Agreement or any other document or instrument delivered by either Party in connection with the Transactions, but subject in all respects to the other provisions of this Section 8.4:

(a)     Seller, on behalf of itself and the Seller Parties, acknowledges and agrees that any disbursement of the Deposit to Seller pursuant to Section 2.2(b), payment of any Seller Expenses to Seller pursuant to Section 6.21 or payment of the Reverse Termination Fee pursuant to Section 8.3 shall be deemed liquidated damages and shall be the sole and exclusive recourse of Seller and the Seller Parties against Purchaser and the Purchaser Group for any loss or damage suffered in connection with, relating to or arising out of this Agreement or the Transactions (including circumstances giving rise to any termination of this Agreement) and including losses or damages suffered as a result of any breach of this Agreement or any representation, warranty, covenant or agreement contained herein by Purchaser or the failure of the Transactions to be consummated (whether or not for intentional, unintentional or willful breach or otherwise), except in the event Seller is entitled to elect specific performance of Purchaser's obligations (including to consummate the Transactions) pursuant to Section 10.12.

(b)     In the event of a valid termination of this Agreement pursuant to Section 8.1, if Seller is entitled to receive the Deposit pursuant to Section 2.2, payment of any Seller Expenses pursuant to Section 6.21, or payment of the Reverse Termination Fee pursuant to Section 8.3, then, upon release of the Deposit to Seller in accordance with Section 2.2(b), payment of such Seller Expenses pursuant to Section 6.21 or payment of the Reverse Termination Fee pursuant to Section 8.3, as applicable, (i) Purchaser and the Purchaser Group shall not have any further liability or obligation relating to or arising out of this Agreement or the Transactions (including any liability or obligation for monetary damages) and (ii) neither Seller nor any of the Seller Parties will have any right of recovery, whether arising under contract Law, tort Law or any other theory of Law, against, and no personal liability shall attach to Purchaser or any other member of the Purchaser Group, whether by or through attempted piercing of the

66

Appellant Appendix ER - 555

corporate, limited partnership or limited liability company veil, by the enforcement of any assessment or by any legal or equitable Action, by virtue of any statute, regulation or applicable Law, or otherwise.

(c) **In the event that the Closing does not occur:** (i) The maximum aggregate liability of Purchaser and the Purchaser Group in connection with this Agreement and the Transactions shall be limited to the sum of (x) (1) solely where and to the extent the Deposit is forfeited by Purchaser in accordance with Section 2.2(b), the Deposit or (2) without duplication of any forfeiture of the Deposit pursuant to Section 2.2(b) and solely where and to the extent the Reverse Termination Fee is payable in accordance with Section 8.3, the Reverse Termination Fee, plus (y) solely where and to extent the Seller Expenses are payable in accordance with Section 6.21, the Seller Expenses; (ii) in no event shall Purchaser be obligated to pay any of the Deposit, the Seller Expenses or the Reverse Termination Fee on more than one occasion and (iii) under no circumstances will any of Seller or any of the Seller Parties seek, obtain or accept, monetary damages or losses of any kind (including damages for the loss of the benefit of the bargain, opportunity cost, loss of premium, time value of money or otherwise, or any consequential, special, expectancy, indirect or punitive damages or any losses or damages based on a multiple or multiplier) in connection with, relating to or arising out of the termination of this Agreement in excess of the sum of (A) (1) solely where and to the extent the Deposit is forfeited in accordance with Section 2.2(b), the Deposit or (2) without duplication of any forfeiture of the Deposit pursuant to Section 2.2(b) and solely where and to the extent the Reverse Termination Fee is payable in accordance with Section 8.3, the Reverse Termination Fee, plus (B) solely where and to the extent the Seller Expenses are payable in accordance with Section 6.21, the Seller Expenses; provided, however, that the foregoing shall not been interpreted to limit in any way Seller's right to require specific performance of Purchaser's obligations (including to consummate the Transactions) pursuant to Section 10.12 in the event this Agreement has not been terminated and to the extent such specific performance is available to Seller under Section 10.12. Notwithstanding anything to the contrary herein or otherwise, in no event shall Seller be entitled to receive both (1) the forfeiture of the Deposit together with all received investment income, if any, pursuant to Section 2.2(b) and (2) the payment of the Reverse Termination Fee pursuant to Section 8.3 (it being acknowledged that the payment of the Reverse Termination Fee pursuant to Section 8.3 includes forfeiture of the Deposit together with all received investment income, if any).

(d) Seller may seek both payment of monetary damages (including the Reverse Termination Fee, the Deposit or the Seller Expenses) in accordance with this Agreement, on the one hand, and specific performance of Purchaser's obligation to consummate the Closing pursuant to Section 10.12; provided that in no event shall Seller be entitled to receive both (1) payment of monetary damages (including the Reverse Termination Fee, the Deposit or the Seller Expenses) in accordance with this Agreement (and for the avoidance of doubt, subject to the other limitations thereon set forth in this Section 8.4) and (2) such specific performance pursuant to Section 10.12.

67

Appellant Appendix ER - 556

## ARTICLE IX

### TAXES

9.1    <u>Transfer Taxes</u>. Any sales, use, purchase, transfer, deed, stamp, documentary or other similar Taxes and recording charges (but excluding any such Taxes or charges that are based in whole or in part upon income, profits or gains) payable by reason of the sale of the Acquired Assets or the assumption of the Assumed Liabilities under this Agreement or the Transactions (the "<u>Transfer Taxes</u>") shall be borne and timely paid by Purchaser, and Purchaser shall timely file all Tax Returns related to any Transfer Taxes.

9.2    <u>Cooperation</u>. Purchaser and Seller shall reasonably cooperate, as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns and any Action, audit, litigation, or other proceeding with respect to Taxes. In furtherance thereof, Purchaser and Seller shall reasonably cooperate in good faith to determine and agree to the tax treatment to each of them and to the Users of the Transactions, provided that agreeing on consistent tax treatment shall not be a closing condition and neither Party shall have any liability under this Agreement if the Parties are unable to so agree.

9.3    <u>Preparation of Tax Returns and Payment of Taxes</u>.

(a)    Except as otherwise provided by <u>Section 9.1</u>, Seller shall prepare and timely file (i) all Tax Returns with respect to the Acquired Assets for any Tax period ending on or before the Closing Date and (ii) all Tax Returns of Seller (including, for the avoidance of doubt, for any Straddle Period, but not including, for the avoidance of doubt, information returns). With respect to any such Tax Return that reflects any Tax that is an Assumed Liability (not including, for the avoidance of doubt, any income Tax Return of Seller or Seller's Affiliates for any tax period and not including any information Tax Return), Seller shall use reasonable best efforts to (x) prepare such Tax Returns consistent with past practice, except as otherwise required by applicable Law, (y) provide Purchaser with a draft of such Tax Returns at least ten (10) days prior to the filing of any such Tax Return, and (z) incorporate any changes reasonably requested by Purchaser with respect to such Tax Returns prior to filing. Except to the extent any Tax reflected on a return required to be prepared and filed by Seller pursuant to this <u>Section 9.3</u> constitutes an Assumed Liability, Seller shall be responsible for paying any Taxes reflected on any Tax Return that Seller is obligated to prepare and file under this <u>Section 9.3(a)</u>. Notwithstanding anything herein to the contrary: (i) nothing in this Agreement shall give Purchaser or its Affiliates any rights with respect to or control over any income Tax Return of Seller or Seller's Affiliates for any tax period (any such Tax Return, a "<u>Seller Income Tax Return</u>"), and (ii) if any Governmental Body approaches (including by way of initiating any audit, investigation, or other proceeding) either Party with respect to the income Tax characterization of the Transactions (any such action, a "<u>Transaction-Related Action</u>"), then the Party in receipt of such notice shall reasonably promptly inform the other Party of such Transaction-Related Action.

(b)    Purchaser shall prepare and timely file all Tax Returns with respect to the Acquired Assets that are not addressed by <u>Section 9.3(a)</u> (including, for the avoidance of doubt, all Tax Returns with respect to the Acquired Assets for any taxable period beginning after the

Closing Date). With respect to any such Tax Return for any Straddle Period that reflects any Tax that is an Excluded Liability (each, a "Relevant Tax Return"), Purchaser shall prepare such Relevant Tax Returns and shall provide Seller with a draft of such Relevant Tax Returns at least ten (10) days prior to the filing of any such Tax Return. Purchaser shall incorporate any changes reasonably requested by Seller with respect to such Tax Returns. Seller shall be responsible for paying any Taxes reflected on any Tax Return that Purchaser is obligated to prepare and file under this Section 9.3(b) to the extent such Taxes constitute Excluded Liabilities.

(c)    Purchaser shall not file any amendment to any previously filed Tax Return with respect to the Acquired Assets for any Pre-Closing Tax Period that would have the effect of increasing any Tax due for a Pre-Closing Tax Period or portion of a Straddle Period ending on the Closing Date, in each case, that is an Excluded Liability, unless Purchaser receives an opinion from a nationally recognized accounting firm or law firm that there is no adequate "reporting position" with respect to any previously-asserted position with respect to Taxes. Upon such determination, Purchaser shall provide no less than forty-five (45) days' notice of such position before filing any such Tax Return. In the event Seller disagrees with such Tax position, and the dispute cannot be resolved between the Parties, such dispute shall be submitted to an independent national accounting firm or law firm for resolution, with the costs of such resolution to be evenly split by Purchaser and Seller. The determination of such independent national accounting firm or law firm shall be binding on both Parties and any Tax Return shall be filed consistently with such resolution.

(d)    For all purposes under this Agreement, in respect of any Straddle Period, the portion of Taxes that are allocable to the portion of the Straddle Period ending on the Closing Date will be: (i) in the case of any Taxes other than those described in clause (ii) below, deemed to include the amount that would be payable if the relevant Straddle Period ended on and included the Closing Date; and (ii) in the case of any property Taxes and other similar Taxes, deemed to include the amount of such Tax for the entire Straddle Period multiplied by a fraction the numerator of which is the number of days in the Straddle Period ending on and including the Closing Date and the denominator of which is the number of days in the entire Straddle Period.

(e)    Notwithstanding anything herein to the contrary, prior to the Closing, Seller and its Affiliates may contribute, assign or otherwise transfer the 3AC Loan to any third-party purchaser, trust or other entity.

### ARTICLE X

### MISCELLANEOUS

10.1    Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers. Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such Party prior to the Closing) of the Parties set forth in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought with respect thereto after the Closing. Each covenant and

agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms, and if no term is specified, then for five (5) years following the Closing Date, and nothing in this <u>Section 10.1</u> will be deemed to limit any rights or remedies of any Person for breach of any such surviving covenant or agreement. Purchaser and Seller acknowledge and agree, on their own behalf and on behalf of the Purchaser Group or the Seller Parties, as the case may be, that the agreements contained in this <u>Section 10.1</u> (a) require performance after the Closing to the maximum extent permitted by applicable Law and will survive the Closing for five (5) years and (b) are an integral part of the Transactions and that, without the agreements set forth in this <u>Section 10.1</u>, neither of the Parties would enter into this Agreement.

10.2    <u>Expenses</u>. Whether or not the Closing takes place, except as otherwise provided herein (including, for the avoidance of doubt, <u>Section 8.2</u>), all fees, costs and expenses (including fees, costs and expenses of Advisors) incurred in connection with the negotiation of this Agreement and the other agreements contemplated hereby, the performance of this Agreement and the other agreements contemplated hereby and the consummation of the transactions contemplated hereby and thereby will be paid by the Party incurring such fees, costs and expenses; it being acknowledged and agreed that all Transfer Taxes will be allocated pursuant to <u>Section 9.1</u> and (c) all Cure Costs will be allocated pursuant to <u>Section 5.4</u>.

10.3    <u>Notices</u>. Except as otherwise expressly provided herein, all notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given (a) when personally delivered, (b) when transmitted by electronic mail, (c) the day following the day on which the same has been delivered prepaid to a reputable national overnight air courier service or (d) the third (3rd) Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case, to the respective Party at the number, electronic mail address or street address, as applicable, set forth below, or at such other number, electronic mail address or street address as such Party may specify by written notice to the other Party.

<u>Notices to Purchaser</u>:

BAM Trading Services, Inc. d/b/a Binance.us
611 Cowper Street, Suite 400
Palo Alto, CA 94301
Attention:    Norman Reed, General Counsel
Email:         norman.reed@binance.us;
               legal@binance.us

70

Appellant Appendix ER - 559

with a copy to (which shall not constitute notice):

Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020
Attention: Robert M. Katz
    Daniel Mun
    Adam J. Goldberg
    Andrew D. Sorkin
    **Jenny Cieplak**
Email:  Robert.Katz@lw.com
    Daniel.Mun@lw.com
    Adam.Goldberg@lw.com
    ~~Andrew.Sorkin~~**Andrew.Sorkin@lw.com**
    **Jenny.Cieplak**@lw.com

Notices to Seller:

Voyager Digital, LLC
33 Irving Place, 3rd Floor
New York, NY 10003
Attention: Stephen Ehrlich
    David Brosgol
Email:  sehrlich@investvoyager.com
    dbrosgol@investvoyager.com

with a copy to (which shall not constitute notice):

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attention: Joshua A. Sussberg, P.C.
    Christine A. Okike, P.C.
    Christopher Marcus, P.C.
    Jonathan L. Davis, P.C.
    Steve Toth
    Eduardo M. Leal
    Allyson B. Smith
Email:  joshua.sussberg@kirkland.com
    christine.okike@kirkland.com
    cmarcus@kirkland.com
    jonathan.davis@kirkland.com
    steve.toth@kirkland.com
    eduardo.leal@kirkland.com
    allyson.smith@kirkland.com

US-DOCS\~~137411268.27~~138346099.6

Appellant Appendix ER - 560

10.4    <u>Binding Effect; Assignment</u>. This Agreement shall be binding upon Purchaser and, subject to the terms of the Bidding Procedures Order (with respect to the matters covered thereby) and the entry and terms of the Agreement Order, the Plan and the Confirmation Order, Seller, and shall inure to the benefit of and be so binding on the Parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Bankruptcy Case or any successor Chapter 7 case; <u>provided</u> that neither this Agreement nor any of the rights or obligations hereunder may be assigned or delegated without the prior written consent of Purchaser and Seller, and any attempted assignment or delegation without such prior written consent shall be null and void; <u>provided</u> <u>further</u> that Purchaser shall be entitled to assign or delegate this Agreement or all or any part of its rights or obligations hereunder to any of its Affiliates; <u>provided</u> <u>further</u> that in each case no such assignment or delegation shall relieve Purchaser of any of its obligations hereunder.

10.5    <u>Amendment and Waiver</u>. Any provision of this Agreement or the Schedules or exhibits hereto may be (a) amended only in a writing signed by Purchaser and Seller or (b) waived only in a writing executed by the Person against which enforcement of such waiver is sought. No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any way any other provision or prior or subsequent breach or default. Except where a specific period for action or inaction is provided herein, no delay on the part of either Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

10.6    <u>Third Party Beneficiaries</u>. Except as otherwise expressly provided herein, nothing expressed or referred to in this Agreement is intended or will be construed to give any Person other than the Parties any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.

10.7    <u>Non-Recourse</u>. This Agreement may only be enforced against, and any Action based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement. Except to the extent named as a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present or future direct or indirect equityholder, shareholder, member, partner, manager, director, officer, employee, Affiliate, agent or Advisor of either Party will have any Liability (whether in contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or Liabilities of any of the parties to this Agreement or for any Action based upon, arising out of or related to this Agreement.

10.8    <u>Severability</u>. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable Law in any jurisdiction, such provision will be ineffective only to the extent of such prohibition or invalidity in such jurisdiction, without invalidating the remainder of such provision or the remaining provisions of this Agreement or in any other jurisdiction. To the extent permitted by applicable Law, each Party waives any provision of Law that renders any provision of this Agreement invalid or unenforceable in any respect.

10.9    <u>Construction</u>. The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction

will be applied against any Person. The table of contents and headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and will in no way restrict or otherwise modify any of the terms or provisions hereof.

10.10   Schedules. The Schedules have been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement; however, each section of the Schedules will be deemed to incorporate by reference all information disclosed in any other section of the Schedules, to the extent it is readily apparent on its face without the need for a cross-reference. Capitalized terms used in the Schedules and not otherwise defined therein have the meanings given to them in this Agreement. The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Schedules or the attached exhibits is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course, and neither Party will use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement, the Schedules or exhibits in any dispute or controversy between the Parties as to whether any obligation, item or matter not set forth or included in this Agreement, the Schedules or exhibits is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course. In addition, matters reflected in the Schedules are not necessarily limited to matters required by this Agreement to be reflected in the Schedules. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. Any description of any agreement, document, instrument, plan, arrangement or other item set forth on any Schedule is a summary only and is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement, or item. The information contained in this Agreement, in the Schedules and exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by either Party to any third party of any matter whatsoever, including any violation of Law or breach of Contract.

10.11   Complete Agreement. This Agreement, together with the Confidentiality Agreement and any other agreements expressly referred to herein or therein, contains the entire agreement of the parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the Transactions and supersedes all prior agreements between the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the Transactions. In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts of this Agreement and the documents referenced herein will not be considered or analyzed for any purpose (including in support of parol evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions hereof or the intent of the Parties with respect hereto and will be deemed joint work product of the Parties.

10.12   Specific Performance. The Parties agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if either of the Parties fails to take any action required of it

US-DOCS\137411268.27138346099.6

hereunder to consummate the Transactions. It is accordingly agreed that (a) the Parties will be entitled to an injunction or injunctions, specific performance or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in the courts described in Section 10.13 without proof of damages or otherwise, this being in addition to any other remedy to which they are entitled under this Agreement, and (b) the right of specific performance and other equitable relief is an integral part of the Transactions and without that right, neither Seller nor Purchaser would have entered into this Agreement. The Parties acknowledge and agree that either Party pursuing an injunction or injunctions or other Order to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this Section 10.12 will not be required to provide any bond or other security in connection with any such Order. Except as limited by Section 8.4(d), (i) the remedies available to Seller pursuant to this Section 10.12 will be in addition to any other remedy to which they were entitled at law or in equity, and (ii) the election to pursue an injunction or specific performance will not restrict, impair or otherwise limit Seller from seeking to collect or collecting damages. If, prior to the Outside Date or Extended Outside Date, if any, either Party brings any action, in each case in accordance with Section 10.13, to enforce specifically the performance of the terms and provisions hereof by any other Party, the Outside Date or Extended Outside Date, if any, will automatically be extended (y) for the period during which such action is pending, plus ten (10) Business Days or (z) by such other time period established by the court presiding over such action, as the case may be.

