Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DEBTORS' MEMORANDUM OF LAW**
**IN SUPPORT OF (I) FINAL APPROVAL OF THE SECOND**
**AMENDED DISCLOSURE STATEMENT RELATING TO THE THIRD**
**AMENDED JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC.**
**AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE**
**BANKRUPTCY CODE AND (II) AN ORDER CONFIRMING THE THIRD**
**AMENDED JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND ITS**
**DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

Appellant Appendix ER - 723

## TABLE OF CONTENTS

Page(s)

Preliminary Statement .................................................................................................................1

Argument .................................................................................................................................10

I.   Case Background and Objections ................................................................................11

    A.   Procedural History. ..........................................................................................11

    B.   The Restructuring Transactions. ......................................................................16

        1.   The Sale Transaction............................................................................17

        2.   The Liquidation Transaction.................................................................18

        3.   The Wind-Down. ..................................................................................19

    C.   The Plan Solicitation and Notification Process. ...............................................20

    D.   The Objections. .................................................................................................22

II.  The Disclosure Statement Contains "Adequate Information" as Required by
Section 1125 of the Bankruptcy Code, and the Debtors Complied with the
Applicable Notice Requirements. ................................................................................23

    A.   The Disclosure Statement Contains Adequate Information................................23

    A.   The Debtors Complied with the Applicable Notice and Solicitation
Requirements. ...................................................................................................26

    B.   Solicitation of the Plan Complied with the Bankruptcy Code and was in
Good Faith. ......................................................................................................27

III. The Plan Satisfies the Requirements of Section 1129 of the Bankruptcy Code. ...........27

    A.   The Plan Complies with the Applicable Provisions of the Bankruptcy
Code (§ 1129(a)(1)). ........................................................................................27

        1.   The Plan Satisfies the Classification Requirements of Section 1122
of the Bankruptcy Code. ......................................................................28

        2.   The Plan Satisfies the Mandatory Plan Requirements of
Section 1123(a) of the Bankruptcy Code...............................................31

            (1)   Designation of Classes of Claims and Equity Interests
(§ 1123(a)(1)).................................................................................31

i

Appellant Appendix ER - 724

(2)     Specification of Unimpaired Classes (§ 1123(a)(2)) ....................31

(3)     Treatment of Impaired Classes (§ 1123(a)(3))................................32

(4)     Equal Treatment within Classes (§ 1123(a)(4))............................32

(5)     Means for Implementation (§ 1123(a)(5)) .....................................33

(6)     Issuance of Non-Voting Securities (§ 1123(a)(6))........................34

(7)     Directors and Officers (§ 1123(a)(7)) ............................................34

3.     The Plan Complies with the Discretionary Provisions of
Section 1123(b) of the Bankruptcy Code......................................35

     (1)     The Settlement of Claims and Controversies Is Fair and
Equitable and Should be Approved. ...............................37

     (2)     The Plan's Release, Exculpation, and Injunction Provisions
Satisfy Section 1123(b) of the Bankruptcy Code. .........................39

          (i)     The Debtor Release Is Appropriate....................................39

          (ii)     The Third-Party Release is Wholly Consensual and
Is Appropriate. ...................................................42

          (iii)     The Exculpation Provision Is Appropriate. .......................45

          (iv)     The Injunction Provision Is Appropriate. ..........................48

     (3)     The Sale Transaction Should Be Approved Under
Sections 363(b)(1) and 1123(b)(4) of the Bankruptcy Code
as Sound Exercise of the Debtors' Business Judgment. ................49

4.     The Plan Complies with Section 1123(d) of the Bankruptcy Code...........53

B.     The Debtors Complied with the Applicable Provisions of the
Bankruptcy Code (§ 1129(a)(2)).............................................................54

     1.     The Debtors Complied with Section 1125 of the Bankruptcy Code. ........55

     2.     The Debtors Complied with Section 1126 of the Bankruptcy Code. ........56

C.     The Plan Was Proposed in Good Faith (§ 1129(a)(3)). .........................................57

D.     The Plan Provides that the Debtors' Payment of Professional Fees and
Expenses Are Subject to Court Approval (§ 1129(a)(4)). ....................................59

Appellant Appendix ER - 725

22-10943-mew Case 1:23-cv-02170-JHR Doc 1071 Filed 02/28/23 Document Entered 02/28/23 16:27:11 Page 4 of 79 Main Document

Pg 4 of 135

E. The Plan Does Not Require Additional Disclosures Regarding Directors, Officers, and Insiders (§ 1129(a)(5)). ....................................................................60

F. The Plan Does Not Require Governmental Regulatory Approval (§ 1129(a)(6)). ......................................................................................................61

G. The Plan Is in the Best Interests of All the Debtors' Creditors (§ 1129(a)(7)). ......................................................................................................62

H. The Plan Is Confirmable Notwithstanding the Requirements of Section 1129(a)(8) of the Bankruptcy Code. ....................................................64

I. The Plan Provides for Payment in Full of All Allowed Priority Claims (§ 1129(a)(9)). ......................................................................................................65

J. At Least One Class of Impaired, Non-Insider Claims Accepted the Plan (§ 1129(a)(10)). ....................................................................................................66

K. The Plan Is Feasible (§ 1129(a)(11)). ....................................................................67

L. All Statutory Fees Have Been or Will Be Paid (§ 1129(a)(12)). ..........................69

M. No Remaining Retiree Benefits Obligations (§ 1129(a)(13)). ..............................70

N. Sections 1129(a)(14) through 1129(a)(16) Do Not Apply to the Plan. .................70

O. The Plan Satisfies the "Cram Down" Requirements of Section 1129(b) of the Bankruptcy Code. ...............................................................................................70

    1. The Plan Is Fair and Equitable (§ 1129(b)(2)(B)(ii)). ...............................71

    2. The Plan Does Not Unfairly Discriminate with Respect to the Impaired Classes that Have Not Voted to Accept the Plan (§ 1129(b)(1)). ...........................................................................................72

P. The Debtors Complied with Section 1129(d) of the Bankruptcy Code. ................74

Q. Modifications to the Plan. .....................................................................................74

R. Good Cause Exists to Waive the Stay of the Confirmation Order. .......................75

IV. The Objections to the Plan Should be Overruled. ..............................................................77

A. The Disclosure Statement Provides Adequate Information Regarding the Sale Transaction. ...................................................................................................77

B. The Disclosure Statement Provides Adequate Information as to Binance.US's Financial Condition and Solvency and the Feasibility of the Sale Transaction. ...................................................................................................79

Appellant Appendix ER - 726

C.     The Disclosure Statement Provides Adequate Information Regarding the
       Transfer of Account Holders and Cryptocurrency to Binance.US. ......................81

D.     The Disclosure Statement Contains Adequate Information Regarding the
       Financial Consequences of the Plan. ......................................................................83

E.     The Plan Does Not Violate Applicable Law..............................................................84

F.     The Release and Exculpation Provisions of the Plan Are Reasonable and
       Appropriate. ...........................................................................................................85

G.     The AHG Objection is Satisfied Pursuant to Language Added to the
       Confirmation Order..................................................................................................92

H.     The Debtors' Treatment of Account Holders Claims Is Appropriate and
       Consistent with Bankruptcy Code. .........................................................................93

I.     The Customer Objections Raise Issues That are Not Barriers to
       Confirmation. ........................................................................................................101

       1.     The Newsom and Warren Objection and the Hendershott et al.
              Objection.......................................................................................................101

       2.     The Shehadeh Papers. .................................................................................103

J.     The BNY Objection Should Be Overruled as No Transfer has Occurred. ..........105

Conclusion ...................................................................................................................105

Appellant Appendix ER - 727

## TABLE OF AUTHORITIES

**Cases**                                                                         **Page(s)**

*In re 500 Fifth Ave. Assocs.*,
148 B.R. 1010 (Bankr. S.D.N.Y. 1993),
*aff'd*, No. 93-cv-844, 1993 WL 316183 (S.D.N.Y. May 21, 1993)...........................10, 28, 29

*In re Adelphia Bus. Sols., Inc.*,
341 B.R. 415 (Bankr. S.D.N.Y. 2003) ...................................................................67

*In re Adelphia Commc'ns Corp.*,
368 B.R. 140 (Bankr. S.D.N.Y. 2007) ...................................................40, 59, 63, 96

*In re Advanced Science Technologies, Inc.*,
Case No. 17-13668 (SMB) (Bankr. S.D.N.Y. Feb. 7, 2018) ...................................46

*In re Aegean Marine Petroleum Network, Inc.*,
599 B.R. 717 (Bankr. S.D.N.Y. 2019)............................................................. *passim*

*In re Aleris Int'l, Inc.*,
No. 09-10478 (BLS), 2010 WL 3492664 (Bankr. D. Del. May 13, 2010)...................68

*In re Ambanc La Mesa L.P.*,
115 F.3d 650 (9th Cir. 1997) .........................................................................71, 97

*In re Amfesco Indus., Inc.*, No. CV-88-2952 (JBW),
1988 WL 141524 (E.D.N.Y. Dec. 21, 1988) ........................................................24

*In re AMR Corp.*,
562 B.R. 20 (Bankr. S.D.N.Y. 2016) ...................................................................99

*In re Avaya Inc.*,
Case No. 17-10089 (SMB) (Bankr. S.D.N.Y. Nov. 28, 2017) .................................46

*Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
526 U.S. 434 (1999)....................................................................................63, 72

*In re Barneys New York, Inc.*,
Case No. 19-36300 (CGM) (Bankr. S.D.N.Y. Nov. 15, 2019).............................22, 90

*Berkeley Fed. Bank & Trust v. Sea Garden Motel and Apartments (In re Sea
Garden Motel and Apartments)*,
195 B.R. 294 (D.N.J. 1996) ...............................................................................68

*In re Boston Generating, LLC*,
440 B.R. 302 (Bankr. S.D.N.Y. 2010) .................................................................50

v

*In re Breitburn Energy Partners LP*,
    582 B.R. 321 (Bankr. S.D.N.Y. March 12, 2018) ..........................................95, 96

*In re Brotby*,
    303 B.R. 177 (B.A.P. 9th Cir. 2003)...........................................................................68

*BSL Operating Corp. v. 125 E Taverns, Inc. (In re BSL Operating Corp.)*,
    57 B.R. 945 (Bankr. S.D.N.Y. 1986)..........................................................................24

*In re Burns & Roe Enters., Inc.*,
    No. 08-4191 (GEB), 2009 WL 438694 (D.N.J. Feb. 23, 2009) ...............................75

*In re Buttonwood Partners, Ltd.*,
    111 B.R. 57 (Bankr. S.D.N.Y. 1990)..........................................................................73

*In re Calpine Corp.*,
    No. 05-60200 (BRL), 2007 WL 4565223 (Bankr. S.D.N.Y. Dec. 19, 2007).........43

*In re Cellular Info. Sys., Inc.*,
    171 B.R. 926 (Bankr. S.D.N.Y. 1994).........................................................................58

*In re Cengage Learning, Inc.*,
    Case No. 13-44106 (ESS) (Bankr. E.D.N.Y. Mar. 14, 2014)..................................46

*In re Cengage Learning, Inc.*,
    No. 13-44106 (ESS) (Bankr. E.D.N.Y. Mar. 14, 2014) ..........................................47

*In re Cent. Med. Ctr., Inc.*,
    122 B.R. 568 (Bankr. E.D. Mo. 1990)........................................................................96

*In re Century Glove, Inc.*,
    1993 WL 239489, at *7 (D. Del. Feb. 10, 1993) ......................................................63

*In re Charter Commc'ns, Inc.*,
    419 B.R. 221 (Bankr. S.D.N.Y. 2009)........................................................................40

*In re Charter Commc'ns, Inc.*,
    Case No. 09-11435 (Bankr. S.D.N.Y. Nov. 17, 2009) .............................................46

*In re Chassix Holdings, Inc.*,
    533 B.R. 64 (Bankr. S.D.N.Y. 2015)..........................................................................43

*In re Chemtura Corp.*,
    439 B.R. 561 (Bankr. S.D.N.Y. 2010)........................................................................43

*In re Chemtura Corp.*,
    No. 09-11233 (REG) (Bankr. S.D.N.Y. Nov. 23, 2010) ..........................................76

Appellant Appendix ER - 729

*In re Copy Crafters Quickprint, Inc.*,
  92 B.R. 973 (Bankr. N.D.N.Y. 1988) ...................................................................24

*In re Cumulus Media Inc.*,
  Case No. 17-13381 (SCC) (Bankr. S.D.N.Y. May 10, 2018) ................................46

*In re Dana Corp*,
  412 B.R. 53 (S.D.N.Y. 2008) .........................................................................33, 95

*In re Ditech Holding Corp.*,
  606 B.R. 544 (Bankr. S.D.N.Y. 2019) .................................................................87

*In re DJK Residential, LLC*,
  No. 08-10375 (JMP) (Bankr. S.D.N.Y. May 7, 2008) ..........................................47

*In re Drexel Burnham Lambert Grp.*,
  960 F.2d 285 (2d Cir. 1992) ................................................................................49

*In re Drexel Burnham Lambert Grp., Inc.*,
  138 B.R. 723 (Bankr. S.D.N.Y. 1992) ...............................................28, 29, 58, 60

*In re Eastman Kodak Co.*,
  2012 Bankr. LEXIS 2746 (Bankr. S.D.N.Y. June 15, 2012) ................................50

*In re Eastman Kodak Co.*,
  Case No. 12-10202 (Bankr. S.D.N.Y. Aug. 23, 2013) ........................................46

*In re Eddington Thread Mfg. Co.*,
  181 B.R. 826 (Bankr. E.D. Pa. 1995) .................................................................68

*In re Enron Corp.*,
  326 B.R. 497 (S.D.N.Y. 2005) ...........................................................................46

*In re Extended Stay Inc.*,
  No. 09-13764 (JMP) (Bankr. S.D.N.Y. July 20, 2010) ........................................76

*In re Fairway Group Holdings Corp.*,
  Case No. 16-11241 (MEW) (Bankr. S.D.N.Y. June 8, 2016) ...............................46

*In re Filene's Basement, LLC*,
  11-13511 (KJC), 2014 WL 1713416 (Bankr. D. Del. Apr. 29, 2014) ....................50

*Frito-Lay, Inc. v. LTV Steel Co.* (*In re Chateaugay Corp.*),
  10 F.3d 944 (2d Cir. 1993) .................................................................................28

*In re Frontier Communications Corporation*,
  Case No. 20-22476 (RDD) (Bankr. S.D.N.Y. Aug. 21, 2020) ..............................90

Appellant Appendix ER - 730

*In re FTX Trading Ltd.*,
Case No. 22-11068 (JTD) (Bankr. D. Del. Nov. 11, 2022) ...................................6

*In re FTX Trading Ltd.*,
No. 22-11068 (Bankr. D. Del. Nov. 11, 2022) ...................................................2, 5

*In re Gaston & Snow*,
Nos. 93-8517 (JGK), 93-8628 (JGK), 1996 WL 694421 (S.D.N.Y. Dec. 4,
1996) ..............................................................................................................58

*In re Gen. Growth Props.*,
426 B.R. 71 (Bankr. S.D.N.Y. 2010) ...............................................................87

*In re Genco Shipping & Trading Ltd.*,
513 B.R. 233 (Bankr. S.D.N.Y. 2014) ..............................................................43

*In re Glob. Safety Textiles Holdings LLC*,
No. 09-12234 (KG), 2009 WL 6825278 (Bankr. D. Del. Nov. 30, 2009)............75

*In re GSC, Inc.*,
453 B.R. 132 (Bankr. S.D.N.Y. 2011) ..............................................................50

*In re Hollander Sleep Products, LLC*,
No. 19-11608 (MEW) (Bankr. S.D.N.Y. May 19, 2019) .................................37, 49

*In re Indianapolis Downs, LLC*,
486 B.R. 286 (Bankr. D. Del. 2013) .................................................................43

*In re Innkeepers USA Trust*,
448 B.R. 131 (Bankr. S.D.N.Y. 2011) ..............................................................50

*In re Integrated Res., Inc.*, 147 B.R. 650 (S.D.N.Y. 1992),
*appeal dismissed*, 3 F.3d 49 (2d Cir. 1993) ......................................................50

*In re International Shipholding Corp.*,
Case No. 16-12220 (SMB) (Bankr. S.D.N.Y. March 2, 2017).............................46

*In re Ionosphere Clubs, Inc.*,
179 B.R. 24 (Bankr. S.D.N.Y. 1995) ................................................................24

*In re Ionosphere Clubs, Inc.*,
98 B.R. 174 (Bankr. S.D.N.Y. 1989) ................................................................29

*In re Iridium Operating LLCs*,
478 F.3d 452 (2d Cir. 2007)............................................................................41

*In re Jason Industries, Inc.*,
Case No. 20-22766 (RDD) (Bankr. S.D.N.Y. Aug. 17, 2020) ...........................90

Appellant Appendix ER - 731

*In re Jewish Memorial Hosp.*,
   13 B.R. 417 (Bankr. S.D.N.Y. 1981) ..................................................................73

*In re John Hancock Mut. Life Ins. Co.*,
   987 F.2d 154 (3d Cir. 1993) ..........................................................................71

*In re Johns-Manville Corp.*,
   60 B.R. 612 (Bankr. S.D.N.Y. 1986) ................................................................50

*In re Johns-Manville Corp.*,
   68 B.R. .....................................................................................................55

*Kane v. Johns-Manville Corp.*,
   843 F.2d 636 (2d Cir. 1988) ...............................................................58, 67, 68

*In re Keene Corp.*,
   164 B.R. 844 (Bankr. S.D.N.Y. 1994) ..............................................................87

*Kirk v. Texaco, Inc.*,
   82 B.R. 678, 682 (S.D.N.Y. 1988) ..................................................................24

*In re Lakeland Tours, LLC*,
   Case No. 20-11647 (JLG) (Bankr. S.D.N.Y. Aug. 21, 2020) .................................90

*In re Lapworth*,
   No. 97-34529 (DWS), 1998 WL 767456 (Bankr. E.D. Pa. Nov. 2, 1998) ...............55

*In re Latam Airlines Group SA*,
   2022 WL 2206829 (Bankr. S.D.N.Y June 18, 2022) ...............................33, 95, 96

*In re Lionel Corp.*,
   722 F.2d 1063 (2d Cir. 1983) .........................................................................50

*In re Lisanti Foods, Inc.*,
   329 B.R. 491 (Bankr. D.N.J. 2005) ..................................................................25

*Manati Sugar Co. v. Mock*,
   75 F.2d 284 (2d Cir. 1935) ............................................................................58

*Mercury Capital Corp. v. Milford Conn. Assocs., L.P.*,
   354 B.R. 1 (D. Conn. 2006),
   *remanded*, No. 04-30511, 2008
   WL 687266 (Bankr. D. Conn. Mar. 10, 2008) ....................................................68

