125. The Plan satisfies section 1129(a)(9) of the Bankruptcy Code. *First*, Article II.A of the Plan satisfies section 1129(a)(9)(A) of the Bankruptcy Code because it provides that each holder of an Allowed Administrative Claim allowed on or prior to the Effective Date will receive payment in full in Cash no later than thirty (30) days after the Effective Date or as soon as reasonably practicable thereafter. *Second*, Article III.C.2 of the Plan satisfies section 1129(a)(9)(B) of the Bankruptcy Code because it provides that holders of the types of Claims specified by 1129(a)(9)(B) shall receive either payment in full in cash or such other treatment as to render such holders unimpaired. *Third*, Article II.C of the Plan satisfies section 1129(a)(9)(C) of the Bankruptcy Code because it provides that holders of Allowed Priority Tax Claims will be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code. The Plan thus satisfies each of the requirements of section 1129(a)(9) of the Bankruptcy Code, and no party has asserted otherwise.

**J.     At Least One Class of Impaired, Non-Insider Claims Accepted the Plan (§ 1129(a)(10)).**

126. Section 1129(a)(10) of the Bankruptcy Code provides that, to the extent there is an impaired class of claims, at least one impaired class of claims must accept the plan, "without including any acceptance of the plan by any insider," as an alternative to the requirement under section 1129(a)(8) of the Bankruptcy Code that each class of claims or interests must either accept the plan or be unimpaired under the plan.[168]

127. As set forth above, Holders of Claims in Classes 3, 4B, and 4C—which are Impaired Classes under the Plan—overwhelmingly voted to accept the Plan independent of any

---

[168]    11 U.S.C. § 1129(a)(10).

Appellant Appendix ER - 802

insiders' votes.[169]  The Debtors did not receive any votes from Holders of Claims in Class 4A. Thus, the Debtors respectfully submit that the Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code, and no party has asserted otherwise.

### K.    The Plan Is Feasible (§ 1129(a)(11)).

128.    Section 1129(a)(11) of the Bankruptcy Code requires that the Court determine, in relevant part, that confirmation is not likely to be followed by the liquidation or further financial reorganization of the Debtors (or any successor thereto), unless such liquidation or reorganization is proposed in the Plan.  This requirement has been interpreted by courts in this district as requiring a determination that the Plan "has a reasonable likelihood of success."[170]  Importantly, "the feasibility inquiry is peculiarly fact intensive and requires a case-by-case analysis, using as a backdrop the relatively low parameters articulated in the statute . . . . There is a relatively low threshold of proof necessary to satisfy the feasibility requirement."[171]  Section 1129(a)(11) does not require the Debtors to guarantee the Plan's complete success.  Instead, and to satisfy the feasibility requirement, the Debtors must show that the Plan has a reasonable chance of success.[172]

---

[169]    *See* Voting Report, <u>Exhibit A</u>.

[170]    *See In re Adelphia Bus. Sols., Inc.*, 341 B.R. 415, 421-22 (Bankr. S.D.N.Y. 2003) ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success."  Success need not be guaranteed.) (citing *Kane v. Johns-Manville*, 843 F.2d at 649); *Texaco*, 84 B.R. at 910 (plan is feasible if there is a "reasonable assurance of commercial viability"); *In re Prudential Energy Co.*, 58 B.R. 857, 862 (Bankr. S.D.N.Y. 1986) ("Guaranteed success in the stiff winds of commerce without the protection of the Code is not the standard under § 1129(a)(11).").

[171]    *See Mercury Capital Corp. v. Milford Conn. Assocs., L.P.*, 354 B.R. 1, 9 (D. Conn. 2006), *remanded*, No. 04-30511, 2008 WL 687266 (Bankr. D. Conn. Mar. 10, 2008), ("[A] 'relatively low threshold of proof' will satisfy the feasibility requirement.") (*quoting In re Brotby*, 303 B.R. 177, 191–92 (B.A.P. 9th Cir. 2003)); *Berkeley Fed. Bank & Trust v. Sea Garden Motel and Apartments (In re Sea Garden Motel and Apartments)*, 195 B.R. 294, 304–05 (D.N.J. 1996); *In re Eddington Thread Mfg. Co.*, 181 B.R. 826, 833 (Bankr. E.D. Pa. 1995) ("[T]he feasibility inquiry is peculiarly fact intensive and requires a case by case analysis, using as a backdrop the relatively broad parameters articulated in the statute.").

[172]    *See In re Aleris Int'l, Inc.*, No. 09-10478 (BLS), 2010 WL 3492664, at *27–29 (Bankr. D. Del. May 13, 2010). *Accord Kane*, 843 F.2d at 649 ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success.  Success need not be guaranteed.").

Appellant Appendix ER - 803

129.    Here, the Plan satisfies the feasibility requirements of section 1129(a)(11) of the Bankruptcy Code by providing for a clear path to emergence from these chapter 11 cases and the ability of the Debtors to satisfy all of their obligations under the Plan.  The implied value of Binance.US's offer is $1.022 billion, comprising:

- the value of cryptocurrency on the Voyager platform as of a date to be determined, which as of December 19, 2022 at 0:00 UTC, is estimated to be $1.002 billion, plus

- additional consideration, which is estimated to provide at least $20 million of incremental value; and

- additional benefits such as:

  o providing the most tax efficient route forward as the Binance.US Platform will provide the means for Account Holders to access 100% of the cryptocurrency types held by Account Holders on the Debtors' platform;

  o being the only transaction available to the Debtors that did not require the Debtors to liquidate cryptocurrency for working capital purposes;

  o including reimbursement by Binance.US of up to $15 million of Seller's expenses;

  o providing a $10 million reverse termination fee payable to the Seller by Binance.US to compensate the Debtors' estates in the event that Binance.US cannot consummate the transaction; and

  o in the event that the Debtors pivot to the Liquidation Transaction, provides that Binance.US will provide certain services to facilitate such transaction to ensure that the Debtors can rely on the Binance.US Platform to minimize leakage with and cybersecurity risks when returning cryptocurrency to creditors.

130.    The Debtors project that in both the Sale Transaction and Liquidation Transaction scenarios there will be sufficient value to satisfy all Priority and Administrative Claims under the Plan, including all Professional Fee Claims.[173]  As such, the Debtors have a demonstrated ability to fund distributions required under the Plan, including to taxing authorities, administrative

---

[173]   *See* Renzi Decl. ¶ 108.

Appellant Appendix ER - 804

claimants, and other Unimpaired Classes of Claims.[174]  Following consummation of the Sale

Transaction or the Liquidation Transaction, as applicable, the Plan provides for an orderly wind

down and dissolution of the Debtors and the Wind-Down Debtor.

131.    Accordingly, the Debtors submit that the Plan fully complies with and satisfies all

of the requirements of section 1129(a)(11) of the Bankruptcy Code.

**L.      All Statutory Fees Have Been or Will Be Paid (§ 1129(a)(12)).**

132.    Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees

payable under section 1930 of title 28 [of the United States Code], as determined by the court at

the hearing on confirmation of the plan."  Section 507(a)(2) of the Bankruptcy Code provides that

"any fees and charges assessed against the estate under [section 1930 of] chapter 123 of title 28"

are afforded priority as administrative expenses.

133.    The Plan satisfies section 1129(a)(12) of the Bankruptcy Code because

Article XII.C of the Plan provides that all fees and applicable interest payable pursuant to

section 1930 of the Judicial Code and 31 U.S.C. § 3717, as applicable, as determined by the Court

at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by the Wind-Down

Debtor (or the Distribution Agent on behalf of the Wind-Down Debtor) for each quarter (including

any fraction thereof) until the chapter 11 cases are converted, dismissed, or a Final Decree is

issued, whichever occurs first.  Accordingly, the Debtors submit that the Plan fully complies with

and satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code, and no party has

asserted otherwise.

---

[174]    *See* Renzi Decl. ¶ 106–13.

Appellant Appendix ER - 805

### M. No Remaining Retiree Benefits Obligations (§ 1129(a)(13)).

134. Section 1129(a)(13) of the Bankruptcy Code requires that all retiree benefits continue post-confirmation at any levels established in accordance with section 1114 of the Bankruptcy Code. The Debtors do not have any remaining obligations to pay retiree benefits (as defined in section 1114 of the Bankruptcy Code). Therefore, section 1129(a)(13) of the Bankruptcy Code is inapplicable to these chapter 11 cases, and no party has asserted otherwise.

### N. Sections 1129(a)(14) through 1129(a)(16) Do Not Apply to the Plan.

135. Section 1129(a)(14) of the Bankruptcy Code relates to the payment of domestic support obligations. Because the Debtors are not subject to any domestic support obligations, the requirements of section 1129(a)(14) of the Bankruptcy Code do not apply. Likewise, section 1129(a)(15) of the Bankruptcy Code applies only in cases in which the debtor is an "individual" as defined in the Bankruptcy Code. Because none of the Debtors is an "individual," the requirements of section 1129(a)(15) of the Bankruptcy Code do not apply. Finally, each of the Debtors are a moneyed, business, or commercial corporation or trust, and therefore, section 1129(a)(16) of the Bankruptcy Code, which provides that property transfers by a corporation or trust that is not a moneyed, business, or commercial corporation or trust be made in accordance with any applicable provisions of nonbankruptcy law, is not applicable to the chapter 11 cases. Accordingly, the Debtors respectfully submit that the Plan is not subject to the requirements of section 1129(a)(14)-(16) of the Bankruptcy Code, and no party has asserted otherwise.

### O. The Plan Satisfies the "Cram Down" Requirements of Section 1129(b) of the Bankruptcy Code.

136. Section 1129(b)(1) of the Bankruptcy Code provides that, if all applicable requirements of section 1129(a) of the Bankruptcy Code are met other than section 1129(a)(8) of

Appellant Appendix ER - 806

the Bankruptcy Code, a plan may be confirmed so long as the requirements set forth in section 1129(b) of the Bankruptcy Code are satisfied. To confirm a plan that has not been accepted by all impaired classes (thereby failing to satisfy section 1129(a)(8) of the Bankruptcy Code), the plan proponent must show that the plan does not "discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes.[175]

137. As noted above, Class 3, Class 4A, Class 4B, and Class 4C, which are Impaired Classes of Claims entitled to vote on the Plan, have voted in favor of the Plan. However, the Deemed Rejecting Class have or are deemed to have rejected the Plan. Nonetheless, as set forth below, the Plan satisfies the requirements under section 1129(b) of the Bankruptcy Code, and no party has asserted otherwise.

### 1. The Plan Is Fair and Equitable (§ 1129(b)(2)(B)(ii)).

138. A plan is "fair and equitable" with respect to an impaired class of claims or interests that rejects a plan (or is deemed to reject a plan) if it follows the "absolute priority" rule.[176] This requires that an impaired rejecting class of claims or interests either be paid in full or that a class junior to the impaired accepting class not receive any distribution under a plan on account of its junior claim or interest.[177]

---

[175] *In re John Hancock Mut. Life Ins. Co.*, 987 F.2d 154, 157 n.5 (3d Cir. 1993); *In re Ambanc La Mesa L.P.*, 115 F.3d 650, 653 (9th Cir. 1997) ("the [p]lan satisfies the 'cramdown' alternative . . . found in 11 U.S.C. § 1129(b), which requires that the [p]lan 'does not discriminate unfairly' against and 'is fair and equitable' towards each impaired class that has not accepted the [p]lan.").

[176] *Bank of Am.*, 526 U.S. at 441–42 ("As to a dissenting class of impaired unsecured creditors, such a plan may be found to be 'fair and equitable' only if the allowed value of the claim is to be paid in full, § 1129(b)(2)(B)(i), or, in the alternative, if 'the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property,' § 1129(b)(2)(B)(ii). That latter condition is the core of what is known as the 'absolute priority rule.'").

[177] *Id.*

Appellant Appendix ER - 807

139.   The Plan satisfies section 1129(b) of the Bankruptcy Code.  Notwithstanding the fact that the Deemed Rejecting Classes are deemed to have rejected the Plan, the Plan is confirmable.[178]  Class 5 (Alameda Loan Facility Claims) is comprised of all Alameda Loan Facility Claims.  Class 6 (Section 510(b) Claims) is comprised of all Section 510(b) Claims.  Class 9 (Existing Equity Interests) is composed of all existing equity Interests in TopCo.  There are no Claims or Interests that are junior to Alameda Loan Facility Claims, Section 510(b) Claims, or Existing Equity Interests that are receiving any recovery under the Plan before any Class that is senior in priority, nor is any Holder of a Claim or Interest receiving more than payment in full of its Claim or Interest.

