23-cv-02171

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

In re Voyager Digital Holdings, Inc., et al., Debtors

United States of America, et al.
*Appellants*,

– v. –

Voyager Digital Holdings, Inc., et al.,
*Appellees.*

Official Committee of Unsecured Creditors
of Voyager Digital Holdings, Inc.,
*Intervenor*

ON APPEAL FROM THE UNITED STATES BANKRUPTCY
COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

### BRIEF FOR INTERVENOR THE OFFICIAL
### COMMITTEE OF UNSECURED CREDITORS

DARREN AZMAN
JOSEPH B. EVANS
   *McDermott Will & Emery LLP*
   *One Vanderbilt Avenue*
   *New York, NY 10017-3852*
   *(212) 574-5400*

PAUL W. HUGHES
ANDREW A. LYONS-BERG*
CHARLES SEIDELL*
   *McDermott Will & Emery LLP*
   *500 North Capitol Street NW*
   *Washington, DC 20001*
   *(202) 756-8000*

*\*pro hac vice* to be filed

*Counsel for the Official Committee of Unsecured Creditors*

## TABLE OF CONTENTS

Table of Authorities..................................................................................ii

Introduction............................................................................................1

Statement ..............................................................................................3

    A.  Factual background...........................................................3

    B.  Procedural background. ...................................................5

Summary of the Argument ...................................................................15

Argument..............................................................................................17

    I.  The government misunderstands the scope and nature
of the exculpation provision..................................................17

    II.  The bankruptcy court had authority to issue the
exculpation provision. ...........................................................23

        A.  The exculpation provision is authorized by the
bankruptcy code. ..........................................................23

        B.  The exculpation provision is an application of
quasi-judicial immunity. ...............................................31

    III. The exculpation provision is not barred by constitutional
concerns or sovereign immunity...........................................38

Conclusion ...........................................................................................48

i

# TABLE OF AUTHORITIES

## Cases

*Matter of 47-49 Charles Street, Inc.*,
   209 B.R. 618 (S.D.N.Y. 1997)........................................................................17

*In re Aegean Petroleum Network, Inc.*,
   599 B.R. 717 (Bankr. S.D.N.Y. 2019).............................................*passim*

*In re Airadigm Commc'ns, Inc.*,
   519 F.3d 640 (7th Cir. 2008)......................................................16, 28, 29

*In re Anderson*,
   884 F.3d 382 (2d Cir. 2018)..........................................................................23

*Barnhart v. Peabody Coal Co.*,
   537 U.S. 149 (2003) ......................................................................................31

*Bennett v. Williams*,
   892 F.2d 822 (9th Cir. 1989).........................................................................32

*Bloom v. Azar*,
   976 F.3d 157 (2d Cir. 2020)..........................................................................31

*In re Bogdanovich*,
   292 F.3d 104 (2d Cir. 2002)..........................................................................23

*Boullion v. McClanahan*,
   639 F.2d 213 (5th Cir. 1981).........................................................................32

*Braatelien v. United States*,
   147 F.2d 888 (8th Cir. 1945).........................................................................36

*Bush v. Rauch*,
   38 F.3d 842 (6th Cir. 1994).............................................................33, 34, 38

*In re Casse*,
   198 F.3d 327 (2d Cir. 1999)..........................................................................19

*In re Charter Comms., Inc.*,
   691 F.3d 476 (2d Cir. 2012)..........................................................................17

*City of New York v. N.Y., N.H. & H.R. Co.*,
   344 U.S. 293 (1953) ......................................................................................45

*In re Congregation Birchos Yosef*,
   699 F. App'x 91 (2d Cir. 2017) ...................................................................45

## Cases—continued

*In re Crown Vantage, Inc.*,
    421 F.3d 963 (9th Cir. 2005) ................................................................... 32

*Czyzewski v. Jevic Holding Corp.*,
    580 U.S. 451 (2017) ...................................................................... 23, 24

*In re Enron Corp.*,
    326 B.R. 497 (S.D.N.Y. 2005) ................................................................ 27

*Forrester v. White*,
    484 U.S. 219 (1988) .............................................................................. 38

*Garvin v. Cook Invs. NW, SPNWY, LLC*,
    922 F.3d 1031 (9th Cir. 2019) ........................................................ 47, 48

*In re Grabis*,
    2020 WL 7346467 (Bankr. S.D.N.Y. 2020) ............................................ 47

*In re Granite Broad. Corp.*,
    369 B.R. 120 (S.D.N.Y. 2007) ................................................................ 27

*Gross v. Rell*,
    695 F.3d 211 (2d Cir. 2012) ................................................................... 32

*In re Harris*,
    590 F.3d 730 (9th Cir. 2009) ................................................................. 32

*In re Kendall*,
    712 F.3d 814 (3d Cir. 2013) ............................................................ 36, 38

*In re LATAM Airlines Grp. S.A.*,
    2022 WL 2206829 (Bankr. S.D.N.Y. 2022) ........................................... 33

*Law v. Siegel*,
    571 U.S. 415 (2014) .............................................................................. 30

*In re Lehman Bros. 3 Holdings, Inc.*,
    855 F.3d 459 (2d Cir. 2017) ................................................................... 17

*In re Momentum Mfg. Corp.*,
    25 F.3d 1132 (2d Cir. 1994) ................................................................... 26

*In re Motors Liquidation Co.*,
    829 F.3d 135 (2d Cir. 2016) ................................................................... 17

*Nken v. Holder*,
    556 U.S. 418 (2009) .............................................................................. 21

## Cases—continued

*NLRB v. Sw. Gen., Inc.*,
    580 U.S. 288 (2017) .............................................................................31

*In re Oneida Ltd.*,
    351 B.R. 79 (S.D.N.Y. 2006)..............................................................27

*In re Perdue Pharms., L.P.*,
    635 B.R. 26 (S.D.N.Y. 2021)..............................................................17

*Peretz v. United States*,
    501 U.S. 923 (1991) ............................................................................39

*Rynasko v. New York Univ.*,
    63 F.4th 186 (2d Cir. 2023)................................................................45

*Six West Retail Acquisition, Inc. v. Loews Cineplex Entertainment Corp.*,
    286 B.R. 239 (S.D.N.Y. 2002)............................................................17

*Taggart v. Lorenzen*,
    139 S. Ct. 1795 (2019) .......................................................................27

*Toibb v. Radloff*,
    501 U.S. 157 (1991) ............................................................................24

*U.S. Dep't of Labor v. Triplett*,
    494 U.S. 715 (1990) ............................................................................45

*United States v. Cardinal Mine Supply*,
    916 F.2d 1087 (6th Cir. 1990).............................................................44

*United States v. Spallone*,
    399 F.3d 415 (2d Cir. 2005)................................................................19

*Wellness Int'l Network Ltd. v. Sharif*,
    135 S. Ct. 1932 (2015) .......................................................................39

## Statutes

11 U.S.C.
    § 105(a) .................................................................................*passim*
    § 106 ...............................................................................................46
    § 524(g)(1)(B)..........................................................................22, 32

**Statutes—continued**

11 U.S.C.—continued

§ 727 .................................................................................23

§ 944 .................................................................................23

§ 1121 ...............................................................................23

§ 1123 ........................................................................23, 26

§ 1125(e) ...........................................................................30

§ 1129 ...............................................................................24

§ 1129(a)(3) ...........................................................2, 41, 42

§ 1129(a)(7) .......................................................................24

§ 1141 ...............................................................................23

§ 1142(b) ...........................................................................24

§ 1192 ...............................................................................23

§ 1228 ...............................................................................23

§ 1328 ...............................................................................23

28 U.S.C.

§ 151 .................................................................................39

§ 152(a)(1) .........................................................................39

§ 158(a) .............................................................................17

**Other Authorities**

2 *Collier on Bankruptcy* ¶ 105.01 (13th ed. 2013) .......................30

4 *Collier on Bankruptcy* ¶ 524.05 (16th ed. 2023) .......................26

7 *Collier on Bankruptcy* ¶ 1103.05 (16th ed. 2023) .......................26

*Good Faith*, Black's Law Dictionary (11th ed. 2019) ...................37

*Statement Regarding SEC Staff Views*, SEC (Sept. 13, 2018) .....................7

## INTRODUCTION

The government has sought to delay the return of assets to over 1.1 million retail creditors in favor of preserving its "hypothetical" right to prosecute professionals for crypto transactions the bankruptcy court has compelled those professionals to execute. The issue at the center of this appeal is the government's objection to an exculpation provision contained in the court-approved Chapter 11 restructuring plan (the Plan) for Debtors Voyager Digital Holdings, Inc., *et al*.

As part of this court-ordered restructuring, certain crypto transactions must be made by the parties or others working at their direction. The bankruptcy court included an exculpation provision in the Plan providing that—so long as parties do not act fraudulently or with gross negligence or willful misconduct—they cannot be held liable simply for performing the actions required by the Court.

