23-cv-02171

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

In re Voyager Digital Holdings, Inc., et al, Debtors

United States of America, et al., Appellants,

v.

Voyager Digital Holdings, Inc., et al., Appellees

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## APPELLEES' BRIEF

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
Lamina Bowen
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, N.Y. 10022
(212) 446-4900
jsussberg@kirkland.com
cmarcus@kirkland.com
christine.okike@kirkland.com
allyson.smith@kirkland.com
lamina.bowen@kirkland.com

Michael B. Slade (admitted *pro hac vice*)
Richard U.S. Howell (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
300 N. LaSalle
Chicago, IL 60654
(312) 862-2000
michael.slade@kirkland.com
richard.howell@kirkland.com

George W. Hicks, Jr., P.C. (*pro hac vice* pending)
Aaron L. Nielson (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
1301 Penn. Ave., N.W.,
Washington, D.C. 20004
(202) 389-5000
george.hicks@kirkland.com
aaron.nielson@kirkland.com

April 14, 2023

## TABLE OF CONTENTS

INTRODUCTION................................................................1

BACKGROUND .................................................................4

I.    STATUTORY BACKGROUND ...............................4

II.   PROCEEDINGS BELOW......................................7

ARGUMENT .....................................................................18

I.    **Exculpation Clauses Are Commonplace Features of Complex Chapter 11 Plans.**...............................................**18**

     A.   The Bankruptcy Code Authorizes Exculpation Clauses. ...................18

     B.   Precedent Also Recognizes The Lawfulness of Exculpation Clauses...........................................................19

     C.   Broader Immunity Principles Also Support Exculpation Clauses...........................................................22

     D.   The Exculpation Clause Here Falls Squarely Within This Settled Authority. ................................................23

II.   **The Government's Arguments Are Unpersuasive. ...................26**

     A.   The Government's Statutory Arguments Are Flawed. ......................27

     B.   The Government's Constitutional Arguments Lack Merit. ...............37

     C.   The Government's Remaining Arguments Fail. ................................48

CONCLUSION..................................................................51

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aegean Marine Petroleum Network Inc.*,
  599 B.R. 717 (Bankr. S.D.N.Y. 2019)..........................................................*passim*

*In re Airadigm Commc'ns, Inc.*,
  519 F.3d 640 (7th Cir. 2008) ....................................................................*passim*

*In re Astria Health*,
  623 B.R. 793 (Bankr. E.D. Wash. 2021) ............................................................7

*Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
  526 U.S. 434 (1999)............................................................................................4

*In re Barneys New York, Inc.*,
  No. 19-36300 (Bankr. S.D.N.Y. Feb. 5, 2020)..................................................22

*Bennett v. Williams*,
  892 F.2d 822 (9th Cir. 1989) .............................................................................23

*Blixseth v. Credit Suisse*,
  961 F.3d 1074 (9th Cir. 2020) ............................................................5, 6, 7, 19

*In re Boy Scouts of America and Delaware BSA, LLC*,
  2023 WL 2662992 (D.Del. 2023)................................................................19, 31

*In re Cenveo, Inc.*,
  No. 18-22178 (Bankr. S.D.N.Y. Aug. 21, 2018)...............................................22

*CFTC v. Zhao, et al.*,
  No. 23-cv-01887 (N.D. Ill. Mar. 27, 2023) ......................................................25

*In re Charter Commc'ns, Inc.*,
  691 F.3d 476 (2d Cir. 2012) ..............................................................................17

*Czyzewski v. Jevic Holding Corp.*,
  137 S.Ct. 973 (2017)............................................................................................4

*In re Deluxe Entertainment Services Group Inc.*,
    No. 19-23774 (Bankr. S.D.N.Y. Oct. 25, 2019) ...................................................22

*In re Ditech Holding Corp.*,
    606 B.R. 544 (Bankr. S.D.N.Y. 2019) ...................................................47

*In re Ditech Holding Corp.*,
    2021 WL 3716398 (Bankr. S.D.N.Y. Aug. 20, 2021) ..................................21, 49

*In re Emerge Energy Servs. LP*,
    2019 WL 7634308 (Bankr. D. Del. Dec. 5, 2019) ...............................................47

*In re Enron Corp.*,
    326 B.R. 497 (S.D.N.Y. 2005) .........................................................20, 24, 49

*In re FGIC Corp.*,
    No. 10-14215 (Bankr. S.D.N.Y. Apr. 23, 2012) .................................................22

*In re Food City, Inc.*,
    110 B.R. 808 (Bankr. W.D. Tex. 1990) ...............................................................36

*In re Fullbeauty Brands Holdings Corp.*,
    No. 19-22185 (Bankr. S.D.N.Y. Feb. 5, 2019) ....................................................22

*Garvin v. Cook Investments NW, SPNWY, LLC*,
    922 F.3d 1031 (9th Cir. 2019) ............................................................................46

*In re Genco Shipping & Trading Ltd.*,
    513 B.R. 233 (Bankr. S.D.N.Y. 2014) ..........................................................21, 47

*In re Granite Broad. Corp.*,
    369 B.R. 120 (Bank. S.D.N.Y. 2007) ...........................................................20, 25

*Gross v. Rell*,
    695 F.3d 211 (2d Cir. 2012) .......................................................................22, 41

*In re Highland Cap. Mgmt. L.P.*,
    48 F.4th 419 (5th Cir. 2022) .................................................................................37

*In re Hollander Sleep Products, LLC*,
    No. 19-11608 (Bankr. S.D.N.Y. Sep. 5, 2019) ...................................................22

*In re Kirwan Offices S.à.r.l.*,
  592 B.R. 489 (S.D.N.Y. 2018) ............................................................17

*In re Lakeland Tours, LLC*,
  No. 20-11647 (Bankr. S.D.N.Y. Sept. 15, 2020)...............................22

*In re Latam Airlines Grp. S.A.*,
  2022 WL 2206829 (Bankr. S.D.N.Y. June 18, 2022) ....................21, 23, 47, 49

*In re Lowenschuss*,
  67 F.3d 1394 (9th Cir. 1995) ..............................................................7

*McGuire v. United States*,
  550 F.3d 903 (9th Cir. 2008) ..............................................................44

*In re Motors Liquidation Co.*,
  829 F.3d 135 (2d Cir. 2016) ...............................................................17

*In re Murray Metallurgical Coal Holdings, LLC*,
  623 B.R. 444 (Bankr. S.D. Ohio 2021) ........................................5, 19

*New Hampshire v. Maine*,
  532 U.S. 742 (2001)............................................................................26

*In re Olinda Star Ltd.*,
  614 B.R. 28 (S.D.N.Y. 2020) .............................................................21

*In re Oneida Ltd.*,
  351 B.R. 79 (S.D.N.Y. 2006) ...............................................20, 24, 49

*In re Petrie Retail, Inc.*,
  304 F.3d 223 (2d Cir. 2002) ...............................................................27

*In re Purdue Pharma*,
  635 B.R. 26 (Bankr. S.D.N.Y. 2021)...............................................7, 31

*In re PWS Holding Corp.*,
  228 F.3d 224 (3d Cir. 2000) ............................................................6, 19

*In re Quincy Med. Ctr., Inc.*,
  2011 WL 5592907 (Bankr. D. Mass. Nov. 16, 2011) ........................48

*RadLAX Gateway Hotel LLC v. Amalgamated Bank*,
566 U.S. 639 (2012).............................................................................................32

*In re Remington Rand Corp.*,
836 F.2d 825 (3d Cir. 1988) ...............................................................................38

*In re Retail Grp., Inc.*,
2021 WL 2188929 (Bankr. E.D. Va. May 28, 2021) .........................................47

*In re Sbarro LLC*,
No. 14-10557 (Bankr. S.D.N.Y. May 19, 2014) ................................................22

*In re Seaside Eng'g & Surveying, Inc.*,
780 F.3d 1070 (11th Cir. 2015) ..........................................................................20

*SEC v. Payward Ventures Inc. (d/b/a Kraken)*,
No. 23-cv-588 (N.D. Cal. Feb. 9, 2023).............................................................25

*SEC v. Sun, et al.*,
No. 23-cr-2433 (S.D.N.Y. Mar. 22, 2023) .........................................................25

*Seila Law LLC v. CFPB*,
140 S. Ct. 2183 (2020)........................................................................................40

*In re Sims*,
534 F.3d 117 (2d Cir. 2008) ...............................................................................17

*In re Stearns Holdings, LLC*,
607 B.R. 781 (Bankr. S.D.N.Y., 2019)..........................................................21, 47

*In re United Retail Group, Inc.*,
No 12-10405 (Bankr. S.D.N.Y. Sept. 18, 2012)................................................22

*United States v. Binday*,
804 F.3d 558 (2d Cir. 2015) ...............................................................................26

*United States v. Energy Res. Co.*,
495 U.S. 545 (1990)............................................................................................19

*United States v. Nixon*,
418 U.S. 683 (1974)............................................................................................40

*United States v. Spallone*,
  399 F.3d 415 (2d Cir. 2005) ................................................................50

**Statutes**

11 U.S.C. §105(a) ...................................................................*passim*

11 U.S.C. §362 ..............................................................................32

11 U.S.C. §524 ..................................................................30, 31, 32

11 U.S.C. §1123(a)(3) ......................................................................5

11 U.S.C. §1123(b)(6).............................................................*passim*

11 U.S.C. §1125(e) ...................................................................29, 30

11 U.S.C. §1129(a)(3).............................................................*passim*

11 U.S.C. §1141(d) .........................................................................29

11 U.S.C. §1142(a) .........................................................................18

**Rules**

N.Y. Rule of Professional Conduct 1.8(h).....................................10, 13

**Other Authorities**

7 Collier on Bankruptcy ¶1129.01 (16th ed. 2021) ..................................4

**INTRODUCTION**

The fundamental goal of Chapter 11 is to maximize value for creditors.  To ensure that debtors can retain qualified people willing to develop, confirm, and execute confirmed Chapter 11 plans and carry out that purpose, debtors commonly propose—and bankruptcy courts routinely approve—exculpation clauses for inclusion in plans of reorganization.   Far from immunizing misconduct or prohibiting attempts to pursue liability, these clauses merely augment affirmative defenses, protecting people who implement court-approved plans from liability for doing what they have been ordered by a court to do.  Exculpation clauses do not protect anyone who commits fraud or engages in willful misconduct or gross negligence, nor do they prevent the government from pursuing injunctive relief or even from seeking civil or criminal liability.