10.13 <u>Jurisdiction and Exclusive Venue</u>. Each of the Parties irrevocably agrees that any Action that may be based upon, arising out of, or related to this Agreement or the negotiation, execution or performance of this Agreement and the Transactions brought by any other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) if the Bankruptcy Court is unwilling or unable to hear such Action, in the Delaware Chancery Court and any state court sitting in the State of Delaware to which an appeal from the Delaware Chancery Court may be validly taken (or, if the Delaware Chancery Court declines to accept jurisdiction over a particular matter, any state or federal court within the state of Delaware) ((a) and (b), the "<u>Chosen Courts</u>"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any such Action arising out of or relating to this Agreement and the Transactions. Each of the Parties agrees not to commence any Action relating thereto except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any Order, decree or award rendered by any Chosen Court, and no Party will file a motion to dismiss any Action filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of *forum non-conveniens*. The Parties irrevocably agree that venue would be proper in any of the Chosen Courts, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of such Action. Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in Section 10.3. Nothing in this Agreement will affect the right of either Party to serve process in any other manner permitted by Law.

US-DOCS\137411268.27138346099.6

10.14    Governing Law; Waiver of Jury Trial.

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement, and any Action that may be based upon, arising out of or related to this Agreement or the negotiation, execution or performance of this Agreement or the Transactions will be governed by and construed in accordance with the internal Laws of the State of Delaware applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

(b)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT, THE DOCUMENTS AND AGREEMENTS CONTEMPLATED HEREBY AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY ACTION BASED ON, ARISING OUT OF OR RELATED TO THIS AGREEMENT, ANY DOCUMENT OR AGREEMENT CONTEMPLATED HEREBY OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY. EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH ACTION WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

10.15    No Right of Set-Off. Purchaser, on its own behalf and on behalf the Purchaser Group and its and their respective successors and permitted assigns, hereby waives any rights of set-off, netting, offset, recoupment or similar rights that Purchaser, any member of the Purchaser Group or any of its or their respective successors and permitted assigns has or may have with respect to the payment of the Purchase Price or any other payments to be made by Purchaser pursuant to this Agreement or any other document or instrument delivered by Purchaser in connection herewith.

10.16    Counterparts and PDF. This Agreement and any other agreements referred to herein or therein, and any amendments hereto or thereto, may be executed in multiple counterparts, any one of which need not contain the signature of more than one party hereto or thereto, but all such counterparts taken together will constitute one and the same instrument. Any counterpart, to the extent signed and delivered by means of a .PDF or other electronic transmission, will be treated in all manner and respects as an original Contract and will be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. Minor variations in the form of the signature page to this Agreement or any

Appellant Appendix ER - 564

agreement or instrument contemplated hereby, including footers from earlier versions of this Agreement or any such other document, will be disregarded in determining the effectiveness of such signature. At the request of any party or pursuant to any such Contract, each other party hereto or thereto will re-execute original forms thereof and deliver them to all other parties. No party hereto or to any such Contract will raise the use of a .PDF or other electronic transmission to deliver a signature or the fact that any signature or Contract was transmitted or communicated through the use of PDF or other electronic transmission as a defense to the formation of a Contract and each such party forever waives any such defense.

10.17 <u>Publicity</u>. The initial press release regarding this Agreement and the Transactions (the "<u>Press Release</u>") shall be made promptly following the execution and delivery of this Agreement and shall be in such form as the Parties mutually agree. Except as contemplated by the Commercial Covenants, and subject in all respects to <u>Section 10.19</u>, none of Seller and the Seller Parties shall issue any press release or public announcement (directly or indirectly) concerning this Agreement, the Transactions, the Acquired Assets, the Assumed Liabilities, the Purchaser Bid Process or any other matters related thereto or arising in connection therewith without obtaining the prior written approval of Purchaser (which approval will not be unreasonably withheld, conditioned or delayed) unless, (a) in the reasonable judgment of Seller after consultation with counsel (who may be in-house counsel), disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or the Plan or (b) to correct any misstatement of fact made by Purchaser in any communication pursuant to the immediate next sentence; <u>provided</u> that Seller shall use its reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with Purchaser with respect to the disclosure thereof. Following the publication of the Press Release, Purchaser shall be permitted to make one or more public statements or issue one or more press releases, in each case, regarding the Acquired Assets and the Assumed Liabilities, this Agreement, the Transactions and the Purchaser Bid Process or any other matter related thereto or arising therefrom or otherwise in connection therewith to the extent not in violation of the Confidentiality Agreement and not in disparagement of Seller or any Seller Party; <u>provided</u> that Purchaser shall use its reasonable best efforts (considered in light of the circumstances in which such disclosure is to be made) to consult in good faith with Seller prior to making any such disclosure.

10.18 <u>Bulk Sales Laws</u>. The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any Encumbrances in the Acquired Assets including any liens or claims arising out of the bulk transfer laws except Permitted Encumbrances, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Confirmation Order. In furtherance of the foregoing, to the extent permitted by applicable Laws, each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the Transactions.

10.19 <u>Fiduciary Obligations</u>. Nothing in this Agreement, or any document related to the Transactions, will require Seller or any of its managers, officers or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations; <u>provided</u>, <u>however</u>, that no such action or inaction

US-DOCS\137411268.27138346099.6

shall be deemed to prevent Purchaser from exercising any termination rights it may have hereunder as a result of such action or inaction.

10.20    <u>No Solicitation</u>. This Agreement, the Plan and the transactions contemplated herein and therein are the product of negotiations between the Parties. Notwithstanding anything herein to the contrary, this Agreement is not, and shall not be deemed to be, (a) a solicitation of votes for the acceptance of the Plan or any other plan of reorganization for the purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise or (b) an offer for the issuance, purchase, sale, exchange, hypothecation, or other transfer of securities or a solicitation of an offer to purchase or otherwise acquire securities for purposes of the Securities Act or the Exchange Act and Seller will not solicit acceptances of the Plan from any party until such party has been provided with copies of a disclosure statement containing adequate information as required by section 1125 of the Bankruptcy Code.

10.21    <u>Acknowledgment</u>. Notwithstanding anything in this Agreement to the contrary (including <u>Section 3.17</u>, <u>Section 3.18</u>, <u>Section 4.10</u>, <u>Section 4.11</u>, <u>Section 6.17</u> and <u>Section 10.1</u>), nothing herein shall relieve any Person from any Liability on account of Fraud.

### ARTICLE XI

#### ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS

11.1    <u>Certain Definitions</u>.

(a)    "<u>3AC Loan</u>" means that certain Master Loan Agreement, dated March 4, 2022, by and between Three Arrows Capital, Ltd., as borrower, and Seller and HTC Trading, Inc., as lenders, and Seller in its capacity as administrative agent for the lenders.

(b)    "<u>Acquired Coins</u>" means, collectively, all Seller Held Coins (other than Withheld Coins) as of the Rebalancing Date and following the completion of the Rebalancing Exercise in accordance with this Agreement, and after taking into account gas or other transaction fees incurred and paid by Seller in connection with transferring such Coins to Purchaser in accordance with <u>Section 2.4(b)</u>.

(c)    "<u>Acquired Coins Value</u>" means, with respect to any Acquired Coin of any type, the VWAP of such Coin determined as of two Business Days prior to the Rebalancing Date**,** *after taking into account gas or other transaction fees incurred and paid by Seller* **or any of its Affiliates in connection with transferring such Coins to Purchaser in accordance with** <u>**Section 2.4(b)**</u>.

(d)    "<u>Action</u>" means any action, claim (including a counterclaim, cross-claim, or defense), complaint, summons, suit, litigation, arbitration, third-party mediation, audit, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, hearing, inquiry, inquest, audit, examination, assessment, notice of violation, citation or investigation, of any kind whatsoever (civil, criminal, administrative, regulatory, investigative, appellate or otherwise), regardless of the legal theory under which such Liability or obligation may be sought to be imposed, whether sounding in contract or tort, or

77

Appellant Appendix ER - 566

whether at law or in equity, or otherwise under any legal or equitable theory, commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Body.

(e)     "<u>Additional Bankruptcy Distributions</u>" means any distributions proposed to be made by the Debtors or any successor thereto to Users or Eligible Creditors after the Closing Date, whether made pursuant to the Plan (including distributions in cash or Coins) or otherwise.

(f)     "<u>Advisors</u>" means, with respect to any Person, any directors, officers, employees, investment bankers, financial advisors, accountants, agents, attorneys, consultants, or other representatives of such Person.

(g)     "<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

(h)     "<u>Alternative Transaction</u>" means any transaction (or series of transactions), whether direct or indirect, concerning a sale, merger, acquisition, issuance, financing, recapitalization, reorganization, liquidation or disposition of Seller or any of its Affiliates or any portion of the equity interests or any material portion of the assets thereof (in any form of transaction, whether by merger, sale of assets or equity or otherwise).

**(i)     "Asset Migration Date" means, with respect to any User or Eligible Creditor, as applicable, who has satisfied the requirements set forth in Section 6.10 and Section 6.12(b) for onboarding to the Binnace.US Platform, the date that is five (5) Business Days following the date on which Seller has delivered to Purchaser the Acquired Coins or cash to be distributed by Purchaser to such User or Eligible Creditor, as applicable, pursuant to this Agreement.**

**(j)**     ~~(i)~~ "<u>Bidding Procedures Order</u>" means the *Order (I) Approving the Bidding Procedures, (II) Scheduling the Bid Deadlines and the Auction, (III) Approving the Form and Manner of Notice Thereof, (IV) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation and (V) Granting Related Relief* [Docket No. 248].

**(k)**     ~~(j)~~ "<u>Binance.US Platform</u>" means Purchaser's and its Affiliates' Binance.US Cryptocurrency savings and trading platform or any successor platform thereto.

**(l)     "BUSD" means a Binance branded stablecoin issued by Paxos Trust Company, approved and regulated by the New York State Department of Financial Services.**

Appellant Appendix ER - 567

**(m)** ~~(k)~~ "<u>Business Accounts</u>" means any and all accounts or registries that Seller owns, maintains or controls with third party vendors, software providers, service providers and other similar third parties that is related to the businesses of Seller.

**(n)** ~~(l)~~ "<u>Business Day</u>" means any day other than a Saturday, Sunday or other day on which banks in New York City, New York are authorized or required by Law to be closed.

**(o)** ~~(m)~~ "<u>Business Software</u>" means any and all proprietary Software owned by (or purported to be owned by) Seller that is related to the businesses of Seller, other than the VGX Token Smart Contracts.

**(p)** ~~(n)~~ "<u>Cash and Cash Equivalents</u>" means all of Seller's cash (including deposits in transit, demand deposits, money markets or similar accounts), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, security entitlements, securities accounts, commodity Contracts, commodity accounts, government securities, or any other cash equivalents, whether on hand, in transit, in banks or other financial institutions, or otherwise held.

**(q)** ~~(o)~~ "<u>Code</u>" means the United States Internal Revenue Code of 1986.

**(r)** ~~(p)~~ "<u>Coin</u>" means, with respect to any type of Cryptocurrency, one coin or token or full unit of such Cryptocurrency (*e.g.*, one (1) Bitcoin; <u>provided</u> that, notwithstanding anything to the contrary herein, for purposes of this Agreement, (i) references to "Coins" shall mean more than one Coin and may include fractional Coins in excess of one (1) Coin, and (ii) as the context requires, "Coin" may refer to a fraction of one (1) Coin.

**(s)** ~~(q)~~ "<u>Commercial Covenants</u>" means, collectively, <u>Sections 6.6</u>, <u>6.10</u>, <u>6.11</u>, <u>6.12</u>, ~~6.13~~<u>6.12(f)</u>, <u>6.14</u> and <u>6.15</u>.

**(t)** ~~(r)~~ "<u>Confidential Information</u>" means any information relating to the business, financial or other affairs (including future plans and targets) of either Party or any of its Affiliates; <u>provided</u>, <u>however</u>, that "Confidential Information" will not include any information that (i) is or becomes (other than as a result of disclosure by either Party or any of its Affiliates in violation of this Agreement) generally available to, or known by, the public, (ii) is independently developed by a Party or any of its Affiliates without use of or reference to information that would be "Confidential Information" but for the exclusions set forth in this proviso or (iii) is received by a Party or any of its Affiliates from a third party not known by such receiving Party or any of its Affiliates after reasonable inquiry to be bound by a duty of confidentiality to such other Party or any of its Affiliates with respect to such information.

**(u)** ~~(s)~~ "<u>Confidentiality Agreement</u>" means that certain letter agreement, dated as of August 2, 2022, by and between Parent and BAM Management US Holdings, Inc.

**(v)** ~~(t)~~ "<u>Confirmation Order</u>" means an Order of the Bankruptcy Court reasonably acceptable to the Parties pursuant to section 1129 of the Bankruptcy Code, which Order shall, among other things and without limitation, (A) confirm the Plan in a form reasonably acceptable to, solely to the extent related to this Agreement and the Transactions (but

Appellant Appendix ER - 568

not with respect to the matters contemplated by <u>Section 6.11(c)</u>), Purchaser and Seller, as may have been amended, supplemented or otherwise modified, solely to the extent related to this Agreement and the Transactions (but not with respect to the matters contemplated by <u>Section 6.11(c)</u>), with the consent of Purchaser (such consent not to be unreasonably withheld, delayed or conditioned), (B) approve, pursuant to sections 105, 363, 365, 1129, 1141 and 1142 of the Bankruptcy Code, (i) the execution, delivery and performance by Seller of this Agreement, (ii) the sale of the Acquired Assets to Purchaser on the terms set forth herein and free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances), and (iii) the performance by Seller of its obligations under this Agreement, (C) authorize and empower Seller to assume and assign to Purchaser the Assigned Contracts, (D) find that Purchaser is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code, find that Purchaser is not a successor to Seller, and grant Purchaser the protections of section 363(m) of the Bankruptcy Code, (E) find that Purchaser shall have no Liability or responsibility for any Liability or other obligation of Seller arising under or related to the Acquired Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor, or transferee Liability, labor law, de facto merger, or substantial continuity (including under applicable Money Transmitter Requirements or any securities or commodities Laws of any Governmental Body), (F) find that Purchaser has provided adequate assurance (as that term is used in section 365 of the Bankruptcy Code) of future performance in connection with the assumption of the Assigned Contracts, (G) find that Purchaser shall have no Liability for any Excluded Liability, and (H) find that Seller has title to, and the ability to sell, transfer and assign, Acquired Coins and Additional Bankruptcy Distributions, in each case, in accordance with the terms and conditions hereof.

(w) (u) "Consent" means any approval, consent, ratification, permission, waiver or authorization, or an Order of the Bankruptcy Court that deems or renders unnecessary the same.

(x) (v) "Contract" means any contract, indenture, note, bond, lease, sublease, mortgage, agreement, guarantee, or other agreement that is binding upon a Person or its property, in each case, other than a purchase order, service order, sales order or Money Transmitter License.

(y) (w) "Credit Matter" means any loan or other type of credit exposure or loan-like instrument.

(z) (x) "Cryptocurrency" means a digital or crypto currency, asset, token or coin in which transactions are verified and records are maintained by a decentralized system using cryptography, rather than by a centralized authority.

**(aa)** **"Delivery Date" means, with respect to any Delayed Acquired Coin, the date, if any, on which such Delayed Acquired Coin is delivered to Purchaser in accordance with (i) Section 2.4(b)(i), (ii) the last sentence of Section 6.12(a) or (iii) Section 6.12(b), as applicable.**

**(bb)** ~~(y)~~ "Deposited Coins" means, with respect to each User as of the Petition Date, the total number of Coins of each type owed to such User with respect to such User's ~~deposits~~**Coins deposited** on the Voyager Platform as of the Petition Date, as set forth on the Seller Statement.

**(cc)** ~~(z)~~ "Deposited Coins Value" means, with respect to any Deposited Coin of any type, the ~~VWAP~~**price** of such Coin ~~determined~~ as of **0:00 U.T.C. on** the Petition Date~~.~~**, as set forth under Section 4(m) of the "Global Notes and Overview of Methodology" included in the *Schedule of Assets and Liabilities of Voyager Digital, LLC (Case No. 22-10945)* [Docket No. 7] as filed in the Bankruptcy Court on the docket in the Bankruptcy Case.**

**(dd)** ~~(aa)~~ "Disclosure Statement" means the disclosure statement for the Plan approved by the Bankruptcy Court pursuant to the Plan Solicitation Order (including all exhibits and schedules thereto).

**(ee)** ~~(bb)~~ "Documents" means all of Seller's written files, documents, instruments, papers, books, reports, records, accounts, accounting records, financial statements, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies, and documents, Tax Returns, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form.

**(ff)** ~~(cc)~~ "Encumbrance" means any lien (as defined in section 101(37) of the Bankruptcy Code), encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), charge, mortgage, deed of trust, option, pledge, security interest or similar interests, title defects, hypothecations, easements, servitudes, restrictive covenants, rights of way, rights of use or possession, rights of first offer or first refusal, third party interest, encroachments, Orders, conditional sale or other title retention agreements and other similar impositions, imperfections or defects of title or restrictions on transfer or use.

**(gg)** ~~(dd)~~ "Environmental Laws" means all applicable Laws concerning pollution or protection of the environment.

**(hh)** ~~(ee)~~ "Equipment" means any and all equipment, computers, furniture, furnishings, fixtures, office supplies, vehicles and all other fixed assets.

**(ii)** ~~(ff)~~ "ERISA" means the Employee Retirement Income Security Act of 1974.

**(jj)** ~~(gg)~~ "ETH Coins" means Ether Coins, being the native Cryptocurrency of the Ethereum Network (symbol: ETH).

81

Appellant Appendix ER - 570

**(kk)** ~~(hh)~~ "Existing User" means as of a particular date any User for which Seller has provided on or prior to such date all data and information reasonably necessary for Purchaser to validate that such User or any Affiliate of such User has a Cryptocurrency account on the Binance.US Platform.