*In re Mesa Air Grp., Inc.*,
   No. 10-10018 MG, 2011 WL 320466 (Bankr. S.D.N.Y. Jan. 20, 2011) .............96, 97

Appellant Appendix ER - 732

*In re Metro-Goldwyn-Mayer Studios Inc.*,
    Case No. 10-15774 (SMB) (Bankr. S.D.N.Y. Dec. 6, 2010)..................................46

*In re Metrocraft Publ'g Servs., Inc.*,
    39 B.R. 567 (Bankr. N.D. Ga. 1984) ......................................................................25

*In re Metromedia Fiber Network, Inc.*,
    416 F.3d 136 (2d Cir. 2005).....................................................................................43

*In re Momentum Mfg. Corp.*,
    25 F.3d 1132 (2d Cir. 1994)..............................................................................24, 56

*In re MPM Silicones*,
    2014 WL 4436335 ...................................................................................................43

*In re Neff Corp.*,
    Case No. 10-12610 (Bankr. S.D.N.Y. Sept. 20, 2010) ...........................................46

*In re New Power Co.*,
    438 F.3d 1113 (11th Cir. 2006) ..............................................................................96

*In re NII Holdings, Inc.*,
    536 B.R. 61 (Bankr. S.D.N.Y. 2015) .................................................................40, 41

*In re Oldco M. Corp.*,
    No. 09-13412 (MG) (Bankr. S.D.N.Y. Feb. 23, 2010) ...........................................76

*In re Oneida Ltd.*,
    351 B.R. 79 (Bankr. S.D.N.Y. 2006) .................................................................40, 46

*Oneida Motor Freight, Inc. v. United Jersey Bank*,
    848 F.2d 414 (3d Cir. 1988)....................................................................................24

*In re Pacific Drilling S.A.*,
    Case No. 17-13193 (MEW) (Bankr. S.D.N.Y. Nov. 2, 2018).................................46

*In re PC Liquidation Corp.*,
    383 B.R. 856 (E.D.N.Y. 2008) ...............................................................................24

*In re Penton Bus. Media Holdings, Inc.*,
    No. 10-10689 (AJG) (Bankr. S.D.N.Y. Mar. 5, 2010) ...........................................76

*In re Phoenix Petroleum Co.*,
    278 B.R. 385 (Bankr. E.D. Pa. 2001) ...............................................................24, 26

*In re Premier Int'l Holdings, Inc.*,
    2010 WL 2745964 (CSS) (Bankr. D. Del. Apr. 29, 2010) .....................................47

Appellant Appendix ER - 733

*In re Prudential Energy Co.*,
   58 B.R. 857 (Bankr. S.D.N.Y. 1986) ...................................................................67

*In re PWS Holding Corp.*,
   228 F.3d 224 (3d Cir. 2000)..............................................................................47

*In re RDA Holding Co.*,
   Case No. 13-22233 (RDD) (Bankr. S.D.N.Y. June 28, 2013)................................46

*In re Reader's Digest Ass'n, Inc.*,
   No. 09-23529 (RDD) (Bankr. S.D.N.Y. Jan. 15, 2010)........................................28

*In re Reader's Digest Ass'n, Inc.*,
   No. 09-23529 (RDD) (Bankr. S.D.N.Y. Jan. 15, 2010)........................................29

*In re Relativity Media, LLC*,
   Case No. 18-11358 (MEW) (Bankr. S.D.N.Y. Jan. 31, 2019) ..............................46

*In re River Village Assoc.*,
   181 B.R. 795 (E.D. Pa. 1995) ...........................................................................24

*In re Sabine Oil & Gas Corp.*,
   555 B.R. 180 (Bankr. S.D.N.Y. 2016)................................................................29

*In re Scioto Valley Mortg. Co.*,
   88 B.R. 168 (Bankr. S.D Ohio 1988).................................................................25

*Smith v. Van Gorkom*,
   488 A.2d 858 (Del. 1985) .................................................................................50

*In re Spansion*,
   2010 WL 2905001 (Bankr. D. Del. April 16, 2010)..............................................47

*In re Stone Barn Manhattan LLC*,
   405 B.R. 68 (Bankr. S.D.N.Y. 2009) .................................................................87

*In re Tex. Extrusion Corp.*,
   844 F.2d 1142 (5th Cir. 1988) ..........................................................................24

*In re Texaco Inc.*,
   84 B.R. 893 (Bankr. S.D.N.Y. 1988).................................................... 55, 58, 67

*In re Toy & Sports Warehouse, Inc.*,
   37 B.R. 141 (Bankr. S.D.N.Y. 1984)........................................................ 55, 59

*In re U.S. Brass Corp.*,
   194 B.R. 20 (Bankr. E.D. Tex. 1996) ................................................................25

Appellant Appendix ER - 734

*United States v. Samuel Bankman-Fried, Caroline Ellison, and Gary Wang*,
   No. 22-cr-673 (RA) (S.D.N.Y. Dec. 19, 2022)....................................................2

*In re Voyager Digital Holdings, Inc.*,
   No. 2210943 (MEW) (Bankr. S.D.N.Y. Jan. 10, 2023)................................ *passim*

*Westland Oil Dev. Corp. v. MCorp Mgmt. Sols., Inc.*,
   157 B.R. 100 (S.D. Tex. 1993) ...........................................................................25

*In re Windstream Holdings, Inc.*,
   Case No. 19-22312 (RDD) (Bankr. S.D.N.Y. June 22, 2020)...............................90

*In re Windstream Holdings, Inc.*,
   No. 19-22312 (RDD), (Bankr. S.D.N.Y. May 8, 2020)........................................46

*In re Wool Growers Cent. Storage Co.*,
   371 B.R. 768 (Bankr. N.D. Tex. 2007).................................................................43

*In re Worldcom, Inc.*,
   2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003) ...............................55, 60, 73

**Statutes**

11 U.S.C. § 101(31) ...................................................................................................61

11 U.S.C. § 157(b)(2)(L) ...........................................................................................91

11 U.S.C. § 363 ...............................................................................................49, 50, 51

11 U.S.C. § 365 ...............................................................................................36, 54, 76

11 U.S.C. § 503 ...................................................................................................66

11 U.S.C. § 507 .................................................................................................66, 69

11 U.S.C. § 510(b) ........................................................................................ *passim*

11 U.S.C. § 541 ...................................................................................................87

11 U.S.C. § 727 ...................................................................................................91

11 U.S.C. § 1102 .....................................................................................................1

11 U.S.C. § 1107 .....................................................................................................1

11 U.S.C. § 1108 .....................................................................................................1

11 U.S.C. § 1114 ...................................................................................................70

Appellant Appendix ER - 735

11 U.S.C. § 1122 ................................................................................ *passim*

11 U.S.C. § 1123 ................................................................................ *passim*

11 U.S.C. § 1125 ................................................................................ *passim*

11 U.S.C. § 1126 ...............................................................20, 55, 57, 58

11 U.S.C. § 1127 ...............................................................................74, 75

11 U.S.C. § 1128 .......................................................................................70

11 U.S.C. § 1129 ................................................................................ *passim*

11 U.S.C. § 1141 .......................................................................................92

28 U.S.C. § 1930 ................................................................................69, 70

31 U.S.C. § 3717 .......................................................................................70

U.S.C. title 49 ...........................................................................................97

Securities Act .............................................................................74, 84, 85

**Rules**

Fed. R. Bankr. P. 1015(b) ..........................................................................1

Fed. R. Bankr. P. 3017 ............................................................................55

Fed. R. Bankr. P. 3018 ............................................................................55

Fed. R. Bankr. P. 3019 ............................................................................75

Fed. R. Bankr. P. 3020 ............................................................................76

Fed. R. Bankr. P. 6004 ............................................................................76

Fed. R. Bankr. P. 6006 ............................................................................76

**Other Authorities**

H.R. Rep. No. 595, at 408-09 (1977) .....................................................24

S. Rep. No. 95-989 (1978), reprinted in 1978 U.S.C.C.A.N. 5787 ...............24

Appellant Appendix ER - 736

The above-captioned debtors (collectively, the "Debtors") submit this memorandum of law (this "Memorandum") in support of (a) approval of the *Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Disclosure Statement") on a final basis[2] and (b) confirmation of the *Third Amended Joint Chapter 11 Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 852] (as modified, amended, or supplemented from time to time, the "Plan"),[3] pursuant to section 1129 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"). In support of confirmation of the Plan and approval of the Disclosure Statement on a final basis and in response to the objections thereto (collectively, the "Objections"), the Debtors respectfully state as follows:

## Preliminary Statement

1. As the first significant cryptocurrency restructuring, the Debtors' chapter 11 cases featured several novel and unprecedented challenges.

---

[2] The Disclosure Statement was conditionally approved by the United States Bankruptcy Court for the Southern District of New York (the "Court") on January 13, 2023 [Docket No. 861], subject to final approval at the Combined Hearing.

[3] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan, the Disclosure Statement, or the Confirmation Order (as defined herein), as applicable.

A detailed description of the Debtors and their businesses and the facts and circumstances surrounding the Debtors' chapter 11 cases is set forth in greater detail in the *Declaration of Stephen Ehrlich, Chief Executive Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 15] (the "First Day Declaration"). On July 5, 2022 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b) [Docket No 18]. On July 19, 2022, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Committee") [Docket No. 106].

Appellant Appendix ER - 737

2.      The Debtors were weeks away from consummating a sale when their proposed purchaser, FTX, epically collapsed. FTX's new CEO publicly announced that the proposed purchaser was a fraud of historic proportions,[4] sending shockwaves through the entire cryptocurrency industry. Senior FTX executives were charged with federal felonies and at least two have pled guilty, admitting that FTX and its affiliates defrauded many, including its own customers and commercial counterparties like the Debtors.[5]

3.      Notwithstanding having to start from scratch, less than three months later, the Debtors stand ready to confirm the Plan. The Plan contemplates a sale of substantially all of the Debtors' assets to BAM Trading Services Inc. ("Binance.US" or "Purchaser" and such transaction, the "Sale Transaction") following around-the-clock negotiations on the heels of FTX's collapse. Moreover, the Plan includes the "toggle" transaction, which ensures the Debtors the opportunity to exit these chapter 11 cases regardless of whether the Sale Transaction ultimately closes.

---

[4]   *See Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings,* filed in *In re FTX Trading Ltd.*, No. 22-11068 (Bankr. D. Del. Nov. 11, 2022) at Docket No. 24, ¶¶ 5, 23, 65, 71 ("Never in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here. From compromised systems integrity and faulty regulatory oversight abroad, to the concentration of control in the hands of a very small group of inexperienced, unsophisticated and potentially compromised individuals, this situation is unprecedented . . . Alameda Research LLC prepared consolidated financial statements on a quarterly basis. To my knowledge, none of these financial statements have been audited. The September 30, 2022 balance sheet for the Alameda Silo shows $13.46 billion in total assets as of its date. However, because this balance sheet was unaudited and produced while the Debtors were controlled by Mr. Bankman-Fried, I do not have confidence in it and the information therein may not be correct as of the date stated . . . The FTX Group did not keep appropriate books and records, or security controls, with respect to its digital assets. Mr. Bankman-Fried and Mr. Wang controlled access to digital assets of the main businesses in the FTX Group (with the exception of LedgerX, regulated by the CFTC, and certain other regulated and/or licensed subsidiaries). Unacceptable management practices included the use of an unsecured group email account as the root user to access confidential private keys and critically sensitive data for the FTX Group companies around the world, the absence of daily reconciliation of positions on the blockchain, the use of software to conceal the misuse of customer funds, the secret exemption of Alameda from certain aspects of FTX.com's auto-liquidation protocol, and the absence of independent governance as between Alameda (owned 90% by Mr. Bankman-Fried and 10% by Mr. Wang) and the Dotcom Silo (in which third parties had invested) . . . One of the most pervasive failures of the FTX.com business in particular is the absence of lasting records of decision-making. Mr. Bankman-Fried often communicated by using applications that were set to auto-delete after a short period of time, and encouraged employees to do the same.").

[5]   *See, e.g., United States v. Samuel Bankman-Fried, Caroline Ellison, and Gary Wang,* No. 22-cr-673 (RA) (S.D.N.Y. Dec. 19, 2022), Hr'g Tr. 28:9–21.

Appellant Appendix ER - 738

4. The Plan, which is supported by the Committee, most importantly enjoys the support of **more than 97 percent of Account Holders in number and 98 percent of Account Holder Claims in amount actually voting**. At the time of the filing of these chapter 11 cases, the Debtors had more than 1 million customers. The Plan itself will effectuate the expeditious sale of the Debtors' customer accounts to Binance.US, provide a meaningful in-kind recovery to creditors on the shortest practicable timeline, and allow for an efficient resolution to these chapter 11 cases. Following consummation of the Sale Transaction, the Plan provides for the orderly wind down of the Debtors' estates. The Plan also allows the Debtors to toggle to the Liquidation Transaction if the Debtors determine, in their business judgment, that the Sale Transaction is no longer viable.

5. The Plan is a significant achievement; it consensually resolves a number of highly complex and intricate issues in a manner that is overwhelmingly supported by the Voting Classes. The Plan is in the best interests of the Debtors' estates, is by far the best alternative for all stakeholders, and should be confirmed.

6. Before the Petition Date, the Debtors commenced a marketing process for an investment in, or a sale of the Debtors' business to, a third-party purchaser. Discussions with interested parties, however, revealed that an in-court process would be necessary to yield the most value-maximizing transaction available to the Debtors. Accordingly, the Debtors commenced these chapter 11 cases and continued their marketing efforts postpetition.[6]

---

[6] *See generally*, First Day Declaration; *Declaration of Jared Dermont Regarding the Debtors' Marketing Process and in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 16]; *Declaration of Brian Tichenor in Support of the Debtors' Motion for Entry of an Order (I) Authorizing Entry into the Asset Purchase Agreement, and (II) Granting Related Relief* [Docket No. 476]; *Declaration of Brian Tichenor in Support of the Debtors' Motion for Entry of an Order (I) Authorizing Entry into the Binance US Purchase Agreement, and (II) Granting Related Relief* [Docket No. 836] (the "Tichenor APA Declaration").

3

Appellant Appendix ER - 739

7. The Debtors and their advisors left no stone unturned. Moelis & Company LLC ("Moelis"), the Debtors' investment banker, reached out to 96 strategic investors and financial sponsors, many of which had significant experience in the cryptocurrency industry. 60 parties executed non-disclosure agreements and were provided with access to a virtual data room containing comprehensive information regarding the Debtors' business operations and financial position. The virtual data room was robust, supplemented throughout the marketing process, and hosted thousands of diligence items. Moelis also held virtual diligence sessions with the Debtors, their management team, and multiple interested parties.

8. On the first day of these chapter 11 cases, the Debtors filed the *Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 17] (the "Standalone Plan"). The Standalone Plan served as a floor for the marketing process. Shortly thereafter, the Debtors filed the *Debtors' Motion Seeking Entry of an Order (I) Approving the Bidding Procedures and Related Dates and Deadlines, (II) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation, and (III) Granting Related Relief* [Docket No. 126] (the "Bidding Procedures Motion," and the bidding procedures established therein, the "Bidding Procedures"),[7] which set a timeline for interested parties to submit bids for an acquisition of the Debtors' assets and procedures for conducting an auction if multiple bids were received.

9. The Debtors' marketing process yielded bids from numerous strategic parties. Accordingly, on September 13, 2022, the Debtors commenced an auction (the "Auction") to

---

[7] The Court approved the Bidding Procedures Motion on August 5, 2022. See *Order (I) Approving the Bidding Procedures, (II) Scheduling the Bid Deadlines and the Auction, (III) Approving the Form and Manner of Notice Thereof, (IV) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation, and (V) Granting Related Relief* [Docket No. 248].

Appellant Appendix ER - 740

determine the winning bid. The two-week Auction consisted of arm's-length negotiations with each participating bidder. At the conclusion of the Auction, West Realm Shires Inc. ("FTX US," and along with its parent entity and affiliates, "FTX") was announced as the winning bidder.

10. On October 20, 2022, the Court entered an *Order Authorizing Entry into the Asset Purchase Agreement* [Docket No. 581] (the "FTX Purchase Agreement," and the transaction contemplated thereby, the "FTX Transaction"). Details of the FTX Transaction were set forth in the Debtors' *First Amended Disclosure Statement Relating to the Second Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 498] (the "FTX Disclosure Statement"). The Debtors contemplated effectuating the FTX Transaction pursuant to the *Second Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 590] (the "FTX Plan"). The Court entered an order approving the adequacy of the FTX Disclosure Statement on October 21, 2022,[8] and solicitation for acceptance or rejection of the FTX Plan commenced shortly thereafter. A confirmation hearing was scheduled for December 8, 2022. But just two weeks after solicitation commenced, it became evident that any transaction with FTX would be unattainable.

11. Shortly after public reports emerged drawing concern around FTX and the legitimacy of its operations, over 100 FTX entities commenced filing for voluntary relief under chapter 11 in the United States Bankruptcy Court for the District of Delaware on November 11, 2022 (the "FTX Bankruptcy Proceeding").[9] FTX US, the contemplated purchaser under the FTX Transaction, filed for chapter 11 three days later on November 14, 2022.

---

[8]   Docket No. 586.

[9]   The FTX Bankruptcy Proceeding is jointly administered under *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Nov. 11, 2022).

Appellant Appendix ER - 741

12.     As FTX's ability to close the FTX Transaction became unclear, on November 10, 2022, the Debtors requested that FTX waive the "No-Shop" provision (Section 5.2) of the FTX Purchase Agreement.  FTX, through its counsel, agreed.  On January 9, 2023, the court overseeing the FTX Bankruptcy Proceeding entered an order approving the termination of the FTX Purchase Agreement.[10]  On January 10, 2023, the Court entered a similar order.[11]

13.     While the Debtors were shocked and dismayed by FTX's cataclysmic collapse, they swiftly reengaged in negotiations with other potential counterparties to evaluate alternative transactions that would maximize value for the Debtors and their creditors.

14.     As the Court is aware, the Debtors had already conducted a comprehensive marketing process that resulted in a two-week Auction and leveraged those prior efforts to move quickly toward agreement with an alternative bidder.  Some of the parties that the Debtors engaged with following the FTX collapse were previously involved in the marketing process.  Several new parties also expressed interest.  When analyzing proposals received from interested parties, the Debtors and their advisors considered both the viability and risk factors associated with each proposed transaction, including timing considerations, third-party financing requirements, ability to consummate, cybersecurity risks, regulatory and licensing status, and counterparty risk based on the Debtors' reverse due diligence conducted during the one-month negotiation period.

15.     Notably, the Debtors and their advisors contemplated pursuing the Liquidation Transaction.  But they ultimately concluded that working to identify a transaction with a third party could provide greater value for creditors and less implementation risk.