### 2. The Plan Does Not Unfairly Discriminate with Respect to the Impaired Classes that Have Not Voted to Accept the Plan (§ 1129(b)(1)).

140.   Although the Bankruptcy Code does not provide a standard for determining when "unfair discrimination" exists, courts typically examine the facts and circumstances of the particular case to make the determination.[179]  In general, courts have held that a plan unfairly discriminates in violation of section 1129(b) of the Bankruptcy Code only if it provides materially different treatment for creditors and interest holders with similar legal rights without compelling justifications for doing so.[180]  Courts in the Second Circuit have ruled that "[u]nder section 1129(b) of the Bankruptcy Code, a plan unfairly discriminates where similarly situated classes are treated differently without a reasonable basis for the disparate treatment."[181]

---

[178]   To the extent any rejecting class amends its vote and determines to accept the Plan, the Debtors will file an amended voting declaration to reflect such update.

[179]   *See In re Jewish Memorial Hosp.*, 13 B.R. 417, 420 (Bankr. S.D.N.Y. 1981) ("[T]he Bankruptcy Act does not establish inexorable rules for distribution that can never be deviated from in the interest of justice and equity.").

[180]   *See WorldCom*, 2003 WL 23861928 at *59 (requiring a reasonable basis to justify disparate treatment).

[181]   *Id.*; *see also In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990) (in evaluating unfair discrimination, courts assess whether "(i) there is a reasonable basis for discriminating, (ii) the debtor cannot

Appellant Appendix ER - 808

141.    Here, the Plan's treatment of the non-accepting Impaired Class (*i.e.*, the Deemed Rejecting Classes) is proper because all similarly situated Holders of Claims and Interests will receive substantially similar treatment and the Plan's classification scheme rests on a legally acceptable rationale.  Claims in the Deemed Rejecting Classes are not similarly situated to any other Classes given their distinctly different legal character from all other Claims and Interests. The Plan's treatment of the Deemed Rejecting Classes is proper because no similarly situated class will receive more favorable treatment.  Furthermore, where the Plan provides differing treatment for certain Classes of Claims or Interests, the Debtors have a rational basis for doing so.

142.    The Debtors have also resolved certain section 1129(b)(1) issues raised by Holders of Alameda Loan Facility Claims and the AHG.  Holders of Alameda Loan Facility Claims have agreed that if the FTX Settlement[182] becomes effective, such claims will be treated pursuant to the FTX Settlement; however, if the FTX Settlement does not become effective, the Debtors will seek to equitably subordinate the Alameda Loan Facility Claims provided that if the Court denies equitable subordination of the Alameda Loan Facility Claims, such claims shall be *pari passu* with General Unsecured Claims at the applicable Debtor entity.  Pursuant to the Debtors' agreement with the AHG, the treatment of Intercompany Claims will be determined by the Court.

143.    For the reasons set forth above, the Plan does not discriminate unfairly in contravention of section 1129(b)(1) of the Bankruptcy Code and the Plan may be confirmed notwithstanding the deemed rejection by the Deemed Rejecting Classes.

---

consummate the plan without discrimination, (iii) the discrimination is proposed in good faith, and (iv) the degree of discrimination is in direct proportion to its rationale," but also noting that the second prong assessing whether the debtor cannot consummate the plan without discrimination is not dispositive of the question of unfair discrimination).

[182]    *See* Docket No. 1106.

Appellant Appendix ER - 809

P.     **The Debtors Complied with Section 1129(d) of the Bankruptcy Code.**

144.     The purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act.[183]   As discussed in greater in section IV.H herein, the SEC's and New Jersey's assertions that the Plan *may* contravene the Securities Act and New Jersey law,[184] respectively, are speculative and hypothetical and cannot, absent a concrete ruling from the SEC or New Jersey as to the status of cryptocurrency as a security, be permitted to hinder the Plan that enjoys the overwhelming support of all voting classes, including over 97 percent of Account Holders and 98 percent in amount of Account Holder Claims actually voting, from receiving distributions pursuant to the Plan.   Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

Q.     **Modifications to the Plan.**

145.     Section 1127(a) of the Bankruptcy Code provides that a plan proponent may modify its plan at any time before confirmation as long as such modified plan meets the requirements of sections 1122 and 1123 of the Bankruptcy Code.  Further, when the proponent of a plan files the plan with modifications with the court, the plan as modified becomes the plan.  Bankruptcy Rule 3019 provides that modifications after a plan has been accepted will be deemed accepted by all creditors and equity security holders who have previously accepted the plan if the court finds that the proposed modifications do not adversely change the treatment of the claim of any creditor or the interest of any equity security holder.  Interpreting Bankruptcy Rule 3019, courts consistently have held that a proposed modification to a previously accepted

---

[183]    *See* Renzi Decl. ¶ 64.

[184]    SEC Objection ¶ 4; New Jersey Objection, ¶ 4.

Appellant Appendix ER - 810

plan will be deemed accepted where the proposed modification is not material or does not adversely affect the way creditors and stakeholders are treated.[185]

146.     Following solicitation, the Debtors made certain minor modifications to the Plan to resolve formal and informal comments to the Plan by parties in interest and to make technical modifications to treatment of certain classes and refine the description of the procedures governing the wind down of the Debtors' estates (collectively, the "Modifications").[186]  The Modifications are immaterial or otherwise do not affect the treatment of creditors and stakeholders and thus comply with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.  Accordingly, the Debtors submit that no additional solicitation or disclosure is required on account of the Modifications, and that such Modifications should be deemed accepted by all creditors that previously accepted the Plan.

### R.     Good Cause Exists to Waive the Stay of the Confirmation Order.

147.     Bankruptcy Rule 3020(e) provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the Court orders otherwise."[187] Bankruptcy Rules 6004(h) and 6006(d) provide similar stays to orders authorizing the use, sale or lease of property (other than cash collateral) and orders authorizing a debtor to assign an executory

---

[185]   *See, e.g.*, *In re Glob. Safety Textiles Holdings LLC*, No. 09-12234 (KG), 2009 WL 6825278, at *4 (Bankr. D. Del. Nov. 30, 2009) (finding that nonmaterial modifications to plan do not require additional disclosure or resolicitation); *In re Burns & Roe Enters., Inc.*, No. 08-4191 (GEB), 2009 WL 438694, at *23 (D.N.J. Feb. 23, 2009) (confirming plan as modified without additional solicitation or disclosure because modifications did "not adversely affect creditors").

[186]   *See Third Amended Joint Plan of Voyager Digital Holdings, Inc. And Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, filed contemporaneously herewith.

[187]   Fed. R. Bankr. P. 3020(e).

Appellant Appendix ER - 811

contract or unexpired lease under section 365(f) of the Bankruptcy Code.[188] Each rule also permits modification of the imposed stay upon court order.[189]

148. The Debtors submit that good cause exists for waiving and eliminating any stay of the Confirmation Order pursuant to Bankruptcy Rules 3020, 6004, and 6006 so that the Confirmation Order will be effective immediately upon its entry.[190] As noted above, these chapter 11 cases and the related transactions have been negotiated and implemented in good faith and with a high degree of transparency and public dissemination of information. The Debtors have undertaken great effort to exit chapter 11 as soon as possible. Additionally, each day the Debtors remain in chapter 11 they incur significant administrative and professional costs.

149. In light of the requisite support by the Voting Classes, no parties will be prejudiced by waiver of the stay to facilitate the Debtors' swift emergence from chapter 11. Accordingly, the Debtors request a waiver of any stay imposed by the Bankruptcy Rules so that the Proposed Confirmation Order may be effective immediately upon its entry.

---

[188]  Fed. R. Bankr. P. 6004(h), 6006(d).

[189]  *Id.*

[190]  *See, e.g.*, *In re Chemtura Corp.*, No. 09-11233 (REG) (Bankr. S.D.N.Y. Nov. 23, 2010) (shortening the Bankruptcy Rule 3020(e) period due to the significant expense to the debtors' estates in delaying the effectiveness of the plan); *In re Extended Stay Inc.*, No. 09-13764 (JMP) (Bankr. S.D.N.Y. July 20, 2010) (waiving stay under Bankruptcy Rule 3020(e)); *In re Penton Bus. Media Holdings, Inc.*, No. 10-10689 (AJG) (Bankr. S.D.N.Y. Mar. 5, 2010) (waiving the stay in Bankruptcy Rule 3020(e) in light of support for the plan by voting classes); *In re Oldco M. Corp.*, No. 09-13412 (MG) (Bankr. S.D.N.Y. Feb. 23, 2010) (waiving the stay imposed by Bankruptcy Rule 3020(e) to permit a distribution trustee to commence its duties as quickly as practicable).

Appellant Appendix ER - 812

## IV.    The Objections to the Plan Should be Overruled.

150.    Certain parties objected to Confirmation of the Plan and approval of the Disclosure Statement on a final basis.[191]  These Objections are without merit and should be overruled.

### A.    The Disclosure Statement Provides Adequate Information Regarding the Sale Transaction.

151.    The SEC Objection, the U.S. Trustee Objection, and the Texas Objection allege that the Disclosure Statement does not include sufficient disclosure regarding the Sale Transaction.[192]  In addition to the extensive detail provided in the Asset Purchase Agreement with respect to the Sale Transaction, the Disclosure Statement provides creditors with, among other details, a description of the FTX collapse and abandonment of the FTX Transaction, the recommencement of the marketing process and negotiation of the Binance.US APA, the consideration being offered by Binance.US, the treatment of Account Holders under the Plan, the mechanics of facilitating distributions to Account Holders, including the Rebalancing Exercise, anticipated distributions to Account Holders under the Sale Transaction and the Toggle Transaction, the Customer Onboarding Protocol, a detailed "Frequently Asked Questions" for Account Holders, and links to Binance.US's terms of service.[193]

152.    The U.S. Trustee Objection demonstrates a fundamental misunderstanding of the Sale Transaction, including the consideration paid by Binance.US and the total value of the Sale Transaction.  The Debtors value the Sale Transaction at $1.022 billion, which is comprised of

---

[191]    Of the remaining outstanding Objections, those that raise actual disclosure deficiencies have been addressed through additional language in the Disclosure Statement and those that raise actual objections to confirmation of the Plan have been addressed through additional language in the Plan or the Confirmation Order, as described herein and summarized in the chart attached hereto as **Exhibit A** (the "Objection Response Chart").

[192]    SEC Objection ¶¶ 4–6; U.S. Trustee Objection, sections B–C; Texas Objection ¶¶ 1–25.

[193]    *See* Disclosure Statement, Articles II, V.B, VIII.N, Exhibit C.

Appellant Appendix ER - 813

$1.002 billion of cryptocurrency on the Debtors' platform as of December 19, 2022, at 0:00 UTC plus an additional $20 million of upfront consideration paid by Binance.US. Binance.US is acquiring substantially all of the cryptocurrency on the Debtors' platform, which will be distributed to Account Holders in accordance with the Plan, assuming certain obligations of the Debtors to Account Holders and other creditors, and paying incremental consideration to the Debtors in the amount of $20 million. The Debtors are not required to transfer cryptocurrency to Binance.US to effectuate the Rebalancing Exercise—the Debtors can use any third-party provider to effectuate that transaction (or series of transactions) subject to Binance.US's right to match more favorable terms provided by a third party. Pursuant to the Asset Purchase Agreement, the Debtors will retain all right, title, and interest in their cryptocurrency prior to closing, including any cryptocurrency rebalanced with Binance.US or any other third-party. Following the closing, cryptocurrency will be transferred to Binance.US on a weekly basis as Account Holders sign up for accounts on the Binance.US platform and complete Binance.US's onboarding requirements. Binance.US must make cryptocurrency transferred to it available to those Account Holders within five business days, and must use commercially reasonable efforts to do so within 48 hours, following receipt thereof. Account Holders who receive cryptocurrency on Binance.US's platform will have the ability to access, trade, sell, stake, or withdraw their cryptocurrency subject to Binance.US's Terms of Use. Account Holders in Supported Jurisdictions who do not open Binance.US accounts in accordance with the Asset Purchase Agreement within three months of the Effective Date will have their cryptocurrency distributions liquidated into USD and distributed by the Debtors to such Account Holders. Cryptocurrency distributions to Account Holders in Unsupported Jurisdictions will not be delivered to Binance.US. Instead, the Debtors will retain control of such cryptocurrency until Binance.US has received the appropriate license,

Appellant Appendix ER - 814

authorization, or exemption, as applicable. If Binance.US does not receive such license, authorization, or exemption in an Unsupported Jurisdiction within six months following the Effective Date, the Debtors will cause the cryptocurrency distributions to Account Holders in such Unsupported Jurisdiction to be liquidated into cash and will distribute such cash to Account Holders in such Unsupported Jurisdiction.