The government objects. As noted by Judge Michael E. Wiles, who oversaw the bankruptcy, the government has had every opportunity to assert that the crypto transactions or other activities required by the Plan are unlawful. It has not done so. After all parties, including the government, had the opportunity to present evidence or argument, the bankruptcy court ruled that the crypto transactions and other activities required under the Plan have "been proposed in good faith and not by any means forbidden by

1

law." ER1191; *see* 11 U.S.C. § 1129(a)(3). And, as the bankruptcy court has made clear, the government at any time in the future may inform the bankruptcy court that actions contemplated under the Plan should be stopped or paused because of concerns about illegality.

Rather than taking either of these readily available alternatives, the government maintains that it may lie in wait: It takes the position that, even though parties must act according to the precise letter of the Plan—including executing the crypto transactions necessary to effectuate it—the government must retain the ability to bring criminal or civil actions against parties who do nothing more than comply with the court's orders. The bankruptcy court had little trouble rejecting that extraordinary claim.

The government raises these same challenges again on appeal—but the exculpation provision at issue here is well within the bankruptcy court's broad equitable powers; it is a consistent application of widely accepted quasi-judicial immunity principles that protect the agents of the court; and it is a common feature of Chapter 11 plans within this Circuit. Moreover, the exculpation provision is narrow: It has no bearing whatsoever on pre-reorganization activity of any entity, it does not exculpate any individuals who engage in fraudulent, willfully unlawful, or grossly negligent conduct in executing the Plan, and it does not prevent the government from later asking the bankruptcy court to stop certain contemplated transactions or

2

other actions, if it claims (unlike its position now) that those actions would be somehow illegal.

Thus, as the bankruptcy court put it, the government's protestations about its ability to protect the public are "red herrings." ER1236.[1] The Court should affirm the decision of the bankruptcy court.

**STATEMENT**

### A.   Factual background.

**1.** Voyager was once one of the most popular crypto brokerages for retail customers. It "operate[d] as a cryptocurrency 'agency broker,' matching its customers with counterparties who can facilitate the customer's desired trade." Bankr. Dkt. 15, at 6 ¶ 12. Instead of matching trades on its own order book, as would a typical crypto exchange, Voyager filled its customers' trade orders "by survey[ing] more than a dozen exchanges and liquidity providers and execut[ing] trades through a proprietary algorithm that evaluates the price, certainty of execution, reliability of the trading venue, and speed of execution." *Id.* at 11 ¶ 22.

---

[1]   Citations to "ER####" refer to materials contained in the government's designated bankruptcy record on appeal (D.I. 60). Materials on the Bankruptcy Court docket that were not included in the electronic record are referred to by "Bankr. Dkt. #". Citations to this Court's docket in this case have the typical form "D.I. #." Citations to the Second Circuit docket, No. 23-467, from the parties' interlocutory appeal are as "App. Dkt. #."

Voyager offered customers lucrative rewards programs—but in order to fund those programs, Voyager lent the crypto that customers deposited on its platform to third parties in the form of risky high-yield loans. *Id.* at 11-12, ¶¶ 23-29. Ultimately, this practice was one of the factors that led to Voyager's demise. As a result of the default of just one of its lending partners, Voyager found itself suffering from significant liquidity issues. *Id.* at 21 ¶ 57. On July 1, 2022, Voyager "froze all withdrawals and trading activity on its platform." *Id.* at 24 ¶ 64. Four days later, it filed for bankruptcy.

Voyager's creditors consist of mostly retail customers. Many of them have filed letters with the court describing the harm they have suffered as a result of Voyager's bankruptcy. *See* D.I. 57 (March 23, 2023 Hearing Tr.), at 31:2–3. Since July 2022, customers have been unable to access their assets stored on Voyager's platform. Many of these retail customers relied on the assets they stored with Voyager for mortgage payments, college funds for children, and basic necessities such as car loan payments. *Id.* at 31:3-5. These retail customers desperately need to have their crypto returned to them as soon as possible. *See* ER1245 ("The automatic stay and other provisions of the bankruptcy code have had the effect of delaying customers' access to their investments since July 2022, and many of those customers invested significant portions of their life savings or retirement savings in cryptocurrencies held by the Debtors.").

## B.     Procedural background.

**1.**  On July 5, 2022, the Debtors filed a voluntary Chapter 11 petition in bankruptcy court; they continue to operate their businesses and manage their properties as debtors in possession pursuant to bankruptcy code sections 1107(a) and 1108. On July 19, 2022, the U.S. Trustee appointed the Committee pursuant to bankruptcy code section 1102(a). *See* Bankr. Dkt. 106.

**2.**  To maximize recovery to creditors, the Debtors sought to sell their assets at a premium through a bankruptcy court-ordered auction process. Initially, on September 28, 2022, the now infamous crypto exchange FTX won the auction—but after FTX itself filed for bankruptcy, the Debtors were forced to restart their bid procedures to find a new purchaser.

On December 18, 2022, the Debtors and BAM Trading Services, Inc. (Binance.US), entered into an asset purchase agreement (the APA) and, on December 21, 2022, the parties sought bankruptcy court authorization to enter into the APA. *See* Bankr. Dkt. 775. On January 9, 2023, the Debtors filed an amended version of the APA (the First Amended APA) (ER168), reflecting certain modifications including, among other things, extensions of certain milestones contained therein. On January 13, 2023, the bankruptcy court entered an order authorizing the Debtors' entry into the First Amended APA. Bankr. Dkt. 860.

Under the First Amended APA, the outside effective date for the closing of the sale to Binance.US is April 18, 2023, with a possible 30-day extension. ER244, at § 8.1(c). The First Amended APA gives Binance.US the option to terminate the sale if the "[c]losing shall not have occurred on or before the date that is four months following the date hereof," which is April 18, 2023. *Id.*; *see also id.* at ER172 at ¶ 2 (providing that terms like "the date hereof" continue to mean December 18, 2022, the date the original APA was signed).

**3.** The Plan, as proposed and ultimately approved by the bankruptcy court, includes a number of key provisions. For example, the sale of Voyager's assets to Binance.US is central component of the Plan. *See* ER1138-39. The Plan also requires Voyager and Binance.US to undertake certain crypto transactions.

First, the Plan requires that the Debtors engage in "rebalancing" transactions prior to the sale of their assets to Binance.US. *See* ER227-229, at § 6.11(a)-(d). These transactions require the Debtors to balance their crypto portfolio so that it contains the appropriate amounts of certain crypto to ensure that creditors will receive *pro rata* in-kind distributions of the crypto that they originally held on Voyager's platform. Second, the Plan requires the eventual distribution of crypto to creditors, which, pending the Plan becoming effective and the closing of the sale to Binance.US, will be

6

completed by Binance.US. *See* ER242-243 at § 7.1(a)-7.4; ER1138-39. The Plan also provides the exculpation provision at issue in this appeal, which is discussed in more detail *infra*.

**4.** Beginning on March 2, 2023, the bankruptcy court held a hearing to consider confirmation of the Plan, which included multiple days of witness testimony and oral argument.

At the hearing, the Securities and Exchange Commission (SEC) objected to confirmation of the Plan on the basis that certain of its provisions may be violative of the securities laws. *See* Bankr. Dkt. 1047. However, the SEC would not provide any basis for *why* it believed the Plan may be unlawful. When the bankruptcy court requested that the SEC provide further details regarding its position, the SEC explicitly stated that the statements were from the "SEC staff" only and "do not reflect the view of the Commission, which has not taken a position with respect to Voyager or Binance." March 3, 2023 Bankr. Hearing Tr., 230:14-16.[2]

_____

[2]   In a statement specifically addressing the views of SEC staff members, former SEC Chairman Jay Clayton noted that the "Commission's longstanding position is that all staff statements are nonbinding and create no enforceable legal rights or obligations of the Commission or other parties." Jay Clayton, *Statement Regarding SEC Staff Views*, SEC (Sept. 13, 2018), https://www.sec.gov/news/public-statement/statement-clayton-091318#.

On March 6, 2023, the government filed an objection to confirmation of the Plan alleging that the Plan and Confirmation Order "contain improperly broad exculpation language that purports to bind the Government from exercising its police and regulatory powers against the Debtors and various third parties." ER862. The government, however, presented no evidence, called no witnesses, and did not cross-examine any witnesses during the confirmation hearing. In fact, the government did not even take an actual position that any conduct required under the Plan would violate the law.

**5.** On March 7, 2023, the bankruptcy court issued a bench ruling confirming the Plan (subject to certain modifications), which was subsequently memorialized in a written opinion issued by the bankruptcy court on March 11, 2023. *See generally* Bankr. Dkt. 1170. On March 8, 2023, the bankruptcy court entered the Confirmation Order (Bankr. Dkt. 1157), which was subsequently corrected and amended on March 10, 2023 and March 11, 2023.