Nonetheless, after decades of similar provisions' inclusion in Chapter 11 plans throughout the Second Circuit, the government now contends that ***all*** exculpation clauses supplant its police powers, lack any basis in statute, and may even violate the U.S. Constitution.   As the bankruptcy court explained, however, the government's arguments exaggerate the scope and effect of the provision at issue here, ignore the bankruptcy court's wall of cited authority, and depend on parade-of-horribles scaremongering that can most charitably be described as hyperbolic. The bankruptcy court ***repeatedly*** made clear that nothing in the exculpation clause

here permits fraud, willful misconduct, or gross negligence, let alone immunizes anyone from liability for violating laws unrelated to the specific court-approved transactions needed to implement the plan.  The bankruptcy court also explained that the exculpation clause does literally nothing to prevent the government from exercising its police power:  Despite many opportunities to do so, the government has not identified anything illegal in the plan, but if the government ever does so, the government can freely step in and attempt to stop that conduct.

Put another way, the government retains authority to enforce any law and enjoin any transaction going forward.  It simply cannot obtain *ex post* liability based on a party's obedience to the bankruptcy court's order.  And even then, the government *can* obtain such liability if the party's conduct comprises "actual fraud, willful misconduct, or gross negligence," *or* any other conduct not specifically authorized and ordered by the bankruptcy court.

The government is thus backed into a corner.  It must argue that *all* exculpation provisions are improper, even though courts routinely uphold them and forbidding their use would blast a gaping hole into Chapter 11 and the orderly functioning of complex reorganizations.  Or it must argue that exculpation provisions are generally permissible (as courts routinely recognize) but categorically cannot be applied to the government.  That latter position, however, is flatly incompatible with any argument under the Bankruptcy Code (which draws no such

distinction) and would make no sense in practice given that the government is not actually precluded from bringing any action and is barred only from obtaining *ex post* liability for specific court-ordered conduct.  Rather than picking one of these theories, however, the government mixes and matches elements from both, offering arguments that neither make sense on their own terms nor reflect what the bankruptcy court actually decided.

While exculpation clauses are commonplace in bankruptcy, moreover, there are especially strong reasons for including one here.  No one disputes that the government has refused to provide guidance on any germane cryptocurrency issue *for years*.[1]  The result is that this trillion-dollar industry is now a political football.  Government officials have not only issued vague threats to take unidentified actions based on standards they refused to articulate, but they have concurrently launched a blitzkrieg against the cryptocurrency industry.  And while all of this is happening, the government effectively seeks a reservation of rights to later obtain civil and criminal liability against court-ordered individuals for court-ordered conduct that

---

[1]  *See, e.g.,* A-1374(39:25-41:4) ("There are firms that operate as cryptocurrency brokers or exchanges and have done so for several years without being subject to clearer and well-defined regulatory requirements.  The regulators themselves cannot seem to agree[.]"); A-1069(24:18-25) ("[T]he SEC is not taking a position on whether any of the transactions in the plan are violative of the federal security laws.").

consummates a restructuring plan.  These are precisely the circumstances where an exculpation clause makes the most sense and is plainly justified by law.

The bankruptcy court's decision confirming Voyager's plan was thorough and correct.  It was supported by factual findings that the government does not dispute, much less contend are clearly erroneous.  The exculpation provision is supported by precedent and does not tie the government's hands.   The bankruptcy court's confirmation order should be affirmed.

## BACKGROUND

## I.   STATUTORY BACKGROUND

**1.**  The "two recognized policies underlying Chapter 11" are "preserving going concerns and maximizing property available to satisfy creditors." *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 453 (1999).  Accordingly, "debtor and creditors try to negotiate a plan that will govern the distribution of valuable assets from the debtor's estate." *Czyzewski v. Jevic Holding Corp.*, 137 S.Ct. 973, 978 (2017).  Obtaining plan confirmation is "the statutory goal of every chapter 11 case." 7 *Collier on Bankruptcy* ¶1129.01 (16th ed. 2021).

Section 1129 sets forth the minimum requirements for plan confirmation.  11 U.S.C. §1129.  Section 1123(a) enumerates various provisions that a plan "shall" contain and requires a bankruptcy court to confirm that a "plan has been proposed

in good faith and not by any means forbidden by law." *Id.* §1123(a)(3).  Section 1123(b) provides that a plan "may" contain discretionary provisions, including "any other appropriate provision not inconsistent with the applicable provisions of [the Code]." *Id.* §1123(b)(6).  Furthermore, §105(a) empowers a bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Code]." *Id.* §105(a).

 **2.**  Bankruptcy courts often invoke §1123(b)(6) and §105(a) to approve exculpation provisions.  *See, e.g.*, *Blixseth v. Credit Suisse*, 961 F.3d 1074, 1084 (9th Cir. 2020); *In re Airadigm Commc'ns, Inc.*, 519 F.3d 640, 657-58 (7th Cir. 2008).  Reorganization often requires the assistance of third parties, including attorneys, investment bankers, creditor committees, and plan administrators.  Yet the Chapter 11 process is "highly litigious," *Blixseth*, 961 F.3d at 1084, and can take place in contexts where the law is evolving.  Bankruptcy courts and debtors—indeed, many Chapter 11 stakeholders—thus face a dilemma: They need the assistance of capable and experienced individuals, but those same individuals have little incentive to offer their services if they face the prospect of personal liability.

 Exculpation provisions help solve this problem.  They "ensure that capable, skilled individuals are willing to assist … in chapter 11 cases" by providing assurances that they "will not be second-guessed and hounded by meritless claims" or by suits based on conduct required by the bankruptcy court.  *In re Murray*

*Metallurgical Coal Holdings, LLC*, 623 B.R. 444, 501 (Bankr. S.D. Ohio 2021). To accomplish that purpose, exculpation provisions "set[] forth the applicable standard of liability," *In re PWS Holding Corp.*, 228 F.3d 224, 247 (3d Cir. 2000), in any future litigation concerning the "actions of various participants in the [p]lan approval process and relating only to that process," *Blixseth*, 961 F.3d at 1082, or confirm that conduct undertaken pursuant to court order will not be a basis for liability in the future. In light of the clear justifications for exculpation provisions, they are "commonplace" in Chapter 11 plans approved in jurisdictions nationwide. *Id*. at 1085.

**3.** Exculpation provisions are materially different from certain other types of provisions that may be found in Chapter 11 plans—*viz.*, "release provisions," with which exculpation provisions can often be confused. There are two basic forms of release provisions: (1) a "debtor release," under which a debtor releases its own claims; and (2) a "non-debtor release," also known as a "third-party release," under which claims held by non-debtor third parties against other non-debtor third parties are released. Whether a particular release provision is styled as a debtor release or a non-debtor release, both kinds of releases ultimately "eliminat[e]" a covered party's liability "altogether," ***regardless*** of circumstances (*e.g.*, regardless of whether certain conduct was court-ordered), *PWS*, 228 F.3d at 247 (emphases added), and there is often no limitation on the scope and time of the claims released.

Case law and restructuring practice reflect the important differences between exculpation provisions and third-party releases.  For example, in the Ninth Circuit, third-party releases are generally prohibited, *see In re Lowenschuss*, 67 F.3d 1394 (9th Cir. 1995), but exculpation provisions are generally permitted, *see Blixseth*, 961 F.3d at 1082.  Similarly, in *In re Purdue Pharma*, 635 B.R. 26 (Bankr. S.D.N.Y. 2021), the confirmed plan contained a third-party release, which the United States Trustee successfully challenged on appeal, *see id.* at 115, but it also contained an exculpation provision, which the U.S. Trustee did not challenge.  *See* No. 19-23649-rdd, Dkt.3726 §10.12 (Bankr. S.D.N.Y. Sept. 2, 2021).

## II.   PROCEEDINGS BELOW

**1.**   Voyager operated a platform with over 1.1 million users that allowed customers to buy, sell, and store cryptocurrency.  A-528(¶9).  Voyager also operated a lending business, and Three Arrows Capital ("3AC") was one of its largest borrowers.  A-549-50(¶15).  Following 3AC's collapse, Voyager filed Chapter 11 petitions on July 5, 2022.  Voyager initially pursued a Chapter 11 plan that contemplated a transaction with FTX.  A-553(¶26).  But Voyager was a victim of FTX's fraud, and following FTX's historic collapse in November 2022, Voyager was forced to explore alternatives.  A-554(¶29).

On December 18, 2022, Voyager Digital, LLC entered into an asset purchase agreement with Binance.US.   ER300(Dkt.60-4).   The Binance.US transaction

contemplates pro rata in-kind distributions of cryptocurrency to Voyager's creditors (*i.e.*, customers), such that each will receive the type of cryptocurrency associated with his or her account.  ER1140(Dkt.60-17); A-536(¶30).

Before Voyager can distribute its holdings to Binance.US, however, it must first rebalance them.  In other words, it must buy and sell cryptocurrencies to ensure it has enough of each type to distribute.  ER319(Dkt.60-4).  The need to rebalance stems in part from Voyager's loan to 3AC, which was not repaid following 3AC's collapsed and left Voyager's portfolio with a deficiency in particular cryptocurrency coins, including Bitcoin and US Dollar Coin or "USDC" (a "stable coin" tied to the U.S. dollar).  A-485(75:9-11).  That need also arises from the combination of the fixed value of each account holder's claim, which was set on the date of Voyager's Chapter 11 petition, and the fluctuation in cryptocurrency prices since Voyager first sought relief.  A-485(75:12-15).  If, for example, one customer held 10 of Coin X and another held 10 of Coin Y, and if at the time of Voyager's petition Coin X was worth double Coin Y but they are now worth the same amount, Voyager would need to sell some of Coin Y to buy some of Coin X to put the customers in the same relative position dollar-wise that they were in when Voyager sought Chapter 11 relief.