**(ll)** ~~(ii)~~ "Exchange Act" means the Exchange Act of 1934 and the rules and regulations promulgated thereunder.

**(mm)** ~~(jj)~~ "Final Order" means a judgment or Order of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Bankruptcy Case (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending; or (ii) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument, or rehearing shall have expired; provided that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

**(nn)** ~~(kk)~~ "Fraud" means an act committed by (a) Seller, in the making to Purchaser of the Express Seller Representations and (b) Purchaser, in the making to Seller of the Express Purchaser Representations, in any such case, with intent to (x) deceive the other Party or (y) induce such other party hereto to enter into this Agreement and requires (i) a false representation or warranty of material fact made in such representation; (ii) with knowledge that such representation or warranty is false; (iii) with an intention to induce the party to whom such representation or warranty is made to act or refrain from acting in reliance upon it; (iv) causing that party, in justifiable reliance upon such false representation or warranty, to take or refrain from taking action; and (v) causing such party to suffer damage by reason of such reliance, which together constitutes common law fraud under Delaware Law (and does not include any fraud claim based on constructive knowledge, negligent misrepresentation, recklessness or a similar theory).

**(oo)** ~~(ll)~~ "GDPR" means the EU General Data Protection Regulation (and any European Union member states' laws and regulations implementing it), and the EU General Data Protection Regulation as it forms part of the United Kingdom ("UK") law by virtue of section 3 of the European Union (Withdrawal) Act 2018 and any applicable implementing or supplementary legislation of the UK (including the UK Data Protection Act 2018).

**(pp)** ~~(mm)~~ "Governmental Authorization" means any permit, license, certificate, approval, consent, permission, clearance, designation, qualification or authorization

Appellant Appendix ER - 571

issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Law.

(qq)  (nn) "Governmental Body" means any government, quasi-governmental entity, or other governmental or regulatory body, commission, agency or political subdivision thereof of any nature, whether foreign, federal, state or local, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court or arbitrator (public or private) of applicable jurisdiction.

(rr)  (oo) "Hazardous Substance" means any toxic or hazardous material, substance or waste regulated under any Environmental Laws.

(ss)  (pp) "Higher and Better Offer" means a bona fide, written Acquisition Proposal that did not result from Seller's breach of Section 5.1(a) for an Alternative Transaction on terms that the board of directors (or comparable governing body) of Seller determines in good faith, after consultation with its financial advisor and outside legal counsel, (i) constitutes a higher and otherwise better offer for the Debtors' assets and (ii) is reasonably likely to be consummated in accordance with its terms.

(tt)  (qq) "IFRS" means the International Financial Reporting Standards.

(uu)  (rr) "Intellectual Property" means all intellectual property rights in any jurisdiction throughout the world, including all: (i) patents and patent applications and patent disclosures (including any provisional applications, patents of addition, continuations, continuations-in-part, substitutions, additions, divisionals, confirmations, re-examinations, reissues, revisions and extensions); (ii) trademarks, service marks, trade dress, logos, brand names, corporate names, social media handles, Internet domain names and other indicia of origin, together with all goodwill associated with each of the foregoing; (iii) copyrights and mask works, whether or not registered; (iv) registrations and applications for any of the foregoing; (v) trade secrets; (vi) Software; (vii) drawings, schematics and other technical plans; (viii) rights in data, data collections and databases; (ix) all other intellectual property; and (x) all legal rights arising from items (i) through (ix), including the right to prosecute, enforce and perfect such interests and rights to sue, oppose, cancel, interfere, enjoin and collect damages based upon such interests.

(vv)  (ss) "IT Systems" means all of the computer systems, servers, hardware, firmware, middleware, networks, workstations, routers, hubs, switches, circuits, servers, data communications lines and all other information technology equipment, and all associated documentation, in each case, only as necessary to use or operate the Voyager Platform.

(ww)  (tt) "Knowledge of Seller" means the actual knowledge without independent verification (and which in no event encompasses constructive, imputed or similar concepts of knowledge) of Stephen Ehrlich, Gerard Hanashe, and Rakesh Gidwani, none of whom, for the sake of clarity and avoidance of doubt, shall have any personal liability or obligations regarding such knowledge.

(xx)  (uu) "Knowledge of Purchaser" means the actual knowledge without independent verification (and which in no event encompasses constructive, imputed or similar

US-DOCS\137411268.27138346099.6

Appellant Appendix ER - 572

concepts of knowledge) of Brian Shroder, Krishna Juvvadi and Abhishek Baid, none of whom, for the sake of clarity and avoidance of doubt, shall have any personal liability or obligations regarding such knowledge.

**(yy)** ~~(vv)~~ "KYC Procedures" means the "know your customer" and "Customer Identification Program" policies, procedures and processes of Purchaser and its Affiliates as in effect from time to time and any equivalent procedures required under, or to comply with, applicable Law, in each case, including with respect to FCPA and any other applicable U.S. or foreign Law concerning anti-corruption, anti-bribery or anti-money laundering and consistent with the same applicable to other customers and users of Binance.US Platform.

**(zz)** ~~(ww)~~ "Law" means any federal, state, provincial, local, municipal, foreign or international, multinational or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, ruling, directive, pronouncement, determination, decision, opinion or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body.

**(aaa)** ~~(xx)~~ "Liability" means, as to any Person, any debt, adverse claim, liability (including any liability that results from, relates to or arises out of tort or any other product liability claim), duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether known or unknown, perfected or unperfected, determined or determinable, disputed or undisputed, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed, at law or in equity or otherwise, including any claims or liability based on successor liability theories or otherwise under any theory of Law or equity, and including all costs and expenses related thereto.

**(bbb)** ~~(yy)~~ "Loan" means any loan made by Seller in the form of Cryptocurrency to counterparties in the cryptocurrency sector; _provided_ that the 3AC Loan shall not be deemed a Loan.

**(ccc)** ~~(zz)~~ "Loan Documents" means all agreements and documents relating to Loans and the 3AC Loan, including security agreements, pledge or collateral agreements, loan agreements, loan policies and manuals.

**(ddd)** ~~(aaa)~~ "Material Adverse Effect" means any matter, event, change, development, occurrence, circumstance, condition, occurrence or effect (each, an "Effect") that, individually or in the aggregate with all other Effects, (x) has had or would reasonably be expected to have a material adverse effect on the Acquired Assets and Assumed Liabilities, taken as whole or (y) has had or would reasonably be expected to have a material adverse effect on the ability of Seller to perform its obligations under this Agreement or any of the Seller Documents or to consummate the Transactions; _provided_ that with respect to clause (x) none of the following shall constitute, or be taken into account in determining whether or not there has been, a Material Adverse Effect: (i) Effects in, arising from or relating to general business or

US-DOCS\~~137411268.27~~138346099.6

Appellant Appendix ER - 573

economic conditions affecting the industry in which Seller and its Affiliates operate; (ii) Effects in, arising from or relating to national or international political or social conditions, including tariffs, riots, protests, the engagement by the United States or other country in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military, cyber or terrorist (whether or not state-sponsored) attack upon the United States or any other country, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, asset, Equipment or personnel of the United States or of any other country; (iii) Effects in, arising from or relating to any fire, flood, hurricane, earthquake, tornado, windstorm, other calamity or act of God, global or national health concern, epidemic, pandemic (whether or not declared as such by any Governmental Body), viral outbreak (including "Coronavirus" or "COVID-19" or the worsening thereof) or any quarantine or trade restrictions related thereto or any other *force majeure*; (iv) Effects in, arising from or relating to financial, banking, securities or Cryptocurrency markets (including (A) any disruption of any of the foregoing markets, (B) any change in currency exchange rates, (C) any decline or rise in the price of any security, commodity, Contract, Cryptocurrency or index and (D) any increased cost, or decreased availability, of capital or pricing or terms related to any financing for the Transactions); (v) Effects in, arising from or relating to changes in, IFRS or the interpretation thereof; (vi) Effects in, arising from or relating to changes in, Laws or other binding directives or determinations issued or made by or agreements with or consents of any Governmental Body; (vii) Effects in, arising from or relating to (A) the taking of any action contemplated by this Agreement or at the written request of Purchaser or its Affiliates, (B) the failure to take any action if such action is expressly prohibited by this Agreement, (C) Purchaser's failure to consent to any of the actions restricted in <u>Section 6.1</u>, (D) the negotiation, announcement or pendency of this Agreement or the Transactions, the identity, nature or ownership of Purchaser or Purchaser's plans with respect to the Acquired Assets and Assumed Liabilities, including the impact thereof on the relationships, contractual or otherwise, of the business of Seller with employees, customers, lessors, suppliers, vendors or other commercial partners or litigation arising from or relating to this Agreement or the Transactions; (viii) any failure, in and of itself, to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items (whether or not shared with Purchaser or its Affiliates or Advisors) (but, for the avoidance of doubt, not the underlying causes of any such failure to the extent such underlying cause is not otherwise excluded from the definition of Material Adverse Effect); (ix) the Effect of any action taken by Purchaser or its Affiliates with respect to the Transactions or any breach by Purchaser of this Agreement or the matters set forth on <u>Schedule <s>11.1(aaa)</s>11.1(aaa)</u>; or (x)(A) the commencement or pendency of the Bankruptcy Case, (B) any objections in the Bankruptcy Court to (1) this Agreement or any of the Transactions or thereby, (2) the Agreement Order, the Confirmation Order, the Plan, or the reorganization of Seller, (3) the Bidding Procedures Order or (4) the assumption or rejection of any Assigned Contract, or (C) any Order of the Bankruptcy Court or any actions or omissions of Seller in compliance therewith; except in the case of clauses (i), (ii), (iii), (iv), (v) and (vi), to the extent such Effects have a materially disproportionate impact on the Acquired Assets and Assumed Liabilities, taken as a whole, as compared to other participants engaged in the business in which Seller operates.

       **(eee)**   <s>**(bbb)**</s> "<u>Moelis</u>" means Moelis & Company LLC, a Delaware limited liability company.

**(fff)** **(ccc)** "Money Transmitter License" means any consent, license, certificate, franchise, permission, variance, clearance, registration, qualification, authorization, waiver, exemption or other permit issued, granted, given or otherwise made available by or under the authority of any Governmental Body pursuant to state money transmission or similar Laws.

**(ggg)** **(ddd)** "Money Transmitter Requirements" shall mean any and all Law or Contract with a Governmental Body relating or pertaining to the business of transmitting or remitting money, monetary value or virtual currency, electronic funds transfers, remittances, issuing or selling stored value, prepaid access or the like, issuing or selling payment instruments, the custody, transfer or exchange of money, monetary value or virtual currency, or any similar payment or money services, including those related to money, monetary value, or Cryptocurrency.

**(hhh)** **(eee)** "Net Owed Coins" means, with respect to each User and each type of such User's Post-Rebalancing Coins, a number of Coins of such type equal to the total number of such User's Post-Rebalancing Coins of such type. For the avoidance of doubt, except as the context may otherwise require, references to Net Owed Coins in this Agreement relating to payments to any User or credits thereof to any User shall be deemed to be the sum of all Net Owed Coins with respect to each type of Post-Rebalancing Coin of such User. Notwithstanding the foregoing, in the event that there is a Rebalancing Exercise Delta for any type of Coin, then (i) Purchaser shall convert any excess Acquired Coins of any type into USDC or United States Dollars at the then-prevailing rates (including applicable fees, spreads, costs and expenses) on the Binance.US Platform, and (ii) Purchaser shall distribute the amounts resulting from such conversions to User accounts with respect to Net Owed Coins where the aggregate number of Net Owed Coins exceeds the number of Acquired Coins, pro rata based on the then-prevailing prices (including applicable fees, spreads, costs and expenses) for all such Net Owed Coins on the Binance.US Platform owed to any such User.

**(iii)** **(fff)** "Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body, whether preliminary, interim, temporary or final, including any order entered by the Bankruptcy Court in the Bankruptcy Case (including the Confirmation Order) or any other court.

**(jjj)** **(ggg)** "Ordinary Course" means the ordinary and usual course of operations of the business of Seller consistent with past practice and taking into account the contemplation, commencement and pendency of the Bankruptcy Case.

**(kkk)** **(hhh)** "Permitted Encumbrances" means (i) Encumbrances for utilities and Taxes not yet due and payable, being contested in good faith, or the nonpayment of which is permitted or required by the Bankruptcy Code, (ii) customary easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the Acquired Assets which do not, individually or in the aggregate, adversely affect the use, ownership or operation of the Acquired Assets, (iii) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens incurred in the Ordinary Course for amounts not yet due and payable, being contested in good faith, (iv) licenses granted on a non-exclusive basis, (v) such other Encumbrances or title

US-DOCS\137411268.27138346099.6

exceptions which do not, individually or in the aggregate, materially affect the operation, value or condition of the Acquired Assets, (vi) any Encumbrances set forth on Schedule ~~11.1(hhh)~~11.1(hhh), or (viii) any Encumbrances that will be removed or released by operation of the Confirmation Order or the Plan.

      **(lll)** ~~(iii)~~ "Permitted Post-Closing Lien" means, with respect to the Acquired Assets (a) Encumbrances described in clause (ii) in the definition of "Permitted Encumbrances" and any non-monetary encumbrances not in fact released upon Closing pursuant to Confirmation Order or Plan, as applicable; provided that with respect to all Encumbrances that are "Permitted Post-Closing Liens" pursuant to this clause (a), such Encumbrances do not materially detract from the use or value of the applicable property as it is currently being used, and (b) other Permitted Encumbrances described in clauses (i), (iii), (iv) and (v) in the definition of "Permitted Encumbrances" securing monetary obligations which, individually or in the aggregate with all other Permitted Encumbrances treated as Permitted Post-Closing Liens pursuant to this clause (b), do not exceed $10,000.

      **(mmm)** ~~(jjj)~~ "Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, organization, estate, Governmental Body or other entity or group.

      **(nnn)** ~~(kkk)~~ "Personal Information" means information, in any form, that identifies, relates to, describes, could be used to locate or contact, is capable of being associated with, or could be linked, directly or indirectly, to, a natural Person, device or household, or is otherwise considered "personally identifiable information," "personal information," "personal data," "nonpublic personal information," or any similar term by any applicable Laws or Privacy Law.

      **(ooo)** ~~(lll)~~ "Plan" means a plan of reorganization prepared by Seller and solely to the extent related to this Agreement (but not with respect to the matters contemplated by Section 6.11(c)) and the Transactions, approved by Purchaser in its reasonable discretion, and attached as an Exhibit to this Agreement by amendment hereto as promptly as practicable, implementing the Transactions.

      **(ppp)** ~~(mmm)~~ "Plan Solicitation Motion" means Seller's motion for an Order (which solely with respect to matters relating to this Agreement and the Transactions, shall be in form and substance reasonably acceptable to Purchaser), (i) approving the Disclosure Statement (including approving the Disclosure Statement as containing "adequate information" (as that term is used by section 1125 of the Bankruptcy Code)), (ii) establishing a voting record date for the Plan, (iii) approving solicitation packages and procedures for the distribution thereof, (iv) approving the forms of ballots, (v) establishing procedures for voting on the Plan, (vi) establishing notice and objection procedures for the confirmation of the Plan and (vii) establishing procedures for the assumption or assignment of executory contracts and unexpired leases under the Plan.

      **(qqq)** ~~(nnn)~~ "Plan Solicitation Order" means an Order entered by the Bankruptcy Court, substantially in the form attached to the Plan Solicitation Motion, which Order shall, among other things, (A) be in form and substance reasonably acceptable to

Appellant Appendix ER - 576

Purchaser (solely with respect to matters relating to this Agreement and the Transaction), and (B) approve the relief sought in the Plan Solicitation Motion, including approving of (i) the Disclosure Statement on a conditional basis and (ii) the procedures for solicitation of votes to accept or reject the Plan.

**(rrr)** ~~(ooo)~~ "Plan Supplement" has the meaning set forth in the Plan.

**(sss)** ~~(ppp)~~ "Post-Petition Coins" means Coins that were deposited with the Debtors following the Petition Date.

**(ttt)** ~~(qqq)~~ "Post-Rebalancing Coins" means, with respect to each User as of the Rebalancing Date and each type of such User's Deposited Coins, ~~(i) the total~~a number of ~~such User's Deposited~~ Coins of such type~~, multiplied by (ii)~~ **such that the Acquired Coins Value of such Coins divided by the Deposited Coins Value of such Coins is equal to** the Rebalancing Ratio, as set forth on the Seller Statement.

**(uuu)** ~~(rrr)~~ "Pre-Closing Tax Period" means any taxable period ending on or before the Closing Date and the portion of any Straddle Period ending on the Closing Date.

**(vvv)** ~~(sss)~~ "Privacy Laws" means all applicable Laws and legally binding self-regulatory guidelines or standards, in each case as amended, consolidated, re-enacted or replaced from time to time, relating to the privacy, security, or Processing of Personal Information, data breach notification, website and mobile application privacy policies and practices, Processing and security of payment card information, and email, text message, or telephone communications, including (to the extent applicable to the business of Seller): the Federal Trade Commission Act; the Gramm-Leach-Bliley Act; the Telephone Consumer Protection Act; the Telemarketing and Consumer Fraud and Abuse Prevention Act; the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003; the California Consumer Privacy Act; the Computer Fraud and Abuse Act; the Payment Card Industry Data Security Standards; the GDPR; and the EU e-Privacy Directive 2002/58/EC as amended by Directive 2009/136/EC (and any European Union member states' laws and regulations implementing it).

**(www)** ~~(ttt)~~ "Process", "Processed" or "Processing" means any operation or set of operations which is performed on Personal Information, such as the use, collection, processing, storage, recording, organization, adaption, alteration, transfer, retrieval, consultation, disclosure, dissemination or combination of such Personal Information, or is otherwise considering "processing" by any applicable Privacy Laws.