---

[10]    *Order (A) Authorizing the Debtors to Enter into the Stipulation with Voyager Digital, LLC and (B) Granting Related Relief* [Docket No. 423], filed in *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Jan. 9, 2023).

[11]    *Joint Stipulation and Agreed Order Between the Debtors and FTX US* [Docket No. 848].

Appellant Appendix ER - 742

16.    Following good-faith, arm's-length negotiations with several parties, the Debtors determined that, based on the information they have to date, the transaction proposed by Binance.US was the highest or otherwise best offer available for the Debtors' assets.  On December 18, 2022, the Debtors and the Purchaser entered into an asset purchase agreement memorializing the terms of the Binance.US bid (as may be amended from time to time in accordance with the terms thereof, the "Asset Purchase Agreement").  On January 13, 2023, the Court entered an order authorizing the Debtors' entry into the Asset Purchase Agreement (the "APA Order").[12]

17.    The Debtors value the Sale Transaction at approximately $1.022 billion, comprising (i) the value of cryptocurrency on the Voyager platform as of a date to be determined, which as of December 19, 2022, at 0:00 UTC, is estimated to be $1.002 billion, plus (ii) additional consideration, which is estimated to provide at least $20 million.  The Sale Transaction also includes additional benefits to creditors:  (i) it provides the most tax efficient route forward as Binance.US supports 100% of the cryptocurrency coins on the Debtors' platform, (ii) it is the only transaction available to the Debtors that did not require the Debtors to liquidate cryptocurrency for working capital purposes, (iii) it includes reimbursement by Binance.US of up to $15 million of Seller's expenses, and (iv) it provides a $10 million reverse termination fee payable to the Seller by Binance.US to compensate the Debtors' estates in the event that Binance.US cannot consummate the transaction.  Additionally, and to protect against any further delay in exiting these chapter 11 cases, the Sale Transaction permits the Debtors to pivot to the Liquidation Transaction if they determine it is a prudent exercise of their fiduciary duties and provides that Binance.US will offer certain services to facilitate the Liquidation Transaction.

---

[12]    *See Order (I) Authorizing Entry Into The Binance US Purchase Agreement and (II) Granting Related Relief*, ¶ 13 [Docket No. 860].

Appellant Appendix ER - 743

18.     The Plan seeks to consummate the Sale Transaction on the shortest practicable timeline.  However, the Asset Purchase Agreement contains a standard "fiduciary out" that allows the Debtors to terminate the Asset Purchase Agreement and toggle *either* to a higher and better third-party bid (should one emerge) *or* to the Liquidation Transaction if the Debtors determine, in their business judgment, that consummating the Sale Transaction is no longer the highest and best option or that doing so is otherwise inconsistent with their fiduciary duties.  Nevertheless, based on the information that the Debtors have at hand, they believe that the Sale Transaction is the most value-maximizing transaction available to the Debtors.

19.     The Debtors engaged with the U.S. Trustee, the Committee, and a number of parties who submitted informal Objections and comments to the Plan in an effort to consensually resolve all parties' Objections to the Plan and Disclosure Statement.  The Objections generally argue, among other things, that:  (i) the Plan and Disclosure Statement fail to disclose adequate information regarding the Sale Transaction, Binance.US's financial condition and solvency, the feasibility of the Sale Transaction, the transfer of Account Holders and cryptocurrency to Binance.US, and the financial consequences of the Plan; (ii) the rebalancing contemplated by the Plan may contravene applicable law; (iii) the Plan's Releases and Injunction provisions are improper; (iv) the Plan and Confirmation Order should clarify the impact the Plan will have on Intercompany Claims and the nature of the Releases, provide that Existing Equity Interests under the Plan will not be cancelled, and provide that the Wind-Down Debtor is not the only party permitted to object to Proofs of Claim; and (v) the Plan unfairly discriminates against Holders of Account Holder Claims in Unsupported Jurisdictions relative to Account Holders in Supported Jurisdictions (each as defined in the Asset Purchase Agreement).  Certain customers also raise various issues with, *inter alia*, the composition of the Committee, the relationship between the

Appellant Appendix ER - 744

Committee and the Debtors, the conduct of the Court, and the legal status of cryptocurrency held

of the Debtors' platform, that do not present barriers to confirmation of the Plan. The Bank of

New York Mellon ("BNY") also filed an Objection (the "BNY Objection")[13] on behalf of

Shellpoint Mortgage Servicing ("Shellpoint") asserting that Shellpoint holds a mortgage claim

secured against a property in Irvine, California, title to which BNY asserts is held by the Debtors,

that is not properly addressed in the Plan.

20.     None of the Objections have merit, and the Plan should be confirmed. *First*, the

Plan, Disclosure Statement, and other Definitive Documents contain adequate information

regarding the Restructuring Transactions. *Second,* the rebalancing contemplated by the Plan does

not contravene any applicable law or regulatory ruling that has actually been issued, and the

Rebalancing Exercise has already begun following approval by the Court.[14] *Third*, the third-party

Releases are fully consensual, opt-in only, and compliant with the Bankruptcy Code and case law

in this Circuit, and the Debtor Release is a sound exercise of the Debtors' business judgment

following the Special Committee's findings and contributions by the Released Parties to the

chapter 11 cases. The Debtors have also added certain language to the Confirmation Order to

address and clarify specific issues raised by certain objecting parties with respect to the Third-Party

Releases and Debtor Releases. *Fourth*, the Confirmation Order and Plan have been amended to

add language clarifying (i) the nature of the Releases and that the treatment of Intercompany

Claims will be determined by the Court, (ii) that Existing Equity Interests will not be cancelled,

and (iii) that any party in interest may object to Proofs of Claim. *Fifth*, the classification scheme

in the Plan is compliant with the Bankruptcy Code, the Plan does not violate the absolute priority

---

[13]     Docket No. 1078.

[14]     *Id.*

Appellant Appendix ER - 745

rule, and the Plan is fair and equitable. ***Sixth***, the argument that Holders of Account Holder Claims in Unsupported Jurisdictions are receiving disparate treatment fails because each Holder of an Account Holder Claim is receiving a recovery based on the "dollarized" amount of such Claim as of the Petition Date, and any delay in distributions is a product of a few outlier states' choices, not the Plan itself. Accordingly, there is no unfair discrimination. ***Seventh***, the other issues raised by the Customer Objections do not present barriers to confirmation of the Plan and should be overruled on that basis. ***Finally***, the Debtors believe that the BNY Objection is resolved pursuant to language added to the Confirmation Order.[15]

21.     The Plan maximizes the value of the Debtors' assets, enables the expeditious distribution of cryptocurrency to customers, and provides for the orderly wind down of the Debtors' remaining estates. For these reasons, and as set forth more fully in this Memorandum, the Objections should be overruled and the Plan should be confirmed.

## Argument

22.     This Memorandum is divided into four parts. Part I provides the procedural history of the Plan and Disclosure Statement, the Debtors' solicitation efforts and voting results, and a summary of the various Objections filed with respect to the Plan and Disclosure Statement. Part II requests that the Court approve the Disclosure Statement on a final basis and find that the Debtors have satisfied all notice requirements approved in the Disclosure Statement Order. Part III establishes the Plan's compliance with each of the applicable requirements for Confirmation, including that certain of the discretionary contents of the Plan, including the Releases, are appropriate and should be approved. Part IV establishes that the Objections to the

---

15     *See* Confirmation Order ¶ 152.

Appellant Appendix ER - 746

Plan should be overruled.  In further support of Confirmation of the Plan, the Debtors have filed

contemporaneously herewith:

- the *Declaration of Leticia Sanchez Regarding the Solicitation and Tabulation of Votes on the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Voting Report");[16]

- the *Declaration of Brian Tichenor in Support of Confirmation of the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Tichenor Declaration");

- the *Declaration of Mark A. Renzi in Support of Confirmation of the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Renzi Declaration"); and

- the *Declaration of Timothy R. Pohl, Independent Director and Member of the Special Committee of the Board of Directors of Voyager Digital, LLC, in Support of Confirmation of the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Pohl Declaration" and, together with the Voting Report, the Tichenor Declaration, and the Renzi Declaration, the "Declarations").

23.    For the reasons stated herein, the Debtors respectfully request that the Court find

that the Debtors have satisfied all relevant burdens, approve the Disclosure Statement on a final

basis, and approve the Plan.

## I.    Case Background and Objections

### A.    Procedural History.

24.    On July 6, 2022, the Debtors filed with the Court, among other pleadings, the *Joint*

*Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to*

*Chapter 11 of the Bankruptcy Code* [Docket No. 17].  On August 3, 2022, the Court entered the

*Order (I) Setting Deadlines for Submitting Proofs of Claim, (II) Approving Procedures for*

*Submitting Proofs of Claim, and (III) Approving Notice Thereof* [Docket No. 218] (the "Bar Date

---

[16]    Docket No. 1108.

Appellant Appendix ER - 747

Order"), which established October 3, 2022, as the General Claims Bar Date and January 3, 2023, as the Governmental Bar Date and provided that any Holder of a Claim that fails to timely submit a Proof of Claim by the applicable bar date shall not be treated as a creditor with respect to such claim for the purposes of either (a) voting on any plan of reorganization filed in these chapter 11 cases or (b) participating in any distribution in the Debtors' chapter 11 cases on account of such Claim.

25. On August 12, 2022, the Debtors filed the *First Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 287] and the *Disclosure Statement Relating to the First Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 288] (as amended, modified, or supplemented from time to time, the "Initial Disclosure Statement"), and the *Debtors' Motion for Entry of an Order Approving (I) the Adequacy of the Disclosure Statement, (II) Solicitation and Notice Procedures, (III) Forms of Ballots and Notices in Connection Therewith, and (IV) Certain Dates With Respect Thereto* [Docket No. 289].

26. On October 5, 2022, the Debtors filed the *Second Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 496] (the "Second Amended Plan")[17] and the *First Amended Disclosure Statement Relating to the Second Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 498] (the "First Amended

---

[17] The Debtors filed revised versions of the Second Amended Plan at Docket Nos. 539, 564, 584, and 590.

12

Disclosure Statement").[18]  On October 19, 2022, the Debtors filed the proposed *Order Approving*

*(I) the Adequacy of the Disclosure Statement, (II) Solicitation and Notice Procedures, (III) Forms*

*of Ballots and Notices in Connection Therewith, and (IV) Certain Dates With Respect Thereto*

[Docket No. 563].  On October 20, 2022, the Court entered an order approving the Debtors' entry

into the Asset Purchase Agreement [Docket No. 581], and on October 21, 2022, the Court entered

an order approving the Initial Disclosure Statement.[19]

27.     Following the collapse of the FTX Transaction and the Debtors' subsequent

negotiations with Binance.US, on December 18, 2022, the Debtors and Binance.US entered into

the Asset Purchase Agreement [Docket No. 748].[20]  On December 22, 2022, the Debtors filed the

*Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to*

*Chapter 11 of the Bankruptcy Code* [Docket No. 777][21] and the *Second Amended Disclosure*

*Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its*

*Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 778],[22] and the

*Debtors' Motion for Entry of an Order (I) Scheduling a Combined Disclosure Statement Approval*

*and Plan Confirmation Hearing, (II) Conditionally Approving the Adequacy of the Debtors'*

*Disclosure Statement, (III) Approving (A) Procedures for Solicitation, (B) Forms of Ballots and*

---

[18]     The Debtors subsequently filed revised versions of the First Amended Disclosure Statement at Docket Nos. 540, 565, 585, and 591.

[19]     *See Order Approving (I) the Adequacy of the Disclosure Statement, (II) the Solicitation and Notice Procedures, (III)the Forms of Ballots and Notices in Connection Therewith, and (IV) Certain Dates with Respect Thereto* [Docket No. 586].

[20]     *See Notice of Successful Bidder*.

[21]     The Debtors subsequently filed revised versions of the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* at Docket Nos. 829 and 852.

[22]     The Debtors subsequently filed a revised version of the *Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* at Docket Nos. 830, 853, and 863.

Appellant Appendix ER - 749

*Notices, (C) Procedures for Tabulation of Votes and (D) Procedures for Objections, and (IV)*
*Granting Related Relief* [Docket No. 779] (the "Disclosure Statement Motion"). On January 13,
2023, the Court entered an order [Docket No. 861] (the "Disclosure Statement Order")
(i) conditionally approving the adequacy of the Disclosure Statement, (ii) scheduling a combined
hearing to consider confirmation of the Plan and approval of the Disclosure Statement on a final
basis, and (iii) approving (a) the Solicitation and Voting Procedures; (b) certain notices and certain
dates and deadlines in connection with solicitation and confirmation of the Plan; and (c) the manner
and form of the Solicitation Packages and the materials contained therein.

28.     The Debtors now intend to implement the Sale Transaction to sell substantially all
of the Debtors' assets through confirmation of the Plan. The Plan, among other things:

- contemplates payment in full of Administrative Claims, Secured Tax Claims, Priority Tax Claims, and Other Priority Claims;

- provides for the distribution of Cryptocurrency, Cash, and any remaining assets at OpCo (including any recovery on account of the 3AC Claims, FTX Claims, or Alameda Claims) to Account Holders and Holders of OpCo General Unsecured Claims subject to the terms of the Asset Purchase Agreement;

- provides for distribution of Cash and other assets at HoldCo to Holders of HoldCo General Unsecured Claims;

- provides for distribution of Cash and other assets at TopCo to Holders of TopCo General Unsecured Claims;

- provides for the treatment of Alameda Loan Facility Claims pursuant to the FTX Settlement or, if the FTX Settlement[23] does not go effective, the equitable subordination of the Alameda Loan Facility Claims or, if such claims are not equitably subordinated, treatment of the Alameda Loan Facility Claims *pari passu* with General Unsecured Claims at the applicable Debtor entity;

- provides for any residual value at TopCo after payment in full of TopCo General Unsecured Claims to be distributed to Holders of Section 510(b) Claims, if any, and Holders of Existing Equity Interests;

---

[23]   *See* Docket No. 1106.

Appellant Appendix ER - 750

- provides for Intercompany Claims to be treated as determined by the Court; and

- designates a Plan Administrator to wind down the Debtors' affairs in accordance with the Plan.

29.    On or about January 25, 2023, the Debtors caused the Claims, Noticing, and Solicitation Agent, to serve the Solicitation Packages and the Combined Hearing Notice in accordance with the terms of the Disclosure Statement Order.[24]   The Debtors also caused the Publication Notice (as defined in the Disclosure Statement Order) to be published in *The New York Times* and the *Financial Times* on February 1, 2023, and February 2, 2023, respectively, as evidenced by each *Affidavit of Service of Publication*.[25]

30.    On February 1, 2023, the Debtors filed the Plan Supplement,[26] which included the Schedule of Assumed Executory Contracts and Unexpired Leases, and served notices of assumption on each of the counterparties to Executory Contracts and Unexpired Leases whose Executory Contracts or Unexpired Leases are being assumed pursuant to the Plan.[27]   On February 8, 2023, the Debtors filed the *First Amended Plan Supplement*,[28] which included the Schedule of Retained Causes of Action and the Customer Onboarding Protocol.  On February 15, 2023, the Debtors filed the *Second Amended Plan Supplement*,[29] which included (a) the Amended Schedule of Assumed Executory Contracts and Unexpired Leases, (b) the Restructuring Transactions Memorandum, (c) the identity of the Plan Administrator and Oversight Committee, (d) the Plan

---

[24]   *See Affidavit of Service* [Docket No. 926] (the "Affidavit of Solicitation").

[25]   Docket Nos. 954 & 955.

[26]   Docket No. 943.

[27]   Docket No. 951.

[28]   Docket No. 986.

[29]   Docket No. 1006.

Appellant Appendix ER - 751

Administrator Agreement, (e) the Wind-Down Budget, and (f) the Employee Transition Plan. On February 21, 2023, the Debtors filed the *Third Amended Plan Supplement*,[30] which included (a) the Amended Schedule of Assumed Executory Contracts and Unexpired Leases; and (b) the Customer Onboarding Protocol.

31.    The deadline (a) to file objections to the Plan and final approval of the Disclosure Statement and (b) for all Holders of Claims and Interests entitled to vote on the Plan to cast their ballots was February 22, 2023, at 4:00 p.m., prevailing Eastern Time.  The Combined Hearing is scheduled for March 2, 2023, at 10:00 a.m., prevailing Eastern Time.  Concurrently with this Memorandum, the Debtors have submitted the proposed *Order Confirming the Second Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Proposed Confirmation Order"), which contemplates, among other things, approval of the Disclosure Statement on a final basis and confirmation of the Plan.

**B.      The Restructuring Transactions.**

32.    The Restructuring Transactions set forth in the Plan, the Restructuring Transactions Memorandum, and the Customer Onboarding Protocol provide for, among other things, (a) all transactions necessary to effectuate the purchase of the Acquired Assets by Purchaser under the Asset Purchase Agreement; (b) the transfer or distribution of any Cryptocurrency or Cash pursuant to the Asset Purchase Agreement or the Liquidation Procedures, as applicable; (c) the execution and delivery of the Plan Administrator Agreement; (d) the transactions necessary or appropriate to form the Wind-Down Debtor; and (e) all other actions that the applicable Entities determine to be necessary or appropriate, or that are reasonably requested by the Purchaser in accordance with the Asset Purchase Agreement, including making filings or recordings that may be required by

---

30    Docket No. 1035.

Appellant Appendix ER - 752

applicable law. As discussed above, the Restructuring Transactions contemplate the sale of substantially all of the Debtors' assets to Binance.US pursuant to the Sale Transaction but allow the Debtors to toggle to the Liquidation Transaction if the Debtors determine, in their business judgment, that the Sale Transaction is no longer the best path forward for the Debtors' creditors.

### 1. The Sale Transaction.

33. The Asset Purchase Agreement provides that, in the event of a Sale Transaction, Binance.US will accept transfers of certain assets relating to the Debtors' cryptocurrency custody and exchange business and will receive all or substantially all Cryptocurrency on the Voyager platform to hold such assets solely in a custodial capacity in trust and solely for the benefit of Account Holders who each open an account on the Binance.US Platform (such Cryptocurrency transfers, the "Acquired Coins") in exchange for Purchaser's payment obligations and commitment to distribute the Acquired Coins to Account Holders and cash to Holders of Opco General Unsecured Claims pursuant to the Asset Purchase Agreement. Following the sale to Binance.US, the Plan Administrator shall wind down the Wind-Down Debtor's affairs in accordance with Article IV.H of the Plan. Additionally, Purchaser shall submit VGX for its standard listing review process in an effort to allow VGX to be traded on the Binance.US Platform. It is currently anticipated that all Account Holders and Holders of OpCo General Unsecured Claims in Supported Jurisdictions will transition to Binance.US subject to their successful completion of Binance.US's "Know Your Customer" process and other procedural and regulatory requirements.