153.    Finally, contrary to the assertions of the SEC, the U.S. Trustee, and Texas, the Disclosure Statement clearly explains the terms and mechanics of the Sale Transaction and includes significant details with respect to the Sale Transaction and the Rebalancing Exercise.[194]

**B.    The Disclosure Statement Provides Adequate Information as to Binance.US's Financial Condition and Solvency and the Feasibility of the Sale Transaction.**

154.    The U.S. Trustee and the SEC each question Binance.US's ability to consummate the Sale Transaction.[195]  Neither offers any evidence to substantiate their concern.

155.    The U.S. Trustee and SEC based their Objections on unverified media reports. They ignore the fact that the Disclosure Statement provides disclosure as to the Debtors' understanding of the ability of Binance.US to consummate the proposed transaction and the basis for this understanding.[196]  Based on the Debtors' due diligence, which has included Binance.US's provision of proof of funds, the Debtors understand that Binance.US is sufficiently capitalized to consummate the Sale Transaction and that it utilizes a business model that makes it less susceptible to a "run on the bank" than business models of other companies in the cryptocurrency sector. Among other things, Binance.US has advised and the Debtors understand that:  (i) Binance.US holds customer assets on a one-to-one basis, meaning that Binance.US has the ability and liquidity

---

[194]    *See* Disclosure Statement, Art. V.A.4.

[195]    SEC Objection, ¶¶ 5–6; U.S. Trustee Objection, section B.

[196]    *See* Disclosure Statement, Art. V.B.1.

Appellant Appendix ER - 815

to meet all customer withdrawals at any time; (ii) Binance.US does not lend customer assets out to third parties; (iii) Binance.US's reserves exceed customer deposits; and (iv) Binance.US has sufficient capital to pay the upfront costs of up to $35 million to consummate the Sale Transaction.[197]

156.    The U.S. Trustee Objection incorrectly claims that the Debtors did not conduct sufficient due diligence on Binance.US before entering into the Asset Purchase Agreement.[198]  The Debtors disclosed their diligence efforts undertaken in connection with the Asset Purchase Agreement in the Tichenor APA Declaration, which efforts included reviews of certain audited financial statements, interim unaudited financial statements, available liquidity, related party services agreements, wallet infrastructure, AML/KYC procedures, money transmitter licensing status, and business plans submitted to selected state regulators in connection with the issuance of money transmitter licenses.[199]  Mr. Tichenor also testified during the January 10, 2023, hearing to consider conditional approval of the Disclosure Statement and approval of the Debtors' entry into the Asset Purchase Agreement (the "DS/APA Hearing") and answered numerous questions from both interested parties and the Court.[200]  The U.S. Trustee appears to ignore all of this disclosure.

157.    The SEC Objection alleges that the Debtors fail to inform stakeholders whether the Sale Transaction provides a meaningful economic benefit other than the $20 million sale of Voyager's customer list to Binance.US.[201]  This, too, is incorrect.  Those additional economic

---

[197]    *Id.*

[198]    U.S. Trustee Objection, section B.

[199]    *See* Tichenor APA Declaration ¶ 21.

[200]    *In re Voyager Digital Holdings, Inc.*, No. 2210943 (MEW) (Bankr. S.D.N.Y. Jan. 10, 2023) Hr'g Tr. 23:8–58:4, 61:2–67:24; 156:1–157:15.

[201]    *See generally* SEC Objection.

Appellant Appendix ER - 816

benefits were clearly laid out in the Debtors' Definitive Documents. Articles II.A, III, and V.B of the Disclosure Statement, paragraphs 14–21 of the Sale Motion, paragraphs 17–31 of the Tichenor APA Declaration, paragraphs 20–27 of the Tichenor Declaration, and paragraphs 92–99 of this Memorandum all discuss the benefits of the Sale Transaction in addition to the $20 million cash consideration. Again, Mr. Tichenor has already testified concerning, and has been subject to cross-examination about, all of those concerns. If the SEC or any other party had additional questions for the Debtors or Binance.US, that they wanted answered before this hearing, they had every opportunity to seek discovery; they did not. Account Holders, the actually affected economic stakeholders, have voted overwhelmingly to proceed with the transaction and the SEC's desire for additional information (which it could obtain through many other means) is no reason to deny confirmation.

158.    The issues raised by the SEC and the U.S. Trustee regarding disclosures related to Binance.US's ability to consummate the Sale Transaction, the Debtors' reverse diligence on Binance.US, and the economic benefits of the Sale Transaction should be overruled.

### C.    The Disclosure Statement Provides Adequate Information Regarding the Transfer of Account Holders and Cryptocurrency to Binance.US.

159.    The SEC and the U.S. Trustee allege that the Disclosure Statement contains insufficient disclosure regarding how the Debtors and Binance.US intend to secure customer assets prior to and after consummation of the Sale Transaction.[202]  To the contrary, the Disclosure Statement describes, in detail, the security protocols that the Debtors have in place to protect Account Holder assets from loss or theft prior to consummation of the Sale Transaction.[203]

---

[202]    SEC Objection, ¶ 6; U.S. Trustee Objection, section B.2.

[203]    *See* Disclosure Statement, Article V.B.

Appellant Appendix ER - 817

Additionally, the Disclosure Statement provides that the Debtors understand that the security protocols that Binance.US has in place to ensure the safe storage of customer assets post-closing adhere to the highest industry standards and have been certified as such by various third-party industry experts.[204] Further, Articles IV.J, V.B, and IX.D.1 of the Disclosure Statement adequately describe the regulatory risks affecting Binance.US, Account Holders, and Account Holders' ability to trade cryptocurrency and identify several issues of law that may reduce recoveries.

160.    The Texas Objection argues that there is inadequate information in the Disclosure Statement surrounding Binance.US's Terms of Use.[205] Yet again, this is incorrect. In three separate places in the Disclosure Statement, the Debtors include a direct link to the Binance.US Terms of Use when describing customers' ability to withdraw their cryptocurrency at any time.[206] Importantly, the Sale Transaction does not contemplate the involuntary and nonconsensual transfer of Account Holders to Binance.US. As clearly stated in the Disclosure Statement and the Customer Onboarding Protocol, it will be each Account Holder's individual decision; Account Holders have ample, clear information laid out step-by-step for the onboarding process to Binance.US if the Account Holders so choose to do so.[207] Cryptocurrency will be transferred from the Debtors to Binance.US only as and when relevant creditors become eligible users (*i.e.*, satisfy Binance.US's know-your-customer requirements and accept the Binance.US terms and conditions identified above) on the Binance.US Platform in accordance with the Asset Purchase Agreement

---

[204]    *See id.*

[205]    Texas Objection, ¶¶ 13–25.

[206]    *See* Disclosure Statement, Art. II.A, V.B.1(a), V.B.1(b) (https://www.binance.us/terms-of-use).

[207]    Disclosure Statement, Art. V.B; *Third Amended Plan Supplement* [Docket No. 1035], Exhibit C.

Appellant Appendix ER - 818

and Plan, and upon such transfer, Binance.US will be obligated to make such Cryptocurrency available to the relevant creditors within five business days of receipt.[208]

161.    The SEC's and the U.S. Trustee's assertions that the Disclosure Statement contains inadequate disclosure regarding how the Debtors and Binance.US intend to secure customer assets prior to and after consummation of the Sale Transaction are incorrect and should be overruled.

**D.    The Disclosure Statement Contains Adequate Information Regarding the Financial Consequences of the Plan.**

162.    The Texas Objection claims that there is inadequate information in the Disclosure Statement regarding the financial consequences of the Plan because creditor recoveries may be substantially less due to the claims surrounding Alameda.[209]   Ironically, while objecting to inadequate information, Texas repeatedly relies on the Disclosure Statement's detailed disclosures around recovery risks, including the numerous disclaimers, estimates, and other information surrounding recoveries and risks that may result in lower recoveries.[210]   In any event, Holders of Claims have been armed with significant information surrounding recoveries and the risks related thereto, including an explicit statement of the sort the Texas Objection requests:  "Specifically, recoveries for both Account Holder Claims and OpCo General Unsecured Claims would be reduced to approximately 24% from approximately 51% under the Sale Transaction if the Alameda Loan Facility Claim is not subordinated and Alameda prevails in its alleged preference claims."[211] The cover letter attached to the Solicitation Package included a similar disclosure that "recoveries

---

[208]    *See* Disclosure Statement, Art. V.B.1(b).

[209]    *See* Texas Objection, ¶¶ 11-12.

[210]    *Id.*

[211]    Disclosure Statement, Art.IV.B.

Appellant Appendix ER - 819

included in this Disclosure Statement are for illustrative purposes only and subject to material change particularly due to . . . the ultimate treatment of the Alameda Loan Facility Claims."[212]

163.    Texas's argument that recoveries may be greater in a chapter 7 liquidation is also misleading and incorrect.  Texas asserts that "if Alameda is successful in its administrative expense claim—the unsecured creditors' recovery would be less than what they would receive in a Chapter 7 liquidation."[213]  Texas apparently fails to recognize that if AlamedaFTX is successful it will reduce creditor recoveries in equal measure regardless of whether the Sale Transaction, Liquidation Transaction, or chapter 7 liquidation is pursued.  The business justifications for the Sale Transaction and the economic reality that the Sale Transaction maximizes recoveries to Account Holders hold true, and the Sale Transaction and the Liquidation Transaction will both pass the best interests test irrespective of the outcome of the AlamedaFTX administrative claims dispute.

164.    The Debtors' disclosures are beyond adequate and provide Holders of Claims with the information necessary to vote on the Plan.  Accordingly, the Texas Objection should be overruled.

### E.    The Plan Does Not Violate Applicable Law.

165.    The SEC Objection alleges that the transactions necessary to effectuate the rebalancing "*may* violate" the prohibition in Section 5 of the Securities Act against the unregistered offer, sale, or delivery after sale of securities.[214]  New Jersey similarly alleges that the

---

212    Solicitation Package Cover Letter, n. 4.

213    Texas Objection, ¶ 8.

214    SEC Objection ¶¶ 3–5 (emphasis added).

Appellant Appendix ER - 820

rebalancing contemplated by the Plan "*may* violate" New Jersey securities law.[215] Notwithstanding either of these allegations, the rebalancing contemplated by the Plan **was already approved** when the Court entered the APA Order.[216]  The Debtors' described the anticipated rebalancing in detail at the DS/APA Hearing and the SEC did not object;[217] its decision to do so after the fact is puzzling, untimely, and effectively moot.  In addition, both the SEC and New Jersey have yet to issue their own rulings as to whether cryptocurrency constitutes a security (and, if so, which one) such that the rebalancing contemplated by the Plan would even potentially be prohibited by Section 5 of the Securities Act or New Jersey securities law; saying that something "may" cause an issue in the future when the SEC and New Jersey have had many years to address the topic and have apparently not made up their own minds is no reason to deny confirmation.

166.    Holding hostage a Plan that is supported by over 97 percent of Account Holders and 98 percent in amount of Account Holder Claims actually voting and that has been overwhelmingly approved by all Voting Classes on the mere speculation that a future ruling at an undetermined date *may* present regulatory concerns would be highly inequitable and needlessly delay distributions to Account Holders.  Accordingly, the SEC Objection and the New Jersey Objection must be overruled.

### F.    The Release and Exculpation Provisions of the Plan Are Reasonable and Appropriate.

167.    Objections related to the Debtor Releases, Third-Party Releases, and related Exculpation provisions in the Plan are raised in the FTC Objection, the AHG Objection, the

---

[215]    New Jersey Objection ¶ 4 (emphasis added).

[216]    Docket No. 860.

[217]    *In re Voyager Digital Holdings, Inc.*, No. 2210943 (MEW) (Bankr. S.D.N.Y. Jan. 10, 2023) Hr'g Tr. 23:21–24:8; 53:2–53:19; 74:25–76:10.

Appellant Appendix ER - 821

Newsom and Warren Objection, the Hendershott et al. Objection, the U.S. Trustee Objection, the

Texas Objection, and the New Jersey Objection (collectively, the "Releases Objections").[218]  All

of the Releases Objections should be overruled.