The Confirmation Order replaced previous versions of exculpatory language with a four-paragraph exculpation provision. *See* ER1215-16. In the bankruptcy court's opinion setting forth its reasoning, the court noted the basis for which it approved the exculpation provision:

> "[E]xculpation" provisions are to some extent based on the
> theory that court-supervised fiduciaries are entitled to a qual-
> ified immunity for discretionary actions that they take in
> their official capacities.  However, a proper exculpation provi-
> sion is also a protection for court-supervised and court-ap-
> proved transactions . . . [P]arties should not be liable for doing
> things that the Court authorizes them to do and that in many
> instances a court may direct them to do.

ER1209–10 (citing *In re Aegean Petroleum Network, Inc.*, 599 B.R. 717

(Bankr. S.D.N.Y. 2019). The key language of the exculpation provision is as

follows:

> Effective as of the Effective Date, to the fullest extent permis-
> sible under applicable law and without affecting or limiting
> either the Debtor release or the third-party release, and ex-
> cept as otherwise specifically provided in the Plan, no Excul-
> pated Party shall have or incur, and **each Exculpated Party
> is hereby exculpated from, any liability for damages
> based on the negotiation, execution and implementa-
> tion of any transactions or actions approved by the
> Bankruptcy Court** in the Chapter 11 Cases, except for
> Causes of Action related to any act or omission that is deter-
> mined in a Final Order to have constituted **actual fraud,
> willful misconduct, or gross negligence**[.] . . .

> [T]he Plan contemplates certain rebalancing transactions and
> the completion of distributions of cryptocurrencies to credi-
> tors. **The Exculpated Parties shall have no liability for,
> and are exculpated from, any claim for fines, penalties,
> damages, or other liabilities based on their execution
> and completion of the rebalancing transactions** and the
> distribution of cryptocurrencies to creditors in the manner
> provided in the Plan.

9

For the avoidance of doubt, the foregoing paragraph reflects the fact that Confirmation of the Plan requires the Exculpated Parties to engage in certain rebalancing transactions and distributions of cryptocurrencies and the fact that no regulatory authority has taken the position during the Combined Hearing that such conduct would violate applicable laws or regulations. Nothing in this provision shall limit in any way the powers of any Governmental Unit to contend that any rebalancing transaction should be stopped or prevented, or that any other action contemplated by the Plan should be enjoined or prevented from proceeding further. …[3]

ER1057 (emphases added).

As the bankruptcy court later explained, this exculpatory language is "specifically limited to the fact that the parties must buy and sell cryptocurrencies as part of the portfolio rebalancing that the plan requires, and must distribute cryptocurrencies to customers. The point is to protect the parties from belated allegations that those very activities are somehow violative of

---

[3]   The Plan, as modified by the Confirmation Order, defines "Exculpated Parties" as follows:

> (a) each of the Debtors; (b) the Committee, and each of the members thereof, solely in their capacity as such; (c) each of the Released Professionals; (d) each of the Released Voyager Employees; (e) the Plan Administrator; (f) the Distribution Agent; (g) each of the Independent Directors; and (h) any other person acting in a fiduciary capacity on behalf of the Debtors in connection with the negotiation, execution, and implementation of any transactions or actions approved by the Bankruptcy Court in the Chapter 11 Cases.

ER1058.

law and that parties should be penalized just for doing what I have ordered them to do." ER1236.

In other words, the only conduct that the exculpation provision covers is the cryptocurrency transactions in and of themselves—specifically, the buying, selling, transferring, and distributing of cryptocurrency that is necessary to complete the rebalancing and distribution transactions. That is all. The exculpation provision does not apply to any other potentially unlawful or criminal conduct that could conceivably occur *in connection with* these transactions; it simply covers executing the transactions themselves.

**6.** The government appealed the Confirmation Order, and it sought a stay pending appeal in the bankruptcy court. In its motion, the government again did not take the position that any of the Plan's contemplated transactions would actually violate the law. Instead, the government simply argued that "[o]ne can imagine any number of laws or regulations [the] Debtors and others may violate after the Plan's effective date—tax laws, environmental laws, securities laws, and criminal laws, among others, in connection with whatever steps they take to effectuate the Plan." Bankr. Dkt. 1182, at 31.

The bankruptcy court denied the motion for stay. The court explained that, pursuant to bankruptcy code section 1142(a), the effect of the Confirmation Order is that "certain parties will be obligated to do what the plan

11

calls for regarding the rebalancing of cryptocurrency portfolios and the distribution of cryptocurrencies to customers." ER1233-34. In addressing the government's argument that it was likely to succeed on the merits of its appeal, the bankruptcy court plainly stated: "the Government's papers exaggerate and in some places mischaracterize what I have done and the authorities on which I have relied, and in other instances rely on hyperbole or on 'straw man' arguments." ER1232. With regards to the government's argument that the Confirmation Order infringed on the government's police powers, the bankruptcy court stated as follows:

> I have not "enjoined" the Government's exercises of police and regulatory powers, I have not "prospectively immunized" the parties from enforcement actions, and I have not barred regulatory actions to stop the contemplated transactions. The Government's arguments to the contrary are just hyperbole. I have made it quite clear that the Government can step in at any time if (due to changing or evolving regulatory views) the Government thinks the rebalancing transactions or cryptocurrency distributions should be stopped. My order also made quite clear that I have not purported to limit the liability of any person for anything they have done that I have not explicitly authorized and/or directed them to do. The Order that I have entered is narrow in scope and is limited to the protection of people who, at least for now and in the absence of regulatory action, will have to do what my order requires.

ER1241.

The bankruptcy court also noted the harm to creditors that would result from a stay of the Confirmation Order, explaining that "[a] stay could

threaten the availability of" the Binance.US Deal, which "would lead to a reduction of approximately $100 million in assets available for distribution to creditors," and that "[e]very delay in these cases means that further administrative expenses will be incurred, which just further reduces creditor recoveries." ER1245.

Finally, with regard to the government's argument that a stay of the Confirmation Order was in the public interest, the bankruptcy court reiterated:

> Notwithstanding the Government's efforts to manufacture ambiguities or excesses, (a) the first paragraph of the modified exculpation provision that I approved is almost identical to what the U.S. Trustee requested in its written objection, and (b) the last two paragraphs make clear that they do not prohibit any regulatory action, including actions to stop the cryptocurrency sales and distributions that the plan contemplates. The only thing my order does in that regard is to say that the parties who will engage in those activities under the authority and direction of my order – after the Government stated that it did not contend that the activities were illegal – should not in the interim be liable for doing what my order requires. I cannot imagine any "public interest" or equitable consideration that would require a different result.

ER1246.

**7.** The government next sought a stay from this Court. During oral argument, the Court again asked the government to specify exactly what type of conduct purportedly authorized under the Plan raised concerns of illegality. The government responded that it "can't say one way or the other"

13

and admitted that it was "trying to come up with hypotheticals, because this is future conduct." March 23, 2023 Stay Hearing Tr. (D.I. 57), at 12:15, 22–23. The government again declined to affirmatively claim that any conduct required under the Plan would violate the law, much less specifying how or why it might do so.

On March 27, 2023, the Court issued an order staying the execution of the Plan. D.I. 45. On March 31, 2023, Court issued an opinion outlining its reasoning. D.I. 53. The Court emphasized that, due to the time constraints posed by the emergency nature of the government's appeal, it had "not engage[d] . . . in an extensive analysis of the merits." *Id.* at 13 n.5. Instead, it noted that "the Government's application centers on potentially novel and admittedly difficult legal questions" which weighed in favor of granting a stay. *Id.* at 17. The Court did note, however, that "[i]t does appear likely that some species of quasi-judicial immunity applies to at least some parties executing the rebalancing transactions." *Id.* at 15.

**8.** Both Voyager and the Committee immediately filed notices of appeal. D.I. 52, 54. On April 3, each appellant filed a motion to vacate this Court's stay. *See* App. Dkt. 29, 30. The Second Circuit held oral argument on April 11. App. Dkt. 60. It concluded that it lacked jurisdiction over the interlocutory appeal and dismissed the case, without expressing any views as to the merits of the government's arguments. App. Dkt. 75.

14

## SUMMARY OF THE ARGUMENT

**I.** As a threshold matter, the government's position is largely based on a misunderstanding of the scope and effect of the exculpation provision. The exculpation provision simply does not do what the government claims. Contrary to the government's belief, the provision only applies to claims or enforcement actions based on the premise that the transactions ordered or contemplated by the Plan are *inherently* unlawful—such as the government's hinted-at but unstated theory that some of the transactions may be unregistered securities dealings. The bankruptcy court itself said as much multiple times—and it is settled law that a court's interpretation of its own order is to be afforded significant respect. Nor does the language of the provision at all resemble an injunction on prosecutions, or otherwise contemplate something other than an affirmative defense in subsequent litigation, as the government repeatedly contends.

**II.** With those misunderstandings cleared away, there is straightforward authority for the exculpation provision in the bankruptcy code and decisional law respecting quasi-judicial immunity. In short, Section 105 of the code empowers the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the bankruptcy code]" (11 U.S.C. § 105(a))—and because Section 1142 provides that "the debtor" and other related entities "*shall* carry out the plan and

15

*shall* comply with any orders of the court" (11 U.S.C. § 1142(a) (emphases added)), it can sometimes be "necessary or appropriate" to immunize those parties from liability that might otherwise arise merely from their compliance with the court's orders.