Voyager requested the bankruptcy court's approval to enter into the Binance.US agreement and to begin the required rebalancing.  A-26-27(¶29).  On

January 13, 2023, following a hearing in which the rebalancing process was described, the bankruptcy court authorized both.  A-455-65.  No government entity objected or even raised any concerns.  Also on January 13, Voyager filed a proposed Chapter 11 plan centered around the Binance.US transaction.  A-304-79.  The plan also provided Voyager a "toggle" option under which it would make cryptocurrency distributions to creditors itself, though at significantly less value to creditors and still following rebalancing (which is necessary for any in-kind cryptocurrency distribution).  ER1139(Dkt.60-17); ER 1190(Dkt.60-18).

    **2.**  When Voyager first proposed a Chapter 11 plan based on the Binance.US transaction, it included the following exculpation provision:

> Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor release or the third-party release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is exculpated from any Cause of Action for any act or omission arising on or after the Petition Date and prior to the Effective Date based on the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing, or consummation of the Disclosure Statement, the Plan, the Special Committee Investigation, any Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation

Order in lieu of such legal opinion), except for Causes of Action related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

A-216.  That version of the proposed plan also provided that:

> The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

*Id*.

The U.S. Trustee objected, arguing that "[t]he exculpation provision [wa]s overly broad."   ER718(Dkt.60-9).   First, the U.S. Trustee contended that the provision should cover "only fiduciaries."   *Id*.   Second, the U.S. Trustee asked the court to limit exculpation to only "claims against the exculpated parties based on the negotiation, execution, and implementation of agreements and transactions that were approved by the Court."   *Id*. (quoting *In re Aegean Marine Petroleum Network Inc.*, 599 B.R. 717, 721 (Bankr. S.D.N.Y. 2019)).   Third, the U.S. Trustee suggested that the exculpation provision "should contain an express carveout for malpractice claims consistent with Rule 1.8(h) of the New Rules of Professional Conduct, which provides that a lawyer shall not make an agreement prospectively limiting the

lawyer's liability to a client for malpractice." *Id*.  The U.S. Trustee did not, however, challenge the entirety of the exculpation provision or argue that it was unconstitutional, violated the Bankruptcy Code, or was inconsistent with any Second Circuit law.  Moreover, no other component of the federal government, including the U.S. Attorney's Office, objected to the exculpation provision.

Voyager then submitted a proposed order confirming the plan.  A-589-664. The order included a provision carving out the government from the exculpation provision's reach.  A-652-53.  A few days later, Voyager amended its proposed order to, among other things, modify the exculpation provision in a way that removed the carveout.  A-807-08.  In paragraph 142 of the amended proposed order, Voyager proposed adding the following language:

> 142. [T]he United States, the States, and their agencies may not, and will not, allege that the Restructuring Transactions are a violation of any rules or regulations enforced by the United States, the States or any of their agencies, nor will they bring any claim against any Person on account of or relating to the Restructuring Transactions.

A-808.  And in paragraph 143, Voyager proposed the following addition:

> 143. [N]o Governmental Unit will allege that the Restructuring Transactions are a violation of any rules or regulations enforced by the United States, the States or any of their agencies, nor will they bring any claim against any Person on account of or relating to the Restructuring Transactions….

*Id*.

11

Both additions drew an objection from the U.S. Attorney's Office, docketed on March 2 (the first day of the confirmation hearing), which characterized the new provisions as "improper."   ER585-59(Dkt.60-12).   Five days later, after further discussions with the government and the bankruptcy court, Voyager circulated a revised Chapter 11 plan and a revised confirmation order, both of which narrowed the exculpation provision.  The revised plan cut a paragraph that provided additional protections to the extent the SEC or other government entities deemed any cryptocurrency a "security."  It also replaced general references to any transactions or actions that occurred during the pendency of the chapter 11 proceedings with specific references to the Binance.US transaction and any related actions that the Bankruptcy Court expressly approved.  And the revised confirmation order deleted from paragraphs 142 and 143 the language to which the U.S. Attorney's Office had objected.

Ultimately, the bankruptcy court rejected even Voyager's narrowed proposal. Instead, it fashioned an exculpation provision of its own, which provides in relevant part:

> 97. Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor release or the third-party release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby exculpated from, any liability for damages based on the negotiation, execution and implementation of any transactions or actions approved by the Bankruptcy Court in the Chapter 11 Cases, except for Causes of Action related to any act or

omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence; provided that nothing in the Plan shall limit the liability of professionals to their clients pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 §1200.8 Rule 1.8(h)(1) (2009).

98. The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes.

99. In addition, the Plan contemplates certain rebalancing transactions and the completion of distributions of cryptocurrencies to creditors. The Exculpated Parties shall have no liability for, and are exculpated from, any claim for fines, penalties, damages, or other liabilities based on their execution and completion of the rebalancing transactions and the distribution of cryptocurrencies to creditors in the manner provided in the Plan. For the avoidance of doubt, the foregoing paragraph reflects the fact that Confirmation of the Plan requires the Exculpated Parties to engage in certain rebalancing transactions and distributions of cryptocurrencies and the fact that no regulatory authority has taken the position during the Combined Hearing that such conduct would violate applicable laws or regulations. Nothing in this provision shall limit in any way the powers of any Governmental Unit to contend that any rebalancing transaction should be stopped or prevented, or that any other action contemplated by the Plan should be enjoined or prevented from proceeding further. Nor does anything in this provision limit the enforcement of any future regulatory or court order that requires that such activities either cease or be modified, or limit the penalties that may be applicable if such a future regulatory or court order is issued and is violated. Similarly, nothing herein shall limit the authority of the Committee on Foreign Investment of the United States to bar any of the contemplated transactions.

ER1093-96(Dkt.60-16).

The result was, as the bankruptcy court explained, an exculpation provision "much narrower than the provision that [Voyager] had originally proposed." ER1236(Dkt.60-19). Indeed, "the language describing the matters that are covered (i.e., liability for damages based on the negotiation, execution and implementation

13

of transactions or actions approved by the Bankruptcy Court) is precisely the modification that the United States Trustee suggested[.]" *Id*. On March 8, 2023, following a four-day trial, the bankruptcy court confirmed the plan.

**3.** In confirming the plan, the bankruptcy court issued factual findings and reached legal conclusions regarding the exculpation clause, many of which related to the government's conduct. More than once during the confirmation hearing, government entities had vaguely suggested that aspects of the Binance.US transaction could be problematic. For example, the SEC's counsel suggested that a specific type of cryptocurrency, the VGX token, has "aspects" of a security requiring registration (which it declined to describe). ER1187(Dkt.60-18). In addition to never providing any more information regarding the staff's position, the SEC emphasized that the views of SEC staff did not constitute the Commission's official views. *Id*. The court also found that "[t]he SEC ha[d] been aware of the VGX token for some time and ha[d] not even reached a conclusion as to whether it is a security, let alone taken any action to stop trading in the token." ER1190(Dkt.60-18).

The bankruptcy court also found that for "many months," government entities "had a full and fair opportunity to object if they believe that the rebalancing transactions that [the court] previously approved and that are contemplated by the plan are illegal in any way, or if they believe that the distributions of cryptocurrencies and cash that are contemplated by the plan are violative in any way

of any applicable statute, rule or regulation." ER1191(Dkt.60-18).   But no government entity objected, with the SEC "only vaguely hint[ing] at possible issues that have not even been described in a manner that would permit the Court or the parties to address them." *Id.*   The bankruptcy court also concluded that the exculpation clause was "routine" and that "parties should not be liable for doing things that the Court authorizes them to do and that in many instances a court may direct them to do." ER1208,1209-10(Dkt.60-18).   The bankruptcy court further found that, pursuant to 11 U.S.C. §1129(a)(3), that the plan was proposed in good faith and not by any means forbidden by law.   ER1068(Dkt.60-16)(¶20).

The bankruptcy court summarized its key findings and conclusions in the following passages:

> My order does not purport to limit any contention regarding things that the Debtors may have done in the past that I did not specifically authorize or approve.  It does not bar the Government from trying to stop transactions from occurring, and does not bar any regulatory contention in that regard.  If the SEC or any other party believes tomorrow that it has grounds to go to court to enjoin further steps in the completion of the contemplated transactions, it is entitled to do so. I am not barring any such thing.  I am simply saying that if we get six weeks down the road and then the SEC decides to take action, the people who have spent six weeks doing what I have ordered them to do will not be held liable on an ex post facto basis for having followed my order in the interim.

> Where the Government has declined to argue that the rebalancing transactions that the plan contemplates are illegal in any way, and where the Government has declined to argue that the distributions of cryptocurrencies to creditors that the Plan contemplates (either through Binance.US or by Voyager if the so-called "Toggle" plan is pursued)

are illegal in any way, then the individuals and entities who will be required by my confirmation order to engage in those activities are entitled to know that they have not been sentenced by me to incur statutory or regulatory liabilities just for doing what I have ordered. That is consistent with ordinary practice in bankruptcy cases, with the authorities that I have cited above, and with basic principles of equity and estoppel.  It is a fair and proper consequence of the Government's own unwillingness or inability to challenge the legality of the contemplated transactions and of the fact that I am entering an order that not only approves those transactions but actually requires them to be carried out.

…

[I] have not attempted to foreclose future arguments by the Government, or the Government's assertion of changing or evolving regulatory views.  [I am] simply protecting those persons who in the interim will be engaging in transactions that the Government has failed to challenge and that must be carried out under the authority of this Court's order.