**(xxx)** ~~(uuu)~~ "Purchaser Development" means any of the following, first occurring after the date hereof and prior to the Closing: (i) the filing of a criminal complaint against, or indictment of, Purchaser or any of its executive officers or "C-suite" officers (including any chief risk officer or chief compliance officer) by the United States Department of Justice, (ii) the filing of a criminal complaint against, or indictment of, any of Purchaser's Affiliates or any of their executive officers or "C-suite" officers (including any chief risk officer or chief compliance officer) by the United States Department of Justice or (iii) the commencement of any criminal or regulatory (including at the appellate level) suit, litigation,

US-DOCS\~~137411268.27~~138346099.6

legal proceeding or prosecution by the United States Department of Justice against any of the Persons described in clauses (i) and (ii), (A) in each case of clauses (i), (ii) and (iii) that relate to the operation of the Binance.US platform and wallet custody business of Purchaser and its Subsidiaries or the business of such Affiliate or the ability of such Affiliate to provide Purchaser and its Subsidiaries with the licensed software and support services necessary to operate the Binance.US Platform; and (B) in each case of clauses (ii) and (iii), that, individually or in the aggregate, would reasonably be expected to (1) prevent or materially impair or materially delay the ability of Purchaser to consummate the Transactions in accordance herewith or (2) materially and adversely affect the Users, Eligible Creditors or the Acquired Coins, in each case in a manner that would prevent Purchaser from performing its obligations under Section 6.12 or otherwise following the Closing.

(yyy) (vvv) "Purchaser Group" means Purchaser, any former, current or future Affiliate of Purchaser and each of their respective former, current or future Affiliates, officers, directors, employees, partners, members, managers, agents, Advisors, successors or permitted assigns.

(zzz) (www) "Rebalancing Exercise Delta" means, with respect to any Acquired Coin, the percentage by which the number of Acquired Coins is higher or lower than the number of Acquired Coins which would be required to cause the number of Acquired Coins to be in full compliance with the Rebalancing Ratio.

(aaaa) (xxx) "Rebalancing Ratio" means, with respect to any type of Acquired Coin, a fraction, expressed as a percentage, (i) the numerator of which is the Total Acquired Coins Value, and (ii) the denominator of which is the Total Deposited Coins Value; provided that in no event will the Rebalancing Ratio be greater than 100% and for the avoidance of doubt, the Rebalancing Ratio shall be calculated following the completion of the Rebalancing Exercise and after taking into account gas or other transaction fees incurred and paid by Seller in connection with transferring Coins to Purchaser in accordance with Section 2.4(b).

(bbbb)(yyy) "Retained Avoidance Action" means any preference or avoidance claim, right or cause of action under Chapter 5 of the Bankruptcy Code or any analogous state law claim against (i) Three Arrows Capital, Ltd. or any of its Affiliates, (ii) any insider as defined in the Bankruptcy Code, (iii) any other such claim, right or cause of action that Purchaser agrees in writing prior to the Closing may be retained by the Debtors, (iv) any person for an actual fraudulent transfer, and (v) West Realm Shires Inc., Alameda Ventures Ltd., or any of their Affiliates.

(cccc) (zzz) "Sanctioned Person" means any Person that is the target of Sanctions, including (a) any Person listed in any Sanctions-related list of designated Persons maintained by the OFAC or the U.S. Department of State, the United Nations Security Council, the European Union, any Member State of the European Union, or the United Kingdom (irrespective of its status vis-à-vis the European Union); (b) any Person operating, organized, or resident in a country or territory that is itself the target of comprehensive Sanctions (as of the date of this Agreement, Cuba, Iran, North Korea, Syria, the Crimea region of Ukraine, the so-called Donetsk People's Republic, and the so-called Luhansk People's Republic) ("Sanctioned Country"); (c) the government of a Sanctioned Country or the Government of

Appellant Appendix ER - 578

Venezuela; or (d) any Person 50% or more owned or controlled by any such Person or Persons or acting for or on behalf of such Person or Persons.

**(dddd)** **(aaaa)** "Securities Act" means the Securities Act of 1933 and the rules and regulations promulgated thereunder.

**(eeee)** **(bbbb)** "Security Incident" means any actual or suspected unauthorized access to, or acquisition, modification, use, destruction, loss or disclosure of any Personal Information maintained by or on behalf of Seller or its Affiliates.

**(ffff)** **(cccc)** "Seller Expense Cap" means an amount equal to either (a) if Purchaser elects to extend the Outside Date to the Extended Outside Date pursuant to Section 8.1(c), $15,000,000 or (b) if Purchaser does not so elect to extend the Outside Date, $10,000,000.

**(gggg)** **(dddd)** "Seller Expense Start Date" means the date that is three months following the date of this Agreement.

**(hhhh)** **(eeee)** "Seller Held Coins" means, without duplication, as of any date of determination, all Coins that are directly or indirectly owned or held by, or attributable to, Seller or any of its Affiliates who are Debtors (including, for the avoidance of doubt, all Coins repaid to Seller or any of its Affiliates who are Debtors at or prior to the Closing in respect of Loans (including in respect of any principal, interest, fees, expenses and penalties thereunder and including for this purpose, the 3AC Loan), including all Coins held by or on behalf of Seller or any of its Affiliates who are Debtors in respect of User accounts on the Voyager Platform), except for any Coins constituting collateral under the 3AC Loan and except any Post-Petition Coins, which for the avoidance of doubt, shall not be included in the Rebalancing Exercise or any other Transactions.

**(iiii)** **(ffff)** "Seller Intellectual Property" means all Intellectual Property owned or purported to be owned by Seller that is an Acquired Asset.

**(jjjj)** **(gggg)** "Seller Parties" means Seller, its former, current, or future Affiliates and the former, current or future officers, directors, employees, partners, members, equityholders, controlling or controlled Persons, managers, agents, Advisors, successors or permitted assigns of the foregoing.

**(kkkk)** **(hhhh)** "Seller Plan" means each (i) employee welfare benefit plan within the meaning of Section 3(1) of ERISA (whether or not subject to ERISA), (ii) employee pension benefit plan within the meaning of Section 3(2) of ERISA (whether or not subject to ERISA), (iii) stock option, stock purchase, stock appreciation right or other equity or equity-based agreement, program or plan, (iv) employment, individual consulting, severance or retention agreement or (v) bonus, incentive, deferred compensation, profit-sharing, retirement, post-termination health or welfare, vacation, severance or termination pay, fringe or any other compensation or benefit plan, program, policy, Contract, agreement or other arrangement, in each case that is sponsored, maintained or contributed to by Seller or Holdings or to which Seller

US-DOCS\137411268.27138346099.6

Appellant Appendix ER - 579

or Holdings is obligated to contribute or with respect to which Seller or Holdings has any Liability.

**(llll)** ~~(iiii)~~ "Software" means any and all computer programs and other software in any form or format, including firmware, middleware, software implementations of algorithms, models and methodologies, whether in source code, object code or other form, including libraries, frameworks, software development kits (SDKs), application programming interfaces (APIs), subroutines, toolsets, procedures, and other components thereof.

**(mmmm)** ~~(jjjj)~~ "Straddle Period" means any taxable period that includes but does not end on the Closing Date.

**(nnnn)** ~~(kkkk)~~ "Subsidiary" or "Subsidiaries" means, with respect to any Person, any corporation of which a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person or a combination thereof or any partnership, association or other business entity of which a majority of the partnership or other similar ownership interest is at the time owned or controlled, directly or indirectly, by such Person or one or more Subsidiaries of such Person or a combination thereof.

**(oooo)** ~~(llll)~~ "Subject Transaction" means (a) a transaction or series of transactions with respect to the Rebalancing Exercise that involves a series of transactions or other actions that are (or are to be) executed with a Person or group of coordinated Persons that are intended to effectuate the Rebalancing Exercise or (b) the planning or negotiation of such transaction or series of transactions, or consulting with respect thereto and, for the avoidance of doubt, does not include individual trades of Coins by Seller that are not intended to effectuate the Rebalancing Exercise or that are components of Subject Transactions that are the subject of a Transaction Notice or any such transactions with respect to Coins that do not trade on the Binance.US Platform as of the date of the proposed Subject Transaction.

**(pppp)** ~~(mmmm)~~ "Tax" or "Taxes" means any federal, state, local, foreign or other taxes, charges, fees or other assessments, including income, gross receipts, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, escheat and unclaimed property, ad valorem, personal property, stamp, excise, occupation, sales, use, transfer, value added, import, export, alternative or add-on minimum or estimated tax, charge or assessment of any kind in the nature of (or similar to) taxes, including any interest, penalty or addition thereto, whether disputed or not.

**(qqqq)** ~~(nnnn)~~ "Tax Return" means any return, claim for refund, report, statement or information return relating to Taxes filed or required to be filed with a Governmental Body, including any schedule or attachment thereto, and including any amendments thereof.

**(rrrr)** ~~(oooo)~~ "Total Acquired Coins Value" means the aggregate Acquired Coins Value with respect to all Acquired Coins of each type (excluding Withheld Coins).

Appellant Appendix ER - 580

**(ssss)** ~~(pppp)~~ "Total Deposited Coins Value" means the aggregate Deposited Coins Value with respect to all Deposited Coins of each type.

**(tttt)** ~~(qqqq)~~ "Transactions" means the transactions contemplated by this Agreement or the Plan, as applicable.

**(uuuu)** ~~(rrrr)~~ "Unsupported Coin" means any Coin, for which Purchaser or its Affiliates does not provide trading services on the Binance.US Platform.

**(vvvv)** ~~(ssss)~~ "User" means any Person located and having a home address in the United States that had a Cryptocurrency account on the Voyager Platform as of the Petition Date; provided that, if a Person has multiple Cryptocurrency accounts on the Voyager Platform, such Person shall constitute a single User and all accounts of such User shall be aggregated for purposes of this Agreement.

~~(tttt) "User Migration Preparation" means, collectively, (i) the completion of the transfer of all Acquired User Data (including, for the avoidance of doubt, any "know your customer" information of the Users) and integration thereof on Purchaser's and its Affiliates' information technology systems and the Binance.US Platform, and (ii) the completion of the other items identified in the Integration Plan as being required for accounts to be opened for Users on the Binance.US Platform.~~

~~(uuuu) "User Asset Migration Date" means the date that is four (4) weeks following the date of completion of the User Migration Preparation; provided that the completion of the User Migration Preparation shall not occur prior to the Closing Date.~~

**(wwww)** ~~(vvvv)~~ "VGX Token Smart Contracts" means any "smart contracts" related to the VGX token, together with any private keys related solely to such "smart contracts."

**(xxxx)** ~~(wwww)~~ "Voyager Platform" means Seller's proprietary Cryptocurrency savings and trading platform (including any website or desktop or mobile application with respect thereto).

**(yyyy)** ~~(xxxx)~~ "VWAP" means, with respect to any type of Coin and as of any date of determination, an amount equal to the volume weighted average price in U.S. dollars for such type of Coin for the consecutive 24-hour period immediately prior to 8:00 a.m. New York Time on such date of determination, as reported on https://coinmarketcap.com.

11.2    Index of Defined Terms.

Acquired Assets...............................1
Acquired Information...........................2
Acquired User Data.............................2
Acquired Voyager Claims........................2
Acquisition Proposal.....................~~26~~27
Agreement.....................................1
Agreement Order.........................~~25~~26

Amended Disclosure Statement.............~~27~~28
Anti-Money Laundering Laws...............~~17~~18
Assigned Contracts............................3
Assignment and Assumption
    Agreement................................10
Assumed Liabilities...........................5
Authentication Credentials...................14

Appellant Appendix ER - 581

Balance Sheet Date ................................. 13
Bankruptcy Case ..................................... 1
Bankruptcy Code .................................... 1
Bankruptcy Court .................................... 1
Cash Payment ........................................ 8
Chosen Courts .................................... 68~~70~~
Closing .......................................... 9~~10~~
Closing Date ....................................... 10
Closing Date Payment ............................ 8~~9~~

**Covered Matters** ............................... 2~~9~~

Credited Additional Bankruptcy
   Distributions .................................. 49~~50~~
CSA ............................................. 11~~12~~
Cure Costs .......................................... 5
Dataroom ....................................... 21~~22~~
Debtors ............................................. 1
**Delayed Acquired Coins** .......................... **10**
Deposit ............................................. 9
**Distribution Agent Termination**
   **Event** ....................................... **51**
**Distribution Agent Termination**
   **Notice** ...................................... **51**
DPA ................................................ 18
Eligible Creditor ................................ 42~~43~~
Enforceability Exceptions ........................ 12~~13~~
Environmental Permits ........................... 18~~19~~
Escrow Account ..................................... 9
Escrow Agent ....................................... 9
Excluded Assets .................................... 3
Excluded Contracts ................................. 3
Excluded Documents ................................. 3
Excluded Liabilities ............................... 6
Express Purchaser Representations ............... 24~~25~~
Express Seller Representations .................. 21~~22~~
Extended Outside Date ........................... 57~~59~~
FCPA .............................................. 17
Filed CSA Documents ............................. 11~~12~~
Financial Statements .............................. 13
Fundamental Representations ..................... 56~~58~~
Higher Offer Determination Notice .................. 27
Holdings ........................................... 1
Indebtedness .................................... 30~~31~~
Information Presentation ......................... 21~~22~~
Integration Plan ................................ 41~~42~~
Leased Real Property .............................. 15

Liquidation ..................................... 54~~56~~
Material Contract .................................. 15
OFAC ........................................... 17~~18~~
Outside Date .................................... 57~~59~~
Parent ............................................. 1
Parties ............................................ 1
Party .............................................. 1

**Paul Hastings** .................................. 2~~9~~

Petition Date ...................................... 1
Petitions .......................................... 1
Post-Bankruptcy Statement ....................... 49~~50~~
Pre-Closing Data Transfer ....................... 38~~39~~
Press Release ................................... 69~~72~~
Privacy Requirements ............................ 19~~20~~
Projections ..................................... 51~~54~~
Purchase Price ..................................... 8
Purchaser .......................................... 1
Purchaser Bid Process ........................... 55~~57~~
Purchaser Default Termination ...................... 9
Purchaser Expenses .............................. 54~~57~~
Rebalancing Date ................................ 43~~44~~
Rebalancing Exercise ............................ 43~~44~~
Relevant Tax Return ............................. 62~~65~~
Reverse Termination Fee ......................... 60~~62~~
Sanctions ....................................... 17~~18~~
Seller ............................................. 1
Seller Contractors ................................ 34
Seller Documents .................................. 12
Seller Employees .................................. 34
Seller Expenses ................................. 53~~56~~
Seller Income Tax Return ........................ 62~~64~~
Seller Marks .................................... 39~~40~~
Seller Registered IP ............................ 18~~19~~
Seller Statement ................................ 44~~45~~
Solvent ......................................... 24~~25~~
Staked Coins .................................... 14~~15~~
Successor Liabilities ........................... 29~~30~~
Trademark and Domain Name
   Assignment Agreement .......................... 10~~11~~
Transaction Notice .............................. 43~~44~~
Transaction Offer Notice ........................ 43~~44~~
Transaction-Related Action ...................... 62~~64~~
Transfer Taxes .................................. 61~~64~~
Unsupported Jurisdiction ........................ 45~~47~~
Unsupported Jurisdiction Approvals .............. 22~~23~~

93

Appellant Appendix ER - 582

Voyager User Accounts....................................2      WARN Act....................................35
                                                             Withheld Coins....................................9

11.3    <u>Rules of Interpretation</u>. Unless otherwise expressly provided in this Agreement, the following will apply to this Agreement, the Schedules and any other certificate, instrument, agreement or other document contemplated hereby or delivered hereunder.

(a)    Accounting terms which are used but not otherwise defined in this Agreement have the respective meanings given to them under IFRS as in effect on the date hereof or for the period with respect to which such principles are applied, consistently applied. To the extent that the definition of an accounting term defined in this Agreement is inconsistent with the meaning of such term under IFRS, the definition set forth in this Agreement will control.

(b)    The terms "hereof," "herein" and "hereunder" and terms of similar import are references to this Agreement as a whole and not to any particular provision of this Agreement. Section, clause, schedule and exhibit references contained in this Agreement are references to sections, clauses, schedules and exhibits in or to this Agreement, unless otherwise specified. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(c)    Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." Where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or."

(d)    The words "to the extent" shall mean "the degree by which" and not "if."

(e)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day.

(f)    Words denoting any gender will include all genders, including the neutral gender. Where a word is defined herein, references to the singular will include references to the plural and vice versa.

(g)    The word "will" will be construed to have the same meaning and effect as the word "shall". The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive.

(h)    All references to "$" and dollars will be deemed to refer to United States currency unless otherwise specifically provided.

US-DOCS\137411268.27138346099.6

Appellant Appendix ER - 583

(i)      All references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(j)      Any document or item will be deemed "delivered," "provided" or "made available" by Seller, within the meaning of this Agreement, if such document or item is included in the Dataroom at least one (1) Business Day prior to the date hereof.

(k)      Any reference to any agreement or Contract will be a reference to such agreement or Contract, as amended, modified, supplemented or waived.

(l)      Any reference to any particular Code section or any Law will be interpreted to include any amendment to, revision of or successor to that section or Law regardless of how it is numbered or classified; underlined provided that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance, with any Code section or Law, the reference to such Code section or Law means such Code section or Law as in effect at the time of such violation or non-compliance or alleged violation or non-compliance.

(m)      A reference to any party to this Agreement or any other agreement or document shall include such party's successors and permitted assigns. **References to Seller after the Plan Effective Date (as defined in the Plan) shall be deemed to include the Wind-Down Trust (as defined in the Plan) and the Wind-Down Debtor (as defined in the Plan) in respect of Seller.**

*(Signature pages follow.)*

US-DOCS\137411268.27 138346099.6

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**BAM TRADING SERVICES INC. D/B/A
BINANCE.US**


By: _____
Name:
Title:

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**VOYAGER DIGITAL, LLC**


By: _____
Name:
Title:

## EXHIBIT A

**FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

(See attached.)

US-DOCS\137411268.27138346099.6

**EXHIBIT B**

**FORM OF TRADEMARK AND DOMAIN NAME ASSIGNMENT AGREEMENT**

(See attached.)