34. As described in greater detail in Article VI.B of the Plan, the Debtors will effectuate the transition of Account Holders to the Binance.US platform pursuant to the Customer Onboarding Protocol, which was included in the Plan Supplement. The Customer Onboarding Protocol provides, among other things, that if any Account Holder or Holder of an Allowed OpCo

Appellant Appendix ER - 753

General Unsecured Claim does not become a Transferred Creditor prior to the date that is three months following the later of the Effective Date or the date on which the terms and conditions for the Binance.US Platform are made available for such person to accept (as provided in the Customer Onboarding Protocol), then the Debtors will transfer the cryptocurrency allocable to such person to the Purchaser, the Purchaser will convert such cryptocurrency into U.S. Dollars at the then-prevailing rates (including applicable fees, spreads, costs, and expenses) on the Binance.US Platform and deliver such U.S. Dollars, together with any cash or others assets in respect of such persons, to the Debtors within five business days for further distribution by the Debtors in accordance with the Plan and the Customer Onboarding Protocol.

### 2. The Liquidation Transaction.

35.    If the parties are unable to consummate the Sale Transaction by the Outside Date or if the Debtors determine to utilize their "fiduciary out" pursuant to the Asset Purchase Agreement, the Debtors will pursue the Liquidation Transaction in accordance with the Liquidation Procedures.  Under the Liquidation Transaction, the Debtors, the Wind-Down Debtor, or the Plan Administrator, as applicable, will distribute certain Cryptocurrency in-kind to Holders of Account Holder Claims in accordance with Article III.C of the Plan, transfer all Wind-Down Debtor Assets[31] to the Wind-Down Debtor, liquidate certain Cryptocurrency, distribute Cash to

---

[31]    Pursuant to the Plan, "Wind-Down Debtor Assets" means any assets of the Debtors' assets transferred to, and vesting in, the Wind-Down Debtor pursuant to the Plan Administrator Agreement, which, in the event the Sale Transaction is consummated, shall exclude the Acquired Assets, and which shall include, without limitation but only to the extent the following are not Acquired Assets, (a) the Wind-Down Reserve, (b) the Net-Owed Coins to be distributed to Account Holders in Supported Jurisdictions until such Account Holders complete the Purchaser's onboarding requirements in accordance with the Asset Purchase Agreement, (c) the Net-Owed Coins to be distributed to Account Holders in Unsupported Jurisdictions to the extent the Purchaser has not obtained the applicable Unsupported Jurisdiction Approval in accordance with Section 6.12 of the Asset Purchase Agreement, (d) any distributions to Account Holders or Holders of OpCo General Unsecured Claims that are returned to the Wind-Down Debtor pursuant to Section 6.12(e) of the Asset Purchase Agreement, (e) 3AC Claims and 3AC Recovery, (f) FTX Claims and FTX Recovery, (g) Alameda Claims and Alameda Recovery, (h) the Non Released D&O Claims, and (h) the Vested Causes of Action.  Plan, Art.I.A.175.

Appellant Appendix ER - 754

Holders of Claims, wind down and dissolve the Debtors, and pursue final administration of the

Debtors' Estates pursuant to the Bankruptcy Code. In order to effectuate *pro rata* in-kind

distributions, the Plan contemplates that the Debtors, in consultation with the Committee, shall be

authorized to rebalance their Cryptocurrency portfolio by, among other things, selling

Cryptocurrency that cannot be distributed to Account Holders and purchasing Cryptocurrency

supported by the Debtors' platform to be distributed to Account Holders.

### 3. The Wind-Down.

36. As set forth in greater detail in Article IV.H of the Plan, on the Effective Date of

the Plan, the Wind-Down Debtor Assets shall, subject to the Plan Administrator Agreement, be

transferred to and vest in the Wind-Down Debtor. The Wind-Down Debtor will conduct no

business operations and will be charged with winding down the Debtors' Estates and shall be

managed by the Plan Administrator and subject to the Wind-Down Debtor Oversight Committee.

Among other things, the Plan Administrator will be charged with: (a) implementing the

Wind-Down Debtor and making the distributions contemplated by the Plan; (b) marshalling,

marketing for sale, and winding down any of the Debtors' assets constituting Wind-Down Debtor

Assets; (c) appointing an independent director at each Debtor to act as a fiduciary for such Debtor

entity in connection with the resolution of Intercompany Claims; (d) filing and prosecuting any

objections to Claims or Interests or settling or otherwise compromising such Claims and Interests,

if necessary and appropriate; (e) commencing, prosecuting, or settling claims and Vested Causes

of Action; (f) recovering and compelling turnover of the Debtors' property; (g) prosecuting and

settling the 3AC Claims, FTX Claims, and Alameda Claims; (h) preparing and filing

post-Effective Date operating reports; and (i) taking such actions as are necessary and reasonable

to wind down the remaining estate. The Wind-Down Debtor will be managed by the Plan

Administrator and will be subject to a Wind-Down Debtor Oversight Committee as set forth in

Appellant Appendix ER - 755

greater detail in Article IV.H.6 of the Plan. Following completion of the Plan Administrator's duties, the Wind-Down Debtor will be dissolved in accordance with the Plan Administrator Agreement.

**C.    The Plan Solicitation and Notification Process.**

37.    In compliance with the Bankruptcy Code, only Holders of Claims and Interests in Impaired Classes receiving or retaining property on account of such Claims or Interests were entitled to vote on the Plan.[32]  Holders of Claims and Interests were not entitled to vote if their rights are Unimpaired or if they are not receiving or retaining any property under the Plan.  The following Classes of Claims and Interests were ***not*** entitled to vote on the Plan, and the Debtors did not solicit votes from Holders of such Claims and Interests:

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 5 | Alameda Loan Facility Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 6 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |
| 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |
| 9 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

38.    The Debtors solicited votes on the Plan from Holders of Claims and Interests in Classes 3, 4A, 4B, and 4C, which were entitled to vote to accept or reject the Plan (collectively, the "Voting Classes").   The voting results, as reflected in the Voting Report, are summarized as follows:

---

[32]    *See* 11 U.S.C. § 1126.

Appellant Appendix ER - 756

| Class | Class Description | Number Accepting | Number Rejecting | Amount Accepting (%) | Amount Rejecting (%) | Voting Result |
|-------|------------------|------------------|------------------|---------------------|---------------------|---------------|
| 3 | Account Holder Claims | 58,969 | 2,112 | 98 | 2 | **Accept** |
| 4A | OpCo General Unsecured Claims | 0 | 0 | 0 | 0 | **N/A** |
| 4B | HoldCo General Unsecured Claims | 4 | 1 | 100 | 0 | **Accept** |
| 4C | TopCo General Unsecured Claims | 9 | 1 | 100 | 0 | **Accept** |

39.     The Debtors strongly believe that the Plan is in the best interests of the Debtors, their estates, and other parties in interest.  And as shown above, Account Holders overwhelmingly agree—97 percent of Account Holders and 98 percent in amount of Account Holder Claims actually voting voted in favor of the Plan.  Further, 80 percent of HoldCo General Unsecured Claims and 100 percent in amount of HoldCo General Unsecured Claims actually voting, and 90 percent of Holders of TopCo General Unsecured Claims and 100 percent in amount of TopCo General Unsecured Claims actually voting voted to accept the Plan.  The Debtors did not receive any votes from Holders of OpCo General Unsecured Claims.

40.     The transactions contemplated by the Plan represent a significant achievement for the Debtors and are the direct result of a thorough marketing process.  Each of the Debtors strongly believes that the Plan is in the best interests of its estate and represents the best available alternative for all of its stakeholders.  The voting results demonstrate that the vast majority of stakeholders agree.  The transactions embodied in the Plan will maximize the value of the Estates and maximize recoveries to Holders of Claims and Interests.

Appellant Appendix ER - 757

D.      **The Objections.**

41.      Formal Objections were filed by (i) the Federal Trade Commission (the "FTC," and such Objection, the "FTC Objection");[33] (ii) the United States Securities and Exchange Commission (the "SEC," and such Objection, the "SEC Objection");[34] (iii) an ad hoc group of equity holders (the "AHG"), which filed an Objection and a supplemental Objection, (such Objections, collectively, the "AHG Objection");[35] (iv) the New York State Department of Financial Services (the "New York," and such Objection, the "New York Objection");[36] (v) Daniel Newsom and Jon Warren ("Newsom and Warren," and such Objection, the "Newsom and Warren Objection");[37] (vi) Tracy Hendershott, Seth Jones, and Trevor Brucker ("Hendershott et al.," and such Objection, the "Hendershott et al. Objection");[38] (vii) Alah Shehadeh ("Mr. Shehadeh"), who filed several letters (the "Shehadeh Letters"),[39] a motion to change venue or judge in these chapter 11 cases (the "Shehadeh Motion"),[40] and a motion accusing the Debtors of fraud and their counsel of ethical violations (the "Shehadeh Fraud Motion");[41] (viii) Shehadeh, Rawand Salah, Yousef Qasem, and Seth Jones (such objection the "Shehadeh Claims Objection," and, along with the Shehadeh Letters, the Shehadeh Motion, and the Shehadeh Fraud Motion, the "Shehadeh

---

[33]      Docket No. 1042.

[34]      Docket No. 1047.

[35]      Docket Nos. 1050 & 1097.

[36]      Docket No. 1051.

[37]      Docket No. 1059.

[38]      Docket No. 1061.

[39]      Docket Nos. 1063 & 1066.

[40]      Docket No. 1072.

[41]      Docket No. 1082.

Appellant Appendix ER - 758

Papers"); (ix) BNY; (x) the U.S. Trustee (such objection, the "U.S. Trustee Objection");[42] (xi) the Texas State Securities Board and the Texas Department of Banking (collectively, "Texas," and such Objection, the "Texas Objection");[43] and (xii) the New Jersey Bureau of Securities ("New Jersey," and such Objection, the "New Jersey Objection").[44]

42.　　While the Objections are listed below, it bears noting that the Plan has a massive amount of consensus. Again, more than 97 percent of Account Holders in number and 98 percent of Account Holders in amount actually voting voted in favor of the Plan. The Debtors have more than 1 million customers and only 8, whose claims, in aggregate, total approximately $500,000, objected to the Plan. The Debtors continue to work to resolve all outstanding Objections in advance of the Combined Hearing. To the extent the Debtors are unable to consensually resolve such Objections prior to the Combined Hearing, the Debtors request that the Court overrule such Objections. A detailed response to each of the outstanding Objections is set forth in section IV of this Memorandum.

**II.　　The Disclosure Statement Contains "Adequate Information" as Required by Section 1125 of the Bankruptcy Code, and the Debtors Complied with the Applicable Notice Requirements.**

**A.　　The Disclosure Statement Contains Adequate Information.**

43.　　The primary purpose of a disclosure statement is to provide "adequate information" that allows parties entitled to vote on a proposed plan to make an informed decision as to whether to vote to accept or reject the plan.[45] "Adequate information" is a flexible standard, based on the

---

[42]　　Docket No. 1085.

[43]　　Docket No. 1086.

[44]　　Docket No. 1087.

[45]　　*See, e.g.*, *In re Momentum Mfg. Corp.*, 25 F.3d 1132, 1136 (2d Cir. 1994); *In re Ionosphere Clubs, Inc.*, 179 B.R. 24, 29 (Bankr. S.D.N.Y. 1995) (adequacy of a disclosure statement "is to be determined on a case-specific basis under a flexible standard that can promote the policy of chapter 11 towards fair settlement through a negotiation

23

facts and circumstances of each case.[46] Courts within the Second Circuit and elsewhere acknowledge that determining what constitutes "adequate information" for the purpose of satisfying section 1125 of the Bankruptcy Code resides within the broad discretion of the court.[47]

44. Courts look for certain information when evaluating the adequacy of the disclosures in a proposed disclosure statement, including:

    a.      the events which led to the filing of a bankruptcy petition;

    b.      the relationship of a debtor with the affiliates;

    c.      a description of the available assets and their value;

    d.      the anticipated future of the company;

    e.      the source of information stated in the disclosure statement;

---

process between informed interested parties" (internal citation omitted)); *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 979 (Bankr. N.D.N.Y. 1988) (same); *In re Amfesco Indus., Inc.*, No. CV-88-2952 (JBW), 1988 WL 141524, at *5 (E.D.N.Y. Dec. 21, 1988) (stating that "[u]nder section 1125 of the Bankruptcy Code, a reasonable and typical creditor or equity security holder must be provided 'adequate information' to make an informed judgment regarding a proposed plan."); *BSL Operating Corp. v. 125 E Taverns, Inc. (In re BSL Operating Corp.)*, 57 B.R. 945, 950 (Bankr. S.D.N.Y. 1986) (stating that "[s]ection 1125 might be described as a non-rigid 'how-to-inform' section . . . . A disclosure statement . . . is evaluated only in terms of whether it provides sufficient information to permit enlightened voting by holders of claims or interests.").

[46]    11 U.S.C. § 1125(a)(1) ("'adequate information' means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records"); *see also Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988) ("From the legislative history of § 1125 we discern that adequate information will be determined by the facts and circumstances of each case."); S. Rep. No. 95-989, at 121 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5907 ("the information required will necessarily be governed by the circumstances of the case").

[47]    *See, e.g., Kirk v. Texaco, Inc.*, 82 B.R. 678, 682 (S.D.N.Y. 1988) ("The legislative history could hardly be more clear in granting broad discretion to bankruptcy judges under § 1125(a): 'Precisely what constitutes adequate information in any particular instance will develop on a case-by-case basis. Courts will take a practical approach as to what is necessary under the circumstances of each case.'" (*quoting* H.R. Rep. No. 595, at 408–09 (1977))); *see also In re River Village Assoc.*, 181 B.R. 795, 804 (E.D. Pa. 1995) ("[T]he Bankruptcy Court is thus given substantial discretion in considering the adequacy of a disclosure statement."); *In re Tex. Extrusion Corp.*, 844 F.2d 1142, 1157 (5th Cir. 1988) ("The determination of what is adequate information is subjective and made on a case by case basis. This determination is largely within the discretion of the bankruptcy court."); *In re Phoenix Petroleum Co.*, 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001) (same); *In re PC Liquidation Corp.*, 383 B.R. 856, 865 (E.D.N.Y. 2008) (internal citations omitted) ("The standard for disclosure is, thus, flexible and what constitutes 'adequate information' in any particular situation is determined on a case-by-case basis, with the determination being largely within the discretion of the bankruptcy court."); *In re Lisanti Foods, Inc.*, 329 B.R. 491, 507 (Bankr. D.N.J. 2005) ("The information required will necessarily be governed by the circumstances of the case.").

Appellant Appendix ER - 760

f. the present condition of a debtor while in chapter 11;

g. the claims asserted against a debtor;

h. the estimated return to creditors under a chapter 7 liquidation;

i. the future management of a debtor;

j. the chapter 11 plan or a summary thereof;

k. the financial information, valuations, and projections relevant to the claimants' decision to accept or reject the chapter 11 plan;

l. the information relevant to the risks posed to claimants under the plan;

m. the actual or projected realizable value from recovery of preferential or otherwise voidable transfers;

n. the litigation likely to arise in a nonbankruptcy context; and

o. the tax attributes of a debtor.[48]

45. The Disclosure Statement contains adequate information and was previously approved on a conditional basis on January 13, 2023.[49] Indeed, the Disclosure Statement contains even more information than the FTX Disclosure Statement that was approved by the Court on a final basis on October 21, 2022.[50] The Disclosure Statement contains descriptions and summaries of, among other things: (a) the transactions contemplated by the Plan; (b) the Debtors' reorganization efforts; (c) certain events and relevant negotiations preceding the commencement

---

[48] *In re U.S. Brass Corp.*, 194 B.R. 20, 424–25 (Bankr. E.D. Tex. 1996) (listing factors courts have considered in determining the adequacy of information provided in a disclosure statement); *Westland Oil Dev. Corp. v. MCorp Mgmt. Sols., Inc.*, 157 B.R. 100, 102 (S.D. Tex. 1993) (same); *In re Scioto Valley Mortg. Co.*, 88 B.R. 168, 170–71 (Bankr. S.D. Ohio 1988) (same); *In re Metrocraft Publ'g Servs., Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984) (same). Disclosure regarding all topics "is not necessary in every case." *In re U.S. Brass Corp.*, 194 B.R. at 425; *see also In re Phx. Petroleum*, 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001) ("[C]ertain categories of information which may be necessary in one case may be omitted in another . . . .").

[49] *See* Disclosure Statement Order [Docket No. 861].

[50] Docket No. 586.

Appellant Appendix ER - 761

of these chapter 11 cases; (d) risk factors affecting the Plan, including risks related to the Restructuring Transactions, risks related to the Debtors' businesses, and risks related to recoveries under the Plan; (e) the investigation performed by the Special Committee of the Board of Directors of Voyager Digital LLC of potential claims against insiders and the resolution of such claims that is incorporated into the Plan; (f) the Liquidation Analysis, which sets forth the estimated return that holders of Claims and Interests would receive in a hypothetical chapter 7 case; (g) federal tax law consequences of the Plan; (h) the Sale Transaction; and (i) the Liquidation Transaction.

46. As discussed above, section 1125(a) requires only "adequate information" sufficient for parties entitled to vote on a proposed plan to make an informed decision about whether to vote to accept or reject the plan. Accordingly, the Disclosure Statement contains adequate information within the meaning of section 1125(a) of the Bankruptcy Code and should be approved.

### A. The Debtors Complied with the Applicable Notice and Solicitation Requirements.

47. In addition to conditionally approving the adequacy of the Disclosure Statement, the Disclosure Statement Order granted final relief regarding solicitation and noticing procedures and materials including, among other things: (a) approving the Solicitation and Voting Procedures; (b) approving the Combined Hearing Notice, certain notices of non-voting status, the Plan Supplement Notice, and the Assumption Notice and Rejection Notice; (c) approving the Ballots; and (d) approving certain dates and deadlines with respect to the Plan and Disclosure Statement. The Debtors have complied with the procedures and timeline approved by the Disclosure Statement Order.

Appellant Appendix ER - 762

B.   **Solicitation of the Plan Complied with the Bankruptcy Code and was in Good Faith.**

48.   Section 1125(e) of the Bankruptcy Code provides that "a person that solicits acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions of this title . . . is not liable" on account of such solicitation for violation of any applicable law, rule, or regulation governing solicitation of acceptance or rejection of a plan.[51]

49.   As set forth in the Disclosure Statement and Disclosure Statement Motion, and as demonstrated by the Debtors' compliance with the Disclosure Statement Order,[52] the Debtors at all times took appropriate actions in connection with the solicitation of the Plan in compliance with section 1125 of the Bankruptcy Code.  Therefore, the Debtors request that the Court grant the parties the protections provided under section 1125(e) of the Bankruptcy Code.