168.    The Releases Objections fundamentally misunderstand what the proposed Releases

do, what claims could be asserted by the estate if not released, and what challenges such claims

would face and costs such claims would require the estate to incur if they were ever pursued.  As

a threshold matter, to be clear, the Plan does not propose to release any third party's direct claims

against non-debtors (to the extent such direct claims exist) without such third party's express

consent, which would be reflected by "opting in" to the Third-Party Releases.  Holders of Claims

and Interests can also affirmatively elect to "contribute" their direct claims against third parties

unaffiliated with the Debtors (to the extent they have any) to the Wind-Down Debtor and vest in

the Wind-Down Debtor with authority to pursue such claims.  This case is therefore fundamentally

different from cases like *In re Aegean Marine Petroleum Network, Inc.*, where a plan proposed

so-called "non-consensual third-party releases."[219]  *Any* creditor, including all of the parties who

filed Releases Objections, is free to not opt in to the Third-Party Releases and to pursue their

retained direct causes of action if they so choose.  Accordingly, any assertion in the Releases

Objections that the Third-Party Releases are non-consensual must be overruled.

169.    The Releases Objections must also be overruled to the extent they challenge the

release of causes of action that *the Debtors* may (or may not) hold against officers, directors, and

employees.  These claims belong to the Debtors *only*, and could never have been brought by

---

[218]  *See* FTC Objection; AHG Objection, ¶¶ 1, 3, 67–68; Newsom and Warren Objection, ¶¶ 1, 4; Hendershott et al. Objection, ¶¶ 15–16; U.S. Trustee Objection, section C; Texas Objection ¶¶ 35–37; New Jersey Objection, ¶ 6.

[219]  599 B.R. 717, 729 (Bankr. S.D.N.Y. 2019).

Appellant Appendix ER - 822

individual creditors, regulators, or anyone else other than the Debtors themselves.[220]  The Court's

review of the Debtors' decision to pursue, settle, or release any such claims "is subject to the

Debtors' own business judgment."[221]  To evaluate the claims that could potentially be pursued by

the Debtors and the estate against officers, directors, or employees, the Debtors appointed two

independent directors with extensive restructuring experience and no prior affiliation with Voyager

or its management team to a Special Committee of Voyager Digital, LLC.  The Debtors then

delegated to that Special Committee exclusive authority to "among other things, (a) investigate

any historical transactions relating to Voyager LLC, and (b) investigate any estate claims and

causes of action against insiders of Voyager LLC, including claims arising from its loan to Three

Arrows Capital, and (c) perform any other activities consistent with the foregoing that the Special

Committee or Voyager LLC's board otherwise deems necessary or appropriate."  The Special

Committee was also vested with sole authority to prosecute, settle, or extinguish any and all claims

and causes of action against officers, directors, and employees.  The Special Committee retained

a preeminent law firm, Quinn Emanuel Urquhart & Sullivan, LLP, which was also completely

independent from the Debtors, to provide independent advice to, and act at the exclusive direction

of, the Special Committee in connection with the Special Committee's mandate.

170.    The Special Committee Investigation was extensive, as the Disclosure Statement

describes in detail.[222]  Among other things, the Special Committee performed extensive research,

---

[220]    *See, e.g., In re Gen. Growth Props.*, 426 B.R. 71, 76 (Bankr. S.D.N.Y. 2010) ("it is well settled that alleged 'acts of breach of fiduciary duty, corporate waste and mismanagement . . . . become property of the estate immediately upon the commencement of a bankruptcy case pursuant to § 541 of the Bankruptcy Code.'"); *In re Keene Corp.*, 164 B.R. 844, 853 (Bankr. S.D.N.Y. 1994) ("Claims based upon breach of a fiduciary duty belong to a corporation.").

[221]    *In re Ditech Holding Corp.*, 606 B.R. 544, 623 (Bankr. S.D.N.Y. 2019); *In re Stone Barn Manhattan LLC*, 405 B.R. 68, 75 (Bankr. S.D.N.Y. 2009) ("Although approval of a settlement rests in the Court's sound discretion . . . the debtor's business judgment should not be ignored.").

[222]    *See* Disclosure Statement Art. VIII.O.

Appellant Appendix ER - 823

requested and reviewed thousands of documents consisting of tens of thousands of pages, and interviewed 12 witnesses for a total of approximately 55 hours. Then, after conducting that detailed investigation, the Special Committee found no theft or fraud–none–by any director or officer of the Debtors, because there was none. Nor did the Special Committee find evidence that Voyager's insiders engaged in self-dealing. To the contrary, Voyager's officers and directors lost substantial sums of money alongside Voyager's stakeholders. Ultimately, the Special Committee concluded that the estate does not have colorable claims against any Voyager director or officer other than potential claims against its CEO and former CFO[223] related to the 3AC Loan. However, while colorable, the standard for successfully prosecuting these claims would be difficult to meet, the litigation of such claims would be extremely expensive and would dissipate funds that would otherwise go to creditors, and any judgment would be difficult to collect, meaning that such claims (if pursued) might well end up with a material net-negative value to the estate.

171. The Special Committee's determination to negotiate and ultimately recommend the settlements is based on the following factors, among others: the relative strength or weakness of these potential claims, which (if pursued) would sound in breach of fiduciary duty premised on alleged gross negligence on the part of the officers; the challenges involved in litigating each element of those claims; the costs of litigating; the financial wherewithal (or lack thereof) of the officers; and the risk of depletion of substantial portions of available insurance that prioritizes the rights of the officers to utilize the insurance for defense costs.[224] The Special Committee therefore negotiated and approved (subject to Court approval) settlements that will result in the CEO's and former CFO's personal contributions to the estate while preserving claims against insurance.

---

[223]  Mr. Psaropoulos was CFO of Voyager Digital, LLC when it made all loans to 3AC.

[224]  Pohl Decl. ¶ 24.

Appellant Appendix ER - 824

172.    Based on the cost-benefit analysis, the Special Committee determined that the settlements embodied in the Plan and disclosed in detail in the Disclosure Statement are in the best interests of the estate.[225]  They are.  Finally, the Debtors' Exculpation provisions in the Plan fully comply with this Court's ruling in *Aegean*.[226]

173.    The U.S. Trustee Objection goes on to argue that not only is the Exculpation provision overly broad, but it is inappropriate for the Plan to provide that certain parties are both exculpated and released.[227]  This is incorrect.  As discussed above, the Exculpation provision is consistent with this Court's ruling in *Aegean*, and the suggestion that it is improper for exculpated parties to also be released under the Plan is patently false.  As the U.S. Trustee Objection outlines, exculpation provisions only cover the period from the commencement of a chapter 11 case through its effectiveness, whereas granted releases cover the entire period prior to effectiveness of a chapter 11 plan.  There is no support in the Bankruptcy Code to block an exculpated party from also being released for entirely separate conduct.[228]  The U.S. Trustee Objection, therefore, should be overruled.[229]

---

[225]    *See* Disclosure Statement Art. VII.2(b)(ii).

[226]    *In re Aegean Marine Petroleum Network Inc.*, 599 B.R. 717, 721 (Bankr. S.D.N.Y. 2019) (determining that an appropriate exculpation provision should bar claims against the exculpated parties based on the negotiation, execution, and implementation of agreements and transactions that were approved by the Court).

[227]    U.S. Trustee Objection, sections C–E.

[228]    *See, e.g.*, *In re Frontier Communications Corporation*, Case No. 20-22476 (RDD) (Bankr. S.D.N.Y. Aug. 21, 2020) (confirmed chapter 11 plan including both exculpation and release of debtors' professionals and employees); *In re Lakeland Tours, LLC*, Case No. 20-11647 (JLG) (Bankr. S.D.N.Y. Aug. 21, 2020) (same); *In re Jason Industries, Inc.*, Case No. 20-22766 (RDD) (Bankr. S.D.N.Y. Aug. 17, 2020) (same); *In re Windstream Holdings, Inc.*, Case No. 19-22312 (RDD) (Bankr. S.D.N.Y. June 22, 2020) (same); *In re Barneys New York, Inc.*, Case No. 19-36300 (CGM) (Bankr. S.D.N.Y. Nov. 15, 2019) (same).

[229]    The remainder of the U.S. Trustee Objection has been resolved and is addressed in the Objection Chart attached hereto as **Exhibit A**.

Appellant Appendix ER - 825

174.    Section VIII.C of the Plan provides that each of the Exculpated Parties will be released and exculpated from any Cause of Action arising out of acts or omissions in connection with these chapter 11 cases and certain related transactions, except for acts or omissions that are found to have been the product of actual fraud, willful misconduct, or gross negligence.[230]  The exculpation provision is an integral part of the Plan and otherwise satisfies the governing standards in the Second Circuit.  This provision provides necessary and customary protections to those parties in interest (whether estate fiduciaries or otherwise) whose efforts were and continue to be vital to formulating and implementing the Plan, which has garnered overwhelming support from the Debtors' creditors entitled to vote on the Plan.  For the reasons set forth below, the Debtors respectfully submit that the Court should overrule the U.S. Trustee Objection to the Exculpation provision, as it is appropriately tailored to the facts and circumstances of these chapter 11 cases.

175.    At the outset, it is important to underscore the difference between the Third-Party Releases and the exculpation provision.  Unlike a third-party release, the exculpation provision does not affect the liability of the Exculpated Parties *per se*, but rather sets a standard of actual fraud, willful misconduct, or gross negligence for any hypothetical future litigation against any Exculpated Party for acts arising out of the Debtors' restructuring.[231]  An exculpation provision represents a legal conclusion that flows inevitably from several different findings a bankruptcy court must reach in confirming a plan.[232]  For example, a bankruptcy court cannot confirm a

---

[230]   *See* Plan Art. VIII.C.

[231]   *See, e.g.*, *Aegean*, 599 B.R. at 721 ("If this Court has approved a transaction as being in the best interests of the estate and has authorized the transaction to proceed, then the parties to those transactions should not be subject to claims that effectively seek to undermine or second-guess this Court's determinations.  In the absence of gross negligence or intentional wrongdoing, parties should not be liable for doing things that the Court authorized them to do and that the Court decided were reasonable things to do.").

[232]   *See* 11 U.S.C. § 157(b)(2)(L).

Appellant Appendix ER - 826

chapter 11 plan unless it finds that the plan has been proposed in good faith.[233]  Once the court

makes this good-faith finding, it is appropriate to provide a standard of care for the parties involved

in the negotiation and formulation of that chapter 11 plan.[234]  Exculpation provisions, therefore,

prevent future collateral attacks against the Court's good faith finding.  Ultimately, the Exculpation

provision provides protection to those parties that worked hand-in-hand with the Debtors and were

instrumental in ensuring the success of the Debtors' restructuring.  Accordingly, the U.S. Trustee

Objection to the Exculpation and Releases should be overruled.

176.    The FTC raises additional issues with the Releases insofar as they release

(i) liabilities of a debtor (x) all or substantially all of whose property is being liquidated under a

chapter 11 plan, (y) that will not engage in business following consummation of the plan, and

(z) that would be denied a discharge under section 727(a) of the Bankruptcy Code if the case were

a case under chapter 7; and/or (ii) fraud-related debts held by a governmental unit.  However,

following good-faith, arm's-length negotiations with the FTC, the Debtors have agreed to add

language to the Confirmation Order[235] to resolve the FTC Objection in its entirety.  The Debtors

believe that the same language added to satisfy the FTC Objection satisfies assertions in the New

Jersey Objection[236] and the Texas Objection[237] that the Plan contemplates a discharge in violation

of section 1141(d)(3) of the Bankruptcy Code.

---

[233]   *See* 11 U.S.C. § 1129(a)(3).

[234]   *See Aegean*, 599 B.R. at 721 ("[A]n appropriate exculpation provision should say that it bars claims against the exculpated parties based on the negotiation, execution, and implementation of agreements and transactions that were approved by the Court.").

[235]   *See* Confirmation Order ¶ 141.

[236]   New Jersey Objection, ¶ 6.

[237]   Texas Objection, ¶ 36.

Appellant Appendix ER - 827

177.    For the foregoing reasons, the Releases Objections should be overruled to the extent they are not already resolved.