Indeed, the Seventh Circuit has explicitly held as much (*see In re Airadigm Commc'ns, Inc.*, 519 F.3d 640, 655-658 (7th Cir. 2008)), and exculpation provisions like this one are a routine feature of Chapter 11 bankruptcies in this district. The government's statutory arguments to the contrary fail to persuade.

**III.** Finally, the government gestures to the separation of powers, due process, and sovereign immunity as reasons why exculpation should not be permitted—but none of its arguments hold any water. With the provision properly understood as simply providing assurances about the scope of quasi-judicial immunity that will apply in a future enforcement proceeding, it does not intrude on the executive power. And the government's due process and sovereign immunity arguments are plainly foreclosed by black-letter law. In sum, the exculpation provision both lawful and "necessary or appropriate" under the particular circumstances of this bankruptcy (11 U.S.C. § 105(a)), and the court should affirm the well-reasoned decision of the bankruptcy court adopting it.

16

## ARGUMENT

This appeal comes to the Court in an appellate posture pursuant to 28 U.S.C. § 158(a). "A bankruptcy court's decision to approve a settlement should not be overturned unless it is manifestly erroneous and a clear abuse of discretion." *Matter of 47-49 Charles Street, Inc.*, 209 B.R. 618, 620 (S.D.N.Y. 1997); *accord Six West Retail Acquisition, Inc. v. Loews Cineplex Entertainment Corp.*, 286 B.R. 239, 247-48 (S.D.N.Y. 2002).

In general, "in bankruptcy appeals, the district court reviews the bankruptcy court's factual findings for clear error and its conclusions of law *de novo.*" *In re Perdue Pharms., L.P.*, 635 B.R. 26, 79 (S.D.N.Y. 2021) (quoting *In re Charter Comms., Inc.*, 691 F.3d 476, 482-83 (2d Cir. 2012)). The "clear error standard is a deferential one." *In re Motors Liquidation Co.*, 829 F.3d 135, 158 (2d Cir. 2016). A factual finding is clearly erroneous only of the Court is "left with the definite and firm conviction that a mistake has been committed." *In re Lehman Bros. 3 Holdings, Inc.*, 855 F.3d 459, 469 (2d Cir. 2017).

Under those standards, the government cannot prevail.

## I. The government misunderstands the scope and nature of the exculpation provision.

**a.** To begin, much of the government's argument is premised on several fundamental misunderstandings about the scope of what the bank-

ruptcy court actually ordered. *See, e.g.* Gov't Br. 3 (asserting that exculpation "for rebalancing and distributing cryptocurrencies in the manner provided in the Plan" is subject to "no carve out for fraud, misconduct, or gross negligence.").

The bankruptcy court was clear that its approval of the exculpation provision does not preclude liability for misconduct that is merely *in connection with* the transactions required by the Plan; rather, it exculpates parties from liability premised on a theory that the transactions *themselves* are unlawful by their nature:

> The third and fourth paragraphs of the exculpation provisions that I approved are specifically limited to the fact that the parties must buy and sell cryptocurrencies as part of the portfolio rebalancing that the plan requires, and must distribute cryptocurrencies to customers. The point is to protect the parties from belated allegations that *those very activities* are somehow violative of law and that parties should be penalized *just* for doing what I have ordered them to do.

ER1236 (emphasis added); *see also* ER1244 ("My Order just says that in the meantime"—*i.e.*, unless and until the government exercises its right to "take action to stop the Debtors' cryptocurrency trades and/or cryptocurrency distributions" via injunctive relief—"the people and entities who do what my order requires will not themselves be liable for having done so.").

The bankruptcy court also expressly rejected as a "red herring[]" the specific notion that the government continues to press on appeal: that its

"Order might somehow be interpreted as immunizing fraud, or theft, or tax avoidance." ER1236; *see also id.* ("Although the plan and the Confirmation Order require the parties to sell cryptocurrencies, they certainly do not require (or permit) anyone to commit fraud in the course of doing so, or to engage in theft in the course of doing so.") (citations omitted); ER1241 ("My order also made quite clear that I have not purported to limit the liability of any person for anything they have done that I have not explicitly authorized and/or directed them to do."). Thus, contrary to the government's contention, the "carve out for fraud, misconduct, or gross negligence" (Gov't Br. 3) *does* apply to the rebalancing transactions and distributions.

Those interpretations of the exculpation language, by the bankruptcy court itself, are entitled to significant deference in determining the meaning of that language. *See, e.g.*, *United States v. Spallone*, 399 F.3d 415, 423 (2d Cir. 2005) (collecting cases) ("When an issuing judge interprets his own orders, we accord substantial deference to the draftsman," and a "judge's construction of an ambiguity in his own words" is definitive absent an "abuse of discretion."); *In re Casse*, 198 F.3d 327, 333 (2d Cir. 1999) ("[I]f a bankruptcy order . . . is ambiguous . . . the bankruptcy court's interpretation of its own order warrants customary appellate deference. The bankruptcy court was in the best position to interpret its own orders.") (quotation marks omitted).

19

As a result, all the exculpation provision does is prevent the government from imposing *ex post* liability on the very transactions contemplated by the bankruptcy court-ordered restructuring Plan—for example, by deeming them to be unlawful transactions in unregistered securities. It does not insulate from scrutiny criminal or other unlawful activity that goes *beyond* simply executing the transactions contemplated by the Plan. Thus, in the government's hypothetical, if "[a] person . . . accomplish[ed] a court-approved (or court-directed) transaction by illegal means, such as by funding a court-authorized purchase with stolen property" (Gov't Br. 49), that person would not be immunized from liability for transacting in stolen property. The government's passing suggestion to the contrary (at 53) does not grapple whatsoever with the deference due to the bankruptcy court's interpretation of its own order, and is meritless.

**b.** Nor, contrary to the concern expressed by the Court in its stay order (D.I. 53 at 17), does the exculpation clause purport to "us[e] generic equity principles to enjoin a future criminal prosecution." Indeed, as the bankruptcy court explained, "I have *not* 'enjoined' the Government's exercises of police and regulatory powers." ER1241 (emphasis added).

The text of the exculpation provision makes this point plain. Unlike an injunction, the exculpation clause does not operate on the government, prohibiting it from taking action (for example, by instituting a prosecution).

20

*See Nken v. Holder*, 556 U.S. 418, 428 (2009) ("[A]n injunction is a judicial process or mandate operating *in personam* . . . . [T]he order is directed at someone, and governs that party's conduct."). Instead, the exculpation provision simply provides that "[t]he Exculpated Parties *shall have no liability for*" claims "based on their execution and completion of the rebalancing transactions." ER1057 (emphasis added). That language does not enjoin a prosecution; it extinguishes liability on the merits.[4]

Thus, the government's assertion that the exculpation clause goes beyond the scope of the quasi-judicial immunity traditionally afforded to bankruptcy-court agents because it is not raised as an affirmative defense (*see* Gov't Br. 44-49) is simply a misreading of the bankruptcy court's order. *See also* pages 31-37, *infra* (explaining that the exculpation clause is a permissible application of the quasi-judicial immunity doctrine). There is no reason whatsoever why the exculpation provided by the order would *not* be "raised if and when an enforcement action is actually brought," at which point the parties could litigate whether "the[] challenged actions in a particular factual context fell within the protected scope." *Id.* at 44-45.

---

[4]   The exculpation clause here is thus quite different from Section 524(g), which does not merely release liability, but explicitly permits "an injunction . . . to enjoin entities from taking legal action" to collect from an asbestos trust. 11 U.S.C. § 524(g)(1)(B); *cf.* Gov't Br. 23.

Again, the bankruptcy court itself already explained exactly this, stating that the exculpation clause simply serves to formalize "just what activities I have authorized and that I thereby intend to be subject to the relevant immunities," but acknowledging that this "immunity" would still need to be "assert[ed]" by the party claiming its protection in "a future court," which would then "rule on" its applicability. ER1242. The court rejected the government's argument not because it viewed exculpation as something other than an affirmative defense in future proceedings, but because it found it appropriate to provide "guidance" to "the persons who may have to assert such defenses (and the courts who need to rule on them)" "as to what exactly it is that I think the confirmation order requires" and therefore what conduct is exculpated. *Id.*

There is no indication from this discussion by the bankruptcy court—which, again, is to be afforded deference in its interpretation of the exculpation language—that the government would somehow be enjoined from instituting a prosecution, rather than being foreclosed on the merits from *convicting* those who have done nothing more than "what [the bankruptcy court] ha[s] ordered them to do." ER1236. Conversely, if a party's conduct falls outside the exculpation provision—perhaps because an individual acts with gross negligence or because the individual does something other than that required to effectuate the Plan—the affirmative defense would fail.

## II.   The bankruptcy court had authority to issue the exculpation provision.

With those misunderstandings cleared away, it is apparent that the exculpation provision here is a permissible exercise of the bankruptcy court's authority.