…

Once again, I am not by any means preventing the enforcement of any law or regulation.  I am not stopping any regulatory body from stepping in and attempting to enjoin any act or transaction on any applicable regulatory ground.  I am simply saying that until such time as some regulatory or court order says that the parties should stop what they are doing, the parties who do what the confirmation order requires them to do should not be held liable for having done so.

ER1216-18(Dkt.60-18).

   **4.**  On March 14, the government appealed to this Court and sought a stay pending appeal from the bankruptcy court.  The bankruptcy court denied a stay because the exculpation provision simply ensures that "people who are required to do things pursuant to [the] confirmation order will not be held liable for having

done" them, while preserving "the right of the Government to seek to stop the activities at any time." ER1234(Dkt.60-19). The government then sought a stay from this Court, which granted it. Voyager and the Committee appealed to the Second Circuit and asked that court to vacate the stay, but the Second Circuit concluded that it lacked jurisdiction and dismissed the appeal.

## LEGAL STANDARD

"A bankruptcy court's decision to confirm a plan of reorganization is reviewed for abuse of discretion." *In re Kirwan Offices S.à.r.l.*, 592 B.R. 489, 500 (S.D.N.Y. 2018). A court abuses its discretion only when it "base[s] its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence or render[s] a decision that cannot be located within the range of permissible decisions." *In re Sims*, 534 F.3d 117, 132 (2d Cir. 2008) (quotations omitted). Findings of fact are reviewed for "clear error" while conclusions of law are reviewed de novo. *In re Charter Commc'ns, Inc.*, 691 F.3d 476, 482-83 (2d Cir. 2012). The "clear error standard is a deferential one, and if the bankruptcy court's account of the evidence is plausible in light of the record viewed in its entirety, the [reviewing court] may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *In re Motors Liquidation Co.*, 829 F.3d 135, 158 (2d Cir. 2016) (quotations omitted).

# ARGUMENT

## I. EXCULPATION CLAUSES ARE COMMONPLACE FEATURES OF COMPLEX CHAPTER 11 PLANS.

The government only challenges the plan's exculpation clause. As the bankruptcy court explained, however, such provisions are supported by "a long line of authority" that "parties should not be liable for things that [a bankruptcy] order will require them to do." ER1231(Dkt.60-19). The bankruptcy court's determination is plainly correct and should be affirmed.

### A. The Bankruptcy Code Authorizes Exculpation Clauses.

A bankruptcy court's authority to approve exculpatory provisions is firmly rooted in the Code. To confirm a plan, a bankruptcy court must find that it is "not by any means forbidden by law." 11 U.S.C. §1129(a)(3). Once the bankruptcy court approves the plan, moreover, the Code provides that "the debtor and any entity organized … for the purpose of carrying out the plan *shall* carry out the plan and *shall* comply with any orders of the court." *Id.* §1142(a) (emphases added). Exculpatory provisions thus assure parties "carry[ing] out the plan" that obeying court orders will not subject them to liability. Indeed, the Code provides that plans "may" contain "*any* other appropriate provision not inconsistent with the applicable provisions of [the Code]," which readily encompasses exculpatory provisions. *Id.* §1123(b)(6) (emphasis added). And §105(a) empowers a bankruptcy court to "issue *any* order, process, or judgment that is necessary or appropriate to carry out the

provisions of [the Code]."  *Id.* §105(a) (emphasis added).  These broad provisions "confer what the Supreme Court has described as a bankruptcy court's 'residual authority' to formulate plans that enable successful and value-maximizing reorganizations, including relief not specifically authorized elsewhere in the Bankruptcy Code."  *In re Boy Scouts of America and Delaware BSA, LLC*, 2023 WL 2662992 at *27 (D.Del., 2023) (citing *United States v. Energy Res. Co.*, 495 U.S. 545, 549 (1990)).

### B.    Precedent Also Recognizes The Lawfulness of Exculpation Clauses.

Courts regularly invoke this suite of statutory provisions to conclude that bankruptcy courts may approve exculpation clauses "intended to trim subsequent litigation over acts taken during the bankruptcy proceedings and so render the plan viable."  *Blixseth,* 961 F.3d at 1084; *see also Murray*, 623 B.R. at 500.  Indeed, as the bankruptcy court explained, many courts have approved exculpation provisions that are similar to or broader than the one here.  ER1240(Dkt.60-19); *see also, e.g., PWS*, 228 F.3d at 245-46 (approving exculpation clause barring suits related to "the consummation of the Plan or the Administration of the Plan or the property to be distributed under the Plan"); *Airadigm,* 519 F.3d at 655 (approving exculpation "for any act or omission arising out of or in connection with the Case, the confirmation of this Plan, the ***consummation*** of this Plan, or the ***administration*** of this Plan or ***property*** to be distributed under this Plan, except for willful misconduct" (emphases

added)); *In re Seaside Eng'g & Surveying, Inc.*, 780 F.3d 1070, 1076 (11th Cir. 2015) (approving exculpation for "any act, omission, transaction or other occurrence in connection with, relating to, or arising out of the Chapter 11 Case … ***or the consummation of the Amended Plan*** …except and solely to the extent such liability is based on fraud, gross negligence or willful misconduct" (emphasis added)).

This Court has also long approved exculpatory provisions.  In *In re Enron Corp.*, 326 B.R. 497 (S.D.N.Y. 2005), for example, the Court approved a clause expansively providing that "[n]one of the Debtors" or a long list of other related individuals "shall have or incur any liability to any Entity for any act taken or omitted to be taken in connection with and subsequent to the commencement of the Chapter 11 Cases, the formulation, preparation, dissemination, ***implementation***, confirmation, or approval of the Plan or any compromises or settlements contained therein." *Id.* at 500-01 (emphasis added).  As the court explained, that provision was "***reasonable and customary*** and in the best interests of the estates."  *Id.* at 504 (emphasis added).

Shortly thereafter, the Court in *In re Oneida Ltd.* overruled objections to exculpation clauses, concluding the proposed language was "***standard in this district***."  351 B.R. 79, 94 n.22 (S.D.N.Y. 2006) (emphasis added).  The Court reached the same conclusion in *In re Granite Broad. Corp.*, 369 B.R. 120 (Bank. S.D.N.Y. 2007), which upheld a bankruptcy-court ordered provision exculpating

parties for "actions in connection, related to, or arising out of the Reorganization Cases … exclud[ing] gross negligence and intentional misconduct." *Id.* at 139. More recently, Judge Wiles specifically upheld an exculpation provision "meant to insulate court-supervised fiduciaries and some other parties from claims that are based on actions that relate to the restructuring, with the exception of claims that are based on allegations of fraud, willful misconduct, or gross negligence." *In re Aegean Marine Petroleum Network Inc.*, 599 B.R. 717, 720-21 (Bankr. S.D.N.Y. 2019). Courts in this District have since uniformly and routinely followed suit.[2]

Fear of a government enforcement action also can chill parties from performing actions that bankruptcy courts have considered lawful and ordered to be done to effectuate a plan. Courts thus regularly confirm exculpatory clauses without any carveout for government officials or government-initiated action. Indeed, in this

---

[2] *See, e.g., In re Latam Airlines Grp. S.A.*, 2022 WL 2206829, at *49-50 (Bankr. S.D.N.Y. June 18, 2022), *corrected*, 2022 WL 2541298 (Bankr. S.D.N.Y. July 7, 2022); *see also In re Ditech Holding Corp.*, 2021 WL 3716398, at *9 (Bankr. S.D.N.Y. Aug. 20, 2021) (collecting cases for the proposition that "[i]t is settled that exculpatory provisions are proper to protect those authorized by bankruptcy courts to carry out the bankruptcy process, even after the effective date of a plan"); *In re Olinda Star Ltd.*, 614 B.R. 28, 48 (S.D.N.Y. 2020) ("This Court agrees that [exculpation] is necessary and appropriate to prevent interference with the consummation of the [restructuring]."); *In re Stearns Holdings, LLC*, 607 B.R. 781, 790 (Bankr. S.D.N.Y., 2019) (concluding that "the exculpation provision is entirely consistent with, and appropriate under, applicable law"); *In re Genco Shipping & Trading Ltd.*, 513 B.R. 233, 268-72 (Bankr. S.D.N.Y. 2014) (finding exculpation provisions "important to the implementation of the Plan").

District alone, judges have confirmed dozens of plans with exculpation provisions like the one here without any carveout for government actions.[3]  The only appellate court, moreover, to assess exculpation clauses directed at the government—the Seventh Circuit—has approved them.  *See Airadigm*, 519 F.3d at 657-58.

### C.    Broader Immunity Principles Also Support Exculpation Clauses.

Exculpation clauses are also consistent with broader principles of law. Individuals or entities who act as agents of a court "are generally immune to the extent that they are acting with the approval of the court."  *Gross v. Rell*, 695 F.3d 211, 216 (2d Cir. 2012) (collecting cases).  As the bankruptcy court explained,

---

[3]  *See, e.g.,* Order Confirming Chapter 11 Plan of Reorganization, Ex. A, Plan, Art. VIII.F, *In re Lakeland Tours, LLC*, No. 20-11647 (JLG) (Bankr. S.D.N.Y. Sept. 15, 2020) [Dkt. No. 191-1]; Order Confirming Chapter 11 Plan, Ex. A, Plan, Art. VIII.F, *In re Barneys New York, Inc.*, No. 19-36300 (CGM) (Bankr. S.D.N.Y. Feb. 5, 2020) [Dkt. No. 789-1]; Order Confirming Chapter 11 Plan of Reorganization, Ex. A, Plan §8.4, *In re Deluxe Entertainment Services Group Inc.*, No. 19-23774 (RDD) (Bankr. S.D.N.Y. Oct. 25, 2019) [Dkt. No. 96]; Order Confirming Chapter 11 Plan, Ex. 1, Plan, Art. VIII.E, I*n re Hollander Sleep Products, LLC*, No. 19-11608 (MEW) (Bankr. S.D.N.Y. Sep. 5, 2019) [Dkt. No. 356]; Order Confirming Chapter 11 Plan of Reorganization, Ex. A, Plan, Art. IX.D, *In re Fullbeauty Brands Holdings Corp.*, No. 19-22185 (RDD) (Bankr. S.D.N.Y. Feb. 5, 2019) [Dkt. No. 39]; Order Confirming Chapter 11 Plan of Reorganization, Ex. 1, Plan, Art. VIII.E, *In re Cenveo, Inc.*, No. 18-22178 (RDD) (Bankr. S.D.N.Y. Aug. 21, 2018) [Dkt. No. 685]; Order Confirming Chapter 11 Plan of Reorganization, Ex. 1, Plan, Art. IX.D, *In re Sbarro LLC*, No. 14-10557 (MG) (Bankr. S.D.N.Y. May 19, 2014) [Dkt. No. 238]; Order Confirming Plan of Liquidation, Ex. A, Plan, Art. IX.F, *In re United Retail Group*, Inc. No 12-10405 (SMB) (Bankr. S.D.N.Y. Sept. 18, 2012) [Dkt. No. 776]; Order Confirming Chapter 11 Plan of Reorganization, Ex. 1, Plan, Art. X.G, *In re FGIC Corp.*, No. 10-14215 (SMB) (Bankr. S.D.N.Y. Apr. 23, 2012) [Dkt. No. 314].

exculpation clauses are "based on the theory that court-supervised fiduciaries are entitled to a qualified immunity for discretionary actions that they take in their official capacities" and also function as "a protection for court-supervised and court-approved transactions."  ER1209(Dkt.60-18).