B

Appellant Appendix ER - 588

**Exhibit B**

**Redline**

THE DEBTORS ARE NOT CURRENTLY SOLICITING VOTES ON A CHAPTER 11 PLAN.  THIS DISCLOSURE STATEMENT REMAINS SUBJECT TO APPROVAL BY THE BANKRUPTCY COURT.
THE DEBTORS WILL SEEK APPROVAL OF THE DISCLOSURE STATEMENT AT A HEARING ON JANUARY 10, 2023, OR SUCH OTHER DATE AS DETERMINED BY THE BANKRUPTCY COURT.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**SECOND AMENDED DISCLOSURE STATEMENT RELATING TO**
**THE THIRD AMENDED JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND**

**ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

---

[1]   The debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital, Ltd. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

## <u>TABLE OF CONTENTS</u>

<b>Page</b>

**IMPORTANT INFORMATION REGARDING THIS DISCLOSURE STATEMENT** .................. 1

**I. INTRODUCTION** ......................................... 7

**II. PRELIMINARY STATEMENT** ......................................... 7
    A. The Sale Transaction. .............................................. 7
    B. The FTX Collapse. .............................................. 9

**III. BACKGROUND** ......................................... 10

**IV. QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN** ......................................... 12
    A. What is chapter 11? ......................................... 12
    B. Why are the Debtors sending me this Disclosure Statement? ......................................... 12
    C. Am I entitled to vote on the Plan? ......................................... 12
    D. What will I receive from the Debtors if the Plan is consummated? ......................................... 13
    E. What will I receive from the Debtors if I hold an Allowed Administrative Claim? ......................................... 19
    F. What is the "toggle" feature of the Plan? ......................................... 20
    G. How will my Account be transitioned to Binance.US? ......................................... 20
    H. What if I am unable or unwilling to transition my Account to Binance.US? ......................................... 20
    I. What are the sources of Consideration and other consideration required to fund the Plan? ......................................... 20
    J. Are any regulatory approvals required to consummate the Sale Transaction and confirm the Plan? ......................................... 21
    K. How will I receive my recovery as an Account Holder if the Sale Transaction is not consummated? ......................................... 22
    L. What happens to my recovery if the Plan is not confirmed or does not go effective? ......................................... 22
    M. If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation"? ......................................... 22
    N. Is there potential litigation related to the Plan? ......................................... 22
    O. Does the Plan provide for the subordination of any Claims? ......................................... 22
    P. Will there be releases and exculpation granted to parties in interest as part of the Plan? ......................................... 23
    Q. What is the deadline to vote on the Plan? ......................................... 24
    R. How do I vote for or against the Plan? ......................................... 25
    S. Why is the Bankruptcy Court holding a Confirmation Hearing? ......................................... 25
    T. When is the Confirmation Hearing set to occur? ......................................... 25
    U. What is the purpose of the Confirmation Hearing? ......................................... 25
    V. What is the effect of the Plan on the Debtors' ongoing business? ......................................... 25
    W. What steps did the Debtors take to evaluate alternatives to a chapter 11 filing? ......................................... 25
    X. Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan? ......................................... 26

**V. THE DEBTORS' PLAN** ......................................... 26
    A. The Plan. ......................................... 26
    B. The Plan Toggle. ......................................... 33
    C. Means for Implementation of the Plan. ......................................... 37

**VI. THE DEBTORS' BUSINESS OPERATIONS AND CAPITAL STRUCTURE** ......................................... 40
    A. The Debtors' Corporate Structure and History. ......................................... 40
    B. The Debtors' Assets and Operations. ......................................... 41
    C. The Debtors' Capital Structure. ......................................... 44

Appellant Appendix ER - 591

| | | |
|---|---|---|
| **VII.** | **EVENTS LEADING TO THESE CHAPTER 11 CASES** | **47** |
| A. | Market and Industry-Specific Challenges. | 47 |
| B. | The Alameda Loan. | 55 |
| C. | Retention of Restructuring Advisors and Initial Third-Party Outreach. | 56 |
| D. | Governance Initiatives. | 56 |
| E. | Voyager's Decision to Commence these Chapter 11 Cases. | 56 |
| **VIII.** | **EVENTS OF THE CHAPTER 11 CASES** | **57** |
| A. | The Stand-Alone Plan. | 57 |
| B. | First and Second Day Relief and Other Case Matters. | 57 |
| C. | Appointment of Unsecured Creditors' Committee. | 59 |
| D. | Schedules and Statements. | 59 |
| E. | Bar Date Motion. | 59 |
| F. | The FBO Motion. | 60 |
| G. | The 3AC Liquidation Proceeding. | 61 |
| H. | Litigation Matters. | 61 |
| I. | The Coinify Sale. | 64 |
| J. | The Key Employee Retention Plan. | 64 |
| K. | Canadian Recognition Proceeding. | 64 |
| L. | The Unwind Motion. | 65 |
| M. | The Request for Appointment of an Equity Committee. | 65 |
| N. | The Post-Petition Sale Process and the Collapse of FTX. | 65 |
| O. | The Special Committee Investigation. | 68 |
| **IX.** | **RISK FACTORS** | **69** |
| A. | Risks Related to the Restructuring. | 69 |
| B. | Risks Related to Recoveries under the Plan. | 72 |
| C. | Disclosure Statement Disclaimer. | 73 |
| D. | Miscellaneous Risk Factors and Disclaimers. | 74 |
| **X.** | **SOLICITATION AND VOTING PROCEDURES** | **80** |
| A. | Classes Entitled to Vote on the Plan. | 80 |
| B. | Votes Required for Acceptance by a Class. | 80 |
| C. | Certain Factors to Be Considered Prior to Voting. | 80 |
| D. | Classes Not Entitled To Vote on the Plan. | 81 |
| E. | Solicitation Procedures. | 81 |
| F. | Voting Procedures. | 82 |
| G. | Voting Tabulation. | 83 |
| H. | Ballots Not Counted. | 84 |
| **XI.** | **CONFIRMATION OF THE PLAN** | **84** |
| A. | Requirements of Section 1129(a) of the Bankruptcy Code. | 84 |
| B. | Best Interests of Creditors—Liquidation Analysis. | 85 |
| C. | Feasibility. | 86 |
| D. | Acceptance by Impaired Classes. | 86 |
| E. | Confirmation without Acceptance by All Impaired Classes. | 87 |
| **XII.** | **CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** | **88** |
| A. | Introduction. | 88 |
| B. | Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors. | 89 |
| C. | Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims Entitled to Vote. | 90 |

Appellant Appendix ER - 592

XIII.    RECOMMENDATION OF THE DEBTORS ................................................................97

Appellant Appendix ER - 593

**EXHIBITS**

EXHIBIT A        Plan

EXHIBIT B        Liquidation Analysis

EXHIBIT C        Frequently Asked Questions & Answers

EXHIBIT D        The Asset Purchase Agreement

iv

**IMPORTANT INFORMATION REGARDING THIS DISCLOSURE STATEMENT**
DISCLOSURE STATEMENT, DATED JANUARY 1~~0~~3, 2023

**SOLICITATION OF VOTES TO ACCEPT OR REJECT THE THIRD AMENDED
JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND
ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**YOU ARE RECEIVING THIS DOCUMENT AND THE ACCOMPANYING MATERIALS BECAUSE AS
OF THE VOTING RECORD DATE, YOU HELD A CLAIM AGAINST THE DEBTORS IN ONE OF THE
FOLLOWING VOTING CLASSES AND THEREFORE ARE ENTITLED TO VOTE ON THE PLAN:**

| VOTING CLASSES | NAME OF CLASS UNDER THE PLAN |
|---|---|
| 3 | Account Holder Claims |
| 4A | OpCo General Unsecured Claims |
| 4B | HoldCo General Unsecured Claims |
| 4C | TopCo General Unsecured Claims |

| DELIVERY OF BALLOTS |
|---|
| 1.     Ballots must be actually received by Stretto, Inc. ("<u>Stretto</u>" or the "<u>Claims, Noticing, and Solicitation Agent</u>") before the Voting Deadline (<u>4:00 p.m., prevailing Eastern Time, on February 22, 2023</u>). <br><br> 2.     Ballots may be returned by the following methods: <br><br>     a)   For Holders of Account Holder Claims: via electronic submission through the Claims, Noticing, and Solicitation Agent's online voting portal at https://cases.stretto.com/Voyager/balloting. <br><br>     b)   For Holders of General Unsecured Claims: (i) via electronic submission through the Claims, Noticing, and Solicitation Agent's online voting portal at https://cases.stretto.com/Voyager/balloting; (ii) in the enclosed pre-paid, pre-addressed return envelope; or (iii) via first class mail, overnight courier, or hand delivery to the address set forth below: <br><br> Voyager Ballot Processing<br>c/o Stretto<br>410 Exchange, Suite 100<br>Irvine, CA 92602 <br><br> If you have any questions on the procedures for voting on the Plan, as defined herein, please contact the Claims, Noticing, and Solicitation Agent by emailing voyagerinquiries@stretto.com and referencing "In re Voyager – Solicitation Inquiry" in the subject line, or by calling (855) 473-8665 (Toll-Free) or (949) 271-6507 (International). |

Appellant Appendix ER - 595

**IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT**

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE THIRD AMENDED JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE IX HEREIN. IN THE EVENT OF ANY INCONSISTENCIES BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE PLAN SHALL GOVERN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE DEBTORS' CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND THEIR FUTURE RESULTS AND OPERATIONS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY

2

Appellant Appendix ER - 596

SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, THOSE HOLDERS OF CLAIMS WHO VOTE TO REJECT THE PLAN, OR THOSE HOLDERS OF CLAIMS AND INTERESTS WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTION CONTEMPLATED THEREBY.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN. THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY, INCLUDING ARTICLE IX, ENTITLED "RISK FACTORS" BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

SUMMARIES OF THE PLAN AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN. THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS ANNEXED TO THIS DISCLOSURE STATEMENT OR OTHERWISE INCORPORATED HEREIN BY REFERENCE ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THOSE DOCUMENTS. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THERE IS NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE. EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR IN ACCORDANCE WITH APPLICABLE LAW, THE DEBTORS ARE UNDER NO DUTY TO UPDATE OR SUPPLEMENT THIS DISCLOSURE STATEMENT.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING VOTES FOR THE ACCEPTANCES AND CONFIRMATION OF THE PLAN AND MAY NOT BE RELIED ON FOR ANY OTHER PURPOSE. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE DISCLOSURE STATEMENT AND THE PLAN, THE RELEVANT PROVISIONS OF THE PLAN WILL GOVERN.

3

## SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS

NEITHER THIS DISCLOSURE STATEMENT NOR THE PLAN HAS BEEN FILED WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY STATE AUTHORITY. THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC OR ANY STATE SECURITIES COMMISSION, AND NEITHER THE SEC NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR THE MERITS OF THE PLAN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS DISCLOSURE STATEMENT, NOTHING IN THIS DISCLOSURE STATEMENT CONSTITUTES A FINDING UNDER U.S. FEDERAL SECURITIES LAWS, FOREIGN SECURITIES LAWS OR ANY STATE SECURITIES LAWS AS TO WHETHER CRYPTOCURRENCY, INCLUDING THE VOYAGER TOKENS, OR TRANSACTIONS INVOLVING CRYPTOCURRENCY ARE SECURITIES. THE SEC AND ITS STAFF HAVE TAKEN THE POSITION THAT CERTAIN CRYPTOCURRENCY ASSETS AND CERTAIN TRANSACTIONS INVOLVING CRYPTOCURRENCY ASSETS FALL WITHIN THE DEFINITION OF A "SECURITY" UNDER THE U.S. FEDERAL SECURITIES LAWS. THE DETERMINATION AS TO WHETHER A CRYPTOCURRENCY ASSET OR A TRANSACTION INVOLVING CRYPTOCURRENCY MAY CONSTITUTE A "SECURITY" UNDER APPLICABLE LAWS IS A DETERMINATION FOR THE SEC, APPLICABLE STATE AND FOREIGN REGULATORY AUTHORITIES, AND COURTS WITH PROPER JURISDICTION.

THIS DISCLOSURE STATEMENT CONTAINS "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS IN THIS DISCLOSURE STATEMENT ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE BUT ARE SUBJECT TO A WIDE RANGE OF RISKS, INCLUDING RISKS ASSOCIATED WITH THE FOLLOWING:

- THE OVERALL HEALTH OF THE CRYPTOCURRENCY INDUSTRY;

- POPULARITY AND RATE OF ADOPTION OF CRYPTOCURRENCIES;

- THE DEBTORS' REGULATORY LICENSES;

- THE POTENTIAL ADOPTION OF NEW GOVERNMENTAL REGULATIONS;

- THE DEBTORS' TECHNOLOGY AND ABILITY TO ADAPT TO RAPID TECHNOLOGICAL CHANGE;

- THE RELIABILITY, STABILITY, PERFORMANCE AND SCALABILITY OF THE DEBTORS' INFRASTRUCTURE AND TECHNOLOGY;

- THE DEBTORS' FINANCIAL CONDITION, REVENUES, CASH FLOWS, AND EXPENSES;

- THE ADEQUACY OF THE DEBTORS' CAPITAL RESOURCES AND LIQUIDITY;

- THE INTEGRATION AND BENEFITS OF ASSET AND PROPERTY ACQUISITIONS OR THE EFFECTS OF ASSET AND PROPERTY ACQUISITIONS OR DISPOSITIONS ON THE DEBTORS' CASH POSITION AND LEVELS OF INDEBTEDNESS;

- GENERAL ECONOMIC AND BUSINESS CONDITIONS;

4

- **EFFECTIVENESS OF THE DEBTORS' RISK MANAGEMENT ACTIVITIES;**

- **COUNTERPARTY CREDIT RISK;**

- **THE OUTCOME OF PENDING AND FUTURE LITIGATION;**

- **EXCHANGE RATE FLUCTUATIONS AND CRYPTOCURRENCY PRICE FLUCTUATIONS;**

- **PLANS, OBJECTIVES, AND EXPECTATIONS;**

- **RISKS IN CONNECTION WITH DISPOSITIONS; AND**

- **RISK OF INFORMATION TECHNOLOGY OR DATA SECURITY BREACHES OR OTHER CYBERATTACKS.**

**STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE DEBTORS' AND THE WIND-DOWN DEBTORS' FUTURE PERFORMANCE. THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE DEBTORS' AND THE WIND-DOWN DEBTORS' ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN OTHER THAN AS REQUIRED BY APPLICABLE LAW. THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE THE FOLLOWING:**

- **THE RISKS AND UNCERTAINTIES ASSOCIATED WITH THE CHAPTER 11 CASES;**

- **THE DEBTORS' ABILITY TO PURSUE THEIR BUSINESS STRATEGIES DURING THE CHAPTER 11 CASES;**

- **THE DEBTORS' ABILITY TO MAINTAIN COMPLIANCE WITH LAWS AND REGULATIONS OR THE INTERPRETATION OR APPLICATION OF SUCH LAWS THAT CURRENTLY APPLY OR MAY BECOME APPLICABLE TO THE DEBTORS' BUSINESS BOTH IN THE UNITED STATES AND INTERNATIONALLY;**

- **CHANGES TO A PARTICULAR CRYPTOCURRENCY ASSET'S OR PRODUCT OFFERING'S STATUS AS A "SECURITY" IN ANY RELEVANT JURISDICTION UNDER RELEVANT LAWS AND REGULATIONS OR REGULATORY INTERPRETATION THEREOF;**

- **LOSS OF CRITICAL BANKING OR INSURANCE RELATIONSHIPS;**

- **THE DIVERSION OF MANAGEMENT'S ATTENTION AS A RESULT OF THE CHAPTER 11 CASES;**

- **INCREASED LEVELS OF EMPLOYEE ATTRITION AS A RESULT OF THE CHAPTER 11 CASES;**

- **CUSTOMER RESPONSES TO THE CHAPTER 11 CASES;**

- **THE IMPACT OF A PROTRACTED RESTRUCTURING ON THE DEBTORS' BUSINESS;**

5

- **THE DEBTORS' ABILITY TO CONFIRM OR CONSUMMATE THE PLAN;**

- **THE DEBTORS' INABILITY TO PREDICT THEIR LONG-TERM LIQUIDITY REQUIREMENTS AND THE ADEQUACY OF THEIR CAPITAL RESOURCES;**

- **THE AVAILABILITY OF CASH TO MAINTAIN THE DEBTORS' OPERATIONS AND FUND EMERGENCE COSTS;**

- **RISKS ASSOCIATED WITH WEAK OR UNCERTAIN GLOBAL ECONOMIC CONDITIONS AND THEIR IMPACT ON DEMAND FOR DIGITAL ASSETS;**

- **OTHER GENERAL ECONOMIC AND POLITICAL CONDITIONS IN THE UNITED STATES, INCLUDING THOSE RESULTING FROM RECESSIONS, POLITICAL EVENTS, ACTS OR THREATS OF TERRORISM, AND MILITARY CONFLICTS;**

- **INDUSTRY CONDITIONS, INCLUDING COMPETITION AND TECHNOLOGICAL INNOVATION;**

- **FLUCTUATIONS IN OPERATING COSTS;**

- **SHIFTS IN POPULATION AND OTHER DEMOGRAPHICS;**

- **LEGISLATIVE OR REGULATORY REQUIREMENTS; AND**

- **FLUCTUATIONS IN INTEREST RATES, EXCHANGE RATES, AND CURRENCY VALUES.**

**YOU ARE CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE, AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-LOOKING STATEMENTS. THE LIQUIDATION ANALYSIS AND OTHER PROJECTIONS AND FORWARD-LOOKING INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ONLY ESTIMATES, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS, AMONG OTHER THINGS, MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED. ANY ANALYSES, ESTIMATES, OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.**

*[Remainder of page intentionally left blank]*

6

# I. INTRODUCTION

Voyager Digital Holdings, Inc. (along with its debtor affiliates, the "Debtors," the "Company," or "Voyager") and its debtor affiliates submit this disclosure statement (including all exhibits hereto and as may be supplemented or amended from time to time, the "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to holders of Claims against and Interests in the Debtors in connection with the solicitation of votes for acceptance of the Debtors' *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. [●]852] (as supplemented or amended from time to time, the "Plan"), which was conditionally approved by the Bankruptcy Court on January [●]13, 2023 [Docket No. [●]861]. A copy of the Plan is attached hereto as **Exhibit A** and is incorporated herein by reference. The Plan constitutes a separate chapter 11 plan for each of the Debtors. [2]

**THE DEBTORS BELIEVE THAT THE COMPROMISES AND SETTLEMENTS CONTEMPLATED BY THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND MAXIMIZE RECOVERIES TO HOLDERS OF CLAIMS. THE DEBTORS BELIEVE THE PLAN IS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES. THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

# II. PRELIMINARY STATEMENT

## A. The Sale Transaction.

The Debtors filed these Chapter 11 Cases in response to a short-term "run on the bank" caused by a downturn in the cryptocurrency industry generally and the default of a significant loan made to a third party. Since the Petition Date, the Debtors have worked tirelessly to identify the most value-maximizing transaction for their customers and other creditors on an expedited timeline. Following a two-week competitive auction process, the Debtors selected the bid submitted by West Realm Shires Inc. ("FTX US," and along with its parent entity and affiliates, "FTX") as the winning bid (the transaction contemplated thereby, the "FTX Transaction"). Had it been effectuated, the FTX Transaction would have provided for substantial in-kind recoveries to Holders of Account Holder Claims, the transfer of substantially all of the customer accounts on the Voyager platform to the FTX platform, and the orderly wind down of the Debtors' estates. But after a series of extraordinary events outlined in detail below, FTX, and with it the FTX Transaction, collapsed. While the Debtors were shocked and dismayed by FTX's cataclysmic collapse, the Debtors swiftly reengaged in negotiations with numerous other potential counterparties to evaluate potential third-party transactions that would maximize value for the Debtors and their creditors. Following good-faith, arm's length negotiations with several such alternative transaction parties, the Debtors elected to accept the bid submitted by BAM Trading Services Inc. ("Binance.US" or the "Purchaser"). The Debtors value Binance.US's offer at approximately $1.022 billion, comprising (i) the fair market value of Cryptocurrency on the Voyager platform as of a date to be determined, which as of December 19, 2022, is estimated to be $1.002 billion plus (ii) additional consideration equal to $20 million of incremental value. Importantly, relative to all currently available alternatives, the Binance.US bid can be effectuated quickly, provides meaningfully greater recovery to creditors, and allows the Debtors to facilitate an efficient resolution of these chapter 11 cases, after which Binance.US's market-leading, secured trading platform will enable customers to trade and store cryptocurrency.