50.   For the forgoing reasons, the Court should enter an order approving the Disclosure Statement on a final basis.

III.   **The Plan Satisfies the Requirements of Section 1129 of the Bankruptcy Code.**

A.   **The Plan Complies with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(1)).**

51.   Under section 1129(a)(1) of the Bankruptcy Code, a plan must "compl[y] with the applicable provisions of [the Bankruptcy Code]."[53]  The legislative history of section 1129(a)(1) of the Bankruptcy Code explains that this provision also encompasses and incorporates the requirements of sections 1122 and 1123 of the Bankruptcy Code, which govern the classification

---

[51]   11 U.S.C. § 1125(e).

[52]   *See generally*, Voting Report.

[53]   11 U.S.C. § 1129(a)(1).

Appellant Appendix ER - 763

of claims and the contents of a plan of reorganization, respectively.[54]  As explained below, the

Plan complies with the requirements of sections 1122 and 1123 in all respects.

### 1. The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code.

52. The classification requirement of section 1122(a) of the Bankruptcy Code provides,

in pertinent part, as follows:

> Except as provided in subsection (b) of this section, a plan may place
> a claim or an interest in a particular class only if such claim or
> interest is substantially similar to the other claims or interests of
> such class.[55]

53. The Second Circuit has recognized that plan proponents have significant flexibility

under section 1122 in classifying claims.[56]  Moreover, the requirement of substantial similarity

does not mean that claims or interests within a particular class must be identical or that all similarly

situated claims must receive the same treatment under a plan.[57]  Indeed, as one court in this district

has stated, "a majority of both cases and commentators have rejected the concept that all creditors

---

[54]  *See In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992).

[55]  11 U.S.C. § 1122(a).

[56]  *See In re Reader's Digest Ass'n, Inc.*, No. 09-23529 (RDD) (Bankr. S.D.N.Y. Jan. 15, 2010) [Docket No. 758] Hr'g Tr. 122:25-123:1-4 (approving a plan of reorganization where debtor provided a reasonable basis for differing classification of general unsecured claims); *Frito-Lay, Inc. v. LTV Steel Co.* (*In re Chateaugay Corp.*), 10 F.3d 944, 956-57 (2d Cir. 1993) (finding separate classification appropriate because classification scheme had a rational basis); *In re 500 Fifth Ave. Assocs.*, 148 B.R. 1010, 1018 (Bankr. S.D.N.Y. 1993) (finding that "the proponent of a plan of reorganization has considerable discretion to classify claims and interests according to the facts and circumstances of the case . . . ."), *aff'd*, No. 93-cv-844, 1993 WL 316183 (S.D.N.Y. May 21, 1993); *Drexel*, 138 B.R. at 757 ("Courts have found that the Bankruptcy Code only prohibits the identical classification of dissimilar claims.  It does not require that similar classes be grouped together . . . .") (citation omitted); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 177–78 (Bankr. S.D.N.Y. 1989) ("a debtor may place claimants of the same rank in different classes and thereby provide different treatment for each respective class.").

[57]  *See In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 310 (Bankr. S.D.N.Y. 2016); *Drexel*, 138 B.R. at 757 (Bankr. S.D.N.Y. 1992) ("Courts have found that the Bankruptcy Code only prohibits the identical classification of dissimilar claims.  It does not require that similar classes be grouped together, but merely that any groups be homogenous or share some attributes.") (citations omitted).

Appellant Appendix ER - 764

of equal rank must receive equal treatment."[58]  Courts generally will approve placement of similar

claims in different classes provided there is a "rational basis" or "reasonable basis" to do so.[59]

54.     The Plan's classification of Claims and Interests satisfies the requirements of

section 1122 of the Bankruptcy Code because the Plan places Claims and Interests into eleven

separate Classes, with Claims and Interests in each Class differing from the Claims and Interests

in each other Class in a legal or factual way or based on other relevant criteria.[60]  Specifically, the

Plan provides for the separate classification of Claims and Interests into the following Classes:

a.     Class 1:  Secured Tax Claims;

b.     Class 2:  Other Priority Claims;

c.     Class 3:  Account Holder Claims;

d.     Class 4A:  OpCo General Unsecured Claims;

e.     Class 4B:  HoldCo General Unsecured Claims;

f.     Class 4C:  TopCo General Unsecured Claims;

g.     Class 5:  Alameda Loan Facility Claims;

h.     Class 6:  Section 510(b) Claims;

i.     Class 7:  Intercompany Claims;

j.     Class 8:  Intercompany Interests; and

k.     Class 9:  Existing Equity Interests.

---

[58]  *See In re Ionosphere Clubs, Inc.*, 98 B.R. at 177.

[59]  *See In re Reader's Digest Ass'n, Inc.*, No. 09-23529 (RDD) (Bankr. S.D.N.Y. Jan. 15, 2010) [Docket No. 758] Hr'g Tr. 122:25-123:1–4 (approving a plan of reorganization where debtor provided a reasonable basis for differing classification of general unsecured claims).

[60]  *See* Plan Art. III.

Appellant Appendix ER - 765

55.     Claims and Interests assigned to each particular Class described above are substantially similar to the other Claims and Interests in such Class.[61]  In addition, valid business, legal, and factual reasons justify the separate classification of the particular Claims or Interests into the Classes created under the Plan, and no unfair discrimination exists between or among Holders of Claims and Interests.[62]  Namely, the Plan separately classifies the Claims and Interests because each Holder of such Claims or Interests may hold (or may have held) rights in the estates legally dissimilar to the Claims or Interests in other Classes or because substantial administrative convenience results from such classification.

56.     Dissimilar Claims and Interests are not classified together under the Plan.  For example, debt and equity are classified separately and secured claims are classified separately from unsecured claims.  Holders of Account Holder Claims are classified separately from Holders of OpCo General Unsecured Claims due to the unique nature and basis for the Account Holder Claims, which are made up of claims held by customers on the Voyager platform.  Other General Unsecured Claims are broken into three classes, OpCo General Unsecured Claims, HoldCo General Unsecured Claims, and TopCo General Unsecured Claims, to account for the fact that Holders of such claims have legal recourse against only specific Debtors.  Further, Alameda Loan Facility Claims are properly classified separately as such claims are on account of loans and asserted against multiple Debtor entities.  Other aspects of the classification scheme recognize the different legal or factual nature of Claims or Interests.

57.     Accordingly, the Claims or Interests assigned to each particular Class described above are substantially similar to the other Claims or Interests in each such Class and the

---

[61]     *See* Renzi Decl. ¶ 35.

[62]     *See id.* ¶ 36.

Appellant Appendix ER - 766

distinctions among Classes are based on valid business, factual, and legal distinctions. The Debtors submit that the Plan fully complies with and satisfies section 1122 of the Bankruptcy Code, and no party has asserted otherwise.

### 2. The Plan Satisfies the Mandatory Plan Requirements of Section 1123(a) of the Bankruptcy Code.

58.     Section 1123(a) of the Bankruptcy Code sets forth seven criteria that every chapter 11 plan must satisfy.[63] The Plan satisfies each of these requirements.[64]

(1)     *Designation of Classes of Claims and Equity Interests (§ 1123(a)(1))*

59.     For the reasons set forth above, Article III of the Plan properly designates classes of Claims and Interests and thus satisfies the requirement of section 1122 of the Bankruptcy Code.[65]

(2)     *Specification of Unimpaired Classes (§ 1123(a)(2))*

60.     Section 1123(a)(2) of the Bankruptcy Code requires that the Plan "specify any class of claims or interests that is not impaired under the plan." The Plan meets this requirement by identifying each Class in Article III that is Unimpaired.[66]

---

[63]   11 U.S.C. § 1123(a)(1)–(7).

[64]   *See* 11 U.S.C. § 1123(a)(1)–(8). Section 1123(a)(8) of the Bankruptcy Code is only applicable to individual debtors.

[65]   *See* Renzi Decl. ¶¶ 35–36.

[66]   *See* Plan Art. III; Renzi Decl. ¶ 37.

Appellant Appendix ER - 767

### (3) Treatment of Impaired Classes (§ 1123(a)(3))

61.     Section 1123(a)(3) of the Bankruptcy Code requires that the Plan "specify the treatment of any class of claims or interests that is impaired under the plan." The Plan meets this requirement by setting forth the treatment of each Class in Article III that is Impaired.[67]

### (4) Equal Treatment within Classes (§ 1123(a)(4))

62.     Section 1123(a)(4) of the Bankruptcy Code requires that the Plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."[68] The Plan meets this requirement because Holders of Allowed Claims or Interests will receive the same rights and treatment as other Holders of Allowed Claims or Interests within such holders' respective Class.[69]

63.     The New York Objection and the Texas Objection argue that the Account Holder Claims are not being treated equally because Account Holders in Unsupported Jurisdictions may receive some or all of their recovery in Cash. This is incorrect. As set forth in greater detail in section IV below, all Account Holder Claims will be "dollarized" as of the Petition Date, and the Holders thereof will receive recoveries proportional to the "dollarized" value of their account holdings relative to the aggregate dollarized value of all customer accounts. The form such distributions take will be a function not of disparate treatment by the Debtors but of the laws and regulations of jurisdictions in which Account Holders reside. The New York Objection and the Texas Objection also argue that the different timing for Plan distributions to Account Holders in Supported Jurisdictions and Unsupported Jurisdictions constitutes unfair discrimination. These

---

[67]    *See id.*

[68]    11 U.S.C. § 1123(a)(4).

[69]    *See* Renzi Decl. ¶ 39.

Appellant Appendix ER - 768

arguments fail as well. Any delay in distributions to Account Holders in Unsupported Jurisdictions arises from the unwillingness of the Unsupported Jurisdictions to arrange accommodations for their constituents to receive in-kind distributions as 46 other states have already managed to do. And in any event, section 1129(b) of the Bankruptcy Code requires only equality of treatment, not equality of result,[70] and the Plan treats Account Holders the same regardless of jurisdiction; any delays in timing are purely a result of unavoidable differences in regulatory regimes across the 50 states. Accordingly, the Plan provides the same treatment to the Account Holder Claims, and the Plan complies with section 1123(a)(4) of the Bankruptcy Code.

### (5) *Means for Implementation (§ 1123(a)(5))*

64. Section 1123(a)(5) of the Bankruptcy Code requires that the Plan provide "adequate means" for its implementation.[71] The Plan satisfies this requirement because Article IV of the Plan, as well as other provisions thereof, provide for the means by which the Plan will be implemented.[72] Among other things, Article IV of the Plan provides for:

    a.    the general settlement of Claims and Interests;

    b.    consummation of the Sale Transaction, if applicable, including (i) the Customer Onboarding Protocol; (ii) the distribution of any Cryptocurrency or Cash pursuant to the Asset Purchase Agreement and the Plan; and (iii) all transactions necessary to provide for the purchase of the Acquired Assets by Purchaser under the Asset Purchase Agreement;

    c.    consummation of the Liquidation Transaction, as applicable;

    d.    the execution of the Plan Administrator Agreement and any transactions necessary or appropriate to form the Wind-Down Debtor;

---

[70] *See In re Latam Airlines Group SA,* 2022 WL 2206829, at *35, (Bankr. S.D.N.Y June 18, 2022) (citing *In re Dana Corp,* 412 B.R. 53, 62 (S.D.N.Y. 2008))

[71] 11 U.S.C. § 1123(a)(5).

[72] *See* Renzi Decl. ¶¶ 40–41.

Appellant Appendix ER - 769

    e.      the effectuation of the Employee Transition Plan;

    f.      the implementation of the D&O Settlement;

    g.      the retention of certain Non-Released D&O Claims to be pursued, settled, or resolved by the Wind-Down Debtor;

    h.      appointment of the Plan Administrator and the Wind-Down Debtor Oversight Committee;

    i.      sources of consideration for Plan distributions;

    j.      the cancellation of certain notes, instruments, certificates, licenses, and other documents; and

    k.      preservation of Vested Causes of Action.

65.    The precise terms governing the execution of these transactions are set forth in the applicable definitive documents or forms of agreements included in the Plan Supplement. The Debtors submit that the Plan satisfies section 1123(a)(5) of the Bankruptcy Code.

*(6)    Issuance of Non-Voting Securities (§ 1123(a)(6))*

66.    Section 1123(a)(6) of the Bankruptcy Code requires that a debtor's corporate constituent documents prohibit the issuance of nonvoting equity securities. On or prior to the Effective Date, the Wind-Down Debtor's organizational documents will be amended to prohibit the issuance of non-voting equity securities. Accordingly, the Plan satisfies the requirements of section 1123(a)(6) of the Bankruptcy Code, and no parties have asserted otherwise.

*(7)    Directors and Officers (§ 1123(a)(7))*

67.    Section 1123(a)(7) of the Bankruptcy Code requires that plan provisions with respect to the manner of selection of any director, officer, or trustee, or any other successor thereto, be "consistent with the interests of creditors and equity security holders and with public policy." The Plan satisfies this requirement by providing that, on the Effective Date, the authority, power, and incumbency of the persons acting as directors and officers of the Debtors shall be deemed to have resigned, solely in their capacities as such, and the Plan Administrator shall be appointed by

Appellant Appendix ER - 770

the Committee as the sole director and the sole officer of the Wind-Down Debtor and shall succeed

to the powers of the Debtors' directors and officers subject to the Wind-Down Debtor Oversight

Committee.[73]  The Debtors also filed the Plan Administrator Agreement in the Plan Supplement,

which provides the identity of the Plan Administrator.  Accordingly, the Plan satisfies

section 1123(a)(7) of the Bankruptcy Code, and no party has asserted otherwise.

### 3. The Plan Complies with the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code.

68.     Section 1123(b) of the Bankruptcy Code sets forth various discretionary provisions

that may be incorporated into a chapter 11 plan.  Among other things, section 1123(b) of the

Bankruptcy Code provides that a plan may:  (a) modify, impair, or leave unimpaired any class of

claims or interests; (b) provide for the settlement or adjustment of claims against or interests in a

debtor or its estate or the retention and enforcement by a debtor, trustee, or other representative of

claims or interests; (c) provide for the assumption or rejection of executory contracts and

unexpired leases; (d) provide for the sale of all or substantially all of the property of the Debtors'

estates, and the distribution of the proceeds of such sale among holders of claims or interests; or

(e) "include any other appropriate provision not inconsistent with the applicable provisions of [the

Bankruptcy Code]."[74]

69.     The Plan is consistent with section 1123(b) of the Bankruptcy Code.  Specifically,

under Article III of the Plan, Classes 1 and 2 are Unimpaired because the Plan leaves unaltered the

legal, equitable, and contractual rights of the Holders of Claims within such Classes.[75]  On the

---

[73]   The Plan Administrator will appoint an independent director at each Debtor to act as a fiduciary for such Debtor entity in connection with the resolution of Intercompany Claims.

[74]   *See* 11 U.S.C. § 1123(b)(1)–(6).

[75]   *See* Plan Art. III.

Appellant Appendix ER - 771

other hand, Classes 3, 4A, 4B, 4C, 6, and 9 are Impaired since the Plan modifies the rights of the Holders of Claims and Interests within such Classes as contemplated in section 1123(b)(1) of the Bankruptcy Code.[76]  The treatment of Class 7 Intercompany Claims will be determined by the Court, and Class 8 Intercompany Interests may be Impaired or Unimpaired under the Plan.

70.     In addition, and under section 1123(b)(2) of the Bankruptcy Code, Article V.A of the Plan provides that, on the Effective Date, all Executory Contracts and Unexpired Leases, including any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, that, as of the Effective Date, were not previously rejected, assumed, or assumed and assigned, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, except to the extent set forth in the Plan.[77]  The Plan also contains provisions implementing certain releases and exculpations, compromising claims and interests, and enjoining certain causes of action.

71.     Additionally, the Plan provides for implementation of the Sale Transaction, which contemplates the sale of certain of the Debtors' assets pursuant to the Asset Purchase Agreement. As set forth in greater detail in Article IV.C of the Plan, on or prior to the Effective Date, the Debtors shall have consummated the Sale Transaction, and, among other things, the Acquired Assets and Assumed Liabilities (as defined in the Asset Purchase Agreement) shall have transferred to the Purchaser free and clear of all Liens, Claims, Interests, charges, or other encumbrances, and the Purchaser shall pay to the Debtors the proceeds from the Sale Transaction, as and to the extent provided for in the Asset Purchase Agreement.

---

[76]   *See id.*

[77]   *See* Plan Art. V.A.

Appellant Appendix ER - 772

72.     Finally, as discussed above, the Plan contains provisions implementing certain releases and exculpations, compromising claims and interests, and enjoining certain causes of action.  These provisions are consistent with those approved by the Court in precedent chapter 11 liquidation plans.[78]  Each of these provisions is appropriate because, as applicable, they (a) are the product of arm's-length negotiations, (b) have been critical to obtaining the support of the various constituencies for the Plan, (c) are given for valuable consideration, (d) are fair and equitable and in the best interests of the Debtors, their estates, and these chapter 11 cases, and (e) are consistent with the relevant provisions of the Bankruptcy Code and Second Circuit law.  Such provisions, including certain releases of potential Debtor claims in connection with the D&O Settlement, are discussed in turn below, but, in summary, satisfy the requirements of section 1123(b).

> (1)     *The Settlement of Claims and Controversies Is Fair and Equitable and Should be Approved.*

73.     The Plan provides for the general settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan.  The Plan also provides for implementation of the D&O Settlement.  As described in greater detail in Article IV.G of the Plan and Article VII.A.2(i) of the Disclosure Statement, the D&O Settlement is the result of the Special Committee Investigation into the facts and circumstances of the Debtors' prepetition conduct.  Over the course of the Investigation, the Special Committee, among other things, collected and reviewed thousands of documents and conducted over 55 hours of interviews with the Debtors' directors and officers.  As set forth in the Investigation Report, the Special Committee found no fraud or theft by any director, officer, or employee of any of the

---

[78]     *See, e.g.*, *Findings of Fact, Conclusions of Law, and Order Confirming Debtors' Modified First Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code* filed in *In re Hollander Sleep Products, LLC*, No. 19-11608 (MEW) (Bankr. S.D.N.Y. May 19, 2019) at docket number 356 (confirming chapter 11 plan containing injunction provisions consistent with those in the Debtors' Plan).

Appellant Appendix ER - 773

Debtors and found no colorable claims against any Voyager director or officer other than potential claims against the Debtors' Chief Executive Officer ("CEO") and Chief Commercial Officer (and former Chief Financial Officer) ("CCO") relating to the 3AC Loan. The Special Committee found that although these particular claims are colorable, the standard for successfully prosecuting such claims would be difficult to meet and any resulting judgment even more difficult to collect. Accordingly, the Special Committee negotiated independent settlements with each of the CEO and CCO as set forth in the Plan, subject to approval of the Court as part of Plan confirmation. Each component of the D&O Settlement is an integral, integrated, and inextricably linked part of the D&O Settlement.[79]

74. While the amounts to be realized from the D&O Settlement (approximately $1.2 million–$2 million of personal assets plus recourse to up to $20 million of D&O insurance) are a fraction of the Debtors' loss incurred in connection with the 3AC Loan, the Special Committee made the decision to settle, subject to Court approval, based on both the challenges in litigating that claim *and* the fact that the CEO and CCO do not have personal assets available to satisfy any potential judgment even if the claims were successfully prosecuted. Moreover, the cost of prosecuting would not only likely exceed the amounts collected even if successful but would simultaneously dissipate the available D&O insurance coverage and the assets that are being paid through the settlement in defense costs. The rationale for the Special Committee's negotiation and recommendation for the settlements is based, among other things, on the relative strength or weakness of these claims, the challenges involved in litigating, the costs of litigating these claims, the financial wherewithal of the officers, and the risk of depletion of substantial portions of available insurance coverage that prioritizes the rights of the officers to utilize the insurance for

---

[79] *See* Pohl Decl. ¶¶ 22–31.