**G.    The AHG Objection is Satisfied Pursuant to Language Added to the Confirmation Order.**

178.    The AHG Objection asserts that (a) the Plan and Confirmation Order should contain language clarifying that neither document will have any impact on the validity, extent, priority, or treatment of Intercompany Claims; (b) the Confirmation Order should contain language clarifying that the Releases in the Plan will not prejudice the rights of any party that did not "opt in" to the applicable releases; (c)(i) the Plan violates section 1123(a)(2) of the Bankruptcy Code by failing to specify whether Holders of Class 7 Intercompany Claims are Impaired or Unimpaired and inappropriately describes such Holders as deemed to accept the Plan if the Intercompany Claims are not being Reinstated, (ii) to the extent such Intercompany Claims are Impaired, the Plan fails to specify treatment for an Impaired Class under Bankruptcy Code section 1123(a)(3), and (iii) in the event that Intercompany Claims are to be cancelled or otherwise extinguished, the Plan seeks to deprive Class 9 Existing Equity Interest Holders of distributions to which they are entitled; (d) the Plan is not fair and equitable with respect to Class 9 Existing Equity Interests; (e) the cancellation of the Existing Equity Interests under the Plan is impermissible; and (f) the Plan improperly provides that only the Wind-Down Debtor can object to proofs of claim.[238]

179.    The AHG has agreed that the AHG Objection is resolved in its entirety by the addition of certain language to the Confirmation Order (i) clarifying that Intercompany Obligations will be treated as determined by the Court, (ii) providing that parties that do not affirmatively opt in to the Third-Party Releases will not be deemed to grant Third-Party Releases

---

[238]    *See generally* AHG Objection.

Appellant Appendix ER - 828

under the Plan, (iii) preserving the rights of Existing Equity Interests as if the shares had not been cancelled, and (iv) clarifying that parties other than the Wind-Down Debtor may object to proofs of claim.[239]

### H. The Debtors' Treatment of Account Holders Claims Is Appropriate and Consistent with Bankruptcy Code.

180.    The New York Objection and the Texas Objection (the "Unfair Discrimination Objections") allege that the Plan unfairly discriminates against Account Holders in New York and Texas, two of the Unsupported Jurisdictions, by delaying their recoveries relative to creditors in the same class and by not allowing them the option to recover cryptocurrency instead of liquidated assets.[240]    Contrary to those assertions, the Plan does not unfairly discriminate against Account Holders in Unsupported Jurisdictions, including New York and Texas, and the Unfair Discrimination Objections should be overruled.

181.    As a preliminary matter, any difference in outcome for Account Holders in New York, Texas, or any other Unsupported Jurisdiction is of such Unsupported Jurisdiction's own making.    New York, Texas, and the other Unsupported Jurisdictions could have, as the other 46 states did prepetition, provided potential avenues for their constituents to receive distributions in kind.    Or they could have engaged constructively on a solution post-petition.    They refused.    In particular, New York and Texas have now chosen to object to the fact that Account Holders in their jurisdictions would receive cash when it would be their state's own regulatory decisions (unless they decide to provide fairly straightforward, basic accommodations to their own citizens) creating this result.

---

[239]    *See* Confirmation Order ¶ 114, 123, 126.

[240]    New York Objection, ¶¶ 25–29; Texas Objection ¶¶ 26–34.

Appellant Appendix ER - 829

182.    The New York Objection is particularly puzzling.  New York suggests that they just learned of New York citizens who were customers on the Voyager platform.[241]  That suggestion lacks any semblance of candor.  Voyager voluntarily reached out to the New York Department of Financial Services in November 2021 and described in detail the nature of the New York customers on Voyager's platform.  Voyager followed up with a letter documenting its discussions with New York on December 3, 2021.[242]  Voyager followed up again by asking the New York regulators if they wanted Voyager to remove the New York customers from the platform, and the New York regulators themselves took the position that doing so was not necessary; the parties discussions on the subject continued to and through the Debtors' chapter 11 filing.  For New York to now try to insert additional obstacles to the Plan, and to prevent Voyager from returning cryptocurrency to customers as quickly and efficiently as possible, adds insult to injury and only hurts New York's own citizens.

183.    The Debtors have made extensive efforts to help the Unsupported Jurisdictions find ways to accommodate in-kind distributions to their constituents.  From the outset of these chapter 11 cases, the Debtors engaged in continued open dialogue with all states, including the potential transaction outcomes at play, but have so far been unsuccessful coming to agreements with New York and Texas.  Indeed, at the DS/APA Hearing, what representatives of New York and Texas asked for was for Binance to establish so-called "withdrawal-only" accounts so that their state's citizens could receive cryptocurrency on the same general timeline as those in other

---

[241]  New York Objection, ¶ 5 ("Despite the fact that none of the Debtors are licensed in New York, the Department is aware of allegations and other information indicating that one or more of the Debtors *may have* operated and *may be* continuing to operate in New York in violation of Applicable Law.") (emphasis added).

[242]  *See* December 3, 2021, Letter from Lowenstein Sandler LLP on behalf of Voyager to the New York Department of Financial Services, attached as **Exhibit B**.

Appellant Appendix ER - 830

states.[243]  The Debtors understand that Binance (at the Debtors' urging) actively engaged and offered precisely that option in an effort to resolve the Unsupported Jurisdiction's concern.  Yet New York and Texas remain obstinate.  The only conclusion to be drawn is that New York and Texas have other considerations in mind.  The Debtors are left with no choice but to proceed with the terms contemplated by the Asset Purchase Agreement.

184.  Setting aside the facts, the law is also against the Unsupported Jurisdictions.  Treatment of Account Holders in Unsupported Jurisdictions is not unfairly discriminatory.  Courts commonly recognize that the requirement for equal treatment within a class requires "equality of treatment, not equality of result" because the inquiry is "not whether all of the claimants in a class obtain the same thing, but whether they have the same opportunity."[244]  Courts have also recognized that "[t]he requirements of section 1123(a)(4) apply only to a plan's treatment *on account of particular claims* or interests in a specific class—not the treatment that members of the class may separately receive under a plan on account of the class members' other rights or contributions."[245]  Further, courts have held that the requirement under Section 1123(a)(4) that all claims in a given class be treated equally is satisfied when the members of the class are subject "to the same process for claim payment."[246]  The applicable standards are satisfied here because the

---

[243]  *In re Voyager Digital Holdings, Inc.*, No. 2210943 (MEW) (Bankr. S.D.N.Y. Jan. 10, 2023) Hr'g Tr. 55:19–56:10; 57:18–59:13.

[244]  *Latam Airlines*, 2022 WL 2206829, at *35 (citing *In re Dana Corp*, 412 B.R. 53, 62 (S.D.N.Y. 2008)); *In re Breitburn Energy Partners LP*, 582 B.R. 321, 358 (Bankr. S.D.N.Y. March 12, 2018).

[245]  *Latam Airlines*, 2002 WL 2206829, at * 35 (citing *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 250-52 (Bankr. S.D.N.Y. 2007)).

[246]  *In re Cent. Med. Ctr., Inc.*, 122 B.R. 568, 575 (Bankr. E.D. Mo. 1990); *accord In re Breitburn Energy Partners LP*, 582 B.R. at 358; *In re Mesa Air Grp., Inc.*, No. 10-10018 MG, 2011 WL 320466 at * 8 (Bankr. S.D.N.Y. Jan. 20, 2011) ("The inquiry under [S]ection 1123(a)(4) is not whether U.S. Citizens and Non–U.S. Citizens receive the same amount of money, but whether U.S. Citizens and Non–U.S. Citizens are given the same opportunity."); *In re New Power Co.*, 438 F.3d 1113, 1122 (11th Cir. 2006) ("delayed receipt of distributions to members of a class whose claims remain disputed does not, in and of itself, violate § 1123(a)(4).").

Appellant Appendix ER - 831

Debtors valued all claims held by Account Holders as of the Petition Date, and, contrary to the assertions of New York and Texas,[247] all Account Holder claims receive the same treatment under the Plan. The process for claim payment applies uniformly, subject to each Account Holder's becoming an eligible user on the Binance.US platform in accordance with the Plan and Asset Purchase Agreement and subject to regulatory compliance. That Account Holders may receive distributions that result in different net outcomes due, for instance, to timing of disbursements or the various tax regimes applicable to different distributions, as New York points out,[248] is of no consequence, as the Court has already observed in these chapter 11 cases.[249] New York's tax-based objections must be overruled as well.

185. New York's reliance on *In re Mesa Air Grp., Inc.* is also unavailing.[250] Indeed, the *Mesa Air* opinion actually bolsters the Debtors' argument that the Plan complies with 1123(a)(4). In *Mesa*, the confirmed chapter 11 plan bifurcated treatment of general unsecured claims depending on whether holders thereof were United States citizens.[251] United States citizens received distributions of new notes and new common stock while non-United States citizens received new notes and new transferable penny warrants that could only be exercised by United States citizens.[252] The bifurcation was necessary to avoid a distribution scheme that would have resulted in non-United State citizens owning more than 25 percent of a United States air carrier in

---

[247] New York Objection ¶¶ 27–29; Texas Objection ¶¶ 26–34.

[248] New York Objection, ¶¶ 24, 28.

[249] *In re Voyager Digital Holdings, Inc.*, No. 2210943 (MEW) (Bankr. S.D.N.Y. Jan. 10, 2023) Hr'g Tr. 116:4–116:14 ("[T]he basic fact is that customers in different states face different tax consequences based on distributions that they receive. And those are never understood as amounting to discriminations by the Debtor.").

[250] 2011 Bankr. LEXIS 3855 (Bankr. S.D.N.Y. Jan. 20, 2011). New York Objection, ¶ 29.

[251] *Id.* at *4–5.

[252] *Id.*

Appellant Appendix ER - 832

violation of applicable law, specifically title 49 of the United States Code.[253]  To compensate
non-United States citizens for the differences in trading value in the warrants and the stock, the
plan provided a 10 precent premium to non-United States Citizens.[254]  Curiously, New York relies
on *Mesa* to argue that its constituents must have the same consideration mix—cryptocurrency
instead of cash—as Account Holders in Supported Jurisdictions who elect to open an account on
the Binance.US platform.[255]  But that is precisely what did not happen in *Mesa*, where some
general unsecured claimants received warrants and others received stock, and the court found that
the plan complied with the Bankruptcy Code: "The inquiry under section 1123(a)(4) is not whether
U.S. Citizens and Non-U.S. Citizens receive 'the same amount of money,' but whether U.S.
Citizens and Non-U.S. Citizens are given the 'same opportunity.'"[256]  In the present case, just as
in *Mesa*, Account Holders clearly have the same "opportunity" regardless of whether unavoidable
applicable law may cause some claimants to receive a different consideration mix than others.

186.  The New York Objection also alleges that the Debtors offer "no argument" for the
delay in distributions to Account Holders in Unsupported Jurisdictions.[257]  As a preliminary matter,
the Debtors are clear in both the Asset Purchase Agreement and the Disclosure Statement that six
months is the maximum amount of time that the Debtors will delay distributions to Account
Holders in Unsupported Jurisdictions, and the timing between distributions to such Account
Holders could be much shorter.  In fact, there may be no delay if Binance.US receives the necessary

---

253  *Id.* at *5.

254  *Id.* at *8.

255  New York Objection, ¶ 29.

256  *Id.* at *21–22 (citations omitted).

257  New York Objection 25.

Appellant Appendix ER - 833

regulatory approvals prior to closing of the Sale Transaction. Further, the maximum delay in cash distributions for Account Holders in Unsupported Jurisdictions under the Asset Purchase Agreement is actually three months (not six months) relative to Account Holders in jurisdictions where Binance.US is licensed or authorized, who will receive cash distributions in lieu of in-kind distributions if they do not become eligible users on the Binance.US platform within three months of closing of the Sale Transaction pursuant to the Plan and Asset Purchase Agreement. As described above, the Debtors and Binance.US have also been working diligently with Unsupported Jurisdictions in the weeks leading up to the Combined Hearing in order to obtain the necessary approvals to make in-kind distributions to Account Holders in the Unsupported Jurisdictions, but the Unsupported Jurisdictions (and not the Debtors) ultimately control that decision.

187. At the APA/DS Hearing, the Court considered a challenge to the Disclosure Statement on the grounds that distributing cash as opposed to cryptocurrency to Account Holders in Unsupported Jurisdictions constituted unfair discrimination and commented that "there are times in bankruptcy when customers have different treatments in different states or have different net outcomes in different states just because of state regulations[.]"[258] The Court then raised the solid precedential basis for distribution schemes like the one contemplated by the Plan:

> . . . in the American Airlines case, for example, [ ] Creditors received equity shares in the combined American Airlines/U.S. Air entity. And under the plan, some people received their equity right away. Some people didn't receive it until disputes over their claims were resolved. People received the same amount of equity, but it being equity, the value fluctuated significantly over time so that the actual value at the time somebody got it might have been higher, might have been lower than what it was at an earlier period of time. But nobody thought that meant there was an impermissible discrimination among Creditors because they all got the same

---

[258] *In re Voyager Digital Holdings, Inc.*, No. 2210943 (MEW) (Bankr. S.D.N.Y. Jan. 10, 2023) Hr'g Tr. 116:4–7.