### A.   The exculpation provision is authorized by the bankruptcy code.

**1.** The "central purpose of the bankruptcy code" is to allow debtors a "fresh start in life and a clear field unburdened by the existence of old debts." *In re Anderson*, 884 F.3d 382, 389 (2d Cir. 2018) (quoting *In re Bogdanovich*, 292 F.3d 104, 107 (2d Cir. 2002). To this end, the code provides several chapters under which debtors can discharge their obligations. *See* 11 U.S.C. §§ 727, 944, 1192, 1228, 1328. Here, Voyager filed bankruptcy under Chapter 11, under which a "debtor and creditors try to negotiate a plan that will govern the distribution of valuable assets from the debtor's estate and often keep the business operating as a going concern." *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 455 (2017); *see* 11 U.S.C. §§ 1121, 1123, 1129, 1141.

The principal goal in Chapter 11 proceedings is to reach a plan that can be approved by the bankruptcy court. *Czyzewski*, 580 U.S. at 455. This is a desirable outcome both for the debtor—a corporation that can continue to operate—and for the creditors, who must "all . . . accept the plan or . . .

23

receive not less than they would receive under a Chapter 7 liquidation." *Toibb v. Radloff*, 501 U.S. 157, 164 (1991) (citing 11 U.S.C. § 1129(a)(7)). Because conversion to a Chapter 7 liquidation is the result when the parties "confess[] an inability to find a plan," *Czyzewski*, 580 U.S. at 456, and because "creditors cannot be expected to approve a plan in which they would receive less than they would from an immediate liquidation of the debtor's assets," *Toibb*, 501 U.S. at 164, the creditors are almost always better off under a court-approved Chapter 11 plan. Chapter 11 plans must also meet a variety of other statutory requirements, including being "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129.

Once the bankruptcy court adopts and imposes a Chapter 11 plan, the bankruptcy code provides that "the debtor and any entity organized or to be organized for the purpose of carrying out the plan *shall* carry out the plan and *shall* comply with any orders of the court" "[n]otwithstanding any otherwise applicable nonbankruptcy law, rule, or regulation relating to financial condition." 11 U.S.C. § 1142(a) (emphasis added). The same statute permits the bankruptcy court to "direct the debtor and any other necessary party to execute or deliver or to join in the execution or delivery of any instrument required to effect a transfer of property dealt with by a confirmed plan, and to perform any other act . . . necessary for the consummation of the plan." *Id.* § 1142(b).

24

That is what the bankruptcy court did here, approving a Plan that authorized the Debtors to "rebalance their Cryptocurrency portfolio to ensure that the Debtors can effectuate *pro rata* in-kind distributions" of the same types of crypto that the creditors held on the Voyager platform. ER1140; *accord* ER1212 ("[C]onfirmation of the plan will require the Debtors and their respective personnel and representatives . . . to complete the rebalancing transactions that the Plan contemplates and to make the distributions of cryptocurrencies that the Plan contemplates.").

On the petition date, Voyager did not have enough crypto to satisfy its creditors and did not have the right types of crypto to satisfy its creditors. For example, on the petition date, Voyager had a shortage of Bitcoin and USDC (a stablecoin tied to the price of the U.S. dollar) but a surplus of other less popular crypto, often referred to as "altcoins." This imbalance was largely due to the fact that the key loans that went badly for Voyager were denominated in Bitcoin and USDC.

**2.** To ensure that plans adopted to advance the common interests of debtors and creditors alike can be effectuated, the bankruptcy code grants the bankruptcy court authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105. Similarly, another provision allows bankruptcy courts to au-

25

thorize plans which "include any other appropriate provision not inconsistent with the applicable provisions of this title." 11 U.S.C. § 1123(b)(6). Under these statutory provisions, "[i]t is well settled that bankruptcy courts are courts of equity, empowered to invoke equitable principles to achieve fairness and justice in the reorganization process." *In re Momentum Mfg. Corp.*, 25 F.3d 1132, 1136 (2d Cir. 1994).

Exculpation provisions like the one here are clear and well-recognized applications of these statutes. An exculpation provision "is a protection not only of court-supervised fiduciaries, but also of court-supervised and court-approved transactions." *In re Aegean Marine Petroleum Network Inc.*, 599 B.R. 717, 721 (Bankr. S.D.N.Y. 2019). Because Section 1142 obligates parties to carry out the bankruptcy court's orders, allowing liability flowing from performance of that duty would permit others to "undermine or second-guess th[e] Court's determinations." *Id.* What is more, the parties themselves would be placed in an untenable position of having to constantly double check the bankruptcy court's work and to weigh their own legal and factual judgments regarding the legality of certain conduct against those of the court, chilling them in the exercise of their appointed duties. And if carrying out a bankruptcy court's orders to facilitate a plan can expose an individual to civil or criminal liability, "it will be extremely difficult to find members to serve" in that capacity. 7 *Collier on Bankruptcy* ¶ 1103.05 [4] (16th ed.

2023); *cf. Taggart v. Lorenzen*, 139 S. Ct. 1795, 1801 (2019) (bankruptcy courts are empowered to enforce their orders through civil contempt).

To avoid these negative outcomes, "[i]n the absence of gross negligence or intentional wrongdoing, parties should not be liable for doing things that the Court authorized them to do and that the Court decided were reasonable things to do." 4 *Collier on Bankruptcy*, *supra*, ¶ 524.05, n.15b (quoting *Aegean*, 599 B.R. at 720-721). Courts in this District have thus routinely approved Chapter 11 plans containing exculpation provisions like the one at issue here. *See, e.g.*, *In re Enron Corp.*, 326 B.R. 497, 504 (S.D.N.Y. 2005) (noting that such provisions are "reasonable and customary and in the best interests of the estates"); *In re Oneida Ltd.*, 351 B.R. 79, 94 n.22 (S.D.N.Y. 2006) (noting that an exculpation provision was "standard in this district"); *In re Granite Broad. Corp.*, 369 B.R. 120, 139 (S.D.N.Y. 2007) (approving an exculpation provision that "generally follows the text that has become standard in this district") (quotation marks omitted).

That is, the statutory authority for the bankruptcy court's order is as follows: Section 105 empowers the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the bankruptcy code]" (11 U.S.C. § 105(a))—and because Section 1142 provides that "the debtor" and other related entities "*shall* carry out the plan and *shall* comply with any orders of the court" (11 U.S.C. § 1142(a)

27

(emphases added)), it can sometimes be "necessary or appropriate" to immunize those parties from liability that might otherwise arise merely from their compliance with the court's orders.[5]

Indeed, that is precisely what the Seventh Circuit held in *Airadigm*. There, the bankruptcy court granted a broad release to a third-party provider of financing from "all liability 'in connection with' the reorganization except for willful misconduct," including with respect to "the consummation of th[e] Plan, or the administration of th[e] Plan or property to be distributed under th[e] Plan," and including liability to a federal government agency (the FCC). *In re Airadigm Commc'ns, Inc.*, 519 F.3d 640, 655 (7th Cir. 2008). As the Seventh Circuit explained, this was an appropriate exercise of the bankruptcy court's "traditionally broad" equitable powers as "codifie[d]" by Section 105, because the release of liability was necessary to secure the financier's participation in the reorganization: "Given how narrow the limitation is and how essential TDS [the financier] was for the reorganization, the release is 'appropriate' and thus within the bankruptcy court's powers." *Id.* at 657-658; *see also id.* at 657 ("[W]hether a release is 'appropriate' for

---

[5]   The government's overall framing that "bankruptcy exists to adjust the debtor-creditor relationship" (Gov't Br. 23; *see id.* at 20-23), is therefore correct, but does not help its case. The exculpation provision extinguishes liabilities of individuals and entities executing the bankruptcy court's orders, but it does so in service of ensuring that the reorganization plan is able to be carried out—thus "adjust[ing] the debtor-creditor relationship."

the reorganization [under Section 105] is fact intensive and depends on the nature of the reorganization.").[6]

Just so here: Individuals and entities performing court-authorized and court-ordered transactions are released from liability *only* with respect to those transactions and *only* to the extent there is no fraud, willful misconduct, or gross negligence. And just as in *Airadigm*, the government here *retains* the power to intervene to prevent future transactions it deems to be unlawful—it just cannot stand mute now, and prosecute later for conduct to which it has not objected during the bankruptcy. *Compare* 519 F.3d at 657-658 (noting that "other provisions of the plan . . . expressly preserve[] the FCC's regulatory power with respect to the licenses," preventing parties from "skirting the FCC's regulations"), *with* ER1244 ("I could not have said any more clearly that the Government is free at any time to take action to stop the Debtors' cryptocurrency trades and/or cryptocurrency distributions if the Government decides that those activities should be stopped.").

**3.** The government resists this conclusion on statutory interpretation grounds, asserting that Section 105 cannot be the source of the bankruptcy court's authority because "this grant of general authority does not allow

---

[6]   The government's only response to *Airadigm* is that "the Seventh Circuit did not consider" "the constitutional questions the Government now raises," and is therefore wrong. Gov't Br. 43. As described below, however, the government's constitutional arguments are meritless. *See* pages 38-46, *infra*.