Simply put, those who perform actions required by a court-approved plan "are entitled to broad immunity from suit when acting within the scope of their authority and pursuant to court order." *Aegean*, 599 B.R. at 720 (quoting *Bennett v. Williams*, 892 F.2d 822, 823 (9th Cir. 1989)).  Furthermore, in this circuit, it is "well settled" that this protection extends to "estate fiduciaries" which include a debtor's employees, others such as "a committee, its members and estate professionals"— and even to non-fiduciaries to the extent necessary based on the specific facts of a plan—in addition to bankruptcy trustees.   *In re LATAM Airlines Grp. S.A.*, 2022 WL 2206829, at *50 (collecting cases).

### D.    The Exculpation Clause Here Falls Squarely Within This Settled Authority.

The exculpation clause here fits comfortably within well-established authority.  It covers only "transactions or actions approved by the Bankruptcy Court," while carving out fraud, willful misconduct, or gross negligence. ER1056(Dkt.60-16).  Furthermore, it does not bar the government from "preventing the enforcement of any law," "stop[ping] transactions from occurring," or limiting liability for violation of regulatory or court orders.  ER1216,1218(Dkt.60-18).

In many respects, the exculpation clause mirrors others that have been upheld. The clause, for example, covers any "act or omission arising on or after the Petition Date and prior to the Effective Date … in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan." ER1093-1094(Dkt.60-16)((¶97-99).  This language is materially the same as the language approved in *Oneida*.  *See Oneida*, 351 B.R. at 94 (upholding clause covering an "act or omission in connection with, or arising out of, the Disclosure Statement, the Plan or any Plan Document ... the solicitation of votes for and the pursuit of Confirmation of [the] Plan, the Effective Date of [the] Plan, or the administration of [the] Plan or the property to be distributed under [the] Plan").

In other respects, moreover, this provision is narrower than many exculpation provisions historically approved in this Circuit, providing only that **court-approved** parties (and their advisors) tasked with carrying out the plan will not bear criminal or civil liability for taking the **court-approved** steps necessary to implement the plan unless their actions constitute fraud, willful misconduct or gross negligence. *Compare* ER1093-94(Dkt.60-16)(¶ 97-99) *with Enron*, 326 B.R. at 500-01 (covering "any act taken or omitted in connection and subsequent to the commencement of the Chapter 11 cases") *or Granite*, 369 B.R. at 139 (covering "actions in connection, related to, or arising out of the Reorganization Cases").

24

And this case is a prime example of why exculpation provisions are important. It is undisputed that, to maximize distributions and return value to creditors, Voyager must "rebalance" its portfolio and then facilitate in-kind transfers of cryptocurrency to customers. Yet the government—despite never having identified any specific concerns for months during Voyager's Chapter 11 proceedings—has recently begun aggressively targeting the cryptocurrency industry, including persons and entities related in some ways to Binance.[4] Under these circumstances, parties connected to these Chapter 11 proceedings are taking considerable risk in proceeding with rebalancing or distribution of cryptocurrencies absent assurances that they will not face liability for that court-ordered conduct.

In short, the bankruptcy court took care to ensure the plan was "not by any means forbidden by law." 11 U.S.C. §1129(a)(3). It gave the government numerous opportunities to explain why the contemplated transactions were unlawful, yet the government failed to do so. ER1187-92(Dkt.60-18). The court thus approved a narrow exculpation provision—narrower than Voyager's proposal—for carrying out court-approved and court-required transactions, while (1) carving out fraud, willful misconduct, and gross negligence; (2) allowing the government to seek to enjoin

---

[4]   *See, e.g.,* Complaint, *CFTC v. Zhao, et al.*, No. 23-cv-01887 (N.D. Ill. Mar. 27, 2023); Complaint, *SEC v. Sun, et al.*, No. 23-cr-2433 (S.D.N.Y. Mar. 22, 2023); Complaint, *SEC v. Payward Ventures Inc. (d/b/a Kraken),* No. 23-cv-588 (N.D. Cal. Feb. 9, 2023).

transactions and obtain penalties for violating such orders; and (3) recognizing the government's power to bring actions under "any civil or criminal laws" for non-court-authorized conduct.   *See* ER1056-57(Dkt.60-16); ER1168-69(Dkt.60-17); ER1215-16(Dkt.60-18).  None of this was an abuse of discretion.

## II.   THE GOVERNMENT'S ARGUMENTS ARE UNPERSUASIVE.

Despite the extensive authority rejecting its position, the government challenges the exculpation clause.  As a threshold matter, the government is barred from doing so based on the doctrine of judicial estoppel, which holds that "[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001); *see also United States v. Binday*, 804 F.3d 558, 600 (2d Cir. 2015).  Here, when Voyager proposed an exculpation clause, the U.S. Trustee objected on the ground that exculpation should be limited to only "claims against the exculpated parties based on the negotiation, execution, and implementation of agreements and transactions that were approved by the Court."  *See* pp.10-11, *supra*.   The exculpation provision that the bankruptcy court ultimately approved was not only narrower than Voyager's proposal, but provided ***exactly*** what the U.S. Trustee requested.  As the bankruptcy court explained:  "[T]he language describing the matters that are covered (i.e., liability for damages based on the negotiation,

execution and implementation of transactions or actions approved by the Bankruptcy Court) is precisely the modification that the United States Trustee suggested." ER1236(Dkt.60-19).  Having prevailed on its prior position, the government cannot now claim that the exculpation clause is improper.

In any event, the government's arguments challenging the exculpation provision are both wrong and radical.  If accepted, they would bar **all** exculpation clauses, whether directed at the government or not.  Moreover, the government's arguments—many of which were never raised in the bankruptcy court and are thus forfeited, *see, e.g.*, *In re Petrie Retail, Inc.*, 304 F.3d 223, 228 n.3 (2d Cir. 2002)— repeatedly misstate the scope and nature of exculpation clauses, mischaracterize and ignore the bankruptcy court's analysis, and are rife with other error.

## A.    The Government's Statutory Arguments Are Flawed.

**1.**  The government's lead argument is that bankruptcy law is concerned with the relationship between debtors and creditors rather than the government's regulatory authority.  *See* Gov.Br.20-21.  This argument, however, ignores the plain language of the statutes Congress enacted and the bankruptcy court's finding that the threat of government enforcement can thwart implementation of a court-approved plan no less than the threat of private litigation.  Here, without an exculpation clause, persons performing the actions required by the plan confirmed by the bankruptcy court undertake considerable risk.  This is not because any of the

necessary transactions are unlawful under any theory the government has ever advanced—to the contrary, the bankruptcy court found that the plan is lawful based on the record before it, ER1069(Dkt.60-16)(¶20); ER1191(Dkt.60-18), and the government does not challenge that finding here.  Yet implementation of the plan raises extraordinary hazards for exculpated parties so long as the government insists it can obtain liability against someone simply for obeying court orders.  Bankruptcy cannot adjust the "debtor-creditor relationship," Gov.Br.21, while this threat looms.

The government's contention that the Bankruptcy Code does not extend beyond the "debtor-creditor relationship" also gives short shrift to the Seventh Circuit's decision in *Airadigm*—the only court of appeals decision to directly address the specific question here.  There, the Seventh Circuit upheld an exculpation provision directed at the Federal Communications Commission.  In this Court's stay order, the Court noted that the exculpation provision in *Airadigm* "preserve[d] the FCC's regulatory powers."  Dct.Dkt.53 at 14 (quoting *Airadigm*, 519 F.3d at 657).  But the exculpation provision here likewise preserves the government's regulatory powers; under it, "the Government is free at any time to take action to stop the Debtors' cryptocurrency trades and/or cryptocurrency distributions if the Government decides that those activities should be stopped."  ER1244(Dkt.60-19).  As the bankruptcy court explained, all the confirmation order does "is to say that the parties who will engage in those activities under the authority and direction of [its]

order—after the Government stated that it did not contend that the activities were illegal—should not in the interim be liable for doing what [its] order requires." ER1246(Dkt.60-19). The government's argument is thus flatly inconsistent with *Airadigm*, which fully supports the bankruptcy court's decision.

**2.** The government fares no better when it discusses the provisions of the Code itself. The government, for example, makes a passing reference to 11 U.S.C. §1141(d), which defines when a plan may discharge a debtor. *See* Gov.Br.22. But as even the government acknowledges, *id.*, Voyager did not seek or obtain a discharge. The government also never explains how a provision setting forth when a debtor may obtain a discharge in any way undermines the bankruptcy court's ability to set out a standard of care for court-ordered actions; among many other things, discharges relate to pre-petition acts, and the exculpation clause here does not.