Under the Asset Purchase Agreement, Binance.US will ~~acquire~~accept transfers of certain assets relating to the Debtors' cryptocurrency custody and exchange business and will receive all or substantially all Cryptocurrency on the Voyager platform ~~for distribution to~~to hold such assets solely in a custodial capacity in trust and solely for the benefit of Account Holders who each open an account on the Binance.US Platform (subject to certain potential exceptions set forth in the Asset Purchase Agreement with respect to Cryptocurrency withheld for the purpose of

---

[2] Capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in the Plan or Asset Purchase Agreement, as applicable. Additionally, this Disclosure Statement incorporates the rules of interpretation located in Article I of the Plan. **The summary provided in this Disclosure Statement of any documents attached to this Disclosure Statement, including the Plan, are qualified in their entirety by reference to the Plan and the documents being summarized. In the event of any inconsistencies between the terms of this Disclosure Statement and the Plan, the Plan shall govern.**

Appellant Appendix ER - 601

satisfying the Debtors' obligations under the Plan) (such Cryptocurrency, transfers being referred to as "Acquired Coins") in exchange for Purchaser's payment obligations set forth in Sections 2.1 and 2.2 of the Asset Purchase Agreement and Purchaser's commitment to distribute the Acquired Coins to Account Holders and cash to Holders of Opco General Unsecured Claims pursuant to Sections 6.12 and 6.14 of the Asset Purchase Agreement. Additionally, Purchaser shall submit VGX for its standard listing review process in an effort to allow VGX to be traded on the Binance.US Platform. The Debtors will effectuate the transition of Account Holders to the Binance.US Platform as described in Article V.C.6 of this Disclosure Statement. It is currently anticipated that all Account Holders and Holders of OpCo General Unsecured Claims will transition to Binance.US subject to their successful completion of Binance.US's "Know Your Customer" process and other procedural and regulatory requirements. Further information regarding how Account Holders and Holders of OpCo General Unsecured Claims can open accounts on Binance.US are available on the Binance.US Platform Terms of Use (which are available at: https://www.binance.us/terms-of-use) and the Binance.US Privacy Policy (available at: https://binance.us/privacy-policy), and will also be provided to all Holders of such Claims in the Customer Onboarding Protocol.

Below is a chart of estimated recoveries to hypothetical Holders of Account Holder Claims.[3]

---

[3]  Recoveries are for illustrative purposes and may materially differ from the amount portrayed in the chart. Account Holder Claims shall be valued in U.S. dollars as of the Petition Date consistent with section 502(b) of the Bankruptcy Code.

8

| Account | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Customer Claim | | | Crypto Recovery | | | | |
| Coin | # of Coins Claimed | 7/5 Coin Price | Claim ($) | Recovery Type | Illustrative Crypto Recovery %[4] | 12/18 Coin Price | # of Coins Recovered[5] | Recovery Value |
| BTC | 0.05 | $20,157.69 | $990.50 | BTC | 51% | $16,769.35 | 0.03 | $500.57 |
| ETH | 0.19 | 1,131.60 | 214.41 | ETH | 51% | 1,185.35 | 0.09 | 108.36 |
| DAI | 49.19 | 1.00 | 49.17 | DAI | 51% | 1.00 | 24.86 | 24.85 |
| DOGE | 978.43 | 0.07 | 65.64 | DOGE | 51% | 0.08 | 419.59 | 33.17 |
| ALGO | 123.83 | 0.31 | 38.07 | ALGO | 51% | 0.19 | 100.67 | 19.24 |
| LINK | 0.29 | 6.31 | 1.83 | LINK | 51% | 6.02 | 0.15 | 0.92 |
| XRP | 122.38 | 0.33 | 39.79 | XRP | 51% | 0.35 | 57.24 | 20.11 |
| HBAR | 130.66 | 0.06 | 8.05 | HBAR | 51% | 0.04 | 92.21 | 4.07 |
| BAND | 24.73 | 1.32 | 32.65 | BAND | 51% | 1.73 | 9.54 | 16.50 |
| VGX | 249.05 | 0.24 | 59.32 | VGX | 51% | 0.29 | 101.90 | 29.98 |
| TRAC | 1,471.96 | 0.19 | 286.88 | TRAC | 51% | 0.18 | 785.81 | 144.98 |
| GALA | 2,274.69 | 0.05 | 121.01 | GALA | 51% | 0.02 | 2,978.93 | 61.16 |
| Claim | | | | | | | | |

| Value Claimed | | $1,907.34 | Value Recovered | | $963.91 |
|---|---|---|---|---|---|
| *Proportion of Total Platform Value* | | *0.0001%* | *Proportion of Total Platform Recovery* | | *0.0001%* |

| Illustrative Recovery | |
|---|---|
| **Crypto Recovery** | |
| Value Recovered (In-Kind) | $1,022.16 |
| Value Recovered (Converted to U.S. Dollars)[6] | - |
| **Crypto Value Recovered** | **$1,022.16** |
| | |
| **Other Items** | |
| Plus: Binance US Consideration | $20.00 |
| Less: Wind-down Costs, Other Benefits and Other Expenses[7] | (78.24) |
| **Total Other Items** | **($58.24)** |

[4] Illustrative cryptocurrency recovery is shown based on the estimated total fair market value of Voyager's cryptocurrency assets based on coin prices as of December 18, 2022. Actual cryptocurrency recovery will be determined by cryptocurrency prices during the fair market value reference period prior to the Effective Date.

[5] Illustrative number of coins recovered based on recovery value divided by the coin price as of December 18, 2022. Actual cryptocurrency prices for purposes of denominating initial distributions will be determined by such cryptocurrency's price during the fair market value reference period prior to the Effective Date.

[6] Assumes hypothetical customer transfers to Binance.US Platform to receive in-kind recoveries; Account Holders that do not transfer to Binance.US will be liquidated at a future date; these non-transferred Account Holders will be subject to portfolio risk, as recoveries will be subject to cryptocurrency market volatility until such time as the estate makes U.S. dollar distributions.

[7] "Other Benefits" includes the estimated pro rata distribution to Account Holder Claims from (i) expense reimbursement and (ii) non-buyer proceeds (including sale of investments, tax returns, Directors and Officers insurance settlements, and other inflows); "Other Expenses" includes (iii) projected cash deficit at Effective Date, (iv) rebalancing leakage, (v) wind-down funding leakage and (vi) VGX impact.

9

| Total Value Recovered | $963.91 |
|---|---|
| *% Total Recovery* | *51%* |

### B. The FTX Collapse.

Following an acute liquidity crunch and "run on the bank" at the FTX ecosystem, on November 11, 2022, 130 FTX entities commenced filing for voluntary relief under chapter 11 in the Bankruptcy Court for the District of Delaware (the "FTX Bankruptcy Proceeding").[8]  While the FTX Bankruptcy Proceeding is still unfolding, early indications are that Mr. Bankman-Fried and FTX were carrying on one of the largest financial frauds in history. Mr. John Ray III, who was appointed Chief Executive Officer of FTX following the resignation of Mr. Bankman-Fried and who oversaw the restructuring of Enron, commented in an early filing in the FTX Bankruptcy Proceeding that "[n]ever in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information."[9]  The full extent of the injury caused by this apparent rampant fraud will likely take years to uncover.

While FTX was collapsing, on November 10th, the Debtors requested that the "No-Shop" provision (Section 5.2) of the FTX Purchase Agreement (as defined herein) be waived.  FTX acquiesced.  Immediately thereafter, the Debtors swiftly reengaged in negotiations with several other potential transaction counterparties.  On December 9, 2022, the Debtors filed with this Court the *Joint Stipulation and Agreed Order Between the Debtors and FTX US* terminating the FTX Purchase Agreement [Docket No. 717].  On December 21, 2022, FTX filed a motion seeking approval of such stipulation by the court overseeing the FTX Bankruptcy Proceeding as well.[10]

The Debtors determined that engaging with third parties to identify an alternative transaction partner was a sound exercise of their business judgment as consummating an alternative transaction would reasonably provide greater recovery to Holders of Claims on a more certain timeline with limited execution risk than if the Debtors pursued a self-liquidating plan.  The Sale Transaction is the culmination of that process and provides more value than the Debtors would otherwise be able to distribute to Holders of Claims on a standalone basis.  Notably, the Plan includes a toggle that allows the Debtors to return Cryptocurrency, Cash, and other assets to Holders of Claims if the Sale Transaction is unable to close on the timeline contemplated under the Asset Purchase Agreement, as described further in Article V.A.2 herein.  Although any "toggle" to a self-liquidating plan may result in less recovery to customers than the Sale Transaction, it would be materially greater and quicker than if the Debtors had to undertake the cost and time necessary to resolicit Holders of Claims to vote on another plan.  Accordingly, the Debtors, whose goal is and has always been to maximize returns to Account Holders and other creditors, determined that the most value-maximizing path forward in these chapter 11 cases is to enter into a transaction with Binance.US that also allows the Debtors to toggle to a plan that returns value to the Debtors' Account Holders and other creditors should the Sale Transaction not be consummated on the timeline contemplated under the Asset Purchase Agreement.

In light of the extraordinary circumstances that precipitated the filing of these Chapter 11 Cases and the equally extraordinary events that transpired thereafter, the Debtors believe that they have achieved a Plan that is fair and equitable, maximizes the value of the Debtors' estates, and maximizes recoveries to Holders of Claims, including, especially, Holders of Account Holder Claims.  Importantly, the "toggle" feature under the Plan ensures an outside date by which the Debtors can pivot to a standalone plan and return value to Holders of Claims without any further delay.

---

[8]  *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Nov. 11, 2022).

[9]  *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 24], filed in *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Nov. 17, 2022); *see also United States of America v. Samuel Bankman-Fried*, 22-crim-673 (S.D.N.Y. December 9, 2022); *Securities and Exchange Commission v. Samuel Bankman-Fried*, Civil Action. No. 22-cv-10501 (S.D.N.Y. Dec. 13, 2022).

[10]  *Motion of Debtors for Entry of an Order (A) Authorizing the Debtors to Enter Into the Stipulation with Voyager Digital, LLC and (B) Granting Related Relief* [Docket No. 283], filed in *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Dec. 21, 2022).

Appellant Appendix ER - 604

Accordingly, the Debtors, in close consultation with Binance.US and other parties in interest, have worked tirelessly to negotiate and formulate a Plan that provides recoveries to Holders of Claims on the quickest timeline and in the most favorable manner in light of the FTX collapse and related industry fallout.

### III.    BACKGROUND

Prior to the Petition Date, Voyager operated a cryptocurrency trading platform that allowed customers to buy, sell, and store cryptocurrency on an easy-to-use and "accessible-to-all" platform.  Using the Company's mobile application, Voyager's customers could earn rewards on the cryptocurrency assets stored on the Company's platform and trade over 100 unique digital assets.  Voyager's mission since inception has been to provide customers with the tools to enter the cryptocurrency industry on their own terms in a way that is tailored to the needs of each customer.  Voyager's mobile application has been downloaded millions of times and had over 1.1 million active users as of July 5, 2022 (the "Petition Date").  In 2021, Voyager was one of the top ten most downloaded cryptocurrency mobile applications in the world.

Recent events in the world economy roiled traditional markets and the cryptocurrency markets alike.  The lingering effects of the COVID-19 pandemic, coupled with rampant inflation and the adverse effects of the war in the Ukraine on the world economy, contributed to a massive sell-off in traditional assets in early 2022.  Total wealth in the United States declined by $5 trillion between January 2022 and May 2022.  The cryptocurrency market is not immune to these macroeconomic trends and likewise experienced extreme market volatility in 2022.  All major coins and cryptocurrency-focused companies experienced significant declines; in early September 2022, the aggregate value of the cryptocurrency market sank below $1 trillion for the first time since 2020.  Several major liquidity events in the cryptocurrency space, including the implosion of Terra LUNA ("Luna") (as discussed in Article VII.A.2 of this Disclosure Statement), accelerated the onset of a "crypto winter" and an industry-wide sell-off to manage risk in 2022.

As described in more detail in Article VII.A.2.b below, in June 2022, it became apparent that the Company's loan to Three Arrows Capital ("3AC" and such loan the "3AC Loan"), a cryptocurrency hedge fund based in Singapore, was in jeopardy of partial or full nonpayment.  The Company's loan to 3AC was one of its largest outstanding loans.  On June 17, 2022, 3AC announced that it had suffered heavy losses due to massive exposure to Luna.  The Company's management team was acutely aware that nonpayment of the loan to 3AC, coupled with severe industry headwinds, would strain the Company's ability to continue operating its trading platform.  Accordingly, the Company's management team immediately began to explore potential strategic solutions.  The Company retained Kirkland & Ellis LLP ("Kirkland") and Moelis & Company LLC ("Moelis").  The Company subsequently retained Berkeley Research Group ("BRG") on June 30, 2022.  The Company engaged in discussions with third parties and potential sources of new liquidity and ultimately obtained an unsecured loan from Alameda Ventures Ltd. ("Alameda"), a major participant in the cryptocurrency space.  With the advice and assistance of Moelis, the Company began discussions with a host of third parties about a more long-term solution to the challenges facing the Company.  Discussions with these third parties, however, ultimately revealed that an in-court process would be necessary to develop the most value-maximizing alternative available to the Company.  Accordingly, the Debtors filed these Chapter 11 Cases on July 5, 2022.

On the first day of these chapter 11 cases, the Debtors filed the *Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 17] (as amended and restated from time to time, the "Standalone Plan").  The Standalone Plan contemplated a restructuring that could be effectuated without a sale and served as a floor for the Debtors' marketing process.  To that end, the Debtors, with the assistance of Moelis and their other advisors, continued their prepetition marketing efforts during these Chapter 11 Cases to canvas the market and identify interest in a transaction with a third-party investor (the "Marketing Process").  Shortly after commencing these chapter 11 cases, the Debtors filed the *Debtors' Motion Seeking Entry of an Order (I) Approving the Bidding Procedures and Related Dates and Deadlines, (II) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation, and (III) Granting Related Relief* [Docket No. 126] (the "Bidding Procedures Motion"), which set a timeline for interested parties to submit bids for an acquisition of the Debtors' assets and procedures for conducting an auction if multiple bids were received.  On August 5, 2022, the Bankruptcy Court entered the *Order (I) Approving the Bidding Procedures and Related Dates and Deadlines, (II) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation, and (III) Granting*

11

*Related Relief* [Docket No. 248] (the procedures approved thereby, the "Bidding Procedures") which, among others, established the Bid Deadline (as defined in the Bidding Procedures) as September 6, 2022 at 12:00 p.m., prevailing Eastern Time and set the Auction (as defined in the Bidding Procedures) for September 13, 2022 at 10:00 a.m., prevailing Eastern Time. Throughout the Marketing Process, the Debtors evaluated Bids received from potential transaction parties in comparison both to other Bids received and the recoveries contemplated by the Stand-Alone Plan as it provided a critical metric in the Debtors' determination of their path forward.[11]

On the Bid Deadline, the Debtors received a number of bids from strategic investors and, accordingly commenced an auction on September 13, 2022, for a sale of the Debtors' business. The two-week Auction featured hard-fought, arms-length negotiations with each participating bidder. At the conclusion of the Auction, the Debtors, in an exercise of their business judgment and in consultation with the Committee, determined that the final bid submitted by FTX US represented the most value-maximizing transaction available to the Debtors. Accordingly, on September 26, 2022, the Debtors announced FTX US as the winning bidder,[12] and on September 27, 2022, the Debtors and FTX US entered into an asset purchase agreement memorializing the terms of the winning bid (as may be amended from time to time in accordance with the terms thereof, the "FTX Purchase Agreement"). On October 20, 2022, the Court entered an order approving the Debtors' entry into the FTX Purchase Agreement.[13] On October 24, 2022, the Debtors filed solicitation versions of their Disclosure Statement and Plan,[14] and began soliciting votes on the Plan.