Appellant Appendix ER - 774

defense costs. The Special Committee therefore believes, and the Debtors agree, that the settlements embodied in the Plan are in the best interests of the estate. The Committee has also been heavily involved in the investigation and settlement process, and it, too, believes the settlements and releases embodied in the Plan are in the best interests of the estate and of unsecured creditors generally.[80]

75. The compromises set forth in the Plan, including the D&O Settlement, are critical to bringing closure to these and other matters addressed in the Plan and permitting the Debtors to avoid waste and maximize the value of the Estate for the benefit of all parties in interest and maximize recoveries for all Holders of Claims and Interests.[81]

> **(2) The Plan's Release, Exculpation, and Injunction Provisions Satisfy Section 1123(b) of the Bankruptcy Code.**

76. The Plan includes certain releases, an exculpation provision, and an injunction provision. These discretionary provisions are proper because, among other things, they are necessary to achieving the value maximizing conclusion to these chapter 11 cases and securing necessary support for the terms of the Plan, including the D&O Settlement, are supported by the Debtors and their key constituents, and are consistent with applicable precedent.[82]

> **(i) The Debtor Release Is Appropriate.**

77. Article VIII.A of the Plan provides for releases by the Debtors of Claims and Causes of Action against the Released Parties[83] (the "Debtor Release"). The Debtor Release is a

---

[80] *See Statement of the Official Committee of Unsecured Creditors in Support of (A) Debtors' Motion for Entry of an Order (I) Authorizing Entry Into the Binance US Purchase Agreement and (II) Granting Related Relief; and (B) Submission of the Committee's Solicitation Letter in Support of the Debtors' Third Amended Joint Plan* [Docket No. 837], Exhibit A.

[81] *See* Pohl Decl. ¶¶ 22–31.

[82] *See* Renzi Decl. ¶¶ 114–15.

[83] Pursuant to the Plan, "Released Parties" means, collectively, in each case in its capacity as such: (a) the Debtors; (b) the Committee, and each of the members thereof; (c) each of the Released Professionals; (d) Purchaser and

Appellant Appendix ER - 775

vital component of the Plan, and as described above it is a sound exercise of the Debtors' business

judgment and should be approved.

78.     It is well-settled that a debtor is authorized to settle or release its claims in a

chapter 11 plan.[84]  Such releases are granted by courts in the Second Circuit where they are in the

"best interests of the estate."[85]  In determining whether such a release is within the best interests

of the estate, the court need not conduct a "'mini-trial' of the facts or the merits underlying [each]

dispute[,]" and "the settlement need not be the best that the debtor could have obtained."[86]

Under this standard, the "court should instead 'canvass [*sic*] the [settled] issues [to] see whether

the settlement falls below the lowest point in the range of reasonableness.'"[87]  Courts in the Second

Circuit consider the following factors to determine whether a settlement is within the range of

reasonableness:  (a) the balance between the claim's possibility of success and the settlement's

benefits; (b) the likelihood of complex and protracted litigation, including attendant expense,

inconvenience, and delay; (c) the interests of creditors; (d) whether other interested parties support

the settlement; (e) the nature and breadth of releases; (f) the competency and experience of counsel

supporting, and the experience and knowledge of the judge reviewing, the settlement; and (g) the

extent to which the settlement is the product of arm's-length bargaining.[88]

---

each of its Related Parties; and (e) each of the Released Voyager Employees (subject to the limitations contained in Article IV.F and Article IV.G of the Plan); provided that if the Asset Purchase Agreement is terminated, Purchaser and each of its Related Parties shall not be "Released Parties" under the Plan.  Plan, Art. I.A.136.

[84]   *See, e.g.*, *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 263 n.289 (Bankr. S.D.N.Y. 2007) (holding the debtor may release its own claims); *In re Oneida Ltd.*, 351 B.R. 79, 94 (Bankr. S.D.N.Y. 2006) (noting that a debtor's release of its own claims is permissible).

[85]   *See In re Charter Commc'ns, Inc.*, 419 B.R. 221, 257 (Bankr. S.D.N.Y. 2009) ("When reviewing releases in a debtor's plan, courts consider whether such releases are in the best interest of the estate.") (citation omitted).

[86]   *In re NII Holdings, Inc.*, 536 B.R. 61, 99 (Bankr. S.D.N.Y. 2015) (*quoting Adelphia*, 368 B.R. at 225).

[87]   *Id.* at 100 (*quoting Adelphia*, 368 B.R. at 225 (citation omitted)).

[88]   *Id.* (citing *In re Iridium Operating LLCs*, 478 F.3d 452, 462 (2d Cir. 2007)).

Appellant Appendix ER - 776

79.     The Debtor Release should be approved.  During the Plan negotiations, it became apparent that the Debtor Release would be a necessary condition of the Restructuring Transactions embodied in the Plan.  Without the Debtor Release, the Debtors and their stakeholders would have been unable to secure the substantial benefits provided by the Plan in the expedited timeframe in which the Debtors propose to exit bankruptcy.[89]  As discussed in greater detail in Article IV.A herein, the Releases include settlement and releases of the Debtors' claims following the Special Committee Investigation into certain historical transactions, including the facts and circumstances related to the 3AC Loan.  The inclusion of the Debtor Release avoids waste and benefits all of the Debtors' stakeholders.  The Debtors' creditors agree:  Holders of Claims in the Voting Classes voted overwhelmingly in support of the Plan.  Only 8 parties objected to the Releases, and even those few objections appear to misunderstand the distinction between a third-party release and the Debtor release that is being proposed.  For the avoidance of doubt, and in an effort to clarify the situation for creditors, **no creditor's direct claim (if they have a direct claim) against any party other than the Debtors is released by the Plan unless such creditor affirmatively opts-in to the Plan's Third Party Release provisions**.  The only thing released without the affirmative "opt-in" from individual creditors are ***the Debtors' potential claims*** against such Released Parties.

80.     Release of the Released Parties is also appropriate under the circumstances. The Released Parties have made substantial and valuable contributions to the Debtors' chapter 11 process through, among other things, their efforts to market and sell the Debtors' assets and negotiate and implement the Plan, which will maximize value for the benefit of all parties in interest.[90]  In addition, as described in section IV.P of the Disclosure Statement, the CEO and CCO

---

[89]     Renzi Decl. ¶¶ 114–15.

[90]     *See id.*

Appellant Appendix ER - 777

are making additional personal contributions to the Plan pursuant to the D&O Settlement. In addition, the active participation of the Released Voyager Employees and the Released Professionals, both in prepetition negotiations and during the course of these chapter 11 cases—and for many through their anticipated assistance in implementing the Plan and getting recoveries to customers as soon as possible—merit their inclusion as Released Parties for purposes of the Debtor Release.[91]

81.     For the foregoing reasons, the Debtors' agreement to provide the Debtor Release constitutes a sound exercise of the Debtors' business judgment and should be approved.

(ii)     The Third-Party Release is Wholly Consensual and Is Appropriate.

82.     Article VIII.B of the Plan provides that each Releasing Party[92] shall release any and all Causes of Action such parties could assert against the Debtors and other Released Parties (the "Third-Party Release," and together with the Debtor Release, the "Releases"). The Releasing Parties include (a) the Debtors; (b) the Wind-Down Debtor; (c) the Committee, and each of the members thereof; (d) each of the Released Professionals; (e) each of the Released Voyager Employees; (f) Purchaser and each of its Related Parties to the extent Purchaser is able to bind such Related Parties; (g) all Holders of Claims that vote to accept the Plan and affirmatively opt

---

[91]   *See* Pohl Decl. ¶ 30.

[92]   Pursuant to the Plan, "Releasing Parties" means, collectively, in each case in its capacity as such: (a) the Debtors; (b) the Committee, and each of the members thereof; (c) each of the Released Professionals; (d) each of the Released Voyager Employees; (e) Purchaser and each of its Related Parties to the extent Purchaser is able to bind such Related Parties; (f) all Holders of Claims that vote to accept the Plan and affirmatively opt into the releases provided by the Plan; (g) all Holders of Claims that vote to reject the Plan and affirmatively opt into the releases provided by the Plan; and (h) all Holders of Claims or Interests that abstain from voting (or are otherwise not entitled to vote) on the Plan and affirmatively opt into the releases provided by the Plan; provided that if the Asset Purchase Agreement is terminated, Purchaser and each of its Related Parties shall not be "Releasing Parties" under the Plan. *See* Plan, Art. I.A.139. For the avoidance of doubt, subject to the express limitations set forth in the Plan and in the D&O Settlement, parties who are covered by the D&O Policies retain their rights to coverage and indemnity as set forth in those policies. *See* Plan, Art. V.E.

Appellant Appendix ER - 778

into the Third-Party Release provided by the Plan; (h) all Holders of Claims that vote to reject the

Plan and affirmatively opt into the Third-Party Release provided by the Plan; and (i) all Holders

of Claims or Interests that abstain from voting (or are otherwise not entitled to vote) on the Plan

and affirmatively opt into the Third-Party Release provided by the Plan; *provided* that if the Asset

Purchase Agreement is terminated, Purchaser and each of its Related Parties shall not be

"Releasing Parties" under the Plan. The Third-Party Release is consensual, consistent with

established Second Circuit law, and integral to the Plan and therefore should be approved.

83. "Most courts allow consensual [third-party] releases to be included in a plan."[93]

Courts in this district regularly approve third party releases such as those contained in the Plan on

the grounds that such releases are consensual.[94] Here, the Third-Party Releases provided under

the Plan are ***entirely consensual*** in that the Plan offers all Holders of Claims and Interests—

whether such Holders vote to accept, vote to reject, or abstain from voting or are otherwise not

entitled to vote on the Plan—to be considered Releasing Parties ***only if they affirmatively opt in***

to the Releases provided by the Plan. Accordingly, the Third-Party Release is fully consensual.

In addition, as set forth in the Voting Report, approximately 65 percent of Holders of Claims or

Interests affirmatively opted into the Third-Party Releases.

84. In addition to being consensual, the Third-Party Release is substantively warranted

for the Released Parties. As discussed above, for months prior to the commencement of these

---

[93] *In re Wool Growers Cent. Storage Co.*, 371 B.R. 768, 775 (Bankr. N.D. Tex. 2007); *see also In re Indianapolis Downs, LLC*, 486 B.R. 286, 305 (Bankr. D. Del. 2013) ("Courts in this jurisdiction have consistently held that a plan may provide for a release of third party claims against a non-debtor upon consent of the party affected.").

[94] *See In re Chassix Holdings, Inc.*, 533 B.R. 64, 80 (Bankr. S.D.N.Y. 2015) ("'Consenting Creditors' should include creditors who voted in favor of the Plan . . . [s]imilarly, creditors who rejected the Plan, but who nevertheless 'opted in' to the releases, have consented to those releases."); *In re MPM Silicones*, 2014 WL 4436335, at *32 (citing *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 141 (2d Cir. 2005)); *see also In re Genco Shipping & Trading Ltd.*, 513 B.R. 233, 271 (Bankr. S.D.N.Y. 2014)*; In re Chemtura Corp.*, 439 B.R. 561, 611 (Bankr. S.D.N.Y. 2010); *In re Calpine Corp.*, No. 05-60200 (BRL), 2007 WL 4565223, at *10 (Bankr. S.D.N.Y. Dec. 19, 2007).

Appellant Appendix ER - 779

chapter 11 cases and throughout the pendency of these chapter 11 cases, the Released Parties made

substantial and valuable contributions to the Debtors' chapter 11 process through, among other

things, efforts to market and sell the Debtors' assets and negotiate and implement the Plan, which

will maximize value for the benefit of all parties in interest.[95]

85.     Finally, throughout these chapter 11 cases and the related negotiations, the Released

Professionals[96] and the Released Voyager Employees[97] steadfastly maintained their duties to

maximize value for the benefit of all stakeholders, investing thousands of hours both pre- and

postpetition in addition to performing their ordinary course responsibilities.[98]   Without the

contributions of the Debtors' board of directors, the Released Voyager Employees, and the

Released Professionals, the Debtors would not have been able to enter into the Asset Purchase

Agreement and pursue confirmation of the Plan.  There would instead be conversion to a chapter

7 liquidation in which creditors would receive a materially smaller recovery while waiting a

materially longer period of time to receive it.  Accordingly, the Debtors submit that the Third-

---

[95]   *See* Renzi Decl. ¶ 114–15; Pohl Decl. ¶ 30.

[96]   Pursuant to the Plan, "Released Professionals" means the following professionals retained by the Debtors, the Committee, or the Purchaser (as applicable):  (i) Kirkland & Ellis LLP; (ii) Moelis & Company LLC; (iii) Berkeley Research Group, LLC; (iv) Bankruptcy Management Solutions, Inc. d/b/a Stretto; (v) Quinn Emanuel Urquhart & Sullivan LLP; (vi) Fasken Martineau DuMoulin LLP; (vii) Campbells Legal (BVI); (viii) McDermott Will & Emery LLP; (ix) FTI Consulting, Inc.; (x) Epiq Corporate Restructuring, LLC; (xi) Cassels, Brock & Blackwell LLP; (xii) Paul Hastings LLP; (xiii) Harney Westwood & Riegels LP (BVI); (xiv) Day Pitney LLP (solely in their capacity as counsel to the Debtors); (xv) Jenner & Block LLP; (xvi) Seyfarth Shaw LLP; (xvii) Alvarez & Marsal Canada Inc.; (xviii) Blake, Cassels & Graydon LLP; (xix) Jaffe Raitt Heuer & Weiss; (xx) Latham & Watkins LLP; (xxi) Lowenstein Sandler LLP; (xxii) Kramer Levin LLP; and (xxiii) Acura Law Firm; provided that if the Asset Purchase Agreement is terminated, Latham & Watkins LLP shall not be a "Released Professional" under the Plan.  Plan, Art.I.A.137.

[97]   Pursuant to the Plan, "Released Voyager Employees" means all directors, officers, and Persons employed by each of the Debtors and their Affiliates serving in such capacity on or after the Petition Date but before the Effective Date (subject to the limitations contained in Article IV.F and Article IV.G of the Plan).  Plan, Art.I.138.

[98]   *See* Renzi Decl. ¶ 114–15; Pohl Decl. ¶ 30.

Appellant Appendix ER - 780

Party Release is consensual and appropriate and, accordingly, the Third-Party Release should be approved.

(iii)    The Exculpation Provision Is Appropriate.

86.    Article VIII.C of the Plan provides that each Exculpated Party[99] shall be released and exculpated from any causes of action arising out of acts or omissions in connection with these chapter 11 cases and certain related transactions, except for acts or omissions that are found to have been the product of actual fraud, willful misconduct, or gross negligence (the "Exculpation"). The Exculpation is intended to prevent collateral attacks against estate fiduciaries or parties that have acted in good faith to help facilitate the Debtors' reorganization. The Exculpation is an integral part of the Plan and otherwise satisfies the governing standards in the Second Circuit. This provision provides necessary and customary protections to those parties in interest (whether estate fiduciaries or otherwise) whose efforts were and continue to be vital to implementing the Plan. The Debtors' Exculpation provisions fully comply with this Court's ruling in *Aegean*.

87.    In the Second Circuit, exculpation provisions like the one set forth in the Plan are regularly approved.[100] Courts evaluate the appropriateness of exculpation provisions based on a

---

[99]  Pursuant to the Plan, "Exculpated Parties" means, collectively, and in each case in its capacity as such: (a) each of the Debtors; (b) the Committee, and each of the members thereof, solely in their capacity as such; (c) each of the Released Professionals; and (d) each of the Released Voyager Employees. *See* Plan, Art. I.A.77.

[100]  *See, e.g.*, *In re Oneida,* 351 B.R. 79, 94, n.22 (Bankr. S.D.N.Y. 2006) (considering an exculpation provision covering a number of prepetition actors with respect to certain prepetition actions, as well as postpetition activity); *In re Relativity Media, LLC*, Case No. 18-11358 (MEW) (Bankr. S.D.N.Y. Jan. 31, 2019) [Docket No. 689-1] (approving exculpation provision for estate fiduciaries and non-fiduciaries); *In re Pacific Drilling S.A.*, Case No. 17-13193 (MEW) (Bankr. S.D.N.Y. Nov. 2, 2018) [Docket No. 746] (finding that an exculpation for both estate fiduciaries and non-fiduciaries was "consistent with prior case law, reasonable in scope, integral to the Plan, and appropriate."); *In re Advanced Science Technologies, Inc.*, Case No. 17-13668 (SMB) (Bankr. S.D.N.Y. Feb. 7, 2018) [Docket No. 60-1] (same); *In re Cumulus Media Inc.*, Case No. 17-13381 (SCC) (Bankr. S.D.N.Y. May 10, 2018) [Docket No. 769] (approving exculpation provision); *In re Avaya Inc.*, Case No. 17-10089 (SMB) (Bankr. S.D.N.Y. Nov. 28, 2017) [Docket No. 1579] (same); *In re International Shipholding Corp.*, Case No. 16-12220 (SMB) (Bankr. S.D.N.Y. March 2, 2017) [Docket No. 671-1] (same); *In re Fairway Group Holdings Corp.*, Case No. 16-11241 (MEW) (Bankr. S.D.N.Y. June 8, 2016) [Docket No. 156] (approving exculpation provision subject to modification of "Exculpated Parties"); *In re Cengage Learning, Inc.*, Case No. 13-44106 (ESS) (Bankr. E.D.N.Y. Mar. 14, 2014) [Docket No. 1225] (approving exculpation provision for estate fiduciaries and non-fiduciaries for "any prepetition or postpetition act taken or omitted to be taken in connection

Appellant Appendix ER - 781

number of factors, including whether the plan was proposed in good faith, whether liability is limited, and whether the exculpation provision was necessary for plan negotiations.[101] Exculpation provisions that are limited to claims not involving actual fraud, willful misconduct, or gross negligence, are customary and generally approved in this district under appropriate circumstances.[102] Unlike third-party releases, exculpation provisions do not affect the liability of third parties *per se* but rather set a standard of care of gross negligence or willful misconduct in future litigation by a non-releasing party against an "Exculpated Party" for acts arising out of the

---

with, or related to formulating, negotiating, soliciting, preparing, disseminating, confirming, implementing, or consummating the Plan"); *In re Eastman Kodak Co.*, Case No. 12-10202 (Bankr. S.D.N.Y. Aug. 23, 2013) [Docket No. 4966] (overruling U.S. Trustee objection to exculpation of both estate fiduciaries and non-fiduciaries from liability for "any prepetition or postpetition act taken or omitted to be taken in connection with, or arising from or relating in any way to, the chapter 11 cases"); *In re RDA Holding Co.*, Case No. 13-22233 (RDD) (Bankr. S.D.N.Y. June 28, 2013) [Docket No. 478] (finding exculpation provisions appropriate); *In re Metro-Goldwyn-Mayer Studios Inc.*, Case No. 10-15774 (SMB) (Bankr. S.D.N.Y. Dec. 6, 2010) [Docket No. 173] ¶ LL (approving exculpation provision); *In re Neff Corp.*, Case No. 10-12610 (Bankr. S.D.N.Y. Sept. 20, 2010) [Docket No. 443] (estate and non-estate fiduciaries "shall neither have, nor incur any liability to any Entity for any prepetition or postpetition act taken or omitted to be taken in connection with, or related to formulating, negotiating . . . the Plan"); *In re Charter Commc'ns, Inc.*, Case No. 09-11435 (Bankr. S.D.N.Y. Nov. 17, 2009) [Docket No. 921] (approving exculpation of estate fiduciaries and non-fiduciaries for "any pre-petition or postpetition act taken or omitted to be taken in connection with, or related to . . . the restructuring of the Company").