Appellant Appendix ER - 834

amount of equity, and there was simply no way to determine how much somebody would get until disputes over the claims were resolved.[259]

Indeed, in *In re AMR Corp.*, the court approved a plan of reorganization that provided that some classes of general unsecured creditors and equity interest holders were to receive new common stock at varying times after the effective date of the plan as part of their recovery and held that disputed claims settled after the effective date were due to receive stock distributions as part of a true-up.[260]  The same dynamic is present here:  the Debtors can do nothing to control either the volatility in cryptocurrency prices nor the structural barriers to effectuating distributions to all Account Holders at the same time.  The former is inherent to cryptocurrency, which trades all across the world 24 hours per day; the latter is an unavoidable consequence of the different regulatory regimes that exist across the United States.  The Plan therefore does not unfairly discriminate against Account Holders in Unsupported Jurisdictions.

188.    In addition, contrary to the assertions of New York and Texas,[261] there are clear business reasons that the Debtors cannot make distributions in-kind to Account Holders in Unsupported Jurisdictions.  ***First***, due to legal, operational, and technical limitations, the Debtors do not have the ability to distribute cryptocurrency themselves to Account Holders in Unsupported Jurisdictions.  The Voyager platform that would be required to facilitate in-kind distributions to creditors is being sold to Binance.US in connection with the Sale Transaction, meaning that any in-kind distributions to creditors in Unsupported Jurisdictions would need to be done manually on a transaction-by-transaction basis for over 120,000 creditors.  Voyager lacks the necessary

---

[259]   *Id.* at 116:22–117:11.

[260]   562 B.R. 20, 24-28 (Bankr. S.D.N.Y. 2016).

[261]   New York Objection ¶¶ 25–26; Texas Objection ¶¶ 26–34.

Appellant Appendix ER - 835

infrastructure and personnel to accomplish such a large and complex transfer after the contemplated sale in a safe and secure manner.

189.     **Second**, there are risks associated with the Debtors' distribution of cryptocurrency to individual creditor wallets as opposed to effectuating such distributions through the Binance.US platform.  The Debtors must comply with anti-money laundering ("AML") and know your customer ("KYC") laws when sending cryptocurrency to individual wallets.  Historically, the Debtors used Chainanalysis for automated verification of certain user-generated cryptocurrency transfer requests.  However, Chainanalysis does not support all of the tokens listed on the Voyager platform (*e.g.*, non-transferable tokens).  While AML/KYC compliance is easy when transferring cryptocurrency to Binance.US wallets, it poses substantial risk to the Debtors as it relates to the manual transfer of cryptocurrency to individual wallets for over 120,000 creditors.  Binance.US has represented to the Debtors that it has existing infrastructure in place that would allow it to perform AML/KYC compliance checks in connection with transferring all cryptocurrency to customer accounts on its platform.[262]

190.     **Third**, there are technical limitations that would prevent the Debtors from making in-kind distributions of certain types of cryptocurrency on the Debtors' platform.  There are 35 cryptocurrency tokens (approximately 20% of the Debtors' cryptocurrency portfolio based on equivalent USD value) on the Debtors' platform that cannot be transferred directly to individual wallets due to technical limitations associated with the Debtors' platform while they can be withdrawn from certain third-party exchanges (like Binance.US).  Historically, users of the Debtors' platform have exited from their positions in such tokens by selling such tokens for cash,

---

[262]  Unlike ACH transfers, which can be reversed, cryptocurrency sent to the wrong wallet cannot, which is why parties will often send a small "test" transaction to a wallet address prior to initiating a large transfer.

Appellant Appendix ER - 836

transactions that previously required close interaction with market makers to effectuate. The only way for the Debtors to distribute the value associated with these non-transferable tokens to creditors in Unsupported Jurisdictions is to liquidate the tokens and distribute the resulting cash.

191.    For the foregoing reasons, the Unfair Discrimination Objections should be overruled.

### I.    The Customer Objections Raise Issues That are Not Barriers to Confirmation.

192.    The Newsom and Warren Objection, the Hendershott et al. Objection, and the Shehadeh Papers (collectively, the "Customer Objections") reflect a fundamental misunderstanding of both chapter 11 bankruptcy and the law in general, restate issues that have been addressed herein or otherwise, and are not barriers to confirmation of the Plan. They should be overruled.

### 1.    The Newsom and Warren Objection and the Hendershott et al. Objection.

193.    The Newsom and Warren Objection and Hendershott et al. Objection oppose the releases included in the Plan on the basis that they are "non-consensual" releases. As addressed in Article IV.I of this Memorandum above, the Plan does not include any non-consensual releases and only includes third-party "opt in" releases that are strictly voluntary. Further, these creditors apparently misunderstand what the Releases do: The Debtor releases do not have any bearing on direct creditor claims (if any exist), and the third-party releases contemplated under the Plan are only those voluntarily and affirmatively opted into, as is made clear throughout the Debtors' materials, including their Solicitation Packages.

Appellant Appendix ER - 837

194.     The Newsom and Warren Objection and Hendershott et al. Objection raise similar assertions to those included in the *Motion for Appointment of a Chapter 11 Trustee*[263] while also relying on the same conclusory arguments and alleged facts (or lack thereof) as included therein, except for including the anonymous and obviously inadmissible survey results of 800 unidentified people who may or may not be Account Holders and whose survey results run directly contrary to the more than 97 percent of Account Holders and 98 percent in amount of Account Holder Claims actually voting who voted to accept the Plan.  The Debtors have thoroughly defended their position in the *Debtors' Omnibus Objection to Certain Motions Set for Hearing on March 2, 2023*,[264] and incorporate those same arguments by reference here.

195.     It bears repeating again:  Appointment of a trustee or conversion to a chapter 7 liquidation will not benefit the Debtors, their creditors, or any other stakeholder in these chapter 11 cases.  Instead, the appointment of a chapter 11 trustee or conversion to a chapter 7 would leave a trustee to start these cases over again without the benefit of the Sale Transaction contemplated in the Plan and, in the event the Sale Transaction cannot be consummated, the Liquidation Transaction.  Moreover, the "toggle" portion of the Plan already contemplates returning assets to creditors in a manner that will be more efficient than a chapter 7 liquidation in the event it becomes necessary for the Debtors to "toggle" to the Liquidation Transaction.  Starting from square one with the appointment of a trustee would lead to massive value destruction.

196.     The Newsom and Warren Objection also asserts that Holders of VGX Tokens are being unfairly discriminated against in violation of section 1129(b) of the Bankruptcy Code.  That assertion is incorrect.  Any Claim on account of VGX Token is classified as an Account Holder

---

[263]   Docket No. 941.

[264]   Docket No. 1076.

Appellant Appendix ER - 838

Claim, and all Account Holder Claims and recoveries will be treated in an identical manner, and, as such, Holders of Account Holder Claims will receive their *pro rata* share of the value of the cryptocurrency on Voyager's platform, regardless of whether an Account Holder had BTC, ETH, USDC, VGX, or any other cryptocurrency in their account.[265]  As explained in the Disclosure Statement, each Account Holder is afforded the same opportunity to recover its equal share of cryptocurrency and other treatment as contemplated under the Plan.

197.    Further, the Newsom and Warren Objection and Hendershott et al. Objection raise certain grievances with the Committee and its advisors.  These conclusory allegations do not bear upon confirmation of the Debtors' Plan.

### 2.    The Shehadeh Papers.[266]

198.    Mr. Shehadeh filed the two Shehadeh Letters, the Shehadeh Claims Objection, the Shehadeh Motion, and the Shehadeh Fraud Motion that, *inter alia*, accuse the Debtors of being a Ponzi scheme with no admissible evidence supporting the claim; accuse the Debtors, the professionals, and the Court of misconduct; demand a change in venue and judge in these chapter 11 cases; and challenge the dollarization of Account Holder Claims.[267]  The Debtors previously addressed Mr. Shehadeh's same arguments in the *Debtors' Omnibus Objection to Certain Motions Set for Hearing on March 2, 2023*,[268] and once again incorporate those arguments by reference herein.

---

[265]   Plan Art. III.C.3.

[266]   The Debtors and their advisors have tried in earnest and in good faith to connect with Mr. Shehadeh and answer any questions he has surrounding the Plan or the chapter 11 cases while patiently listening to his impassioned theories of the case and other alleged villainy all the while Shehadeh secretly records the Debtors' counsel without their knowledge or consent to seemingly impress his other embattled cronies in their Telegram Channel.

[267]   *See* Shehadeh Letter, Shehadeh Claims Objection, Shehadeh Motion, Shehadeh Fraud Motion.

[268]   Docket No. 1074.

Appellant Appendix ER - 839

199.     Shehadeh et al.'s objection to dollarization of Account Holder Claims in the Shehadeh Claims Objection was already addressed by the Court at hearing on February 22, 2023. As the Court explained in response to Mr. Shehadeh's insistence that his claim be denominated in cryptocurrency, "under the Bankruptcy Code, the value of [ ] claim[s] for purposes of distribution has to be measured in terms of dollars as of the filing date."[269]  For the reasons the Court has already outlined, the dollarization arguments in the Shehadeh Claims Objection must be overruled.

200.     Notwithstanding his claims to the contrary, Mr. Shehadeh has exercised his rights by vigorously engaging in these chapter 11 cases as both an active participant at hearings and a serial filer of letters, motions, and objections,[270] all of which have been taken with the utmost sincerity by both the Debtors and the Court.  But none of his assertions has any merit, and his inflammatory accusations are not well taken.

201.     Mr. Shehadeh has received more than sufficient due process by continually raising and being heard on baseless allegations repeatedly, despite the reality that all he is doing is further draining estate resources that should be going to creditors.

202.     The Shehadeh Fraud Motion is more of the same.  Mr. Shehadeh once again levels serious but baseless allegations against the Debtors without a single shred of evidence.[271]  The Shehadeh Fraud Motion also asserts that counsel to the Debtors has not properly disclosed any connections to the Debtors and "may have violated requirements of the [Bankruptcy Code] to file list of creditors, a schedule of assets and liabilities, and a statement of financial affairs."[272]  This

---

[269]  *In re Voyager Digital Holdings, Inc.*, No. 2210943 (MEW) (Bankr. S.D.N.Y. Feb. 22, 2023) Hr'g Tr. 48:2–48:5.

[270]  *See* Docket Nos. 922, 930, 934, 940, 942, 944, 945, 946, 947, 948, 953, 967, 1030, 1063, 1064, 1066, 1069, 1070, 1072, and 1082.

[271]  Docket No. 1082.

[272]  *Id.*

Appellant Appendix ER - 840

is patently false; the Debtors have made substantial disclosures with respect to counsel's retention, and the creditor list, schedules of assets and liabilities, and statements of financial affairs were filed long ago at substantial expense.[273]  It is time for this nonsense to end, and thus time for the Plan to be confirmed.

**J.  The BNY Objection Should Be Overruled as No Transfer has Occurred.**

203.  The BNY Objection asserts that Shellpoint holds a perfected mortgage claim on the property commonly known as 37 Black Hawk, Irvine, California 92603 (the "Property") and that title to the Property was transferred from mortgage borrowers Michael G. Beason and Mickey L. Wiebe to Debtor Voyager Digital, LLC on January 5, 2023.[274]  BNY objects that (i) if such transfer was not authorized by the Court it should be voided and (ii) to the extent such transfer was authorized by the Court Shellpoint has a secured claim against the Debtors in excess of $5.149 million that is not properly addressed in the Plan.[275]  The Debtors believe this Objection is resolved pursuant to language added to the Confirmation Order.[276]

**Conclusion**

204.  For all of the reasons set forth herein and in the Voting Report, the Tichenor Declaration, the Renzi Declaration, and the Pohl Declaration, and as will be further shown at the Combined Hearing, the Debtors respectfully request that the Court approve the Disclosure Statement on a final basis and confirm the Plan as fully satisfying all of the applicable requirements

---

[273]  *Id.*

[274]  BNY Objection, ¶¶ 1–2.

[275]  *Id.* at ¶¶ 4–6.

[276]  *See* Confirmation Order ¶ 152.

Appellant Appendix ER - 841

of the Bankruptcy Code by entering the Proposed Confirmation Order, overruling any remaining Objections, and granting such other and further relief as is just and proper.