29

bankruptcy courts to enter orders that would contravene the Code." Gov't Br. 25 (citing *Law v. Siegel*, 571 U.S. 415, 421 (2014)).

But what *Law* actually says is that, "in exercising" its Section 105(a) "powers, a bankruptcy court may not contravene *specific statutory provisions*." *Law*, 571 U.S. at 421 (emphasis added); *see also id.* ("It is hornbook law that § 105(a) 'does not allow the bankruptcy court to override *explicit mandates* of other sections of the Bankruptcy Code.'") (quoting 2 *Collier on Bankruptcy* ¶ 105.01[2], p.105-106 (13th ed. 2013)) (emphasis added); *id.* (Section 105(a) "must yield to a *specific prohibition* found elsewhere" in the statute) (emphasis added).

Of course, there *is no* "specific statutory provision[]," "explicit mandate[]" or "specific prohibition" in the bankruptcy code that prohibits exculpation clauses. The government's contrary argument relies not on a specific prohibition in the text, but on negative-implication reasoning, arguing that the existence of 11 U.S.C. § 1125(e), which provides categorical immunity to bankruptcy parties under certain narrow circumstances, somehow forecloses the power exercised by the bankruptcy court under Section 105 here. *See* Gov't Br. 24-25.

But the conclusion simply does not follow from the premise: Congress's choice (embodied in Section 1125(e)) that immunity is *always* appropriate in one narrow circumstance does nothing to indicate that exculpation

30

will *never* be "necessary or appropriate" (11 U.S.C. § 105(a)) under other circumstances, and thus authorized under Section 105. *See, e.g.*, *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) ("We do not read the enumeration of one case to exclude another unless it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it."); *Bloom v. Azar*, 976 F.3d 157, 162 (2d Cir. 2020) ("The Supreme Court has explained that the 'force of any negative implication'" reasoning "depends on context," and applies only "when circumstances support[] a sensible inference that the term left out must have been meant to be excluded.") (quoting *NLRB v. Sw. Gen., Inc.*, 580 U.S. 288, 303 (2017)).[7] Again, the government has done nothing to discredit Section 105(a) as the statutory source of authority for the bankruptcy court's order.

## B.  The exculpation provision is an application of quasi-judicial immunity.

**1.** Moreover, the widely accepted, forward-looking exculpation provisions that have become common in this District are consistent with—and may be viewed as an application of—another body of law holding that indi-

---

[7]  The same is true of the government's reliance Section 524(e), which does not merely permit a bankruptcy court to release liability, but explicitly permits "[A]n injunction" against "taking legal action" under certain circumstances. 11 U.S.C. § 524(g)(1)(B); *see* page 21 n.4, *supra*.

viduals or entities acting as agents of the bankruptcy court, such as bankruptcy trustees, "are generally immune to the extent that they are acting with the approval of the court." *Gross v. Rell*, 695 F.3d 211, 216 (2d Cir. 2012) (collecting cases); *see also* ER1209-10 (confirmation order) (noting that exculpation provisions are "based on" this quasi-judicial immunity); *Aegean*, 599 B.R. at 720 (same); ER1242 (exculpation provision here is intended as "guidance" to "a future court" "as to just what activities I have authorized and that I thereby intend to be subject to the relevant immunities.").

That is, court agents like bankruptcy trustees "are entitled to broad immunity from suit when acting within the scope of their authority and pursuant to court order." *Gross*, 695 F.3d at 216 (quoting *Bennett v. Williams*, 892 F.2d 822, 823 (9th Cir. 1989)); *see also, e.g.*, *In re Harris*, 590 F.3d 730, 742 (9th Cir. 2009) ("[C]ourt appointed officers who represent the estate are the functional equivalent of a trustee," and are therefore also immune "when acting within the scope of their authority and pursuant to court order.") (quoting *In re Crown Vantage, Inc.*, 421 F.3d 963, 973 (9th Cir. 2005)); *Boullion v. McClanahan*, 639 F.2d 213, 214 (5th Cir. 1981) ("[A]n arm of the Court [who] sought and obtained court approval of his actions . . . is entitled to derived immunity"). And "[i]t is well settled that" this protection extends to "estate fiduciaries like a committee, its members, and estate

professionals"—and even to non-fiduciaries to the extent necessary based on the specific facts of a plan—in addition to bankruptcy trustees. *In re LATAM Airlines Grp. S.A.*, 2022 WL 2206829, at *50 (Bankr. S.D.N.Y. 2022) (collecting cases).

As one court of appeals put it, "[q]uasi-judicial immunity extends to those persons performing tasks so integral or intertwined with the judicial process that these persons are considered an arm of the judicial officer who is immune," and "enforcing or executing a court order is intrinsically associated with a judicial proceeding" so as to generate immunity. *Bush v. Rauch*, 38 F.3d 842, 847 (6th Cir. 1994) (collecting cases); *see also id.* (explaining that it is "the nature of the function performed, not the identity of the actor who performed it" that is relevant to quasi-judicial immunity). As the court explained:

> [O]fficials must be permitted to rely upon a judge's findings and determinations to preserve the integrity of the court's authority and ability to function. It does not seem logical to grant immunity to a judge in making a judicial determination and then hold the official enforcing or relying on that determination liable for failing to question the judge's findings. This would result in the official second-guessing the judge who is primarily responsible for interpreting and applying the law.

*Id.* at 848; *accord, e.g.*, *Aegean*, 599 B.R. at 721 ("If this Court has approved a transaction as being in the best interests of the estate and has authorized the transaction to proceed, then the parties to those transactions should…

33

not be subject to claims that effectively seek to undermine or second-guess this Court's determinations. In the absence of gross negligence or intentional wrongdoing, parties should not be liable for doing things that the Court authorized them to do and that the Court decided were reasonable things to do.").

The upshot is that, if a party has a dispute with what a court has ordered, that party's recourse is to go before the judge who ordered it, or to take an appeal to a higher court on the substance of the order; it cannot instead seek to hold liable the entities simply carrying out the actions approved as lawful and ordered by the court, effectively mounting a collateral attack on the court's judgment. *Bush*, 38 F.3d at 847. Just so here, where the government had every opportunity to challenge the restructuring on the basis that it contemplated unlawful transactions, yet failed to do so. The government's recourse in this scenario is that expressly contemplated by the exculpation clause: If it reaches a firm conclusion that any transactions are illegal, it may return to the bankruptcy court to seek injunctive relief stopping those transactions. *See* pages 10, 12, *supra*. What it cannot do is hold liable the entities that merely carry out the transactions approved by the court.

The exculpation clause here is simply an instantiation of these principles. And as the bankruptcy court explained, it made sense for the court to

provide *ex ante* "guidance . . . as to just what activities I have authorized and that I therefore intend to be subject to the relevant immunities" rather than litigate immunity without that guidance in a potential future enforcement proceeding (ER1242)—particularly given the government's refusal to clearly state whether it believed the transactions contemplated by the Plan would be inherently unlawful. With the government playing coy about its intentions by not objecting to the Plan as illegal yet "reserv[ing] the right to penalize" "the very cryptocurrency trades and cryptocurrency distributions" laid out in the Plan (ER1242), crystallizing *ex post* principles of quasi-judicial immunity into *ex ante* assurances to the parties and associated professionals that would have to carry out those transactions makes ample practical sense.

    **2.** In its stay order, the Court acknowledged that it is "likely that some species of quasi-judicial immunity applies to at least some parties executing the rebalancing transactions." D.I. 53 at 15. The court nevertheless found the exculpation provision potentially objectionable, on the basis that it "appears to go further than the quasi-judicial immunity doctrine allows." *Id.* at 14.

    Respectfully, the Court's reservations on this score were unfounded. Apart from the government's incorrect notion that exculpation under the provision would be raised as something other than an affirmative defense

35

(*see* pages 20-22, *supra*), the Court noted that "[j]udicial immunity often does not, for example, bar injunctive relief," while the exculpation provision here "limits claims for 'fines, penalties, damages, or other liabilities.'" D.I. 53, at 16. Those two propositions, however, are entirely consistent: No item in the list of "fines, penalties, damages, or other liabilities" encompasses injunctive relief—and indeed, the plan expressly contemplates that the government may seek injunctive relief to stop a transaction before it takes place: "Nothing in this provision *shall limit in any way* the powers of any Governmental Unit to contend that any rebalancing transaction should be stopped or prevented, or that any other action contemplated by the Plan should be enjoined or prevented from proceeding further." ER1215-16 (emphasis added).[8]

The Court also acknowledged that courts have applied judicial immunity even to criminal liability where acts were taken in good faith (*see Braatelien v. United States*, 147 F.2d 888, 895 (8th Cir. 1945); *In re Kendall*, 712 F.3d 814, 833-37 (3d Cir. 2013) (Roth, J., concurring) (collecting authorities)), but suggested that the exculpation provision goes further because "a criminal act that was not done in good faith also might fall short of willful

---

[8]  *See also* ER1244 ("I could not have said any more clearly that the Government is free at any time to take action to stop the Debtors' cryptocurrency trades and/or cryptocurrency distributions if the Government decides that those activities should be stopped.")

misconduct or gross negligence," and thus still be within the scope of the exculpation provision. D.I. 53 at 16-17. The Committee respectfully disagrees: An act that was "not done in good faith" by definition cannot "fall short of willful misconduct." *See Good Faith*, Black's Law Dictionary (11th ed. 2019) ("A state of mind consisting in . . . absence of intent to defraud or seek unconscionable advantage").