The government next argues that 11 U.S.C. §1125(e)—which provides some exculpation for individuals who in good faith solicit acceptance or rejection of a plan— is the only section that permits any exculpation for any post-petition conduct. Accepting this argument, however, would be revolutionary. Nothing about it is limited to government-initiated litigation; it would apply to essentially ***all*** exculpation provisions, even though courts routinely authorize exculpation outside of §1125(e). Regardless, the government does not explain how Congress's inclusion

29

of a mandatory exculpation provision in a statutory section specifically related to post-petition solicitation forecloses precludes a bankruptcy court's discretion to order exculpation for entirely different conduct under entirely different provisions of the Code.  Providing exculpation for court-ordered individuals engaging in good faith in court-ordered activities is certainly not ***inconsistent*** with §1125(e), and thus—by statutory definition—is permitted by §1123(b)(6).

Nor is the government's citation to 11 U.S.C. §524 persuasive.  The government contends that §524 is the only Code provision that permits third-party releases for pre-petition conduct.  Gov.Br.23-25.  Yet as the bankruptcy court explained, the exculpation clause here is not a third-party release.  *See* ER1236-37(Dkt.60-19) ("I have repeatedly made clear that I am not relying on the authorities and arguments that purportedly justify the 'third party releases' that are at issue in the cases cited by the Government.").  As demonstrated above, third-party releases and exculpation clauses are not the same and are not based on same legal authorities. *See* pp.6-7, *supra*.[5]

The fundamental distinction between releases and exculpation provisions also defeats the government's reliance on *Purdue*, 635 B.R. 26.  The plan in that case

---

[5]  Indeed, apparently recognizing how far-reaching its position is, the government conceded in the Second Circuit that §1129(a) also authorizes exculpation provisions—just not provisions of this purported "breadth."  Gov.Opp.Stay.40. Yet that concession defeats its §1125(e) argument.

contemplated releasing non-debtors from thousands of tort and consumer fraud claims brought by municipalities and personal injury plaintiffs arising out of opioid manufacturing and marketing. *Id.* at 67. On appeal, the district court concluded that because §524 specifically governs releases, §105(a) does not authorize a bankruptcy court to "order the non-consensual release of third-party claims against non-debtors." *Id.* at 115. But that is not what is happening here. No claims are being released. Rather, the exculpation clause here only establishes the standard of care for individuals executing the plan at the bankruptcy court's express direction. Indeed, the district court in *Purdue* acknowledged the difference between third-party releases and exculpation and favorably cited Judge Wiles's opinion in *Aegean* for the proposition that third-party releases are "different." *Id.* at 110 (quoting *Aegean*, 599 B.R. at 723).[6]

Because nothing about exculpation clauses is related to releases under §524, moreover, the government's citation to *RadLAX Gateway Hotel LLC v. Amalgamated Bank*, 566 U.S. 639 (2012), is misplaced. No one argues that where

---

[6] Although the *Purdue* decision is not relevant to exculpation clauses, it bears noting that "[t]he district court's decision in *Purdue* is currently on appeal before the Second Circuit, and that decision departs from existing Second Circuit precedent, which, like the Third Circuit, holds that bankruptcy courts are authorized to enjoin and release third-party claims against non-debtors where such releases are integral to the reorganization." *In re Boy Scouts of America*, 2023 WL 2662992, at *27 (D. Del. Mar. 28, 2023) (citing Second and Third Circuit cases).

a statute contains a specific authorization, a court can rely on a more general authorization to avoid Congress's decision to impose limits on that specific authorization. *See id.* at 649. To the contrary, this is a straightforward case where the Code's broad language authorizes bankruptcy courts to approve exculpation provisions when doing so would help facilitate the full implementation of court-approved Chapter 11 plans.

The government also invokes 11 U.S.C. §362, *see* Gov.Br.29-30, a provision that exempts criminal prosecutions and exercises of government police power from the automatic stay. The government argues that this provision demonstrates that the Code prohibits exculpation clauses addressed to the government. But the logic does not follow. Not only does an exculpation provision for plan confirmation have nothing to do with the automatic stay triggered at the outset of the Chapter 11 process, but the government does not articulate why setting a standard of care for individuals implementing a confirmed plan could prevent the government's ability to exercise its police powers during a bankruptcy case. To the contrary, as the bankruptcy court emphasized, this exculpation clause does not bar, enjoin, or prevent regulatory enforcement at all.

**3.** The government's response to the statutory provisions cited by Voyager, moreover, further underscores why the Court should affirm the bankruptcy court's decision.

The government, for example, disputes the relevance of §1142(a).   The government concedes that this provision "instructs the debtor and others to 'carry out the plan,'" but argues that "it does not authorize a bankruptcy court to bar the Government from enforcing its police and regulatory powers."  Gov.Br.24.  Once more, the exculpation clause here emphatically does ***not*** "bar the Government from enforcing its police and regulatory power."  As the bankruptcy court explained, even putting aside that the exculpation clause only applies to court-approved transactions—and even then does not cover fraud, willful misconduct, or gross negligence—the government "can step in at any time" to prevent illegality. ER1241(Dkt.60-19).   Regardless, as the bankruptcy court also explained, the government's emphasis on §1142(a) "focuse[s] on only part of the relevant equation."  ER1237(Dkt.60-19).  Section 1142(a) requires the parties to perform certain actions as part of a court-approved plan, thus providing the statutory authorization for the bankruptcy court's broad authority under ***other*** provisions to see that the court-approved plan is implemented.[7]

---

[7]   The government also observes that §1142(a) "only addresses 'the debtor and any entity organized or to be organized for the purpose of carrying out the plan.'" Gov.Br.24.  This argument is yet another broadside against exculpation clauses generally and reflects a complete misunderstanding of how companies operate. Because corporations can only act through individuals, an exculpation clause that only protected the debtor but not the debtors' agents would serve no function. Both §1123(b)(6) and §105(a) broadly empower bankruptcy courts to effectuate their authority under §1142(a)

The government next argues that §105(a) "does not allow bankruptcy courts to enter orders that would contravene the Code" and is not a "freestanding source of authority," Gov.Br.25-26, another argument that, if accepted, would bar any exculpation provision in all cases.  Yet the reason why courts around the country *routinely* approve such provisions is because far from contravening the Code or providing bankruptcy courts with roving commissions to do equity, exculpation clauses facilitate implementation of court-ordered Chapter 11 plans by allowing court-ordered individuals to unreservedly perform court-ordered tasks—precisely as §1142(a) requires.  Section 105(a) empowers bankruptcy courts to "issue *any* order … necessary or appropriate to carry out the provisions of this title" and to "tak[e] *any* action … necessary or appropriate to enforce or implement court orders." Exculpation clauses comfortably fit in that plain language.  Indeed, the government's argument that §105(a) cannot apply because exculpation clauses supposedly "cannot be reconciled with the Code's text, structure, or purpose," Gov.Br.26, collapses because text, structure, and purpose all support exculpation clauses.

The government also urges the Court to reject §1123(b)(6) for the same reason it asks the Court to ignore §105(a): exculpation supposedly is "inconsistent" with the Code.  For all the reasons given by the bankruptcy court and the host of other courts around the country that have approved exculpation clauses like the one here, the government's argument simply is not persuasive.  There is no inconsistency

34

between confirming a plan requiring certain transactions and approving an exculpation clause shielding parties who implement those transactions from liability for doing precisely what the bankruptcy court ordered them to do. By contrast, despite the plain terms of §1142(a), the government's position would prevent a bankruptcy court from taking basic steps to ensure that its lawful orders are implemented. Section 1123(b)(6) prevents such absurdity.

Finally, the government dismisses the relevance of §1129(a)(3), despite the fact that Congress specifically ordered bankruptcy courts to ensure that a "plan has been proposed in good faith and not by any means forbidden by law" before approving it. According to the government, the fact that bankruptcy courts must determine that plans are lawful does not mean that they can issue exculpation clauses protecting those who implement those lawful plans, even though Congress has (repeatedly) authorized bankruptcy courts to take "any" appropriate steps to effectuate their orders. Yet the government's principal authority—*Purdue*—does not concern exculpation provisions at all and is irrelevant here for the reasons previously discussed. *See* pp.30-31, *supra*.

The government's reliance on *In re Food City, Inc.*, 110 B.R. 808 (Bankr. W.D. Tex. 1990), misses the point. No one is asking for the bankruptcy court to identify any possible illegality. Instead, much more modestly, the bankruptcy court made a determination that the plan could go forward after soliciting briefing from

all interested parties, including relevant regulators.  Indeed, certain agencies were active participants in the bankruptcy court, including the SEC.  Yet although the government had ample opportunity to present evidence of any unlawfulness, it did not do so.  ER1212(Dkt.60-18).  Even now, the government still has not identified any potentially unlawful act called for by the plan.  Based on all the information available to it, the bankruptcy court accordingly found that the steps needed to consummate this transaction are not unlawful while specifically carving out fraud, willful misconduct, or negligence.   To safeguard the government's regulatory authority, moreover, the court also recognized that the government remains free to seek injunctive relief if the government determines that any conduct is illegal.

Nor is any other portion in the government's tour of Chapter 11 relevant.  No one disputes that debtors "must comply with the law like everyone else," the automatic stay does not bar criminal prosecution, or "'[h]aving been a debtor in bankruptcy' does not 'authorize a firm to operate a nuisance … or otherwise excuse it from complying with laws of general application.'"  Gov.Br.30 (citations omitted). The only relevant question is whether, after finding a plan to be lawful, a bankruptcy court can provide limited protection (exempting fraud, willful misconduct, or gross

negligence) to those who obey its orders.  For all the reasons given by the bankruptcy court, the answer is plainly yes.  *See, e.g.*, ER1209-18(Dkt.40-07).[8]

### B.    The Government's Constitutional Arguments Lack Merit.

The government's constitutional arguments are also flawed.  Notably, the government does not argue that the exculpation clause here is actually unconstitutional—only that it raises "serious constitutional concerns."  Gov.Br.31. Yet the weakness in the government's argument only further confirms that Congress authorized the bankruptcy court to issue the exculpation provision here.  Indeed, the government refashions the same argument three times, claiming that the exculpation clause contradicts separation of powers principles, then due process, then sovereign immunity.  But each challenge is fundamentally the same, and all are equally without merit.