As set forth in greater detail in Article VIII.N hereof, the Debtors' journey to consummation of the FTX Transaction was derailed over the ensuing weeks. Following a series of extraordinary events, on November 11, 2022, Sam Bankman-Fried resigned from his role as CEO of the FTX enterprise, and FTX announced the chapter 11 filing of approximately 130 of its affiliates. Immediately following announcement of the FTX bankruptcy, the Debtors reengaged in discussions with numerous potential transaction parties interested in consummating a transaction with the Debtors. Following good-faith, arm's-length negotiations with several potential transaction parties regarding a variety of deal structures and terms, the Debtors determined, in an exercise of their business judgment and in consultation with the Committee, that the bid submitted by Binance.US represented the highest or otherwise best offer available to purchase the Debtors' business enterprise. On December 18, 2022, the Debtors and the Purchaser entered into an asset purchase agreement memorializing the terms of the Binance.US bid (as may be amended from time to time in accordance with the terms thereof, the "Asset Purchase Agreement").

The Debtors seek to effectuate the transactions contemplated by the Asset Purchase Agreement (collectively, the "Sale Transaction") pursuant to the Plan. The Plan, among other things:

- contemplates payment in full of Administrative Claims, Secured Tax Claims, Priority Tax Claims, and Other Priority Claims;

- provides for the distribution of Cryptocurrency, Cash, and any remaining assets at OpCo (including any recovery on account of the 3AC Claims, FTX Claims, or Alameda Claims) to Account Holders and Holders of OpCo General Unsecured Claims, subject to the terms of the Asset Purchase Agreement;

- provides for distribution of Cash and other assets at HoldCo to Holders of HoldCo General Unsecured Claims;

- provides for distribution of Cash and other assets at TopCo to Holders of TopCo General Unsecured Claims;

- provides for the equitable subordination of the Alameda Loan Facility Claims;

---

[11] Certain dates in the Bidding Procedures were amended by Docket Nos. 328, 343, 365, and 442.

[12] *See Notice of Successful Bidder* [Docket No. 457].

[13] Docket No. 581.

[14] Docket Nos. 590 and 591.

Appellant Appendix ER - 606

- provides for any residual value at TopCo after payment in full of TopCo General Unsecured Claims to be distributed to Holders of Section 510(b) Claims, if any, and Holders of Existing Equity Interests; and

- designates a Wind-Down Entity Trustee to wind down the Debtors' affairs in accordance with the Plan.

The Debtors believe that the Plan maximizes stakeholder recoveries in the Chapter 11 Cases. In particular, the Sale Transaction with Binance.US that the Plan contemplates represents, relative to all currently available alternatives, meaningfully greater and faster recovery to creditors. Accordingly, the Debtors urge all Holders of Claims entitled to vote to accept the Plan by returning their ballots so that Stretto actually receives such ballots by February 22, 2023 at 4:00 p.m. prevailing Eastern Time (the "Voting Deadline"). Assuming the Plan receives the requisite acceptances, the Debtors will seek the Bankruptcy Court's approval of the Plan at a hearing on March 2, 2023 at [●]:00 [a/p.m.]10:00 a.m. (prevailing Eastern Time) (the "Confirmation Hearing").

## IV. QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN

### A. What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor (whether or not such creditor or equity interest holder voted to accept the plan), and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B. Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims and interests whose votes on the Plan are being solicited. This Disclosure Statement is being submitted in accordance with these requirements.

### C. Am I entitled to vote on the Plan?

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold. Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class." Each Class's respective voting status is set forth below.

| | | | |
|---|---|---|---|
| 1 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | Account Holder Claims | Impaired | Entitled to Vote |

13

| | | | |
|---|---|---|---|
| 4A | OpCo General Unsecured Claims | Impaired | Entitled to Vote |
| 4B | HoldCo General Unsecured Claims | Impaired | Entitled to Vote |
| 4C | TopCo General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Alameda Loan Facility Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 6 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |
| 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |
| 9 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

**D.     What will I receive from the Debtors if the Plan is consummated?**

The following chart provides a summary of the anticipated recovery to Holders of Claims and Interests under the Plan.  Any estimates of Claims and Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.  Amounts in the far right column under the heading "Liquidation Recovery" are estimates only and are based on certain assumptions described herein and set forth in greater detail in the liquidation analysis attached hereto as **Exhibit B** (the "Liquidation Analysis").

**In a hypothetical liquidation under chapter 7 of the Bankruptcy Code, Holders of Account Holder Claims and General Unsecured Claims would likely receive a significantly reduced recovery relative to what such Holders would receive under the Plan**.  In the event of a chapter 7 liquidation, the Bankruptcy Court may appoint a trustee (the "Liquidating Trustee") to oversee and effectuate the liquidation of the Debtors' assets.  The Liquidating Trustee's fees and expenses would be paid by the Debtors and would be paid prior to any Account Holder Claims or General Unsecured Claims.  Given the novelty and complexity of the Debtors' business and the strong likelihood that any Liquidating Trustee appointed by the Bankruptcy Court may have minimal cryptocurrency experience, the Liquidating Trustee's fees and expenses and the anticipated reduction in value obtained through the monetization of cryptocurrency by the Liquidating Trustee would likely result in Account Holders and Holders of General Unsecured Claims receiving significantly reduced recoveries.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE BASED ON, AMONG OTHER THINGS, ALLOWED CLAIMS ARISING FROM THE REJECTION OF EXECUTORY CONTRACTS OR UNEXPIRED LEASES AND THE RESOLUTION OF DISPUTED CLAIMS.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[15]**

---

[15]   The recoveries set forth below may change based upon changes in the amount of Claims that are Allowed as well as other factors related to the Debtors' business operations and general economic conditions.

14

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims (in $mm)[16][17] | Projected Sale Transaction Recovery under the Plan | Projected Liquidation Transaction Recovery under the Plan | Liquidation Recovery |
|---|---|---|---|---|---|---|
| 1 | Secured Tax Claims | Each Holder of an Allowed Secured Tax Claim shall receive, in full and final satisfaction of such Allowed Secured Tax Claim, at the option of the Wind-Down Entity, payment in full in Cash of such Holder's Allowed Secured Tax Claim or such other treatment rendering such Holder's Allowed Secured Tax Claim Unimpaired. | $0.0 | N/A | N/A | N/A |
| 2 | Other Priority Claims | Each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Allowed Other Priority Claim, at the option of the applicable Debtor, payment in full in Cash of such Holder's Allowed Other Priority Claim or such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired. | $1.0 | 100% | 100% | 99% – 99% |
| 3 | Account Holder Claims[18] | Each Holder of an Allowed Account Holder Claim will receive in exchange for such Allowed Account Holder Claim:<br><br>(i) If the Sale Transaction is consummated by the Outside Date:<br><br>    a. its Net Owed Coins, as provided in and subject to the requirements of Sections 6.10 and 6.12 of the Asset Purchase Agreement; *provided* that for Account Holders in Unsupported Jurisdictions and only to the extent that the Purchaser does not obtain the Unsupported Jurisdiction Approval for the jurisdiction in | $1,763.8 | 51% | 45% | 35% – 39% |

---

[16]  The lower recovery compared to the FTX Transaction is largely due to fluctuations in the market following the FTX collapse along with the value differential under the Sale Transaction.

[17]  **The recoveries included in this Disclosure Statement are for illustrative purposes only and subject to material change particularly due to, among other things, market volatility, the ultimate treatment of the Alameda Loan Facility Claims and the Intercompany Obligations, and whether Alameda prevails on its asserted preference and related administrative claim which could substantially reduce the recoveries projected above.**

[18]  Account Holder Claims shall be valued in U.S. dollars as of the Petition Date consistent with section 502(b) of the Bankruptcy Code.

15

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims (in $mm)[1617] | Projected Sale Transaction Recovery under the Plan | Projected Liquidation Transaction Recovery under the Plan | Liquidation Recovery |
|---|---|---|---|---|---|---|
| | | which such Account Holder resides within 6 months following the Closing Date (as defined in the Asset Purchase Agreement), such Account Holders shall receive, after expiration of such time period, value in Cash at which such Net Owed Coins allocable to such Account Holder are liquidated; <br><br> b. its Pro Rata share of any Additional Bankruptcy Distributions, in Cryptocurrency or Cash as provided in and subject to the requirements of Sections 6.12 and 6.14 of the Asset Purchase Agreement; <br><br> c. its Pro Rata share of Distributable OpCo Cash; and <br><br> d. to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to OpCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims; <br><br> *provided* that distributions made to any Account Holder pursuant to clauses (b), (c), and (d) above shall be made after taking into account the Acquired Coins Value of the Net Owed Coins or the value in Cash at which such Net Owed Coins are liquidated, as applicable, previously allocated to such Account Holder; or <br><br> (ii) If the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated: <br><br> a. its Pro Rata share of Distributable OpCo Cash; <br><br> b. its Pro Rata share of Distributable Cryptocurrency, which such Account Holder | | | | |

Appellant Appendix ER - 610

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims (in $mm)[16][17] | Projected Sale Transaction Recovery under the Plan | Projected Liquidation Transaction Recovery under the Plan | Liquidation Recovery |
|---|---|---|---|---|---|---|
| | | shall be able to withdraw in kind, alternative Cryptocurrency, and/or Cash for a period of thirty (30) days after the Effective Date through the Voyager platform or, if elected by Seller pursuant to Section 6.12(d) of the Asset Purchase Agreement, through the Binance.US Platform; *provided* that, if the applicable transfer is made through the Voyager platform and such Account Holder does not withdraw its Pro Rata share of Distributable Cryptocurrency available to such Account Holder from the Voyager platform within such thirty (30) day period, such Account Holder will receive Cash in the equivalent value to its Pro Rata share of Distributable Cryptocurrency; and <br><br> c. to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to OpCo; *provided* that any distributions on account of Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims. | | | | |
| 4A | OpCo General Unsecured Claims | Each Holder of an Allowed OpCo General Unsecured Claim will receive in exchange for such Allowed OpCo General Unsecured Claim: <br><br> (i) If the Sale Transaction is consummated by the Outside Date: <br><br> a. its Pro Rata share of Distributable Cryptocurrency in Cash; <br><br> b. its Pro Rata share of Additional Bankruptcy Distributions, in Cryptocurrency or Cash as | $14.0 | 51% | 45% | 35% – 39% |

Appellant Appendix ER - 611

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims (in $mm)[1617] | Projected Sale Transaction Recovery under the Plan | Projected Liquidation Transaction Recovery under the Plan | Liquidation Recovery |
|---|---|---|---|---|---|---|
| | | provided in and subject to the requirements of Section 6.12 and 6.14 of the Asset Purchase Agreement;<br><br>c. its Pro Rata share of Distributable OpCo Cash; and<br><br>d. to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to OpCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims;<br><br>(ii) If the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated:<br><br>a. its Pro Rata share of Distributable Cryptocurrency in Cash;<br><br>b. its Pro Rata share of Distributable OpCo Cash; and<br><br>c. to effectuate distributions from the Wind-Down Entity, its Pro Rata share of Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to OpCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims. | | | | |
| 4B | HoldCo General | Each Holder of an Allowed HoldCo General Unsecured Claim will receive in exchange for such | $8.3 | 6% | 6% | 0% – 0% |

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims (in $mm)[1617] | Projected Sale Transaction Recovery under the Plan | Projected Liquidation Transaction Recovery under the Plan | Liquidation Recovery |
|---|---|---|---|---|---|---|
| | Unsecured Claims | Allowed HoldCo General Unsecured Claim: <br> (i) its Pro Rata share of Distributable HoldCo Cash; and <br> (ii) to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to HoldCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims. | | | | |
| 4C | TopCo General Unsecured Claims | Each Holder of an Allowed TopCo General Unsecured Claim will receive in exchange for such Allowed TopCo General Unsecured Claim: <br> (i) its Pro Rata share of Distributable TopCo Cash; and <br> (ii) to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of the Wind-Down Trust Assets attributable to TopCo; *provided* that any distributions on account of the Wind-Down Entity Assets or the Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims. | $3.0 | 64% | 64% | 65% – 65% |
| 5 | Alameda Loan Facility Claims | Each Holder of an Allowed Alameda Loan Facility Claim will receive in exchange for such Allowed Alameda Loan Facility Claim to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets; *provided* that any distributions on account of Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, all Allowed Claims at OpCo, HoldCo, and TopCo, including, but not limited to, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, Allowed Account Holder Claims, Allowed | $75.1 | 0% | 0% | 0% – 0% |

19

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims (in $mm)[1617] | Projected Sale Transaction Recovery under the Plan | Projected Liquidation Transaction Recovery under the Plan | Liquidation Recovery |
|---|---|---|---|---|---|---|
| | | OpCo General Unsecured Claims, Allowed HoldCo General Unsecured Claims, and Allowed TopCo General Unsecured Claims; *provided, however,* if the Bankruptcy Court denies subordination of the Alameda Loan Facility Claims, then such Alameda Loan Facility Claims shall be *pari passu* with General Unsecured Claims at the applicable Debtor entity. | | | | |
| 6 | Section 510(b) Claims | Each Holder of Allowed Section 510(b) Claims against TopCo will receive, to effectuate distributions, if applicable, from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to TopCo; *provided* that any distributions on account of the Wind Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, and Allowed TopCo General Unsecured Claims. | $0.0 | N/A | N/A | N/A |
| 7 | Intercompany Claims | On the Effective Date, all Intercompany Claims shall be, at the option of the Debtors, either (a) Reinstated or (b) converted to equity, otherwise set off, settled, distributed, contributed, or cancelled, in each case in accordance with the Restructuring Transactions Memorandum. | $0.0 | 0% | 0% | 0% – 0% |
| 8 | Intercompany Interests | On the Effective Date, all Intercompany Interests shall be, at the option of the Debtors, either (a) Reinstated in accordance with Article III.G of the Plan or (b) set off, settled, addressed, distributed, contributed, merged, or cancelled, in each case in accordance with the Restructuring Transactions Memorandum. | $0.0 | 0% | 0% | 0% – 0% |
| 9 | Existing Equity Interests | Each Holder of Existing Equity Interests will receive, to effectuate distributions, if applicable, from the Wind-Down Entity, its Pro Rata share of the Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to TopCo; *provided* that any distributions on account of Wind-Down Trust Units shall only be made following payment in full of, or reserve for, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, and Allowed TopCo General Unsecured Claims. | $0.0 | N/A | N/A | N/A |

20

### E. What will I receive from the Debtors if I hold an Allowed Administrative Claim?

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan. The chart below summarizes the various unclassified claims and provides the relevant section of the Plan that addresses their treatment:

| Claim | Description of Claim | Plan Section |
|---|---|---|
| Administrative Claims | A Claim against a Debtor for the costs and expenses of administration of the Chapter 11 Cases arising on or after the Petition Date and prior to the Effective Date pursuant to section 503(b) of the Bankruptcy Code and entitled to priority pursuant to sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' business and (b) Allowed Professional Fee Claims. For the avoidance of doubt, any Cryptocurrency inadvertently deposited to the Debtors' account(s) after the Petition Date shall be returned in full to the sender. | Article II, Section A |
| Professional Fee Claims | Any Administrative Claim by a Professional for compensation for services rendered or reimbursement of expenses incurred by such Professional through and including the Effective Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court. | Article II, Section B |
| Priority Tax Claims | Any Claim of a Governmental Unit against a Debtor of the kind specified in section 507(a)(8) of the Bankruptcy Code. | Article II, Section C |

### F. What is the "toggle" feature of the Plan?

The "toggle" feature of the Plan provides that, if the Sale Transaction is not consummated by Outside Date or the Asset Purchase Agreement is terminated, the Debtors can pivot to a standalone plan whereby the Debtors will distribute their assets to creditors in accordance with Article IV of the Plan. The "toggle" allows the Debtors to abandon the Sale Transaction and to initiate distributions to Holders of Claims without the need to restart the Disclosure Statement and Plan solicitation process. As a result, Holders of Claims will receive recoveries under the Plan on a much quicker timeline than if the Debtors have to recommence the solicitation process on the standalone plan.

### G. How will my Account be transitioned to Binance.US?

The Debtors will transition Account Holders and Holders of OpCo General Unsecured Claims to the Binance.US Platform and effectuate delivery of Plan distributions to such Holders' Binance.US Accounts as set forth in Article V.C.6 of this Disclosure Statement and subject to the terms of the Asset Purchase Agreement based on whether Account Holders and Holders of OpCo General Unsecured Claims are in Supported Jurisdictions or Unsupported Jurisdictions. All Account Holders and Holders of Allowed OpCo General Unsecured Claims should closely review Article V.C.6 of this Disclosure Statement. It is currently anticipated that all Account Holders and Holders of OpCo General Unsecured Claims will transition to Binance.US subject to their successful completion of Binance.US's "Know Your Customer" process and other procedural and regulatory requirements as further described in the Asset Purchase Agreement.

### H. What if I am unable or unwilling to transition my Account to Binance.US?

We expect that substantially all Account Holders will be transitioning to Binance.US. In the event that a customer is not successfully transitioned to Binance.US (for instance, in the event such Account Holder resides in an Unsupported Jurisdiction for which Binance.US does not obtain the Unsupported Jurisdiction Approval within

21

six (6) months of the Closing Date (as defined in the Asset Purchase Agreement)), such customer will not receive any distributions in Cryptocurrency form ("in kind"). They will instead receive a Cash distribution from the Debtor's estates as and when such distributions are made pursuant to the Bankruptcy Code.

I. **What are the sources of Consideration and other consideration required to fund the Plan?**

Distributions under the Plan shall be funded by (i) the proceeds of Purchaser's payment obligations under Sections 2.1 and 2.2 of the Asset Purchase Agreement, (ii) distributions of Acquired Coins pursuant to Sections 6.12 and 6.14 of the Asset Purchase Agreement, and (iii) the Wind-Down Entity or Wind-Down Trust (as applicable) from the Wind-Down Entity Assets or Wind-Down Trust Assets (as applicable); *provided*, *however*, that Allowed Professional Fee Claims shall be paid from the Professional Fee Escrow Account in the first instance. The Wind-Down Trust Entity Assets or Wind-Down Trust Assets (as applicable) shall be used to pay the Wind-Down Trust Entity Expenses (including the compensation of the Wind-Down Trustee and any professionals retained by the Wind-Down Trust), and to satisfy payment of Allowed Claims and Interests as set forth in the Plan.