[101] *See, e.g.*, *In re Enron Corp.*, 326 B.R. 497, 503 (S.D.N.Y. 2005) (evaluating the exculpation clause based on the manner in which the clause was made a part of the agreement, the necessity of the limited liability to the plan negotiations, and that those who participated in proposing the plan did so in good faith).

[102] *See, e.g.*, *In re Windstream Holdings, Inc.*, No. 19-22312 (RDD), (Bankr. S.D.N.Y. May 8, 2020) Hr'g Tr. at 92:21–23 (approving exculpation provisions and noting that "with the carveout for fraud and gross negligence, I don't have a problem with [the exculpation]"); *Oneida*, 351 B.R. at 94 n.22 (approving exculpation provision except in cases of gross negligence, willful misconduct, fraud, or criminal conduct over an objection that was raised but "not pursue[d] at the confirmation hearing" and noting that the language "generally follows the text that has become standard in this district, is sufficiently narrow to be unexceptional"); *see In re Cengage Learning, Inc.*, No. 13-44106 (ESS) (Bankr. E.D.N.Y. Mar. 14, 2014) [Docket No. 1225] (approving exculpation provision that extended to estate fiduciaries and non-fiduciaries that excluded gross negligence and willful misconduct); *In re DJK Residential, LLC*, No. 08-10375 (JMP) (Bankr. S.D.N.Y. May 7, 2008) [Docket No. 497] (approving an exculpation provision that excluded gross negligence and willful misconduct).

Appellant Appendix ER - 782

Debtors' restructuring.[103]  Exculpation for parties participating in the Plan process is appropriate where Plan negotiations could not have occurred without protection from liability.[104]

88.     The Exculpated Parties have participated in good faith in formulating and negotiating the Plan as it relates to the Debtors, and they should be entitled to protection from exposure to any lawsuits related to this chapter 11 process filed by unsatisfied parties.[105] Moreover, the Exculpation provision and the liability standard it sets represent a conclusion of law that flows logically from certain findings of fact that the Court must reach in confirming the Plan as it relates to the Debtors.  As discussed above, this Court must find, under section 1129(a)(2), that the Debtors have complied with the applicable provisions of the Bankruptcy Code. Additionally, this Court must find, under section 1129(a)(3), that the Plan has been proposed in good faith and not by any means forbidden by law.  These findings apply to the Debtors and, by extension, to the Debtors' officers, directors, employees, and professionals.  Further, these findings imply that the Plan was negotiated at arm's-length and in good faith.

89.     Here, the Debtors and their officers, directors, and professionals actively negotiated the Plan with the Committee, the Purchaser, and others.[106]  Such negotiations were extensive, and the resulting agreements were implemented in good faith with a high degree of transparency, and as a result, the Plan enjoys support from approximately 97 percent in number and 98 percent in

---

[103]   *See In re PWS Holding Corp.*, 228 F.3d 224, 245 (3d Cir. 2000) (finding that an exculpation provision "is apparently a commonplace provision in Chapter 11 plans, [and] does not affect the liability of these parties, but rather states the standard of liability under the Code"); *see also In re Premier Int'l Holdings, Inc.*, 2010 WL 2745964, at *10 (CSS) (Bankr. D. Del. Apr. 29, 2010) (approving a similar exculpation provision as that provided for under the Plan); *In re Spansion*, 2010 WL 2905001, at *16 (Bankr. D. Del. April 16, 2010) (same).

[104]   *In re Aegean Marine Petroleum Network, Inc.*, 599 B.R. 717, 721 (Bankr. S.D.N.Y. 2019) ("I believe that an appropriate exculpation provision should say that it bars claims against the exculpated parties based on the negotiation, execution, and implementation of agreements and transactions that were approved by the Court.").

[105]   Renzi Decl. ¶¶ 114–15.

[106]   Renzi Decl. ¶¶ 20, 32, 46, 108.

Appellant Appendix ER - 783

amount of Holders of Account Holder Claims actually voting.[107]  The Exculpated Parties played a critical role in negotiating, formulating, and implementing the Disclosure Statement, the Plan, the Asset Purchase Agreement, and related documents in furtherance of the Sale Transaction or the Liquidation Transaction contemplated by the Plan.  Furthermore, the Exculpation provision is limited to acts during these chapter 11 cases and does not extend beyond such time period. Accordingly, the Court's findings of good faith vis-à-vis the Debtors' chapter 11 cases should also extend to the Exculpated Parties.  Additionally, the promise of exculpation played a significant role in facilitating Plan negotiations.[108]  All of the Exculpated Parties played a key role in developing the Plan that paved the way for a successful transaction and likely would not have been so inclined to participate in the Plan process without the promise of exculpation.[109]

90.    Under the circumstances, it is appropriate for the Court to approve the Exculpation provision and to find that the Exculpated Parties have acted in good faith and in compliance with the law.

(iv)    The Injunction Provision Is Appropriate.

91.    The injunction provision set forth in Article VIII.D of the Plan merely implements the Plan's Releases and Exculpation provisions in a manner consistent with provisions approved by the Court in precedent chapter 11 liquidation plans.[110]  Thus, the injunction provision is a key provision of the Plan because it enforces the Releases and Exculpation provisions that are centrally

---

[107]    *See generally*, Voting Report.

[108]    Renzi Decl. ¶¶ 9, 114–15.

[109]    *Id.*

[110]    *See, e.g.*, *Findings of Fact, Conclusions of Law, and Order Confirming Debtors' Modified First Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code* filed in *In re Hollander Sleep Products, LLC*, No. 19-11608 (MEW) (Bankr. S.D.N.Y. May 19, 2019) at docket number 356 (confirming chapter 11 plan containing injunction provisions consistent with those in the Debtors' Plan).

Appellant Appendix ER - 784

important to the Plan.[111]  As such, to the extent the Court finds that the Exculpation and Releases are appropriate, the Debtors respectfully submit that the injunction provision must also be appropriate.  Moreover, this injunction provision is narrowly tailored to achieve its purpose.

    *(3)* *The Sale Transaction Should Be Approved Under Sections 363(b)(1) and 1123(b)(4) of the Bankruptcy Code as Sound Exercise of the Debtors' Business Judgment.*

 92. The Court may authorize the Debtors to sell the Acquired Assets (as defined in the Asset Purchase Agreement) and all other assets transferred to the Purchaser under the Asset Purchase Agreement pursuant to sections 363(b)(1) and 1123(b)(4) of the Bankruptcy Code. Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  Similarly, section 1123(b)(4) provides that a "plan may provide for the sale of all or substantially all of the property of the estate."  To approve a sale under section 363(b)(1) of the Bankruptcy Code, the debtor is required to show that the decision to sell the property outside of the ordinary course of business was based on a sound exercise of the debtor's business judgment.[112] Accordingly, for the purpose of selling property of the estate, the Debtors need only show a legitimate business justification for the proposed action.[113]

---

[111] *See In re Drexel Burnham Lambert Grp.*, 960 F.2d 285, 293 (2d Cir. 1992) (holding that a court may approve injunction provision where such provision "plays an important part in the debtor's reorganization plan").

[112] *See, e.g.*, *In re Eastman Kodak Co.*, 2012 Bankr. LEXIS 2746, at *8 (Bankr. S.D.N.Y. June 15, 2012) ("[A] sale under section 363 requires 'some articulated business justification.'") (quoting *In re Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Innkeepers USA Trust*, 448 B.R. 131, 146 (Bankr. S.D.N.Y. 2011) (same); *In re Boston Generating, LLC*, 440 B.R. 302, 322 (Bankr. S.D.N.Y. 2010) (same).

[113] *See, e.g.*, *Lionel*, 722 F.2d at 1070; *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct.").

Appellant Appendix ER - 785

93.     The business judgment rule shields a debtor's management decisions from judicial second guessing.[114]  Once a debtor articulates a valid business justification, the law vests the debtor's decision to use property outside of the ordinary course of business with a strong presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."[115]  Parties challenging a debtor's decision must make a showing of "bad faith, self-interest or gross negligence."[116]  Generally, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code.

94.     The Debtors' sale of the assets under the Asset Purchase Agreement represents a sound exercise of the Debtors' business judgment, is essential to the Sale Transaction under the Plan, and is justified under section 363(b) of the Bankruptcy Code.  As set forth in greater detail in Article II.A and Article V.B of the Disclosure Statement, following the collapse of the FTX Transaction, the Debtors and their advisors immediately restarted the marketing process, leveraged the significant groundwork laid during the prior marketing process, and reengaged with many of the parties that were previously involved in the process as well as several new parties who expressed interest in acquiring the Debtors' assets.

---

[114]   *Johns-Manville Corp.*, 60 B.R. at 615–16 (discussing how a "presumption of reasonableness attaches to a debtor's management decisions" and courts will generally not entertain objections to the debtor's conduct after a reasonable basis is set forth).

[115]   *In re GSC, Inc.*, 453 B.R. 132, 174 (Bankr. S.D.N.Y. 2011) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)); *see also In re Filene's Basement, LLC*, 11-13511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) ("If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate") (citations omitted); *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993).

[116]   *Integrated Res.*, 147 B.R. at 656 (citations omitted).

Appellant Appendix ER - 786

95.     The Debtors received several proposals and engaged in extensive negotiations with all interested parties.  The Debtors, with the assistance of their advisors, analyzed each proposal received from interested parties, answered numerous requests for additional information, held several conferences with the Debtors' management teams, their advisors, and the Committee, pushed the bidders to improve the economic and other terms of their bids, and analyzed the viability of each of the proposed transactions.  When analyzing proposals received from interested parties, the Debtors and their advisors considered both the viability and risk factors associated with each proposed transaction, including but not limited to, timing considerations, third-party financing requirements, ability to consummate, cybersecurity risks, regulatory and licensing status, and counterparty risk based on the counterparty due diligence conducted both prior to and during the initial Auction and following the collapse of FTX.  After thoroughly engaging with all interested parties, on December 18, 2022, Voyager Digital, LLC (the "Seller") executed the Asset Purchase Agreement with Binance.US.  On December 21, 2022, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Authorizing Entry Into the Binance US Purchase Agreement and (II) Granting Related Relief* (the "Sale Motion"),[117] which sought approval of the Seller's entry into the Asset Purchase Agreement.  On January 13, 2023, the Court entered the APA Order.[118]

96.     The Debtors value the Sale Transaction at approximately $1.022 billion, comprising (a) the value of cryptocurrency on the Voyager platform as of a date to be determined, which as of December 19, 2022 at 0:00 UTC, is estimated to be $1.002 billion, plus (b) additional consideration, which is estimated to provide at least $20 million of incremental value.  The Sale Transaction also includes additional benefits, as it (a) provides the most tax efficient route forward

---

[117]    Docket No. 775.

[118]    Docket No. 860.

Appellant Appendix ER - 787

as Binance.US supports 100% of the cryptocurrency coins on the Debtors' platform, (b) is the only transaction available to the Debtors that did not contemplate requiring the Debtors to liquidate cryptocurrency for working capital purposes in the first instance, (c) includes reimbursement by Binance.US of up to $15 million of Seller's expenses under certain circumstances set forth in the Asset Purchase Agreement, (d) provides a $10 million reverse termination fee payable to the Seller by Binance.US to compensate the Debtors' estates in the event that Binance.US cannot consummate the transaction under certain circumstances set forth in the Asset Purchase Agreement, and (e) in the event that the Debtors pivot to the Liquidation Transaction, provides that Binance.US will provide certain services to facilitate such Liquidation Transaction to ensure that the Debtors can rely on the Binance.US platform to minimize leakage with, and cybersecurity risks when, returning cryptocurrency to creditors.

97.     Importantly, the "fiduciary out" included in the Asset Purchase Agreement permits the Debtors to toggle *either* to a higher and better third-party bid (should one emerge) *or* to the Liquidation Transaction, if the Debtors determine that the Sale Transaction is no longer the highest or otherwise best option.  However, the Debtors believe that the Sale Transaction presents the most value maximizing path forward because the Liquidation Transaction, while still presenting a viable option, could (a) lead to incremental value leakage (*e.g.*, the Debtors would likely be forced to realize a discount due to liquidation of sizable positions in the marketplace), over and above that in a third party transaction, thereby resulting in worse creditor recoveries, (b) require the Debtors to liquidate additional cryptocurrency to fund working capital requirements to complete the work required (including AML/KYC compliance), (c) create additional security risks (particularly if the Debtors are unable to retain critical personnel necessary to perform the Liquidation Transaction), (d) be less tax efficient for customers than a third-party transaction, (e) strand certain

52

cryptocurrency coins, which can be withdrawn by customers from certain third-party exchanges (like Binance.US) but not from Voyager,[119] and (f) may severely damage the value of the VGX token, which is the native token of the Voyager brokerage platform.

98.     The Debtors believe that the Sale Transaction represents the most efficient and appropriate means of maximizing the value of the Debtors' estates.   Moreover, the Sale Transaction is appropriate under section 1123(b)(4) as it is to be effectuated pursuant to the Plan, which, for the reasons set forth in herein, satisfies all of the requirements to be confirmed.  For the foregoing reasons, the Debtors believe that entering into the Sale Transaction is a sound exercise of their business judgment and represents the best path forward for the Debtors, their creditors, and other parties in interest.  Accordingly, the Sale Transaction should be approved.

99.     The Debtors submit that the discretionary provisions of the Plan are consistent with and permissible under section 1123(b) of the Bankruptcy Code.  In light of the foregoing, because the Plan fully complies with section 1122 and 1123 of the Bankruptcy Code, the Debtors submit that the Plan fully complies with and satisfies the requirements of section 1129(a)(1) of the Bankruptcy Code.

### 4.     The Plan Complies with Section 1123(d) of the Bankruptcy Code.

100.     Section 1123(d) of the Bankruptcy Code provides that "if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and nonbankruptcy law."[120]

---

[119]   The Debtors understand that 35 tokens, representing approximately 20% of the value of all tokens held by Voyager, are not able to be withdrawn by customers from Voyager due to technical limitations but can be withdrawn by customers from Binance.US following consummation of the proposed transaction.

[120]   11 U.S.C. § 1123(d).

Appellant Appendix ER - 789

101.    The Plan complies with section 1123(d) of the Bankruptcy Code.    The Plan provides for the satisfaction of monetary defaults under each Executory Contract and Unexpired Lease to be assumed under the Plan by payment of the default amount, if any, on the Effective Date, subject to the limitations described in Article V.D of the Plan or the Confirmation Order.[121] In accordance with Article V.D of the Plan and section 365 of the Bankruptcy Code, the Debtors provided notice of the amount and timing of payment of any cure payments to the parties to the applicable assumed Executory Contracts or Unexpired Leases as part of the Plan Supplement.    The Plan also sets forth procedures for counterparties to assumed Executory Contracts or Unexpired Leases to follow in the event they submit a request for payment that differs from ordinary course amounts paid or proposed to be paid by the Debtors.    Accordingly, the Plan satisfies the requirements of section 1123(d) of the Bankruptcy Code, and no party has asserted otherwise.

### B.    The Debtors Complied with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(2)).

102.    The principal purpose of section 1129(a)(2) is to ensure that a plan proponent has complied with the requirements of the Bankruptcy Code regarding solicitation of acceptances of a plan.[122]  The legislative history to section 1129(a)(2) provides that section 1129(a)(2) is intended to encompass the disclosure and solicitation requirements set forth in section 1125 and the plan acceptance requirements set forth in section 1126 of the Bankruptcy Code.[123]  As set forth below,

---

[121]  *See* Plan Art. V.D.

[122]  *See, e.g.*, *In re Texaco Inc.*, 84 B.R. 893, 906-07 (Bankr. S.D.N.Y. 1988) ("The principal purpose of Section 1129(a)(2) is to assure that the proponents have complied with the requirements of section 1125 in the solicitation of acceptances to the plan."); *In re Johns-Manville Corp.*, 68 B.R. at 629-30 ("Objections to confirmation raised under § 1129(a)(2) generally involve the alleged failure of the plan proponent to comply with § 1125 and § 1126 of the Code . . . . These sections provide for the appropriate manner of disclosure and solicitation of plan votes."); *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984) (Section 1129(a)(2) requires that "the proponent must comply with the ban on post-petition solicitation of the plan unaccompanied by a written disclosure statement approved by the court in accordance with Code §§ 1125 and 1126.").

[123]  *In re Lapworth*, No. 97-34529 (DWS), 1998 WL 767456, at *3 (Bankr. E.D. Pa. Nov. 2, 1998) ("The legislative history of § 1129(a)(2) specifically identifies compliance with the disclosure requirements of § 1125 as a

54

the Debtors have complied with these provisions, including sections 1125 and 1126 of the Bankruptcy Code, as well as Bankruptcy Rules 3017 and 3018, by distributing the Disclosure Statement and soliciting acceptances of the Plan through their Claims, Noticing, and Solicitation Agent in accordance with the Disclosure Statement Order.