[*Remainder of page intentionally left blank*]

Appellant Appendix ER - 842

Dated: February 28, 2023
New York, New York

/s/ Joshua A. Sussberg
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900
Email:          jsussberg@kirkland.com
                cmarcus@kirkland.com
                christine.okike@kirkland.com
                allyson.smith@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

**Exhibit A**

**Objection Response Chart**

A-1

IN RE VOYAGER DIGITAL HOLDINGS, INC., *ET AL.*, CASE NO. 22-10943 (MEW)

CHART OF OBJECTIONS AND PROPOSED RESPONSES TO THE THIRD
AMENDED JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND ITS DEBTOR
AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE (THE "<u>PLAN</u>")[1]

| DOCKET # | OBJECTING PARTY | OBJECTION SUMMARY | PROPOSED ACTION/RESPONSE |
|---|---|---|---|
| 1042 | **Federal Trade Commission ("<u>FTC</u>," and such Objection the "<u>FTC Objection</u>")[2]** | • The FTC objects to the Releases proposed in the Plan insofar as they enjoin (i) liabilities of a debtor (x) all or substantially all of whose property is being liquidated under a chapter 11 plan, (y) that will not engage in business following consummation of the plan, and (z) that would be denied a discharge under section 727(a) of the Bankruptcy Code if the case were a case under chapter 7; and/or (ii) fraud-related debts held by a governmental unit. | • The Debtors believe this Objection is resolved pursuant to language added to the Confirmation Order. *See* Confirmation Order ¶ 141. |
| 1047 | **U.S. Securities and Exchange Commission ("<u>SEC</u>," and such Objection the "<u>SEC Objection</u>")** | • The Disclosure Statement and Plan fail to provide necessary information regarding the security of assets on the Binance.US platform.<br><br>• The transactions necessary to effectuate the rebalancing may violate the prohibition in Section 5 of the Securities Act of 1933 against the unregistered offer, sale, or delivery after sale of securities.<br><br>• The Plan, Disclosure Statement, and APA do not adequately describe the impact of potential regulatory actions on Binance.US, on Account Holders, and on Account Holders' ability to trade crypto assets. | • *See* Memorandum, section IV.D.<br><br>• *See* Memorandum, section IV.E.<br><br>• *See* Memorandum, section IV.D. |

---

1   Capitalized terms used but not defined herein have the meanings given to them in the Plan, the Memorandum, or the applicable Objection, as applicable.

\*   Denotes late-filed Objections.  The Debtors reserve all rights to contest the validity of any late-filed Objection.

2   Heath Mendelsohn filed a letter in support of the FTC Objection after the deadline to file objections to the Plan.  *See* Docket No. 1060.

A-2

Appellant Appendix ER - 845

| DOCKET # | OBJECTING PARTY | OBJECTION SUMMARY | PROPOSED ACTION/RESPONSE |
|---|---|---|---|
| | | • Creditors and stakeholders are entitled to know whether the Sale Transaction provides a meaningful economic benefit other than the $20 million sale of Voyager's customer list to Binance.US. | • *See* Memorandum, section IV.B. |
| 1050, 1097* | **Ad Hoc Group of Equity Holders ("AHG," and such Objection the "AHG Objection")** | • The Plan and Confirmation Order should contain language clarifying that neither document will have any impact on the validity, extent, priority, or treatment of Intercompany Claims.<br><br>• The Confirmation Order should contain language clarifying that the Releases in the Plan will not prejudice the rights of any party that did not "opt in" to the applicable releases.<br><br>• The Plan (i) violates section 1123(a)(2) of the Bankruptcy Code by failing to specify whether Holders of Class 7 Intercompany Claims are Impaired or Unimpaired and inappropriately describes such Holders as deemed to accept the Plan; (ii) to the extent such Intercompany Claims are Impaired, fails to specify treatment for an Impaired Class under Bankruptcy Code section 1123(a)(3); and (iii) in the event that Intercompany Claims are to be cancelled or otherwise extinguished, seeks to deprive Class 9 Existing Equity Interest Holders of distributions to which they are entitled.<br><br>• The Plan is not fair and equitable with respect to Class 9 Existing Equity Interests.<br><br>• The cancellation of Existing Equity Interests under the Plan is impermissible.<br><br>• The Wind-Down Debtor should not be the only entity with the right to object to a proof of claim. | • The Debtors believe this Objection is resolved pursuant to language added to the Confirmation Order. *See* Confirmation Order ¶¶ 114, 123, 126. |

A-3

| DOCKET # | OBJECTING PARTY | OBJECTION SUMMARY | PROPOSED ACTION/RESPONSE |
|---|---|---|---|
| 1051 | **New York State Department of Financial Services ("New York," and such Objection the "New York Objection")[3]** | • The Plan unfairly discriminates against Account Holders in Unsupported Jurisdictions, including New York, by delaying their recovery compared to creditors in the same class and by not allowing them the option to recover cryptocurrency instead of liquidated assets. | • *See* Memorandum section IV.H. |
| 1059* | **Daniel Newsom and Jon Warren ("Newsom and Warren," and such Objection the "Newsom and Warren Objection")** | • The Releases in the Plan should not be approved (i) for the reasons set forth in the FTC Objection; (ii) because there are viable claims against certain directors and officers and the third party Releases are not necessary to effectuate the Sale Transaction; and (iii) the Debtors' Releases of the directors and officers following the Special Committee Investigation is a poor exercise of their business judgment.<br><br>• Paul Hage should not be appointed wind down trustee and McDermott Will & Emery should not be appointed counsel to the Wind-Down Debtor; a third party should be appointed to oversee the wind down trust. | • *See* Memorandum, sections IV.F, IV.I.1.<br><br>• *See Statement of the Official Committee of Unsecured Creditors in Support of the Third Amended Joint Plan of Voyager Digital Holdings, Inc., and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1109] (the "Committee Statement"), filed contemporaneously herewith, at ¶¶ 45–47, 55–61. |

---

[3] The New York Objection is joined by the People of the State of New York, by Letitia James, Attorney General of the State of New York. *See* Docket No. 1052.

A-4

22-10943-mew Doc 1110 Filed 02/28/23 Entered 02/28/23 16:27:01 Main Document
Pg 126 of 135

| DOCKET # | OBJECTING PARTY | OBJECTION SUMMARY | PROPOSED ACTION/RESPONSE |
|---|---|---|---|
| | | • There is a conflict of interest between Committee chairman Jason Raznick and Stephen Ehrlich that renders the UCC ineffective. | • See Declaration of Jason Raznick in Support of the Statement of the Official Committee of Unsecured Creditors in Support of the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code (the "Raznick Declaration"), filed contemporaneously herewith, at ¶¶ 3–6. |
| | | • The Plan unfairly discriminates against holders of VGX token in violation of section 1129(b) of the Bankruptcy Code because it will trigger a race to sell VGX before it loses its value. | • See Memorandum, section IV.I.1. |
| 1061* | **Tracy Hendershott, Seth Jones, and Trevor Brucker ("Hendershott et al.," and such Objection, the "Hendershott et al. Objection")** | • The Debtors are carrying on illegal business operations due, inter alia, to their being unlicensed sellers of unregistered securities, employing secretive and complex strategies and fee structures, and failing to require minimum investor qualifications. | • The Debtors dispute this allegation, but in any event, it is not a barrier to confirmation. |
| | | • The Debtors have been operating a Ponzi scheme. | • See Memorandum section IV.I.2. |
| | | • The Debtors engaged in false and misleading advertisements and testimony to entice additional individual investors to invest on the Voyager platform. | • The Debtors dispute this allegation, but in any event, it is not a barrier to confirmation. |
| | | • The Debtors entered into the FTX Asset Purchase Agreement despite substantial risks, elected not to exercise any back-up bidder clause in the Bidding Procedures, and ignored the Court's recommendation that they pursue a plan that allows for a toggle to self-liquidation. | • Entry into the FTX Asset Purchase Agreement was already approved by the Court. The Debtors' choice not to employ a back-up bidder as permitted by the Bidding Procedures was a valid exercise of their business judgment. Finally, the Plan includes the sort of toggle feature that Hendershott et al. request. |
| | | • Binance.US has provided inadequate disclosure. | • See Memorandum, sections IV.A–C. |

A-5

Appellant Appendix ER - 848

| DOCKET # | OBJECTING PARTY | OBJECTION SUMMARY | PROPOSED ACTION/RESPONSE |
|---|---|---|---|
| | | • There is a conflict of interest between Committee chairman Jason Raznik and Stephen Ehrlich that renders the UCC ineffective. | • *See* Raznick Declaration, ¶¶ 3–6. |
| | | • The Committee has failed to discharge its duties to the satisfaction of Hendershott et al. | • *See* Committee Statement, ¶¶ 7–40. |
| | | • Paul Hage should not be appointed wind down trustee and McDermott Will & Emery should not be appointed counsel to the Wind-Down Debtor. | • *See* Committee Statement, ¶¶ 45–47, 55–61. |
| | | • The chapter 11 cases should be converted to cases under chapter 7 of the Bankruptcy Code and a trustee should be appointed pursuant to section 1104 of the Bankruptcy Code. | • *See* Memorandum, section IV.I.1. |
| | | • The Releases proposed in the Plan should be denied (i) insofar as they permit a discharge that would be denied under section 727(a) of the Bankruptcy Code if the case were a case under chapter 7 and (ii) because they have no effect on the implementation of the Plan under section 1123(a)(5) of the Bankruptcy Code. | • The Debtors believe that Hendershott et al.'s allegation that the Plan contains an impermissible discharge is resolved pursuant to language added to the Confirmation Order. *See* Confirmation Order ¶ 141. *See also* Memorandum, section IV.F. |
| **1063\***, **1066\*** | **Certain letters filed by Alah Shehadeh ("Mr. Shehadeh," and such Objections, the "Shehadeh Letters")** | The Shehadeh Letters variously allege that: | |
| | | • Mr. Shehadeh has been denied his right to be heard under sections 341 of the Bankruptcy Code, the Due Process Clause of the United States Constitution, and established principles of bankruptcy law. | • *See* Memorandum, section IV.J.2. |
| | | • The Court has failed to maintain impartial as required by controlling case law, the Bankruptcy Rules, and the Judicial Conduct and Disability Act of 1980. | • *See* Memorandum, section IV.J.2. |
| | | • The Debtors' business enterprise is a Ponzi scheme and has been defrauding its customers and the market as evidenced by certain findings in the SEC investigation and other charges brought by governmental entities. | • *See* Memorandum, section IV.J.2. |

A-6

Appellant Appendix ER - 849

| DOCKET # | OBJECTING PARTY | OBJECTION SUMMARY | PROPOSED ACTION/RESPONSE |
|---|---|---|---|
| 1070*[4] | **Mr. Shehadeh, Rawand Salah, Yousef Qasem, and Seth Jones** (such objection the "**Shehadah Claims Objection**") | • The Account Holders are entitled to distributions in kind as opposed to in a dollarized amount.<br><br>• Cryptocurrency on the Debtors' platform is property of the estate.<br><br>• Failure to return cryptocurrency to Account Holders violates the Federal Trade Commission Act.<br><br>• Cryptocurrency is a commodity under the Commodity Exchange Act. | • *See* Memorandum, section IV.I.2.<br><br>• *See* Memorandum, section IV.I.2.<br><br>• *See* Memorandum, section IV.I.2.<br><br>• *See* Memorandum, section IV.I.2. |
| 1072* | **Mr. Shehadeh (such motion, the "Shehadeh Motion")** | • Mr. Shehadeh requests a change of venue or judge for these chapter 11 cases. | • *See* Memorandum, section IV.I.2. |
| 1078 | **Bank of New York Mellon ("BNY," and such Objection, the "BNY Objection") on behalf of Shellpoint Mortgage Servicing ("Shellpoint")** | • Shellpoint holds a perfected mortgage lien on certain property that was transferred to the Debtors on January 5, 2023.<br>• BNY argues that such transfer of title should be voided to the extent not authorized by the Court.<br>• To the extent the Debtors were authorized to take title to the property, Shellpoint has a claim in excess of $5.149 million that is not addressed in the Plan. | • The Debtors believe this Objection is resolved pursuant to language added to the Confirmation Order. *See* Confirmation Order ¶ 152. |
| 1082* | **Mr. Shehadeh (such motion, the "Shehadeh Fraud Motion")** | • The Debtors have issued fake coins to pay for expenses, provided false financial insights, and committed fraud to the detriment of their creditors in violation of the Bankruptcy Code, Securities Act, Sarbanes-Oxley Act of 2002, and the Racketeer Influenced and Corrupt Organizations Act.<br><br>• Counsel to the Debtors has violated ethical and professional standards, including sections 110, 329, and 521 of the Bankruptcy Code. | • *See* Memorandum, section IV.I.2.<br><br>• *See* Memorandum, section IV.I.2. |