The exculpation clause thus merely serves as judicial confirmation of the backdrop principles of immunity that shield individuals from liability for performing court orders. The bankruptcy court's case-specific articulation of that principle is no doubt warranted here, where the government refuses to represent whether it believes the steps ordered are indeed lawful.

\* \* \*

While we would of course disagree, should the Court rule that the exculpation provision is unauthorized or otherwise unlawful, we would respectfully request that the Court make clear in its ruling that any potential problems with the provision are limited to its application to the appellants (*i.e.*, the U.S. government). Any broader ruling—apart from going beyond the arguments advanced by the government here—would have significant and widespread implications for exculpation provisions in civil litigation involving parties not included in this action, not just in this case, but in Chapter 11 cases throughout the United States.

37

## III.  The exculpation provision is not barred by constitutional concerns or sovereign immunity.

Without a compelling response to the authority for exculpation in the bankruptcy code and decisional law, the government makes a vague appeal to supposed "constitutional concerns" about the separation of powers and due process. But these inchoate arguments fair no better than the government's statutory claims.

**1.** Before getting to the government's specific contentions, it critical to note that the quasi-judicial immunity that underlies exculpation clauses like this one actually *promotes* the proper separation of powers. If those who "act as an arm of the court in carrying out the court['s] order[s]" could be held liable, or even prosecuted, merely for following the directions of the court, "the integrity of the court's authority and ability to function" would be severely impinged. *Bush*, 38 F.3d at 847.

More generally, judicial immunity—from which quasi-judicial immunity of court agents is derived (*see, e.g.*, *Bush*, 38 F.3d at 847)—"protect[s] judicial independence by insulating judges from vexatious actions prosecuted by disgruntled litigants." *Forrester v. White*, 484 U.S. 219, 225 (1988); *see also id.* at 226 (the "rationale" for judicial immunity is "freeing the judicial process of harassment or intimidation"). And there is no more powerful potentially disgruntled litigant than the Executive Branch. *See, e.g.*, *Kendall*, 712 F.3d at 750 (Roth, J., concurring) ("If judges are protected

against civil actions for judicial acts, the reasons are more weighty that they should be protected against criminal actions.") (quotation marks omitted); *id.* ("Judges made timid because of fear of criminal prosecutions for errors in their decisions make poor public servants.") (quotation marks omitted).

That is, *allowing* the Executive Branch to prosecute or otherwise penalize those who execute a court's orders, merely for doing so, trammels the independence and integrity of the Judicial Branch.[9] The government's position here—that it *cannot* be stopped from prosecuting agents of the court simply for carrying out court orders—is itself on constitutionally thin ice.

**2.** Even setting aside those principles, the Court should not give credence the government's gestures toward separation of powers. Gov't Br. 31-34. Its claim boils down to the unsupported assertion that "no court—much less an Article I court—can require the Government to determine whether and to what extent proposed transactions or their manner of implementation might violate federal laws on pain of losing the ability to bring future

---

[9]   The government repeatedly characterizes the bankruptcy court as an "Article I court"—but that is not completely accurate. Though bankruptcy judges are not themselves Article III judges, they "are appointed and subject to removal by Article III judges," they "'serve as judicial officers of the United States district court,' and collectively 'constitute a unit of the district court' for that district." *Wellness Int'l Network Ltd. v. Sharif*, 135 S. Ct. 1932, 1945 (2015) (quoting *Peretz v. United States*, 501 U.S. 923, 937 (1991), and 28 U.S.C. §§ 151, 152(a)(1)).

civil or criminal claims." *Id.* at 32. According to the United States of America, the bankruptcy court has "arrogate[d] to itself the powers of the Executive and Legislative Branches in defiance of the Constitution"[10] by "effectively replac[ing] all applicable statutes of limitations." *Id.* at 31.

In light of this rhetoric, it is worth pausing to recall what the bankruptcy court actually approved here. The exculpation provision is not a broad license to ignore state or federal laws. To the contrary, the bankruptcy court explained that where "different regulatory requirements and licenses in . . . different states" prevent the Debtors and Binance.US from "mak[ing] in kind distributions to customers as soon as they become customers of Binance.US," the "plan itself does not have the power to sweep away the different regulations that apply in different states." ER1220. The clause does not exculpate any pre-bankruptcy criminal wrongdoing that might have led to Voyager's collapse. And it does not apply to conduct that constitutes actual fraud, willful misconduct, or gross negligence.

Instead, Congress has *required* the bankruptcy court to ascertain whether the proposed plan would violate federal laws, including criminal

---

[10]  The government makes a halfhearted claim that the bankruptcy court also usurped legislative authority, without any explanation. One might reasonably ask how the government can complain in the same paragraph that the bankruptcy court is an "Article I" court and still allege that it is improperly exercising Article I powers.

laws. The bankruptcy court can confirm only a plan that is "proposed in good faith and *not by any means forbidden by law*." 11 U.S.C. § 1129(a)(3) (emphasis added). That is just what the court did here. After a four-day confirmation hearing, the bankruptcy court here determined that this condition was satisfied. In particular, the court noted that "[t]he SEC and all other government agencies have had a full and fair opportunity to object if they believe the rebalancing transactions that I have previously approved and that are contemplated by the plan are illegal in any way, or if they believe that the distributions of cryptocurrencies and cash that are contemplated by the plan are violative in any way of any applicable statute, rule, or regulation." ER1191. "The plain fact is, however, that" these agencies have "not actually made any objection." *Id.*

That fact remains as true now as it was when the bankruptcy court first wrote it. That is, the only basis for the government's objection appears to be a desire to be able to prosecute individuals for court-ordered activities that the government has *never claimed are illegal*.

The government's separation-of-powers argument rings hollow in light of the Plan and the bankruptcy code. In contrast to the pre-enforcement challenges that the government invokes, Congress has here obligated the bankruptcy court to determine in advance whether compliance with the Plan would violate the law—the court can approve a plan only if it is not

41

illegal. 11 U.S.C. § 1129(a)(3). No one disputes that the court had such an obligation, or that confirmation of the Plan would obligate individuals to carry out the Plan's mandates "[n]otwithstanding any otherwise applicable nonbankruptcy law, rule or regulation relating to financial condition." 11 U.S.C. § 1142(a). The exculpation provision is a simple recognition of these obligations—it is not an arrogation of executive power.

The incoherence of the government's argument is especially clear in that there are at least three ways for it to ensure that the Plan does not require citizens to take unlawful actions. First, it can note any illegal conduct prior to confirmation; it did not do so here. Second, it can appeal the confirmation by identifying some provision of law that the Plan would violate; it has not done so here. Finally, the Plan *itself* leaves open the possibility that "the Government can step in any time if (due to changing or evolving regulatory views) the Government thinks the rebalancing transactions or cryptocurrency distributions should be stopped." ER1241. The government has bountiful options to compel whatever it believes the law to require.

Discontent with these options, the government's contrary approach is nothing short of terrifying—it brandishes the threat of unidentified criminal sanctions *tethered to the performance of court-ordered actions*, even though it is unwilling or unable to articulate what conduct it believes objec-

tionable so that the bankruptcy court and those it orders can conduct themselves accordingly. Unsurprisingly, courts have not adopted the government's approach—they routinely approve exculpation provisions that contain no special carve-out for claims by the government.[11] The government's only explanation for the myriad cases where bankruptcy courts have approved provisions with the exact feature the government now claims is a vast intrusion on its prerogative is that it never before bothered to object. This response defies credulity; the government was on notice and participated in each of these cases.