**1.** The government first argues that the exculpation provision here may offend separation-of-powers principles by "preemptively immunizing" individuals who follow the court-ordered plan from criminal and civil liability, thereby supposedly

---

[8]   The government notes that the Fifth and Tenth Circuits do not approve of exculpation provisions at all.  *See* Gov.Br.41.  This circuit split is irrelevant, however, because the Second Circuit has not joined either of those circuits.  *See, e.g.*, *In re Highland Cap. Mgmt. L.P.*, 48 F.4th 419, 436 (5th Cir. 2022) (explaining that circuit split is the Fifth and Tenth Circuits versus "the Second, Third, Fourth, Sixth, Seventh, [Ninth] and Eleventh Circuits").  The Fifth and Tenth Circuits' failure to distinguish between releases and exculpation clauses, moreover, is plainly wrong.

supplanting enforcement powers reserved for the Executive and Legislative branches.  Gov.Br.31.  This argument is a red herring, and the bankruptcy court rightly rejected such "hyperbole."  ER 1232(Dkt.60-19).

To begin, the government's contention that the bankruptcy court usurped the power of Congress makes no sense given that Congress enacted each of the statutory provisions at issue.  The government's theory that the bankruptcy court's order would "replace[] all applicable statutes of limitations with that court's own truncated timeline," Gov.Br.31, also ignores that no limitations period has been shortened.  Rather, "the Government is free at any time"—on *any* timeline—"to take action to stop the Debtors' cryptocurrency trades."  ER1244 (Dkt.60-19).  Regardless, Congress regularly shortens statutes of limitations in bankruptcy, including against the government.  *See, e.g.*, *In re Remington Rand Corp.*, 836 F.2d 825, 827-28 (3d Cir. 1988).  Thus even if the government's lament that "investigations take time and involve the development of complex factual records" were relevant, Gov.Br.34, it should be directed to Congress, which has authorized bankruptcy courts to issue "any order … that is necessary or appropriate to carry out" Chapter 11.  11 U.S.C. §105(a).

Nor is the government correct that the bankruptcy court "defi[ed]" the Constitution, Gov.Br.31, by depriving the Executive Branch of its power to enforce the law.  Just the opposite:  The exculpation clause expressly preserves the

government's regulatory powers.  As the bankruptcy court explained, the clause does not "prohibit any regulatory action" but instead merely "say[s] that the parties who will engage in [court-required] activities under the authority and direction of [the bankruptcy court's] order—after the Government stated that it did not contend that the activities were illegal—should not in the interim be liable for doing what [that] order requires."  ER1246(Dkt.60-19).

In other words, the exculpation provision here allows the government to seek to enjoin *any* transaction at *any* time under *any* law.  If, tomorrow, the government wants to file an action seeking to enjoin the rebalancing transactions, nothing prevents it from doing so.  Indeed, if the government wants to pursue liability against one of the exculpated parties, it can do so.  All the provision does is augment a narrow and tailored defense that those parties would raise, assuring them that they will not be held liable *ex post* for conduct authorized and ordered by the bankruptcy court—conduct that the government has never alleged is improper and still does not allege is improper.  And even then, exculpation does not apply to unauthorized conduct or to fraud, willful misconduct, or gross negligence.  The provision is narrower than that sought by Voyager and similar to, if not narrower than, exculpation provisions commonly upheld by courts here and elsewhere.

For similar reasons, the government's reliance on cases like *Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020), is misplaced.  No one disputes that "[t]he Executive

Branch has 'exclusive authority and absolute discretion to decide whether to prosecute a case.'"  Gov.Br.33 (quoting *United States v. Nixon*, 418 U.S. 683, 693 (1974)).  But nothing about the exculpation clause here prevents civil or criminal prosecution.  The clause simply buttresses an affirmative defense against *ex post* liability should the government later attempt to punish someone for obeying a court order.  As explained above, *see* pp.22-23, *supra*, authority overwhelmingly demonstrates that parties who obey court orders are entitled to immunity for doing so.  Under the government's view, all of those cases were wrongly decided because they hinder Executive Branch prosecution.  Yet merely recognizing a defense to prosecution in no way hinders the government's power to bring a prosecution.

In fact, the government itself *recognizes* that, as a general matter, a party engaging in conduct it is ordered to engage in by the bankruptcy court could be subject to qualified immunity in future litigation or prosecution.  *See* Gov.Br.53.  This Court's stay opinion also recognized that "some species of quasi-judicial immunity" likely "applies to at least some parties executing the rebalancing transaction." Dct.Dkt.53 at 15.  These recognitions belie the government's argument here because individuals acting as agents of the bankruptcy court "are generally immune to the extent that they are acting with the approval of the court." *Gross*, 695 F.3d at 216.  Nor is it realistic to suppose that such immunity will allow blatantly unlawful conduct.  Not only would no court issue such an order, but if it did, the

40

government could successfully challenge such a provision on appeal. Here, however, the government does not attempt to make such an argument (and has not even identified it as an issue for appeal) because it has never identified anything unlawful regarding the plan or the required rebalancing transactions that must occur before any distribution to Voyager's creditors.

Rather than rejecting the principle that immunity applies to those who obey court orders, the government disputes that the exculpation clause here is an affirmative defense. *See* Gov.Br.44. Instead, the government argues that "Debtors [have] cited no cases in which courts elevated a defense such as collateral estoppel, res judicata, or qualified immunity into a preemptive pre-suit release." *Id.* Yet this is not a "pre-suit release" at all; instead, it is a defense to liability that exculpated parties may be able to assert in future litigation depending on future events. On its face, nothing in the exculpation clause purports to prevent the government from pursuing any civil or criminal action it wishes. To the contrary, by carving out fraud, willful misconduct, and gross negligence—each of which would need to be proven based on case-specific facts—the clause expressly contemplates proceedings in separate litigation. The government's lengthy discussion of why only an affirmative defense is permissible thus misses the fundamental point: All this exculpation does is augment the very affirmative defense the government recognizes. Furthermore, because the exculpation clause here is materially the same as countless others,

41

adopting the government's argument would spell the end of exculpation provisions generally.

Nor is the government's discussion of justiciability doctrines relevant. *See* Gov.Br.33-34. For one thing, this is yet another argument that would bar *all* exculpation clauses—not just provisions that apply to the government. Regardless, the government again misunderstands the nature of an exculpation clause. Because such clauses merely set forth a standard in a future proceeding for acts taken pursuant to a court order, they do not prevent any subsequent litigation. Accordingly, should the government eventually argue that the way the transactions required by the plan here are performed is unlawful, the government would be the plaintiff in any hypothetical proceedings concerning those transactions.

**2.** The government next turns the Constitution on its head by invoking due process—a protection *against* the government. Gov.Br.34. The government admits as much, recognizing that "governmental entities have no right to due process under the Fifth Amendment's due process clause." *Id*. Yet a paragraph later, the government vaguely suggests that the exculpation provision deprives the government of its "opportunity to be heard on any specific claims that are released." *Id*. at 44. The government has no right to seek an alleged constitutional protection it concedes it cannot invoke. Regardless, the government's contention that the exculpation provision "releases parties from liability to the Government for

hypothetical enforcement actions that have not yet been brought, for conduct that may not even have occurred yet," *id.*, again ignores what exculpation clauses are and how they operate.  Should facts eventually arise justifying litigation, nothing about the clause prevents the government from bringing suit.

Next, the government—again recognizing that it has no due process rights—suggests that other, non-governmental parties that may wish to sue the individuals protected by the exculpation provision would have their due process rights violated. Putting aside the fact that the government is not the proper party to pursue such a challenge and that none of these other parties are concerned with the exculpation provision, this is yet another argument that would bar ***all*** exculpation provisions. But as discussed above, exculpation clauses are routinely accepted by courts across the country.  And the U.S. Trustee's office—the primary branch of the Department of Justice responsible for enforcing the Bankruptcy Code—acknowledged below that the exculpation provision here is, as a general matter, lawful.  It objected to the scope of the clause but did not dispute that parties implementing confirmed Chapter 11 plans should not be subject to legal exposure in doing so.  *See* pp.10-11, *supra*. Furthermore, the bankruptcy court rejected any suggestion that the government did not receive adequate notice here or that the government was not given an opportunity to identify any potential unlawfulness associated with the required rebalancing

transactions.  ER1238-40(Dkt.60-19).  The government's contention that it has lost a "right" flatly contradicts the record.

If anything, what jeopardizes due process is the government's willingness to use the threat of prosecution for supposed crimes it refuses to identify.  Permitting the government to obtain civil or criminal liability against an individual for obeying a court order that requires him to take certain actions—especially where, as here, the court specifically concluded that the conduct at issue is lawful, and the government never previously identified that conduct as unlawful—is a direct threat to due process, the integrity of judicial decisionmaking, and the separation of powers.  It is thus no surprise that the government cannot identify a single case in the Nation's history where an individual was subjected to liability for undertaking court-ordered conduct that the government never identified as improper.

**3.**  The government also wrongly invokes sovereign immunity, a doctrine that bars suit *against* the government.  Indeed, all the cases the government cites discuss when the government can be sued.  *See, e.g., McGuire v. United States*, 550 F.3d 903, 912 (9th Cir. 2008).  This argument is mystifying because no one has suggested an intent to sue the government for anything.  Yet rather than explain why a bar on suits against the government is even arguably relevant to the well-established power of a bankruptcy court to issue exculpation provisions, the government accuses

44

Voyager of not understanding something "basic." Gov.Br.36n.6. Respectfully, it is not Voyager that misunderstands sovereign immunity.