J. **Are any regulatory approvals required to consummate the Sale Transaction and confirm the Plan?**

Voyager currently maintains state money transmission licenses or their equivalents (each, a "Money Transmission License") in seventeen (17) states,[19] and has license applications pending[20] in eighteen (18) states.[21]

The Debtors have engaged with the state banking departments throughout the bankruptcy process and will continue to actively do so with the goal of ensuring that the Sale Transaction and the Plan provides for compliance by Voyager and the Purchaser, as applicable, with state money transmission laws as of the consummation of the Sale Transaction. The state banking departments may have broad discretion as to the approvals required in connection with the Sale Transaction, thus it is not possible to predict with certainty the scope of such approvals, whether they will ultimately be granted, and the expected timeframes of the state banking departments' determinations. There are unresolved questions of law with respect to the intersection of state money transmission statutes and the Bankruptcy Code and the answers to those questions may impact the ability of the state banking departments to require certain approvals with respect to consummation of the Sale Transaction and confirmation of the Plan.

As an initial matter, it is important to note that Money Transmission Licenses are not assets that can be purchased or transferred; they are specific to the entity to which they are issued, and thus an acquisition of a licensed entity must be conducted through a stock purchase or merger in which the licensed entity is the surviving entity for the licenses to remain in effect.

Pursuant to the Asset Purchase Agreement, the Purchaser will not acquire Voyager's Money Transmission Licenses; rather, the Asset Purchase Agreement provides for the transfer of the Acquired Coins and Additional Bankruptcy Distributions to the Binance.US Platform for distribution in accordance with the Asset Purchase

---

[19] The Alaska Division of Banking and Securities suspended Voyager's license on July 6, 2022 and subsequently reversed such suspension on July 14, 2022. There is a risk that one or more additional state banking departments may choose to suspend Voyager's Money Transmission Licenses going forward.

[20] On July 17, 2022, the North Dakota Department of Financial Institutions notified Voyager that it required Voyager's pending money transmitter license application be withdrawn on grounds that it would not approve an application with an active bankruptcy filing. There is a risk that one or more additional state banking departments with which Voyager has pending applications may impose similar restrictions on Voyager going forward.

The Debtors have two applications pending in New York: (a) a money transmitter license application and (b) a virtual currency business activity license application or "Bitlicense." Voyager Digital NY, LLC, a non-operational affiliate of the Debtors, filed such applications.

[21] Voyager also maintains a registration as a "money services business" with the Financial Crimes Enforcement Network ("FinCEN") pursuant to federal money transmission laws. A change in ownership of an entity registered with FinCEN requires notice to FinCEN following consummation of the relevant transaction, but does not require prior regulatory approval.

Appellant Appendix ER - 616

Agreement and the transition of Account Holders and Holders of OpCo General Unsecured Claims to Binance.US accounts in order to receive the same, subject to the terms and conditions set forth in the Asset Purchase Agreement (which include prohibitions on such transfers and transitions with respect to Account Holders and Holders of OpCo General Unsecured Claims located in Unsupported Jurisdictions).

Following consummation of the Sale Transaction, Voyager will take steps to (i) withdraw those money transmission license applications that are pending with state banking departments and (ii) surrender those Money Transmission Licenses it holds (the "Licensing Wind-Down Process"). Such Licensing Wind-Down Process will require notice to, and in some cases approval by, those state banking departments in states where the Debtors have applications pending or are licensed pursuant to the requirements set forth in each state money transmission statute and as otherwise required by the relevant state banking departments.[22]

In the event that the "toggle" function is triggered, causing a pivot to a self-liquidating plan, Voyager would maintain its Money Transmission Licenses for so long as necessary to effect distribution of recoveries to Holders of Claims and complete the Licensing Wind-Down Process at the appropriate time.

**K.      How will I receive my recovery as an Account Holder if the Sale Transaction is not consummated?**

In the event that the Sale Transaction is not consummated by the Outside Date, the Debtors will outline the steps necessary for Account Holders to receive Distributable Cryptocurrency on an in-kind basis and will describe the transition process in further detail. It is currently anticipated that all Account Holders will receive the option to receive Distributable Cryptocurrency in certain formats that will render such transfer "in-kind" to allow such distributions to be positioned in the most tax-efficient manner possible for Account Holders.

**L.      What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to consummate the Restructuring Transactions. It is possible that any alternative transaction may provide Holders of Claims and Interests with less than they would have received pursuant to the Plan. For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* Article XI.B of this Disclosure Statement, titled "Best Interests of Creditors—Liquidation Analysis" and the Liquidation Analysis attached hereto as **Exhibit B**.

**M.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation"?**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective. Initial distributions to Holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as practicable thereafter, as specified in the Plan. *See* Article IX of the Plan for a description of the conditions precedent to consummation of the Plan.

**N.      Is there potential litigation related to the Plan?**

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan as well, which could potentially lead to litigation. *See* Article IX.D.2 of this Disclosure Statement titled "The Wind-Down Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases as well as Ongoing Regulatory Investigations" for further discussion on this issue.

As of the Petition Date, the Debtors were parties to certain litigation matters that arose in the ordinary course of operating their business and could become parties to additional litigation in the future. Although the Debtors have disputed, are disputing, or will dispute in the future the amounts asserted by such litigation

---

[22]   The state approval process for the surrender of a license typically takes several months.

23

counterparties, to the extent these parties are ultimately entitled to a higher amount than is reflected in the amounts estimated by the Debtors herein, the value of recoveries to Account Holders and Holders of General Unsecured Claims could change, and such changes could be material.

The Debtors may also reject Executory Contracts and Unexpired Leases, which may result in parties asserting General Unsecured Claims for rejection damages. An increase in the estimated amount of rejection damages claims could result in reduced recoveries for Account Holders and Holders of General Unsecured Claims. Finally, the Debtors may object to certain Proofs of Claim, and any such objections ultimately could cause the total amount of Allowed General Unsecured Claims to change. These changes could affect recoveries to Account Holders and Holders of General Unsecured Claims, and such changes could be material.

### O.  Does the Plan provide for the subordination of any Claims?

The Plan contemplates that the Class 5 Alameda Loan Facility Claims are subordinated Claims. Section 510(c) of the Bankruptcy Code provides, in relevant part, that the Bankruptcy Court may, "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest." 11 U.S.C. § 510(c)(l). Bankruptcy courts have ruled that equitable subordination is proper where three conditions are met: ( 1) the claimant must have engaged in some type of inequitable conduct; (2) the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must not be inconsistent with the provisions of the federal bankruptcy regime. *See In re LightSquared Inc.*, 511 B.R. 253, 346 (Bankr. S.D.N.Y. 2014) citing *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 699-700 (5th Cir. 1977).

The Debtors believe that the Alameda Loan Facility Claims should be equitably subordinated due to Alameda and its affiliates' inequitable conduct that has harmed the Debtors' creditors in multiple instances. Since the outset of these Chapter 11 Cases, Alameda has sought to undermine and sabotage the Debtors' restructuring efforts at every turn. The Alameda Loan Agreement that was entered into just prior to the filing of these Chapter 11 Cases included a provision that required the Debtors to only engage in lending activities with Alameda.[23] Alameda's effort to front-run the Debtors' marketing process continued when, on July 22, 2022, it issued a press release and low-ball proposal for the Debtors' business while openly disparaging the Debtors. Alameda's attempts to mislead creditors with false statements were so egregious that the Debtors were forced issue a response to correct the record.[24] Alameda's claims, made with full knowledge of their falsity, chilled the Debtors' marketing process and lowered the floor for potential bids in the Auction. Prior to the Auction, the Debtors requested that Alameda unwind all outstanding prepetition loans made by the Debtors to Alameda (some of which were collateralized) to ensure fairness and equal footing for all participants in the Auction.[25] Alameda finally acquiesced to the repayment of the prepetition loans once the Debtors communicated that Alameda's participation in the Auction was contingent on either repaying the prepetition loans or disclosing its financial wherewithal to the other bidders to ensure a level playing field for all Auction participants.

Given the fallout following the discovery of the apparent historic fraud committed by Alameda and FTX, the Debtors and other parties-in-interest now understand that Alameda's behavior in the Chapter 11 Cases was an effort to fill holes on its balance sheet resulting from their apparent fraudulent business operations. Alameda's insistence to skirt the Debtors' robust marketing process was a feigned attempt to acquire the Debtors' cryptocurrency in the quick of night, not to return Cryptocurrency to the Debtors' stakeholders despite Alameda's and FTX's former leadership's adamant contentions.[26] Accordingly, the Debtors believe that such behavior

---

[23]  *See* Alameda Loan Agreement, Section 4.7.

[24]  *See Notice of Response to Alameda/FTX US Press Release* [Docket No. 137].

[25]  *See* Unwind Motion; Article VIII.L of this Disclosure Statement.

[26]  *See, e.g.*, @SBF, Tᴡɪᴛᴛᴇʀ (July 24, 2022, 8:32 P.M. ET),
https://twitter.com/SBF_FTX/status/1551364656085602305?s=20&t=67p5C4w-kxALBYJjQ1UVCg.

24

warrants the equitable subordination of the Alameda Loan Facility Claims.  The Debtors will further demonstrate the legal and factual bases for subordinating the Alameda Loan Facility Claims prior to or at Confirmation.

Although the Debtors have classified the Alameda Loan Facility Claims as subordinated claims, the Bankruptcy Court may rule that subordination of the Alameda Loan Facility Claims is improper.  If the Bankruptcy Court denies subordination of the Alameda Loan Facility Claims, then such Alameda Loan Facility Claims shall be *pari passu* with General Unsecured Claims at the applicable Debtor entity.

**P.      Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes, Article VIII of the Plan proposes to provide certain releases to the Released Parties and also provides for exculpation of the Exculpated Parties.  The release, exculpation, and injunction provisions that are contained in the Plan are copied in Article V.A.3 of this Disclosure Statement, entitled "Releases."  For the avoidance of doubt, the decision to "opt in" to the releases is voluntary, and the failure to "opt in" does not prejudice any electing creditors' rights.

On the Petition Date, the board of directors of Voyager Digital, LLC voted to appoint two independent directors to the board of Voyager Digital, LLC and to establish a special committee (the "Special Committee").  The Special Committee consists of the newly appointed independent directors and was established to investigate certain historical transactions, including the facts and circumstances related to the Debtors' loan to 3AC (the "Investigation").  On August 4, 2022, the Bankruptcy Court entered an order approving the appointment of Quinn Emmanuel Urquhart & Sullivan, LLP as legal counsel to the Special Committee ("Special Committee Counsel") with the mandate to conduct the Investigation.  The Special Committee's investigation, and the settlements reached by the Special Committee that are incorporated into the Plan, are described in more detail in Article VII.A.2(b)(i)-(ii) below.  As described in Article VII.A.2(b)(i)-(ii), the potential estate claims the Special Committee identified as colorable are being settled pursuant to the Plan on the terms set forth herein.

The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' chapter 11 process through, among other things, efforts to market and sell the Debtors' assets and negotiate and implement the Plan, which will maximize value for the benefit of all parties in interest.  The Debtors' Chief Executive Officer, Mr. Ehrlich ("CEO") and Chief Commercial Officer (and former Chief Financial Officer), Mr. Psaropoulos ("CCO") are also making additional personal contributions to the Plan pursuant to the settlements reached with the Special Committee.  Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

The Debtor releases (other than with respect to derivative claims) do not affect the Canadian Class Action.  The Debtor releases are releases of the Debtors' claims against third parties.  The Canadian Class Action claim against Voyager Digital Ltd. is a Claim against a Debtor, which will be subject to the treatment of Section 510(b) Claims under the Plan.  The Canadian Class Action direct claims against the Debtors' directors and officers are not impacted by the Debtor release.

The third-party releases do not release direct claims unless a Holder of such Claim or Interest affirmatively elects to opt into the third-party release.  Holders of Claims or Interests may also contribute their third-party claims against Persons other than the Debtors to the Wind-Down Entity pursuant to Article IV.Q of the Plan.  If the Holder of a Claim or Interest contributes their Contributed Third-Party Claims to the Wind-Down Entity then they will be barred from pursuing such Contributed Third-Party Claims.  However, pursuant to the Plan, Contributed Third-Party Claims do not include (i) any derivative claims of the Debtors, (ii) any direct claims against the Releasing Parties, (iii) any direct Causes of Action that any Contributing Claimant has against Mark Cuban, Dallas Basketball Limited d/b/a Dallas Mavericks, the National Basketball Association, and any of their Related Parties, or (iv) any direct Causes of Action that any Contributing Claimant, in its capacity as an equity holder of Voyager Digital Ltd., has that are asserted in the Canadian Class Action against Voyager Digital Ltd., Stephen Ehrlich, Philip Eytan, Evan Psaropoulos, Lewis Bateman, Krisztian Toth, Jennifer Ackart, Glenn Stevens, and Brian Brooks.  The Wind-Down Entity will be able to pursue Contributed Third-Party Claims subject to the terms of the Plan.  To the extent the Wind-Down Entity chooses to pursue the contributed Claims, and is successful, additional recovery may be generated as a result, which will be distributed in accordance with the Plan waterfall.

Appellant Appendix ER - 619

The Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Second Circuit. Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.

**ALL HOLDERS OF CLAIMS THAT (I) VOTE TO ACCEPT THE PLAN AND WHO AFFIRMATIVELY OPT INTO THE RELEASES PROVIDED BY THE PLAN; (II) VOTE TO REJECT THE PLAN AND WHO AFFIRMATIVELY OPT INTO THE RELEASES PROVIDED BY THE PLAN; OR (III) ABSTAIN FROM VOTING ON THE PLAN AND AFFIRMATIVELY OPT INTO TO THE RELEASES PROVIDED IN THE PLAN WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY RELEASED AND DISCHARGED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE RELEASED PARTIES, INCLUDING THE DEBTORS OR THE WIND-DOWN DEBTORS, AS APPLICABLE.**

**Q.     What is the deadline to vote on the Plan?**

The Voting Deadline is February 22, 2023, at 4:00 p.m. (prevailing Eastern Time).

**R.     How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote on the Plan.  To be counted as votes to accept or reject the Plan, each ballot (a "Ballot") must be properly executed, completed, and delivered in accordance with the instructions provided such that a vote cast is **actually received** before the Voting Deadline by Stretto.  *See* Article X of this Disclosure Statement, entitled "Solicitation and Voting Procedures."

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE CLAIMS, NOTICING, AND SOLICITATION AGENT.  ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE VOTING INSTRUCTIONS WILL NOT BE COUNTED EXCEPT AS DETERMINED BY THE DEBTORS.**

**S.     Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on Confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

**T.     When is the Confirmation Hearing set to occur?**

The Debtors will request that the Bankruptcy Court schedule the Confirmation Hearing for March 2, 2023, at ~~4:00 p.m.~~ 10:00 a.m. (prevailing Eastern Time).  The Confirmation Hearing may be adjourned from time to time without further notice.  The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing.  Subject to section 1127 of the Bankruptcy Code, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Objections to Confirmation of the Plan must be filed and served on the Debtors, and certain other parties, by February 22, 2023, at 4:00 p.m. (prevailing Eastern Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement.

The Debtors will publish the notice of the Confirmation Hearing, which will contain the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in *The New York Times* (national edition) and *Financial Times* to provide notification to those persons who may not receive notice by mail.  The Debtors may also publish the notice of the Confirmation Hearing in such trade or other publications as the Debtors may choose.

**U.     What is the purpose of the Confirmation Hearing?**

26

The confirmation of a plan by a bankruptcy court binds the debtor, any issuer of securities under a plan, any person acquiring property under a plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.

**V.      What is the effect of the Plan on the Debtors' ongoing business?**

The Debtors are liquidating under chapter 11 of the Bankruptcy Code.  Following Confirmation, the Plan will be consummated on the Effective Date.  On or after the Effective Date, unless otherwise provided in the Plan, the Wind-Down Trustee will commence the wind down of the Wind-Down Debtors in accordance with the terms of the Plan.  Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

**W.      What steps did the Debtors take to evaluate alternatives to a chapter 11 filing?**

As described in Article VII herein, as well as in the *Declaration of Stephen Ehrlich, Chief Executive Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 15] (the "First Day Declaration"), prior to the Petition Date, the Debtors evaluated numerous potential alternatives, including options relating to mergers, sales, capital raising, and consensual recapitalizations, to provide stability and requisite capitalization to their business enterprise in light of significant market volatility.

**X.      Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Claims, Noticing, and Solicitation Agent:

By electronic mail at:
voyagerinquiries@stretto.com with a reference to "In re Voyager – Solicitation Inquiry" in the subject line.

By telephone at:
(855) 473-8665 (Toll-Free) or (949) 271-6507 (International)

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in these Chapter 11 Cases are available upon written request to the Debtors' Claims, Noticing, and Solicitation Agent at the address above or by downloading the exhibits and documents from the website of the Debtors' Claims, Noticing, and Solicitation Agent at http://cases.stretto.com/Voyager (free of charge) or the Bankruptcy Court's website at https://www.nysb.uscourts.gov/ecf-and-pacer-information (for a fee).

**V.      THE DEBTORS' PLAN**

**A.      The Plan.**

The Plan contemplates, among other things, (a) if the Sale Transaction is consummated by the Outside Date, the Debtors will (i) transfer all Acquired Coins to the Binance.US Platform for distribution in accordance with the Asset Purchase Agreement, (ii) distribute recoveries to Holders of HoldCo General Unsecured Claims and TopCo Unsecured Claims, (iii) transfer all Claims, Interests, and assets to the Wind-Down Reserve, and (iv) liquidate the Debtors' business and remaining assets under chapter 11 of the Bankruptcy Code; or (b) if the Sale Transaction is not consummated by the Outside Date, (i) distribute substantially all of the Cryptocurrency on the Debtors platform to Account Holders and distribute Cash at each Debtor entity to Holders of Claims at such entity, (ii) transfer all Claims, Interests, and assets to the Wind-Down Reserve, and (iii) liquidate the Debtors' business and remaining assets under chapter 11 of the Bankruptcy Code.  The Plan contemplates the following key terms, among others described herein and therein:

**1.      *General Settlement of Claims and Interests***

Appellant Appendix ER - 621