### 1. The Debtors Complied with Section 1125 of the Bankruptcy Code.

103. Section 1125 of the Bankruptcy Code prohibits the solicitation of acceptances or rejections of a plan of reorganization "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information."[124] Section 1125 ensures that parties in interest are fully informed regarding the debtor's condition so that they may make an informed decision whether to approve or reject the plan.[125]

104. Section 1125 is satisfied here. Before the Debtors solicited votes on the Plan, the Court conditionally approved the Disclosure Statement in accordance with section 1125(a)(1).[126] The Court also approved the Solicitation Packages provided to Holders of Claims entitled to vote on the Plan, the non-voting materials provided to parties not entitled to vote on the Plan, and the relevant dates for voting and objecting to the Plan.[127] As stated in the Voting Report, the Debtors,

---

requirement of § 1129(a)(2)."); *In re Worldcom, Inc.*, 2003 WL 23861928 at *49 (Bankr. S.D.N.Y. Oct. 31, 2003) (stating that section 1129(a)(2) requires plan proponents to comply with applicable provisions of the Bankruptcy Code, including "disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code").

[124] 11 U.S.C. § 1125(b).

[125] *See Momentum Mfg. Corp. v. Emp. Creditors Comm. (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994) (finding that section 1125 of the Bankruptcy Code obliges a debtor to engage in full and fair disclosure that would enable a hypothetical reasonable investor to make an informed judgment about the plan).

[126] *See* Docket No. 861.

[127] *Id.*

Appellant Appendix ER - 791

through the Claims, Noticing, and Solicitation Agent, complied with the content and delivery requirements of the Disclosure Statement Order, thereby satisfying sections 1125(a) and (b) of the Bankruptcy Code.[128]  The Debtors also satisfied section 1125(c) of the Bankruptcy Code, which provides that the same disclosure statement must be transmitted to each holder of a claim or interest in a particular Class.  Here, the Debtors caused the Disclosure Statement to be transmitted to all parties entitled to vote on the Plan and parties deemed to reject the Plan.[129]

105.    Based on the foregoing, the Debtors submit that they have complied in all respects with the solicitation requirements of section 1125 of the Bankruptcy Code and the Disclosure Statement Order, and no party has asserted otherwise.

### 2.    The Debtors Complied with Section 1126 of the Bankruptcy Code.

106.    Section 1126 of the Bankruptcy Code provides that only holders of allowed claims and equity interests in impaired classes that will receive or retain property under a plan on account of such claims or equity interests may vote to accept or reject a plan.[130]  As noted above, the Debtors did not solicit votes on the Plan from the following Classes:

- Classes 1 (Secured Tax Claims) and 2 (Other Priority Claims), which are Unimpaired under the Plan (collectively, the "Unimpaired Classes").[131]  Pursuant to section 1126(f) of the Bankruptcy Code, Holders of Claims in the Unimpaired Classes are conclusively presumed to have accepted the Plan and, therefore, were not entitled to vote on the Plan.

- Class 5 (Alameda Loan Facility Claims), Class 6 (Section 510(b) Claims), and Class 9 (Existing Equity Interests), which are Impaired and receiving no recovery under the Plan (the "Deemed Rejecting Classes").[132]  Pursuant to section 1126(g)

---

[128]    *See* Voting Report ¶ 5; *see also* Affidavit of Solicitation.

[129]    *See id.* at ¶ 6; *see also generally* Affidavit of Solicitation.

[130]    *See* 11 U.S.C. § 1126.

[131]    *See* Plan, Art. III.B.

[132]    *Id.*

Appellant Appendix ER - 792

of the Bankruptcy Code, Holders of Claims and Interests in the Deemed Rejecting Classes are deemed to have rejected the Plan and, therefore, were not entitled to vote on the Plan.

- The treatment of Class 7 (Intercompany Claims) will be determined by the Court, and Class 8 (Intercompany Interests) may be Impaired or Unimpaired under the Plan at the option of the Debtors. Pursuant to section 1126(f) or 1126(g) of the Bankruptcy Code, as applicable, Holders of Claims in Class 8 are conclusively presumed to have accepted the Plan or rejected the Plan, as applicable, and, therefore, were not entitled to vote on the Plan.

107. Accordingly, the Debtors solicited votes only from Holders of Allowed Claims in the Voting Classes—Classes 3, 4A, 4B, and 4C—because each of these Classes is Impaired and entitled to receive a distribution under the Plan.[133] With respect to the Voting Classes of Claims, section 1126(c) of the Bankruptcy Code provides that:

A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of [section 1126], that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of [section 1126], that have accepted or rejected such plan.[134]

108. The Voting Report, summarized above, reflects the results of the voting process in accordance with section 1126 of the Bankruptcy Code.[135] Based on the foregoing, the Debtors submit that they have satisfied the requirements of section 1129(a)(2), and no party has asserted otherwise.

### C.    The Plan Was Proposed in Good Faith (§ 1129(a)(3)).

109. Section 1129(a)(3) of the Bankruptcy Code requires that a chapter 11 plan be "proposed in good faith and not by any means forbidden by law."[136] The Second Circuit has

---

[133]    *Id. See generally* Affidavit of Solicitation.

[134]    11 U.S.C. § 1126(c).

[135]    *See generally* Voting Report, Exhibit A.

[136]    11 U.S.C. § 1129(a)(3); *see also In re Gaston & Snow*, Nos. 93-8517 (JGK), 93-8628 (JGK), 1996 WL 694421, at *9 (S.D.N.Y. Dec. 4, 1996).

Appellant Appendix ER - 793

construed the good-faith standard in the bankruptcy context as "requiring a showing that the plan was proposed with honesty and good intentions and with a basis for expecting that the reorganization can be effected."[137]  Additionally, courts generally hold that "good faith" should be evaluated in light of the totality of the circumstances surrounding confirmation.[138]  In the context of plans of reorganization, "a plan is proposed in good faith if there is a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the [Bankruptcy] Code."[139]  The Court is in the best position to assess the good faith of the parties' proposals.[140]

110.  The Plan was proposed with integrity, good intentions, and with the goal of maximizing stakeholder recoveries.  Throughout these cases, the Debtors, the Debtors' board of directors, and their senior management team have upheld their fiduciary duties to stakeholders and protected the interests of all constituents.  The Plan follows an extensive marketing process to solicit proposals for an acquisition of the Debtors' business and extensive arm's-length negotiations among the Debtors, the Purchaser, the Committee, and other parties in interest and provides stakeholders with the highest possible recoveries under the circumstances.[141]  Indeed, the Debtors' management team and advisors expended countless hours to conduct a comprehensive and complex marketing process, prepared and filed motions to expand the Company's staking

---

[137] *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988) (internal citations and quotations omitted); *see also Manati Sugar Co. v. Mock*, 75 F.2d 284, 285 (2d Cir. 1935); *In re Texaco Inc.*, 84 B.R. at 907 (holding that, generally, a plan is proposed in good faith "if there is a likelihood that the plan will achieve a result consistent with the standards prescribed under the Code.") (internal citations omitted); *Drexel*, 138 B.R. at 759; *In re Gaston & Snow*, 1996 WL 694421, at *9 ("In this context, the failure to propose a plan in good faith occurs when the Plan is not proposed with honesty, good intentions, and to effectuate the reorganization of the enterprise, but rather for some other motive.") (internal citations omitted).

[138] *See, e.g.*, *In re Cellular Info. Sys., Inc.*, 171 B.R. 926, 945 (Bankr. S.D.N.Y. 1994) (collecting cases).

[139] *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984) (citations omitted).

[140] *Adelphia*, 368 B.R. at 247.

[141] *See* Tichenor Decl. ¶ 40.

Appellant Appendix ER - 794

activity, sold non-core assets, including the Coinify business, and evaluated and negotiated the Restructuring Transactions to provide the most value for their stakeholders.[142]  Similarly, after FTX's unexpected collapse, the Debtors' management team and advisors swiftly reengaged in negotiations with numerous potential counterparties to evaluate potential transactions with the goal of maximizing value for Account Holders and other parties in interest.  Following good-faith, arm's-length negotiations with all interested parties, the Debtors' management team and advisors selected the proposal from Binance.US.  Importantly, the Plan is supported by the Committee[143] and Holders of Account Holder Claims.  Accordingly, the Plan and the Debtors' conduct satisfy section 1129(a)(3) of the Bankruptcy Code.

**D.    The Plan Provides that the Debtors' Payment of Professional Fees and Expenses Are Subject to Court Approval (§ 1129(a)(4)).**

111.    Section 1129(a)(4) of the Bankruptcy Code requires that certain fees and expenses paid by the plan proponent, by the debtor, or by a person receiving distributions of property under the plan, be subject to approval by the Court as reasonable.[144]  Courts have construed this section to require that all payments of professional fees paid out of estate assets be subject to review and approval by the Court as to their reasonableness.[145]

112.    The Plan satisfies section 1129(a)(4) of the Bankruptcy Code.[146]  All payments made or to be made by the Debtors for services or for costs or expenses in connection with these chapter 11 cases prior to the Confirmation Date, including all Professional Fee Claims, have been

---

[142]  *Id.*

[143]  *See* Docket No. 837.

[144]  11 U.S.C. § 1129(a)(4).

[145]  *See, e.g.*, *Worldcom, Inc.*, 2003 WL 23861928, at *54; *Drexel*, 138 B.R. at 760.

[146]  *See* Renzi Decl. ¶ 39.

Appellant Appendix ER - 795

approved by, or are subject to approval of, the Court.[147] Article II.B of the Plan provides that all final requests for payment of Professional Fee Claims shall be filed no later than 45 days after the Effective Date for determination by the Court, after notice and a hearing, in accordance with the procedures established by the Court.[148] Accordingly, the Plan fully complies with the requirements of section 1129(a)(4) of the Bankruptcy Code, and no party has asserted otherwise.

**E.      The Plan Does Not Require Additional Disclosures Regarding Directors, Officers, and Insiders (§ 1129(a)(5)).**

113.    The Bankruptcy Code requires the plan proponent to disclose the affiliation of any individual proposed to serve as a director or officer of the debtor or a successor to the debtor under the plan.[149] Section 1129(a)(5)(A)(ii) further requires that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy.[150]

114.    The Plan satisfies section 1129(a)(5). As set forth in Article IV.H of the Plan, on the Effective Date, the Wind-Down Debtor Assets shall, subject to the Plan Administrator Agreement, be transferred to and vest in the Wind-Down Debtor. The Wind-Down Debtor shall be the successor-in-interest to the Debtors and the Debtors' rights, title, and interest in the Wind-Down Debtor Assets. The Wind-Down Debtor shall be managed by the Plan Administrator and shall be subject to a Wind-Down Debtor Oversight Committee. As such, section 1129(a)(5) of the Bankruptcy Code is inapplicable to the Plan. To the extent section 1129(a)(5) applies to the Wind-Down Debtor, it will have satisfied the requirements of this provision by, among other

---

[147] *See* Plan, Art. II.

[148] *Id.*

[149] 11 U.S.C. § 1129(a)(5)(A)(i).

[150] 11 U.S.C. § 1129(a)(5)(A)(ii).

60

Appellant Appendix ER - 796

things, disclosing the identity of the Plan Administrator and the Wind-Down Debtor Oversight Committee in the Plan Supplement.[151]

115. In addition, section 1129(a)(5)(B) also requires a plan proponent to disclose the identity of any "insider" (as defined by 11 U.S.C. § 101(31)) to be employed or retained by the reorganized debtor and the nature of any compensation for such insider.[152] Here, on or after the Effective Date, the Wind-Down Debtor shall be deemed to have withdrawn its business operations from any state in which the Debtors were previously conducting business.[153] After, among other things, effectuating final distributions pursuant to the Plan and filing a certificate of dissolution with the Court, the Wind-Down Debtor shall be dissolved in accordance with the Plan Administrator Agreement. Because no individual person shall serve as a director, officer, or voting trustee of a reorganized Debtor and no individual, including any insider, will be employed by the Debtors following the Effective Date, section 1129(a)(5)(B) is inapplicable to the Plan, and no party has asserted otherwise.

**F. The Plan Does Not Require Governmental Regulatory Approval (§ 1129(a)(6)).**

116. Section 1129(a)(6) of the Bankruptcy Code permits confirmation only if any regulatory commission that has or will have jurisdiction over a debtor after confirmation has approved any rate change provided for in the plan. Section 1129(a)(6) of the Bankruptcy Code is inapplicable to these chapter 11 cases, and no party has asserted otherwise.

---

[151] *See* Docket No. 1006, <u>Exhibit E</u>. The Plan Administrator will appoint an independent director at each Debtor to act as a fiduciary for such Debtor entity in connection with the resolution of Intercompany Claims.

[152] 11 U.S.C. § 1129(a)(5)(B).

[153] Plan, Art. IV.J.

Appellant Appendix ER - 797

### G. The Plan Is in the Best Interests of All the Debtors' Creditors (§ 1129(a)(7)).

117. Section 1129(a)(7) of the Bankruptcy Code, commonly known as the "best interests test," provides, in relevant part:

> With respect to each impaired class of claims or interests—
>
> (A)   each holder of a claim or interest of such class—
>
>         (i)   has accepted the plan; or
>
>         (ii)  will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of [the Bankruptcy Code] on such date . . . . [154]

118. The best interests test applies to individual dissenting holders of impaired claims and interests rather than classes and is generally satisfied through a comparison of the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation of that debtor's estate against the estimated recoveries under that debtor's plan of reorganization.[155] As section 1129(a)(7) of the Bankruptcy Code makes clear, the best interests test applies only to holders of non-accepting impaired claims or interests.  Here, all holders of Claims and Interests in all Impaired Classes will recover at least as much as a result of the confirmation of the Plan as they would in a hypothetical chapter 7 liquidation.[156]  Accordingly, the Plan satisfies section 1129(a)(7) of the Bankruptcy Code and the best interests test.

---

[154]  11 U.S.C. § 1129(a)(7)(A).  *See also Adelphia*, 368 B.R. at 252 ("In determining whether the best interests standard is met, the court must measure what is to be received by rejecting creditors in the impaired classes under the plan against what would be received by them in the event of liquidation under chapter 7.").

[155]  *Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."); *Century Glove*, 1993 WL 239489, at *7; *Adelphia*, 368 B.R. at 251 (stating that section 1129(a)(7) is satisfied when an impaired holder of claims would receive "no less than such holder would receive in a hypothetical chapter 7 liquidation").

[156]  *See* Renzi Decl. ¶ 54.

Appellant Appendix ER - 798

119.    To demonstrate compliance with section 1129(a)(7) of the Bankruptcy Code, the

Debtors, with the assistance of Berkeley Research Group, the Debtors' restructuring advisors,

prepared a liquidation analysis, which is attached to the Disclosure Statement as <u>Exhibit B</u>

(the "<u>Liquidation Analysis</u>") and discussed at length in the Renzi Declaration.[157]  The Liquidation

Analysis compares the projected range of recoveries that would result from the liquidation of the

Debtors in a hypothetical case under chapter 7 of the Bankruptcy Code with the estimated

distributions to Holders of Allowed Claims and Interests under the Plan.[158]  The Liquidation

Analysis is based on the value of the Debtors' assets and liabilities as of a certain date and

incorporates various estimates and assumptions, including a hypothetical conversion to a chapter 7

liquidation as of a certain date.[159]  The illustrative recoveries provided in the Liquidation Analysis

are subject to potentially material change, including due to macroeconomic business conditions

and legal rulings.[160]

120.    Based on the unaudited Liquidation Analysis, and the assumptions included therein,

the value of any distributions in a chapter 7 liquidation would be no greater than the value of

distributions under the Plan in either the Sale Transaction or Liquidation Transaction scenario.[161]

As a result, Holders of Claims and Interests in all Impaired Classes will recover at least as much

as a result of confirmation of the Plan as they would recover through a hypothetical chapter 7

---

[157]    *See* Renzi Decl. ¶¶ 66–105.

[158]    *See id.*

[159]    *See id.*

[160]    *See id.* at ¶¶ 76–85.

[161]    *See id.* at ¶ 105.

Appellant Appendix ER - 799

liquidation.[162]  Based on the recoveries set forth in the Liquidation Analysis, the Plan satisfies the best interests test as required by the Bankruptcy Code.

### H.      The Plan Is Confirmable Notwithstanding the Requirements of Section 1129(a)(8) of the Bankruptcy Code.

121.    Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests must either accept a plan or be unimpaired under a plan.[163]  If any class of claims or interests rejects the plan, the plan must satisfy the "cramdown" requirements with respect to the claims or interests in that class.[164]

122.    Here, the Plan satisfies either the voting requirements or the "cramdown" requirements with respect to each Class.  Class 3 (Account Holder Claims), Class 4B (HoldCo General Unsecured Claims), and Class 4C (TopCo General Unsecured Claims), which are impaired under the Plan, voted overwhelmingly to accept the Plan.  The Debtors did not receive any votes from Holders of Claims in Class 4A (OpCo General Unsecured Claims). Class 1 (Secured Tax Claims) and Class 2 (Other Priority Claims) are Unimpaired and are presumed to accept the Plan.  Class 7 (Intercompany Claims) and Class 8 (Intercompany Interests) are deemed to accept or reject depending on their ultimate treatment.  The remaining Classes, Class 5 (Alameda Loan Facility), Class 6 (Section 510(b) Claims), and Class 9 (Existing Equity Interests) are deemed to reject the Plan.  As discussed below, the Plan satisfies the "cramdown" requirements of section 1129(b) with respect to all Classes that are Impaired under but have not voted to accept the Plan.

---

[162]   *See id.* at ¶¶ 54, 66.

[163]   11 U.S.C. § 1129(a)(8).

[164]   11 U.S.C. § 1129(b).

Appellant Appendix ER - 800

123.     Therefore, the Plan satisfies section 1129(a)(8) or otherwise satisfies the "cramdown" requirements of the Bankruptcy Code, and no party has asserted otherwise.[165]

**I.     The Plan Provides for Payment in Full of All Allowed Priority Claims (§ 1129(a)(9)).**

124.     Section 1129(a)(9) of the Bankruptcy Code requires that certain priority claims be paid in full on the effective date of a plan and that the holders of certain other priority claims receive deferred cash payments.[166]     In particular, pursuant to section 1129(a)(9)(A) of the Bankruptcy Code, holders of claims of a kind specified in section 507(a)(2) of the Bankruptcy Code—administrative claims allowed under section 503(b) of the Bankruptcy Code— must receive on the effective date cash equal to the allowed amount of such claims.[167] Section 1129(a)(9)(B) of the Bankruptcy Code requires that each holder of a claim of a kind specified in section 507(a)(1) or (4) through (7) of the Bankruptcy Code—generally wage, employee benefit, and deposit claims entitled to priority—must receive deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim (if such class has accepted the plan), or cash of a value equal to the allowed amount of such claim on the effective date of the plan (if such class has not accepted the plan).  Finally, section 1129(a)(9)(C) of the Bankruptcy Code provides that the holder of a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code—*i.e.*, priority tax claims—must receive cash payments over a period not to exceed five years from the petition date, the present value of which equals the allowed amount of the claim.

---

[165]     *See* Renzi Decl., ¶ 55.

[166]     11 U.S.C. § 1129(a)(9).

[167]     11 U.S.C. § 1129(a)(9)(A).

Appellant Appendix ER - 801