A-7

4   The Shehadeh Claims Objection revised the *Objection to Claim Amounts* filed immediately prior to the Shehadeh Claims Objection.  Docket No. 1069.

| DOCKET # | OBJECTING PARTY | OBJECTION SUMMARY | PROPOSED ACTION/RESPONSE |
|---|---|---|---|
| 1085 | The U.S. Trustee (such Objection, the "U.S. Trustee Objection") | • The Disclosure Statement does not include adequate information related to Binance.US, specifically the due diligence the Debtors conducted to ensure Binance.US is a viable transaction partner, the security protocols in place to ensure Binance.US is able to keep Account Holders' Coins safe and secure, justification for the Debtors' claims that Binance.US will not engage in activities that might require registration with certain governmental agencies. | • *See* Memorandum, section IV.A–C. |
| | | • The Disclosure Statement does not contain adequate information regarding the rationale for including the Released Professionals and the Released Voyager Employees. | • *See* Memorandum, section IV.F. |
| | | • The Releases include prospective releases to the Wind-Down Debtors and the Plan Administrator. | • The Debtors believe this Objection is resolved pursuant to revisions to the Plan. *See* Plan Art. A.I.135. |
| | | • The Exculpation is impermissibly broad and should be narrowed. | • *See* Memorandum, section IV.F. |
| | | • The Plan and Confirmation Order should make clear that the Court is not approving the undisclosed terms of the Employee Transition Plan and the Court is not approving any bonuses or severance plans in connection therewith. | • The Debtors believe this Objection is resolved pursuant to language added to the Confirmation Order. *See* Confirmation Order ¶ 146. |
| | | • The Plan provides that proofs of claim will be considered objected to without further action from the Debtors. | • The Debtors believe this Objection is resolved pursuant to revisions to the Plan. *See* Plan Art. VII.A. |
| | | • The Wind-Down Debtor should not be the only entity with the right to object to a proof of claim. | • The Debtors believe this Objection is resolved pursuant to revisions to the Plan. *See* Plan Art. VII.B. |
| | | • Claims filed after the Bar Date should be deemed "late filed," not automatically disallowed and expunged. | • The Debtors believe this Objection is resolved pursuant to revisions to the Plan. *See* Plan Art. VII.A. |

A-8

22-10943-mew   Doc 1110   Filed 02/28/23   Entered 02/28/23 16:27:01   Main Document
Pg 130 of 135

| DOCKET # | OBJECTING PARTY | OBJECTION SUMMARY | PROPOSED ACTION/RESPONSE |
|---|---|---|---|
| 1086 | **Texas State Securities Board ("Texas," and such Objection, the "Texas Objection")** | • The Disclosure Statement does not contain adequate information regarding: (i) the possibility that recoveries for Holders of Account Holder Claims may be diminished if Alameda is successful in proving its administrative expense claim; (ii) Alameda's possible defenses to subordination of their claim; and (iii) the transfer, use, and indemnity requirements Account Holders must agree to in order to use Binance.US's services. | • *See* Memorandum, section IV.D. |
| | | • The Plan unfairly discriminates against Account Holders in Unsupported Jurisdictions, including Texas, by delaying their recovery compared to creditors in the same class and by not allowing them the option to recover cryptocurrency instead of liquidated assets. | • *See* Memorandum section IV.H. |
| | | • The Releases and Injunctions in the Plan are a disguised discharge that violates section 1141(d)(3) of the Bankruptcy Code. | • The Debtors believe that Texas's allegation that the Plan contains an impermissible discharge is resolved pursuant to language added to the Confirmation Order. *See* Confirmation Order ¶141. |
| 1087 | **New Jersey Bureau of Securities ("New Jersey," and such Objection, the "New Jersey Objection")** | • New Jersey joins the SEC Objection and all parts of the Texas Objection other than the Section C ("The Plan Needlessly and Unfairly Discriminates Against Texas Consumers"). | • *See supra* Debtors' responses to the SEC Objection and the Texas Objection. |
| | | • New Jersey adds that the rebalancing contemplated by the Plan may violate New Jersey securities law. | • *See* Memorandum section IV.E. |
| | | • New Jersey objects to any provision in the Plan that would discharge New Jersey's claims, or any portion thereof, that fall within the protections of sections 523(a)(2)(A)–(B) of the Bankruptcy Code. | • The Debtors believe that New Jersey's allegation that the Plan contains an impermissible discharge is resolved pursuant to language added to the Confirmation Order. *See* Confirmation Order ¶141. |

A-9

**Exhibit B**

**December 3, 2021, Letter to**
**New York Department of Financial Services**

Appellant Appendix ER - 853



**Ethan L. Silver**
Partner

1251 Avenue of the Americas
New York, New York 10020

**T**: 212.419.5862
**F**: 973.597.2400
**E**: esilver@lowenstein.com

December 3, 2021

**FOIL CONFIDENTIAL TREATMENT REQUESTED**

SENT VIA EMAIL: daniel.sangeap@dfs.ny.gov

Daniel Sangeap
NYS Department of Financial Services ("DFS")
One State Street
New York, NY 10004-1511

Re:     **Voyager Digital LLC ("Voyager") - New York Resident Accounts**

Dear Mr. Sangeap,

As discussed during our telephone conversation on November 23, 2021 please see below for further details regarding certain Voyager customer accounts with listed residences in New York State as well as relevant remedial measures.

**Overview**

Voyager, founded in 2018, is one of the fastest-growing cryptocurrency platforms in the United States with over 2.7 million verified users on its mobile application (the "App"). Voyager does not solicit business for any of its services from New York residents; disclaimers on Voyager's website and app store descriptions expressly provide that New York residents are currently not permitted to use the App. To prevent New York residents from opening Voyager accounts and using its App, Voyager has developed a user entitlement feature within the App that only allows users to open a Voyager account if the user resides in one of Voyager's approved jurisdictions. This user entitlement feature has been in place since the App's public launch in February 2019 and has successfully blocked approximately 87,000 New York residents from opening accounts with Voyager.

**NY Resident Accounts**

Despite the procedures put in place by Voyager to block New York residents from opening accounts, however, Voyager currently has over 1,000 customer accounts with listed residences in New York State. The circumstances under which these accounts have been opened broadly fall into the following five (5) categories:

1. Voyager employees, investors, business partners, and advisors;

2. Close friends and family of Voyager employees;

3. Beta version users of the App;

4. Users inadvertently permitted to open accounts as a result of errors associated with implementing an emergency feature (as further detailed below); and

**FOIL CONFIDENTIAL TREATMENT REQUESTED**

5.  Users who have moved to New York <u>after</u> opening a Voyager account as a resident of another state.

**1. Voyager employees, investors, business partners, and advisors**

Approximately 70 Voyager accounts belong to New York-based Voyager employees, investors, business partners, and advisors. These users are all sophisticated parties, and have an important business need to personally interact with the App and its features to be effective in their roles. To allow New York-based users in this category to open Voyager accounts, Voyager created an override to the user entitlement feature that allows New York-based accounts to be opened if the user has been added to an internal list (the "<u>whitelist</u>"). All New York-based Voyager employees, investors, business partners, and advisors with Voyager accounts were specifically added to the whitelist prior to them opening their respective accounts.

**2. Close friends and family of Voyager employees**

Voyager has an internal policy of allowing close friends and family members of Voyager employees to open Voyager accounts. This policy serves the important business need of allowing Voyager employees to discreetly solicit valuable candid feedback on the App and its functionality. As a result, there are approximately 250 New York-based users that have been placed on the whitelist and permitted to open accounts under the close friends and family policy.

**3. Beta version users**

In October 2018 Voyager released a beta—*i.e.*, early or test—version of the App to a limited subset of users who had specifically signed up to try out the beta. Due to the beta's early, unfinished nature, Voyager had not yet implemented a system to block New York users from opening accounts and using the App at the time of the beta's launch. Consequently, there are approximately 20 New York-based users that still have Voyager accounts that were opened during the beta period.

Soon after the beta's launch, however, Voyager quickly moved to implement the user entitlement feature to block New York residents from opening accounts, and the user entitlement feature has been in place since the App was officially and publicly launched in February 2019.

**4. Users inadvertently permitted to open accounts as a result of errors associated with implementing an emergency feature**

Around 1,100 New York-based users were inadvertently permitted to open Voyager accounts as a result of errors associated with implementing an emergency feature on the App during a period of massive and unanticipated growth in Voyager's user base. In January 2021, a confluence of several public events—including the Gamestop-Robinhood controversy—suddenly resulted in an enormous influx of new users attempting to open Voyager accounts. This unprecedented volume ended up crashing the App entirely. In order to re-establish existing user access to their Voyager accounts, Voyager implemented emergency updates, including an emergency waitlist feature that was designed to prevent the additional load of new users still waiting to open Voyager accounts from crashing the App again. To implement the emergency waitlist, Voyager made some adjustments to the existing whitelist feature. Given the extremely expedited nature of the emergency work from this period—Voyager successfully restored the App within 48 hours—however, human errors in adjusting the whitelist inadvertently allowed a subset of New York-based users to open Voyager accounts, although the user entitlement feature was still able to block many New York residents from doing so.

These errors have since been identified and remediated by Voyager, and can no longer be used by New York residents to open Voyager accounts.

**5. Users who have moved to New York after opening a Voyager account elsewhere**



Approximately eight current Voyager users opened their accounts in other jurisdictions but subsequently moved to New York, where they now reside. Voyager is currently in the process of memorializing policies and procedures to address current and future New York accounts in this category of users.

**Remediation Measures**

As indicated above, Voyager has since undertaken significant remedial efforts to safeguard against the inadvertent opening of New York resident Voyager accounts. These measures include: (1) significantly restricting the use of whitelists together with instituting robust supervisory procedures; and (2) enhancing ongoing Voyager account monitoring procedures.

As it relates to remediating existing New York resident accounts, despite the de minimis nature of these accounts, Voyager is committed to protecting the best interests of these New York resident customers. Rather than possibly restricting or closing these accounts, which would expose customers to potentially significant financial and tax consequences, Voyager believes an orderly transition of these accounts to a DFS-approved trading platform (a "Qualified Provider") will provide the best path forward from a customer protection perspective. Of course, Voyager looks to work collaboratively with DFS to ensure all appropriate steps taken would be consistent with DFS guidance.

Given the strength of Voyager's existing relationships with each of its New York resident customers and their familiarity with the Voyager platform, Voyager strongly believes that transferring these accounts to Voyager Digital NY LLC ("Voyager NY") upon DFS approval of its outstanding virtual currency and money transmission license applications provides the most efficient and effective solution. Voyager has worked tirelessly in good faith, and at considerable cost and expense, over the course of the last three years to obtain licensure in New York. Despite having limited visibility into the DFS approval timeframe, Voyager understands that Voyager NY's virtual currency and money transmission applications may shortly be subject to approval. In anticipation of Voyager NY becoming a Qualified Provider, Voyager has been dedicating significant resources into establishing the technology, security, and infrastructure that would be necessary to safely and securely convert existing New York resident accounts to Voyager NY.

We appreciate DFS discussing these issues with us and look forward to continuing this dialogue, not only in connection with completing the Voyager NY virtual currency and money transmission applications, but also with respect to resolving the above remediation items to everyone's satisfaction.

***

**We respectfully request confidential treatment pursuant to the state Freedom of Information Law ("FOIL"), N.Y. Pub. Off. § 89(5), of this letter (the "Letter"). The information contained in this Letter constitutes proprietary trade secrets and/or confidential commercial and financial information. Specifically, we request that this Letter be treated as nonpublic and confidential, exempt from production under FOIL pursuant to N.Y. Pub. Off. § 87(2) and any other applicable law or regulation, that the information not be published, made part of any public record, or made available to any person.**

**We also respectfully request that you please notify David Brosgol at the email address indicated above of the receipt of any request for access under FOIL to any information or document covered by this request for confidential treatment under FOIL. We request that the New York Department of Financial Services ("DFS") promptly advise us whenever any person makes a request pursuant to FOIL or otherwise for the information or documents for which confidential treatment is sought. If the DFS intends to release the information or document, we request that we be given ten (10) days' advance notice of any such release and an opportunity to object and pursue available remedies.**

***



**FOIL CONFIDENTIAL TREATMENT REQUESTED**

      If you have any questions about this letter or require any further information, please do not hesitate to get in touch with me at 212.419.5862.

               Sincerely,

               Ethan L. Silver

CC:    Mariya Komartsova, mariya.komartsova@dfs.ny.gov
        Adrienne Oppenheim, Adrienne.oppenheim@dfs.ny.gov