---

[11] *See, e.g.*, Order Confirming Chapter 11 Plan of Reorganization, Ex. A, Plan, Art. VIII.F, *In re Lakeland Tours, LLC*, No. 20-11647 (JLG) (Bankr. S.D.N.Y. Sept. 15, 2020) [Docket No. 191-1]; Order Confirming Chapter 11 Plan, Ex. A, Plan, Art. VIII.F, *In re Barneys New York, Inc.*, No. 19-36300 (CGM) (Bankr. S.D.N.Y. Feb. 5, 2020) [Docket No.789-1]; Order Confirming Chapter 11 Plan of Reorganization, Ex. A, Plan § 8.4, *In re Deluxe Entertainment Services Group Inc.*, No. 19-23774 (RDD) (Bankr. S.D.N.Y. Oct. 25, 2019) [Docket No. 96]; Order Confirming Chapter 11 Plan, Ex. 1, Plan, Art. VIII.E, I*n re Hollander Sleep Products, LLC*, No. 19-11608 (MEW) (Bankr. S.D.N.Y. Sep. 5, 2019) [Docket No. 356]; Order Confirming Chapter 11 Plan of Reorganization, Ex. A, Plan, Art. IX.D, *In re Fullbeauty Brands Holdings Corp.*, No. 19-22185 (RDD) (Bankr. S.D.N.Y. Feb. 5, 2019) [Docket No. 39]; Order Confirming Chapter 11 Plan of Reorganization, Ex. 1, Plan, Art. VIII.E, *In re Cenveo, Inc.*, No. 18-22178 (RDD) (Bankr. S.D.N.Y. Aug. 21, 2018) [Docket No. 685]; Order Confirming Chapter 11 Plan of Reorganization, Ex. 1, Plan, Art. IX.D, *In re Sbarro LLC*, No. 14-10557 (MG) (Bank. S.D.N.Y. May 19, 2014) [Docket No. 238]; Order Confirming Plan of Liquidation, Ex. A, Plan, Art. IX.F, *In re United Retail Group*, Inc. No 12-10405 (SMB) (Bank. S.D.N.Y. Sept. 18, 2012) [Docket No. 776]; Order Confirming Chapter 11 Plan of Reorganization, Ex. 1, Plan, Art. X.G, *In re FGIC Corp.*, No. 10-14215 (SMB) (Bankr. S.D.N.Y. Apr. 23, 2012) [Docket No. 314].

The government's refusal to take a firm position on which of the crypto transactions required by the Plan are illegal is consistent with how the government has been regulating crypto since its rise in popularity. For over a decade, the government has largely refused to make clear what conduct it believes is unlawful, favoring enforcement actions over legislation, tailored regulations, or clear policy guidance. The government is continuously auditioning new theories of criminality or regulatory violations concerning crypto activities—activities that have been occurring for years without incident. The government's inability to inform the public which crypto activities are illegal has raised the stakes of this exculpation provision. Here, the SEC, the Department of Justice, and a series of state regulators have voiced "concerns" or issued non-binding "staff statements" without ever revealing (or deciding) whether the actions ordered by the bankruptcy court would violate the law. Professionals charged with executing the crypto transactions required under the Plan understandably want—and deserve—exculpation. That is precisely why Judge Wiles issued the exculpation provision.

**3.** The government next devotes two paragraphs to a nonsensical argument that the exculpation provision violates "basic principles of notice and due process." Gov. Br. 34. But as the government admits, "governmental entities *have no right* to due process." *Id.* (citing *United States v. Cardinal Mine Supply*, 916 F.2d 1087, 1089 n.3 (6th Cir. 1990)) (emphasis added).

And the government has not even attempted to demonstrate that it has standing to assert the due process rights of nongovernmental entities, which it plainly lacks. *See, e.g.*, *Rynasko v. New York Univ.*, 63 F.4th 186, 193 (2d Cir. 2023) ("[A] litigant must ordinarily assert the litigant's own legal rights and interests and 'cannot rest [a] claim to relief on the legal rights or interests of third parties.'") (quoting *U.S. Dep't of Labor v. Triplett*, 494 U.S. 715, 720 (1990)); *In re Congregation Birchos Yosef*, 699 F. App'x 91, 92 (2d Cir. 2017) ("alternative theories of standing" may be "forfeited" if not "raised").

As for the government's assertion that, even for the government, "it is 'a basic principle of justice . . . that a reasonable opportunity to be heard must precede judicial denial of a party's claimed rights'" (Gov't Br. 35 (quoting *City of New York v. N.Y., N.H. & H.R. Co.*, 344 U.S. 293, 297 (1953)), the government here had *ample* "opportunity to be heard," and declined to argue to the bankruptcy court that any crypto transactions contemplated by the Plan here would be unlawful. Having done so, the government can hardly now invoke fairness principles to justify the prosecution of parties who will simply carry out the court-approved Plan.

**4.** Finally, the government suggests that sovereign immunity somehow bars the exculpation provision adopted here. *See* Gov't Br. 35-39. This argument, too, is nonsense. Nobody has suggested suing the government for anything, and the exculpation clause does not "exercise jurisdiction over the

45

United States" (Gov't Br. 36)—it merely sets out the scope of quasi-judicial immunity available based on the acts required by the Plan. *See* pages 31-37, *supra*.

But even if sovereign immunity were relevant, the Bankruptcy Code *does* contain a relevant waiver: 11 U.S.C. § 106 provides that "sovereign immunity is abrogated" by more than fifty provisions, specifically including Sections 105 and 1142, such that "[t]he court may hear and determine any issue arising with respect to the application of such sections to governmental units" and "may issue against a governmental unit an order, process, or judgment under such sections." *Id.* Applying Section 105 "to governmental units" is precisely what the bankruptcy court did here.

The government's only response to this explicit waiver of sovereign immunity for orders, like the exculpation clause here, that are premised on the bankruptcy court's Section 105 powers is to assert that Section 105 does not actually "empower[] bankruptcy courts to exculpate parties from liability to the United States, as discussed." Gov't Br. 37. But that is simply a repackaging of the government's merits position, not an independent bar to the exculpation clause. Thus, if we are right that Section 105 authorizes the bankruptcy court's action here (and we are), sovereign immunity poses no separate impediment.

46

The government also appears to suggest that sovereign immunity is particularly warranted because "[a]n Article I bankruptcy court lacks *any* power over criminal matters." Gov't Br. 38-39.[12] But that is beside the point—the cases cited by the government simply provide that bankruptcy courts "lack[] subject matter jurisdiction to enforce state or federal criminal laws." *Id.* (quoting *In re Grabis*, 2020 WL 7346467, at *12 n.71 (Bankr. S.D.N.Y. 2020)). That a bankruptcy court is not a valid forum for enforcing the criminal law and meting out criminal penalties says nothing about whether its equitable powers extend to exculpating those it orders to take action (essentially, the agents of the court) from liability for those very actions.

\* \* \*

In sum, while the government reaches for some theory—any theory— why the exculpation provision approved by the bankruptcy court is illegitimate, each of its attempts fail. The exculpation provision, which simply specifies the application of quasi-judicial immunity to the facts of this case,

---

[12] This Court raised similar concerns in its stay order. *See* D.I. 53 at 14. It also quoted case law for the proposition that "confirmation of a plan does not insulate debtors from prosecution for criminal activity, even if that activity is part of the plan itself" (*Id.* at 15 (quoting *Garvin v. Cook Invs. NW, SPNWY, LLC*, 922 F.3d 1031, 1036 (9th Cir. 2019))—but that is similarly not germane: We do not argue that confirmation of a plan, without more, precludes prosecution; our point is that an exculpation provision can do so, and no exculpation provision was involved in the *Garvin* case.

47

is well within the bankruptcy court's power because it is "necessary or appropriate" to the restructuring given the circumstances presented here. 11 U.S.C. § 105(a). In the bankruptcy court's own estimation—which must be credited absent abuse of discretion—all the clause does is prevent civil or criminal enforcement against the parties who must carry out the reorganization "just for doing what I have ordered them to do." ER1236. That is unexceptional, and amply justified here in light of the government's repeated refusal to take a position on whether the crypto transactions contemplated by the Plan may be viewed as inherently unlawful.

## CONCLUSION

The Court should affirm the judgment of the bankruptcy court and lift the stay pending appeal.

Dated: April 14, 2023

Respectfully submitted,

/s/ *Paul W. Hughes*

DARREN AZMAN
JOSEPH B. EVANS
   *McDermott Will & Emery LLP*
   *One Vanderbilt Avenue*
   *New York, NY 10017-3852*
   *(212) 574-5400*

PAUL W. HUGHES
ANDREW A. LYONS-BERG*
CHARLES SEIDELL*
   *McDermott Will & Emery LLP*
   *500 North Capitol Street NW*
   *Washington, DC 20001*
   *(202) 756-8000*

*pro hac vice* to be filed

*Counsel for the Official Committee
of Unsecured Creditors*

49

## CERTIFICATE OF COMPLIANCE

Pursuant to Bankruptcy Rule 8015(h), the undersigned counsel for Appellant certifies that this motion:

(i)      complies with Rule 8015(a)(7), because it contains 11,270 words, including footnotes and excluding the parts of the brief exempted by Rule 8015(g); and

(ii)     complies with the typeface requirements of Rule 8015(a)(5) and the type style requirements of Rule 8015(a)(6) because it has been prepared using Microsoft Office Word 2016 and is set in New Century Schoolbook font in a size equivalent to 14 points or larger.

Dated: April 14, 2023                          _/s/ Paul W. Hughes_

## CERTIFICATE OF SERVICE

I hereby certify that that on April 14, 2023, I filed the foregoing brief via the Court's CM/ECF system, which effected service on all registered parties to this case.


Dated: April 14, 2023                    /s/ *Paul W. Hughes*