The government cryptically suggests that given sovereign immunity, the bankruptcy court was wrong to "immunize parties from the Government's police and regulatory powers." Gov.Br.37; *see also id*. at 38 ("[There is no waiver of sovereign immunity that would allow a bankruptcy court to nullify criminal liability to the United States for conduct that violates criminal laws enacted by Congress."). This argument, if accepted, would call into doubt the entire of body of law recognizing immunity for those who obey court orders. It also does not accurately reflect what the exculpation clause here does. As the bankruptcy court never tired of repeating, the government can pursue any action it wishes to prevent any illegality it can prove. "If the Government has not already taken regulatory actions with respect to cryptocurrencies, or if it delays in taking any further regulatory actions, those delays will certainly not be attributable in any way to [the bankruptcy court's] order." ER1244(Dkt.60-19).

Regardless, even if sovereign immunity were relevant here, the government has already waived it. As the government concedes, Congress has waived the government's sovereign immunity with relation to "Sections 105 and 1142(a)"— two of the statutes that courts have previously held support exculpation provisions. The government argues that this waiver of sovereign immunity does not apply

45

because "the Exculpation Provision is entirely *inconsistent* with non-bankruptcy law, including applicable statutes of limitations and substantive liability standards." Gov.Br.38.  In other words, the government's sovereign immunity argument is just a repackaging of the government's erroneous statutory arguments.

The government next argues that because "bankruptcy courts have no power to hear criminal cases, they certainly have no power to extinguish them before they are brought and before the relevant conduct has even taken place." Gov.Br.39.  This argument has nothing to do with sovereign immunity.  Regardless, it is wrong for the same reason the government's other variations on this theme are wrong: Nothing about the exculpation clause bars the government from bringing any suit it wishes, from obtaining injunctive relief for any violation of law, or from obtaining criminal convictions for acts that constitutes fraud, willful misconduct, or gross negligence. No different from any other application of immunity, all the exculpation clause does here is create a defense to liability for actions taken pursuant to the bankruptcy court's order.[9]

---

[9]   The government's citation to *Garvin v. Cook Investments NW, SPNWY, LLC*, 922 F.3d 1031 (9th Cir. 2019), is inapposite.  The government cites *Garvin* for the proposition that "confirmation of a plan does not insulate debtors from prosecution for criminal activity, even if that activity is part of the plan itself." Gov.Br.39.  But the conduct at issue in *Garvin* was known to be illegal.  Here, by contrast, the government has has not identified any conduct directed by the plan that it believes to be illegal.  If the government ever does so, moreover, it can step in and stop the conduct.

Case 1:23-cv-02171-JHR   Document 67   Filed 04/14/23   Page 54 of 60

Finally, the government ignores *Airadigm*, in which the Seventh Circuit upheld an exculpation provision over the government's objection. 519 F.3d at 657. To be sure, the government's smorgasbord of constitutional theories was not presented to the Seventh Circuit, but it not credible that the Seventh Circuit would have simply overlooked supposedly fundamental constitutional flaws. This Court, moreover, previously suggested that *Airadigm* may be distinguishable because "unlike here, the clause [there] 'expressly preserve[d] the FCC's regulatory powers.'" Dct.Dkt.53 at 14. But just like in *Airadigm*, the exculpation provision here also preserves regulatory powers; "the Government is free at any time to take action to stop the Debtors' cryptocurrency trades and/or cryptocurrency distributions if the Government decides that those activities should be stopped." ER 1234(Dkt.60-19).

**4.** Common sense also defeats the government's constitutional arguments. The government stresses, for example, that no court has upheld an exculpation provision over the constitutional theories it raised for the first time here. Yet the government has intervened in hundreds of Chapter 11 actions across the country, often raising objections to exculpation provisions.[10] In any one of these cases the

---

[10] *See, e.g.*, *Latam*, 2022 WL 2206829, at *50-51; *Aegean*, 599 B.R. at 721; *Stearns*, 607 B.R. at 790; *Genco*, 513 B.R. at 268-72; *In re Ditech Holding Corp.*, 606 B.R. 544, 631 (Bankr. S.D.N.Y. 2019); *see also In re Astria Health*, 623 B.R. 793, 799-800 (Bankr. E.D. Wash. 2021); *In re Retail Grp., Inc.*, 2021 WL 2188929, at *9 (Bankr. E.D. Va. May 28, 2021); *In re Emerge Energy Servs. LP*,

government could have made the same constitutional arguments it raises here.  The government's failure do so before is evidence that these arguments are not colorable.  Additionally, the government concedes, as it must, that no court has ever accepted any of its constitutional arguments.  This Court should not be the first.

### C.    The Government's Remaining Arguments Fail.

Finally, the government disagrees that the exculpation clause here merely protects those who obey the bankruptcy court's orders.  For the reasons explained by the bankruptcy court, this argument rests on a serious misreading of what the bankruptcy court did.

First, the government complains that exculpation here is not limited to conduct during the bankruptcy case and extends beyond plan fiduciaries.  This argument, however, has nothing to do with whether the clause here only protects those who obey court orders; instead, of course, it is just another an attack on the bankruptcy court's substantive authority to issue exculpation clauses at all.  The statutory authorities discussed above squarely rebut the government's argument.  *See* pp.19-21, *supra*.  Indeed, none of the cases in this circuit suggests that such distinctions matter.  The Court in *Enron* and *Oneida* approved exculpation clauses that extended beyond the effective date to the implementation and administration of

---

2019 WL 7634308, at *19 (Bankr. D. Del. Dec. 5, 2019); *In re Quincy Med. Ctr., Inc.*, 2011 WL 5592907 (Bankr. D. Mass. Nov. 16, 2011).

the company's respective plans.  *Enron,* 326 B.R. at 500-01; *Oneida*, 351 B.R. at 94

n.22.  Indeed, the *Ditech* court in 2021 concluded that "[i]t is settled that exculpatory

provisions are proper to protect those authorized by bankruptcy courts to carry out

the bankruptcy process, ***even after the effective date of a plan***."  2021 WL 3716398,

at *9 (emphasis added).  And the *Latam* court expressly recognized that "Exculpated

Parties who are not estate fiduciaries are entitled to benefit from a broad exculpation

provision."  2022 WL 2206829, at *50.  The government simply ignores these cases.

Furthermore, these cases make perfect sense: Where, as here, the success of the plan

requires activity after confirmation by a broad group of people, a bankruptcy court

has authority to ensure that they are shielded from liability for obeying court orders.

Second, the government argues that the exculpation provision "is not limited

to … particular actions approved by the bankruptcy court, but provides

impermissible prospective immunity from suit."  Gov.Br.50.  This argument

conflicts with the exculpation clause's plain language.  As the bankruptcy court

explained, "The third and fourth paragraphs of the exculpation provisions … are

specifically limited to the fact that the parties must buy and sell cryptocurrencies as

part of the portfolio rebalancing that the plan requires, and must distribute

cryptocurrencies to customers," and so "protect the parties from belated allegations

that those very activities are somehow violative of law and that parties should be

penalized just for doing what [the court] ordered them to do."  ER1236(Dkt.60-19);

*see also United States v. Spallone*, 399 F.3d 415, 423 (2d Cir. 2005) ("When an issuing judge interprets his own orders, we accord substantial deference to the draftsman, and we will not reverse the judge's construction of an ambiguity in his own words except for abuse of discretion.").   Further, whether immunity from liability will exist necessarily depends on the specific facts of any hypothetical future case.  *See* pp.41-42, *supra*.[11]

Last, the government contends exculpation is vague because it does not "spell out with precision all the steps that the parties must take to implement these transactions."  Gov.Br.51.  The plan, however, is quite specific.  Regardless, this argument again highlights the government's misunderstanding of exculpation. Exculpation sets a standard of care for conduct undertaken as directed by the bankruptcy court.  To date, the government, despite countless opportunities, has not identified any unlawful or even potentially unlawful acts called for by the plan.  And the clause only functions to protect the individuals who ***acted in accordance with the plan***—and by extension the Bankruptcy Code—prior to any indication from the

---

[11]  In its stay briefing, the government complained that although the first paragraph of the exculpation provision contains the carveout for fraud, willful misconduct, and gross negligence, the third paragraph does not.  It appears that the government has abandoned this argument because it is obvious that the bankruptcy court understood the carveout to apply to that third paragraph. Regardless, for the avoidance of doubt, Voyager would not object to expressly attaching the first paragraph's carveout to the third paragraph, too.

government that court-approved conduct is unlawful (at which point the government can step in to stop such conduct).  ER1216(Dkt.60-18).

## CONCLUSION

The Court should affirm the Confirmation Order.

Dated:  April 14, 2023           */s/ Joshua A. Sussberg*
New York, New York

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
Lamina Bowen
601 Lexington Avenue
New York, N.Y. 10022
Telephone:  (212) 446-4800
Email:      jsussberg@kirkland.com
            cmarcus@kirkland.com
            christine.okike@kirkland.com
            allyson.smith@kirkland.com
            lamina.bowen@kirkland.com

Michael B. Slade (admitted *pro hac vice*)
Richard U.S. Howell, P.C. (admitted *pro hac vice*)
300 N. LaSalle Drive
Chicago, IL 60654
Telephone:  (312) 862-2000
Email:      mslade@kirkland.com
            rhowell@kirkland.com

George W. Hicks, Jr., P.C. (*pro hac vice* pending)
Aaron L. Nielson (admitted *pro hac vice*)
1301 Penn. Ave., N.W.,
Washington, D.C. 20004
Telephone:   (202) 389-5000
Email:      george.hicks@kirkland.com
            aaron.nielson@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

## CERTIFICATE OF COMPLIANCE

I, Joshua A. Susberg, P.C., counsel of record for Appellees, certify that this brief was prepared using Microsoft Word, and that this processing program has been applied to include all text other than what Fed. R. Bank. P. 8015(g) allows to be excluded in preparing the following word count. I further certify that this brief contains 12,355 words.

By:     */s/ Joshua A. Sussberg*
          Joshua A. Sussberg