23-cv-02171

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

In re Voyager Digital Holdings, Inc., et al, Debtors

United States of America, et al., Appellants,

v.

Voyager Digital Holdings, Inc., et al., Appellees

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## APPELLEES' APPENDIX

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
Lamina Bowen
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, N.Y. 10022
(212) 446-4900
jsussberg@kirkland.com
cmarcus@kirkland.com
christine.okike@kirkland.com
allyson.smith@kirkland.com
lamina.bowen@kirkland.com

Michael B. Slade (admitted *pro hac vice*)
Richard U.S. Howell (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
300 N. LaSalle
Chicago, IL  60654
(312) 862-2000
michael.slade@kirkland.com
richard.howell@kirkland.com

George W. Hicks, Jr., P.C. (*pro hac vice* pending)
Aaron L. Nielson (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
1301 Penn. Ave., N.W.,
Washington, D.C. 20004
(202) 389-5000
george.hicks@kirkland.com
aaron.nielson@kirkland.com

April 14, 2023

## TABLE OF CONTENTS

| Document | Date | Bk. Dkt. | Page |
|---|---|---|---|
| Motion to Authorize / Debtors' Motion for Entry of an Order (I) Authorizing Entry into the Binance US Purchase Agreement and (II) Granting Related Relief | 12/21/2023 | 775 | A-1–A-150 |
| Third Amended Plan / Notice of Filing of Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code | 12/22/2023 | 777 | A-151–A-303 |
| Amended Plan /Notice of Filing of Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code | 1/10/2023 | 852 | A-304–A-454 |
| Order signed on 1/13/2023 Granting Motion (I) Authorizing Entry Into the Binance US Purchase Agreement and (II) Granting Related Relief | 1/13/2023 | 860 | A-455–A-465 |
| January 10, 2023 Hearing Transcript | 1/10/2023 | | A-466–A-523 |
| Declaration of Brian Tichenor in Support of Confirmation of the Third Amended Joint Plan of Voyager Digital Holdings, Inc. And Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code | 2/28/2023 | 1113 | A-524–A-543 |
| Declaration of Mark A. Renzi in Support of Confirmation of the Third Amended Joint Plan of Voyager Digital Holdings, Inc. And Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy | 2/28/2023 | 1119 | A-544–A-588 |

| Document | Date | Bk. Dkt. | Page |
|---|---|---|---|
| Notice of Proposed Order / Order (I) Approving the Second Amended Disclosure Statement and (II) Confirming the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code | 2/28/2023 | 1120 | A-589–A-738 |
| Amended Notice of Proposed Order / Order (I) Approving the Second Amended Disclosure Statement and (II) Confirming the Third Amended Joint Plan of Voyager Digital Holdings, Inc. And Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code | 3/2/2023 | 1130 | A739–A-904 |
| Amended Plan /Notice of Filing of Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code | 1138 | 3/5/2023 | A-905–A-1062 |
| March 2, 2023 Confirmation Hearing Transcript | | 3/2/2023 | A-1063–A-1167 |
| March 3, 2023 Confirmation Hearing Transcript | | 3/3/2023 | A-1168–A-1269 |
| March 6, 2023 Confirmation Hearing Transcript | | 3/6/2023 | A-1270–A-1363 |
| March 7, 2023 Confirmation Hearing Transcript | | 3/7/2023 | A-1364–A-1406 |

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 11 |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | Case No. 22-10943 (MEW) |
| Debtors. | (Jointly Administered) |

**NOTICE OF HEARING ON DEBTORS' MOTION**
**FOR ENTRY OF AN ORDER (I) AUTHORIZING ENTRY INTO THE**
**BINANCE US PURCHASE AGREEMENT AND (II) GRANTING RELATED RELIEF**

**PLEASE TAKE NOTICE** that a hearing on the *Debtors' Motion for Entry of An Order (I) Authorizing Entry Into the Binance US Purchase Agreement and (II) Granting Related Relief* (the "Motion,") will be held on **January 5, 2023, at 1:00 p.m., prevailing Eastern Time** (the "Hearing").  In accordance with General Order M-543 dated March 20, 2020, the Hearing will be conducted telephonically.  Any parties wishing to participate must do so by making arrangements through CourtSolutions by visiting https://www.court-solutions.com.

**PLEASE TAKE FURTHER NOTICE** that any responses or objections to the relief requested in the Motion shall:  (a) be in writing; (b) conform to the Federal Rules of Bankruptcy

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

Procedure, the Local Bankruptcy Rules for the Southern District of New York, and all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York; (c) be filed electronically with the Court on the docket of *In re Voyager Digital Holdings, Inc.*, No. 22-10943 (MEW) by registered users of the Court's electronic filing system and in accordance with all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York (which are available on the Court's website at http://www.nysb.uscourts.gov); and (d) be served so as to be actually received by **December 30, 2022, at 4:00 p.m., prevailing Eastern Time**, by (i) the entities on the Master Service List available on the case website of the above-captioned debtors and debtors in possession (the "<u>Debtors</u>") at https://cases.stretto.com/Voyager and (ii) any person or entity with a particularized interest in the subject matter of the Motion.

**PLEASE TAKE FURTHER NOTICE** that only those responses or objections that are timely filed, served, and received will be considered at the Hearing. Failure to file a timely objection may result in entry of a final order granting the Motion as requested by the Debtors.

**PLEASE TAKE FURTHER NOTICE** that copies of the Motion and other pleadings filed in these chapter 11 cases may be obtained free of charge by visiting the website of Stretto at https://cases.stretto.com/Voyager. You may also obtain copies of the Motion and other pleadings filed in these chapter 11 cases by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

*[Remainder of page intentionally left blank]*

A-2

Dated: December 21, 2022
New York, New York

/s/ Joshua A. Sussberg

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900
Email:          jsussberg@kirkland.com
                cmarcus@kirkland.com
                christine.okike@kirkland.com
                allyson.smith@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

<div align="center">

**DEBTORS' MOTION FOR**
**ENTRY OF AN ORDER (I) AUTHORIZING ENTRY INTO THE**
**BINANCE US PURCHASE AGREEMENT AND (II) GRANTING RELATED RELIEF**

</div>

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") respectfully state the following in support of this motion (this "<u>Motion</u>"):[2]

<div align="center">

**Preliminary Statement**

</div>

1.      For the better part of the past year, the cryptocurrency industry experienced (and continues to experience) unprecedented turmoil.  The Debtors commenced these chapter 11 cases with the objective of consummating the most value-maximizing transaction for their customers and other creditors on an expedited timeline.  Following a thorough and extensive marketing

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

[2]      Capitalized terms used by not defined herein shall have the meaning given to them in the Binance US Purchase Agreement or the Bidding Procedures (each as defined below), as applicable.

<div align="center">

A-4

</div>

process, the Debtors believed they accomplished that goal with the proposed sale transaction with West Realm Shires Inc. ("WRSI" and, along with affiliates, "FTX," and the sale transaction thereunder, the "FTX Transaction"). However, and as discussed in more detail herein, the shocking collapse of FTX gutted any possibility of closing the FTX Transaction. The Debtors quickly pivoted to reengaging with alternative bidders and on December 18, 2022 executed that certain asset purchase agreement (the "Binance US Purchase Agreement") with BAM Trading Services Inc. d/b/a Binance.US ("Binance US" and the sale transaction thereunder, the "Binance US Transaction"). Importantly, the contemplated Binance US Transaction includes a "toggle" to a transaction whereby the Debtors will return cryptocurrency to creditors should they conclude that option to be in creditors' best interests and exercise their "Fiduciary Out," or should the Binance US Transaction not close by a date certain to ensure an outside date (the "Toggle Transaction").

2.     The Debtors value Binance US's bid at approximately $1.022 billion, comprised of (a) the value of cryptocurrency on the Voyager platform as of a date to be determined, which as of December 19, 2022 at 0:00 UTC, is estimated to be $1.002 billion, plus (b) additional consideration, which is estimated to provide at least $20 million of incremental value. The Debtors intend to move swiftly towards confirmation and resolution of these chapter 11 cases in order to mitigate any further delay in distributing recoveries to their creditors.

## I.     The Initial Marketing Process and Proposed Sale to FTX.

3.     Before the Petition Date, and as discussed in the *Declaration of Stephen Ehrlich, Chief Executive Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 15] (the "First Day Declaration"), the Debtors commenced a marketing process for an investment in, or a sale of the Debtors' business to, a third-party purchaser. Discussions with

interested parties, however, revealed that an in-court process would be necessary to yield the most value-maximizing transaction available to the Debtors. Accordingly, the Debtors commenced these chapter 11 cases and continued their marketing efforts postpetition.

4. The Debtors and their advisors left no stone unturned. Over the past six months, Moelis & Company LLC ("Moelis"), the Debtors' investment banker, reached out to 96 strategic investors and financial sponsors, many of which had significant experience in the cryptocurrency industry. 60 parties executed non-disclosure agreements and were provided with access to a virtual data room with comprehensive information regarding the Debtors' business operations and financial position. The virtual data room was robust, supplemented throughout the marketing process, and contained thousands of diligence items. Moelis also held virtual diligence sessions with the Debtors and multiple interested parties.

5. On the first day of these chapter 11 cases, the Debtors filed the *Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 17] (as amended and restated from time to time, the "Standalone Plan"). The Standalone Plan served as a floor for the marketing process. Shortly thereafter, the Debtors filed the *Debtors' Motion Seeking Entry of an Order (I) Approving the Bidding Procedures and Related Dates and Deadlines, (II) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation, and (III) Granting Related Relief* [Docket No. 126] (the "Bidding Procedures Motion," and the bidding procedures established therein, the "Bidding Procedures"),[3] which set a timeline for interested

---

[3]  The Court approved the Bidding Procedures Motion on August 5, 2022. See *Order (I) Approving the Bidding Procedures, (II) Scheduling the Bid Deadlines and the Auction, (III) Approving the Form and Manner of Notice Thereof, (IV) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation, and (V) Granting Related Relief* [Docket No. 248] (the "Bidding Procedures Order").

parties to submit bids for an acquisition of the Debtors' assets and procedures for conducting an auction if multiple bids were received.

6.     The Debtors' marketing process proved fruitful and yielded bids from numerous strategic investors.  Accordingly, on September 13, 2022, the Debtors commenced an auction (the "Auction") to determine the winning bid.  The two-week Auction consisted of hard-fought, arm's-length negotiations with each participating bidder.  At the conclusion of the Auction, WRSI was announced as the Successful Bidder.

7.     This court entered an *Order Authorizing Entry into the Asset Purchase Agreement* [Docket No. 581] (the FTX Purchase Agreement") on October 20, 2022.  Details of the FTX Transaction were set forth in the Debtors' *First Amended Disclosure Statement Relating to the Second Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 498] (the "FTX Disclosure Statement") and contemplated to be effectuated pursuant to the *Second Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 590] (the "FTX Plan").  The Court entered an order approving the adequacy of the FTX Disclosure Statement on October 21, 2022 [Docket No. 586], and solicitation for acceptance or rejection of the FTX Plan commenced shortly thereafter.  A confirmation hearing was scheduled for December 8, 2022.  However, a mere two weeks after solicitation commenced, it quickly became evident that any transaction with FTX would be unattainable.

## II.    The FTX Collapse.

8.     Shortly after public reports emerged drawing concern around FTX and the legitimacy of its operations, on November 11, 2022, 101 FTX entities commenced filing for voluntary relief under chapter 11 in the United States Bankruptcy Court for the District of

Delaware (the "FTX Bankruptcy Proceeding").[4]  WRSI, the contemplated purchaser under the FTX Transaction, filed for chapter 11 on November 14, 2022.

9.      While the FTX Bankruptcy Proceeding is still unfolding, early indications are that the former Chief Executive Officer of FTX, Sam Bankman-Fried, and FTX were carrying on one of the largest financial frauds in history.  Mr. John Ray III, who was appointed Chief Executive Officer of FTX following the resignation of Mr. Bankman-Fried and who previously oversaw the restructuring of Enron, commented in an early filing in the FTX Bankruptcy Proceeding that "[n]ever in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information."[5]  On December 12, 2022, Mr. Bankman-Fried was arrested by the Bahamian Police and is currently being held at the Fox Hill Prison in Nassau, Bahamas without bail.  The full extent of the injury caused by FTX's apparent fraud will likely take years to uncover.

## III.    Continuation of the Marketing Process.

10.      As FTX appeared to be collapsing, but before its chapter 11 filing, on November 10, 2022, the Debtors requested that FTX waive the "No-Shop" provision (Section 5.2) of the FTX Purchase Agreement.  FTX, through its counsel, acquiesced.  On December 9, 2022, the Debtors filed with this Court the *Joint Stipulation and Agreed Order Between the Debtors and FTX US* seeking to terminate the FTX Purchase Agreement [Docket No. 717] (the "Stipulation").  The Debtors and FTX intend to seek approval of the Stipulation by the court overseeing the FTX Bankruptcy Proceeding as well.

---

[4]      *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Nov. 11, 2022).

[5]      *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 24], filed in *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Nov. 17, 2022); *see also United States of America v. Samuel Bankman-Fried*, 22-crim-673 (S.D.N.Y. December 9, 2022); *Securities and Exchange Commission v. Samuel Bankman-Fried*, Civil Action. No. 22-cv-10501 (S.D.N.Y. Dec. 13, 2022).

5

11.     While the Debtors were shocked and dismayed by FTX's cataclysmic collapse, they swiftly reengaged in negotiations with other potential counterparties to evaluate alternative transactions that would maximize value for the Debtors and their creditors.

12.     As disclosed throughout the entirety of these cases, the Debtors had already conducted a comprehensive marketing process that resulted in a two-week Auction and leveraged those prior efforts to move quickly towards agreement with an alternative bidder.  While many of the parties that the Debtors engaged with following the FTX collapse were previously involved in the marketing process, several new parties expressed interest and engaged in discussions with the Debtors.  When analyzing proposals received from interested parties, the Debtors and their advisors considered both the viability and risk factors associated with each proposed transaction, including but not limited to, timing considerations, third-party financing requirements, ability to consummate, cybersecurity risks, regulatory and licensing status, and counterparty risk based on the Debtors' counterparty due diligence conducted during the one-month negotiation period.

13.     Notably, the Debtors and their advisors contemplated pursuing the Toggle Transaction.  The Debtors and their advisors determined that pursuing the Toggle Transaction would impose costs of its own on the Debtors, would take time, and would present its own risks. Among other things, the Toggle Transaction would involve the Debtors "rebalancing" their cryptocurrency holdings to prepare for distributions to creditors, and then reopening the Voyager platform for approximately a month to allow customers to withdraw their pro rata share of cryptocurrency, to the extent it can be withdrawn.  While a viable option, the Toggle Transaction, among other things, would likely (a) be less tax efficient for customers than a third party transaction; (b) lead to incremental value leakage over and above that in a third party transaction; (c) create additional security risks (particularly if the Debtors are unable to retain critical personnel

6

A-9

necessary to perform the Toggle Transaction); (d) require the Debtors to liquidate additional cryptocurrency as working capital to complete the work required; (e) strand certain cryptocurrency, which can be withdrawn by customers from certain third party exchanges (like Binance US) but not from Voyager; and (f) severely damage the value of the VGX token, which is the native token of the Voyager platform.

## IV.    The Proposed Sale to Binance US.

14.    Following good-faith, arm's length negotiations with several alternative transaction parties, the Debtors determined that based on the information they have to date, the transaction proposed by Binance US was the highest or otherwise best offer available for the Debtors' assets. The Debtors value the Binance US Transaction at approximately $1.022 billion, comprising (i) the value of cryptocurrency on the Voyager platform as of a date to be determined, which as of December 19, 2022 at 0:00 UTC, is estimated to be $1.002 billion, plus (ii) additional consideration, which is estimated to provide at least $20 million of incremental value.  The Binance US Transaction also includes additional benefits, such as it (i) provides the most tax efficient route forward as Binance US supports 100% of the cryptocurrency coins on the Debtors' platform, (ii) it is the only transaction available to the Debtors that did not require the Debtors to liquidate cryptocurrency for working capital purposes, (iii) includes reimbursement by Binance US of up to $15 million of Seller's expenses, (iv) provides a $10 million reverse termination fee payable to the Seller by Binance US to compensate the Debtors' estates in the event that Binance US cannot consummate the transaction, and (v) in the event that the Debtors pivot to the Toggle Transaction, provides that Binance US will provide certain services to facilitate such transaction to ensure that the Debtors can rely on the Binance US platform to minimize leakage with and cybersecurity risks when returning cryptocurrency to creditors.

15.     It was (and is) well known that the Debtors' assets were once again for sale following the very public FTX collapse.  The Debtors believed (and continue to believe) that time is of the essence to enter into a transaction that can be consummated expeditiously to reduce the administrative costs of these chapter 11 cases, maximize stakeholder recoveries, and minimize uncertainty while the cryptocurrency environment continues to fluctuate.  Nonetheless, as described in the Tichenor Declaration, the most recent marketing process was thorough, public, fair, and produced the most value-maximizing transaction upon culmination of further negotiations with several interested parties.

16.     The Debtors will seek to effectuate the Binance US Transaction through the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Plan"), filed substantially contemporaneously herewith, whereby the Debtors' customers and other creditors will be able to vote to accept or reject the Plan and ultimately the Binance US Transaction included therein.  The Debtors do not seek approval of the Binance US Transaction through this Motion.

17.     However, by this Motion, the Debtors do seek the Court's approval to enter into the Binance US Purchase Agreement.  The Binance US Purchase Agreement provides a viable path for the Debtors to exit from these chapter 11 cases in an industry experiencing significant volatility during the continued "Crypto Winter."  Prior to approval of this Motion, the Debtors are subject to a strict "No Shop" under the Binance US Purchase Agreement.  The "No Shop" was important to Binance US during the interim period between the filing of the Binance US Purchase Agreement and the hearing on this Motion during which Binance US would not have the protection of payment of the Purchaser Expenses (as defined below) in the event the Debtors determined to proceed with a higher and/or better offer.  Upon approval of this Motion, the "No Shop" provision will revert to

8

the formulation approved by the Court in connection with the FTX Transaction, which (if approved) would prohibit the Seller from initiating contact with, or soliciting, an alternative transaction. However, the "No Shop" provision does not prohibit any other party from coming forward with a higher and better offer.

18.     Importantly, the Binance US Purchase Agreement contains a "Fiduciary Out", which provides that the Seller may terminate the Binance US Purchase Agreement at any time in the event that not doing so would be inconsistent with the Seller's fiduciary duties. Moreover, the structure of the proposed transaction, including its "Fiduciary Out," permits the Debtors to toggle *either* to a higher and better third-party bid (should one emerge) *or* to the Toggle Transaction, if the Debtors determine in their business judgment between now and closing that the Binance US Transaction is no longer the highest and best option for any reason. Based on the diligence the Debtors have performed to date on their proposed counterparty, they believe the Binance US Transaction is the highest and best option. But the Debtors recognize that the cryptocurrency industry is experiencing an extremely volatile period for an already volatile business, and the Debtors continue to monitor what seem to be daily developments in the sector. Not only does the structure of the proposed transaction permit the Debtors to pivot to the Toggle Transaction if they conclude the Binance US Purchase Agreement is no longer higher and better due to a development along the way, but also the work to prepare to consummate and execute on the Binance US Purchase Agreement will better prepare the Debtors to complete the Toggle Transaction if the toggle becomes necessary.

19.     The Binance US Purchase Agreement includes an expense reimbursement provision whereby the Seller would be responsible to reimburse Binance US for its reasonable and documented out-of-pocket expenses of up to $5 million in the event the Binance US Purchase

A-12

Agreement is terminated (a) by the Seller if the closing has not occurred by the Outside Date or extended Outside Date, as applicable, in circumstances where Binance US would be entitled to terminate the Binance US Purchase Agreement for breach of the Binance US Purchase Agreement by the Seller, or (b) pursuant to Section 8.1(e) (Seller breach), Section 8.1(g) (Seller exercise of the fiduciary out), Section 8.1(h) (dismissal or conversion of the chapter 11 cases to chapter 7, or if the automatic stay is lifted with respect to any Acquired Assets), or Section 8.1(i)(ix) (Seller breach of the "No Shop"); *provided* that if the Binance US Purchase Agreement is validly terminated by Seller pursuant to Section 8.1(g) (Seller exercise of the fiduciary out) (x) in order for Seller to pursue the Toggle Transaction as a result of and following any Effect with respect to Binance US's business, financial condition, operations, assets, management, employees, compliance, or liabilities, taken as a whole, or any Effect with respect to Binance US's Affiliates that has an Effect thereon that would reasonably be expected to (i) prevent or materially impair or materially delay the ability of Binance US to consummate the Binance US Transaction or (ii) materially and adversely affect the customers, creditors, or the acquired cryptocurrency on the Binance US platform, and (y) such termination was not caused by (i) the Debtors determination to pursue a higher and better offer from a third party or (ii) because the estimated proceeds from the Toggle Transaction are or would reasonably be expected to be greater than the consideration under the Binance US Transaction, then no Purchaser Expenses shall be payable (the "Purchaser Expenses").[6] *See* Binance US Purchase Agreement, Section 6.22. The Purchaser Expenses were negotiated at arm's length and insisted on by Binance US as a required condition to entering into the Binance US Purchase Agreement. However, the Purchaser Expenses are narrow. The Debtors

---

[6]  This summary of the circumstances that can trigger the Purchaser Expenses is entirely qualified by the Binance US Purchase Agreement (including Sections 6.22 and 8.1 thereof). In the event that there is a conflict between this summary and Binance US Purchase Agreement, the Binance US Purchase Agreement shall govern.

believe that the Purchaser Expenses, which are only triggered in the limited circumstances noted above, are a small price to pay to lock in a transaction that will provide meaningful recoveries to creditors in these chapter 11 cases.

20.     Further, the Debtors successfully negotiated additional assurances and value for the benefit of their estates under the Binance US Purchase Agreement, including (i) reimbursement by Binance US of up to $15 million of Seller's expenses, (ii) a $10 million good faith deposit paid by Binance US to the Seller, and (iii) a $10 million reverse termination fee payable to the Seller by Binance US, in each case, subject to the terms and conditions set forth in the Binance US Purchase Agreement.

21.     In light of the foregoing, the Debtors believe that entry into the Binance US Purchase Agreement is in the best interests of the Debtors' estates.

## Relief Requested

22.     The Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Order"), (i) authorizing entry into the Binance US Purchase Agreement and (ii) granting related relief.  In support of the Debtors' request for entry of the Order, the Debtors submit the Tichenor Declaration, filed substantially contemporaneously herewith.[7]

## Jurisdiction and Venue

23.     The United States Bankruptcy Court for the Southern District of New York (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, entered February 1, 2012.  The Debtors confirm their consent to the Court

---

[7]     *See Declaration of Brian Tichenor in Support of the Debtors' Motion for Entry of An Order (I) Authorizing Entry Into the Binance US Purchase Agreement and (II) Granting Related Relief* (the "Tichenor Declaration"), filed substantially contemporaneously herewith.

entering a final order in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

24.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

25.      The bases for the relief requested herein are sections 105(a), 363, 1107, and 1108 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), rule 2002 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), rules 2002-1 and 9006-1 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules"), and the *Sale Guidelines for the Conduct of Asset Sales Established and Adopted by the United States Bankruptcy Court for the Southern District of New York Pursuant to General Order M-383* (the "Sale Guidelines").

### Background

26.      On July 5, 2022 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  A detailed description of the facts and circumstances of these chapter 11 cases is set forth in the First Day Declaration, incorporated by reference herein.

27.      The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  These chapter 11 cases have been consolidated for procedural purposes only and are jointly administered pursuant to Bankruptcy Rule 1015(b) [Docket No. 18].  On July 19, 2022, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed an official committee of unsecured creditors [Docket No. 102] (the "Committee").

## Summary of the Key Terms of the Binance US Purchase Agreement

28.     As described herein, the Debtors executed the Binance US Purchase Agreement following a robust and extensive marketing process and multiple rounds of bidding at the Auction over the course of two weeks and then further engagement with interested third parties following the FTX collapse.  The following chart summarizes the principal terms of the Binance US Purchase Agreement.

| Agreement Provision | Summary Description[8] |
|---|---|
| **Parties** | Seller:  Voyager Digital, LLC<br>Purchaser:  BAM Trading Services Inc. d/b/a Binance US |
| **Purchase Price** | • The Purchase Price to be paid by Purchaser for the purchase of the Acquired Assets shall be: (i) (A) the assumption of Assumed Liabilities, (B) a cash payment of $20,000,000, (C) the Seller Expenses, if any, payable pursuant to Section 6.21, and (D) Purchaser's obligations to make the payments set forth in Section 6.12 and Section 6.14.<br><br>*See* **Binance US Purchase Agreement, § 2.1.** |
| **Acquired Assets** | • all Acquired Coins, together with all information regarding the underlying networks and smart contracts to which such Acquired Coins are subject;<br><br>• to the extent permissible under applicable Law, (1) all (i) information and Personal Information (including, for the avoidance of doubt, names, account numbers, social security numbers, passports (including passport numbers), drivers licenses (including driver license numbers), "liveness check" selfies, email addresses, mailing addresses, phone numbers, contact information, usernames, user IDs, passwords, and any Personal Information collected for purposes of KYC Procedures) related to (A) all active and inactive accounts of Users ("Voyager User Accounts") and (B) any other consumers located or having a home address in the United States from whom Personal Information was collected by Seller; (ii) information that has been anonymized, pseudonymized, or otherwise de-identified; (iii) data contained in the Seller Statement or the Post-Bankruptcy Statement; (iv) information relating to Voyager User Accounts that must be obtained and retained by Purchaser or any of its Affiliates for regulatory or legal purposes; and (v) any encryption key, passcode or cypher required to access any of the foregoing (collectively, the "Acquired User Data"), and (2) all other information and data relating to the other categories of Acquired Assets, the Voyager Platform, other than Acquired User Data (clauses (1) and (2), collectively, "Acquired Information");<br><br>• all rights, causes of action, claims (including, for the avoidance of doubt, |

---

[8]     This summary is qualified in its entirety by the Binance US Purchase Agreement. In the event that there is a conflict between this summary and the Binance US Purchase Agreement, the Binance US Purchase Agreement shall govern.

| Agreement Provision | Summary Description[8] |
|---|---|
| | any claims and causes of action arising under Chapter 5 of the Bankruptcy Code), counterclaims, defenses, credits, rebates, demands, allowances, refunds (other than Tax refunds or Tax attributes, in each case, to the extent enumerated in Section 1.2(i)), causes of action, rights of set off, rights of recovery, rights of recoupment or rights under or with respect to express or implied guarantees, warranties, representations, covenants or indemnities of any kind, in each case that Seller may have against any User located or having a home address in the United States solely to the extent that such claim or cause of action is against a User in such Person's capacity as a User (in each case, excluding (i) Retained Avoidance Actions, (ii) claims, causes of action or other rights against Seller or any of its Affiliates, or (iii) any of the foregoing to the extent relating to any Credit Matter) (collectively, "Acquired Voyager Claims"); |
| | • other than VGX Token Smart Contracts, all Intellectual Property owned by Seller or otherwise used or held for use by or on behalf of Seller in connection with the operation of its businesses, including all Business Software (in source code and object code form), any Bedrock source code and other IT Systems owned by Seller and required to operate the Voyager Platform, all Business Accounts (provided that Purchaser may elect, by written notice to Seller until two (2) Business Days prior to the Closing Date, to designate any Business Account(s) as Excluded Asset(s)), all rights to collect royalties and proceeds in connection therewith with respect to the period from and after the Closing, all rights, claims and causes of action to sue and recover for past, present and future infringements, dilutions, misappropriations of, or other conflicts with, such Intellectual Property and any and all corresponding rights that, now or hereafter, may be secured throughout the world; |
| | • all rights to continue the customer relationships with customers of Seller and its Affiliates to the extent pertaining to savings and trading services related to Cryptocurrency; |
| | • all Contracts listed on Schedule 1.1(f) (the "Assigned Contracts") (for the avoidance of doubt, not including the 3AC Loan); and |
| | • other than the Excluded Documents, all Documents, goodwill, payment intangibles and general intangible assets and rights of or otherwise used or held for use by or on behalf of Seller and its Affiliates, in each case in connection with or related to any of the foregoing categories of Acquired Assets; provided that Seller shall be entitled to retain copies of Documents (subject to Section 6.19). |
| | *See* **Binance US Purchase Agreement, § 1.1.** |
| Excluded Assets | All other properties, rights, interests and other assets of Seller that are not Acquired Assets, including the following: |
| | • all Cash and Cash Equivalents, all bank accounts, and all deposits (including maintenance deposits and security deposits for rent, electricity, telephone or otherwise) or prepaid or deferred charges and expenses, including all lease and rental payments, that have been prepaid by Seller, and any retainers or similar amounts paid to Advisors or other professional service providers, in each case, other than the Acquired Coins; |
| | • all Contracts of Seller other than the Assigned Contracts, including the |

| Agreement Provision | Summary Description[8] |
|---|---|
| | Contracts listed on Schedule 1.2(b) (the "Excluded Contracts");<br><br>• all Documents, in each case, (i) to the extent they are primarily used in, or primarily relate to, any of the Excluded Assets or Excluded Liabilities (including information stored on the computer systems, data networks or servers of Seller, other than Voyager User Accounts), (ii) to the extent that such Documents constitute Seller's financial accounting Documents, all minute books, organizational documents, stock registers and such other books and records of Seller to the extent pertaining to the ownership, organization or existence of Seller, Tax Returns (and any related work papers), corporate seals, checkbooks, and canceled checks, in each case to the extent not primarily relating to the Acquired Assets or Assumed Liabilities or (iii) that Seller is required by Law to retain; provided that, to the extent not prohibited by applicable Law, Purchaser shall have the right to make copies of any portions of such Documents;<br><br>• all Documents to the extent prepared or received by Seller or any of its Affiliates in connection with the sale of the Acquired Assets, the Agreement, or the Transactions, including (i) all records and reports prepared or received by Seller or any of its Affiliates or Advisors in connection with the sale of the Acquired Assets and the Transactions, including all analyses relating to the business of Purchaser or its Affiliates so prepared or received in connection therewith, (ii) all bids and expressions of interest received from third parties with respect to the acquisition of Seller's business or assets, and (iii) all privileged materials, documents and records of Seller or any of its Affiliates (together with the Documents specified in Sections 1.2(c) and 1.2(h), the "Excluded Documents");<br><br>• all current and prior insurance policies of Seller, including for the avoidance or doubt all director and officer insurance policies, and all rights and benefits of any nature of Seller with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries, in each case, other than Acquired Voyager Claims;<br><br>• all membership interests or other equity interests of Seller or any of its Affiliates or securities convertible into, exchangeable, or exercisable for any such membership interests or other equity interests;<br><br>• (i) all Retained Avoidance Actions, (ii) all preference or avoidance claims or actions arising under the Bankruptcy Code or applicable Law, (iii) all other rights, claims, causes of action, rights of recovery, rights of set-off, and rights of recoupment as of the Closing of Seller or any of its Affiliates, in each case, either (A) arising out of or relating to events occurring on or prior to the Closing Date, except as set forth in Section 1.1, or (B) related to any Credit Matter, and (iv) all claims that Seller or any of its Affiliates may have against any Person with respect to any other Excluded Assets or any Excluded Liabilities, in each case other than Acquired Voyager Claims;<br><br>• Seller's claims or other rights under the Agreement, including the Purchase Price, or any agreement, certificate, instrument, or other document executed and delivered between Seller and Purchaser or their respective Affiliates in connection with the Transactions, or any other agreement between Seller and Purchaser or their respective Affiliates |

15

A-18

| Agreement Provision | Summary Description[8] |
|---|---|
| | entered into on or after the date hereof; |
| | • (x) all Tax attributes of Seller or its Affiliates (including refunds of income Taxes of Seller or its Affiliates, but excluding any Tax refunds or Tax attributes with respect to Taxes in respect of the Acquired Assets for any taxable period (or portion thereof) beginning after the Closing Date allocable to Purchaser in accordance with Section 9.3(d) or with respect to Transfer Taxes), (y) all Tax refunds and Tax attributes with respect to Taxes in respect of the Acquired Assets (i) for any Pre-Closing Tax Period or (ii) that are Excluded Liabilities, and (z) all Tax refunds and Tax attributes with respect to Taxes in respect of the Excluded Assets; |
| | • every asset of Seller that would otherwise constitute an Acquired Asset (if owned immediately prior to the Closing) if conveyed or otherwise disposed of during the period from the date hereof until the Closing Date (i) at the direction of the Bankruptcy Court or (ii) as otherwise permitted under Section 6.1(b); |
| | • all demands, allowances, refunds, rebates (including any vendor or supplier rebates), rights (including under or with respect to express or implied guarantees, warranties, representations, covenants and indemnities), claims, counterclaims, defenses, credits, causes of action, rights of set off, rights of recovery or rights of recoupment relating to or arising against suppliers, vendors, merchants, manufacturers and counterparties to leases, licenses or any Contract, arising out of or relating to events occurring on or prior to the Closing Date, in each case other than Acquired Voyager Claims; |
| | • the properties, rights, interests, equity and assets of Coinify ApS and its direct and indirect subsidiaries; |
| | • all Money Transmitter Licenses; |
| | • Seller's accounts receivable, and other amounts or Liabilities owing, from its Affiliates; |
| | • (i) all Seller Plans and assets of all Seller Plans that do not constitute Acquired Coins and (ii) personnel records relating to employees of Seller and Holdings; |
| | • all information and Personal Information related to individual consumers that is not Acquired User Data, including any Personal Information that is subject to the GDPR or collected from natural persons with addresses outside of the United States; |
| | • the 3AC Loan; |
| | • all VGX Token Smart Contracts; and |
| | • the properties, rights, interests and assets set forth on Schedule 1.2(s). |
| | *See* **Binance US Purchase Agreement, § 1.2.** |
| **Assumed Liabilities** | • all Liabilities and obligations of Seller under the Assigned Contracts to the extent such Liabilities arise from and after the Closing or relate to events, facts and circumstances first existing after the Closing; |
| | • all cure costs required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned |

16

| Agreement Provision | Summary Description[8] |
|---|---|
| | Contracts (the "Cure Costs"); |
| | • all Liabilities arising out of the conduct of the business or the ownership of the Acquired Assets, in each case, solely by Purchaser from and after the Closing Date and to the extent such Liabilities arise from events, facts and circumstances first existing after the Closing Date; |
| | • all Liabilities for Taxes with respect to the Acquired Assets for any taxable period (or portion thereof) beginning after the Closing Date allocable to Purchaser in accordance with Section 9.3(d); |
| | • all Liabilities relating to all Transfer Taxes; and |
| | • all Liabilities set forth on Schedule 1.3(f); |
| | *provided*, *however*, that whether or not any Liability for Taxes is an Assumed Liability shall be governed solely by Section 1.3(d) and Section 1.3(e). |
| | ***See*** **Binance US Purchase Agreement, § 1.3.** |
| **Excluded Liabilities** | Any Liabilities of, or Action against, Seller or any of its Affiliates or relating to the Acquired Assets, the Excluded Assets or the business and operations of Seller and its Affiliates, of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on or prior to the Closing Date or arising thereafter, including as a result of any act, omission, or circumstances taking place prior to the Closing, other than the Assumed Liabilities, including the following: |
| | • all Liabilities (i) existing prior to the filing of the Bankruptcy Case that are subject to compromise under the Bankruptcy Code and (ii) to the extent not otherwise expressly assumed herein (including in the Commercial Covenants), incurred subsequent to the filing of the Bankruptcy Case and prior to the Closing; |
| | • all Liabilities related to (i) customer accounts of Seller or its Affiliates (including Voyager User Accounts), except for those obligations of Purchaser expressly set forth in the Commercial Covenants and (ii) commercial payables or amounts owing by Seller or its Affiliates, including to any software vendors; |
| | • all Liabilities for Taxes (i) with respect to the Acquired Assets for any Pre-Closing Tax Period allocable to Seller in accordance with Section 9.3(d); (ii) of Seller and their Affiliates for any taxable period; or (iii) arising from or in connection with an Excluded Asset; and |
| | • all Liabilities resulting from Seller's or any of its Affiliates' breach of, violation of, or non-compliance with the provisions of any Laws relating to the ownership or operation of their respective businesses, the Acquired Assets and the Excluded Assets or the Transactions, including any bulk transfer Laws or similar Laws of any jurisdiction in connection with the Transactions; and |
| | • all Successor Liabilities, including with respect to any investigation or other Action against, concerning or otherwise with respect to Seller, its business or its assets. |

17

| Agreement Provision | Summary Description[8] |
|---|---|
| | *See* **Binance US Purchase Agreement, § 1.4.** |
| **Conditions Precedent to Obligations of Purchaser and Seller** | • there shall be no Law or Order (including any temporary restraining order or preliminary or permanent injunction) in effect restraining, enjoining, making illegal or otherwise prohibiting the Transactions;<br><br>• the Bankruptcy Court shall have entered the Agreement Order, which Agreement Order shall (i) be in form and substance reasonably acceptable to Purchaser, (ii) comply in all respects with Section 5.1(b), and (iii) be a Final Order; and<br><br>• the Bankruptcy Court shall have entered the Confirmation Order, in form and substance, solely with respect to matters relating to the Agreement or the Transactions, reasonably acceptable to Purchaser, confirming a Plan in form and substance, solely with respect to matters relating to the Agreement or the Transactions, reasonably acceptable to Purchaser, and the Confirmation Order shall be a Final Order. |
| | *See* **Binance US Purchase Agreement, § 7.1.** |
| **Conditions Precedent to Obligations of Purchaser** | • (i) the representations and warranties of Seller set forth in Article III (in each case, other than the Fundamental Representations and the representations and warranties set forth in Section 3.16(a)) shall be true and correct in all respects as of the Closing Date as though made on and as of the Closing Date, except (x) that representations and warranties that are made as of a specified date need be so true and correct only as of such date and (y) to the extent that the failure of such representations and warranties to be true and correct as of such dates has not had, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; provided that for purposes of the immediately preceding clause (i), the qualifications as to materiality and Material Adverse Effect contained in such representations and warranties shall not be given effect; (ii) the representations and warranties set forth in Section 3.1(a) (Organization and Qualification), Section 3.2 (Authorization of Agreement), Section 3.3(a)(i) (Conflicts; Consents), Section 3.6(a) (Exclusive Ownership), and Section 3.14 (Brokers) (collectively, the "Fundamental Representations") shall be true and correct in all but de minimis respects as of the Closing Date as though made on and as of the Closing Date, except that such Fundamental Representations that are made as of a specified date need be true and correct in all but de minimis respects only as of such date; and (iii) the representations and warranties set forth in Section 3.16(a) shall be true and correct in all respects as of the date hereof and as of the Closing Date as though made on and as of the Closing Date;<br><br>• Seller shall not have materially breached any of the covenants required to be performed or complied with by Seller under the Agreement on or prior to the Closing; provided that notwithstanding the foregoing, Seller shall have performed or caused to be performed, in all respects, all of the obligations and covenants required by Section 6.15(a) and (b); and<br><br>• Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 2.4. |
| | *See* **Binance US Purchase Agreement, § 7.2.** |
| **Conditions Precedent to** | • the representations and warranties made by Purchaser in Article IV shall |

| Agreement Provision | Summary Description[8] |
|---|---|
| **Obligations of Seller** | be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except (x) that representations and warranties that are made as of a specified date need be so true and correct only as of such date and (y) where the failure of such representations or warranties to be so true and correct has not and would not, individually or in the aggregate, reasonably be expected to prevent or materially impair or delay the ability of Purchaser to consummate the Transactions; provided that for purposes of Section 7.3(a), the qualifications as to materiality, material adverse effect and words of similar import contained in such representations and warranties shall not be given effect; |
| | • Purchaser shall not have materially breached any of the covenants required to be performed or complied with by Purchaser under the Agreement on or prior to the Closing; and |
| | • Purchaser shall have delivered, or caused to be delivered, to Seller all of the items set forth in Section 2.5. |
| | *See* **Binance US Purchase Agreement, § 7.3.** |
| **Means of Implementation** | • The Binance US Transaction shall be implemented and effectuated through a chapter 11 plan. |
| | *See* **Binance US Purchase Agreement, §§ 5.3, 5.5.** |
| **Milestones** | The Agreement may be terminated at any time prior to the Closing by written notice from the Purchaser to the Seller if, among other things: |
| | • the Agreement Order is not entered by January 6, 2023; |
| | • the Plan Solicitation Motion and the Amended Disclosure Statement are not filed with the Bankruptcy Court by December 21, 2022; |
| | • the Plan Solicitation Order is not entered by January 6, 2023; |
| | • the Confirmation Order is not entered by March 1, 2023; |
| | • Seller or any of the other Debtors file any motions, pleadings, notices or other documents with the Bankruptcy Court in material breach of Section 5.7; |
| | • Seller enters into one or more Alternative Transactions with one or more Persons other than Purchaser, or the Bankruptcy Court approves an Alternative Transaction other than with Purchaser; |
| | • Seller has delivered a Higher Offer Determination Notice to Purchaser; |
| | • Seller or its Affiliates or Advisors have committed a breach of Section 5.1(a); or |
| | • Seller or its Affiliates or Advisors have committed a breach of, Section 5.2; provided that (without modifying Purchaser's rights to terminate the Agreement under any other Section of the Agreement) Purchaser shall not be entitled to terminate the Agreement pursuant to Section 8.1(i)(ix) following entry of the Agreement Order by the Bankruptcy Court. |
| | *See* **Binance US Purchase Agreement, §§ 5.3 and 8.1.** |
| **No-Shop** | • From and following the execution and delivery of the Agreement by Seller, Seller and its Affiliates shall not, and shall not permit their respective Advisors or Affiliates to, (i) initiate contact with, or solicit or encourage |

19

| Agreement Provision | Summary Description[8] |
|---|---|
| | submission of any inquiries, proposals or offers by, any Person (other than Purchaser, its Affiliates and its and their respective Advisors) with respect to an Alternative Transaction, (ii) engage in, continue or otherwise participate in any discussions or negotiations regarding an Alternative Transaction or that could reasonably be expected to lead to an Alternative Transaction, (iii) enter into any confidentiality agreement with respect to, or provide any non-public information or data to any Person relating to, any Alternative Transaction, or (iv) otherwise agree, authorize or commit to do any of the foregoing; provided that, notwithstanding the foregoing, from and after entry of the Agreement Order, Seller may take the actions set forth in clauses (ii) and (iii) above if (A) Seller has received a written, bona fide offer, proposal or indication of interest to engage in an Alternative Transaction (an "Acquisition Proposal") from any Person after the date of the Agreement that did not result from Seller's breach of Section 5.2(a), and (B) the board of directors (or similar governing body) of Seller determines in good faith, after consultation with its financial advisor and outside legal counsel, that such Acquisition Proposal constitutes or is reasonably likely to lead to a Higher and Better Offer and that failure to take such actions would violate the directors' fiduciary duties under applicable Law; provided further that if the Closing has not occurred prior to the Outside Date unless the failure of the Closing to have occurred by the Outside Date was caused by Seller's failure to perform any of its obligations under the Agreement, and there is no Back-up Bidder (as defined in the Bidding Procedures Order) or the agreement with the Back-up Bidder has terminated in accordance with its terms, then Section 5.2(a) shall automatically terminate and be of no further force and effect as of such date. Until entry of the Agreement Order, Seller shall promptly (but in any event within twenty-four (24) hours) provide written notice to Purchaser of any breach of Section 5.2(a). |
| | • Seller shall promptly (but in any event within twenty-four (24) hours) give written notice to Purchaser if (i) any inquiries, proposals or offers with respect to an Alternative Transaction or that could reasonably be expected to lead to an Alternative Transaction are received, (ii) any non-public information or data concerning Seller or its Affiliates or access to Seller's or its Affiliates' properties, books or records in connection with any Alternative Transaction or any inquiry, proposal or offer that could reasonably be expected to lead to an Alternative Transaction is requested, or (iii) any discussions or negotiations relating to an Alternative Transaction or any inquiry, proposal or offer that could reasonably be expected to lead to an Alternative Transaction are sought to be engaged in or continued by, from or with Seller, its Affiliates or any of its or their respective Advisors, as the case may be. Such notice shall set forth the name of the applicable Person making such inquiry, the material terms and conditions of any proposed Alternative Transaction (including, if applicable, correct and complete copies of any proposed agreements, inquiries, proposals or offers or, where no such copies are available, a reasonably detailed written description thereof) and the status of any such discussions or negotiations. Seller shall thereafter keep Purchaser reasonably informed, on a reasonably prompt basis, of the status of any discussions or negotiations with respect thereto. Until entry of the Agreement Order, Seller shall promptly (but in any event within twenty- |

20

| Agreement Provision | Summary Description[8] |
|---|---|
| | four (24) hours) provide written notice to Purchaser of any breach of Section 5.2(b). |
| | • Seller (i) shall promptly (and in any event within twenty-four (24) hours) give notice to Purchaser upon a determination by Seller or its board of directors (or comparable governing body) that any Acquisition Proposal received from any Person after the date of the Agreement that did not result from Seller's breach of Section 5.2(a) constitutes a Higher and Better Offer (a "Higher Offer Determination Notice") and (ii) may cause or permit Seller or any of the other Debtors to enter into a definitive agreement with respect to such Acquisition Proposal; provided that (A) Seller and its board of directors (or comparable governing body) may only make such determination described in clause (i) of Section 5.2(c) if, prior to the determination that such Acquisition Proposal constitutes a Higher and Better Offer, Seller negotiates, and causes its representatives to negotiate, with Purchaser in good faith (to the extent Purchaser and its representatives desire to negotiate) during such three (3) Business Day period to amend the terms and conditions of the Agreement and, no earlier than the end of such three (3) Business Day period, the board of directors (or comparable governing body) of Seller determines in good faith (after consultation with its financial advisor(s) and outside legal counsel), after giving effect to such proposed amendments to the terms and conditions of the Agreement, that such Acquisition Proposal still constitutes a Higher and Better Offer (provided further that if any material amendment is made to such Acquisition Proposal, such Acquisition Proposal shall be subject again (but only once again) to the foregoing, except that references to three (3) Business Days shall be deemed to be two (2) Business Days, and whatever the result of the second instance of the foregoing, Seller shall not be required to undertake the foregoing again before making a determination that such Acquisition Proposal constitutes a Higher and Better Offer and, if applicable, terminating the Agreement), and (B) Seller and its board of directors (or comparable governing body) may only take such action described in clause (ii) of Section 5.2(c) if the board of directors (or comparable governing body) of Seller determines in good faith (after consultation with its outside legal counsel) that the failure to take such action would violate with its fiduciary duties under applicable Law. <br><br> *See* **Binance US Purchase Agreement, § 5.2.** |
| **Good-Faith Deposit** | • Purchaser has made, on the date thereof, or will make on the first Business Day following the date thereof, an earnest money deposit in the amount equal to $10,000,000.00 by wire transfer of immediately available funds for deposit into an escrow account. Subject to Section 2.2(b) and Section 2.2(c), the Deposit and any received investment income, if any, shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of Seller or Purchaser and shall be applied against payment of the Purchase Price on the Closing Date. Seller hereby acknowledges and agrees that the Deposit qualifies as the deposit required pursuant to the Bidding Procedures Order. |
| | • If the Agreement has been validly terminated (i) by Seller pursuant to Section 8.1(d) or Section 8.1(f), (ii) by Purchaser pursuant to Section 8.1(c), in circumstances where Seller would be entitled to terminate the Agreement pursuant to Section 8.1(d) or Section 8.1(f), or (iii) by Seller |

| Agreement Provision | Summary Description[8] |
|---|---|
|  | pursuant to Section 8.1(g) in connection with and following any Purchaser Development and not in connection with a Higher and Better Offer (each of (i), (ii), and (iii), a "Purchaser Default Termination"), then within three (3) Business Days after the date of such termination, the Parties shall execute any instructions necessary to permit the Escrow Agent to disburse the Deposit together with all received investment income, if any, to Seller.<br><br>• If the Agreement has been validly terminated by either Party, other than as contemplated by Section 2.2(b), then the Deposit, together with all received investment income, if any, shall be returned to Purchaser within three (3) Business Days after such termination, and, at Purchaser's request, Seller shall execute any instructions necessary to permit the Escrow Agent to disburse the Deposit together with all received investment income, if any, to Purchaser.<br><br>• If the Closing occurs, the Deposit shall be transferred to Seller.<br><br>*See* **Binance US Purchase Agreement, § 2.2.** |
| **Reverse Termination Fee** | In the event that (a) the conditions set forth in Sections 7.1(b), 7.1(c), and 7.2 have been satisfied or duly waived and (b) (i) the Agreement is validly terminated in accordance with Section 8.1(b) or Section 8.1(c), (ii) Purchaser fails to consummate the Closing by the Outside Date or the Extended Outside Date, as applicable, as a result of the failure of the conditions set forth in Section 7.1(a), or (iii) the Agreement is terminated pursuant to Section 8.1(g) in connection with and following a Purchaser Development and not in connection with a Higher and Better Offer, then, in any such case, within three (3) Business Days following such valid termination the Deposit (including all received investment income, if any) shall be released to Seller (such release, which, for the avoidance of doubt, shall be equal to and shall not exceed $10,000,000 in the aggregate, the "Reverse Termination Fee").<br><br>*See* **Binance US Purchase Agreement, § 8.3.** |
| **Expense Reimbursement by Purchaser to Seller** | Purchaser shall (i) at the Closing bear as a component of the Purchase Price pursuant to Section 2.1(a), without duplication, the Seller Expenses or (ii) if the Agreement is validly terminated in accordance with its terms, pay to Seller, within three (3) Business Days following such termination, cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by Seller in an amount equal to the Seller Expenses; provided that notwithstanding anything to the contrary herein, (A) in no event shall the aggregate amount of Seller Expenses payable by Purchaser exceed the Seller Expense Cap, (B) any fees and expenses (including reasonable and documented out-of-pocket financial advisor and legal fees, expenses and disbursements) incurred by Seller or any of its Affiliates, or otherwise relating to the activities or operations of Seller or any of its Affiliates, on or prior to the Seller Expense Start Date shall not constitute Seller Expenses, and (C) (x) if the Closing or the termination of the Agreement occurs on or prior to the Seller Expense Start Date, (y) if the Agreement is terminated pursuant to (1) Section 8.1(b) or Section 8.1(c) by Purchaser, or by Seller in circumstances where Purchaser would be entitled to terminate the Agreement pursuant to Section 8.1(e), or (2) Section 8.1(e), Section 8.1(g), Section 8.1(h) or Section 8.1(i), or (z) the Closing does not occur on or prior to the Seller Expense Start Date due to any act or omission by Seller or any of its Affiliates or any material breach of the Agreement by Seller, then in each case the Seller Expenses shall be zero (0).<br><br>*See* **Binance US Purchase Agreement, §§ 6.21, 8.1.** |

| Agreement Provision | Summary Description[8] |
|---|---|
| **Expense Reimbursement by Seller to Purchaser** | If the Agreement is terminated (i) by Seller pursuant to Section 8.1(c), in circumstances where Purchaser would be entitled to terminate the Agreement pursuant to Section 8.1(e), or (ii) pursuant to Section 8.1(e), Section 8.1(g), Section 8.1(h) or Section 8.1(i)(ix), then Seller shall pay to Purchaser, within three (3) Business Days following such termination, cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by Purchaser in an amount equal to the Purchaser Expenses; provided that notwithstanding anything to the contrary herein, in no event shall the aggregate amount of Purchaser Expenses payable by Seller hereunder exceed $5,000,000; provided further that if the Agreement is validly terminated by Seller pursuant to Section 8.1(g) (x) in order for Seller to pursue a Liquidation as a result of and following any Effect with respect to Purchaser's business, financial condition, operations, assets, management, employees, compliance, or liabilities, taken as a whole, or any Effect with respect to Purchaser's Affiliates that has an Effect on Purchaser's business, financial condition, operations, assets, management, employees, compliance, or liabilities, taken as a whole, that, individually or in the aggregate with all other such Effects, would reasonably be expected to (1) prevent or materially impair or materially delay the ability of Purchaser to consummate the Transactions in accordance herewith or (2) materially and adversely affect the Users, Eligible Creditors, or the Acquired Coins on the Binance.US Platform, including following the Closing, as compared to users and Coins on the Binance.US Platform as of the date hereof, and (y) such termination was not effected (1) in connection with a Higher and Better Offer or (2) because the estimated proceeds from such Liquidation are or would reasonably be expected to be greater than the Closing Date Payment (plus the fair market value of any Acquired Coins or any proceeds therefrom, in each case, as determined at the time Seller commences such Liquidation), then no Purchaser Expenses shall be payable.<br><br>*See* **Binance US Purchase Agreement, §§ 6.22, 8.1.** |
| **Fiduciary Out** | Nothing in the Agreement, or any document related to the Transactions, will require Seller or any of its managers, officers or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations; provided, however, that no such action or inaction shall be deemed to prevent Purchaser from exercising any termination rights it may have as a result of such action or inaction.<br><br>*See* **Binance US Purchase Agreement, § 10.19.** |

## III.   Rebalancing of the Debtors' Cryptocurrency.

29.     The Debtors hold a significant amount of cryptocurrency across a diverse portfolio of coins.  To effectuate the Binance US Transaction or the Toggle Transaction, the Debtors will need to "rebalance" their cryptocurrency portfolio (*i.e.*, execute trades of various types of cryptocurrency to ensure that the proper types of coins are available for distribution to each customer) on the Debtors' platform.  Accordingly, the Debtors seek authority to execute any

rebalancing to effectuate the Binance US Transaction or the Toggle Transaction pursuant to the terms of the Binance US Purchase Agreement.

<div align="center">**Basis for Relief**</div>

**I. The Debtors' Entry into the Binance US Purchase Agreement Should Be Approved as an Exercise of Sound Business Judgment.**

30. The Court may authorize the Debtors to enter into the Binance US Purchase Agreement pursuant to sections 105(a) and 363(b) of the Bankruptcy Code. Pursuant to section 363(b) of the Bankruptcy Code, the Debtors need only show a legitimate business justification to enter into the Binance US Purchase Agreement. *See, e.g.*, *Comm. Of Equity Sec. Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1070 (2d Cir. 1983); *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts generally will not entertain objections to the debtor's conduct."). When a valid business justification exists, the law vests the debtor's decision with a strong presumption "'that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" *In re GSC, Inc.*, 453 B.R. 132, 174 (Bankr. S.D.N.Y. 2011) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)). Accordingly, parties challenging a debtor's decision must make a showing of "bad faith, self-interest or gross negligence." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (citations omitted).

31. In addition, the Court may also authorize the entry into the Binance US Purchase Agreement based on section 105(a) of the Bankruptcy Code. Section 105(a) codifies the Court's inherent equitable powers to "issue any order, process, or judgment that is necessary or appropriate

<div align="center">24</div>

to carry out the provisions of this title." Under section 105(a), courts may authorize actions that are essential to the continued operation of a debtor's business. *See In re C.A.F. Bindery, Inc.*, 199 B.R. 828, 835 (Bankr. S.D.N.Y. 1996).

32.     The relief requested by this Motion represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is justified under sections 105(a) and 363(b) of the Bankruptcy Code. The Binance US Purchase Agreement represents the most efficient and appropriate means of maximizing recoveries to stakeholders on an expedited timeline in light of the extraordinary circumstances in these cases.

**A.     A Sound Business Purpose Exists for Entry into the Binance US Purchase Agreement.**

33.     The Debtors have concluded that entry into the Binance US Purchase Agreement, which outlines and governs the terms of the Binance US Transaction, is in the best interest of their chapter 11 estates and is supported by a number of sound business reasons.

- *First*, the Debtors believe that the Binance US Transaction will maximize the value of the Debtors' assets because the Purchase Price offers significantly more value and less risk than the Acquired Assets would have on a stand-alone basis or through any other bids received by the Debtors.

- *Second*, the Debtors believe that, as a result of the marketing efforts that have been undertaken, the highest and best offer has been obtained and will provide maximum value to the Debtors under the current circumstances.

- *Third*, the Sale was subject to a public and competitive process, enhancing the Debtors' ability to receive the highest or otherwise best value for their assets. Consequently, the Sale has been subject to a "market check" that, in the Debtors' reasonable business judgment, was the best means for establishing whether a fair and reasonable price is being paid. *See, e.g.*, *In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326 at *4 (Bankr. D. Del. 2001) (although a "section 363(b) sale transaction does not require an auction procedure," "[t]he auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").

- *Fourth*, the Seller engaged in hard-fought, arm's length negotiations with Binance US over the terms of the Binance US Purchase Agreement, which includes protections for the Seller including (i) a $10 million good faith deposit

paid by Binance US to the Seller (section 2.2 of the Binance US Purchase Agreement), (ii) reimbursement by Binance US to the Seller of up to $15 million in expenses subject to the terms of the Binance US Purchase Agreement (section 6.21 of the Binance US Purchase Agreement) and (iii) a $10 million Reverse Termination Fee owed by Binance US to the Seller, subject to the terms of the Binance US Purchase Agreement (section 8.3 of the Binance US Purchase Agreement).

- *Fifth*, entry into the Binance US Purchase Agreement allows the Debtors to lock in the terms of the Binance US Transaction now, subject to confirmation of the Plan, which is particularly important given the continued volatility of cryptocurrency markets.

34.     The Debtors submit that the Binance US Transaction contemplated under the Binance US Purchase Agreement constitutes the highest or otherwise best offer for the Acquired Assets and will provide the Debtors the best path forward to maximizing value for their estates and, ultimately, providing a recovery to creditors on an efficient timeline.  As such, the Debtors believe that entry into the Binance US Purchase Agreement is a valid and sound exercise of the Debtors' business judgment.

**B.      Adequate and Reasonable Notice of Entry Into the Binance US Purchase Agreement Has Been Provided.**

35.     Although the Debtors do not seek approval of the Binance US Transaction by this Motion, notice of entry into the Binance US Purchase Agreement was adequate and reasonable. Further, the Debtors' marketing process and the notice provided through this Motion constitute adequate and reasonable notice of the Binance US Transaction.  The Debtors undertook a very public and lengthy Auction that spanned multiple weeks and received late interest from parties. The Debtors' creditors and parties-in-interest were apprised of the marketing process throughout these chapter 11 cases.  Creditors and parties-in-interest were also aware of the very public FTX collapse and the Debtors' need to pursue an alternative transaction immediately.  Further, parties-in-interest will have the opportunity to vote on and/or object to the Binance US Transaction through the Plan solicitation and confirmation process.

26

    **C.**    **The Purchase Price Contemplated in the Binance US Purchase Agreement Reflects a Fair Value Transaction.**

    36.    It is well-settled that, where there is a court-approved auction process, a full and fair price is presumed to have been obtained for the assets sold as the best way to determine value is exposure to the market. *See Bank of Am. Nat'l Trust & Sav. Ass'n. v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999); *see also Trans World Airlines*, 2001 WL 1820326 at *4. As discussed herein, the Debtors and their advisors conducted a thorough and extensive marketing process. Among other things, the Debtors have engaged in significant discussions with 90 interested parties, provided potential bidders with virtual data room access, including thousands of pages of business and financial diligence, hosted meetings with the Debtors' management team, held numerous conference calls and meetings with interested parties, considered alternative transaction structures, and otherwise taken all appropriate efforts to increase transaction value. The Debtors respectfully submit that this process maximized the number of bidders that participated in a competitive Auction process and subsequent thorough and robust negotiations following the FTX collapse, and, accordingly, provided the Debtors and their stakeholders with the best possible transaction.

**II.**    **A Sound Business Purpose Exists for The Seller to Agree to the Purchaser Expenses Provision under the Binance US Purchase Agreement.**

    37.    Binance US insisted on the Purchaser Expenses provision as a condition to entering into the Binance US Purchase Agreement. However, the Purchaser Expenses are narrow and the Seller is only responsible to reimburse Binance US for its reasonable and documented out-of-pocket expenses of up to $5 million in the event the Binance US Purchase Agreement is terminated (a) by the Seller if the closing has not occurred by the Outside Date or extended Outside Date, as applicable, in circumstances where Binance US would be entitled to terminate the Binance US Purchase Agreement for breach of the Binance US Purchase Agreement by the Seller, or

(b) pursuant to Section 8.1(e) (Seller breach), Section 8.1(g) (Seller exercise of the fiduciary out),

Section 8.1(h) (dismissal or conversion of the chapter 11 cases to chapter 7, or if the automatic

stay is lifted with respect to any Acquired Assets), or Section 8.1(i)(ix) (Seller breach of the "No

Shop"); *provided* that if the Binance US Purchase Agreement is validly terminated by Seller

pursuant to Section 8.1(g) (Seller exercise of the fiduciary out) (x) in order for Seller to pursue the

Toggle Transaction as a result of and following any Effect with respect to Binance US's business,

financial condition, operations, assets, management, employees, compliance, or liabilities, taken

as a whole, or any Effect with respect to Binance US's Affiliates that has an Effect thereon that

would reasonably be expected to (i) prevent or materially impair or materially delay the ability of

Binance US to consummate the Binance US Transaction or (ii) materially and adversely affect the

customers, creditors, or the acquired cryptocurrency on the Binance US platform, and (y) such

termination was not caused by (i) the Debtors determination to pursue a higher and better offer

from a third party or (ii) because the estimated proceeds from the Toggle Transaction are or would

reasonably be expected to be greater than the consideration under the Binance US Transaction,

then no Purchaser Expenses shall be payable. *See* Binance US Purchase Agreement, Section 6.22.

38.     The potential for the Debtors to potentially be responsible for Purchaser Expenses

was already contemplated by this Court's Bidding Procedures Order.  Moreover, bankruptcy courts

routinely approve asset purchase agreements that contain similar bid protections that provide a

benefit to the estates.  *See, e.g.*, *In re WorldSpace, Inc.*, 2010 WL 4739929, at *4–5 (Bankr. D.

Del. June 2, 2010) (approving the break-up fee in an asset purchase agreement for a variety of

reasons, including that the break-up fee was reasonable and appropriate, essential to induce the

buyer to enter the agreement, and entered into under the debtors' compelling and sound business

justification); *see also In re Genco Shipping & Trading Limited*, 509 B.R. 455, 465 (Bankr.

S.D.N.Y 2014) (citing *In re Metaldyne Corp.*, 409 B.R. 661, 670 (Bankr. S.D.N.Y. 2009); *see also In re Integrated Res., Inc.*, 147 B.R. at 657–58 (to evaluate bid protections, courts should employ the business judgment rule, which proscribes judicial second-guessing of the corporate debtor's actions taken in good faith, absent self-dealing and in the exercise of honest judgment); *In re Fin. News Network, Inc.*, 980 F.2d 165 (2d Cir. 1992); *Integrated Res., Inc.*, 147 B.R. at 659–60 ("Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets . . . . In fact, because the . . . corporation has a duty to encourage bidding, break-up fees can be ***necessary*** to discharge [such] duties to maximize value." (emphasis added)); *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527 (3d Cir. 1999).

39.     Further, the Purchaser Expenses under the Binance US Purchase Agreement. constitute "actual and necessary costs and expenses of preserving the estate" entitled to administrative expense status and payment under sections 503(b) and 507(a)(2) of the Bankruptcy Code. 11 U.S.C. §§ 503(b)(1)(A) and 507(a)(2).  Courts in this district have often granted relief similar to the relief requested herein. *See, e.g.*, *In re Garrett Motion, Inc.*, Case No. 20-12212 (Bankr. S.D.N.Y. Mar. 12, 2021) (approving administrative expense priority to backstop fees and expenses); *In re SunEdison, Inc.*, Case No. 16-10992 (Bankr. S.D.N.Y. June 6, 2017) (same); *In re Roust Corp.*, Case No. 16-23786 (Bankr. S.D.N.Y. Jan. 10, 2017) (same); *In re In re K-V Discovery Solutions Inc.*, Case No. 12-13346 (Bankr. S.D.N.Y. June 7, 2013) (same).  The facts and circumstances here warrant similar treatment.

40.     The Court should rely on the business judgment standard when determining the appropriateness of the Purchaser Expenses.  The Seller exhibited a sound exercise of its business judgment in agreeing to the Purchaser Expenses because Binance US is unwilling to enter into the Binance US Purchase Agreement and have its transaction subject to higher and better offers

without the protection of reimbursement of the expenses it incurred in setting a floor for other potential bidders.  The risk of losing the Binance US Transaction due to the Seller's refusal to agree to the Purchaser Expenses significantly outweighs the cost associated with the Purchaser Expenses that are triggered under very limited circumstances.

41.     In short, the proposed Purchaser Expenses are fair and reasonable under the circumstances because they constitute a "fair and reasonable percentage of the proposed purchase price" and are "reasonably related to the risk, effort, and expenses of the prospective purchaser." *In re Intergrated Res., Inc.*, 147 B.R. at 662 (quoting *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989)).  Approval of the Purchaser Expenses is necessary for Binance US to enter into the Binance US Purchase Agreement and remain committed through the Debtors' plan solicitation and confirmation process, all during which the Debtors have the ability to exercise their fiduciary out should a higher or otherwise better offer be proposed.  Accordingly, the Purchaser Expenses are an appropriate and crucial component of the Binance US Purchase Agreement and a prudent exercise of the Debtors' business judgment consistent with the legal standards this Court and other courts in this jurisdiction have established and recognized.

**<u>Reservation of Rights</u>**

42.     Nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion is intended or should be construed as (a) an admission as to the validity of any particular claim against the Debtors, (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds, (c) a promise or requirement to pay any particular claim, (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion, (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code,

(f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law, or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are valid, and the Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of all such liens. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

### Motion Practice

43.     This Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated and a discussion of their application to this Motion. Accordingly, the Debtors submit that this Motion satisfies Local Rule 9013-1(a).

### Notice

44.     The Debtors will provide notice of this Motion to the following parties and/or their respective counsel, as applicable: (a) the U.S. Trustee; (b) the Committee; (c) the lender under the Debtors' prepetition loan facility; (d) the United States Attorney's Office for the Southern District of New York; (e) the Internal Revenue Service; (f) the Toronto Stock Exchange; (g) the attorneys general in the states where the Debtors conduct their business operations; (h) all parties who have expressed a written interest in the Acquired Assets; and (i) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

### No Prior Request

45.     No prior request for the relief sought in this Motion has been made to this or any other court.

A-34

WHEREFORE, the Debtors respectfully request that the Court enter the Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested in this Motion and granting such other and further relief as is appropriate under the circumstances.

Dated: December 21, 2022          */s/ Joshua A. Sussberg*
New York, New York          **KIRKLAND & ELLIS LLP**
                  **KIRKLAND & ELLIS INTERNATIONAL LLP**
                  Joshua A. Sussberg, P.C.
                  Christopher Marcus, P.C.
                  Christine A. Okike, P.C.
                  Allyson B. Smith (admitted *pro hac vice*)
                  601 Lexington Avenue
                  New York, New York 10022
                  Telephone:    (212) 446-4800
                  Facsimile:    (212) 446-4900
                  Email:      jsussberg@kirkland.com
                          cmarcus@kirkland.com
                          christine.okike@kirkland.com
                          allyson.smith@kirkland.com

                  *Counsel to the Debtors and Debtors in Possession*

**<u>Exhibit A</u>**

**Proposed Form of Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

### ORDER (I) AUTHORIZING ENTRY INTO THE
### BINANCE US PURCHASE AGREEMENT AND (II) GRANTING RELATED RELIEF

Upon the Motion (the "Motion")[2] of the above-captioned debtors and debtors in possession

(collectively, the "Debtors") for entry of an order (this "Order"):  (i) authorizing entry into the

Binance US Purchase Agreement and (ii) granting related relief; and the Debtors having

determined, after an extensive marketing process, that BAM Trading Services Inc. d/b/a

Binance.US ("Binance US" or the "Purchaser") has submitted the highest or otherwise best bid for

the Acquired Assets; and the Debtors having selected Binance US as the Winning Bidder pursuant

to the Bidding Procedures Order; and upon adequate and sufficient notice of the Motion, all as

more fully set forth in the Motion; and upon the First Day Declaration and the Tichenor

Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334 and the *Amended Standing Order of Reference from the United States District Court for the*

*Southern District of New York*, entered February 1, 2012; and this Court having the power to enter

a final order consistent with Article III of the United States Constitution; and this Court having

found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

§§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY FOUND AND DETERMINED THAT:

A.      The Debtors and the Purchaser negotiated the Binance US Purchase Agreement at arm's length and in good faith, without collusion, all within the meaning of section 363(m) of the Bankruptcy Code.

B.      The Purchaser Expenses, as set forth in the Binance US Purchase Agreement, are: (1) commensurate to the real and substantial benefits conferred upon the Debtors' estates by the Purchaser; (2) reasonable and appropriate in light of the size and nature of the proposed sale contemplated by the Binance US Purchase Agreement, the commitments that have been made by the Purchaser, and the efforts that have been and will be expended by the Purchaser; and (3) necessary to induce the Purchaser to continue to pursue such sale and continue to be bound by the Binance US Purchase Agreement.  The Purchaser Expenses are an essential inducement to, and condition of, the Purchaser's entry into, and continuing obligations under, the Binance US Purchase Agreement.  Unless it is assured that the Purchaser Expenses will be available, the Purchaser is unwilling to be bound to the terms of the Binance US Purchase Agreement (including the obligation to maintain its committed offer in accordance with the terms of the Binance US

Purchase Agreement while such offer is subject to higher or otherwise better bids as contemplated by the Bidding Procedures). The Purchaser has provided a material benefit to the Debtors and their creditors by providing a baseline value, thereby increasing the likelihood that the value of the Acquired Assets will be maximized through the Debtors' sale process.

**C.** Accordingly, the Purchaser Expenses are (1) fair, reasonable and appropriate and designed to maximize value for the benefit of the Debtors' estates; and (2) an actual and necessary cost of preserving the Debtors' estates within the meanings of sections 503(b) and 507(a) of the Bankruptcy Code.

IT IS HEREBY ORDERED THAT:

**I.    Notice of the Motion.**

1.    Notice of the Hearing, the Motion, and the Debtors' entry into the Binance US Purchase Agreement, was timely, proper, and reasonably calculated to provide interested parties with timely and proper notice thereof, and no other or further notice of the Motion and the Hearing is, or shall be, required. The requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice. A reasonable opportunity to object and be heard with respect to the Motion and the relief requested therein has been afforded to all interested persons and entities.

**II.    Highest or Otherwise Best Offer.**

2.    The Debtors' pre- and postpetition marketing process with respect to the Acquired Assets afforded a full, fair, and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the Acquired Assets. The transactions contemplated by the Binance US Purchase Agreement constitute the highest or otherwise best offer for the Acquired Assets, and the Debtors' determination that the terms of the Binance US Purchase Agreement constitute the highest or otherwise best offer for the Acquired Assets constitutes a valid and sound exercise of the Debtors' business judgment; *provided* that nothing in this Order shall limit or

3

otherwise restrict in any way the Seller's rights and obligations under section 5.2 of the Binance US Purchase Agreement. Entry of this Order, including approval of the Seller's entry into, and performance under, the Binance US Purchase Agreement, is in the best interests of the Debtors, their estates, creditors, and all other parties in interest.

### III.    General Provisions.

3.    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to these chapter 11 cases pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

4.    All objections to the Motion or the relief requested therein that have not been withdrawn, waived, or settled as announced to the Court at the Hearing or by stipulation filed with the Court, and all reservations of rights included in such objections or otherwise, are hereby denied and overruled on the merits with prejudice.

5.    The Motion is granted as set forth herein.

6.    Voyager Digital, LLC, as seller under the Binance US Purchase Agreement, is authorized, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, to enter into the Binance US Purchase Agreement and perform its obligations under the Binance US Purchase Agreement other than those obligations to be performed at or after the consummation of the Sale, which obligations the Debtors will seek approval of in connection with confirmation of a chapter 11 plan. The Seller and Purchaser are granted all rights and remedies provided to them under the Binance US Purchase Agreement.

7.    The Binance US Purchase Agreement shall be binding and specifically enforceable against the parties thereto in accordance with its terms, including, without limitation, Section 5.2

4

(the "No-Shop" provision) and, as applicable, those additional obligations set forth in Article V (Bankruptcy Court Matters) and Article VI (Covenants and Agreements) of the Binance US Purchase Agreement.

8.       The Debtors are authorized, but not directed, to enter into non-material amendments to the Binance US Purchase Agreement from time to time as necessary, subject to the terms and conditions set forth in the Binance US Purchase Agreement, and without further order of the Court.

9.       The Seller is authorized to satisfy the Purchaser Expenses pursuant to the terms and conditions set forth in the Binance US Purchase Agreement, and the Purchaser Expenses, as set forth in the Binance US Purchase Agreement, are approved in their entirety.  The Purchaser Expenses provisions in the Binance US Purchase Agreement and this Order shall be binding on the Seller, its successors and assigns, and shall survive the termination of the Binance US Purchase Agreement, appointment of a chapter 11 trustee or similar fiduciary, and dismissal or conversion of the chapter 11 cases; *provided, however*, that the obligation to pay or honor the Purchaser Expenses shall be subject to the terms and conditions of the Binance US Purchase Agreement.  The Purchaser Expenses shall be entitled to administrative expense status under sections 503(b) and 507(a)(2) of the Bankruptcy Code.

10.       The Purchaser is obligated to satisfy the terms and conditions of the Binance US Purchase Agreement in its entirety, including Section 2.2 (Good Faith Deposit), Section 6.21 (Seller Expenses), and Section 8.3 (the Reverse Termination Fee).

11.       To the extent the automatic stay provisions of section 362 of the Bankruptcy Code would otherwise apply, such provisions are vacated and modified to the extent necessary to permit the parties to the Binance US Purchase Agreement to exercise their termination rights thereunder in accordance with its terms, and deliver any notice contemplated thereunder, in each case, without

further order of the Court.

12.    The Debtors are authorized to rebalance their cryptocurrency portfolio subject to the terms of the Binance US Purchase Agreement.

13.    Nothing in this Order, the Binance US Purchase Agreement, the Plan, or any order confirming the Plan discharges, releases, impairs or otherwise precludes: (i) any liability to any governmental unit as defined in 11 U.S.C. § 101(27) ("Governmental Unit") that is not a "claim" within the meaning section 101(5) of the Bankruptcy Code; (ii) any claim of any Governmental Unit under police and regulatory statutes or regulations that any entity would be subject to as the owner or operator of property after the date of the closing of the Sale; or (iii) any liability to a Governmental Unit on the part of any Person other than the Debtors. Nor shall anything in this Order or related documents enjoin or otherwise bar a Governmental Unit from asserting or enforcing any liability described in the preceding sentence.  Notwithstanding anything to the contrary, nothing in this paragraph 13 shall be construed as a determination as to any liability or claim owing to a Governmental Unit or whether any Governmental Unit is subject to the automatic stay under section 362 of the Bankruptcy Code or limits, lifts or otherwise modifies the automatic stay under section 362 of the Bankruptcy Code.

14.    Further, nothing in this Order, the Binance US Purchase Agreement, the Plan, or any order confirming the Plan authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law.  Nothing in this Order, the Binance US Purchase Agreement, the Plan, or any order confirming the Plan shall relieve any entity from any otherwise applicable obligation to address or comply with information requests or inquiries from any

6

A-42

Governmental Unit. Nothing in this Order, the Binance US Purchase Agreement, the Plan, or any order confirming the Plan shall affect any valid setoff or recoupment rights of any Governmental Unit. Nothing in this Order, the Binance US Purchase Agreement, the Plan, or any order confirming the Plan divests any state tribunal of any otherwise applicable jurisdiction it may have under police or regulatory law. Nothing in this Order, the Binance US Purchase Agreement, the Plan, or any order confirming the Plan, shall be construed as a determination of whether the automatic stay applies to this paragraph 14 or limits, lifts or otherwise modifies the automatic stay under section 362 of the Bankruptcy Code.

15.     Notwithstanding the relief granted in this Order and any actions taken pursuant to such relief, nothing in this Order shall be deemed: (a) an admission as to the validity of any particular claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Order or the Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to the Motion are valid, and the Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of all such liens. Any payment made pursuant to this Order is not intended and should not be construed as an admission as the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

16.     The Debtors shall maintain copies of their books and records as set forth in the Plan. Nothing in this Order shall affect the obligations of the Debtors and/or any transferee or

custodian to maintain all books and records that are subject to any governmental subpoena, document preservation letter, or other investigative request from a governmental agency.

17.     Notwithstanding anything to the contrary in the Motion, this Order, or any findings announced at the Hearing, nothing in the Motion, this Order, or announced at the Hearing constitutes a finding under the federal securities laws as to whether crypto tokens or transactions involving crypto tokens are securities, and the right of the United States Securities and Exchange Commission to challenge transactions involving crypto tokens on any basis is expressly reserved.

18.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

19.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

20.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

21.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

22.     The failure to specifically include any particular provision of the Binance US Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that entry into the Binance US Purchase Agreement be authorized and approved in its entirety.

23.     The Court shall retain exclusive jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the Binance US Purchase Agreement, all amendments thereto and any waivers and consents thereunder, and to adjudicate,

if necessary, any and all disputes concerning or relating in any way to interpretation, implementation, or enforcement of the Binance US Purchase Agreement, including, but not limited to, any matter, claim, or dispute arising from or relating to the Binance US Purchase Agreement, and any purported termination of the Binance US Purchase Agreement pursuant to paragraph 11 of this Order.

24. To the extent that this Order is inconsistent with the Motion, the terms of this Order shall govern.

Dated: _____, 2022
New York, New York      _____
                    THE HONORABLE MICHAEL E WILES
                    UNITED STATES BANKRUPTCY JUDGE

**Exhibit B**

**Binance US Purchase Agreement**

---

### ASSET PURCHASE AGREEMENT

### DATED AS OF DECEMBER 18, 2022

### BY AND BETWEEN

### BAM TRADING SERVICES INC. D/B/A BINANCE.US, AS PURCHASER,

### AND

### VOYAGER DIGITAL, LLC, AS SELLER.

---

# TABLE OF CONTENTS

**Page**

**ARTICLE I PURCHASE AND SALE OF THE ACQUIRED ASSETS; ASSUMPTION OF ASSUMED LIABILITIES** ...................................................................................................1

1.1     Purchase and Sale of the Acquired Assets ...................................1
1.2     Excluded Assets ...........................................................................3
1.3     Assumption of Certain Liabilities ................................................5
1.4     Excluded Liabilities .....................................................................6
1.5     Assumption/Rejection of Certain Contracts ................................6

**ARTICLE II CONSIDERATION; PAYMENT; CLOSING** ..............................................8

2.1     Consideration; Payment ...............................................................8
2.2     Deposit .........................................................................................9
2.3     Closing .........................................................................................9
2.4     Closing Deliveries by Seller ......................................................10
2.5     Closing Deliveries by Purchaser ...............................................10
2.6     Withholding ...............................................................................11

**ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLER** ......................11

3.1     Organization and Qualification .................................................11
3.2     Authorization of Agreement ......................................................12
3.3     Conflicts; Consents ...................................................................12
3.4     Financial Statements .................................................................13
3.5     Cryptocurrency; Loans; Customer Accounts ............................13
3.6     Title to Acquired Assets; Staked Coins; Exclusive Ownership; Sufficiency of Assets .................................................................................14
3.7     Title to Properties ......................................................................14
3.8     Contracts ....................................................................................15
3.9     Permits; Compliance with Laws ...............................................16
3.10    Environmental Matters ..............................................................18
3.11    Intellectual Property; Data Privacy ...........................................18
3.12    Tax Matters ................................................................................19
3.13    Affiliate Transactions ................................................................20
3.14    Brokers ......................................................................................21
3.15    Litigation ...................................................................................21
3.16    Absence of Changes ..................................................................21
3.17    No Other Representations or Warranties ...................................21
3.18    No Outside Reliance ..................................................................21

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PURCHASER** .................22

4.1     Organization and Qualification .................................................22
4.2     Authorization of Agreement ......................................................22
4.3     Conflicts; Consents ...................................................................22
4.4     Financing ...................................................................................23
4.5     Permits ......................................................................................23
4.6     Brokers ......................................................................................23
4.7     No Litigation .............................................................................23

# TABLE OF CONTENTS

<div align="right">**Page**</div>

| | | |
|---|---|---:|
| 4.8 | Certain Arrangements | 24 |
| 4.9 | Solvency | 24 |
| 4.10 | No Additional Representations or Warranties | 24 |
| 4.11 | No Outside Reliance | 24 |

**ARTICLE V BANKRUPTCY COURT MATTERS** ...... **25**

| | | |
|---|---|---:|
| 5.1 | Selection of Successful Bid and Winning Bidder and Sale Approval | 25 |
| 5.2 | No-Shop | 26 |
| 5.3 | Bankruptcy Actions | 27 |
| 5.4 | Cure Costs | 29 |
| 5.5 | Approval | 29 |
| 5.6 | No Successor Liability | 29 |
| 5.7 | Filings | 29 |
| 5.8 | Waiver of Conflicts | 29 |

**ARTICLE VI COVENANTS AND AGREEMENTS** ...... **30**

| | | |
|---|---|---:|
| 6.1 | Conduct of Seller | 30 |
| 6.2 | Access to Information | 32 |
| 6.3 | Employee Matters | 34 |
| 6.4 | Regulatory Matters | 36 |
| 6.5 | Reasonable Best Efforts; Cooperation | 38 |
| 6.6 | Data Transfer Matters | 38 |
| 6.7 | Use of Name | 39 |
| 6.8 | Further Assurances | 40 |
| 6.9 | Insurance Matters | 40 |
| 6.10 | User Migration | 41 |
| 6.11 | Rebalancing Exercise; Seller Statement | 43 |
| 6.12 | Crediting of Accounts; Unsupported Jurisdictions, Transfer of Coins to Seller; Liquidations or Distributions by Seller | 45 |
| 6.13 | VGX Token Listing Review Process | 48 |
| 6.14 | Additional Bankruptcy Distributions | 48 |
| 6.15 | Unstaking | 49 |
| 6.16 | Receipt of Misdirected Assets; Liabilities | 50 |
| 6.17 | Acknowledgment by Purchaser | 50 |
| 6.18 | IT Migration | 52 |
| 6.19 | Confidentiality | 52 |
| 6.20 | Acquired Assets Owned by Non-Debtors | 53 |
| 6.21 | Seller Expenses | 53 |
| 6.22 | Purchaser Expenses | 54 |

**ARTICLE VII CONDITIONS TO CLOSING** ...... **55**

| | | |
|---|---|---:|
| 7.1 | Conditions Precedent to the Obligations of Purchaser and Seller | 55 |
| 7.2 | Conditions Precedent to the Obligations of Purchaser | 55 |
| 7.3 | Conditions Precedent to the Obligations of Seller | 56 |
| 7.4 | Waiver of Conditions | 56 |

# TABLE OF CONTENTS

| | | | Page |
|---|---|---|---|

**ARTICLE VIII TERMINATION** ........................................................................**57**

| 8.1 | Termination of Agreement | 57 |
|---|---|---|
| 8.2 | Effect of Termination | 59 |
| 8.3 | Reverse Termination Fee | 60 |
| 8.4 | Further Effect of Termination | 60 |

**ARTICLE IX TAXES** ....................................................................................**61**

| 9.1 | Transfer Taxes | 61 |
|---|---|---|
| 9.2 | Cooperation | 61 |
| 9.3 | Preparation of Tax Returns and Payment of Taxes | 62 |

**ARTICLE X MISCELLANEOUS** .....................................................................**63**

| 10.1 | Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers | 63 |
|---|---|---|
| 10.2 | Expenses | 63 |
| 10.3 | Notices | 64 |
| 10.4 | Binding Effect; Assignment | 65 |
| 10.5 | Amendment and Waiver | 65 |
| 10.6 | Third Party Beneficiaries | 65 |
| 10.7 | Non-Recourse | 66 |
| 10.8 | Severability | 66 |
| 10.9 | Construction | 66 |
| 10.10 | Schedules | 66 |
| 10.11 | Complete Agreement | 67 |
| 10.12 | Specific Performance | 67 |
| 10.13 | Jurisdiction and Exclusive Venue | 67 |
| 10.14 | Governing Law; Waiver of Jury Trial | 68 |
| 10.15 | No Right of Set-Off | 69 |
| 10.16 | Counterparts and PDF | 69 |
| 10.17 | Publicity | 69 |
| 10.18 | Bulk Sales Laws | 70 |
| 10.19 | Fiduciary Obligations | 70 |
| 10.20 | No Solicitation | 70 |
| 10.21 | Acknowledgment | 70 |

**ARTICLE XI ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS** ..........**70**

| 11.1 | Certain Definitions | 70 |
|---|---|---|
| 11.2 | Index of Defined Terms | 85 |
| 11.3 | Rules of Interpretation | 86 |

## INDEX OF EXHIBITS

EXHIBIT A      FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT

EXHIBIT B      FORM OF TRADEMARK AND DOMAIN NAME ASSIGNMENT AGREEMENT

iv

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "<u>Agreement</u>"), dated as of December 18, 2022, is made by and between BAM Trading Services Inc. d/b/a Binance.us, a Delaware corporation ("<u>Purchaser</u>"), and Voyager Digital, LLC, a Delaware limited liability company ("<u>Seller</u>"). Purchaser and Seller are each referred to herein individually as a "<u>Party</u>" and collectively as the "<u>Parties</u>." Capitalized terms used herein shall have the meanings set forth herein or in <u>Article XI</u>.

WHEREAS, on July 5, 2022 (the "<u>Petition Date</u>"), Seller, together with Voyager Digital Ltd., a Canadian corporation and Seller's indirect equityholder ("<u>Parent</u>"), and Voyager Digital Holdings, Inc., a Delaware corporation and Seller's direct equityholder ("<u>Holdings</u>" and, collectively with Seller and Parent, the "<u>Debtors</u>"), filed voluntary petitions for relief (collectively, the "<u>Petitions</u>") under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "<u>Bankruptcy Code</u>"), in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>"), to be jointly administered for procedural purposes (collectively, the "<u>Bankruptcy Case</u>"); and

WHEREAS, Purchaser desires to purchase the Acquired Assets and assume the Assumed Liabilities from Seller, and Seller desires to sell, convey, assign, and transfer to Purchaser the Acquired Assets together with the Assumed Liabilities, in a sale authorized by the Bankruptcy Court pursuant to, inter alia, sections 105, 363, 365, 1129, 1141 and 1142 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this Agreement, the Agreement Order, the Plan and the Confirmation Order.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants, and agreements set forth herein, intending to be legally bound hereby, Purchaser and Seller hereby agree as follows.

## ARTICLE I

## PURCHASE AND SALE OF THE ACQUIRED ASSETS; ASSUMPTION OF ASSUMED LIABILITIES

1.1    <u>Purchase and Sale of the Acquired Assets</u>. Pursuant to sections 105, 363, 365, 1129, 1141 and 1142 of the Bankruptcy Code, on the terms and subject to the conditions set forth herein and in the Agreement Order, the Plan and the Confirmation Order, at the Closing, Seller shall sell, transfer, assign, convey, and deliver to Purchaser, and Purchaser shall purchase, acquire, and accept from Seller, all of Seller's right, title and interest in and to, as of the Closing, the Acquired Assets, free and clear of all Encumbrances other than Permitted Post-Closing Liens; <u>provided</u>, in respect of the Acquired Coins, Purchaser shall acquire all of Seller's right, title and interest in and to the Acquired Coins free and clear of all Encumbrances (including Encumbrances implemented through "smart contracts" or other technological means), except that with respect to any ETH Coins that are Staked Coins as of the date hereof and cannot be unstaked as of the Closing, such ETH Coins shall be subject to such staking. "<u>Acquired Assets</u>" means all of the properties, rights and interests in and to only the following assets of Seller as of the Closing, wherever located and

whether or not required to be reflected on a balance sheet prepared in accordance with IFRS, including any such properties, rights and interests in any assets of the following types acquired by Seller after the date hereof and prior to the Closing:

(a)    all Acquired Coins, together with all information regarding the underlying networks and smart contracts to which such Acquired Coins are subject;

(b)    to the extent permissible under applicable Law, (1) all (i) information and Personal Information (including, for the avoidance of doubt, names, account numbers, social security numbers, passports (including passport numbers), drivers licenses (including driver license numbers), "liveness check" selfies, email addresses, mailing addresses, phone numbers, contact information, usernames, user IDs, passwords, and any Personal Information collected for purposes of KYC Procedures) related to (A) all active and inactive accounts of Users ("Voyager User Accounts") and (B) any other consumers located or having a home address in the United States from whom Personal Information was collected by Seller; (ii) information that has been anonymized, pseudonymized, or otherwise de-identified; (iii) data contained in the Seller Statement or the Post-Bankruptcy Statement; (iv) information relating to Voyager User Accounts that must be obtained and retained by Purchaser or any of its Affiliates for regulatory or legal purposes; and (v) any encryption key, passcode or cypher required to access any of the foregoing (collectively, the "Acquired User Data"), and (2) all other information and data relating to the other categories of Acquired Assets, the Voyager Platform, other than Acquired User Data (clauses (1) and (2), collectively, "Acquired Information");

(c)    all rights, causes of action, claims (including, for the avoidance of doubt, any claims and causes of action arising under Chapter 5 of the Bankruptcy Code), counterclaims, defenses, credits, rebates, demands, allowances, refunds (other than Tax refunds or Tax attributes, in each case, to the extent enumerated in Section 1.2(i)), causes of action, rights of set off, rights of recovery, rights of recoupment or rights under or with respect to express or implied guarantees, warranties, representations, covenants or indemnities of any kind, in each case that Seller may have against any User located or having a home address in the United States solely to the extent that such claim or cause of action is against a User in such Person's capacity as a User (in each case, excluding (i) Retained Avoidance Actions, (ii) claims, causes of action or other rights against Seller or any of its Affiliates, or (iii) any of the foregoing to the extent relating to any Credit Matter) (collectively, "Acquired Voyager Claims");

(d)    other than VGX Token Smart Contracts, all Intellectual Property owned by Seller or otherwise used or held for use by or on behalf of Seller in connection with the operation of its businesses, including all Business Software (in source code and object code form), any Bedrock source code and other IT Systems owned by Seller and required to operate the Voyager Platform, all Business Accounts (provided that Purchaser may elect, by written notice to Seller until two (2) Business Days prior to the Closing Date, to designate any Business Account(s) as Excluded Asset(s)), all rights to collect royalties and proceeds in connection therewith with respect to the period from and after the Closing, all rights, claims and causes of action to sue and recover for past, present and future infringements, dilutions, misappropriations of, or other conflicts with, such Intellectual Property and any and all corresponding rights that, now or hereafter, may be secured throughout the world;

2

(e)     all rights to continue the customer relationships with customers of Seller and its Affiliates to the extent pertaining to savings and trading services related to Cryptocurrency;

(f)     all Contracts listed on Schedule 1.1(f) (the "Assigned Contracts") (for the avoidance of doubt, not including the 3AC Loan); and

(g)     other than the Excluded Documents, all Documents, goodwill, payment intangibles and general intangible assets and rights of or otherwise used or held for use by or on behalf of Seller and its Affiliates, in each case in connection with or related to any of the foregoing categories of Acquired Assets; provided that Seller shall be entitled to retain copies of Documents (subject to Section 6.19).

1.2     Excluded Assets. Notwithstanding anything to the contrary in this Agreement, in no event shall Seller be deemed to sell, transfer, assign, convey or deliver, and Seller shall retain all right, title and interest to all other properties, rights, interests and other assets of Seller that are not Acquired Assets, including the following (collectively, the "Excluded Assets"):

(a)     all Cash and Cash Equivalents, all bank accounts, and all deposits (including maintenance deposits and security deposits for rent, electricity, telephone or otherwise) or prepaid or deferred charges and expenses, including all lease and rental payments, that have been prepaid by Seller, and any retainers or similar amounts paid to Advisors or other professional service providers, in each case, other than the Acquired Coins;

(b)     all Contracts of Seller other than the Assigned Contracts, including the Contracts listed on Schedule 1.2(b) (the "Excluded Contracts");

(c)     all Documents, in each case, (i) to the extent they are primarily used in, or primarily relate to, any of the Excluded Assets or Excluded Liabilities (including information stored on the computer systems, data networks or servers of Seller, other than Voyager User Accounts), (ii) to the extent that such Documents constitute Seller's financial accounting Documents, all minute books, organizational documents, stock registers and such other books and records of Seller to the extent pertaining to the ownership, organization or existence of Seller, Tax Returns (and any related work papers), corporate seals, checkbooks, and canceled checks, in each case to the extent not primarily relating to the Acquired Assets or Assumed Liabilities or (iii) that Seller is required by Law to retain; provided that, to the extent not prohibited by applicable Law, Purchaser shall have the right to make copies of any portions of such Documents;

(d)     all Documents to the extent prepared or received by Seller or any of its Affiliates in connection with the sale of the Acquired Assets, this Agreement, or the Transactions, including (i) all records and reports prepared or received by Seller or any of its Affiliates or Advisors in connection with the sale of the Acquired Assets and the Transactions, including all analyses relating to the business of Purchaser or its Affiliates so prepared or received in connection therewith, (ii) all bids and expressions of interest received from third parties with respect to the acquisition of Seller's business or assets, and (iii) all privileged materials, documents and records of Seller or any of its Affiliates (together with the Documents specified in Sections 1.2(c) and 1.2(h), the "Excluded Documents");

(e)     all current and prior insurance policies of Seller, including for the avoidance or doubt all director and officer insurance policies, and all rights and benefits of any nature of Seller with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries, in each case, other than Acquired Voyager Claims;

(f)     all membership interests or other equity interests of Seller or any of its Affiliates or securities convertible into, exchangeable, or exercisable for any such membership interests or other equity interests;

(g)     (i) all Retained Avoidance Actions, (ii) all preference or avoidance claims or actions arising under the Bankruptcy Code or applicable Law, (iii) all other rights, claims, causes of action, rights of recovery, rights of set-off, and rights of recoupment as of the Closing of Seller or any of its Affiliates, in each case, either (A) arising out of or relating to events occurring on or prior to the Closing Date, except as set forth in Section 1.1, or (B) related to any Credit Matter, and (iv) all claims that Seller or any of its Affiliates may have against any Person with respect to any other Excluded Assets or any Excluded Liabilities, in each case other than Acquired Voyager Claims;

(h)     Seller's claims or other rights under this Agreement, including the Purchase Price hereunder, or any agreement, certificate, instrument, or other document executed and delivered between Seller and Purchaser or their respective Affiliates in connection with the Transactions, or any other agreement between Seller and Purchaser or their respective Affiliates entered into on or after the date hereof;

(i)     (x) all Tax attributes of Seller or its Affiliates (including refunds of income Taxes of Seller or its Affiliates, but excluding any Tax refunds or Tax attributes with respect to Taxes in respect of the Acquired Assets for any taxable period (or portion thereof) beginning after the Closing Date allocable to Purchaser in accordance with Section 9.3(d) or with respect to Transfer Taxes), (y) all Tax refunds and Tax attributes with respect to Taxes in respect of the Acquired Assets (i) for any Pre-Closing Tax Period or (ii) that are Excluded Liabilities, and (z) all Tax refunds and Tax attributes with respect to Taxes in respect of the Excluded Assets;

(j)     every asset of Seller that would otherwise constitute an Acquired Asset (if owned immediately prior to the Closing) if conveyed or otherwise disposed of during the period from the date hereof until the Closing Date (i) at the direction of the Bankruptcy Court or (ii) as otherwise permitted under Section 6.1(b);

(k)     all demands, allowances, refunds, rebates (including any vendor or supplier rebates), rights (including under or with respect to express or implied guarantees, warranties, representations, covenants and indemnities), claims, counterclaims, defenses, credits, causes of action, rights of set off, rights of recovery or rights of recoupment relating to or arising against suppliers, vendors, merchants, manufacturers and counterparties to leases, licenses or any Contract, arising out of or relating to events occurring on or prior to the Closing Date, in each case other than Acquired Voyager Claims;

(l)     the properties, rights, interests, equity and assets of Coinify ApS and its direct and indirect subsidiaries;

4

(m)     all Money Transmitter Licenses;

(n)     Seller's accounts receivable, and other amounts or Liabilities owing, from its Affiliates;

(o)     (i) all Seller Plans and assets of all Seller Plans that do not constitute Acquired Coins and (ii) personnel records relating to employees of Seller and Holdings;

(p)     all information and Personal Information related to individual consumers that is not Acquired User Data, including any Personal Information that is subject to the GDPR or collected from natural persons with addresses outside of the United States;

(q)     the 3AC Loan;

(r)     all VGX Token Smart Contracts; and

(s)     the properties, rights, interests and assets set forth on <u>Schedule 1.2(s)</u>.

1.3     <u>Assumption of Certain Liabilities</u>. On the terms and subject to the conditions set forth herein and in the Agreement Order, the Plan and the Confirmation Order, effective as of the Closing, in addition to the other components of the Purchase Price described in <u>Section 2.1(a)</u>, Purchaser shall irrevocably assume from Seller (or with respect to Taxes, if applicable, from Seller's applicable Affiliate) (and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and Seller shall (or with respect to Taxes, if applicable, cause Seller's applicable Affiliate to) irrevocably transfer, assign, convey, and deliver to Purchaser, only the following Liabilities, without duplication and only to the extent not paid prior to the Closing (collectively, the "<u>Assumed Liabilities</u>"):

(a)     all Liabilities and obligations of Seller under the Assigned Contracts to the extent such Liabilities arise from and after the Closing or relate to events, facts and circumstances first existing after the Closing;

(b)     all cure costs required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts (the "<u>Cure Costs</u>");

(c)     all Liabilities arising out of the conduct of the business or the ownership of the Acquired Assets, in each case, solely by Purchaser from and after the Closing Date and to the extent such Liabilities arise from events, facts and circumstances first existing after the Closing Date;

(d)     all Liabilities for Taxes with respect to the Acquired Assets for any taxable period (or portion thereof) beginning after the Closing Date allocable to Purchaser in accordance with <u>Section 9.3(d)</u>;

(e)     all Liabilities relating to all Transfer Taxes; and

(f)     all Liabilities set forth on <u>Schedule 1.3(f)</u>;

US-DOCS\137411268.27

provided, however, that whether or not any Liability for Taxes is an Assumed Liability shall be governed solely by Section 1.3(d) and Section 1.3(e).

1.4    Excluded Liabilities. Notwithstanding anything herein to the contrary, Purchaser shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, Seller or any of its Affiliates or relating to the Acquired Assets, the Excluded Assets or the business and operations of Seller and its Affiliates, of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on or prior to the Closing Date or arising thereafter, including as a result of any act, omission, or circumstances taking place prior to the Closing, other than the Assumed Liabilities (all such Liabilities that are not Assumed Liabilities being referred to collectively herein as the "Excluded Liabilities"). For the avoidance of doubt, and without limiting the foregoing, Purchaser shall not be obligated to assume, and does not assume, and hereby disclaims, all of the following Liabilities of Seller and its Affiliates (each of which shall constitute an Excluded Liability hereunder):

(a)    all Liabilities (i) existing prior to the filing of the Bankruptcy Case that are subject to compromise under the Bankruptcy Code and (ii) to the extent not otherwise expressly assumed herein (including in the Commercial Covenants), incurred subsequent to the filing of the Bankruptcy Case and prior to the Closing;

(b)    all Liabilities related to (i) customer accounts of Seller or its Affiliates (including Voyager User Accounts), except for those obligations of Purchaser expressly set forth in the Commercial Covenants and (ii) commercial payables or amounts owing by Seller or its Affiliates, including to any software vendors;

(c)    all Liabilities for Taxes (i) with respect to the Acquired Assets for any Pre-Closing Tax Period allocable to Seller in accordance with Section 9.3(d); (ii) of Seller and their Affiliates for any taxable period; or (iii) arising from or in connection with an Excluded Asset; and

(d)    all Liabilities resulting from Seller's or any of its Affiliates' breach of, violation of, or non-compliance with the provisions of any Laws relating to the ownership or operation of their respective businesses, the Acquired Assets and the Excluded Assets or the Transactions, including any bulk transfer Laws or similar Laws of any jurisdiction in connection with the Transactions; and

(e)    all Successor Liabilities, including with respect to any investigation or other Action against, concerning or otherwise with respect to Seller, its business or its assets.

1.5    Assumption/Rejection of Certain Contracts.

(a)    Assumption and Assignment of Executory Contracts. Seller shall, and shall cause its Affiliates to, provide timely and proper written notice of the Seller's request for entry of the Confirmation Order to all parties to any executory Contracts or unexpired leases to which Seller is a party that are Assigned Contracts and take all other actions reasonably necessary to cause such Contracts to be assumed by Seller and assigned to Purchaser pursuant to section 365 of the Bankruptcy Code to the extent that such Contracts are Assigned Contracts at Closing. The

US-DOCS\137411268.27

Confirmation Order shall provide that as of and conditioned on the occurrence of the Closing, Seller shall assign or cause to be assigned to Purchaser, as applicable, the Assigned Contracts, each of which shall be identified by the name or appropriate description and date of the Assigned Contract (if available), the other party to the Assigned Contract and the address of such party for notice purposes, all included on an exhibit attached to either the Plan Supplement, a notice filed in connection with the motion for approval of the Confirmation Order or a separate motion for authority to assume and assign such Assigned Contracts. Such exhibit shall also set forth Seller's good faith estimate of the amounts necessary to cure any defaults under each of the Assigned Contracts as determined by Seller based on Seller's books and records or as otherwise determined by the Bankruptcy Court. At the Closing, Seller shall, pursuant to the Agreement Order, the Confirmation Order and the Assignment and Assumption Agreement(s), assume and assign to Purchaser (the consideration for which is included in the Purchase Price), all Assigned Contracts that may be assigned by Seller to Purchaser pursuant to sections 363 and 365 of the Bankruptcy Code, subject to adjustment pursuant to Section 1.5(b). At the Closing, Purchaser shall (i) pay all Cure Costs and (ii) assume, and thereafter in due course and in accordance with its respective terms pay, fully satisfy, discharge and perform all of the obligations under each Assigned Contract pursuant to section 365 of the Bankruptcy Code.

(b)  Excluding or Adding Assigned Contracts Prior to Closing. Purchaser shall have the right to notify Seller in writing of any Assigned Contract that it does not wish to assume or a Contract to which Seller is a party that Purchaser wishes to add as an Assigned Contract up to five (5) Business Days prior to the Closing Date, and (i) any such previously considered Assigned Contract that Purchaser no longer wishes to assume shall be automatically deemed removed from the Schedules related to Assigned Contracts and automatically deemed to be an Excluded Contract, in each case, without any adjustment to the Purchase Price, and (ii) any such previously considered Excluded Contract that Purchaser wishes to assume as an Assigned Contract shall be automatically deemed added to the Schedules related to Assigned Contracts, automatically deemed removed from the Schedules related to Excluded Contracts, and assumed by Seller to sell and assign to Purchaser, in each case, without any adjustment to the Purchase Price. Purchaser shall be solely responsible for the payment, performance and discharge when due of the Liabilities under the Assigned Contracts arising or that are otherwise payable from the time of and after the Closing. No Contract set forth on Schedule 1.2(s) shall be subject to the terms of this Section 1.5(b).

(c)  Non-Assignment.

(i)  Notwithstanding anything to the contrary in this Agreement but subject to Section 6.1, a Contract shall not be an Assigned Contract hereunder and shall not be assigned to, or assumed by, Purchaser to the extent that such Contract is rejected by Seller or terminated by Seller or any other party thereto, or terminates or expires by its terms, on or prior to such time as it is to be assumed by Purchaser as an Assigned Contract hereunder and is not continued or otherwise extended upon assumption; provided that Seller shall obtain Purchaser's consent prior to seeking to reject or terminate, or rejecting or terminating, any Assigned Contract or any Contract assumed by Purchaser pursuant to Section 1.5(a) or Section 1.5(b) from and after the date of this Agreement.

(ii)  Notwithstanding anything to the contrary in this Agreement, to the extent an Acquired Asset requires a Consent or Governmental Authorization (other than,

7

and in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to Purchaser of Seller's rights over such asset, and such Consent or Governmental Authorization has not been obtained prior to such time as it is to be transferred by Purchaser as an Acquired Asset hereunder, such asset shall not be an Acquired Asset hereunder and shall not be transferred to, or received by, Purchaser. In the event that any Acquired Asset is deemed not to be assigned pursuant to this <u>clause (ii)</u>, the Closing shall nonetheless take place subject to the terms and conditions set forth herein and, thereafter, through the earlier of such time as such Consent or Governmental Authorization is obtained and the closing of the Bankruptcy Case, Seller and Purchaser shall (A) use reasonable best efforts to secure such Consent or Governmental Authorization as promptly as practicable after the Closing and (B) enter into a commercially reasonable arrangement reasonably proposed by Purchaser, including subcontracting, licensing, or sublicensing to Purchaser any or all of Seller's rights and obligations with respect to any such Acquired Asset, under which (1) Purchaser shall obtain (without materially infringing upon the legal rights of such third party or violating any Law) the economic rights and benefits (net of the amount of any related Tax costs actually incurred by Seller or its Affiliates or any direct reasonable and documented out-of-pocket costs actually incurred by Seller or its Affiliates resulting from the retention and maintenance by Seller or its Affiliates) with respect to such Acquired Asset with respect to which the Consent or Governmental Authorization has not been obtained and (2) Purchaser shall assume any related burden and obligation with respect to such Acquired Asset to the extent such burden and obligation would constitute an Assumed Liability if such Acquired Asset was transferred at Closing. Upon satisfying any requisite Consent or Governmental Authorization requirement applicable to such Acquired Asset after the Closing, such Acquired Asset shall promptly be transferred and assigned to Purchaser in accordance with the terms of this Agreement, the Agreement Order, the Plan and Confirmation Order, and the Bankruptcy Code. Notwithstanding anything herein to the contrary, the provisions of this <u>Section 1.5(c)</u> shall not apply to any consent or approval that is not required to be obtained by operation of the Bankruptcy Code (including section 365(f)).

## ARTICLE II

## CONSIDERATION; PAYMENT; CLOSING

2.1     <u>Consideration; Payment</u>.

(a)     Subject to the terms and conditions herein, the aggregate consideration (collectively, the "<u>Purchase Price</u>") to be paid by Purchaser for the purchase of the Acquired Assets shall be: (i) (A) the assumption of Assumed Liabilities, (B) a cash payment of $20,000,000 (the "<u>Cash Payment</u>"), (C) the Seller Expenses, if any, payable pursuant to <u>Section 6.21</u>, and (D) Purchaser's obligations to make the payments set forth in <u>Section 6.12</u> and <u>Section 6.14</u>.

(b)     Subject to the terms and conditions herein, at the Closing, Purchaser shall deliver, or cause to be delivered, to Seller (i) the Cash Payment, <u>plus</u> (ii) the Seller Expenses, if any, payable pursuant to <u>Section 6.21</u>, <u>less</u> (iii) the Deposit, together with all received investment income, if any (the "<u>Closing Date Payment</u>"). Any payment required to be made pursuant to this Agreement in cash (including the Closing Date Payment) shall be made by wire transfer of

8

immediately available funds to such bank account as shall be designated in writing by the applicable Party to the other Party at least two (2) Business Days prior to the date such payment is to be made.

(c)     Upon reasonable advance written notice to Purchaser (in any event delivered to Purchaser no less than five Business Days prior to the Closing Date) Seller shall be entitled to withhold such portion of the Seller Held Coins as is necessary to satisfy Seller's obligations under the Plan (the "Withheld Coins"), and Seller shall distribute, or take such other action with respect to, the Withheld Coins only in accordance with the Plan and the provisions of this Agreement. To the extent there are any Withheld Coins, the provisions of this Agreement shall be read accordingly to give effect to the withholding and subsequent transfer, distribution or other action with respect to any such Withheld Coins, *mutatis mutandis*.

2.2     Deposit.

(a)     Purchaser has made, on the date hereof or will make on the first Business Day following the date hereof, an earnest money deposit with Acquiom Clearing House LLC (the "Escrow Agent") in the amount equal to $10,000,000 (the "Deposit"), by wire transfer of immediately available funds for deposit into an escrow account (the "Escrow Account"). Subject to Section 2.2(b) and Section 2.2(c), the Deposit and any received investment income, if any, shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of Seller or Purchaser and shall be applied against payment of the Purchase Price on the Closing Date. Seller hereby acknowledges and agrees that the Deposit qualifies as the deposit required pursuant to the Bidding Procedures Order.

(b)     If this Agreement has been validly terminated (i) by Seller pursuant to Section 8.1(d) or Section 8.1(f), (ii) by Purchaser pursuant to Section 8.1(c), in circumstances where Seller would be entitled to terminate this Agreement pursuant to Section 8.1(d) or Section 8.1(f), or (iii) by Seller pursuant to Section 8.1(g) in connection with and following any Purchaser Development and not in connection with a Higher and Better Offer (each of (i), (ii), and (iii), a "Purchaser Default Termination"), then within three (3) Business Days after the date of such termination, the Parties shall execute any instructions necessary to permit the Escrow Agent to disburse the Deposit together with all received investment income, if any, to Seller.

(c)     If this Agreement has been validly terminated by either Party, other than as contemplated by Section 2.2(b), then the Deposit, together with all received investment income, if any, shall be returned to Purchaser within three (3) Business Days after such termination, and, at Purchaser's request, Seller shall execute any instructions necessary to permit the Escrow Agent to disburse the Deposit together with all received investment income, if any, to Purchaser.

(d)     If the Closing occurs, the Deposit shall be transferred to Seller.

2.3     Closing. Subject to the terms and on the conditions set forth in this Agreement, the closing of the purchase and sale of the Acquired Assets, the delivery of the Purchase Price, the assumption of the Assumed Liabilities and the consummation of the other transactions contemplated by this Agreement at and in connection with such closing (the "Closing") will take place by telephone conference and electronic exchange of documents (or, if the Parties agree to

hold a physical closing, at the offices of Kirkland & Ellis LLP, located at 601 Lexington Avenue, New York, New York 10022) at 10:00 a.m. Eastern Time on the third (3rd) Business Day following full satisfaction or due waiver (by the Party entitled to the benefit of such condition) of the closing conditions set forth in Article VII (other than conditions that by their terms or nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions), or at such other place and time as the Parties may agree in writing. The date on which the Closing actually occurs in accordance with the provisions hereof is referred to herein as the "Closing Date."

2.4    Closing Deliveries by Seller. At the Closing, Seller shall deliver to Purchaser:

(a)    a bill of sale and assignment and assumption agreement substantially in the form of Exhibit A (the "Assignment and Assumption Agreement") duly executed by Seller;

(b)    each of the Acquired Coins to the wallet address designated by Purchaser for the relevant Acquired Coins of such type; and prior to transferring any Acquired Coins in full, Seller shall send a test transaction of a *de minimis* amount and shall immediately deliver the remainder of the relevant Acquired Coins, following Purchaser's confirmation that the *de minimis* amount was properly delivered; provided that such transfers of the Acquired Coins shall be deemed complete when each transfer is publicly confirmed on the blockchain for the related Coin at least the number of times set forth on https://support.kraken.com/hc/en-us/articles/203325283-Cryptocurrency-deposit-processing-times (or a successor site agreed by Seller and Purchaser); provided further that (i) for Acquired Coins held on the Binance.US Platform as of the Closing Date, such Acquired Coins shall be transferred to the Binance.US Platform account designated by Purchaser and (ii) in the case of ETH Coins that are Staked Coins as of the date hereof, such staked ETH Coins shall be delivered pursuant to the means mutually agreed between Purchaser and Seller acting reasonably;

(c)    a short-form trademark and domain name assignment agreement substantially in the form of Exhibit B (the "Trademark and Domain Name Assignment Agreement"), duly executed by Seller;

(d)    an IRS Form W-9 properly completed and duly executed by Seller or Seller's regarded owner for U.S. federal income Tax purposes;

(e)    an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Seller certifying that the conditions set forth in Sections 7.2(a) and 7.2(b) have been satisfied; and

(f)    the Seller Statement pursuant to Section 6.11(c).

2.5    Closing Deliveries by Purchaser. At the Closing, Purchaser shall deliver to (or at the direction of) Seller:

(a)    without duplication, the Closing Date Payment pursuant to Section 2.1(b);

(b)    the Assignment and Assumption Agreement, duly executed by Purchaser;

(c)      the Trademark and Domain Name Assignment Agreement, duly executed by Purchaser; and

(d)      an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Purchaser certifying that the conditions set forth in Sections 7.3(a) and 7.3(b) have been satisfied.

2.6      Withholding. Purchaser and its Affiliates shall be entitled to deduct and withhold from any amounts otherwise payable pursuant to this Agreement such amounts as are required to be deducted or withheld under applicable tax Law. Prior to making any such deduction or withholding, Purchaser or its applicable Affiliate shall use reasonable best efforts to (x) notify the person in respect of which such withholding or deduction is proposed to be made of such deduction or withholding and (y) give such person a reasonable amount of time to demonstrate that no or reduced withholding is required under applicable tax Law. To the extent that amounts are so deducted or withheld and paid to the appropriate Governmental Body, such amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction and withholding was made.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as (i) disclosed in the forms, reports, schedules, statements, exhibits and other documents filed with (or furnished to) the Canadian Securities Administrators ("CSA") by Parent in respect of Seller and its business during the two-year period prior to the date hereof to the extent publicly available at least one (1) Business Day prior to the date hereof on the CSA's System for Electronic Document Analysis and Retrieval, excluding (x) any disclosures set forth or referred to in any risk factor or similar section that do not constitute statements of fact, (y) any disclosures in any forward-looking statements disclaimer, and (z) any other disclosures that are generally cautionary, predictive or forward-looking in nature (the "Filed CSA Documents") (it being acknowledged that nothing disclosed in the Filed CSA Documents will be deemed to modify or qualify the Fundamental Representations), (ii) disclosed in any forms, statements or other documents filed by any of the Debtors with the Bankruptcy Court in the Bankruptcy Case as of one (1) Business Day prior to the date hereof, or (iii) set forth in the Schedules delivered by Seller concurrently herewith and subject to Section 10.10, Seller represents and warrants to Purchaser as follows as of the date hereof and as of the Closing Date:

3.1      Organization and Qualification.

(a)      Except as set forth on Schedule 3.1, Seller is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware and has all requisite limited liability company power and authority necessary to own, lease and operate its properties and assets and to carry on its business as it is now being conducted, except (other than with respect to Seller's due formation and valid existence) as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)    Except as set forth on <u>Schedule 3.1</u>, Seller is duly qualified to do business and is in good standing (where such concept is recognized under applicable Law) in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets owned, leased or operated by it makes such qualification necessary, except where the failure to be so qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.2    <u>Authorization of Agreement</u>. Subject to requisite Bankruptcy Court approvals:

(a)    Seller has all necessary power and authority to execute and deliver this Agreement and to perform its obligations hereunder and to consummate the Transactions;

(b)    the execution, delivery and performance by Seller of this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement to which it is a party or to be executed by it in connection with the consummation of the Transactions (the "<u>Seller Documents</u>"), and the consummation by Seller of the Transactions, have been duly authorized by all requisite limited liability company action and no other limited liability company proceedings on its part are necessary to authorize the execution, delivery and performance by Seller of this Agreement and the Seller Documents and the consummation by it of the Transactions; and

(c)    this Agreement has been, and the Seller Documents will be, when delivered pursuant to the terms hereof, duly executed and delivered by Seller and, assuming due authorization, execution and delivery hereof by the other Party, constitutes a legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, except that such enforceability (i) may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other similar Laws of general application affecting or relating to the enforcement of creditors' rights generally and (ii) is subject to general principles of equity, whether considered in a proceeding at law or in equity (collectively, the "<u>Enforceability Exceptions</u>").

3.3    <u>Conflicts; Consents</u>.

(a)    Assuming that (x) requisite Bankruptcy Court approvals are obtained, and (y) the notices, authorizations, approvals, Orders, permits or consents set forth on <u>Schedule 3.3(a)</u> are made, given or obtained (as applicable), neither the execution and delivery by Seller of this Agreement, nor the consummation by Seller of the Transactions, nor performance or compliance by Seller with any of the terms or provisions hereof, will (i) conflict with or violate any provision of Seller's certificate of formation or limited liability company agreement, (ii) violate any Law or Order applicable to Seller, the Acquired Assets or the Assumed Liabilities, (iii) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancellation of any obligation or to the loss of any benefit, any of the terms or provisions of any Material Contract or accelerate Seller's obligations under any such Material Contract, (iv) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any properties or assets of Seller or (v) violate, contravene or conflict with, result in termination or lapse of, or in any way affect any permit, except, in the case of <u>clauses</u>

(ii) through (v), as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b) Except as set forth on <u>Schedule 3.3(a)</u>, Seller is not required to file, seek or obtain any notice, authorization, approval, Order, permit or consent of or with any Governmental Body in connection with the execution, delivery and performance by Seller of this Agreement or the consummation by Seller of the Transactions, except (i) any requisite Bankruptcy Court approvals, or (ii) where failure to file, seek or obtain such notice, authorization, approval, Order, permit or consent would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.4 <u>Financial Statements</u>. Attached to <u>Schedule 3.4</u> are Parent's unaudited statements of financial position as of June 30, 2022 (the "<u>Balance Sheet Date</u>") and audited statements of financial position as of June 30, 2021, and the related statements of loss and cash flows for each fiscal year then ended, in each case (collectively, the "<u>Financial Statements</u>"). Except as set forth on <u>Schedule 3.4</u>, the Financial Statements have been prepared, in each case, in conformity in all material respects with IFRS consistently applied, except for the absence of footnote disclosure and any customary year-end adjustments and except, in the case of the unaudited statements as of June 30, 2020 or the fiscal year then ended, with respect to any Tax matters or any impact or effect thereof. The Financial Statements are prepared based on the books and records of Parent and its Subsidiaries and present fairly in all material respects, in accordance with IFRS consistently applied, the consolidated financial condition and results of operations of Parent as of the dates and for the periods referred to therein, except as may be indicated in the notes thereto.

3.5 <u>Cryptocurrency; Loans; Customer Accounts</u>.

(a) <u>Schedule 3.5(a)</u> sets forth a list of all Cryptocurrency held by Seller as of a date within three (3) Business Days of the date hereof, the means through which Seller as of such date controls such Cryptocurrency (*e.g.*, "private keys," custody agreements or agreements with parties performing validation services), whether or not such Cryptocurrency is attributable to User accounts on the Voyager Platform, and whether such Cryptocurrency constitutes collateral under any Loan (including, solely for this purpose, the 3AC Loan), which <u>Schedule 3.5(a)</u> shall be provided to Purchaser no later than December 18, 2022. Seller has the exclusive ability to control, including by use of "private keys" or other equivalent means or through custody arrangements or other equivalent means, all such Cryptocurrency set forth on <u>Schedule 3.5(a)</u> (other than, solely to the extent of any staking contract, Staked Coins), and owns such Cryptocurrency (other than Cryptocurrency that constitutes collateral under any Loan (including, solely for this purpose, the 3AC Loan) and, solely to the extent of any staking contract, Staked Coins) free and clear of all Encumbrances (other than Encumbrances that will be removed or released by operation of the Confirmation Order or the Plan); <u>provided</u> that such ownership and exclusive ability to control Cryptocurrency is subject to the continued existence, validity, legality, governance and public availability of the relevant blockchains.

(b) <u>Schedule 3.5(b)</u> sets forth a true, correct and complete list of all amounts (including any principal, interest, fees, expenses or penalties) outstanding or unpaid under any Loan.

(c)     Schedule 3.5(c) sets forth a list of all Users (excluding Users with addresses in the United Kingdom, European Union or European Economic Area) as of the Petition Date and a date within three (3) Business Days of the date hereof and the account position (including type and amount of Cryptocurrency) that such User held as of immediately prior to the Petition Date and as of the date hereof, which Schedule 3.5(c) shall be provided to Purchaser no later than December 18, 2022.

(d)     Seller has implemented procedures and controls regarding management of authentication credentials such as private keys and means for instructing third party custodians ("Authentication Credentials") for Cryptocurrencies, including limitation of access to Authentication Credentials to employees who need to have such access and requiring multiple individuals to sign off on transactions. Where Authentication Credentials are not held by employees of Seller, such Authentication Credentials are held by reputable third-party custodians or wallet providers whose security procedures have been evaluated by Seller and found to be fit for purpose.

(e)     Schedule 3.5(e) sets forth a true, correct and complete list of the number and type of Post-Petition Coins, on a User-by-User basis, which Schedule 3.5(e) shall be provided to Purchaser no later than December 18, 2022.

3.6     Title to Acquired Assets; Staked Coins; Exclusive Ownership; Sufficiency of Assets.

(a)     Seller has good and valid title to all Acquired Assets (other than Coins pledged by a borrower as collateral in respect of any Loans and, solely to the extent of any staking contract, Staked Coins), free and clear of all Encumbrances (other than Permitted Encumbrances) and, at the Closing, subject to Section 1.5(c), Purchaser will be vested with good and valid title to all such Acquired Assets, free and clear of all Encumbrances (other than Permitted Post-Closing Liens) and Excluded Liabilities, to the fullest extent permissible under Law, including section 363(f) of the Bankruptcy Code; provided, in respect of the Acquired Coins, Purchaser will be vested with good and valid title thereto free and clear of all Encumbrances (including Encumbrances implemented through "smart contracts" or other technological means), except that with respect to any staked ETH Coins that cannot be unstaked as of the Closing, such ETH Coins shall be subject to such staking. Schedule 3.6(a) sets forth a true, correct and complete list of all Seller Held Coins that are subject to staking ("Staked Coins").

(b)     Seller is the sole owner of all Coins relating to the exchange and custody business of the Voyager Platform and has good and valid title to such Coins, free and clear of all Encumbrances (except to the extent such Coin constitutes collateral under any Loan (including, solely for this purpose, the 3AC Loan) and, solely to the extent of any staking contract, Staked Coins).

3.7     Title to Properties.

(a)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, Seller has a good and valid leasehold interest to all

US-DOCS\137411268.27

real property leased by Seller (the "Leased Real Property"), free and clear of all Encumbrances (other than Permitted Encumbrances). Seller does not own any real property.

(b)     Subject to requisite Bankruptcy Court approvals, and assumption by Seller of the applicable Contract in accordance with applicable Law (including satisfaction of any applicable Cure Costs) and except as a result of the commencement of the Bankruptcy Case, Seller holds good title to, or holds a valid leasehold interest in, all of the material tangible property necessary in the conduct of its business as now conducted, free and clear of all Encumbrances, except for Permitted Encumbrances, other than any failure to own or hold such tangible property that is not material to Seller.

3.8     Contracts.

(a)     Schedule 3.8 sets forth a list of each Material Contract as of the date of this Agreement. For purposes of this Agreement, "Material Contract" means (x) any Assigned Contract, and (y) any other Contract to which Seller is a party or by which it is bound (in each case, excluding any Seller Plan) that in the case of this clause (y):

(i)     relates to the formation, creation, governance, economics, or control of any joint venture, partnership or other similar arrangement, other than for the avoidance of doubt, marketing and licensing Contracts entered into in the Ordinary Course;

(ii)     provides for indebtedness for borrowed money of Seller having an outstanding or committed amount in excess of $1,000,000, other than letters of credit;

(iii)     relates to the acquisition or disposition of any material business (whether by merger, sale of stock, sale of assets or otherwise) pursuant to which any earn-out or deferred or contingent payment obligations remain outstanding that would reasonably be expected to involve payments by or to Seller of more than $1,000,000 after the date hereof (in each case, excluding for the avoidance of doubt, acquisitions or dispositions of Equipment, Cryptocurrency, properties or other assets in the Ordinary Course or of Equipment, properties or other assets that are obsolete, worn out, surplus or no longer used or useful in the conduct of the business of Seller);

(iv)     involves the license of material Seller Intellectual Property to third parties (other than (x) Contracts with end users of Seller's products and services entered into in the ordinary course of business or (y) non-exclusive licenses granted to service providers, suppliers and other third parties in connection with the provision of goods or services to Seller; provided such licenses are ancillary to, and not the primary purpose of, such Contract);

(v)     is a Contract (other than purchase orders or Contracts with respect to the acquisition of Cryptocurrency in the Ordinary Course) for the purchase of materials, supplies, goods, services, Equipment, or other assets pursuant to which Seller would reasonably be expected to make payments of more than $3,000,000 during any fiscal year;

(vi)     contains any provision (A) limiting, in any material respect, the right of Seller to engage in any business, make use of any Seller Intellectual Property that is

15

material to Seller, compete with any Person, or operate anywhere in the world, or (B) granting any exclusivity right to any third party or containing a "most favored nation" provision in favor of any third party, in each case of (A) and (B), other than (x) a Contract that can be terminated on ninety (90) days' notice or less without resulting in a breach or violation of, or any acceleration of any rights or obligations or the payment of any penalty under, such Contract, (y) customer Contracts entered into in the Ordinary Course granting exclusive rights to certain of Seller's services or containing "most favored nation" provisions with respect to certain of Seller's products or (z) any provision in any license agreements for third party Intellectual Property being licensed to Seller that limits Seller's use of such licensed Intellectual Property to specified fields of use or specified territories;

(vii)    evidences or relates to a Loan, including security or collateral agreements;

(viii)   is a custody agreement or agreement with any Person performing validation or staking services with respect to any Cryptocurrency;

(ix)    each Contract evidencing or governing financial or commodity hedging or similar trading activities (including with respect to Cryptocurrency), including any master agreements or confirmations governing swaps, options or other derivatives, or futures account agreements and/or brokerage statements or similar Contract; and

(x)    any Contracts with any Governmental Body, regulatory service providers or self-regulatory organizations in connection with Seller's business or the Voyager Platform.

(b)    Subject to requisite Bankruptcy Court approvals, and assumption by Seller of the applicable Contract in accordance with applicable Law (including satisfaction by Purchaser of any applicable Cure Costs) and except (i) as a result of the commencement of the Bankruptcy Case and (ii) with respect to any Contract that has previously expired in accordance with its terms, been terminated, restated, or replaced, (A) each Material Contract is valid and binding on Seller and, to the Knowledge of Seller, each other party thereto, and is in full force and effect, subject to the Enforceability Exceptions, (B) Seller, and, to the Knowledge of Seller, any other party thereto, have performed all obligations required to be performed by it under each Material Contract, (C) Seller has not received a written notice of the existence of any breach or default on the part of Seller under any Material Contract, (D) there are no events or conditions which constitute, or, after notice or lapse of time or both, will constitute a default on the part of Seller, or to the Knowledge of Seller, any counterparty under such Material Contract and (E) to the Knowledge of Seller, Seller has not received any written notice from any Person that such Person intends to terminate, or not renew, any Material Contract, except in each case of (A) through (E), as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.9    Permits; Compliance with Laws.

(a)    Except as set forth on Schedule 3.9, (i) Seller is not in violation of any Laws, Orders or any Money Transmitter Requirement, applicable to the Acquired Assets and (ii) Seller holds, and is in compliance with, all licenses, permits, registrations and authorizations, including

16

Money Transmitter Licenses, necessary for the lawful ownership and operation of the Acquired Assets and Seller's business, except in each case as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b) Seller and each of its directors, officers and employees acting in such capacity are and have in the past three (3) years been in compliance with the Foreign Corrupt Practices Act of 1977, as amended (the "FCPA"), and any other U.S. or foreign Law concerning anti-corruption or anti-bribery applicable to its business, and Seller is not, to the Knowledge of Seller, being investigated by any Governmental Body with respect to, or been given notice in writing by a Governmental Body of, any violation by Seller of the FCPA or any other U.S. or foreign Law concerning anti-corruption or anti-bribery applicable to its business, in each case, except to the extent such non-compliance, investigation or notice of violation would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(c) Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (i) neither Seller nor any director or officer of Seller, or any employee, agent or representative or other Person who performs or has performed services on behalf of Seller in the past three (3) years, is a Person that is the subject or target of economic sanctions administered by the Office of Foreign Assets Control of the United States Department of Treasury ("OFAC") (including the designation as a "Specially Designated National or Blocked Person" thereunder), the United Nations Security Council, His Majesty's Treasury, the European Union, the Bureau of Industry Security of the U.S. Department of Commerce, the U.S. Department of State, or any sanctions measures under the U.S. International Emergency Economic Powers Act, the U.S. Trading with the Enemy Act, the U.S. Iran Sanctions Act, the U.S. Comprehensive Iran Sanctions, Accountability and Divestment Act of 2010, the U.S. Iran Threat Reduction and Syria Human Rights Act of 2012, the U.S. National Defense Authorization Act of 2012 or the U.S. National Defense Authorization Act of 2013, or any executive order, directive or regulation pursuant to the authority of any of the foregoing, including the regulations of the United States Department of the Treasury set forth under 31 CFR, Subtitle B, Chapter V, or any orders or licenses issued thereunder (collectively, "Sanctions"), nor any Sanctioned Person; (ii) to the Knowledge of Seller, the Acquired Assets are not the property or interests in property of a Sanctioned Person, and are not otherwise the subject or target of Sanctions; and (iii) Seller has not in the past three (3) years been in violation of applicable Sanctions.

(d) Seller and each of its directors, officers and employees acting in such capacity are and have in the past three (3) years been in compliance with all anti-money laundering and financial recordkeeping and reporting Laws to which it is subject, including the related rules, regulations or guidelines issued, administered or enforced by any Governmental Body (collectively, the "Anti-Money Laundering Laws"), and no Action by or before any Governmental Body involving Seller (or, in respect of the dealings of Seller, involving any of Seller's directors, officers or employees) with respect to the Anti-Money Laundering Laws is pending, or, to the Knowledge of Seller, threatened, in each case, except to the extent such non-compliance or Action would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(e) Seller does not (i) have assets located outside the United States, or (ii) derive revenue from users located outside the United States.

17

(f)     Seller does not engage in (a) the design, fabrication, development, testing, production, or manufacture of one or more "critical technologies" within the meaning of Section 721 of the Defense Production Act of 1950, as amended, including all implementing regulations thereof (the "<u>DPA</u>"), or (b) the ownership, operation, maintenance, supply, manufacture, or servicing of "covered investment critical infrastructure" within the meaning of the DPA (where such activities are covered by column 2 of Appendix A to 31 C.F.R. Part 800).

3.10    <u>Environmental Matters</u>. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (a) Seller is, and has been since January 1, 2021, in compliance with all applicable Environmental Laws, (b) since January 1, 2021, Seller has not received any written notice alleging that Seller is in violation of or liable under, any Environmental Law that is unresolved, (c) Seller possesses and is in compliance with all permits required under Environmental Laws for the operation of its business as currently conducted ("<u>Environmental Permits</u>"), (d) there is no Action under or pursuant to any Environmental Law or Environmental Permit that is pending or, to the Knowledge of Seller, threatened in writing against Seller, (e) Seller is not subject to any Order imposed by any Governmental Body pursuant to Environmental Laws under which there are uncompleted, outstanding or unresolved obligations on the part of Seller and (f) Seller has not released any Hazardous Substances at the Leased Real Property in quantities or concentrations that currently require Seller to conduct remedial activities, or that have given rise to any Action against Seller, under Environmental Laws.

3.11    <u>Intellectual Property; Data Privacy</u>.

(a)     <u>Schedule 3.11(a)(i)</u> sets forth as of the date hereof a true, correct and complete list of all registrations and applications included in the Seller Intellectual Property (the "<u>Seller Registered IP</u>"), indicating for each item the owner, registration or application number, registration or application date and the applicable filing jurisdiction or domain name registrar, as applicable. Except as otherwise indicated on <u>Schedule 3.11(a)</u>, all Seller Registered IP is owned exclusively by Seller, and is subsisting, and to the Knowledge of Seller, valid and enforceable. There is no outstanding Action or Order challenging or adversely affecting the validity or enforceability of any material Seller Registered IP, or Seller's ownership of or rights in any material Seller Intellectual Property.

(b)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, Seller owns all of the rights, title and interest in and to the Seller Intellectual Property (other than Intellectual Property licensed to Seller), free and clear of all Encumbrances (other than Permitted Encumbrances). Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, all of the Seller Intellectual Property (other than Intellectual Property licensed to Seller) is subsisting, valid and enforceable.

(c)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (i) Seller owns or has legally enforceable and sufficient rights to use all Intellectual Property necessary to the conduct of the business of Seller as currently conducted free and clear of all Encumbrances (other than Permitted Encumbrances) and (ii) Seller has taken commercially reasonable steps in accordance with industry practice to maintain the confidentiality of non-public Intellectual Property; <u>provided</u> that nothing in this

US-DOCS\137411268.27

Section 3.11(c) shall be interpreted or construed as a representation or warranty with respect to whether there is any infringement, misappropriation, or violation of any Intellectual Property, which is the subject of Section 3.11(e).

(d)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, no Actions are pending or, to the Knowledge of Seller, threatened against Seller, and since January 1, 2021, Seller has not received any written notice or claim, (i) challenging the ownership, validity, enforceability or use by Seller of any Intellectual Property owned by or exclusively licensed to Seller or (ii) alleging that Seller is infringing, misappropriating or otherwise violating the Intellectual Property of any Person.

(e)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, since January 1, 2021, (i) no Person has infringed, misappropriated or otherwise violated the rights of Seller with respect to any Intellectual Property owned by or exclusively licensed to Seller and (ii) the operation of the business of Seller has not violated, misappropriated or infringed the Intellectual Property of any other Person.

(f)     The consummation of the Transactions will not result in the grant of any right or license to any third party of any material Seller Intellectual Property (other than Intellectual Property licensed to Seller).

(g)     Seller has complied in the past three (3) years in all material respects with all applicable Privacy Laws, privacy policies and notices, and contractual commitments related to the Processing of Personal Information (collectively, "Privacy Requirements"), and the consummation of the Transactions will not cause Seller to breach, in any material respect, any Privacy Requirements.

(h)     Seller has established and implemented and maintains a written information security program that contains commercially reasonable safeguards designed to protect Personal Information and against any Security Incident.

(i)     Except as would not, individually or in the aggregate, reasonably be expected to have a material impact on the Acquired Assets, taken as a whole, there have been no Security Incidents involving Personal Information in Seller's custody, possession or control or for which Seller is otherwise responsible. Except as set forth on Schedule 3.11(i), Seller has not in the past three (3) years: (i) notified or been legally required to notify any affected individuals, Governmental Body or other parties in connection with any Security Incident pursuant to Privacy Requirements; (ii) been the subject of any Action with respect to any unauthorized Processing of Personal Information or violation of any Privacy Laws by any Person; (iii) received any written inquiry, notice, request, claim, complaint, correspondence, or other communication from any Governmental Body or other Person relating to any Security Incident or alleged violation of any Privacy Laws; or (iv) made any ransomware or similar payment in connection with any Security Incident.

3.12    Tax Matters.

(a)     To the Knowledge of Seller, except with respect to income Tax and information Tax Returns, Seller has prepared (or caused to be prepared) and duly and timely filed

US-DOCS\137411268.27

(taking into account valid extensions of time within which to file) all material Tax Returns in respect of the Acquired Assets or otherwise required to be filed by it, and all such Tax Returns (taking into account all amendments filed in respect thereto) are true, correct and complete in all material respects.

(b)     To the Knowledge of Seller, all material Taxes in respect of the Acquired Assets, other than income Taxes or Taxes attributable to information Tax Returns, or otherwise required to be paid by Seller (whether or not shown on any Tax Return) have been duly and timely paid.

(c)     To the Knowledge of Seller, there are no Encumbrances for Taxes on the Acquired Assets or any other assets of Seller other than for Taxes not yet due or payable.

(d)     Seller has not, within the past five (5) years, been a member of an affiliated group of corporations filing a consolidated federal income Tax Return (other than a group the common parent of which is Parent or one of its Subsidiaries).

(e)     Seller has not waived any statute of limitations in respect of material Taxes or agreed to any extension of time with respect to an assessment or deficiency for material Taxes (other than pursuant to extensions of time to file Tax Returns obtained in the Ordinary Course), including, for the avoidance of doubt, with respect to Taxes in respect of the Acquired Assets.

(f)     Seller has not participated in any "listed transaction" within the meaning of U.S. Treasury Regulation Section 1.6011-4(b)(2).

(g)     Except as set forth on Schedule 3.12(g), solely as of the date hereof, (x) Seller has not received a written notice from a Governmental Body of any proposed adjustment, deficiency or underpayment of material amounts of Taxes with respect to the Acquired Assets, and (y) there are no pending or threatened audits or other Actions for or relating to any Liability for Taxes with respect to the Acquired Assets, except for, in each case of clause (x) and (y), those that have been fully satisfied, resolved or finally withdrawn.

(h)     Seller has not received a claim from a Governmental Body that Tax Returns are required to be filed in relation to the Acquired Assets or the Assumed Liabilities in a jurisdiction where no such Tax Returns have been filed or are currently filed.

(i)     Notwithstanding anything in this Agreement to the contrary, the representations and warranties in this Section 3.12 shall constitute the sole representations and warranties with respect to Taxes and no representation or warranty is made with respect to the validity of any Tax position or the availability of any Tax attribute for any Tax period (or any portion thereof) following the Closing.

3.13     Affiliate Transactions. Except as set forth on Schedule 3.13 or in the "Interest Of Management And Others In Material Transactions" disclosure in the Filed CSA Documents or customer accounts of officers or directors, to the Knowledge of Seller, no Affiliate of Seller, or any officer or director of Parent or Seller, (a) is a party to any agreement that constitutes an Acquired Asset having a potential or actual value or a contingent or actual Liability exceeding $500,000, other than (i) loans and other extensions of credit to directors and officers of Seller for

20

travel, business or relocation expenses or other employment-related purposes in the Ordinary Course, (ii) employment arrangements in the Ordinary Course and (iii) the Seller Plans or (b) has any material interest in any Acquired Asset.

3.14    Brokers. Except for Moelis, the fees and expenses of which will be paid by Seller, no broker, investment banker, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses in connection therewith, in connection with the Transactions based upon arrangements made by or on behalf of Seller or any of its Affiliates for which Purchaser or its Affiliates shall be liable.

3.15    Litigation. Except for the general pendency of the Bankruptcy Case, Actions that would not reasonably be expected to have a Material Adverse Effect or as set forth Schedule 3.15, there are no filed actions, claims, complains, summons, suits, litigations, arbitrations pending or threatened in writing against Seller.

3.16    Absence of Changes. Since the Balance Sheet Date, (a) there has not been any Material Adverse Effect and (b) no action has been taken with respect to the Acquired Assets that would have required the consent of Purchaser under Section 6.1 if undertaken after the date hereof.

3.17    No Other Representations or Warranties. Except for the representations and warranties expressly contained in this Article III (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) or in the certificate to be delivered pursuant to Section 2.4(e) (the "Express Seller Representations") (it being understood that Purchaser has relied only on the Express Seller Representations), Purchaser acknowledges and agrees that neither Seller nor any other Person on behalf of Seller makes, and Purchaser has not relied on, is not relying on, and will not rely on the accuracy or completeness of any express or implied representation or warranty with respect to Seller, the Acquired Assets or the Assumed Liabilities or with respect to any information, statements, disclosures, documents, projections, forecasts or other material of any nature made available or provided by any Person (including in any presentations or other materials prepared by Moelis) (the "Information Presentation") or in that certain datasite administered by Datasite (the "Dataroom") or elsewhere to Purchaser or any of its Affiliates or their respective Advisors by or on behalf of Seller or any of its Affiliates. Without limiting the foregoing, except for the Express Seller Representations, neither Seller nor any other Person will have or be subject to any Liability whatsoever to Purchaser, or any other Person, resulting from the distribution to Purchaser or any of its Affiliates or their respective Advisors, or Purchaser's or any of its Affiliates' or Advisors' use of or reliance on, any such information, including the Information Presentation, any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom or otherwise in expectation of the Transactions or any discussions with respect to any of the foregoing information.

3.18    No Outside Reliance. Notwithstanding anything contained in this Article III or any other provision of this Agreement to the contrary, Seller acknowledges and agrees that the Express Purchaser Representations are the sole and exclusive representations, warranties and statements of any kind made to Seller and on which Seller may rely in connection with the Transactions. Seller acknowledges and agrees that all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including the

US-DOCS\137411268.27

completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Purchaser Representations), including in any meetings, calls or correspondence with management of Purchaser or any other Person on behalf of Purchaser or any of its Affiliates or Advisors, are, in each case, specifically disclaimed by Purchaser and that Seller has not relied on any such representations, warranties or statements.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Except as set forth in the Schedules delivered by Purchaser concurrently herewith and subject to Section 10.10, Purchaser represents and warrants to Seller as follows as of the date hereof and as of the Closing Date.

4.1  <u>Organization and Qualification</u>. Purchaser is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware and has all requisite power and authority necessary to carry on its business as it is now being conducted, except (other than with respect to Purchaser's due incorporation and valid existence) as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the Transactions. Purchaser is duly licensed or qualified to do business and is in good standing (or its equivalent) in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets leased by it makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the Transactions.

4.2  <u>Authorization of Agreement</u>. Purchaser has all necessary power and authority to execute and deliver this Agreement and to perform its obligations hereunder and to consummate the Transactions. The execution, delivery and performance by Purchaser of this Agreement, and the consummation by Purchaser of the Transactions, subject to requisite Bankruptcy Court approvals, have been duly authorized by all requisite corporate or similar organizational action and no other corporate or similar organizational proceedings on its part are necessary to authorize the execution, delivery and performance by Purchaser of this Agreement and the consummation by it of the Transactions. Subject to requisite Bankruptcy Court approvals, this Agreement has been duly executed and delivered by Purchaser and, assuming due authorization, execution and delivery hereof by the other Party, constitutes a legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, except that such enforceability may be limited by the Enforceability Exceptions.

4.3  <u>Conflicts; Consents</u>.

(a)  Except for the consents, licenses, waivers, exemptions, authorizations, approvals, filings, notifications or registrations required under any Money Transmitter Requirements in any Unsupported Jurisdiction applicable to Purchaser and the Binance.US Platform (the "<u>Unsupported Jurisdiction Approvals</u>"), assuming that (i) requisite Bankruptcy Court approvals are obtained, and (ii) the notices, authorizations, approvals, Orders, permits or consents set forth on <u>Schedule 4.3</u> are made, given or obtained (as applicable), neither the

US-DOCS\137411268.27

execution and delivery by Purchaser of this Agreement, nor the consummation by Purchaser of the Transactions, nor performance or compliance by Purchaser with any of the terms or provisions hereof, will (A) conflict with or violate any provision of Purchaser's articles of incorporation or bylaws or similar organizational documents, (B) violate any Law or Order applicable to Purchaser, (C) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancelation of any obligation or to the loss of any benefit, any of the terms or provisions of any loan or credit agreement or other Contract to which Purchaser is a party or accelerate Purchaser's obligations under any such Contract, or (D) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any properties or assets of Purchaser or any of its Subsidiaries, except, in the case of <u>clauses (B)</u> through <u>(D)</u>, as would not, individually or in the aggregate, reasonably be expected to prevent or materially impair or delay the ability of Purchaser to consummate the Transactions.

(b)     Except for the Unsupported Jurisdiction Approvals, Purchaser is not required to file, seek or obtain any notice, authorization, approval, Order, permit or consent of or with any Governmental Body in connection with the execution, delivery and performance by Purchaser of this Agreement or the consummation by Purchaser of the Transactions, except where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not, individually or in the aggregate, reasonably be expected to prevent or materially impair or delay the ability of Purchaser to consummate the Transactions.

4.4     <u>Financing</u>. Purchaser has, as of the date hereof, and will have at the Closing, sufficient funds in cash in an aggregate amount necessary to (a) pay the Closing Date Payment pursuant to <u>Section 2.1(b)</u> and any Seller Expenses to the extent payable by Purchaser pursuant to <u>Section 6.21</u>, and (b) pay all fees and expenses of Purchaser in connection with the Closing. Purchaser is and shall be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assigned Contracts and the related Assumed Liabilities.

4.5     <u>Permits</u>. Purchaser has Money Transmitter Licenses in all States of the United States of America, other than the Unsupported Jurisdictions and any States in which the operation of Purchaser's business does not require a Money Transmitter License. Assuming the accuracy in all material respects of the representations and warranties set forth on <u>Sections 3.9(a)</u>, <u>3.9(d)</u> and <u>3.9(e)</u> (in each case, as qualified by the Schedules) and Seller's compliance in all material respects with the covenants set forth in <u>Sections 6.4</u>, <u>6.6</u>, <u>6.10</u> and the other Commercial Covenants, except for the Unsupported Jurisdiction Approvals, Purchaser holds all licenses, franchises, permits, certificates, approvals, and authorizations from Governmental Bodies necessary for the ownership and use of the Acquired Assets.

4.6     <u>Brokers</u>. There is no investment banker, broker, finder, or other intermediary which has been retained by or is authorized to act on behalf of Purchaser that might be entitled to any fee or commission in connection with the Transactions.

4.7     <u>No Litigation</u>. There are no Actions pending or, to the Knowledge of Purchaser, threatened against or affecting Purchaser that will materially and adversely affect Purchaser's performance under this Agreement or Purchaser's ability to consummate the Transactions.

23

4.8 <u>Certain Arrangements</u>. As of the date hereof, there are no Contracts, undertakings, commitments, agreements or obligations, whether written or oral, between any member of the Purchaser Group, on the one hand, and any member of the management of Seller or its board of managers (or applicable governing body of any Affiliate of Seller), any holder of equity or debt securities of Seller, or any lender or creditor of Seller or any of its Affiliates, on the other hand, (a) relating in any way to the acquisition of the Acquired Assets or the Transactions or (b) that would be reasonably likely to prevent, restrict, impede or affect adversely the ability of Seller or any of its Affiliates to entertain, negotiate or participate in any of the Transactions.

4.9 <u>Solvency</u>. As of the date hereof Purchaser is and, assuming (x) that the representations and warranties made by Seller herein are true and connect, (y) Seller has complied in all material respects with its covenants and other agreements hereunder, and (z) the conditions set forth in <u>Section 7.1</u> and <u>Section 7.2</u> have been satisfied, then immediately after giving effect to the transactions contemplated hereby Purchaser shall be, Solvent. "Solvent" means, with respect to any Person, such Person (a) is able to pay its debts as they become due; (b) owns property that has a fair saleable value greater than the amounts required to pay its debt (including a reasonable estimate of the amount of all contingent liabilities) and (c) has adequate capital to carry on its business. In connection with the Transactions, Purchaser is not incurring, has not incurred, and does not plan to incur, debts beyond its ability to pay as they become absolute and matured.

4.10 <u>No Additional Representations or Warranties</u>. Except for the representations and warranties expressly contained in this <u>Article IV</u> (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) or in the certificate to be delivered pursuant to <u>Section 2.5(d)</u> (the "<u>Express Purchaser Representations</u>") (it being understood that Seller has relied only on the Express Purchaser Representations), Seller acknowledges and agrees that neither Purchaser nor any other Person on behalf of Purchaser makes, and Seller has not relied on, is not relying on, and will not rely on the accuracy or completeness of any express or implied representation or warranty with respect to Purchaser or with respect to any information, statements, disclosures, documents, projections, forecasts or other material of any nature made available or provided by any Person to Seller or any of its Affiliates or their respective Advisors on behalf of Purchaser. Without limiting the foregoing, except for the Express Purchaser Representations, neither Purchaser nor any other Person will have or be subject to any Liability whatsoever to Seller, or any other Person, resulting from the distribution to Seller, its Affiliates or their respective Advisors, or Seller's, its Affiliates' or their respective Advisors' use of or reliance on, any such information, statements, disclosures, documents, projections, forecasts or other material made available to them in expectation of the Transactions or any discussions with respect to any of the foregoing information.

4.11 <u>No Outside Reliance</u>. Notwithstanding anything contained in this <u>Article IV</u> or any other provision of this Agreement to the contrary, Purchaser acknowledges and agrees that the Express Seller Representations are the sole and exclusive representations, warranties and statements of any kind made to Purchaser and on which Purchaser may rely in connection with the Transactions. Purchaser acknowledges and agrees that all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (a) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Seller Representations), including in the Information Presentation, the Dataroom, any projections or in

24

any meetings, calls or correspondence with management of Seller or any other Person on behalf of Seller or any of its Affiliates or Advisors and (b) any other statement relating to the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental compliance, employee matters, regulatory compliance, business risks and prospects of Seller, or the quality, quantity or condition of Seller's assets, are, in each case specifically disclaimed by Seller and Purchaser has not relied on any such representations, warranties or statements. Purchaser acknowledges that it has conducted to its full satisfaction an independent investigation and verification of the business including its financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental compliance, employee matters, regulatory compliance, business risks and prospects of Seller, and, in making its determination to proceed with the Transactions, Purchaser has relied solely on the results of the Purchaser Group's own independent investigation and verification, and has not relied on, is not relying on, and will not rely on, Seller, the Information Presentation, any projections or any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom or otherwise, in each case, whether written or oral, made or provided by, or as part of, any of the foregoing or Seller or any of its Affiliates or Advisors, or any failure of any of the foregoing to disclose or contain any information, except for the Express Seller Representations (it being understood that Purchaser has relied only on the Express Seller Representations).

## ARTICLE V

## BANKRUPTCY COURT MATTERS

5.1 <u>Selection of Successful Bid and Winning Bidder and Sale Approval</u>.

(a) Pursuant to the Bidding Procedures Order, by execution and delivery of its counterpart signature page hereto, Seller hereby confirms that Purchaser has made the highest or otherwise best bid pursuant to the Bidding Procedures Order and has selected the Transactions as the Successful Bid and Purchaser as the Winning Bidder (each, as defined in the Bidding Procedures Order).

(b) (i) Promptly, and in any event no later than December 21, 2022 (subject to Bankruptcy Court approval where indicated), Seller shall: publicly announce that the Transactions have been selected as the Successful Bid and Purchaser has been selected as the Winning Bidder; and (ii) promptly, and in any event no later than December 21, 2022 (subject to Bankruptcy Court approval where indicated), Seller shall file a motion with the Bankruptcy Court attaching the form of an order approving the execution, delivery and performance of this Agreement by Seller (including payment of the Purchaser Expenses pursuant to <u>Section 6.21(b)</u> and the provisions of this <u>Article V</u> contemplating certain performance by Seller prior to Closing), other than the performance of those obligations to be performed at or after the Closing (the "<u>Agreement Order</u>"), which Agreement Order shall be in form and substance acceptable to Purchaser. Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining Bankruptcy Court approval of the Agreement Order.

5.2 <u>No-Shop</u>.

(a) From and following the execution and delivery of this Agreement by Seller, Seller and its Affiliates shall not, and shall not permit their respective Advisors or Affiliates to, (i) initiate contact with, or solicit or encourage submission of any inquiries, proposals or offers by, any Person (other than Purchaser, its Affiliates and its and their respective Advisors) with respect to an Alternative Transaction, (ii) engage in, continue or otherwise participate in any discussions or negotiations regarding an Alternative Transaction or that could reasonably be expected to lead to an Alternative Transaction, (iii) enter into any confidentiality agreement with respect to, or provide any non-public information or data to any Person relating to, any Alternative Transaction, or (iv) otherwise agree, authorize or commit to do any of the foregoing; <u>provided</u> that, notwithstanding the foregoing, from and after entry of the Agreement Order, Seller may take the actions set forth in clauses (ii) and (iii) above if (A) Seller has received a written, bona fide offer, proposal or indication of interest to engage in an Alternative Transaction (an "<u>Acquisition Proposal</u>") from any Person after the date of this Agreement that did not result from Seller's breach of this <u>Section 5.2(a)</u>, and (B) the board of directors (or similar governing body) of Seller determines in good faith, after consultation with its financial advisor and outside legal counsel, that such Acquisition Proposal constitutes or is reasonably likely to lead to a Higher and Better Offer and that failure to take such actions would violate the directors' fiduciary duties under applicable Law; <u>provided</u> <u>further</u> that if the Closing has not occurred prior to the Outside Date unless the failure of the Closing to have occurred by the Outside Date was caused by Seller's failure to perform any of its obligations under this Agreement, and there is no Back-up Bidder (as defined in the Bidding Procedures Order) or the agreement with the Back-up Bidder has terminated in accordance with its terms, then this <u>Section 5.2(a)</u> shall automatically terminate and be of no further force and effect as of such date. Until entry of the Agreement Order, Seller shall promptly (but in any event within twenty-four (24) hours) provide written notice to Purchaser of any breach of this <u>Section 5.2(a)</u>.

(b) Seller shall promptly (but in any event within twenty-four (24) hours) give written notice to Purchaser if (i) any inquiries, proposals or offers with respect to an Alternative Transaction or that could reasonably be expected to lead to an Alternative Transaction are received, (ii) any non-public information or data concerning Seller or its Affiliates or access to Seller's or its Affiliates' properties, books or records in connection with any Alternative Transaction or any inquiry, proposal or offer that could reasonably be expected to lead to an Alternative Transaction is requested, or (iii) any discussions or negotiations relating to an Alternative Transaction or any inquiry, proposal or offer that could reasonably be expected to lead to an Alternative Transaction are sought to be engaged in or continued by, from or with Seller, its Affiliates or any of its or their respective Advisors, as the case may be. Such notice shall set forth the name of the applicable Person making such inquiry, the material terms and conditions of any proposed Alternative Transaction (including, if applicable, correct and complete copies of any proposed agreements, inquiries, proposals or offers or, where no such copies are available, a reasonably detailed written description thereof) and the status of any such discussions or negotiations. Seller shall thereafter keep Purchaser reasonably informed, on a reasonably prompt basis, of the status of any discussions or negotiations with respect thereto. Until entry of the Agreement Order, Seller shall promptly (but in any event within twenty-four (24) hours) provide written notice to Purchaser of any breach of this <u>Section 5.2(b)</u>.

26

(c)     Seller (i) shall promptly (and in any event within twenty-four (24) hours) give notice to Purchaser upon a determination by Seller or its board of directors (or comparable governing body) that any Acquisition Proposal received from any Person after the date of this Agreement that did not result from Seller's breach of Section 5.2(a) constitutes a Higher and Better Offer (a "Higher Offer Determination Notice") and (ii) may cause or permit Seller or any of the other Debtors to enter into a definitive agreement with respect to such Acquisition Proposal; provided that (A) Seller and its board of directors (or comparable governing body) may only make such determination described in clause (i) of this Section 5.2(c) if, prior to the determination that such Acquisition Proposal constitutes a Higher and Better Offer, Seller negotiates, and causes its representatives to negotiate, with Purchaser in good faith (to the extent Purchaser and its representatives desire to negotiate) during such three (3) Business Day period to amend the terms and conditions of this Agreement and, no earlier than the end of such three (3) Business Day period, the board of directors (or comparable governing body) of Seller determines in good faith (after consultation with its financial advisor(s) and outside legal counsel), after giving effect to such proposed amendments to the terms and conditions of this Agreement, that such Acquisition Proposal still constitutes a Higher and Better Offer (provided further that if any material amendment is made to such Acquisition Proposal, such Acquisition Proposal shall be subject again (but only once again) to the foregoing, except that references to three (3) Business Days shall be deemed to be two (2) Business Days, and whatever the result of the second instance of the foregoing, Seller shall not be required to undertake the foregoing again before making a determination that such Acquisition Proposal constitutes a Higher and Better Offer and, if applicable, terminating this Agreement), and (B) Seller and its board of directors (or comparable governing body) may only take such action described in clause (ii) of this Section 5.2(c) if the board of directors (or comparable governing body) of Seller determines in good faith (after consultation with its outside legal counsel) that the failure to take such action would violate with its fiduciary duties under applicable Law.

5.3     Bankruptcy Actions.

(a)     No later than December 21, 2022, Seller shall file with the Bankruptcy Court an amended Disclosure Statement (the "Amended Disclosure Statement") containing such amendments as may be necessary or appropriate to reflect the Seller's entry into this Agreement and pursuit of the Transactions, which, solely with respect to matters relating to this Agreement and the Transactions, shall be in a form and substance reasonably acceptable to Purchaser. Concurrently with the filing of such Amended Disclosure Statement (i.e., no later than December 21, 2022), Seller shall file the Plan Solicitation Motion which, solely with respect to matters relating to this Agreement and the Transactions, shall be in form and substance reasonably acceptable to Purchaser; provided that Seller may modify the Plan Solicitation Motion, the Plan, and the Confirmation Order pursuant to discussions with the United States Trustee assigned to the Bankruptcy Case, the Bankruptcy Court, any creditor or committee representing a group of creditors in the Bankruptcy Case, or any other party in interest, in each case, with the consent of Purchaser solely as it pertains to matters relating to this Agreement and Transactions (such consent not to be unreasonably withheld, conditioned or delayed).

(b)     From the date hereof until the earlier of (i) the termination of this Agreement in accordance with Article VIII and (ii) the Closing Date, Seller shall use reasonable best efforts to obtain entry by the Bankruptcy Court of the Agreement Order and the Confirmation Order.

27

(c)     The Parties shall use their respective reasonable best efforts to (i) obtain entry by the Bankruptcy Court of the Agreement Order, (ii) obtain entry by the Bankruptcy Court of the Plan Solicitation Order, (iii) commence solicitation of the Plan, and (iv) (A) facilitate the solicitation, confirmation, and consummation of the Plan and the transactions contemplated thereby and hereby, (B) obtain entry of the Confirmation Order, and (C) and consummate the Plan and the Transactions on the timeline set forth in the Plan Solicitation Motion and in any case prior to the Outside Date.

(d)     Purchaser shall promptly take all actions as are reasonably requested by Seller to assist in obtaining the Bankruptcy Court's entry of the Agreement Order, the Plan Solicitation Order, the Confirmation Order, and any other Order reasonably necessary in connection with the Transactions as promptly as practicable, including furnishing affidavits, financial information, or other documents or information for filing with the Bankruptcy Court and making such employees and Advisors of Purchaser and its Affiliates reasonably available to testify before the Bankruptcy Court for the purposes of, among other things providing necessary assurances of performance by Purchaser under this Agreement, and demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code, as well as demonstrating Purchaser's ability to pay and perform or otherwise satisfy any Assumed Liabilities following the Closing.

(e)     Any documents filed by Seller with the Bankruptcy Court in connection with obtaining approval of effectuating the Closing shall be reasonably acceptable to Purchaser.

(f)     Each of Seller and Purchaser shall (i) appear formally or informally in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the Transactions and the Plan solely with respect to matters relating to this Agreement and (ii) keep the other reasonably apprised of the status of material matters related to the Agreement and the Plan solely as it pertains to matters relating to this Agreement and Transactions, including, upon reasonable request promptly furnishing the other with copies of notices or other communications received by Seller from the Bankruptcy Court with respect to the Transactions or the Plan solely as it pertains to matters relating to this Agreement and Transactions.

(g)     Seller and Purchaser acknowledge that this Agreement and the sale of the Acquired Assets are subject to Bankruptcy Court approval. Purchaser acknowledges that Seller and the other Debtors must take reasonable steps to demonstrate that they have sought to obtain the highest or otherwise best price for the Acquired Assets, including giving notice thereof to the creditors of the Debtors and other interested parties, providing information about Seller to prospective bidders, entertaining higher and better offers from such prospective bidders.

(h)     Purchaser shall provide adequate assurance of future performance as required under section 365 of the Bankruptcy Code for the Assigned Contracts. Purchaser agrees that it will take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assigned Contracts, such as furnishing affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Purchaser's Advisors reasonably available to testify before the Bankruptcy Court.

28

A-79

5.4     Cure Costs. Subject to entry of the Agreement Order and the Confirmation Order, Purchaser shall, on or prior to the Closing (or, in the case of any Contract that is to be assigned following the Closing pursuant to Section 1.5, on or prior to the date of such assignment), pay the Cure Costs and cure any and all other defaults and breaches under the Assigned Contracts so that such Contracts may be assumed by Seller and assigned to Purchaser in accordance with the provisions of section 365 of the Bankruptcy Code and this Agreement.

5.5     Approval. Seller's and Purchaser's obligations under this Agreement and in connection with the Transactions are subject to entry of and, to the extent entered, the terms of any Orders of the Bankruptcy Court (including entry of the Agreement Order and the Confirmation Order). Nothing in this Agreement shall require Seller or its Affiliates to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

5.6     No Successor Liability. The Parties intend that upon the Closing the Purchaser Group shall not and shall not be deemed to: (a) be a successor (or other such similarly situated party), or otherwise be deemed a successor, to Seller, including, a "successor employer" for the purposes of the Code, ERISA, or other applicable Laws; (b) have Liability or responsibility for any Liability or other obligation of Seller arising under or related to the Acquired Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor, or transferee Liability, labor law, de facto merger, or substantial continuity (including under applicable Money Transmitter Requirements or securities Laws of any Governmental Body); (c) have, de facto or otherwise, merged with or into Seller; (d) be an alter ego or a mere continuation or substantial continuation of any of Seller (and there is no continuity of enterprise between Purchaser and Seller), including, within the meaning of any foreign, federal, state or local revenue, pension, ERISA, COBRA, Tax, labor, employment, environmental, or other Law, rule or regulation (including filing requirements under any such Laws, rules or regulations), or under any products liability Law or doctrine with respect to Seller's Liability under such Law, rule or regulation or doctrine; or (e) be holding itself out to the public as a continuation of Seller or its estate (the foregoing clauses (a) through (e), collectively, "Successor Liabilities").

5.7     Filings. Seller shall, and shall cause the other Debtors to, give Purchaser reasonable advance notice of, and opportunity to review and approve, any motions, pleadings, notices and other documents to be filed during the Bankruptcy Case that would reasonably be expected to be material and adverse to the Transactions (such approval not to be unreasonably withheld, conditioned or delayed, provided that Purchaser may withhold their approval in their sole discretion to the extent such motions, pleadings, notices and other documents would be inconsistent with the consummation of the Transactions in accordance herewith).

5.8     Waiver of Conflicts. Notwithstanding anything to the contrary herein or otherwise, Seller acknowledges that Paul Hastings LLP ("Paul Hastings" ) may have represented and may currently represent the Purchaser or one or more of its Affiliates in connection with the Transactions (including the negotiation, preparation, execution and delivery of this Agreement and related agreements, and the consummation of the Transactions) as well as other past and ongoing regulatory matters generally (the "Covered Matters" ). Accordingly, Seller hereby irrevocably consents and agrees, on its behalf and on behalf of its Affiliates, to Paul Hastings representing the

US-DOCS\137411268.27

Purchaser and its Affiliates from and after the Closing in connection with any matter arising out of or related to the Covered Matters. Seller (i) hereby irrevocably waives and will not assert, and will cause each of its Affiliates to waive and not assert, any actual or potential conflict of interest which has or may arise as a result of Paul Hasting's representation of the Purchaser or one or more of its Affiliates, including in any Action, in a Covered Matter, (ii) hereby consents, and will cause each of its Affiliates to consent to, any such representation, even though, in each case, (x) the interests of the Purchaser or such Affiliates may be directly adverse to Seller or its Affiliates, (y) Paul Hastings may have represented Seller or its Affiliates in a substantially related matter, or (z) Paul Hastings may be handling other ongoing matters for Seller or its Affiliates, and (iii) shall cooperate, and shall cause each of its Affiliates to cooperate, with the Purchaser in effectuating the foregoing waiver (including with respect to any objections raised by or before the Bankruptcy Court or the United States Trustee assigned to the Bankruptcy Case in respect of such waiver or representation).

## ARTICLE VI

## COVENANTS AND AGREEMENTS

6.1    <u>Conduct of Seller</u>.

(a)    Except (i) as required by applicable Law, Order or a Governmental Body, (ii) any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code, (iii) as expressly contemplated or required by this Agreement, (iv) to the extent related to an Excluded Asset or an Excluded Liability or (v) as set forth on <u>Schedule 6.1</u>, during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to <u>Article VIII</u>), unless Purchaser otherwise consents in writing, Seller shall use its reasonable best efforts to carry on its business in the Ordinary Course in all material respects; <u>provided</u> that no action by Seller with respect to matters specifically addressed by <u>Section 6.1(b)</u> shall be deemed to be a breach of this <u>Section 6.1(a)</u> unless such action would constitute a breach of <u>Section 6.1(b)</u>.

(b)    Except (i) as required by applicable Law, Order or a Governmental Body, (ii) any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code, (iii) as expressly contemplated, required or permitted by this Agreement, (iv) to the extent related to an Excluded Asset or an Excluded Liability or (v) as set forth on <u>Schedule 6.1</u>, during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to <u>Article VIII</u>), unless Purchaser otherwise consents in writing, Seller shall not:

(i)    (A) incur, assume or otherwise become liable for any indebtedness for borrowed money, issue or sell any debt securities or warrants or other rights to acquire any debt securities of Seller, guarantee any such indebtedness or any debt securities of another Person or enter into any "keep well" or other agreement to maintain any financial statement condition of another Person (collectively, "<u>Indebtedness</u>"), except (1) for letters of credit, bank guarantees, security or performance bonds or similar credit support instruments, overdraft facilities or cash management programs, in each case issued, made or entered into in the Ordinary Course, (2) for Indebtedness incurred under existing

arrangements (including in respect of letters of credit) in an amount not to exceed $5,000,000 in the aggregate outstanding at any time and (3) Indebtedness incurred in connection with the refinancing of any Indebtedness existing on the date of this Agreement or permitted to be incurred, assumed or otherwise entered into hereunder; provided that no such refinancing Indebtedness shall have a principal amount greater than the principal amount of the Indebtedness being refinanced (plus any applicable premiums, defeasance costs, accrued interest, fees and expenses) and shall not include any greater prepayment premiums or restrictions on prepayment than the Indebtedness being refinanced, in each case of this clause (A), other than Excluded Liabilities, (B) enter into any swap or hedging transaction or other derivative agreements or (C) make any loans, capital contributions or advances to, or investments in, any Person;

(ii)     sell or transfer to any Person, in a single transaction or series of related transactions, any of the Acquired Assets, other than the sale or transfer of Withheld Coins;

(iii)     perform or offer to perform any staking that is not unstaked prior to the Rebalancing Date;

(iv)     enter into referral agreements with a third party with respect to Users and any Documents with respect to Users or account information with respect thereto;

(v)     make any changes in financial accounting methods, principles or practices affecting the consolidated assets, Liabilities or results of operations of Seller, except (x) insofar as may be required (A) by IFRS (or any interpretation thereof), (B) by any applicable Law or (C) by any Governmental Body or quasi-governmental authority (including the International Accounting Standards Board or any similar organization) or (y) as necessary or desirable to accommodate reasonable tax positions, to the extent such tax positions would not adversely affect the Acquired Assets or Purchaser in a taxable period (or portion thereof) beginning after the Closing Date;

(vi)     (x) grant any Encumbrance (other than Permitted Encumbrances) on any of its material Acquired Assets (other than Acquired Coins, which, for the avoidance of doubt, are addressed in subclause (y) of this item (vi)) other than to secure Indebtedness and other obligations in existence at the date of this Agreement (and required to be so secured by their terms), or (y) grant any Encumbrance (other than any Encumbrances that will be removed or released by operation of the Confirmation Order or the Plan) on Acquired Coins, including by submitting any Cryptocurrency to any staking contract or otherwise causing any Seller Held Coins that are not currently Staked Coins to become Staked Coins;

(vii)     except, in each case, with respect to income Taxes or information Tax Returns: make, change or revoke any material Tax election; change an annual accounting period for material Taxes; adopt or change any material accounting method with respect to material Taxes; file any amended material Tax Return; enter into any closing agreement for material Taxes; settle or compromise any material Tax claim or assessment; or consent to any extension or waiver of the limitation period applicable to any

US-DOCS\137411268.27

claim or assessment with respect to material Taxes; in each case to the extent such action would adversely affect the Acquired Assets or Purchaser in a taxable period (or portion thereof) beginning after the Closing Date;

(viii) waive, release, assign, settle or compromise any pending or threatened Action against Seller to the extent that such wavier, release, assignment, settlement or compromise would (A) result in an Assumed Liability in an amount in excess of $1,000,000, individually or in the aggregate, or (B) waive or release any material rights or claims that would constitute Acquired Assets;

(ix) enter into any referral agreement with a third party with respect to Users;

(x) terminate or transfer any Business Accounts (other than any such Business Accounts that are not necessary to the operation of the Voyager Platform, with the Parties to cooperate in good faith to determine which Business Accounts are not necessary and may be terminated or transferred);

(xi) lend any Cryptocurrency to any Person, or engage in purchases or sales of any Cryptocurrency (other than Withheld Coins) other than in connection with the Rebalancing Exercise; or

(xii) authorize any of, or commit or agree, in writing or otherwise, to take any of, the foregoing actions.

(c) Nothing contained in this Agreement is intended to give Purchaser or its Affiliates, directly or indirectly, the right to control or direct Seller's operations or business prior to the Closing, and nothing contained in this Agreement is intended to give Seller, directly or indirectly, the right to control or direct Purchaser's or its Subsidiaries' operations. Notwithstanding anything to the contrary contained herein, (i) any action taken, or omitted to be taken, by Seller pursuant to any Law, Order, directive, pronouncement or guideline issued by any Governmental Body or industry group providing for business closures, "sheltering-in-place" or other restrictions that relates to, or arises out of, any pandemic, epidemic or disease outbreak shall in no event be deemed to constitute a breach of this Section 6.1 and (ii) any action taken, or omitted to be taken, by Seller to protect the business of Seller that is responsive to any pandemic, epidemic or disease outbreak, as determined by Seller in its reasonable discretion, shall in no event be deemed to constitute a breach of this Section 6.1.

6.2     Access to Information.

(a) From the date hereof until the Closing (or the earlier termination of this Agreement pursuant to Article VIII), Seller will (x) provide Purchaser and its authorized Advisors with reasonable access to, upon reasonable advance notice and during regular business hours, Seller's officers, employees, Advisors, properties, systems, offices, and data, documents, and information of the Seller Parties regarding the Acquired Assets, the Assumed Liabilities, the Users, Voyager User Accounts and the Voyager Platform (including, for the avoidance of doubt any of the foregoing that constitutes Acquired Information), including such financial, operating and other data and information related to the Transactions, the Acquired Assets, the Assumed Liabilities, the

32

Users, Voyager User Accounts, or the Voyager Platform (including, for the avoidance of doubt any of the foregoing that constitutes Acquired Information) as Purchaser or any of its representatives may reasonably request and (y) instruct the representatives of Seller to cooperate to provide such access; provided that (i) such access will occur in such a manner reasonably appropriate to protect the confidentiality of the Transactions, (ii) all requests for access will be directed to Moelis or such other Person(s) as Seller may designate in writing from time to time and (iii) nothing herein will require Seller to provide access to, or to disclose any information to, Purchaser if such access or disclosure (A) would waive any legal privilege or (B) would be in violation of applicable Laws or would violate any fiduciary duty under applicable Law with respect to Seller; provided that, in the event that Seller withholds access or information in reliance on the foregoing clause (A) or (B), Seller shall provide (to the extent possible without waiving or violating the applicable agreement, legal privilege, Law or fiduciary duty under applicable Law with respect to Seller) notice to Purchaser that such access or information is being so withheld and shall use reasonable best efforts to provide such access or information in a way that would not risk waiver of such legal privilege, applicable Law, or fiduciary duty.

(b)     The information provided pursuant to this Section 6.2 will be governed by the Confidentiality Agreement and the confidentiality provisions in Section 6.19. Each Party will, and will cause its Advisors to, abide by the terms of the Confidentiality Agreement with respect to such access and any information furnished to such Party or any of its Advisors. Neither Party makes any representation or warranty as to the accuracy of any information, if any, provided pursuant to this Section 6.2, and the other Party may not rely on the accuracy of any such information, in each case, other than, with respect to Purchaser, the Express Seller Representations and, with respect to Seller, the Express Purchaser Representations.

(c)     From and after the Closing for a period of three (3) years following the Closing Date (or, if later, the closing of the Bankruptcy Case), Purchaser will, following Seller's good faith written request, and solely to the extent necessary for Seller to (i) comply with Tax reporting obligations, (ii) consummate the closing of the Bankruptcy Case, (iii) prepare annual audited financial statements, (iv) submit a filing pursuant to applicable securities laws and regulations or (v) conduct the wind down of the estate (including reconciliation, investigation, and pursuit of claims) and dissolution of Seller and its Affiliates, provide Seller and its Advisors with reasonable access, during normal business hours, and upon reasonable advance notice, to the books and records in Purchaser's custody or control, including work papers, schedules, memoranda, Tax Returns, Tax schedules, Tax rulings, and other documents (for the purpose of examining and copying), in each case to the extent relating to the Acquired Assets, the Excluded Assets, the Assumed Liabilities or the Excluded Liabilities with respect to periods or occurrences prior to the Closing Date, and reasonable access, during normal business hours, and upon reasonable advance notice, to employees, officers, Advisors, accountants, offices and properties of Purchaser, in each case at no cost or expense to Purchaser; provided that (i) such access does not unreasonably interfere with the normal operations of Purchaser and (ii) nothing herein will require Purchaser to provide access to, or to disclose any information to, Seller or its Advisors if such access or disclosure (A) would waive any legal privilege or (B) would be in violation of applicable Laws or would violate any fiduciary duty; provided that, in the event that Purchaser withholds access or information in reliance on the foregoing clause (A) or (B), Purchaser shall provide (to the extent possible without waiving or violating the applicable agreement, legal privilege, Law or fiduciary duty) notice to Seller that such access or information is being so withheld and shall use reasonable

US-DOCS\137411268.27

best efforts to provide such access or information in a way that would not risk waiver of such legal privilege, applicable Law, or fiduciary duty. Unless otherwise consented to in writing by Seller, Purchaser will not, for a period of three (3) years following the Closing Date, destroy, alter or otherwise dispose of any of such books and records without first offering to surrender to Seller such books and records or any portion thereof that Purchaser may intend to destroy, alter or dispose of.

(d)     Except as expressly contemplated by this Agreement (including in connection with the Commercial Covenants, <u>Section 6.3, Section 6.10(b)</u> and <u>Section 6.18</u>), Purchaser will not, and will not permit any member of the Purchaser Group to, contact any officer, manager, director, employee, customer, supplier, lessee, lessor, lender, licensee, licensor, distributor, noteholder or other material business relation of Seller prior to the Closing with respect to Seller, their business or the Transactions without the prior written consent of Seller for each such contact.

6.3     <u>Employee Matters</u>.

(a)     From and after the date hereof (and, if applicable, following the Closing until the winddown or dissolution of Seller), subject to applicable Laws, Seller shall deliver to Purchaser such information and documents regarding employees of Holdings (the "<u>Seller Employees</u>") and independent contractors of Seller or Holdings (the "<u>Seller Contractors</u>"), in each case, as Purchaser shall reasonably request. Prior to the date hereof, Seller has provided Purchaser a true, correct and complete list of the Seller Employees and Seller Contractors identified by name, if applicable, department, and (subject to applicable Laws) true, correct and complete copies of all talent assessment reports for each such Seller Employee and Seller Contractor. From and after the date hereof (and, if applicable, following the Closing until the winddown or dissolution of Seller), Seller shall use reasonable best efforts to make such Seller Employees who remain employed by Holdings and Seller Contractors who remain engaged by Seller or Holdings, in each case, reasonably available to Purchaser or its Affiliates and Purchaser will work in good faith with Seller to identify top performing Seller Employees and Seller Contractors and will determine whether to make offers of employment or other services to any such Seller Employee or Seller Contractors (including by prioritizing review of Seller Employees for applicable open positions of Purchaser and its Affiliates, if any). Purchaser (or an Affiliate of Purchaser) may, in its sole discretion, make offers of employment, consulting or other services to such Seller Employees or Seller Contractors (if any) as Purchaser shall determine, on such terms and conditions as Purchaser shall determine in its sole and absolute discretion. In the event that Purchaser (or an Affiliate of Purchaser) makes such an offer of employment or services and such Seller Employee or Seller Contractor accepts, Seller hereby agrees not to enforce against Purchaser (or its Affiliate) or such Seller Employee or independent contractor the terms and conditions of any agreement to refrain from competing, directly or indirectly, with the business of Seller or any of its Affiliates or to refrain from soliciting employees, customers or suppliers of Seller or any of its Affiliates that may be applicable to such Seller Employee or Seller Contractor. Seller shall not take any action that would reasonably be expected to materially and adversely affect Purchaser's hiring or engagement of such Seller Employee(s) or Seller Contractor(s) in accordance with this <u>Section 6.3</u>; <u>provided</u> that the announcement and implementation of any Seller Plans (including any retention programs or post-Closing treatment of Seller Employees), in each case, in a manner consistent with the provisions of this Agreement, shall not be deemed to be a breach of this sentence. Notwithstanding anything

34

to the contrary herein or otherwise, nothing herein shall require or obligate Purchaser or any of its Affiliates to employ or make offers of employment to any Person, or make any such offers of employment on any particular terms, each of which decisions shall be made in Purchaser's sole discretion.

(b)     Prior to and following the Closing Date, Seller, Holdings and each of their Affiliates shall not communicate, and shall ensure that no representative of Seller, Holdings or their respective Affiliates communicates, with any Seller Employee or other service provider of Seller regarding post-Closing employment matters (including post-Closing employee benefit plans and compensation) with Purchaser without the prior written consent of Purchaser; provided that Seller, Holdings, and their Affiliates shall be permitted to communicate regarding their employment and termination plans and related matters.

(c)     Purchaser shall not assume any Seller Plans or any Liability to or in respect of any employees or former employees of Holdings and Seller and which relates to such employees' employment with Holdings or Seller, including (i) any employment agreement, whether or not written, between Seller and any person, (ii) any Liability under any Seller Plan, or (iii) Liability arising out of any claim of an unfair labor practice, or any claim under any state unemployment compensation or worker's compensation law or regulation or under any federal or state employment discrimination law or regulation as a result of an action taken by Seller or Holdings, and all such Liabilities shall be Excluded Liabilities hereunder.

(d)     Seller will, or will cause its Affiliates to, comply in all material respects with the Worker Adjustment and Retraining Notification Act of 1988 or any similar Laws ("WARN Act") with respect to any "plant closing" or "mass layoff" or group termination or similar event under the WARN Act affecting employees of Debtors (including as a result of the consummation of Transactions) whether occurring prior to or on the Closing. Subject to the terms of this Agreement, Seller and its Affiliates (including Holdings) reserve the right to (i) terminate any of their employees at any time, and otherwise reduce employee work hours, benefits and compensation, and (ii) issue termination and/or WARN Act notices relating to their employees at any time.

(e)     For any employees who are principally based outside the United States, the provisions of this Section 6.3 shall apply to such employees mutatis mutandis to the maximum extent permitted by applicable Law.

(f)     The provisions of this Section 6.3 are for the sole benefit of the Parties and nothing herein, express or implied, is intended or shall be construed to confer upon or give any Person (including for the avoidance of doubt any employees of Seller or Holdings), other than the Parties and their respective permitted successors and assigns, any legal or equitable or other rights or remedies (with respect to the matters provided for in this Section 6.3 or under or by reason of any provision of this Agreement). Nothing contained herein, express or implied: (i) shall be construed to establish, amend, or modify any benefit plan, program, agreement or arrangement; (ii) shall, subject to compliance with the other provisions of this Section 6.3, alter or limit Purchaser's, Seller's or Holdings' ability to amend, modify or terminate any particular benefit plan, program, agreement or arrangement; or (iii) is intended to confer upon any current or former employee any right to an offer of employment or service, employment or continued employment

US-DOCS\137411268.27

or service for any period of time by reason of this Agreement, or any right to a particular term or condition of employment or service.

6.4    <u>Regulatory Matters</u>.

(a)    From time to time from and after the date hereof until the Closing (or the valid termination of this Agreement in accordance with its terms, if earlier), subject to the other provisions of this <u>Section 6.4</u>, Seller will, and will cause its Affiliates and its and their respective employees, representatives, advisors and agents to, (i) make or cause to be made all filings and submissions to the extent required to be made by Seller or any of its Affiliates under any applicable Laws for the consummation of the Transactions, if any, (ii) cooperate with Purchaser, its Affiliates and its and their respective representatives in exchanging such information and providing such assistance as Purchaser may reasonably request in connection with any filings or submissions to be made by any member of the Purchaser Group under any applicable Laws in connection with the Transactions, (iii) supply promptly any additional information and documentary material that may be requested in connection with such filings or submissions and (iv) use reasonable best efforts to take any actions necessary to obtain all approvals or clearances from any relevant Governmental Body that are required to be obtained by Seller or its Affiliates under applicable Law for the consummation of the Transactions.

(b)    From time to time from and after the date hereof until the Closing (or the valid termination of this Agreement in accordance with its terms, if earlier), subject to the other provisions of this <u>Section 6.4</u>, Purchaser will, and will cause its respective employees, representatives, advisors and agents to, (i) make or cause to be made all filings and submissions to the extent required to be made by Purchaser under any applicable Laws for the consummation of the Transactions, if any, (ii) cooperate with Seller, its Affiliates and its and their respective representatives in exchanging such information and providing such assistance as Seller may reasonably request in connection with any filings or submissions to be made by Seller or any of its Affiliates under any applicable Laws in connection with the Transactions, (iii) supply promptly any additional information and documentary material that may be requested in connection with such filings or submissions, and (iv) use reasonable best efforts to take any actions necessary to obtain all approvals or clearances from any relevant Governmental Body that are required to be obtained by Purchaser under applicable Law for the consummation of the Transactions.

(c)    From time to time from and after the date hereof until the Closing (or the valid termination of this Agreement in accordance with its terms, if earlier), the Parties commit to instruct their respective counsel to cooperate with each other to respond to any reasonable inquiries and use reasonable best efforts to seek to resolve any objections raised by any Governmental Body as promptly as practicable and for greater certainty, each Party and its respective counsel undertake to (i) promptly notify the other Party or its counsel of, and, if in writing, furnish such other Party or its counsel with copies of (or, in the case of oral communications, advise such other Party or its counsel of the contents of), any substantive communication received by such Person from a Governmental Body and (ii) keep the other Party or its counsel informed with respect to the status of any applicable submissions and filings to or inquiries by any Governmental Body in connection with this Agreement and the Transactions and any developments, meetings or discussions with any Governmental Body in respect thereof, including with respect to (A) the commencement or proposed or threatened commencement of any investigation or other Action, and (B) the nature

36

A-87

and status of any inquiries or objections raised or proposed or threatened to be raised by any Governmental Body with respect to this Agreement and the Transactions. From and after the date hereof until the Closing (or the valid termination of this Agreement in accordance with its terms, if earlier), none of Seller or any of its Affiliates, on the one hand, or Purchaser, on the other hand, will participate in any substantive meeting or discussion with any Governmental Body with respect of any such filings, applications, investigation or other inquiry without giving the other Party reasonable prior notice of the meeting or discussion and, to the extent permitted by the relevant Governmental Body, a reasonable opportunity to attend and participate in such meeting or discussion, and each Party will have a reasonable opportunity to review and provide comments (which shall be considered in good faith by the other Party) on the content of any filing, submission or other written communication (and any analyses, memoranda, presentations, white papers, correspondence or other written materials submitted therewith) to be submitted by the other Party or any of its Affiliates to any Governmental Body in advance of any such submission. Each Party acknowledges that, with respect to any non-public information provided by a Party to the other under this Section 6.4, each Party may (1) designate such material as restricted to "outside counsel only" and any such material shall not be shared with employees, officers or directors or their equivalents of the receiving Party without approval of the disclosing Party and (2) make appropriately limited redactions necessary to satisfy contractual confidentiality obligations, preserve attorney-client privilege or protect material relating to the valuation of the Acquired Assets. Notwithstanding anything to the contrary herein or otherwise, Purchaser will control and have final decision making authority on all regulatory strategy, submissions and procedures, after considering in good faith any reasonable advice provided by Seller in good faith.

(d)     Notwithstanding anything to the contrary in this Agreement, nothing shall require or be construed to require any member of the Purchaser Group to (i) oppose any motion or Action for a temporary, preliminary or permanent Order against, or preventing or delaying, the consummation of the Transactions, or exhaust all avenues of appeal, including any proper appeal of any adverse decision or Order by any Governmental Body, (ii) enter into a consent decree, consent agreement, settlement or other agreement or arrangement (including any ancillary agreements) to hold separate, license, sell, transfer, dispose or divest (pursuant to such terms as may be required by any Governmental Body) any asset (whether tangible or intangible), (iii) agree to the termination, modification, or assignment of any relationships, joint ventures, contracts, assets, liabilities or obligations, (iv) agree to any limitations on governance, conduct, or actions of members of the Purchaser Group or operations of their respective businesses or with respect to the Acquired Assets or Assumed Liabilities, or (v) enter into any national security agreement, letter of assurance, or other mitigation agreement with the Committee on Foreign Investment in the United States or any member agency thereof acting in that capacity.

(e)     From and after the date hereof until the Closing (or the valid termination of this Agreement in accordance with its terms, if earlier), Seller will not, and will not permit any of its Affiliates to, knowingly take any action, engage in any conduct or enter into any transaction that would reasonably be expected to (i) materially increase the risk of any Governmental Body entering an Order prohibiting or materially delaying the consummation of the Transactions or (ii) materially delay the consummation of the Transactions.

(f)     Subject to Section 6.4(d), from and after the date hereof until the Closing (or the valid termination of this Agreement in accordance with its terms, if earlier), each Party will

US-DOCS\137411268.27

use reasonable best efforts to (i) cooperate with and (ii) seek to secure approvals or authorizations from, any relevant Governmental Body, including state banking departments enforcing money transmission laws, in order to permit consummation of the Transactions in a timely manner in compliance with applicable Laws.

6.5 <u>Reasonable Best Efforts; Cooperation</u>.

(a) Subject to the other terms of this Agreement, and without limiting, affecting or modifying the Parties' obligations under <u>Section 6.4</u>, or any of the Commercial Covenants, each Party shall, and shall cause its Advisors to, use its reasonable best efforts to perform its obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things necessary under applicable Law to cause the transactions contemplated herein to be effected as soon as practicable and the closing conditions set forth in <u>Article VII</u> to be satisfied, but in any event on or prior to the Outside Date, in accordance with the terms hereof and to cooperate with the other Party, its Affiliates and its and their respective Advisors in connection with any step required to be taken as a part of its obligations hereunder. The "reasonable best efforts" of Seller will not require Seller or any of its Affiliates or Advisors to expend any money to remedy any breach of any representation or warranty, to commence any Action, to waive or surrender any right, to modify any Contract or to waive or forgo any right, remedy or condition hereunder. Notwithstanding anything to the contrary herein, in the event of a conflict between this <u>Section 6.5(a)</u> and <u>Section 6.4</u>, the provisions of <u>Section 6.4</u> shall control with respect to such conflict.

(b) The obligations of Seller and Purchaser pursuant to this Agreement, including this <u>Section 6.5</u>, shall be subject to any Orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code (including in connection with the Bankruptcy Case), Seller's debtor-in-possession financing, if any, and Seller's obligations as a debtor-in-possession to comply with any Order of the Bankruptcy Court (including the Bidding Procedures Order, the Agreement Order, and the Confirmation Order) and Seller's duty to seek and obtain the highest or otherwise best price for the Acquired Assets as required by the Bankruptcy Code.

6.6 <u>Data Transfer Matters</u>.

(a) Seller shall, and shall cause its Affiliates to, (i) within 30 days (with the Parties using their reasonable best efforts to do so within five (5) Business Days) following the later of the date hereof and the date Purchaser provides the form of such notification, distribute an initial email notification, in the form provided by Purchaser, to all Users and any other consumers located or having a home address in the United States from whom Seller has collected Personal Information regarding the Transactions (including the Rebalancing Exercise) and the transfer of such individuals' Personal Information or accounts (including the ability to opt in to a pre-Closing transfer of such User's Acquired User Data to Purchaser), and prominently post a notice, in the form provided by Purchaser, to Seller's and its Affiliates' (as applicable) primary customer-facing website regarding the same; (ii) on a weekly basis, upon the expiration of any opt in period provided in the email notification distributed by Seller, but no earlier than the later of January 3, 2023 and entry of the Agreement Order, deliver to Purchaser the respective Acquired User Data for Users who have opted into the pre-Closing data transfer pursuant to the foregoing item (i) and whose Acquired User Data has not previously been transferred (the "<u>Pre-Closing Data Transfer</u>");

US-DOCS\137411268.27

(iii) following the date of the initial email notification until the Closing Date, continue distributing additional email notifications, in the form provided by Purchaser, to such individuals, as Purchaser reasonably requires; and (iv) on the Closing Date, deliver to Purchaser all other Acquired User Data. All notifications contemplated by the foregoing shall be subject to Purchaser's consideration of any comments thereto proposed in good faith by Seller or counsel to the committee of unsecured creditors in the Bankruptcy Case and subject to applicable Law.

(b)     From and after the date hereof and through and following the Closing, Seller shall, and shall cause its Affiliates to, maintain or maintain with a third party data management and retention firm, for the entirety of the applicable retention period and at least ninety (90) days thereafter, all information required to be maintained pursuant to, or to comply with, applicable Money Transmitter Requirements or Laws related to Sanctions.

(c)     Seller shall, and shall cause its Affiliates to, use reasonable best efforts to procure that all information and documentation requested in connection with the KYC Procedures meets the standards set forth in such KYC Procedures (including moving files located in storage repositories (*e.g.*, Google Drive or Box) to the appropriate files associated with the applicable User and associating such information and documentation with the applicable User), as determined by Purchaser in its reasonable discretion, prior to the User Asset Migration Date, but in each case in no event prior to the applicable timing contemplated by clauses (i) through (iv) of <u>Section 6.6(a)</u>.

6.7     <u>Use of Name</u>.

(a)     Seller agrees that: (i) within ninety (90) days from the Closing Date, Seller shall (and shall cause its Affiliates to) cause an amendment to the governing documents of Seller and its Affiliates (as applicable) to be filed with the appropriate Governmental Body and shall take all other reasonable actions necessary to change Seller's and such Affiliate's legal, name to a name or names not containing "Voyager," any other trade mark or trade name set forth in <u>Schedule 6.7(a)</u> or any name confusingly similar to the foregoing; (ii) after the Closing Date neither Seller nor any of its Affiliates shall have any ownership rights in or to the name "Voyager," any other trade mark or trade name set forth in <u>Schedule 6.7(a)</u> or any service marks, trademarks, trade names, identifying symbols, logos, emblems, signs or insignia related thereto or containing or comprising the foregoing, including any name or mark confusingly similar thereto (collectively, the "<u>Seller Marks</u>"); and (iii) except as set forth in <u>Section 6.7(a)</u>, Seller and its Affiliates shall, within ninety (90) days of the Closing Date, cease to make any use of the Seller Marks, including in any corporate or other legal name.

(b)     Notwithstanding <u>Section 6.7(a)</u>, for a period of ninety (90) days after the closing of the Bankruptcy Case, unless extended by mutual agreement of Purchaser and Seller, Purchaser hereby grants to Seller and its Affiliates (including, for the avoidance of doubt, any wind-down or similar administrator in the Bankruptcy Case or under the Plan) a non-exclusive, limited, non-transferable, non-sublicensable and revocable license to use the Seller Marks for the sole purposes of unwinding Seller's businesses and assisting Purchaser with all migrations, integrations and Transactions.

US-DOCS\137411268.27

6.8    Further Assurances.

(a)    From time to time from and after the date hereof through and following the Closing (in the case of Seller, until the winddown or dissolution of Seller), as and when requested by either Party, the other Party will execute and deliver, or cause to be executed and delivered, all such further conveyances, notices, assumptions, assignments, documents and other instruments and will take, or cause to be taken, all such further or other actions as such requesting Party may reasonably deem necessary or desirable to evidence and effectuate the Transactions (including for the avoidance of doubt, the transfer and conveyance of any Acquired Assets that may be in the possession of Seller's Affiliates to Purchaser); provided that nothing in this Section 6.8 shall require Purchaser or the Purchaser Group to assume any Liabilities of Seller or any of its Affiliates other than the Assumed Liabilities or Seller or any of its Affiliates to transfer any assets other than Acquired Assets. In addition, from time to time following the Closing Date (in the case of Seller, until the winddown or dissolution of Seller), each Party shall, and shall cause its Affiliates to, promptly execute, acknowledge and deliver such further documents and perform such further acts as are reasonably requested by the other Party and as may be reasonably necessary to transfer and convey to Purchaser, or make available to Purchaser the Acquired Assets or the Assumed Liabilities pursuant to this Section 6.8.

(b)    Without limiting Section 6.8(a), Seller will use reasonable best efforts to evidence and effectuate the transfer and conveyance of all Seller Held Coins (solely for purposes of this Section 6.8(b)), deeming the phrase "who are Debtors" in the definition of Seller Held Coins to instead read as "who are not Debtors" in accordance with Section 6.8(a), *mutatis mutandis*.

6.9    Insurance Matters. Purchaser acknowledges that, upon Closing, all nontransferable insurance coverage provided in relation to Seller and the Acquired Assets that is maintained by Seller or its Affiliates (whether such policies are maintained with third party insurers or with Seller or its Affiliates) shall cease to provide any coverage to Purchaser and the Acquired Assets and no further coverage shall be available to Purchaser or the Acquired Assets under any such policies; provided that to the extent such insurance coverage is available with respect to any Acquired Assets or Assumed Liabilities, after the Closing, (a) Seller shall, and shall cause its applicable Affiliates to, use reasonable best efforts to report in good faith to the applicable third-party insurance provider, if applicable, all events, acts, errors, accidents, omissions, incidents, injuries or other forms of occurrences to the extent relating to any Acquired Assets or Assumed Liabilities that, in each case, occurred at or prior to the Closing as reasonably requested by Purchaser to be so reported the extent covered by an occurrence-based insurance policy, (b) Purchaser shall use its reasonable best efforts to comply with the terms of any such insurance policy and (c) Seller shall, and shall cause its applicable Affiliates to, (i) use reasonable best efforts to obtain the benefit of the applicable insurance coverage under any such insurance policy and (ii) pay such benefit to Purchaser, net of (A) any deductibles, co-payment or self-insured amounts payable by Seller or any of its Affiliates or other out-of-pocket costs and expenses (including reasonable legal fees and expenses, if any) actually and reasonably incurred by Seller or any of its Affiliates in seeking such insurance proceeds and (B) any Taxes imposed on Seller or any of its Affiliates in respect of the receipt or accrual of such insurance proceeds.

6.10    <u>User Migration</u>.

(a)    Following the date hereof, Seller shall, and shall cause its Affiliates to cooperate with Purchaser to, develop (and each Party shall use reasonable best efforts to develop within 15 Business Days following the date hereof) a mutually agreed upon integration plan that sets forth all technology integrations that Purchaser deems reasonably necessary to enable all migrations of User accounts on the Voyager Platform to the Binance.US Platform as contemplated by this Agreement (the "<u>Integration Plan</u>"). The Integration Plan will include among other things: (i) directing customers on the Voyager Platform (including through links on the home screen for the web interface and mobile app for the Voyager Platform) to the Binance.US Platform log-in webpage or mobile app, (ii) migrating all Acquired User Data (subject to <u>Section 6.6(a)</u>) reasonably necessary for Purchaser to validate whether Users qualify as Existing Users and (iii) developing a process whereby any User that is not an Existing User can affirmatively accept terms and conditions to provide such User with access to their Net Owed Coins in a new Binance.US Platform account from directly within the Voyager Platform and related app in accordance with the provisions of this Agreement. Each Party shall, and shall cause its Affiliates and its and their respective employees and representatives to, comply with and implement the Integration Plan. From and after the date hereof (and following the Closing, if applicable, until the date that is six (6) months following the Closing Date), Seller shall, and shall cause its Affiliates and its and their respective employees and representatives to provide to Purchaser, its Affiliates and its and their respective employees and representatives (x) any assistance reasonably requested or required by Purchaser, its Affiliates and its and their respective employees and representatives in connection with the opening of User accounts on the Binance.US Platform, the transfer of information and Net Owed Coins from the Voyager Platform to the Binance.US Platform (including in connection with customer queries and troubleshooting with respect thereto), and the actions contemplated by this <u>Section 6.10</u> and the Integration Plan and (y) subject to <u>Section 6.6</u> and applicable Law, all necessary Acquired User Data in Seller's or its Affiliates' possession required to effectuate the Integration Plan. Purchaser shall bear the reasonable and documented out-of-pocket expenses incurred by Seller in connection with the provision of such assistance following the Closing pursuant to the immediately preceding sentence.

(b)    Notwithstanding the provisions of <u>Section 6.2(c)</u> or <u>Section 10.17</u>, following entry of the Agreement Order, Purchaser and its Affiliates shall, at their sole cost and expense, be entitled to issue communications directed to Users on the Binance.US Platform and through other means of Purchaser's choosing in connection with the Transactions or the opening of accounts on the Binance.US Platform; <u>provided</u> that such communications are consistent with this Agreement and applicable Law; <u>provided</u> that Purchaser shall not issue any such communications prior to the Closing Date without Seller's prior written consent (which shall not be unreasonably withheld, conditioned or delayed) and subject to reasonable consultation with counsel to the committee of unsecured creditors in the Bankruptcy Case. Except as required by <u>Section 6.11(d)</u>, Seller shall not, and Seller shall cause its Affiliates not to, issue any communication to Users, whether on the Voyager Platform or otherwise, except to the extent the form and substance of such communication has been previously approved by Purchaser or is required by applicable Law; <u>provided</u> that the foregoing shall not prohibit Seller from responding on an individual basis to technical support queries from Users or answering questions related to the amount of Coins such User has deposited on the Voyager Platform or communicating with customers regarding withdrawal of cash from the "for benefit of" customer accounts at

41

Metropolitan Commercial Bank; provided further that Seller shall, and shall cause its Affiliates to, provide Purchaser and counsel to the committee of unsecured creditors in the Bankruptcy Case with regular updates on the timing and content of such communications and shall cooperate with Purchaser in addressing any concerns related thereto. The Parties will work in good faith to (i) develop a set of talking points or FAQs for Users and Eligible Creditors with respect to the Transactions, the Bankruptcy Cases, and related matters and (ii) continue to review and revise such talking points or FAQs as other inquiries from Users and Eligible Creditors or other circumstances arise.

(c)     Subject to Seller's providing the Acquired User Data in accordance with Section 6.6, and such Acquired User Data meeting the standards set forth in the KYC Procedures, as determined by Purchaser in its reasonable discretion, Purchaser shall cause an account to be opened for each User on the Binance.US Platform on or before the User Asset Migration Date. In addition to the foregoing, if Seller has not provided or does not have Acquired User Data meeting such standards with respect to a particular User, if such User provides such information and documentation meeting the standards set forth in such KYC Procedures, as determined by Purchaser in its reasonable discretion, Purchaser shall cause an account to be opened for such User in accordance with its standard account opening procedures following its receipt of such information and documentation.

(d)     Seller and Purchaser shall offer (i) each eligible creditor pursuant to the Plan that is not a User (each, an "Eligible Creditor" ) and (ii) each User the opportunity, subject to the consummation of the Closing and such User and Eligible Creditor meeting the requirements of the KYC Procedures and accepting the terms and conditions of the Binance.US Platform, to receive its Net Owed Coins or other Plan distribution through the Binance.US Platform in accordance with Section 6.12 and the Plan. Within three (3) Business Days following the request of Purchaser (which request for the sake of clarity may be offered multiple times), Seller shall send to each User and Eligible Creditor a communication in the form provided by Purchaser notifying them of such offer.

(e)     For the sake of clarity and notwithstanding anything to the contrary herein or otherwise, (i) none of Purchaser or any of its Affiliates shall be required to (A) activate an account or pay or credit any amount, whether in Coins, cash or otherwise, to any User or Eligible Creditor (or its account) that does not meet the requirements of the KYC Procedures and accept the terms and conditions of the Binance.US Platform, (B) pay or credit any amount, whether in Coins, cash or otherwise, to any User or Eligible Creditor or its account except in accordance with the Plan, or (C) credit the account of any User or Eligible Creditor with respect to Coins that have not actually been delivered to Purchaser in accordance with the provisions of Section 2.4(b), (ii) neither Purchaser nor any of its Affiliates is assuming any Liabilities of Seller or any of its Affiliates with respect to Users' accounts on the Voyager Platform or any Eligible Creditor, all of which Liabilities shall constitute Excluded Liabilities, and (iii) neither Purchaser nor any of its Affiliates shall be required to provide trading services on the Binance.US Platform or otherwise in respect of any Unsupported Coins.

US-DOCS\137411268.27

6.11    Rebalancing Exercise; Seller Statement.

(a)    Following the date hereof and prior to the Closing (or the earlier termination of this Agreement pursuant to Article VIII), (i) Seller shall purchase and sell Cryptocurrency through one or more transactions such that, following the completion of such transactions, the number of Acquired Coins of each type is equal to the aggregate number of Deposited Coins of such type multiplied by the Rebalancing Ratio (subject to a Rebalancing Exercise Delta with respect to each Acquired Coin of no more than five percent (5%) or, if after conducting such transactions and using reasonable best efforts to meet the Rebalancing Exercise Delta of five percent (5%), Seller reasonably and in good faith determines that it will not be able to meet such Rebalancing Exercise Delta, then such other amount as Purchaser and Seller consent to, such consent not to be unreasonably withheld, conditioned or delayed), the purpose of which transactions the Parties acknowledge and agree is to ensure that there are sufficient Acquired Coins of each type to pay to each User's account on the Binance.US Platform a number of Post-Rebalancing Coins of such type in accordance with the provisions of this Agreement (such transactions, the "Rebalancing Exercise"), and (ii) Seller shall, and shall cause its employees, accountants, advisors and representatives to, consult with, and keep reasonably informed, Purchaser, its Affiliates and their respective employees, accountants, advisors and representatives with respect to the Rebalancing Exercise and all actions taken in connection therewith, including by providing Purchaser with regular updates regarding the status of the Rebalancing Exercise. For the sake of clarity, the Parties agree that for purposes of the Rebalancing Exercise, if ETH Coins that are Staked Coins cannot be unstaked by the Rebalancing Date, or if there are Coins that Seller is otherwise unable to access due to such Coins being custodied with providers that have entered insolvency proceedings prior to the date hereof, then the Parties will agree on appropriate modifications to the Rebalancing Exercise and the process for distributing Net Owed Coins to Users in light of the foregoing. The Parties agree that the Rebalancing Exercise shall be completed in accordance with the provisions of this Agreement by no later than the date that is one (1) Business Day prior to the Closing Date (such date, the "Rebalancing Date").

(b)    In order to facilitate the Rebalancing Exercise, Seller shall, promptly following the date hereof, to the extent not already created prior to the date hereof, create an institutional account in Seller's name on the Binance.US Platform, and Seller may, but shall not be required to, transfer any or all Seller Held Coins to such institutional account in order to facilitate the Rebalancing Exercise (and, for the avoidance of doubt, the Binance.US Platform shall serve merely as an exchange agent in connection with the Rebalancing Exercise). Prior to engaging in any Subject Transaction outside the Binance.US Platform, Seller shall provide Purchaser with a written notice describing the parameters of such Subject Transaction, including the proposed number of Seller Held Coins of each type to be transferred in connection with such Subject Transaction (each, a "Transaction Notice") and Purchaser shall be entitled to make, by written notice (each, a "Transaction Offer Notice") to Seller within three (3) Business Days following receipt of such Transaction Notice, an offer to conduct such Subject Transaction on the Binance.US Platform, including a description of the estimated numbers of Acquired Coins that would result from the consummation of such Subject Transaction. If Seller receives any proposal to conduct such Subject Transaction from any third party which would result in a number of Acquired Coins in excess of that set forth in the Transaction Notice, Seller shall inform Purchaser of the same, and Seller shall not conduct such Subject Transaction with or through other Person(s) unless Seller provides written notice to Purchaser that Seller has determined in good faith that the

43

terms offered by such other Person(s) with respect to such Subject Transaction (which such terms shall be set forth in such notice) are more favorable (in terms of the best interests of Seller and its estate) than the terms set forth in the Transaction Offer Notice and Purchaser does not provide an updated Transaction Offer Notice within one (1) Business Day following receipt of such notice from Seller with terms as or more favorable (in terms of the best interests of Seller and its estate) than those set forth in Seller's notice. If Purchaser does so provide such an updated Transaction Offer Notice, Seller conduct such applicable Subject Transaction on the Binance.US Platform in accordance with such updated Transaction Offer Notice. In addition to the foregoing, Seller may request that Purchaser facilitate all or part of the Rebalancing Exercise, in which case all or such portion of the Rebalancing Exercise shall be conducted on the Binance.US Platform. Seller's use of the Binance.US Platform for the Rebalancing Exercise shall be subject in all respects to the standard terms and conditions of the Binance.US Platform (including applicable fees, spreads, costs and expenses except as set forth in the applicable Transaction Offer Notice). For the sake of clarity, Seller may withdraw any Coins from the Binance.US Platform prior to the Closing and Seller shall not be required to maintain Coins on the Binance.US Platform in connection with the Rebalancing Exercise or otherwise (except as otherwise expressly contemplated hereunder from and after the Closing and acknowledging that this sentence is not intended to and shall not preclude transactions in the Rebalancing Exercise being undertaken on the Binance.US Platform in accordance with the provisions hereof).

(c)     At least one (1) Business Day prior to the Closing Date and following completion of the Rebalancing Exercise in accordance with <u>Section 6.11(a)</u>, Seller will deliver to Purchaser a ledger in a form reasonably specified by Purchaser as far in advance of the Rebalancing Date as is reasonably practicable (the "<u>Seller Statement</u>") setting forth in reasonable detail, in each case as of the Rebalancing Date and following the completion of the Rebalancing Exercise in accordance with <u>Section 6.11(a)</u>, (i) each User's user identification number, (ii) the Rebalancing Ratio and the calculation thereof, (iii) the number of each User's Deposited Coins of each type (including the name and relevant ticker symbol used on the Voyager Platform for such Deposited Coins, together with all information regarding the underlying networks and smart contracts to which such Coins are subject), (iv) the number of each User's Post-Rebalancing Coins of each type (including the name and relevant ticker symbol used on the Voyager Platform for such Post-Rebalancing Coins, together with all information regarding the underlying networks and smart contracts to which such Coins are subject), (v) the total number of Seller Held Coins and Acquired Coins of each type (including the name and relevant ticker symbol used on the Voyager Platform for such Seller Held Coins and Acquired Coins, together with all information regarding the underlying networks and smart contracts to which such Coins are subject), (vi) the total amount of gas fees that Seller will pay in connection with the transfer of each type of Acquired Coin to Purchaser in accordance with <u>Section 2.4</u>, and (vii) the amount of cash, Coins or other property (including the name and relevant ticker symbol used on the Voyager Platform for such Coins, together with all information regarding the underlying networks and smart contracts to which such Coins are subject) payable to each Eligible Creditor, after taking into account gas or other transaction fees incurred and paid by Seller in connection with transferring such Coins to Purchaser, and any identifying information and information required to make such payments to such Eligible Creditor under the Plan, in each case together with reasonably detailed supporting information and documentation and prepared by Seller based on Seller's and its Affiliates' books and records. Notwithstanding anything to the contrary herein, Seller hereby acknowledges and agrees that (A) Purchaser and its Affiliates shall be entitled to fully rely on the Seller Statement

44

and any data, information or calculation set forth therein for purposes of <u>Section 6.11(d)</u>, and (B) in no event shall Purchaser of any of its Affiliates be responsible (x) to any Person for the Seller Statement, any data, information or calculation set forth therein or any error or inaccuracy with respect thereto or (y) for any losses, liabilities or damages in respect thereof, in each case, to the extent Purchaser takes any action in reliance thereon.

(d)     Promptly following the completion of the Rebalancing Exercise, Seller shall send to each User a communication notifying such User of the Rebalancing Exercise, such User's Deposited Coins, and the Net Owed Coins attributable to such User's account on the Voyager Platform following the Rebalancing Exercise and any gas fees incurred in connection with the transfer of Coins to Purchaser pursuant to <u>Section 2.4</u>. Seller will, upon Purchaser's request, deliver to each Eligible Creditor a communication relating to the Transactions, any payments to be made by Purchaser or any of its Affiliates to such Eligible Creditor and any matters relating to opening an account on the Binance.US Platform, in each case that is in form and substance reasonably acceptable to Purchaser.

6.12    <u>Crediting of Accounts; Unsupported Jurisdictions, Transfer of Coins to Seller; Liquidations or Distributions by Seller</u>.

(a)     Subject to the provisions of <u>Section 6.10</u>, on the User Asset Migration Date, Purchaser shall credit, or cause to be credited, (i) to the Binance.US Platform account of each User, such User's Net Owed Coins and (ii) to the Binance.US Platform account of each Eligible Creditor, the applicable amount payable to such Eligible Creditor as set forth in the Seller Statement. For the avoidance of doubt, Coins credited to any User's or Eligible Creditor's accounts on the Binance.US Platform may be made from any Coins held by or on behalf of Purchaser or any of its Affiliates. As a condition precedent to any User or Eligible Creditor accessing its account or Coins on the Binance.US Platform, such User or Eligible Creditor must satisfy the requirements set forth in <u>Section 6.10</u>. Following such User's or Eligible Creditor's satisfaction of such requirements, Purchaser shall allow such User or Eligible Creditor, as applicable, to access trading services with respect to its Coins subject to the Binance.US Platform's customary terms and conditions (including any transaction fees, spreads, costs and expenses). Notwithstanding anything to the contrary herein, with respect to any User or Eligible Creditor that does not satisfy such requirements prior to the date that is three (3) months following the later of the Closing Date or the date on which such terms and conditions are made available for such User or Eligible Creditor to accept, then Purchaser shall convert any Acquired Coins with respect to such Users or Eligible Creditors into United States Dollars at the then-prevailing rates (including applicable fees, spreads, costs and expenses) on the Binance.US Platform and deliver such United States Dollars, together with any cash or others assets in respect of such Users or Eligible Creditors to Seller within five (5) Business Days, for further distribution by Seller in accordance with the Plan.

(b)     Notwithstanding anything to the contrary herein or otherwise, for any Person (including any User or Eligible Creditor) that is located in Hawaii, New York, Texas or Vermont, to the extent that Purchaser does not have a Money Transmitter License or similar license in such jurisdiction or in any other jurisdiction where the applicable Governmental Body asserts after the date of this Agreement that Purchaser or any of its Affiliates requires a Money Transmitter License or similar license in order to consummate the Transactions or perform its obligations hereunder (each, an "<u>Unsupported Jurisdiction</u>"), Purchaser and its Affiliates shall not be required

to (i) credit or make any payment (with any Coins, cash or otherwise) to any account of such Person (including any User or Eligible Creditor) on the Binance.US Platform, or (ii) permit any such Person or account of such Person on the Binance.US Platform to be active or conduct any trading or investing in Coins. Notwithstanding anything herein to the contrary, prior to the Closing, Seller have the option to elect (upon consultation with professionals representing the committee of unsecured creditors in the Bankruptcy Case) that either (i) Seller shall not deliver to Purchaser any Coins, cash, or other asset with respect to any User or Eligible Creditor located in an Unsupported Jurisdiction or (ii) Seller shall deliver such Coins to Purchaser at Closing. Upon receipt by Purchaser of any Unsupported Jurisdiction Approvals with respect to any Unsupported Jurisdiction(s), which Unsupported Jurisdiction Approvals permit Purchaser to perform its obligations under Section 6.12(a) in such Unsupported Jurisdiction, then Purchaser shall promptly notify Seller of receipt of such Unsupported Jurisdiction Approval and, if Seller has not previously delivered applicable Coins, cash, or other asset with respect to any User or Eligible Creditor located in such Unsupported Jurisdiction then Seller shall so deliver such assets to Purchaser within five (5) Business Days of such notification, and Purchaser shall (following receipt of any applicable assets if required) consummate the actions in such Unsupported Jurisdiction that were restricted by this Section 6.12(b); provided that to the extent Purchaser does not receive such Unsupported Jurisdiction Approval(s) with respect to any Unsupported Jurisdiction prior to the date that is six (6) months following the Closing Date, then to the extent Purchaser is holding any Acquired Coins with respect to Users or Eligible Creditors in such Unsupported Jurisdictions, Purchaser shall convert such Acquired Coins into United States Dollars at the then-prevailing rates (including applicable fees, spreads, costs and expenses) on the Binance.US Platform and deliver such United States Dollars, together with any cash or others assets in respect of such Users or Eligible Creditors to Seller within five (5) Business Days, for further distribution by Seller in accordance with the Plan.

(c)     From and after the Closing, or if this Agreement is terminated in accordance with its terms (other than in connection with a Purchaser Default Termination), then from and after such termination, if Seller or any of its Affiliates intends to consummate a transaction or series of related transactions pursuant to which it will purchase, sell or liquidate any Coins or distribute the proceeds thereof to any User or Eligible Creditor, in each case other than any Additional Bankruptcy Distributions (but including any purchase, sale or liquidation of any Coins prior to making any Additional Bankruptcy Distributions) or any of the transactions provided for in the preceding provisions of this Section 6.12 then (i) Seller may, but shall not be required to, utilize the Binance.US Platform, or other service offerings of Purchaser or its Affiliates, to consummate such transaction or series of related transactions (including any purchase, sale, liquidation or distribution described above) on Purchaser's and its Affiliates' standard terms and conditions (including any transaction fees, spreads, costs and expenses) and (ii) if this Agreement is terminated in accordance with its terms (other than in connection with a Purchaser Default Termination), then Seller may, but shall not be required to, elect that Purchaser and Seller will (and Seller will cause its Affiliates and any other Person with whom Seller or its Affiliates is consummating any such transaction or transactions to) cooperate in good faith to develop and facilitate any transaction similar to the Rebalancing Exercise required by Seller, any of its Affiliates, and any other Person with whom Seller or its Affiliates is consummating any such transaction or transactions, in order to consummate any such transaction or series of related transactions; provided that in no event will Purchaser or any of its Affiliates be required to make any distribution or facilitate or consummate any transaction under this Section 6.12(c) with respect

to any User located in an Unsupported Jurisdiction. In connection with any distribution made by Purchaser or its Affiliates pursuant to this Section 6.12(c), all right, title and interest in and to any property so distributed (including any Coins) shall be made or transferred to Purchaser or its Affiliates free and clear of any Encumbrances prior to any such distribution by Purchaser or its Affiliates and such distributions will be made on Purchaser's and its Affiliates' standard terms and conditions (including any transaction fees, spreads, costs and expenses).

(d)     The provisions of Sections 6.10, 6.11, 6.12, and 6.14 shall be subject to such protocols, if any, as the Parties may agree in writing after the date hereof with respect to the transfer of information, migration of users, migration or transfer of Coins, and any matters related to the foregoing or such Sections.

(e)     Notwithstanding anything to the contrary herein, but subject to the last sentence of this Section 6.12(e), (i) Seller (prior to the Closing) and each User and Eligible Creditor (from and after the Closing) shall retain all right, title, and interest in and to Coins allocated to it in accordance with this Agreement on the Binance.US Platform (notwithstanding any terms and conditions of the Binance.US Platform) through and including such time as such Coins are returned or distributed to Seller or such User and Eligible Creditor, as applicable, hereunder, and such Coins shall be held by Purchaser solely in a custodial capacity in trust and solely for the benefit of Seller or the applicable User or Eligible Creditor; provided that in the case of Coins allocable to Users or Eligible Creditors located in Unsupported Jurisdictions, to the extent, if any, that such Coins are transferred to Purchaser pursuant to Section 6.12(b), from and after the Closing until the applicable Unsupported Jurisdiction Approval is obtained or such Coins are liquidated in accordance with Section 6.12(b) hereunder, such Coins shall be held by Purchaser in a custodial capacity on behalf of Seller and not the applicable User or Eligible Creditor; (ii) any and all cash or cash equivalents to be transferred at any time to Purchaser hereunder for further distribution to Seller or any User or Eligible Creditor (and not for Purchaser's own account (e.g., Purchaser Expenses)) shall at all times (until transferred by Purchaser to Seller or the applicable User or Eligible Creditor, as applicable, hereunder) be held solely in a third party bank account of a FDIC-insured financial institution solely for the benefit of or "fbo" Seller or such User or Eligible Creditor, as applicable; (iii) Purchaser shall not, after the date hereof, introduce any further conditions to the withdrawal of cash from accounts on the Binance.US Platform that are not in effect as of the date hereof that would apply to any User's or Eligible Creditor's account on the Binance.US Platform; (iv) Purchaser shall not at any time halt (temporarily or permanently) withdrawals of cash or such Coins from any User's or Eligible Creditor's account on the Binance.US Platform; (v) Purchaser shall not halt trading of such Coins on the Binance.US Platform at any point during the 30 days following any distribution to any User's or Eligible Creditor's account on the Binance.US Platform hereunder, except, in the case of each of the foregoing clauses (iii), (iv) and (v), (A) as required by applicable Law or any Order or Governmental Body, (B) as may be permitted pursuant to Purchaser's terms and conditions in effect on the Closing Date (including for purposes of halting fraud or illegal activity), (C) as necessary to complete any system, account, wallet, security or exchange maintenance, patching, repair, upgrade or to the extent any withdrawal or trading is unable to be processed due to any act or omission by, or any Event related to, any third party (e.g., a bank closure or a third party ceasing to support any Cryptocurrency), (D) in order to avoid any legal, compliance or regulatory issue or in order to ensure market stability, or (E) in order to avoid any information security risk; (vi) Purchaser shall not take, permit to be taken, or omit to take any action that would reasonably

47

be expected to (A) result in the insolvency of Purchaser or (B) prevent or materially impair or materially delay the ability of Purchaser to perform the Commercial Covenants in accordance herewith; (vii) Purchaser shall comply in all material respects with all provisions of the Plan applicable to Purchaser or the Distribution Agent (as defined in the Plan) to the extent Purchaser is acting as a distribution agent in connection with the Plan; and (viii) Purchaser shall not pledge, repledge, hypothecate, rehypothecate, sell, lend, stake, arrange for staking, or otherwise transfer or use any amount of such Coins, separately or together with other property, with all attendant rights of ownership, and for any period of time and without retaining a like amount of Coins, or invest such Coins (except as otherwise directed by Seller or any User or Eligible Creditor, as applicable). Notwithstanding the foregoing, Purchaser's obligations under this Section 6.12(e) shall terminate and be of no further force or effect on the earlier of (x) the date that Purchaser's obligations under Section 6.10, Section 6.11, Section 6.12, and Section 6.14 have been performed in full or Purchaser otherwise ceases to have any obligations thereunder, and (y) the date on which this Agreement is terminated in accordance with is terms.

6.13    VGX Token Listing Review Process. Following the entry of the Agreement Order, Purchaser will initiate and undertake consistent with its policies and past practices an internal review process to determine whether VGX tokens can be listed for trading on the Binance.US Platform, which review process will include submitting the VGX token to Purchaser's listing committee for consideration consistent with its policies and past practices.

6.14    Additional Bankruptcy Distributions. The provisions of this Section 6.14 shall cease to apply and be of no further force and effect upon the soonest to occur of (a) Purchaser ceasing to provide the services necessary to comply with this Section 6.14, (b) Purchaser's bankruptcy or insolvency, (c) the issuance of a final, non-appealable Order by a Governmental Body prohibiting the consummation of the transactions contemplated by this Section 6.14, (d) any Purchaser Development (disregarding for the purposes of this Section 6.14 the language "prior to the Closing"), and (e) Purchaser's material breach of Section 6.12(e) or this Section 6.14 which remains uncured for 30 days following Purchaser's receipt of Seller's written notice of such material breach.

(a)    Any Additional Bankruptcy Distributions made on account of Users' or Eligible Creditors' claims against the Debtors and all right, title and interest therein and thereto shall be made or transferred to Purchaser free and clear of any Encumbrances. Any such transfers in Coins shall be deemed complete when each transfer is publicly confirmed on the blockchain for the related Coin at least the number of times set forth on https://support.kraken.com/hc/en-us/articles/203325283-Cryptocurrency-deposit-processing-times (or a successor site mutually agreed by Seller and Purchaser), or, for any Coins held in Seller's account on the Binance.US Platform, transferred to the Binance.US Platform account designated by Purchaser, or in the case of staked ETH Coins, such staked ETH Coins shall be delivered pursuant to the means reasonably specified by Purchaser.

(b)    Upon the Bankruptcy Court's approval of any Additional Bankruptcy Distributions (including through the Confirmation Order), Seller shall deliver to Purchaser a statement setting forth (i) the amount of Additional Bankruptcy Distributions to be made to each User or Eligible Creditor, as applicable, as approved by the Bankruptcy Court in Coins (including the name and relevant ticker symbol used on the Voyager Platform for such Coins, together with

48

all information regarding the underlying networks and smart contracts to which such Coins are subject) after taking into account gas or other transaction fees incurred and paid by Seller in connection with transferring such Coins to Purchaser in accordance with this Section 6.14, (ii) the amount of Additional Bankruptcy Distributions to be made to each User or Eligible Creditor, as applicable, as approved by the Bankruptcy Court in cash, and (iii) the user identification number of each such User or other identifying or account information of any Eligible Creditor, as applicable (such statement, the "Post-Bankruptcy Statement"). The provisions set forth in the last sentence of Section 6.11(a) shall apply to the Post-Bankruptcy Statement, *mutatis mutandis*.

(c)     Promptly following Purchaser's receipt of any Additional Bankruptcy Distributions (but no later than five (5) Business Days following receipt of any Additional Bankruptcy Distributions), Purchaser shall credit such Additional Bankruptcy Distributions to each User's and Eligible Creditor's accounts, if any, on the Binance.US Platform in such amounts set forth on, and in accordance with, the Post-Bankruptcy Statement. The Additional Bankruptcy Distributions credited to each User and Eligible Creditor in accordance with this Section 6.14(a) are referred to herein as "Credited Additional Bankruptcy Distributions".

(d)     If any Additional Bankruptcy Distribution is to be received by Purchaser pursuant to Section 6.14(a), prior to the crediting of the applicable Credited Additional Bankruptcy Distribution pursuant to Section 6.14(a), Seller shall reduce such Credited Additional Bankruptcy Distribution by and shall retain (i) the number of Coins allocated in the applicable Post-Bankruptcy Statement to each User or Eligible Creditor located in an Unsupported Jurisdiction in which Purchaser or its applicable Affiliate(s) have not received the necessary Money Transmitter License, and (ii) the amount of cash allocated in the applicable Post-Bankruptcy Statement to each User or Eligible Creditor located in an Unsupported Jurisdiction in which Purchaser or its applicable Affiliate(s) have not received the necessary Money Transmitter License, and, in either case, such amounts shall be distributed by Seller in accordance with the Plan.

(e)     There shall be no transaction fees, spreads, costs or expenses charged to or payable by Seller, any User, or any Eligible Creditor with respect to any Additional Bankruptcy Distributions to the account of Seller, such User or such Eligible Creditor, as applicable, on the Binance.US Platform contemplated by this Section 6.14.  With respect to any User or Eligible Creditor that does not meet the requirements of the KYC Procedures and accept the terms and conditions of the Binance.US Platform (or otherwise is not or no longer is a user with an active account on the Binance.US Platform) as of or prior to the date of such Post-Bankruptcy Statement, Purchaser shall convert all Coins allocable to such User or Eligible Creditor in such Additional Bankruptcy Distribution into United States Dollars at the then-prevailing rates (including applicable fees, spreads, costs and expenses) on the Binance.US Platform and deliver such United States Dollars, together with any cash or others assets in respect of such Users or Eligible Creditors, to Seller within five (5) Business Days, for further distribution by Seller in accordance with the Plan.

6.15     Unstaking. Promptly following the date hereof (until the Closing or the earlier termination of this Agreement pursuant to Article VIII) but without limiting what is permitted by Section 6.1(b)(iii), Seller shall, and shall cause its Affiliates to, (a) ensure that all Seller Held Coins (other than ETH Coins that are Staked Coins as of the date hereof) are freely transferable and not subject to any restrictions on transfer (including restrictions on transfer implemented through

49

"smart contracts" or other technological means), (b) without limiting the foregoing, ensure that all Seller Held Coins (other than ETH Coins that are Staked Coins as of the date hereof) are unstaked prior to the Rebalancing Date, and (c) consult with Purchaser and its representatives, keep Purchaser and its representatives reasonably informed, and provide Purchaser and its representatives with draft documents reasonably in advance of execution or delivery thereof and incorporate any comments therein proposed in good faith by Purchaser or its representatives, in each case, in connection with any of the foregoing.

6.16    Receipt of Misdirected Assets; Liabilities. From and after the Closing, if Purchaser or Seller becomes aware that Seller or any of its Affiliates is in possession of any right, property or asset that is an Acquired Asset, such Party shall promptly inform the other Party of that fact. Thereafter, at the request of Purchaser, Seller shall promptly transfer or cause such of its Affiliates to transfer such right, property or asset (and shall promptly endorse and deliver any such asset that is received in the form of cash, checks or other documents) to Purchaser or any other entities nominated by Purchaser for no consideration, and such asset will be deemed the property of Purchaser of any such nominees held in trust by Seller for Purchaser or any such nominees until so transferred. From and after the Closing, if Purchaser or Seller becomes aware that Purchaser or any of its Affiliates is in possession of any right, property or asset that is an Excluded Asset, such Party shall promptly inform the other Party of that fact. Thereafter, at the request of Seller, Purchaser shall promptly transfer or cause such of its Affiliates to transfer such right, property or asset (and shall promptly endorse and deliver any such asset that is received in the form of cash, checks or other documents) to Seller or any other entities nominated by Seller for no consideration, and such asset will be deemed the property of Seller of any such nominees held in trust by Purchaser for Seller or any such nominees until so transferred; provided that if Purchaser discovers any items (or portions thereof) that would be Documents but for the fact that they relate to Excluded Assets, Purchaser shall use reasonable best efforts to destroy such items. Notwithstanding anything to the contrary herein or otherwise, if any amount (including any principal, interest, fees, expenses or penalties) is outstanding or unpaid under any Loan from or after the Closing, then such Loan, any agreements or documents entered into in connection therewith and any collateral posted in respect thereof shall be deemed Acquired Assets for all purposes under this Agreement and any other agreements or documents entered into in connection herewith, and Seller shall, and shall cause its Affiliates to, sell, transfer, assign, convey and deliver to Purchaser all of its and their right, title and interest in and to the foregoing, free and clear of all Encumbrances in the same manner as the other Acquired Assets under Section 1.1, *mutatis mutandis*, for no additional consideration and at no cost or expense to Purchaser or its Affiliates.

6.17    Acknowledgment by Purchaser.

(a)    Purchaser acknowledges and agrees that it has conducted to its full satisfaction an independent investigation and verification of the business, including its financial condition, results of operations, assets, Liabilities, properties, Contracts, regulatory compliance, business risks and prospects of Seller and the Acquired Assets and the Assumed Liabilities, and, in making its determination to proceed with the Transactions, Purchaser and the Purchaser Group have relied solely on the results of the Purchaser Group's own independent investigation and verification and have not relied on, are not relying on, and will not rely on, Seller, any information, statements, disclosures, documents, Projections, forecasts or other material made available to Purchaser or any of its Affiliates or their respective Advisors in the Dataroom, the Information

Presentation, or the Projections or any information, statements, disclosures or materials, in each case, whether written or oral, made or provided by, or as part of, any of the foregoing or any other Seller Party, or any failure of any of the foregoing to disclose or contain any information, except for the Express Seller Representations (it being understood that Purchaser and the Purchaser Group have relied only on the Express Seller Representations). Purchaser acknowledges and agrees that (i) the Express Seller Representations are the sole and exclusive representations, warranties and statements of any kind made to Purchaser or any member of the Purchaser Group and on which Purchaser or any member of the Purchaser Group may rely in connection with the Transactions and (ii) all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (A) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Seller Representations) including in the Dataroom, Information Presentation, Projections, meetings, calls or correspondence with management of Seller, any of the Seller Parties or any other Person on behalf of Seller or any of the Seller Parties or any of their respective Affiliates or Advisors and (B) any other statement relating to the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, Contracts, regulatory compliance, business risks and prospects of Seller, or the quality, quantity or condition of Seller's assets, are, in each case, specifically disclaimed by Seller, on its behalf and on behalf of the Seller Parties. Purchaser: (x) disclaims reliance on the items in <u>clause (ii)</u> in the immediately preceding sentence (which, for the avoidance of doubt, do not include any Express Seller Representations); and (y) acknowledges and agrees that it has relied on, is relying on and will rely on only the items in <u>clause (i)</u> in the immediately preceding sentence. Without limiting the generality of the foregoing, Purchaser acknowledges and agrees that neither Seller or any other Person (including the Seller Parties), has made, is making or is authorized to make, any representations or warranties, whether in written, electronic or oral form, express or implied with respect to, (1) any potentially material information regarding Seller or any of its assets (including the Acquired Assets), Liabilities (including the Assumed Liabilities) or operations and (2) as to the quality, merchantability, fitness for a particular purpose, or condition of Seller's business, operations, assets, Liabilities, Contracts, regulatory compliance, business risks and prospects or any portion thereof, except, in each case, solely to the extent set forth in the Express Seller Representations.

(b)     Without limiting the generality of the foregoing, in connection with the investigation by the Purchaser Group of Seller, Purchaser and the members of the Purchaser Group, and the Advisors of each of the foregoing, have received or may receive, from or on behalf of Seller, certain projections, forward-looking statements and other forecasts (whether in written, electronic, or oral form, and including in the Information Presentation, Dataroom, management meetings, etc.) (collectively, "<u>Projections</u>"). Purchaser acknowledges and agrees that (i) such Projections are being provided solely for the convenience of Purchaser to facilitate its own independent investigation of Seller, (ii) there are uncertainties inherent in attempting to make such Projections, (iii) Purchaser is familiar with such uncertainties, and (iv) Purchaser is taking full responsibility for making its own evaluation of the adequacy and accuracy of all Projections (including the reasonableness of the assumptions underlying such Projections).

6.18   <u>IT Migration</u>. From and after the date hereof until one hundred twenty (120) days after the Closing Date, upon Purchaser's request, Seller shall, and shall cause its Affiliates to, use reasonable best efforts to make available all relevant technical staff, employees and representatives

51

of Seller and its Affiliates, including the Chief Technology Officer of Seller and its Affiliates, to Purchaser and its Affiliates, to (a) assist Purchaser and its Affiliates in understanding all Business Software and Business Accounts, (b) assist with the Integration Plan, (c) transition of all accounts with third party sites necessary to support the Voyager Platform and its associated mobile applications, (d) address the logistics of transferring the Business Software and Business Accounts to Purchaser, including providing Purchaser with access to all credentials to GitHub accounts and other repositories for storage of source code for the Business Software, and (e) any other technical assistance that Purchaser or any of its Affiliates deems reasonably necessary to enable all migrations, integrations and Transactions. Purchaser hereby grants Seller a limited, non-exclusive, non-transferable, non-sublicensable and revocable license to access and use the Business Software for the sole purpose of providing the support to Purchaser as contemplated in this <u>Section 6.18</u>. Seller and its Affiliates may not use, modify, share, disclose or revise such Business Software for any other purpose. Seller shall bear all costs and expenses associated with the provision of such services on or prior to the Closing Date pursuant to this <u>Section 6.18</u>. Purchaser shall bear the reasonable and documented costs and expenses incurred by Seller in connection with the provision of such services during the 120-day period after the Closing Date pursuant to this <u>Section 6.18</u>. Seller can provide no assurance that Seller 's employees will elect to remain employed by Seller prior to or following the Closing and Seller will not be required to replace any such resigning employees.

6.19   <u>Confidentiality</u>.

(a)   Each Party acknowledges that Confidential Information has been, and in the future will be, provided to it in connection with this Agreement and the Transactions, including under <u>Section 6.2</u>.

(b)   Seller acknowledges that from and after the Closing, all non-public information relating to the Acquired Assets and the Assumed Liabilities will be valuable and proprietary to Purchaser and its Affiliates. Seller agrees that, from and after the Closing, Seller will not, and will cause their Affiliates and Advisors not to, directly or indirectly, without the prior consent of Purchaser, disclose to any Person any Confidential Information relating to Purchaser and its Affiliates, the Acquired Assets or the Assumed Liabilities.

(c)   Notwithstanding anything to the contrary herein, the provisions of this <u>Section 6.19</u> will not prohibit any disclosure (i) required by applicable Law, Order or the rules of a securities exchange to which it is subject, (ii) in connection with a regulatory inquiry by a Governmental Body or self-regulatory organization, (iii) as necessary in connection with Seller's bankruptcy process or (iv) to each Party's Advisors who have been informed of the confidential nature of the information and have been instructed to keep such information confidential. Purchaser acknowledges and understands that this Agreement may be publicly filed in the Bankruptcy Court and further made available by Seller to prospective bidders and that, except as prohibited herein, such disclosure will not be deemed to violate any confidentiality obligations owing to Purchaser, whether pursuant to this Agreement or otherwise. Each Party agrees that such Party will be responsible for any breach or violation of the provisions of this <u>Section 6.19</u> by any of such Party's Affiliates. Each Party acknowledges and agrees that the remedies at law for any breach or threatened breach of this <u>Section 6.19</u> by Seller or Purchaser are inadequate to protect Purchaser or Seller and its Affiliates, as applicable, and that the damages resulting from any such

52

breach are not readily susceptible to being measured in monetary terms. Accordingly, without prejudice to any other rights or remedies otherwise available to either Party or its Affiliates, each Party acknowledges and agrees that upon any breach or threatened breach by a Party of the terms and conditions of this <u>Section 6.19</u>, the other Party and its Affiliates, as applicable will be entitled to immediate injunctive relief and to seek an order restraining any threatened or future breach from any court of competent jurisdiction without proof of actual damages or posting of any bond in connection with any such remedy. The provisions of this <u>Section 6.19</u> will survive the Closing and terminate two (2) years after the Closing Date.

6.20    <u>Acquired Assets Owned by Non-Debtors</u>. To the extent any item set forth in <u>Schedule 6.20</u> or any other asset used in or relating to the Cryptocurrency custody and trading business of Seller constitutes property of Voyager IP, LLC, and, but for this <u>Section 6.20</u>, is of a type that would constitute an Acquired Asset (disregarding solely for this purpose any reference to "of Seller" or other reference indicating ownership, licensing, holding, leasing or use of any type of Acquired Asset by Seller), Seller shall cause Voyager IP, LLC's right, title and interest in and to such item or asset to be transferred (for no additional consideration) to Purchaser reasonably promptly after Closing as an Acquired Asset as if transferred at the Closing in accordance with the other provisions of this Agreement, including by designating Voyager IP, LLC as an additional assignor under the Trademark and Domain Name Assignment Agreement.

6.21    <u>Seller Expenses</u>.

(a)    Purchaser shall (i) at the Closing bear as a component of the Purchase Price pursuant to <u>Section 2.1(a)</u>, without duplication, the Seller Expenses or (ii) if this Agreement is validly terminated in accordance with its terms, pay to Seller, within three (3) Business Days following such termination, cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by Seller in an amount equal to the Seller Expenses; <u>provided</u> that notwithstanding anything to the contrary herein, (A) in no event shall the aggregate amount of Seller Expenses payable by Purchaser hereunder exceed the Seller Expense Cap, (B) any fees and expenses (including reasonable and documented out-of-pocket financial advisor and legal fees, expenses and disbursements) incurred by Seller or any of its Affiliates, or otherwise relating to the activities or operations of Seller or any of its Affiliates, on or prior to the Seller Expense Start Date shall not constitute Seller Expenses, and (C) (x) if the Closing or the termination of this Agreement occurs on or prior to the Seller Expense Start Date, (y) if this Agreement is terminated pursuant to (1) <u>Section 8.1(b)</u> or <u>Section 8.1(c)</u> by Purchaser, or by Seller in circumstances where Purchaser would be entitled to terminate this Agreement pursuant to <u>Section 8.1(e)</u>, or (2) <u>Section 8.1(e)</u>, <u>Section 8.1(g)</u>, <u>Section 8.1(h)</u> or <u>Section 8.1(i)</u>, or (z) the Closing does not occur on or prior to the Seller Expense Start Date due to any act or omission by Seller or any of its Affiliates or any material breach of this Agreement by Seller, then in each case the Seller Expenses shall be zero (0).

(b)    For purposes of this Agreement, "<u>Seller Expenses</u>" means all reasonable and documented costs, fees, and expenses (including reasonable and documented out-of-pocket financial advisor and legal fees, expenses and disbursements) incurred by or behalf of any Debtor during the period beginning on the Seller Expense Start Date and ending on the earlier of (i) the Closing Date and (ii) the date on which this Agreement is validly terminated in accordance with its terms, in each case (A) solely in connection with maintaining its operations in the Ordinary

US-DOCS\137411268.27

Course or by professionals in connection with the Bankruptcy Case, (B) that Seller would not have otherwise incurred if the Closing had occurred on or prior to the Seller Expense Start Date, and (C) which fees and expenses of such professional are approved by the Bankruptcy Court.

6.22 <u>Purchaser Expenses</u>.

(a) If this Agreement is terminated (i) by Seller pursuant to <u>Section 8.1(c)</u>, in circumstances where Purchaser would be entitled to terminate this Agreement pursuant to <u>Section 8.1(e)</u>, or (ii) pursuant to <u>Section 8.1(e)</u>, <u>Section 8.1(g)</u>, <u>Section 8.1(h)</u> or <u>Section 8.1(i)(ix)</u>, then Seller shall pay to Purchaser, within three (3) Business Days following such termination, cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by Purchaser in an amount equal to the Purchaser Expenses; <u>provided</u> that notwithstanding anything to the contrary herein, in no event shall the aggregate amount of Purchaser Expenses payable by Seller hereunder exceed $5,000,000; <u>provided</u> <u>further</u> that if this Agreement is validly terminated by Seller pursuant to <u>Section 8.1(g)</u> (x) in order for Seller to pursue a Liquidation as a result of and following any Effect with respect to Purchaser's business, financial condition, operations, assets, management, employees, compliance, or liabilities, taken as a whole, or any Effect with respect to Purchaser's Affiliates that has an Effect on Purchaser's business, financial condition, operations, assets, management, employees, compliance, or liabilities, taken as a whole, that, individually or in the aggregate with all other such Effects, would reasonably be expected to (1) prevent or materially impair or materially delay the ability of Purchaser to consummate the Transactions in accordance herewith or (2) materially and adversely affect the Users, Eligible Creditors, or the Acquired Coins on the Binance.US Platform, including following the Closing, as compared to users and Coins on the Binance.US Platform as of the date hereof, and (y) such termination was not effected (1) in connection with a Higher and Better Offer or (2) because the estimated proceeds from such Liquidation are or would reasonably be expected to be greater than the Closing Date Payment (plus the fair market value of any Acquired Coins or any proceeds therefrom, in each case, as determined at the time Seller commences such Liquidation), then no Purchaser Expenses shall be payable.

(b) For purposes of this Agreement, "<u>Liquidation</u>" means any combination of one or more of the following: (i) a plan under chapter 11 of the Bankruptcy Code that provides for sales or liquidation of the Debtors' assets through a transaction (other than a sale of substantially all of the Debtors' assets to one purchaser on a going concern basis), including the Plan, (ii) one or more sales of assets pursuant to section 363 of the Bankruptcy Code other than a sale of substantially all of the Debtors' assets to one purchaser on a going concern basis, (iii) conversion of the Bankruptcy Case to cases under chapter 7 of the Bankruptcy Code, (iv) foreclosure or other exercise of remedies (including a deed in lieu of foreclosure) by or in favor of one or more creditors, (v) abandonment of the Debtors' assets to a creditor, or (vi) a dismissal of the Bankruptcy Cases.

(c) For the purposes of this Agreement, "<u>Purchaser Expenses</u>" means all reasonable and documented fees and expenses (including reasonable and documented out-of-pocket legal fees, expenses and disbursements) incurred by Purchaser since August 5, 2022, in connection with, arising from or related to efforts to purchase the Acquired Assets (as defined in the Bidding Procedures Order), which, for the avoidance of doubt, includes its evaluation,

54

A-105

negotiation and pursuit of the Transactions, this Agreement and the other documents and agreements contemplated hereby (the "<u>Purchaser Bid Process</u>").

(d)     All amounts payable to Purchaser pursuant to <u>Section 6.22(a)</u> upon termination of this Agreement shall be payable in cash by wire transfer of immediately available funds to such bank account as shall be designated by Purchaser in writing, and without the requirement of any notice or demand from Purchaser or any application to or order of the Bankruptcy Court other than the Agreement Order.

## ARTICLE VII
## CONDITIONS TO CLOSING

7.1     <u>Conditions Precedent to the Obligations of Purchaser and Seller</u>. The respective obligations of each Party to consummate the Transactions are subject to the satisfaction (or to the extent permitted by Law, written waiver by Seller and Purchaser) on or prior to the Closing Date, of each of the following conditions:

(a)     there shall be no Law or Order (including any temporary restraining order or preliminary or permanent injunction) in effect restraining, enjoining, making illegal or otherwise prohibiting the Transactions;

(b)     the Bankruptcy Court shall have entered the Agreement Order, which Agreement Order shall (i) be in form and substance reasonably acceptable to Purchaser, (ii) comply in all respects with <u>Section 5.1(b)</u>, and (iii) be a Final Order; and

(c)     the Bankruptcy Court shall have entered the Confirmation Order, in form and substance, solely with respect to matters relating to this Agreement or the Transactions, reasonably acceptable to Purchaser, confirming a Plan in form and substance, solely with respect to matters relating to this Agreement or the Transactions, reasonably acceptable to Purchaser, and the Confirmation Order shall be a Final Order.

7.2     <u>Conditions Precedent to the Obligations of Purchaser</u>. The obligations of Purchaser to consummate the Transactions are subject to the satisfaction (or to the extent permitted by Law, written waiver by Purchaser in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)     (i) the representations and warranties of Seller set forth in <u>Article III</u> (in each case, other than the Fundamental Representations and the representations and warranties set forth in <u>Section 3.16(a)</u>) shall be true and correct in all respects as of the Closing Date as though made on and as of the Closing Date, except (x) that representations and warranties that are made as of a specified date need be so true and correct only as of such date and (y) to the extent the failure of such representations and warranties to be true and correct as of such dates has not had, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; <u>provided</u> that for purposes of the immediately preceding clause (i), the qualifications as to materiality and Material Adverse Effect contained in such representations and warranties shall not be given effect; (ii) the representations and warranties set forth in <u>Section 3.1(a)</u> (*Organization and Qualification*), <u>Section 3.2</u> (*Authorization of Agreement*), <u>Section 3.3(a)(i)</u> (*Conflicts; Consents*), <u>Section 3.6(a)</u> (*Exclusive Ownership*), and <u>Section 3.14</u> (*Brokers*) (collectively, the

55

"Fundamental Representations") shall be true and correct in all but *de minimis* respects as of the Closing Date as though made on and as of the Closing Date, except that such Fundamental Representations that are made as of a specified date need be true and correct in all but *de minimis* respects only as of such date; and (iii) the representations and warranties set forth in Section 3.16(a) shall be true and correct in all respects as of the date hereof and as of the Closing Date as though made on and as of the Closing Date;

(b)    Seller shall not have materially breached any of the covenants required to be performed or complied with by Seller under this Agreement on or prior to the Closing; provided that notwithstanding the foregoing, Seller shall have performed or caused to be performed, in all respects, all of the obligations and covenants required by Section 6.15(a) and (b); and

(c)    Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 2.4.

7.3    Conditions Precedent to the Obligations of Seller. The obligations of Seller to consummate the Transactions are subject to the satisfaction (or to the extent permitted by Law, written waiver by Seller in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)    the representations and warranties made by Purchaser in Article IV shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except (x) that representations and warranties that are made as of a specified date need be so true and correct only as of such date and (y) where the failure of such representations or warranties to be so true and correct has not and would not, individually or in the aggregate, reasonably be expected to prevent or materially impair or delay the ability of Purchaser to consummate the Transactions; provided that for purposes of this Section 7.3(a), the qualifications as to materiality, material adverse effect and words of similar import contained in such representations and warranties shall not be given effect;

(b)    Purchaser shall not have materially breached any of the covenants required to be performed or complied with by Purchaser under this Agreement on or prior to the Closing; and

(c)    Purchaser shall have delivered, or caused to be delivered, to Seller all of the items set forth in Section 2.5.

7.4    Waiver of Conditions.  Upon the occurrence of the Closing, any condition set forth in this Article VII that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing. Neither Purchaser nor Seller may rely on the failure of any condition set forth in this Article VII, as applicable, to be satisfied if such failure was caused by such Party's material breach of any covenant, representation or warranty hereunder.

# ARTICLE VIII

# TERMINATION

8.1    <u>Termination of Agreement</u>. This Agreement may be terminated only in accordance with this <u>Section 8.1</u>. This Agreement may be terminated at any time prior to the Closing:

(a)    by the mutual written consent of Seller and Purchaser;

(b)    by written notice of either Purchaser or Seller, upon the issuance of an Order by a Governmental Body restraining, enjoining or otherwise prohibiting the consummation of the Transactions or declaring unlawful the Transactions, and such Order having become final, binding and non-appealable; <u>provided</u> that no termination may be made by a Party under this <u>Section 8.1(b)</u> if the issuance of such Order was caused by such Party's material breach of any of its representation, warranties, covenants or agreements hereunder;

(c)    by written notice of either Purchaser or Seller, if the Closing shall not have occurred on or before the date that is four (4) months following the date hereof (the "<u>Outside Date</u>"); <u>provided</u> that Purchaser may, at its election and upon written notice to Seller, elect to extend the Outside Date for an additional thirty (30) days (such extended date, the "<u>Extended Outside Date</u>" ); <u>provided</u> <u>further</u> that a Party shall not be permitted to terminate this Agreement, or extend the Outside Date, pursuant to this <u>Section 8.1(c)</u> if the failure of the Closing to have occurred by the Outside Date or Extended Outside Date, as applicable, was caused by such Party's material breach of any of its representation, warranties, covenants or agreements;

(d)    by written notice from Seller to Purchaser, upon a breach of any covenant or agreement on the part of Purchaser, or if any representation or warranty of Purchaser is or will have become untrue, in each case, such that the conditions set forth in <u>Section 7.1</u> or <u>Section 7.3</u> would not be satisfied, including a breach of Purchaser's obligation to consummate the Closing; <u>provided</u> that (i) if such breach is curable by Purchaser then Seller may not terminate this Agreement under this <u>Section 8.1(d)</u> unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date or Extended Outside Date, if any, and (B) thirty (30) days after Seller notifies Purchaser of such breach and (ii) the right to terminate this Agreement pursuant to this <u>Section 8.1(d)</u> will not be available to Seller at any time that Seller is in material breach of, any covenant, representation or warranty hereunder;

(e)    by written notice from Purchaser to Seller, upon a breach of any covenant or agreement on the part of Seller, or if any representation or warranty of Seller is or will have become untrue, in each case, such that the conditions set forth in <u>Section 7.2(a)</u> or <u>Section 7.2(b)</u> would not be satisfied; <u>provided</u> that (i) if such breach is curable by Seller then Purchaser may not terminate this Agreement under this <u>Section 8.1(e)</u> unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date or Extended Outside Date, if any, and (B) thirty (30) days after Purchaser notifies Seller of such breach and (ii) the right to terminate this Agreement pursuant to this <u>Section 8.1(e)</u> will not be available to Purchaser at any time that Purchaser is in material breach of, any covenant, representation or warranty hereunder;

57

(f)     by written notice from Seller to Purchaser, if (A) all of the conditions set forth in Sections 7.1 and 7.2 have been and continue to be satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived, (B) Seller has confirmed in writing to Purchaser that all of the conditions set forth in Sections 7.1 and 7.2 have been and continue to be satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived and Seller stands ready, willing and able to consummate the Closing so, and (C) Purchaser fails to consummate the Closing within three (3) Business Days of its receipt of such written notice from Seller;

(g)     by written notice from Seller to Purchaser, which may be revocable in the sole discretion of Seller by written notice from Seller to Purchaser within five (5) Business Days, if Seller or the board of directors (or similar governing body) of Seller determine, in good faith and after consultation with its legal and other advisors, that proceeding with the Transactions or failing to terminate this Agreement would be inconsistent with its or such Person's or body's fiduciary duties; provided that if such determination is in connection with an Acquisition Proposal, Seller may only terminate this Agreement pursuant to this Section 8.1(g) upon compliance with the provisions set forth in Section 5.2(c);

(h)     by written notice from Purchaser to Seller, if (A) Seller seeks or otherwise take material steps in furtherance of, or do not use reasonable best efforts to oppose any other Person in seeking, an order of the Bankruptcy Court dismissing the Bankruptcy Case or converting the Bankruptcy Case to a petition for relief under Chapter 7 of the Bankruptcy Code, (B) the Bankruptcy Case is dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of Seller is appointed in the Bankruptcy Case or (C) the Bankruptcy Court enters an order pursuant to section 362 of the Bankruptcy Code lifting the automatic stay with respect to any Acquired Assets; or

(i)     by written notice from Purchaser to Seller, if:

(i)     the Agreement Order is not entered by January 6, 2023;

(ii)    the Plan Solicitation Motion and the Amended Disclosure Statement are not filed with the Bankruptcy Court by December 21, 2022;

(iii)   the Plan Solicitation Order is not entered by January 6, 2023;

(iv)    the Confirmation Order is not entered by March 1, 2023;

(v)     Seller or any of the other Debtors file any motions, pleadings, notices or other documents with the Bankruptcy Court in material breach of Section 5.7;

(vi)    Seller enters into one or more Alternative Transactions with one or more Persons other than Purchaser, or the Bankruptcy Court approves an Alternative Transaction other than with Purchaser;

US-DOCS\137411268.27

(vii)    Seller has delivered a Higher Offer Determination Notice to Purchaser;

(viii)    Seller or its Affiliates or Advisors have committed a breach of Section 5.1(a); or

(ix)    Seller or its Affiliates or Advisors have committed a breach of, Section 5.2; provided that (without modifying Purchaser's rights to terminate this Agreement under any other Section of this Agreement) Purchaser shall not be entitled to terminate this Agreement pursuant to this Section 8.1(i)(ix) following entry of the Agreement Order by the Bankruptcy Court.

8.2    Effect of Termination.

(a)    In the event of termination of this Agreement pursuant to Section 8.1, this Agreement shall forthwith become void and there shall be no Liability on the part of either Party or any of its agents, officers, directors or shareholders; provided that Section 2.2, Section 6.2(b), Section 6.12(c), Section 6.19, Section 6.21, Section 6.22, this Section 8.2, Section 8.3, Section 8.4 and Article X (other than Section 10.12 with respect to the availability of an injunction or injunctions, specific performance or other equitable relief to cause the Closing to occur, which shall terminate upon any termination of this Agreement) and the definitions referenced in such Sections and Articles, even if not included in such Sections and Articles, and, for the avoidance of doubt, the Confidentiality Agreement, shall survive any such termination; provided further that, subject to Section 8.3, no termination will relieve either Party from any Liability for damages (including damages based on the loss of the economic benefits of the Transactions, including the Purchase Price, to Seller), losses, costs, or expenses (including reasonable legal fees and expenses) resulting from any willful breach of this Agreement by such Party prior to any such termination or Fraud by such Party. For purposes of this Agreement, "willful breach" means with respect to any breaches or failures to perform any of the covenants or other agreements contained herein, a material breach that is a consequence of an act or failure to act undertaken by the breaching Person with actual knowledge (which shall not be deemed to include knowledge of facts that a Person acting reasonably should have, based on reasonable due inquiry) that such Person's act or failure to act would, or would reasonably be expected to, result in or constitute a material breach of this Agreement.

(b)    If this Agreement is terminated prior to the Closing, at any time following such termination, promptly following the written request of Seller, Purchaser shall, as soon as practicable, return, destroy or permanently erase (on all forms of physical and electronic media) all Acquired User Data transferred to Purchaser prior to the Closing in accordance with Section 6.6(a) or otherwise in connection with the KYC Procedures and permanently close and remove any account established with or with reference to any Acquired User Data, and, upon written request from Seller following any destruction or erasure of data, provide an officer's certificate certifying as to such destruction or erasure. Such destruction or erasure shall be in accordance with all Laws regarding data disposal, and the eradication and destruction technique used will be appropriate for the storage medium and format. Notwithstanding the foregoing, Purchaser shall have the right to retain a copy of the Acquired User Data to the extent required for legal, regulatory or compliance purposes, so long as such Acquired User Data is kept confidential

59

as required under this Agreement and the Confidentiality Agreement and is used for no other purpose.

8.3    _Reverse Termination Fee_. In the event that (a) the conditions set forth in Sections 7.1(b), 7.1(c), and 7.2 have been satisfied or duly waived and (b) (i) this Agreement is validly terminated in accordance with Section 8.1(b) or Section 8.1(c), (ii) Purchaser fails to consummate the Closing by the Outside Date or the Extended Outside Date, as applicable, as a result of the failure of the conditions set forth in Section 7.1(a), or (iii) this Agreement is terminated pursuant to Section 8.1(g) in connection with and following a Purchaser Development and not in connection with a Higher and Better Offer, then, in any such case, within three (3) Business Days following such valid termination the Deposit (including all received investment income, if any) shall be released to Seller (such release, which, for the avoidance of doubt, shall be equal to and shall not exceed $10,000,000 in the aggregate, the "Reverse Termination Fee").

8.4    _Further Effect of Termination_. Notwithstanding anything to the contrary in this Agreement, the Confidentiality Agreement or any other document or instrument delivered by either Party in connection with the Transactions, but subject in all respects to the other provisions of this Section 8.4:

(a)    Seller, on behalf of itself and the Seller Parties, acknowledges and agrees that any disbursement of the Deposit to Seller pursuant to Section 2.2(b), payment of any Seller Expenses to Seller pursuant to Section 6.21 or payment of the Reverse Termination Fee pursuant to Section 8.3 shall be deemed liquidated damages and shall be the sole and exclusive recourse of Seller and the Seller Parties against Purchaser and the Purchaser Group for any loss or damage suffered in connection with, relating to or arising out of this Agreement or the Transactions (including circumstances giving rise to any termination of this Agreement) and including losses or damages suffered as a result of any breach of this Agreement or any representation, warranty, covenant or agreement contained herein by Purchaser or the failure of the Transactions to be consummated (whether or not for intentional, unintentional or willful breach or otherwise), except in the event Seller is entitled to elect specific performance of Purchaser's obligations (including to consummate the Transactions) pursuant to Section 10.12.

(b)    In the event of a valid termination of this Agreement pursuant to Section 8.1, if Seller is entitled to receive the Deposit pursuant to Section 2.2, payment of any Seller Expenses pursuant to Section 6.21, or payment of the Reverse Termination Fee pursuant to Section 8.3, then, upon release of the Deposit to Seller in accordance with Section 2.2(b), payment of such Seller Expenses pursuant to Section 6.21 or payment of the Reverse Termination Fee pursuant to Section 8.3, as applicable, (i) Purchaser and the Purchaser Group shall not have any further liability or obligation relating to or arising out of this Agreement or the Transactions (including any liability or obligation for monetary damages) and (ii) neither Seller nor any of the Seller Parties will have any right of recovery, whether arising under contract Law, tort Law or any other theory of Law, against, and no personal liability shall attach to Purchaser or any other member of the Purchaser Group, whether by or through attempted piercing of the corporate, limited partnership or limited liability company veil, by the enforcement of any assessment or by any legal or equitable Action, by virtue of any statute, regulation or applicable Law, or otherwise.

US-DOCS\137411268.27

(c)      (i) The maximum aggregate liability of Purchaser and the Purchaser Group in connection with this Agreement and the Transactions shall be limited to the sum of (x) (1) solely where and to the extent the Deposit is forfeited by Purchaser in accordance with <u>Section 2.2(b)</u>, the Deposit or (2) without duplication of any forfeiture of the Deposit pursuant to <u>Section 2.2(b)</u> and solely where and to the extent the Reverse Termination Fee is payable in accordance with <u>Section 8.3</u>, the Reverse Termination Fee, <u>plus</u> (y)  solely where and to extent the Seller Expenses are payable in accordance with <u>Section 6.21</u>, the Seller Expenses; (ii) in no event shall Purchaser be obligated to pay any of the Deposit, the Seller Expenses or the Reverse Termination Fee on more than one occasion and (iii) under no circumstances will any of Seller or any of the Seller Parties seek, obtain or accept, monetary damages or losses of any kind (including damages for the loss of the benefit of the bargain, opportunity cost, loss of premium, time value of money or otherwise, or any consequential, special, expectancy, indirect or punitive damages or any losses or damages based on a multiple or multiplier) in connection with, relating to or arising out of the termination of this Agreement in excess of the sum of (A) (1) solely where and to the extent the Deposit is forfeited in accordance with <u>Section 2.2(b)</u>, the Deposit or (2) without duplication of any forfeiture of the Deposit pursuant to <u>Section 2.2(b)</u> and solely where and to the extent the Reverse Termination Fee is payable in accordance with <u>Section 8.3</u>, the Reverse Termination Fee, <u>plus</u> (B) solely where and to the extent the Seller Expenses are payable in accordance with <u>Section 6.21</u>, the Seller Expenses; <u>provided</u>, <u>however</u>, that the foregoing shall not been interpreted to limit in any way Seller's right to require specific performance of Purchaser's obligations (including to consummate the Transactions) pursuant to <u>Section 10.12</u> in the event this Agreement has not been terminated and to the extent such specific performance is available to Seller under <u>Section 10.12</u>.  Notwithstanding anything to the contrary herein or otherwise, in no event shall Seller be entitled to receive both (1) the forfeiture of the Deposit together with all received investment income, if any, pursuant to <u>Section 2.2(b)</u> and (2) the payment of the Reverse Termination Fee pursuant to <u>Section 8.3</u> (it being acknowledged that the payment of the Reverse Termination Fee pursuant to <u>Section 8.3</u> includes forfeiture of the Deposit together with all received investment income, if any).

(d)      Seller may seek both payment of monetary damages (including the Reverse Termination Fee, the Deposit or the Seller Expenses) in accordance with this Agreement, on the one hand, and specific performance of Purchaser's obligation to consummate the Closing pursuant to <u>Section 10.12</u>; provided that in no event shall Seller be entitled to receive both (1) payment of monetary damages (including the Reverse Termination Fee, the Deposit or the Seller Expenses) in accordance with this Agreement (and for the avoidance of doubt, subject to the other limitations thereon set forth in this <u>Section 8.4</u>) and (2) such specific performance pursuant to <u>Section 10.12</u>.

## ARTICLE IX

## TAXES

9.1      <u>Transfer Taxes</u>. Any sales, use, purchase, transfer, deed, stamp, documentary or other similar Taxes and recording charges (but excluding any such Taxes or charges that are based in whole or in part upon income, profits or gains) payable by reason of the sale of the Acquired Assets or the assumption of the Assumed Liabilities under this Agreement or the Transactions (the "<u>Transfer Taxes</u>") shall be borne and timely paid by Purchaser, and Purchaser shall timely file all Tax Returns related to any Transfer Taxes.

61

9.2    Cooperation. Purchaser and Seller shall reasonably cooperate, as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns and any Action, audit, litigation, or other proceeding with respect to Taxes. In furtherance thereof, Purchaser and Seller shall reasonably cooperate in good faith to determine and agree to the tax treatment to each of them and to the Users of the Transactions, provided that agreeing on consistent tax treatment shall not be a closing condition and neither Party shall have any liability under this Agreement if the Parties are unable to so agree.

9.3    Preparation of Tax Returns and Payment of Taxes.

(a)    Except as otherwise provided by Section 9.1, Seller shall prepare and timely file (i) all Tax Returns with respect to the Acquired Assets for any Tax period ending on or before the Closing Date and (ii) all Tax Returns of Seller (including, for the avoidance of doubt, for any Straddle Period, but not including, for the avoidance of doubt, information returns). With respect to any such Tax Return that reflects any Tax that is an Assumed Liability (not including, for the avoidance of doubt, any income Tax Return of Seller or Seller's Affiliates for any tax period and not including any information Tax Return), Seller shall use reasonable best efforts to (x) prepare such Tax Returns consistent with past practice, except as otherwise required by applicable Law, (y) provide Purchaser with a draft of such Tax Returns at least ten (10) days prior to the filing of any such Tax Return, and (z) incorporate any changes reasonably requested by Purchaser with respect to such Tax Returns prior to filing. Except to the extent any Tax reflected on a return required to be prepared and filed by Seller pursuant to this Section 9.3 constitutes an Assumed Liability, Seller shall be responsible for paying any Taxes reflected on any Tax Return that Seller is obligated to prepare and file under this Section 9.3(a). Notwithstanding anything herein to the contrary: (i) nothing in this Agreement shall give Purchaser or its Affiliates any rights with respect to or control over any income Tax Return of Seller or Seller's Affiliates for any tax period (any such Tax Return, a "Seller Income Tax Return"), and (ii) if any Governmental Body approaches (including by way of initiating any audit, investigation, or other proceeding) either Party with respect to the income Tax characterization of the Transactions (any such action, a "Transaction-Related Action"), then the Party in receipt of such notice shall reasonably promptly inform the other Party of such Transaction-Related Action.

(b)    Purchaser shall prepare and timely file all Tax Returns with respect to the Acquired Assets that are not addressed by Section 9.3(a) (including, for the avoidance of doubt, all Tax Returns with respect to the Acquired Assets for any taxable period beginning after the Closing Date). With respect to any such Tax Return for any Straddle Period that reflects any Tax that is an Excluded Liability (each, a "Relevant Tax Return"), Purchaser shall prepare such Relevant Tax Returns and shall provide Seller with a draft of such Relevant Tax Returns at least ten (10) days prior to the filing of any such Tax Return. Purchaser shall incorporate any changes reasonably requested by Seller with respect to such Tax Returns. Seller shall be responsible for paying any Taxes reflected on any Tax Return that Purchaser is obligated to prepare and file under this Section 9.3(b) to the extent such Taxes constitute Excluded Liabilities.

(c)    Purchaser shall not file any amendment to any previously filed Tax Return with respect to the Acquired Assets for any Pre-Closing Tax Period that would have the effect of increasing any Tax due for a Pre-Closing Tax Period or portion of a Straddle Period ending on the Closing Date, in each case, that is an Excluded Liability, unless Purchaser receives an opinion

from a nationally recognized accounting firm or law firm that there is no adequate "reporting position" with respect to any previously-asserted position with respect to Taxes. Upon such determination, Purchaser shall provide no less than forty-five (45) days' notice of such position before filing any such Tax Return. In the event Seller disagrees with such Tax position, and the dispute cannot be resolved between the Parties, such dispute shall be submitted to an independent national accounting firm or law firm for resolution, with the costs of such resolution to be evenly split by Purchaser and Seller. The determination of such independent national accounting firm or law firm shall be binding on both Parties and any Tax Return shall be filed consistently with such resolution.

(d)     For all purposes under this Agreement, in respect of any Straddle Period, the portion of Taxes that are allocable to the portion of the Straddle Period ending on the Closing Date will be: (i) in the case of any Taxes other than those described in clause (ii) below, deemed to include the amount that would be payable if the relevant Straddle Period ended on and included the Closing Date; and (ii) in the case of any property Taxes and other similar Taxes, deemed to include the amount of such Tax for the entire Straddle Period multiplied by a fraction the numerator of which is the number of days in the Straddle Period ending on and including the Closing Date and the denominator of which is the number of days in the entire Straddle Period.

(e)     Notwithstanding anything herein to the contrary, prior to the Closing, Seller and its Affiliates may contribute, assign or otherwise transfer the 3AC Loan to any third-party purchaser, trust or other entity.

## ARTICLE X

## MISCELLANEOUS

10.1     <u>Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers</u>. Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such Party prior to the Closing) of the Parties set forth in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought with respect thereto after the Closing. Each covenant and agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms, and if no term is specified, then for five (5) years following the Closing Date, and nothing in this <u>Section 10.1</u> will be deemed to limit any rights or remedies of any Person for breach of any such surviving covenant or agreement. Purchaser and Seller acknowledge and agree, on their own behalf and on behalf of the Purchaser Group or the Seller Parties, as the case may be, that the agreements contained in this <u>Section 10.1</u> (a) require performance after the Closing to the maximum extent permitted by applicable Law and will survive the Closing for five (5) years and (b) are an integral part of the Transactions and that, without the agreements set forth in this <u>Section 10.1</u>, neither of the Parties would enter into this Agreement.

US-DOCS\137411268.27

10.2  Expenses. Whether or not the Closing takes place, except as otherwise provided herein (including, for the avoidance of doubt, Section 8.2), all fees, costs and expenses (including fees, costs and expenses of Advisors) incurred in connection with the negotiation of this Agreement and the other agreements contemplated hereby, the performance of this Agreement and the other agreements contemplated hereby and the consummation of the transactions contemplated hereby and thereby will be paid by the Party incurring such fees, costs and expenses; it being acknowledged and agreed that all Transfer Taxes will be allocated pursuant to Section 9.1 and (c) all Cure Costs will be allocated pursuant to Section 5.4.

10.3  Notices. Except as otherwise expressly provided herein, all notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given (a) when personally delivered, (b) when transmitted by electronic mail, (c) the day following the day on which the same has been delivered prepaid to a reputable national overnight air courier service or (d) the third (3rd) Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case, to the respective Party at the number, electronic mail address or street address, as applicable, set forth below, or at such other number, electronic mail address or street address as such Party may specify by written notice to the other Party.

<div style="margin-left:2em">

Notices to Purchaser:

BAM Trading Services, Inc. d/b/a Binance.us
611 Cowper Street, Suite 400
Palo Alto, CA 94301
Attention:      Norman Reed, General Counsel
Email:          norman.reed@binance.us;
                legal@binance.us

with a copy to (which shall not constitute notice):

Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020
Attention:      Robert M. Katz
                Daniel Mun
                Adam J. Goldberg
                Andrew D. Sorkin
Email:          Robert.Katz@lw.com
                Daniel.Mun@lw.com
                Adam.Goldberg@lw.com
                Andrew.Sorkin@lw.com

</div>

Notices to Seller:

Voyager Digital, LLC
33 Irving Place, 3rd Floor
New York, NY 10003
Attention:     Stephen Ehrlich
               David Brosgol
Email:         sehrlich@investvoyager.com
               dbrosgol@investvoyager.com

with a copy to (which shall not constitute notice):

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attention:     Joshua A. Sussberg, P.C.
               Christine A. Okike, P.C.
               Christopher Marcus, P.C.
               Jonathan L. Davis, P.C.
               Steve Toth
               Eduardo M. Leal
               Allyson B. Smith
Email:         joshua.sussberg@kirkland.com
               christine.okike@kirkland.com
               cmarcus@kirkland.com
               jonathan.davis@kirkland.com
               steve.toth@kirkland.com
               eduardo.leal@kirkland.com
               allyson.smith@kirkland.com

10.4    <u>Binding Effect; Assignment</u>. This Agreement shall be binding upon Purchaser and, subject to the terms of the Bidding Procedures Order (with respect to the matters covered thereby) and the entry and terms of the Agreement Order, the Plan and the Confirmation Order, Seller, and shall inure to the benefit of and be so binding on the Parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Bankruptcy Case or any successor Chapter 7 case; <u>provided</u> that neither this Agreement nor any of the rights or obligations hereunder may be assigned or delegated without the prior written consent of Purchaser and Seller, and any attempted assignment or delegation without such prior written consent shall be null and void; <u>provided</u> <u>further</u> that Purchaser shall be entitled to assign or delegate this Agreement or all or any part of its rights or obligations hereunder to any of its Affiliates; <u>provided</u> <u>further</u> that in each case no such assignment or delegation shall relieve Purchaser of any of its obligations hereunder.

10.5    <u>Amendment and Waiver</u>. Any provision of this Agreement or the Schedules or exhibits hereto may be (a) amended only in a writing signed by Purchaser and Seller or (b) waived only in a writing executed by the Person against which enforcement of such waiver is sought. No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any

65

way any other provision or prior or subsequent breach or default. Except where a specific period for action or inaction is provided herein, no delay on the part of either Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

10.6    <u>Third Party Beneficiaries</u>. Except as otherwise expressly provided herein, nothing expressed or referred to in this Agreement is intended or will be construed to give any Person other than the Parties any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.

10.7    <u>Non-Recourse</u>. This Agreement may only be enforced against, and any Action based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement. Except to the extent named as a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present or future direct or indirect equityholder, shareholder, member, partner, manager, director, officer, employee, Affiliate, agent or Advisor of either Party will have any Liability (whether in contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or Liabilities of any of the parties to this Agreement or for any Action based upon, arising out of or related to this Agreement.

10.8    <u>Severability</u>. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable Law in any jurisdiction, such provision will be ineffective only to the extent of such prohibition or invalidity in such jurisdiction, without invalidating the remainder of such provision or the remaining provisions of this Agreement or in any other jurisdiction. To the extent permitted by applicable Law, each Party waives any provision of Law that renders any provision of this Agreement invalid or unenforceable in any respect.

10.9    <u>Construction</u>. The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Person. The table of contents and headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and will in no way restrict or otherwise modify any of the terms or provisions hereof.

10.10    <u>Schedules</u>. The Schedules have been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement; <u>however</u>, each section of the Schedules will be deemed to incorporate by reference all information disclosed in any other section of the Schedules, to the extent it is readily apparent on its face without the need for a cross-reference. Capitalized terms used in the Schedules and not otherwise defined therein have the meanings given to them in this Agreement. The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Schedules or the attached exhibits is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course, and neither Party will use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement, the Schedules or exhibits in any dispute or controversy between the Parties as to whether any obligation, item or matter not set forth or

66

included in this Agreement, the Schedules or exhibits is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course. In addition, matters reflected in the Schedules are not necessarily limited to matters required by this Agreement to be reflected in the Schedules. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. Any description of any agreement, document, instrument, plan, arrangement or other item set forth on any Schedule is a summary only and is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement, or item. The information contained in this Agreement, in the Schedules and exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by either Party to any third party of any matter whatsoever, including any violation of Law or breach of Contract.

10.11  <u>Complete Agreement</u>. This Agreement, together with the Confidentiality Agreement and any other agreements expressly referred to herein or therein, contains the entire agreement of the parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the Transactions and supersedes all prior agreements between the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the Transactions. In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts of this Agreement and the documents referenced herein will not be considered or analyzed for any purpose (including in support of parol evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions hereof or the intent of the Parties with respect hereto and will be deemed joint work product of the Parties.

10.12  <u>Specific Performance</u>. The Parties agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if either of the Parties fails to take any action required of it hereunder to consummate the Transactions. It is accordingly agreed that (a) the Parties will be entitled to an injunction or injunctions, specific performance or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in the courts described in <u>Section 10.13</u> without proof of damages or otherwise, this being in addition to any other remedy to which they are entitled under this Agreement, and (b) the right of specific performance and other equitable relief is an integral part of the Transactions and without that right, neither Seller nor Purchaser would have entered into this Agreement. The Parties acknowledge and agree that either Party pursuing an injunction or injunctions or other Order to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this <u>Section 10.12</u> will not be required to provide any bond or other security in connection with any such Order. Except as limited by <u>Section 8.4(d)</u>, (i) the remedies available to Seller pursuant to this <u>Section 10.12</u> will be in addition to any other remedy to which they were entitled at law or in equity, and (ii) the election to pursue an injunction or specific performance will not restrict, impair or otherwise limit Seller from seeking to collect or collecting damages. If, prior to the Outside Date or Extended Outside Date, if any, either Party brings any action, in each case in accordance with <u>Section 10.13</u>, to enforce specifically the performance of the terms and provisions hereof by any other Party, the Outside Date or Extended Outside Date, if any, will automatically be extended

67

(y) for the period during which such action is pending, plus ten (10) Business Days or (z) by such other time period established by the court presiding over such action, as the case may be.

10.13    Jurisdiction and Exclusive Venue. Each of the Parties irrevocably agrees that any Action that may be based upon, arising out of, or related to this Agreement or the negotiation, execution or performance of this Agreement and the Transactions brought by any other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) if the Bankruptcy Court is unwilling or unable to hear such Action, in the Delaware Chancery Court and any state court sitting in the State of Delaware to which an appeal from the Delaware Chancery Court may be validly taken (or, if the Delaware Chancery Court declines to accept jurisdiction over a particular matter, any state or federal court within the state of Delaware)) ((a) and (b), the "Chosen Courts"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any such Action arising out of or relating to this Agreement and the Transactions. Each of the Parties agrees not to commence any Action relating thereto except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any Order, decree or award rendered by any Chosen Court, and no Party will file a motion to dismiss any Action filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of *forum non-conveniens*. The Parties irrevocably agree that venue would be proper in any of the Chosen Courts, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of such Action. Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in Section 10.3. Nothing in this Agreement will affect the right of either Party to serve process in any other manner permitted by Law.

10.14    Governing Law; Waiver of Jury Trial.

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement, and any Action that may be based upon, arising out of or related to this Agreement or the negotiation, execution or performance of this Agreement or the Transactions will be governed by and construed in accordance with the internal Laws of the State of Delaware applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

(b)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT, THE DOCUMENTS AND AGREEMENTS CONTEMPLATED HEREBY AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY ACTION BASED ON, ARISING OUT OF OR RELATED TO THIS AGREEMENT, ANY DOCUMENT OR AGREEMENT CONTEMPLATED HEREBY OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY. EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH ACTION WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES TO THIS AGREEMENT MAY FILE

US-DOCS\137411268.27

AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

10.15   No Right of Set-Off. Purchaser, on its own behalf and on behalf the Purchaser Group and its and their respective successors and permitted assigns, hereby waives any rights of set-off, netting, offset, recoupment or similar rights that Purchaser, any member of the Purchaser Group or any of its or their respective successors and permitted assigns has or may have with respect to the payment of the Purchase Price or any other payments to be made by Purchaser pursuant to this Agreement or any other document or instrument delivered by Purchaser in connection herewith.

10.16   Counterparts and PDF. This Agreement and any other agreements referred to herein or therein, and any amendments hereto or thereto, may be executed in multiple counterparts, any one of which need not contain the signature of more than one party hereto or thereto, but all such counterparts taken together will constitute one and the same instrument. Any counterpart, to the extent signed and delivered by means of a .PDF or other electronic transmission, will be treated in all manner and respects as an original Contract and will be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. Minor variations in the form of the signature page to this Agreement or any agreement or instrument contemplated hereby, including footers from earlier versions of this Agreement or any such other document, will be disregarded in determining the effectiveness of such signature. At the request of any party or pursuant to any such Contract, each other party hereto or thereto will re-execute original forms thereof and deliver them to all other parties. No party hereto or to any such Contract will raise the use of a .PDF or other electronic transmission to deliver a signature or the fact that any signature or Contract was transmitted or communicated through the use of PDF or other electronic transmission as a defense to the formation of a Contract and each such party forever waives any such defense.

10.17   Publicity. The initial press release regarding this Agreement and the Transactions (the "Press Release") shall be made promptly following the execution and delivery of this Agreement and shall be in such form as the Parties mutually agree. Except as contemplated by the Commercial Covenants, and subject in all respects to Section 10.19, none of Seller and the Seller Parties shall issue any press release or public announcement (directly or indirectly) concerning this Agreement, the Transactions, the Acquired Assets, the Assumed Liabilities, the Purchaser Bid Process or any other matters related thereto or arising in connection therewith without obtaining the prior written approval of Purchaser (which approval will not be unreasonably withheld, conditioned or delayed) unless, (a) in the reasonable judgment of Seller after consultation with counsel (who may be in-house counsel), disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or the Plan or (b) to correct any misstatement of fact made by Purchaser in any communication pursuant to the immediate next sentence; provided that Seller shall use its

69

US-DOCS\137411268.27

reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with Purchaser with respect to the disclosure thereof. Following the publication of the Press Release, Purchaser shall be permitted to make one or more public statements or issue one or more press releases, in each case, regarding the Acquired Assets and the Assumed Liabilities, this Agreement, the Transactions and the Purchaser Bid Process or any other matter related thereto or arising therefrom or otherwise in connection therewith to the extent not in violation of the Confidentiality Agreement and not in disparagement of Seller or any Seller Party; provided that Purchaser shall use its reasonable best efforts (considered in light of the circumstances in which such disclosure is to be made) to consult in good faith with Seller prior to making any such disclosure.

10.18  Bulk Sales Laws. The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any Encumbrances in the Acquired Assets including any liens or claims arising out of the bulk transfer laws except Permitted Encumbrances, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Confirmation Order. In furtherance of the foregoing, to the extent permitted by applicable Laws, each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the Transactions.

10.19  Fiduciary Obligations. Nothing in this Agreement, or any document related to the Transactions, will require Seller or any of its managers, officers or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations; provided, however, that no such action or inaction shall be deemed to prevent Purchaser from exercising any termination rights it may have hereunder as a result of such action or inaction.

10.20  No Solicitation. This Agreement, the Plan and the transactions contemplated herein and therein are the product of negotiations between the Parties. Notwithstanding anything herein to the contrary, this Agreement is not, and shall not be deemed to be, (a) a solicitation of votes for the acceptance of the Plan or any other plan of reorganization for the purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise or (b) an offer for the issuance, purchase, sale, exchange, hypothecation, or other transfer of securities or a solicitation of an offer to purchase or otherwise acquire securities for purposes of the Securities Act or the Exchange Act and Seller will not solicit acceptances of the Plan from any party until such party has been provided with copies of a disclosure statement containing adequate information as required by section 1125 of the Bankruptcy Code.

10.21  Acknowledgment. Notwithstanding anything in this Agreement to the contrary (including Section 3.17, Section 3.18, Section 4.10, Section 4.11, Section 6.17 and Section 10.1), nothing herein shall relieve any Person from any Liability on account of Fraud.

70

# ARTICLE XI

## ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS

11.1    <u>Certain Definitions</u>.

(a)    "<u>3AC Loan</u>" means that certain Master Loan Agreement, dated March 4, 2022, by and between Three Arrows Capital, Ltd., as borrower, and Seller and HTC Trading, Inc., as lenders, and Seller in its capacity as administrative agent for the lenders.

(b)    "<u>Acquired Coins</u>" means, collectively, all Seller Held Coins (other than Withheld Coins) as of the Rebalancing Date and following the completion of the Rebalancing Exercise in accordance with this Agreement, and after taking into account gas or other transaction fees incurred and paid by Seller in connection with transferring such Coins to Purchaser in accordance with <u>Section 2.4(b)</u>.

(c)    "<u>Acquired Coins Value</u>" means, with respect to any Acquired Coin of any type, the VWAP of such Coin determined as of two Business Days prior to the Rebalancing Date.

(d)    "<u>Action</u>" means any action, claim (including a counterclaim, cross-claim, or defense), complaint, summons, suit, litigation, arbitration, third-party mediation, audit, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, hearing, inquiry, inquest, audit, examination, assessment, notice of violation, citation or investigation, of any kind whatsoever (civil, criminal, administrative, regulatory, investigative, appellate or otherwise), regardless of the legal theory under which such Liability or obligation may be sought to be imposed, whether sounding in contract or tort, or whether at law or in equity, or otherwise under any legal or equitable theory, commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Body.

(e)    "<u>Additional Bankruptcy Distributions</u>" means any distributions proposed to be made by the Debtors or any successor thereto to Users or Eligible Creditors after the Closing Date, whether made pursuant to the Plan (including distributions in cash or Coins) or otherwise.

(f)    "<u>Advisors</u>" means, with respect to any Person, any directors, officers, employees, investment bankers, financial advisors, accountants, agents, attorneys, consultants, or other representatives of such Person.

(g)    "<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

(h)    "<u>Alternative Transaction</u>" means any transaction (or series of transactions), whether direct or indirect, concerning a sale, merger, acquisition, issuance, financing, recapitalization, reorganization, liquidation or disposition of Seller or any of its Affiliates or any

US-DOCS\137411268.27

portion of the equity interests or any material portion of the assets thereof (in any form of transaction, whether by merger, sale of assets or equity or otherwise).

(i) "<u>Bidding Procedures Order</u>" means the *Order (I) Approving the Bidding Procedures, (II) Scheduling the Bid Deadlines and the Auction, (III) Approving the Form and Manner of Notice Thereof, (IV) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation and (V) Granting Related Relief* [Docket No. 248].

(j) "<u>Binance.US Platform</u>" means Purchaser's and its Affiliates' Binance.US Cryptocurrency savings and trading platform or any successor platform thereto.

(k) "<u>Business Accounts</u>" means any and all accounts or registries that Seller owns, maintains or controls with third party vendors, software providers, service providers and other similar third parties that is related to the businesses of Seller.

(l) "<u>Business Day</u>" means any day other than a Saturday, Sunday or other day on which banks in New York City, New York are authorized or required by Law to be closed.

(m) "<u>Business Software</u>" means any and all proprietary Software owned by (or purported to be owned by) Seller that is related to the businesses of Seller, other than the VGX Token Smart Contracts.

(n) "<u>Cash and Cash Equivalents</u>" means all of Seller's cash (including deposits in transit, demand deposits, money markets or similar accounts), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, security entitlements, securities accounts, commodity Contracts, commodity accounts, government securities, or any other cash equivalents, whether on hand, in transit, in banks or other financial institutions, or otherwise held.

(o) "<u>Code</u>" means the United States Internal Revenue Code of 1986.

(p) "<u>Coin</u>" means, with respect to any type of Cryptocurrency, one coin or token or full unit of such Cryptocurrency (*e.g.*, one (1) Bitcoin); <u>provided</u> that, notwithstanding anything to the contrary herein, for purposes of this Agreement, (i) references to "Coins" shall mean more than one Coin and may include fractional Coins in excess of one (1) Coin, and (ii) as the context requires, "Coin" may refer to a fraction of one (1) Coin.

(q) "<u>Commercial Covenants</u>" means, collectively, <u>Sections 6.6</u>, <u>6.10</u>, <u>6.11</u>, <u>6.12</u>, <u>6.13</u>, <u>6.14</u> and <u>6.15</u>.

(r) "<u>Confidential Information</u>" means any information relating to the business, financial or other affairs (including future plans and targets) of either Party or any of its Affiliates; <u>provided</u>, <u>however</u>, that "Confidential Information" will not include any information that (i) is or becomes (other than as a result of disclosure by either Party or any of its Affiliates in violation of this Agreement) generally available to, or known by, the public, (ii) is independently developed by a Party or any of its Affiliates without use of or reference to information that would be "Confidential Information" but for the exclusions set forth in this proviso or (iii) is received by a

US-DOCS\137411268.27

Party or any of its Affiliates from a third party not known by such receiving Party or any of its Affiliates after reasonable inquiry to be bound by a duty of confidentiality to such other Party or any of its Affiliates with respect to such information.

(s)     "<u>Confidentiality Agreement</u>" means that certain letter agreement, dated as of August 2, 2022, by and between Parent and BAM Management US Holdings, Inc.

(t)     "<u>Confirmation Order</u>" means an Order of the Bankruptcy Court reasonably acceptable to the Parties pursuant to section 1129 of the Bankruptcy Code, which Order shall, among other things and without limitation, (A) confirm the Plan in a form reasonably acceptable to, solely to the extent related to this Agreement and the Transactions (but not with respect to the matters contemplated by <u>Section 6.11(c)</u>), Purchaser and Seller, as may have been amended, supplemented or otherwise modified, solely to the extent related to this Agreement and the Transactions (but not with respect to the matters contemplated by <u>Section 6.11(c)</u>), with the consent of Purchaser (such consent not to be unreasonably withheld, delayed or conditioned), (B) approve, pursuant to sections 105, 363, 365, 1129, 1141 and 1142 of the Bankruptcy Code, (i) the execution, delivery and performance by Seller of this Agreement, (ii) the sale of the Acquired Assets to Purchaser on the terms set forth herein and free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances), and (iii) the performance by Seller of its obligations under this Agreement, (C) authorize and empower Seller to assume and assign to Purchaser the Assigned Contracts, (D) find that Purchaser is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code, find that Purchaser is not a successor to Seller, and grant Purchaser the protections of section 363(m) of the Bankruptcy Code, (E) find that Purchaser shall have no Liability or responsibility for any Liability or other obligation of Seller arising under or related to the Acquired Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor, or transferee Liability, labor law, de facto merger, or substantial continuity (including under applicable Money Transmitter Requirements or any securities or commodities Laws of any Governmental Body), (F) find that Purchaser has provided adequate assurance (as that term is used in section 365 of the Bankruptcy Code) of future performance in connection with the assumption of the Assigned Contracts, (G) find that Purchaser shall have no Liability for any Excluded Liability, and (H) find that Seller has title to, and the ability to sell, transfer and assign, Acquired Coins and Additional Bankruptcy Distributions, in each case, in accordance with the terms and conditions hereof.

(u)     "<u>Consent</u>" means any approval, consent, ratification, permission, waiver or authorization, or an Order of the Bankruptcy Court that deems or renders unnecessary the same.

(v)     "<u>Contract</u>" means any contract, indenture, note, bond, lease, sublease, mortgage, agreement, guarantee, or other agreement that is binding upon a Person or its property, in each case, other than a purchase order, service order, sales order or Money Transmitter License.

(w)     "<u>Credit Matter</u>" means any loan or other type of credit exposure or loan-like instrument.

US-DOCS\137411268.27

(x)     "<u>Cryptocurrency</u>" means a digital or crypto currency, asset, token or coin in which transactions are verified and records are maintained by a decentralized system using cryptography, rather than by a centralized authority.

(y)     "<u>Deposited Coins</u>" means, with respect to each User as of the Petition Date, the total number of Coins of each type owed to such User with respect to such User's deposits on the Voyager Platform as of the Petition Date, as set forth on the Seller Statement.

(z)     "<u>Deposited Coins Value</u>" means, with respect to any Deposited Coin of any type, the VWAP of such Coin determined as of the Petition Date.

(aa)    "<u>Disclosure Statement</u>" means the disclosure statement for the Plan approved by the Bankruptcy Court pursuant to the Plan Solicitation Order (including all exhibits and schedules thereto).

(bb)    "<u>Documents</u>" means all of Seller's written files, documents, instruments, papers, books, reports, records, accounts, accounting records, financial statements, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies, and documents, Tax Returns, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form.

(cc)    "<u>Encumbrance</u>" means any lien (as defined in section 101(37) of the Bankruptcy Code), encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), charge, mortgage, deed of trust, option, pledge, security interest or similar interests, title defects, hypothecations, easements, servitudes, restrictive covenants, rights of way, rights of use or possession, rights of first offer or first refusal, third party interest, encroachments, Orders, conditional sale or other title retention agreements and other similar impositions, imperfections or defects of title or restrictions on transfer or use.

(dd)    "<u>Environmental Laws</u>" means all applicable Laws concerning pollution or protection of the environment.

(ee)    "<u>Equipment</u>" means any and all equipment, computers, furniture, furnishings, fixtures, office supplies, vehicles and all other fixed assets.

(ff)    "<u>ERISA</u>" means the Employee Retirement Income Security Act of 1974.

(gg)    "<u>ETH Coins</u>" means Ether Coins, being the native Cryptocurrency of the Ethereum Network (symbol: ETH).

(hh)    "<u>Existing User</u>" means as of a particular date any User for which Seller has provided on or prior to such date all data and information reasonably necessary for Purchaser to

74

validate that such User or any Affiliate of such User has a Cryptocurrency account on the Binance.US Platform.

(ii) "Exchange Act" means the Exchange Act of 1934 and the rules and regulations promulgated thereunder.

(jj) "Final Order" means a judgment or Order of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Bankruptcy Case (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending; or (ii) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument, or rehearing shall have expired; provided that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

(kk) "Fraud" means an act committed by (a) Seller, in the making to Purchaser of the Express Seller Representations and (b) Purchaser, in the making to Seller of the Express Purchaser Representations, in any such case, with intent to (x) deceive the other Party or (y) induce such other party hereto to enter into this Agreement and requires (i) a false representation or warranty of material fact made in such representation; (ii) with knowledge that such representation or warranty is false; (iii) with an intention to induce the party to whom such representation or warranty is made to act or refrain from acting in reliance upon it; (iv) causing that party, in justifiable reliance upon such false representation or warranty, to take or refrain from taking action; and (v) causing such party to suffer damage by reason of such reliance, which together constitutes common law fraud under Delaware Law (and does not include any fraud claim based on constructive knowledge, negligent misrepresentation, recklessness or a similar theory).

(ll) "GDPR" means the EU General Data Protection Regulation (and any European Union member states' laws and regulations implementing it), and the EU General Data Protection Regulation as it forms part of the United Kingdom ("UK") law by virtue of section 3 of the European Union (Withdrawal) Act 2018 and any applicable implementing or supplementary legislation of the UK (including the UK Data Protection Act 2018).

(mm) "Governmental Authorization" means any permit, license, certificate, approval, consent, permission, clearance, designation, qualification or authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Law.

(nn) "<u>Governmental Body</u>" means any government, quasi-governmental entity, or other governmental or regulatory body, commission, agency or political subdivision thereof of any nature, whether foreign, federal, state or local, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court or arbitrator (public or private) of applicable jurisdiction.

(oo) "<u>Hazardous Substance</u>" means any toxic or hazardous material, substance or waste regulated under any Environmental Laws.

(pp) "<u>Higher and Better Offer</u>" means a bona fide, written Acquisition Proposal that did not result from Seller's breach of <u>Section 5.1(a)</u> for an Alternative Transaction on terms that the board of directors (or comparable governing body) of Seller determines in good faith, after consultation with its financial advisor and outside legal counsel, (i) constitutes a higher and otherwise better offer for the Debtors' assets and (ii) is reasonably likely to be consummated in accordance with its terms.

(qq) "<u>IFRS</u>" means the International Financial Reporting Standards.

(rr) "<u>Intellectual Property</u>" means all intellectual property rights in any jurisdiction throughout the world, including all: (i) patents and patent applications and patent disclosures (including any provisional applications, patents of addition, continuations, continuations-in-part, substitutions, additions, divisionals, confirmations, re-examinations, reissues, revisions and extensions); (ii) trademarks, service marks, trade dress, logos, brand names, corporate names, social media handles, Internet domain names and other indicia of origin, together with all goodwill associated with each of the foregoing; (iii) copyrights and mask works, whether or not registered; (iv) registrations and applications for any of the foregoing; (v) trade secrets; (vi) Software; (vii) drawings, schematics and other technical plans; (viii) rights in data, data collections and databases; (ix) all other intellectual property; and (x) all legal rights arising from items (i) through (ix), including the right to prosecute, enforce and perfect such interests and rights to sue, oppose, cancel, interfere, enjoin and collect damages based upon such interests.

(ss) "<u>IT Systems</u>" means all of the computer systems, servers, hardware, firmware, middleware, networks, workstations, routers, hubs, switches, circuits, servers, data communications lines and all other information technology equipment, and all associated documentation, in each case, only as necessary to use or operate the Voyager Platform.

(tt) "<u>Knowledge of Seller</u>" means the actual knowledge without independent verification (and which in no event encompasses constructive, imputed or similar concepts of knowledge) of Stephen Ehrlich, Gerard Hanashe, and Rakesh Gidwani, none of whom, for the sake of clarity and avoidance of doubt, shall have any personal liability or obligations regarding such knowledge.

(uu) "<u>Knowledge of Purchaser</u>" means the actual knowledge without independent verification (and which in no event encompasses constructive, imputed or similar concepts of knowledge) of Brian Shroder, Krishna Juvvadi and Abhishek Baid, none of whom, for the sake of clarity and avoidance of doubt, shall have any personal liability or obligations regarding such knowledge.

(vv)   "KYC Procedures" means the "know your customer" and "Customer Identification Program" policies, procedures and processes of Purchaser and its Affiliates as in effect from time to time and any equivalent procedures required under, or to comply with, applicable Law, in each case, including with respect to FCPA and any other applicable U.S. or foreign Law concerning anti-corruption, anti-bribery or anti-money laundering and consistent with the same applicable to other customers and users of Binance.US Platform.

(ww)   "Law" means any federal, state, provincial, local, municipal, foreign or international, multinational or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, ruling, directive, pronouncement, determination, decision, opinion or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body.

(xx)   "Liability" means, as to any Person, any debt, adverse claim, liability (including any liability that results from, relates to or arises out of tort or any other product liability claim), duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether known or unknown, perfected or unperfected, determined or determinable, disputed or undisputed, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed, at law or in equity or otherwise, including any claims or liability based on successor liability theories or otherwise under any theory of Law or equity, and including all costs and expenses related thereto.

(yy)   "Loan" means any loan made by Seller in the form of Cryptocurrency to counterparties in the cryptocurrency sector; provided that, the 3AC Loan shall not be deemed a Loan.

(zz)   "Loan Documents" means all agreements and documents relating to Loans and the 3AC Loan, including security agreements, pledge or collateral agreements, loan agreements, loan policies and manuals.

(aaa)   "Material Adverse Effect" means any matter, event, change, development, occurrence, circumstance, condition, occurrence or effect (each, an "Effect") that, individually or in the aggregate with all other Effects, (x) has had or would reasonably be expected to have a material adverse effect on the Acquired Assets and Assumed Liabilities, taken as whole or (y) has had or would reasonably be expected to have a material adverse effect on the ability of Seller to perform its obligations under this Agreement or any of the Seller Documents or to consummate the Transactions; provided that with respect to clause (x) none of the following shall constitute, or be taken into account in determining whether or not there has been, a Material Adverse Effect: (i) Effects in, arising from or relating to general business or economic conditions affecting the industry in which Seller and its Affiliates operate; (ii) Effects in, arising from or relating to national or international political or social conditions, including tariffs, riots, protests, the engagement by the United States or other country in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military, cyber or terrorist (whether or not state-sponsored) attack upon the United States or any

77

other country, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, asset, Equipment or personnel of the United States or of any other country; (iii) Effects in, arising from or relating to any fire, flood, hurricane, earthquake, tornado, windstorm, other calamity or act of God, global or national health concern, epidemic, pandemic (whether or not declared as such by any Governmental Body), viral outbreak (including "Coronavirus" or "COVID-19" or the worsening thereof) or any quarantine or trade restrictions related thereto or any other *force majeure*; (iv) Effects in, arising from or relating to financial, banking, securities or Cryptocurrency markets (including (A) any disruption of any of the foregoing markets, (B) any change in currency exchange rates, (C) any decline or rise in the price of any security, commodity, Contract, Cryptocurrency or index and (D) any increased cost, or decreased availability, of capital or pricing or terms related to any financing for the Transactions); (v) Effects in, arising from or relating to changes in, IFRS or the interpretation thereof; (vi) Effects in, arising from or relating to changes in, Laws or other binding directives or determinations issued or made by or agreements with or consents of any Governmental Body; (vii) Effects in, arising from or relating to (A) the taking of any action contemplated by this Agreement or at the written request of Purchaser or its Affiliates, (B) the failure to take any action if such action is expressly prohibited by this Agreement, (C) Purchaser's failure to consent to any of the actions restricted in Section 6.1, (D) the negotiation, announcement or pendency of this Agreement or the Transactions, the identity, nature or ownership of Purchaser or Purchaser's plans with respect to the Acquired Assets and Assumed Liabilities, including the impact thereof on the relationships, contractual or otherwise, of the business of Seller with employees, customers, lessors, suppliers, vendors or other commercial partners or litigation arising from or relating to this Agreement or the Transactions; (viii) any failure, in and of itself, to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items (whether or not shared with Purchaser or its Affiliates or Advisors) (but, for the avoidance of doubt, not the underlying causes of any such failure to the extent such underlying cause is not otherwise excluded from the definition of Material Adverse Effect); (ix) the Effect of any action taken by Purchaser or its Affiliates with respect to the Transactions or any breach by Purchaser of this Agreement or the matters set forth on Schedule 11.1(aaa); or (x)(A) the commencement or pendency of the Bankruptcy Case, (B) any objections in the Bankruptcy Court to (1) this Agreement or any of the Transactions or thereby, (2) the Agreement Order, the Confirmation Order, the Plan, or the reorganization of Seller, (3) the Bidding Procedures Order or (4) the assumption or rejection of any Assigned Contract, or (C) any Order of the Bankruptcy Court or any actions or omissions of Seller in compliance therewith; except in the case of clauses (i), (ii), (iii), (iv), (v) and (vi), to the extent such Effects have a materially disproportionate impact on the Acquired Assets and Assumed Liabilities, taken as a whole, as compared to other participants engaged in the business in which Seller operates.

(bbb) "Moelis" means Moelis & Company LLC, a Delaware limited liability company.

(ccc) "Money Transmitter License" means any consent, license, certificate, franchise, permission, variance, clearance, registration, qualification, authorization, waiver, exemption or other permit issued, granted, given or otherwise made available by or under the authority of any Governmental Body pursuant to state money transmission or similar Laws.

78

US-DOCS\137411268.27

(ddd)  "Money Transmitter Requirements" shall mean any and all Law or Contract with a Governmental Body relating or pertaining to the business of transmitting or remitting money, monetary value or virtual currency, electronic funds transfers, remittances, issuing or selling stored value, prepaid access or the like, issuing or selling payment instruments, the custody, transfer or exchange of money, monetary value or virtual currency, or any similar payment or money services, including those related to money, monetary value, or Cryptocurrency.

(eee)  "Net Owed Coins" means, with respect to each User and each type of such User's Post-Rebalancing Coins, a number of Coins of such type equal to the total number of such User's Post-Rebalancing Coins of such type. For the avoidance of doubt, except as the context may otherwise require, references to Net Owed Coins in this Agreement relating to payments to any User or credits thereof to any User shall be deemed to be the sum of all Net Owed Coins with respect to each type of Post-Rebalancing Coin of such User. Notwithstanding the foregoing, in the event that there is a Rebalancing Exercise Delta for any type of Coin, then (i) Purchaser shall convert any excess Acquired Coins of any type into USDC or United States Dollars at the then-prevailing rates (including applicable fees, spreads, costs and expenses) on the Binance.US Platform, and (ii) Purchaser shall distribute the amounts resulting from such conversions to User accounts with respect to Net Owed Coins where the aggregate number of Net Owed Coins exceeds the number of Acquired Coins, pro rata based on the then-prevailing prices (including applicable fees, spreads, costs and expenses) for all such Net Owed Coins on the Binance.US Platform owed to any such User.

(fff)  "Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body, whether preliminary, interim, temporary or final, including any order entered by the Bankruptcy Court in the Bankruptcy Case (including the Confirmation Order) or any other court.

(ggg)  "Ordinary Course" means the ordinary and usual course of operations of the business of Seller consistent with past practice and taking into account the contemplation, commencement and pendency of the Bankruptcy Case.

(hhh)  "Permitted Encumbrances" means (i) Encumbrances for utilities and Taxes not yet due and payable, being contested in good faith, or the nonpayment of which is permitted or required by the Bankruptcy Code, (ii) customary easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the Acquired Assets which do not, individually or in the aggregate, adversely affect the use, ownership or operation of the Acquired Assets, (iii) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens incurred in the Ordinary Course for amounts not yet due and payable, being contested in good faith, (iv) licenses granted on a non-exclusive basis, (v) such other Encumbrances or title exceptions which do not, individually or in the aggregate, materially affect the operation, value or condition of the Acquired Assets, (vi) any Encumbrances set forth on Schedule 11.1(hhh), or (viii) any Encumbrances that will be removed or released by operation of the Confirmation Order or the Plan.

(iii)  "Permitted Post-Closing Lien" means, with respect to the Acquired Assets (a) Encumbrances described in clause (ii) in the definition of "Permitted Encumbrances" and any non-monetary encumbrances not in fact released upon Closing pursuant to Confirmation Order or

Plan, as applicable; <u>provided</u> that with respect to all Encumbrances that are "Permitted Post-Closing Liens" pursuant to this clause (a), such Encumbrances do not materially detract from the use or value of the applicable property as it is currently being used, and (b) other Permitted Encumbrances described in clauses (i), (iii), (iv) and (v) in the definition of "Permitted Encumbrances" securing monetary obligations which, individually or in the aggregate with all other Permitted Encumbrances treated as Permitted Post-Closing Liens pursuant to this clause (b), do not exceed $10,000.

(jjj)　"Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, organization, estate, Governmental Body or other entity or group.

(kkk)　"Personal Information" means information, in any form, that identifies, relates to, describes, could be used to locate or contact, is capable of being associated with, or could be linked, directly or indirectly, to, a natural Person, device or household, or is otherwise considered "personally identifiable information," "personal information," "personal data," "nonpublic personal information," or any similar term by any applicable Laws or Privacy Law.

(lll)　"Plan" means a plan of reorganization prepared by Seller and solely to the extent related to this Agreement (but not with respect to the matters contemplated by Section 6.11(c)) and the Transactions, approved by Purchaser in its reasonable discretion, and attached as an Exhibit to this Agreement by amendment hereto as promptly as practicable, implementing the Transactions.

(mmm)"Plan Solicitation Motion" means Seller's motion for an Order (which solely with respect to matters relating to this Agreement and the Transactions, shall be in form and substance reasonably acceptable to Purchaser), (i) approving the Disclosure Statement (including approving the Disclosure Statement as containing "adequate information" (as that term is used by section 1125 of the Bankruptcy Code)), (ii) establishing a voting record date for the Plan, (iii) approving solicitation packages and procedures for the distribution thereof, (iv) approving the forms of ballots, (v) establishing procedures for voting on the Plan, (vi) establishing notice and objection procedures for the confirmation of the Plan and (vii) establishing procedures for the assumption or assignment of executory contracts and unexpired leases under the Plan.

(nnn)　"Plan Solicitation Order" means an Order entered by the Bankruptcy Court, substantially in the form attached to the Plan Solicitation Motion, which Order shall, among other things, (A) be in form and substance reasonably acceptable to Purchaser (solely with respect to matters relating to this Agreement and the Transaction), and (B) approve the relief sought in the Plan Solicitation Motion, including approving of (i) the Disclosure Statement on a conditional basis and (ii) the procedures for solicitation of votes to accept or reject the Plan.

(ooo)　"Plan Supplement" has the meaning set forth in the Plan.

(ppp)　"Post-Petition Coins" means Coins that were deposited with the Debtors following the Petition Date.

(qqq)　"Post-Rebalancing Coins" means, with respect to each User as of the Rebalancing Date and each type of such User's Deposited Coins, (i) the total number of such

80

User's Deposited Coins of such type, <u>multiplied</u> by (ii) the Rebalancing Ratio, as set forth on the Seller Statement.

(rrr)    "<u>Pre-Closing Tax Period</u>" means any taxable period ending on or before the Closing Date and the portion of any Straddle Period ending on the Closing Date.

(sss)    "<u>Privacy Laws</u>" means all applicable Laws and legally binding self-regulatory guidelines or standards, in each case as amended, consolidated, re-enacted or replaced from time to time, relating to the privacy, security, or Processing of Personal Information, data breach notification, website and mobile application privacy policies and practices, Processing and security of payment card information, and email, text message, or telephone communications, including (to the extent applicable to the business of Seller): the Federal Trade Commission Act; the Gramm-Leach-Bliley Act; the Telephone Consumer Protection Act; the Telemarketing and Consumer Fraud and Abuse Prevention Act; the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003; the California Consumer Privacy Act; the Computer Fraud and Abuse Act; the Payment Card Industry Data Security Standards; the GDPR; and the EU e-Privacy Directive 2002/58/EC as amended by Directive 2009/136/EC (and any European Union member states' laws and regulations implementing it).

(ttt)    "<u>Process</u>", "<u>Processed</u>" or "<u>Processing</u>" means any operation or set of operations which is performed on Personal Information, such as the use, collection, processing, storage, recording, organization, adaption, alteration, transfer, retrieval, consultation, disclosure, dissemination or combination of such Personal Information, or is otherwise considering "processing" by any applicable Privacy Laws.

(uuu)    "<u>Purchaser Development</u>" means any of the following, first occurring after the date hereof and prior to the Closing:  (i) the filing of a criminal complaint against, or indictment of, Purchaser or any of its executive officers or "C-suite" officers (including any chief risk officer or chief compliance officer) by the United States Department of Justice, (ii) the filing of a criminal complaint against, or indictment of, any of Purchaser's Affiliates or any of their executive officers or "C-suite" officers (including any chief risk officer or chief compliance officer) by the United States Department of Justice or (iii) the commencement of any criminal or regulatory (including at the appellate level) suit, litigation, legal proceeding or prosecution by the United States Department of Justice against any of the Persons described in clauses (i) and (ii), (A) in each case of clauses (i), (ii) and (iii) that relate to the operation of the Binance.US platform and wallet custody business of Purchaser and its Subsidiaries or the business of such Affiliate or the ability of such Affiliate to provide Purchaser and its Subsidiaries with the licensed software and support services necessary to operate the Binance.US Platform; and (B) in each case of clauses (ii) and (iii), that, individually or in the aggregate, would reasonably be expected to (1) prevent or materially impair or materially delay the ability of Purchaser to consummate the Transactions in accordance herewith or (2) materially and adversely affect the Users, Eligible Creditors or the Acquired Coins, in each case in a manner that would prevent Purchaser from performing its obligations under <u>Section 6.12</u> or otherwise following the Closing.

(vvv)    "<u>Purchaser Group</u>" means Purchaser, any former, current or future Affiliate of Purchaser and each of their respective former, current or future Affiliates, officers, directors, employees, partners, members, managers, agents, Advisors, successors or permitted assigns.

US-DOCS\137411268.27

(www) "<u>Rebalancing Exercise Delta</u>" means, with respect to any Acquired Coin, the percentage by which the number of Acquired Coins is higher or lower than the number of Acquired Coins which would be required to cause the number of Acquired Coins to be in full compliance with the Rebalancing Ratio.

(xxx) "<u>Rebalancing Ratio</u>" means, with respect to any type of Acquired Coin, a fraction, expressed as a percentage, (i) the numerator of which is the Total Acquired Coins Value, and (ii) the denominator of which is the Total Deposited Coins Value; <u>provided</u> that in no event will the Rebalancing Ratio be greater than 100% and for the avoidance of doubt, the Rebalancing Ratio shall be calculated following the completion of the Rebalancing Exercise and after taking into account gas or other transaction fees incurred and paid by Seller in connection with transferring Coins to Purchaser in accordance with <u>Section 2.4(b)</u>.

(yyy) "<u>Retained Avoidance Action</u>" means any preference or avoidance claim, right or cause of action under Chapter 5 of the Bankruptcy Code or any analogous state law claim against (i) Three Arrows Capital, Ltd. or any of its Affiliates, (ii) any insider as defined in the Bankruptcy Code, (iii) any other such claim, right or cause of action that Purchaser agrees in writing prior to the Closing may be retained by the Debtors, (iv) any person for an actual fraudulent transfer, and (v) West Realm Shires Inc., Alameda Ventures Ltd., or any of their Affiliates.

(zzz) "<u>Sanctioned Person</u>" means any Person that is the target of Sanctions, including (a) any Person listed in any Sanctions-related list of designated Persons maintained by the OFAC or the U.S. Department of State, the United Nations Security Council, the European Union, any Member State of the European Union, or the United Kingdom (irrespective of its status vis-à-vis the European Union); (b) any Person operating, organized, or resident in a country or territory that is itself the target of comprehensive Sanctions (as of the date of this Agreement, Cuba, Iran, North Korea, Syria, the Crimea region of Ukraine, the so-called Donetsk People's Republic, and the so-called Luhansk People's Republic) ("<u>Sanctioned Country</u>"); (c) the government of a Sanctioned Country or the Government of Venezuela; or (d) any Person 50% or more owned or controlled by any such Person or Persons or acting for or on behalf of such Person or Persons.

(aaaa) "<u>Securities Act</u>" means the Securities Act of 1933 and the rules and regulations promulgated thereunder.

(bbbb) "<u>Security Incident</u>" means any actual or suspected unauthorized access to, or acquisition, modification, use, destruction, loss or disclosure of any Personal Information maintained by or on behalf of Seller or its Affiliates.

(cccc) "<u>Seller Expense Cap</u>" means an amount equal to either (a) if Purchaser elects to extend the Outside Date to the Extended Outside Date pursuant to <u>Section 8.1(c)</u>, $15,000,000 or (b) if Purchaser does not so elect to extend the Outside Date, $10,000,000.

(dddd) "<u>Seller Expense Start Date</u>" means the date that is three months following the date of this Agreement.

(eeee) "<u>Seller Held Coins</u>" means, without duplication, as of any date of determination, all Coins that are directly or indirectly owned or held by, or attributable to, Seller

or any of its Affiliates who are Debtors (including, for the avoidance of doubt, all Coins repaid to Seller or any of its Affiliates who are Debtors at or prior to the Closing in respect of Loans (including in respect of any principal, interest, fees, expenses and penalties thereunder and including for this purpose, the 3AC Loan), including all Coins held by or on behalf of Seller or any of its Affiliates who are Debtors in respect of User accounts on the Voyager Platform), except for any Coins constituting collateral under the 3AC Loan and except any Post-Petition Coins, which for the avoidance of doubt, shall not be included in the Rebalancing Exercise or any other Transactions.

(ffff) "Seller Intellectual Property" means all Intellectual Property owned or purported to be owned by Seller that is an Acquired Asset.

(gggg) "Seller Parties" means Seller, its former, current, or future Affiliates and the former, current or future officers, directors, employees, partners, members, equityholders, controlling or controlled Persons, managers, agents, Advisors, successors or permitted assigns of the foregoing.

(hhhh) "Seller Plan" means each (i) employee welfare benefit plan within the meaning of Section 3(1) of ERISA (whether or not subject to ERISA), (ii) employee pension benefit plan within the meaning of Section 3(2) of ERISA (whether or not subject to ERISA), (iii) stock option, stock purchase, stock appreciation right or other equity or equity-based agreement, program or plan, (iv) employment, individual consulting, severance or retention agreement or (v) bonus, incentive, deferred compensation, profit-sharing, retirement, post-termination health or welfare, vacation, severance or termination pay, fringe or any other compensation or benefit plan, program, policy, Contract, agreement or other arrangement, in each case that is sponsored, maintained or contributed to by Seller or Holdings or to which Seller or Holdings is obligated to contribute or with respect to which Seller or Holdings has any Liability.

(iiii) "Software" means any and all computer programs and other software in any form or format, including firmware, middleware, software implementations of algorithms, models and methodologies, whether in source code, object code or other form, including libraries, frameworks, software development kits (SDKs), application programming interfaces (APIs), subroutines, toolsets, procedures, and other components thereof.

(jjjj) "Straddle Period" means any taxable period that includes but does not end on the Closing Date.

(kkkk) "Subsidiary" or "Subsidiaries" means, with respect to any Person, any corporation of which a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person or a combination thereof or any partnership, association or other business entity of which a majority of the partnership or other similar ownership interest is at the time owned or controlled, directly or indirectly, by such Person or one or more Subsidiaries of such Person or a combination thereof.

US-DOCS\137411268.27

(llll)  "Subject Transaction" means (a) a transaction or series of transactions with respect to the Rebalancing Exercise that involves a series of transactions or other actions that are (or are to be) executed with a Person or group of coordinated Persons that are intended to effectuate the Rebalancing Exercise or (b) the planning or negotiation of such transaction or series of transactions, or consulting with respect thereto and, for the avoidance of doubt, does not include individual trades of Coins by Seller that are not intended to effectuate the Rebalancing Exercise or that are components of Subject Transactions that are the subject of a Transaction Notice or any such transactions with respect to Coins that do not trade on the Binance.US Platform as of the date of the proposed Subject Transaction.

(mmmm)    "Tax" or "Taxes" means any federal, state, local, foreign or other taxes, charges, fees or other assessments, including income, gross receipts, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, escheat and unclaimed property, ad valorem, personal property, stamp, excise, occupation, sales, use, transfer, value added, import, export, alternative or add-on minimum or estimated tax, charge or assessment of any kind in the nature of (or similar to) taxes, including any interest, penalty or addition thereto, whether disputed or not.

(nnnn) "Tax Return" means any return, claim for refund, report, statement or information return relating to Taxes filed or required to be filed with a Governmental Body, including any schedule or attachment thereto, and including any amendments thereof.

(oooo) "Total Acquired Coins Value" means the aggregate Acquired Coins Value with respect to all Acquired Coins of each type (excluding Withheld Coins).

(pppp) "Total Deposited Coins Value" means the aggregate Deposited Coins Value with respect to all Deposited Coins of each type.

(qqqq) "Transactions" means the transactions contemplated by this Agreement or the Plan, as applicable.

(rrrr)  "Unsupported Coin" means any Coin, for which Purchaser or its Affiliates does not provide trading services on the Binance.US Platform.

(ssss)  "User" means any Person located and having a home address in the United States that had a Cryptocurrency account on the Voyager Platform as of the Petition Date; provided that, if a Person has multiple Cryptocurrency accounts on the Voyager Platform, such Person shall constitute a single User and all accounts of such User shall be aggregated for purposes of this Agreement.

(tttt)   "User Migration Preparation" means, collectively, (i) the completion of the transfer of all Acquired User Data (including, for the avoidance of doubt, any "know your customer" information of the Users) and integration thereof on Purchaser's and its Affiliates' information technology systems and the Binance.US Platform, and (ii) the completion of the other items identified in the Integration Plan as being required for accounts to be opened for Users on the Binance.US Platform.

(uuuu) "<u>User Asset Migration Date</u>" means the date that is four (4) weeks following the date of completion of the User Migration Preparation; <u>provided</u> that the completion of the User Migration Preparation shall not occur prior to the Closing Date.

(vvvv) "<u>VGX Token Smart Contracts</u>" means any "smart contracts" related to the VGX token, together with any private keys related solely to such "smart contracts."

(wwww)    "<u>Voyager Platform</u>" means Seller's proprietary Cryptocurrency savings and trading platform (including any website or desktop or mobile application with respect thereto).

(xxxx) "<u>VWAP</u>" means, with respect to any type of Coin and as of any date of determination, an amount equal to the volume weighted average price in U.S. dollars for such type of Coin for the consecutive 24-hour period immediately prior to 8:00 a.m. New York Time on such date of determination, as reported on https://coinmarketcap.com.

11.2    <u>Index of Defined Terms</u>.

Acquired Assets ...........................................1
Acquired Information .................................2
Acquired User Data .....................................2
Acquired Voyager Claims ...........................2
Acquisition Proposal..................................26
Agreement.....................................................1
Agreement Order .......................................25
Amended Disclosure Statement................27
Anti-Money Laundering Laws .................17
Assigned Contracts ......................................3
Assignment and Assumption
    Agreement.............................................10
Assumed Liabilities .....................................5
Authentication Credentials ........................14
Balance Sheet Date ....................................13
Bankruptcy Case ..........................................1
Bankruptcy Code .........................................1
Bankruptcy Court.........................................1
Cash Payment ...............................................8
Chosen Courts............................................68
Closing ..........................................................9
Closing Date ...............................................10
Closing Date Payment .................................8
Covered Matters.........................................29
Credited Additional Bankruptcy
    Distributions .........................................49
CSA...............................................................11
Cure Costs .....................................................5
Dataroom ....................................................21

Debtors..........................................................1
Deposit ..........................................................9
DPA ..............................................................18
Eligible Creditor ........................................42
Enforceability Exceptions.........................12
Environmental Permits ..............................18
Escrow Account...........................................9
Escrow Agent................................................9
Excluded Assets............................................3
Excluded Contracts ......................................3
Excluded Documents ...................................3
Excluded Liabilities .....................................6
Express Purchaser Representations ..........24
Express Seller Representations.................21
Extended Outside Date ..............................57
FCPA ............................................................17
Filed CSA Documents ...............................11
Financial Statements ..................................13
Fundamental Representations....................56
Higher Offer Determination Notice..........27
Holdings.........................................................1
Indebtedness ...............................................30
Information Presentation ...........................21
Integration Plan...........................................41
Leased Real Property .................................15
Liquidation..................................................54
Material Contract ........................................15
OFAC............................................................17
Outside Date ...............................................57

Parent ..........................................................1
Parties ........................................................1
Party ..........................................................1
Paul Hastings ...........................................29
Petition Date .............................................1
Petitions .....................................................1
Post-Bankruptcy Statement .......................49
Pre-Closing Data Transfer ........................38
Press Release ............................................69
Privacy Requirements................................19
Projections ................................................51
Purchase Price ...........................................8
Purchaser....................................................1
Purchaser Bid Process..............................55
Purchaser Default Termination...................9
Purchaser Expenses ..................................54
Rebalancing Date......................................43
Rebalancing Exercise................................43
Relevant Tax Return .................................62
Reverse Termination Fee ..........................60
Sanctions...................................................17
Seller ..........................................................1
Seller Contractors ....................................34
Seller Documents ......................................12
Seller Employees ......................................34
Seller Expenses .........................................53
Seller Income Tax Return.........................62
Seller Marks..............................................39
Seller Registered IP .................................18
Seller Statement .......................................44
Solvent ......................................................24
Staked Coins .............................................14
Successor Liabilities .................................29
Trademark and Domain Name
    Assignment Agreement...........................10
Transaction Notice....................................43
Transaction Offer Notice ..........................43
Transaction-Related Action ......................62
Transfer Taxes ..........................................61
Unsupported Jurisdiction ..........................45
Unsupported Jurisdiction Approvals .........22
Voyager User Accounts..............................2
WARN Act ................................................35
Withheld Coins ...........................................9

86

11.3 <u>Rules of Interpretation</u>. Unless otherwise expressly provided in this Agreement, the following will apply to this Agreement, the Schedules and any other certificate, instrument, agreement or other document contemplated hereby or delivered hereunder.

(a) Accounting terms which are used but not otherwise defined in this Agreement have the respective meanings given to them under IFRS as in effect on the date hereof or for the period with respect to which such principles are applied, consistently applied. To the extent that the definition of an accounting term defined in this Agreement is inconsistent with the meaning of such term under IFRS, the definition set forth in this Agreement will control.

(b) The terms "hereof," "herein" and "hereunder" and terms of similar import are references to this Agreement as a whole and not to any particular provision of this Agreement. Section, clause, schedule and exhibit references contained in this Agreement are references to sections, clauses, schedules and exhibits in or to this Agreement, unless otherwise specified. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(c) Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." Where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or."

(d) The words "to the extent" shall mean "the degree by which" and not "if."

(e) When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day.

(f) Words denoting any gender will include all genders, including the neutral gender. Where a word is defined herein, references to the singular will include references to the plural and vice versa.

(g) The word "will" will be construed to have the same meaning and effect as the word "shall". The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive.

(h) All references to "$" and dollars will be deemed to refer to United States currency unless otherwise specifically provided.

(i) All references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(j) Any document or item will be deemed "delivered," "provided" or "made available" by Seller, within the meaning of this Agreement, if such document or item is included in the Dataroom at least one (1) Business Day prior to the date hereof.

(k) Any reference to any agreement or Contract will be a reference to such agreement or Contract, as amended, modified, supplemented or waived.

(l)     Any reference to any particular Code section or any Law will be interpreted to include any amendment to, revision of or successor to that section or Law regardless of how it is numbered or classified; underline provided that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance, with any Code section or Law, the reference to such Code section or Law means such Code section or Law as in effect at the time of such violation or non-compliance or alleged violation or non-compliance.

(m)     A reference to any party to this Agreement or any other agreement or document shall include such party's successors and permitted assigns.

*(Signature pages follow.)*

88

A-139

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**BAM TRADING SERVICES INC. D/B/A BINANCE.US**

By: *Brian Shroder*
ACA2F0AF79BC412...
Name: Brian Shroder
Title: Chief Executive Officer

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**VOYAGER DIGITAL, LLC**

By: _Stephen Ehrlich_
Name: Stephen Ehrlich
Title:   Chief Executive Officer

# EXHIBIT A

**FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

(See attached.)

US-DOCS\137411268.27

## BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT

This BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") is made and entered into as of [●], by and between BAM Trading Services Inc. d/b/a Binance.us, a Delaware corporation ("Purchaser") and Voyager Digital, LLC, a Delaware limited liability company ("Seller").

WHEREAS, Seller and Purchaser have entered into that certain Asset Purchase Agreement, dated as of December 18, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Purchase Agreement"), providing for, among other things, the sale and assignment by Seller to Purchaser of the Acquired Assets and the assumption by Purchaser of the Assumed Liabilities;

WHEREAS, Seller desires to sell, transfer, assign, convey and deliver to Purchaser, and Purchaser shall purchase, acquire and accept from Seller, all of Seller's right, title and interest in and to, as of the Closing, the Acquired Assets, pursuant to the terms of, and in consummation of the transactions contemplated by, the Purchase Agreement;

WHEREAS, the execution and delivery of this Agreement is required by Sections 2.4(a) and 2.5(b) of the Purchase Agreement; and

WHEREAS, this Agreement, as duly executed by Seller and Purchaser, is being delivered as of the date hereof by each party hereto to the other party effective as of the Closing.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements set forth herein, and intending to be legally bound hereby, Seller and the Purchaser hereby agree as follows:

1.      Definitions.  Capitalized terms used but not defined herein shall have the respective meanings given to such terms in the Purchase Agreement.

2.      Transfer of Acquired Assets.  Subject to the terms and conditions of the Purchase Agreement and the Agreement Order, the Plan and the Confirmation Order, Seller does hereby sell, transfer, assign, convey and deliver to Purchaser, and Purchaser does hereby purchase, acquire and accept from Seller, all of Seller's right, title and interest in and to, as of the Closing, the Acquired Assets, free and clear of all Encumbrances (other than Permitted Encumbrances).

3.      Assignment and Assumption.  Subject to the terms and conditions of the Purchase Agreement and the Agreement Order, the Plan and the Confirmation Order, Purchaser does hereby irrevocably assume from Seller, and Seller shall irrevocably transfer, assign, convey, and deliver to Purchaser, and Purchaser does hereby take assignment of, all of Seller's right, title and interest in and to, as of the Closing, the Assigned Contracts free and clear of all Encumbrances (other than Permitted Encumbrances). Subject to the terms and conditions of the Purchase Agreement and the Agreement Order, the Plan and the Confirmation Order, Purchaser does hereby assume the Assumed Liabilities.

4.      Excluded Assets.  Notwithstanding anything to the contrary in this Agreement or in the Purchase Agreement, Seller shall not and does not hereby sell, transfer, assign, convey or

deliver to Purchaser, and Seller shall retain all right, title and interest to, and Purchaser shall not and does not hereby purchase, acquire or accept, or take assignment of, any of the Excluded Assets.

5.    <u>Excluded Liabilities</u>.  Notwithstanding anything to the contrary in this Agreement or in the Purchase Agreement, Purchaser shall not assume, be deemed to have assumed or be obligated to pay, perform or otherwise discharge or otherwise be liable in respect of or be responsible for, and hereby disclaims, any of the Excluded Liabilities.

6.    <u>Terms of the Purchase Agreement</u>.  This Agreement is executed and delivered pursuant to the Purchase Agreement.  In the event of a conflict between the terms and conditions of this Agreement and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede and prevail in all respects to the extent of such conflict.  Notwithstanding anything to the contrary in this Agreement, nothing herein is intended to, nor shall this Agreement be construed to, extend, amplify, modify, limit or otherwise alter in any way the terms and conditions of the Purchase Agreement (including, without limitation, any representation, warranty, covenant or obligation contained in the Purchase Agreement).

7.    <u>Governing Law</u>.  Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement, and any Action that may be based upon, arising out of or related to this Agreement or the negotiation, execution or performance of this Agreement or the transactions contemplated hereby will be governed by and construed in accordance with the internal Laws of the State of Delaware applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

8.    <u>Successors and Assigns</u>. This Agreement shall be binding upon Purchaser and, subject to the terms of the Bidding Procedures Order (with respect to the matters covered thereby) and the entry and terms of the Agreement Order, the Plan and the Confirmation Order, Seller, and shall inure to the benefit of and be so binding on the parties hereto and their respective successors and permitted assigns under the Purchase Agreement.

9.    <u>Counterparts</u>.  For the convenience of the parties hereto, this Agreement may be executed and delivered (by facsimile or PDF signature) in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

10.    <u>Additional Provisions</u>. The provisions contained in Sections 6.8 (*Further Assurances*), 10.5 (*Amendment and Waiver*), 10.6 (*Third Party Beneficiaries*), 10.8 (*Severability*), 10.9 (*Construction*), 10.13 (*Jurisdiction and Exclusive Venue*) and 10.14(b) (*Waiver of Jury Trial*) of the Purchase Agreement are hereby incorporated by reference into this Agreement, *mutatis mutandis*, and made a part of this Agreement as if set forth fully herein.

<p align="center">[<em>The remainder of this page is intentionally left blank.</em>]</p>

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

<u>**SELLER:**</u>

**VOYAGER DIGITAL, LLC**

_____

Name:
Title:

**PURCHASER:**

**BAM TRADING SERVICES INC. D/B/A
BINANCE.US**


By:_____
Name:
Title:

## EXHIBIT B

## FORM OF TRADEMARK AND DOMAIN NAME ASSIGNMENT AGREEMENT

(See attached.)

# TRADEMARK AND DOMAIN NAME ASSIGNMENT

This TRADEMARK AND DOMAIN NAME ASSIGNMENT (this "Assignment"), effective as of [●] (the "Effective Date"), is made by Voyager Digital, LLC, a Delaware limited liability company ("Voyager Digital") and Voyager IP, LLC (f/k/a CryptoTrading IP LLC), a Delaware limited liability company ("Voyager IP," each of Voyager Digital and Voyager IP individually, an "Assignor," and together, the "Assignors"), to BAM Trading Services Inc. d/b/a Binance.us, a Delaware corporation ("Assignee"). Assignors and Assignee are each referred to individually as a "Party" and together as the "Parties."

**WHEREAS**, Voyager Digital and Assignee have executed an Asset Purchase Agreement, effective as of December 18, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Purchase Agreement"), pursuant to which Voyager Digital has agreed to sell, transfer, assign and convey and to cause Voyager IP to sell, transfer, assign and convey to Assignee, and Assignee has agreed to purchase, acquire and accept from Assignors, all of such Assignor's right, title and interest in and to certain intellectual property assets to Assignee;

**WHEREAS**, the assets assigned pursuant to the Purchase Agreement include the intellectual property listed in Exhibit A attached hereto (the "Assigned IP");

**WHEREAS**, Assignee is a successor to that part of Assignors' business to which the Assigned IP pertain, and that business is ongoing and existing; and

**WHEREAS**, pursuant to the Purchase Agreement, Voyager Digital has agreed to execute this Assignment and to cause Voyager IP to execute this Assignment in order to effectuate, evidence and record such Assignor's assignment of the Assigned IP to Assignee in the United States Patent and Trademark Office and corresponding offices in other applicable jurisdictions.

**NOW, THEREFORE**, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties do hereby agree as follows:

**SECTION 1.** Assignment. Assignors hereby irrevocably conveys, assigns, transfers and delivers to Assignee and its successors and assigns, free and clear of all liens, all of such Assignor's right, title and interest in and to the Assigned IP, including all rights of priority and goodwill associated with any of the foregoing and any and all common law rights in and to any of the foregoing, all rights in and to any of the foregoing provided by applicable law of any jurisdiction, by international treaties or conventions, all rights, interests, and claims of such Assignor or any of its affiliates, all rights to collect royalties and proceeds in connection with the foregoing from and after the Effective Date, all rights to sue or otherwise recover for any past, present, or future infringement, dilution or other violations of the foregoing and all corresponding rights that, now or hereafter, may be secured throughout the world, including any deposits or prepayments with respect to any of the foregoing.

**SECTION 2.**   Recordation.  Assignors hereby authorize: (i) the Commissioner for Trademarks in the United States Patent and Trademark Office, and the officials of corresponding entities or agencies in any applicable jurisdictions to record this Assignment upon request by Assignee, and (ii) the registrar of the domain names identified as such in Exhibit A to effectuate the transfers to Assignee of such domain names.

**SECTION 3.**   Further Assurances.  From and after the Effective Date, upon Assignee's request, Assignors shall (and shall cause such Assignor's Affiliates to) cooperate with and use commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or to cause to be done, all things reasonably necessary, proper or advisable on such Assignor's part under applicable law to effect and validate the assignment of the Assigned IP to Assignee.

**SECTION 4.**  Definitions.  Capitalized terms used but not defined in this Assignment have the meanings given to such terms in the Purchase Agreement.

**SECTION 5.**  Purchase Agreement.  This Assignment is executed and delivered pursuant to the Purchase Agreement. In the event of a conflict between the terms and conditions of this Assignment and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede and prevail in all respects to the extent of such conflict. Notwithstanding anything to the contrary in this Assignment, nothing herein is intended to, nor shall this Assignment be construed to, extend, amplify, modify, limit or otherwise alter in any way the terms and conditions of the Purchase Agreement (including, without limitation, any representation, warranty, covenant or obligation contained in the Purchase Agreement).

**SECTION 6.**   Governing Law.  Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Assignment, and any Action that may be based upon, arising out of or related to this Assignment or the negotiation, execution or performance of this Assignment or the transactions contemplated hereby will be governed by and construed in accordance with the internal Laws of the State of Delaware applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

**SECTION 7.**  Counterparts and PDF. This Assignment may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument. This Assignment or any counterpart may be executed and delivered by facsimile copies or delivered by electronic communications by portable document format (.pdf), each of which shall be deemed an original. At the request of either Party, the other Party hereto will re-execute original forms of this Assignment and deliver it to the other Party. No Party will raise the use of a facsimile machine, .PDF or other electronic transmission to deliver a signature or the fact that any signature or contract was transmitted or communicated through the use of facsimile machine, .PDF or other electronic transmission as a defense to the formation of a contract and each Party forever waives any such defense.

[*Signature Page Follows*]

A-2

*Final Version*

**IN WITNESS WHEREOF**, Assignors and Assignee have caused this Assignment to be executed by its duly authorized representative as of the Effective Date.

**VOYAGER DIGITAL, LLC**

By: _____
Name:
Title:

**VOYAGER IP, LLC**

By: _____
Name:
Title:

**BAM TRADING SERVICES INC. D/B/A BINANCE.US**

By: _____
Name:
Title:

[Signature Page to Trademark and Domain Name Assignment]

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | Case No. 22-10943 (MEW) |
| Debtors. | (Jointly Administered) |

**NOTICE OF FILING OF THIRD AMENDED**
**JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND ITS DEBTOR**
**AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**PLEASE TAKE NOTICE** that on July 6, 2022, the above-captioned debtors and debtors

in possession (collectively, the "Debtors") filed the *Joint Plan of Reorganization of Voyager*

*Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*

(the "Initial Plan") [Docket No. 17].

**PLEASE TAKE FURTHER NOTICE** that on August 12, 2022, the Debtors filed the

*First Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor*

*Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 287].

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

PLEASE TAKE FURTHER NOTICE that on October 5, 2022, the Debtors filed the *Second Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 496].

PLEASE TAKE FURTHER NOTICE that on October 17, 2022, the Debtors filed the *Second Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 539].

PLEASE TAKE FURTHER NOTICE that on October 19, 2022, the Debtors filed the *Second Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 564].

PLEASE TAKE FURTHER NOTICE that on October 20, 2022, the Debtors filed the *Second Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 584].

PLEASE TAKE FURTHER NOTICE that on October 24, 2022, the Debtors filed the *Second Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 590] (the "Second Amended Plan").

PLEASE TAKE FURTHER NOTICE that the Debtors hereby file a *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code,* attached hereto as **Exhibit A** (the "Third Amended Plan").

PLEASE TAKE FURTHER NOTICE THAT a comparison between the Second Amended Plan and the Third Amended Plan, is attached hereto as **Exhibit B**.

PLEASE TAKE FURTHER NOTICE that copies of the Initial Plan, Second Amended Plan, and other pleadings filed in the above-captioned chapter 11 cases may be obtained free of charge by visiting the website of Stretto at http://www.cases.stretto.com/Voyager.  You may also

obtain copies of any pleadings by visiting the Court's website at http://www.nysb.uscourts.gov in

accordance with the procedures and fees set forth therein.

[*Remainder of page intentionally left blank.*]

Dated: December 21, 2022
New York, New York

/s/ Joshua A. Sussberg

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:     jsussberg@kirkland.com
           cmarcus@kirkland.com
           christine.okike@kirkland.com
           allyson.smith@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

**Exhibit A**

**Third Amended Plan**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| VOYAGER DIGITAL HOLDINGS, INC. *et al.*,[1] | Case No. 22-10943 (MEW) |
| Debtors. | (Jointly Administered) |

---

**THIRD AMENDED JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND
ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

---

**NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN OFFER, ACCEPTANCE,
COMMITMENT, OR LEGALLY BINDING OBLIGATION OF THE DEBTORS OR ANY
OTHER PARTY IN INTEREST, AND THIS PLAN IS SUBJECT TO APPROVAL BY THE
BANKRUPTCY COURT AND OTHER CUSTOMARY CONDITIONS.  THIS PLAN IS NOT AN
OFFER WITH RESPECT TO ANY SECURITIES.**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Voyager Digital Holdings, Inc. (7687); Voyager Digital, LTD. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

# TABLE OF CONTENTS

**Page**

Introduction .................................................................................................................................. 1

**Article I. Defined Terms, Rules of Interpretation, Computation of Time, Governing Law, and Other References** ...................................................................................................................... 1

| | | |
|---|---|---|
| A. | Defined Terms | 1 |
| B. | Rules of Interpretation | 17 |
| C. | Computation of Time | 17 |
| D. | Governing Law | 17 |
| E. | Reference to Monetary Figures | 18 |
| F. | Reference to the Debtors or the Wind-Down Debtors | 18 |
| G. | Nonconsolidated Plan | 18 |

**Article II. Administrative and Priority Claims** ................................................................... 18

| | | |
|---|---|---|
| A. | Administrative Claims | 18 |
| B. | Professional Fee Claims | 19 |
| C. | Priority Tax Claims | 20 |

**Article III. Classification, Treatment, and Voting of Claims and Interests** ..................... 20

| | | |
|---|---|---|
| A. | Classification of Claims and Interests | 20 |
| B. | Summary of Classification | 21 |
| C. | Treatment of Classes of Claims and Interests | 22 |
| D. | Special Provision Governing Unimpaired Claims | 28 |
| E. | Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes | 28 |
| F. | Subordinated Claims | 28 |
| G. | Intercompany Interests | 28 |
| H. | Controversy Concerning Impairment | 29 |
| I. | Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code | 29 |

**Article IV. Provisions for Implementation of the Plan** ....................................................... 29

| | | |
|---|---|---|
| A. | General Settlement of Claims and Interests | 29 |
| B. | Restructuring Transactions | 29 |
| C. | The Sale Transaction | 30 |
| D. | The Liquidation Transaction | 31 |
| E. | Management Transition Plan | 31 |
| F. | Non-Released D&O Claims | 32 |
| G. | The D&O Settlement | 32 |
| H. | Wind-Down Trust | 34 |
| I. | Sources of Consideration for Plan Distributions | 39 |
| J. | Corporate Existence and Dissolution | 39 |
| K. | Corporate Action | 40 |
| L. | Vesting of Assets in the Wind-Down Entity | 41 |
| M. | Cancellation of Notes, Instruments, Certificates, and Other Documents | 41 |
| N. | Effectuating Documents; Further Transactions | 41 |
| O. | Section 1146(a) Exemption | 41 |

P.      Preservation of Rights of Action........................................................................42
Q.      Election to Contribute Third-Party Claims ....................................................... 43
R.      Contribution of Contributed Third-Party Claims .............................................. 43
S.      Closing the Chapter 11 Cases ............................................................................ 43

**Article V. Treatment of Executory Contracts and Unexpired Leases ........................ 44**

A.      Assumption and Rejection of Executory Contracts and Unexpired Leases...................... 44
B.      Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases.................................................................................................. 44
C.      Claims Based on Rejection of Executory Contracts or Unexpired Leases ............. 44
D.      Cure of Defaults for Executory Contracts and Unexpired Leases Assumed ................... 45
E.      Insurance Policies and Surety Bonds ................................................................. 46
F.      Reservation of Rights........................................................................................ 47
G.      Nonoccurrence of Effective Date ...................................................................... 47
H.      Contracts and Leases Entered into After the Petition Date ............................... 47

**Article VI. Provisions Governing Distributions ........................................................... 47**

A.      Timing and Calculation of Amounts to Be Distributed ..................................... 47
B.      Rights and Powers of Distribution Agent .......................................................... 48
C.      Delivery of Distributions and Undeliverable or Unclaimed Distributions ......... 48
D.      Compliance Matters .......................................................................................... 50
E.      Foreign Currency Exchange Rate ...................................................................... 50
F.      Claims Paid or Payable by Third Parties ........................................................... 51
G.      Setoffs and Recoupment ................................................................................... 51
H.      Allocation between Principal and Accrued Interest........................................... 52

**Article VII. Procedures for Resolving Disputed, Contingent, and Unliquidated Claims and Interests.......................................................................................... 52**

A.      Disputed Claims Process ................................................................................... 52
B.      Objections to Claims or Interests ...................................................................... 53
C.      Estimation of Claims ......................................................................................... 53
D.      No Distributions Pending Allowance ................................................................ 54
E.      Distributions After Allowance .......................................................................... 54
F.      No Interest......................................................................................................... 54
G.      Adjustment to Claims and Interests without Objection ...................................... 54
H.      Time to File Objections to Claims ..................................................................... 55
I.      Disallowance of Claims or Interests .................................................................. 55
J.      Amendments to Proofs of Claim ....................................................................... 55

**Article VIII. Effect of Confirmation of the Plan .......................................................... 55**

A.      Releases by the Debtors .................................................................................... 55
B.      Releases by Holders of Claims and Interests ..................................................... 56
C.      Exculpation ....................................................................................................... 57
D.      Injunction ......................................................................................................... 58
E.      Release of Liens ................................................................................................ 58
F.      OSC and SEC .................................................................................................... 58
G.      Protection against Discriminatory Treatment .................................................... 58
H.      Document Retention .......................................................................................... 59
I.      Reimbursement or Contribution ........................................................................ 59

|  | J. | Term of Injunctions or Stays | 59 |

### Article IX. Conditions Precedent to the Effective Date ........................................................ 59

|  | A. | Conditions Precedent to the Effective Date | 59 |
|  | B. | Waiver of Conditions Precedent | 60 |
|  | C. | Effect of Non-Occurrence of Conditions to Consummation | 60 |

### Article X. Modification, Revocation, or Withdrawal of the Plan .......................................... 61

|  | A. | Modification of Plan | 61 |
|  | B. | Effect of Confirmation on Modifications | 61 |
|  | C. | Revocation or Withdrawal of Plan | 61 |

### Article XI. Retention of Jurisdiction ..................................................................................... 61

### Article XII. Miscellaneous Provisions .................................................................................... 63

|  | A. | Immediate Binding Effect | 63 |
|  | B. | Additional Documents | 64 |
|  | C. | Payment of Statutory Fees | 64 |
|  | D. | Dissolution of Statutory Committees | 64 |
|  | E. | Reservation of Rights | 64 |
|  | F. | Successors and Assigns | 64 |
|  | G. | Service of Documents | 64 |
|  | H. | Entire Agreement; Controlling Document | 65 |
|  | I. | Plan Supplement | 65 |
|  | J. | Non-Severability | 66 |
|  | K. | Votes Solicited in Good Faith | 66 |
|  | L. | Waiver or Estoppel | 66 |

A-159

## INTRODUCTION

Voyager Digital Holdings, Inc. and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (each a "Debtor" and, collectively, the "Debtors") propose this third amended joint plan (the "Plan") for the resolution of the outstanding Claims against and Interests in the Debtors pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used in the Plan and not otherwise defined shall have the meanings set forth in Article I.A of the Plan. Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The classifications of Claims and Interests set forth in Article III of the Plan shall be deemed to apply separately with respect to each Plan proposed by each Debtor, as applicable. The Plan does not contemplate substantive consolidation of any of the Debtors. Reference is made to the Disclosure Statement for a discussion of the Debtors' history, business, properties and operations, projections, risk factors, a summary and analysis of this Plan, and certain related matters.

ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE I.

### DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES

**A.     Defined Terms**

Capitalized terms used in this Plan have the meanings ascribed to them below.

1.     "*3AC*" means Three Arrows Capital, Ltd and any of its Affiliates or subsidiaries.

2.     "*3AC Claims*" means the claims or causes of action asserted or assertable by the Debtors against 3AC, whether in the 3AC Liquidation Proceeding or otherwise.

3.     "*3AC Liquidation Proceeding*" means that certain liquidation proceeding captioned *In the Matter of Three Arrows Capital Ltd. and in the Matter of Sections 159(1) and 162(1)(a) and (b) of the Insolvency Act 2003*, Claim No. BVIHC(COM)2022/0119 before the Eastern Caribbean Supreme Court in the High Court of Justice in the British Virgin Islands and the chapter 15 foreign recognition proceeding captioned *In re Three Arrows Capital, Ltd.*, No. 22-10920 (Bankr. S.D.N.Y. Jul. 1, 2022).

4.     "*3AC Loan*" means that loan of 15,250 Bitcoins and 350 million USDC to 3AC pursuant to that certain master loan agreement dated March 4, 2022 by and between 3AC, as borrower, and OpCo and HTC Trading, Inc., as lenders.

5.     "*3AC Recovery*" means the recovery, if any, of the Debtors from 3AC on account of the 3AC Claims.

6.     "*Account*" means any account at OpCo held by an Account Holder relating to Cryptocurrency, which Account is identified in the Debtors' books and records as holding Cryptocurrency as of the Petition Date.

7.      "*Account Holder*" means any Person or Entity who holds an Account with OpCo as of the Petition Date.

8.      "*Account Holder Claim*" means any Claim against the Debtors that is held by an Account Holder on account of such Holder's Account.

9.      "*Acquired Assets*" has the meaning ascribed to it in the Asset Purchase Agreement.

10.     "*Acquired Coins*" has the meaning ascribed to it in the Asset Purchase Agreement.

11.     "*Acquired Coins Value*" has the meaning ascribed to it in the Asset Purchase Agreement.

12.     "*Additional Bankruptcy Distribution*" has the meaning ascribed to it in the Asset Purchase Agreement.

13.     "*Administrative Claim*" means a Claim against a Debtor for the costs and expenses of administration of the Chapter 11 Cases arising on or after the Petition Date and prior to the Effective Date pursuant to section 503(b) of the Bankruptcy Code and entitled to priority pursuant to sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' business and (b) Allowed Professional Fee Claims.

14.     "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims (other than requests for payment of Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code), which: (a) with respect to Administrative Claims other than Professional Fee Claims, shall be thirty days after the Effective Date; and (b) with respect to Professional Fee Claims, shall be forty-five days after the Effective Date.

15.     "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code. With respect to any Person that is not a Debtor, the term "Affiliate" shall apply to such Person as if the Person were a Debtor.

16.     "*Alameda*" means Alameda Ventures Ltd., along with its Affiliates and subsidiaries.

17.     "*Alameda Claims*" means the claims or causes of action asserted or assertable by the Debtors against Alameda, whether in the FTX Bankruptcy Proceeding or otherwise.

18.     "*Alameda Loan Agreement*" means that certain unsecured loan agreement, dated as of June 21, 2022, as amended, restated, amended and restated, modified, or supplemented from time to time, by and among Voyager Digital Holdings, Inc., as the borrower, Voyager, as the guarantor, and Alameda, as the lender thereto.

19.     "*Alameda Loan Facility*" means that certain unsecured loan facility provided for under the Alameda Loan Agreement.

20.     "*Alameda Loan Facility Claims*" means any Claim against any Debtor derived from, based upon, or arising under the Alameda Loan Agreement and any fees, costs, and expenses that are reimbursable by any Debtor pursuant to the Alameda Loan Agreement.

21.     "*Alameda Recovery*" means the recovery, if any, of the Debtors from Alameda on account of the Alameda Claims.

22. "*Allowed*" means, with respect to any Claim or Interest, except as otherwise provided herein: (a) a Claim or Interest that is evidenced by a Proof of Claim timely Filed by the Bar Date or a request for payment of Administrative Claim timely Filed by the Administrative Claims Bar Date (or for which Claim or Interest under the Plan, the Bankruptcy Code, or a Final Order of the Bankruptcy Court a Proof of Claim or a request for payment of Administrative Claim is not or shall not be required to be Filed); (b) a Claim or Interest that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely Filed; (c) a Claim or Interest Allowed pursuant to the Plan, any stipulation approved by the Bankruptcy Court, any contract, instrument, indenture, or other agreement entered into or assumed in connection with the Plan, or a Final Order of the Bankruptcy Court, or (d) a Claim or Interest as to which the liability of the Debtors and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court; *provided* that, with respect to a Claim or Interest described in clauses (a) and (b) above, such Claim or Interest shall be considered Allowed only if and to the extent that with respect to such Claim or Interest no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or if such an objection is so interposed, such Claim or Interest shall have been Allowed by a Final Order. Any Claim or Interest that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes. A Proof of Claim Filed after and subject to the Bar Date or a request for payment of an Administrative Claim Filed after and subject to the Administrative Claims Bar Date, as applicable, shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim. "Allow" and "Allowing" shall have correlative meanings.

23. "*Asset Purchase Agreement*" means that certain asset purchase agreement dated as of December 18, 2022 by and between BAM Trading Services Inc. (d/b/a Binance.US) as Purchaser and Voyager Digital, LLC as Seller.

24. "*Assumed Liabilities*" has the meaning ascribed to it in the Asset Purchase Agreement.

25. "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or hereafter amended.

26. "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York, or any other court having jurisdiction over the Chapter 11 Cases, including to the extent of the withdrawal of reference under section 157 of the Judicial Code, the United States District Court for the Southern District of New York.

27. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated by the United States Supreme Court under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

28. "*Bar Date*" means the applicable deadline by which Proofs of Claim must be Filed, as established by: (a) the Bar Date Order; (b) a Final Order of the Bankruptcy Court; or (c) the Plan.

29. "*Bar Date Order*" means the *Order (I) Setting Deadlines for Submitting Proofs of Claims, (II) Approving Procedures for Submitting Proofs of Claim, and (III) Approving Notice Thereof* [Docket No. 218].

30.     "*Binance.US Platform*" has the meaning ascribed to it in the Asset Purchase Agreement.

31.     "*Binance US*" means BAM Trading Services Inc. (d/b/a Binance.US).

32.     "*Binance US Account*" means a customer account opened with the Purchaser by an Account Holder or a Holder of an Allowed OpCo General Unsecured Claim.

33.     "*Business Day*" means any day, other than a Saturday, Sunday, or a "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

34.     "*Cash*" or "*$*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

35.     "*Causes of Action*" mean any action, Claim, cross-claim, third-party claim, damage, judgment, cause of action, controversy, demand, right, suit, obligation, liability, debt, account, defense, offset, power, privilege, license, Lien, indemnity, interest, guaranty, or franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, matured or unmatured, suspected or unsuspected, in contract or in tort, at law or in equity, or pursuant to any other theory of law or otherwise.  For the avoidance of doubt, "Causes of Action" includes:  (a) any right of setoff, counterclaim, or recoupment and any claim arising from any contract or for breach of duties imposed by law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of local, state, federal, or foreign law, or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) any right to object to or otherwise contest Claims or Interests; (d) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; and (e) any claim or defense, including fraud, mistake, duress, usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

36.     "*CCO*" means Evan Psaropoulos.

37.     "*CEO*" means Stephen Ehrlich.

38.     "*Certificate*" means any instrument evidencing a Claim or an Interest.

39.     "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor in the Bankruptcy Court under chapter 11 of the Bankruptcy Code and (b) when used with reference to all Debtors, the procedurally consolidated cases filed for the Debtors in the Bankruptcy Court under chapter 11 of the Bankruptcy Code.

40.     "*Claim*" has the meaning set forth in section 101(5) of the Bankruptcy Code.

41.     "*Claims Objection Bar Date*" means the deadline for objecting to a Claim, which shall be on the date that is the later of (a) (i) with respect to Administrative Claims (other than Professional Fee Claims and Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code), sixty days after the Administrative Claims Bar Date or (ii) with respect to all other Claims (other than Professional Fee Claims), 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by the Debtors or the Wind-Down Trust, as applicable, as approved by an order of the Bankruptcy Court for objecting to such Claims.

42.     "*Claims Register*" means the official register of Claims against and Interests in the Debtors maintained by the Clerk of the Bankruptcy Court or the Claims, Noticing, and Solicitation Agent.

43.  "*Claims, Noticing, and Solicitation Agent*" means Bankruptcy Management Solutions, Inc. d/b/a Stretto, in its capacity as the claims, noticing, and solicitation agent in the Chapter 11 Cases for the Debtors and any successors appointed by an order of the Bankruptcy Court.

44.  "*Class*" means a class of Claims against or Interests in the Debtors as set forth in Article III of the Plan in accordance with section 1122(a) of the Bankruptcy Code.

45.  "*Committee*" means the Official Committee of Unsecured Creditors appointed in these Chapter 11 Cases.

46.  "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

47.  "*Confirmation Date*" means the date on which Confirmation occurs.

48.  "*Confirmation Hearing*" means the hearing before the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code at which the Debtors will seek Confirmation of the Plan.

49.  "*Confirmation Order*" has the meaning ascribed to it in the Asset Purchase Agreement.

50.  "*Consummation*" means the occurrence of the Effective Date.

51.  "*Contributed Third-Party Claims*" means all direct Causes of Action that any Contributing Claimant has against any Person (other than a Debtor) that had a direct relationship with the Debtors, their predecessors, or respective affiliates and that harmed such Contributing Claimant in the claimant's capacity as a creditor of Voyager, including (a) all Causes of Action based on, arising out of, or related to the marketing, sale, and issuance of Cryptocurrency that at any point was held or offered on Voyager's platform; (b) all Causes of Action based on, arising out of, or related to the alleged misrepresentation of any of the Debtors' financial information, business operations, or related internal controls; and (c) all Causes of Action based on, arising out of, or related to any alleged failure to disclose, or actual or attempted cover up or obfuscation of, any of the Debtors' conduct prior to the Petition Date; *provided, however*, that Contributed Third-Party Claims do not include (i) any derivative claims of the Debtors; (ii) any direct claims against the Released Parties; (iii) any direct Causes of Action that any Contributing Claimant has against Mark Cuban, Dallas Basketball Limited d/b/a Dallas Mavericks, the National Basketball Association, and any of their Related Parties; or (iv) any direct Causes of Action that any Contributing Claimant, in its capacity as an equity holder of Voyager Digital Ltd., has that are asserted in the currently filed complaint, dated as of July 6, 2022, in the Ontario Superior Court of Justice by Francine De Sousa, against Voyager Digital Ltd., Stephen Ehrlich, Philip Eytan, Evan Psaropoulos, Lewis Bateman, Krisztian Toth, Jennifer Ackart, Glenn Stevens, and Brian Brooks.

52.  "*Contributing Claimants*" means any Holders of Claims or Interests that elect on their ballots or opt-in forms to contribute their Contributed Third-Party Claims to the Wind-Down Entity.

53.  "*Cryptocurrency*" means a digital currency or crypto asset in which transactions are verified and records maintained by a decentralized system using cryptography, rather than by a centralized authority, including stablecoins, digital coins and tokens, such as security tokens, utility tokens and governance tokens.

54.  "*Cure*" or "*Cure Claim*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's default under an Executory Contract or an Unexpired Lease assumed

by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

55. "*Customer Onboarding Protocol*" means the protocol describing the process of onboarding Account Holders and Holders of OpCo General Unsecured Claims onto the Binance.US Platform, the form of which shall be included in the Plan Supplement and filed no later than by February 3, 2023, and which shall be in a form acceptable to the Purchaser.

56. "*D&O Carriers*" means the insurance carriers of the D&O Liability Insurance Policies.

57. "*D&O Liability Insurance Policies*" means all unexpired insurance policies maintained by the Debtors, the Wind-Down Debtors, or the Estates as of the Effective Date that have been issued (or provide coverage) regarding directors', managers', officers', members', and trustees' liability (including any "tail policy"), including but not limited to the Management Liability Policy, the Excess Policies, and the Side-A Policy, and all agreements, documents, or instruments relating thereto.

58. "*D&O Settlement*" means the settlement between the Debtors and CEO and CCO as set forth in Article IV.G of the Plan.

59. "*Debtors*" means, collectively, each of the following:  Voyager Digital Holdings, Inc.; Voyager Digital Ltd.; and Voyager Digital, LLC.

60. "*Definitive Documents*" means:  (a) the Plan (and any and all exhibits, annexes, and schedules thereto); (b) the Confirmation Order; (c) the Disclosure Statement and the other Solicitation Materials; (d) the Disclosure Statement Order; (e) all pleadings filed by the Debtors in connection with the Chapter 11 Cases (or related orders); (f) the Plan Supplement; (g) the Management Transition Plan; (h) any new material employment, consulting, or similar agreements entered into between the Wind-Down Trust and any of the Debtors' employees, if any; (i) the Asset Purchase Agreement; (j) the Customer Onboarding Protocol; and (k) any and all other deeds, agreements, filings, notifications, pleadings, orders, certificates, letters, instruments or other documents reasonably desired or necessary to consummate and document the transactions contemplated by the Restructuring Transactions (including any exhibits, amendments, modifications, or supplements made from time to time thereto).

61. "*Disclosure Statement*" means the *Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, as may be amended, supplemented, or otherwise modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan.

62. "*Disclosure Statement Order*" means the order entered by the Bankruptcy Court approving the Disclosure Statement.

63. "*Disputed*" means a Claim or an Interest or any portion thereof:  (a) that is not Allowed; (b) that is not disallowed under the Plan, the Bankruptcy Code, or a Final Order; and (c) with respect to which a party in interest has Filed a Proof of Claim, a Proof of Interest, or otherwise made a written request to a Debtor for payment.

64. "*Disputed Claims Reserve*" means an appropriate reserve in an amount to be determined by the Wind-Down Trust for distributions on account of Disputed Claims that are subsequently Allowed after the Effective Date, in accordance with Article VII.D hereof.

65.    "*Distributable Cryptocurrency*" means all Cryptocurrency held on the Voyager platform or that is otherwise property of any Debtor on the Effective Date after payment in full of, or reserve for, all Allowed Administrative Claims, Priority Tax Claims, Secured Tax Claims, and Other Priority Claims.

66.    "*Distributable HoldCo Cash*" means HoldCo's Cash, less (x) any Cash necessary to satisfy Allowed Administrative Claims, Priority Tax Claims, Secured Tax Claims, and Other Priority Claims at HoldCo in full; and (y) to fund HoldCo's Pro Rata share of the Wind-Down Reserve.

67.    "*Distributable OpCo Cash*" means OpCo's Cash, including the Purchase Price Cash, less (x) any Cash necessary to satisfy Allowed Administrative Claims, Priority Tax Claims, Secured Tax Claims, and Other Priority Claims at OpCo in full; and (y) to fund OpCo's Pro Rata share of the Wind-Down Reserve.

68.    "*Distributable TopCo Cash*" means TopCo's Cash, less (x) any Cash necessary to satisfy Allowed Administrative Claims, Priority Tax Claims, Secured Tax Claims, and Other Priority Claims at TopCo in full; and (y) to fund TopCo's Pro Rata share of the Wind-Down Reserve.

69.    "*Distribution Agent*" means, as applicable, the Purchaser, Wind-Down Debtors, Wind-Down Trust or any Entity or Entities designated by the Purchaser, Wind-Down Debtors, or the Wind-Down Trust (as applicable) to make or to facilitate distributions that are to be made pursuant to the Plan, Definitive Documents, and Asset Purchase Agreement.

70.    "*Distribution Date*" means, except as otherwise set forth herein, the date or dates determined by the Wind-Down Trust, on or after the Effective Date, upon which the Distribution Agent shall make distributions to Holders of Allowed Claims entitled to receive distributions under the Plan.

71.    "*Distribution Record Date*" means the record date for purposes of determining which Holders of Allowed Claims and Interests against the Debtors are eligible to receive distributions under the Plan, which date shall be the Effective Date, or such other date as is determined by the Debtors or designated by an order of the Bankruptcy Court.

72.    "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which (a) all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of the Plan have been satisfied or waived in accordance with Article IX.B of the Plan, (b) no stay of the Confirmation Order is in effect, and (c) the Debtors declare the Plan effective.

73.    "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

74.    "*Estate*" means, as to each Debtor, the estate created on the Petition Date for the Debtor in its Chapter 11 Case pursuant to sections 301 and 541 of the Bankruptcy Code and all property (as defined in section 541 of the Bankruptcy Code) acquired by the Debtor after the Petition Date through and including the Effective Date.

75.    "*Excess Policies*" means, collectively, the Excess Insurance Policy, No. EFI1203041-01, issued by Euclid Financial on behalf of Certain Underwriters of Lloyd's, London, the Excess Insurance Policy, No. RILEDOA3392022, issued by Relm Insurance Ltd., both for the February 22, 2022 to February 22, 2023 period, and the Excess Policy, No. ELU184180-23, issued by XL Specialty Insurance Company, for the February 22, 2022 to July 1, 2023 period.

76.    "*Exculpated Parties*" means, collectively, and in each case in its capacity as such:  (a) each of the Debtors; (b) the Committee, and each of the members thereof, solely in their capacity as such; (c) each of the Released Professionals; (d) each of the Released Voyager Employees; and (e) the Distribution Agent.

77.    "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

78.    "*Existing Equity Interests*" means any Interest in TopCo existing immediately prior to the occurrence of the Effective Date.

79.    "*Extended Outside Date*" has the meaning set forth in the Asset Purchase Agreement.

80.    "*Federal Judgment Rate*" means the federal judgment interest rate in effect as of the Petition Date calculated as set forth in section 1961 of the Judicial Code.

81.    "*File*," "*Filed*," or "*Filing*" means file, filed, or filing, respectively, in the Chapter 11 Cases with the Bankruptcy Court or its authorized designee, or, with respect to the filing of a Proof of Claim or Proof of Interest, file, filed, or filing, respectively, with the Claims, Noticing, and Solicitation Agent.

82.    "*Final Decree*" means the decree contemplated under Bankruptcy Rule 3022.

83.    "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, petition for certiorari, or move for a new trial, reargument, reconsideration, or rehearing has expired and no appeal, petition for certiorari, or motion for a new trial, reargument, reconsideration, or rehearing has been timely taken or filed, or as to which any appeal that has been or may be taken or any petition for certiorari or any motion for a new trial, reargument, reconsideration, or rehearing that has been or may be made or filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the motion for a new trial, reargument, reconsideration, or rehearing shall have been denied, resulted in no modification of such order (if any such motion has been or may be granted), or have otherwise been dismissed with prejudice; *provided* that the possibility that a motion under rule 60 of the Federal Rules of Civil Procedure or any comparable Bankruptcy Rule may be filed relating to such order or judgment shall not cause such order or judgment to not be a Final Order.

84.    "*FTX*" means FTX Trading, Ltd. and any of its Affiliates or subsidiaries, including West Realm Shires Inc (d/b/a "FTX.US").

85.    "*FTX Bankruptcy Proceeding*" means that certain chapter 11 proceeding captioned *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Nov. 11, 2022).

86.    "*FTX Claims*" means the claims or causes of action asserted or assertable by the Debtors against FTX, whether in the FTX Bankruptcy Proceeding or otherwise.

87.    "*FTX Recovery*" means the recovery, if any, of the Debtors from FTX on account of the FTX Claims.

88.    "*General Unsecured Claim*" means, collectively, any HoldCo General Unsecured Claim, OpCo General Unsecured Claim, or TopCo General Unsecured Claim.

89.    "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

90. "*Government Bar Date*" means the applicable deadline by which Proofs of Claim by a Governmental Unit must be Filed, as established by: (a) the Bar Date Order; (b) a Final Order of the Bankruptcy Court; or (c) the Plan.

91. "*HoldCo*" means Voyager Digital Holdings, Inc.

92. "*HoldCo General Unsecured Claim*" means any Claim against HoldCo that is not Secured and is not: (a) paid in full prior to the Effective Date pursuant to an order of the Bankruptcy Court; (b) an Administrative Claim; (c) a Secured Tax Claim; (d) a Priority Tax Claim; (e) an Other Priority Claim; (f) a Professional Fee Claim; (g) an Alameda Loan Facility Claim; or (h) an Intercompany Claim. For the avoidance of doubt, all (i) Claims resulting from the rejection of Executory Contracts and Unexpired Leases, and (ii) Claims that are not Secured resulting from litigation, against HoldCo are HoldCo General Unsecured Claims.

93. "*Holder*" means an Entity holding a Claim against or an Interest in any Debtor.

94. "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

95. "*Insurance Policies*" means any and all insurance policies entered into by the Debtors, including the D&O Insurance Policies.

96. "*Intercompany Claim*" means any Claim held by a Debtor or a Debtor's Affiliate against a Debtor.

97. "*Intercompany Interest*" means, other than an Interest in Voyager, an Interest in one Debtor held by another Debtor or a Debtor's Affiliate.

98. "*Interest*" means any equity security (as such term is defined in section 101(16) of the Bankruptcy Code) including all issued, unissued, authorized, or outstanding shares of capital stock and any other common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profit interests of an Entity, including all options, warrants, rights, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable, or exchangeable securities, or other agreements, arrangements, or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in an Entity whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security, and including any Claim against the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to the foregoing.

99. "*Interim Compensation Order*" means the *Order (I) Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals and (II) Granting Related Relief* [Docket No. 236].

100. "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001 and the rules and regulations promulgated thereunder, as applicable to the Chapter 11 Cases.

101. "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

102.    "*Liquidation Procedures*" means, in the event the Sale Transaction is not consummated by the Outside Date, such procedures filed by the Wind-Down Entity identifying the mechanics and procedures to effectuate the Liquidation Transaction.

103.    "*Liquidation Transaction*" means, in the event the Sale Transaction is not consummated by the Outside Date, the distribution of the Debtors' Cryptocurrency, Cash and other assets pursuant to Article IV.D of this Plan.

104.    "*Management Liability Policy*" means the Executive and Corporate Securities Liability Insurance Policy, No. ELU181214-22, issued by XL Specialty Insurance Company for the February 22, 2022 to February 22, 2023 period.

105.    "*Management Transition Plan*" has the meaning set forth in Article IV.E of the Plan, and which shall be in form and substance reasonably acceptable to the Committee.

106.    "*Net Owed Coins*" has the meaning ascribed to it in the Asset Purchase Agreement.

107.    "*Non-Released D&O Claims*" has the meaning set forth in Article IV.F of the Plan.

108.    "*Non-Released D&O Claim Budget*" means the amount allocated to pursue the Non-Released D&O Claims and the Non-Released Insurance Claims, which amount shall be agreed upon between the Debtors and the Committee prior to the Confirmation Hearing.

109.    "*Non-Released Insurance Claims*" has the meaning set forth in Article IV.F of the Plan.

110.    "*OpCo*" means Voyager Digital, LLC.

111.    "*OpCo General Unsecured Claim*" means any Claim against OpCo that is not Secured and is not: (a) paid in full prior to the Effective Date pursuant to an order of the Bankruptcy Court; (b) an Administrative Claim; (c) a Secured Tax Claim; (d) a Priority Tax Claim; (e) an Other Priority Claim; (f) a Professional Fee Claim; (g) an Account Holder Claim; or (h) an Intercompany Claim.  For the avoidance of doubt, all (i) Claims resulting from the rejection of Executory Contracts and Unexpired Leases, and (ii) Claims that are not Secured resulting from litigation against OpCo are OpCo General Unsecured Claims.

112.    "*OSC*" means the Ontario Securities Commission.

113.    "*Other Priority Claim*" means any Claim against a Debtor, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

114.    "*Outside Date*" has the meaning set forth in the Asset Purchase Agreement.  All references herein to the "Outside Date" shall be deemed to include the "Extended Outside Date" to the extent the Outside Date is extended in accordance with Section 8.1(c) of the Asset Purchase Agreement.

115.    "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

116.    "*Petition Date*" means July 5, 2022.

117.    "*Plan*" means this joint chapter 11 plan and all exhibits, supplements, appendices, and schedules hereto, as may be altered, amended, supplemented, or otherwise modified from time to time in

accordance with Article X.A hereof, including the Plan Supplement (as altered, amended, supplemented, or otherwise modified from time to time), which is incorporated herein by reference and made part of the Plan as if set forth herein.

118.    "*Plan Supplement*" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (in each case, as may thereafter be amended, supplemented, or otherwise modified from time to time in accordance with the terms of the Plan, the Bankruptcy Code, the Bankruptcy Rules, and applicable law), to be Filed by the Debtors no later than seven days before the Voting Deadline or such later date as may be approved by the Bankruptcy Court, and additional documents Filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement. The Plan Supplement may include the following, as applicable:  (a) the Schedule of Assumed Executory Contracts and Unexpired Leases; (b) the Schedule of Retained Causes of Action; (c) the Schedule of Assumed and Assigned Executory Contracts and Unexpired Leases; (d) the Customer Onboarding Protocol; (e) the Restructuring Transactions Memorandum; (f) the Wind-Down Trust Agreement; and (g) any additional documents necessary to effectuate or that is contemplated by the Plan, including any compensation program for any of the Debtors' employees to be established as contemplated in the Plan and the Definitive Documents to facilitate the transfer of Acquired Assets pursuant to the Asset Purchase Agreement and the wind-down of the Debtors' Estates; *provided* that the Schedule of Retained Causes of Action shall be filed no later than 14 days before the Voting Deadline.  The Plan Supplement (and the contents thereof) shall be (x) subject to Purchaser's consent rights solely to the extent set forth under the Asset Purchase Agreement (and shall otherwise be consistent with the Asset Purchase Agreement) and (y) reasonably acceptable to the Committee.

119.    "*Priority Tax Claim*" means any Claim of a Governmental Unit against a Debtor of the kind specified in section 507(a)(8) of the Bankruptcy Code.

120.    "*Pro Rata*" means the proportion that (i) an Allowed Claim or an Allowed Interest in a particular Class bears to (ii) the aggregate amount of Allowed Claims or Allowed Interests in that Class and, solely with respect to Claims in Classes 3 and 4(a), the proportion that an Allowed Claim in either such Class bears to the aggregate amount of Allowed Claims in Classes 3 and 4(a) in the aggregate, unless otherwise indicated.  For purposes of calculating Pro Rata distributions if the Sale Transaction is consummated by the Outside Date, the Pro Rata shares of all Holders of Allowed Claims or Allowed Interests shall be calculated taking into account the Acquired Coins Value of the Net Owed Coins distributed to each of the Account Holders.

121.    "*Professional*" means an Entity: (a) employed in the Chapter 11 Cases pursuant to an order of the Bankruptcy Court in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered and expenses incurred pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code or (b) for which compensation and reimbursement has been Allowed by Final Order of the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

122.    "*Professional Fee Claim*" means any Administrative Claim by a Professional for compensation for services rendered or reimbursement of expenses incurred by such Professional through and including the Effective Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court.  To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

123.    "*Professional Fee Escrow Account*" means an escrow account funded by the Debtors with Cash no later than the Effective Date in an amount equal to the Professional Fee Escrow Amount.

124. "*Professional Fee Escrow Amount*" means the aggregate amount of quarterly U.S. Trustee fees, Professional Fee Claims, and other unpaid fees and expenses the Professionals have incurred or will incur in rendering services in connection with the Chapter 11 Cases prior to and as of the Confirmation Date projected to be outstanding as of the anticipated Effective Date, which shall be estimated pursuant to the method set forth in Article II.B of the Plan.

125. "*Proof of Claim*" means a written proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

126. "*Proof of Interest*" means a written proof of Interest Filed against any of the Debtors in the Chapter 11 Cases.

127. "*Purchase Price Cash*" means the Cash paid by the Purchaser to OpCo pursuant to the Asset Purchase Agreement.

128. "*Purchaser*" means Binance US.

129. "*Reinstated*" or "*Reinstatement*" means, with respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

130. "*Related Party*" means, with respect to any Entity, in each case in its capacity as such with respect to such Entity, such Entity's current and former directors, managers, officers, investment committee members, special committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and advisors.

131. "*Released Parties*" means, collectively, in each case in its capacity as such: (a) the Debtors; (b) the Wind-Down Debtors; (c) the Committee, and each of the members thereof; (d) each of the Released Professionals; (e) Purchaser and each of its Related Parties; and (f) each of the Released Voyager Employees (subject to the limitations contained in Article IV.F and Article IV.G of the Plan); *provided* that if the Asset Purchase Agreement is terminated, Purchaser and each of its Related Parties shall not be "Released Parties" under the Plan.

132. "*Released Professionals*" means the following professionals retained by the Debtors, the Committee, or the Purchaser (as applicable): (i) Kirkland & Ellis LLP; (ii) Moelis & Company LLC; (iii) Berkeley Research Group, LLC; (iv) Bankruptcy Management Solutions, Inc. d/b/a Stretto; (v) Quinn Emanuel Urquhart & Sullivan LLP; (vi) Fasken Martineau DuMoulin LLP; (vii) Campbells Legal (BVI); (viii) McDermott Will & Emery LLP; (ix) FTI Consulting, Inc.; (x) Epiq Corporate Restructuring, LLC; (xi) Cassels, Brock & Blackwell LLP; (xii) Paul Hastings LLP; (xiii) Harney Westwood & Riegels LP (BVI); (xiv) Day Pitney LLP (solely in their capacity as counsel to the Debtors); (xv) Jenner & Block LLP; (xvi) Seyfarth Shaw LLP; (xvii) Alvarez & Marsal Canada Inc.; (xviii) Blake, Cassels & Graydon LLP; (xix) Jaffe Raitt Heuer & Weiss; (xx) Latham & Watkins LLP; (xxi) Lowenstein Sandler LLP; (xxii) Kramer Levin LLP; and (xxiii) Acura Law Firm; *provided* that if the Asset Purchase Agreement is terminated, Latham & Watkins LLP shall not be a "Released Professional" under the Plan.

133. "*Released Voyager Employees*" means all directors, officers, and Persons employed by each of the Debtors and their Affiliates serving in such capacity on or after the Petition Date but before the Effective Date (subject to the limitations contained in Article IV.F and Article IV.G of the Plan).

134.    "*Releasing Parties*" means, collectively, in each case in its capacity as such:  (a) the Debtors; (b) the Wind-Down Debtors; (c) the Committee, and each of the members thereof; (d) each of the Released Professionals; (e) each of the Released Voyager Employees; (f) Purchaser and each of its Related Parties to the extent Purchaser is able to bind such Related Parties; (g) all Holders of Claims that vote to accept the Plan and affirmatively opt into the releases provided by the Plan; (h) all Holders of Claims that vote to reject the Plan and affirmatively opt into the releases provided by the Plan; and (i) all Holders of Claims or Interests that abstain from voting (or are otherwise not entitled to vote) on the Plan and affirmatively opt into the releases provided by the Plan; *provided* that if the Asset Purchase Agreement is terminated, Purchaser and each of its Related Parties shall not be "Releasing Parties" under the Plan.

135.    "*Restructuring Transactions*" means those mergers, amalgamations, consolidations, reorganizations, arrangements, continuances, restructurings, transfers, conversions, dispositions, liquidations, dissolutions, or other corporate transactions that the Debtors and the Committee jointly determine to be necessary to implement the transactions described in this Plan, as described in more detail in Article IV.B herein and the Restructuring Transactions Memorandum.

136.    "*Restructuring Transactions Memorandum*" means that certain memorandum as may be amended, supplemented, or otherwise modified from time to time, describing the steps to be carried out to effectuate the Restructuring Transactions, the form of which shall be included in the Plan Supplement, and which shall be in a form reasonably acceptable to the Committee.

137.    "*Robertson Class Action*" means that certain putative class action litigation filed in the United States District Court for the Southern District of Florida, captioned *Robertson, et al. v. Cuban, et al.*, No. 1:22-cv-22538-RKA (S.D. Fla. Aug. 10, 2022).

138.    "*Sale Transaction*" means the sale of certain of the Debtors' assets and all other transactions pursuant to the Asset Purchase Agreement.

139.    "*Schedule of Assumed and Assigned Executory Contracts and Unexpired Leases*" means a schedule that may be Filed as part of the Plan Supplement, which shall be in form and substance acceptable to the Purchaser and in all respects consistent with the terms of the Asset Purchase Agreement, of certain Executory Contracts and Unexpired Leases to be assumed by the Debtors and assigned to the Purchaser pursuant to the Plan and Asset Purchase Agreement, as the same may be amended, modified, or supplemented from time to time by the Debtors or Wind-Down Trust, as applicable, in accordance with the Plan.

140.    "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means a schedule that may be Filed as part of the Plan Supplement, which shall be in form and substance reasonably acceptable to the Committee, of certain Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time by the Debtors or Wind-Down Trust, as applicable, in accordance with the Plan.

141.    "*Schedule of Retained Causes of Action*" means the schedule of certain Causes of Action of the Debtors that are not released, waived, settled, compromised, or transferred pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time by the Debtors and/or the Wind-Down Entity, which shall be included in the Plan Supplement.  For the avoidance of doubt, any failure to specifically list any Causes of Action on the Schedule of Retained Causes of Action shall not be deemed a waiver or admission that any such Cause of Action does not constitute Vested Causes of Action.

142.    "*Schedules*" means, collectively, the schedules of assets and liabilities, Schedule of Assumed Executory Contracts and Unexpired Leases, Schedule of Assumed and Assigned Executory

13

Contracts and Unexpired Leases, and statements of financial affairs Filed by each of the Debtors pursuant to section 521 of the Bankruptcy Code, as such schedules and statements may have been or may be amended, modified, or supplemented from time to time.

143. "*SEC*" means the United States Securities and Exchange Commission.

144. "*Section 510(b) Claim*" means any Claim against a Debtor subject to subordination under section 510(b) of the Bankruptcy Code.

145. "*Secured*" means, when referring to a Claim: (a) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) Allowed pursuant to the Plan as a secured Claim.

146. "*Secured Tax Claim*" means any Secured Claim against a Debtor that, absent its Secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

147. "*Securities Act*" means the U.S. Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

148. "*Security*" has the meaning set forth in section 2(a)(1) of the Securities Act.

149. "*Side-A Policy*" means the Cornerstone A-Side Management Liability Policy, ELU184179-22, issued by XL Specialty Insurance Company, for the July 1, 2022 to July 1, 2023 period.

150. "*Solicitation Materials*" means all solicitation materials with respect to the Plan.

151. "*Special Committee*" means the special committee established at OpCo, comprised of two independent directors, to conduct the Special Committee Investigation.

152. "*Special Committee Investigation*" means that certain investigation undertaken by the Special Committee into certain historical transactions, as more fully described in the Disclosure Statement.

153. "*Supported Jurisdiction*" has the meaning ascribed to it in the Asset Purchase Agreement.

154. "*TopCo*" means Voyager Digital Ltd., a Canadian corporation that is publicly traded on the Toronto Stock Exchange.

155. "*TopCo General Unsecured Claim*" means any Claim against TopCo that is not Secured and is not: (a) paid in full prior to the Effective Date pursuant to an order of the Bankruptcy Court; (b) an Administrative Claim; (c) a Secured Tax Claim; (d) a Priority Tax Claim; (e) an Other Priority Claim; (f) a Professional Fee Claim; (g) an Alameda Loan Facility Claim; (h) an Intercompany Claim; or (i) a Section 510(b) Claim. For the avoidance of doubt, all (i) Claims resulting from the rejection of Executory Contracts and Unexpired Leases, and (ii) Claims that are not Secured resulting from litigation, other than 510(b) Claims, against TopCo are TopCo General Unsecured Claims.

156.    "*Transferred Creditors*" means Account Holders and Holders of Allowed OpCo General Unsecured Claims who have completed all documentation and "KYC" processes reasonably required by Purchaser in the ordinary course of Purchaser's business with respect to similarly situated clients and who have opened a Binance US Account as of the date that is three (3) months following the later of the Closing Date (as defined in the Asset Purchase Agreement) or such later date as may be specified in the Customer Onboarding Protocol, and the successors and assigns of such Holders.

157.    "*Transferred Cryptocurrency Value*" means the aggregate VWAP of any Cryptocurrency that is the subject of an Additional Bankruptcy Distribution as of the date that is two Business Days prior to such Additional Bankruptcy Distribution.

158.     "*U.S. Trustee*" means the Office of the United States Trustee for Region 2.

159.    "*Unclaimed Distribution*" means any distribution under the Plan on account of an Allowed Claim or Allowed Interest to a Holder that, after the expiration of six months after the Effective Date, has not:  (a) accepted a distribution, (b) given notice to the Wind-Down Trust of an intent to accept a particular distribution, (c) responded to the Debtors' or Wind-Down Trust's requests for information necessary to facilitate a particular distribution, or (d) taken any other action necessary to facilitate such distribution.

160.    "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or section 1123 of the Bankruptcy Code.

161.    "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

162.     "*Unsupported Jurisdiction*" has the meaning ascribed to it in the Asset Purchase Agreement.

163.     "*Unsupported Jurisdiction Approval*" has the meaning ascribed to it in the Asset Purchase Agreement.

164.    "*Vested Causes of Action*" means the Causes of Action vesting in the Wind-Down Entity pursuant to Article IV.L of the Plan, including, but not limited to, those Causes of Action enumerated on the Schedule of Retained Causes of Action, which shall be included in the Plan Supplement and in all respects consistent with the terms of the Asset Purchase Agreement.

165.    "*VGX*" means Voyager Token, that certain Cryptocurrency issued by the Debtors.

166.    "*Voting Deadline*" means January 27, 2023.

167.    "*Voyager*" means Voyager Digital Ltd. and its direct and indirect Affiliates.

168.    "*VWAP*" means, with respect to any type of Cryptocurrency and as of any date of determination, an amount equal to the volume weighted average price in U.S. dollars for such type of Cryptocurrency for the consecutive 24-hour period immediately prior to 8:00 a.m. New York Time on such date of determination, as reported on https://coinmarketcap.com.

169.    "*Wind-Down Debtor*" means a Debtor, or any successor or assign thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Effective Date.

170.  "*Wind-Down Entity*" means the Wind-Down Debtor or the Wind-Down Trust, as applicable, pursuant to the Restructuring Transactions Memorandum.

171.  "*Wind-Down Entity Assets*" means the Wind-Down Trust Assets or any assets transferred to the Wind-Down Debtor, as applicable.

172.  "*Wind-Down Reserve*" means an amount, which shall be agreed upon between the Debtors and the Committee prior to the Confirmation Hearing.

173.  "*Wind-Down Trust*" means the trust established on the Effective Date and described in Article IV.H to be established under Delaware trust law that, among other things, shall effectuate the wind-down of the Wind-Down Debtors, commence, litigate and settle the Vested Causes of Action that are not released, waived, settled, compromised, or transferred under the Plan and make distributions pursuant to the terms of the Plan and the Wind-Down Trust Agreement; *provided* that, for the avoidance of doubt, the Wind-Down Trust shall not conduct any business operations or continue the Debtors' business operations after the Effective Date.

174.  "*Wind-Down Trust Agreement*" means that certain trust agreement by and among the Debtors, the Committee, and the Wind-Down Trust, which shall be included in the Plan Supplement in a form reasonably acceptable to the Committee.

175.  "*Wind-Down Trust Assets*" means all of the Debtors' assets transferred to, and vesting in, the Wind-Down Trust pursuant to the Wind-Down Trust Agreement, which, in the event the Sale Transaction is consummated, shall exclude the Acquired Assets, and which shall include, without limitation but only to the extent the following are not Acquired Assets, (a) the Wind-Down Reserve, (b) to the extent not purchased by Purchaser pursuant to the Asset Purchase Agreement, all VGX held by the Debtors as of the Petition Date, (c) 3AC Claims and 3AC Recovery, (d) FTX Claims and FTX Recovery, (e) Alameda Claims and Alameda Recovery, (f) the Non-Released D&O Claims, and (g) the Vested Causes of Action.

176.  "*Wind-Down Trust Beneficiaries*" means the Holders of Allowed Claims or Allowed Interests that are entitled to receive distributions pursuant to the terms of the Plan, whether or not such Claims or Interests are Allowed as of the Effective Date.

177.  "*Wind-Down Trust Expenses*" means all actual and necessary costs and expenses incurred by the Wind-Down Trustee in connection with carrying out the obligations of the Wind-Down Trust pursuant to the terms of the Plan and the Wind-Down Trust Agreement.

178.  "*Wind-Down Trust Oversight Committee*" means the oversight committee tasked with overseeing the Wind-Down Trust in accordance with the Plan and the Wind-Down Trust Agreement.

179.  "*Wind-Down Trust Units*" means the beneficial interests in the Wind-Down Trust as more fully set forth in the Wind-Down Trust Agreement.

180.  "*Wind-Down Trustee*" means the Person or Persons selected by the Committee, after consultation with the Debtors, subject to the approval of the Bankruptcy Court and identified in the Plan Supplement, to serve as the trustee(s) of the Wind-Down Trust, and any successor thereto, appointed pursuant to the Wind-Down Trust Agreement.

**B.** **Rules of Interpretation**

For purposes of this Plan: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter gender; (2) capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form; (3) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (4) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed, or to be Filed, shall mean that document, schedule, or exhibit, as it may thereafter have been or may thereafter be validly amended, amended and restated, supplemented, or otherwise modified; (5) unless otherwise specified, any reference to an Entity as a Holder of a Claim or Interest, includes that Entity's successors and assigns; (6) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (7) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (8) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) unless otherwise specified, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (12) references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (13) unless otherwise specified, all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases; (14) any effectuating provisions may be interpreted by the Debtors or the Wind-Down Trust in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; (15) any references herein to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter; (16) all references herein to consent, acceptance, or approval shall be deemed to include the requirement that such consent, acceptance, or approval be evidenced by a writing, which may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail; (17) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; and (18) the use of "include" or "including" is without limitation unless otherwise stated.

**C.** **Computation of Time**

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

**D.** **Governing Law**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan and any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, documents, instruments,

or contracts, in which case the governing law of such agreement shall control); *provided* that corporate, limited liability company, or partnership governance matters relating to the Debtors or the Wind-Down Debtors, as applicable, shall be governed by the laws of the jurisdiction of incorporation or formation of the relevant Debtor or Wind-Down Debtor, as applicable.

## E.    Reference to Monetary Figures

All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

## F.    Reference to the Debtors or the Wind-Down Debtors

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Wind-Down Debtors mean the Debtors and the Wind-Down Debtors, as applicable, to the extent the context requires.

## G.    Nonconsolidated Plan

Although for purposes of administrative convenience and efficiency the Plan has been filed as a joint plan for each of the Debtors and presents together Classes of Claims against and Interests in the Debtors, the Plan does not provide for the substantive consolidation of any of the Debtors.

<div align="center">

# ARTICLE II.

## ADMINISTRATIVE AND PRIORITY CLAIMS

</div>

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

## A.    Administrative Claims

Except as otherwise provided in this Article II.A and except with respect to Administrative Claims that are Professional Fee Claims or subject to 11 U.S.C. § 503(b)(1)(D), unless previously Filed, requests for payment of Allowed Administrative Claims (other than Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code) must be Filed and served on the Wind-Down Entity pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date. Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property, and such Administrative Claims shall be deemed satisfied as of the Effective Date without the need for any objection from the Wind-Down Entity or any notice to or action, order, or approval of the Bankruptcy Court or any other Entity. Objections to such requests, if any, must be Filed and served on the Wind-Down Entity and the requesting party by the Claims Objection Bar Date for Administrative Claims. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed by Final Order of the Bankruptcy Court.

Except with respect to Administrative Claims that are Professional Fee Claims, and except to the extent that an Administrative Claim or Priority Tax Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall receive an amount of Cash equal to the

amount of the unpaid or unsatisfied portion of such Allowed Administrative Claim in accordance with the following: (1) if such Administrative Claim is Allowed on or prior to the Effective Date, no later than thirty (30) days after the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction or course of business giving rise to such Allowed Administrative Claim, without any further action by the Holder of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtors or the Wind-Down Entity, as applicable; or (5) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court. Any Cryptocurrency inadvertently deposited to the Debtors' account(s) after the Petition Date shall be returned to the sender in full.

Objections to requests for payment of such Administrative Claims, if any, must be Filed with the Bankruptcy Court and served on the Wind-Down Entity and the requesting Holder no later than the Claims Objection Bar Date for Administrative Claims. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with, an order that becomes a Final Order of the Bankruptcy Court.

**B.**     **Professional Fee Claims**

     1.     <u>Final Fee Applications and Payment of Professional Fee Claims</u>

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five (45) days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code and Bankruptcy Rules. The Wind-Down Entity shall pay Professional Fee Claims in Cash to such Professionals in the amount the Bankruptcy Court allows, including from funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court; *provided* that the Debtors' and the Wind-Down Entity's obligations to pay Allowed Professional Fee Claims shall not be limited or deemed limited to funds held in the Professional Fee Escrow Account.

     2.     <u>Professional Fee Escrow Account</u>

No later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and the U.S. Trustee and for no other Entities until all quarterly U.S. Trustee fees and all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the U.S. Trustee or to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court. No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. No funds held in the Professional Fee Escrow Account shall be property of the Estates of the Debtors or the Wind-Down Entity. When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, and all U.S. Trustee quarterly fees plus statutory interest, if any, have been paid in full, any remaining funds held in the Professional Fee

Escrow Account shall be turned over to the Wind-Down Entity without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

    3.    <u>Professional Fee Escrow Amount</u>

The Professionals shall deliver to the Debtors a reasonable and good-faith estimate of their unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Confirmation Date projected to be outstanding as of the anticipated Effective Date, and shall deliver such estimate no later than five Business Days prior to the anticipated Effective Date.  For the avoidance of doubt, no such estimate shall be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that are the subject of a Professional's final request for payment of Professional Fee Claims Filed with the Bankruptcy Court, and such Professionals are not bound to any extent by the estimates.  If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.  The total aggregate amount so estimated to be outstanding as of the anticipated Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account; *provided* that the Wind-Down Entity shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are Filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

    4.    <u>Post-Confirmation Date Fees and Expenses</u>

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors and/or the Wind-Down Entity, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Wind-Down Entity.  Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Wind-Down Entity may employ and pay any Professional in the ordinary course of business for the period after the Confirmation Date without any further notice to or action, order, or approval of the Bankruptcy Court.

For the avoidance of doubt, no Administrative Claims, Professional Fee Claims, or any other post-confirmation fees and expenses shall be paid prior to payment of any quarterly fees due and outstanding to the U.S. Trustee.

**C.    Priority Tax Claims**

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

## ARTICLE III.

## CLASSIFICATION, TREATMENT,
## AND VOTING OF CLAIMS AND INTERESTS

**A.    Classification of Claims and Interests**

Except for the Claims addressed in Article II of the Plan, all Claims against and Interests in the Debtors are classified in the Classes set forth in this Article III for all purposes, including voting,

Confirmation, and distributions pursuant to the Plan and in accordance with section 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

**B.    Summary of Classification**

A summary of the classification of Claims against and Interests in each Debtor pursuant to the Plan is set forth in the following chart. The Plan constitutes a separate chapter 11 plan for each of the Debtors, and accordingly, the classification of Claims and Interests set forth below applies separately to each of the Debtors. All of the potential Classes for the Debtors are set forth herein. Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Claims or Interests shall be treated as set forth in Article III.E hereof. Voting tabulations for recording acceptances or rejections of the Plan will be conducted on a Debtor-by-Debtor basis as set forth above.[1]

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | Account Holder Claims | Impaired | Entitled to Vote |
| 4A | OpCo General Unsecured Claims | Impaired | Entitled to Vote |
| 4B | HoldCo General Unsecured Claims | Impaired | Entitled to Vote |
| 4C | TopCo General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Alameda Loan Facility Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 6 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |
| 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |

---

[1]    The Debtors reserve the right to separately classify Claims or Interests to the extent necessary to comply with any requirements under the Bankruptcy Code or applicable law.

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 9 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

## C. Treatment of Classes of Claims and Interests

Subject to Article VI hereof, each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors or Wind-Down Entity, as applicable, and the Holder of such Allowed Claim or Allowed Interest, as applicable. In no event shall any Holder of a Claim receive more than such Holder's Allowed amount on account of such Claim.

1.  Class 1 —Secured Tax Claims

    (a)  *Classification*: Class 1 consists of all Secured Tax Claims.

    (b)  *Treatment*: Each Holder of an Allowed Secured Tax Claim shall receive, in full and final satisfaction of such Allowed Secured Tax Claim, at the option of the Wind-Down Entity, payment in full in Cash of such Holder's Allowed Secured Tax Claim or such other treatment rendering such Holder's Allowed Secured Tax Claim Unimpaired.

    (c)  *Voting*: Class 1 is Unimpaired under the Plan. Holders of Allowed Secured Tax Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Therefore, Holders of Allowed Secured Tax Claims are not entitled to vote to accept or reject the Plan.

2.  Class 2 — Other Priority Claims

    (a)  *Classification*: Class 2 consists of all Other Priority Claims.

    (b)  *Treatment*: Each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Allowed Other Priority Claim, at the option of the applicable Debtor, payment in full in Cash of such Holder's Allowed Other Priority Claim or such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired.

    (c)  *Voting*: Class 2 is Unimpaired under the Plan. Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Therefore, Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan.

3.  Class 3 — Account Holder Claims

    (a)  *Classification*: Class 3 consists of all Account Holder Claims.

    (b)  *Allowance*: Account Holder Claims shall be conclusively Allowed in the amount listed on OpCos's *Amended Schedules of Assets and Liabilities* (Case No. 22-10945) [Docket No. 18]; *provided* that the rights of any Holder of an

Account Holder Claim to object to the scheduled amount shall be preserved.  To the extent an Account Holder Claim is Allowed in a greater amount than the scheduled amount of such Account Holder Claim, such Holder shall be entitled to a subsequent distribution such that it will receive its Pro Rata share of recoveries to Holders of Allowed Account Holder Claims.  Account Holder Claims shall be valued in U.S. dollars as of the Petition Date consistent with section 502(b) of the Bankruptcy Code.

(c)     *Treatment*:  Each Holder of an Allowed Account Holder Claim will receive in exchange for such Allowed Account Holder Claim:

(i)     If the Sale Transaction is consummated by the Outside Date:

A.     for Account Holders in Supported Jurisdictions, its Net Owed Coins, as provided in and subject to the requirements of Section 6.12 of the Asset Purchase Agreement;

B.     for Account Holders in Unsupported Jurisdictions, value in Cash at which such Net Owned Coins allocable to such Account Holder are liquidated; *provided* that to the extent that the Purchaser obtains the Unsupported Jurisdiction Approval for the jurisdiction in which such Account Holder resides and the Debtors and/or Wind-Down Entity has not made such Cash distribution to such Account Holder, then such Account Holder shall receive the treatment in Article III.C.3(c)(i)(A);

C.     its Pro Rata share of any Additional Bankruptcy Distributions, in Cryptocurrency or Cash as provided in and subject to the requirements of Sections 6.12 and 6.14 of the Asset Purchase Agreement;

D.     its Pro Rata share of Distributable OpCo Cash; and

E.     to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to OpCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims;

*provided* that distributions made to any Account Holder pursuant to clauses (C), (D), and (E) above shall be made after taking into account the Acquired Coins Value of the Net Owed Coins or the value in Cash at which such Net Owed Coins are liquidated, as applicable, previously allocated to such Account Holder; or

(ii)     If the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated:

A. its Pro Rata share of Distributable OpCo Cash;

B. its Pro Rata share of Distributable Cryptocurrency, which such Account Holder shall be able to withdraw in kind, alternative Cryptocurrency, and/or Cash for a period of thirty (30) days after the Effective Date through the Voyager platform or, if elected by Seller pursuant to Section 6.12(d) of the Asset Purchase Agreement, through the Binance.US Platform; *provided* that if the applicable transfer is made through the Voyager platform and such Account Holder does not withdraw its Pro Rata share of Distributable Cryptocurrency available to such Account Holder from the Voyager platform within such thirty (30) day period, such Account Holder will receive Cash in the equivalent value to its Pro Rata share of Distributable Cryptocurrency; and

C. to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to OpCo; *provided* that any distributions on account of Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

(d)     *Voting:* Class 3 is Impaired under the Plan. Holders of Allowed Account Holder Claims are entitled to vote to accept or reject the Plan.

4.     <u>Class 4A — OpCo General Unsecured Claims</u>

(a)     *Classification*: Class 4A consists of all OpCo General Unsecured Claims.

(b)     *Treatment*: Each Holder of an Allowed OpCo General Unsecured Claim will receive in exchange for such Allowed OpCo General Unsecured Claim:

(i)     If the Sale Transaction is consummated by the Outside Date:

A. its Pro Rata share of Distributable Cryptocurrency in Cash;

B. its Pro Rata share of Additional Bankruptcy Distributions, in Cryptocurrency or Cash as provided in and subject to the requirements of Sections 6.12 and 6.14 of the Asset Purchase Agreement;

C. its Pro Rata share of Distributable OpCo Cash; and

D. to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-

> Down Trust Assets attributable to OpCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims; or

    (ii)    If the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated:

        A.    its Pro Rata share of Distributable Cryptocurrency in Cash;

        B.    its Pro Rata share of Distributable OpCo Cash; and

        C.    to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to OpCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

    (c)    *Voting*: Class 4A is Impaired under the Plan. Holders of Allowed OpCo General Unsecured Claims are entitled to vote to accept or reject the Plan.

5.    <u>Class 4B — HoldCo General Unsecured Claims</u>

    (a)    *Classification*: Class 4B consists of all HoldCo General Unsecured Claims.

    (b)    *Treatment*: Each Holder of an Allowed HoldCo General Unsecured Claim will receive in exchange for such Allowed HoldCo General Unsecured Claim:

    (i)    its Pro Rata share of Distributable HoldCo Cash; and

    (ii)    to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to HoldCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

(c)   *Voting*: Class 4B is Impaired under the Plan.  Holders of Allowed HoldCo General Unsecured Claims are entitled to vote to accept or reject the Plan.

6.   <u>Class 4C — TopCo General Unsecured Claims</u>

(a)   *Classification*:  Class 4C consists of all TopCo General Unsecured Claims.

(b)   *Treatment*:  Each Holder of an Allowed TopCo General Unsecured Claim will receive in exchange for such Allowed TopCo General Unsecured Claim:

(i)   its Pro Rata share of Distributable TopCo Cash; and

(ii)   to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of the Wind-Down Trust Assets attributable to TopCo; *provided* that any distributions on account of the Wind-Down Entity Assets or the Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

(c)   *Voting*:  Class 4C is Impaired under the Plan.  Holders of Allowed TopCo General Unsecured Claims are entitled to vote to accept or reject the Plan.

7.   <u>Class 5 — Alameda Loan Facility Claims</u>

(a)   *Classification*:  Class 5 consists of all Alameda Loan Facility Claims.

(b)   *Treatment*:  Each Holder of an Allowed Alameda Loan Facility Claim will receive in exchange for such Allowed Alameda Loan Facility Claim to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets; *provided* that any distributions on account of Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, all Allowed Claims at OpCo, HoldCo, and TopCo, including, but not limited to, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, Allowed Account Holder Claims, Allowed OpCo General Unsecured Claims, Allowed HoldCo General Unsecured Claims, and Allowed TopCo General Unsecured Claims.

(c)   *Voting*:  Class 5 is Impaired under the Plan.  Holders of Allowed Alameda Loan Facility Claims are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Allowed Alameda Loan Facility Claims are not entitled to vote to accept or reject the Plan.

8.     <u>Class 6 — Section 510(b) Claims</u>

     (a)    *Classification*: Class 6 consists of all Section 510(b) Claims against TopCo.

     (b)    *Allowance*: Notwithstanding anything to the contrary herein, a Section 510(b) Claim against TopCo, if any such Section 510(b) Claim exists, may only become Allowed by Final Order of the Bankruptcy Court.

     (c)    *Treatment*: Each Holder of Allowed Section 510(b) Claims against TopCo will receive, to effectuate distributions, if applicable, from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to TopCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, and Allowed TopCo General Unsecured Claims.

     (d)    *Voting*: Class 6 is Impaired under the Plan. Holders (if any) of Allowed Section 510(b) Claims against TopCo are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. Therefore, Holders (if any) of Allowed Section 510(b) Claims against TopCo are not entitled to vote to accept or reject the Plan.

9.     <u>Class 7 — Intercompany Claims</u>

     (a)    *Classification*: Class 7 consists of all Intercompany Claims.

     (b)    *Treatment*: On the Effective Date, all Intercompany Claims shall be, at the option of the Debtors, either (a) Reinstated or (b) converted to equity, otherwise set off, settled, distributed, contributed, or cancelled, in each case in accordance with the Restructuring Transactions Memorandum.

     (c)    *Voting*: Holders of Intercompany Claims are either Unimpaired or Impaired, and such Holders of Intercompany Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Therefore, Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

10.     <u>Class 8 — Intercompany Interests</u>

     (a)    *Classification*: Class 8 consists of all Intercompany Interests.

     (b)    *Treatment*: On the Effective Date, all Intercompany Interests shall be, at the option of the Debtors, either (a) Reinstated in accordance with Article III.G of the Plan or (b) set off, settled, addressed, distributed, contributed, merged, or cancelled, in each case in accordance with the Restructuring Transactions Memorandum.

     (c)    *Voting*: Holders of Intercompany Interests are either Unimpaired or Impaired, and such Holders of Intercompany Interests are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Therefore,

Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

11. <u>Class 9 — Existing Equity Interests</u>

    (a)    *Classification*: Class 9 consists of all Existing Equity Interests.

    (b)    *Treatment*: Each Holder of Existing Equity Interests will receive, to effectuate distributions, if applicable, from the Wind-Down Entity, its Pro Rata share of the Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to TopCo; *provided* that any distributions on account of Wind-Down Trust Units shall only be made following payment in full of, or reserve for, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, and Allowed TopCo General Unsecured Claims.

    (c)    *Voting*: Class 9 is Impaired under the Plan. Holders of Existing Equity Interests are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. Therefore, Holders of Existing Equity Interests are not entitled to vote to accept or reject the Plan.

**D.    Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Wind-Down Entity's rights in respect of any Unimpaired Claim, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

**E.    Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes**

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

**F.    Subordinated Claims**

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims against and Allowed Interests in the Debtors and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors and the Wind-Down Entity reserve the right to reclassify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

**G.    Intercompany Interests**

To the extent Reinstated under the Plan, distributions (if any) on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the corporate

structure given the existing intercompany systems connecting the Debtors and their Affiliates, and in exchange for the Debtors' and Wind-Down Entity's agreement under the Plan to make certain distributions to the Holders of Allowed Claims.

## H. Controversy Concerning Impairment

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

## I. Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code

Section 1129(a)(10) of the Bankruptcy Code is satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims or Interests. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

## ARTICLE IV.

## PROVISIONS FOR IMPLEMENTATION OF THE PLAN

## A. General Settlement of Claims and Interests

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan. The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 of all such Claims, Interests, Causes of Action, and controversies, as well as a finding by the Bankruptcy Court that such compromise and settlement is fair, equitable, reasonable, and in the best interests of the Debtors, their Estates, and Holders of Claims and Interests. Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Interests in any Class are intended to be and shall be final.

## B. Restructuring Transactions

On or before the Effective Date, the applicable Debtors will take any action as may be necessary or advisable to effectuate the Restructuring Transactions described in the Plan, the Restructuring Transactions Memorandum, and the Customer Onboarding Protocol, including: (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (3) the filing of appropriate

certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (4) the transfer or distribution of any Cryptocurrency or Cash pursuant to the Asset Purchase Agreement, or the Liquidation Procedures, as applicable; (5) the execution and delivery of the Wind-Down Trust Agreement; (6) any transactions necessary or appropriate to form the Wind-Down Entity; (7) such other transactions that are required to effectuate the Restructuring Transactions, including any sales, mergers, consolidations, restructurings, conversions, dispositions, transfers, formations, organizations, dissolutions, or liquidations; (8) all transactions necessary to provide for the purchase of the Acquired Assets by Purchaser under the Asset Purchase Agreement; and (9) all other actions that the applicable Entities determine to be necessary or appropriate, or that are reasonably requested by the Purchaser in accordance with the Asset Purchase Agreement, including making filings or recordings that may be required by applicable law.

The Confirmation Order shall, and shall be deemed to, pursuant to sections 1123 and 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions.

## C.     The Sale Transaction

If the Sale Transaction is consummated by the Outside Date, pursuant to the terms of the Asset Purchase Agreement, then the following terms shall govern:

On or prior to the Effective Date, the Debtors shall have consummated the Sale Transaction, and, among other things, the Acquired Assets and Assumed Liabilities shall have transferred to the Purchaser free and clear of all Liens, Claims, Interests, charges, or other encumbrances, and the Purchaser shall pay to the Debtors or Holders of Account Holder Claims and Holders of OpCo General Unsecured Claims, as applicable, the proceeds from the Sale Transaction, as and to the extent provided for in the Asset Purchase Agreement, and this Plan. The Confirmation Order shall authorize the Debtors, the Purchaser, and the Wind-Down Entity, as applicable, to undertake the transactions contemplated by the Asset Purchase Agreement, including pursuant to sections 363, 365, 1123(a)(5)(B), and 1123(a)(5)(D) of the Bankruptcy Code.

The Debtors and Purchaser shall be authorized to take all actions as may be deemed necessary or appropriate to consummate the Sale Transaction pursuant to the terms of the Asset Purchase Agreement the Customer Onboarding Protocol, and this Plan. The Debtors shall be authorized to sell any Cryptocurrency to satisfy all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims. On and after the Effective Date, except as otherwise provided in the Plan and the Wind-Down Trust Agreement, the Wind-Down Debtors, the Wind-Down Entity, or the Purchaser, as applicable, may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; provided, that the Bankruptcy Court shall retain jurisdiction to resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with any of the foregoing.

Notwithstanding anything contained in this Plan and any Definitive Documents, if the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated, all provisions contained in this Plan and the Definitive Documents governing the Sale Transaction shall have no further force and effect, and the provisions governing the Liquidation Transaction shall govern. The rights and remedies of the Seller and Purchaser under the Asset Purchase Agreement and any related orders of the Bankruptcy Court shall be expressly preserved.

**D.      The Liquidation Transaction**

If the Sale Transaction is not consummated by the Outside Date, pursuant to the Asset Purchase Agreement, then the following terms shall govern:

1.      *The Liquidation Transaction*

On or after the Outside Date, the Debtors will pursue the Liquidation Transaction in accordance with the Liquidation Procedures. Pursuant to the Liquidation Transaction, the Debtors, the Wind-Down Entity, or the Wind-Down Trustee, as applicable, will distribute certain of the Cryptocurrency in-kind to Holders of Account Holder Claims in accordance with Article III.C of the Plan, transfer all Wind-Down Entity Assets or Wind-Down Trust Assets to the Wind-Down Reserve, liquidate certain of the Cryptocurrency, distribute Cash to Holders of Claims, wind down and dissolve the Debtors, and pursue final administration of the Debtors' Estates pursuant to the Bankruptcy Code.

The Debtors, or the Wind-Down Entity, as applicable, shall be authorized to take all actions as may be deemed necessary or appropriate to consummate the Liquidation Transaction pursuant to this Plan. On or before the date that is twenty-one days prior to the anticipated commencement of the Liquidation Transaction, the Debtors, or the Wind-Down Entity, as applicable, shall file the Liquidation Procedures with the Bankruptcy Court. Parties in interest shall have ten days to object to the Liquidation Procedures, and if no objections are timely filed, the Liquidation Procedures shall be approved. In the event of a timely objection, the Bankruptcy Court shall adjudicate any objection to the Liquidation Procedures.

On and after the Effective Date, except as otherwise provided in the Plan, the Wind-Down Trust Agreement, and the Liquidation Procedures, the Wind-Down Debtors or the Wind-Down Entity as applicable, may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; provided, that the Bankruptcy Court shall retain jurisdiction to resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with any of the foregoing.

2.      *Cryptocurrency Rebalancing*

Prior to the Effective Date the Debtors shall, in consultation with the Committee, be authorized to rebalance their Cryptocurrency portfolio, *provided* that such rebalancing shall be in accordance with the Asset Purchase Agreement. The Debtors may effectuate such rebalancing by (i) selling such Cryptocurrency that cannot be distributed to Account Holders, (ii) purchasing Cryptocurrency supported by Voyager's or Purchaser's platform (as provided by the Asset Purchase Agreement) that shall be distributed to Account Holders, and (iii) engaging in any other transaction, including the execution of trades of Cryptocurrency, necessary or appropriate to effectuate distributions of the Distributable Cryptocurrency to Holders of Allowed Account Holder Claims.

**E.      Management Transition Plan**

The Debtors shall be authorized to implement the Management Transition Plan, the terms of which shall be reasonably acceptable to Purchaser and the Committee and included in the Plan Supplement. The Management Transition Plan shall help ensure that employees are available to provide transition services to the Debtors and/or the Wind-Down Entity to effectuate the Sale Transaction and to wind down the Debtors' Estates.

## F. Non-Released D&O Claims

Any Claims or Causes of Action held by the Debtors or their respective estates against the Debtors' CEO and/or CCO (regardless of any fiduciary capacity in which such individuals were acting) that are expressly related to approval of the 3AC Loan are not released pursuant to the Plan (collectively, the "Non-Released D&O Claims"), and shall be assigned and transferred to the Wind-Down Entity to be pursued, settled, or resolved by the Wind-Down Entity in accordance with the terms of Article IV.G of this Plan and subject to the Wind-Down Reserve. Any claims against the D&O Carriers that the Debtors' insurance transactions within the 90 days prior to the Petition Date are avoidable under the Bankruptcy Code, applicable state law, or both (the "Non-Released Insurance Claims") shall be assigned and transferred to the Wind-Down Entity to be pursued, settled, or resolved solely by the Wind-Down Entity in accordance with the terms of Article IV.G of this Plan. The Wind-Down Entity shall be a successor to the Debtors' rights, title, and interest in any Non-Released D&O Claims and Non-Released Insurance Claims, and the Wind-Down Entity shall have standing to pursue the Non-Released D&O Claims and the Non-Released Insurance Claims in accordance with the terms of Article IV.G of this Plan; *provided* that: (i) any recovery by the Wind-Down Entity (and the beneficiaries thereof) on account of any Non-Released D&O Claim, including in each case by way of settlement or judgment, shall be satisfied solely by and to the extent of the proceeds of the Debtors' available D&O Liability Insurance Policies (and/or from the D&O Carriers directly) after payment from such D&O Liability Insurance Policies of any and all covered costs and expenses incurred in connection with the defense of the Non-Released D&O Claims; (ii) any party, including any trustee or any beneficiary of the Wind-Down Entity, seeking to execute, garnish, or otherwise attempt to collect on any settlement of or judgment in the Non-Released D&O Claims shall do so solely upon available insurance coverage from the Debtors' available D&O Liability Insurance Policies; and (iii) no party shall (a) record any judgment against the CEO or CCO, or (b) otherwise attempt to collect, directly or indirectly, from the personal assets of the CEO or CCO with respect to the Non-Released D&O Claims. For the avoidance of doubt, this provision does not enjoin, limit, or impair direct claims held by third parties against the Debtors' CEO or CCO (if any) other than any direct claims held by Holders of Claims or Interests that opt into the third party release in Article VIII.B of this Plan. Only upon the occurrence of the earlier of (x) a release being given as part of any later settlement of the Non-Released D&O Claims; (y) final resolution of any coverage claims asserted against the Debtors' available D&O Liability Insurance Policies on account of the Non-Released D&O Claims; or (z) exhaustion of the available insurance coverage under the D&O Liability Insurance Policies, the Non-Released D&O Claims shall be released and discharged without the need for further action or Bankruptcy Court order. For the avoidance of doubt, any release of the Non-Released D&O Claims shall not become effective until one of the three conditions stated in the preceding sentence above has been met.

## G. The D&O Settlement

On the Effective Date, the terms of the D&O Settlement shall be effectuated as provided in this Article IV.G.

Pursuant to the D&O Settlement, CEO shall repay the $1,900,000 received from the Debtors on or around February 28, 2022, by paying the after-tax amount of such transfer (approximately $1,125,000) to OpCo in cash and assigning the right, if any, to any tax refund for the balance to the Wind-Down Entity. CEO shall subordinate any Claims (including any indemnification claims asserted under this Art. IV.F) he holds against the Debtors until all other Holders of Claims are paid in full. CCO shall subordinate 50 percent of any Claims he holds other than indemnification claims (and 100% of any indemnification claims asserted under this Art. IV.F) against the Debtors until all other Holders of Claims are paid in full; *provided*, *however*, that in the event the D&O Carriers deny coverage to CEO or CCO under the D&O Insurance Policies on account of such subordination of any indemnification claim, then any indemnification claims by CEO or CCO shall not be so subordinated, but may be filed as an OpCo General Unsecured Claim.

CEO and CCO, each as insureds, under the D&O Liability Insurance Policies agree: (i) not to draw down on the Side-A Policy; *provided*, *however*, that should coverage continue to be available under the Side-A Policy following resolution of the Debtors' and/or the Wind-Down Entity's claims for the avoidance of the premium paid for the policy (whether by judgment or settlement or otherwise) such officer shall be entitled to seek coverage under the Side-A Policy to the extent any such coverage remains; and (ii) not to object to any settlement by the Debtors or Wind Down Entity of avoidance claims under the Side-A Policy, even if such settlement results in termination of benefits under the Side-A Policy. For the avoidance of doubt, this agreement is not intended to and shall not alter or amend each of the insureds' duties under the D&O Liability Insurance Policies. In the event that any insurer under the D&O Liability Insurance Policies denies coverage for any reason, the Wind-Down Entity shall have the right to bring a coverage claim against the insurer(s) in the name of the insured, the insureds shall reasonably cooperate with respect to any such claim, and the insured may participate at their election (and at their sole cost). For the avoidance of doubt, nothing contained in this Plan is intended as a waiver or release of the Debtors' and/or Wind-Down Entity's right to assert any Non-Released D&O Claim, but rather limits such recovery in the manner set forth above.

CEO and CCO shall be entitled to receive their salary and benefits for as long as they work for the Debtors and/or the Wind-Down Entity and retain the right to assert claims for advancement and indemnification up to the limits of any available coverage in the event any of the insurers that issued the Management Liability Policy, the Excess Policy, or the Side-A Policy denies coverage to CEO and/or CCO based upon or arising out of the lack of a formal claim for indemnification; *provided*, *however*, that any such indemnification or advancement claims shall be subordinated in full unless and until all other Holders of Claims are paid in full; *provided*, *further*, that in the event that any of the D&O Carriers deny coverage to CEO or CCO under the D&O Insurance Policies on account of such subordination of any indemnification claim, then any indemnification claims by CEO or CCO shall not be so subordinated, but may be filed as an OpCo General Unsecured Claim.

CEO and CCO shall subordinate any and all rights and entitlements under the Cornerstone A-Side Management Liability Insurance Policy to Voyager Digital LLC, Policy Number ELU184179-22, to any recovery by the Debtors and/or the Wind-Down Entity on account of the Debtors' and/or Wind-Down Entity's claims for the avoidance of the premium paid for the policy. For the avoidance of doubt, should coverage continue to be available under the Side-A Policy following resolution of the Debtors' and/or the Wind-Down Entity's claims for the avoidance of the premium paid for the policy (whether by judgment or settlement or otherwise), CEO and/or CCO shall be entitled to seek coverage under the Side-A Policy. CEO and CCO shall remain at, and continue performing the responsibilities of, their respective position(s) with the Debtors and assist with the Debtors' transition for at least 30 days from entry of the Confirmation Order; *provided* that CCO shall have no obligation to remain at his position with the Debtors beyond January 15, 2023 and the CEO shall have the right to pursue and engage in any employment opportunity, business venture, consulting arrangement, or investment that may become available; *provided*, *further*, that both the CEO and CCO shall be available to the Debtors and/or the Wind-Down Entity for a maximum of five hours per month for the one year following the Effective Date.

In the event that the sworn financial disclosure statements under penalty of perjury provided to the Debtors, the Special Committee and the Committee by CEO and CCO are later determined at any time by Final Order of the Bankruptcy Court or other court of competent jurisdiction to be materially inaccurate, (a) the limitations on recovery by the Wind-Down Entity under this Article IV.G shall no longer apply, (b) any and all release, exculpation and injunction provisions in Article VIII of this Plan with respect to CEO and/or CCO (as applicable) shall be deemed null and void, (c) all Releasing Parties' rights with respect to the CEO and/or CCO (as applicable) shall be fully intact and preserved, (d) amounts paid by CEO shall not be repaid by the Wind-Down Entity, and (e) any applicable statute of limitations shall be deemed tolled from the Petition Date to the date of entry of the order referenced above. The Wind-Down Trust, as successor to the Debtors, shall have standing to bring a motion seeking relief pursuant to this Article IV.G.

Entry of the Confirmation Order shall be deemed approval of the D&O Settlement and, to the extent not already approved by the Bankruptcy Court, the Debtors or the Wind-Down Debtors, as applicable, are authorized to negotiate, execute, and deliver those documents necessary or appropriate to effectuate the D&O Settlement, without further notice or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors, the Wind-Down Debtors, the Committee, and the Special Committee may deem to be necessary to effectuate the D&O Settlement.

**H.      Wind-Down Trust**

On the Effective Date, the Wind-Down Trust shall be formed for the benefit of the Wind-Down Trust Beneficiaries and each of the Debtors shall transfer the Wind-Down Trust Assets for distribution in accordance with the terms of the Plan.  The Confirmation Order shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

1.      Establishment of a Wind-Down Trust

Pursuant to the Wind-Down Trust Agreement, the Wind-Down Trust will be established.  The Wind-Down Trust shall be the successor-in-interest to the Debtors, and the Wind-Down Trust shall be a successor to the Debtors' rights, title, and interest to the Wind-Down Trust Assets.  The Wind-Down Trust will conduct no business operations and will be charged with winding down the Debtors' Estates.  The Wind-Down Trust shall be managed by the Wind-Down Trustee and shall be subject to a Wind-Down Trust Oversight Committee.  For the avoidance of doubt, in the event that the Restructuring Transactions Memorandum specifies that the Wind-Down Debtors will be the Wind-Down Entity, the Wind-Down Debtors shall be managed by the Wind-Down Trustee and shall be subject to the Wind-Down Trust Oversight Committee in the same manner as if the Wind-Down Entity is the Wind-Down Trust.  The Wind-Down Trust shall be administered in accordance with the terms of the Wind-Down Trust Agreement and shall be subject to the Wind-Down Reserve and the Non-Released D&O Claim Budget.  For the avoidance of doubt, the Wind-Down Trust shall not have any right or interest in any Cause of Action or Claim constituting an Acquired Asset.  The Wind-Down Trust shall be administered in a manner consistent with the SEC's published guidance on liquidating trusts.

Prior to the Effective Date, any and all of the Debtors' assets shall remain assets of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and on the Effective Date the Wind-Down Trust Assets shall, subject to the Wind-Down Trust Agreement, be transferred to and vest in the Wind-Down Trust or the Wind-Down Debtors, as applicable.  For the avoidance of doubt, to the extent not otherwise waived in writing, released, settled, compromised, assigned or sold pursuant to a prior order or the Plan, the Wind-Down Entity specifically retains and reserves the right to assert, after the Effective Date, any and all of the Vested Causes of Action and related rights, whether or not asserted as of the Effective Date, and all proceeds of the foregoing, subject to the terms of the Plan, including without limitation Article IV.F and Article IV.G.

Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, only the Wind-Down Trust and the Wind-Down Trustee shall have the right to pursue or not to pursue, or, subject to the terms hereof and the Wind-Down Trust Agreement, compromise or settle any Wind-Down Trust Assets transferred to the Wind-Down Trust.  On and after the Effective Date, the Wind-Down Trust and the Wind-Down Trustee may, without further Bankruptcy Court approval, commence, litigate, and settle any Vested Causes of Action or Claims relating to any Wind-Down Trust Assets transferred to the Wind-Down Trust or rights to payment or Claims that belong to the Debtors as of the Effective Date or are instituted by the Wind-Down Trust or

the Wind-Down Trustee on or after the Effective Date, except as otherwise expressly provided herein and in the Wind-Down Trust Agreement. All of the Wind-Down Trust's activities shall be subject to the Wind-Down Reserve and the Non-Released D&O Claim Budget. The Wind-Down Trust shall be entitled to enforce all defenses and counterclaims to all Claims asserted against the Debtors and their Estates, including setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code.

The Wind-Down Trustee shall be deemed hereby substituted as plaintiff, defendant, or in any other capacity for the Debtors in any Causes of Action pending before the Bankruptcy Court or any other court that relates to a Wind-Down Trust Asset without the need for filing any motion for such relief. On the Effective Date, the Debtors and the Wind-Down Trustee shall execute the Wind-Down Trust Agreement and shall have established the Wind-Down Trust pursuant hereto. In the event of any conflict between the terms of this Article IV.H and the terms of the Wind-Down Trust Agreement, the terms of the Wind-Down Trust Agreement shall control.

### 2. Wind-Down Entity Assets

Notwithstanding any prohibition on assignability under applicable non-bankruptcy law, on the Effective Date and thereafter if additional Wind-Down Entity Assets become available, the Debtors shall be deemed, subject to the Wind-Down Trust Agreement, to have automatically transferred to the applicable Wind-Down Entity all of their right, title, and interest in and to all of the Wind-Down Trust Assets, in accordance with section 1141 of the Bankruptcy Code. All such assets shall automatically vest in the Wind-Down Entity free and clear of all Claims, Liens, and other interests, subject only to the Allowed Claims and Interests as set forth herein and the expenses of the Wind-Down Trust as set forth herein and in the Wind-Down Trust Agreement. Thereupon, the Debtors shall have no interest in or with respect to the Wind-Down Entity Assets or the Wind-Down Trust.

### 3. Treatment of Wind-Down Trust for Federal Income Tax Purposes; No Successor-in-Interest

The Wind-Down Trust shall be established for the primary purpose of liquidating and distributing the Wind-Down Trust Assets transferred to it, in accordance with Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Wind-Down Trust. Accordingly, the Wind-Down Trustee may, in an expeditious but orderly manner, liquidate the Wind-Down Trust Assets, make timely distributions to the Wind-Down Trust Beneficiaries and not unduly prolong its duration. The Wind-Down Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth herein or in the Wind-Down Trust Agreement. The record holders of beneficial interests shall be recorded and set forth in a register maintained by the Wind-Down Trustee expressly for such purpose.

The Wind-Down Trust is intended to qualify as a "grantor trust" for federal income tax purposes to the extent reasonably practicable, with the Wind-Down Trust Beneficiaries treated as grantors and owners of the Wind-Down Trust. However, with respect to any of the assets of the Wind-Down Trust that are subject to potential disputed claims of ownership or uncertain distributions, *or* to the extent "liquidating trust" treatment is otherwise unavailable, the Debtors anticipate that such assets will be subject to disputed ownership fund treatment under Section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes. Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account. Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account

(and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

    4.    <u>Appointment of Wind-Down Trustee</u>

        The Wind-Down Trustee shall be selected by the Committee, in consultation with the Debtors, and shall be identified in the Plan Supplement. The appointment of the Wind-Down Trustee shall be approved in the Confirmation Order, and the Wind-Down Trustee's duties shall commence as of the Effective Date. The Wind-Down Trustee shall administer the distributions to the Wind-Down Trust Beneficiaries and shall serve as a representative of the Estates under section 1123(b) of the Bankruptcy Code for the purpose of enforcing Vested Causes of Action belonging to the Estates that are not released, waived, settled, compromised, or transferred pursuant to the Plan and subject to the limitations set forth in the Plan, including Article IV.F and Article IV.G.

        In accordance with the Wind-Down Trust Agreement, the Wind-Down Trustee shall serve in such capacity through the earlier of (i) the date on which the Wind-Down Trust is dissolved in accordance with the Wind-Down Trust Agreement, and (ii) the date on which a Wind-Down Trustee resigns, is terminated, or is otherwise unable to serve; *provided, however*, that, in the event that a Wind-Down Trustee resigns, is terminated, or is otherwise unable to serve, the Wind-Down Trust Oversight Committee shall appoint a successor to serve as a Wind-Down Trustee in accordance with the Wind-Down Trust Agreement. If the Wind-Down Trust Oversight Committee does not appoint a successor within the time periods specified in the Wind-Down Trust Agreement, then the Bankruptcy Court, upon the motion of any party-in-interest, including counsel to the Wind-Down Trust, shall approve a successor to serve as a Wind-Down Trustee.

    5.    <u>Responsibilities of Wind-Down Trustee</u>

        Responsibilities of the Wind-Down Trustee shall be as identified in the Wind-Down Trust Agreement and shall include, but are not limited to:

        (a)    Implementing the Wind-Down Trust, and making the distributions contemplated by the Plan;

        (b)    Marshalling, marketing for sale, and wind-down of any of the Debtors' assets constituting Wind-Down Trust Assets;

        (c)    Filing and prosecuting any objections to Claims or Interests or settling or otherwise compromising such Claims and Interests, if necessary and appropriate, in accordance with the Plan hereof;

        (d)    Commencing, prosecuting, or settling claims and Vested Causes of Action;

        (e)    Recovering and compelling turnover of the Debtors' property;

        (f)    Prosecuting and settling the 3AC Claims, FTX Claims, and Alameda Claims;

        (g)    Paying Wind-Down Trust Expenses;

        (h)    Abandoning any Debtor assets that cannot be sold or otherwise disposed of for value and where a distribution to Holders of Allowed Claims or Interests would not be feasible or cost-effective in the Wind-Down Trustee's reasonable judgment;

<div style="margin-left:2em">

(i)      Preparing and filing post-Effective Date operating reports (including the month in which the Effective Date occurs);

(j)      Filing appropriate tax returns in the exercise of the Wind-Down Trustee's fiduciary obligations;

(k)      Retaining such Professionals as are necessary and appropriate in furtherance of the Wind-Down Trustee's fiduciary obligations; and

(l)      Taking such actions as are necessary and reasonable to carry out the purposes of the Wind-Down Trust, including winding down the Debtors' business affairs.

</div>

6.      <u>The Wind-Down Trust Oversight Committee</u>

The Wind-Down Trust Oversight Committee shall consist of those parties selected by the Committee and identified in the Plan Supplement, and which, at no time shall consist of greater than seven members.

The Wind-Down Trust Oversight Committee shall have the responsibility to review and advise the Wind-Down Trustee with respect to the liquidation and distribution of the Wind-Down Entity Assets transferred to the Wind-Down Trust in accordance herewith and the Wind-Down Trust Agreement. For the avoidance of doubt, in advising the Wind-Down Trustee, the Wind-Down Trust Oversight Committee shall maintain the same fiduciary responsibilities as the Wind-Down Trustee. Vacancies on the Wind-Down Trust Oversight Committee shall be filled by a Person designated by the remaining member or members of the Wind-Down Trust Oversight Committee from among the Holders of Account Holder Claims. The Wind-Down Trustee shall have the authority to seek an order from the Bankruptcy Court removing or replacing members of the Wind-Down Trust Oversight Committee for cause.

7.      <u>Expenses of Wind-Down Trustee</u>

The Wind-Down Trust Expenses shall be paid from the Wind-Down Trust Assets subject to the Wind-Down Reserve and the Non-Released D&O Claim Budget.

8.      <u>Insurance; Bond</u>

The Wind-Down Trustee may obtain insurance coverage (in the form of an errors and omissions policy or otherwise) with respect to the liabilities and obligations of the Wind-Down Trustee and the Wind-Down Trust Oversight Committee under the Wind-Down Trust Agreement. Unless otherwise agreed to by the Wind-Down Trust Oversight Committee, the Wind-Down Trustee shall serve with a bond, the terms of which shall be agreed to by the Wind-Down Trust Oversight Committee, and the cost and expense of which shall be paid by the Wind-Down Trust.

9.    Fiduciary Duties of the Wind-Down Trustee

Pursuant hereto and the Wind-Down Trust Agreement and the Wind-Down Trustee shall act in a fiduciary capacity on behalf of the interests of all Holders of Claims and Interests that will receive distributions pursuant to Plan.

10.    Termination of the Wind-Down Trust

The Wind-Down Trust will terminate on the earlier of:  (a) (i) the final liquidation, administration and distribution of the Wind-Down Trust Assets in accordance with the terms of the Wind-Down Trust Agreement and the Plan, and its full performance of all other duties and functions as set forth herein or in the Wind-Down Trust Agreement and (ii) the Chapter 11 Cases of the Debtors have been closed; or (b) the Wind-Down Trustee determines in its reasonable judgment that the Wind-Down Trust lacks sufficient assets and financial resources, after reasonable collection efforts, to complete the duties and powers assigned to him or her under the Plan, the Confirmation Order and/or the Wind-Down Trust Agreement. After (x) the final distributions pursuant hereto, (y) the Filing by or on behalf of the Wind-Down Trust of a certification of dissolution with the Bankruptcy Court, and (z) any other action deemed appropriate by the Wind-Down Trustee, the Wind-Down Trust shall be deemed dissolved for all purposes without the necessity for any other or further actions.

11.    Liability of Wind-Down Trustee; Indemnification

Neither the Wind-Down Trustee, the Wind-Down Trust Oversight Committee, their respective members, employees, employers, designees or professionals, or any of their duly designated agents or representatives (each, a "Wind-Down Trust Party" and collectively, the "Wind-Down Trust Parties") shall be liable for losses, claims, damages, liabilities or expenses in connection with the affairs of the Wind-Down Trust or for the act or omission of any other Wind-Down Trust Party, nor shall the Wind-Down Trust Parties be liable for any act or omission taken or omitted to be taken pursuant to the discretion, powers and authority conferred, or in good faith believed to be conferred by the Wind-Down Trust Agreement or the Plan other than for specific acts or omissions resulting from such Wind-Down Trust Party's willful misconduct, gross negligence or actual fraud.  Subject to the Wind-Down Trust Agreement, the Wind-Down Trustee shall be entitled to enjoy all of the rights, powers, immunities and privileges applicable to a chapter 7 trustee, and the Wind-Down Trust Oversight Committee shall be entitled to enjoy all of the rights, powers, immunities and privileges of an official committee of unsecured creditors.  The Wind-Down Trustee or the Wind-Down Trust Oversight Committee may, in connection with the performance of its functions, and in its sole and absolute discretion, consult with its attorneys, accountants, financial advisors and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such persons, regardless of whether such advice or opinions are provided in writing. Notwithstanding such authority, neither the Wind-Down Trustee nor the Wind-Down Trust Oversight Committee shall be under any obligation to consult with its attorneys, accountants, financial advisors or agents, and their determination not to do so shall not result in the imposition of liability on the Wind-Down Trustee, the Wind-Down Trust Oversight Committee, or their respective members and/or designees, unless such determination is based on willful misconduct, gross negligence, or actual fraud.  The Wind-Down Trust shall indemnify and hold harmless the Wind-Down Trust Parties (in their capacity as such), from and against and in respect of all liabilities, losses, damages, claims, costs and expenses (including, without limitation, reasonable attorneys' fees, disbursements, and related expenses) that such parties may incur or to which such parties may become subject in connection with any action, suit, proceeding or investigation brought by or threatened against such parties arising out of or due to their acts or omissions, or consequences of such acts or omissions, with respect to the implementation or administration of the Wind-Down Trust or the Plan or the discharge of their duties hereunder; *provided*, *however*, that no such indemnification will be made to such Persons for actions or omissions as a result of willful misconduct, gross negligence, or actual

38

fraud. Persons dealing or having any relationship with the Wind-Down Trustee shall have recourse only to the Wind-Down Trust Assets and shall look only to the Wind-Down Trust Assets to satisfy any liability or other obligations incurred by the Wind-Down Trustee or the Wind-Down Trust Oversight Committee to such Person in carrying out the terms of the Wind-Down Trust Agreement, and neither the Wind-Down Trustee nor the Wind-Down Trust Oversight Committee, shall have any personal obligation to satisfy any such liability. The Wind-Down Trustee and/or the Wind-Down Trust Oversight Committee members shall not be liable whatsoever except for the performance of such duties and obligations as are specifically set forth herein, and no implied covenants or obligations shall be read into the Wind-Down Trust Agreement against any of them. The Wind-Down Trust shall promptly pay expenses reasonably incurred by any Wind-Down Trust Party in defending, participating in, or settling any action, proceeding or investigation in which such Wind-Down Trust Party is a party or is threatened to be made a party or otherwise is participating in connection with the Wind-Down Trust Agreement or the duties, acts or omissions of the Wind-Down Trustee or otherwise in connection with the affairs of the Wind-Down Trust, upon submission of invoices therefor, whether in advance of the final disposition of such action, proceeding, or investigation or otherwise. Each Wind-Down Trust Party hereby undertakes, and the Wind-Down Trust hereby accepts his or her undertaking, to repay any and all such amounts so advanced if it shall ultimately be determined that such exculpated party is not entitled to be indemnified therefor under the Wind-Down Trust Agreement. The foregoing indemnity in respect of any Wind-Down Trust Party shall survive the termination of such Wind-Down Trust Party from the capacity for which they are indemnified.

12. No Liability of the Wind-Down Trust.

On and after the Effective Date, the Wind-Down Trust shall have no liability on account of any Claims or Interests except as set forth herein and in the Wind-Down Trust Agreement. All payments and all distributions made by the Wind-Down Trustee hereunder shall be in exchange for all Claims or Interests against the Debtors.

I.     **Sources of Consideration for Plan Distributions**

Distributions under the Plan shall be funded by (i) the proceeds of Purchaser's payment obligations under Sections 2.1 and 2.2 of the Asset Purchase Agreement and distributions of Acquired Coins pursuant to Sections 6.12, and 6.14 of the Asset Purchase Agreement, (ii) the Wind-Down Entity or Wind-Down Trust (as applicable) from the Wind-Down Entity Assets or Wind-Down Trust Assets (as applicable); *provided*, *however*, that Allowed Professional Fee Claims shall be paid from the Professional Fee Escrow Account in the first instance. The Wind-Down Entity Assets or Wind-Down Trust Assets (as applicable) shall be used to pay the Wind-Down Entity Expenses (including the compensation of the Wind-Down Trustee and any professionals retained by the Wind-Down Trust), and to satisfy payment of Allowed Claims and Interests as set forth in the Plan.

J.     **Corporate Existence and Dissolution**

Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificates or articles of incorporation, certificates of formation, certificates of organization, or certificates of limited partnership and bylaws, operating agreements, limited liability company agreements, or limited partnership agreements (or other formation documents) in effect prior to the Effective Date, except to the extent such certificates or articles of incorporation, certificates of formation, certificates of organization, or certificates of limited partnership and bylaws, operating agreements, limited liability company agreements, or limited partnership agreements (or other formation

documents) are amended pursuant to the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings under applicable state or federal law).

On and after the Effective Date, the Wind-Down Entity will be authorized and directed to implement the Plan and any applicable orders of the Bankruptcy Court, and the Wind-Down Entity shall have the power and authority to take any action necessary to wind down and dissolve the Debtors' Estates.

Upon a certification to be Filed with the Bankruptcy Court by the Wind-Down Trustee of all distributions having been made and completion of all of its duties under the Plan and entry of a final decree closing the last of the Chapter 11 Cases, the Wind-Down Debtors shall be deemed to be dissolved without any further action by the Wind-Down Debtors, including the Filing of any documents with the secretary of state for the state in which the Wind-Down Debtors are formed or any other jurisdiction. The Wind-Down Trustee, however, shall have authority to take all necessary actions to dissolve the Wind-Down Debtors in and withdraw the Wind-Down Debtors from applicable states.

As soon as practicable after the Effective Date, the Wind-Down Entity shall take such actions as the Wind-Down Entity may determine to be necessary or desirable to carry out the purposes of the Plan. Any certificate of dissolution or equivalent document may be executed by the Wind-Down Entity on behalf of any Wind-Down Debtor without need for any action or approval by the shareholders or board of directors or managers of such Debtor. On and after the Effective Date, the Wind-Down Debtors (1) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (2) shall be deemed to have cancelled pursuant to this Plan all Interests, and (3) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date. Notwithstanding such Debtors' dissolution, such Debtors shall be deemed to remain intact solely with respect to the preparation, filing, review, and resolution of applications for Professional Fee Claims.

## K. Corporate Action

Upon the Effective Date, all actions contemplated under the Plan, Definitive Documents, and Asset Purchase Agreement shall be deemed authorized and approved in all respects, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, directors, managers, managing-members, limited or general partners, or officers of the Debtors, the Wind-Down Debtors, the Wind-Down Trust or any other Entity, including: (1) appointment of the directors, managers, members, and officers for the Wind-Down Debtors as provided herein; (2) the issuances, transfer, and distribution of the Wind-Down Trust Units; (3) the formation of the Wind-Down Trust and appointment of the Wind-Down Trustee and Wind-Down Trust Oversight Committee; (4) the formation of any entities pursuant to and the implementation of the Plan and performance of all actions and transactions contemplated hereby and thereby; (5) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; and (6) all other acts or actions contemplated by the Plan, Definitive Documents, and Asset Purchase Agreement or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions (including effectuating the Restructuring Transactions Memorandum and the Customer Onboarding Protocol) (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan, Definitive Documents, and Asset Purchase Agreement involving the corporate structure of the Debtors or the Wind-Down Debtors, as applicable, and any corporate action required by the Debtors or the Wind-Down Debtors, as applicable, in connection with the Plan shall be deemed to have occurred on, and shall be in effect as of, the Effective Date, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the

Wind-Down Debtors, as applicable. On or, as applicable, prior to the Effective Date, the appropriate officers of the Debtors or the Wind-Down Debtors or the Wind-Down Trust, as applicable, shall be authorized and, as applicable, directed to issue, execute, and deliver the agreements, documents, Securities, certificates of incorporation, certificates of formation, bylaws, operating agreements, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Wind-Down Debtors, and any and all other agreements, documents, Securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this Article IV.K shall be effective notwithstanding any requirements under non-bankruptcy law.

## L. Vesting of Assets in the Wind-Down Entity

Except as otherwise provided in the Plan, or in any agreement, instrument, or other document incorporated in the Plan, notwithstanding any prohibition of assignability under applicable non-bankruptcy law and in accordance with section 1141 of the Bankruptcy Code, on the Effective Date, all property constituting Wind-Down Trust Assets, including all Vested Causes of Action of the Debtors (unless otherwise released, waived, compromised, settled, transferred, or discharged pursuant to the Plan), and any property acquired by any of the Debtors under the Plan shall vest in the Wind-Down Entity, free and clear of all Liens, Claims, charges, or other encumbrances.

## M. Cancellation of Notes, Instruments, Certificates, and Other Documents

On the later of the Effective Date and the date on which distributions are made pursuant to the Plan (if not made on the Effective Date), except for the purpose of evidencing a right to and allowing Holders of Claims and Interests to receive a distribution under the Plan or to the extent otherwise specifically provided for in the Plan, the Confirmation Order, or any agreement, instrument, or other document entered into in connection with or pursuant to the Plan or the Restructuring Transactions (including, without limitation, the Definitive Documents and the Asset Purchase Agreement), all notes, bonds, indentures, certificates, Securities, shares, purchase rights, options, warrants, collateral agreements, subordination agreements, intercreditor agreements, or other instruments or documents directly or indirectly evidencing, creating, or relating to any indebtedness or obligations of, or ownership interest in, the Debtors, giving rise to any Claims against or Interests in the Debtors or to any rights or obligations relating to any Claims against or Interests in the Debtors shall be deemed cancelled without any need for a Holder to take further action with respect thereto.

## N. Effectuating Documents; Further Transactions

On and after the Effective Date, the Wind-Down Debtors, and its directors, managers, partners, officers, authorized persons, and members thereof, and the Wind-Down Trust and Wind-Down Trustee are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, Definitive Documents, and Asset Purchase Agreement, in the name of and on behalf of the Wind-Down Debtors, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

## O. Section 1146(a) Exemption

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Wind-Down Debtor, the Wind-Down Trust, the Purchaser, or to any other Entity) of property under the Plan, Definitive Documents, and Asset Purchase Agreement or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or

the Wind-Down Debtors; (2) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, including the Asset Purchase Agreement, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, sales or use tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forgo the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**P.      Preservation of Rights of Action**

In accordance with section 1123(b) of the Bankruptcy Code, the Wind-Down Entity shall succeed to all rights to commence and pursue any and all Vested Causes of Action of the Debtors, whether arising before or after the Petition Date, including, without limitation, any actions specifically enumerated in the Schedule of Retained Causes of Action other than Causes of Action released, waived, settled, compromised, or transferred. Such rights shall be preserved by the Debtors and Wind-Down Debtors and shall vest in the Wind-Down Entity, with the Wind-Down Entity's rights to commence, prosecute, or settle such Causes of Action preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action expressly released, waived, settled, compromised, or transferred by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan or pursuant to the Asset Purchase Agreement, which shall be deemed released and waived by the Debtors and Wind-Down Debtors as of the Effective Date.

The Wind-Down Trust may pursue such Causes of Action, as appropriate, in accordance with the best interests of the beneficiaries of the Wind-Down Trust and in accordance with the Wind-Down Trust Agreement and the Plan. **No Entity may rely on the absence of a specific reference in the Schedules of Assets and Liabilities or Statement of Financial Affairs, the Plan, the Plan Supplement, the Disclosure Statement, or the Schedule of Retained Causes of Action to any Cause of Action against it as any indication that the Debtors, the Wind-Down Debtors or the Wind-Down Trust, as applicable, will not pursue any and all available Causes of Action of the Debtors against it. The Wind-Down Trust, on behalf of the Debtors and the Wind-Down Debtors, expressly reserves all rights to prosecute any and all Causes of Action against any Entity, except as otherwise provided in the Plan, including Article VIII of the Plan.** Unless any Cause of Action of the Debtors is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or pursuant to a Final Order, the Wind-Down Trust, on behalf of the Debtors and Wind-Down Debtors and in accordance with the Wind-Down Trust Agreement, expressly reserves all such Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or Consummation.

The Wind-Down Trust, on behalf of the Debtors and Wind-Down Debtors, reserves and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Cause of Action that a Debtor may hold against any Entity shall vest in the Wind-Down Trust, except as otherwise provided in the Plan, including Article VIII of the Plan. The Wind-Down Trust, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Wind-Down Trust shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court in accordance with the Plan.

**Q.      Election to Contribute Third-Party Claims**

Because aggregating all Contributed Third-Party Claims may enable the pursuit and settlement of such litigation claims in a more efficient and effective manner, each Holder of a Claim or Interest may agree, by electing on its ballot or opt-in form, to contribute its Contributed Third-Party Claims to the Wind-Down Entity. By electing such option on its ballot or opt-in form, each Contributing Claimant agrees that, subject to the occurrence of the Effective Date and the formation of the Wind-Down Entity, it will be deemed, without further action, (i) to have irrevocably contributed its Contributed Third-Party Claims to the Wind-Down Entity, and (ii) to have agreed to execute any documents reasonably requested by the Debtors or the Wind-Down Entity to memorialize and effectuate such contribution.

**R.      Contribution of Contributed Third-Party Claims**

On the Effective Date, all Contributed Third-Party Claims will be irrevocably contributed to the Wind-Down Entity and shall thereafter be Wind-Down Trust Assets for all purposes. No Person may rely on the absence of a specific reference in the Plan, the Disclosure Statement, the Confirmation Order, the Wind-Down Trust Agreement, the Plan Supplement, or any other document as any indication that the Wind-Down Trust will or will not pursue any and all available Contributed Third-Party Claims against such Person. The Wind-Down Trust shall have, retain, reserve, and be entitled to assert all Contributed Third-Party Claims fully to the same extent that the Contributing Claimants could have asserted such claims prior to the Effective Date. For the avoidance of doubt, the Contributed Third-Party Claims shall not include the rights of any of the Contributing Claimants to receive the distributions under the Plan on account of their Claims or Interests.

**S.      Closing the Chapter 11 Cases**

On and after the Effective Date, the Wind-Down Entity shall be permitted to classify all of the Chapter 11 Cases of the Debtors except for the Chapter 11 Case of Voyager Digital, LLC, or any other Debtor identified in the Restructuring Transactions Memorandum as having its Chapter 11 Case remain open following the Effective Date, as closed, and all contested matters relating to any of the Debtors, including objections to Claims or Interests and any adversary proceedings, may be administered and heard in the Chapter 11 Case of Voyager Digital, LLC, or any other Debtor identified in the Restructuring Transactions Memorandum as having its Chapter 11 Case remain open following the Effective Date,

irrespective of whether such Claims or Interests were Filed or such adversary proceeding was commenced against a Debtor whose Chapter 11 Case was closed.

## ARTICLE V.

### TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.**     **Assumption and Rejection of Executory Contracts and Unexpired Leases**

On the Effective Date, except as otherwise provided herein, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (1) is specifically described in the Plan as to be assumed in connection with confirmation of the Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement; (2) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Effective Date; (3) is to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, in connection with the Sale Transaction; (4) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; or (5) is a D&O Liability Insurance Policy other than the Side-A Policy. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, assignments, and rejections, including the assumption of the Executory Contracts or Unexpired Leases as provided in the Plan Supplement, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

**B.**     **Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases**

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Wind-Down Debtors, as applicable, under such Executory Contract or Unexpired Lease. Without limiting the general nature of the foregoing, and notwithstanding any non-bankruptcy law to the contrary, the Debtors and Wind-Down Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the Debtors contracting from non-Debtor counterparties to any rejected Executory Contract or Unexpired Lease.

**C.**     **Claims Based on Rejection of Executory Contracts or Unexpired Leases**

Counterparties to Executory Contracts or Unexpired Leases listed subject to rejection under the Plan shall be served with a notice of rejection of Executory Contracts and Unexpired Leases with the Plan Supplement. Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Claims, Noticing, and Solicitation Agent and served on the Debtors or Wind-Down Entity, as applicable, no later than thirty days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, or the Wind-Down Entity, the Estates, or their property without the need for any objection by the Wind-Down Entity or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed released, and be subject to the permanent injunction set forth in Article VIII.D of the Plan, including any Claims against any**

**Debtor listed on the Debtors' schedules as unliquidated, contingent, or disputed.** All Allowed Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease shall be treated as General Unsecured Claims in accordance with Article III.C of the Plan.

D.      **Cure of Defaults for Executory Contracts and Unexpired Leases Assumed**

The Debtors, the Wind-Down Entity, or the Purchaser, as applicable pursuant to the Asset Purchase Agreement, shall pay Cures, if any, on the Effective Date. The Debtors shall provide notice of the amount and timing of payment of any such Cure to the parties to the applicable assumed Executory Contracts or Unexpired Leases as part of the Plan Supplement. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure that differ from the ordinary course amounts paid or proposed to be paid by the Debtors, the Wind-Down Entity, or the Purchaser shall be dealt with in the ordinary course of business and, if needed, shall be Filed with the Claims, Noticing, and Solicitation Agent on or before thirty days after the Effective Date. **If any counterparty to an Executory Contract or Unexpired Lease does not receive a notice of assumption and applicable cure amount, such counterparty shall have until on or before thirty days after the Effective Date to bring forth and File a request for payment of Cure.** Any such request that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Wind-Down Debtor or the Wind-Down Entity, without the need for any objection by the Wind-Down Entity or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure shall be deemed fully satisfied and released upon payment by the Debtors or the Wind-Down Entity or the Purchaser of the Cure in the ordinary course of business or upon and in accordance with any resolution of a Cure dispute (whether by order of the Bankruptcy Court or through settlement with the applicable Executory Contract or Unexpired Lease counterparty); *provided, however*, that nothing herein shall prevent the Wind-Down Entity or the Purchaser, as applicable, from paying any Cure Claim despite the failure of the relevant counterparty to File such request for payment of such Cure. The Wind-Down Entity or the Purchaser may also settle any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court. In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be Filed with the Bankruptcy Court on or before thirty days after the Effective Date. Any such objection will be scheduled to be heard by the Bankruptcy Court at the Debtors' first scheduled omnibus hearing for which such objection is timely Filed. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

In the event of a dispute regarding: (1) the amount of any Cure Claim, (2) the ability of the Wind-Down Debtors, Purchaser, or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed (or assumed and assigned, as applicable), or (3) any other matter pertaining to assumption or assignment, then any disputed Cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made as soon as reasonably practicable following, and in accordance with, the entry of a Final Order of the Bankruptcy Court resolving such dispute or as may be agreed upon by the Debtors, the Wind-Down Entity, or Purchaser, as applicable, and the counterparty to the Executory Contract or Unexpired Lease, and any such unresolved dispute shall not prevent or delay implementation of the Plan or the occurrence of the Effective Date.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise or assignment of any Executory Contract or Unexpired Lease to the Purchaser and full payment of any applicable Cure pursuant to this Article V.D, or upon and in accordance with any resolution of a Cure dispute (whether by order of the Bankruptcy Court or through settlement with the applicable Executory Contract or Unexpired Lease counterparty), shall result in the full release and satisfaction of any Cures,

Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed or assumed and assigned in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to this Article V.D, in the amount and at the time in the ordinary course of business or upon and in accordance with any resolution of a Cure dispute (whether by order of the Bankruptcy Court or through settlement with the applicable Executory Contract or Unexpired Lease counterparty), shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court. For the avoidance of doubt, in the event that any counterparty to an Executory Contract or Unexpired Lease receives a notice of assumption and applicable proposed Cure amount, and disputes the Debtors' proposed Cure amount, such party shall not be required to File a Proof of Claim with respect to such dispute. Any counterparty to an Executory Contract or Unexpired Lease that does not receive a notice or applicable proposed Cure amount, and believes a Cure amount is owed, shall have thirty days after the Effective Date to File a Proof of Claim with respect to such alleged Cure amount, which Claim shall not be expunged until such Cure dispute is resolved.**

## E.    Insurance Policies and Surety Bonds

Each D&O Liability Insurance Policy (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto) other than the Side-A Policy shall be assumed, in their entirety, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date, pursuant to sections 105 and 365 of the Bankruptcy Code with the Wind-Down Entity being authorized to pursue any proceeds thereof on behalf of the Debtors or the Wind-Down Entity. The Side-A Policy shall ride through these Chapter 11 Cases with the Debtors, and the Wind-Down Entity preserves all avoidance and other actions in connection with the premium paid thereunder. All beneficiaries under the D&O Insurance Policies reserve their rights under such D&O Insurance Policies subject to the limitations set forth in this Plan.

The Debtors or the Wind-Down Entity, as applicable, shall not terminate or otherwise reduce the coverage under any D&O Liability Insurance Policy (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto) in effect prior to the Effective Date, and any current and former directors, officers, managers, and employees of the Debtors who served in such capacity at any time before or after the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy subject to the terms thereof regardless of whether such directors, officers, managers, and employees remain in such positions after the Effective Date. Notwithstanding anything to the contrary in the Plan, the Debtors or the Wind-Down Entity shall retain the ability to supplement such D&O Liability Insurance Policy as the Debtors or Wind-Down Entity may deem necessary, subject to the prior written consent of the Wind-Down Entity. Notwithstanding anything to the contrary contained in the Plan, the Wind-Down Trust shall be entitled to pursue avoidance of the premium paid for the XL Specialty Insurance Company Cornerstone A-Side Management Liability Insurance Policy No. ELU184179-22, and nothing in this Plan shall be deemed a waiver or abrogation of any such rights.

The Debtors shall continue to satisfy their obligations under their surety bonds and insurance policies in full and continue such programs in the ordinary course of business. Each of the Debtors' surety bonds and insurance policies, and any agreements, documents, or instruments relating thereto shall be treated as Executory Contracts under the Plan. On the Effective Date: (a) the Debtors shall be deemed to have assumed all such surety bonds and insurance policies and any agreements, documents, and instruments relating thereto in their entirety; *provided* that the Debtors have assumed all indemnity agreements and cash

collateral agreements related to the surety bonds and (b) such surety bonds and insurance policies and any agreements, documents, or instruments relating thereto shall revest in the applicable Wind-Down Debtor(s) unaltered.

**F.      Reservation of Rights**

Nothing contained in the Plan or the Plan Supplement (unless otherwise explicitly provided) shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Wind-Down Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Wind-Down Entity, as applicable, shall have forty-five days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, including by rejecting such contract or lease effective as of the Confirmation Date.

**G.      Nonoccurrence of Effective Date**

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

**H.      Contracts and Leases Entered into After the Petition Date**

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed under section 365 of the Bankruptcy Code, will be performed by the applicable Debtor or Wind-Down Debtor liable thereunder in the ordinary course of its business.  Such contracts and leases that are not rejected under the Plan shall survive and remain unaffected by entry of the Confirmation Order.

## ARTICLE VI.

## PROVISIONS GOVERNING DISTRIBUTIONS

**A.      Timing and Calculation of Amounts to Be Distributed**

Except (1) as otherwise provided herein, (2) upon a Final Order, or (3) as otherwise agreed to by the Debtors, the Purchaser, or the Wind-Down Entity, as the case may be, and the Holder of the applicable Claim, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the next Distribution Date after such Claim becomes, as applicable, an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive the full amount of distributions that the Plan provides for Allowed Claims in the applicable Class from the Distribution Agent.  In the event that any payment or distribution under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or distribution may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  Except as specifically provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

**B.**     **Rights and Powers of Distribution Agent**

    1.     Powers of the Distribution Agent

The Distribution Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties and exercise its rights under the Plan; (b) make all distributions contemplated under the Plan; (c) employ professionals to represent it with respect to its responsibilities and powers; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions of the Plan.

    2.     Expenses Incurred on or after the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Distribution Agent on or after the Effective Date and any reasonable compensation and expense reimbursement claims (including reasonable attorney and/or other professional fees and expenses) made by such Distribution Agent shall be paid in Cash by the Wind-Down Entity.

**C.**     **Delivery of Distributions and Undeliverable or Unclaimed Distributions**

    1.     Distributions Generally

Except as otherwise provided in the Plan (including in paragraph 8 below), the Distribution Agent shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the applicable register or in the Debtors' records as of the date of any such distribution (as applicable), including the address set forth in any Proof of Claim filed by that Holder.

    2.     Distributions on Account of Obligations of Multiple Debtors

For all purposes associated with distributions under the Plan, all guarantees by any Debtor of the obligations of any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor, shall be deemed eliminated so that any obligation that could otherwise be asserted against more than one Debtor shall result in a single distribution under the Plan. Any such Claims shall be subject to all potential objections, defenses, and counterclaims, and to estimation pursuant to section 502(c) of the Bankruptcy Code.

    3.     Record Date of Distributions

On the Distribution Record Date, the various transfer registers for each Class of Claims or Interests as maintained by the Debtors or their respective agents shall be deemed closed, and there shall be no further changes in the record Holders of any Claims or Interests. The Distribution Agent shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date. In addition, with respect to payment of any Cure amounts or disputes over any Cure amounts, neither the Debtors nor the Distribution Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the Effective Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure amount.

    4.     Special Rules for Distributions to Holders of Disputed Claims and Interests

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the Wind-Down Entity, on the one hand, and the Holder of a Disputed Claim or Interest, on the other hand, or

as set forth in a Final Order, no partial payments and no partial distributions shall be made with respect to a Disputed Claim or Interest until all of the Disputed Claim or Interest has become an Allowed Claim or Interest or has otherwise been resolved by settlement or Final Order; *provided* that, if the Wind-Down Entity does not dispute a portion of an amount asserted pursuant to an otherwise Disputed Claim or Interest, the Distribution Agent may make a partial distribution on account of such portion of such Claim or Interest that is not Disputed at the time and in the manner that the Distribution Agent makes distributions to similarly situated Holders of Allowed Claims or Interests pursuant to the Plan. Any dividends or other distributions arising from property distributed to Holders of Allowed Claims or Interests, as applicable, in a Class and paid to such Holders under the Plan shall also be paid, in the applicable amounts, to any Holder of a Disputed Claim or Interest, as applicable, in such Class that becomes an Allowed Claim or Interest after the date or dates that such dividends or other distributions were earlier paid to Holders of Allowed Claims or Interests in such Class.

5.  De Minimis Distributions; Minimum Distributions

The Distribution Agent shall not make any Cash distributions to any Holder of an Allowed Claim or Interest pursuant to Article III.C.1-11 of this Plan on account of such Allowed Claim or Interest if such distribution is valued, in the reasonable discretion of the Distribution Agent, at less than $1.00, and each Holder of an Allowed Claim or Interest to which this limitation applies shall not be entitled to any distributions under the Plan. Notwithstanding anything to the contrary in this Plan, there shall be no minimum distribution threshold on account of distributions of any Cryptocurrency to Holders of Allowed Account Holder Claims and Allowed OpCo General Unsecured Claims.

6.  Undeliverable Distributions and Unclaimed Property

In the event that either (a) a distribution to any Holder is returned as undeliverable or (b) the Holder of an Allowed Claim or Interest does not respond to a request by the Debtors or the Distribution Agent for information necessary to facilitate a particular distribution, no distribution to such Holder shall be made unless and until the Distribution Agent has determined the then-current address of such Holder or received the necessary information to facilitate a particular distribution, at which time such distribution shall be made to such Holder without interest, dividends, or other accruals of any kind; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code on the date that is one year after the Effective Date. After such date, all unclaimed property or interests in property shall revert to the Wind-Down Entity automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable local, state, federal, or foreign escheat, abandoned, or unclaimed property laws to the contrary), and the Claim or Interest of any Holder to such property or interest in property shall not be entitled to any distributions under the Plan.

7.  Manner of Payment Pursuant to the Plan

At the option of the Distribution Agent, any Cash payment to be made hereunder may be made by check, wire transfer, automated clearing house, credit card, or as otherwise provided in applicable agreements.

8.  Distributions of Net Owed Coins; Additional Bankruptcy Distributions

As a general matter, the Purchaser will allocate each Account Holder's Net Owed Coins to its account on the Binance.US Platform, and each Holder of OpCo General Unsecured Claim's Pro Rata share of the Distributable Cryptocurrency (in Cash) to its account on the Binance.US Platform in accordance with, and subject to, the provisions of Section 6.12 of the Asset Purchase Agreement.

49

As a general matter, the Customer Onboarding Protocol will provide that Purchaser will make Additional Bankruptcy Distributions to Transferred Creditors corresponding to their Pro Rata shares of such Additional Bankruptcy Distribution (if such Additional Bankruptcy Distribution is in Cryptocurrency, based on the Transferred Cryptocurrency Value of the Cryptocurrency included in such Additional Bankruptcy Distribution), all in accordance with any applicable Post-Bankruptcy Statement (as defined in the Asset Purchase Agreement).

If any Account Holder or Holder of an Allowed OpCo General Unsecured Claim does not become a Transferred Creditor prior to the date that is three (3) months following the later of the Closing Date or the date on which the terms and conditions for the Binance.US Platform are made available for such Person to accept (as provided in the Customer Onboarding Protocol), then Purchaser shall convert any Cryptocurrency allocable to such Person into U.S. Dollars at the then-prevailing rates (including applicable fees, spreads, costs and expenses) on the Binance.US Platform and deliver such U.S. Dollars, together with any cash or others assets in respect of such Persons, to the Debtors within five (5) Business Days, for further distribution by the Debtors in accordance with this Plan and the Customer Onboarding Protocol.

If any Account Holder or Holder of an Allowed OpCo General Unsecured Claim is located in an Unsupported Jurisdiction (as defined in the Asset Purchase Agreement), then the Net Owed Coins, if applicable, and Additional Bankruptcy Distributions allocable to such Person shall be handled pursuant to Section 6.12(b) or, if applicable, Section 6.14(d) of the Asset Purchase Agreement.

Purchaser shall have no responsibility to make any distributions other than as contemplated by Sections 6.12 and 6.14 of the Asset Purchase Agreement.

**D.      Compliance Matters**

In connection with the Plan, to the extent applicable, the Debtors, the Wind-Down Entity, any Distribution Agent, and any other applicable withholding and reporting agents shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Debtors, the Wind-Down Entity, the Distribution Agent, and any other applicable withholding and reporting agents shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including wind-down a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms that are reasonable and appropriate; *provided* that the Wind-Down Entity and the Distribution Agent, as applicable, shall request appropriate documentation from the applicable distributees and allow such distributees a reasonable amount of time to respond. The Debtors, the Wind-Down Entity, the Distribution Agent, and any other applicable withholding and reporting agents reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

**E.      Foreign Currency Exchange Rate**

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim, asserted in government issued currency (for the avoidance of doubt, not including any Cryptocurrency) other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using

the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Effective Date.

**F.      Claims Paid or Payable by Third Parties**

    1.      <u>Claims Paid by Third Parties</u>

The Debtors or the Wind-Down Entity, as applicable, shall reduce a Claim or Interest, and such Claim or Interest (or portion thereof) shall be disallowed without an objection to such Claim or Interest having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim or Interest receives a payment on account of such Claim or Interest from a party that is not a Debtor or Wind-Down Debtor (or other Distribution Agent), as applicable, including any payments made in connection with the Sale Transaction. To the extent a Holder of a Claim or Interest receives a distribution on account of such Claim or Interest and receives payment from a party that is not a Debtor or a Wind-Down Debtor (or other Distribution Agent), including payments made in connection with the Sale Transaction, as applicable, on account of such Claim or Interest, such Holder shall, within ten Business Days of receipt thereof, repay, return, or deliver any distribution held by or transferred to the Holder to the applicable Wind-Down Debtor to the extent the Holder's total recovery on account of such Claim or Interest from the third party and under the Plan exceeds the amount of such Claim or Interest as of the date of any such distribution under the Plan. The failure of such Holder to timely repay, return, or deliver such distribution shall result in the Holder owing the applicable Wind-Down Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the ten-Business Day grace period specified above until the amount is repaid.

    2.      <u>Claims Payable by Third Parties</u>

No distributions under the Plan shall be made on account of an Allowed Claim or Interest that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim or Interest has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim or Interest (if and to the extent adjudicated by a court of competent jurisdiction or otherwise settled), then immediately upon such payment, such Claim or Interest may be expunged or reduced on the Claims Register by the Claims, Noticing, and Solicitation Agent to the extent of any such payment without an objection to such Claim or Interest having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

    3.      <u>Applicability of Insurance Policies</u>

Except as otherwise provided herein, payments to Holders of Claims or Interests shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any rights, defenses, or Cause of Action that the Debtors, the Wind-Down Entity or any other Entity may hold against any other Entity, including insurers, under any policies of insurance, agreements related thereto, or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any rights or defenses, including coverage defenses, held by such insurers under the applicable insurance policies, agreements related thereto, and applicable non-bankruptcy law.

**G.      Setoffs and Recoupment**

Except as otherwise expressly provided for herein, each Debtor, Wind-Down Debtor, the Wind-Down Entity, or such Entity's designee as instructed by such Debtor, Wind-Down Entity, as applicable, may, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code),

applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, set off against or recoup from an Allowed Claim and any distributions to be made pursuant to the Plan on account of such Allowed Claim, any Claims, rights, and Causes of Action of any nature whatsoever that the Debtor, Wind-Down Debtor or Wind-Down Entity, as applicable, may have against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action have not been otherwise compromised, settled, or released on or prior to the Effective Date (whether pursuant to the Plan or otherwise).  Notwithstanding the foregoing, except as expressly stated in Article VIII of this Plan, neither the failure to effect such a setoff or recoupment nor the non-allowance of any Claim pursuant to the Plan shall constitute a waiver or release by the Debtors or the Wind-Down Entity of any such Claims, rights, or Causes of Action the Debtors or the Wind-Down Entity may possess against such Holder.

## H.  Allocation between Principal and Accrued Interest

Except as otherwise provided herein, the aggregate consideration paid to Holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof and as determined for federal income tax purposes) and second, to the extent the consideration exceeds the principal amount of the Allowed Claims, to the remaining portion of such Allowed Claim if any.

## ARTICLE VII.

## PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT, AND UNLIQUIDATED CLAIMS AND INTERESTS

## A.  Disputed Claims Process

After the Effective Date, the Wind-Down Entity, and any party-in-interest, shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim or Interest immediately before the Effective Date.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim or Interest shall become an Allowed Claim or Interest unless and until such Claim or Interest is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim or Interest.  If a Holder of a Claim or Interest in Class disputes the amount of their Claim or Interest as listed in the Schedules, the Holder should notify the Debtors or the Wind-Down Entity of such dispute.  If the Debtors and the Holder agree to an amended Claim amount prior to the Effective Date, the Debtors shall file amended Schedules prior to the Effective Date.  If between the Confirmation Date and the Effective Date, the dispute cannot be consensually resolved, the Holder may seek (by letter to the Court) to have the claim or interest dispute resolved before the Bankruptcy Court (and, with the consent of the Debtors, before any other court or tribunal with jurisdiction over the parties).  After the Effective Date, the creditor may seek to have the claim dispute resolved before the Bankruptcy Court or any other court or tribunal with jurisdiction over the parties.

Unless relating to a Claim or Interest expressly Allowed pursuant to the Plan, all Proofs of Claim filed in these Chapter 11 Cases shall be considered objected to and Disputed without further action by the Debtors.  Upon the Effective Date, all Proofs of Claim filed against the Debtors, regardless of the time of filing, and including Proofs of Claim filed after the Effective Date, shall be deemed withdrawn and expunged, other than as provided below.  Notwithstanding anything in this Plan to the contrary:  (1) all Claims against the Debtors that result from the Debtors' rejection of an Executory Contract or Unexpired Lease; (2) Claims filed to dispute the amount of any proposed Cure pursuant to section 365 of the Bankruptcy Code; and (3) Claims that the Debtors seek to have determined by the Bankruptcy Court, shall

in all cases be determined by the Bankruptcy Court, if not otherwise resolved through settlement with the applicable claimant.

Notwithstanding any provision herein to the contrary, nothing in the Disclosure Statement, Plan, or Confirmation Order grants the Bankruptcy Court with jurisdiction over any police and regulatory actions by the SEC, and the SEC shall retain the power and authority to commence and continue any such actions against any person or entity, including without limitation, the Debtors, in any forum with jurisdiction, provided, however, that enforcement of any money judgment against the Debtors must be in accordance with the Plan. In addition, the SEC may file any proof of claim by the Government Bar Date or such later date as ordered by the Bankruptcy Court and amend its proof of claim upon determination of liability on its claims. Any objection to such claim shall be in accordance with Bankruptcy Rule 3007, and such claim shall not automatically be deemed objected to, withdrawn, or expunged.

On the Effective Date, the Debtors or Wind-Down Trustee, as applicable, may establish one or more accounts or funds to hold and dispose of certain assets, pursue certain litigation (including the Causes of Action preserved under the Plan or otherwise vesting in the Wind-Down Trust), and/or satisfy certain Claims (including Claims that are contingent or have not yet been Allowed). For any such account or fund, the Debtors or the Wind-Down Trustee, as applicable, may take the position that grantor trust treatment applies in whole or in part. To the extent such treatment applies to any such account or fund, for all U.S. federal income tax purposes, the beneficiaries of any such account or fund would be treated as grantors and owners thereof, and it is intended, to the extent reasonably practicable, that any such account or fund would be classified as a liquidating trust under section 301.7701-4 of the Treasury Regulations. Alternatively, any such account or fund may be subject to the tax rules that apply to "disputed ownership funds" under 26 C.F.R. 1.468B–9. If such rules apply, such assets would be subject to entity-level taxation, and the Debtors and Wind-Down Trustee would be required to comply with the relevant rules.

## B.    Objections to Claims or Interests

Except as otherwise specifically provided in the Plan, after the Effective Date, the Wind-Down Entity shall have the sole authority to:  (1) File, withdraw, or litigate to judgment, any objections to Claims or Interests; and (2) settle or compromise any Disputed Claim or Interest without any further notice to or action, order, or approval by the Bankruptcy Court. For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, the Wind-Down Entity shall have and retain any and all rights and defenses each such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to Article IV.P of the Plan.

Any objections to Claims or Interests shall be Filed on or before the Claims Objection Bar Date. For the avoidance of doubt, the Bankruptcy Court may extend the time period to object to Claims or Interests set forth in this paragraph at any time, including before or after the expiration of one hundred eighty days after the Effective Date, in its discretion or upon request by the Debtors or any party in interest.

## C.    Estimation of Claims

Before or after the Effective Date, the Debtors or the Wind-Down Entity, as applicable, may (but are not required to), at any time, request that the Bankruptcy Court estimate any Disputed Claim or Interest that is contingent or unliquidated pursuant to applicable law, including pursuant to section 502(c) of the Bankruptcy Code, for any reason, regardless of whether any party previously has objected to such Disputed Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under sections 157 and 1334 of the Judicial Code to estimate any such Disputed Claim or Interest, including during the litigation of any objection to any Disputed Claim or Interest or during the pendency of any appeal relating to such objection. Notwithstanding any provision

otherwise in the Plan, a Disputed Claim or Interest that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions) and may be used as evidence in any supplemental proceedings, and the Debtors or the Wind-Down Entity may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Disputed Claim or Interest that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before fourteen days after the date on which such Disputed Claim or Interest is estimated.

### D.      No Distributions Pending Allowance

Notwithstanding any other provision of the Plan, if any portion of a Claim or Interest is a Disputed Claim or Interest, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest; *provided* that if only a portion of a Claim or Interest is Disputed, such Claim or Interest shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount.

### E.      Distributions After Allowance

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim or Interest in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court Allowing any Disputed Claim or Interest becomes a Final Order, the Distribution Agent shall provide to the Holder of such Allowed Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest, dividends, or accruals to be paid on account of such Allowed Claim or Interest unless required under applicable bankruptcy law.

### F.      No Interest

Unless otherwise specifically provided for herein or by Final Order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on Claims against the Debtors, and no Holder of a Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such Claim. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

### G.      Adjustment to Claims and Interests without Objection

Any Claim or Interest that has been paid, satisfied, amended, superseded, cancelled, or otherwise expunged (including pursuant to the Plan) may be adjusted or expunged on the Claims Register at the direction of the Wind-Down Entity without the Wind-Down Entity having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court. Additionally, any Claim or Interest that is duplicative or redundant with another Claim or Interest against the same Debtor may be adjusted or expunged on the Claims Register at the direction of the Wind-Down Entity without the Wind-Down Entity having to File an application, motion, complaint, objection, or any other legal proceeding

seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

**H.      Time to File Objections to Claims**

Any objections to Claims shall be Filed on or before the Claims Objection Bar Date.

**I.      Disallowance of Claims or Interests**

Any Claims or Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims or Interests until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Wind-Down Entity, as applicable.

**Except as otherwise provided herein or as agreed to by the Debtors or the Wind-Down Entity, any and all Proofs of Claim Filed after the Bar Date shall be deemed disallowed and expunged as of the Effective Date without any further notice to, or action, order, or approval of, the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order.**

**J.      Amendments to Proofs of Claim**

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Proof of Claim or Proof of Interest may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Wind-Down Entity, and any such new or amended Proof of Claim or Proof of Interest Filed shall be deemed disallowed in full and expunged without any further action, order, or approval of the Bankruptcy Court.

## ARTICLE VIII.

## EFFECT OF CONFIRMATION OF THE PLAN

**A.      Releases by the Debtors**

**Notwithstanding anything contained in the Plan to the contrary, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Wind-Down Debtors, and their Estates, the Wind-Down Entity, and in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of, the foregoing Entities, from any and all Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their**

capital structure, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Chapter 11 Cases and related adversary proceedings, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, the administration and implementation of the Restructuring Transactions or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date; *provided* that, subject to the D&O Settlement, nothing in this Article VIII.A shall be construed to release the Released Parties from actual fraud, willful misconduct, or gross negligence as determined by a Final Order.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019, of the releases described in this Article VIII.A by the Debtors, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article VIII.A is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) except to the extent contemplated by Article IV.E and Article IV.F of the Plan, a bar to any of the Debtors or Wind-Down Debtors or their respective Estates or Wind-Down Entity asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

Notwithstanding anything to the contrary contained herein, nothing in this Plan shall release, waive, or otherwise limit the (i) rights, duties, or obligations of the Purchaser under the Asset Purchase Agreement or the Definitive Documents and (ii) the Non-Released D&O Claims, but such Non-Released D&O Claims shall remain subject to the limitations contained in Article IV.E and Article IV.F of this Plan.

## B.     Releases by Holders of Claims and Interests

Except as expressly set forth in the Plan, effective on the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted or assertable on behalf of any of the Debtors, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor,

the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, the administration and implementation of the Restructuring Transactions, or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date, *provided* that nothing in this Article VIII.B shall be construed to release the Released Parties from actual fraud, willful misconduct, or gross negligence as determined by a Final Order.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII.B, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article VIII.B is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) except to the extent contemplated by Article IV.F and Article IV.G of the Plan, a bar to any of the Releasing Parties or the Debtors or Wind-Down Debtors or their respective Estates or Wind-Down Entity asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

## C.    Exculpation

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor release or the third-party release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is exculpated from any Cause of Action for any act or omission arising on or after the Petition Date and prior to the Effective Date based on the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing, or consummation of the Disclosure Statement, the Plan, the Special Committee Investigation, any Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for Causes of Action related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan

**D.     Injunction**

The assets of the Debtors and of the Wind-Down Entity shall be used for the satisfaction of expense obligations and the payment of Claims and Interests only in the manner set forth in this Plan and shall not be available for any other purpose.  All Persons and Entities who have held, hold, or may hold Claims or Interests based upon any act, omission, transaction, or other activity of any kind or nature related to the Debtors, the Wind-Down Entity, or the Debtors' Chapter 11 Cases that occurred prior to the Effective Date, other than as expressly provided in the Plan or the Confirmation Order, shall be precluded and permanently enjoined on and after the Effective Date from interfering with the use and distribution of the Debtors' assets in the manner contemplated by the Plan.

In addition, as of the Effective Date and subject to the occurrence of the Effective Date, except as otherwise specifically provided in this Plan or the Confirmation Order, all Persons and Entities who have held, hold, or may hold Claims or Interests that are fully satisfied pursuant to the Plan or any Claim or Interest that is subject to the releases and exculpations set forth in Article VIII.B and Article VIII.C of this Plan shall be precluded and permanently enjoined on and after the Effective Date from enforcing, pursuing, or seeking any setoff or relief with respect to such Claims or Interests, except for the receipt of the payments or distributions that are contemplated by this Plan.

**E.     Release of Liens**

Except as otherwise provided in the Plan, the Plan Supplement, or any contract, instrument, release, or other agreement or document created pursuant to the Plan or Confirmation Order on the Effective Date, and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, compromised, and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Debtors shall automatically revert to the applicable Debtor or Wind-Down Debtor, as applicable, and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors.  Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as requested by the Debtors or Wind-Down Entity to evidence the release of such Lien, including the execution, delivery, and filing or recording of such documents evidencing such releases.  The presentation or filing of the Confirmation Order to or with any local, state, federal, or foreign agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

**F.     OSC and SEC**

Notwithstanding any language to the contrary herein, no provision shall (a) preclude the OSC or the SEC from enforcing its police or regulatory powers; or (b) enjoin, limit, impair or delay the OSC or SEC from commencing or continuing any claims, causes of action, proceeding, or investigations against any non-Debtor person or non-Debtor entity in any forum.

**G.     Protection against Discriminatory Treatment**

As provided by section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Entity, including Governmental Units, shall discriminate against any Wind-Down Debtor or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, or discriminate with respect to such a grant against, any

Wind-Down Debtor, or any Entity with which a Wind-Down Debtor has been or is associated, solely because such Wind-Down Debtor was a debtor under chapter 11 of the Bankruptcy Code, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

## H.     Document Retention

Upon the occurrence of the Effective Date, the Debtors' books and records shall be transferred to the Wind-Down Entity, which shall continue to preserve all financial books and records, emails, and other financial documents relating to the Debtors' business that are currently in the Debtors' possession. The Wind-Down Trust shall not destroy or otherwise abandon any such documents or records without providing advance notice to the U.S. Securities and Exchange Commission (c/o Therese Scheuer, U.S. Securities and Exchange Commission, 100 F Street, NE, Washington, DC 20549, ScheuerT@SEC.GOV) and seeking further authorization from this Court. Nothing in this Plan or the Confirmation Order shall affect the obligations of the pre-Effective Date Debtors, the Wind-Down Entity, and/or any transferee or custodian to maintain all books and records that are subject to any governmental subpoena, document preservation letter, or other investigative request from a governmental agency.

## I.     Reimbursement or Contribution

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (1) such Claim has been adjudicated as non-contingent; or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

## J.     Term of Injunctions or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code, or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date. **All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.**

## ARTICLE IX.

## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

## A.     Conditions Precedent to the Effective Date

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article IX.B of the Plan:

1.   The Bankruptcy Court shall have entered the Confirmation Order, which shall be in a form and substance reasonably satisfactory to the Debtors and the Committee, and subject to the consent rights of Purchaser under the Asset Purchase Agreement, and such order shall be a Final Order and in full force and effect.

2. The Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan, Definitive Documents, and the Asset Purchase Agreement.

3. Each Definitive Document and each other document contained in any supplement to the Plan, including the Plan Supplement and any exhibits, schedules, amendments, modifications or supplements thereto or other documents contained therein, shall have been executed or Filed, as applicable, in form and substance consistent in all respects with the Plan, and subject to the Purchaser's consent rights under the Asset Purchase Agreement, and shall not have been modified in a manner inconsistent therewith;

4. The Professional Fee Escrow Account shall have been established and funded with Cash in accordance with Article II.B.2 of the Plan.

5. The Wind-Down Reserve shall have been established and funded with Cash in accordance with the Plan.

6. If prior to the Outside Date, the Asset Purchase Agreement shall be in full force and effect and the Sale Transaction shall have been consummated.

7. The Restructuring Transactions shall have been consummated or shall be anticipated to be consummated concurrently with the occurrence of the Effective Date in a manner consistent with the Plan, the Customer Onboarding Protocol, the other Definitive Documents, and the Asset Purchase Agreement, and the Plan shall have been substantially consummated or shall be anticipated to be substantially consummated concurrently with the occurrence of the Effective Date.

## B. Waiver of Conditions Precedent

The Debtors, with the consent of the Committee and, solely to the extent related to the Asset Purchase Agreement and the Sale Transaction, prior to the Outside Date, the consent of Purchaser, may waive any of the conditions to the Effective Date set forth in Article IX.A of the Plan at any time, without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm and consummate the Plan.

## C. Effect of Non-Occurrence of Conditions to Consummation

If the Effective Date does not occur within 120 days after the Confirmation Date, then the Plan will be null and void in all respects, any and all compromises or settlements not previously approved by Final Order of the Bankruptcy Court embodied in the Plan (including with respect to the fixing, limiting, or treatment of any Claim or Interest, including, without limitation, the Alameda Loan Facility Claims), shall be deemed null and void, and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims, Interests, or Causes of Action held by any Debtor or any other Entity; (2) prejudice in any manner the rights of any Debtor or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity in any respect.

# ARTICLE X.

## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

**A.     Modification of Plan**

Subject to the limitations and terms contained in the Plan and Purchaser's consent rights under the Asset Purchase Agreement, the Debtors, with the consent of the Committee, reserve the right to (1) amend or modify the Plan before the entry of the Confirmation Order, in accordance with the Bankruptcy Code and the Bankruptcy Rules and (2) after the entry of the Confirmation Order, the Debtors or the Wind-Down Entity, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, to remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan consistent with the terms set forth herein.

**B.     Effect of Confirmation on Modifications**

Entry of the Confirmation Order shall constitute approval of all modifications or amendments to the Plan occurring after the solicitation thereof pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

**C.     Revocation or Withdrawal of Plan**

The Debtors reserve the right, with the consent of the Committee, to revoke or withdraw the Plan with respect to any or all Debtors before the Confirmation Date and to File subsequent chapter 11 plans. If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then: (1) the Plan will be null and void in all respects; (2) any settlement or compromise not previously approved by Final Order of the Bankruptcy Court embodied in the Plan (including the fixing or limiting to an amount certain of the Claims or Classes of Claims), assumption or rejection of Executory Contracts or Unexpired Leases effectuated by the Plan, and any document or agreement executed pursuant to the Plan will be null and void in all respects; and (3) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims, Interests, or Causes of Action by any Entity, (b) prejudice in any manner the rights of any Debtor or any other Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

# ARTICLE XI.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.     Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.     decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.     resolve any matters related to Executory Contracts or Unexpired Leases, including: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure Claims or other Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed or assumed and assigned; and (c) any dispute regarding whether a contract or lease is or was executory, expired, or terminated;

4.     ensure that distributions to Holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

5.     adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor or the Estates that may be pending on the Effective Date;

6.     enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of (a) contracts, instruments, releases, and other agreements or documents approved by Final Order in the Chapter 11 Cases and (b) the Plan, the Confirmation Order, and contracts, instruments, releases, and other agreements or documents created in connection with the Plan; *provided* that the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection, or dispute resolution clause that refers disputes to a different court;

7.     enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

8.     grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

9.     issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

10.     hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Cases, including:  (a) with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or an Interest for amounts not timely repaid pursuant to Article VI of the Plan; (b) with respect to the releases, injunctions, and other provisions contained in Article VIII of the Plan, including entry of such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions; (c) anything that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan and the Confirmation Order; or (d) related to section 1141 of the Bankruptcy Code;

11.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

12.      adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

13.      consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

14.      enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases with respect to any Entity, and resolve any cases, controversies, suits, or disputes that may arise in connection with any Entity's rights arising from or obligations incurred in connection with the Plan;

15.      hear and determine matters concerning local, state, federal, and foreign taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

16.      enter an order or Final Decree concluding or closing the Chapter 11 Cases;

17.      enforce all orders previously entered by the Bankruptcy Court; and

18.      hear and determine any other matters related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code or the Judicial Code.

Nothing herein limits the jurisdiction of the Bankruptcy Court to interpret and enforce the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, or the Disclosure Statement, without regard to whether the controversy with respect to which such interpretation or enforcement relates may be pending in any state or other federal court of competent jurisdiction.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in this Article XI, the provisions of this Article XI shall have no effect on and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

Unless otherwise specifically provided herein or in a prior order of the Bankruptcy Court, the Bankruptcy Court shall have exclusive jurisdiction to hear and determine disputes concerning Claims against or Interests in the Debtors that arose prior to the Effective Date.

## ARTICLE XII.

## MISCELLANEOUS PROVISIONS

### A.      Immediate Binding Effect

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtors, the Wind-Down Entity, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, exculpations, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims against and Interests in the Debtors shall be

as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or Interest has voted on the Plan.

**B.       Additional Documents**

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors, the Wind-Down Entity, and all Holders of Claims and Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

**C.       Payment of Statutory Fees**

All fees and applicable interest payable pursuant to section 1930 of the Judicial Code and 31 U.S.C. § 3717, as applicable, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the Wind-Down Debtors (or the Distribution Agent on behalf of the Wind-Down Entity) for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or a Final Decree is issued, whichever occurs first.

**D.       Dissolution of Statutory Committees**

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases; *provided*, however, that such committees will remain in existence for the limited purposes of (a) pursuing, supporting, or otherwise participating in, any outstanding appeals in the Chapter 11 Cases; and (b) filing, objecting, or otherwise participating in, any final fee applications of Professionals.

**E.       Reservation of Rights**

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests, unless and until the Effective Date has occurred.

**F.       Successors and Assigns**

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiary, or guardian, if any, of each such Entity.

**G.       Service of Documents**

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Wind-Down Debtors shall be served on:

|                          |                                                                                                                                                                 |
|--------------------------|-----------------------------------------------------------------------------------------------------------------------------------------------------------------|
| Wind-Down Debtors        | **Voyager Digital Holdings, Inc.**<br>33 Irving Place<br>New York, New York 10003<br>Attention: David Brosgol<br>General Counsel,<br>E-mail address: dbrosgol@investvoyager.com |
|                          | with copies for information only (which shall not constitute notice) to:                                                                                         |
| Counsel to the Debtors   | **Kirkland & Ellis LLP**<br>**Kirkland & Ellis International LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br>Attention: Joshua A. Sussberg, P.C., Christopher Marcus, P.C., Christine A. Okike, P.C., and Allyson B. Smith |
| Counsel to the Committee | **McDermott Will & Emery LLP**<br>One Vanderbilt Avenue<br>New York, New York 10017<br>Attention: Darren Azman                                                    |

## H.    Entire Agreement; Controlling Document

Except as otherwise indicated, on the Effective Date, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations with respect to the subject matter of the Plan, all of which will have become merged and integrated into the Plan; *provided, however*, that notwithstanding the foregoing or anything to the contrary herein, to the extent there is any conflict between the Plan and the Confirmation Order, on the one hand, and the Asset Purchase Agreement, on the other hand, the Asset Purchase Agreement shall govern solely in the event the Sale Transaction is consummated. Except as set forth in the Plan, in the event that any provision of the Disclosure Statement, the Plan Supplement, or any order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control. In the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall control.

## I.    Plan Supplement

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the website of the Claims, Noticing, and Solicitation Agent at https://cases.stretto.com/Voyager or the Bankruptcy Court's website at http://www.nysb.uscourts.gov. Unless otherwise ordered by the Bankruptcy Court, to the extent any exhibit or document in the Plan Supplement is inconsistent with the terms of any part of the Plan that does not constitute the Plan Supplement, such part of the Plan that does not constitute the Plan Supplement shall control.

**J.      Non-Severability**

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, subject to the Purchaser's consent rights under the Asset Purchase Agreement prior to the Outside Date, shall have the power to alter and interpret such term or provision to make it valid or enforceable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is:  (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent, consistent with the terms set forth herein; and (3) non-severable and mutually dependent.

**K.      Votes Solicited in Good Faith**

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors, and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties nor individuals or the Wind-Down Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan or any previous plan.

**L.      Waiver or Estoppel**

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed prior to the Confirmation Date.

Dated:  December 21, 2022                    VOYAGER DIGITAL HOLDINGS, INC.
                                             on behalf of itself and all other Debtors


                                             _/s/ Stephen Ehrlich_____
                                             Stephen Ehrlich
                                             Co-Founder and Chief Executive Officer
                                             Voyager Digital Holdings, Inc.

**Exhibit B**

**Redline**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| VOYAGER DIGITAL HOLDINGS, INC. *et al.*,[1] | Case No. 22-10943 (MEW) |
| Debtors. | (Jointly Administered) |

## ~~SECOND~~THIRD AMENDED JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

**NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN OFFER, ACCEPTANCE, COMMITMENT, OR LEGALLY BINDING OBLIGATION OF THE DEBTORS OR ANY OTHER PARTY IN INTEREST, AND THIS PLAN IS SUBJECT TO APPROVAL BY THE BANKRUPTCY COURT AND OTHER CUSTOMARY CONDITIONS.  THIS PLAN IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES.**

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Voyager Digital Holdings, Inc. (7687); Voyager Digital, LTD. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

## <u>TABLE OF CONTENTS</u>

**Page**

Introduction ........................................................................................................... **1**

**Article I. Defined Terms, Rules of Interpretation, Computation of Time, Governing Law,
and Other References** ............................................................................. **1**

    A.    Defined Terms ......................................................................................... 1

    B.    Rules of Interpretation ........................................................................... 1~~5~~6

    C.    Computation of Time ............................................................................. 1~~6~~7

    D.    Governing Law ...................................................................................... 1~~6~~7

    E.    Reference to Monetary Figures .............................................................. 1~~6~~7

    F.    Reference to the Debtors or the Wind-Down Debtors ........................... 1~~6~~8

    G.    Nonconsolidated Plan ............................................................................ 1~~6~~8

**Article II. Administrative and Priority Claims** ..................................................... **1~~6~~8**

    A.    Administrative Claims ........................................................................... 1~~6~~8

    B.    Professional Fee Claims ........................................................................ 1~~7~~9

    C.    Priority Tax Claims ............................................................................... ~~19~~20

**Article III. Classification, Treatment, and Voting of Claims and Interests** ............ **~~19~~20**

    A.    Classification of Claims and Interests ................................................... ~~19~~20

    B.    Summary of Classification ..................................................................... 2~~1~~0

    C.    Treatment of Classes of Claims and Interests ....................................... 2~~0~~1

    D.    Special Provision Governing Unimpaired Claims ................................. 2~~5~~7

    E.    Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes .... 2~~5~~7

    F.    Subordinated Claims .............................................................................. 2~~5~~8

    G.    Intercompany Interests .......................................................................... 2~~5~~8

    H.    Controversy Concerning Impairment ..................................................... 2~~5~~8

    I.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code ...... 2~~5~~8

**Article IV. Provisions for Implementation of the Plan** ........................................... **2~~6~~8**

    A.    General Settlement of Claims and Interests ........................................... 2~~6~~8

    B.    Restructuring Transactions ..................................................................... 2~~6~~9

    C.    The Sale Transaction ............................................................................. 2~~7~~9

    <u>D.</u>    <u>The Liquidation Transaction</u> ................................................................ <u>30</u>

    ~~D~~E.    Management Transition Plan ................................................................. 27~~31~~

    ~~E~~F.    Non-Released D&O Claims ................................................................... 27~~31~~

    ~~F~~G.    The D&O Settlement ............................................................................. 32~~8~~

    ~~G~~H.    Wind-Down Trust .................................................................................. 2~~9~~33

    ~~H~~I.    Sources of Consideration for Plan Distributions ................................... 34~~8~~

    ~~I~~J.    Corporate Existence and Dissolution .................................................... 35~~9~~

    ~~J~~K.    Corporate Action ................................................................................... 35~~9~~

    ~~K~~L.    Vesting of Assets in the Wind-Down Entity .......................................... 36~~40~~

    ~~L~~M.    Cancellation of Notes, Instruments, Certificates, and Other Documents ... 36~~40~~

    ~~M~~N.    Effectuating Documents; Further Transactions ...................................... 36~~41~~

    ~~N~~O.    Section 1146(a) Exemption ................................................................... 37~~41~~

O P.    Preservation of Rights of Action .......................................... 37 41
P Q.    Election to Contribute Third-Party Claims ............................ 38 42
Q R.    Contribution of Contributed Third-Party Claims .................... 38 42
R S.    Closing the Chapter 11 Cases ............................................. 43 8

**Article V. Treatment of Executory Contracts and Unexpired Leases** ............. 43 9

A.    Assumption and Rejection of Executory Contracts and Unexpired Leases ... 43 9
B.    Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases ...................................................... 43 9
C.    Claims Based on Rejection of Executory Contracts or Unexpired Leases ... 43 9
D.    Cure of Defaults for Executory Contracts and Unexpired Leases Assumed ... 40 4
E.    Insurance Policies and Surety Bonds ................................... 41 5
F.    Reservation of Rights ...................................................... 42 6
G.    Nonoccurrence of Effective Date ........................................ 42 6
H.    Contracts and Leases Entered into After the Petition Date ........... 42 6

**Article VI. Provisions Governing Distributions** ............................... 42 6

A.    Timing and Calculation of Amounts to Be Distributed ................. 42 6
B.    Rights and Powers of Distribution Agent ............................... 43 7
C.    Delivery of Distributions and Undeliverable or Unclaimed Distributions ... 43 7
D.    Compliance Matters ........................................................ 45 9
E.    Foreign Currency Exchange Rate ......................................... 46 50
F.    Claims Paid or Payable by Third Parties ................................ 46 50
G.    Setoffs and Recoupment .................................................... 47 51
H.    Allocation between Principal and Accrued Interest .................... 47 51

**Article VII. Procedures for Resolving Disputed, Contingent, and Unliquidated Claims and Interests** .............................................. 47 51

A.    Disputed Claims Process .................................................. 47 51
B.    Objections to Claims or Interests ....................................... 48 52
C.    Estimation of Claims ...................................................... 48 53
D.    No Distributions Pending Allowance ..................................... 49 53
E.    Distributions After Allowance ........................................... 49 53
F.    No Interest ................................................................ 49 53
G.    Adjustment to Claims and Interests without Objection ................ 54 9
H.    Time to File Objections to Claims ....................................... 50 4
I.    Disallowance of Claims or Interests ..................................... 50 4
J.    Amendments to Proofs of Claim .......................................... 50 4

**Article VIII. Effect of Confirmation of the Plan** ............................ 50 4

A.    Releases by the Debtors .................................................. 50 4
B.    Releases by Holders of Claims and Interests ........................... 51 5
C.    Exculpation ................................................................ 52 6
D.    Injunction .................................................................. 53 7
E.    Release of Liens .......................................................... 53 7
F.    OSC and SEC ............................................................... 53 8
G.    Protection against Discriminatory Treatment .......................... 54 8
H.    Document Retention ....................................................... 54 8
I.    Reimbursement or Contribution ........................................... 54 8

J.        Term of Injunctions or Stays .................................................................. 548

**Article IX. Conditions Precedent to the Effective Date** ..................................... **559**

A.        Conditions Precedent to the Effective Date .......................................... 559
B.        Waiver of Conditions Precedent ........................................................... 559
C.        Effect of Non-Occurrence of Conditions to Consummation ................. 5560

**Article X. Modification, Revocation, or Withdrawal of the Plan** ...................... **560**

A.        Modification of Plan .............................................................................. 560
B.        Effect of Confirmation on Modifications .............................................. 560
C.        Revocation or Withdrawal of Plan ....................................................... 560

**Article XI. Retention of Jurisdiction** ................................................................. **561**

**Article XII. Miscellaneous Provisions** ............................................................... **5863**

A.        Immediate Binding Effect ..................................................................... 5863
B.        Additional Documents ........................................................................... 5963
C.        Payment of Statutory Fees .................................................................... 5963
D.        Dissolution of Statutory Committees .................................................... 5963
E.        Reservation of Rights ........................................................................... 5963
F.        Successors and Assigns .......................................................................... 5964
G.        Service of Documents ............................................................................ 5964
H.        Entire Agreement; Controlling Document ............................................ 604
I.        Plan Supplement .................................................................................... 605
J.        Non-Severability ................................................................................... 605
K.        Votes Solicited in Good Faith ............................................................... 615
L.        Waiver or Estoppel ............................................................................... 615

## INTRODUCTION

Voyager Digital Holdings, Inc. and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (each a "<u>Debtor</u>" and, collectively, the "<u>Debtors</u>") propose this ~~second~~third amended joint plan (the "<u>Plan</u>") for the resolution of the outstanding Claims against and Interests in the Debtors pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used in the Plan and not otherwise defined shall have the meanings set forth in Article I.A of the Plan. Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The classifications of Claims and Interests set forth in Article III of the Plan shall be deemed to apply separately with respect to each Plan proposed by each Debtor, as applicable. The Plan does not contemplate substantive consolidation of any of the Debtors. Reference is made to the Disclosure Statement for a discussion of the Debtors' history, business, properties and operations, projections, risk factors, a summary and analysis of this Plan, and certain related matters.

ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE I.

## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES

### A. Defined Terms

Capitalized terms used in this Plan have the meanings ascribed to them below.

1. "*3AC*" means Three Arrows Capital, Ltd and any of its Affiliates or subsidiaries.

2. "*3AC Claims*" means the claims or causes of action asserted or assertable by the Debtors against 3AC, whether in the 3AC Liquidation Proceeding or otherwise.

3. "*3AC Liquidation Proceeding*" means that certain liquidation proceeding captioned *In the Matter of Three Arrows Capital Ltd. and in the Matter of Sections 159(1) and 162(1)(a) and (b) of the Insolvency Act 2003*, Claim No. BVIHC(COM)2022/0119 before the Eastern Caribbean Supreme Court in the High Court of Justice in the British Virgin Islands and the chapter 15 foreign recognition proceeding captioned *In re Three Arrows Capital, Ltd.*, No. 22-10920 (Bankr. S.D.N.Y. Jul. 1, 2022).

4. "*3AC Loan*" means that loan of 15,250 Bitcoins and 350 million USDC to 3AC pursuant to that certain master loan agreement dated March 4, 2022 by and between 3AC, as borrower, and OpCo and HTC Trading, Inc., as lenders.

5. "*3AC Recovery*" means the recovery, if any, of the Debtors from 3AC on account of the 3AC Claims.

6. "*Account*" means any account at OpCo held by an Account Holder relating to Cryptocurrency, which Account is identified in the Debtors' books and records as holding Cryptocurrency as of the Petition Date.

7.    "*Account Holder*" means any Person or Entity who holds an Account with OpCo as of the Petition Date.

8.    "*Account Holder Claim*" means any Claim against the Debtors that is held by an Account Holder on account of such Holder's Account.

9.    "*Acquired Assets*" has the meaning ascribed to it in the Asset Purchase Agreement.

10.    "*Acquired Coins*" has the meaning ascribed to it in the Asset Purchase Agreement.

11.    "*Acquired Coins Value*" has the meaning ascribed to it in the Asset Purchase Agreement.

12.    "*Additional Bankruptcy Distribution*" has the meaning ascribed to it in the Asset Purchase Agreement.

13.    ~~10.~~ "*Administrative Claim*" means a Claim against a Debtor for the costs and expenses of administration of the Chapter 11 Cases arising on or after the Petition Date and prior to the Effective Date pursuant to section 503(b) of the Bankruptcy Code and entitled to priority pursuant to sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' business and (b) Allowed Professional Fee Claims.

14.    ~~11.~~ "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims (other than requests for payment of Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code), which:  (a) with respect to Administrative Claims other than Professional Fee Claims, shall be thirty days after the Effective Date; and (b) with respect to Professional Fee Claims, shall be forty-five days after the Effective Date.

15.    ~~12.~~ "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.  With respect to any Person that is not a Debtor, the term "Affiliate" shall apply to such Person as if the Person were a Debtor.

16.    ~~13.~~ "*Alameda*" means Alameda Ventures Ltd., along with its Affiliates and subsidiaries.

17.    "*Alameda Claims*" means the claims or causes of action asserted or assertable by the Debtors against Alameda, whether in the FTX Bankruptcy Proceeding or otherwise.

18.    ~~14.~~ "*Alameda Loan Agreement*" means that certain unsecured loan agreement, dated as of June 21, 2022, as amended, restated, amended and restated, modified, or supplemented from time to time, by and among Voyager Digital Holdings, Inc., as the borrower, Voyager, as the guarantor, and Alameda, as the lender thereto.

19.    ~~15.~~ "*Alameda Loan Facility*" means that certain unsecured loan facility provided for under the Alameda Loan Agreement.

20.    ~~16.~~ "*Alameda Loan Facility Claims*" means any Claim against any Debtor derived from, based upon, or arising under the Alameda Loan Agreement and any fees, costs, and expenses that are reimbursable by any Debtor pursuant to the Alameda Loan Agreement.

21.    "*Alameda Recovery*" means the recovery, if any, of the Debtors from Alameda on account of the Alameda Claims.

22. 17. "*Allowed*" means, with respect to any Claim or Interest, except as otherwise provided herein: (a) a Claim or Interest that is evidenced by a Proof of Claim timely Filed by the Bar Date or a request for payment of Administrative Claim timely Filed by the Administrative Claims Bar Date (or for which Claim or Interest under the Plan, the Bankruptcy Code, or a Final Order of the Bankruptcy Court a Proof of Claim or a request for payment of Administrative Claim is not or shall not be required to be Filed); (b) a Claim or Interest that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely Filed; (c) a Claim or Interest Allowed pursuant to the Plan, any stipulation approved by the Bankruptcy Court, any contract, instrument, indenture, or other agreement entered into or assumed in connection with the Plan, or a Final Order of the Bankruptcy Court, or (d) a Claim or Interest as to which the liability of the Debtors and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court; *provided* that, with respect to a Claim or Interest described in clauses (a) and (b) above, such Claim or Interest shall be considered Allowed only if and to the extent that with respect to such Claim or Interest no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or if such an objection is so interposed, such Claim or Interest shall have been Allowed by a Final Order. Any Claim or Interest that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes. A Proof of Claim Filed after and subject to the Bar Date or a request for payment of an Administrative Claim Filed after and subject to the Administrative Claims Bar Date, as applicable, shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim. "Allow" and "Allowing" shall have correlative meanings.

18. "*Acquired Cash*" means any Cash acquired pursuant to the Asset Purchase Agreement.

23. 19. "*Asset Purchase Agreement*" means that certain asset purchase agreement dated as of SDeptcember 2718, 2022 by and between West Realm ShiresBAM Trading Services Inc. (d/b/a Binance.US) as Purchaser and Voyager Digital, LLC as Seller (and as amended from time to time in accordance with the terms thereof).

24. 20. "*Assumed Liabilities*" has the meaning ascribed to it in the Asset Purchase Agreement.

25. 21. "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or hereafter amended.

26. 22. "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York, or any other court having jurisdiction over the Chapter 11 Cases, including to the extent of the withdrawal of reference under section 157 of the Judicial Code, the United States District Court for the Southern District of New York.

27. 23. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated by the United States Supreme Court under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

28. 24. "*Bar Date*" means the applicable deadline by which Proofs of Claim must be Filed, as established by: (a) the Bar Date Order; (b) a Final Order of the Bankruptcy Court; or (c) the Plan.

29. 25. "*Bar Date Order*" means the *Order (I) Setting Deadlines for Submitting Proofs of Claims, (II) Approving Procedures for Submitting Proofs of Claim, and (III) Approving Notice Thereof* [Docket No. 218].

30. "*Binance.US Platform*" has the meaning ascribed to it in the Asset Purchase Agreement.

31. "*Binance US*" means BAM Trading Services Inc. (d/b/a Binance.US).

32. "*Binance US Account*" means a customer account opened with the Purchaser by an Account Holder or a Holder of an Allowed OpCo General Unsecured Claim.

33. 26. "*Business Day*" means any day, other than a Saturday, Sunday, or a "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

34. 27. "*Cash*" or "*$*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

35. 28. "*Causes of Action*" mean any action, Claim, cross-claim, third-party claim, damage, judgment, cause of action, controversy, demand, right, suit, obligation, liability, debt, account, defense, offset, power, privilege, license, Lien, indemnity, interest, guaranty, or franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, matured or unmatured, suspected or unsuspected, in contract or in tort, at law or in equity, or pursuant to any other theory of law or otherwise. For the avoidance of doubt, "Causes of Action" includes: (a) any right of setoff, counterclaim, or recoupment and any claim arising from any contract or for breach of duties imposed by law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of local, state, federal, or foreign law, or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) any right to object to or otherwise contest Claims or Interests; (d) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; and (e) any claim or defense, including fraud, mistake, duress, usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

36. 29. "*CCO*" means Evan Psaropoulos.

37. 30. "*CEO*" means Stephen Ehrlich.

38. 31. "*Certificate*" means any instrument evidencing a Claim or an Interest.

39. 32. "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor in the Bankruptcy Court under chapter 11 of the Bankruptcy Code and (b) when used with reference to all Debtors, the procedurally consolidated cases filed for the Debtors in the Bankruptcy Court under chapter 11 of the Bankruptcy Code.

40. 33. "*Claim*" has the meaning set forth in section 101(5) of the Bankruptcy Code.

41. 34. "*Claims Objection Bar Date*" means the deadline for objecting to a Claim, which shall be on the date that is the later of (a) (i) with respect to Administrative Claims (other than Professional Fee Claims and Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code), sixty days after the Administrative Claims Bar Date or (ii) with respect to all other Claims (other than Professional Fee Claims), 180 days after the Effective Date and (b) such other period of limitation

as may be specifically fixed by the Debtors or the Wind-Down Trust, as applicable, as approved by an order of the Bankruptcy Court for objecting to such Claims.

42. 35. "*Claims Register*" means the official register of Claims against and Interests in the Debtors maintained by the Clerk of the Bankruptcy Court or the Claims, Noticing, and Solicitation Agent.

43. 36. "*Claims, Noticing, and Solicitation Agent*" means Bankruptcy Management Solutions, Inc. d/b/a Stretto, in its capacity as the claims, noticing, and solicitation agent in the Chapter 11 Cases for the Debtors and any successors appointed by an order of the Bankruptcy Court.

44. 37. "*Class*" means a class of Claims against or Interests in the Debtors as set forth in Article III of the Plan in accordance with section 1122(a) of the Bankruptcy Code.

45. 38. "*Committee*" means the Official Committee of Unsecured Creditors appointed in these Chapter 11 Cases.

46. 39. "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

47. 40. "*Confirmation Date*" means the date on which Confirmation occurs.

48. 41. "*Confirmation Hearing*" means the hearing before the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code at which the Debtors will seek Confirmation of the Plan.

49. 42. "*Confirmation Order*" means the Bankruptcy Court's order confirming the Plan pursuant to section 1129 of the Bankruptcy Code has the meaning ascribed to it in the Asset Purchase Agreement.

50. 43. "*Consummation*" means the occurrence of the Effective Date.

51. 44. "*Contributed Third-Party Claims*" means all direct Causes of Action that any Contributing Claimant has against any Person (other than a Debtor) that had a direct relationship with the Debtors, their predecessors, or respective affiliates and that harmed such Contributing Claimant in the claimant's capacity as a creditor of Voyager, including (a) all Causes of Action based on, arising out of, or related to the marketing, sale, and issuance of Cryptocurrency that at any point was held or offered on Voyager's platform; (b) all Causes of Action based on, arising out of, or related to the alleged misrepresentation of any of the Debtors' financial information, business operations, or related internal controls; and (c) all Causes of Action based on, arising out of, or related to any alleged failure to disclose, or actual or attempted cover up or obfuscation of, any of the Debtors' conduct prior to the Petition Date; *provided*, *however*, that Contributed Third-Party Claims do not include (i) any derivative claims of the Debtors; (ii) any direct claims against the Released Parties; (iii) any direct Causes of Action that any Contributing Claimant has against Mark Cuban, Dallas Basketball Limited d/b/a Dallas Mavericks, the National Basketball Association, and any of their Related Parties; or (iv) any direct Causes of Action that any Contributing Claimant, in its capacity as an equity holder of Voyager Digital Ltd., has that are asserted in the currently filed complaint, dated as of July 6, 2022, in the Ontario Superior Court of Justice by Francine De Sousa, against Voyager Digital Ltd., Stephen Ehrlich, Philip Eytan, Evan Psaropoulos, Lewis Bateman, Krisztian Toth, Jennifer Ackart, Glenn Stevens, and Brian Brooks.

52.    45. "*Contributing Claimants*" means any Holders of Claims or Interests that elect on their ballots or opt-in forms to contribute their Contributed Third-Party Claims to the Wind-Down Entity.

53.    46. "*Cryptocurrency*" means a digital currency or crypto asset in which transactions are verified and records maintained by a decentralized system using cryptography, rather than by a centralized authority, including stablecoins, digital coins and tokens, such as security tokens, utility tokens and governance tokens.

54.    47. "*Cure*" or "*Cure Claim*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's default under an Executory Contract or an Unexpired Lease assumed by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

55.    48. "*Customer ~~Migration~~Onboarding Protocol*" means ~~a protocol prepared by Purchaser for the migration of Transferred Creditors to Purchaser's platform pursuant to the Plan that is consistent with the terms of the Asset Purchase Agreement and otherwise mutually acceptable to OpCo and the Purchaser, and~~the protocol describing the process of onboarding Account Holders and Holders of OpCo General Unsecured Claims onto the Binance.US Platform, the form of which shall be included in the Plan Supplement and filed no later than by February 3, 2023, and which shall be in a form acceptable to the Purchaser.

56.    49. "*D&O Carriers*" means the insurance carriers of the D&O Liability Insurance Policies.

57.    50. "*D&O Liability Insurance Policies*" means all unexpired insurance policies maintained by the Debtors, the Wind-Down Debtors, or the Estates as of the Effective Date that have been issued (or provide coverage) regarding directors', managers', officers', members', and trustees' liability (including any "tail policy"), including but not limited to the Management Liability Policy, the Excess Policies, and the Side-A Policy, and all agreements, documents, or instruments relating thereto.

58.    51. "*D&O Settlement*" means the settlement between the Debtors and CEO and CCO as set forth in Article IV.~~F~~G of the Plan.

59.    52. "*Debtors*" means, collectively, each of the following:  Voyager Digital Holdings, Inc.; Voyager Digital Ltd.; and Voyager Digital, LLC.

60.    53. "*Definitive Documents*" means:  (a) the Plan (and any and all exhibits, annexes, and schedules thereto); (b) the Confirmation Order; (c) the Disclosure Statement and the other Solicitation Materials; (d) the Disclosure Statement Order; (e) all pleadings filed by the Debtors in connection with the Chapter 11 Cases (or related orders); (f) the Plan Supplement; (g) the Management Transition Plan; (h) any new material employment, consulting, or similar agreements entered into between the Wind-Down Trust and any of the Debtors' employees, if any; ~~and~~ (i) the Asset Purchase Agreement; (j) the Customer Onboarding Protocol; and (k) any and all other deeds, agreements, filings, notifications, pleadings, orders, certificates, letters, instruments or other documents reasonably desired or necessary to consummate and document the transactions contemplated by the Restructuring Transactions (including any exhibits, amendments, modifications, or supplements made from time to time thereto).

61.    54. "*Disclosure Statement*" means the *Amended Disclosure Statement Relating to the ~~Second~~Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to*

*Chapter 11 of the Bankruptcy Code*, as may be amended, supplemented, or otherwise modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan.

62. 55. "*Disclosure Statement Order*" means the order entered by the Bankruptcy Court approving the Disclosure Statement.

63. 56. "*Disputed*" means a Claim or an Interest or any portion thereof: (a) that is not Allowed; (b) that is not disallowed under the Plan, the Bankruptcy Code, or a Final Order; and (c) with respect to which a party in interest has Filed a Proof of Claim, a Proof of Interest, or otherwise made a written request to a Debtor for payment.

64. 57. "*Disputed Claims Reserve*" means an appropriate reserve in an amount to be determined by the Wind-Down Trust for distributions on account of Disputed Claims that are subsequently Allowed after the Effective Date, in accordance with Article VII.D hereof.

65. "*Distributable Cryptocurrency*" means all Cryptocurrency held on the Voyager platform or that is otherwise property of any Debtor on the Effective Date after payment in full of, or reserve for, all Allowed Administrative Claims, Priority Tax Claims, Secured Tax Claims, and Other Priority Claims.

66. 58. "*Distributable HoldCo Cash*" means HoldCo's Cash, less (x) any Cash necessary to satisfy Allowed Administrative Claims, Priority Tax Claims, Secured Tax Claims, and Other Priority Claims at HoldCo in full; and (y) to fund HoldCo's Pro Rata share of the Wind-Down Reserve.

67. 59. "*Distributable OpCo Cash*" means OpCo's Cash, including the Purchase Price Cash, less (x) any Cash necessary to satisfy Allowed Administrative Claims, Priority Tax Claims, Secured Tax Claims, and Other Priority Claims at OpCo in full; and (y) to fund OpCo's Pro Rata share of the Wind-Down Reserve.

68. 60. "*Distributable TopCo Cash*" means TopCo's Cash, less (x) any Cash necessary to satisfy Allowed Administrative Claims, Priority Tax Claims, Secured Tax Claims, and Other Priority Claims at TopCo in full; and (y) to fund TopCo's Pro Rata share of the Wind-Down Reserve.

69. 61. "*Distribution Agent*" means, as applicable, the Purchaser, Wind-Down Debtors, Wind-Down Wind-Down Trust or any Entity or Entities designated by the Purchaser, Wind-Down Debtors, or the Wind-Down Wind-Down Trust (as applicable) to make or to facilitate distributions that are to be made pursuant to the Plan; *provided* that, for the avoidance of doubt, Purchaser shall be the Distribution Agent solely for distributions made to Transferred Creditors pursuant to the Customer Migration Protocol, Definitive Documents, and Asset Purchase Agreement.

70. 62. "*Distribution Date*" means, except as otherwise set forth herein, the date or dates determined by the Wind-Down Trust, on or after the Effective Date, upon which the Distribution Agent shall make distributions to Holders of Allowed Claims entitled to receive distributions under the Plan.

71. 63. "*Distribution Record Date*" means the record date for purposes of determining which Holders of Allowed Claims and Interests against the Debtors are eligible to receive distributions under the Plan, which date shall be the Effective Date, or such other date as is determined by the Debtors or designated by an order of the Bankruptcy Court.

72. 64. "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which (a) all conditions precedent to the occurrence of the Effective Date set forth in

Article IX.A of the Plan have been satisfied or waived in accordance with Article IX.B of the Plan, (b) no stay of the Confirmation Order is in effect, and (c) the Debtors declare the Plan effective.

73. 65. "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

74. 66. "*Estate*" means, as to each Debtor, the estate created on the Petition Date for the Debtor in its Chapter 11 Case pursuant to sections 301 and 541 of the Bankruptcy Code and all property (as defined in section 541 of the Bankruptcy Code) acquired by the Debtor after the Petition Date through and including the Effective Date.

75. 67. "*Excess Policies*" means, collectively, the Excess Insurance Policy, No. EFI1203041-01, issued by Euclid Financial on behalf of Certain Underwriters of Lloyd's, London, the Excess Insurance Policy, No. RILEDOA3392022, issued by Relm Insurance Ltd., both for the February 22, 2022 to February 22, 2023 period, and the Excess Policy, No. ELU184180-23, issued by XL Specialty Insurance Company, for the February 22, 2022 to July 1, 2023 period.

76. 68. "*Exculpated Parties*" means, collectively, and in each case in its capacity as such: (a) each of the Debtors; (b) the Committee, and each of the members thereof, solely in their capacity as such; (c) each of the Released Professionals; and (d) each of the Released Voyager Employees; and (e) the Distribution Agent.

77. 69. "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

78. 70. "*Existing Equity Interests*" means any Interest in TopCo existing immediately prior to the occurrence of the Effective Date.

79. "*Extended Outside Date*" has the meaning set forth in the Asset Purchase Agreement.

80. 71. "*Federal Judgment Rate*" means the federal judgment interest rate in effect as of the Petition Date calculated as set forth in section 1961 of the Judicial Code.

81. 72. "*File*," "*Filed*," or "*Filing*" means file, filed, or filing, respectively, in the Chapter 11 Cases with the Bankruptcy Court or its authorized designee, or, with respect to the filing of a Proof of Claim or Proof of Interest, file, filed, or filing, respectively, with the Claims, Noticing, and Solicitation Agent.

82. 73. "*Final Decree*" means the decree contemplated under Bankruptcy Rule 3022.

83. 74. "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, petition for certiorari, or move for a new trial, reargument, reconsideration, or rehearing has expired and no appeal, petition for certiorari, or motion for a new trial, reargument, reconsideration, or rehearing has been timely taken or filed, or as to which any appeal that has been or may be taken or any petition for certiorari or any motion for a new trial, reargument, reconsideration, or rehearing that has been or may be made or filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the motion for a new trial, reargument, reconsideration, or rehearing shall have been denied, resulted in no modification of such order (if any such motion has been or may be granted), or have otherwise been dismissed with prejudice; *provided* that the possibility that a motion under rule 60 of

the Federal Rules of Civil Procedure or any comparable Bankruptcy Rule may be filed relating to such order or judgment shall not cause such order or judgment to not be a Final Order.

84. "*FTX*" means FTX Trading, Ltd. and any of its Affiliates or subsidiaries, including West Realm Shires Inc (d/b/a "FTX.US").

85. "*FTX Bankruptcy Proceeding*" means that certain chapter 11 proceeding captioned *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Nov. 11, 2022).

86. "*FTX Claims*" means the claims or causes of action asserted or assertable by the Debtors against FTX, whether in the FTX Bankruptcy Proceeding or otherwise.

87. ~~75.~~ "*FTX* ~~US Account~~" ~~means a customer~~ *Recovery*" means the recovery, if any, of the Debtors from FTX on account ~~opened by an Account Holder or a Holder of an Allowed OpCo General Unsecured~~ of the FTX Claims ~~with Purchaser~~.

88. ~~76.~~ "*General Unsecured Claim*" means, collectively, any HoldCo General Unsecured Claim, OpCo General Unsecured Claim, or TopCo General Unsecured Claim.

89. ~~77.~~ "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

90. "*Government Bar Date*" means the applicable deadline by which Proofs of Claim by a Governmental Unit must be Filed, as established by:  (a) the Bar Date Order; (b) a Final Order of the Bankruptcy Court; or (c) the Plan.

91. ~~78.~~ "*HoldCo*" means Voyager Digital Holdings, Inc.

92. ~~79.~~ "*HoldCo General Unsecured Claim*" means any Claim against HoldCo that is not Secured and is not:  (a) paid in full prior to the Effective Date pursuant to an order of the Bankruptcy Court; (b) an Administrative Claim; (c) a Secured Tax Claim; (d) a Priority Tax Claim; (e) an Other Priority Claim; (f) a Professional Fee Claim; (g) an Alameda Loan Facility Claim; or (h) an Intercompany Claim.  For the avoidance of doubt, all (i) Claims resulting from the rejection of Executory Contracts and Unexpired Leases, and (ii) Claims that are not Secured resulting from litigation, against HoldCo are HoldCo General Unsecured Claims.

93. ~~80.~~ "*Holder*" means an Entity holding a Claim against or an Interest in any Debtor.

94. ~~81.~~ "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

95. ~~82.~~ "*Insurance Policies*" means any and all insurance policies entered into by the Debtors, including the D&O Insurance Policies.

96. ~~83.~~ "*Intercompany Claim*" means any Claim held by a Debtor or a Debtor's Affiliate against a Debtor.

97. ~~84.~~ "*Intercompany Interest*" means, other than an Interest in Voyager, an Interest in one Debtor held by another Debtor or a Debtor's Affiliate.

98. ~~85.~~ "*Interest*" means any equity security (as such term is defined in section 101(16) of the Bankruptcy Code) including all issued, unissued, authorized, or outstanding shares of capital stock

9

and any other common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profit interests of an Entity, including all options, warrants, rights, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable, or exchangeable securities, or other agreements, arrangements, or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in an Entity whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security, and including any Claim against the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to the foregoing.

99.    86.  "*Interim Compensation Order*" means the *Order (I) Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals and (II) Granting Related Relief* [Docket No. 236].

100.    87.  "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001 and the rules and regulations promulgated thereunder, as applicable to the Chapter 11 Cases.

101.    88.  "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

102.    "*Liquidation Procedures*" means, in the event the Sale Transaction is not consummated by the Outside Date, such procedures filed by the Wind-Down Entity identifying the mechanics and procedures to effectuate the Liquidation Transaction.

103.    "*Liquidation Transaction*" means, in the event the Sale Transaction is not consummated by the Outside Date, the distribution of the Debtors' Cryptocurrency, Cash and other assets pursuant to Article IV.D of this Plan.

104.    89.  "*Management Liability Policy*" means the Executive and Corporate Securities Liability Insurance Policy, No. ELU181214-22, issued by XL Specialty Insurance Company for the February 22, 2022 to February 22, 2023 period.

105.    90.  "*Management Transition Plan*" has the meaning set forth in Article IV.D̶E of the Plan, and which shall be in form and substance reasonably acceptable to the Committee.

106.    "*Net Owed Coins*" has the meaning ascribed to it in the Asset Purchase Agreement.

107.    91.  "*Non-Released D&O Claims*" has the meaning set forth in Article IV.E̶F of the Plan.

108.    92.  "*Non-Released D&O Claim Budget*" means the amount allocated to pursue the Non-Released D&O Claims and the Non-Released Insurance Claims, which amount shall be agreed upon between the Debtors and the Committee prior to the Confirmation Hearing.

109.    93.  "*Non-Released Insurance Claims*" has the meaning set forth in Article IV.E̶F of the Plan.

110.    94.  "*OpCo*" means Voyager Digital, LLC.

111.    95.  "*OpCo General Unsecured Claim*" means any Claim against OpCo that is not Secured and is not: (a) paid in full prior to the Effective Date pursuant to an order of the Bankruptcy Court; (b) an Administrative Claim; (c) a Secured Tax Claim; (d) a Priority Tax Claim; (e) an Other Priority Claim; (f) a Professional Fee Claim; (g) an Account Holder Claim; or (h) an Intercompany Claim.  For the avoidance of doubt, all (i) Claims resulting from the rejection of Executory Contracts and

Unexpired Leases, and (ii) Claims that are not Secured resulting from litigation against OpCo are OpCo General Unsecured Claims.

112. ~~96.~~ "*OSC*" means the Ontario Securities Commission.

113. ~~97.~~ "*Other Priority Claim*" means any Claim against a Debtor, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

114. "*Outside Date*" has the meaning set forth in the Asset Purchase Agreement. All references herein to the "Outside Date" shall be deemed to include the "Extended Outside Date" to the extent the Outside Date is extended in accordance with Section 8.1(c) of the Asset Purchase Agreement.

115. ~~98.~~ "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

116. ~~99.~~ "*Petition Date*" means July 5, 2022.

117. ~~100.~~ "*Plan*" means this joint chapter 11 plan and all exhibits, supplements, appendices, and schedules hereto, as may be altered, amended, supplemented, or otherwise modified from time to time in accordance with Article X.A hereof, including the Plan Supplement (as altered, amended, supplemented, or otherwise modified from time to time), which is incorporated herein by reference and made part of the Plan as if set forth herein.

118. ~~101.~~ "*Plan Supplement*" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (in each case, as may thereafter be amended, supplemented, or otherwise modified from time to time in accordance with the terms of the Plan, the Bankruptcy Code, the Bankruptcy Rules, and applicable law), to be Filed by the Debtors no later than seven days before the Voting Deadline or such later date as may be approved by the Bankruptcy Court, and additional documents Filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement. The Plan Supplement may include the following, as applicable: (a) the Schedule of Assumed Executory Contracts and Unexpired Leases; (b) the Schedule of Retained Causes of Action; (c) the Schedule of Assumed and Assigned Executory Contracts and Unexpired Leases; (d) the Customer ~~Migration~~Onboarding Protocol; (e) the Restructuring Transactions Memorandum; (f) the Wind-Down Trust Agreement; and (g) any additional documents necessary to effectuate or that is contemplated by the Plan, including any compensation program for any of the Debtors' employees to be established as contemplated in the Plan and the Definitive Documents to facilitate the transfer of Acquired Assets pursuant to the Asset Purchase Agreement and the wind-down of the Debtors' Estates; *provided* that the ~~Customer Migration Protocol and the~~ Schedule of Retained Causes of Action shall be filed no later than 14 days before the Voting Deadline. The Plan Supplement (and the contents thereof) shall be (x) subject to Purchaser's consent rights solely to the extent set forth under the Asset Purchase Agreement (and shall otherwise be consistent with the Asset Purchase Agreement) and (y) reasonably acceptable to the Committee.

119. ~~102.~~ "*Priority Tax Claim*" means any Claim of a Governmental Unit against a Debtor of the kind specified in section 507(a)(8) of the Bankruptcy Code.

120. ~~103.~~ "*Pro Rata*" means the proportion that (i) an Allowed Claim or an Allowed Interest in a particular Class bears to (ii) the aggregate amount of Allowed Claims or Allowed Interests in that Class ~~or the proportion of the~~and, solely with respect to Claims in Classes 3 and 4(a), the proportion that an Allowed Claim in either such Class bears to the aggregate amount of Allowed Claims in Classes 3 and 4(a) in the aggregate, unless otherwise indicated. For purposes of calculating Pro Rata distributions if

the Sale Transaction is consummated by the Outside Date, the Pro Rata shares of all Holders of Allowed Claims or Allowed Interests in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim or Allowed Interests under the Plan, unless otherwise indicated. shall be calculated taking into account the Acquired Coins Value of the Net Owed Coins distributed to each of the Account Holders.

121.  104. "*Professional*" means an Entity:  (a) employed in the Chapter 11 Cases pursuant to an order of the Bankruptcy Court in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered and expenses incurred pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code or (b) for which compensation and reimbursement has been Allowed by Final Order of the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

122.  105. "*Professional Fee Claim*" means any Administrative Claim by a Professional for compensation for services rendered or reimbursement of expenses incurred by such Professional through and including the Effective Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court.  To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

123.  106. "*Professional Fee Escrow Account*" means an escrow account funded by the Debtors with Cash no later than the Effective Date in an amount equal to the Professional Fee Escrow Amount.

124.  107. "*Professional Fee Escrow Amount*" means the aggregate amount of quarterly U.S. Trustee fees, Professional Fee Claims, and other unpaid fees and expenses the Professionals have incurred or will incur in rendering services in connection with the Chapter 11 Cases prior to and as of the Confirmation Date projected to be outstanding as of the anticipated Effective Date, which shall be estimated pursuant to the method set forth in Article II.B of the Plan.

125.  108. "*Proof of Claim*" means a written proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

126.  109. "*Proof of Interest*" means a written proof of Interest Filed against any of the Debtors in the Chapter 11 Cases.

127.  110. "*Purchase Price Cash*" means the Cash paid by the Purchaser to OpCo pursuant to the Asset Purchase Agreement.

128.  111. "*Purchaser*" means West Realm Shires Inc Binance US.

129.  112. "*Reinstated*" or "*Reinstatement*" means, with respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

130.  113. "*Related Party*" means, with respect to any Entity, in each case in its capacity as such with respect to such Entity, such Entity's current and former directors, managers, officers, investment committee members, special committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers,

employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and advisors.

131.    ~~114.~~ "*Released Parties*" means, collectively, in each case in its capacity as such: (a) the Debtors; (b) the Wind-Down Debtors; (c) the Committee, and each of the members thereof; (d) each of the Released Professionals; (e) Purchaser and each of its Related Parties; ~~(e) Alameda~~ and ~~each of its Related Parties;~~ (f) each of the ~~Released Professionals; and (g) each of the~~ Released Voyager Employees (subject to the limitations contained in Article IV.~~E~~F and Article IV.~~F~~G of the Plan); *provided* that if the Asset Purchase Agreement is terminated, Purchaser and each of its Related Parties shall not be "Released Parties" under the Plan.

132.    ~~115.~~ "*Released Professionals*" means the following professionals retained by the Debtors, the Committee, or the Purchaser (as applicable): (i) Kirkland & Ellis LLP; (ii) Moelis & Company LLC; (iii) Berkeley Research Group, LLC; (iv) Bankruptcy Management Solutions, Inc. d/b/a Stretto; (v) Quinn Emanuel Urquhart & Sullivan LLP; (vi) Fasken Martineau DuMoulin LLP; (vii) Campbells Legal (BVI); (viii) McDermott Will & Emery LLP; (ix) FTI Consulting, Inc.; (x) Epiq Corporate Restructuring, LLC; (xi) Cassels, Brock & Blackwell LLP; (xii) Paul Hastings LLP; (xiii) Harney Westwood & Riegels LP (BVI); (xiv) Day Pitney LLP (solely in their capacity as counsel to the Debtors); (xv) Jenner & Block LLP; (xvi) Seyfarth Shaw LLP; (xvii) Alvarez & Marsal ~~Holdings, LLC~~Canada Inc.; (xviii) Blake, Cassels & Graydon LLP; ~~and~~ (xix) ~~Sullivan & Cromwell LLP.~~Jaffe Raitt Heuer & Weiss; (xx) Latham & Watkins LLP; (xxi) Lowenstein Sandler LLP; (xxii) Kramer Levin LLP; and (xxiii) Acura Law Firm; *provided* that if the Asset Purchase Agreement is terminated, Latham & Watkins LLP shall not be a "Released Professional" under the Plan.

133.    ~~116.~~ "*Released Voyager Employees*" means all directors, officers, and Persons employed by each of the Debtors and their Affiliates serving in such capacity on or after the Petition Date but before the Effective Date (subject to the limitations contained in Article IV.~~E~~F and Article IV.~~F~~G of the Plan).

134.    ~~117.~~ "*Releasing Parties*" means, collectively, in each case in its capacity as such: (a) the Debtors; (b) the Wind-Down Debtors; (c) the Committee, and each of the members thereof; (d) each of the Released Professionals; (e) each of the Released Voyager Employees; (f) ~~Alameda and each of its Related Parties to the extent Alameda is able to bind such Related Parties; (g)~~ Purchaser and each of its Related Parties to the extent Purchaser is able to bind such Related Parties; (~~h~~g) all Holders of Claims that vote to accept the Plan and affirmatively opt into the releases provided by the Plan; (~~i~~h) all Holders of Claims that vote to reject the Plan and affirmatively opt into the releases provided by the Plan; and (~~j~~i) all Holders of Claims or Interests that abstain from voting (or are otherwise not entitled to vote) on the Plan and affirmatively opt into the releases provided by the Plan; *provided* that if the Asset Purchase Agreement is terminated, Purchaser and each of its Related Parties shall not be "Releasing Parties" under the Plan.

135.    ~~118.~~ "*Restructuring Transactions*" means those mergers, amalgamations, consolidations, reorganizations, arrangements, continuances, restructurings, transfers, conversions, dispositions, liquidations, dissolutions, or other corporate transactions that the Debtors and the Committee jointly determine to be necessary to implement the transactions described in this Plan, as described in more detail in Article IV.B herein and the Restructuring Transactions Memorandum.

136.    ~~119.~~ "*Restructuring Transactions Memorandum*" means that certain memorandum as may be amended, supplemented, or otherwise modified from time to time, describing the steps to be

carried out to effectuate the Restructuring Transactions, the form of which shall be included in the Plan Supplement, and which shall be in a form reasonably acceptable to the Committee.

137. 120. "*Robertson Class Action*" means that certain putative class action litigation filed in the United States District Court for the Southern District of Florida, captioned *Robertson, et al. v. Cuban, et al.*, No. 1:22-cv-22538-RKA (S.D. Fla. Aug. 10, 2022).

138. 121. "*Sale Transaction*" means the sale of certain of the Debtors' assets and all other transactions pursuant to the Asset Purchase Agreement.

139. 122. "*Schedule of Assumed and Assigned Executory Contracts and Unexpired Leases*" means a schedule that may be Filed as part of the Plan Supplement, which shall be in form and substance acceptable to the Purchaser and in all respects consistent with the terms of the Asset Purchase Agreement, of certain Executory Contracts and Unexpired Leases to be assumed by the Debtors and assigned to the Purchaser pursuant to the Plan and Asset Purchase Agreement, as the same may be amended, modified, or supplemented from time to time by the Debtors or Wind-Down Trust, as applicable, in accordance with the Plan.

140. 123. "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means a schedule that may be Filed as part of the Plan Supplement, which shall be in form and substance reasonably acceptable to the Committee, of certain Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time by the Debtors or Wind-Down Trust, as applicable, in accordance with the Plan.

141. 124. "*Schedule of Retained Causes of Action*" means the schedule of certain Causes of Action of the Debtors that are not released, waived, settled, compromised, or transferred pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time by the Debtors and/or the Wind-Down Entity, which shall be included in the Plan Supplement. For the avoidance of doubt, any failure to specifically list any Causes of Action on the Schedule of Retained Causes of Action shall not be deemed a waiver or admission that any such Cause of Action does not constitute Vested Causes of Action.

142. 125. "*Schedules*" means, collectively, the schedules of assets and liabilities, Schedule of Assumed Executory Contracts and Unexpired Leases, Schedule of Assumed and Assigned Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by each of the Debtors pursuant to section 521 of the Bankruptcy Code, as such schedules and statements may have been or may be amended, modified, or supplemented from time to time.

143. 126. "*SEC*" means the United States Securities and Exchange Commission.

144. 127. "*Section 510(b) Claim*" means any Claim against a Debtor subject to subordination under section 510(b) of the Bankruptcy Code.

145. 128. "*Secured*" means, when referring to a Claim: (a) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) Allowed pursuant to the Plan as a secured Claim.

146.   129.  "*Secured Tax Claim*" means any Secured Claim against a Debtor that, absent its Secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

147.   130.  "*Securities Act*" means the U.S. Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

148.   131.  "*Security*" has the meaning set forth in section 2(a)(1) of the Securities Act.

149.   132.  "*Side-A Policy*" means the Cornerstone A-Side Management Liability Policy, ELU184179-22, issued by XL Specialty Insurance Company, for the July 1, 2022 to July 1, 2023 period.

150.   133.  "*Solicitation Materials*" means all solicitation materials with respect to the Plan.

151.   134.  "*Special Committee*" means the special committee established at OpCo, comprised of two independent directors, to conduct the Special Committee Investigation.

152.   135.  "*Special Committee Investigation*" ~~has the meaning set forth in Article IV.F of the Plan~~means that certain investigation undertaken by the Special Committee into certain historical transactions, as more fully described in the Disclosure Statement.

153.   "*Supported Jurisdiction*" has the meaning ascribed to it in the Asset Purchase Agreement.

154.   136.  "*TopCo*" means Voyager Digital Ltd., a Canadian corporation that is publicly traded on the Toronto Stock Exchange.

155.   137.  "*TopCo General Unsecured Claim*" means any Claim against TopCo that is not Secured and is not: (a) paid in full prior to the Effective Date pursuant to an order of the Bankruptcy Court; (b) an Administrative Claim; (c) a Secured Tax Claim; (d) a Priority Tax Claim; (e) an Other Priority Claim; (f) a Professional Fee Claim; (g) an Alameda Loan Facility Claim; (h) an Intercompany Claim; or (i) a Section 510(b) Claim.  For the avoidance of doubt, all (i) Claims resulting from the rejection of Executory Contracts and Unexpired Leases, and (ii) Claims that are not Secured resulting from litigation, other than 510(b) Claims, against TopCo are TopCo General Unsecured Claims.

156.   138.  "*Transferred Creditors*" means Account Holders and Holders of Allowed OpCo General Unsecured Claims who have completed all documentation and "KYC" processes reasonably required by Purchaser in the ordinary course of Purchaser's business with respect to similarly situated clients and who have opened ~~FTX~~a Binance US Accounts as of the date that is three (3) months following the later of the Closing Date (as defined in the Asset Purchase Agreement) or such later date as may be specified in the Customer ~~Migration~~Onboarding Protocol, and the successors and assigns of such Holders.

157.   139.  "*Transferred Cryptocurrency Value*" means the ~~fair market value~~aggregate VWAP of any Cryptocurrency ~~constituting an Acquired Asset~~that is the subject of an Additional Bankruptcy Distribution as of the date that is two Business Days prior to such Additional Bankruptcy Distribution.

158.   140.  "*U.S. Trustee*" means the Office of the United States Trustee for Region 2.

159.   141.  "*Unclaimed Distribution*" means any distribution under the Plan on account of an Allowed Claim or Allowed Interest to a Holder that, after the expiration of six months after the Effective

Date, has not: (a) accepted a distribution, (b) given notice to the Wind-Down Trust of an intent to accept a particular distribution, (c) responded to the Debtors' or Wind-Down Trust's requests for information necessary to facilitate a particular distribution, or (d) taken any other action necessary to facilitate such distribution.

160. ~~142.~~ "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or section 1123 of the Bankruptcy Code.

161. ~~143.~~ "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

162. *"Unsupported Jurisdiction"* has the meaning ascribed to it in the Asset Purchase Agreement.

163. *"Unsupported Jurisdiction Approval"* has the meaning ascribed to it in the Asset Purchase Agreement.

164. ~~144.~~ "*Vested Causes of Action*" means the Causes of Action vesting in the Wind-Down Entity pursuant to Article IV.~~O~~L of the Plan, including, but not limited to, those Causes of Action enumerated on the Schedule of Retained Causes of Action, which shall be included in the Plan Supplement and in all respects consistent with the terms of the Asset Purchase Agreement.

165. ~~145.~~ "*VGX*" means Voyager Token, that certain Cryptocurrency issued by the Debtors.

166. ~~146.~~ "*Voting Deadline*" means ~~November~~January 2~~9~~7, 202~~2~~3.

167. ~~147.~~ "*Voyager*" means Voyager Digital Ltd. and its direct and indirect Affiliates.

168. *"VWAP"* means, with respect to any type of Cryptocurrency and as of any date of determination, an amount equal to the volume weighted average price in U.S. dollars for such type of Cryptocurrency for the consecutive 24-hour period immediately prior to 8:00 a.m. New York Time on such date of determination, as reported on https://coinmarketcap.com.

169. ~~148.~~ "*Wind-Down Debtor*" means a Debtor, or any successor or assign thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Effective Date.

170. ~~149.~~ "*Wind-Down Entity*" means the Wind-Down Debtor or the Wind-Down Trust, as applicable, pursuant to the Restructuring Transactions Memorandum.

171. ~~150.~~ "*Wind-Down Entity Assets*" means the Wind-Down Trust Assets or any assets transferred to the Wind-Down Debtor, as applicable.

172. ~~151.~~ "*Wind-Down Reserve*" means an amount, which shall be agreed upon between the Debtors and the Committee prior to the Confirmation Hearing.

173. ~~152.~~ "*Wind-Down Trust*" means the trust established on the Effective Date and described in Article IV.~~G~~H to be established under Delaware trust law that, among other things, shall effectuate the wind-down of the Wind-Down Debtors, commence, litigate and settle the Vested Causes of Action that are not released, waived, settled, compromised, or transferred under the Plan and make distributions pursuant to the terms of the Plan and the Wind-Down Trust Agreement; *provided* that, for the avoidance

of doubt, the Wind-Down Trust shall not conduct any business operations or continue the Debtors' business operations after the Effective Date.

174. 153. "*Wind-Down Trust Agreement*" means that certain trust agreement by and among the Debtors, the Committee, and the Wind-Down Trust, which shall be included in the Plan Supplement in a form reasonably acceptable to the Committee.

175. 154. "*Wind-Down Trust Assets*" means all of the Debtors' assets transferred to, and vesting in, the Wind-Down Trust pursuant to the Wind-Down Trust Agreement, which, in the event the Sale Transaction is consummated, shall exclude the Acquired Assets, and which shall include, without limitation but only to the extent the following are not Acquired Assets, (a) the Wind-Down Reserve, (b) to the extent not purchased by Purchaser pursuant to the Asset Purchase Agreement, all VGX held by the Debtors as of the Petition Date, (c) 3AC Claims and 3AC Recovery, (d) the FTX Claims and FTX Recovery, (e) Alameda Claims and Alameda Recovery, (f) the Non- Non- Released D&O Claims, and (eg) the Vested Causes of Action.

176. 155. "*Wind-Down Trust Beneficiaries*" means the Holders of Allowed Claims or Allowed Interests that are entitled to receive distributions pursuant to the terms of the Plan, whether or not such Claims or Interests are Allowed as of the Effective Date.

177. 156. "*Wind-Down Trust Expenses*" means all actual and necessary costs and expenses incurred by the Wind-Down Trustee in connection with carrying out the obligations of the Wind-Down Trust pursuant to the terms of the Plan and the Wind-Down Trust Agreement.

178. 157. "*Wind-Down Trust Oversight Committee*" means the oversight committee tasked with overseeing the Wind-Down Trust in accordance with the Plan and the Wind-Down Trust Agreement.

179. 158. "*Wind-Down Trust Units*" means the beneficial interests in the Wind-Down Trust as more fully set forth in the Wind-Down Trust Agreement.

180. 159. "*Wind-Down Trustee*" means the Person or Persons selected by the Committee, after consultation with the Debtors, subject to the approval of the Bankruptcy Court and identified in the Plan Supplement, to serve as the trustee(s) of the Wind-Down Trust, and any successor thereto, appointed pursuant to the Wind-Down Trust Agreement.

## B.    Rules of Interpretation

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter gender; (2) capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form; (3) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (4) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed, or to be Filed, shall mean that document, schedule, or exhibit, as it may thereafter have been or may thereafter be validly amended, amended and restated, supplemented, or otherwise modified; (5) unless otherwise specified, any reference to an Entity as a Holder of a Claim or Interest, includes that Entity's successors and assigns; (6) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (7) unless

otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (8) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) unless otherwise specified, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (12) references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (13) unless otherwise specified, all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases; (14) any effectuating provisions may be interpreted by the Debtors or the Wind-Down Trust in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; (15) any references herein to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter; (16) all references herein to consent, acceptance, or approval shall be deemed to include the requirement that such consent, acceptance, or approval be evidenced by a writing, which may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail; (17) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; and (18) the use of "include" or "including" is without limitation unless otherwise stated.

## C.      Computation of Time

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

## D.      Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan and any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, documents, instruments, or contracts, in which case the governing law of such agreement shall control); *provided* that corporate, limited liability company, or partnership governance matters relating to the Debtors or the Wind-Down Debtors, as applicable, shall be governed by the laws of the jurisdiction of incorporation or formation of the relevant Debtor or Wind-Down Debtor, as applicable.

## E.      Reference to Monetary Figures

All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

## F.    Reference to the Debtors or the Wind-Down Debtors

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Wind-Down Debtors mean the Debtors and the Wind-Down Debtors, as applicable, to the extent the context requires.

## G.    Nonconsolidated Plan

Although for purposes of administrative convenience and efficiency the Plan has been filed as a joint plan for each of the Debtors and presents together Classes of Claims against and Interests in the Debtors, the Plan does not provide for the substantive consolidation of any of the Debtors.

<div align="center">

### ARTICLE II.

### ADMINISTRATIVE AND PRIORITY CLAIMS

</div>

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

## A.    Administrative Claims

Except as otherwise provided in this Article II.A and except with respect to Administrative Claims that are Professional Fee Claims or subject to 11 U.S.C. § 503(b)(1)(D), unless previously Filed, requests for payment of Allowed Administrative Claims (other than Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code) must be Filed and served on the Wind-Down Entity pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date.  Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property, and such Administrative Claims shall be deemed satisfied as of the Effective Date without the need for any objection from the Wind-Down Entity or any notice to or action, order, or approval of the Bankruptcy Court or any other Entity.  Objections to such requests, if any, must be Filed and served on the Wind-Down Entity and the requesting party by the Claims Objection Bar Date for Administrative Claims.  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed by Final Order of the Bankruptcy Court.

Except with respect to Administrative Claims that are Professional Fee Claims, and except to the extent that an Administrative Claim or Priority Tax Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall receive an amount of Cash equal to the amount of the unpaid or unsatisfied portion of such Allowed Administrative Claim in accordance with the following:  (1) if such Administrative Claim is Allowed on or prior to the Effective Date, no later than thirty (30) days after the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction or course of business giving rise to

<div align="center">

19

A-250

</div>

such Allowed Administrative Claim, without any further action by the Holder of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtors or the Wind-Down Entity, as applicable; or (5) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court. Any Cryptocurrency inadvertently deposited to the Debtors' account(s) after the Petition Date shall be returned to the sender in full.

Objections to requests for payment of such Administrative Claims, if any, must be Filed with the Bankruptcy Court and served on the Wind-Down Entity and the requesting Holder no later than the Claims Objection Bar Date for Administrative Claims. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with, an order that becomes a Final Order of the Bankruptcy Court.

**B.      Professional Fee Claims**

1.      <u>Final Fee Applications and Payment of Professional Fee Claims</u>

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five (45) days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code and Bankruptcy Rules. The Wind-Down Entity shall pay Professional Fee Claims in Cash to such Professionals in the amount the Bankruptcy Court allows, including from funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court; *provided* that the Debtors' and the Wind-Down Entity's obligations to pay Allowed Professional Fee Claims shall not be limited or deemed limited to funds held in the Professional Fee Escrow Account.

2.      <u>Professional Fee Escrow Account</u>

No later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and the U.S. Trustee and for no other Entities until all quarterly U.S. Trustee fees and all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the U.S. Trustee or to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court. No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. No funds held in the Professional Fee Escrow Account shall be property of the Estates of the Debtors or the Wind-Down Entity. When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, and all U.S. Trustee quarterly fees plus statutory interest, if any, have been paid in full, any remaining funds held in the Professional Fee Escrow Account shall be turned over to the Wind-Down Entity without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

3.      <u>Professional Fee Escrow Amount</u>

The Professionals shall deliver to the Debtors a reasonable and good-faith estimate of their unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Confirmation Date projected to be outstanding as of the anticipated Effective Date, and shall deliver such estimate no

later than five Business Days prior to the anticipated Effective Date. For the avoidance of doubt, no such estimate shall be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that are the subject of a Professional's final request for payment of Professional Fee Claims Filed with the Bankruptcy Court, and such Professionals are not bound to any extent by the estimates. If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional. The total aggregate amount so estimated to be outstanding as of the anticipated Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account; *provided* that the Wind-Down Entity shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are Filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

4. Post-Confirmation Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors and/or the Wind-Down Entity, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Wind-Down Entity. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Wind-Down Entity may employ and pay any Professional in the ordinary course of business for the period after the Confirmation Date without any further notice to or action, order, or approval of the Bankruptcy Court.

For the avoidance of doubt, no Administrative Claims, Professional Fee Claims, or any other post-confirmation fees and expenses shall be paid prior to payment of any quarterly fees due and outstanding to the U.S. Trustee.

## C. Priority Tax Claims

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release ~~of~~, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

## ARTICLE III.

## CLASSIFICATION, TREATMENT,
## AND VOTING OF CLAIMS AND INTERESTS

## A. Classification of Claims and Interests

Except for the Claims addressed in Article II of the Plan, all Claims against and Interests in the Debtors are classified in the Classes set forth in this Article III for all purposes, including voting, Confirmation, and distributions pursuant to the Plan and in accordance with section 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under

the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

**B.      Summary of Classification**

A summary of the classification of Claims against and Interests in each Debtor pursuant to the Plan is set forth in the following chart.  The Plan constitutes a separate chapter 11 plan for each of the Debtors, and accordingly, the classification of Claims and Interests set forth below applies separately to each of the Debtors.  All of the potential Classes for the Debtors are set forth herein.  Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Claims or Interests shall be treated as set forth in Article III.E hereof.  Voting tabulations for recording acceptances or rejections of the Plan will be conducted on a Debtor-by-Debtor basis as set forth above.[1]

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | Account Holder Claims | Impaired | Entitled to Vote |
| ~~4~~4A | ~~Alameda Loan Facility~~OpCo General Unsecured Claims | Impaired | Entitled to Vote |
| ~~5A~~4B | ~~OpCo~~HoldCo General Unsecured Claims | Impaired | Entitled to Vote |
| ~~5B~~4C | ~~HoldCo~~TopCo General Unsecured Claims | Impaired | Entitled to Vote |
| ~~5C~~5 | ~~TopCo General Unsecured~~Alameda Loan Facility Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 6 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |
| 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |
| 9 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

---

[1]    The Debtors reserve the right to separately classify Claims or Interests to the extent necessary to comply with any requirements under the Bankruptcy Code or applicable law.

C.   **Treatment of Classes of Claims and Interests**

Subject to Article VI hereof, each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors or Wind-Down Entity, as applicable, and the Holder of such Allowed Claim or Allowed Interest, as applicable.  In no event shall any Holder of a Claim receive more than such Holder's Allowed amount on account of such Claim.

1.   Class 1 —Secured Tax Claims

(a)   *Classification*: Class 1 consists of all Secured Tax Claims.

(b)   *Treatment*:  Each Holder of an Allowed Secured Tax Claim shall receive, in full and final satisfaction of such Allowed Secured Tax Claim, at the option of the Wind-Down Entity, payment in full in Cash of such Holder's Allowed Secured Tax Claim or such other treatment rendering such Holder's Allowed Secured Tax Claim Unimpaired.

(c)   *Voting*: Class 1 is Unimpaired under the Plan.  Holders of Allowed Secured Tax Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Secured Tax Claims are not entitled to vote to accept or reject the Plan.

2.   Class 2 — Other Priority Claims

(a)   *Classification*: Class 2 consists of all Other Priority Claims.

(b)   *Treatment*:  Each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Allowed Other Priority Claim, at the option of the applicable Debtor, payment in full in Cash of such Holder's Allowed Other Priority Claim or such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired.

(c)   *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan.

3.   Class 3 — Account Holder Claims

(a)   *Classification*: Class 3 consists of all Account Holder Claims.

(b)   *Allowance*: Account Holder Claims shall be conclusively Allowed in the amount listed on OpCos's *Amended Schedules of Assets and Liabilities* (Case No. 22-10945) [Docket No. 1~~0~~8]; *provided* that the rights of any Holder of an Account Holder Claim to object to the scheduled amount shall be preserved. To the extent an Account Holder Claim is Allowed in a greater amount than the scheduled amount of such Account Holder Claim, such Holder shall be entitled to a subsequent distribution such that it will receive its Pro Rata share of

recoveries to Holders of Allowed Account Holder Claims. Account Holder Claims shall be valued in U.S. dollars as of the Petition Date consistent with section 502(b) of the Bankruptcy Code.

(c) *Treatment*: Each Holder of an Allowed Account Holder Claim will receive in exchange for such Allowed Account Holder Claim:

(i) If the Sale Transaction is consummated by the Outside Date:

A. for Account Holders in Supported Jurisdictions, its Net Owed Coins, as provided in and subject to the requirements of Section 6.12 of the Asset Purchase Agreement;

B. for Account Holders in Unsupported Jurisdictions, value in Cash at which such Net Owed Coins allocable to such Account Holder are liquidated; *provided* that to the extent that the Purchaser obtains the Unsupported Jurisdiction Approval for the jurisdiction in which such Account Holder resides and the Debtors and/or Wind-Down Entity has not made such Cash distribution to such Account Holder, then such Account Holder shall receive the treatment in Article III.C.3(c)(i)(A);

C. ~~(i)~~ its Pro Rata share of ~~Transferred Cryptocurrency Value~~any Additional Bankruptcy Distributions, in Cryptocurrency or Cash as provided in ~~the Customer Migration Protocol~~and subject to the requirements of Sections 6.12 and 6.14 of the Asset Purchase Agreement;

~~(ii) the right to become a Transferred Creditor as provided in the Customer Migration Protocol;~~

D. ~~(iii)~~ its Pro Rata share of Distributable OpCo Cash; and

E. ~~(iv)~~ to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to OpCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims~~.~~;

*provided* that distributions made to any Account Holder pursuant to clauses (C), (D), and (E) above shall be made after taking into account the Acquired Coins Value of the Net Owed Coins or the value in Cash at which such Net Owed Coins are liquidated, as applicable, previously allocated to such Account Holder; or

(d) ~~*Voting*: Class 3 is Impaired under the Plan. Holders of Allowed Account Holder Claims are entitled to vote to accept or reject the Plan.~~

~~4. Class 4 — Alameda Loan Facility Claims~~

~~(a) *Classification*: Class 4 consists of all Alameda Loan Facility Claims.~~

~~(b) *Treatment*: Pursuant to the Asset Purchase Agreement, on the Effective Date, the Alameda Loan Facility Claims shall be deemed Allowed, and all rights, titles, and interests in the Alameda Loan Facility Claims shall be conveyed to OpCo, and OpCo shall be entitled to any recovery on account of the Alameda Loan Facility Claims. The treatment of Class 4 Alameda Loan Facility Claims is contractually settled pursuant to the Asset Purchase Agreement.~~

(ii) If the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated:

A. its Pro Rata share of Distributable OpCo Cash;

B. its Pro Rata share of Distributable Cryptocurrency, which such Account Holder shall be able to withdraw in kind, alternative Cryptocurrency, and/or Cash for a period of thirty (30) days after the Effective Date through the Voyager platform or, if elected by Seller pursuant to Section 6.12(d) of the Asset Purchase Agreement, through the Binance.US Platform; *provided* that if the applicable transfer is made through the Voyager platform and such Account Holder does not withdraw its Pro Rata share of Distributable Cryptocurrency available to such Account Holder from the Voyager platform within such thirty (30) day period, such Account Holder will receive Cash in the equivalent value to its Pro Rata share of Distributable Cryptocurrency; and

C. to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to OpCo; *provided* that any distributions on account of Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

(b) ~~(e)~~ *Voting*: Class 4~~3~~ is Impaired under the Plan. Holders of Allowed ~~Alameda Loan Facility~~Account Holder Claims are entitled to vote to accept or reject the Plan.

4. ~~5.~~ Class ~~5A~~4A — OpCo General Unsecured Claims

(a) *Classification*: Class ~~5A~~4A consists of all OpCo General Unsecured Claims.

(b) *Treatment*: Each Holder of an Allowed OpCo General Unsecured Claim will receive in exchange for such Allowed OpCo General Unsecured Claim:

(i) If the Sale Transaction is consummated by the Outside Date:

A. its Pro Rata share of Distributable Cryptocurrency in Cash;

B. ~~(i)~~ its Pro Rata share of ~~Transferred Cryptocurrency Value~~Additional Bankruptcy Distributions, in Cryptocurrency or Cash as provided in ~~the Customer Migration Protocol~~and subject to the requirements of Sections 6.12 and 6.14 of the Asset Purchase Agreement;

~~(ii) the right to become a Transferred Creditor as provided in the Customer Migration Protocol;~~

C. ~~(iii)~~ its Pro Rata share of Distributable OpCo Cash; and

D. to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to OpCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims; or

(ii) If the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated:

A. its Pro Rata share of Distributable Cryptocurrency in Cash;

B. its Pro Rata share of Distributable OpCo Cash; and

C. ~~(iv)~~ to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to OpCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

(c)     *Voting*:  Class ~~5A~~4A is Impaired under the Plan.  Holders of Allowed OpCo General Unsecured Claims are entitled to vote to accept or reject the Plan.

5.     ~~6.  Class 5B~~4B — HoldCo General Unsecured Claims

(a)     *Classification*:  Class ~~5B~~4B consists of all HoldCo General Unsecured Claims.

(b)     *Treatment*:  Each Holder of an Allowed HoldCo General Unsecured Claim will receive in exchange for such Allowed HoldCo General Unsecured Claim:

(i)     its Pro Rata share of Distributable HoldCo Cash; and

(ii)     to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to HoldCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

(c)     *Voting*:  Class ~~5B~~4B is Impaired under the Plan.  Holders of Allowed HoldCo General Unsecured Claims are entitled to vote to accept or reject the Plan.

6.     ~~7.  Class 5C~~4C — TopCo General Unsecured Claims

(a)     *Classification*:  Class ~~5C~~4C consists of all TopCo General Unsecured Claims.

(b)     *Treatment*:  Each Holder of an Allowed TopCo General Unsecured Claim will receive in exchange for such Allowed TopCo General Unsecured Claim:

(i)     its Pro Rata share of Distributable TopCo Cash; and

(ii)     to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of the Wind-Down Trust Assets attributable to TopCo; *provided* that any distributions on account of the Wind-Down Entity Assets or the Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

(c)     *Voting*:  Class ~~5C~~4C is Impaired under the Plan.  Holders of Allowed TopCo General Unsecured Claims are entitled to vote to accept or reject the Plan.

7.     Class 5 — Alameda Loan Facility Claims

(a)     *Classification*:  Class 5 consists of all Alameda Loan Facility Claims.

(b)     *Treatment*:  Each Holder of an Allowed Alameda Loan Facility Claim will receive in exchange for such Allowed Alameda Loan Facility Claim to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down

Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets; *provided* that any distributions on account of Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, all Allowed Claims at OpCo, HoldCo, and TopCo, including, but not limited to, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, Allowed Account Holder Claims, Allowed OpCo General Unsecured Claims, Allowed HoldCo General Unsecured Claims, and Allowed TopCo General Unsecured Claims.

(c)     *Voting*: Class 5 is Impaired under the Plan. Holders of Allowed Alameda Loan Facility Claims are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. Therefore, Holders of Allowed Alameda Loan Facility Claims are not entitled to vote to accept or reject the Plan.

8.     Class 6 — Section 510(b) Claims

(a)     *Classification*: Class 6 consists of all Section 510(b) Claims against TopCo.

(b)     *Allowance*: Notwithstanding anything to the contrary herein, a Section 510(b) Claim against TopCo, if any such Section 510(b) Claim exists, may only become Allowed by Final Order of the Bankruptcy Court.

(c)     *Treatment*: Each Holder of Allowed Section 510(b) Claims against TopCo will receive, to effectuate distributions, if applicable, from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to TopCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, and Allowed TopCo General Unsecured Claims.

(d)     *Voting*: Class 6 is Impaired under the Plan. Holders (if any) of Allowed Section 510(b) Claims against TopCo are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. Therefore, Holders (if any) of Allowed Section 510(b) Claims against TopCo are not entitled to vote to accept or reject the Plan.

9.     Class 7 — Intercompany Claims

(a)     *Classification*: Class 7 consists of all Intercompany Claims.

(b)     *Treatment*: On the Effective Date, all Intercompany Claims shall be, at the option of the Debtors, either (a) Reinstated or (b) converted to equity, otherwise set off, settled, distributed, contributed, or cancelled, in each case in accordance with the Restructuring Transactions Memorandum.

(c)     *Voting*: Holders of Intercompany Claims are either Unimpaired or Impaired, and such Holders of Intercompany Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Therefore,

Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

10. <u>Class 8 — Intercompany Interests</u>

    (a)     *Classification*:  Class 8 consists of all Intercompany Interests.

    (b)     *Treatment*:  On the Effective Date, all Intercompany Interests shall be, at the option of the Debtors, either (a) Reinstated in accordance with Article III.G of the Plan or (b) set off, settled, addressed, distributed, contributed, merged, or cancelled, in each case in accordance with the Restructuring Transactions Memorandum.

    (c)     *Voting*:  Holders of Intercompany Interests are either Unimpaired or Impaired, and such Holders of Intercompany Interests are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

11. <u>Class 9 — Existing Equity Interests</u>

    (a)     *Classification*:  Class 9 consists of all Existing Equity Interests.

    (b)     *Treatment*:  Each Holder of Existing Equity Interests will receive, to effectuate distributions, if applicable, from the Wind-Down Entity, its Pro Rata share of the Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to TopCo; *provided* that any distributions on account of Wind-Down Trust Units shall only be made following payment in full of, or reserve for, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, and Allowed TopCo General Unsecured Claims.

    (c)     *Voting*:  Class 9 is Impaired under the Plan.  Holders of Existing Equity Interests are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Existing Equity Interests are not entitled to vote to accept or reject the Plan.

## D.    Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Wind-Down Entity's rights in respect of any Unimpaired Claim, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

## E.    Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

### F. Subordinated Claims

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims against and Allowed Interests in the Debtors and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors and the Wind-Down Entity reserve the right to reclassify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

### G. Intercompany Interests

To the extent Reinstated under the Plan, distributions (if any) on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the corporate structure given the existing intercompany systems connecting the Debtors and their Affiliates, and in exchange for the Debtors' and Wind-Down Entity's agreement under the Plan to make certain distributions to the Holders of Allowed Claims.

### H. Controversy Concerning Impairment

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

### I. Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code

Section 1129(a)(10) of the Bankruptcy Code is satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims or Interests. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

### ARTICLE IV.

### PROVISIONS FOR IMPLEMENTATION OF THE PLAN

### A. General Settlement of Claims and Interests

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan. The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such

compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 of all such Claims, Interests, Causes of Action, and controversies, as well as a finding by the Bankruptcy Court that such compromise and settlement is fair, equitable, reasonable, and in the best interests of the Debtors, their Estates, and Holders of Claims and Interests. Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Interests in any Class are intended to be and shall be final.

**B.      Restructuring Transactions**

On or before the Effective Date, the applicable Debtors will take any action as may be necessary or advisable to effectuate the Restructuring Transactions described in the Plan, the Restructuring Transactions Memorandum, and the Customer ~~Migration~~Onboarding Protocol, including: (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (4) the transfer or distribution of any Cryptocurrency or Cash pursuant to the ~~Customer Migration Protocol or the~~ Asset Purchase Agreement, or the Liquidation Procedures, as applicable; (5) the execution and delivery of the Wind-Down Trust Agreement; (6) any transactions necessary or appropriate to form the Wind-Down Entity; (7) such other transactions that are required to effectuate the Restructuring Transactions, including any sales, mergers, consolidations, restructurings, conversions, dispositions, transfers, formations, organizations, dissolutions, or liquidations; (8) all transactions necessary to provide for the purchase of the Acquired Assets by Purchaser under the Asset Purchase Agreement; and (9) all other actions that the applicable Entities determine to be necessary or appropriate, or that are reasonably requested by the Purchaser in accordance with the Asset Purchase Agreement, including making filings or recordings that may be required by applicable law.

The Confirmation Order shall, and shall be deemed to, pursuant to sections 1123 and 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions.

**C.      The Sale Transaction**

If the Sale Transaction is consummated by the Outside Date, pursuant to the terms of the Asset Purchase Agreement, then the following terms shall govern:

On or prior to the Effective Date, the Debtors shall have consummated the Sale Transaction, and, among other things, the Acquired Assets and Assumed Liabilities shall have transferred to the Purchaser free and clear of all Liens, Claims, Interests, charges, or other encumbrances, and the Purchaser shall pay to the Debtors or Holders of Account Holder Claims and Holders of OpCo General Unsecured Claims, as applicable, the proceeds from the Sale Transaction, as and to the extent provided for in the Asset Purchase Agreement, and ~~the Customer Migration Protocol~~this Plan. The Confirmation Order shall authorize the Debtors, the Purchaser, and the Wind-Down Entity, as applicable, to undertake the transactions contemplated by the Asset Purchase Agreement, including pursuant to sections 363, 365, 1123(a)(5)(B), and 1123(a)(5)(D) of the Bankruptcy Code.

The Debtors and Purchaser shall be authorized to take all actions as may be deemed necessary or appropriate to consummate the Sale Transaction pursuant to the terms of the Asset Purchase Agreement, the Customer Migration Onboarding Protocol, and this Plan.  The Debtors shall be authorized to sell any Cryptocurrency to satisfy all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.  On and after the Effective Date, except as otherwise provided in the Plan and the Wind-Down Trust Agreement, the Wind-Down Debtors, the Wind-Down Entity, or the Purchaser, as applicable, may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; provided, that the Bankruptcy Court shall retain jurisdiction to resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with any of the foregoing.

Notwithstanding anything contained in this Plan and any Definitive Documents, if the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated, all provisions contained in this Plan and the Definitive Documents governing the Sale Transaction shall have no further force and effect, and the provisions governing the Liquidation Transaction shall govern.  The rights and remedies of the Seller and Purchaser under the Asset Purchase Agreement and any related orders of the Bankruptcy Court shall be expressly preserved.

**D.** **The Liquidation Transaction**

If the Sale Transaction is not consummated by the Outside Date, pursuant to the Asset Purchase Agreement, then the following terms shall govern:

1. *The Liquidation Transaction*

On or after the Outside Date, the Debtors will pursue the Liquidation Transaction in accordance with the Liquidation Procedures.  Pursuant to the Liquidation Transaction, the Debtors, the Wind-Down Entity, or the Wind-Down Trustee, as applicable, will distribute certain of the Cryptocurrency in-kind to Holders of Account Holder Claims in accordance with Article III.C of the Plan, transfer all Wind-Down Entity Assets or Wind-Down Trust Assets to the Wind-Down Reserve, liquidate certain of the Cryptocurrency, distribute Cash to Holders of Claims, wind down and dissolve the Debtors, and pursue final administration of the Debtors' Estates pursuant to the Bankruptcy Code.

The Debtors, or the Wind-Down Entity, as applicable, shall be authorized to take all actions as may be deemed necessary or appropriate to consummate the Liquidation Transaction pursuant to this Plan.  On or before the date that is twenty-one days prior to the anticipated commencement of the Liquidation Transaction, the Debtors, or the Wind-Down Entity, as applicable, shall file the Liquidation Procedures with the Bankruptcy Court.  Parties in interest shall have ten days to object to the Liquidation Procedures, and if no objections are timely filed, the Liquidation Procedures shall be approved.  In the event of a timely objection, the Bankruptcy Court shall adjudicate any objection to the Liquidation Procedures.

On and after the Effective Date, except as otherwise provided in the Plan, the Wind-Down Trust Agreement, and the Liquidation Procedures, the Wind-Down Debtors or the Wind-Down Entity as applicable, may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; provided, that the Bankruptcy Court shall retain jurisdiction to resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with any of the foregoing.

2.    *Cryptocurrency Rebalancing*

Prior to the Effective Date the Debtors shall, in consultation with the Committee, be authorized to rebalance their Cryptocurrency portfolio, *provided* that such rebalancing shall be in accordance with the Asset Purchase Agreement.  The Debtors may effectuate such rebalancing by (i) selling such Cryptocurrency that cannot be distributed to Account Holders, (ii) purchasing Cryptocurrency supported by Voyager's or Purchaser's platform (as provided by the Asset Purchase Agreement) that shall be distributed to Account Holders, and (iii) engaging in any other transaction, including the execution of trades of Cryptocurrency, necessary or appropriate to effectuate distributions of the Distributable Cryptocurrency to Holders of Allowed Account Holder Claims.

## E.    ~~D.~~ Management Transition Plan

The Debtors shall be authorized to implement the Management Transition Plan, the terms of which shall be reasonably acceptable to Purchaser and the Committee and included in the Plan Supplement.  The Management Transition Plan shall help ensure that employees are available to provide transition services to the Debtors and/or the Wind-Down Entity to effectuate the Sale Transaction and to wind down the Debtors' Estates.

## F.    ~~E.~~ Non-Released D&O Claims

Any Claims or Causes of Action held by the Debtors or their respective estates against the Debtors' CEO and/or CCO (regardless of any fiduciary capacity in which such individuals were acting) that are expressly related to approval of the 3AC Loan are not released pursuant to the Plan (collectively, the "Non-Released D&O Claims"), and shall be assigned and transferred to the Wind-Down Entity to be pursued, settled, or resolved by the Wind-Down Entity in accordance with the terms of Article IV.~~F~~G of this Plan and subject to the Wind-Down Reserve.  Any claims against the D&O Carriers that the Debtors' insurance transactions within the 90 days prior to the Petition Date are avoidable under the Bankruptcy Code, applicable state law, or both (the "Non-Released Insurance Claims") shall be assigned and transferred to the Wind-Down Entity to be pursued, settled, or resolved solely by the Wind-Down Entity in accordance with the terms of Article IV.~~F~~G of this Plan.  The Wind-Down Entity shall be a successor to the Debtors' rights, title, and interest in any Non-Released D&O Claims and Non-Released Insurance Claims, and the Wind-Down Entity shall have standing to pursue the Non-Released D&O Claims and the Non-Released Insurance Claims in accordance with the terms of Article IV.~~F~~G of this Plan; *provided* that: (i) any recovery by the Wind-Down Entity (and the beneficiaries thereof) on account of any Non-Released D&O Claim, including in each case by way of settlement or judgment, shall be satisfied solely by and to the extent of the proceeds of the Debtors' available D&O Liability Insurance Policies (and/or from the D&O Carriers directly) after payment from such D&O Liability Insurance Policies of any and all covered costs and expenses incurred in connection with the defense of the Non-Released D&O Claims; (ii) any party, including any trustee or any beneficiary of the Wind-Down Entity, seeking to execute, garnish, or otherwise attempt to collect on any settlement of or judgment in the Non-Released D&O Claims shall do so solely upon available insurance coverage from the Debtors' available D&O Liability Insurance Policies; and (iii) no party shall (a) record any judgment against the CEO or CCO, or (b) otherwise attempt to collect, directly or indirectly, from the personal assets of the CEO or CCO with respect to the Non-Released D&O Claims.  For the avoidance of doubt, this provision does not enjoin, limit, or impair direct claims held by third parties against the Debtors' CEO or CCO (if any) other than any direct claims held by Holders of Claims or Interests that opt into the third party release in Article VIII.B of this Plan.  Only upon the occurrence of the earlier of (x) a release being given as part of any later settlement of the Non-Released D&O Claims; (y) final resolution of any coverage claims asserted against the Debtors' available D&O Liability Insurance Policies on account of the Non-Released D&O Claims; or (z) exhaustion of the available insurance coverage under the D&O Liability Insurance

Policies, the Non-Released D&O Claims shall be released and discharged without the need for further action or Bankruptcy Court order. For the avoidance of doubt, any release of the Non-Released D&O Claims shall not become effective until one of the three conditions stated in the preceding sentence above has been met.

### G. ~~F.~~ The D&O Settlement

On the Effective Date, the terms of the D&O Settlement shall be effectuated as provided in this Article IV.~~F~~G.

Pursuant to the D&O Settlement, CEO shall repay the $1,900,000 received from the Debtors on or around February 28, 2022, by paying the after-tax amount of such transfer (approximately $1,125,000) to OpCo in cash and assigning the right, if any, to any tax refund for the balance to the Wind-Down Entity. CEO shall subordinate any Claims (including any indemnification claims asserted under this Art. IV.F) he holds against the Debtors until all other Holders of Claims are paid in full. CCO shall subordinate 50 percent of any Claims he holds other than indemnification claims (and 100% of any indemnification claims asserted under this Art. IV.F) against the Debtors until all other Holders of Claims are paid in full; *provided, however*, that in the event the D&O Carriers deny coverage to CEO or CCO under the D&O Insurance Policies on account of such subordination of any indemnification claim, then any indemnification claims by CEO or CCO shall not be so subordinated, but may be filed as an OpCo General Unsecured Claim.

CEO and CCO, each as insureds, under the D&O Liability Insurance Policies agree: (i) not to draw down on the Side-A Policy; *provided, however*, that should coverage continue to be available under the Side-A Policy following resolution of the Debtors' and/or the Wind-Down Entity's claims for the avoidance of the premium paid for the policy (whether by judgment or settlement or otherwise) such officer shall be entitled to seek coverage under the Side-A Policy to the extent any such coverage remains; and (ii) not to object to any settlement by the Debtors or Wind Down Entity of avoidance claims under the Side-A Policy, even if such settlement results in termination of benefits under the Side-A Policy. For the avoidance of doubt, this agreement is not intended to and shall not alter or amend each of the insureds' duties under the D&O Liability Insurance Policies. In the event that any insurer under the D&O Liability Insurance Policies denies coverage for any reason, the Wind-Down Entity shall have the right to bring a coverage claim against the insurer(s) in the name of the insured, the insureds shall reasonably cooperate with respect to any such claim, and the insured may participate at their election (and at their sole cost). For the avoidance of doubt, nothing contained in this Plan is intended as a waiver or release of the Debtors' and/or Wind-Down Entity's right to assert any Non-Released D&O Claim, but rather limits such recovery in the manner set forth above.

CEO and CCO shall be entitled to receive their salary and benefits for as long as they work for the Debtors and/or the Wind-Down Entity and retain the right to assert claims for advancement and indemnification up to the limits of any available coverage in the event any of the insurers that issued the Management Liability Policy, the Excess Policy, or the Side-A Policy denies coverage to CEO and/or CCO based upon or arising out of the lack of a formal claim for indemnification; *provided, however*, that any such indemnification or advancement claims shall be subordinated in full unless and until all other Holders of Claims are paid in full; *provided, further*, that in the event that any of the D&O Carriers deny coverage to CEO or CCO under the D&O Insurance Policies on account of such subordination of any indemnification claim, then any indemnification claims by CEO or CCO shall not be so subordinated, but may be filed as an OpCo General Unsecured Claim.

CEO and CCO shall subordinate any and all rights and entitlements under the Cornerstone A-Side Management Liability Insurance Policy to Voyager Digital Ltd., Policy Number ELU184179-22,

to any recovery by the Debtors and/or the Wind-Down Entity on account of the Debtors' and/or Wind-Down Entity's claims for the avoidance of the premium paid for the policy. For the avoidance of doubt, should coverage continue to be available under the Side-A Policy following resolution of the Debtors' and/or the Wind-Down Entity's claims for the avoidance of the premium paid for the policy (whether by judgment or settlement or otherwise), CEO and/or CCO shall be entitled to seek coverage under the Side-A Policy. CEO and CCO shall remain at, and continue performing the responsibilities of, their respective position(s) with the Debtors and assist with the Debtors' transition for at least 30 days from entry of the Confirmation Order; *provided* that CCO shall have no obligation to remain at his position with the Debtors beyond January 15, 2023 and the CEO shall have the right to pursue and engage in any employment opportunity, business venture, consulting arrangement, or investment that may become available; *provided*, *further*, that both the CEO and CCO shall be available to the Debtors and/or the Wind-Down Entity for a maximum of five hours per month for the one year following the Effective Date.

In the event that the sworn financial disclosure statements under penalty of perjury provided to the Debtors, the Special Committee and the Committee by CEO and CCO are later determined at any time by Final Order of the Bankruptcy Court or other court of competent jurisdiction to be materially inaccurate, (a) the limitations on recovery by the Wind-Down Entity under this Article IV.~~F~~G shall no longer apply, (b) any and all release, exculpation and injunction provisions in Article VIII of this Plan with respect to CEO and/or CCO (as applicable) shall be deemed null and void, (c) all Releasing Parties' rights with respect to the CEO and/or CCO (as applicable) shall be fully intact and preserved, (d) amounts paid by CEO shall not be repaid by the Wind-Down Entity, and (e) any applicable statute of limitations shall be deemed tolled from the Petition Date to the date of entry of the order referenced above. The Wind-Down Trust, as successor to the Debtors, shall have standing to bring a motion seeking relief pursuant to this Article IV.~~F~~G.

Entry of the Confirmation Order shall be deemed approval of the D&O Settlement and, to the extent not already approved by the Bankruptcy Court, the Debtors or the Wind-Down Debtors, as applicable, are authorized to negotiate, execute, and deliver those documents necessary or appropriate to effectuate the D&O Settlement, without further notice or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors, the Wind-Down Debtors, the Committee, and the Special Committee may deem to be necessary to effectuate the D&O Settlement.

## **H.** ~~G.~~ **Wind-Down Trust**

On the Effective Date, the Wind-Down Trust shall be formed for the benefit of the Wind-Down Trust Beneficiaries and each of the Debtors shall transfer the Wind-Down Trust Assets for distribution in accordance with the terms of the Plan. The Confirmation Order shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

1.    <u>Establishment of a Wind-Down Trust</u>

Pursuant to the Wind-Down Trust Agreement, the Wind-Down Trust will be established.  The Wind-Down Trust shall be the successor-in-interest to the Debtors, and the Wind-Down Trust shall be a successor to the Debtors' rights, title, and interest to the Wind-Down Trust Assets.  The Wind-Down Trust will conduct no business operations and will be charged with winding down the Debtors' Estates.  The Wind-Down Trust shall be managed by the Wind-Down Trustee and shall be subject to a Wind-Down Trust Oversight Committee.  For the avoidance of doubt, in the event that the Restructuring Transactions Memorandum specifies that the Wind-Down Debtors will be the Wind-Down Entity, the Wind-Down Debtors shall be managed by the Wind-Down Trustee and shall be subject to the Wind-Down Trust Oversight Committee in the same manner as if the Wind-Down Entity is the Wind-Down Trust.  The Wind-Down Trust shall be administered in accordance with the terms of the Wind-Down Trust Agreement and shall be subject to the Wind-Down Reserve and the Non-Released D&O Claim Budget.  For the avoidance of doubt, the Wind-Down Trust shall not have any right or interest in any Cause of Action or Claim constituting an Acquired Asset.  The Wind-Down Trust shall be administered in a manner consistent with the SEC's published guidance on liquidating trusts.

Prior to the Effective Date, any and all of the Debtors' assets shall remain assets of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and on the Effective Date the Wind-Down Trust Assets shall, subject to the Wind-Down Trust Agreement, be transferred to and vest in the Wind-Down Trust or the Wind-Down Debtors, as applicable.  For the avoidance of doubt, to the extent not otherwise waived in writing, released, settled, compromised, assigned or sold pursuant to a prior order or the Plan, the Wind-Down Entity specifically retains and reserves the right to assert, after the Effective Date, any and all of the Vested Causes of Action and related rights, whether or not asserted as of the Effective Date, and all proceeds of the foregoing, subject to the terms of the Plan, including without limitation Article IV.EF and Article IV.FG.

Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, only the Wind-Down Trust and the Wind-Down Trustee shall have the right to pursue or not to pursue, or, subject to the terms hereof and the Wind-Down Trust Agreement, compromise or settle any Wind-Down Trust Assets transferred to the Wind-Down Trust.  On and after the Effective Date, the Wind-Down Trust and the Wind-Down Trustee may, without further Bankruptcy Court approval, commence, litigate, and settle any Vested Causes of Action or Claims relating to any Wind-Down Trust Assets transferred to the Wind-Down Trust or rights to payment or Claims that belong to the Debtors as of the Effective Date or are instituted by the Wind-Down Trust or the Wind-Down Trustee on or after the Effective Date, except as otherwise expressly provided herein and in the Wind-Down Trust Agreement.  All of the Wind-Down Trust's activities shall be subject to the Wind-Down Reserve and the Non-Released D&O Claim Budget.  The Wind-Down Trust shall be entitled to enforce all defenses and counterclaims to all Claims asserted against the Debtors and their Estates, including setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code.

The Wind-Down Trustee shall be deemed hereby substituted as plaintiff, defendant, or in any other capacity for the Debtors in any Causes of Action pending before the Bankruptcy Court or any other court that relates to a Wind-Down Trust Asset without the need for filing any motion for such relief.  On the Effective Date, the Debtors and the Wind-Down Trustee shall execute the Wind-Down Trust Agreement and shall have established the Wind-Down Trust pursuant hereto.  In the event of any conflict between the terms of this Article IV.GH and the terms of the Wind-Down Trust Agreement, the terms of the Wind-Down Trust Agreement shall control.

2. <u>Wind-Down Entity Assets</u>

Notwithstanding any prohibition on assignability under applicable non-bankruptcy law, on the Effective Date and thereafter if additional Wind-Down Entity Assets become available, the Debtors shall be deemed, subject to the Wind-Down Trust Agreement, to have automatically transferred to the applicable Wind-Down Entity all of their right, title, and interest in and to all of the Wind-Down Trust Assets, in accordance with section 1141 of the Bankruptcy Code. All such assets shall automatically vest in the Wind-Down Entity free and clear of all Claims, Liens, and other interests, subject only to the Allowed Claims and Interests as set forth herein and the expenses of the Wind-Down Trust as set forth herein and in the Wind-Down Trust Agreement. Thereupon, the Debtors shall have no interest in or with respect to the Wind-Down Entity Assets or the Wind-Down Trust.

3. <u>Treatment of Wind-Down Trust for Federal Income Tax Purposes; No Successor-in-Interest</u>

The Wind-Down Trust shall be established for the primary purpose of liquidating and distributing the Wind-Down Trust Assets transferred to it, in accordance with Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Wind-Down Trust. Accordingly, the Wind-Down Trustee may, in an expeditious but orderly manner, liquidate the Wind-Down Trust Assets, make timely distributions to the Wind-Down Trust Beneficiaries and not unduly prolong its duration. The Wind-Down Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth herein or in the Wind-Down Trust Agreement. The record holders of beneficial interests shall be recorded and set forth in a register maintained by the Wind-Down Trustee expressly for such purpose.

The Wind-Down Trust is intended to qualify as a "grantor trust" for federal income tax purposes to the extent reasonably practicable, with the Wind-Down Trust Beneficiaries treated as grantors and owners of the Wind-Down Trust. However, with respect to any of the assets of the Wind-Down Trust that are subject to potential disputed claims of ownership or uncertain distributions, *or* to the extent "liquidating trust" treatment is otherwise unavailable, the Debtors anticipate that such assets will be subject to disputed ownership fund treatment under Section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes. Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account. Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

4. <u>Appointment of Wind-Down Trustee</u>

The Wind-Down Trustee shall be selected by the Committee, in consultation with the Debtors, and shall be identified in the Plan Supplement. The appointment of the Wind-Down Trustee shall be approved in the Confirmation Order, and the Wind-Down Trustee's duties shall commence as of the Effective Date. The Wind-Down Trustee shall administer the distributions to the Wind-Down Trust Beneficiaries and shall serve as a representative of the Estates under section 1123(b) of the Bankruptcy Code for the purpose of enforcing Vested Causes of Action belonging to the Estates that are not released, waived, settled, compromised, or transferred pursuant to the Plan and subject to the limitations set forth in the Plan, including Article IV.~~E~~F and Article IV.~~F~~G.

In accordance with the Wind-Down Trust Agreement, the Wind-Down Trustee shall serve in such capacity through the earlier of (i) the date on which the Wind-Down Trust is dissolved in accordance with the Wind-Down Trust Agreement, and (ii) the date on which a Wind-Down Trustee resigns, is terminated, or is otherwise unable to serve; *provided*, *however*, that, in the event that a Wind-Down Trustee resigns, is terminated, or is otherwise unable to serve, the Wind-Down Trust Oversight Committee shall appoint a successor to serve as a Wind-Down Trustee in accordance with the Wind-Down Trust Agreement. If the Wind-Down Trust Oversight Committee does not appoint a successor within the time periods specified in the Wind-Down Trust Agreement, then the Bankruptcy Court, upon the motion of any party-in-interest, including counsel to the Wind-Down Trust, shall approve a successor to serve as a Wind-Down Trustee.

5.  <u>Responsibilities of Wind-Down Trustee</u>

Responsibilities of the Wind-Down Trustee shall be as identified in the Wind-Down Trust Agreement and shall include, but are not limited to:

(a)  Implementing the Wind-Down Trust, and making the distributions contemplated by the Plan;

(b)  Marshalling, marketing for sale, and wind-down of any of the Debtors' assets constituting Wind-Down Trust Assets;

(c)  Filing and prosecuting any objections to Claims or Interests or settling or otherwise compromising such Claims and Interests, if necessary and appropriate, in accordance with the Plan hereof;

(d)  Commencing, prosecuting, or settling claims and Vested Causes of Action;

(e)  Recovering and compelling turnover of the Debtors' property;

(f)  Prosecuting and settling the 3AC Claims, FTX Claims, and Alameda Claims;

(g)  Paying Wind-Down Trust Expenses;

(h)  Abandoning any Debtor assets that cannot be sold or otherwise disposed of for value and where a distribution to Holders of Allowed Claims or Interests would not be feasible or cost-effective in the Wind-Down Trustee's reasonable judgment;

(i)  Preparing and filing post-Effective Date operating reports (including the month in which the Effective Date occurs);

(j)  Filing appropriate tax returns in the exercise of the Wind-Down Trustee's fiduciary obligations;

(k)  Retaining such Professionals as are necessary and appropriate in furtherance of the Wind-Down Trustee's fiduciary obligations; and

(l)  Taking such actions as are necessary and reasonable to carry out the purposes of the Wind-Down Trust, including winding down the Debtors' business affairs.

6.     The Wind-Down Trust Oversight Committee

The Wind-Down Trust Oversight Committee shall consist of those parties selected by the Committee and identified in the Plan Supplement, and which, at no time shall consist of greater than seven members.

The Wind-Down Trust Oversight Committee shall have the responsibility to review and advise the Wind-Down Trustee with respect to the liquidation and distribution of the Wind-Down Entity Assets transferred to the Wind-Down Trust in accordance herewith and the Wind-Down Trust Agreement. For the avoidance of doubt, in advising the Wind-Down Trustee, the Wind-Down Trust Oversight Committee shall maintain the same fiduciary responsibilities as the Wind-Down Trustee. Vacancies on the Wind-Down Trust Oversight Committee shall be filled by a Person designated by the remaining member or members of the Wind-Down Trust Oversight Committee from among the Holders of Account Holder Claims. The Wind-Down Trustee shall have the authority to seek an order from the Bankruptcy Court removing or replacing members of the Wind-Down Trust Oversight Committee for cause.

7.     Expenses of Wind-Down Trustee

The Wind-Down Trust Expenses shall be paid from the Wind-Down Trust Assets subject to the Wind-Down Reserve and the Non-Released D&O Claim Budget.

8.     Insurance; Bond

The Wind-Down Trustee may obtain insurance coverage (in the form of an errors and omissions policy or otherwise) with respect to the liabilities and obligations of the Wind-Down Trustee and the Wind-Down Trust Oversight Committee under the Wind-Down Trust Agreement. Unless otherwise agreed to by the Wind-Down Trust Oversight Committee, the Wind-Down Trustee shall serve with a bond, the terms of which shall be agreed to by the Wind-Down Trust Oversight Committee, and the cost and expense of which shall be paid by the Wind-Down Trust.

9.     Fiduciary Duties of the Wind-Down Trustee

Pursuant hereto and the Wind-Down Trust Agreement and the Wind-Down Trustee shall act in a fiduciary capacity on behalf of the interests of all Holders of Claims and Interests that will receive distributions pursuant to Plan.

10.    Termination of the Wind-Down Trust

The Wind-Down Trust will terminate on the earlier of:   (a) (i) the final liquidation, administration and distribution of the Wind-Down Trust Assets in accordance with the terms of the Wind-Down Trust Agreement and the Plan, and its full performance of all other duties and functions as set forth herein or in the Wind-Down Trust Agreement and (ii) the Chapter 11 Cases of the Debtors have been closed; or (b) the Wind-Down Trustee determines in its reasonable judgment that the Wind-Down Trust lacks sufficient assets and financial resources, after reasonable collection efforts, to complete the duties and powers assigned to him or her under the Plan, the Confirmation Order and/or the Wind-Down Trust Agreement. After (x) the final distributions pursuant hereto, (y) the Filing by or on behalf of the Wind-Down Trust of a certification of dissolution with the Bankruptcy Court, and (z) any other action deemed appropriate by the Wind-Down Trustee, the Wind-Down Trust shall be deemed dissolved for all purposes without the necessity for any other or further actions.

11.    Liability of Wind-Down Trustee; Indemnification

Neither the Wind-Down Trustee, the Wind-Down Trust Oversight Committee, their respective members, employees, employers, designees or professionals, or any of their duly designated agents or representatives (each, a "Wind-Down Trust Party" and collectively, the "Wind-Down Trust Parties") shall be liable for losses, claims, damages, liabilities or expenses in connection with the affairs of the Wind-Down Trust or for the act or omission of any other Wind-Down Trust Party, nor shall the Wind-Down Trust Parties be liable for any act or omission taken or omitted to be taken pursuant to the discretion, powers and authority conferred, or in good faith believed to be conferred by the Wind-Down Trust Agreement or the Plan other than for specific acts or omissions resulting from such Wind-Down Trust Party's willful misconduct, gross negligence or actual fraud.  Subject to the Wind-Down Trust Agreement, the Wind-Down Trustee shall be entitled to enjoy all of the rights, powers, immunities and privileges applicable to a chapter 7 trustee, and the Wind-Down Trust Oversight Committee shall be entitled to enjoy all of the rights, powers, immunities and privileges of an official committee of unsecured creditors.  The Wind-Down Trustee or the Wind-Down Trust Oversight Committee may, in connection with the performance of its functions, and in its sole and absolute discretion, consult with its attorneys, accountants, financial advisors and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such persons, regardless of whether such advice or opinions are provided in writing.  Notwithstanding such authority, neither the Wind-Down Trustee nor the Wind-Down Trust Oversight Committee shall be under any obligation to consult with its attorneys, accountants, financial advisors or agents, and their determination not to do so shall not result in the imposition of liability on the Wind-Down Trustee, the Wind-Down Trust Oversight Committee, or their respective members and/or designees, unless such determination is based on willful misconduct, gross negligence, or actual fraud.  The Wind-Down Trust shall indemnify and hold harmless the Wind-Down Trust Parties (in their capacity as such), from and against and in respect of all liabilities, losses, damages, claims, costs and expenses (including, without limitation, reasonable attorneys' fees, disbursements, and related expenses) that such parties may incur or to which such parties may become subject in connection with any action, suit, proceeding or investigation brought by or threatened against such parties arising out of or due to their acts or omissions, or consequences of such acts or omissions, with respect to the implementation or administration of the Wind-Down Trust or the Plan or the discharge of their duties hereunder; *provided*, *however*, that no such indemnification will be made to such Persons for actions or omissions as a result of willful misconduct, gross negligence, or actual fraud.  Persons dealing or having any relationship with the Wind-Down Trustee shall have recourse only to the Wind-Down Trust Assets and shall look only to the Wind-Down Trust Assets to satisfy any liability or other obligations incurred by the Wind-Down Trustee or the Wind-Down Trust Oversight Committee to such Person in carrying out the terms of the Wind-Down Trust Agreement, and neither the Wind-Down Trustee nor the Wind-Down Trust Oversight Committee, shall have any personal obligation to satisfy any such liability.  The Wind-Down Trustee and/or the Wind-Down Trust Oversight Committee members shall not be liable whatsoever except for the performance of such duties and obligations as are specifically set forth herein, and no implied covenants or obligations shall be read into the Wind-Down Trust Agreement against any of them.  The Wind-Down Trust shall promptly pay expenses reasonably incurred by any Wind-Down Trust Party in defending, participating in, or settling any action, proceeding or investigation in which such Wind-Down Trust Party is a party or is threatened to be made a party or otherwise is participating in connection with the Wind-Down Trust Agreement or the duties, acts or omissions of the Wind-Down Trustee or otherwise in connection with the affairs of the Wind-Down Trust, upon submission of invoices therefor, whether in advance of the final disposition of such action, proceeding, or investigation or otherwise.  Each Wind-Down Trust Party hereby undertakes, and the Wind-Down Trust hereby accepts his or her undertaking, to repay any and all such amounts so advanced if it shall ultimately be determined that such exculpated party is not entitled to be indemnified therefor under the Wind-Down Trust Agreement.  The foregoing indemnity in respect of any Wind-Down

Trust Party shall survive the termination of such Wind-Down Trust Party from the capacity for which they are indemnified.

12. No Liability of the Wind-Down Trust.

On and after the Effective Date, the Wind-Down Trust shall have no liability on account of any Claims or Interests except as set forth herein and in the Wind-Down Trust Agreement. All payments and all distributions made by the Wind-Down Trustee hereunder shall be in exchange for all Claims or Interests against the Debtors.

## I. H. Sources of Consideration for Plan Distributions

The Wind-Down Trust shall fund dDistributions under the Plan from the shall be funded by (i) the proceeds of Purchaser's payment obligations under Sections 2.1 and 2.2 of the Asset Purchase Agreement and distributions of Acquired Coins pursuant to Sections 6.12, and 6.14 of the Asset Purchase Agreement, (ii) the Wind-Down Entity or Wind-Down Trust (as applicable) from the Wind-Down Entity Assets or Wind-Down Trust Assets (as applicable); *provided*, *however*, that Allowed Professional Fee Claims shall be paid from the Professional Fee Escrow Account in the first instance. The Wind-Down Entity Assets or Wind-Down Trust Assets (as applicable) shall be used to pay the Wind-Down Trust Entity Expenses (including the compensation of the Wind-Down Trustee and any professionals retained by the Wind-Down Trust), and to satisfy payment of Allowed Claims and Interests as set forth in the Plan.

## J. I. Corporate Existence and Dissolution

Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificates or articles of incorporation, certificates of formation, certificates of organization, or certificates of limited partnership and bylaws, operating agreements, limited liability company agreements, or limited partnership agreements (or other formation documents) in effect prior to the Effective Date, except to the extent such certificates or articles of incorporation, certificates of formation, certificates of organization, or certificates of limited partnership and bylaws, operating agreements, limited liability company agreements, or limited partnership agreements (or other formation documents) are amended pursuant to the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings under applicable state or federal law).

On and after the Effective Date, the Wind-Down Entity will be authorized and directed to implement the Plan and any applicable orders of the Bankruptcy Court, and the Wind-Down Entity shall have the power and authority to take any action necessary to wind down and dissolve the Debtors' Estates.

Upon a certification to be Filed with the Bankruptcy Court by the Wind-Down Trustee of all distributions having been made and completion of all of its duties under the Plan and entry of a final decree closing the last of the Chapter 11 Cases, the Wind-Down Debtors shall be deemed to be dissolved without any further action by the Wind-Down Debtors, including the Filing of any documents with the secretary of state for the state in which the Wind-Down Debtors are formed or any other jurisdiction. The Wind-Down Trustee, however, shall have authority to take all necessary actions to dissolve the Wind-Down Debtors in and withdraw the Wind-Down Debtors from applicable states.

As soon as practicable after the Effective Date, the Wind-Down Entity shall: (1) cause the Debtors to comply with, and abide by, the terms of the Asset Purchase Agreement, and any other documents contemplated thereby; (2) to the extent applicable, file a certificate of dissolution or equivalent document, together with all other necessary corporate and company documents, to effect the dissolution of the Wind-Down Debtors under the applicable laws of their state of incorporation or formation (as applicable); and (3) take such other take such actions as the Wind-Down Entity may determine to be necessary or desirable to carry out the purposes of the Plan. Any certificate of dissolution or equivalent document may be executed by the Wind-Down Entity on behalf of any Wind-Down Debtor without need for any action or approval by the shareholders or board of directors or managers of such Debtor. On and after the Effective Date, the Wind-Down Debtors (1) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (2) shall be deemed to have cancelled pursuant to this Plan all Interests, and (3) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date. Notwithstanding such Debtors' dissolution, such Debtors shall be deemed to remain intact solely with respect to the preparation, filing, review, and resolution of applications for Professional Fee Claims.

## K. ~~J.~~ Corporate Action

Upon the Effective Date, all actions contemplated under the Plan, Definitive Documents, and Asset Purchase Agreement shall be deemed authorized and approved in all respects, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, directors, managers, managing-members, limited or general partners, or officers of the Debtors, the Wind-Down Debtors, the Wind-Down Trust or any other Entity, including: (1) appointment of the directors, managers, members, and officers for the Wind-Down Debtors as provided herein; (2) the issuances, transfer, and distribution of the Wind-Down Trust Units; (3) the formation of the Wind-Down Trust and appointment of the Wind-Down Trustee and Wind-Down Trust Oversight Committee; (4) the formation of any entities pursuant to and the implementation of the Plan and performance of all actions and transactions contemplated hereby and thereby; (5) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; and (6) all other acts or actions contemplated by the Plan, Definitive Documents, and Asset Purchase Agreement or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions (including effectuating the Restructuring Transactions Memorandum and the Customer ~~Migration~~Onboarding Protocol) (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan, Definitive Documents, and Asset Purchase Agreement involving the corporate structure of the Debtors or the Wind-Down Debtors, as applicable, and any corporate action required by the Debtors or the Wind-Down Debtors, as applicable, in connection with the Plan shall be deemed to have occurred on, and shall be in effect as of, the Effective Date, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Wind-Down Debtors, as applicable. On or, as applicable, prior to the Effective Date, the appropriate officers of the Debtors or the Wind-Down Debtors or the Wind-Down Trust, as applicable, shall be authorized and, as applicable, directed to issue, execute,

and deliver the agreements, documents, Securities, certificates of incorporation, certificates of formation, bylaws, operating agreements, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Wind-Down Debtors, and any and all other agreements, documents, Securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this Article IV.JK shall be effective notwithstanding any requirements under non-bankruptcy law.

**L.** ~~K.~~ **Vesting of Assets in the Wind-Down Entity**

Except as otherwise provided in the Plan, or in any agreement, instrument, or other document incorporated in the Plan, notwithstanding any prohibition of assignability under applicable non-bankruptcy law and in accordance with section 1141 of the Bankruptcy Code, on the Effective Date, all property constituting Wind-Down Trust Assets, including all Vested Causes of Action of the Debtors (unless otherwise released, waived, compromised, settled, transferred, or discharged pursuant to the Plan), and any property acquired by any of the Debtors under the Plan shall vest in the Wind-Down Entity, free and clear of all Liens, Claims, charges, or other encumbrances.

**M.** ~~L.~~ **Cancellation of Notes, Instruments, Certificates, and Other Documents**

On the later of the Effective Date and the date on which distributions are made pursuant to the Plan (if not made on the Effective Date), except for the purpose of evidencing a right to and allowing Holders of Claims and Interests to receive a distribution under the Plan or to the extent otherwise specifically provided for in the Plan, the Confirmation Order, or any agreement, instrument, or other document entered into in connection with or pursuant to the Plan or the Restructuring Transactions (including, without limitation, the Definitive Documents and the Asset Purchase Agreement), all notes, bonds, indentures, certificates, Securities, shares, purchase rights, options, warrants, collateral agreements, subordination agreements, intercreditor agreements, or other instruments or documents directly or indirectly evidencing, creating, or relating to any indebtedness or obligations of, or ownership interest in, the Debtors, giving rise to any Claims against or Interests in the Debtors or to any rights or obligations relating to any Claims against or Interests in the Debtors shall be deemed cancelled without any need for a Holder to take further action with respect thereto.

**N.** ~~M.~~ **Effectuating Documents; Further Transactions**

On and after the Effective Date, the Wind-Down Debtors, and its directors, managers, partners, officers, authorized persons, and members thereof, and the Wind-Down Trust and Wind-Down Trustee are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, Definitive Documents, and Asset Purchase Agreement, in the name of and on behalf of the Wind-Down Debtors, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

**O.** ~~N.~~ **Section 1146(a) Exemption**

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Wind-Down Debtor, the Wind-Down Trust, the Purchaser, or to any other Entity) of property under the Plan, Definitive Documents, and Asset Purchase Agreement or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Wind-Down Debtors; (2) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or

sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, including the Asset Purchase Agreement, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, sales or use tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forgo the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**P.** ~~O.~~ **Preservation of Rights of Action**

In accordance with section 1123(b) of the Bankruptcy Code, the Wind-Down Entity shall succeed to all rights to commence and pursue any and all Vested Causes of Action of the Debtors, whether arising before or after the Petition Date, including, without limitation, any actions specifically enumerated in the Schedule of Retained Causes of Action other than Causes of Action released, waived, settled, compromised, or transferred. Such rights shall be preserved by the Debtors and Wind-Down Debtors and shall vest in the Wind-Down Entity, with the Wind-Down Entity's rights to commence, prosecute, or settle such Causes of Action preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action expressly released, waived, settled, compromised, or transferred by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan or pursuant to the Asset Purchase Agreement, which shall be deemed released and waived by the Debtors and Wind-Down Debtors as of the Effective Date.

The Wind-Down Trust may pursue such Causes of Action, as appropriate, in accordance with the best interests of the beneficiaries of the Wind-Down Trust and in accordance with the Wind-Down Trust Agreement and the Plan. **No Entity may rely on the absence of a specific reference in the Schedules of Assets and Liabilities or Statement of Financial Affairs, the Plan, the Plan Supplement, the Disclosure Statement, or the Schedule of Retained Causes of Action to any Cause of Action against it as any indication that the Debtors, the Wind-Down Debtors or the Wind-Down Trust, as applicable, will not pursue any and all available Causes of Action of the Debtors against it. The Wind-Down Trust, on behalf of the Debtors and the Wind-Down Debtors, expressly reserves all rights to prosecute any and all Causes of Action against any Entity, except as otherwise provided in the Plan, including Article VIII of the Plan.** Unless any Cause of Action of the Debtors is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or pursuant to a Final Order, the Wind-Down Trust, on behalf of the Debtors and Wind-Down Debtors and in accordance with the Wind-Down Trust Agreement, expressly reserves all such Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or Consummation.

The Wind-Down Trust, on behalf of the Debtors and Wind-Down Debtors, reserves and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Cause of Action that a Debtor may hold

against any Entity shall vest in the Wind-Down Trust, except as otherwise provided in the Plan, including Article VIII of the Plan. The Wind-Down Trust, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Wind-Down Trust shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court in accordance with the Plan.

**Q.** ~~P.~~ **Election to Contribute Third-Party Claims**

Because aggregating all Contributed Third-Party Claims may enable the pursuit and settlement of such litigation claims in a more efficient and effective manner, each Holder of a Claim or Interest may agree, by electing on its ballot or opt-in form, to contribute its Contributed Third-Party Claims to the Wind-Down Entity.  By electing such option on its ballot or opt-in form, each Contributing Claimant agrees that, subject to the occurrence of the Effective Date and the formation of the Wind-Down Entity, it will be deemed, without further action, (i) to have irrevocably contributed its Contributed Third-Party Claims to the Wind-Down Entity, and (ii) to have agreed to execute any documents reasonably requested by the Debtors or the Wind-Down Entity to memorialize and effectuate such contribution.

**R.** ~~Q.~~ **Contribution of Contributed Third-Party Claims**

On the Effective Date, all Contributed Third-Party Claims will be irrevocably contributed to the Wind-Down Entity and shall thereafter be Wind-Down Trust Assets for all purposes.  No Person may rely on the absence of a specific reference in the Plan, the Disclosure Statement, the Confirmation Order, the Wind-Down Trust Agreement, the Plan Supplement, or any other document as any indication that the Wind-Down Trust will or will not pursue any and all available Contributed Third-Party Claims against such Person.  The Wind-Down Trust shall have, retain, reserve, and be entitled to assert all Contributed Third-Party Claims fully to the same extent that the Contributing Claimants could have asserted such claims prior to the Effective Date.  For the avoidance of doubt, the Contributed Third-Party Claims shall not include the rights of any of the Contributing Claimants to receive the distributions under the Plan on account of their Claims or Interests.

**S.** ~~R.~~ **Closing the Chapter 11 Cases**

On and after the Effective Date, the Wind-Down Entity shall be permitted to classify all of the Chapter 11 Cases of the Debtors except for the Chapter 11 Case of Voyager Digital, LLC, or any other Debtor identified in the Restructuring Transactions Memorandum as having its Chapter 11 Case remain open following the Effective Date, as closed, and all contested matters relating to any of the Debtors, including objections to Claims or Interests and any adversary proceedings, may be administered and heard in the Chapter 11 Case of Voyager Digital, LLC, or any other Debtor identified in the Restructuring Transactions Memorandum as having its Chapter 11 Case remain open following the Effective Date, irrespective of whether such Claims or Interests were Filed or such adversary proceeding was commenced against a Debtor whose Chapter 11 Case was closed.

## ARTICLE V.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.** **Assumption and Rejection of Executory Contracts and Unexpired Leases**

On the Effective Date, except as otherwise provided herein, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (1) is specifically described in the Plan as to be assumed in connection with confirmation of the Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement; (2) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Effective Date; (3) is to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, in connection with the Sale

Transaction; (4) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; or (5) is a D&O Liability Insurance Policy other than the Side-A Policy. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, assignments, and rejections, including the assumption of the Executory Contracts or Unexpired Leases as provided in the Plan Supplement, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

**B.     Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases**

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Wind-Down Debtors, as applicable, under such Executory Contract or Unexpired Lease. Without limiting the general nature of the foregoing, and notwithstanding any non-bankruptcy law to the contrary, the Debtors and Wind-Down Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the Debtors contracting from non-Debtor counterparties to any rejected Executory Contract or Unexpired Lease.

**C.     Claims Based on Rejection of Executory Contracts or Unexpired Leases**

Counterparties to Executory Contracts or Unexpired Leases listed subject to rejection under the Plan shall be served with a notice of rejection of Executory Contracts and Unexpired Leases with the Plan Supplement. Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Claims, Noticing, and Solicitation Agent and served on the Debtors or Wind-Down Entity, as applicable, no later than thirty days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, or the Wind-Down Entity, the Estates, or their property without the need for any objection by the Wind-Down Entity or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed released, and be subject to the permanent injunction set forth in Article VIII.D of the Plan, including any Claims against any Debtor listed on the Debtors' schedules as unliquidated, contingent, or disputed.** All Allowed Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease shall be treated as General Unsecured Claims in accordance with Article III.C of the Plan.

**D.     Cure of Defaults for Executory Contracts and Unexpired Leases Assumed**

The Debtors, the Wind-Down Entity, or the Purchaser, as applicable pursuant to the Asset Purchase Agreement, shall pay Cures, if any, on the Effective Date. The Debtors shall provide notice of the amount and timing of payment of any such Cure to the parties to the applicable assumed Executory Contracts or Unexpired Leases as part of the Plan Supplement. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure that differ from the ordinary course amounts paid or proposed to be paid by the Debtors, the Wind-Down Entity, or the Purchaser shall be dealt with in the ordinary course of business and, if needed, shall be Filed with the Claims, Noticing, and Solicitation Agent on or before thirty days after the Effective Date. **If any counterparty to an Executory Contract or Unexpired Lease does not receive a notice of assumption and applicable cure amount, such counterparty shall have until on or before thirty days after the Effective Date to bring forth and File a request for payment of Cure.** Any such

request that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Wind-Down Debtor or the Wind-Down Entity, without the need for any objection by the Wind-Down Entity or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.  Any Cure shall be deemed fully satisfied, and released upon payment by the Debtors or the Wind-Down Entity or the Purchaser of the Cure in the ordinary course of business or upon and in accordance with any resolution of a Cure dispute (whether by order of the Bankruptcy Court or through settlement with the applicable Executory Contract or Unexpired Lease counterparty); *provided*, *however*, that nothing herein shall prevent the Wind-Down Entity or the Purchaser, as applicable, from paying any Cure Claim despite the failure of the relevant counterparty to File such request for payment of such Cure.  The Wind-Down Entity or the Purchaser may also settle any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court.  In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be Filed with the Bankruptcy Court on or before thirty days after the Effective Date.  Any such objection will be scheduled to be heard by the Bankruptcy Court at the Debtors' first scheduled omnibus hearing for which such objection is timely Filed.  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

In the event of a dispute regarding:  (1) the amount of any Cure Claim, (2) the ability of the Wind-Down Debtors, Purchaser, or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed (or assumed and assigned, as applicable), or (3) any other matter pertaining to assumption or assignment, then any disputed Cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made as soon as reasonably practicable following, and in accordance with, the entry of a Final Order of the Bankruptcy Court resolving such dispute or as may be agreed upon by the Debtors, the Wind-Down Entity, or Purchaser, as applicable, and the counterparty to the Executory Contract or Unexpired Lease, and any such unresolved dispute shall not prevent or delay implementation of the Plan or the occurrence of the Effective Date.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise or assignment of any Executory Contract or Unexpired Lease to the Purchaser and full payment of any applicable Cure pursuant to this Article V.D, or upon and in accordance with any resolution of a Cure dispute (whether by order of the Bankruptcy Court or through settlement with the applicable Executory Contract or Unexpired Lease counterparty), shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.  **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed or assumed and assigned in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to this Article V.D, in the amount and at the time in the ordinary course of business or upon and in accordance with any resolution of a Cure dispute (whether by order of the Bankruptcy Court or through settlement with the applicable Executory Contract or Unexpired Lease counterparty), shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.  For the avoidance of doubt, in the event that any counterparty to an Executory Contract or Unexpired Lease receives a notice of assumption and applicable proposed Cure amount, and disputes the Debtors' proposed Cure amount, such party shall not be required to File a Proof of Claim with respect to such dispute.  Any counterparty to an Executory Contract or Unexpired Lease that does not receive a notice or applicable proposed Cure amount, and believes a Cure amount is owed, shall have thirty**

**days after the Effective Date to File a Proof of Claim with respect to such alleged Cure amount, which Claim shall not be expunged until such Cure dispute is resolved.**

### E. Insurance Policies and Surety Bonds

Each D&O Liability Insurance Policy (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto) other than the Side-A Policy shall be assumed, in their entirety, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date, pursuant to sections 105 and 365 of the Bankruptcy Code with the Wind-Down Entity being authorized to pursue any proceeds thereof on behalf of the Debtors or the Wind-Down Entity. The Side-A Policy shall ride through these Chapter 11 Cases with the Debtors, and the Wind-Down Entity preserves all avoidance and other actions in connection with the premium paid thereunder. All beneficiaries under the D&O Insurance Policies reserve their rights under such D&O Insurance Policies subject to the limitations set forth in this Plan.

The Debtors or the Wind-Down Entity, as applicable, shall not terminate or otherwise reduce the coverage under any D&O Liability Insurance Policy (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto) in effect prior to the Effective Date, and any current and former directors, officers, managers, and employees of the Debtors who served in such capacity at any time before or after the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy subject to the terms thereof regardless of whether such directors, officers, managers, and employees remain in such positions after the Effective Date. Notwithstanding anything to the contrary in the Plan, the Debtors or the Wind-Down Entity shall retain the ability to supplement such D&O Liability Insurance Policy as the Debtors or Wind-Down Entity may deem necessary, subject to the prior written consent of the Wind-Down Entity. Notwithstanding anything to the contrary contained in the Plan, the Wind-Down Trust shall be entitled to pursue avoidance of the premium paid for the XL Specialty Insurance Company Cornerstone A-Side Management Liability Insurance Policy No. ELU184179-22, and nothing in this Plan shall be deemed a waiver or abrogation of any such rights.

The Debtors shall continue to satisfy their obligations under their surety bonds and insurance policies in full and continue such programs in the ordinary course of business. Each of the Debtors' surety bonds and insurance policies, and any agreements, documents, or instruments relating thereto shall be treated as Executory Contracts under the Plan. On the Effective Date: (a) the Debtors shall be deemed to have assumed all such surety bonds and insurance policies and any agreements, documents, and instruments relating thereto in their entirety; *provided* that the Debtors have assumed all indemnity agreements and cash collateral agreements related to the surety bonds and (b) such surety bonds and insurance policies and any agreements, documents, or instruments relating thereto shall revest in the applicable Wind-Down Debtor(s) unaltered.

### F. Reservation of Rights

Nothing contained in the Plan or the Plan Supplement (unless otherwise explicitly provided) shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Wind-Down Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Wind-Down Entity, as applicable, shall have forty-five days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, including by rejecting such contract or lease effective as of the Confirmation Date.

## G.     Nonoccurrence of Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## H.     Contracts and Leases Entered into After the Petition Date

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed under section 365 of the Bankruptcy Code, will be performed by the applicable Debtor or Wind-Down Debtor liable thereunder in the ordinary course of its business. Such contracts and leases that are not rejected under the Plan shall survive and remain unaffected by entry of the Confirmation Order.

## ARTICLE VI.

## PROVISIONS GOVERNING DISTRIBUTIONS

## A.     Timing and Calculation of Amounts to Be Distributed

Except (1) as otherwise provided herein, (2) upon a Final Order, or (3) as otherwise agreed to by the Debtors, the Purchaser, or the Wind-Down Entity, as the case may be, and the Holder of the applicable Claim, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the next Distribution Date after such Claim becomes, as applicable, an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive the full amount of distributions that the Plan provides for Allowed Claims in the applicable Class from the Distribution Agent. In the event that any payment or distribution under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or distribution may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. Except as specifically provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

## B.     Rights and Powers of Distribution Agent

### 1.     Powers of the Distribution Agent

The Distribution Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties and exercise its rights under the Plan; (b) make all distributions contemplated under the Plan; (c) employ professionals to represent it with respect to its responsibilities and powers; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions of the Plan.

### 2.     Expenses Incurred on or after the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Distribution Agent on or after the Effective Date and any reasonable compensation and expense reimbursement claims (including reasonable attorney and/or other

professional fees and expenses) made by such Distribution Agent shall be paid in Cash by the Wind-Down Entity.

**C.    Delivery of Distributions and Undeliverable or Unclaimed Distributions**

1.    <u>Distributions Generally</u>

Except as otherwise provided in the Plan (including in paragraph 8 below), the Distribution Agent shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the applicable register or in the Debtors' records as of the date of any such distribution (as applicable), including the address set forth in any Proof of Claim filed by that Holder.

2.    <u>Distributions on Account of Obligations of Multiple Debtors</u>

For all purposes associated with distributions under the Plan, all guarantees by any Debtor of the obligations of any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor, shall be deemed eliminated so that any obligation that could otherwise be asserted against more than one Debtor shall result in a single distribution under the Plan.  Any such Claims shall be subject to all potential objections, defenses, and counterclaims, and to estimation pursuant to section 502(c) of the Bankruptcy Code.

3.    <u>Record Date of Distributions</u>

On the Distribution Record Date, the various transfer registers for each Class of Claims or Interests as maintained by the Debtors or their respective agents shall be deemed closed, and there shall be no further changes in the record Holders of any Claims or Interests.  The Distribution Agent shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date.  In addition, with respect to payment of any Cure amounts or disputes over any Cure amounts, neither the Debtors nor the Distribution Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the Effective Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure amount.

4.    <u>Special Rules for Distributions to Holders of Disputed Claims and Interests</u>

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the Wind-Down Entity, on the one hand, and the Holder of a Disputed Claim or Interest, on the other hand, or as set forth in a Final Order, no partial payments and no partial distributions shall be made with respect to a Disputed Claim or Interest until all of the Disputed Claim or Interest has become an Allowed Claim or Interest or has otherwise been resolved by settlement or Final Order; *provided* that, if the Wind-Down Entity does not dispute a portion of an amount asserted pursuant to an otherwise Disputed Claim or Interest, the Distribution Agent may make a partial distribution on account of that portion of such Claim or Interest that is not Disputed at the time and in the manner that the Distribution Agent makes distributions to similarly situated Holders of Allowed Claims or Interests pursuant to the Plan.  Any dividends or other distributions arising from property distributed to Holders of Allowed Claims or Interests, as applicable, in a Class and paid to such Holders under the Plan shall also be paid, in the applicable amounts, to any Holder of a Disputed Claim or Interest, as applicable, in such Class that becomes an Allowed Claim or Interest after the date or dates that such dividends or other distributions were earlier paid to Holders of Allowed Claims or Interests in such Class.

5.     De Minimis Distributions; Minimum Distributions

The Distribution Agent shall not make any Cash distributions to any Holder of an Allowed Claim or Interest pursuant to Article III.C.1-11 of this Plan on account of such Allowed Claim or Interest if such distribution is valued, in the reasonable discretion of the Distribution Agent, at less than $1.00, and each Holder of an Allowed Claim or Interest to which this limitation applies shall not be entitled to any distributions under the Plan.  Notwithstanding anything to the contrary in this Plan, there shall be no minimum distribution threshold on account of distributions of any Cryptocurrency to Holders of Allowed Account Holder Claims and Allowed OpCo General Unsecured Claims.

6.     Undeliverable Distributions and Unclaimed Property

In the event that either (a) a distribution to any Holder is returned as undeliverable or (b) the Holder of an Allowed Claim or Interest does not respond to a request by the Debtors or the Distribution Agent for information necessary to facilitate a particular distribution, no distribution to such Holder shall be made unless and until the Distribution Agent has determined the then-current address of such Holder or received the necessary information to facilitate a particular distribution, at which time such distribution shall be made to such Holder without interest, dividends, or other accruals of any kind; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code on the date that is one year after the Effective Date. After such date, all unclaimed property or interests in property shall revert to the Wind-Down Entity automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable local, state, federal, or foreign escheat, abandoned, or unclaimed property laws to the contrary), and the Claim or Interest of any Holder to such property or interest in property shall not be entitled to any distributions under the Plan.

7.     Manner of Payment Pursuant to the Plan

At the option of the Distribution Agent, any Cash payment to be made hereunder may be made by check, wire transfer, automated clearing house, credit card, or as otherwise provided in applicable agreements.

8.     ~~Transferred Cryptocurrency Value~~ Distributions of Net Owed Coins; Additional Bankruptcy Distributions

~~The Transferred Cryptocurrency Value will be determined prior to the Effective Date pursuant to the Asset Purchase Agreement.~~

As a general matter, the Purchaser will allocate each Account Holder's Net Owed Coins to its account on the Binance.US Platform, and each Holder of OpCo General Unsecured Claim's Pro Rata share of the Distributable Cryptocurrency (in Cash) to its account on the Binance.US Platform in accordance with, and subject to, the provisions of Section 6.12 of the Asset Purchase Agreement.

As a general matter, the Customer ~~Migration~~Onboarding Protocol will provide that Purchaser will make ~~initial~~Additional Bankruptcy ~~d~~Distributions to Transferred Creditors corresponding to their Pro Rata ~~amounts of the Transferred Cryptocurrency Value as contemplated in the Customer Migration Protocol.  Subject to the conditions set forth in the Customer Migration Protocol, if a Transferred Creditor has become a Transferred Creditor prior to one Business Day prior to the Closing Date and Purchaser supports the Cryptocurrency maintained by such Transferred Creditor in such Transferred Creditor's Account (e.g., BTC, ETH), Purchaser will credit to such Transferred Creditor's FTX Account~~shares of such Additional Bankruptcy Distribution (if such Additional Bankruptcy Distribution is in Cryptocurrency, based on~~ the Transferred Cryptocurrency Value ~~in kind.  Subject to the conditions~~

~~set forth in the Customer Migration Protocol, if (i) Purchaser does not support~~of the Cryptocurrency ~~maintained by a Transferred Creditor in such Transferred Creditor's Account, (ii) a Transferred Creditor did not maintain Cryptocurrency in an Account or (iii) a Transferred Creditor becomes a Transferred Creditor after such date but before the final cut-off date 45 days after the Closing Date as contemplated in the Customer Migration Protocol, Purchaser will credit to the FTX Account of such Transferred Creditor USDC in an amount equal to the Transferred Cryptocurrency Value on a Pro Rata basis.~~ included in such Additional Bankruptcy Distribution), all in accordance with any applicable Post-Bankruptcy Statement (as defined in the Asset Purchase Agreement).

~~Following such initial distributions to Transferred Creditors, the remaining Cash available on account of the sale of Cryptocurrency to Purchaser under the Asset Purchase Agreement shall be paid by Purchaser to the Debtors and applied by the Debtors to make initial distributions of Transferred Cryptocurrency Value to Holders of Allowed Account Holder Claims and Allowed OpCo General Unsecured Claims that did not become Transferred Creditors by the cut off date provided in the Customer Migration Protocol.~~

If any Account Holder or Holder of an Allowed OpCo General Unsecured Claim does not become a Transferred Creditor prior to the date that is three (3) months following the later of the Closing Date or the date on which the terms and conditions for the Binance.US Platform are made available for such Person to accept (as provided in the Customer Onboarding Protocol), then Purchaser shall convert any Cryptocurrency allocable to such Person into U.S. Dollars at the then-prevailing rates (including applicable fees, spreads, costs and expenses) on the Binance.US Platform and deliver such U.S. Dollars, together with any cash or others assets in respect of such Persons, to the Debtors within five (5) Business Days, for further distribution by the Debtors in accordance with this Plan and the Customer Onboarding Protocol.

If any Account Holder or Holder of an Allowed OpCo General Unsecured Claim is located in an Unsupported Jurisdiction (as defined in the Asset Purchase Agreement), then the Net Owed Coins, if applicable, and Additional Bankruptcy Distributions allocable to such Person shall be handled pursuant to Section 6.12(b) or, if applicable, Section 6.14(d) of the Asset Purchase Agreement.

Purchaser shall have no responsibility to make any distributions other than ~~the distributions to Transferred Creditors of their Pro Rata share of Transferred Cryptocurrency Value~~ as contemplated by ~~the Customer Migration Protocol. All other distributions shall be made by the Distribution Agent (other than Purchaser) or as the Distribution Agent (other than Purchaser) shall otherwise determine.~~Sections 6.12 and 6.14 of the Asset Purchase Agreement.

**D.      Compliance Matters**

In connection with the Plan, to the extent applicable, the Debtors, the Wind-Down Entity, any Distribution Agent, and any other applicable withholding and reporting agents shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Debtors, the Wind-Down Entity, the Distribution Agent, and any other applicable withholding and reporting agents shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including wind-down a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms that are reasonable and appropriate; *provided* that the Wind-Down Entity and the Distribution Agent, as applicable, shall request appropriate documentation from the applicable distributees and allow such distributees a reasonable amount of time

to respond. The Debtors, the Wind-Down Entity, the Distribution Agent, and any other applicable withholding and reporting agents reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

**E.     Foreign Currency Exchange Rate**

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim, asserted in government issued currency (for the avoidance of doubt, not including any Cryptocurrency) other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Effective Date.

**F.     Claims Paid or Payable by Third Parties**

1.     _Claims Paid by Third Parties_

The Debtors or the Wind-Down Entity, as applicable, shall reduce a Claim or Interest, and such Claim or Interest (or portion thereof) shall be disallowed without an objection to such Claim or Interest having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim or Interest receives a payment on account of such Claim or Interest from a party that is not a Debtor or Wind-Down Debtor (or other Distribution Agent), as applicable, including any payments made in connection with the Sale Transaction. To the extent a Holder of a Claim or Interest receives a distribution on account of such Claim or Interest and receives payment from a party that is not a Debtor or a Wind-Down Debtor (or other Distribution Agent), including payments made in connection with the Sale Transaction, as applicable, on account of such Claim or Interest, such Holder shall, within ten Business Days of receipt thereof, repay, return, or deliver any distribution held by or transferred to the Holder to the applicable Wind-Down Debtor to the extent the Holder's total recovery on account of such Claim or Interest from the third party and under the Plan exceeds the amount of such Claim or Interest as of the date of any such distribution under the Plan. The failure of such Holder to timely repay, return, or deliver such distribution shall result in the Holder owing the applicable Wind-Down Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the ten-Business Day grace period specified above until the amount is repaid.

2.     _Claims Payable by Third Parties_

No distributions under the Plan shall be made on account of an Allowed Claim or Interest that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim or Interest has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim or Interest (if and to the extent adjudicated by a court of competent jurisdiction or otherwise settled), then immediately upon such payment, such Claim or Interest may be expunged or reduced on the Claims Register by the Claims, Noticing, and Solicitation Agent to the extent of any such payment without an objection to such Claim or Interest having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.    Applicability of Insurance Policies

Except as otherwise provided herein, payments to Holders of Claims or Interests shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any rights, defenses, or Cause of Action that the Debtors, the Wind-Down Entity or any other Entity may hold against any other Entity, including insurers, under any policies of insurance, agreements related thereto, or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any rights or defenses, including coverage defenses, held by such insurers under the applicable insurance policies, agreements related thereto, and applicable non-bankruptcy law.

**G.    Setoffs and Recoupment**

Except as otherwise expressly provided for herein, each Debtor, Wind-Down Debtor, the Wind-Down Entity, or such Entity's designee as instructed by such Debtor, Wind-Down Entity, as applicable, may, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, set off against or recoup from an Allowed Claim and any distributions to be made pursuant to the Plan on account of such Allowed Claim, any Claims, rights, and Causes of Action of any nature whatsoever that the Debtor, Wind-Down Debtor or Wind-Down Entity, as applicable, may have against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action have not been otherwise compromised, settled, or released on or prior to the Effective Date (whether pursuant to the Plan or otherwise). Notwithstanding the foregoing, except as expressly stated in Article VIII of this Plan, neither the failure to effect such a setoff or recoupment nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by the Debtors or the Wind-Down Entity of any such Claims, rights, or Causes of Action the Debtors or the Wind-Down Entity may possess against such Holder.

**H.    Allocation between Principal and Accrued Interest**

Except as otherwise provided herein, the aggregate consideration paid to Holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof and as determined for federal income tax purposes) and second, to the extent the consideration exceeds the principal amount of the Allowed Claims, to the remaining portion of such Allowed Claim if any.

**ARTICLE VII.**

**PROCEDURES FOR RESOLVING DISPUTED,
CONTINGENT, AND UNLIQUIDATED CLAIMS AND INTERESTS**

**A.    Disputed Claims Process**

After the Effective Date, the Wind-Down Entity, and any party-in-interest, shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim or Interest immediately before the Effective Date.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim or Interest shall become an Allowed Claim or Interest unless and until such Claim or Interest is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim or Interest.  If a Holder of a Claim or Interest in Class disputes the amount of their Claim or Interest as listed in the Schedules, the Holder should notify the Debtors or the Wind-Down Entity of such

dispute. If the Debtors and the Holder agree to an amended Claim amount prior to the Effective Date, the Debtors shall file amended Schedules prior to the Effective Date. If between the Confirmation Date and the Effective Date, the dispute cannot be consensually resolved, the Holder may seek (by letter to the Court) to have the claim or interest dispute resolved before the Bankruptcy Court (and, with the consent of the Debtors, before any other court or tribunal with jurisdiction over the parties). After the Effective Date, the creditor may seek to have the claim dispute resolved before the Bankruptcy Court or any other court or tribunal with jurisdiction over the parties.

Unless relating to a Claim or Interest expressly Allowed pursuant to the Plan, all Proofs of Claim filed in these Chapter 11 Cases shall be considered objected to and Disputed without further action by the Debtors. Upon the Effective Date, all Proofs of Claim filed against the Debtors, regardless of the time of filing, and including Proofs of Claim filed after the Effective Date, shall be deemed withdrawn and expunged, other than as provided below. Notwithstanding anything in this Plan to the contrary: (1) all Claims against the Debtors that result from the Debtors' rejection of an Executory Contract or Unexpired Lease; (2) Claims filed to dispute the amount of any proposed Cure pursuant to section 365 of the Bankruptcy Code; and (3) Claims that the Debtors seek to have determined by the Bankruptcy Court, shall in all cases be determined by the Bankruptcy Court, if not otherwise resolved through settlement with the applicable claimant.

Notwithstanding any provision herein to the contrary, nothing in the Disclosure Statement, Plan, or Confirmation Order grants the Bankruptcy Court with jurisdiction over any police and regulatory actions by the SEC, and the SEC shall retain the power and authority to commence and continue any such actions against any person or entity, including without limitation, the Debtors, in any forum with jurisdiction, provided, however, that enforcement of any money judgment against the Debtors must be in accordance with the Plan. In addition, the SEC may file any proof of claim by the Government Bar Date or such later date as ordered by the Bankruptcy Court and amend its proof of claim upon determination of liability on its claims. Any objection to such claim shall be in accordance with Bankruptcy Rule 3007, and such claim shall not automatically be deemed objected to, withdrawn, or expunged.

On the Effective Date, the Debtors or Wind-Down Trustee, as applicable, may establish one or more accounts or funds to hold and dispose of certain assets, pursue certain litigation (including the Causes of Action preserved under the Plan or otherwise vesting in the Wind-Down Trust), and/or satisfy certain Claims (including Claims that are contingent or have not yet been Allowed). For any such account or fund, the Debtors or the Wind-Down Trustee, as applicable, may take the position that grantor trust treatment applies in whole or in part. To the extent such treatment applies to any such account or fund, for all U.S. federal income tax purposes, the beneficiaries of any such account or fund would be treated as grantors and owners thereof, and it is intended, to the extent reasonably practicable, that any such account or fund would be classified as a liquidating trust under section 301.7701-4 of the Treasury Regulations. Alternatively, any such account or fund may be subject to the tax rules that apply to "disputed ownership funds" under 26 C.F.R. 1.468B–9. If such rules apply, such assets would be subject to entity-level taxation, and the Debtors and Wind-Down Trustee would be required to comply with the relevant rules.

## B.    Objections to Claims or Interests

Except as otherwise specifically provided in the Plan, after the Effective Date, the Wind-Down Entity shall have the sole authority to: (1) File, withdraw, or litigate to judgment, any objections to Claims or Interests; and (2) settle or compromise any Disputed Claim or Interest without any further notice to or action, order, or approval by the Bankruptcy Court. For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, the Wind-Down Entity shall have and retain any and all rights and defenses each such Debtor had immediately prior to the Effective Date with

respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to ~~Article IV.O~~Article IV.P of the Plan.

Any objections to Claims or Interests shall be Filed on or before the Claims Objection Bar Date. For the avoidance of doubt, the Bankruptcy Court may extend the time period to object to Claims or Interests set forth in this paragraph at any time, including before or after the expiration of one hundred eighty days after the Effective Date, in its discretion or upon request by the Debtors or any party in interest.

## C.    Estimation of Claims

Before or after the Effective Date, the Debtors or the Wind-Down Entity, as applicable, may (but are not required to), at any time, request that the Bankruptcy Court estimate any Disputed Claim or Interest that is contingent or unliquidated pursuant to applicable law, including pursuant to section 502(c) of the Bankruptcy Code, for any reason, regardless of whether any party previously has objected to such Disputed Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under sections 157 and 1334 of the Judicial Code to estimate any such Disputed Claim or Interest, including during the litigation of any objection to any Disputed Claim or Interest or during the pendency of any appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Disputed Claim or Interest that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions) and may be used as evidence in any supplemental proceedings, and the Debtors or the Wind-Down Entity may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Disputed Claim or Interest that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before fourteen days after the date on which such Disputed Claim or Interest is estimated.

## D.    No Distributions Pending Allowance

Notwithstanding any other provision of the Plan, if any portion of a Claim or Interest is a Disputed Claim or Interest, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest; *provided* that if only a portion of a Claim or Interest is Disputed, such Claim or Interest shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount.

## E.    Distributions After Allowance

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim or Interest in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court Allowing any Disputed Claim or Interest becomes a Final Order, the Distribution Agent shall provide to the Holder of such Allowed Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest, dividends, or

accruals to be paid on account of such Allowed Claim or Interest unless required under applicable bankruptcy law.

**F.      No Interest**

Unless otherwise specifically provided for herein or by Final Order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on Claims against the Debtors, and no Holder of a Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such Claim. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

**G.      Adjustment to Claims and Interests without Objection**

Any Claim or Interest that has been paid, satisfied, amended, superseded, cancelled, or otherwise expunged (including pursuant to the Plan) may be adjusted or expunged on the Claims Register at the direction of the Wind-Down Entity without the Wind-Down Entity having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.  Additionally, any Claim or Interest that is duplicative or redundant with another Claim or Interest against the same Debtor may be adjusted or expunged on the Claims Register at the direction of the Wind-Down Entity without the Wind-Down Entity having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

**H.      Time to File Objections to Claims**

Any objections to Claims shall be Filed on or before the Claims Objection Bar Date.

**I.      Disallowance of Claims or Interests**

Any Claims or Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims or Interests until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Wind-Down Entity, as applicable.

**Except as otherwise provided herein or as agreed to by the Debtors or the Wind-Down Entity, any and all Proofs of Claim Filed after the Bar Date shall be deemed disallowed and expunged as of the Effective Date without any further notice to, or action, order, or approval of, the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order.**

**J.      Amendments to Proofs of Claim**

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Proof of Claim or Proof of Interest may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Wind-Down Entity, and any such new or amended Proof of Claim or Proof of

Interest Filed shall be deemed disallowed in full and expunged without any further action, order, or approval of the Bankruptcy Court.

## ARTICLE VIII.

## EFFECT OF CONFIRMATION OF THE PLAN

**A.      Releases by the Debtors**

**Notwithstanding anything contained in the Plan to the contrary, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Wind-Down Debtors, and their Estates, the Wind-Down Entity, and in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of, the foregoing Entities, from any and all Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Chapter 11 Cases and related adversary proceedings, the** ~~**Alameda Loan Facility, the**~~ **Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, the administration and implementation of the Restructuring Transactions or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date;** *provided* **that, subject to the D&O Settlement, nothing in this Article VIII.A shall be construed to release the Released Parties from actual fraud, willful misconduct, or gross negligence as determined by a Final Order.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019, of the releases described in this Article VIII.A by the Debtors, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article VIII.A is:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) except to the extent contemplated by Article IV.E and Article IV.F of the Plan, a bar to any of the Debtors or Wind-Down Debtors or their respective Estates or Wind-Down Entity asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.**

Notwithstanding anything to the contrary contained herein, nothing in this Plan shall release, waive, or otherwise limit the (i) rights, duties, or obligations of the Purchaser under the Asset Purchase Agreement or the Definitive Documents and (ii) the Non-Released D&O Claims, but such Non-Released D&O Claims shall remain subject to the limitations contained in Article IV.E and Article IV.F of this Plan.

B.      Releases by Holders of Claims and Interests

Except as expressly set forth in the Plan, effective on the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted or assertable on behalf of any of the Debtors, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Alameda Loan Facility, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, the administration and implementation of the Restructuring Transactions, or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date, *provided* that nothing in this Article VIII.B shall be construed to release the Released Parties from actual fraud, willful misconduct, or gross negligence as determined by a Final Order.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII.B, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article VIII.B is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) except to the extent contemplated by Article IV.EF and Article IV.FG of the Plan, a bar to any of the Releasing Parties or the Debtors or Wind-Down Debtors or their respective Estates or Wind-Down Entity asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

C.      Exculpation

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor release or the third-party release, and except as

otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is exculpated from any Cause of Action for any act or omission arising on or after the Petition Date and prior to the Effective Date based on the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing, or consummation of the Disclosure Statement, the Plan, the Special Committee Investigation, any Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for Causes of Action related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan

D.    Injunction

The assets of the Debtors and of the Wind-Down Entity shall be used for the satisfaction of expense obligations and the payment of Claims and Interests only in the manner set forth in this Plan and shall not be available for any other purpose. All Persons and Entities who have held, hold, or may hold Claims or Interests based upon any act, omission, transaction, or other activity of any kind or nature related to the Debtors, the Wind-Down Entity, or the Debtors' Chapter 11 Cases that occurred prior to the Effective Date, other than as expressly provided in the Plan or the Confirmation Order, shall be precluded and permanently enjoined on and after the Effective Date from interfering with the use and distribution of the Debtors' assets in the manner contemplated by the Plan.

In addition, as of the Effective Date and subject to the occurrence of the Effective Date, except as otherwise specifically provided in this Plan or the Confirmation Order, all Persons and Entities who have held, hold, or may hold Claims or Interests that are fully satisfied pursuant to the Plan or any Claim or Interest that is subject to the releases and exculpations set forth in Article VIII.B and Article VIII.C of this Plan shall be precluded and permanently enjoined on and after the Effective Date from enforcing, pursuing, or seeking any setoff or relief with respect to such Claims or Interests, except for the receipt of the payments or distributions that are contemplated by this Plan.

E.    Release of Liens

Except as otherwise provided in the Plan, the Plan Supplement, or any contract, instrument, release, or other agreement or document created pursuant to the Plan or Confirmation Order on the Effective Date, and concurrently with the applicable distributions made pursuant to the Plan, all

mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, ~~and~~ compromised, <u>and discharged,</u> and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Debtors shall automatically revert to the applicable Debtor or Wind-Down Debtor, as applicable, and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors. Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as requested by the Debtors or Wind-Down Entity to evidence the release of such Lien, including the execution, delivery, and filing or recording of such documents evidencing such releases. The presentation or filing of the Confirmation Order to or with any local, state, federal, or foreign agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

## F.    OSC and SEC

Notwithstanding any language to the contrary herein, no provision shall (a) preclude the OSC or the SEC from enforcing its police or regulatory powers; or (b) enjoin, limit, impair or delay the OSC or SEC from commencing or continuing any claims, causes of action, proceeding, or investigations against any non-Debtor person or non-Debtor entity in any forum.

## G.    Protection against Discriminatory Treatment

As provided by section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Entity, including Governmental Units, shall discriminate against any Wind-Down Debtor or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, or discriminate with respect to such a grant against, any Wind-Down Debtor, or any Entity with which a Wind-Down Debtor has been or is associated, solely because such Wind-Down Debtor was a debtor under chapter 11 of the Bankruptcy Code, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

## H.    Document Retention

Upon the occurrence of the Effective Date, the Debtors' books and records shall be transferred to the Wind-Down Entity, which shall continue to preserve all financial books and records, emails, and other financial documents relating to the Debtors' business that are currently in the Debtors' possession. The Wind-Down Trust shall not destroy or otherwise abandon any such documents or records without providing advance notice to the U.S. Securities and Exchange Commission (c/o Therese Scheuer, U.S. Securities and Exchange Commission, 100 F Street, NE, Washington, DC 20549, ScheuerT@SEC.GOV) and seeking further authorization from this Court. Nothing in this Plan or the Confirmation Order shall affect the obligations of the pre-Effective Date Debtors, the Wind-Down Entity, and/or any transferee or custodian to maintain all books and records that are subject to any governmental subpoena, document preservation letter, or other investigative request from a governmental agency.

## I.    Reimbursement or Contribution

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent

as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (1) such Claim has been adjudicated as non-contingent; or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

**J.** **Term of Injunctions or Stays**

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code, or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date. **All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.**

<div align="center">

**ARTICLE IX.**

**CONDITIONS PRECEDENT TO THE EFFECTIVE DATE**

</div>

**A.** **Conditions Precedent to the Effective Date.**

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article IX.B of the Plan:

1. The Bankruptcy Court shall have entered the Confirmation Order, which shall be in a form and substance reasonably satisfactory to the Debtors and the Committee, and subject to the consent rights of Purchaser under the Asset Purchase Agreement, and such order shall be a Final Order and in full force and effect.

2. The Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan, Definitive Documents, and the Asset Purchase Agreement.

3. Each Definitive Document and each other document contained in any supplement to the Plan, including the Plan Supplement and any exhibits, schedules, amendments, modifications or supplements thereto or other documents contained therein, shall have been executed or Filed, as applicable, in form and substance consistent in all respects with the Plan, and subject to the Purchaser's consent rights under the Asset Purchase Agreement, and shall not have been modified in a manner inconsistent therewith;

4. The Professional Fee Escrow Account shall have been established and funded with Cash in accordance with Article II.B.2 of the Plan.

5. The Wind-Down Reserve shall have been established and funded with Cash in accordance with the Plan.

6. TheIf prior to the Outside Date, the Asset Purchase Agreement shall be in full force and effect and the Sale Transaction shall have been consummated.

7. The Restructuring Transactions shall have been consummated or shall be anticipated to be consummated concurrently with the occurrence of the Effective Date in a manner consistent

with the Plan ~~and~~, the Customer ~~Migration~~Onboarding Protocol, the other Definitive Documents, and the Asset Purchase Agreement, and the Plan shall have been substantially consummated or shall be anticipated to be substantially consummated concurrently with the occurrence of the Effective Date.

**B.      Waiver of Conditions Precedent**

The Debtors, with the consent of the Committee and, solely to the extent related to the Asset Purchase Agreement and the Sale Transaction, prior to the Outside Date, the consent of Purchaser, may waive any of the conditions to the Effective Date set forth in Article IX.A of the Plan at any time, without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm and consummate the Plan.

**C.      Effect of Non-Occurrence of Conditions to Consummation**

If the Effective Date does not occur within 120 days after the Confirmation Date, then the Plan will be null and void in all respects, any and all compromises or settlements not previously approved by Final Order of the Bankruptcy Court embodied in the Plan (including with respect to the fixing, limiting, or treatment of any Claim or Interest, including, without limitation, the Alameda Loan Facility Claims), shall be deemed null and void, and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims, Interests, or Causes of Action held by any Debtor or any other Entity; (2) prejudice in any manner the rights of any Debtor or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity in any respect.

## ARTICLE X.

## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

**A.      Modification of Plan**

Subject to the limitations and terms contained in the Plan and Purchaser's consent rights under the Asset Purchase Agreement, the Debtors, with the consent of the Committee, reserve the right to (1) amend or modify the Plan before the entry of the Confirmation Order, in accordance with the Bankruptcy Code and the Bankruptcy Rules and (2) after the entry of the Confirmation Order, the Debtors or the Wind-Down Entity, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, to remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan consistent with the terms set forth herein.

**B.      Effect of Confirmation on Modifications**

Entry of the Confirmation Order shall constitute approval of all modifications or amendments to the Plan occurring after the solicitation thereof pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.       **Revocation or Withdrawal of Plan**

The Debtors reserve the right, with the consent of the Committee, to revoke or withdraw the Plan with respect to any or all Debtors before the Confirmation Date and to File subsequent chapter 11 plans. If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then: (1) the Plan will be null and void in all respects; (2) any settlement or compromise not previously approved by Final Order of the Bankruptcy Court embodied in the Plan (including the fixing or limiting to an amount certain of the Claims or Classes of Claims), assumption or rejection of Executory Contracts or Unexpired Leases effectuated by the Plan, and any document or agreement executed pursuant to the Plan will be null and void in all respects; and (3) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims, Interests, or Causes of Action by any Entity, (b) prejudice in any manner the rights of any Debtor or any other Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

## ARTICLE XI.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.       Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.       decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.       resolve any matters related to Executory Contracts or Unexpired Leases, including: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure Claims or other Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed or assumed and assigned; and (c) any dispute regarding whether a contract or lease is or was executory, expired, or terminated;

4.       ensure that distributions to Holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

5.       adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor or the Estates that may be pending on the Effective Date;

6.       enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of (a) contracts, instruments, releases, and other agreements or documents approved by Final Order in the Chapter 11 Cases and (b) the Plan, the Confirmation Order,

and contracts, instruments, releases, and other agreements or documents created in connection with the Plan; *provided* that the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection, or dispute resolution clause that refers disputes to a different court;

7.      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

8.      grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

9.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

10.      hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Cases, including:  (a) with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or an Interest for amounts not timely repaid pursuant to Article VI of the Plan; (b) with respect to the releases, injunctions, and other provisions contained in Article VIII of the Plan, including entry of such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions; (c) anything that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan and the Confirmation Order; or (d) related to section 1141 of the Bankruptcy Code;

11.      enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

12.      adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

13.      consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

14.      enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases with respect to any Entity, and resolve any cases, controversies, suits, or disputes that may arise in connection with any Entity's rights arising from or obligations incurred in connection with the Plan;

15.      hear and determine matters concerning local, state, federal, and foreign taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

16.      enter an order or Final Decree concluding or closing the Chapter 11 Cases;

17.      enforce all orders previously entered by the Bankruptcy Court; and

18.      hear and determine any other matters related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code or the Judicial Code.

Nothing herein limits the jurisdiction of the Bankruptcy Court to interpret and enforce the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, or the Disclosure Statement, without regard to whether the controversy with respect to which

such interpretation or enforcement relates may be pending in any state or other federal court of competent jurisdiction.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in this Article XI, the provisions of this Article XI shall have no effect on and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

Unless otherwise specifically provided herein or in a prior order of the Bankruptcy Court, the Bankruptcy Court shall have exclusive jurisdiction to hear and determine disputes concerning Claims against or Interests in the Debtors that arose prior to the Effective Date.

## ARTICLE XII.

### MISCELLANEOUS PROVISIONS

#### A.    Immediate Binding Effect

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtors, the Wind-Down Entity, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, exculpations, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims against and Interests in the Debtors shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or Interest has voted on the Plan.

#### B.    Additional Documents

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors, the Wind-Down Entity, and all Holders of Claims and Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

#### C.    Payment of Statutory Fees

All fees and applicable interest payable pursuant to section 1930 of the Judicial Code and 31 U.S.C. § 3717, as applicable, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the Wind-Down Debtors (or the Distribution Agent on behalf of the Wind-Down Entity) for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or a Final Decree is issued, whichever occurs first.

#### D.    Dissolution of Statutory Committees

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases; *provided*, however, that such committees will remain in existence for

the limited purposes of (a) pursuing, supporting, or otherwise participating in, any outstanding appeals in the Chapter 11 Cases; and (b) filing, objecting, or otherwise participating in, any final fee applications of Professionals.

**E.      Reservation of Rights**

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests, unless and until the Effective Date has occurred.

**F.      Successors and Assigns**

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiary, or guardian, if any, of each such Entity.

**G.      Service of Documents**

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Wind-Down Debtors shall be served on:

| | |
|---|---|
| Wind-Down Debtors | **Voyager Digital Holdings, Inc.** |
| | 33 Irving Place |
| | New York, New York 10003 |
| | Attention: David Brosgol |
| | General Counsel, |
| | E-mail address: dbrosgol@investvoyager.com |
| | |
| | with copies for information only (which shall not constitute notice) to: |
| | |
| Counsel to the Debtors | **Kirkland & Ellis LLP** |
| | **Kirkland & Ellis International LLP** |
| | 601 Lexington Avenue |
| | New York, New York 10022 |
| | Attention: Joshua A. Sussberg, P.C., Christopher Marcus, P.C., Christine A. Okike, P.C., and Allyson B. Smith |
| | |
| Counsel to the Committee | **McDermott Will & Emery LLP** |
| | One Vanderbilt Avenue |
| | New York, New York 10017 |
| | Attention: Darren Azman |

**H.      Entire Agreement; Controlling Document**

Except as otherwise indicated, on the Effective Date, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations

68

A-299

with respect to the subject matter of the Plan, all of which will have become merged and integrated into the Plan; *provided, however*, that notwithstanding the foregoing or anything to the contrary herein, to the extent there is any conflict between the Plan and the Confirmation Order, on the one hand, and the Asset Purchase Agreement, on the other hand, the Asset Purchase Agreement shall govern solely in the event the Sale Transaction is consummated. Except as set forth in the Plan, in the event that any provision of the Disclosure Statement, the Plan Supplement, or any order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control. In the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall control.

**I.      Plan Supplement**

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the website of the Claims, Noticing, and Solicitation Agent at https://cases.stretto.com/Voyager or the Bankruptcy Court's website at http://www.nysb.uscourts.gov. Unless otherwise ordered by the Bankruptcy Court, to the extent any exhibit or document in the Plan Supplement is inconsistent with the terms of any part of the Plan that does not constitute the Plan Supplement, such part of the Plan that does not constitute the Plan Supplement shall control.

**J.      Non-Severability**

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, subject to the Purchaser's consent rights under the Asset Purchase Agreement prior to the Outside Date, shall have the power to alter and interpret such term or provision to make it valid or enforceable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is:  (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent, consistent with the terms set forth herein; and (3) non-severable and mutually dependent.

**K.      Votes Solicited in Good Faith**

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors, and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties nor individuals or the Wind-Down Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan or any previous plan.

**L.    Waiver or Estoppel**

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed prior to the Confirmation Date.

Dated: ~~October~~December 2~~4~~1, 2022

VOYAGER DIGITAL HOLDINGS, INC.
on behalf of itself and all other Debtors

_/s/ Stephen Ehrlich_

Stephen Ehrlich
Co-Founder and Chief Executive Officer
Voyager Digital Holdings, Inc.

| Summary report: | |
|---|---|
| **Litera Compare for Word 11.2.0.54 Document comparison done on 12/21/2022 11:38:32 PM** | |
| **Style name:** Color (Kirkland Default) | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://dms.kirkland.com/LEGAL/90142955/40 | |
| **Modified DMS:** iw://dms.kirkland.com/LEGAL/90142955/56 | |
| **Changes:** | |
| Add | 582 |
| Delete | 446 |
| Move From | 23 |
| Move To | 23 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 1074 |

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**NOTICE OF FILING OF THIRD AMENDED**
**JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND ITS DEBTOR**
**AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**PLEASE TAKE NOTICE** that on July 6, 2022, the above-captioned debtors and debtors

in possession (collectively, the "Debtors") filed the *Joint Plan of Reorganization of Voyager*

*Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*

(the "Initial Plan") [Docket No. 17].

**PLEASE TAKE FURTHER NOTICE** that on August 12, 2022, the Debtors filed the

*First Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor*

*Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 287].

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

A-304

PLEASE TAKE FURTHER NOTICE that on October 5, 2022, the Debtors filed the *Second Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 496].

PLEASE TAKE FURTHER NOTICE that on October 17, 2022, the Debtors filed the *Second Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 539].

PLEASE TAKE FURTHER NOTICE that on October 19, 2022, the Debtors filed the *Second Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 564].

PLEASE TAKE FURTHER NOTICE that on October 20, 2022, the Debtors filed the *Second Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 584].

PLEASE TAKE FURTHER NOTICE that on October 24, 2022, the Debtors filed the *Second Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 590] (the "Second Amended Plan").

PLEASE TAKE FURTHER NOTICE that on December 22, 2022, the Debtors filed the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 777].

PLEASE TAKE FURTHER NOTICE that on January 8, 2023, the Debtors filed the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 829] (the "Third Amended Plan").

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file a *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code,* attached hereto as **<u>Exhibit A</u>** (the "<u>Revised Third Amended Plan</u>").

**PLEASE TAKE FURTHER NOTICE THAT** a comparison between the Third Amended Plan and the Revised Third Amended Plan, is attached hereto as **<u>Exhibit B</u>**.

**PLEASE TAKE FURTHER NOTICE** that copies of the Initial Plan, Second Amended Plan, and other pleadings filed in the above-captioned chapter 11 cases may be obtained free of charge by visiting the website of Stretto at http://www.cases.stretto.com/Voyager. You may also obtain copies of any pleadings by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

*[Remainder of page intentionally left blank.]*

Dated: January 10, 2023          /s/ Joshua A. Sussberg
New York, New York               **KIRKLAND & ELLIS LLP**
                                 **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                 Joshua A. Sussberg, P.C.
                                 Christopher Marcus, P.C.
                                 Christine A. Okike, P.C.
                                 Allyson B. Smith (admitted *pro hac vice*)
                                 601 Lexington Avenue
                                 New York, New York 10022
                                 Telephone:     (212) 446-4800
                                 Facsimile:     (212) 446-4900
                                 Email:         jsussberg@kirkland.com
                                                cmarcus@kirkland.com
                                                christine.okike@kirkland.com
                                                allyson.smith@kirkland.com

                                 *Counsel to the Debtors and Debtors in Possession*

**Exhibit A**

**Revised Third Amended Plan**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC. *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**THIRD AMENDED JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND**
**ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

> **NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN OFFER, ACCEPTANCE,**
> **COMMITMENT, OR LEGALLY BINDING OBLIGATION OF THE DEBTORS OR ANY**
> **OTHER PARTY IN INTEREST, AND THIS PLAN IS SUBJECT TO APPROVAL BY THE**
> **BANKRUPTCY COURT AND OTHER CUSTOMARY CONDITIONS.  THIS PLAN IS NOT AN**
> **OFFER WITH RESPECT TO ANY SECURITIES.**

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Voyager Digital Holdings, Inc. (7687); Voyager Digital, LTD. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

# **TABLE OF CONTENTS**

Page

Introduction ............................................................................................................1

Article I. Defined Terms, Rules of Interpretation, Computation of Time, Governing Law, and
    Other References ..............................................................................................1

    A.    Defined Terms .......................................................................................1
    B.    Rules of Interpretation ..........................................................................17
    C.    Computation of Time ............................................................................17
    D.    Governing Law .....................................................................................17
    E.    Reference to Monetary Figures ............................................................18
    F.    Reference to the Debtors or the Wind-Down Debtors .........................18
    G.    Nonconsolidated Plan ...........................................................................18

Article II. Administrative and Priority Claims ...................................................18

    A.    Administrative Claims ..........................................................................18
    B.    Professional Fee Claims .......................................................................19
    C.    Priority Tax Claims ..............................................................................20

Article III. Classification, Treatment, and Voting of Claims and Interests ............20

    A.    Classification of Claims and Interests .................................................20
    B.    Summary of Classification ....................................................................21
    C.    Treatment of Classes of Claims and Interests .....................................22
    D.    Special Provision Governing Unimpaired Claims ................................28
    E.    Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes ..28
    F.    Subordinated Claims ............................................................................28
    G.    Intercompany Interests .........................................................................28
    H.    Controversy Concerning Impairment ...................................................29
    I.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy
    Code ....................................................................................................29

Article IV. Provisions for Implementation of the Plan ......................................29

    A.    General Settlement of Claims and Interests ........................................29
    B.    Restructuring Transactions ...................................................................29
    C.    The Sale Transaction ...........................................................................30
    D.    The Liquidation Transaction ................................................................31
    E.    Management and Employee Transition Plans .......................................31
    F.    Non-Released D&O Claims ..................................................................32
    G.    The D&O Settlement ............................................................................32
    H.    Wind-Down Trust ................................................................................34
    I.    Sources of Consideration for Plan Distributions .................................39
    J.    Corporate Existence and Dissolution ...................................................39
    K.    Corporate Action ..................................................................................40
    L.    Vesting of Assets in the Wind-Down Entity ........................................40
    M.    Cancellation of Notes, Instruments, Certificates, and Other Documents ............41
    N.    Effectuating Documents; Further Transactions ...................................41
    O.    Section 1146(a) Exemption ..................................................................41

P.      Preservation of Rights of Action ........................................................42
Q.      Election to Contribute Third-Party Claims ........................................43
R.      Contribution of Contributed Third-Party Claims ...............................43
S.      Closing the Chapter 11 Cases ............................................................43

**Article V. Treatment of Executory Contracts and Unexpired Leases .....................................44**

A.      Assumption and Rejection of Executory Contracts and Unexpired Leases .........44
B.      Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases................................................................................................44
C.      Claims Based on Rejection of Executory Contracts or Unexpired Leases...........44
D.      Cure of Defaults for Executory Contracts and Unexpired Leases Assumed........45
E.      Insurance Policies and Surety Bonds..................................................46
F.      Reservation of Rights.........................................................................47
G.      Nonoccurrence of Effective Date ......................................................47
H.      Contracts and Leases Entered into After the Petition Date ................47

**Article VI. Provisions Governing Distributions .............................................................47**

A.      Timing and Calculation of Amounts to Be Distributed .....................47
B.      Rights and Powers of Distribution Agent ..........................................48
C.      Delivery of Distributions and Undeliverable or Unclaimed Distributions ..........48
D.      Compliance Matters............................................................................50
E.      Foreign Currency Exchange Rate ......................................................50
F.      Claims Paid or Payable by Third Parties ...........................................51
G.      Setoffs and Recoupment ....................................................................51
H.      Allocation between Principal and Accrued Interest ...........................52

**Article VII. Procedures for Resolving Disputed, Contingent, and Unliquidated Claims and Interests.........................................................................................................52**

A.      Disputed Claims Process ....................................................................52
B.      Objections to Claims or Interests.......................................................53
C.      Estimation of Claims ..........................................................................53
D.      No Distributions Pending Allowance .................................................54
E.      Distributions After Allowance ...........................................................54
F.      No Interest...........................................................................................54
G.      Adjustment to Claims and Interests without Objection ......................54
H.      Time to File Objections to Claims .....................................................55
I.      Disallowance of Claims or Interests ..................................................55
J.      Amendments to Proofs of Claim .......................................................55

**Article VIII. Effect of Confirmation of the Plan .............................................................55**

A.      Releases by the Debtors .....................................................................55
B.      Releases by Holders of Claims and Interests.....................................56
C.      Exculpation .........................................................................................57
D.      Injunction ............................................................................................58
E.      Release of Liens .................................................................................58
F.      OSC and SEC......................................................................................58
G.      Protection against Discriminatory Treatment ....................................58
H.      Document Retention ...........................................................................59
I.      Reimbursement or Contribution ........................................................59

    J.     Term of Injunctions or Stays ...................................................................59

**Article IX. Conditions Precedent to the Effective Date...............................................59**

    A.     Conditions Precedent to the Effective Date....................................59
    B.     Waiver of Conditions Precedent ....................................................60
    C.     Effect of Non-Occurrence of Conditions to Consummation ..............60

**Article X. Modification, Revocation, or Withdrawal of the Plan.............................61**

    A.     Modification of Plan .......................................................................61
    B.     Effect of Confirmation on Modifications .......................................61
    C.     Revocation or Withdrawal of Plan..................................................61

**Article XI. Retention of Jurisdiction .............................................................................61**

**Article XII. Miscellaneous Provisions ............................................................................63**

    A.     Immediate Binding Effect...............................................................63
    B.     Additional Documents ....................................................................64
    C.     Payment of Statutory Fees..............................................................64
    D.     Dissolution of Statutory Committees..............................................64
    E.     Reservation of Rights......................................................................64
    F.     Successors and Assigns ..................................................................64
    G.     Service of Documents .....................................................................64
    H.     Entire Agreement; Controlling Document.......................................65
    I.     Plan Supplement .............................................................................65
    J.     Non-Severability.............................................................................66
    K.     Votes Solicited in Good Faith.........................................................66
    L.     Waiver or Estoppel .........................................................................66

## INTRODUCTION

Voyager Digital Holdings, Inc. and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (each a "Debtor" and, collectively, the "Debtors") propose this third amended joint plan (the "Plan") for the resolution of the outstanding Claims against and Interests in the Debtors pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used in the Plan and not otherwise defined shall have the meanings set forth in Article I.A of the Plan. Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The classifications of Claims and Interests set forth in Article III of the Plan shall be deemed to apply separately with respect to each Plan proposed by each Debtor, as applicable. The Plan does not contemplate substantive consolidation of any of the Debtors. Reference is made to the Disclosure Statement for a discussion of the Debtors' history, business, properties and operations, projections, risk factors, a summary and analysis of this Plan, and certain related matters.

ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE I.

## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES

### A.  Defined Terms

Capitalized terms used in this Plan have the meanings ascribed to them below.

1.  "*3AC*" means Three Arrows Capital, Ltd and any of its Affiliates or subsidiaries.

2.  "*3AC Claims*" means the claims or causes of action asserted or assertable by the Debtors against 3AC, whether in the 3AC Liquidation Proceeding or otherwise.

3.  "*3AC Liquidation Proceeding*" means that certain liquidation proceeding captioned *In the Matter of Three Arrows Capital Ltd. and in the Matter of Sections 159(1) and 162(1)(a) and (b) of the Insolvency Act 2003*, Claim No. BVIHC(COM)2022/0119 before the Eastern Caribbean Supreme Court in the High Court of Justice in the British Virgin Islands and the chapter 15 foreign recognition proceeding captioned *In re Three Arrows Capital, Ltd.*, No. 22-10920 (Bankr. S.D.N.Y. Jul. 1, 2022).

4.  "*3AC Loan*" means that loan of 15,250 Bitcoins and 350 million USDC to 3AC pursuant to that certain master loan agreement dated March 4, 2022 by and between 3AC, as borrower, and OpCo and HTC Trading, Inc., as lenders.

5.  "*3AC Recovery*" means the recovery, if any, of the Debtors from 3AC on account of the 3AC Claims.

6.  "*Account*" means any account at OpCo held by an Account Holder relating to Cryptocurrency, which Account is identified in the Debtors' books and records as holding Cryptocurrency as of the Petition Date.

7.    "*Account Holder*" means any Person or Entity who holds an Account with OpCo as of the Petition Date.

8.    "*Account Holder Claim*" means any Claim against the Debtors that is held by an Account Holder on account of such Holder's Account.

9.    "*Acquired Assets*" has the meaning ascribed to it in the Asset Purchase Agreement.

10.    "*Acquired Coins*" has the meaning ascribed to it in the Asset Purchase Agreement.

11.    "*Acquired Coins Value*" has the meaning ascribed to it in the Asset Purchase Agreement.

12.    "*Additional Bankruptcy Distribution*" has the meaning ascribed to it in the Asset Purchase Agreement.

13.    "*Administrative Claim*" means a Claim against a Debtor for the costs and expenses of administration of the Chapter 11 Cases arising on or after the Petition Date and prior to the Effective Date pursuant to section 503(b) of the Bankruptcy Code and entitled to priority pursuant to sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' business and (b) Allowed Professional Fee Claims.

14.    "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims (other than requests for payment of Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code), which:  (a) with respect to Administrative Claims other than Professional Fee Claims, shall be thirty days after the Effective Date; and (b) with respect to Professional Fee Claims, shall be forty-five days after the Effective Date.

15.    "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.  With respect to any Person that is not a Debtor, the term "Affiliate" shall apply to such Person as if the Person were a Debtor.

16.    "*Alameda*" means Alameda Ventures Ltd., along with its Affiliates and subsidiaries.

17.    "*Alameda Claims*" means the claims or causes of action asserted or assertable by the Debtors against Alameda, whether in the FTX Bankruptcy Proceeding or otherwise.

18.    "*Alameda Loan Agreement*" means that certain unsecured loan agreement, dated as of June 21, 2022, as amended, restated, amended and restated, modified, or supplemented from time to time, by and among Voyager Digital Holdings, Inc., as the borrower, Voyager, as the guarantor, and Alameda, as the lender thereto.

19.    "*Alameda Loan Facility*" means that certain unsecured loan facility provided for under the Alameda Loan Agreement.

20.    "*Alameda Loan Facility Claims*" means any Claim against any Debtor derived from, based upon, or arising under the Alameda Loan Agreement and any fees, costs, and expenses that are reimbursable by any Debtor pursuant to the Alameda Loan Agreement.

21.    "*Alameda Recovery*" means the recovery, if any, of the Debtors from Alameda on account of the Alameda Claims.

22.  "*Allowed*" means, with respect to any Claim or Interest, except as otherwise provided herein: (a) a Claim or Interest that is evidenced by a Proof of Claim timely Filed by the Bar Date or a request for payment of Administrative Claim timely Filed by the Administrative Claims Bar Date (or for which Claim or Interest under the Plan, the Bankruptcy Code, or a Final Order of the Bankruptcy Court a Proof of Claim or a request for payment of Administrative Claim is not or shall not be required to be Filed); (b) a Claim or Interest that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely Filed; (c) a Claim or Interest Allowed pursuant to the Plan, any stipulation approved by the Bankruptcy Court, any contract, instrument, indenture, or other agreement entered into or assumed in connection with the Plan, or a Final Order of the Bankruptcy Court, or (d) a Claim or Interest as to which the liability of the Debtors and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court; *provided* that, with respect to a Claim or Interest described in clauses (a) and (b) above, such Claim or Interest shall be considered Allowed only if and to the extent that with respect to such Claim or Interest no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or if such an objection is so interposed, such Claim or Interest shall have been Allowed by a Final Order.  Any Claim or Interest that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.  Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes.  A Proof of Claim Filed after and subject to the Bar Date or a request for payment of an Administrative Claim Filed after and subject to the Administrative Claims Bar Date, as applicable, shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim.  "Allow" and "Allowing" shall have correlative meanings.

23.  "*Asset Purchase Agreement*" means that certain asset purchase agreement dated as of December 18, 2022 by and between BAM Trading Services Inc. (d/b/a Binance.US) as Purchaser and Voyager Digital, LLC as Seller.

24.  "*Assumed Liabilities*" has the meaning ascribed to it in the Asset Purchase Agreement.

25.  "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or hereafter amended.

26.  "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York, or any other court having jurisdiction over the Chapter 11 Cases, including to the extent of the withdrawal of reference under section 157 of the Judicial Code, the United States District Court for the Southern District of New York.

27.  "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated by the United States Supreme Court under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

28.  "*Bar Date*" means the applicable deadline by which Proofs of Claim must be Filed, as established by:  (a) the Bar Date Order; (b) a Final Order of the Bankruptcy Court; or (c) the Plan.

29.  "*Bar Date Order*" means the *Order (I) Setting Deadlines for Submitting Proofs of Claims, (II) Approving Procedures for Submitting Proofs of Claim, and (III) Approving Notice Thereof* [Docket No. 218].

30.     "*Binance.US Platform*" has the meaning ascribed to it in the Asset Purchase Agreement.

31.     "*Binance US*" means BAM Trading Services Inc. (d/b/a Binance.US).

32.     "*Binance US Account*" means a customer account opened with the Purchaser by an Account Holder or a Holder of an Allowed OpCo General Unsecured Claim.

33.     "*Business Day*" means any day, other than a Saturday, Sunday, or a "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

34.     "*Cash*" or "*$*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

35.     "*Causes of Action*" mean any action, Claim, cross-claim, third-party claim, damage, judgment, cause of action, controversy, demand, right, suit, obligation, liability, debt, account, defense, offset, power, privilege, license, Lien, indemnity, interest, guaranty, or franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, matured or unmatured, suspected or unsuspected, in contract or in tort, at law or in equity, or pursuant to any other theory of law or otherwise.  For the avoidance of doubt, "Causes of Action" includes:  (a) any right of setoff, counterclaim, or recoupment and any claim arising from any contract or for breach of duties imposed by law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of local, state, federal, or foreign law, or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) any right to object to or otherwise contest Claims or Interests; (d) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; and (e) any claim or defense, including fraud, mistake, duress, usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

36.     "*CCO*" means Evan Psaropoulos.

37.     "*CEO*" means Stephen Ehrlich.

38.     "*Certificate*" means any instrument evidencing a Claim or an Interest.

39.     "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor in the Bankruptcy Court under chapter 11 of the Bankruptcy Code and (b) when used with reference to all Debtors, the procedurally consolidated cases filed for the Debtors in the Bankruptcy Court under chapter 11 of the Bankruptcy Code.

40.     "*Claim*" has the meaning set forth in section 101(5) of the Bankruptcy Code.

41.     "*Claims Objection Bar Date*" means the deadline for objecting to a Claim, which shall be on the date that is the later of (a) (i) with respect to Administrative Claims (other than Professional Fee Claims and Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code), sixty days after the Administrative Claims Bar Date or (ii) with respect to all other Claims (other than Professional Fee Claims), 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by the Debtors or the Wind-Down Trust, as applicable, as approved by an order of the Bankruptcy Court for objecting to such Claims.

42.     "*Claims Register*" means the official register of Claims against and Interests in the Debtors maintained by the Clerk of the Bankruptcy Court or the Claims, Noticing, and Solicitation Agent.

43.　"*Claims, Noticing, and Solicitation Agent*" means Bankruptcy Management Solutions, Inc. d/b/a Stretto, in its capacity as the claims, noticing, and solicitation agent in the Chapter 11 Cases for the Debtors and any successors appointed by an order of the Bankruptcy Court.

44.　"*Class*" means a class of Claims against or Interests in the Debtors as set forth in Article III of the Plan in accordance with section 1122(a) of the Bankruptcy Code.

45.　"*Committee*" means the Official Committee of Unsecured Creditors appointed in these Chapter 11 Cases.

46.　"*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

47.　"*Confirmation Date*" means the date on which Confirmation occurs.

48.　"*Confirmation Hearing*" means the hearing before the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code at which the Debtors will seek Confirmation of the Plan.

49.　"*Confirmation Order*" has the meaning ascribed to it in the Asset Purchase Agreement.

50.　"*Consummation*" means the occurrence of the Effective Date.

51.　"*Contributed Third-Party Claims*" means all direct Causes of Action that any Contributing Claimant has against any Person (other than a Debtor) that had a direct relationship with the Debtors, their predecessors, or respective affiliates and that harmed such Contributing Claimant in the claimant's capacity as a creditor of Voyager, including (a) all Causes of Action based on, arising out of, or related to the marketing, sale, and issuance of Cryptocurrency that at any point was held or offered on Voyager's platform; (b) all Causes of Action based on, arising out of, or related to the alleged misrepresentation of any of the Debtors' financial information, business operations, or related internal controls; and (c) all Causes of Action based on, arising out of, or related to any alleged failure to disclose, or actual or attempted cover up or obfuscation of, any of the Debtors' conduct prior to the Petition Date; *provided*, *however*, that Contributed Third-Party Claims do not include (i) any derivative claims of the Debtors; (ii) any direct claims against the Released Parties; (iii) any direct Causes of Action that any Contributing Claimant has against Mark Cuban, Dallas Basketball Limited d/b/a Dallas Mavericks, the National Basketball Association, and any of their Related Parties; or (iv) any direct Causes of Action that any Contributing Claimant, in its capacity as an equity holder of Voyager Digital Ltd., has that are asserted in the currently filed complaint, dated as of July 6, 2022, in the Ontario Superior Court of Justice by Francine De Sousa, against Voyager Digital Ltd., Stephen Ehrlich, Philip Eytan, Evan Psaropoulos, Lewis Bateman, Krisztian Toth, Jennifer Ackart, Glenn Stevens, and Brian Brooks.

52.　"*Contributing Claimants*" means any Holders of Claims or Interests that elect on their ballots or opt-in forms to contribute their Contributed Third-Party Claims to the Wind-Down Entity.

53.　"*Cryptocurrency*" means a digital currency or crypto asset in which transactions are verified and records maintained by a decentralized system using cryptography, rather than by a centralized authority, including stablecoins, digital coins and tokens, such as security tokens, utility tokens and governance tokens.

54.　"*Cure*" or "*Cure Claim*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's default under an Executory Contract or an Unexpired Lease assumed

by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

55.     "*Customer Onboarding Protocol*" means the protocol describing the process of onboarding Account Holders and Holders of OpCo General Unsecured Claims onto the Binance.US Platform, the form of which shall be included in the Plan Supplement and filed no later than by February 8, 2023, and which shall be in a form acceptable to the Purchaser.

56.     "*D&O Carriers*" means the insurance carriers of the D&O Liability Insurance Policies.

57.     "*D&O Liability Insurance Policies*" means all unexpired insurance policies maintained by the Debtors, the Wind-Down Debtors, or the Estates as of the Effective Date that have been issued (or provide coverage) regarding directors', managers', officers', members', and trustees' liability (including any "tail policy"), including but not limited to the Management Liability Policy, the Excess Policies, and the Side-A Policy, and all agreements, documents, or instruments relating thereto.

58.     "*D&O Settlement*" means the settlement between the Debtors and CEO and CCO as set forth in Article IV.G of the Plan.

59.     "*Debtors*" means, collectively, each of the following:  Voyager Digital Holdings, Inc.; Voyager Digital Ltd.; and Voyager Digital, LLC.

60.     "*Definitive Documents*" means:  (a) the Plan (and any and all exhibits, annexes, and schedules thereto); (b) the Confirmation Order; (c) the Disclosure Statement and the other Solicitation Materials; (d) the Disclosure Statement Order; (e) all pleadings filed by the Debtors in connection with the Chapter 11 Cases (or related orders); (f) the Plan Supplement; (g) the Management Transition Plan; (h) any new material employment, consulting, or similar agreements entered into between the Wind-Down Trust and any of the Debtors' employees, if any; (i) the Asset Purchase Agreement; (j) the Customer Onboarding Protocol; and (k) any and all other deeds, agreements, filings, notifications, pleadings, orders, certificates, letters, instruments or other documents reasonably desired or necessary to consummate and document the transactions contemplated by the Restructuring Transactions (including any exhibits, amendments, modifications, or supplements made from time to time thereto).

61.     "*Disclosure Statement*" means the *Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, as may be amended, supplemented, or otherwise modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan.

62.     "*Disclosure Statement Order*" means the order entered by the Bankruptcy Court approving the Disclosure Statement.

63.     "*Disputed*" means a Claim or an Interest or any portion thereof:  (a) that is not Allowed; (b) that is not disallowed under the Plan, the Bankruptcy Code, or a Final Order; and (c) with respect to which a party in interest has Filed a Proof of Claim, a Proof of Interest, or otherwise made a written request to a Debtor for payment.

64.     "*Disputed Claims Reserve*" means an appropriate reserve in an amount to be determined by the Wind-Down Trust for distributions on account of Disputed Claims that are subsequently Allowed after the Effective Date, in accordance with Article VII.D hereof.

65.    "*Distributable Cryptocurrency*" means all Cryptocurrency held on the Voyager platform or that is otherwise property of any Debtor on the Effective Date after payment in full of, or reserve for, all Allowed Administrative Claims, Priority Tax Claims, Secured Tax Claims, and Other Priority Claims.

66.    "*Distributable HoldCo Cash*" means HoldCo's Cash, less (x) any Cash necessary to satisfy Allowed Administrative Claims, Priority Tax Claims, Secured Tax Claims, and Other Priority Claims at HoldCo in full; and (y) to fund HoldCo's Pro Rata share of the Wind-Down Reserve.

67.    "*Distributable OpCo Cash*" means OpCo's Cash, including the Purchase Price Cash, less (x) any Cash necessary to satisfy Allowed Administrative Claims, Priority Tax Claims, Secured Tax Claims, and Other Priority Claims at OpCo in full; and (y) to fund OpCo's Pro Rata share of the Wind-Down Reserve.

68.    "*Distributable TopCo Cash*" means TopCo's Cash, less (x) any Cash necessary to satisfy Allowed Administrative Claims, Priority Tax Claims, Secured Tax Claims, and Other Priority Claims at TopCo in full; and (y) to fund TopCo's Pro Rata share of the Wind-Down Reserve.

69.    "*Distribution Agent*" means, as applicable, the Purchaser, Wind-Down Debtors, Wind-Down Trust or any Entity or Entities designated by the Purchaser, Wind-Down Debtors, or the Wind-Down Trust (as applicable) to make or to facilitate distributions that are to be made pursuant to the Plan, Definitive Documents, and Asset Purchase Agreement.

70.    "*Distribution Date*" means, except as otherwise set forth herein, the date or dates determined by the Wind-Down Trust, on or after the Effective Date, upon which the Distribution Agent shall make distributions to Holders of Allowed Claims entitled to receive distributions under the Plan.

71.    "*Distribution Record Date*" means the record date for purposes of determining which Holders of Allowed Claims and Interests against the Debtors are eligible to receive distributions under the Plan, which date shall be the Effective Date, or such other date as is determined by the Debtors or designated by an order of the Bankruptcy Court.

72.    "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which (a) all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of the Plan have been satisfied or waived in accordance with Article IX.B of the Plan, (b) no stay of the Confirmation Order is in effect, and (c) the Debtors declare the Plan effective.

73.    "*Employee Transition Plan*" has the meaning set forth in Article IV.E of the Plan, and which shall be in form and substance reasonably acceptable to the Committee.

74.    "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

75.    "*Estate*" means, as to each Debtor, the estate created on the Petition Date for the Debtor in its Chapter 11 Case pursuant to sections 301 and 541 of the Bankruptcy Code and all property (as defined in section 541 of the Bankruptcy Code) acquired by the Debtor after the Petition Date through and including the Effective Date.

76.    "*Excess Policies*" means, collectively, the Excess Insurance Policy, No. EFI1203041-01, issued by Euclid Financial on behalf of Certain Underwriters of Lloyd's, London, the Excess Insurance Policy, No. RILEDOA3392022, issued by Relm Insurance Ltd., both for the February 22, 2022 to February 22, 2023 period, and the Excess Policy, No. ELU184180-23, issued by XL Specialty Insurance Company, for the February 22, 2022 to July 1, 2023 period.

77.     "*Exculpated Parties*" means, collectively, and in each case in its capacity as such:  (a) each of the Debtors; (b) the Committee, and each of the members thereof, solely in their capacity as such; (c) each of the Released Professionals; (d) each of the Released Voyager Employees; and (e) the Distribution Agent.

78.     "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

79.     "*Existing Equity Interests*" means any Interest in TopCo existing immediately prior to the occurrence of the Effective Date.

80.     "*Extended Outside Date*" has the meaning set forth in the Asset Purchase Agreement.

81.     "*Federal Judgment Rate*" means the federal judgment interest rate in effect as of the Petition Date calculated as set forth in section 1961 of the Judicial Code.

82.     "*File*," "*Filed*," or "*Filing*" means file, filed, or filing, respectively, in the Chapter 11 Cases with the Bankruptcy Court or its authorized designee, or, with respect to the filing of a Proof of Claim or Proof of Interest, file, filed, or filing, respectively, with the Claims, Noticing, and Solicitation Agent.

83.     "*Final Decree*" means the decree contemplated under Bankruptcy Rule 3022.

84.     "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, petition for certiorari, or move for a new trial, reargument, reconsideration, or rehearing has expired and no appeal, petition for certiorari, or motion for a new trial, reargument, reconsideration, or rehearing has been timely taken or filed, or as to which any appeal that has been or may be taken or any petition for certiorari or any motion for a new trial, reargument, reconsideration, or rehearing that has been or may be made or filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the motion for a new trial, reargument, reconsideration, or rehearing shall have been denied, resulted in no modification of such order (if any such motion has been or may be granted), or have otherwise been dismissed with prejudice; *provided* that the possibility that a motion under rule 60 of the Federal Rules of Civil Procedure or any comparable Bankruptcy Rule may be filed relating to such order or judgment shall not cause such order or judgment to not be a Final Order.

85.     "*FTX*" means FTX Trading, Ltd. and any of its Affiliates or subsidiaries, including West Realm Shires Inc (d/b/a "FTX.US").

86.     "*FTX Bankruptcy Proceeding*" means that certain chapter 11 proceeding captioned *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Nov. 11, 2022).

87.     "*FTX Claims*" means the claims or causes of action asserted or assertable by the Debtors against FTX, whether in the FTX Bankruptcy Proceeding or otherwise.

88.     "*FTX Recovery*" means the recovery, if any, of the Debtors from FTX on account of the FTX Claims.

89.     "*General Unsecured Claim*" means, collectively, any HoldCo General Unsecured Claim, OpCo General Unsecured Claim, or TopCo General Unsecured Claim.

90.     "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

91. "*Government Bar Date*" means the applicable deadline by which Proofs of Claim by a Governmental Unit must be Filed, as established by: (a) the Bar Date Order; (b) a Final Order of the Bankruptcy Court; or (c) the Plan.

92. "*HoldCo*" means Voyager Digital Holdings, Inc.

93. "*HoldCo General Unsecured Claim*" means any Claim against HoldCo that is not Secured and is not: (a) paid in full prior to the Effective Date pursuant to an order of the Bankruptcy Court; (b) an Administrative Claim; (c) a Secured Tax Claim; (d) a Priority Tax Claim; (e) an Other Priority Claim; (f) a Professional Fee Claim; (g) an Alameda Loan Facility Claim; or (h) an Intercompany Claim. For the avoidance of doubt, all (i) Claims resulting from the rejection of Executory Contracts and Unexpired Leases, and (ii) Claims that are not Secured resulting from litigation, against HoldCo are HoldCo General Unsecured Claims.

94. "*Holder*" means an Entity holding a Claim against or an Interest in any Debtor.

95. "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

96. "*Insurance Policies*" means any and all insurance policies entered into by the Debtors, including the D&O Insurance Policies.

97. "*Intercompany Claim*" means any Claim held by a Debtor or a Debtor's Affiliate against a Debtor.

98. "*Intercompany Interest*" means, other than an Interest in Voyager, an Interest in one Debtor held by another Debtor or a Debtor's Affiliate.

99. "*Interest*" means any equity security (as such term is defined in section 101(16) of the Bankruptcy Code) including all issued, unissued, authorized, or outstanding shares of capital stock and any other common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profit interests of an Entity, including all options, warrants, rights, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable, or exchangeable securities, or other agreements, arrangements, or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in an Entity whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security, and including any Claim against the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to the foregoing.

100. "*Interim Compensation Order*" means the *Order (I) Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals and (II) Granting Related Relief* [Docket No. 236].

101. "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001 and the rules and regulations promulgated thereunder, as applicable to the Chapter 11 Cases.

102. "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

103. "*Liquidation Procedures*" means, in the event the Sale Transaction is not consummated by the Outside Date, such procedures filed by the Wind-Down Entity identifying the mechanics and procedures to effectuate the Liquidation Transaction.

104. "*Liquidation Transaction*" means, in the event the Sale Transaction is not consummated by the Outside Date, the distribution of the Debtors' Cryptocurrency, Cash and other assets pursuant to Article IV.D of this Plan.

105. "*Management Liability Policy*" means the Executive and Corporate Securities Liability Insurance Policy, No. ELU181214-22, issued by XL Specialty Insurance Company for the February 22, 2022 to February 22, 2023 period.

106. "*Management Transition Plan*" has the meaning set forth in Article IV.E of the Plan, and which shall be in form and substance reasonably acceptable to the Committee.

107. "*Net Owed Coins*" has the meaning ascribed to it in the Asset Purchase Agreement.

108. "*Non-Released D&O Claims*" has the meaning set forth in Article IV.F of the Plan.

109. "*Non-Released D&O Claim Budget*" means the amount allocated to pursue the Non-Released D&O Claims and the Non-Released Insurance Claims, which amount shall be agreed upon between the Debtors and the Committee prior to the Confirmation Hearing.

110. "*Non-Released Insurance Claims*" has the meaning set forth in Article IV.F of the Plan.

111. "*OpCo*" means Voyager Digital, LLC.

112. "*OpCo General Unsecured Claim*" means any Claim against OpCo that is not Secured and is not: (a) paid in full prior to the Effective Date pursuant to an order of the Bankruptcy Court; (b) an Administrative Claim; (c) a Secured Tax Claim; (d) a Priority Tax Claim; (e) an Other Priority Claim; (f) a Professional Fee Claim; (g) an Account Holder Claim; or (h) an Intercompany Claim. For the avoidance of doubt, all (i) Claims resulting from the rejection of Executory Contracts and Unexpired Leases, and (ii) Claims that are not Secured resulting from litigation against OpCo are OpCo General Unsecured Claims.

113. "*OSC*" means the Ontario Securities Commission.

114. "*Other Priority Claim*" means any Claim against a Debtor, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

115. "*Outside Date*" has the meaning set forth in the Asset Purchase Agreement. All references herein to the "Outside Date" shall be deemed to include the "Extended Outside Date" to the extent the Outside Date is extended in accordance with Section 8.1(c) of the Asset Purchase Agreement.

116. "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

117. "*Petition Date*" means July 5, 2022.

118. "*Plan*" means this joint chapter 11 plan and all exhibits, supplements, appendices, and schedules hereto, as may be altered, amended, supplemented, or otherwise modified from time to time in

accordance with Article X.A hereof, including the Plan Supplement (as altered, amended, supplemented, or otherwise modified from time to time), which is incorporated herein by reference and made part of the Plan as if set forth herein.

119.    "*Plan Supplement*" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (in each case, as may thereafter be amended, supplemented, or otherwise modified from time to time in accordance with the terms of the Plan, the Bankruptcy Code, the Bankruptcy Rules, and applicable law), to be Filed by the Debtors no later than seven days before the Voting Deadline or such later date as may be approved by the Bankruptcy Court, and additional documents Filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement. The Plan Supplement may include the following, as applicable:  (a) the Schedule of Assumed Executory Contracts and Unexpired Leases; (b) the Schedule of Retained Causes of Action; (c) the Schedule of Assumed and Assigned Executory Contracts and Unexpired Leases; (d) the Customer Onboarding Protocol; (e) the Restructuring Transactions Memorandum; (f) the Wind-Down Trust Agreement; and (g) any additional documents necessary to effectuate or that is contemplated by the Plan, including any compensation program for any of the Debtors' employees to be established as contemplated in the Plan and the Definitive Documents to facilitate the transfer of Acquired Assets pursuant to the Asset Purchase Agreement and wind-down of the Debtors' Estates; *provided* that the Schedule of Retained Causes of Action shall be filed no later than 14 days before the Voting Deadline.  The Plan Supplement (and the contents thereof) shall be (x) subject to Purchaser's consent rights solely to the extent set forth under the Asset Purchase Agreement (and shall otherwise be consistent with the Asset Purchase Agreement) and (y) reasonably acceptable to the Committee.

120.    "*Priority Tax Claim*" means any Claim of a Governmental Unit against a Debtor of the kind specified in section 507(a)(8) of the Bankruptcy Code.

121.    "*Pro Rata*" means the proportion that (i) an Allowed Claim or an Allowed Interest in a particular Class bears to (ii) the aggregate amount of Allowed Claims or Allowed Interests in that Class and, solely with respect to Claims in Classes 3 and 4(a), the proportion that an Allowed Claim in either such Class bears to the aggregate amount of Allowed Claims in Classes 3 and 4(a) in the aggregate, unless otherwise indicated.  For purposes of calculating Pro Rata distributions if the Sale Transaction is consummated by the Outside Date, the Pro Rata shares of all Holders of Allowed Claims or Allowed Interests shall be calculated taking into account the Acquired Coins Value of the Net Owed Coins distributed to each of the Account Holders.

122.    "*Professional*" means an Entity: (a) employed in the Chapter 11 Cases pursuant to an order of the Bankruptcy Court in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered and expenses incurred pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code or (b) for which compensation and reimbursement has been Allowed by Final Order of the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

123.    "*Professional Fee Claim*" means any Administrative Claim by a Professional for compensation for services rendered or reimbursement of expenses incurred by such Professional through and including the Effective Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court.  To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

124.    "*Professional Fee Escrow Account*" means an escrow account funded by the Debtors with Cash no later than the Effective Date in an amount equal to the Professional Fee Escrow Amount.

125. "*Professional Fee Escrow Amount*" means the aggregate amount of quarterly U.S. Trustee fees, Professional Fee Claims, and other unpaid fees and expenses the Professionals have incurred or will incur in rendering services in connection with the Chapter 11 Cases prior to and as of the Confirmation Date projected to be outstanding as of the anticipated Effective Date, which shall be estimated pursuant to the method set forth in Article II.B of the Plan.

126. "*Proof of Claim*" means a written proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

127. "*Proof of Interest*" means a written proof of Interest Filed against any of the Debtors in the Chapter 11 Cases.

128. "*Purchase Price Cash*" means the Cash paid by the Purchaser to OpCo pursuant to the Asset Purchase Agreement.

129. "*Purchaser*" means Binance US.

130. "*Reinstated*" or "*Reinstatement*" means, with respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

131. "*Related Party*" means, with respect to any Entity, in each case in its capacity as such with respect to such Entity, such Entity's current and former directors, managers, officers, investment committee members, special committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and advisors.

132. "*Released Parties*" means, collectively, in each case in its capacity as such: (a) the Debtors; (b) the Wind-Down Debtors; (c) the Committee, and each of the members thereof; (d) each of the Released Professionals; (e) Purchaser and each of its Related Parties; and (f) each of the Released Voyager Employees (subject to the limitations contained in Article IV.F and Article IV.G of the Plan); *provided* that if the Asset Purchase Agreement is terminated, Purchaser and each of its Related Parties shall not be "Released Parties" under the Plan.

133. "*Released Professionals*" means the following professionals retained by the Debtors, the Committee, or the Purchaser (as applicable): (i) Kirkland & Ellis LLP; (ii) Moelis & Company LLC; (iii) Berkeley Research Group, LLC; (iv) Bankruptcy Management Solutions, Inc. d/b/a Stretto; (v) Quinn Emanuel Urquhart & Sullivan LLP; (vi) Fasken Martineau DuMoulin LLP; (vii) Campbells Legal (BVI); (viii) McDermott Will & Emery LLP; (ix) FTI Consulting, Inc.; (x) Epiq Corporate Restructuring, LLC; (xi) Cassels, Brock & Blackwell LLP; (xii) Paul Hastings LLP; (xiii) Harney Westwood & Riegels LP (BVI); (xiv) Day Pitney LLP (solely in their capacity as counsel to the Debtors); (xv) Jenner & Block LLP; (xvi) Seyfarth Shaw LLP; (xvii) Alvarez & Marsal Canada Inc.; (xviii) Blake, Cassels & Graydon LLP; (xix) Jaffe Raitt Heuer & Weiss; (xx) Latham & Watkins LLP; (xxi) Lowenstein Sandler LLP; (xxii) Kramer Levin LLP; and (xxiii) Acura Law Firm; *provided* that if the Asset Purchase Agreement is terminated, Latham & Watkins LLP shall not be a "Released Professional" under the Plan.

134. "*Released Voyager Employees*" means all directors, officers, and Persons employed by each of the Debtors and their Affiliates serving in such capacity on or after the Petition Date but before the Effective Date (subject to the limitations contained in Article IV.F and Article IV.G of the Plan).

135.    "*Releasing Parties*" means, collectively, in each case in its capacity as such:  (a) the Debtors; (b) the Wind-Down Debtors; (c) the Committee, and each of the members thereof; (d) each of the Released Professionals; (e) each of the Released Voyager Employees; (f) Purchaser and each of its Related Parties to the extent Purchaser is able to bind such Related Parties; (g) all Holders of Claims that vote to accept the Plan and affirmatively opt into the releases provided by the Plan; (h) all Holders of Claims that vote to reject the Plan and affirmatively opt into the releases provided by the Plan; and (i) all Holders of Claims or Interests that abstain from voting (or are otherwise not entitled to vote) on the Plan and affirmatively opt into the releases provided by the Plan; *provided* that if the Asset Purchase Agreement is terminated, Purchaser and each of its Related Parties shall not be "Releasing Parties" under the Plan.

136.    " *Restructuring Transactions* " means those mergers, amalgamations, consolidations, reorganizations, arrangements, continuances, restructurings, transfers, conversions, dispositions, liquidations, dissolutions, or other corporate transactions that the Debtors and the Committee jointly determine to be necessary to implement the transactions described in this Plan, as described in more detail in Article IV.B herein and the Restructuring Transactions Memorandum.

137.    "*Restructuring Transactions Memorandum*" means that certain memorandum as may be amended, supplemented, or otherwise modified from time to time, describing the steps to be carried out to effectuate the Restructuring Transactions, the form of which shall be included in the Plan Supplement, and which shall be in a form reasonably acceptable to the Committee.

138.    "*Robertson Class Action*" means that certain putative class action litigation filed in the United States District Court for the Southern District of Florida, captioned *Robertson, et al. v. Cuban, et al.*, No. 1:22-cv-22538-RKA (S.D. Fla. Aug. 10, 2022).

139.    "*Sale Transaction*" means the sale of certain of the Debtors' assets and all other transactions pursuant to the Asset Purchase Agreement.

140.    "*Schedule of Assumed and Assigned Executory Contracts and Unexpired Leases*" means a schedule that may be Filed as part of the Plan Supplement, which shall be in form and substance acceptable to the Purchaser and in all respects consistent with the terms of the Asset Purchase Agreement, of certain Executory Contracts and Unexpired Leases to be assumed by the Debtors and assigned to the Purchaser pursuant to the Plan and Asset Purchase Agreement, as the same may be amended, modified, or supplemented from time to time by the Debtors or Wind-Down Trust, as applicable, in accordance with the Plan.

141.    "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means a schedule that may be Filed as part of the Plan Supplement, which shall be in form and substance reasonably acceptable to the Committee, of certain Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time by the Debtors or Wind-Down Trust, as applicable, in accordance with the Plan.

142.    "*Schedule of Retained Causes of Action*" means the schedule of certain Causes of Action of the Debtors that are not released, waived, settled, compromised, or transferred pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time by the Debtors and/or the Wind-Down Entity, which shall be included in the Plan Supplement.  For the avoidance of doubt, any failure to specifically list any Causes of Action on the Schedule of Retained Causes of Action shall not be deemed a waiver or admission that any such Cause of Action does not constitute Vested Causes of Action.

143.    "*Schedules*" means, collectively, the schedules of assets and liabilities, Schedule of Assumed Executory Contracts and Unexpired Leases, Schedule of Assumed and Assigned Executory

Contracts and Unexpired Leases, and statements of financial affairs Filed by each of the Debtors pursuant to section 521 of the Bankruptcy Code, as such schedules and statements may have been or may be amended, modified, or supplemented from time to time.

144. "*SEC*" means the United States Securities and Exchange Commission.

145. "*Section 510(b) Claim*" means any Claim against a Debtor subject to subordination under section 510(b) of the Bankruptcy Code.

146. "*Secured*" means, when referring to a Claim: (a) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) Allowed pursuant to the Plan as a secured Claim.

147. "*Secured Tax Claim*" means any Secured Claim against a Debtor that, absent its Secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

148. "*Securities Act*" means the U.S. Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

149. "*Security*" has the meaning set forth in section 2(a)(1) of the Securities Act.

150. "*Side-A Policy*" means the Cornerstone A-Side Management Liability Policy, ELU184179-22, issued by XL Specialty Insurance Company, for the July 1, 2022 to July 1, 2023 period.

151. "*Solicitation Materials*" means all solicitation materials with respect to the Plan.

152. "*Special Committee*" means the special committee established at OpCo, comprised of two independent directors, to conduct the Special Committee Investigation.

153. "*Special Committee Investigation*" means that certain investigation undertaken by the Special Committee into certain historical transactions, as more fully described in the Disclosure Statement.

154. "*Supported Jurisdiction*" has the meaning ascribed to it in the Asset Purchase Agreement.

155. "*TopCo*" means Voyager Digital Ltd., a Canadian corporation that is publicly traded on the Toronto Stock Exchange.

156. "*TopCo General Unsecured Claim*" means any Claim against TopCo that is not Secured and is not: (a) paid in full prior to the Effective Date pursuant to an order of the Bankruptcy Court; (b) an Administrative Claim; (c) a Secured Tax Claim; (d) a Priority Tax Claim; (e) an Other Priority Claim; (f) a Professional Fee Claim; (g) an Alameda Loan Facility Claim; (h) an Intercompany Claim; or (i) a Section 510(b) Claim. For the avoidance of doubt, all (i) Claims resulting from the rejection of Executory Contracts and Unexpired Leases, and (ii) Claims that are not Secured resulting from litigation, other than 510(b) Claims, against TopCo are TopCo General Unsecured Claims.

157.    "*Transferred Creditors*" means Account Holders and Holders of Allowed OpCo General Unsecured Claims who have completed all documentation and "KYC" processes reasonably required by Purchaser in the ordinary course of Purchaser's business with respect to similarly situated clients and who have opened a Binance US Account as of the date that is three (3) months following the later of the Closing Date (as defined in the Asset Purchase Agreement) or such later date as may be specified in the Customer Onboarding Protocol, and the successors and assigns of such Holders.

158.    "*Transferred Cryptocurrency Value*" means the aggregate VWAP of any Cryptocurrency that is the subject of an Additional Bankruptcy Distribution as of the date that is two Business Days prior to such Additional Bankruptcy Distribution.

159.     "*U.S. Trustee*" means the Office of the United States Trustee for Region 2.

160.    "*Unclaimed Distribution*" means any distribution under the Plan on account of an Allowed Claim or Allowed Interest to a Holder that, after the expiration of six months after the Effective Date, has not: (a) accepted a distribution, (b) given notice to the Wind-Down Trust of an intent to accept a particular distribution, (c) responded to the Debtors' or Wind-Down Trust's requests for information necessary to facilitate a particular distribution, or (d) taken any other action necessary to facilitate such distribution.

161.    "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or section 1123 of the Bankruptcy Code.

162.    "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

163.     "*Unsupported Jurisdiction*" has the meaning ascribed to it in the Asset Purchase Agreement.

164.     "*Unsupported Jurisdiction Approval*" has the meaning ascribed to it in the Asset Purchase Agreement.

165.    "*Vested Causes of Action*" means the Causes of Action vesting in the Wind-Down Entity pursuant to Article IV.L of the Plan, including, but not limited to, those Causes of Action enumerated on the Schedule of Retained Causes of Action, which shall be included in the Plan Supplement and in all respects consistent with the terms of the Asset Purchase Agreement.

166.    "*VGX*" means Voyager Token, that certain Cryptocurrency issued by the Debtors.

167.    "*Voting Deadline*" means February 22, 2023.

168.    "*Voyager*" means Voyager Digital Ltd. and its direct and indirect Affiliates.

169.    "*VWAP*" means, with respect to any type of Cryptocurrency and as of any date of determination, an amount equal to the volume weighted average price in U.S. dollars for such type of Cryptocurrency for the consecutive 24-hour period immediately prior to 8:00 a.m. New York Time on such date of determination, as reported on https://coinmarketcap.com.

170.    "*Wind-Down Debtor*" means a Debtor, or any successor or assign thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Effective Date.

171.    "*Wind-Down Entity*" means the Wind-Down Debtor or the Wind-Down Trust, as applicable, pursuant to the Restructuring Transactions Memorandum.

172.    "*Wind-Down Entity Assets*" means the Wind-Down Trust Assets or any assets transferred to the Wind-Down Debtor, as applicable.

173.    "*Wind-Down Reserve*" means an amount, which shall be agreed upon between the Debtors and the Committee prior to the Confirmation Hearing.

174.    "*Wind-Down Trust*" means the trust established on the Effective Date and described in Article IV.H to be established under Delaware trust law that, among other things, shall effectuate the wind-down of the Wind-Down Debtors, commence, litigate and settle the Vested Causes of Action that are not released, waived, settled, compromised, or transferred under the Plan and make distributions pursuant to the terms of the Plan and the Wind-Down Trust Agreement; *provided* that, for the avoidance of doubt, the Wind-Down Trust shall not conduct any business operations or continue the Debtors' business operations after the Effective Date.

175.    "*Wind-Down Trust Agreement*" means that certain trust agreement by and among the Debtors, the Committee, and the Wind-Down Trust, which shall be included in the Plan Supplement in a form reasonably acceptable to the Committee.

176.    "*Wind-Down Trust Assets*" means all of the Debtors' assets transferred to, and vesting in, the Wind-Down Trust pursuant to the Wind-Down Trust Agreement, which, in the event the Sale Transaction is consummated, shall exclude the Acquired Assets, and which shall include, without limitation but only to the extent the following are not Acquired Assets, (a) the Wind-Down Reserve, (b) the Net-Owed Coins to be distributed to Account Holders in Unsupported Jurisdictions to the extent the Purchaser has not obtained the applicable Unsupported Jurisdiction Approval in accordance with Section 6.12 of the Asset Purchase Agreement, (c) any distributions to Account Holders or Holders of OpCo General Unsecured Claims that are returned to the Wind-Down Entity pursuant to Section 6.12(e) of the Asset Purchase Agreement, (d) 3AC Claims and 3AC Recovery, (e) FTX Claims and FTX Recovery, (f) Alameda Claims and Alameda Recovery, (g) the Non-Released D&O Claims, and (h) the Vested Causes of Action.

177.    "*Wind-Down Trust Beneficiaries*" means the Holders of Allowed Claims or Allowed Interests that are entitled to receive distributions pursuant to the terms of the Plan, whether or not such Claims or Interests are Allowed as of the Effective Date.

178.    "*Wind-Down Trust Expenses*" means all actual and necessary costs and expenses incurred by the Wind-Down Trustee in connection with carrying out the obligations of the Wind-Down Trust pursuant to the terms of the Plan and the Wind-Down Trust Agreement.

179.    "*Wind-Down Trust Oversight Committee*" means the oversight committee tasked with overseeing the Wind-Down Trust in accordance with the Plan and the Wind-Down Trust Agreement.

180.    "*Wind-Down Trust Units*" means the beneficial interests in the Wind-Down Trust as more fully set forth in the Wind-Down Trust Agreement.

181.    "*Wind-Down Trustee*" means the Person or Persons selected by the Committee, after consultation with the Debtors, subject to the approval of the Bankruptcy Court and identified in the Plan Supplement, to serve as the trustee(s) of the Wind-Down Trust, and any successor thereto, appointed pursuant to the Wind-Down Trust Agreement.

### B.    Rules of Interpretation

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter gender; (2) capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form; (3) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (4) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed, or to be Filed, shall mean that document, schedule, or exhibit, as it may thereafter have been or may thereafter be validly amended, amended and restated, supplemented, or otherwise modified; (5) unless otherwise specified, any reference to an Entity as a Holder of a Claim or Interest, includes that Entity's successors and assigns; (6) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (7) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (8) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) unless otherwise specified, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (12) references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (13) unless otherwise specified, all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases; (14) any effectuating provisions may be interpreted by the Debtors or the Wind-Down Trust in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; (15) any references herein to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter; (16) all references herein to consent, acceptance, or approval shall be deemed to include the requirement that such consent, acceptance, or approval be evidenced by a writing, which may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail; (17) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; and (18) the use of "include" or "including" is without limitation unless otherwise stated.

### C.    Computation of Time

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

### D.    Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan and any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, documents, instruments,

or contracts, in which case the governing law of such agreement shall control); *provided* that corporate, limited liability company, or partnership governance matters relating to the Debtors or the Wind-Down Debtors, as applicable, shall be governed by the laws of the jurisdiction of incorporation or formation of the relevant Debtor or Wind-Down Debtor, as applicable.

**E.      Reference to Monetary Figures**

All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

**F.      Reference to the Debtors or the Wind-Down Debtors**

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Wind-Down Debtors mean the Debtors and the Wind-Down Debtors, as applicable, to the extent the context requires.

**G.      Nonconsolidated Plan**

Although for purposes of administrative convenience and efficiency the Plan has been filed as a joint plan for each of the Debtors and presents together Classes of Claims against and Interests in the Debtors, the Plan does not provide for the substantive consolidation of any of the Debtors.

<div align="center">

**ARTICLE II.**

**ADMINISTRATIVE AND PRIORITY CLAIMS**

</div>

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

**A.      Administrative Claims**

Except as otherwise provided in this Article II.A and except with respect to Administrative Claims that are Professional Fee Claims or subject to 11 U.S.C. § 503(b)(1)(D), unless previously Filed, requests for payment of Allowed Administrative Claims (other than Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code) must be Filed and served on the Wind-Down Entity pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date. Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property, and such Administrative Claims shall be deemed satisfied as of the Effective Date without the need for any objection from the Wind-Down Entity or any notice to or action, order, or approval of the Bankruptcy Court or any other Entity. Objections to such requests, if any, must be Filed and served on the Wind-Down Entity and the requesting party by the Claims Objection Bar Date for Administrative Claims. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed by Final Order of the Bankruptcy Court.

Except with respect to Administrative Claims that are Professional Fee Claims, and except to the extent that an Administrative Claim or Priority Tax Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall receive an amount of Cash equal to the

amount of the unpaid or unsatisfied portion of such Allowed Administrative Claim in accordance with the following: (1) if such Administrative Claim is Allowed on or prior to the Effective Date, no later than thirty (30) days after the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction or course of business giving rise to such Allowed Administrative Claim, without any further action by the Holder of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtors or the Wind-Down Entity, as applicable; or (5) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court. Any Cryptocurrency inadvertently deposited to the Debtors' account(s) after the Petition Date shall be returned to the sender in full.

Objections to requests for payment of such Administrative Claims, if any, must be Filed with the Bankruptcy Court and served on the Wind-Down Entity and the requesting Holder no later than the Claims Objection Bar Date for Administrative Claims. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with, an order that becomes a Final Order of the Bankruptcy Court.

**B.      Professional Fee Claims**

1.      Final Fee Applications and Payment of Professional Fee Claims

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five (45) days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code and Bankruptcy Rules. The Wind-Down Entity shall pay Professional Fee Claims in Cash to such Professionals in the amount the Bankruptcy Court allows, including from funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court; *provided* that the Debtors' and the Wind-Down Entity's obligations to pay Allowed Professional Fee Claims shall not be limited or deemed limited to funds held in the Professional Fee Escrow Account.

2.      Professional Fee Escrow Account

No later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and the U.S. Trustee and for no other Entities until all quarterly U.S. Trustee fees and all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the U.S. Trustee or to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court. No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. No funds held in the Professional Fee Escrow Account shall be property of the Estates of the Debtors or the Wind-Down Entity. When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, and all U.S. Trustee quarterly fees plus statutory interest, if any, have been paid in full, any remaining funds held in the Professional Fee

Escrow Account shall be turned over to the Wind-Down Entity without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

        3.    <u>Professional Fee Escrow Amount</u>

The Professionals shall deliver to the Debtors a reasonable and good-faith estimate of their unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Confirmation Date projected to be outstanding as of the anticipated Effective Date, and shall deliver such estimate no later than five Business Days prior to the anticipated Effective Date. For the avoidance of doubt, no such estimate shall be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that are the subject of a Professional's final request for payment of Professional Fee Claims Filed with the Bankruptcy Court, and such Professionals are not bound to any extent by the estimates. If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional. The total aggregate amount so estimated to be outstanding as of the anticipated Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account; *provided* that the Wind-Down Entity shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are Filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

        4.    <u>Post-Confirmation Date Fees and Expenses</u>

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors and/or the Wind-Down Entity, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Wind-Down Entity. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Wind-Down Entity may employ and pay any Professional in the ordinary course of business for the period after the Confirmation Date without any further notice to or action, order, or approval of the Bankruptcy Court.

For the avoidance of doubt, no Administrative Claims, Professional Fee Claims, or any other post-confirmation fees and expenses shall be paid prior to payment of any quarterly fees due and outstanding to the U.S. Trustee.

**C.    Priority Tax Claims**

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

<div align="center">

**ARTICLE III.**

**CLASSIFICATION, TREATMENT,
AND VOTING OF CLAIMS AND INTERESTS**

</div>

**A.    Classification of Claims and Interests**

Except for the Claims addressed in Article II of the Plan, all Claims against and Interests in the Debtors are classified in the Classes set forth in this Article III for all purposes, including voting,

<div align="center">

20

A-332

</div>

Confirmation, and distributions pursuant to the Plan and in accordance with section 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

## B. Summary of Classification

A summary of the classification of Claims against and Interests in each Debtor pursuant to the Plan is set forth in the following chart. The Plan constitutes a separate chapter 11 plan for each of the Debtors, and accordingly, the classification of Claims and Interests set forth below applies separately to each of the Debtors. All of the potential Classes for the Debtors are set forth herein. Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Claims or Interests shall be treated as set forth in Article III.E hereof. Voting tabulations for recording acceptances or rejections of the Plan will be conducted on a Debtor-by-Debtor basis as set forth above.[1]

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | Account Holder Claims | Impaired | Entitled to Vote |
| 4A | OpCo General Unsecured Claims | Impaired | Entitled to Vote |
| 4B | HoldCo General Unsecured Claims | Impaired | Entitled to Vote |
| 4C | TopCo General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Alameda Loan Facility Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 6 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |
| 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |

---

[1] The Debtors reserve the right to separately classify Claims or Interests to the extent necessary to comply with any requirements under the Bankruptcy Code or applicable law.

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 9 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

## C.    Treatment of Classes of Claims and Interests

Subject to Article VI hereof, each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors or Wind-Down Entity, as applicable, and the Holder of such Allowed Claim or Allowed Interest, as applicable.  In no event shall any Holder of a Claim receive more than such Holder's Allowed amount on account of such Claim.

1.    Class 1 —Secured Tax Claims

(a)    *Classification*:  Class 1 consists of all Secured Tax Claims.

(b)    *Treatment*:  Each Holder of an Allowed Secured Tax Claim shall receive, in full and final satisfaction of such Allowed Secured Tax Claim, at the option of the Wind-Down Entity, payment in full in Cash of such Holder's Allowed Secured Tax Claim or such other treatment rendering such Holder's Allowed Secured Tax Claim Unimpaired.

(c)    *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Allowed Secured Tax Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Secured Tax Claims are not entitled to vote to accept or reject the Plan.

2.    Class 2 — Other Priority Claims

(a)    *Classification*:  Class 2 consists of all Other Priority Claims.

(b)    *Treatment*:  Each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Allowed Other Priority Claim, at the option of the applicable Debtor, payment in full in Cash of such Holder's Allowed Other Priority Claim or such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired.

(c)    *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan.

3.    Class 3 — Account Holder Claims

(a)    *Classification*:  Class 3 consists of all Account Holder Claims.

(b)    *Allowance*: Account Holder Claims shall be conclusively Allowed in the amount listed on OpCos's *Amended Schedules of Assets and Liabilities* (Case No. 22-10945) [Docket No. 18]; *provided* that the rights of any Holder of an

Account Holder Claim to object to the scheduled amount shall be preserved. To the extent an Account Holder Claim is Allowed in a greater amount than the scheduled amount of such Account Holder Claim, such Holder shall be entitled to a subsequent distribution such that it will receive its Pro Rata share of recoveries to Holders of Allowed Account Holder Claims. Account Holder Claims shall be valued in U.S. dollars as of the Petition Date consistent with section 502(b) of the Bankruptcy Code.

(c)     *Treatment*: Each Holder of an Allowed Account Holder Claim will receive in exchange for such Allowed Account Holder Claim:

       (i)     If the Sale Transaction is consummated by the Outside Date:

            A.     its Net Owed Coins, as provided in and subject to the requirements of Sections 6.10 and 6.12 of the Asset Purchase Agreement; *provided* that for Account Holders in Unsupported Jurisdictions and only to the extent that the Purchaser does not obtain the Unsupported Jurisdiction Approval for the jurisdiction in which such Account Holder resides within 6 months following the Closing Date (as defined in the Asset Purchase Agreement), such Account Holders shall receive, after expiration of such time period, value in Cash at which such Net Owed Coins allocable to such Account Holder are liquidated;

            B.     its Pro Rata share of any Additional Bankruptcy Distributions, in Cryptocurrency or Cash as provided in and subject to the requirements of Sections 6.12 and 6.14 of the Asset Purchase Agreement;

            C.     its Pro Rata share of Distributable OpCo Cash; and

            D.     to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to OpCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims;

       *provided* that distributions made to any Account Holder pursuant to clauses (B), (C), and (D) above shall be made after taking into account the Acquired Coins Value of the Net Owed Coins or the value in Cash at which such Net Owed Coins are liquidated, as applicable, previously allocated to such Account Holder; or

       (ii)     If the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated:

            A.     its Pro Rata share of Distributable OpCo Cash;

B. its Pro Rata share of Distributable Cryptocurrency, which such Account Holder shall be able to withdraw in kind, alternative Cryptocurrency, and/or Cash for a period of thirty (30) days after the Effective Date through the Voyager platform or, if elected by Seller pursuant to Section 6.12(d) of the Asset Purchase Agreement, through the Binance.US Platform; *provided* that if the applicable transfer is made through the Voyager platform and such Account Holder does not withdraw its Pro Rata share of Distributable Cryptocurrency available to such Account Holder from the Voyager platform within such thirty (30) day period, such Account Holder will receive Cash in the equivalent value to its Pro Rata share of Distributable Cryptocurrency; and

C. to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to OpCo; *provided* that any distributions on account of Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

(d) *Voting:* Class 3 is Impaired under the Plan. Holders of Allowed Account Holder Claims are entitled to vote to accept or reject the Plan.

4. Class 4A — OpCo General Unsecured Claims

(a) *Classification*: Class 4A consists of all OpCo General Unsecured Claims.

(b) *Treatment*: Each Holder of an Allowed OpCo General Unsecured Claim will receive in exchange for such Allowed OpCo General Unsecured Claim:

(i) If the Sale Transaction is consummated by the Outside Date:

A. its Pro Rata share of Distributable Cryptocurrency in Cash;

B. its Pro Rata share of Additional Bankruptcy Distributions, in Cryptocurrency or Cash as provided in and subject to the requirements of Sections 6.12 and 6.14 of the Asset Purchase Agreement;

C. its Pro Rata share of Distributable OpCo Cash; and

D. to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to OpCo; *provided* that any distributions on account of the Wind-Down Entity Assets or

Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims; or

(ii) If the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated:

A. its Pro Rata share of Distributable Cryptocurrency in Cash;

B. its Pro Rata share of Distributable OpCo Cash; and

C. to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to OpCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

(c) *Voting*: Class 4A is Impaired under the Plan. Holders of Allowed OpCo General Unsecured Claims are entitled to vote to accept or reject the Plan.

5. <u>Class 4B — HoldCo General Unsecured Claims</u>

(a) *Classification*: Class 4B consists of all HoldCo General Unsecured Claims.

(b) *Treatment*: Each Holder of an Allowed HoldCo General Unsecured Claim will receive in exchange for such Allowed HoldCo General Unsecured Claim:

(i) its Pro Rata share of Distributable HoldCo Cash; and

(ii) to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to HoldCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

(c)     *Voting*: Class 4B is Impaired under the Plan. Holders of Allowed HoldCo General Unsecured Claims are entitled to vote to accept or reject the Plan.

6.      <u>Class 4C — TopCo General Unsecured Claims</u>

(a)     *Classification*: Class 4C consists of all TopCo General Unsecured Claims.

(b)     *Treatment*: Each Holder of an Allowed TopCo General Unsecured Claim will receive in exchange for such Allowed TopCo General Unsecured Claim:

        (i)     its Pro Rata share of Distributable TopCo Cash; and

        (ii)     to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of the Wind-Down Trust Assets attributable to TopCo; *provided* that any distributions on account of the Wind-Down Entity Assets or the Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

(c)     *Voting*: Class 4C is Impaired under the Plan. Holders of Allowed TopCo General Unsecured Claims are entitled to vote to accept or reject the Plan.

7.      <u>Class 5 — Alameda Loan Facility Claims</u>

(a)     *Classification*: Class 5 consists of all Alameda Loan Facility Claims.

(b)     *Treatment*: Each Holder of an Allowed Alameda Loan Facility Claim will receive in exchange for such Allowed Alameda Loan Facility Claim to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets; *provided* that any distributions on account of Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, all Allowed Claims at OpCo, HoldCo, and TopCo, including, but not limited to, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, Allowed Account Holder Claims, Allowed OpCo General Unsecured Claims, Allowed HoldCo General Unsecured Claims, and Allowed TopCo General Unsecured Claims; *provided*, *however*, if the Bankruptcy Court denies subordination of the Alameda Loan Facility Claims, then such Alameda Loan Facility Claims shall be *pari passu* with General Unsecured Claims at the applicable Debtor entity.

(c)     *Voting*: Class 5 is Impaired under the Plan. Holders of Allowed Alameda Loan Facility Claims are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. Therefore, Holders of Allowed Alameda Loan Facility Claims are not entitled to vote to accept or reject the Plan.

8. <u>Class 6 — Section 510(b) Claims</u>

(a) *Classification*: Class 6 consists of all Section 510(b) Claims against TopCo.

(b) *Allowance*: Notwithstanding anything to the contrary herein, a Section 510(b) Claim against TopCo, if any such Section 510(b) Claim exists, may only become Allowed by Final Order of the Bankruptcy Court.

(c) *Treatment*: Each Holder of Allowed Section 510(b) Claims against TopCo will receive, to effectuate distributions, if applicable, from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to TopCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, and Allowed TopCo General Unsecured Claims.

(d) *Voting*: Class 6 is Impaired under the Plan. Holders (if any) of Allowed Section 510(b) Claims against TopCo are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. Therefore, Holders (if any) of Allowed Section 510(b) Claims against TopCo are not entitled to vote to accept or reject the Plan.

9. <u>Class 7 — Intercompany Claims</u>

(a) *Classification*: Class 7 consists of all Intercompany Claims.

(b) *Treatment*: On the Effective Date, all Intercompany Claims shall be, at the option of the Debtors, either (a) Reinstated or (b) converted to equity, otherwise set off, settled, distributed, contributed, or cancelled, in each case in accordance with the Restructuring Transactions Memorandum.

(c) *Voting*: Holders of Intercompany Claims are either Unimpaired or Impaired, and such Holders of Intercompany Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Therefore, Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

10. <u>Class 8 — Intercompany Interests</u>

(a) *Classification*: Class 8 consists of all Intercompany Interests.

(b) *Treatment*: On the Effective Date, all Intercompany Interests shall be, at the option of the Debtors, either (a) Reinstated in accordance with Article III.G of the Plan or (b) set off, settled, addressed, distributed, contributed, merged, or cancelled, in each case in accordance with the Restructuring Transactions Memorandum.

(c) *Voting*: Holders of Intercompany Interests are either Unimpaired or Impaired, and such Holders of Intercompany Interests are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Therefore,

Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

11.   <u>Class 9 — Existing Equity Interests</u>

(a)   *Classification*:  Class 9 consists of all Existing Equity Interests.

(b)   *Treatment*:  Each Holder of Existing Equity Interests will receive, to effectuate distributions, if applicable, from the Wind-Down Entity, its Pro Rata share of the Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to TopCo; *provided* that any distributions on account of Wind-Down Trust Units shall only be made following payment in full of, or reserve for, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, and Allowed TopCo General Unsecured Claims.

(c)   *Voting*:  Class 9 is Impaired under the Plan.  Holders of Existing Equity Interests are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. Therefore, Holders of Existing Equity Interests are not entitled to vote to accept or reject the Plan.

**D.   Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Wind-Down Entity's rights in respect of any Unimpaired Claim, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

**E.   Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes**

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

**F.   Subordinated Claims**

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims against and Allowed Interests in the Debtors and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors and the Wind-Down Entity reserve the right to reclassify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

**G.   Intercompany Interests**

To the extent Reinstated under the Plan, distributions (if any) on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the corporate

structure given the existing intercompany systems connecting the Debtors and their Affiliates, and in exchange for the Debtors' and Wind-Down Entity's agreement under the Plan to make certain distributions to the Holders of Allowed Claims.

## H. Controversy Concerning Impairment

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

## I. Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code

Section 1129(a)(10) of the Bankruptcy Code is satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims or Interests. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

## ARTICLE IV.

## PROVISIONS FOR IMPLEMENTATION OF THE PLAN

## A. General Settlement of Claims and Interests

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan. The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 of all such Claims, Interests, Causes of Action, and controversies, as well as a finding by the Bankruptcy Court that such compromise and settlement is fair, equitable, reasonable, and in the best interests of the Debtors, their Estates, and Holders of Claims and Interests. Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Interests in any Class are intended to be and shall be final.

## B. Restructuring Transactions

On or before the Effective Date, the applicable Debtors will take any action as may be necessary or advisable to effectuate the Restructuring Transactions described in the Plan, the Restructuring Transactions Memorandum, and the Customer Onboarding Protocol, including: (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (3) the filing of appropriate

certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (4) the transfer or distribution of any Cryptocurrency or Cash pursuant to the Asset Purchase Agreement, or the Liquidation Procedures, as applicable; (5) the execution and delivery of the Wind-Down Trust Agreement; (6) any transactions necessary or appropriate to form the Wind-Down Entity; (7) such other transactions that are required to effectuate the Restructuring Transactions, including any sales, mergers, consolidations, restructurings, conversions, dispositions, transfers, formations, organizations, dissolutions, or liquidations; (8) all transactions necessary to provide for the purchase of the Acquired Assets by Purchaser under the Asset Purchase Agreement; and (9) all other actions that the applicable Entities determine to be necessary or appropriate, or that are reasonably requested by the Purchaser in accordance with the Asset Purchase Agreement, including making filings or recordings that may be required by applicable law.

The Confirmation Order shall, and shall be deemed to, pursuant to sections 1123 and 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions.

## C.    The Sale Transaction

If the Sale Transaction is consummated by the Outside Date, pursuant to the terms of the Asset Purchase Agreement, then the following terms shall govern:

On or prior to the Effective Date, the Debtors shall have consummated the Sale Transaction, and, among other things, the Acquired Assets and Assumed Liabilities shall have transferred to the Purchaser free and clear of all Liens, Claims, Interests, charges, or other encumbrances, and the Purchaser shall pay to the Debtors or Holders of Account Holder Claims and Holders of OpCo General Unsecured Claims, as applicable, the proceeds from the Sale Transaction, as and to the extent provided for in the Asset Purchase Agreement, and this Plan. The Confirmation Order shall authorize the Debtors, the Purchaser, and the Wind-Down Entity, as applicable, to undertake the transactions contemplated by the Asset Purchase Agreement, including pursuant to sections 363, 365, 1123(a)(5)(B), and 1123(a)(5)(D) of the Bankruptcy Code.

The Debtors and Purchaser shall be authorized to take all actions as may be deemed necessary or appropriate to consummate the Sale Transaction pursuant to the terms of the Asset Purchase Agreement the Customer Onboarding Protocol, and this Plan. The Debtors shall be authorized to sell any Cryptocurrency to satisfy all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims. On and after the Effective Date, except as otherwise provided in the Plan and the Wind-Down Trust Agreement, the Wind-Down Debtors, the Wind-Down Entity, or the Purchaser, as applicable, may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; provided, that the Bankruptcy Court shall retain jurisdiction to resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with any of the foregoing.

Notwithstanding anything contained in this Plan and any Definitive Documents, if the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated, all provisions contained in this Plan and the Definitive Documents governing the Sale Transaction shall have no further force and effect, and the provisions governing the Liquidation Transaction shall govern. The rights and remedies of the Seller and Purchaser under the Asset Purchase Agreement and any related orders of the Bankruptcy Court shall be expressly preserved.

## D.     The Liquidation Transaction

If the Sale Transaction is not consummated by the Outside Date, pursuant to the Asset Purchase Agreement, then the following terms shall govern:

### 1.     *The Liquidation Transaction*

On or after the Outside Date, the Debtors will pursue the Liquidation Transaction in accordance with the Liquidation Procedures. Pursuant to the Liquidation Transaction, the Debtors, the Wind-Down Entity, or the Wind-Down Trustee, as applicable, will distribute certain of the Cryptocurrency in-kind to Holders of Account Holder Claims in accordance with Article III.C of the Plan, transfer all Wind-Down Entity Assets or Wind-Down Trust Assets to the Wind-Down Reserve, liquidate certain of the Cryptocurrency, distribute Cash to Holders of Claims, wind down and dissolve the Debtors, and pursue final administration of the Debtors' Estates pursuant to the Bankruptcy Code.

The Debtors, or the Wind-Down Entity, as applicable, shall be authorized to take all actions as may be deemed necessary or appropriate to consummate the Liquidation Transaction pursuant to this Plan. On or before the date that is twenty-one days prior to the anticipated commencement of the Liquidation Transaction, the Debtors, or the Wind-Down Entity, as applicable, shall file the Liquidation Procedures with the Bankruptcy Court. Parties in interest shall have ten days to object to the Liquidation Procedures, and if no objections are timely filed, the Liquidation Procedures shall be approved. In the event of a timely objection, the Bankruptcy Court shall adjudicate any objection to the Liquidation Procedures.

On and after the Effective Date, except as otherwise provided in the Plan, the Wind-Down Trust Agreement, and the Liquidation Procedures, the Wind-Down Debtors or the Wind-Down Entity as applicable, may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; provided, that the Bankruptcy Court shall retain jurisdiction to resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with any of the foregoing.

### 2.     *Cryptocurrency Rebalancing*

Prior to the Effective Date the Debtors shall, in consultation with the Committee, be authorized to rebalance their Cryptocurrency portfolio to ensure that the Debtors can effectuate *pro rata* in-kind distributions of the Distributable Cryptocurrency according to Article III.C.3(c) of this Plan, *provided* that such rebalancing shall be in accordance with the Asset Purchase Agreement (if the Asset Purchase Agreement has not been terminated). The Debtors may effectuate such rebalancing by (i) selling such Cryptocurrency that cannot be distributed to Account Holders, (ii) purchasing Cryptocurrency supported by Voyager's or Purchaser's platform (as provided by the Asset Purchase Agreement) that shall be distributed to Account Holders, and (iii) engaging in any other transaction, including the execution of trades of Cryptocurrency, necessary or appropriate to effectuate distributions of the Distributable Cryptocurrency to Holders of Allowed Account Holder Claims.

## E.     Management and Employee Transition Plans

The Debtors shall be authorized to implement the Management Transition Plan and Employee Transition Plan, the terms of which shall be reasonably acceptable to Purchaser and the Committee and included in the Plan Supplement. The Management Transition Plan and Employee Transition Plan shall help ensure that employees are available to provide transition services to the Debtors and/or the Wind-Down Entity to effectuate the Sale Transaction and to wind down the Debtors' Estates.

## F.    Non-Released D&O Claims

Any Claims or Causes of Action held by the Debtors or their respective estates against the Debtors' CEO and/or CCO (regardless of any fiduciary capacity in which such individuals were acting) that are expressly related to approval of the 3AC Loan are not released pursuant to the Plan (collectively, the "Non-Released D&O Claims"), and shall be assigned and transferred to the Wind-Down Entity to be pursued, settled, or resolved by the Wind-Down Entity in accordance with the terms of Article IV.G of this Plan and subject to the Wind-Down Reserve. Any claims against the D&O Carriers that the Debtors' insurance transactions within the 90 days prior to the Petition Date are avoidable under the Bankruptcy Code, applicable state law, or both (the "Non-Released Insurance Claims") shall be assigned and transferred to the Wind-Down Entity to be pursued, settled, or resolved solely by the Wind-Down Entity in accordance with the terms of Article IV.G of this Plan. The Wind-Down Entity shall be a successor to the Debtors' rights, title, and interest in any Non-Released D&O Claims and Non-Released Insurance Claims, and the Wind-Down Entity shall have standing to pursue the Non-Released D&O Claims and the Non-Released Insurance Claims in accordance with the terms of Article IV.G of this Plan; *provided* that: (i) any recovery by the Wind-Down Entity (and the beneficiaries thereof) on account of any Non-Released D&O Claim, including in each case by way of settlement or judgment, shall be satisfied solely by and to the extent of the proceeds of the Debtors' available D&O Liability Insurance Policies (and/or from the D&O Carriers directly) after payment from such D&O Liability Insurance Policies of any and all covered costs and expenses incurred in connection with the defense of the Non-Released D&O Claims; (ii) any party, including any trustee or any beneficiary of the Wind-Down Entity, seeking to execute, garnish, or otherwise attempt to collect on any settlement of or judgment in the Non-Released D&O Claims shall do so solely upon available insurance coverage from the Debtors' available D&O Liability Insurance Policies; and (iii) no party shall (a) record any judgment against the CEO or CCO, or (b) otherwise attempt to collect, directly or indirectly, from the personal assets of the CEO or CCO with respect to the Non-Released D&O Claims. For the avoidance of doubt, this provision does not enjoin, limit, or impair direct claims held by third parties against the Debtors' CEO or CCO (if any) other than any direct claims held by Holders of Claims or Interests that opt into the third party release in Article VIII.B of this Plan. Only upon the occurrence of the earlier of (x) a release being given as part of any later settlement of the Non-Released D&O Claims; (y) final resolution of any coverage claims asserted against the Debtors' available D&O Liability Insurance Policies on account of the Non-Released D&O Claims; or (z) exhaustion of the available insurance coverage under the D&O Liability Insurance Policies, the Non-Released D&O Claims shall be released and discharged without the need for further action or Bankruptcy Court order. For the avoidance of doubt, any release of the Non-Released D&O Claims shall not become effective until one of the three conditions stated in the preceding sentence above has been met.

## G.    The D&O Settlement

On the Effective Date, the terms of the D&O Settlement shall be effectuated as provided in this Article IV.G.

Pursuant to the D&O Settlement, CEO shall repay the $1,900,000 received from the Debtors on or around February 28, 2022, by paying the after-tax amount of such transfer (approximately $1,125,000) to OpCo in cash and assigning the right, if any, to any tax refund for the balance to the Wind-Down Entity. CEO shall subordinate any Claims (including any indemnification claims asserted under this Art. IV.F) he holds against the Debtors until all other Holders of Claims are paid in full. CCO shall subordinate 50 percent of any Claims he holds other than indemnification claims (and 100% of any indemnification claims asserted under this Art. IV.F) against the Debtors until all other Holders of Claims are paid in full; *provided*, *however*, that in the event the D&O Carriers deny coverage to CEO or CCO under the D&O Insurance Policies on account of such subordination of any indemnification claim, then any indemnification claims by CEO or CCO shall not be so subordinated, but may be filed as an OpCo General Unsecured Claim.

CEO and CCO, each as insureds, under the D&O Liability Insurance Policies agree: (i) not to draw down on the Side-A Policy; *provided*, *however*, that should coverage continue to be available under the Side-A Policy following resolution of the Debtors' and/or the Wind-Down Entity's claims for the avoidance of the premium paid for the policy (whether by judgment or settlement or otherwise) such officer shall be entitled to seek coverage under the Side-A Policy to the extent any such coverage remains; and (ii) not to object to any settlement by the Debtors or Wind Down Entity of avoidance claims under the Side-A Policy, even if such settlement results in termination of benefits under the Side-A Policy. For the avoidance of doubt, this agreement is not intended to and shall not alter or amend each of the insureds' duties under the D&O Liability Insurance Policies. In the event that any insurer under the D&O Liability Insurance Policies denies coverage for any reason, the Wind-Down Entity shall have the right to bring a coverage claim against the insurer(s) in the name of the insured, the insureds shall reasonably cooperate with respect to any such claim, and the insured may participate at their election (and at their sole cost). For the avoidance of doubt, nothing contained in this Plan is intended as a waiver or release of the Debtors' and/or Wind-Down Entity's right to assert any Non-Released D&O Claim, but rather limits such recovery in the manner set forth above.

CEO and CCO shall be entitled to receive their salary and benefits for as long as they work for the Debtors and/or the Wind-Down Entity and retain the right to assert claims for advancement and indemnification up to the limits of any available coverage in the event any of the insurers that issued the Management Liability Policy, the Excess Policy, or the Side-A Policy denies coverage to CEO and/or CCO based upon or arising out of the lack of a formal claim for indemnification; *provided*, *however*, that any such indemnification or advancement claims shall be subordinated in full unless and until all other Holders of Claims are paid in full; *provided*, *further*, that in the event that any of the D&O Carriers deny coverage to CEO or CCO under the D&O Insurance Policies on account of such subordination of any indemnification claim, then any indemnification claims by CEO or CCO shall not be so subordinated, but may be filed as an OpCo General Unsecured Claim.

CEO and CCO shall subordinate any and all rights and entitlements under the Cornerstone A-Side Management Liability Insurance Policy to Voyager Digital Ltd., Policy Number ELU184179-22, to any recovery by the Debtors and/or the Wind-Down Entity on account of the Debtors' and/or Wind-Down Entity's claims for the avoidance of the premium paid for the policy. For the avoidance of doubt, should coverage continue to be available under the Side-A Policy following resolution of the Debtors' and/or the Wind-Down Entity's claims for the avoidance of the premium paid for the policy (whether by judgment or settlement or otherwise), CEO and/or CCO shall be entitled to seek coverage under the Side-A Policy. CEO and CCO shall remain at, and continue performing the responsibilities of, their respective position(s) with the Debtors and assist with the Debtors' transition for at least 30 days from entry of the Confirmation Order; *provided* that CCO shall have no obligation to remain at his position with the Debtors beyond January 15, 2023 and the CEO shall have the right to pursue and engage in any employment opportunity, business venture, consulting arrangement, or investment that may become available; *provided*, *further*, that both the CEO and CCO shall be available to the Debtors and/or the Wind-Down Entity for a maximum of five hours per month for the one year following the Effective Date.

In the event that the sworn financial disclosure statements under penalty of perjury provided to the Debtors, the Special Committee and the Committee by CEO and CCO are later determined at any time by Final Order of the Bankruptcy Court or other court of competent jurisdiction to be materially inaccurate, (a) the limitations on recovery by the Wind-Down Entity under this Article IV.G shall no longer apply, (b) any and all release, exculpation and injunction provisions in Article VIII of this Plan with respect to CEO and/or CCO (as applicable) shall be deemed null and void, (c) all Releasing Parties' rights with respect to the CEO and/or CCO (as applicable) shall be fully intact and preserved, (d) amounts paid by CEO shall not be repaid by the Wind-Down Entity, and (e) any applicable statute of limitations shall be deemed tolled from the Petition Date to the date of entry of the order referenced above. The Wind-Down Trust, as successor to the Debtors, shall have standing to bring a motion seeking relief pursuant to this Article IV.G.

Entry of the Confirmation Order shall be deemed approval of the D&O Settlement and, to the extent not already approved by the Bankruptcy Court, the Debtors or the Wind-Down Debtors, as applicable, are authorized to negotiate, execute, and deliver those documents necessary or appropriate to effectuate the D&O Settlement, without further notice or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors, the Wind-Down Debtors, the Committee, and the Special Committee may deem to be necessary to effectuate the D&O Settlement.

## H.    Wind-Down Trust

On the Effective Date, the Wind-Down Trust shall be formed for the benefit of the Wind-Down Trust Beneficiaries and each of the Debtors shall transfer the Wind-Down Trust Assets for distribution in accordance with the terms of the Plan. The Confirmation Order shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

1.    <u>Establishment of a Wind-Down Trust</u>

Pursuant to the Wind-Down Trust Agreement, the Wind-Down Trust will be established. The Wind-Down Trust shall be the successor-in-interest to the Debtors, and the Wind-Down Trust shall be a successor to the Debtors' rights, title, and interest to the Wind-Down Trust Assets. The Wind-Down Trust will conduct no business operations and will be charged with winding down the Debtors' Estates. The Wind-Down Trust shall be managed by the Wind-Down Trustee and shall be subject to a Wind-Down Trust Oversight Committee. For the avoidance of doubt, in the event that the Restructuring Transactions Memorandum specifies that the Wind-Down Debtors will be the Wind-Down Entity, the Wind-Down Debtors shall be managed by the Wind-Down Trustee and shall be subject to the Wind-Down Trust Oversight Committee in the same manner as if the Wind-Down Entity is the Wind-Down Trust. The Wind-Down Trust shall be administered in accordance with the terms of the Wind-Down Trust Agreement and shall be subject to the Wind-Down Reserve and the Non-Released D&O Claim Budget. For the avoidance of doubt, the Wind-Down Trust shall not have any right or interest in any Cause of Action or Claim constituting an Acquired Asset. The Wind-Down Trust shall be administered in a manner consistent with the SEC's published guidance on liquidating trusts.

Prior to the Effective Date, any and all of the Debtors' assets shall remain assets of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and on the Effective Date the Wind-Down Trust Assets shall, subject to the Wind-Down Trust Agreement, be transferred to and vest in the Wind-Down Trust or the Wind-Down Debtors, as applicable. For the avoidance of doubt, to the extent not otherwise waived in writing, released, settled, compromised, assigned or sold pursuant to a prior order or the Plan, the Wind-Down Entity specifically retains and reserves the right to assert, after the Effective Date, any and all of the Vested Causes of Action and related rights, whether or not asserted as of the Effective Date, and all proceeds of the foregoing, subject to the terms of the Plan, including without limitation Article IV.F and Article IV.G.

Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, only the Wind-Down Trust and the Wind-Down Trustee shall have the right to pursue or not to pursue, or, subject to the terms hereof and the Wind-Down Trust Agreement, compromise or settle any Wind-Down Trust Assets transferred to the Wind-Down Trust. On and after the Effective Date, the Wind-Down Trust and the Wind-Down Trustee may, without further Bankruptcy Court approval, commence, litigate, and settle any Vested Causes of Action or Claims relating to any Wind-Down Trust Assets transferred to the Wind-Down Trust or rights to payment or Claims that belong to the Debtors as of the Effective Date or are instituted by the Wind-Down Trust or

the Wind-Down Trustee on or after the Effective Date, except as otherwise expressly provided herein and in the Wind-Down Trust Agreement. All of the Wind-Down Trust's activities shall be subject to the Wind-Down Reserve and the Non-Released D&O Claim Budget. The Wind-Down Trust shall be entitled to enforce all defenses and counterclaims to all Claims asserted against the Debtors and their Estates, including setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code.

The Wind-Down Trustee shall be deemed hereby substituted as plaintiff, defendant, or in any other capacity for the Debtors in any Causes of Action pending before the Bankruptcy Court or any other court that relates to a Wind-Down Trust Asset without the need for filing any motion for such relief. On the Effective Date, the Debtors and the Wind-Down Trustee shall execute the Wind-Down Trust Agreement and shall have established the Wind-Down Trust pursuant hereto. In the event of any conflict between the terms of this Article IV.H and the terms of the Wind-Down Trust Agreement, the terms of the Wind-Down Trust Agreement shall control.

### 2. Wind-Down Entity Assets

Notwithstanding any prohibition on assignability under applicable non-bankruptcy law, on the Effective Date and thereafter if additional Wind-Down Entity Assets become available, the Debtors shall be deemed, subject to the Wind-Down Trust Agreement, to have automatically transferred to the applicable Wind-Down Entity all of their right, title, and interest in and to all of the Wind-Down Trust Assets, in accordance with section 1141 of the Bankruptcy Code. All such assets shall automatically vest in the Wind-Down Entity free and clear of all Claims, Liens, and other interests, subject only to the Allowed Claims and Interests as set forth herein and the expenses of the Wind-Down Trust as set forth herein and in the Wind-Down Trust Agreement. Thereupon, the Debtors shall have no interest in or with respect to the Wind-Down Entity Assets or the Wind-Down Trust.

### 3. Treatment of Wind-Down Trust for Federal Income Tax Purposes; No Successor-in-Interest

The Wind-Down Trust shall be established for the primary purpose of liquidating and distributing the Wind-Down Trust Assets transferred to it, in accordance with Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Wind-Down Trust. Accordingly, the Wind-Down Trustee may, in an expeditious but orderly manner, liquidate the Wind-Down Trust Assets, make timely distributions to the Wind-Down Trust Beneficiaries and not unduly prolong its duration. The Wind-Down Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth herein or in the Wind-Down Trust Agreement. The record holders of beneficial interests shall be recorded and set forth in a register maintained by the Wind-Down Trustee expressly for such purpose.

The Wind-Down Trust is intended to qualify as a "grantor trust" for federal income tax purposes to the extent reasonably practicable, with the Wind-Down Trust Beneficiaries treated as grantors and owners of the Wind-Down Trust. However, with respect to any of the assets of the Wind-Down Trust that are subject to potential disputed claims of ownership or uncertain distributions, *or* to the extent "liquidating trust" treatment is otherwise unavailable, the Debtors anticipate that such assets will be subject to disputed ownership fund treatment under Section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes. Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account. Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account

(and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

      4.    <u>Appointment of Wind-Down Trustee</u>

The Wind-Down Trustee shall be selected by the Committee, in consultation with the Debtors, and shall be identified in the Plan Supplement. The appointment of the Wind-Down Trustee shall be approved in the Confirmation Order, and the Wind-Down Trustee's duties shall commence as of the Effective Date. The Wind-Down Trustee shall administer the distributions to the Wind-Down Trust Beneficiaries and shall serve as a representative of the Estates under section 1123(b) of the Bankruptcy Code for the purpose of enforcing Vested Causes of Action belonging to the Estates that are not released, waived, settled, compromised, or transferred pursuant to the Plan and subject to the limitations set forth in the Plan, including Article IV.F and Article IV.G.

In accordance with the Wind-Down Trust Agreement, the Wind-Down Trustee shall serve in such capacity through the earlier of (i) the date on which the Wind-Down Trust is dissolved in accordance with the Wind-Down Trust Agreement, and (ii) the date on which a Wind-Down Trustee resigns, is terminated, or is otherwise unable to serve; *provided, however*, that, in the event that a Wind-Down Trustee resigns, is terminated, or is otherwise unable to serve, the Wind-Down Trust Oversight Committee shall appoint a successor to serve as a Wind-Down Trustee in accordance with the Wind-Down Trust Agreement. If the Wind-Down Trust Oversight Committee does not appoint a successor within the time periods specified in the Wind-Down Trust Agreement, then the Bankruptcy Court, upon the motion of any party-in-interest, including counsel to the Wind-Down Trust, shall approve a successor to serve as a Wind-Down Trustee.

      5.    <u>Responsibilities of Wind-Down Trustee</u>

Responsibilities of the Wind-Down Trustee shall be as identified in the Wind-Down Trust Agreement and shall include, but are not limited to:

    (a)    Implementing the Wind-Down Trust, and making the distributions contemplated by the Plan;

    (b)    Marshalling, marketing for sale, and wind-down of any of the Debtors' assets constituting Wind-Down Trust Assets;

    (c)    Filing and prosecuting any objections to Claims or Interests or settling or otherwise compromising such Claims and Interests, if necessary and appropriate, in accordance with the Plan hereof;

    (d)    Commencing, prosecuting, or settling claims and Vested Causes of Action;

    (e)    Recovering and compelling turnover of the Debtors' property;

    (f)    Prosecuting and settling the 3AC Claims, FTX Claims, and Alameda Claims;

    (g)    Paying Wind-Down Trust Expenses;

    (h)    Abandoning any Debtor assets that cannot be sold or otherwise disposed of for value and where a distribution to Holders of Allowed Claims or Interests would not be feasible or cost-effective in the Wind-Down Trustee's reasonable judgment;

(i)      Preparing and filing post-Effective Date operating reports (including the month in which the Effective Date occurs);

(j)      Filing appropriate tax returns in the exercise of the Wind-Down Trustee's fiduciary obligations;

(k)      Retaining such Professionals as are necessary and appropriate in furtherance of the Wind-Down Trustee's fiduciary obligations; and

(l)      Taking such actions as are necessary and reasonable to carry out the purposes of the Wind-Down Trust, including winding down the Debtors' business affairs.

6.     <u>The Wind-Down Trust Oversight Committee</u>

The Wind-Down Trust Oversight Committee shall consist of those parties selected by the Committee and identified in the Plan Supplement, and which, at no time shall consist of greater than seven members.

The Wind-Down Trust Oversight Committee shall have the responsibility to review and advise the Wind-Down Trustee with respect to the liquidation and distribution of the Wind-Down Entity Assets transferred to the Wind-Down Trust in accordance herewith and the Wind-Down Trust Agreement. For the avoidance of doubt, in advising the Wind-Down Trustee, the Wind-Down Trust Oversight Committee shall maintain the same fiduciary responsibilities as the Wind-Down Trustee. Vacancies on the Wind-Down Trust Oversight Committee shall be filled by a Person designated by the remaining member or members of the Wind-Down Trust Oversight Committee from among the Holders of Account Holder Claims. The Wind-Down Trustee shall have the authority to seek an order from the Bankruptcy Court removing or replacing members of the Wind-Down Trust Oversight Committee for cause.

7.     <u>Expenses of Wind-Down Trustee</u>

The Wind-Down Trust Expenses shall be paid from the Wind-Down Trust Assets subject to the Wind-Down Reserve and the Non-Released D&O Claim Budget.

8.     <u>Insurance; Bond</u>

The Wind-Down Trustee may obtain insurance coverage (in the form of an errors and omissions policy or otherwise) with respect to the liabilities and obligations of the Wind-Down Trustee and the Wind-Down Trust Oversight Committee under the Wind-Down Trust Agreement. Unless otherwise agreed to by the Wind-Down Trust Oversight Committee, the Wind-Down Trustee shall serve with a bond, the terms of which shall be agreed to by the Wind-Down Trust Oversight Committee, and the cost and expense of which shall be paid by the Wind-Down Trust.

9.      Fiduciary Duties of the Wind-Down Trustee

Pursuant hereto and the Wind-Down Trust Agreement and the Wind-Down Trustee shall act in a fiduciary capacity on behalf of the interests of all Holders of Claims and Interests that will receive distributions pursuant to Plan.

10.      Termination of the Wind-Down Trust

The Wind-Down Trust will terminate on the earlier of:  (a) (i) the final liquidation, administration and distribution of the Wind-Down Trust Assets in accordance with the terms of the Wind-Down Trust Agreement and the Plan, and its full performance of all other duties and functions as set forth herein or in the Wind-Down Trust Agreement and (ii) the Chapter 11 Cases of the Debtors have been closed; or (b) the Wind-Down Trustee determines in its reasonable judgment that the Wind-Down Trust lacks sufficient assets and financial resources, after reasonable collection efforts, to complete the duties and powers assigned to him or her under the Plan, the Confirmation Order and/or the Wind-Down Trust Agreement. After (x) the final distributions pursuant hereto, (y) the Filing by or on behalf of the Wind-Down Trust of a certification of dissolution with the Bankruptcy Court, and (z) any other action deemed appropriate by the Wind-Down Trustee, the Wind-Down Trust shall be deemed dissolved for all purposes without the necessity for any other or further actions.

11.      Liability of Wind-Down Trustee; Indemnification

Neither the Wind-Down Trustee, the Wind-Down Trust Oversight Committee, their respective members, employees, employers, designees or professionals, or any of their duly designated agents or representatives (each, a "Wind-Down Trust Party" and collectively, the "Wind-Down Trust Parties") shall be liable for losses, claims, damages, liabilities or expenses in connection with the affairs of the Wind-Down Trust or for the act or omission of any other Wind-Down Trust Party, nor shall the Wind-Down Trust Parties be liable for any act or omission taken or omitted to be taken pursuant to the discretion, powers and authority conferred, or in good faith believed to be conferred by the Wind-Down Trust Agreement or the Plan other than for specific acts or omissions resulting from such Wind-Down Trust Party's willful misconduct, gross negligence or actual fraud.  Subject to the Wind-Down Trust Agreement, the Wind-Down Trustee shall be entitled to enjoy all of the rights, powers, immunities and privileges applicable to a chapter 7 trustee, and the Wind-Down Trust Oversight Committee shall be entitled to enjoy all of the rights, powers, immunities and privileges of an official committee of unsecured creditors.  The Wind-Down Trustee or the Wind-Down Trust Oversight Committee may, in connection with the performance of its functions, and in its sole and absolute discretion, consult with its attorneys, accountants, financial advisors and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such persons, regardless of whether such advice or opinions are provided in writing. Notwithstanding such authority, neither the Wind-Down Trustee nor the Wind-Down Trust Oversight Committee shall be under any obligation to consult with its attorneys, accountants, financial advisors or agents, and their determination not to do so shall not result in the imposition of liability on the Wind-Down Trustee, the Wind-Down Trust Oversight Committee, or their respective members and/or designees, unless such determination is based on willful misconduct, gross negligence, or actual fraud.  The Wind-Down Trust shall indemnify and hold harmless the Wind-Down Trust Parties (in their capacity as such), from and against and in respect of all liabilities, losses, damages, claims, costs and expenses (including, without limitation, reasonable attorneys' fees, disbursements, and related expenses) that such parties may incur or to which such parties may become subject in connection with any action, suit, proceeding or investigation brought by or threatened against such parties arising out of or due to their acts or omissions, or consequences of such acts or omissions, with respect to the implementation or administration of the Wind-Down Trust or the Plan or the discharge of their duties hereunder; *provided*, *however*, that no such indemnification will be made to such Persons for actions or omissions as a result of willful misconduct, gross negligence, or actual

fraud. Persons dealing or having any relationship with the Wind-Down Trustee shall have recourse only to the Wind-Down Trust Assets and shall look only to the Wind-Down Trust Assets to satisfy any liability or other obligations incurred by the Wind-Down Trustee or the Wind-Down Trust Oversight Committee to such Person in carrying out the terms of the Wind-Down Trust Agreement, and neither the Wind-Down Trustee nor the Wind-Down Trust Oversight Committee, shall have any personal obligation to satisfy any such liability. The Wind-Down Trustee and/or the Wind-Down Trust Oversight Committee members shall not be liable whatsoever except for the performance of such duties and obligations as are specifically set forth herein, and no implied covenants or obligations shall be read into the Wind-Down Trust Agreement against any of them. The Wind-Down Trust shall promptly pay expenses reasonably incurred by any Wind-Down Trust Party in defending, participating in, or settling any action, proceeding or investigation in which such Wind-Down Trust Party is a party or is threatened to be made a party or otherwise is participating in connection with the Wind-Down Trust Agreement or the duties, acts or omissions of the Wind-Down Trustee or otherwise in connection with the affairs of the Wind-Down Trust, upon submission of invoices therefor, whether in advance of the final disposition of such action, proceeding, or investigation or otherwise. Each Wind-Down Trust Party hereby undertakes, and the Wind-Down Trust hereby accepts his or her undertaking, to repay any and all such amounts so advanced if it shall ultimately be determined that such exculpated party is not entitled to be indemnified therefor under the Wind-Down Trust Agreement. The foregoing indemnity in respect of any Wind-Down Trust Party shall survive the termination of such Wind-Down Trust Party from the capacity for which they are indemnified.

12.     No Liability of the Wind-Down Trust.

On and after the Effective Date, the Wind-Down Trust shall have no liability on account of any Claims or Interests except as set forth herein and in the Wind-Down Trust Agreement. All payments and all distributions made by the Wind-Down Trustee hereunder shall be in exchange for all Claims or Interests against the Debtors.

**I.      Sources of Consideration for Plan Distributions**

Distributions under the Plan shall be funded by (i) the proceeds of Purchaser's payment obligations under Sections 2.1 and 2.2 of the Asset Purchase Agreement and distributions of Acquired Coins pursuant to Sections 6.12, and 6.14 of the Asset Purchase Agreement, (ii) the Wind-Down Entity or Wind-Down Trust (as applicable) from the Wind-Down Entity Assets or Wind-Down Trust Assets (as applicable); *provided*, *however*, that Allowed Professional Fee Claims shall be paid from the Professional Fee Escrow Account in the first instance. The Wind-Down Entity Assets or Wind-Down Trust Assets (as applicable) shall be used to pay the Wind-Down Entity Expenses (including the compensation of the Wind-Down Trustee and any professionals retained by the Wind-Down Trust), and to satisfy payment of Allowed Claims and Interests as set forth in the Plan.

**J.      Corporate Existence and Dissolution**

Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificates or articles of incorporation, certificates of formation, certificates of organization, or certificates of limited partnership and bylaws, operating agreements, limited liability company agreements, or limited partnership agreements (or other formation documents) in effect prior to the Effective Date, except to the extent such certificates or articles of incorporation, certificates of formation, certificates of organization, or certificates of limited partnership and bylaws, operating agreements, limited liability company agreements, or limited partnership agreements (or other formation

documents) are amended pursuant to the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings under applicable state or federal law).

On and after the Effective Date, the Wind-Down Entity will be authorized and directed to implement the Plan and any applicable orders of the Bankruptcy Court, and the Wind-Down Entity shall have the power and authority to take any action necessary to wind down and dissolve the Debtors' Estates.

Upon a certification to be Filed with the Bankruptcy Court by the Wind-Down Trustee of all distributions having been made and completion of all of its duties under the Plan and entry of a final decree closing the last of the Chapter 11 Cases, the Wind-Down Debtors shall be deemed to be dissolved without any further action by the Wind-Down Debtors, including the Filing of any documents with the secretary of state for the state in which the Wind-Down Debtors are formed or any other jurisdiction. The Wind-Down Trustee, however, shall have authority to take all necessary actions to dissolve the Wind-Down Debtors in and withdraw the Wind-Down Debtors from applicable states.

As soon as practicable after the Effective Date, the Wind-Down Entity shall take such actions as the Wind-Down Entity may determine to be necessary or desirable to carry out the purposes of the Plan. Any certificate of dissolution or equivalent document may be executed by the Wind-Down Entity on behalf of any Wind-Down Debtor without need for any action or approval by the shareholders or board of directors or managers of such Debtor. On and after the Effective Date, the Wind-Down Debtors (1) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (2) shall be deemed to have cancelled pursuant to this Plan all Interests, and (3) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date. Notwithstanding such Debtors' dissolution, such Debtors shall be deemed to remain intact solely with respect to the preparation, filing, review, and resolution of applications for Professional Fee Claims.

## K.  Corporate Action

Upon the Effective Date, all actions contemplated under the Plan, Definitive Documents, and Asset Purchase Agreement shall be deemed authorized and approved in all respects, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, directors, managers, managing-members, limited or general partners, or officers of the Debtors, the Wind-Down Debtors, the Wind-Down Trust or any other Entity, including: (1) appointment of the directors, managers, members, and officers for the Wind-Down Debtors as provided herein; (2) the issuances, transfer, and distribution of the Wind-Down Trust Units; (3) the formation of the Wind-Down Trust and appointment of the Wind-Down Trustee and Wind-Down Trust Oversight Committee; (4) the formation of any entities pursuant to and the implementation of the Plan and performance of all actions and transactions contemplated hereby and thereby; (5) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; and (6) all other acts or actions contemplated by the Plan, Definitive Documents, and Asset Purchase Agreement or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions (including effectuating the Restructuring Transactions Memorandum and the Customer Onboarding Protocol) (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan, Definitive Documents, and Asset Purchase Agreement involving the corporate structure of the Debtors or the Wind-Down Debtors, as applicable, and any corporate action required by the Debtors or the Wind-Down Debtors, as applicable, in connection with the Plan shall be deemed to have occurred on, and shall be in effect as of, the Effective Date, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the

Wind-Down Debtors, as applicable. On or, as applicable, prior to the Effective Date, the appropriate officers of the Debtors or the Wind-Down Debtors or the Wind-Down Trust, as applicable, shall be authorized and, as applicable, directed to issue, execute, and deliver the agreements, documents, Securities, certificates of incorporation, certificates of formation, bylaws, operating agreements, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Wind-Down Debtors, and any and all other agreements, documents, Securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this Article IV.K shall be effective notwithstanding any requirements under non-bankruptcy law.

## L. Vesting of Assets in the Wind-Down Entity

Except as otherwise provided in the Plan, or in any agreement, instrument, or other document incorporated in the Plan, notwithstanding any prohibition of assignability under applicable non-bankruptcy law and in accordance with section 1141 of the Bankruptcy Code, on the Effective Date, all property constituting Wind-Down Trust Assets, including all Vested Causes of Action of the Debtors (unless otherwise released, waived, compromised, settled, transferred, or discharged pursuant to the Plan), and any property acquired by any of the Debtors under the Plan shall vest in the Wind-Down Entity, free and clear of all Liens, Claims, charges, or other encumbrances.

## M. Cancellation of Notes, Instruments, Certificates, and Other Documents

On the later of the Effective Date and the date on which distributions are made pursuant to the Plan (if not made on the Effective Date), except for the purpose of evidencing a right to and allowing Holders of Claims and Interests to receive a distribution under the Plan or to the extent otherwise specifically provided for in the Plan, the Confirmation Order, or any agreement, instrument, or other document entered into in connection with or pursuant to the Plan or the Restructuring Transactions (including, without limitation, the Definitive Documents and the Asset Purchase Agreement), all notes, bonds, indentures, certificates, Securities, shares, purchase rights, options, warrants, collateral agreements, subordination agreements, intercreditor agreements, or other instruments or documents directly or indirectly evidencing, creating, or relating to any indebtedness or obligations of, or ownership interest in, the Debtors, giving rise to any Claims against or Interests in the Debtors or to any rights or obligations relating to any Claims against or Interests in the Debtors shall be deemed cancelled without any need for a Holder to take further action with respect thereto.

## N. Effectuating Documents; Further Transactions

On and after the Effective Date, the Wind-Down Debtors, and its directors, managers, partners, officers, authorized persons, and members thereof, and the Wind-Down Trust and Wind-Down Trustee are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, Definitive Documents, and Asset Purchase Agreement, in the name of and on behalf of the Wind-Down Debtors, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

## O. Section 1146(a) Exemption

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Wind-Down Debtor, the Wind-Down Trust, the Purchaser, or to any other Entity) of property under the Plan, Definitive Documents, and Asset Purchase Agreement or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or

the Wind-Down Debtors; (2) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, including the Asset Purchase Agreement, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, sales or use tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forgo the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**P.     Preservation of Rights of Action**

In accordance with section 1123(b) of the Bankruptcy Code, the Wind-Down Entity shall succeed to all rights to commence and pursue any and all Vested Causes of Action of the Debtors, whether arising before or after the Petition Date, including, without limitation, any actions specifically enumerated in the Schedule of Retained Causes of Action other than Causes of Action released, waived, settled, compromised, or transferred. Such rights shall be preserved by the Debtors and Wind-Down Debtors and shall vest in the Wind-Down Entity, with the Wind-Down Entity's rights to commence, prosecute, or settle such Causes of Action preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action expressly released, waived, settled, compromised, or transferred by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan or pursuant to the Asset Purchase Agreement, which shall be deemed released and waived by the Debtors and Wind-Down Debtors as of the Effective Date.

The Wind-Down Trust may pursue such Causes of Action, as appropriate, in accordance with the best interests of the beneficiaries of the Wind-Down Trust and in accordance with the Wind-Down Trust Agreement and the Plan. **No Entity may rely on the absence of a specific reference in the Schedules of Assets and Liabilities or Statement of Financial Affairs, the Plan, the Plan Supplement, the Disclosure Statement, or the Schedule of Retained Causes of Action to any Cause of Action against it as any indication that the Debtors, the Wind-Down Debtors or the Wind-Down Trust, as applicable, will not pursue any and all available Causes of Action of the Debtors against it. The Wind-Down Trust, on behalf of the Debtors and the Wind-Down Debtors, expressly reserves all rights to prosecute any and all Causes of Action against any Entity, except as otherwise provided in the Plan, including Article VIII of the Plan.** Unless any Cause of Action of the Debtors is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or pursuant to a Final Order, the Wind-Down Trust, on behalf of the Debtors and Wind-Down Debtors and in accordance with the Wind-Down Trust Agreement, expressly reserves all such Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or Consummation.

The Wind-Down Trust, on behalf of the Debtors and Wind-Down Debtors, reserves and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Cause of Action that a Debtor may hold against any Entity shall vest in the Wind-Down Trust, except as otherwise provided in the Plan, including Article VIII of the Plan. The Wind-Down Trust, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Wind-Down Trust shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court in accordance with the Plan.

**Q.    Election to Contribute Third-Party Claims**

Because aggregating all Contributed Third-Party Claims may enable the pursuit and settlement of such litigation claims in a more efficient and effective manner, each Holder of a Claim or Interest may agree, by electing on its ballot or opt-in form, to contribute its Contributed Third-Party Claims to the Wind-Down Entity. By electing such option on its ballot or opt-in form, each Contributing Claimant agrees that, subject to the occurrence of the Effective Date and the formation of the Wind-Down Entity, it will be deemed, without further action, (i) to have irrevocably contributed its Contributed Third-Party Claims to the Wind-Down Entity, and (ii) to have agreed to execute any documents reasonably requested by the Debtors or the Wind-Down Entity to memorialize and effectuate such contribution.

**R.    Contribution of Contributed Third-Party Claims**

On the Effective Date, all Contributed Third-Party Claims will be irrevocably contributed to the Wind-Down Entity and shall thereafter be Wind-Down Trust Assets for all purposes. No Person may rely on the absence of a specific reference in the Plan, the Disclosure Statement, the Confirmation Order, the Wind-Down Trust Agreement, the Plan Supplement, or any other document as any indication that the Wind-Down Trust will or will not pursue any and all available Contributed Third-Party Claims against such Person. The Wind-Down Trust shall have, retain, reserve, and be entitled to assert all Contributed Third-Party Claims fully to the same extent that the Contributing Claimants could have asserted such claims prior to the Effective Date. For the avoidance of doubt, the Contributed Third-Party Claims shall not include the rights of any of the Contributing Claimants to receive the distributions under the Plan on account of their Claims or Interests.

**S.    Closing the Chapter 11 Cases**

On and after the Effective Date, the Wind-Down Entity shall be permitted to classify all of the Chapter 11 Cases of the Debtors except for the Chapter 11 Case of Voyager Digital, LLC, or any other Debtor identified in the Restructuring Transactions Memorandum as having its Chapter 11 Case remain open following the Effective Date, as closed, and all contested matters relating to any of the Debtors, including objections to Claims or Interests and any adversary proceedings, may be administered and heard in the Chapter 11 Case of Voyager Digital, LLC, or any other Debtor identified in the Restructuring Transactions Memorandum as having its Chapter 11 Case remain open following the Effective Date,

irrespective of whether such Claims or Interests were Filed or such adversary proceeding was commenced against a Debtor whose Chapter 11 Case was closed.

## ARTICLE V.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.    Assumption and Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, except as otherwise provided herein, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (1) is specifically described in the Plan as to be assumed in connection with confirmation of the Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement; (2) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Effective Date; (3) is to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, in connection with the Sale Transaction; (4) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; or (5) is a D&O Liability Insurance Policy other than the Side-A Policy. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, assignments, and rejections, including the assumption of the Executory Contracts or Unexpired Leases as provided in the Plan Supplement, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

### B.    Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Wind-Down Debtors, as applicable, under such Executory Contract or Unexpired Lease. Without limiting the general nature of the foregoing, and notwithstanding any non-bankruptcy law to the contrary, the Debtors and Wind-Down Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the Debtors contracting from non-Debtor counterparties to any rejected Executory Contract or Unexpired Lease.

### C.    Claims Based on Rejection of Executory Contracts or Unexpired Leases

Counterparties to Executory Contracts or Unexpired Leases listed subject to rejection under the Plan shall be served with a notice of rejection of Executory Contracts and Unexpired Leases with the Plan Supplement. Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Claims, Noticing, and Solicitation Agent and served on the Debtors or Wind-Down Entity, as applicable, no later than thirty days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection.  **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, or the Wind-Down Entity, the Estates, or their property without the need for any objection by the Wind-Down Entity or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed released, and be subject to the permanent injunction set forth in Article VIII.D of the Plan, including any Claims against any**

**Debtor listed on the Debtors' schedules as unliquidated, contingent, or disputed.** All Allowed Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease shall be treated as General Unsecured Claims in accordance with Article III.C of the Plan.

D.     **Cure of Defaults for Executory Contracts and Unexpired Leases Assumed**

The Debtors, the Wind-Down Entity, or the Purchaser, as applicable pursuant to the Asset Purchase Agreement, shall pay Cures, if any, on the Effective Date. The Debtors shall provide notice of the amount and timing of payment of any such Cure to the parties to the applicable assumed Executory Contracts or Unexpired Leases as part of the Plan Supplement. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure that differ from the ordinary course amounts paid or proposed to be paid by the Debtors, the Wind-Down Entity, or the Purchaser shall be dealt with in the ordinary course of business and, if needed, shall be Filed with the Claims, Noticing, and Solicitation Agent on or before thirty days after the Effective Date. **If any counterparty to an Executory Contract or Unexpired Lease does not receive a notice of assumption and applicable cure amount, such counterparty shall have until on or before thirty days after the Effective Date to bring forth and File a request for payment of Cure.** Any such request that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Wind-Down Debtor or the Wind-Down Entity, without the need for any objection by the Wind-Down Entity or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure shall be deemed fully satisfied and released upon payment by the Debtors or the Wind-Down Entity or the Purchaser of the Cure in the ordinary course of business or upon and in accordance with any resolution of a Cure dispute (whether by order of the Bankruptcy Court or through settlement with the applicable Executory Contract or Unexpired Lease counterparty); *provided, however*, that nothing herein shall prevent the Wind-Down Entity or the Purchaser, as applicable, from paying any Cure Claim despite the failure of the relevant counterparty to File such request for payment of such Cure. The Wind-Down Entity or the Purchaser may also settle any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court. In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be Filed with the Bankruptcy Court on or before thirty days after the Effective Date. Any such objection will be scheduled to be heard by the Bankruptcy Court at the Debtors' first scheduled omnibus hearing for which such objection is timely Filed. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

In the event of a dispute regarding: (1) the amount of any Cure Claim, (2) the ability of the Wind-Down Debtors, Purchaser, or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed (or assumed and assigned, as applicable), or (3) any other matter pertaining to assumption or assignment, then any disputed Cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made as soon as reasonably practicable following, and in accordance with, the entry of a Final Order of the Bankruptcy Court resolving such dispute or as may be agreed upon by the Debtors, the Wind-Down Entity, or Purchaser, as applicable, and the counterparty to the Executory Contract or Unexpired Lease, and any such unresolved dispute shall not prevent or delay implementation of the Plan or the occurrence of the Effective Date.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise or assignment of any Executory Contract or Unexpired Lease to the Purchaser and full payment of any applicable Cure pursuant to this Article V.D, or upon and in accordance with any resolution of a Cure dispute (whether by order of the Bankruptcy Court or through settlement with the applicable Executory Contract or Unexpired Lease counterparty), shall result in the full release and satisfaction of any Cures,

Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed or assumed and assigned in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to this Article V.D, in the amount and at the time in the ordinary course of business or upon and in accordance with any resolution of a Cure dispute (whether by order of the Bankruptcy Court or through settlement with the applicable Executory Contract or Unexpired Lease counterparty), shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court. For the avoidance of doubt, in the event that any counterparty to an Executory Contract or Unexpired Lease receives a notice of assumption and applicable proposed Cure amount, and disputes the Debtors' proposed Cure amount, such party shall not be required to File a Proof of Claim with respect to such dispute. Any counterparty to an Executory Contract or Unexpired Lease that does not receive a notice or applicable proposed Cure amount, and believes a Cure amount is owed, shall have thirty days after the Effective Date to File a Proof of Claim with respect to such alleged Cure amount, which Claim shall not be expunged until such Cure dispute is resolved.**

## E.     Insurance Policies and Surety Bonds

Each D&O Liability Insurance Policy (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto) other than the Side-A Policy shall be assumed, in their entirety, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date, pursuant to sections 105 and 365 of the Bankruptcy Code with the Wind-Down Entity being authorized to pursue any proceeds thereof on behalf of the Debtors or the Wind-Down Entity. The Side-A Policy shall ride through these Chapter 11 Cases with the Debtors, and the Wind-Down Entity preserves all avoidance and other actions in connection with the premium paid thereunder. All beneficiaries under the D&O Insurance Policies reserve their rights under such D&O Insurance Policies subject to the limitations set forth in this Plan.

The Debtors or the Wind-Down Entity, as applicable, shall not terminate or otherwise reduce the coverage under any D&O Liability Insurance Policy (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto) in effect prior to the Effective Date, and any current and former directors, officers, managers, and employees of the Debtors who served in such capacity at any time before or after the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy subject to the terms thereof regardless of whether such directors, officers, managers, and employees remain in such positions after the Effective Date. Notwithstanding anything to the contrary in the Plan, the Debtors or the Wind-Down Entity shall retain the ability to supplement such D&O Liability Insurance Policy as the Debtors or Wind-Down Entity may deem necessary, subject to the prior written consent of the Wind-Down Entity. Notwithstanding anything to the contrary contained in the Plan, the Wind-Down Trust shall be entitled to pursue avoidance of the premium paid for the XL Specialty Insurance Company Cornerstone A-Side Management Liability Insurance Policy No. ELU184179-22, and nothing in this Plan shall be deemed a waiver or abrogation of any such rights.

The Debtors shall continue to satisfy their obligations under their surety bonds and insurance policies in full and continue such programs in the ordinary course of business. Each of the Debtors' surety bonds and insurance policies, and any agreements, documents, or instruments relating thereto shall be treated as Executory Contracts under the Plan. On the Effective Date: (a) the Debtors shall be deemed to have assumed all such surety bonds and insurance policies and any agreements, documents, and instruments relating thereto in their entirety; *provided* that the Debtors have assumed all indemnity agreements and cash

collateral agreements related to the surety bonds and (b) such surety bonds and insurance policies and any agreements, documents, or instruments relating thereto shall revest in the applicable Wind-Down Debtor(s) unaltered.

**F.      Reservation of Rights**

Nothing contained in the Plan or the Plan Supplement (unless otherwise explicitly provided) shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Wind-Down Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Wind-Down Entity, as applicable, shall have forty-five days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, including by rejecting such contract or lease effective as of the Confirmation Date.

**G.      Nonoccurrence of Effective Date**

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

**H.      Contracts and Leases Entered into After the Petition Date**

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed under section 365 of the Bankruptcy Code, will be performed by the applicable Debtor or Wind-Down Debtor liable thereunder in the ordinary course of its business.  Such contracts and leases that are not rejected under the Plan shall survive and remain unaffected by entry of the Confirmation Order.

<div align="center">

**ARTICLE VI.**

**PROVISIONS GOVERNING DISTRIBUTIONS**

</div>

**A.      Timing and Calculation of Amounts to Be Distributed**

Except (1) as otherwise provided herein, (2) upon a Final Order, or (3) as otherwise agreed to by the Debtors, the Purchaser, or the Wind-Down Entity, as the case may be, and the Holder of the applicable Claim, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the next Distribution Date after such Claim becomes, as applicable, an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive the full amount of distributions that the Plan provides for Allowed Claims in the applicable Class from the Distribution Agent.  In the event that any payment or distribution under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or distribution may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  Except as specifically provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

B.    **Rights and Powers of Distribution Agent**

    1.    Powers of the Distribution Agent

        The Distribution Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties and exercise its rights under the Plan; (b) make all distributions contemplated under the Plan; (c) employ professionals to represent it with respect to its responsibilities and powers; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions of the Plan.

    2.    Expenses Incurred on or after the Effective Date

        Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Distribution Agent on or after the Effective Date and any reasonable compensation and expense reimbursement claims (including reasonable attorney and/or other professional fees and expenses) made by such Distribution Agent shall be paid in Cash by the Wind-Down Entity.

C.    **Delivery of Distributions and Undeliverable or Unclaimed Distributions**

    1.    Distributions Generally

        Except as otherwise provided in the Plan (including in paragraph 8 below), the Distribution Agent shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the applicable register or in the Debtors' records as of the date of any such distribution (as applicable), including the address set forth in any Proof of Claim filed by that Holder.

    2.    Distributions on Account of Obligations of Multiple Debtors

        For all purposes associated with distributions under the Plan, all guarantees by any Debtor of the obligations of any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor, shall be deemed eliminated so that any obligation that could otherwise be asserted against more than one Debtor shall result in a single distribution under the Plan.  Any such Claims shall be subject to all potential objections, defenses, and counterclaims, and to estimation pursuant to section 502(c) of the Bankruptcy Code.

    3.    Record Date of Distributions

        On the Distribution Record Date, the various transfer registers for each Class of Claims or Interests as maintained by the Debtors or their respective agents shall be deemed closed, and there shall be no further changes in the record Holders of any Claims or Interests.  The Distribution Agent shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date. In addition, with respect to payment of any Cure amounts or disputes over any Cure amounts, neither the Debtors nor the Distribution Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the Effective Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure amount.

    4.    Special Rules for Distributions to Holders of Disputed Claims and Interests

        Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the Wind-Down Entity, on the one hand, and the Holder of a Disputed Claim or Interest, on the other hand, or

as set forth in a Final Order, no partial payments and no partial distributions shall be made with respect to a Disputed Claim or Interest until all of the Disputed Claim or Interest has become an Allowed Claim or Interest or has otherwise been resolved by settlement or Final Order; *provided* that, if the Wind-Down Entity does not dispute a portion of an amount asserted pursuant to an otherwise Disputed Claim or Interest, the Distribution Agent may make a partial distribution on account of such portion of such Claim or Interest that is not Disputed at the time and in the manner that the Distribution Agent makes distributions to similarly situated Holders of Allowed Claims or Interests pursuant to the Plan. Any dividends or other distributions arising from property distributed to Holders of Allowed Claims or Interests, as applicable, in a Class and paid to such Holders under the Plan shall also be paid, in the applicable amounts, to any Holder of a Disputed Claim or Interest, as applicable, in such Class that becomes an Allowed Claim or Interest after the date or dates that such dividends or other distributions were earlier paid to Holders of Allowed Claims or Interests in such Class.

5.    De Minimis Distributions; Minimum Distributions

The Distribution Agent shall not make any Cash distributions to any Holder of an Allowed Claim or Interest pursuant to Article III.C.1-11 of this Plan on account of such Allowed Claim or Interest if such distribution is valued, in the reasonable discretion of the Distribution Agent, at less than $1.00, and each Holder of an Allowed Claim or Interest to which this limitation applies shall not be entitled to any distributions under the Plan. Notwithstanding anything to the contrary in this Plan, there shall be no minimum distribution threshold on account of distributions of any Cryptocurrency to Holders of Allowed Account Holder Claims and Allowed OpCo General Unsecured Claims.

6.    Undeliverable Distributions and Unclaimed Property

In the event that either (a) a distribution to any Holder is returned as undeliverable or (b) the Holder of an Allowed Claim or Interest does not respond to a request by the Debtors or the Distribution Agent for information necessary to facilitate a particular distribution, no distribution to such Holder shall be made unless and until the Distribution Agent has determined the then-current address of such Holder or received the necessary information to facilitate a particular distribution, at which time such distribution shall be made to such Holder without interest, dividends, or other accruals of any kind; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code on the date that is one year after the Effective Date. After such date, all unclaimed property or interests in property shall revert to the Wind-Down Entity automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable local, state, federal, or foreign escheat, abandoned, or unclaimed property laws to the contrary), and the Claim or Interest of any Holder to such property or interest in property shall not be entitled to any distributions under the Plan.

7.    Manner of Payment Pursuant to the Plan

At the option of the Distribution Agent, any Cash payment to be made hereunder may be made by check, wire transfer, automated clearing house, credit card, or as otherwise provided in applicable agreements.

8.    Distributions of Net Owed Coins; Additional Bankruptcy Distributions

As a general matter, the Purchaser will allocate each Account Holder's Net Owed Coins to its account on the Binance.US Platform, and each Holder of OpCo General Unsecured Claim's Pro Rata share of the Distributable Cryptocurrency (in Cash) to its account on the Binance.US Platform in accordance with, and subject to, the provisions of Section 6.12 of the Asset Purchase Agreement.

As a general matter, the Customer Onboarding Protocol will provide that Purchaser will make Additional Bankruptcy Distributions to Transferred Creditors corresponding to their Pro Rata shares of such Additional Bankruptcy Distribution (if such Additional Bankruptcy Distribution is in Cryptocurrency, based on the Transferred Cryptocurrency Value of the Cryptocurrency included in such Additional Bankruptcy Distribution), all in accordance with any applicable Post-Bankruptcy Statement (as defined in the Asset Purchase Agreement).

If any Account Holder or Holder of an Allowed OpCo General Unsecured Claim does not become a Transferred Creditor prior to the date that is three (3) months following the later of the Closing Date or the date on which the terms and conditions for the Binance.US Platform are made available for such Person to accept (as provided in the Customer Onboarding Protocol), then Purchaser shall convert any Cryptocurrency allocable to such Person into U.S. Dollars at the then-prevailing rates (including applicable fees, spreads, costs and expenses) on the Binance.US Platform and deliver such U.S. Dollars, together with any cash or others assets in respect of such Persons, to the Debtors within five (5) Business Days, for further distribution by the Debtors in accordance with this Plan and the Customer Onboarding Protocol.

If any Account Holder or Holder of an Allowed OpCo General Unsecured Claim is located in an Unsupported Jurisdiction (as defined in the Asset Purchase Agreement), then the Net Owed Coins, if applicable, and Additional Bankruptcy Distributions allocable to such Person shall be handled pursuant to Section 6.12(b) or, if applicable, Section 6.14(d) of the Asset Purchase Agreement.

Purchaser shall have no responsibility to make any distributions other than as contemplated by Sections 6.12 and 6.14 of the Asset Purchase Agreement.

## D. Compliance Matters

In connection with the Plan, to the extent applicable, the Debtors, the Wind-Down Entity, any Distribution Agent, and any other applicable withholding and reporting agents shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Debtors, the Wind-Down Entity, the Distribution Agent, and any other applicable withholding and reporting agents shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including wind-down a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms that are reasonable and appropriate; *provided* that the Wind-Down Entity and the Distribution Agent, as applicable, shall request appropriate documentation from the applicable distributees and allow such distributees a reasonable amount of time to respond. The Debtors, the Wind-Down Entity, the Distribution Agent, and any other applicable withholding and reporting agents reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

## E. Foreign Currency Exchange Rate

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim, asserted in government issued currency (for the avoidance of doubt, not including any Cryptocurrency) other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using

the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Effective Date.

## F.     Claims Paid or Payable by Third Parties

### 1.     Claims Paid by Third Parties

The Debtors or the Wind-Down Entity, as applicable, shall reduce a Claim or Interest, and such Claim or Interest (or portion thereof) shall be disallowed without an objection to such Claim or Interest having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim or Interest receives a payment on account of such Claim or Interest from a party that is not a Debtor or Wind-Down Debtor (or other Distribution Agent), as applicable, including any payments made in connection with the Sale Transaction.  To the extent a Holder of a Claim or Interest receives a distribution on account of such Claim or Interest and receives payment from a party that is not a Debtor or a Wind-Down Debtor (or other Distribution Agent), including payments made in connection with the Sale Transaction, as applicable, on account of such Claim or Interest, such Holder shall, within ten Business Days of receipt thereof, repay, return, or deliver any distribution held by or transferred to the Holder to the applicable Wind-Down Debtor to the extent the Holder's total recovery on account of such Claim or Interest from the third party and under the Plan exceeds the amount of such Claim or Interest as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay, return, or deliver such distribution shall result in the Holder owing the applicable Wind-Down Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the ten-Business Day grace period specified above until the amount is repaid.

### 2.     Claims Payable by Third Parties

No distributions under the Plan shall be made on account of an Allowed Claim or Interest that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim or Interest has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim or Interest (if and to the extent adjudicated by a court of competent jurisdiction or otherwise settled), then immediately upon such payment, such Claim or Interest may be expunged or reduced on the Claims Register by the Claims, Noticing, and Solicitation Agent to the extent of any such payment without an objection to such Claim or Interest having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

### 3.     Applicability of Insurance Policies

Except as otherwise provided herein, payments to Holders of Claims or Interests shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any rights, defenses, or Cause of Action that the Debtors, the Wind-Down Entity or any other Entity may hold against any other Entity, including insurers, under any policies of insurance, agreements related thereto, or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any rights or defenses, including coverage defenses, held by such insurers under the applicable insurance policies, agreements related thereto, and applicable non-bankruptcy law.

## G.     Setoffs and Recoupment

Except as otherwise expressly provided for herein, each Debtor, Wind-Down Debtor, the Wind-Down Entity, or such Entity's designee as instructed by such Debtor, Wind-Down Entity, as applicable, may, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code),

applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, set off against or recoup from an Allowed Claim and any distributions to be made pursuant to the Plan on account of such Allowed Claim, any Claims, rights, and Causes of Action of any nature whatsoever that the Debtor, Wind-Down Debtor or Wind-Down Entity, as applicable, may have against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action have not been otherwise compromised, settled, or released on or prior to the Effective Date (whether pursuant to the Plan or otherwise). Notwithstanding the foregoing, except as expressly stated in Article VIII of this Plan, neither the failure to effect such a setoff or recoupment nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by the Debtors or the Wind-Down Entity of any such Claims, rights, or Causes of Action the Debtors or the Wind-Down Entity may possess against such Holder.

## H.    Allocation between Principal and Accrued Interest

Except as otherwise provided herein, the aggregate consideration paid to Holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof and as determined for federal income tax purposes) and second, to the extent the consideration exceeds the principal amount of the Allowed Claims, to the remaining portion of such Allowed Claim if any.

## ARTICLE VII.

## PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT, AND UNLIQUIDATED CLAIMS AND INTERESTS

## A.    Disputed Claims Process

After the Effective Date, the Wind-Down Entity, and any party-in-interest, shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim or Interest immediately before the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim or Interest shall become an Allowed Claim or Interest unless and until such Claim or Interest is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim or Interest. If a Holder of a Claim or Interest in Class disputes the amount of their Claim or Interest as listed in the Schedules, the Holder should notify the Debtors or the Wind-Down Entity of such dispute. If the Debtors and the Holder agree to an amended Claim amount prior to the Effective Date, the Debtors shall file amended Schedules prior to the Effective Date. If between the Confirmation Date and the Effective Date, the dispute cannot be consensually resolved, the Holder may seek (by letter to the Court) to have the claim or interest dispute resolved before the Bankruptcy Court (and, with the consent of the Debtors, before any other court or tribunal with jurisdiction over the parties). After the Effective Date, the creditor may seek to have the claim dispute resolved before the Bankruptcy Court or any other court or tribunal with jurisdiction over the parties.

Unless relating to a Claim or Interest expressly Allowed pursuant to the Plan, all Proofs of Claim filed in these Chapter 11 Cases shall be considered objected to and Disputed without further action by the Debtors. Upon the Effective Date, all Proofs of Claim filed against the Debtors, regardless of the time of filing, and including Proofs of Claim filed after the Effective Date, shall be deemed withdrawn and expunged, other than as provided below. Notwithstanding anything in this Plan to the contrary: (1) all Claims against the Debtors that result from the Debtors' rejection of an Executory Contract or Unexpired Lease; (2) Claims filed to dispute the amount of any proposed Cure pursuant to section 365 of the Bankruptcy Code; and (3) Claims that the Debtors seek to have determined by the Bankruptcy Court, shall

in all cases be determined by the Bankruptcy Court, if not otherwise resolved through settlement with the applicable claimant.

Notwithstanding any provision herein to the contrary, nothing in the Disclosure Statement, Plan, or Confirmation Order grants the Bankruptcy Court with jurisdiction over any police and regulatory actions by the SEC, and the SEC shall retain the power and authority to commence and continue any such actions against any person or entity, including without limitation, the Debtors, in any forum with jurisdiction, provided, however, that enforcement of any money judgment against the Debtors must be in accordance with the Plan. In addition, the SEC may file any proof of claim by the Government Bar Date or such later date as ordered by the Bankruptcy Court and amend its proof of claim upon determination of liability on its claims. Any objection to such claim shall be in accordance with Bankruptcy Rule 3007, and such claim shall not automatically be deemed objected to, withdrawn, or expunged.

On the Effective Date, the Debtors or Wind-Down Trustee, as applicable, may establish one or more accounts or funds to hold and dispose of certain assets, pursue certain litigation (including the Causes of Action preserved under the Plan or otherwise vesting in the Wind-Down Trust), and/or satisfy certain Claims (including Claims that are contingent or have not yet been Allowed). For any such account or fund, the Debtors or the Wind-Down Trustee, as applicable, may take the position that grantor trust treatment applies in whole or in part. To the extent such treatment applies to any such account or fund, for all U.S. federal income tax purposes, the beneficiaries of any such account or fund would be treated as grantors and owners thereof, and it is intended, to the extent reasonably practicable, that any such account or fund would be classified as a liquidating trust under section 301.7701-4 of the Treasury Regulations. Alternatively, any such account or fund may be subject to the tax rules that apply to "disputed ownership funds" under 26 C.F.R. 1.468B–9. If such rules apply, such assets would be subject to entity-level taxation, and the Debtors and Wind-Down Trustee would be required to comply with the relevant rules.

## B.    Objections to Claims or Interests

Except as otherwise specifically provided in the Plan, after the Effective Date, the Wind-Down Entity shall have the sole authority to: (1) File, withdraw, or litigate to judgment, any objections to Claims or Interests; and (2) settle or compromise any Disputed Claim or Interest without any further notice to or action, order, or approval by the Bankruptcy Court. For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, the Wind-Down Entity shall have and retain any and all rights and defenses each such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to Article IV.P of the Plan.

Any objections to Claims or Interests shall be Filed on or before the Claims Objection Bar Date. For the avoidance of doubt, the Bankruptcy Court may extend the time period to object to Claims or Interests set forth in this paragraph at any time, including before or after the expiration of one hundred eighty days after the Effective Date, in its discretion or upon request by the Debtors or any party in interest.

## C.    Estimation of Claims

Before or after the Effective Date, the Debtors or the Wind-Down Entity, as applicable, may (but are not required to), at any time, request that the Bankruptcy Court estimate any Disputed Claim or Interest that is contingent or unliquidated pursuant to applicable law, including pursuant to section 502(c) of the Bankruptcy Code, for any reason, regardless of whether any party previously has objected to such Disputed Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under sections 157 and 1334 of the Judicial Code to estimate any such Disputed Claim or Interest, including during the litigation of any objection to any Disputed Claim or Interest or during the pendency of any appeal relating to such objection. Notwithstanding any provision

otherwise in the Plan, a Disputed Claim or Interest that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions) and may be used as evidence in any supplemental proceedings, and the Debtors or the Wind-Down Entity may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Disputed Claim or Interest that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before fourteen days after the date on which such Disputed Claim or Interest is estimated.

### D.      No Distributions Pending Allowance

Notwithstanding any other provision of the Plan, if any portion of a Claim or Interest is a Disputed Claim or Interest, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest; *provided* that if only a portion of a Claim or Interest is Disputed, such Claim or Interest shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount.

### E.      Distributions After Allowance

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim or Interest in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court Allowing any Disputed Claim or Interest becomes a Final Order, the Distribution Agent shall provide to the Holder of such Allowed Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest, dividends, or accruals to be paid on account of such Allowed Claim or Interest unless required under applicable bankruptcy law.

### F.      No Interest

Unless otherwise specifically provided for herein or by Final Order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on Claims against the Debtors, and no Holder of a Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such Claim. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

### G.      Adjustment to Claims and Interests without Objection

Any Claim or Interest that has been paid, satisfied, amended, superseded, cancelled, or otherwise expunged (including pursuant to the Plan) may be adjusted or expunged on the Claims Register at the direction of the Wind-Down Entity without the Wind-Down Entity having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court. Additionally, any Claim or Interest that is duplicative or redundant with another Claim or Interest against the same Debtor may be adjusted or expunged on the Claims Register at the direction of the Wind-Down Entity without the Wind-Down Entity having to File an application, motion, complaint, objection, or any other legal proceeding

seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

**H.      Time to File Objections to Claims**

Any objections to Claims shall be Filed on or before the Claims Objection Bar Date.

**I.      Disallowance of Claims or Interests**

Any Claims or Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims or Interests until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Wind-Down Entity, as applicable.

**Except as otherwise provided herein or as agreed to by the Debtors or the Wind-Down Entity, any and all Proofs of Claim Filed after the Bar Date shall be deemed disallowed and expunged as of the Effective Date without any further notice to, or action, order, or approval of, the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order.**

**J.      Amendments to Proofs of Claim**

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Proof of Claim or Proof of Interest may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Wind-Down Entity, and any such new or amended Proof of Claim or Proof of Interest Filed shall be deemed disallowed in full and expunged without any further action, order, or approval of the Bankruptcy Court.

<div align="center">

**ARTICLE VIII.**

**EFFECT OF CONFIRMATION OF THE PLAN**

</div>

**A.      Releases by the Debtors**

**Notwithstanding anything contained in the Plan to the contrary, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Wind-Down Debtors, and their Estates, the Wind-Down Entity, and in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of, the foregoing Entities, from any and all Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their**

<div align="center">

55

A-367

</div>

capital structure, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Chapter 11 Cases and related adversary proceedings, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, the administration and implementation of the Restructuring Transactions or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019, of the releases described in this Article VIII.A by the Debtors, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article VIII.A is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) except to the extent contemplated by Article IV.E and Article IV.F of the Plan, a bar to any of the Debtors or Wind-Down Debtors or their respective Estates or Wind-Down Entity asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

Notwithstanding anything to the contrary contained herein, nothing in this Plan shall release, waive, or otherwise limit the (i) rights, duties, or obligations of the Purchaser under the Asset Purchase Agreement or the Definitive Documents and (ii) the Non-Released D&O Claims, but such Non-Released D&O Claims shall remain subject to the limitations contained in Article IV.E and Article IV.F of this Plan.

**B.** **Releases by Holders of Claims and Interests**

Except as expressly set forth in the Plan, effective on the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted or assertable on behalf of any of the Debtors, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the

pursuit of consummation of the Plan, the administration and implementation of the Restructuring Transactions, or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date, *provided* that nothing in this Article VIII.B shall be construed to release the Released Parties from actual fraud, willful misconduct, or gross negligence as determined by a Final Order.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII.B, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article VIII.B is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) except to the extent contemplated by Article IV.F and Article IV.G of the Plan, a bar to any of the Releasing Parties or the Debtors or Wind-Down Debtors or their respective Estates or Wind-Down Entity asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

## C.    Exculpation

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor release or the third-party release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is exculpated from any Cause of Action for any act or omission arising on or after the Petition Date and prior to the Effective Date based on the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing, or consummation of the Disclosure Statement, the Plan, the Special Committee Investigation, any Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for Causes of Action related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan

**D.      Injunction**

The assets of the Debtors and of the Wind-Down Entity shall be used for the satisfaction of expense obligations and the payment of Claims and Interests only in the manner set forth in this Plan and shall not be available for any other purpose. All Persons and Entities who have held, hold, or may hold Claims or Interests based upon any act, omission, transaction, or other activity of any kind or nature related to the Debtors, the Wind-Down Entity, or the Debtors' Chapter 11 Cases that occurred prior to the Effective Date, other than as expressly provided in the Plan or the Confirmation Order, shall be precluded and permanently enjoined on and after the Effective Date from interfering with the use and distribution of the Debtors' assets in the manner contemplated by the Plan.

In addition, as of the Effective Date and subject to the occurrence of the Effective Date, except as otherwise specifically provided in this Plan or the Confirmation Order, all Persons and Entities who have held, hold, or may hold Claims or Interests that are fully satisfied pursuant to the Plan or any Claim or Interest that is subject to the releases and exculpations set forth in Article VIII.B and Article VIII.C of this Plan shall be precluded and permanently enjoined on and after the Effective Date from enforcing, pursuing, or seeking any setoff or relief with respect to such Claims or Interests, except for the receipt of the payments or distributions that are contemplated by this Plan.

**E.      Release of Liens**

Except as otherwise provided in the Plan, the Plan Supplement, or any contract, instrument, release, or other agreement or document created pursuant to the Plan or Confirmation Order on the Effective Date, and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, compromised, and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Debtors shall automatically revert to the applicable Debtor or Wind-Down Debtor, as applicable, and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors. Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as requested by the Debtors or Wind-Down Entity to evidence the release of such Lien, including the execution, delivery, and filing or recording of such documents evidencing such releases. The presentation or filing of the Confirmation Order to or with any local, state, federal, or foreign agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

**F.      OSC and SEC**

Notwithstanding any language to the contrary herein, no provision shall (a) preclude the OSC or the SEC from enforcing its police or regulatory powers; or (b) enjoin, limit, impair or delay the OSC or SEC from commencing or continuing any claims, causes of action, proceeding, or investigations against any non-Debtor person or non-Debtor entity in any forum.

**G.      Protection against Discriminatory Treatment**

As provided by section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Entity, including Governmental Units, shall discriminate against any Wind-Down Debtor or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, or discriminate with respect to such a grant against, any

Wind-Down Debtor, or any Entity with which a Wind-Down Debtor has been or is associated, solely because such Wind-Down Debtor was a debtor under chapter 11 of the Bankruptcy Code, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

## H. Document Retention

Upon the occurrence of the Effective Date, the Debtors' books and records shall be transferred to the Wind-Down Entity, which shall continue to preserve all financial books and records, emails, and other financial documents relating to the Debtors' business that are currently in the Debtors' possession. The Wind-Down Trust shall not destroy or otherwise abandon any such documents or records without providing advance notice to the U.S. Securities and Exchange Commission (c/o Therese Scheuer, U.S. Securities and Exchange Commission, 100 F Street, NE, Washington, DC 20549, ScheuerT@SEC.GOV) and seeking further authorization from this Court. Nothing in this Plan or the Confirmation Order shall affect the obligations of the pre-Effective Date Debtors, the Wind-Down Entity, and/or any transferee or custodian to maintain all books and records that are subject to any governmental subpoena, document preservation letter, or other investigative request from a governmental agency.

## I. Reimbursement or Contribution

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (1) such Claim has been adjudicated as non-contingent; or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

## J. Term of Injunctions or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code, or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date. **All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.**

## ARTICLE IX.

## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

## A. Conditions Precedent to the Effective Date

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article IX.B of the Plan:

1. The Bankruptcy Court shall have entered the Confirmation Order, which shall be in a form and substance reasonably satisfactory to the Debtors and the Committee, and subject to the consent rights of Purchaser under the Asset Purchase Agreement, and such order shall be a Final Order and in full force and effect.

2. The Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan, Definitive Documents, and the Asset Purchase Agreement.

3. Each Definitive Document and each other document contained in any supplement to the Plan, including the Plan Supplement and any exhibits, schedules, amendments, modifications or supplements thereto or other documents contained therein, shall have been executed or Filed, as applicable, in form and substance consistent in all respects with the Plan, and subject to the Purchaser's consent rights under the Asset Purchase Agreement, and shall not have been modified in a manner inconsistent therewith;

4. The Professional Fee Escrow Account shall have been established and funded with Cash in accordance with Article II.B.2 of the Plan.

5. The Wind-Down Reserve shall have been established and funded with Cash in accordance with the Plan.

6. If prior to the Outside Date, the Asset Purchase Agreement shall be in full force and effect and the Sale Transaction shall have been consummated.

7. The Restructuring Transactions shall have been consummated or shall be anticipated to be consummated concurrently with the occurrence of the Effective Date in a manner consistent with the Plan, the Customer Onboarding Protocol, the other Definitive Documents, and the Asset Purchase Agreement, and the Plan shall have been substantially consummated or shall be anticipated to be substantially consummated concurrently with the occurrence of the Effective Date.

## B. Waiver of Conditions Precedent

The Debtors, with the consent of the Committee and, solely to the extent related to the Asset Purchase Agreement and the Sale Transaction, prior to the Outside Date, the consent of Purchaser, may waive any of the conditions to the Effective Date set forth in Article IX.A of the Plan at any time, without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm and consummate the Plan.

## C. Effect of Non-Occurrence of Conditions to Consummation

If the Effective Date does not occur within 120 days after the Confirmation Date, then the Plan will be null and void in all respects, any and all compromises or settlements not previously approved by Final Order of the Bankruptcy Court embodied in the Plan (including with respect to the fixing, limiting, or treatment of any Claim or Interest, including, without limitation, the Alameda Loan Facility Claims), shall be deemed null and void, and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims, Interests, or Causes of Action held by any Debtor or any other Entity; (2) prejudice in any manner the rights of any Debtor or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity in any respect.

# ARTICLE X.

## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

**A.    Modification of Plan**

Subject to the limitations and terms contained in the Plan and Purchaser's consent rights under the Asset Purchase Agreement, the Debtors, with the consent of the Committee, reserve the right to (1) amend or modify the Plan before the entry of the Confirmation Order, in accordance with the Bankruptcy Code and the Bankruptcy Rules and (2) after the entry of the Confirmation Order, the Debtors or the Wind-Down Entity, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, to remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan consistent with the terms set forth herein.

**B.    Effect of Confirmation on Modifications**

Entry of the Confirmation Order shall constitute approval of all modifications or amendments to the Plan occurring after the solicitation thereof pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

**C.    Revocation or Withdrawal of Plan**

The Debtors reserve the right, with the consent of the Committee, to revoke or withdraw the Plan with respect to any or all Debtors before the Confirmation Date and to File subsequent chapter 11 plans. If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then: (1) the Plan will be null and void in all respects; (2) any settlement or compromise not previously approved by Final Order of the Bankruptcy Court embodied in the Plan (including the fixing or limiting to an amount certain of the Claims or Classes of Claims), assumption or rejection of Executory Contracts or Unexpired Leases effectuated by the Plan, and any document or agreement executed pursuant to the Plan will be null and void in all respects; and (3) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims, Interests, or Causes of Action by any Entity, (b) prejudice in any manner the rights of any Debtor or any other Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

# ARTICLE XI.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.    Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.       decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.       resolve any matters related to Executory Contracts or Unexpired Leases, including: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure Claims or other Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed or assumed and assigned; and (c) any dispute regarding whether a contract or lease is or was executory, expired, or terminated;

4.       ensure that distributions to Holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

5.       adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor or the Estates that may be pending on the Effective Date;

6.       enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of (a) contracts, instruments, releases, and other agreements or documents approved by Final Order in the Chapter 11 Cases and (b) the Plan, the Confirmation Order, and contracts, instruments, releases, and other agreements or documents created in connection with the Plan; *provided* that the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection, or dispute resolution clause that refers disputes to a different court;

7.       enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

8.       grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

9.       issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

10.       hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Cases, including:  (a) with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or an Interest for amounts not timely repaid pursuant to Article VI of the Plan; (b) with respect to the releases, injunctions, and other provisions contained in Article VIII of the Plan, including entry of such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions; (c) anything that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan and the Confirmation Order; or (d) related to section 1141 of the Bankruptcy Code;

11.       enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

12.    adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

13.    consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

14.    enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases with respect to any Entity, and resolve any cases, controversies, suits, or disputes that may arise in connection with any Entity's rights arising from or obligations incurred in connection with the Plan;

15.    hear and determine matters concerning local, state, federal, and foreign taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

16.    enter an order or Final Decree concluding or closing the Chapter 11 Cases;

17.    enforce all orders previously entered by the Bankruptcy Court; and

18.    hear and determine any other matters related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code or the Judicial Code.

Nothing herein limits the jurisdiction of the Bankruptcy Court to interpret and enforce the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, or the Disclosure Statement, without regard to whether the controversy with respect to which such interpretation or enforcement relates may be pending in any state or other federal court of competent jurisdiction.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in this Article XI, the provisions of this Article XI shall have no effect on and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

Unless otherwise specifically provided herein or in a prior order of the Bankruptcy Court, the Bankruptcy Court shall have exclusive jurisdiction to hear and determine disputes concerning Claims against or Interests in the Debtors that arose prior to the Effective Date.

# ARTICLE XII.

## MISCELLANEOUS PROVISIONS

**A.    Immediate Binding Effect**

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtors, the Wind-Down Entity, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, exculpations, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors. All Claims against and Interests in the Debtors shall be

as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or Interest has voted on the Plan.

**B.** **Additional Documents**

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors, the Wind-Down Entity, and all Holders of Claims and Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

**C.** **Payment of Statutory Fees**

All fees and applicable interest payable pursuant to section 1930 of the Judicial Code and 31 U.S.C. § 3717, as applicable, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the Wind-Down Debtors (or the Distribution Agent on behalf of the Wind-Down Entity) for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or a Final Decree is issued, whichever occurs first.

**D.** **Dissolution of Statutory Committees**

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases; *provided*, however, that such committees will remain in existence for the limited purposes of (a) pursuing, supporting, or otherwise participating in, any outstanding appeals in the Chapter 11 Cases; and (b) filing, objecting, or otherwise participating in, any final fee applications of Professionals.

**E.** **Reservation of Rights**

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests, unless and until the Effective Date has occurred.

**F.** **Successors and Assigns**

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiary, or guardian, if any, of each such Entity.

**G.** **Service of Documents**

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Wind-Down Debtors shall be served on:

| Wind-Down Debtors | **Voyager Digital Holdings, Inc.** |
| | 33 Irving Place |
| | New York, New York 10003 |
| | Attention: David Brosgol |
| | General Counsel, |
| | E-mail address: dbrosgol@investvoyager.com |
| | |
| | with copies for information only (which shall not constitute notice) to: |
| | |
| Counsel to the Debtors | **Kirkland & Ellis LLP** |
| | **Kirkland & Ellis International LLP** |
| | 601 Lexington Avenue |
| | New York, New York 10022 |
| | Attention: Joshua A. Sussberg, P.C., Christopher Marcus, P.C., Christine A. Okike, P.C., and Allyson B. Smith |
| | |
| Counsel to the Committee | **McDermott Will & Emery LLP** |
| | One Vanderbilt Avenue |
| | New York, New York 10017 |
| | Attention: Darren Azman |

## H. Entire Agreement; Controlling Document

Except as otherwise indicated, on the Effective Date, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations with respect to the subject matter of the Plan, all of which will have become merged and integrated into the Plan; *provided, however,* that notwithstanding the foregoing or anything to the contrary herein, to the extent there is any conflict between the Plan and the Confirmation Order, on the one hand, and the Asset Purchase Agreement, on the other hand, the Asset Purchase Agreement shall govern solely in the event the Sale Transaction is consummated. Except as set forth in the Plan, in the event that any provision of the Disclosure Statement, the Plan Supplement, or any order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control. In the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall control.

## I. Plan Supplement

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the website of the Claims, Noticing, and Solicitation Agent at https://cases.stretto.com/Voyager or the Bankruptcy Court's website at http://www.nysb.uscourts.gov. Unless otherwise ordered by the Bankruptcy Court, to the extent any exhibit or document in the Plan Supplement is inconsistent with the terms of any part of the Plan that does not constitute the Plan Supplement, such part of the Plan that does not constitute the Plan Supplement shall control.

### J. Non-Severability

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, subject to the Purchaser's consent rights under the Asset Purchase Agreement prior to the Outside Date, shall have the power to alter and interpret such term or provision to make it valid or enforceable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent, consistent with the terms set forth herein; and (3) non-severable and mutually dependent.

### K. Votes Solicited in Good Faith

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors, and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties nor individuals or the Wind-Down Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan or any previous plan.

### L. Waiver or Estoppel

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed prior to the Confirmation Date.

Dated:  January 10, 2023                    VOYAGER DIGITAL HOLDINGS, INC.
                                            on behalf of itself and all other Debtors


                                            _/s/ Stephen Ehrlich_
                                            Stephen Ehrlich
                                            Co-Founder and Chief Executive Officer
                                            Voyager Digital Holdings, Inc.

**Exhibit B**

**Redline**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC. *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

---

### THIRD AMENDED JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

---

**NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN OFFER, ACCEPTANCE, COMMITMENT, OR LEGALLY BINDING OBLIGATION OF THE DEBTORS OR ANY OTHER PARTY IN INTEREST, AND THIS PLAN IS SUBJECT TO APPROVAL BY THE BANKRUPTCY COURT AND OTHER CUSTOMARY CONDITIONS.  THIS PLAN IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES.**

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Voyager Digital Holdings, Inc. (7687); Voyager Digital, LTD. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

## TABLE OF CONTENTS

**Page**

**Introduction** .................................................................................................................. **1**

**Article I. Defined Terms, Rules of Interpretation, Computation of Time, Governing Law, and Other References** .................................................................................. **1**

    A.    Defined Terms .................................................................................................. 1
    B.    Rules of Interpretation .................................................................................... 17
    C.    Computation of Time ...................................................................................... 17
    D.    Governing Law ............................................................................................... 17
    E.    Reference to Monetary Figures ...................................................................... 18
    F.    Reference to the Debtors or the Wind-Down Debtors .................................. 18
    G.    Nonconsolidated Plan ..................................................................................... 18

**Article II. Administrative and Priority Claims** ......................................................... **18**

    A.    Administrative Claims .................................................................................... 18
    B.    Professional Fee Claims ................................................................................. 19
    C.    Priority Tax Claims ........................................................................................ 20

**Article III. Classification, Treatment, and Voting of Claims and Interests** ........... **20**

    A.    Classification of Claims and Interests ........................................................... 20
    B.    Summary of Classification ............................................................................. 21
    C.    Treatment of Classes of Claims and Interests ............................................... 22
    D.    Special Provision Governing Unimpaired Claims ........................................ 28
    E.    Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes ... 28
    F.    Subordinated Claims ...................................................................................... 28
    G.    Intercompany Interests ................................................................................... 28
    H.    Controversy Concerning Impairment ............................................................ 29
    I.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code ................................................................................. 29

**Article IV. Provisions for Implementation of the Plan** ............................................. **29**

    A.    General Settlement of Claims and Interests ................................................... 29
    B.    Restructuring Transactions ............................................................................ 29
    C.    The Sale Transaction ...................................................................................... 30
    D.    The Liquidation Transaction .......................................................................... 31
    E.    Management and Employee Transition Plans ................................................ 31
    F.    Non-Released D&O Claims ............................................................................ 32
    G.    The D&O Settlement ....................................................................................... 32
    H.    Wind-Down Trust ........................................................................................... 34
    I.    Sources of Consideration for Plan Distributions ........................................... 39
    J.    Corporate Existence and Dissolution ............................................................ 39
    K.    Corporate Action ............................................................................................ 40
    L.    Vesting of Assets in the Wind-Down Entity ................................................. 41
    M.    Cancellation of Notes, Instruments, Certificates, and Other Documents ..... 41
    N.    Effectuating Documents; Further Transactions ............................................. 41
    O.    Section 1146(a) Exemption ........................................................................... 41

i

P.      Preservation of Rights of Action ........................................................... 42
Q.      Election to Contribute Third-Party Claims ......................................... 43
R.      Contribution of Contributed Third-Party Claims ............................... 43
S.      Closing the Chapter 11 Cases .............................................................. 43

**Article V. Treatment of Executory Contracts and Unexpired Leases                44**

A.      Assumption and Rejection of Executory Contracts and Unexpired Leases ... 44
B.      Preexisting Obligations to the Debtors Under Executory Contracts and
        Unexpired Leases ................................................................................... 44
C.      Claims Based on Rejection of Executory Contracts or Unexpired Leases ... 44
D.      Cure of Defaults for Executory Contracts and Unexpired Leases Assumed ... 45
E.      Insurance Policies and Surety Bonds .................................................. 46
F.      Reservation of Rights ........................................................................... 47
G.      Nonoccurrence of Effective Date ........................................................ 47
H.      Contracts and Leases Entered into After the Petition Date ............... 47

**Article VI. Provisions Governing Distributions                                   47**

A.      Timing and Calculation of Amounts to Be Distributed ...................... 47
B.      Rights and Powers of Distribution Agent ........................................... 48
C.      Delivery of Distributions and Undeliverable or Unclaimed Distributions ... 48
D.      Compliance Matters .............................................................................. 50
E.      Foreign Currency Exchange Rate ....................................................... 50
F.      Claims Paid or Payable by Third Parties ............................................ 51
G.      Setoffs and Recoupment ...................................................................... 51
H.      Allocation between Principal and Accrued Interest ........................... 52

**Article VII. Procedures for Resolving Disputed, Contingent, and Unliquidated Claims and
Interests                                                                          52**

A.      Disputed Claims Process ...................................................................... 52
B.      Objections to Claims or Interests ......................................................... 53
C.      Estimation of Claims ............................................................................ 53
D.      No Distributions Pending Allowance .................................................. 54
E.      Distributions After Allowance ............................................................. 54
F.      No Interest ............................................................................................. 54
G.      Adjustment to Claims and Interests without Objection ...................... 54
H.      Time to File Objections to Claims ....................................................... 55
I.      Disallowance of Claims or Interests .................................................... 55
J.      Amendments to Proofs of Claim ......................................................... 55

**Article VIII. Effect of Confirmation of the Plan                                 55**

A.      Releases by the Debtors ........................................................................ 55
B.      Releases by Holders of Claims and Interests ...................................... 56
C.      Exculpation ........................................................................................... 57
D.      Injunction .............................................................................................. 58
E.      Release of Liens .................................................................................... 58
F.      OSC and SEC ....................................................................................... 58
G.      Protection against Discriminatory Treatment ..................................... 58
H.      Document Retention ............................................................................. 59
I.      Reimbursement or Contribution .......................................................... 59

ii

A-383

    J.     Term of Injunctions or Stays .................................................................... 59

**Article IX. Conditions Precedent to the Effective Date** ........................................ **59**

    A.    Conditions Precedent to the Effective Date ............................................... 59
    B.    Waiver of Conditions Precedent .............................................................. 60
    C.    Effect of Non-Occurrence of Conditions to Consummation ...................... 60

**Article X. Modification, Revocation, or Withdrawal of the Plan** ........................... **61**

    A.    Modification of Plan .............................................................................. 61
    B.    Effect of Confirmation on Modifications .................................................. 61
    C.    Revocation or Withdrawal of Plan .......................................................... 61

**Article XI. Retention of Jurisdiction** ..................................................................... **61**

**Article XII. Miscellaneous Provisions** ................................................................... **63**

    A.    Immediate Binding Effect ...................................................................... 63
    B.    Additional Documents ........................................................................... 64
    C.    Payment of Statutory Fees ..................................................................... 64
    D.    Dissolution of Statutory Committees ....................................................... 64
    E.    Reservation of Rights ............................................................................ 64
    F.    Successors and Assigns ......................................................................... 64
    G.    Service of Documents ............................................................................ 64
    H.    Entire Agreement; Controlling Document ................................................ 65
    I.    Plan Supplement .................................................................................. 65
    J.    Non-Severability .................................................................................. 66
    K.    Votes Solicited in Good Faith ................................................................ 66
    L.    Waiver or Estoppel ............................................................................... 66

## INTRODUCTION

Voyager Digital Holdings, Inc. and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (each a "Debtor" and, collectively, the "Debtors") propose this third amended joint plan (the "Plan") for the resolution of the outstanding Claims against and Interests in the Debtors pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used in the Plan and not otherwise defined shall have the meanings set forth in Article I.A of the Plan. Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The classifications of Claims and Interests set forth in Article III of the Plan shall be deemed to apply separately with respect to each Plan proposed by each Debtor, as applicable. The Plan does not contemplate substantive consolidation of any of the Debtors. Reference is made to the Disclosure Statement for a discussion of the Debtors' history, business, properties and operations, projections, risk factors, a summary and analysis of this Plan, and certain related matters.

ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE I.

### DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES

#### A.  Defined Terms

Capitalized terms used in this Plan have the meanings ascribed to them below.

1.  "*3AC*" means Three Arrows Capital, Ltd and any of its Affiliates or subsidiaries.

2.  "*3AC Claims*" means the claims or causes of action asserted or assertable by the Debtors against 3AC, whether in the 3AC Liquidation Proceeding or otherwise.

3.  "*3AC Liquidation Proceeding*" means that certain liquidation proceeding captioned *In the Matter of Three Arrows Capital Ltd. and in the Matter of Sections 159(1) and 162(1)(a) and (b) of the Insolvency Act 2003*, Claim No. BVIHC(COM)2022/0119 before the Eastern Caribbean Supreme Court in the High Court of Justice in the British Virgin Islands and the chapter 15 foreign recognition proceeding captioned *In re Three Arrows Capital, Ltd.*, No. 22-10920 (Bankr. S.D.N.Y. Jul. 1, 2022).

4.  "*3AC Loan*" means that loan of 15,250 Bitcoins and 350 million USDC to 3AC pursuant to that certain master loan agreement dated March 4, 2022 by and between 3AC, as borrower, and OpCo and HTC Trading, Inc., as lenders.

5.  "*3AC Recovery*" means the recovery, if any, of the Debtors from 3AC on account of the 3AC Claims.

6.  "*Account*" means any account at OpCo held by an Account Holder relating to Cryptocurrency, which Account is identified in the Debtors' books and records as holding Cryptocurrency as of the Petition Date.

7.    "*Account Holder*" means any Person or Entity who holds an Account with OpCo as of the Petition Date.

8.    "*Account Holder Claim*" means any Claim against the Debtors that is held by an Account Holder on account of such Holder's Account.

9.    "*Acquired Assets*" has the meaning ascribed to it in the Asset Purchase Agreement.

10.   "*Acquired Coins*" has the meaning ascribed to it in the Asset Purchase Agreement.

11.   "*Acquired Coins Value*" has the meaning ascribed to it in the Asset Purchase Agreement.

12.   "*Additional Bankruptcy Distribution*" has the meaning ascribed to it in the Asset Purchase Agreement.

13.   "*Administrative Claim*" means a Claim against a Debtor for the costs and expenses of administration of the Chapter 11 Cases arising on or after the Petition Date and prior to the Effective Date pursuant to section 503(b) of the Bankruptcy Code and entitled to priority pursuant to sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' business and (b) Allowed Professional Fee Claims.

14.   "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims (other than requests for payment of Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code), which:  (a) with respect to Administrative Claims other than Professional Fee Claims, shall be thirty days after the Effective Date; and (b) with respect to Professional Fee Claims, shall be forty-five days after the Effective Date.

15.   "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.  With respect to any Person that is not a Debtor, the term "Affiliate" shall apply to such Person as if the Person were a Debtor.

16.   "*Alameda*" means Alameda Ventures Ltd., along with its Affiliates and subsidiaries.

17.   "*Alameda Claims*" means the claims or causes of action asserted or assertable by the Debtors against Alameda, whether in the FTX Bankruptcy Proceeding or otherwise.

18.   "*Alameda Loan Agreement*" means that certain unsecured loan agreement, dated as of June 21, 2022, as amended, restated, amended and restated, modified, or supplemented from time to time, by and among Voyager Digital Holdings, Inc., as the borrower, Voyager, as the guarantor, and Alameda, as the lender thereto.

19.   "*Alameda Loan Facility*" means that certain unsecured loan facility provided for under the Alameda Loan Agreement.

20.   "*Alameda Loan Facility Claims*" means any Claim against any Debtor derived from, based upon, or arising under the Alameda Loan Agreement and any fees, costs, and expenses that are reimbursable by any Debtor pursuant to the Alameda Loan Agreement.

21.   "*Alameda Recovery*" means the recovery, if any, of the Debtors from Alameda on account of the Alameda Claims.

22.     "*Allowed*" means, with respect to any Claim or Interest, except as otherwise provided herein:  (a) a Claim or Interest that is evidenced by a Proof of Claim timely Filed by the Bar Date or a request for payment of Administrative Claim timely Filed by the Administrative Claims Bar Date (or for which Claim or Interest under the Plan, the Bankruptcy Code, or a Final Order of the Bankruptcy Court a Proof of Claim or a request for payment of Administrative Claim is not or shall not be required to be Filed); (b) a Claim or Interest that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely Filed; (c) a Claim or Interest Allowed pursuant to the Plan, any stipulation approved by the Bankruptcy Court, any contract, instrument, indenture, or other agreement entered into or assumed in connection with the Plan, or a Final Order of the Bankruptcy Court, or (d) a Claim or Interest as to which the liability of the Debtors and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court; *provided* that, with respect to a Claim or Interest described in clauses (a) and (b) above, such Claim or Interest shall be considered Allowed only if and to the extent that with respect to such Claim or Interest no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or if such an objection is so interposed, such Claim or Interest shall have been Allowed by a Final Order.  Any Claim or Interest that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.  Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes.  A Proof of Claim Filed after and subject to the Bar Date or a request for payment of an Administrative Claim Filed after and subject to the Administrative Claims Bar Date, as applicable, shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim.  "Allow" and "Allowing" shall have correlative meanings.

23.     "*Asset Purchase Agreement*" means that certain asset purchase agreement dated as of December 18, 2022 by and between BAM Trading Services Inc. (d/b/a Binance.US) as Purchaser and Voyager Digital, LLC as Seller.

24.     "*Assumed Liabilities*" has the meaning ascribed to it in the Asset Purchase Agreement.

25.     "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or hereafter amended.

26.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York, or any other court having jurisdiction over the Chapter 11 Cases, including to the extent of the withdrawal of reference under section 157 of the Judicial Code, the United States District Court for the Southern District of New York.

27.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated by the United States Supreme Court under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

28.     "*Bar Date*" means the applicable deadline by which Proofs of Claim must be Filed, as established by:  (a) the Bar Date Order; (b) a Final Order of the Bankruptcy Court; or (c) the Plan.

29.     "*Bar Date Order*" means the *Order (I) Setting Deadlines for Submitting Proofs of Claims, (II) Approving Procedures for Submitting Proofs of Claim, and (III) Approving Notice Thereof* [Docket No. 218].

30. "*Binance.US Platform*" has the meaning ascribed to it in the Asset Purchase Agreement.

31. "*Binance US*" means BAM Trading Services Inc. (d/b/a Binance.US).

32. "*Binance US Account*" means a customer account opened with the Purchaser by an Account Holder or a Holder of an Allowed OpCo General Unsecured Claim.

33. "*Business Day*" means any day, other than a Saturday, Sunday, or a "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

34. "*Cash*" or "*$*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

35. "*Causes of Action*" mean any action, Claim, cross-claim, third-party claim, damage, judgment, cause of action, controversy, demand, right, suit, obligation, liability, debt, account, defense, offset, power, privilege, license, Lien, indemnity, interest, guaranty, or franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, matured or unmatured, suspected or unsuspected, in contract or in tort, at law or in equity, or pursuant to any other theory of law or otherwise. For the avoidance of doubt, "Causes of Action" includes: (a) any right of setoff, counterclaim, or recoupment and any claim arising from any contract or for breach of duties imposed by law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of local, state, federal, or foreign law, or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) any right to object to or otherwise contest Claims or Interests; (d) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; and (e) any claim or defense, including fraud, mistake, duress, usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

36. "*CCO*" means Evan Psaropoulos.

37. "*CEO*" means Stephen Ehrlich.

38. "*Certificate*" means any instrument evidencing a Claim or an Interest.

39. "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor in the Bankruptcy Court under chapter 11 of the Bankruptcy Code and (b) when used with reference to all Debtors, the procedurally consolidated cases filed for the Debtors in the Bankruptcy Court under chapter 11 of the Bankruptcy Code.

40. "*Claim*" has the meaning set forth in section 101(5) of the Bankruptcy Code.

41. "*Claims Objection Bar Date*" means the deadline for objecting to a Claim, which shall be on the date that is the later of (a) (i) with respect to Administrative Claims (other than Professional Fee Claims and Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code), sixty days after the Administrative Claims Bar Date or (ii) with respect to all other Claims (other than Professional Fee Claims), 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by the Debtors or the Wind-Down Trust, as applicable, as approved by an order of the Bankruptcy Court for objecting to such Claims.

42.     "*Claims Register*" means the official register of Claims against and Interests in the Debtors maintained by the Clerk of the Bankruptcy Court or the Claims, Noticing, and Solicitation Agent.

43.     "*Claims, Noticing, and Solicitation Agent*" means Bankruptcy Management Solutions, Inc. d/b/a Stretto, in its capacity as the claims, noticing, and solicitation agent in the Chapter 11 Cases for the Debtors and any successors appointed by an order of the Bankruptcy Court.

44.     "*Class*" means a class of Claims against or Interests in the Debtors as set forth in Article III of the Plan in accordance with section 1122(a) of the Bankruptcy Code.

45.     "*Committee*" means the Official Committee of Unsecured Creditors appointed in these Chapter 11 Cases.

46.     "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

47.     "*Confirmation Date*" means the date on which Confirmation occurs.

48.     "*Confirmation Hearing*" means the hearing before the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code at which the Debtors will seek Confirmation of the Plan.

49.     "*Confirmation Order*" has the meaning ascribed to it in the Asset Purchase Agreement.

50.     "*Consummation*" means the occurrence of the Effective Date.

51.     "*Contributed Third-Party Claims*" means all direct Causes of Action that any Contributing Claimant has against any Person (other than a Debtor) that had a direct relationship with the Debtors, their predecessors, or respective affiliates and that harmed such Contributing Claimant in the claimant's capacity as a creditor of Voyager, including (a) all Causes of Action based on, arising out of, or related to the marketing, sale, and issuance of Cryptocurrency that at any point was held or offered on Voyager's platform; (b) all Causes of Action based on, arising out of, or related to the alleged misrepresentation of any of the Debtors' financial information, business operations, or related internal controls; and (c) all Causes of Action based on, arising out of, or related to any alleged failure to disclose, or actual or attempted cover up or obfuscation of, any of the Debtors' conduct prior to the Petition Date; *provided*, *however*, that Contributed Third-Party Claims do not include (i) any derivative claims of the Debtors; (ii) any direct claims against the Released Parties; (iii) any direct Causes of Action that any Contributing Claimant has against Mark Cuban, Dallas Basketball Limited d/b/a Dallas Mavericks, the National Basketball Association, and any of their Related Parties; or (iv) any direct Causes of Action that any Contributing Claimant, in its capacity as an equity holder of Voyager Digital Ltd., has that are asserted in the currently filed complaint, dated as of July 6, 2022, in the Ontario Superior Court of Justice by Francine De Sousa, against Voyager Digital Ltd., Stephen Ehrlich, Philip Eytan, Evan Psaropoulos, Lewis Bateman, Krisztian Toth, Jennifer Ackart, Glenn Stevens, and Brian Brooks.

52.     "*Contributing Claimants*" means any Holders of Claims or Interests that elect on their ballots or opt-in forms to contribute their Contributed Third-Party Claims to the Wind-Down Entity.

53.     "*Cryptocurrency*" means a digital currency or crypto asset in which transactions are verified and records maintained by a decentralized system using cryptography, rather than by a

centralized authority, including stablecoins, digital coins and tokens, such as security tokens, utility tokens and governance tokens.

54. "*Cure*" or "*Cure Claim*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's default under an Executory Contract or an Unexpired Lease assumed by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

55. "*Customer Onboarding Protocol*" means the protocol describing the process of onboarding Account Holders and Holders of OpCo General Unsecured Claims onto the Binance.US Platform, the form of which shall be included in the Plan Supplement and filed no later than by February 8, 2023, and which shall be in a form acceptable to the Purchaser.

56. "*D&O Carriers*" means the insurance carriers of the D&O Liability Insurance Policies.

57. "*D&O Liability Insurance Policies*" means all unexpired insurance policies maintained by the Debtors, the Wind-Down Debtors, or the Estates as of the Effective Date that have been issued (or provide coverage) regarding directors', managers', officers', members', and trustees' liability (including any "tail policy"), including but not limited to the Management Liability Policy, the Excess Policies, and the Side-A Policy, and all agreements, documents, or instruments relating thereto.

58. "*D&O Settlement*" means the settlement between the Debtors and CEO and CCO as set forth in Article IV.G of the Plan.

59. "*Debtors*" means, collectively, each of the following: Voyager Digital Holdings, Inc.; Voyager Digital Ltd.; and Voyager Digital, LLC.

60. "*Definitive Documents*" means: (a) the Plan (and any and all exhibits, annexes, and schedules thereto); (b) the Confirmation Order; (c) the Disclosure Statement and the other Solicitation Materials; (d) the Disclosure Statement Order; (e) all pleadings filed by the Debtors in connection with the Chapter 11 Cases (or related orders); (f) the Plan Supplement; (g) the Management Transition Plan; (h) any new material employment, consulting, or similar agreements entered into between the Wind-Down Trust and any of the Debtors' employees, if any; (i) the Asset Purchase Agreement; (j) the Customer Onboarding Protocol; and (k) any and all other deeds, agreements, filings, notifications, pleadings, orders, certificates, letters, instruments or other documents reasonably desired or necessary to consummate and document the transactions contemplated by the Restructuring Transactions (including any exhibits, amendments, modifications, or supplements made from time to time thereto).

61. "*Disclosure Statement*" means the *Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, as may be amended, supplemented, or otherwise modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan.

62. "*Disclosure Statement Order*" means the order entered by the Bankruptcy Court approving the Disclosure Statement.

63. "*Disputed*" means a Claim or an Interest or any portion thereof: (a) that is not Allowed; (b) that is not disallowed under the Plan, the Bankruptcy Code, or a Final Order; and (c) with respect to which a party in interest has Filed a Proof of Claim, a Proof of Interest, or otherwise made a written request to a Debtor for payment.

64. "*Disputed Claims Reserve*" means an appropriate reserve in an amount to be determined by the Wind-Down Trust for distributions on account of Disputed Claims that are subsequently Allowed after the Effective Date, in accordance with Article VII.D hereof.

65. "*Distributable Cryptocurrency*" means all Cryptocurrency held on the Voyager platform or that is otherwise property of any Debtor on the Effective Date after payment in full of, or reserve for, all Allowed Administrative Claims, Priority Tax Claims, Secured Tax Claims, and Other Priority Claims.

66. "*Distributable HoldCo Cash*" means HoldCo's Cash, less (x) any Cash necessary to satisfy Allowed Administrative Claims, Priority Tax Claims, Secured Tax Claims, and Other Priority Claims at HoldCo in full; and (y) to fund HoldCo's Pro Rata share of the Wind-Down Reserve.

67. "*Distributable OpCo Cash*" means OpCo's Cash, including the Purchase Price Cash, less (x) any Cash necessary to satisfy Allowed Administrative Claims, Priority Tax Claims, Secured Tax Claims, and Other Priority Claims at OpCo in full; and (y) to fund OpCo's Pro Rata share of the Wind-Down Reserve.

68. "*Distributable TopCo Cash*" means TopCo's Cash, less (x) any Cash necessary to satisfy Allowed Administrative Claims, Priority Tax Claims, Secured Tax Claims, and Other Priority Claims at TopCo in full; and (y) to fund TopCo's Pro Rata share of the Wind-Down Reserve.

69. "*Distribution Agent*" means, as applicable, the Purchaser, Wind-Down Debtors, Wind-Down Trust or any Entity or Entities designated by the Purchaser, Wind-Down Debtors, or the Wind-Down Trust (as applicable) to make or to facilitate distributions that are to be made pursuant to the Plan, Definitive Documents, and Asset Purchase Agreement.

70. "*Distribution Date*" means, except as otherwise set forth herein, the date or dates determined by the Wind-Down Trust, on or after the Effective Date, upon which the Distribution Agent shall make distributions to Holders of Allowed Claims entitled to receive distributions under the Plan.

71. "*Distribution Record Date*" means the record date for purposes of determining which Holders of Allowed Claims and Interests against the Debtors are eligible to receive distributions under the Plan, which date shall be the Effective Date, or such other date as is determined by the Debtors or designated by an order of the Bankruptcy Court.

72. "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which (a) all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of the Plan have been satisfied or waived in accordance with Article IX.B of the Plan, (b) no stay of the Confirmation Order is in effect, and (c) the Debtors declare the Plan effective.

73. "*Employee Transition Plan*" has the meaning set forth in Article IV.E of the Plan, and which shall be in form and substance reasonably acceptable to the Committee.

74. "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

75. "*Estate*" means, as to each Debtor, the estate created on the Petition Date for the Debtor in its Chapter 11 Case pursuant to sections 301 and 541 of the Bankruptcy Code and all property (as defined in section 541 of the Bankruptcy Code) acquired by the Debtor after the Petition Date through and including the Effective Date.

76. "*Excess Policies*" means, collectively, the Excess Insurance Policy, No. EFI1203041-01, issued by Euclid Financial on behalf of Certain Underwriters of Lloyd's, London, the Excess Insurance

Policy, No. RILEDOA3392022, issued by Relm Insurance Ltd., both for the February 22, 2022 to February 22, 2023 period, and the Excess Policy, No. ELU184180-23, issued by XL Specialty Insurance Company, for the February 22, 2022 to July 1, 2023 period.

77.     "*Exculpated Parties*" means, collectively, and in each case in its capacity as such:  (a) each of the Debtors; (b) the Committee, and each of the members thereof, solely in their capacity as such; (c) each of the Released Professionals; (d) each of the Released Voyager Employees; and (e) the Distribution Agent.

78.     "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

79.     "*Existing Equity Interests*" means any Interest in TopCo existing immediately prior to the occurrence of the Effective Date.

80.     "*Extended Outside Date*" has the meaning set forth in the Asset Purchase Agreement.

81.     "*Federal Judgment Rate*" means the federal judgment interest rate in effect as of the Petition Date calculated as set forth in section 1961 of the Judicial Code.

82.     "*File*," "*Filed*," or "*Filing*" means file, filed, or filing, respectively, in the Chapter 11 Cases with the Bankruptcy Court or its authorized designee, or, with respect to the filing of a Proof of Claim or Proof of Interest, file, filed, or filing, respectively, with the Claims, Noticing, and Solicitation Agent.

83.     "*Final Decree*" means the decree contemplated under Bankruptcy Rule 3022.

84.     "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, petition for certiorari, or move for a new trial, reargument, reconsideration, or rehearing has expired and no appeal, petition for certiorari, or motion for a new trial, reargument, reconsideration, or rehearing has been timely taken or filed, or as to which any appeal that has been or may be taken or any petition for certiorari or any motion for a new trial, reargument, reconsideration, or rehearing that has been or may be made or filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the motion for a new trial, reargument, reconsideration, or rehearing shall have been denied, resulted in no modification of such order (if any such motion has been or may be granted), or have otherwise been dismissed with prejudice; *provided* that the possibility that a motion under rule 60 of the Federal Rules of Civil Procedure or any comparable Bankruptcy Rule may be filed relating to such order or judgment shall not cause such order or judgment to not be a Final Order.

85.     "*FTX*" means FTX Trading, Ltd. and any of its Affiliates or subsidiaries, including West Realm Shires Inc (d/b/a "FTX.US").

86.     "*FTX Bankruptcy Proceeding*" means that certain chapter 11 proceeding captioned *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Nov. 11, 2022).

87.     "*FTX Claims*" means the claims or causes of action asserted or assertable by the Debtors against FTX, whether in the FTX Bankruptcy Proceeding or otherwise.

88.     "*FTX Recovery*" means the recovery, if any, of the Debtors from FTX on account of the FTX Claims.

89.     "*General Unsecured Claim*" means, collectively, any HoldCo General Unsecured Claim, OpCo General Unsecured Claim, or TopCo General Unsecured Claim.

90.     "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

91.     "*Government Bar Date*" means the applicable deadline by which Proofs of Claim by a Governmental Unit must be Filed, as established by:  (a) the Bar Date Order; (b) a Final Order of the Bankruptcy Court; or (c) the Plan.

92.     "*HoldCo*" means Voyager Digital Holdings, Inc.

93.     "*HoldCo General Unsecured Claim*" means any Claim against HoldCo that is not Secured and is not:  (a) paid in full prior to the Effective Date pursuant to an order of the Bankruptcy Court; (b) an Administrative Claim; (c) a Secured Tax Claim; (d) a Priority Tax Claim; (e) an Other Priority Claim; (f) a Professional Fee Claim; (g) an Alameda Loan Facility Claim; or (h) an Intercompany Claim.  For the avoidance of doubt, all (i) Claims resulting from the rejection of Executory Contracts and Unexpired Leases, and (ii) Claims that are not Secured resulting from litigation, against HoldCo are HoldCo General Unsecured Claims.

94.     "*Holder*" means an Entity holding a Claim against or an Interest in any Debtor.

95.     "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

96.     "*Insurance Policies*" means any and all insurance policies entered into by the Debtors, including the D&O Insurance Policies.

97.     "*Intercompany Claim*" means any Claim held by a Debtor or a Debtor's Affiliate against a Debtor.

98.     "*Intercompany Interest*" means, other than an Interest in Voyager, an Interest in one Debtor held by another Debtor or a Debtor's Affiliate.

99.     "*Interest*" means any equity security (as such term is defined in section 101(16) of the Bankruptcy Code) including all issued, unissued, authorized, or outstanding shares of capital stock and any other common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profit interests of an Entity, including all options, warrants, rights, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable, or exchangeable securities, or other agreements, arrangements, or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in an Entity whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security, and including any Claim against the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to the foregoing.

100. "*Interim Compensation Order*" means the *Order (I) Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals and (II) Granting Related Relief* [Docket No. 236].

101. "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001 and the rules and regulations promulgated thereunder, as applicable to the Chapter 11 Cases.

102. "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

103. "*Liquidation Procedures*" means, in the event the Sale Transaction is not consummated by the Outside Date, such procedures filed by the Wind-Down Entity identifying the mechanics and procedures to effectuate the Liquidation Transaction.

104. "*Liquidation Transaction*" means, in the event the Sale Transaction is not consummated by the Outside Date, the distribution of the Debtors' Cryptocurrency, Cash and other assets pursuant to Article IV.D of this Plan.

105. "*Management Liability Policy*" means the Executive and Corporate Securities Liability Insurance Policy, No. ELU181214-22, issued by XL Specialty Insurance Company for the February 22, 2022 to February 22, 2023 period.

106. "*Management Transition Plan*" has the meaning set forth in Article IV.E of the Plan, and which shall be in form and substance reasonably acceptable to the Committee.

107. "*Net Owed Coins*" has the meaning ascribed to it in the Asset Purchase Agreement.

108. "*Non-Released D&O Claims*" has the meaning set forth in Article IV.F of the Plan.

109. "*Non-Released D&O Claim Budget*" means the amount allocated to pursue the Non-Released D&O Claims and the Non-Released Insurance Claims, which amount shall be agreed upon between the Debtors and the Committee prior to the Confirmation Hearing.

110. "*Non-Released Insurance Claims*" has the meaning set forth in Article IV.F of the Plan.

111. "*OpCo*" means Voyager Digital, LLC.

112. "*OpCo General Unsecured Claim*" means any Claim against OpCo that is not Secured and is not: (a) paid in full prior to the Effective Date pursuant to an order of the Bankruptcy Court; (b) an Administrative Claim; (c) a Secured Tax Claim; (d) a Priority Tax Claim; (e) an Other Priority Claim; (f) a Professional Fee Claim; (g) an Account Holder Claim; or (h) an Intercompany Claim. For the avoidance of doubt, all (i) Claims resulting from the rejection of Executory Contracts and Unexpired Leases, and (ii) Claims that are not Secured resulting from litigation against OpCo are OpCo General Unsecured Claims.

113. "*OSC*" means the Ontario Securities Commission.

114. "*Other Priority Claim*" means any Claim against a Debtor, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

115.    "*Outside Date*" has the meaning set forth in the Asset Purchase Agreement.    All references herein to the "Outside Date" shall be deemed to include the "Extended Outside Date" to the extent the Outside Date is extended in accordance with Section 8.1(c) of the Asset Purchase Agreement.

116.    "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

117.    "*Petition Date*" means July 5, 2022.

118.    "*Plan*" means this joint chapter 11 plan and all exhibits, supplements, appendices, and schedules hereto, as may be altered, amended, supplemented, or otherwise modified from time to time in accordance with Article X.A hereof, including the Plan Supplement (as altered, amended, supplemented, or otherwise modified from time to time), which is incorporated herein by reference and made part of the Plan as if set forth herein.

119.    "*Plan Supplement*" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (in each case, as may thereafter be amended, supplemented, or otherwise modified from time to time in accordance with the terms of the Plan, the Bankruptcy Code, the Bankruptcy Rules, and applicable law), to be Filed by the Debtors no later than seven days before the Voting Deadline or such later date as may be approved by the Bankruptcy Court, and additional documents Filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement.  The Plan Supplement may include the following, as applicable:  (a) the Schedule of Assumed Executory Contracts and Unexpired Leases; (b) the Schedule of Retained Causes of Action; (c) the Schedule of Assumed and Assigned Executory Contracts and Unexpired Leases; (d) the Customer Onboarding Protocol; (e) the Restructuring Transactions Memorandum; (f) the Wind-Down Trust Agreement; and (g) any additional documents necessary to effectuate or that is contemplated by the Plan, including any compensation program for any of the Debtors' employees to be established as contemplated in the Plan and the Definitive Documents to facilitate the transfer of Acquired Assets pursuant to the Asset Purchase Agreement and the wind-down of the Debtors' Estates; *provided* that the Schedule of Retained Causes of Action shall be filed no later than 14 days before the Voting Deadline. The Plan Supplement (and the contents thereof) shall be (x) subject to Purchaser's consent rights solely to the extent set forth under the Asset Purchase Agreement (and shall otherwise be consistent with the Asset Purchase Agreement) and (y) reasonably acceptable to the Committee.

120.    "*Priority Tax Claim*" means any Claim of a Governmental Unit against a Debtor of the kind specified in section 507(a)(8) of the Bankruptcy Code.

121.    "*Pro Rata*" means the proportion that (i) an Allowed Claim or an Allowed Interest in a particular Class bears to (ii) the aggregate amount of Allowed Claims or Allowed Interests in that Class and, solely with respect to Claims in Classes 3 and 4(a), the proportion that an Allowed Claim in either such Class bears to the aggregate amount of Allowed Claims in Classes 3 and 4(a) in the aggregate, unless otherwise indicated.  For purposes of calculating Pro Rata distributions if the Sale Transaction is consummated by the Outside Date, the Pro Rata shares of all Holders of Allowed Claims or Allowed Interests shall be calculated taking into account the Acquired Coins Value of the Net Owed Coins distributed to each of the Account Holders.

122.    "*Professional*" means an Entity:  (a) employed in the Chapter 11 Cases pursuant to an order of the Bankruptcy Court in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered and expenses incurred pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code or (b) for which compensation and reimbursement has been Allowed by Final Order of the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

123.     "*Professional Fee Claim*" means any Administrative Claim by a Professional for compensation for services rendered or reimbursement of expenses incurred by such Professional through and including the Effective Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court.  To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

124.     "*Professional Fee Escrow Account*" means an escrow account funded by the Debtors with Cash no later than the Effective Date in an amount equal to the Professional Fee Escrow Amount.

125.     "*Professional Fee Escrow Amount*" means the aggregate amount of quarterly U.S. Trustee fees, Professional Fee Claims, and other unpaid fees and expenses the Professionals have incurred or will incur in rendering services in connection with the Chapter 11 Cases prior to and as of the Confirmation Date projected to be outstanding as of the anticipated Effective Date, which shall be estimated pursuant to the method set forth in Article II.B of the Plan.

126.     "*Proof of Claim*" means a written proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

127.     "*Proof of Interest*" means a written proof of Interest Filed against any of the Debtors in the Chapter 11 Cases.

128.     "*Purchase Price Cash*" means the Cash paid by the Purchaser to OpCo pursuant to the Asset Purchase Agreement.

129.     "*Purchaser*" means Binance US.

130.     "*Reinstated*" or "*Reinstatement*" means, with respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

131.     "*Related Party*" means, with respect to any Entity, in each case in its capacity as such with respect to such Entity, such Entity's current and former directors, managers, officers, investment committee members, special committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and advisors.

132.     "*Released Parties*" means, collectively, in each case in its capacity as such: (a) the Debtors; (b) the Wind-Down Debtors; (c) the Committee, and each of the members thereof; (d) each of the Released Professionals; (e) Purchaser and each of its Related Parties; and (f) each of the Released Voyager Employees (subject to the limitations contained in Article IV.F and Article IV.G of the Plan); *provided* that if the Asset Purchase Agreement is terminated, Purchaser and each of its Related Parties shall not be "Released Parties" under the Plan.

133.     "*Released Professionals*" means the following professionals retained by the Debtors, the Committee, or the Purchaser (as applicable):  (i) Kirkland & Ellis LLP; (ii) Moelis & Company LLC; (iii) Berkeley Research Group, LLC; (iv) Bankruptcy Management Solutions, Inc. d/b/a Stretto; (v) Quinn Emanuel Urquhart & Sullivan LLP; (vi) Fasken Martineau DuMoulin LLP; (vii) Campbells Legal (BVI); (viii) McDermott Will & Emery LLP; (ix) FTI Consulting, Inc.; (x) Epiq Corporate Restructuring,

LLC; (xi) Cassels, Brock & Blackwell LLP; (xii) Paul Hastings LLP; (xiii) Harney Westwood & Riegels LP (BVI); (xiv) Day Pitney LLP (solely in their capacity as counsel to the Debtors); (xv) Jenner & Block LLP; (xvi) Seyfarth Shaw LLP; (xvii) Alvarez & Marsal Canada Inc.; (xviii) Blake, Cassels & Graydon LLP; (xix) Jaffe Raitt Heuer & Weiss; (xx) Latham & Watkins LLP; (xxi) Lowenstein Sandler LLP; (xxii) Kramer Levin LLP; and (xxiii) Acura Law Firm; *provided* that if the Asset Purchase Agreement is terminated, Latham & Watkins LLP shall not be a "Released Professional" under the Plan.

134. "*Released Voyager Employees*" means all directors, officers, and Persons employed by each of the Debtors and their Affiliates serving in such capacity on or after the Petition Date but before the Effective Date (subject to the limitations contained in Article IV.F and Article IV.G of the Plan).

135. "*Releasing Parties*" means, collectively, in each case in its capacity as such: (a) the Debtors; (b) the Wind-Down Debtors; (c) the Committee, and each of the members thereof; (d) each of the Released Professionals; (e) each of the Released Voyager Employees; (f) Purchaser and each of its Related Parties to the extent Purchaser is able to bind such Related Parties; (g) all Holders of Claims that vote to accept the Plan and affirmatively opt into the releases provided by the Plan; (h) all Holders of Claims that vote to reject the Plan and affirmatively opt into the releases provided by the Plan; and (i) all Holders of Claims or Interests that abstain from voting (or are otherwise not entitled to vote) on the Plan and affirmatively opt into the releases provided by the Plan; *provided* that if the Asset Purchase Agreement is terminated, Purchaser and each of its Related Parties shall not be "Releasing Parties" under the Plan.

136. " *Restructuring Transactions*" means those mergers, amalgamations, consolidations, reorganizations, arrangements, continuances, restructurings, transfers, conversions, dispositions, liquidations, dissolutions, or other corporate transactions that the Debtors and the Committee jointly determine to be necessary to implement the transactions described in this Plan, as described in more detail in Article IV.B herein and the Restructuring Transactions Memorandum.

137. " *Restructuring Transactions Memorandum*" means that certain memorandum as may be amended, supplemented, or otherwise modified from time to time, describing the steps to be carried out to effectuate the Restructuring Transactions, the form of which shall be included in the Plan Supplement, and which shall be in a form reasonably acceptable to the Committee.

138. "*Robertson Class Action*" means that certain putative class action litigation filed in the United States District Court for the Southern District of Florida, captioned *Robertson, et al. v. Cuban, et al.*, No. 1:22-cv-22538-RKA (S.D. Fla. Aug. 10, 2022).

139. "*Sale Transaction*" means the sale of certain of the Debtors' assets and all other transactions pursuant to the Asset Purchase Agreement.

140. "*Schedule of Assumed and Assigned Executory Contracts and Unexpired Leases*" means a schedule that may be Filed as part of the Plan Supplement, which shall be in form and substance acceptable to the Purchaser and in all respects consistent with the terms of the Asset Purchase Agreement, of certain Executory Contracts and Unexpired Leases to be assumed by the Debtors and assigned to the Purchaser pursuant to the Plan and Asset Purchase Agreement, as the same may be amended, modified, or supplemented from time to time by the Debtors or Wind-Down Trust, as applicable, in accordance with the Plan.

141. "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means a schedule that may be Filed as part of the Plan Supplement, which shall be in form and substance reasonably acceptable to the Committee, of certain Executory Contracts and Unexpired Leases to be assumed by the

Debtors pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time by the Debtors or Wind-Down Trust, as applicable, in accordance with the Plan.

142. "*Schedule of Retained Causes of Action*" means the schedule of certain Causes of Action of the Debtors that are not released, waived, settled, compromised, or transferred pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time by the Debtors and/or the Wind-Down Entity, which shall be included in the Plan Supplement. For the avoidance of doubt, any failure to specifically list any Causes of Action on the Schedule of Retained Causes of Action shall not be deemed a waiver or admission that any such Cause of Action does not constitute Vested Causes of Action.

143. "*Schedules*" means, collectively, the schedules of assets and liabilities, Schedule of Assumed Executory Contracts and Unexpired Leases, Schedule of Assumed and Assigned Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by each of the Debtors pursuant to section 521 of the Bankruptcy Code, as such schedules and statements may have been or may be amended, modified, or supplemented from time to time.

144. "*SEC*" means the United States Securities and Exchange Commission.

145. "*Section 510(b) Claim*" means any Claim against a Debtor subject to subordination under section 510(b) of the Bankruptcy Code.

146. "*Secured*" means, when referring to a Claim: (a) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) Allowed pursuant to the Plan as a secured Claim.

147. "*Secured Tax Claim*" means any Secured Claim against a Debtor that, absent its Secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

148. "*Securities Act*" means the U.S. Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

149. "*Security*" has the meaning set forth in section 2(a)(1) of the Securities Act.

150. "*Side-A Policy*" means the Cornerstone A-Side Management Liability Policy, ELU184179-22, issued by XL Specialty Insurance Company, for the July 1, 2022 to July 1, 2023 period.

151. "*Solicitation Materials*" means all solicitation materials with respect to the Plan.

152. "*Special Committee*" means the special committee established at OpCo, comprised of two independent directors, to conduct the Special Committee Investigation.

153. "*Special Committee Investigation*" means that certain investigation undertaken by the Special Committee into certain historical transactions, as more fully described in the Disclosure Statement.

154.     "*Supported Jurisdiction*" has the meaning ascribed to it in the Asset Purchase Agreement.

155.     "*TopCo*" means Voyager Digital Ltd., a Canadian corporation that is publicly traded on the Toronto Stock Exchange.

156.     "*TopCo General Unsecured Claim*" means any Claim against TopCo that is not Secured and is not: (a) paid in full prior to the Effective Date pursuant to an order of the Bankruptcy Court; (b) an Administrative Claim; (c) a Secured Tax Claim; (d) a Priority Tax Claim; (e) an Other Priority Claim; (f) a Professional Fee Claim; (g) an Alameda Loan Facility Claim; (h) an Intercompany Claim; or (i) a Section 510(b) Claim. For the avoidance of doubt, all (i) Claims resulting from the rejection of Executory Contracts and Unexpired Leases, and (ii) Claims that are not Secured resulting from litigation, other than 510(b) Claims, against TopCo are TopCo General Unsecured Claims.

157.     "*Transferred Creditors*" means Account Holders and Holders of Allowed OpCo General Unsecured Claims who have completed all documentation and "KYC" processes reasonably required by Purchaser in the ordinary course of Purchaser's business with respect to similarly situated clients and who have opened a Binance US Account as of the date that is three (3) months following the later of the Closing Date (as defined in the Asset Purchase Agreement) or such later date as may be specified in the Customer Onboarding Protocol, and the successors and assigns of such Holders.

158.     "*Transferred Cryptocurrency Value*" means the aggregate VWAP of any Cryptocurrency that is the subject of an Additional Bankruptcy Distribution as of the date that is two Business Days prior to such Additional Bankruptcy Distribution.

159.      "*U.S. Trustee*" means the Office of the United States Trustee for Region 2.

160.     "*Unclaimed Distribution*" means any distribution under the Plan on account of an Allowed Claim or Allowed Interest to a Holder that, after the expiration of six months after the Effective Date, has not: (a) accepted a distribution, (b) given notice to the Wind-Down Trust of an intent to accept a particular distribution, (c) responded to the Debtors' or Wind-Down Trust's requests for information necessary to facilitate a particular distribution, or (d) taken any other action necessary to facilitate such distribution.

161.     "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or section 1123 of the Bankruptcy Code.

162.     "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

163.     "*Unsupported Jurisdiction*" has the meaning ascribed to it in the Asset Purchase Agreement.

164.     "*Unsupported Jurisdiction Approval*" has the meaning ascribed to it in the Asset Purchase Agreement.

165.     "*Vested Causes of Action*" means the Causes of Action vesting in the Wind-Down Entity pursuant to Article IV.L of the Plan, including, but not limited to, those Causes of Action enumerated on the Schedule of Retained Causes of Action, which shall be included in the Plan Supplement and in all respects consistent with the terms of the Asset Purchase Agreement.

166. "*VGX*" means Voyager Token, that certain Cryptocurrency issued by the Debtors.

167. "*Voting Deadline*" means February 22, 2023.

168. "*Voyager*" means Voyager Digital Ltd. and its direct and indirect Affiliates.

169. "*VWAP*" means, with respect to any type of Cryptocurrency and as of any date of determination, an amount equal to the volume weighted average price in U.S. dollars for such type of Cryptocurrency for the consecutive 24-hour period immediately prior to 8:00 a.m. New York Time on such date of determination, as reported on https://coinmarketcap.com.

170. "*Wind-Down Debtor*" means a Debtor, or any successor or assign thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Effective Date.

171. "*Wind-Down Entity*" means the Wind-Down Debtor or the Wind-Down Trust, as applicable, pursuant to the Restructuring Transactions Memorandum.

172. "*Wind-Down Entity Assets*" means the Wind-Down Trust Assets or any assets transferred to the Wind-Down Debtor, as applicable.

173. "*Wind-Down Reserve*" means an amount, which shall be agreed upon between the Debtors and the Committee prior to the Confirmation Hearing.

174. "*Wind-Down Trust*" means the trust established on the Effective Date and described in Article IV.H to be established under Delaware trust law that, among other things, shall effectuate the wind-down of the Wind-Down Debtors, commence, litigate and settle the Vested Causes of Action that are not released, waived, settled, compromised, or transferred under the Plan and make distributions pursuant to the terms of the Plan and the Wind-Down Trust Agreement; *provided* that, for the avoidance of doubt, the Wind-Down Trust shall not conduct any business operations or continue the Debtors' business operations after the Effective Date.

175. "*Wind-Down Trust Agreement*" means that certain trust agreement by and among the Debtors, the Committee, and the Wind-Down Trust, which shall be included in the Plan Supplement in a form reasonably acceptable to the Committee.

176. "*Wind-Down Trust Assets*" means all of the Debtors' assets transferred to, and vesting in, the Wind-Down Trust pursuant to the Wind-Down Trust Agreement, which, in the event the Sale Transaction is consummated, shall exclude the Acquired Assets, and which shall include, without limitation but only to the extent the following are not Acquired Assets, (a) the Wind-Down Reserve, (b) the Net-Owned Coins to be distributed to Account Holders in Unsupported Jurisdictions to the extent the Purchaser has not obtained the applicable Unsupported Jurisdiction Approval in accordance with Section 6.12 of the Asset Purchase Agreement, (c) any distributions to Account Holders or Holders of OpCo General Unsecured Claims that are returned to the Wind-Down Entity pursuant to Section 6.12(e) of the Asset Purchase Agreement, (d) 3AC Claims and 3AC Recovery, (e) FTX Claims and FTX Recovery, (f) Alameda Claims and Alameda Recovery, (g) the Non-Released D&O Claims, and (h) the Vested Causes of Action.

177. "*Wind-Down Trust Beneficiaries*" means the Holders of Allowed Claims or Allowed Interests that are entitled to receive distributions pursuant to the terms of the Plan, whether or not such Claims or Interests are Allowed as of the Effective Date.

178.    "*Wind-Down Trust Expenses*" means all actual and necessary costs and expenses incurred by the Wind-Down Trustee in connection with carrying out the obligations of the Wind-Down Trust pursuant to the terms of the Plan and the Wind-Down Trust Agreement.

179.    "*Wind-Down Trust Oversight Committee*" means the oversight committee tasked with overseeing the Wind-Down Trust in accordance with the Plan and the Wind-Down Trust Agreement.

180.    "*Wind-Down Trust Units*" means the beneficial interests in the Wind-Down Trust as more fully set forth in the Wind-Down Trust Agreement.

181.    "*Wind-Down Trustee*" means the Person or Persons selected by the Committee, after consultation with the Debtors, subject to the approval of the Bankruptcy Court and identified in the Plan Supplement, to serve as the trustee(s) of the Wind-Down Trust, and any successor thereto, appointed pursuant to the Wind-Down Trust Agreement.

## B.    Rules of Interpretation

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter gender; (2) capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form; (3) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (4) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed, or to be Filed, shall mean that document, schedule, or exhibit, as it may thereafter have been or may thereafter be validly amended, amended and restated, supplemented, or otherwise modified; (5) unless otherwise specified, any reference to an Entity as a Holder of a Claim or Interest, includes that Entity's successors and assigns; (6) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (7) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (8) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) unless otherwise specified, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (12) references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (13) unless otherwise specified, all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases; (14) any effectuating provisions may be interpreted by the Debtors or the Wind-Down Trust in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; (15) any references herein to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter; (16) all references herein to consent, acceptance, or approval shall be deemed to include the requirement that such consent, acceptance, or approval be evidenced by a writing, which may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail; (17) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or

"managers," as applicable, as such terms are defined under the applicable state limited liability company laws; and (18) the use of "include" or "including" is without limitation unless otherwise stated.

## C.     Computation of Time

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

## D.     Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan and any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, documents, instruments, or contracts, in which case the governing law of such agreement shall control); *provided* that corporate, limited liability company, or partnership governance matters relating to the Debtors or the Wind-Down Debtors, as applicable, shall be governed by the laws of the jurisdiction of incorporation or formation of the relevant Debtor or Wind-Down Debtor, as applicable.

## E.     Reference to Monetary Figures

All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

## F.     Reference to the Debtors or the Wind-Down Debtors

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Wind-Down Debtors mean the Debtors and the Wind-Down Debtors, as applicable, to the extent the context requires.

## G.     Nonconsolidated Plan

Although for purposes of administrative convenience and efficiency the Plan has been filed as a joint plan for each of the Debtors and presents together Classes of Claims against and Interests in the Debtors, the Plan does not provide for the substantive consolidation of any of the Debtors.

## ARTICLE II.

## ADMINISTRATIVE AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

## A.     Administrative Claims

Except as otherwise provided in this Article II.A and except with respect to Administrative Claims that are Professional Fee Claims or subject to 11 U.S.C. § 503(b)(1)(D), unless previously Filed,

requests for payment of Allowed Administrative Claims (other than Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code) must be Filed and served on the Wind-Down Entity pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date. Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property, and such Administrative Claims shall be deemed satisfied as of the Effective Date without the need for any objection from the Wind-Down Entity or any notice to or action, order, or approval of the Bankruptcy Court or any other Entity. Objections to such requests, if any, must be Filed and served on the Wind-Down Entity and the requesting party by the Claims Objection Bar Date for Administrative Claims. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed by Final Order of the Bankruptcy Court.

Except with respect to Administrative Claims that are Professional Fee Claims, and except to the extent that an Administrative Claim or Priority Tax Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall receive an amount of Cash equal to the amount of the unpaid or unsatisfied portion of such Allowed Administrative Claim in accordance with the following: (1) if such Administrative Claim is Allowed on or prior to the Effective Date, no later than thirty (30) days after the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction or course of business giving rise to such Allowed Administrative Claim, without any further action by the Holder of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtors or the Wind-Down Entity, as applicable; or (5) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court. Any Cryptocurrency inadvertently deposited to the Debtors' account(s) after the Petition Date shall be returned to the sender in full.

Objections to requests for payment of such Administrative Claims, if any, must be Filed with the Bankruptcy Court and served on the Wind-Down Entity and the requesting Holder no later than the Claims Objection Bar Date for Administrative Claims. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with, an order that becomes a Final Order of the Bankruptcy Court.

## B. Professional Fee Claims

### 1. Final Fee Applications and Payment of Professional Fee Claims

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five (45) days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code and Bankruptcy Rules. The Wind-Down Entity shall pay Professional Fee Claims in Cash to such Professionals in the amount the Bankruptcy Court allows, including from funds held in the

Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court; *provided* that the Debtors' and the Wind-Down Entity's obligations to pay Allowed Professional Fee Claims shall not be limited or deemed limited to funds held in the Professional Fee Escrow Account.

      2.      <u>Professional Fee Escrow Account</u>

No later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and the U.S. Trustee and for no other Entities until all quarterly U.S. Trustee fees and all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the U.S. Trustee or to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court. No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. No funds held in the Professional Fee Escrow Account shall be property of the Estates of the Debtors or the Wind-Down Entity. When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, and all U.S. Trustee quarterly fees plus statutory interest, if any, have been paid in full, any remaining funds held in the Professional Fee Escrow Account shall be turned over to the Wind-Down Entity without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

      3.      <u>Professional Fee Escrow Amount</u>

The Professionals shall deliver to the Debtors a reasonable and good-faith estimate of their unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Confirmation Date projected to be outstanding as of the anticipated Effective Date, and shall deliver such estimate no later than five Business Days prior to the anticipated Effective Date. For the avoidance of doubt, no such estimate shall be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that are the subject of a Professional's final request for payment of Professional Fee Claims Filed with the Bankruptcy Court, and such Professionals are not bound to any extent by the estimates. If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional. The total aggregate amount so estimated to be outstanding as of the anticipated Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account; *provided* that the Wind-Down Entity shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are Filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

      4.      <u>Post-Confirmation Date Fees and Expenses</u>

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors and/or the Wind-Down Entity, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Wind-Down Entity. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Wind-Down Entity may employ and pay any Professional in the ordinary course of business for the

period after the Confirmation Date without any further notice to or action, order, or approval of the Bankruptcy Court.

For the avoidance of doubt, no Administrative Claims, Professional Fee Claims, or any other post-confirmation fees and expenses shall be paid prior to payment of any quarterly fees due and outstanding to the U.S. Trustee.

## C. Priority Tax Claims

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

## ARTICLE III.

## CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS

### A. Classification of Claims and Interests

Except for the Claims addressed in Article II of the Plan, all Claims against and Interests in the Debtors are classified in the Classes set forth in this Article III for all purposes, including voting, Confirmation, and distributions pursuant to the Plan and in accordance with section 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

### B. Summary of Classification

A summary of the classification of Claims against and Interests in each Debtor pursuant to the Plan is set forth in the following chart. The Plan constitutes a separate chapter 11 plan for each of the Debtors, and accordingly, the classification of Claims and Interests set forth below applies separately to each of the Debtors. All of the potential Classes for the Debtors are set forth herein. Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Claims or Interests shall be treated as set forth in Article III.E hereof. Voting tabulations for recording acceptances or rejections of the Plan will be conducted on a Debtor-by-Debtor basis as set forth above.[1]

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |

---

[1] The Debtors reserve the right to separately classify Claims or Interests to the extent necessary to comply with any requirements under the Bankruptcy Code or applicable law.

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | Account Holder Claims | Impaired | Entitled to Vote |
| 4A | OpCo General Unsecured Claims | Impaired | Entitled to Vote |
| 4B | HoldCo General Unsecured Claims | Impaired | Entitled to Vote |
| 4C | TopCo General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Alameda Loan Facility Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 6 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |
| 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |
| 9 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

## C.    Treatment of Classes of Claims and Interests

Subject to Article VI hereof, each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors or Wind-Down Entity, as applicable, and the Holder of such Allowed Claim or Allowed Interest, as applicable. In no event shall any Holder of a Claim receive more than such Holder's Allowed amount on account of such Claim.

1.    <u>Class 1 —Secured Tax Claims</u>

(a)    *Classification*: Class 1 consists of all Secured Tax Claims.

(b)    *Treatment*: Each Holder of an Allowed Secured Tax Claim shall receive, in full and final satisfaction of such Allowed Secured Tax Claim, at the option of the Wind-Down Entity, payment in full in Cash of such Holder's Allowed Secured Tax Claim or such other treatment rendering such Holder's Allowed Secured Tax Claim Unimpaired.

(c)    *Voting*: Class 1 is Unimpaired under the Plan. Holders of Allowed Secured Tax Claims are conclusively presumed to have accepted the Plan under

section 1126(f) of the Bankruptcy Code. Therefore, Holders of Allowed Secured Tax Claims are not entitled to vote to accept or reject the Plan.

2.      Class 2 — Other Priority Claims

(a)      *Classification*:  Class 2 consists of all Other Priority Claims.

(b)      *Treatment*:  Each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Allowed Other Priority Claim, at the option of the applicable Debtor, payment in full in Cash of such Holder's Allowed Other Priority Claim or such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired.

(c)      *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan.

3.      Class 3 — Account Holder Claims

(a)      *Classification*:  Class 3 consists of all Account Holder Claims.

(b)      *Allowance*: Account Holder Claims shall be conclusively Allowed in the amount listed on OpCos's *Amended Schedules of Assets and Liabilities* (Case No. 22-10945) [Docket No. 18]; *provided* that the rights of any Holder of an Account Holder Claim to object to the scheduled amount shall be preserved. To the extent an Account Holder Claim is Allowed in a greater amount than the scheduled amount of such Account Holder Claim, such Holder shall be entitled to a subsequent distribution such that it will receive its Pro Rata share of recoveries to Holders of Allowed Account Holder Claims.  Account Holder Claims shall be valued in U.S. dollars as of the Petition Date consistent with section 502(b) of the Bankruptcy Code.

(c)      *Treatment*:  Each Holder of an Allowed Account Holder Claim will receive in exchange for such Allowed Account Holder Claim:

(i)      If the Sale Transaction is consummated by the Outside Date:

A.      its Net Owed Coins, as provided in and subject to the requirements of Sections 6.10 and 6.12 of the Asset Purchase Agreement; *provided* that for Account Holders in Unsupported Jurisdictions and only to the extent that the Purchaser does not obtain the Unsupported Jurisdiction Approval for the jurisdiction in which such Account Holder resides within 6 months following the Closing Date (as defined in the Asset Purchase Agreement), such Account Holders shall receive, after expiration of such time period, value in Cash at which such Net Owned Coins allocable to such Account Holder are liquidated;

B. its Pro Rata share of any Additional Bankruptcy Distributions, in Cryptocurrency or Cash as provided in and subject to the requirements of Sections 6.12 and 6.14 of the Asset Purchase Agreement;

C. its Pro Rata share of Distributable OpCo Cash; and

D. to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to OpCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims;

*provided* that distributions made to any Account Holder pursuant to clauses (B), (C), and (D) above shall be made after taking into account the Acquired Coins Value of the Net Owed Coins or the value in Cash at which such Net Owned Coins are liquidated, as applicable, previously allocated to such Account Holder; or

(ii) If the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated:

A. its Pro Rata share of Distributable OpCo Cash;

B. its Pro Rata share of Distributable Cryptocurrency, which such Account Holder shall be able to withdraw in kind, alternative Cryptocurrency, and/or Cash for a period of thirty (30) days after the Effective Date through the Voyager platform or, if elected by Seller pursuant to Section 6.12(d) of the Asset Purchase Agreement, through the Binance.US Platform; *provided* that if the applicable transfer is made through the Voyager platform and such Account Holder does not withdraw its Pro Rata share of Distributable Cryptocurrency available to such Account Holder from the Voyager platform within such thirty (30) day period, such Account Holder will receive Cash in the equivalent value to its Pro Rata share of Distributable Cryptocurrency; and

C. to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to OpCo; *provided* that any distributions on account of Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims,

Allowed Secured Tax Claims, and Allowed Other Priority Claims.

(d)    *Voting:* Class 3 is Impaired under the Plan. Holders of Allowed Account Holder Claims are entitled to vote to accept or reject the Plan.

4.    <u>Class 4A — OpCo General Unsecured Claims</u>

(a)    *Classification*: Class 4A consists of all OpCo General Unsecured Claims.

(b)    *Treatment*: Each Holder of an Allowed OpCo General Unsecured Claim will receive in exchange for such Allowed OpCo General Unsecured Claim:

(i)    If the Sale Transaction is consummated by the Outside Date:

A.    its Pro Rata share of Distributable Cryptocurrency in Cash;

B.    its Pro Rata share of Additional Bankruptcy Distributions, in Cryptocurrency or Cash as provided in and subject to the requirements of Sections 6.12 and 6.14 of the Asset Purchase Agreement;

C.    its Pro Rata share of Distributable OpCo Cash; and

D.    to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to OpCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims; or

(ii)    If the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated:

A.    its Pro Rata share of Distributable Cryptocurrency in Cash;

A.    its Pro Rata share of Distributable OpCo Cash; and

B.    to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to OpCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

(c) *Voting*: Class 4A is Impaired under the Plan. Holders of Allowed OpCo General Unsecured Claims are entitled to vote to accept or reject the Plan.

5. <u>Class 4B — HoldCo General Unsecured Claims</u>

(a) *Classification*: Class 4B consists of all HoldCo General Unsecured Claims.

(b) *Treatment*: Each Holder of an Allowed HoldCo General Unsecured Claim will receive in exchange for such Allowed HoldCo General Unsecured Claim:

(i) its Pro Rata share of Distributable HoldCo Cash; and

(ii) to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to HoldCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

(c) *Voting*: Class 4B is Impaired under the Plan. Holders of Allowed HoldCo General Unsecured Claims are entitled to vote to accept or reject the Plan.

6. <u>Class 4C — TopCo General Unsecured Claims</u>

(a) *Classification*: Class 4C consists of all TopCo General Unsecured Claims.

(b) *Treatment*: Each Holder of an Allowed TopCo General Unsecured Claim will receive in exchange for such Allowed TopCo General Unsecured Claim:

(i) its Pro Rata share of Distributable TopCo Cash; and

(ii) to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of the Wind-Down Trust Assets attributable to TopCo; *provided* that any distributions on account of the Wind-Down Entity Assets or the Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

(c) *Voting*: Class 4C is Impaired under the Plan. Holders of Allowed TopCo General Unsecured Claims are entitled to vote to accept or reject the Plan.

7. <u>Class 5 — Alameda Loan Facility Claims</u>

(a) *Classification*: Class 5 consists of all Alameda Loan Facility Claims.

(b) *Treatment*: Each Holder of an Allowed Alameda Loan Facility Claim will receive in exchange for such Allowed Alameda Loan Facility Claim to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down

26

A-410

Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets; *provided* that any distributions on account of Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, all Allowed Claims at OpCo, HoldCo, and TopCo, including, but not limited to, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, Allowed Account Holder Claims, Allowed OpCo General Unsecured Claims, Allowed HoldCo General Unsecured Claims, and Allowed TopCo General Unsecured Claims; *provided, however,* if the Bankruptcy Court denies subordination of the Alameda Loan Facility Claims, then such Alameda Loan Facility Claims shall be *pari passu* with General Unsecured Claims at the applicable Debtor entity.

(c) *Voting*: Class 5 is Impaired under the Plan. Holders of Allowed Alameda Loan Facility Claims are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. Therefore, Holders of Allowed Alameda Loan Facility Claims are not entitled to vote to accept or reject the Plan.

8. Class 6 — Section 510(b) Claims

(a) *Classification*: Class 6 consists of all Section 510(b) Claims against TopCo.

(b) *Allowance*: Notwithstanding anything to the contrary herein, a Section 510(b) Claim against TopCo, if any such Section 510(b) Claim exists, may only become Allowed by Final Order of the Bankruptcy Court.

(c) *Treatment*: Each Holder of Allowed Section 510(b) Claims against TopCo will receive, to effectuate distributions, if applicable, from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to TopCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, and Allowed TopCo General Unsecured Claims.

(d) *Voting*: Class 6 is Impaired under the Plan. Holders (if any) of Allowed Section 510(b) Claims against TopCo are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. Therefore, Holders (if any) of Allowed Section 510(b) Claims against TopCo are not entitled to vote to accept or reject the Plan.

9. Class 7 — Intercompany Claims

(a) *Classification*: Class 7 consists of all Intercompany Claims.

(b) *Treatment*: On the Effective Date, all Intercompany Claims shall be, at the option of the Debtors, either (a) Reinstated or (b) converted to equity, otherwise set off, settled, distributed, contributed, or cancelled, in each case in accordance with the Restructuring Transactions Memorandum.

(c) *Voting*: Holders of Intercompany Claims are either Unimpaired or Impaired, and such Holders of Intercompany Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

10. Class 8 — Intercompany Interests

(a) *Classification*: Class 8 consists of all Intercompany Interests.

(b) *Treatment*:  On the Effective Date, all Intercompany Interests shall be, at the option of the Debtors, either (a) Reinstated in accordance with Article III.G of the Plan or (b) set off, settled, addressed, distributed, contributed, merged, or cancelled, in each case in accordance with the Restructuring Transactions Memorandum.

(c) *Voting*:  Holders of Intercompany Interests are either Unimpaired or Impaired, and such Holders of Intercompany Interests are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

11. Class 9 — Existing Equity Interests

(a) *Classification*: Class 9 consists of all Existing Equity Interests.

(b) *Treatment*:  Each Holder of Existing Equity Interests will receive, to effectuate distributions, if applicable, from the Wind-Down Entity, its Pro Rata share of the Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to TopCo; *provided* that any distributions on account of Wind-Down Trust Units shall only be made following payment in full of, or reserve for, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, and Allowed TopCo General Unsecured Claims.

(c) *Voting*:  Class 9 is Impaired under the Plan.  Holders of Existing Equity Interests are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. Therefore, Holders of Existing Equity Interests are not entitled to vote to accept or reject the Plan.

**D.  Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Wind-Down Entity's rights in respect of any Unimpaired Claim, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

**E.  Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes**

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from

the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

## F.    Subordinated Claims

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims against and Allowed Interests in the Debtors and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors and the Wind-Down Entity reserve the right to reclassify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

## G.    Intercompany Interests

To the extent Reinstated under the Plan, distributions (if any) on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the corporate structure given the existing intercompany systems connecting the Debtors and their Affiliates, and in exchange for the Debtors' and Wind-Down Entity's agreement under the Plan to make certain distributions to the Holders of Allowed Claims.

## H.    Controversy Concerning Impairment

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

## I.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code

Section 1129(a)(10) of the Bankruptcy Code is satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims or Interests.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

## ARTICLE IV.

## PROVISIONS FOR IMPLEMENTATION OF THE PLAN

## A.    General Settlement of Claims and Interests

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved

pursuant to the Plan. The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 of all such Claims, Interests, Causes of Action, and controversies, as well as a finding by the Bankruptcy Court that such compromise and settlement is fair, equitable, reasonable, and in the best interests of the Debtors, their Estates, and Holders of Claims and Interests. Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Interests in any Class are intended to be and shall be final.

## B.      Restructuring Transactions

On or before the Effective Date, the applicable Debtors will take any action as may be necessary or advisable to effectuate the Restructuring Transactions described in the Plan, the Restructuring Transactions Memorandum, and the Customer Onboarding Protocol, including: (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (4) the transfer or distribution of any Cryptocurrency or Cash pursuant to the Asset Purchase Agreement, or the Liquidation Procedures, as applicable; (5) the execution and delivery of the Wind-Down Trust Agreement; (6) any transactions necessary or appropriate to form the Wind-Down Entity; (7) such other transactions that are required to effectuate the Restructuring Transactions, including any sales, mergers, consolidations, restructurings, conversions, dispositions, transfers, formations, organizations, dissolutions, or liquidations; (8) all transactions necessary to provide for the purchase of the Acquired Assets by Purchaser under the Asset Purchase Agreement; and (9) all other actions that the applicable Entities determine to be necessary or appropriate, or that are reasonably requested by the Purchaser in accordance with the Asset Purchase Agreement, including making filings or recordings that may be required by applicable law.

The Confirmation Order shall, and shall be deemed to, pursuant to sections 1123 and 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions.

## C.      The Sale Transaction

If the Sale Transaction is consummated by the Outside Date, pursuant to the terms of the Asset Purchase Agreement, then the following terms shall govern:

On or prior to the Effective Date, the Debtors shall have consummated the Sale Transaction, and, among other things, the Acquired Assets and Assumed Liabilities shall have transferred to the Purchaser free and clear of all Liens, Claims, Interests, charges, or other encumbrances, and the Purchaser shall pay to the Debtors or Holders of Account Holder Claims and Holders of OpCo General Unsecured Claims, as applicable, the proceeds from the Sale Transaction, as and to the extent provided for in the Asset Purchase Agreement, and this Plan. The Confirmation Order shall authorize the Debtors, the Purchaser, and the Wind-Down Entity, as applicable, to undertake the transactions contemplated by the Asset Purchase Agreement, including pursuant to sections 363, 365, 1123(a)(5)(B), and 1123(a)(5)(D) of the Bankruptcy Code.

The Debtors and Purchaser shall be authorized to take all actions as may be deemed necessary or appropriate to consummate the Sale Transaction pursuant to the terms of the Asset Purchase Agreement the Customer Onboarding Protocol, and this Plan. The Debtors shall be authorized to sell any Cryptocurrency to satisfy all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims. On and after the Effective Date, except as otherwise provided in the Plan and the Wind-Down Trust Agreement, the Wind-Down Debtors, the Wind-Down Entity, or the Purchaser, as applicable, may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; provided, that the Bankruptcy Court shall retain jurisdiction to resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with any of the foregoing.

Notwithstanding anything contained in this Plan and any Definitive Documents, if the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated, all provisions contained in this Plan and the Definitive Documents governing the Sale Transaction shall have no further force and effect, and the provisions governing the Liquidation Transaction shall govern. The rights and remedies of the Seller and Purchaser under the Asset Purchase Agreement and any related orders of the Bankruptcy Court shall be expressly preserved.

## D.     The Liquidation Transaction

If the Sale Transaction is not consummated by the Outside Date, pursuant to the Asset Purchase Agreement, then the following terms shall govern:

### 1.     *The Liquidation Transaction*

On or after the Outside Date, the Debtors will pursue the Liquidation Transaction in accordance with the Liquidation Procedures. Pursuant to the Liquidation Transaction, the Debtors, the Wind-Down Entity, or the Wind Down Trustee, as applicable, will distribute certain of the Cryptocurrency in-kind to Holders of Account Holder Claims in accordance with Article III.C of the Plan, transfer all Wind-Down Entity Assets or Wind-Down Trust Assets to the Wind-Down Reserve, liquidate certain of the Cryptocurrency, distribute Cash to Holders of Claims, wind down and dissolve the Debtors, and pursue final administration of the Debtors' Estates pursuant to the Bankruptcy Code.

The Debtors, or the Wind-Down Entity, as applicable, shall be authorized to take all actions as may be deemed necessary or appropriate to consummate the Liquidation Transaction pursuant to this Plan. On or before the date that is twenty-one days prior to the anticipated commencement of the Liquidation Transaction, the Debtors, or the Wind-Down Entity, as applicable, shall file the Liquidation Procedures with the Bankruptcy Court. Parties in interest shall have ten days to object to the Liquidation Procedures, and if no objections are timely filed, the Liquidation Procedures shall be approved. In the event of a timely objection, the Bankruptcy Court shall adjudicate any objection to the Liquidation Procedures.

On and after the Effective Date, except as otherwise provided in the Plan, the Wind-Down Trust Agreement, and the Liquidation Procedures, the Wind-Down Debtors or the Wind-Down Entity as applicable, may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; provided, that the Bankruptcy Court shall retain jurisdiction to resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with any of the foregoing.

2. *Cryptocurrency Rebalancing*

Prior to the Effective Date the Debtors shall, in consultation with the Committee, be authorized to rebalance their Cryptocurrency portfolio to ensure that the Debtors can effectuate *pro rata* in-kind distributions of the Distributable Cryptocurrency according to Article III.C.3(c) of this Plan, *provided* that such rebalancing shall be in accordance with the Asset Purchase Agreement (if the Asset Purchase Agreement has not been terminated). The Debtors may effectuate such rebalancing by (i) selling such Cryptocurrency that cannot be distributed to Account Holders, (ii) purchasing Cryptocurrency supported by Voyager's or Purchaser's platform (as provided by the Asset Purchase Agreement) that shall be distributed to Account Holders, and (iii) engaging in any other transaction, including the execution of trades of Cryptocurrency, necessary or appropriate to effectuate distributions of the Distributable Cryptocurrency to Holders of Allowed Account Holder Claims.

## E. Management and Employee Transition Plans

The Debtors shall be authorized to implement the Management Transition Plan and Employee Transition Plan, the terms of which shall be reasonably acceptable to Purchaser and the Committee and included in the Plan Supplement. The Management Transition Plan and Employee Transition Plan shall help ensure that employees are available to provide transition services to the Debtors and/or the Wind-Down Entity to effectuate the Sale Transaction and to wind down the Debtors' Estates.

## F. Non-Released D&O Claims

Any Claims or Causes of Action held by the Debtors or their respective estates against the Debtors' CEO and/or CCO (regardless of any fiduciary capacity in which such individuals were acting) that are expressly related to approval of the 3AC Loan are not released pursuant to the Plan (collectively, the "Non-Released D&O Claims"), and shall be assigned and transferred to the Wind-Down Entity to be pursued, settled, or resolved by the Wind-Down Entity in accordance with the terms of Article IV.G of this Plan and subject to the Wind-Down Reserve. Any claims against the D&O Carriers that the Debtors' insurance transactions within the 90 days prior to the Petition Date are avoidable under the Bankruptcy Code, applicable state law, or both (the "Non-Released Insurance Claims") shall be assigned and transferred to the Wind-Down Entity to be pursued, settled, or resolved solely by the Wind-Down Entity in accordance with the terms of Article IV.G of this Plan. The Wind-Down Entity shall be a successor to the Debtors' rights, title, and interest in any Non-Released D&O Claims and Non-Released Insurance Claims, and the Wind-Down Entity shall have standing to pursue the Non-Released D&O Claims and the Non-Released Insurance Claims in accordance with the terms of Article IV.G of this Plan; *provided* that: (i) any recovery by the Wind-Down Entity (and the beneficiaries thereof) on account of any Non-Released D&O Claim, including in each case by way of settlement or judgment, shall be satisfied solely by and to the extent of the proceeds of the Debtors' available D&O Liability Insurance Policies (and/or from the D&O Carriers directly) after payment from such D&O Liability Insurance Policies of any and all covered costs and expenses incurred in connection with the defense of the Non-Released D&O Claims; (ii) any party, including any trustee or any beneficiary of the Wind-Down Entity, seeking to execute, garnish, or otherwise attempt to collect on any settlement of or judgment in the Non-Released D&O Claims shall do so solely upon available insurance coverage from the Debtors' available D&O Liability Insurance Policies; and (iii) no party shall (a) record any judgment against the CEO or CCO, or (b) otherwise attempt to collect, directly or indirectly, from the personal assets of the CEO or CCO with respect to the Non-Released D&O Claims. For the avoidance of doubt, this provision does not enjoin, limit, or impair direct claims held by third parties against the Debtors' CEO or CCO (if any) other than any direct claims held by Holders of Claims or Interests that opt into the third party release in Article VIII.B of this Plan. Only upon the occurrence of the earlier of (x) a release being given as part of any later settlement of the Non-Released D&O Claims; (y) final resolution of any coverage claims asserted

against the Debtors' available D&O Liability Insurance Policies on account of the Non-Released D&O Claims; or (z) exhaustion of the available insurance coverage under the D&O Liability Insurance Policies, the Non-Released D&O Claims shall be released and discharged without the need for further action or Bankruptcy Court order. For the avoidance of doubt, any release of the Non-Released D&O Claims shall not become effective until one of the three conditions stated in the preceding sentence above has been met.

## G.      The D&O Settlement

On the Effective Date, the terms of the D&O Settlement shall be effectuated as provided in this Article IV.G.

Pursuant to the D&O Settlement, CEO shall repay the $1,900,000 received from the Debtors on or around February 28, 2022, by paying the after-tax amount of such transfer (approximately $1,125,000) to OpCo in cash and assigning the right, if any, to any tax refund for the balance to the Wind-Down Entity. CEO shall subordinate any Claims (including any indemnification claims asserted under this Art. IV.F) he holds against the Debtors until all other Holders of Claims are paid in full. CCO shall subordinate 50 percent of any Claims he holds other than indemnification claims (and 100% of any indemnification claims asserted under this Art. IV.F) against the Debtors until all other Holders of Claims are paid in full; *provided*, *however*, that in the event the D&O Carriers deny coverage to CEO or CCO under the D&O Insurance Policies on account of such subordination of any indemnification claim, then any indemnification claims by CEO or CCO shall not be so subordinated, but may be filed as an OpCo General Unsecured Claim.

CEO and CCO, each as insureds, under the D&O Liability Insurance Policies agree:  (i) not to draw down on the Side-A Policy; *provided*, *however*, that should coverage continue to be available under the Side-A Policy following resolution of the Debtors' and/or the Wind-Down Entity's claims for the avoidance of the premium paid for the policy (whether by judgment or settlement or otherwise) such officer shall be entitled to seek coverage under the Side-A Policy to the extent any such coverage remains; and (ii) not to object to any settlement by the Debtors or Wind Down Entity of avoidance claims under the Side-A Policy, even if such settlement results in termination of benefits under the Side-A Policy. For the avoidance of doubt, this agreement is not intended to and shall not alter or amend each of the insureds' duties under the D&O Liability Insurance Policies. In the event that any insurer under the D&O Liability Insurance Policies denies coverage for any reason, the Wind-Down Entity shall have the right to bring a coverage claim against the insurer(s) in the name of the insured, the insureds shall reasonably cooperate with respect to any such claim, and the insured may participate at their election (and at their sole cost). For the avoidance of doubt, nothing contained in this Plan is intended as a waiver or release of the Debtors' and/or Wind-Down Entity's right to assert any Non-Released D&O Claim, but rather limits such recovery in the manner set forth above.

CEO and CCO shall be entitled to receive their salary and benefits for as long as they work for the Debtors and/or the Wind-Down Entity and retain the right to assert claims for advancement and indemnification up to the limits of any available coverage in the event any of the insurers that issued the Management Liability Policy, the Excess Policy, or the Side-A Policy denies coverage to CEO and/or CCO based upon or arising out of the lack of a formal claim for indemnification; *provided*, *however*, that any such indemnification or advancement claims shall be subordinated in full unless and until all other Holders of Claims are paid in full; *provided*, *further*, that in the event that any of the D&O Carriers deny coverage to CEO or CCO under the D&O Insurance Policies on account of such subordination of any indemnification claim, then any indemnification claims by CEO or CCO shall not be so subordinated, but may be filed as an OpCo General Unsecured Claim.

CEO and CCO shall subordinate any and all rights and entitlements under the Cornerstone A-Side Management Liability Insurance Policy to Voyager Digital Ltd., Policy Number ELU184179-22, to any recovery by the Debtors and/or the Wind-Down Entity on account of the Debtors' and/or Wind-Down Entity's claims for the avoidance of the premium paid for the policy. For the avoidance of doubt, should coverage continue to be available under the Side-A Policy following resolution of the Debtors' and/or the Wind-Down Entity's claims for the avoidance of the premium paid for the policy (whether by judgment or settlement or otherwise), CEO and/or CCO shall be entitled to seek coverage under the Side-A Policy. CEO and CCO shall remain at, and continue performing the responsibilities of, their respective position(s) with the Debtors and assist with the Debtors' transition for at least 30 days from entry of the Confirmation Order; *provided* that CCO shall have no obligation to remain at his position with the Debtors beyond January 15, 2023 and the CEO shall have the right to pursue and engage in any employment opportunity, business venture, consulting arrangement, or investment that may become available; *provided*, *further*, that both the CEO and CCO shall be available to the Debtors and/or the Wind-Down Entity for a maximum of five hours per month for the one year following the Effective Date.

In the event that the sworn financial disclosure statements under penalty of perjury provided to the Debtors, the Special Committee and the Committee by CEO and CCO are later determined at any time by Final Order of the Bankruptcy Court or other court of competent jurisdiction to be materially inaccurate, (a) the limitations on recovery by the Wind-Down Entity under this Article IV.G shall no longer apply, (b) any and all release, exculpation and injunction provisions in Article VIII of this Plan with respect to CEO and/or CCO (as applicable) shall be deemed null and void, (c) all Releasing Parties' rights with respect to the CEO and/or CCO (as applicable) shall be fully intact and preserved, (d) amounts paid by CEO shall not be repaid by the Wind-Down Entity, and (e) any applicable statute of limitations shall be deemed tolled from the Petition Date to the date of entry of the order referenced above. The Wind-Down Trust, as successor to the Debtors, shall have standing to bring a motion seeking relief pursuant to this Article IV.G.

Entry of the Confirmation Order shall be deemed approval of the D&O Settlement and, to the extent not already approved by the Bankruptcy Court, the Debtors or the Wind-Down Debtors, as applicable, are authorized to negotiate, execute, and deliver those documents necessary or appropriate to effectuate the D&O Settlement, without further notice or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors, the Wind-Down Debtors, the Committee, and the Special Committee may deem to be necessary to effectuate the D&O Settlement.

**H.     Wind-Down Trust**

On the Effective Date, the Wind-Down Trust shall be formed for the benefit of the Wind-Down Trust Beneficiaries and each of the Debtors shall transfer the Wind-Down Trust Assets for distribution in accordance with the terms of the Plan. The Confirmation Order shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

1. <u>Establishment of a Wind-Down Trust</u>

Pursuant to the Wind-Down Trust Agreement, the Wind-Down Trust will be established. The Wind-Down Trust shall be the successor-in-interest to the Debtors, and the Wind-Down Trust shall be a successor to the Debtors' rights, title, and interest to the Wind-Down Trust Assets. The Wind-Down Trust will conduct no business operations and will be charged with winding down the Debtors' Estates. The Wind-Down Trust shall be managed by the Wind-Down Trustee and shall be subject to a Wind-Down Trust Oversight Committee. For the avoidance of doubt, in the event that the Restructuring Transactions Memorandum specifies that the Wind-Down Debtors will be the Wind-Down Entity, the Wind-Down Debtors shall be managed by the Wind-Down Trustee and shall be subject to the Wind-Down Trust Oversight Committee in the same manner as if the Wind-Down Entity is the Wind-Down Trust. The Wind-Down Trust shall be administered in accordance with the terms of the Wind-Down Trust Agreement and shall be subject to the Wind-Down Reserve and the Non-Released D&O Claim Budget. For the avoidance of doubt, the Wind-Down Trust shall not have any right or interest in any Cause of Action or Claim constituting an Acquired Asset. The Wind-Down Trust shall be administered in a manner consistent with the SEC's published guidance on liquidating trusts.

Prior to the Effective Date, any and all of the Debtors' assets shall remain assets of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and on the Effective Date the Wind-Down Trust Assets shall, subject to the Wind-Down Trust Agreement, be transferred to and vest in the Wind-Down Trust or the Wind-Down Debtors, as applicable. For the avoidance of doubt, to the extent not otherwise waived in writing, released, settled, compromised, assigned or sold pursuant to a prior order or the Plan, the Wind-Down Entity specifically retains and reserves the right to assert, after the Effective Date, any and all of the Vested Causes of Action and related rights, whether or not asserted as of the Effective Date, and all proceeds of the foregoing, subject to the terms of the Plan, including without limitation Article IV.F and Article IV.G.

Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, only the Wind-Down Trust and the Wind-Down Trustee shall have the right to pursue or not to pursue, or, subject to the terms hereof and the Wind-Down Trust Agreement, compromise or settle any Wind-Down Trust Assets transferred to the Wind-Down Trust. On and after the Effective Date, the Wind-Down Trust and the Wind-Down Trustee may, without further Bankruptcy Court approval, commence, litigate, and settle any Vested Causes of Action or Claims relating to any Wind-Down Trust Assets transferred to the Wind-Down Trust or rights to payment or Claims that belong to the Debtors as of the Effective Date or are instituted by the Wind-Down Trust or the Wind-Down Trustee on or after the Effective Date, except as otherwise expressly provided herein and in the Wind-Down Trust Agreement. All of the Wind-Down Trust's activities shall be subject to the Wind-Down Reserve and the Non-Released D&O Claim Budget. The Wind-Down Trust shall be entitled to enforce all defenses and counterclaims to all Claims asserted against the Debtors and their Estates, including setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code.

The Wind-Down Trustee shall be deemed hereby substituted as plaintiff, defendant, or in any other capacity for the Debtors in any Causes of Action pending before the Bankruptcy Court or any other court that relates to a Wind-Down Trust Asset without the need for filing any motion for such relief. On the Effective Date, the Debtors and the Wind-Down Trustee shall execute the Wind-Down Trust Agreement and shall have established the Wind-Down Trust pursuant hereto. In the event of any conflict between the terms of this Article IV.H and the terms of the Wind-Down Trust Agreement, the terms of the Wind-Down Trust Agreement shall control.

2. <u>Wind-Down Entity Assets</u>

Notwithstanding any prohibition on assignability under applicable non-bankruptcy law, on the Effective Date and thereafter if additional Wind-Down Entity Assets become available, the Debtors shall be deemed, subject to the Wind-Down Trust Agreement, to have automatically transferred to the applicable Wind-Down Entity all of their right, title, and interest in and to all of the Wind-Down Trust Assets, in accordance with section 1141 of the Bankruptcy Code. All such assets shall automatically vest in the Wind-Down Trust free and clear of all Claims, Liens, and other interests, subject only to the Allowed Claims and Interests as set forth herein and the expenses of the Wind-Down Trust as set forth herein and in the Wind-Down Trust Agreement. Thereupon, the Debtors shall have no interest in or with respect to the Wind-Down Entity Assets or the Wind-Down Trust.

3. <u>Treatment of Wind-Down Trust for Federal Income Tax Purposes; No Successor-in-Interest</u>

The Wind-Down Trust shall be established for the primary purpose of liquidating and distributing the Wind-Down Trust Assets transferred to it, in accordance with Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Wind-Down Trust. Accordingly, the Wind-Down Trustee may, in an expeditious but orderly manner, liquidate the Wind-Down Trust Assets, make timely distributions to the Wind-Down Trust Beneficiaries and not unduly prolong its duration. The Wind-Down Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth herein or in the Wind-Down Trust Agreement. The record holders of beneficial interests shall be recorded and set forth in a register maintained by the Wind-Down Trustee expressly for such purpose.

The Wind-Down Trust is intended to qualify as a "grantor trust" for federal income tax purposes to the extent reasonably practicable, with the Wind-Down Trust Beneficiaries treated as grantors and owners of the Wind-Down Trust. However, with respect to any of the assets of the Wind-Down Trust that are subject to potential disputed claims of ownership or uncertain distributions, *or* to the extent "liquidating trust" treatment is otherwise unavailable, the Debtors anticipate that such assets will be subject to disputed ownership fund treatment under Section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes. Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account. Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

4. <u>Appointment of Wind-Down Trustee</u>

The Wind-Down Trustee shall be selected by the Committee, in consultation with the Debtors, and shall be identified in the Plan Supplement. The appointment of the Wind-Down Trustee shall be approved in the Confirmation Order, and the Wind-Down Trustee's duties shall commence as of the Effective Date. The Wind-Down Trustee shall administer the distributions to the Wind-Down Trust Beneficiaries and shall serve as a representative of the Estates under section 1123(b) of the Bankruptcy Code for the purpose of enforcing Vested Causes of Action belonging to the Estates that are not released, waived, settled, compromised, or transferred pursuant to the Plan and subject to the limitations set forth in the Plan, including Article IV.F and Article IV.G.

In accordance with the Wind-Down Trust Agreement, the Wind-Down Trustee shall serve in such capacity through the earlier of (i) the date on which the Wind-Down Trust is dissolved in accordance with the Wind-Down Trust Agreement, and (ii) the date on which a Wind-Down Trustee resigns, is terminated, or is otherwise unable to serve; *provided*, *however*, that, in the event that a Wind-Down Trustee resigns, is terminated, or is otherwise unable to serve, the Wind-Down Trust Oversight Committee shall appoint a successor to serve as a Wind-Down Trustee in accordance with the Wind-Down Trust Agreement. If the Wind-Down Trust Oversight Committee does not appoint a successor within the time periods specified in the Wind-Down Trust Agreement, then the Bankruptcy Court, upon the motion of any party-in-interest, including counsel to the Wind-Down Trust, shall approve a successor to serve as a Wind-Down Trustee.

5.  Responsibilities of Wind-Down Trustee

Responsibilities of the Wind-Down Trustee shall be as identified in the Wind-Down Trust Agreement and shall include, but are not limited to:

(a)  Implementing the Wind-Down Trust, and making the distributions contemplated by the Plan;

(b)  Marshalling, marketing for sale, and wind-down of any of the Debtors' assets constituting Wind-Down Trust Assets;

(c)  Filing and prosecuting any objections to Claims or Interests or settling or otherwise compromising such Claims and Interests, if necessary and appropriate, in accordance with the Plan hereof;

(d)  Commencing, prosecuting, or settling claims and Vested Causes of Action;

(e)  Recovering and compelling turnover of the Debtors' property;

(f)  Prosecuting and settling the 3AC Claims, FTX Claims, and Alameda Claims;

(g)  Paying Wind-Down Trust Expenses;

(h)  Abandoning any Debtor assets that cannot be sold or otherwise disposed of for value and where a distribution to Holders of Allowed Claims or Interests would not be feasible or cost-effective in the Wind-Down Trustee's reasonable judgment;

(i)  Preparing and filing post-Effective Date operating reports (including the month in which the Effective Date occurs);

(j)  Filing appropriate tax returns in the exercise of the Wind-Down Trustee's fiduciary obligations;

(k)  Retaining such Professionals as are necessary and appropriate in furtherance of the Wind-Down Trustee's fiduciary obligations; and

(l)  Taking such actions as are necessary and reasonable to carry out the purposes of the Wind-Down Trust, including winding down the Debtors' business affairs.

6. The Wind-Down Trust Oversight Committee

The Wind-Down Trust Oversight Committee shall consist of those parties selected by the Committee and identified in the Plan Supplement, and which, at no time shall consist of greater than seven members.

The Wind-Down Trust Oversight Committee shall have the responsibility to review and advise the Wind-Down Trustee with respect to the liquidation and distribution of the Wind-Down Entity Assets transferred to the Wind-Down Trust in accordance herewith and the Wind-Down Trust Agreement. For the avoidance of doubt, in advising the Wind-Down Trustee, the Wind-Down Trust Oversight Committee shall maintain the same fiduciary responsibilities as the Wind-Down Trustee. Vacancies on the Wind-Down Trust Oversight Committee shall be filled by a Person designated by the remaining member or members of the Wind-Down Trust Oversight Committee from among the Holders of Account Holder Claims. The Wind-Down Trustee shall have the authority to seek an order from the Bankruptcy Court removing or replacing members of the Wind-Down Trust Oversight Committee for cause.

7. Expenses of Wind-Down Trustee

The Wind-Down Trust Expenses shall be paid from the Wind-Down Trust Assets subject to the Wind-Down Reserve and the Non-Released D&O Claim Budget.

8. Insurance; Bond

The Wind-Down Trustee may obtain insurance coverage (in the form of an errors and omissions policy or otherwise) with respect to the liabilities and obligations of the Wind-Down Trustee and the Wind-Down Trust Oversight Committee under the Wind-Down Trust Agreement. Unless otherwise agreed to by the Wind-Down Trust Oversight Committee, the Wind-Down Trustee shall serve with a bond, the terms of which shall be agreed to by the Wind-Down Trust Oversight Committee, and the cost and expense of which shall be paid by the Wind-Down Trust.

9. Fiduciary Duties of the Wind-Down Trustee

Pursuant hereto and the Wind-Down Trust Agreement and the Wind-Down Trustee shall act in a fiduciary capacity on behalf of the interests of all Holders of Claims and Interests that will receive distributions pursuant to Plan.

10. Termination of the Wind-Down Trust

The Wind-Down Trust will terminate on the earlier of: (a) (i) the final liquidation, administration and distribution of the Wind-Down Trust Assets in accordance with the terms of the Wind-Down Trust Agreement and the Plan, and its full performance of all other duties and functions as set forth herein or in the Wind-Down Trust Agreement and (ii) the Chapter 11 Cases of the Debtors have been closed; or (b) the Wind-Down Trustee determines in its reasonable judgment that the Wind-Down Trust lacks sufficient assets and financial resources, after reasonable collection efforts, to complete the duties and powers assigned to him or her under the Plan, the Confirmation Order and/or the Wind-Down Trust Agreement. After (x) the final distributions pursuant hereto, (y) the Filing by or on behalf of the Wind-Down Trust of a certification of dissolution with the Bankruptcy Court, and (z) any other action deemed appropriate by the Wind-Down Trustee, the Wind-Down Trust shall be deemed dissolved for all purposes without the necessity for any other or further actions.

11.    Liability of Wind-Down Trustee; Indemnification

Neither the Wind-Down Trustee, the Wind-Down Trust Oversight Committee, their respective members, employees, employers, designees or professionals, or any of their duly designated agents or representatives (each, a "Wind-Down Trust Party" and collectively, the "Wind-Down Trust Parties") shall be liable for losses, claims, damages, liabilities or expenses in connection with the affairs of the Wind-Down Trust or for the act or omission of any other Wind-Down Trust Party, nor shall the Wind-Down Trust Parties be liable for any act or omission taken or omitted to be taken pursuant to the discretion, powers and authority conferred, or in good faith believed to be conferred by the Wind-Down Trust Agreement or the Plan other than for specific acts or omissions resulting from such Wind-Down Trust Party's willful misconduct, gross negligence or actual fraud.  Subject to the Wind-Down Trust Agreement, the Wind-Down Trustee shall be entitled to enjoy all of the rights, powers, immunities and privileges applicable to a chapter 7 trustee, and the Wind-Down Trust Oversight Committee shall be entitled to enjoy all of the rights, powers, immunities and privileges of an official committee of unsecured creditors.  The Wind-Down Trustee or the Wind-Down Trust Oversight Committee may, in connection with the performance of its functions, and in its sole and absolute discretion, consult with its attorneys, accountants, financial advisors and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such persons, regardless of whether such advice or opinions are provided in writing.  Notwithstanding such authority, neither the Wind-Down Trustee nor the Wind-Down Trust Oversight Committee shall be under any obligation to consult with its attorneys, accountants, financial advisors or agents, and their determination not to do so shall not result in the imposition of liability on the Wind-Down Trustee, the Wind-Down Trust Oversight Committee, or their respective members and/or designees, unless such determination is based on willful misconduct, gross negligence, or actual fraud.  The Wind-Down Trust shall indemnify and hold harmless the Wind-Down Trust Parties (in their capacity as such), from and against and in respect of all liabilities, losses, damages, claims, costs and expenses (including, without limitation, reasonable attorneys' fees, disbursements, and related expenses) that such parties may incur or to which such parties may become subject in connection with any action, suit, proceeding or investigation brought by or threatened against such parties arising out of or due to their acts or omissions, or consequences of such acts or omissions, with respect to the implementation or administration of the Wind-Down Trust or the Plan or the discharge of their duties hereunder; *provided*, *however*, that no such indemnification will be made to such Persons for actions or omissions as a result of willful misconduct, gross negligence, or actual fraud.  Persons dealing or having any relationship with the Wind-Down Trustee shall have recourse only to the Wind-Down Trust Assets and shall look only to the Wind-Down Trust Assets to satisfy any liability or other obligations incurred by the Wind-Down Trustee or the Wind-Down Trust Oversight Committee to such Person in carrying out the terms of the Wind-Down Trust Agreement, and neither the Wind-Down Trustee nor the Wind-Down Trust Oversight Committee, shall have any personal obligation to satisfy any such liability.  The Wind-Down Trustee and/or the Wind-Down Trust Oversight Committee members shall not be liable whatsoever except for the performance of such duties and obligations as are specifically set forth herein, and no implied covenants or obligations shall be read into the Wind-Down Trust Agreement against any of them.  The Wind-Down Trust shall promptly pay expenses reasonably incurred by any Wind-Down Trust Party in defending, participating in, or settling any action, proceeding or investigation in which such Wind-Down Trust Party is a party or is threatened to be made a party or otherwise is participating in connection with the Wind-Down Trust Agreement or the duties, acts or omissions of the Wind-Down Trustee or otherwise in connection with the affairs of the Wind-Down Trust, upon submission of invoices therefor, whether in advance of the final disposition of such action, proceeding, or investigation or otherwise.  Each Wind-Down Trust Party hereby undertakes, and the Wind-Down Trust hereby accepts his or her undertaking, to repay any and all such amounts so advanced if it shall ultimately be determined that such exculpated party is not entitled to be indemnified therefor under the Wind-Down Trust Agreement.  The foregoing indemnity in respect of any Wind-Down

Trust Party shall survive the termination of such Wind-Down Trust Party from the capacity for which they are indemnified.

      12.      <u>No Liability of the Wind-Down Trust.</u>

On and after the Effective Date, the Wind-Down Trust shall have no liability on account of any Claims or Interests except as set forth herein and in the Wind-Down Trust Agreement. All payments and all distributions made by the Wind-Down Trustee hereunder shall be in exchange for all Claims or Interests against the Debtors.

**I.**      **Sources of Consideration for Plan Distributions**

Distributions under the Plan shall be funded by (i) the proceeds of Purchaser's payment obligations under Sections 2.1 and 2.2 of the Asset Purchase Agreement and distributions of Acquired Coins pursuant to Sections 6.12, and 6.14 of the Asset Purchase Agreement, (ii) the Wind-Down Entity or Wind-Down Trust (as applicable) from the Wind-Down Entity Assets or Wind-Down Trust Assets (as applicable); *provided*, *however*, that Allowed Professional Fee Claims shall be paid from the Professional Fee Escrow Account in the first instance. The Wind-Down Entity Assets or Wind-Down Trust Assets (as applicable) shall be used to pay the Wind-Down Entity Expenses (including the compensation of the Wind-Down Trustee and any professionals retained by the Wind-Down Trust), and to satisfy payment of Allowed Claims and Interests as set forth in the Plan.

**J.**      **Corporate Existence and Dissolution**

Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificates or articles of incorporation, certificates of formation, certificates of organization, or certificates of limited partnership and bylaws, operating agreements, limited liability company agreements, or limited partnership agreements (or other formation documents) in effect prior to the Effective Date, except to the extent such certificates or articles of incorporation, certificates of formation, certificates of organization, or certificates of limited partnership and bylaws, operating agreements, limited liability company agreements, or limited partnership agreements (or other formation documents) are amended pursuant to the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings under applicable state or federal law).

On and after the Effective Date, the Wind-Down Entity will be authorized and directed to implement the Plan and any applicable orders of the Bankruptcy Court, and the Wind-Down Entity shall have the power and authority to take any action necessary to wind down and dissolve the Debtors' Estates.

Upon a certification to be Filed with the Bankruptcy Court by the Wind-Down Trustee of all distributions having been made and completion of all of its duties under the Plan and entry of a final decree closing the last of the Chapter 11 Cases, the Wind-Down Debtors shall be deemed to be dissolved without any further action by the Wind-Down Debtors, including the Filing of any documents with the secretary of state for the state in which the Wind-Down Debtors are formed or any other jurisdiction. The Wind-Down Trustee, however, shall have authority to take all necessary actions to dissolve the Wind-Down Debtors in and withdraw the Wind-Down Debtors from applicable states.

As soon as practicable after the Effective Date, the Wind-Down Entity shall take such actions as the Wind-Down Entity may determine to be necessary or desirable to carry out the purposes of the Plan. Any certificate of dissolution or equivalent document may be executed by the Wind-Down Entity on behalf of any Wind-Down Debtor without need for any action or approval by the shareholders or board of directors or managers of such Debtor. On and after the Effective Date, the Wind-Down Debtors (1) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (2) shall be deemed to have cancelled pursuant to this Plan all Interests, and (3) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date. Notwithstanding such Debtors' dissolution, such Debtors shall be deemed to remain intact solely with respect to the preparation, filing, review, and resolution of applications for Professional Fee Claims.

## K.  Corporate Action

Upon the Effective Date, all actions contemplated under the Plan, Definitive Documents, and Asset Purchase Agreement shall be deemed authorized and approved in all respects, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, directors, managers, managing-members, limited or general partners, or officers of the Debtors, the Wind-Down Debtors, the Wind-Down Trust or any other Entity, including: (1) appointment of the directors, managers, members, and officers for the Wind-Down Debtors as provided herein; (2) the issuances, transfer, and distribution of the Wind-Down Trust Units; (3) the formation of the Wind-Down Trust and appointment of the Wind-Down Trustee and Wind-Down Trust Oversight Committee; (4) the formation of any entities pursuant to and the implementation of the Plan and performance of all actions and transactions contemplated hereby and thereby; (5) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; and (6) all other acts or actions contemplated by the Plan, Definitive Documents, and Asset Purchase Agreement or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions (including effectuating the Restructuring Transactions Memorandum and the Customer Onboarding Protocol) (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan, Definitive Documents, and Asset Purchase Agreement involving the corporate structure of the Debtors or the Wind-Down Debtors, as applicable, and any corporate action required by the Debtors or the Wind-Down Debtors, as applicable, in connection with the Plan shall be deemed to have occurred on, and shall be in effect as of, the Effective Date, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Wind-Down Debtors, as applicable. On or, as applicable, prior to the Effective Date, the appropriate officers of the Debtors or the Wind-Down Debtors or the Wind-Down Trust, as applicable, shall be authorized and, as applicable, directed to issue, execute, and deliver the agreements, documents, Securities, certificates of incorporation, certificates of formation, bylaws, operating agreements, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Wind-Down Debtors, and any and all other agreements, documents, Securities, and instruments relating to the foregoing. The

authorizations and approvals contemplated by this Article IV.K shall be effective notwithstanding any requirements under non-bankruptcy law.

### L. Vesting of Assets in the Wind-Down Entity

Except as otherwise provided in the Plan, or in any agreement, instrument, or other document incorporated in the Plan, notwithstanding any prohibition of assignability under applicable non-bankruptcy law and in accordance with section 1141 of the Bankruptcy Code, on the Effective Date, all property constituting Wind-Down Trust Assets, including all Vested Causes of Action of the Debtors (unless otherwise released, waived, compromised, settled, transferred, or discharged pursuant to the Plan), and any property acquired by any of the Debtors under the Plan shall vest in the Wind-Down Entity, free and clear of all Liens, Claims, charges, or other encumbrances.

### M. Cancellation of Notes, Instruments, Certificates, and Other Documents

On the later of the Effective Date and the date on which distributions are made pursuant to the Plan (if not made on the Effective Date), except for the purpose of evidencing a right to and allowing Holders of Claims and Interests to receive a distribution under the Plan or to the extent otherwise specifically provided for in the Plan, the Confirmation Order, or any agreement, instrument, or other document entered into in connection with or pursuant to the Plan or the Restructuring Transactions (including, without limitation, the Definitive Documents and the Asset Purchase Agreement), all notes, bonds, indentures, certificates, Securities, shares, purchase rights, options, warrants, collateral agreements, subordination agreements, intercreditor agreements, or other instruments or documents directly or indirectly evidencing, creating, or relating to any indebtedness or obligations of, or ownership interest in, the Debtors, giving rise to any Claims against or Interests in the Debtors or to any rights or obligations relating to any Claims against or Interests in the Debtors shall be deemed cancelled without any need for a Holder to take further action with respect thereto.

### N. Effectuating Documents; Further Transactions

On and after the Effective Date, the Wind-Down Debtors, and its directors, managers, partners, officers, authorized persons, and members thereof, and the Wind-Down Trust and Wind-Down Trustee are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, Definitive Documents, and Asset Purchase Agreement, in the name of and on behalf of the Wind-Down Debtors, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

### O. Section 1146(a) Exemption

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Wind-Down Debtor, the Wind-Down Trust, the Purchaser, or to any other Entity) of property under the Plan, Definitive Documents, and Asset Purchase Agreement or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Wind-Down Debtors; (2) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, including the Asset Purchase Agreement, shall not be subject to any

document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, sales or use tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forgo the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

## P.      Preservation of Rights of Action

In accordance with section 1123(b) of the Bankruptcy Code, the Wind-Down Entity shall succeed to all rights to commence and pursue any and all Vested Causes of Action of the Debtors, whether arising before or after the Petition Date, including, without limitation, any actions specifically enumerated in the Schedule of Retained Causes of Action other than Causes of Action released, waived, settled, compromised, or transferred. Such rights shall be preserved by the Debtors and Wind-Down Debtors and shall vest in the Wind-Down Entity, with the Wind-Down Entity's rights to commence, prosecute, or settle such Causes of Action preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action expressly released, waived, settled, compromised, or transferred by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan or pursuant to the Asset Purchase Agreement, which shall be deemed released and waived by the Debtors and Wind-Down Debtors as of the Effective Date.

The Wind-Down Trust may pursue such Causes of Action, as appropriate, in accordance with the best interests of the beneficiaries of the Wind-Down Trust and in accordance with the Wind-Down Trust Agreement and the Plan. **No Entity may rely on the absence of a specific reference in the Schedules of Assets and Liabilities or Statement of Financial Affairs, the Plan, the Plan Supplement, the Disclosure Statement, or the Schedule of Retained Causes of Action to any Cause of Action against it as any indication that the Debtors, the Wind-Down Debtors or the Wind-Down Trust, as applicable, will not pursue any and all available Causes of Action of the Debtors against it. The Wind-Down Trust, on behalf of the Debtors and the Wind-Down Debtors, expressly reserves all rights to prosecute any and all Causes of Action against any Entity, except as otherwise provided in the Plan, including Article VIII of the Plan.** Unless any Cause of Action of the Debtors is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or pursuant to a Final Order, the Wind-Down Trust, on behalf of the Debtors and Wind-Down Debtors and in accordance with the Wind-Down Trust Agreement, expressly reserves all such Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or Consummation.

The Wind-Down Trust, on behalf of the Debtors and Wind-Down Debtors, reserves and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Cause of Action that a Debtor may hold against any Entity shall vest in the Wind-Down Trust, except as otherwise provided in the Plan, including Article VIII of the Plan. The Wind-Down Trust, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Wind-Down Trust shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce,

abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court in accordance with the Plan.

**Q.**     **Election to Contribute Third-Party Claims**

Because aggregating all Contributed Third-Party Claims may enable the pursuit and settlement of such litigation claims in a more efficient and effective manner, each Holder of a Claim or Interest may agree, by electing on its ballot or opt-in form, to contribute its Contributed Third-Party Claims to the Wind-Down Entity. By electing such option on its ballot or opt-in form, each Contributing Claimant agrees that, subject to the occurrence of the Effective Date and the formation of the Wind-Down Entity, it will be deemed, without further action, (i) to have irrevocably contributed its Contributed Third-Party Claims to the Wind-Down Entity, and (ii) to have agreed to execute any documents reasonably requested by the Debtors or the Wind-Down Entity to memorialize and effectuate such contribution.

**R.**     **Contribution of Contributed Third-Party Claims**

On the Effective Date, all Contributed Third-Party Claims will be irrevocably contributed to the Wind-Down Entity and shall thereafter be Wind-Down Trust Assets for all purposes. No Person may rely on the absence of a specific reference in the Plan, the Disclosure Statement, the Confirmation Order, the Wind-Down Trust Agreement, the Plan Supplement, or any other document as any indication that the Wind-Down Trust will or will not pursue any and all available Contributed Third-Party Claims against such Person. The Wind-Down Trust shall have, retain, reserve, and be entitled to assert all Contributed Third-Party Claims fully to the same extent that the Contributing Claimants could have asserted such claims prior to the Effective Date. For the avoidance of doubt, the Contributed Third-Party Claims shall not include the rights of any of the Contributing Claimants to receive the distributions under the Plan on account of their Claims or Interests.

**S.**     **Closing the Chapter 11 Cases**

On and after the Effective Date, the Wind-Down Entity shall be permitted to classify all of the Chapter 11 Cases of the Debtors except for the Chapter 11 Case of Voyager Digital, LLC, or any other Debtor identified in the Restructuring Transactions Memorandum as having its Chapter 11 Case remain open following the Effective Date, as closed, and all contested matters relating to any of the Debtors, including objections to Claims or Interests and any adversary proceedings, may be administered and heard in the Chapter 11 Case of Voyager Digital, LLC, or any other Debtor identified in the Restructuring Transactions Memorandum as having its Chapter 11 Case remain open following the Effective Date, irrespective of whether such Claims or Interests were Filed or such adversary proceeding was commenced against a Debtor whose Chapter 11 Case was closed.

<div align="center">

**ARTICLE V.**

**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

</div>

**A.**     **Assumption and Rejection of Executory Contracts and Unexpired Leases**

On the Effective Date, except as otherwise provided herein, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (1) is specifically described in the Plan as to be assumed in connection with confirmation of the Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement; (2) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Effective Date; (3) is to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, in connection with the Sale Transaction; (4) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; or (5) is a D&O Liability Insurance Policy other than the Side-A Policy. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, assignments, and rejections, including the assumption of the Executory Contracts or Unexpired Leases as provided in the Plan Supplement, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

**B.      Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases**

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Wind-Down Debtors, as applicable, under such Executory Contract or Unexpired Lease. Without limiting the general nature of the foregoing, and notwithstanding any non-bankruptcy law to the contrary, the Debtors and Wind-Down Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the Debtors contracting from non-Debtor counterparties to any rejected Executory Contract or Unexpired Lease.

**C.      Claims Based on Rejection of Executory Contracts or Unexpired Leases**

Counterparties to Executory Contracts or Unexpired Leases listed subject to rejection under the Plan shall be served with a notice of rejection of Executory Contracts and Unexpired Leases with the Plan Supplement. Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Claims, Noticing, and Solicitation Agent and served on the Debtors or Wind-Down Entity, as applicable, no later than thirty days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, or the Wind-Down Entity, the Estates, or their property without the need for any objection by the Wind-Down Entity or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed released, and be subject to the permanent injunction set forth in Article VIII.D of the Plan, including any Claims against any Debtor listed on the Debtors' schedules as unliquidated, contingent, or disputed.** All Allowed Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease shall be treated as General Unsecured Claims in accordance with Article III.C of the Plan.

**D.      Cure of Defaults for Executory Contracts and Unexpired Leases Assumed**

The Debtors, the Wind-Down Entity, or the Purchaser, as applicable pursuant to the Asset Purchase Agreement, shall pay Cures, if any, on the Effective Date. The Debtors shall provide notice of

the amount and timing of payment of any such Cure to the parties to the applicable assumed Executory Contracts or Unexpired Leases as part of the Plan Supplement. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure that differ from the ordinary course amounts paid or proposed to be paid by the Debtors, the Wind-Down Entity, or the Purchaser shall be dealt with in the ordinary course of business and, if needed, shall be Filed with the Claims, Noticing, and Solicitation Agent on or before thirty days after the Effective Date. **If any counterparty to an Executory Contract or Unexpired Lease does not receive a notice of assumption and applicable cure amount, such counterparty shall have until on or before thirty days after the Effective Date to bring forth and File a request for payment of Cure.** Any such request that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Wind-Down Debtor or the Wind-Down Entity, without the need for any objection by the Wind-Down Entity or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure shall be deemed fully satisfied and released upon payment by the Debtors or the Wind-Down Entity or the Purchaser of the Cure in the ordinary course of business or upon and in accordance with any resolution of a Cure dispute (whether by order of the Bankruptcy Court or through settlement with the applicable Executory Contract or Unexpired Lease counterparty); *provided*, *however*, that nothing herein shall prevent the Wind-Down Entity or the Purchaser, as applicable, from paying any Cure despite the failure of the relevant counterparty to File such request for payment of such Cure. The Wind-Down Entity or the Purchaser may also settle any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court. In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be Filed with the Bankruptcy Court on or before thirty days after the Effective Date. Any such objection will be scheduled to be heard by the Bankruptcy Court at the Debtors' first scheduled omnibus hearing for which such objection is timely Filed. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

In the event of a dispute regarding:  (1) the amount of any Cure Claim, (2) the ability of the Wind-Down Debtors, Purchaser, or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed (or assumed and assigned, as applicable), or (3) any other matter pertaining to assumption or assignment, then any disputed Cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made as soon as reasonably practicable following, and in accordance with, the entry of a Final Order of the Bankruptcy Court resolving such dispute or as may be agreed upon by the Debtors, the Wind-Down Entity, or Purchaser, as applicable, and the counterparty to the Executory Contract or Unexpired Lease, and any such unresolved dispute shall not prevent or delay implementation of the Plan or the occurrence of the Effective Date.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise or assignment of any Executory Contract or Unexpired Lease to the Purchaser and full payment of any applicable Cure pursuant to this Article V.D, or upon and in accordance with any resolution of a Cure dispute (whether by order of the Bankruptcy Court or through settlement with the applicable Executory Contract or Unexpired Lease counterparty), shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed or assumed and assigned in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to this Article V.D, in the amount and at the time in the ordinary course of business or upon and in accordance with any resolution of a Cure dispute (whether by order of the Bankruptcy Court or through settlement**

with the applicable Executory Contract or Unexpired Lease counterparty), shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court. For the avoidance of doubt, in the event that any counterparty to an Executory Contract or Unexpired Lease receives a notice of assumption and applicable proposed Cure amount, and disputes the Debtors' proposed Cure amount, such party shall not be required to File a Proof of Claim with respect to such dispute. Any counterparty to an Executory Contract or Unexpired Lease that does not receive a notice or applicable proposed Cure amount, and believes a Cure amount is owed, shall have thirty days after the Effective Date to File a Proof of Claim with respect to such alleged Cure amount, which Claim shall not be expunged until such Cure dispute is resolved.

**E.      Insurance Policies and Surety Bonds**

Each D&O Liability Insurance Policy (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto) other than the Side-A Policy shall be assumed, in their entirety, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date, pursuant to sections 105 and 365 of the Bankruptcy Code with the Wind-Down Entity being authorized to pursue any proceeds thereof on behalf of the Debtors or the Wind-Down Entity. The Side-A Policy shall ride through these Chapter 11 Cases with the Debtors, and the Wind-Down Entity preserves all avoidance and other actions in connection with the premium paid thereunder. All beneficiaries under the D&O Insurance Policies reserve their rights under such D&O Insurance Policies subject to the limitations set forth in this Plan.

The Debtors or the Wind-Down Entity, as applicable, shall not terminate or otherwise reduce the coverage under any D&O Liability Insurance Policy (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto) in effect prior to the Effective Date, and any current and former directors, officers, managers, and employees of the Debtors who served in such capacity at any time before or after the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy subject to the terms thereof regardless of whether such directors, officers, managers, and employees remain in such positions after the Effective Date. Notwithstanding anything to the contrary in the Plan, the Debtors or the Wind-Down Entity shall retain the ability to supplement such D&O Liability Insurance Policy as the Debtors or Wind-Down Entity may deem necessary, subject to the prior written consent of the Wind-Down Entity. Notwithstanding anything to the contrary contained in the Plan, the Wind-Down Trust shall be entitled to pursue avoidance of the premium paid for the XL Specialty Insurance Company Cornerstone A-Side Management Liability Insurance Policy No. ELU184179-22, and nothing in this Plan shall be deemed a waiver or abrogation of any such rights.

The Debtors shall continue to satisfy their obligations under their surety bonds and insurance policies in full and continue such programs in the ordinary course of business. Each of the Debtors' surety bonds and insurance policies, and any agreements, documents, or instruments relating thereto shall be treated as Executory Contracts under the Plan. On the Effective Date: (a) the Debtors shall be deemed to have assumed all such surety bonds and insurance policies and any agreements, documents, and instruments relating thereto in their entirety; *provided* that the Debtors have assumed all indemnity agreements and cash collateral agreements related to the surety bonds and (b) such surety bonds and insurance policies and any agreements, documents, or instruments relating thereto shall revest in the applicable Wind-Down Debtor(s) unaltered.

## F.     Reservation of Rights

Nothing contained in the Plan or the Plan Supplement (unless otherwise explicitly provided) shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Wind-Down Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Wind-Down Entity, as applicable, shall have forty-five days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, including by rejecting such contract or lease effective as of the Confirmation Date.

## G.     Nonoccurrence of Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## H.     Contracts and Leases Entered into After the Petition Date

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed under section 365 of the Bankruptcy Code, will be performed by the applicable Debtor or Wind-Down Debtor liable thereunder in the ordinary course of its business. Such contracts and leases that are not rejected under the Plan shall survive and remain unaffected by entry of the Confirmation Order.

## ARTICLE VI.

## PROVISIONS GOVERNING DISTRIBUTIONS

## A.     Timing and Calculation of Amounts to Be Distributed

Except (1) as otherwise provided herein, (2) upon a Final Order, or (3) as otherwise agreed to by the Debtors, the Purchaser, or the Wind-Down Entity, as the case may be, and the Holder of the applicable Claim, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the next Distribution Date after such Claim becomes, as applicable, an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive the full amount of distributions that the Plan provides for Allowed Claims in the applicable Class from the Distribution Agent. In the event that any payment or distribution under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or distribution may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. Except as specifically provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

## B.     Rights and Powers of Distribution Agent

### 1.     Powers of the Distribution Agent

The Distribution Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties and exercise its rights under the Plan; (b) make all distributions contemplated under the Plan; (c) employ professionals to represent it with respect to its responsibilities and powers; and (d) exercise such other powers as may be vested in the

Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions of the Plan.

      2.    <u>Expenses Incurred on or after the Effective Date</u>

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Distribution Agent on or after the Effective Date and any reasonable compensation and expense reimbursement claims (including reasonable attorney and/or other professional fees and expenses) made by such Distribution Agent shall be paid in Cash by the Wind-Down Entity.

**C.    Delivery of Distributions and Undeliverable or Unclaimed Distributions**

      1.    <u>Distributions Generally</u>

Except as otherwise provided in the Plan (including in paragraph 8 below), the Distribution Agent shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the applicable register or in the Debtors' records as of the date of any such distribution (as applicable), including the address set forth in any Proof of Claim filed by that Holder.

      2.    <u>Distributions on Account of Obligations of Multiple Debtors</u>

For all purposes associated with distributions under the Plan, all guarantees by any Debtor of the obligations of any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor, shall be deemed eliminated so that any obligation that could otherwise be asserted against more than one Debtor shall result in a single distribution under the Plan. Any such Claims shall be subject to all potential objections, defenses, and counterclaims, and to estimation pursuant to section 502(c) of the Bankruptcy Code.

      3.    <u>Record Date of Distributions</u>

On the Distribution Record Date, the various transfer registers for each Class of Claims or Interests as maintained by the Debtors or their respective agents shall be deemed closed, and there shall be no further changes in the record Holders of any Claims or Interests. The Distribution Agent shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date. In addition, with respect to payment of any Cure amounts or disputes over any Cure amounts, neither the Debtors nor the Distribution Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the Effective Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure amount.

      4.    <u>Special Rules for Distributions to Holders of Disputed Claims and Interests</u>

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the Wind-Down Entity, on the one hand, and the Holder of a Disputed Claim or Interest, on the other hand, or as set forth in a Final Order, no partial payments and no partial distributions shall be made with respect to a Disputed Claim or Interest until all of the Disputed Claim or Interest has become an Allowed Claim or Interest or has otherwise been resolved by settlement or Final Order; *provided* that, if the Wind-Down Entity does not dispute a portion of an amount asserted pursuant to an otherwise Disputed Claim or Interest, the Distribution Agent may make a partial distribution on account of that portion of such Claim or Interest that is not Disputed at the time and in the manner that the Distribution Agent

makes distributions to similarly situated Holders of Allowed Claims or Interests pursuant to the Plan. Any dividends or other distributions arising from property distributed to Holders of Allowed Claims or Interests, as applicable, in a Class and paid to such Holders under the Plan shall also be paid, in the applicable amounts, to any Holder of a Disputed Claim or Interest, as applicable, in such Class that becomes an Allowed Claim or Interest after the date or dates that such dividends or other distributions were earlier paid to Holders of Allowed Claims or Interests in such Class.

### 5. De Minimis Distributions; Minimum Distributions

The Distribution Agent shall not make any Cash distributions to any Holder of an Allowed Claim or Interest pursuant to Article III.C.1-11 of this Plan on account of such Allowed Claim or Interest if such distribution is valued, in the reasonable discretion of the Distribution Agent, at less than $1.00, and each Holder of an Allowed Claim or Interest to which this limitation applies shall not be entitled to any distributions under the Plan. Notwithstanding anything to the contrary in this Plan, there shall be no minimum distribution threshold on account of distributions of any Cryptocurrency to Holders of Allowed Account Holder Claims and Allowed OpCo General Unsecured Claims.

### 6. Undeliverable Distributions and Unclaimed Property

In the event that either (a) a distribution to any Holder is returned as undeliverable or (b) the Holder of an Allowed Claim or Interest does not respond to a request by the Debtors or the Distribution Agent for information necessary to facilitate a particular distribution, no distribution to such Holder shall be made unless and until the Distribution Agent has determined the then-current address of such Holder or received the necessary information to facilitate a particular distribution, at which time such distribution shall be made to such Holder without interest, dividends, or other accruals of any kind; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code on the date that is one year after the Effective Date. After such date, all unclaimed property or interests in property shall revert to the Wind-Down Entity automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable local, state, federal, or foreign escheat, abandoned, or unclaimed property laws to the contrary), and the Claim or Interest of any Holder to such property or interest in property shall not be entitled to any distributions under the Plan.

### 7. Manner of Payment Pursuant to the Plan

At the option of the Distribution Agent, any Cash payment to be made hereunder may be made by check, wire transfer, automated clearing house, credit card, or as otherwise provided in applicable agreements.

### 8. Distributions of Net Owed Coins; Additional Bankruptcy Distributions

As a general matter, the Purchaser will allocate each Account Holder's Net Owed Coins to its account on the Binance.US Platform, and each Holder of OpCo General Unsecured Claim's Pro Rata share of the Distributable Cryptocurrency (in Cash) to its account on the Binance.US Platform in accordance with, and subject to, the provisions of Section 6.12 of the Asset Purchase Agreement.

As a general matter, the Customer Onboarding Protocol will provide that Purchaser will make Additional Bankruptcy Distributions to Transferred Creditors corresponding to their Pro Rata shares of such Additional Bankruptcy Distribution (if such Additional Bankruptcy Distribution is in Cryptocurrency, based on the Transferred Cryptocurrency Value of the Cryptocurrency included in such

Additional Bankruptcy Distribution), all in accordance with any applicable Post-Bankruptcy Statement (as defined in the Asset Purchase Agreement).

If any Account Holder or Holder of an Allowed OpCo General Unsecured Claim does not become a Transferred Creditor prior to the date that is three (3) months following the later of the Closing Date or the date on which the terms and conditions for the Binance.US Platform are made available for such Person to accept (as provided in the Customer Onboarding Protocol), then Purchaser shall convert any Cryptocurrency allocable to such Person into U.S. Dollars at the then-prevailing rates (including applicable fees, spreads, costs and expenses) on the Binance.US Platform and deliver such U.S. Dollars, together with any cash or others assets in respect of such Persons, to the Debtors within five (5) Business Days, for further distribution by the Debtors in accordance with this Plan and the Customer Onboarding Protocol.

If any Account Holder or Holder of an Allowed OpCo General Unsecured Claim is located in an Unsupported Jurisdiction (as defined in the Asset Purchase Agreement), then the Net Owed Coins, if applicable, and Additional Bankruptcy Distributions allocable to such Person shall be handled pursuant to Section 6.12(b) or, if applicable, Section 6.14(d) of the Asset Purchase Agreement.

Purchaser shall have no responsibility to make any distributions other than as contemplated by Sections 6.12 and 6.14 of the Asset Purchase Agreement.

## D.    Compliance Matters

In connection with the Plan, to the extent applicable, the Debtors, the Wind-Down Entity, any Distribution Agent, and any other applicable withholding and reporting agents shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Debtors, the Wind-Down Entity, the Distribution Agent, and any other applicable withholding and reporting agents shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including wind-down a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms that are reasonable and appropriate; *provided* that the Wind-Down Entity and the Distribution Agent, as applicable, shall request appropriate documentation from the applicable distributees and allow such distributees a reasonable amount of time to respond.  The Debtors, the Wind-Down Entity, the Distribution Agent, and any other applicable withholding and reporting agents reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

### E. Foreign Currency Exchange Rate

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim, asserted in government issued currency (for the avoidance of doubt, not including any Cryptocurrency) other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Effective Date.

### F. Claims Paid or Payable by Third Parties

#### 1. Claims Paid by Third Parties

The Debtors or the Wind-Down Entity, as applicable, shall reduce a Claim or Interest, and such Claim or Interest (or portion thereof) shall be disallowed without an objection to such Claim or Interest having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim or Interest receives a payment on account of such Claim or Interest from a party that is not a Debtor or Wind-Down Debtor (or other Distribution Agent), as applicable, including any payments made in connection with the Sale Transaction. To the extent a Holder of a Claim or Interest receives a distribution on account of such Claim or Interest and receives payment from a party that is not a Debtor or a Wind-Down Debtor (or other Distribution Agent), including payments made in connection with the Sale Transaction, as applicable, on account of such Claim or Interest, such Holder shall, within ten Business Days of receipt thereof, repay, return, or deliver any distribution held by or transferred to the Holder to the applicable Wind-Down Debtor to the extent the Holder's total recovery on account of such Claim or Interest from the third party and under the Plan exceeds the amount of such Claim or Interest as of the date of any such distribution under the Plan. The failure of such Holder to timely repay, return, or deliver such distribution shall result in the Holder owing the applicable Wind-Down Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the ten-Business Day grace period specified above until the amount is repaid.

#### 2. Claims Payable by Third Parties

No distributions under the Plan shall be made on account of an Allowed Claim or Interest that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim or Interest has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim or Interest (if and to the extent adjudicated by a court of competent jurisdiction or otherwise settled), then immediately upon such payment, such Claim or Interest may be expunged or reduced on the Claims Register by the Claims, Noticing, and Solicitation Agent to the extent of any such payment without an objection to such Claim or Interest having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.    <u>Applicability of Insurance Policies</u>

Except as otherwise provided herein, payments to Holders of Claims or Interests shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any rights, defenses, or Cause of Action that the Debtors, the Wind-Down Entity or any other Entity may hold against any other Entity, including insurers, under any policies of insurance, agreements related thereto, or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any rights or defenses, including coverage defenses, held by such insurers under the applicable insurance policies, agreements related thereto, and applicable non-bankruptcy law.

**G.**     **Setoffs and Recoupment**

Except as otherwise expressly provided for herein, each Debtor, Wind-Down Debtor, the Wind-Down Entity, or such Entity's designee as instructed by such Debtor, Wind-Down Entity, as applicable, may, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, set off against or recoup from an Allowed Claim and any distributions to be made pursuant to the Plan on account of such Allowed Claim, any Claims, rights, and Causes of Action of any nature whatsoever that the Debtor, Wind-Down Debtor or Wind-Down Entity, as applicable, may have against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action have not been otherwise compromised, settled, or released on or prior to the Effective Date (whether pursuant to the Plan or otherwise). Notwithstanding the foregoing, except as expressly stated in Article VIII of this Plan, neither the failure to effect such a setoff or recoupment nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by the Debtors or the Wind-Down Entity of any such Claims, rights, or Causes of Action the Debtors or the Wind-Down Entity may possess against such Holder.

**H.**     **Allocation between Principal and Accrued Interest**

Except as otherwise provided herein, the aggregate consideration paid to Holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof and as determined for federal income tax purposes) and second, to the extent the consideration exceeds the principal amount of the Allowed Claims, to the remaining portion of such Allowed Claim if any.

## ARTICLE VII.

### PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT, AND UNLIQUIDATED CLAIMS AND INTERESTS

**A.**     **Disputed Claims Process**

After the Effective Date, the Wind-Down Entity, and any party-in-interest, shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim or Interest immediately before the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim or Interest shall become an Allowed Claim or Interest unless and until such Claim or Interest is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim or Interest. If a Holder of a Claim or Interest in Class disputes the amount of their Claim or Interest as listed in the Schedules, the Holder should notify the Debtors or the Wind-Down Entity of such

dispute. If the Debtors and the Holder agree to an amended Claim amount prior to the Effective Date, the Debtors shall file amended Schedules prior to the Effective Date. If between the Confirmation Date and the Effective Date, the dispute cannot be consensually resolved, the Holder may seek (by letter to the Court) to have the claim or interest dispute resolved before the Bankruptcy Court (and, with the consent of the Debtors, before any other court or tribunal with jurisdiction over the parties). After the Effective Date, the creditor may seek to have the claim dispute resolved before the Bankruptcy Court or any other court or tribunal with jurisdiction over the parties.

Unless relating to a Claim or Interest expressly Allowed pursuant to the Plan, all Proofs of Claim filed in these Chapter 11 Cases shall be considered objected to and Disputed without further action by the Debtors. Upon the Effective Date, all Proofs of Claim filed against the Debtors, regardless of the time of filing, and including Proofs of Claim filed after the Effective Date, shall be deemed withdrawn and expunged, other than as provided below. Notwithstanding anything in this Plan to the contrary: (1) all Claims against the Debtors that result from the Debtors' rejection of an Executory Contract or Unexpired Lease; (2) Claims filed to dispute the amount of any proposed Cure pursuant to section 365 of the Bankruptcy Code; and (3) Claims that the Debtors seek to have determined by the Bankruptcy Court, shall in all cases be determined by the Bankruptcy Court, if not otherwise resolved through settlement with the applicable claimant.

Notwithstanding any provision herein to the contrary, nothing in the Disclosure Statement, Plan, or Confirmation Order grants the Bankruptcy Court with jurisdiction over any police and regulatory actions by the SEC, and the SEC shall retain the power and authority to commence and continue any such actions against any person or entity, including without limitation, the Debtors, in any forum with jurisdiction, provided, however, that enforcement of any money judgment against the Debtors must be in accordance with the Plan. In addition, the SEC may file any proof of claim by the Government Bar Date or such later date as ordered by the Bankruptcy Court and amend its proof of claim upon determination of liability on its claims. Any objection to such claim shall be in accordance with Bankruptcy Rule 3007, and such claim shall not automatically be deemed objected to, withdrawn, or expunged.

On the Effective Date, the Debtors or Wind-Down Trustee, as applicable, may establish one or more accounts or funds to hold and dispose of certain assets, pursue certain litigation (including the Causes of Action preserved under the Plan or otherwise vesting in the Wind-Down Trust), and/or satisfy certain Claims (including Claims that are contingent or have not yet been Allowed). For any such account or fund, the Debtors or the Wind-Down Trustee, as applicable, may take the position that grantor trust treatment applies in whole or in part. To the extent such treatment applies to any such account or fund, for all U.S. federal income tax purposes, the beneficiaries of any such account or fund would be treated as grantors and owners thereof, and it is intended, to the extent reasonably practicable, that any such account or fund would be classified as a liquidating trust under section 301.7701-4 of the Treasury Regulations. Alternatively, any such account or fund may be subject to the tax rules that apply to "disputed ownership funds" under 26 C.F.R. 1.468B–9. If such rules apply, such assets would be subject to entity-level taxation, and the Debtors and Wind-Down Trustee would be required to comply with the relevant rules.

## B.     Objections to Claims or Interests

Except as otherwise specifically provided in the Plan, after the Effective Date, the Wind-Down Entity shall have the sole authority to: (1) File, withdraw, or litigate to judgment, any objections to Claims or Interests; and (2) settle or compromise any Disputed Claim or Interest without any further notice to or action, order, or approval by the Bankruptcy Court. For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, the Wind-Down Entity shall have and retain any and all rights and defenses each such Debtor had immediately prior to the Effective Date with

respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to Article IV.P of the Plan.

Any objections to Claims or Interests shall be Filed on or before the Claims Objection Bar Date. For the avoidance of doubt, the Bankruptcy Court may extend the time period to object to Claims or Interests set forth in this paragraph at any time, including before or after the expiration of one hundred eighty days after the Effective Date, in its discretion or upon request by the Debtors or any party in interest.

## C.    Estimation of Claims

Before or after the Effective Date, the Debtors or the Wind-Down Entity, as applicable, may (but are not required to), at any time, request that the Bankruptcy Court estimate any Disputed Claim or Interest that is contingent or unliquidated pursuant to applicable law, including pursuant to section 502(c) of the Bankruptcy Code, for any reason, regardless of whether any party previously has objected to such Disputed Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under sections 157 and 1334 of the Judicial Code to estimate any such Disputed Claim or Interest, including during the litigation of any objection to any Disputed Claim or Interest or during the pendency of any appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Disputed Claim or Interest that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions) and may be used as evidence in any supplemental proceedings, and the Debtors or the Wind-Down Entity may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Disputed Claim or Interest that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before fourteen days after the date on which such Disputed Claim or Interest is estimated.

## D.    No Distributions Pending Allowance

Notwithstanding any other provision of the Plan, if any portion of a Claim or Interest is a Disputed Claim or Interest, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest; *provided* that if only a portion of a Claim or Interest is Disputed, such Claim or Interest shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount.

## E.    Distributions After Allowance

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Interest in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court Allowing any Disputed Claim or Interest becomes a Final Order, the Distribution Agent shall provide to the Holder of such Allowed Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest, dividends, or

accruals to be paid on account of such Allowed Claim or Interest unless required under applicable bankruptcy law.

**F.     No Interest**

Unless otherwise specifically provided for herein or by Final Order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on Claims against the Debtors, and no Holder of a Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such Claim. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

**G.     Adjustment to Claims and Interests without Objection**

Any Claim or Interest that has been paid, satisfied, amended, superseded, cancelled, or otherwise expunged (including pursuant to the Plan) may be adjusted or expunged on the Claims Register at the direction of the Wind-Down Entity without the Wind-Down Entity having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.  Additionally, any Claim or Interest that is duplicative or redundant with another Claim or Interest against the same Debtor may be adjusted or expunged on the Claims Register at the direction of the Wind-Down Entity without the Wind-Down Entity having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

**H.     Time to File Objections to Claims**

Any objections to Claims shall be Filed on or before the Claims Objection Bar Date.

**I.     Disallowance of Claims or Interests**

Any Claims or Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims or Interests until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Wind-Down Entity, as applicable.

**Except as otherwise provided herein or as agreed to by the Debtors or the Wind-Down Entity, any and all Proofs of Claim Filed after the Bar Date shall be deemed disallowed and expunged as of the Effective Date without any further notice to, or action, order, or approval of, the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order.**

**J.     Amendments to Proofs of Claim**

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Proof of Claim or Proof of Interest may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Wind-Down Entity, and any such new or amended Proof of Claim or Proof of

Interest Filed shall be deemed disallowed in full and expunged without any further action, order, or approval of the Bankruptcy Court.

## ARTICLE VIII.

## EFFECT OF CONFIRMATION OF THE PLAN

**A.     Releases by the Debtors**

Notwithstanding anything contained in the Plan to the contrary, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Wind-Down Debtors, and their Estates, the Wind-Down Entity, and in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of, the foregoing Entities, from any and all Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Chapter 11 Cases and related adversary proceedings, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, the administration and implementation of the Restructuring Transactions or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019, of the releases described in this Article VIII.A by the Debtors, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article VIII.A is:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) except to the extent contemplated by Article IV.E and Article IV.F of the Plan, a bar to any of the Debtors or Wind-Down Debtors or their respective Estates or Wind-Down Entity asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

Notwithstanding anything to the contrary contained herein, nothing in this Plan shall release, waive, or otherwise limit the (i) rights, duties, or obligations of the Purchaser under the Asset Purchase Agreement or the Definitive Documents and (ii) the Non-Released D&O Claims,

but such Non-Released D&O Claims shall remain subject to the limitations contained in Article IV.E and Article IV.F of this Plan.

**B.     Releases by Holders of Claims and Interests**

Except as expressly set forth in the Plan, effective on the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted or assertable on behalf of any of the Debtors, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, the administration and implementation of the Restructuring Transactions, or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date, *provided* that nothing in this Article VIII.B shall be construed to release the Released Parties from actual fraud, willful misconduct, or gross negligence as determined by a Final Order.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII.B, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article VIII.B is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) except to the extent contemplated by Article IV.F and Article IV.G of the Plan, a bar to any of the Releasing Parties or the Debtors or Wind-Down Debtors or their respective Estates or Wind-Down Entity asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

**C.     Exculpation**

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor release or the third-party release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is exculpated from any Cause of Action for any act or omission arising on or after the Petition Date and prior to the Effective Date based on the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing, or consummation of the Disclosure

Statement, the Plan, the Special Committee Investigation, any Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for Causes of Action related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan

**D.    Injunction**

The assets of the Debtors and of the Wind-Down Entity shall be used for the satisfaction of expense obligations and the payment of Claims and Interests only in the manner set forth in this Plan and shall not be available for any other purpose. All Persons and Entities who have held, hold, or may hold Claims or Interests based upon any act, omission, transaction, or other activity of any kind or nature related to the Debtors, the Wind-Down Entity, or the Debtors' Chapter 11 Cases that occurred prior to the Effective Date, other than as expressly provided in the Plan or the Confirmation Order, shall be precluded and permanently enjoined on and after the Effective Date from interfering with the use and distribution of the Debtors' assets in the manner contemplated by the Plan.

In addition, as of the Effective Date and subject to the occurrence of the Effective Date, except as otherwise specifically provided in this Plan or the Confirmation Order, all Persons and Entities who have held, hold, or may hold Claims or Interests that are fully satisfied pursuant to the Plan or any Claim or Interest that is subject to the releases and exculpations set forth in Article VIII.B and Article VIII.C of this Plan shall be precluded and permanently enjoined on and after the Effective Date from enforcing, pursuing, or seeking any setoff or relief with respect to such Claims or Interests, except for the receipt of the payments or distributions that are contemplated by this Plan.

**E.    Release of Liens**

Except as otherwise provided in the Plan, the Plan Supplement, or any contract, instrument, release, or other agreement or document created pursuant to the Plan or Confirmation Order on the Effective Date, and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, compromised, and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Debtors shall automatically revert to the applicable Debtor or Wind-Down Debtor, as applicable,

and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors. Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as requested by the Debtors or Wind-Down Entity to evidence the release of such Lien, including the execution, delivery, and filing or recording of such documents evidencing such releases. The presentation or filing of the Confirmation Order to or with any local, state, federal, or foreign agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

**F.      OSC and SEC**

Notwithstanding any language to the contrary herein, no provision shall (a) preclude the OSC or the SEC from enforcing its police or regulatory powers; or (b) enjoin, limit, impair or delay the OSC or SEC from commencing or continuing any claims, causes of action, proceeding, or investigations against any non-Debtor person or non-Debtor entity in any forum.

**G.      Protection against Discriminatory Treatment**

As provided by section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Entity, including Governmental Units, shall discriminate against any Wind-Down Debtor or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, or discriminate with respect to such a grant against, any Wind-Down Debtor, or any Entity with which a Wind-Down Debtor has been or is associated, solely because such Wind-Down Debtor was a debtor under chapter 11 of the Bankruptcy Code, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

**H.      Document Retention**

Upon the occurrence of the Effective Date, the Debtors' books and records shall be transferred to the Wind-Down Entity, which shall continue to preserve all financial books and records, emails, and other financial documents relating to the Debtors' business that are currently in the Debtors' possession. The Wind-Down Trust shall not destroy or otherwise abandon any such documents or records without providing advance notice to the U.S. Securities and Exchange Commission (c/o Therese Scheuer, U.S. Securities and Exchange Commission, 100 F Street, NE, Washington, DC 20549, ScheuerT@SEC.GOV) and seeking further authorization from this Court. Nothing in this Plan or the Confirmation Order shall affect the obligations of the pre-Effective Date Debtors, the Wind-Down Entity, and/or any transferee or custodian to maintain all books and records that are subject to any governmental subpoena, document preservation letter, or other investigative request from a governmental agency.

**I.      Reimbursement or Contribution**

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (1) such Claim has been adjudicated as non-contingent; or (2) the relevant Holder of a Claim has Filed a

non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

**J.      Term of Injunctions or Stays**

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code, or any order of the Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date. **All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.**

## ARTICLE IX.

## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

**A.      Conditions Precedent to the Effective Date**

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article IX.B of the Plan:

1.  The Bankruptcy Court shall have entered the Confirmation Order, which shall be in a form and substance reasonably satisfactory to the Debtors and the Committee, and subject to the consent rights of Purchaser under the Asset Purchase Agreement, and such order shall be a Final Order and in full force and effect.

2.  The Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan, Definitive Documents, and the Asset Purchase Agreement.

3.  Each Definitive Document and each other document contained in any supplement to the Plan, including the Plan Supplement and any exhibits, schedules, amendments, modifications or supplements thereto or other documents contained therein, shall have been executed or Filed, as applicable, in form and substance consistent in all respects with the Plan, and subject to the Purchaser's consent rights under the Asset Purchase Agreement, and shall not have been modified in a manner inconsistent therewith;

4.  The Professional Fee Escrow Account shall have been established and funded with Cash in accordance with Article II.B.2 of the Plan.

5.  The Wind-Down Reserve shall have been established and funded with Cash in accordance with the Plan.

6.  If prior to the Outside Date, the Asset Purchase Agreement shall be in full force and effect and the Sale Transaction shall have been consummated.

7.  The Restructuring Transactions shall have been consummated or shall be anticipated to be consummated concurrently with the occurrence of the Effective Date in a manner consistent with the Plan, the Customer Onboarding Protocol, the other Definitive Documents, and the Asset Purchase Agreement, and the Plan shall have been substantially consummated or shall

be anticipated to be substantially consummated concurrently with the occurrence of the Effective Date.

## B.     Waiver of Conditions Precedent

The Debtors, with the consent of the Committee and, solely to the extent related to the Asset Purchase Agreement and the Sale Transaction, prior to the Outside Date, the consent of Purchaser, may waive any of the conditions to the Effective Date set forth in Article IX.A of the Plan at any time, without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm and consummate the Plan.

## C.     Effect of Non-Occurrence of Conditions to Consummation

If the Effective Date does not occur within 120 days after the Confirmation Date, then the Plan will be null and void in all respects, any and all compromises or settlements not previously approved by Final Order of the Bankruptcy Court embodied in the Plan (including with respect to the fixing, limiting, or treatment of any Claim or Interest, including, without limitation, the Alameda Loan Facility Claims), shall be deemed null and void, and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims, Interests, or Causes of Action held by any Debtor or any other Entity; (2) prejudice in any manner the rights of any Debtor or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity in any respect.

## ARTICLE X.

## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

## A.     Modification of Plan

Subject to the limitations and terms contained in the Plan and Purchaser's consent rights under the Asset Purchase Agreement, the Debtors, with the consent of the Committee, reserve the right to (1) amend or modify the Plan before the entry of the Confirmation Order, in accordance with the Bankruptcy Code and the Bankruptcy Rules and (2) after the entry of the Confirmation Order, the Debtors or the Wind-Down Entity, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, to remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan consistent with the terms set forth herein.

## B.     Effect of Confirmation on Modifications

Entry of the Confirmation Order shall constitute approval of all modifications or amendments to the Plan occurring after the solicitation thereof pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

## C.     Revocation or Withdrawal of Plan

The Debtors reserve the right, with the consent of the Committee, to revoke or withdraw the Plan with respect to any or all Debtors before the Confirmation Date and to File subsequent chapter 11 plans. If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then:

(1) the Plan will be null and void in all respects; (2) any settlement or compromise not previously approved by Final Order of the Bankruptcy Court embodied in the Plan (including the fixing or limiting to an amount certain of the Claims or Classes of Claims), assumption or rejection of Executory Contracts or Unexpired Leases effectuated by the Plan, and any document or agreement executed pursuant to the Plan will be null and void in all respects; and (3) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims, Interests, or Causes of Action by any Entity, (b) prejudice in any manner the rights of any Debtor or any other Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

## ARTICLE XI.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1. Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2. decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3. resolve any matters related to Executory Contracts or Unexpired Leases, including: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure Claims or other Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed or assumed and assigned; and (c) any dispute regarding whether a contract or lease is or was executory, expired, or terminated;

4. ensure that distributions to Holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

5. adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor or the Estates that may be pending on the Effective Date;

6. enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of (a) contracts, instruments, releases, and other agreements or documents approved by Final Order in the Chapter 11 Cases and (b) the Plan, the Confirmation Order, and contracts, instruments, releases, and other agreements or documents created in connection with the Plan; *provided* that the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection, or dispute resolution clause that refers disputes to a different court;

7.      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

8.      grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

9.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

10.     hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Cases, including:  (a) with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or an Interest for amounts not timely repaid pursuant to Article VI of the Plan; (b) with respect to the releases, injunctions, and other provisions contained in Article VIII of the Plan, including entry of such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions; (c) anything that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan and the Confirmation Order; or (d) related to section 1141 of the Bankruptcy Code;

11.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

12.     adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

13.     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

14.     enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases with respect to any Entity, and resolve any cases, controversies, suits, or disputes that may arise in connection with any Entity's rights arising from or obligations incurred in connection with the Plan;

15.     hear and determine matters concerning local, state, federal, and foreign taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

16.     enter an order or Final Decree concluding or closing the Chapter 11 Cases;

17.     enforce all orders previously entered by the Bankruptcy Court; and

18.     hear and determine any other matters related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code or the Judicial Code.

Nothing herein limits the jurisdiction of the Bankruptcy Court to interpret and enforce the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, or the Disclosure Statement, without regard to whether the controversy with respect to which such interpretation or enforcement relates may be pending in any state or other federal court of competent jurisdiction.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11

Cases, including the matters set forth in this Article XI, the provisions of this Article XI shall have no effect on and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

Unless otherwise specifically provided herein or in a prior order of the Bankruptcy Court, the Bankruptcy Court shall have exclusive jurisdiction to hear and determine disputes concerning Claims against or Interests in the Debtors that arose prior to the Effective Date.

# ARTICLE XII.

## MISCELLANEOUS PROVISIONS

### A.    Immediate Binding Effect

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtors, the Wind-Down Entity, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, exculpations, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors. All Claims against and Interests in the Debtors shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or Interest has voted on the Plan.

### B.    Additional Documents

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors, the Wind-Down Entity, and all Holders of Claims and Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### C.    Payment of Statutory Fees

All fees and applicable interest payable pursuant to section 1930 of the Judicial Code and 31 U.S.C. § 3717, as applicable, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the Wind-Down Debtors (or the Distribution Agent on behalf of the Wind-Down Entity) for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or a Final Decree is issued, whichever occurs first.

### D.    Dissolution of Statutory Committees

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases; *provided*, however, that such committees will remain in existence for the limited purposes of (a) pursuing, supporting, or otherwise participating in, any outstanding appeals in the Chapter 11 Cases; and (b) filing, objecting, or otherwise participating in, any final fee applications of Professionals.

### E.  Reservation of Rights

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests, unless and until the Effective Date has occurred.

### F.  Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiary, or guardian, if any, of each such Entity.

### G.  Service of Documents

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Wind-Down Debtors shall be served on:

| | |
|---|---|
| Wind-Down Debtors | **Voyager Digital Holdings, Inc.** |
| | 33 Irving Place |
| | New York, New York 10003 |
| | Attention: David Brosgol |
| | General Counsel, |
| | E-mail address: dbrosgol@investvoyager.com |
| | |
| | with copies for information only (which shall not constitute notice) to: |
| | |
| Counsel to the Debtors | **Kirkland & Ellis LLP** |
| | **Kirkland & Ellis International LLP** |
| | 601 Lexington Avenue |
| | New York, New York 10022 |
| | Attention: Joshua A. Sussberg, P.C., Christopher Marcus, P.C., Christine A. Okike, P.C., and Allyson B. Smith |
| | |
| Counsel to the Committee | **McDermott Will & Emery LLP** |
| | One Vanderbilt Avenue |
| | New York, New York 10017 |
| | Attention: Darren Azman |

### H.  Entire Agreement; Controlling Document

Except as otherwise indicated, on the Effective Date, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations with respect to the subject matter of the Plan, all of which will have become merged and integrated into the Plan; *provided, however*, that notwithstanding the foregoing or anything to the contrary herein, to the extent there is any conflict between the Plan and the Confirmation Order, on the one hand, and the Asset Purchase Agreement, on the other hand, the Asset Purchase Agreement shall govern solely in the event

the Sale Transaction is consummated. Except as set forth in the Plan, in the event that any provision of the Disclosure Statement, the Plan Supplement, or any order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control. In the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall control.

## I.   Plan Supplement

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the website of the Claims, Noticing, and Solicitation Agent at https://cases.stretto.com/Voyager or the Bankruptcy Court's website at http://www.nysb.uscourts.gov. Unless otherwise ordered by the Bankruptcy Court, to the extent any exhibit or document in the Plan Supplement is inconsistent with the terms of any part of the Plan that does not constitute the Plan Supplement, such part of the Plan that does not constitute the Plan Supplement shall control.

## J.   Non-Severability

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, subject to the Purchaser's consent rights under the Asset Purchase Agreement prior to the Outside Date, shall have the power to alter and interpret such term or provision to make it valid or enforceable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent, consistent with the terms set forth herein; and (3) non-severable and mutually dependent.

## K.   Votes Solicited in Good Faith

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors, and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties nor individuals or the Wind-Down Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan or any previous plan.

## L.   Waiver or Estoppel

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in

a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed prior to the Confirmation Date.

Dated:  January 810, 2023                    VOYAGER DIGITAL HOLDINGS, INC.
                                             on behalf of itself and all other Debtors


                                             */s/ Stephen Ehrlich*
                                             _____
                                             Stephen Ehrlich
                                             Co-Founder and Chief Executive Officer
                                             Voyager Digital Holdings, Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**ORDER (I) AUTHORIZING ENTRY INTO THE**
**BINANCE US PURCHASE AGREEMENT AND (II) GRANTING RELATED RELIEF**

Upon the Motion (the "Motion")[2] of the above-captioned debtors and debtors in possession

(collectively, the "Debtors") for entry of an order (this "Order"): (i) authorizing entry into the

Binance US Purchase Agreement and (ii) granting related relief; and the Debtors having

determined, after an extensive marketing process, that BAM Trading Services Inc. d/b/a

Binance.US ("Binance US" or the "Purchaser") has submitted the highest or otherwise best bid for

the Acquired Assets; and the Debtors having selected Binance US as the Winning Bidder pursuant

to the Bidding Procedures Order; and upon adequate and sufficient notice of the Motion, all as

more fully set forth in the Motion; and upon the First Day Declaration and the Tichenor

Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334 and the *Amended Standing Order of Reference from the United States District Court for the*

*Southern District of New York*, entered February 1, 2012; and this Court having the power to enter

a final order consistent with Article III of the United States Constitution; and this Court having

found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

§§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY FOUND AND DETERMINED THAT:

A.      The Debtors and the Purchaser negotiated the Binance US Purchase Agreement at arm's length and in good faith, without collusion, all within the meaning of section 363(m) of the Bankruptcy Code.

B.      The agreement to reimburse Purchaser Expenses, as set forth in the Binance US Purchase Agreement, is: (1) commensurate to the real and substantial benefits conferred upon the Debtors' estates by the Purchaser; (2) reasonable and appropriate in light of the size and nature of the proposed sale contemplated by the Binance US Purchase Agreement, the commitments that have been made by the Purchaser, and the efforts that have been and will be expended by the Purchaser; and (3) necessary to induce the Purchaser to continue to pursue such sale and continue to be bound by the Binance US Purchase Agreement. The Purchaser Expenses are an essential inducement to, and condition of, the Purchaser's entry into, and continuing obligations under, the Binance US Purchase Agreement. Unless it is assured that the Purchaser Expenses will be available, the Purchaser is unwilling to be bound to the terms of the Binance US Purchase Agreement (including the obligation to maintain its committed offer in accordance with the terms

2

A-456

of the Binance US Purchase Agreement while such offer is subject to higher or otherwise better bids as contemplated by the Bidding Procedures). The Purchaser has provided a material benefit to the Debtors and their creditors by providing a baseline value, thereby increasing the likelihood that the value of the Acquired Assets will be maximized through the Debtors' sale process.

**C.** The amount of Purchaser Expenses to be paid shall be subject to the review and approval of this Court for reasonableness, and the Binance.US Purchase Agreement is deemed modified to reflect this term. Accordingly, the Purchaser Expenses are (1) fair, reasonable and appropriate and designed to maximize value for the benefit of the Debtors' estates; and (2) an actual and necessary cost of preserving the Debtors' estates within the meanings of sections 503(b) and 507(a) of the Bankruptcy Code.

IT IS HEREBY ORDERED THAT:

**I.  Notice of the Motion.**

1. Notice of the Hearing, the Motion, and the Debtors' entry into the Binance US Purchase Agreement, was timely, proper, and reasonably calculated to provide interested parties with timely and proper notice thereof, and no other or further notice of the Motion and the Hearing is, or shall be, required. The requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice. A reasonable opportunity to object and be heard with respect to the Motion and the relief requested therein has been afforded to all interested persons and entities.

**II.  Highest or Otherwise Best Offer.**

2. The Debtors' pre- and postpetition marketing process with respect to the Acquired Assets afforded a full, fair, and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the Acquired Assets. The transactions contemplated by the Binance US Purchase Agreement constitute the highest or otherwise best offer for the Acquired

3

A-457

Assets, and the Debtors' determination that the terms of the Binance US Purchase Agreement constitute the highest or otherwise best offer for the Acquired Assets constitutes a valid and sound exercise of the Debtors' business judgment; *provided* that nothing in this Order shall limit or otherwise restrict in any way the Seller's rights and obligations under section 5.2 of the Binance US Purchase Agreement. Entry of this Order, including approval of the Seller's entry into, and performance (for the limited purposes approved by this Order) under, the Binance US Purchase Agreement, is in the best interests of the Debtors, their estates, creditors, and all other parties in interest.

### III.  General Provisions.

3.     The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to these chapter 11 cases pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

4.     All objections to the Motion to authorize the Debtors to enter into the Binance US Purchase Agreement or the relief requested therein that have not been withdrawn, waived, or settled as announced to the Court at the Hearing or by stipulation filed with the Court, and all reservations of rights regarding the Motion, are hereby denied and overruled on the merits with prejudice; *provided* that, notwithstanding anything in this Order or the Binance US Purchase Agreement, the rights of all parties to object to the Plan and final approval of the Disclosure Statement are expressly reserved and preserved.

5.     The request by the United States Trustee for the appointment of a Consumer Privacy Ombudsman is denied without prejudice for the reasons stated on the record at the Hearing.

A-458

6.    The Motion is granted as set forth herein.

7.    Voyager Digital, LLC, as seller under the Binance US Purchase Agreement, is authorized, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, to enter into the Binance US Purchase Agreement and perform its obligations under the Binance US Purchase Agreement other than those obligations to be performed at or after the consummation of the Sale, which obligations the Debtors will seek approval of in connection with confirmation of a chapter 11 plan.  The Seller and Purchaser are granted all rights and remedies provided to them under the Binance US Purchase Agreement.

8.    The Binance US Purchase Agreement shall be binding and specifically enforceable against the parties thereto in accordance with its terms, including, without limitation, Section 5.2 (the "No-Shop" provision) and, as applicable, those additional obligations set forth in Article V (Bankruptcy Court Matters) and Article VI (Covenants and Agreements) of the Binance US Purchase Agreement.

9.    The Debtors are authorized, but not directed, to enter into non-material amendments to the Binance US Purchase Agreement from time to time as necessary, subject to the terms and conditions set forth in the Binance US Purchase Agreement, and without further order of the Court.

10.    The Seller is authorized to satisfy the Purchaser Expenses pursuant to the terms and conditions set forth in the Binance US Purchase Agreement and subject to the review and approval of the Court for reasonableness.  The Purchaser Expenses provisions in the Binance US Purchase Agreement and this Order shall be binding on the Seller, its successors and assigns, and shall survive the termination of the Binance US Purchase Agreement, appointment of a chapter 11 trustee or similar fiduciary, and dismissal or conversion of the chapter 11 cases; *provided, however,* that the obligation to pay or honor the Purchaser Expenses shall be subject to the terms and

conditions of the Binance US Purchase Agreement, and the reasonableness of the amount of any Purchaser Expenses paid to Binance US are subject to the Court's review and approval. The Purchaser Expenses shall be entitled to administrative expense status under sections 503(b) and 507(a)(2) of the Bankruptcy Code.

11. The Purchaser is obligated to satisfy the terms and conditions of the Binance US Purchase Agreement in its entirety, including Section 2.2 (Good Faith Deposit), Section 6.21 (Seller Expenses), and Section 8.3 (the Reverse Termination Fee).

12. To the extent the automatic stay provisions of section 362 of the Bankruptcy Code would otherwise apply, such provisions are vacated and modified to the extent necessary to permit the parties to the Binance US Purchase Agreement to exercise their termination rights thereunder in accordance with its terms, and deliver any notice contemplated thereunder, in each case, without further order of the Court.

13. The Debtors are authorized to rebalance their cryptocurrency portfolio subject to the terms of the Binance US Purchase Agreement.

14. Notwithstanding anything to the contrary in this Order or in the Binance US Purchase Agreement, upon the transfer of any cryptocurrency or cash to Binance US, subject to approval of the Binance US Purchase Agreement and in accordance with the terms thereof, Binance US shall have only nominal title to such cryptocurrency or cash, which shall be held solely in a custodial capacity in trust and solely for the benefit of the Seller or the applicable User or Eligible Creditor (each as defined in the Binance US Purchase Agreement). For the avoidance of doubt, beneficial title to such cryptocurrency or cash shall remain with the Debtors, or the applicable User or Eligible Creditor, as applicable.

15.     For the avoidance of doubt, notwithstanding anything to the contrary in this Order, this Order does not approve the Binance US Transaction or authorize the Debtors to consummate the Binance US Transaction.   Consummation of the transaction is contingent upon the consummation of a plan of reorganization, among other things.

16.     Nothing in this Order or the Binance US Purchase Agreement releases, impairs or otherwise precludes: (i) any liability to any governmental unit as defined in 11 U.S.C. § 101(27) ("Governmental Unit") that is not a "claim" within the meaning section 101(5) of the Bankruptcy Code; (ii) any claim of any Governmental Unit under police and regulatory statutes or regulations that any entity would be subject to as the owner or operator of property after the date of the closing of the Sale; or (iii) any liability to a Governmental Unit on the part of any Person other than the Debtors.  Nor shall anything in this Order or Binance US Purchase Agreement enjoin or otherwise bar a Governmental Unit from asserting or enforcing any liability described in the preceding sentence.   Notwithstanding anything to the contrary, nothing in this paragraph 14 shall be construed as a determination as to any liability or claim owing to a Governmental Unit or whether any Governmental Unit is subject to the automatic stay under section 362 of the Bankruptcy Code or limits, lifts or otherwise modifies the automatic stay under section 362 of the Bankruptcy Code.

17.     Further, nothing in this Order or the Binance US Purchase Agreement authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law. Nothing in this Order or the Binance US Purchase Agreement shall relieve any entity from any otherwise applicable obligation to address or comply with information requests or inquiries from any Governmental Unit. Nothing in this Order or the Binance US Purchase Agreement shall affect

7

any valid setoff or recoupment rights of any Governmental Unit. Nothing in this Order or the Binance US Purchase Agreement divests any state tribunal of any otherwise applicable jurisdiction it may have under police or regulatory law. Nothing in this Order or the Binance US Purchase Agreement shall be construed as a determination of whether the automatic stay applies to this paragraph 14 or limits, lifts or otherwise modifies the automatic stay under section 362 of the Bankruptcy Code.

18.     Notwithstanding the relief granted in this Order and any actions taken pursuant to such relief, nothing in this Order shall be deemed: (a) an admission as to the validity of any particular claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Order or the Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to the Motion are valid, and the Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of all such liens. Any payment made pursuant to this Order is not intended and should not be construed as an admission as the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

19.     Notwithstanding anything to the contrary in this Order or the Binance US Purchase Agreement, no transitional use of Oracle America Inc.'s (including any of its predecessors-in-interest) (collectively, "Oracle")) licenses, products or services is authorized to any party by virtue of the Binance US Purchase Agreement approval herein, absent a further agreement between

Oracle, Debtors and the Purchaser, or further order of Court specifically relating to transitional services.

20. Notwithstanding anything in this Order or the Binance US Purchase Agreement, in the event that any party receives a Notice of Assumption and Assignment of Executory Contracts and Unexpired Leases (Asset Purchase Agreement), attached to the order approving the Disclosure Statement as Exhibit 9, after February 1, 2023, such parties shall have 21 days from the mailing of such notice to object to any proposed cure; *provided* that such cure objection, if any, shall not preclude confirmation of the Plan or effectuation of the Binance US Transaction pursuant thereto.

21. The Debtors shall maintain copies of their books and records as set forth in the Plan. Nothing in this Order shall affect the obligations of the Debtors and/or any transferee or custodian to maintain all books and records that are subject to any governmental subpoena, document preservation letter, or other investigative request from a governmental agency.

22. Notwithstanding anything to the contrary in the Motion, this Order, or any findings announced at the Hearing, nothing in the Motion, this Order, or announced at the Hearing constitutes a finding under the federal securities laws as to whether crypto tokens or transactions involving crypto tokens are securities, and the right of the United States Securities and Exchange Commission to challenge transactions involving crypto tokens on any basis is expressly reserved.

23. Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

24. Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

9

25.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

26.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

27.     The failure to specifically include any particular provision of the Binance US Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that entry into the Binance US Purchase Agreement be authorized and approved; *provided* that the consummation of the Binance US Purchase Agreement shall be subject to confirmation of the Plan, and the rights of all parties to object to the Plan are expressly reserved and preserved.

28.     The Court shall retain exclusive jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the Binance US Purchase Agreement, all amendments thereto and any waivers and consents thereunder, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to interpretation, implementation, or enforcement of the Binance US Purchase Agreement, including, but not limited to, any matter, claim, or dispute arising from or relating to the Binance US Purchase Agreement, and any purported termination of the Binance US Purchase Agreement pursuant to paragraph 11 of this Order.

A-464

29.     To the extent that this Order is inconsistent with the Motion, the terms of this Order

shall govern.

 Dated: New York, New York
         January 13, 2023

                                /s/ **Michael E. Wiles**
                                THE HONORABLE MICHAEL E. WILES
                                UNITED STATES BANKRUPTCY JUDGE

11

A-465

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 22-10943-mew

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    VOYAGER DIGITAL HOLDINGS, INC.,

8

9            Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                   United States Bankruptcy Court

13                   One Bowling Green

14                   New York, NY   10004

15

16                   January 10, 2023

17                   2:03 PM

18

19

20

21   B E F O R E :

22   HON MICHAEL E. WILES

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  KB

Page 2

1   HEARING re Hearing Re: motion authorizing entry into the
2   Binance.US purchase agreement, and granting related relief
3   Objections filed
4
5   HEARING re Motion scheduling a combined disclosure statement
6   approval and plan confirmation hearing, conditionally
7   approving the adequacy of the Debtors' disclosure statement,
8   approving procedures for solicitation, forms of ballots and
9   notices, procedures for tabulation of votes and procedures
10  for objections, and granting related relief
11  Objections filed
12
13
14
15
16
17
18
19
20
21
22
23
24
25  Transcribed by:  Sonya Ledanski Hyde

Page 3

1   A P P E A R A N C E S :
2
3   KIRKLAND & ELLIS LLP
4       Attorneys for the Debtor
5       601 Lexington Avenue
6       New York, NY 10022
7
8   BY:  JOSHUA SUSSBERG
9        CHRISTINE OKIKE
10
11  KIRKLAND & ELLIS LLP
12      Attorneys for the Debtor
13      300 North LaSalle
14      Chicago, IL 60625
15
16  BY:  MICHAEL SLADE
17
18  NATIONAL ASSOCIATION OF ATTORNEYS GENERAL
19      Attorneys for States
20      1850 M St NW, 12th Floor
21      Washington, DC, 20036
22
23  BY:  KAREN CORDRY
24
25

Page 4

1   MCDERMOTT WILL & EMERY LLP
2       Attorneys for Official Committee of Unsecured Creditors
3       340 Madison Avenue
4       New York, NY 10173
5
6   BY:  DARREN AZMAN
7
8   LATHAM WATKINS
9       Attorneys for Binance U.S.
10      885 Third Avenue
11      New York, NY, 10022
12
13  BY:  ADAM GOLDBERG
14
15  UNITED STATES DEPARTMENT OF JUSTICE
16      Attorneys for the U.S. Trustee
17      201 Varick Street, Suite 1006
18      New York, NY 10014
19
20  BY:  RICHARD MORRISSEY
21
22
23
24
25

Page 5

1   VERMONT DEPARTMENT OF FINANCIAL REGULATION
2       89 Main Street
3       Montpelier, VT, 05620
4
5   BY:  JENNIFER ROOD
6
7   OFFICE OF THE ATTORNEY GENERAL OF TEXAS
8   BANKRUPTCY & COLLECTIONS DIVISION
9       Attorneys for TX State Securities Board & TX Department
10      of Banking
11      P. O. Box 12548
12      Austin, Texas 78711
13
14  BY:  ABIGAIL RYAN
15
16  MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP
17      Attorneys for New Jersey Bureau of Securities
18      570 Broad Street
19      Newark, NJ, 07102
20
21  BY:  JEFFREY BERNSTEIN
22
23
24
25

A-467

Page 6

1  DAN NEWSOM
2       Pro Se Creditor
3       253 Cahaba Oaks Trail
4       Indian Springs, AL, 35124
5
6  TRACY HENDERSHOTT
7       Pro Se Creditor
8       3165 Santa Barbara Blvd North
9       Cape Coral, FL, 33993
10
11  JAMES JONES
12       Pro Se Creditor
13       694 Sunset Avenue
14       Wheelersburg, OH 45694
15
16  LISA PROVINO
17       Pro Se Creditor
18       50 Old Town Highway
19       Bridgewater, CT 06752
20
21  YEHUDAH ABRAHAM
22       Pro Se Creditor
23       970 Revere Drive
24       Hillside, NJ, 07205
25

Page 8

1  JASMINE BALL
2  THOMAS BRAZIEL
3  STEVEN CHURCH
4  LISA DAGNOLI
5  RICKY ESTR
6  CHRISTOPHER GASTELU
7  CELESTE KOEPSEL
8  JONATHAN KORNBERG
9  NIZAR LAKHDHIR
10  DAVID LEE
11  TRONY LEE
12  MATT MADER
13  KEITHER MCCORMACK
14  LETICIA SANCHEZ
15  COURTNEY STEADMAN
16  NANDAN CHAPA
17  SOMA BISWAS
18  JASON DIBATTISTA
19  TOM HALS
20  DIETRICH KNAUTH
21  MIKE LEGGE
22  BETH SILVERBERG
23  MIKE SIMARI
24  VINCE SULLIVAN
25  PHILIP BRENDEL

Page 7

1  SULLIVAN & CROMWELL LLP
2       Attorneys for FTX Debtors
3       125 Broad Street
4       New York, NY, 10004
5
6  BY:  BRIAN GLUECKSTEIN
7
8  ALSO PRESENT TELEPHONICALLY:
9  DENISE KALOUDIS
10  NIKHILESH DE
11  LISANDRA AVILA
12  LINDA DONAHUE
13  ANGELA HERRING
14  LAYLA MILLIGAN
15  CHRISTOPHER MULVIHILL
16  BENJAMIN NICKERSON
17  KEVIN PUVALOWSKI
18  THERESE SCHEUER
19  ETHAN TROTZ
20  BENJAMIN BELLER
21  CHRISTOPHER STAUBLE
22  JASON ST. JOHN
23  PAUL HAGE
24  JASON RAZNICK
25  ETHAN MCLAUGHLIN

A-468

Page 9

1  MARVIN CLEMENTS
2  TAYLOR HARRISON
3  TRACY HENDERSHOTT
4  PATRICK HOLOHAN
5  VICTOR UBIERNA DE LAS HERAS
6  ALLAN ZWART
7  DUSTIN PETERSON
8  ERIK HANNER
9  LUKE PORCARI
10  JACOB BALTAYTIS
11  CHRIS MAULTSBY
12  MATTHEW CHERRY
13  MICHAEL COPPOLA
14  ARTHUR JONES
15  DANIEL KING
16  BENJAMIN PELZ
17  BRAD RAWE
18  NEGISA BALLUKU
19  ANDREW SROKIN
20  HEATH MENDELSOHN
21  MARISOL CURIEL-WADE
22  ZAC CIULLO
23  SHERYL GIUGLIANO
24  SUSAN GOLDAN
25  ELLE JOHNSON

Page 10

1  MARIS KANDESTIN
2  CHRISTOPHER MARCUS
3  SHELBY PERRY
4  CAROLINE SALLS
5  KATHERINE SCHERLING
6  VIRGINIA SHEA
7  ALLYSON SMITH
8  BRIAN TICHENOR
9  JON WARREN
10  JASON ROSELL
11  NACIF TAOUSSE
12  JONATHAN WEISCHSELBAUM
13  MATTHEW DUNDON
14  AUTUMN HIGHSMITH
15  VLADIMIR JELISAVCIC
16  AMISH DOSHI
17  GARETT HUNTER
18  ARI NEWMAN
19  DAVID POSNER
20  NATALIE THOMPSON
21  LAUREN KELLY GREENBACKER
22  TIMOTHY REILLY
23  KELLY MOYNIHAN
24  PAUL ROSENBLATT
25  VINCENT SASSO

Page 12

1              I N D E X
2
3  WITNESSES:      DIRECT: CROSS:   REDIRECT: RECROSS
4
5  BRIAN TICHENOR   155    23/49/57/63      60
6
7
8
9  EXHIBITS:                          PAGE:
10
11            (None marked)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 11

1  DANIEL KERNS
2  JONATHAN WHITE
3  SIGMUND WISSNER-GROSS
4  TINA LAWRENCE
5  DAVID O'BRIEN
6  LILY YARBOROUGH
7  MARK BRUH
8  LINDA RIFKIN
9  DAVID HOLLERITH
10  LISA PROVINO
11  MARTIN ALLOCATI
12  KAREN CORDRY
13  JOHN CALANDRA
14  DANIEL SIMON
15  GREGG STEINMAN
16  GRAYSON WILLIAMS
17  JOSEPH EVANS
18  CHARLES GIBBS
19  JON WARREN
20
21
22
23
24
25

A-469

Page 13

1              P R O C E E D I N G S
2        THE COURT:  Good morning, everybody.  Are the
3  parties ready to proceed on the Voyager case?
4        MR. SUSSBERG:  Yes, Your Honor.
5        THE COURT:  Okay, who's going to take the lead for
6  the Debtors?
7        MR. SUSSBERG:  Your Honor, it's Joshua Sussberg
8  from Kirkland and Ellis.  Happy, healthy new year to you.
9        THE COURT:  Thank you.  Happy new year to
10  everybody.
11        MR. SUSSBERG:  Your Honor, I wanted to take a few
12  minutes at the outset to set the stage for the hearing.
13  It's been, by my count, 56 days since we were last before
14  Your Honor back on November 15th, and we were quite
15  confused, I think I said dismayed, at what had transpired
16  through the course of the week prior with the FTX debacle
17  and bankruptcy, and we were left at a place where we had
18  completed solicitation as it related to the FTX Alameda
19  transaction and we needed to figure out quickly how to
20  jumpstart the case and re-commence our process.
21        And you know, Your Honor, I'd be remiss not to
22  mention that a lot of people have worked incredibly hard
23  over the last 56 days, including the Voyager management
24  team, the advisor team, Ms. Okike, Ms. Smith, Moelis, the
25  Latham representing Binance, and the UCC.  And everyone's

1  worked collaboratively to do right by our customers and that

2  was what we wanted to do from the very outset of these

3  cases, Your Honor, and that is what we are trying to do

4  today.

5        Very briefly, Your Honor, we entered into the

6  Binance -- transaction with Binance.US, and we'll talk about

7  that, on December 18th and we are proposing to move forward

8  swiftly with a combined disclosure statement and

9  confirmation hearing on March 2nd, the idea being that we do

10  not want to delay getting money, getting crypto back into

11  our customers' hands.  Importantly, Your Honor, at the same

12  time that we renewed our marketing process, we also took a

13  very hard look at a standalone self-liquidation and I think

14  you'll see from the declarations that were submitted by Mr.

15  Tichenor as well as the UCC statement in support of both the

16  entry into the contract as well as the disclosure statement,

17  the self-liquidation option is not an option that is going

18  to put the most money in our customers' pockets.

19        And we think that there's a lot of confusion out

20  in the marketplace and in the media about what this

21  transaction with Binance actually is, and Ms. Okike is going

22  to spend time walking through it today, but in effect, it's

23  a platform play where Binance will have an opportunity to

24  onboard willing customers from Voyager onto Binance and some

25  people will ask to get their crypto back, some people will

1  ask to get their cash back, but Binance is paying $20

2  million for that opportunity.  So as far as the financial

3  wherewithal to affect this transaction, you know, we think

4  that argument that has been reiterated by certain States has

5  no basis in fact or law.

6        The objections that you're going to here today,

7  Your Honor, really fall into three buckets and I want to

8  briefly address them at the outset so everybody's aware.

9  It's a total of approximately six objections at this point,

10  a few of which have been resolved from a disclosure

11  standpoint.  But the three that I want to focus on are

12  CFIUS, the objecting states -- there's various states that

13  have objected -- as well as Alameda and FTX.

14        As far as CFIUS is concerned, and I know Your

15  Honor is familiar but for those that aren't, this is the

16  Committee on Foreign Investment in the United States, and to

17  be clear, this is a committee, an interagency body of the

18  government, that's empowered to review transactions

19  involving foreign persons and U.S. businesses so they can

20  evaluate the impact on U.S. national security.

21        And we recognize that the Binance transaction is

22  potentially subject to CFIUS review, and in fact, we

23  received an inquiry even over the holidays from CFIUS

24  directly indicating that it had questions and it was

25  planning to potentially review the transaction.  We are

1  coordinating with Binance and their respective counsels

2  including their CFIUS counsel to not only deal with the

3  inquiry but to voluntarily submit an application to move

4  this process along.

5        And I say that because, Your Honor, the

6  alternative to the Binance transaction is a self-

7  liquidation, and again that's something that collectively

8  the advisors across the board do not believe is in our

9  customers' best interest and will in fact result in reduced

10  recoveries.  So we're going to work with CFIUS as well as --

11  and I'll get to in a second -- the objecting states so that

12  we can avoid a self-liquidation.  Because if the CFIUS

13  review process and the objecting states prevail on their

14  objections, the outcome is a self-liquidation and again,

15  that's in no one's interest and no one should be pushing for

16  it.

17        As far as the state and federal agencies that

18  opposed the Binance transaction, again, these are entities

19  that on their face, are seeking to force a liquidation of

20  all assets and a result of return of cash to customers.  Now

21  Binance itself, Your Honor, has licenses, authorizations,

22  or exemptions in 46 of the 50 states, and it will allow

23  Voyager customers to quickly onboard to Binance, that

24  platform, resulting in access to their pro rata share of

25  cryptocurrency.

1        The objecting states assert unfair treatment for

2  customers in various states and we believe it's misguided.

3  Creditors in unsupported jurisdictions, the four

4  jurisdictions in question, are going to receive the same

5  recovery as all otherly situated creditors just in a

6  different form of currency as a result of the applicable

7  states' regulations.

8        And the interesting thing here is the states are

9  effectively speaking out of both sides of their mouth

10  because the objecting states actually have the authority and

11  the wherewithal to provide temporary solutions to allow for

12  distributions of cryptocurrency itself to be made to those

13  constituents in kind.  And so this issue is really one of

14  the states' own making.

15        Nonetheless, as we always do, the Debtors,

16  Binance, and the Committee remain committed to continuing to

17  work with the states.  I think we've been able to work

18  through some of the issues.  Some remain for today, but we

19  will continue to power through that.

20        And finally Your Honor, Alameda and FTX and this

21  one is frankly a head scratcher.  I will say at the outset

22  that I spoke to Mr. Dietderich this morning, who I've told

23  the Court I have a lot of respect and admiration for and

24  consider a friend, and we agreed that we would sit down and

25  see if there was a way to resolve this on an expedited basis

A-470

1    because again, the two pieces of objection here are a bit
2    head scratching.
3            You know, number one Alameda is coming into this
4    Court and arguing that our plan is unfairly treating the
5    loan that it made to the company at the HoldCo, not at the
6    operating company.  And even on its face, we believe there
7    is sufficient basis for equitable subordination.  I don't
8    need to belabor the point.  I frankly think it's not even a
9    close call, and equitable subordination is something that's
10   often bantered but rarely executed upon.
11           We have people that have been federally indicted
12   for their behavior in what will go down as one of the
13   largest frauds of all time, and so we'll deal with that in
14   the context of the plan and I think we've addressed it with
15   disclosure.
16           The other issue that FTX and Alameda raise is more
17   complicated and admittedly a large dollar value number, and
18   this relates to the order that Your Honored entered at
19   Docket 470 allowing for the repayment of loans that Alameda
20   made to the Debtors.  Alameda and FTX have now argued that
21   those were preferences and may be entitled to administrative
22   priority in our cases, this is five to six hundred million
23   dollars.  To be clear, there's been no administrative claim
24   filed, no preference action has been filed in Delaware, but
25   we need to figure out a resolution here and we need to

1    figure it out quickly.
2            And we frankly believe we have significant
3    defenses including setoffs which we'll articulate at the
4    right time, but to have our customers have five or six
5    hundred million dollars held up while this Voyager entity
6    litigates with Alameda after everything that's happened in
7    these cases seems preposterous to us.
8            And so as I said we will speak to Mr. Dietderich
9    and we will see if we can come to a commercial resolution
10   without having to spend and waste money that otherwise
11   belongs in our customers' pockets.
12           THE COURT:  Mr. Sussberg --
13           MR. SUSSBERG:  Finally, Your Honor --
14           THE COURT:  If I --
15           MR. SUSSBERG:  Yes, sir.
16           THE COURT:  -- remember correctly, if I remember
17   correctly that Alameda loan was at least partially secured.
18   Alameda had posted collateral that was returned to it.  Is
19   that right?
20           MR. SUSSBERG:  That is correct, Your Honor.
21           THE COURT:  What was the -- what were the values
22   on the date of the repayment?  How much of the loan was
23   collateralized at that point, based on then current
24   collateral values?
25           MR. SUSSBERG:  I'd have to go check back, Your

1    Honor.  I'd be speaking out of school.  I don't have the
2    number at my fingertips.
3            THE COURT:  Okay.
4            MR. SUSSBERG:  But we can run that down.  Last but
5    not least, Your Honor, I just wanted to mention, you know,
6    our hope is today to move forward and seek approval of the
7    two agenda items that we will walk through and we will
8    address the objections.  We are looking to quickly get our
9    disclosure statement out to stakeholders that includes the
10   Binance transaction.  The plan incorporates the sale.
11           It also has a toggle feature in the event that the
12   CFIUS delay is such that we need to effect the self-
13   liquidation, which we very much want to avoid, but our goal
14   is to move this as quickly as we can and get people back
15   their money.  People are tired.  People are upset.  We read
16   everything that's out there.  We understand it and I want
17   everybody to appreciate and know that we're going to do
18   everything in our power to bring these cases to an
19   appropriate conclusion as quickly as possible.
20           So with that Your Honor, unless you have any
21   questions, we propose to dive right into the agenda.
22           THE COURT:  All right.  I have plenty of
23   questions.  Won't surprise you that I've read all the papers
24   and I have my own series of questions that I'd probably like
25   to do first and in a particular order, but before we do

1    that, it may make sense to get the evidentiary record
2    completed and for you to offer whatever declarations you
3    wish to offer in evidence and see if there's additional
4    cross examination that people desire.
5            MR. SUSSBERG:  Absolutely.  I'm going to turn the
6    podium over to Ms. Okike.
7            THE COURT:  Thank you.
8            MS. OKIKE:  Good afternoon, Your Honor.  Christie
9    Okike of Kirkland and Ellis on behalf of the Debtors.  Can
10   you hear me okay.
11           THE COURT:  I can, thank you.
12           MS. OKIKE:  Your Honor, so as Mr. Sussberg said,
13   we have two items on today's agenda, the Debtors' motion
14   seeking authorization to enter into the Binance.US APA and
15   the Debtors' motion seeking conditional approval of the
16   disclosure statement.
17           We would propose to proceed with the APA motion
18   followed by the disclosure statement motion, if Your Honor
19   is amenable to that.
20           THE COURT:  I'm fine with that.  Actually some of
21   the issues overlap, so certainly the questions that I will
22   be asking will overlap.  So I would like to just get the
23   evidentiary record on both kind of over with and then we can
24   proceed with the issues.
25           MS. OKIKE:  Understood, Your Honor.  So we filed

A-471

1  the declaration of Mr. Brian Tichenor, managing director at
2  Moelis, the investment banker to the Debtors, in support of
3  the APA motion at Docket No. 836 and we would request that
4  that declaration be admitted into evidence. Mr. Tichenor is
5  on the line if any party wishes to cross examine him.
6       THE COURT:  All right.  Does any party object to
7  the admission of Mr. Tichenor's declaration into evidence?
8       Very good.  Mr. Tichenor, will you verify that the
9  statements made in your declarations are true and correct to
10  the best of your knowledge, information, and belief, and
11  that you will so testify if called under oath?
12       MR. TICHENOR:  I would, Your Honor.
13       THE COURT:  All right.  And does anybody wish to
14  cross examine Mr. Tichenor?  All right.  I haven't heard
15  anything --
16       MS. CORDRY:  Your Honor, this is --
17       THE COURT:  Go ahead.
18       MS. CORDRY:  This is Karen Cordry.  Can you hear
19  me?
20       THE COURT:  I can now, yes.
21       MS. CORDRY:  Okay.  Yes, I'm sorry.  We did have
22  some questions.  I'm representing a number of states and we
23  did have some questions to try to clarify some of the
24  aspects of what was being proposed here.  So would this be
25  the time you would want us to ask those questions?

1       THE COURT:  It depends on whether Mr. Tichenor is
2  the right witness for some of those questions, but why don't
3  you try.
4       MS. CORDRY:  Okay.  So they are going through
5  pretty much what was put in his declaration.
6       CROSS EXAMINATION OF BRIAN TICHENOR
7  BY MS. CORDRY:
8  Q   Mr. Tichenor, my first question would be -- and as I
9  say, some of these are just to clarify because we have not
10  had a chance to sit down and go over these documents with
11  you outside of this hearing process.  So first question
12  would be, this rebalancing transaction that the company is
13  proposing that is separate from the plan, that would be done
14  under any version of the kind of proposals that -- to
15  resolve this case; is that correct?
16  A   That is correct.
17  Q   Okay.  And that could be done now.  That does not
18  require waiting for the confirmation process or anything
19  like that; is that also correct?
20  A   That is my understanding.
21  Q   Okay.  How long do you estimate that process will take?
22  A   We estimate that that process would likely take in the
23  range of approximately one month.  That being said, there is
24  still work being done and performed around ultimately what
25  the series of transactions would ultimately look like in

1  connection with the rebalancing transaction.
2  Q   And when do you intend to start that?
3  A   We would intend to start that likely at the beginning
4  of February.  In connection with the rebalancing
5  transaction, we do plan to confer with the UCC and as we
6  mentioned, there is still additional work being done in
7  advance of that transaction to make sure that it is being
8  executed in an appropriate manner.
9  Q   Okay.  And what is the overall estimated cost of that
10  process?
11  A   We estimate that -- the cost of that process to be
12  potentially in, I believe, approximately $30 million which
13  my recollection is largely relates to slippage associated
14  with ultimately the value recovered on those coins relative
15  to the value associated with them today.
16  Q   Okay.  And who is bearing that cost?
17  A   Ultimately that cost would be born through recovery
18  value for the underlying creditors.
19  Q   So that is not something that Binance is paying in any
20  respect, that's coming out of the Voyager funds?
21  A   Yes.  The slippage relates to, effectively to the
22  extent that you are selling illiquid tokens, for example,
23  the price impact that those sales or transactions could
24  ultimately have on the price of the token itself.
25  Q   Okay.  Now all of this process is going through an

1  account, as I understand it from your documents, that
2  Voyager is going to establish under its own name on the
3  Binance platform; is that correct?
4  A   So those transactions may occur through Binance but
5  under the APA they do not have to occur through Binance.  As
6  proposed, the Debtor is working through ultimately what
7  those transactions could look like and they could involve
8  transactions that the Debtor executes on other third party
9  exchanges, for example, even away from Binance directly
10  itself.
11       MAN 1:  This is what I sent to Melanie.
12       WOMAN 1:  Right, because I already sent them to
13  her.
14       MS. CORDRY:  We're getting somebody else on the
15  line.
16       THE COURT:  Excuse me.  Excuse me.  Everybody
17  who's not actively participating, please mute your line.
18  BY MS. CORDRY:
19  Q   Okay, so just, the end you were saying it may go
20  through on Binance, but you have the option of also using
21  other platforms, doing it yourself directly; is that
22  correct?
23  A   That is correct.  So for example, prior to filing, the
24  company had relationships with a number of market makers
25  that it used for purposes of being able to execute

A-472

1  transactions for customers through its exchange itself and
2  transactions could be executed by the company directly, for
3  example, under a similar structure.
4  Q   Okay.  And at the end of this process, this rebalanced
5  set of coins, they will all still be held on Voyager's own
6  platform; is that correct?
7  A   I believe that is correct, yes.
8  Q   Okay.  Let's see.  All right.  So your Paragraph 20 of
9  your affidavit says that the Debtors will maintain control
10 of all of their crypto including during rebalancing until
11 "the transfer of cryptocurrency to Binance."  So how does
12 that particular statement relate to the question of delayed
13 acquired coins?  Are those coins again continuing to be held
14 on Voyager's platform until there is an account set up at
15 Binance that they could be transferred to for a particular
16 customer?  Again, is that correct as our understanding?
17 A   So that is correct.  It's my understanding that the
18 nature of the transaction would be that only after a
19 customer has opened an account at Binance.US and gone
20 through an AML and KYC process, after that process has
21 occurred and only after that process has occurred, would the
22 coins be transferred to Binance.
23 Q   Okay.  On another topic, I note in Paragraph 3.3 of the
24 purchase agreement, it refers to a Schedule 3.3(a) that
25 spells out all of the governmental authorizations, consents,

1  et cetera that have to be given for this transaction.  With
2  all of these documents, I had trouble.  I couldn't find that
3  particular schedule.  Is it attached to one document or
4  another to look at?
5  A   I don't know.  I would have to defer to counsel.
6  Q   Okay.  And do you view approval of the purchase
7  agreement or entering into the purchase agreement as
8  actually being a determination that that schedule is in fact
9  correctly reflects all governmental approvals,
10 authorizations, and consents and so forth?
11 A   I don't know the answer to that.  Our basis for review
12 was based on our understanding of Binance's MTL and
13 regulatory licensing stature.
14 Q   Do you view that statement in the purchase agreement as
15 being binding on the governmental entities?
16 A   I am not an expert on that.
17 Q   As of the current moment, who owns coins held by
18 customers on Voyager's platform?  Does the customer have
19 ownership of those coins?
20 A   My understanding is --
21     MR. SLADE:  Your Honor -- I apologize Your Honor.
22 This is Mike Slade for the Debtors.  I object.  That (audio
23 drops) the witness for a legal conclusion.
24     THE COURT:  I'm sorry, what was the objection?
25     MR. SLADE:  That is asked the witness to offer a

1  legal conclusion.
2     THE COURT:  All right, I agree with that.
3  Objection sustained.
4     MS. CORDRY:  All right.  Well, I may come back to
5  his affidavit at the end, but let me go on because I think
6  his affidavit, I believe, made statements along that line.
7  BY MS. CORDRY:
8  Q   Yeah, because Paragraph 22 of your affidavit talks
9  about, it's my understanding that Section 6.12 of the
10 purchase agreement provides that the seller and each
11 transferred creditor will retain all right, title, and
12 interest to the cryptocurrency allocated to it in accordance
13 with the purchase agreement and so on and so forth.
14     So it was my basis for asking about that is that there
15 is language about that in his affidavit.  I was trying to
16 get a clearer sense as to in that affidavit when -- who
17 owned what under -- what he's saying there, who owned what
18 at what time and when would those matters change over the
19 course of this process?
20 A   So I believe the section that you're referring to would
21 relate to ownership interests and title and custody relating
22 to the coins prior to a transfer to Binance US.  The section
23 of that statement related to my understanding of the way in
24 which the coins would be custodied by Voyager as the
25 organisation prior to the transfer of such coin to

1  Binance.US for purposes of being distributed to account
2  holders.
3  Q   Right.  And then the last sentence, "It is my
4  understanding that under the purchase agreement the
5  cryptocurrency would be held by Binance.US solely for the
6  benefit of the seller or transferred creditors applicable
7  until the distributions are made."  So first question, until
8  such distributions are made, are those distributions when a
9  creditor would be taking their funds out of the Binance
10 platform?  Is that what that's referring to?
11 A   I -- that would refer to when the crypto is being
12 deposited into the underlying account of such creditor on
13 the Binance.US platform.
14 Q   Okay.  Then at that point it would still be it would be
15 -- it would be held by Binance for the benefit then of that
16 transferred creditor, so the transferred creditor would have
17 -- those would be the transferred creditor's funds when
18 they're on the Binance platform?  Again, is that your
19 understanding?
20 A   That is my understanding, yes.
21 Q   Okay.  Okay.  Let's see.  And I think you had a
22 discussion, a considerable discussion in your declaration
23 why having Voyager carry out its own distribution of the
24 coins, I guess this self-liquidation process you were
25 talking about, would be more difficult and costly than

A-473

Page 30

1  having Binance do it.  Is that the basis for the asserted
2  difference between the projected 51 percent recovery through
3  the Binance plan versus the 45 percent projected for a do-
4  it-yourself payment plan?
5     A   Yes, that's correct.
6     Q   Okay.  There is a lot in your declaration and the
7  Creditors Committee declaration that is not in the
8  disclosure statement, and does help to explain that.  I
9  mean, my reading of those documents initially was that they
10  were quite conclusory and didn't really explain why there
11  was a difference there.  Is there a willingness to add some
12  more of that into the disclosure statement so people would
13  actually understand it?
14        MR. SLADE:  Your Honor, I would object.  That's a
15  not appropriate question for this witness about whether
16  we're willing to add stuff to the disclosure statement.
17        THE COURT:  I think that's right.  You can raise
18  your question with counsel, but --
19        MS. CORDRY:  All right.
20        THE COURT:  -- question for the witness.
21        MS. CORDRY:  That's fine.  That's fine.  Let's
22  see.
23  BY MS. CORDRY:
24     Q   For the unsupported jurisdiction states, the proposal
25  is for Voyager to continue to retain custody of these

Page 31

1  accounts.  This would again stay on its own platform, is
2  that correct, during the six month period?
3     A   That is my understanding, yes.
4     Q   Okay.  Is there any explicit reason why those accounts
5  need to be held for six months before anything is done with
6  them as opposed to allowing some process by which customers
7  could withdraw the funds either in cash or by in-kind
8  distributions or whatever process is worked out; is there
9  any reason for the six-month holding period?
10     A   We negotiated this provision with Binance.US in
11  connection with the underlying transaction.  Our
12  understanding of the nature of their transaction is largely
13  around the ability to acquire the value and ability to
14  acquire customers under their structure.
15        This was an important provision from their perspective
16  relating to such ability to either at closing or at a point
17  in time in the future, the ability to acquire the
18  relationship with those customers.  As we evaluated the
19  transaction in a holistic basis, we believe that the
20  transaction is in the best interest of the estate itself
21  under that basis.
22     Q   So essentially, they're paying more in order to be able
23  to hold on to these customers and hope that they will
24  eventually get license approval so they could acquire them;
25  is that correct?

Page 32

1     A   Yes, I believe that's correct, that they would seek to
2  try to get a relationship with that customer in the six
3  months preceding closing, and that they would like the --
4  they are seeking the option to be able to have the right to
5  be able to get that relationship with such customers.
6     Q   Okay.  And that is purely based on whether or not they
7  can get approval from the states for a license to deal with
8  those customers; is that correct?
9     A   I'm not an expert in regulatory matters around
10  ultimately what would or would not preclude Binance from
11  being able to get a relationship with those customers, but
12  that is my understanding.
13     Q   Okay.  There's no functional reason why those customers
14  could not be allowed to transfer out if they wished, in
15  terms of the way this deal is structured.  This is purely a
16  matter of working with Binance's desire to keep them
17  available for the six-month period, correct?
18     A   I apologize.  I may not understand the full nature of
19  the question.
20     Q   Question is, in terms of the function of the platform
21  and what you would eventually do with these customers if the
22  six months passes and so forth, there's no reason it
23  functionally needs to be six months.  That is a function of
24  what Binance would like to have in terms of keeping these
25  customers available?

Page 33

1     A   The six months was negotiated based on the transaction
2  and that was what was ultimately agreed to, and was an
3  important provision from Binance's perspective with regards
4  to the, you know, broader transaction itself.  You know, as
5  Voyager would operate, they would maintain custody of that
6  crypto during the six-month period up until the point where
7  Binance may have an ability to onboard those customers.
8     Q   Okay, but again, my question was that that is a matter
9  of Binance's desire to be able to onboard those customers.
10  It's not a -- there's nothing in the nature of those
11  customers that preclude them from being given the option to
12  leave earlier than six months except for the fact that
13  you've negotiated this particular arrangement with Binance,
14  correct?
15     A   Well -- and I think the the line of my question was, I
16  guess, is the line of questions relating to whether or not
17  those customers would be able to receive in-kind
18  distributions, for example, through Voyager or relating to
19  something else?
20     Q   It's simply saying that there's no reason that they
21  have to -- that whatever treatment they are accorded,
22  there's no reason it has to wait for six months.  That is a
23  function of something you've agreed to with Binance,
24  correct?
25     A   Correct.

A-474

Page 34

```
1    Q    Okay.  And customers in these supported jurisdictions
2    would have the option of once they put their money into a
3    Binance account, they could withdraw it immediately, the day
4    after they have it in the account if they wish, correct?
5    A    Upon the funds being available in their account, they
6    would be able to withdraw immediately, correct.
7    Q    Okay.  So that is a distinction between the supported
8    versus the unsupported jurisdictions, is how soon the people
9    could have an ability to withdraw the funds and do something
10   else with them if they choose?
11   A    That is correct.
12   Q    Okay.  Roughly how many customers are in the
13   unsupported jurisdictions?
14   A    My understanding is it's approximately 120,000
15   customers.
16   Q    Okay.  And do you know what the rough total of the
17   funds are that those customers hold?
18   A    I believe it's approximately 10 percent.
19   Q    Okay.  And what -- and it's 120,000 customers, is that
20   10 percent of your overall customer base or something more
21   or less than that?  What percentage --
22   A    That's correct.  Voyager has approximately 1.2 million
23   funded customers.
24   Q    Okay.  Okay.  Let's see.  What are the circumstances
25   under which Voyager would receive the extra $15 million of
```

Page 35

```
1    seller expenses under the purchase agreement?
2    A    There are certain provisions relating to expense
3    reimbursement, relating to scenarios in which closing occurs
4    beyond an agreed -- mutually agreed upon date.  In the first
5    instance, an expense reimbursement would be up to $10
6    million which would primarily relate to expense
7    reimbursement for months three to four, effectively in the
8    first instance, upon -- from signing of the APA.  There is
9    an option that at the discretion of Binance they could
10   exercise to extend the outside date an additional month
11   which would include an additional incremental, up to $5
12   million of additional expense reimbursement.
13   Q    So do you view this, the purchase agreement, as being
14   signed now, is that time running now or is this -- is the
15   time going to start at some future point after the Court
16   approves this purchase agreement or entering into this
17   purchase agreement, what you're trying to do right now?
18   A    My recollection of the APA is that it begins at signing
19   of the APA.  There are additional extensions embedded in it
20   relating to delays from a Court perspective for example.  I
21   don't recall the specifics around those extensions at this
22   time, no.
23   Q    Well actually what my question is, has that date -- do
24   you view the purchase agreement as having been signed and
25   entered into now?  Is that time period running or is that
```

Page 36

```
1    still to start in the future?
2    A    I view that time period as having started.
3    Q    Okay.  And do you know what date then you're treating
4    that as running from, what the signature date was for the
5    purchase agreement?
6    A    It would have been towards the end of December.  I
7    don't recall the specific date off the top of my head.
8    Q    Okay, so even if it was towards the end of December,
9    that would be then towards the end of March before this
10   would kick in, so if the confirmation date goes through in
11   early March as you're hoping, these expenses would not come
12   into play; would that be correct?
13   A    That would be correct.
14   Q    Okay.
15   A    So to the extent there was an expeditious closing to a
16   transaction, the expense reimbursements would likely not
17   occur.
18   Q    Okay.  So those are a contingency at this point.  The
19   only for sure you're getting out of this deal is $20 million
20   dollars coming from Binance at this point?
21   A    That's correct.
22   Q    Okay.  Let's see.  Where does Binance maintain its
23   records with respect to its cryptocurrency operations?
24   A    I'm not sure I understand the nature of the question.
25   Is --
```

Page 37

```
1    Q    Geographically --
2    A    -- elaborate?
3    Q    -- where.  Geographically, where does it maintain its
4    records with respect to these, to its cryptocurrency
5    accounts that it maintains?
6         MR. SLADE:  Your Honor, can I -- objection to the
7    relevance of that question.
8         THE COURT:  Overruled.
9         MS. CORDRY:  I think it goes to the question
10   (audio drops) have about the suitability of Binance and
11   issues with respect to its operation.
12        THE COURT:  I've overruled the objection.  The
13   witness can answer.
14   BY MS. CORDRY:
15   Q    Sorry.
16   A    My understanding is that the company is headquartered
17   in Palo Alto, California.  I can't speak to any physical
18   records where they maintain.  I am aware that Binance.US
19   maintains wallet infrastructure operations that are hosted
20   on AWS servers in Virginia and Tokyo, to the extent that's
21   the nature of the question.
22   Q    Yes, that was.  Okay.  Can you distinguish which
23   records are held where?
24   A    I don't recall specifically the variants.  My
25   recollection was the majority of those operations are in
```

A-475

1  Virginia.

2  Q    And do you know if it plans to maintain those separate

3  record locations or to consolidate them?

4  A    I don't recall.

5       MS. CORDRY:  Okay.  All right.  I think that's all

6  the questions that I have at this point.

7       THE COURT:  Thank you.  Is there anybody else who

8  wishes to cross examine Mr. Tichenor?

9       MR. AZMAN:  Your Honor, it's Darren Azman from

10  McDermott, Will, and Emery for the Committee.  We'd like to

11  ask Mr. Tichenor some questions, but it's in the form of a

12  redirect.  I don't know if you'd prefer that we go now and

13  do a cross or just wait for the redirect from the Debtors

14  and then we can go after that.

15       THE COURT:  Actually, I have some questions I'd

16  like to ask Mr. Tichenor.  Let me do that and then I'll give

17  both you and the Debtors your chance to redirect, okay?

18       MR. AZMAN:  Thank you, Your Honor.

19       THE COURT:  Mr. Tichenor, the testimony you just

20  gave in response to questions about whether the six month

21  delay is just to accommodate Binance's desire to maybe be

22  able to establish accounts with those customers, I need to

23  make sure that I understand because it didn't seem to me

24  that that's what you were saying in your declaration.  So

25  let me put it this way.

1       THE WITNESS:  That is correct, Your Honor, and

2  that is one of the large complications associated with such

3  a transaction.  As it stands today, the Debtor has

4  infrastructure in place for regular way operations that

5  facilitate a customer entering a wallet address that crypto

6  could be transferred to.  There are automated procedures on

7  the back end that do things like know your transaction

8  verification relating to the nature of that account and

9  wallet that that crypto is ultimately being transferred to.

10       To the extent that the Debtor were to enter into

11  the transaction with Binance, that infrastructure would no

12  longer be in place and would require an extensive manual

13  process to be able to actually appropriately transfer crypto

14  to those wallets based on information that individuals would

15  send to the Debtor for such transfers.

16       THE COURT:  And if a customer in one of the

17  unsupported jurisdictions just wanted to skip distribution

18  through Binance and just receive cryptocurrency into an

19  account that they would designate for you at Coinbase or I

20  don't know, whoever else is out there, would the customer

21  have the right to do that, and if not why not?

22       THE WITNESS:  So the customer would not have the

23  right to do that and transfer to, for example, Binance in

24  that instance would not be different than a transfer to any

25  other wallet, Your Honor.  It's the nature of the transfers,

1       If we do this sale transaction, will the Debtors

2  have any ability to transfer cryptocurrencies directly to

3  customers in the unsupported jurisdictions?

4       THE WITNESS:  To the extent that the Debtor were

5  to move forward with the Binance.US transaction, given the

6  fact that the underlying platform itself would be

7  transferred to Binance and the nature of the remaining

8  operations on a go forward basis, my understanding is that

9  due to technical and other feasibility issues associated

10  with the direct transfer of cryptocurrencies from the

11  remaining business to account holders directly would be an

12  excessive burden on and the Debtor and for context, Your

13  Honor, of the approximately 120,000 customers, on average, a

14  Voyager user has approximately three tokens in their

15  account.

16       And so to the extent that the Debtor were required

17  to transfer cryptocurrency in kind to customers in those

18  unsupported jurisdictions, it would require approximately

19  360,000 individual trades, which would also require AML and

20  KYC in connection with those transfers that on a go-forward

21  basis the Debtor would not have the infrastructure to be

22  able to appropriately support.

23       THE COURT:  And every one of those customers would

24  have to have a wallet somewhere for the Debtor to make the

25  transfer to; is that correct?

1  of the number of transactions that would ultimately need to

2  occur, and the ability to verify individually and manually

3  those transfers and the nature of the remaining operations

4  that also the Debtor would need to maintain in order to

5  facilitate such transactions.

6       THE COURT:  So under the transaction, the only way

7  any customer can receive cryptocurrency is by -- is through

8  a Binance account, even if they make a withdrawal from that

9  account and customers --

10       THE WITNESS:  That's correct, Your Honor.

11       THE COURT:  And unsupported -- customers in

12  unsupported jurisdictions have to wait until Binance can --

13  has the authority to establish such an account; is that

14  right?

15       THE WITNESS:  To the extent that a customer in an

16  unsupported jurisdiction would seek to receive an in-kind

17  distribution, that's correct, Your Honor.  The only way in

18  which that could occur would be through that customer having

19  the ability to open a Binance.US account.

20       THE COURT:  All right.  And you've stated in your

21  declaration that you did financial and business counter

22  party due diligence of Binance.  Would you -- that's pretty

23  conclusory, I think.  Could you describe more specifically

24  what -- how thorough an investigation you did, what

25  information you were able to obtain, and what you found in

1    your investigation?

2          THE WITNESS:  Yes, Your Honor.  So the nature of

3    our review was customary and consistent with the nature of

4    diligence that investment bank would perform in connection

5    with evaluating a counterparty for purposes of their

6    financial wherewithal, for example, that included, for

7    example, a review of their audited 2020 and 2021 financial

8    statements.  We did also review their interim financial

9    statements on a year-to-date basis through September 30 of

10   this year.

11         In addition to that financial review around the

12   nature of their ability to be able to close the transaction

13   and have available liquidity to be able to facilitate

14   closing, we did do reviews of additional operational

15   elements of the business, including for example, the nature

16   of their wallet infrastructure and a review of related party

17   agreements that they had with Binance.com, a review of their

18   governance structure.

19         We reviewed AML and KYC procedures and manuals.

20   We reviewed a business plan that had been provided to state

21   regulators, and I would note, Your Honor, we do continue to

22   do due diligence on Binance.US.  We don't view this as a

23   static, historical review of Binance.US.  We do view it as

24   an ongoing review and we do, in addition to that, continue

25   to review public sources of information that are available

1    on the Debtor including analysing information relating to

2    public wallets, blockchain wallets that they have, which

3    allow us to analyze things like fund flows and the total

4    amount of assets that are being held on their platform

5    itself.

6          THE COURT:  All right.  In terms of the audited

7    financial statements, are those publicly available?

8          THE WITNESS:  Not that I'm aware of, Your Honor.

9          THE COURT:  They're not filed with any regulators

10   to your knowledge, publicly available basis?

11         THE WITNESS:  I believe their financial statements

12   have been provided to state regulators, but on a

13   confidential basis.  I don't believe that their financial

14   statements are publicly available, Your Honor.  That's my

15   understanding.

16         THE COURT:  And tell me what you concluded as to

17   the financial position of Binance from looking at its

18   financial statement?  Is it -- how well capitalized is it?

19   What's the net equity?

20         THE WITNESS:  We view it as adequately capitalized

21   in order to be able to close the transaction and that they

22   have multiples of available liquidity and capital and equity

23   available to be able to close the transaction, without

24   stating a specific number.  We do know the number, but we

25   don't feel comfortable sharing it for confidentiality

1    reasons, Your Honor.

2          THE COURT:  I understand that, but what -- is the

3    Binance.US entity a guarantor of the obligations of any of

4    the other finance companies?

5          THE WITNESS:  Not that I'm aware of, Your Honor,

6    but I don't know.

7          THE COURT:  How would you characterize your level

8    of confidence as to the financial stability of Binance?

9          THE WITNESS:  Based on our review of their

10   financial statements, we believe that they would have ample

11   liquidity to be able to close the transaction and continue

12   to operate their business based on information that was

13   given to us around their historical P&L.

14         For quite a period of time, even to the extent

15   that there was a view that there was a "run on the bank,"

16   given the nature of the way that they hold customer funds

17   which are held on a one-on-one basis, which has been the

18   primary driver for the majority of situations that we are

19   seeing in the crypto space which results in runs on the

20   banks, so they -- as a result of not rehypothecating or

21   lending assets and acting as a custodian, even to the extent

22   that 100 percent of customers withdrew, they would still

23   continue to operate a trading platform and would be able to

24   facilitate withdrawals for such customers.

25         THE COURT:  Okay.  You -- in that regard,

1    obviously this case and other cases have highlighted the

2    issue of just what rights customers have with respect to

3    cryptocurrencies.  Are they the general unsecured creditors?

4    Is there rehypothecation?  Is the exchange just a custodian?

5    And if so, how is it effectuating that role?

6          What have you found in terms of your investigation

7    of Binance as to what the Binance relationship is with

8    customers and would be as to the Voyager customers?  Would

9    that be a custody relationship or a different kind of

10   relationship?

11         THE WITNESS:  I can speak to what I understand

12   from a business perspective, which is that our understanding

13   is that they act as a custodian for customers.  They do not

14   view themselves as having, for example, title or ownership

15   of customer crypto itself.

16         THE COURT:  And how is that custodial relationship

17   effected in -- through the wallet infrastructure that you

18   said you investigated?  How is that done?  Do they --

19         THE WITNESS:  Yes, Your Honor --

20         THE COURT:  -- the customer assets?

21         THE WITNESS:  I apologize, Your Honor.  I missed

22   the last part of that question.

23         THE COURT:  Do they segregate all the customer

24   holdings from other holdings?

25         THE WITNESS:  That's my understanding, Your Honor.

A-477

1      THE COURT:  Okay.  And what else did you learn in
2  your due diligence about the wallet infrastructure at
3  Binance?
4      THE WITNESS:  Our understanding of their wallet
5  infrastructure is that they use hot and cold wallets,
6  whereby for example, parties are able to when they deposit
7  funds onto the platform, those funds are deposited into hot
8  wallets.  They use then customary and industry standards
9  relating to the transfer and storage of those assets into
10 cold storage.  Our understanding is that they use a TSS
11 multi-sig approach for purposes of maintaining private keys,
12 for example, relating to cold storage of those wallets.
13      You know, we view that and understand that to be a
14 industry leading standard and based on our review of the
15 financial statements and information that was provided to
16 us, we do understand that they view those customer assets as
17 being assets of the customers themselves directly.
18      THE COURT:  And is that reflected in the Binance
19 terms of use, to your knowledge?
20      THE WITNESS:  That would be a legal determination,
21 but my understanding is based on discussions with our
22 counsel, that that's correct.
23      THE COURT:  Can I just ask if the Binance -- is
24 this a good time, if the Binance counsel is on the phone,
25 would you verify that that's how it works at Binance?

1      MR. GOLDBERG:  Your Honor, this is Adam Goldberg
2  of Latham & Watkins on behalf of Binance.US.  Yes, Your
3  Honor.  That's our understanding of how Binance terms of
4  service operate.
5      THE COURT:  Okay.
6      THE WITNESS:  I would also note, Your Honor, in
7  the APA itself, we also, you know, expressly included
8  provisions to make sure even above and beyond those terms of
9  service, that up until such customer has transferred the
10 crypto, that we expressly call out custody and title of
11 those cryptocurrencies.
12      THE COURT:  I have some questions, further
13 questions about that that are probably for the lawyers, not
14 for you as the witness, though.  You testified that you also
15 asked or investigated the related party agreements and
16 transactions.  What particularly did you look at and what
17 did you learn?
18      THE WITNESS:  So Your Honor, our focus was on the
19 relationship that Binance.US has with Binance.com.  Our
20 understanding is that there are certain services agreements
21 from a perpetual basis that they have in place with
22 Binance.com.  We do also understand there to be common
23 ownership interests through a common owner being CZ, but
24 believe the business is based on the information that was
25 provided to us to be separated from an operating

1  perspective.
2      THE COURT:  And the cryptocurrency that's held in
3  segregated wallets for customers, is that all held with
4  Binance.US as the nominal owner?
5      THE WITNESS:  Yes, based on the information that
6  was provided to us, Your Honor.
7      THE COURT:  But the understanding is I -- as you
8  said, is that it's in a kind of trust custody relationship
9  that it's a nominal owner but that the beneficial ownership
10 belongs directly to the customers, right?
11      THE WITNESS:  That's my understanding, Your Honor.
12      THE COURT:  And is any of the segregated customer
13 cryptocurrency subject to the control or access of any of
14 the other Binance companies?  Do they have access to the
15 keys and they -- do they have any ability to transfer,
16 anything of the kind?
17      THE WITNESS:  I am not aware, Your Honor of an
18 ability for a Binance.com employee to be able to transfer
19 cryptocurrency outside of the platform.
20      THE COURT:  Thank you very much.  Do the Debtors
21 and the Committee have further questions they wish to ask of
22 (audio drops)?
23      MR. SLADE:  Not for the Debtors, Your Honor.  You
24 asked all of my questions.
25      MS. RYAN:  Your Honor, this is Abigail Ryan with

1  the Office of the Texas Attorney General, and when the time
2  is appropriate, I have a few questions for the witness.
3      MS. ROOD:  Yeah, Jennifer Rood, Vermont Department
4  of Financial Regulation.  I also have one or two questions.
5      THE COURT:  All right.  On behalf of Texas, go
6  ahead.
7      MS. RYAN:  Thank you, Your Honor.
8            CROSS EXAMINATION OF BRIAN TICHENOR
9  BY MS. RYAN:
10 Q    Good afternoon, and I just have a few follow-up
11 questions.  So help me understand.  Right now, does Voyager
12 have access to all the wallet addresses?
13 A    To its own wallet addresses?
14 Q    Correct.
15 A    My understanding is that Voyager has access to all of
16 its cryptocurrency, yes.
17 Q    And right now, does Voyager have an operational
18 platform?
19 A    I don't believe the -- their platform is operational as
20 it stands today to be able to, for example, allow for the
21 withdrawal of cryptocurrency to customers.
22 Q    Okay.  So in the APA or in the disclosure statement in
23 APA, if the APA is terminated, it said that account holders
24 would have 30 days to withdraw their coin from Voyager
25 platforms.  Would that be available now?

Page 50

```
 1   A    As it stands today, there are certain, for example
 2   third-party contracts that the company would need to have in
 3   place in order to be able to facilitate the withdrawal of
 4   crypto from the Voyager platform.  So operationally, the
 5   company is not able to facilitate the withdrawal of crypto
 6   as it stands today to customers.  As part of the work
 7   leading into any Binance transaction, to the extent the
 8   company were to go to a toggle transaction, the work leading
 9   up to any closing would ultimately also involve, you know,
10   similar work around potentially restarting certain of those
11   operations to the extent that the Debtor are needed to pivot
12   to a toggle.  So kind of restarting contracts for example,
13   to allow for the withdrawal of crypto.
14           THE COURT:  Let me just --
15   BY MS. RYAN:
16   Q    Did any of --
17           THE COURT:  Let me interrupt to make a legal
18   point.  The practical ability to distribute to customers at
19   the moment is separate from the legal issue.  Voyager is not
20   permitted to make distributions to its creditors except
21   pursuant to a confirmed plan.  So right now, a customer
22   can't take crypto from Voyager.  We've had prior hearings
23   where Voyager has said and I believe the Committee has
24   agreed and nobody's pointed to any reasons to the contrary
25   for me that essentially the customers of Voyager at least
```

Page 51

```
 1   don't have direct ownership rights to their crypto.  They
 2   are general unsecured creditors of Voyager.  So they can
 3   only get crypto if a plan is confirmed and if the plan
 4   provides for distributions of crypto and satisfaction of
 5   claims.
 6           MS. RYAN:  Thank you, Your Honor.  That is a very,
 7   very good point and absolutely a plan would have to be
 8   confirmed allowing any distribution of crypto.  I completely
 9   agree with that.
10   BY MS. RYAN:
11   Q    So to transfer the coin to Binance, will any of these
12   third-party agreements need to be put back into place?
13   A    Certain third-party agreements may need to be put in
14   place.  A number of the agreements in particular that relate
15   to the return of cryptocurrency for individual customers
16   largely relate to in some ways AML and KYC procedures that
17   the company would need to have in order to be able to
18   effectuate transactions for individual customers to specific
19   wallet addresses.  In particular, know your transaction
20   customer reviews for example relate to making sure that
21   crypto is not transferred to, for example, OFAC banned
22   wallet addresses the ability to do transactions to a single
23   party, for example, with a known white-listed wallet, make
24   that process much easier from an operational perspective
25   relative to trying to facilitate these types of transactions
```

Page 52

```
 1   for 1.2 million customers.
 2   Q    Okay.  So just help me understand.  If the APA is
 3   terminated, account -- that will all go back into place and
 4   account holders will have 30 days to withdraw their coin or
 5   cash it out from the Voyager platform, right?
 6   A    That's correct.  Under the toggle, the plan would be to
 7   have a 30-day period that would allow customers to be able
 8   to withdrawal crypto.  That's correct.
 9   Q    So let's talk about that a little more.  If under the
10   current plan, a customer who's in a consenting jurisdiction
11   has their coins (audio drops) Binance but they don't want to
12   stay with Binance, they want to cash out, they have three
13   months to do so, right?
14   A    Under the existing structure a customer, to the extent
15   that they were transferred to Binance, would have their
16   account at Binance.  At that point in time, they could do as
17   they see fit with their crypto whether that's maintaining it
18   at Binance.US, whether that's selling it and converting it
19   into cash, or moving to another third-party wallet address
20   at their discretion.
21   Q    Okay.  So --
22   A    -- limited to three months.
23   Q    Okay.  So for the unconsenting jurisdiction customers,
24   when will their coins be valued?  Will it be at the same
25   time as everyone else's, if it has to be sold, or will it be
```

Page 53

```
 1   at the end of that six months?
 2   A    Under the plan, the way that we view the distribution
 3   from a business perspective as working as -- at the time of
 4   the determination of the rebalancing date that those
 5   customers are receiving their distribution in kind, and so
 6   you know, customers would then ultimately be liquidated into
 7   cash to the extent that it was at the end of the six month
 8   period, with those proceeds being distributed accordingly.
 9   But it would be no different than a customer that chose to
10   migrate over a three-month period, for example, to receive
11   an in-kind distribution.
12   Q    So is your answer that for the nonconsenting
13   jurisdictions, the price of their crypto would be valued at
14   the end of the six months?
15   A    My understanding is that the price, the value of their
16   crypto would be valued at the end of the rebalancing period,
17   similar to all other customers, that they would have
18   received the distribution in kind effectively at closing of
19   the transaction.
20   Q    Okay.  So in reading Exhibit C to the disclosure
21   statement, it actually says, and I'll read it to you, "If
22   Binance.US is unable to make distributions to account
23   holders in unsupported jurisdictions at the conclusion of
24   the six-month period, the account holders in such
25   unsupported jurisdiction will have their in-kind currency
```

1  distribution converted to U.S. dollars at the then

2  prevailing market prices and then they'll be distributed."

3      So based on that, doesn't it sound like the value will

4  be determined in six months?

5  A    In that instance, yes.  I think what I was providing a

6  distinction on is that from the view of the Debtor, the

7  distribution effectively would have occurred at closing of

8  the transaction for all parties based on their pro rata

9  distribution of crypto.  In that instance, at the end of the

10 six month period, to the extent they were in a non-

11 supporting jurisdiction, yes, that -- they would be then

12 auto-liquidated, effectively, with the cash distribution

13 being made on that basis.

14     That's very similar to in the toggle plan, for example,

15 at the end of the 30-day period to the extent that customers

16 are allowed to withdraw their crypto, to the extent they

17 have yet to do that, those customers would also be auto-

18 liquidated with distributions being made at then prevailing

19 market prices.

20     THE COURT:  So Mr. Tichenor, just -- sorry to

21 interrupt, but just to make sure that I've got this right.

22 There will be one point in time at which all customers'

23 proportionate holdings of crypto will be established.  When

24 customers can actually receive that may depend on regulatory

25 issues in the states where those customers live so that

1  customers were Binance has authority to make the

2  distributions may receive it earlier.  The other customers

3  may receive it if and only when the regulatory authorities

4  do what's necessary to allow Binance to do it in those

5  states, and if six months goes by that the crypto that they

6  got will just be liquidated, it will have to be at the price

7  that's prevailing at that time, but the amount of crypto

8  will have been determined at a prior time and on an equal

9  pro rata basis.  Is that right?

10     THE WITNESS:  That's correct, Your Honor.

11     MS. RYAN:  Okay. So I have just a couple of other

12 questions, and thank you, Your Honor.  That was an excellent

13 explanation of his testimony.  I do appreciate that.

14 BY MS. RYAN:

15 Q    So how much of the purchase price is allocated to

16 Binance's ability to hold the nonconsenting jurisdictions'

17 coins for six months?

18 A    I can't -- I don't know the answer to that.

19 Q    Okay. Did Voyager and Binance ever consider through a

20 plan allowing the unconsenting jurisdictions' customers to

21 have a withdrawal only account at Binance so that their coin

22 can be transferred at the same time as everyone else's and

23 all they would be able to do is withdraw?

24 A    The nature of the discussions that we had related to

25 the proposed transaction based on the APA.  They sought for

1  the six month period.  From our perspective, we viewed that

2  as the highest and best value from the state perspective.

3  We do also understand that, you know, state regulators on a

4  state-by-state basis could provide provisional licensing.  I

5  can't speak for Binance's appetite, though, with regards to

6  whether or not that type of a structure would make sense.

7  You know, I think from a business perspective though, only

8  having the ability to withdrawal is very different than

9  being able to establish a relationship with an underlying

10 account holder.

11 Q    So at this point, does Binance have a one-to-one basis

12 for the coin they're buying from Voyager?

13 A    I'm sorry, I may not understand the nature of the

14 question.  So the -- upon the coin being transferred to

15 Binance, it would be held in effectively a custodial

16 capacity and therefore it would be on a one-to-one basis.

17 We also understand that as it stands today, they hold coin

18 on a one-for-one basis.

19 Q    Okay, so that basis would continue for the coin that

20 they then purchase from Voyager?

21 A    Yes, and by purchase, I think, it's you know, the coin

22 would transfer and then would effectively be holding it

23 on behalf of the customer that has effectively received that

24 distribution.

25 Q    And then are you aware that Binance had a license

1  application pending with the Texas Department of Banking for

2  a year that it abandoned due to the inability to submit

3  financial documents to the Department of Banking?

4  A    I'm aware that Binance has had discussions with the

5  Texas state regulators.  I can't speak to the specifics

6  though of discussions that they've had as I wasn't a party

7  to those.

8      MS. RYAN:  Well, I think those are all the

9  questions I have for now.  Thank you for your time.

10     THE COURT:  Okay.  And did the attorney for the

11 Vermont objectors have questions?

12     MS. ROOD:  Thank you, Your Honor.  Jennifer Rood

13 for the Vermont Department of Financial Regulation.  I just

14 had one question that follows up on the Court's question

15 about wallets and also Ms. Ryan's question.

16     CROSS EXAMINATION OF BRIAN TICHENOR

17 BY MS. ROOD:

18 Q    Ms. Ryan asked you whether you and -- Voyager and

19 Binance have discussed having withdrawal only.  Well, I have

20 a related question.  I mean, I recognize that to migrate

21 customers, wallets have to be set up, but is there any

22 reason other than Binance's desires, sort of marketing

23 desires, why withdrawal only wallets could not be set up so

24 that the account holders in unsupported jurisdictions could

25 be treated approximately equally with those in the other

A-480

1    jurisdictions?

2    A    I can't speak to the nature of the impact that that

3    might have on their own infrastructure.  I just don't know

4    the answer to that.

5         MS. ROOD:  All right.  That's all I had.  Thank

6    you.

7         THE COURT:  Can I just ask the attorney who just

8    asked that question, under Vermont and the other -- any of

9    the unsupported states here, under your rules, is it your

10   position that Binance could set up accounts for these

11   customers right away from which they could either leave

12   their crypto with Binance or withdraw it or -- I understood

13   that the situation was that Binance wouldn't be allowed to

14   do that.  Am I wrong about that?

15        MS. RYAN:  Your Honor --

16        MS. ROOD:  -- Vermont -- sorry.

17        MS. RYAN:  Sorry, Ms. Rood.  This is Abby Ryan

18   from the Texas Attorney General's Office on behalf of the

19   State Securities Board and the Department of Banking.

20   Through a plan approved by Your Honor and customers from

21   Texas and nonconsenting jurisdictions having just a

22   withdrawal account, that is something we would consider and

23   be happy to discuss with Binance and the Debtors, Your

24   Honor.

25        MS. ROOD:  If I could interject, Jennifer Rood

1    from Vermont.  From -- under Vermont law, and I can't speak

2    for every unsupported jurisdiction, but for Vermont, we do

3    not think a money transmitter license is required for either

4    Voyager or Binance to make distributions directly to

5    creditors under a Court approved plan.  What they cannot do

6    is allow those customers then to carry on with Binance, you

7    know, into the future without having proper licensure.  But

8    withdrawal only wallet or some other form of direct

9    distribution would not, in our view, violate Vermont money

10   transmitter law.  And again, I can't speak for other

11   jurisdictions, but I have to think that there's a path here

12   that we could get to that would make some of us less

13   unhappy.

14        MS. CORDRY:  And Your Honor, this is Karen

15   Corddry, if I might just throw in one sentence here.

16        THE COURT:  Yeah.

17        MS. CORDRY:  Okay --

18        THE COURT:  Go ahead.

19        MS. CORDRY:  This particular point has been raised

20   with Debtor and Binance and we have made clear we would like

21   to discuss these matters.  We suggested an adjournment of

22   the hearing.  That wasn't agreed to, but we would think that

23   perhaps holding the hearing open for a short period of time

24   might allow this particular point to be discussed.  I mean,

25   this only came up after we got these documents, you know,

1    late Sunday night and there was a fairly substantial change

2    in the approach being taken.  So we have not had time before

3    this to discuss this, but I think it is -- I think there is

4    a way to hopefully get this issue perhaps resolved if we had

5    some time.  And I'm not talking weeks.  I'm just talking

6    days to actually work through this.

7         MS. OKIKE:  Your Honor, this is Christine Okike

8    from Kirkland and Ellis on behalf of the Debtors.  From our

9    perspective, we don't think we're actually seeking your

10   approval of this provision today, and we're willing to

11   continue to work with the unsupported states in the lead-up

12   to confirmation to hopefully come to a consensual

13   resolution.  But we're prepared to move forward with the

14   relief that we're seeking today, you know, without having

15   come to some sort of an agreement.

16        THE COURT:  All right.  Are there any more

17   questions for the witness?

18        MAN 2:  --Your Honor, will --

19        MS. RYAN:  -- Ryan for --

20        MAN 2:  -- creditor --

21        MS. RYAN:  I have -- I apologize.  This is Mrs.

22   Ryan.  I had one final question for the witness, if that's

23   okay.

24        THE COURT:  Okay.

25        RECROSS EXAMINATION OF BRIAN TICHENOR

1    BY MS. RYAN:

2    Q    So at a high level, Binance is basically purchasing a

3    customer list.  Will Binance receive any of the personally

4    identifiable information of the nonconsenting jurisdictions'

5    customers before it's determined whether they can get

6    licensed in the states or not?

7    A    Yes, that's my understanding.  All the personal

8    identifiable information associated with the entire customer

9    base would transfer at closing of the transaction.

10   Q    So what's the point in holding their coin for six

11   months while they attempt to get licensed, when they already

12   have the information -- they being Binance -- and once

13   licensed, they have the information to reach out and try to

14   get their business?

15   A    My understanding is that, you know, from a business

16   perspective, it's very different establishing a relationship

17   with a customer directly where money would be on their

18   platform, it would require the customer to log into the

19   platform.  They would get the experience associated with --

20        MAN 3:  Baby.  Baby.

21        THE COURT:  Somebody needs to mute their phone.

22   Please, if you're not actively questioning or speaking, mute

23   your phone.

24   BY MS. RYAN:

25   A    So to continue, Your Honor, the nature of the

A-481

Page 62

1  engagement with the customer in that instance would be very
2  different relative to an inbound marketing campaign, for
3  example, requiring that customer to log in, engage,
4  understand the experience, trade, et cetera is very
5  different engagement with an underlying customer relative to
6  a marketing distribution, for example.
7       And so we do often see this in fintech organizations
8  where for example, there's a concept of CAC which relates to
9  the cost of acquiring a customer and actually having them on
10 the platform itself, which is very different than, for
11 example, buying a distribution list with a group of emails
12 to try and market to those customers and actually have them
13 go onto the platform itself.  It's a very different customer
14 experience in that regard.
15 Q   So if Binance were to set up withdrawal accounts only
16 for the nonconsenting jurisdictions, if they were able to
17 get licensed at a later date, those accounts would still
18 exist presumably, right?
19 A   Presumably, I think, and I can't speak for Binance
20 specifically on their own view.  I would characterize that
21 though, as probably being a different relationship to the
22 extent that you were to log in and were solely directed to
23 being able to withdraw funds relative to having a more broad
24 and direct engagement experience, potentially (audio drops)
25 platform post-closing, knowing that you are able to do more

Page 63

1  than just withdraw your crypto.  So in that instance, you
2  could see a situation where customers in an unsupported
3  jurisdiction, for example, would log in, withdraw their
4  crypto immediately, and then would even upon that
5  jurisdiction becoming a supported state, would be less
6  likely to engage with the platform even to the extent they
7  were marketed to on an after the fact basis, by virtue of
8  the fact that all they did was withdraw at the onset.
9  Q   And just one last question, and I truly mean it this
10 time.  In the due diligence that was done with Binance and
11 the regulatory issues, did Binance present you with the
12 publicly available letter from the Texas Department of
13 Banking regarding the abandonment of their year-long
14 application for a license?
15 A   I did not review that document.
16      MS. RYAN:  Thank you.  I have no further
17 questions.
18      THE COURT:  Okay.  Anybody else --
19      MAN 2:  Your Honor, will creditors have a chance
20 to ask a question or speak?
21      THE COURT:  Have you have you asked for a speaking
22 line today?
23      MAN 2:  Yes, sir.
24      THE COURT:  Okay.  If you have a question for the
25 witness, you may ask --

Page 64

1       MAN 2:  Thank you.
2            CROSS EXAMINATION BRIAN TICHENOR
3  BY MAN 2:
4  Q   So what I heard earlier from the witness is the reason
5  why Voyager can't distribute the coins back to the creditors
6  directly is it's too complicated.  I mean, obviously they
7  don't have Court approval to do so, but if that was so
8  granted, you know, just days before the accounts were shut
9  down and locked millions of people were withdrawing.  I
10 mean, that's one of the reasons why they shut down and
11 locked the accounts.
12      All the KYC has already been documented it's still
13 being retained.  It should just be a quick toggle after the
14 Court allows it to be able to take that pathway.  And the
15 reason why I'm asking is because I feel all of the financial
16 and the risk management of this action of transferring all
17 of us as customers over to Binance is all falling on
18 creditor's shoulders.  Binance parent company, you know,
19 it's having challenges both at the national and --
20      THE COURT:  Let me --
21      MAN 2:  -- state level.
22      THE COURT:  I'm going to -- let me interrupt you.
23 Let me interrupt you.
24      MAN 2:  Yes, sir.
25      THE COURT:  I need you to ask questions of the

Page 65

1  witness.  If there's an objection you wish to make later, I
2  can hear the objection, but right now we're taking evidence
3  so -- rather than arguments.  So if you have a question of
4  the witness, please pose it.
5       MAN 2:  Yes sir.  Thank you for clarifying format
6  to me.
7  BY MAN 2:
8  Q   So the question is, I'm confused where the complexity
9  is for allowing Voyager instead of handing us off to an
10 entity that none of us have chosen to associate ourselves
11 with, where is the complexity with reinitiating the accounts
12 and utilizing the KYC that Voyager has already secured over
13 many years to allow us to withdrawal the crypto, whatever is
14 remaining of it to our own personal benefit.
15 A   Yes, and appreciate the nature of the question.  So I
16 think there is a distinction between the references relating
17 to the ability to withdraw crypto, for example, relating to
18 unsupported states in connection with a Binance.US
19 transaction relative to what's being referred to in the plan
20 as a toggle plan.
21      And so as contemplated in the plan itself, to the
22 extent that the Debtor were to, for example, exercise a
23 fiduciary out to move towards the toggle transaction, in
24 that instance, the Voyager platform would in fact actually
25 be reopened for a period of approximately one month, which

Page 66

1  would then allow customers to be able to withdraw their
2  cryptocurrency.  One nuance that we would mention in
3  connection with that, though, is that there are
4  cryptocurrencies that for example are unable to withdrawn
5  outright from the Voyager platform and have never been able
6  to be withdrawn from the Voyager platform.
7      That represents around 20 percent of the underlying
8  cryptocurrency portfolio, and there has never been a
9  situation where Voyager has had the operational ability to
10  allow those customers to be able to withdraw those tokens in
11  kind.
12      One of the advantages that we do see in the Binance.US
13  transaction in addition to the purchase price itself is the
14  fact that their operations allow for a withdrawal of 100
15  percent of the tokens on the Voyager platform, and so while
16  Voyager itself in a toggle transaction would actually need
17  to liquidate those tokens and convert them into cash at
18  likely depressed market prices, in a scenario where they did
19  a transaction with Binance, those customers would in fact
20  actually be able to withdraw their tokens in kind for those
21  unsupported tokens.
22  Q    So you're stating even for the tokens that Binance does
23  not currently support, they would be transferred from
24  Voyager over to Binance and we as creditors will be able to
25  withdraw them from Binance?

Page 67

1  A    That's correct.  So my understanding is that Binance's
2  wallet infrastructure and KYC procedures would allow for an
3  ability to withdraw those tokens on an in-kind basis.
4  Voyager itself does not have the ability from either a KML,
5  AYC, or operational perspective to facilitate the withdrawal
6  on an in-kind basis of those cryptocurrencies.  And this was
7  an element that we did analyze in connection with an array
8  of different types of self-liquidating proposals.
9  Q    Because that goes against my direct experience on
10  Binance.  If a token is not supported by them, so I'm -- and
11  forgive me, I was unable to read all the hundreds of pages
12  of documentation.  Is this written verbatim that we will
13  have that right as creditors in the APA or is this just
14  assumptions being made at this juncture?
15  A    My understanding is that it's disclosed in the
16  disclosure statement, but I would have to go back through
17  and verify.  This is our understanding based on discussions
18  that we've had with Binance around the nature of their
19  infrastructure and agreements that they've made in
20  connection with the transaction.
21  Q    So it's not in writing, it's just your understanding,
22  if I'm hearing correctly?
23  A    I would have to review the APA again, I apologize, to
24  see the specific language relating to that specific aspect.
25  Q    Would it be best then that we wait until that is

Page 68

1  confirmed?
2      THE COURT:  We're just questioning --
3      MS. OKIKE:  Your Honor?
4      THE COURT:  We're just questioning the witness
5  now.  We can have argument later.  Okay?
6      MAN 2:  Yes.  Understand.  Thank you, sir.
7      THE COURT:  Any other questions for the witness?
8  All right, thank you, Mr. Tichenor.  You're excused.  We're
9  going to take a five-minute break before we proceed and --
10  but it'll only be five minutes, so don't go far.
11      (Recess)
12      THE COURT:  All right, are we ready to resume?
13      MS. OKIKE:  Yes, Your Honor.  Your Honor, for the
14  record, Christine Okike of Kirkland and Ellis on behalf of
15  the Debtors. Your Honor, can you hear me okay?
16      THE COURT:  I can, yes.
17      MS. OKIKE:  Your Honor, in the days leading up to
18  the FTX collapse, the Debtors realized that FTX would not be
19  able to fulfill their obligations and commitments to the
20  Debtors' account holders and OpCo general unsecured
21  creditors under the asset purchase agreement.  At that time,
22  we immediately reengaged with parties that had participated
23  in the prior sales process and received outreach from
24  several additional parties who expressed interest in the
25  Debtors' assets.

Page 69

1      We spent about a month negotiating with those
2  parties in an effort to improve terms and ultimately
3  determined that the bid put forth by BAM Trading Services,
4  Inc. or Binance.US represented the best path forward to
5  maximize value.  Your Honor, the Binance.US transaction is
6  structurally similar to the FTX transaction but it also
7  provides the Debtors with important protections that were
8  not present in the FTX transaction and which are informed by
9  our unfortunate experience with FTX.
10      Your Honor, the Debtors' valued the Binance.US
11  transaction at approximately $1.022 billion which is
12  comprised of $1.002 billion of cryptocurrency on the
13  Debtors' platform as of December 18th plus an additional $20
14  million of upfront consideration paid by Binance.US.  There
15  appears to be a misconception by some of the objectors that
16  Binance.US would be required to pay the Debtors that amount
17  to consummate the transaction and questions about whether
18  Binance.US has the financial wherewithal to do so.
19      To clarify, Binance.US will only be obligated to
20  pay up to $35 million in upfront consideration to the
21  Debtors.  Although they are acquiring substantially all of
22  the cryptocurrency on the Debtors' platform, they are
23  essentially serving as a distribution agent of that
24  cryptocurrency to account holders in accordance with the
25  plan.  Your Honor, it's also important to note that

A-483

Page 70

1  recoveries are largely dependent on the value of the
2  Debtors' cryptocurrency which will continue to fluctuate
3  until the confirmation hearing.
4        And just by way of example, the $1.022 billion is
5  tied to cryptocurrency prices as of December 18th, which we
6  estimated as providing a 51 percent recovery to account
7  holders.  But since that time prices have risen and as of
8  yesterday, account holders would receive a 57 percent
9  recovery.  The Debtors believe that the Binance.US
10 transaction provides the most valuable -- the most value
11 currently available for the Debtors' assets and ultimately
12 their stakeholders, the fastest route to distributing that
13 value to customers and the least degree of risk to the
14 Debtors' stakeholders compared to other available
15 alternatives.
16        It provides the most tax efficient path forward,
17 as Binance.US will enable users to access 100 percent of the
18 cryptocurrency coins on the Debtors' platform.  It includes
19 reimbursement by Binance.US of up to $15 million of the
20 Debtors' expenses in certain circumstances and provides a
21 $10 million reverse termination fee payable to the Debtors
22 by Binance.US to compensate the Debtors' estates in the
23 event that Binance.US cannot consummate the transaction
24 under certain circumstances.
25        The Binance.US transaction also provides for

Page 71

1  certain other protections which are designed to minimize
2  risk.  These protections include, first, all of the Debtors,
3  cryptocurrency will not transfer to Binance.US at closing.
4  Rather, cryptocurrency and cash will be transferred to
5  Binance.US following closing on a weekly basis as account
6  holders and OpCo general unsecured creditors complete
7  Binance's onboarding requirements which includes satisfying
8  their know your customer requirements and accepting the
9  Binance.US terms and conditions.
10        Second, Binance.US has to make any cryptocurrency
11 and cash transferred to it by the Debtors available to those
12 account holders and holders of OpCo general unsecured claims
13 that have completed the onboarding requirements within five
14 business days and to use commercially reasonable efforts to
15 do it in 48 hours following receipt.
16        Third, account holders and holders of OpCo general
17 unsecured claims will retain all right, title, and interest
18 in the distributions made to them on the Binance.US
19 platform.
20        Fourth, cryptocurrency will be held by Binance.US
21 solely in a custodial capacity in trust for the benefit of
22 account holders.
23        Fifth, cash transferred to Binance.US for further
24 distribution to account holders or OpCo general unsecured
25 creditors will at all times until transferred to such

Page 72

1  creditor held solely in a third-party bank account of an
2  FDIC insured financial institution solely for the benefit of
3  such customers.
4        And six -- and I think this one is very important
5  -- Binance.US will not pledge, repledge, hypothecate,
6  rehypothecate, invest, sell, lend, stake, transfer, or use
7  any of the cryptocurrency to be distributed to account
8  holders for any period of time and without retaining a like
9  amount of cryptocurrency except as may otherwise be directed
10 by the creditor themselves.
11        The Debtors believe that these protections
12 significantly reduce the risks associated with the
13 transaction and the transfer of cryptocurrency to Binance.US
14 to facilitate distributions to creditors.  Your Honor, while
15 the Debtors believe that the Binance.US transaction is the
16 most value maximizing option available to the Debtors today,
17 we recognize that the cryptocurrency industry is
18 experiencing an extremely volatile period and circumstances
19 may change.
20        And for that reason, the Debtors negotiated a
21 fiduciary out consistent with the fiduciary out Your Honor
22 approved in the FTX APA which allows the Debtors to toggle
23 either to a higher and better third party bid should one
24 emerge or to a transaction where the Debtors would
25 distribute cryptocurrency and cash to creditors on their own

Page 73

1  or what we have been referring to as the toggle transaction,
2  if the Debtors determine in their business judgment between
3  now and closing that the Binance.US transaction is no longer
4  the highest or otherwise best option or the transaction is
5  not consummated by the outside date of April 18th which may
6  be extended to May 18th in certain circumstances.
7        As described in the APA motion, the Binance.US APA
8  Provides for the sale to Binance.US to be consummated
9  through a Chapter 11 plan and so through the APA motion,
10 Your Honor, the Debtors are not seeking approval of the
11 Binance.US transaction today.  Rather, we're seeking
12 authority for Voyager Digital LLC to enter into the asset
13 purchase agreement with Binance.US so that we can lock in
14 the highest and best (audio drops) for the debtor's assets
15 determined after an extensive prepetition and post-petition
16 marketing process.
17        This will allow the Debtors to receive the
18 protections of up to a $15 million expense reimbursement and
19 a $10 million reverse termination fee while progressing to
20 the plan confirmation stage.  Entry into the APA will also
21 entitle Binance.US to up to a $5 million expense
22 reimbursement in certain limited circumstances, specifically
23 if the seller breaches the APA, the Chapter 11 cases are
24 dismissed or converted to Chapter 7, or if the automatic
25 stay is lifted with respect to any acquired assets, the

A-484

Page 74

1  seller breaches the no-shop, or the seller exercises its
2  fiduciary out.
3       Notably, the seller's exercise of its fiduciary
4  out does not trigger the expense reimbursement if the seller
5  determines to terminate the transaction to pursue the toggle
6  transaction as a result of an effect with respect to
7  Binance.US' business, financial condition, operations,
8  assets, management, employees, compliance, or liabilities
9  that would reasonably be expected to prevent or materially
10 impair or materially delay the ability of Binance.US to
11 consummate the transaction or materially and adversely
12 affect the customers, creditors, or acquired cryptocurrency
13 on the platform and such termination is not caused by the
14 Debtors' decision to pursue a higher or better offer from a
15 third party or because the estimated proceeds of the toggle
16 transaction are greater than the consideration under the
17 Binance.US transaction.
18      Your Honor, the Debtors believe that the expense
19 reimbursement is fair and reasonable under the
20 circumstances.  Given that upon entry into the APA,
21 Binance.US will be obligated to remain committed through the
22 Debtors' plan confirmation process during which the Debtors
23 may exercise their fiduciary out to pursue a higher and
24 better offer.
25      Importantly, Your Honor, holders of account holder

Page 75

1  claims and general unsecured claims are entitled to vote on
2  the Binance.US transaction and all parties in interest will
3  have the opportunity to object to the transaction on any
4  valid grounds at the confirmation hearing.  Your Honor, the
5  Debtors are also seeking authority to rebalance their
6  cryptocurrency portfolio which will be necessary in either
7  scenario either the Binance.US transaction or the toggle
8  transaction.
9       The Debtors' loan to 3AC resulted in a hole in the
10 Debtors' cryptocurrency portfolio and a deficiency of
11 certain cryptocurrency coins, particularly Bitcoin in USBC.
12 In addition, due to the dollarization of account holder
13 claims as of the petition date and the continued fluctuation
14 in cryptocurrency prices since then, there is an imbalance
15 in the Debtors' cryptocurrency portfolio.
16      As a result, to effectuate pro rata in-kind
17 distributions of the cryptocurrency to account holders, the
18 Debtors must rebalance their cryptocurrency portfolio
19 through the purchase and sale of cryptocurrency in a series
20 of transactions or what we've been referring to as the
21 rebalancing exercise.
22      The rebalancing exercise will be conducted to
23 ensure that the aggregate value in U.S. dollars for each
24 type of cryptocurrency coin held by the Debtors as a
25 percentage of the aggregate value of such type of

Page 76

1  cryptocurrency coin that was on deposit with the Debtors as
2  of the petition date is consistent across the cryptocurrency
3  portfolio so that we can process and initiate in-kind
4  distributions.
5       And to effectuate the rebalancing exercise prior
6  to the effective date, the Debtors would plan to enter into
7  a series of transactions that would result in the buying and
8  selling of cryptocurrency coins until the balancing ratio is
9  consistent for each type of crypto coin -- cryptocurrency
10 coin held by the Debtors.
11      Your Honor, the business judgment rule governs the
12 Debtors' entry into the Binance.US APA.  The Debtors believe
13 that they have satisfied the standard.  Your Honor, we
14 received eight objections or reservation of rights to the
15 APA motion filed by the SEC, New Jersey, Vermont, New York,
16 Texas, CFIUS, the U.S. Trustee, and Oracle.  We have
17 resolved for purposes of today the objections of Oracle, the
18 SEC, and New Jersey.
19      Notably, Your Honor, your entry into the APA
20 motion is supported by the Unsecured Creditors Committee.
21 Your Honor, at its core, the objectors question the Debtors'
22 exercise of their business judgment in determining to enter
23 into the Binance.US APA.  First, they question whether the
24 Binance.US transaction is feasible.  The Debtors submit that
25 it is.  We have performed due diligence on Binance.US and

Page 77

1  Binance.US' financials show that it has ample cash on hand
2  to pay the Debtors up to $35 million in cash, the maximum
3  amount that may be due under the Binance.US APA.
4       In addition, the risk of a run on the bank which
5  has befallen some of the other companies in the industry is
6  minimized by Binance.US' business model.  Our understanding
7  is that Binance.US maintains 100 percent reserves for all of
8  its customers' digital assets.  That means that if a
9  customer has deposited one Bitcoin with Binance.US,
10 Binance.US holds one Bitcoin on account of such customer.
11      And importantly, Your Honor, our understanding is
12 that Binance.US does not engage in any lending.  Based on
13 what we know, even if all of Binance.US' customers withdrew
14 all of their assets, Binance.US would still have the
15 financial wherewithal to consummate the proposed
16 transaction.  Further, Your Honor, any issues relating to
17 Binance.US' ability to consummate the sale transaction are
18 really not right for the relief that we're seeing today and
19 are preserved for confirmation.
20      Your Honor, the objectors question the due
21 diligence the Debtors performed on Binance.US.  Your Honor,
22 as Mr. Tichenor has described in detail, the Debtors have
23 conducted due diligence on Binance.US which included
24 reviewing documentation and discussions with senior
25 management relating to audited financial statements, interim

1  unaudited financial statements, available liquidity, related

2  party services agreements, wallet infrastructure, AML/KYC

3  procedures, money transmitter license statuses, and business

4  plans submitted to certain state regulators.

5       Third, Your Honor, the objectors expressed concern

6  over Binance.US' custody and security protocols.

7  Binance.US' security protocols have achieved various third-

8  party expert certifications, attesting to their compliance

9  with industry standards.  In terms of custody, Your Honor,

10  BAM Trading Services, Inc., a Delaware corporation and the

11  purchaser under the Binance.US APA will custody

12  cryptocurrency distributed to account holders in connection

13  with the transaction pursuant to its standard wallet

14  infrastructure which is stored on servers at Amazon Web

15  Services.

16       THE COURT:  Could you repeat what you just --

17  could you just repeat what you just said as to who would --

18       MS. OKIKE:  Yes, Your Honor.  BAM Trading

19  Services, Inc., which is a Delaware corporation -- they are

20  also the purchaser under the Binance.US APA -- they will be

21  the entity that is custodying cryptocurrency distributed to

22  account holders in connection with the transaction and

23  pursuant to their standard wallet infrastructure which is

24  stored at Amazon Web Services.

25       THE COURT:  Okay.

1       MS. OKIKE:  Your Honor, as noted, cryptocurrency

2  will be transferred from the Debtors to Binance.US only as

3  and when relevant creditors on board onto the Binance.US

4  platform and upon such transfer, Binance.US will be

5  obligated to make such cryptocurrency available to the

6  relevant creditors within five business days of receipt.  We

7  believe this structure of weekly transfers as customers sign

8  up will allow the Debtors to quickly become aware and

9  rectify any issues that may arise in connection with

10  consummation of the transaction.

11       Your Honor, the U.S. Trustee also alleges that the

12  Binance.US APA does not protect against the unauthorized

13  transfer of customer information prior to closing.  The

14  Binance APA provides an option for customers to opt in to

15  the transfer of their data preclosing so that if the

16  transaction is approved, they will be able to access their

17  distributions more quickly.  Outside of a customer

18  voluntarily agreeing to provide their data to Binance.US,

19  there will be no transfer of account holder data preclosing.

20       Rather, for any customers that do not opt into the

21  transfer of their data preclosing such data will be

22  delivered to Binance.US on the closing date.  The transfer

23  of data to a buyer in connection with the restructuring is

24  specifically contemplated by Voyager's privacy policy.

25  Specifically, Section 6 of Voyager's privacy policy provides

A-486

1  "Voyager may share your information with a buyer or other

2  successor in the event of a merger, divestiture,

3  restructuring, reorganization, dissolution, or other sale or

4  transfer of some or all of Voyager's assets, whether as a

5  going concern or as part of a bankruptcy, liquidation, or

6  similar proceeding, in which personal information held by

7  Voyager about you and your Voyager account is among the

8  assets transferred."

9       Your Honor, we disagree with the U.S. Trustee that

10  a consumer privacy ombudsman is required in these cases,

11  given that the Debtors fall within the exception in Section

12  363(b)(1) regarding a transfer of personally identifiable

13  information in connection with the sale that is consistent

14  with their existing privacy policy.

15       Finally, Your Honor, Vermont, New York, Texas, and

16  Hawai'i are what we refer to as the unsupported

17  jurisdictions, allege that the Binance.US APA unfairly

18  treats account holders located in their jurisdictions.  Your

19  Honor, it bears repeating that we are not seeking approval

20  of the Binance.US transaction today and we view the

21  objections of the unsupported jurisdictions regarding the

22  treatment of customers in their states as premature and more

23  appropriately considered at the confirmation hearing.  That

24  being said, I'd like to briefly respond to the objections.

25       The objections really center on the potential

1  form, cash versus cryptocurrency, and delay, six months

2  versus three months, of recoveries to account holders in

3  unsupported jurisdictions.  Your Honor, the Binance.US APA

4  and the plan provides for the opportunity for all account

5  holders to receive distributions in kind, and it's well

6  established that all claimants are required to receive

7  equality of treatment under Section 1123(a)(4), meaning that

8  all class members receive equal value.

9       But multiple Courts have held that this does not

10  mean that all claimants are required to receive equality of

11  result.  Section 1123(a)(4) is satisfied if claimants in the

12  same class have the same opportunity to recover.  This means

13  that if a plan subject to all the members of the class to

14  the same means of claim determination, it's sufficient to

15  satisfy the requirements of Section 1123(a)(4) and we

16  believe the plan does that.

17       All account holders are subject to the same

18  process for claims satisfaction, but that process does not

19  have to yield the same results for each class member and the

20  fact that an account holder is located in a state where

21  Binance.US does not have regulatory approvals to make a

22  distribution in cryptocurrency may dictate a different

23  result.  We view that similar to cases where you have CLOs

24  who can't receive equity and so they get the equivalent

25  amount in cash.

1    Your Honor, the Debtors' focus from the start of
2  these cases has been to maximize recoveries for the creditor
3  body as a whole and we believe that entering into the
4  Binance.US APA will allow us to do that.  One of the
5  benefits of the Binance.US transaction -- and this is in
6  response to, I don't remember the gentleman's name, but the
7  gentleman who was questioning Mr. Tichenor -- is that
8  Binance.US supports all of the tokens listed on the Debtors'
9  platform, with the exception of VGX, which they have agreed
10  to submit for the process of listing, and Binance.US
11  would be able to make in-kind distributions to
12  customers of the same type of cryptocurrency that they had
13  on the Voyager platform as of the petition date.
14    If Binance.US is not able to make distributions in
15  kind, it will be because the unsupported states themselves
16  have not allowed it to happen, not because the Debtors are
17  seeking to discriminate against customers in those states.
18    Your Honor, in terms of the potential delay in
19  distribution, the business deal that the Debtors struck with
20  Binance.US gives them a six-month window to obtain the
21  necessary regulatory approvals to make distributions in kind
22  to all customers on the Debtors' platform, and this is three
23  months longer than the window for customers in supported
24  jurisdictions who, if they don't sign up, will also be
25  converted to cash at that point in time.

1    At its core, Binance.US is acquiring the Debtors'
2  customer relationships and the opportunity to try to keep
3  customers on their platform.  They negotiated for the right
4  to try to get approval from the four states where they do
5  not have existing authorizations today to be able to make
6  distributions in kind to those customers.
7    And it's important to note that we believe the
8  customers as a whole would like to receive in-kind
9  distributions, particularly given the tax consequences and
10  that's what we're trying to facilitate through the
11  Binance.US APA.  From the Debtors' perspective, all account
12  holders are treated the same.  They will receive the same
13  pro rata recovery, although some crypto -- some recoveries
14  maybe in cryptocurrency or cash or in slightly different
15  timelines to ensure compliance with regulatory restrictions.
16    The Debtors would like nothing more than for
17  Binance.US to make in-kind distributions to customers in the
18  unsupported jurisdictions and we have had productive
19  conversations with the unsupported jurisdictions to date and
20  we're committed to continuing to work with them in
21  Binance.US and lead up to the confirmation hearing to come
22  up with potential solutions.
23    But again, Your Honor, we don't believe this is an
24  issue ripe for today, given that we're not seeking approval
25  of the Binance.US transaction and this issue may be moot if

1  it's resolved before the confirmation hearing.
2    Finally, Your Honor, with respect to CFIUS, the
3  APA motion does not seek to limit CFIUS' right to review the
4  Binance.US transaction, and as Mr. Sussberg noted, is
5  interested in this transaction and we are taking this issue
6  head on seeking to accelerate CFIUS' review by making a
7  voluntary CFIUS filing. If CFIUS determines in its review
8  process that the Binance transaction should not be closed,
9  we have built in the protections to be able to pivot to the
10  toggle transaction.
11    And so Your Honor, we believe that we've satisfied
12  the standard for the relief that we're seeking today.  I'm
13  happy to answer any questions.
14    THE COURT:  I do have questions and comments that
15  I'd like to go through before we hear from any of the other
16  parties, because they may resolve some of those other
17  parties' issues.
18    I found it very helpful to hear the answers to
19  some of the questions about how the arrangement will work,
20  but I guess a couple of preliminary questions.  I understand
21  that the Delaware Court has approved the stipulation that --
22  about the termination of the FTX transaction and we have
23  entered our own order approving that stipulation.  Were
24  there any objections to that relief in Delaware?
25    MS. OKIKE:  No, Your Honor.  There were no

1  objections and the order was submitted under certification
2  of counsel after the objection deadline passed.
3    THE COURT:  And has it has it been entered now by
4  Delaware?
5    MS. OKIKE:  Yes, Your Honor.  It was entered last
6  night, I believe.
7    THE COURT:  Okay.  At the outset of the prior
8  hearing regarding FTX, we clarified just what was being
9  approved and what the practical effect was of other -- in
10  that case had been some confusion, but it seems pretty clear
11  here that transaction when -- although I'm being asked to
12  approve the entry into the agreement, the agreement itself
13  is contingent on plan confirmation so that in effect, what's
14  going into effect through my agreement is just the no-shop
15  and fiduciary out provisions and the potential expense
16  reimbursements; is that right?
17    MS. OKIKE:  Yes, that's correct, Your Honor.
18    THE COURT:  Okay.  As to the nature of the
19  relationship here, it's a little confusing to me because
20  there are parts of the agreement that say that Binance will
21  acquire the coins themselves and there's other parts that
22  say that title will remain with Voyager until certain
23  distributions are made.  Section 6.12(e) says that coins
24  will be held in trust or custody through and including the
25  time as they're returned or distributed to the seller or to

Page 86

1    the user/eligible creditor, and similar provisions as to
2    delayed acquired coins.  But I wonder if those provisions
3    are really quite as clear or as strong as they should be.
4         Number one, I don't know why the agreement says
5    that Binance is acquiring the coins if the rest of the
6    agreement says that they're acquiring only nominal title and
7    holding it in trust or custody.  Is there a reason why it's
8    -- why the other parts of the agreement are phrased as
9    Binance itself is buying the coins?
10        MS. OKIKE:  Your Honor, I think it's structured
11   this way because the coins are going to transfer to them.  I
12   agree with you, that title will remain with Voyager,
13   obviously, until the transfer and then pass to the customer
14   at that point in time.
15        I think we do need to kind of -- the agreement
16   does need to contemplate that transfer, which is I think
17   what we're trying to do when we talk about, you know,
18   acquired assets, that they're -- that this is something
19   that's transferring over to them in connection with the
20   agreement, but if there's certain provisions that we need to
21   clarify to make clear that they're not actually acquiring
22   title to the coins, we can of course make those adjustment.
23        THE COURT:  Might be able to just put it in the
24   order that --
25        MS. OKIKE:  Yes.

Page 87

1         THE COURT:  (audio drops) clarification --
2         MS. OKIKE:  That works.
3         THE COURT:  -- of the agreement.  And also, the
4    order says that title remains with the seller.  That's
5    literally not correct, is it?  Isn't title here whatever is
6    reflected on the key and won't that be with Binance?  Don't
7    you really mean to say that beneficial title or beneficial
8    ownership will remain, and that only nominal title will be
9    with Binance?
10        MS. OKIKE:  I'm sorry, Your Honor.  Which
11   provision exactly are you referring to?
12        THE COURT:  Well, there are various points in the
13   agreement where it says the title remains with the seller,
14   right?  Including 6.12(e).  But that's not -- literally not
15   right, is it?  I mean, once they're transferred to Binance,
16   and the only way that happens is through the block chain,
17   right, isn't title then with Binance?  Or don't you mean to
18   say that Binance has only nominal title?
19        MS. OKIKE:  Yes.
20        THE COURT:  And that the beneficial ownership will
21   be with the seller or with the user once it's put in the
22   user's name or in the user's account?
23        MS. OKIKE:  Yes, Your Honor.  That's correct.  We
24   can address that language.
25        THE COURT:  And then, you know, just saying that

Page 88

1    this is a trust or a custody relationship, is that
2    sufficient?  There have been articles written about this,
3    and I know that in the Celsius case there were some disputes
4    over whether it was enough to say that there was a trust or
5    custody relationship that was contemplated, and whether, for
6    example, the trust assets had to be segregated from other
7    assets.  Is there something else we ought to be doing here,
8    for example, requiring that Binance establish a separate
9    wallet, or the cryptocurrency that is coming from Voyager
10   and is to be distributed to the Voyager customers, and that
11   it remain in that separate wallet until the appropriate
12   point of time at which the customer becomes a Binance
13   customer, at which point it can just go and be part of
14   whatever the normal Binance arrangement is?  Isn't that
15   necessary to kind of give effects to what is contemplated
16   here?
17        MS. OKIKE:  Your Honor, we've had discussions on
18   this point, and our understanding is kind of the
19   infrastructure that Binance has.  It's not really possible
20   to kind of create an infrastructure where there's going to
21   be (indiscernible) of what's transferring over to them.  And
22   that the costs of trying to do so are, you know, very
23   expensive such that, you know, the purchase price itself may
24   be reduced.  But you know, I think our view is that we
25   (indiscernible) --

Page 89

1         THE COURT:  I don't understand that.  Please
2    explain that to me.  What I was suggesting is that there be
3    a separate wallet for the cryptocurrency that's going to go
4    to the -- be distributed as part of the plan.  What -- why
5    is that so expensive just to establish a separate wallet?
6         MS. OKIKE:  Yeah.  My understanding, Your Honor,
7    and obviously Binance can speak to it as well, is that they
8    have an existing wallet infrastructure, right, that kind of
9    governs obviously the assets that they're holding for
10   customers on their platform.  And that to have, you know,
11   something segregated out of that infrastructure would be
12   basically require them to kind of create, you know, a whole
13   new different, you know, wallet infrastructure.
14        And so we had conversations about whether this was
15   a possibility, and my understanding is that, you know, you
16   would have to kind of develop, you know, new code and other
17   things to try to be able to effectuate where they're not
18   holding the assets that are transferred over them along with
19   other customer assets.
20        MR. GOLDBERG:  And Your Honor, this is Adam
21   Goldberg of Latham Watkins on behalf of Binance U.S.  If I
22   can add to that, I would just say that, you know, you've
23   raised a great question, Your Honor, which is something that
24   the Creditors committee focused on very closely.  And if
25   you're -- if you've seen the redline of the APA between the

A-488

Page 90

1 initial filing and now, that will reflect the changes that
2 we made in response to the committee raising this very
3 issue.
4 And we fully agree with Ms. Okike's
5 representations that it would be technically very
6 challenging and expensive and time-consuming to set up a
7 segregated wallet system.  And so rather than embark on a
8 process like that, we worked with the committee to resolve a
9 procedure under the APA such that the cryptocurrency is not
10 actually transferred to Binance U.S. under the APA until the
11 time that individual customers have agreed to the terms of
12 service and become eligible customers under the Binance U.S.
13 platform.
14 And the -- after the closing at that stage, the
15 cryptocurrency would then be transferred as customers join
16 the Binance U.S. platform on a weekly basis, and Binance
17 U.S. would be required to very swiftly make that available
18 to customers so that there is a very minimal amount of time
19 in which any cryptocurrency would be held in anything other
20 than a customer account subject to the terms of service that
21 are intended to provide clarity that that cryptocurrency is
22 owned by the customers.
23 And I think we heard the testimony today, Your
24 Honor, based on the Debtor's diligence that Binance U.S.
25 holds -- it holds one-to-one cryptocurrency reserves.  In

Page 91

1 other words, Binance U.S. has cryptocurrency on hand for 100
2 percent of customer deposits.
3 THE COURT:  And just to make sure everybody's on
4 the same page, does a customer of Voyager have to agree to
5 be a Binance customer in order to receive an in-kind
6 distribution?
7 MS. OKIKE:  Yes, Your Honor.
8 THE COURT:  So what you're saying is that the
9 customer has to make that determination, at which point it
10 will be subject to the normal Binance situation.  And that
11 in the absence of that, they'll just get a cash
12 distribution.
13 MS. OKIKE:  Correct, Your Honor.
14 THE COURT:  Who will make the cash distributions?
15 MS. OKIKE:  The cash distributions will be made by
16 Voyager.  Because we will only have that situation in which
17 a customer has not signed up.  At that point in time with
18 respect to customers in the supported jurisdictions, the
19 Debtors would allow Binance to basically serve as the
20 liquidation agent for that cryptocurrency.  So although we
21 would be holding it for customers that have not signed up
22 until that period of time, we would then execute a
23 transaction where Binance would liquidate the crypto
24 attributable to those customers for cash and send the cash
25 back to Voyager for distribution to customers.

Page 92

1 THE COURT:  And the committee is satisfied that
2 this arrangement without any further segregation is
3 sufficient?
4 MR. AZMAN:  Your Honor, it's Darren Azman from
5 McDermott Will and Emery for the Committee.  We have a few
6 comments I'd like to make and then I can address your
7 question.  We obviously took the long way to get here, not
8 by choice of course, but the committee fully supports the
9 Binance transaction and the plan.  Not only do we think the
10 transaction offers Creditors the best opportunity to
11 maximize recoveries through the distribution of assets that
12 are on hand right now, but probably more importantly the
13 ability to recover additional amounts on the back end
14 through litigation that will be pursued by a Creditor
15 controlled trust.
16 We view that feature as a cornerstone of the plan
17 because 50 cents is not enough.  Creditors deserve more.
18 And we'll have the ability to do that after the plan goes
19 effective.
20 With respect to the Binance transaction and your
21 questions, we certainly had our concerns and we heard
22 concerns from many Creditors.  Probably the biggest concern
23 we had was ensuring that we did not have an FTX repeat or
24 something that could've been far worse if Voyager's crypto
25 had been transferred to FTX prior to the bankruptcy filing,

Page 93

1 prior to FTX's bankruptcy filing.
2 The initial version of the proposed Binance
3 transaction called for Voyager to transfer all of their
4 crypto on day one of the closing.  The problem with that
5 structure, as you've heard now, is that customers would not
6 be able to access their crypto immediately.  For example, a
7 customer who maybe waited four weeks to enroll with Binance,
8 their crypto would've been sitting at Binance.  And moreover
9 in certain states, as you also know, Binance is not licensed
10 as we sit here today.  So in a worst case scenario, at
11 closing, Voyager would have transferred all of its crypto to
12 Binance, and then a few days later Binance could file for
13 bankruptcy leaving this estate with a billion dollar
14 unsecured claim.
15 So we asked Binance a number of ways to address
16 this.  And ultimately where we landed is this structure
17 where crypto is only transferred when it's ready to be made
18 available to a customer's account.  Binance listened to our
19 concerns, and they worked hard to address those concerns.
20 Ultimately they agreed to what is now in the APA.  It's a
21 weekly transfer of crypto.  And the outcome of this new
22 structure is that crypto will be made available to a
23 customer's account within days after Voyager transfers that
24 crypto to Binance.
25 At that time, the customer can trade that crypto,

A-489

1  sell it, withdraw it entirely if they want to.  Of course
2  customers will need to make their own decision about whether
3  they want to keep their crypto at Binance, but that is up to
4  each individual Creditor.  And, our concern was ensuring
5  the safety of crypto at all times before it's put into the
6  customer's account and they have control of it, and we have
7  accomplished exactly that I think with the revised APA.
8       You know, you asked whether Binance should hold
9  crypto in a segregated wallet.  I just told you a minute ago
10  that we had proposed several solutions to Binance, but we
11  ultimately learned that segregating the crypto in a
12  different wallet would be technically challenging and
13  expensive for Binance to accomplish within their ecosystem.
14  That is when we pivoted to the weekly transfer concept,
15  which again limits the period of time during which Binance
16  is holding crypto, and the customer does not have access to
17  it.
18       If the customer does not want to be on the Binance
19  platform, they can immediate withdraw their crypto.  Or if a
20  customer is really concerned and wants nothing to do with
21  Binance, they can wait the three-month period, and then they
22  will get cash from Voyager.  And we believe that this is
23  sufficient protection for Creditors.
24       THE COURT:  Thanks.  As long as you've mentioned
25  that, does the customer have to wait the three months, or

1  can the customer immediately elect to receive cash?
2       MR. AZMAN:  I'll let Ms. Okike correct me if I'm
3  wrong, but I do not believe that there's an election for a
4  customer to essentially terminate that three-month wait
5  time.  And that was -- look, there are a number of
6  provisions in the Binance APA that we would love to be more
7  favorable to Creditors, but at the end of the day they are
8  paying $20 million for the opportunity to acquire these
9  customers.  And I think that was an important point, an
10  economic consideration for them in the APA to have that
11  three-month waiting period.
12       MS. OKIKE:  That's correct, Your Honor.  There is
13  a three-month period for them to have the opportunity to get
14  customers to sign up for the platform.
15       THE COURT:  Okay.  All right.  Let me skip over.
16  That answers some of my questions.  I'll skip that one.
17       MR. GOLDBERG:  Your Honor, this is Adam Goldberg
18  of -- on behalf of Binance U.S. again.  Just on that
19  particular issue, a customer could open an account through
20  Binance and then liquidate their crypto immediately if they
21  wish to pursue that path.
22       THE COURT:  Right.
23       MR. AZMAN:  Your Honor, it's Darren Azman again.
24  I have some other comments regarding the objections from the
25  states, but if you want to skip this topic, then I can

1  address them at another time.
2       THE COURT:  Yeah.  I'll -- I'm going to come to
3  the different objections in course here.  I'm just looking
4  over all the comments I had about the custody arrangements
5  to see if there's any other questions that I wanted to ask.
6  Just give me a minute.  On the transfer of the customer
7  data, it does seem that under the agreement, while it won't
8  happen until closing, all data relating to both active and
9  inactive accounts of users or former users, as long as they
10  were in the United States, will be acquired by Binance U.S.
11  And it's all defined as acquired user data.
12       The U.S. Trustee had objected and asked for a
13  privacy ombudsman, but Voyager has pointed out that that's
14  only required if a sale does not comply with existing
15  privacy policies, and says that the Voyager privacy policy
16  provides for such transfers.  What is the U.S. Trustee's
17  current position in that regard?  Is somebody on the phone?
18       MR. MORRISSEY:  Your Honor, Richard Morrissey for
19  the U.S. Trustee.  I'm sorry.  I was actually timed out
20  there for a moment.  The U.S. still believes that a consumer
21  privacy ombudsman should be appointed in this case.  As far
22  as the privacy policy, we did receive a copy of the privacy
23  policy, and we did review, I think it was paragraph 6 of
24  that privacy policy, which indicated, Your Honor, that the
25  private information, the PII, could be shared in the event

1  of a sale or other transaction.
2       However, Your Honor, that privacy policy was
3  undated.  I do not know, Your Honor, and I don't know if the
4  Debtor knows, but I do not know if that privacy policy, the
5  one that I saw and the one that counsel referred to earlier,
6  was in effect when each and every one of the customers
7  signed onto the platform and signed the user agreement.
8  There is -- I know that Voyager hasn't been around for many,
9  many decades, but I certainly don't know how long the
10  privacy policy has been around.
11       The -- at the beginning of the case, Your Honor,
12  you'll remember that we had a whole dialogue where the
13  Debtor was very concerned about the privacy of the -- not
14  only the customers, but also the employees and others
15  involved in the case.  And spreading the news of personal
16  information of those parties was also of great concern to
17  the court in the context of notice procedures, for example.
18  We still have those concerns when it comes to sharing
19  personally identifiable information with Binance.
20       The customers did not sign up with Binance as one
21  of the customers said earlier today.  And given the current
22  state of affairs in the crypto industry, an independent
23  third party should look into the sharing of PII with
24  Binance.  It so happens that the bankruptcy code provides
25  for a disinterested third party, a consumer privacy

A-490

Page 98

1  ombudsman.  And I think given the facts and circumstances of
2  this case beyond the existence of the privacy policy itself,
3  that I think it would safer and give much comfort to a lot
4  of customers here who are very uncomfortable with the way
5  the case has proceeded, that at least there's an independent
6  third party, and independent set of eyes on the transfer of
7  a PII from Voyager to Binance.
8           And also, I would note that the cost of such an
9  ombudsman in the scheme of things with respect to this case
10  is very low and it would not place an undue burden.  And
11  under the proposed timeline, certainly the ombudsman would
12  have sufficient opportunity to look under the covers or kick
13  the tires, whatever expression you want to use.  And I don't
14  think it would -- it certainly shouldn't cause any harm, and
15  I think it should provide for much comfort to the parties in
16  interest.  Thank you, Your Honor.
17          THE COURT:  I don't have the relevant code
18  provision in front of me at the moment, but if I remember
19  right, it says that I can appoint and should appoint a
20  consumer privacy ombudsman if the existing privacy policy
21  would not permit the transfer of data that is contemplated
22  by the agreement.  I think you're not necessarily telling me
23  that that is the case.  You're just saying you have
24  questions about whether what Voyager has said is correct
25  when Voyager says that its privacy policy already

Page 99

1  contemplates the transfer of this information.
2  (Indiscernible) --
3          MR. MORRISSEY:  Your Honor, in fairness --
4          THE COURT:  Do I have even the authority to
5  appoint a consumer privacy ombudsman in the absence of an
6  explicit showing that the existing privacy policies don't
7  contemplate this?
8          MR. MORRISSEY:  Your Honor, if -- I believe that
9  if the privacy -- if we knew, and we don't as far as I'm
10 aware, that the privacy policy cited by counsel was in
11 existence and applied to all the customers from the
12 beginning -- from the inception of Voyager's platform, I
13 think that argument may apply.  But we don't know that.  And
14 it could be --
15         THE COURT:  Why would it have to have been in
16 existence from the inception of the platform?  I assume the
17 online agreements say that the customers automatically are
18 bound by changes to the policies, and they probably get
19 notice of changes of privacy policies.  So --
20         MR. MORRISSEY:  Well, again, Your Honor --
21         THE COURT:  Ms. Okike, do you know when the -- you
22 didn't just adopt this policy a week ago, right?  Do you
23 know when this policy was put into effect?
24         MS. OKIKE:  Your Honor, I don't know the exact
25 date it was put into effect, but it hasn't been amended,

Page 100

1  obviously, since we've commenced our cases.  But I took a
2  look at the customer agreement, and it does say that we can
3  amend at any time and -- you know, without notice actually,
4  and that customers will continue to be bound by the policy.
5          So I understand Mr. Morrissey's point, and I don't
6  know the exact date of -- or whether any updates have been
7  made to the privacy policy itself.  But I would argue that
8  in any event the customers are bound by the current terms
9  under the terms of the agreement.
10         THE COURT:  Mr. Morrissey, you can investigate
11 this further.  And if you have reason to doubt the policy is
12 as stated or that it applied to customers, I'll rehear you.
13 But I don't want to -- you know, customers have expressed
14 concerns, but one of the concerns they've expressed is how
15 much money is being spent in these cases.  And I don't want
16 to add yet another professional expense without a
17 demonstration that it's actually (indiscernible).
18         MR. AZMAN:  Your Honor, it's Darren Azman again
19 from McDermott for the Committee.  Just going to the
20 discretionary element here, we have received thousands of
21 inquiries from Creditors.  We have lots of complaints and
22 lots of questions about the case.  I can tell you the one
23 thing that we have not heard probably from a single Creditor
24 in this case is this issue.  So I don't actually think that
25 this is what Creditors and customers are focused on.

Page 101

1          THE COURT:  Thank you.
2          MR. MORRISSEY:  Okay, Your Honor.  And as far as
3  the timing of the privacy policy, what matters is when the
4  customer signed on, the process -- and I'm sure anyone on
5  the phone can picture this -- it clicks -- they click on the
6  user agreement to see what was there.  Whether they keep
7  clicking on the user agreement to see how it changed over
8  time, I'm not sure if we could impose that burden on all the
9  customers, you know, since the inception of Voyager.  So
10 again, I think it would be a reasonable thing.
11         And in terms of the administrative cost, Your
12 Honor, we've had many cases with consumer privacy ombudsmen.
13 Their shelf life is very short, and the expense is not
14 large.  Even in a small case, Your Honor, it's not large.
15 In a case like this, it's an extremely small percentage of
16 the overall administrative costs.  Thank you, Your Honor.
17         THE COURT:  Yeah, I'm going to deny your request
18 without prejudice to renew in the event you have other
19 information for me to consider as to the scope of the
20 current policy, okay?
21         MR. MORRISSEY:  Okay.  Thank you, Your Honor.  And
22 I assume I'll be speaking later about other issues.
23         THE COURT:  Yes.  I --
24         MR. MORRISSEY:  Thank you.
25         THE COURT:  -- have notes about individual issues,

A-491

Page 102

1  and then we'll come back.  We need to take another five-
2  minute break and then we'll be back, okay?
3          (Recess)
4          THE COURT:  All right.  Are the parties ready to
5  resume?
6          MS. OKIKE:  Yes, Your Honor.
7          THE COURT:  Okay.  On the various objections by
8  the regulatory authorities, there's a number of issues that
9  have been raised.  Let me just tell you what my reactions
10  are, and then I might comment.  First, some of the
11  regulators have said that Voyager in the past did not comply
12  with applicable regulations, may have violated state laws
13  regarding the sale of -- unauthorized sale of securities,
14  etcetera.  States may or may not have issues or even claims
15  against Voyager in that regard.  I don't know if they filed
16  claims, but I don't see that those past issues have anything
17  to do with what we're doing today.  If somebody disagrees,
18  please tell me why.  Okay.  I don't hear any comment.
19          MR. NEWSOM:  My name is Dan Newsom.  I'm an
20  unsecured creditor.  I would ask that the relevation of --
21  in determining whether Voyager did, in fact, sell
22  unregistered security does I believe have importance as to
23  it relates to the releases of the directors and officers in
24  the APA and disclosure statements.
25          THE COURT:  Okay.  That may have to be addressed

Page 103

1  at the confirmation hearing as to whether the releases are
2  appropriate in terms of approving a disclosure statement,
3  which -- in terms of the adequacy of the description of
4  what Voyager is proposing, and in terms of the -- and
5  approval of the sale agreement on an interim basis that the
6  overall effect depending on confirmation.  I don't see how
7  that really affects what I'm actually being asked to do
8  today.
9          MR. HENDERSHOTT:  Your Honor, Tracy Hendershott,
10  another Creditor.  I think those accusations do apply to
11  this APA, and it's a larger issue, you know, tying into is
12  Chapter 11 even appropriate for this case at this point.
13  You know, I mean, you know more than anyone there's really
14  two benefits to Chapter 11.  One is to Creditors.  They get
15  a higher return hopefully, a higher recovery if the
16  organization is an ongoing or reorganized entity.
17          And then too, the other benefit is really to the
18  Debtors.  They get to retain and power of running the whole
19  entire process as well as the organization.  They get to
20  retain their salaries, benefits, bonuses, you know,
21  potential releases.  In this case, Your Honor, there is no
22  benefit for the Creditors anymore in Chapter 11.  There is
23  no chance of a reorg.  There's no chance of an ongoing
24  business entity.
25          All the benefits that remain in Chapter 11,

Page 104

1  especially in lieu of, you know, potential actions by states
2  and various regulatory bodies only benefits the Debtors.
3  You know, and there's been real material damages occur to
4  the Creditors.  This elimination of Creditor benefit has
5  been known by all of the parties, the Debtors, the Debtor's
6  counsel, the UCC counsel since late summer.  All the
7  Creditor value's been taken away from the Chapter 11 process
8  many months ago.  And real material damages have occurred to
9  the Creditor class in my opinion.
10          You know, millions of salaries have been expended
11  out of the Creditor assets.  Tens of millions have been
12  spent on legal fees, you know, over the last six months and
13  with no unforeseeable end in sight.  There's, you know,
14  continued erosion as this continuously drags on with the
15  market, the crypto market and the asset value just
16  depreciating.  You know, the $20 million that the counsel
17  both for UCC and the Debtors are promoting as the best value
18  for us, I think that's disingenuous.
19          $20 million payment from Binance, my understanding
20  under this APA, 13 million of that is going to go to
21  (Indiscernible).  Sixty million of that is going to go to
22  counsel for the UCC committee for the undefined future war
23  chest to you, you know, try to initiate more litigation.  How
24  many millions --
25          THE COURT:  I'm going to stop you right there.

Page 105

1  I'm going to stop you right there.
2          MR. HENDERSHOTT:  Yes, sir.
3          THE COURT:  First, in terms of whether there
4  should even be a Chapter 11, I have no motion to convert to
5  Chapter 7.  I've never received such a motion.  I won't
6  entertain such a motion on an oral basis.  It needs to be
7  made and made on notice.  So nobody has asked me to convert
8  to Chapter 7.  And you may be unhappy with how long it's
9  taking, etcetera, but we are where we are.  I can't change
10  the past.
11          The real issue here is as to what I'm being asked
12  to do today in terms of the proposed agreement, I don't see
13  that issues regarding whether Voyager complied with
14  regulatory requirements.  But they don't really make it --
15  they're not being resolved today in any way.  They don't
16  have to be resolved in order to do what I'm being asked to
17  approve today, and therefore I don't see that they are
18  really relevant to what I'm being asked to approve today.
19          That may be relevant at the confirmation hearing
20  in terms of not so much releases of Voyager, but releases of
21  officers or directors.  And you may have other issues about
22  confirmation as to whether confirmation is appropriate or
23  whether Creditors will be getting at least what they would
24  get in a Chapter 7.  You can raise those at the confirmation
25  hearing, but those aren't issues for today.  Okay?

A-492

## Page 106

1    MR. HENDERSHOTT:  Yes, sir.  Thank you.

2    THE COURT:  Sure.

3    MR. HENDERSHOTT:  So the potential that there has

4  been wrongdoing from multiple regulatory bodies I think

5  calls into question, you know, the assertations of due

6  diligence and risk management that we have heard from,

7  again, both parties' counsel.  They fall on deaf ears with

8  us.  The same level of due diligence and risk management

9  that brought us to this APA being approved today is from the

10  same organization that brought us to bankruptcy to begin

11  with.  It's due to faulty risk management and due diligence.

12  It's the same organization that brought us to a FTX

13  solution.

14    WOMAN:  Hi, pick up for Erica (Indiscernible).

15  It's S-C-Y.

16    THE COURT:  Whoever just spoke, please mute --

17  please mute your telephone whoever just interrupted and only

18  unmute your phone if you're actively speaking.

19    I'm sorry you were interrupted.  Go ahead.

20    MR. HENDERSHOTT:  Thank you, sir.  I think, you

21  know, both of those are relevant to whether this APA that is

22  originating from the Debtors that put us in these situations

23  repeatedly.  And looking to possibly do it a second time.

24  There's real concerns with finance both from -- they also

25  are facing red flags from national level and state level.

## Page 107

1  They -- the counsel for the Debtors earlier said -- they

2  talked about a bank run.

3    If you look online, the parent company of Binance

4  U.S. has actually been in a bank run for the last couple of

5  weeks in the billions of dollars across, you know, multiple

6  financial sources.  I think there is relevancy, Your Honor,

7  and I appreciate you providing the governance of, you know,

8  court proceeding of policies.  I'm certain an amateur, as

9  most of us Creditors are, and thank you.

10    THE COURT:  You know, I understand throughout the

11  case that many of the Creditors have been angry at what

12  happened to Voyager, have been critical of management and of

13  things that happened.  To make clear my perspective today,

14  and more importantly my perspective at confirmation, is in

15  part going to be based on I can't change things that have

16  already happened.  And the question is what does it make

17  sense to do today.

18    So the Debtors and the committee have offered

19  their opinions and their expert opinions that doing this

20  particular transaction will have tax benefits for the

21  Voyager customers, and will also -- because of operational

22  issues, be less expensive, and on the whole produce bigger

23  recoveries than a direct liquidation by the Debtors or a

24  conversion to Chapter 7.

25    So if any Creditor takes issue with that

## Page 108

1  conclusion, they have the right to do that at the

2  confirmation hearing.  I've heard and understand that there

3  are people who are skeptical who don't trust the Debtors and

4  the Debtors' calculations anymore.  That's not really

5  evidence for me.  I need somebody, if they think that that's

6  wrong, can actually show me why it's wrong.  And people will

7  have the opportunity to do that.  People -- customers also,

8  I understand, are upset that things and recoveries aren't

9  going to be as good as they would prefer.  But we can only

10  do what we can do today.

11    As I said, we can't change the past.  We can't

12  change the fact that cryptocurrency values have fallen.

13  That's out of our control.  And we can just do the best with

14  the situation that we actually have, okay?  So --

15    MR. HENDERSHOTT:  Yes.

16    THE COURT:  -- the various objections that were

17  filed also said that -- also raised questions about whether

18  Voyager could transfer licenses, but it seems clear to me

19  that Voyager is not proposing to transfer any licenses to

20  Binance.  So I don't really see that that's an issue unless

21  somebody disagrees.  Okay.

22    MR. JONES:  Your Honor, James Jones, Creditor.

23  I've just got a couple of questions if you don't mind, Your

24  Honor.

25    THE COURT:  Are they about the issue that I just

## Page 109

1  raised?

2    MR. JONES:  It's about Binance.

3    THE COURT:  Well --

4    MR. JONES:  Yeah, so if Creditors' assets were

5  transferred to Binance, what protections would there be if

6  Binance went under?  And if Creditors didn't pool the

7  assets, would he fallback -- or Creditors did pool the

8  assets, would the fallback be enacted on those Creditors'

9  assets?

10    THE COURT:  See, I didn't hear your question, all

11  of it, but I think you asked if Binance went under, what

12  would your rights be.  That's actually one of the questions

13  --

14    MR. JONES:  Yeah.  The fallback

15    THE COURT:  That's one of the questions that I was

16  asking the parties.

17    MR. JONES:  Yeah.

18    THE COURT:  What the parties have said -- I have

19  no independent way of knowing this, but what -- the answers

20  that I've gotten today from both Binance and from Mr.

21  Tichenor based on his review is that unlike Voyager, Binance

22  takes the position that it holds cryptocurrency as a

23  custodian with the beneficial ownership belonging to the

24  customers.

25    MR. JONES:  Your Honor --

A-493

Page 110

1       THE COURT:  Whereas the Voyager --
2       MR. JONES:  Your Honor, Your Honor, FTX had the
3   same language in their terms of service also.
4       THE COURT:  Right.
5       MR. JONES:  So I mean, they don't -- I mean, it
6   don't matter.
7       THE COURT:  Well, what would you have me do?
8       MR. JONES:  I mean, label all Creditors as the
9   secured Creditors for one, maybe.  So they're -- in case
10  they go down, we're not going to get screwed over, you know?
11      THE COURT:  I don't think I have the power to say
12  that you will be a secured Creditor of Binance.
13      MR. JONES:  What about --
14      THE COURT:  You certainly don't --
15      MR. JONES:  What if (indiscernible) --
16      THE COURT:  You certainly --
17      MR. JONES:  -- and (indiscernible)?
18      THE COURT:  You certainly don't have to go through
19  Binance.  You don't have to open a Binance account.
20      MR. JONES:  I understand that, but that's a
21  (indiscernible) if we get liquidated from Voyager.
22      THE COURT:  Right.
23      MR. JONES:  We just want protection from fallback,
24  you know, in case Binance goes under.  Thank you, Your
25  Honor.

Page 111

1       THE COURT:  All right.  I understand the question.
2   That seems to me I've been given some assurances today about
3   how this works.  The only thing I'm approving today is
4   essentially a potential expense reimbursement and provisions
5   regarding the extent to which Voyager can negotiate with
6   other people in the interim.  You should raise those
7   concerns with the Creditors committee and talk to their
8   counsel about them and try to understand --
9       MR. JONES:  Sir, we've --
10      THE COURT:  -- what they're thinking.
11      MR. JONES:  We have raised millions of questions
12  with the Unsecured Creditors Committee, and they are inept.
13  They're not helpful, and we (indiscernible) --
14      MR. HENDERSHOTT:  The Creditors Committee does not
15  represent us.
16      MR. JONES:  What was that?
17      MR. HENDERSHOTT:  This is Tracy Hendershott.  The
18  Creditors Committee does not represent us.
19      MR. JONES:  Yeah, go ahead.  Yeah, go on.
20      MR. HENDERSHOTT:  They have actually withheld
21  information from the court in, you know, previous hearings
22  from the Creditors' Committees.  They have, you know, failed
23  to, you know, have any kind of resemblance of, you know,
24  bidirectional communications with us.  If you look at your
25  docket, Your Honor, and you know, 843, you know, there was a

Page 112

1   third-party survey sent out via Survey Monkey, you know,
2   with some controls to try to limit, you know, repeat
3   responders, you know, from trying to skew the outcomes.
4   It's over 95 percent of Creditors that feel the UCC
5   committee does not represent us.
6       MR. JONES:  Well, we appreciate (indiscernible) --
7       THE COURT:  Well, if that's true, then perhaps
8   that'll be reflected in the vote on the plan.  And if you
9   think that Creditors would do better by just having the
10  toggle plan and having Voyager attempt to make
11  distributions, or if you think Creditors would do better by
12  Chapter 7, then you need to organize yourselves and present
13  me with those arguments.  But I can't -- the mere fact that
14  you feel in a kind of conclusory way that you have a
15  grievance or that you don't like the conclusions that people
16  have reached, I can't really act on that.  I need evidence,
17  I need argument, I need (indiscernible).
18      MR. JONES:  Your Honor, and we do not want
19  McDermott and UCC to control the $60 million wind-down
20  trust.  We don't trust them to be responsible.  They spent
21  $7 million on investigating -- in investigations, and they
22  got a $1.2 million fallback from Steve Urlich.  You know,
23  that's a negative.
24      THE COURT:  Then if you don't want them to have
25  control of a trust, you should make that objection, and I'll

Page 113

1   consider it at the confirmation.
2       MR. JONES:  All right.  Thank you, Your Honor.
3       THE COURT:  Okay.
4       MR. HENDERSHOTT:  Your Honor, we do --
5       MS. OKIKE:  Your Honor?
6       MR. HENDERSHOTT:  -- I have submitted
7   documentation and evidence on Docket 843, you know, if you
8   have the ability to have yourself or someone in chambers
9   review that.  That would be greatly appreciated.
10      THE COURT:  And what is this that you're asking me
11  to review?
12      MR. HENDERSHOTT:  You asked to submit a formal
13  request in writing that oral argument is not, you know,
14  persuasive enough for you.
15      THE COURT:  And are you referring to the --
16      MR. HENDERSHOTT:  And that's already been
17  submitted.
18      THE COURT:  Well, but you submitted a letter on --
19  yesterday, right?  Or the day before?
20      MR. HENDERSHOTT:  Yeah, I think it was late last
21  week.  That's why I understand if you haven't been able to
22  review it, but you know, just (indiscernible).
23      THE COURT:  No, I saw it.  It's not -- it's a
24  letter.  It's not a proper motion.  If you want a motion or
25  particular relief, you have to make a motion.  You have to

A-494

Page 114

1   do it in compliance with the rules and with the proper
2   notice to other parties, give them a chance to respond, and
3   then I'll hear it.  But just sending me a letter a few days
4   before the hearing is not enough for me to consider it at
5   this scheduled hearing, okay?
6           MR. HENDERSHOTT:  Yes, understand.  I --
7           THE COURT:  Okay.
8           MR. HENDERSHOTT:  Is my understanding, Your Honor,
9   that you do have the authority to convert from Chapter 11 to
10  7?
11          THE COURT:  Well, if -- under the bankruptcy code
12  I have the power to do that if the correct showings are
13  made.  But you'd have to -- I can't give you legal advice.
14  You'd have to consult with an attorney as to what those
15  standards are and as to whether you can show that the right
16  standards are met so that such a conversion would be
17  appropriate.
18          MR. HENDERSHOTT:  Yes, sir.  Thank you.
19          THE COURT:  Okay.  All right.  As to the Binance
20  compliance with regulatory issues, perhaps the identity of
21  Binance, its finances, all that Creditors have expressed
22  concerns about, which seem to me to be confirmation issues,
23  I don't -- it seems to me that whether Binance will or won't
24  be in compliance with regulations and therefore will or
25  won't be able to have accounts with customers is an issue

Page 115

1   for Binance.  But under this particular proposal, if Binance
2   can't have a customer -- or an account relationship with a
3   customer, then it just won't have that customer, and that
4   Creditor will just get a cash payment as I understand it.
5           So I don't really see why the regulatory
6   compliance is an issue that I'm resolving today or
7   prejudicing today, or that necessarily is going to be an
8   issue except possibly at confirmation as to whether it makes
9   sense to go through Binance to do this deal.  Does anybody
10  disagree with that?  And if so, why?  All right.  Very good.
11          And then the main issue that the states have
12  raised is whether customers in different jurisdictions are
13  unfairly being treated differently.  There's some suggestion
14  today that maybe there will be a mechanism that will allow
15  earlier distributions to Creditors in the unsupported states.
16  And if that can be worked out, that would obviously be a
17  wonderful solution.
18          I don't really think that the fact that the
19  Debtors and Binance are allowed to do things in some states
20  but not others is a discrimination under the plan itself
21  that is so obvious or so severe that I should prevent even
22  the disclosure statement from going out.  I will hear the
23  issue at confirmation, and I'll hear evidence at that time
24  as to what the practical options are and whether this is a
25  discrimination being imposed by the plan as opposed to a

Page 116

1   change that's simply attributable to the fact that there are
2   different regulations and different authorities who have
3   control in different jurisdictions.
4           But there are times in bankruptcy when customers
5   have different treatments in different states or have
6   different net outcomes in different states just because of
7   state regulations.  And you know, the basic fact is that
8   customers in different states face different tax
9   consequences based on distributions that they receive.  And
10  those are never understood as amounting to discriminations
11  by the Debtor.  It just has to do with the fact that there
12  are different states that have different rules and different
13  consequences.
14          And it could be that some Creditors will have
15  their rights to crypto determined at a particular time, but
16  not -- may not actually have the ability to get to it at the
17  same time.  So that by the time they actually have the right
18  to make decisions over it, the values may have gone up or
19  may have gone down.  Again, I'll hear people at confirmation
20  as to whether this makes sense, but it's not a show stopper
21  for me to stop the proposal for me even going forward.
22          It is often the case.  I remember in the American
23  Airlines case, for example, where Creditors received equity
24  shares in the combined American Airlines/U.S. Air entity.
25  And under the plan, some people received their equity right

Page 117

1   away.  Some people didn't receive it until disputes over
2   their claims were resolved.  People received the same amount
3   of equity, but it being equity, the value fluctuated
4   significantly over time so that the actual value at the time
5   somebody got it might have been higher, might have been
6   lower than what it was at an earlier period of time.
7           But nobody thought that meant that there was an
8   impermissible discrimination among Creditors because they
9   all got the same amount of equity, and there was simply no
10  way to determine how much somebody would get until disputes
11  over the claims were resolved.  So you know, if there are
12  still issues about this, I really hope that the states and
13  regulators will work with Voyager and Binance about this,
14  and everybody will have an open mind and be able to address
15  this.  But I'm not convinced that there is a kind of per se
16  unconfirmable plan here in that regard.
17          Nothing I'm saying today is a final determination
18  of that issue, but I don't see that it's a show stopper of
19  the disclosure statement stage.  It's also unclear to me
20  what -- let's say that Voyager can't make distributions in
21  the unsupported states and that the unsupported states
22  regulators think that that's -- it's not fair for other
23  Creditors to be able to get things when Creditors in New
24  York and Vermont and Texas can't.
25          What's the consequence?  Does that mean everybody

A-495

1  has to wait, and that nobody can get anything until whenever
2  New York and Vermont can get anything?  And how would that
3  be in the interest of Creditors generally?  I'm not sure how
4  the proposed discrimination would really be solved in a way
5  that would satisfy the technical aspects of the objection
6  without in effect being prejudicial to many, many other
7  Creditors.  But again, we can consider that issue at
8  confirmation.  So --
9       MS. CORDRY:  Your Honor, this is Karen Cordry.  If
10 I might just make just one very quick comment or so on that?
11      THE COURT:  Yes, go ahead.
12      MS. CORDRY:  Okay.  Yes.  And we do understand,
13 and we are certainly not, despite what the Debtor was trying
14 to suggest, trying to hold up distributions to everyone.  I
15 think our concern was simply that -- and I think you heard
16 admitted very candidly on the record that this is a
17 marketing technique, that this is what Binance wants in
18 order to throw in some more money.
19      We do think that there are a number of ways this
20 could be resolved which would have a less prejudicial effect
21 on those parties.  Even without dealing with the kind of
22 provisional licensing or court orders or any of the other
23 kinds of suggestions were made.  I mean, if nothing else,
24 they could be cashed out without being held for six months.
25 That's a marketing technique for Binance, and we understand

1  why they want to do it.
2       It is something that's only worth about $2 million
3  in the context of this entire case.  So it's a bit of a
4  tail-wagging a very big dog, but we will continue to work
5  with the Debtor and with Binance.  We will see if we can
6  resolve this issue.  I think it is something that if they
7  had approached us long before, we might've been able to do
8  this before confirmation, but I certainly -- or before this
9  stage of this disclosure statement hearing.  We certainly do
10 understand your point about wanting to keep the case moving
11 along, so that's all I have to say at this point.  Thank
12 you.
13      THE COURT:  All right.  So we would all be very
14 happy if that issue can be worked out, and I encourage you
15 to try to work it out.  There was some --
16      MS. RYAN:  Your Honor?
17      THE COURT:  Yeah.
18      MS. RYAN:  I'm sorry.  This is Abigail Ryan with
19 the Texas Attorney General's Office, and I do want to make
20 one comment.  For the record regarding the treatment of the
21 citizens in the non-consenting jurisdictions, and I agree
22 this will be a confirmation issue if we don't get a new
23 treatment agreed to with the Debtors and Binance, which I'm
24 more than happy to work with them to try to find a better
25 resolution.

1       But in many of the Debtors' pleadings, they've
2  stated this is a mess of the states' own making, and it's
3  our fault if our citizens don't get paid, and that is not
4  correct.  For the record, Binance is using our citizens as
5  pawns to get what they could not get under state law, a
6  license from the Department of Banking.  As of December
7  2022, their application was abandoned for their failure to
8  submit financial information requested by the Department of
9  Banking, and now they're coming into this deal saying, oh,
10 but you can provisionally license us.  Well, we don't have
11 comfort with their financials because they've refused to
12 give them to us.
13      And I think it's extremely disingenuous to say
14 this is a creation of the states' own making when it clearly
15 is not.  Binance is not able to get licensed under state law
16 for failure to produce financial information.  And if they
17 present another application to the Department of Banking
18 State Securities Board, they absolutely will consider it.
19 They will ask for similar financial information, but this is
20 not the States' fault, and we don't like seeing our citizens
21 used as pawns for Binance to try to do an end run around
22 regulators.  Thank you, Your Honor.
23      MR. GOLDBERG:  Your Honor, this is --
24      MS. ROOD:  Your Honor, Jennifer Rood from Vermont.
25 I would echo everything Ms. Ryan said.  And it really is not

1  -- and also to the Court's point that somehow, you know,
2  improving the treatment of our citizens will have a -- you
3  know, adverse consequences on everyone else, that doesn't
4  have to happen.  All they have to do is show a little
5  willingness to set up a -- withdraw only one other or some
6  other slightly creative solution that would put everybody in
7  the same situation and not create this unnecessary inequity,
8  you know, just because Binance wants to get these customers
9  and can't.
10      And it's not the states' obligation to, you know,
11 get Binance through the licensing process.  They need to
12 submit proper applications with proper support.  If they
13 haven't done that, then there are reasons why they were
14 licensed.  So I really would urge the Court to give that
15 careful consideration.  I'd hate to see this case get sent
16 down a track that it's going to be hard to change.
17      MR. GOLDBERG:  Your Honor, this is Adam Goldberg
18 of Latham and Watkins on behalf of Binance U.S.  I'd like to
19 just make clear first and foremost that Binance U.S.'s goal
20 here is to return cryptocurrency to customers as quickly as
21 possible, and that's been our objective throughout this
22 process and what we believe our bid does and what we're
23 trying to achieve by working with the Debtors to -- and the
24 Creditors Committee to seek the relief that we're all
25 seeking here today.

A-496

Page 122

1     We'd also like to be clear that we are grateful to
2  the Debtors, the Creditors Committee, all of the parties in
3  this case, including all of the state regulators here,
4  including the objectors, and especially the Court for all
5  the time and attention that everyone's putting into these
6  novel and challenging issues that are put before the Court.
7  We have nearly two months before the confirmation hearing,
8  which in the context of this case is quite a lot of time.
9  In just the last two months, the parties in this case have
10 worked together to salvage the situation from the collapse
11 of FTX to the -- where we stand here today with a new deal
12 to deliver cryptocurrency to customers in a very rapid and
13 efficient format.
14        And over the next two months, we have much fewer
15 issues than we have had over the last two months to resolve.
16 We look forward to working with everyone in an effort to see
17 if those issues can be brought to a mutually acceptable
18 solution, and hope to work towards that.  And we are
19 grateful again for everyone's attention to these issues.
20        I'd like to be clear, though, in relation to the
21 remarks from the State of Texas that Binance has been
22 working very -- has been working to engage with the State of
23 Texas and will continue to do so.  I think from our
24 perspective, Binance U.S. would say that they have not
25 received the responses that they're looking for on clarity

Page 123

1  on what needs to be done for the license.  And if
2  resubmission of the license is required, that will be done,
3  and we're actively working to achieve regulatory compliance
4  in all of these states.
5        THE COURT:  All right.
6        MR. GOLDBERG:  Thank you, Your Honor.
7        THE COURT:  Okay.  I think that takes care of the
8  states' objections as to today.  Obviously they remain as
9  potential confirmation objections, but I don't think they
10 are, as I said, things that require me to kind of halt the
11 proceedings today and to decide that things are
12 irretrievably faulty, and I shouldn't even let them
13 (indiscernible) forward.  So is there anything else anybody
14 wishes to say on behalf of the various objections made by
15 the State Regulatory Authority?
16        MR. BERNSTEIN:  Your Honor, this is Jeffrey
17 Bernstein, McElroy Deutsch Mulvaney and Carpenter for the
18 New Jersey Bureau of Securities.  It's been a long
19 afternoon.  I'd like to just take one moment to make a
20 statement.  We engaged with the Debtor as they had made many
21 changes to the disclosure statement in their Sunday evening
22 filing.  And we were glad that they did that in a productive
23 way.  There's a significant amount of materials that had to
24 be reviewed.
25        And of course I think as Your Honor and others

A-497

Page 124

1  have, you know, clearly made, today is really just a
2  conditional approval of the disclosure statement with a
3  reservation to be heard further at the final hearing once we
4  go through all the materials in chief.  And of course, I
5  just want to point out that the disclosure statement, as
6  Your Honor has indicated, it's wholly separate from the
7  confirmation hearing.  The Bureau has concerns regarding the
8  suitability of Binance U.S. as a counterparty, but that's
9  for another day.
10        And we are concerned that the customers don't, in
11 the long run, end off in a worse position than they are now.
12 That's what the Bureau is concerned about, and we'll address
13 those at the confirmation hearing or you, know, in some
14 other fashion.  But thank you for your time today, Your
15 Honor.
16        THE COURT:  Very good.  Anybody else?
17        MS. PROVINO:  Yes, Your Honor.  This is Lisa
18 Provino.  I've been waiting patiently.  I had a three-point,
19 please, and there will be some questions.  I wanted to tag
20 -- because I've waiting to make a comment, on Richard -- Mr.
21 Richard Morrissey the U.S. Trustee.  He made a comment about
22 the Voyager privacy, and I am in support of that.  I think
23 that it is a nominal fee, and I am going to stress that some
24 -- I can't say for all Creditors, but I do think that we
25 would appreciate the privacy being looked at that he

Page 125

1  discussed.
2        The second question and point, you know, point I
3  have is you had mentioned or Mr. Okike -- forgive me if I
4  said that wrong -- she mentioned about a toggle plan, and it
5  was discussed today also by one of the unsecured Creditors
6  as well Tracy Hendershott.  You mentioned about the going
7  from Chapter 11 to Chapter 7, and you mentioned that the
8  motion must be done legally and in time.  And our question
9  is since we don't have an attorney, can we work with the
10 Office of U.S. Trustee or do we do it ourselves as a group.
11 There is a group of us that want to understand, and we don't
12 want a further loss as all of these bankings of Vermont and
13 the lady Ms. Abigail Ryan, she had discussed.
14        We don't want Binance to go down the same
15 (indiscernible) that FTX did.  So what I'm getting back to
16 is, what will you allow us to do in order to do the motion
17 since we are not attorneys?  What will you allow us to do to
18 either ask the questions that -- to initiate or to request a
19 motion for the 11 to 7, or to understand Ms. Okike's toggle
20 plan third option?  And I still am unclear -- the question
21 -- I am unclear about the toggle plan.  She goes too fast
22 for me, and I don't understand it, and I would like to
23 understand it.  Thank you, sir.
24        THE COURT:  If you wish to make a motion, and if
25 there's a group of you, I strongly encourage you to consult

Page 126

1    with an attorney because you have to understand the
2    bankruptcy code provisions, the rule provisions regarding
3    notice, and you have to comply with those.  And so I
4    strongly urge you to do that.  I can't -- as the judge, I
5    can't give you legal advice about how to make your motion.
6    I hope you understand that.  I don't think you
7    (indiscernible) --
8              MS. PROVINO:  I know.  I'm not trying to be rude.
9              THE COURT:  Yeah.  I don't think the U.S. Trustee
10   can do that either.  There are rules, there are code
11   provisions that govern these things.  At a minimum, if you
12   ask for relief, you need to make a request for that.  File a
13   paper that makes that request and serve it.  The Debtors
14   have a service list that they can give you, but you -- in
15   order to -- if you really want to do that, you should do it
16   the right way, and you should do it with the appropriate
17   citations and things like that.
18             So it's definitely best for you to consult with
19   counsel.  If you don't have counsel, you at a minimum have
20   to file a request for relief with an -- and call my chambers
21   to get a hearing date and get the service list from the
22   Debtors so that you can serve your request.  Okay?
23             MS. PROVINO:  And we will do that, Your Honor.
24   And I appreciate you explaining to us.  We are trying very
25   hard to find our avenue and our voice.  Because even if we

Page 127

1    have thrust, which we have thrust through the NEW, that we
2    wanted a monthly update and stuff of this nature.  We don't
3    get the communication the way that we as a group feel we
4    should be getting it.
5              Should be having maybe a monthly Twitter feed or
6    something where -- and that's where I think the frustration
7    -- and it's not at you or at the group, it's just us
8    bubbling up and finally you're now wanting our voices to be
9    heard, sir.  And we're not trying to waste your time.  We
10   really do need to be heard.  This is our money, and we have
11   lost it.  And we are trying very hard to recover whatever we
12   can, and we appreciate your time with that.  So I would
13   still like to understand from Ms. Okike what this toggle
14   plan is.  Is there Ms. Okike on the line?  And can she
15   clarify this toggle plan for me?
16             MS. OKIKE:  Yes, I'm happy to do that.  So the
17   plan that we have on file contemplates the Binance U.S.
18   transaction, which we've talked about.  But it also builds
19   in an option where we can return crypto and cash on the
20   platform if the Binance transaction for whatever reason is
21   not able to close.
22             And the reason why we kind of incorporated the two
23   options into the plan is that we want to prevent a situation
24   which occurred with FTX where we didn't have the second
25   option, and obviously the deal fell apart, and now we're

Page 128

1    having to kind of reinitiate the process.  So what it
2    provides us to do is to solicit votes on the plan.  And if
3    for whatever reason we aren't able to consummate the Binance
4    U.S. transaction, it would allow us to, you know, reopen the
5    platform for a limited period of time and make distributions
6    of the crypto and cash that the company has.
7              MS. PROVINO:  So could I ask you a follow-up
8    question, ma'am, please, about what you just stated?
9              MS. OKIKE:  Yes.
10             MS. PROVINO:  I want to know -- okay.  So what I
11   thought I heard you say is that if Binance is not accepted,
12   meaning this plan is not accepted by all of these wonderful
13   professionals that are on the line, then you would say that
14   the third option would be to basically cash us out.  Did I
15   understand that in layman's terms?
16             MS. OKIKE:  Yeah.  So it's a little bit of a
17   distinction between that.  So we have one plan of
18   reorganization that provides for the -- provides for two
19   options, right?  It provides for the Binance transaction.
20   And assuming that the company still feels that's the highest
21   and best offer at the time that we reach confirmation, then
22   we would move forward with the transaction and distributions
23   would be made as we've talked about through the Binance
24   platform or through Voyager in certain circumstances.
25             What it does is it allows us to solicit at the

Page 129

1    same time that we're soliciting votes on the Binance
2    transaction, Creditors are also voting for what they would
3    get in the event that we would decide to exercise our
4    fiduciary out and move to the toggle transaction.  So when
5    you get a ballot to vote on the plan, you're being asked to
6    approve, you know, everything in the plan, but also what you
7    would get in both of those scenarios.  So both the Binance
8    U.S. transaction and the toggle transaction.  So if you were
9    to vote no, then you would be voting no against the plan as
10   we have proposed.
11             MS. PROVINO:  Okay.  And is there a motion or a
12   document that I can reference and reread this again please?
13   Could you tell me the documentation number so I can go and
14   (indiscernible), please?
15             MS. OKIKE:  Yes.  It is the Plan of
16   Reorganization, and we're happy to forward it to you.  So
17   you can send me an email and we're happy to kind of send
18   that your way.
19             MS. PROVINO:  I would greatly appreciate that,
20   ma'am.  Thank you very much.  And thank you, Judge, for your
21   time.
22             MR. AZMAN:  Ms. Provino, it's Darren Azman from
23   McDermott.  I don't know if you've seen, but over the last
24   24 hours we've been putting out a number of updates on
25   Twitter, and we are --

A-498

Page 130

```
1          MS. PROVINO:  Yeah.
2          MR. AZMAN:  -- scheduling another town hall to
3    occur sometime next week.
4          MS. PROVINO:  No, we appreciate that, but I guess
5    -- and I'm not trying to attack you.  I just -- I am a
6    communications major, and I need more updates from your
7    group.  I need a monthly scheduled -- whether it's January
8    1st, February 1st, March 1st, whatever it is, we are paying
9    a portion of our money and we want a monthly hearing from
10   you.  We want to have -- be able to have access to you or to
11   your organization.  Please understand this is very vital to
12   us, and we are all talking.  Trust me.  There are a lot of
13   us that have dissent.  Please hear what we're saying and
14   take it into consideration.
15         If you limit to an hour, we will make sure we have
16   a form in.  We will make sure whatever needs to be done is
17   handled appropriately.  I'm learning through this process,
18   so -- and I'm sure all of us are, but I mean unsecured
19   Creditors.  We've never been through this before.  I've
20   never been through bankruptcy in my life, and I don't plan
21   on it.  But I would like to understand how to do it the
22   right way.  And with your help, I'm asking that you would do
23   that for us.  Please.
24         MR. AZMAN:  Sure.  Why don't we -- why don't you
25   reach out to me after the hearing today and maybe we can
```

Page 131

```
1    work on a regularly scheduled call to have?  And there's no
2    time limits.  The last town hall, which I think you were on,
3    I spoke for three and a half hours, took as many questions
4    as I could.
5          MS. PROVINO:  I know.
6          MR. AZMAN:  But we're happy to try to work on
7    doing that more often.
8          MS. PROVINO:  We have to.  Otherwise you're going
9    to get more people on this -- on these meetings that's
10   wasting the judge's time.  But I'm telling you we need that.
11   It will calm us down.  Right now we're not calm, and we're
12   trying to be calm.  And I appreciate that.
13         THE COURT:  All right.  Very good.  You should
14   work that out with the Committee, counsel, and it sounds
15   like they're willing to work that out with you.
16   (Indiscernible.)
17         MS. PROVINO:  And I appreciate that very much.
18         THE COURT:  Okay.  To get back as to the various
19   objections --
20         MR. ABRAHAM:  Your Honor?
21         THE COURT:  Yes.  Who is this?
22         MR. ABRAHAM:  Hi, Your Honor.  It's Mr. Abraham.
23   I'm an unsecured Creditor.  I -- my first question is
24   between here and the confirmation hearing there will be the
25   vote for all the unsecured Creditors to vote whether they're
```

A-499

Page 132

```
1    in favor of the plan or not, correct?
2          THE COURT:  That's correct.
3          MR. ABRAHAM:  Okay.  So with that being said, I
4    would ask from you if there's a way that the vote could be
5    really detailed.  Not in length, but really it should
6    specify the options.  Because with the previous vote with
7    FTX, people were flocking to YouTube to hear from
8    influencers how they should vote because people weren't
9    given enough accurate information to form their own
10   decision.
11         Now, for example, one of the attorneys said before
12   that if we got with the Binance deal as of when it was
13   created in December it would be a 51 percent return.  I
14   understand it fluctuates based on the crypto market.  But as
15   of that day in December, it would've been 51 percent with
16   the Binance deal versus a 45 percent return with the toggle,
17   which is a 6 percent difference.  So when they put the vote
18   out there, I understand there's also other things to take
19   into consideration.
20         For example, if we go through with the Binance
21   deal, you're getting your crypto back in-kind.  Whereas if
22   it gets toggled, you don't.  But there's -- also on the flip
23   side, there's a risk of what if Binance goes under.  So that
24   I think people could decide or read up on their own.  But
25   just as far as just the numbers go, I think if it would be
```

Page 133

```
1    spelled out that if we go with the Binance deal it's a
2    certain percent, but if we toggle, you're losing 6 percent.
3    At that point, whether it's people who are in states that
4    right now can't accept Binance and have to wait six months,
5    or whether it's people who don't want to take the risk of
6    another company going under, someone can make that
7    determination for themselves.  Is it worth the 6 percent?
8    I'd take that risk.
9          Obviously if it's a 20 percent different spread,
10   then you'll have people more inclined towards a Binance
11   deal.  Whereas obviously if there's a one percent
12   difference, everybody would be in favor of the toggle.  So
13   all I'm asking is if there's a way that when the next vote
14   comes out that people don't have to go to YouTube to get
15   their information, but that the information that comes out
16   with the vote is a lot more specific so people can make an
17   informed decision on their own.
18         THE COURT:  Well, the information --
19         MS. OKIKE:  I can --
20         THE COURT:  The information will be set forth in a
21   disclosure statement, and that'll be a lengthy document.
22   It's kind of ironic when we get disclosure statements
23   because three-quarters of the objections about -- are about
24   things that -- about which people want more detail, and then
25   one quarter of the objections are that the statement is too
```

1  long and hard to read.  And we can't have it both ways.

2          MR. ABRAHAM:  Right.

3          THE COURT:  The statements wind up being lengthy

4  because there are so many requirements of what need to be in

5  them, but they're pretty thorough.  So people ought to be

6  able to find what -- the answers that they're looking for

7  that aren't met.  Or to call committee counsel if they have

8  a question.  But --

9          MR. ABRAHAM:  I --

10          THE COURT:  I won't comment on using YouTube, but

11  -- the other thing you ask is essentially I think -- I think

12  what you're essentially saying is that could Creditors vote

13  separately as to whether they prefer the toggle or the

14  finance deal.  That's what you're asking.

15          MR. ABRAHAM:  Well, from what I just heard a few

16  minutes ago, it seemed like if the vote did not go in favor

17  of the Binance deal, it would automatically revert to the

18  toggle.

19          THE COURT:  Well, I think the way it's set up --

20          MR. ABRAHAM:  Did I not understand that correctly?

21          THE COURT:  No.  Yeah, I think that's not right.

22  I think the way the plan is set up right now it will be the

23  Binance deal, but the Debtors would have the right if they

24  think it makes more sense to go to the toggle deal.  But --

25          MR. ABRAHAM:  Right.  I understand that.

1          THE COURT:  -- (indiscernible) --

2          MR. ABRAHAM:  But what is a majority --

3          THE COURT:  It's not being set up --

4          MR. ABRAHAM:  I'm sorry.  Go ahead.

5          THE COURT:  -- (indiscernible).  I don't think it

6  is currently being set up to ask Creditors whether they

7  would prefer the toggle deal as opposed to the Binance deal.

8  I'm right about that, Ms. --

9          MR. ABRAHAM:  Right.

10          THE COURT:  -- Okike?

11          MR. ABRAHAM:  I understand --

12          MS. OKIKE:  Yes, Your Honor.  That's correct.

13          THE COURT:  So --

14          MR. ABRAHAM:  Right.  I understand that --

15          THE COURT:  If the question --

16          MR. ABRAHAM:  -- but what if the majority --

17          THE COURT:  Yeah, if the question is, is there any

18  way to even know whether the Creditors would -- the majority

19  would prefer the toggle deal or should that opinion be

20  solicited as part of the voting process.  What's your

21  thought on that, Ms. Okike?

22          MR. ABRAHAM:  Well, if -- with what you just

23  explained, what's -- what would -- what's the outcome if the

24  majority of unsecured Creditors vote not in favor of the

25  deal?  What's the default -- what happens then?  What

1  happens by default?  I mean, I understand it's not Binance

2  or toggle, but if the majority doesn't vote in favor, isn't

3  toggle the alternative?

4          THE COURT:  It would require a new plan that would

5  have the toggle provisions in it.  Because if

6  (indiscernible) --

7          MR. ABRAHAM:  Because the language says if the

8  Binance -- sorry, go ahead.

9          THE COURT:  Yeah.  This proposal as it's currently

10  structured, Creditors would have to vote in favor, and the

11  toggle would only come if the Debtors decide that that makes

12  more sense than Binance.  If Creditors vote no but then we

13  have no plan unless and until a new plan is proposed, which

14  at that point might be the toggle, might be a Chapter 7

15  liquidation.  I don't know what it would be, but it's -- as

16  it's currently set up, we do not have a situation where you

17  could directly to the toggle and Creditors could vote down

18  doing it through Binance.  It's not the way it's set up

19  right now.

20          So the question I understand from this comment,

21  Ms. Okike, is whether there's a way to structure this so

22  that Creditors could express their opinion as to which they

23  prefer and possibly avoid having to do this through a

24  separate process.  What's your comment on that?

25          MS. OKIKE:  Yeah, Your Honor, I think from our

1  perspective we've evaluated all of the options on the table.

2  We've evaluated the Binance U.S. transaction.  We've

3  evaluated the toggle transaction.  We've evaluated, you

4  know, a straight liquidation.  And from our perspective, the

5  Binance U.S. transaction provides the most value and

6  maximizes value for customers for all the reasons that we've

7  discussed today.

8          And so the plan that we've put forward presumes

9  that we're moving forward with the Binance transaction

10  because that's what is the most value-maximizing option.

11  We've obviously built in the protection that in the event

12  we're not able to close the transaction or somebody else

13  shows up, you know, that we can, you know, pivot to the

14  toggle.  But I think from our view of the available options

15  and our evaluation of the value, I think we're soliciting

16  the plan that we believe, you know, provides the most return

17  and recoveries to customers.

18          MR. HENDERSHOTT:  Ms. Okike, this is Tracy

19  Hendershott.  I believe we've covered here today that

20  there's considerable concern, though, from the Creditor

21  class.  Would it not be beneficial to present that option to

22  us as two distinct voting pathways to go to a toggle versus

23  being handed off to Binance?

24          MS. PROVINO:  I second that.  This is Lisa.

25          MR. HENDERSHOTT:  Is this not supposed to be for

A-500

1 the benefit of the Creditors and not the Debtors?

2         MR. JONES:  Because if it's not, what's the point

3 of the vote?  If no one knows what the alternative is, even

4 the judge --

5         THE COURT:  Let's not --

6         MR. JONES:  -- just said -- the --

7         THE COURT:  Let's not --

8         MR. JONES:  -- judge just said himself that we

9 don't have a plan.

10         THE COURT:  Let's not have a free-for-all.

11         MR. JONES:  No, I'm --

12         THE COURT:  You may just ask.  That's the

13 question.  Did the Debtors wish to prevent -- present the

14 proposal that way?  And what's the Committee's view at the

15 same time?  That question.  Ms. Okike, are you willing to

16 present it that way, or do you want to do it as was

17 currently structured?  And what's the Committee view?

18         MS. OKIKE:  Your Honor, our view is that we'd like

19 to do it as currently structured.  Again, I think there's

20 some misconceptions about the toggle and the value of the

21 toggle.  We believe that there's, you know, potentially over

22 100 million of value leakage in that scenario, and so we

23 don't believe it's value-maximizing.

24         And while we understand the concerns that have

25 been expressed with respect to the transaction, we think

1 we've built in the protection that people who don't want to

2 join Binance don't have to join Binance, and we'll be able

3 to access their recoveries.  And so from our perspective in

4 our business judgment, we're moving forward with the

5 transaction that we believe maximizes value for Creditors.

6 And so from our perspective, you know, I don't -- we're not

7 willing at this point to try to modify the plan.  You know,

8 it's obviously in our discretion.  We have exclusivity and

9 we've put forward the plan that we believe is in the best

10 interest of the estates.

11         THE COURT:  And let me hear the Committee

12 counsel's view on this.

13         MR. AZMAN:  Your Honor, Darren Azman from

14 McDermott for the Committee.  I think optionality is

15 sometimes a great thing.  My concern here is that the

16 Committee as well as the Debtors, a lot of labor has gone

17 into evaluating what a self-liquidation would look like.

18 And we as the professionals understand the cost and the time

19 that would be involved in that.  Some of it came out through

20 testimony today from Mr. Tichenor.

21         For example, there is a significant amount of

22 coins in value that would not be easily distributable from

23 the estate.  And my concern about including an option like

24 this is that a number of Creditors -- there are a million

25 customers let's remember, it's not just 50 or 100 or 1,000

1 -- may not understand the full import of this other option.

2 We don't look to impose on Creditors something that they

3 don't want, but this is what we think is in the best

4 interest of all the Creditors.  And a lot of homework was

5 done to develop this plan.

6         THE COURT:  Okay.  Let me just say in response to

7 the question that was asked, the way the bankruptcy code is

8 set up, the Debtors have the exclusive right to make a

9 proposal, which is then voted on for Creditors.  I don't

10 really have the authority to tell them what their proposal

11 should be or to require them to change it, nor does the

12 Committee.  Although their views might carry some weight.

13 But I have no power to tell them to give Creditors this kind

14 of option that you're suggesting.

15         The issue when the Debtors make a proposal is

16 whether Creditors accept it, and then for me, whether it

17 complies with certain other technical provisions of the

18 bankruptcy code.  But I -- they have the right to make their

19 proposal, and this is the way they wish to structure it.  So

20 given that that's what has been presented, the only option

21 Creditors will have was either to say yes or no.  Okay?

22         MR. ABRAHAM:  Your Honor, I have a question as it

23 relates to the fair and equitable treatment for Ms. Okike.

24 If I may.

25         THE COURT:  Well, do you have an objection?  You

1 know, if you have a question, you should do it not in the

2 middle of the court hearing.  I don't want to turn this into

3 a town hall.  It's a court hearing to consider whether

4 certain relief should be granted.  Okay?

5         MR. ABRAHAM:  I do believe in terms of fair and

6 equitable treatment under Section 1123-84 as Ms. Okike

7 stated, this warrants consideration whether to confirm the

8 plan or not.  My question relates to VGX.

9         THE COURT:  The question relates to what?

10         MR. ABRAHAM:  VGX.  The native utility token of

11 the exchange or the brokerage.

12         THE COURT:  VGX?

13         MR. ABRAHAM:  Yes, sir.

14         THE COURT:  My understanding under the plan is

15 that VGX may or may not wind up being supported by Binance

16 depending on what Binance decides to do.  So what is your

17 question about that?

18         MR. ABRAHAM:  Well, that's it.  Ms. Okike stated

19 that substantially all cryptocurrency, but it would

20 transferred.  They have acknowledged that Binance has agreed

21 to submit that the process of listing VGX.  But my

22 understanding is that means they're determining whether or

23 not to list the token, not that they will list the token.

24 What happens if Binance decides not to list the token?  And

25 would that be considered fair and equitable treatment?  More

Page 142

1  specifically, that the members of the same class have the
2  opportunity to take the same action as she stated under the
3  Bankruptcy Law Section 1123.84.  And does that impact the
4  confirmation of the sale or not.
5      MS. OKIKE:  Your Honor, I'm happy to address that.
6  So the transaction contemplates that VGX would transfer
7  similar to all other tokens to Binance.  There is a question
8  whether Binance would be able to list the token on the
9  platform, and they've agreed to kind of undertake that
10  internal review process.  But you will get your pro rata
11  distribution of BGX, and you will be able to withdraw it
12  from the Binance platform regardless of whether they
13  determine to list the token or not on the exchange, and you
14  will be getting your pro rata value determined at the time
15  of the rebalancing exercise.
16      In addition, I think it's important to note that
17  the actual VGO -- VGX smart contracts are not being acquired
18  by Binance.  And so we're going to continue to work with
19  third parties in an effort to identify a solution for
20  supporting the utility of VGX, you know, post-sale.
21      MR. ABRAHAM:  Thank you for the explanation.  And
22  Your Honor, thank you for entertaining unsecured Creditors'
23  concerns and opinions today.  I think that it's evidence
24  that the UCC and her lawyers have -- you know, have
25  opportunity to interact with the Creditors, and I appreciate

Page 143

1  the opportunity for us to initiate that today.  Thank you.
2      THE COURT:  Okay.  To move on as to other issues,
3  there's a proposal in the plan and in the documents to be
4  sent to Creditors to -- by which Creditors would contribute
5  their direct claims to a trust.  I know I had issues about
6  this in -- when a similar proposal was made as to FTX, and I
7  think it's been clarified that none of the claims that are
8  being attributed would be claims that would just wind up
9  being released as a result of being contributed.
10     But I'm still concerned that I don't think it's
11  sufficiently clear in what's being told to Creditors here
12  that if they submit their claims to this trust that any
13  recoveries on those claims will go to claims generally and
14  not just to the -- for the benefit of the people who have
15  contributed claims.  I think Creditors need to understand
16  that, and I don't think that's clear enough in what's here.
17  That needs to be in the disclosure statement and in the
18  ballot provisions that ask Creditors whether they wish to do
19  that.  Okay?
20     MS. OKIKE:  Understood, Your Honor.  We will make
21  that change.
22     THE COURT:  I think the Paul Hastings and CFI U.S.
23  issues are really non-issues for today.  The provisions
24  about Paul Hastings have been removed, and everybody's
25  making clear I think that nothing's interfering with or

Page 144

1  shortcutting or proposing to bypass any CFI U.S. reviews or
2  approvals.  Does anybody else want to be heard about that or
3  have anything else to say on those issues?
4      MR. MORRISSEY:  Your Honor, Richard Morrissey for
5  the U.S. Trustee.  On the Paul Hastings issue, the provision
6  that we had a problem with, I believe it was at least the
7  former Section 5.8 of the Asset Purchase Agreement has been
8  deleted.  That's what we asked for in our objection.  So as
9  far as the U.S. Trustee is concerned, that's no longer an
10  issue.  Thank you.
11     THE COURT:  All right.  And I don't hear any
12  comment on the CFI U.S. issue.  I think -- I understand that
13  the Oracle objection is resolved?
14     MS. OKIKE:  That's correct, Your Honor.
15     THE COURT:  The agreement says that the purchaser
16  can modify the lists of assumed and assigned contracts up to
17  five days before closing, but this seems to be a persistent
18  issue that I get in Chapter 11.  The buyer wants
19  flexibility, and yet the procedures that are proposed to me
20  all require objections by parties -- the other parties to
21  these contracts that wind up being before -- specified as
22  dates that are before the decision is even made as to what
23  the contract is to be assumed and assigned.
24     So, however you're going to do this, however much
25  time you're going to allow Binance to do it, you have to say

Page 145

1  how that's going to work, what amount of notice those people
2  are going to get, and what kind of objections they can make.
3  So if there's going to be a deadline for people to make
4  objections to assumption or rejection, then the decision as
5  to whether they're being proposed for assumption and
6  rejection has to be reasonably in advance of that date.
7      Unless you want to say that people who are --
8  where the decision is made after that date will have a
9  specified amount of time to object with the idea that if I
10  -- if they object and if I decide in their favor, then the
11  contract doesn't get assumed, but the whole deal isn't being
12  held up in the meantime.  Whatever you're going to do, you
13  can't just have these provisions that don't really mesh
14  together, okay?
15     MS. OKIKE:  Understood, Your Honor.  We'll clarify
16  that.
17     THE COURT:  Okay.  On the Alameda objection, I was
18  a little confused as to who the parties to the loan were.
19  And part of it is as I understand the papers,
20  (Indiscernible) Holdings was named as the borrower and the
21  company we've referred to as Top Co. was named as the
22  guarantor.  The plan definition in definition Paragraph 18
23  describes it as holdings -- Hold Co. as the borrower and
24  Voyager as the guarantor.  But the definition of Voyager is
25  defined as Top Co. and its direct and indirect affiliates.

Page 146

1  Was anybody other than Top Co. named as the guarantor?

2       MS. OKIKE:  Your Honor, the borrower is Hold Co.,

3  and the guarantor is Top Co.  I believe that's a

4  clarification we need to make in the definition.

5       THE COURT:  Okay.  Very good.  So in the -- as to

6  the proposed equitable subordination, I think Alameda was

7  right as to the original wording of the plan.  Because while

8  the response was that the claims would be treated as

9  unsecured Creditor claims if subordination was denied, the

10 plan didn't say that, although I think it's been modified

11 either last night or this morning so that actually says

12 that.

13      As to the arguments about absolute priority and

14 things like that, I think what that effectively means is

15 that there's no subordination unless I rule that

16 subordination is appropriate.  Is there any remaining

17 objection on that particular issue?

18      MS. OKIKE:  No, Your Honor.  I believe we've

19 resolved Alameda's objection for purposes of the disclosure

20 statement.

21      THE COURT:  Okay.  All right.  And does Alameda

22 agree with that?  Is there any remaining issue?

23      MR. GLUECKSTEIN:  Good afternoon, Your Honor.

24 This is Brian Glueckstein for Alameda.  We agree for

25 purposes of today with the modifications that have been made

Page 147

1  that the objection is resolved on those issues.

2       THE COURT:  Okay.  I have a few questions and

3  comments about the proposed orders, but before I go there,

4  are there any other issues and objections that have been set

5  forth that we haven't addressed and that people wish to

6  raise and that we need to discuss?

7       MR. MORRISSEY:  Your Honor, Richard Morrissey for

8  the U.S. Trustee.  If I could raise a couple of issues?

9       THE COURT:  Okay.

10      MR. MORRISSEY:  Thank you, Your Honor.  I wanted

11 to make a point about the ballots, Your Honor.  Although

12 obviously plan issues are to be dealt with later, ballots

13 are to be issued -- to be dealt with now.  I just wanted to

14 explain to the Court and to the parties on the phone that

15 there's going to be a tabulation of ballots.  And I believe

16 Debtors have agreed that it won't be just a tabulation with

17 respect to the votes to accept or reject the plan itself,

18 but also the results of the vote on releases.

19      There's an opt-in provision on the ballots, if

20 parties have had a chance to review those, and there will be

21 a tabulation of results regarding the third-party releases

22 as well as the vote on the plan itself.

23      Your Honor, touching on the Alameda claim that was

24 just discussed, Ms. Okike said earlier on that there should

25 be hopefully a 51 percent distribution.  Although given

Page 148

1  where the market is right now, maybe a 57 percent

2  distribution.  I think the parties should understand that it

3  could also be considerably less than that depending on how

4  things turn out.

5       With respect to the Alameda claim, I believe that

6  if the Debtor -- the disclosure statement does say that if

7  the equitable subordination does not work out in the

8  Debtor's favor, then the claim -- then the distribution

9  would not be 51 or 57 percent, but it would an estimated 26

10 percent.

11      The other issue out there, Your Honor, involves

12 intercompany transfers.  And there's a question as to

13 whether certain transfers would be characterized as capital

14 contributions or loans.  That could also make a difference.

15 The outcome of that could also make a difference in terms of

16 what the parties are going to get under the plan.

17      So although in the chart there are a couple of

18 scenarios for distribution, and I'm referring to a chart in

19 the disclosure statement, the scenario being, for example,

20 if the plan is accepted with the APA with finance is going

21 to be one thing.  And if it's going to be the toggle plan,

22 it's going to be something else.  And if it's going to be

23 conversion, it's going to be something else.

24      But there are other alternatives also that the

25 Creditors should be made aware of, and I think it should be

Page 149

1  clear.  I don't think that the Debtors wanted to put those

2  scenarios in the -- on the ballots themselves in conspicuous

3  language, but the U.S. Trustee is a bit concerned about the

4  fact that in order to see what the alternatives actually are

5  and what the different scenarios actually are, the Creditors

6  really have to look very carefully through various parts of

7  the disclosure statement and plan.  And it's a bit of a

8  treasure hunt for them to find those things.

9       THE COURT:  Well --

10      MR. MORRISSEY:  The --

11      THE COURT:  -- as I understand -- let me interrupt

12 you here for a second.  As I understand it, it is true that

13 the resolution of the equitable subordination claims may

14 affect recoveries, particularly at the Hold Co. and Top Co.

15 level.  And if Alameda's asserting a claim at the Op Co.

16 level and if it succeeds, then it could affect recoveries

17 there.

18      And it is true that the characterization of the

19 intercompany arrangements may affect recoveries.  But none

20 of that is dependent on the structure of the plan and

21 whether there's a finance deal, whether there's a toggle

22 deal, whether there's any other kind of distribution.

23 There's an equal effect on all of those possibilities as I

24 understand it.  Isn't that right?

25      MR. MORRISSEY:  Your Honor, I believe that is

A-503

1 right. I'm just commenting on the lack of conspicuousness
2 of the alternative scenarios. That -- and that is our
3 concern there.
4      THE COURT: They are mentioned in the risk
5 factors, right? And if you read the descriptions of these
6 claims that it does say that they could have a material
7 effect on the outcomes, don't they?
8      MR. MORRISSEY: Right. If you look in the right
9 places, yes. You can find all of that information, Your
10 Honor, but if you simply look in the chart as to the
11 scenarios and what could happen, the only three scenarios
12 listed are the -- if the plan, the Binance plan I'll call it
13 --
14      THE COURT: Let me ask the Debtors in the footnote
15 to just put a little bold type introduction that says that
16 these recoveries could change depending upon the issues
17 regarding equitable subordination as to Alameda and the
18 issues regarding the treatment of the intercompany claims,
19 and just cite to the pages in the disclosure statement where
20 that can be found. Would that address your issue, Mr.
21 Morrissey?
22      MR. MORRISSEY: Yes. Your Honor, you're referring
23 to the ballot?
24      THE COURT: I'm referring to the disclosure
25 statement in the part where it lists what the prospective

1 recoveries are.
2      MR. MORRISSEY: Yes, Your Honor. That would be
3 fine. Thank you.
4      THE COURT: Okay. Were there any other issues?
5      MS. SCHEUER: Your Honor? Your Honor, this is
6 Therese Scheuer for the U.S. Securities and Exchange
7 Commission.
8      THE COURT: Yes.
9      MS. SCHEUER: Your Honor, the SEC filed a limited
10 objection to the APA and conditional approval of the
11 disclosure statement. I just rise to note that the
12 disclosure as it's been made is the Debtor's disclosure, and
13 the SEC reserves its right to object to plan confirmation on
14 any basis, including the ability to consummate the
15 transaction, the safety of assets on the purchasers'
16 platform, and any arrangement the purchasers make that
17 impact the safety of those assets. Thank you, Your Honor.
18      THE COURT: Okay.
19      MR. MORRISSEY: And Your Honor, Richard Morrissey
20 once again for the U.S. Trustee. I wanted to point out to
21 Your Honor that a change -- now Your Honor I know is going
22 to go through the orders, but a change has been agreed to by
23 the Debtors in the order approving the Debtors' entry into
24 the APA. And I believe if -- at Paragraph 4, in its
25 original form, that provision of the order provided that all

1 reservations of rights of the objectors would be terminated.
2 And what we wanted to do is limit that so that the
3 reservation of rights would be reserved for the final
4 approval of the APA itself, which is embodied in the plan so
5 that parties could still reject -- object to the final
6 approval of the APA and the disclosure -- the final
7 disclosure statement, and the plan itself.
8      And Debtor's counsel was good enough to agree to
9 make that change. And again, I just wanted to point out for
10 the customers who are on the phone that all that's being
11 requested today is approval for the Debtors to enter into
12 the Asset Purchase Agreement with Binance. It's not an
13 approval of the sale itself. That'll come later. It's --
14 that is embodied in the plan, and that will be addressed at
15 the confirmation hearing. And Your Honor, that's all I
16 have. Thank you.
17      THE COURT: Okay. So you have worked out language
18 that satisfies your concerns in that regard?
19      MR. MORRISSEY: Yes, Your Honor.
20      THE COURT: Okay. Are there any other --
21      CLERK: Your Honor --
22      THE COURT: -- objections? Yeah.
23      CLERK: I'm sorry, Your Honor. This is the law
24 clerk. It's coming up on four hours. I don't know if we
25 should change the tape.

1      THE COURT: Probably we should do so. You want to
2 take five minutes and do that? Are we going to be timed out
3 anytime soon, or...
4      CLERK: I don't know. I've sent a message to the
5 ECRO, but I don't know.
6      THE COURT: All right. Why don't you -- we'll
7 take a five-minute break, and you can have the ECRO change
8 the tape, okay?
9      CLERK: Thank you.
10      THE COURT: Thank you.
11      (Recess)
12      THE COURT: All right. Are we ready to resume?
13      WOMAN 1: Yes, Your Honor.
14      THE COURT: Okay. All right. I think we've dealt
15 with all the objections for the reasons stated on the
16 record. I am prepared to approve the disclosure statements
17 subject to the modifications we've discussed and to approve
18 the APA with the understandings that we've discussed as to -
19 - and the fact that it's effective -- conditioned -- on
20 confirmation of the plan.
21      I do have some comments on the proposed orders.
22 It's possible I may have others because I know changes
23 continue to be made and I really an out of time to keep up
24 with all of the various proposals, but I think I caught up.
25 But I will look once again at the final version you've sent

A-504

1  me and here are my comments.

2          As to the APA order, there is proposed findings

3  about the expense reimbursement provisions and how they are

4  proportionate to the benefits to be obtained and how Binance

5  wouldn't do the deal without them.  Is there -- where in the

6  declaration is there my evidence to support those findings?

7          WOMAN 1:  Your Honor, I believe it was addressed

8  in Mr. Tichenor's declaration.  I believe it was the

9  original declaration that we filed with the motion itself

10  but let me double check.

11          THE COURT:  Well, wherever it is, we should make

12  sure it's in evidence for this hearing, right, so that I

13  have a factual basis for any findings that I'm being asked

14  to make.

15          WOMAN 1:  Yes, Your Honor.  I guess we proposed to

16  -- I'm just confirming whether we filed the supplemental

17  declaration.  Your Honor, I guess we proposed to put Mr.

18  Tichenor on the address that.

19          THE COURT:  Okay.

20          CLERK:  Your Honor, we may actually have to take a

21  break again because people are starting to drop off the line

22  at the four-hour mark and maybe everybody who hasn't called

23  in in the last half hour should just redial in.

24          THE COURT:  All right.  Let's just -- I tell you

25  what, everybody on the phone redial in.  I'll do the same.

1  Will that solve our issue, Lorraine?

2          CLERK:  It did last time.

3          THE COURT:  Okay.  All right.  So sorry for that

4  (indiscernible) but that's what we'll do.  Give everybody a

5  few minutes to complete logging in.

6          (Pause)

7          THE COURT:  All right.  I hope we've allowed

8  enough time for everybody to log back in.  I'll ask

9  everybody again to mute themselves if they're not actively

10  speaking.

11          AUTOMATED VOICE:  Unknown participant is now

12  joining.

13          MAN 1:  Randy, I think you're on.

14          MAN 2:  Okay.

15          THE COURT:  All right.  Ms. Okike, are we ready to

16  go?

17          MS. OKIKE:  Yes, Your Honor.  We'd like to put on

18  the direct testimony of Mr. Brian Tichenor.

19          THE COURT:  Very good.  Mr. Tichenor, do you swear

20  that the testimony you're about to give is the truth, thew

21  whole truth, and nothing but the truth so help you God?

22          MR. TICHENOR:  I do, Your Honor.

23          THE COURT:  Okay.  Please proceed, Ms. Okike.

24          DIRECT EXAMINATION OF BRIAN TICHENOR

25  BY MS. OKIKE:

1  Q    Mr. Tichenor, can you let us know what your role is

2  with the Debtors?

3  A    I'm an investment banker to the Debtor.

4  Q    And were you involved in the negotiation of the asset

5  purchase agreement with Binance.US?

6  A    I was.

7  Q    Is there an expense reimbursement contemplated by the

8  Binance.US APA?

9  A    Yes.  The Binance APA contemplates a $5 million expense

10  reimbursement payable by Voyager to Binance.US under a

11  certain narrow set of facts and circumstances.

12  Q    And based off of your professional judgment, do you

13  believe that the expense reimbursement being requested is

14  reasonable and appropriate?

15  A    I do.

16  Q    And do you believe that it confers substantial benefits

17  upon the Debtors' estates?

18  A    I do.

19  Q    In your opinion, would Binance.US proceed with the

20  transaction without the expense reimbursement?

21  A    I do not.  This was a point that was heavily negotiated

22  during discussions with Binance.US.  It was a point that we

23  sought to have removed to the extent that it possible but

24  was viewed as a item that was a requirement for purposes of

25  being able to move forward with the transaction.

1  Q    And do you believe that the expense reimbursement which

2  is triggered under certain circumstances is designed to

3  maximize value for the estate?

4  A    I do in the sense that I believe that the transaction

5  generally maximizes value for the estate.  The expense

6  reimbursement is only paid under a narrow set of facts and

7  circumstances and the APA generally still provides the

8  Debtor with the ability to execute and move towards a toggle

9  transaction to the extent that it so chooses to exercise a

10  fiduciary out.  Additionally, given the circumstances in

11  which expense reimbursement is paid and the narrow sets of

12  facts and circumstances around that, we feel comfortable

13  that this is a -- from a transaction perspective, the

14  transaction is value maximizing for purposes of the estate

15  and recoveries.

16          MS. OKIKE:  Thank you, Your Honor.  No further

17  questions.

18          THE COURT:  Does anyone else wish to cross-examine

19  Mr. Tichenor on this issue?  All right.  Very good.  Thank

20  you, Mr. Tichenor.

21          Getting back to the order, the -- Paragraph 23

22  still says that I'm approving the agreement in its entirety

23  which seems a little potentially confusing to me.  I'd like

24  to make clear in the order as I think we did at FTX that the

25  effectiveness of the agreement is subject to confirmation of

A-505

Page 158

1    the plan and is not binding in the absence of confirmation.
2    So if the statement in Paragraph 23 about authorizing entry
3    and agreement in its entirety is not needed, I prefer to
4    take that out because -- to have the explicit statement that
5    I just said.  Does that work for you?
6        MS. OKIKE:  Yes, Your Honor.  I'm just trying to
7    locate the provision.  I don't know if I'm looking at a
8    different version.  You said it's Paragraph 23?  Do you know
9    wish --
10       THE COURT:  It may have been renumbered.  It was
11   Paragraph 23 in what I originally read which seemed to have
12   the idea that I was authorizing the entire agreement.
13   There's another provision somewhere else that says that the
14   parties are granted all rights and remedies under the
15   agreement.  Those a little confusing in light of the fact
16   that the agreement itself is contingent on confirmation and
17   I just don't want there to be any --
18       MS. OKIKE:  Understood, Your Honor.  We'll make
19   that revision.
20       THE COURT:  Okay.  Thank you.  Is it contemplated
21   if you're called on by the seller -- excuse me -- to
22   pay the purchaser expenses -- is it contemplated that those
23   would be subject to my review and approval?
24       MS. OKIKE:  Your Honor, I believe what we're
25   asking today is the approval of the expense reimbursement.

Page 159

1    The provision itself does require that the expense
2    themselves are, I believe, reasonable and necessary.
3        THE COURT:  And is it contemplated that that
4    determination will be subject to review by me?
5        MS. OKIKE:  Your Honor, if you could just give me
6    one moment as I just look at the provision.  I don't want to
7    misstate what we've agreed to.
8        THE COURT:  The technical reason is that it's all
9    part of the plan process and even if you decide to toggle to
10   a different plan and if you kick off the purchaser expense
11   in context with their -- where they're kicked off, it's all
12   part of a plan process and determination and includes the
13   payment of fees and I think you have an 1129(a) -- I don't
14   even have it in front of me -- (a)(4) issue that I have to
15   approve it as reasonable.
16       MS. OKIKE:  I'm just thinking through that, Your
17   Honor.  So -- I mean, what we're seeking today is the
18   authority to the extent that the expense reimbursement is
19   triggered under the provisions in the APA to pay the
20   purchaser expenses up to a cap of 5 million and then is the
21   request that Your Honor is able to review the fees
22   themselves to ensure reasonableness.
23       THE COURT:  Yeah.  I think that as a technical
24   matter, this being part of a plan process, I have to -- I
25   can't confirm unless any fees that are payable in connection

Page 160

1    with this process which this, I think, would qualify for
2    unless -- they're subject to my determination of
3    reasonableness.
4        MS. OKIKE:  Your Honor, I think -- I'm just trying
5    to think through it because in our minds, we view Binance.US
6    as basically serving as, you know, a stalking horse, right,
7    that may get topped in the process.  And so I'm just trying
8    to understand that you, you know, in the context of a 363 sale
9    where you have a stalking horse that gets approved for
10   expense reimbursement -- I don't believe in most
11   circumstances the Court would review those fees for
12   reasonableness and we kind of view this --
13       THE COURT:  That's because Statute 1129 isn't
14   applicable then -- that Section 1129 -- this is all part of
15   a plan process -- Section 2219, one of the requirements for
16   confirmation is that any fees payable to anybody involved in
17   the plan process have to be subject to my review for
18   reasonableness.
19       MS. OKIKE:  Understood, Your Honor.
20       MR. GOLDBERG:  Your Honor, if I may.  Adam
21   Goldberg of Latham & Watkins on behalf of Binance.US.  Of
22   course the fees would have to be reasonable to be payable by
23   the Debtor and we have no issue including a provision that
24   makes clear that Your Honor would be entitled to review for
25   reasonableness.  But the -- to be clear, our position would

Page 161

1    be that these fees are payable and would be allowed as
2    administrative expenses pursuant to this order regardless of
3    whether a plan is confirmed if the fees become payable in
4    accordance with the APA.
5        That, I think, is the deal that we struck with the
6    Debtors to effectively serve as the stalking horse as Ms.
7    Okike just pointed out.
8        THE COURT:  I do understand that but let's just
9    make them subject to my review for reasonableness and just
10   leave it at that because it's possible -- there is the
11   possibility that I'll confirm the plan without these fees
12   and I (indiscernible) without the Binance agreement going
13   forward and with these fees being payable so let's just
14   provide that I'll review them for reasonableness and we'll
15   be protected in all of them.
16       MS. OKIKE:  Understood.  That's works, Your Honor.
17       MR. GOLDBERG:  Thank you, Your Honor.
18       THE COURT:  Thank you.  Very good.  On the
19   disclosure statement order, in all of the ballots where
20   people are being given the choice to opt in to the relief
21   (indiscernible) or to contribute their claims, I would like
22   there to be an explicit statement that says that your
23   decision as to whether to do this or not is entirely
24   voluntary and is -- it is not required.  Okay?
25       MS. OKIKE:  Yes, Your Honor.

A-506

Page 162

1    THE COURT:  I'm not sure that I saw in the order
2  any provisions that said when cure notices would be sent,
3  when the objections to assumption or assignment would be
4  due, although I did see in some of the attachments that you
5  seem to be looking for February 8th as the objection date on
6  contract objections.  Starting with cure notices, when are
7  you proposing to give people notice as to the contracts are
8  to assumed and rejected and the proposed cure amounts?
9    MS. OKIKE:  I believe those are in the exhibits,
10  Your Honor.  I just want to look.  We can of course add it
11  to the order.  February -- for assumed contracts, it's
12  February 22nd.
13    THE COURT:  That's when you're going to -- my
14  question was more, when will you be telling the other
15  contracting parties that you're proposing to assume their
16  contract and telling them what their proposed cure amounts
17  are.
18    MS. OKIKE:  Yes, Your Honor.  I believe that's
19  February 8th.
20    THE COURT:  Okay.  All right.
21    MS. OKIKE:  We can add that to the order.
22    THE COURT:  I thought that was what you were
23  proposing as to when they would be able to object.  So
24  you're -- and then you're asking them to object two weeks
25  later?

Page 163

1    MS. OKIKE:  Yes, Your Honor.
2    THE COURT:  But do you need all the way until
3  February 8th to make that determination?
4    MS. OKIKE:  Your Honor, I believe we could do it
5  earlier than that.  I think we have a sense of what
6  contracts may be needed.
7    THE COURT:  I'd prefer to give the contracting
8  parties 21 days if you don't have to give them less time
9  than (indiscernible).
10    MS. OKIKE:  Will do.
11    THE COURT:  Very good.  And there's a provision
12  about -- in some of the procedures that says that the
13  Debtors will be able object until a few days before the
14  voting deadline.  Do you need that much time?  I'm concerned
15  about whether people will have enough time to seek interim
16  allowance if you make an objection two days before the
17  voting deadline.
18    MS. OKIKE:  Your Honor, we can move that up.
19    THE COURT:  Okay.  I appreciate that.  Proposed
20  Paragraph 13 says that the disclosure statement materials
21  won't be sent to people who are not entitled to vote.  I see
22  this proposal all the time but I'm concerned because Rule
23  3017(d) says that I can dispense with the mailing of the
24  disclosure statement to creditors in classes that are
25  unimpaired, but it doesn't seem to give me discretion to

Page 164

1  dispense with it as to other classes.  Am I missing
2  something?  Do I have that discretion under some other rule
3  that I'm missing?
4    MS. OKIKE:  No, Your Honor.  I believe that's
5  correct and we can modify that to make clear that we'll send
6  it to those parties.
7    THE COURT:  And are you proposing to seek
8  voluntary releases or contributions of claims from anybody
9  in classes that are unimpaired?  Do you have --
10    THE COURT:  No, Your Honor.
11    THE COURT:  Okay.
12    MS. OKIKE:  No, Your Honor.
13    THE COURT:  All right.  Those are my comments.
14    MS. OKIKE:  Your Honor, sorry.  I do want to
15  clarify.  With respect to parties in unimpaired classes, I
16  believe -- and I just want to double check -- I believe they
17  may be getting a notice of unimpaired status.  I don't
18  believe that they contributing claims but I just want to
19  double check just to make sure.
20    THE COURT:  Yeah.  If they're being asked to give
21  a release or being asked to contribute claims, they should
22  get the disclosure statement so they can read the
23  disclosures that are relevant to those points.
24    MS. OKIKE:  Understood, Your Honor.  They are
25  getting an opt-in notice so we will provide the disclosure

Page 165

1  statement to them as well.
2    THE COURT:  Okay.  All right.  Are there any other
3  comments or -- I will look at the final versions of the
4  orders when they're ready and if you could do another set --
5  redlines -- that compare them to the orders that I entered
6  as to the FTX proposals, that will help me because I went
7  through the other redlines somewhat but I was
8  (indiscernible) pretty fatigued by the time I got to them
9  and it would be useful for me to have a fresh set of full
10  comparisons to look at.
11    MS. OKIKE:  Yes, Your Honor.  Of course we'll do
12  that and we really appreciate you accommodating our late-
13  night filing and getting through all the documents.  So our
14  appreciation for that.  Thank you.
15    THE COURT:  All right.  That being said, is there
16  anything else to be accomplished today?
17    MS. CORDRY:  It's Karen Cordry, Your Honor.  If I
18  could ask if we could possible also see a set of the
19  redlines because we might have some comments as well just in
20  terms of some of the points that we had raised that are
21  being addressed.
22    MS. OKIKE:  Of course.  Yep, we can share the
23  redlines.
24    MS. CORDRY:  Thank you.  We appreciate it.
25    THE COURT:  Okay.  Anything else?  Very good.

A-507

Page 166

```
1   Thank you all very much.  I hope you will continue to

2   discuss the issues that are still open and wish you good

3   luck in reaching resolutions of them.

4        MS. OKIKE:  Thank you, Your Honor.

5        MR. GOLDBERG:  Thank you, Your Honor.

6        THE COURT:  Okay.  All right.  On that note, we

7   are adjourned.  Thank you very much.

8        (Whereupon these proceedings were concluded at

9   6:06 PM)
```

Page 168

```
1        C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4   transcript is a true and accurate record of the proceedings.

5

6

7

8   Sonya Ledanski Hyde

9
```



```
20  Veritext Legal Solutions

21  330 Old Country Road

22  Suite 300

23  Mineola, NY 11501

25  Date:  January 13, 2023
```

Page 167

```
1              I N D E X

2              RULINGS

3

4                          PAGE   LINE

5   Request to renew denied without prejudice   101   17
```

[& - 60625]                                                              Page 1

&
& 3:3,11 4:1
  5:8,9,16 7:1
  47:2 160:21

0
05620 5:3
06752 6:19
07102 5:19
07205 6:24

1
1 25:11,12
  80:12 153:13
  154:7,15
  155:13
1,000 139:25
1.002 69:12
1.022 69:11
  70:4
1.2 34:22 52:1
  112:22
10 1:16 34:18
  34:20 35:5
  70:21 73:19
100 44:22
  66:14 70:17
  77:7 91:1
  138:22 139:25
10004 1:14 7:4
10014 4:18
10022 3:6 4:1 1
1006 4:17
101 167:5
10173 4:4
11 73:9,23
  103:12,14,22
  103:25 104:7

105:4 114:9
  125:7,19
  144:18
1123 81:7,11
  81:15
1123-84 141:6
1123.84. 142:3
1129 159:13
  160:13,14
11501 168:23
120,000 34:14
  34:19 39:13
12151 168:6
125 7:3
12548 5:11
12th 3:20
13 104:20
  163:20 168:25
15 34:25 70:19
  73:18
155 12:5
15th 13:14
17 167:5
18 145:22
1850 3:20
18th 14:7
  69:13 70:5
  73:5,6
1st 130:8,8,8

2
2 60:18,20
  63:19,23 64:1
  64:3,21,24
  65:5,7 68:6
  119:2 155:14
20 15:1 26:8
  36:19 66:7

69:13 95:8
  104:16,19
  133:9
20036 3:21
201 4:17
2020 42:7
2021 42:7
2022 120:7
2023 1:16
  168:25
21 163:8
22 28:8
22-10943 1:3
2219 160:15
22nd 162:12
23 157:21
  158:2,8,11
23/49/57/63
  12:5
24 129:24
253 6:3
26 148:9
2:03 1:17
2nd 14:9

3
3 61:20
3.3 26:23,24
30 24:12 42:9
  49:24 52:4,7
  54:15
300 3:13
  168:22
3017 163:23
3165 6:8
330 168:21
33993 6:9

340 4:3
35 69:20 77:2
35124 6:4
360,000 39:19
363 80:12
  160:8
3ac 75:9

4
4 81:7,11,15
  151:24 159:14
45 30:3 132:16
45694 6:14
46 16:22
470 18:19
48 71:15

5
5 35:11 73:21
  156:9 159:20
5.8 144:7
50 6:18 16:22
  92:17 139:25
51 30:2 70:6
  132:13,15
  147:25 148:9
56 13:13,23
57 70:8 148:1,9
570 5:18

6
6 79:25 96:23
  132:17 133:2,7
6.12 28:9 85:23
  87:14
60 12:5 112:19
601 3:5
60625 3:14

A-508

| | | | |
|---|---|---|---|
| **694** 6:13 | 56:8 65:17 | 132:3 134:2,9 | **accordance** |
| **6:06** 166:9 | 66:9 67:3,4 | 134:15,20,25 | 28:12 69:24 |
| **7** | 74:10 77:17 | 135:2,4,9,11 | 161:4 |
| **7** 73:24 105:5,8 | 92:13,18 113:8 | 135:14,16,22 | **accorded** 33:21 |
| 105:24 107:24 | 116:16 151:14 | 136:7 140:22 | **account** 25:1 |
| 112:12,21 | 157:8 | 141:5,10,13,18 | 26:14,19 29:1 |
| 114:10 125:7 | **able** 17:17 | 142:21 | 29:12 34:3,4,5 |
| 125:19 136:14 | 25:25 31:22 | **absence** 91:11 | 39:11,15 40:8 |
| **78711** 5:12 | 32:4,5,11 33:9 | 99:5 158:1 | 40:19 41:8,9 |
| **8** | 33:17 34:6 | **absolute** | 41:13,19 49:23 |
| **836** 22:3 | 38:22 39:22 | 146:13 | 52:3,4,16 |
| **843** 111:25 | 40:13 41:25 | **absolutely** 21:5 | 53:22,24 55:21 |
| 113:7 | 42:12,13 43:21 | 51:7 120:18 | 56:10 57:24 |
| **885** 4:10 | 43:23 44:11,23 | **accelerate** 84:6 | 58:22 68:20 |
| **89** 5:2 | 46:6 48:18 | **accept** 133:4 | 69:24 70:6,8 |
| **8th** 162:5,19 | 49:20 50:3,5 | 140:16 147:17 | 71:5,12,16,22 |
| 163:3 | 51:17 52:7 | **acceptable** | 71:24 72:1,7 |
| **9** | 55:23 56:9 | 122:17 | 74:25 75:12,17 |
| **95** 112:4 | 62:16,23,25 | **accepted** | 77:10 78:12,22 |
| **970** 6:23 | 64:14 66:1,5 | 128:11,12 | 79:19 80:7,18 |
| **a** | 66:10,20,24 | 148:20 | 81:2,4,17,20 |
| **abandoned** | 68:19 79:16 | **accepting** 71:8 | 83:11 87:22 |
| 57:2 120:7 | 82:11,14 83:5 | **access** 16:24 | 90:20 93:18,23 |
| **abandonment** | 84:9 86:23 | 48:13,14 49:12 | 94:6 95:19 |
| 63:13 | 89:17 93:6 | 49:15 70:17 | 110:19 115:2 |
| **abby** 58:17 | 113:21 114:25 | 79:16 93:6 | 115:23 |
| **abigail** 5:14 | 117:14,23 | 94:16 130:10 | 116:23 |
| 48:25 119:18 | 119:7 120:15 | 139:3 | 128:19 |
| 125:13 | 127:21 128:3 | **accommodate** | 162:15,17 64:8 |
| **ability** 31:13 | 130:10 134:6 | 38:21 | 64:11 65:11 |
| 31:13,16,17 | 137:12 139:2 | **accommodat-** | 96:9 114:25 |
| 33:7 34:9 39:2 | 142:8,11 | 165:12 | **accurate** 132:9 |
| 41:2,19 42:12 | 156:25 159:21 | **accomplish** | 168:4 |
| 48:15,18 50:18 | 162:23 163:13 | 94:13 | **accusations** |
| 51:22 55:16 | **above** 47:8 | **accomplished** | 103:10 |
| | **abraham** 6:21 | 94:7 165:16 | **achieve** 121:23 |
| | 131:20,22,22 | | 123:3 |

| | | | |
|---|---|---|---|
| 68:21 73:13 | **allan** 9:6 | **amateur** 107:8 | 134:6 |
| 85:12,12,14,20 | **allege** 80:17 | **amazon** 78:14 | **anybody** 22:13 |
| 86:4,6,8,15,20 | **alleges** 79:11 | 78:24 | 38:7 63:18 |
| 87:3,13 96:7 | **allocated** 28:12 | **amenable** | 115:9 123:13 |
| 97:7 98:22 | 55:15 | 21:19 | 124:16 144:2 |
| 100:2,9 101:6 | **allocati** 11:11 | **amend** 100:3 | 146:1 160:16 |
| 101:7 103:5 | **allow** 16:22 | **amended** 99:25 | 164:8 |
| 105:12 144:7 | 17:11 43:3 | 146:1 | **anymore** |
| 144:15 152:12 | 49:20 50:13 | **american** | 103:22 108:4 |
| 156:5 157:22 | 52:7 55:4 59:6 | 116:22,24 | **anytime** 153:3 |
| 157:25 158:3 | 59:24 65:13 | **amish** 10:16 | **apa** 21:14,17 |
| 158:12,15,16 | 66:1,10,14 | **aml** 26:20 | 22:3 25:5 35:8 |
| 161:12 | 67:2 73:17 | 39:19 42:19 | 35:18,19 47:7 |
| **agreements** | 79:8 82:4 | 51:16 78:2 | 49:22,23,23 |
| 42:17 47:15,20 | 91:19 115:14 | **amount** 45:4 | 52:2 55:25 |
| 51:12,13,14 | 125:16,17 | 55:7 69:16 | 67:13,23 72:22 |
| 67:19 78:2 | 128:4 144:25 | 72:9 77:3 | 73:7,7,9,20,23 |
| 99:17 | **allowance** | 81:25 90:18 | 74:20 76:12,15 |
| **ahead** 22:17 | 163:16 | 117:2,9 123:23 | 76:19,23 77:3 |
| 49:6 59:18 | **allowed** 32:14 | 139:21 145:1,9 | 78:11,20 79:12 |
| 106:19 111:19 | 54:16 58:13 | **amounting** | 79:14 80:17 |
| 118:11 135:4 | 82:16 115:19 | 116:10 | 81:3 82:4 |
| 136:8 | 155:7 161:1 | **amounts** 92:13 | 83:11 84:3 |
| **air** 116:24 | **allowing** 18:19 | 162:8,16 | 85:25 90:9,10 |
| **airlines** 116:23 | 31:6 51:8 | **ample** 44:10 | 93:20 94:7 |
| 116:24 | 55:20 65:9 | 77:1 | 95:6,10 102:24 |
| **al** 6:4 | **allows** 64:14 | **analyze** 43:3 | 103:11 104:20 |
| **alameda** 13:18 | 72:22 128:25 | 67:7 | 106:9,21 |
| 15:13 17:20 | **allyson** 10:7 | **analyzing** 43:1 | 148:20 151:10 |
| 18:3,16,19,20 | **alternative** | **andrew** 9:19 | 151:24 152:4,6 |
| 19:6,17,18 | 16:6 136:3 | **angela** 7:13 | 153:18 154:2 |
| 145:17 146:6 | 138:3 150:2 | **angry** 107:11 | 158:8 159:2 |
| 146:21,24 | **alternatives** | **answer** 27:11 | 156:8,9 157:7 |
| 147:23 148:5 | 70:15 148:24 | 37:13 53:12 | 159:19 161:4 |
| 150:17 | 149:4 | 55:18 58:4 | **apart** 127:25 |
| **alameda's** | **alto** 37:17 | 84:13 | **apologize** |
| 146:19 149:15 | | **answers** 84:18 | 27:21 32:18 |
| | | 95:16 109:19 | 45:21 60:21 |

| | | | |
|---|---|---|---|
| **achieved** 78:7 | 109:12 111:20 | **adequacy** 2:7 | **affects** 103:7 |
| **acknowledged** | 116:16,17 | 103:3 | **affidavit** 26:9 |
| 141:20 | 146:11 149:4,5 | **adequately** | 28:5,6,8,15,16 |
| **acquire** 31:13 | 154:20 | 43:20 | **affiliates** |
| 31:14,17,24 | **adam** 4:13 | **adjourned** | 145:25 |
| 85:21 95:8 | 47:1 89:20 | 166:7 | **afternoon** 21:8 |
| **acquired** 26:13 | 95:17 121:17 | **adjournment** | 49:10 123:19 |
| 73:25 74:12 | 160:20 | 59:21 | 146:23 |
| 86:2,18 96:10 | **add** 30:11,16 | **adjustment** | **agencies** 16:17 |
| 96:11 142:17 | 89:22 100:16 | 86:22 | **agenda** 20:7,21 |
| **acquiring** 62:9 | 162:10,21 | **administrative** | 21:13 |
| 69:21 83:1 | **addition** 42:11 | 18:21,23 | **agent** 69:23 |
| 86:5,6,21 | 42:24 66:13 | 101:11,16 | 91:20 |
| **act** 45:13 | 75:12 77:4 | 161:2 | **aggregate** |
| 112:16 | 142:16 | **admiration** | 75:23,25 |
| **acting** 44:21 | **additional** 21:3 | 17:23 | **ago** 94:9 99:22 |
| **action** 18:24 | 24:6 35:10,11 | **admission** 22:7 | 104:8 134:16 |
| 64:16 142:2 | 35:12,19 42:14 | **admitted** 22:4 | **agree** 28:2 51:9 |
| **actions** 104:1 | 68:24 69:13 | 118:16 | 86:12 90:4 |
| **active** 96:8 | 92:13 | **admittedly** | 91:4 119:21 |
| **actively** 25:17 | **additionally** | 18:17 | 146:22,24 |
| 61:22 106:18 | 157:10 | **adopt** 99:22 | 152:8 |
| 123:3 155:9 | **address** 15:8 | **advance** 24:7 | **agreed** 17:24 |
| **actual** 117:4 | 20:8 40:5 | 145:6 | 33:2,23 35:4,4 |
| 142:17 | 52:19 87:24 | **advantages** | 50:24 59:22 |
| **actually** 14:21 | 92:6 93:15,19 | 66:12 | 82:9 90:11 |
| 17:10 21:20 | 96:1 117:14 | **adverse** 121:3 | 93:20 119:23 |
| 27:8 30:13 | 124:12 142:5 | **adversely** | 141:20 142:9 |
| 35:23 38:15 | 150:20 154:18 | 74:11 | 147:16 151:22 |
| 40:13 53:21 | **addressed** | **advice** 114:13 | 159:7 |
| 54:24 60:6,9 | 18:14 102:25 | 126:5 | **agreeing** 79:18 |
| 62:9,12 65:24 | 147:5 152:14 | **advisor** 13:24 | **agreement** 2:2 |
| 66:16,20 86:21 | 154:7 165:21 | **advisors** 16:8 | 26:24 27:7,7 |
| 90:10 96:19 | **addresses** | **affairs** 97:22 | 27:14 28:10,13 |
| 100:3,17,24 | 49:12,13 51:19 | **affect** 15:3 | 29:4 35:1,13 |
| 103:7 107:4 | 51:22 | 74:12 149:14 | 35:16,17,24 |
| 108:6,14 | | 150:14 | 36:5 60:15 |

| | | | |
|---|---|---|---|
| 67:23 | **appropriate** | **approximately** | 109:11 113:12 |
| **appears** 69:15 | 20:19 24:8 | 15:9 23:23 | 129:5 140:7 |
| **appetite** 56:5 | 30:15 49:2 | 24:12 34:14,18 | 144:8 154:13 |
| **applicable** 16:7 | 88:11 103:2,12 | 34:22 39:13,14 | 164:20,21 |
| 29:6 102:12 | 105:22 114:17 | 39:18 57:25 | **asking** 21:22 |
| 160:14 | 126:16 146:16 | 65:25 69:11 | 28:14 64:15 |
| **application** | 156:14 | 104:21 | 109:16 113:10 |
| 16:3 57:1 | **appropriately** | **april** 73:5 | 130:22 133:13 |
| 63:14 120:7,17 | 39:22 40:13 | 109:16 111:10 | 134:14 158:25 |
| **applications** | 80:23 130:17 | 130:22 133:13 | 162:24 |
| 121:12 | **approval** 2:6 | 134:7 | **aspect** 67:24 |
| **applied** 99:11 | 20:6 21:15 | **argue** 100:7 | **aspects** 22:24 |
| 100:12 | 27:6 31:24 | **argued** 18:20 | 115:4 |
| **apply** 99:13 | 32:7 60:10 | **arguing** 18:4 | **assert** 17:1 |
| 103:10 | 64:7 73:10 | **argument** 15:4 | **assertations** |
| **appoint** 98:19 | 80:19 83:4,24 | 68:5 99:13 | 106:5 |
| 98:19 99:5 | 103:5 124:2 | 112:17 113:13 | **asserted** 30:1 |
| **appointed** | 151:10 152:4,6 | 106:5 | **asserting** |
| 96:21 | 152:11,13 | **arguments** | 149:15 |
| **appreciate** | 158:23,25 | 65:3 112:13 | **asset** 68:21 |
| 20:17 55:13 | **approvals** 27:9 | 146:13 | 73:12 104:15 |
| 65:15 107:7 | 81:21 82:21 | **ari** 10:18 | 144:7 152:12 |
| 112:6 124:25 | 144:2 | 158:23,25 | 156:4 |
| 126:24 127:12 | **approve** 85:12 | **arrangement** | **assets** 16:20 |
| 129:19 130:4 | 105:17,18 | 33:13 84:19 | 43:4 44:21 |
| 131:12,17 | 129:6 153:16 | 88:14 92:2 | 45:20 46:9,16 |
| 142:25 163:19 | 153:17 159:15 | 151:16 | 46:17 68:25 |
| 165:12,24 | **approved** | **arrangements** | 70:3 73:13,14,25 |
| **appreciated** | 58:20 99:5 | 96:4 149:19 | 80:4,8 86:18 |
| 113:9 | 72:22 79:16 | **array** 67:7 | 86:6,7 89:9,18 |
| **appreciation** | 84:21 85:9 | **arthur** 9:14 | 89:19 92:11 |
| 165:14 | 106:9 160:9 | **articles** 88:2 | 104:11 109:4,7 |
| **approach** | **approves** 35:16 | **articulate** 19:3 | 109:8,9 151:15 |
| 46:11 60:2 | **approving** 2:7 | **asked** 27:25 | 151:17 |
| **approached** | 2:8 84:23 | 47:15 48:24 | **assigned** |
| 119:7 | 103:2 111:3 | 58:18 63:21 | 144:16,23 |
| | | 151:23 157:22 | 105:7,11,16,18 |

**[assignment - bankings]** Page 6

**assignment**
162:3
**associate** 65:10
**associated**
24:13,15 39:9
40:2 61:8,19
72:12
**association**
3:18
**assume** 99:16
101:22 162:15
**assumed**
144:16,23
145:11 162:8
162:11
**assuming**
128:20
**assumption**
145:4,5 162:3
**assumptions**
67:14
**assurances**
111:2
**attached** 27:3
**attachments**
162:4
**attack** 130:5
**attempt** 61:11
112:10
**attention** 122:5
122:19
**attesting** 78:8
**attorney** 5:7
49:1 57:10
58:7,18 114:14
119:19 125:9
126:1

**attorneys** 3:4
3:12,18,19 4:2
4:9,16 5:9,17
7:2 125:17
132:11
**attributable**
91:24 116:1
**attributed**
143:8
**audio** 27:22
37:10 48:22
52:11 62:24
73:14 87:1
**audited** 42:7
43:6 77:25
**austin** 5:12
**authorities**
55:3 102:8
116:2
**authority**
17:10 41:13
55:1 73:12
75:5 99:4
114:9 123:15
140:10 159:18
**authorization**
21:14
**authorizations**
16:21 26:25
27:10 83:5
**authorizing**
2:1 158:2,12
**auto** 54:12,17
40:6 155:11
**automatic**
73:24

**automatically**
99:17 134:17
**autumn** 10:14
**available** 32:17
32:25 34:5
42:13,25 43:7
43:10,14,22,23
49:25 63:12
70:11,14 71:11
72:16 78:1
79:5 90:17
93:18,22
137:14
**avenue** 3:5 4:3
4:10 6:13
126:25
**average** 39:13
**avila** 71:1
**avoid** 16:12
20:13 136:23
**aware** 15:8
37:18 43:8
44:5 48:17
56:25 57:4
79:8 99:10
148:25
**aws** 37:20
**ayc** 67:5
**azman** 4:6 38:9
38:9,18 92:4,4
95:2,23,23
100:18,18
129:22,22
130:2,24 131:6
139:13,13

**b**

**b** 1:21 80:12
**baby** 61:20,20
**back** 13:14
14:10,25 15:1
19:25 20:14
28:4 40:7
51:12 52:3
64:5 67:16
91:25 92:13
102:1,2 125:15
131:18 132:21
155:8 157:21
**balancing** 76:8
**ball** 8:1
**ballot** 129:5
143:18 150:23
**ballots** 2:8
147:11,12,15
147:19 149:2
161:19
**balluku** 9:18
**baltaytis** 9:10
**bam** 69:3
78:10,18
**bank** 42:4
44:15 72:1
77:4 107:2,4
**banker** 22:2
156:3
**banking** 5:10
57:1,3 58:19
63:13 120:6,9
120:17
**bankings**
125:12

**[binance - brian]** Page 8

41:8,12,22
43:17 44:8
45:7,7 46:3,18
46:23,24,25
47:3 48:14
50:7 51:11
52:11,12,15,16
55:1,4,19,21
56:11,15,25
57:4,19 58:10
58:12,13,23
59:4,6,20 61:2
61:3,12 62:15
62:19 63:10,11
64:17,18 66:19
66:22,24,25
67:10,18 79:14
84:8 85:20
86:5,9 87:6,9
87:15,17,18
88:8,12,14,19
89:7,21 90:10
90:12,16,16,24
91:1,5,10,19
91:23 92:9,20
93:2,7,8,9,12
93:12,15,18,24
94:3,8,10,13
94:15,18,21
95:6,18,20
96:10 97:19,20
97:24 98:7
104:19 107:3
108:20 109:2,5
109:6,11,20,21
110:12,19,19
110:24 114:19

114:21,23
115:1,1,9,19
117:13 118:17
118:25 119:5
119:23 120:4
120:15,21
121:8,11,18,19
122:21,24
124:8 125:14
127:17,20
128:3,11,19,23
129:1,7 132:12
132:16,20,23
133:1,4,10
134:17,23
135:7 136:1,8
136:12,18
137:14,17
139:2,2 141:15
141:16,20,24
142:7,8,12,18
144:25 150:12
152:12 154:4
156:9 161:12
**binance's**
27:12 32:16
33:3,9 38:21
55:16 56:5
57:22 67:1
71:7
**binance.com**
42:17 48:18
**binance.com.**
47:19,22
**binance.us** 2:2
14:6 16:21
21:14 26:19

29:1,5,13
31:10 37:18
39:5 41:19
44:3 47:19
48:4 52:18
53:22 65:18
66:12 69:4,5
69:10,16,18,19
70:9,17,19,22
70:23,25 71:3
71:5,9,10,18
71:20,23 72:5
72:13,15 73:3
73:7,8,11,13
73:21 74:7,10
74:17,21 75:2
75:7 76:12,23
76:24,25 77:1
77:3,6,7,9,10
77:12,13,14,17
77:23 78:6,7
78:11,20 79:2
79:3,4,12,18
79:22 80:17,20
81:3,21 82:4,5
82:8,11,14,20
83:1,11,17,21
83:25 84:4
85:6,8,10,19
160:5
**binance.us.**
42:22,23 47:2
69:14 77:21
156:22 160:21
**binding** 27:15
158:1

**biswas** 8:17
**bit** 18:1 119:3
128:16 149:3,7
**bitcoin** 75:11
77:9,10
**block** 87:16
**blockchain**
43:2
**blvd** 6:8
**board** 5:9 16:8
58:19 79:3
120:18
**bodies** 104:2
106:4
**body** 15:17
82:3
**bold** 150:15
**bonuses** 103:20
**born** 24:17
**borrower**
145:20,23
146:2
**bound** 99:18
100:4,8
**bowling** 1:13
**box** 5:11
**brad** 9:17
**braziel** 8:2
**breaches** 73:25
74:1
**break** 68:9
102:2 153:7
154:21
**brendel** 8:25
**brian** 7:6 10:8
12:5 22:1 23:6
49:8 57:16

**[bankruptcy - binance]** Page 7

**bankruptcy**
1:1,12,23 5:8
13:17 80:5
92:25 93:1,13
97:24 106:10
114:11 116:4
126:2 130:20
140:7,18 142:3
**banks** 44:20
**banned** 51:21
**bantered** 18:10
**barbara** 6:8
**base** 34:20
61:9
**based** 19:23
27:12 32:6
33:1 40:14
44:9,12 46:14
46:21 47:24
48:5 54:3,8
55:25 67:17
77:12 90:24
107:15 109:21
116:9 132:14
156:12
**basic** 116:7
**basically** 61:2
89:12 91:19
124:18 160:6
**basis** 15:5
17:25 18:7
27:11 28:14
30:1 31:19,21
39:8,21 42:9
43:10,13 44:17
47:21 54:13
55:9 56:4,11

56:16,18,19
63:7 67:3,6
71:5 90:16
103:5 105:6
151:14 154:13
**bearing** 24:16
**bears** 80:19
**becoming** 63:5
**befallen** 77:5
**beginning** 24:3
97:11 99:12
**begins** 35:18
**behalf** 21:9
47:2 49:5
56:23 58:18
80:8 68:14
89:21 95:18
121:18 123:14
160:21
**behavior** 18:12
**belabor** 18:8
**belief** 22:10
**believe** 16:8
17:2 18:16 19:2
24:12 26:7
24:20 30:31:19
32:1 34:18
43:11,13 44:10
47:24 49:19
50:23 70:9
72:11,15 74:18
76:12 79:7
81:16 82:3
83:7,23 84:11
85:6 94:22
95:9 99:8
102:22 121:22

**137:16,19
138:21,23
139:5,9 141:5
144:6 146:3,18
147:15 148:5
149:25 151:24
154:7,8 156:13
156:16 157:1,4
158:24 159:2
160:10 162:9
162:18 163:4
164:4,16,16,18
believes** 96:10
**beller** 7:20
**belonging**
109:23
**belongs** 19:11
48:10
**beneficial** 48:9
87:7,7,20
109:23 137:21
**benefit** 29:6,15
65:14 71:21
72:2 103:17,22
104:4 138:1
143:14
**benefits** 82:5
103:14,20,25
106:11,15,22
154:4 156:16
**benjamin** 7:16
7:20 9:16
**bernstein** 5:21
123:16,17
**best** 16:9 22:10
31:20 56:2
37:10 39:7
40:11,18,23

**73:4,14 92:10
104:17 108:13
126:18 128:21
139:9 140:3
**beth** 8:22
**better** 72:23
74:14,24 112:9
112:11 119:24
**beyond** 35:4
47:8 98:2
**bgx** 142:11
**bid** 69:3 72:23
121:22
**bidirectional**
111:24
**big** 119:4
**bigger** 107:22
**biggest** 92:22
**billion** 69:11
69:12 70:4
93:13
**billions** 107:5
**binance** 4:9
13:25 14:6,21
14:23,24 15:1
15:21 16:1,6
16:18,23 17:16
20:10 24:19
25:3,4,5,9,20
26:11,15,22
28:22 29:9,15
29:18 30:1,3
32:10,24 33:7
33:13,23 34:3
35:9 36:20,22
37:10 39:7
40:11,18,23

A-510

**[brian - certainly]** Page 9

60:25 64:2
146:24 155:18
155:24
**bridgewater**
6:19
**briefly** 14:5
15:8 80:24
**bring** 20:18
62:23
**broad** 5:18 7:3
62:23
**broader** 33:4
**brokerage**
141:11
**brought** 106:9
106:10,12
122:17
**bruh** 11:7
**bubbling** 127:8
**buckets** 15:7
**builds** 127:18
**built** 84:9
137:11 139:1
**burden** 39:12
98:10 101:8
**bureau** 5:17
123:18 124:7
124:12
**business** 39:11
41:21 42:15,20
44:12 45:12
56:7 61:14,15
71:14 73:2
74:7 76:11,22
77:6 78:3 79:6
82:19 103:24
139:4

**businesses**
15:19
**buyer** 79:23
80:1 144:18
**buying** 56:12
62:11 76:7
86:9
**bypass** 144:1

**c**

**c** 3:1 13:1
53:20 106:15
168:1,1
**cac** 6:3
**cahaba** 6:3
**calandra** 11:13
**calculations**
108:4
**california**
37:17
**call** 18:9 47:10
126:20 131:1
134:7 150:12
**called** 22:11
93:3 154:22
158:21
**calls** 106:5
**calm** 131:11,11
131:12
**campaign** 62:2
**candidly**
118:16
**can't** 105:9
107:15 108:11
108:11 112:13
112:16 114:13
115:2 117:20
117:24 121:9

**124:24 126:4,5
133:4 134:1
145:13
**cap** 159:20
**capacity** 56:16
71:21
**cape** 6:9
**capital** 43:22
148:13
**capitalized**
43:18,20
**care** 123:17
**careful** 121:15
**carefully** 149:6
**caroline** 10:4
**carpenter** 5:16
123:17
**carry** 29:23
59:6 140:12
**case** 1:3 13:3
13:20 23:15
45:1 85:10
88:3 93:10
96:21 97:11,15
98:2,5,9,23
100:22,24
101:14,15
107:11 110:9
110:24 116:22
116:23 119:3
119:10 121:15
122:3,8,9
**cases** 14:3
18:22 19:7
20:18 45:1
73:23 80:10

**81:23 82:2
100:1,15
101:12
**cash** 15:1
16:20 31:7
52:5,12,19
53:7 54:12
66:17 71:4,11
71:23 72:25
77:1,2 81:1,25
82:25 83:14
91:11,14,15,24
91:24 94:22
95:1 113:4
127:19 128:6
128:14
**cashed** 118:24
**caught** 153:24
**cause** 98:14
**caused** 74:13
**celeste** 8:7
**celsius** 88:3
**center** 80:25
**cents** 92:13
**certain** 15:4
35:2 47:20
50:1,10 51:13
70:20,24 71:1
73:6,22 75:11
78:4 85:22
86:20 93:9
107:8 128:24
133:2 140:17
141:4 148:13
156:11 157:2
**certainly** 21:21
92:21 97:9

## [certainly - clerk]

| | | | |
|---|---|---|---|
| 98:11,14 | 152:25 153:7 | chris 9:11 | 150:6,18 |
| 110:14,16,18 | changed 101:7 | christie 21:8 | 161:21 164:8 |
| 118:13 119:8,9 | changes 90:1 | christine 3:9 | 164:18,21 |
| certification | 99:18,19 | 60:7 68:14 | clarification |
| 85:1 | 123:21 153:22 | christopher | 87:1 146:4 |
| certifications | chapa 8:16 | 7:15,21 8:6 | clarified 85:8 |
| 78:8 | chapter 73:9 | 10:2 | 143:7 |
| certified 168:3 | 73:23,24 | church 8:3 | clarify 22:23 |
| cetera 27:1 | 103:12,14,22 | circumstances | 23:9 69:19 |
| 62:4 | 103:25 104:7 | 34:24 70:20,24 | 86:21 127:15 |
| cfi 143:22 | 105:4,5,8,24 | 72:18 73:6,22 | 145:15 164:15 |
| 144:1,12 | 107:24 112:12 | 74:20 98:1 | clarifying 65:5 |
| cfius 15:12,14 | 114:9 125:7,7 | 128:24 156:11 | clarity 90:21 |
| 15:22,23 16:2 | 136:14 144:18 | 157:2,7,10,12 | 122:25 |
| 16:10,12 20:12 | characterizat... | 160:11 | class 81:8,12 |
| 76:16 84:2,3,4 | 149:18 | citations | 81:13,19 104:9 |
| 84:6,7,7 | characterize | 126:17 | 137:21 142:1 |
| chain 81:1 | 44:7 62:20 | cite 150:19 | classes 163:24 |
| challenges | characterized | cited 99:10 | 164:1,9,15 |
| 64:19 | 148:13 | citizens 119:21 | clear 15:17 |
| challenging | charles 11:18 | 120:3,4,20 | 18:23 59:20 |
| 90:6 94:12 | chart 148:17 | 121:2 | 85:10 86:3,21 |
| 122:6 | 148:18 150:10 | ciullo 9:22 | 107:13 108:18 |
| chambers | check 19:25 | claim 18:23 | 121:19 122:1 |
| 113:8 126:20 | 154:10 164:16 | 81:14 93:14 | 122:20 143:11 |
| chance 23:10 | 164:19 | 147:23 148:5,8 | 143:16,25 |
| 38:17 63:19 | cherry 9:12 | 149:15 | 149:1 157:24 |
| 103:23,23 | chest 104:23 | claimants 81:6 | 160:24,25 |
| 114:2 147:20 | chicago 3:14 | 81:10,11 | 164:5 |
| change 28:18 | chief 124:4 | claims 51:5 | clearer 28:16 |
| 60:1 72:19 | choice 92:8 | 71:12,17 75:1 | clearly 120:14 |
| 105:9 107:15 | 161:20 | 75:1,13 81:18 | 124:1 |
| 108:11,12 | choose 34:10 | 102:14,16 | clements 9:1 |
| 116:1 121:16 | chooses 157:9 | 117:2,11 143:5 | clerk 152:21 |
| 140:11 143:21 | chose 53:9 | 143:7,8,12,13 | 152:23,24 |
| 150:16 151:21 | chosen 65:10 | 143:13,15 | 153:4,9 154:20 |
| 151:22 152:9 | | 146:8,9 149:13 | 155:2 |

## [click - completed]

| | | | |
|---|---|---|---|
| click 101:5 | 64:5 70:18 | commenced | 122:2 131:14 |
| clicking 101:7 | 75:11 76:8 | 100:1 | 134:7 138:17 |
| clicks 101:5 | 85:21,23 86:2 | comment | 139:11,14,16 |
| clos 81:23 | 86:5,9,11,22 | 102:10,18 | 140:12 |
| close 18:9 | 139:22 | 118:10 119:20 | committees |
| 42:12 43:21,23 | cold 46:5,10,12 | 124:20,21 | 111:22 |
| 44:11 127:21 | collaboratively | 134:10 136:20 | committee's |
| 137:12 | 14:1 | 136:24 144:12 | 138:14 |
| closed 84:8 | collapse 68:18 | commenting | common 47:22 |
| closely 89:24 | 122:10 | 150:1 | 47:23 |
| closing 31:16 | collateral | comments | communicati... |
| 32:3 35:3 | 19:18,24 | 84:14 92:6 | 127:3 |
| 36:15 42:14 | collateralized | 95:24 96:4 | communicati... |
| 50:9 53:18 | 19:23 | 147:3 153:21 | 111:24 130:6 |
| 54:7 61:9 | collections 5:8 | 154:1 164:13 | companies |
| 62:25 71:3,5 | 16:7 | 165:3,19 | 44:4 48:14 |
| 73:3 79:13,22 | collectively | commercial | 77:5 |
| 90:14 93:4,11 | 16:7 | 19:9 | company 18:5 |
| 96:8 144:17 | combined 2:5 | commercially | 18:6 23:12 |
| code 89:16 | 14:8 116:24 | 71:14 | 25:24 26:2 |
| 97:24 98:17 | come 19:9 28:4 | commission | 37:16 50:2,5,8 |
| 114:11 126:2 | 36:11 60:12,15 | 151:7 | 51:17 64:18 |
| 126:10 140:7 | 83:21 96:2 | commitments | 107:3 128:6,20 |
| 140:18 | 102:1 136:11 | 68:19 | 133:6 145:21 |
| coin 28:25 | 152:13 | committed | compare 165:5 |
| 49:24 51:11 | comes 97:18 | 17:16 74:21 | compared |
| 52:4 55:21 | 133:14,15 | 83:20 | 70:14 |
| 56:12,14,17,19 | comfort 98:3 | committee 4:2 | comparisons |
| 56:21 61:10 | 98:15 120:11 | 15:16,17 17:16 | 165:10 |
| 75:24 76:1,9 | comfortable | 30:7 38:10 | compensate |
| 76:10 | 43:25 157:12 | 48:21 50:23 | 70:22 |
| coinbase 40:19 | coming 31:1 | 76:20 89:24 | complaints |
| coins 24:14 | 24:20 36:20 | 90:2,8 92:1,5,8 | 100:21 |
| 26:5,13,13,22 | 88:9 120:9 | 100:19 104:22 | complete 71:6 |
| 27:17,19 28:22 | 152:24 | 107:18 111:7 | 155:5 |
| 28:24 29:24 | commence | 111:12,14,18 | completed |
| 52:11,24 55:17 | 13:20 | 112:5 121:17 | 13:18 21:2 |

## [completed - consistent]

| | | | |
|---|---|---|---|
| 71:13 | concerns 92:21 | confirm 141:7 | 39:20 42:4 |
| completely | 92:22 93:19,19 | 159:25 161:11 | 65:18 66:3 |
| 51:8 | 97:18 100:14 | confirmation | 67:7,20 78:12 |
| complexity | 100:14 106:24 | 2:6 14:9 23:18 | 78:22 79:9,23 |
| 65:8,11 | 111:7 114:22 | 36:10 60:12 | 80:13 86:19 |
| compliance | 124:7 138:24 | 70:3 73:20 | 159:25 |
| 74:8 78:8 | 142:23 152:18 | 74:22 75:4 | consensual |
| 83:15 114:1,20 | concluded | 77:19 80:23 | 60:12 |
| 114:24 115:6 | 43:16 166:8 | 83:21 84:1 | consenting |
| 123:3 | conclusion | 85:13 103:1,6 | 52:10 119:21 |
| complicated | 20:19 27:23 | 105:24 107:14 | consents 26:25 |
| 18:17 64:6 | 28:1 53:23 | 108:2 113:1 | 27:10 |
| complications | 108:1 | 114:22 115:8 | consequence |
| 40:2 | conclusions | 115:23 116:19 | 117:25 |
| complied | 112:15 | 118:8 119:8,22 | consequences |
| 105:13 | conclusory | 122:7 123:9 | 83:9 116:9,13 |
| complies | 30:10 41:23 | 124:7,13 | 121:3 |
| 140:17 | 112:14 | 128:21 131:24 | consider 17:24 |
| comply 96:14 | conditional | 142:4 151:13 | 55:19 58:22 |
| 102:11 126:3 | 21:15 124:2 | 152:15 153:20 | 101:19 113:1 |
| comprised | 151:10 | 157:25 158:1 | 114:4 118:7 |
| 69:12 | conditionally | 158:16 160:16 | 120:18 141:3 |
| concept 62:8 | 2:6 | confirmed | considerable |
| 94:14 | conditioned | 50:21 51:3,8 | 29:22 137:20 |
| concern 78:5 | 153:19 | 68:1 161:3 | considerably |
| 80:5 92:22 | conditions 71:9 | confirming | 148:3 |
| 94:4 97:16 | conducted | 154:16 | consideration |
| 118:15 137:20 | 75:22 77:23 | confused 13:15 | 69:14,20 74:16 |
| 139:15,23 | confer 24:5 | 65:8 145:18 | 95:10 121:15 |
| 150:3 | confers 156:16 | confusing | 130:14 132:19 |
| concerned | confidence | 85:19 157:23 | 141:7 |
| 15:14 94:20 | 44:8 | 158:15 | considered |
| 97:13 124:10 | confidential | confusion | 80:23 141:25 |
| 124:12 143:10 | 43:13 | 14:19 85:10 | consistent 42:3 |
| 144:9 149:3 | confidentiality | connection | 72:21 76:2,9 |
| 163:14,22 | 43:25 | 24:1,4 31:11 | 80:13 |

## [consolidate - could've]

| | | | |
|---|---|---|---|
| consolidate | 159:11 160:8 | contributions | 165:17,17,24 |
| 38:3 | contingency | 148:14 164:8 | core 76:21 83:1 |
| conspicuous | 36:18 | control 26:9 | cornerstone |
| 149:2 | contingent | 48:13 94:6 | 92:16 |
| conspicuous... | 85:13 158:16 | 108:13 112:19 | corporation |
| 150:1 | continue 17:19 | 112:25 116:3 | 78:10,19 |
| constituents | 30:25 42:21,24 | controlled | correct 19:20 |
| 17:13 | 44:11,23 56:19 | 92:15 | 22:9 23:15,16 |
| consult 114:14 | 60:11 61:15 | controls 112:2 | 23:19 25:3,22 |
| 125:25 126:18 | 70:2 100:4 | conversations | 26:16,17 30:5 |
| consumer | 119:4 122:23 | 83:19 89:14 | 31:2,25 32:1,8 |
| 80:10 96:20 | 142:18 153:23 | 142:18 153:25 | 32:17 33:14,24 |
| 97:25 98:20 | 166:1 | 166:1 | 33:25 34:4,6 |
| 99:5 101:12 | continued | conversion | 34:11,22 36:12 |
| consuming | 75:13 104:14 | 107:24 114:16 | 36:13,21 39:25 |
| 90:6 | continuing | 148:23 | 40:1 41:10,17 |
| consummate | 17:16 26:13 | convert 66:17 | 42:6 43:15 |
| 69:17 70:23 | 83:20 | 105:4,7 114:9 | 46:22 49:14 |
| 74:11 77:15,17 | continuously | converted 54:1 | 52:6,8 55:10 |
| 128:3 151:14 | 104:14 | 73:24 82:25 | 67:1 85:17 |
| consummated | contract 14:16 | converting | 87:5,23 91:13 |
| 73:5,8 | 144:23 145:11 | 52:18 | 95:2,12 98:24 |
| consummation | 162:6,16 | convinced | 114:12 120:4 |
| 79:10 | contracting | 117:15 | 132:1,2 135:12 |
| contemplate | 162:15 163:7 | coordinating | 144:14 164:5 |
| 86:16 99:7 | contracts 50:2 | 16:1 | correctly 19:16 |
| contemplated | 50:12 142:17 | coppola 9:13 | 19:17 27:9 |
| 65:21 79:24 | 144:16,21 | copy 96:22 | 67:22 134:20 |
| 88:5,15 98:21 | 162:7,11 163:6 | coral 6:9 | cost 24:9,11,16 |
| 156:7 158:20 | contrary 50:24 | corddry 3:23 | 24:17 62:9 |
| 158:22 159:3 | contribute | 7:12 | 98:8 101:11 |
| contemplates | 143:4 161:21 | 111:12 22:16,18 | 139:18 |
| 99:1 127:17 | 164:21 | 22:18,21 23:4 | costly 29:25 |
| 142:6 156:9 | contributed | 23:7 25:14,18 | costs 88:22 |
| context 18:14 | 143:9,15 | 28:4,7 30:19 | 101:16 |
| 39:12 97:17 | contributing | 30:21,23 37:9 | could've 92:24 |
| 119:3 122:8 | 164:18 | 37:14 38:5 | |
| | | 59:14,17,19 | |
| | | 118:9,9,12 | |

**[counsel - creditors]** — Page 14

counsel 16:2
27:5 30:18
46:22,24 85:2
97:5 99:10
104:6,6,16,22
106:7 107:1
111:8 126:19
126:19 131:14
134:7 152:8
counsels 16:1
counsel's
139:12
count 13:13
counter 41:21
counterparty
42:5 124:8
country 168:21
couple 55:11
84:20 107:4
108:23 147:8
148:17
course 13:16
28:19 86:22
92:8 94:1 96:3
123:25 124:4
160:22 162:10
165:11,22
court 1:1,12
13:2,5,9 17:23
18:4 19:12,14
19:16,21 20:3
20:22 21:7,11
21:20 22:6,13
22:17,20 23:1
25:16 27:24
28:2 30:17,20
35:15,20 37:8

37:12 38:7,15
38:19 39:23
40:16 41:6,11
41:20 43:6,9
43:16 44:2,7
44:25 45:16,20
45:23 46:1,18
46:23 47:5,12
48:2,7,12,20
49:5 50:14,17
54:20 57:10
58:7 59:5,16
59:18 60:16,24
61:21 63:18,21
63:24 64:7,14
64:20,22,25
78:16,25 84:14
84:21 85:3,7
85:18 86:23
87:1,3,12,20
87:25 89:1
91:3,8,14 92:1
94:24 95:15,22
96:2 97:17
98:17 99:4,15
99:21 100:10
101:1,17,23,25
102:4,7,25
104:25 105:3
106:2,16 107:8
107:10 108:16
108:25 109:3
109:10,15,18
110:1,4,7,11
110:14,16,18
110:22 111:1

111:10,21
112:7,24 113:3
113:10,15,18
113:23 114:7
114:11,19
118:11,22
119:13,17
121:14 122:4,6
123:5,7 124:16
125:24 126:9
131:13,18,21
132:2 133:18
133:20 134:3
134:10,19,21
135:1,3,5,10
135:13,15,17
136:4,9 138:5
138:7,10,12
139:11 140:6
140:25 141:2,3
141:9,12,14
143:2,22
144:11,15
145:17 146:5
146:21 147:2,9
147:14 149:9
149:11 150:4
150:14,24
151:4,8,18
152:17,20,22
153:1,6,10,12
153:14 154:11
154:19,24
155:3,7,15,19
155:23 157:18
158:10,20
159:3,8,23

160:11,13
161:8,18 162:1
162:13,20,22
163:2,7,11,19
164:7,10,11,13
164:20 165:2
165:15,25
166:6
court's 57:14
courtney 8:15
courts 81:9
court's 121:1
covered 137:19
covers 98:12
create 88:20
89:12 121:7
created 132:13
creation
120:14
creative 121:6
creditor 6:2,7
6:12,17,22
28:11 29:9,12
29:16,16 60:20
72:1,10 82:2
86:1 92:14
94:4 100:23
102:20 103:10
104:4,7,9,11
107:25 108:22
110:12 115:4
131:23 137:20
146:9
creditor's
29:17 64:18
creditors 4:2
17:3,5 24:18

---

**[creditors - customer]** — Page 15

29:6 30:7 45:3
50:20 51:2
59:5 63:19
64:5 66:24
67:13 68:21
71:6,25 72:14
72:25 74:12
76:20 79:3,6
89:24 92:10,17
92:22 94:23
95:7 100:21,25
103:14,22
104:4 105:23
107:9,11 109:6
109:7 110:8,9
111:7,12,14,18
112:4,9,11
114:21 115:15
116:14,23
117:8,23,23
118:3,7 121:24
122:2 124:24
125:5 129:2
130:19 131:25
134:12 135:6
135:18,24
136:10,12,17
136:22 138:1
139:5,24 140:22
140:4,9,13,16
140:21 142:25
143:4,4,11,15
143:18 148:25
149:5 163:24
creditors'
109:4,8 111:22
142:22

critical 107:12
cromwell 7:1
cross 12:3 21:4
22:5,14 23:6
38:8,13 49:8
57:16 64:2
157:18
crypto 14:10
14:25 26:10
29:11 33:6
40:5,9,13
44:19 45:18
47:10 50:4,5
50:13,22 51:1
51:3,4,8,21
52:8,17 53:13
53:16 54:9,16
54:23 55:5,7
58:12 63:1,4
65:13,17 76:9
83:13 91:23
92:24 93:4,6,8
93:11,17,21,22
93:24,25 94:3
94:5,9,11,16
94:19 95:20
97:22 104:15
116:15 127:19
128:6 132:14
132:21
cryptocurren...
39:2,10 45:3
47:11 66:4
67:6
cryptocurrency
16:25 17:12
26:11 28:12

29:5 36:23
37:4 39:17
40:18 41:7
48:2,13,19
49:16,21 51:15
66:2,8 69:12
69:22,24 70:2
70:5,18 71:3,4
71:10,20 72:7
72:9,13,17,25
74:12 75:6,10
75:11,14,15,17
75:18,19,24
76:1,2,8,9
78:12,21 79:1
79:5 81:1,22
82:12 83:14
88:9 89:3 90:9
90:15,19,21,25
91:1,20 108:12
109:22 121:20
122:12 141:19
ct 6:19
cure 162:2,6,8
162:16
curiel 9:21
currency 17:6
53:25
current 19:23
27:17 52:10
62:3,5,9,13
71:8 77:9,10
79:13,17 83:2
89:19 90:20
91:2,4,5,9,17
93:7,25 94:16
94:18,20,25

custodial 45:16
56:15 71:21
custodian
44:21 45:4,13
109:23
custodied
28:24
custody 28:21
30:25 33:5
45:9 47:10
48:8 78:6,9,11
85:24 86:7
88:1,5 96:4
custodying
78:21
customary
42:3 46:8
customer
26:16,19 27:18
32:2 34:20
40:5,16,20,22
41:7,15,18
44:16 45:15,20
45:23 46:16
47:9 48:12
50:21 51:20
52:10,14 53:9
56:23 61:3,8
61:17,18 62:1
62:3,5,9,13
71:8 77:9,10
79:13,17 83:2
89:19 90:20
91:2,4,5,9,17
93:7,25 94:16
94:18,20,25

---

**[customer - debtors]** — Page 16

95:1,4,19 96:6
100:2 101:4
115:2,3,3
customers 14:1
14:11,18,24
16:9,20,23
17:2 19:4,11
26:1 27:18
31:6,14,18,23
32:5,8,11,13
32:21,25 33:7
33:9,11,17
34:1,12,15,17
34:19,23 38:22
39:3,13,17,23
41:9,11 44:22
44:24 45:2,8,8
45:13 46:17
48:3,10 49:21
49:25 50:14
50:16,18,25
51:5,15,18 52:1
52:7,23 53:5,6
53:17 54:15,17
54:22,24,25
55:1,2,20
57:21 58:11,20
59:6 61:5
62:12 63:2
64:17 66:1,10
66:19 70:13
72:3 74:12
77:8,13 79:7
79:14,20 80:22
82:12,17,22,23
83:3,6,8,17
88:10 89:10
90:11,12,15,18

90:22 91:18,21
91:24,25 93:5
94:2 95:9,14
97:6,14,20,21
98:4 99:11,17
100:4,8,12,13
100:25 101:9
107:21 108:7
109:24 114:25
115:12 116:4,8
121:8,20
122:12 124:10
137:6,17
139:25 152:10
customer's
93:18,23 94:6
cz 47:23

**d**
d 12:1 13:1
163:23 167:1
dagnoli 8:4
damages 104:3
104:8
dan 6:1 102:19
daniel 9:15
11:1,14
darren 4:6
38:9 92:4
95:23 100:18
129:22 139:13
data 79:15,18
79:19,21,21,23
96:7,8,11
98:21
date 19:22 35:4
35:10,23 36:3
36:4,7,10 42:9

53:4 62:17
73:5 75:13
76:2,6 79:22
82:13 83:19
99:25 100:6
126:21 145:6,8
162:5 168:25
dates 115:15
144:22
david 8:10
10:19 11:5,9
day 34:3 52:7
54:15 93:4
95:7 113:19
124:9 132:15
days 13:13,23
49:24 52:4
60:6 64:8
68:17 71:14
79:6 93:12,23
114:3 144:17
163:8,13,16
dc 3:21
de 7:10 9:5
deadline 85:2
145:3 163:14
163:17
deaf 106:7
deal 16:2 18:13
32:7,15 36:19
82:19 115:9
120:9 122:11
127:25 132:12
132:16,21
133:1,11
134:14,17,23
134:24 135:7,7

135:19,25
145:11 149:21
149:22 154:5
161:5
dealing 118:21
dealt 147:12,13
153:14
debacle 13:16
debtor 1:9 3:4
3:12 25:6,8
39:4,12,16,21
39:24 40:3,10
40:15 41:4
43:1 50:11
54:6 59:20
65:22 97:4,13
116:11 118:13
119:5 123:20
148:6 156:3
157:8 160:23
debtor's 73:14
90:24 104:5
148:8 151:12
152:8
debtors 2:7 7:2
13:6 17:15
18:20 21:9,13
21:15 22:2
28:13,17 38:8
38:13,17 39:1
48:20,23 58:23
60:8 68:15,18
68:20,25 69:7
69:10,13,16,21
69:22 70:2,9
70:11,14,18,20
70:21,22 71:2

---

**[debtors - determines]** — Page 17

71:11 72:11,15
72:16,20,22,24
73:2,10,17
74:14,18,22,22
75:5,9,10,15
75:18,24 76:1
76:6,10,12,17
76:21,24 77:2
77:21,22 79:2
79:8 80:11
82:1,8,16,19
82:22 83:1,11
83:16 91:19
103:18 104:2,5
104:17 106:22
107:1,18,23
108:3 115:19
119:23 121:23
122:2 126:13
126:22 134:23
136:11 138:1
138:13 139:16
140:8,15
147:16 149:1
150:14 151:23
152:11 156:2
156:17 161:6
163:13
debtors'
120:1 151:23
decades 97:9
december 14:7
36:6,8 69:13
70:5 120:6
132:13,15
decide 123:11
129:3 132:24

136:11 145:10
159:9
decides 141:16
141:24
decision 74:14
94:2 132:10
133:17 144:22
145:4,8 161:23
decisions
116:18
declaration
22:1,4,7 23:5
29:22 30:6,7
38:24 41:21
154:6,8,9,17
declarations
14:14 21:2
22:9
default 135:25
136:1
defenses 19:3
defer 27:5
deficiency
75:10
defined 96:11
145:25
definitely
126:18
definition
145:22,22,24
146:4
degree 70:13
delaware 18:24
78:10,19 84:21
84:24 85:4
delay 14:10
20:12 38:21

74:10 81:1
82:18
delayed 26:12
86:2
delays 35:20
deleted 144:8
deliver 122:12
delivered
79:22
demonstration
100:17
denied 146:9
167:5
denise 7:9
deny 101:17
department
4:15 5:1,9 49:3
57:1,3,13
58:19 63:12
120:6,8,17
depend 54:24
dependent
70:1 149:20
depending
103:6 141:16
148:3 150:16
depends 23:1
deposit 46:6
76:1
deposited
29:12 46:7
77:9
deposits 91:2
depreciating
104:16
depressed
66:18

describe 41:23
described 73:7
77:22
describes
145:23
description
103:3
descriptions
150:5
deserve 92:17
designate
40:19
designated 71:1
157:2
desire 21:4
32:16 33:9
38:21
desires 57:22
57:23
despite 118:13
detail 77:22
133:24
detailed 132:5
determination
27:8 46:20
53:4 81:14
91:9 117:17
133:7 159:4,12
determine 73:2
117:10 142:13
determined
54:4 55:8 61:5
69:3 73:15
116:15 142:14
determines
74:5 84:7

A-512

**[determining - distributing]**                          Page 18

determining
76:22 102:21
141:22
deutsch 5:16
123:17
develop 89:16
140:5
dialogue 97:12
dibattista 8:18
dictate 81:22
didn't 99:22
109:6,10 117:1
127:24 146:10
dietderich
17:22 19:8
dietrich 8:20
difference 30:2
30:11 132:17
133:12 148:14
148:15
different 17:6
40:24 45:9
53:9 56:8
61:16 62:2,5
62:10,13,21
67:8 81:22
83:14 89:13
94:12 96:3
115:12 116:2,2
116:3,5,5,6,6,8
116:8,12,12,12
133:9 149:5
158:8 159:10
differently
115:13
difficult 29:25

digital 1:7
73:12 77:8
diligence 41:22
42:4,22 46:2
63:10 76:25
77:21,23 90:24
106:6,8,11
direct 12:3
39:10 51:1
59:8 62:24
67:9 107:23
143:5 145:25
155:18,24
directed 62:22
72:9
directly 15:24
25:9,21 26:2
39:2,11 46:17
48:10 59:4
61:17 64:6
136:17
director 22:1
directors
102:23 105:21
disagree 80:9
115:10
disagrees
102:17 108:21
disclosed 67:15
disclosure 2:5
2:7 14:8,16
15:10 18:15
20:9 21:16,18
30:8,12,16
49:22 53:20
67:16 102:24
103:2 115:22

117:19 119:9
123:21 124:2,5
133:21,22
143:17 146:19
148:6,19 149:7
150:19,24
151:11,12,12
152:6,7 153:16
161:19 163:20
163:24 164:22
164:25
disclosures
164:23
discretion 35:9
52:20 139:8
163:25 164:2
discretionary
100:20
discriminate
82:17
discrimination
115:20,25
117:8 118:4
discriminatio...
116:10
discuss 58:23
59:21 60:3
147:6 166:2
discussed
57:19 59:24
125:1,5,13
137:7 147:24
153:17,18
discussion
29:22,22
discussions
46:21 55:24

57:4,6 67:17
77:24 88:17
156:22
disingenuous
104:18 120:13
disinterested
97:25
dismayed
13:15
dismissed
73:24
dispense
163:23 164:1
disputes 88:3
117:1,10
dissent 130:13
dissolution
80:3
distinct 137:22
distinction
34:7 54:6
65:16 128:17
distinguish
37:22
distributable
139:22
distribute
50:18 64:5
72:25
distributed
29:1 53:8 54:2
72:7 78:12,21
85:25 88:10
89:4
distributing
70:12

**[effectively - estates]**                          Page 20

effectively 17:9
24:21 35:7
53:18 54:7,12
56:15,22,23
146:14 161:6
effectiveness
157:25
effects 88:15
effectuate
51:18 75:16
76:5 89:17
effectuating
45:5
efficient 70:16
122:13
effort 69:2
122:16 142:19
efforts 71:14
eight 76:14
either 31:7,16
58:11 59:3
67:4 72:23
75:6,7 125:18
126:10 140:21
146:11
elaborate 37:2
elect 95:1
election 95:3
element 67:7
100:20
elements 42:15
eligible 86:1
90:12
elimination
104:4
elle 9:25

ellis 3:3,11
13:8 21:9 60:8
68:14
else's 52:25
55:22
email 129:17
emails 62:11
embark 90:7
embedded
35:19
embodied
152:4,14
emerge 72:24
emery 4:1
38:10 92:5
employee
48:18
employees 74:8
161:23
empowered
15:18
enable 70:17
enacted 109:8
encourage
119:14 125:25
engage 62:3
63:6 77:12
122:22
engaged
123:20
engagement
62:1,5,24
enroll 93:7
ensure 75:23
ensuring 92:23
94:4

enter 21:14
40:10 73:12
76:6,22 152:11
entered 14:5
18:18 35:25
84:23 85:3,5
165:5
entering 27:7
35:16 40:5
82:3
entertain 105:6
entertaining
142:22
entire 61:8
103:19 119:3
158:12
entirely 94:1
161:23
entirety 157:22
158:3
entities 16:18
27:15
entitle 73:21
entitled 18:21
75:1 160:24
163:21
entity 19:5
44:3 65:10
78:21 103:16
103:24 116:24
entry 2:1 14:16
73:20 74:20
76:12,19 85:12
151:23 158:2
equal 55:8 81:8
149:23

equality 81:7
81:10
equally 57:25
equitable 18:7
18:9 140:23
141:6,25 146:6
148:7 149:13
150:17
equity 43:19
43:22 81:24
116:23,25
117:3,3,9
equivalent
81:24
erica 106:14
erik 9:8
erosion 104:14
especially
81:22
essentially
31:22 50:25
69:23 95:4
111:4 134:11
134:12
establish 25:2
38:22 41:13
56:9 88:8 89:5
established
54:23 81:6
establishing
61:16
estate 31:20
93:13 139:23
157:3,5,14
estates 70:22
139:10 156:17

**[distribution - effective]**                          Page 19

distribution
29:23 40:17
41:17 51:8
53:2,5,11,18
54:1,7,9,12
56:24 59:9
62:6,11 69:23
71:24 81:22
82:19 91:6,12
91:25 92:11
142:11 147:25
148:2,8,18
149:22
distributions
17:12 29:7,8,8
31:8 33:18
50:20 51:4
53:22 54:18
55:2 59:4
71:18 72:14
75:17 76:4
79:17 81:5
82:11,14,21
83:6,9,17
85:23 91:14,15
112:11 115:15
116:9 117:20
118:14 128:5
128:22
district 1:2
dive 20:21
divestiture
80:2
division 5:8
docket 18:19
22:3 111:25
113:7

document 27:3
63:15 129:12
133:21
documentation
67:12 77:24
113:7 129:13
documented
64:12
documents
23:10 25:1
27:2 30:9 57:3
59:25 143:3
165:13
doesn't 121:3
136:2 145:11
dog 119:4
doing 25:21
88:7 102:17
107:19 131:7
136:18
dollar 18:17
93:13
dollarization
75:12
dollars 18:23
19:5 36:20
54:1 75:23
107:5
donahue 7:12
don't 87:17
89:1 98:13,17
99:6,9,24
100:13,15,24
102:16,18
103:6 105:12
105:14,15,17
108:3,20,23

110:5,6,11,14
110:18,19
112:15,20,24
114:23 115:5
115:18 117:18
119:22 120:3
120:10,20
123:9 124:10
125:9,11,14,22
126:6,9,19
127:2 130:20
130:24,24
132:22 133:5
133:14 135:5
138:9,23 139:1
139:2,6 140:2
140:3,9 141:2
143:10,16
144:11 145:13
149:1 150:7
153:6
doshi 10:16
double 154:10
164:16,19
doubt 100:11
drags 104:14
drive 6:23
driver 44:18
drop 154:21
drops 27:23
37:10 48:22
52:11 62:24
73:14 87:1
due 39:9 41:22
42:22 46:2
57:2 63:10
75:12 76:6

77:3,20,23
85:9,11,11,11
162:4
dundon 10:13
dustin 9:7

**e**

e 1:21,21,22
3:1,1 12:1 13:1
13:1 85:23
87:14 167:1
168:1
earlier 33:12
55:2 64:4 97:5
97:21 107:1
115:15 117:6
147:24 163:5
early 36:11
ears 106:7
easier 51:24
easily 139:22
echo 120:25
economic
95:10
ecosystem
94:13
ecro 1:25 153:5
153:7
effect 14:22
20:12 74:6
85:9,13,14
97:6 99:23,25
103:6 118:6,20
149:23 150:7
effected 45:17
effective 76:6
92:19 153:19

A-513

**[estimate - experience]**                          Page 21

estimate 23:21
23:22 24:11
estimated 24:9
70:6 74:15
148:9
estr 8:5
et 27:1 62:4
etcetera 102:14
105:9
ethan 7:19,25
evaluate 15:20
evaluated
31:18 137:1,2
137:3,3
evaluating
42:5 139:17
evaluation
137:15
evans 11:17
evening 123:21
event 20:11
70:23 80:2
96:25 100:8
137:11
eventually
31:24 32:21
everybody
13:2,10 20:17
25:16 117:14
117:25 121:6
133:12 154:22
154:25 155:4,8
155:9
everybody's
15:8

everybody's
91:3 143:24
everyone's
13:25
everyone's
122:5,19
evidence 21:3
22:4,7 65:2
108:5 112:16
113:7 115:23
142:23 154:6
154:12
evidentiary
21:1,23
exact 99:24
100:6
exactly 87:11
94:7
examination
21:4 23:6 49:8
57:16 60:25
64:2 155:24
examine 22:5
22:14 38:8
157:18
example 24:22
25:9,23 26:3
33:18 35:20
40:23 42:6,7
42:15 45:14
46:6,12 49:20
50:1,12 51:20
51:21,23 53:10
54:14 62:3,6,8
62:11 63:3
65:17,22 66:4
70:4 88:6,8

93:6 97:17
116:23 132:11
132:20 139:21
148:19
excellent 55:12
except 33:12
50:20 72:9
115:8
exception
80:11 82:9
excessive 39:12
154:12
exchanges 25:9
exclusive 140:8
exclusivity
139:8
excuse 25:16
25:16 158:21
excused 68:8
execute 25:25
91:22 157:8
executed 18:10
24:8 26:2
executes 25:8
exemptions
16:22
exercise 37:10
65:22 74:3,23
75:21,22 76:5
76:22 129:3
142:15 157:9
exercises 74:1
exhibit 53:20
exhibits 12:9
162:9

exist 62:18
existence 98:2
99:11,16
existing 52:14
80:14 83:5
89:8 96:14
98:20 99:6
expected 74:9
expedited
17:25
expeditious
36:15
expedited
104:10
expense 35:2,5
35:6,12 36:16
73:18,21 74:4
74:18 85:15
100:16 101:13
111:4 154:3
156:7,9,13,20
157:1,5,11
158:25 159:1
159:10,18
160:10
expenses 35:1
36:11 70:20
158:22 159:20
161:2
expensive
88:23 89:5
90:6 94:13
107:22
experience
61:19 62:4,14
62:24 67:9
69:9

| | | | |
|---|---|---|---|
| **experiencing** 72:18 | 54:16 62:22 | **fair** 74:19 | **february** 24:4 |
| **expert** 27:16 | 63:6 65:22 | 117:22 140:23 | 130:8 162:5,11 |
| 32:9 78:8 | 111:5 156:23 | 141:5,25 | 162:12,19 |
| 107:19 | 157:9 159:18 | **fairly** 60:1 | 163:3 |
| **explain** 30:8,10 | **extra** 34:25 | **fairness** 99:3 | **federal** 16:17 |
| 89:2 147:14 | **extremely** | **fall** 15:7 80:11 | **federally** 18:11 |
| **explained** | 72:18 101:15 | 106:7 | **fee** 70:21 73:17 |
| 135:23 | 120:13 | **fallback** 109:7 | 124:23 |
| **explaining** | **eyes** 98:6 | 109:8,14 | **feed** 127:5 |
| 126:24 | | 110:23 112:22 | **feel** 43:25 |
| **explanation** | **f** | **fallen** 108:12 | 64:15 112:4,14 |
| 55:13 142:21 | **f** 1:21 168:1 | **falling** 64:17 | 127:3 157:12 |
| **explicit** 31:4 | **face** 16:19 18:6 | **familiar** 15:15 | **feels** 128:20 |
| 99:6 158:4 | 116:8 | **far** 15:2,14 | **fees** 104:12 |
| 161:22 | **facilitate** 40:5 | 16:17 68:10 | 159:13,21,25 |
| **express** 136:22 | 41:5 42:13 | 92:24 96:21 | 160:11,16,22 |
| **expressed** | 44:24 50:3,5 | 99:9 101:2 | 161:1,3,11,13 |
| 68:24 78:5 | 51:25 67:5 | 132:25 144:9 | 162:1,12 |
| 100:13,14 | 72:14 83:10 | **fashion** 124:14 | **fewer** 122:14 |
| 114:21 138:25 | **facing** 106:25 | **fast** 125:21 | **fiduciary** 65:23 |
| **expression** | **fact** 15:5,22 | **fastest** 70:12 | 72:21,21 74:2 |
| 98:13 | 16:9 27:8 | **fatigued** 165:8 | 74:3,23 85:15 |
| **expressly** 47:7 | 33:12 39:6 | **fault** 120:3,20 | 129:4 157:10 |
| 47:10 | 63:7,8 65:24 | **faulty** 106:11 | **fifth** 71:23 |
| **extend** 35:10 | 66:14,19 81:20 | 123:12 | **figure** 13:19 |
| **extended** 73:6 | 102:21 108:12 | **favor** 132:1 | 18:25 19:1 |
| **extensions** | 112:13 115:18 | 133:12 134:16 | **file** 93:12 |
| 35:19,21 | 116:1,7,11 | 135:24 136:2 | 126:12,20 |
| **extensive** 40:12 | 149:4 153:19 | 136:10 145:10 | 127:17 |
| 73:15 | 158:15 | 148:8 | **filed** 2:3,11 |
| **extent** 24:22 | **factors** 150:5 | **favorable** 95:7 | 18:24,24 21:25 |
| 36:15 37:20 | **facts** 98:1 | **fdic** 72:2 | 43:9 76:15 |
| 39:4,16 40:10 | 156:11 157:6 | **feasibility** 39:9 | 102:15 108:17 |
| 41:15 44:14,21 | 157:12 | **feasible** 76:24 | 151:9 154:9,16 |
| 50:7,11 52:14 | **factual** 154:13 | **feature** 20:11 | **filing** 25:23 |
| 53:7 54:10,15 | **failed** 111:22 | 92:16 | 84:7 90:1 |
| | **failure** 120:7 | | 92:25 93:1 |
| | 120:16 | | |

| | | | |
|---|---|---|---|
| **fund** 43:3 | **getting** 14:10 | 67:16 68:10 | 116:21 121:16 |
| **funded** 34:23 | 14:10 25:14 | 84:15 88:13 | 124:23 125:6 |
| **funds** 24:20 | 36:19 105:23 | 89:3 104:20,21 | 131:8 133:6 |
| 29:9,17 31:7 | 125:15 127:4 | 106:19 110:10 | 142:18 144:24 |
| 34:5,9,17 | 132:21 142:14 | 110:18 111:19 | 144:25 145:1,2 |
| 44:16 46:7,7 | 157:21 164:17 | 111:19 115:9 | 145:3,12 |
| 62:23 | 164:25 165:13 | 118:11 124:4 | 147:15 148:16 |
| **further** 47:12 | **gibbs** 11:18 | 125:14 129:13 | 148:20,21,22 |
| 48:21 63:16 | 25:14 129:13 | 132:20,25 | 148:22,23 |
| 71:23 77:16 | **give** 38:16 | 133:1,14 | 151:21 153:2 |
| 92:2 100:11 | 88:15 96:6 | 134:16,24 | 161:12 162:13 |
| 157:16 | 98:3 114:2,13 | 135:4 136:8 | **goldan** 9:24 |
| **future** 31:17 | 112:10 121:14 | 137:22 143:13 | **goldberg** 4:13 |
| 35:15 36:1 | 126:5,14 | 147:3 151:22 | 47:1,1 89:20 |
| 59:7 104:22 | 140:13 155:4 | 155:16 | 89:21 95:17,17 |
| | 155:20 159:5 | **goal** 20:13 | 120:23 121:17 |
| **g** | 162:7 163:7,8 | 121:19 | 121:17 123:6 |
| **g** 13:13 | 163:25 164:20 | **god** 155:21 | 160:20,21 |
| **garett** 10:17 | **given** 27:1 | 160:20,22 | 161:17 166:5 |
| **gastelu** 8:6 | 33:11 39:5 | 55:5 67:9 | **good** 13:2 21:8 |
| **general** 3:18 | 44:13,16 74:20 | 92:18 110:24 | 22:8 46:24 |
| 5:7 45:3 49:1 | 80:11 83:9,24 | 125:21 132:23 | 49:10 51:7 |
| 51:2 68:20 | 97:21 98:1 | **going** 13:5 | 108:9 115:10 |
| 71:6,12,16,24 | 111:2 132:9 | 14:17,21 15:6 | 124:16 131:13 |
| 75:1 | 140:20 147:25 | 16:10 17:4 | 146:5,23 152:8 |
| **general's** 58:18 | 157:10 161:20 | 20:17 21:5 | 155:19 157:19 |
| **generally** | **gives** 82:20 | 23:4 24:25 | 161:18 163:11 |
| 118:3 143:13 | **glad** 123:22 | 25:2 35:15 | 165:25 166:2 |
| 157:5,7 | **glueckstein** 7:6 | 64:22 68:9 | **gotten** 109:20 |
| **general's** | 146:23,24 | 80:5 85:14 | **govern** 126:11 |
| 119:19 | **go** 18:12 19:25 | 86:11 88:20 | **governance** |
| **gentleman** | 22:17 23:10 | 89:3 96:2 | 42:18 107:7 |
| 82:7 | 25:19 28:5 | 100:19 101:17 | **government** |
| **gentleman's** | 38:12,14 39:8 | 104:20,21,25 | 15:18 |
| 82:6 | 39:20 49:5 | 105:1 107:15 | **governmental** |
| **geographically** | 50:8 52:3 | 108:9 110:10 | 26:25 27:9,15 |
| 37:1,3 | 59:18 62:13 | 115:7,22 | |

| | | | |
|---|---|---|---|
| 123:22 165:13 | **first** 20:25 23:8 | **footnote** | **four** 17:3 35:7 |
| **final** 60:22 | 23:11 29:7 | 150:14 | 83:4 93:7 |
| 117:17 124:3 | 35:4,8 71:2 | **force** 16:19 | 152:24 154:22 |
| 152:3,5,6 | 76:23 102:10 | **foregoing** | **fourth** 71:20 |
| 153:25 165:3 | 105:3 121:19 | 168:3 | **frankly** 7:21 |
| **finally** 17:20 | 131:23 | **foreign** 15:16 | 18:8 19:2 |
| 19:13 80:15 | **fit** 52:17 | 110:5 | **frauds** 18:13 |
| 84:2 127:8 | **five** 18:22 19:4 | **foremost** | **free** 138:10 |
| **finance** 44:4 | 68:9,10 71:13 | 121:19 | **fresh** 165:9 |
| 106:24 134:14 | 79:6 102:1 | **forgive** 67:11 | **friend** 17:24 |
| 148:20 149:21 | 144:17 153:2,7 | 125:3 | **front** 98:18 |
| **finances** | **fl** 6:9 | **form** 117:6 | 159:14 |
| 114:21 | **flags** 106:25 | 38:11 59:8 | **frustration** |
| **financial** 5:1 | **flexibility** | 81:1 130:16 | 127:6 |
| 15:2 41:21 | 144:19 | 132:9 151:25 | **ftx** 7:2 13:16 |
| 42:6,7,8,11 | **flip** 132:22 | **formal** 113:12 | 13:18 15:13 |
| 43:7,11,13,17 | **flocking** 132:7 | **format** 65:5 | 17:20 18:16,20 |
| 43:18 44:8,10 | **floor** 3:20 | 122:13 | 68:18,18 69:6 |
| 46:15 49:4 | **flows** 43:3 | **former** 96:9 | 69:8,9 72:22 |
| 57:3,13 64:15 | **fluctuate** 70:2 | 144:7 | 84:22 85:8 |
| 69:18 72:2 | **fluctuated** | **forms** 2:8 | 92:23,25 |
| 74:7 77:15,25 | 117:3 | **forth** 27:10 | 106:12 110:2 |
| 78:1 107:6 | **fluctuates** | 28:13 32:22 | 122:11 120:15 |
| 120:8,16,19 | 132:14 | 69:3 133:20 | 127:24 132:7 |
| **financials** 77:1 | **fluctuation** | 147:5 | 143:6 157:24 |
| 120:11 | 75:13 | **forward** 14:7 | 165:6 |
| **find** 27:2 | **focus** 15:11 | 20:6 39:5,8,20 | **ftx's** 93:1 |
| 119:24 126:25 | 47:18 82:1 | 60:13 69:4 | 132:6 158:23 |
| 134:6 149:8 | **focused** 89:24 | 70:16 116:21 | **fulfill** 68:19 |
| 150:9 | 100:25 | 122:16 123:13 | **full** 32:18 |
| **findings** 154:2 | **follow** 49:10 | 128:22 129:16 | 140:1 165:9 |
| 154:6,13 | 128:7 | 137:8,9 139:4 | **fully** 90:4 92:8 |
| **fine** 21:20 | **followed** 21:18 | 139:9 156:25 | **function** 32:20 |
| 30:21,21 151:3 | **following** 71:5 | 161:13 | 32:23 33:23 |
| **fingertips** 20:2 | 71:15 | **found** 41:25 | **functional** |
| **fintech** 62:7 | **follows** 57:14 | 45:6 84:18 | 32:13 |
| | | 150:20 | **functionally** |
| | | | 32:23 |

| | | | |
|---|---|---|---|
| **governs** 76:11 | **hall** 130:2 | **hate** 121:15 | 130:25 131:24 |
| 89:9 | 131:2 141:3 | **haven't** 113:21 | 141:2,3 152:15 |
| **granted** 64:8 | **hals** 8:19 | 121:13 147:5 | 154:12 |
| 141:4 158:14 | **halt** 123:10 | **hawai'i** 80:16 | **hearings** 50:22 |
| **granting** 2:2 | **hand** 77:11 91:1 | **head** 17:21 | 111:21 |
| 2:10 | 92:12 | 18:2 36:7 84:6 | **heath** 9:20 |
| **grateful** 122:1 | **handed** 137:23 | **headquartered** | **heavily** 156:21 |
| 122:19 | **handing** 65:9 | 37:16 | **held** 19:5 26:5 |
| **grayson** 11:10 | **handled** | **healthy** 13:8 | 26:13 27:17 |
| **great** 89:23 | 130:17 | **hear** 21:10 | 29:5,15 31:5 |
| 97:16 139:15 | **hands** 14:11 | 22:18 65:2 | 37:23 43:4 |
| **greater** 74:16 | **hanner** 9:8 | 85:18 141:9 | 44:17 48:2,3 |
| **greatly** 113:9 | **happen** 82:16 | 102:18 109:10 | 56:15 71:20 |
| 120:19 | 96:8 121:4 | 114:3 115:22 | 72:1 75:24 |
| **green** 1:13 | 150:11 | 115:23 116:19 | 76:10 80:6 |
| **greenbacker** | **happened** 99:6 | 130:13 132:7 | 81:9 85:24 |
| 10:21 | 107:12,13,16 | 139:11 144:11 | 90:19 118:24 |
| **gregg** 11:15 | **happens** 87:16 | 144:2 | 145:12 |
| **grievance** | 97:24 135:25 | **heard** 22:14 | **help** 30:8 49:11 |
| 112:15 | 136:1 141:24 | 64:4 90:23 | 52:2 130:22 |
| **gross** 11:3 | **happy** 13:8,9 | 92:21 93:5 | 155:21 165:6 |
| **grounds** 75:4 | 58:23 84:13 | 100:23 106:6 | **helpful** 84:18 |
| **group** 62:11 | 119:14,24 | 108:2 118:15 | 111:13 |
| 125:10,11,25 | 127:16 129:16 | 124:3 127:9,10 | **hendershott** |
| 127:3,7 130:7 | 129:17 131:6 | 128:11 134:15 | 6:6 9:3 103:9,9 |
| **guarantor** 44:3 | 142:5 | 144:2 | 105:2 106:1,3 |
| 145:22,24 | **hard** 13:22 | **hearing** 2:1,1,5 | 106:20 108:15 |
| 146:1,3 | 14:13 93:19 | 2:6 13:12 14:9 | 111:14,17,17 |
| **guess** 29:24 | 121:16 126:25 | 23:11 59:22,23 | 112:10 113:4,6 |
| 33:16 84:20 | 127:11 131:1 | 57:22 70:3 | 113:12,16,20 |
| 130:4 154:15 | 139:4 154:15 | 75:4 80:23 | 114:6,8,18 |
| 154:17 | | 83:21 84:1 | 125:6 137:18 |
| | **harm** 98:14 | 85:8 103:1 | 137:19,25 |
| **h** | **harrison** 9:2 | 105:19,25 | |
| **hage** 7:23 | **hasn't** 97:8 | 108:2 114:4,5 | **heras** 9:5 |
| **half** 131:3 | 99:25 | 119:9 122:7 | **herring** 7:13 |
| 154:23 | **hastings** | 124:3,7,13 | **hi** 106:14 |
| | 143:22,24 | 126:21 130:9 | 131:22 |
| | 144:5 | | |

## [high - hopefully]   Page 26

high 61:2
higher 72:23
74:14,23
103:15,15
117:5
highest 56:2
73:4,14 128:20
highlighted
45:1
highsmith
10:14
highway 6:18
hillside 6:24
historical
42:23 44:13
hold 31:23
34:17 44:16
55:16 56:17
94:8 118:14
145:23 146:2
149:14
holdco 18:5
holder 56:10
74:25 75:12
79:19 81:20
holders 29:2
39:11 49:23
52:4 53:23,24
57:24 68:20
69:24 70:7,8
71:6,12,12,16
71:16,22,24
72:8 74:25
75:17 78:12,22
80:18 81:2,5
81:17 83:12

holding 31:9
56:22 59:23
61:10 86:7
89:9,18 91:21
94:16
holdings 1:7
45:24,24 54:23
145:20,23
holds 77:10
90:25,25
109:22
hole 75:9
holidays 15:23
holistic 31:19
hollerith 11:9
holohan 9:4
homework
140:4
hon 1:22
honor 13:4,7
13:11,14,21
14:3,5,11 15:7
15:15 16:5,21
17:20 19:13,20
20:1,5,20 21:8
21:12,18,25
22:12,16 27:21
27:21 30:14
37:6 38:9,18
39:13 40:1,25
41:10,17 42:2
42:13 43:8,14
44:1,5 45:19
45:21,25 47:1
47:3,6,18 48:6
48:11,17,23,25
49:7 51:6

55:10,12 57:12
58:15,20,24
59:14 60:7,18
61:25 63:19
68:3,13,13,15
68:17 69:5,10
69:25 72:14,21
73:10 74:18,25
75:4 76:11,13
76:19,21 77:11
77:16,20,21
78:5,9,18 79:1
79:11 80:9,15
80:19 81:3
82:1,18 83:23
84:2,11,25
85:5,17 86:10
87:10,23 88:17
89:6,20,23
90:24 91:7,13
92:4 95:12,17
95:23 96:18,24
97:2,3,11
98:16 99:3,8
99:20,24
100:18 101:2
101:12,14,16
101:21 102:6
103:9,21 107:6
108:22,24
109:25 110:2,2
110:25 111:25
112:18 113:2,4
113:5 114:8
118:9 119:16
120:22,23,24
121:17 123:6

123:16,25
124:6,15,17
126:23 131:20
131:22 135:12
136:25 138:18
139:13 140:22
142:5,22
143:20 144:4
144:14 145:15
146:2,18,23
147:7,10,11,23
148:11 149:25
150:10,22
151:2,5,5,9,17
151:19,21,21
152:15,19,21
152:23 153:13
154:7,15,17,20
155:17,22
157:16 158:6
158:18,24
159:5,17,21
160:4,19,20,24
161:16,17,25
164:4,10,12,14
164:24 165:11
166:5 166:4,5
honored 18:18
hope 20:6
31:23 117:12
122:18 126:6
155:7 166:1
hopefully 60:4
60:12 103:15
147:25

## [hoping - information]   Page 27

hoping 36:11
horse 160:6,9
161:6
hosted 37:19
hot 46:5,7
hour 130:15
154:22,23
hours 71:15
129:24 131:3
152:24
hundred 18:22
19:5
hundreds
67:11
hunt 149:8
hunter 10:17
hyde 2:25
168:3,8
hypothecate
72:5

i
idea 14:9 145:9
158:12
identifiable
61:4,8 80:12
97:19
identify 142:19
identity 114:20
il 3:14
illiquid 24:22
imbalance
75:14
immediate
94:19
immediately
34:3,6 63:4
68:22 93:6

95:1,20
impact 15:20
24:23 58:2
142:3 151:17
impair 74:10
impermissible
117:6
import 140:1
importance
102:22
important
31:15 33:3
69:7,25 72:4
83:7 95:9
142:16
importantly
14:11 74:25
77:11 92:12
107:14
impose 101:8
140:2
imposed
115:25
improve 69:2
improving
121:2
inability 57:2
inactive 96:9
inbound 62:2
inception
99:12,16 101:9
inclined 133:10
include 35:11
71:2
included 42:6
47:7 77:23

includes 20:9
70:18 71:7
159:12
including
13:23 16:2
19:3 26:10
42:15 43:1
85:24 87:14
122:3,4 139:23
151:14 160:23
incorporated
127:22
incorporates
20:10
incredibly
13:22
incremental
35:11
independent
97:22 98:5,6
109:19
indian 6:4
indicated
22:10 40:14
96:24 124:6
indicating
15:24
indicted 18:11
indirect 145:25
indiscernible
88:21,25 99:2
100:17 104:21
106:14 110:15
110:17,21
111:13 112:6
112:17 113:22
123:13 125:15
150:9

131:16 135:1,5
136:6 145:20
155:4 161:12
161:21 163:9
165:8
individual
39:19 51:15,18
90:11 94:4
101:25
individually
41:2
individuals
40:14
industry 46:5
46:14 72:17
77:5 78:9
97:22
inept 111:12
inequity 121:7
influencers
132:8
information
22:10 40:14
41:25 42:25
43:1 44:12
46:15 47:24
48:5 61:4,8,12
61:13 79:13
80:1,6,13
96:25 97:16,19
99:1 101:19
111:21 120:8
120:16,19
132:9 133:15
133:15,18,20
150:9

## [informed - it's]   Page 28

informed 69:8
133:17
infrastructure
37:19 39:21
40:4,11 42:16
45:17 46:2,5
58:3 67:2,19
78:2,14,23
88:19,20 89:8
89:11,13
initial 90:1
93:2
initially 30:9
initiate 76:3
104:23 125:18
inquiries
100:21
inquiry 15:23
16:3
instance 35:5,8
40:24 54:5,9
62:1 63:1
65:24
institution 72:2
insured 72:2
intend 24:2,3
intended 90:21
interact 142:25
interagency
15:17
intercompany
148:12 149:19
150:18
interest 16:9
16:15 28:12
31:20 68:24

71:17 75:2
98:16 118:3
139:10 140:4
141:11
interested 84:5
interesting
17:8
interests 28:21
47:23
interfering
143:25
interim 42:8
77:25 103:5
111:6 163:15
interject 58:25
internal 142:10
143:1
interrupt
50:17 54:21
64:22,23
149:11
interrupted
106:17,19
introduction
150:15
invest 72:6
investigate
100:10
investigated
45:18 47:15
investigating
112:21
investigation
41:24 42:1
45:6
investigations
112:21
investment
15:16 22:2

42:4 156:3
involve 25:7
50:9
involved 97:15
139:19 156:4
160:16
involves
148:11
involving
15:19
ironic 133:22
irretrievably
123:12
isn't 87:17
88:14 136:2
145:11 149:24
issue 17:13
50:19 60:4
83:24,25 84:5
90:3 95:19
100:24 103:11
105:11 107:25
108:20,25
114:25 115:6,8
115:11,23
117:18 118:7
119:6,14,22
140:15 144:5
144:10,12,18
146:17,22
148:11 150:20
155:1 157:19
159:14 160:23
issued 147:13
issues 17:18
16:15 22:2

39:9 54:25
63:11 77:16
79:9 84:17
101:22,25
102:8,14,16
105:13,21,25
107:22 114:20
114:22 117:12
122:6,15,17,19
143:2,5,23,23
144:3 147:1,4
147:8,12
150:16,18
154:13 166:2
it'll 68:10
item 156:2
items 20:7
21:13
it's 87:21 88:19
92:4 93:20
94:5 95:23
96:11 100:17
100:18 101:14
101:15 103:11
105:8 106:11
106:12,15
108:6 109:2
112:4 113:23
113:23,24
116:20 117:18
117:19,22
119:3 120:2,13
121:10,16
123:18 124:6
126:18 127:7,7
128:16 129:22
130:7 131:22

## [it's - kind]   Page 29

133:1,3,5,9,22
134:19 135:3
136:1,9,15,18
136:18 138:2
138:23 139:8
139:25 141:3
130:19 153:4
146:10 148:21
148:22,22,23
149:7 151:12
152:12,13,24
i'd 92:6 121:18
122:20 123:19
133:8
i'll 95:2,16
96:2 100:12
101:22 112:25
114:3 115:23
116:19 150:12
i'm 87:10 95:2
96:2,3,19 99:9
101:4,8,17
102:19 103:7
104:25 105:1
105:11,16,18
106:19 107:8
111:3 115:6
117:15,17
118:3 119:18
119:23 125:15
126:8 127:16
131:10,23
133:13 135:4,8
138:11 142:5
143:10 148:18

150:1,24
152:23
i've 105:5
108:2,23
109:20 111:2
124:18,20
130:19 153:4

j
jacob 9:10
james 6:11
108:22
january 1:16
130:7 168:25
jasmine 8:1
jason 7:22,24
8:18 10:10
jeffrey 5:25
123:16
jelisavcic 10:15
jennifer 5:5
49:3 57:12
58:25 120:24
jersey 5:17
76:15,18
123:18
john 7:22
11:13
johnson 9:25
50:25 57:24
join 90:15
139:2,2
joining 155:12
jon 10:9 11:19
jonathan 8:8
10:12 11:2
jones 6:11 9:14
108:22,22
109:2,4,14,17

109:25 110:2,5
110:8,13,15,17
110:20,23
111:9,11,16,19
112:6,18 113:2
138:2,6,8,11
joseph 11:17
joshua 3:8 13:7
judge 1:23
126:4 129:20
138:4,8
judge's 131:10
judgment 73:2
76:11,22 139:4
156:12
jumpstart
13:20
juncture 67:14
jurisdiction
30:24 41:16
52:10,23 53:25
54:11 59:2
63:3,5
jurisdictions
17:3,4 34:1,8
34:13 39:3,18
40:17 41:12
53:13,23 55:16
55:20 57:24
58:11,21 59:11
61:4 62:16
80:17,18,21
81:3 82:24
83:18,19 91:18
112:16 116:3
119:21

justice 4:15

k
kaloudis 7:19
kandestin 10:1
karen 3:23
11:12 22:18
59:14 118:9
165:17
katherine 10:5
kb 1:25
keep 32:16
83:2 94:3
101:6 119:10
153:23
keeping 32:24
keither 8:13
kelly 10:21,23
kerns 1:1
kevin 7:17
keys 46:11
48:15
kick 36:10
98:12 159:10
kicked 159:11
kind 17:13
21:23 23:14
31:7 33:17
39:17 41:16
45:9 48:6,15
50:12 53:5,11
53:18,25 66:11
66:20 67:3,6
75:16 76:3
81:5 82:11,15
82:21 83:6,8
83:17 86:15

## [kind - lending] — Page 30

88:15,18,20
89:8,12,16
91:5 111:23
112:14 117:15
118:21 123:10
127:22 128:1
129:17 132:21
133:22 140:13
142:9 145:2
149:22 160:12
**kinds** 118:23
**king** 9:15
**kirkland** 3:3
3:11 13:8 21:9
60:8 68:14
**kml** 67:4
**knauth** 8:20
**knew** 99:9
**know** 13:21
15:3,14 18:3
20:5,17 27:5
27:11 33:4,4
34:16 36:3
38:2,12 40:7
40:20 43:24
44:6 46:13
47:7 50:9
51:19 53:6
55:18 56:3,7
56:21 58:3
59:7,25 60:14
61:15 64:8,18
71:8 77:13
86:4,17 87:25
88:3,22,23,24
89:10,12,13,15
89:16,22 93:9

94:8 97:3,3,4,8
97:9 99:13,21
99:23,24 100:3
100:6,13 101:9
102:15 103:11
103:13,13,20
104:1,3,10,12
104:13,16,23
106:5,21 107:5
107:7,10
110:10,24
111:21,22,23
111:23,25,25
112:1,2,3,22
113:7,13,22
116:7 117:11
121:1,3,8,10
124:1,13 125:2
126:8 128:4,10
129:6,23 131:5
135:18 136:15
137:4,13,13,16
138:21 139:6,7
141:1 142:20
142:24 143:5
151:21 152:24
153:4,5,22
156:1 158:7,8
160:6,8
**knowing** 62:25
109:19
**knowledge**
22:10 43:10
46:19
**known** 51:23
104:5

**knows** 97:4
138:3
**koepsel** 8:7
**kornberg** 8:8
**kyc** 26:20
39:20 42:19
51:16 64:12
65:12 67:2
78:2

**l**
**label** 110:8
**labor** 139:16
**lack** 150:1
**lady** 125:13
**lakhdhir** 8:9
**landed** 93:16
**language** 28:15
67:24 87:24
110:3 136:7
149:3 152:17
**large** 18:17
40:2 101:14,14
**largely** 24:13
31:12 51:16
70:1
**larger** 103:11
**largest** 18:13
**las** 9:5
**lasalle** 3:13
**late** 60:1 104:6
113:20 165:12
**latham** 4:8
13:25 47:2
89:21 121:18
160:21
**lauren** 10:21

**law** 15:5 59:1
59:10 120:5,15
142:3 152:23
**lawrence** 11:4
**laws** 102:12
**lawyers** 47:13
142:24
**layla** 7:14
**layman's**
128:15
**lead** 13:5 60:11
83:21
**leading** 46:14
50:7,8 68:17
**leakage** 138:22
**learn** 46:1
47:17
**learned** 94:11
**learning**
130:17
**leave** 33:12
58:11 161:10
**leaving** 93:13
**ledanski** 2:25
16:8 18:8
**lee** 8:10,11
**left** 13:17
**legal** 27:23
28:1 46:20
50:17,19
104:12 114:13
126:5 168:20
**legally** 125:8
**legge** 8:21
**lend** 72:6
**lending** 44:21
77:12

## [length - loss] — Page 31

**length** 132:5
**lengthy** 133:21
134:3
**leticia** 8:14
**letter** 63:12
113:18,24
114:3
**let's** 117:20
138:5,7,10
139:25
**level** 44:7 61:2
64:21 106:8,25
106:25 149:15
149:16
**lexington** 3:5
**liabilities** 74:8
**license** 31:24
32:7 56:25
59:3 63:14
78:3 120:6,10
123:1,2
**licensed** 61:6
61:11,13 62:17
93:9 120:15
121:14
**licenses** 16:21
108:18,19
**licensing** 27:13
56:4 118:22
121:11
**licensure** 59:7
**lieu** 104:1
**life** 101:13
130:20
**lifted** 72:16
**light** 158:15

**likely** 23:22
24:3 36:16
63:6 66:18
**lily** 11:6
**limit** 84:3
112:2 130:15
152:2
**limited** 52:22
73:22 128:5
151:9
**limits** 94:15
131:2
**linda** 7:12 11:8
**line** 22:5 25:15
25:17 28:6
33:15,16 63:22
127:14 128:13
154:21 167:4
**liquidate** 66:17
91:23 95:20
**liquidated** 53:6
54:12,18 55:6
110:21
**liquidating**
67:8
**liquidation**
14:13,17 16:7
16:12,14,19
20:13 29:24
80:5 91:20
107:23 136:15
137:4 139:17
**liquidity** 42:13
43:22 44:11
78:1
**lisa** 6:16 8:4
11:10 124:17

137:24
**lisandra** 7:11
**list** 16:3 62:11
126:14,21
141:23,23,24
142:8,13
**listed** 51:23
82:8 150:12
**listened** 93:18
**listing** 82:10
141:21
**lists** 144:16
150:25
**literally** 87:5
87:14
**litigates** 19:6
**litigation** 92:14
104:23
**little** 52:9
85:19 121:4
128:16 145:18
150:15 157:23
158:15
**live** 54:25
**llc** 73:12
**llp** 3:3,11 4:1
5:16 7:1
**loan** 18:5 19:17
19:22 75:9
145:18
**loans** 18:19
148:14
**locate** 158:7
**located** 80:18
81:20
**locations** 38:3

**lock** 73:13
**locked** 64:9,11
**log** 61:18 62:3
62:22 63:3
155:8
**logging** 155:5
**long** 23:21
63:13 92:7
94:24 96:9
97:9 105:8
119:7 123:18
124:11 134:1
**longer** 40:12
73:5 82:23
144:9
**look** 14:13
23:25 25:7
27:4 47:16
95:5 97:23
98:12 100:2
107:3 111:24
122:16 139:17
140:2 149:6
150:8,10
153:25 159:6
160:10 165:5
165:10
**looked** 124:25
**looking** 20:8
43:17 96:3
134:6 158:7
162:5
**lorraine** 155:1
**losing** 133:2
**loss** 125:12

## [lost - maultsby] — Page 32

**lost** 127:11
**lot** 13:22 14:19
17:23 30:6
98:3 122:8
130:12 133:16
139:16 140:4
**lots** 100:21,22
**love** 95:6
**low** 98:10
**lower** 117:6
**luck** 166:3
**luke** 9:9

**m**
**m** 3:20
**ma'am** 128:8
129:20
**made** 17:12
18:5,20 22:9
28:6 29:7,8
54:13,18 59:20
67:14,19 71:18
85:23 90:2
91:15 93:17,22
100:7 105:7,7
114:13 118:23
123:14,20
124:1,21
128:23 143:6
144:22 145:8
146:25 148:25
151:12 153:23
**mader** 8:12
**madison** 4:3
**mailing** 163:23
**main** 5:2
115:11

**maintain** 26:9
33:5 36:22
37:3,18 38:2
41:4
**maintaining**
46:11 52:17
**maintains** 37:5
37:19 77:7
**major** 130:6
**majority** 37:25
44:18 135:2,16
135:18,24
136:2
**make** 21:1 24:7
38:23 39:24
41:8 47:8
50:17,20 51:23
53:22 54:21
55:1 56:6 59:4
59:12 65:1
71:10 79:5
81:21 82:11,14
82:21 83:5,17
86:21,22 90:17
91:3,9,14 92:6
94:2 105:14
107:13,16
112:10,25
113:25 116:18
117:20 118:10
119:19 121:19
123:19 124:20
125:24 126:5
126:12 128:5
130:15,16
133:6,16 140:8
140:15,18

143:20 145:2,3
146:4 147:11
148:14,15
151:16 152:9
154:11,14
157:24 158:18
161:9 163:3,16
164:5,19
**makers** 25:24
**makes** 115:8
116:20 126:13
134:24 136:11
160:24
**making** 17:14
51:20 84:6
120:2,14
143:25
**man** 25:11
60:18,20 61:20
63:19,23 64:1
64:3,21,24
65:5,7 68:6
155:13,14
**management**
13:23 64:16
74:8 77:25
106:6,8,11
107:12
**managing** 22:1
**manner** 24:8
**manual** 40:12
**manually** 41:2
**manuals** 42:19
**march** 14:9
36:9,11 130:8
**marcus** 10:7

**maris** 10:1
**marisol** 9:21
**mark** 11:7
154:22
**marked** 12:11
**market** 25:24
54:2,19 62:12
66:18 104:15
104:15 132:14
148:1
**marketed** 83:7
**marketing**
14:12 57:22
62:2,6 73:16
118:17,25
**marketplace**
14:20
**martin** 11:11
**marvin** 9:1
**material** 104:3
104:8 150:6
**materially** 74:9
74:10,11
**materials**
123:23 124:4
163:20
**matt** 8:12
**matter** 1:5
32:16 33:8
110:6 159:24
**matters** 28:18
32:9 59:21
101:3
**matthew** 9:12
10:13
**maultsby** 9:11

## [maximize - months] — Page 33

**maximize** 69:5
82:2 92:11
157:3
**maximizes**
137:6 139:5
157:5
**maximizing**
72:16 137:10
138:23 157:14
**maximum** 77:2
20:5 66:2
**mccormack**
8:13
**mcdermott** 4:1
38:10 92:5
100:19 112:19
129:23 139:14
**mcelroy** 5:16
123:17
**mclaughlin**
7:25
**mean** 30:9
57:20 59:24
63:9 64:6,10
81:10 87:7,15
87:17 103:13
110:5,5,8
117:25 118:23
130:18 136:1
159:17
**meaning** 81:7
128:12
**means** 77:8
81:12,14
141:22 146:14
**meant** 117:7
**mechanism**
115:14

**media** 14:20
**meetings** 131:9
**melanie** 25:11
**member** 81:19
**members** 81:8
81:13 142:1
**mendelsohn**
9:20
**mention** 13:22
20:5 66:2
**mentioned**
24:6 94:24
25:3,4,6,7
150:4
**mere** 112:13
**merger** 86:2
**mesh** 145:13
**mess** 120:2
**message** 153:4
**met** 114:16
134:7
**mew** 1:3
**michael** 1:22
3:16 9:13
**middle** 141:2
**might've** 119:7
**migrate** 53:10
57:20
**mike** 8:21,23
27:22
**milligan** 7:14
**million** 15:2
18:22 19:5
24:12 34:22,25
35:6,12 36:19
52:1 69:14,20
70:19,21 73:18

73:19,21 77:2
95:8 104:16,19
104:20,21
112:19,21,22
119:2 138:22
139:24 156:9
159:20
**millions** 64:9
104:10,11,24
111:11
**mind** 108:23
117:14
**minds** 160:5
**minela** 168:23
**minimal** 90:18
**minimize** 71:1
**minimized**
77:6
**minimum**
126:11,19
**minute** 68:9
94:9 96:6
102:2 153:7
**minutes** 13:12
68:10 134:16
153:2 155:5
**misconception**
69:15
**misconcepti...**
138:20
**misguided** 17:2
**missed** 45:21
**missing** 164:1
164:3
**misstate** 159:7
**model** 77:6

**modifications**
146:25 153:17
**modified**
146:10
**modify** 139:7
144:16 164:5
**moelis** 13:24
22:2
**moment** 27:17
50:19 96:20
98:18 123:19
159:6
**money** 14:10
14:18 19:10
20:15 34:2
53:9,9 61:17
78:3 100:15
118:18 127:10
130:9
**monkey** 112:1
**month** 23:23
31:2,9 32:17
33:6 35:10
38:20 53:7,10
53:24 54:10
56:10 65:25
69:1 82:20
94:21 95:4,11
95:13
**monthly** 127:2
127:5 130:7,9
**months** 31:5
32:3,22,23
33:1,12,22
35:7 52:13,22
53:1,14 54:1
55:5,17 61:11

A-516

| | | | |
|---|---|---|---|
| 81:1,2 82:23 | moving 52:19 | nature 26:18 | 123:1 130:16 |
| 94:25 104:8,12 | 119:10 137:9 | 31:12 32:18 | 143:17 |
| 118:24 122:7,9 | 139:4 | 33:10 36:24 | negative |
| 122:14,15 | moynihan | 37:21 39:7 | 112:23 |
| 133:4 | 10:23 | 40:8,25 41:3 | negisa 9:18 |
| montpelier 5:3 | mtl 27:12 | 42:2,3,12,15 | negotiate 111:5 |
| moot 83:25 | multi 46:11 | 44:16 55:24 | negotiated |
| morning 13:2 | multiple 81:9 | 56:13 58:2 | 31:10 33:1,13 |
| 17:22 146:11 | 106:4 107:5 | 61:25 65:15 | 72:20 83:3 |
| morrissey 4:20 | multiples | 67:18 85:18 | 156:21 |
| 96:18,18 99:3 | 43:22 | 127:2 | negotiating |
| 99:8,20 100:10 | mulvaney 5:16 | nearly 122:7 | 69:1 |
| 101:2,21,24 | 123:17 | necessarily | negotiation |
| 124:21 144:4,4 | mulvihill 7:15 | 98:22 115:7 | 156:4 |
| 147:7,7,10 | mute 25:17 | necessary 55:4 | net 43:19 116:6 |
| 149:10,25 | 61:21,22 | 75:6 82:21 | never 66:5,8 |
| 150:8,21,22 | 106:16,17 | 88:15 159:2 | 105:5 116:10 |
| 151:2,19,19 | 155:9 | need 18:25 | 130:19,20 |
| 152:19 | mutually 35:4 | 18:25 20:12 | new 12:14 3:6 |
| morrissey's | 122:17 | 31:5 38:22 | 4:4,11,18 5:17 |
| 100:5 | **n** | 41:1,4 50:2 | 7:4 13:8,9 |
| motion 2:1,5 | n 3:1 12:1 13:1 | 51:12,13,17 | 76:15,15,18 |
| 21:13,15,17,18 | 167:1 168:1 | 64:25 66:16 | 80:15 89:13,16 |
| 22:3 73:7,9 | nacif 10:11 | 86:15,16,20 | 93:21 117:23 |
| 76:15,20 84:3 | name 25:2 82:6 | 94:2 102:1 | 118:2 119:22 |
| 105:4,5,6 | 87:22 102:19 | 108:5 112:12 | 122:11 123:18 |
| 113:24,24,25 | named 145:20 | 112:16,17,17 | 127:1 136:4,13 |
| 125:8,16,19,24 | 145:21 146:1 | 121:11 126:12 | newark 5:19 |
| 126:5 129:11 | nandan 8:16 | 127:10 130:6,7 | newman 10:18 |
| 154:9 | narrow 156:11 | 131:10 134:4 | news 97:15 |
| mouth 17:9 | 157:6,11 | 143:15 146:4 | newsom 6:1 |
| move 14:7 16:3 | natalie 10:20 | 147:6 163:2,14 | 102:19,19 |
| 20:6,14 39:5 | national 3:18 | needed 13:19 | nickerson 7:16 |
| 60:13 65:23 | 15:20 64:19 | 50:11 158:3 | night 60:1 85:6 |
| 128:22 129:4 | 106:25 | 163:6 | 146:11 165:13 |
| 143:2 156:25 | native 141:10 | needs 32:23 | nikhilesh 7:10 |
| 157:8 163:18 | | 61:21 105:6 | |

| | | | |
|---|---|---|---|
| 30:6 31:4 32:6 | okike 3:9 13:24 | old 6:18 168:21 | 51:24 66:9 |
| 32:13 33:8 | 14:21 21:6,8,9 | ombudsman | 67:5 107:21 |
| 34:1,7,12,16 | 21:12,25 60:7 | 80:10 96:13,21 | operationally |
| 34:19,24,24 | 60:7 68:3,13 | 98:1,9,11,20 | 50:4 |
| 36:3,8,14,18 | 68:14,17 78:18 | 99:5 | operations |
| 36:22 37:22 | 79:1 84:25 | ombudsmen | 36:23 37:19,25 |
| 38:5,17 44:25 | 85:5,17 86:10 | 101:12 | 39:8 40:4 41:3 |
| 46:1 47:5 | 86:25 87:2,10 | onboard 14:24 | 50:1 66:14 |
| 49:22 52:2,21 | 87:19,23 88:17 | 16:23 33:7,9 | 74:7 |
| 52:23 53:20 | 89:6 91:7,13 | onboarding | opinion 104:9 |
| 55:11,19 56:19 | 91:15 95:2,12 | 71:7,13 | 135:19 136:22 |
| 57:10 59:17 | 99:21,24 102:16 | once 34:2 | 156:19 |
| 60:23,24 63:18 | 113:5 125:3 | 61:12 87:15,21 | opinions |
| 63:24 68:5,15 | 127:13,14,16 | 124:3 151:20 | 107:19,19 |
| 78:25 85:7,18 | 128:9,16 | 153:25 | 142:23 |
| 95:15 101:2,20 | 129:15 133:19 | one's 16:15 | opportunity |
| 101:21 102:2,7 | 135:10,12,21 | ongoing 42:24 | 14:23 15:2 |
| 102:18,25 | 136:21,25 | 103:16,23 | 75:3 81:4,12 |
| 105:25 108:14 | 137:18 138:15 | online 99:17 | 83:2 92:10 |
| 108:21 113:3 | 138:18 140:23 | 107:3 | 95:8,13 98:12 |
| 114:5,7,19 | 141:6,18 142:5 | onset 63:8 | 108:7 142:2,25 |
| 118:12 123:7 | 143:20 144:14 | op 149:15 | 143:1 |
| 126:22 128:10 | 145:15 146:2 | opco 18:9 | opposed 16:18 |
| 129:11 131:18 | 146:18 147:24 | 71:6,12,16,24 | 31:6 115:25 |
| 132:3 140:6,21 | 155:15,17,23 | open 41:19 | 135:7 |
| 141:4 143:2,19 | 155:25 157:16 | 59:23 95:19 | opt 79:14,20 |
| 145:14,17 | 158:6,18,24 | 110:19 117:14 | 147:19 161:20 |
| 146:5,21 147:2 | 159:5,16 160:4 | 166:2 | 164:25 |
| 147:9 151:4,18 | 160:19 161:7 | opened 33:5 | option 14:17 |
| 152:17,20 | 161:16,25 | operate 33:5 | 14:17 25:20 |
| 153:8,14 | 162:9,18,21 | 44:12,23 47:4 | 32:4 33:11 |
| 154:19 155:3 | 163:1,4,10,18 | operating 18:6 | 34:2 35:9 |
| 155:14,23 | 164:4,12,14,24 | 47:25 | 72:16 73:4 |
| 158:20 161:24 | 165:11,22 | operation | 79:14 125:20 |
| 162:20 163:19 | 166:4 | 37:11 | 127:19,25 |
| 164:11 165:2 | okike's 90:4 | operational | 128:14 137:10 |
| 165:25 166:6 | 125:19 | 42:14 49:17,19 | 137:21 139:23 |

| | | | |
|---|---|---|---|
| nizar 8:9 | november | 37:6,12 65:1,2 | obtained 154:4 |
| nj 5:19 6:24 | 13:14 | 85:2 112:25 | obvious 115:21 |
| nobody's 50:24 | nuance 66:2 | 118:5 140:25 | obviously 45:1 |
| nominal 48:4,9 | number 18:3 | 144:8,13 | 64:6 86:13 |
| 86:6 87:8,18 | 18:17 20:2 | 145:17 146:17 | 89:7,9 92:7 |
| 124:23 | 22:22 25:24 | 146:19 147:1 | 100:1 115:16 |
| non 54:10 | 41:1 43:24,24 | 151:10 162:5 | 123:8 127:25 |
| 119:21 143:23 | 51:14 86:4 | 163:16 | 133:9,11 |
| nonconsenting | 93:15 95:5 | objections 2:3 | 137:11 139:8 |
| 53:12 55:16 | 102:8 118:19 | 2:10,11 15:6,9 | 147:12 |
| 58:21 61:4 | 129:13,24 | 16:14 20:8 | occur 25:4,5 |
| 62:16 | 139:24 | 76:14,17 80:21 | 36:17 41:2,18 |
| normal 88:14 | numbers | 80:24,25 84:24 | 104:3 130:3 |
| 91:10 | 132:25 | 85:1 95:24 | occurred 26:21 |
| north 3:13 6:8 | nw 3:20 | 96:3 102:7 | 26:21 54:7 |
| notably 74:3 | ny 1:14 3:6 4:4 | 108:16 123:8,9 | 104:8 127:24 |
| 76:19 | 4:11,18 7:4 | 123:14 131:19 | occurs 35:3 |
| note 26:23 | 168:23 | 133:23,25 | offer 21:2,3 |
| 42:21 47:6 | **o** | 144:20 145:2,4 | 27:25 74:14,24 |
| 69:25 83:7 | o 1:21 5:11 | 147:4 152:22 | 128:21 |
| 98:8 142:16 | 13:1 168:1 | 153:15 162:3,6 | offered 107:18 |
| 151:11 166:6 | o'brien 11:5 | objective | offers 92:10 |
| noted 79:1 | oaks 6:3 | 121:21 | office 57:4 9:1 |
| 84:4 | oath 22:11 | objectors | 58:18 119:19 |
| notes 101:25 | object 22:6 | 57:11 69:15 | 120:10 |
| nothing's | 27:22 30:14 | 76:21 77:20 | officers 102:23 |
| 143:25 | 75:3 145:9,10 | 78:5 122:4 | 105:21 |
| notice 97:17 | 151:13 152:5 | 152:1 | official 4:2 |
| 99:19 100:3 | 162:23,24 | obligated | oh 6:14 120:9 |
| 105:7 114:2 | 163:13 | 69:19 74:21 | okay 13:5 20:3 |
| 126:3 145:11 | objected 15:13 | 79:5 | 21:10 22:21 |
| 162:7 164:17 | 96:12 | obligation | 23:4,17,21 |
| 164:25 | objecting | 121:10 | 24:9,16,25 |
| notices 2:9 | 15:12 16:11,13 | obligations | 25:19 26:4,8 |
| 162:2,6 | 17:1,10 | 44:3 68:19 | 26:23 27:6 |
| novel 122:6 | objection 18:1 | obtain 41:25 | 29:14,21,21 |
| | 27:24 28:11 | 82:20 | |

| | | | |
|---|---|---|---|
| 140:1,14,20 | originally | owned 28:17 | 159:12,24 |
| optionality | 158:11 | 28:17 90:22 | 160:14 |
| 139:14 | originating | owner 47:23 | partially 19:17 |
| options 115:24 | 106:22 | 48:4,9 | participant |
| 127:23 128:19 | otherly 17:5 | ownership | 155:11 |
| 132:6 137:1,14 | ought 88:7 | 27:19 28:21 | participated |
| 144:13 | 134:5 | 45:14 47:23 | 68:22 |
| oracle 76:16,17 | outcome 16:14 | 48:9 51:1 87:8 | participating |
| 144:13 | 93:21 135:23 | 87:20 109:23 | 25:17 |
| oral 105:6 | 148:15 | 125:17 | particular |
| 113:13 | outcomes | owns 27:17 | 20:25 26:12,15 |
| order 18:18 | 112:3 116:6 | | 27:3 33:13 |
| 20:25 31:22 | 150:7 | **p** | 51:14,19 59:19 |
| 41:4 43:21 | outreach 68:23 | p 3:1,1 5:11 | 59:24 95:19 |
| 50:3 51:17 | outright 66:5 | 13:1 | 107:20 113:25 |
| 84:23 85:1 | outset 13:12 | p&l 44:13 | 115:1 116:15 |
| 86:24 87:4 | 14:2 15:8 | page 12:9 91:4 | 146:17 |
| 91:5 105:16 | 17:21 85:7 | 167:4 | particularly |
| 118:18 125:16 | outside 23:11 | pages 67:11 | 47:16 75:11 |
| 126:15 149:4 | 35:10 48:19 | 150:19 | 83:9 149:14 |
| 151:23,25 | 73:5 79:17 | paid 69:14 | parties 13:3 |
| 154:2 157:21 | overall 24:9 | 120:3 157:6,11 | 46:6 54:8 |
| 161:19 162:1 | 34:20 101:16 | palo 37:17 | 68:22,24 69:2 |
| 162:11,21 | 103:6 | paper 126:13 | 75:2 84:16,17 |
| orders 118:22 | overlap 21:21 | papers 20:23 | 97:16 98:15 |
| 147:3 151:22 | 21:22 | 145:19 | 102:4 104:5 |
| 153:21 165:4,5 | overruled 37:8 | paragraph | 109:16,18 |
| organization | 37:12 | 26:8,23 28:8 | 114:2 118:21 |
| 28:25 103:16 | own 17:14 | 96:23 145:22 | 122:2,9 142:19 |
| 103:19 106:10 | 20:24 25:2 | 151:24 157:21 | 144:20,20 |
| 106:12 130:11 | 26:5 29:23 | 158:2,8,11 | 145:18 147:14 |
| organizations | 31:1 49:13 | 163:20 | 147:20 148:2 |
| 62:7 | 58:3 62:20 | parent 64:18 | 148:16 152:5 |
| organize | 65:14 72:25 | 107:3 | 158:14 162:15 |
| 112:12 | 84:23 94:2 | part 45:22 50:6 | 163:8 164:6,15 |
| original 146:7 | 120:2,14 132:9 | 80:5 88:13 | parties' 106:7 |
| 151:25 154:9 | 132:24 133:17 | 89:4 107:15 | |
| | | 135:20 145:19 | |
| | | 150:25 159:9 | |

**parts** 85:20,21 86:8 149:6
**party** 22:5,6 25:8 41:22 42:16 47:15 50:2 51:12,13 51:23 52:19 57:6 72:1,23 74:15 78:2,8 97:23,25 98:6 112:1 147:21
**pass** 86:13
**passed** 85:2
**passes** 32:22
**past** 102:11,16 105:10 108:11
**path** 59:11 69:4 70:16 95:21
**pathway** 64:14
**pathways** 137:22
**patiently** 124:18
**patrick** 9:4
**paul** 7:23 10:24 143:22 143:24 144:5
**pause** 155:6
**pawns** 120:5 120:21
**pay** 69:16,20 77:2 158:21,22 159:19
**payable** 70:21 156:10 159:25 160:16,22
161:1,3,13
**paying** 15:1 24:19 31:22 95:8 130:8
**payment** 30:4 104:19 115:4 159:13
**pelz** 9:16
**pending** 57:1
**people** 13:22 14:25,25 18:11 20:14,15,15 21:4 30:12 34:8 64:9 108:3,6,7 111:6 112:15 116:19,25 117:1,2 131:9 132:7,8,24 133:3,5,10,14 133:16,24 134:5 139:1 143:14 145:1,3 145:7 147:5 154:21 161:20 162:7 163:15 163:21
**percent** 30:2,3 34:18,20 44:22 66:7,15 70:6,8 70:17 77:7 91:2 112:4 132:13,15,16 132:17 133:2,2 133:7,9,11 147:25 148:1,9 148:10
**percentage** 34:21 75:25 101:15
**perform** 42:4
**performed** 23:24 76:25 77:21
**period** 31:2,9 32:17 33:6 35:25 36:2 44:14 52:7 53:8,10,16,24 54:10,15 56:1 59:23 65:25 72:8,18 91:22 94:15,21 95:11 95:13 117:6 128:5
**permit** 98:21
**permitted** 50:20
**perpetual** 47:21
**perry** 10:1
**persistent** 144:17
**personal** 61:7 65:14 80:6 97:15
**personally** 61:3 80:12 97:19
**persons** 15:19
**perspective** 31:15 33:3 35:20 45:12 48:1 51:24
53:3 56:1,2,7 60:9 61:16 67:5 83:11 107:13,14 122:24 137:1,4 139:3,6 157:13
**persuasive** 113:14
**peterson** 9:7
**petition** 73:15 75:13 76:2 82:13
**philip** 8:25
**phone** 46:24 61:21,23 96:17 101:5 106:18 147:14 152:10 154:25
**phrased** 86:8
**physical** 37:17
**pick** 106:14
**picture** 101:5
**pieces** 18:1
**pii** 96:25 97:23 98:7
**pivot** 50:11 84:9 137:13
**pivoted** 94:14
**place** 13:17 40:4,12 47:21 50:3 51:12,14 52:3 98:10
**places** 150:9
**plan** 2:6 18:4 18:14 20:10 23:13 24:5 30:3,4 42:20

50:21 51:3,3,7 52:6,10 53:2 54:14 55:20 58:20 59:5 65:19,20,21 69:25 73:9,20 74:22 76:6 81:4,13,16 85:13 89:4 92:9,16,18 112:8,10 115:20,25 116:23 117:16 125:4,20,21 127:14,15,17 127:23 128:2 128:12,17 129:5,6,9,15 130:20 132:1 134:22 136:4 136:13,13 137:8,16 138:9 139:7,9 140:5 141:8,14 143:3 145:22 146:7 146:10 147:12 147:17,22 148:16,20,21 150:12,12 151:13 152:4,7 152:14 153:20 158:1 159:9,10 159:12,24 160:15,17 161:3,11
**planning** 15:25
**plans** 38:2 78:4
**platform** 14:3 16:24 25:3 26:6,14 27:18 29:10,13,18 31:1 32:20 39:6 43:4 44:23 46:7 48:19 49:18,19 50:4 52:5 61:18,19 62:10 62:13,25 63:6 65:24 66:5,6 66:15 69:13,22 70:18 71:19 74:13 79:4 82:9,13,22 83:3 89:10 90:13,16 94:19 95:14 97:7 99:12,16 127:20 128:5 128:24 142:9 142:12 151:16
**platforms** 25:21 49:25
**play** 14:23 36:12
**pleadings** 120:1
**please** 25:17 61:22 65:4 89:1 102:18 106:16,17 124:19 128:8 129:12,14
130:11,13,23 155:23
**pledge** 72:5
**plenty** 20:22
**plus** 69:13
**pm** 1:17 166:9
**pockets** 14:18 19:11
**podium** 21:6
**point** 15:9 18:8 19:23 29:14 31:16 33:6 35:15 36:18,20 38:6 50:18 51:7 52:16 54:22 56:11 59:19,24 61:10 82:25 86:14 88:12,13,18 91:9,17 95:9 100:5 103:12 119:10,11 121:1 124:5,18 125:2,2 133:3 136:14 138:2 139:7 147:11 151:20 152:9
**pointed** 50:24 96:13 161:7
**points** 87:12 164:23 165:20
**policies** 96:15 99:6,18,19 107:8
**policy** 79:24,25
96:23,24 97:2 97:4,10 98:2 98:20,25 99:10 99:22,23 100:4 100:7,11 101:3 101:20
**pool** 109:6,7
**porcari** 9:9
**portfolio** 66:8 75:6,10,15,18 76:3
**portion** 130:9
**pose** 65:4
**position** 43:17 58:10 96:17 109:22 124:11 160:25
**posner** 10:19
**possibilities** 149:23
**possibility** 89:15 161:11
**possible** 20:19 88:19 121:21 153:22 156:23 161:10 165:18
**possibly** 106:23 115:8 136:23
**post** 62:25 73:15 142:20
**posted** 19:18
**potential** 80:25 82:18 83:22 85:15 103:21 104:1 106:3 111:4 123:9

**potentially** 15:22,25 24:12 50:10 62:24 138:21 157:23
**power** 17:19 20:18 103:18 110:11 114:12 140:13
**practical** 50:18 85:9 115:24
**preceding** 32:3
**preclosing** 79:15,19,21
**preclude** 52:10 33:11
**prefer** 38:12 108:9 134:13 135:7,19 136:23 158:3 163:7
**preference** 18:24
**preferences** 18:21
**prejudice** 101:18 167:5
**prejudicial** 118:6,20
**prejudicing** 115:7
**preliminary** 84:20
**premature** 80:22
**prepared** 60:13 153:16
**prepetition** 73:15
**preposterous** 19:7
**present** 7:8 63:11 69:8 112:12 120:17 137:21 138:13 138:16
**presented** 140:20
**preserved** 77:19
**presumably** 62:18,19
**presumes** 137:8
**pretty** 23:5 41:22 85:10 134:5 165:8
**prevail** 16:13
**prevailing** 54:2 54:18 55:7
**prevent** 74:9 115:21 127:23 138:13
**previous** 111:21 132:6
**price** 24:23,24 53:13,15 55:6 55:15 66:13 88:23
**prices** 54:2,19 66:18 70:5,7 75:14
**primarily** 35:6
**primary** 44:18
**prior** 1:16 25:23 28:22,25 50:22 55:8 68:23 76:5 79:13 85:7 92:25 93:1
**priority** 18:22 146:13
**privacy** 79:24 79:25 80:10,14 96:13,15,15,21 96:22,22,24 97:2,4,10,13 97:25 98:2,20 98:20,25 99:5 99:6,9,10,19 100:7 101:3,12 124:22,25
**private** 46:11 96:25
**pro** 6:2,7,12,17 6:22 16:24 54:8 55:9 75:16 83:13 142:10,14
**probably** 20:24 47:13 62:21 92:12,22 99:18 100:23 153:1
**problem** 93:4 144:6
**procedure** 90:9
**procedures** 2:8 2:9,9 40:6 42:19 51:16 67:2 78:3
97:17 144:19 163:12
**proceed** 13:3 21:17,24 68:9 155:23 156:19
**proceeded** 98:5
**proceeding** 80:6 107:8
**proceedings** 123:11 166:8 168:4
**proceeds** 73:8 74:15
**process** 13:20 14:12 16:4,13 23:11,18,21,22 24:10,11,25 26:4,20,20,21 28:19 29:24 31:6,8 40:13 51:24 68:23 73:16 74:22 76:3 81:18,18 82:10 84:8 90:8 101:4 103:19 104:7 121:11,22 128:1 130:17 135:20 136:24 141:21 142:10 159:9,12,24 160:1,7,15,17
**produce** 107:22 120:16
**productive** 83:18 123:22

**professional** 100:16 156:12
**professionals** 128:13 139:18
**progressing** 73:19
**projected** 30:2 30:3
**promoting** 104:17
**proper** 59:7 113:24 114:1 121:12,12
**proportionate** 54:23 154:4
**proposal** 30:24 115:1 116:21 136:9 138:14 140:9,10,15,19 143:3,6 163:22
**proposals** 23:14 67:8 153:24 165:6
**propose** 20:21 21:17
**proposed** 22:24 25:6 55:25 77:15 93:2 94:10 98:11 105:12 118:4 129:10 136:13 144:19 145:5 146:6 147:3 153:21 154:2,15,17 162:8,16 163:19
**proposing** 14:7 23:13 103:4 108:19 144:1 162:7,15,23 164:7
**prospective** 150:25
**protect** 79:12
**protected** 161:15
**protection** 94:23 110:23 121:12
**protections** 69:7 71:1,2 72:11 73:18 84:9 109:5
**protocols** 78:6 78:7
**provide** 17:11 56:4 79:18 90:21 98:15 161:14 164:25
**provided** 42:20 43:12 46:15 47:25 48:6 125:15
**provides** 28:10 51:4 69:7 70:10,16,20,25 73:8 79:14,25 81:4 96:16 97:24 128:2,18 128:18,19 137:5,16 157:7
**providing** 54:5 70:6 107:7
**provino** 6:16 11:10 124:17 124:18 126:8 126:23 128:7 128:10 129:11 129:19,22 130:1,4 131:5 131:8,17 137:24
**provision** 31:10,15 133:3 60:10 87:13 98:18 144:5 147:19 151:25 158:7,13 159:1 159:6 160:23 163:11
**provisional** 56:4 118:22
**provisionally** 120:10
**provisions** 35:2 47:8 85:15 86:1,2,20 95:6 126:11 136:5 140:17 143:18 154:3 145:13 154:3 159:19 162:2
**public** 42:25 43:2
**publicly** 43:7 43:10,14 63:12
**purchase** 2:2 26:24 27:6,7 27:14 28:10,13
29:4 35:1,13 35:16,17,24 36:5 55:15 56:20,21 66:13 68:21 73:13 75:19 88:23 144:7 152:12 156:5
**purchaser** 78:11,20 144:15 158:22 159:10,20
**purchasers** 151:16
**purchasers'** 151:15
**purchasing** 61:2
**purely** 32:6,15
**purposes** 25:25 29:1 42:5 46:11 76:17 146:19,25 156:24 157:14
**pursuant** 50:21 78:13,23 161:2
**pursue** 74:5,14 74:23 95:21
**pursued** 92:14
**pushing** 16:15
**put** 14:18 23:5 34:2 38:25 51:12,13 69:3 86:23 87:21 94:5 99:23,25 106:22 121:6 122:6 132:17

137:8 139:9
149:1 150:15
154:17 155:17
**putting** 122:5
129:24
**puvalowski**
7:17

**q**

**qualify** 160:1
**quarter** 133:25
**quarters**
133:23
**question** 17:4
23:8,11 26:12
29:7 30:15,18
30:20 32:19,20
33:8,15 35:23
36:24 37:7,9
37:21 45:22
56:14 57:14,14
57:15,20 58:8
60:22 63:9,20
63:24 65:3,8
65:15 76:21,23
77:20 89:23
92:7 106:5
107:16 109:10
111:1 125:2,8
125:20 128:8
131:23 134:8
135:15,17
136:20 138:13
138:15 140:7
140:22 141:1,8
141:9,17 142:7
148:12 162:14

**questioning**
61:22 68:2,4
82:7
**questions**
15:24 20:21,23
20:24 21:21
22:22,23,25
23:2 33:16
38:6,11,15,20
47:12,13 48:21
48:24 49:2,4
49:11 55:12
57:9,11 60:17
63:17 64:25
68:7 69:17
84:13,14,19,20
92:21 95:16
96:5 98:24
100:22 108:17
108:23 109:12
109:15 111:11
124:19 125:18
131:3 147:2
157:17
**quick** 64:13
118:10
**quickly** 13:19
16:23 19:1
20:8,14,19
79:8,17 121:20
**quite** 13:14
30:10 44:14
86:3 122:8

**r**

**r** 1:21 3:1 13:1
168:1

**raise** 18:16
30:17 105:24
111:6 147:6,8
**raised** 59:9
89:23 102:9
108:17 109:1
111:11 115:12
165:20
**raising** 90:2
**randy** 155:13
**range** 23:23
**rapid** 122:12
**rarely** 18:10
**rata** 16:24 54:8
55:9 75:16
83:13 142:10
142:14
**rather** 65:3
71:4 73:1,1
79:20 90:7
**ratio** 76:8
**rawe** 9:17
**raznick** 7:24
**reach** 61:13
128:21 130:25
**reached** 112:16
**reaching** 166:3
**reactions** 102:9
**read** 20:15,23
53:21 67:11
132:24 134:1
150:5 158:11
164:22
**reading** 30:9
53:20
**ready** 13:3
68:12 93:17

102:4 153:12
155:15 165:4
**real** 104:3,8
105:11 106:24
**realized** 68:18
**really** 15:7
17:13 30:10
77:18 80:25
86:3 87:7
88:19 94:20
103:7,13,17
105:14,18
108:4,20
112:16 115:5
115:18 117:12
118:4 120:25
121:14 124:1
126:15 127:10
132:5,5 140:10
143:23 143:13
149:6 153:23
165:12
**reason** 31:4,9
32:13,22 33:10
33:22 57:22
64:4,15 72:20
86:7 100:11
127:20,22
128:3 159:8
**reasonable**
71:14 74:19
101:10 156:14
159:2,15
160:22
**reasonableness**
159:22 160:3
160:12,18,25

**rehypothecate**
72:6
**rehypothecat...**
44:20
**rehypothecat...**
45:4
**reilly** 10:22
**reimbursement**
35:3,5,7,12
70:19 73:18,22
74:4,19 111:4
154:3 156:7,10
156:13,20
157:1,6,11
158:25 159:18
160:10
**reimburseme...**
36:16 85:16
**reinitiate** 128:1
**reinitiating**
65:11
**reiterated** 15:4
152:5
**reject** 147:17
152:5
**rejected** 162:8
**rejection** 145:4
145:6
**relate** 26:12
28:21 35:6
51:14,16,20
**related** 2:2,10
13:18 28:23
42:16 47:15
55:24 57:20
78:1
**relates** 18:18
24:13,21 62:8

102:23 140:23
141:8,9
**relating** 28:21
31:16 33:16,18
35:2,3,20 40:8
43:1 46:9,12
65:16,17 67:24
77:16,25 96:8
**relation** 122:20
**relationship**
31:18 32:2,5
32:11 45:7,9
45:10,16 47:19
48:8 56:9
61:16 62:21
**relationships**
146:22
**relative** 24:14
51:25 62:2,5
62:23 65:19
**release** 164:21
**released** 143:9
**releases** 102:23
103:1,21
105:20,20
147:18,21
164:8
**relevance** 37:7
**relevancy**
107:6
**relevant** 79:3,6
98:17 105:18
105:19 106:21
164:23

**relevation**
102:20
**relief** 2:2,10
60:14 77:18
84:12,24
113:25 121:24
126:12,20
141:4 161:20
**remain** 17:16
17:18 74:21
85:22 86:12
87:8 88:11
103:18,25
123:8
**remaining** 39:7
39:11 41:3
65:14 146:16
146:22
**remains** 87:4
87:13
**remarks**
122:21
**remedies**
158:14
**remember**
19:16,16 82:6
97:12 98:18
116:22 139:25
**remiss** 13:21
**removed**
143:24 156:23
**renew** 101:18
167:5
**renewed** 14:12
**renumbered**
158:10

**reopen** 128:4
**reopened**
65:25
**reorg** 103:23
**reorganization**
80:3 128:18
129:16
**reorganized**
103:16
**repayment**
18:19 19:22
**repeat** 78:16
78:17 92:23
112:2
**repeatedly**
106:23
**repeating**
80:19
**repledge** 72:5
**represent**
111:15,18
112:5
**representations**
90:5
**represented**
69:4
**representing**
13:25 22:22
**represents**
66:7
**request** 22:3
101:17 113:13
125:18 126:12
126:13,20,22
159:21 167:5
**requested**
120:8 152:11

161:9,14
**reasonably**
74:9 145:6
**reasons** 44:1
50:24 64:10
121:13 137:6
153:15
**rebalance** 75:5
75:18
**rebalanced**
26:4
**rebalancing**
23:12 24:1,4
26:10 53:4,16
75:21,22 76:5
142:15
**recall** 35:21
36:7 37:24
38:4
**receipt** 71:15
79:6
**receive** 71:4
33:17 34:25
40:18 41:7,16
53:10 54:24
55:2,3 61:3
70:8 73:17
81:5,6,8,10,24
95:1 96:22
116:9 117:1
**received** 15:23
53:18 56:23
68:23 76:14
100:20 105:5
116:23,25
117:2 122:25

**receiving** 53:5
**recess** 68:11
102:3 153:11
**recognize**
15:21 57:20
72:17
**recollection**
24:13 35:18
37:25
**record** 21:1,23
38:3 68:14
118:16 119:20
120:4 153:16
**records** 36:23
37:4,18,23
**recover** 81:12
92:13 127:11
**recovered**
24:14
**recoveries**
24:14
**recovery** 71:15
24:17 30:2
70:6,9 83:13
103:15
**recross** 12:3
60:25

**rectify** 79:9
**red** 106:25
**redial** 154:23
154:25
**redirect** 12:3
38:12,13,17
**redline** 89:25
**redlines** 165:5
165:7,19,23
**reduce** 72:12
**reduced** 16:9
88:24
**reengaged**
68:22
**refer** 29:11
80:16
**reference**
129:12
**references**
65:16
**referred** 65:19
97:5 145:21
**referring** 28:20
29:10 73:1
75:20 87:11
113:15 148:18
150:22,24
**refers** 26:24
**reflect** 90:1
**reflected** 46:18
87:6 112:8
102:8 104:2
**reflects** 27:9
**refused** 120:11
**regard** 44:25
62:14 96:17
102:15 117:16
152:18

**regarding**
63:13 80:12,21
85:8 95:24
102:13 105:13
111:5 119:20
124:7 126:2
147:21 150:17
150:18
**regardless**
142:12 161:2
**regards** 33:3
56:5
**regular** 40:4
**regularly**
131:1
**regulation** 5:1
49:4 57:13
**regulations**
17:7 102:12
114:24 116:2,7
122:3
**regulatory**
27:13 32:9
54:24 55:3
63:11 81:21
82:21 83:15
102:8 104:2
105:14 106:4
114:20 115:5
123:3,15
**rehear** 100:12

156:13
**require** 23:18
39:18,19 40:12
61:18 89:12
123:10 136:4
140:11 144:20
159:1
**required** 39:16
59:3 69:16
80:10 81:6,10
90:17 96:14
123:2 161:24
**requirement**
156:24
**requirements**
71:7,8,13
81:15 105:14
134:4 160:15
**requiring** 62:3
88:8
**reread** 129:12
**resemblance**
111:23
**reservation**
76:14 124:3
152:3
**reservations**
152:1
**reserved** 152:3
**reserves** 77:7
90:25 151:13
**resolution**
18:25 19:9
60:13 119:25
149:13
**resolutions**
166:3

**resolve** 17:25
23:15 84:16
90:8 119:6
122:15
**resolved** 15:10
60:4 76:17
84:1 105:15,16
117:2,11
118:20 144:13
146:19 147:1
**resolving** 115:6
**respect** 17:23
24:20 36:23
37:4,11 45:2
73:25 74:6
84:2 91:18
92:20 98:9
138:25 147:17
148:5 164:15
**respective** 41:2
**respond** 80:24
114:2
**responders**
112:3
**response** 38:20
82:6 90:2
140:6 146:8
**responses**
122:25
**responsible**
112:20
**rest** 86:5
**restarting**
50:10,12
**restrictions**
83:15

**restructuring**
79:23 80:3
96:23 109:21
113:9,11,22
142:10 147:20
158:23 159:4
159:21 160:11
160:17,24
143:9
**resulted** 75:9
**resulting** 16:24
**results** 44:19
81:19 147:18
147:21
**resume** 68:12
102:5 153:12
**retain** 28:11
30:25 71:17
103:20
**retained** 40:13
**retaining** 72:8
**return** 16:20
51:15 103:15
121:20 127:19
132:13,16
137:16
**returned** 19:18
85:25
**revere** 6:23
79:10
**reverse** 70:21
73:19
**revert** 134:17
**review** 15:18
15:22,25 16:13
27:11 42:3,7,8
42:11,16,17,23
42:24,25 44:9

46:14 63:15
67:23 84:3,6,7
96:23 109:21
113:9,11,22
142:10 147:20
158:23 159:4
159:21 160:11
160:17,24
143:9
**reviewed** 42:19
42:20 123:24
**reviewing**
77:24
**reviews** 42:14
51:20 144:1
**revised** 94:7
**revision** 158:19
**richard** 4:20
96:18 124:20
124:21 144:4
147:7 151:19
**ricky** 8:5
**rifkin** 11:8
**right** 14:1 19:4
19:19 20:21,22
22:6,13,14
23:2 25:12
26:8 28:2,4,11
32:4 35:17
38:5 40:21,23
41:14,20 43:6
49:17 50:21
52:5,13 54:21
55:9 58:5,11
60:16 62:18

A-519

**[right - scheme]** Page 46

```
65:2 67:13          rise  151:11        ryan  5:14           92:1
68:8,12 71:17       risen  70:7         48:25,25 49:7        satisfies  152:18
77:18 83:3          risk  64:16         49:9 50:15           satisfy  81:15
84:3 85:16          70:13 71:2          51:6,10 55:11        118:5
87:14,15,17         77:4 106:6,8        55:14 57:8,18        satisfying  71:7
89:8 92:12          106:11 132:23       58:15,17,17          saw  97:5
95:15,22 98:19      133:5,8 150:4       60:19,19,21,22       113:23 162:1
99:22 102:4         risks  72:12        61:1,24 63:16        saying  25:19
104:25 105:1        road  168:21        119:16,18,18         28:17 33:20
108:1 110:4,22      role  45:5 156:1    120:25 125:13        38:24 87:25
111:1 113:2,19      rood  5:5 49:3,3    ryan's  57:15        91:8 98:23
114:15,19           57:12,12,17                              117:17 120:9
115:10 116:17       58:5,16,17,25        s                   130:13 134:12
116:25 119:13       58:25 120:24       s  3:1 13:1           says  26:9 53:21
123:5 126:16        120:24             106:15                85:23 86:4,6
128:19 130:22       rosell  10:10      safer  98:3           87:4,13 96:15
131:11,13           rosenblatt         safety  94:5          98:19,25 136:7
133:4 134:2,21      10:24              151:15,17             144:15 146:11
134:22,23,25        rough  34:16       salaries  103:20      150:15 157:22
135:8,9,14          roughly  34:12     104:10               158:13 161:22
136:19 140:8        route  70:12       sale  20:10 39:1      163:12,20,23
140:18 144:11       rude  126:8        73:8 75:19           scenario  66:18
146:7,21 148:1      rule  76:11        77:17 80:3,13        75:7 93:10
149:24 150:1,5      162:2 146:15       96:14 97:1           138:22 148:19
150:8,8 151:13      163:22 164:2       102:13,13            scenarios  35:3
153:6,12,14         rules  58:9        103:5 142:4,20       129:7 148:18
154:12,24           114:1 116:12       152:13 160:8         149:2,5 150:2
155:3,7,15          126:10             sales  24:23          150:11,11
157:19 160:6        rulings  167:2     68:23                schedule  26:24
162:20 164:13       run  20:4 44:15    salls  10:4           27:3,8
165:2,15 166:6      77:4 107:2,4       salvage  122:10      scheduled
                    120:21 124:11      sanchez  8:14        114:5 130:7
rights  45:2        running  35:14     santa  6:8           131:1
51:1 76:14          35:25 36:4         sasso  10:25         scheduling  2:5
109:12 116:15       103:18             satisfaction         130:2
152:1,3 158:14      runs  44:19        51:4 81:18           scheme  98:9
ripe  83:24                            satisfied  76:13
                                       81:11 84:11
```

---

**[set - sonya]** Page 48

```
136:18 140:8        shows  137:13       106:1,20 111:9       slippage  24:13
147:4 156:11        shut  64:8,10       114:18 125:23        24:21
157:6 165:4,9       side  132:23        127:9 141:13         small  101:14
165:18              sides  17:9         sit  17:24 23:10      101:15
setoffs  19:3       sig  46:11          93:10                smart  142:17
sets  157:11        sight  104:13       sitting  93:8        smith  10:7
several  68:24      sigmund  11:3       situated  17:5       13:24
94:10               sign  79:7 82:24    situation  58:13     sold  52:25
severe  115:21      95:14 97:20         63:2 66:9            solely  29:5
share  16:24        signature  36:4     91:10,16             62:22 71:21
80:1 165:22         168:6               108:14 121:7         72:1,2
shared  96:25       signed  35:11       122:10 127:23        solicit  128:2,25
shares  116:24      35:24 91:17,21      136:16               solicitation  2:8
sharing  43:25      97:7,7 101:4        situations           13:18
97:18,23            significant         44:18 106:22         solicited
shea  10:6          19:2 123:23         six  15:9 18:22      135:20
shelby  10:3        139:21              19:4 31:2,5,9        soliciting  129:1
shelf  101:3        significantly       32:2,17,22,23        137:15
sheryl  9:23        72:12 117:4         33:1,6,12,22         solution  106:13
shop  74:1          signing  35:8,18    38:20 53:1,7         115:17 121:6
85:14               silverberg  8:22    53:14,24 54:4        122:18 142:19
short  59:23        simari  8:23        54:10 55:5,17        solutions  17:11
101:13              similar  26:3       56:1 61:10           83:22 94:10
shortcutting        50:10 53:17         72:4 81:1            168:20
144:1               54:14 69:6          82:20 104:12         solve  155:1
shoulders           80:6 81:23          118:24 133:4         solved  118:4
64:18               86:1 120:19         sixty  104:21        soma  8:17
shouldn't           142:7 143:6         skeptical  108:3     somebody
98:14 123:12        simon  11:14        skew  112:3          25:14 61:21
show  77:1          simply  33:20       skip  40:17          96:17 102:17
108:6 114:15        116:1 117:9         95:15,16             108:5,21 117:5
116:20 117:18       118:15 150:10       slade  3:16          117:10 137:12
121:4               single  51:22       27:21,22,25          somewhat
showing  99:6       100:23              30:14 37:6           165:7
showings            sir  19:15 63:23    48:23                sonya  2:25
114:12              64:24 65:5          slightly  83:14      168:3,8
                    68:6 105:2          121:6
```

---

**[scherling - set]** Page 47

```
scherling  10:5     34:24 36:22        segregate            143:4 153:4,25
scheuer  7:18       52:17 62:7         45:23                162:2 163:21
151:5,6,9           63:2 66:12         segregated           sentence  29:3
school  20:1        67:24 96:5         48:3,12 88:6         59:15
scope  101:19       101:6,7 102:16     89:11 90:7           separate  23:13
scratcher           103:6 105:12       94:9                 38:2 50:19
17:21               105:17 108:20      segregating          88:8,11 89:3,5
scratching          109:10 115:5       94:11                124:6 136:24
18:2                117:18 119:5       segregation          separated
screwed             121:15 122:16      92:2                 47:25
110:10              149:4 162:4        self  14:13,17        separately
se  6:2,7,12,17     163:21 165:18      16:6,12,14           134:13
6:22 117:15         seeing  44:19      20:12 29:24          september
sec  76:15,18       77:18 120:20       67:8 139:17          42:9
151:9,13            seek  20:6 32:1    sell  72:6 94:1      series  20:24
second  16:11       41:16 84:3         102:21               23:25 75:19
71:10 106:23        121:24 163:15      seller  28:10        76:7
125:2 127:24        164:7              29:6 35:1            serve  91:19
137:24 149:12       seeking  16:19     73:23 74:1,1,4       126:13,22
section  28:9,20    21:14,15 32:4      85:25 87:4,13        161:6
28:22 79:25         60:9,14 73:10      87:21 158:21         servers  37:20
80:11 81:7,11       73:11 75:5         seller's  74:3       78:14,24
81:15 85:23         80:19 82:17        selling  24:22       service  47:4,9
141:6 142:3         83:24 84:6,12      52:18 76:8           90:12,20 110:3
144:7 160:14        121:25 159:17      send  40:15          126:14,21
160:15              seem  38:23        91:24 129:17         services  47:20
secured  19:17      96:7 114:22        129:17 164:5         69:3 78:2,10
65:12 110:9,12      162:5 163:25       sending  114:3       78:15,19,24
securities  5:9     seemed  134:16     senior  77:24        serving  69:23
5:17 58:19          158:11             sense  21:1          160:6
102:13 120:18       seems  19:7        28:16 56:6           set  13:12 26:5
123:18 151:6        85:10 108:18       107:17 115:9         26:14 57:21,23
security  15:20     111:2 114:23       116:20 134:24        58:10 62:15
78:6,7 102:22       144:17 157:23      136:12 157:4         90:6 98:6
see  14:14 17:25    seen  89:25        163:5                121:5 133:20
19:9 21:3 26:8      129:23             sent  25:11,12       134:19,22
29:21 30:22                            131:9,12,18          135:3,6 136:16
```

---

**[soon - states']** Page 49

```
soon  34:8          specifics  35:21    standpoint           133:21,25
153:3               57:5               15:11                143:17 146:20
sorry  22:21        specified           stands  40:3         148:6,19 149:7
27:24 37:15         144:21 145:9       49:20 50:1,6         150:19,25
54:20 56:13         specify  132:6     56:17                151:11 152:7
58:16,17 87:10      spelled  133:1      start  24:2,3        158:2,4 161:19
96:19 106:19        spells  26:25      35:15 36:1           161:22 163:20
119:18 135:4        spend  14:22       82:1                 163:24 164:22
136:8 152:23        19:10              started  36:2        165:1
155:3 164:14        spent  69:1        starting  154:21     statements
sort  57:22         100:15 104:12      112:20               22:9 28:6 42:8
60:15               112:20             state  5:9 16:17     43:4 43:7,11
sought  55:25       spoke  17:22       42:20 43:12          43:14 44:10
156:23              106:16 131:3       56:2,3,4,4 57:5      46:15 77:25
sound  54:3         spread  133:9      58:19 63:5           78:1 102:24
sounds  131:14      spreading          64:21 78:4           133:22 134:3
sources  42:25      97:15              81:20 97:22          153:16
107:6               springs  6:4       102:12 106:25       states  1:1,12
southern  1:2       srokin  9:19       116:7 120:5,15      3:19 4:15 15:4
space  44:19        st  3:20 7:22      120:18 122:3         15:12,12,16
speak  19:8         stability  44:8    122:21,22           16:11,13,22
37:17 45:11         stage  13:12       123:15               17:1,2,7,8,10
56:5 57:5 58:2      73:20 90:14        stated  41:20        17:14,17 22:22
59:1,10 62:19       117:19 119:9       100:12 120:2        30:24 32:7
63:20 89:7          stake  72:6        128:8 141:7,18       54:25 55:5
speaking  17:9      stakeholders       142:2 153:15        58:9 60:11
20:1 61:22          20:9 70:12,14      statement  2:5       61:6 65:18
63:21 101:22        stalking  160:6    2:7 14:8,15,16       80:22 82:15,17
106:18 155:10       160:9 161:6        20:9 21:16,18        83:4 93:9
specific  36:7      stand  122:11      26:12 27:14          95:25 96:10
43:24 51:18         standalone         36:10,11 46:10       102:14 104:1
67:24,24            14:13              49:22 53:21          115:11,19
133:16              standard  46:14    67:16 103:2         116:5,6,8,12
specifically        76:13 78:13,23     115:22 117:19        117:12,21,21
37:24 41:23         84:12              119:9 123:20         123:4 133:3
62:20 73:22         standards  46:8    123:21 124:2,5      states'  120:2
79:24,25 142:1      78:9 114:15,16     123:21 124:2,5      120:14,20
```

```
121:10 123:8        structure 26:3      succeeds            82:23 91:18
static 42:23          31:14 42:18         149:16              141:15
stating 43:24         52:14 56:6        successor 80:2      supporting
  66:22               79:7 93:5,16      sufficient 18:7       54:11 142:20
stature 27:13         93:22 136:21        81:14 88:2        supports 42:8
status 164:17         140:19 149:20       92:3 94:23          92:8
statuses 78:3       structured            98:12             supposed
statute 160:13        32:15 86:10       sufficiently          137:25
stauble 7:21          136:10 138:17       143:11            sure 24:7 36:19
stay 31:1 52:12       138:19            suggest 118:14        36:24 38:23
  73:25             stuff 30:16         suggested             47:8 51:20
steadman 8:15         127:2              59:21                54:21 91:3
steinman 11:15      subject 15:22      suggesting            101:4,8 106:2
steve 112:22          48:13 81:13,17     89:2 140:14          118:3 130:15
steven 8:3            90:20 91:10       suggestion            130:16,18,24
stick 95:25           153:17 157:25      115:13               154:12 162:1
stipulation           158:23 159:4      suggestions           164:19
  84:21,23          submit 16:3          118:23             surprise 20:23
  90:12,10            57:2 76:24        suitability          survey 112:1,1
  105:1 116:21        82:10 113:12       37:10 124:8        susan 9:24
stopper 116:20        120:8 121:12      suit 4:17           sussberg 3:8
  117:18             141:21 143:12       168:22              13:4,7,7,11
storage 46:9,10     submitted          sullivan 7:1         19:12,13,15,20
  46:12              14:14 78:4          8:24                19:25 20:4
stored 74:11         85:1 113:6,17     summer 104:6         21:5,12 84:4
  78:24              113:18            sunday 60:1         sustained 28:3
straight 137:4      subordination        121:21            swear 155:19
street 4:17 5:2      18:7,9 146:6,9    sunset 6:13         swiftly 14:8
  5:18 7:3           146:15,16        supplemental          90:17
stress 124:23        148:7 149:13        154:16            system 90:7
strong 86:3          150:17            support 14:15
strongly           substantial           22:2 39:22                 t
  125:25 126:4       60:1 156:16         66:23 121:12      t 168:1,1
struck 82:19       substantially         124:22 154:6      table 137:1
  161:5              69:21 141:19      supported 34:1      tabulation 2:9
structurally                             34:7 63:5           147:15,16,21
  69:6                                    67:10 76:20      tag 124:19
```

```
they'll 91:11       96:23 98:1,3       third 4:10 25:8     64:2 68:8
they're 87:15         98:14,15,22        50:2 51:12,13       77:22 82:7
  89:9,17 105:15      99:13 100:24       52:19 71:16         109:21 139:20
  110:9 111:10        101:10 103:10      72:1,23 74:15       154:18 155:18
  111:13 120:9        104:18 106:4       78:5,7 97:23        155:19,22,24
  122:25 131:15       106:20 107:6       97:25 98:6          156:1 157:19
  131:25 134:5,6      108:5 109:11       112:1 125:20        157:20
  141:22 145:5        110:11 112:9       128:14 142:19     tichenor's 22:7
they've 100:14        112:11 113:20      147:21              154:8
  120:1,11            115:18 117:22    thomas 8:2          tied 70:5
thing 17:8            118:15,15,19     thompson           time 14:12,22
  100:23 101:10       119:6 120:13       10:20               18:13 19:4
  111:3 134:11        122:23 123:7,9   thorough             22:25 28:18
  139:15 148:21       123:25 124:22      41:24 134:5         31:17 35:14,15
things 40:7           124:24 126:6,9   thought 117:7        35:22,25 36:2
  43:3 89:17          127:6 131:2        128:11 135:21       44:14 46:24
  98:9 107:13,15      132:24,25          162:22              49:1 52:16,25
  108:8 115:19        134:11,11,19     thousands            53:3 54:22
  117:23 123:10       134:21,22,24       100:20              55:7,8,22 57:9
  123:11 126:11       135:5 136:25     three 15:7,11        59:23 60:2,5
  126:17 132:18       137:14,15          35:7 39:14          63:10 68:21
  133:24 146:14       138:19,25          52:12,22 53:10      70:7 72:8
  148:4 149:8         139:14 140:3       81:2 82:22          82:25 85:25
think 13:15           142:16,23          94:21,25 95:4       86:14 88:12
  14:13,19 15:3       143:7,10,15,16     95:11,13            90:6,11,18
  17:17 18:8,14       143:22,25          124:18 131:3        91:17,22 93:25
  28:5 29:21          144:12 146:6       133:23 150:11       94:15 95:5
  30:17 33:15         146:10,14        throw 59:15          96:1 100:3
  37:9 38:5           148:2,25 149:1     118:18              101:8 106:23
  41:23 54:5          153:14,24        thrust 127:1,1       115:23 116:15
  56:7,21 57:8        155:13 157:24    tichenor 10:8         116:17,17
  59:3,11,22          159:13,23          12:5 14:15          117:4,4,6
  60:3,3,9 62:19      160:1,4,5          22:1,4,8,12,14      122:5,8 124:14
  65:16 72:4          161:5 163:5        23:1,6,8 38:8       125:8 127:9,12
  86:10,15,16       thinking             58:11,16,19        128:5,21 129:1
  88:24 90:23         111:10 159:16      49:8 54:20          129:21 131:2
  92:9 94:7 95:9                         51:19 60:25         131:10 138:15
```

```
tail 119:4          telephonically     90:23 139:20       that's 87:14
take 13:5,11          7:8                155:18,20           89:3 96:13
  23:21,22 50:22    tell 43:16         texas 5:7,12         104:18 108:4,5
  64:14 68:9          100:22 102:9       49:1,5 57:1,5       108:13,20
  102:1 123:19        102:18 129:13      58:18,21 63:12      109:12 119:15
  130:14 132:18       140:10,13          76:16 80:15        110:20 112:7
  133:5,8 142:2       154:24             117:24 119:19       113:16,21
  153:2,7 154:20    telling 98:22        122:21,23           116:1 117:22
  158:4               131:10 162:14    thank 13:9           118:25 119:2
taken 60:2            162:16             21:7,11 38:7        119:11 121:21
  104:7             temporary            38:18 48:20        124:8,12 127:6
takes 107:25          17:11              49:7 51:6          128:20 131:19
  109:22 123:7      tens 104:11          55:12 57:9,12      130:10 141:9
talk 14:6 52:9      terminate 74:5       58:5 63:16         137:10 138:12
  86:17 111:7         95:4               64:1 65:5 68:6     140:20 141:18
talked 107:2       terminated           68:8 98:16         143:16 144:8,9
  127:18 128:23       49:23 52:3         101:1,16,21,24     145:1 146:3
talking 29:25         152:1              106:1,20 107:9     152:10,15
  60:5,5 130:12    termination          110:24 113:2     therese 7:18
talks 28:8            70:21 73:19        114:18 119:11      71:6
taousse 10:11         74:13 84:22        120:22 123:6     there's 88:20
tape 152:25        terms 32:15,20        124:14 125:23      95:3 96:5 98:5
  153:8              32:24 43:6          129:20,20          102:8 103:13
tax 70:16 83:9       45:6 46:19          142:21,22          103:23 104:3
  107:20 116:8       47:3,8 69:2         143:1 144:10       104:13 106:24
taylor 9:2           71:9 78:9           147:10 151:3       115:13 123:23
team 13:24,24        82:18 90:11,20      151:17 152:16      125:25 131:1
technical 39:9       100:8,9 101:11      153:9,10           132:4,18,22,23
  118:5 140:17       103:2,3,4           157:16,19          133:11,13
  159:8,23           105:3,12,20         158:20 161:17      136:21 137:20
technically          110:3 128:15       161:18 165:14       138:19,21
  90:5 94:12         141:5 148:15       165:24 166:1,4      143:3 145:3
technique            165:20             166:5,7             146:15 147:19
  118:17,25        testified 47:14    thanks 94:24          148:12 149:21
telephone          testify 22:11     that'll 112:8          149:22,23
  106:17           testimony            133:21 152:13     thew 155:20
                     38:19 55:13
```

```
139:18 142:14       107:17 108:10     token 24:24        trade 62:4
  144:25 145:9        109:20 111:2,3    67:10 141:10        93:25
  153:23 155:2,8      115:6,7,14         141:23,23,24     trades 39:19
  163:8,14,15,22      117:17 121:25      142:8,13         trading 44:23
  165:8               122:11 123:8     tokens 24:22         69:3 78:10,18
timed 96:19           123:11 124:1       39:14 66:10,15   trail 6:3
  153:2               124:14 125:5       66:17,20,21,22   transaction
timeline 98:11        125:20 137:7       67:3 82:8          13:19 14:6,21
timelines 83:15       137:19 139:20      142:7              15:3,21,25
times 71:25           142:23 143:1     tokyo 37:20          16:6,18 20:10
  94:5 116:4          143:23 146:25    told 17:22 94:9      23:12 24:1,5,7
timing 101:3          152:11 158:25      143:11             26:18 27:1
timothy 10:22         159:17 165:16    tom 8:19             31:11,12,19,20
tina 11:4           today's 21:13     took 14:12           32:5,23 33:1,4
tired 20:15         together             92:7 100:1         36:16,18 39:1,5
tires 98:13           122:10 145:14      131:3              39:1,5 40:3,7
title 28:11,21      toggle 20:11      top 36:7              42:12 43:21,23
  45:14 47:10         50:8,12 52:6       145:21,25          44:11 50:7,8
  71:17 85:22         54:14 64:13        146:1,3 149:14     51:19 53:19
  86:6,12,22          65:20,23 66:16   topic 26:23          54:8 55:25
  87:4,5,7,8,13       72:22 73:1         95:25              61:9 65:19,23
  87:17,18            74:5,15 75:7     topped 160:7         66:13,16,19
today 14:4,22         84:10 112:10     total 15:9          67:20 69:5,6,8
  15:6 17:18          125:4,19,21        34:16 43:3         69:11,17 70:10
  20:6 24:15          127:13,15        touching             70:23,25 72:13
  40:3 49:20          129:4,8 132:16     147:23             72:15,24 73:1
  50:1,6 56:17        133:2,12         towards 36:6,8       73:3,4,11 74:5
  60:10,14 63:22      134:13,18,24       36:9 65:23         74:6,11,16,17
  72:16 73:11         135:7,19 136:2     122:18 133:10      75:2,3,7,8
  76:17 77:18         136:3,5,11,14      157:8              76:24 77:16,17
  80:20 83:5,24       136:17 137:3     town 6:18            78:13,22 79:10
  84:12 90:23         137:14,22          130:2 131:2        79:16 80:20
  93:10 97:21         138:20,21          141:3              82:5 83:25
  102:17 103:8        148:21 149:21    track 121:16        84:4,5,8,10,22
  105:12,15,17        157:8 159:9      tracy 6:6 9:3        85:11 91:23
  105:18,25           158:5 167:18       103:9 111:17       92:9,10,20
  106:9 107:13      toggled 132:22       125:6 137:18       93:3 97:1
```

212-267-6868    Veritext Legal Solutions    516-608-2400
www.veritext.com

212-267-6868    Veritext Legal Solutions    516-608-2400
www.veritext.com

212-267-6868    Veritext Legal Solutions    516-608-2400
www.veritext.com

212-267-6868    Veritext Legal Solutions    516-608-2400
www.veritext.com

A-521

## [transaction - u.s.]  — Page 54

```
107:20 127:18        29:6,16,16,17      treats 80:18       trying 14:3
127:20 128:4         39:7 40:6,9        trigger 74:4         28:15 35:17
128:19,22            47:9 51:21         triggered            51:25 83:10
129:2,4,8,8          52:15 55:22          157:2 159:19       86:17 88:22
137:2,3,5,9,12       56:14 66:23        trony 8:11           112:3 118:13
138:25 139:5         71:4,11,23,25      trotz 7:19           118:14 121:23
142:6 151:15         79:2 80:8          trouble 27:2         126:8,24 127:9
156:20,25            85:15 89:18        true 22:9 112:7      127:11 130:5
157:4,9,13,14        90:10,15 92:25       149:12,18          131:12 158:6
transactions         93:11,17 109:5       168:4              160:4,7
15:18 23:25          141:20             truly 63:9         tss 46:10
24:23 25:4,7,8     transferring         trust 48:8         turn 21:5
26:1,2 41:1,5        64:16 86:19          71:21 85:24        141:2 148:4
47:16 51:18,22       88:21                86:7 88:1,4,6    twitter 127:5
51:25 75:20        transfers 39:20        92:15 108:3        129:25
76:7                 40:15,25 41:3        112:20,20,25     two 18:1 20:7
transcribed          79:7 93:23           130:12 143:5       21:13 49:4
2:25                 96:16 148:12         143:12             103:14 122:7,9
transcript           148:13            trustee 4:16         122:14,15
168:4              transmitter           76:16 79:11        127:22 128:18
transfer 26:11       59:3,10 78:3         80:9 96:12,19      137:22 162:24
28:22,25 32:14     transpired            124:21 125:10       163:16
39:2,10,17,25        13:15               126:9 144:5,9    tx 5:9,9
40:13,23,24        treasure 149:8        147:8 149:3      tying 103:11
46:9 48:15,18      treated 57:25         151:20           type 56:6 75:24
51:11 56:22          83:12 115:13      trustee's 96:16      75:25 76:9
61:9 71:3 72:16      146:8             truth 155:20         82:12 150:15
72:13 79:4,13      treating 18:4         155:21,21        types 51:25
79:15,19,21,22       36:3              try 22:23 23:3       67:8
80:4,12 86:11      treatment 17:1       32:2 61:13
86:13,16 93:3        33:21 80:22         62:12 83:2,4           u
93:21 94:14          81:7 119:20,23      89:17 104:23    u.s. 1:23 4:9,16
96:6 98:6,21         121:2 140:23        111:8 112:2       15:19,20 54:1
99:1 108:18,19       141:6,25            119:15,24         75:23 76:16
142:6                150:18              120:21 131:6      79:11 80:9
transferred        treatments           139:7             89:21 90:10,12
26:15,22 28:11       116:5                                90:16,17,24
                                                           91:1 95:18
```

## [u.s. - unregistered]  — Page 55

```
96:10,12,16,19     unconsenting       46:13,16 47:22     77:6,11 88:18
96:20 107:4          52:23 55:20        49:11 52:2         89:6,15 104:19
116:24 121:18      undated 97:3         56:3,13,17         114:8 141:14
122:24 124:8       undefined           62:4 68:6          141:22
124:21 125:10        104:22             84:20 89:1       understandings
126:9 127:17       under 22:11          100:5 107:10       153:18
128:4 129:8          23:14 25:2,5       108:2,8 110:20   understood
137:2,5 143:22       26:3 28:17         111:1,8 113:21     21:25 58:12
144:1,5,9,12         29:4 31:14,21      114:6 115:4        116:10 143:20
147:8 149:3          34:25 35:1         118:12,25          145:15 158:18
151:6,20             41:6 52:6,9,14     119:10 125:11      160:19 161:16
u.s.'s 121:19        53:2 58:8,9        125:19,22,23       164:24
ubierna 9:5          59:1,5 68:21       126:1,6 127:13   undertake
ucc 13:25            126:1,6 127:13     128:15 130:11      142:9
14:15 24:5           128:15 130:11      130:21 132:14    undue 98:10
104:6,17,22          130:21 132:14      132:18 134:20    unfair 17:11
112:4,19             132:18 134:20      134:23 135:1     unfairly 18:4
142:24               134:25 135:11      135:14 136:1       80:17 115:13
ultimately           135:14 136:1       136:20 138:24    unforeseeable
23:24,25 24:14       136:20 138:24      139:18 140:1       104:13
24:17,24 25:6        139:18 140:1       143:15 144:12    unfortunate
32:10 33:2           143:15 144:12      145:19 148:2       69:9
40:9 41:1 50:9       145:19 148:2       149:11,12,24     unhappy 59:13
53:6 69:2            149:11,12,24       160:8 161:16       105:8
70:11 93:16,20       160:8 161:8        164:24           unimpaired
94:11              understanding      underlying           163:25 164:9
unable 53:22         23:20 26:16,17     24:18 29:12        164:15,17
66:4 67:11           27:12,20 28:9      31:11 39:6       united 1:1,12
unaudited 78:1       28:23 29:4,19      36:24 62:5 66:7    4:15 15:16
unauthorized         29:20 31:3,12    understand           96:10
79:12 102:13         32:12 34:14        20:16 25:1       unknown
unclear 117:19       37:16 39:6         30:13 32:18        155:11
125:20,21            39:25 62:5 66:7    36:24 38:23      unmute 106:18
uncomfortable                           44:2 45:11       unnecessary
98:4                                   53:15 61:7,15       121:7
unconfirmable                          67:1,15,17,21     unregistered
117:16                                  102:22             102:22
```

## [unsecured - vote]  — Page 56

```
unsecured 4:2      used 25:25         variants 37:24     42:22,23 43:20
45:3 51:2            120:21           varick 4:17          44:15 45:14
68:20 71:6,12      useful 165:9       various 15:12        46:13,16 53:2
71:17,24 75:1      user 39:14 86:1      17:2 78:7          54:6 59:9
76:20 93:14          87:21 96:11        87:12 102:7        62:20 80:20
102:20 111:12        97:7 101:6,7       104:2 108:16       81:23 88:24
125:5 130:18       users 70:17          123:14 131:18      92:16 137:14
131:23,25            96:9,9             149:6 153:24       146:23 153:24
135:24 142:22      user's 87:22,22    verbatim 67:12
146:9                146:9              139:12 160:5
unsupported        using 25:20          160:12
17:3 30:24           120:4 134:10     verification
34:8,13 39:3       utility 141:10       40:8
39:18 40:17          142:20           verify 22:8
41:11,12,16        utilizing 65:12      41:2 46:25
53:23,25 57:24                          67:17
58:9 59:2                v            veritext 168:20
60:11 63:2         valid 75:4         vermont 5:1
65:18 66:21        valuable 70:10       49:3 57:11,13
80:16,21 81:3      value 18:17          58:8,16 59:1,1
82:15 83:18,19       24:14,15,18        59:2,9 76:15
115:15 117:21        31:13 53:15        80:15 117:24
117:21               54:3 56:2 69:5     118:2 120:24
update 127:2         70:1,10,13         125:12
updates 100:6        72:16 75:23,25   version 23:14
129:24 130:6         81:8 104:15,17     93:2 153:25
upfront 69:14        117:3,4 137:5      158:8
69:20                137:6,10,15      versions 165:3
upset 20:15          138:20,22,23     versus 30:3
108:8                139:5,22           34:8 81:1,2
urge 121:14          142:14 157:3,5     132:16 137:22
126:4                157:14           vgo 142:17
urlich 112:22      valued 52:24       vgx 82:9 141:8
usbc 75:11           53:13,16 69:10     141:10,12,15
use 46:5,8,10      values 19:21         141:21 142:6
46:19 71:14          19:24 108:12       142:17,20
72:6 98:13           116:18           victor 9:5
                   value's 104:7      view 27:6,14
                                        35:13,24 36:2
```

## [vote - we've]  — Page 57

```
136:10,12,17       94:9,12            voyager's 26:5     144:18
138:3 147:18       wallets 40:14        26:14 27:18     war 104:22
147:22 163:21        43:2,2 46:5,8      79:24,25 80:4   warrants 147:7
voted 140:9          46:12 48:3       voyager's         warren 10:9
votes 2:9 128:2      57:15,21,23        92:24 99:12       11:19
129:1 147:17       want 14:10         vt 5:3            washington
voting 129:12        15:7,11 20:13                        3:21
135:20 137:22        20:16 22:25           w           waste 19:10
163:14,17            52:11,12 94:1    wade 9:21           127:9
voyager 1:7          94:3,18 95:25    wagging 119:4     wasting 131:10
13:3,23 14:24        98:13 100:13     wait 33:22        watkins 4:8
16:23 19:5           100:15 110:23      38:13 41:12       47:2 89:21
24:20 25:2           112:18,24          57:25 94:21,25    121:18 160:21
28:24 29:23          113:24 118:16      95:4 118:1      way 17:25
30:25 33:5,18        124:20             133:4             28:23 32:15
34:22,25 39:14     wanted 13:11       waited 93:7         38:25 40:4
45:8 49:11,15        14:2 20:5        waiting 23:18       41:6,17 44:16
49:17,24 50:4        124:19 127:2       95:11 124:18      53:2 60:4 70:4
50:19,22,23,25       147:10,13          124:20            86:11 87:16
51:2 52:5            149:1 151:20     walk 20:7           92:7 98:4
55:19 56:12,20       152:2,9          walking 14:22       105:15 109:19
57:18 59:4         wanting            wallet 37:19        112:14 117:10
64:5 65:9,12         119:10 127:8       39:24 40:5,9      118:4 123:23
65:24 66:5,6,9     wants 94:20          40:25 42:16       126:16 127:3
66:15,16,24          118:17 121:8       45:17 46:2,4     129:18 130:22
67:4 73:12                              49:12,13 51:19    132:4 133:13
80:1,7,7 82:13                          51:22,23 52:19    134:19,22
85:22 86:12                             59:8 67:2 78:2    135:18 136:18
88:9,10 91:4                            78:13,23 88:9     136:21 138:14
91:16,25 93:3                           88:11 89:3,5,8    138:16 140:7
93:11,23 94:22                          89:13 90:7        140:19 163:2
96:13,15 97:8                                           ways 51:16
98:7,24,25                                                93:15 118:19
101:9 102:11                                              134:1
102:15,21                                               we've
103:4 105:13                                              18:14 50:22
105:20 107:12                                             67:18 75:20
```

| | | | |
|---|---|---|---|
| 84:11 153:14 | 128:23 129:24 | 138:13 140:19 | 30:20 37:13 |
| 153:17,18 | 130:19 137:1,2 | 143:18 147:5 | 39:4 40:1,22 |
| 155:7 159:7 | 137:2,3,6,8,11 | 157:18 158:9 | 41:10,15 42:2 |
| **web** 78:14,24 | 137:19 139:1,9 | 166:2 | 43:8,11,20 |
| **week** 13:16 | 145:21 146:18 | **wished** 32:14 | 44:5,9 45:11 |
| 99:22 113:21 | **what's** 88:21 | **wishes** 22:5 | 45:19,21,25 |
| 130:3 | 117:25 135:20 | 38:8 123:14 | 46:4,20 47:6 |
| **weekly** 71:5 | 135:23,23,25 | **wissner** 11:3 | 47:14,18 48:5 |
| 79:7 90:16 | 136:24 138:2 | **withdraw** 31:7 | 48:11,17 49:2 |
| 93:21 94:14 | 138:14,17 | 34:3,6,9 49:24 | 55:10 60:17,22 |
| **weeks** 60:5 | 143:11,16 | 52:4 54:16 | 63:25 64:4 |
| 93:7 107:5 | **wheelersburg** | 55:23 58:12 | 65:1,4 68:4,7 |
| 162:24 | 6:14 | 62:23 63:1,3,8 | **witnesses** 12:3 |
| **weight** 140:12 | **wherewithal** | 65:17 66:1,10 | **woman** 25:12 |
| **weischselba...** | 15:3 17:11 | 66:20,25 67:3 | 106:14 153:13 |
| 10:12 | 42:6 69:18 | 94:1,19 121:5 | 154:7,15 |
| **went** 109:6,11 | 77:15 | 142:11 | **wonder** 86:2 |
| 165:6 | **white** 11:2 | **withdrawal** | **wonderful** |
| **weren't** 132:8 | 51:23 | 41:8 49:21 | 115:17 128:12 |
| **we'd** 122:1 | **wholly** 124:6 | 50:3,5,13 52:8 | **won't** 96:7 |
| 138:18 | **wiles** 1:22 | 55:21 56:8 | 105:5 114:23 |
| **we'll** 92:18 | **williams** 11:16 | 57:19,23 58:22 | 114:25 115:3 |
| 102:1,2 124:12 | **willing** 14:24 | 59:8 62:15 | 134:10 147:16 |
| 139:2 145:15 | 30:16 60:10 | 65:13 66:14 | **wording** 146:7 |
| 153:6 | 131:15 138:15 | 67:5 | **words** 91:1 |
| **we're** 102:17 | 139:7 | **withdrawals** | **work** 16:10 |
| 110:10 121:22 | **willingness** | 44:24 | 17:17,17 23:24 |
| 121:24 123:3 | 30:11 121:5 | **withdrawing** | 24:6 50:6,8,10 |
| 127:9,25 129:1 | **wind** 112:19 | 64:9 | 60:6,11 83:20 |
| 129:16,17 | 134:3 141:15 | **withdrawn** | 84:19 117:13 |
| 130:13 131:6 | 143:8 144:21 | 66:4,6 | 119:4,15,24 |
| 131:11,11 | **window** 82:20 | **withdrew** | 122:18 125:9 |
| 137:9,12,15 | 82:23 | 44:22 77:13 | 131:1,6,14,15 |
| 139:4,6 142:18 | **wish** 21:3 | **withheld** | 142:18 145:1 |
| **we've** 88:17 | 22:13 34:4 | 111:20 | 148:7 158:5 |
| 100:1 101:12 | 48:21 65:1 | **witness** 23:2 | **worked** 13:22 |
| 111:9 127:18 | 95:21 125:24 | 27:23,25 30:15 | 14:1 31:8 90:8 |

| | | |
|---|---|---|
| 93:19 115:16 | 96:2 101:17 | **you've** 89:22 |
| 119:14 122:10 | 109:4,14,17 | 89:25 93:5 |
| 152:17 | 111:19,19 | 94:24 129:23 |
| **working** 25:6 | 113:20 119:17 | |
| 32:16 53:3 | 126:9 128:16 | **z** |
| 121:23 122:16 | 130:1 134:21 | **zac** 9:22 |
| 122:22,22 | 135:17 136:9 | **zwart** 9:6 |
| 123:3 | 136:25 152:22 | |
| **works** 46:25 | 159:23 164:20 | |
| 87:2 111:3 | **year** 13:8,9 | |
| 161:16 | 42:9,10 57:2 | |
| **worse** 92:24 | 63:13 | |
| 124:11 | **years** 65:13 | |
| **worst** 93:10 | **yehudah** 6:21 | |
| **worth** 119:2 | **yep** 165:22 | |
| 133:7 | **yesterday** 70:8 | |
| **would've** 93:8 | 113:19 | |
| 132:15 | **yield** 81:19 | |
| **writing** 67:21 | **york** 1:2,14 3:6 | |
| 113:13 | 4:4,11,18 7:4 | |
| **written** 67:12 | 76:15 80:15 | |
| 88:2 | 117:24 118:2 | |
| **wrong** 58:14 | **youtube** 132:7 | |
| 95:3 108:6,6 | 133:14 134:10 | |
| 125:4 | **you'd** 114:13 | |
| **wrongdoing** | 114:14 | |
| 106:4 | **you'll** 97:12 | |
| | 133:10 | |
| **x** | **you're** 89:25 | |
| **x** 1:4,10 12:1 | 91:8 98:22,23 | |
| 167:1 | 106:18 113:10 | |
| | 127:8 129:5 | |
| **y** | 131:8 132:21 | |
| **y** 106:15 | 133:2 134:12 | |
| **yarborough** | 134:14 140:14 | |
| 11:6 | 144:24,25 | |
| **yeah** 28:8 49:3 | 145:12 150:22 | |
| 59:16 89:6 | | |

A-523

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DECLARATION OF BRIAN TICHENOR**
**IN SUPPORT OF CONFIRMATION OF THE THIRD AMENDED**
**JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND ITS DEBTOR**
**AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

I, Brian Tichenor, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury

as follows:

1.       I am a Managing Director in the Financial Institutions Group at Moelis &

Company LLC ("Moelis") and have served as an investment banker to the Debtors since

June 2022.

2.       I submit this declaration in support of confirmation of the *Third Amended Joint*

*Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

Bankruptcy Code (as may be amended, supplemented, or otherwise modified from time to time, the "Plan")[2] [Docket No. 852] and the *Debtors' Memorandum of Law in Support of (I) Final Approval of the Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code and (II) an Order Confirming the Debtors' Third Amended Joint Chapter 11 Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates* (the "Confirmation Brief"), filed contemporaneously herewith.

3. The statements in this declaration are, except where specifically noted, based on (a) my personal knowledge or opinion of the Debtors' operations and finances, (b) my personal knowledge, belief, or opinion, (c) information I have received from the Debtors' employees or advisors and/or other employees of Moelis, or (d) from the Debtors' records maintained in the ordinary course of their business. If called to testify, I could and would testify competently to the facts set forth herein.

## QUALIFICATIONS

4. Moelis is an investment banking firm with its principal office located in New York, New York. Moelis is a registered broker-dealer with the United States Securities and Exchange Commission and is a member of the Financial Industry Regulatory Authority. Moelis was founded in 2007 and is a wholly-owned subsidiary of Moelis & Company Group LP. Moelis & Company Group LP, together with its subsidiaries, has approximately 1,000 employees in offices in North

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan, the Asset Purchase Agreement, the Confirmation Brief, or Confirmation Order as applicable.

2

A-525

America, South America, Europe, the Middle East, and Asia. Moelis & Company Group LP is a subsidiary of Moelis & Company, a public company listed on the New York Stock Exchange.

5. Moelis provides a broad range of financial advisory and investment banking services to its clients, including: (a) general corporate finance; (b) mergers, acquisitions, and divestitures; (c) corporate restructurings; (d) special committee assignments; and (e) capital raising. Moelis and its senior professionals have extensive experience in the reorganization and restructuring of distressed companies, both out-of-court and in chapter 11 cases. Moelis' business reorganization professionals have served as financial advisors and/or investment bankers in numerous cases, including: *In re Knotel, Inc.*, No. 21-10146 (MFW) (Bankr. D. Del. Mar. 12, 2021); *In re CBL & Assocs. Props., Inc.*, No. 20-35226 (DRJ) (Bankr. S.D. Tex. Dec. 30, 2020); *In re Energy Alloys Holdings, LLC*, No. 20-12088 (MFW) (Bankr. D. Del. Nov. 23, 2020); *In re Jason Indus., Inc.*, No. 20-22766 (RDD) (Bankr. S.D.N.Y. Aug. 27, 2020); *In re The Hertz Corp.*, No. 20-11218 (MFW) (Bankr. D. Del. July 30, 2020); *In re Extraction Oil & Gas, Inc.*, No. 20-11548 (CSS) (Bankr. D. Del. Aug. 11, 2020); *In re The McClatchy Co.*, No. 20-10418 (MEW) (Bankr. S.D.N.Y. May 18, 2020); *In re Internap Technology Solutions Inc.*, No. 20-22393 (RDD) (Bankr. S.D.N.Y. May 5, 2020); *In re Rentpath Holdings, Inc.*, No. 20-10312 (BLS) (Bankr. D. Del. Mar. 10, 2020); *In re Sanchez Energy Corp.*, No. 19-34508 (MI) (Bankr. S.D. Tex. Oct. 21, 2019); *In re Monitronics Int'l, Inc.*, No. 19-33650 (DRJ) (Bankr. S. D. Tex. Aug. 1, 2019); *In re Aegerion Pharmaceuticals, Inc.*, No. 19-11632 (MG) (Bankr. S.D.N.Y. July 10, 2019); *In re Joerns WoundCo Holdings, Inc.*, No. 19-11401 (JTD) (Bankr. D. Del. July 25, 2019); *In re FTD Cos.*, No. 19-11240 (LSS) (Bankr. D. Del. July 2, 2019); *In re Hexion Holdings LLC*, No. 19-10684 (KG) (Bankr. D. Del. May 15, 2019); *In re Parker Drilling Company, Inc.*, No. 18-36958 (MI) (Bankr. S.D. Tex. Jan. 15, 2019); *In re Aralez Pharmaceuticals US Inc.*, No. 18-12425 (MG)

3

(Bankr. S.D.N.Y. Oct. 31, 2018); *In re iHeartMedia, Inc.*, No. 18-31274 (MI) (Bankr. S.D. Tex. July 24, 2018); *In re Global A&T Electronics Ltd.*, No. 17-23931 (RDD) (Bankr. S.D.N.Y. Feb. 26, 2018); *In re Toys "R" US, Inc.*, No. 17-34665 (KLP) (Bankr. E.D. Va. Nov. 21, 2017); *In re TK Holdings, Inc.*, No. 17-11375 (BLS) (Bankr. D. Del. Aug. 30, 2017); *In re Basic Energy Services, Inc.*, No. 16-12320 (KJC) (Bankr. D. Del. Nov. 17, 2016); *In re UCI International, LLC*, No. 16-11354 (MFW) (Bankr. D. Del. July 12, 2016); *In re AOG Ent., Inc.*, No. 16-11090 (SMB) (Bankr. S.D.N.Y. June 8, 2016); *In re SFX Entertainment, Inc.*, No. 16-10238 (MFW) (Bankr. D. Del. Mar. 21, 2016); *In re American Apparel, Inc.*, No. 15-12055 (BLS) (Bankr. D. Del. Nov. 30, 2015); *In re Allied Nevada Gold Corp.*, No. 15-10503 (MFW) (Bankr. D. Del. Apr. 15, 2015); *In re GSE Envt'l, Inc.*, No. 14-11126 (MFW) (Bankr. D. Del. May 30, 2014); *In re MACH Gen, LLC*, No. 14-10461 (MFW) (Bankr. D. Del. Apr. 11, 2014); *In re MPM Silicones, LLC*, No. 14-22503 (RDD) (Bankr. S.D.N.Y. May 16, 2014).

6.     I have over 10 years of investment banking experience advising companies, equity investors, financial vehicles, and creditors across a broad range of industries and geographies in a full suite of corporate transactions. Prior to joining Moelis, I was in the corporate and investment banking group at Citigroup Inc. where I focused on investment banking advisory transactions in the Financial Institutions Group. I hold a Bachelor of Science degrees in finance and computer science from Boston College and have a Master of Business Administration degree from Georgetown University.

7.     I have been involved in several notable chapter 11 cases and restructuring assignments, including as advisor to the ad hoc group of senior unsecured noteholders in Walter Investment Management Corporation's $4.1 billion restructuring; and as advisor to New Residential Investment Corporation's $1.2 billion acquisition of select assets from Ditech Holding

4

Corporation pursuant to a section 363 asset sale. I have also been involved in numerous restructuring transactions outside of the chapter 11 context, including advising New Residential Investment Corporation in its $600 million recapitalization and restructuring, Ambac Financial Group in its $18 billion restructuring of Puerto Rico's sales tax financing corporation (COFINA), Syncora Guarantee Inc. in its $13.5 billion reinsurance of financial guarantee policies to Assured Guarantee Corporation and other liability management including the sale of its operating business to GoldenTree Asset Management, Ambac Financial Group on its $557 million exchange offer of its Auction Market Preferred Shares, Ambac Financial Group on its $538 million exchange of Corolla Trust obligations and Junior Surplus Notes, an approximately $10 billion ad hoc group of non-litigating preferred shareholders in a proposed $6.9 trillion restructuring of Fannie Mae and Freddie Mac, secured lenders of AG Mortgage Investment Trust in its $3.0 billion restructuring of its repurchase agreement portfolio, and secured lenders of MFA Financial, Inc. in its $5.8 billion restructuring of its repurchase agreement portfolio. And in addition to these chapter 11 cases, I am currently part of the Moelis teams serving as investment bankers to the debtors and debtors-in-possession in *In re BlockFi Inc.,* No. 22-19361 (MBK) (Bankr. D. N.J.) and *In re Genesis General HoldCo LLC*, No. 23-10063 (SHL) (Bankr. S.D.N.Y.).

8.      In June 2022, Moelis was engaged to advise the Debtors as to strategic alternatives in light of the Debtors' efforts to navigate the challenges then impacting the cryptocurrency industry. I have been involved as a senior member of the Moelis team throughout our engagement, including participating in the Debtors' sales and auction processes in these chapter 11 cases.

## EVENTS LEADING UP TO CONFIRMATION

9.      Prior to these chapter 11 cases, Voyager operated a cryptocurrency trading platform that allowed customers to buy, sell, and store cryptocurrency on an easy-to-use and "accessible-to-all" platform. Voyager's primary operations consisted of (i) brokerage services, (ii) custodial

services through which customers earned interest and other rewards on stored cryptocurrency assets, and (iii) lending programs. All of Voyager's services were accessible through a mobile application that users could download on their smartphones and other smart devices. Voyager's mobile application was downloaded millions of times and had over 1.1 million active users as of the Petition Date. In 2021, Voyager was one of the top ten most downloaded cryptocurrency mobile applications in the world.

10. Cryptocurrency has been volatile, and prices vacillate by the second due to constant trading occurring 24 hours a day, seven days a week globally. 2022 saw historic levels of volatility in the markets at large, and the cryptocurrency markets were not immune. Bitcoin and Ethereum slumped by over 65% and 68%, respectively, from January 1, 2022 to year-end:[3]



11. In June 2022, the Debtors engaged Moelis to advise the Debtors as to strategic alternatives in light of this market volatility and the broader challenges plaguing the

---

[3]   CoinDesk; February 18, 2023, 6:03 p.m. ET.

cryptocurrency sector. Beginning on or about June 20, 2022, Moelis initiated a process to solicit interest in possible deal structures. By early-July 2022, and after evaluating market support for an out-of-court restructuring, the Debtors determined that filing for chapter 11 would improve their chances of effectuating a transaction to help stabilize the Debtors' business and preserve the value of the Debtors' enterprise, in the best interests of the Debtors and their estates as well as the Debtors' creditors, customers, employees, and all other parties in interest.

12. On July 5, 2022, the Debtors filed these chapter 11 cases. Soon thereafter, on July 21, 2022, the Debtors commenced a formal sale process led by Moelis and filed the *Motion Seeking Entry of an Order (I) Approving the Bidding Procedures and Related Dates and Deadlines, (II) Scheduling Hearings and Objection Deadlines With Respect To the Debtors' Sale, and (III) Granting Related Relief* [Docket No. 126].

13. On September 13, 2022, the Debtors commenced a two-week auction (the "Auction"). The Auction included multiple rounds of bidding and featured extensive arm's-length negotiations with each participating bidder. I was one of the people at Moelis responsible for and participating in the Auction.

14. The Debtors, in coordination with the Official Committee of Unsecured Creditors (the "Committee"), ultimately selected the bid from West Realm Shires Inc. ("FTX US," and along with its parent entity and affiliates, "FTX") and closed the Auction. On September 27, 2022, the Debtors and FTX US executed an asset purchase agreement (as amended, the "FTX Purchase Agreement") memorializing the terms of the FTX US bid. Following the conclusion of the Auction, the Debtors sought, and obtained, this Court's approval to enter into the FTX Purchase Agreement. The Debtors then proceeded to commence solicitation of votes on a prior version of the Plan that contemplated the effectuation of the FTX Purchase Agreement.

15.     A few weeks after this Court approved the Debtors' entry into the FTX Purchase Agreement, FTX and its affiliates unexpectedly collapsed.  On November 11, 2022, certain FTX US affiliates commenced chapter 11 proceedings.  Three days later, FTX US did the same.  The Debtors restarted their sale process effectively simultaneously with the FTX collapse.

16.     Cryptocurrency market headwinds only grew stronger in the fall of 2022 and the market was thrown into further turmoil due to FTX's historic collapse.  While the Debtors leveraged the groundwork and interest from their first sales process, given the significant market decline, the Debtors were left with fewer opportunities.

17.     As part of the second sales process, the Debtors engaged in extensive month-long negotiations with interested parties that included parties that had previously participated in the Auction as well as new parties that emerged.  Moelis, along with the Debtors' other advisors and the Debtors' management team, evaluated each proposal, and pushed bidders to improve the economic and other terms of their bids.  When analyzing proposals received from interested parties, the Debtors and their advisors considered both the viability and risk factors associated with each proposed transaction, including but not limited to, timing considerations, third-party financing requirements, ability to consummate, cybersecurity risks, regulatory and licensing status, and counterparty risk based on the counterparty due diligence conducted by the Debtors during the first and second sales processes.

18.     Throughout the negotiations, the Debtors, in consultation with the Committee, also considered pursuing a transaction that would allow the Debtors to pivot and distribute cryptocurrency or cash to creditors on their own (the "Liquidation Transaction"), without pivoting to a chapter 7 liquidation.  The Debtors and their advisors ultimately used the Liquidation Transaction as a floor against which to compare third-party bids.  Ultimately, the Debtors

8

determined that pursuing a sale transaction with a third party could, depending on the structure of the transaction, provide the potential for the best recovery currently available to creditors under the circumstances while also reducing the risk surrounding execution of the transaction and reducing the likely value leakage that would occur in the Liquidation Transaction. Accordingly, the Debtors, in their business judgment, determined to reengage with third parties to identify an alternative transaction partner.

19. After negotiation and deliberation, on December 18, 2022, Debtor Voyager Digital, LLC (the "Seller") executed that certain asset purchase agreement (the "Asset Purchase Agreement") with BAM Trading Services Inc. ("Binance.US" or "Purchaser," and such transaction thereunder, the "Sale Transaction"). The Court approved the Debtors' entry into the Asset Purchase Agreement on January 13, 2022 [Docket No. 860].

## THE DEBTORS' PLAN SHOULD BE CONFIRMED

## I. THE PLAN PROVIDES THE HIGHEST AVAILABLE VALUE TO CREDITORS UNDER THE CIRCUMSTANCES.

20. The Debtors value the Sale Transaction at approximately $1.022 billion, comprising (a) the value of cryptocurrency on the Voyager platform as of a date to be determined, which as of December 16, 2022 at 0:00 UTC, is estimated to be $1.002 billion, plus (b) additional consideration, which is estimated to provide at least $20 million of incremental value. Pursuant to the Asset Purchase Agreement, under the terms and conditions of the Plan and subject to the Debtors' ongoing assessment that the Sale Transaction is higher and better than the Liquidation Transaction, Binance.US will acquire and distribute substantially all of the Debtors' assets to creditors. Either the transaction contemplated by the Asset Purchase Agreement or, if the Debtors toggle, the Liquidation Transaction, will be effectuated through the Plan.

A-532

21.     Based on information in the Debtors' possession to date, the Sale Transaction (a) is the only transaction currently available to the Debtors that did not contemplate requiring the Debtors to liquidate cryptocurrency for working capital purposes in the first instance, (b) includes reimbursement by Binance.US of up to $15 million of Seller's expenses under certain circumstances set forth in the Asset Purchase Agreement, and (c) provides a $10 million reverse termination fee payable to the Seller by Binance.US to compensate the Debtors' estates in the event that Binance.US cannot consummate the transaction under certain circumstances set forth in the Asset Purchase Agreement.

22.     In addition, the Debtors, the Committee, and their respective advisors negotiated certain provisions designed to safeguard the Debtors' cryptocurrency in advance of distributions being made to creditors.  Specifically, the Asset Purchase Agreement provides that, up until the transfer of cryptocurrency to Binance.US, the Debtors will maintain control of all of the Debtors' cryptocurrency, including during the rebalancing of the Debtors' cryptocurrency portfolio (that may include the use of third parties and third-party exchanges to execute the rebalancing transactions), which is a prerequisite to closing and effectuating distributions to creditors.  I believe that allowing the Debtors to retain control of all of the Debtors' cryptocurrency until closing is critical to minimizing risk given the increased volatility in the crypto space.

23.     Further, in connection with the evaluation of the Binance.US proposal, the Debtors conducted certain financial and business counterparty due diligence on Binance.US.  This due diligence included reviews of certain documentation provided by Binance.US and discussions with senior management at Binance.US relating to, among other things: audited financial statements, interim unaudited financial statements, available liquidity, related party services agreements, wallet infrastructure, anti-money laundering laws ("<u>AML</u>") and "know your customer" ("<u>KYC</u>")

10

procedures, money transmitter licensing status, and business plans submitted to selected state regulators in connection with the issuance of money transmitter licenses. Such due diligence was based on information provided to the Debtors' and the Committee's financial and legal advisors by Binance.US and representations made by Binance.US senior management. As outlined in Moelis's engagement letter, while Moelis was involved in such discussions and diligence reviews, Moelis is not a technical expert on matters relating to the appropriateness of information security or other custody protocols. *See Application of Debtors and Debtors in Possession For Entry Of An Order Authorizing the Employment and Retention Of Moelis & Company Llc As Investment Banker, Capital Markets Advisor, And Financial Advisor Effective As Of The Petition Date* [Docket No. 117].

24.     Moreover, I have been informed by the Debtors' legal advisors that Section 6.12 of the Asset Purchase Agreement provides that the Seller (prior to the transfer of cryptocurrency to Binance.US) and each transferred creditor (from and after the transfer of cryptocurrency to Binance.US) will retain all right, title, and interest in and to the cryptocurrency allocated to it in accordance with the Binance.US Asset Purchase Agreement through and including such time as such cryptocurrency is returned to Seller or distributed to such transferred creditor. It is my understanding that under the Asset Purchase Agreement, the cryptocurrency will be held by Binance.US solely for the benefit of the Seller or transferred creditor, as applicable, until such distributions are made.

25.     In addition, under the Asset Purchase Agreement, the Debtors' claims against Three Arrows Capital and other parties will will vest in the Wind-Down Debtor and any recovery thereon will be distributed to creditors.

A-534

26.     Finally, and most importantly, the Asset Purchase Agreement allows the Debtors to react to changing market conditions.  If the Debtors otherwise determine that the Asset Purchase Agreement is not the highest and best available option for creditors under the circumstances and exercise their "fiduciary out," or the Sale Transaction is otherwise not effectuated by the Outside Date, then the Debtors may pivot to the Liquidation Transaction and pursue self-liquidation.  This feature of the Asset Purchase Agreement, in my view, is protective of creditors in a volatile market, and provides a more certain timeline for recovery and resolution of Claims.  The Debtors will toggle to the Liquidation Transaction if they conclude in their good faith judgment that the Sale Transaction no longer is the highest or otherwise best option for creditors available under the circumstances.

27.     For all the reasons set forth in this Section I, I believe that the Plan is the compilation of months of long, hard-fought negotiations whereby the Debtors worked to negotiate a Plan that provides for distributions to creditors on an expeditious timeline, and it provides the highest value available to creditors under the circumstances.

## II.     THE PLAN IS UNLIKELY TO BE FOLLOWED BY A LIQUIDATION OR FURTHER REORGANZIATION

28.     I understand that Section 1129(a)(5) of the Bankruptcy Codes requires the Court to determine, in relevant part, whether the Plan provides adequate means for implementation.  I also understand that Section 1129(a)(11) of the Bankruptcy Code requires the Court determine, in relevant part, that confirmation is not likely to be followed by the liquidation or further financial reorganization of the Debtors (or any successor thereto), unless such liquidation or reorganization is proposed in the Plan.

29.     *First*, I believe that the Sale Transaction, which has an implied value of $1.022 billion, will allow the Debtors to satisfy their obligations under the Plan.  The Sale Transaction

provides the highest value currently available under the circumstances to the Debtors' creditors. I understand that the value created by the Sale Transaction will be sufficient to satisfy all Allowed Priority Claims and Allowed Administrative Claims under the Plan, including all Allowed Professional Fee Claims, in full. As such, the Debtors have a demonstrated ability to fund distributions required under the Plan, including to taxing authorities, administrative claimants, and other Unimpaired Classes of Claims.

30. Further, Binance.US has represented to the Debtor and its advisors that it has the legal, operational, financial, and technical capacity to distribute cryptocurrency in-kind to Holders of Allowed Account Holder Claims, including the necessary money transmitter licensing approvals required to facilitate in-kind distributions. Binance.US has agreed to hold the cryptocurrency solely for the benefit of the Seller or transferred creditor, as applicable, until such distributions are made. In the Unsupported Jurisdictions,[4] the Debtors will retain custody of the cryptocurrency that would be distributed to those creditors. In the event that Binance.US is not able to obtain the necessary approvals to make distributions to creditors in Unsupported Jurisdictions within six months following the closing (*i.e.*, an incremental 3 months following distributions to creditors in other jurisdictions), the Debtors would convert the cryptocurrency attributable to such creditors to cash and the Debtors would then distribute the equivalent realized cash value associated with such liquidations to such creditors under the chapter 11 plan. If

---

[4] "Unsupported Jurisdictions" refers to Hawaii, New York, Texas, and Vermont, in which Binance.US does not yet have the requisite money transmitter licensing approvals, authorizations, or exemptions (as applicable).

Binance.US is able to obtain the necessary money transmitter licensing approvals within that six-month period, Binance.US would make in-kind distributions to those creditors.

31.     *Second*, Binance.US has represented that it has sufficient cash and other consideration, as applicable, to pay the Purchase Price. The Debtors requested and received proof satisfactory to them of funds to substantiate that representation. Pursuant to the Asset Purchase Agreement, I understand the Debtors negotiated additional assurances and value for the benefit of their estates under the Asset Purchase Agreement, including (a) reimbursement by Binance.US of up to $15 million of Seller's expenses in certain circumstances, (b) a $10 million good-faith deposit paid by Binance.US to the Seller, and (c) a $10 million reverse termination fee payable to the Seller by Binance.US, in each case, subject to the terms and conditions set forth in the Asset Purchase Agreement. I understand, based on Binance.US's representations that Binance.US will have the ability to pay the expense reimbursement and reverse termination fee if and when they become due. Binance.US paid the $10 million good faith deposit to the Seller, pursuant to the Asset Purchase Agreement, which the Seller shall be entitled to keep, in full, in the event of a Purchaser Default Termination.

32.     *Third*, in response to recent media reports that Binance.US allegedly transferred more than $400 million to Merit Peak Ltd., a trading firm managed by Binance CEO Changpeng Zhao, the Debtors have been engaged in an ongoing review of additional supplemental diligence into Binance.US.[5] The Debtor's supplemental diligence is examining the relationship between Binance.US, Merit Peak Ltd., an additional third-party market maker, and Zhao, as well as Binance.US's financial controls, including review of audit results testing the sufficiency of

---

[5]     *See Crypto giant Binance moved $400 million from U.S. partner to firm managed by CEO Zhao*, REUTERS.COM (Feb. 16, 2023), *available at* https://www.reuters.com/technology/crypto-giant-binance-moved-400-million-us-partner-firm-managed-by-ceo-zhao-2023-02-16/

Binance.US's Information Security Management System and Privacy Information Management System. The documents are being provided by Binance.US with the intention of demonstrating Binance.US's ability to consummate the Asset Purchase Agreement, to which the Debtors are conducting an ongoing review. To the extent undisclosed information uncovered during the Debtors' ongoing review reveals Binance.US is unable to consummate the Asset Purchase Agreement, as discussed elsewhere in this Declaration, the Debtors will promptly pivot to the Liquidation Transaction.

33.     *Fourth*, I am aware that, pursuant to the Plan, on the Effective Date, all property constituting Wind-Down Debtor Assets, including all Vested Causes of Action of the Debtors (unless otherwise released, waived, compromised, settled, transferred, or discharged pursuant to the Plan), will vest in the Wind-Down Debtor. It is my understanding that any proceeds acquired from pursuit of the Vested Causes of Action (if any) will inure to the benefit of the Debtors' creditors.

34.     Based on the foregoing, it is unlikely that confirmation of the Plan will be followed by a liquidation or the need for further reorganization except for that disclosed in the Plan.

## III.    The Liquidation Transaction Provides an Alternative Transaction That Will Obviate the Need for Further Reorganization or Chapter 7 Liquidation.

35.     Based on the diligence the Debtors have performed to date, and as discussed above, I believe the Sale Transaction is the highest and best option currently available under the circumstances. But the cryptocurrency industry remains volatile, even for an already volatile business, and Moelis and the Debtors' other advisors continue to closely monitor developments. To that end, the Asset Purchase Agreement permits the Debtors to pivot to a higher and better third-party bid (should one emerge) or the Liquidation Transaction if the Debtors exercise their "fiduciary out" or the Sale Transaction is not effectuated by the outside date included thereunder,

A-538

subject to expense reimbursement of Binance.US in certain circumstances set forth in the Asset Purchase Agreement.

36.     Pursuing the Liquidation Transaction would, however, impose costs of its own on the Debtors, take time, and present its own risks.  Among other things, the Liquidation Transaction would involve the Debtors "rebalancing" their cryptocurrency holdings to prepare for distributions to creditors, and then reopening the Voyager platform for approximately a month to allow customers to withdraw their *pro rata* share of cryptocurrency, to the extent it can be withdrawn. The Liquidation Transaction, among other things, would likely lead to incremental value leakage (*e.g.*, the Debtors would likely be forced to realize a discount due to liquidation of sizable positions in the marketplace), over and above that in a third-party transaction, thereby resulting in diminished creditor recoveries, and/or require the Debtors to liquidate additional cryptocurrency to fund working capital requirements to complete the work required (including AML/KYC compliance).  The Debtors and their other advisors have also indicated that the Liquidation Transaction may create additional security risks (particularly if the Debtors are unable to retain critical personnel necessary to perform the Liquidation Transaction), be less tax efficient for customers than a third-party transaction,  strand some coins, which can be withdrawn by customers from certain third-party exchanges (like Binance.US) but not from Voyager, and may severely damage the value of the VGX token, the native token of the Voyager platform.

37.     In light of these risks, the Asset Purchase Agreement provides that in the event Debtors pivot to the Liquidation Transaction, Binance.US will provide certain services to facilitate the Liquidation Transaction to ensure that the Debtors can rely on the Binance.US platform to minimize leakage with, and cybersecurity risks when, returning cryptocurrency to creditors. In addition, the work to prepare to consummate and execute on the Asset Purchase Agreement will

better prepare the Debtors to address the aforementioned self-liquidation challenges and complete the Liquidation Transaction if necessary.

38.     My understanding, based on my work with the Debtors, is that the Debtors have a plan in place to pivot to and implement the Liquidation Transaction, if necessary.  As a result, in the event the Sale Transaction fails to close, the Debtors have the infrastructure and capability (and, due to the other protections provided in the Plan, including the Employee Transition Plan, the personnel) to proceed with a self-liquidation.  The ability to perform this self-liquidation pursuant to the Liquidation Transaction makes it unlikely that Debtors will need to undergo a court-supervised liquidation or pursue further reorganization other than that provided in the Plan.

## IV.     THE PLAN WAS PROPOSED IN GOOD FAITH

39.     I understand that Section 1129(a)(3) requires that the Plan be proposed in good faith.  I and the other members of the Moelis team, along with the Debtors' other advisors, were intimately involved in the negotiation and execution of the Asset Purchase Agreement and the development of the Plan.  The Plan and Asset Purchase Agreement followed extensive arm's-length negotiations among sophisticated, well-represented parties, including the Debtors, the Committee, and interested counterparties, ensuring that the Debtors' stakeholders realize the highest possible recoveries under the circumstances.[6]

40.     I believe that the Debtors' marketing process with respect to the Sale Transaction afforded a reasonable opportunity for any party to make a higher or otherwise better offer. Following FTX's bankruptcy, no other party or parties offered to purchase the Acquired Assets for greater overall value to the Debtors' estates than Binance.US.  Based on our analysis to date, I

---

[6]     For the avoidance of doubt, Binance.US is not an "insider" or "affiliate" of any of the Debtors, as those terms are defined in the Bankruptcy Code, and no common identity of incorporators, directors, or controlling stakeholders exist between the Purchaser and the Debtors.

believe the Asset Purchase Agreement will provide a greater recovery for the Debtors than would be provided by any other currently available alternative and, if the Debtors ultimately determine that another third-party option (if one emerges) or the Liquidation Transaction will deliver greater value to creditors, they will toggle to that transaction.

41.     In my opinion the consideration provided by Binance.US pursuant to the Asset Purchase Agreement constitutes the best offer for the Acquired Assets that is currently available.

42.     I am not aware of any side deals or other arrangements that would evidence a lack of good faith.  Further, while I recognize that Binance.US has been cooperating with a variety of regulatory bodies internationally, I have no knowledge of Binance.US engaging in any improper action or inaction, which would cause or permit the Asset Purchase Agreement or the Sale Transaction to be avoided or impose any costs or damages.  All that said, I am not an authorized representative of Binance.US nor am I in a position to "vouch" for the bona fides of Binance.US. And if events since May 2022 have taught us anything, it is that the benefits of having a decentralized and largely unregulated cryptocurrency business are counterbalanced by the challenges in identifying and preventing fraud.

## CONCLUSION

43.     The Plan and the Sale Transaction will provide the greatest currently available recovery to creditors, allow the Debtors to facilitate an efficient resolution of these chapter 11 cases, and give customers the opportunity to migrate to Binance.US's market-leading trading platform to trade and store cryptocurrency upon consummation of the Sale Transaction.  Further, in the event that the Debtors determine that the Sale Transaction is not the highest and best option available for their stakeholders under the circumstances, they have the right to, and will, toggle to

Liquidation Transaction provided under the Plan to quickly and efficiently return cryptocurrency to creditors and facilitate the expedient resolution of these chapter 11 cases.

44.     For these reasons, I support confirmation of the Debtors' Plan.

*[Remainder of page intentionally left blank.]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: February 28, 2023                    Respectfully submitted,

*/s/ Brian Tichenor*
Brian Tichenor
Managing Director
Moelis & Company LLC

*Investment Banker for the Debtors*

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## DECLARATION OF MARK A. RENZI
## IN SUPPORT OF CONFIRMATION OF THE THIRD
## AMENDED JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND ITS
## DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

I, Mark. A. Renzi, hereby declare under penalty of perjury, as follows:

1.     I submit this Declaration in support of confirmation of the *Third Amended Joint Chapter 11 Plan of Voyager Digital Holdings, Inc., and Its Debtor Affiliates* [Docket No. 852] (as may be amended, supplemented, or otherwise modified from time to time, the "Plan"), and the *Debtors' Memorandum of Law In Support of (I) Final Approval of the Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code and (II) an Order Confirming the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Confirmation Brief")[2], filed contemporaneously herewith.  I am a Managing Director with Berkeley Research Group, LLC ("BRG") and have served as a financial advisor to Voyager Digital Holdings, Inc. since July 5, 2022.

2.     The statements in this declaration are, except where specifically noted, based on (a) my personal knowledge or opinion of the Debtors' operations and finances, (b) my personal knowledge, belief, or opinion, (c) information I have received from the Debtors' employees or advisors and/or other employees of BRG, or (d) from the Debtors' records maintained in the ordinary course of their business.  If called to testify, I could and would testify competently to the facts set forth herein.

3.     I am not being specifically compensated for this testimony other than through payments that may be received by BRG as a professional retained by the Debtors.

---

[2] Capitalized terms used but not defined herein shall have the meanings given to such terms in the Plan or Confirmation Brief, as applicable.

2

## I.    Qualifications

4.    I am a Managing Director and the Head of the Corporate Finance Financial Institutions Group for BRG, the financial advisor to the Debtors.

5.    BRG's corporate finance practice consists of senior financial, management consulting, accounting, and other professionals who specialize in providing financial, business, and strategic assistance typically in distressed business settings.  BRG has a wealth of experience in providing financial advisory services in in- and out-of-court restructuring, sale, and wind down scenarios, and enjoys an excellent reputation for services it has rendered in large and complex chapter 11 cases on behalf of debtors and creditors throughout the United States. BRG professionals have significant restructuring and industry experience assisting distressed companies with financial and operational challenges and working with management teams and boards of directors of large companies facing financial challenges similar to those of the Debtors. BRG regularly assists large and complex businesses similar to the Debtors.

6.    BRG has acted as financial advisor, crisis manager, and corporate officer in middle market to large multinational companies in crisis or those in need of performance improvement in specific financial and operational areas across a wide array of industries.  Moreover, the professionals at BRG have assisted and advised debtors, creditors, creditors' committees, bondholders, investors, and others in numerous bankruptcy cases, including the bankruptcy cases of *Intelsat S.A.; Liberty Power Holdings, LLC; The Collected Group, LLC; CBL & Associates Properties, Inc.; Hospital Acquisition LLC (d/b/a LifeCare); rue21, inc.; Sports Authority Holdings, Inc.*; *Specialty Retail Shops Holding Corp. (a.k.a. Shopko); Brookstone Holding Corp.; American Apparel LLC; Rentpath Holdings, Inc.; MF Global Holdings, Ltd.; Le Tote, Inc.; Chrysler (a.k.a. Old Carco LLC); Southern Foods Group; Speedcast International Limited; The*

3

*Hertz Corporation, LLC; Borden Dairy Company; Nine West Holdings, Inc.; Verity Health System of California, Inc.; Real Industry, Inc.; M & G USA Corporation; Peabody Energy Corporation; Sabine Oil & Gas Corporation; Molycorp Inc.; Refco, Inc.; Spiegel Inc.; W.R. Grace; Penson Worldwide; Dynegy Holdings, LLC; Calpine Generating Company;* and *Nortel Networks Inc.*[3] Currently, in addition to serving as financial advisor to the Debtors in these chapter 11 cases, I am the Chief Restructuring Officer of BlockFi and its related debtors and debtors in possession,[4] and I am one of the leaders of the team advising the Official Committee of Unsecured Creditors in the Genesis Global HoldCo, LLC, chapter 11 proceedings.[5]

7.      I am a member of the Association of Insolvency and Restructuring Advisors, as well as the Turnaround Management Association. I have more than twenty-five (25) years of business experience, with approximately twenty (20) years of financial consulting experience, including liquidity and capital structure assessment, debt and equity restructuring advice, and identification of reorganization alternatives. During the course of my career, I have personally provided restructuring services on more than thirty-five (35) engagements in both out-of-court workout situations and in-court reorganizations. Further, I have served in interim management positions and advised distressed companies with day-to-day management activities, including development of pro forma financials, cash flow management, cost rationalization, and identification of liquidity enhancing activities. In addition to operational turnarounds, I have assisted in financial restructurings, including refinancings, recapitalizations, debt-for-equity swaps, and strategic mergers and acquisitions.

---

[3] The professionals were employed in certain of these engagements prior to joining BRG.

[4] In re BlockFi Inc., No. 22-19361 (MBK), U.S.B.C., D.N.J.

[5] In re Genesis General HoldCo LLC, No. 23-10063 (SHL), U.S.B.C., S.D.N.Y.

8.     Prior to joining BRG, I was a Senior Managing Director at a global business advisory firm with a 15-year tenure. I also worked at a boutique money management firm in New York evaluating equity and commodity derivative portfolios, and held various positions in FP&A, business plan development, treasury, and global cash management. I received a B.A. in Economics from Washington College and an M.S. in Finance from Boston College.

9.     Since the Debtors engaged BRG in July 2022, I have worked closely with the Debtors' management and other professionals on the Debtors' restructuring efforts, including assisting the Debtors in preparing cash flow projects, budgets, and other reports, as well as assisting with strategic operations including, most recently, the rebalancing of the Debtors' cryptocurrency portfolio and preparation for execution on the proposed Plan, whether that ultimately be through a Sale Transaction with Binance.US or the Liquidation Transaction.  I lead the BRG team advising the Debtors.  In this capacity I have become well-acquainted with the Debtors' restructuring efforts. I am also familiar with the terms and provisions of the Plan, as well as all previously submitted plans—I participated directly in the due diligence, discussions, and analysis related to the Plan, as well as all previously submitted plans.

10.     The Debtors requested that I address for the Court and parties-in-interest, among other things described in more detail below: (1) the purpose of the Plan; (2) the ability of the Plan, including the Sale Transaction or the Liquidation Transaction to satisfy the "best interests test" as defined in section 1129(a)(7) of the bankruptcy code; (3) the feasibility of the Plan, including the Sale Transaction or the Liquidation Transaction as applicable, under section 1129(a)(11) of the bankruptcy code; (4) the need for key Debtor employees to continue providing services to the Debtors (and the Wind-Down Estate) in order to successfully effectuate the Plan, including the

Sale Transaction or the Liquidation Transaction; and (5) whether or not appointment of a trustee in these chapter 11 cases is warranted under the circumstances.

## II.    Background

11.    To understand why I reach the opinions described below, it is necessary to understand Voyager's operational history as well as the history of these chapter 11 cases.

### A.  Operations

12.    Voyager's primary operations consist of (i) brokerage services, (ii) custodial services through which customers earn interest and other rewards, and (iii) lending programs.  All of Voyager's services are accessible through a mobile application that users can download on their smartphones and other smart devices.

13.    **Brokerage Services**. Voyager operates as a cryptocurrency "agency broker," matching its customers with counterparties who can facilitate the customers' desired trades. The Company's platform surveys approximately a dozen exchanges and liquidity providers and executes trades through a proprietary algorithm that evaluates the price, certainty of execution, reliability of the trading venue, and speed of execution.

14.    **Custodial Services.**  Customers store their digital assets on the Voyager platform and, unless they "opted out" of the rewards program (which all customers had the opportunity to do), earned interests on deposits which, prior to the Petition Date, were primarily paid in three ways: (i) PIK Interest; (ii) through VGX and the Voyager Loyalty Program; and (iii) through "staking" programs. Customers could also sign up for a Voyager Debit Card.

15.    **Lending Program.** As part of providing customers with PIK Interest, Voyager lent cryptocurrency deposited on its platform to third parties, sometimes on a collateralized basis but often on an uncollateralized basis.  Customers were advised of this through clear language in the

Customer Agreement. Such third parties paid Voyager a pre-negotiated interest rate that is payable in either cash or payment-in-kind (*i.e.*, a Bitcoin loan accrues interest payable in Bitcoin). Voyager's lending program was an integral part of its business and necessary to provide customers with a meaningful return on their assets. Loans made by the Company that were outstanding as of the Petition Date were as follows:

| Loan Counterparty | Borrowing Rates | Amount Outstanding (in thousands) |
|---|---|---|
| Alameda Research Ltd. | 1% - 11.5% | $376,784 |
| Three Arrows Capital | 3% - 10% | $654,195 |
| Genesis Global Capital, LLC | 4% - 13.5% | $17,556 |
| Wintermute Trading Ltd | 1% - 14% | $27,342 |
| Galaxy Digital LLC | 1% - 30% | $34,427 |
| Tai Mo Shan Limited | 10% | $13,770 |
| Other | 4% - 8% | $751 |
| **Total Loan Obligations** | | **$1,124,825** |

### B. The Market Crashes and Voyager Seeks Chapter 11 Protection

16.     Cryptocurrency is inherently volatile, and prices vacillate by the second due to constant trading occurring 24 hours a day, seven days a week. 2022 saw historic levels of volatility in the markets generally, and the cryptocurrency markets were not immune. Bitcoin slumped over 65% from January 1, 2022 to year-end:



17.     Crypto's 2022 pullback began with the collapse of LUNA, a cryptocurrency issued by Terra, an open-source blockchain protocol. Terra issued LUNA to execute transactions on the Terra blockchain. In early May 2022, LUNA was trading at $86 per token and had a market capitalization of approximately $14 billion. Along with LUNA, Terra issued TerraUSD ("UST"), an algorithmic stablecoin that was pegged at $1.

18.     On May 7, 2022, $2 billion of UST was unstaked and immediately sold. This dropped UST's price to $0.91. UST holders saw the "de-peg" and rushed to unstake and sell their coins.

19.     Traders redeemed UST for LUNA and sold their LUNA, leading to a significant decrease in its price. Simultaneously, other traders attempted to repeg LUNA to UST by burning UST to create LUNA, which in turn created an oversupply of LUNA and further exacerbated its price decline. In one week, LUNA's price fell from $82.55 to $0.000001 per token, eliminating $18 billion of value in the cryptocurrency sector.

8

A-551

20. Many cryptocurrency-focused hedge funds, and other cryptocurrency companies, owned LUNA. Some were unable to sell their LUNA under staking agreements and were forced to incur up to a 99% loss on their investment. And in mid-June, reportedly due in part to the collapse of LUNA, Three Arrows Capital ("3AC"), a major player in the space, collapsed.

21. On June 15, 2022, 3AC confirmed that it had suffered at least some loss from the LUNA collapse and that it had hired legal and financial advisors to explore potential liquidity solutions. Shortly thereafter, on June 27, 2022, 3AC was ordered by a court in the British Virgin Islands to commence liquidation proceedings.

22. Voyager was a victim of 3AC's collapse. As stated above and as disclosed to customers, to provide customers with a yield on the assets they store with Voyager, Voyager loans out a portion of its cryptocurrency reserves to third parties. One such loan was to 3AC. In March 2022, the Company entered into a master loan agreement with 3AC (the "3AC Loan"). Pursuant to the 3AC Loan, the Company agreed to lend 15,250 Bitcoins and 350 million USDC to 3AC. The 3AC Loan was callable at any time by the Company. 3AC fully drew down on the 15,250 Bitcoins and 350 million USDC.

23. After the LUNA crash in 2022, Voyager began to assess 3AC's downside exposure and the likelihood of repayment under the 3AC Loan. Voyager then made an initial request for a repayment by 3AC of $25 million of USDC by June 24, 2022, and subsequently requested repayment of the entire outstanding balance of Bitcoin and USDC by June 27, 2022. 3AC did not repay either requested amount. Accordingly, on June 27, 2022, Voyager issued a notice of default to 3AC for failure to make the required payments under the 3AC Loan.

24. Once it became clear that 3AC had significant exposure to the crash, Voyager's management team swiftly took action to identify potential sources of liquidity to stabilize

9

Voyager's business and remain adequately capitalized, and it ultimately became necessary that Voyager begin marketing its business and enter these chapter 11 proceedings.

### C. Voyager Markets a Sale, AlamedaFTX Implodes

25.    Beginning on or about June 20, 2022, the Debtors commenced a marketing process to solicit interest in a sale to a third-party investor. However, discussions with interested parties revealed that an in-court process for the Debtors' assets would be necessary to consummate the most value-maximizing transaction for stakeholders. Accordingly, the Debtors commenced these chapter 11 cases on July 5, 2022 (the "Petition Date"), and continued their marketing efforts.

26.    As discussed in greater detail in the *Declaration of Brian Tichenor in Support of Confirmation of the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, filed contemporaneously herewith (the "Moelis Declaration"), the Debtors' multi-month marketing process culminated in an auction process on September 13, 2022, to identify the highest and best bid from interested parties. The Debtors' financial advisor, Moelis, scrutinized the bids along with me and my team at BRG, the Debtors' legal advisors, and the Debtors' management team, Board of Directors, and independent directors, and ultimately concluded AlamedaFTX was the best option because all believed—based on what is now known to be fraud—that AlamedaFTX could timely close and effectuate the sales process and had the wherewithal to do so. The Court approved the Debtors' entry into a purchase agreement with AlamedaFTX on October 20, 2022.  Confirmation was originally set for December 8, 2022.

27.    On November 2, 2022, public reports began to circulate citing leaked, internal financial statements and questioning the health and liquidity of both FTX and Alameda Research

LLC (and their various affiliates, none of which appear to have operated independently). That and other public reporting began a death spiral for AlamedaFTX.

28.     On November 8, 2022, FTX's CEO stated publicly that FTX was experiencing a "liquidity crunch" due to user withdrawals.[6]  The Debtors and their advisors inquired with FTX and its advisors, who either could not or would not share any material information about what was happening.  On November 11, 2022, AlamedaFTX began the process of filing for bankruptcy.[7]  The counterparty to the APA with the Debtors, West Realm Shires d/b/a FTX US, did not file until November 14, 2022.

**D.  Voyager Markets a Sale Again, Reaches Agreement with Binance.US**

29.     On November 10, 2022, the day before AlamedaFTX publicly filed for bankruptcy, AlamedaFTX agreed to waive the "no shop" provision of the AlamedaFTX Purchase Agreement. The Debtors promptly restarted their sales process, and engaged in extensive negotiations with the interested parties over the course of approximately one month.

30.     Ultimately, on December 18, 2022, Debtor Voyager Digital, LLC (the "Seller") executed an asset purchase agreement (the "Asset Purchase Agreement") with BAM Trading Services Inc. ("Binance.US" or "Purchaser" and the transaction, "Sale Transaction"). The Asset Purchase Agreement provided that the Sale Transaction would be consummated through the Plan.

31.     The Debtors value the Sale Transaction at approximately $1.022 billion, comprising (a) the value of cryptocurrency on the Voyager platform as of a date to be determined, which as of December 18, 2022, is estimated to be $1.002 billion, plus (b) additional consideration, which is estimated to provide at least $20 million of incremental value. The Sale Transaction

---

[6] @SBF_FTX, Twitter (Nov. 8, 2022).

[7] @SBF_FTX, Twitter (Nov 11, 2022).

includes reimbursement by Binance.US of up to $15 million of Seller's expenses, and provides a $10 million reverse termination fee payable to the Seller by Binance.US to compensate the Debtors' estates in the event that Binance.US cannot consummate the transaction.

32.     The Plan also allows the Debtors to toggle to either a higher and better third-party bid (should one emerge) or to a self-liquidation if the Debtors determine, in their business judgment, that the Sale Transaction is no longer the best path forward for the Debtors' creditors (the "Liquidation Transaction"). The Plan was negotiated heavily between many parties, including the Debtors and the Official Committee of Unsecured Creditors (the "Committee"). Thousands of hours have been invested in creating as good of an outcome for creditors as is possible under the circumstances and the Plan (if confirmed) does exactly that.

### III.    The Plan Satisfies the Confirmation Requirements

33.     For the reasons detailed below, I believe that the Plan satisfies the applicable bankruptcy code requirements for confirmation of a plan of reorganization. I set forth the reasons for such belief below, except where such compliance is apparent on the face of the Plan, the Plan Supplement, and the related documents or where it will be the subject of other evidence introduced at the Combined Hearing.

### A.    The Plan Fully Complies with the Applicable Provisions of the Bankruptcy Code — § 1129(a)(1).

34.     I understand that section 1129(a)(1) of the bankruptcy code requires a chapter 11 plan to comply with all applicable provisions of the bankruptcy code.

#### 1.    Proper Classification of Claims and Interests — § 1122 and § 1123(a)(1).

35.     I understand that sections 1122 and 1123(a)(1) of the bankruptcy code govern the manner in which a debtor may classify claims and interests. I believe that the Plan's classification of Claims and Interests satisfies the requirements of section 1122 of the bankruptcy code because

the Plan places Claims and Interests into eleven separate Classes, with the Claims and Interests in each Class differing from the Claims and Interests in each other Class in a legal or factual nature or based on other relevant criteria.

36.     I believe that valid business, legal, and factual reasons justify the separate classification of the particular Claims or Interests into the Classes created under the Plan, and no unfair discrimination exists between or among Holders of Claims and Interests.  In particular, I understand that general unsecured claims are broken into three classes, OpCo General Unsecured Claims, HoldCo General Unsecured Claims, and TopCo General Unsecured Claims to comport with certain requirements of the bankruptcy code and to account for the fact that Holders of such claims have legal recourse against only specific Debtors.  Holders of Account Holder Claims are classified separately from Holders of other General Unsecured Claims due to the unique nature and basis for the Account Holder Claims, which are made up of claims held by customers on the Voyager platform.  Further, Alameda Loan Facility Claims are properly classified separately as such Claims are asserted against multiple Debtor entities and are Claims on account of an unsecured loan.

### 2.  Specification of Unimpaired Classes — § 1123(a)(2).

37.     I understand that Article III.B of the Plan identifies each Class that is Unimpaired.

### 3.  Treatment of Impaired Classes — § 1123(a)(3).

38.     I understand that Article III.B of the Plan identifies each Class that is Impaired and describes the treatment thereof.

### 4.  Equal Treatment of Similarly Situated Claims and Interests — § 1123(a)(4).

39.     I understand that section 1123(a)(4) of the bankruptcy code requires that the Plan provide the same rights and treatment to each holder of claims or interests as other holders of

allowed claims or interests within such holders' respective class. I believe that the Plan satisfies this requirement, as all Holders of Allowed Claims or Interests will receive the same rights and treatment as other Holders of Allowed Claims or Interests within such Holders' respective Class. In particular, all Account Holder Claims will be "dollarized" as of the Petition Date, and the Holders thereof will receive recoveries proportional to the "dollarized" value of their account holdings relative to the aggregate dollarized value of all customer accounts. The form such distributions take will be a function of the laws and regulations of jurisdictions in which Account Holders reside.

### 5. Adequate Means for Implementation — § 1123(a)(5).

40.  I understand that section 1123(a)(5) of the bankruptcy code requires that a chapter 11 plan provide adequate means for a plan's implementation. I believe that the Plan provides adequate means for implementation as required under section 1123(a)(5) of the bankruptcy code. Among other things, Article IV of the Plan:

i.  constitutes a good faith compromise and settlement of all Claims, Interests, Causes of Action and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan;

ii.  authorizes the applicable Debtors to take all actions necessary or appropriate to effectuate the Plan, including those actions necessary to effectuate the Restructuring Transactions, as set forth in the Plan Supplement, as the same may be modified or amended (in accordance with the terms of the Plan) from time to time prior to the Effective Date;

iii.  authorizes the Debtors to consummate the Restructuring Transactions, including (i) all transactions necessary to provide for the purchase of the Acquired Assets by

14

A-557

Purchaser under the Asset Purchase Agreement, if applicable, (ii) the distribution of Cryptocurrency or Cash pursuant to the Asset Purchase Agreement, as applicable; (iii) the execution of the Plan Administrator Agreement and any transactions necessary or appropriate to form the Wind-Down Debtor; and (iv) the transfer of the Wind-Down Debtor assets to the Wind-Down Debtor;

iv. provides for consummation of the Sale Transaction or the Liquidation Transaction, as applicable;

v. effectuates the Employee Transition Plan;

vi. provides for the retention of certain Non-Released D&O Claims to be pursued, settled, or resolved by the Wind-Down Debtor;

vii. implements the D&O Settlement;

viii. creates the Wind-Down Debtor and appoints the Plan Administrator and Wind-Down Debtor Oversight Committee;

ix. provides sources of consideration for Plan distributions;

x. effectuates the cancellation of certain notes, instruments, certificates and other documents; and

xi. preserves certain Vested Causes of Action.

41. On the Effective Date, the Wind-Down Debtor Assets shall, subject to the Plan Administer Agreement, be transferred to and vest in the Wind-Down Debtor. The Wind-Down Debtor will be charged with winding down the Debtors' estates and will be the successor-in-interest to the Debtors, and a successor to the Debtors' rights, title and interest to the Wind-Down Debtor Assets. The Wind-Down Debtor will be managed by the Plan Administrator and will be subject to a Wind-Down Debtor Oversight Committee.

### 6.  Prohibition of Issuance of Non-Voting Stock — § 1123(a)(6).

42.      I understand that section 1123(a)(6) of the bankruptcy code requires that a debtor's organizational documents prohibit the issuance of nonvoting equity securities.  The Debtors are winding down, and there will not be any issuance of nonvoting equity securities or preferred stock.  Accordingly, I believe section 1123(a)(6) of the bankruptcy code is inapplicable to the Plan.

### 7.  Selection of Officers and Directors — § 1123(a)(7).

43.      I understand that section 1123(a)(7) of the bankruptcy code requires that any provisions in the Plan with respect to the manner of selection of any director, officer, or trustee be consistent with the interests of creditors, equity holders, and public policy.  I believe that the Plan satisfies this requirement by providing that, on the Effective Date, the authority, power, and incumbency of the persons acting as directors and officers of the Debtors will be deemed to have resigned, solely in their capacities as such, and the Plan Administrator will be appointed by the Debtors as the sole director and the sole officer of the Wind-Down Debtor and will succeed to the powers of the Debtors' directors and officers.  The Debtors filed the Plan Administrator Agreement with the Plan Supplement, which provides the identity of the Plan Administrator and Wind-Down Oversight Committee.

### 8.  Discretionary Contents of the Plan — § 1123(b).

44.      I understand that section 1123(b) of the bankruptcy code sets forth various discretionary provisions that may be incorporated into a chapter 11 plan.  I understand that pursuant to section 1123(b) of the bankruptcy code, among other things, a plan may: (a) impair or leave unimpaired any class of claims or interests; (b) provide for the assumption or rejection of executory contracts or unexpired leases not previously rejected; (c) provide for the settlement or adjustment

16

A-559

of any claim or interest belonging to a debtor; or (d) include any other provision not inconsistent with applicable provisions of chapter 11.

45. I believe that the Plan is consistent with section 1123(b) of the bankruptcy code. *First,* the treatment of Classes under the Plan renders such Classes either Impaired or Unimpaired. Class 1 (Secured Tax Claims) and Class 2 (Other Priority Claims) are Unimpaired, and Class 3 (Account Holder Claims), Class 4A (OpCo General Unsecured Claims), Class 4B (HoldCo General Unsecured Claims), Class 4C (TopCo General Unsecured Claims), Class 5 (Alameda Loan Facility Claims), Class 6 (Section 510(b) Claims), and Class 9 (Existing Equity Interests) are Impaired under the Plan. Class 7 (Intercompany Claims) and Class 8 (Intercompany Interests) may be Impaired or Unimpaired under the Plan. *Second,* Article V of the Plan satisfies section 1123(b)(2) because it provides that, on the Effective Date, all Executory Contracts and Unexpired Leases, including any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, that, as of the Effective Date, were not previously rejected, assumed, or assumed and assigned, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the bankruptcy code, except to the extent set forth in the plan. *Third,* for the reasons set forth in Section II below, I believe that the Plan's release, exculpation, and injunction provisions are consistent with section 1123(b) of the bankruptcy code. *Finally,* the Plan also effectuates the Sale Transaction contemplated by the Asset Purchase Agreement or the Liquidation Transaction as applicable.

46. I submit that each of these provisions are appropriate because, among other things, they are (a) the product of arm's-length negotiations, (b) given for valuable consideration, (c) fair and equitable and in the best interests of the Debtors, their estates, and these chapter 11 cases, and

(d) consistent with the relevant provisions of the bankruptcy code and Second Circuit law as explained to me.

### 9. The Debtors Will Cure Monetary Defaults of Any Assumed Executory Contracts or Unexpired Leases — § 1123(d).

47.     I understand that section 1123(d) of the bankruptcy code requires that cure amounts be determined in accordance with the underlying agreement and nonbankruptcy law.

48.     I believe that the Plan complies with section 1123(d) of the bankruptcy code.  The Plan provides for the satisfaction of cure costs under each Executory Contract and Unexpired Lease to be assumed under the Plan on the Effective Date or in the ordinary course of business, subject to the limitations described in Article V of the Plan, and that the Wind-Down Debtor or the Purchaser, as applicable, shall pay any Cure Amounts on the Effective Date.

### 10. The Debtors Complied with the Solicitation Requirements of the Bankruptcy Code — § 1129(a)(2).

49.     I understand that section 1129(a)(2) of the bankruptcy code requires that plan proponents comply with the applicable provisions of the bankruptcy code and, in that regard, is specifically intended to ensure compliance with the disclosure and solicitation requirements set forth in sections 1125 and 1126 of the bankruptcy code.  Based on my review of information provided by the Debtors and their advisors, along with the Voting Report, I believe that the Debtors have complied with sections 1125 and 1126 of the bankruptcy code.

### 11. The Debtors Proposed the Plan in Good Faith — § 1129(a)(3).

50.     I understand that section 1129(a)(3) of the bankruptcy code requires that a chapter 11 plan be proposed in good faith and not by any means forbidden by law.  Here, there is no question in my mind that section 1129(a)(3) has been satisfied.  The Plan was proposed by the Debtors with honesty, good intentions, and a desire to maximize stakeholder recoveries under extraordinarily challenging circumstances.  That is particularly so after the historic FTX collapse

18

derailed the prior proposed plan, when the Debtors, their employees, their advisors, and the Committee and its advisors, worked together to find another transaction partner and pivot to the current Plan—which includes flexibility to toggle to the Liquidation Transaction if necessary— quickly. Moreover, the Sale Transaction effectuated by the Plan is the product of extensive, arm's-length negotiations with numerous written and verbal proposals and counterproposals exchanged among sophisticated parties over the course of several months. Further, the Liquidation Transaction contemplated under the Plan ensures that Holders of Claims can receive the highest recoveries available on the shortest timeline in the event that the Sale Transaction is not ultimately consummated.

### 12. Payment of Professional Fees and Expenses Are Subject to Court Approval — § 1129(a)(4).

51.     I understand that section 1129(a)(4) of the bankruptcy code requires a Court to approve certain fees and expenses that either a plan proponent, debtor, or person receiving property distributions under the plan has paid as reasonable. I can confirm that Professional Fee Claims and corresponding payments are subject to prior Bankruptcy Court approval and the reasonableness requirements under sections 328 or 330 of the bankruptcy code. Article II.B of the Plan, moreover, provides that Professionals shall file all final requests for payment of Professional Fee Claims no later than 45 days after the Effective Date, thereby providing an adequate period of time for interested parties' to review such Professional Fee Claims.

### 13. The Governance Disclosure Requirements Do Not Apply to the Debtors or Are Satisfied — § 1129(a)(5).

52.     I understand that section 1129(a)(5) of the bankruptcy code requires (a) that a plan proponent disclose the identity and affiliation of any individual proposed to serve as a director or officer of the debtor, or a successor thereto, under a chapter 11 plan, (b) that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity

19

security holders and with public policy, and (c) that a plan proponent disclose the identities or affiliations of insiders to be employed or retained by the reorganized debtors as directors and officers and the nature of any compensation for such insider. Because the Plan provides for the vesting of the Debtors' remaining assets in the Wind-Down Debtor and the subsequent dissolution of the Debtors, I understand that section 1129(a)(5) of the bankruptcy code is not applicable to these chapter 11 cases. Nevertheless, I believe that Article IV.H of the Plan and the Plan Supplement satisfy the requirements of section 1129(a)(5) of the bankruptcy code, to the extent applicable, as the Debtors disclosed the method of selection, compensation, and affiliations of the Plan Administrator and the Wind-Down Oversight Committee.

### 14. The Plan Does Not Require the Government to Approve Rate Changes — § 1129(a)(6).

53. I have been advised that the Debtors are not subject to regulations that would invoke section 1129(a)(6)'s requirement that they seek regulatory approval for rate changes provided for under the Plan. The Plan does not propose any rate changes. As such, I do not believe that section 1129(a)(6) is applicable to the Plan.

### 15. The Plan Satisfies the Best Interests Test — § 1129(a)(7).

54. As fulsomely discussed in Section IV, *infra*, I understand that section 1129(a)(7) of the bankruptcy code requires that any chapter 11 plan must satisfy the "best interests of creditors" test, which provides that holders of claims or interests in impaired, non-accepting classes must receive under a chapter 11 plan at least as much as they would in a liquidation. It is my opinion that it does.

### 16. Acceptance by Impaired Classes — § 1129(a)(8).

55. I understand that the bankruptcy code generally requires that each class of claims or interests must either accept the plan or be unimpaired under the plan. I further understand that

20

A-563

if any class of claims or interests rejects the plan, the plan must satisfy the "cram down" requirements with respect to the claims or interests in that class. I understand that Class 3 (Account Holder Claims), Class 4B (HoldCo General Unsecured Claims), and Class 4C (TopCo General Unsecured Claims) voted to accept the Plan and the voting has been overwhelmingly in favor of the Plan. I understand that no holders of OpCo General Unsecured Claims voted on the Plan. However, I understand that because certain Classes are or may be deemed to reject the Plan, the Debtors do not satisfy section 1129(a)(8) of the bankruptcy code. However, even though certain Classes are or may be deemed to reject the Plan, I understand that the Debtors still satisfy section 1129(b) as at least one Impaired Class voted to accept the Plan.

### 17. Priority Cash Payments — § 1129(a)(9).

56.     I understand that the bankruptcy code generally requires that claims entitled to administrative priority must be repaid in full in cash on the effective date or receive certain other specified treatment that the Holder of such claim has agreed to. I understand that the Plan provides that each Holder of an Allowed Administrative Claim allowed on or prior to the Effective Date will receive payment in full in Cash no later than thirty (30) days after the Effective Date or as soon as reasonably practicable thereafter. Article II.A of the Plan generally provides that each Holder of Allowed Administrative Claims shall receive payment in full in Cash or such other treatment as to render such holders unimpaired. Finally, I understand that Allowed Priority Tax Claims will be treated in accordance with the requirements of the bankruptcy code. Accordingly, I believe that the Plan fully complies with and satisfies all of the requirements of section 1129(a)(9) of the bankruptcy code.

### 18. At Least One Impaired Class Voted to Accept the Plan — § 1129(a)(10).

21

57.     I understand that the bankruptcy code provides that, to the extent there is an impaired class of claims, at least one impaired class of claims must accept the plan "without including any acceptance of the plan by any insider," as an alternative to the requirement under section 1129(a)(8) of the bankruptcy code that each class of claims or interests must either accept the plan or be unimpaired under the plan.  I understand that the following Impaired Classes of Claims entitled to vote on the Plan—Classes 3, 4B, and 4C—voted to accept the Plan, independent of any insiders' votes.

### 19. The Plan is Feasible — § 1129(a)(11).

58.     As fulsomely discussed in Section V, *infra*, I understand that section 1129(a)(11) of the bankruptcy code requires a court to determine that a chapter 11 plan is feasible and that confirmation of such plan is not likely to be followed by the liquidation or further financial reorganization of the Debtors (or any successors thereto) unless such liquidation or reorganization is proposed in the Plan.  Provided that the Plan is confirmed as proposed, without material changes, I believe that consummation of either the Sale Transaction or the Liquidation Transaction is feasible, and I believe the Plan satisfies the feasibility requirements of section 1129(a)(11).

### 20. The Plan Provides for Payment of All Fees — § 1129(a)(12).

59.     I understand that section 1129(a)(12) of the bankruptcy code requires the payment of all fees payable under 28 U.S.C. § 1930.  Article XII.C of the Plan includes an express provision requiring payment of all fees in compliance with the bankruptcy code.  Accordingly, I believe the Plan satisfies the requirements of section 1129(a)(12) of the bankruptcy code.

### 21. The Plan Complies with Section 1129(a)(13) of the Bankruptcy Code.

60.     It is my understanding that section 1129(a)(13) of the bankruptcy code requires that any applicable retiree benefits will continue to be paid post effective date at the level established

by agreement or by court order pursuant to section 1114 of the bankruptcy code at any time prior

to confirmation of the Plan, for the duration of the period which the debtor has obligated itself. I

do not believe retiree benefits as defined by section 1129(a)(13) are implicated by the Plan.

### 22. Sections 1129(a)(14) through 1129(a)(16) of the Bankruptcy Code Do Not Apply to the Plan.

61.     Based on my knowledge of the Debtors' business and information provided by the

Debtors' advisors, I believe that sections 1129(a)(14) through 1129(a)(16) of the bankruptcy code

do not apply to the Plan because the Debtors are not subject to domestic support obligations, are

not "individuals," and are not nonprofit corporations.

### 23. The Plan Complies with the Other Provisions of Section 1129 of the Bankruptcy Code.

#### i. The Cram Down Provisions are Appropriate — § 1129(b).

62.     I understand that if all applicable requirements of section 1129(a) of the bankruptcy

code are satisfied, other than section 1129(a)(8), a plan may still be confirmed so long as the

requirements set forth in section 1129(b) are satisfied. I believe that the Debtors satisfied all

applicable requirements of section 1129(b) of the bankruptcy code as Impaired Classes 3, 4B, and

4C voted to accept the Plan, thus permitting the Debtors to "cram down" the Plan pursuant to

section 1129(b) on any Class deemed to reject the Plan.

#### ii. Only One Plan Is Eligible to Be Confirmed — § 1129(c).

63.     I understand that section 1129(c) of the bankruptcy code prohibits the confirmation

of multiple plans. Section 1129(c) of the bankruptcy code is not implicated here because there is

only one proposed plan of reorganization.

#### iii. The Principal Purpose of the Plan Is Not the Avoidance of Taxes as Required Under Section 1129(d) of the Bankruptcy Code.

64.    The Plan was not filed for the purpose of avoidance of taxes or the application of section 5 of the Securities Act of 1933, as amended.  Rather, the Debtors filed the Plan to accomplish their objective of efficiently and responsibly effectuating distributions to creditors in the face of unprecedented economic circumstances in a developing market and consummating the most value-maximizing transaction available.  Moreover, I understand that no party that is a governmental unit, or any other entity, requested that the Bankruptcy Court decline to confirm the Plan on the grounds that the principal purpose of the Plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933.  Accordingly, I believe that the Debtors satisfied the requirements of section 1129(d) of the bankruptcy code.

### iv. Section 1129(e) of the Bankruptcy Code Is Inapplicable.

65.    Lastly, I understand that section 1129(e) of the bankruptcy code does not apply to the Plan because none of the Debtors' chapter 11 cases is a "small business case" within the meaning of the bankruptcy code.

## IV.    Liquidation Analysis

66.    I performed the Liquidation Analysis to address the ability of the Sale Transaction or Liquidation Transaction to satisfy the "best interests of creditors" test as defined in section 1129(a)(7) of the bankruptcy code, which provides that holders of claims or interests in impaired, non-accepting classes must receive under a chapter 11 plan at least as much as they would in a liquidation.[8]

---

[8] The results of my Liquidation Analysis along with a summary of my assumptions were set forth as Exhibit B to the *Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and its Debtor Affiliates* [Docket No. 863]. In this Declaration, I discuss the Liquidation Analysis in detail.

24

A-567

67.     To prepare this Liquidation Analysis, and working with my team at BRG, the Debtors, and the Debtors' other advisors, along with the advisors to the Committee, I estimated proceeds, costs, and resulting recoveries in three separate scenarios: (1) consummation of the Sale Transaction; (2) consummation of the Liquidation Transaction; and (3) a chapter 7 liquidation. For the chapter 7 liquidation scenario, I estimated both a "high case" and a "low case." As discussed below, the primary difference between the high case and the low case is the estimated proceeds from liquidation of the coin portfolio, which is difficult to estimate given the nature of the cryptocurrency market but which will clearly be more challenging and less successful in the hypothetical chapter 7 scenario.

68.     With respect to the chapter 7 liquidation scenario, I assumed the Debtors would convert their current chapter 11 cases to cases under chapter 7 of the bankruptcy code on or about April 18, 2023 (the "Conversion Date"), absent confirmation of the Plan. I assumed that on the Conversion Date, the Bankruptcy Court would appoint a chapter 7 trustee ("Trustee"), and that the Trustee would immediately sell or surrender all of the Debtors' assets and the cash proceeds of those sales, net of the liquidation-related costs, would then be distributed to creditors in accordance with the applicable law.

69.     More specifically, in order to estimate the creditor recoveries in each scenario, I performed the following four steps:

(i)     **Step 1 - Estimated Gross Proceeds**

70.     For the chapter 7 liquidation scenario, I estimated the cash proceeds that the Trustee would generate if the Debtor's chapter 11 case were converted to a chapter 7 case and the assets of the Debtor's bankruptcy estate were liquidated.

25

A-568

71.     For the Sale Transaction and Liquidation Transaction scenarios, I estimated the proceeds that would be generated if each transaction were consummated. For the Sale Transaction scenario, I assumed the Plan would be confirmed on the same date as the hypothetical Conversion Date. I assumed the Liquidation Transaction would be consummated on a later schedule, with a date of June 18, 2023. This is because the Liquidation Transaction assumes that the parties to the Sale Transaction would work to close that deal until April 18, 2023, and the Debtors would toggle to the Liquidation Transaction only after they determined during the course of that process that the Sale Transaction would not produce the highest and best outcome for creditors. After that pivot, the Debtors would need additional time to ramp up vendors, internal infrastructure, and third-party developers necessary to support trading activity (as costs were reduced to the extent possible over the course of the case) and to sell unsupported coins into U.S. dollars in order to effectuate the self-liquidation contemplated in the Liquidation Transaction.

72.     The Debtors consist of three corporate entities, Voyager Digital Ltd. ("TopCo"); Voyager Digital Holdings, Inc. ("HoldCo"); and Voyager Digital, LLC ("OpCo"). The specific assets and claims discussed here originate from one of the three specific entities, which my analysis takes into account.  However, for purposes of this discussion, I describe the analysis on a consolidated basis, referring to assets and liabilities belonging to the Debtors more generally.

73.     I calculated the Estimated Gross Proceeds based on the value of assets at each entity as of October 31, 2022[9]—the date of the most recent unaudited financial statements that were available for my analysis. The specific sources of proceeds I estimated are as follows:

74.     *Cash and Cash Equivalents.* I estimated Cash and Cash Equivalents by using the level of cash balance on hand on December 30, 2022, and projecting to the Conversion Date.  I

---

[9] With the exception of Cash/Cash Equivalents and Coin Liquidation Value, discussed later.

assumed starting cash and cash equivalents to be the same under the chapter 7 liquidation, Sale Transaction, and Liquidation Transaction scenarios.

75. *Coin Portfolio Liquidation.* The vast majority of the assets held by the Debtors, from which the majority of proceeds would be generated, are in Voyager's coin portfolio. That coin portfolio comprises 106 different types of cryptocurrencies. I valued each cryptocurrency at its December 18, 2022, spot price. I then estimated how that spot price would be discounted due to certain risks discussed below. Given the volatility and ever-changing nature of the cryptocurrency market, the December 18, 2022, spot price is only illustrative, but it is instructive because it can be used to compare how any given spot price would move in a chapter 7 liquidation scenario, versus an organized and Debtor-led sale.



76. The main reason why the spot price would be discounted under the Sale Transaction, Liquidation Transaction, or chapter 7 liquidation scenarios (but more so in the chapter 7 liquidation, as I discuss below) involves what I refer to as "market-depth constraints." A market-depth constraint refers to the fact that, where a particular token is subject to fewer transactions in the market, a mass sale of that cryptocurrency would "move the market"—that is, would result in a depreciation in cryptocurrency valuation at the time of that sale. During a hypothetical liquidation, tokens with highly liquid markets, such as Bitcoin or Ethereum, would see less (but still some) market-depth constraint. On the other hand, tokens in illiquid markets are anticipated to have greater market-depth constraints—that is, a mass sale would move the market more significantly.

27

A-570

77.     In addition to market-depth constraints, numerous other risk factors, which I detail below, could also cause a discount against spot pricing.

78.     *Headline Risk*. Headline Risk refers to how the value of a coin can be influenced by news and social media.  Given the youth of the cryptocurrency market, coin valuation can be diminished by even unsubstantiated statements, including commentary regarding planned trades.

79.     *Black Swan Events*. Black Swan Events refer to unpredictable market events that have severe downward consequences on cryptocurrency values.  Recent examples include the AlamedaFTX collapse and the LUNA collapse.

80.     *Conditions of Cryptomarket/Volatility*. The cryptomarket itself has recently been strained, both by mass liquidation events and the numerous cryptofirm bankruptcies.  These events have removed liquidity from the market and created general uncertainty, exposing any cryptocurrency sale to greater down-market risk.

81.     *Block Trading*. When engaging in block trades in less regulated markets, such as cryptocurrencies, there are several risks including, but not limited to, the risk that a bad actor can front-run a large trade and affect its outcome.

82.     *Number of Supporting Exchanges*.  Unlike more mature trade exchanges, cryptocurrency platforms offer only discrete trading paths for particular coins.  This limits exchange options, increasing the risk that a less favorable exchange will occur.

83.     *Asymmetric Information Issues*. Depending on what information is made publicly available, individual traders could ascertain the Debtors' portfolio position.  If a position is ascertained during the liquidation process, that trader could potentially drive pricing up or down on particular coins to the Debtors' disadvantage.

A-571

84.    *Conversion Factors*. In a liquidation event, all trades would be a particular coin for U.S. dollars.  This conversion factor can be less favorable than other forms of exchanges (*e.g.*, exchanging of one token for another), and thus, could result in lower returns.

85.    *Execution Capabilities*. The company and its experts better know the portfolio than a less familiar liquidator.  Lack of expertise could result in sales that do not maximize trade value and result in price impairment.

86.    I estimated the discounts from spot prices realistically but conservatively, both with respect to the discount arising from market-depth constraints and the discounts arising from the additional risk factors discussed above.  Through discussions with Voyager management and trading experts, my team and I engaged in a multi-step empirical analysis and adopted a largely rules-based approach to estimating the discounts to apply to each of the 106 coin types and in each of the Sale Transaction, Liquidation Transaction, and chapter 7 liquidation scenarios.

87.    Our analysis started with an empirical study to understand the market-depth constraints for each coin type.  To estimate the discounts for each coin type, we collected historical trade volume data by coin for discreet periods (monthly, weekly, and daily) and compared that liquidity to the notional value of the coins held in Voyager's portfolio.  Using a market-based set of rules,[10] I then bucketed coins into distinct categories of liquidity and applied discounts to those categories.  I compared my findings against third-party portfolio bid data. Voyager, Moelis, and the Debtors' other advisors also reviewed the resulting analysis for reasonableness; any feedback was taken into consideration and integrated into the analysis where appropriate.

---

[10] Key statistics included: daily volume weighted average coin price; daily $ volume; daily coin volume; monthly average $ volume; monthly average coin volume; daily volatility in $ coin prices; monthly average volatility in $ coin pricing; average volume by coin.

88. In the chapter 7 liquidation high-case, I concluded that the coin portfolio would be liquidated at an approximately 20% discount, with average trading fees of 2%. In the chapter 7 liquidation low-case, I concluded that the coin portfolio would be liquidated at an approximately 26% discount, with the same average trading fees of 2%. As stated, it is my opinion that both these estimates are conversative discounts.

89. Because a chapter 7 liquidation would impose mass-sale conditions that could be avoided by both the Sale Transaction and Liquidation Transaction scenarios, these discounts are estimated to be materially greater than discounts under the Sale Transaction or Liquidation Transaction.

90. *Sale Proceeds*. I estimated the sale proceeds of $20 million to occur only under the Sale Transaction, and not under the Liquidation Transaction or the chapter 7 liquidation scenario.

91. *Other Assets and Investments*. I assumed that during the liquidation period, the Debtors would continue to consume certain prepaid expenses such as professional fee retainers, licenses, engineering, software, marketing, and other similar contractual obligations. I also assumed that Debtors would sell their equity investments in other private and public companies, and I assumed recovery rates from 0% to 100% across these positions depending on the liquidity of that particular investment. Recoveries on other assets and investments are identical in the high and low cases, approximating $1.8 million.

92. *3AC Claims*. The Debtors have a claim against 3AC related to the cryptocurrency loan of 15,250 BTC and 350 million USDC made in 2022. For purposes of this analysis, I did not make an assumption regarding recovery of this claim and thus it is reflected as 0% recovery in all scenarios. For the avoidance of doubt, the Debtors and creditors are highly likely to see some 3AC recovery (although the magnitude is unclear at this point). That recovery will likely be either the

30

A-573

same or lower in the hypothetical liquidation scenario (due to the need to take a discount in that scenario reflecting monetizing that asset earlier, paying fees to do so, or both).

93.    *Intangible Assets.* In the chapter 7 liquidation scenario, I assumed no recovery value for the Debtors' intellectual property, which comprises goodwill, favorable leasehold interests, trademarks, patents, license agreements, and e-commerce registered domain names.

94.    *Litigation Claims.* I excluded litigation claims, which (in a best-case scenario) would be the same under the Sale Transaction, Liquidation Transaction, and chapter 7 liquidation, and thus are not valuable for comparative purposes.  In all likelihood litigation claims would produce a lower recovery in a chapter 7 liquidation given the challenges in financing any such litigation and the likelihood that some litigation would not be pursued at all by a chapter 7 trustee.

(ii)    **Step 2 - Wind-Down Costs**

95.    I next analyzed the estimated costs of the liquidation or wind-down process.  I estimated these costs as follows.

96.    *Professional Fees.* I estimated professional fees, including costs for financial advisors, attorneys, and other professionals retained by the Debtors (in the Sale Transaction or Liquidation Transaction scenario) or the Trustee (in the chapter 7 liquidation scenario). I estimated these fees based on input from the Debtor's retained professionals and analysis of wind-down professional fees from comparable cases. Based on this analysis and previous experience, I estimated lower professional fees in the liquidation scenario (the same in high and low cases) because the Trustee team would be primarily responsible for execution of the wind down. However, given the novelty and complexity of the Debtor's business and the strong likelihood that the Trustee may have minimal cryptocurrency experience, I view this estimate of professional fees as conservative.

97.    *Chapter 7 Trustee Fees*.  In the chapter 7 liquidation scenario, I assumed the Trustee would recover a fee equaling 3% of the proceeds of sales excluding recoveries relating to cash and cash equivalents.  In the high case, this would result in an estimated $23.9 million fee; in the low case, $ 21.8 million.

98.    *Wind-Down Operating Costs*.  Winding down the business would require that the Debtors continue to employ key personnel and incur platform operating costs. I determined estimated wind-down operating costs based on discussions with management and analysis of historical operating costs. In the chapter 7 liquidation scenario, these costs would be the same in the high and low cases.

99.    *Other Costs*. The wind-down process would incur other miscellaneous expenses including insurance, document/data retention services, and third-party processing fees for the liquidation of accounts, all of which are assumed to be the same amounts in the Sale Transaction, Liquidation Transaction, and chapter 7 liquidation (high and low) scenarios. The Sale Transaction and Liquidation Transaction scenarios include additional costs in this category, including cure costs for outstanding contract obligations, and a wind-down reserve for unforeseen additional costs.

100.    In sum, for the purposes of this analysis, I estimated total wind down expenses of $75.6 million for the Sale Transaction and Liquidation Transaction and $51.7 million for the chapter 7 high and low scenarios (net of estimated U.S. Trustee fees).

(iii)    **Step 3 - Net Proceeds**

101.    I calculated the Net Proceeds available for distribution by subtracting the Wind-Down Costs from the Estimated Gross Proceeds for each of the scenarios.

(iv)    **Step 4 - Distribution of Net Proceeds**

32

A-575

102.    Finally, I estimated the recoveries to creditors at each of the Debtors by running the Net Proceeds and estimated claims as of the Petition Date through a waterfall recovery model, which pays claims based on priority until fulfilled, and then "waterfalls" to the next lower priority claim, until all proceeds are depleted. The distributions to creditors in my analysis reflects bankruptcy code section 1129's "absolute priority rule" that no junior creditor at a given entity would receive any distribution until all senior creditors are paid in full at that entity, and no equity holder would receive any distribution until all creditors at such entity are paid in full.

103.    More specifically, the Net Proceeds would be distributed as follows:

(a)    *Secured Tax Claims*.  Based on the December 6, 2022 claims register, there are no identified Secured Tax Claims.  My analysis thus assumes zero payment.  That said, if any are later revealed, a 100% recovery is expected.

(b)    *Administrative, Priority Tax Claims and other Priority Claims*.

(i)    *Administrative Claims*.  Administrative Claims include unpaid-post-petition accounts payable, accrued operating expenses, unpaid post-petition taxes, and chapter 11 professional fees incurred through the Conversion Date. On the Conversion Date, these are anticipated to be approximately $39.1 million and are the same in the Sale Transaction, Liquidation Transaction, and chapter 7 liquidation scenarios.

(ii)    *Priority Tax Claims*.  Federal and state tax claims are estimated to be $3.0 million in all three scenarios.

(iii)    *Other Priority Claims*. Other Priority Claims, namely potential claims by government agencies, are estimated to be $1.0 million in all three scenarios.

33

A-576

(c)     *Unsecured Claims: Account Holder Claims and General Unsecured Claims.*

(i)     Account Holder Claims are estimated to be approximately $1.764 billion as of the Conversion Date in all three scenarios based on the number of customer coins and coin prices as of the Petition Date.

(ii)     Based on the December 6, 2022 claims register, General Unsecured Claims are estimated to total approximately $25.3 million on the Conversion Date, in all three scenarios.

(iii)     The remainder of the Debtors' funds would be distributed pro rata across the Account Holder Claims and General Unsecured Claims, as illustrated below.[11]

| | Claims All Scenarios 4/18/2023 | Binance Plan 4/18/2023 | *Recovery* | Toggle Plan 6/18/2023 | *Recovery* | High Case Liquidation 4/18/2023 | *Recovery* | Low Case Liquidation 4/18/2023 | *Recovery* |
|---|---|---|---|---|---|---|---|---|---|
| **Voyager Digital Consolidated** | | | | | | | | | |
| TOTAL ESTIMATED PROCEEDS (NET) | | 935.7 | | 841.6 | | 726.2 | | 661.4 | |
| Administrative Claims | 39.1 | 39.1 | *100%* | 39.1 | *100%* | 39.1 | *100%* | 39.1 | *100%* |
| Priority Tax Claims | 3.0 | 3.0 | *100%* | 3.0 | *100%* | 1.1 | *36%* | 1.0 | *35%* |
| Secured Tax Claims | - | - | *0%* | - | *0%* | - | *0%* | - | *0%* |
| Other Priority Claims | 1.0 | 1.0 | *100%* | 1.0 | *100%* | 1.0 | *99%* | 1.0 | *99%* |
| Account Holder Claims | 1,763.8 | 883.0 | *50%* | 789.5 | *45%* | 678.1 | *38%* | 613.8 | *35%* |
| OpCo General Unsecured Claims | 14.0 | 7.0 | *50%* | 6.3 | *45%* | 5.4 | *38%* | 4.9 | *35%* |
| HoldCo General Unsecured Claims | 8.3 | 0.9 | *11%* | 0.9 | *11%* | - | *0%* | - | *0%* |
| TopCo General Unsecured Claims | 3.0 | 1.7 | *58%* | 1.7 | *58%* | 1.6 | *53%* | 1.6 | *52%* |
| Alameda Loan Facility Claims | 75.1 | - | *0%* | - | *0%* | - | *0%* | - | *0%* |
| Section 510(b) Claims | - | - | *0%* | - | *0%* | - | *0%* | - | *0%* |
| Intercompany Claims | - | - | *0%* | - | *0%* | - | *0%* | - | *0%* |
| Intercompany Interests | - | - | *0%* | - | *0%* | - | *0%* | - | *0%* |
| Existing Equity Interests | - | - | *0%* | - | *0%* | - | *0%* | - | *0%* |
| **TOTAL RECOVERIES** | 1,907.3 | 935.7 | *49%* | 841.6 | *44%* | 726.2 | *38%* | 661.4 | *35%* |

---

[11] Recoveries in Table reflect updated estimates for wind down costs in all scenarios, including costs for the shuttering of foreign entities, additional severance and incremental operating costs, for a total of $8.2M in incremental costs, as reflected in the *Second Amended Plan Supplement* [Docket No. 1006], filed after my Liquidation Analysis provided as Exhibit B to the *Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and its Debtor Affiliates* [Docket No. 863]. Any litigation fund reserves are assumed to recover at minimum the funds utilized to pursue the recoveries.

        (d)    *Alameda Loan Facility Claims.* Alameda Loan Facility Claims are estimated to be approximately $75.1 million as of the Conversion Date. The analysis assumes that such claims would be equitably subordinated. Because there would be no remaining funds after distributing funds for Account Holder Claims and General Unsecured Claims, the Alameda Loan Facility Claims Holder would recover nothing.

104.    Based on the above steps, and as illustrated in the chart above, under both the high and low case, a chapter 7 liquidation results in lower recoveries than either the Sale Transaction or Liquidation Transaction. A chapter 7 liquidation would result in inferior recoveries for holders of Other Priority Claims, Account Holder Claims, and General Unsecured Claims. Taking all creditor claims together, the Sale Transaction and Liquidation Transaction scenarios provide higher blended recovery rates than a chapter 7 liquidation.

105.    Accordingly, it is my opinion that confirmation of the Sale Transaction or Liquidation Transaction will provide creditors with a recovery that is greater than or equal to what they would otherwise receive in connection with a liquidation of the Debtors under chapter 7 of the bankruptcy code. Moreover, I believe creditors will receive more value under confirmation of the Plan, including either the Sale Transaction or Liquidation Transaction, as compared to under a chapter 7 liquidation for additional reasons. First, I understand that conversion to a chapter 7 liquidation would require entry of a new bar date. Accordingly, the amount of Claims ultimately filed and allowed against the Debtors could materially increase, thereby further reducing creditor recoveries versus those available under the Sale Transaction or Liquidation Transaction. Second, and relatedly, I understand that conversion to a chapter 7 liquidation will result in significantly

delayed recoveries to creditors, versus under confirmation of the Plan, where the Debtors stand ready to consummate a value-maximizing transaction and return cryptocurrency in the near term.

## V. Plan Feasibility

106. I understand that section 1129(a)(11) of the bankruptcy code requires a court to determine that a chapter 11 plan is feasible and that confirmation of such plan is not likely to be followed by the liquidation or further financial reorganization of the Debtors (or any successors thereto) unless such liquidation or reorganization is proposed in the plan.

107. For the reasons outlined below, it is my professional opinion that the Plan is feasible and is not likely to be followed by liquidation or further financial reorganization as contemplated by the Plan.

108. The Sale Transaction is the culmination of a multi-month marketing process to identify the best possible path forward for the Debtors' creditors. I was intimately involved, along with the Debtors' other advisors and the management team and working closely with the Committee, in the Debtors' marketing process and the negotiations that, ultimately, led to execution of the Asset Purchase Agreement and development of the Plan. The Plan maximizes the value of the Debtors' estates, and the proceeds obtained from the Sale Transaction will allow the Debtors to satisfy all Priority and Administrative Claims under the Plan in full. Further, as the Sale Transaction contemplates a sale of substantially all assets of the Debtors to Binance.US and the subsequent wind-down of the Debtors' estates, I do not believe that consummation of the Sale Transaction will be followed by a liquidation or further reorganization of the Debtors.

109. As demonstrated in my Liquidation Analysis, the Sale Transaction maximizes the value of the Debtors' estate and will allow the Debtors to satisfy their obligations under the Plan, including satisfying all Priority and Administrative Claims under the Plan in full, and maximizing

36

A-579

recovery to remaining creditors. In addition, the Plan provides customers the most tax efficient route forward as Binance.US supports (or will support) 100% of the cryptocurrency coins on the Debtors' platform.

110. Moreover, if the Sale Transaction cannot be consummated or if the Debtors conclude in their good faith judgment that the Sale Transaction will not produce a value-maximizing outcome for creditors, the Debtors will pursue the Liquidation Transaction and consummate a self-liquidation. I believe that provided the Plan is confirmed without material changes and the strategy set forth in the Plan is pursued in full by the Wind Down Trustee, the Liquidation Transaction is feasible, and that the Debtors will be able to distribute their cryptocurrency assets to customers (i) on a faster timeline than a chapter 7 liquidation and (ii) on a much more cost-effective basis, as the Debtors will not incur the additional administrative costs associated with a chapter 7 liquidation and subsequent distribution or the price leakage associated with a mass-sale event that I describe in my Liquidation Analysis. As I demonstrate in the Liquidation Analysis, in the event that the Debtors' pursue the Liquidation Transaction, I believe that the Debtors will be able to pay all Administrative and Priority Claims in full and satisfy all other obligations under the bankruptcy code.

111. To do this, however, it is necessary that the Debtors maintain the staffing levels and internal expertise necessary to execute both the Sale Transaction and the Liquidation Transaction. The Binance.US Asset Purchase Agreement imposes a number of obligations on the Debtors that will require the services of employees in operations, customer service, engineering, security, finance, and data to fulfill these obligations. Specifically, after the Binance.US Transaction closes, the Debtors retain obligations related to: (a) making regulatory filings and cooperating with regulators; (b) maintaining and transferring data securely; (c) developing and implementing a user

migration plan involving modifications to Voyager's web interface and mobile app, and an electronic process facilitating the acceptance of certain terms and conditions on the Binance.US Platform; (d) being available for a period following close of the Sale Transaction to provide assistance reasonably requested by the Purchaser in connection with the opening of user accounts and transfer of information and Cryptocurrency; (e) rebalancing the Cryptocurrency on the Debtors' platform to prepare for closing of the Sale Transaction on a timely basis; (f) "unstaking" certain coins and ensuring they are freely transferable and not subject to restrictions, and (g) making available technical IT staff to assist Binance.US during the transaction.[12]

112.    The Debtors also must have certain expertise present (as a practical matter) only within certain existing employees in the event the Debtors need to pivot to the Liquidation Transaction. The Liquidation Transaction would require the Debtors to, among other tasks, rebalance the Cryptocurrency in their possession, complete anti-money laundering and know-your-customer compliances and reopen the Debtors' platform for a period of time to permit customers to withdraw Cryptocurrency, while making sure that these transactions can all occur safely, securely and efficiently, with minimum value leakage and risk given the highly sensitive nature of these transactions. This exercise will be challenging and, without certain key employees who are currently working for the Debtors, likely cannot be done without assuming materially greater risk than we would recommend the Debtors taking.

113.    It is for that reason that a key component of the Debtors' proposed Plan, which was created with input from the Committee, is the Employee Transition Plan, which is described in the Plan Supplement and is accounted for in the Wind-Down Budget. The personnel responsible for executing the proposed Plan have no incentives to remain associated with the company and

---

[12] Asset Purchase Agreement §§ 6.4, 6.6, 6.10, 6.11, 6.15, 6.16.

complete this work following confirmation given that the Debtors will not exist at the end of the process and they will need to find other jobs. The Employee Transition Plan was created (and approved by the Committee) to ensure the expertise needed to execute the Sale Transaction and the Liquidation Transaction stays with the enterprise in order to complete the process of returning cryptocurrency to customers in the most efficient way possible. Without the employees, however, the Debtors would be unable to honor their obligations in the Sale Transaction and would not be able to do the work needed to consummate the Liquidation Transaction and the likely only option would be conversion to a full liquidation under chapter 7 of the bankruptcy code, which as discussed above in the Liquidation Analysis, would materially reduce and delay customer recoveries. In other words, my opinions with respect to feasibility are informed in part by the fact that the Debtors have taken steps to ensure that the experience and expertise necessary to execute the Sale Transaction and/or the Liquidation Transaction will remain in place until the process runs its course, and the Committee and its advisors have recognized the necessity of the Employee Transition Plan for that to happen.

## VI. The Releases and Exculpations In the Plan Are Reasonable and Appropriate.

114. It is my understanding that the Plan contemplates releases of the Debtors' potential claims, subject to the terms of the D&O Settlement, of their directors, officers, and employees who have worked during the course of these chapter 11 cases. For the avoidance of doubt, these debtor releases are of potential *Debtor* claims, and do not have any impact on any direct claims that any customer or other third party may have (if any) against any of the directors, officers, and employees.

115. Given my close involvement with these individuals, I have a firsthand understanding of their involvement and "sweat equity" contributions made to the Debtors and their

39

A-582

estates during the entirety of these chapter 11 cases. I also know full well the contributions that we will need those individuals to continue to make as we Wind-Down the estate and return funds to customers. It would be massively value-destructive and not helpful to the process, and would ultimately lead to less value to creditors, if the Debtors and/or the Wind-Down Estate were to spend capital pursuing such claims that are covered by the Debtor releases. And it is critical to the delicate process envisioned by the Plan for those Debtor releases to go into effect. Again, this has no impact whatsoever on any direct claims creditors and parties-in-interest may have against Released Parties, but as far as the Debtors' releases go, I believe such releases are appropriate.

## VII.    Appointment of a Trustee Is Not Warranted In These Chapter 11 Cases.

116.    I understand that certain creditors have sought to appoint a trustee in these chapter 11 cases. As an industry professional for over 25 years, I can state with certainty that appointment of a trustee would be an unmitigated disaster. There is no benefit at all to appointing a trustee and unwinding the significant work and progress made to date by the Debtors in these chapter 11 cases. As described herein, my team and I have worked intimately with the Debtors and their management team, as well as the Debtors' advisors and the advisors to the UCC, and all appear aware of the significant progress and achievements obtained during these chapter 11 cases to date. No trustee could realistically displace management and execute on any of the transactions contemplated by the Plan (or any comparable transaction), and the only realistic outcome from a trustee's appointment would be a chapter 7 liquidation in which creditor recoveries would be materially reduced and materially delayed. It is my professional opinion that appointing a trustee at this time would be wholly inappropriate given that the Debtors have completed solicitation and are already before the Court seeking confirmation of the Plan to move forward with the transactions contemplated thereunder that provide distributions to Holders of Claims.

40

A-583

## VIII.  The Plan Provides Recovery Options for Creditors in Unsupported Jurisdictions.

117.  I am aware that Binance.US does not yet have the requisite money transmitter licensing approvals, authorizations, or exemptions (as applicable) in Hawaii, New York, Texas, and Vermont (the "Unsupported Jurisdictions") and understand that, as a result, it will be unable to make cash or cryptocurrency distributions to creditors in those states on the Effective Date of the Plan unless some or all of the Unsupported Jurisdictions choose to follow the lead of the other 46 states and permit Binance.US to make such distributions.  Due to the legal, operational, and technical limitations, set forth below, if the Binance.US Transaction is approved, the Debtors will not be able to distribute cryptocurrency themselves to creditors in Unsupported Jurisdictions.

118.  *First*, the Voyager platform that would be required to facilitate in-kind distributions to creditors is being sold to Binance.US in connection with the transaction.  This means that any in-kind distributions to creditors in Unsupported Jurisdictions would need to be done manually on a transaction-by-transaction basis for approximately 120,000 creditors.  My understanding is that not only would manual distributions outside the Voyager platform be extremely complex, but the Debtors do not have the necessary infrastructure or personnel to accomplish this in a safe and secure manner.

119.  *Second*, my understanding is that there are risks associated with the Debtors' distribution of cryptocurrency to individual creditor wallets as opposed to effectuating such distributions through the Binance.US platform.  The Debtors must comply with AML/KYC laws when sending cryptocurrency to individual wallets.  Historically, the Debtors used Chainanalysis for automated verification of certain user generated cryptocurrency transfer requests.  However, Chainanalysis does not support all of the tokens listed on the Voyager platform.  I have been advised that AML/KYC compliance is straightforward when transferring cryptocurrency to

41

Binance.US wallets, but it poses substantial risk to the Debtors as it relates to the manual transfer of cryptocurrency to individual wallets for approximately 120,000 creditors. Binance.US has represented to the Debtors that it has existing infrastructure in place that would allow it to perform AML/KYC compliance checks in connection with transferring all cryptocurrency to customer accounts on its platform. Unlike ACH transfers that can be reversed, cryptocurrency sent to the wrong wallet cannot, which is why parties will often send a small "test" transaction to a wallet address prior to initiating a large transfer.

120. *Third*, there are technical limitations that would prevent the Debtors from making in-kind distributions of certain types of cryptocurrency on the Debtors' platform. There are 35 cryptocurrency tokens (approximately 17% of the Debtors' cryptocurrency portfolio based on equivalent USD value) on the Debtors' platform that cannot be transferred directly to individual wallets due to technical limitations associated with the Debtors' platform. Users can, however, withdraw these tokens using certain third-party exchanges (such as Binance.US). Historically, users of the Debtors' platform have exited from their positions in such tokens by selling such tokens for cash, transactions that previously required close interaction with market makers to effectuate. The only way for the Debtors to distribute the value associated with these non-transferable tokens to creditors in Unsupported Jurisdictions other than through the Binance.US transaction is to liquidate the tokens and distribute the resulting cash.

121. *Finally*, the Debtors would need to significantly increase the engineering, regulatory, compliance, and other operational staff contemplated under the Plan to facilitate manual transfers to individual customer wallets that they otherwise would not have to do if transfers to customers were made through the Binance.US platform or the Voyager platform (which is being sold to Binance). The Debtors would also need to revive certain dormant contracts

with third-party vendors to process distributions to creditors in this manner. This would result in increased administrative costs as compared to the costs of liquidating the cryptocurrency associated with creditors in Unsupported Jurisdictions and distributing the equivalent value in cash.

122.    In light of these challenges, for creditors in the Unsupported Jurisdictions, the Debtors will retain custody of the cryptocurrency that would be distributed to those creditors until Binance.US obtains the necessary approvals. In the event that Binance.US is unable to obtain those necessary approvals to make distributions to creditors in Unsupported Jurisdictions within six months following the closing (*i.e.*, an incremental three months following distributions to creditors in other jurisdictions), it is my understanding that the Plan calls for the Debtors to convert the cryptocurrency attributable to such creditors to cash and distribute the equivalent realized cash value associated with such liquidations to such creditors. It is my understanding that Binance.US shall have the opportunity to execute in such conversion transactions subject to the agreed-upon protocol between the Debtors and Binance.US set forth in the Binance.US Purchase Agreement. If, however, Binance.US is able to obtain the necessary approvals within that six-month period, Binance.US would make in kind distributions to the creditors in newly approved jurisdictions.

123.    It is also my understanding that the Unsupported Jurisdictions can provide temporary solutions to allow Binance.US to make distributions in kind to creditors. The Debtors do not believe it would be appropriate to jeopardize the Binance.US Transaction—which is in the best interests of their estates as a whole—or take on significant additional risks and costs to endeavor to give in-kind distributions to creditors in Unsupported Jurisdictions if the state banking departments choose not to provide such temporary solutions.

IX.   **The Plan Modifications Are Reasonable, Do Not Require Resolicitation, and Should Be Approved.**

124.   I understand that section 1127(a) of the bankruptcy code provides that a plan proponent may modify its plan at any time before confirmation as long as such modified plan meets the requirements of sections 1122 and 1123 of the bankruptcy code. I have also been advised that under section 1125 of the bankruptcy code, a proposed modification to a previously accepted plan will be deemed accepted where the proposed modification is not material or does not adversely affect the way creditors and stakeholders are treated, unless such affected creditors consent to the treatment.

X.   **Conclusion**

125.   In summary, it is my opinion that the Plan satisfies the standards for confirmation applicable under the bankruptcy code. Among other things, the Sale Transaction or the Liquidation Transaction will provide all holders of claims and interests with a recovery (if any) that is not less than what such holders would receive pursuant to a hypothetical liquidation of the Debtors under chapter 7 of the bankruptcy code. And given the optionality created by the Plan, it is my opinion that the Plan (provided it is confirmed without material changes and is executed as anticipated) is feasible and will not result in additional liquidation or financial restructuring beyond that contemplated in the Plan. Finally, as described above, appointment of a trustee in these chapter 11 cases is not warranted.

*[Remainder of page intentionally left blank]*

A-587

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: February 28, 2023
Boston, Massachusetts

/s/ *Mark A. Renzi*

Mark A. Renzi
Managing Director
Berkley Research Group, LLC

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**ORDER (I) APPROVING THE SECOND AMENDED
DISCLOSURE STATEMENT AND (II) CONFIRMING THE THIRD
AMENDED JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND ITS
DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

Voyager Digital Holdings, Inc. and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors")[2] having:

    a.    commenced, on July 5, 2022 (the "Petition Date"), these chapter 11 cases (the "Chapter 11 Cases") by filing voluntary petitions for relief in the United States Bankruptcy Court for the Southern District of New York (the "Court") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code");

    b.    continued to operate their business and manage their property during these Chapter 11 Cases as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

    c.    filed,[3] on July 6, 2022, the *Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 17];

    d.    filed, on July 21, 2022, the *Debtors' Motion Seeking Entry of an Order (I) Approving the Bidding Procedures and Related Dates and Deadlines, (II) Scheduling Hearings and Objection Deadlines with Respect to the Debtors'*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital, Ltd. (7224); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan, the Disclosure Statement, the Asset Purchase Agreement, or the Bankruptcy Code (each as defined herein), as applicable. The rules of interpretation set forth in Article I.B. of the Plan apply.

[3] Unless otherwise indicated, use of the term "filed" herein refers also to the service of the applicable document filed on the docket in these Chapter 11 Cases, as applicable.

*Sale, Disclosure Statement, and Plan Confirmation, and (III) Granting Related Relief* [Docket No. 126];

e.  obtained, on August 5, 2022, the entry of the *Order (I) Approving the Bidding Procedures, (II) Scheduling the Bid Deadlines and the Auction, (III) Approving the Form and Manner of Notice Thereof, (IV) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation and (V) Granting Related Relief* [Docket No. 248] (the "<u>Bidding Procedures Order</u>") approving the *Bidding Procedures for the Submission, Receipt, and Analysis of Bids in Connection with the Sale of the Debtors*, attached to the Bidding Procedures Order as <u>Exhibit 1</u> (the "<u>Bidding Procedures</u>");

f.  filed, on August 12, 2022, the *First Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 287], the *Disclosure Statement Relating to the First Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 288], and the *Debtors' Motion for Entry of an Order Approving (I) the Adequacy of the Disclosure Statement, (II) Solicitation and Notice Procedures, (III) Forms of Ballots and Notices in Connection Therewith, and (IV) Certain Dates with Respect Thereto* [Docket No. 289];

g.  commenced, on September 13, 2022, the Auction for the sale of substantially all of the Debtors' assets in accordance with the Bidding Procedures;

h.  closed, on September 26, 2022, the Auction and selected West Realm Shires Inc. ("<u>FTX US</u>") as the Winning Bidder (as defined in the Bidding Procedures);

i.  obtained, on October 20, 2022, entry of the *Order (I) Authorizing Entry of the Asset Purchase Agreement and (II) Granting Related Relief* [Docket No. 581], which authorized entry into that certain asset purchase agreement by and between Voyager Digital, LLC and West Realm Shires Inc. (together with its affiliates, "<u>FTX US</u>," and the asset purchase agreement, the "<u>FTX US Asset Purchase Agreement</u>");

j.  filed, on October 24, 2022, the *Second Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 590] and the *First Amended Disclosure Statement Relating to the Second Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 591];

k.  filed, on December 9, 2022, the *Stipulation and Agreed Order* [Docket No. 717] by and between FTX US and the Debtors (the "<u>FTX US APA Stipulation</u>"), terminating the FTX US Asset Purchase Agreement;

l.  filed, on December 21, 2022, the *Debtors' Motion for Entry of an Order (I) Authorizing Entry into the Binance US Purchase Agreement and (II) Granting Related Relief* [Docket No. 775] and that certain asset purchase agreement by and between Voyager Digital, LLC and BAM Trading Services Inc. d/b/a Binance.US

(together with its affiliates, "Binance.US," and the asset purchase agreement, the "Asset Purchase Agreement")

m.   filed, on December 22, 2022, the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 777] (as amended, modified, or supplemented from time to time, the "Plan"), the *Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 778] (as amended, modified, or supplemented from time to time, the "Disclosure Statement"), and the *Debtors' Motion for Entry of an Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Conditionally Approving the Adequacy of the Debtors' Disclosure Statement, (III) Approving (A) Procedures for Solicitation, (B) Forms of Ballots and Notices, (C) Procedures for Tabulation of Votes, and (D) Procedures for Objections, and (IV) Granting Related Relief* [Docket No. 779];

n.   filed, on January 9, 2023, the first amendment to the Asset Purchase Agreement [Docket No. 835];

o.   obtained, on January 10, 2023, approval of the FTX US APA Stipulation [Docket No. 849];

p.   filed, on January 10, 2023, the revised Plan [Docket No. 852];

q.   filed, on January 13, 2023, the revised Disclosure Statement [Docket No. 863];

r.   obtained, on January 13, 2023, entry of the *Order (I) Authorizing Entry into the Asset Purchase Agreement and (II) Granting Related Relief* [Docket No. 775], which granted entry into the asset purchase agreement with Binance.US (the "Asset Purchase Agreement Order");

s.   obtained, on January 13, 2023, entry of the *Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Conditionally Approving the Adequacy of the Debtors' Disclosure Statement, (III) Approving (A) Procedures for Solicitation, (B) Forms of Ballots and Notices, (C) Procedures for Tabulation of Votes and (D) Procedures for Objections* [Docket No. 861] (the "Conditional Disclosure Statement Order") conditionally approving the Disclosure Statement, solicitation procedures (the "Solicitation Procedures"), and solicitation materials, including notices, forms, and ballots (collectively, the "Solicitation Packages");

t.   caused the Solicitation Packages and notice of the Combined Hearing and the deadline for objecting to the Disclosure Statement and to confirmation of the Plan ("Confirmation") to be distributed on or before January 25, 2023 (the "Solicitation Date"), in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules"), the Disclosure Statement Order, and the

3

Solicitation Procedures, as evidenced by, among other things, the *Affidavit of Service* [Docket No. 926] and the *Supplemental Affidavit of Service* [Docket Nos. 927 and 1016] (collectively, the "Affidavit of Solicitation");

u.  filed, on February 1, 2023, the *Plan Supplement for the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates* [Docket No. 943] (the "Initial Plan Supplement") and caused notice of the filing of the Initial Plan Supplement to be distributed in accordance with paragraph 12 of the Disclosure Statement Order, as evidenced by, among other things, the *Affidavit of Service* [Docket No. 951];

v.  published, on February 3, 2023, notice of the Combined Hearing (the "Combined Hearing Notice") in the *The New York Times* (National Edition) and *Financial Times* (International Edition), as evidenced by the *Affidavits of Publication* [Docket Nos. 954 and 955] (the "Publication Affidavits" and, together with the Affidavit of Solicitation, the "Affidavits");

w.  filed, on February 8, 2023, the *First Amended Plan Supplement for the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates* [Docket No. 986] (the "First Amended Plan Supplement") and caused notice of the filing of the First Amended Plan Supplement to be distributed in accordance with paragraph 12 of the Disclosure Statement Order, as evidenced by, among other things, the *Affidavit of Service* [Docket No. 992];

x.  filed, on February 15, 2023, the *Second Amended Plan Supplement for the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates* (the "Second Amended Plan Supplement") [Docket No. 1006] and caused notice of the filing of the Second Amended Plan Supplement to be distributed in accordance with paragraph 12 of the Disclosure Statement Order, as evidenced by, among other things, the *Affidavit of Service* [Docket No. 1037];

y.  filed, on February 21, 2023, the *Third Amended Plan Supplement for the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates* (the "Third Amended Plan Supplement") [Docket No. 1035] and caused notice of the filing of the Third Amended Plan Supplement to be distributed in accordance with paragraph 12 of the Disclosure Statement Order, as evidenced by, among other things, the *Affidavit of Service* [Docket No. 1058];

z.  filed, on February 28, 2023, the *Debtors' Motion for Entry of an Order Approving Joint Stipulation and Agreed Order Between the Voyager Debtors, the FTX Debtors, and Their Respective Official Committees of Unsecured Creditors* [Docket No. 1106] (the "FTX Settlement");

aa.  filed, on February 28, 2023, the *Declaration of Leticia Sanchez Regarding the Solicitation and Tabulation of Votes on the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1108] (the "Voting Report");

4

bb.     filed, on February 28, 2023, the *Debtors' Memorandum of Law in Support of (I) Final Approval of the Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code and (II) an Order Confirming the Debtors' Third Amended Joint Chapter 11 Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates* [Docket No. 1110] (the "Confirmation Brief");

cc.     filed, on February 28, 2023, the *Declaration of Timothy R. Pohl, Independent Director and Member of the Special Committee of the Board of Directors of Voyager Digital, LLC, in Support of Confirmation of the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1111] (the "Pohl Declaration")

dd.     filed, on February 28, 2023, the *Declaration of Brian Tichenor in Support of Confirmation of the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1113] (the "Tichenor Declaration");

ee.     filed, on February 28, 2023, the *Fourth Amended Plan Supplement for the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates* (the "Fourth Amended Plan Supplement") (together with the Initial Plan Supplement, First Amended Plan Supplement, Second Amended Plan Supplement, and Third Amended Plan Supplement, and as may be modified, amended, or supplemented from time to time, the "Plan Supplement") [Docket No. 1115] and will cause notice of the filing of the Fourth Amended Plan Supplement to be distributed in accordance with paragraph 12 of the Disclosure Statement Order; and

ff.     filed, on February 28, 2023, the revised version of the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1117];

gg.     filed, on February 28, 2023, the *Declaration of Mark A. Renzi in Support of Confirmation of the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1119] (the "Renzi Declaration," and, together with the Voting Report, the Pohl Declaration, the Tichenor Declaration, and the Renzi Declaration, the "Declarations");

hh.     filed, on February 28, 2023, this *Notice of Filing of Proposed Findings of Fact, Conclusions of Law, and Order (I) Approving the Second Amended Disclosure Statement and (II) Confirming the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (this "Confirmation Order").

The Court having:

a.  entered the Bidding Procedures Order on August 5, 2022 [Docket No. 248];

b.  entered the Asset Purchase Agreement Order on January 13, 2023 [Docket No. 775];

c.  entered the Conditional Disclosure Statement Order on January 13, 2023 [Docket No. 861];

d.  set February 22, 2023, at 4:00 p.m. (prevailing Eastern Time) as the deadline to object to the Disclosure Statement and the Plan and to object to proposed cure costs and any assumption of an Executory Contract or Unexpired Lease pursuant to the *Schedule of Assumed Executory Contracts and Unexpired Leases* (the "Assumed Contract Schedule"), filed as Exhibit A to the Plan Supplement (the "Plan Objection Deadline");

e.  set February 22, 2023, at 4:00 p.m. (prevailing Eastern Time) as the deadline for voting on the Plan (the "Voting Deadline");

f.  set March 2, 2023 at 10:00 a.m. (prevailing Eastern Time) as the date and time for the commencement of the Combined Hearing, pursuant to Bankruptcy Rules 3017 and 3018 and sections 1126, 1128, and 1129 of the Bankruptcy Code;

g.  reviewed the Plan, the Disclosure Statement, the Plan Supplement, the Confirmation Brief, the Declarations, the Voting Report, the Combined Hearing Notice, the Affidavits, and all filed pleadings, exhibits, statements, and comments regarding Confirmation, including all objections, statements, and reservations of rights filed by parties in interest on the docket of the Chapter 11 Cases;

h.  held the Combined Hearing on March 2, 2023 at 10:00 a.m., prevailing Eastern Time;

i.  heard the statements and arguments made by counsel with respect to final approval of the Disclosure Statement and Confirmation of the Plan;

j.  considered all oral representations, live testimony, written direct testimony, designated deposition testimony, exhibits, documents, filings, and other evidence presented at the Combined Hearing;

k.  overruled any and all objections to the Disclosure Statement and the Plan and to Confirmation and all statements and reservations of rights not consensually resolved, agreed to, or withdrawn, unless otherwise indicated; and

l.  taken judicial notice of all papers and pleadings and other documents filed, all orders entered, and all evidence and arguments presented in these Chapter 11 Cases.

NOW, THEREFORE, the Court having found that the notice of the Combined Hearing and the opportunity for any party in interest to object to approval of the Disclosure Statement and confirmation of the Plan were adequate and appropriate as to all parties affected or to be affected by the Plan and the transactions contemplated therein, and that the legal and factual bases set forth in the documents filed in support of approval of the Disclosure Statement and confirmation of the Plan and other evidence presented at the Combined Hearing and the record of the Chapter 11 Cases establish just cause for the relief granted herein; and after due deliberation thereon and good cause appearing therefor, the Court makes and issues the following findings of fact and conclusions of law, and orders:

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

IT IS DETERMINED, FOUND, ADJUDGED, DECREED, AND ORDERED THAT:

**A.     Findings and Conclusions.**

1.      The findings and conclusions set forth herein and in the record of the Combined Hearing constitute the Court's findings of fact and conclusions of law under rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052 and 9014.  To the extent any of the following conclusions of law constitute findings of fact, or vice versa, they are adopted as such.

**B.     Jurisdiction, Venue, and Core Proceeding.**

2.      The Court has jurisdiction over these Chapter 11 Cases pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, entered February 1, 2012.  The Court has exclusive jurisdiction to determine whether the Disclosure Statement and the Plan comply with the applicable provisions of the Bankruptcy Code and should be approved and confirmed,

respectively.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  Confirmation of the Plan is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

**C.**      **Eligibility for Relief.**

3.      The Debtors were and are entities eligible for relief under section 109 of the Bankruptcy Code.

**D.**      **Commencement and Joint Administration of the Chapter 11 Cases.**

4.      On the Petition Date, each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code.  In accordance with the *Order (I) Directing Joint Administration of the Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 18], these Chapter 11 Cases were consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015.  Since the Petition Date, the Debtors have operated their business and managed their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

**E.**      **Appointment of the Committee.**

5.      On July 19, 2022, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Committee") [Docket No. 106].

**F.**      **Judicial Notice, Objections Overruled.**

6.      The Court takes judicial notice of (and deems admitted into evidence for purposes of final approval of the Disclosure Statement and Confirmation of the Plan) the docket of the Chapter 11 Cases maintained by the clerk of the Court or its duly appointed agent, including all pleadings and other documents on file, all orders entered, all hearing transcripts, and all evidence and arguments made, proffered, or adduced at the hearings held before the Court during the pendency of these Chapter 11 Cases.  All objections, statements, informal objections, and

8

reservations of rights not consensually resolved, agreed to, or withdrawn, if any, related to the Disclosure Statement, the Plan, or Confirmation are overruled on the merits unless otherwise indicated in this Confirmation Order.

### G. Conditional Disclosure Statement Order.

7.     On January 13, 2023, the Court entered the Conditional Disclosure Statement Order [Docket No. 861], which, among other things, set (i) February 22, 2023, at 4:00 p.m. (prevailing Eastern Time) as (a) the Plan Objection Deadline and (b) the Voting Deadline and (ii) March 2, 2023, at 10:00 a.m. (prevailing Eastern Time) as the date and time for commencement of the Combined Hearing.

### H. Adequacy of the Disclosure Statement.

8.     The Disclosure Statement contains (a) sufficient information of a kind necessary to satisfy the disclosure requirements of all applicable nonbankruptcy laws, rules, and regulations, including the Securities Act, and (b) "adequate information" (as such term is defined in section 1125(a) of the Bankruptcy Code and used in section 1126(b)(2) of the Bankruptcy Code) with respect to the Debtors, the Plan, and the transactions contemplated therein.  The filing of the Disclosure Statement with the clerk of the Court satisfied Bankruptcy Rule 3016(b), and the Disclosure Statement, the Plan, and the Solicitation Packages provided all parties-in-interest with sufficient notice regarding the settlement, release, exculpation, and injunction provisions contained in the Plan in compliance with Bankruptcy Rule 3016(c).

### I. Burden of Proof—Confirmation of the Plan.

9.     The Debtors, as proponents of the Plan, have met their burden of proving the applicable elements of sections 1129(a) and 1129(b) of the Bankruptcy Code by a preponderance of the evidence, which is the applicable evidentiary standard for Confirmation.

**J.      Notice.**

10.      The Debtors provided due, adequate, and sufficient notice of the Disclosure Statement, the Conditional Disclosure Statement Order, the Plan, the Plan Supplement, the Solicitation Packages, the Combined Hearing Notice, the proposed assumption and rejection of Executory Contracts and Unexpired Leases and the proposed cure amounts, and all the other materials distributed by the Debtors in connection with Confirmation of the Plan, together with the Plan Objection Deadline, the Voting Deadline, and the Combined Hearing, and any applicable bar dates and hearings described in the Conditional Disclosure Statement Order, in compliance with the Bankruptcy Rules, Local Rules, and the procedures set forth in the Disclosure Statement Order.  No other or further notice is or shall be required.

**K.      Solicitation.**

11.      Prior to the Combined Hearing, the Debtors filed the Voting Report.  The Voting Report was admitted into evidence during the Combined Hearing.  As described in the Voting Report, the solicitation of votes on the Plan complied with the Solicitation Procedures, was appropriate and satisfactory based upon the circumstances of these Chapter 11 Cases, and was in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any other applicable rules, laws, and regulations.

12.      As described in the Voting Report, following the Petition Date, the Solicitation Packages, the Plan Supplement, and the Combined Hearing Notice were transmitted and served, including to all Holders of Claims in Class 3 (Account Holder Claims), Class 4A (OpCo General Unsecured Claims), Class 4B (HoldCo General Unsecured Claims), and Class 4C (TopCo General Unsecured Claims) (collectively, the "Voting Classes") that held a Claim as of January 10, 2023 (the date specified in such documents for the purpose of solicitation) (the "Voting Record Date"), in compliance with the Bankruptcy Code, including sections 1125 and 1126 thereof, the

Bankruptcy Rules, including Bankruptcy Rules 3017 and 3018, the Local Rules, the Disclosure Statement Order, and any applicable nonbankruptcy law. Transmission and service of the Solicitation Packages and the Combined Hearing Notice were timely, adequate, and sufficient. The establishment and notice of the Voting Record Date were reasonable and sufficient. No other or further notice is required.

13.     The period during which Holders in the Voting Classes were required to submit acceptances or rejections to the Plan was reasonable and sufficient for such Holders to make an informed decision to accept or reject the Plan.

14.     As set forth in the Plan, Holders of Claims in the Voting Classes were eligible to vote on the Plan in accordance with the Solicitation Procedures. Holders of Claims in Class 1 (Secured Tax Claims) and Class 2 (Other Priority Claims) (collectively, the "Presumed Accepting Classes") are Unimpaired and conclusively presumed to accept the Plan and, therefore, did not vote to accept or reject the Plan. Holders of Claims in Class 7 (Intercompany Claims) and Interests in Class 8 (Intercompany Interests) either are Unimpaired and conclusively presumed to have accepted the Plan (to the extent reinstated) or Impaired and conclusively deemed to have rejected the Plan, and, therefore, are not entitled to vote to accept or reject the Plan. Holders of Claims in Class 5 (Alameda Loan Facility Claims) and Class 6 (Section 510(b) Claims) and Interests in Class 9 (Existing Equity Claims) (collectively, the "Deemed Rejecting Classes") are Impaired under the Plan and are deemed to have rejected the Plan. Nevertheless, the Debtors served Holders in such Deemed Rejecting Classes with the Plan, the Disclosure Statement, the Non-Voting Status Notice, and the Combined Hearing Notice.

**L.    Voting.**

15.     As evidenced by the Voting Report, votes to accept or reject the Plan have been solicited and tabulated fairly, in good faith, and in compliance with the Bankruptcy Code, the

11

A-599

Bankruptcy Rules, the Local Rules, the Conditional Disclosure Statement Order, and any applicable nonbankruptcy law, rule, or regulation.

16.     As evidenced by the Voting Report, Class 3 (Account Holder Claims), Class 4B (HoldCo General Unsecured Claims), and Class 4C (TopCo General Unsecured Claims) voted to accept the Plan in accordance with section 1126 of the Bankruptcy Code.

17.     Based on the foregoing, and as evidenced by the Voting Report, at least one Impaired Class of Claims (excluding the acceptance by any insiders of any of the Debtors) has voted to accept the Plan in accordance with the requirements of sections 1124 and 1126 of the Bankruptcy Code.

### M.     Plan Supplement.

18.     The Plan Supplement complies with the Bankruptcy Code and the terms of the Plan, and the filing and notice of the documents included in the Plan Supplement are adequate and proper in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Conditional Disclosure Statement Order, and the facts and circumstances of the Chapter 11 Cases.  No other or further notice is or will be required with respect to the Plan Supplement.  All documents included in the Plan Supplement are integral to, part of, and incorporated by reference into the Plan.  Subject to the terms of the Plan, compliance with the Bankruptcy Code and the Bankruptcy Rules, and, solely to the extent set forth under the Asset Purchase Agreement, consent of the Purchaser, and in a form reasonably acceptable to the Committee, the Debtors reserve the right to alter, amend, update, or modify the Plan Supplement before the Effective Date.

### N.     Modifications to the Plan.

19.      Pursuant to section 1127 of the Bankruptcy Code, any modifications to the Plan since the commencement of Solicitation described or set forth herein constitute technical changes or changes with respect to particular Claims or Interests made pursuant to the agreement of the

Holders of such Claims or Interests and do not materially and adversely affect or change the treatment of any other Claims or Interests. Pursuant to Bankruptcy Rule 3019, these modifications do not require additional disclosure under section 1125 of the Bankruptcy Code or the resolicitation of votes under section 1126 of the Bankruptcy Code, nor do they require that the Holders of Claims or Interests be afforded an opportunity to change previously cast acceptances or rejections of the Plan.

20.　　This Confirmation Order contains modifications to the Plan that were made to address objections and informal comments received from various parties in interest. Modifications to the Plan since the entry of the Conditional Disclosure Statement Order, if any, are consistent with the provisions of the Bankruptcy Code. The disclosure of any Plan modifications prior to or on the record at the Combined Hearing constitutes due and sufficient notice of any and all Plan modifications. The Plan as modified shall constitute the Plan submitted for Confirmation.

**O.　　Bankruptcy Rule 3016.**

21.　　The Plan and all modifications thereto are dated and identify the Entities submitting them, thereby satisfying Bankruptcy Rule 3016(a). The Debtors appropriately filed the Disclosure Statement and the Plan with the Court, thereby satisfying Bankruptcy Rule 3016(b). The injunction, release, and exculpation provisions in the Disclosure Statement and the Plan describe, in bold font and with specific and conspicuous language, all acts to be enjoined and identify the entities that will be subject to the injunction, thereby satisfying Bankruptcy Rule 3016(c).

**P.　　Compliance with Bankruptcy Code Requirements—Section 1129(a)(1).**

22.　　The Plan complies with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy Code.

**(i)　　　　Proper Classification—Sections 1122 and 1123(a)(1).**

13

A-601

23.     The classification of Claims and Interests under the Plan is proper under the Bankruptcy Code.  In accordance with sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, Article III of the Plan provides for the separate classification of Claims and Interests into eleven Classes.  Valid business, factual, and legal reasons exist for the separate classification of such Classes of Claims and Interests.  The classifications were not implemented for any improper purpose and do not unfairly discriminate between, or among, Holders of Claims or Interests.  Each Class of Claims and Interests contains only Claims or Interests that are substantially similar to the other Claims or Interests within that Class.  Accordingly, the Plan satisfies the requirements of sections 1122(a), 1122(b), and 1123(a)(1) of the Bankruptcy Code.

**(ii)        Specified Unimpaired Classes—Section 1123(a)(2).**

24.     Article III of the Plan specifies that Claims in Class 1 (Secured Tax Claims) and Class 2 (Other Priority Claims) are Unimpaired under the Plan and Claims and Interests in Class 7 (Intercompany Claims) and Class 8 (Intercompany Interests), respectively, are either Impaired or Unimpaired under the Plan.

25.     Article III of the Plan specifies that Claims in the following Classes are Unimpaired under the Plan within the meaning of section 1124 of the Bankruptcy Code:

| Class | Designation |
|---|---|
| 1 | Secured Tax Claims |
| 2 | Other Priority Claims |

26.     Additionally, Article II of the Plan specifies that Allowed Administrative Claims, Allowed Professional Fee Claims, Allowed Priority Tax Claims, and all fees due and payable pursuant to section 1930 of title 28 of the United States Code before the Effective Date will be paid in full in accordance with the terms of the Plan, although these Claims are not separately classified under the Plan. Accordingly, the Plan satisfies the requirements of section 1123(a)(2) of the Bankruptcy Code.

14

(iii) **(iii)**      **Specified Treatment of Impaired Classes—Section 1123(a)(3).**

27.      The Plan satisfies the requirements of section 1123(a)(3) of the Bankruptcy Code. Article III of the Plan specifies that Claims and Interests, as applicable, in the following Classes (collectively, the "Impaired Classes") are Impaired under the Plan within the meaning of section 1124 of the Bankruptcy Code, and describes the treatment of such Classes.

| Class | Designation |
|---|---|
| 3 | Account Holder Claims |
| 4A | OpCo General Unsecured Claims |
| 4B | HoldCo General Unsecured Claims |
| 4C | TopCo General Unsecured Claims |
| 5 | Alameda Loan Facility Claims |
| 6 | Section 510(b) Claims |
| 9 | Existing Equity Interests |

**(iv)**      **No Discrimination—Section 1123(a)(4).**

28.      The Plan satisfies the requirements of section 1123(a)(4) of the Bankruptcy Code. The Plan provides for the same treatment by the Debtors for each Claim or Interest in each respective Class unless the Holder of a particular Claim or Interest has agreed to a less favorable treatment of such Claim or Interest.

**(v)**      **Adequate Means for Plan Implementation—Section 1123(a)(5).**

29.      The Plan satisfies the requirements of section 1123(a)(5) of the Bankruptcy Code. The provisions in Article IV and elsewhere in the Plan and the Plan Supplement, and in the exhibits and attachments to the Disclosure Statement provide, in detail, adequate and proper means for the Plan's implementation, including the: (a) effectuation of the Restructuring Transactions contemplated by the Plan, the Restructuring Transactions Memorandum, and the Customer Onboarding Protocol; (b) consummation of the Sale Transaction by the Outside Date pursuant to the Asset Purchase Agreement; (c) if the Sale Transaction is not consummated by the Outside Date pursuant to the Asset Purchase Agreement, then the effectuation of the Liquidation Transaction in

accordance with the Liquidation Procedures; (d) adoption and implementation of the Employee Transition Plan; (e) retention of certain Claims or Causes of Action held by the Debtors or their Estates, which shall be assigned and transferred to the Wind-Down Debtor after the Effective Date; (f) effectuation of the terms of the D&O Settlement; (g) authorization for the Debtors and the Wind-Down Debtor, as applicable, to take all actions as may be necessary or appropriate to effectuate the Restructuring Transactions and any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan; (h) establishment of the Wind-Down Debtor pursuant to the Plan Administrator Agreement and the transfer of the Wind-Down Debtor Assets to the Wind-Down Debtor after the Effective Date; (i) the funding and sources of consideration for the Plan distributions; and (j) settlement, satisfaction, and compromise of Claims and Interests as set forth in the Plan.

### (vi)        Voting Power of Equity Securities—Section 1123(a)(6).

30.     Section 1123(a)(6) of the Bankruptcy Code requires that a debtor's corporate constituent documents prohibit the issuance of nonvoting equity securities. On the Effective Date the Wind-Down Debtor Assets shall, subject to the Plan Administrator Agreement, be transferred to and vest in the Wind-Down Debtor. The Wind-Down Debtor shall be managed by the Plan Administrator and shall be subject to a Wind-Down Debtor Oversight Committee. The Plan Administrator shall be responsible for, among other things: (a) implementing the Wind-Down Debtor, and making distributions contemplated by the Plan; (b) marshalling, marketing for sale, and winding down any of the Debtors' assets constituting Wind-Down Debtor Assets; (c) appointing an independent director at each Debtor to act as a fiduciary for such Debtor entity in connection with the resolution of the Intercompany Claims; (d) overseeing the accounts of the Debtors and the Wind-Down Debtor and the wind-down and dissolution of the Debtors and the Wind-Down Debtor, including effectuating the transactions described in the Restructuring

16

Transactions Memorandum; (e) receiving, maintaining, conserving, supervising, prosecuting, collecting, settling, managing, investing, protecting, and where appropriate, causing the Wind-Down Debtor to abandon the Wind-Down Debtor Assets, including causing the Wind-Down Debtor to invest any moneys held as Wind-Down Debtor Assets; (f) opening and maintaining bank accounts on behalf of or in the name of the Debtors or the Wind-Down Debtor, including, in the Plan Administrator's discretion, separate bank accounts for each of the Debtors; (g) entering into any agreement or executing any document or instrument required by or consistent with the Plan, this Confirmation Order, or the Plan Administrator Agreement, and to perform all obligations thereunder; (h) collecting and liquidating all Wind-Down Debtor Assets, including the sale of any Wind-Down Debtor Assets; (i) protecting and enforcing the rights to the Wind-Down Debtor Assets (including any Vested Causes of Action and Contributed Third-Party Claims) vested in the Wind-Down Debtor and Plan Administrator by the Plan Administrator Agreement by any method deemed appropriate, including, without limitation, by judicial proceedings or otherwise; (j) investigating any Wind-Down Debtor Assets, and any other potential Vested Causes of Action and Contributed Third-Party Claims; (k) reviewing, reconciling, compromising, settling, objecting, or prosecuting Claims or Interests of any kind; (l) seeking the examination of any Person pursuant to Federal Rule of Bankruptcy Procedure 2004; (m) retaining professionals, disbursing agents, and other agents, independent contractors, and third parties pursuant to the Plan Administrator Agreement and paying the reasonable compensation thereof; (n) paying all lawful expenses, debts, charges, taxes, and other liabilities, and making all other payments relating to the Wind-Down Debtor Assets, solely out of Wind-Down Debtor Assets; (o) prosecuting and settling the Vested Causes of Action, including, without limitation, the 3AC Claims, FTX Claims, Alameda Claims, Contributed Third-Party Claims, and any causes of action not included in the

Asset Purchase Agreement or released under the Plan; (p) reviewing, reconciling, pursuing, commencing, prosecuting, compromising, settling, dismissing, releasing, waiving, withdrawing, abandoning, resolving, or electing not to pursue all Vested Causes of Action and Contributed Third-Party Claims; (q) acquiring litigation and other claims related to the Debtors, and prosecuting such claims; (r) reviewing and compelling turnover of the Debtors or the Wind-Down Debtor's property; (s) calculating and making all Distributions to the holders of Allowed Claims against each Debtor and, solely to the extent of payment in full of Allowed Claims, to holders of Allowed Interests, as provided for in, or contemplated by, the Plan and the Plan Administrator Agreement; *provided* that because the Plan does not substantively consolidate the Debtors' Estates, the Plan Administrator shall make Distributions from the Wind-Down Debtor Assets to the holders of Claims and Interests (if applicable) against that specific Debtor; (t) establishing, administering, adjusting, and maintaining the Wind-Down Reserve and the Disputed Claims Reserve; (u) withholding from the amount distributable to any Person the maximum amount needed to pay any tax or other charge that the Plan Administrator has determined, based upon the advice of his agents or professionals, may be required to be withheld from such Distribution under the income tax or other laws of the United States or of any state or political subdivision thereof; (v) in reliance upon the Debtors' Schedules, the official Claims Register maintained in the Chapter 11 Cases and the Debtors' filed lists of equity security holders, reviewing, and where appropriate, allowing or objecting to Claims and (if applicable) Interests, and supervising and administering the commencement, prosecution, settlement, compromise, withdrawal, or resolution of all objections to Disputed Claims and (if applicable) Disputed Interests required to be administered by the Wind-Down Debtor; (w) making all tax withholdings, filing tax information returns, filing and prosecuting tax refunds claims, making tax elections by and on behalf of the Debtors or the

18

Wind-Down Debtor, and filing tax returns for the Debtors or the Wind-Down Debtor pursuant to and in accordance with the Plan, and paying taxes, if any, payable for and on behalf of the Debtors or the Wind-Down Debtor, as applicable; *provided, however*, that notwithstanding any other provision of the Plan Administrator Agreement, the Plan Administrator shall not have any responsibility or personal liability in any capacity whatsoever for the signing or accuracy of the Debtors' income tax returns that are due to be filed after the Effective Date or for any tax liability related thereto; (x) abandoning or donating to a charitable organization qualifying under IRC section 501(c)(3) any Wind-Down Debtor Assets that the Plan Administrator determines to be too impractical to distribute or of inconsequential value; (y) seeking a determination of tax liability or refund under Bankruptcy Code section 505; (z) establishing reserves for taxes, assessments, and other expenses of administration of the Debtors or the Wind-Down Debtor as may be necessary and appropriate for the proper operation of matters incident to the Debtors or the Wind-Down Debtor; paying Wind-Down Debtor Expenses; (aa) if the Plan Administrator deems appropriate in the Plan Administrator's sole discretion, seeking to establish a bar date for filing proofs of Interest in any Debtor or otherwise to determine the holders and extent of Allowed Interests in any Debtor; (bb) purchasing and carrying all insurance policies that the Plan Administrator deems reasonably necessary or advisable and paying all associated insurance premiums and costs; (cc) undertaking all administrative functions remaining in the Chapter 11 Cases to the extent necessary to carry out the Debtors', the Wind-Down Debtor's, or the Plan Administrator's duties under the Plan, including reporting and making required payments of fees to the U.S. Trustee and overseeing the closing of the Chapter 11 Cases; (dd) retaining, terminating, appointing, hiring, or otherwise employees, personnel, management, and directors at any of the Debtors to the extent necessary to carry out the purposes of the Plan Administrator Agreement and the Plan, including, without

limitation, to address any disputes between the Debtors; (ee) exercising, implementing, enforcing, and discharging all of the terms, conditions, powers, duties, and other provisions of the Plan, the Confirmation Order, and the Plan Administrator Agreement; and (ff) taking all other actions consistent with the provisions of the Plan and the Plan Administrator Agreement that the Plan Administrator deems reasonably necessary or desirable to administer the Debtors and the Wind-Down Debtor.  Further, on or prior to the Effective Date, the Wind-Down Debtor's organizational documents will be amended to prohibit the issuance of non-voting equity securities. Accordingly, the Plan satisfies the requirements of section 1123(a)(6) of the Bankruptcy Code.

### (vii)        Directors and Officers—Section 1123(a)(7).

31.        The Plan satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code. Article IV.J of the Plan provides that, upon filing of the certificate of dissolution (or equivalent document), the Wind-Down Debtor will be dissolved.  Article IV.H of the Plan provides for the formation of the Wind-Down Debtor for the benefit of the Wind-Down Debtor Beneficiaries.  The Wind-Down Debtor shall be managed by the Plan Administrator and shall be subject to a Wind-Down Debtor Committee.  The selection of the Plan Administrator by the Committee, in consultation with the Debtors, is consistent with the interests of Holders of Claims and Interests and public policy.  The appointment of the Plan Administrator identified in the Plan Supplement is approved, and the Plan Administrator's duties shall commence as of the Effective Date.  In accordance with the Plan Administrator Agreement, the Plan Administrator shall serve in such capacity through the earlier of (i) the date on which the Wind-Down Debtor is dissolved in accordance with the Plan Administrator Agreement, and (ii) the date on which the Plan Administrator resigns, is terminated, or is otherwise unable to serve; *provided*, *however*, that, in the event that the Plan Administrator resigns, is terminated, or is otherwise unable to serve, the Wind-Down Debtor Oversight Committee shall appoint a successor to serve as the Plan

Administrator in accordance with the Plan Administrator Agreement. If the Wind-Down Debtor Oversight Committee does not appoint a successor within the time periods specified in the Plan Administrator Agreement, then the Court, upon the motion of any party-in-interest, including counsel to the Wind-Down Debtor, shall approve a successor to serve as the Plan Administrator. Accordingly, the Plan satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code.

(viii)        **Impairment / Unimpairment of Classes—Section 1123(b)(1).**

32.      The Plan is consistent with section 1123(b)(1) of the Bankruptcy Code. Article III of the Plan leaves each Class of Claims and Interests Impaired or Unimpaired.

(ix)        **Treatment of Executory Contracts and Unexpired Leases—Section 1123(b)(2).**

33.      The Plan is consistent with section 1123(b)(2) of the Bankruptcy Code. Article V of the Plan provides that, on the Effective Date, except as otherwise provided in the Plan, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (1) is specifically described in the Plan as to be assumed in connection with Confirmation of the Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement; (2) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Effective Date; (3) is to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, in connection with the Sale Transaction; (4) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; or (5) is a D&O Liability Insurance Policy other than the Side-A Policy. Each of the Debtors' determinations regarding the assumption and rejection of

21

Executory Contracts and Unexpired Leases is based on and within the sound business judgment of the Debtors, is necessary to the implementation of the Plan, and is in the best interests of the Debtors, their Estates, Holders of Claims and Interests, and other parties in interest in these Chapter 11 Cases.

      **(x)**      **Settlement, Releases, Exculpation, Injunction, and Preservation of Claims and Causes of Action—Section 1123(b)(3).**

34.     The Plan is consistent with section 1123(b)(3) of the Bankruptcy Code. Except as otherwise provided in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies settled, compromised, satisfied, or otherwise resolved pursuant to the Plan. The Plan is deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of this Confirmation Order constitutes the Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 of all such Claims, Interests, Causes of Action, and controversies, as well as a finding that such compromise and settlement is fair, equitable, reasonable, and in the best interests of the Debtors, their Estates, and Holders of Claims and Interests. Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Interests in any Class are intended to be and shall be final.

      **(xi)**      **Additional Plan Provisions—Section 1123(b)(6).**

35.     The other discretionary provisions of the Plan are appropriate and consistent with the applicable provisions of the Bankruptcy Code, thereby satisfying section 1123(b)(6) of the Bankruptcy Code.

Q.     **Debtor Compliance with the Bankruptcy Code—Section 1129(a)(2).**

36.     The Debtors have complied with the applicable provisions of the Bankruptcy Code,

except as otherwise provided or permitted by orders of the Court, and thus, satisfied the

requirements of section 1129(a)(2) of the Bankruptcy Code.  Specifically, each Debtor:

> a.  is an eligible debtor under section 109, and a proper proponent of the Plan under section 1121(a), of the Bankruptcy Code; and
>
> b.  complied with the applicable provisions of the Bankruptcy Code, including sections 1125 and 1126, the Bankruptcy Rules, the Local Rules, any applicable nonbankruptcy law, rule and regulation, the Conditional Disclosure Statement Order, and all other applicable law, in transmitting the Solicitation Packages and related documents and notices, and in soliciting and tabulating the votes on the Plan.

R.     **Plan Proposed in Good Faith—Section 1129(a)(3).**

37.     The Plan satisfies the requirements of section 1129(a)(3) of the Bankruptcy Code.

The Debtors have proposed the Plan in good faith and not by any means forbidden by law.  In so

determining, the Court has examined the totality of the circumstances surrounding the filing of

these Chapter 11 Cases, the Plan itself, the process leading to Confirmation, including the support

of Holders of Claims and Interests for the Plan, and the transactions to be implemented pursuant

thereto.  These Chapter 11 Cases were filed, and the Plan was proposed, with the legitimate

purpose of allowing the Debtors to implement the Restructuring Transactions and maximize the

value of the Estates and the recoveries of Holders of Claims and Interests.

S.     **Payment for Services or Costs and Expenses—Section 1129(a)(4).**

38.     The procedures set forth in the Plan for the Court's review and ultimate

determination of the fees and expenses to be paid by the Debtors in connection with these

Chapter 11 Cases, or in connection with the Plan and incident to these Chapter 11 Cases, satisfy

the objectives of, and are in compliance with, section 1129(a)(4) of the Bankruptcy Code.

**T.** **Directors, Officers, and Insiders—Section 1129(a)(5).**

39.     Because the Plan provides for the winding down and dissolution of the Debtors, section 1129(a)(5) of the Bankruptcy Code does not apply to the Debtors.  To the extent section 1129(a)(5) applies to the Wind-Down Debtor, the requirements of this provision are satisfied by, among other things, disclosing the identity and terms of compensation of the Plan Administrator and the Wind-Down Debtor Oversight Committee.

**U.** **No Rate Changes—Section 1129(a)(6).**

40.     Section 1129(a)(6) of the Bankruptcy Code is not applicable to these Chapter 11 Cases.  The Plan does not propose any rate change subject to the jurisdiction of any governmental regulatory commission.

**V.** **Best Interest of Creditors—Section 1129(a)(7).**

41.     The Plan is in the best interests of the Debtors' creditors and satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.  The liquidation analysis attached to the Disclosure Statement and the other evidence related thereto in support of the Plan that was proffered or adduced in the Declarations or at, prior to, or in connection with the Combined Hearing:  (a) are reasonable, persuasive, credible, and accurate as of the dates such analysis or evidence was prepared, presented, or proffered; (b) utilize reasonable and appropriate methodologies and assumptions; (c) have not been controverted by other evidence; and (d) establish that Holders of Allowed Claims and Interests in each Class will recover at least as much under the Plan on account of such Claim or Interest, as of the Effective Date, as such Holder would receive if the Debtors were liquidated, on the Effective Date, under chapter 7 of the Bankruptcy Code.

W.     **Acceptance by Certain Classes—Section 1129(a)(8).**

42.     Class 1 (Secured Tax Claims) and Class 2 (Other Priority Claims) are Unimpaired under the Plan and are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Class 3 (Account Holder Claims), Class 4B (HoldCo General Unsecured Claims), and Class 4C (TopCo General Unsecured Claims) are impaired under the Plan and voted to accept the Plan.  Class 5 (Alameda Loan Facility Claims), Class 6 (Section 510(b) Claims), and Class 9 (Existing Equity Holders) are impaired under the Plan and are deemed to reject the Plan. Because the Plan has not been accepted by the Deemed Rejecting Classes, the Debtors seek Confirmation under section 1129(b), solely with respect to the Deemed Rejecting Classes, rather than section 1129(a)(8) of the Bankruptcy Code.  Although section 1129(a)(8) has not been satisfied with respect to the Deemed Rejecting Classes, the Plan is confirmable because the Plan does not discriminate unfairly and is fair and equitable with respect to the Deemed Rejecting Classes and thus satisfies section 1129(b) of the Bankruptcy Code with respect to such Classes as described further below.  As a result, the requirements of section 1129(b) of the Bankruptcy Code are satisfied.

X.     **Treatment of Claims Entitled to Priority Under Section 507(a) of the Bankruptcy Code—Section 1129(a)(9).**

43.     The treatment of Allowed Administrative Claims, Allowed Professional Fee Claims, and Allowed Priority Tax Claims under Article II of the Plan, and of Allowed Other Priority Claims under Article III of the Plan, satisfies the requirements of, and complies in all respects with, section 1129(a)(9) of the Bankruptcy Code.

Y.     **Acceptance by At Least One Impaired Class—Section 1129(a)(10).**

44.     The Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code. As evidenced by the Voting Report, the Voting Classes voted to accept the Plan by the requisite

numbers and amounts of Claims, determined without including any acceptance of the Plan by any insider (as that term is defined in section 101(31) of the Bankruptcy Code), specified under the Bankruptcy Code.

### Z.    Feasibility—Section 1129(a)(11).

45.    The Plan satisfies section 1129(a)(11) of the Bankruptcy Code.  The evidence supporting the Plan proffered or adduced by the Debtors at or before the Combined Hearing:  (a) is reasonable, persuasive, credible, and accurate as of the dates such evidence was prepared, presented, or proffered; (b) has not been controverted by other persuasive evidence; (c) establishes that the Plan is feasible and Confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization; (d) establishes that the Distribution Agent, or the Wind-Down Debtor, as applicable, will have sufficient funds available to meet their obligations under the Plan—including sufficient amounts of Cash, Cryptocurrency, or other consideration, as applicable, to reasonably ensure payment of, among other things, Allowed Administrative Claims, Allowed Professional Fee Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed Account Holder Claims, and Allowed General Unsecured Claims, as applicable, pursuant to the terms of the Plan and in accordance with section 507(a) of the Bankruptcy Code; and (e) establishes that the Wind-Down Debtor will have the financial wherewithal to satisfy their obligations following the Effective Date.

### AA.    Payment of Statutory Fees—Section 1129(a)(12).

46.    The Plan satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code. Article XII.C of the Plan provides for the payment of all fees due and payable under 28 U.S.C. § 1930 by each of the Wind-Down Debtor (or the Distribution Agent on behalf of the Wind-Down Debtor).

**BB.** **Continuation of Employee Benefits—Section 1129(a)(13).**

47.     The Debtors do not have any remaining obligations to pay retiree benefits (as defined in section 1114 of the Bankruptcy Code). Therefore, section 1129(a)(13) of the Bankruptcy Code is inapplicable to these Chapter 11 Cases or the Plan.

**CC.** **Non-Applicability of Certain Sections—Sections 1129(a)(14), (15), and (16).**

48.     Sections 1129(a)(14), 1129(a)(15), and 1129(a)(16) of the Bankruptcy Code do not apply to these Chapter 11 Cases. The Debtors owe no domestic support obligations, are not individuals, and are not nonprofit corporations.

**DD.** **"Cram Down" Requirements—Section 1129(b).**

49.     The Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code. Notwithstanding the fact that the Deemed Rejecting Classes have not accepted the Plan, the Plan may be confirmed pursuant to section 1129(b)(1) of the Bankruptcy Code. *First*, all of the requirements of section 1129(a) of the Bankruptcy Code other than section 1129(a)(8) have been met. *Second*, the Plan is fair and equitable with respect to Class 5 (Alameda Loan Facility Claims), Class 6 (Section 510(b) Claims), and Class 9 (Existing Equity Interests). The Plan has been proposed in good faith, is reasonable, and meets the requirements that (a) no Holder of any Claim or Interest that is junior to each such Class will receive or retain any property under the Plan on account of such junior Claim or Interest, and (b) no Holder of a Claim or Interest in a Class senior to such Classes is receiving more than payment in full on account of its Claim or Interest. Specifically, to the extent Class 8 (Intercompany Interests) are Reinstated, such treatment is provided for administrative convenience and efficiency, and not on account of such Interests, and will not alter the treatment provided for any other Holder of any Claim or Interest. Further, Class 7 (Intercompany Claims) will receive the treatment as determined by the Court. Accordingly, the Plan is fair and equitable towards all Holders of Claims and Interests in the Deemed Rejecting

Classes.  *Third*, the Plan does not discriminate unfairly with respect to the Deemed Rejecting Classes because similarly situated Claim and Interest Holders will receive substantially similar treatment on account of their Claims or Interests, as applicable, in such class.  Therefore, the Plan may be confirmed despite the fact that not all Impaired Classes have voted to accept the Plan.

### EE. Only One Plan—Section 1129(c).

50.     The Plan satisfies the requirements of section 1129(c) of the Bankruptcy Code. The Plan is the only chapter 11 plan filed in each of these Chapter 11 Cases.

### FF. Principal Purpose of the Plan—Section 1129(d).

51.     The Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code. The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act.

### GG. Not Small Business Cases—Section 1129(e).

52.     The Chapter 11 Cases are not small business cases and, accordingly, section 1129(e) of the Bankruptcy Code does not apply to the Chapter 11 Cases.

### HH. Good Faith Solicitation—Section 1125(e).

53.     The Debtors have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code and in compliance with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules in connection with all of their respective activities relating to support and consummation of the Plan, including the solicitation and receipt of acceptances of the Plan, and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code.

### II. Satisfaction of Confirmation Requirements.

54.     Based on the foregoing, the Plan satisfies the requirements for Confirmation set forth in section 1129 of the Bankruptcy Code.

**JJ.    Likelihood of Satisfaction of Conditions Precedent to the Effective Date.**

55.    Each of the conditions precedent to the Effective Date, as set forth in Article IX.A of the Plan, has been or is reasonably likely to be satisfied or, as applicable, waived in accordance with Article IX.B of the Plan.

**KK.    Implementation.**

56.    All documents and agreements necessary to implement the transactions contemplated by the Plan, including those contained or summarized in the Plan Supplement, and all other relevant and necessary documents (including the Asset Purchase Agreement) have been negotiated in good faith and at arm's length, are in the best interests of the Debtors, and shall, upon completion of documentation and execution, be valid, binding, and enforceable agreements and shall not be in conflict with any federal, state, or local law.  The Debtors are authorized to take any action reasonably necessary or appropriate to consummate such agreements and the transactions contemplated thereby.

**LL.    Executory Contracts and Unexpired Leases.**

57.    The Debtors' decisions to assume or reject certain Executory Contracts and Unexpired Leases, as provided in Article V of the Plan and in the Plan Supplement, are reasonable exercises of the Debtors' business judgment.  The Debtors have demonstrated adequate assurance of future performance of the assumed Executory Contracts and Unexpired Leases within the meaning of section 365(b)(1)(C) of the Bankruptcy Code by the Wind-Down Debtor.

58.    Except with respect to the Executory Contracts and Unexpired Leases discussed in the following paragraph of this Confirmation Order, the amounts set forth in the Plan Supplement (the "Cure Amounts") are the sole amounts necessary to be paid upon assumption of the associated Executory Contracts and Unexpired Leases under section 365(b)(1)(A) and (B) of the Bankruptcy Code, and the payment of such amounts will effect a cure of all defaults existing under such

Executory Contracts and Unexpired Leases and compensate the counterparties to such Executory Contracts and Unexpired Leases for any actual pecuniary loss resulting from all defaults existing under such Executory Contracts and Unexpired Leases as of the Effective Date.

59. The objections of counterparties to the assumption of their Executory Contracts and Unexpired Leases, to the extent that such objection was timely raised in accordance with Article V.C of the Plan, are preserved and will be considered by the Court at a date and time to be scheduled. As provided in the Conditional Disclosure Statement Order and the Solicitation Packages, the Debtors and the Wind-Down Debtor have reserved the right to (a) add any Executory Contract or Unexpired Lease to the Assumed Contract Schedule and assume such Executory Contract or Unexpired Lease pursuant to the terms of the Plan, or remove any Executory Contract or Unexpired Lease from the Assumed Contract Schedule, in each case, up until the Effective Date and (b) contest any Claim asserted in connection with rejection of any Executory Contract or Unexpired Lease.

**MM. Disclosure of Facts.**

60. The Debtors have disclosed all material facts regarding the Plan, including with respect to consummation of the Sale Transaction and the Liquidation Transaction, as applicable.

**NN. Appropriate Exercise of Business Judgment.**

61. The Debtors' decision to effectuate the Sale Transaction or the Liquidation Transaction, as applicable, is an appropriate exercise of their business judgment.

**OO. Good Faith.**

62. The Debtors, the Released Parties, and the Releasing Parties have been and will be acting in good faith if they proceed to: (a) consummate the Plan and the agreements, settlements, transactions, and transfers contemplated thereby; and (b) take the actions authorized and directed by this Confirmation Order to wind-down the Debtors' businesses and effect the Sale Transaction

or the Liquidation Transaction, as applicable, and the other Restructuring Transactions. The Released Parties have made a substantial contribution to these Chapter 11 Cases.

**PP.    Essential Elements of the Plan.**

63.    The Sale Transaction is an essential element of the Plan, and consummation of the Sale Transaction is in the best interests of the Debtors, their estates, and their creditors. The Debtors have exercised sound business judgment in selecting the Purchaser and the Debtors have done so without collusion and in good faith. The Purchaser is consummating the Sale Transaction in good faith and is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code. The Purchaser has proceeded in good faith and without collusion in all respects in connection with the Sale Transaction. The Purchaser is therefore entitled to all of the protections afforded under section 363(m) of the Bankruptcy Code, and the Sale Transaction, to the extent consummated, may not be avoided pursuant to section 363(n) of the Bankruptcy Code.

64.    The Debtors' marketing process with respect to the Sale Transaction afforded a full, fair, and reasonable opportunity for any party to make a higher or otherwise better offer. No other party or parties has offered to purchase the Acquired Assets for greater overall value to the Debtors' Estates than the Purchaser. The Asset Purchase Agreement will provide a greater recovery for the Debtors' Estates than would be provided by any other available alternative. The Debtors' determination that the Sale Transaction is the most value-maximizing transaction is a valid and sound exercise of the Debtors' business judgment. Consummation of the Sale Transaction is in the best interests of the Debtors' Estates, their creditors, and other parties in interest.

65.    The consideration provided by the Purchaser pursuant to the Asset Purchase Agreement (a) is fair and reasonable, (b) constitutes the best offer for the Acquired Assets, and (c) constitutes reasonably equivalent value (as those terms are defined in each of the Uniform

31

Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, and section 548 of the Bankruptcy Code) and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.

66.     The Purchaser is not a mere continuation or substantial continuation of the Debtors or their Estates and there is no continuity of enterprise or common identity between the Purchaser and any of the Debtors.  The Purchaser is not holding itself out to the public as a continuation of any of the Debtors.  The Purchaser is not a successor to the Debtors or their Estates by reason of any theory of law or equity, and the Sale Transaction does not amount to a consolidation, merger, or de facto merger of the Purchaser with or into any of the Debtors.  The Purchaser has entered into the Asset Purchase Agreement in material reliance on and with fair consideration provided for the Sale Transaction being free and clear of all claims and interests relating to the Debtors arising prior to the closing of the Sale Transaction, including any successor or vicarious liabilities of any kind or nature, as set forth herein and in the Asset Purchase Agreement, and would not have entered into the Asset Purchase Agreement or the Sale Transaction without such terms and the findings herein.

67.     The conditions of section 363(f) of the Bankruptcy Code have been satisfied in full; therefore, the Debtors may sell, and upon the Closing of the Sale Transaction shall be deemed to have sold, assets and property pursuant to the Asset Purchase Agreement free and clear of any claims, liens, encumbrances, or other interests of any kind or nature whatsoever other than as expressly provided under the Asset Purchase Agreement.  In addition to and without limiting the foregoing, the proposed Sale Transaction is to be consummated under the Plan, and the assets and property to be sold pursuant to the Sale Transaction are dealt with by the Plan; therefore, except as expressly provided under the Asset Purchase Agreement, the Debtors may sell, and upon the

32

Closing of the Sale Transaction shall be deemed to have sold, assets and property pursuant to the Asset Purchase Agreement free and clear of any claims, liens, encumbrances, or other interests of any kind or nature whatsoever pursuant to section 1141(c) of the Bankruptcy Code.

68.     The Debtors may sell, and upon the Closing of the Sale Transaction shall be deemed to have sold, such assets free and clear of all claims, liens, encumbrances, and other interests of any kind or nature whatsoever (other than as expressly permitted under the Asset Purchase Agreement) because, in each case, one or more of the standards set forth in sections 363(f)(l)–(5), 1129(b)(2)(A)(ii), 1141(a), or 1141(c) of the Bankruptcy Code has been satisfied. All holders of such claims, liens, encumbrances, or other interests against the Debtors, their Estates, or any of the assets subject to the Sale Transaction (a) who did not object, or who withdrew their objections, to the Sale Transaction are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code and (b) are bound by the Plan pursuant to section 1141(a) of the Bankruptcy Code.  All holders of such claims, liens, encumbrances, or other interests are adequately protected by having their claims, liens, encumbrances, or other interests, if any, in each instance against the Debtors, their Estates, or any of the assets subject to the Sale Transaction, attach to the proceeds of the Sale Transaction ultimately attributable to the assets in which such creditor alleges a claim, lien, encumbrance, or other interest, in the same order of priority, with the same validity, force, and effect that such claim, lien, encumbrance, or other interest had prior to consummation of the Sale Transaction, subject to any claims and defenses the Debtors and their Estates may possess with respect thereto, and with such claims, liens, encumbrances, or other interests being treated in accordance with the Plan.

69.     Article VIII.A of the Plan describes certain releases granted by the Debtors, the Wind-Down Debtor, and the Debtors' and the Wind-Down Debtor's Estates (the "<u>Debtor</u>

Release"). The Debtors have satisfied the business judgment standard with respect to the propriety of the Debtor Release. Such release is a necessary and integral element of the Plan, and is fair, reasonable, and in the best interests of the Debtors, the Debtors' Estates, and Holders of Claims and Interests. The Debtors', the Wind-Down Debtor's and their Estates' pursuit of any such claims against the Released Parties is not in the best interests of the Estates' various constituencies because the costs involved would likely outweigh any potential benefit from pursuing such claims. Additionally, including for the reasons set forth in the Declarations, the Debtor Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties following extensive, arm's-length negotiations between sophisticated parties represented by able counsel; (b) a good-faith settlement and compromise of such Causes of Action released by the Debtor Release, which bore a substantial likelihood of complex and protracted litigation, with attendant expense, inconvenience, and delay; (c) in the best interests of the Debtors and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; (f) a sound exercise of the Debtors' business judgment; and (g) except to the extent contemplated by Article IV.F of the Plan, a bar to any of the Debtors, the Wind-Down Debtor or their Estates asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

70.     Article IV.G of the Plan describes the D&O Settlement. The D&O Settlement constitutes a good-faith compromise and settlement of all Claims, Causes of Action, disputes, and controversies released, settled, compromised, or otherwise resolved between the Debtors and the CEO and CCO. The D&O Settlement is fair, equitable, and reasonable and in the best interests of the Debtors, their Estates, and Holders of Claims and Interests.

71.     Article VIII.B of the Plan describes certain releases granted by the Releasing Parties (the "Third-Party Release"). The Third-Party Release provides finality for the Debtors, the Wind-Down Debtor, and the other Released Parties. The Third-Party Release is consensual with respect to the Releasing Parties. The Combined Hearing Notice sent to Holders of Claims and Interests and published in *The New York Times* (National Edition) and the *Financial Times* (International Edition) on February 3, 2023, and the ballots and notices, as applicable, sent to Holders of Claims and Interests unambiguously stated that the Plan contains the Third-Party Release and that each Holder of Claims or Interests may elect not to grant such Third-Party Release. Such release provisions of the Plan were conspicuous, emphasized with boldface type in the Plan, the Disclosure Statement, and the ballots and notices. Among other things, the Plan provides appropriate and specific disclosure with respect to the claims and Causes of Action that are subject to the Third-Party Release, and no other disclosure or notice is necessary. The Third-Party Release is a necessary and integral element of the Plan, and is fair, equitable, reasonable, and in the best interests of the Debtors, the Debtors' Estates, and all Holders of Claims and Interests. Also, the Third-Party Release is:  (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good-faith settlement and compromise of such the Claims released by the Third-Party Releases; (c) in the best interests of the Debtors and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; (f) a sound exercise of the Debtors' business judgment; and (g) except to the extent contemplated by Article IV.E and Article IV.F of the Plan, a bar to any of the Debtors or Wind-Down Debtor or their respective Estates asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

72. The Third-Party Releases are consensual and those Holders of Claims and Interests who are bound by the Third-Party Releases voluntarily opted-in to the Third-Party Releases. The Plan does not release any third party's direct claims against non-Debtors (to the extent such direct claims exist) without such third party's express consent. Holders of Claims and Interests also had the ability to affirmatively elect to "contribute" their claims to the Wind-Down Debtor and vest the Wind-Down Debtor with authority to pursue such claims against the Debtors.

73. The exculpation described in Article VIII.C of the Plan (the "Exculpation") is appropriate under applicable law because it was proposed in good faith, was formulated following extensive good-faith, arm's-length negotiations with key constituents, and is appropriately limited in scope. Without limiting anything in the Exculpation, each Exculpated Party has participated in these Chapter 11 Cases in good faith and, except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated as set forth in the Plan; *provided* that the foregoing "Exculpation" shall have no effect on the liability of any entity that results from any such act or omission that is determined by a Final Order to have constituted actual fraud, gross negligence, or willful misconduct, but in all respects such entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have participated in any and all activities potentially underlying any Exculpated Claim in good faith and in compliance with the applicable laws. The Exculpation, including its carve-out for actual fraud, gross negligence, or willful misconduct, is consistent with established practice in this jurisdiction and others.

74. The injunction provision set forth in Article VIII.D of the Plan is necessary to prevent interference with the payment of Claims and Interests in the manner set forth in the Plan and is narrowly tailored to achieve these purposes.

A-624

75. Article IV.P of the Plan provides that, in accordance with section 1123(b)(3) of the Bankruptcy Code, any Cause of Action that a Debtor may hold against any Entity shall vest in the Wind-Down Debtor, except as otherwise provided in the Plan, including Article VIII of the Plan. The Wind-Down Debtor, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Wind-Down Debtor shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Court in accordance with the Plan. The provisions regarding the preservation of Causes of Action in the Plan, including the Plan Supplement, are appropriate, fair, equitable, and reasonable, and are in the best interests of the Debtors, the Debtors' estates, and Holders of Claims and Interests.

76. The full release and discharge of all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates described in Article VIII.E of the Plan (the "Lien Release") is necessary to implement the Plan. The provisions of the Lien Release are appropriate, fair, equitable, and reasonable and are in the best interests of the Debtors, the Debtors' estates, and Holders of Claims and Interests.

## ORDER

BASED ON THE FOREGOING FINDINGS OF FACT AND CONCLUSIONS OF LAW, IT IS ORDERED, ADJUDGED, DECREED, AND DETERMINED THAT:

77. **Findings of Fact and Conclusions of Law.** The above-referenced findings of fact and conclusions of law are hereby incorporated by reference as though fully set forth herein and constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made

applicable herein by Bankruptcy Rule 9014. To the extent that any finding of fact is determined to be a conclusion of law, it is deemed so, and vice versa.

78.    **Approval of the Disclosure Statement.** The Disclosure Statement, the Solicitation Packages, and the Solicitation Procedures are approved on a final basis pursuant to section 1125 of the Bankruptcy Code.

79.    **Solicitation.** To the extent applicable, the solicitation of votes on the Plan complied with sections 1125 and 1126 of the Bankruptcy Code, Bankruptcy Rules 3017 and 3018, all other provisions of the Bankruptcy Code, and all other applicable rules, laws, and regulations, and was appropriate and satisfactory and is approved in all respects.

80.    **Notice of Combined Hearing.** The Notice of Combined Hearing was appropriate and satisfactory and is approved in all respects.

81.    **Confirmation of the Plan.** The Plan is approved in its entirety and CONFIRMED under section 1129 of the Bankruptcy Code. The terms of the Plan, including the Plan Supplement, are incorporated by reference into and are an integral part of this Confirmation Order.

82.    **Objections.** All objections and all reservations of rights pertaining to Confirmation of the Plan and approval of the Disclosure Statement that have not been withdrawn, waived, or consensually resolved are overruled on the merits unless otherwise indicated in this Confirmation Order. All withdrawn objections, if any, are deemed withdrawn with prejudice. All objections to approval of the Disclosure Statement and Confirmation of the Plan not filed and served prior to the Objection Deadline, if any, are deemed waived and shall not be considered by the Court.

83.    All parties have had a full and fair opportunity to litigate all issues raised or that might have been raised in the objections to approval of the Disclosure Statement and Confirmation

of the Plan, and the objections have been fully and fairly litigated or resolved, including by agreed-upon reservations of rights as set forth in this Confirmation Order.

84. **Plan Modifications.** The Plan Modifications do not materially adversely affect the treatment of any Claim against or Interest in any of the Debtors under the Plan, and are hereby approved pursuant to section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019. After giving effect to the Plan Modifications, the Plan continues to meet the requirements of sections 1122 and 1123 of the Bankruptcy Code. The filing with the Court on February 28, 2023 of the modifications to the Plan and the disclosure of any additional Plan Modifications on the record at the Combined Hearing constitute due and sufficient notice thereof. Accordingly, pursuant to section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019, the Plan Modifications do not require additional disclosure under section 1125 of the Bankruptcy Code or resolicitation of votes under section 1126 of the Bankruptcy Code, nor do they require that holders of Claims be afforded an opportunity to change previously cast acceptances or rejections of the Plan.

85. **Deemed Acceptance of Plan.** In accordance with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, all Holders of Claims and Interests who voted to accept the Plan or who are conclusively presumed to accept the Plan are deemed to have accepted the Plan, as modified by the Plan Modifications. No Holder of a Claim or Interest shall be permitted to change its vote as a consequence of the Plan Modifications.

86. **Restructuring Transactions**. On or before the Effective Date, the applicable Debtors will take any action as may be necessary or advisable to effectuate the Restructuring Transactions described in the Plan, the Restructuring Transactions Memorandum, and the Customer Onboarding Protocol, including: (a) the execution and delivery of any appropriate

agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (d) the transfer or distribution of any Cryptocurrency or Cash pursuant to the Asset Purchase Agreement and the Plan, as applicable; (e) the execution and delivery of the Plan Administrator Agreement; (f) any transactions necessary or appropriate to form the Wind-Down Debtor; (g) such other transactions that are required to effectuate the Restructuring Transactions, including any sales, mergers, consolidations, restructurings, conversions, dispositions, transfers, formations, organizations, dissolutions, or liquidations; (h) all transactions necessary to provide for the purchase of the Acquired Assets by Purchaser under the Asset Purchase Agreement; and (i) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

87.     This Confirmation Order shall, and shall be deemed to, pursuant to sections 1123 and 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions, the Sale Transaction, and the Liquidation Transaction, as applicable.

88.     **The Sale Transaction.** The Sale Transaction and the Asset Purchase Agreement, all other ancillary documents, and all of the terms and conditions thereof, are hereby approved,

pursuant to sections 105, 363, 364, and 554 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6004, and 9014, each as applicable. Entry of this Confirmation Order shall authorize the Debtors, the Purchaser, and the Wind-Down Debtor, as applicable, to undertake the transactions contemplated by the Asset Purchase Agreement, as applicable, including pursuant to sections 363, 365, 1123(a)(5)(B), and 1123(a)(5)(D) of the Bankruptcy Code.

89.     Pursuant to sections 363(b) and (f) of the Bankruptcy Code, the Debtors are authorized and empowered to take any and all actions necessary or appropriate to (a) consummate the Sale Transaction pursuant to and in accordance with the terms and conditions of the Asset Purchase Agreement, (b) close the Sale Transaction as contemplated in the Asset Purchase Agreement, and (c) execute and deliver, perform under, consummate, implement, and fully close the Asset Purchase Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Asset Purchase Agreement and the Sale Transaction.

90.     Subject to the restrictions set forth in this Confirmation Order, the Plan, and the Asset Purchase Agreement, the Debtors and the Purchaser hereby are authorized to take any and all actions as may be necessary or desirable, including any actions that otherwise would require further approval by shareholders, members, or its board of directors, as the case may be, without the need of obtaining such approvals, to implement the Sale Transaction, and any actions taken by the Debtors or the Purchaser necessary or desirable to implement the Sale Transaction prior to the date of this Confirmation Order, hereby are approved and ratified.

91.     This Confirmation Order and the terms and provisions of the Asset Purchase Agreement shall be binding in all respects upon the Debtors, their affiliates, their estates, all creditors of and holders of equity interests in any Debtor, any holders of Liens, Claims, or other

interests (whether known or unknown) in, against, or on all or any portion of the Acquired Assets, all counterparties to any executory contract or unexpired lease of the Debtors, the Purchaser and all successors and assigns of the Purchaser, the Acquired Assets, and any trustees, examiners, or receivers, if any, subsequently appointed in any of the Debtors' chapter 11 cases or upon a conversion to chapter 7 under the Bankruptcy Code of any of the Debtors' cases. This Confirmation Order and the Asset Purchase Agreement shall inure to the benefit of the Debtors, their estates and creditors, the Purchaser, and the respective successors and assigns of each of the foregoing.

92. Pursuant to sections 105(a), 363(b), 363(f), 365(b) and 365(f) of the Bankruptcy Code, the Debtors are authorized to transfer the Acquired Assets in accordance with the terms of the Asset Purchase Agreement and such transfer shall constitute a legal, valid, binding, and effective sale of the Acquired Assets and shall vest Purchaser with title to the Acquired Assets subject to the Asset Purchase Agreement, and the Acquired Assets shall be free and clear of all Liens, Claims, Encumbrances, and other interests of any kind or nature whatsoever (other than as expressly permitted under the Asset Purchase Agreement), with all such Liens, Claims, or other interests to attach to the cash proceeds of the Purchase Price ultimately attributable to the property against or in which such Liens, Claims, or other interests are asserted, subject to the terms thereof, with the same validity, force, and effect, and in the same order of priority, which such Liens, Claims, or other interests had prior to the Transaction, subject to any rights, claims, and defenses the Debtors or their estates, as applicable, may possess with respect thereto.

93. The sale of the Acquired Assets to the Purchaser pursuant to the Asset Purchase Agreement and the consummation of the transactions contemplated by the Asset Purchase Agreement do not require any consents other than as specifically provided for in the Asset

42

Purchase Agreement. Each and every federal, state, and local governmental agency or department

is hereby authorized to accept any and all documents and instruments necessary and appropriate

to consummate the transactions contemplated by the Asset Purchase Agreement. A certified copy

of this Confirmation Order may be filed with the appropriate clerk or recorded with the recorder

of any state, county, or local authority to act to cancel any of the Liens, Claims, and other

encumbrances of record.

94.     If any person or entity that has filed statements or other documents evidencing

Claims or Liens on, or interests in, all or any portion of the Acquired Assets shall not have

delivered to the Debtors, in proper form for filing and executed by the appropriate parties,

termination statements, instruments of satisfaction, releases of liens and easements, and any other

documents necessary for the purpose of documenting the release of all Claims, Liens, or interests

which the person or entity has or may assert with respect to all or any portion of the Acquired

Assets, the Debtors are hereby authorized, and the Purchaser is hereby authorized, on behalf of the

Debtors and the Debtors' creditors, to execute and file such statements, instruments, releases and

other documents on behalf of such person or entity with respect to the Acquired Assets. The

Debtors and the Purchaser are each authorized to file a copy of this Confirmation Order, which,

upon filing, shall be conclusive evidence of the release and termination of such Claim, Lien or

interest.

95.     This Confirmation Order is and shall be binding upon and govern the acts of all

persons and entities, including, without limitation, all filing agents, filing officers, title agents, title

companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative

agencies, governmental departments, secretaries of state, federal, state, and local officials, and all

other persons and entities who may be required by operation of law, the duties of their office, or

contract, to accept, file, register, or otherwise record or release any documents or instruments; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement.

96. All persons and entities that are presently, or on the Closing may be, in possession of some or all of the Acquired Assets pursuant to the Asset Purchase Agreement are hereby directed to surrender possession of the Acquired Assets to the Purchaser unless such person or entity was a good faith, bona fide purchaser of the Acquired Assets without notice of the Debtors' rights in such property. Subject to the terms, conditions, and provisions of this Confirmation Order, all persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtors to sell and/or transfer the Acquired Assets to the Purchaser in accordance with the terms of the Asset Purchase Agreement and this Confirmation Order.

97. Except as otherwise permitted by the Asset Purchase Agreement, the Plan, or this Confirmation Order, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, trade creditors, litigation claimants, and other creditors, holding Liens, Claims, or other interests of any kind or nature whatsoever against or in all or any portion of the Acquired Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinate), arising under or out of, in connection with, or in any way relating to the Debtors, the Acquired Assets, the operation of the Debtors' business prior to the closing of the Sale Transaction, or the transfer of the Acquired Assets to the Purchaser, hereby are forever barred, estopped and permanently enjoined from asserting against the Purchaser, any of

44

A-632

the foregoing's affiliates, successors, or assigns, their property or the Acquired Assets, such persons' or entities' Liens, Claims, or interests in and to the Acquired Assets, including, without limitation, the following actions: (a) commencing or continuing in any manner any action or other proceeding against the Purchaser and each of its affiliates, successors, assets or properties; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against the Purchaser and each of its affiliates, successors, assets, or properties; (c) creating, perfecting, or enforcing any Lien or other Claim against the Purchaser and each of its affiliates, successors, assets, or properties; (d) asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due the Purchaser, its affiliates or its successors; or (e) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Confirmation Order, or the agreements or actions contemplated or taken in respect thereof.

98.     All persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtors to sell and transfer the Acquired Assets to the Purchaser in accordance with the terms of the Asset Purchase Agreement, the Plan, and this Confirmation Order.

99.     Purchaser shall have no Liability (as defined in the Asset Purchase Agreement) for any Excluded Liability, and, other than as expressly set forth in the Asset Purchase Agreement, Purchaser is not assuming, by virtue of the consummation of the Sale Transaction, nor shall the Purchaser be liable or responsible for, as a successor or otherwise (including under any theory of successor or vicarious liability of any kind or character or any other theory of law or equity, including any theory of antirust, environmental successor or transferee liability, labor law, *de facto*

merger, or substantial continuity (including under applicable Money Transmitter Requirements or any securities or commodities Laws of any Governmental Body)):

(i)      any Liability (as defined in the Asset Purchase Agreement), debts, commitments, or obligations of the Debtors or any of their predecessors or affiliates or any obligations of the Debtors or their predecessors or affiliates, in all cases whether known or unknown, disclosed or undisclosed, now existing or hereafter arising, asserted or unasserted, fixed or contingent, choate or inchoate, liquidated or unliquidated, and in all cases to the extent relating to or arising from, in any way whatsoever, the Acquired Assets or the Debtors' operation of their businesses or use of the Acquired Assets or any such liabilities, debts, commitments, or obligations that in any way whatsoever are to be observed, paid, satisfied, compromised, or performed (in each case, including any liabilities that result from, relate to or arise out of tort or product liability claims), or

(ii)      any Liability (as defined in the Asset Purchase Agreement) calculable by reference to the Debtors or their assets or operations, or relating to the operation of the Debtors' businesses prior to the Closing of the Sale Transaction, or relating to continuing conditions existing, including with respect to any of Debtors' predecessors or affiliates, which liabilities, debts, commitments, and obligations are hereby extinguished insofar as they may give rise to successor liability, without regard to whether the claimant asserting any such liabilities, debts, commitments, or obligations has delivered to the Purchaser a release thereof.

For the avoidance of doubt, (i) nothing herein shall release the Purchaser with respect to its obligations as Distribution Agent of Cryptocurrency and Cash to Holders of Account Holder Claims and OpCo General Unsecured Creditor Claims as provided in, and subject to the terms and conditions of, the Asset Purchase Agreement and the Plan, and (ii) notwithstanding the transfer to Purchaser, pursuant to the Asset Purchase Agreement, of any Acquired Assets that constitute Coins or Cash, each User and Eligible Creditor shall retain, from and after the Closing of the Sale Transaction, all right, title, and interest in and to such Coins and Cash allocated to it on the Binance.US Platform in accordance with the Asset Purchase Agreement (notwithstanding any terms and conditions of the Binance.US Platform to the contrary, if any) through and including such time as such Coins and Cash are returned or distributed to Seller or such User and Eligible Creditor, as applicable, and such Coins and Cash shall be held by Purchaser solely in a custodial capacity in trust and solely for the benefit of Seller or the applicable User or Eligible Creditor.

100. The Asset Purchase Agreement and any related documents or other instruments may be modified, amended, or supplemented by the parties thereto and in accordance with the terms thereof, without further order of the Court.

101. Paragraphs 88–100 of this Confirmation Order shall be deemed to be excised from this Confirmation Order in the event that the Asset Purchase Agreement is terminated prior to Closing. For the avoidance of doubt, subject to the requirements set forth in the Asset Purchase Agreement (including, without limitation, Sections 6.22 and 5.2(c) thereof), the Debtors may exercise the "fiduciary out" in Section 8.1(g) of the Asset Purchase Agreement at any time prior to Closing.

102. **Corporate Action.** Upon the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, and, to the extent taken prior to the

Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, directors, managers, managing-members, limited or general partners, or officers of the Debtors, the Wind-Down Debtor, or any other Entity.

103.     All matters provided for in the Plan involving the corporate structure of the Debtors or the Wind-Down Debtor, as applicable, and any corporate action required by the Debtors or the Wind-Down Debtor, as applicable, in connection with the Plan shall be deemed to have occurred on, and shall be in effect as of, the Effective Date, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Wind-Down Debtor, as applicable.  On or, as applicable, prior to the Effective Date, the appropriate officers of the Debtors or the Wind-Down Debtor, as applicable, shall be authorized and, as applicable, directed to issue, execute, and deliver the agreements, documents, certificates of incorporation, certificates of formation, bylaws, operating agreements, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Wind-Down Debtor, and any and all other agreements, documents, and instruments relating to the foregoing.  The authorizations and approvals contemplated by Article IV.J of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

104.     As soon as practicable after the Effective Date, the Wind-Down Debtor shall take such actions as the Wind-Down Debtor may determine to be necessary or desirable to carry out the purposes of the Plan.  Any certificate of dissolution or equivalent document may be executed by the Wind-Down Debtor on behalf of any Wind-Down Debtor without need for any action or approval by the shareholders or board of directors or managers of such Debtor.  On and after the Effective Date, the Debtors or the Wind-Down Debtor (1) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously

48

conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (2) shall be deemed to have cancelled pursuant to the Plan all Interests, and (3) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date. Pursuant to the terms of the Plan, any Money Transmitter Licenses that have not been terminated shall be deemed withdrawn and no further action is required to be taken by the Debtors or the Wind-Down Debtor to effectuate such withdrawal; *provided* that, following the Effective Date, the Debtors or the Wind-Down Debtor, as applicable, shall use commercially reasonable efforts to comply with all state banking department requirements for the surrender of a Money Transmitter License. Notwithstanding such Debtors' dissolution, such Debtors shall be deemed to remain intact solely with respect to the preparation, filing, review, and resolution of applications for Professional Fee Claims.

105. **Binding Effect.** Upon the occurrence of the Effective Date, the terms of the Plan are immediately effective and enforceable and deemed binding on the Debtors, the Wind-Down Debtor, any and all Holders of Claims or Interests (regardless of whether such Holders of Claims or Interests have, or are deemed to have, accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan or this Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors. All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

106. Pursuant to section 1141 of the Bankruptcy Code, subject to the occurrence of the Effective Date and subject to the terms of the Plan and this Confirmation Order, all prior orders

entered in these Chapter 11 Cases and all documents and agreements executed by the Debtors as authorized and directed thereunder as of the Effective Date shall be binding upon and shall inure to the benefit of the Debtors, the Purchaser, or the Wind-Down Debtor, as applicable, and their respective successors and assigns.

107.    **Vesting of Assets.**  Except as otherwise provided in the Plan, this Confirmation Order, the Asset Purchase Agreement, the Schedule of Retained Causes of Action, or in any agreement, instrument, or other documented incorporated herein or therein, or in any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, notwithstanding any prohibition of assignability under applicable non-bankruptcy law and in accordance with section 1141 of the Bankruptcy Code, on the Effective Date, all property constituting Wind-Down Debtor Assets, including all Vested Causes of Action of the Debtors (unless otherwise released, waived, compromised, settled, satisfied, or transferred pursuant to the Plan) shall vest in the Wind-Down Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.

108.    Prior to the Effective Date, any and all of the Debtors' assets shall remain assets of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and on the Effective Date the Wind-Down Debtor Assets shall, subject to the Plan Administrator Agreement, be transferred to and vest in the Wind-Down Debtor.  For the avoidance of doubt, to the extent not otherwise waived in writing, released, settled, compromised, assigned, or sold pursuant to a prior order or the Plan, the Plan Administrator specifically retains and reserves the right to assert, after the Effective Date, any and all of the Vested Causes of Action and related rights, whether or not asserted as of the Effective Date, and all proceeds of the foregoing, subject to the terms of the Plan, including without limitation Article IV.F.

109.     Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, only the Wind-Down Debtor and the Plan Administrator shall have the right to pursue or not to pursue, or, subject to the terms hereof and the Plan Administrator Agreement, compromise or settle any Wind-Down Debtor Assets transferred to the Wind-Down Debtor.  On and after the Effective Date, the Wind-Down Debtor and the Plan Administrator may, without further Court approval, commence, litigate, and settle any Vested Causes of Action or Claims relating to any Wind-Down Debtor Assets transferred to the Wind-Down Debtor or rights to payment or Claims that belong to the Debtors as of the Effective Date or are instituted by the Wind-Down Debtor and Plan Administrator on or after the Effective Date, except as otherwise expressly provided herein and in the Plan Administrator Agreement.  The Wind-Down Debtor shall be entitled to enforce all defenses and counterclaims to all Claims asserted against the Debtors and their Estates, including setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code.

110.     Notwithstanding any prohibition on assignability under applicable non-bankruptcy law, on the Effective Date and thereafter if additional Wind-Down Debtor Assets become available, the Debtors shall be deemed, subject to the Plan Administrator Agreement, to have automatically transferred to the applicable Wind-Down Debtor all of their right, title, and interest in and to all of the Wind-Down Debtor Assets, in accordance with section 1141 of the Bankruptcy Code.  All such assets shall automatically vest in the Wind-Down Debtor free and clear of all Claims, Liens, and other interests, subject only to the Allowed Claims and Interests as set forth in the Plan and the expenses of the Wind-Down Debtor as set forth in the Plan and in the Plan Administrator Agreement.  Thereupon, the Debtors shall have no interest in or with respect to the Wind-Down Debtor Assets or the Wind-Down Debtor.

111.    On the Effective Date, the Debtors or Plan Administrator, as applicable, may establish one or more accounts or funds to hold and dispose of certain assets, pursue certain litigation (including the Vested Causes of Action), and/or satisfy certain Claims (including Claims that are contingent or have not yet been Allowed).  For any such account or fund, the Debtors or the Plan Administrator, as applicable, may take the position that grantor trust treatment applies in whole or in part.  To the extent such treatment applies to any such account or fund, for all U.S. federal income tax purposes, the beneficiaries of any such account or fund would be treated as grantors and owners thereof, and it is intended, to the extent reasonably practicable, that any such account or fund would be classified as a liquidating trust under section 301.7701-4 of the Treasury Regulations.  Alternatively, any such account or fund may be subject to the tax rules that apply to "disputed ownership funds" under 26 C.F.R. 1.468B–9.  If such rules apply, such assets would be subject to entity-level taxation, and the Debtors and Plan Administrator would be required to comply with the relevant rules.

112.    **Effectiveness of All Actions**.  All actions contemplated by the Plan, including all actions in connection with the Sale Transaction or the Liquidation Transaction, as applicable, are hereby effective and authorized to be taken on, prior to, or after the Effective Date, as applicable, under this Confirmation Order, without further application to, or order of the Court, or further action by the respective officers, directors, managers, members, or equity holders of the Debtors or the Wind-Down Debtor and with the effect that such actions had been taken by unanimous action of such officers, directors, managers, members, or equity holders.

113.    **Cancellation of Notes, Instruments, Certificates, and Other Documents.**  On the later of the Effective Date and the date on which distributions are made pursuant to the Plan (if not made on the Effective Date), except for the purpose of evidencing a right to and allowing

Holders of Claims and Interests to receive a distribution under the Plan or to the extent otherwise specifically provided for in the Plan, this Confirmation Order, or any agreement, instrument, or other document entered into in connection with or pursuant to the Plan or the Restructuring Transactions, all notes, bonds, indentures, certificates, Securities, shares, purchase rights, options, warrants, collateral agreements, subordination agreements, intercreditor agreements, or other instruments or documents directly or indirectly evidencing, creating, or relating to any indebtedness or obligations of, or ownership interest in, the Debtors, giving rise to any Claims against or Interests in the Debtors or to any rights or obligations relating to any Claims against or Interests in the Debtors shall be deemed cancelled without any need for a Holder to take further action with respect thereto.

114.    For the avoidance of doubt, cancellation of Existing Equity Interests pursuant to the Plan shall not affect the rights of the Holders of Existing Equity Interests to receive distributions, if any, under the Plan on account of such Existing Equity Interests.  Holders of Existing Equity Interests shall continue to possess all rights, powers, privileges, and standing associated with such Existing Equity Interests as if those Existing Equity Interests continue to exist subject to the terms of the Plan and this Confirmation Order.

115.    **Distributions.**  The procedures governing distributions contained in Article VI of the Plan shall be, and hereby are, approved in their entirety.  Except as otherwise set forth in the Plan or this Confirmation Order, the Plan Administrator shall make all distributions required under the Plan and the timing of distributions required under the Plan or this Confirmation Order shall be made in accordance with and as set forth in the Plan, this Confirmation Order, or the Plan Administrator Agreement, as applicable; *provided* that, if a creditor does not timely provide the Plan Administrator with its taxpayer identification number in the manner and by the deadline

53

established by the Plan Administrator and/or the Plan, the creditor shall be deemed to have forfeited its right to any current, reserved or future distributions provided for under the Plan and such creditor's Claim or Interest shall be disallowed and expunged without further order of the Court. Any such forfeited distribution shall be deemed to have reverted back to the Wind-Down Debtor for all purposes, including for distributions to other holders of Allowed Claims or Allowed Interests (as applicable) against the particular Debtor in respect of which the forfeited distribution was made, notwithstanding any federal, provincial or state escheat, abandoned or unclaimed property law to the contrary.

116. **Claims Register.** Any Claim or Interest that has been paid, satisfied, amended, superseded, cancelled, or otherwise expunged (including pursuant to the Plan) may be adjusted or expunged, as applicable, on the Claims Register at the direction of the Debtors or Wind-Down Debtor without the Debtors or Wind-Down Debtor having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Court.

117. **Preservation of Rights of Action.** In accordance with section 1123(b) of the Bankruptcy Code, the Wind-Down Debtor shall succeed to all rights to commence and pursue any and all Vested Causes of Action of the Debtors, whether arising before or after the Petition Date, including, without limitation, any actions specifically enumerated in the Schedule of Retained Causes of Action other than Causes of Action released, waived, settled, compromised, or transferred. Such rights shall be preserved by the Debtors and Wind-Down Debtor and shall vest in the Wind-Down Debtor, with the Wind-Down Debtor's rights to commence, prosecute, or settle such Causes of Action preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action expressly released, waived, settled, compromised, or transferred by the

Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII

of the Plan or pursuant to the Asset Purchase Agreement, which shall be deemed released and

waived by the Debtors and the Wind-Down Debtor as of the Effective Date.

118.    The Wind-Down Debtor may pursue such Causes of Action, as appropriate, in

accordance with the best interests of the beneficiaries of the Wind-Down Debtor and in accordance

with the Plan Administrator Agreement and the Plan.  No Entity may rely on the absence of a

specific reference in the Schedules of Assets and Liabilities or Statement of Financial Affairs, the

Plan, the Plan Supplement, the Disclosure Statement, or the Schedule of Retained Causes of Action

to any Cause of Action against it as any indication that the Debtors or the Wind-Down Debtor will

not pursue any and all available Causes of Action against it.  The Wind-Down Debtor, on behalf

of the Debtors and the Wind-Down Debtor, expressly reserves all rights to prosecute any and all

Causes of Action against any Entity, except as otherwise provided in the Plan, including Article

VIII of the Plan.  Unless any Cause of Action of the Debtors is expressly waived, relinquished,

exculpated, released, compromised, or settled in the Plan or pursuant to a Final Order, the Wind-

Down Debtor, on behalf of the Debtors and Wind-Down Debtor and in accordance with the Plan

Administrator Agreement, expressly reserves all such Causes of Action for later adjudication, and,

therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue

preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to

such Causes of Action upon, after, or as a consequence of Confirmation.

119.    The Wind-Down Debtor, on behalf of the Debtors and the Wind-Down Debtor,

reserves and shall retain such Causes of Action of the Debtors notwithstanding the rejection or

repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or

pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Cause

of Action that a Debtor may hold against any Entity shall vest in the Wind-Down Debtor, except as otherwise provided in the Plan, including Article VIII of the Plan. The Wind-Down Debtor, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Wind-Down Debtor shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Court in accordance with the Plan.

120. **Subordination.** Except as expressly provided in the Plan, the allowance, classification, and treatment of all Allowed Claims against and Allowed Interests in the Debtors and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors and the Wind-Down Debtor reserve the right to reclassify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

121. **Release of Liens.** Except as otherwise provided in the Plan, the Plan Supplement, or any contract, instrument, release, or other agreement or document created pursuant to the Plan or this Confirmation Order on the Effective Date, and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised, and all of the right, title, and interest of any holder of such mortgages, deeds of

trust, Liens, pledges, or other security interests against any property of the Debtors shall automatically revert to the applicable Debtor or Wind-Down Debtor, as applicable, and their successors and assigns, in each case, without any further approval or order of the Court and without any action or Filing being required to be made by the Debtors. The presentation or filing of this Confirmation Order to or with any local, state, federal, or foreign agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

122. **Governance of the Wind-Down Debtor.** The Plan Administrator shall appoint an independent director at each Debtor to act as a fiduciary for such Debtor entity in connection with the resolution of the Intercompany Claims.

123. **Intercompany Claims.** For the avoidance of doubt, nothing in this Confirmation Order or the Plan shall have any impact on the validity, extent, priority, or treatment of the Intercompany Claims. Any determination as to the validity, extent, priority, or treatment of the Intercompany Claims shall be determined by the Court in a separate matter on proper notice to parties in interest. Notwithstanding anything to the contrary in this Confirmation Order or the Plan, the rights of the ad hoc group of equityholders (the "AHG") to continue or participate in any adjudication of the Intercompany Claims are preserved, and any party reserves any and all rights, claims, and defenses in connection therewith, including without limitation, the Debtors and/or the Wind-Down Debtor's right to challenge the AHG's standing with respect thereto; *provided* that such right, claim, or defense is not based on any provision in this Confirmation Order or the Plan.

124. **FTX Settlement.** Pursuant to the terms of the FTX Settlement, the Debtors shall reserve and hold the amount of $445 million in Cash on account of the Preference Claims (as defined in the FTX Settlement) asserted by FTX, Alameda, and their estates in the FTX

Bankruptcy Proceeding, subject to all defenses and counterclaims thereto, until the final resolution of the Preference Claims by settlement or a final and unappealable order by the court in the FTX Bankruptcy Proceeding, including any appeals therefrom.

125. **General Settlement of Claims and Interests.** As discussed in detail in the Disclosure Statement and as otherwise provided in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan. The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of this Confirmation Order shall constitute the Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 of all such Claims, Interests, Causes of Action, and controversies, as well as a finding by the Court that such compromise and settlement is fair, equitable, reasonable, and in the best interests of the Debtors, their Estates, and Holders of Claims and Interests. Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Interests in any Class are intended to be and shall be final.

126. **Third-Party Releases.** For the avoidance of doubt, any party that did not affirmatively "opt in" to the Third-Party Releases contained in the Plan shall not be deemed to grant such Third-Party Releases contained in the Plan.

127. **Contributed Third Party Claims.** For the avoidance of doubt, any party that did not affirmatively "opt in" to contribute their Contributed Third-Party Claims to the Wind-Down

Debtor shall not be deemed to contribute their claims to the Wind-Down Debtor; *provided*, *however*, that any party may contribute their Contributed Third-Party Claims to the Wind-Down Debtor on or after the Effective Date by separate agreement with the Plan Administrator and Wind-Down Debtor. Any such agreement shall be valid to the same extent as if the party affirmatively opted in to contribute their Contributed Third-Party Claims to the Wind-Down Debtor.

128.  **Operations After Closing.**  On and after the Effective Date, expect as otherwise provided in the Plan, the Debtors or the Wind-Down Debtor may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

129.  **Assumption and Rejection of Executory Contracts and Unexpired Leases.**  On the Effective Date, except as otherwise provided in the Plan, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (a) is specifically described in the Plan as to be assumed in connection with confirmation of the Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement; (b) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Effective Date; (c) is to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, in connection with the Sale Transaction; (d) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; or (e) is a D&O Liability Insurance Policy other than the Side-A Policy.  Entry of this Confirmation Order constitutes approval of such assumptions, assignments, and rejections,

59

including the assumption of the Executory Contracts or Unexpired Leases as provided in the Plan Supplement, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Except as otherwise provided in this Confirmation Order, any and all objections or reservations of rights in connection with the rejection of an Executory Contract or Unexpired Lease under the Plan, if any, are overruled on their merits.

130. **Waiver or Estoppel.** Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed prior to the Confirmation Date.

131. **Insurance Policies and Surety Bonds.** Each D&O Liability Insurance Policy (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto) other than the Side-A Policy shall be assumed, in their entirety, without the need for any further notice to or action, order, or approval of the Court, as of the Effective Date, pursuant to sections 105 and 365 of the Bankruptcy Code with the Wind-Down Debtor being authorized to pursue any proceeds thereof on behalf of the Debtors or the Wind-Down Debtor. The Side-A Policy shall remain in effect during these Chapter 11 Cases with the Debtors, and the Wind-Down Debtor preserves all avoidance and other actions in connection with the premium paid thereunder. All beneficiaries under the D&O Insurance Policies reserve their rights under such D&O Insurance Policies subject to the limitations set forth in the Plan.

132. The Debtors or the Wind-Down Debtor, as applicable, shall not terminate or otherwise reduce the coverage under any D&O Liability Insurance Policy (including, without

limitation, any "tail policy" and all agreements, documents, or instruments related thereto) in effect prior to the Effective Date, and subject in all respects to the D&O Settlement, any current and former directors, officers, managers, and employees of the Debtors who served in such capacity at any time before or after the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy subject to the terms thereof regardless of whether such directors, officers, managers, and employees remain in such positions after the Effective Date. Notwithstanding anything to the contrary in the Plan, the Debtors or the Wind-Down Debtor shall retain the ability to supplement such D&O Liability Insurance Policy as the Debtors or Wind-Down Debtor may deem necessary, subject to the prior written consent of the Wind-Down Debtor.

133.    The Debtors shall continue to satisfy their obligations under their insurance policies in full and continue such programs in the ordinary course of business.  Each of the Debtors' insurance policies, and any agreements, documents, or instruments relating thereto shall be treated as Executory Contracts under the Plan.  On the Effective Date:  (a) the Debtors shall be deemed to have assumed all such insurance policies and any agreements, documents, and instruments relating thereto in their entirety and (b) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the applicable Wind-Down Debtor(s) unaltered.

134.    **Authorization to Consummate.**  The Debtors are authorized to consummate the Plan at any time after the entry of this Confirmation Order subject to satisfaction or waiver (by the required parties) of the conditions precedent to consummation as set forth in Article IX of the Plan.

135.    **Professional Compensation.**  All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than sixty (60) days after the Effective Date.  The Court shall determine

the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code and Bankruptcy Rules. The Wind-Down Debtor shall pay Professional Fee Claims in Cash to such Professionals in the amount the Court allows, including from funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by entry of an order of the Court; *provided* that the Debtors' and the Wind-Down Debtor's obligations to pay Allowed Professional Fee Claims shall not be limited or deemed limited to funds held in the Professional Fee Escrow Account.

136. No later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Court. No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. No funds held in the Professional Fee Escrow Account shall be property of the Estates of the Debtors or the Wind-Down Debtor. When all Professional Fee Claims Allowed by the Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Court, any remaining funds held in the Professional Fee Escrow Account shall be turned over to the Wind-Down Debtor without any further notice to or action, order, or approval of the Court or any other Entity.

137. The Professionals shall deliver to the Debtors a reasonable and good-faith estimate of their unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Confirmation Date projected to be outstanding as of the anticipated Effective Date, and shall

62

A-650

deliver such estimate no later than five Business Days prior to the anticipated Effective Date. For the avoidance of doubt, no such estimate shall be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that are the subject of a Professional's final request for payment of Professional Fee Claims Filed with the Court, and such Professionals are not bound to any extent by the estimates. If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional. The total aggregate amount so estimated to be outstanding as of the anticipated Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account; provided that the Wind-Down Debtor shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are Filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

138. Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors and/or the Wind-Down Debtor, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Wind-Down Debtor. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Wind-Down Debtor may employ and pay any Professional in the ordinary course of business for the period after the Confirmation Date without any further notice to or action, order, or approval of the Court.

139. **Return of Deposits.** All utilities, including, but not limited to, any Person or Entity that received a deposit or other form of adequate assurance of performance under section 366 of

A-651

the Bankruptcy Code during these Chapter 11 Cases, must return such deposit or other form of adequate assurance of performance to the Wind-Down Debtor promptly following the occurrence of the Effective Date, if not returned or applied earlier.

140. **Release, Exculpation, and Injunction Provisions.** The release, exculpation, injunction, opt in, and related provisions set forth in the Plan are approved and authorized in their entirety, and such provisions are effective and binding on all Persons and Entities to the extent provided therein except as otherwise provided in this Confirmation Order, *provided*, *however*, that nothing in the exculpation related provisions of the Plan shall release the Debtors from the provisions of the Plan governing satisfaction of Allowed Claims including Allowed Administrative Expense Claims or change the standard for liability on Allowed Claims or Allowed Administrative Expense Claims, subject to any applicable bankruptcy and non-bankruptcy law.

141. **Governmental Units.** Nothing in this Confirmation Order or the Plan shall effect a release of any claim by the United States or any of its agencies arising under the Internal Revenue Code, the environmental laws or any civil or criminal laws of the United States, or under any rules or regulations enforced by the United States or any of its agencies against the Released Parties, nor shall anything in the Confirmation Order or the Plan enjoin the United States from bringing any claim, suit, action or other proceedings against the Released Parties for any liability for any claim, suit or action arising under the Internal Revenue Code, the environmental laws or any civil or criminal laws of the United States, or under any rules or regulations enforced by the United States or any of its agencies, nor shall anything in the Confirmation Order or the Plan exculpate any such party from any liability to the United States or any of its agencies, arising under the Internal Revenue Code, the environmental laws or any civil or criminal laws of the United States, or under any rules or regulations enforced by the United States or any of its agencies; *provided*,

however, that nothing in this Confirmation Order or the Plan shall modify in any respect the relief previously granted in the Bar Date Order and thus no person or entity, including the United States or any of its agencies, can seek or receive a direct or indirect distribution of any property of the Debtors' estates unless they filed a Proof of Claim prior to the Governmental Bar Date.

142. **Securities and Exchange Commission Provisions.** Notwithstanding anything to the contrary in this Confirmation Order, or any findings announced at the Combined Hearing, nothing in this Confirmation Order, or announced at the Combined Hearing, constitutes a finding under the federal securities laws as to whether crypto tokens or transactions involving crypto tokens are securities, and the right of the SEC to challenge transactions involving crypto tokens on any basis is expressly reserved.

143. Notwithstanding any provision herein to the contrary, nothing in this Confirmation Order or the Plan grants this Court with jurisdiction over any police and regulatory actions by the SEC, and the SEC shall retain the power and authority to commence and continue any such actions against any person or entity, including without limitation, the Debtors, in any forum with jurisdiction; *provided*, however, that nothing in this Confirmation Order or the Plan shall modify in any respect the relief previously granted in the Bar Date Order and thus no person or entity, including the United States or any of its agencies, can seek or receive a direct or indirect distribution of any property of the Debtors' estates unless they filed a Proof of Claim prior to the Governmental Bar Date.

144. Upon the occurrence of the Effective Date, the Debtors' books and records shall be transferred to the Wind-Down Debtor, which shall continue to preserve all financial books and records, emails, and other financial documents relating to the Debtors' business that are currently in the Debtors' possession. The Wind-Down Debtor shall not destroy or otherwise abandon any

such documents or records without providing advance notice to the SEC (c/o Therese Scheuer, U.S. Securities and Exchange Commission, 100 F Street, NE, Washington, DC 20549, ScheuerT@SEC.GOV) and seeking further authorization from this Court. Nothing in the Plan or this Confirmation Order shall affect the obligations of the pre-Effective Date Debtors, the Wind-Down Debtor, and/or any transferee or custodian to maintain all books and records that are subject to any governmental subpoena, document preservation letter, or other investigative request from a governmental agency.

145.     Notwithstanding any language to the contrary herein, no provision in the Plan or this Confirmation Order shall (a) preclude the OSC or the SEC from enforcing its police or regulatory powers or (b) enjoin, limit, impair or delay the OSC or SEC from commencing or continuing any claims, causes of action, proceeding, or investigations against any non-Debtor person or non-Debtor entity in any forum.

146.     **Employee Transition Plan.** The Employee Transition Plan, the terms of which are included in the Plan Supplement as Exhibit H, will be implemented following the Effective Date and is not subject to the Court's approval.

147.     **Compliance with Tax Requirements.** In connection with the Plan, to the extent applicable, the Debtors, the Wind-Down Debtor, any Distribution Agent, and any other applicable withholding and reporting agents shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Debtors, the Wind-Down Debtor, the Distribution Agent, and any other applicable withholding and reporting agents shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including winding-down

a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms that are reasonable and appropriate; *provided* that the Wind-Down Debtor and the Distribution Agent, as applicable, shall request appropriate documentation from the applicable distributees and allow such distributees a reasonable amount of time to respond. The Debtors, the Wind-Down Debtor, the Distribution Agent, and any other applicable withholding and reporting agents reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

148. **Exemption from Certain Taxes and Fees.** To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Debtor, the Wind-Down Debtor, the Purchaser, or to any other Entity) of property under the Plan or pursuant to: (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Wind-Down Debtor; (b) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (c) the making, assignment, or recording of any lease or sublease; or (d) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, including the Asset Purchase Agreement, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, sales or use tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee,

or other similar tax or governmental assessment, and upon entry of this Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forgo the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

149.   **Termination of Asset Purchase Agreement.**  If the Asset Purchase Agreement is terminated and the Sale Transaction is not consummated, all provisions in this Confirmation Order relating to the Asset Purchase Agreement, the Sale Transaction, and the Purchaser shall be of no force and effect, and the Debtors are authorized to consummate the Liquidation Transaction without further order of the Court.

150.   **The Liquidation Transaction.**  If the Asset Purchase Agreement is terminated, the Debtors shall pursue the Liquidation Transaction contemplated under the Plan and shall provide all Holders of Claims and Interests with the treatment afforded to such Holders under the Plan.  In the event that the Debtors determine to pursue the Liquidation Transaction contemplated under Article IV of the Plan, the Debtors shall promptly notify the Court and all parties in interest.  The Plan shall be deemed to satisfy all requirements under the Bankruptcy Code with respect to either the Sale Transaction or the Liquidation Transaction pursuant to this Confirmation Order.

151.   **Documents, Mortgages, and Instruments.**  Each federal, state, commonwealth, local, foreign, or other governmental agency is authorized to accept any and all documents,

mortgages, and instruments necessary or appropriate to effectuate, implement, or consummate the Plan, including the Restructuring Transactions, and this Confirmation Order.

152. **The BNY Objection.** This Confirmation Order confirms that the Deed of Trust and Assignment of Rents recorded January 5, 2023 Official Records of Orange County (the "Deed") transferring title of 37 Black Hawk, Irvine, California 92603 (the "Property") from Michael G. Beason and Mickey L. Wiebeis (collectively, the "Property Borrowers") to Voyager Digital, LLC is void. This Confirmation Order may be recorded against the Property as evidence and confirmation that the Deed is void. The Bank Of New York Mellon f/k/a the Bank Of New York, As Trustee For The Certificateholders Of CWALT, Inc., Alternative Loan Trust 2005-38, Mortgage Pass-Through Certificates, Series 2005-38 as Serviced by Shellpoint Mortgage Servicing ("Shellpoint") shall be permitted to take any other the necessary actions to void the Deed. To the extent necessary, the automatic stay is lifted solely as it pertains to Shellpoint's rights to take action against the Property and shall be effective immediately upon entry of this Confirmation Order. The Debtor(s) shall not be party to any foreclosure or other proceeding related to the Property as they lack any interest in the Property. Shellpoint shall release the Debtors and the Wind-Down Debtor of any costs and claims incurred on account of the Property, including any actions taken in any foreclosure or other proceeding or associated with voiding the Deed. This Confirmation Order shall in no way prevent Shellpoint from pursuing any and all lawful rights and remedies as to the Property Borrowers.

153. **Continued Effect of Stays and Injunction.** Unless otherwise provided in the Plan or this Confirmation Order, all injunctions or stays arising under or entered during these Chapter 11 Cases under section 362 of the Bankruptcy Code or otherwise and in existence on the

Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

154. **Non-Severability.** Each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the Debtors' consent, consistent with the terms set forth herein; and (c) non-severable and mutually dependent.

155. **Notice of Subsequent Pleadings.** Except as otherwise provided in the Plan or in this Confirmation Order, notice of all subsequent pleadings in these Chapter 11 Cases after the Effective Date will be limited to the following parties: (a) the Wind-Down Debtor and its counsel; (b) the U.S. Trustee; (c) counsel to the Purchaser; (d) any party known to be directly affected by the relief sought by such pleadings; and (e) any party that specifically requests additional notice in writing to the Debtors, the Wind-Down Debtor, or the Plan Administrator, as applicable, or files a request for notice under Bankruptcy Rule 2002 after the Effective Date. The Notice and Claims Agent shall not be required to file updated service lists.

156. **Post-Confirmation Modifications.** Subject to the limitations and terms contained in the Plan and Purchaser's consent rights under the Asset Purchase Agreement, the Debtors, with the consent of the Committee, reserve the right to (a) amend or modify the Plan before the entry of this Confirmation Order, in accordance with the Bankruptcy Code and the Bankruptcy Rules and (b) after the entry of this Confirmation Order, the Debtors or the Wind-Down Debtor, as applicable, may, upon order of the Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, to remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan consistent with the terms set forth in the Plan.

70

157. **Plan Classification Controlling.** The terms of the Plan shall solely govern the classification of Claims and Interests for purposes of the distributions to be made thereunder and the classifications set forth on the ballots tendered to or returned by the Holders of Claims or Interests in connection with voting on the Plan: (a) were set forth thereon solely for purposes of voting to accept or reject the Plan; (b) do not necessarily represent, and in no event shall be deemed to modify or otherwise affect, the actual classification of Claims and Interests under the Plan for distribution purposes; (c) may not be relied upon by any Holder of a Claim or Interest as representing the actual classification of such Claim or Interest under the Plan for distribution purposes; and (d) shall not be binding on the Debtors except for voting purposes.

158. **Choice of Law.** Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan and any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, documents, instruments, or contracts, in which case the governing law of such agreement shall control); provided that corporate, limited liability company, or partnership governance matters relating to the Debtors or the Wind-Down Debtor, as applicable, shall be governed by the laws of the jurisdiction of incorporation or formation of the relevant Debtor or Wind-Down Debtor, as applicable.

159. **Applicable Nonbankruptcy Law.** The provisions of this Confirmation Order, the Plan and related documents, or any amendments or modifications thereto, shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.

160.   **Waiver of Filings.**  Any requirement under section 521 of the Bankruptcy Code or Bankruptcy Rule 1007 obligating the Debtors to file any list, schedule, or statement with the Court or the Office of the U.S. Trustee is permanently waived as to any such list, schedule, or statement not filed as of the Confirmation Date.

161.   **Governmental Approvals Not Required.**   This Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules, or regulations of any state, federal, or other governmental authority with respect to the dissemination, implementation, or consummation of the Plan and the Disclosure Statement, any certifications, documents, instruments or agreements, and any amendments or modifications thereto, and any other acts referred to in, or contemplated by, the Plan and the Disclosure Statement.   As provided in section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any permit or license of the Debtors or Wind-Down Debtor on account of the filing or pendency of the Chapter 11 Cases.

162.   **Protection Against Discriminatory Treatment.**   As provided by section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Entity, including Governmental Units, shall discriminate against any Wind-Down Debtor or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, or discriminate with respect to such a grant against, any Wind-Down Debtor, or any Entity with which a Wind-Down Debtor has been or is associated, solely because such Wind-Down Debtor was a debtor under chapter 11 of the Bankruptcy Code or may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases).

163.  **Notices of Confirmation and Effective Date.**  The Debtors or the Wind-Down Debtor, as applicable, shall serve notice of entry of this Confirmation Order, of the occurrence of the Effective Date, and of applicable deadlines (the "Notice of Confirmation") in accordance with Bankruptcy Rules 2002 and 3020(c) on all parties served with the Combined Hearing Notice seven Business Days after the Effective Date; *provided* that no notice of any kind shall be required to be mailed or made upon any Entity to whom the Debtors mailed notice of the Combined Hearing, but received such notice returned marked "undeliverable as addressed," "moved, left no forwarding address," or "forwarding order expired," or similar reason, unless the Debtors have been informed in writing by such Entity, or are otherwise aware, of that Entity's new address.  For those parties receiving electronic service, filing on the docket is deemed sufficient to satisfy such service and notice requirements.

164.  No later than ten Business Days after the Effective Date, the Wind-Down Debtor shall cause the Notice of Confirmation, modified for publication, to be published on one occasion in *The New York Times* (national edition) and *USA Today* (national edition).  Mailing and publication of the Notice of Confirmation in the time and manner set forth in this paragraph will be good, adequate, and sufficient notice under the particular circumstances and in accordance with the requirements of Bankruptcy Rules 2002 and 3020(c).  No further notice is necessary.

165.  The Notice of Confirmation will have the effect of an order of the Court, will constitute sufficient notice of the entry of this Confirmation Order to filing and recording officers, and will be a recordable instrument notwithstanding any contrary provision of applicable nonbankruptcy law.  The above-referenced notices are adequate under the particular circumstances of these Chapter 11 Cases and no other or further notice is necessary.

166.   **Dissolution of Statutory Committees.**  On the Effective Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases; *provided*, *however*, that such committees will remain in existence for the limited purposes of (a) pursuing, supporting, or otherwise participating in, any outstanding appeals in the Chapter 11 Cases; and (b) filing, objecting, or otherwise participating in, any final fee applications of Professionals.

167.   **Exemption from Registration.**  The Plan Administrator shall hold the equity of the Voyager Digital Ltd., to the extent that any new equity is issued, in an agency capacity, for the benefit of and to facilitate the rights of Holders of Interests provided under the Plan and any such equity shall not be deemed "securities" under applicable laws.

168.   Distributions to Holders of Claims and Interests in accordance with the Plan shall not be deemed to be unlicensed money transmission or to violate any securities laws.

169.   **Effect of Non-Occurrence of Conditions to Confirmation.**  If the Effective Date does not occur within 120 days after the Confirmation Date, then the Plan will be null and void in all respects, any and all compromises or settlements not previously approved by Final Order of the Court embodied in the Plan (including with respect to the fixing, limiting, or treatment of any Claim or Interest), shall be deemed null and void, and nothing contained in the Plan or the Disclosure Statement shall:  (a) constitute a waiver or release of any Claims, Interests, or Causes of Action held by any Debtor or any other Entity; (b) prejudice in any manner the rights of any Debtor or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity in any respect.

170. **Substantial Consummation.** On the Effective Date, the Plan shall be deemed to have been substantially consummated or shall be anticipated to be substantially consummated concurrent with the occurrence of the Effective Date.

171. **Waiver of Stay.** For good cause shown, the stay of this Confirmation Order provided by any Bankruptcy Rule is waived, and this Confirmation Order shall be effective and enforceable immediately upon its entry by the Court.

172. **Immediate Binding Effect.** Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtors, the Wind-Down Debtor, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, exculpations, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors. All Claims against and Interests in the Debtors shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or Interest has voted on the Plan.

173. **References to and Omissions of Plan Provisions.** References to articles, sections, and provisions of the Plan are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan. The failure to specifically include or to refer to any particular article, section, or provision of the Plan in this Confirmation Order shall not diminish or impair the effectiveness of such article, section, or provision, it being the intent of the Court that the Plan be confirmed in its entirety, except as expressly modified herein, and incorporated herein by reference.

A-663

174.   **Headings.**  Headings utilized herein are for convenience and reference only, and do not constitute a part of the Plan or this Confirmation Order for any other purpose.

175.   **Effect of Conflict.**  This Confirmation Order supersedes any Court order issued prior to the Confirmation Date that may be inconsistent with this Confirmation Order.  If there is any inconsistency between the terms of the Plan and the terms of this Confirmation Order, the terms of this Confirmation Order shall govern and control.

176.   **Final, Appealable Order.**  This Confirmation Order is a final judgment, order, or decree for purposes of 28 U.S.C. § 158(a), and the period in which an appeal must be filed shall commence upon the entry hereof.

177.   **Retention of Jurisdiction.**  The Court may properly, and upon the Effective Date shall, to the full extent set forth in the Plan, retain jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including (i) the matters set forth in Article XI of the Plan and (ii) as set forth in Section 10.13 of the Asset Purchase Agreement.

New York, New York
Dated: _____, 2023

_____
THE HONORABLE MICHAEL E. WILES
UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT A

**The Plan**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC. *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

---

### THIRD AMENDED JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN OFFER, ACCEPTANCE, COMMITMENT, OR LEGALLY BINDING OBLIGATION OF THE DEBTORS OR ANY OTHER PARTY IN INTEREST, AND THIS PLAN IS SUBJECT TO APPROVAL BY THE BANKRUPTCY COURT AND OTHER CUSTOMARY CONDITIONS.  THIS PLAN IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES.

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Voyager Digital Holdings, Inc. (7687); Voyager Digital, LTD. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

**TABLE OF CONTENTS**

Page

Introduction ..........................................................................................................................1

Article I. Defined Terms, Rules of Interpretation, Computation of Time, Governing Law, and
    Other References.......................................................................................................1

    A.    Defined Terms .......................................................................................1
    B.    Rules of Interpretation .........................................................................17
    C.    Computation of Time ...........................................................................17
    D.    Governing Law ....................................................................................18
    E.    Reference to Monetary Figures.............................................................18
    F.    Reference to the Debtors or the Wind-Down Debtor .............................18
    G.    Nonconsolidated Plan ..........................................................................18

Article II. Administrative and Priority Claims ...................................................................18

    A.    Administrative Claims ..........................................................................18
    B.    Professional Fee Claims .......................................................................19
    C.    Priority Tax Claims .............................................................................20

Article III. Classification, Treatment, and Voting of Claims and Interests ............................21

    A.    Classification of Claims and Interests ...................................................21
    B.    Summary of Classification....................................................................21
    C.    Treatment of Classes of Claims and Interests........................................22
    D.    Special Provision Governing Unimpaired Claims..................................28
    E.    Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes ..28
    F.    Subordinated Claims............................................................................28
    G.    Intercompany Interests.........................................................................28
    H.    Controversy Concerning Impairment ....................................................29
    I.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy
        Code ...................................................................................................29

Article IV. Provisions for Implementation of the Plan.........................................................29

    A.    General Settlement of Claims and Interests............................................29
    B.    Restructuring Transactions ...................................................................29
    C.    The Sale Transaction ...........................................................................30
    D.    The Liquidation Transaction.................................................................30
    E.    Employee Transition Plan ....................................................................31
    F.    Non-Released D&O Claims...................................................................32
    G.    The D&O Settlement ...........................................................................32
    H.    The Wind-Down Debtor ......................................................................34
    I.    Sources of Consideration for Plan Distributions ...................................41
    J.    Corporate Existence and Dissolution....................................................41
    K.    Corporate Action.................................................................................42
    L.    Vesting of Assets in the Wind-Down Debtor.........................................43
    M.    Cancellation of Notes, Instruments, Certificates, and Other Documents ............43
    N.    Effectuating Documents; Further Transactions .....................................43
    O.    Section 1146(a) Exemption .................................................................44

P.   Preservation of Rights of Action ...................................................................44
Q.   Election to Contribute Third-Party Claims ..................................................45
R.   Contribution of Contributed Third-Party Claims ........................................45
S.   Closing the Chapter 11 Cases .......................................................................45

**Article V. Treatment of Executory Contracts and Unexpired Leases ....................................46**

A.   Assumption and Rejection of Executory Contracts and Unexpired Leases .........46
B.   Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases ......................................................................................46
C.   Claims Based on Rejection of Executory Contracts or Unexpired Leases ...........46
D.   Cure of Defaults for Executory Contracts and Unexpired Leases Assumed .......47
E.   Insurance Policies .........................................................................................48
F.   Reservation of Rights ....................................................................................49
G.   Nonoccurrence of Effective Date .................................................................49
H.   Contracts and Leases Entered into After the Petition Date .......................49

**Article VI. Provisions Governing Distributions ........................................................................49**

A.   Timing and Calculation of Amounts to Be Distributed ..............................49
B.   Rights and Powers of Distribution Agent .....................................................50
C.   Delivery of Distributions and Undeliverable or Unclaimed Distributions ..........50
D.   Compliance Matters .......................................................................................52
E.   Foreign Currency Exchange Rate .................................................................52
F.   Claims Paid or Payable by Third Parties ......................................................53
G.   Setoffs and Recoupment ...............................................................................53
H.   Allocation between Principal and Accrued Interest .....................................54

**Article VII. Procedures for Resolving Disputed, Contingent, and Unliquidated Claims and Interests ..........................................................................................54**

A.   Disputed Claims Process ...............................................................................54
B.   Objections to Claims or Interests ..................................................................55
C.   Estimation of Claims .....................................................................................55
D.   No Distributions Pending Allowance ............................................................56
E.   Distributions After Allowance .......................................................................56
F.   No Interest .....................................................................................................56
G.   Adjustment to Claims and Interests without Objection ...............................56
H.   Time to File Objections to Claims .................................................................56
I.   Disallowance of Claims or Interests .............................................................57
J.   Amendments to Proofs of Claim ..................................................................57

**Article VIII. Effect of Confirmation of the Plan ........................................................................57**

A.   Releases by the Debtors .................................................................................57
B.   Releases by Holders of Claims and Interests ...............................................58
C.   Exculpation ....................................................................................................59
D.   Injunction .......................................................................................................59
E.   Release of Liens .............................................................................................60
F.   OSC and SEC .................................................................................................60
G.   Protection against Discriminatory Treatment ..............................................60
H.   Document Retention ......................................................................................60
I.   Reimbursement or Contribution ...................................................................61

ii

        J.       Term of Injunctions or Stays ........................................................................61

**Article IX. Conditions Precedent to the Effective Date** ...........................................**61**

        A.       Conditions Precedent to the Effective Date .................................................61
        B.       Waiver of Conditions Precedent .................................................................62
        C.       Effect of Non-Occurrence of Conditions to Consummation ............................62

**Article X. Modification, Revocation, or Withdrawal of the Plan** ............................**62**

        A.       Modification of Plan .................................................................................62
        B.       Effect of Confirmation on Modifications .....................................................63
        C.       Revocation or Withdrawal of Plan ..............................................................63

**Article XI. Retention of Jurisdiction** ......................................................................**63**

**Article XII. Miscellaneous Provisions** ....................................................................**65**

        A.       Immediate Binding Effect ..........................................................................65
        B.       Additional Documents ...............................................................................65
        C.       Payment of Statutory Fees .........................................................................65
        D.       Dissolution of Statutory Committees ...........................................................66
        E.       Reservation of Rights ................................................................................66
        F.       Successors and Assigns ..............................................................................66
        G.       Service of Documents ...............................................................................66
        H.       Entire Agreement; Controlling Document .....................................................67
        I.       Plan Supplement ......................................................................................67
        J.       Non-Severability ......................................................................................67
        K.       Votes Solicited in Good Faith .....................................................................67
        L.       Waiver or Estoppel ...................................................................................68

## INTRODUCTION

Voyager Digital Holdings, Inc. and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (each a "Debtor" and, collectively, the "Debtors") propose this third amended joint plan (the "Plan") for the resolution of the outstanding Claims against and Interests in the Debtors pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used in the Plan and not otherwise defined shall have the meanings set forth in Article I.A of the Plan. Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The classifications of Claims and Interests set forth in Article III of the Plan shall be deemed to apply separately with respect to each Plan proposed by each Debtor, as applicable. The Plan does not contemplate substantive consolidation of any of the Debtors. Reference is made to the Disclosure Statement for a discussion of the Debtors' history, business, properties and operations, projections, risk factors, a summary and analysis of this Plan, and certain related matters.

ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE I.

## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES

### A. Defined Terms

Capitalized terms used in this Plan have the meanings ascribed to them below.

1. "*3AC*" means Three Arrows Capital, Ltd and any of its Affiliates or subsidiaries.

2. "*3AC Claims*" means the claims or causes of action asserted or assertable by the Debtors against 3AC, whether in the 3AC Liquidation Proceeding or otherwise.

3. "*3AC Liquidation Proceeding*" means that certain liquidation proceeding captioned *In the Matter of Three Arrows Capital Ltd. and in the Matter of Sections 159(1) and 162(1)(a) and (b) of the Insolvency Act 2003*, Claim No. BVIHC(COM)2022/0119 before the Eastern Caribbean Supreme Court in the High Court of Justice in the British Virgin Islands and the chapter 15 foreign recognition proceeding captioned *In re Three Arrows Capital, Ltd.*, No. 22-10920 (Bankr. S.D.N.Y. Jul. 1, 2022).

4. "*3AC Loan*" means that loan of 15,250 Bitcoins and 350 million USDC to 3AC pursuant to that certain master loan agreement dated March 4, 2022 by and between 3AC, as borrower, and OpCo and HTC Trading, Inc., as lenders.

5. "*3AC Recovery*" means the recovery, if any, of the Debtors from 3AC on account of the 3AC Claims.

6. "*Account*" means any account at OpCo held by an Account Holder relating to Cryptocurrency, which Account is identified in the Debtors' books and records as holding Cryptocurrency as of the Petition Date.

7.      "*Account Holder*" means any Person or Entity who holds an Account with OpCo as of the Petition Date.

8.      "*Account Holder Claim*" means any Claim against the Debtors that is held by an Account Holder on account of such Holder's Account.

9.      "*Acquired Assets*" has the meaning ascribed to it in the Asset Purchase Agreement.

10.     "*Acquired Coins*" has the meaning ascribed to it in the Asset Purchase Agreement.

11.     "*Acquired Coins Value*" has the meaning ascribed to it in the Asset Purchase Agreement.

12.     "*Additional Bankruptcy Distribution*" has the meaning ascribed to it in the Asset Purchase Agreement.

13.     "*Administrative Claim*" means a Claim against a Debtor for the costs and expenses of administration of the Chapter 11 Cases arising on or after the Petition Date and prior to the Effective Date pursuant to section 503(b) of the Bankruptcy Code and entitled to priority pursuant to sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' business and (b) Allowed Professional Fee Claims.

14.     "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims (other than requests for payment of Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code), which:  (a) with respect to Administrative Claims other than Professional Fee Claims, shall be thirty days after the Effective Date; and (b) with respect to Professional Fee Claims, shall be forty-five days after the Effective Date.

15.     "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.  With respect to any Person that is not a Debtor, the term "Affiliate" shall apply to such Person as if the Person were a Debtor.

16.     "*Alameda*" means Alameda Ventures Ltd., along with its Affiliates and subsidiaries.

17.     "*Alameda Claims*" means the claims or causes of action asserted or assertable by the Debtors against Alameda, whether in the FTX Bankruptcy Proceeding or otherwise.

18.     "*Alameda Loan Agreement*" means that certain unsecured loan agreement, dated as of June 21, 2022, as amended, restated, amended and restated, modified, or supplemented from time to time, by and among HoldCo, as the borrower, TopCo, as the guarantor, and Alameda, as the lender thereto.

19.     "*Alameda Loan Facility*" means that certain unsecured loan facility provided for under the Alameda Loan Agreement.

20.     "*Alameda Loan Facility Claims*" means any Claim against any Debtor derived from, based upon, or arising under the Alameda Loan Agreement and any fees, costs, and expenses that are reimbursable by any Debtor pursuant to the Alameda Loan Agreement.

21.     "*Alameda Recovery*" means the recovery, if any, of the Debtors from Alameda on account of the Alameda Claims.

22.     "*Allowed*" means, with respect to any Claim or Interest, except as otherwise provided herein:  (a) a Claim or Interest that is evidenced by a Proof of Claim timely Filed by the Bar Date or a request for payment of Administrative Claim timely Filed by the Administrative Claims Bar Date (or for which Claim or Interest under the Plan, the Bankruptcy Code, or a Final Order of the Bankruptcy Court a Proof of Claim or a request for payment of Administrative Claim is not or shall not be required to be Filed); (b) a Claim or Interest that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely Filed; (c) a Claim or Interest Allowed pursuant to the Plan, any stipulation approved by the Bankruptcy Court, any contract, instrument, indenture, or other agreement entered into or assumed in connection with the Plan, or a Final Order of the Bankruptcy Court, or (d) a Claim or Interest as to which the liability of the Debtors and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court; *provided* that, with respect to a Claim or Interest described in clauses (a) and (b) above, such Claim or Interest shall be considered Allowed only if and to the extent that with respect to such Claim or Interest no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or if such an objection is so interposed, such Claim or Interest shall have been Allowed by a Final Order.  Any Claim or Interest that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes. A Proof of Claim Filed after and subject to the Bar Date or a request for payment of an Administrative Claim Filed after and subject to the Administrative Claims Bar Date, as applicable, shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim.  "Allow" and "Allowing" shall have correlative meanings.

23.     "*Asset Purchase Agreement*" means that certain asset purchase agreement dated as of December 18, 2022 by and between BAM Trading Services Inc. (d/b/a Binance.US) as Purchaser and Voyager Digital, LLC as Seller.

24.     "*Assumed Liabilities*" has the meaning ascribed to it in the Asset Purchase Agreement.

25.     "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or hereafter amended.

26.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York, or any other court having jurisdiction over the Chapter 11 Cases, including to the extent of the withdrawal of reference under section 157 of the Judicial Code, the United States District Court for the Southern District of New York.

27.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated by the United States Supreme Court under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

28.     "*Bar Date*" means the applicable deadline by which Proofs of Claim must be Filed, as established by:  (a) the Bar Date Order; (b) a Final Order of the Bankruptcy Court; or (c) the Plan.

29.     "*Bar Date Order*" means the *Order (I) Setting Deadlines for Submitting Proofs of Claims, (II) Approving Procedures for Submitting Proofs of Claim, and (III) Approving Notice Thereof* [Docket No. 218].

30.     "*Binance.US Platform*" has the meaning ascribed to it in the Asset Purchase Agreement.

31.     "*Binance US*" means BAM Trading Services Inc. (d/b/a Binance.US).

32.     "*Binance US Account*" means a customer account opened with the Purchaser by an Account Holder or a Holder of an Allowed OpCo General Unsecured Claim.

33.     "*Business Day*" means any day, other than a Saturday, Sunday, or a "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

34.     "*Cash*" or "*$*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

35.     "*Causes of Action*" mean any action, Claim, cross-claim, third-party claim, damage, judgment, cause of action, controversy, demand, right, suit, obligation, liability, debt, account, defense, offset, power, privilege, license, Lien, indemnity, interest, guaranty, or franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, matured or unmatured, suspected or unsuspected, in contract or in tort, at law or in equity, or pursuant to any other theory of law in accordance with applicable law.  For the avoidance of doubt, "Causes of Action" includes:  (a) any right of setoff, counterclaim, or recoupment and any claim arising from any contract or for breach of duties imposed by law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of local, state, federal, or foreign law, or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) any right to object to or otherwise contest Claims or Interests; (d) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; and (e) any claim or defense, including fraud, mistake, duress, usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

36.     "*CCO*" means Evan Psaropoulos.

37.     "*CEO*" means Stephen Ehrlich.

38.     "*Certificate*" means any instrument evidencing a Claim or an Interest.

39.     "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor in the Bankruptcy Court under chapter 11 of the Bankruptcy Code and (b) when used with reference to all Debtors, the procedurally consolidated cases filed for the Debtors in the Bankruptcy Court under chapter 11 of the Bankruptcy Code.

40.     "*Claim*" has the meaning set forth in section 101(5) of the Bankruptcy Code.

41.     "*Claims Objection Bar Date*" means the deadline for objecting to a Claim, which shall be on the date that is the later of (a) (i) with respect to Administrative Claims (other than Professional Fee Claims and Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code), sixty days after the Administrative Claims Bar Date or (ii) with respect to all other Claims (other than Professional Fee Claims), 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by the Debtors or the Wind-Down Debtor, as applicable, as approved by an order of the Bankruptcy Court for objecting to such Claims.

42.    "*Claims Register*" means the official register of Claims against and Interests in the Debtors maintained by the Clerk of the Bankruptcy Court or the Claims, Noticing, and Solicitation Agent.

43.    "*Claims, Noticing, and Solicitation Agent*" means Bankruptcy Management Solutions, Inc. d/b/a Stretto, in its capacity as the claims, noticing, and solicitation agent in the Chapter 11 Cases for the Debtors and any successors appointed by an order of the Bankruptcy Court.

44.    "*Class*" means a class of Claims against or Interests in the Debtors as set forth in Article III of the Plan in accordance with section 1122(a) of the Bankruptcy Code.

45.    "*Committee*" means the Official Committee of Unsecured Creditors appointed in these Chapter 11 Cases.

46.    "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

47.    "*Confirmation Date*" means the date on which Confirmation occurs.

48.    "*Confirmation Hearing*" means the hearing before the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code at which the Debtors will seek Confirmation of the Plan.

49.    "*Confirmation Order*" has the meaning ascribed to it in the Asset Purchase Agreement.

50.    "*Consummation*" means the occurrence of the Effective Date.

51.    "*Contributed Third-Party Claims*" means all direct Causes of Action that any Contributing Claimant has against any Person (other than a Debtor) that had a direct relationship with the Debtors, their predecessors, or respective affiliates and that harmed such Contributing Claimant in the claimant's capacity as a creditor of Voyager, including (a) all Causes of Action based on, arising out of, or related to the marketing, sale, and issuance of Cryptocurrency that at any point was held or offered on Voyager's platform; (b) all Causes of Action based on, arising out of, or related to the alleged misrepresentation of any of the Debtors' financial information, business operations, or related internal controls; and (c) all Causes of Action based on, arising out of, or related to any alleged failure to disclose, or actual or attempted cover up or obfuscation of, any of the Debtors' conduct prior to the Petition Date; *provided*, *however*, that Contributed Third-Party Claims do not include (i) any derivative claims of the Debtors; (ii) any direct claims against the Released Parties; (iii) any direct Causes of Action that any Contributing Claimant has against Mark Cuban, Dallas Basketball Limited d/b/a Dallas Mavericks, the National Basketball Association, and any of their Related Parties; or (iv) any direct Causes of Action that any Contributing Claimant, in its capacity as an equity holder of Voyager Digital Ltd., has that are asserted in the currently filed complaint, dated as of July 6, 2022, in the Ontario Superior Court of Justice by Francine De Sousa, against Voyager Digital Ltd., Stephen Ehrlich, Philip Eytan, Evan Psaropoulos, Lewis Bateman, Krisztian Toth, Jennifer Ackart, Glenn Stevens, and Brian Brooks.

52.    "*Contributing Claimants*" means any Holders of Claims or Interests that elect on their ballots or opt-in forms to contribute their Contributed Third-Party Claims to the Wind-Down Debtor.

53.    "*Cryptocurrency*" means a digital currency or crypto asset in which transactions are verified and records maintained by a decentralized system using cryptography, rather than by a centralized authority, including stablecoins, digital coins and tokens, such as security tokens, utility tokens and governance tokens.

54.    "*Cure*" or "*Cure Claim*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's default under an Executory Contract or an Unexpired Lease assumed by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

55.    "*Customer Onboarding Protocol*" means the protocol describing the process of onboarding Account Holders and Holders of OpCo General Unsecured Claims onto the Binance.US Platform, the form of which shall be included in the Plan Supplement and filed no later than by February 8, 2023, and which shall be in a form acceptable to the Purchaser.

56.    "*D&O Carriers*" means the insurance carriers of the D&O Liability Insurance Policies.

57.    "*D&O Liability Insurance Policies*" means all unexpired insurance policies maintained by the Debtors, the Wind-Down Debtor, or the Estates as of the Effective Date that have been issued (or provide coverage) regarding directors', managers', officers', members', and trustees' liability (including any "tail policy"), including but not limited to the Management Liability Policy, the Excess Policies, and the Side-A Policy, and all agreements, documents, or instruments relating thereto.

58.    "*D&O Settlement*" means the settlement between the Debtors and CEO and CCO as set forth in Article IV.G of the Plan.

59.    "*Debtors*" means, collectively, each of the following:  Voyager Digital Holdings, Inc.; Voyager Digital Ltd.; and Voyager Digital, LLC.

60.    "*Definitive Documents*" means:  (a) the Plan (and any and all exhibits, annexes, and schedules thereto); (b) the Confirmation Order; (c) the Disclosure Statement and the other Solicitation Materials; (d) the Disclosure Statement Order; (e) all pleadings filed by the Debtors in connection with the Chapter 11 Cases (or related orders); (f) the Plan Supplement; (g) the Employee Transition Plan; (h) any new material employment, consulting, or similar agreements entered into between the Wind-Down Debtor and any of the Debtors' employees, if any; (i) the Asset Purchase Agreement; (j) the Customer Onboarding Protocol; and (k) any and all other deeds, agreements, filings, notifications, pleadings, orders, certificates, letters, instruments or other documents reasonably desired or necessary to consummate and document the transactions contemplated by the Restructuring Transactions (including any exhibits, amendments, modifications, or supplements made from time to time thereto).

61.    "*Disclosure Statement*" means the *Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, as may be amended, supplemented, or otherwise modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan.

62.    "*Disclosure Statement Order*" means the order entered by the Bankruptcy Court approving the Disclosure Statement.

63.    "*Disputed*" means a Claim or an Interest or any portion thereof:  (a) that is not Allowed; (b) that is not disallowed under the Plan, the Bankruptcy Code, or a Final Order; and (c) with respect to which a party in interest has Filed a Proof of Claim, a Proof of Interest, or otherwise made a written request to a Debtor for payment.

64.    "*Disputed Claims Reserve*" means an appropriate reserve in an amount to be determined by the Wind-Down Debtor for distributions on account of Disputed Claims that are subsequently Allowed after the Effective Date, in accordance with Article VII.D hereof.

65. "*Distributable Cryptocurrency*" means all Cryptocurrency held on the Voyager platform or that is otherwise property of any Debtor on the Effective Date after payment in full of, or reserve for, all Allowed Administrative Claims, Priority Tax Claims, Secured Tax Claims, and Other Priority Claims.

66. "*Distributable HoldCo Cash*" means HoldCo's Cash, less (x) any Cash necessary to satisfy Allowed Administrative Claims, Priority Tax Claims, Secured Tax Claims, and Other Priority Claims at HoldCo in full; and (y) to fund HoldCo's Pro Rata share of the Wind-Down Budget.

67. "*Distributable OpCo Cash*" means OpCo's Cash, including the Purchase Price Cash, less (x) any Cash necessary to satisfy Allowed Administrative Claims, Priority Tax Claims, Secured Tax Claims, and Other Priority Claims at OpCo in full; and (y) to fund OpCo's Pro Rata share of the Wind-Down Budget.

68. "*Distributable TopCo Cash*" means TopCo's Cash, less (x) any Cash necessary to satisfy Allowed Administrative Claims, Priority Tax Claims, Secured Tax Claims, and Other Priority Claims at TopCo in full; and (y) to fund TopCo's Pro Rata share of the Wind-Down Budget.

69. "*Distribution Agent*" means, as applicable, the Purchaser, the Debtors, the Wind-Down Debtor or any Entity or Entities designated by the Purchaser, the Debtors, or the Wind-Down Debtor to make or to facilitate distributions that are to be made pursuant to the Plan, Definitive Documents, and Asset Purchase Agreement.

70. "*Distribution Date*" means, except as otherwise set forth herein, the date or dates determined by the Debtors or the Wind-Down Debtor, on or after the Effective Date, upon which the Distribution Agent shall make distributions to Holders of Allowed Claims or Allowed Interests entitled to receive distributions under the Plan.

71. "*Distribution Record Date*" means the record date for purposes of determining which Holders of Allowed Claims and Interests against the Debtors are eligible to receive distributions under the Plan, which date shall be the Effective Date, or such other date as is determined by the Debtors or designated by an order of the Bankruptcy Court.

72. "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which (a) all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of the Plan have been satisfied or waived in accordance with Article IX.B of the Plan, (b) no stay of the Confirmation Order is in effect, and (c) the Debtors declare the Plan effective.

73. "*Employee Transition Plan*" has the meaning set forth in Article IV.E of the Plan, and which shall be in form and substance reasonably acceptable to the Committee.

74. "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

75. "*Estate*" means, as to each Debtor, the estate created on the Petition Date for the Debtor in its Chapter 11 Case pursuant to sections 301 and 541 of the Bankruptcy Code and all property (as defined in section 541 of the Bankruptcy Code) acquired by the Debtor after the Petition Date through and including the Effective Date.

76. "*Excess Policies*" means, collectively, the Excess Insurance Policy, No. EFI1203041-01, issued by Euclid Financial on behalf of Certain Underwriters of Lloyd's, London, the Excess Insurance Policy, No. RILEDOA3392022, issued by Relm Insurance Ltd., both for the February 22, 2022 to

February 22, 2023 period, and the Excess Policy, No. ELU184180-23, issued by XL Specialty Insurance Company, for the February 22, 2022 to July 1, 2023 period.

77. "*Exculpated Parties*" means, collectively, and in each case in its capacity as such: (a) each of the Debtors; (b) the Committee, and each of the members thereof, solely in their capacity as such; (c) each of the Released Professionals; (d) each of the Released Voyager Employees; and (e) the Distribution Agent.

78. "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

79. "*Existing Equity Interests*" means any Interest in TopCo existing immediately prior to the occurrence of the Effective Date.

80. "*Extended Outside Date*" has the meaning set forth in the Asset Purchase Agreement.

81. "*Federal Judgment Rate*" means the federal judgment interest rate in effect as of the Petition Date calculated as set forth in section 1961 of the Judicial Code.

82. "*File*," "*Filed*," or "*Filing*" means file, filed, or filing, respectively, in the Chapter 11 Cases with the Bankruptcy Court or its authorized designee, or, with respect to the filing of a Proof of Claim or Proof of Interest, file, filed, or filing, respectively, with the Claims, Noticing, and Solicitation Agent.

83. "*Final Decree*" means the decree contemplated under Bankruptcy Rule 3022.

84. "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, petition for certiorari, or move for a new trial, reargument, reconsideration, or rehearing has expired and no appeal, petition for certiorari, or motion for a new trial, reargument, reconsideration, or rehearing has been timely taken or filed, or as to which any appeal that has been or may be taken or any petition for certiorari or any motion for a new trial, reargument, reconsideration, or rehearing that has been or may be made or filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the motion for a new trial, reargument, reconsideration, or rehearing shall have been denied, resulted in no modification of such order (if any such motion has been or may be granted), or have otherwise been dismissed with prejudice; *provided* that the possibility that a motion under rule 60 of the Federal Rules of Civil Procedure or any comparable Bankruptcy Rule may be filed relating to such order or judgment shall not cause such order or judgment to not be a Final Order.

85. "*FTX*" means FTX Trading, Ltd. and any of its Affiliates or subsidiaries, including West Realm Shires Inc (d/b/a "FTX.US").

86. "*FTX Bankruptcy Proceeding*" means that certain chapter 11 proceeding captioned *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Nov. 11, 2022).

87. "*FTX Claims*" means the claims or causes of action asserted or assertable by the Debtors against FTX, whether in the FTX Bankruptcy Proceeding or otherwise.

88. "*FTX Recovery*" means the recovery, if any, of the Debtors from FTX on account of the FTX Claims.

89.    "*FTX Settlement*" means the settlement between the Debtors, the Committee, FTX, Alameda, and the official committee of unsecured creditors in the FTX Bankruptcy Proceeding, pursuant to the terms set forth in the *Debtors' Motion for Entry of an Order Approving the Joint Stipulation and Agreed Order Between the Voyager Debtors, the FTX Debtors, and Their Respective Official Committees of Unsecured Creditors* [Docket No. 1106].

90.    "*General Unsecured Claim*" means, collectively, any HoldCo General Unsecured Claim, OpCo General Unsecured Claim, or TopCo General Unsecured Claim.

91.    "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

92.    "*Government Bar Date*" means the applicable deadline by which Proofs of Claim by a Governmental Unit must be Filed, as established by:  (a) the Bar Date Order; (b) a Final Order of the Bankruptcy Court; or (c) the Plan.

93.    "*HoldCo*" means Voyager Digital Holdings, Inc.

94.    "*HoldCo General Unsecured Claim*" means any Claim against HoldCo that is not Secured and is not:  (a) paid in full prior to the Effective Date pursuant to an order of the Bankruptcy Court; (b) an Administrative Claim; (c) a Secured Tax Claim; (d) a Priority Tax Claim; (e) an Other Priority Claim; (f) a Professional Fee Claim; (g) an Alameda Loan Facility Claim; or (h) an Intercompany Claim.  For the avoidance of doubt, all (i) Claims resulting from the rejection of Executory Contracts and Unexpired Leases, and (ii) Claims that are not Secured resulting from litigation, against HoldCo are HoldCo General Unsecured Claims.

95.    "*Holder*" means an Entity holding a Claim against or an Interest in any Debtor.

96.    "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

97.    "*Insurance Policies*" means any and all insurance policies entered into by the Debtors, including the D&O Insurance Policies.

98.    "*Intercompany Claim*" means any Claim held by a Debtor or a Debtor's Affiliate against a Debtor.

99.    "*Intercompany Interest*" means, other than an Interest in Voyager, an Interest in one Debtor held by another Debtor or a Debtor's Affiliate.

100.    "*Interest*" means any equity security (as such term is defined in section 101(16) of the Bankruptcy Code) including all issued, unissued, authorized, or outstanding shares of capital stock and any other common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profit interests of an Entity, including all options, warrants, rights, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable, or exchangeable securities, or other agreements, arrangements, or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in an Entity whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security, and including any Claim against the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to the foregoing.

101. "*Interim Compensation Order*" means the *Order (I) Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals and (II) Granting Related Relief* [Docket No. 236].

102. "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001 and the rules and regulations promulgated thereunder, as applicable to the Chapter 11 Cases.

103. "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

104. "*Liquidation Procedures*" means, in the event the Sale Transaction is not consummated by the Outside Date, such procedures filed by the Wind-Down Debtor identifying the mechanics and procedures to effectuate the Liquidation Transaction.

105. "*Liquidation Transaction*" means, in the event the Sale Transaction is not consummated by the Outside Date, the distribution of the Debtors' Cryptocurrency, Cash and other assets pursuant to Article IV.D of this Plan.

106. "*Management Liability Policy*" means the Executive and Corporate Securities Liability Insurance Policy, No. ELU181214-22, issued by XL Specialty Insurance Company for the February 22, 2022 to February 22, 2023 period.

107. "*Money Transmitter License*" means any consent, license, certificate, franchise, permission, variance, clearance, registration, qualification, authorization, waiver, exemption or other permit issued, granted, given or otherwise made available by or under the authority of any Governmental Unit pursuant to state money transmission or similar laws.

108. "*Net Owed Coins*" has the meaning ascribed to it in the Asset Purchase Agreement.

109. "*Non-Released D&O Claims*" has the meaning set forth in Article IV.F of the Plan.

110. "*Non-Released D&O Claim Budget*" means the amount allocated to pursue the Non-Released D&O Claims and the Non-Released Insurance Claims, which amount shall be agreed upon between the Debtors and the Committee prior to the Confirmation Hearing.

111. "*Non-Released Insurance Claims*" has the meaning set forth in Article IV.F of the Plan.

112. "*OpCo*" means Voyager Digital, LLC.

113. "*OpCo General Unsecured Claim*" means any Claim against OpCo that is not Secured and is not: (a) paid in full prior to the Effective Date pursuant to an order of the Bankruptcy Court; (b) an Administrative Claim; (c) a Secured Tax Claim; (d) a Priority Tax Claim; (e) an Other Priority Claim; (f) a Professional Fee Claim; (g) an Account Holder Claim; or (h) an Intercompany Claim. For the avoidance of doubt, all (i) Claims resulting from the rejection of Executory Contracts and Unexpired Leases, and (ii) Claims that are not Secured resulting from litigation against OpCo are OpCo General Unsecured Claims.

114. "*OSC*" means the Ontario Securities Commission.

115. "*Other Priority Claim*" means any Claim against a Debtor, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

116.    "*Outside Date*" has the meaning set forth in the Asset Purchase Agreement.  All references herein to the "Outside Date" shall be deemed to include the "Extended Outside Date" to the extent the Outside Date is extended in accordance with Section 8.1(c) of the Asset Purchase Agreement.

117.    "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

118.    "*Petition Date*" means July 5, 2022.

119.    "*Plan*" means this joint chapter 11 plan and all exhibits, supplements, appendices, and schedules hereto, as may be altered, amended, supplemented, or otherwise modified from time to time in accordance with Article X.A hereof, including the Plan Supplement (as altered, amended, supplemented, or otherwise modified from time to time), which is incorporated herein by reference and made part of the Plan as if set forth herein.

120.    "*Plan Administrator*" means the Person or Persons selected by the Committee, after consultation with the Debtors, subject to the approval of the Bankruptcy Court and identified in the Plan Supplement, to serve as the administrator(s) of the Wind-Down Debtor, and any successor thereto, appointed pursuant to the Plan Administrator Agreement.

121.    "*Plan Administrator Agreement*" means that certain agreement by and among the Debtors, the Committee, the Plan Administrator and the Wind-Down Debtor, which shall be included in the Plan Supplement in a form reasonably acceptable to the Committee.

122.    "*Plan Supplement*" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (in each case, as may thereafter be amended, supplemented, or otherwise modified from time to time in accordance with the terms of the Plan, the Bankruptcy Code, the Bankruptcy Rules, and applicable law), to be Filed by the Debtors no later than seven days before the Voting Deadline or such later date as may be approved by the Bankruptcy Court, and additional documents Filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement.  The Plan Supplement may include the following, as applicable:  (a) the Schedule of Assumed Executory Contracts and Unexpired Leases; (b) the Schedule of Retained Causes of Action; (c) the Schedule of Assumed and Assigned Executory Contracts and Unexpired Leases; (d) the Customer Onboarding Protocol; (e) the Restructuring Transactions Memorandum; (f) the Plan Administrator Agreement; (g)  the Employee Transition Plan; and (h) any additional documents necessary to effectuate or that is contemplated by the Plan, including any compensation program for any of the Debtors' employees to be established as contemplated in the Plan and the Definitive Documents to facilitate the transfer of Acquired Assets pursuant to the Asset Purchase Agreement and the wind-down of the Debtors' Estates; *provided* that the Schedule of Retained Causes of Action shall be filed no later than 14 days before the Voting Deadline.  The Plan Supplement (and the contents thereof) shall be (x) subject to Purchaser's consent rights solely to the extent set forth under the Asset Purchase Agreement (and shall otherwise be consistent with the Asset Purchase Agreement) and (y) reasonably acceptable to the Committee.

123.    "*Priority Tax Claim*" means any Claim of a Governmental Unit against a Debtor of the kind specified in section 507(a)(8) of the Bankruptcy Code.

124.    "*Pro Rata*" means the proportion that (i) an Allowed Claim or an Allowed Interest in a particular Class bears to (ii) the aggregate amount of Allowed Claims or Allowed Interests in that Class and, solely with respect to Claims in Classes 3 and 4(a), the proportion that an Allowed Claim in either such Class bears to the aggregate amount of Allowed Claims in Classes 3 and 4(a) in the aggregate, unless otherwise indicated.  For purposes of calculating Pro Rata distributions if the Sale Transaction is consummated by the Outside Date, the Pro Rata shares of all Holders of Allowed Claims or Allowed

Interests shall be calculated taking into account the Acquired Coins Value of the Net Owed Coins distributed to each of the Account Holders.

125.  "*Professional*" means an Entity:  (a) employed in the Chapter 11 Cases pursuant to an order of the Bankruptcy Court in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered and expenses incurred pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code or (b) for which compensation and reimbursement has been Allowed by Final Order of the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

126.  "*Professional Fee Claim*" means any Administrative Claim by a Professional for compensation for services rendered or reimbursement of expenses incurred by such Professional through and including the Effective Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court.  To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

127.  "*Professional Fee Escrow Account*" means an escrow account funded by the Debtors with Cash no later than the Effective Date in an amount equal to the Professional Fee Escrow Amount.

128.  "*Professional Fee Escrow Amount*" means the aggregate amount of quarterly U.S. Trustee fees, Professional Fee Claims, and other unpaid fees and expenses the Professionals have incurred or will incur in rendering services in connection with the Chapter 11 Cases prior to and as of the Confirmation Date projected to be outstanding as of the anticipated Effective Date, which shall be estimated pursuant to the method set forth in Article II.B of the Plan.

129.  "*Proof of Claim*" means a written proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

130.  "*Proof of Interest*" means a written proof of Interest Filed against any of the Debtors in the Chapter 11 Cases.

131.  "*Purchase Price Cash*" means the Cash paid by the Purchaser to OpCo pursuant to the Asset Purchase Agreement.

132.  "*Purchaser*" means Binance US.

133.  "*Reinstated*" or "*Reinstatement*" means, with respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

134.  "*Related Party*" means, with respect to any Entity, in each case in its capacity as such with respect to such Entity, such Entity's current and former directors, managers, officers, investment committee members, special committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and advisors.

135.  "*Released Parties*" means, collectively, in each case in its capacity as such: (a) the Debtors; (b) the Committee, and each of the members thereof; (c) each of the Released Professionals; (d) Purchaser and each of its Related Parties; and (e) each of the Released Voyager Employees (subject to

the limitations contained in Article IV.F and Article IV.G of the Plan); *provided* that if the Asset Purchase Agreement is terminated, Purchaser and each of its Related Parties shall not be "Released Parties" under the Plan.

136. "*Released Professionals*" means the following professionals retained by the Debtors, the Committee, or the Purchaser (as applicable): (i) Kirkland & Ellis LLP; (ii) Moelis & Company LLC; (iii) Berkeley Research Group, LLC; (iv) Bankruptcy Management Solutions, Inc. d/b/a Stretto; (v) Quinn Emanuel Urquhart & Sullivan LLP; (vi) Fasken Martineau DuMoulin LLP; (vii) Campbells Legal (BVI); (viii) McDermott Will & Emery LLP; (ix) FTI Consulting, Inc.; (x) Epiq Corporate Restructuring, LLC; (xi) Cassels, Brock & Blackwell LLP; (xii) Paul Hastings LLP; (xiii) Harney Westwood & Riegels LP (BVI); (xiv) Day Pitney LLP (solely in their capacity as counsel to the Debtors); (xv) Jenner & Block LLP; (xvi) Seyfarth Shaw LLP; (xvii) Alvarez & Marsal Canada Inc.; (xviii) Blake, Cassels & Graydon LLP; (xix) Jaffe Raitt Heuer & Weiss; (xx) Latham & Watkins LLP; (xxi) Lowenstein Sandler LLP; (xxii) Kramer Levin LLP; and (xxiii) Acura Law Firm; *provided* that if the Asset Purchase Agreement is terminated, Latham & Watkins LLP shall not be a "Released Professional" under the Plan.

137. "*Released Voyager Employees*" means all directors, officers, and Persons employed by each of the Debtors and their Affiliates serving in such capacity on or after the Petition Date but before the Effective Date (subject to the limitations contained in Article IV.F and Article IV.G of the Plan).

138. "*Releasing Parties*" means, collectively, in each case in its capacity as such: (a) the Debtors; (b) the Committee, and each of the members thereof; (c) each of the Released Professionals; (d) each of the Released Voyager Employees; (e) Purchaser and each of its Related Parties to the extent Purchaser is able to bind such Related Parties; (f) all Holders of Claims that vote to accept the Plan and affirmatively opt into the releases provided by the Plan; (g) all Holders of Claims that vote to reject the Plan and affirmatively opt into the releases provided by the Plan; and (h) all Holders of Claims or Interests that abstain from voting (or are otherwise not entitled to vote) on the Plan and affirmatively opt into the releases provided by the Plan; *provided* that if the Asset Purchase Agreement is terminated, Purchaser and each of its Related Parties shall not be "Releasing Parties" under the Plan.

139. " *Restructuring Transactions* " means those mergers, amalgamations, consolidations, reorganizations, arrangements, continuances, restructurings, transfers, conversions, dispositions, liquidations, dissolutions, or other corporate transactions that the Debtors and the Committee jointly determine to be necessary to implement the transactions described in this Plan, as described in more detail in Article IV.B herein and the Restructuring Transactions Memorandum.

140. "*Restructuring Transactions Memorandum*" means that certain memorandum as may be amended, supplemented, or otherwise modified from time to time, describing the steps to be carried out to effectuate the Restructuring Transactions, the form of which shall be included in the Plan Supplement, and which shall be in a form reasonably acceptable to the Committee.

141. "*Robertson Class Action*" means that certain putative class action litigation filed in the United States District Court for the Southern District of Florida, captioned *Robertson, et al. v. Cuban, et al.*, No. 1:22-cv-22538-RKA (S.D. Fla. Aug. 10, 2022).

142. "*Sale Transaction*" means the sale of certain of the Debtors' assets and all other transactions pursuant to the Asset Purchase Agreement.

143. "*Schedule of Assumed and Assigned Executory Contracts and Unexpired Leases*" means a schedule that may be Filed as part of the Plan Supplement, which shall be in form and substance acceptable to the Purchaser and in all respects consistent with the terms of the Asset Purchase Agreement, of certain

Executory Contracts and Unexpired Leases to be assumed by the Debtors and assigned to the Purchaser pursuant to the Plan and Asset Purchase Agreement, as the same may be amended, modified, or supplemented from time to time by the Debtors or Wind-Down Debtor, as applicable, in accordance with the Plan.

144. "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means a schedule that may be Filed as part of the Plan Supplement, which shall be in form and substance reasonably acceptable to the Committee, of certain Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time by the Debtors or Wind-Down Debtor, as applicable, in accordance with the Plan.

145. "*Schedule of Retained Causes of Action*" means the schedule of certain Causes of Action of the Debtors that are not released, waived, settled, compromised, or transferred pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time by the Debtors and/or the Wind-Down Debtor, which shall be included in the Plan Supplement. For the avoidance of doubt, any failure to specifically list any Causes of Action on the Schedule of Retained Causes of Action shall not be deemed a waiver or admission that any such Cause of Action does not constitute Vested Causes of Action.

146. "*Schedules*" means, collectively, the schedules of assets and liabilities, Schedule of Assumed Executory Contracts and Unexpired Leases, Schedule of Assumed and Assigned Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by each of the Debtors pursuant to section 521 of the Bankruptcy Code, as such schedules and statements may have been or may be amended, modified, or supplemented from time to time.

147. "*SEC*" means the United States Securities and Exchange Commission.

148. "*Section 510(b) Claim*" means any Claim against a Debtor subject to subordination under section 510(b) of the Bankruptcy Code.

149. "*Secured*" means, when referring to a Claim: (a) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) Allowed pursuant to the Plan as a secured Claim.

150. "*Secured Tax Claim*" means any Secured Claim against a Debtor that, absent its Secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

151. "*Securities Act*" means the U.S. Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

152. "*Security*" has the meaning set forth in section 2(a)(1) of the Securities Act.

153. "*Side-A Policy*" means the Cornerstone A-Side Management Liability Policy, ELU184179-22, issued by XL Specialty Insurance Company, for the July 1, 2022 to July 1, 2023 period.

154. "*Solicitation Materials*" means all solicitation materials with respect to the Plan.

155.     "*Special Committee*" means the special committee established at OpCo, comprised of two independent directors, to conduct the Special Committee Investigation.

156.     "*Special Committee Investigation*" means that certain investigation undertaken by the Special Committee into certain historical transactions, as more fully described in the Disclosure Statement.

157.     "*Supported Jurisdiction*" has the meaning ascribed to it in the Asset Purchase Agreement.

158.     "*TopCo*" means Voyager Digital Ltd., a Canadian corporation that is publicly traded on the Toronto Stock Exchange.

159.     "*TopCo General Unsecured Claim*" means any Claim against TopCo that is not Secured and is not: (a) paid in full prior to the Effective Date pursuant to an order of the Bankruptcy Court; (b) an Administrative Claim; (c) a Secured Tax Claim; (d) a Priority Tax Claim; (e) an Other Priority Claim; (f) a Professional Fee Claim; (g) an Alameda Loan Facility Claim; (h) an Intercompany Claim; or (i) a Section 510(b) Claim.  For the avoidance of doubt, all (i) Claims resulting from the rejection of Executory Contracts and Unexpired Leases, and (ii) Claims that are not Secured resulting from litigation, other than 510(b) Claims, against TopCo are TopCo General Unsecured Claims.

160.     "*Transferred Creditors*" means Account Holders and Holders of Allowed OpCo General Unsecured Claims who have completed all documentation and "KYC" processes reasonably required by Purchaser in the ordinary course of Purchaser's business with respect to similarly situated clients and who have opened a Binance US Account as of the date that is three (3) months following the later of the Closing Date (as defined in the Asset Purchase Agreement) or such later date as may be specified in the Customer Onboarding Protocol, and the successors and assigns of such Holders.

161.     "*Transferred Cryptocurrency Value*" means the aggregate VWAP of any Cryptocurrency that is the subject of an Additional Bankruptcy Distribution as of the date that is two Business Days prior to such Additional Bankruptcy Distribution.

162.     "*U.S. Trustee*" means the Office of the United States Trustee for Region 2.

163.     "*Unclaimed Distribution*" means any distribution under the Plan on account of an Allowed Claim or Allowed Interest to a Holder that, after the expiration of six months after the Effective Date, has not:  (a) accepted a distribution, (b) given notice to the Wind-Down Debtor of an intent to accept a particular distribution, (c) responded to the Debtors' or Wind-Down Debtor's requests for information necessary to facilitate a particular distribution, or (d) taken any other action necessary to facilitate such distribution.

164.     "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or section 1123 of the Bankruptcy Code.

165.     "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

166.     "*Unsupported Jurisdiction*" has the meaning ascribed to it in the Asset Purchase Agreement.

167.     "*Unsupported Jurisdiction Approval*" has the meaning ascribed to it in the Asset Purchase Agreement.

168.     "*Vested Causes of Action*" means the Causes of Action vesting in the Wind-Down Debtor pursuant to Article IV.L of the Plan, including, but not limited to, those Causes of Action enumerated on the Schedule of Retained Causes of Action, which shall be included in the Plan Supplement and in all respects consistent with the terms of the Asset Purchase Agreement.

169.     "*VGX*" means Voyager Token, that certain Cryptocurrency issued by the Debtors.

170.     "*Voting Deadline*" means February 22, 2023.

171.     "*Voyager*" means Voyager Digital Ltd. and its direct and indirect Affiliates.

172.     "*VWAP*" means, with respect to any type of Cryptocurrency and as of any date of determination, an amount equal to the volume weighted average price in U.S. dollars for such type of Cryptocurrency for the consecutive 24-hour period immediately prior to 8:00 a.m. New York Time on such date of determination, as reported on https://coinmarketcap.com.

173.     "*Wind-Down Debtor*" means a Debtor, or any successor or assign thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Effective Date, and as described in Article IV.H to, among other things, effectuate the wind-down of the Debtors and the Wind-Down Debtor, commence, litigate and settle the Vested Causes of Action that are not released, waived, settled, compromised, or transferred under the Plan and make distributions pursuant to the terms of the Plan and the Plan Administrator Agreement; *provided* that, for the avoidance of doubt, the Wind-Down Debtor shall not conduct any business operations or continue the Debtors' business operations after the Effective Date.

174.     "*Wind-Down Debtor Assets*" means any assets of the Debtors transferred to, and vesting in, the Wind-Down Debtor pursuant to the Plan Administrator Agreement, which, in the event the Sale Transaction is consummated, shall exclude the Acquired Assets, and which shall include, without limitation but only to the extent the following are not Acquired Assets, (a) the Wind-Down Reserve, (b) the Net-Owed Coins to be distributed to Account Holders in Supported Jurisdictions until such Account Holders complete the Purchaser's onboarding requirements in accordance with the Asset Purchase Agreement, (c) the Net-Owed Coins to be distributed to Account Holders in Unsupported Jurisdictions to the extent the Purchaser has not obtained the applicable Unsupported Jurisdiction Approval in accordance with Section 6.12 of the Asset Purchase Agreement, (d) any distributions to Account Holders or Holders of OpCo General Unsecured Claims that are returned to the Wind-Down Debtor pursuant to Section 6.12(e) of the Asset Purchase Agreement, (e) 3AC Claims and 3AC Recovery, (f) FTX Claims and FTX Recovery, (g) Alameda Claims and Alameda Recovery, (h) the Non-Released D&O Claims, and (i) the Vested Causes of Action.

175.     "*Wind-Down Debtor Beneficiaries*" means the Holders of Allowed Claims or Allowed Interests that are entitled to receive distributions pursuant to the terms of the Plan, whether or not such Claims or Interests are Allowed as of the Effective Date.

176.     "*Wind-Down Debtor Expenses*" means all actual and necessary costs and expenses incurred by the Wind-Down Debtor or Plan Administrator in connection with carrying out the obligations of the Wind-Down Debtor pursuant to the terms of the Plan and the Plan Administrator Agreement.

177.     "*Wind-Down Debtor Oversight Committee*" means the oversight committee tasked with overseeing the Wind-Down Debtor in accordance with the Plan and the Plan Administrator Agreement.

178.     "*Wind-Down Budget*" means the budget to fund the Wind-Down Debtor, which will be included in the Plan Supplement.

179.    "*Wind-Down Reserve*" means the amount set forth in the Wind-Down Budget to fund the Wind-Down Debtor.

## B.    Rules of Interpretation

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter gender; (2) capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form; (3) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (4) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed, or to be Filed, shall mean that document, schedule, or exhibit, as it may thereafter have been or may thereafter be validly amended, amended and restated, supplemented, or otherwise modified; (5) unless otherwise specified, any reference to an Entity as a Holder of a Claim or Interest, includes that Entity's successors and assigns; (6) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (7) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (8) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) unless otherwise specified, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (12) references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (13) unless otherwise specified, all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases; (14) any effectuating provisions may be interpreted by the Debtors or the Wind-Down Debtor in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; (15) any references herein to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter; (16) all references herein to consent, acceptance, or approval shall be deemed to include the requirement that such consent, acceptance, or approval be evidenced by a writing, which may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail; (17) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; and (18) the use of "include" or "including" is without limitation unless otherwise stated.

## C.    Computation of Time

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

## D.    Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving

effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan and any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, documents, instruments, or contracts, in which case the governing law of such agreement shall control); *provided* that corporate, limited liability company, or partnership governance matters relating to the Debtors or the Wind-Down Debtor, as applicable, shall be governed by the laws of the jurisdiction of incorporation or formation of the relevant Debtor or Wind-Down Debtor, as applicable.

**E.     Reference to Monetary Figures**

All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

**F.     Reference to the Debtors or the Wind-Down Debtor**

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Wind-Down Debtor mean the Debtors and the Wind-Down Debtor, as applicable, to the extent the context requires.

**G.     Nonconsolidated Plan**

Although for purposes of administrative convenience and efficiency the Plan has been filed as a joint plan for each of the Debtors and presents together Classes of Claims against and Interests in the Debtors, the Plan does not provide for the substantive consolidation of any of the Debtors.

<div align="center">

**ARTICLE II.**

**ADMINISTRATIVE AND PRIORITY CLAIMS**

</div>

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

**A.     Administrative Claims**

Except as otherwise provided in this Article II.A and except with respect to Administrative Claims that are Professional Fee Claims or subject to 11 U.S.C. § 503(b)(1)(D), unless previously Filed, requests for payment of Allowed Administrative Claims (other than Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code) must be Filed and served on the Wind-Down Debtor pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date.  Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property, and such Administrative Claims shall be deemed satisfied as of the Effective Date without the need for any objection from the Wind-Down Debtor or any notice to or action, order, or approval of the Bankruptcy Court or any other Entity.  Objections to such requests, if any, must be Filed and served on the Wind-Down Debtor and the requesting party by the Claims Objection Bar Date for Administrative Claims. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed by Final Order of the Bankruptcy Court.

Except with respect to Administrative Claims that are Professional Fee Claims, and except to the extent that an Administrative Claim or Priority Tax Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall receive an amount of Cash equal to the amount of the unpaid or unsatisfied portion of such Allowed Administrative Claim in accordance with the following: (1) if such Administrative Claim is Allowed on or prior to the Effective Date, no later than thirty (30) days after the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction or course of business giving rise to such Allowed Administrative Claim, without any further action by the Holder of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtors or the Wind-Down Debtor, as applicable; or (5) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court. Any Cryptocurrency inadvertently deposited to the Debtors' account(s) after the Petition Date shall be returned to the sender in full.

Objections to requests for payment of such Administrative Claims, if any, must be Filed with the Bankruptcy Court and served on the Wind-Down Debtor and the requesting Holder no later than the Claims Objection Bar Date for Administrative Claims. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with, an order that becomes a Final Order of the Bankruptcy Court.

**B.      Professional Fee Claims**

1.      <u>Final Fee Applications and Payment of Professional Fee Claims</u>

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than sixty (60) days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code and Bankruptcy Rules. The Wind-Down Debtor shall pay Professional Fee Claims in Cash to such Professionals in the amount the Bankruptcy Court allows, including from funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court; *provided* that the Debtors' and the Wind-Down Debtor's obligations to pay Allowed Professional Fee Claims shall not be limited or deemed limited to funds held in the Professional Fee Escrow Account.

2.      <u>Professional Fee Escrow Account</u>

No later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and the U.S. Trustee and for no other Entities until all quarterly U.S. Trustee fees and all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the U.S. Trustee or to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court. No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. No funds held in the Professional Fee Escrow Account shall be property of the Estates of the Debtors or the Wind-Down Debtor. When all

Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, and all U.S. Trustee quarterly fees plus statutory interest, if any, have been paid in full, any remaining funds held in the Professional Fee Escrow Account shall be turned over to the Wind-Down Debtor without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

3. <u>Professional Fee Escrow Amount</u>

The Professionals shall deliver to the Debtors a reasonable and good-faith estimate of their unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Confirmation Date projected to be outstanding as of the anticipated Effective Date, and shall deliver such estimate no later than five Business Days prior to the anticipated Effective Date. For the avoidance of doubt, no such estimate shall be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that are the subject of a Professional's final request for payment of Professional Fee Claims Filed with the Bankruptcy Court, and such Professionals are not bound to any extent by the estimates. If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional. The total aggregate amount so estimated to be outstanding as of the anticipated Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account; *provided* that the Wind-Down Debtor shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are Filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

4. <u>Post-Confirmation Date Fees and Expenses</u>

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors and/or the Wind-Down Debtor, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Wind-Down Debtor. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Wind-Down Debtor may employ and pay any Professional in the ordinary course of business for the period after the Confirmation Date without any further notice to or action, order, or approval of the Bankruptcy Court.

For the avoidance of doubt, no Administrative Claims, Professional Fee Claims, or any other post-confirmation fees and expenses shall be paid prior to payment of any quarterly fees due and outstanding to the U.S. Trustee.

**C.      Priority Tax Claims**

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

# ARTICLE III.

## CLASSIFICATION, TREATMENT,
## AND VOTING OF CLAIMS AND INTERESTS

### A.     Classification of Claims and Interests

Except for the Claims addressed in Article II of the Plan, all Claims against and Interests in the Debtors are classified in the Classes set forth in this Article III for all purposes, including voting, Confirmation, and distributions pursuant to the Plan and in accordance with section 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

### B.     Summary of Classification

A summary of the classification of Claims against and Interests in each Debtor pursuant to the Plan is set forth in the following chart.  The Plan constitutes a separate chapter 11 plan for each of the Debtors, and accordingly, the classification of Claims and Interests set forth below applies separately to each of the Debtors.  All of the potential Classes for the Debtors are set forth herein.  Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Claims or Interests shall be treated as set forth in Article III.E hereof.  Voting tabulations for recording acceptances or rejections of the Plan will be conducted on a Debtor-by-Debtor basis as set forth above.[1]

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | Account Holder Claims | Impaired | Entitled to Vote |
| 4A | OpCo General Unsecured Claims | Impaired | Entitled to Vote |
| 4B | HoldCo General Unsecured Claims | Impaired | Entitled to Vote |
| 4C | TopCo General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Alameda Loan Facility Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

---

[1]     The Debtors reserve the right to separately classify Claims or Interests to the extent necessary to comply with any requirements under the Bankruptcy Code or applicable law.

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 6 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |
| 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |
| 9 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

**C.    Treatment of Classes of Claims and Interests**

Subject to Article VI hereof, each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors or Wind-Down Debtor, as applicable, and the Holder of such Allowed Claim or Allowed Interest, as applicable. In no event shall any Holder of a Claim receive more than such Holder's Allowed amount on account of such Claim.

1.    <u>Class 1 —Secured Tax Claims</u>

(a)    *Classification*: Class 1 consists of all Secured Tax Claims.

(b)    *Treatment*: Each Holder of an Allowed Secured Tax Claim shall receive, in full and final satisfaction of such Allowed Secured Tax Claim, at the option of the Wind-Down Debtor, payment in full in Cash of such Holder's Allowed Secured Tax Claim or such other treatment rendering such Holder's Allowed Secured Tax Claim Unimpaired.

(c)    *Voting*: Class 1 is Unimpaired under the Plan. Holders of Allowed Secured Tax Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Therefore, Holders of Allowed Secured Tax Claims are not entitled to vote to accept or reject the Plan.

2.    <u>Class 2 — Other Priority Claims</u>

(a)    *Classification*: Class 2 consists of all Other Priority Claims.

(b)    *Treatment*: Each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Allowed Other Priority Claim, at the option of the applicable Debtor, payment in full in Cash of such Holder's Allowed Other Priority Claim or such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired.

(c)    *Voting*: Class 2 is Unimpaired under the Plan. Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan under section 1126(f)

of the Bankruptcy Code.  Therefore, Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan.

3.   <u>Class 3 — Account Holder Claims</u>

(a)   *Classification*:  Class 3 consists of all Account Holder Claims.

(b)   *Allowance*: Account Holder Claims shall be conclusively Allowed in the amount listed on OpCos's *Amended Schedules of Assets and Liabilities* (Case No. 22-10945) [Docket No. 18]; *provided* that the rights of any Holder of an Account Holder Claim to object to the scheduled amount shall be preserved.  To the extent an Account Holder Claim is Allowed in a greater amount than the scheduled amount of such Account Holder Claim, such Holder shall be entitled to a subsequent distribution such that it will receive its Pro Rata share of recoveries to Holders of Allowed Account Holder Claims.  Account Holder Claims shall be valued in U.S. dollars as of the Petition Date consistent with section 502(b) of the Bankruptcy Code.

(c)   *Treatment*:  Each Holder of an Allowed Account Holder Claim will receive in exchange for such Allowed Account Holder Claim:

(i)   If the Sale Transaction is consummated by the Outside Date:

A.   its Net Owed Coins, as provided in and subject to the requirements of Sections 6.10 and 6.12 of the Asset Purchase Agreement; *provided* that for Account Holders in Supported Jurisdictions who do not complete the Purchaser's onboarding requirements within three (3) months following the Closing Date and Account Holders in Unsupported Jurisdictions and only to the extent that the Purchaser does not obtain the Unsupported Jurisdiction Approval for the jurisdiction in which such Account Holder resides within 6 months following the Closing Date (as defined in the Asset Purchase Agreement), such Account Holders shall receive, after expiration of such time period, value in Cash at which such Net Owed Coins allocable to such Account Holder are liquidated;

B.   its Pro Rata share of any Additional Bankruptcy Distributions, in Cryptocurrency or Cash as provided in and subject to the requirements of Sections 6.12 and 6.14 of the Asset Purchase Agreement;

C.   its Pro Rata share of Distributable OpCo Cash; and

D.   to effectuate distributions from the Wind-Down Debtor, its Pro Rata share of the Wind-Down Debtor Assets attributable to OpCo; *provided* that any distributions on account of the Wind-Down Debtor Assets attributable to OpCo shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed

Secured Tax Claims, and Allowed Other Priority Claims at OpCo;

*provided* that distributions made to any Account Holder pursuant to clauses (B), (C), and (D) above shall be made after taking into account the Acquired Coins Value of the Net Owed Coins or the value in Cash at which such Net Owed Coins are liquidated, as applicable, previously allocated to such Account Holder; or

(ii)     If the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated:

A.     its Pro Rata share of Distributable OpCo Cash;

B.     its Pro Rata share of Distributable Cryptocurrency, which such Account Holder shall be able to withdraw in kind, alternative Cryptocurrency, and/or Cash for a period of thirty (30) days after the Effective Date through the Voyager platform or, if elected by Seller pursuant to Section 6.12(d) of the Asset Purchase Agreement, through the Binance.US Platform; *provided* that if the applicable transfer is made through the Voyager platform and such Account Holder does not withdraw its Pro Rata share of Distributable Cryptocurrency available to such Account Holder from the Voyager platform within such thirty (30) day period, such Account Holder will receive Cash in the equivalent value to its Pro Rata share of Distributable Cryptocurrency; and

C.     to effectuate distributions from the Wind-Down Debtor, its Pro Rata share of the Wind-Down Debtor Assets attributable to OpCo; *provided* that any distributions on account of Wind-Down Debtor Assets attributable to OpCo shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims at OpCo.

(d)     *Voting:* Class 3 is Impaired under the Plan. Holders of Allowed Account Holder Claims are entitled to vote to accept or reject the Plan.

4.     <u>Class 4A — OpCo General Unsecured Claims</u>

(a)     *Classification*: Class 4A consists of all OpCo General Unsecured Claims.

(b)     *Treatment*: Each Holder of an Allowed OpCo General Unsecured Claim will receive in exchange for such Allowed OpCo General Unsecured Claim:

(i)     If the Sale Transaction is consummated by the Outside Date:

A.     its Pro Rata share of Distributable Cryptocurrency in Cash;

B. its Pro Rata share of Additional Bankruptcy Distributions, in Cryptocurrency or Cash as provided in and subject to the requirements of Sections 6.12 and 6.14 of the Asset Purchase Agreement;

C. its Pro Rata share of Distributable OpCo Cash; and

D. to effectuate distributions from the Wind-Down Debtor, its Pro Rata share of the Wind-Down Debtor Assets attributable to OpCo; *provided* that any distributions on account of the Wind-Down Debtor Assets attributable to OpCo shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims at OpCo; or

(ii) If the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated:

A. its Pro Rata share of Distributable Cryptocurrency in Cash;

B. its Pro Rata share of Distributable OpCo Cash; and

C. to effectuate distributions from the Wind-Down Debtor, its Pro Rata share of the Wind-Down Debtor Assets attributable to OpCo; *provided* that any distributions on account of the Wind-Down Debtor Assets attributable to OpCo shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims at OpCo.

(c) *Voting*: Class 4A is Impaired under the Plan. Holders of Allowed OpCo General Unsecured Claims are entitled to vote to accept or reject the Plan.

5. Class 4B — HoldCo General Unsecured Claims

(a) *Classification*: Class 4B consists of all HoldCo General Unsecured Claims.

(b) *Treatment*: Each Holder of an Allowed HoldCo General Unsecured Claim will receive in exchange for such Allowed HoldCo General Unsecured Claim:

(i) its Pro Rata share of Distributable HoldCo Cash; and

(ii) to effectuate distributions from the Wind-Down Debtor, its Pro Rata share of the Wind-Down Debtor Assets attributable to HoldCo; *provided* that any distributions on account of the Wind-Down Debtor Assets attributable to HoldCo shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims at HoldCo.

(c) *Voting*:  Class 4B is Impaired under the Plan.  Holders of Allowed HoldCo General Unsecured Claims are entitled to vote to accept or reject the Plan.

6. <u>Class 4C — TopCo General Unsecured Claims</u>

(a) *Classification*:  Class 4C consists of all TopCo General Unsecured Claims.

(b) *Treatment*:  Each Holder of an Allowed TopCo General Unsecured Claim will receive in exchange for such Allowed TopCo General Unsecured Claim:

(i) its Pro Rata share of Distributable TopCo Cash; and

(ii) to effectuate distributions from the Wind-Down Debtor, its Pro Rata share of the Wind-Down Debtor Assets attributable to TopCo; *provided* that any distributions on account of the Wind-Down Debtor Assets attributable at TopCo shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims at TopCo.

(c) *Voting*:  Class 4C is Impaired under the Plan.  Holders of Allowed TopCo General Unsecured Claims are entitled to vote to accept or reject the Plan.

7. <u>Class 5 — Alameda Loan Facility Claims</u>

(a) *Classification*:  Class 5 consists of all Alameda Loan Facility Claims.

(b) *Treatment*:  If the FTX Settlement becomes effective, each Holder of an Allowed Alameda Loan Facility Claim shall, at the election of the Debtors with the consent of the Committee, in their sole discretion, following written notice to counsel to FTX, Alameda and to the official committee of unsecured creditors in the FTX Bankruptcy Proceeding of such election, which written notice shall be given no later than the date that is thirty (30) days after the Confirmation Hearing, (a) withdraw its Alameda Loan Facility Claims in their entirety, with prejudice to FTX or any other party reasserting such claims, or (b) contribute the Alameda Loan Facility Claims to OpCo.  If the FTX Settlement does not become effective, the Alameda Loan Facility Claims shall be subordinated to all Allowed Claims at OpCo, HoldCo, and TopCo, including, but not limited to, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, Allowed Account Holder Claims, Allowed OpCo General Unsecured Claims, Allowed HoldCo General Unsecured Claims, and Allowed TopCo General Unsecured Claims; *provided, however*, if the Bankruptcy Court denies subordination of the Alameda Loan Facility Claims, then such Alameda Loan Facility Claims shall be *pari passu* with General Unsecured Claims at the applicable Debtor entity.

(c) *Voting*:  Class 5 is Impaired under the Plan.  Holders of Allowed Alameda Loan Facility Claims are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Allowed Alameda Loan Facility Claims are not entitled to vote to accept or reject the Plan.

8.    <u>Class 6 — Section 510(b) Claims</u>

(a)    *Classification*:  Class 6 consists of all Section 510(b) Claims against TopCo.

(b)    *Allowance*:  Notwithstanding anything to the contrary herein, a Section 510(b) Claim against TopCo, if any such Section 510(b) Claim exists, may only become Allowed by Final Order of the Bankruptcy Court.

(c)    *Treatment*:  Each Holder of Allowed Section 510(b) Claims against TopCo will receive, to effectuate distributions, if applicable, from the Wind-Down Debtor, its Pro Rata share of the Wind-Down Debtor Assets attributable to TopCo; *provided* that any distributions on account of the Wind-Down Debtor Assets attributable to TopCo shall only be made following payment in full of, or reserve for, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, and Allowed TopCo General Unsecured Claims at TopCo.

(d)    *Voting*:  Class 6 is Impaired under the Plan.  Holders (if any) of Allowed Section 510(b) Claims against TopCo are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Therefore, Holders (if any) of Allowed Section 510(b) Claims against TopCo are not entitled to vote to accept or reject the Plan.

9.    <u>Class 7 — Intercompany Claims</u>

(a)    *Classification*:  Class 7 consists of all Intercompany Claims.

(b)    *Treatment*:  Each Intercompany Claim shall receive the treatment for such Intercompany Claim as determined by the Bankruptcy Court.

(c)    *Voting*:  Holders of Intercompany Claims are either Unimpaired or Impaired, and such Holders of Intercompany Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

10.    <u>Class 8 — Intercompany Interests</u>

(a)    *Classification*:  Class 8 consists of all Intercompany Interests.

(b)    *Treatment*:  On the Effective Date, all Intercompany Interests shall be, at the option of the Debtors, either (a) Reinstated in accordance with Article III.G of the Plan or (b) set off, settled, addressed, distributed, contributed, merged, or cancelled, in each case in accordance with the Restructuring Transactions Memorandum.

(c)    *Voting*:  Holders of Intercompany Interests are either Unimpaired or Impaired, and such Holders of Intercompany Interests are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

11. <u>Class 9 — Existing Equity Interests</u>

(a)     *Classification*: Class 9 consists of all Existing Equity Interests.

(b)     *Treatment*: Each Holder of Existing Equity Interests will receive, to effectuate distributions, if applicable, from the Wind-Down Debtor, its Pro Rata share of the Wind-Down Debtor Assets attributable to TopCo; *provided* that any distributions on account of Wind-Down Debtor Assets attributable at TopCo shall only be made following payment in full of, or reserve for, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, and Allowed TopCo General Unsecured Claims at TopCo.

(c)     *Voting*: Class 9 is Impaired under the Plan. Holders of Existing Equity Interests are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. Therefore, Holders of Existing Equity Interests are not entitled to vote to accept or reject the Plan.

**D.**     **Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Wind-Down Debtor's rights in respect of any Unimpaired Claim, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

**E.**     **Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes**

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

**F.**     **Subordinated Claims**

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims against and Allowed Interests in the Debtors and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors and the Wind-Down Debtor reserve the right to reclassify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

**G.**     **Intercompany Interests**

To the extent Reinstated under the Plan, distributions (if any) on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the corporate structure given the existing intercompany systems connecting the Debtors and their Affiliates, and in exchange for the Debtors' and Wind-Down Debtor's agreement under the Plan to make certain distributions to the Holders of Allowed Claims.

### H. Controversy Concerning Impairment

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

### I. Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code

Section 1129(a)(10) of the Bankruptcy Code is satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims or Interests. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

### ARTICLE IV.

### PROVISIONS FOR IMPLEMENTATION OF THE PLAN

### A. General Settlement of Claims and Interests

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan. The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 of all such Claims, Interests, Causes of Action, and controversies, as well as a finding by the Bankruptcy Court that such compromise and settlement is fair, equitable, reasonable, and in the best interests of the Debtors, their Estates, and Holders of Claims and Interests. Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Interests in any Class are intended to be and shall be final.

### B. Restructuring Transactions

On or before the Effective Date, the applicable Debtors will take any action as may be necessary or advisable to effectuate the Restructuring Transactions described in the Plan, the Restructuring Transactions Memorandum, and the Customer Onboarding Protocol, including: (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (4) the transfer or distribution of any Cryptocurrency or Cash pursuant to the Asset Purchase Agreement, or the Liquidation Procedures, as applicable; (5) the execution and delivery of the Plan Administrator Agreement; (6) any transactions necessary or appropriate to form or convert into

the Wind-Down Debtor; (7) such other transactions that are required to effectuate the Restructuring Transactions, including any sales, mergers, consolidations, restructurings, conversions, dispositions, transfers, formations, organizations, dissolutions, or liquidations; (8) all transactions necessary to provide for the purchase of the Acquired Assets by Purchaser under the Asset Purchase Agreement; and (9) all other actions that the applicable Entities determine to be necessary or appropriate, or that are reasonably requested by the Purchaser in accordance with the Asset Purchase Agreement, including making filings or recordings that may be required by applicable law.

The Confirmation Order shall, and shall be deemed to, pursuant to sections 1123 and 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions.

## C. The Sale Transaction

If the Sale Transaction is consummated by the Outside Date, pursuant to the terms of the Asset Purchase Agreement, then the following terms shall govern:

On or prior to the Effective Date, the Debtors shall have consummated the Sale Transaction, and, among other things, the Acquired Assets and Assumed Liabilities shall have transferred to the Purchaser free and clear of all Liens, Claims, Interests, charges, or other encumbrances, and the Purchaser shall pay to the Debtors or Holders of Account Holder Claims and Holders of OpCo General Unsecured Claims, as applicable, the proceeds from the Sale Transaction, as and to the extent provided for in the Asset Purchase Agreement, and this Plan. The Confirmation Order shall authorize the Debtors, the Purchaser, and the Wind-Down Debtor, as applicable, to undertake the transactions contemplated by the Asset Purchase Agreement, including pursuant to sections 363, 365, 1123(a)(5)(B), and 1123(a)(5)(D) of the Bankruptcy Code.

The Debtors and Purchaser shall be authorized to take all actions as may be deemed necessary or appropriate to consummate the Sale Transaction pursuant to the terms of the Asset Purchase Agreement the Customer Onboarding Protocol, and this Plan. The Debtors shall be authorized to sell any Cryptocurrency to satisfy all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims. On and after the Effective Date, except as otherwise provided in the Plan and the Plan Administrator Agreement, the Wind-Down Debtor, or the Purchaser, as applicable, may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; provided, that the Bankruptcy Court shall retain jurisdiction to resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with any of the foregoing.

Notwithstanding anything contained in this Plan and any Definitive Documents, if the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated, all provisions contained in this Plan and the Definitive Documents governing the Sale Transaction shall have no further force and effect, and the provisions governing the Liquidation Transaction shall govern. The rights and remedies of the Seller and Purchaser under the Asset Purchase Agreement and any related orders of the Bankruptcy Court shall be expressly preserved.

## D. The Liquidation Transaction

If the Sale Transaction is not consummated by the Outside Date, pursuant to the Asset Purchase Agreement, then the following terms shall govern:

1. *The Liquidation Transaction*

On or after the Outside Date, the Debtors will pursue the Liquidation Transaction in accordance with the Liquidation Procedures. Pursuant to the Liquidation Transaction, the Debtors, the Wind-Down Debtor, or the Plan Administrator, as applicable, will distribute certain of the Cryptocurrency in-kind to Holders of Account Holder Claims in accordance with Article III.C of the Plan, transfer all Wind-Down Debtor Assets to the Wind-Down Debtor, liquidate certain of the Cryptocurrency, distribute Cash to Holders of Claims, wind down and dissolve the Debtors, and pursue final administration of the Debtors' Estates pursuant to the Bankruptcy Code.

The Debtors, or the Wind-Down Debtor, as applicable, shall be authorized to take all actions as may be deemed necessary or appropriate to consummate the Liquidation Transaction pursuant to this Plan. On or before the date that is twenty-one days prior to the anticipated commencement of the Liquidation Transaction, the Debtors, or the Wind-Down Debtor, as applicable, shall file the Liquidation Procedures with the Bankruptcy Court. Parties in interest shall have ten days to object to the Liquidation Procedures, and if no objections are timely filed, the Liquidation Procedures shall be approved. In the event of a timely objection, the Bankruptcy Court shall adjudicate any objection to the Liquidation Procedures.

On and after the Effective Date, except as otherwise provided in the Plan, the Plan Administrator Agreement, and the Liquidation Procedures, the Debtors or the Wind-Down Debtor, as applicable, may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; provided, that the Bankruptcy Court shall retain jurisdiction to resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with any of the foregoing.

2. *Cryptocurrency Rebalancing*

Prior to the Effective Date the Debtors shall, in consultation with the Committee, be authorized to rebalance their Cryptocurrency portfolio to ensure that the Debtors can effectuate *pro rata* in-kind distributions of the Distributable Cryptocurrency according to Article III.C.3(c) of this Plan, *provided* that such rebalancing shall be in accordance with the Asset Purchase Agreement (if the Asset Purchase Agreement has not been terminated). The Debtors may effectuate such rebalancing by (i) selling such Cryptocurrency that cannot be distributed to Account Holders, (ii) purchasing Cryptocurrency supported by Voyager's or Purchaser's platform (as provided by the Asset Purchase Agreement) that shall be distributed to Account Holders, and (iii) engaging in any other transaction, including the execution of trades of Cryptocurrency, necessary or appropriate to effectuate distributions of the Distributable Cryptocurrency to Holders of Allowed Account Holder Claims.

## E. Employee Transition Plan

The Debtors shall be authorized to implement the Employee Transition Plan, the terms of which shall be reasonably acceptable to Purchaser and the Committee and included in the Plan Supplement. The Employee Transition Plan shall help ensure that employees are available to provide transition services to the Debtors and/or the Wind-Down Debtor to effectuate the Sale Transaction and to wind down the Debtors' Estates.

## F. Non-Released D&O Claims

Any Claims or Causes of Action held by the Debtors or their respective estates against the Debtors' CEO and/or CCO (regardless of any fiduciary capacity in which such individuals were acting) that are expressly related to approval of the 3AC Loan are not released pursuant to the Plan (collectively, the "Non-Released D&O Claims"), and shall be assigned and transferred to the Wind-Down Debtor to be pursued, settled, or resolved by the Wind-Down Debtor in accordance with the terms of Article IV.G of this Plan and subject to the Wind-Down Budget. Any claims against the D&O Carriers that the Debtors' insurance transactions within the 90 days prior to the Petition Date are avoidable under the Bankruptcy Code, applicable state law, or both (the "Non-Released Insurance Claims") shall be assigned and transferred to the Wind-Down Debtor to be pursued, settled, or resolved solely by the Wind-Down Debtor in accordance with the terms of Article IV.G of this Plan. The Wind-Down Debtor shall be a successor to the Debtors' rights, title, and interest in any Non-Released D&O Claims and Non-Released Insurance Claims, and the Wind-Down Debtor shall have standing to pursue the Non-Released D&O Claims and the Non-Released Insurance Claims in accordance with the terms of Article IV.G of this Plan; *provided* that: (i) any recovery by the Wind-Down Debtor (and the beneficiaries thereof) on account of any Non-Released D&O Claim, including in each case by way of settlement or judgment, shall be satisfied solely by and to the extent of the proceeds of the Debtors' available D&O Liability Insurance Policies (and/or from the D&O Carriers directly) after payment from such D&O Liability Insurance Policies of any and all covered costs and expenses incurred in connection with the defense of the Non-Released D&O Claims; (ii) any party, including any trustee or any beneficiary of the Wind-Down Debtor, seeking to execute, garnish, or otherwise attempt to collect on any settlement of or judgment in the Non-Released D&O Claims shall do so solely upon available insurance coverage from the Debtors' available D&O Liability Insurance Policies; and (iii) no party shall (a) record any judgment against the CEO or CCO, or (b) otherwise attempt to collect, directly or indirectly, from the personal assets of the CEO or CCO with respect to the Non-Released D&O Claims. For the avoidance of doubt, this provision does not enjoin, limit, or impair direct claims held by third parties against the Debtors' CEO or CCO (if any) other than any direct claims held by Holders of Claims or Interests that opt into the third-party release in Article VIII.B of this Plan. Only upon the occurrence of the earlier of (x) a release being given as part of any later settlement of the Non-Released D&O Claims; (y) final resolution of any coverage claims asserted against the Debtors' available D&O Liability Insurance Policies on account of the Non-Released D&O Claims; or (z) exhaustion of the available insurance coverage under the D&O Liability Insurance Policies, the Non-Released D&O Claims shall be released and discharged without the need for further action or Bankruptcy Court order. For the avoidance of doubt, any release of the Non-Released D&O Claims shall not become effective until one of the three conditions stated in the preceding sentence above has been met.

## G. The D&O Settlement

On the Effective Date, the terms of the D&O Settlement shall be effectuated as provided in this Article IV.G.

Pursuant to the D&O Settlement, CEO shall repay the $1,900,000 received from the Debtors on or around February 28, 2022, by paying the after-tax amount of such transfer (approximately $1,125,000) to OpCo in cash and assigning the right, if any, to any tax refund for the balance to the Wind-Down Debtor. CEO shall subordinate any Claims (including any indemnification claims asserted under this Art. IV.F) he holds against the Debtors until all other Holders of Claims are paid in full. CCO shall subordinate 50 percent of any Claims he holds other than indemnification claims (and 100% of any indemnification claims asserted under this Art. IV.F) against the Debtors until all other Holders of Claims are paid in full; *provided, however*, that in the event the D&O Carriers deny coverage to CEO or CCO under the D&O Insurance Policies on account of such subordination of any indemnification claim, then any indemnification claims by CEO or CCO shall not be so subordinated, but may be filed as an OpCo General Unsecured Claim.

CEO and CCO, each as insureds, under the D&O Liability Insurance Policies agree: (i) not to draw down on the Side-A Policy; *provided*, *however*, that should coverage continue to be available under the Side-A Policy following resolution of the Debtors' and/or the Wind-Down Debtor's claims for the avoidance of the premium paid for the policy (whether by judgment or settlement or otherwise) such officer shall be entitled to seek coverage under the Side-A Policy to the extent any such coverage remains; and (ii) not to object to any settlement by the Debtors or Wind Down Entity of avoidance claims under the Side-A Policy, even if such settlement results in termination of benefits under the Side-A Policy. For the avoidance of doubt, this agreement is not intended to and shall not alter or amend each of the insureds' duties under the D&O Liability Insurance Policies. In the event that any insurer under the D&O Liability Insurance Policies denies coverage for any reason, the Wind-Down Debtor shall have the right to bring a coverage claim against the insurer(s) in the name of the insured, the insureds shall reasonably cooperate with respect to any such claim, and the insured may participate at their election (and at their sole cost). For the avoidance of doubt, nothing contained in this Plan is intended as a waiver or release of the Debtors' and/or Wind-Down Debtor's right to assert any Non-Released D&O Claim, but rather limits such recovery in the manner set forth above.

CEO and CCO shall be entitled to receive their salary and benefits for as long as they work for the Debtors and/or the Wind-Down Debtor and retain the right to assert claims for advancement and indemnification up to the limits of any available coverage in the event any of the insurers that issued the Management Liability Policy, the Excess Policy, or the Side-A Policy denies coverage to CEO and/or CCO based upon or arising out of the lack of a formal claim for indemnification; *provided*, *however*, that any such indemnification or advancement claims shall be subordinated in full unless and until all other Holders of Claims are paid in full; *provided*, *further*, that in the event that any of the D&O Carriers deny coverage to CEO or CCO under the D&O Insurance Policies on account of such subordination of any indemnification claim, then any indemnification claims by CEO or CCO shall not be so subordinated, but may be filed as an OpCo General Unsecured Claim.

CEO and CCO shall subordinate any and all rights and entitlements under the Cornerstone A-Side Management Liability Insurance Policy to Voyager Digital Ltd., Policy Number ELU184179-22, to any recovery by the Debtors and/or the Wind-Down Debtor on account of the Debtors' and/or Wind-Down Debtor's claims for the avoidance of the premium paid for the policy. For the avoidance of doubt, should coverage continue to be available under the Side-A Policy following resolution of the Debtors' and/or the Wind-Down Debtor's claims for the avoidance of the premium paid for the policy (whether by judgment or settlement or otherwise), CEO and/or CCO shall be entitled to seek coverage under the Side-A Policy. CEO and CCO shall remain at, and continue performing the responsibilities of, their respective position(s) with the Debtors and assist with the Debtors' transition for at least 30 days from entry of the Confirmation Order; *provided* that CCO shall have no obligation to remain at his position with the Debtors beyond January 15, 2023, and the CEO shall have the right to pursue and engage in any employment opportunity, business venture, consulting arrangement, or investment that may become available; *provided*, *further*, that both the CEO and CCO shall be available to the Debtors and/or the Wind-Down Debtor for a maximum of five hours per month for the one year following the Effective Date.

In the event that the sworn financial disclosure statements under penalty of perjury provided to the Debtors, the Special Committee and the Committee by CEO and CCO are later determined at any time by Final Order of the Bankruptcy Court or other court of competent jurisdiction to be materially inaccurate, (a) the limitations on recovery by the Wind-Down Debtor under this Article IV.G shall no longer apply, (b) any and all release, exculpation and injunction provisions in Article VIII of this Plan with respect to CEO and/or CCO (as applicable) shall be deemed null and void, (c) all Releasing Parties' rights with respect to the CEO and/or CCO (as applicable) shall be fully intact and preserved, (d) amounts paid by CEO shall not be repaid by the Wind-Down Debtor, and (e) any applicable statute of limitations shall be deemed tolled

from the Petition Date to the date of entry of the order referenced above. The Wind-Down Debtor, as successor to the Debtors, shall have standing to bring a motion seeking relief pursuant to this Article IV.G.

Entry of the Confirmation Order shall be deemed approval of the D&O Settlement and, to the extent not already approved by the Bankruptcy Court, the Debtors or the Wind-Down Debtor, as applicable, are authorized to negotiate, execute, and deliver those documents necessary or appropriate to effectuate the D&O Settlement, without further notice or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors, the Wind-Down Debtor, the Committee, and the Special Committee may deem to be necessary to effectuate the D&O Settlement.

## H. The Wind-Down Debtor

On the Effective Date, the Wind-Down Debtor shall be formed or converted into for the benefit of the Wind-Down Debtor Beneficiaries and each of the Debtors shall transfer the Wind-Down Debtor Assets for distribution in accordance with the terms of the Plan. The Confirmation Order shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

### 1. Establishment of a Wind-Down Debtor

Pursuant to the Plan Administrator Agreement, the Wind-Down Debtor will be established, formed, merged, or converted. The Wind-Down Debtor shall be the successor-in-interest to the Debtors, and the Wind-Down Debtor shall be a successor to the Debtors' rights, title, and interest to the Wind-Down Debtor Assets. The Wind-Down Debtor will conduct no business operations and will be charged with winding down the Debtors' Estates. The Wind-Down Debtor shall be managed by the Plan Administrator and shall be subject to the Wind-Down Debtor Oversight Committee. The Wind-Down Debtor shall be administered in accordance with the terms of the Plan Administrator Agreement and shall be subject to the Wind-Down Budget and the Non-Released D&O Claim Budget. For the avoidance of doubt, the Wind-Down Debtor shall not have any right or interest in any Cause of Action or Claim constituting an Acquired Asset. The Wind-Down Debtor shall be administered in a manner consistent with the SEC's published guidance on liquidating trusts.

Prior to the Effective Date, any and all of the Debtors' assets shall remain assets of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and on the Effective Date the Wind-Down Debtor Assets shall, subject to the Plan Administrator Agreement, be transferred to and vest in the Wind-Down Debtor. For the avoidance of doubt, to the extent not otherwise waived in writing, released, settled, compromised, assigned or sold pursuant to a prior order or the Plan, the Wind-Down Debtor specifically retains and reserves the right to assert, after the Effective Date, any and all of the Vested Causes of Action and related rights, whether or not asserted as of the Effective Date, and all proceeds of the foregoing, subject to the terms of the Plan, including without limitation Article IV.F and Article IV.G.

Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, only the Wind-Down Debtor and the Plan Administrator shall have the right to pursue or not to pursue, or, subject to the terms hereof and the Plan Administrator Agreement, compromise or settle any Wind-Down Debtor Assets transferred to the Wind-Down Debtor. On and after the Effective Date, the Wind-Down Debtor and the Plan Administrator may, without further Bankruptcy Court approval, commence, litigate, and settle any Vested Causes of Action or Claims relating to any Wind-Down Debtor Assets transferred to the Wind-Down Debtor or rights to payment or Claims that belong to the Debtors as of the Effective Date or are instituted by the Wind-Down Debtor and the Plan Administrator on or after the Effective Date, except as otherwise expressly

provided herein and in the Plan Administrator Agreement. All of the Wind-Down Debtor's activities shall be subject to the Wind-Down Budget and the Non-Released D&O Claim Budget. The Wind-Down Debtor shall be entitled to enforce all defenses and counterclaims to all Claims asserted against the Debtors and their Estates, including setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code.

The Wind-Down Debtor shall be deemed hereby substituted as plaintiff, defendant, or in any other capacity for the Debtors and the Committee, as applicable, in any Causes of Action pending before the Bankruptcy Court or any other court that relates to a Wind-Down Debtor Asset without the need for filing any motion for such relief. On the Effective Date, the Debtors and the Plan Administrator shall execute the Plan Administrator Agreement and shall have established the Wind-Down Debtor pursuant hereto. In the event of any conflict between the terms of this Article IV.H and the terms of the Plan Administrator Agreement, the terms of the Plan Administrator Agreement shall control.

2.    Wind-Down Debtor Assets

Notwithstanding any prohibition on assignability under applicable non-bankruptcy law, on the Effective Date and thereafter if additional Wind-Down Debtor Assets become available, the Debtors shall be deemed, subject to the Plan Administrator Agreement, to have automatically transferred to the applicable Wind-Down Debtor all of their right, title, and interest in and to all of the Wind-Down Debtor Assets, in accordance with section 1141 of the Bankruptcy Code. All such assets shall automatically vest in the Wind-Down Debtor free and clear of all Claims, Liens, and other interests, subject only to the Allowed Claims and Interests as set forth herein and the expenses of the Wind-Down Debtor as set forth herein and in the Plan Administrator Agreement. Thereupon, the Debtors shall have no interest in or with respect to the Wind-Down Debtor Assets or the Wind-Down Debtor.

3.    Treatment of Wind-Down Debtor for Federal Income Tax Purposes; No Successor-in-Interest

The Wind-Down Debtor shall be established for the primary purpose of liquidating and distributing the Wind-Down Debtor Assets transferred to it, in accordance with Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Wind-Down Debtor. Accordingly, the Plan Administrator may, in an expeditious but orderly manner, liquidate the Wind-Down Debtor Assets, make timely distributions to the Wind-Down Debtor Beneficiaries and not unduly prolong its duration. The Wind-Down Debtor shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth herein or in the Wind-Down Debtor Agreement. The record holders of beneficial interests shall be recorded and set forth in a register maintained by the Wind-Down Debtor expressly for such purpose.

The Wind-Down Debtor is intended to qualify as a "grantor trust" for federal income tax purposes to the extent reasonably practicable, with the Wind-Down Debtor Beneficiaries treated as grantors and owners of the Wind-Down Debtor. However, with respect to any of the assets of the Wind-Down Debtor that are subject to potential disputed claims of ownership or uncertain distributions, *or* to the extent "liquidating trust" treatment is otherwise unavailable, the Debtors anticipate that such assets will be subject to disputed ownership fund treatment under Section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes. Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account. Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

4. <u>Appointment of Plan Administrator</u>

The Plan Administrator shall be selected by the Committee, in consultation with the Debtors, and shall be identified in the Plan Supplement. The appointment of the Plan Administrator shall be approved in the Confirmation Order, and the Plan Administrator's duties shall commence as of the Effective Date. The Plan Administrator shall administer the distributions to the Wind-Down Debtor Beneficiaries and shall serve as a representative of the Estates under section 1123(b) of the Bankruptcy Code for the purpose of enforcing Vested Causes of Action belonging to the Estates that are not released, waived, settled, compromised, or transferred pursuant to the Plan and subject to the limitations set forth in the Plan, including Article IV.F and Article IV.G.

In accordance with the Plan Administrator Agreement, the Plan Administrator shall serve in such capacity through the earlier of (i) the date on which the Wind-Down Debtor is dissolved in accordance with the Plan Administrator Agreement, and (ii) the date on which a Plan Administrator resigns, is terminated, or is otherwise unable to serve; *provided*, *however*, that, in the event that a Plan Administrator resigns, is terminated, or is otherwise unable to serve, the Wind-Down Debtor Oversight Committee shall appoint a successor to serve as a Plan Administrator in accordance with the Plan Administrator Agreement. If the Wind-Down Debtor Oversight Committee does not appoint a successor within the time periods specified in the Plan Administrator Agreement, then the Bankruptcy Court, upon the motion of any party-in-interest, including counsel to the Wind-Down Debtor, shall approve a successor to serve as a Plan Administrator.

5. <u>Responsibilities of Plan Administrator</u>

Responsibilities of the Plan Administrator shall be as identified in the Plan Administrator Agreement and shall include, but are not limited to:

(a)    implementing the Wind-Down Debtor, and making distributions contemplated by the Plan;

(b)    marshalling, marketing for sale, and winding down any of the Debtors' assets constituting Wind-Down Debtor Assets;

(c)    appointing an independent director at each Debtor to act as a fiduciary for such Debtor entity in connection with the resolution of the Intercompany Claims;

(d)    overseeing the accounts of the Debtors and the Wind-Down Debtor and the wind down and dissolution of the Debtors and the Wind-Down Debtor, including effectuating the transactions described in the Restructuring Transactions Memorandum;

(e)    receiving, maintaining, conserving, supervising, prosecuting, collecting, settling, managing, investing, protecting, and where appropriate, causing the Wind-Down Debtor to abandon the Wind-Down Debtor Assets, including causing the Wind-Down Debtor to invest any moneys held as Wind-Down Debtor Assets;

(f)    opening and maintaining bank accounts on behalf of or in the name of the Debtors or the Wind-Down Debtor, including, in the Plan Administrator's discretion, separating bank accounts for each of the Debtors;

(g)      entering into any agreement or executing any document or instrument required by or consistent with the Plan, the Confirmation Order, or the Plan Administrator Agreement, and to perform all obligations thereunder;

(h)      collecting and liquidating all Wind-Down Debtor Assets, including the sale of any Wind-Down Debtor Assets;

(i)      protecting and enforcing the rights to the Wind-Down Debtor Assets (including any Vested Causes of Action and Contributed Third-Party Claims) vested in the Wind-Down Debtor and Plan Administrator by the Plan Administrator Agreement by any method deemed appropriate, including, without limitation, by judicial proceedings or otherwise;

(j)      investigating any Wind-Down Debtor Assets, and any other potential Vested Causes of Action and Contributed Third-Party Claims;

(k)      reviewing, reconciling, compromising, settling, objecting, or prosecuting Claims or Interests of any kind;

(l)      seeking the examination of any Person pursuant to Federal Rule of Bankruptcy Procedure 2004;

(m)      retaining professionals, disbursing agents, and other agents, independent contractors, and third parties pursuant to the Plan Administrator Agreement and paying the reasonable compensation thereof;

(n)      paying all lawful expenses, debts, charges, taxes, and other liabilities, and making all other payments relating to the Wind-Down Debtor Assets, solely out of Wind-Down Debtor Assets;

(o)      prosecuting and settling the Vested Causes of Action, including, without limitation, the 3AC Claims, FTX Claims, Alameda Claims, Contributed Third-Party Claims, and any causes of action not included in the Asset Purchase Agreement or released under the Plan;

(p)      reviewing, reconciling, pursuing, commencing, prosecuting, compromising, settling, dismissing, releasing, waiving, withdrawing, abandoning, resolving, or electing not to pursue all Vested Causes of Action and Contributed Third-Party Claims;

(q)      acquiring litigation and other claims related to the Debtors, and prosecuting such claims;

(r)      reviewing and compelling turnover of the Debtors or the Wind-Down Debtor's property;

(s)      calculating and making all Distributions to the holders of Allowed Claims against each Debtor and, solely to the extent of payment in full of Allowed Claims, to holders of Allowed Interests, as provided for in, or contemplated by, the Plan and the Plan Administrator Agreement; *provided* that because the Plan does not substantively consolidate the Debtors' Estates, the Plan Administrator shall make

Distributions from the Wind-Down Debtor Assets to the holders of Claims and Interests (if applicable) against that specific Debtor;

(t) establishing, administering, adjusting, and maintaining the Wind-Down Reserve and the Disputed Claims Reserve;

(u) withholding from the amount distributable to any Person the maximum amount needed to pay any tax or other charge that the Plan Administrator has determined, based upon the advice of his agents or professionals, may be required to be withheld from such Distribution under the income tax or other laws of the United States or of any state or political subdivision thereof;

(v) in reliance upon the Debtors' Schedules, the official Claims Register maintained in the Chapter 11 Cases and the Debtors' filed lists of equity security holders, reviewing, and where appropriate, allowing or objecting to Claims and (if applicable) Interests, and supervising and administering the commencement, prosecution, settlement, compromise, withdrawal, or resolution of all objections to Disputed Claims and (if applicable) Disputed Interests required to be administered by the Wind-Down Debtor;

(w) making all tax withholdings, filing tax information returns, filing and prosecuting tax refunds claims, making tax elections by and on behalf of the Debtors or the Wind-Down Debtor, and filing tax returns for the Debtors or the Wind-Down Debtor pursuant to and in accordance with the Plan, and paying taxes, if any, payable for and on behalf of the Debtors or the Wind-Down Debtor, as applicable; *provided, however*, that notwithstanding any other provision of the Plan Administrator Agreement, the Plan Administrator shall not have any responsibility or personal liability in any capacity whatsoever for the signing or accuracy of the Debtors' income tax returns that are due to be filed after the Effective Date or for any tax liability related thereto;

(x) abandoning or donating to a charitable organization qualifying under IRC section 501(c)(3) any Wind-Down Debtor Assets that the Plan Administrator determines to be too impractical to distribute or of inconsequential value;

(y) seeking a determination of tax liability or refund under Bankruptcy Code section 505;

(z) establishing reserves for taxes, assessments, and other expenses of administration of the Debtors or the Wind-Down Debtor as may be necessary and appropriate for the proper operation of matters incident to the Debtors or the Wind-Down Debtor;

(aa) paying Wind-Down Debtor Expenses;

(bb) if the Plan Administrator deems appropriate in the Plan Administrator's sole discretion, seeking to establish a bar date for filing proofs of Interest in any Debtor or otherwise to determine the holders and extent of Allowed Interests in any Debtor;

38

(cc)    purchasing and carrying all insurance policies that the Plan Administrator deems reasonably necessary or advisable and paying all associated insurance premiums and costs;

(dd)    undertaking all administrative functions remaining in the Chapter 11 Cases to the extent necessary to carry out the Debtors', the Wind-Down Debtor's, or the Plan Administrator's duties under the Plan, including reporting and making required payments of fees to the U.S. Trustee and overseeing the closing of the Chapter 11 Cases;

(ee)    retaining, terminating, appointing, hiring, or otherwise employees, personnel, management, and directors at any of the Debtors to the extent necessary to carry out the purposes of the Plan Administrator Agreement and the Plan, including, without limitation, to address any disputes between the Debtors;

(ff)    exercising, implementing, enforcing, and discharging all of the terms, conditions, powers, duties, and other provisions of the Plan, the Confirmation Order, and the Plan Administrator Agreement; and

(gg)    taking all other actions consistent with the provisions of the Plan and the Plan Administrator Agreement that the Plan Administrator deems reasonably necessary or desirable to administer the Debtors and the Wind-Down Debtor.

6.    <u>The Wind-Down Debtor Oversight Committee</u>

The Wind-Down Debtor Oversight Committee shall consist of those parties selected by the Committee and identified in the Plan Supplement, and which, at no time shall consist of greater than seven members.

The Wind-Down Debtor Oversight Committee shall have the responsibility to review and advise the Plan Administrator with respect to the liquidation and distribution of the Wind-Down Debtor Assets transferred to the Wind-Down Debtor in accordance herewith and the Plan Administrator Agreement. For the avoidance of doubt, in advising the Plan Administrator, the Wind-Down Debtor Oversight Committee shall maintain the same fiduciary responsibilities as the Plan Administrator. Vacancies on the Wind-Down Debtor Oversight Committee shall be filled by a Person designated by the Plan Administrator, subject to the unanimous consent of the remaining member or members of the Wind-Down Debtor Oversight Committee. The Plan Administrator shall have the authority to seek an order from the Bankruptcy Court removing or replacing members of the Wind-Down Debtor Oversight Committee for cause.

7.    <u>Expenses of Wind-Down Debtor</u>

The Wind-Down Debtor Expenses shall be paid from the Wind-Down Debtor Assets subject to the Wind-Down Budget and the Non-Released D&O Claim Budget.

8.    <u>Insurance; Bond</u>

The Plan Administrator may obtain insurance coverage (in the form of an errors and omissions policy or otherwise) with respect to the liabilities and obligations of the Plan Administrator and the Wind-Down Debtor Oversight Committee under the Plan Administrator Agreement. Unless otherwise agreed to by the Wind-Down Debtor Oversight Committee, the Plan Administrator shall serve with a bond, the terms

of which shall be agreed to by the Wind-Down Debtor Oversight Committee, and the cost and expense of which shall be paid by the Wind-Down Debtor.

9.  Fiduciary Duties of the Plan Administrator

Pursuant hereto and the Plan Administrator Agreement, the Plan Administrator shall act in a fiduciary capacity on behalf of the interests of all Holders of Claims and Interests that will receive distributions pursuant to Plan.

10.  Termination of the Wind-Down Debtor

The Wind-Down Debtor will terminate on the earlier of: (a) (i) the final liquidation, administration and distribution of the Wind-Down Debtor Assets in accordance with the terms of the Plan Administrator Agreement and the Plan, and its full performance of all other duties and functions as set forth herein or in the Plan Administrator Agreement and (ii) the Chapter 11 Cases of the Debtors have been closed; or (b) the Plan Administrator determines in its reasonable judgment that the Wind-Down Debtor lacks sufficient assets and financial resources, after reasonable collection efforts, to complete the duties and powers assigned to him or her under the Plan, the Confirmation Order and/or the Plan Administrator Agreement. After (x) the final distributions pursuant hereto, (y) the Filing by or on behalf of the Wind-Down Debtor of a certification of dissolution with the Bankruptcy Court, and (z) any other action deemed appropriate by the Plan Administrator, the Wind-Down Debtor shall be deemed dissolved for all purposes without the necessity for any other or further actions.

11.  Liability of Plan Administrator; Indemnification

Neither the Plan Administrator, the Wind-Down Debtor Oversight Committee, their respective members, employees, employers, designees or professionals, or any of their duly designated agents or representatives (each, a "Wind-Down Debtor Party" and collectively, the "Wind-Down Debtor Parties") shall be liable for losses, claims, damages, liabilities or expenses in connection with the affairs of the Wind-Down Debtor or for the act or omission of any other Wind-Down Debtor Party, nor shall the Wind-Down Debtor Parties be liable for any act or omission taken or omitted to be taken pursuant to the discretion, powers and authority conferred, or in good faith believed to be conferred by the Plan Administrator Agreement or the Plan other than for specific acts or omissions resulting from such Wind-Down Debtor Party's willful misconduct, gross negligence or actual fraud. Subject to the Plan Administrator Agreement, the Plan Administrator shall be entitled to enjoy all of the rights, powers, immunities and privileges applicable to a chapter 7 trustee, and the Wind-Down Debtor Oversight Committee shall be entitled to enjoy all of the rights, powers, immunities and privileges of an official committee of unsecured creditors. The Plan Administrator or the Wind-Down Debtor Oversight Committee may, in connection with the performance of its functions, and in its sole and absolute discretion, consult with its attorneys, accountants, financial advisors and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such persons, regardless of whether such advice or opinions are provided in writing. Notwithstanding such authority, neither the Plan Administrator nor the Wind-Down Debtor Oversight Committee shall be under any obligation to consult with its attorneys, accountants, financial advisors or agents, and their determination not to do so shall not result in the imposition of liability on the Plan Administrator, the Wind-Down Debtor Oversight Committee, or their respective members and/or designees, unless such determination is based on willful misconduct, gross negligence, or actual fraud. The Wind-Down Debtor shall indemnify and hold harmless the Wind-Down Debtor Parties (in their capacity as such), from and against and in respect of all liabilities, losses, damages, claims, costs and expenses (including, without limitation, reasonable attorneys' fees, disbursements, and related expenses) that such parties may incur or to which such parties may become subject in connection with any action, suit, proceeding or investigation brought by or threatened against such parties arising out

of or due to their acts or omissions, or consequences of such acts or omissions, with respect to the implementation or administration of the Wind-Down Debtor or the Plan or the discharge of their duties hereunder; *provided*, *however*, that no such indemnification will be made to such Persons for actions or omissions as a result of willful misconduct, gross negligence, or actual fraud. Persons dealing or having any relationship with the Plan Administrator shall have recourse only to the Wind-Down Debtor Assets and shall look only to the Wind-Down Debtor Assets to satisfy any liability or other obligations incurred by the Wind-Down Debtor or the Wind-Down Debtor Oversight Committee to such Person in carrying out the terms of the Plan Administrator Agreement, and neither the Plan Administrator nor the Wind-Down Debtor Oversight Committee, shall have any personal obligation to satisfy any such liability. The Plan Administrator and/or the Wind-Down Debtor Oversight Committee members shall not be liable whatsoever except for the performance of such duties and obligations as are specifically set forth herein, and no implied covenants or obligations shall be read into the Plan Administrator Agreement against any of them. The Wind-Down Debtor shall promptly pay expenses reasonably incurred by any Wind-Down Debtor Party in defending, participating in, or settling any action, proceeding or investigation in which such Wind-Down Debtor Party is a party or is threatened to be made a party or otherwise is participating in connection with the Plan Administrator Agreement or the duties, acts or omissions of the Plan Administrator or otherwise in connection with the affairs of the Wind-Down Debtor, upon submission of invoices therefor, whether in advance of the final disposition of such action, proceeding, or investigation or otherwise. Each Wind-Down Debtor Party hereby undertakes, and the Wind-Down Debtor hereby accepts his or her undertaking, to repay any and all such amounts so advanced if it shall ultimately be determined that such exculpated party is not entitled to be indemnified therefor under the Plan Administrator Agreement. The foregoing indemnity in respect of any Wind-Down Debtor Party shall survive the termination of such Wind-Down Debtor Party from the capacity for which they are indemnified.

12. No Liability of the Wind-Down Debtor

On and after the Effective Date, the Wind-Down Debtor shall have no liability on account of any Claims or Interests except as set forth herein and in the Plan Administrator Agreement. All payments and all distributions made by the Plan Administrator hereunder shall be in exchange for all Claims or Interests against the Debtors.

I. **Sources of Consideration for Plan Distributions**

Distributions under the Plan shall be funded by (i) the proceeds of Purchaser's payment obligations under Sections 2.1 and 2.2 of the Asset Purchase Agreement and distributions of Acquired Coins pursuant to Sections 6.12, and 6.14 of the Asset Purchase Agreement, (ii) the Wind-Down Debtor from the Wind-Down Debtor Assets; *provided*, *however*, that Allowed Professional Fee Claims shall be paid from the Professional Fee Escrow Account in the first instance. The Wind-Down Debtor Assets shall be used to pay the Wind-Down Debtor Expenses (including the compensation of the Plan Administrator and any professionals retained by the Wind-Down Debtor), and to satisfy payment of Allowed Claims and Interests as set forth in the Plan.

J. **Corporate Existence and Dissolution**

Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificates or articles of incorporation, certificates of formation, certificates of organization, or certificates of limited partnership and bylaws, operating agreements, limited liability company agreements, or limited partnership agreements (or other formation documents) in effect

41

A-710

prior to the Effective Date, except to the extent such certificates or articles of incorporation, certificates of formation, certificates of organization, or certificates of limited partnership and bylaws, operating agreements, limited liability company agreements, or limited partnership agreements (or other formation documents) are amended pursuant to the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings under applicable state or federal law).

On and after the Effective Date, the Wind-Down Debtor will be authorized and directed to implement the Plan and any applicable orders of the Bankruptcy Court, and the Wind-Down Debtor shall have the power and authority to take any action necessary to wind down and dissolve the Debtors' Estates.

Upon a certification to be Filed with the Bankruptcy Court by the Plan Administrator of all distributions having been made and completion of all of its duties under the Plan and entry of a final decree closing the last of the Chapter 11 Cases, the Wind-Down Debtor shall be deemed to be dissolved without any further action by the Debtors or the Wind-Down Debtor, including the Filing of any documents with the secretary of state for the state in which the Wind-Down Debtor are formed or any other jurisdiction. The Plan Administrator, however, shall have authority to take all necessary actions to dissolve the Debtors or the Wind-Down Debtor in and withdraw the Wind-Down Debtor from applicable states.

As soon as practicable after the Effective Date, the Wind-Down Debtor shall take such actions as the Wind-Down Debtor may determine to be necessary or desirable to carry out the purposes of the Plan. Any certificate of dissolution or equivalent document may be executed by the Wind-Down Debtor on behalf of any Wind-Down Debtor without need for any action or approval by the shareholders or board of directors or managers of such Debtor. On and after the Effective Date, the Debtors or the Wind-Down Debtor (1) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (2) shall be deemed to have cancelled pursuant to this Plan all Interests, and (3) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date. Pursuant to the terms of this Plan, any Money Transmitter Licenses that have not been terminated shall be deemed withdrawn and no further action is required to be taken by the Debtors or the Wind-Down Debtor to effectuate such withdrawal; *provided* that, following the Effective Date, the Debtors or the Wind-Down Debtor, as applicable, shall use commercially reasonable efforts to comply with all state banking department requirements for the surrender of a Money Transmitter License. Nothing in this Plan shall be construed to limit the rights of creditors, Debtors, the Wind-Down Debtor, or regulators to pursue recoveries against surety bonds maintained by the Debtors in connection with this Money Transmitter Licenses. Notwithstanding such Debtors' dissolution, such Debtors shall be deemed to remain intact solely with respect to the preparation, filing, review, and resolution of applications for Professional Fee Claims.

## K.    Corporate Action

Upon the Effective Date, all actions contemplated under the Plan, Definitive Documents, and Asset Purchase Agreement shall be deemed authorized and approved in all respects, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, directors, managers, managing-members, limited or general partners, or officers of the Debtors, the Wind-Down Debtor or any other Entity, including: (1) appointment of the directors, managers, members, and officers for the Wind-Down Debtor as provided herein; (2) the issuances, transfer, and distribution of the Wind-Down Debtor Assets; (3) the formation of the Wind-Down Debtor and appointment of the Plan Administrator and Wind-Down Debtor Oversight Committee; (4) the formation of any entities pursuant to and the implementation of the Plan and performance of all actions and transactions contemplated hereby

and thereby; (5) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; and (6) all other acts or actions contemplated by the Plan, Definitive Documents, and Asset Purchase Agreement or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions (including effectuating the Restructuring Transactions Memorandum and the Customer Onboarding Protocol) (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan, Definitive Documents, and Asset Purchase Agreement involving the corporate structure of the Debtors or the Wind-Down Debtor, as applicable, and any corporate action required by the Debtors or the Wind-Down Debtor, as applicable, in connection with the Plan shall be deemed to have occurred on, and shall be in effect as of, the Effective Date, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Wind-Down Debtor, as applicable. On or, as applicable, prior to the Effective Date, the appropriate officers of the Debtors or the Wind-Down Debtor, as applicable, shall be authorized and, as applicable, directed to issue, execute, and deliver the agreements, documents, Securities, certificates of incorporation, certificates of formation, bylaws, operating agreements, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Wind-Down Debtor, and any and all other agreements, documents, Securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this Article IV.K shall be effective notwithstanding any requirements under non-bankruptcy law.

## L.     Vesting of Assets in the Wind-Down Debtor

Except as otherwise provided in the Plan, or in any agreement, instrument, or other document incorporated in the Plan, notwithstanding any prohibition of assignability under applicable non-bankruptcy law and in accordance with section 1141 of the Bankruptcy Code, on the Effective Date, all property constituting Wind-Down Debtor Assets, including all Vested Causes of Action of the Debtors (unless otherwise released, waived, compromised, settled, transferred, or discharged pursuant to the Plan), and any property acquired by any of the Debtors under the Plan shall vest in the Wind-Down Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.

## M.     Cancellation of Notes, Instruments, Certificates, and Other Documents

On the later of the Effective Date and the date on which distributions are made pursuant to the Plan (if not made on the Effective Date), except for the purpose of evidencing a right to and allowing Holders of Claims and Interests to receive a distribution under the Plan or to the extent otherwise specifically provided for in the Plan, the Confirmation Order, or any agreement, instrument, or other document entered into in connection with or pursuant to the Plan or the Restructuring Transactions (including, without limitation, the Definitive Documents and the Asset Purchase Agreement), all notes, bonds, indentures, certificates, Securities, shares, purchase rights, options, warrants, collateral agreements, subordination agreements, intercreditor agreements, or other instruments or documents directly or indirectly evidencing, creating, or relating to any indebtedness or obligations of, or ownership interest in, the Debtors, giving rise to any Claims against or Interests in the Debtors or to any rights or obligations relating to any Claims against or Interests in the Debtors shall be deemed cancelled without any need for a Holder to take further action with respect thereto.

## N.     Effectuating Documents; Further Transactions

On and after the Effective Date, the Debtors, and its directors, managers, partners, officers, authorized persons, and members thereof, and the Wind-Down Debtor and Plan Administrator are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, Definitive Documents,

and Asset Purchase Agreement, in the name of and on behalf of the Debtors and Wind-Down Debtor, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

**O.    Section 1146(a) Exemption**

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Wind-Down Debtor, the Purchaser, or to any other Entity) of property under the Plan, Definitive Documents, and Asset Purchase Agreement or pursuant to:  (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Wind-Down Debtor; (2) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, including the Asset Purchase Agreement, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, sales or use tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forgo the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**P.    Preservation of Rights of Action**

In accordance with section 1123(b) of the Bankruptcy Code, the Wind-Down Debtor shall succeed to all rights to commence and pursue any and all Vested Causes of Action of the Debtors, whether arising before or after the Petition Date, including, without limitation, any actions specifically enumerated in the Schedule of Retained Causes of Action other than Causes of Action released, waived, settled, compromised, or transferred.  Such rights shall be preserved by the Debtors and Wind-Down Debtor and shall vest in the Wind-Down Debtor, with the Wind-Down Debtor's rights to commence, prosecute, or settle such Causes of Action preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action expressly released, waived, settled, compromised, or transferred by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan or pursuant to the Asset Purchase Agreement, which shall be deemed released and waived by the Debtors and Wind-Down Debtor as of the Effective Date.

The Wind-Down Debtor may pursue such Causes of Action, as appropriate, in accordance with the best interests of the beneficiaries of the Wind-Down Debtor and in accordance with the Plan Administrator Agreement and the Plan.  **No Entity may rely on the absence of a specific reference in the Schedules of Assets and Liabilities or Statement of Financial Affairs, the Plan, the Plan Supplement, the Disclosure Statement, or the Schedule of Retained Causes of Action to any Cause of Action against it as any indication that the Debtors or the Wind-Down Debtor, as applicable, will not pursue any and all available Causes of Action of the Debtors against it.  The Wind-Down Debtor, on behalf of the Debtors and the Wind-Down Debtor, expressly reserves all rights to prosecute any and all Causes of Action against any Entity, except as otherwise provided in the Plan, including Article VIII of the**

**Plan.** Unless any Cause of Action of the Debtors is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or pursuant to a Final Order, the Wind-Down Debtor, on behalf of the Debtors and Wind-Down Debtor and in accordance with the Plan Administrator Agreement, expressly reserves all such Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or Consummation.

The Wind-Down Debtor, on behalf of the Debtors, reserves and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Cause of Action that a Debtor may hold against any Entity shall vest in the Wind-Down Debtor, except as otherwise provided in the Plan, including Article VIII of the Plan. The Wind-Down Debtor, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Wind-Down Debtor shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court in accordance with the Plan.

**Q.      Election to Contribute Third-Party Claims**

Because aggregating all Contributed Third-Party Claims may enable the pursuit and settlement of such litigation claims in a more efficient and effective manner, each Holder of a Claim or Interest may agree, by electing on its ballot or opt-in form, to contribute its Contributed Third-Party Claims to the Wind-Down Debtor. By electing such option on its ballot or opt-in form, each Contributing Claimant agrees that, subject to the occurrence of the Effective Date and the formation of the Wind-Down Debtor, it will be deemed, without further action, (i) to have irrevocably contributed its Contributed Third-Party Claims to the Wind-Down Debtor, and (ii) to have agreed to execute any documents reasonably requested by the Debtors or the Wind-Down Debtor to memorialize and effectuate such contribution.

**R.      Contribution of Contributed Third-Party Claims**

On the Effective Date, all Contributed Third-Party Claims will be irrevocably contributed to the Wind-Down Debtor and shall thereafter be Wind-Down Debtor Assets for all purposes. No Person may rely on the absence of a specific reference in the Plan, the Disclosure Statement, the Confirmation Order, the Plan Administrator Agreement, the Plan Supplement, or any other document as any indication that the Wind-Down Debtor will or will not pursue any and all available Contributed Third-Party Claims against such Person. The Wind-Down Debtor shall have, retain, reserve, and be entitled to assert all Contributed Third-Party Claims fully to the same extent that the Contributing Claimants could have asserted such claims prior to the Effective Date. For the avoidance of doubt, the Contributed Third-Party Claims shall not include the rights of any of the Contributing Claimants to receive the distributions under the Plan on account of their Claims or Interests.

**S.      Closing the Chapter 11 Cases**

On and after the Effective Date, the Wind-Down Debtor shall be permitted to classify all of the Chapter 11 Cases of the Debtors except for the Chapter 11 Case of Voyager Digital, LLC, or any other Debtor identified in the Restructuring Transactions Memorandum as having its Chapter 11 Case remain open following the Effective Date, as closed, and all contested matters relating to any of the Debtors, including objections to Claims or Interests and any adversary proceedings, may be administered and heard

in the Chapter 11 Case of Voyager Digital, LLC, or any other Debtor identified in the Restructuring Transactions Memorandum as having its Chapter 11 Case remain open following the Effective Date, irrespective of whether such Claims or Interests were Filed or such adversary proceeding was commenced against a Debtor whose Chapter 11 Case was closed.

# ARTICLE V.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.    Assumption and Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, except as otherwise provided herein, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (1) is specifically described in the Plan as to be assumed in connection with confirmation of the Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement; (2) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Effective Date; (3) is to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, in connection with the Sale Transaction; (4) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; or (5) is a D&O Liability Insurance Policy other than the Side-A Policy.  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, assignments, and rejections, including the assumption of the Executory Contracts or Unexpired Leases as provided in the Plan Supplement, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

### B.    Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Wind-Down Debtor, as applicable, under such Executory Contract or Unexpired Lease.  Without limiting the general nature of the foregoing, and notwithstanding any non-bankruptcy law to the contrary, the Debtors and Wind-Down Debtor expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the Debtors contracting from non-Debtor counterparties to any rejected Executory Contract or Unexpired Lease.

### C.    Claims Based on Rejection of Executory Contracts or Unexpired Leases

Counterparties to Executory Contracts or Unexpired Leases listed subject to rejection under the Plan shall be served with a notice of rejection of Executory Contracts and Unexpired Leases with the Plan Supplement.  Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Claims, Noticing, and Solicitation Agent and served on the Debtors or Wind-Down Debtor, as applicable, no later than thirty days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection.  **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, or the Wind-Down Debtor, the Estates, or their property without the need for any objection by the Wind-Down Debtor or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the**

46

rejection of the Executory Contract or Unexpired Lease shall be deemed released, and be subject to the permanent injunction set forth in Article VIII.D of the Plan, including any Claims against any Debtor listed on the Debtors' schedules as unliquidated, contingent, or disputed. All Allowed Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease shall be treated as General Unsecured Claims in accordance with Article III.C of the Plan.

**D.      Cure of Defaults for Executory Contracts and Unexpired Leases Assumed**

The Debtors, the Wind-Down Debtor, or the Purchaser, as applicable pursuant to the Asset Purchase Agreement, shall pay Cures, if any, on the Effective Date. The Debtors shall provide notice of the amount and timing of payment of any such Cure to the parties to the applicable assumed Executory Contracts or Unexpired Leases as part of the Plan Supplement. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure that differ from the ordinary course amounts paid or proposed to be paid by the Debtors, the Wind-Down Debtor, or the Purchaser shall be dealt with in the ordinary course of business and, if needed, shall be Filed with the Claims, Noticing, and Solicitation Agent on or before thirty days after the Effective Date. **If any counterparty to an Executory Contract or Unexpired Lease does not receive a notice of assumption and applicable cure amount, such counterparty shall have until on or before thirty days after the Effective Date to bring forth and File a request for payment of Cure.** Any such request that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Debtor or the Wind-Down Debtor, without the need for any objection by the Wind-Down Debtor or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure shall be deemed fully satisfied and released upon payment by the Debtors or the Wind-Down Debtor or the Purchaser of the Cure in the ordinary course of business or upon and in accordance with any resolution of a Cure dispute (whether by order of the Bankruptcy Court or through settlement with the applicable Executory Contract or Unexpired Lease counterparty); *provided*, *however*, that nothing herein shall prevent the Wind-Down Debtor or the Purchaser, as applicable, from paying any Cure Claim despite the failure of the relevant counterparty to File such request for payment of such Cure. The Wind-Down Debtor or the Purchaser may also settle any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court. In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be Filed with the Bankruptcy Court on or before thirty days after the Effective Date. Any such objection will be scheduled to be heard by the Bankruptcy Court at the Debtors' first scheduled omnibus hearing for which such objection is timely Filed. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

In the event of a dispute regarding: (1) the amount of any Cure Claim, (2) the ability of the Debtors, the Wind-Down Debtor, Purchaser, or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed (or assumed and assigned, as applicable), or (3) any other matter pertaining to assumption or assignment, then any disputed Cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made as soon as reasonably practicable following, and in accordance with, the entry of a Final Order of the Bankruptcy Court resolving such dispute or as may be agreed upon by the Debtors, the Wind-Down Debtor, or Purchaser, as applicable, and the counterparty to the Executory Contract or Unexpired Lease, and any such unresolved dispute shall not prevent or delay implementation of the Plan or the occurrence of the Effective Date.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise or assignment of any Executory Contract or Unexpired Lease to the Purchaser and full payment of any applicable Cure pursuant to this Article V.D, or upon and in accordance with any resolution of a Cure

dispute (whether by order of the Bankruptcy Court or through settlement with the applicable Executory Contract or Unexpired Lease counterparty), shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed or assumed and assigned in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to this Article V.D, in the amount and at the time in the ordinary course of business or upon and in accordance with any resolution of a Cure dispute (whether by order of the Bankruptcy Court or through settlement with the applicable Executory Contract or Unexpired Lease counterparty), shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court. For the avoidance of doubt, in the event that any counterparty to an Executory Contract or Unexpired Lease receives a notice of assumption and applicable proposed Cure amount, and disputes the Debtors' proposed Cure amount, such party shall not be required to File a Proof of Claim with respect to such dispute. Any counterparty to an Executory Contract or Unexpired Lease that does not receive a notice or applicable proposed Cure amount, and believes a Cure amount is owed, shall have thirty days after the Effective Date to File a Proof of Claim with respect to such alleged Cure amount, which Claim shall not be expunged until such Cure dispute is resolved.**

**E.     Insurance Policies**

Each D&O Liability Insurance Policy (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto) other than the Side-A Policy shall be assumed, in their entirety, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date, pursuant to sections 105 and 365 of the Bankruptcy Code with the Wind-Down Debtor being authorized to pursue any proceeds thereof on behalf of the Debtors or the Wind-Down Debtor. The Side-A Policy shall ride through these Chapter 11 Cases with the Debtors, and the Wind-Down Debtor preserves all avoidance and other actions in connection with the premium paid thereunder. All beneficiaries under the D&O Insurance Policies reserve their rights under such D&O Insurance Policies subject to the limitations set forth in this Plan.

The Debtors or the Wind-Down Debtor, as applicable, shall not terminate or otherwise reduce the coverage under any D&O Liability Insurance Policy (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto) in effect prior to the Effective Date, and any current and former directors, officers, managers, and employees of the Debtors who served in such capacity at any time before or after the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy subject to the terms thereof regardless of whether such directors, officers, managers, and employees remain in such positions after the Effective Date. Notwithstanding anything to the contrary in the Plan, the Debtors or the Wind-Down Debtor shall retain the ability to supplement such D&O Liability Insurance Policy as the Debtors or Wind-Down Debtor may deem necessary, subject to the prior written consent of the Wind-Down Debtor. Notwithstanding anything to the contrary contained in the Plan, the Wind-Down Debtor shall be entitled to pursue avoidance of the premium paid for the XL Specialty Insurance Company Cornerstone A-Side Management Liability Insurance Policy No. ELU184179-22, and nothing in this Plan shall be deemed a waiver or abrogation of any such rights.

The Debtors shall continue to satisfy their obligations under their insurance policies in full and continue such policies in the ordinary course of business. Each of the Debtors' insurance policies, and any agreements, documents, or instruments relating thereto shall be treated as Executory Contracts under the Plan. On the Effective Date: (a) the Debtors shall be deemed to have assumed all such insurance policies

and any agreements, documents, and instruments relating thereto in their entirety; and (b) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the applicable Debtors or the Wind-Down Debtor unaltered.

**F.      Reservation of Rights**

Nothing contained in the Plan or the Plan Supplement (unless otherwise explicitly provided) shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor or the Wind-Down Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Wind-Down Debtor, as applicable, shall have forty-five days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, including by rejecting such contract or lease effective as of the Confirmation Date.

**G.      Nonoccurrence of Effective Date**

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

**H.      Contracts and Leases Entered into After the Petition Date**

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed under section 365 of the Bankruptcy Code, will be performed by the applicable Debtor or Wind-Down Debtor liable thereunder in the ordinary course of its business.  Such contracts and leases that are not rejected under the Plan shall survive and remain unaffected by entry of the Confirmation Order.

## ARTICLE VI.

## PROVISIONS GOVERNING DISTRIBUTIONS

**A.      Timing and Calculation of Amounts to Be Distributed**

Except (1) as otherwise provided herein, (2) upon a Final Order, or (3) as otherwise agreed to by the Debtors, the Purchaser, or the Wind-Down Debtor, as the case may be, and the Holder of the applicable Claim, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the next Distribution Date after such Claim becomes, as applicable, an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive the full amount of distributions that the Plan provides for Allowed Claims in the applicable Class from the Distribution Agent.  In the event that any payment or distribution under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or distribution may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  Except as specifically provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

**B.      Rights and Powers of Distribution Agent**

      1.      <u>Powers of the Distribution Agent</u>

The Distribution Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties and exercise its rights under the Plan; (b) make all distributions contemplated under the Plan; (c) employ professionals to represent it with respect to its responsibilities and powers; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions of the Plan.

      2.      <u>Expenses Incurred on or after the Effective Date</u>

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Distribution Agent on or after the Effective Date and any reasonable compensation and expense reimbursement claims (including reasonable attorney and/or other professional fees and expenses) made by such Distribution Agent shall be paid in Cash by the Wind-Down Debtor.

**C.      Delivery of Distributions and Undeliverable or Unclaimed Distributions**

      1.      <u>Distributions Generally</u>

Except as otherwise provided in the Plan (including in paragraph 8 below), the Distribution Agent shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the applicable register or in the Debtors' records as of the date of any such distribution (as applicable), including the address set forth in any Proof of Claim filed by that Holder.

      2.      <u>Distributions on Account of Obligations of Multiple Debtors</u>

For all purposes associated with distributions under the Plan, all guarantees by any Debtor of the obligations of any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor, shall be deemed eliminated so that any obligation that could otherwise be asserted against more than one Debtor shall result in a single distribution under the Plan.  Any such Claims shall be subject to all potential objections, defenses, and counterclaims, and to estimation pursuant to section 502(c) of the Bankruptcy Code.

      3.      <u>Record Date of Distributions</u>

On the Distribution Record Date, the various transfer registers for each Class of Claims or Interests as maintained by the Debtors or their respective agents shall be deemed closed, and there shall be no further changes in the record Holders of any Claims or Interests.  The Distribution Agent shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date. In addition, with respect to payment of any Cure amounts or disputes over any Cure amounts, neither the Debtors nor the Distribution Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the Effective Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure amount.

      4.      <u>Special Rules for Distributions to Holders of Disputed Claims and Interests</u>

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the Wind-Down Debtor, on the one hand, and the Holder of a Disputed Claim or Interest, on the other hand, or

as set forth in a Final Order, no partial payments and no partial distributions shall be made with respect to a Disputed Claim or Interest until all of the Disputed Claim or Interest has become an Allowed Claim or Interest or has otherwise been resolved by settlement or Final Order; *provided* that, if the Wind-Down Debtor does not dispute a portion of an amount asserted pursuant to an otherwise Disputed Claim or Interest, the Distribution Agent may make a partial distribution on account of that portion of such Claim or Interest that is not Disputed at the time and in the manner that the Distribution Agent makes distributions to similarly situated Holders of Allowed Claims or Interests pursuant to the Plan.  Any dividends or other distributions arising from property distributed to Holders of Allowed Claims or Interests, as applicable, in a Class and paid to such Holders under the Plan shall also be paid, in the applicable amounts, to any Holder of a Disputed Claim or Interest, as applicable, in such Class that becomes an Allowed Claim or Interest after the date or dates that such dividends or other distributions were earlier paid to Holders of Allowed Claims or Interests in such Class.

5.      De Minimis Distributions; Minimum Distributions

The Distribution Agent shall not make any Cash distributions to any Holder of an Allowed Claim or Interest pursuant to Article III.C.1-11 of this Plan on account of such Allowed Claim or Interest if such distribution is valued, in the reasonable discretion of the Distribution Agent, at less than $1.00, and each Holder of an Allowed Claim or Interest to which this limitation applies shall not be entitled to any distributions under the Plan.  Notwithstanding anything to the contrary in this Plan, there shall be no minimum distribution threshold on account of distributions of any Cryptocurrency to Holders of Allowed Account Holder Claims and Allowed OpCo General Unsecured Claims.

6.      Undeliverable Distributions and Unclaimed Property

In the event that either (a) a distribution to any Holder is returned as undeliverable or (b) the Holder of an Allowed Claim or Interest does not respond to a request by the Debtors or the Distribution Agent for information necessary to facilitate a particular distribution, no distribution to such Holder shall be made unless and until the Distribution Agent has determined the then-current address of such Holder or received the necessary information to facilitate a particular distribution, at which time such distribution shall be made to such Holder without interest, dividends, or other accruals of any kind; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code on the date that is one year after the Effective Date. After such date, all unclaimed property or interests in property shall revert to the Wind-Down Debtor automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable local, state, federal, or foreign escheat, abandoned, or unclaimed property laws to the contrary), and the Claim or Interest of any Holder to such property or interest in property shall not be entitled to any distributions under the Plan.

7.      Manner of Payment Pursuant to the Plan

At the option of the Distribution Agent, any Cash payment to be made hereunder may be made by check, wire transfer, automated clearing house, credit card, or as otherwise provided in applicable agreements.

8.      Distributions of Net Owed Coins; Additional Bankruptcy Distributions

As a general matter, the Purchaser will allocate each Account Holder's Net Owed Coins to its account on the Binance.US Platform, and each Holder of OpCo General Unsecured Claim's Pro Rata share of the Distributable Cryptocurrency (in Cash) to its account on the Binance.US Platform in accordance with, and subject to, the provisions of Section 6.12 of the Asset Purchase Agreement.

Subject to the terms of the Asset Purchase Agreement, the Purchaser may make Additional Bankruptcy Distributions to Transferred Creditors, including Distributable OpCo Cash and/or other Wind-Down Debtor Assets, corresponding to their Pro Rata shares of such Additional Bankruptcy Distribution (if such Additional Bankruptcy Distribution is in Cryptocurrency, based on the Transferred Cryptocurrency Value of the Cryptocurrency included in such Additional Bankruptcy Distribution), all in accordance with any applicable Post-Bankruptcy Statement (as defined in the Asset Purchase Agreement).

If any Account Holder or Holder of an Allowed OpCo General Unsecured Claim does not become a Transferred Creditor prior to the date that is three (3) months following the later of the Closing Date or the date on which the terms and conditions for the Binance.US Platform are made available for such Person to accept (as provided in the Customer Onboarding Protocol), then Purchaser shall convert any Cryptocurrency allocable to such Person into U.S. Dollars at the then-prevailing rates (including applicable fees, spreads, costs and expenses) on the Binance.US Platform and deliver such U.S. Dollars, together with any cash or others assets in respect of such Persons, to the Debtors within five (5) Business Days, for further distribution by the Debtors in accordance with this Plan and the Customer Onboarding Protocol.

If any Account Holder or Holder of an Allowed OpCo General Unsecured Claim is located in an Unsupported Jurisdiction (as defined in the Asset Purchase Agreement), then the Net Owed Coins, Distributable Cryptocurrency (in Cash) and Additional Bankruptcy Distributions, if applicable, allocable to such Person shall be handled pursuant to Section 6.12(b) or, if applicable, Section 6.14(d) of the Asset Purchase Agreement.

Purchaser shall have no responsibility to make any distributions other than as contemplated by Sections 6.12 and 6.14 of the Asset Purchase Agreement.

## D.    Compliance Matters

In connection with the Plan, to the extent applicable, the Debtors, the Wind-Down Debtor, any Distribution Agent, and any other applicable withholding and reporting agents shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Debtors, the Wind-Down Debtor, the Distribution Agent, and any other applicable withholding and reporting agents shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including wind-down a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms that are reasonable and appropriate; *provided* that the Wind-Down Debtor and the Distribution Agent, as applicable, shall request appropriate documentation from the applicable distributees and allow such distributees a reasonable amount of time to respond. The Debtors, the Wind-Down Debtor, the Distribution Agent, and any other applicable withholding and reporting agents reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

## E.    Foreign Currency Exchange Rate

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim, asserted in government issued currency (for the avoidance of doubt, not including any Cryptocurrency) other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using

the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Effective Date.

## F.     Claims Paid or Payable by Third Parties

### 1.     Claims Paid by Third Parties

The Debtors or the Wind-Down Debtor, as applicable, shall reduce a Claim or Interest, and such Claim or Interest (or portion thereof) shall be disallowed without an objection to such Claim or Interest having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim or Interest receives a payment on account of such Claim or Interest from a party that is not a Debtor or Wind-Down Debtor (or other Distribution Agent), as applicable, including any payments made in connection with the Sale Transaction. To the extent a Holder of a Claim or Interest receives a distribution on account of such Claim or Interest and receives payment from a party that is not a Debtor or a Wind-Down Debtor (or other Distribution Agent), including payments made in connection with the Sale Transaction, as applicable, on account of such Claim or Interest, such Holder shall, within ten Business Days of receipt thereof, repay, return, or deliver any distribution held by or transferred to the Holder to the applicable Wind-Down Debtor to the extent the Holder's total recovery on account of such Claim or Interest from the third party and under the Plan exceeds the amount of such Claim or Interest as of the date of any such distribution under the Plan. The failure of such Holder to timely repay, return, or deliver such distribution shall result in the Holder owing the applicable Wind-Down Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the ten-Business Day grace period specified above until the amount is repaid.

### 2.     Claims Payable by Third Parties

No distributions under the Plan shall be made on account of an Allowed Claim or Interest that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim or Interest has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim or Interest (if and to the extent adjudicated by a court of competent jurisdiction or otherwise settled), then immediately upon such payment, such Claim or Interest may be expunged or reduced on the Claims Register by the Claims, Noticing, and Solicitation Agent to the extent of any such payment without an objection to such Claim or Interest having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

### 3.     Applicability of Insurance Policies

Except as otherwise provided herein, payments to Holders of Claims or Interests shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any rights, defenses, or Cause of Action that the Debtors, the Wind-Down Debtor or any other Entity may hold against any other Entity, including insurers, under any policies of insurance, agreements related thereto, or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any rights or defenses, including coverage defenses, held by such insurers under the applicable insurance policies, agreements related thereto, and applicable non-bankruptcy law.

## G.     Setoffs and Recoupment

Except as otherwise expressly provided for herein, each Debtor, the Wind-Down Debtor, or such Entity's designee as instructed by such Debtor, the Wind-Down Debtor, as applicable, may, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as

may be agreed to by the Holder of a Claim, set off against or recoup from an Allowed Claim and any distributions to be made pursuant to the Plan on account of such Allowed Claim, any Claims, rights, and Causes of Action of any nature whatsoever that the Debtor or the Wind-Down Debtor, as applicable, may have against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action have not been otherwise compromised, settled, or released on or prior to the Effective Date (whether pursuant to the Plan or otherwise). Notwithstanding the foregoing, except as expressly stated in Article VIII of this Plan, neither the failure to effect such a setoff or recoupment nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by the Debtors or the Wind-Down Debtor of any such Claims, rights, or Causes of Action the Debtors or the Wind-Down Debtor may possess against such Holder.

## H. Allocation between Principal and Accrued Interest

Except as otherwise provided herein, the aggregate consideration paid to Holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof and as determined for federal income tax purposes) and second, to the extent the consideration exceeds the principal amount of the Allowed Claims, to the remaining portion of such Allowed Claim if any.

## ARTICLE VII.

## PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT, AND UNLIQUIDATED CLAIMS AND INTERESTS

## A. Disputed Claims Process

After the Effective Date, the Debtors, the Wind-Down Debtor, and any party-in-interest, shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim or Interest immediately before the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim or Interest shall become an Allowed Claim or Interest unless and until such Claim or Interest is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim or Interest. If a Holder of a Claim or Interest in Class disputes the amount of their Claim or Interest as listed in the Schedules, the Holder should notify the Debtors or the Wind-Down Debtor of such dispute. If the Debtors and the Holder agree to an amended Claim amount prior to the Effective Date, the Debtors shall file amended Schedules prior to the Effective Date. If between the Confirmation Date and the Effective Date, the dispute cannot be consensually resolved, the Holder may seek (by letter to the Court) to have the claim or interest dispute resolved before the Bankruptcy Court (and, with the consent of the Debtors, before any other court or tribunal with jurisdiction over the parties). After the Effective Date, the creditor may seek to have the claim dispute resolved before the Bankruptcy Court or any other court or tribunal with jurisdiction over the parties.

Notwithstanding anything in this Plan to the contrary: (1) all Claims against the Debtors that result from the Debtors' rejection of an Executory Contract or Unexpired Lease; (2) Claims filed to dispute the amount of any proposed Cure pursuant to section 365 of the Bankruptcy Code; and (3) Claims that the Debtors seek to have determined by the Bankruptcy Court, shall in all cases be determined by the Bankruptcy Court, if not otherwise resolved through settlement with the applicable claimant.

On the Effective Date, the Debtors or Plan Administrator, as applicable, may establish one or more accounts or funds to hold and dispose of certain assets, pursue certain litigation (including the Causes of Action preserved under the Plan or otherwise vesting in the Wind-Down Debtor), and/or satisfy certain

Claims (including Claims that are contingent or have not yet been Allowed). For any such account or fund, the Debtors or the Plan Administrator, as applicable, may take the position that grantor trust treatment applies in whole or in part. To the extent such treatment applies to any such account or fund, for all U.S. federal income tax purposes, the beneficiaries of any such account or fund would be treated as grantors and owners thereof, and it is intended, to the extent reasonably practicable, that any such account or fund would be classified as a liquidating trust under section 301.7701-4 of the Treasury Regulations. Alternatively, any such account or fund may be subject to the tax rules that apply to "disputed ownership funds" under 26 C.F.R. 1.468B–9. If such rules apply, such assets would be subject to entity-level taxation, and the Debtors and the Wind-Down Debtor would be required to comply with the relevant rules.

## B.      Objections to Claims or Interests

Except as otherwise specifically provided in the Plan, after the Effective Date, the Wind-Down Debtor shall have the sole authority on behalf of the Debtors to: (1) File, withdraw, or litigate to judgment, any objections to Claims or Interests; and (2) settle or compromise any Disputed Claim or Interest without any further notice to or action, order, or approval by the Bankruptcy Court. For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, the Wind-Down Debtor shall have and retain any and all rights and defenses each such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to Article IV.P of the Plan.

Any objections to Claims or Interests shall be Filed on or before the Claims Objection Bar Date. For the avoidance of doubt, any party may object to any Claims or Interests prior to the Claims Objection Bar Date. Further, the Bankruptcy Court may extend the time period to object to Claims or Interests set forth in this paragraph at any time, including before or after the expiration of one hundred eighty days after the Effective Date, in its discretion or upon request by the Debtors or any party in interest.

## C.      Estimation of Claims

Before or after the Effective Date, the Debtors or the Wind-Down Debtor, as applicable, may (but are not required to), at any time, request that the Bankruptcy Court estimate any Disputed Claim or Interest that is contingent or unliquidated pursuant to applicable law, including pursuant to section 502(c) of the Bankruptcy Code, for any reason, regardless of whether any party previously has objected to such Disputed Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under sections 157 and 1334 of the Judicial Code to estimate any such Disputed Claim or Interest, including during the litigation of any objection to any Disputed Claim or Interest or during the pendency of any appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Disputed Claim or Interest that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions) and may be used as evidence in any supplemental proceedings, and the Debtors or the Wind-Down Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Disputed Claim or Interest that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before fourteen days after the date on which such Disputed Claim or Interest is estimated.

**D.      No Distributions Pending Allowance**

Notwithstanding any other provision of the Plan, if any portion of a Claim or Interest is a Disputed Claim or Interest, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest; *provided* that if only a portion of a Claim or Interest is Disputed, such Claim or Interest shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount.

**E.      Distributions After Allowance**

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim or Interest in accordance with the provisions of the Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court Allowing any Disputed Claim or Interest becomes a Final Order, the Distribution Agent shall provide to the Holder of such Allowed Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest, dividends, or accruals to be paid on account of such Allowed Claim or Interest unless required under applicable bankruptcy law.

**F.      No Interest**

Unless otherwise specifically provided for herein or by Final Order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on Claims against the Debtors, and no Holder of a Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such Claim. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

**G.      Adjustment to Claims and Interests without Objection**

Any Claim or Interest that has been paid, satisfied, amended, superseded, cancelled, or otherwise expunged (including pursuant to the Plan) may be adjusted or expunged on the Claims Register at the direction of the Wind-Down Debtor without the Wind-Down Debtor having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.  Additionally, any Claim or Interest that is duplicative or redundant with another Claim or Interest against the same Debtor may be adjusted or expunged on the Claims Register at the direction of the Wind-Down Debtor without the Wind-Down Debtor having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

**H.      Time to File Objections to Claims**

Any objections to Claims shall be Filed on or before the Claims Objection Bar Date.

**I.      Disallowance of Claims or Interests**

Any Claims or Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims or Interests until such time as such Causes of Action against that Entity have

been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Wind-Down Debtor, as applicable.

**Except as otherwise provided herein or as agreed to by the Debtors or the Wind-Down Debtor, any and all Proofs of Claim Filed after the Bar Date shall be deemed disallowed and expunged as of the Effective Date subject to the approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order.**

**J.      Amendments to Proofs of Claim**

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Proof of Claim or Proof of Interest may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Wind-Down Debtor, and any such new or amended Proof of Claim or Proof of Interest Filed shall be deemed disallowed in full and expunged without any further action, order, or approval of the Bankruptcy Court.

## ARTICLE VIII.

## EFFECT OF CONFIRMATION OF THE PLAN

**A.      Releases by the Debtors**

**Notwithstanding anything contained in the Plan to the contrary, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Wind-Down Debtor, and their Estates, and in each case on behalf of themselves and their respective successors, assigns, and representatives, who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of, the foregoing Entities, from any and all Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Chapter 11 Cases and related adversary proceedings, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, the administration and implementation of the Restructuring Transactions or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019, of the releases described in**

this Article VIII.A by the Debtors, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article VIII.A is:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) except to the extent contemplated by Article IV.E and Article IV.F of the Plan, a bar to any of the Debtors or Wind-Down Debtor or their respective Estates asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

Notwithstanding anything to the contrary contained herein, nothing in this Plan shall release, waive, or otherwise limit the (i) rights, duties, or obligations of the Purchaser under the Asset Purchase Agreement or the Definitive Documents and (ii) the Non-Released D&O Claims, but such Non-Released D&O Claims shall remain subject to the limitations contained in Article IV.E and Article IV.F of this Plan.

## B. Releases by Holders of Claims and Interests

Except as expressly set forth in the Plan, effective on the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted or assertable on behalf of any of the Debtors, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, the administration and implementation of the Restructuring Transactions, or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date, *provided* that nothing in this Article VIII.B shall be construed to release the Released Parties from actual fraud, willful misconduct, or gross negligence as determined by a Final Order.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII.B, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article VIII.B is:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) except to

the extent contemplated by Article IV.F and Article IV.G of the Plan, a bar to any of the Releasing Parties or the Debtors or the Wind-Down Debtor or their respective Estates asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

C.      **Exculpation**

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor release or the third-party release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is exculpated from any Cause of Action for any act or omission arising on or after the Petition Date and prior to the Effective Date based on the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing, or consummation of the Disclosure Statement, the Plan, the Special Committee Investigation, any Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for Causes of Action related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan

D.      **Injunction**

The assets of the Debtors and of the Wind-Down Debtor shall be used for the satisfaction of expense obligations and the payment of Claims and Interests only in the manner set forth in this Plan and shall not be available for any other purpose. All Persons and Entities who have held, hold, or may hold Claims or Interests based upon any act, omission, transaction, or other activity of any kind or nature related to the Debtors, the Wind-Down Debtor, or the Debtors' Chapter 11 Cases that occurred prior to the Effective Date, other than as expressly provided in the Plan or the Confirmation Order, shall be precluded and permanently enjoined on and after the Effective Date from interfering with the use and distribution of the Debtors' assets in the manner contemplated by the Plan.

In addition, as of the Effective Date and subject to the occurrence of the Effective Date, except as otherwise specifically provided in this Plan or the Confirmation Order, all Persons and Entities who have held, hold, or may hold Claims or Interests that are fully satisfied pursuant to the Plan or any Claim or Interest that is subject to the releases and exculpations set forth in Article VIII.B and Article VIII.C of this Plan shall be precluded and permanently enjoined on and after the Effective Date from enforcing, pursuing, or seeking any setoff or relief with respect to such Claims or Interests, except for the receipt of the payments or distributions that are contemplated by this Plan.

**E.      Release of Liens**

Except as otherwise provided in the Plan, the Plan Supplement, or any contract, instrument, release, or other agreement or document created pursuant to the Plan or Confirmation Order on the Effective Date, and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, compromised, and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Debtors shall automatically revert to the applicable Debtor or the Wind-Down Debtor, as applicable, and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors. Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as requested by the Debtors or Wind-Down Debtor to evidence the release of such Lien, including the execution, delivery, and filing or recording of such documents evidencing such releases. The presentation or filing of the Confirmation Order to or with any local, state, federal, or foreign agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

**F.      OSC and SEC**

Notwithstanding any language to the contrary herein, no provision shall (a) preclude the OSC or the SEC from enforcing its police or regulatory powers; or (b) enjoin, limit, impair or delay the OSC or SEC from commencing or continuing any claims, causes of action, proceeding, or investigations against any non-Debtor person or non-Debtor entity in any forum.

**G.      Protection against Discriminatory Treatment**

As provided by section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Entity, including Governmental Units, shall discriminate against any Debtor or the Wind-Down Debtor or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, or discriminate with respect to such a grant against, any Debtor or the Wind-Down Debtor, or any Entity with which a Debtor or the Wind-Down Debtor has been or is associated, solely because such Debtor or the Wind-Down Debtor was a debtor under chapter 11 of the Bankruptcy Code, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

**H.      Document Retention**

Upon the occurrence of the Effective Date, the Debtors' books and records shall be transferred to the Wind-Down Debtor, which shall continue to preserve all financial books and records, emails, and other financial documents relating to the Debtors' business that are currently in the Debtors' possession. The Wind-Down Debtor shall not destroy or otherwise abandon any such documents or records without providing advance notice to the U.S. Securities and Exchange Commission (c/o Therese Scheuer, U.S. Securities and Exchange Commission, 100 F Street, NE, Washington, DC 20549, ScheuerT@SEC.GOV) and seeking further authorization from this Bankruptcy Court. Nothing in this Plan or the Confirmation Order shall affect the obligations of the pre-Effective Date Debtors, the Wind-Down Debtor, and/or any transferee or custodian to maintain all books and records that are subject to any governmental subpoena, document preservation letter, or other investigative request from a governmental agency.

**I.    Reimbursement or Contribution**

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (1) such Claim has been adjudicated as non-contingent; or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

**J.    Term of Injunctions or Stays**

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code, or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.  **All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.**

## ARTICLE IX.

## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

**A.    Conditions Precedent to the Effective Date**

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article IX.B of the Plan:

1. The Bankruptcy Court shall have entered the Confirmation Order, which shall be in a form and substance reasonably satisfactory to the Debtors and the Committee, and subject to the consent rights of Purchaser under the Asset Purchase Agreement, and such order shall be a Final Order and in full force and effect.

2. The Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan, Definitive Documents, and the Asset Purchase Agreement.

3. Each Definitive Document and each other document contained in any supplement to the Plan, including the Plan Supplement and any exhibits, schedules, amendments, modifications or supplements thereto or other documents contained therein, shall have been executed or Filed, as applicable, in form and substance consistent in all respects with the Plan, and subject to the Purchaser's consent rights under the Asset Purchase Agreement, and shall not have been modified in a manner inconsistent therewith;

4. The Professional Fee Escrow Account shall have been established and funded with Cash in accordance with Article II.B.2 of the Plan.

5. The Wind-Down Reserve shall have been established and funded with Cash in accordance with the Plan.

6. If prior to the Outside Date, the Asset Purchase Agreement shall be in full force and effect and the Sale Transaction shall have been consummated.

7. The Restructuring Transactions shall have been consummated or shall be anticipated to be consummated concurrently with the occurrence of the Effective Date in a manner consistent with the Plan, the Customer Onboarding Protocol, the other Definitive Documents, and the Asset Purchase Agreement, and the Plan shall have been substantially consummated or shall be anticipated to be substantially consummated concurrently with the occurrence of the Effective Date.

## B. Waiver of Conditions Precedent

The Debtors, with the consent of the Committee and, solely to the extent related to the Asset Purchase Agreement and the Sale Transaction, prior to the Outside Date, the consent of Purchaser, may waive any of the conditions to the Effective Date set forth in Article IX.A of the Plan at any time, without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm and consummate the Plan.

## C. Effect of Non-Occurrence of Conditions to Consummation

If the Effective Date does not occur within 120 days after the Confirmation Date, then the Plan will be null and void in all respects, any and all compromises or settlements not previously approved by Final Order of the Bankruptcy Court embodied in the Plan (including with respect to the fixing, limiting, or treatment of any Claim or Interest, including, without limitation, the Alameda Loan Facility Claims), shall be deemed null and void, and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims, Interests, or Causes of Action held by any Debtor or any other Entity; (2) prejudice in any manner the rights of any Debtor or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity in any respect.

## ARTICLE X.

## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

## A. Modification of Plan

Subject to the limitations and terms contained in the Plan and Purchaser's consent rights under the Asset Purchase Agreement, the Debtors, with the consent of the Committee, reserve the right to (1) amend or modify the Plan before the entry of the Confirmation Order, in accordance with the Bankruptcy Code and the Bankruptcy Rules and (2) after the entry of the Confirmation Order, the Debtors or the Wind-Down Debtor, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, to remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan consistent with the terms set forth herein.

## B. Effect of Confirmation on Modifications

Entry of the Confirmation Order shall constitute approval of all modifications or amendments to the Plan occurring after the solicitation thereof pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

### C.     Revocation or Withdrawal of Plan

The Debtors reserve the right, with the consent of the Committee, to revoke or withdraw the Plan with respect to any or all Debtors before the Confirmation Date and to File subsequent chapter 11 plans. If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then: (1) the Plan will be null and void in all respects; (2) any settlement or compromise not previously approved by Final Order of the Bankruptcy Court embodied in the Plan (including the fixing or limiting to an amount certain of the Claims or Classes of Claims), assumption or rejection of Executory Contracts or Unexpired Leases effectuated by the Plan, and any document or agreement executed pursuant to the Plan will be null and void in all respects; and (3) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims, Interests, or Causes of Action by any Entity, (b) prejudice in any manner the rights of any Debtor or any other Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

### ARTICLE XI.

### RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.     Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.     decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.     resolve any matters related to Executory Contracts or Unexpired Leases, including: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure Claims or other Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed or assumed and assigned; and (c) any dispute regarding whether a contract or lease is or was executory, expired, or terminated;

4.     ensure that distributions to Holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

5.     adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor or the Estates that may be pending on the Effective Date;

6.     enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of (a) contracts, instruments, releases, and other agreements or documents approved by Final Order in the Chapter 11 Cases and (b) the Plan, the Confirmation Order, and contracts,

instruments, releases, and other agreements or documents created in connection with the Plan; *provided* that the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection, or dispute resolution clause that refers disputes to a different court;

7.      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

8.      grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

9.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

10.      hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Cases, including:  (a) with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or an Interest for amounts not timely repaid pursuant to Article VI of the Plan; (b) with respect to the releases, injunctions, and other provisions contained in Article VIII of the Plan, including entry of such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions; (c) anything that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan and the Confirmation Order; or (d) related to section 1141 of the Bankruptcy Code;

11.      enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

12.      adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

13.      consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

14.      enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases with respect to any Entity, and resolve any cases, controversies, suits, or disputes that may arise in connection with any Entity's rights arising from or obligations incurred in connection with the Plan;

15.      hear and determine matters concerning local, state, federal, and foreign taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

16.      enter an order or Final Decree concluding or closing the Chapter 11 Cases;

17.      enforce all orders previously entered by the Bankruptcy Court; and

18.      hear and determine any other matters related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code or the Judicial Code.

Nothing herein limits the jurisdiction of the Bankruptcy Court to interpret and enforce the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, or the Disclosure Statement, without regard to whether the controversy with respect to which such

interpretation or enforcement relates may be pending in any state or other federal court of competent jurisdiction.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in this Article XI, the provisions of this Article XI shall have no effect on and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

Unless otherwise specifically provided herein or in a prior order of the Bankruptcy Court, the Bankruptcy Court shall have exclusive jurisdiction to hear and determine disputes concerning Claims against or Interests in the Debtors that arose prior to the Effective Date.

## ARTICLE XII.

## MISCELLANEOUS PROVISIONS

### A.    Immediate Binding Effect

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtors, the Wind-Down Debtor, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, exculpations, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims against and Interests in the Debtors shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or Interest has voted on the Plan.

### B.    Additional Documents

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors, the Wind-Down Debtor, and all Holders of Claims and Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### C.    Payment of Statutory Fees

All fees and applicable interest payable pursuant to section 1930 of the Judicial Code and 31 U.S.C. § 3717, as applicable, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the Debtors or the Wind-Down Debtor (or the Distribution Agent on behalf of the Wind-Down Debtor) for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or a Final Decree is issued, whichever occurs first.

### D.    Dissolution of Statutory Committees

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related

to, the Chapter 11 Cases; *provided*, however, that such committees will remain in existence for the limited purposes of (a) pursuing, supporting, or otherwise participating in, any outstanding appeals in the Chapter 11 Cases; and (b) filing, objecting, or otherwise participating in, any final fee applications of Professionals.

**E.     Reservation of Rights**

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests, unless and until the Effective Date has occurred.

**F.     Successors and Assigns**

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiary, or guardian, if any, of each such Entity.

**G.     Service of Documents**

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors or the Wind-Down Debtor shall be served on:

| | |
|---|---|
| Debtors | **Voyager Digital Holdings, Inc.**<br>33 Irving Place<br>New York, New York 10003<br>Attention:  David Brosgol<br>General Counsel,<br>E-mail address:  dbrosgol@investvoyager.com<br><br>with copies for information only (which shall not constitute notice) to: |
| Counsel to the Debtors | **Kirkland & Ellis LLP**<br>**Kirkland & Ellis International LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br>Attention:  Joshua A. Sussberg, P.C., Christopher Marcus, P.C., Christine A. Okike, P.C., and Allyson B. Smith |
| Counsel to the Committee | **McDermott Will & Emery LLP**<br>One Vanderbilt Avenue<br>New York, New York 10017<br>Attention: Darren Azman |

**H.     Entire Agreement; Controlling Document**

Except as otherwise indicated, on the Effective Date, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations with respect to the subject matter of the Plan, all of which will have become merged and integrated into the Plan;

*provided, however,* that notwithstanding the foregoing or anything to the contrary herein, to the extent there is any conflict between the Plan and the Confirmation Order, on the one hand, and the Asset Purchase Agreement, on the other hand, the Asset Purchase Agreement shall govern solely in the event the Sale Transaction is consummated.  Except as set forth in the Plan, in the event that any provision of the Disclosure Statement, the Plan Supplement, or any order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control. In the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall control.

## I.  Plan Supplement

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the website of the Claims, Noticing, and Solicitation Agent at https://cases.stretto.com/Voyager or the Bankruptcy Court's website at http://www.nysb.uscourts.gov.  Unless otherwise ordered by the Bankruptcy Court, to the extent any exhibit or document in the Plan Supplement is inconsistent with the terms of any part of the Plan that does not constitute the Plan Supplement, such part of the Plan that does not constitute the Plan Supplement shall control.

## J.  Non-Severability

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, subject to the Purchaser's consent rights under the Asset Purchase Agreement prior to the Outside Date, shall have the power to alter and interpret such term or provision to make it valid or enforceable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is:  (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent, consistent with the terms set forth herein; and (3) non-severable and mutually dependent.

## K.  Votes Solicited in Good Faith

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors, and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties nor individuals or the Debtors or the Wind-Down Debtor will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan or any previous plan.

**L.**   **Waiver or Estoppel**

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed prior to the Confirmation Date.

Dated: February 28, 2023

VOYAGER DIGITAL HOLDINGS, INC.
on behalf of itself and all other Debtors

*/s/ Stephen Ehrlich*
Stephen Ehrlich
Co-Founder and Chief Executive Officer
Voyager Digital Holdings, Inc.

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**NOTICE OF FILING OF THE REVISED**
**ORDER (I) APPROVING THE SECOND AMENDED**
**DISCLOSURE STATEMENT AND (II) CONFIRMING THE THIRD**
**AMENDED JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND ITS**
**DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**PLEASE TAKE NOTICE** Debtors hereby file a revised *Order (I) Approving the Second Amended Disclosure Statement and (II) Confirming the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Revised Confirmation Order"), attached hereto as **Exhibit A**. A redline of the Revised Confirmation Order is attached hereto as **Exhibit B**, which reflects changes from the original *Order (I) Approving the Second Amended Disclosure Statement and (II) Confirming the Third*

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

*Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1120] filed on February 28, 2023.

**PLEASE TAKE FURTHER NOTICE** that the Debtors reserve the right to materially alter, amend, or modify the Revised Confirmation Order; *provided* that if the Revised Confirmation Order is altered, amended, or modified in any materials respect, the Debtors will file a revised version of such document the United States Bankruptcy Court for the Southern District of New York (the "Court").

**PLEASE TAKE FURTHER NOTICE** that the hearing at which the Court will consider approval and entry of the Revised Disclosure Statement Order will be held before the Honorable Michael E. Wiles of the United States Bankruptcy Court for the Southern District of New York on **March 2, 2023, at 10:00 a.m. (prevailing Eastern Time)**.

**PLEASE TAKE FURTHER NOTICE** that copies of the Revised Confirmation Order and other pleadings filed in the above-captioned chapter 11 cases may be obtained free of charge by visiting the website of Stretto at http://www.cases.stretto.com/Voyager. You may also obtain copies of any pleadings by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

Dated: March 2, 2023　　　　　　/s/ Joshua A. Sussberg
New York, New York　　　　　　**KIRKLAND & ELLIS LLP**
　　　　　　　　　　　　　　　**KIRKLAND & ELLIS INTERNATIONAL LLP**
　　　　　　　　　　　　　　　Joshua A. Sussberg, P.C.
　　　　　　　　　　　　　　　Christopher Marcus, P.C.
　　　　　　　　　　　　　　　Christine A. Okike, P.C.
　　　　　　　　　　　　　　　Allyson B. Smith (admitted *pro hac vice*)
　　　　　　　　　　　　　　　601 Lexington Avenue
　　　　　　　　　　　　　　　New York, New York 10022
　　　　　　　　　　　　　　　Telephone:　　(212) 446-4800
　　　　　　　　　　　　　　　Facsimile:　　(212) 446-4900
　　　　　　　　　　　　　　　Email:　　　　jsussberg@kirkland.com
　　　　　　　　　　　　　　　　　　　　　cmarcus@kirkland.com
　　　　　　　　　　　　　　　　　　　　　christine.okike@kirkland.com
　　　　　　　　　　　　　　　　　　　　　allyson.smith@kirkland.com

　　　　　　　　　　　　　　　*Counsel to the Debtors and Debtors in Possession*

**Exhibit A**

**Revised Confirmation Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**ORDER (I) APPROVING THE SECOND AMENDED
DISCLOSURE STATEMENT AND (II) CONFIRMING THE THIRD
AMENDED JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND ITS
DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

Voyager Digital Holdings, Inc. and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "<u>Debtors</u>")[2] having:

a.   commenced, on July 5, 2022 (the "<u>Petition Date</u>"), these chapter 11 cases (the "<u>Chapter 11 Cases</u>") by filing voluntary petitions for relief in the United States Bankruptcy Court for the Southern District of New York (the "<u>Court</u>") under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>");

b.   continued to operate their business and manage their property during these Chapter 11 Cases as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

c.   filed,[3] on July 6, 2022, the *Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 17];

d.   filed, on July 21, 2022, the *Debtors' Motion Seeking Entry of an Order (I) Approving the Bidding Procedures and Related Dates and Deadlines, (II) Scheduling Hearings and Objection Deadlines with Respect to the Debtors'*

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital, Ltd. (7224); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

[2]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan, the Disclosure Statement, the Asset Purchase Agreement, or the Bankruptcy Code (each as defined herein), as applicable. The rules of interpretation set forth in Article I.B. of the Plan apply.

[3]   Unless otherwise indicated, use of the term "filed" herein refers also to the service of the applicable document filed on the docket in these Chapter 11 Cases, as applicable.

*Sale, Disclosure Statement, and Plan Confirmation, and (III) Granting Related Relief* [Docket No. 126];

e.    obtained, on August 5, 2022, the entry of the *Order (I) Approving the Bidding Procedures, (II) Scheduling the Bid Deadlines and the Auction, (III) Approving the Form and Manner of Notice Thereof, (IV) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation and (V) Granting Related Relief* [Docket No. 248] (the "<u>Bidding Procedures Order</u>") approving the *Bidding Procedures for the Submission, Receipt, and Analysis of Bids in Connection with the Sale of the Debtors*, attached to the Bidding Procedures Order as <u>Exhibit 1</u> (the "<u>Bidding Procedures</u>");

f.    filed, on August 12, 2022, the *First Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 287], the *Disclosure Statement Relating to the First Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 288], and the *Debtors' Motion for Entry of an Order Approving (I) the Adequacy of the Disclosure Statement, (II) Solicitation and Notice Procedures, (III) Forms of Ballots and Notices in Connection Therewith, and (IV) Certain Dates with Respect Thereto* [Docket No. 289];

g.    commenced, on September 13, 2022, the Auction for the sale of substantially all of the Debtors' assets in accordance with the Bidding Procedures;

h.    closed, on September 26, 2022, the Auction and selected West Realm Shires Inc. ("<u>FTX US</u>") as the Winning Bidder (as defined in the Bidding Procedures);

i.    obtained, on October 20, 2022, entry of the *Order (I) Authorizing Entry of the Asset Purchase Agreement and (II) Granting Related Relief* [Docket No. 581], which authorized entry into that certain asset purchase agreement by and between Voyager Digital, LLC and West Realm Shires Inc. (together with its affiliates, "<u>FTX US</u>," and the asset purchase agreement, the "<u>FTX US Asset Purchase Agreement</u>");

j.    filed, on October 24, 2022, the *Second Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 590] and the *First Amended Disclosure Statement Relating to the Second Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 591];

k.    filed, on December 9, 2022, the *Stipulation and Agreed Order* [Docket No. 717] by and between FTX US and the Debtors (the "<u>FTX US APA Stipulation</u>"), terminating the FTX US Asset Purchase Agreement;

l.    filed, on December 21, 2022, the *Debtors' Motion for Entry of an Order (I) Authorizing Entry into the Binance US Purchase Agreement and (II) Granting Related Relief* [Docket No. 775] and that certain asset purchase agreement by and between Voyager Digital, LLC and BAM Trading Services Inc. d/b/a Binance.US

2

(together with its affiliates, "Binance.US," and the asset purchase agreement, the "Asset Purchase Agreement")

m.  filed, on December 22, 2022, the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 777] (as amended, modified, or supplemented from time to time, the "Plan"), the *Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 778] (as amended, modified, or supplemented from time to time, the "Disclosure Statement"), and the *Debtors' Motion for Entry of an Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Conditionally Approving the Adequacy of the Debtors' Disclosure Statement, (III) Approving (A) Procedures for Solicitation, (B) Forms of Ballots and Notices, (C) Procedures for Tabulation of Votes, and (D) Procedures for Objections, and (IV) Granting Related Relief* [Docket No. 779];

n.  filed, on January 9, 2023, the first amendment to the Asset Purchase Agreement [Docket No. 835];

o.  obtained, on January 10, 2023, approval of the FTX US APA Stipulation [Docket No. 849];

p.  filed, on January 10, 2023, the revised Plan [Docket No. 852];

q.  filed, on January 13, 2023, the revised Disclosure Statement [Docket No. 863];

r.  obtained, on January 13, 2023, entry of the *Order (I) Authorizing Entry into the Asset Purchase Agreement and (II) Granting Related Relief* [Docket No. 775], which granted entry into the asset purchase agreement with Binance.US (the "Asset Purchase Agreement Order");

s.  obtained, on January 13, 2023, entry of the *Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Conditionally Approving the Adequacy of the Debtors' Disclosure Statement, (III) Approving (A) Procedures for Solicitation, (B) Forms of Ballots and Notices, (C) Procedures for Tabulation of Votes and (D) Procedures for Objections* [Docket No. 861] (the "Conditional Disclosure Statement Order") conditionally approving the Disclosure Statement, solicitation procedures (the "Solicitation Procedures"), and solicitation materials, including notices, forms, and ballots (collectively, the "Solicitation Packages");

t.  caused the Solicitation Packages and notice of the Combined Hearing and the deadline for objecting to the Disclosure Statement and to confirmation of the Plan ("Confirmation") to be distributed on or before January 25, 2023 (the "Solicitation Date"), in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules"), the Disclosure Statement Order, and the

Solicitation Procedures, as evidenced by, among other things, the *Affidavit of Service* [Docket No. 926] and the *Supplemental Affidavit of Service* [Docket Nos. 927 and 1016] (collectively, the "Affidavit of Solicitation");

u.  filed, on February 1, 2023, the *Plan Supplement for the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates* [Docket No. 943] (the "Initial Plan Supplement") and caused notice of the filing of the Initial Plan Supplement to be distributed in accordance with paragraph 12 of the Disclosure Statement Order, as evidenced by, among other things, the *Affidavit of Service* [Docket No. 951];

v.  published, on February 3, 2023, notice of the Combined Hearing (the "Combined Hearing Notice") in the *The New York Times* (National Edition) and *Financial Times* (International Edition), as evidenced by the *Affidavits of Publication* [Docket Nos. 954 and 955] (the "Publication Affidavits" and, together with the Affidavit of Solicitation, the "Affidavits");

w.  filed, on February 8, 2023, the *First Amended Plan Supplement for the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates* [Docket No. 986] (the "First Amended Plan Supplement") and caused notice of the filing of the First Amended Plan Supplement to be distributed in accordance with paragraph 12 of the Disclosure Statement Order, as evidenced by, among other things, the *Affidavit of Service* [Docket No. 992];

x.  filed, on February 15, 2023, the *Second Amended Plan Supplement for the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates* (the "Second Amended Plan Supplement") [Docket No. 1006] and caused notice of the filing of the Second Amended Plan Supplement to be distributed in accordance with paragraph 12 of the Disclosure Statement Order, as evidenced by, among other things, the *Affidavit of Service* [Docket No. 1037];

y.  filed, on February 21, 2023, the *Third Amended Plan Supplement for the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates* (the "Third Amended Plan Supplement") [Docket No. 1035] and caused notice of the filing of the Third Amended Plan Supplement to be distributed in accordance with paragraph 12 of the Disclosure Statement Order, as evidenced by, among other things, the *Affidavit of Service* [Docket No. 1058];

z.  filed, on February 28, 2023, the *Debtors' Motion for Entry of an Order Approving Joint Stipulation and Agreed Order Between the Voyager Debtors, the FTX Debtors, and Their Respective Official Committees of Unsecured Creditors* [Docket No. 1106] (the "FTX Settlement");

aa.  filed, on February 28, 2023, the *Declaration of Leticia Sanchez Regarding the Solicitation and Tabulation of Votes on the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1108];

4

bb.     filed, on February 28, 2023, the *Debtors' Memorandum of Law in Support of (I) Final Approval of the Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code and (II) an Order Confirming the Debtors' Third Amended Joint Chapter 11 Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates* [Docket No. 1110] (the "Confirmation Brief");

cc.     filed, on February 28, 2023, the *Declaration of Timothy R. Pohl, Independent Director and Member of the Special Committee of the Board of Directors of Voyager Digital, LLC, in Support of Confirmation of the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1111] (the "Pohl Declaration")

dd.     filed, on February 28, 2023, the *Declaration of Brian Tichenor in Support of Confirmation of the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1113] (the "Tichenor Declaration");

ee.     filed, on February 28, 2023, the *Fourth Amended Plan Supplement for the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates* (the "Fourth Amended Plan Supplement") (together with the Initial Plan Supplement, First Amended Plan Supplement, Second Amended Plan Supplement, and Third Amended Plan Supplement, and as may be modified, amended, or supplemented from time to time, the "Plan Supplement") [Docket No. 1115] and will cause notice of the filing of the Fourth Amended Plan Supplement to be distributed in accordance with paragraph 12 of the Disclosure Statement Order; and

ff.     filed, on February 28, 2023, the revised version of the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1117];

gg.     filed, on February 28, 2023, the *Declaration of Mark A. Renzi in Support of Confirmation of the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1119] (the "Renzi Declaration," and, together with the Voting Report, the Pohl Declaration, the Tichenor Declaration, and the Renzi Declaration, the "Declarations");

hh.     filed, on February 28, 2023, the *Notice of Filing of Proposed Findings of Fact, Conclusions of Law, and Order (I) Approving the Second Amended Disclosure Statement and (II) Confirming the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*;

5

ii.    filed, on March 1, 2023, the revised version of the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1125];

jj.    filed, on March 1, 2023, the *Amended Declaration of Leticia Sanchez Regarding the Solicitation and Tabulation of Votes on the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1127] (the "Voting Report"); and

kk.    filed, on March 2, 2023, the revised version of the *Notice of Filing of Proposed Findings of Fact, Conclusions of Law, and Order (I) Approving the Second Amended Disclosure Statement and (II) Confirming the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (this "Confirmation Order").

The Court having:

a.    entered the Bidding Procedures Order on August 5, 2022 [Docket No. 248];

b.    entered the Asset Purchase Agreement Order on January 13, 2023 [Docket No. 775];

c.    entered the Conditional Disclosure Statement Order on January 13, 2023 [Docket No. 861];

d.    set February 22, 2023, at 4:00 p.m. (prevailing Eastern Time) as the deadline to object to the Disclosure Statement and the Plan and to object to proposed cure costs and any assumption of an Executory Contract or Unexpired Lease pursuant to the *Schedule of Assumed Executory Contracts and Unexpired Leases* (the "Assumed Contract Schedule"), filed as Exhibit A to the Plan Supplement (the "Plan Objection Deadline");

e.    set February 22, 2023, at 4:00 p.m. (prevailing Eastern Time) as the deadline for voting on the Plan (the "Voting Deadline");

f.    set March 2, 2023 at 10:00 a.m. (prevailing Eastern Time) as the date and time for the commencement of the Combined Hearing, pursuant to Bankruptcy Rules 3017 and 3018 and sections 1126, 1128, and 1129 of the Bankruptcy Code;

g.    reviewed the Plan, the Disclosure Statement, the Plan Supplement, the Confirmation Brief, the Declarations, the Voting Report, the Combined Hearing Notice, the Affidavits, and all filed pleadings, exhibits, statements, and comments regarding Confirmation, including all objections, statements, and reservations of rights filed by parties in interest on the docket of the Chapter 11 Cases;

h.    held the Combined Hearing on March 2, 2023 at 10:00 a.m., prevailing Eastern Time;

A-748

i.      heard the statements and arguments made by counsel with respect to final approval of the Disclosure Statement and Confirmation of the Plan;

j.      considered all oral representations, live testimony, written direct testimony, designated deposition testimony, exhibits, documents, filings, and other evidence presented at the Combined Hearing;

k.      overruled any and all objections to the Disclosure Statement and the Plan and to Confirmation and all statements and reservations of rights not consensually resolved, agreed to, or withdrawn, unless otherwise indicated; and

l.      taken judicial notice of all papers and pleadings and other documents filed, all orders entered, and all evidence and arguments presented in these Chapter 11 Cases.

NOW, THEREFORE, the Court having found that the notice of the Combined Hearing and the opportunity for any party in interest to object to approval of the Disclosure Statement and confirmation of the Plan were adequate and appropriate as to all parties affected or to be affected by the Plan and the transactions contemplated therein, and that the legal and factual bases set forth in the documents filed in support of approval of the Disclosure Statement and confirmation of the Plan and other evidence presented at the Combined Hearing and the record of the Chapter 11 Cases establish just cause for the relief granted herein; and after due deliberation thereon and good cause appearing therefor, the Court makes and issues the following findings of fact and conclusions of law, and orders:

## <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

IT IS DETERMINED, FOUND, ADJUDGED, DECREED, AND ORDERED THAT:

**A.**      **Findings and Conclusions.**

1.      The findings and conclusions set forth herein and in the record of the Combined Hearing constitute the Court's findings of fact and conclusions of law under rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052 and 9014.  To the extent any of the following conclusions of law constitute findings of fact, or vice versa, they are adopted as such.

### B. Jurisdiction, Venue, and Core Proceeding.

2.       The Court has jurisdiction over these Chapter 11 Cases pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, entered February 1, 2012.  The Court has exclusive jurisdiction to determine whether the Disclosure Statement and the Plan comply with the applicable provisions of the Bankruptcy Code and should be approved and confirmed, respectively.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  Confirmation of the Plan is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

### C. Eligibility for Relief.

3.       The Debtors were and are entities eligible for relief under section 109 of the Bankruptcy Code.

### D. Commencement and Joint Administration of the Chapter 11 Cases.

4.       On the Petition Date, each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code.  In accordance with the *Order (I) Directing Joint Administration of the Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 18], these Chapter 11 Cases were consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015.  Since the Petition Date, the Debtors have operated their business and managed their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

### E. Appointment of the Committee.

5.       On July 19, 2022, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Committee") [Docket No. 106].

8

A-750

**F.    Judicial Notice, Objections Overruled.**

6.      The Court takes judicial notice of (and deems admitted into evidence for purposes of final approval of the Disclosure Statement and Confirmation of the Plan) the docket of the Chapter 11 Cases maintained by the clerk of the Court or its duly appointed agent, including all pleadings and other documents on file, all orders entered, all hearing transcripts, and all evidence and arguments made, proffered, or adduced at the hearings held before the Court during the pendency of these Chapter 11 Cases.  All objections, statements, informal objections, and reservations of rights not consensually resolved, agreed to, or withdrawn, if any, related to the Disclosure Statement, the Plan, or Confirmation are overruled on the merits unless otherwise indicated in this Confirmation Order.

**G.    Conditional Disclosure Statement Order.**

7.      On January 13, 2023, the Court entered the Conditional Disclosure Statement Order [Docket No. 861], which, among other things, set (i) February 22, 2023, at 4:00 p.m. (prevailing Eastern Time) as (a) the Plan Objection Deadline and (b) the Voting Deadline and (ii) March 2, 2023, at 10:00 a.m. (prevailing Eastern Time) as the date and time for commencement of the Combined Hearing.

**H.    Adequacy of the Disclosure Statement.**

8.      The Disclosure Statement contains (a) sufficient information of a kind necessary to satisfy the disclosure requirements of all applicable nonbankruptcy laws, rules, and regulations, including the Securities Act, and (b) "adequate information" (as such term is defined in section 1125(a) of the Bankruptcy Code and used in section 1126(b)(2) of the Bankruptcy Code) with respect to the Debtors, the Plan, and the transactions contemplated therein.  The filing of the Disclosure Statement with the clerk of the Court satisfied Bankruptcy Rule 3016(b), and the Disclosure Statement, the Plan, and the Solicitation Packages provided all parties-in-interest with

sufficient notice regarding the settlement, release, exculpation, and injunction provisions contained in the Plan in compliance with Bankruptcy Rule 3016(c).

**I.    Burden of Proof—Confirmation of the Plan.**

9.    The Debtors, as proponents of the Plan, have met their burden of proving the applicable elements of sections 1129(a) and 1129(b) of the Bankruptcy Code by a preponderance of the evidence, which is the applicable evidentiary standard for Confirmation.

**J.    Notice.**

10.    The Debtors provided due, adequate, and sufficient notice of the Disclosure Statement, the Conditional Disclosure Statement Order, the Plan, the Plan Supplement, the Solicitation Packages, the Combined Hearing Notice, the proposed assumption and rejection of Executory Contracts and Unexpired Leases and the proposed cure amounts, and all the other materials distributed by the Debtors in connection with Confirmation of the Plan, together with the Plan Objection Deadline, the Voting Deadline, and the Combined Hearing, and any applicable bar dates and hearings described in the Conditional Disclosure Statement Order, in compliance with the Bankruptcy Rules, Local Rules, and the procedures set forth in the Disclosure Statement Order.  No other or further notice is or shall be required.

**K.    Solicitation.**

11.    Prior to the Combined Hearing, the Debtors filed the Voting Report.  The Voting Report was admitted into evidence during the Combined Hearing.  As described in the Voting Report, the solicitation of votes on the Plan complied with the Solicitation Procedures, was appropriate and satisfactory based upon the circumstances of these Chapter 11 Cases, and was in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any other applicable rules, laws, and regulations.

12. As described in the Voting Report, following the Petition Date, the Solicitation Packages, the Plan Supplement, and the Combined Hearing Notice were transmitted and served, including to all Holders of Claims in Class 3 (Account Holder Claims), Class 4A (OpCo General Unsecured Claims), Class 4B (HoldCo General Unsecured Claims), and Class 4C (TopCo General Unsecured Claims) (collectively, the "Voting Classes") that held a Claim as of January 10, 2023 (the date specified in such documents for the purpose of solicitation) (the "Voting Record Date"), in compliance with the Bankruptcy Code, including sections 1125 and 1126 thereof, the Bankruptcy Rules, including Bankruptcy Rules 3017 and 3018, the Local Rules, the Disclosure Statement Order, and any applicable nonbankruptcy law. Transmission and service of the Solicitation Packages and the Combined Hearing Notice were timely, adequate, and sufficient. The establishment and notice of the Voting Record Date were reasonable and sufficient. No other or further notice is required.

13. The period during which Holders in the Voting Classes were required to submit acceptances or rejections to the Plan was reasonable and sufficient for such Holders to make an informed decision to accept or reject the Plan.

14. As set forth in the Plan, Holders of Claims in the Voting Classes were eligible to vote on the Plan in accordance with the Solicitation Procedures. Holders of Claims in Class 1 (Secured Tax Claims) and Class 2 (Other Priority Claims) (collectively, the "Presumed Accepting Classes") are Unimpaired and conclusively presumed to accept the Plan and, therefore, did not vote to accept or reject the Plan. Holders of Claims in Class 7 (Intercompany Claims) and Interests in Class 8 (Intercompany Interests) either are Unimpaired and conclusively presumed to have accepted the Plan (to the extent reinstated) or Impaired and conclusively deemed to have rejected the Plan, and, therefore, are not entitled to vote to accept or reject the Plan. Holders of Claims in

11

A-753

Class 5 (Alameda Loan Facility Claims) and Class 6 (Section 510(b) Claims) and Interests in Class 9 (Existing Equity Claims) (collectively, the "Deemed Rejecting Classes") are Impaired under the Plan and are deemed to have rejected the Plan. Nevertheless, the Debtors served Holders in such Deemed Rejecting Classes with the Plan, the Disclosure Statement, the Non-Voting Status Notice, and the Combined Hearing Notice.

### L. Voting.

15.     As evidenced by the Voting Report, votes to accept or reject the Plan have been solicited and tabulated fairly, in good faith, and in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Conditional Disclosure Statement Order, and any applicable nonbankruptcy law, rule, or regulation.

16.     As evidenced by the Voting Report, Class 3 (Account Holder Claims), Class 4A (OpCo General Unsecured Claims), Class 4B (HoldCo General Unsecured Claims), and Class 4C (TopCo General Unsecured Claims) voted to accept the Plan in accordance with section 1126 of the Bankruptcy Code.

17.     Based on the foregoing, and as evidenced by the Voting Report, at least one Impaired Class of Claims (excluding the acceptance by any insiders of any of the Debtors) has voted to accept the Plan in accordance with the requirements of sections 1124 and 1126 of the Bankruptcy Code.

### M. Plan Supplement.

18.     The Plan Supplement complies with the Bankruptcy Code and the terms of the Plan, and the filing and notice of the documents included in the Plan Supplement are adequate and proper in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Conditional Disclosure Statement Order, and the facts and circumstances of the Chapter 11 Cases. No other or further notice is or will be required with respect to the Plan Supplement. All documents included

12

in the Plan Supplement are integral to, part of, and incorporated by reference into the Plan.  Subject to the terms of the Plan, compliance with the Bankruptcy Code and the Bankruptcy Rules, and, solely to the extent set forth under the Asset Purchase Agreement, consent of the Purchaser, and in a form reasonably acceptable to the Committee, the Debtors reserve the right to alter, amend, update, or modify the Plan Supplement before the Effective Date.

      **N.**    **Modifications to the Plan.**

      19.    Pursuant to section 1127 of the Bankruptcy Code, any modifications to the Plan since the commencement of Solicitation described or set forth herein constitute technical changes or changes with respect to particular Claims or Interests made pursuant to the agreement of the Holders of such Claims or Interests and do not materially and adversely affect or change the treatment of any other Claims or Interests. Pursuant to Bankruptcy Rule 3019, these modifications do not require additional disclosure under section 1125 of the Bankruptcy Code or the resolicitation of votes under section 1126 of the Bankruptcy Code, nor do they require that the Holders of Claims or Interests be afforded an opportunity to change previously cast acceptances or rejections of the Plan.

      20.    This Confirmation Order contains modifications to the Plan that were made to address objections and informal comments received from various parties in interest.  Modifications to the Plan since the entry of the Conditional Disclosure Statement Order, if any, are consistent with the provisions of the Bankruptcy Code.  The disclosure of any Plan modifications prior to or on the record at the Combined Hearing constitutes due and sufficient notice of any and all Plan modifications.  The Plan as modified shall constitute the Plan submitted for Confirmation.

      **O.**    **Bankruptcy Rule 3016.**

      21.    The Plan and all modifications thereto are dated and identify the Entities submitting them, thereby satisfying Bankruptcy Rule 3016(a).  The Debtors appropriately filed the Disclosure

13

Statement and the Plan with the Court, thereby satisfying Bankruptcy Rule 3016(b). The injunction, release, and exculpation provisions in the Disclosure Statement and the Plan describe, in bold font and with specific and conspicuous language, all acts to be enjoined and identify the entities that will be subject to the injunction, thereby satisfying Bankruptcy Rule 3016(c).

### P. Compliance with Bankruptcy Code Requirements—Section 1129(a)(1).

22. The Plan complies with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy Code.

### (i) Proper Classification—Sections 1122 and 1123(a)(1).

23. The classification of Claims and Interests under the Plan is proper under the Bankruptcy Code. In accordance with sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, Article III of the Plan provides for the separate classification of Claims and Interests into eleven Classes. Valid business, factual, and legal reasons exist for the separate classification of such Classes of Claims and Interests. The classifications were not implemented for any improper purpose and do not unfairly discriminate between, or among, Holders of Claims or Interests. Each Class of Claims and Interests contains only Claims or Interests that are substantially similar to the other Claims or Interests within that Class. Accordingly, the Plan satisfies the requirements of sections 1122(a), 1122(b), and 1123(a)(1) of the Bankruptcy Code.

### (ii) Specified Unimpaired Classes—Section 1123(a)(2).

24. Article III of the Plan specifies that Claims in Class 1 (Secured Tax Claims) and Class 2 (Other Priority Claims) are Unimpaired under the Plan and Claims and Interests in Class 7 (Intercompany Claims) and Class 8 (Intercompany Interests), respectively, are either Impaired or Unimpaired under the Plan.

25.    Article III of the Plan specifies that Claims in the following Classes are Unimpaired under the Plan within the meaning of section 1124 of the Bankruptcy Code:

| Class | Designation |
|-------|-------------|
| 1 | Secured Tax Claims |
| 2 | Other Priority Claims |

26.    Additionally, Article II of the Plan specifies that Allowed Administrative Claims, Allowed Professional Fee Claims, Allowed Priority Tax Claims, and all fees due and payable pursuant to section 1930 of title 28 of the United States Code before the Effective Date will be paid in full in accordance with the terms of the Plan, although these Claims are not separately classified under the Plan. Accordingly, the Plan satisfies the requirements of section 1123(a)(2) of the Bankruptcy Code.

(iii)    **Specified Treatment of Impaired Classes—Section 1123(a)(3).**

27.    The Plan satisfies the requirements of section 1123(a)(3) of the Bankruptcy Code. Article III of the Plan specifies that Claims and Interests, as applicable, in the following Classes (collectively, the "Impaired Classes") are Impaired under the Plan within the meaning of section 1124 of the Bankruptcy Code, and describes the treatment of such Classes.

| Class | Designation |
|-------|-------------|
| 3 | Account Holder Claims |
| 4A | OpCo General Unsecured Claims |
| 4B | HoldCo General Unsecured Claims |
| 4C | TopCo General Unsecured Claims |
| 5 | Alameda Loan Facility Claims |
| 6 | Section 510(b) Claims |
| 9 | Existing Equity Interests |

(iv)    **No Discrimination—Section 1123(a)(4).**

28.    The Plan satisfies the requirements of section 1123(a)(4) of the Bankruptcy Code. The Plan provides for the same treatment by the Debtors for each Claim or Interest in each

respective Class unless the Holder of a particular Claim or Interest has agreed to a less favorable treatment of such Claim or Interest.

          (v)        **Adequate Means for Plan Implementation—Section 1123(a)(5).**

29.       The Plan satisfies the requirements of section 1123(a)(5) of the Bankruptcy Code. The provisions in Article IV and elsewhere in the Plan and the Plan Supplement, and in the exhibits and attachments to the Disclosure Statement provide, in detail, adequate and proper means for the Plan's implementation, including the: (a) effectuation of the Restructuring Transactions contemplated by the Plan, the Restructuring Transactions Memorandum, and the Customer Onboarding Protocol; (b) consummation of the Sale Transaction by the Outside Date pursuant to the Asset Purchase Agreement; (c) if the Sale Transaction is not consummated by the Outside Date pursuant to the Asset Purchase Agreement, then the effectuation of the Liquidation Transaction in accordance with the Liquidation Procedures; (d) adoption and implementation of the Employee Transition Plan; (e) retention of certain Claims or Causes of Action held by the Debtors or their Estates, which shall be assigned and transferred to the Wind-Down Debtor after the Effective Date; (f) effectuation of the terms of the D&O Settlement; (g) authorization for the Debtors and the Wind-Down Debtor, as applicable, to take all actions as may be necessary or appropriate to effectuate the Restructuring Transactions and any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan; (h) establishment of the Wind-Down Debtor pursuant to the Plan Administrator Agreement and the transfer of the Wind-Down Debtor Assets to the Wind-Down Debtor after the Effective Date; (i) the funding and sources of consideration for the Plan distributions; and (j) settlement, satisfaction, and compromise of Claims and Interests as set forth in the Plan.

16

(vi)       **Voting Power of Equity Securities—Section 1123(a)(6).**

30.     Section 1123(a)(6) of the Bankruptcy Code requires that a debtor's corporate constituent documents prohibit the issuance of nonvoting equity securities. On the Effective Date the Wind-Down Debtor Assets shall, subject to the Plan Administrator Agreement, be transferred to and vest in the Wind-Down Debtor. The Wind-Down Debtor shall be managed by the Plan Administrator and shall be subject to a Wind-Down Debtor Oversight Committee. The Plan Administrator shall be responsible for, among other things: (a) implementing the Wind-Down Debtor, and making distributions contemplated by the Plan; (b) marshalling, marketing for sale, and winding down any of the Debtors' assets constituting Wind-Down Debtor Assets; (c) appointing an independent director at each Debtor to act as a fiduciary for such Debtor entity in connection with the resolution of the Intercompany Claims; (d) overseeing the accounts of the Debtors and the Wind-Down Debtor and the wind-down and dissolution of the Debtors and the Wind-Down Debtor, including effectuating the transactions described in the Restructuring Transactions Memorandum; (e) receiving, maintaining, conserving, supervising, prosecuting, collecting, settling, managing, investing, protecting, and where appropriate, causing the Wind-Down Debtor to abandon the Wind-Down Debtor Assets, including causing the Wind-Down Debtor to invest any moneys held as Wind-Down Debtor Assets; (f) opening and maintaining bank accounts on behalf of or in the name of the Debtors or the Wind-Down Debtor, including, in the Plan Administrator's discretion, separate bank accounts for each of the Debtors; (g) entering into any agreement or executing any document or instrument required by or consistent with the Plan, this Confirmation Order, or the Plan Administrator Agreement, and to perform all obligations thereunder; (h) collecting and liquidating all Wind-Down Debtor Assets, including the sale of any Wind-Down Debtor Assets; (i) protecting and enforcing the rights to the Wind-Down Debtor Assets (including any Vested Causes of Action and Contributed Third-Party Claims) vested in the

17

A-759

Wind-Down Debtor and Plan Administrator by the Plan Administrator Agreement by any method deemed appropriate, including, without limitation, by judicial proceedings or otherwise;  (j) investigating any Wind-Down Debtor Assets, and any other potential Vested Causes of Action and Contributed Third-Party Claims; (k) reviewing, reconciling, compromising, settling, objecting, or prosecuting Claims or Interests of any kind; (l) seeking the examination of any Person pursuant to Federal Rule of Bankruptcy Procedure 2004; (m) retaining professionals, disbursing agents, and other agents, independent contractors, and third parties pursuant to the Plan Administrator Agreement and paying the reasonable compensation thereof; (n) paying all lawful expenses, debts, charges, taxes, and other liabilities, and making all other payments relating to the Wind-Down Debtor Assets, solely out of Wind-Down Debtor Assets; (o) prosecuting and settling the Vested Causes of Action, including, without limitation, the 3AC Claims, FTX Claims, Alameda Claims, Contributed Third-Party Claims, and any causes of action not included in the Asset Purchase Agreement or released under the Plan; (p) reviewing, reconciling, pursuing, commencing, prosecuting, compromising, settling, dismissing, releasing, waiving, withdrawing, abandoning, resolving, or electing not to pursue all Vested Causes of Action and Contributed Third-Party Claims; (q) acquiring litigation and other claims related to the Debtors, and prosecuting such claims; (r) reviewing and compelling turnover of the Debtors or the Wind-Down Debtor's property; (s) calculating and making all Distributions to the holders of Allowed Claims against each Debtor and, solely to the extent of payment in full of Allowed Claims, to holders of Allowed Interests, as provided for in, or contemplated by, the Plan and the Plan Administrator Agreement; *provided* that because the Plan does not substantively consolidate the Debtors' Estates, the Plan Administrator shall make Distributions from the Wind-Down Debtor Assets to the holders of Claims and Interests (if applicable) against that specific Debtor; (t) establishing, administering,

18

adjusting, and maintaining the Wind-Down Reserve and the Disputed Claims Reserve; (u) withholding from the amount distributable to any Person the maximum amount needed to pay any tax or other charge that the Plan Administrator has determined, based upon the advice of his agents or professionals, may be required to be withheld from such Distribution under the income tax or other laws of the United States or of any state or political subdivision thereof; (v) in reliance upon the Debtors' Schedules, the official Claims Register maintained in the Chapter 11 Cases and the Debtors' filed lists of equity security holders, reviewing, and where appropriate, allowing or objecting to Claims and (if applicable) Interests, and supervising and administering the commencement, prosecution, settlement, compromise, withdrawal, or resolution of all objections to Disputed Claims and (if applicable) Disputed Interests required to be administered by the Wind-Down Debtor; (w) making all tax withholdings, filing tax information returns, filing and prosecuting tax refunds claims, making tax elections by and on behalf of the Debtors or the Wind-Down Debtor, and filing tax returns for the Debtors or the Wind-Down Debtor pursuant to and in accordance with the Plan, and paying taxes, if any, payable for and on behalf of the Debtors or the Wind-Down Debtor, as applicable; *provided, however*, that notwithstanding any other provision of the Plan Administrator Agreement, the Plan Administrator shall not have any responsibility or personal liability in any capacity whatsoever for the signing or accuracy of the Debtors' income tax returns that are due to be filed after the Effective Date or for any tax liability related thereto; (x) abandoning or donating to a charitable organization qualifying under IRC section 501(c)(3) any Wind-Down Debtor Assets that the Plan Administrator determines to be too impractical to distribute or of inconsequential value; (y) seeking a determination of tax liability or refund under Bankruptcy Code section 505; (z) establishing reserves for taxes, assessments, and other expenses of administration of the Debtors or the Wind-Down Debtor as may be necessary

19

A-761

and appropriate for the proper operation of matters incident to the Debtors or the Wind-Down Debtor; paying Wind-Down Debtor Expenses; (aa) if the Plan Administrator deems appropriate in the Plan Administrator's sole discretion, seeking to establish a bar date for filing proofs of Interest in any Debtor or otherwise to determine the holders and extent of Allowed Interests in any Debtor; (bb) purchasing and carrying all insurance policies that the Plan Administrator deems reasonably necessary or advisable and paying all associated insurance premiums and costs; (cc) undertaking all administrative functions remaining in the Chapter 11 Cases to the extent necessary to carry out the Debtors', the Wind-Down Debtor's, or the Plan Administrator's duties under the Plan, including reporting and making required payments of fees to the U.S. Trustee and overseeing the closing of the Chapter 11 Cases; (dd) retaining, terminating, appointing, hiring, or otherwise employees, personnel, management, and directors at any of the Debtors to the extent necessary to carry out the purposes of the Plan Administrator Agreement and the Plan, including, without limitation, to address any disputes between the Debtors; (ee) exercising, implementing, enforcing, and discharging all of the terms, conditions, powers, duties, and other provisions of the Plan, the Confirmation Order, and the Plan Administrator Agreement; and (ff) taking all other actions consistent with the provisions of the Plan and the Plan Administrator Agreement that the Plan Administrator deems reasonably necessary or desirable to administer the Debtors and the Wind-Down Debtor. Further, on or prior to the Effective Date, the Wind-Down Debtor's organizational documents will be amended to prohibit the issuance of non-voting equity securities. Accordingly, the Plan satisfies the requirements of section 1123(a)(6) of the Bankruptcy Code.

        **(vii)**        **Directors and Officers—Section 1123(a)(7).**

    31.    The Plan satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code. Article IV.J of the Plan provides that, upon filing of the certificate of dissolution (or equivalent document), the Wind-Down Debtor will be dissolved. Article IV.H of the Plan provides for the

formation of the Wind-Down Debtor for the benefit of the Wind-Down Debtor Beneficiaries. The Wind-Down Debtor shall be managed by the Plan Administrator and shall be subject to a Wind-Down Debtor Committee. The selection of the Plan Administrator by the Committee, in consultation with the Debtors, is consistent with the interests of Holders of Claims and Interests and public policy. The appointment of the Plan Administrator identified in the Plan Supplement is approved, and the Plan Administrator's duties shall commence as of the Effective Date. In accordance with the Plan Administrator Agreement, the Plan Administrator shall serve in such capacity through the earlier of (i) the date on which the Wind-Down Debtor is dissolved in accordance with the Plan Administrator Agreement, and (ii) the date on which the Plan Administrator resigns, is terminated, or is otherwise unable to serve; *provided*, *however*, that, in the event that the Plan Administrator resigns, is terminated, or is otherwise unable to serve, the Wind-Down Debtor Oversight Committee shall appoint a successor to serve as the Plan Administrator in accordance with the Plan Administrator Agreement. If the Wind-Down Debtor Oversight Committee does not appoint a successor within the time periods specified in the Plan Administrator Agreement, then the Court, upon the motion of any party-in-interest, including counsel to the Wind-Down Debtor, shall approve a successor to serve as the Plan Administrator. Accordingly, the Plan satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code.

       (viii)        **Impairment / Unimpairment of Classes—Section 1123(b)(1).**

32.      The Plan is consistent with section 1123(b)(1) of the Bankruptcy Code. Article III of the Plan leaves each Class of Claims and Interests Impaired or Unimpaired.

       (ix)        **Treatment of Executory Contracts and Unexpired Leases—Section 1123(b)(2).**

33.      The Plan is consistent with section 1123(b)(2) of the Bankruptcy Code. Article V of the Plan provides that, on the Effective Date, except as otherwise provided in the Plan, each

21

Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease:  (1) is specifically described in the Plan as to be assumed in connection with Confirmation of the Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement; (2) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Effective Date; (3) is to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, in connection with the Sale Transaction; (4) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; or (5) is a D&O Liability Insurance Policy other than the Side-A Policy.  Each of the Debtors' determinations regarding the assumption and rejection of Executory Contracts and Unexpired Leases is based on and within the sound business judgment of the Debtors, is necessary to the implementation of the Plan, and is in the best interests of the Debtors, their Estates, Holders of Claims and Interests, and other parties in interest in these Chapter 11 Cases.

       **(x)**        **Settlement, Releases, Exculpation, Injunction, and Preservation of Claims and Causes of Action—Section 1123(b)(3).**

34.     The Plan is consistent with section 1123(b)(3) of the Bankruptcy Code.  Except as otherwise provided in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies settled, compromised, satisfied, or otherwise resolved pursuant to the Plan.  The Plan is deemed a

22

motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes

of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of this Confirmation

Order constitutes the Court's approval of such compromise and settlement under section 1123 of

the Bankruptcy Code and Bankruptcy Rule 9019 of all such Claims, Interests, Causes of Action,

and controversies, as well as a finding that such compromise and settlement is fair, equitable,

reasonable, and in the best interests of the Debtors, their Estates, and Holders of Claims and

Interests.  Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims

and Interests in any Class are intended to be and shall be final.

<div align="center">(xi)      <b>Additional Plan Provisions—Section 1123(b)(6).</b></div>

35.     The other discretionary provisions of the Plan are appropriate and consistent with

the applicable provisions of the Bankruptcy Code, thereby satisfying section 1123(b)(6) of the

Bankruptcy Code.

### Q.    Debtor Compliance with the Bankruptcy Code—Section 1129(a)(2).

36.     The Debtors have complied with the applicable provisions of the Bankruptcy Code,

except as otherwise provided or permitted by orders of the Court, and thus, satisfied the

requirements of section 1129(a)(2) of the Bankruptcy Code.  Specifically, each Debtor:

    a. is an eligible debtor under section 109, and a proper proponent of the Plan under
section 1121(a), of the Bankruptcy Code; and

    b. complied with the applicable provisions of the Bankruptcy Code, including
sections 1125 and 1126, the Bankruptcy Rules, the Local Rules, any applicable
nonbankruptcy law, rule and regulation, the Conditional Disclosure Statement
Order, and all other applicable law, in transmitting the Solicitation Packages
and related documents and notices, and in soliciting and tabulating the votes on
the Plan.

### R.    Plan Proposed in Good Faith—Section 1129(a)(3).

37.     The Plan satisfies the requirements of section 1129(a)(3) of the Bankruptcy Code.

The Debtors have proposed the Plan in good faith and not by any means forbidden by law.  In so

<div align="center">23</div>

determining, the Court has examined the totality of the circumstances surrounding the filing of these Chapter 11 Cases, the Plan itself, the process leading to Confirmation, including the support of Holders of Claims and Interests for the Plan, and the transactions to be implemented pursuant thereto. These Chapter 11 Cases were filed, and the Plan was proposed, with the legitimate purpose of allowing the Debtors to implement the Restructuring Transactions and maximize the value of the Estates and the recoveries of Holders of Claims and Interests.

### S. Payment for Services or Costs and Expenses—Section 1129(a)(4).

38. The procedures set forth in the Plan for the Court's review and ultimate determination of the fees and expenses to be paid by the Debtors in connection with these Chapter 11 Cases, or in connection with the Plan and incident to these Chapter 11 Cases, satisfy the objectives of, and are in compliance with, section 1129(a)(4) of the Bankruptcy Code.

### T. Directors, Officers, and Insiders—Section 1129(a)(5).

39. Because the Plan provides for the winding down and dissolution of the Debtors, section 1129(a)(5) of the Bankruptcy Code does not apply to the Debtors. To the extent section 1129(a)(5) applies to the Wind-Down Debtor, the requirements of this provision are satisfied by, among other things, disclosing the identity and terms of compensation of the Plan Administrator and the Wind-Down Debtor Oversight Committee.

### U. No Rate Changes—Section 1129(a)(6).

40. Section 1129(a)(6) of the Bankruptcy Code is not applicable to these Chapter 11 Cases. The Plan does not propose any rate change subject to the jurisdiction of any governmental regulatory commission.

### V. Best Interest of Creditors—Section 1129(a)(7).

41. The Plan is in the best interests of the Debtors' creditors and satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code. The liquidation analysis attached to

the Disclosure Statement and the other evidence related thereto in support of the Plan that was proffered or adduced in the Declarations or at, prior to, or in connection with the Combined Hearing: (a) are reasonable, persuasive, credible, and accurate as of the dates such analysis or evidence was prepared, presented, or proffered; (b) utilize reasonable and appropriate methodologies and assumptions; (c) have not been controverted by other evidence; and (d) establish that Holders of Allowed Claims and Interests in each Class will recover at least as much under the Plan on account of such Claim or Interest, as of the Effective Date, as such Holder would receive if the Debtors were liquidated, on the Effective Date, under chapter 7 of the Bankruptcy Code.

### W. Acceptance by Certain Classes—Section 1129(a)(8).

42. Class 1 (Secured Tax Claims) and Class 2 (Other Priority Claims) are Unimpaired under the Plan and are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Class 3 (Account Holder Claims), Class 4A (OpCo General Unsecured Claims), Class 4B (HoldCo General Unsecured Claims), and Class 4C (TopCo General Unsecured Claims) are impaired under the Plan and voted to accept the Plan. Class 5 (Alameda Loan Facility Claims), Class 6 (Section 510(b) Claims), and Class 9 (Existing Equity Holders) are impaired under the Plan and are deemed to reject the Plan. Because the Plan has not been accepted by the Deemed Rejecting Classes, the Debtors seek Confirmation under section 1129(b), solely with respect to the Deemed Rejecting Classes, rather than section 1129(a)(8) of the Bankruptcy Code. Although section 1129(a)(8) has not been satisfied with respect to the Deemed Rejecting Classes, the Plan is confirmable because the Plan does not discriminate unfairly and is fair and equitable with respect to the Deemed Rejecting Classes and thus satisfies section 1129(b) of the Bankruptcy

Code with respect to such Classes as described further below.  As a result, the requirements of section 1129(b) of the Bankruptcy Code are satisfied.

**X.     Treatment of Claims Entitled to Priority Under Section 507(a) of the Bankruptcy Code—Section 1129(a)(9).**

43.     The treatment of Allowed Administrative Claims, Allowed Professional Fee Claims, and Allowed Priority Tax Claims under Article II of the Plan, and of Allowed Other Priority Claims under Article III of the Plan, satisfies the requirements of, and complies in all respects with, section 1129(a)(9) of the Bankruptcy Code.

**Y.     Acceptance by At Least One Impaired Class—Section 1129(a)(10).**

44.     The Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code.  As evidenced by the Voting Report, the Voting Classes voted to accept the Plan by the requisite numbers and amounts of Claims, determined without including any acceptance of the Plan by any insider (as that term is defined in section 101(31) of the Bankruptcy Code), specified under the Bankruptcy Code.

**Z.     Feasibility—Section 1129(a)(11).**

45.     The Plan satisfies section 1129(a)(11) of the Bankruptcy Code.  The evidence supporting the Plan proffered or adduced by the Debtors at or before the Combined Hearing:  (a) is reasonable, persuasive, credible, and accurate as of the dates such evidence was prepared, presented, or proffered; (b) has not been controverted by other persuasive evidence; (c) establishes that the Plan is feasible and Confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization; (d) establishes that the Distribution Agent, or the Wind-Down Debtor, as applicable, will have sufficient funds available to meet their obligations under the Plan—including sufficient amounts of Cash, Cryptocurrency, or other consideration, as applicable, to reasonably ensure payment of, among other things, Allowed Administrative Claims,

Allowed Professional Fee Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed Account Holder Claims, and Allowed General Unsecured Claims, as applicable, pursuant to the terms of the Plan and in accordance with section 507(a) of the Bankruptcy Code; and (e) establishes that the Wind-Down Debtor will have the financial wherewithal to satisfy their obligations following the Effective Date.

### AA.    Payment of Statutory Fees—Section 1129(a)(12).

46.    The Plan satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code. Article XII.C of the Plan provides for the payment of all fees due and payable under 28 U.S.C. § 1930 by each of the Wind-Down Debtor (or the Distribution Agent on behalf of the Wind-Down Debtor).

### BB.    Continuation of Employee Benefits—Section 1129(a)(13).

47.    The Debtors do not have any remaining obligations to pay retiree benefits (as defined in section 1114 of the Bankruptcy Code).    Therefore, section 1129(a)(13) of the Bankruptcy Code is inapplicable to these Chapter 11 Cases or the Plan.

### CC.    Non-Applicability of Certain Sections—Sections 1129(a)(14), (15), and (16).

48.    Sections 1129(a)(14), 1129(a)(15), and 1129(a)(16) of the Bankruptcy Code do not apply to these Chapter 11 Cases.    The Debtors owe no domestic support obligations, are not individuals, and are not nonprofit corporations.

### DD.    "Cram Down" Requirements—Section 1129(b).

49.    The Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code. Notwithstanding the fact that the Deemed Rejecting Classes have not accepted the Plan, the Plan may be confirmed pursuant to section 1129(b)(1) of the Bankruptcy Code.    *First*, all of the requirements of section 1129(a) of the Bankruptcy Code other than section 1129(a)(8) have been met.    *Second*, the Plan is fair and equitable with respect to Class 5 (Alameda Loan Facility Claims),

27

Class 6 (Section 510(b) Claims), and Class 9 (Existing Equity Interests). The Plan has been proposed in good faith, is reasonable, and meets the requirements that (a) no Holder of any Claim or Interest that is junior to each such Class will receive or retain any property under the Plan on account of such junior Claim or Interest, and (b) no Holder of a Claim or Interest in a Class senior to such Classes is receiving more than payment in full on account of its Claim or Interest. Specifically, to the extent Class 8 (Intercompany Interests) are Reinstated, such treatment is provided for administrative convenience and efficiency, and not on account of such Interests, and will not alter the treatment provided for any other Holder of any Claim or Interest. Further, Class 7 (Intercompany Claims) will receive the treatment as determined by the Court. Accordingly, the Plan is fair and equitable towards all Holders of Claims and Interests in the Deemed Rejecting Classes. *Third*, the Plan does not discriminate unfairly with respect to the Deemed Rejecting Classes because similarly situated Claim and Interest Holders will receive substantially similar treatment on account of their Claims or Interests, as applicable, in such class. Therefore, the Plan may be confirmed despite the fact that not all Impaired Classes have voted to accept the Plan.

### EE. Only One Plan—Section 1129(c).

50. The Plan satisfies the requirements of section 1129(c) of the Bankruptcy Code. The Plan is the only chapter 11 plan filed in each of these Chapter 11 Cases.

### FF. Principal Purpose of the Plan—Section 1129(d).

51. The Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code. The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act.

### GG. Not Small Business Cases—Section 1129(e).

52. The Chapter 11 Cases are not small business cases and, accordingly, section 1129(e) of the Bankruptcy Code does not apply to the Chapter 11 Cases.

28

**HH.** **Good Faith Solicitation—Section 1125(e).**

53.     The Debtors have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code and in compliance with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules in connection with all of their respective activities relating to support and consummation of the Plan, including the solicitation and receipt of acceptances of the Plan, and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code.

**II.** **Satisfaction of Confirmation Requirements.**

54.     Based on the foregoing, the Plan satisfies the requirements for Confirmation set forth in section 1129 of the Bankruptcy Code.

**JJ.** **Likelihood of Satisfaction of Conditions Precedent to the Effective Date.**

55.     Each of the conditions precedent to the Effective Date, as set forth in Article IX.A of the Plan, has been or is reasonably likely to be satisfied or, as applicable, waived in accordance with Article IX.B of the Plan.

**KK.** **Implementation.**

56.     All documents and agreements necessary to implement the transactions contemplated by the Plan, including those contained or summarized in the Plan Supplement, and all other relevant and necessary documents (including the Asset Purchase Agreement) have been negotiated in good faith and at arm's length, are in the best interests of the Debtors, and shall, upon completion of documentation and execution, be valid, binding, and enforceable agreements and shall not be in conflict with any federal, state, or local law.  The Debtors are authorized to take any action reasonably necessary or appropriate to consummate such agreements and the transactions contemplated thereby.

LL.    **Executory Contracts and Unexpired Leases.**

57.    The Debtors' decisions to assume or reject certain Executory Contracts and Unexpired Leases, as provided in Article V of the Plan and in the Plan Supplement, are reasonable exercises of the Debtors' business judgment. The Debtors have demonstrated adequate assurance of future performance of the assumed Executory Contracts and Unexpired Leases within the meaning of section 365(b)(1)(C) of the Bankruptcy Code by the Wind-Down Debtor.

58.    Except with respect to the Executory Contracts and Unexpired Leases discussed in the following paragraph of this Confirmation Order, the amounts set forth in the Plan Supplement (the "Cure Amounts") are the sole amounts necessary to be paid upon assumption of the associated Executory Contracts and Unexpired Leases under section 365(b)(1)(A) and (B) of the Bankruptcy Code, and the payment of such amounts will effect a cure of all defaults existing under such Executory Contracts and Unexpired Leases and compensate the counterparties to such Executory Contracts and Unexpired Leases for any actual pecuniary loss resulting from all defaults existing under such Executory Contracts and Unexpired Leases as of the Effective Date.

59.    The objections of counterparties to the assumption of their Executory Contracts and Unexpired Leases, to the extent that such objection was timely raised in accordance with Article V.C of the Plan, are preserved and will be considered by the Court at a date and time to be scheduled. As provided in the Conditional Disclosure Statement Order and the Solicitation Packages, the Debtors and the Wind-Down Debtor have reserved the right to (a) add any Executory Contract or Unexpired Lease to the Assumed Contract Schedule and assume such Executory Contract or Unexpired Lease pursuant to the terms of the Plan, or remove any Executory Contract or Unexpired Lease from the Assumed Contract Schedule, in each case, up until the Effective Date and (b) contest any Claim asserted in connection with rejection of any Executory Contract or Unexpired Lease.

**MM. Disclosure of Facts.**

60.     The Debtors have disclosed all material facts regarding the Plan, including with respect to consummation of the Sale Transaction and the Liquidation Transaction, as applicable.

**NN. Appropriate Exercise of Business Judgment.**

61.     The Debtors' decision to effectuate the Sale Transaction or the Liquidation Transaction, as applicable, is an appropriate exercise of their business judgment.

**OO. Good Faith.**

62.     The Debtors, the Released Parties, and the Releasing Parties have been and will be acting in good faith if they proceed to:  (a) consummate the Plan and the agreements, settlements, transactions, and transfers contemplated thereby; and (b) take the actions authorized and directed by this Confirmation Order to wind-down the Debtors' businesses and effect the Sale Transaction or the Liquidation Transaction, as applicable, and the other Restructuring Transactions.  The Released Parties have made a substantial contribution to these Chapter 11 Cases.

**PP. Essential Elements of the Plan.**

63.     The Sale Transaction is an essential element of the Plan, and consummation of the Sale Transaction is in the best interests of the Debtors, their estates, and their creditors. The Debtors have exercised sound business judgment in selecting the Purchaser and the Debtors have done so without collusion and in good faith.  The Purchaser is consummating the Sale Transaction in good faith and is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code.  The Purchaser has proceeded in good faith and without collusion in all respects in connection with the Sale Transaction.  The Purchaser is therefore entitled to all of the protections afforded under section 363(m) of the Bankruptcy Code, and the Sale Transaction, to the extent consummated, may not be avoided pursuant to section 363(n) of the Bankruptcy Code.

31

64.     The Debtors' marketing process with respect to the Sale Transaction afforded a full, fair, and reasonable opportunity for any party to make a higher or otherwise better offer.  No other party or parties has offered to purchase the Acquired Assets for greater overall value to the Debtors' Estates than the Purchaser.  The Asset Purchase Agreement will provide a greater recovery for the Debtors' Estates than would be provided by any other available alternative.  The Debtors' determination that the Sale Transaction is the most value-maximizing transaction is a valid and sound exercise of the Debtors' business judgment.  Consummation of the Sale Transaction is in the best interests of the Debtors' Estates, their creditors, and other parties in interest.

65.     The consideration provided by the Purchaser pursuant to the Asset Purchase Agreement (a) is fair and reasonable, (b) constitutes the best offer for the Acquired Assets, and (c) constitutes reasonably equivalent value (as those terms are defined in each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, and section 548 of the Bankruptcy Code) and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.

66.     The Purchaser is not a mere continuation or substantial continuation of the Debtors or their Estates and there is no continuity of enterprise or common identity between the Purchaser and any of the Debtors.  The Purchaser is not holding itself out to the public as a continuation of any of the Debtors.  The Purchaser is not a successor to the Debtors or their Estates by reason of any theory of law or equity, and the Sale Transaction does not amount to a consolidation, merger, or de facto merger of the Purchaser with or into any of the Debtors.  The Purchaser has entered into the Asset Purchase Agreement in material reliance on and with fair consideration provided for the Sale Transaction being free and clear of all claims and interests relating to the Debtors arising

prior to the closing of the Sale Transaction, including any successor or vicarious liabilities of any kind or nature, as set forth herein and in the Asset Purchase Agreement, and would not have entered into the Asset Purchase Agreement or the Sale Transaction without such terms and the findings herein.

67. The conditions of section 363(f) of the Bankruptcy Code have been satisfied in full; therefore, the Debtors may sell, and upon the Closing of the Sale Transaction shall be deemed to have sold, assets and property pursuant to the Asset Purchase Agreement free and clear of any claims, liens, encumbrances, or other interests of any kind or nature whatsoever other than as expressly provided under the Asset Purchase Agreement. In addition to and without limiting the foregoing, the proposed Sale Transaction is to be consummated under the Plan, and the assets and property to be sold pursuant to the Sale Transaction are dealt with by the Plan; therefore, except as expressly provided under the Asset Purchase Agreement, the Debtors may sell, and upon the Closing of the Sale Transaction shall be deemed to have sold, assets and property pursuant to the Asset Purchase Agreement free and clear of any claims, liens, encumbrances, or other interests of any kind or nature whatsoever pursuant to section 1141(c) of the Bankruptcy Code.

68. The Debtors may sell, and upon the Closing of the Sale Transaction shall be deemed to have sold, such assets free and clear of all claims, liens, encumbrances, and other interests of any kind or nature whatsoever (other than as expressly permitted under the Asset Purchase Agreement) because, in each case, one or more of the standards set forth in sections 363(f)(l)–(5), 1129(b)(2)(A)(ii), 1141(a), or 1141(c) of the Bankruptcy Code has been satisfied. All holders of such claims, liens, encumbrances, or other interests against the Debtors, their Estates, or any of the assets subject to the Sale Transaction (a) who did not object, or who withdrew their objections, to the Sale Transaction are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy

33

Code and (b) are bound by the Plan pursuant to section 1141(a) of the Bankruptcy Code. All holders of such claims, liens, encumbrances, or other interests are adequately protected by having their claims, liens, encumbrances, or other interests, if any, in each instance against the Debtors, their Estates, or any of the assets subject to the Sale Transaction, attach to the proceeds of the Sale Transaction ultimately attributable to the assets in which such creditor alleges a claim, lien, encumbrance, or other interest, in the same order of priority, with the same validity, force, and effect that such claim, lien, encumbrance, or other interest had prior to consummation of the Sale Transaction, subject to any claims and defenses the Debtors and their Estates may possess with respect thereto, and with such claims, liens, encumbrances, or other interests being treated in accordance with the Plan.

69.     Article VIII.A of the Plan describes certain releases granted by the Debtors, the Wind-Down Debtor, and the Debtors' and the Wind-Down Debtor's Estates (the "Debtor Release"). The Debtors have satisfied the business judgment standard with respect to the propriety of the Debtor Release. Such release is a necessary and integral element of the Plan, and is fair, reasonable, and in the best interests of the Debtors, the Debtors' Estates, and Holders of Claims and Interests. The Debtors', the Wind-Down Debtor's and their Estates' pursuit of any such claims against the Released Parties is not in the best interests of the Estates' various constituencies because the costs involved would likely outweigh any potential benefit from pursuing such claims. Additionally, including for the reasons set forth in the Declarations, the Debtor Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties following extensive, arm's-length negotiations between sophisticated parties represented by able counsel; (b) a good-faith settlement and compromise of such Causes of Action released by the Debtor Release, which bore a substantial likelihood of complex and protracted litigation, with attendant

34

A-776

expense, inconvenience, and delay; (c) in the best interests of the Debtors and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; (f) a sound exercise of the Debtors' business judgment; and (g) except to the extent contemplated by Article IV.F of the Plan, a bar to any of the Debtors, the Wind-Down Debtor or their Estates asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

70.     Article IV.G of the Plan describes the D&O Settlement.  The D&O Settlement constitutes a good-faith compromise and settlement of all Claims, Causes of Action, disputes, and controversies released, settled, compromised, or otherwise resolved between the Debtors and the CEO and CCO.  The D&O Settlement is fair, equitable, and reasonable and in the best interests of the Debtors, their Estates, and Holders of Claims and Interests.

71.     Article VIII.B of the Plan describes certain releases granted by the Releasing Parties (the "Third-Party Release").  The Third-Party Release provides finality for the Debtors, the Wind-Down Debtor, and the other Released Parties.  The Third-Party Release is consensual with respect to the Releasing Parties.  The Combined Hearing Notice sent to Holders of Claims and Interests and published in *The New York Times* (National Edition) and the *Financial Times* (International Edition) on February 3, 2023, and the ballots and notices, as applicable, sent to Holders of Claims and Interests unambiguously stated that the Plan contains the Third-Party Release and that each Holder of Claims or Interests may elect not to grant such Third-Party Release.  Such release provisions of the Plan were conspicuous, emphasized with boldface type in the Plan, the Disclosure Statement, and the ballots and notices.  Among other things, the Plan provides appropriate and specific disclosure with respect to the claims and Causes of Action that are subject to the Third-Party Release, and no other disclosure or notice is necessary.  The Third-

35

Party Release is a necessary and integral element of the Plan, and is fair, equitable, reasonable, and in the best interests of the Debtors, the Debtors' Estates, and all Holders of Claims and Interests. Also, the Third-Party Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good-faith settlement and compromise of such the Claims released by the Third-Party Releases; (c) in the best interests of the Debtors and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; (f) a sound exercise of the Debtors' business judgment; and (g) except to the extent contemplated by Article IV.E and Article IV.F of the Plan, a bar to any of the Debtors or Wind-Down Debtor or their respective Estates asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

72.     The Third-Party Releases are consensual and those Holders of Claims and Interests who are bound by the Third-Party Releases voluntarily opted-in to the Third-Party Releases. The Plan does not release any third party's direct claims against non-Debtors (to the extent such direct claims exist) without such third party's express consent. Holders of Claims and Interests also had the ability to affirmatively elect to "contribute" their claims to the Wind-Down Debtor and vest the Wind-Down Debtor with authority to pursue such claims against the Debtors.

73.     The exculpation described in Article VIII.C of the Plan (the "Exculpation") is appropriate under applicable law because it was proposed in good faith, was formulated following extensive good-faith, arm's-length negotiations with key constituents, and is appropriately limited in scope. Without limiting anything in the Exculpation, each Exculpated Party has participated in these Chapter 11 Cases in good faith and, except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated as set forth in the Plan; *provided* that the foregoing "Exculpation" shall have no effect on the

36

liability of any entity that results from any such act or omission that is determined by a Final Order to have constituted actual fraud, gross negligence, or willful misconduct, but in all respects such entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have participated in any and all activities potentially underlying any Exculpated Claim in good faith and in compliance with the applicable laws. The Exculpation, including its carve-out for actual fraud, gross negligence, or willful misconduct, is consistent with established practice in this jurisdiction and others.

74. The injunction provision set forth in Article VIII.D of the Plan is necessary to prevent interference with the payment of Claims and Interests in the manner set forth in the Plan and is narrowly tailored to achieve these purposes.

75. Article IV.P of the Plan provides that, in accordance with section 1123(b)(3) of the Bankruptcy Code, any Cause of Action that a Debtor may hold against any Entity shall vest in the Wind-Down Debtor, except as otherwise provided in the Plan, including Article VIII of the Plan. The Wind-Down Debtor, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Wind-Down Debtor shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Court in accordance with the Plan. The provisions regarding the preservation of Causes of Action in the Plan, including the Plan Supplement, are appropriate, fair, equitable, and reasonable, and are in the best interests of the Debtors, the Debtors' estates, and Holders of Claims and Interests.

76. The full release and discharge of all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates described in Article VIII.E of the Plan (the "Lien Release") is necessary to implement the Plan. The provisions of the Lien Release are appropriate, fair, equitable, and reasonable and are in the best interests of the Debtors, the Debtors' estates, and Holders of Claims and Interests.

## ORDER

BASED ON THE FOREGOING FINDINGS OF FACT AND CONCLUSIONS OF LAW, IT IS ORDERED, ADJUDGED, DECREED, AND DETERMINED THAT:

77. **Findings of Fact and Conclusions of Law.** The above-referenced findings of fact and conclusions of law are hereby incorporated by reference as though fully set forth herein and constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable herein by Bankruptcy Rule 9014. To the extent that any finding of fact is determined to be a conclusion of law, it is deemed so, and vice versa.

78. **Approval of the Disclosure Statement.** The Disclosure Statement, the Solicitation Packages, and the Solicitation Procedures are approved on a final basis pursuant to section 1125 of the Bankruptcy Code.

79. **Solicitation.** To the extent applicable, the solicitation of votes on the Plan complied with sections 1125 and 1126 of the Bankruptcy Code, Bankruptcy Rules 3017 and 3018, all other provisions of the Bankruptcy Code, and all other applicable rules, laws, and regulations, and was appropriate and satisfactory and is approved in all respects.

80. **Notice of Combined Hearing.** The Notice of Combined Hearing was appropriate and satisfactory and is approved in all respects.

81. **Confirmation of the Plan.** The Plan is approved in its entirety and CONFIRMED under section 1129 of the Bankruptcy Code. The terms of the Plan, including the Plan Supplement, are incorporated by reference into and are an integral part of this Confirmation Order.

82. **Objections.** All objections and all reservations of rights pertaining to Confirmation of the Plan and approval of the Disclosure Statement that have not been withdrawn, waived, or consensually resolved are overruled on the merits unless otherwise indicated in this Confirmation Order. All withdrawn objections, if any, are deemed withdrawn with prejudice. All objections to approval of the Disclosure Statement and Confirmation of the Plan not filed and served prior to the Objection Deadline, if any, are deemed waived and shall not be considered by the Court.

83. All parties have had a full and fair opportunity to litigate all issues raised or that might have been raised in the objections to approval of the Disclosure Statement and Confirmation of the Plan, and the objections have been fully and fairly litigated or resolved, including by agreed-upon reservations of rights as set forth in this Confirmation Order.

84. **Plan Modifications.** The Plan Modifications do not materially adversely affect the treatment of any Claim against or Interest in any of the Debtors under the Plan, and are hereby approved pursuant to section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019. After giving effect to the Plan Modifications, the Plan continues to meet the requirements of sections 1122 and 1123 of the Bankruptcy Code. The filing with the Court on February 28, 2023 of the modifications to the Plan and the disclosure of any additional Plan Modifications on the record at the Combined Hearing constitute due and sufficient notice thereof. Accordingly, pursuant to section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019, the Plan Modifications do not require additional disclosure under section 1125 of the Bankruptcy Code or resolicitation of votes under section 1126 of the Bankruptcy Code, nor do they require that holders

of Claims be afforded an opportunity to change previously cast acceptances or rejections of the Plan.

85. **Deemed Acceptance of Plan.** In accordance with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, all Holders of Claims and Interests who voted to accept the Plan or who are conclusively presumed to accept the Plan are deemed to have accepted the Plan, as modified by the Plan Modifications. No Holder of a Claim or Interest shall be permitted to change its vote as a consequence of the Plan Modifications.

86. **Restructuring Transactions**. On or before the Effective Date, the applicable Debtors will take any action as may be necessary or advisable to effectuate the Restructuring Transactions described in the Plan, the Restructuring Transactions Memorandum, and the Customer Onboarding Protocol, including: (a) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (d) the transfer or distribution of any Cryptocurrency or Cash pursuant to the Asset Purchase Agreement and the Plan, as applicable; (e) the execution and delivery of the Plan Administrator Agreement; (f) any transactions necessary or appropriate to form the Wind-Down Debtor; (g) such other transactions that are required to effectuate the Restructuring Transactions, including any sales, mergers, consolidations, restructurings, conversions, dispositions, transfers, formations, organizations, dissolutions, or

liquidations; (h) all transactions necessary to provide for the purchase of the Acquired Assets by Purchaser under the Asset Purchase Agreement; and (i) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

87.     This Confirmation Order shall, and shall be deemed to, pursuant to sections 1123 and 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including, as applicable, the Sale Transaction, the Liquidation Transaction, and the Restructuring Transactions, including, for the avoidance of doubt, entry into any agreements following the Confirmation Date by the Debtors, the Purchaser, and any of the Unsupported Jurisdictions in connection with Distributions contemplated to be made by Purchaser to Users and Eligible Creditors (as such terms are defined in the Asset Purchase Agreement) located in Unsupported Jurisdictions, pursuant to and in accordance with the Plan and the Asset Purchase Agreement.

88.     **The Sale Transaction.** The Sale Transaction and the Asset Purchase Agreement, all other ancillary documents, and all of the terms and conditions thereof, are hereby approved, pursuant to sections 105, 363, 364, and 554 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6004, and 9014, each as applicable. Entry of this Confirmation Order shall authorize the Debtors, the Purchaser, and the Wind-Down Debtor, as applicable, to undertake the transactions contemplated by the Asset Purchase Agreement, as applicable, including pursuant to sections 363, 365, 1123(a)(5)(B), and 1123(a)(5)(D) of the Bankruptcy Code.

89.     Pursuant to sections 363(b) and (f) of the Bankruptcy Code, the Debtors are authorized and empowered to take any and all actions necessary or appropriate to (a) consummate

41

A-783

the Sale Transaction pursuant to and in accordance with the terms and conditions of the Asset Purchase Agreement, (b) close the Sale Transaction as contemplated in the Asset Purchase Agreement, and (c) execute and deliver, perform under, consummate, implement, and fully close the Asset Purchase Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Asset Purchase Agreement and the Sale Transaction.

90.     Subject to the restrictions set forth in this Confirmation Order, the Plan, and the Asset Purchase Agreement, the Debtors and the Purchaser hereby are authorized to take any and all actions as may be necessary or desirable, including any actions that otherwise would require further approval by shareholders, members, or its board of directors, as the case may be, without the need of obtaining such approvals, to implement the Sale Transaction, and any actions taken by the Debtors or the Purchaser necessary or desirable to implement the Sale Transaction prior to the date of this Confirmation Order, hereby are approved and ratified.

91.     This Confirmation Order and the terms and provisions of the Asset Purchase Agreement shall be binding in all respects upon the Debtors, their affiliates, their estates, all creditors of and holders of equity interests in any Debtor, any holders of Liens, Claims, or other interests (whether known or unknown) in, against, or on all or any portion of the Acquired Assets, all counterparties to any executory contract or unexpired lease of the Debtors, the Purchaser and all successors and assigns of the Purchaser, the Acquired Assets, and any trustees, examiners, or receivers, if any, subsequently appointed in any of the Debtors' chapter 11 cases or upon a conversion to chapter 7 under the Bankruptcy Code of any of the Debtors' cases.  This Confirmation Order and the Asset Purchase Agreement shall inure to the benefit of the Debtors,

their estates and creditors, the Purchaser, and the respective successors and assigns of each of the foregoing.

92.     Pursuant to sections 105(a), 363(b), 363(f), 365(b) and 365(f) of the Bankruptcy Code, the Debtors are authorized to transfer the Acquired Assets in accordance with the terms of the Asset Purchase Agreement and such transfer shall constitute a legal, valid, binding, and effective sale of the Acquired Assets and shall vest Purchaser with title to the Acquired Assets subject to the Asset Purchase Agreement, and the Acquired Assets shall be free and clear of all Liens, Claims, Encumbrances, and other interests of any kind or nature whatsoever (other than as expressly permitted under the Asset Purchase Agreement), with all such Liens, Claims, or other interests to attach to the cash proceeds of the Purchase Price ultimately attributable to the property against or in which such Liens, Claims, or other interests are asserted, subject to the terms thereof, with the same validity, force, and effect, and in the same order of priority, which such Liens, Claims, or other interests had prior to the Transaction, subject to any rights, claims, and defenses the Debtors or their estates, as applicable, may possess with respect thereto.

93.     The sale of the Acquired Assets to the Purchaser pursuant to the Asset Purchase Agreement and the consummation of the transactions contemplated by the Asset Purchase Agreement do not require any consents other than as specifically provided for in the Asset Purchase Agreement. Each and every federal, state, and local governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement. A certified copy of this Confirmation Order may be filed with the appropriate clerk or recorded with the recorder of any state, county, or local authority to act to cancel any of the Liens, Claims, and other encumbrances of record.

43

94.     If any person or entity that has filed statements or other documents evidencing Claims or Liens on, or interests in, all or any portion of the Acquired Assets shall not have delivered to the Debtors, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all Claims, Liens, or interests which the person or entity has or may assert with respect to all or any portion of the Acquired Assets, the Debtors are hereby authorized, and the Purchaser is hereby authorized, on behalf of the Debtors and the Debtors' creditors, to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Acquired Assets. The Debtors and the Purchaser are each authorized to file a copy of this Confirmation Order, which, upon filing, shall be conclusive evidence of the release and termination of such Claim, Lien or interest.

95.     This Confirmation Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement.

96.     All persons and entities that are presently, or on the Closing may be, in possession of some or all of the Acquired Assets pursuant to the Asset Purchase Agreement are hereby

44

directed to surrender possession of the Acquired Assets to the Purchaser unless such person or entity was a good faith, bona fide purchaser of the Acquired Assets without notice of the Debtors' rights in such property. Subject to the terms, conditions, and provisions of this Confirmation Order, all persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtors to sell and/or transfer the Acquired Assets to the Purchaser in accordance with the terms of the Asset Purchase Agreement and this Confirmation Order.

97.    Except as otherwise permitted by the Asset Purchase Agreement, the Plan, or this Confirmation Order, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, trade creditors, litigation claimants, and other creditors, holding Liens, Claims, or other interests of any kind or nature whatsoever against or in all or any portion of the Acquired Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinate), arising under or out of, in connection with, or in any way relating to the Debtors, the Acquired Assets, the operation of the Debtors' business prior to the closing of the Sale Transaction, or the transfer of the Acquired Assets to the Purchaser, hereby are forever barred, estopped and permanently enjoined from asserting against the Purchaser, any of the foregoing's affiliates, successors, or assigns, their property or the Acquired Assets, such persons' or entities' Liens, Claims, or interests in and to the Acquired Assets, including, without limitation, the following actions:  (a) commencing or continuing in any manner any action or other proceeding against the Purchaser and each of its affiliates, successors, assets or properties; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against the Purchaser and each of its affiliates, successors, assets, or properties; (c) creating,

perfecting, or enforcing any Lien or other Claim against the Purchaser and each of its affiliates, successors, assets, or properties; (d) asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due the Purchaser, its affiliates or its successors; or (e) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Confirmation Order, or the agreements or actions contemplated or taken in respect thereof.

98.     All persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtors to sell and transfer the Acquired Assets to the Purchaser in accordance with the terms of the Asset Purchase Agreement, the Plan, and this Confirmation Order.

99.     Purchaser shall have no Liability (as defined in the Asset Purchase Agreement) for any Excluded Liability, and, other than as expressly set forth in the Asset Purchase Agreement, Purchaser is not assuming, by virtue of the consummation of the Sale Transaction, nor shall the Purchaser be liable or responsible for, as a successor or otherwise (including under any theory of successor or vicarious liability of any kind or character or any other theory of law or equity, including any theory of antirust, environmental successor or transferee liability, labor law, *de facto* merger, or substantial continuity (including under applicable Money Transmitter Requirements or any securities or commodities Laws of any Governmental Body)):

> (i)     any Liability (as defined in the Asset Purchase Agreement), debts, commitments, or obligations of the Debtors or any of their predecessors or affiliates or any obligations of the Debtors or their predecessors or affiliates, in all cases whether known or unknown, disclosed or undisclosed, now existing or hereafter arising, asserted or unasserted, fixed or contingent,

46

A-788

choate or inchoate, liquidated or unliquidated, and in all cases to the extent relating to or arising from, in any way whatsoever, the Acquired Assets or the Debtors' operation of their businesses or use of the Acquired Assets or any such liabilities, debts, commitments, or obligations that in any way whatsoever are to be observed, paid, satisfied, compromised, or performed (in each case, including any liabilities that result from, relate to or arise out of tort or product liability claims), or

(ii)  any Liability (as defined in the Asset Purchase Agreement) calculable by reference to the Debtors or their assets or operations, or relating to the operation of the Debtors' businesses prior to the Closing of the Sale Transaction, or relating to continuing conditions existing, including with respect to any of Debtors' predecessors or affiliates, which liabilities, debts, commitments, and obligations are hereby extinguished insofar as they may give rise to successor liability, without regard to whether the claimant asserting any such liabilities, debts, commitments, or obligations has delivered to the Purchaser a release thereof.

For the avoidance of doubt, (i) nothing herein shall release the Purchaser with respect to its obligations as Distribution Agent of Cryptocurrency and Cash to Holders of Account Holder Claims and OpCo General Unsecured Creditor Claims as provided in, and subject to the terms and conditions of, the Asset Purchase Agreement and the Plan, and (ii) notwithstanding the transfer to Purchaser, pursuant to the Asset Purchase Agreement, of any Acquired Assets that constitute Coins or Cash, each User and Eligible Creditor shall retain, from and after the Closing of the Sale Transaction, all right, title, and interest in and to such Coins and Cash allocated to it on the

47

A-789

Binance.US Platform in accordance with the Asset Purchase Agreement (notwithstanding any terms and conditions of the Binance.US Platform to the contrary, if any) through and including such time as such Coins and Cash are returned or distributed to Seller or such User and Eligible Creditor, as applicable, and such Coins and Cash shall be held by Purchaser solely in a custodial capacity in trust and solely for the benefit of Seller or the applicable User or Eligible Creditor.

100.    The Asset Purchase Agreement and any related documents or other instruments may be modified, amended, or supplemented by the parties thereto and in accordance with the terms thereof, without further order of the Court.

101.    Paragraphs 88–100 of this Confirmation Order shall be deemed to be excised from this Confirmation Order in the event that the Asset Purchase Agreement is terminated prior to Closing.  For the avoidance of doubt, subject to the requirements set forth in the Asset Purchase Agreement (including, without limitation, Sections 6.22 and 5.2(c) thereof), the Debtors may exercise the "fiduciary out" in Section 8.1(g) of the Asset Purchase Agreement at any time prior to Closing.

102.    **Corporate Action.**  Upon the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, directors, managers, managing-members, limited or general partners, or officers of the Debtors, the Wind-Down Debtor, or any other Entity.

103.    All matters provided for in the Plan involving the corporate structure of the Debtors or the Wind-Down Debtor, as applicable, and any corporate action required by the Debtors or the Wind-Down Debtor, as applicable, in connection with the Plan shall be deemed to have occurred on, and shall be in effect as of, the Effective Date, without any requirement of further action by

the security holders, directors, managers, or officers of the Debtors or the Wind-Down Debtor, as applicable.  On or, as applicable, prior to the Effective Date, the appropriate officers of the Debtors or the Wind-Down Debtor, as applicable, shall be authorized and, as applicable, directed to issue, execute, and deliver the agreements, documents, certificates of incorporation, certificates of formation, bylaws, operating agreements, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Wind-Down Debtor, and any and all other agreements, documents, and instruments relating to the foregoing.  The authorizations and approvals contemplated by Article IV.J of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

104.    As soon as practicable after the Effective Date, the Wind-Down Debtor shall take such actions as the Wind-Down Debtor may determine to be necessary or desirable to carry out the purposes of the Plan.  Any certificate of dissolution or equivalent document may be executed by the Wind-Down Debtor on behalf of any Wind-Down Debtor without need for any action or approval by the shareholders or board of directors or managers of such Debtor.  On and after the Effective Date, the Debtors or the Wind-Down Debtor (1) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (2) shall be deemed to have cancelled pursuant to the Plan all Interests, and (3) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date.  Pursuant to the terms of the Plan, any Money Transmitter Licenses that have not been terminated shall be deemed withdrawn and no further action is required to be taken by the Debtors or the Wind-Down Debtor to effectuate such withdrawal; *provided* that,

49

following the Effective Date, the Debtors or the Wind-Down Debtor, as applicable, shall use commercially reasonable efforts to comply with all state banking department requirements for the surrender of a Money Transmitter License. Notwithstanding such Debtors' dissolution, such Debtors shall be deemed to remain intact solely with respect to the preparation, filing, review, and resolution of applications for Professional Fee Claims.

105. **Binding Effect.** Upon the occurrence of the Effective Date, the terms of the Plan are immediately effective and enforceable and deemed binding on the Debtors, the Wind-Down Debtor, any and all Holders of Claims or Interests (regardless of whether such Holders of Claims or Interests have, or are deemed to have, accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan or this Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors. All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

106. Pursuant to section 1141 of the Bankruptcy Code, subject to the occurrence of the Effective Date and subject to the terms of the Plan and this Confirmation Order, all prior orders entered in these Chapter 11 Cases and all documents and agreements executed by the Debtors as authorized and directed thereunder as of the Effective Date shall be binding upon and shall inure to the benefit of the Debtors, the Purchaser, or the Wind-Down Debtor, as applicable, and their respective successors and assigns.

107. **Vesting of Assets.** Except as otherwise provided in the Plan, this Confirmation Order, the Asset Purchase Agreement, the Schedule of Retained Causes of Action, or in any agreement, instrument, or other documented incorporated herein or therein, or in any agreement,

instrument, or other document incorporated in the Plan or the Plan Supplement, notwithstanding any prohibition of assignability under applicable non-bankruptcy law and in accordance with section 1141 of the Bankruptcy Code, on the Effective Date, all property constituting Wind-Down Debtor Assets, including all Vested Causes of Action of the Debtors (unless otherwise released, waived, compromised, settled, satisfied, or transferred pursuant to the Plan) shall vest in the Wind-Down Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.

108. Prior to the Effective Date, any and all of the Debtors' assets shall remain assets of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and on the Effective Date the Wind-Down Debtor Assets shall, subject to the Plan Administrator Agreement, be transferred to and vest in the Wind-Down Debtor. For the avoidance of doubt, to the extent not otherwise waived in writing, released, settled, compromised, assigned, or sold pursuant to a prior order or the Plan, the Plan Administrator specifically retains and reserves the right to assert, after the Effective Date, any and all of the Vested Causes of Action and related rights, whether or not asserted as of the Effective Date, and all proceeds of the foregoing, subject to the terms of the Plan, including without limitation Article IV.F.

109. Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, only the Wind-Down Debtor and the Plan Administrator shall have the right to pursue or not to pursue, or, subject to the terms hereof and the Plan Administrator Agreement, compromise or settle any Wind-Down Debtor Assets transferred to the Wind-Down Debtor. On and after the Effective Date, the Wind-Down Debtor and the Plan Administrator may, without further Court approval, commence, litigate, and settle any Vested Causes of Action or Claims relating to any Wind-Down Debtor Assets transferred to the Wind-Down Debtor or rights to payment or Claims that belong to the Debtors as of the Effective Date or are instituted by the Wind-Down Debtor and Plan Administrator on or

after the Effective Date, except as otherwise expressly provided herein and in the Plan Administrator Agreement. The Wind-Down Debtor shall be entitled to enforce all defenses and counterclaims to all Claims asserted against the Debtors and their Estates, including setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code.

110.    Notwithstanding any prohibition on assignability under applicable non-bankruptcy law, on the Effective Date and thereafter if additional Wind-Down Debtor Assets become available, the Debtors shall be deemed, subject to the Plan Administrator Agreement, to have automatically transferred to the applicable Wind-Down Debtor all of their right, title, and interest in and to all of the Wind-Down Debtor Assets, in accordance with section 1141 of the Bankruptcy Code. All such assets shall automatically vest in the Wind-Down Debtor free and clear of all Claims, Liens, and other interests, subject only to the Allowed Claims and Interests as set forth in the Plan and the expenses of the Wind-Down Debtor as set forth in the Plan and in the Plan Administrator Agreement. Thereupon, the Debtors shall have no interest in or with respect to the Wind-Down Debtor Assets or the Wind-Down Debtor.

111.    On the Effective Date, the Debtors or Plan Administrator, as applicable, may establish one or more accounts or funds to hold and dispose of certain assets, pursue certain litigation (including the Vested Causes of Action), and/or satisfy certain Claims (including Claims that are contingent or have not yet been Allowed). For any such account or fund, the Debtors or the Plan Administrator, as applicable, may take the position that grantor trust treatment applies in whole or in part. To the extent such treatment applies to any such account or fund, for all U.S. federal income tax purposes, the beneficiaries of any such account or fund would be treated as grantors and owners thereof, and it is intended, to the extent reasonably practicable, that any such account or fund would be classified as a liquidating trust under section 301.7701-4 of the Treasury

Regulations. Alternatively, any such account or fund may be subject to the tax rules that apply to "disputed ownership funds" under 26 C.F.R. 1.468B–9. If such rules apply, such assets would be subject to entity-level taxation, and the Debtors and Plan Administrator would be required to comply with the relevant rules.

112. **Effectiveness of All Actions**. All actions contemplated by the Plan, including all actions in connection with the Sale Transaction or the Liquidation Transaction, as applicable, are hereby effective and authorized to be taken on, prior to, or after the Effective Date, as applicable, under this Confirmation Order, without further application to, or order of the Court, or further action by the respective officers, directors, managers, members, or equity holders of the Debtors or the Wind-Down Debtor and with the effect that such actions had been taken by unanimous action of such officers, directors, managers, members, or equity holders.

113. **Cancellation of Notes, Instruments, Certificates, and Other Documents.** On the later of the Effective Date and the date on which distributions are made pursuant to the Plan (if not made on the Effective Date), except for the purpose of evidencing a right to and allowing Holders of Claims and Interests to receive a distribution under the Plan or to the extent otherwise specifically provided for in the Plan, this Confirmation Order, or any agreement, instrument, or other document entered into in connection with or pursuant to the Plan or the Restructuring Transactions, all notes, bonds, indentures, certificates, Securities, shares, purchase rights, options, warrants, collateral agreements, subordination agreements, intercreditor agreements, or other instruments or documents directly or indirectly evidencing, creating, or relating to any indebtedness or obligations of, or ownership interest in, the Debtors, giving rise to any Claims against or Interests in the Debtors or to any rights or obligations relating to any Claims against or Interests in the

Debtors shall be deemed cancelled without any need for a Holder to take further action with respect thereto.

114.     For the avoidance of doubt, cancellation of Existing Equity Interests pursuant to the Plan shall not affect the rights of the Holders of Existing Equity Interests to receive distributions, if any, under the Plan on account of such Existing Equity Interests.  Holders of Existing Equity Interests shall continue to possess all rights, powers, privileges, and standing associated with such Existing Equity Interests as if those Existing Equity Interests continue to exist subject to the terms of the Plan and this Confirmation Order.

115.     **Distributions.**  The procedures governing distributions contained in Article VI of the Plan shall be, and hereby are, approved in their entirety.  Except as otherwise set forth in the Plan or this Confirmation Order, the Plan Administrator shall make all distributions required under the Plan and the timing of distributions required under the Plan or this Confirmation Order shall be made in accordance with and as set forth in the Plan, this Confirmation Order, or the Plan Administrator Agreement, as applicable; *provided* that, if a creditor does not timely provide the Plan Administrator with its taxpayer identification number in the manner and by the deadline established by the Plan Administrator and/or the Plan, the creditor shall be deemed to have forfeited its right to any current, reserved or future distributions provided for under the Plan and such creditor's Claim or Interest shall be disallowed and expunged without further order of the Court. Any such forfeited distribution shall be deemed to have reverted back to the Wind-Down Debtor for all purposes, including for distributions to other holders of Allowed Claims or Allowed Interests (as applicable) against the particular Debtor in respect of which the forfeited distribution was made, notwithstanding any federal, provincial or state escheat, abandoned or unclaimed property law to the contrary.

116. **Claims Register.** Any Claim or Interest that has been paid, satisfied, amended, superseded, cancelled, or otherwise expunged (including pursuant to the Plan) may be adjusted or expunged, as applicable, on the Claims Register at the direction of the Debtors or Wind-Down Debtor without the Debtors or Wind-Down Debtor having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Court.

117. **Preservation of Rights of Action.** In accordance with section 1123(b) of the Bankruptcy Code, the Wind-Down Debtor shall succeed to all rights to commence and pursue any and all Vested Causes of Action of the Debtors, whether arising before or after the Petition Date, including, without limitation, any actions specifically enumerated in the Schedule of Retained Causes of Action other than Causes of Action released, waived, settled, compromised, or transferred. Such rights shall be preserved by the Debtors and Wind-Down Debtor and shall vest in the Wind-Down Debtor, with the Wind-Down Debtor's rights to commence, prosecute, or settle such Causes of Action preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action expressly released, waived, settled, compromised, or transferred by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan or pursuant to the Asset Purchase Agreement, which shall be deemed released and waived by the Debtors and the Wind-Down Debtor as of the Effective Date.

118. The Wind-Down Debtor may pursue such Causes of Action, as appropriate, in accordance with the best interests of the beneficiaries of the Wind-Down Debtor and in accordance with the Plan Administrator Agreement and the Plan. No Entity may rely on the absence of a specific reference in the Schedules of Assets and Liabilities or Statement of Financial Affairs, the Plan, the Plan Supplement, the Disclosure Statement, or the Schedule of Retained Causes of Action

55

A-797

to any Cause of Action against it as any indication that the Debtors or the Wind-Down Debtor will not pursue any and all available Causes of Action against it. The Wind-Down Debtor, on behalf of the Debtors and the Wind-Down Debtor, expressly reserves all rights to prosecute any and all Causes of Action against any Entity, except as otherwise provided in the Plan, including Article VIII of the Plan. Unless any Cause of Action of the Debtors is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or pursuant to a Final Order, the Wind-Down Debtor, on behalf of the Debtors and Wind-Down Debtor and in accordance with the Plan Administrator Agreement, expressly reserves all such Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation.

119.    The Wind-Down Debtor, on behalf of the Debtors and the Wind-Down Debtor, reserves and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Cause of Action that a Debtor may hold against any Entity shall vest in the Wind-Down Debtor, except as otherwise provided in the Plan, including Article VIII of the Plan. The Wind-Down Debtor, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Wind-Down Debtor shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Court in accordance with the Plan.

120. **Subordination.** Except as expressly provided in the Plan, the allowance, classification, and treatment of all Allowed Claims against and Allowed Interests in the Debtors and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors and the Wind-Down Debtor reserve the right to reclassify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

121. **Release of Liens.** Except as otherwise provided in the Plan, the Plan Supplement, or any contract, instrument, release, or other agreement or document created pursuant to the Plan or this Confirmation Order on the Effective Date, and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Debtors shall automatically revert to the applicable Debtor or Wind-Down Debtor, as applicable, and their successors and assigns, in each case, without any further approval or order of the Court and without any action or Filing being required to be made by the Debtors. The presentation or filing of this Confirmation Order to or with any local, state, federal, or foreign agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

122.     **Governance of the Wind-Down Debtor.**  The Plan Administrator shall appoint an independent director at each Debtor to act as a fiduciary for such Debtor entity in connection with the resolution of the Intercompany Claims.

123.     **Intercompany Claims.**  For the avoidance of doubt, nothing in this Confirmation Order or the Plan shall have any impact on the validity, extent, priority, or treatment of the Intercompany Claims.  Any determination as to the validity, extent, priority, or treatment of the Intercompany Claims shall be determined by the Court in a separate matter on proper notice to parties in interest.  Notwithstanding anything to the contrary in this Confirmation Order or the Plan, the rights of the ad hoc group of equityholders (the "AHG") to continue or participate in any adjudication of the Intercompany Claims are preserved, and any party reserves any and all rights, claims, and defenses in connection therewith, including without limitation, the Debtors and/or the Wind-Down Debtor's right to challenge the AHG's standing with respect thereto; *provided* that such right, claim, or defense is not based on any provision in this Confirmation Order or the Plan.

124.     **FTX Settlement.**  Pursuant to the terms of the FTX Settlement, the Debtors shall reserve and hold the amount of $445 million in Cash on account of the Preference Claims (as defined in the FTX Settlement) asserted by FTX, Alameda, and their estates in the FTX Bankruptcy Proceeding, subject to all defenses and counterclaims thereto, until the final resolution of the Preference Claims by settlement or a final and unappealable order by the court in the FTX Bankruptcy Proceeding, including any appeals therefrom.

125.     **General Settlement of Claims and Interests.**  As discussed in detail in the Disclosure Statement and as otherwise provided in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the

provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan. The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of this Confirmation Order shall constitute the Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 of all such Claims, Interests, Causes of Action, and controversies, as well as a finding by the Court that such compromise and settlement is fair, equitable, reasonable, and in the best interests of the Debtors, their Estates, and Holders of Claims and Interests. Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Interests in any Class are intended to be and shall be final.

126. **Third-Party Releases.** For the avoidance of doubt, any party that did not affirmatively "opt in" to the Third-Party Releases contained in the Plan shall not be deemed to grant such Third-Party Releases contained in the Plan.

127. **Contributed Third Party Claims.** For the avoidance of doubt, any party that did not affirmatively "opt in" to contribute their Contributed Third-Party Claims to the Wind-Down Debtor shall not be deemed to contribute their claims to the Wind-Down Debtor; *provided*, *however*, that any party may contribute their Contributed Third-Party Claims to the Wind-Down Debtor on or after the Effective Date by separate agreement with the Plan Administrator and Wind-Down Debtor. Any such agreement shall be valid to the same extent as if the party affirmatively opted in to contribute their Contributed Third-Party Claims to the Wind-Down Debtor.

128. **Operations After Closing.** On and after the Effective Date, expect as otherwise provided in the Plan, the Debtors or the Wind-Down Debtor may use, acquire, or dispose of

59

A-801

property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

129.    **Assumption and Rejection of Executory Contracts and Unexpired Leases.**  On the Effective Date, except as otherwise provided in the Plan, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (a) is specifically described in the Plan as to be assumed in connection with confirmation of the Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement; (b) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Effective Date; (c) is to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, in connection with the Sale Transaction; (d) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; or (e) is a D&O Liability Insurance Policy other than the Side-A Policy.  Entry of this Confirmation Order constitutes approval of such assumptions, assignments, and rejections, including the assumption of the Executory Contracts or Unexpired Leases as provided in the Plan Supplement, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Except as otherwise provided in this Confirmation Order, any and all objections or reservations of rights in connection with the rejection of an Executory Contract or Unexpired Lease under the Plan, if any, are overruled on their merits.

130.    **Waiver or Estoppel.**  Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest

should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue

of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement

was not disclosed in the Plan, the Disclosure Statement, or papers Filed prior to the Confirmation

Date.

131.     **Insurance Policies and Surety Bonds.**  Each D&O Liability Insurance Policy

(including, without limitation, any "tail policy" and all agreements, documents, or instruments

related thereto) other than the Side-A Policy shall be assumed, in their entirety, without the need

for any further notice to or action, order, or approval of the Court, as of the Effective Date, pursuant

to sections 105 and 365 of the Bankruptcy Code with the Wind-Down Debtor being authorized to

pursue any proceeds thereof on behalf of the Debtors or the Wind-Down Debtor.  The Side-A

Policy shall remain in effect during these Chapter 11 Cases with the Debtors, and the Wind-Down

Debtor preserves all avoidance and other actions in connection with the premium paid thereunder.

All beneficiaries under the D&O Insurance Policies reserve their rights under such D&O Insurance

Policies subject to the limitations set forth in the Plan.

132.     The Debtors or the Wind-Down Debtor, as applicable, shall not terminate or

otherwise reduce the coverage under any D&O Liability Insurance Policy (including, without

limitation, any "tail policy" and all agreements, documents, or instruments related thereto) in effect

prior to the Effective Date, and subject in all respects to the D&O Settlement, any current and

former directors, officers, managers, and employees of the Debtors who served in such capacity at

any time before or after the Effective Date shall be entitled to the full benefits of any such policy

for the full term of such policy subject to the terms thereof regardless of whether such directors,

officers, managers, and employees remain in such positions after the Effective Date.

Notwithstanding anything to the contrary in the Plan, the Debtors or the Wind-Down Debtor shall

61

A-803

retain the ability to supplement such D&O Liability Insurance Policy as the Debtors or Wind-Down Debtor may deem necessary, subject to the prior written consent of the Wind-Down Debtor.

133.    The Debtors shall continue to satisfy their obligations under their insurance policies in full and continue such programs in the ordinary course of business.  Each of the Debtors' insurance policies, and any agreements, documents, or instruments relating thereto shall be treated as Executory Contracts under the Plan.  On the Effective Date:  (a) the Debtors shall be deemed to have assumed all such insurance policies and any agreements, documents, and instruments relating thereto in their entirety and (b) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the applicable Wind-Down Debtor(s) unaltered.

134.    **Authorization to Consummate.**  The Debtors are authorized to consummate the Plan at any time after the entry of this Confirmation Order subject to satisfaction or waiver (by the required parties) of the conditions precedent to consummation as set forth in Article IX of the Plan.

135.    **Professional Compensation.**  All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than sixty (60) days after the Effective Date.  The Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code and Bankruptcy Rules.  The Wind-Down Debtor shall pay Professional Fee Claims in Cash to such Professionals in the amount the Court allows, including from funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by entry of an order of the Court; *provided* that the Debtors' and the Wind-Down Debtor's obligations to pay Allowed Professional

Fee Claims shall not be limited or deemed limited to funds held in the Professional Fee Escrow Account.

136.     No later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Court.  No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way.  No funds held in the Professional Fee Escrow Account shall be property of the Estates of the Debtors or the Wind-Down Debtor.  When all Professional Fee Claims Allowed by the Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Court, any remaining funds held in the Professional Fee Escrow Account shall be turned over to the Wind-Down Debtor without any further notice to or action, order, or approval of the Court or any other Entity.

137.     The Professionals shall deliver to the Debtors a reasonable and good-faith estimate of their unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Confirmation Date projected to be outstanding as of the anticipated Effective Date, and shall deliver such estimate no later than five Business Days prior to the anticipated Effective Date.  For the avoidance of doubt, no such estimate shall be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that are the subject of a Professional's final request for payment of Professional Fee Claims Filed with the Court, and such Professionals are not bound to any extent by the estimates.  If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.  The total

63

aggregate amount so estimated to be outstanding as of the anticipated Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account; provided that the Wind-Down Debtor shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are Filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

138.    Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors and/or the Wind-Down Debtor, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Wind-Down Debtor.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Wind-Down Debtor may employ and pay any Professional in the ordinary course of business for the period after the Confirmation Date without any further notice to or action, order, or approval of the Court.

139.    **Return of Deposits.**  All utilities, including, but not limited to, any Person or Entity that received a deposit or other form of adequate assurance of performance under section 366 of the Bankruptcy Code during these Chapter 11 Cases, must return such deposit or other form of adequate assurance of performance to the Wind-Down Debtor promptly following the occurrence of the Effective Date, if not returned or applied earlier.

140.    **Release, Exculpation, and Injunction Provisions.**  The release, exculpation, injunction, opt in, and related provisions set forth in the Plan are approved and authorized in their entirety, and such provisions are effective and binding on all Persons and Entities to the extent

64

A-806

provided therein except as otherwise provided in this Confirmation Order, *provided*, *however*, that nothing in the exculpation related provisions of the Plan shall release the Debtors from the provisions of the Plan governing satisfaction of Allowed Claims including Allowed Administrative Expense Claims or change the standard for liability on Allowed Claims or Allowed Administrative Expense Claims, subject to any applicable bankruptcy and non-bankruptcy law.

141.    For the avoidance of doubt, the Debtors are not seeking a discharge under section 1141(d).

142.    **Governmental Units.**  Nothing in this Confirmation Order or the Plan shall effect a release by the United States, the States or any of their agencies of any claim arising under the Internal Revenue Code, the environmental laws or any civil or criminal laws of the United States or the States, or under any rules or regulations enforced by the United States, the States or any of their agencies against the Released Parties, nor shall anything in the Confirmation Order or the Plan enjoin the United States or the States from bringing any claim, suit, action or other proceedings against the Released Parties for any liability for any claim, suit or action arising under the Internal Revenue Code, the environmental laws or any civil or criminal laws of the United States or the States, or under any rules or regulations enforced by the United States, the States or any of their agencies, nor shall anything in the Confirmation Order or the Plan exculpate any such party from any liability to the United States, the States or any of their agencies, arising under the Internal Revenue Code, the environmental laws or any civil or criminal laws of the United States or the States, or under any rules or regulations enforced by the United States, the States or any of their agencies; *provided*, however, that nothing in this Confirmation Order or the Plan shall modify in any respect the relief previously granted in the Bar Date Order and thus no person or entity, including the United States, the States or any of their agencies, can seek or receive a direct or

65

A-807

indirect distribution of any property of the Debtors' estates unless they filed a Proof of Claim prior to the Governmental Bar Date; *provided*, further, that the United States, the States, and their agencies may not, and will not, allege that the Restructuring Transactions are a violation of any rules or regulations enforced by the United States, the States or any of their agencies, nor will they bring any claim against any Person on account of or relating to the Restructuring Transactions.

143.    Nothing in this Confirmation Order, the Disclosure Statement, the Plan, or the Asset Purchase Agreement releases, precludes, or enjoins: (i) any liability to any governmental unit as defined in 11 U.S.C. § 101(27) ("Governmental Unit") that is not a "claim" as defined in 11 U.S.C. § 101(5) ("Claim"); (ii) any Claim of a Governmental Unit arising on or after the Effective Date; or (iii) any liability to a Governmental Unit on the part of any non-Debtor (except to the extent set forth in paragraphs 97 and 99 herein); *provided*, however, that nothing in this Confirmation Order or the Plan shall modify in any respect the relief previously granted in the Bar Date Order; *provided*, further, that no Governmental Unit will allege that the Restructuring Transactions are a violation of any rules or regulations enforced by the United States, the States or any of their agencies, nor will they bring any claim against any Person on account of or relating to the Restructuring Transactions.  Nothing in this Confirmation Order, the Disclosure Statement, the Plan, or the Asset Purchase Agreement authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, without compliance with all applicable legal requirements.

144.    **Securities and Exchange Commission Provisions.**  Notwithstanding anything to the contrary in this Confirmation Order, or any findings announced at the Combined Hearing, nothing in this Confirmation Order, or announced at the Combined Hearing, constitutes a finding under the federal securities laws as to whether crypto tokens or transactions involving crypto

66

A-808

tokens are securities, and the right of the SEC to challenge transactions involving crypto tokens on any basis is expressly reserved.

145.    Notwithstanding any provision herein to the contrary, nothing in this Confirmation Order or the Plan grants this Court jurisdiction over any police and regulatory actions by the SEC, and the SEC shall retain the power and authority to commence and continue any such actions against any person or entity, including without limitation, the Debtors, in any forum with jurisdiction; *provided*, however, that nothing in this Confirmation Order or the Plan shall modify in any respect the relief previously granted in the Bar Date Order; *provided*, *however*, that the SEC will not allege that the Restructuring Transactions are a violation of any rules or regulations enforced by the SEC, nor will they bring any claim against any Person on account of or relating to the Restructuring Transactions.

146.    Upon the occurrence of the Effective Date, the Debtors' books and records shall be transferred to the Wind-Down Debtor, which shall continue to preserve all financial books and records, emails, and other financial documents relating to the Debtors' business that are currently in the Debtors' possession. The Wind-Down Debtor shall not destroy or otherwise abandon any such documents or records without providing advance notice to the SEC (c/o Therese Scheuer, U.S. Securities and Exchange Commission, 100 F Street, NE, Washington, DC 20549, ScheuerT@SEC.GOV) and seeking further authorization from this Court.  Nothing in the Plan or this Confirmation Order shall affect the obligations of the pre-Effective Date Debtors, the Wind-Down Debtor, and/or any transferee or custodian to maintain all books and records that are subject to any governmental subpoena, document preservation letter, or other investigative request from a governmental agency.

147.    Notwithstanding any language to the contrary herein, no provision in the Plan or this Confirmation Order shall (a) preclude the OSC or the SEC from enforcing its police or regulatory powers or (b) enjoin, limit, impair or delay the OSC or SEC from commencing or continuing any claims, causes of action, proceeding, or investigations against any non-Debtor person or non-Debtor entity in any forum.

148.    **Employee Transition Plan.**  The Employee Transition Plan, the terms of which are included in the Plan Supplement as <u>Exhibit H</u>, will be implemented following the Effective Date and is not subject to the Court's approval.

149.    **Compliance with Tax Requirements.**  In connection with the Plan, to the extent applicable, the Debtors, the Wind-Down Debtor, any Distribution Agent, and any other applicable withholding and reporting agents shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Debtors, the Wind-Down Debtor, the Distribution Agent, and any other applicable withholding and reporting agents shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including winding-down a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms that are reasonable and appropriate; *provided* that the Wind-Down Debtor and the Distribution Agent, as applicable, shall request appropriate documentation from the applicable distributees and allow such distributees a reasonable amount of time to respond.  The Debtors, the Wind-Down Debtor, the Distribution Agent, and any other applicable withholding and reporting agents reserve the right to allocate all

distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

150. **Exemption from Certain Taxes and Fees.** To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Debtor, the Wind-Down Debtor, the Purchaser, or to any other Entity) of property under the Plan or pursuant to: (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Wind-Down Debtor; (b) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (c) the making, assignment, or recording of any lease or sublease; or (d) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, including the Asset Purchase Agreement, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, sales or use tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of this Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forgo the collection of any such tax

69

A-811

or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

151. **Termination of Asset Purchase Agreement.** If the Asset Purchase Agreement is terminated and the Sale Transaction is not consummated, all provisions in this Confirmation Order relating to the Asset Purchase Agreement, the Sale Transaction, and the Purchaser shall be of no force and effect, and the Debtors are authorized to consummate the Liquidation Transaction without further order of the Court.

152. **The Liquidation Transaction.** If the Asset Purchase Agreement is terminated, the Debtors shall pursue the Liquidation Transaction contemplated under the Plan and shall provide all Holders of Claims and Interests with the treatment afforded to such Holders under the Plan. In the event that the Debtors determine to pursue the Liquidation Transaction contemplated under Article IV of the Plan, the Debtors shall promptly notify the Court and all parties in interest. The Plan shall be deemed to satisfy all requirements under the Bankruptcy Code with respect to either the Sale Transaction or the Liquidation Transaction pursuant to this Confirmation Order.

153. **Documents, Mortgages, and Instruments.** Each federal, state, commonwealth, local, foreign, or other governmental agency is authorized to accept any and all documents, mortgages, and instruments necessary or appropriate to effectuate, implement, or consummate the Plan, including the Restructuring Transactions, and this Confirmation Order.

154. **The BNY Objection.** This Confirmation Order confirms that the Deed of Trust and Assignment of Rents recorded January 5, 2023 Official Records of Orange County (the "Deed") transferring title of 37 Black Hawk, Irvine, California 92603 (the "Property") from Michael G. Beason and Mickey L. Wiebeis (collectively, the "Property Borrowers") to Voyager Digital, LLC is void. This Confirmation Order may be recorded against the Property as evidence

and confirmation that the Deed is void. The Bank Of New York Mellon f/k/a the Bank Of New York, As Trustee For The Certificateholders Of CWALT, Inc., Alternative Loan Trust 2005-38, Mortgage Pass-Through Certificates, Series 2005-38 as Serviced by Shellpoint Mortgage Servicing ("Shellpoint") shall be permitted to take any other the necessary actions to void the Deed. To the extent necessary, the automatic stay is lifted solely as it pertains to Shellpoint's rights to take action against the Property and shall be effective immediately upon entry of this Confirmation Order. The Debtor(s) shall not be party to any foreclosure or other proceeding related to the Property as they lack any interest in the Property. Shellpoint shall release the Debtors and the Wind-Down Debtor of any costs and claims incurred on account of the Property, including any actions taken in any foreclosure or other proceeding or associated with voiding the Deed. This Confirmation Order shall in no way prevent Shellpoint from pursuing any and all lawful rights and remedies as to the Property Borrowers.

155. **Continued Effect of Stays and Injunction.** Unless otherwise provided in the Plan or this Confirmation Order, all injunctions or stays arising under or entered during these Chapter 11 Cases under section 362 of the Bankruptcy Code or otherwise and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

156. **Non-Severability.** Each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the Debtors' consent, consistent with the terms set forth herein; and (c) non-severable and mutually dependent.

157. **Notice of Subsequent Pleadings.** Except as otherwise provided in the Plan or in this Confirmation Order, notice of all subsequent pleadings in these Chapter 11 Cases after the

A-813

Effective Date will be limited to the following parties: (a) the Wind-Down Debtor and its counsel; (b) the U.S. Trustee; (c) counsel to the Purchaser; (d) any party known to be directly affected by the relief sought by such pleadings; and (e) any party that specifically requests additional notice in writing to the Debtors, the Wind-Down Debtor, or the Plan Administrator, as applicable, or files a request for notice under Bankruptcy Rule 2002 after the Effective Date. The Notice and Claims Agent shall not be required to file updated service lists.

158. **Post-Confirmation Modifications.** Subject to the limitations and terms contained in the Plan and Purchaser's consent rights under the Asset Purchase Agreement, the Debtors, with the consent of the Committee, reserve the right to (a) amend or modify the Plan before the entry of this Confirmation Order, in accordance with the Bankruptcy Code and the Bankruptcy Rules and (b) after the entry of this Confirmation Order, the Debtors or the Wind-Down Debtor, as applicable, may, upon order of the Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, to remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan consistent with the terms set forth in the Plan.

159. **Plan Classification Controlling.** The terms of the Plan shall solely govern the classification of Claims and Interests for purposes of the distributions to be made thereunder and the classifications set forth on the ballots tendered to or returned by the Holders of Claims or Interests in connection with voting on the Plan: (a) were set forth thereon solely for purposes of voting to accept or reject the Plan; (b) do not necessarily represent, and in no event shall be deemed to modify or otherwise affect, the actual classification of Claims and Interests under the Plan for distribution purposes; (c) may not be relied upon by any Holder of a Claim or Interest as

72

A-814

representing the actual classification of such Claim or Interest under the Plan for distribution purposes; and (d) shall not be binding on the Debtors except for voting purposes.

160.    **Choice of Law.**  Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan and any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, documents, instruments, or contracts, in which case the governing law of such agreement shall control); provided that corporate, limited liability company, or partnership governance matters relating to the Debtors or the Wind-Down Debtor, as applicable, shall be governed by the laws of the jurisdiction of incorporation or formation of the relevant Debtor or Wind-Down Debtor, as applicable.

161.    **Applicable Nonbankruptcy Law.**  The provisions of this Confirmation Order, the Plan and related documents, or any amendments or modifications thereto, shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.

162.    **Waiver of Filings.**  Any requirement under section 521 of the Bankruptcy Code or Bankruptcy Rule 1007 obligating the Debtors to file any list, schedule, or statement with the Court or the Office of the U.S. Trustee is permanently waived as to any such list, schedule, or statement not filed as of the Confirmation Date.

163.    **Governmental Approvals Not Required.**  This Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules, or regulations of any state, federal, or other governmental authority with respect to the dissemination, implementation, or consummation of the Plan and the Disclosure Statement, any certifications, documents,

instruments or agreements, and any amendments or modifications thereto, and any other acts referred to in, or contemplated by, the Plan and the Disclosure Statement. As provided in section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any permit or license of the Debtors or Wind-Down Debtor on account of the filing or pendency of the Chapter 11 Cases.

164. **Protection Against Discriminatory Treatment.** As provided by section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Entity, including Governmental Units, shall discriminate against any Wind-Down Debtor or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, or discriminate with respect to such a grant against, any Wind-Down Debtor, or any Entity with which a Wind-Down Debtor has been or is associated, solely because such Wind-Down Debtor was a debtor under chapter 11 of the Bankruptcy Code or may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases).

165. **Notices of Confirmation and Effective Date.** The Debtors or the Wind-Down Debtor, as applicable, shall serve notice of entry of this Confirmation Order, of the occurrence of the Effective Date, and of applicable deadlines (the "Notice of Confirmation") in accordance with Bankruptcy Rules 2002 and 3020(c) on all parties served with the Combined Hearing Notice seven Business Days after the Effective Date; *provided* that no notice of any kind shall be required to be mailed or made upon any Entity to whom the Debtors mailed notice of the Combined Hearing, but received such notice returned marked "undeliverable as addressed," "moved, left no forwarding address," or "forwarding order expired," or similar reason, unless the Debtors have been informed in writing by such Entity, or are otherwise aware, of that Entity's new address. For those parties

74

receiving electronic service, filing on the docket is deemed sufficient to satisfy such service and notice requirements.

166.    No later than ten Business Days after the Effective Date, the Wind-Down Debtor shall cause the Notice of Confirmation, modified for publication, to be published on one occasion in *The New York Times* (national edition) and *USA Today* (national edition).  Mailing and publication of the Notice of Confirmation in the time and manner set forth in this paragraph will be good, adequate, and sufficient notice under the particular circumstances and in accordance with the requirements of Bankruptcy Rules 2002 and 3020(c).  No further notice is necessary.

167.    The Notice of Confirmation will have the effect of an order of the Court, will constitute sufficient notice of the entry of this Confirmation Order to filing and recording officers, and will be a recordable instrument notwithstanding any contrary provision of applicable nonbankruptcy law.  The above-referenced notices are adequate under the particular circumstances of these Chapter 11 Cases and no other or further notice is necessary.

168.    **Dissolution of Statutory Committees.**  On the Effective Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases; *provided*, *however*, that such committees will remain in existence for the limited purposes of (a) pursuing, supporting, or otherwise participating in, any outstanding appeals in the Chapter 11 Cases; and (b) filing, objecting, or otherwise participating in, any final fee applications of Professionals.

169.    **Exemption from Registration.**  The Plan Administrator shall hold the equity of the Voyager Digital Ltd., to the extent that any new equity is issued, in an agency capacity, for the

75

A-817

benefit of and to facilitate the rights of Holders of Interests provided under the Plan; *provided* that such equity, if issued, shall be uncertificated and non-transferable.

170.     Distributions to Holders of Claims and Interests in accordance with the Plan shall not be deemed to be unlicensed money transmission.

171.     **Effect of Non-Occurrence of Conditions to Confirmation.**  If the Effective Date does not occur within 120 days after the Confirmation Date, then the Plan will be null and void in all respects, any and all compromises or settlements not previously approved by Final Order of the Court embodied in the Plan (including with respect to the fixing, limiting, or treatment of any Claim or Interest), shall be deemed null and void, and nothing contained in the Plan or the Disclosure Statement shall:  (a) constitute a waiver or release of any Claims, Interests, or Causes of Action held by any Debtor or any other Entity; (b) prejudice in any manner the rights of any Debtor or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity in any respect.

172.     **Substantial Consummation.**  On the Effective Date, the Plan shall be deemed to have been substantially consummated or shall be anticipated to be substantially consummated concurrent with the occurrence of the Effective Date.

173.     **Waiver of Stay.**  For good cause shown, the stay of this Confirmation Order provided by any Bankruptcy Rule is waived, and this Confirmation Order shall be effective and enforceable immediately upon its entry by the Court.

174.     **Immediate Binding Effect.**  Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtors, the Wind-Down Debtor, and any and all Holders of Claims or Interests (irrespective of whether such Claims or

Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, exculpations, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors. All Claims against and Interests in the Debtors shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or Interest has voted on the Plan.

175. **References to and Omissions of Plan Provisions.** References to articles, sections, and provisions of the Plan are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan. The failure to specifically include or to refer to any particular article, section, or provision of the Plan in this Confirmation Order shall not diminish or impair the effectiveness of such article, section, or provision, it being the intent of the Court that the Plan be confirmed in its entirety, except as expressly modified herein, and incorporated herein by reference.

176. **Headings.** Headings utilized herein are for convenience and reference only, and do not constitute a part of the Plan or this Confirmation Order for any other purpose.

177. **Effect of Conflict.** This Confirmation Order supersedes any Court order issued prior to the Confirmation Date that may be inconsistent with this Confirmation Order. If there is any inconsistency between the terms of the Plan and the terms of this Confirmation Order, the terms of this Confirmation Order shall govern and control. For the avoidance of doubt, the *Stipulation and Agreed Order Between the Debtors and Metropolitan Commercial Bank* [Docket No. 821] remains in effect and is not superseded by this Confirmation Order.

178. **Final, Appealable Order.** This Confirmation Order is a final judgment, order, or decree for purposes of 28 U.S.C. § 158(a), and the period in which an appeal must be filed shall commence upon the entry hereof.

179. **Retention of Jurisdiction.** The Court may properly, and upon the Effective Date shall, to the full extent set forth in the Plan, retain jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including (i) the matters set forth in Article XI of the Plan and (ii) as set forth in Section 10.13 of the Asset Purchase Agreement.

New York, New York
Dated: _____, 2023

THE HONORABLE MICHAEL E. WILES
UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT A

## The Plan

## Exhibit B

**Redline**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

|                                         |     |                          |
|-----------------------------------------|-----|--------------------------|
| In re:                                  | )   | Chapter 11               |
|                                         | )   |                          |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | )   | Case No. 22-10943 (MEW)  |
|                                         | )   |                          |
| Debtors.                                | )   | (Jointly Administered)   |
|                                         | )   |                          |

_____

### ORDER (I) APPROVING THE SECOND AMENDED DISCLOSURE STATEMENT AND (II) CONFIRMING THE THIRD AMENDED JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

Voyager Digital Holdings, Inc. and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors")[2] having:

a.  commenced, on July 5, 2022 (the "Petition Date"), these chapter 11 cases (the "Chapter 11 Cases") by filing voluntary petitions for relief in the United States Bankruptcy Court for the Southern District of New York (the "Court") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code");

b.  continued to operate their business and manage their property during these Chapter 11 Cases as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

c.  filed,[3] on July 6, 2022, the *Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 17];

d.  filed, on July 21, 2022, the *Debtors' Motion Seeking Entry of an Order (I) Approving the Bidding Procedures and Related Dates and Deadlines, (II) Scheduling Hearings and Objection Deadlines with Respect to the Debtors'*

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital, Ltd. (7224); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

[2]  Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan, the Disclosure Statement, the Asset Purchase Agreement, or the Bankruptcy Code (each as defined herein), as applicable. The rules of interpretation set forth in Article I.B. of the Plan apply.

[3]  Unless otherwise indicated, use of the term "filed" herein refers also to the service of the applicable document filed on the docket in these Chapter 11 Cases, as applicable.

*Sale, Disclosure Statement, and Plan Confirmation, and (III) Granting Related Relief* [Docket No. 126];

e.      obtained, on August 5, 2022, the entry of the *Order (I) Approving the Bidding Procedures, (II) Scheduling the Bid Deadlines and the Auction, (III) Approving the Form and Manner of Notice Thereof, (IV) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation and (V) Granting Related Relief* [Docket No. 248] (the "Bidding Procedures Order") approving the *Bidding Procedures for the Submission, Receipt, and Analysis of Bids in Connection with the Sale of the Debtors*, attached to the Bidding Procedures Order as Exhibit 1 (the "Bidding Procedures");

f.      filed, on August 12, 2022, the *First Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 287], the *Disclosure Statement Relating to the First Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 288], and the *Debtors' Motion for Entry of an Order Approving (I) the Adequacy of the Disclosure Statement, (II) Solicitation and Notice Procedures, (III) Forms of Ballots and Notices in Connection Therewith, and (IV) Certain Dates with Respect Thereto* [Docket No. 289];

g.      commenced, on September 13, 2022, the Auction for the sale of substantially all of the Debtors' assets in accordance with the Bidding Procedures;

h.      closed, on September 26, 2022, the Auction and selected West Realm Shires Inc. ("FTX US") as the Winning Bidder (as defined in the Bidding Procedures);

i.      obtained, on October 20, 2022, entry of the *Order (I) Authorizing Entry of the Asset Purchase Agreement and (II) Granting Related Relief* [Docket No. 581], which authorized entry into that certain asset purchase agreement by and between Voyager Digital, LLC and West Realm Shires Inc. (together with its affiliates, "FTX US," and the asset purchase agreement, the "FTX US Asset Purchase Agreement");

j.      filed, on October 24, 2022, the *Second Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 590] and the *First Amended Disclosure Statement Relating to the Second Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 591];

k.      filed, on December 9, 2022, the *Stipulation and Agreed Order* [Docket No. 717] by and between FTX US and the Debtors (the "FTX US APA Stipulation"), terminating the FTX US Asset Purchase Agreement;

l.      filed, on December 21, 2022, the *Debtors' Motion for Entry of an Order (I) Authorizing Entry into the Binance US Purchase Agreement and (II) Granting Related Relief* [Docket No. 775] and that certain asset purchase agreement by and

2

A-824

between Voyager Digital, LLC and BAM Trading Services Inc. d/b/a Binance.US (together with its affiliates, "Binance.US," and the asset purchase agreement, the "Asset Purchase Agreement")

m.      filed, on December 22, 2022, the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 777] (as amended, modified, or supplemented from time to time, the "Plan"), the *Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 778] (as amended, modified, or supplemented from time to time, the "Disclosure Statement"), and the *Debtors' Motion for Entry of an Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Conditionally Approving the Adequacy of the Debtors' Disclosure Statement, (III) Approving (A) Procedures for Solicitation, (B) Forms of Ballots and Notices, (C) Procedures for Tabulation of Votes, and (D) Procedures for Objections, and (IV) Granting Related Relief* [Docket No. 779];

n.      filed, on January 9, 2023, the first amendment to the Asset Purchase Agreement [Docket No. 835];

o.      obtained, on January 10, 2023, approval of the FTX US APA Stipulation [Docket No. 849];

p.      filed, on January 10, 2023, the revised Plan [Docket No. 852];

q.      filed, on January 13, 2023, the revised Disclosure Statement [Docket No. 863];

r.      obtained, on January 13, 2023, entry of the *Order (I) Authorizing Entry into the Asset Purchase Agreement and (II) Granting Related Relief* [Docket No. 775], which granted entry into the asset purchase agreement with Binance.US (the "Asset Purchase Agreement Order");

s.      obtained, on January 13, 2023, entry of the *Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Conditionally Approving the Adequacy of the Debtors' Disclosure Statement, (III) Approving (A) Procedures for Solicitation, (B) Forms of Ballots and Notices, (C) Procedures for Tabulation of Votes and (D) Procedures for Objections* [Docket No. 861] (the "Conditional Disclosure Statement Order") conditionally approving the Disclosure Statement, solicitation procedures (the "Solicitation Procedures"), and solicitation materials, including notices, forms, and ballots (collectively, the "Solicitation Packages");

t.      caused the Solicitation Packages and notice of the Combined Hearing and the deadline for objecting to the Disclosure Statement and to confirmation of the Plan ("Confirmation") to be distributed on or before January 25, 2023 (the "Solicitation Date"), in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Local Bankruptcy

3

A-825

Rules for the Southern District of New York (the "<u>Local Rules</u>"), the Disclosure Statement Order, and the Solicitation Procedures, as evidenced by, among other things, the *Affidavit of Service* [Docket No. 926] and the *Supplemental Affidavit of Service* [Docket Nos. 927 and 1016] (collectively, the "<u>Affidavit of Solicitation</u>");

u.  filed, on February 1, 2023, the *Plan Supplement for the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates* [Docket No. 943] (the "<u>Initial Plan Supplement</u>") and caused notice of the filing of the Initial Plan Supplement to be distributed in accordance with paragraph 12 of the Disclosure Statement Order, as evidenced by, among other things, the *Affidavit of Service* [Docket No. 951];

v.  published, on February 3, 2023, notice of the Combined Hearing (the "<u>Combined Hearing Notice</u>") in the *The New York Times* (National Edition) and *Financial Times* (International Edition), as evidenced by the *Affidavits of Publication* [Docket Nos. 954 and 955] (the "<u>Publication Affidavits</u>" and, together with the Affidavit of Solicitation, the "<u>Affidavits</u>");

w.  filed, on February 8, 2023, the *First Amended Plan Supplement for the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates* [Docket No. 986] (the "<u>First Amended Plan Supplement</u>") and caused notice of the filing of the First Amended Plan Supplement to be distributed in accordance with paragraph 12 of the Disclosure Statement Order, as evidenced by, among other things, the *Affidavit of Service* [Docket No. 992];

x.  filed, on February 15, 2023, the *Second Amended Plan Supplement for the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates* (the "<u>Second Amended Plan Supplement</u>") [Docket No. 1006] and caused notice of the filing of the Second Amended Plan Supplement to be distributed in accordance with paragraph 12 of the Disclosure Statement Order, as evidenced by, among other things, the *Affidavit of Service* [Docket No. 1037];

y.  filed, on February 21, 2023, the *Third Amended Plan Supplement for the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates* (the "<u>Third Amended Plan Supplement</u>") [Docket No. 1035] and caused notice of the filing of the Third Amended Plan Supplement to be distributed in accordance with paragraph 12 of the Disclosure Statement Order, as evidenced by, among other things, the *Affidavit of Service* [Docket No. 1058];

z.  filed, on February 28, 2023, the *Debtors' Motion for Entry of an Order Approving Joint Stipulation and Agreed Order Between the Voyager Debtors, the FTX Debtors, and Their Respective Official Committees of Unsecured Creditors* [Docket No. 1106] (the "<u>FTX Settlement</u>");

aa.  filed, on February 28, 2023, the *Declaration of Leticia Sanchez Regarding the Solicitation and Tabulation of Votes on the Third Amended Joint Plan of Voyager*

*Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1108] (the "Voting Report");

bb.    filed, on February 28, 2023, the *Debtors' Memorandum of Law in Support of (I) Final Approval of the Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code and (II) an Order Confirming the Debtors' Third Amended Joint Chapter 11 Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates* [Docket No. 1110] (the "Confirmation Brief");

cc.    filed, on February 28, 2023, the *Declaration of Timothy R. Pohl, Independent Director and Member of the Special Committee of the Board of Directors of Voyager Digital, LLC, in Support of Confirmation of the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1111] (the "Pohl Declaration")

dd.    filed, on February 28, 2023, the *Declaration of Brian Tichenor in Support of Confirmation of the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1113] (the "Tichenor Declaration");

ee.    filed, on February 28, 2023, the *Fourth Amended Plan Supplement for the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates* (the "Fourth Amended Plan Supplement") (together with the Initial Plan Supplement, First Amended Plan Supplement, Second Amended Plan Supplement, and Third Amended Plan Supplement, and as may be modified, amended, or supplemented from time to time, the "Plan Supplement") [Docket No. 1115] and will cause notice of the filing of the Fourth Amended Plan Supplement to be distributed in accordance with paragraph 12 of the Disclosure Statement Order; and

ff.    filed, on February 28, 2023, the revised version of the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1117];

gg.    filed, on February 28, 2023, the *Declaration of Mark A. Renzi in Support of Confirmation of the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1119] (the "Renzi Declaration," and, together with the Voting Report, the Pohl Declaration, the Tichenor Declaration, and the Renzi Declaration, the "Declarations");

hh.    filed, on February 28, 2023, the *Notice of Filing of Proposed Findings of Fact, Conclusions of Law, and Order (I) Approving the Second Amended Disclosure Statement and (II) Confirming the Third Amended Joint Plan of Voyager Digital*

5

*Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code;*

ii.    filed, on March 1, 2023, the revised version of the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1125];

jj.    filed, on March 1, 2023, the *Amended Declaration of Leticia Sanchez Regarding the Solicitation and Tabulation of Votes on the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1127] (the "Voting Report"); and

kk.    ~~hh.~~ filed, on ~~February~~March 2~~8~~, 2023, ~~this~~the revised version of the *Notice of Filing of Proposed Findings of Fact, Conclusions of Law, and Order (I) Approving the Second Amended Disclosure Statement and (II) Confirming the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (this "<u>Confirmation Order</u>").

The Court having:

a.    entered the Bidding Procedures Order on August 5, 2022 [Docket No. 248];

b.    entered the Asset Purchase Agreement Order on January 13, 2023 [Docket No. 775];

c.    entered the Conditional Disclosure Statement Order on January 13, 2023 [Docket No. 861];

d.    set February 22, 2023, at 4:00 p.m. (prevailing Eastern Time) as the deadline to object to the Disclosure Statement and the Plan and to object to proposed cure costs and any assumption of an Executory Contract or Unexpired Lease pursuant to the *Schedule of Assumed Executory Contracts and Unexpired Leases* (the "<u>Assumed Contract Schedule</u>"), filed as <u>Exhibit A</u> to the Plan Supplement (the "<u>Plan Objection Deadline</u>");

e.    set February 22, 2023, at 4:00 p.m. (prevailing Eastern Time) as the deadline for voting on the Plan (the "<u>Voting Deadline</u>");

f.    set March 2, 2023 at 10:00 a.m. (prevailing Eastern Time) as the date and time for the commencement of the Combined Hearing, pursuant to Bankruptcy Rules 3017 and 3018 and sections 1126, 1128, and 1129 of the Bankruptcy Code;

g.    reviewed the Plan, the Disclosure Statement, the Plan Supplement, the Confirmation Brief, the Declarations, the Voting Report, the Combined Hearing Notice, the Affidavits, and all filed pleadings, exhibits, statements, and comments

6

regarding Confirmation, including all objections, statements, and reservations of rights filed by parties in interest on the docket of the Chapter 11 Cases;

h.      held the Combined Hearing on March 2, 2023 at 10:00 a.m., prevailing Eastern Time;

i.      heard the statements and arguments made by counsel with respect to final approval of the Disclosure Statement and Confirmation of the Plan;

j.      considered all oral representations, live testimony, written direct testimony, designated deposition testimony, exhibits, documents, filings, and other evidence presented at the Combined Hearing;

k.      overruled any and all objections to the Disclosure Statement and the Plan and to Confirmation and all statements and reservations of rights not consensually resolved, agreed to, or withdrawn, unless otherwise indicated; and

l.      taken judicial notice of all papers and pleadings and other documents filed, all orders entered, and all evidence and arguments presented in these Chapter 11 Cases.

NOW, THEREFORE, the Court having found that the notice of the Combined Hearing and the opportunity for any party in interest to object to approval of the Disclosure Statement and confirmation of the Plan were adequate and appropriate as to all parties affected or to be affected by the Plan and the transactions contemplated therein, and that the legal and factual bases set forth in the documents filed in support of approval of the Disclosure Statement and confirmation of the Plan and other evidence presented at the Combined Hearing and the record of the Chapter 11 Cases establish just cause for the relief granted herein; and after due deliberation thereon and good cause appearing therefor, the Court makes and issues the following findings of fact and conclusions of law, and orders:

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

IT IS DETERMINED, FOUND, ADJUDGED, DECREED, AND ORDERED THAT:

**A.** **Findings and Conclusions.**

1.      The findings and conclusions set forth herein and in the record of the Combined Hearing constitute the Court's findings of fact and conclusions of law under rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052 and 9014.  To the extent any of the following conclusions of law constitute findings of fact, or vice versa, they are adopted as such.

**B.** **Jurisdiction, Venue, and Core Proceeding.**

2.      The Court has jurisdiction over these Chapter 11 Cases pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, entered February 1, 2012.  The Court has exclusive jurisdiction to determine whether the Disclosure Statement and the Plan comply with the applicable provisions of the Bankruptcy Code and should be approved and confirmed, respectively.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  Confirmation of the Plan is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

**C.** **Eligibility for Relief.**

3.      The Debtors were and are entities eligible for relief under section 109 of the Bankruptcy Code.

**D.** **Commencement and Joint Administration of the Chapter 11 Cases.**

4.      On the Petition Date, each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code.  In accordance with the *Order (I) Directing Joint Administration of the Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 18], these

Chapter 11 Cases were consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015. Since the Petition Date, the Debtors have operated their business and managed their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

### E. Appointment of the Committee.

5. On July 19, 2022, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Committee") [Docket No. 106].

### F. Judicial Notice, Objections Overruled.

6. The Court takes judicial notice of (and deems admitted into evidence for purposes of final approval of the Disclosure Statement and Confirmation of the Plan) the docket of the Chapter 11 Cases maintained by the clerk of the Court or its duly appointed agent, including all pleadings and other documents on file, all orders entered, all hearing transcripts, and all evidence and arguments made, proffered, or adduced at the hearings held before the Court during the pendency of these Chapter 11 Cases. All objections, statements, informal objections, and reservations of rights not consensually resolved, agreed to, or withdrawn, if any, related to the Disclosure Statement, the Plan, or Confirmation are overruled on the merits unless otherwise indicated in this Confirmation Order.

### G. Conditional Disclosure Statement Order.

7. On January 13, 2023, the Court entered the Conditional Disclosure Statement Order [Docket No. 861], which, among other things, set (i) February 22, 2023, at 4:00 p.m. (prevailing Eastern Time) as (a) the Plan Objection Deadline and (b) the Voting Deadline and

9

A-831

(ii) March 2, 2023, at 10:00 a.m. (prevailing Eastern Time) as the date and time for commencement of the Combined Hearing.

### H. Adequacy of the Disclosure Statement.

8. The Disclosure Statement contains (a) sufficient information of a kind necessary to satisfy the disclosure requirements of all applicable nonbankruptcy laws, rules, and regulations, including the Securities Act, and (b) "adequate information" (as such term is defined in section 1125(a) of the Bankruptcy Code and used in section 1126(b)(2) of the Bankruptcy Code) with respect to the Debtors, the Plan, and the transactions contemplated therein. The filing of the Disclosure Statement with the clerk of the Court satisfied Bankruptcy Rule 3016(b), and the Disclosure Statement, the Plan, and the Solicitation Packages provided all parties-in-interest with sufficient notice regarding the settlement, release, exculpation, and injunction provisions contained in the Plan in compliance with Bankruptcy Rule 3016(c).

### I. Burden of Proof—Confirmation of the Plan.

9. The Debtors, as proponents of the Plan, have met their burden of proving the applicable elements of sections 1129(a) and 1129(b) of the Bankruptcy Code by a preponderance of the evidence, which is the applicable evidentiary standard for Confirmation.

### J. Notice.

10. The Debtors provided due, adequate, and sufficient notice of the Disclosure Statement, the Conditional Disclosure Statement Order, the Plan, the Plan Supplement, the Solicitation Packages, the Combined Hearing Notice, the proposed assumption and rejection of Executory Contracts and Unexpired Leases and the proposed cure amounts, and all the other materials distributed by the Debtors in connection with Confirmation of the Plan, together with the Plan Objection Deadline, the Voting Deadline, and the Combined Hearing, and any

applicable bar dates and hearings described in the Conditional Disclosure Statement Order, in compliance with the Bankruptcy Rules, Local Rules, and the procedures set forth in the Disclosure Statement Order. No other or further notice is or shall be required.

### K. Solicitation.

11.     Prior to the Combined Hearing, the Debtors filed the Voting Report. The Voting Report was admitted into evidence during the Combined Hearing. As described in the Voting Report, the solicitation of votes on the Plan complied with the Solicitation Procedures, was appropriate and satisfactory based upon the circumstances of these Chapter 11 Cases, and was in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any other applicable rules, laws, and regulations.

12.     As described in the Voting Report, following the Petition Date, the Solicitation Packages, the Plan Supplement, and the Combined Hearing Notice were transmitted and served, including to all Holders of Claims in Class 3 (Account Holder Claims), Class 4A (OpCo General Unsecured Claims), Class 4B (HoldCo General Unsecured Claims), and Class 4C (TopCo General Unsecured Claims) (collectively, the "Voting Classes") that held a Claim as of January 10, 2023 (the date specified in such documents for the purpose of solicitation) (the "Voting Record Date"), in compliance with the Bankruptcy Code, including sections 1125 and 1126 thereof, the Bankruptcy Rules, including Bankruptcy Rules 3017 and 3018, the Local Rules, the Disclosure Statement Order, and any applicable nonbankruptcy law. Transmission and service of the Solicitation Packages and the Combined Hearing Notice were timely, adequate, and sufficient. The establishment and notice of the Voting Record Date were reasonable and sufficient. No other or further notice is required.

13.     The period during which Holders in the Voting Classes were required to submit acceptances or rejections to the Plan was reasonable and sufficient for such Holders to make an informed decision to accept or reject the Plan.

14.     As set forth in the Plan, Holders of Claims in the Voting Classes were eligible to vote on the Plan in accordance with the Solicitation Procedures.  Holders of Claims in Class 1 (Secured Tax Claims) and Class 2 (Other Priority Claims) (collectively, the "Presumed Accepting Classes") are Unimpaired and conclusively presumed to accept the Plan and, therefore, did not vote to accept or reject the Plan.  Holders of Claims in Class 7 (Intercompany Claims) and Interests in Class 8 (Intercompany Interests) either are Unimpaired and conclusively presumed to have accepted the Plan (to the extent reinstated) or Impaired and conclusively deemed to have rejected the Plan, and, therefore, are not entitled to vote to accept or reject the Plan.  Holders of Claims in Class 5 (Alameda Loan Facility Claims) and Class 6 (Section 510(b) Claims) and Interests in Class 9 (Existing Equity Claims) (collectively, the "Deemed Rejecting Classes") are Impaired under the Plan and are deemed to have rejected the Plan.  Nevertheless, the Debtors served Holders in such Deemed Rejecting Classes with the Plan, the Disclosure Statement, the Non-Voting Status Notice, and the Combined Hearing Notice.

**L.     Voting.**

15.     As evidenced by the Voting Report, votes to accept or reject the Plan have been solicited and tabulated fairly, in good faith, and in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Conditional Disclosure Statement Order, and any applicable nonbankruptcy law, rule, or regulation.

16.     As evidenced by the Voting Report, Class 3 (Account Holder Claims), Class 4A (OpCo General Unsecured Claims), Class 4B (HoldCo General Unsecured Claims),

12

A-834

and Class 4C (TopCo General Unsecured Claims) voted to accept the Plan in accordance with section 1126 of the Bankruptcy Code.

17.     Based on the foregoing, and as evidenced by the Voting Report, at least one Impaired Class of Claims (excluding the acceptance by any insiders of any of the Debtors) has voted to accept the Plan in accordance with the requirements of sections 1124 and 1126 of the Bankruptcy Code.

**M.     Plan Supplement.**

18.     The Plan Supplement complies with the Bankruptcy Code and the terms of the Plan, and the filing and notice of the documents included in the Plan Supplement are adequate and proper in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Conditional Disclosure Statement Order, and the facts and circumstances of the Chapter 11 Cases.  No other or further notice is or will be required with respect to the Plan Supplement.  All documents included in the Plan Supplement are integral to, part of, and incorporated by reference into the Plan.  Subject to the terms of the Plan, compliance with the Bankruptcy Code and the Bankruptcy Rules, and, solely to the extent set forth under the Asset Purchase Agreement, consent of the Purchaser, and in a form reasonably acceptable to the Committee, the Debtors reserve the right to alter, amend, update, or modify the Plan Supplement before the Effective Date.

**N.     Modifications to the Plan.**

19.      Pursuant to section 1127 of the Bankruptcy Code, any modifications to the Plan since the commencement of Solicitation described or set forth herein constitute technical changes or changes with respect to particular Claims or Interests made pursuant to the agreement of the Holders of such Claims or Interests and do not materially and adversely affect or change

13

A-835

the treatment of any other Claims or Interests. Pursuant to Bankruptcy Rule 3019, these modifications do not require additional disclosure under section 1125 of the Bankruptcy Code or the resolicitation of votes under section 1126 of the Bankruptcy Code, nor do they require that the Holders of Claims or Interests be afforded an opportunity to change previously cast acceptances or rejections of the Plan.

20.     This Confirmation Order contains modifications to the Plan that were made to address objections and informal comments received from various parties in interest. Modifications to the Plan since the entry of the Conditional Disclosure Statement Order, if any, are consistent with the provisions of the Bankruptcy Code. The disclosure of any Plan modifications prior to or on the record at the Combined Hearing constitutes due and sufficient notice of any and all Plan modifications. The Plan as modified shall constitute the Plan submitted for Confirmation.

### O.     Bankruptcy Rule 3016.

21.     The Plan and all modifications thereto are dated and identify the Entities submitting them, thereby satisfying Bankruptcy Rule 3016(a). The Debtors appropriately filed the Disclosure Statement and the Plan with the Court, thereby satisfying Bankruptcy Rule 3016(b). The injunction, release, and exculpation provisions in the Disclosure Statement and the Plan describe, in bold font and with specific and conspicuous language, all acts to be enjoined and identify the entities that will be subject to the injunction, thereby satisfying Bankruptcy Rule 3016(c).

### P.     Compliance with Bankruptcy Code Requirements—Section 1129(a)(1).

22.     The Plan complies with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy Code.

### (i)    Proper Classification—Sections 1122 and 1123(a)(1).

23.     The classification of Claims and Interests under the Plan is proper under the Bankruptcy Code. In accordance with sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, Article III of the Plan provides for the separate classification of Claims and Interests into eleven Classes. Valid business, factual, and legal reasons exist for the separate classification of such Classes of Claims and Interests. The classifications were not implemented for any improper purpose and do not unfairly discriminate between, or among, Holders of Claims or Interests. Each Class of Claims and Interests contains only Claims or Interests that are substantially similar to the other Claims or Interests within that Class. Accordingly, the Plan satisfies the requirements of sections 1122(a), 1122(b), and 1123(a)(1) of the Bankruptcy Code.

### (ii)    Specified Unimpaired Classes—Section 1123(a)(2).

24.     Article III of the Plan specifies that Claims in Class 1 (Secured Tax Claims) and Class 2 (Other Priority Claims) are Unimpaired under the Plan and Claims and Interests in Class 7 (Intercompany Claims) and Class 8 (Intercompany Interests), respectively, are either Impaired or Unimpaired under the Plan.

25.     Article III of the Plan specifies that Claims in the following Classes are Unimpaired under the Plan within the meaning of section 1124 of the Bankruptcy Code:

| Class | Designation |
|-------|-------------|
| 1 | Secured Tax Claims |
| 2 | Other Priority Claims |

26.     Additionally, Article II of the Plan specifies that Allowed Administrative Claims, Allowed Professional Fee Claims, Allowed Priority Tax Claims, and all fees due and payable pursuant to section 1930 of title 28 of the United States Code before the Effective Date will be paid in full in accordance with the terms of the Plan, although these Claims are not separately

15

A-837

classified under the Plan. Accordingly, the Plan satisfies the requirements of section 1123(a)(2) of the Bankruptcy Code.

### (iii)       Specified Treatment of Impaired Classes—Section 1123(a)(3).

27.     The Plan satisfies the requirements of section 1123(a)(3) of the Bankruptcy Code. Article III of the Plan specifies that Claims and Interests, as applicable, in the following Classes (collectively, the "Impaired Classes") are Impaired under the Plan within the meaning of section 1124 of the Bankruptcy Code, and describes the treatment of such Classes.

| Class | Designation |
|-------|-------------|
| 3 | Account Holder Claims |
| 4A | OpCo General Unsecured Claims |
| 4B | HoldCo General Unsecured Claims |
| 4C | TopCo General Unsecured Claims |
| 5 | Alameda Loan Facility Claims |
| 6 | Section 510(b) Claims |
| 9 | Existing Equity Interests |

### (iv)       No Discrimination—Section 1123(a)(4).

28.     The Plan satisfies the requirements of section 1123(a)(4) of the Bankruptcy Code. The Plan provides for the same treatment by the Debtors for each Claim or Interest in each respective Class unless the Holder of a particular Claim or Interest has agreed to a less favorable treatment of such Claim or Interest.

### (v)       Adequate Means for Plan Implementation—Section 1123(a)(5).

29.     The Plan satisfies the requirements of section 1123(a)(5) of the Bankruptcy Code. The provisions in Article IV and elsewhere in the Plan and the Plan Supplement, and in the exhibits and attachments to the Disclosure Statement provide, in detail, adequate and proper means for the Plan's implementation, including: (a) effectuation of the Restructuring Transactions contemplated by the Plan, the Restructuring Transactions Memorandum, and the

16

Customer Onboarding Protocol; (b) consummation of the Sale Transaction by the Outside Date pursuant to the Asset Purchase Agreement; (c) if the Sale Transaction is not consummated by the Outside Date pursuant to the Asset Purchase Agreement, then the effectuation of the Liquidation Transaction in accordance with the Liquidation Procedures; (d) adoption and implementation of the Employee Transition Plan; (e) retention of certain Claims or Causes of Action held by the Debtors or their Estates, which shall be assigned and transferred to the Wind-Down Debtor after the Effective Date; (f) effectuation of the terms of the D&O Settlement; (g) authorization for the Debtors and the Wind-Down Debtor, as applicable, to take all actions as may be necessary or appropriate to effectuate the Restructuring Transactions and any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan; (h) establishment of the Wind-Down Debtor pursuant to the Plan Administrator Agreement and the transfer of the Wind-Down Debtor Assets to the Wind-Down Debtor after the Effective Date; (i) the funding and sources of consideration for the Plan distributions; and (j) settlement, satisfaction, and compromise of Claims and Interests as set forth in the Plan.

<div align="center">

(vi)        **Voting Power of Equity Securities—Section 1123(a)(6).**

</div>

30.      Section 1123(a)(6) of the Bankruptcy Code requires that a debtor's corporate constituent documents prohibit the issuance of nonvoting equity securities. On the Effective Date the Wind-Down Debtor Assets shall, subject to the Plan Administrator Agreement, be transferred to and vest in the Wind-Down Debtor. The Wind-Down Debtor shall be managed by the Plan Administrator and shall be subject to a Wind-Down Debtor Oversight Committee. The Plan Administrator shall be responsible for, among other things: (a) implementing the Wind-Down Debtor, and making distributions contemplated by the Plan; (b) marshalling, marketing for sale, and winding down any of the Debtors' assets constituting Wind-Down

<div align="center">

17

A-839

</div>

Debtor Assets; (c) appointing an independent director at each Debtor to act as a fiduciary for such Debtor entity in connection with the resolution of the Intercompany Claims; (d) overseeing the accounts of the Debtors and the Wind-Down Debtor and the wind-down and dissolution of the Debtors and the Wind-Down Debtor, including effectuating the transactions described in the Restructuring Transactions Memorandum; (e) receiving, maintaining, conserving, supervising, prosecuting, collecting, settling, managing, investing, protecting, and where appropriate, causing the Wind-Down Debtor to abandon the Wind-Down Debtor Assets, including causing the Wind-Down Debtor to invest any moneys held as Wind-Down Debtor Assets; (f) opening and maintaining bank accounts on behalf of or in the name of the Debtors or the Wind-Down Debtor, including, in the Plan Administrator's discretion, separate bank accounts for each of the Debtors; (g) entering into any agreement or executing any document or instrument required by or consistent with the Plan, this Confirmation Order, or the Plan Administrator Agreement, and to perform all obligations thereunder; (h) collecting and liquidating all Wind-Down Debtor Assets, including the sale of any Wind-Down Debtor Assets; (i) protecting and enforcing the rights to the Wind-Down Debtor Assets (including any Vested Causes of Action and Contributed Third-Party Claims) vested in the Wind-Down Debtor and Plan Administrator by the Plan Administrator Agreement by any method deemed appropriate, including, without limitation, by judicial proceedings or otherwise; (j) investigating any Wind-Down Debtor Assets, and any other potential Vested Causes of Action and Contributed Third-Party Claims; (k) reviewing, reconciling, compromising, settling, objecting, or prosecuting Claims or Interests of any kind; (l) seeking the examination of any Person pursuant to Federal Rule of Bankruptcy Procedure 2004; (m) retaining professionals, disbursing agents, and other agents, independent contractors, and third parties pursuant to the Plan Administrator Agreement and paying the reasonable

compensation thereof; (n) paying all lawful expenses, debts, charges, taxes, and other liabilities, and making all other payments relating to the Wind-Down Debtor Assets, solely out of Wind-Down Debtor Assets; (o) prosecuting and settling the Vested Causes of Action, including, without limitation, the 3AC Claims, FTX Claims, Alameda Claims, Contributed Third-Party Claims, and any causes of action not included in the Asset Purchase Agreement or released under the Plan; (p) reviewing, reconciling, pursuing, commencing, prosecuting, compromising, settling, dismissing, releasing, waiving, withdrawing, abandoning, resolving, or electing not to pursue all Vested Causes of Action and Contributed Third-Party Claims; (q) acquiring litigation and other claims related to the Debtors, and prosecuting such claims; (r) reviewing and compelling turnover of the Debtors or the Wind-Down Debtor's property; (s) calculating and making all Distributions to the holders of Allowed Claims against each Debtor and, solely to the extent of payment in full of Allowed Claims, to holders of Allowed Interests, as provided for in, or contemplated by, the Plan and the Plan Administrator Agreement; *provided* that because the Plan does not substantively consolidate the Debtors' Estates, the Plan Administrator shall make Distributions from the Wind-Down Debtor Assets to the holders of Claims and Interests (if applicable) against that specific Debtor; (t) establishing, administering, adjusting, and maintaining the Wind-Down Reserve and the Disputed Claims Reserve; (u) withholding from the amount distributable to any Person the maximum amount needed to pay any tax or other charge that the Plan Administrator has determined, based upon the advice of his agents or professionals, may be required to be withheld from such Distribution under the income tax or other laws of the United States or of any state or political subdivision thereof; (v) in reliance upon the Debtors' Schedules, the official Claims Register maintained in the Chapter 11 Cases and the Debtors' filed lists of equity security holders, reviewing, and where appropriate,

19

allowing or objecting to Claims and (if applicable) Interests, and supervising and administering the commencement, prosecution, settlement, compromise, withdrawal, or resolution of all objections to Disputed Claims and (if applicable) Disputed Interests required to be administered by the Wind-Down Debtor; (w) making all tax withholdings, filing tax information returns, filing and prosecuting tax refunds claims, making tax elections by and on behalf of the Debtors or the Wind-Down Debtor, and filing tax returns for the Debtors or the Wind-Down Debtor pursuant to and in accordance with the Plan, and paying taxes, if any, payable for and on behalf of the Debtors or the Wind-Down Debtor, as applicable; *provided, however*, that notwithstanding any other provision of the Plan Administrator Agreement, the Plan Administrator shall not have any responsibility or personal liability in any capacity whatsoever for the signing or accuracy of the Debtors' income tax returns that are due to be filed after the Effective Date or for any tax liability related thereto; (x) abandoning or donating to a charitable organization qualifying under IRC section 501(c)(3) any Wind-Down Debtor Assets that the Plan Administrator determines to be too impractical to distribute or of inconsequential value; (y) seeking a determination of tax liability or refund under Bankruptcy Code section 505; (z) establishing reserves for taxes, assessments, and other expenses of administration of the Debtors or the Wind-Down Debtor as may be necessary and appropriate for the proper operation of matters incident to the Debtors or the Wind-Down Debtor; paying Wind-Down Debtor Expenses; (aa) if the Plan Administrator deems appropriate in the Plan Administrator's sole discretion, seeking to establish a bar date for filing proofs of Interest in any Debtor or otherwise to determine the holders and extent of Allowed Interests in any Debtor; (bb) purchasing and carrying all insurance policies that the Plan Administrator deems reasonably necessary or advisable and paying all associated insurance premiums and costs; (cc) undertaking all administrative functions remaining in the Chapter 11

20

A-842

Cases to the extent necessary to carry out the Debtors', the Wind-Down Debtor's, or the Plan Administrator's duties under the Plan, including reporting and making required payments of fees to the U.S. Trustee and overseeing the closing of the Chapter 11 Cases; (dd) retaining, terminating, appointing, hiring, or otherwise employees, personnel, management, and directors at any of the Debtors to the extent necessary to carry out the purposes of the Plan Administrator Agreement and the Plan, including, without limitation, to address any disputes between the Debtors; (ee) exercising, implementing, enforcing, and discharging all of the terms, conditions, powers, duties, and other provisions of the Plan, the Confirmation Order, and the Plan Administrator Agreement; and (ff) taking all other actions consistent with the provisions of the Plan and the Plan Administrator Agreement that the Plan Administrator deems reasonably necessary or desirable to administer the Debtors and the Wind-Down Debtor. Further, on or prior to the Effective Date, the Wind-Down Debtor's organizational documents will be amended to prohibit the issuance of non-voting equity securities. Accordingly, the Plan satisfies the requirements of section 1123(a)(6) of the Bankruptcy Code.

<div align="center">(vii)      <strong>Directors and Officers—Section 1123(a)(7).</strong></div>

31.      The Plan satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code. Article IV.J of the Plan provides that, upon filing of the certificate of dissolution (or equivalent document), the Wind-Down Debtor will be dissolved. Article IV.H of the Plan provides for the formation of the Wind-Down Debtor for the benefit of the Wind-Down Debtor Beneficiaries. The Wind-Down Debtor shall be managed by the Plan Administrator and shall be subject to a Wind-Down Debtor Committee. The selection of the Plan Administrator by the Committee, in consultation with the Debtors, is consistent with the interests of Holders of Claims and Interests and public policy. The appointment of the Plan Administrator identified in the Plan Supplement

<div align="center">21</div>

is approved, and the Plan Administrator's duties shall commence as of the Effective Date. In accordance with the Plan Administrator Agreement, the Plan Administrator shall serve in such capacity through the earlier of (i) the date on which the Wind-Down Debtor is dissolved in accordance with the Plan Administrator Agreement, and (ii) the date on which the Plan Administrator resigns, is terminated, or is otherwise unable to serve; *provided*, *however*, that, in the event that the Plan Administrator resigns, is terminated, or is otherwise unable to serve, the Wind-Down Debtor Oversight Committee shall appoint a successor to serve as the Plan Administrator in accordance with the Plan Administrator Agreement. If the Wind-Down Debtor Oversight Committee does not appoint a successor within the time periods specified in the Plan Administrator Agreement, then the Court, upon the motion of any party-in-interest, including counsel to the Wind-Down Debtor, shall approve a successor to serve as the Plan Administrator. Accordingly, the Plan satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code.

(viii)      **Impairment / Unimpairment of Classes—Section 1123(b)(1).**

32.      The Plan is consistent with section 1123(b)(1) of the Bankruptcy Code. Article III of the Plan leaves each Class of Claims and Interests Impaired or Unimpaired.

(ix)      **Treatment of Executory Contracts and Unexpired Leases—Section 1123(b)(2).**

33.      The Plan is consistent with section 1123(b)(2) of the Bankruptcy Code. Article V of the Plan provides that, on the Effective Date, except as otherwise provided in the Plan, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired

22

A-844

Lease: (1) is specifically described in the Plan as to be assumed in connection with Confirmation of the Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement; (2) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Effective Date; (3) is to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, in connection with the Sale Transaction; (4) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; or (5) is a D&O Liability Insurance Policy other than the Side-A Policy. Each of the Debtors' determinations regarding the assumption and rejection of Executory Contracts and Unexpired Leases is based on and within the sound business judgment of the Debtors, is necessary to the implementation of the Plan, and is in the best interests of the Debtors, their Estates, Holders of Claims and Interests, and other parties in interest in these Chapter 11 Cases.

(x)     **Settlement, Releases, Exculpation, Injunction, and Preservation of Claims and Causes of Action—Section 1123(b)(3).**

34.     The Plan is consistent with section 1123(b)(3) of the Bankruptcy Code.  Except as otherwise provided in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies settled, compromised, satisfied, or otherwise resolved pursuant to the Plan.  The Plan is deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of this Confirmation Order constitutes the Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 of all such Claims, Interests, Causes of Action, and controversies, as well as a finding that such compromise and settlement is fair, equitable, reasonable, and in the best interests of the Debtors, their Estates, and Holders of Claims and Interests.  Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Interests in any Class are intended to be and shall be final.

(xi)     **Additional Plan Provisions—Section 1123(b)(6).**

35.     The other discretionary provisions of the Plan are appropriate and consistent with the applicable provisions of the Bankruptcy Code, thereby satisfying section 1123(b)(6) of the Bankruptcy Code.

**Q.     Debtor Compliance with the Bankruptcy Code—Section 1129(a)(2).**

36.     The Debtors have complied with the applicable provisions of the Bankruptcy Code, except as otherwise provided or permitted by orders of the Court, and thus,

24

A-846

satisfied the requirements of section 1129(a)(2) of the Bankruptcy Code. Specifically, each

Debtor:

> a. is an eligible debtor under section 109, and a proper proponent of the Plan under section 1121(a), of the Bankruptcy Code; and

> b. complied with the applicable provisions of the Bankruptcy Code, including sections 1125 and 1126, the Bankruptcy Rules, the Local Rules, any applicable nonbankruptcy law, rule and regulation, the Conditional Disclosure Statement Order, and all other applicable law, in transmitting the Solicitation Packages and related documents and notices, and in soliciting and tabulating the votes on the Plan.

**R.  Plan Proposed in Good Faith—Section 1129(a)(3).**

37.  The Plan satisfies the requirements of section 1129(a)(3) of the Bankruptcy Code.

The Debtors have proposed the Plan in good faith and not by any means forbidden by law. In so

determining, the Court has examined the totality of the circumstances surrounding the filing of

these Chapter 11 Cases, the Plan itself, the process leading to Confirmation, including the

support of Holders of Claims and Interests for the Plan, and the transactions to be implemented

pursuant thereto. These Chapter 11 Cases were filed, and the Plan was proposed, with the

legitimate purpose of allowing the Debtors to implement the Restructuring Transactions and

maximize the value of the Estates and the recoveries of Holders of Claims and Interests.

**S.  Payment for Services or Costs and Expenses—Section 1129(a)(4).**

38.  The procedures set forth in the Plan for the Court's review and ultimate

determination of the fees and expenses to be paid by the Debtors in connection with these

Chapter 11 Cases, or in connection with the Plan and incident to these Chapter 11 Cases, satisfy

the objectives of, and are in compliance with, section 1129(a)(4) of the Bankruptcy Code.

**T. Directors, Officers, and Insiders—Section 1129(a)(5).**

39. Because the Plan provides for the winding down and dissolution of the Debtors, section 1129(a)(5) of the Bankruptcy Code does not apply to the Debtors. To the extent section 1129(a)(5) applies to the Wind-Down Debtor, the requirements of this provision are satisfied by, among other things, disclosing the identity and terms of compensation of the Plan Administrator and the Wind-Down Debtor Oversight Committee.

**U. No Rate Changes—Section 1129(a)(6).**

40. Section 1129(a)(6) of the Bankruptcy Code is not applicable to these Chapter 11 Cases. The Plan does not propose any rate change subject to the jurisdiction of any governmental regulatory commission.

**V. Best Interest of Creditors—Section 1129(a)(7).**

41. The Plan is in the best interests of the Debtors' creditors and satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code. The liquidation analysis attached to the Disclosure Statement and the other evidence related thereto in support of the Plan that was proffered or adduced in the Declarations or at, prior to, or in connection with the Combined Hearing: (a) are reasonable, persuasive, credible, and accurate as of the dates such analysis or evidence was prepared, presented, or proffered; (b) utilize reasonable and appropriate methodologies and assumptions; (c) have not been controverted by other evidence; and (d) establish that Holders of Allowed Claims and Interests in each Class will recover at least as much under the Plan on account of such Claim or Interest, as of the Effective Date, as such Holder would receive if the Debtors were liquidated, on the Effective Date, under chapter 7 of the Bankruptcy Code.

26

W.      **Acceptance by Certain Classes—Section 1129(a)(8).**

42.      Class 1 (Secured Tax Claims) and Class 2 (Other Priority Claims) are Unimpaired under the Plan and are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Class 3 (Account Holder Claims), Class 4A (OpCo General Unsecured Claims), Class 4B (HoldCo General Unsecured Claims), and Class 4C (TopCo General Unsecured Claims) are impaired under the Plan and voted to accept the Plan.  Class 5 (Alameda Loan Facility Claims), Class 6 (Section 510(b) Claims), and Class 9 (Existing Equity Holders) are impaired under the Plan and are deemed to reject the Plan.  Because the Plan has not been accepted by the Deemed Rejecting Classes, the Debtors seek Confirmation under section 1129(b), solely with respect to the Deemed Rejecting Classes, rather than section 1129(a)(8) of the Bankruptcy Code.  Although section 1129(a)(8) has not been satisfied with respect to the Deemed Rejecting Classes, the Plan is confirmable because the Plan does not discriminate unfairly and is fair and equitable with respect to the Deemed Rejecting Classes and thus satisfies section 1129(b) of the Bankruptcy Code with respect to such Classes as described further below.  As a result, the requirements of section 1129(b) of the Bankruptcy Code are satisfied.

X.      **Treatment of Claims Entitled to Priority Under Section 507(a) of the Bankruptcy Code—Section 1129(a)(9).**

43.      The treatment of Allowed Administrative Claims, Allowed Professional Fee Claims, and Allowed Priority Tax Claims under Article II of the Plan, and of Allowed Other Priority Claims under Article III of the Plan, satisfies the requirements of, and complies in all respects with, section 1129(a)(9) of the Bankruptcy Code.

Y.      **Acceptance by At Least One Impaired Class—Section 1129(a)(10).**

44.      The Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code.  As evidenced by the Voting Report, the Voting Classes voted to accept the

27

A-849

Plan by the requisite numbers and amounts of Claims, determined without including any acceptance of the Plan by any insider (as that term is defined in section 101(31) of the Bankruptcy Code), specified under the Bankruptcy Code.

**Z.      Feasibility—Section 1129(a)(11).**

45.      The Plan satisfies section 1129(a)(11) of the Bankruptcy Code.  The evidence supporting the Plan proffered or adduced by the Debtors at or before the Combined Hearing: (a) is reasonable, persuasive, credible, and accurate as of the dates such evidence was prepared, presented, or proffered; (b) has not been controverted by other persuasive evidence; (c) establishes that the Plan is feasible and Confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization; (d) establishes that the Distribution Agent, or the Wind-Down Debtor, as applicable, will have sufficient funds available to meet their obligations under the Plan—including sufficient amounts of Cash, Cryptocurrency, or other consideration, as applicable, to reasonably ensure payment of, among other things, Allowed Administrative Claims, Allowed Professional Fee Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed Account Holder Claims, and Allowed General Unsecured Claims, as applicable, pursuant to the terms of the Plan and in accordance with section 507(a) of the Bankruptcy Code; and (e) establishes that the Wind-Down Debtor will have the financial wherewithal to satisfy their obligations following the Effective Date.

**AA.      Payment of Statutory Fees—Section 1129(a)(12).**

46.      The Plan satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code.  Article XII.C of the Plan provides for the payment of all fees due and payable under 28 U.S.C. § 1930 by each of the Wind-Down Debtor (or the Distribution Agent on behalf of the Wind-Down Debtor).

28

**BB.** **Continuation of Employee Benefits—Section 1129(a)(13).**

47.     The Debtors do not have any remaining obligations to pay retiree benefits (as defined in section 1114 of the Bankruptcy Code). Therefore, section 1129(a)(13) of the Bankruptcy Code is inapplicable to these Chapter 11 Cases or the Plan.

**CC.** **Non-Applicability of Certain Sections—Sections 1129(a)(14), (15), and (16).**

48.     Sections 1129(a)(14), 1129(a)(15), and 1129(a)(16) of the Bankruptcy Code do not apply to these Chapter 11 Cases. The Debtors owe no domestic support obligations, are not individuals, and are not nonprofit corporations.

**DD.** **"Cram Down" Requirements—Section 1129(b).**

49.     The Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code. Notwithstanding the fact that the Deemed Rejecting Classes have not accepted the Plan, the Plan may be confirmed pursuant to section 1129(b)(1) of the Bankruptcy Code. *First*, all of the requirements of section 1129(a) of the Bankruptcy Code other than section 1129(a)(8) have been met. *Second*, the Plan is fair and equitable with respect to Class 5 (Alameda Loan Facility Claims), Class 6 (Section 510(b) Claims), and Class 9 (Existing Equity Interests). The Plan has been proposed in good faith, is reasonable, and meets the requirements that (a) no Holder of any Claim or Interest that is junior to each such Class will receive or retain any property under the Plan on account of such junior Claim or Interest, and (b) no Holder of a Claim or Interest in a Class senior to such Classes is receiving more than payment in full on account of its Claim or Interest. Specifically, to the extent Class 8 (Intercompany Interests) are Reinstated, such treatment is provided for administrative convenience and efficiency, and not on account of such Interests, and will not alter the treatment provided for any other Holder of any Claim or Interest. Further, Class 7 (Intercompany Claims) will receive the treatment as determined by the Court.

29

A-851

Accordingly, the Plan is fair and equitable towards all Holders of Claims and Interests in the Deemed Rejecting Classes. *Third*, the Plan does not discriminate unfairly with respect to the Deemed Rejecting Classes because similarly situated Claim and Interest Holders will receive substantially similar treatment on account of their Claims or Interests, as applicable, in such class. Therefore, the Plan may be confirmed despite the fact that not all Impaired Classes have voted to accept the Plan.

### EE. Only One Plan—Section 1129(c).

50. The Plan satisfies the requirements of section 1129(c) of the Bankruptcy Code. The Plan is the only chapter 11 plan filed in each of these Chapter 11 Cases.

### FF. Principal Purpose of the Plan—Section 1129(d).

51. The Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code. The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act.

### GG. Not Small Business Cases—Section 1129(e).

52. The Chapter 11 Cases are not small business cases and, accordingly, section 1129(e) of the Bankruptcy Code does not apply to the Chapter 11 Cases.

### HH. Good Faith Solicitation—Section 1125(e).

53. The Debtors have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code and in compliance with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules in connection with all of their respective activities relating to support and consummation of the Plan, including the solicitation and receipt of acceptances of the Plan, and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code.

## II.      Satisfaction of Confirmation Requirements.

54.      Based on the foregoing, the Plan satisfies the requirements for Confirmation set forth in section 1129 of the Bankruptcy Code.

## JJ.      Likelihood of Satisfaction of Conditions Precedent to the Effective Date.

55.      Each of the conditions precedent to the Effective Date, as set forth in Article IX.A of the Plan, has been or is reasonably likely to be satisfied or, as applicable, waived in accordance with Article IX.B of the Plan.

## KK.      Implementation.

56.      All documents and agreements necessary to implement the transactions contemplated by the Plan, including those contained or summarized in the Plan Supplement, and all other relevant and necessary documents (including the Asset Purchase Agreement) have been negotiated in good faith and at arm's length, are in the best interests of the Debtors, and shall, upon completion of documentation and execution, be valid, binding, and enforceable agreements and shall not be in conflict with any federal, state, or local law.  The Debtors are authorized to take any action reasonably necessary or appropriate to consummate such agreements and the transactions contemplated thereby.

## LL.      Executory Contracts and Unexpired Leases.

57.      The Debtors' decisions to assume or reject certain Executory Contracts and Unexpired Leases, as provided in Article V of the Plan and in the Plan Supplement, are reasonable exercises of the Debtors' business judgment.  The Debtors have demonstrated adequate assurance of future performance of the assumed Executory Contracts and Unexpired Leases within the meaning of section 365(b)(1)(C) of the Bankruptcy Code by the Wind-Down Debtor.

58.     Except with respect to the Executory Contracts and Unexpired Leases discussed in the following paragraph of this Confirmation Order, the amounts set forth in the Plan Supplement (the "Cure Amounts") are the sole amounts necessary to be paid upon assumption of the associated Executory Contracts and Unexpired Leases under section 365(b)(1)(A) and (B) of the Bankruptcy Code, and the payment of such amounts will effect a cure of all defaults existing under such Executory Contracts and Unexpired Leases and compensate the counterparties to such Executory Contracts and Unexpired Leases for any actual pecuniary loss resulting from all defaults existing under such Executory Contracts and Unexpired Leases as of the Effective Date.

59.     The objections of counterparties to the assumption of their Executory Contracts and Unexpired Leases, to the extent that such objection was timely raised in accordance with Article V.C of the Plan, are preserved and will be considered by the Court at a date and time to be scheduled.  As provided in the Conditional Disclosure Statement Order and the Solicitation Packages, the Debtors and the Wind-Down Debtor have reserved the right to (a) add any Executory Contract or Unexpired Lease to the Assumed Contract Schedule and assume such Executory Contract or Unexpired Lease pursuant to the terms of the Plan, or remove any Executory Contract or Unexpired Lease from the Assumed Contract Schedule, in each case, up until the Effective Date and (b) contest any Claim asserted in connection with rejection of any Executory Contract or Unexpired Lease.

**MM.  Disclosure of Facts.**

60.     The Debtors have disclosed all material facts regarding the Plan, including with respect to consummation of the Sale Transaction and the Liquidation Transaction, as applicable.

**NN. Appropriate Exercise of Business Judgment.**

61.     The Debtors' decision to effectuate the Sale Transaction or the Liquidation Transaction, as applicable, is an appropriate exercise of their business judgment.

**OO. Good Faith.**

62.     The Debtors, the Released Parties, and the Releasing Parties have been and will be acting in good faith if they proceed to: (a) consummate the Plan and the agreements, settlements, transactions, and transfers contemplated thereby; and (b) take the actions authorized and directed by this Confirmation Order to wind-down the Debtors' businesses and effect the Sale Transaction or the Liquidation Transaction, as applicable, and the other Restructuring Transactions. The Released Parties have made a substantial contribution to these Chapter 11 Cases.

**PP. Essential Elements of the Plan.**

63.     The Sale Transaction is an essential element of the Plan, and consummation of the Sale Transaction is in the best interests of the Debtors, their estates, and their creditors. The Debtors have exercised sound business judgment in selecting the Purchaser and the Debtors have done so without collusion and in good faith. The Purchaser is consummating the Sale Transaction in good faith and is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code. The Purchaser has proceeded in good faith and without collusion in all respects in connection with the Sale Transaction. The Purchaser is therefore entitled to all of the protections afforded under section 363(m) of the Bankruptcy Code, and the Sale Transaction, to the extent consummated, may not be avoided pursuant to section 363(n) of the Bankruptcy Code.

64.     The Debtors' marketing process with respect to the Sale Transaction afforded a full, fair, and reasonable opportunity for any party to make a higher or otherwise better offer. No

other party or parties has offered to purchase the Acquired Assets for greater overall value to the Debtors' Estates than the Purchaser. The Asset Purchase Agreement will provide a greater recovery for the Debtors' Estates than would be provided by any other available alternative. The Debtors' determination that the Sale Transaction is the most value-maximizing transaction is a valid and sound exercise of the Debtors' business judgment. Consummation of the Sale Transaction is in the best interests of the Debtors' Estates, their creditors, and other parties in interest.

65.    The consideration provided by the Purchaser pursuant to the Asset Purchase Agreement (a) is fair and reasonable, (b) constitutes the best offer for the Acquired Assets, and (c) constitutes reasonably equivalent value (as those terms are defined in each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, and section 548 of the Bankruptcy Code) and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.

66.    The Purchaser is not a mere continuation or substantial continuation of the Debtors or their Estates and there is no continuity of enterprise or common identity between the Purchaser and any of the Debtors. The Purchaser is not holding itself out to the public as a continuation of any of the Debtors. The Purchaser is not a successor to the Debtors or their Estates by reason of any theory of law or equity, and the Sale Transaction does not amount to a consolidation, merger, or de facto merger of the Purchaser with or into any of the Debtors. The Purchaser has entered into the Asset Purchase Agreement in material reliance on and with fair consideration provided for the Sale Transaction being free and clear of all claims and interests relating to the Debtors arising prior to the closing of the Sale Transaction, including any successor or vicarious liabilities of any kind or nature, as set forth herein and in the Asset

Purchase Agreement, and would not have entered into the Asset Purchase Agreement or the Sale
Transaction without such terms and the findings herein.

67.     The conditions of section 363(f) of the Bankruptcy Code have been satisfied in
full; therefore, the Debtors may sell, and upon the Closing of the Sale Transaction shall be
deemed to have sold, assets and property pursuant to the Asset Purchase Agreement free and
clear of any claims, liens, encumbrances, or other interests of any kind or nature whatsoever
other than as expressly provided under the Asset Purchase Agreement.  In addition to and
without limiting the foregoing, the proposed Sale Transaction is to be consummated under the
Plan, and the assets and property to be sold pursuant to the Sale Transaction are dealt with by the
Plan; therefore, except as expressly provided under the Asset Purchase Agreement, the Debtors
may sell, and upon the Closing of the Sale Transaction shall be deemed to have sold, assets and
property pursuant to the Asset Purchase Agreement free and clear of any claims, liens,
encumbrances, or other interests of any kind or nature whatsoever pursuant to section 1141(c) of
the Bankruptcy Code.

68.     The Debtors may sell, and upon the Closing of the Sale Transaction shall be
deemed to have sold, such assets free and clear of all claims, liens, encumbrances, and other
interests of any kind or nature whatsoever (other than as expressly permitted under the Asset
Purchase Agreement) because, in each case, one or more of the standards set forth in sections
363(f)(l)–(5), 1129(b)(2)(A)(ii), 1141(a), or 1141(c) of the Bankruptcy Code has been satisfied.
All holders of such claims, liens, encumbrances, or other interests against the Debtors, their
Estates, or any of the assets subject to the Sale Transaction (a) who did not object, or who
withdrew their objections, to the Sale Transaction are deemed to have consented pursuant to
section 363(f)(2) of the Bankruptcy Code and (b) are bound by the Plan pursuant to section

35

1141(a) of the Bankruptcy Code. All holders of such claims, liens, encumbrances, or other interests are adequately protected by having their claims, liens, encumbrances, or other interests, if any, in each instance against the Debtors, their Estates, or any of the assets subject to the Sale Transaction, attach to the proceeds of the Sale Transaction ultimately attributable to the assets in which such creditor alleges a claim, lien, encumbrance, or other interest, in the same order of priority, with the same validity, force, and effect that such claim, lien, encumbrance, or other interest had prior to consummation of the Sale Transaction, subject to any claims and defenses the Debtors and their Estates may possess with respect thereto, and with such claims, liens, encumbrances, or other interests being treated in accordance with the Plan.

69.     Article VIII.A of the Plan describes certain releases granted by the Debtors, the Wind-Down Debtor, and the Debtors' and the Wind-Down Debtor's Estates (the "Debtor Release"). The Debtors have satisfied the business judgment standard with respect to the propriety of the Debtor Release. Such release is a necessary and integral element of the Plan, and is fair, reasonable, and in the best interests of the Debtors, the Debtors' Estates, and Holders of Claims and Interests. The Debtors', the Wind-Down Debtor's and their Estates' pursuit of any such claims against the Released Parties is not in the best interests of the Estates' various constituencies because the costs involved would likely outweigh any potential benefit from pursuing such claims. Additionally, including for the reasons set forth in the Declarations, the Debtor Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties following extensive, arm's-length negotiations between sophisticated parties represented by able counsel; (b) a good-faith settlement and compromise of such Causes of Action released by the Debtor Release, which bore a substantial likelihood of complex and protracted litigation, with attendant expense, inconvenience, and delay; (c) in the best interests of

36

A-858

the Debtors and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given

and made after due notice and opportunity for hearing; (f) a sound exercise of the Debtors'

business judgment; and (g) except to the extent contemplated by Article IV.F of the Plan, a bar

to any of the Debtors, the Wind-Down Debtor or their Estates asserting any Cause of Action

related thereto, of any kind, against any of the Released Parties or their property.

70.    Article IV.G of the Plan describes the D&O Settlement.  The D&O Settlement

constitutes a good-faith compromise and settlement of all Claims, Causes of Action, disputes,

and controversies released, settled, compromised, or otherwise resolved between the Debtors and

the CEO and CCO.  The D&O Settlement is fair, equitable, and reasonable and in the best

interests of the Debtors, their Estates, and Holders of Claims and Interests.

71.    Article VIII.B of the Plan describes certain releases granted by the

Releasing Parties (the "Third-Party Release").  The Third-Party Release provides finality for the

Debtors, the Wind-Down Debtor, and the other Released Parties.  The Third-Party Release is

consensual with respect to the Releasing Parties.  The Combined Hearing Notice sent to Holders

of Claims and Interests and published in *The New York Times* (National Edition) and the

*Financial Times* (International Edition) on February 3, 2023, and the ballots and notices, as

applicable, sent to Holders of Claims and Interests unambiguously stated that the Plan contains

the Third-Party Release and that each Holder of Claims or Interests may elect not to grant such

Third-Party Release.  Such release provisions of the Plan were conspicuous, emphasized with

boldface type in the Plan, the Disclosure Statement, and the ballots and notices.  Among other

things, the Plan provides appropriate and specific disclosure with respect to the claims and

Causes of Action that are subject to the Third-Party Release, and no other disclosure or notice is

necessary.  The Third-Party Release is a necessary and integral element of the Plan, and is fair,

equitable, reasonable, and in the best interests of the Debtors, the Debtors' Estates, and all Holders of Claims and Interests. Also, the Third-Party Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good-faith settlement and compromise of such the Claims released by the Third-Party Releases; (c) in the best interests of the Debtors and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; (f) a sound exercise of the Debtors' business judgment; and (g) except to the extent contemplated by Article IV.E and Article IV.F of the Plan, a bar to any of the Debtors or Wind-Down Debtor or their respective Estates asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

72.     The Third-Party Releases are consensual and those Holders of Claims and Interests who are bound by the Third-Party Releases voluntarily opted-in to the Third-Party Releases. The Plan does not release any third party's direct claims against non-Debtors (to the extent such direct claims exist) without such third party's express consent. Holders of Claims and Interests also had the ability to affirmatively elect to "contribute" their claims to the Wind-Down Debtor and vest the Wind-Down Debtor with authority to pursue such claims against the Debtors.

73.     The exculpation described in Article VIII.C of the Plan (the "Exculpation") is appropriate under applicable law because it was proposed in good faith, was formulated following extensive good-faith, arm's-length negotiations with key constituents, and is appropriately limited in scope. Without limiting anything in the Exculpation, each Exculpated Party has participated in these Chapter 11 Cases in good faith and, except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each

38

A-860

Exculpated Party is hereby released and exculpated as set forth in the Plan; *provided* that the foregoing "Exculpation" shall have no effect on the liability of any entity that results from any such act or omission that is determined by a Final Order to have constituted actual fraud, gross negligence, or willful misconduct, but in all respects such entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have participated in any and all activities potentially underlying any Exculpated Claim in good faith and in compliance with the applicable laws. The Exculpation, including its carve-out for actual fraud, gross negligence, or willful misconduct, is consistent with established practice in this jurisdiction and others.

74. The injunction provision set forth in Article VIII.D of the Plan is necessary to prevent interference with the payment of Claims and Interests in the manner set forth in the Plan and is narrowly tailored to achieve these purposes.

75. Article IV.P of the Plan provides that, in accordance with section 1123(b)(3) of the Bankruptcy Code, any Cause of Action that a Debtor may hold against any Entity shall vest in the Wind-Down Debtor, except as otherwise provided in the Plan, including Article VIII of the Plan. The Wind-Down Debtor, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Wind-Down Debtor shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Court in accordance with the Plan. The provisions regarding the preservation of Causes of Action in the Plan,

including the Plan Supplement, are appropriate, fair, equitable, and reasonable, and are in the best interests of the Debtors, the Debtors' estates, and Holders of Claims and Interests.

76.     The full release and discharge of all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates described in Article VIII.E of the Plan (the "Lien Release") is necessary to implement the Plan.  The provisions of the Lien Release are appropriate, fair, equitable, and reasonable and are in the best interests of the Debtors, the Debtors' estates, and Holders of Claims and Interests.

## ORDER

BASED ON THE FOREGOING FINDINGS OF FACT AND CONCLUSIONS OF LAW, IT IS ORDERED, ADJUDGED, DECREED, AND DETERMINED THAT:

77.     **Findings of Fact and Conclusions of Law.**  The above-referenced findings of fact and conclusions of law are hereby incorporated by reference as though fully set forth herein and constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable herein by Bankruptcy Rule 9014.  To the extent that any finding of fact is determined to be a conclusion of law, it is deemed so, and vice versa.

78.     **Approval of the Disclosure Statement.**   The Disclosure Statement, the Solicitation Packages, and the Solicitation Procedures are approved on a final basis pursuant to section 1125 of the Bankruptcy Code.

79.     **Solicitation.**   To the extent applicable, the solicitation of votes on the Plan complied with sections 1125 and 1126 of the Bankruptcy Code, Bankruptcy Rules 3017 and 3018, all other provisions of the Bankruptcy Code, and all other applicable rules, laws, and regulations, and was appropriate and satisfactory and is approved in all respects.

80. **Notice of Combined Hearing.** The Notice of Combined Hearing was appropriate and satisfactory and is approved in all respects.

81. **Confirmation of the Plan.** The Plan is approved in its entirety and CONFIRMED under section 1129 of the Bankruptcy Code. The terms of the Plan, including the Plan Supplement, are incorporated by reference into and are an integral part of this Confirmation Order.

82. **Objections.** All objections and all reservations of rights pertaining to Confirmation of the Plan and approval of the Disclosure Statement that have not been withdrawn, waived, or consensually resolved are overruled on the merits unless otherwise indicated in this Confirmation Order. All withdrawn objections, if any, are deemed withdrawn with prejudice. All objections to approval of the Disclosure Statement and Confirmation of the Plan not filed and served prior to the Objection Deadline, if any, are deemed waived and shall not be considered by the Court.

83. All parties have had a full and fair opportunity to litigate all issues raised or that might have been raised in the objections to approval of the Disclosure Statement and Confirmation of the Plan, and the objections have been fully and fairly litigated or resolved, including by agreed-upon reservations of rights as set forth in this Confirmation Order.

84. **Plan Modifications.** The Plan Modifications do not materially adversely affect the treatment of any Claim against or Interest in any of the Debtors under the Plan, and are hereby approved pursuant to section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019. After giving effect to the Plan Modifications, the Plan continues to meet the requirements of sections 1122 and 1123 of the Bankruptcy Code. The filing with the Court on February 28, 2023 of the modifications to the Plan and the disclosure of any additional Plan Modifications on the

41

A-863

record at the Combined Hearing constitute due and sufficient notice thereof. Accordingly, pursuant to section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019, the Plan Modifications do not require additional disclosure under section 1125 of the Bankruptcy Code or resolicitation of votes under section 1126 of the Bankruptcy Code, nor do they require that holders of Claims be afforded an opportunity to change previously cast acceptances or rejections of the Plan.

85. **Deemed Acceptance of Plan.** In accordance with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, all Holders of Claims and Interests who voted to accept the Plan or who are conclusively presumed to accept the Plan are deemed to have accepted the Plan, as modified by the Plan Modifications. No Holder of a Claim or Interest shall be permitted to change its vote as a consequence of the Plan Modifications.

86. **Restructuring Transactions**. On or before the Effective Date, the applicable Debtors will take any action as may be necessary or advisable to effectuate the Restructuring Transactions described in the Plan, the Restructuring Transactions Memorandum, and the Customer Onboarding Protocol, including: (a) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (d) the transfer or distribution of any Cryptocurrency or Cash pursuant to the Asset Purchase Agreement and the Plan, as applicable;

(e) the execution and delivery of the Plan Administrator Agreement; (f) any transactions necessary or appropriate to form the Wind-Down Debtor; (g) such other transactions that are required to effectuate the Restructuring Transactions, including any sales, mergers, consolidations, restructurings, conversions, dispositions, transfers, formations, organizations, dissolutions, or liquidations; (h) all transactions necessary to provide for the purchase of the Acquired Assets by Purchaser under the Asset Purchase Agreement; and (i) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

87.     This Confirmation Order shall, and shall be deemed to, pursuant to sections 1123 and 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions, as applicable, the Sale Transaction, and the Liquidation Transaction, as applicable. and the Restructuring Transactions, including, for the avoidance of doubt, entry into any agreements following the Confirmation Date by the Debtors, the Purchaser, and any of the Unsupported Jurisdictions in connection with Distributions contemplated to be made by Purchaser to Users and Eligible Creditors (as such terms are defined in the Asset Purchase Agreement) located in Unsupported Jurisdictions, pursuant to and in accordance with the Plan and the Asset Purchase Agreement.

88.     **The Sale Transaction.** The Sale Transaction and the Asset Purchase Agreement, all other ancillary documents, and all of the terms and conditions thereof, are hereby approved, pursuant to sections 105, 363, 364, and 554 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6004, and 9014, each as applicable.  Entry of this Confirmation Order shall authorize the Debtors, the Purchaser, and the Wind-Down Debtor, as applicable, to undertake the transactions

43

contemplated by the Asset Purchase Agreement, as applicable, including pursuant to sections 363, 365, 1123(a)(5)(B), and 1123(a)(5)(D) of the Bankruptcy Code.

89.  Pursuant to sections 363(b) and (f) of the Bankruptcy Code, the Debtors are authorized and empowered to take any and all actions necessary or appropriate to (a) consummate the Sale Transaction pursuant to and in accordance with the terms and conditions of the Asset Purchase Agreement, (b) close the Sale Transaction as contemplated in the Asset Purchase Agreement, and (c) execute and deliver, perform under, consummate, implement, and fully close the Asset Purchase Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Asset Purchase Agreement and the Sale Transaction.

90.  Subject to the restrictions set forth in this Confirmation Order, the Plan, and the Asset Purchase Agreement, the Debtors and the Purchaser hereby are authorized to take any and all actions as may be necessary or desirable, including any actions that otherwise would require further approval by shareholders, members, or its board of directors, as the case may be, without the need of obtaining such approvals, to implement the Sale Transaction, and any actions taken by the Debtors or the Purchaser necessary or desirable to implement the Sale Transaction prior to the date of this Confirmation Order, hereby are approved and ratified.

91.  This Confirmation Order and the terms and provisions of the Asset Purchase Agreement shall be binding in all respects upon the Debtors, their affiliates, their estates, all creditors of and holders of equity interests in any Debtor, any holders of Liens, Claims, or other interests (whether known or unknown) in, against, or on all or any portion of the Acquired Assets, all counterparties to any executory contract or unexpired lease of the Debtors, the Purchaser and all successors and assigns of the Purchaser, the Acquired Assets, and any trustees,

44

A-866

examiners, or receivers, if any, subsequently appointed in any of the Debtors' chapter 11 cases or upon a conversion to chapter 7 under the Bankruptcy Code of any of the Debtors' cases. This Confirmation Order and the Asset Purchase Agreement shall inure to the benefit of the Debtors, their estates and creditors, the Purchaser, and the respective successors and assigns of each of the foregoing.

92.      Pursuant to sections 105(a), 363(b), 363(f), 365(b) and 365(f) of the Bankruptcy Code, the Debtors are authorized to transfer the Acquired Assets in accordance with the terms of the Asset Purchase Agreement and such transfer shall constitute a legal, valid, binding, and effective sale of the Acquired Assets and shall vest Purchaser with title to the Acquired Assets subject to the Asset Purchase Agreement, and the Acquired Assets shall be free and clear of all Liens, Claims, Encumbrances, and other interests of any kind or nature whatsoever (other than as expressly permitted under the Asset Purchase Agreement), with all such Liens, Claims, or other interests to attach to the cash proceeds of the Purchase Price ultimately attributable to the property against or in which such Liens, Claims, or other interests are asserted, subject to the terms thereof, with the same validity, force, and effect, and in the same order of priority, which such Liens, Claims, or other interests had prior to the Transaction, subject to any rights, claims, and defenses the Debtors or their estates, as applicable, may possess with respect thereto.

93.      The sale of the Acquired Assets to the Purchaser pursuant to the Asset Purchase Agreement and the consummation of the transactions contemplated by the Asset Purchase Agreement do not require any consents other than as specifically provided for in the Asset Purchase Agreement. Each and every federal, state, and local governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement. A

45

certified copy of this Confirmation Order may be filed with the appropriate clerk or recorded

with the recorder of any state, county, or local authority to act to cancel any of the Liens, Claims,

and other encumbrances of record.

94.     If any person or entity that has filed statements or other documents evidencing

Claims or Liens on, or interests in, all or any portion of the Acquired Assets shall not have

delivered to the Debtors, in proper form for filing and executed by the appropriate parties,

termination statements, instruments of satisfaction, releases of liens and easements, and any

other documents necessary for the purpose of documenting the release of all Claims, Liens, or

interests which the person or entity has or may assert with respect to all or any portion of the

Acquired Assets, the Debtors are hereby authorized, and the Purchaser is hereby authorized, on

behalf of the Debtors and the Debtors' creditors, to execute and file such statements,

instruments, releases and other documents on behalf of such person or entity with respect to the

Acquired Assets.  The Debtors and the Purchaser are each authorized to file a copy of this

Confirmation Order, which, upon filing, shall be conclusive evidence of the release and

termination of such Claim, Lien or interest.

95.     This Confirmation Order is and shall be binding upon and govern the acts of all

persons and entities, including, without limitation, all filing agents, filing officers, title agents,

title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative

agencies, governmental departments, secretaries of state, federal, state, and local officials, and

all other persons and entities who may be required by operation of law, the duties of their office,

or contract, to accept, file, register, or otherwise record or release any documents or instruments;

and each of the foregoing persons and entities is hereby directed to accept for filing any and all

A-868

of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement.

96.     All persons and entities that are presently, or on the Closing may be, in possession of some or all of the Acquired Assets pursuant to the Asset Purchase Agreement are hereby directed to surrender possession of the Acquired Assets to the Purchaser unless such person or entity was a good faith, bona fide purchaser of the Acquired Assets without notice of the Debtors' rights in such property.  Subject to the terms, conditions, and provisions of this Confirmation Order, all persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtors to sell and/or transfer the Acquired Assets to the Purchaser in accordance with the terms of the Asset Purchase Agreement and this Confirmation Order.

97.     Except as otherwise permitted by the Asset Purchase Agreement, the Plan, or this Confirmation Order, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, trade creditors, litigation claimants, and other creditors, holding Liens, Claims, or other interests of any kind or nature whatsoever against or in all or any portion of the Acquired Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinate), arising under or out of, in connection with, or in any way relating to the Debtors, the Acquired Assets, the operation of the Debtors' business prior to the closing of the Sale Transaction, or the transfer of the Acquired Assets to the Purchaser, hereby are forever barred, estopped and permanently enjoined from asserting against the Purchaser, any of the foregoing's affiliates, successors, or assigns, their property or the Acquired Assets, such persons' or entities' Liens, Claims, or interests in and to the Acquired

A-869

Assets, including, without limitation, the following actions: (a) commencing or continuing in any manner any action or other proceeding against the Purchaser and each of its affiliates, successors, assets or properties; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against the Purchaser and each of its affiliates, successors, assets, or properties; (c) creating, perfecting, or enforcing any Lien or other Claim against the Purchaser and each of its affiliates, successors, assets, or properties; (d) asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due the Purchaser, its affiliates or its successors; or (e) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Confirmation Order, or the agreements or actions contemplated or taken in respect thereof.

98.     All persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtors to sell and transfer the Acquired Assets to the Purchaser in accordance with the terms of the Asset Purchase Agreement, the Plan, and this Confirmation Order.

99.     Purchaser shall have no Liability (as defined in the Asset Purchase Agreement) for any Excluded Liability, and, other than as expressly set forth in the Asset Purchase Agreement, Purchaser is not assuming, by virtue of the consummation of the Sale Transaction, nor shall the Purchaser be liable or responsible for, as a successor or otherwise (including under any theory of successor or vicarious liability of any kind or character or any other theory of law or equity, including any theory of antirust, environmental successor or transferee liability, labor law, *de facto* merger, or substantial continuity (including under applicable Money Transmitter Requirements or any securities or commodities Laws of any Governmental Body)):

48

(i)     any Liability (as defined in the Asset Purchase Agreement), debts, commitments, or obligations of the Debtors or any of their predecessors or affiliates or any obligations of the Debtors or their predecessors or affiliates, in all cases whether known or unknown, disclosed or undisclosed, now existing or hereafter arising, asserted or unasserted, fixed or contingent, choate or inchoate, liquidated or unliquidated, and in all cases to the extent relating to or arising from, in any way whatsoever, the Acquired Assets or the Debtors' operation of their businesses or use of the Acquired Assets or any such liabilities, debts, commitments, or obligations that in any way whatsoever are to be observed, paid, satisfied, compromised, or performed (in each case, including any liabilities that result from, relate to or arise out of tort or product liability claims), or

(ii)    any Liability (as defined in the Asset Purchase Agreement) calculable by reference to the Debtors or their assets or operations, or relating to the operation of the Debtors' businesses prior to the Closing of the Sale Transaction, or relating to continuing conditions existing, including with respect to any of Debtors' predecessors or affiliates, which liabilities, debts, commitments, and obligations are hereby extinguished insofar as they may give rise to successor liability, without regard to whether the claimant asserting any such liabilities, debts, commitments, or obligations has delivered to the Purchaser a release thereof.

A-871

For the avoidance of doubt, (i) nothing herein shall release the Purchaser with respect to its obligations as Distribution Agent of Cryptocurrency and Cash to Holders of Account Holder Claims and OpCo General Unsecured Creditor Claims as provided in, and subject to the terms and conditions of, the Asset Purchase Agreement and the Plan, and (ii) notwithstanding the transfer to Purchaser, pursuant to the Asset Purchase Agreement, of any Acquired Assets that constitute Coins or Cash, each User and Eligible Creditor shall retain, from and after the Closing of the Sale Transaction, all right, title, and interest in and to such Coins and Cash allocated to it on the Binance.US Platform in accordance with the Asset Purchase Agreement (notwithstanding any terms and conditions of the Binance.US Platform to the contrary, if any) through and including such time as such Coins and Cash are returned or distributed to Seller or such User and Eligible Creditor, as applicable, and such Coins and Cash shall be held by Purchaser solely in a custodial capacity in trust and solely for the benefit of Seller or the applicable User or Eligible Creditor.

100.    The Asset Purchase Agreement and any related documents or other instruments may be modified, amended, or supplemented by the parties thereto and in accordance with the terms thereof, without further order of the Court.

101.    Paragraphs 88–100 of this Confirmation Order shall be deemed to be excised from this Confirmation Order in the event that the Asset Purchase Agreement is terminated prior

50

to Closing. For the avoidance of doubt, subject to the requirements set forth in the Asset Purchase Agreement (including, without limitation, Sections 6.22 and 5.2(c) thereof), the Debtors may exercise the "fiduciary out" in Section 8.1(g) of the Asset Purchase Agreement at any time prior to Closing.

102.     **Corporate Action.** Upon the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, directors, managers, managing-members, limited or general partners, or officers of the Debtors, the Wind-Down Debtor, or any other Entity.

103.     All matters provided for in the Plan involving the corporate structure of the Debtors or the Wind-Down Debtor, as applicable, and any corporate action required by the Debtors or the Wind-Down Debtor, as applicable, in connection with the Plan shall be deemed to have occurred on, and shall be in effect as of, the Effective Date, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Wind-Down Debtor, as applicable. On or, as applicable, prior to the Effective Date, the appropriate officers of the Debtors or the Wind-Down Debtor, as applicable, shall be authorized and, as applicable, directed to issue, execute, and deliver the agreements, documents, certificates of incorporation, certificates of formation, bylaws, operating agreements, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Wind-Down Debtor, and any and all other agreements, documents, and instruments relating to the foregoing. The authorizations and approvals contemplated by Article IV.J of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

104.     As soon as practicable after the Effective Date, the Wind-Down Debtor shall take
such actions as the Wind-Down Debtor may determine to be necessary or desirable to carry out
the purposes of the Plan.  Any certificate of dissolution or equivalent document may be executed
by the Wind-Down Debtor on behalf of any Wind-Down Debtor without need for any action or
approval by the shareholders or board of directors or managers of such Debtor.  On and after the
Effective Date, the Debtors or the Wind-Down Debtor (1) for all purposes shall be deemed to
have withdrawn their business operations from any state in which the Debtors were previously
conducting, or are registered or licensed to conduct, their business operations, and shall not be
required to file any document, pay any sum, or take any other action in order to effectuate such
withdrawal, (2) shall be deemed to have cancelled pursuant to the Plan all Interests, and (3) shall
not be liable in any manner to any taxing authority for franchise, business, license, or similar
taxes accruing on or after the Effective Date.  Pursuant to the terms of the Plan, any Money
Transmitter Licenses that have not been terminated shall be deemed withdrawn and no further
action is required to be taken by the Debtors or the Wind-Down Debtor to effectuate such
withdrawal; *provided* that, following the Effective Date, the Debtors or the Wind-Down Debtor,
as applicable, shall use commercially reasonable efforts to comply with all state banking
department requirements for the surrender of a Money Transmitter License.  Notwithstanding
such Debtors' dissolution, such Debtors shall be deemed to remain intact solely with respect to
the preparation, filing, review, and resolution of applications for Professional Fee Claims.

105.     **Binding Effect.**  Upon the occurrence of the Effective Date, the terms of the Plan
are immediately effective and enforceable and deemed binding on the Debtors, the Wind-Down
Debtor, any and all Holders of Claims or Interests (regardless of whether such Holders of Claims
or Interests have, or are deemed to have, accepted the Plan), all Entities that are parties to or are

subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan or this Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors. All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

106.    Pursuant to section 1141 of the Bankruptcy Code, subject to the occurrence of the Effective Date and subject to the terms of the Plan and this Confirmation Order, all prior orders entered in these Chapter 11 Cases and all documents and agreements executed by the Debtors as authorized and directed thereunder as of the Effective Date shall be binding upon and shall inure to the benefit of the Debtors, the Purchaser, or the Wind-Down Debtor, as applicable, and their respective successors and assigns.

107.    **Vesting of Assets.** Except as otherwise provided in the Plan, this Confirmation Order, the Asset Purchase Agreement, the Schedule of Retained Causes of Action, or in any agreement, instrument, or other documented incorporated herein or therein, or in any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, notwithstanding any prohibition of assignability under applicable non-bankruptcy law and in accordance with section 1141 of the Bankruptcy Code, on the Effective Date, all property constituting Wind-Down Debtor Assets, including all Vested Causes of Action of the Debtors (unless otherwise released, waived, compromised, settled, satisfied, or transferred pursuant to the Plan) shall vest in the Wind-Down Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.

108.    Prior to the Effective Date, any and all of the Debtors' assets shall remain assets of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and on the Effective

Date the Wind-Down Debtor Assets shall, subject to the Plan Administrator Agreement, be transferred to and vest in the Wind-Down Debtor. For the avoidance of doubt, to the extent not otherwise waived in writing, released, settled, compromised, assigned, or sold pursuant to a prior order or the Plan, the Plan Administrator specifically retains and reserves the right to assert, after the Effective Date, any and all of the Vested Causes of Action and related rights, whether or not asserted as of the Effective Date, and all proceeds of the foregoing, subject to the terms of the Plan, including without limitation Article IV.F.

109. Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, only the Wind-Down Debtor and the Plan Administrator shall have the right to pursue or not to pursue, or, subject to the terms hereof and the Plan Administrator Agreement, compromise or settle any Wind-Down Debtor Assets transferred to the Wind-Down Debtor. On and after the Effective Date, the Wind-Down Debtor and the Plan Administrator may, without further Court approval, commence, litigate, and settle any Vested Causes of Action or Claims relating to any Wind-Down Debtor Assets transferred to the Wind-Down Debtor or rights to payment or Claims that belong to the Debtors as of the Effective Date or are instituted by the Wind-Down Debtor and Plan Administrator on or after the Effective Date, except as otherwise expressly provided herein and in the Plan Administrator Agreement. The Wind-Down Debtor shall be entitled to enforce all defenses and counterclaims to all Claims asserted against the Debtors and their Estates, including setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code.

110. Notwithstanding any prohibition on assignability under applicable non-bankruptcy law, on the Effective Date and thereafter if additional Wind-Down Debtor Assets become available, the Debtors shall be deemed, subject to the Plan Administrator Agreement, to have automatically transferred to the applicable Wind-Down Debtor all of their

right, title, and interest in and to all of the Wind-Down Debtor Assets, in accordance with section 1141 of the Bankruptcy Code. All such assets shall automatically vest in the Wind-Down Debtor free and clear of all Claims, Liens, and other interests, subject only to the Allowed Claims and Interests as set forth in the Plan and the expenses of the Wind-Down Debtor as set forth in the Plan and in the Plan Administrator Agreement. Thereupon, the Debtors shall have no interest in or with respect to the Wind-Down Debtor Assets or the Wind-Down Debtor.

111. On the Effective Date, the Debtors or Plan Administrator, as applicable, may establish one or more accounts or funds to hold and dispose of certain assets, pursue certain litigation (including the Vested Causes of Action), and/or satisfy certain Claims (including Claims that are contingent or have not yet been Allowed). For any such account or fund, the Debtors or the Plan Administrator, as applicable, may take the position that grantor trust treatment applies in whole or in part. To the extent such treatment applies to any such account or fund, for all U.S. federal income tax purposes, the beneficiaries of any such account or fund would be treated as grantors and owners thereof, and it is intended, to the extent reasonably practicable, that any such account or fund would be classified as a liquidating trust under section 301.7701-4 of the Treasury Regulations. Alternatively, any such account or fund may be subject to the tax rules that apply to "disputed ownership funds" under 26 C.F.R. 1.468B–9. If such rules apply, such assets would be subject to entity-level taxation, and the Debtors and Plan Administrator would be required to comply with the relevant rules.

112. **Effectiveness of All Actions**. All actions contemplated by the Plan, including all actions in connection with the Sale Transaction or the Liquidation Transaction, as applicable, are hereby effective and authorized to be taken on, prior to, or after the Effective Date, as applicable, under this Confirmation Order, without further application to, or order of the Court, or further

action by the respective officers, directors, managers, members, or equity holders of the Debtors or the Wind-Down Debtor and with the effect that such actions had been taken by unanimous action of such officers, directors, managers, members, or equity holders.

113.    **Cancellation of Notes, Instruments, Certificates, and Other Documents.**  On the later of the Effective Date and the date on which distributions are made pursuant to the Plan (if not made on the Effective Date), except for the purpose of evidencing a right to and allowing Holders of Claims and Interests to receive a distribution under the Plan or to the extent otherwise specifically provided for in the Plan, this Confirmation Order, or any agreement, instrument, or other document entered into in connection with or pursuant to the Plan or the Restructuring Transactions, all notes, bonds, indentures, certificates, Securities, shares, purchase rights, options, warrants, collateral agreements, subordination agreements, intercreditor agreements, or other instruments or documents directly or indirectly evidencing, creating, or relating to any indebtedness or obligations of, or ownership interest in, the Debtors, giving rise to any Claims against or Interests in the Debtors or to any rights or obligations relating to any Claims against or Interests in the Debtors shall be deemed cancelled without any need for a Holder to take further action with respect thereto.

114.    For the avoidance of doubt, cancellation of Existing Equity Interests pursuant to the Plan shall not affect the rights of the Holders of Existing Equity Interests to receive distributions, if any, under the Plan on account of such Existing Equity Interests.  Holders of Existing Equity Interests shall continue to possess all rights, powers, privileges, and standing associated with such Existing Equity Interests as if those Existing Equity Interests continue to exist subject to the terms of the Plan and this Confirmation Order.

A-878

115.  **Distributions.**  The procedures governing distributions contained in Article VI of the Plan shall be, and hereby are, approved in their entirety.  Except as otherwise set forth in the Plan or this Confirmation Order, the Plan Administrator shall make all distributions required under the Plan and the timing of distributions required under the Plan or this Confirmation Order shall be made in accordance with and as set forth in the Plan, this Confirmation Order, or the Plan Administrator Agreement, as applicable; *provided* that, if a creditor does not timely provide the Plan Administrator with its taxpayer identification number in the manner and by the deadline established by the Plan Administrator and/or the Plan, the creditor shall be deemed to have forfeited its right to any current, reserved or future distributions provided for under the Plan and such creditor's Claim or Interest shall be disallowed and expunged without further order of the Court. Any such forfeited distribution shall be deemed to have reverted back to the Wind-Down Debtor for all purposes, including for distributions to other holders of Allowed Claims or Allowed Interests (as applicable) against the particular Debtor in respect of which the forfeited distribution was made, notwithstanding any federal, provincial or state escheat, abandoned or unclaimed property law to the contrary.

116.  **Claims Register.**  Any Claim or Interest that has been paid, satisfied, amended, superseded, cancelled, or otherwise expunged (including pursuant to the Plan) may be adjusted or expunged, as applicable, on the Claims Register at the direction of the Debtors or Wind-Down Debtor without the Debtors or Wind-Down Debtor having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Court.

117.  **Preservation of Rights of Action.**  In accordance with section 1123(b) of the Bankruptcy Code, the Wind-Down Debtor shall succeed to all rights to commence and pursue

any and all Vested Causes of Action of the Debtors, whether arising before or after the Petition

Date, including, without limitation, any actions specifically enumerated in the Schedule of

Retained Causes of Action other than Causes of Action released, waived, settled, compromised,

or transferred. Such rights shall be preserved by the Debtors and Wind-Down Debtor and shall

vest in the Wind-Down Debtor, with the Wind-Down Debtor's rights to commence, prosecute, or

settle such Causes of Action preserved notwithstanding the occurrence of the Effective Date,

other than the Causes of Action expressly released, waived, settled, compromised, or transferred

by the Debtors pursuant to the releases and exculpations contained in the Plan, including in

Article VIII of the Plan or pursuant to the Asset Purchase Agreement, which shall be deemed

released and waived by the Debtors and the Wind-Down Debtor as of the Effective Date.

118. The Wind-Down Debtor may pursue such Causes of Action, as appropriate, in

accordance with the best interests of the beneficiaries of the Wind-Down Debtor and in

accordance with the Plan Administrator Agreement and the Plan. No Entity may rely on the

absence of a specific reference in the Schedules of Assets and Liabilities or Statement of

Financial Affairs, the Plan, the Plan Supplement, the Disclosure Statement, or the Schedule of

Retained Causes of Action to any Cause of Action against it as any indication that the Debtors or

the Wind-Down Debtor will not pursue any and all available Causes of Action against it. The

Wind-Down Debtor, on behalf of the Debtors and the Wind-Down Debtor, expressly reserves all

rights to prosecute any and all Causes of Action against any Entity, except as otherwise provided

in the Plan, including Article VIII of the Plan. Unless any Cause of Action of the Debtors is

expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or

pursuant to a Final Order, the Wind-Down Debtor, on behalf of the Debtors and Wind-Down

Debtor and in accordance with the Plan Administrator Agreement, expressly reserves all such

Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation.

119.    The Wind-Down Debtor, on behalf of the Debtors and the Wind-Down Debtor, reserves and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Cause of Action that a Debtor may hold against any Entity shall vest in the Wind-Down Debtor, except as otherwise provided in the Plan, including Article VIII of the Plan.  The Wind-Down Debtor, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Wind-Down Debtor shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Court in accordance with the Plan.

120.    **Subordination.**  Except as expressly provided in the Plan, the allowance, classification, and treatment of all Allowed Claims against and Allowed Interests in the Debtors and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors and the Wind-Down

59

Debtor reserve the right to reclassify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

121.    **Release of Liens.**    Except as otherwise provided in the Plan, the Plan Supplement, or any contract, instrument, release, or other agreement or document created pursuant to the Plan or this Confirmation Order on the Effective Date, and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Debtors shall automatically revert to the applicable Debtor or Wind-Down Debtor, as applicable, and their successors and assigns, in each case, without any further approval or order of the Court and without any action or Filing being required to be made by the Debtors.  The presentation or filing of this Confirmation Order to or with any local, state, federal, or foreign agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

122.    **Governance of the Wind-Down Debtor.**    The Plan Administrator shall appoint an independent director at each Debtor to act as a fiduciary for such Debtor entity in connection with the resolution of the Intercompany Claims.

123.    **Intercompany Claims.**    For the avoidance of doubt, nothing in this Confirmation Order or the Plan shall have any impact on the validity, extent, priority, or treatment of the Intercompany Claims.  Any determination as to the validity, extent, priority, or treatment of the Intercompany Claims shall be determined by the Court in a separate matter on proper notice to parties in interest.  Notwithstanding anything to the contrary in this Confirmation Order or the

60

Plan, the rights of the ad hoc group of equityholders (the "AHG") to continue or participate in any adjudication of the Intercompany Claims are preserved, and any party reserves any and all rights, claims, and defenses in connection therewith, including without limitation, the Debtors and/or the Wind-Down Debtor's right to challenge the AHG's standing with respect thereto; *provided* that such right, claim, or defense is not based on any provision in this Confirmation Order or the Plan.

124.  **FTX Settlement.**  Pursuant to the terms of the FTX Settlement, the Debtors shall reserve and hold the amount of $445 million in Cash on account of the Preference Claims (as defined in the FTX Settlement) asserted by FTX, Alameda, and their estates in the FTX Bankruptcy Proceeding, subject to all defenses and counterclaims thereto, until the final resolution of the Preference Claims by settlement or a final and unappealable order by the court in the FTX Bankruptcy Proceeding, including any appeals therefrom.

125.  **General Settlement of Claims and Interests.**  As discussed in detail in the Disclosure Statement and as otherwise provided in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan.  The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of this Confirmation Order shall constitute the Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 of all such Claims, Interests, Causes of Action, and controversies, as

61

A-883

well as a finding by the Court that such compromise and settlement is fair, equitable, reasonable, and in the best interests of the Debtors, their Estates, and Holders of Claims and Interests. Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Interests in any Class are intended to be and shall be final.

126.    **Third-Party Releases.**   For the avoidance of doubt, any party that did not affirmatively "opt in" to the Third-Party Releases contained in the Plan shall not be deemed to grant such Third-Party Releases contained in the Plan.

127.    **Contributed Third Party Claims.**   For the avoidance of doubt, any party that did not affirmatively "opt in" to contribute their Contributed Third-Party Claims to the Wind-Down Debtor shall not be deemed to contribute their claims to the Wind-Down Debtor; *provided*, *however*, that any party may contribute their Contributed Third-Party Claims to the Wind-Down Debtor on or after the Effective Date by separate agreement with the Plan Administrator and Wind-Down Debtor. Any such agreement shall be valid to the same extent as if the party affirmatively opted in to contribute their Contributed Third-Party Claims to the Wind-Down Debtor.

128.    **Operations After Closing.**   On and after the Effective Date, expect as otherwise provided in the Plan, the Debtors or the Wind-Down Debtor may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

129.    **Assumption and Rejection of Executory Contracts and Unexpired Leases.** On the Effective Date, except as otherwise provided in the Plan, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including any

employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (a) is specifically described in the Plan as to be assumed in connection with confirmation of the Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement; (b) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Effective Date; (c) is to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, in connection with the Sale Transaction; (d) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; or (e) is a D&O Liability Insurance Policy other than the Side-A Policy. Entry of this Confirmation Order constitutes approval of such assumptions, assignments, and rejections, including the assumption of the Executory Contracts or Unexpired Leases as provided in the Plan Supplement, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Except as otherwise provided in this Confirmation Order, any and all objections or reservations of rights in connection with the rejection of an Executory Contract or Unexpired Lease under the Plan, if any, are overruled on their merits.

130. **Waiver or Estoppel.** Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed prior to the Confirmation Date.

131. **Insurance Policies and Surety Bonds.** Each D&O Liability Insurance Policy (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto) other than the Side-A Policy shall be assumed, in their entirety, without the need for any further notice to or action, order, or approval of the Court, as of the Effective Date, pursuant to sections 105 and 365 of the Bankruptcy Code with the Wind-Down Debtor being authorized to pursue any proceeds thereof on behalf of the Debtors or the Wind-Down Debtor. The Side-A Policy shall remain in effect during these Chapter 11 Cases with the Debtors, and the Wind-Down Debtor preserves all avoidance and other actions in connection with the premium paid thereunder. All beneficiaries under the D&O Insurance Policies reserve their rights under such D&O Insurance Policies subject to the limitations set forth in the Plan.

132. The Debtors or the Wind-Down Debtor, as applicable, shall not terminate or otherwise reduce the coverage under any D&O Liability Insurance Policy (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto) in effect prior to the Effective Date, and subject in all respects to the D&O Settlement, any current and former directors, officers, managers, and employees of the Debtors who served in such capacity at any time before or after the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy subject to the terms thereof regardless of whether such directors, officers, managers, and employees remain in such positions after the Effective Date. Notwithstanding anything to the contrary in the Plan, the Debtors or the Wind-Down Debtor shall retain the ability to supplement such D&O Liability Insurance Policy as the Debtors or Wind-Down Debtor may deem necessary, subject to the prior written consent of the Wind-Down Debtor.

64

A-886

133.   The Debtors shall continue to satisfy their obligations under their insurance policies in full and continue such programs in the ordinary course of business.  Each of the Debtors' insurance policies, and any agreements, documents, or instruments relating thereto shall be treated as Executory Contracts under the Plan.  On the Effective Date:  (a) the Debtors shall be deemed to have assumed all such insurance policies and any agreements, documents, and instruments relating thereto in their entirety and (b) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the applicable Wind-Down Debtor(s) unaltered.

134.   **Authorization to Consummate.**  The Debtors are authorized to consummate the Plan at any time after the entry of this Confirmation Order subject to satisfaction or waiver (by the required parties) of the conditions precedent to consummation as set forth in Article IX of the Plan.

135.   **Professional Compensation.**  All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than sixty (60) days after the Effective Date.  The Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code and Bankruptcy Rules.  The Wind-Down Debtor shall pay Professional Fee Claims in Cash to such Professionals in the amount the Court allows, including from funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by entry of an order of the Court; *provided* that the Debtors' and the Wind-Down Debtor's obligations to pay Allowed Professional Fee Claims shall not be limited or deemed limited to funds held in the Professional Fee Escrow Account.

136.     No later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Court.  No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way.  No funds held in the Professional Fee Escrow Account shall be property of the Estates of the Debtors or the Wind-Down Debtor.  When all Professional Fee Claims Allowed by the Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Court, any remaining funds held in the Professional Fee Escrow Account shall be turned over to the Wind-Down Debtor without any further notice to or action, order, or approval of the Court or any other Entity.

137.     The Professionals shall deliver to the Debtors a reasonable and good-faith estimate of their unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Confirmation Date projected to be outstanding as of the anticipated Effective Date, and shall deliver such estimate no later than five Business Days prior to the anticipated Effective Date.  For the avoidance of doubt, no such estimate shall be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that are the subject of a Professional's final request for payment of Professional Fee Claims Filed with the Court, and such Professionals are not bound to any extent by the estimates.  If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.  The total aggregate amount so estimated to be outstanding as of the anticipated Effective Date shall be utilized by the Debtors to determine the amount to be funded to the

66

A-888

Professional Fee Escrow Account; provided that the Wind-Down Debtor shall use Cash on hand
to increase the amount of the Professional Fee Escrow Account to the extent fee applications are
Filed after the Effective Date in excess of the amount held in the Professional Fee Escrow
Account based on such estimates.

138.    Except as otherwise specifically provided in the Plan, from and after the
Confirmation Date, the Debtors and/or the Wind-Down Debtor, as applicable, shall, in the
ordinary course of business and without any further notice to or action, order, or approval of the
Court, pay in Cash the reasonable and documented legal, professional, or other fees and
expenses related to implementation of the Plan and Consummation incurred by the Wind-Down
Debtor.  Upon the Confirmation Date, any requirement that Professionals comply with sections
327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation
for services rendered after such date shall terminate, and the Wind-Down Debtor may employ
and pay any Professional in the ordinary course of business for the period after the Confirmation
Date without any further notice to or action, order, or approval of the Court.

139.    **Return of Deposits.**  All utilities, including, but not limited to, any Person or
Entity that received a deposit or other form of adequate assurance of performance under
section 366 of the Bankruptcy Code during these Chapter 11 Cases, must return such deposit or
other form of adequate assurance of performance to the Wind-Down Debtor promptly following
the occurrence of the Effective Date, if not returned or applied earlier.

140.    **Release, Exculpation, and Injunction Provisions.**  The release, exculpation,
injunction, opt in, and related provisions set forth in the Plan are approved and authorized in
their entirety, and such provisions are effective and binding on all Persons and Entities to the
extent provided therein except as otherwise provided in this Confirmation Order, *provided*,

*however*, that nothing in the exculpation related provisions of the Plan shall release the Debtors from the provisions of the Plan governing satisfaction of Allowed Claims including Allowed Administrative Expense Claims or change the standard for liability on Allowed Claims or Allowed Administrative Expense Claims, subject to any applicable bankruptcy and non-bankruptcy law.

141. For the avoidance of doubt, the Debtors are not seeking a discharge under section 1141(d).

142. ~~141.~~ **Governmental Units.** Nothing in this Confirmation Order or the Plan shall effect a release ~~of any claim~~ by the United States, the States or any of ~~its~~their agencies of any claim arising under the Internal Revenue Code, the environmental laws or any civil or criminal laws of the United States or the States, or under any rules or regulations enforced by the United States, the States or any of ~~its~~their agencies against the Released Parties, nor shall anything in the Confirmation Order or the Plan enjoin the United States or the States from bringing any claim, suit, action or other proceedings against the Released Parties for any liability for any claim, suit or action arising under the Internal Revenue Code, the environmental laws or any civil or criminal laws of the United States or the States, or under any rules or regulations enforced by the United States, the States or any of ~~its~~their agencies, nor shall anything in the Confirmation Order or the Plan exculpate any such party from any liability to the United States, the States or any of ~~its~~their agencies, arising under the Internal Revenue Code, the environmental laws or any civil or criminal laws of the United States or the States, or under any rules or regulations enforced by the United States, the States or any of ~~its~~their agencies; *provided*, however, that nothing in this Confirmation Order or the Plan shall modify in any respect the relief previously granted in the Bar Date Order and thus no person or entity, including the United

States, the States or any of its their agencies, can seek or receive a direct or indirect distribution of any property of the Debtors' estates unless they filed a Proof of Claim prior to the Governmental Bar Date.; provided, further, that the United States, the States, and their agencies may not, and will not, allege that the Restructuring Transactions are a violation of any rules or regulations enforced by the United States, the States or any of their agencies, nor will they bring any claim against any Person on account of or relating to the Restructuring Transactions.

143.    Nothing in this Confirmation Order, the Disclosure Statement, the Plan, or the Asset Purchase Agreement releases, precludes, or enjoins: (i) any liability to any governmental unit as defined in 11 U.S.C. § 101(27) ("Governmental Unit") that is not a "claim" as defined in 11 U.S.C. § 101(5) ("Claim"); (ii) any Claim of a Governmental Unit arising on or after the Effective Date; or (iii) any liability to a Governmental Unit on the part of any non-Debtor (except to the extent set forth in paragraphs 97 and 99 herein); provided, however, that nothing in this Confirmation Order or the Plan shall modify in any respect the relief previously granted in the Bar Date Order; provided, further, that no Governmental Unit will allege that the Restructuring Transactions are a violation of any rules or regulations enforced by the United States, the States or any of their agencies, nor will they bring any claim against any Person on account of or relating to the Restructuring Transactions.  Nothing in this Confirmation Order, the Disclosure Statement, the Plan, or the Asset Purchase Agreement authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, without compliance with all applicable legal requirements.

144.    142.  **Securities and Exchange Commission Provisions.**    Notwithstanding anything to the contrary in this Confirmation Order, or any findings announced at the Combined Hearing, nothing in this Confirmation Order, or announced at the Combined Hearing, constitutes

a finding under the federal securities laws as to whether crypto tokens or transactions involving crypto tokens are securities, and the right of the SEC to challenge transactions involving crypto tokens on any basis is expressly reserved.

145. ~~143.~~ Notwithstanding any provision herein to the contrary, nothing in this Confirmation Order or the Plan grants this Court ~~with~~ jurisdiction over any police and regulatory actions by the SEC, and the SEC shall retain the power and authority to commence and continue any such actions against any person or entity, including without limitation, the Debtors, in any forum with jurisdiction; *provided*, however, that nothing in this Confirmation Order or the Plan shall modify in any respect the relief previously granted in the Bar Date Order ~~and thus no person or entity, including the United States or any of its agencies, can seek or receive a direct or indirect distribution of any property of the Debtors' estates unless they filed a Proof of Claim prior to the Governmental Bar Date.~~; *provided, however,* that the SEC will not allege that the Restructuring Transactions are a violation of any rules or regulations enforced by the SEC, nor will they bring any claim against any Person on account of or relating to the Restructuring Transactions.

146. ~~144.~~ Upon the occurrence of the Effective Date, the Debtors' books and records shall be transferred to the Wind-Down Debtor, which shall continue to preserve all financial books and records, emails, and other financial documents relating to the Debtors' business that are currently in the Debtors' possession. The Wind-Down Debtor shall not destroy or otherwise abandon any such documents or records without providing advance notice to the SEC (c/o Therese Scheuer, U.S. Securities and Exchange Commission, 100 F Street, NE, Washington, DC 20549, ScheuerT@SEC.GOV) and seeking further authorization from this Court. Nothing in the Plan or this Confirmation Order shall affect the obligations of the pre-Effective Date Debtors,

the Wind-Down Debtor, and/or any transferee or custodian to maintain all books and records that are subject to any governmental subpoena, document preservation letter, or other investigative request from a governmental agency.

147.   145.  Notwithstanding any language to the contrary herein, no provision in the Plan or this Confirmation Order shall (a) preclude the OSC or the SEC from enforcing its police or regulatory powers or (b) enjoin, limit, impair or delay the OSC or SEC from commencing or continuing any claims, causes of action, proceeding, or investigations against any non-Debtor person or non-Debtor entity in any forum.

148.   146.  **Employee Transition Plan.**  The Employee Transition Plan, the terms of which are included in the Plan Supplement as <u>Exhibit H</u>, will be implemented following the Effective Date and is not subject to the Court's approval.

149.   147.  **Compliance with Tax Requirements.**  In connection with the Plan, to the extent applicable, the Debtors, the Wind-Down Debtor, any Distribution Agent, and any other applicable withholding and reporting agents shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Debtors, the Wind-Down Debtor, the Distribution Agent, and any other applicable withholding and reporting agents shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including winding-down a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms that are reasonable and appropriate; *provided* that the Wind-Down Debtor and the Distribution

71

Agent, as applicable, shall request appropriate documentation from the applicable distributees and allow such distributees a reasonable amount of time to respond. The Debtors, the Wind-Down Debtor, the Distribution Agent, and any other applicable withholding and reporting agents reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

150. 148. **Exemption from Certain Taxes and Fees.** To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Debtor, the Wind-Down Debtor, the Purchaser, or to any other Entity) of property under the Plan or pursuant to: (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Wind-Down Debtor; (b) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (c) the making, assignment, or recording of any lease or sublease; or (d) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, including the Asset Purchase Agreement, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, sales or use tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of this Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for

72

filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forgo the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

151. ~~149.~~ **Termination of Asset Purchase Agreement.** If the Asset Purchase Agreement is terminated and the Sale Transaction is not consummated, all provisions in this Confirmation Order relating to the Asset Purchase Agreement, the Sale Transaction, and the Purchaser shall be of no force and effect, and the Debtors are authorized to consummate the Liquidation Transaction without further order of the Court.

152. ~~150.~~ **The Liquidation Transaction.** If the Asset Purchase Agreement is terminated, the Debtors shall pursue the Liquidation Transaction contemplated under the Plan and shall provide all Holders of Claims and Interests with the treatment afforded to such Holders under the Plan. In the event that the Debtors determine to pursue the Liquidation Transaction contemplated under Article IV of the Plan, the Debtors shall promptly notify the Court and all parties in interest. The Plan shall be deemed to satisfy all requirements under the Bankruptcy Code with respect to either the Sale Transaction or the Liquidation Transaction pursuant to this Confirmation Order.

153. ~~151.~~ **Documents, Mortgages, and Instruments.** Each federal, state, commonwealth, local, foreign, or other governmental agency is authorized to accept any and all

documents, mortgages, and instruments necessary or appropriate to effectuate, implement, or consummate the Plan, including the Restructuring Transactions, and this Confirmation Order.

154. 152. **The BNY Objection.** This Confirmation Order confirms that the Deed of Trust and Assignment of Rents recorded January 5, 2023 Official Records of Orange County (the "Deed") transferring title of 37 Black Hawk, Irvine, California 92603 (the "Property") from Michael G. Beason and Mickey L. Wiebeis (collectively, the "Property Borrowers") to Voyager Digital, LLC is void. This Confirmation Order may be recorded against the Property as evidence and confirmation that the Deed is void. The Bank Of New York Mellon f/k/a the Bank Of New York, As Trustee For The Certificateholders Of CWALT, Inc., Alternative Loan Trust 2005-38, Mortgage Pass-Through Certificates, Series 2005-38 as Serviced by Shellpoint Mortgage Servicing ("Shellpoint") shall be permitted to take any other the necessary actions to void the Deed. To the extent necessary, the automatic stay is lifted solely as it pertains to Shellpoint's rights to take action against the Property and shall be effective immediately upon entry of this Confirmation Order. The Debtor(s) shall not be party to any foreclosure or other proceeding related to the Property as they lack any interest in the Property. Shellpoint shall release the Debtors and the Wind-Down Debtor of any costs and claims incurred on account of the Property, including any actions taken in any foreclosure or other proceeding or associated with voiding the Deed. This Confirmation Order shall in no way prevent Shellpoint from pursuing any and all lawful rights and remedies as to the Property Borrowers.

155. 153. **Continued Effect of Stays and Injunction.** Unless otherwise provided in the Plan or this Confirmation Order, all injunctions or stays arising under or entered during these Chapter 11 Cases under section 362 of the Bankruptcy Code or otherwise and in existence on the

Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

156. ~~154.~~ **Non-Severability.** Each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the Debtors' consent, consistent with the terms set forth herein; and (c) non-severable and mutually dependent.

157. ~~155.~~ **Notice of Subsequent Pleadings.** Except as otherwise provided in the Plan or in this Confirmation Order, notice of all subsequent pleadings in these Chapter 11 Cases after the Effective Date will be limited to the following parties: (a) the Wind-Down Debtor and its counsel; (b) the U.S. Trustee; (c) counsel to the Purchaser; (d) any party known to be directly affected by the relief sought by such pleadings; and (e) any party that specifically requests additional notice in writing to the Debtors, the Wind-Down Debtor, or the Plan Administrator, as applicable, or files a request for notice under Bankruptcy Rule 2002 after the Effective Date. The Notice and Claims Agent shall not be required to file updated service lists.

158. ~~156.~~ **Post-Confirmation Modifications.** Subject to the limitations and terms contained in the Plan and Purchaser's consent rights under the Asset Purchase Agreement, the Debtors, with the consent of the Committee, reserve the right to (a) amend or modify the Plan before the entry of this Confirmation Order, in accordance with the Bankruptcy Code and the Bankruptcy Rules and (b) after the entry of this Confirmation Order, the Debtors or the Wind-Down Debtor, as applicable, may, upon order of the Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, to remedy any defect or omission, or

reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan consistent with the terms set forth in the Plan.

159. ~~157.~~ **Plan Classification Controlling.** The terms of the Plan shall solely govern the classification of Claims and Interests for purposes of the distributions to be made thereunder and the classifications set forth on the ballots tendered to or returned by the Holders of Claims or Interests in connection with voting on the Plan: (a) were set forth thereon solely for purposes of voting to accept or reject the Plan; (b) do not necessarily represent, and in no event shall be deemed to modify or otherwise affect, the actual classification of Claims and Interests under the Plan for distribution purposes; (c) may not be relied upon by any Holder of a Claim or Interest as representing the actual classification of such Claim or Interest under the Plan for distribution purposes; and (d) shall not be binding on the Debtors except for voting purposes.

160. ~~158.~~ **Choice of Law.** Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan and any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, documents, instruments, or contracts, in which case the governing law of such agreement shall control); provided that corporate, limited liability company, or partnership governance matters relating to the Debtors or the Wind-Down Debtor, as applicable, shall be governed by the laws of the jurisdiction of incorporation or formation of the relevant Debtor or Wind-Down Debtor, as applicable.

A-898

161.   ~~159.~~ **Applicable Nonbankruptcy Law.**   The provisions of this Confirmation Order, the Plan and related documents, or any amendments or modifications thereto, shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.

162.   ~~160.~~ **Waiver of Filings.**   Any requirement under section 521 of the Bankruptcy Code or Bankruptcy Rule 1007 obligating the Debtors to file any list, schedule, or statement with the Court or the Office of the U.S. Trustee is permanently waived as to any such list, schedule, or statement not filed as of the Confirmation Date.

163.   ~~161.~~ **Governmental Approvals Not Required.**   This Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules, or regulations of any state, federal, or other governmental authority with respect to the dissemination, implementation, or consummation of the Plan and the Disclosure Statement, any certifications, documents, instruments or agreements, and any amendments or modifications thereto, and any other acts referred to in, or contemplated by, the Plan and the Disclosure Statement.   As provided in section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any permit or license of the Debtors or Wind-Down Debtor on account of the filing or pendency of the Chapter 11 Cases.

164.   ~~162.~~ **Protection Against Discriminatory Treatment.**   As provided by section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Entity, including Governmental Units, shall discriminate against any Wind-Down Debtor or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, or discriminate with respect to such a grant against, any Wind-Down Debtor, or any Entity with which a Wind-Down Debtor has been or is associated, solely because such Wind-Down Debtor was a debtor under chapter 11 of

the Bankruptcy Code or may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases).

165.   163.  **Notices of Confirmation and Effective Date.**   The Debtors or the Wind-Down Debtor, as applicable, shall serve notice of entry of this Confirmation Order, of the occurrence of the Effective Date, and of applicable deadlines (the "Notice of Confirmation") in accordance with Bankruptcy Rules 2002 and 3020(c) on all parties served with the Combined Hearing Notice seven Business Days after the Effective Date; *provided* that no notice of any kind shall be required to be mailed or made upon any Entity to whom the Debtors mailed notice of the Combined Hearing, but received such notice returned marked "undeliverable as addressed," "moved, left no forwarding address," or "forwarding order expired," or similar reason, unless the Debtors have been informed in writing by such Entity, or are otherwise aware, of that Entity's new address.  For those parties receiving electronic service, filing on the docket is deemed sufficient to satisfy such service and notice requirements.

166.   164.  No later than ten Business Days after the Effective Date, the Wind-Down Debtor shall cause the Notice of Confirmation, modified for publication, to be published on one occasion in *The New York Times* (national edition) and *USA Today* (national edition).  Mailing and publication of the Notice of Confirmation in the time and manner set forth in this paragraph will be good, adequate, and sufficient notice under the particular circumstances and in accordance with the requirements of Bankruptcy Rules 2002 and 3020(c).  No further notice is necessary.

167.   165.  The Notice of Confirmation will have the effect of an order of the Court, will constitute sufficient notice of the entry of this Confirmation Order to filing and recording officers, and will be a recordable instrument notwithstanding any contrary provision of

applicable nonbankruptcy law.  The above-referenced notices are adequate under the particular circumstances of these Chapter 11 Cases and no other or further notice is necessary.

168. ~~166.~~ **Dissolution of Statutory Committees.**  On the Effective Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases; *provided*, *however*, that such committees will remain in existence for the limited purposes of (a) pursuing, supporting, or otherwise participating in, any outstanding appeals in the Chapter 11 Cases; and (b) filing, objecting, or otherwise participating in, any final fee applications of Professionals.

169. ~~167.~~ **Exemption from Registration.**  The Plan Administrator shall hold the equity of the Voyager Digital Ltd., to the extent that any new equity is issued, in an agency capacity, for the benefit of and to facilitate the rights of Holders of Interests provided under the Plan ~~and any~~; *provided that* such equity ~~shall not be deemed "securities" under applicable laws~~, if issued, shall be uncertificated and non-transferable.

170. ~~168.~~ Distributions to Holders of Claims and Interests in accordance with the Plan shall not be deemed to be unlicensed money transmission ~~or to violate any securities laws~~.

171. ~~169.~~ **Effect of Non-Occurrence of Conditions to Confirmation.**  If the Effective Date does not occur within 120 days after the Confirmation Date, then the Plan will be null and void in all respects, any and all compromises or settlements not previously approved by Final Order of the Court embodied in the Plan (including with respect to the fixing, limiting, or treatment of any Claim or Interest), shall be deemed null and void, and nothing contained in the Plan or the Disclosure Statement shall:  (a) constitute a waiver or release of any Claims, Interests, or Causes of Action held by any Debtor or any other Entity; (b) prejudice in any

manner the rights of any Debtor or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity in any respect.

172. ~~170.~~ **Substantial Consummation.**  On the Effective Date, the Plan shall be deemed to have been substantially consummated or shall be anticipated to be substantially consummated concurrent with the occurrence of the Effective Date.

173. ~~171.~~ **Waiver of Stay.**  For good cause shown, the stay of this Confirmation Order provided by any Bankruptcy Rule is waived, and this Confirmation Order shall be effective and enforceable immediately upon its entry by the Court.

174. ~~172.~~ **Immediate Binding Effect.**  Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtors, the Wind-Down Debtor, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, exculpations, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims against and Interests in the Debtors shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or Interest has voted on the Plan.

175. ~~173.~~ **References to and Omissions of Plan Provisions.**  References to articles, sections, and provisions of the Plan are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan.  The failure to specifically include or to refer to any particular article, section, or provision of the Plan in this Confirmation

A-902

Order shall not diminish or impair the effectiveness of such article, section, or provision, it being the intent of the Court that the Plan be confirmed in its entirety, except as expressly modified herein, and incorporated herein by reference.

176.   ~~174.~~ **Headings.**  Headings utilized herein are for convenience and reference only, and do not constitute a part of the Plan or this Confirmation Order for any other purpose.

177.   ~~175.~~ **Effect of Conflict.**  This Confirmation Order supersedes any Court order issued prior to the Confirmation Date that may be inconsistent with this Confirmation Order.  If there is any inconsistency between the terms of the Plan and the terms of this Confirmation Order, the terms of this Confirmation Order shall govern and control.  For the avoidance of doubt, the *Stipulation and Agreed Order Between the Debtors and Metropolitan Commercial Bank* [Docket No. 821] remains in effect and is not superseded by this Confirmation Order.

178.   ~~176.~~ **Final, Appealable Order.**  This Confirmation Order is a final judgment, order, or decree for purposes of 28 U.S.C. § 158(a), and the period in which an appeal must be filed shall commence upon the entry hereof.

179.   ~~177.~~ **Retention of Jurisdiction.**  The Court may properly, and upon the Effective Date shall, to the full extent set forth in the Plan, retain jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including (i) the matters set forth in Article XI of the Plan and (ii) as set forth in Section 10.13 of the Asset Purchase Agreement.

New York, New York
Dated: _____, 2023

THE HONORABLE MICHAEL E. WILES
UNITED STATES BANKRUPTCY JUDGE

81

A-903

**<u>EXHIBIT A</u>**

**The Plan**

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) Case No. 22-10943 (MEW) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**NOTICE OF FILING OF THIRD AMENDED JOINT**
**PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND ITS DEBTOR**
**AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**PLEASE TAKE NOTICE** that on July 6, 2022, the above-captioned debtors and debtors

in possession (collectively, the "Debtors") filed the *Joint Plan of Reorganization of Voyager*

*Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*

(the "Initial Plan") [Docket No. 17].

**PLEASE TAKE FURTHER NOTICE** that on August 12, 2022, the Debtors filed the

*First Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor*

*Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 287].

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

PLEASE TAKE FURTHER NOTICE that on October 5, 2022, the Debtors filed the *Second Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 496].

PLEASE TAKE FURTHER NOTICE that on October 17, 2022, the Debtors filed the *Second Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 539].

PLEASE TAKE FURTHER NOTICE that on October 19, 2022, the Debtors filed the *Second Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 564].

PLEASE TAKE FURTHER NOTICE that on October 20, 2022, the Debtors filed the *Second Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 584].

PLEASE TAKE FURTHER NOTICE that on October 24, 2022, the Debtors filed the *Second Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 590].

PLEASE TAKE FURTHER NOTICE that on December 22, 2022, the Debtors filed the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code [Docket No. 777].

PLEASE TAKE FURTHER NOTICE that on January 8, 2023, the Debtors filed the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 829].

PLEASE TAKE FURTHER NOTICE that on January 10, 2023, the Debtors filed the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 852].

PLEASE TAKE FURTHER NOTICE that on February 28, 2023, the Debtors filed the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1117].

PLEASE TAKE FURTHER NOTICE that on March 1, 2023, the Debtors filed the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1125] (the "Revised Plan").

PLEASE TAKE FURTHER NOTICE that the Debtors hereby file the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, attached hereto as **Exhibit A** (the "Second Revised Plan").

PLEASE TAKE FURTHER NOTICE THAT a comparison between the Revised Plan and the Second Amended Plan, is attached hereto as **Exhibit B**.

PLEASE TAKE FURTHER NOTICE that copies of the Initial Plan, the Second Revised Plan, and other pleadings filed in the above-captioned chapter 11 cases may be obtained free of charge by visiting the website of Stretto at http://www.cases.stretto.com/Voyager.  You may also obtain copies of any pleadings by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

Dated:  March 5, 2023  
New York, New York

*/s/ Joshua A. Sussberg*
_____

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**

Joshua A. Sussberg, P.C.  
Christopher Marcus, P.C.  
Christine A. Okike, P.C.  
Allyson B. Smith (admitted *pro hac vice*)  
601 Lexington Avenue  
New York, New York 10022  
Telephone:   (212) 446-4800  
Facsimile:   (212) 446-4900  
Email:   jsussberg@kirkland.com  
  cmarcus@kirkland.com  
  christine.okike@kirkland.com  
  allyson.smith@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

**Exhibit A**

**Second Revised Plan**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC. *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**THIRD AMENDED JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

---

**NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN OFFER, ACCEPTANCE, COMMITMENT, OR LEGALLY BINDING OBLIGATION OF THE DEBTORS OR ANY OTHER PARTY IN INTEREST, AND THIS PLAN IS SUBJECT TO APPROVAL BY THE BANKRUPTCY COURT AND OTHER CUSTOMARY CONDITIONS. THIS PLAN IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES.**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital, LTD. (7224); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

# **TABLE OF CONTENTS**

<div align="right">Page</div>

Introduction ...................................................................................................................1

**Article I. Defined Terms, Rules of Interpretation, Computation of Time, Governing Law, and Other References**...........................................................................................1

| | | |
|---|---|---|
| A. | Defined Terms | 1 |
| B. | Rules of Interpretation | 17 |
| C. | Computation of Time | 17 |
| D. | Governing Law | 17 |
| E. | Reference to Monetary Figures | 18 |
| F. | Reference to the Debtors or the Wind-Down Debtor | 18 |
| G. | Nonconsolidated Plan | 18 |

**Article II. Administrative and Priority Claims** ...........................................................18

| | | |
|---|---|---|
| A. | Administrative Claims | 18 |
| B. | Professional Fee Claims | 19 |
| C. | Priority Tax Claims | 20 |

**Article III. Classification, Treatment, and Voting of Claims and Interests** ............21

| | | |
|---|---|---|
| A. | Classification of Claims and Interests | 21 |
| B. | Summary of Classification | 21 |
| C. | Treatment of Classes of Claims and Interests | 22 |
| D. | Special Provision Governing Unimpaired Claims | 28 |
| E. | Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes | 28 |
| F. | Subordinated Claims | 29 |
| G. | Intercompany Interests | 29 |
| H. | Controversy Concerning Impairment | 29 |
| I. | Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code | 29 |

**Article IV. Provisions for Implementation of the Plan**...........................................29

| | | |
|---|---|---|
| A. | General Settlement of Claims and Interests | 29 |
| B. | Restructuring Transactions | 30 |
| C. | The Sale Transaction | 30 |
| D. | The Liquidation Transaction | 31 |
| E. | Employee Transition Plan | 32 |
| F. | Non-Released D&O Claims | 32 |
| G. | The D&O Settlement | 33 |
| H. | The Wind-Down Debtor | 34 |
| I. | Sources of Consideration for Plan Distributions | 42 |
| J. | Corporate Existence and Dissolution | 42 |
| K. | Corporate Action | 43 |
| L. | Vesting of Assets in the Wind-Down Debtor | 43 |
| M. | Cancellation of Notes, Instruments, Certificates, and Other Documents | 44 |
| N. | Effectuating Documents; Further Transactions | 44 |
| O. | Section 1146(a) Exemption | 44 |

P.       Preservation of Rights of Action ...................................................................45
Q.      Election to Contribute Third-Party Claims ...................................................45
R.      Contribution of Contributed Third-Party Claims ..........................................46
S.      Closing the Chapter 11 Cases .......................................................................46

**Article V. Treatment of Executory Contracts and Unexpired Leases ......................................46**

A.      Assumption and Rejection of Executory Contracts and Unexpired Leases ........46
B.      Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases ...................................................................................................47
C.      Claims Based on Rejection of Executory Contracts or Unexpired Leases ...........47
D.      Cure of Defaults for Executory Contracts and Unexpired Leases Assumed .......47
E.      Insurance Policies ........................................................................................49
F.      Reservation of Rights ....................................................................................49
G.      Nonoccurrence of Effective Date .................................................................49
H.      Contracts and Leases Entered into After the Petition Date ..................................50

**Article VI. Provisions Governing Distributions ..........................................................................50**

A.      Timing and Calculation of Amounts to Be Distributed ....................................50
B.      Rights and Powers of Distribution Agent .......................................................50
C.      Delivery of Distributions and Undeliverable or Unclaimed Distributions ...........50
D.      Compliance Matters ....................................................................................53
E.      Securities Registration Exemption ...............................................................53
F.      Foreign Currency Exchange Rate .................................................................53
G.      Claims Paid or Payable by Third Parties .......................................................54
H.      Setoffs and Recoupment ..............................................................................54
I.      Allocation between Principal and Accrued Interest .......................................55

**Article VII. Procedures for Resolving Disputed, Contingent, and Unliquidated Claims and Interests ........................................................................................................................................55**

A.      Disputed Claims Process ..............................................................................55
B.      Objections to Claims or Interests .................................................................56
C.      Estimation of Claims ....................................................................................56
D.      No Distributions Pending Allowance ...........................................................57
E.      Distributions After Allowance .....................................................................57
F.      No Interest ....................................................................................................57
G.      Adjustment to Claims and Interests without Objection ....................................57
H.      Time to File Objections to Claims ...............................................................57
I.      Disallowance of Claims or Interests .............................................................57
J.      Amendments to Proofs of Claim ...................................................................58

**Article VIII. Effect of Confirmation of the Plan .........................................................................58**

A.      Releases by the Debtors ...............................................................................58
B.      Releases by Holders of Claims and Interests .................................................59
C.      Exculpation ..................................................................................................60
D.      Injunction ....................................................................................................60
E.      Release of Liens ..........................................................................................61
F.      OSC and SEC ..............................................................................................61
G.      Protection against Discriminatory Treatment ...............................................61
H.      Document Retention ....................................................................................62

ii

I.     Reimbursement or Contribution ...............................................................62

J.     Term of Injunctions or Stays ..................................................................62

**Article IX. Conditions Precedent to the Effective Date** ..........................................**62**

A.    Conditions Precedent to the Effective Date ...........................................62

B.    Waiver of Conditions Precedent ............................................................63

C.    Effect of Non-Occurrence of Conditions to Consummation ..................63

**Article X. Modification, Revocation, or Withdrawal of the Plan** ...........................**63**

A.    Modification of Plan ..............................................................................63

B.    Effect of Confirmation on Modifications ..............................................64

C.    Revocation or Withdrawal of Plan.........................................................64

**Article XI. Retention of Jurisdiction** ......................................................................**64**

**Article XII. Miscellaneous Provisions** .....................................................................**66**

A.    Immediate Binding Effect......................................................................66

B.    Additional Documents............................................................................66

C.    Payment of Statutory Fees .....................................................................67

D.    Dissolution of Statutory Committees ....................................................67

E.    Reservation of Rights.............................................................................67

F.    Successors and Assigns ..........................................................................67

G.    Service of Documents ............................................................................67

H.    Entire Agreement; Controlling Document.............................................68

I.     Plan Supplement ....................................................................................68

J.     Non-Severability ...................................................................................68

K.    Votes Solicited in Good Faith................................................................69

L.     Waiver or Estoppel ................................................................................69

**INTRODUCTION**

Voyager Digital Holdings, Inc. and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (each a "<u>Debtor</u>" and, collectively, the "<u>Debtors</u>") propose this third amended joint plan (the "<u>Plan</u>") for the resolution of the outstanding Claims against and Interests in the Debtors pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used in the Plan and not otherwise defined shall have the meanings set forth in Article I.A of the Plan. Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The classifications of Claims and Interests set forth in Article III of the Plan shall be deemed to apply separately with respect to each Plan proposed by each Debtor, as applicable. The Plan does not contemplate substantive consolidation of any of the Debtors. Reference is made to the Disclosure Statement for a discussion of the Debtors' history, business, properties and operations, projections, risk factors, a summary and analysis of this Plan, and certain related matters.

ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

**ARTICLE I.**

**DEFINED TERMS, RULES OF INTERPRETATION,
COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES**

A. **Defined Terms**

Capitalized terms used in this Plan have the meanings ascribed to them below.

1. "*3AC*" means Three Arrows Capital, Ltd and any of its Affiliates or subsidiaries.

2. "*3AC Claims*" means the claims or causes of action asserted or assertable by the Debtors against 3AC, whether in the 3AC Liquidation Proceeding or otherwise.

3. "*3AC Liquidation Proceeding*" means that certain liquidation proceeding captioned *In the Matter of Three Arrows Capital Ltd. and in the Matter of Sections 159(1) and 162(1)(a) and (b) of the Insolvency Act 2003*, Claim No. BVIHC(COM)2022/0119 before the Eastern Caribbean Supreme Court in the High Court of Justice in the British Virgin Islands and the chapter 15 foreign recognition proceeding captioned *In re Three Arrows Capital, Ltd.*, No. 22-10920 (Bankr. S.D.N.Y. Jul. 1, 2022).

4. "*3AC Loan*" means that loan of 15,250 Bitcoins and 350 million USDC to 3AC pursuant to that certain master loan agreement dated March 4, 2022 by and between 3AC, as borrower, and OpCo and HTC Trading, Inc., as lenders.

5. "*3AC Recovery*" means the recovery, if any, of the Debtors from 3AC on account of the 3AC Claims.

6. "*Account*" means any account at OpCo held by an Account Holder relating to Cryptocurrency, which Account is identified in the Debtors' books and records as holding Cryptocurrency as of the Petition Date.

7.    "*Account Holder*" means any Person or Entity who holds an Account with OpCo as of the Petition Date.

8.    "*Account Holder Claim*" means any Claim against the Debtors that is held by an Account Holder on account of such Holder's Account.

9.    "*Acquired Assets*" has the meaning ascribed to it in the Asset Purchase Agreement.

10.   "*Acquired Coins*" has the meaning ascribed to it in the Asset Purchase Agreement.

11.   "*Acquired Coins Value*" has the meaning ascribed to it in the Asset Purchase Agreement.

12.   "*Additional Bankruptcy Distribution*" has the meaning ascribed to it in the Asset Purchase Agreement.

13.   "*Administrative Claim*" means a Claim against a Debtor for the costs and expenses of administration of the Chapter 11 Cases arising on or after the Petition Date and prior to the Effective Date pursuant to section 503(b) of the Bankruptcy Code and entitled to priority pursuant to sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' business and (b) Allowed Professional Fee Claims.

14.   "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims (other than requests for payment of Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code), which:  (a) with respect to Administrative Claims other than Professional Fee Claims, shall be thirty days after the Effective Date; and (b) with respect to Professional Fee Claims, shall be forty-five days after the Effective Date.

15.   "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.  With respect to any Person that is not a Debtor, the term "Affiliate" shall apply to such Person as if the Person were a Debtor.

16.   "*Alameda*" means Alameda Ventures Ltd., along with its Affiliates and subsidiaries.

17.   "*Alameda Claims*" means the claims or causes of action asserted or assertable by the Debtors against Alameda, whether in the FTX Bankruptcy Proceeding or otherwise.

18.   "*Alameda Loan Agreement*" means that certain unsecured loan agreement, dated as of June 21, 2022, as amended, restated, amended and restated, modified, or supplemented from time to time, by and among HoldCo, as the borrower, TopCo, as the guarantor, and Alameda, as the lender thereto.

19.   "*Alameda Loan Facility*" means that certain unsecured loan facility provided for under the Alameda Loan Agreement.

20.   "*Alameda Loan Facility Claims*" means any Claim against any Debtor derived from, based upon, or arising under the Alameda Loan Agreement and any fees, costs, and expenses that are reimbursable by any Debtor pursuant to the Alameda Loan Agreement.

21.   "*Alameda Recovery*" means the recovery, if any, of the Debtors from Alameda on account of the Alameda Claims.

22.     "*Allowed*" means, with respect to any Claim or Interest, except as otherwise provided herein:  (a) a Claim or Interest that is evidenced by a Proof of Claim timely Filed by the Bar Date or a request for payment of Administrative Claim timely Filed by the Administrative Claims Bar Date (or for which Claim or Interest under the Plan, the Bankruptcy Code, or a Final Order of the Bankruptcy Court a Proof of Claim or a request for payment of Administrative Claim is not or shall not be required to be Filed); (b) a Claim or Interest that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely Filed; (c) a Claim or Interest Allowed pursuant to the Plan, any stipulation approved by the Bankruptcy Court, any contract, instrument, indenture, or other agreement entered into or assumed in connection with the Plan, or a Final Order of the Bankruptcy Court, or (d) a Claim or Interest as to which the liability of the Debtors and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court; *provided* that, with respect to a Claim or Interest described in clauses (a) and (b) above, such Claim or Interest shall be considered Allowed only if and to the extent that with respect to such Claim or Interest no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or if such an objection is so interposed, such Claim or Interest shall have been Allowed by a Final Order.  Any Claim or Interest that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes. A Proof of Claim Filed after and subject to the Bar Date or a request for payment of an Administrative Claim Filed after and subject to the Administrative Claims Bar Date, as applicable, shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim.  "Allow" and "Allowing" shall have correlative meanings.

23.     "*Asset Purchase Agreement*" means that certain asset purchase agreement dated as of December 18, 2022 by and between BAM Trading Services Inc. (d/b/a Binance.US) as Purchaser and Voyager Digital, LLC as Seller.

24.     "*Assumed Liabilities*" has the meaning ascribed to it in the Asset Purchase Agreement.

25.     "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or hereafter amended.

26.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York, or any other court having jurisdiction over the Chapter 11 Cases, including to the extent of the withdrawal of reference under section 157 of the Judicial Code, the United States District Court for the Southern District of New York.

27.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated by the United States Supreme Court under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

28.     "*Bar Date*" means the applicable deadline by which Proofs of Claim must be Filed, as established by:  (a) the Bar Date Order; (b) a Final Order of the Bankruptcy Court; or (c) the Plan.

29.     "*Bar Date Order*" means the *Order (I) Setting Deadlines for Submitting Proofs of Claims, (II) Approving Procedures for Submitting Proofs of Claim, and (III) Approving Notice Thereof* [Docket No. 218].

30.      "*Binance.US Platform*" has the meaning ascribed to it in the Asset Purchase Agreement.

31.      "*Binance US*" means BAM Trading Services Inc. (d/b/a Binance.US).

32.      "*Binance US Account*" means a customer account opened with the Purchaser by an Account Holder or a Holder of an Allowed OpCo General Unsecured Claim.

33.      "*Business Day*" means any day, other than a Saturday, Sunday, or a "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

34.      "*Cash*" or "*$*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

35.      "*Causes of Action*" mean any action, Claim, cross-claim, third-party claim, damage, judgment, cause of action, controversy, demand, right, suit, obligation, liability, debt, account, defense, offset, power, privilege, license, Lien, indemnity, interest, guaranty, or franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, matured or unmatured, suspected or unsuspected, in contract or in tort, at law or in equity, or pursuant to any other theory of law in accordance with applicable law.  For the avoidance of doubt, "Causes of Action" includes:  (a) any right of setoff, counterclaim, or recoupment and any claim arising from any contract or for breach of duties imposed by law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of local, state, federal, or foreign law, or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) any right to object to or otherwise contest Claims or Interests; (d) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; and (e) any claim or defense, including fraud, mistake, duress, usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

36.      "*CCO*" means Evan Psaropoulos.

37.      "*CEO*" means Stephen Ehrlich.

38.      "*Certificate*" means any instrument evidencing a Claim or an Interest.

39.      "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor in the Bankruptcy Court under chapter 11 of the Bankruptcy Code and (b) when used with reference to all Debtors, the procedurally consolidated cases filed for the Debtors in the Bankruptcy Court under chapter 11 of the Bankruptcy Code.

40.      "*Claim*" has the meaning set forth in section 101(5) of the Bankruptcy Code.

41.      "*Claims Objection Bar Date*" means the deadline for objecting to a Claim, which shall be on the date that is the later of (a) (i) with respect to Administrative Claims (other than Professional Fee Claims and Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code), sixty days after the Administrative Claims Bar Date or (ii) with respect to all other Claims (other than Professional Fee Claims), 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by the Debtors or the Wind-Down Debtor, as applicable, as approved by an order of the Bankruptcy Court for objecting to such Claims.

42. "*Claims Register*" means the official register of Claims against and Interests in the Debtors maintained by the Clerk of the Bankruptcy Court or the Claims, Noticing, and Solicitation Agent.

43. "*Claims, Noticing, and Solicitation Agent*" means Bankruptcy Management Solutions, Inc. d/b/a Stretto, in its capacity as the claims, noticing, and solicitation agent in the Chapter 11 Cases for the Debtors and any successors appointed by an order of the Bankruptcy Court.

44. "*Class*" means a class of Claims against or Interests in the Debtors as set forth in Article III of the Plan in accordance with section 1122(a) of the Bankruptcy Code.

45. "*Committee*" means the Official Committee of Unsecured Creditors appointed in these Chapter 11 Cases.

46. "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

47. "*Confirmation Date*" means the date on which Confirmation occurs.

48. "*Confirmation Hearing*" means the hearing before the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code at which the Debtors will seek Confirmation of the Plan.

49. "*Confirmation Order*" has the meaning ascribed to it in the Asset Purchase Agreement.

50. "*Consummation*" means the occurrence of the Effective Date.

51. "*Contributed Third-Party Claims*" means all direct Causes of Action that any Contributing Claimant has against any Person (other than a Debtor) that had a direct relationship with the Debtors, their predecessors, or respective affiliates and that harmed such Contributing Claimant in the claimant's capacity as a creditor of Voyager, including (a) all Causes of Action based on, arising out of, or related to the marketing, sale, and issuance of Cryptocurrency that at any point was held or offered on Voyager's platform; (b) all Causes of Action based on, arising out of, or related to the alleged misrepresentation of any of the Debtors' financial information, business operations, or related internal controls; and (c) all Causes of Action based on, arising out of, or related to any alleged failure to disclose, or actual or attempted cover up or obfuscation of, any of the Debtors' conduct prior to the Petition Date; *provided*, *however*, that Contributed Third-Party Claims do not include (i) any derivative claims of the Debtors; (ii) any direct claims against the Released Parties; (iii) any direct Causes of Action that any Contributing Claimant has against Mark Cuban, Dallas Basketball Limited d/b/a Dallas Mavericks, the National Basketball Association, and any of their Related Parties; or (iv) any direct Causes of Action that any Contributing Claimant, in its capacity as an equity holder of Voyager Digital Ltd., has that are asserted in the currently filed complaint, dated as of July 6, 2022, in the Ontario Superior Court of Justice by Francine De Sousa, against Voyager Digital Ltd., Stephen Ehrlich, Philip Eytan, Evan Psaropoulos, Lewis Bateman, Krisztian Toth, Jennifer Ackart, Glenn Stevens, and Brian Brooks.

52. "*Contributing Claimants*" means any Holders of Claims or Interests that elect on their ballots or opt-in forms to contribute their Contributed Third-Party Claims to the Wind-Down Debtor.

53. "*Cryptocurrency*" means a digital currency or crypto asset in which transactions are verified and records maintained by a decentralized system using cryptography, rather than by a centralized authority, including stablecoins, digital coins and tokens, such as security tokens, utility tokens and governance tokens.

54.    "*Cure*" or "*Cure Claim*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's default under an Executory Contract or an Unexpired Lease assumed by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

55.    "*Customer Onboarding Protocol*" means the protocol describing the process of onboarding Account Holders and Holders of OpCo General Unsecured Claims onto the Binance.US Platform, the form of which shall be included in the Plan Supplement and filed no later than by February 8, 2023, and which shall be in a form acceptable to the Purchaser.

56.    "*D&O Carriers*" means the insurance carriers of the D&O Liability Insurance Policies.

57.    "*D&O Liability Insurance Policies*" means all unexpired insurance policies maintained by the Debtors, the Wind-Down Debtor, or the Estates as of the Effective Date that have been issued (or provide coverage) regarding directors', managers', officers', members', and trustees' liability (including any "tail policy"), including but not limited to the Management Liability Policy, the Excess Policies, and the Side-A Policy, and all agreements, documents, or instruments relating thereto.

58.    "*D&O Settlement*" means the settlement between the Debtors and CEO and CCO as set forth in Article IV.G of the Plan.

59.    "*Debtors*" means, collectively, each of the following:  Voyager Digital Holdings, Inc.; Voyager Digital Ltd.; and Voyager Digital, LLC.

60.    "*Definitive Documents*" means:  (a) the Plan (and any and all exhibits, annexes, and schedules thereto); (b) the Confirmation Order; (c) the Disclosure Statement and the other Solicitation Materials; (d) the Disclosure Statement Order; (e) all pleadings filed by the Debtors in connection with the Chapter 11 Cases (or related orders); (f) the Plan Supplement; (g) the Asset Purchase Agreement; (h) the Customer Onboarding Protocol; and (i) any and all other deeds, agreements, filings, notifications, pleadings, orders, certificates, letters, instruments or other documents reasonably desired or necessary to consummate and document the transactions contemplated by the Restructuring Transactions (including any exhibits, amendments, modifications, or supplements made from time to time thereto).

61.    "*Disclosure Statement*" means the *Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, as may be amended, supplemented, or otherwise modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan.

62.    "*Disclosure Statement Order*" means the order entered by the Bankruptcy Court approving the Disclosure Statement.

63.    "*Disputed*" means a Claim or an Interest or any portion thereof:  (a) that is not Allowed; (b) that is not disallowed under the Plan, the Bankruptcy Code, or a Final Order; and (c) with respect to which a party in interest has Filed a Proof of Claim, a Proof of Interest, or otherwise made a written request to a Debtor for payment.

64.    "*Disputed Claims Reserve*" means an appropriate reserve in an amount to be determined by the Wind-Down Debtor for distributions on account of Disputed Claims that are subsequently Allowed after the Effective Date, in accordance with Article VII.D hereof.

65. "*Distributable Cryptocurrency*" means all Cryptocurrency held on the Voyager platform or that is otherwise property of any Debtor on the Effective Date after payment in full of, or reserve for, all Allowed Administrative Claims, Priority Tax Claims, Secured Tax Claims, and Other Priority Claims.

66. "*Distributable HoldCo Cash*" means HoldCo's Cash, less (x) any Cash necessary to satisfy Allowed Administrative Claims, Priority Tax Claims, Secured Tax Claims, and Other Priority Claims at HoldCo in full; and (y) to fund HoldCo's Pro Rata share of the Wind-Down Budget.

67. "*Distributable OpCo Cash*" means OpCo's Cash, including the Purchase Price Cash, less (x) any Cash necessary to satisfy Allowed Administrative Claims, Priority Tax Claims, Secured Tax Claims, and Other Priority Claims at OpCo in full; and (y) to fund OpCo's Pro Rata share of the Wind-Down Budget.

68. "*Distributable TopCo Cash*" means TopCo's Cash, less (x) any Cash necessary to satisfy Allowed Administrative Claims, Priority Tax Claims, Secured Tax Claims, and Other Priority Claims at TopCo in full; and (y) to fund TopCo's Pro Rata share of the Wind-Down Budget.

69. "*Distribution Agent*" means, as applicable, the Purchaser, the Debtors, the Wind-Down Debtor or any Entity or Entities designated by the Purchaser, the Debtors, or the Wind-Down Debtor to make or to facilitate distributions that are to be made pursuant to the Plan, Definitive Documents, and Asset Purchase Agreement.

70. "*Distribution Date*" means, except as otherwise set forth herein, the date or dates determined by the Debtors or the Wind-Down Debtor, on or after the Effective Date, upon which the Distribution Agent shall make distributions to Holders of Allowed Claims or Allowed Interests entitled to receive distributions under the Plan.

71. "*Distribution Record Date*" means the record date for purposes of determining which Holders of Allowed Claims and Interests against the Debtors are eligible to receive distributions under the Plan, which date shall be the Effective Date, or such other date as is determined by the Debtors or designated by an order of the Bankruptcy Court.

72. "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which (a) all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of the Plan have been satisfied or waived in accordance with Article IX.B of the Plan, (b) no stay of the Confirmation Order is in effect, and (c) the Debtors declare the Plan effective.

73. "*Employee Transition Plan*" has the meaning set forth in Article IV.E of the Plan, and which shall be in form and substance reasonably acceptable to the Committee.

74. "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

75. "*Estate*" means, as to each Debtor, the estate created on the Petition Date for the Debtor in its Chapter 11 Case pursuant to sections 301 and 541 of the Bankruptcy Code and all property (as defined in section 541 of the Bankruptcy Code) acquired by the Debtor after the Petition Date through and including the Effective Date.

76. "*Excess Policies*" means, collectively, the Excess Insurance Policy, No. EFI1203041-01, issued by Euclid Financial on behalf of Certain Underwriters of Lloyd's, London, the Excess Insurance Policy, No. RILEDOA3392022, issued by Relm Insurance Ltd., both for the February 22, 2022 to

February 22, 2023 period, and the Excess Policy, No. ELU184180-23, issued by XL Specialty Insurance Company, for the February 22, 2022 to July 1, 2023 period.

77. "*Exculpated Parties*" means, collectively, and in each case in its capacity as such: (a) each of the Debtors; (b) the Committee, and each of the members thereof, solely in their capacity as such; (c) each of the Released Professionals; (d) each of the Released Voyager Employees; and (e) the Distribution Agent.

78. "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

79. "*Existing Equity Interests*" means any Interest in TopCo existing immediately prior to the occurrence of the Effective Date.

80. "*Extended Outside Date*" has the meaning set forth in the Asset Purchase Agreement.

81. "*Federal Judgment Rate*" means the federal judgment interest rate in effect as of the Petition Date calculated as set forth in section 1961 of the Judicial Code.

82. "*File*," "*Filed*," or "*Filing*" means file, filed, or filing, respectively, in the Chapter 11 Cases with the Bankruptcy Court or its authorized designee, or, with respect to the filing of a Proof of Claim or Proof of Interest, file, filed, or filing, respectively, with the Claims, Noticing, and Solicitation Agent.

83. "*Final Decree*" means the decree contemplated under Bankruptcy Rule 3022.

84. "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, petition for certiorari, or move for a new trial, reargument, reconsideration, or rehearing has expired and no appeal, petition for certiorari, or motion for a new trial, reargument, reconsideration, or rehearing has been timely taken or filed, or as to which any appeal that has been or may be taken or any petition for certiorari or any motion for a new trial, reargument, reconsideration, or rehearing that has been or may be made or filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the motion for a new trial, reargument, reconsideration, or rehearing shall have been denied, resulted in no modification of such order (if any such motion has been or may be granted), or have otherwise been dismissed with prejudice; *provided* that the possibility that a motion under rule 60 of the Federal Rules of Civil Procedure or any comparable Bankruptcy Rule may be filed relating to such order or judgment shall not cause such order or judgment to not be a Final Order.

85. "*FTX*" means FTX Trading, Ltd. and any of its Affiliates or subsidiaries, including West Realm Shires Inc (d/b/a "FTX.US").

86. "*FTX Bankruptcy Proceeding*" means that certain chapter 11 proceeding captioned *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Nov. 11, 2022).

87. "*FTX Claims*" means the claims or causes of action asserted or assertable by the Debtors against FTX, whether in the FTX Bankruptcy Proceeding or otherwise.

88. "*FTX Recovery*" means the recovery, if any, of the Debtors from FTX on account of the FTX Claims.

89. "*FTX Settlement*" means the settlement between the Debtors, the Committee, FTX, Alameda, and the official committee of unsecured creditors in the FTX Bankruptcy Proceeding, pursuant to the terms set forth in the *Debtors' Motion for Entry of an Order Approving the Joint Stipulation and Agreed Order Between the Voyager Debtors, the FTX Debtors, and Their Respective Official Committees of Unsecured Creditors* [Docket No. 1106].

90. "*General Unsecured Claim*" means, collectively, any HoldCo General Unsecured Claim, OpCo General Unsecured Claim, or TopCo General Unsecured Claim.

91. "*Governmental Claimant Stipulation*" means the *Joint Stipulation and Agreed Order Between the Debtors and Governmental Claimants* [Docket. No. 1100].

92. "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

93. "*Government Bar Date*" means the applicable deadline by which Proofs of Claim by a Governmental Unit must be Filed, as established by: (a) the Bar Date Order; (b) a Final Order of the Bankruptcy Court; or (c) the Plan.

94. "*HoldCo*" means Voyager Digital Holdings, Inc.

95. "*HoldCo General Unsecured Claim*" means any Claim against HoldCo that is not Secured and is not: (a) paid in full prior to the Effective Date pursuant to an order of the Bankruptcy Court; (b) an Administrative Claim; (c) a Secured Tax Claim; (d) a Priority Tax Claim; (e) an Other Priority Claim; (f) a Professional Fee Claim; (g) an Alameda Loan Facility Claim; or (h) an Intercompany Claim. For the avoidance of doubt, all (i) Claims resulting from the rejection of Executory Contracts and Unexpired Leases, and (ii) Claims that are not Secured resulting from litigation, against HoldCo are HoldCo General Unsecured Claims.

96. "*Holder*" means an Entity holding a Claim against or an Interest in any Debtor.

97. "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

98. "*Insurance Policies*" means any and all insurance policies entered into by the Debtors, including the D&O Insurance Policies.

99. "*Intercompany Claim*" means any Claim held by a Debtor or a Debtor's Affiliate against a Debtor.

100. "*Intercompany Interest*" means, other than an Interest in Voyager, an Interest in one Debtor held by another Debtor or a Debtor's Affiliate.

101. "*Interest*" means any equity security (as such term is defined in section 101(16) of the Bankruptcy Code) including all issued, unissued, authorized, or outstanding shares of capital stock and any other common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profit interests of an Entity, including all options, warrants, rights, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable, or exchangeable securities, or other agreements, arrangements, or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in an Entity whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security, and including any Claim against

the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to the foregoing.

102.    "*Interim Compensation Order*" means the *Order (I) Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals and (II) Granting Related Relief* [Docket No. 236].

103.    "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001 and the rules and regulations promulgated thereunder, as applicable to the Chapter 11 Cases.

104.    "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

105.    "*Liquidation Procedures*" means, in the event the Sale Transaction is not consummated by the Outside Date, such procedures filed by the Wind-Down Debtor identifying the mechanics and procedures to effectuate the Liquidation Transaction.

106.    "*Liquidation Transaction*" means, in the event the Sale Transaction is not consummated by the Outside Date, the distribution of the Debtors' Cryptocurrency, Cash and other assets pursuant to Article IV.D of this Plan.

107.    "*Management Liability Policy*" means the Executive and Corporate Securities Liability Insurance Policy, No. ELU181214-22, issued by XL Specialty Insurance Company for the February 22, 2022 to February 22, 2023 period.

108.    "*Money Transmitter License*" means any consent, license, certificate, franchise, permission, variance, clearance, registration, qualification, authorization, waiver, exemption or other permit issued, granted, given or otherwise made available by or under the authority of any Governmental Unit pursuant to state money transmission or similar laws.

109.    "*Net Owed Coins*" has the meaning ascribed to it in the Asset Purchase Agreement.

110.    "*Non-Released D&O Claims*" has the meaning set forth in Article IV.F of the Plan.

111.    "*Non-Released D&O Claim Budget*" means the amount allocated to pursue the Non-Released D&O Claims and the Non-Released Insurance Claims, which amount shall be agreed upon between the Debtors and the Committee prior to the Confirmation Hearing.

112.    "*Non-Released Insurance Claims*" has the meaning set forth in Article IV.F of the Plan.

113.    "*OpCo*" means Voyager Digital, LLC.

114.    "*OpCo General Unsecured Claim*" means any Claim against OpCo that is not Secured and is not: (a) paid in full prior to the Effective Date pursuant to an order of the Bankruptcy Court; (b) an Administrative Claim; (c) a Secured Tax Claim; (d) a Priority Tax Claim; (e) an Other Priority Claim; (f) a Professional Fee Claim; (g) an Account Holder Claim; or (h) an Intercompany Claim.  For the avoidance of doubt, all (i) Claims resulting from the rejection of Executory Contracts and Unexpired Leases, and (ii) Claims that are not Secured resulting from litigation against OpCo are OpCo General Unsecured Claims.

115.    "*OSC*" means the Ontario Securities Commission.

116.    "*Other Priority Claim*" means any Claim against a Debtor, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

117.    "*Outside Date*" has the meaning set forth in the Asset Purchase Agreement.  All references herein to the "Outside Date" shall be deemed to include the "Extended Outside Date" to the extent the Outside Date is extended in accordance with Section 8.1(c) of the Asset Purchase Agreement.

118.    "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

119.    "*Petition Date*" means July 5, 2022.

120.    "*Plan*" means this joint chapter 11 plan and all exhibits, supplements, appendices, and schedules hereto, as may be altered, amended, supplemented, or otherwise modified from time to time in accordance with Article X.A hereof, including the Plan Supplement (as altered, amended, supplemented, or otherwise modified from time to time), which is incorporated herein by reference and made part of the Plan as if set forth herein.

121.    "*Plan Administrator*" means the Person or Persons selected by the Committee, after consultation with the Debtors, subject to the approval of the Bankruptcy Court and identified in the Plan Supplement, to serve as the administrator(s) of the Wind-Down Debtor, and any successor thereto, appointed pursuant to the Plan Administrator Agreement.

122.    "*Plan Administrator Agreement*" means that certain agreement by and among the Debtors, the Committee, the Plan Administrator and the Wind-Down Debtor, which shall be included in the Plan Supplement in a form reasonably acceptable to the Committee.

123.    "*Plan Supplement*" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (in each case, as may thereafter be amended, supplemented, or otherwise modified from time to time in accordance with the terms of the Plan, the Bankruptcy Code, the Bankruptcy Rules, and applicable law), to be Filed by the Debtors no later than seven days before the Voting Deadline or such later date as may be approved by the Bankruptcy Court, and additional documents Filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement.  The Plan Supplement may include the following, as applicable:  (a) the Schedule of Assumed Executory Contracts and Unexpired Leases; (b) the Schedule of Retained Causes of Action; (c) the Schedule of Assumed and Assigned Executory Contracts and Unexpired Leases; (d) the Customer Onboarding Protocol; (e) the Restructuring Transactions Memorandum; (f) the Plan Administrator Agreement; (g)  the Employee Transition Plan; and (h) any additional documents necessary to effectuate or that is contemplated by the Plan, including any compensation program for any of the Debtors' employees to be established as contemplated in the Plan and the Definitive Documents to facilitate the transfer of Acquired Assets pursuant to the Asset Purchase Agreement and the wind-down of the Debtors' Estates; *provided* that the Schedule of Retained Causes of Action shall be filed no later than 14 days before the Voting Deadline.  The Plan Supplement (and the contents thereof) shall be (x) subject to Purchaser's consent rights solely to the extent set forth under the Asset Purchase Agreement (and shall otherwise be consistent with the Asset Purchase Agreement) and (y) reasonably acceptable to the Committee.

124.    "*Priority Tax Claim*" means any Claim of a Governmental Unit against a Debtor of the kind specified in section 507(a)(8) of the Bankruptcy Code.

125.    "*Pro Rata*" means the proportion that (i) an Allowed Claim or an Allowed Interest in a particular Class bears to (ii) the aggregate amount of Allowed Claims or Allowed Interests in that Class

and, solely with respect to Claims in Classes 3 and 4(a), the proportion that an Allowed Claim in either such Class bears to the aggregate amount of Allowed Claims in Classes 3 and 4(a) in the aggregate, unless otherwise indicated. For purposes of calculating Pro Rata distributions if the Sale Transaction is consummated by the Outside Date, the Pro Rata shares of all Holders of Allowed Claims or Allowed Interests shall be calculated taking into account the Acquired Coins Value of the Net Owed Coins distributed to each of the Account Holders.

126. "*Professional*" means an Entity: (a) employed in the Chapter 11 Cases pursuant to an order of the Bankruptcy Court in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered and expenses incurred pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code or (b) for which compensation and reimbursement has been Allowed by Final Order of the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

127. "*Professional Fee Claim*" means any Administrative Claim by a Professional for compensation for services rendered or reimbursement of expenses incurred by such Professional through and including the Effective Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court. To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

128. "*Professional Fee Escrow Account*" means an escrow account funded by the Debtors with Cash no later than the Effective Date in an amount equal to the Professional Fee Escrow Amount.

129. "*Professional Fee Escrow Amount*" means the aggregate amount of quarterly U.S. Trustee fees, Professional Fee Claims, and other unpaid fees and expenses the Professionals have incurred or will incur in rendering services in connection with the Chapter 11 Cases prior to and as of the Confirmation Date projected to be outstanding as of the anticipated Effective Date, which shall be estimated pursuant to the method set forth in Article II.B of the Plan.

130. "*Proof of Claim*" means a written proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

131. "*Proof of Interest*" means a written proof of Interest Filed against any of the Debtors in the Chapter 11 Cases.

132. "*Purchase Price Cash*" means the Cash paid by the Purchaser to OpCo pursuant to the Asset Purchase Agreement.

133. "*Purchaser*" means Binance US.

134. "*Reinstated*" or "*Reinstatement*" means, with respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

135. "*Related Party*" means, with respect to any Entity, in each case in its capacity as such with respect to such Entity, such Entity's current and former directors, managers, officers, investment committee members, special committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and advisors.

136.    "*Released Parties*" means, collectively, in each case in its capacity as such: (a) the Debtors; (b) the Committee, and each of the members thereof; (c) each of the Released Professionals; (d) Purchaser and each of its Related Parties; and (e) each of the Released Voyager Employees (subject to the limitations contained in Article IV.F and Article IV.G of the Plan); *provided* that if the Asset Purchase Agreement is terminated, Purchaser and each of its Related Parties shall not be "Released Parties" under the Plan.

137.    "*Released Professionals*" means the following professionals retained by the Debtors, the Committee, or the Purchaser (as applicable):  (i) Kirkland & Ellis LLP; (ii) Moelis & Company LLC; (iii) Berkeley Research Group, LLC; (iv) Bankruptcy Management Solutions, Inc. d/b/a Stretto; (v) Quinn Emanuel Urquhart & Sullivan LLP; (vi) Fasken Martineau DuMoulin LLP; (vii) Campbells Legal (BVI); (viii) McDermott Will & Emery LLP; (ix) FTI Consulting, Inc.; (x) Epiq Corporate Restructuring, LLC; (xi) Cassels, Brock & Blackwell LLP; (xii) Paul Hastings LLP; (xiii) Harney Westwood & Riegels LP (BVI); (xiv) Day Pitney LLP (solely in their capacity as counsel to the Debtors); (xv) Jenner & Block LLP; (xvi) Seyfarth Shaw LLP; (xvii) Alvarez & Marsal Canada Inc.; (xviii) Blake, Cassels & Graydon LLP; (xix) Jaffe Raitt Heuer & Weiss; (xx) Latham & Watkins LLP; (xxi) Lowenstein Sandler LLP; (xxii) Kramer Levin LLP; and (xxiii) Acura Law Firm; *provided* that if the Asset Purchase Agreement is terminated, Latham & Watkins LLP shall not be a "Released Professional" under the Plan.

138.    "*Released Voyager Employees*" means all directors, officers, and Persons employed by each of the Debtors and their Affiliates serving in such capacity on or after the Petition Date but before the Effective Date (subject to the limitations contained in Article IV.F and Article IV.G of the Plan).

139.    "*Releasing Parties*" means, collectively, in each case in its capacity as such:  (a) the Debtors; (b) the Committee, and each of the members thereof; (c) each of the Released Voyager Employees; (d) each of the Released Voyager Employees; (e) Purchaser and each of its Related Parties to the extent Purchaser is able to bind such Related Parties; (f) all Holders of Claims that vote to accept the Plan and affirmatively opt into the releases provided by the Plan; (g) all Holders of Claims that vote to reject the Plan and affirmatively opt into the releases provided by the Plan; and (h) all Holders of Claims or Interests that abstain from voting (or are otherwise not entitled to vote) on the Plan and affirmatively opt into the releases provided by the Plan; *provided* that if the Asset Purchase Agreement is terminated, Purchaser and each of its Related Parties shall not be "Releasing Parties" under the Plan.

140.    " *Restructuring Transactions* " means those mergers, amalgamations, consolidations, reorganizations, arrangements, continuances, restructurings, transfers, conversions, dispositions, liquidations, dissolutions, or other corporate transactions that the Debtors and the Committee jointly determine to be necessary to implement the transactions described in this Plan, as described in more detail in Article IV.B herein and the Restructuring Transactions Memorandum.

141.    "*Restructuring Transactions Memorandum*" means that certain memorandum as may be amended, supplemented, or otherwise modified from time to time, describing the steps to be carried out to effectuate the Restructuring Transactions, the form of which shall be included in the Plan Supplement, and which shall be in a form reasonably acceptable to the Committee.

142.    "*Robertson Class Action*" means that certain putative class action litigation filed in the United States District Court for the Southern District of Florida, captioned *Robertson, et al. v. Cuban, et al.*, No. 1:22-cv-22538-RKA (S.D. Fla. Aug. 10, 2022).

143.    "*Sale Transaction*" means the sale of certain of the Debtors' assets and all other transactions pursuant to the Asset Purchase Agreement.

144. "*Schedule of Assumed and Assigned Executory Contracts and Unexpired Leases*" means a schedule that may be Filed as part of the Plan Supplement, which shall be in form and substance acceptable to the Purchaser and in all respects consistent with the terms of the Asset Purchase Agreement, of certain Executory Contracts and Unexpired Leases to be assumed by the Debtors and assigned to the Purchaser pursuant to the Plan and Asset Purchase Agreement, as the same may be amended, modified, or supplemented from time to time by the Debtors or Wind-Down Debtor, as applicable, in accordance with the Plan.

145. "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means a schedule that may be Filed as part of the Plan Supplement, which shall be in form and substance reasonably acceptable to the Committee, of certain Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time by the Debtors or Wind-Down Debtor, as applicable, in accordance with the Plan.

146. "*Schedule of Retained Causes of Action*" means the schedule of certain Causes of Action of the Debtors that are not released, waived, settled, compromised, or transferred pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time by the Debtors and/or the Wind-Down Debtor, which shall be included in the Plan Supplement. For the avoidance of doubt, any failure to specifically list any Causes of Action on the Schedule of Retained Causes of Action shall not be deemed a waiver or admission that any such Cause of Action does not constitute Vested Causes of Action.

147. "*Schedules*" means, collectively, the schedules of assets and liabilities, Schedule of Assumed Executory Contracts and Unexpired Leases, Schedule of Assumed and Assigned Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by each of the Debtors pursuant to section 521 of the Bankruptcy Code, as such schedules and statements may have been or may be amended, modified, or supplemented from time to time.

148. "*SEC*" means the United States Securities and Exchange Commission.

149. "*Section 510(b) Claim*" means any Claim against a Debtor subject to subordination under section 510(b) of the Bankruptcy Code.

150. "*Secured*" means, when referring to a Claim: (a) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) Allowed pursuant to the Plan as a secured Claim.

151. "*Secured Tax Claim*" means any Secured Claim against a Debtor that, absent its Secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

152. "*Securities Act*" means the U.S. Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

153. "*Security*" has the meaning set forth in section 2(a)(1) of the Securities Act.

154. "*Side-A Policy*" means the Cornerstone A-Side Management Liability Policy, ELU184179-22, issued by XL Specialty Insurance Company, for the July 1, 2022 to July 1, 2023 period.

155.  "*Solicitation Materials*" means all solicitation materials with respect to the Plan.

156.  "*Special Committee*" means the special committee established at OpCo, comprised of two independent directors, to conduct the Special Committee Investigation.

157.  "*Special Committee Investigation*" means that certain investigation undertaken by the Special Committee into certain historical transactions, as more fully described in the Disclosure Statement.

158.  "*Supported Jurisdiction*" has the meaning ascribed to it in the Asset Purchase Agreement.

159.  "*TopCo*" means Voyager Digital Ltd., a Canadian corporation that is publicly traded on the Toronto Stock Exchange.

160.  "*TopCo General Unsecured Claim*" means any Claim against TopCo that is not Secured and is not: (a) paid in full prior to the Effective Date pursuant to an order of the Bankruptcy Court; (b) an Administrative Claim; (c) a Secured Tax Claim; (d) a Priority Tax Claim; (e) an Other Priority Claim; (f) a Professional Fee Claim; (g) an Alameda Loan Facility Claim; (h) an Intercompany Claim; or (i) a Section 510(b) Claim.  For the avoidance of doubt, all (i) Claims resulting from the rejection of Executory Contracts and Unexpired Leases, and (ii) Claims that are not Secured resulting from litigation, other than 510(b) Claims, against TopCo are TopCo General Unsecured Claims.

161.  "*Transferred Creditors*" means Account Holders and Holders of Allowed OpCo General Unsecured Claims who have completed all documentation and "KYC" processes reasonably required by Purchaser in the ordinary course of Purchaser's business with respect to similarly situated clients and who have opened a Binance US Account as of the date that is three (3) months following the later of the Closing Date (as defined in the Asset Purchase Agreement) or such later date as may be specified in the Customer Onboarding Protocol, and the successors and assigns of such Holders.

162.  "*Transferred Cryptocurrency Value*" means the aggregate VWAP of any Cryptocurrency that is the subject of an Additional Bankruptcy Distribution as of the date that is two Business Days prior to such Additional Bankruptcy Distribution.

163.  "*U.S. Trustee*" means the Office of the United States Trustee for Region 2.

164.  "*Unclaimed Distribution*" means any distribution under the Plan on account of an Allowed Claim or Allowed Interest to a Holder that, after the expiration of six months after the Effective Date, has not:  (a) accepted a distribution, (b) given notice to the Wind-Down Debtor of an intent to accept a particular distribution, (c) responded to the Debtors' or Wind-Down Debtor's requests for information necessary to facilitate a particular distribution, or (d) taken any other action necessary to facilitate such distribution.

165.  "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or section 1123 of the Bankruptcy Code.

166.  "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

167.  "*Unsupported Jurisdiction*" has the meaning ascribed to it in the Asset Purchase Agreement.

168.  "*Unsupported Jurisdiction Approval*" has the meaning ascribed to it in the Asset Purchase Agreement.

169. "*Vested Causes of Action*" means the Causes of Action vesting in the Wind-Down Debtor pursuant to Article IV.L of the Plan, including, but not limited to, those Causes of Action enumerated on the Schedule of Retained Causes of Action, which shall be included in the Plan Supplement and in all respects consistent with the terms of the Asset Purchase Agreement.

170. "*VGX*" means Voyager Token, that certain Cryptocurrency issued by the Debtors.

171. "*Voting Deadline*" means February 22, 2023.

172. "*Voyager*" means Voyager Digital Ltd. and its direct and indirect Affiliates.

173. "*VWAP*" means, with respect to any type of Cryptocurrency and as of any date of determination, an amount equal to the volume weighted average price in U.S. dollars for such type of Cryptocurrency for the consecutive 24-hour period immediately prior to 8:00 a.m. New York Time on such date of determination, as reported on https://coinmarketcap.com.

174. "*Wind-Down Debtor*" means a Debtor, or any successor or assign thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Effective Date, and as described in Article IV.H to, among other things, effectuate the wind-down of the Debtors and the Wind-Down Debtor, commence, litigate and settle the Vested Causes of Action that are not released, waived, settled, compromised, or transferred under the Plan and make distributions pursuant to the terms of the Plan and the Plan Administrator Agreement; *provided* that, for the avoidance of doubt, the Wind-Down Debtor shall not conduct any business operations or continue the Debtors' business operations after the Effective Date.

175. "*Wind-Down Debtor Assets*" means any assets of the Debtors transferred to, and vesting in, the Wind-Down Debtor pursuant to the Plan Administrator Agreement, which, in the event the Sale Transaction is consummated, shall exclude the Acquired Assets, and which shall include, without limitation but only to the extent the following are not Acquired Assets, (a) the Wind-Down Reserve, (b) the Net-Owed Coins to be distributed to Account Holders in Supported Jurisdictions until such Account Holders complete the Purchaser's onboarding requirements in accordance with the Asset Purchase Agreement, (c) the Net-Owed Coins to be distributed to Account Holders in Unsupported Jurisdictions to the extent the Purchaser has not obtained the applicable Unsupported Jurisdiction Approval in accordance with Section 6.12 of the Asset Purchase Agreement, (d) any distributions to Account Holders or Holders of OpCo General Unsecured Claims that are returned to the Wind-Down Debtor pursuant to Section 6.12(e) of the Asset Purchase Agreement, (e) 3AC Claims and 3AC Recovery, (f) FTX Claims and FTX Recovery, (g) Alameda Claims and Alameda Recovery, (h) the Non-Released D&O Claims, and (i) the Vested Causes of Action.

176. "*Wind-Down Debtor Beneficiaries*" means the Holders of Allowed Claims or Allowed Interests that are entitled to receive distributions pursuant to the terms of the Plan, whether or not such Claims or Interests are Allowed as of the Effective Date.

177. "*Wind-Down Debtor Expenses*" means all actual and necessary costs and expenses incurred by the Wind-Down Debtor or Plan Administrator in connection with carrying out the obligations of the Wind-Down Debtor pursuant to the terms of the Plan and the Plan Administrator Agreement.

178. "*Wind-Down Debtor Oversight Committee*" means the oversight committee tasked with overseeing the Wind-Down Debtor in accordance with the Plan and the Plan Administrator Agreement.

179. "*Wind-Down Budget*" means the budget to fund the Wind-Down Debtor, which will be included in the Plan Supplement.

180. "*Wind-Down Reserve*" means the amount set forth in the Wind-Down Budget to fund the Wind-Down Debtor.

## B.    Rules of Interpretation

For purposes of this Plan: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter gender; (2) capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form; (3) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (4) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed, or to be Filed, shall mean that document, schedule, or exhibit, as it may thereafter have been or may thereafter be validly amended, amended and restated, supplemented, or otherwise modified; (5) unless otherwise specified, any reference to an Entity as a Holder of a Claim or Interest, includes that Entity's successors and assigns; (6) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (7) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (8) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) unless otherwise specified, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (12) references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (13) unless otherwise specified, all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases; (14) any effectuating provisions may be interpreted by the Debtors or the Wind-Down Debtor in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; (15) any references herein to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter; (16) all references herein to consent, acceptance, or approval shall be deemed to include the requirement that such consent, acceptance, or approval be evidenced by a writing, which may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail; (17) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; and (18) the use of "include" or "including" is without limitation unless otherwise stated.

## C.    Computation of Time

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

## D.    Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving

effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan and any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, documents, instruments, or contracts, in which case the governing law of such agreement shall control); *provided* that corporate, limited liability company, or partnership governance matters relating to the Debtors or the Wind-Down Debtor, as applicable, shall be governed by the laws of the jurisdiction of incorporation or formation of the relevant Debtor or Wind-Down Debtor, as applicable.

**E.      Reference to Monetary Figures**

All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

**F.      Reference to the Debtors or the Wind-Down Debtor**

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Wind-Down Debtor mean the Debtors and the Wind-Down Debtor, as applicable, to the extent the context requires.

**G.      Nonconsolidated Plan**

Although for purposes of administrative convenience and efficiency the Plan has been filed as a joint plan for each of the Debtors and presents together Classes of Claims against and Interests in the Debtors, the Plan does not provide for the substantive consolidation of any of the Debtors.

<div align="center">

**ARTICLE II.**

**ADMINISTRATIVE AND PRIORITY CLAIMS**

</div>

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

**A.      Administrative Claims**

Except as otherwise provided in this Article II.A and except with respect to Administrative Claims that are Professional Fee Claims or subject to 11 U.S.C. § 503(b)(1)(D), unless previously Filed, requests for payment of Allowed Administrative Claims (other than Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code) must be Filed and served on the Wind-Down Debtor pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date.  Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property, and such Administrative Claims shall be deemed satisfied as of the Effective Date without the need for any objection from the Wind-Down Debtor or any notice to or action, order, or approval of the Bankruptcy Court or any other Entity.  Objections to such requests, if any, must be Filed and served on the Wind-Down Debtor and the requesting party by the Claims Objection Bar Date for Administrative Claims. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed by Final Order of the Bankruptcy Court.

<div align="center">

18

A-931

</div>

Except with respect to Administrative Claims that are Professional Fee Claims, and except to the extent that an Administrative Claim or Priority Tax Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall receive an amount of Cash equal to the amount of the unpaid or unsatisfied portion of such Allowed Administrative Claim in accordance with the following: (1) if such Administrative Claim is Allowed on or prior to the Effective Date, no later than thirty (30) days after the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction or course of business giving rise to such Allowed Administrative Claim, without any further action by the Holder of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtors or the Wind-Down Debtor, as applicable; or (5) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court. Any Cryptocurrency inadvertently deposited to the Debtors' account(s) after the Petition Date shall be returned to the sender in full.

Objections to requests for payment of such Administrative Claims, if any, must be Filed with the Bankruptcy Court and served on the Wind-Down Debtor and the requesting Holder no later than the Claims Objection Bar Date for Administrative Claims. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with, an order that becomes a Final Order of the Bankruptcy Court.

**B.**     **Professional Fee Claims**

1.     <u>Final Fee Applications and Payment of Professional Fee Claims</u>

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than sixty (60) days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code and Bankruptcy Rules. The Wind-Down Debtor shall pay Professional Fee Claims in Cash to such Professionals in the amount the Bankruptcy Court allows, including from funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court; *provided* that the Debtors' and the Wind-Down Debtor's obligations to pay Allowed Professional Fee Claims shall not be limited or deemed limited to funds held in the Professional Fee Escrow Account.

2.     <u>Professional Fee Escrow Account</u>

No later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and the U.S. Trustee and for no other Entities until all quarterly U.S. Trustee fees and all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the U.S. Trustee or to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court. No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. No funds held in the Professional Fee Escrow Account shall be property of the Estates of the Debtors or the Wind-Down Debtor. When all

19

Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, and all U.S. Trustee quarterly fees plus statutory interest, if any, have been paid in full, any remaining funds held in the Professional Fee Escrow Account shall be turned over to the Wind-Down Debtor without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

       3.      <u>Professional Fee Escrow Amount</u>

     The Professionals shall deliver to the Debtors a reasonable and good-faith estimate of their unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Confirmation Date projected to be outstanding as of the anticipated Effective Date, and shall deliver such estimate no later than five Business Days prior to the anticipated Effective Date.  For the avoidance of doubt, no such estimate shall be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that are the subject of a Professional's final request for payment of Professional Fee Claims Filed with the Bankruptcy Court, and such Professionals are not bound to any extent by the estimates.  If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.  The total aggregate amount so estimated to be outstanding as of the anticipated Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account; *provided* that the Wind-Down Debtor shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are Filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

       4.      <u>Post-Confirmation Date Fees and Expenses</u>

     Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors and/or the Wind-Down Debtor, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Wind-Down Debtor.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Wind-Down Debtor may employ and pay any Professional in the ordinary course of business for the period after the Confirmation Date without any further notice to or action, order, or approval of the Bankruptcy Court.

     For the avoidance of doubt, no Administrative Claims, Professional Fee Claims, or any other post-confirmation fees and expenses shall be paid prior to payment of any quarterly fees due and outstanding to the U.S. Trustee.

**C.**      **Priority Tax Claims**

     Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

# ARTICLE III.

## CLASSIFICATION, TREATMENT,
## AND VOTING OF CLAIMS AND INTERESTS

### A.   Classification of Claims and Interests

Except for the Claims addressed in Article II of the Plan, all Claims against and Interests in the Debtors are classified in the Classes set forth in this Article III for all purposes, including voting, Confirmation, and distributions pursuant to the Plan and in accordance with section 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

### B.   Summary of Classification

A summary of the classification of Claims against and Interests in each Debtor pursuant to the Plan is set forth in the following chart.  The Plan constitutes a separate chapter 11 plan for each of the Debtors, and accordingly, the classification of Claims and Interests set forth below applies separately to each of the Debtors.  All of the potential Classes for the Debtors are set forth herein.  Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Claims or Interests shall be treated as set forth in Article III.E hereof.  Voting tabulations for recording acceptances or rejections of the Plan will be conducted on a Debtor-by-Debtor basis as set forth above.[1]

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | Account Holder Claims | Impaired | Entitled to Vote |
| 4A | OpCo General Unsecured Claims | Impaired | Entitled to Vote |
| 4B | HoldCo General Unsecured Claims | Impaired | Entitled to Vote |
| 4C | TopCo General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Alameda Loan Facility Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

---

[1]   The Debtors reserve the right to separately classify Claims or Interests to the extent necessary to comply with any requirements under the Bankruptcy Code or applicable law.

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 6 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |
| 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |
| 9 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

**C.      Treatment of Classes of Claims and Interests**

        Subject to Article VI hereof, each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors or Wind-Down Debtor, as applicable, and the Holder of such Allowed Claim or Allowed Interest, as applicable.  In no event shall any Holder of a Claim receive more than such Holder's Allowed amount on account of such Claim.

        1.      Class 1 —Secured Tax Claims

        (a)      *Classification*:  Class 1 consists of all Secured Tax Claims.

        (b)      *Treatment*:  Each Holder of an Allowed Secured Tax Claim shall receive, in full and final satisfaction of such Allowed Secured Tax Claim, at the option of the Wind-Down Debtor, payment in full in Cash of such Holder's Allowed Secured Tax Claim or such other treatment rendering such Holder's Allowed Secured Tax Claim Unimpaired.

        (c)      *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Allowed Secured Tax Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Secured Tax Claims are not entitled to vote to accept or reject the Plan.

        2.      Class 2 — Other Priority Claims

        (a)      *Classification*:  Class 2 consists of all Other Priority Claims.

        (b)      *Treatment*:  Each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Allowed Other Priority Claim, at the option of the applicable Debtor, payment in full in Cash of such Holder's Allowed Other Priority Claim or such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired.

        (c)      *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan under section 1126(f)

of the Bankruptcy Code. Therefore, Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan.

3. <u>Class 3 — Account Holder Claims</u>

    (a)    *Classification*: Class 3 consists of all Account Holder Claims.

    (b)    *Allowance*: Account Holder Claims shall be conclusively Allowed in the amount listed on OpCos's *Amended Schedules of Assets and Liabilities* (Case No. 22-10945) [Docket No. 18]; *provided* that the rights of any Holder of an Account Holder Claim to object to the scheduled amount shall be preserved. To the extent an Account Holder Claim is Allowed in a greater amount than the scheduled amount of such Account Holder Claim, such Holder shall be entitled to a subsequent distribution such that it will receive its Pro Rata share of recoveries to Holders of Allowed Account Holder Claims. Account Holder Claims shall be valued in U.S. dollars as of the Petition Date consistent with section 502(b) of the Bankruptcy Code.

    (c)    *Treatment*: Each Holder of an Allowed Account Holder Claim will receive in exchange for such Allowed Account Holder Claim:

        (i)    If the Sale Transaction is consummated by the Outside Date:

            A.    its Net Owed Coins, as provided in and subject to the requirements of Sections 6.10 and 6.12 of the Asset Purchase Agreement and Article VI.C.8 of the Plan; *provided* that (i) for Account Holders in Supported Jurisdictions who do not complete the Purchaser's onboarding requirements within three (3) months following the Closing Date, (ii) Account Holders in Unsupported Jurisdictions who make a written election, in accordance with a notice to be issued by the Debtors and within three (3) months following the later of the Closing Date or the date which the terms and conditions for the Binance.US Platform are made available to such Account Holders to accept, to receive value in Cash on account of the Net Owed Coins allocable to such Account Holders, and (iii) Account Holders in Unsupported Jurisdictions who do not make the election in the prior clause only to the extent that the Purchaser does not obtain the Unsupported Jurisdiction Approval for the jurisdiction in which such Account Holder resides within 6 months following the Closing Date (as defined in the Asset Purchase Agreement), such Account Holders shall receive, after expiration of such applicable time period (*i.e.*, (a) three (3) months following the Closing Date for the Account Holders described in subsection (i) of this paragraph, (b) three (3) months following the later of the Closing Date or the date which the terms and conditions for the Binance.US Platform are made available to such Account Holder to accept for the Account Holders described in subsection (ii) of this paragraph, and (c) six (6) months for the Account Holders described in subsection (iii) of this paragraph),

value in Cash at which such Net Owed Coins allocable to such Account Holder are liquidated;

B.    its Pro Rata share of any Additional Bankruptcy Distributions, in Cryptocurrency or Cash as provided in and subject to the requirements of Sections 6.12 and 6.14 of the Asset Purchase Agreement;

C.    its Pro Rata share of Distributable OpCo Cash; and

D.    to effectuate distributions from the Wind-Down Debtor, its Pro Rata share of the Wind-Down Debtor Assets attributable to OpCo; *provided* that any distributions on account of the Wind-Down Debtor Assets attributable to OpCo shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims at OpCo;

*provided* that distributions made to any Account Holder pursuant to clauses (B), (C), and (D) above shall be made after taking into account the Acquired Coins Value of the Net Owed Coins or the value in Cash at which such Net Owed Coins are liquidated, as applicable, previously allocated to such Account Holder; or

(ii)    If the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated:

A.    its Pro Rata share of Distributable OpCo Cash;

B.    its Pro Rata share of Distributable Cryptocurrency, which such Account Holder shall be able to withdraw in kind, alternative Cryptocurrency, and/or Cash for a period of thirty (30) days after the Effective Date through the Voyager platform or, if elected by Seller pursuant to Section 6.12(d) of the Asset Purchase Agreement, through the Binance.US Platform; *provided* that if the applicable transfer is made through the Voyager platform and such Account Holder does not withdraw its Pro Rata share of Distributable Cryptocurrency available to such Account Holder from the Voyager platform within such thirty (30) day period, such Account Holder will receive Cash in the equivalent value to its Pro Rata share of Distributable Cryptocurrency; and

C.    to effectuate distributions from the Wind-Down Debtor, its Pro Rata share of the Wind-Down Debtor Assets attributable to OpCo; *provided* that any distributions on account of Wind-Down Debtor Assets attributable to OpCo shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed

Secured Tax Claims, and Allowed Other Priority Claims at OpCo.

(d)    *Voting:* Class 3 is Impaired under the Plan. Holders of Allowed Account Holder Claims are entitled to vote to accept or reject the Plan.

4.    Class 4A — OpCo General Unsecured Claims

(a)    *Classification*: Class 4A consists of all OpCo General Unsecured Claims.

(b)    *Treatment*: Each Holder of an Allowed OpCo General Unsecured Claim will receive in exchange for such Allowed OpCo General Unsecured Claim:

(i)    If the Sale Transaction is consummated by the Outside Date:

A.    its Pro Rata share of Distributable Cryptocurrency in Cash;

B.    its Pro Rata share of Additional Bankruptcy Distributions, in Cryptocurrency or Cash as provided in and subject to the requirements of Sections 6.12 and 6.14 of the Asset Purchase Agreement;

C.    its Pro Rata share of Distributable OpCo Cash; and

D.    to effectuate distributions from the Wind-Down Debtor, its Pro Rata share of the Wind-Down Debtor Assets attributable to OpCo; *provided* that any distributions on account of the Wind-Down Debtor Assets attributable to OpCo shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims at OpCo; or

(ii)    If the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated:

A.    its Pro Rata share of Distributable Cryptocurrency in Cash;

B.    its Pro Rata share of Distributable OpCo Cash; and

C.    to effectuate distributions from the Wind-Down Debtor, its Pro Rata share of the Wind-Down Debtor Assets attributable to OpCo; *provided* that any distributions on account of the Wind-Down Debtor Assets attributable to OpCo shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims at OpCo.

(c)    *Voting*:  Class 4A is Impaired under the Plan.  Holders of Allowed OpCo General Unsecured Claims are entitled to vote to accept or reject the Plan.

5.    Class 4B — HoldCo General Unsecured Claims

(a)    *Classification*:  Class 4B consists of all HoldCo General Unsecured Claims.

(b)    *Treatment*:  Each Holder of an Allowed HoldCo General Unsecured Claim will receive in exchange for such Allowed HoldCo General Unsecured Claim:

(i)    its Pro Rata share of Distributable HoldCo Cash; and

(ii)    to effectuate distributions from the Wind-Down Debtor, its Pro Rata share of the Wind-Down Debtor Assets attributable to HoldCo; *provided* that any distributions on account of the Wind-Down Debtor Assets attributable to HoldCo shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims at HoldCo.

(c)    *Voting*:  Class 4B is Impaired under the Plan.  Holders of Allowed HoldCo General Unsecured Claims are entitled to vote to accept or reject the Plan.

6.    Class 4C — TopCo General Unsecured Claims

(a)    *Classification*:  Class 4C consists of all TopCo General Unsecured Claims.

(b)    *Treatment*:  Each Holder of an Allowed TopCo General Unsecured Claim will receive in exchange for such Allowed TopCo General Unsecured Claim:

(i)    its Pro Rata share of Distributable TopCo Cash; and

(ii)    to effectuate distributions from the Wind-Down Debtor, its Pro Rata share of the Wind-Down Debtor Assets attributable to TopCo; *provided* that any distributions on account of the Wind-Down Debtor Assets attributable at TopCo shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims at TopCo.

(c)    *Voting*:  Class 4C is Impaired under the Plan.  Holders of Allowed TopCo General Unsecured Claims are entitled to vote to accept or reject the Plan.

7.    Class 5 — Alameda Loan Facility Claims

(a)    *Classification*:  Class 5 consists of all Alameda Loan Facility Claims.

(b)    *Treatment*:  If the FTX Settlement becomes effective, each Holder of an Allowed Alameda Loan Facility Claim shall, at the election of the Debtors with the consent of the Committee, in their sole discretion, following written notice to counsel to FTX, Alameda and to the official committee of unsecured creditors in the FTX Bankruptcy Proceeding of such election, which written notice shall be given no later than the date that is thirty (30) days after the Confirmation Hearing, (a)

withdraw its Alameda Loan Facility Claims in their entirety, with prejudice to FTX or any other party reasserting such claims, or (b) contribute the Alameda Loan Facility Claims to OpCo. If the FTX Settlement does not become effective, the Alameda Loan Facility Claims shall be subordinated to all Allowed Claims at OpCo, HoldCo, and TopCo, including, but not limited to, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, Allowed Account Holder Claims, Allowed OpCo General Unsecured Claims, Allowed HoldCo General Unsecured Claims, and Allowed TopCo General Unsecured Claims; *provided, however*, if the Bankruptcy Court denies subordination of the Alameda Loan Facility Claims, then such Alameda Loan Facility Claims shall be *pari passu* with General Unsecured Claims at the applicable Debtor entity.

(c)     *Voting*: Class 5 is Impaired under the Plan. Holders of Allowed Alameda Loan Facility Claims are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. Therefore, Holders of Allowed Alameda Loan Facility Claims are not entitled to vote to accept or reject the Plan.

8.     Class 6 — Section 510(b) Claims

(a)     *Classification*: Class 6 consists of all Section 510(b) Claims against TopCo.

(b)     *Allowance*: Notwithstanding anything to the contrary herein, a Section 510(b) Claim against TopCo, if any such Section 510(b) Claim exists, may only become Allowed by Final Order of the Bankruptcy Court.

(c)     *Treatment*: Each Holder of Allowed Section 510(b) Claims against TopCo will receive, to effectuate distributions, if applicable, from the Wind-Down Debtor, its Pro Rata share of the Wind-Down Debtor Assets attributable to TopCo; *provided* that any distributions on account of the Wind-Down Debtor Assets attributable to TopCo shall only be made following payment in full of, or reserve for, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, and Allowed TopCo General Unsecured Claims at TopCo.

(d)     *Voting*: Class 6 is Impaired under the Plan. Holders (if any) of Allowed Section 510(b) Claims against TopCo are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. Therefore, Holders (if any) of Allowed Section 510(b) Claims against TopCo are not entitled to vote to accept or reject the Plan.

9.     Class 7 — Intercompany Claims

(a)     *Classification*: Class 7 consists of all Intercompany Claims.

(b)     *Treatment*:  Each Intercompany Claim shall receive the treatment for such Intercompany Claim as determined by the Bankruptcy Court.

(c)     *Voting*: Holders of Intercompany Claims are either Unimpaired or Impaired, and such Holders of Intercompany Claims are conclusively presumed to have accepted

27

A-940

the Plan under section 1126(f) of the Bankruptcy Code. Therefore, Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

10.    <u>Class 8 — Intercompany Interests</u>

(a)    *Classification*: Class 8 consists of all Intercompany Interests.

(b)    *Treatment*: On the Effective Date, all Intercompany Interests shall be, at the option of the Debtors, either (a) Reinstated in accordance with Article III.G of the Plan or (b) set off, settled, addressed, distributed, contributed, merged, or cancelled, in each case in accordance with the Restructuring Transactions Memorandum.

(c)    *Voting*: Holders of Intercompany Interests are either Unimpaired or Impaired, and such Holders of Intercompany Interests are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Therefore, Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

11.    <u>Class 9 — Existing Equity Interests</u>

(a)    *Classification*: Class 9 consists of all Existing Equity Interests.

(b)    *Treatment*: Each Holder of Existing Equity Interests will receive, to effectuate distributions, if applicable, from the Wind-Down Debtor, its Pro Rata share of the Wind-Down Debtor Assets attributable to TopCo; *provided* that any distributions on account of Wind-Down Debtor Assets attributable at TopCo shall only be made following payment in full of, or reserve for, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, and Allowed TopCo General Unsecured Claims at TopCo.

(c)    *Voting*: Class 9 is Impaired under the Plan. Holders of Existing Equity Interests are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. Therefore, Holders of Existing Equity Interests are not entitled to vote to accept or reject the Plan.

## D.    Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Wind-Down Debtor's rights in respect of any Unimpaired Claim, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

## E.    Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

## F.    Subordinated Claims

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims against and Allowed Interests in the Debtors and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors and the Wind-Down Debtor reserve the right to reclassify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

## G.    Intercompany Interests

To the extent Reinstated under the Plan, distributions (if any) on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the corporate structure given the existing intercompany systems connecting the Debtors and their Affiliates, and in exchange for the Debtors' and Wind-Down Debtor's agreement under the Plan to make certain distributions to the Holders of Allowed Claims.

## H.    Controversy Concerning Impairment

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

## I.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code

Section 1129(a)(10) of the Bankruptcy Code is satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims or Interests.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

## ARTICLE IV.

## PROVISIONS FOR IMPLEMENTATION OF THE PLAN

## A.    General Settlement of Claims and Interests

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan.  The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under

section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 of all such Claims, Interests, Causes of Action, and controversies, as well as a finding by the Bankruptcy Court that such compromise and settlement is fair, equitable, reasonable, and in the best interests of the Debtors, their Estates, and Holders of Claims and Interests. Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Interests in any Class are intended to be and shall be final.

## B. Restructuring Transactions

On or before the Effective Date, the applicable Debtors will take any action as may be necessary or advisable to effectuate the Restructuring Transactions described in the Plan, the Restructuring Transactions Memorandum, and the Customer Onboarding Protocol, including: (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (4) the transfer or distribution of any Cryptocurrency or Cash pursuant to the Asset Purchase Agreement, or the Liquidation Procedures, as applicable; (5) the execution and delivery of the Plan Administrator Agreement; (6) any transactions necessary or appropriate to form or convert into the Wind-Down Debtor; (7) such other transactions that are required to effectuate the Restructuring Transactions, including any sales, mergers, consolidations, restructurings, conversions, dispositions, transfers, formations, organizations, dissolutions, or liquidations; (8) all transactions necessary to provide for the purchase of the Acquired Assets by Purchaser under the Asset Purchase Agreement; and (9) all other actions that the applicable Entities determine to be necessary or appropriate, or that are reasonably requested by the Purchaser in accordance with the Asset Purchase Agreement, including making filings or recordings that may be required by applicable law.

The Confirmation Order shall, and shall be deemed to, pursuant to sections 1123 and 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions.

## C. The Sale Transaction

If the Sale Transaction is consummated by the Outside Date, pursuant to the terms of the Asset Purchase Agreement, then the following terms shall govern:

On or prior to the Effective Date, the Debtors shall have consummated the Sale Transaction, and, among other things, the Acquired Assets and Assumed Liabilities shall have transferred to the Purchaser free and clear of all Liens, Claims, Interests, charges, or other encumbrances, and the Purchaser shall pay to the Debtors or Holders of Account Holder Claims and Holders of OpCo General Unsecured Claims, as applicable, the proceeds from the Sale Transaction, as and to the extent provided for in the Asset Purchase Agreement, and this Plan. The Confirmation Order shall authorize the Debtors, the Purchaser, and the Wind-Down Debtor, as applicable, to undertake the transactions contemplated by the Asset Purchase Agreement, including pursuant to sections 363, 365, 1123(a)(5)(B), and 1123(a)(5)(D) of the Bankruptcy Code.

The Debtors and Purchaser shall be authorized to take all actions as may be deemed necessary or appropriate to consummate the Sale Transaction pursuant to the terms of the Asset Purchase Agreement the Customer Onboarding Protocol, and this Plan. The Debtors shall be authorized to sell any Cryptocurrency

to satisfy all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims. On and after the Effective Date, except as otherwise provided in the Plan and the Plan Administrator Agreement, the Wind-Down Debtor, or the Purchaser, as applicable, may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; provided, that the Bankruptcy Court shall retain jurisdiction to resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with any of the foregoing.

Notwithstanding anything to the contrary in the Asset Purchase Agreement, this Plan, or any Definitive Document, the Debtors, each Account Holder or Holder of an Allowed OpCo General Unsecured Claim, as applicable, shall retain all right, title, and interest in and to any Cryptocurrency allocated to such Account Holder or Holder of an Allowed OpCo General Unsecured Claim pursuant to this Plan through and including such time as such Cryptocurrency is returned or distributed to the Debtors or such Account Holder or Holder of an Allowed OpCo General Unsecured Claim, as applicable, hereunder, and such Cryptocurrency shall be held by Purchaser solely in a custodial capacity in trust and solely for the benefit of the Debtors or Account Holder or Holder of an Allowed OpCo General Unsecured Claim, as applicable, thereafter.

Notwithstanding anything contained in this Plan and any Definitive Documents, if the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated, all provisions contained in this Plan and the Definitive Documents governing the Sale Transaction shall have no further force and effect, and the provisions governing the Liquidation Transaction shall govern. The rights and remedies of the Seller and Purchaser under the Asset Purchase Agreement and any related orders of the Bankruptcy Court shall be expressly preserved.

## D. The Liquidation Transaction

If the Sale Transaction is not consummated by the Outside Date, pursuant to the Asset Purchase Agreement, then the following terms shall govern:

### 1. *The Liquidation Transaction*

On or after the Outside Date, the Debtors will pursue the Liquidation Transaction in accordance with the Liquidation Procedures. Pursuant to the Liquidation Transaction, the Debtors, the Wind-Down Debtor, or the Plan Administrator, as applicable, will distribute certain of the Cryptocurrency in-kind to Holders of Account Holder Claims in accordance with Article III.C of the Plan, transfer all Wind-Down Debtor Assets to the Wind-Down Debtor, liquidate certain of the Cryptocurrency, distribute Cash to Holders of Claims, wind down and dissolve the Debtors, and pursue final administration of the Debtors' Estates pursuant to the Bankruptcy Code.

The Debtors, or the Wind-Down Debtor, as applicable, shall be authorized to take all actions as may be deemed necessary or appropriate to consummate the Liquidation Transaction pursuant to this Plan. On or before the date that is twenty-one days prior to the anticipated commencement of the Liquidation Transaction, the Debtors, or the Wind-Down Debtor, as applicable, shall file the Liquidation Procedures with the Bankruptcy Court. Parties in interest shall have ten days to object to the Liquidation Procedures, and if no objections are timely filed, the Liquidation Procedures shall be approved. In the event of a timely objection, the Bankruptcy Court shall adjudicate any objection to the Liquidation Procedures.

On and after the Effective Date, except as otherwise provided in the Plan, the Plan Administrator Agreement, and the Liquidation Procedures, the Debtors or the Wind-Down Debtor, as applicable, may

operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; *provided*, that the Bankruptcy Court shall retain jurisdiction to resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with any of the foregoing.

2.  *Cryptocurrency Rebalancing*

Prior to the Effective Date the Debtors shall, in consultation with the Committee, be authorized to rebalance their Cryptocurrency portfolio to ensure that the Debtors can effectuate *pro rata* in-kind distributions of the Distributable Cryptocurrency according to Article III.C.3(c) of this Plan, *provided* that such rebalancing shall be in accordance with the Asset Purchase Agreement (if the Asset Purchase Agreement has not been terminated). The Debtors may effectuate such rebalancing by (i) selling such Cryptocurrency that cannot be distributed to Account Holders, (ii) purchasing Cryptocurrency supported by Voyager's or Binance.US Platform (as provided by the Asset Purchase Agreement) that shall be distributed to Account Holders, and (iii) engaging in any other transaction, including the execution of trades of Cryptocurrency, necessary or appropriate to effectuate distributions of the Distributable Cryptocurrency to Holders of Allowed Account Holder Claims.

## E.  Employee Transition Plan

The Debtors shall be authorized to implement the Employee Transition Plan, the terms of which shall be reasonably acceptable to Purchaser and the Committee and included in the Plan Supplement. The Employee Transition Plan shall help ensure that employees are available to provide transition services to the Debtors and/or the Wind-Down Debtor to effectuate the Sale Transaction and to wind down the Debtors' Estates.

## F.  Non-Released D&O Claims

Any Claims or Causes of Action held by the Debtors or their respective estates against the Debtors' CEO and/or CCO (regardless of any fiduciary capacity in which such individuals were acting) that are expressly related to approval of the 3AC Loan are not released pursuant to the Plan (collectively, the "Non-Released D&O Claims"), and shall be assigned and transferred to the Wind-Down Debtor to be pursued, settled, or resolved by the Wind-Down Debtor in accordance with the terms of Article IV.G of this Plan and subject to the Wind-Down Budget. Any claims against the D&O Carriers that the Debtors' insurance transactions within the 90 days prior to the Petition Date are avoidable under the Bankruptcy Code, applicable state law, or both (the "Non-Released Insurance Claims") shall be assigned and transferred to the Wind-Down Debtor to be pursued, settled, or resolved solely by the Wind-Down Debtor in accordance with the terms of Article IV.G of this Plan. The Wind-Down Debtor shall be a successor to the Debtors' rights, title, and interest in any Non-Released D&O Claims and Non-Released Insurance Claims, and the Wind-Down Debtor shall have standing to pursue the Non-Released D&O Claims and the Non-Released Insurance Claims in accordance with the terms of Article IV.G of this Plan; *provided* that: (i) any recovery by the Wind-Down Debtor (and the beneficiaries thereof) on account of any Non-Released D&O Claim, including in each case by way of settlement or judgment, shall be satisfied solely by and to the extent of the proceeds of the Debtors' available D&O Liability Insurance Policies (and/or from the D&O Carriers directly) after payment from such D&O Liability Insurance Policies of any and all covered costs and expenses incurred in connection with the defense of the Non-Released D&O Claims; (ii) any party, including any trustee or any beneficiary of the Wind-Down Debtor, seeking to execute, garnish, or otherwise attempt to collect on any settlement of or judgment in the Non-Released D&O Claims shall do so solely upon available insurance coverage from the Debtors' available D&O Liability Insurance Policies; and (iii) no party shall (a) record any judgment against the CEO or CCO, or (b) otherwise attempt to collect,

directly or indirectly, from the personal assets of the CEO or CCO with respect to the Non-Released D&O Claims.  For the avoidance of doubt, this provision does not enjoin, limit, or impair direct claims held by third parties against the Debtors' CEO or CCO (if any) other than any direct claims held by Holders of Claims or Interests that opt into the third-party release in Article VIII.B of this Plan.  Only upon the occurrence of the earlier of (x) a release being given as part of any later settlement of the Non-Released D&O Claims; (y) final resolution of any coverage claims asserted against the Debtors' available D&O Liability Insurance Policies on account of the Non-Released D&O Claims; or (z) exhaustion of the available insurance coverage under the D&O Liability Insurance Policies, the Non-Released D&O Claims shall be released and discharged without the need for further action or Bankruptcy Court order.  For the avoidance of doubt, any release of the Non-Released D&O Claims shall not become effective until one of the three conditions stated in the preceding sentence above has been met.

**G.      The D&O Settlement**

On the Effective Date, the terms of the D&O Settlement shall be effectuated as provided in this Article IV.G.

Pursuant to the D&O Settlement, CEO shall repay the $1,900,000 received from the Debtors on or around February 28, 2022, by paying the after-tax amount of such transfer (approximately $1,125,000) to OpCo in cash and assigning the right, if any, to any tax refund for the balance to the Wind-Down Debtor.  CEO shall subordinate any Claims (including any indemnification claims asserted under this Art. IV.F) he holds against the Debtors until all other Holders of Claims are paid in full.  CCO shall subordinate 50 percent of any Claims he holds other than indemnification claims (and 100% of any indemnification claims asserted under this Art. IV.F) against the Debtors until all other Holders of Claims are paid in full; *provided, however*, that in the event the D&O Carriers deny coverage to CEO or CCO under the D&O Insurance Policies on account of such subordination of any indemnification claim, then any indemnification claims by CEO or CCO shall not be so subordinated, but may be filed as an OpCo General Unsecured Claim.

CEO and CCO, each as insureds, under the D&O Liability Insurance Policies agree:  (i) not to draw down on the Side-A Policy; *provided, however*, that should coverage continue to be available under the Side-A Policy following resolution of the Debtors' and/or the Wind-Down Debtor's claims for the avoidance of the premium paid for the policy (whether by judgment or settlement or otherwise) such officer shall be entitled to seek coverage under the Side-A Policy to the extent any such coverage remains; and (ii) not to object to any settlement by the Debtors or Wind Down Entity of avoidance claims under the Side-A Policy, even if such settlement results in termination of benefits under the Side-A Policy.  For the avoidance of doubt, this agreement is not intended to and shall not alter or amend each of the insureds' duties under the D&O Liability Insurance Policies.  In the event that any insurer under the D&O Liability Insurance Policies denies coverage for any reason, the Wind-Down Debtor shall have the right to bring a coverage claim against the insurer(s) in the name of the insured, the insureds shall reasonably cooperate with respect to any such claim, and the insured may participate at their election (and at their sole cost).  For the avoidance of doubt, nothing contained in this Plan is intended as a waiver or release of the Debtors' and/or Wind-Down Debtor's right to assert any Non-Released D&O Claim, but rather limits such recovery in the manner set forth above.

CEO and CCO shall be entitled to receive their salary and benefits for as long as they work for the Debtors and/or the Wind-Down Debtor and retain the right to assert claims for advancement and indemnification up to the limits of any available coverage in the event any of the insurers that issued the Management Liability Policy, the Excess Policy, or the Side-A Policy denies coverage to CEO and/or CCO based upon or arising out of the lack of a formal claim for indemnification; *provided, however*, that any such indemnification or advancement claims shall be subordinated in full unless and until all other Holders of Claims are paid in full; *provided, further*, that in the event that any of the D&O Carriers deny coverage

to CEO or CCO under the D&O Insurance Policies on account of such subordination of any indemnification claim, then any indemnification claims by CEO or CCO shall not be so subordinated, but may be filed as an OpCo General Unsecured Claim.

CEO and CCO shall subordinate any and all rights and entitlements under the Cornerstone A-Side Management Liability Insurance Policy to Voyager Digital Ltd., Policy Number ELU184179-22, to any recovery by the Debtors and/or the Wind-Down Debtor on account of the Debtors' and/or Wind-Down Debtor's claims for the avoidance of the premium paid for the policy. For the avoidance of doubt, should coverage continue to be available under the Side-A Policy following resolution of the Debtors' and/or the Wind-Down Debtor's claims for the avoidance of the premium paid for the policy (whether by judgment or settlement or otherwise), CEO and/or CCO shall be entitled to seek coverage under the Side-A Policy. CEO and CCO shall remain at, and continue performing the responsibilities of, their respective position(s) with the Debtors and assist with the Debtors' transition for at least 30 days from entry of the Confirmation Order; *provided* that CCO shall have no obligation to remain at his position with the Debtors beyond January 15, 2023 and the CEO shall have the right to pursue and engage in any employment opportunity, business venture, consulting arrangement, or investment that may become available; *provided*, *further*, that both the CEO and CCO shall be available to the Debtors and/or the Wind-Down Debtor for a maximum of five hours per month for the one year following the Effective Date.

In the event that the sworn financial disclosure statements under penalty of perjury provided to the Debtors, the Special Committee and the Committee by CEO and CCO are later determined at any time by Final Order of the Bankruptcy Court or other court of competent jurisdiction to be materially inaccurate, (a) the limitations on recovery by the Wind-Down Debtor under this Article IV.G shall no longer apply, (b) any and all release, exculpation and injunction provisions in Article VIII of this Plan with respect to CEO and/or CCO (as applicable) shall be deemed null and void, (c) all Releasing Parties' rights with respect to the CEO and/or CCO (as applicable) shall be fully intact and preserved, (d) amounts paid by CEO shall not be repaid by the Wind-Down Debtor, and (e) any applicable statute of limitations shall be deemed tolled from the Petition Date to the date of entry of the order referenced above. The Wind-Down Debtor, as successor to the Debtors, shall have standing to bring a motion seeking relief pursuant to this Article IV.G.

Entry of the Confirmation Order shall be deemed approval of the D&O Settlement and, to the extent not already approved by the Bankruptcy Court, the Debtors or the Wind-Down Debtor, as applicable, are authorized to negotiate, execute, and deliver those documents necessary or appropriate to effectuate the D&O Settlement, without further notice or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors, the Wind-Down Debtor, the Committee, and the Special Committee may deem to be necessary to effectuate the D&O Settlement.

## H. The Wind-Down Debtor

On the Effective Date, the Wind-Down Debtor shall be formed or converted into for the benefit of the Wind-Down Debtor Beneficiaries and each of the Debtors shall transfer the Wind-Down Debtor Assets for distribution in accordance with the terms of the Plan. The Confirmation Order shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

### 1. Establishment of a Wind-Down Debtor

Pursuant to the Plan Administrator Agreement, the Wind-Down Debtor will be established, formed, merged, or converted. The Wind-Down Debtor shall be the successor-in-interest to the Debtors, and the

Wind-Down Debtor shall be a successor to the Debtors' rights, title, and interest to the Wind-Down Debtor Assets. The Wind-Down Debtor will conduct no business operations and will be charged with winding down the Debtors' Estates. The Wind-Down Debtor shall be managed by the Plan Administrator and shall be subject to the Wind-Down Debtor Oversight Committee. The Wind-Down Debtor shall be administered in accordance with the terms of the Plan Administrator Agreement and shall be subject to the Wind-Down Budget and the Non-Released D&O Claim Budget. For the avoidance of doubt, the Wind-Down Debtor shall not have any right or interest in any Cause of Action or Claim constituting an Acquired Asset. The Wind-Down Debtor shall be administered in a manner consistent with the SEC's published guidance on liquidating trusts.

Prior to the Effective Date, any and all of the Debtors' assets shall remain assets of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and on the Effective Date the Wind-Down Debtor Assets shall, subject to the Plan Administrator Agreement, be transferred to and vest in the Wind-Down Debtor. For the avoidance of doubt, to the extent not otherwise waived in writing, released, settled, compromised, assigned or sold pursuant to a prior order or the Plan, the Wind-Down Debtor specifically retains and reserves the right to assert, after the Effective Date, any and all of the Vested Causes of Action and related rights, whether or not asserted as of the Effective Date, and all proceeds of the foregoing, subject to the terms of the Plan, including without limitation Article IV.F and Article IV.G.

Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, only the Wind-Down Debtor and the Plan Administrator shall have the right to pursue or not to pursue, or, subject to the terms hereof and the Plan Administrator Agreement, compromise or settle any Wind-Down Debtor Assets transferred to the Wind-Down Debtor. On and after the Effective Date, the Wind-Down Debtor and the Plan Administrator may, without further Bankruptcy Court approval, commence, litigate, and settle any Vested Causes of Action or Claims relating to any Wind-Down Debtor Assets transferred to the Wind-Down Debtor or rights to payment or Claims that belong to the Debtors as of the Effective Date or are instituted by the Wind-Down Debtor and the Plan Administrator on or after the Effective Date, except as otherwise expressly provided herein and in the Plan Administrator Agreement. All of the Wind-Down Debtor's activities shall be subject to the Wind-Down Budget and the Non-Released D&O Claim Budget. The Wind-Down Debtor shall be entitled to enforce all defenses and counterclaims to all Claims asserted against the Debtors and their Estates, including setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code.

The Wind-Down Debtor shall be deemed hereby substituted as plaintiff, defendant, or in any other capacity for the Debtors and the Committee, as applicable, in any Causes of Action pending before the Bankruptcy Court or any other court that relates to a Wind-Down Debtor Asset without the need for filing any motion for such relief. On the Effective Date, the Debtors and the Plan Administrator shall execute the Plan Administrator Agreement and shall have established the Wind-Down Debtor pursuant hereto. In the event of any conflict between the terms of this Article IV.H and the terms of the Plan Administrator Agreement, the terms of the Plan Administrator Agreement shall control.

2. Wind-Down Debtor Assets

Notwithstanding any prohibition on assignability under applicable non-bankruptcy law, on the Effective Date and thereafter if additional Wind-Down Debtor Assets become available, the Debtors shall be deemed, subject to the Plan Administrator Agreement, to have automatically transferred to the applicable Wind-Down Debtor all of their right, title, and interest in and to all of the Wind-Down Debtor Assets, in accordance with section 1141 of the Bankruptcy Code. All such assets shall automatically vest in the Wind-Down Debtor free and clear of all Claims, Liens, and other interests, subject only to the Allowed Claims and Interests as set forth herein and the expenses of the Wind-Down Debtor as set forth herein and in the Plan Administrator Agreement. Thereupon, the Debtors shall have no interest in or with respect to the Wind-Down Debtor Assets or the Wind-Down Debtor.

3.     Treatment of Wind-Down Debtor for Federal Income Tax Purposes; No Successor-in-Interest

The Wind-Down Debtor shall be established for the primary purpose of liquidating and distributing the Wind-Down Debtor Assets transferred to it, in accordance with Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Wind-Down Debtor. Accordingly, the Plan Administrator may, in an expeditious but orderly manner, liquidate the Wind-Down Debtor Assets, make timely distributions to the Wind-Down Debtor Beneficiaries and not unduly prolong its duration. The Wind-Down Debtor shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth herein or in the Wind-Down Debtor Agreement. The record holders of beneficial interests shall be recorded and set forth in a register maintained by the Wind-Down Debtor expressly for such purpose.

The Wind-Down Debtor is intended to qualify as a "grantor trust" for federal income tax purposes to the extent reasonably practicable, with the Wind-Down Debtor Beneficiaries treated as grantors and owners of the Wind-Down Debtor. However, with respect to any of the assets of the Wind-Down Debtor that are subject to potential disputed claims of ownership or uncertain distributions, *or* to the extent "liquidating trust" treatment is otherwise unavailable, the Debtors anticipate that such assets will be subject to disputed ownership fund treatment under Section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes. Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account. Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

4.     Appointment of Plan Administrator

The Plan Administrator shall be selected by the Committee, in consultation with the Debtors, and shall be identified in the Plan Supplement. The appointment of the Plan Administrator shall be approved in the Confirmation Order, and the Plan Administrator's duties shall commence as of the Effective Date. The Plan Administrator shall administer the distributions to the Wind-Down Debtor Beneficiaries and shall serve as a representative of the Estates under section 1123(b) of the Bankruptcy Code for the purpose of enforcing Vested Causes of Action belonging to the Estates that are not released, waived, settled, compromised, or transferred pursuant to the Plan and subject to the limitations set forth in the Plan, including Article IV.F and Article IV.G.

In accordance with the Plan Administrator Agreement, the Plan Administrator shall serve in such capacity through the earlier of (i) the date on which the Wind-Down Debtor is dissolved in accordance with the Plan Administrator Agreement, and (ii) the date on which a Plan Administrator resigns, is terminated, or is otherwise unable to serve; *provided*, *however*, that, in the event that a Plan Administrator resigns, is terminated, or is otherwise unable to serve, the Wind-Down Debtor Oversight Committee shall appoint a successor to serve as a Plan Administrator in accordance with the Plan Administrator Agreement. If the Wind-Down Debtor Oversight Committee does not appoint a successor within the time periods specified in the Plan Administrator Agreement, then the Bankruptcy Court, upon the motion of any party-in-interest, including counsel to the Wind-Down Debtor, shall approve a successor to serve as a Plan Administrator.

5.     <u>Responsibilities of Plan Administrator</u>

Responsibilities of the Plan Administrator shall be as identified in the Plan Administrator Agreement and shall include, but are not limited to:

(a)     implementing the Wind-Down Debtor, and making distributions contemplated by the Plan;

(b)     marshalling, marketing for sale, and winding down any of the Debtors' assets constituting Wind-Down Debtor Assets;

(c)     appointing an independent director at each Debtor to act as a fiduciary for such Debtor entity in connection with the resolution of the Intercompany Claims;

(d)     overseeing the accounts of the Debtors and the Wind-Down Debtor and the wind down and dissolution of the Debtors and the Wind-Down Debtor, including effectuating the transactions described in the Restructuring Transactions Memorandum;

(e)     receiving, maintaining, conserving, supervising, prosecuting, collecting, settling, managing, investing, protecting, and where appropriate, causing the Wind-Down Debtor to abandon the Wind-Down Debtor Assets, including causing the Wind-Down Debtor to invest any moneys held as Wind-Down Debtor Assets;

(f)     opening and maintaining bank accounts on behalf of or in the name of the Debtors or the Wind-Down Debtor, including, in the Plan Administrator's discretion, separating bank accounts for each of the Debtors;

(g)     entering into any agreement or executing any document or instrument required by or consistent with the Plan, the Confirmation Order, or the Plan Administrator Agreement, and to perform all obligations thereunder;

(h)     collecting and liquidating all Wind-Down Debtor Assets, including the sale of any Wind-Down Debtor Assets;

(i)     protecting and enforcing the rights to the Wind-Down Debtor Assets (including any Vested Causes of Action and Contributed Third-Party Claims) vested in the Wind-Down Debtor and Plan Administrator by the Plan Administrator Agreement by any method deemed appropriate, including, without limitation, by judicial proceedings or otherwise;

(j)     investigating any Wind-Down Debtor Assets, and any other potential Vested Causes of Action and Contributed Third-Party Claims;

(k)     reviewing, reconciling, compromising, settling, objecting, or prosecuting Claims or Interests of any kind;

(l)     seeking the examination of any Person pursuant to Federal Rule of Bankruptcy Procedure 2004;

(m)        retaining professionals, disbursing agents, and other agents, independent contractors, and third parties pursuant to the Plan Administrator Agreement and paying the reasonable compensation thereof;

(n)        paying all lawful expenses, debts, charges, taxes, and other liabilities, and making all other payments relating to the Wind-Down Debtor Assets, solely out of Wind-Down Debtor Assets;

(o)        prosecuting and settling the Vested Causes of Action, including, without limitation, the 3AC Claims, FTX Claims, Alameda Claims, Contributed Third-Party Claims, and any causes of action not included in the Asset Purchase Agreement or released under the Plan;

(p)        reviewing, reconciling, pursuing, commencing, prosecuting, compromising, settling, dismissing, releasing, waiving, withdrawing, abandoning, resolving, or electing not to pursue all Vested Causes of Action and Contributed Third-Party Claims;

(q)        acquiring litigation and other claims related to the Debtors, and prosecuting such claims;

(r)        reviewing and compelling turnover of the Debtors or the Wind-Down Debtor's property;

(s)        calculating and making all Distributions to the holders of Allowed Claims against each Debtor and, solely to the extent of payment in full of Allowed Claims, to holders of Allowed Interests, as provided for in, or contemplated by, the Plan and the Plan Administrator Agreement; *provided* that because the Plan does not substantively consolidate the Debtors' Estates, the Plan Administrator shall make Distributions from the Wind-Down Debtor Assets to the holders of Claims and Interests (if applicable) against that specific Debtor;

(t)        establishing, administering, adjusting, and maintaining the Wind-Down Reserve and the Disputed Claims Reserve;

(u)        withholding from the amount distributable to any Person the maximum amount needed to pay any tax or other charge that the Plan Administrator has determined, based upon the advice of his agents or professionals, may be required to be withheld from such Distribution under the income tax or other laws of the United States or of any state or political subdivision thereof;

(v)        in reliance upon the Debtors' Schedules, the official Claims Register maintained in the Chapter 11 Cases and the Debtors' filed lists of equity security holders, reviewing, and where appropriate, allowing or objecting to Claims and (if applicable) Interests, and supervising and administering the commencement, prosecution, settlement, compromise, withdrawal, or resolution of all objections to Disputed Claims and (if applicable) Disputed Interests required to be administered by the Wind-Down Debtor;

(w)        making all tax withholdings, filing tax information returns, filing and prosecuting tax refunds claims, making tax elections by and on behalf of the Debtors or the

Wind-Down Debtor, and filing tax returns for the Debtors or the Wind-Down Debtor pursuant to and in accordance with the Plan, and paying taxes, if any, payable for and on behalf of the Debtors or the Wind-Down Debtor, as applicable; *provided, however*, that notwithstanding any other provision of the Plan Administrator Agreement, the Plan Administrator shall not have any responsibility or personal liability in any capacity whatsoever for the signing or accuracy of the Debtors' income tax returns that are due to be filed after the Effective Date or for any tax liability related thereto;

(x) abandoning or donating to a charitable organization qualifying under IRC section 501(c)(3) any Wind-Down Debtor Assets that the Plan Administrator determines to be too impractical to distribute or of inconsequential value;

(y) seeking a determination of tax liability or refund under Bankruptcy Code section 505;

(z) establishing reserves for taxes, assessments, and other expenses of administration of the Debtors or the Wind-Down Debtor as may be necessary and appropriate for the proper operation of matters incident to the Debtors or the Wind-Down Debtor;

(aa) paying Wind-Down Debtor Expenses;

(bb) if the Plan Administrator deems appropriate in the Plan Administrator's sole discretion, seeking to establish a bar date for filing proofs of Interest in any Debtor or otherwise to determine the holders and extent of Allowed Interests in any Debtor;

(cc) purchasing and carrying all insurance policies that the Plan Administrator deems reasonably necessary or advisable and paying all associated insurance premiums and costs;

(dd) undertaking all administrative functions remaining in the Chapter 11 Cases to the extent necessary to carry out the Debtors', the Wind-Down Debtor's, or the Plan Administrator's duties under the Plan, including reporting and making required payments of fees to the U.S. Trustee and overseeing the closing of the Chapter 11 Cases;

(ee) retaining, terminating, appointing, hiring, or otherwise employees, personnel, management, and directors at any of the Debtors to the extent necessary to carry out the purposes of the Plan Administrator Agreement and the Plan, including, without limitation, to address any disputes between the Debtors;

(ff) exercising, implementing, enforcing, and discharging all of the terms, conditions, powers, duties, and other provisions of the Plan, the Confirmation Order, and the Plan Administrator Agreement; and

(gg) taking all other actions consistent with the provisions of the Plan and the Plan Administrator Agreement that the Plan Administrator deems reasonably necessary or desirable to administer the Debtors and the Wind-Down Debtor.

6.    The Wind-Down Debtor Oversight Committee

The Wind-Down Debtor Oversight Committee shall consist of those parties selected by the Committee and identified in the Plan Supplement, and which, at no time shall consist of greater than seven members.

The Wind-Down Debtor Oversight Committee shall have the responsibility to review and advise the Plan Administrator with respect to the liquidation and distribution of the Wind-Down Debtor Assets transferred to the Wind-Down Debtor in accordance herewith and the Plan Administrator Agreement. For the avoidance of doubt, in advising the Plan Administrator, the Wind-Down Debtor Oversight Committee shall maintain the same fiduciary responsibilities as the Plan Administrator. Vacancies on the Wind-Down Debtor Oversight Committee shall be filled by a Person designated by the Plan Administrator, subject to the unanimous consent of the remaining member or members of the Wind-Down Debtor Oversight Committee. The Plan Administrator shall have the authority to seek an order from the Bankruptcy Court removing or replacing members of the Wind-Down Debtor Oversight Committee for cause.

7.    Expenses of Wind-Down Debtor

The Wind-Down Debtor Expenses shall be paid from the Wind-Down Debtor Assets subject to the Wind-Down Budget and the Non-Released D&O Claim Budget.

8.    Insurance; Bond

The Plan Administrator may obtain insurance coverage (in the form of an errors and omissions policy or otherwise) with respect to the liabilities and obligations of the Plan Administrator and the Wind-Down Debtor Oversight Committee under the Plan Administrator Agreement. Unless otherwise agreed to by the Wind-Down Debtor Oversight Committee, the Plan Administrator shall serve with a bond, the terms of which shall be agreed to by the Wind-Down Debtor Oversight Committee, and the cost and expense of which shall be paid by the Wind-Down Debtor.

9.    Fiduciary Duties of the Plan Administrator

Pursuant hereto and the Plan Administrator Agreement, the Plan Administrator shall act in a fiduciary capacity on behalf of the interests of all Holders of Claims and Interests that will receive distributions pursuant to Plan.

10.    Termination of the Wind-Down Debtor

The Wind-Down Debtor will terminate on the earlier of: (a) (i) the final liquidation, administration and distribution of the Wind-Down Debtor Assets in accordance with the terms of the Plan Administrator Agreement and the Plan, and its full performance of all other duties and functions as set forth herein or in the Plan Administrator Agreement and (ii) the Chapter 11 Cases of the Debtors have been closed; or (b) the Plan Administrator determines in its reasonable judgment that the Wind-Down Debtor lacks sufficient assets and financial resources, after reasonable collection efforts, to complete the duties and powers assigned to him or her under the Plan, the Confirmation Order and/or the Plan Administrator Agreement. After (x) the final distributions pursuant hereto, (y) the Filing by or on behalf of the Wind-Down Debtor of a certification of dissolution with the Bankruptcy Court, and (z) any other action deemed appropriate by the Plan Administrator, the Wind-Down Debtor shall be deemed dissolved for all purposes without the necessity for any other or further actions.

11.    Liability of Plan Administrator; Indemnification

Neither the Plan Administrator, the Wind-Down Debtor Oversight Committee, their respective members, employees, employers, designees or professionals, or any of their duly designated agents or representatives (each, a "Wind-Down Debtor Party" and collectively, the "Wind-Down Debtor Parties") shall be liable for losses, claims, damages, liabilities or expenses in connection with the affairs of the Wind-Down Debtor or for the act or omission of any other Wind-Down Debtor Party, nor shall the Wind-Down Debtor Parties be liable for any act or omission taken or omitted to be taken pursuant to the discretion, powers and authority conferred, or in good faith believed to be conferred by the Plan Administrator Agreement or the Plan other than for specific acts or omissions resulting from such Wind-Down Debtor Party's willful misconduct, gross negligence or actual fraud. Subject to the Plan Administrator Agreement, the Plan Administrator shall be entitled to enjoy all of the rights, powers, immunities and privileges applicable to a chapter 7 trustee, and the Wind-Down Debtor Oversight Committee shall be entitled to enjoy all of the rights, powers, immunities and privileges of an official committee of unsecured creditors. The Plan Administrator or the Wind-Down Debtor Oversight Committee may, in connection with the performance of its functions, and in its sole and absolute discretion, consult with its attorneys, accountants, financial advisors and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such persons, regardless of whether such advice or opinions are provided in writing. Notwithstanding such authority, neither the Plan Administrator nor the Wind-Down Debtor Oversight Committee shall be under any obligation to consult with its attorneys, accountants, financial advisors or agents, and their determination not to do so shall not result in the imposition of liability on the Plan Administrator, the Wind-Down Debtor Oversight Committee, or their respective members and/or designees, unless such determination is based on willful misconduct, gross negligence, or actual fraud. The Wind-Down Debtor shall indemnify and hold harmless the Wind-Down Debtor Parties (in their capacity as such), from and against and in respect of all liabilities, losses, damages, claims, costs and expenses (including, without limitation, reasonable attorneys' fees, disbursements, and related expenses) that such parties may incur or to which such parties may become subject in connection with any action, suit, proceeding or investigation brought by or threatened against such parties arising out of or due to their acts or omissions, or consequences of such acts or omissions, with respect to the implementation or administration of the Wind-Down Debtor or the Plan or the discharge of their duties hereunder; *provided*, *however*, that no such indemnification will be made to such Persons for actions or omissions as a result of willful misconduct, gross negligence, or actual fraud. Persons dealing or having any relationship with the Plan Administrator shall have recourse only to the Wind-Down Debtor Assets and shall look only to the Wind-Down Debtor Assets to satisfy any liability or other obligations incurred by the Wind-Down Debtor or the Wind-Down Debtor Oversight Committee to such Person in carrying out the terms of the Plan Administrator Agreement, and neither the Plan Administrator nor the Wind-Down Debtor Oversight Committee, shall have any personal obligation to satisfy any such liability. The Plan Administrator and/or the Wind-Down Debtor Oversight Committee members shall not be liable whatsoever except for the performance of such duties and obligations as are specifically set forth herein, and no implied covenants or obligations shall be read into the Plan Administrator Agreement against any of them. The Wind-Down Debtor shall promptly pay expenses reasonably incurred by any Wind-Down Debtor Party in defending, participating in, or settling any action, proceeding or investigation in which such Wind-Down Debtor Party is a party or is threatened to be made a party or otherwise is participating in connection with the Plan Administrator Agreement or the duties, acts or omissions of the Plan Administrator or otherwise in connection with the affairs of the Wind-Down Debtor, upon submission of invoices therefor, whether in advance of the final disposition of such action, proceeding, or investigation or otherwise. Each Wind-Down Debtor Party hereby undertakes, and the Wind-Down Debtor hereby accepts his or her undertaking, to repay any and all such amounts so advanced if it shall ultimately be determined that such exculpated party is not entitled to be indemnified therefor under the Plan Administrator Agreement. The foregoing indemnity in respect of any Wind-Down Debtor Party shall survive the termination of such Wind-Down Debtor Party from the capacity for which they are indemnified.

12.    No Liability of the Wind-Down Debtor

On and after the Effective Date, the Wind-Down Debtor shall have no liability on account of any Claims or Interests except as set forth herein and in the Plan Administrator Agreement.  All payments and all distributions made by the Plan Administrator hereunder shall be in exchange for all Claims or Interests against the Debtors.

**I.    Sources of Consideration for Plan Distributions**

Distributions under the Plan shall be funded by (i) the proceeds of Purchaser's payment obligations under Sections 2.1 and 2.2 of the Asset Purchase Agreement and distributions of Acquired Coins pursuant to Sections 6.12, and 6.14 of the Asset Purchase Agreement, (ii) the Wind-Down Debtor from the Wind-Down Debtor Assets; *provided*, *however*, that Allowed Professional Fee Claims shall be paid from the Professional Fee Escrow Account in the first instance.  The Wind-Down Debtor Assets shall be used to pay the Wind-Down Debtor Expenses (including the compensation of the Plan Administrator and any professionals retained by the Wind-Down Debtor), and to satisfy payment of Allowed Claims and Interests as set forth in the Plan.

**J.    Corporate Existence and Dissolution**

Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificates or articles of incorporation, certificates of formation, certificates of organization, or certificates of limited partnership and bylaws, operating agreements, limited liability company agreements, or limited partnership agreements (or other formation documents) in effect prior to the Effective Date, except to the extent such certificates or articles of incorporation, certificates of formation, certificates of organization, or certificates of limited partnership and bylaws, operating agreements, limited liability company agreements, or limited partnership agreements (or other formation documents) are amended pursuant to the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings under applicable state or federal law).

On and after the Effective Date, the Wind-Down Debtor will be authorized and directed to implement the Plan and any applicable orders of the Bankruptcy Court, and the Wind-Down Debtor shall have the power and authority to take any action necessary to wind down and dissolve the Debtors' Estates.

Upon a certification to be Filed with the Bankruptcy Court by the Plan Administrator of all distributions having been made and completion of all of its duties under the Plan and entry of a final decree closing the last of the Chapter 11 Cases, the Wind-Down Debtor shall be deemed to be dissolved without any further action by the Debtors or the Wind-Down Debtor, including the Filing of any documents with the secretary of state for the state in which the Wind-Down Debtor are formed or any other jurisdiction.  The Plan Administrator, however, shall have authority to take all necessary actions to dissolve the Debtors or the Wind-Down Debtor in and withdraw the Wind-Down Debtor from applicable states.

As soon as practicable after the Effective Date, the Wind-Down Debtor shall take such actions as the Wind-Down Debtor may determine to be necessary or desirable to carry out the purposes of the Plan. Any certificate of dissolution or equivalent document may be executed by the Wind-Down Debtor on behalf of any Wind-Down Debtor without need for any action or approval by the shareholders or board of directors or managers of such Debtor.  On and after the Effective Date, the Debtors or the Wind-Down Debtor (1) for

all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (2) shall be deemed to have cancelled pursuant to this Plan all Interests, and (3) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date. Pursuant to the terms of this Plan, any Money Transmitter Licenses that have not been terminated shall be deemed withdrawn and no further action is required to be taken by the Debtors or the Wind-Down Debtor to effectuate such withdrawal; *provided* that, following the Effective Date, the Debtors or the Wind-Down Debtor, as applicable, shall use commercially reasonable efforts to comply with all state banking department requirements for the surrender of a Money Transmitter License. Nothing in this Plan shall be construed to limit the rights of creditors, Debtors, the Wind-Down Debtor, or regulators to pursue recoveries against surety bonds maintained by the Debtors in connection with this Money Transmitter Licenses. Notwithstanding such Debtors' dissolution, such Debtors shall be deemed to remain intact solely with respect to the preparation, filing, review, and resolution of applications for Professional Fee Claims.

**K.** **Corporate Action**

Upon the Effective Date, all actions contemplated under the Plan, Definitive Documents, and Asset Purchase Agreement shall be deemed authorized and approved in all respects, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, directors, managers, managing-members, limited or general partners, or officers of the Debtors, the Wind-Down Debtor or any other Entity, including: (1) appointment of the directors, managers, members, and officers for the Wind-Down Debtor as provided herein; (2) the issuances, transfer, and distribution of the Wind-Down Debtor Assets; (3) the formation of the Wind-Down Debtor and appointment of the Plan Administrator and Wind-Down Debtor Oversight Committee; (4) the formation of any entities pursuant to and the implementation of the Plan and performance of all actions and transactions contemplated hereby and thereby; (5) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; and (6) all other acts or actions contemplated by the Plan, Definitive Documents, and Asset Purchase Agreement or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions (including effectuating the Restructuring Transactions Memorandum and the Customer Onboarding Protocol) (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan, Definitive Documents, and Asset Purchase Agreement involving the corporate structure of the Debtors or the Wind-Down Debtor, as applicable, and any corporate action required by the Debtors or the Wind-Down Debtor, as applicable, in connection with the Plan shall be deemed to have occurred on, and shall be in effect as of, the Effective Date, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Wind-Down Debtor, as applicable. On or, as applicable, prior to the Effective Date, the appropriate officers of the Debtors or the Wind-Down Debtor, as applicable, shall be authorized and, as applicable, directed to issue, execute, and deliver the agreements, documents, Securities, certificates of incorporation, certificates of formation, bylaws, operating agreements, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Wind-Down Debtor, and any and all other agreements, documents, Securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this Article IV.K shall be effective notwithstanding any requirements under non-bankruptcy law.

**L.** **Vesting of Assets in the Wind-Down Debtor**

Except as otherwise provided in the Plan, or in any agreement, instrument, or other document incorporated in the Plan, notwithstanding any prohibition of assignability under applicable non-bankruptcy law and in accordance with section 1141 of the Bankruptcy Code, on the Effective Date, all property

constituting Wind-Down Debtor Assets, including all Vested Causes of Action of the Debtors (unless otherwise released, waived, compromised, settled, transferred, or discharged pursuant to the Plan), and any property acquired by any of the Debtors under the Plan shall vest in the Wind-Down Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.

**M.     Cancellation of Notes, Instruments, Certificates, and Other Documents**

On the later of the Effective Date and the date on which distributions are made pursuant to the Plan (if not made on the Effective Date), except for the purpose of evidencing a right to and allowing Holders of Claims and Interests to receive a distribution under the Plan or to the extent otherwise specifically provided for in the Plan, the Confirmation Order, or any agreement, instrument, or other document entered into in connection with or pursuant to the Plan or the Restructuring Transactions (including, without limitation, the Definitive Documents and the Asset Purchase Agreement), all notes, bonds, indentures, certificates, Securities, shares, purchase rights, options, warrants, collateral agreements, subordination agreements, intercreditor agreements, or other instruments or documents directly or indirectly evidencing, creating, or relating to any indebtedness or obligations of, or ownership interest in, the Debtors, giving rise to any Claims against or Interests in the Debtors or to any rights or obligations relating to any Claims against or Interests in the Debtors shall be deemed cancelled without any need for a Holder to take further action with respect thereto.

**N.     Effectuating Documents; Further Transactions**

On and after the Effective Date, the Debtors, and its directors, managers, partners, officers, authorized persons, and members thereof, and the Wind-Down Debtor and Plan Administrator are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, Definitive Documents, and Asset Purchase Agreement, in the name of and on behalf of the Debtors and Wind-Down Debtor, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

**O.     Section 1146(a) Exemption**

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Wind-Down Debtor, the Purchaser, or to any other Entity) of property under the Plan, Definitive Documents, and Asset Purchase Agreement or pursuant to:  (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Wind-Down Debtor; (2) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, including the Asset Purchase Agreement, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, sales or use tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall

comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forgo the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**P.  Preservation of Rights of Action**

In accordance with section 1123(b) of the Bankruptcy Code, the Wind-Down Debtor shall succeed to all rights to commence and pursue any and all Vested Causes of Action of the Debtors, whether arising before or after the Petition Date, including, without limitation, any actions specifically enumerated in the Schedule of Retained Causes of Action other than Causes of Action released, waived, settled, compromised, or transferred. Such rights shall be preserved by the Debtors and Wind-Down Debtor and shall vest in the Wind-Down Debtor, with the Wind-Down Debtor's rights to commence, prosecute, or settle such Causes of Action preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action expressly released, waived, settled, compromised, or transferred by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan or pursuant to the Asset Purchase Agreement, which shall be deemed released and waived by the Debtors and Wind-Down Debtor as of the Effective Date.

The Wind-Down Debtor may pursue such Causes of Action, as appropriate, in accordance with the best interests of the beneficiaries of the Wind-Down Debtor and in accordance with the Plan Administrator Agreement and the Plan. **No Entity may rely on the absence of a specific reference in the Schedules of Assets and Liabilities or Statement of Financial Affairs, the Plan, the Plan Supplement, the Disclosure Statement, or the Schedule of Retained Causes of Action to any Cause of Action against it as any indication that the Debtors or the Wind-Down Debtor, as applicable, will not pursue any and all available Causes of Action of the Debtors against it. The Wind-Down Debtor, on behalf of the Debtors and the Wind-Down Debtor, expressly reserves all rights to prosecute any and all Causes of Action against any Entity, except as otherwise provided in the Plan, including Article VIII of the Plan.** Unless any Cause of Action of the Debtors is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or pursuant to a Final Order, the Wind-Down Debtor, on behalf of the Debtors and Wind-Down Debtor and in accordance with the Plan Administrator Agreement, expressly reserves all such Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or Consummation.

The Wind-Down Debtor, on behalf of the Debtors, reserves and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Cause of Action that a Debtor may hold against any Entity shall vest in the Wind-Down Debtor, except as otherwise provided in the Plan, including Article VIII of the Plan. The Wind-Down Debtor, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Wind-Down Debtor shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court in accordance with the Plan.

**Q.  Election to Contribute Third-Party Claims**

Because aggregating all Contributed Third-Party Claims may enable the pursuit and settlement of such litigation claims in a more efficient and effective manner, each Holder of a Claim or Interest may

agree, by electing on its ballot or opt-in form, to contribute its Contributed Third-Party Claims to the Wind-Down Debtor. By electing such option on its ballot or opt-in form, each Contributing Claimant agrees that, subject to the occurrence of the Effective Date and the formation of the Wind-Down Debtor, it will be deemed, without further action, (i) to have irrevocably contributed its Contributed Third-Party Claims to the Wind-Down Debtor, and (ii) to have agreed to execute any documents reasonably requested by the Debtors or the Wind-Down Debtor to memorialize and effectuate such contribution.

**R.      Contribution of Contributed Third-Party Claims**

On the Effective Date, all Contributed Third-Party Claims will be irrevocably contributed to the Wind-Down Debtor and shall thereafter be Wind-Down Debtor Assets for all purposes. No Person may rely on the absence of a specific reference in the Plan, the Disclosure Statement, the Confirmation Order, the Plan Administrator Agreement, the Plan Supplement, or any other document as any indication that the Wind-Down Debtor will or will not pursue any and all available Contributed Third-Party Claims against such Person. The Wind-Down Debtor shall have, retain, reserve, and be entitled to assert all Contributed Third-Party Claims fully to the same extent that the Contributing Claimants could have asserted such claims prior to the Effective Date. For the avoidance of doubt, the Contributed Third-Party Claims shall not include the rights of any of the Contributing Claimants to receive the distributions under the Plan on account of their Claims or Interests.

**S.      Closing the Chapter 11 Cases**

On and after the Effective Date, the Wind-Down Debtor shall be permitted to classify all of the Chapter 11 Cases of the Debtors except for the Chapter 11 Case of Voyager Digital, LLC, or any other Debtor identified in the Restructuring Transactions Memorandum as having its Chapter 11 Case remain open following the Effective Date, as closed, and all contested matters relating to any of the Debtors, including objections to Claims or Interests and any adversary proceedings, may be administered and heard in the Chapter 11 Case of Voyager Digital, LLC, or any other Debtor identified in the Restructuring Transactions Memorandum as having its Chapter 11 Case remain open following the Effective Date, irrespective of whether such Claims or Interests were Filed or such adversary proceeding was commenced against a Debtor whose Chapter 11 Case was closed.

## ARTICLE V.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.      Assumption and Rejection of Executory Contracts and Unexpired Leases**

On the Effective Date, except as otherwise provided herein, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (1) is specifically described in the Plan as to be assumed in connection with confirmation of the Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement; (2) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Effective Date; (3) is to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, in connection with the Sale Transaction; (4) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; or (5) is a D&O Liability Insurance Policy other than the Side-A Policy. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions,

assignments, and rejections, including the assumption of the Executory Contracts or Unexpired Leases as provided in the Plan Supplement, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

**B.      Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases**

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Wind-Down Debtor, as applicable, under such Executory Contract or Unexpired Lease. Without limiting the general nature of the foregoing, and notwithstanding any non-bankruptcy law to the contrary, the Debtors and Wind-Down Debtor expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the Debtors contracting from non-Debtor counterparties to any rejected Executory Contract or Unexpired Lease.

**C.      Claims Based on Rejection of Executory Contracts or Unexpired Leases**

Counterparties to Executory Contracts or Unexpired Leases listed subject to rejection under the Plan shall be served with a notice of rejection of Executory Contracts and Unexpired Leases with the Plan Supplement. Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Claims, Noticing, and Solicitation Agent and served on the Debtors or Wind-Down Debtor, as applicable, no later than thirty days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, or the Wind-Down Debtor, the Estates, or their property without the need for any objection by the Wind-Down Debtor or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed released, and be subject to the permanent injunction set forth in Article VIII.D of the Plan, including any Claims against any Debtor listed on the Debtors' schedules as unliquidated, contingent, or disputed.** All Allowed Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease shall be treated as General Unsecured Claims in accordance with Article III.C of the Plan.

**D.      Cure of Defaults for Executory Contracts and Unexpired Leases Assumed**

The Debtors, the Wind-Down Debtor, or the Purchaser, as applicable pursuant to the Asset Purchase Agreement, shall pay Cures, if any, on the Effective Date. The Debtors shall provide notice of the amount and timing of payment of any such Cure to the parties to the applicable assumed Executory Contracts or Unexpired Leases as part of the Plan Supplement. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure that differ from the ordinary course amounts paid or proposed to be paid by the Debtors, the Wind-Down Debtor, or the Purchaser shall be dealt with in the ordinary course of business and, if needed, shall be Filed with the Claims, Noticing, and Solicitation Agent on or before thirty days after the Effective Date. **If any counterparty to an Executory Contract or Unexpired Lease does not receive a notice of assumption and applicable cure amount, such counterparty shall have until on or before thirty days after the Effective Date to bring forth and File a request for payment of Cure.** Any such request that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Debtor or the Wind-Down Debtor, without the need for any objection by the Wind-Down Debtor or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure shall be deemed fully satisfied and released upon payment by the Debtors or

the Wind-Down Debtor or the Purchaser of the Cure in the ordinary course of business or upon and in accordance with any resolution of a Cure dispute (whether by order of the Bankruptcy Court or through settlement with the applicable Executory Contract or Unexpired Lease counterparty); *provided*, *however*, that nothing herein shall prevent the Wind-Down Debtor or the Purchaser, as applicable, from paying any Cure Claim despite the failure of the relevant counterparty to File such request for payment of such Cure. The Wind-Down Debtor or the Purchaser may also settle any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court. In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be Filed with the Bankruptcy Court on or before thirty days after the Effective Date. Any such objection will be scheduled to be heard by the Bankruptcy Court at the Debtors' first scheduled omnibus hearing for which such objection is timely Filed. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

In the event of a dispute regarding: (1) the amount of any Cure Claim, (2) the ability of the Debtors, the Wind-Down Debtor, Purchaser, or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed (or assumed and assigned, as applicable), or (3) any other matter pertaining to assumption or assignment, then any disputed Cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made as soon as reasonably practicable following, and in accordance with, the entry of a Final Order of the Bankruptcy Court resolving such dispute or as may be agreed upon by the Debtors, the Wind-Down Debtor, or Purchaser, as applicable, and the counterparty to the Executory Contract or Unexpired Lease, and any such unresolved dispute shall not prevent or delay implementation of the Plan or the occurrence of the Effective Date.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise or assignment of any Executory Contract or Unexpired Lease to the Purchaser and full payment of any applicable Cure pursuant to this Article V.D, or upon and in accordance with any resolution of a Cure dispute (whether by order of the Bankruptcy Court or through settlement with the applicable Executory Contract or Unexpired Lease counterparty), shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed or assumed and assigned in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to this Article V.D, in the amount and at the time in the ordinary course of business or upon and in accordance with any resolution of a Cure dispute (whether by order of the Bankruptcy Court or through settlement with the applicable Executory Contract or Unexpired Lease counterparty), shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court. For the avoidance of doubt, in the event that any counterparty to an Executory Contract or Unexpired Lease receives a notice of assumption and applicable proposed Cure amount, and disputes the Debtors' proposed Cure amount, such party shall not be required to File a Proof of Claim with respect to such dispute. Any counterparty to an Executory Contract or Unexpired Lease that does not receive a notice or applicable proposed Cure amount, and believes a Cure amount is owed, shall have thirty days after the Effective Date to File a Proof of Claim with respect to such alleged Cure amount, which Claim shall not be expunged until such Cure dispute is resolved.**

### E.    Insurance Policies

Each D&O Liability Insurance Policy (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto) other than the Side-A Policy shall be assumed, in their entirety, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date, pursuant to sections 105 and 365 of the Bankruptcy Code with the Wind-Down Debtor being authorized to pursue any proceeds thereof on behalf of the Debtors or the Wind-Down Debtor.  The Side-A Policy shall ride through these Chapter 11 Cases with the Debtors, and the Wind-Down Debtor preserves all avoidance and other actions in connection with the premium paid thereunder. All beneficiaries under the D&O Insurance Policies reserve their rights under such D&O Insurance Policies subject to the limitations set forth in this Plan.

The Debtors or the Wind-Down Debtor, as applicable, shall not terminate or otherwise reduce the coverage under any D&O Liability Insurance Policy (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto) in effect prior to the Effective Date, and any current and former directors, officers, managers, and employees of the Debtors who served in such capacity at any time before or after the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy subject to the terms thereof regardless of whether such directors, officers, managers, and employees remain in such positions after the Effective Date.  Notwithstanding anything to the contrary in the Plan, the Debtors or the Wind-Down Debtor shall retain the ability to supplement such D&O Liability Insurance Policy as the Debtors or Wind-Down Debtor may deem necessary, subject to the prior written consent of the Wind-Down Debtor.  Notwithstanding anything to the contrary contained in the Plan, the Wind-Down Debtor shall be entitled to pursue avoidance of the premium paid for the XL Specialty Insurance Company Cornerstone A-Side Management Liability Insurance Policy No. ELU184179-22, and nothing in this Plan shall be deemed a waiver or abrogation of any such rights.

The Debtors shall continue to satisfy their obligations under their insurance policies in full and continue such policies in the ordinary course of business.  Each of the Debtors' insurance policies, and any agreements, documents, or instruments relating thereto shall be treated as Executory Contracts under the Plan.  On the Effective Date:  (a) the Debtors shall be deemed to have assumed all such insurance policies and any agreements, documents, and instruments relating thereto in their entirety; and (b) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the applicable Debtors or the Wind-Down Debtor unaltered.

### F.    Reservation of Rights

Nothing contained in the Plan or the Plan Supplement (unless otherwise explicitly provided) shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor or the Wind-Down Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Wind-Down Debtor, as applicable, shall have forty-five days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, including by rejecting such contract or lease effective as of the Confirmation Date.

### G.    Nonoccurrence of Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

**H.** **Contracts and Leases Entered into After the Petition Date**

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed under section 365 of the Bankruptcy Code, will be performed by the applicable Debtor or Wind-Down Debtor liable thereunder in the ordinary course of its business. Such contracts and leases that are not rejected under the Plan shall survive and remain unaffected by entry of the Confirmation Order.

## ARTICLE VI.

## PROVISIONS GOVERNING DISTRIBUTIONS

**A.** **Timing and Calculation of Amounts to Be Distributed**

Except (1) as otherwise provided herein, (2) upon a Final Order, or (3) as otherwise agreed to by the Debtors, the Purchaser, or the Wind-Down Debtor, as the case may be, and the Holder of the applicable Claim, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the next Distribution Date after such Claim becomes, as applicable, an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive the full amount of distributions that the Plan provides for Allowed Claims in the applicable Class from the Distribution Agent. In the event that any payment or distribution under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or distribution may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. Except as specifically provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

**B.** **Rights and Powers of Distribution Agent**

1. Powers of the Distribution Agent

The Distribution Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties and exercise its rights under the Plan; (b) make all distributions contemplated under the Plan; (c) employ professionals to represent it with respect to its responsibilities and powers; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions of the Plan.

From and after the Effective Date, the Distribution Agent, solely in its capacity as Distribution Agent, shall be exculpated by all Entities, including, without limitation, holders of Claims against and Interests in the Debtors and other parties in interest, from any and all Claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Distribution Agent by the Plan or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or ultra vires acts of such Distribution Agent. No holder of a Claim or Interest or other party in interest shall have or pursue any Claim or Cause of Action vested in a Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by such Distribution Agent to be necessary and proper to implement the provisions hereof.

2.      Expenses Incurred on or after the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Distribution Agent on or after the Effective Date and any reasonable compensation and expense reimbursement claims (including reasonable attorney and/or other professional fees and expenses) made by such Distribution Agent shall be paid in Cash by the Wind-Down Debtor.

## C.      Delivery of Distributions and Undeliverable or Unclaimed Distributions

1.      Distributions Generally

Except as otherwise provided in the Plan (including in paragraph 8 below), the Distribution Agent shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the applicable register or in the Debtors' records as of the date of any such distribution (as applicable), including the address set forth in any Proof of Claim filed by that Holder.

2.      Distributions on Account of Obligations of Multiple Debtors

For all purposes associated with distributions under the Plan, all guarantees by any Debtor of the obligations of any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor, shall be deemed eliminated so that any obligation that could otherwise be asserted against more than one Debtor shall result in a single distribution under the Plan. Any such Claims shall be subject to all potential objections, defenses, and counterclaims, and to estimation pursuant to section 502(c) of the Bankruptcy Code.

3.      Record Date of Distributions

On the Distribution Record Date, the various transfer registers for each Class of Claims or Interests as maintained by the Debtors or their respective agents shall be deemed closed, and there shall be no further changes in the record Holders of any Claims or Interests. The Distribution Agent shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date. In addition, with respect to payment of any Cure amounts or disputes over any Cure amounts, neither the Debtors nor the Distribution Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the Effective Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure amount.

4.      Special Rules for Distributions to Holders of Disputed Claims and Interests

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the Wind-Down Debtor, on the one hand, and the Holder of a Disputed Claim or Interest, on the other hand, or as set forth in a Final Order, no partial payments and no partial distributions shall be made with respect to a Disputed Claim or Interest until all of the Disputed Claim or Interest has become an Allowed Claim or Interest or has otherwise been resolved by settlement or Final Order; *provided* that, if the Wind-Down Debtor does not dispute a portion of an amount asserted pursuant to an otherwise Disputed Claim or Interest, the Distribution Agent may make a partial distribution on account of that portion of such Claim or Interest that is not Disputed at the time and in the manner that the Distribution Agent makes distributions to similarly situated Holders of Allowed Claims or Interests pursuant to the Plan. Any dividends or other distributions arising from property distributed to Holders of Allowed Claims or Interests, as applicable, in a Class and paid to such Holders under the Plan shall also be paid, in the applicable amounts, to any Holder of a Disputed Claim or Interest, as applicable, in such Class that becomes an Allowed Claim or Interest after

51

the date or dates that such dividends or other distributions were earlier paid to Holders of Allowed Claims or Interests in such Class.

5.      De Minimis Distributions; Minimum Distributions

The Distribution Agent shall not make any Cash distributions to any Holder of an Allowed Claim or Interest pursuant to Article III.C.1-11 of this Plan on account of such Allowed Claim or Interest if such distribution is valued, in the reasonable discretion of the Distribution Agent, at less than $1.00, and each Holder of an Allowed Claim or Interest to which this limitation applies shall not be entitled to any distributions under the Plan.  Notwithstanding anything to the contrary in this Plan, there shall be no minimum distribution threshold on account of distributions of any Cryptocurrency to Holders of Allowed Account Holder Claims and Allowed OpCo General Unsecured Claims.

6.      Undeliverable Distributions and Unclaimed Property

In the event that either (a) a distribution to any Holder is returned as undeliverable or (b) the Holder of an Allowed Claim or Interest does not respond to a request by the Debtors or the Distribution Agent for information necessary to facilitate a particular distribution, no distribution to such Holder shall be made unless and until the Distribution Agent has determined the then-current address of such Holder or received the necessary information to facilitate a particular distribution, at which time such distribution shall be made to such Holder without interest, dividends, or other accruals of any kind; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code on the date that is one year after the Effective Date. After such date, all unclaimed property or interests in property shall revert to the Wind-Down Debtor automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable local, state, federal, or foreign escheat, abandoned, or unclaimed property laws to the contrary), and the Claim or Interest of any Holder to such property or interest in property shall not be entitled to any distributions under the Plan.

7.      Manner of Payment Pursuant to the Plan

At the option of the Distribution Agent, any Cash payment to be made hereunder may be made by check, wire transfer, automated clearing house, credit card, or as otherwise provided in applicable agreements.

8.      Distributions of Net Owed Coins; Additional Bankruptcy Distributions

As a general matter, the Purchaser will allocate each Account Holder's Net Owed Coins to its account on the Binance.US Platform, and each Holder of OpCo General Unsecured Claim's Pro Rata share of the Distributable Cryptocurrency (in Cash) to its account on the Binance.US Platform in accordance with, and subject to, the provisions of Section 6.12 of the Asset Purchase Agreement.

Subject to the terms of the Asset Purchase Agreement, the Purchaser may make Additional Bankruptcy Distributions to Transferred Creditors, including Distributable OpCo Cash and/or other Wind-Down Debtor Assets, corresponding to their Pro Rata shares of such Additional Bankruptcy Distribution (if such Additional Bankruptcy Distribution is in Cryptocurrency, based on the Transferred Cryptocurrency Value of the Cryptocurrency included in such Additional Bankruptcy Distribution), all in accordance with any applicable Post-Bankruptcy Statement (as defined in the Asset Purchase Agreement).

If any Account Holder or Holder of an Allowed OpCo General Unsecured Claim does not become a Transferred Creditor prior to the date that is three (3) months following the later of the Closing Date or the date on which the terms and conditions for the Binance.US Platform are made available for such Person

to accept (as provided in the Customer Onboarding Protocol), then Purchaser shall convert any Cryptocurrency allocable to such Person into U.S. Dollars at the then-prevailing rates (including applicable fees, spreads, costs and expenses) on the Binance.US Platform and deliver such U.S. Dollars, together with any cash or others assets in respect of such Persons, to the Debtors within five (5) Business Days, for further distribution by the Debtors in accordance with this Plan and the Customer Onboarding Protocol.

If any Account Holder or Holder of an Allowed OpCo General Unsecured Claim is located in an Unsupported Jurisdiction (as defined in the Asset Purchase Agreement), then the Net Owed Coins, Distributable Cryptocurrency (in Cash) and Additional Bankruptcy Distributions, if applicable, allocable to such Person shall be handled pursuant to Section 6.12(b) or, if applicable, Section 6.14(d) of the Asset Purchase Agreement. Notwithstanding anything to the contrary in the Asset Purchase Agreement, this Plan, or any Definitive Document, if any Account Holder or Holder of an Allowed OpCo General Unsecured Claim in an Unsupported Jurisdiction elects to not become a Transferred Creditor prior to the date that is three (3) months following the later of the Closing Date or the date on which the terms and conditions for the Binance.US Platform are made available for such Person to accept (as provided in the Customer Onboarding Protocol), then Purchaser shall on the date that is three (3) months following the later of the Closing Date or the date which the terms and conditions for the Binance.US Platform are made available for such person to accept, convert any Cryptocurrency allocable to such Person into U.S. Dollars at the then-prevailing rates (including applicable fees, spreads, costs and expenses) on the Binance.US Platform and deliver such U.S. Dollars, together with any cash or others assets in respect of such Persons, to the Debtors within five (5) Business Days, for further distribution by the Debtors in accordance with this Plan and the Customer Onboarding Protocol.

Purchaser shall have no responsibility to make any distributions other than as contemplated by Sections 6.12 and 6.14 of the Asset Purchase Agreement.

### D.        Compliance Matters

In connection with the Plan, to the extent applicable, the Debtors, the Wind-Down Debtor, any Distribution Agent, and any other applicable withholding and reporting agents shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Debtors, the Wind-Down Debtor, the Distribution Agent, and any other applicable withholding and reporting agents shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including wind-down a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms that are reasonable and appropriate; *provided* that the Wind-Down Debtor and the Distribution Agent, as applicable, shall request appropriate documentation from the applicable distributees and allow such distributees a reasonable amount of time to respond. The Debtors, the Wind-Down Debtor, the Distribution Agent, and any other applicable withholding and reporting agents reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

### E.        Securities Registration Exemption

To the extent that any Cryptocurrency (including VGX) is deemed to be a "security" (as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, or by any applicable laws of any Governmental Unit) by the SEC or any Governmental Unit, such Cryptocurrency to be offered, issued and distributed to Holders of Account Holder Claims or any other Holders of Claims hereunder, in each case in exchange for such Claims, shall be exempt, without any further act or action by any Entity, from registration

under the Securities Act or any similar federal, state, or local law in reliance upon (i) section 1145 of the Bankruptcy Code (except with respect to an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code) or (ii) (including with respect to an entity that is an "underwriter") pursuant to section 4(a)(2) under the Securities Act and/or Regulation D thereunder.

Notwithstanding anything to the contrary in the Plan, no entity may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the Cryptocurrency, to the extent deemed to be a "security" are exempt from registration.

## F.      Foreign Currency Exchange Rate

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim, asserted in government issued currency (for the avoidance of doubt, not including any Cryptocurrency) other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Effective Date.

## G.      Claims Paid or Payable by Third Parties

### 1.      Claims Paid by Third Parties

The Debtors or the Wind-Down Debtor, as applicable, shall reduce a Claim or Interest, and such Claim or Interest (or portion thereof) shall be disallowed without an objection to such Claim or Interest having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim or Interest receives a payment on account of such Claim or Interest from a party that is not a Debtor or Wind-Down Debtor (or other Distribution Agent), as applicable, including any payments made in connection with the Sale Transaction.  To the extent a Holder of a Claim or Interest receives a distribution on account of such Claim or Interest and receives payment from a party that is not a Debtor or a Wind-Down Debtor (or other Distribution Agent), including payments made in connection with the Sale Transaction, as applicable, on account of such Claim or Interest, such Holder shall, within ten Business Days of receipt thereof, repay, return, or deliver any distribution held by or transferred to the Holder to the applicable Wind-Down Debtor to the extent the Holder's total recovery on account of such Claim or Interest from the third party and under the Plan exceeds the amount of such Claim or Interest as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay, return, or deliver such distribution shall result in the Holder owing the applicable Wind-Down Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the ten-Business Day grace period specified above until the amount is repaid.

### 2.      Claims Payable by Third Parties

No distributions under the Plan shall be made on account of an Allowed Claim or Interest that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim or Interest has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim or Interest (if and to the extent adjudicated by a court of competent jurisdiction or otherwise settled), then immediately upon such payment, such Claim or Interest may be expunged or reduced on the Claims Register by the Claims, Noticing, and Solicitation Agent to the extent of any such payment without an objection to such Claim or Interest having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.        Applicability of Insurance Policies

Except as otherwise provided herein, payments to Holders of Claims or Interests shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any rights, defenses, or Cause of Action that the Debtors, the Wind-Down Debtor or any other Entity may hold against any other Entity, including insurers, under any policies of insurance, agreements related thereto, or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any rights or defenses, including coverage defenses, held by such insurers under the applicable insurance policies, agreements related thereto, and applicable non-bankruptcy law.

## H.        Setoffs and Recoupment

Except as otherwise expressly provided for herein, each Debtor, the Wind-Down Debtor, or such Entity's designee as instructed by such Debtor, the Wind-Down Debtor, as applicable, may, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, set off against or recoup from an Allowed Claim and any distributions to be made pursuant to the Plan on account of such Allowed Claim, any Claims, rights, and Causes of Action of any nature whatsoever that the Debtor or the Wind-Down Debtor, as applicable, may have against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action have not been otherwise compromised, settled, or released on or prior to the Effective Date (whether pursuant to the Plan or otherwise). Notwithstanding the foregoing, except as expressly stated in Article VIII of this Plan, neither the failure to effect such a setoff or recoupment nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by the Debtors or the Wind-Down Debtor of any such Claims, rights, or Causes of Action the Debtors or the Wind-Down Debtor may possess against such Holder.

## I.        Allocation between Principal and Accrued Interest

Except as otherwise provided herein, the aggregate consideration paid to Holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof and as determined for federal income tax purposes) and second, to the extent the consideration exceeds the principal amount of the Allowed Claims, to the remaining portion of such Allowed Claim if any.

## ARTICLE VII.

## PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT, AND UNLIQUIDATED CLAIMS AND INTERESTS

## A.        Disputed Claims Process

After the Effective Date, the Debtors, the Wind-Down Debtor, and any party-in-interest, shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim or Interest immediately before the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim or Interest shall become an Allowed Claim or Interest unless and until such Claim or Interest is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim or Interest. If a Holder of a Claim or Interest in Class disputes the amount of their Claim or Interest as listed in the Schedules, the Holder should notify the Debtors or the Wind-Down Debtor of such dispute. If the Debtors and the Holder agree to an amended Claim amount prior to the Effective Date, the Debtors shall

file amended Schedules prior to the Effective Date. If between the Confirmation Date and the Effective Date, the dispute cannot be consensually resolved, the Holder may seek (by letter to the Court) to have the claim or interest dispute resolved before the Bankruptcy Court (and, with the consent of the Debtors, before any other court or tribunal with jurisdiction over the parties). After the Effective Date, the creditor may seek to have the claim dispute resolved before the Bankruptcy Court or any other court or tribunal with jurisdiction over the parties.

Notwithstanding anything in this Plan to the contrary: (1) all Claims against the Debtors that result from the Debtors' rejection of an Executory Contract or Unexpired Lease; (2) Claims filed to dispute the amount of any proposed Cure pursuant to section 365 of the Bankruptcy Code; and (3) Claims that the Debtors seek to have determined by the Bankruptcy Court, shall in all cases be determined by the Bankruptcy Court, if not otherwise resolved through settlement with the applicable claimant.

On the Effective Date, the Debtors or Plan Administrator, as applicable, may establish one or more accounts or funds to hold and dispose of certain assets, pursue certain litigation (including the Causes of Action preserved under the Plan or otherwise vesting in the Wind-Down Debtor), and/or satisfy certain Claims (including Claims that are contingent or have not yet been Allowed). For any such account or fund, the Debtors or the Plan Administrator, as applicable, may take the position that grantor trust treatment applies in whole or in part. To the extent such treatment applies to any such account or fund, for all U.S. federal income tax purposes, the beneficiaries of any such account or fund would be treated as grantors and owners thereof, and it is intended, to the extent reasonably practicable, that any such account or fund would be classified as a liquidating trust under section 301.7701-4 of the Treasury Regulations. Alternatively, any such account or fund may be subject to the tax rules that apply to "disputed ownership funds" under 26 C.F.R. 1.468B–9. If such rules apply, such assets would be subject to entity-level taxation, and the Debtors and the Wind-Down Debtor would be required to comply with the relevant rules.

## B. Objections to Claims or Interests

Except as otherwise specifically provided in the Plan, after the Effective Date, the Wind-Down Debtor shall have the sole authority on behalf of the Debtors to: (1) File, withdraw, or litigate to judgment, any objections to Claims or Interests; and (2) settle or compromise any Disputed Claim or Interest without any further notice to or action, order, or approval by the Bankruptcy Court. For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, the Wind-Down Debtor shall have and retain any and all rights and defenses each such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to Article IV.P of the Plan. In the event that the Wind-Down Debtor settles or otherwise compromises the Signatory Governmental Claims (as defined in the Governmental Claimant Stipulation) asserted against TopCo, any other Claim Filed or asserted by a Governmental Unit against TopCo, or any other Claim Filed or asserted against TopCo in an amount greater than $100,000, any such proposed settlement or compromise shall require approval of the Bankruptcy Court after notice and a hearing.

Any objections to Claims or Interests shall be Filed on or before the Claims Objection Bar Date. For the avoidance of doubt, any party may object to any Claims or Interests prior to the Claims Objection Bar Date. Further, the Bankruptcy Court may extend the time period to object to Claims or Interests set forth in this paragraph at any time, including before or after the expiration of one hundred eighty days after the Effective Date, in its discretion or upon request by the Debtors or any party in interest.

## C. Estimation of Claims

Before or after the Effective Date, the Debtors or the Wind-Down Debtor, as applicable, may (but are not required to), at any time, request that the Bankruptcy Court estimate any Disputed Claim or

Interest that is contingent or unliquidated pursuant to applicable law, including pursuant to section 502(c) of the Bankruptcy Code, for any reason, regardless of whether any party previously has objected to such Disputed Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under sections 157 and 1334 of the Judicial Code to estimate any such Disputed Claim or Interest, including during the litigation of any objection to any Disputed Claim or Interest or during the pendency of any appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Disputed Claim or Interest that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions) and may be used as evidence in any supplemental proceedings, and the Debtors or the Wind-Down Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Disputed Claim or Interest that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before fourteen days after the date on which such Disputed Claim or Interest is estimated.

**D.  No Distributions Pending Allowance**

Notwithstanding any other provision of the Plan, if any portion of a Claim or Interest is a Disputed Claim or Interest, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest; *provided* that if only a portion of a Claim or Interest is Disputed, such Claim or Interest shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount.

**E.  Distributions After Allowance**

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim or Interest in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court Allowing any Disputed Claim or Interest becomes a Final Order, the Distribution Agent shall provide to the Holder of such Allowed Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest, dividends, or accruals to be paid on account of such Allowed Claim or Interest unless required under applicable bankruptcy law.

**F.  No Interest**

Unless otherwise specifically provided for herein or by Final Order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on Claims against the Debtors, and no Holder of a Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such Claim. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

**G.  Adjustment to Claims and Interests without Objection**

Any Claim or Interest that has been paid, satisfied, amended, superseded, cancelled, or otherwise expunged (including pursuant to the Plan) may be adjusted or expunged on the Claims Register at the direction of the Wind-Down Debtor without the Wind-Down Debtor having to File an application, motion,

complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court. Additionally, any Claim or Interest that is duplicative or redundant with another Claim or Interest against the same Debtor may be adjusted or expunged on the Claims Register at the direction of the Wind-Down Debtor without the Wind-Down Debtor having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

**H.      Time to File Objections to Claims**

Any objections to Claims shall be Filed on or before the Claims Objection Bar Date.

**I.      Disallowance of Claims or Interests**

Any Claims or Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims or Interests until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Wind-Down Debtor, as applicable.

**Except as otherwise provided herein or as agreed to by the Debtors or the Wind-Down Debtor, any and all Proofs of Claim Filed after the Bar Date shall be deemed disallowed and expunged as of the Effective Date subject to the approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order.**

**J.      Amendments to Proofs of Claim**

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Proof of Claim or Proof of Interest may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Wind-Down Debtor, and any such new or amended Proof of Claim or Proof of Interest Filed shall be deemed disallowed in full and expunged without any further action, order, or approval of the Bankruptcy Court.

## ARTICLE VIII.

## EFFECT OF CONFIRMATION OF THE PLAN

**A.      Releases by the Debtors**

**Notwithstanding anything contained in the Plan to the contrary, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Wind-Down Debtor, and their Estates, and in each case on behalf of themselves and their respective successors, assigns, and representatives, who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of, the foregoing Entities, from any and all Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the Debtors, whether known or unknown, foreseen or unforeseen,**

matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Chapter 11 Cases and related adversary proceedings, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, the administration and implementation of the Restructuring Transactions or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019, of the releases described in this Article VIII.A by the Debtors, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article VIII.A is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) except to the extent contemplated by Article IV.E and Article IV.F of the Plan, a bar to any of the Debtors or Wind-Down Debtor or their respective Estates asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

Notwithstanding anything to the contrary contained herein, nothing in this Plan shall release, waive, or otherwise limit the (i) rights, duties, or obligations of the Purchaser under the Asset Purchase Agreement or the Definitive Documents and (ii) the Non-Released D&O Claims, but such Non-Released D&O Claims shall remain subject to the limitations contained in Article IV.E and Article IV.F of this Plan.

B.      Releases by Holders of Claims and Interests

Except as expressly set forth in the Plan, effective on the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted or assertable on behalf of any of the Debtors, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the

business or contractual arrangements between any Debtor and any Released Party, the Debtors'
out-of-court restructuring efforts, intercompany transactions between or among a Debtor and
another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation
of the Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other
agreement or document created or entered into in connection with the Definitive Documents, the
pursuit of consummation of the Plan, the administration and implementation of the Restructuring
Transactions, or upon any other act or omission, transaction, agreement, event, or other occurrence
related to the Debtors taking place on or before the Effective Date, *provided* that nothing in this
Article VIII.B shall be construed to release the Released Parties from actual fraud, willful
misconduct, or gross negligence as determined by a Final Order.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant
to Bankruptcy Rule 9019, of the releases described in this Article VIII.B, which includes by reference
each of the related provisions and definitions contained in this Plan, and further, shall constitute the
Bankruptcy Court's finding that each release described in this Article VIII.B is: (1) in exchange for
the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement
and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of
Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and
opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) except to
the extent contemplated by Article IV.F and Article IV.G of the Plan, a bar to any of the Releasing
Parties or the Debtors or the Wind-Down Debtor or their respective Estates asserting any Cause of
Action related thereto, of any kind, against any of the Released Parties or their property.

C.     Exculpation

Effective as of the Effective Date, to the fullest extent permissible under applicable law and
without affecting or limiting either the Debtor release or the third-party release, and except as
otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each
Exculpated Party is exculpated from any Cause of Action for any act or omission arising on or after
the Petition Date and prior to the Effective Date based on the Chapter 11 Cases, the formulation,
preparation, dissemination, negotiation or filing, or consummation of the Disclosure Statement, the
Plan, the Special Committee Investigation, any Definitive Documents or any Restructuring
Transaction, contract, instrument, release, or other agreement or document created or entered into
in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit
of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of
the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property
under the Plan or any other related agreement (including, for the avoidance of doubt, providing any
legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or
other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or
the Confirmation Order in lieu of such legal opinion), except for Causes of Action related to any act
or omission that is determined in a Final Order of a court of competent jurisdiction to have
constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall
be entitled to reasonably rely upon the advice of counsel with respect to their duties and
responsibilities pursuant to the Plan; *provided* that nothing in the Plan shall limit the liability of
professionals to their clients pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8 Rule 1.8(h)(1)
(2009).

To the extent that any Cryptocurrency is deemed to be a "security" by the SEC or any
Governmental Unit, distribution of such Cryptocurrency shall have been done in good faith and in
compliance with all applicable laws, rules, and regulations and the Exculpated Parties shall not be

liable at any time for the violation of any applicable law, rule, or regulation governing the distribution of Cryptocurrency whether such Cryptocurrency is deemed to be a "security" or otherwise.

The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

**D.     Injunction**

The assets of the Debtors and of the Wind-Down Debtor shall be used for the satisfaction of expense obligations and the payment of Claims and Interests only in the manner set forth in this Plan and shall not be available for any other purpose.  All Persons and Entities who have held, hold, or may hold Claims or Interests based upon any act, omission, transaction, or other activity of any kind or nature related to the Debtors, the Wind-Down Debtor, or the Debtors' Chapter 11 Cases that occurred prior to the Effective Date, other than as expressly provided in the Plan or the Confirmation Order, shall be precluded and permanently enjoined on and after the Effective Date from interfering with the use and distribution of the Debtors' assets in the manner contemplated by the Plan.

In addition, as of the Effective Date and subject to the occurrence of the Effective Date, except as otherwise specifically provided in this Plan or the Confirmation Order, all Persons and Entities who have held, hold, or may hold Claims or Interests that are fully satisfied pursuant to the Plan or any Claim or Interest that is subject to the releases and exculpations set forth in Article VIII.B and Article VIII.C of this Plan shall be precluded and permanently enjoined on and after the Effective Date from enforcing, pursuing, or seeking any setoff or relief with respect to such Claims or Interests, except for the receipt of the payments or distributions that are contemplated by this Plan.

**E.     Release of Liens**

Except as otherwise provided in the Plan, the Plan Supplement, or any contract, instrument, release, or other agreement or document created pursuant to the Plan or Confirmation Order on the Effective Date, and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, compromised, and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Debtors shall automatically revert to the applicable Debtor or the Wind-Down Debtor, as applicable, and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors.  Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as requested by the Debtors or Wind-Down Debtor to evidence the release of such Lien, including the execution, delivery, and filing or recording of such documents evidencing such releases.  The presentation or filing of the Confirmation Order to or with any local, state, federal, or foreign agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

## F.    OSC and SEC

Notwithstanding any language to the contrary herein, no provision shall (a) preclude the OSC or the SEC from enforcing its police or regulatory powers; or (b) enjoin, limit, impair or delay the OSC or SEC from commencing or continuing any claims, causes of action, proceeding, or investigations against any non-Debtor person or non-Debtor entity in any forum.

## G.    Protection against Discriminatory Treatment

As provided by section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Entity, including Governmental Units, shall discriminate against any Debtor or the Wind-Down Debtor or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, or discriminate with respect to such a grant against, any Debtor or the Wind-Down Debtor, or any Entity with which a Debtor or the Wind-Down Debtor has been or is associated, solely because such Debtor or the Wind-Down Debtor was a debtor under chapter 11 of the Bankruptcy Code, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

## H.    Document Retention

Upon the occurrence of the Effective Date, the Debtors' books and records shall be transferred to the Wind-Down Debtor, which shall continue to preserve all financial books and records, emails, and other financial documents relating to the Debtors' business that are currently in the Debtors' possession. The Wind-Down Debtor shall not destroy or otherwise abandon any such documents or records without providing advance notice to the U.S. Securities and Exchange Commission (c/o Therese Scheuer, U.S. Securities and Exchange Commission, 100 F Street, NE, Washington, DC 20549, ScheuerT@SEC.GOV) and seeking further authorization from this Bankruptcy Court. Nothing in this Plan or the Confirmation Order shall affect the obligations of the pre-Effective Date Debtors, the Wind-Down Debtor, and/or any transferee or custodian to maintain all books and records that are subject to any governmental subpoena, document preservation letter, or other investigative request from a governmental agency.

## I.    Reimbursement or Contribution

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (1) such Claim has been adjudicated as non-contingent; or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

## J.    Term of Injunctions or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code, or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date. **All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.**

# ARTICLE IX.

## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

**A.    Conditions Precedent to the Effective Date**

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article IX.B of the Plan:

1.    The Bankruptcy Court shall have entered the Confirmation Order, which shall be in a form and substance reasonably satisfactory to the Debtors and the Committee, and subject to the consent rights of Purchaser under the Asset Purchase Agreement, and such order shall be a Final Order and in full force and effect.

2.    The Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan, Definitive Documents, and the Asset Purchase Agreement.

3.    Each Definitive Document and each other document contained in any supplement to the Plan, including the Plan Supplement and any exhibits, schedules, amendments, modifications or supplements thereto or other documents contained therein, shall have been executed or Filed, as applicable, in form and substance consistent in all respects with the Plan, and subject to the Purchaser's consent rights under the Asset Purchase Agreement, and shall not have been modified in a manner inconsistent therewith;

4.    The Professional Fee Escrow Account shall have been established and funded with Cash in accordance with Article II.B.2 of the Plan.

5.    The Wind-Down Reserve shall have been established and funded with Cash in accordance with the Plan.

6.    If prior to the Outside Date, the Asset Purchase Agreement shall be in full force and effect and the Sale Transaction shall have been consummated.

7.    The Restructuring Transactions shall have been consummated or shall be anticipated to be consummated concurrently with the occurrence of the Effective Date in a manner consistent with the Plan, the Customer Onboarding Protocol, the other Definitive Documents, and the Asset Purchase Agreement, and the Plan shall have been substantially consummated or shall be anticipated to be substantially consummated concurrently with the occurrence of the Effective Date.

**B.    Waiver of Conditions Precedent**

The Debtors, with the consent of the Committee and, solely to the extent related to the Asset Purchase Agreement and the Sale Transaction, prior to the Outside Date, the consent of Purchaser, may waive any of the conditions to the Effective Date set forth in Article IX.A of the Plan at any time, without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm and consummate the Plan.

### C. Effect of Non-Occurrence of Conditions to Consummation

If the Effective Date does not occur within 120 days after the Confirmation Date, then the Plan will be null and void in all respects, any and all compromises or settlements not previously approved by Final Order of the Bankruptcy Court embodied in the Plan (including with respect to the fixing, limiting, or treatment of any Claim or Interest, including, without limitation, the Alameda Loan Facility Claims), shall be deemed null and void, and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims, Interests, or Causes of Action held by any Debtor or any other Entity; (2) prejudice in any manner the rights of any Debtor or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity in any respect.

## ARTICLE X.

## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

### A. Modification of Plan

Subject to the limitations and terms contained in the Plan and Purchaser's consent rights under the Asset Purchase Agreement, the Debtors, with the consent of the Committee, reserve the right to (1) amend or modify the Plan before the entry of the Confirmation Order, in accordance with the Bankruptcy Code and the Bankruptcy Rules and (2) after the entry of the Confirmation Order, the Debtors or the Wind-Down Debtor, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, to remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan consistent with the terms set forth herein.

### B. Effect of Confirmation on Modifications

Entry of the Confirmation Order shall constitute approval of all modifications or amendments to the Plan occurring after the solicitation thereof pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

### C. Revocation or Withdrawal of Plan

The Debtors reserve the right, with the consent of the Committee, to revoke or withdraw the Plan with respect to any or all Debtors before the Confirmation Date and to File subsequent chapter 11 plans. If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then: (1) the Plan will be null and void in all respects; (2) any settlement or compromise not previously approved by Final Order of the Bankruptcy Court embodied in the Plan (including the fixing or limiting to an amount certain of the Claims or Classes of Claims), assumption or rejection of Executory Contracts or Unexpired Leases effectuated by the Plan, and any document or agreement executed pursuant to the Plan will be null and void in all respects; and (3) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims, Interests, or Causes of Action by any Entity, (b) prejudice in any manner the rights of any Debtor or any other Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

# ARTICLE XI.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to Executory Contracts or Unexpired Leases, including: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure Claims or other Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed or assumed and assigned; and (c) any dispute regarding whether a contract or lease is or was executory, expired, or terminated;

4.      ensure that distributions to Holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor or the Estates that may be pending on the Effective Date;

6.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of (a) contracts, instruments, releases, and other agreements or documents approved by Final Order in the Chapter 11 Cases and (b) the Plan, the Confirmation Order, and contracts, instruments, releases, and other agreements or documents created in connection with the Plan; *provided* that the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection, or dispute resolution clause that refers disputes to a different court;

7.      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

8.      grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

9.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

10.      hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Cases, including: (a) with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or an Interest for amounts not timely repaid pursuant to Article VI of the Plan; (b) with respect to the releases, injunctions, and other provisions contained in Article VIII of the Plan, including entry of such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions; (c) anything that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan and the Confirmation Order; or (d) related to section 1141 of the Bankruptcy Code;

11.      enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

12.      adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

13.      consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

14.      enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases with respect to any Entity, and resolve any cases, controversies, suits, or disputes that may arise in connection with any Entity's rights arising from or obligations incurred in connection with the Plan;

15.      hear and determine matters concerning local, state, federal, and foreign taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

16.      hear and determine matters concerning exemptions from state and federal registration requirements in accordance with section 1145 of the Bankruptcy Code;

17.      enter an order or Final Decree concluding or closing the Chapter 11 Cases;

18.      enforce all orders previously entered by the Bankruptcy Court; and

19.      hear and determine any other matters related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code or the Judicial Code.

Nothing herein limits the jurisdiction of the Bankruptcy Court to interpret and enforce the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, or the Disclosure Statement, without regard to whether the controversy with respect to which such interpretation or enforcement relates may be pending in any state or other federal court of competent jurisdiction.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in this Article XI, the provisions of this Article XI shall have no effect on and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

Unless otherwise specifically provided herein or in a prior order of the Bankruptcy Court, the Bankruptcy Court shall have exclusive jurisdiction to hear and determine disputes concerning Claims against or Interests in the Debtors that arose prior to the Effective Date.

## ARTICLE XII.

## MISCELLANEOUS PROVISIONS

**A.      Immediate Binding Effect**

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtors, the Wind-Down Debtor, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, exculpations, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims against and Interests in the Debtors shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or Interest has voted on the Plan.

**B.      Additional Documents**

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors, the Wind-Down Debtor, and all Holders of Claims and Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

**C.      Payment of Statutory Fees**

All fees and applicable interest payable pursuant to section 1930 of the Judicial Code and 31 U.S.C. § 3717, as applicable, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the Debtors or the Wind-Down Debtor (or the Distribution Agent on behalf of the Wind-Down Debtor) for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or a Final Decree is issued, whichever occurs first.

**D.      Dissolution of Statutory Committees**

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases; *provided*, however, that such committees will remain in existence for the limited purposes of (a) pursuing, supporting, or otherwise participating in, any outstanding appeals in the Chapter 11 Cases; and (b) filing, objecting, or otherwise participating in, any final fee applications of Professionals.

**E.      Reservation of Rights**

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests, unless and until the Effective Date has occurred.

## F.   Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiary, or guardian, if any, of each such Entity.

## G.   Service of Documents

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors or the Wind-Down Debtor shall be served on:

| Debtors | **Voyager Digital Holdings, Inc.** 33 Irving Place New York, New York 10003 Attention: David Brosgol General Counsel, E-mail address: dbrosgol@investvoyager.com |
|---|---|
| | with copies for information only (which shall not constitute notice) to: |
| Counsel to the Debtors | **Kirkland & Ellis LLP** **Kirkland & Ellis International LLP** 601 Lexington Avenue New York, New York 10022 Attention: Joshua A. Sussberg, P.C., Christopher Marcus, P.C., Christine A. Okike, P.C., and Allyson B. Smith |
| Counsel to the Committee | **McDermott Will & Emery LLP** One Vanderbilt Avenue New York, New York 10017 Attention: Darren Azman |

## H.   Entire Agreement; Controlling Document

Except as otherwise indicated, on the Effective Date, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations with respect to the subject matter of the Plan, all of which will have become merged and integrated into the Plan; *provided, however*, that notwithstanding the foregoing or anything to the contrary herein, to the extent there is any conflict between the Plan and the Confirmation Order, on the one hand, and the Asset Purchase Agreement, on the other hand, the Asset Purchase Agreement shall govern solely in the event the Sale Transaction is consummated. Except as set forth in the Plan, in the event that any provision of the Disclosure Statement, the Plan Supplement, or any order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control. In the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall control.

I.        **Plan Supplement**

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the website of the Claims, Noticing, and Solicitation Agent at https://cases.stretto.com/Voyager or the Bankruptcy Court's website at http://www.nysb.uscourts.gov.  Unless otherwise ordered by the Bankruptcy Court, to the extent any exhibit or document in the Plan Supplement is inconsistent with the terms of any part of the Plan that does not constitute the Plan Supplement, such part of the Plan that does not constitute the Plan Supplement shall control.

J.        **Non-Severability**

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, subject to the Purchaser's consent rights under the Asset Purchase Agreement prior to the Outside Date, shall have the power to alter and interpret such term or provision to make it valid or enforceable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is:  (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent, consistent with the terms set forth herein; and (3) non-severable and mutually dependent.

K.        **Votes Solicited in Good Faith**

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and solely to the extent permitted by section 1125(e) of the Bankruptcy Code, the Debtors, and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties nor individuals or the Debtors or the Wind-Down Debtor will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan or any previous plan.

L.        **Waiver or Estoppel**

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed prior to the Confirmation Date.

Dated:  March 5, 2023

VOYAGER DIGITAL HOLDINGS, INC.
on behalf of itself and all other Debtors

*/s/ Stephen Ehrlich*

Stephen Ehrlich
Co-Founder and Chief Executive Officer
Voyager Digital Holdings, Inc.

**Exhibit B**

**Redline**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC. *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

---

**THIRD AMENDED JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND**
**ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

> **NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN OFFER, ACCEPTANCE,
> COMMITMENT, OR LEGALLY BINDING OBLIGATION OF THE DEBTORS OR ANY
> OTHER PARTY IN INTEREST, AND THIS PLAN IS SUBJECT TO APPROVAL BY THE
> BANKRUPTCY COURT AND OTHER CUSTOMARY CONDITIONS.  THIS PLAN IS NOT AN
> OFFER WITH RESPECT TO ANY SECURITIES.**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Voyager Digital Holdings, Inc. (7687); Voyager Digital, LTD. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| **Introduction** |  | **1** |
| **Article I. Defined Terms, Rules of Interpretation, Computation of Time, Governing Law, and Other References** |  | **1** |
| A. | Defined Terms | 1 |
| B. | Rules of Interpretation | 17 |
| C. | Computation of Time | 17 |
| D. | Governing Law | 187 |
| E. | Reference to Monetary Figures | 18 |
| F. | Reference to the Debtors or the Wind-Down Debtor | 18 |
| G. | Nonconsolidated Plan | 18 |
| **Article II. Administrative and Priority Claims** |  | **18** |
| A. | Administrative Claims | 18 |
| B. | Professional Fee Claims | 19 |
| C. | Priority Tax Claims | 20 |
| **Article III. Classification, Treatment, and Voting of Claims and Interests** |  | **21** |
| A. | Classification of Claims and Interests | 21 |
| B. | Summary of Classification | 21 |
| C. | Treatment of Classes of Claims and Interests | 22 |
| D. | Special Provision Governing Unimpaired Claims | 28 |
| E. | Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes | 28 |
| F. | Subordinated Claims | 289 |
| G. | Intercompany Interests | 289 |
| H. | Controversy Concerning Impairment | 29 |
| I. | Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code | 29 |
| **Article IV. Provisions for Implementation of the Plan** |  | **29** |
| A. | General Settlement of Claims and Interests | 29 |
| B. | Restructuring Transactions | 2930 |
| C. | The Sale Transaction | 30 |
| D. | The Liquidation Transaction | 301 |
| E. | Employee Transition Plan | 312 |
| F. | Non-Released D&O Claims | 32 |
| G. | The D&O Settlement | 323 |
| H. | The Wind-Down Debtor | 34 |
| I. | Sources of Consideration for Plan Distributions | 412 |
| J. | Corporate Existence and Dissolution | 412 |
| K. | Corporate Action | 423 |
| L. | Vesting of Assets in the Wind-Down Debtor | 43 |
| M. | Cancellation of Notes, Instruments, Certificates, and Other Documents | 434 |
| N. | Effectuating Documents; Further Transactions | 434 |
| O. | Section 1146(a) Exemption | 44 |

P.      Preservation of Rights of Action ........................................... 44 5
Q.      Election to Contribute Third-Party Claims .............................. 45
R.      Contribution of Contributed Third-Party Claims ..................... 45 6
S.      Closing the Chapter 11 Cases ............................................... 45 6

**Article V. Treatment of Executory Contracts and Unexpired Leases** ............ **46**

A.      Assumption and Rejection of Executory Contracts and Unexpired Leases ....... 46
B.      Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases ........................................... 46 7
C.      Claims Based on Rejection of Executory Contracts or Unexpired Leases ....... 46 7
D.      Cure of Defaults for Executory Contracts and Unexpired Leases Assumed ....... 47
E.      Insurance Policies .................................................................. 48 9
F.      Reservation of Rights ............................................................. 49
G.      Nonoccurrence of Effective Date ............................................ 49
H.      Contracts and Leases Entered into After the Petition Date ......... 49 50

**Article VI. Provisions Governing Distributions** ............................... **49 50**

A.      Timing and Calculation of Amounts to Be Distributed ............ 49 50
B.      Rights and Powers of Distribution Agent ............................... 50
C.      Delivery of Distributions and Undeliverable or Unclaimed Distributions ....... 50
D.      Compliance Matters ............................................................. 52 3
E.      Securities Registration Exemption ........................................ 53
E F.    Foreign Currency Exchange Rate ........................................... 52 3
F G.    Claims Paid or Payable by Third Parties ................................ 53 4
G H.    Setoffs and Recoupment ....................................................... 53 4
H I.    Allocation between Principal and Accrued Interest ................... 54 5

**Article VII. Procedures for Resolving Disputed, Contingent, and Unliquidated Claims and Interests** ........................................... **54 5**

A.      Disputed Claims Process ....................................................... 54 5
B.      Objections to Claims or Interests ........................................... 55 6
C.      Estimation of Claims ............................................................ 55 6
D.      No Distributions Pending Allowance ...................................... 56 7
E.      Distributions After Allowance ............................................... 56 7
F.      No Interest .......................................................................... 56 7
G.      Adjustment to Claims and Interests without Objection ............ 56 7
H.      Time to File Objections to Claims .......................................... 56 7
I.      Disallowance of Claims or Interests ....................................... 57
J.      Amendments to Proofs of Claim ............................................ 57 8

**Article VIII. Effect of Confirmation of the Plan** ............................... **57 8**

A.      Releases by the Debtors ........................................................ 57 8
B.      Releases by Holders of Claims and Interests ........................... 58 9
C.      Exculpation ......................................................................... 59 60
D.      Injunction ........................................................................... 59 60
E.      Release of Liens .................................................................. 60 1
F.      OSC and SEC ...................................................................... 60 1
G.      Protection against Discriminatory Treatment .......................... 60 1
H.      Document Retention ............................................................. 60 2

I.       Reimbursement or Contribution ............................................................ 61~~2~~

J.      Term of Injunctions or Stays ............................................................ 61~~2~~

**Article IX. Conditions Precedent to the Effective Date** .......................... **61~~2~~**

A.     Conditions Precedent to the Effective Date ........................................ 61~~2~~

B.     Waiver of Conditions Precedent ........................................................ 62~~3~~

C.     Effect of Non-Occurrence of Conditions to Consummation .................. 62~~3~~

**Article X. Modification, Revocation, or Withdrawal of the Plan** .............. **62~~3~~**

A.     Modification of Plan ........................................................................ 62~~3~~

B.     Effect of Confirmation on Modifications ............................................ 63~~4~~

C.     Revocation or Withdrawal of Plan .................................................... 63~~4~~

**Article XI. Retention of Jurisdiction** .................................................... **63~~4~~**

**Article XII. Miscellaneous Provisions** .................................................. **65~~6~~**

A.     Immediate Binding Effect ................................................................ 65~~6~~

B.     Additional Documents .................................................................... 65~~6~~

C.     Payment of Statutory Fees .............................................................. 65~~7~~

D.     Dissolution of Statutory Committees ................................................ 66~~7~~

E.     Reservation of Rights .................................................................... 66~~7~~

F.     Successors and Assigns .................................................................. 66~~7~~

G.     Service of Documents .................................................................... 66~~7~~

H.     Entire Agreement; Controlling Document .......................................... 67~~8~~

I.       Plan Supplement ............................................................................ 67~~8~~

J.      Non-Severability ............................................................................ 67~~8~~

K.     Votes Solicited in Good Faith .......................................................... 67~~9~~

L.     Waiver or Estoppel ........................................................................ 68~~9~~

## INTRODUCTION

Voyager Digital Holdings, Inc. and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (each a "Debtor" and, collectively, the "Debtors") propose this third amended joint plan (the "Plan") for the resolution of the outstanding Claims against and Interests in the Debtors pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used in the Plan and not otherwise defined shall have the meanings set forth in Article I.A of the Plan. Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The classifications of Claims and Interests set forth in Article III of the Plan shall be deemed to apply separately with respect to each Plan proposed by each Debtor, as applicable. The Plan does not contemplate substantive consolidation of any of the Debtors. Reference is made to the Disclosure Statement for a discussion of the Debtors' history, business, properties and operations, projections, risk factors, a summary and analysis of this Plan, and certain related matters.

ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE I.

## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES

### A. Defined Terms

Capitalized terms used in this Plan have the meanings ascribed to them below.

1. "*3AC*" means Three Arrows Capital, Ltd and any of its Affiliates or subsidiaries.

2. "*3AC Claims*" means the claims or causes of action asserted or assertable by the Debtors against 3AC, whether in the 3AC Liquidation Proceeding or otherwise.

3. "*3AC Liquidation Proceeding*" means that certain liquidation proceeding captioned *In the Matter of Three Arrows Capital Ltd. and in the Matter of Sections 159(1) and 162(1)(a) and (b) of the Insolvency Act 2003*, Claim No. BVIHC(COM)2022/0119 before the Eastern Caribbean Supreme Court in the High Court of Justice in the British Virgin Islands and the chapter 15 foreign recognition proceeding captioned *In re Three Arrows Capital, Ltd.*, No. 22-10920 (Bankr. S.D.N.Y. Jul. 1, 2022).

4. "*3AC Loan*" means that loan of 15,250 Bitcoins and 350 million USDC to 3AC pursuant to that certain master loan agreement dated March 4, 2022 by and between 3AC, as borrower, and OpCo and HTC Trading, Inc., as lenders.

5. "*3AC Recovery*" means the recovery, if any, of the Debtors from 3AC on account of the 3AC Claims.

6. "*Account*" means any account at OpCo held by an Account Holder relating to Cryptocurrency, which Account is identified in the Debtors' books and records as holding Cryptocurrency as of the Petition Date.

7.     "*Account Holder*" means any Person or Entity who holds an Account with OpCo as of the Petition Date.

8.     "*Account Holder Claim*" means any Claim against the Debtors that is held by an Account Holder on account of such Holder's Account.

9.     "*Acquired Assets*" has the meaning ascribed to it in the Asset Purchase Agreement.

10.    "*Acquired Coins*" has the meaning ascribed to it in the Asset Purchase Agreement.

11.    "*Acquired Coins Value*" has the meaning ascribed to it in the Asset Purchase Agreement.

12.    "*Additional Bankruptcy Distribution*" has the meaning ascribed to it in the Asset Purchase Agreement.

13.    "*Administrative Claim*" means a Claim against a Debtor for the costs and expenses of administration of the Chapter 11 Cases arising on or after the Petition Date and prior to the Effective Date pursuant to section 503(b) of the Bankruptcy Code and entitled to priority pursuant to sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' business and (b) Allowed Professional Fee Claims.

14.    "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims (other than requests for payment of Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code), which:  (a) with respect to Administrative Claims other than Professional Fee Claims, shall be thirty days after the Effective Date; and (b) with respect to Professional Fee Claims, shall be forty-five days after the Effective Date.

15.    "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.  With respect to any Person that is not a Debtor, the term "Affiliate" shall apply to such Person as if the Person were a Debtor.

16.    "*Alameda*" means Alameda Ventures Ltd., along with its Affiliates and subsidiaries.

17.    "*Alameda Claims*" means the claims or causes of action asserted or assertable by the Debtors against Alameda, whether in the FTX Bankruptcy Proceeding or otherwise.

18.    "*Alameda Loan Agreement*" means that certain unsecured loan agreement, dated as of June 21, 2022, as amended, restated, amended and restated, modified, or supplemented from time to time, by and among HoldCo, as the borrower, TopCo, as the guarantor, and Alameda, as the lender thereto.

19.    "*Alameda Loan Facility*" means that certain unsecured loan facility provided for under the Alameda Loan Agreement.

20.    "*Alameda Loan Facility Claims*" means any Claim against any Debtor derived from, based upon, or arising under the Alameda Loan Agreement and any fees, costs, and expenses that are reimbursable by any Debtor pursuant to the Alameda Loan Agreement.

21.    "*Alameda Recovery*" means the recovery, if any, of the Debtors from Alameda on account of the Alameda Claims.

22. "*Allowed*" means, with respect to any Claim or Interest, except as otherwise provided herein: (a) a Claim or Interest that is evidenced by a Proof of Claim timely Filed by the Bar Date or a request for payment of Administrative Claim timely Filed by the Administrative Claims Bar Date (or for which Claim or Interest under the Plan, the Bankruptcy Code, or a Final Order of the Bankruptcy Court a Proof of Claim or a request for payment of Administrative Claim is not or shall not be required to be Filed); (b) a Claim or Interest that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely Filed; (c) a Claim or Interest Allowed pursuant to the Plan, any stipulation approved by the Bankruptcy Court, any contract, instrument, indenture, or other agreement entered into or assumed in connection with the Plan, or a Final Order of the Bankruptcy Court, or (d) a Claim or Interest as to which the liability of the Debtors and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court; *provided* that, with respect to a Claim or Interest described in clauses (a) and (b) above, such Claim or Interest shall be considered Allowed only if and to the extent that with respect to such Claim or Interest no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or if such an objection is so interposed, such Claim or Interest shall have been Allowed by a Final Order. Any Claim or Interest that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes. A Proof of Claim Filed after and subject to the Bar Date or a request for payment of an Administrative Claim Filed after and subject to the Administrative Claims Bar Date, as applicable, shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim. "Allow" and "Allowing" shall have correlative meanings.

23. "*Asset Purchase Agreement*" means that certain asset purchase agreement dated as of December 18, 2022 by and between BAM Trading Services Inc. (d/b/a Binance.US) as Purchaser and Voyager Digital, LLC as Seller.

24. "*Assumed Liabilities*" has the meaning ascribed to it in the Asset Purchase Agreement.

25. "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or hereafter amended.

26. "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York, or any other court having jurisdiction over the Chapter 11 Cases, including to the extent of the withdrawal of reference under section 157 of the Judicial Code, the United States District Court for the Southern District of New York.

27. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated by the United States Supreme Court under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

28. "*Bar Date*" means the applicable deadline by which Proofs of Claim must be Filed, as established by: (a) the Bar Date Order; (b) a Final Order of the Bankruptcy Court; or (c) the Plan.

29. "*Bar Date Order*" means the *Order (I) Setting Deadlines for Submitting Proofs of Claims, (II) Approving Procedures for Submitting Proofs of Claim, and (III) Approving Notice Thereof* [Docket No. 218].

30. "*Binance.US Platform*" has the meaning ascribed to it in the Asset Purchase Agreement.

31. "*Binance US*" means BAM Trading Services Inc. (d/b/a Binance.US).

32. "*Binance US Account*" means a customer account opened with the Purchaser by an Account Holder or a Holder of an Allowed OpCo General Unsecured Claim.

33. "*Business Day*" means any day, other than a Saturday, Sunday, or a "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

34. "*Cash*" or "*$*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

35. "*Causes of Action*" mean any action, Claim, cross-claim, third-party claim, damage, judgment, cause of action, controversy, demand, right, suit, obligation, liability, debt, account, defense, offset, power, privilege, license, Lien, indemnity, interest, guaranty, or franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, matured or unmatured, suspected or unsuspected, in contract or in tort, at law or in equity, or pursuant to any other theory of law in accordance with applicable law. For the avoidance of doubt, "Causes of Action" includes: (a) any right of setoff, counterclaim, or recoupment and any claim arising from any contract or for breach of duties imposed by law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of local, state, federal, or foreign law, or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) any right to object to or otherwise contest Claims or Interests; (d) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; and (e) any claim or defense, including fraud, mistake, duress, usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

36. "*CCO*" means Evan Psaropoulos.

37. "*CEO*" means Stephen Ehrlich.

38. "*Certificate*" means any instrument evidencing a Claim or an Interest.

39. "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor in the Bankruptcy Court under chapter 11 of the Bankruptcy Code and (b) when used with reference to all Debtors, the procedurally consolidated cases filed for the Debtors in the Bankruptcy Court under chapter 11 of the Bankruptcy Code.

40. "*Claim*" has the meaning set forth in section 101(5) of the Bankruptcy Code.

41. "*Claims Objection Bar Date*" means the deadline for objecting to a Claim, which shall be on the date that is the later of (a) (i) with respect to Administrative Claims (other than Professional Fee Claims and Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code), sixty days after the Administrative Claims Bar Date or (ii) with respect to all other Claims (other than Professional Fee Claims), 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by the Debtors or the Wind-Down Debtor, as applicable, as approved by an order of the Bankruptcy Court for objecting to such Claims.

42. "*Claims Register*" means the official register of Claims against and Interests in the Debtors maintained by the Clerk of the Bankruptcy Court or the Claims, Noticing, and Solicitation Agent.

43. "*Claims, Noticing, and Solicitation Agent*" means Bankruptcy Management Solutions, Inc. d/b/a Stretto, in its capacity as the claims, noticing, and solicitation agent in the Chapter 11 Cases for the Debtors and any successors appointed by an order of the Bankruptcy Court.

44. "*Class*" means a class of Claims against or Interests in the Debtors as set forth in Article III of the Plan in accordance with section 1122(a) of the Bankruptcy Code.

45. "*Committee*" means the Official Committee of Unsecured Creditors appointed in these Chapter 11 Cases.

46. "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

47. "*Confirmation Date*" means the date on which Confirmation occurs.

48. "*Confirmation Hearing*" means the hearing before the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code at which the Debtors will seek Confirmation of the Plan.

49. "*Confirmation Order*" has the meaning ascribed to it in the Asset Purchase Agreement.

50. "*Consummation*" means the occurrence of the Effective Date.

51. "*Contributed Third-Party Claims*" means all direct Causes of Action that any Contributing Claimant has against any Person (other than a Debtor) that had a direct relationship with the Debtors, their predecessors, or respective affiliates and that harmed such Contributing Claimant in the claimant's capacity as a creditor of Voyager, including (a) all Causes of Action based on, arising out of, or related to the marketing, sale, and issuance of Cryptocurrency that at any point was held or offered on Voyager's platform; (b) all Causes of Action based on, arising out of, or related to the alleged misrepresentation of any of the Debtors' financial information, business operations, or related internal controls; and (c) all Causes of Action based on, arising out of, or related to any alleged failure to disclose, or actual or attempted cover up or obfuscation of, any of the Debtors' conduct prior to the Petition Date; *provided*, *however*, that Contributed Third-Party Claims do not include (i) any derivative claims of the Debtors; (ii) any direct claims against the Released Parties; (iii) any direct Causes of Action that any Contributing Claimant has against Mark Cuban, Dallas Basketball Limited d/b/a Dallas Mavericks, the National Basketball Association, and any of their Related Parties; or (iv) any direct Causes of Action that any Contributing Claimant, in its capacity as an equity holder of Voyager Digital Ltd., has that are asserted in the currently filed complaint, dated as of July 6, 2022, in the Ontario Superior Court of Justice by Francine De Sousa, against Voyager Digital Ltd., Stephen Ehrlich, Philip Eytan, Evan Psaropoulos, Lewis Bateman, Krisztian Toth, Jennifer Ackart, Glenn Stevens, and Brian Brooks.

52. "*Contributing Claimants*" means any Holders of Claims or Interests that elect on their ballots or opt-in forms to contribute their Contributed Third-Party Claims to the Wind-Down Debtor.

53. "*Cryptocurrency*" means a digital currency or crypto asset in which transactions are verified and records maintained by a decentralized system using cryptography, rather than by a

centralized authority, including stablecoins, digital coins and tokens, such as security tokens, utility tokens and governance tokens.

54.     "*Cure*" or "*Cure Claim*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's default under an Executory Contract or an Unexpired Lease assumed by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

55.     "*Customer Onboarding Protocol*" means the protocol describing the process of onboarding Account Holders and Holders of OpCo General Unsecured Claims onto the Binance.US Platform, the form of which shall be included in the Plan Supplement and filed no later than by February 8, 2023, and which shall be in a form acceptable to the Purchaser.

56.     "*D&O Carriers*" means the insurance carriers of the D&O Liability Insurance Policies.

57.     "*D&O Liability Insurance Policies*" means all unexpired insurance policies maintained by the Debtors, the Wind-Down Debtor, or the Estates as of the Effective Date that have been issued (or provide coverage) regarding directors', managers', officers', members', and trustees' liability (including any "tail policy"), including but not limited to the Management Liability Policy, the Excess Policies, and the Side-A Policy, and all agreements, documents, or instruments relating thereto.

58.     "*D&O Settlement*" means the settlement between the Debtors and CEO and CCO as set forth in Article IV.G of the Plan.

59.     "*Debtors*" means, collectively, each of the following:  Voyager Digital Holdings, Inc.; Voyager Digital Ltd.; and Voyager Digital, LLC.

60.     "*Definitive Documents*" means:  (a) the Plan (and any and all exhibits, annexes, and schedules thereto); (b) the Confirmation Order; (c) the Disclosure Statement and the other Solicitation Materials; (d) the Disclosure Statement Order; (e) all pleadings filed by the Debtors in connection with the Chapter 11 Cases (or related orders); (f) the Plan Supplement; (g) the Asset Purchase Agreement; (h) the Customer Onboarding Protocol; and (i) any and all other deeds, agreements, filings, notifications, pleadings, orders, certificates, letters, instruments or other documents reasonably desired or necessary to consummate and document the transactions contemplated by the Restructuring Transactions (including any exhibits, amendments, modifications, or supplements made from time to time thereto).

61.     "*Disclosure Statement*" means the *Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, as may be amended, supplemented, or otherwise modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan.

62.     "*Disclosure Statement Order*" means the order entered by the Bankruptcy Court approving the Disclosure Statement.

63.     "*Disputed*" means a Claim or an Interest or any portion thereof:  (a) that is not Allowed; (b) that is not disallowed under the Plan, the Bankruptcy Code, or a Final Order; and (c) with respect to which a party in interest has Filed a Proof of Claim, a Proof of Interest, or otherwise made a written request to a Debtor for payment.

64. "*Disputed Claims Reserve*" means an appropriate reserve in an amount to be determined by the Wind-Down Debtor for distributions on account of Disputed Claims that are subsequently Allowed after the Effective Date, in accordance with Article VII.D hereof.

65. "*Distributable Cryptocurrency*" means all Cryptocurrency held on the Voyager platform or that is otherwise property of any Debtor on the Effective Date after payment in full of, or reserve for, all Allowed Administrative Claims, Priority Tax Claims, Secured Tax Claims, and Other Priority Claims.

66. "*Distributable HoldCo Cash*" means HoldCo's Cash, less (x) any Cash necessary to satisfy Allowed Administrative Claims, Priority Tax Claims, Secured Tax Claims, and Other Priority Claims at HoldCo in full; and (y) to fund HoldCo's Pro Rata share of the Wind-Down Budget.

67. "*Distributable OpCo Cash*" means OpCo's Cash, including the Purchase Price Cash, less (x) any Cash necessary to satisfy Allowed Administrative Claims, Priority Tax Claims, Secured Tax Claims, and Other Priority Claims at OpCo in full; and (y) to fund OpCo's Pro Rata share of the Wind-Down Budget.

68. "*Distributable TopCo Cash*" means TopCo's Cash, less (x) any Cash necessary to satisfy Allowed Administrative Claims, Priority Tax Claims, Secured Tax Claims, and Other Priority Claims at TopCo in full; and (y) to fund TopCo's Pro Rata share of the Wind-Down Budget.

69. "*Distribution Agent*" means, as applicable, the Purchaser, the Debtors, the Wind-Down Debtor or any Entity or Entities designated by the Purchaser, the Debtors, or the Wind-Down Debtor to make or to facilitate distributions that are to be made pursuant to the Plan, Definitive Documents, and Asset Purchase Agreement.

70. "*Distribution Date*" means, except as otherwise set forth herein, the date or dates determined by the Debtors or the Wind-Down Debtor, on or after the Effective Date, upon which the Distribution Agent shall make distributions to Holders of Allowed Claims or Allowed Interests entitled to receive distributions under the Plan.

71. "*Distribution Record Date*" means the record date for purposes of determining which Holders of Allowed Claims and Interests against the Debtors are eligible to receive distributions under the Plan, which date shall be the Effective Date, or such other date as is determined by the Debtors or designated by an order of the Bankruptcy Court.

72. "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which (a) all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of the Plan have been satisfied or waived in accordance with Article IX.B of the Plan, (b) no stay of the Confirmation Order is in effect, and (c) the Debtors declare the Plan effective.

73. "*Employee Transition Plan*" has the meaning set forth in Article IV.E of the Plan, and which shall be in form and substance reasonably acceptable to the Committee.

74. "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

75. "*Estate*" means, as to each Debtor, the estate created on the Petition Date for the Debtor in its Chapter 11 Case pursuant to sections 301 and 541 of the Bankruptcy Code and all property (as defined in section 541 of the Bankruptcy Code) acquired by the Debtor after the Petition Date through and including the Effective Date.

76.    "*Excess Policies*" means, collectively, the Excess Insurance Policy, No. EFI1203041-01, issued by Euclid Financial on behalf of Certain Underwriters of Lloyd's, London, the Excess Insurance Policy, No. RILEDOA3392022, issued by Relm Insurance Ltd., both for the February 22, 2022 to February 22, 2023 period, and the Excess Policy, No. ELU184180-23, issued by XL Specialty Insurance Company, for the February 22, 2022 to July 1, 2023 period.

77.    "*Exculpated Parties*" means, collectively, and in each case in its capacity as such: (a) each of the Debtors; (b) the Committee, and each of the members thereof, solely in their capacity as such; (c) each of the Released Professionals; (d) each of the Released Voyager Employees; and (e) the Distribution Agent.

78.    "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

79.    "*Existing Equity Interests*" means any Interest in TopCo existing immediately prior to the occurrence of the Effective Date.

80.    "*Extended Outside Date*" has the meaning set forth in the Asset Purchase Agreement.

81.    "*Federal Judgment Rate*" means the federal judgment interest rate in effect as of the Petition Date calculated as set forth in section 1961 of the Judicial Code.

82.    "*File*," "*Filed*," or "*Filing*" means file, filed, or filing, respectively, in the Chapter 11 Cases with the Bankruptcy Court or its authorized designee, or, with respect to the filing of a Proof of Claim or Proof of Interest, file, filed, or filing, respectively, with the Claims, Noticing, and Solicitation Agent.

83.    "*Final Decree*" means the decree contemplated under Bankruptcy Rule 3022.

84.    "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, petition for certiorari, or move for a new trial, reargument, reconsideration, or rehearing has expired and no appeal, petition for certiorari, or motion for a new trial, reargument, reconsideration, or rehearing has been timely taken or filed, or as to which any appeal that has been or may be taken or any petition for certiorari or any motion for a new trial, reargument, reconsideration, or rehearing that has been or may be made or filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the motion for a new trial, reargument, reconsideration, or rehearing shall have been denied, resulted in no modification of such order (if any such motion has been or may be granted), or have otherwise been dismissed with prejudice; *provided* that the possibility that a motion under rule 60 of the Federal Rules of Civil Procedure or any comparable Bankruptcy Rule may be filed relating to such order or judgment shall not cause such order or judgment to not be a Final Order.

85.    "*FTX*" means FTX Trading, Ltd. and any of its Affiliates or subsidiaries, including West Realm Shires Inc (d/b/a "FTX.US").

86.    "*FTX Bankruptcy Proceeding*" means that certain chapter 11 proceeding captioned *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Nov. 11, 2022).

87.    "*FTX Claims*" means the claims or causes of action asserted or assertable by the Debtors against FTX, whether in the FTX Bankruptcy Proceeding or otherwise.

88.  "*FTX Recovery*" means the recovery, if any, of the Debtors from FTX on account of the FTX Claims.

89.  "*FTX Settlement*" means the settlement between the Debtors, the Committee, FTX, Alameda, and the official committee of unsecured creditors in the FTX Bankruptcy Proceeding, pursuant to the terms set forth in the *Debtors' Motion for Entry of an Order Approving the Joint Stipulation and Agreed Order Between the Voyager Debtors, the FTX Debtors, and Their Respective Official Committees of Unsecured Creditors* [Docket No. 1106].

90.  "*General Unsecured Claim*" means, collectively, any HoldCo General Unsecured Claim, OpCo General Unsecured Claim, or TopCo General Unsecured Claim.

91.  "*Governmental Claimant Stipulation*" means the *Joint Stipulation and Agreed Order Between the Debtors and Governmental Claimants* [Docket. No. 1100].

92.  "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

93.  "*Government Bar Date*" means the applicable deadline by which Proofs of Claim by a Governmental Unit must be Filed, as established by:  (a) the Bar Date Order; (b) a Final Order of the Bankruptcy Court; or (c) the Plan.

94.  "*HoldCo*" means Voyager Digital Holdings, Inc.

95.  "*HoldCo General Unsecured Claim*" means any Claim against HoldCo that is not Secured and is not:  (a) paid in full prior to the Effective Date pursuant to an order of the Bankruptcy Court; (b) an Administrative Claim; (c) a Secured Tax Claim; (d) a Priority Tax Claim; (e) an Other Priority Claim; (f) a Professional Fee Claim; (g) an Alameda Loan Facility Claim; or (h) an Intercompany Claim.  For the avoidance of doubt, all (i) Claims resulting from the rejection of Executory Contracts and Unexpired Leases, and (ii) Claims that are not Secured resulting from litigation, against HoldCo are HoldCo General Unsecured Claims.

96.  "*Holder*" means an Entity holding a Claim against or an Interest in any Debtor.

97.  "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

98.  "*Insurance Policies*" means any and all insurance policies entered into by the Debtors, including the D&O Insurance Policies.

99.  "*Intercompany Claim*" means any Claim held by a Debtor or a Debtor's Affiliate against a Debtor.

100.  "*Intercompany Interest*" means, other than an Interest in Voyager, an Interest in one Debtor held by another Debtor or a Debtor's Affiliate.

101.  "*Interest*" means any equity security (as such term is defined in section 101(16) of the Bankruptcy Code) including all issued, unissued, authorized, or outstanding shares of capital stock and any other common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profit interests of an Entity, including all options, warrants, rights, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable, or exchangeable securities, or other agreements, arrangements, or commitments of any

character relating to, or whose value is related to, any such interest or other ownership interest in an Entity whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security, and including any Claim against the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to the foregoing.

102. "*Interim Compensation Order*" means the *Order (I) Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals and (II) Granting Related Relief* [Docket No. 236].

103. "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001 and the rules and regulations promulgated thereunder, as applicable to the Chapter 11 Cases.

104. "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

105. "*Liquidation Procedures*" means, in the event the Sale Transaction is not consummated by the Outside Date, such procedures filed by the Wind-Down Debtor identifying the mechanics and procedures to effectuate the Liquidation Transaction.

106. "*Liquidation Transaction*" means, in the event the Sale Transaction is not consummated by the Outside Date, the distribution of the Debtors' Cryptocurrency, Cash and other assets pursuant to Article IV.D of this Plan.

107. "*Management Liability Policy*" means the Executive and Corporate Securities Liability Insurance Policy, No. ELU181214-22, issued by XL Specialty Insurance Company for the February 22, 2022 to February 22, 2023 period.

108. "*Money Transmitter License*" means any consent, license, certificate, franchise, permission, variance, clearance, registration, qualification, authorization, waiver, exemption or other permit issued, granted, given or otherwise made available by or under the authority of any Governmental Unit pursuant to state money transmission or similar laws.

109. "*Net Owed Coins*" has the meaning ascribed to it in the Asset Purchase Agreement.

110. "*Non-Released D&O Claims*" has the meaning set forth in Article IV.F of the Plan.

111. "*Non-Released D&O Claim Budget*" means the amount allocated to pursue the Non-Released D&O Claims and the Non-Released Insurance Claims, which amount shall be agreed upon between the Debtors and the Committee prior to the Confirmation Hearing.

112. "*Non-Released Insurance Claims*" has the meaning set forth in Article IV.F of the Plan.

113. "*OpCo*" means Voyager Digital, LLC.

114. "*OpCo General Unsecured Claim*" means any Claim against OpCo that is not Secured and is not: (a) paid in full prior to the Effective Date pursuant to an order of the Bankruptcy Court; (b) an Administrative Claim; (c) a Secured Tax Claim; (d) a Priority Tax Claim; (e) an Other Priority Claim; (f) a Professional Fee Claim; (g) an Account Holder Claim; or (h) an Intercompany Claim. For the avoidance of doubt, all (i) Claims resulting from the rejection of Executory Contracts and Unexpired Leases, and (ii) Claims that are not Secured resulting from litigation against OpCo are OpCo General Unsecured Claims.

115.     "*OSC*" means the Ontario Securities Commission.

116.     "*Other Priority Claim*" means any Claim against a Debtor, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

117.     "*Outside Date*" has the meaning set forth in the Asset Purchase Agreement.  All references herein to the "Outside Date" shall be deemed to include the "Extended Outside Date" to the extent the Outside Date is extended in accordance with Section 8.1(c) of the Asset Purchase Agreement.

118.     "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

119.     "*Petition Date*" means July 5, 2022.

120.     "*Plan*" means this joint chapter 11 plan and all exhibits, supplements, appendices, and schedules hereto, as may be altered, amended, supplemented, or otherwise modified from time to time in accordance with Article X.A hereof, including the Plan Supplement (as altered, amended, supplemented, or otherwise modified from time to time), which is incorporated herein by reference and made part of the Plan as if set forth herein.

121.     "*Plan Administrator*" means the Person or Persons selected by the Committee, after consultation with the Debtors, subject to the approval of the Bankruptcy Court and identified in the Plan Supplement, to serve as the administrator(s) of the Wind-Down Debtor, and any successor thereto, appointed pursuant to the Plan Administrator Agreement.

122.     "*Plan Administrator Agreement*" means that certain agreement by and among the Debtors, the Committee, the Plan Administrator and the Wind-Down Debtor, which shall be included in the Plan Supplement in a form reasonably acceptable to the Committee.

123.     "*Plan Supplement*" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (in each case, as may thereafter be amended, supplemented, or otherwise modified from time to time in accordance with the terms of the Plan, the Bankruptcy Code, the Bankruptcy Rules, and applicable law), to be Filed by the Debtors no later than seven days before the Voting Deadline or such later date as may be approved by the Bankruptcy Court, and additional documents Filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement.  The Plan Supplement may include the following, as applicable:  (a) the Schedule of Assumed Executory Contracts and Unexpired Leases; (b) the Schedule of Retained Causes of Action; (c) the Schedule of Assumed and Assigned Executory Contracts and Unexpired Leases; (d) the Customer Onboarding Protocol; (e) the Restructuring Transactions Memorandum; (f) the Plan Administrator Agreement; (g) the Employee Transition Plan; and (h) any additional documents necessary to effectuate or that is contemplated by the Plan, including any compensation program for any of the Debtors' employees to be established as contemplated in the Plan and the Definitive Documents to facilitate the transfer of Acquired Assets pursuant to the Asset Purchase Agreement and the wind-down of the Debtors' Estates; *provided* that the Schedule of Retained Causes of Action shall be filed no later than 14 days before the Voting Deadline.  The Plan Supplement (and the contents thereof) shall be (x) subject to Purchaser's consent rights solely to the extent set forth under the Asset Purchase Agreement (and shall otherwise be consistent with the Asset Purchase Agreement) and (y) reasonably acceptable to the Committee.

124. "*Priority Tax Claim*" means any Claim of a Governmental Unit against a Debtor of the kind specified in section 507(a)(8) of the Bankruptcy Code.

125. "*Pro Rata*" means the proportion that (i) an Allowed Claim or an Allowed Interest in a particular Class bears to (ii) the aggregate amount of Allowed Claims or Allowed Interests in that Class and, solely with respect to Claims in Classes 3 and 4(a), the proportion that an Allowed Claim in either such Class bears to the aggregate amount of Allowed Claims in Classes 3 and 4(a) in the aggregate, unless otherwise indicated. For purposes of calculating Pro Rata distributions if the Sale Transaction is consummated by the Outside Date, the Pro Rata shares of all Holders of Allowed Claims or Allowed Interests shall be calculated taking into account the Acquired Coins Value of the Net Owed Coins distributed to each of the Account Holders.

126. "*Professional*" means an Entity: (a) employed in the Chapter 11 Cases pursuant to an order of the Bankruptcy Court in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered and expenses incurred pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code or (b) for which compensation and reimbursement has been Allowed by Final Order of the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

127. "*Professional Fee Claim*" means any Administrative Claim by a Professional for compensation for services rendered or reimbursement of expenses incurred by such Professional through and including the Effective Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court. To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

128. "*Professional Fee Escrow Account*" means an escrow account funded by the Debtors with Cash no later than the Effective Date in an amount equal to the Professional Fee Escrow Amount.

129. "*Professional Fee Escrow Amount*" means the aggregate amount of quarterly U.S. Trustee fees, Professional Fee Claims, and other unpaid fees and expenses the Professionals have incurred or will incur in rendering services in connection with the Chapter 11 Cases prior to and as of the Confirmation Date projected to be outstanding as of the anticipated Effective Date, which shall be estimated pursuant to the method set forth in Article II.B of the Plan.

130. "*Proof of Claim*" means a written proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

131. "*Proof of Interest*" means a written proof of Interest Filed against any of the Debtors in the Chapter 11 Cases.

132. "*Purchase Price Cash*" means the Cash paid by the Purchaser to OpCo pursuant to the Asset Purchase Agreement.

133. "*Purchaser*" means Binance US.

134. "*Reinstated*" or "*Reinstatement*" means, with respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

135. "*Related Party*" means, with respect to any Entity, in each case in its capacity as such with respect to such Entity, such Entity's current and former directors, managers, officers, investment committee members, special committee members, equity holders (regardless of whether such interests are

held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and advisors.

136. "*Released Parties*" means, collectively, in each case in its capacity as such: (a) the Debtors; (b) the Committee, and each of the members thereof; (c) each of the Released Professionals; (d) Purchaser and each of its Related Parties; and (e) each of the Released Voyager Employees (subject to the limitations contained in Article IV.F and Article IV.G of the Plan); *provided* that if the Asset Purchase Agreement is terminated, Purchaser and each of its Related Parties shall not be "Released Parties" under the Plan.

137. "*Released Professionals*" means the following professionals retained by the Debtors, the Committee, or the Purchaser (as applicable): (i) Kirkland & Ellis LLP; (ii) Moelis & Company LLC; (iii) Berkeley Research Group, LLC; (iv) Bankruptcy Management Solutions, Inc. d/b/a Stretto; (v) Quinn Emanuel Urquhart & Sullivan LLP; (vi) Fasken Martineau DuMoulin LLP; (vii) Campbells Legal (BVI); (viii) McDermott Will & Emery LLP; (ix) FTI Consulting, Inc.; (x) Epiq Corporate Restructuring, LLC; (xi) Cassels, Brock & Blackwell LLP; (xii) Paul Hastings LLP; (xiii) Harney Westwood & Riegels LP (BVI); (xiv) Day Pitney LLP (solely in their capacity as counsel to the Debtors); (xv) Jenner & Block LLP; (xvi) Seyfarth Shaw LLP; (xvii) Alvarez & Marsal Canada Inc.; (xviii) Blake, Cassels & Graydon LLP; (xix) Jaffe Raitt Heuer & Weiss; (xx) Latham & Watkins LLP; (xxi) Lowenstein Sandler LLP; (xxii) Kramer Levin LLP; and (xxiii) Acura Law Firm; *provided* that if the Asset Purchase Agreement is terminated, Latham & Watkins LLP shall not be a "Released Professional" under the Plan.

138. "*Released Voyager Employees*" means all directors, officers, and Persons employed by each of the Debtors and their Affiliates serving in such capacity on or after the Petition Date but before the Effective Date (subject to the limitations contained in Article IV.F and Article IV.G of the Plan).

139. "*Releasing Parties*" means, collectively, in each case in its capacity as such: (a) the Debtors; (b) the Committee, and each of the members thereof; (c) each of the Released Professionals; (d) each of the Released Voyager Employees; (e) Purchaser and each of its Related Parties to the extent Purchaser is able to bind such Related Parties; (f) all Holders of Claims that vote to accept the Plan and affirmatively opt into the releases provided by the Plan; (g) all Holders of Claims that vote to reject the Plan and affirmatively opt into the releases provided by the Plan; and (h) all Holders of Claims or Interests that abstain from voting (or are otherwise not entitled to vote) on the Plan and affirmatively opt into the releases provided by the Plan; *provided* that if the Asset Purchase Agreement is terminated, Purchaser and each of its Related Parties shall not be "Releasing Parties" under the Plan.

140. " *Restructuring Transactions*" means those mergers, amalgamations, consolidations, reorganizations, arrangements, continuances, restructurings, transfers, conversions, dispositions, liquidations, dissolutions, or other corporate transactions that the Debtors and the Committee jointly determine to be necessary to implement the transactions described in this Plan, as described in more detail in Article IV.B herein and the Restructuring Transactions Memorandum.

141. " *Restructuring Transactions Memorandum*" means that certain memorandum as may be amended, supplemented, or otherwise modified from time to time, describing the steps to be carried out to effectuate the Restructuring Transactions, the form of which shall be included in the Plan Supplement, and which shall be in a form reasonably acceptable to the Committee.

142.    "*Robertson Class Action*" means that certain putative class action litigation filed in the United States District Court for the Southern District of Florida, captioned *Robertson, et al. v. Cuban, et al.*, No. 1:22-cv-22538-RKA (S.D. Fla. Aug. 10, 2022).

143.    "*Sale Transaction*" means the sale of certain of the Debtors' assets and all other transactions pursuant to the Asset Purchase Agreement.

144.    "*Schedule of Assumed and Assigned Executory Contracts and Unexpired Leases*" means a schedule that may be Filed as part of the Plan Supplement, which shall be in form and substance acceptable to the Purchaser and in all respects consistent with the terms of the Asset Purchase Agreement, of certain Executory Contracts and Unexpired Leases to be assumed by the Debtors and assigned to the Purchaser pursuant to the Plan and Asset Purchase Agreement, as the same may be amended, modified, or supplemented from time to time by the Debtors or Wind-Down Debtor, as applicable, in accordance with the Plan.

145.    "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means a schedule that may be Filed as part of the Plan Supplement, which shall be in form and substance reasonably acceptable to the Committee, of certain Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time by the Debtors or Wind-Down Debtor, as applicable, in accordance with the Plan.

146.    "*Schedule of Retained Causes of Action*" means the schedule of certain Causes of Action of the Debtors that are not released, waived, settled, compromised, or transferred pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time by the Debtors and/or Wind-Down Debtor, which shall be included in the Plan Supplement.  For the avoidance of doubt, any failure to specifically list any Causes of Action on the Schedule of Retained Causes of Action shall not be deemed a waiver or admission that any such Cause of Action does not constitute Vested Causes of Action.

147.    "*Schedules*" means, collectively, the schedules of assets and liabilities, Schedule of Assumed Executory Contracts and Unexpired Leases, Schedule of Assumed and Assigned Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by each of the Debtors pursuant to section 521 of the Bankruptcy Code, as such schedules and statements may have been or may be amended, modified, or supplemented from time to time.

148.    "*SEC*" means the United States Securities and Exchange Commission.

149.    "*Section 510(b) Claim*" means any Claim against a Debtor subject to subordination under section 510(b) of the Bankruptcy Code.

150.    "*Secured*" means, when referring to a Claim:  (a) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) Allowed pursuant to the Plan as a secured Claim.

151. "*Secured Tax Claim*" means any Secured Claim against a Debtor that, absent its Secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

152. "*Securities Act*" means the U.S. Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

153. "*Security*" has the meaning set forth in section 2(a)(1) of the Securities Act.

154. "*Side-A Policy*" means the Cornerstone A-Side Management Liability Policy, ELU184179-22, issued by XL Specialty Insurance Company, for the July 1, 2022 to July 1, 2023 period.

155. "*Solicitation Materials*" means all solicitation materials with respect to the Plan.

156. "*Special Committee*" means the special committee established at OpCo, comprised of two independent directors, to conduct the Special Committee Investigation.

157. "*Special Committee Investigation*" means that certain investigation undertaken by the Special Committee into certain historical transactions, as more fully described in the Disclosure Statement.

158. "*Supported Jurisdiction*" has the meaning ascribed to it in the Asset Purchase Agreement.

159. "*TopCo*" means Voyager Digital Ltd., a Canadian corporation that is publicly traded on the Toronto Stock Exchange.

160. "*TopCo General Unsecured Claim*" means any Claim against TopCo that is not Secured and is not: (a) paid in full prior to the Effective Date pursuant to an order of the Bankruptcy Court; (b) an Administrative Claim; (c) a Secured Tax Claim; (d) a Priority Tax Claim; (e) an Other Priority Claim; (f) a Professional Fee Claim; (g) an Alameda Loan Facility Claim; (h) an Intercompany Claim; or (i) a Section 510(b) Claim. For the avoidance of doubt, all (i) Claims resulting from the rejection of Executory Contracts and Unexpired Leases, and (ii) Claims that are not Secured resulting from litigation, other than 510(b) Claims, against TopCo are TopCo General Unsecured Claims.

161. "*Transferred Creditors*" means Account Holders and Holders of Allowed OpCo General Unsecured Claims who have completed all documentation and "KYC" processes reasonably required by Purchaser in the ordinary course of Purchaser's business with respect to similarly situated clients and who have opened a Binance US Account as of the date that is three (3) months following the later of the Closing Date (as defined in the Asset Purchase Agreement) or such later date as may be specified in the Customer Onboarding Protocol, and the successors and assigns of such Holders.

162. "*Transferred Cryptocurrency Value*" means the aggregate VWAP of any Cryptocurrency that is the subject of an Additional Bankruptcy Distribution as of the date that is two Business Days prior to such Additional Bankruptcy Distribution.

163. "*U.S. Trustee*" means the Office of the United States Trustee for Region 2.

164. "*Unclaimed Distribution*" means any distribution under the Plan on account of an Allowed Claim or Allowed Interest to a Holder that, after the expiration of six months after the Effective Date, has not: (a) accepted a distribution, (b) given notice to the Wind-Down Debtor of an intent to accept a particular distribution, (c) responded to the Debtors' or Wind-Down Debtor's requests for

information necessary to facilitate a particular distribution, or (d) taken any other action necessary to facilitate such distribution.

165. "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or section 1123 of the Bankruptcy Code.

166. "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

167. "*Unsupported Jurisdiction*" has the meaning ascribed to it in the Asset Purchase Agreement.

168. "*Unsupported Jurisdiction Approval*" has the meaning ascribed to it in the Asset Purchase Agreement.

169. "*Vested Causes of Action*" means the Causes of Action vesting in the Wind-Down Debtor pursuant to Article IV.L of the Plan, including, but not limited to, those Causes of Action enumerated on the Schedule of Retained Causes of Action, which shall be included in the Plan Supplement and in all respects consistent with the terms of the Asset Purchase Agreement.

170. "*VGX*" means Voyager Token, that certain Cryptocurrency issued by the Debtors.

171. "*Voting Deadline*" means February 22, 2023.

172. "*Voyager*" means Voyager Digital Ltd. and its direct and indirect Affiliates.

173. "*VWAP*" means, with respect to any type of Cryptocurrency and as of any date of determination, an amount equal to the volume weighted average price in U.S. dollars for such type of Cryptocurrency for the consecutive 24-hour period immediately prior to 8:00 a.m. New York Time on such date of determination, as reported on https://coinmarketcap.com.

174. "*Wind-Down Debtor*" means a Debtor, or any successor or assign thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Effective Date, and as described in Article IV.H to, among other things, effectuate the wind-down of the Debtors and the Wind-Down Debtor, commence, litigate and settle the Vested Causes of Action that are not released, waived, settled, compromised, or transferred under the Plan and make distributions pursuant to the terms of the Plan and the Plan Administrator Agreement; *provided* that, for the avoidance of doubt, the Wind-Down Debtor shall not conduct any business operations or continue the Debtors' business operations after the Effective Date.

175. "*Wind-Down Debtor Assets*" means any assets of the Debtors transferred to, and vesting in, the Wind-Down Debtor pursuant to the Plan Administrator Agreement, which, in the event the Sale Transaction is consummated, shall exclude the Acquired Assets, and which shall include, without limitation but only to the extent the following are not Acquired Assets, (a) the Wind-Down Reserve, (b) the Net-Owed Coins to be distributed to Account Holders in Supported Jurisdictions until such Account Holders complete the Purchaser's onboarding requirements in accordance with the Asset Purchase Agreement, (c) the Net-Owed Coins to be distributed to Account Holders in Unsupported Jurisdictions to the extent the Purchaser has not obtained the applicable Unsupported Jurisdiction Approval in accordance with Section 6.12 of the Asset Purchase Agreement, (d) any distributions to Account Holders or Holders of OpCo General Unsecured Claims that are returned to the Wind-Down

Debtor pursuant to Section 6.12(e) of the Asset Purchase Agreement, (e) 3AC Claims and 3AC Recovery, (f) FTX Claims and FTX Recovery, (g) Alameda Claims and Alameda Recovery, (h) the Non-Released D&O Claims, and (i) the Vested Causes of Action.

176.    "*Wind-Down Debtor Beneficiaries*" means the Holders of Allowed Claims or Allowed Interests that are entitled to receive distributions pursuant to the terms of the Plan, whether or not such Claims or Interests are Allowed as of the Effective Date.

177.    "*Wind-Down Debtor Expenses*" means all actual and necessary costs and expenses incurred by the Wind-Down Debtor or Plan Administrator in connection with carrying out the obligations of the Wind-Down Debtor pursuant to the terms of the Plan and the Plan Administrator Agreement.

178.    "*Wind-Down Debtor Oversight Committee*" means the oversight committee tasked with overseeing the Wind-Down Debtor in accordance with the Plan and the Plan Administrator Agreement.

179.    "*Wind-Down Budget*" means the budget to fund the Wind-Down Debtor, which will be included in the Plan Supplement.

180.    "*Wind-Down Reserve*" means the amount set forth in the Wind-Down Budget to fund the Wind-Down Debtor.

## B.    Rules of Interpretation

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter gender; (2) capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form; (3) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (4) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed, or to be Filed, shall mean that document, schedule, or exhibit, as it may thereafter have been or may thereafter be validly amended, amended and restated, supplemented, or otherwise modified; (5) unless otherwise specified, any reference to an Entity as a Holder of a Claim or Interest, includes that Entity's successors and assigns; (6) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (7) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (8) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) unless otherwise specified, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (12) references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (13) unless otherwise specified, all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases; (14) any effectuating provisions may be interpreted by the Debtors or the Wind-Down Debtor in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; (15) any references herein to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter; (16) all

references herein to consent, acceptance, or approval shall be deemed to include the requirement that such consent, acceptance, or approval be evidenced by a writing, which may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail; (17) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; and (18) the use of "include" or "including" is without limitation unless otherwise stated.

## C.    Computation of Time

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

## D.    Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan and any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, documents, instruments, or contracts, in which case the governing law of such agreement shall control); *provided* that corporate, limited liability company, or partnership governance matters relating to the Debtors or the Wind-Down Debtor, as applicable, shall be governed by the laws of the jurisdiction of incorporation or formation of the relevant Debtor or Wind-Down Debtor, as applicable.

## E.    Reference to Monetary Figures

All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

## F.    Reference to the Debtors or the Wind-Down Debtor

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Wind-Down Debtor mean the Debtors and the Wind-Down Debtor, as applicable, to the extent the context requires.

## G.    Nonconsolidated Plan

Although for purposes of administrative convenience and efficiency the Plan has been filed as a joint plan for each of the Debtors and presents together Classes of Claims against and Interests in the Debtors, the Plan does not provide for the substantive consolidation of any of the Debtors.

## ARTICLE II.

## ADMINISTRATIVE AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

## A.  Administrative Claims

Except as otherwise provided in this Article II.A and except with respect to Administrative Claims that are Professional Fee Claims or subject to 11 U.S.C. § 503(b)(1)(D), unless previously Filed, requests for payment of Allowed Administrative Claims (other than Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code) must be Filed and served on the Wind-Down Debtor pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date.  Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property, and such Administrative Claims shall be deemed satisfied as of the Effective Date without the need for any objection from the Wind-Down Debtor or any notice to or action, order, or approval of the Bankruptcy Court or any other Entity.  Objections to such requests, if any, must be Filed and served on the Wind-Down Debtor and the requesting party by the Claims Objection Bar Date for Administrative Claims.  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed by Final Order of the Bankruptcy Court.

Except with respect to Administrative Claims that are Professional Fee Claims, and except to the extent that an Administrative Claim or Priority Tax Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall receive an amount of Cash equal to the amount of the unpaid or unsatisfied portion of such Allowed Administrative Claim in accordance with the following:  (1) if such Administrative Claim is Allowed on or prior to the Effective Date, no later than thirty (30) days after the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction or course of business giving rise to such Allowed Administrative Claim, without any further action by the Holder of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtors or the Wind-Down Debtor, as applicable; or (5) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.  Any Cryptocurrency inadvertently deposited to the Debtors' account(s) after the Petition Date shall be returned to the sender in full.

Objections to requests for payment of such Administrative Claims, if any, must be Filed with the Bankruptcy Court and served on the Wind-Down Debtor and the requesting Holder no later than the Claims Objection Bar Date for Administrative Claims.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with, an order that becomes a Final Order of the Bankruptcy Court.

## B.  Professional Fee Claims

### 1.  Final Fee Applications and Payment of Professional Fee Claims

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than sixty (60)

days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code and Bankruptcy Rules. The Wind-Down Debtor shall pay Professional Fee Claims in Cash to such Professionals in the amount the Bankruptcy Court allows, including from funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court; *provided* that the Debtors' and the Wind-Down Debtor's obligations to pay Allowed Professional Fee Claims shall not be limited or deemed limited to funds held in the Professional Fee Escrow Account.

2. Professional Fee Escrow Account

No later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and the U.S. Trustee and for no other Entities until all quarterly U.S. Trustee fees and all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the U.S. Trustee or to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court. No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. No funds held in the Professional Fee Escrow Account shall be property of the Estates of the Debtors or the Wind-Down Debtor. When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, and all U.S. Trustee quarterly fees plus statutory interest, if any, have been paid in full, any remaining funds held in the Professional Fee Escrow Account shall be turned over to the Wind-Down Debtor without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

3. Professional Fee Escrow Amount

The Professionals shall deliver to the Debtors a reasonable and good-faith estimate of their unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Confirmation Date projected to be outstanding as of the anticipated Effective Date, and shall deliver such estimate no later than five Business Days prior to the anticipated Effective Date. For the avoidance of doubt, no such estimate shall be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that are the subject of a Professional's final request for payment of Professional Fee Claims Filed with the Bankruptcy Court, and such Professionals are not bound to any extent by the estimates. If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional. The total aggregate amount so estimated to be outstanding as of the anticipated Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account; *provided* that the Wind-Down Debtor shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are Filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

4. Post-Confirmation Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors and/or the Wind-Down Debtor, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Wind-Down Debtor. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy

Code in seeking retention or compensation for services rendered after such date shall terminate, and the Wind-Down Debtor may employ and pay any Professional in the ordinary course of business for the period after the Confirmation Date without any further notice to or action, order, or approval of the Bankruptcy Court.

For the avoidance of doubt, no Administrative Claims, Professional Fee Claims, or any other post-confirmation fees and expenses shall be paid prior to payment of any quarterly fees due and outstanding to the U.S. Trustee.

## C. Priority Tax Claims

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

## ARTICLE III.

## CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS

### A. Classification of Claims and Interests

Except for the Claims addressed in Article II of the Plan, all Claims against and Interests in the Debtors are classified in the Classes set forth in this Article III for all purposes, including voting, Confirmation, and distributions pursuant to the Plan and in accordance with section 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

### B. Summary of Classification

A summary of the classification of Claims against and Interests in each Debtor pursuant to the Plan is set forth in the following chart. The Plan constitutes a separate chapter 11 plan for each of the Debtors, and accordingly, the classification of Claims and Interests set forth below applies separately to each of the Debtors. All of the potential Classes for the Debtors are set forth herein. Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Claims or Interests shall be treated as set forth in Article III.E hereof. Voting tabulations for recording acceptances or rejections of the Plan will be conducted on a Debtor-by-Debtor basis as set forth above.[1]

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | Account Holder Claims | Impaired | Entitled to Vote |
| 4A | OpCo General Unsecured Claims | Impaired | Entitled to Vote |
| 4B | HoldCo General Unsecured Claims | Impaired | Entitled to Vote |
| 4C | TopCo General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Alameda Loan Facility Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 6 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |
| 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |
| 9 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

## C.     Treatment of Classes of Claims and Interests

Subject to Article VI hereof, each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors or Wind-Down Debtor, as applicable, and the Holder of such Allowed Claim or Allowed Interest, as

---

[1]    The Debtors reserve the right to separately classify Claims or Interests to the extent necessary to comply with any requirements under the Bankruptcy Code or applicable law.

applicable.  In no event shall any Holder of a Claim receive more than such Holder's Allowed amount on account of such Claim.

1. <u>Class 1 —Secured Tax Claims</u>

   (a) *Classification*: Class 1 consists of all Secured Tax Claims.

   (b) *Treatment*:  Each Holder of an Allowed Secured Tax Claim shall receive, in full and final satisfaction of such Allowed Secured Tax Claim, at the option of the Wind-Down Debtor, payment in full in Cash of such Holder's Allowed Secured Tax Claim or such other treatment rendering such Holder's Allowed Secured Tax Claim Unimpaired.

   (c) *Voting*: Class 1 is Unimpaired under the Plan.  Holders of Allowed Secured Tax Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Secured Tax Claims are not entitled to vote to accept or reject the Plan.

2. <u>Class 2 — Other Priority Claims</u>

   (a) *Classification*:  Class 2 consists of all Other Priority Claims.

   (b) *Treatment*:  Each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Allowed Other Priority Claim, at the option of the applicable Debtor, payment in full in Cash of such Holder's Allowed Other Priority Claim or such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired.

   (c) *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan.

3. <u>Class 3 — Account Holder Claims</u>

   (a) *Classification*:  Class 3 consists of all Account Holder Claims.

   (b) *Allowance*: Account Holder Claims shall be conclusively Allowed in the amount listed on OpCos's *Amended Schedules of Assets and Liabilities* (Case No. 22-10945) [Docket No. 18]; *provided* that the rights of any Holder of an Account Holder Claim to object to the scheduled amount shall be preserved. To the extent an Account Holder Claim is Allowed in a greater amount than the scheduled amount of such Account Holder Claim, such Holder shall be entitled to a subsequent distribution such that it will receive its Pro Rata share of recoveries to Holders of Allowed Account Holder Claims.  Account Holder Claims shall be valued in U.S. dollars as of the Petition Date consistent with section 502(b) of the Bankruptcy Code.

   (c) *Treatment*:  Each Holder of an Allowed Account Holder Claim will receive in exchange for such Allowed Account Holder Claim:

(i) If the Sale Transaction is consummated by the Outside Date:

    A. its Net Owed Coins, as provided in and subject to the requirements of Sections 6.10 and 6.12 of the Asset Purchase Agreement and Article VI.C.8 of the Plan; *provided* that (i) for Account Holders in Supported Jurisdictions who do not complete the Purchaser's onboarding requirements within three (3) months following the Closing Date and, (ii) Account Holders in Unsupported Jurisdictions andwho make a written election, in accordance with a notice to be issued by the Debtors and within three (3) months following the later of the Closing Date or the date which the terms and conditions for the Binance.US Platform are made available to such Account Holders to accept, to receive value in Cash on account of the Net Owed Coins allocable to such Account Holders, and (iii) Account Holders in Unsupported Jurisdictions who do not make the election in the prior clause only to the extent that the Purchaser does not obtain the Unsupported Jurisdiction Approval for the jurisdiction in which such Account Holder resides within 6 months following the Closing Date (as defined in the Asset Purchase Agreement), such Account Holders shall receive, after expiration of such applicable time period (*i.e.,* (a) three (3) months following the Closing Date for the Account Holders described in subsection (i) of this paragraph, (b) three (3) months following the later of the Closing Date or the date which the terms and conditions for the Binance.US Platform are made available to such Account Holder to accept for the Account Holders described in subsection (ii) of this paragraph, and (c) six (6) months for the Account Holders described in subsection (iii) of this paragraph), value in Cash at which such Net Owed Coins allocable to such Account Holder are liquidated;

    B. its Pro Rata share of any Additional Bankruptcy Distributions, in Cryptocurrency or Cash as provided in and subject to the requirements of Sections 6.12 and 6.14 of the Asset Purchase Agreement;

    C. its Pro Rata share of Distributable OpCo Cash; and

    D. to effectuate distributions from the Wind-Down Debtor, its Pro Rata share of the Wind-Down Debtor Assets attributable to OpCo; *provided* that any distributions on account of the Wind-Down Debtor Assets attributable to OpCo shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims at OpCo;

*provided* that distributions made to any Account Holder pursuant to clauses (B), (C), and (D) above shall be made after taking into account

the Acquired Coins Value of the Net Owed Coins or the value in Cash at which such Net Owed Coins are liquidated, as applicable, previously allocated to such Account Holder; or

(ii)     If the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated:

        A.     its Pro Rata share of Distributable OpCo Cash;

        B.     its Pro Rata share of Distributable Cryptocurrency, which such Account Holder shall be able to withdraw in kind, alternative Cryptocurrency, and/or Cash for a period of thirty (30) days after the Effective Date through the Voyager platform or, if elected by Seller pursuant to Section 6.12(d) of the Asset Purchase Agreement, through the Binance.US Platform; *provided* that if the applicable transfer is made through the Voyager platform and such Account Holder does not withdraw its Pro Rata share of Distributable Cryptocurrency available to such Account Holder from the Voyager platform within such thirty (30) day period, such Account Holder will receive Cash in the equivalent value to its Pro Rata share of Distributable Cryptocurrency; and

        C.     to effectuate distributions from the Wind-Down Debtor, its Pro Rata share of the Wind-Down Debtor Assets attributable to OpCo; *provided* that any distributions on account of Wind-Down Debtor Assets attributable to OpCo shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims at OpCo.

(d)     *Voting:*   Class 3 is Impaired under the Plan. Holders of Allowed Account Holder Claims are entitled to vote to accept or reject the Plan.

4.     <u>Class 4A — OpCo General Unsecured Claims</u>

(a)     *Classification*: Class 4A consists of all OpCo General Unsecured Claims.

(b)     *Treatment*: Each Holder of an Allowed OpCo General Unsecured Claim will receive in exchange for such Allowed OpCo General Unsecured Claim:

(i)     If the Sale Transaction is consummated by the Outside Date:

        A.     its Pro Rata share of Distributable Cryptocurrency in Cash;

        B.     its Pro Rata share of Additional Bankruptcy Distributions, in Cryptocurrency or Cash as provided in and subject to the requirements of Sections 6.12 and 6.14 of the Asset Purchase Agreement;

C.      its Pro Rata share of Distributable OpCo Cash; and

D.      to effectuate distributions from the Wind-Down Debtor, its Pro Rata share of the Wind-Down Debtor Assets attributable to OpCo; *provided* that any distributions on account of the Wind-Down Debtor Assets attributable to OpCo shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims at OpCo; or

(ii)      If the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated:

A.      its Pro Rata share of Distributable Cryptocurrency in Cash;

A.      its Pro Rata share of Distributable OpCo Cash; and

B.      to effectuate distributions from the Wind-Down Debtor, its Pro Rata share of the Wind-Down Debtor Assets attributable to OpCo; *provided* that any distributions on account of the Wind-Down Debtor Assets attributable to OpCo shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims at OpCo.

(c)      *Voting*:   Class 4A is Impaired under the Plan. Holders of Allowed OpCo General Unsecured Claims are entitled to vote to accept or reject the Plan.

5.      <u>Class 4B — HoldCo General Unsecured Claims</u>

(a)      *Classification*:   Class 4B consists of all HoldCo General Unsecured Claims.

(b)      *Treatment*:   Each Holder of an Allowed HoldCo General Unsecured Claim will receive in exchange for such Allowed HoldCo General Unsecured Claim:

(i)      its Pro Rata share of Distributable HoldCo Cash; and

(ii)      to effectuate distributions from the Wind-Down Debtor, its Pro Rata share of the Wind-Down Debtor Assets attributable to HoldCo; *provided* that any distributions on account of the Wind-Down Debtor Assets attributable to HoldCo shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims at HoldCo.

(c)     *Voting*:  Class 4B is Impaired under the Plan.  Holders of Allowed HoldCo General Unsecured Claims are entitled to vote to accept or reject the Plan.

6.     <u>Class 4C — TopCo General Unsecured Claims</u>

(a)     *Classification*:  Class 4C consists of all TopCo General Unsecured Claims.

(b)     *Treatment*:  Each Holder of an Allowed TopCo General Unsecured Claim will receive in exchange for such Allowed TopCo General Unsecured Claim:

(i)     its Pro Rata share of Distributable TopCo Cash; and

(ii)     to effectuate distributions from the Wind-Down Debtor, its Pro Rata share of the Wind-Down Debtor Assets attributable to TopCo; *provided* that any distributions on account of the Wind-Down Debtor Assets attributable at TopCo shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims at TopCo.

(c)     *Voting*:  Class 4C is Impaired under the Plan.  Holders of Allowed TopCo General Unsecured Claims are entitled to vote to accept or reject the Plan.

7.     <u>Class 5 — Alameda Loan Facility Claims</u>

(a)     *Classification*:  Class 5 consists of all Alameda Loan Facility Claims.

(b)     *Treatment*:  If the FTX Settlement becomes effective, each Holder of an Allowed Alameda Loan Facility Claim shall, at the election of the Debtors with the consent of the Committee, in their sole discretion, following written notice to counsel to FTX, Alameda and to the official committee of unsecured creditors in the FTX Bankruptcy Proceeding of such election, which written notice shall be given no later than the date that is thirty (30) days after the Confirmation Hearing, (a) withdraw its Alameda Loan Facility Claims in their entirety, with prejudice to FTX or any other party reasserting such claims, or (b) contribute the Alameda Loan Facility Claims to OpCo.  If the FTX Settlement does not become effective, the Alameda Loan Facility Claims shall be subordinated to all Allowed Claims at OpCo, HoldCo, and TopCo, including, but not limited to, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, Allowed Account Holder Claims, Allowed OpCo General Unsecured Claims, Allowed HoldCo General Unsecured Claims, and Allowed TopCo General Unsecured Claims; *provided, however*, if the Bankruptcy Court denies subordination of the Alameda Loan Facility Claims, then such Alameda Loan Facility Claims shall be *pari passu* with General Unsecured Claims at the applicable Debtor entity.

(c)     *Voting*:  Class 5 is Impaired under the Plan.  Holders of Allowed Alameda Loan Facility Claims are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Allowed Alameda Loan Facility Claims are not entitled to vote to accept or reject the Plan.

8. <u>Class 6 — Section 510(b) Claims</u>

    (a)     *Classification*: Class 6 consists of all Section 510(b) Claims against TopCo.

    (b)     *Allowance*: Notwithstanding anything to the contrary herein, a Section 510(b) Claim against TopCo, if any such Section 510(b) Claim exists, may only become Allowed by Final Order of the Bankruptcy Court.

    (c)     *Treatment*: Each Holder of Allowed Section 510(b) Claims against TopCo will receive, to effectuate distributions, if applicable, from the Wind-Down Debtor, its Pro Rata share of the Wind-Down Debtor Assets attributable to TopCo; *provided* that any distributions on account of the Wind-Down Debtor Assets attributable to TopCo shall only be made following payment in full of, or reserve for, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, and Allowed TopCo General Unsecured Claims at TopCo.

    (d)     *Voting*: Class 6 is Impaired under the Plan. Holders (if any) of Allowed Section 510(b) Claims against TopCo are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. Therefore, Holders (if any) of Allowed Section 510(b) Claims against TopCo are not entitled to vote to accept or reject the Plan.

9. <u>Class 7 — Intercompany Claims</u>

    (a)     *Classification*: Class 7 consists of all Intercompany Claims.

    (b)     *Treatment*: Each Intercompany Claim shall receive the treatment for such Intercompany Claim as determined by the Bankruptcy Court.

    (c)     *Voting*: Holders of Intercompany Claims are either Unimpaired or Impaired, and such Holders of Intercompany Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Therefore, Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

10. <u>Class 8 — Intercompany Interests</u>

    (a)     *Classification*: Class 8 consists of all Intercompany Interests.

    (b)     *Treatment*: On the Effective Date, all Intercompany Interests shall be, at the option of the Debtors, either (a) Reinstated in accordance with Article III.G of the Plan or (b) set off, settled, addressed, distributed, contributed, merged, or cancelled, in each case in accordance with the Restructuring Transactions Memorandum.

    (c)     *Voting*: Holders of Intercompany Interests are either Unimpaired or Impaired, and such Holders of Intercompany Interests are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Therefore, Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

11. Class 9 — Existing Equity Interests

    (a)    *Classification*: Class 9 consists of all Existing Equity Interests.

    (b)    *Treatment*: Each Holder of Existing Equity Interests will receive, to effectuate distributions, if applicable, from the Wind-Down Debtor, its Pro Rata share of the Wind-Down Debtor Assets attributable to TopCo; *provided* that any distributions on account of Wind-Down Debtor Assets attributable at TopCo shall only be made following payment in full of, or reserve for, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, and Allowed TopCo General Unsecured Claims at TopCo.

    (c)    *Voting*: Class 9 is Impaired under the Plan. Holders of Existing Equity Interests are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. Therefore, Holders of Existing Equity Interests are not entitled to vote to accept or reject the Plan.

**D.    Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Wind-Down Debtor's rights in respect of any Unimpaired Claim, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

**E.    Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes**

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

**F.    Subordinated Claims**

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims against and Allowed Interests in the Debtors and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors and the Wind-Down Debtor reserve the right to reclassify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

**G.    Intercompany Interests**

To the extent Reinstated under the Plan, distributions (if any) on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the corporate structure given the existing intercompany systems connecting the Debtors and

their Affiliates, and in exchange for the Debtors' and Wind-Down Debtor's agreement under the Plan to make certain distributions to the Holders of Allowed Claims.

**H.      Controversy Concerning Impairment**

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**I.      Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code**

Section 1129(a)(10) of the Bankruptcy Code is satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims or Interests.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

## ARTICLE IV.

## PROVISIONS FOR IMPLEMENTATION OF THE PLAN

**A.      General Settlement of Claims and Interests**

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan.  The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 of all such Claims, Interests, Causes of Action, and controversies, as well as a finding by the Bankruptcy Court that such compromise and settlement is fair, equitable, reasonable, and in the best interests of the Debtors, their Estates, and Holders of Claims and Interests.  Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Interests in any Class are intended to be and shall be final.

**B.      Restructuring Transactions**

On or before the Effective Date, the applicable Debtors will take any action as may be necessary or advisable to effectuate the Restructuring Transactions described in the Plan, the Restructuring Transactions Memorandum, and the Customer Onboarding Protocol, including:  (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (3) the filing of appropriate

certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (4) the transfer or distribution of any Cryptocurrency or Cash pursuant to the Asset Purchase Agreement, or the Liquidation Procedures, as applicable; (5) the execution and delivery of the Plan Administrator Agreement; (6) any transactions necessary or appropriate to form or convert into the Wind-Down Debtor; (7) such other transactions that are required to effectuate the Restructuring Transactions, including any sales, mergers, consolidations, restructurings, conversions, dispositions, transfers, formations, organizations, dissolutions, or liquidations; (8) all transactions necessary to provide for the purchase of the Acquired Assets by Purchaser under the Asset Purchase Agreement; and (9) all other actions that the applicable Entities determine to be necessary or appropriate, or that are reasonably requested by the Purchaser in accordance with the Asset Purchase Agreement, including making filings or recordings that may be required by applicable law.

The Confirmation Order shall, and shall be deemed to, pursuant to sections 1123 and 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions.

## C.     The Sale Transaction

If the Sale Transaction is consummated by the Outside Date, pursuant to the terms of the Asset Purchase Agreement, then the following terms shall govern:

On or prior to the Effective Date, the Debtors shall have consummated the Sale Transaction, and, among other things, the Acquired Assets and Assumed Liabilities shall have transferred to the Purchaser free and clear of all Liens, Claims, Interests, charges, or other encumbrances, and the Purchaser shall pay to the Debtors or Holders of Account Holder Claims and Holders of OpCo General Unsecured Claims, as applicable, the proceeds from the Sale Transaction, as and to the extent provided for in the Asset Purchase Agreement, and this Plan. The Confirmation Order shall authorize the Debtors, the Purchaser, and the Wind-Down Debtor, as applicable, to undertake the transactions contemplated by the Asset Purchase Agreement, including pursuant to sections 363, 365, 1123(a)(5)(B), and 1123(a)(5)(D) of the Bankruptcy Code.

The Debtors and Purchaser shall be authorized to take all actions as may be deemed necessary or appropriate to consummate the Sale Transaction pursuant to the terms of the Asset Purchase Agreement the Customer Onboarding Protocol, and this Plan. The Debtors shall be authorized to sell any Cryptocurrency to satisfy all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims. On and after the Effective Date, except as otherwise provided in the Plan and the Plan Administrator Agreement, the Wind-Down Debtor, or the Purchaser, as applicable, may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; provided, that the Bankruptcy Court shall retain jurisdiction to resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with any of the foregoing.

Notwithstanding anything to the contrary in the Asset Purchase Agreement, this Plan, or any Definitive Document, the Debtors, each Account Holder or Holder of an Allowed OpCo General Unsecured Claim, as applicable, shall retain all right, title, and interest in and to any Cryptocurrency allocated to such Account Holder or Holder of an Allowed OpCo General Unsecured Claim pursuant to this Plan through and including such time as such Cryptocurrency is returned or distributed to the Debtors or such Account Holder or Holder of an Allowed OpCo General Unsecured Claim, as applicable, hereunder, and such Cryptocurrency shall be held by Purchaser solely in a custodial capacity in trust and

solely for the benefit of the Debtors or Account Holder or Holder of an Allowed OpCo General Unsecured Claim, as applicable, thereafter.

Notwithstanding anything contained in this Plan and any Definitive Documents, if the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated, all provisions contained in this Plan and the Definitive Documents governing the Sale Transaction shall have no further force and effect, and the provisions governing the Liquidation Transaction shall govern. The rights and remedies of the Seller and Purchaser under the Asset Purchase Agreement and any related orders of the Bankruptcy Court shall be expressly preserved.

## D. The Liquidation Transaction

If the Sale Transaction is not consummated by the Outside Date, pursuant to the Asset Purchase Agreement, then the following terms shall govern:

### 1. *The Liquidation Transaction*

On or after the Outside Date, the Debtors will pursue the Liquidation Transaction in accordance with the Liquidation Procedures. Pursuant to the Liquidation Transaction, the Debtors, the Wind-Down Debtor, or the Plan Administrator, as applicable, will distribute certain of the Cryptocurrency in-kind to Holders of Account Holder Claims in accordance with Article III.C of the Plan, transfer all Wind-Down Debtor Assets to the Wind-Down Debtor, liquidate certain of the Cryptocurrency, distribute Cash to Holders of Claims, wind down and dissolve the Debtors, and pursue final administration of the Debtors' Estates pursuant to the Bankruptcy Code.

The Debtors, or the Wind-Down Debtor, as applicable, shall be authorized to take all actions as may be deemed necessary or appropriate to consummate the Liquidation Transaction pursuant to this Plan. On or before the date that is twenty-one days prior to the anticipated commencement of the Liquidation Transaction, the Debtors, or the Wind-Down Debtor, as applicable, shall file the Liquidation Procedures with the Bankruptcy Court. Parties in interest shall have ten days to object to the Liquidation Procedures, and if no objections are timely filed, the Liquidation Procedures shall be approved. In the event of a timely objection, the Bankruptcy Court shall adjudicate any objection to the Liquidation Procedures.

On and after the Effective Date, except as otherwise provided in the Plan, the Plan Administrator Agreement, and the Liquidation Procedures, the Debtors or the Wind-Down Debtor, as applicable, may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; provided, that the Bankruptcy Court shall retain jurisdiction to resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with any of the foregoing.

### 2. *Cryptocurrency Rebalancing*

Prior to the Effective Date the Debtors shall, in consultation with the Committee, be authorized to rebalance their Cryptocurrency portfolio to ensure that the Debtors can effectuate *pro rata* in-kind distributions of the Distributable Cryptocurrency according to Article III.C.3(c) of this Plan, *provided* that such rebalancing shall be in accordance with the Asset Purchase Agreement (if the Asset Purchase Agreement has not been terminated). The Debtors may effectuate such rebalancing by (i) selling such Cryptocurrency that cannot be distributed to Account Holders, (ii) purchasing Cryptocurrency supported by Voyager's or ~~Purchaser's~~Binance.US ~~p~~Platform (as provided by the Asset Purchase Agreement) that

shall be distributed to Account Holders, and (iii) engaging in any other transaction, including the execution of trades of Cryptocurrency, necessary or appropriate to effectuate distributions of the Distributable Cryptocurrency to Holders of Allowed Account Holder Claims.

**E.      Employee Transition Plan**

The Debtors shall be authorized to implement the Employee Transition Plan, the terms of which shall be reasonably acceptable to Purchaser and the Committee and included in the Plan Supplement. The Employee Transition Plan shall help ensure that employees are available to provide transition services to the Debtors and/or the Wind-Down Debtor to effectuate the Sale Transaction and to wind down the Debtors' Estates.

**F.      Non-Released D&O Claims**

Any Claims or Causes of Action held by the Debtors or their respective estates against the Debtors' CEO and/or CCO (regardless of any fiduciary capacity in which such individuals were acting) that are expressly related to approval of the 3AC Loan are not released pursuant to the Plan (collectively, the "Non-Released D&O Claims"), and shall be assigned and transferred to the Wind-Down Debtor to be pursued, settled, or resolved by the Wind-Down Debtor in accordance with the terms of Article IV.G of this Plan and subject to the Wind-Down Budget. Any claims against the D&O Carriers that the Debtors' insurance transactions within the 90 days prior to the Petition Date are avoidable under the Bankruptcy Code, applicable state law, or both (the "Non-Released Insurance Claims") shall be assigned and transferred to the Wind-Down Debtor to be pursued, settled, or resolved solely by the Wind-Down Debtor in accordance with the terms of Article IV.G of this Plan. The Wind-Down Debtor shall be a successor to the Debtors' rights, title, and interest in any Non-Released D&O Claims and Non-Released Insurance Claims, and the Wind-Down Debtor shall have standing to pursue the Non-Released D&O Claims and the Non-Released Insurance Claims in accordance with the terms of Article IV.G of this Plan; *provided* that: (i) any recovery by the Wind-Down Debtor (and the beneficiaries thereof) on account of any Non-Released D&O Claim, including in each case by way of settlement or judgment, shall be satisfied solely by and to the extent of the proceeds of the Debtors' available D&O Liability Insurance Policies (and/or from the D&O Carriers directly) after payment from such D&O Liability Insurance Policies of any and all covered costs and expenses incurred in connection with the defense of the Non-Released D&O Claims; (ii) any party, including any trustee or any beneficiary of the Wind-Down Debtor, seeking to execute, garnish, or otherwise attempt to collect on any settlement of or judgment in the Non-Released D&O Claims shall do so solely upon available insurance coverage from the Debtors' available D&O Liability Insurance Policies; and (iii) no party shall (a) record any judgment against the CEO or CCO, or (b) otherwise attempt to collect, directly or indirectly, from the personal assets of the CEO or CCO with respect to the Non-Released D&O Claims. For the avoidance of doubt, this provision does not enjoin, limit, or impair direct claims held by third parties against the Debtors' CEO or CCO (if any) other than any direct claims held by Holders of Claims or Interests that opt into the third-party release in Article VIII.B of this Plan. Only upon the occurrence of the earlier of (x) a release being given as part of any later settlement of the Non-Released D&O Claims; (y) final resolution of any coverage claims asserted against the Debtors' available D&O Liability Insurance Policies on account of the Non-Released D&O Claims; or (z) exhaustion of the available insurance coverage under the D&O Liability Insurance Policies, the Non-Released D&O Claims shall be released and discharged without the need for further action or Bankruptcy Court order. For the avoidance of doubt, any release of the Non-Released D&O Claims shall not become effective until one of the three conditions stated in the preceding sentence above has been met.

### G.    The D&O Settlement

On the Effective Date, the terms of the D&O Settlement shall be effectuated as provided in this Article IV.G.

Pursuant to the D&O Settlement, CEO shall repay the $1,900,000 received from the Debtors on or around February 28, 2022, by paying the after-tax amount of such transfer (approximately $1,125,000) to OpCo in cash and assigning the right, if any, to any tax refund for the balance to the Wind-Down Debtor. CEO shall subordinate any Claims (including any indemnification claims asserted under this Art. IV.F) he holds against the Debtors until all other Holders of Claims are paid in full. CCO shall subordinate 50 percent of any Claims he holds (and 100% of any indemnification claims asserted under this Art. IV.F) against the Debtors until all other Holders of Claims are paid in full; *provided*, *however*, that in the event the D&O Carriers deny coverage to CEO or CCO under the D&O Insurance Policies on account of such subordination of any indemnification claim, then any indemnification claims by CEO or CCO shall not be so subordinated, but may be filed as an OpCo General Unsecured Claim.

CEO and CCO, each as insureds, under the D&O Liability Insurance Policies agree: (i) not to draw down on the Side-A Policy; *provided*, *however*, that should coverage continue to be available under the Side-A Policy following resolution of the Debtors' and/or the Wind-Down Debtor's claims for the avoidance of the premium paid for the policy (whether by judgment or settlement or otherwise) such officer shall be entitled to seek coverage under the Side-A Policy to the extent any such coverage remains; and (ii) not to object to any settlement by the Debtors or Wind Down Entity of avoidance claims under the Side-A Policy, even if such settlement results in termination of benefits under the Side-A Policy. For the avoidance of doubt, this agreement is not intended to and shall not alter or amend each of the insureds' duties under the D&O Liability Insurance Policies. In the event that any insurer under the D&O Liability Insurance Policies denies coverage for any reason, the Wind-Down Debtor shall have the right to bring a coverage claim against the insurer(s) in the name of the insured, the insureds shall reasonably cooperate with respect to any such claim, and the insured may participate at their election (and at their sole cost). For the avoidance of doubt, nothing contained in this Plan is intended as a waiver or release of the Debtors' and/or Wind-Down Debtor's right to assert any Non-Released D&O Claim, but rather limits such recovery in the manner set forth above.

CEO and CCO shall be entitled to receive their salary and benefits for as long as they work for the Debtors and/or the Wind-Down Debtor and retain the right to assert claims for advancement and indemnification up to the limits of any available coverage in the event any of the insurers that issued the Management Liability Policy, the Excess Policy, or the Side-A Policy denies coverage to CEO and/or CCO based upon or arising out of the lack of a formal claim for indemnification; *provided*, *however*, that any such indemnification or advancement claims shall be subordinated in full unless and until all other Holders of Claims are paid in full; *provided*, *further*, that in the event that any of the D&O Carriers deny coverage to CEO or CCO under the D&O Insurance Policies on account of such subordination of any indemnification claim, then any indemnification claims by CEO or CCO shall not be so subordinated, but may be filed as an OpCo General Unsecured Claim.

CEO and CCO shall subordinate any and all rights and entitlements under the Cornerstone A-Side Management Liability Insurance Policy to Voyager Digital Ltd., Policy Number ELU184179-22, to any recovery by the Debtors and/or the Wind-Down Debtor on account of the Debtors' and/or Wind-Down Debtor's claims for the avoidance of the premium paid for the policy. For the avoidance of doubt, should coverage continue to be available under the Side-A Policy following resolution of the Debtors' and/or the Wind-Down Debtor's claims for the avoidance of the premium paid for the policy (whether by judgment or settlement or otherwise), CEO and/or CCO shall be entitled to seek coverage

under the Side-A Policy. CEO and CCO shall remain at, and continue performing the responsibilities of, their respective position(s) with the Debtors and assist with the Debtors' transition for at least 30 days from entry of the Confirmation Order; *provided* that CCO shall have no obligation to remain at his position with the Debtors beyond January 15, 2023 and the CEO shall have the right to pursue and engage in any employment opportunity, business venture, consulting arrangement, or investment that may become available; *provided, further*, that both the CEO and CCO shall be available to the Debtors and/or the Wind-Down Debtor for a maximum of five hours per month for the one year following the Effective Date.

In the event that the sworn financial disclosure statements under penalty of perjury provided to the Debtors, the Special Committee and the Committee by CEO and CCO are later determined at any time by Final Order of the Bankruptcy Court or other court of competent jurisdiction to be materially inaccurate, (a) the limitations on recovery by the Wind-Down Debtor under this Article IV.G shall no longer apply, (b) any and all release, exculpation and injunction provisions in Article VIII of this Plan with respect to CEO and/or CCO (as applicable) shall be deemed null and void, (c) all Releasing Parties' rights with respect to the CEO and/or CCO (as applicable) shall be fully intact and preserved, (d) amounts paid by CEO shall not be repaid by the Wind-Down Debtor, and (e) any applicable statute of limitations shall be deemed tolled from the Petition Date to the date of entry of the order referenced above. The Wind-Down Debtor, as successor to the Debtors, shall have standing to bring a motion seeking relief pursuant to this Article IV.G.

Entry of the Confirmation Order shall be deemed approval of the D&O Settlement and, to the extent not already approved by the Bankruptcy Court, the Debtors or the Wind-Down Debtor, as applicable, are authorized to negotiate, execute, and deliver those documents necessary or appropriate to effectuate the D&O Settlement, without further notice or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors, the Wind-Down Debtor, the Committee, and the Special Committee may deem to be necessary to effectuate the D&O Settlement.

## H.  The Wind-Down Debtor

On the Effective Date, the Wind-Down Debtor shall be formed or converted into for the benefit of the Wind-Down Debtor Beneficiaries and each of the Debtors shall transfer the Wind-Down Debtor Assets for distribution in accordance with the terms of the Plan. The Confirmation Order shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

1.      Establishment of a Wind-Down Debtor

Pursuant to the Plan Administrator Agreement, the Wind-Down Debtor will be established, formed, merged, or converted.  The Wind-Down Debtor shall be the successor-in-interest to the Debtors, and the Wind-Down Debtor shall be a successor to the Debtors' rights, title, and interest to the Wind-Down Debtor Assets.  The Wind-Down Debtor will conduct no business operations and will be charged with winding down the Debtors' Estates.  The Wind-Down Debtor shall be managed by the Plan Administrator and shall be subject to the Wind-Down Debtor Oversight Committee.  The Wind-Down Debtor shall be administered in accordance with the terms of the Plan Administrator Agreement and shall be subject to the Wind-Down Budget and the Non-Released D&O Claim Budget.  For the avoidance of doubt, the Wind-Down Debtor shall not have any right or interest in any Cause of Action or Claim constituting an Acquired Asset.  The Wind-Down Debtor shall be administered in a manner consistent with the SEC's published guidance on liquidating trusts.

Prior to the Effective Date, any and all of the Debtors' assets shall remain assets of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and on the Effective Date the Wind-Down Debtor Assets shall, subject to the Plan Administrator Agreement, be transferred to and vest in the Wind-Down Debtor.  For the avoidance of doubt, to the extent not otherwise waived in writing, released, settled, compromised, assigned or sold pursuant to a prior order or the Plan, the Wind-Down Debtor specifically retains and reserves the right to assert, after the Effective Date, any and all of the Vested Causes of Action and related rights, whether or not asserted as of the Effective Date, and all proceeds of the foregoing, subject to the terms of the Plan, including without limitation Article IV.F and Article IV.G.

Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, only the Wind-Down Debtor and the Plan Administrator shall have the right to pursue or not to pursue, or, subject to the terms hereof and the Plan Administrator Agreement, compromise or settle any Wind-Down Debtor Assets transferred to the Wind-Down Debtor.  On and after the Effective Date, the Wind-Down Debtor and the Plan Administrator may, without further Bankruptcy Court approval, commence, litigate, and settle any Vested Causes of Action or Claims relating to any Wind-Down Debtor Assets transferred to the Wind-Down Debtor or rights to payment or Claims that belong to the Debtors as of the Effective Date or are instituted by the Wind-Down Debtor and the Plan Administrator on or after the Effective Date, except as otherwise expressly provided herein and in the Plan Administrator Agreement.  All of the Wind-Down Debtor's activities shall be subject to the Wind-Down Budget and the Non-Released D&O Claim Budget.  The Wind-Down Debtor shall be entitled to enforce all defenses and counterclaims to all Claims asserted against the Debtors and their Estates, including setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code.

The Wind-Down Debtor shall be deemed hereby substituted as plaintiff, defendant, or in any other capacity for the Debtors and the Committee, as applicable, in any Causes of Action pending before the Bankruptcy Court or any other court that relates to a Wind-Down Debtor Asset without the need for filing any motion for such relief.  On the Effective Date, the Debtors and the Plan Administrator shall execute the Plan Administrator Agreement and shall have established the Wind-Down Debtor pursuant hereto.  In the event of any conflict between the terms of this Article IV.H and the terms of the Plan Administrator Agreement, the terms of the Plan Administrator Agreement shall control.

2.      Wind-Down Debtor Assets

Notwithstanding any prohibition on assignability under applicable non-bankruptcy law, on the Effective Date and thereafter if additional Wind-Down Debtor Assets become available, the Debtors shall be deemed, subject to the Plan Administrator Agreement, to have automatically transferred to the

applicable Wind-Down Debtor all of their right, title, and interest in and to all of the Wind-Down Debtor Assets, in accordance with section 1141 of the Bankruptcy Code.  All such assets shall automatically vest in the Wind-Down Debtor free and clear of all Claims, Liens, and other interests, subject only to the Allowed Claims and Interests as set forth herein and the expenses of the Wind-Down Debtor as set forth herein and in the Plan Administrator Agreement.  Thereupon, the Debtors shall have no interest in or with respect to the Wind-Down Debtor Assets or the Wind-Down Debtor.

3. Treatment of Wind-Down Debtor for Federal Income Tax Purposes;  No Successor-in-Interest

The Wind-Down Debtor shall be established for the primary purpose of liquidating and distributing the Wind-Down Debtor Assets transferred to it, in accordance with Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Wind-Down Debtor.  Accordingly, the Plan Administrator may, in an expeditious but orderly manner, liquidate the Wind-Down Debtor Assets, make timely distributions to the Wind-Down Debtor Beneficiaries and not unduly prolong its duration.  The Wind-Down Debtor shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth herein or in the Wind-Down Debtor Agreement.  The record holders of beneficial interests shall be recorded and set forth in a register maintained by the Wind-Down Debtor expressly for such purpose.

The Wind-Down Debtor is intended to qualify as a "grantor trust" for federal income tax purposes to the extent reasonably practicable, with the Wind-Down Debtor Beneficiaries treated as grantors and owners of the Wind-Down Debtor.  However, with respect to any of the assets of the Wind-Down Debtor that are subject to potential disputed claims of ownership or uncertain distributions, *or* to the extent "liquidating trust" treatment is otherwise unavailable, the Debtors anticipate that such assets will be subject to disputed ownership fund treatment under Section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes.  Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account.  Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

4. Appointment of Plan Administrator

The Plan Administrator shall be selected by the Committee, in consultation with the Debtors, and shall be identified in the Plan Supplement.  The appointment of the Plan Administrator shall be approved in the Confirmation Order, and the Plan Administrator's duties shall commence as of the Effective Date. The Plan Administrator shall administer the distributions to the Wind-Down Debtor Beneficiaries and shall serve as a representative of the Estates under section 1123(b) of the Bankruptcy Code for the purpose of enforcing Vested Causes of Action belonging to the Estates that are not released, waived, settled, compromised, or transferred pursuant to the Plan and subject to the limitations set forth in the Plan, including Article IV.F and Article IV.G.

In accordance with the Plan Administrator Agreement, the Plan Administrator shall serve in such capacity through the earlier of (i) the date on which the Wind-Down Debtor is dissolved in accordance with the Plan Administrator Agreement, and (ii) the date on which a Plan Administrator resigns, is terminated, or is otherwise unable to serve; *provided*, *however*, that, in the event that a Plan Administrator resigns, is terminated, or is otherwise unable to serve, the Wind-Down Debtor Oversight Committee shall appoint a successor to serve as a Plan Administrator in accordance with the Plan

Administrator Agreement. If the Wind-Down Debtor Oversight Committee does not appoint a successor within the time periods specified in the Plan Administrator Agreement, then the Bankruptcy Court, upon the motion of any party-in-interest, including counsel to the Wind-Down Debtor, shall approve a successor to serve as a Plan Administrator.

5. <u>Responsibilities of Plan Administrator</u>

Responsibilities of the Plan Administrator shall be as identified in the Plan Administrator Agreement and shall include, but are not limited to:

(a) implementing the Wind-Down Debtor, and making distributions contemplated by the Plan;

(b) marshalling, marketing for sale, and winding down any of the Debtors' assets constituting Wind-Down Debtor Assets;

(c) appointing an independent director at each Debtor to act as a fiduciary for such Debtor entity in connection with the resolution of the Intercompany Claims;

(d) overseeing the accounts of the Debtors and the Wind-Down Debtor and the wind down and dissolution of the Debtors and the Wind-Down Debtor, including effectuating the transactions described in the Restructuring Transactions Memorandum;

(e) receiving, maintaining, conserving, supervising, prosecuting, collecting, settling, managing, investing, protecting, and where appropriate, causing the Wind-Down Debtor to abandon the Wind-Down Debtor Assets, including causing the Wind-Down Debtor to invest any moneys held as Wind-Down Debtor Assets;

(f) opening and maintaining bank accounts on behalf of or in the name of the Debtors or the Wind-Down Debtor, including, in the Plan Administrator's discretion, separating bank accounts for each of the Debtors;

(g) entering into any agreement or executing any document or instrument required by or consistent with the Plan, the Confirmation Order, or the Plan Administrator Agreement, and to perform all obligations thereunder;

(h) collecting and liquidating all Wind-Down Debtor Assets, including the sale of any Wind-Down Debtor Assets;

(i) protecting and enforcing the rights to the Wind-Down Debtor Assets (including any Vested Causes of Action and Contributed Third-Party Claims) vested in the Wind-Down Debtor and Plan Administrator by the Plan Administrator Agreement by any method deemed appropriate, including, without limitation, by judicial proceedings or otherwise;

(j) investigating any Wind-Down Debtor Assets, and any other potential Vested Causes of Action and Contributed Third-Party Claims;

(k) reviewing, reconciling, compromising, settling, objecting, or prosecuting Claims or Interests of any kind;

(l)      seeking the examination of any Person pursuant to Federal Rule of Bankruptcy Procedure 2004;

(m)     retaining professionals, disbursing agents, and other agents, independent contractors, and third parties pursuant to the Plan Administrator Agreement and paying the reasonable compensation thereof;

(n)      paying all lawful expenses, debts, charges, taxes, and other liabilities, and making all other payments relating to the Wind-Down Debtor Assets, solely out of Wind-Down Debtor Assets;

(o)      prosecuting and settling the Vested Causes of Action, including, without limitation, the 3AC Claims, FTX Claims, Alameda Claims, Contributed Third-Party Claims, and any causes of action not included in the Asset Purchase Agreement or released under the Plan;

(p)      reviewing, reconciling, pursuing, commencing, prosecuting, compromising, settling, dismissing, releasing, waiving, withdrawing, abandoning, resolving, or electing not to pursue all Vested Causes of Action and Contributed Third-Party Claims;

(q)      acquiring litigation and other claims related to the Debtors, and prosecuting such claims;

(r)      reviewing and compelling turnover of the Debtors or the Wind-Down Debtor's property;

(s)      calculating and making all Distributions to the holders of Allowed Claims against each Debtor and, solely to the extent of payment in full of Allowed Claims, to holders of Allowed Interests, as provided for in, or contemplated by, the Plan and the Plan Administrator Agreement; *provided* that because the Plan does not substantively consolidate the Debtors' Estates, the Plan Administrator shall make Distributions from the Wind-Down Debtor Assets to the holders of Claims and Interests (if applicable) against that specific Debtor;

(t)      establishing, administering, adjusting, and maintaining the Wind-Down Reserve and the Disputed Claims Reserve;

(u)      withholding from the amount distributable to any Person the maximum amount needed to pay any tax or other charge that the Plan Administrator has determined, based upon the advice of his agents or professionals, may be required to be withheld from such Distribution under the income tax or other laws of the United States or of any state or political subdivision thereof;

(v)      in reliance upon the Debtors' Schedules, the official Claims Register maintained in the Chapter 11 Cases and the Debtors' filed lists of equity security holders, reviewing, and where appropriate, allowing or objecting to Claims and (if applicable) Interests, and supervising and administering the commencement, prosecution, settlement, compromise, withdrawal, or resolution of all objections

to Disputed Claims and (if applicable) Disputed Interests required to be administered by the Wind-Down Debtor;

(w)    making all tax withholdings, filing tax information returns, filing and prosecuting tax refunds claims, making tax elections by and on behalf of the Debtors or the Wind-Down Debtor, and filing tax returns for the Debtors or the Wind-Down Debtor pursuant to and in accordance with the Plan, and paying taxes, if any, payable for and on behalf of the Debtors or the Wind-Down Debtor, as applicable; *provided, however*, that notwithstanding any other provision of the Plan Administrator Agreement, the Plan Administrator shall not have any responsibility or personal liability in any capacity whatsoever for the signing or accuracy of the Debtors' income tax returns that are due to be filed after the Effective Date or for any tax liability related thereto;

(x)    abandoning or donating to a charitable organization qualifying under IRC section 501(c)(3) any Wind-Down Debtor Assets that the Plan Administrator determines to be too impractical to distribute or of inconsequential value;

(y)    seeking a determination of tax liability or refund under Bankruptcy Code section 505;

(z)    establishing reserves for taxes, assessments, and other expenses of administration of the Debtors or the Wind-Down Debtor as may be necessary and appropriate for the proper operation of matters incident to the Debtors or the Wind-Down Debtor;

(aa)    paying Wind-Down Debtor Expenses;

(bb)    if the Plan Administrator deems appropriate in the Plan Administrator's sole discretion, seeking to establish a bar date for filing proofs of Interest in any Debtor or otherwise to determine the holders and extent of Allowed Interests in any Debtor;

(cc)    purchasing and carrying all insurance policies that the Plan Administrator deems reasonably necessary or advisable and paying all associated insurance premiums and costs;

(dd)    undertaking all administrative functions remaining in the Chapter 11 Cases to the extent necessary to carry out the Debtors', the Wind-Down Debtor's, or the Plan Administrator's duties under the Plan, including reporting and making required payments of fees to the U.S. Trustee and overseeing the closing of the Chapter 11 Cases;

(ee)    retaining, terminating, appointing, hiring, or otherwise employees, personnel, management, and directors at any of the Debtors to the extent necessary to carry out the purposes of the Plan Administrator Agreement and the Plan, including, without limitation, to address any disputes between the Debtors;

(ff) exercising, implementing, enforcing, and discharging all of the terms, conditions, powers, duties, and other provisions of the Plan, the Confirmation Order, and the Plan Administrator Agreement; and

(gg) taking all other actions consistent with the provisions of the Plan and the Plan Administrator Agreement that the Plan Administrator deems reasonably necessary or desirable to administer the Debtors and the Wind-Down Debtor.

6. The Wind-Down Debtor Oversight Committee

The Wind-Down Debtor Oversight Committee shall consist of those parties selected by the Committee and identified in the Plan Supplement, and which, at no time shall consist of greater than seven members.

The Wind-Down Debtor Oversight Committee shall have the responsibility to review and advise the Plan Administrator with respect to the liquidation and distribution of the Wind-Down Debtor Assets transferred to the Wind-Down Debtor in accordance herewith and the Plan Administrator Agreement. For the avoidance of doubt, in advising the Plan Administrator, the Wind-Down Debtor Oversight Committee shall maintain the same fiduciary responsibilities as the Plan Administrator. Vacancies on the Wind-Down Debtor Oversight Committee shall be filled by a Person designated by the Plan Administrator, subject to the unanimous consent of the remaining member or members of the Wind-Down Debtor Oversight Committee. The Plan Administrator shall have the authority to seek an order from the Bankruptcy Court removing or replacing members of the Wind-Down Debtor Oversight Committee for cause.

7. Expenses of Wind-Down Debtor

The Wind-Down Debtor Expenses shall be paid from the Wind-Down Debtor Assets subject to the Wind-Down Budget and the Non-Released D&O Claim Budget.

8. Insurance; Bond

The Plan Administrator may obtain insurance coverage (in the form of an errors and omissions policy or otherwise) with respect to the liabilities and obligations of the Plan Administrator and the Wind-Down Debtor Oversight Committee under the Plan Administrator Agreement. Unless otherwise agreed to by the Wind-Down Debtor Oversight Committee, the Plan Administrator shall serve with a bond, the terms of which shall be agreed to by the Wind-Down Debtor Oversight Committee, and the cost and expense of which shall be paid by the Wind-Down Debtor.

9. Fiduciary Duties of the Plan Administrator

Pursuant hereto and the Plan Administrator Agreement, the Plan Administrator shall act in a fiduciary capacity on behalf of the interests of all Holders of Claims and Interests that will receive distributions pursuant to Plan.

10. Termination of the Wind-Down Debtor

The Wind-Down Debtor will terminate on the earlier of: (a) (i) the final liquidation, administration and distribution of the Wind-Down Debtor Assets in accordance with the terms of the Plan Administrator Agreement and the Plan, and its full performance of all other duties and functions as set forth herein or in the Plan Administrator Agreement and (ii) the Chapter 11 Cases of the Debtors have been closed; or (b) the Plan Administrator determines in its reasonable judgment that the Wind-Down

Debtor lacks sufficient assets and financial resources, after reasonable collection efforts, to complete the duties and powers assigned to him or her under the Plan, the Confirmation Order and/or the Plan Administrator Agreement. After (x) the final distributions pursuant hereto, (y) the Filing by or on behalf of the Wind-Down Debtor of a certification of dissolution with the Bankruptcy Court, and (z) any other action deemed appropriate by the Plan Administrator, the Wind-Down Debtor shall be deemed dissolved for all purposes without the necessity for any other or further actions.

11.     Liability of Plan Administrator; Indemnification

Neither the Plan Administrator, the Wind-Down Debtor Oversight Committee, their respective members, employees, employers, designees or professionals, or any of their duly designated agents or representatives (each, a "Wind-Down Debtor Party" and collectively, the "Wind-Down Debtor Parties") shall be liable for losses, claims, damages, liabilities or expenses in connection with the affairs of the Wind-Down Debtor or for the act or omission of any other Wind-Down Debtor Party, nor shall the Wind-Down Debtor Parties be liable for any act or omission taken or omitted to be taken pursuant to the discretion, powers and authority conferred, or in good faith believed to be conferred by the Plan Administrator Agreement or the Plan other than for specific acts or omissions resulting from such Wind-Down Debtor Party's willful misconduct, gross negligence or actual fraud. Subject to the Plan Administrator Agreement, the Plan Administrator shall be entitled to enjoy all of the rights, powers, immunities and privileges applicable to a chapter 7 trustee, and the Wind-Down Debtor Oversight Committee shall be entitled to enjoy all of the rights, powers, immunities and privileges of an official committee of unsecured creditors. The Plan Administrator or the Wind-Down Debtor Oversight Committee may, in connection with the performance of its functions, and in its sole and absolute discretion, consult with its attorneys, accountants, financial advisors and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such persons, regardless of whether such advice or opinions are provided in writing. Notwithstanding such authority, neither the Plan Administrator nor the Wind-Down Debtor Oversight Committee shall be under any obligation to consult with its attorneys, accountants, financial advisors or agents, and their determination not to do so shall not result in the imposition of liability on the Plan Administrator, the Wind-Down Debtor Oversight Committee, or their respective members and/or designees, unless such determination is based on willful misconduct, gross negligence, or actual fraud. The Wind-Down Debtor shall indemnify and hold harmless the Wind-Down Debtor Parties (in their capacity as such), from and against and in respect of all liabilities, losses, damages, claims, costs and expenses (including, without limitation, reasonable attorneys' fees, disbursements, and related expenses) that such parties may incur or to which such parties may become subject in connection with any action, suit, proceeding or investigation brought by or threatened against such parties arising out of or due to their acts or omissions, or consequences of such acts or omissions, with respect to the implementation or administration of the Wind-Down Debtor or the Plan or the discharge of their duties hereunder; *provided*, *however*, that no such indemnification will be made to such Persons for actions or omissions as a result of willful misconduct, gross negligence, or actual fraud. Persons dealing or having any relationship with the Plan Administrator and shall have recourse only to the Wind-Down Debtor Assets and shall look only to the Wind-Down Debtor Assets to satisfy any liability or other obligations incurred by the Wind-Down Debtor or the Wind-Down Debtor Oversight Committee to such Person in carrying out the terms of the Plan Administrator Agreement, and neither the Plan Administrator nor the Wind-Down Debtor Oversight Committee, shall have any personal obligation to satisfy any such liability. The Plan Administrator and/or the Wind-Down Debtor Oversight Committee members shall not be liable whatsoever except for the performance of such duties and obligations as are specifically set forth herein, and no implied covenants or obligations shall be read into the Plan Administrator Agreement against any of them. The Wind-Down Debtor shall promptly pay expenses reasonably incurred by any Wind-Down Debtor Party in defending, participating in, or settling any action, proceeding or investigation in which such Wind-Down Debtor Party is a party or is threatened to be made a party or otherwise is participating in

connection with the Plan Administrator Agreement or the duties, acts or omissions of the Plan Administrator or otherwise in connection with the affairs of the Wind-Down Debtor, upon submission of invoices therefor, whether in advance of the final disposition of such action, proceeding, or investigation or otherwise. Each Wind-Down Debtor Party hereby undertakes, and the Wind-Down Debtor hereby accepts his or her undertaking, to repay any and all such amounts so advanced if it shall ultimately be determined that such exculpated party is not entitled to be indemnified therefor under the Plan Administrator Agreement. The foregoing indemnity in respect of any Wind-Down Debtor Party shall survive the termination of such Wind-Down Debtor Party from the capacity for which they are indemnified.

  12.  <u>No Liability of the Wind-Down Debtor</u>

  On and after the Effective Date, the Wind-Down Debtor shall have no liability on account of any Claims or Interests except as set forth herein and in the Plan Administrator Agreement. All payments and all distributions made by the Plan Administrator hereunder shall be in exchange for all Claims or Interests against the Debtors.

**I.**  **Sources of Consideration for Plan Distributions**

  Distributions under the Plan shall be funded by (i) the proceeds of Purchaser's payment obligations under Sections 2.1 and 2.2 of the Asset Purchase Agreement and distributions of Acquired Coins pursuant to Sections 6.12, and 6.14 of the Asset Purchase Agreement, (ii) the Wind-Down Debtor from the Wind-Down Debtor Assets; *provided*, *however*, that Allowed Professional Fee Claims shall be paid from the Professional Fee Escrow Account in the first instance. The Wind-Down Debtor Assets shall be used to pay the Wind-Down Debtor Expenses (including the compensation of the Plan Administrator and any professionals retained by the Wind-Down Debtor), and to satisfy payment of Allowed Claims and Interests as set forth in the Plan.

**J.**  **Corporate Existence and Dissolution**

  Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificates or articles of incorporation, certificates of formation, certificates of organization, or certificates of limited partnership and bylaws, operating agreements, limited liability company agreements, or limited partnership agreements (or other formation documents) in effect prior to the Effective Date, except to the extent such certificates or articles of incorporation, certificates of formation, certificates of organization, or certificates of limited partnership and bylaws, operating agreements, limited liability company agreements, or limited partnership agreements (or other formation documents) are amended pursuant to the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings under applicable state or federal law).

  On and after the Effective Date, the Wind-Down Debtor will be authorized and directed to implement the Plan and any applicable orders of the Bankruptcy Court, and the Wind-Down Debtor shall have the power and authority to take any action necessary to wind down and dissolve the Debtors' Estates.

Upon a certification to be Filed with the Bankruptcy Court by the Plan Administrator of all distributions having been made and completion of all of its duties under the Plan and entry of a final decree closing the last of the Chapter 11 Cases, the Wind-Down Debtor shall be deemed to be dissolved without any further action by the Debtors or the Wind-Down Debtor, including the Filing of any documents with the secretary of state for the state in which the Wind-Down Debtor are formed or any other jurisdiction. The Plan Administrator, however, shall have authority to take all necessary actions to dissolve the Debtors or the Wind-Down Debtor in and withdraw the Wind-Down Debtor from applicable states.

As soon as practicable after the Effective Date, the Wind-Down Debtor shall take such actions as the Wind-Down Debtor may determine to be necessary or desirable to carry out the purposes of the Plan. Any certificate of dissolution or equivalent document may be executed by the Wind-Down Debtor on behalf of any Wind-Down Debtor without need for any action or approval by the shareholders or board of directors or managers of such Debtor. On and after the Effective Date, the Debtors or the Wind-Down Debtor (1) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (2) shall be deemed to have cancelled pursuant to this Plan all Interests, and (3) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date. Pursuant to the terms of this Plan, any Money Transmitter Licenses that have not been terminated shall be deemed withdrawn and no further action is required to be taken by the Debtors or the Wind-Down Debtor to effectuate such withdrawal; *provided* that, following the Effective Date, the Debtors or the Wind-Down Debtor, as applicable, shall use commercially reasonable efforts to comply with all state banking department requirements for the surrender of a Money Transmitter License. Nothing in this Plan shall be construed to limit the rights of creditors, Debtors, the Wind-Down Debtor, or regulators to pursue recoveries against surety bonds maintained by the Debtors in connection with this Money Transmitter Licenses. Notwithstanding such Debtors' dissolution, such Debtors shall be deemed to remain intact solely with respect to the preparation, filing, review, and resolution of applications for Professional Fee Claims.

## K.    Corporate Action

Upon the Effective Date, all actions contemplated under the Plan, Definitive Documents, and Asset Purchase Agreement shall be deemed authorized and approved in all respects, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, directors, managers, managing-members, limited or general partners, or officers of the Debtors, the Wind-Down Debtor or any other Entity, including: (1) appointment of the directors, managers, members, and officers for the Wind-Down Debtor as provided herein; (2) the issuances, transfer, and distribution of the Wind-Down Debtor Assets; (3) the formation of the Wind-Down Debtor and appointment of the Plan Administrator and Wind-Down Debtor Oversight Committee; (4) the formation of any entities pursuant to and the implementation of the Plan and performance of all actions and transactions contemplated hereby and thereby; (5) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; and (6) all other acts or actions contemplated by the Plan, Definitive Documents, and Asset Purchase Agreement or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions (including effectuating the Restructuring Transactions Memorandum and the Customer Onboarding Protocol) (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan, Definitive Documents, and Asset Purchase Agreement involving the corporate structure of the Debtors or the Wind-Down Debtor, as applicable, and any corporate action required by the Debtors or the Wind-Down Debtor, as applicable, in connection with the Plan shall be deemed to have occurred on, and shall be in effect as of, the Effective Date, without any requirement of further action by the security holders, directors, managers, or officers

of the Debtors or the Wind-Down Debtor, as applicable. On or, as applicable, prior to the Effective Date, the appropriate officers of the Debtors or the Wind-Down Debtor, as applicable, shall be authorized and, as applicable, directed to issue, execute, and deliver the agreements, documents, Securities, certificates of incorporation, certificates of formation, bylaws, operating agreements, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Wind-Down Debtor, and any and all other agreements, documents, Securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this Article IV.K shall be effective notwithstanding any requirements under non-bankruptcy law.

### L.    Vesting of Assets in the Wind-Down Debtor

Except as otherwise provided in the Plan, or in any agreement, instrument, or other document incorporated in the Plan, notwithstanding any prohibition of assignability under applicable non-bankruptcy law and in accordance with section 1141 of the Bankruptcy Code, on the Effective Date, all property constituting Wind-Down Debtor Assets, including all Vested Causes of Action of the Debtors (unless otherwise released, waived, compromised, settled, transferred, or discharged pursuant to the Plan), and any property acquired by any of the Debtors under the Plan shall vest in the Wind-Down Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.

### M.    Cancellation of Notes, Instruments, Certificates, and Other Documents

On the later of the Effective Date and the date on which distributions are made pursuant to the Plan (if not made on the Effective Date), except for the purpose of evidencing a right to and allowing Holders of Claims and Interests to receive a distribution under the Plan or to the extent otherwise specifically provided for in the Plan, the Confirmation Order, or any agreement, instrument, or other document entered into in connection with or pursuant to the Plan or the Restructuring Transactions (including, without limitation, the Definitive Documents and the Asset Purchase Agreement), all notes, bonds, indentures, certificates, Securities, shares, purchase rights, options, warrants, collateral agreements, subordination agreements, intercreditor agreements, or other instruments or documents directly or indirectly evidencing, creating, or relating to any indebtedness or obligations of, or ownership interest in, the Debtors, giving rise to any Claims against or Interests in the Debtors or to any rights or obligations relating to any Claims against or Interests in the Debtors shall be deemed cancelled without any need for a Holder to take further action with respect thereto.

### N.    Effectuating Documents; Further Transactions

On and after the Effective Date, the Debtors, and its directors, managers, partners, officers, authorized persons, and members thereof, and the Wind-Down Debtor and Plan Administrator are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, Definitive Documents, and Asset Purchase Agreement, in the name of and on behalf of the Debtors and Wind-Down Debtor, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

### O.    Section 1146(a) Exemption

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Wind-Down Debtor, the Purchaser, or to any other Entity) of property under the Plan, Definitive Documents, and Asset Purchase Agreement or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the

Wind-Down Debtor; (2) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, including the Asset Purchase Agreement, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, sales or use tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forgo the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**P.     Preservation of Rights of Action**

In accordance with section 1123(b) of the Bankruptcy Code, the Wind-Down Debtor shall succeed to all rights to commence and pursue any and all Vested Causes of Action of the Debtors, whether arising before or after the Petition Date, including, without limitation, any actions specifically enumerated in the Schedule of Retained Causes of Action other than Causes of Action released, waived, settled, compromised, or transferred. Such rights shall be preserved by the Debtors and Wind-Down Debtor and shall vest in the Wind-Down Debtor, with the Wind-Down Debtor's rights to commence, prosecute, or settle such Causes of Action preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action expressly released, waived, settled, compromised, or transferred by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan or pursuant to the Asset Purchase Agreement, which shall be deemed released and waived by the Debtors and Wind-Down Debtor as of the Effective Date.

The Wind-Down Debtor may pursue such Causes of Action, as appropriate, in accordance with the best interests of the beneficiaries of the Wind-Down Debtor and in accordance with the Plan Administrator Agreement and the Plan. **No Entity may rely on the absence of a specific reference in the Schedules of Assets and Liabilities or Statement of Financial Affairs, the Plan, the Plan Supplement, the Disclosure Statement, or the Schedule of Retained Causes of Action to any Cause of Action against it as any indication that the Debtors or the Wind-Down Debtor, as applicable, will not pursue any and all available Causes of Action of the Debtors against it. The Wind-Down Debtor, on behalf of the Debtors and the Wind-Down Debtor, expressly reserves all rights to prosecute any and all Causes of Action against any Entity, except as otherwise provided in the Plan, including Article VIII of the Plan.** Unless any Cause of Action of the Debtors is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or pursuant to a Final Order, the Wind-Down Debtor, on behalf of the Debtors and Wind-Down Debtor and in accordance with the Plan Administrator Agreement, expressly reserves all such Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or Consummation.

The Wind-Down Debtor, on behalf of the Debtors, reserves and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Cause of Action that a Debtor may hold against any Entity shall vest in the Wind-Down Debtor, except as otherwise provided in the Plan, including Article VIII of the Plan. The Wind-Down Debtor, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Wind-Down Debtor shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court in accordance with the Plan.

Q.     **Election to Contribute Third-Party Claims**

Because aggregating all Contributed Third-Party Claims may enable the pursuit and settlement of such litigation claims in a more efficient and effective manner, each Holder of a Claim or Interest may agree, by electing on its ballot or opt-in form, to contribute its Contributed Third-Party Claims to the Wind-Down Debtor.  By electing such option on its ballot or opt-in form, each Contributing Claimant agrees that, subject to the occurrence of the Effective Date and the formation of the Wind-Down Debtor, it will be deemed, without further action, (i) to have irrevocably contributed its Contributed Third-Party Claims to the Wind-Down Debtor, and (ii) to have agreed to execute any documents reasonably requested by the Debtors or the Wind-Down Debtor to memorialize and effectuate such contribution.

R.     **Contribution of Contributed Third-Party Claims**

On the Effective Date, all Contributed Third-Party Claims will be irrevocably contributed to the Wind-Down Debtor and shall thereafter be Wind-Down Debtor Assets for all purposes.  No Person may rely on the absence of a specific reference in the Plan, the Disclosure Statement, the Confirmation Order, the Plan Administrator Agreement, the Plan Supplement, or any other document as any indication that the Wind-Down Debtor will or will not pursue any and all available Contributed Third-Party Claims against such Person.  The Wind-Down Debtor shall have, retain, reserve, and be entitled to assert all Contributed Third-Party Claims fully to the same extent that the Contributing Claimants could have asserted such claims prior to the Effective Date.  For the avoidance of doubt, the Contributed Third-Party Claims shall not include the rights of any of the Contributing Claimants to receive the distributions under the Plan on account of their Claims or Interests.

S.     **Closing the Chapter 11 Cases**

On and after the Effective Date, the Wind-Down Debtor shall be permitted to classify all of the Chapter 11 Cases of the Debtors except for the Chapter 11 Case of Voyager Digital, LLC, or any other Debtor identified in the Restructuring Transactions Memorandum as having its Chapter 11 Case remain open following the Effective Date, as closed, and all contested matters relating to any of the Debtors, including objections to Claims or Interests and any adversary proceedings, may be administered and heard in the Chapter 11 Case of Voyager Digital, LLC, or any other Debtor identified in the Restructuring Transactions Memorandum as having its Chapter 11 Case remain open following the Effective Date, irrespective of whether such Claims or Interests were Filed or such adversary proceeding was commenced against a Debtor whose Chapter 11 Case was closed.

## ARTICLE V.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.     **Assumption and Rejection of Executory Contracts and Unexpired Leases**

On the Effective Date, except as otherwise provided herein, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (1) is specifically described in the Plan as to be assumed in connection with confirmation of the Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement; (2) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Effective Date; (3) is to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, in connection with the Sale Transaction; (4) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; or (5) is a D&O Liability Insurance Policy other than the Side-A Policy. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, assignments, and rejections, including the assumption of the Executory Contracts or Unexpired Leases as provided in the Plan Supplement, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

**B.**     **Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases**

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Wind-Down Debtor, as applicable, under such Executory Contract or Unexpired Lease. Without limiting the general nature of the foregoing, and notwithstanding any non-bankruptcy law to the contrary, the Debtors and Wind-Down Debtor expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the Debtors contracting from non-Debtor counterparties to any rejected Executory Contract or Unexpired Lease.

**C.**     **Claims Based on Rejection of Executory Contracts or Unexpired Leases**

Counterparties to Executory Contracts or Unexpired Leases listed subject to rejection under the Plan shall be served with a notice of rejection of Executory Contracts and Unexpired Leases with the Plan Supplement. Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Claims, Noticing, and Solicitation Agent and served on the Debtors or Wind-Down Debtor, as applicable, no later than thirty days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, or the Wind-Down Debtor, the Estates, or their property without the need for any objection by the Wind-Down Debtor or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed released, and be subject to the permanent injunction set forth in Article VIII.D of the Plan, including any Claims against any Debtor listed on the Debtors' schedules as unliquidated, contingent, or disputed.** All Allowed Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease shall be treated as General Unsecured Claims in accordance with Article III.C of the Plan.

**D.**     **Cure of Defaults for Executory Contracts and Unexpired Leases Assumed**

The Debtors, the Wind-Down Debtor, or the Purchaser, as applicable pursuant to the Asset Purchase Agreement, shall pay Cures, if any, on the Effective Date. The Debtors shall provide notice of

the amount and timing of payment of any such Cure to the parties to the applicable assumed Executory Contracts or Unexpired Leases as part of the Plan Supplement. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure that differ from the ordinary course amounts paid or proposed to be paid by the Debtors, the Wind-Down Debtor, or the Purchaser shall be dealt with in the ordinary course of business and, if needed, shall be Filed with the Claims, Noticing, and Solicitation Agent on or before thirty days after the Effective Date. **If any counterparty to an Executory Contract or Unexpired Lease does not receive a notice of assumption and applicable cure amount, such counterparty shall have until on or before thirty days after the Effective Date to bring forth and File a request for payment of Cure.** Any such request that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Debtor or the Wind-Down Debtor, without the need for any objection by the Wind-Down Debtor or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure shall be deemed fully satisfied and released upon payment by the Debtors or the Wind-Down Debtor or the Purchaser of the Cure in the ordinary course of business or upon and in accordance with any resolution of a Cure dispute (whether by order of the Bankruptcy Court or through settlement with the applicable Executory Contract or Unexpired Lease counterparty); *provided*, *however*, that nothing herein shall prevent the Wind-Down Debtor or the Purchaser, as applicable, from paying any Cure Claim despite the failure of the relevant counterparty to File such request for payment of such Cure. The Wind-Down Debtor or the Purchaser may also settle any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court. In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be Filed with the Bankruptcy Court on or before thirty days after the Effective Date. Any such objection will be scheduled to be heard by the Bankruptcy Court at the Debtors' first scheduled omnibus hearing for which such objection is timely Filed. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

In the event of a dispute regarding: (1) the amount of any Cure Claim, (2) the ability of the Debtors, the Wind-Down Debtor, Purchaser, or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed (or assumed and assigned, as applicable), or (3) any other matter pertaining to assumption or assignment, then any disputed Cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made as soon as reasonably practicable following, and in accordance with, the entry of a Final Order of the Bankruptcy Court resolving such dispute or as may be agreed upon by the Debtors, the Wind-Down Debtor, or Purchaser, as applicable, and the counterparty to the Executory Contract or Unexpired Lease, and any such unresolved dispute shall not prevent or delay implementation of the Plan or the occurrence of the Effective Date.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise or assignment of any Executory Contract or Unexpired Lease to the Purchaser and full payment of any applicable Cure pursuant to this Article V.D, or upon and in accordance with any resolution of a Cure dispute (whether by order of the Bankruptcy Court or through settlement with the applicable Executory Contract or Unexpired Lease counterparty), shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed or assumed and assigned in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to this Article V.D, in the amount and at the time in the ordinary course of business or upon and in accordance with any resolution of a Cure dispute (whether by order of the Bankruptcy Court or through settlement**

with the applicable Executory Contract or Unexpired Lease counterparty), shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court. For the avoidance of doubt, in the event that any counterparty to an Executory Contract or Unexpired Lease receives a notice of assumption and applicable proposed Cure amount, and disputes the Debtors' proposed Cure amount, such party shall not be required to File a Proof of Claim with respect to such dispute. Any counterparty to an Executory Contract or Unexpired Lease that does not receive a notice or applicable proposed Cure amount, and believes a Cure amount is owed, shall have thirty days after the Effective Date to File a Proof of Claim with respect to such alleged Cure amount, which Claim shall not be expunged until such Cure dispute is resolved.

**E.      Insurance Policies**

Each D&O Liability Insurance Policy (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto) other than the Side-A Policy shall be assumed, in their entirety, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date, pursuant to sections 105 and 365 of the Bankruptcy Code with the Wind-Down Debtor being authorized to pursue any proceeds thereof on behalf of the Debtors or the Wind-Down Debtor. The Side-A Policy shall ride through these Chapter 11 Cases with the Debtors, and the Wind-Down Debtor preserves all avoidance and other actions in connection with the premium paid thereunder. All beneficiaries under the D&O Insurance Policies reserve their rights under such D&O Insurance Policies subject to the limitations set forth in this Plan.

The Debtors or the Wind-Down Debtor, as applicable, shall not terminate or otherwise reduce the coverage under any D&O Liability Insurance Policy (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto) in effect prior to the Effective Date, and any current and former directors, officers, managers, and employees of the Debtors who served in such capacity at any time before or after the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy subject to the terms thereof regardless of whether such directors, officers, managers, and employees remain in such positions after the Effective Date. Notwithstanding anything to the contrary in the Plan, the Debtors or the Wind-Down Debtor shall retain the ability to supplement such D&O Liability Insurance Policy as the Debtors or Wind-Down Debtor may deem necessary, subject to the prior written consent of the Wind-Down Debtor. Notwithstanding anything to the contrary contained in the Plan, the Wind-Down Debtor shall be entitled to pursue avoidance of the premium paid for the XL Specialty Insurance Company Cornerstone A-Side Management Liability Insurance Policy No. ELU184179-22, and nothing in this Plan shall be deemed a waiver or abrogation of any such rights.

The Debtors shall continue to satisfy their obligations under their insurance policies in full and continue such policies in the ordinary course of business. Each of the Debtors' insurance policies, and any agreements, documents, or instruments relating thereto shall be treated as Executory Contracts under the Plan. On the Effective Date: (a) the Debtors shall be deemed to have assumed all such insurance policies and any agreements, documents, and instruments relating thereto in their entirety; and (b) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the applicable Debtors or the Wind-Down Debtor unaltered.

**F.      Reservation of Rights**

Nothing contained in the Plan or the Plan Supplement (unless otherwise explicitly provided) shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor or the Wind-Down Debtor has any liability

thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Wind-Down Debtor, as applicable, shall have forty-five days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, including by rejecting such contract or lease effective as of the Confirmation Date.

## G. Nonoccurrence of Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## H. Contracts and Leases Entered into After the Petition Date

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed under section 365 of the Bankruptcy Code, will be performed by the applicable Debtor or Wind-Down Debtor liable thereunder in the ordinary course of its business. Such contracts and leases that are not rejected under the Plan shall survive and remain unaffected by entry of the Confirmation Order.

## ARTICLE VI.

## PROVISIONS GOVERNING DISTRIBUTIONS

## A. Timing and Calculation of Amounts to Be Distributed

Except (1) as otherwise provided herein, (2) upon a Final Order, or (3) as otherwise agreed to by the Debtors, the Purchaser, or the Wind-Down Debtor, as the case may be, and the Holder of the applicable Claim, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the next Distribution Date after such Claim becomes, as applicable, an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive the full amount of distributions that the Plan provides for Allowed Claims in the applicable Class from the Distribution Agent. In the event that any payment or distribution under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or distribution may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. Except as specifically provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

## B. Rights and Powers of Distribution Agent

### 1. Powers of the Distribution Agent

The Distribution Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties and exercise its rights under the Plan; (b) make all distributions contemplated under the Plan; (c) employ professionals to represent it with respect to its responsibilities and powers; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions of the Plan.

From and after the Effective Date, the Distribution Agent, solely in its capacity as Distribution Agent, shall be exculpated by all Entities, including, without limitation, holders of Claims against and

Interests in the Debtors and other parties in interest, from any and all Claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Distribution Agent by the Plan or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or ultra vires acts of such Distribution Agent. No holder of a Claim or Interest or other party in interest shall have or pursue any Claim or Cause of Action vested in a Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by such Distribution Agent to be necessary and proper to implement the provisions hereof.

2.　　　Expenses Incurred on or after the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Distribution Agent on or after the Effective Date and any reasonable compensation and expense reimbursement claims (including reasonable attorney and/or other professional fees and expenses) made by such Distribution Agent shall be paid in Cash by the Wind-Down Debtor.

**C.　　　Delivery of Distributions and Undeliverable or Unclaimed Distributions**

1.　　　Distributions Generally

Except as otherwise provided in the Plan (including in paragraph 8 below), the Distribution Agent shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the applicable register or in the Debtors' records as of the date of any such distribution (as applicable), including the address set forth in any Proof of Claim filed by that Holder.

2.　　　Distributions on Account of Obligations of Multiple Debtors

For all purposes associated with distributions under the Plan, all guarantees by any Debtor of the obligations of any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor, shall be deemed eliminated so that any obligation that could otherwise be asserted against more than one Debtor shall result in a single distribution under the Plan. Any such Claims shall be subject to all potential objections, defenses, and counterclaims, and to estimation pursuant to section 502(c) of the Bankruptcy Code.

3.　　　Record Date of Distributions

On the Distribution Record Date, the various transfer registers for each Class of Claims or Interests as maintained by the Debtors or their respective agents shall be deemed closed, and there shall be no further changes in the record Holders of any Claims or Interests. The Distribution Agent shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date. In addition, with respect to payment of any Cure amounts or disputes over any Cure amounts, neither the Debtors nor the Distribution Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the Effective Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure amount.

4.　　　Special Rules for Distributions to Holders of Disputed Claims and Interests

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the Wind-Down Debtor, on the one hand, and the Holder of a Disputed Claim or Interest, on the other hand,

or as set forth in a Final Order, no partial payments and no partial distributions shall be made with respect to a Disputed Claim or Interest until all of the Disputed Claim or Interest has become an Allowed Claim or Interest or has otherwise been resolved by settlement or Final Order; *provided* that, if the Wind-Down Debtor does not dispute a portion of an amount asserted pursuant to an otherwise Disputed Claim or Interest, the Distribution Agent may make a partial distribution on account of that portion of such Claim or Interest that is not Disputed at the time and in the manner that the Distribution Agent makes distributions to similarly situated Holders of Allowed Claims or Interests pursuant to the Plan. Any dividends or other distributions arising from property distributed to Holders of Allowed Claims or Interests, as applicable, in a Class and paid to such Holders under the Plan shall also be paid, in the applicable amounts, to any Holder of a Disputed Claim or Interest, as applicable, in such Class that becomes an Allowed Claim or Interest after the date or dates that such dividends or other distributions were earlier paid to Holders of Allowed Claims or Interests in such Class.

5.     <u>De Minimis Distributions; Minimum Distributions</u>

The Distribution Agent shall not make any Cash distributions to any Holder of an Allowed Claim or Interest pursuant to Article III.C.1-11 of this Plan on account of such Allowed Claim or Interest if such distribution is valued, in the reasonable discretion of the Distribution Agent, at less than $1.00, and each Holder of an Allowed Claim or Interest to which this limitation applies shall not be entitled to any distributions under the Plan. Notwithstanding anything to the contrary in this Plan, there shall be no minimum distribution threshold on account of distributions of any Cryptocurrency to Holders of Allowed Account Holder Claims and Allowed OpCo General Unsecured Claims.

6.     <u>Undeliverable Distributions and Unclaimed Property</u>

In the event that either (a) a distribution to any Holder is returned as undeliverable or (b) the Holder of an Allowed Claim or Interest does not respond to a request by the Debtors or the Distribution Agent for information necessary to facilitate a particular distribution, no distribution to such Holder shall be made unless and until the Distribution Agent has determined the then-current address of such Holder or received the necessary information to facilitate a particular distribution, at which time such distribution shall be made to such Holder without interest, dividends, or other accruals of any kind; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code on the date that is one year after the Effective Date. After such date, all unclaimed property or interests in property shall revert to the Wind-Down Debtor automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable local, state, federal, or foreign escheat, abandoned, or unclaimed property laws to the contrary), and the Claim or Interest of any Holder to such property or interest in property shall not be entitled to any distributions under the Plan.

7.     <u>Manner of Payment Pursuant to the Plan</u>

At the option of the Distribution Agent, any Cash payment to be made hereunder may be made by check, wire transfer, automated clearing house, credit card, or as otherwise provided in applicable agreements.

8.     <u>Distributions of Net Owed Coins; Additional Bankruptcy Distributions</u>

As a general matter, the Purchaser will allocate each Account Holder's Net Owed Coins to its account on the Binance.US Platform, and each Holder of OpCo General Unsecured Claim's Pro Rata share of the Distributable Cryptocurrency (in Cash) to its account on the Binance.US Platform in accordance with, and subject to, the provisions of Section 6.12 of the Asset Purchase Agreement.

Subject to the terms of the Asset Purchase Agreement, the Purchaser may make Additional Bankruptcy Distributions to Transferred Creditors, including Distributable OpCo Cash and/or other Wind-Down Debtor Assets, corresponding to their Pro Rata shares of such Additional Bankruptcy Distribution (if such Additional Bankruptcy Distribution is in Cryptocurrency, based on the Transferred Cryptocurrency Value of the Cryptocurrency included in such Additional Bankruptcy Distribution), all in accordance with any applicable Post-Bankruptcy Statement (as defined in the Asset Purchase Agreement).

If any Account Holder or Holder of an Allowed OpCo General Unsecured Claim does not become a Transferred Creditor prior to the date that is three (3) months following the later of the Closing Date or the date on which the terms and conditions for the Binance.US Platform are made available for such Person to accept (as provided in the Customer Onboarding Protocol), then Purchaser shall convert any Cryptocurrency allocable to such Person into U.S. Dollars at the then-prevailing rates (including applicable fees, spreads, costs and expenses) on the Binance.US Platform and deliver such U.S. Dollars, together with any cash or others assets in respect of such Persons, to the Debtors within five (5) Business Days, for further distribution by the Debtors in accordance with this Plan and the Customer Onboarding Protocol.

If any Account Holder or Holder of an Allowed OpCo General Unsecured Claim is located in an Unsupported Jurisdiction (as defined in the Asset Purchase Agreement), then the Net Owed Coins, Distributable Cryptocurrency (in Cash) and Additional Bankruptcy Distributions, if applicable, allocable to such Person shall be handled pursuant to Section 6.12(b) or, if applicable, Section 6.14(d) of the Asset Purchase Agreement. Notwithstanding anything to the contrary in the Asset Purchase Agreement, this Plan, or any Definitive Document, if any Account Holder or Holder of an Allowed OpCo General Unsecured Claim in an Unsupported Jurisdiction elects to not become a Transferred Creditor prior to the date that is three (3) months following the later of the Closing Date or the date on which the terms and conditions for the Binance.US Platform are made available for such Person to accept (as provided in the Customer Onboarding Protocol), then Purchaser shall on the date that is three (3) months following the later of the Closing Date or the date which the terms and conditions for the Binance.US Platform are made available for such person to accept, convert any Cryptocurrency allocable to such Person into U.S. Dollars at the then-prevailing rates (including applicable fees, spreads, costs and expenses) on the Binance.US Platform and deliver such U.S. Dollars, together with any cash or others assets in respect of such Persons, to the Debtors within five (5) Business Days, for further distribution by the Debtors in accordance with this Plan and the Customer Onboarding Protocol.

Purchaser shall have no responsibility to make any distributions other than as contemplated by Sections 6.12 and 6.14 of the Asset Purchase Agreement.

**D.    Compliance Matters**

In connection with the Plan, to the extent applicable, the Debtors, the Wind-Down Debtor, any Distribution Agent, and any other applicable withholding and reporting agents shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Debtors, the Wind-Down Debtor, the Distribution Agent, and any other applicable withholding and reporting agents shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including wind-down a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms that are reasonable and appropriate; *provided* that the Wind-Down Debtor and the Distribution Agent, as applicable, shall request appropriate

documentation from the applicable distributees and allow such distributees a reasonable amount of time to respond. The Debtors, the Wind-Down Debtor, the Distribution Agent, and any other applicable withholding and reporting agents reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

**E.**     **Securities Registration Exemption**

To the extent that any Cryptocurrency (including VGX) is deemed to be a "security" (as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, or by any applicable laws of any Governmental Unit) by the SEC or any Governmental Unit, such Cryptocurrency to be offered, issued and distributed to Holders of Account Holder Claims or any other Holders of Claims hereunder, in each case in exchange for such Claims, shall be exempt, without any further act or action by any Entity, from registration under the Securities Act or any similar federal, state, or local law in reliance upon (i) section 1145 of the Bankruptcy Code (except with respect to an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code) or (ii) (including with respect to an entity that is an "underwriter") pursuant to section 4(a)(2) under the Securities Act and/or Regulation D thereunder.

Notwithstanding anything to the contrary in the Plan, no entity may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the Cryptocurrency, to the extent deemed to be a "security" are exempt from registration.

**F.** ~~E.~~ **Foreign Currency Exchange Rate**

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim, asserted in government issued currency (for the avoidance of doubt, not including any Cryptocurrency) other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Effective Date.

**G.** ~~F.~~ **Claims Paid or Payable by Third Parties**

1. <u>Claims Paid by Third Parties</u>

The Debtors or the Wind-Down Debtor, as applicable, shall reduce a Claim or Interest, and such Claim or Interest (or portion thereof) shall be disallowed without an objection to such Claim or Interest having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim or Interest receives a payment on account of such Claim or Interest from a party that is not a Debtor or Wind-Down Debtor (or other Distribution Agent), as applicable, including any payments made in connection with the Sale Transaction. To the extent a Holder of a Claim or Interest receives a distribution on account of such Claim or Interest and receives payment from a party that is not a Debtor or a Wind-Down Debtor (or other Distribution Agent), including payments made in connection with the Sale Transaction, as applicable, on account of such Claim or Interest, such Holder shall, within ten Business Days of receipt thereof, repay, return, or deliver any distribution held by or transferred to the Holder to the applicable Wind-Down Debtor to the extent the Holder's total recovery on account of such Claim or Interest from the third party and under the Plan exceeds the amount of such Claim or Interest as of the date of any such distribution under the Plan. The failure of such Holder to timely repay, return, or deliver such distribution shall result in the Holder owing the applicable Wind-Down Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the ten-Business Day grace period specified above until the amount is repaid.

2. <u>Claims Payable by Third Parties</u>

No distributions under the Plan shall be made on account of an Allowed Claim or Interest that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim or Interest has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim or Interest (if and to the extent adjudicated by a court of competent jurisdiction or otherwise settled), then immediately upon such payment, such Claim or Interest may be expunged or reduced on the Claims Register by the Claims, Noticing, and Solicitation Agent to the extent of any such payment without an objection to such Claim or Interest having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.     Applicability of Insurance Policies

Except as otherwise provided herein, payments to Holders of Claims or Interests shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any rights, defenses, or Cause of Action that the Debtors, the Wind-Down Debtor or any other Entity may hold against any other Entity, including insurers, under any policies of insurance, agreements related thereto, or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any rights or defenses, including coverage defenses, held by such insurers under the applicable insurance policies, agreements related thereto, and applicable non-bankruptcy law.

**H.** ~~G.~~ **Setoffs and Recoupment**

Except as otherwise expressly provided for herein, each Debtor, the Wind-Down Debtor, or such Entity's designee as instructed by such Debtor, the Wind-Down Debtor, as applicable, may, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, set off against or recoup from an Allowed Claim and any distributions to be made pursuant to the Plan on account of such Allowed Claim, any Claims, rights, and Causes of Action of any nature whatsoever that the Debtor or the Wind-Down Debtor, as applicable, may have against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action have not been otherwise compromised, settled, or released on or prior to the Effective Date (whether pursuant to the Plan or otherwise).  Notwithstanding the foregoing, except as expressly stated in Article VIII of this Plan, neither the failure to effect such a setoff or recoupment nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by the Debtors or the Wind-Down Debtor of any such Claims, rights, or Causes of Action the Debtors or the Wind-Down Debtor may possess against such Holder.

**I.** ~~H.~~ **Allocation between Principal and Accrued Interest**

Except as otherwise provided herein, the aggregate consideration paid to Holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof and as determined for federal income tax purposes) and second, to the extent the consideration exceeds the principal amount of the Allowed Claims, to the remaining portion of such Allowed Claim if any.

**ARTICLE VII.**

**PROCEDURES FOR RESOLVING DISPUTED,
CONTINGENT, AND UNLIQUIDATED CLAIMS AND INTERESTS**

**A.     Disputed Claims Process**

After the Effective Date, the Debtors, the Wind-Down Debtor, and any party-in-interest, shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim or Interest immediately before the Effective Date.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim or Interest shall become an Allowed Claim or Interest unless and until such Claim or Interest is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim or Interest.  If a Holder of a Claim or Interest in Class disputes the amount of their Claim or Interest as listed in the Schedules, the Holder should notify the Debtors or the Wind-Down Debtor of

such dispute. If the Debtors and the Holder agree to an amended Claim amount prior to the Effective Date, the Debtors shall file amended Schedules prior to the Effective Date. If between the Confirmation Date and the Effective Date, the dispute cannot be consensually resolved, the Holder may seek (by letter to the Court) to have the claim or interest dispute resolved before the Bankruptcy Court (and, with the consent of the Debtors, before any other court or tribunal with jurisdiction over the parties). After the Effective Date, the creditor may seek to have the claim dispute resolved before the Bankruptcy Court or any other court or tribunal with jurisdiction over the parties.

Notwithstanding anything in this Plan to the contrary: (1) all Claims against the Debtors that result from the Debtors' rejection of an Executory Contract or Unexpired Lease; (2) Claims filed to dispute the amount of any proposed Cure pursuant to section 365 of the Bankruptcy Code; and (3) Claims that the Debtors seek to have determined by the Bankruptcy Court, shall in all cases be determined by the Bankruptcy Court, if not otherwise resolved through settlement with the applicable claimant.

On the Effective Date, the Debtors or Plan Administrator, as applicable, may establish one or more accounts or funds to hold and dispose of certain assets, pursue certain litigation (including the Causes of Action preserved under the Plan or otherwise vesting in the Wind-Down Debtor), and/or satisfy certain Claims (including Claims that are contingent or have not yet been Allowed). For any such account or fund, the Debtors or the Plan Administrator, as applicable, may take the position that grantor trust treatment applies in whole or in part. To the extent such treatment applies to any such account or fund, for all U.S. federal income tax purposes, the beneficiaries of any such account or fund would be treated as grantors and owners thereof, and it is intended, to the extent reasonably practicable, that any such account or fund would be classified as a liquidating trust under section 301.7701-4 of the Treasury Regulations. Alternatively, any such account or fund may be subject to the tax rules that apply to "disputed ownership funds" under 26 C.F.R. 1.468B–9. If such rules apply, such assets would be subject to entity-level taxation, and the Debtors and the Wind-Down Debtor would be required to comply with the relevant rules.

## B. Objections to Claims or Interests

Except as otherwise specifically provided in the Plan, after the Effective Date, the Wind-Down Debtor shall have the sole authority on behalf of the Debtors to: (1) File, withdraw, or litigate to judgment, any objections to Claims or Interests; and (2) settle or compromise any Disputed Claim or Interest without any further notice to or action, order, or approval by the Bankruptcy Court. For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, the Wind-Down Debtor shall have and retain any and all rights and defenses each such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to Article IV.P of the Plan. In the event that the Wind-Down Debtor settles or otherwise compromises the Signatory Governmental Claims (as defined in the Governmental Claimant Stipulation) asserted against TopCo, any other Claim Filed or asserted by a Governmental Unit against TopCo, or any other Claim Filed or asserted against TopCo in an amount greater than $100,000, any such proposed settlement or compromise shall require approval of the Bankruptcy Court after notice and a hearing.

Any objections to Claims or Interests shall be Filed on or before the Claims Objection Bar Date. For the avoidance of doubt, any party may object to any Claims or Interests prior to the Claims Objection Bar Date. Further, the Bankruptcy Court may extend the time period to object to Claims or Interests set forth in this paragraph at any time, including before or after the expiration of one hundred eighty days after the Effective Date, in its discretion or upon request by the Debtors or any party in interest.

C.       **Estimation of Claims**

Before or after the Effective Date, the Debtors or the Wind-Down Debtor, as applicable, may (but are not required to), at any time, request that the Bankruptcy Court estimate any Disputed Claim or Interest that is contingent or unliquidated pursuant to applicable law, including pursuant to section 502(c) of the Bankruptcy Code, for any reason, regardless of whether any party previously has objected to such Disputed Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under sections 157 and 1334 of the Judicial Code to estimate any such Disputed Claim or Interest, including during the litigation of any objection to any Disputed Claim or Interest or during the pendency of any appeal relating to such objection.  Notwithstanding any provision otherwise in the Plan, a Disputed Claim or Interest that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions) and may be used as evidence in any supplemental proceedings, and the Debtors or the Wind-Down Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Disputed Claim or Interest that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before fourteen days after the date on which such Disputed Claim or Interest is estimated.

D.       **No Distributions Pending Allowance**

Notwithstanding any other provision of the Plan, if any portion of a Claim or Interest is a Disputed Claim or Interest, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest; *provided* that if only a portion of a Claim or Interest is Disputed, such Claim or Interest shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount.

E.       **Distributions After Allowance**

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim or Interest in accordance with the provisions of the Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court Allowing any Disputed Claim or Interest becomes a Final Order, the Distribution Agent shall provide to the Holder of such Allowed Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest, dividends, or accruals to be paid on account of such Allowed Claim or Interest unless required under applicable bankruptcy law.

F.       **No Interest**

Unless otherwise specifically provided for herein or by Final Order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on Claims against the Debtors, and no Holder of a Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such Claim. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed

Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

**G.      Adjustment to Claims and Interests without Objection**

Any Claim or Interest that has been paid, satisfied, amended, superseded, cancelled, or otherwise expunged (including pursuant to the Plan) may be adjusted or expunged on the Claims Register at the direction of the Wind-Down Debtor without the Wind-Down Debtor having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.  Additionally, any Claim or Interest that is duplicative or redundant with another Claim or Interest against the same Debtor may be adjusted or expunged on the Claims Register at the direction of the Wind-Down Debtor without the Wind-Down Debtor having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

**H.      Time to File Objections to Claims**

Any objections to Claims shall be Filed on or before the Claims Objection Bar Date.

**I.      Disallowance of Claims or Interests**

Any Claims or Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims or Interests until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Wind-Down Debtor, as applicable.

**Except as otherwise provided herein or as agreed to by the Debtors or the Wind-Down Debtor, any and all Proofs of Claim Filed after the Bar Date shall be deemed disallowed and expunged as of the Effective Date subject to the approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order.**

**J.      Amendments to Proofs of Claim**

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Proof of Claim or Proof of Interest may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Wind-Down Debtor, and any such new or amended Proof of Claim or Proof of Interest Filed shall be deemed disallowed in full and expunged without any further action, order, or approval of the Bankruptcy Court.

# ARTICLE VIII.

## EFFECT OF CONFIRMATION OF THE PLAN

**A.      Releases by the Debtors**

  **Notwithstanding anything contained in the Plan to the contrary, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Wind-Down Debtor, and their Estates, and in each case on behalf of themselves and their respective successors, assigns, and representatives, who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of, the foregoing Entities, from any and all Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Chapter 11 Cases and related adversary proceedings, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, the administration and implementation of the Restructuring Transactions or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date.**

  **Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019, of the releases described in this Article VIII.A by the Debtors, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article VIII.A is:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) except to the extent contemplated by Article IV.E and Article IV.F of the Plan, a bar to any of the Debtors or Wind-Down Debtor or their respective Estates asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.**

  **Notwithstanding anything to the contrary contained herein, nothing in this Plan shall release, waive, or otherwise limit the (i) rights, duties, or obligations of the Purchaser under the Asset Purchase Agreement or the Definitive Documents and (ii) the Non-Released D&O Claims, but such Non-Released D&O Claims shall remain subject to the limitations contained in Article IV.E and Article IV.F of this Plan.**

B. **Releases by Holders of Claims and Interests**

Except as expressly set forth in the Plan, effective on the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted or assertable on behalf of any of the Debtors, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, the administration and implementation of the Restructuring Transactions, or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date, *provided* that nothing in this Article VIII.B shall be construed to release the Released Parties from actual fraud, willful misconduct, or gross negligence as determined by a Final Order.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII.B, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article VIII.B is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) except to the extent contemplated by Article IV.F and Article IV.G of the Plan, a bar to any of the Releasing Parties or the Debtors or the Wind-Down Debtor or their respective Estates asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

C. **Exculpation**

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor release or the third-party release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is exculpated from any Cause of Action for any act or omission arising on or after the Petition Date and prior to the Effective Date based on the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing, or consummation of the Disclosure Statement, the Plan, the Special Committee Investigation, any Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter

11 Cases, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for Causes of Action related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan; *provided* that nothing in the Plan shall limit the liability of professionals to their clients pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8 Rule 1.8(h)(1) (2009).

To the extent that any Cryptocurrency is deemed to be a "security" by the SEC or any Governmental Unit, distribution of such Cryptocurrency shall have been done in good faith and in compliance with all applicable laws, rules, and regulations and the Exculpated Parties shall not be liable at any time for the violation of any applicable law, rule, or regulation governing the distribution of Cryptocurrency whether such Cryptocurrency is deemed to be a "security" or otherwise.

The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

D.      **Injunction**

The assets of the Debtors and of the Wind-Down Debtor shall be used for the satisfaction of expense obligations and the payment of Claims and Interests only in the manner set forth in this Plan and shall not be available for any other purpose. All Persons and Entities who have held, hold, or may hold Claims or Interests based upon any act, omission, transaction, or other activity of any kind or nature related to the Debtors, the Wind-Down Debtor, or the Debtors' Chapter 11 Cases that occurred prior to the Effective Date, other than as expressly provided in the Plan or the Confirmation Order, shall be precluded and permanently enjoined on and after the Effective Date from interfering with the use and distribution of the Debtors' assets in the manner contemplated by the Plan.

In addition, as of the Effective Date and subject to the occurrence of the Effective Date, except as otherwise specifically provided in this Plan or the Confirmation Order, all Persons and Entities who have held, hold, or may hold Claims or Interests that are fully satisfied pursuant to the Plan or any Claim or Interest that is subject to the releases and exculpations set forth in Article VIII.B and Article VIII.C of this Plan shall be precluded and permanently enjoined on and after the Effective Date from enforcing, pursuing, or seeking any setoff or relief with respect to such Claims or Interests, except for the receipt of the payments or distributions that are contemplated by this Plan.

### E. Release of Liens

Except as otherwise provided in the Plan, the Plan Supplement, or any contract, instrument, release, or other agreement or document created pursuant to the Plan or Confirmation Order on the Effective Date, and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, compromised, and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Debtors shall automatically revert to the applicable Debtor or the Wind-Down Debtor, as applicable, and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors. Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as requested by the Debtors or Wind-Down Debtor to evidence the release of such Lien, including the execution, delivery, and filing or recording of such documents evidencing such releases. The presentation or filing of the Confirmation Order to or with any local, state, federal, or foreign agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

### F. OSC and SEC

Notwithstanding any language to the contrary herein, no provision shall (a) preclude the OSC or the SEC from enforcing its police or regulatory powers; or (b) enjoin, limit, impair or delay the OSC or SEC from commencing or continuing any claims, causes of action, proceeding, or investigations against any non-Debtor person or non-Debtor entity in any forum.

### G. Protection against Discriminatory Treatment

As provided by section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Entity, including Governmental Units, shall discriminate against any Debtor or the Wind-Down Debtor or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, or discriminate with respect to such a grant against, any Debtor or the Wind-Down Debtor, or any Entity with which a Debtor or the Wind-Down Debtor has been or is associated, solely because such Debtor or the Wind-Down Debtor was a debtor under chapter 11 of the Bankruptcy Code, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

### H. Document Retention

Upon the occurrence of the Effective Date, the Debtors' books and records shall be transferred to the Wind-Down Debtor, which shall continue to preserve all financial books and records, emails, and other financial documents relating to the Debtors' business that are currently in the Debtors' possession. The Wind-Down Debtor shall not destroy or otherwise abandon any such documents or records without providing advance notice to the U.S. Securities and Exchange Commission (c/o Therese Scheuer, U.S. Securities and Exchange Commission, 100 F Street, NE, Washington, DC 20549, ScheuerT@SEC.GOV) and seeking further authorization from this Bankruptcy Court. Nothing in this Plan or the Confirmation Order shall affect the obligations of the pre-Effective Date Debtors, the Wind-Down Debtor, and/or any

transferee or custodian to maintain all books and records that are subject to any governmental subpoena, document preservation letter, or other investigative request from a governmental agency.

**I.    Reimbursement or Contribution**

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (1) such Claim has been adjudicated as non-contingent; or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

**J.    Term of Injunctions or Stays**

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code, or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.  **All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.**

# ARTICLE IX.

## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

**A.    Conditions Precedent to the Effective Date**

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article IX.B of the Plan:

1.  The Bankruptcy Court shall have entered the Confirmation Order, which shall be in a form and substance reasonably satisfactory to the Debtors and the Committee, and subject to the consent rights of Purchaser under the Asset Purchase Agreement, and such order shall be a Final Order and in full force and effect.

2.  The Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan, Definitive Documents, and the Asset Purchase Agreement.

3.  Each Definitive Document and each other document contained in any supplement to the Plan, including the Plan Supplement and any exhibits, schedules, amendments, modifications or supplements thereto or other documents contained therein, shall have been executed or Filed, as applicable, in form and substance consistent in all respects with the Plan, and subject to the Purchaser's consent rights under the Asset Purchase Agreement, and shall not have been modified in a manner inconsistent therewith;

4.  The Professional Fee Escrow Account shall have been established and funded with Cash in accordance with Article II.B.2 of the Plan.

5. The Wind-Down Reserve shall have been established and funded with Cash in accordance with the Plan.

6. If prior to the Outside Date, the Asset Purchase Agreement shall be in full force and effect and the Sale Transaction shall have been consummated.

7. The Restructuring Transactions shall have been consummated or shall be anticipated to be consummated concurrently with the occurrence of the Effective Date in a manner consistent with the Plan, the Customer Onboarding Protocol, the other Definitive Documents, and the Asset Purchase Agreement, and the Plan shall have been substantially consummated or shall be anticipated to be substantially consummated concurrently with the occurrence of the Effective Date.

## B. Waiver of Conditions Precedent

The Debtors, with the consent of the Committee and, solely to the extent related to the Asset Purchase Agreement and the Sale Transaction, prior to the Outside Date, the consent of Purchaser, may waive any of the conditions to the Effective Date set forth in Article IX.A of the Plan at any time, without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm and consummate the Plan.

## C. Effect of Non-Occurrence of Conditions to Consummation

If the Effective Date does not occur within 120 days after the Confirmation Date, then the Plan will be null and void in all respects, any and all compromises or settlements not previously approved by Final Order of the Bankruptcy Court embodied in the Plan (including with respect to the fixing, limiting, or treatment of any Claim or Interest, including, without limitation, the Alameda Loan Facility Claims), shall be deemed null and void, and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims, Interests, or Causes of Action held by any Debtor or any other Entity; (2) prejudice in any manner the rights of any Debtor or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity in any respect.

# ARTICLE X.

# MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

## A. Modification of Plan

Subject to the limitations and terms contained in the Plan and Purchaser's consent rights under the Asset Purchase Agreement, the Debtors, with the consent of the Committee, reserve the right to (1) amend or modify the Plan before the entry of the Confirmation Order, in accordance with the Bankruptcy Code and the Bankruptcy Rules and (2) after the entry of the Confirmation Order, the Debtors or the Wind-Down Debtor, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, to remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan consistent with the terms set forth herein.

**B.**  **Effect of Confirmation on Modifications**

Entry of the Confirmation Order shall constitute approval of all modifications or amendments to the Plan occurring after the solicitation thereof pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

**C.**  **Revocation or Withdrawal of Plan**

The Debtors reserve the right, with the consent of the Committee, to revoke or withdraw the Plan with respect to any or all Debtors before the Confirmation Date and to File subsequent chapter 11 plans. If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then: (1) the Plan will be null and void in all respects; (2) any settlement or compromise not previously approved by Final Order of the Bankruptcy Court embodied in the Plan (including the fixing or limiting to an amount certain of the Claims or Classes of Claims), assumption or rejection of Executory Contracts or Unexpired Leases effectuated by the Plan, and any document or agreement executed pursuant to the Plan will be null and void in all respects; and (3) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims, Interests, or Causes of Action by any Entity, (b) prejudice in any manner the rights of any Debtor or any other Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

## ARTICLE XI.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.  Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.  decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.  resolve any matters related to Executory Contracts or Unexpired Leases, including: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure Claims or other Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed or assumed and assigned; and (c) any dispute regarding whether a contract or lease is or was executory, expired, or terminated;

4.  ensure that distributions to Holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

5. adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor or the Estates that may be pending on the Effective Date;

6. enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of (a) contracts, instruments, releases, and other agreements or documents approved by Final Order in the Chapter 11 Cases and (b) the Plan, the Confirmation Order, and contracts, instruments, releases, and other agreements or documents created in connection with the Plan; *provided* that the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection, or dispute resolution clause that refers disputes to a different court;

7. enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

8. grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

9. issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

10. hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Cases, including: (a) with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or an Interest for amounts not timely repaid pursuant to Article VI of the Plan; (b) with respect to the releases, injunctions, and other provisions contained in Article VIII of the Plan, including entry of such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions; (c) anything that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan and the Confirmation Order; or (d) related to section 1141 of the Bankruptcy Code;

11. enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

12. adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

13. consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

14. enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases with respect to any Entity, and resolve any cases, controversies, suits, or disputes that may arise in connection with any Entity's rights arising from or obligations incurred in connection with the Plan;

15. hear and determine matters concerning local, state, federal, and foreign taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

16. hear and determine matters concerning exemptions from state and federal registration requirements in accordance with section 1145 of the Bankruptcy Code;

17.    ~~16.~~ enter an order or Final Decree concluding or closing the Chapter 11 Cases;

18.    ~~17.~~ enforce all orders previously entered by the Bankruptcy Court; and

19.    ~~18.~~ hear and determine any other matters related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code or the Judicial Code.

Nothing herein limits the jurisdiction of the Bankruptcy Court to interpret and enforce the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, or the Disclosure Statement, without regard to whether the controversy with respect to which such interpretation or enforcement relates may be pending in any state or other federal court of competent jurisdiction.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in this Article XI, the provisions of this Article XI shall have no effect on and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

Unless otherwise specifically provided herein or in a prior order of the Bankruptcy Court, the Bankruptcy Court shall have exclusive jurisdiction to hear and determine disputes concerning Claims against or Interests in the Debtors that arose prior to the Effective Date.

## ARTICLE XII.

## MISCELLANEOUS PROVISIONS

### A.    Immediate Binding Effect

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtors, the Wind-Down Debtor, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, exculpations, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims against and Interests in the Debtors shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or Interest has voted on the Plan.

### B.    Additional Documents

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors, the Wind-Down Debtor, and all Holders of Claims and Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### C. Payment of Statutory Fees

All fees and applicable interest payable pursuant to section 1930 of the Judicial Code and 31 U.S.C. § 3717, as applicable, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the Debtors or the Wind-Down Debtor (or the Distribution Agent on behalf of the Wind-Down Debtor) for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or a Final Decree is issued, whichever occurs first.

### D. Dissolution of Statutory Committees

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases; *provided*, however, that such committees will remain in existence for the limited purposes of (a) pursuing, supporting, or otherwise participating in, any outstanding appeals in the Chapter 11 Cases; and (b) filing, objecting, or otherwise participating in, any final fee applications of Professionals.

### E. Reservation of Rights

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests, unless and until the Effective Date has occurred.

### F. Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiary, or guardian, if any, of each such Entity.

### G. Service of Documents

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors or the Wind-Down Debtor shall be served on:

| | |
|---|---|
| Debtors | **Voyager Digital Holdings, Inc.**<br>33 Irving Place<br>New York, New York 10003<br>Attention: David Brosgol<br>General Counsel,<br>E-mail address: dbrosgol@investvoyager.com<br><br>with copies for information only (which shall not constitute notice) to: |
| Counsel to the Debtors | **Kirkland & Ellis LLP**<br>**Kirkland & Ellis International LLP** |

601 Lexington Avenue
New York, New York 10022
Attention: Joshua A. Sussberg, P.C., Christopher Marcus,
P.C., Christine A. Okike, P.C., and Allyson B. Smith

Counsel to the Committee  **McDermott Will & Emery LLP**
One Vanderbilt Avenue
New York, New York 10017
Attention: Darren Azman

## H.     Entire Agreement; Controlling Document

Except as otherwise indicated, on the Effective Date, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations with respect to the subject matter of the Plan, all of which will have become merged and integrated into the Plan; *provided, however*, that notwithstanding the foregoing or anything to the contrary herein, to the extent there is any conflict between the Plan and the Confirmation Order, on the one hand, and the Asset Purchase Agreement, on the other hand, the Asset Purchase Agreement shall govern solely in the event the Sale Transaction is consummated.  Except as set forth in the Plan, in the event that any provision of the Disclosure Statement, the Plan Supplement, or any order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control.  In the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall control.

## I.      Plan Supplement

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the website of the Claims, Noticing, and Solicitation Agent at https://cases.stretto.com/Voyager or the Bankruptcy Court's website at http://www.nysb.uscourts.gov.  Unless otherwise ordered by the Bankruptcy Court, to the extent any exhibit or document in the Plan Supplement is inconsistent with the terms of any part of the Plan that does not constitute the Plan Supplement, such part of the Plan that does not constitute the Plan Supplement shall control.

## J.      Non-Severability

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, subject to the Purchaser's consent rights under the Asset Purchase Agreement prior to the Outside Date, shall have the power to alter and interpret such term or provision to make it valid or enforceable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is:  (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified

without the Debtors' consent, consistent with the terms set forth herein; and (3) non-severable and mutually dependent.

## K.      Votes Solicited in Good Faith

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and solely to the extent permitted by section 1125(e) of the Bankruptcy Code, the Debtors, and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties nor individuals or the Debtors or the Wind-Down Debtor will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan or any previous plan.

## L.      Waiver or Estoppel

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed prior to the Confirmation Date.

Dated: March ~~1~~5, 2023

VOYAGER DIGITAL HOLDINGS, INC.
on behalf of itself and all other Debtors


*/s/ Stephen Ehrlich*

Stephen Ehrlich
Co-Founder and Chief Executive Officer
Voyager Digital Holdings, Inc.

```
                                                        Page 1

 1   UNITED STATES BANKRUPTCY COURT

 2   SOUTHERN DISTRICT OF NEW YORK

 3   Case No. 22-10943-mew

 4   Adv. Case No. 22-01133-mew

 5   - - - - - - - - - - - - - - - - - - - - - - - - - - x

 6   In the Matter of:

 7   VOYAGER DIGITAL HOLDINGS,

 8            Debtor.

 9   - - - - - - - - - - - - - - - - - - - - - - - - - - x

10   VOYAGER DIGITAL HOLDINGS, INC.,

11                  Plaintiff,

12            v.

13   DESOUSA,

14                  Defendant.

15   - - - - - - - - - - - - - - - - - - - - - - - - - - x

16   Adv. Case No. 22-01170-mew

17   - - - - - - - - - - - - - - - - - - - - - - - - - - x

18   THE AD HOC GROUP OF EQUITY INTEREST HOLDERS OF VOYAGER OF

19   VOYAGER DIGITAL LTD.,

20                  Plaintiff,

21            v.

22   VOYAGER DIGITAL HOLDINGS, INC., et al.,

23                  Defendants.

24   - - - - - - - - - - - - - - - - - - - - - - - - - - x

25
```

Page 2

1    United States Bankruptcy Court
2    One Bowling Green
3    New York, NY  10004
4
5    March 2, 2023
6    9:58 AM
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21   B E F O R E :
22   HON MICHAEL E. WILES
23   U.S. BANKRUPTCY JUDGE
24
25   ECRO:  JONATHAN

---

Page 3

1    HEARING re Adversary proceeding: 22-01133-mew Voyager
2    Digital Holdings, Inc. v. De Sousa Motion to extend
3    automatic stay or, in the alternative, for injunctive relief
4    enjoining prosecution of certain pending litigation against
5    the debtors, directors and officers
6
7    HEARING re Adversary proceeding: 22-01170-mew The Ad Hoc
8    Group of Equity Interest Holders
9    of Voy v. Voyager Digital Holdings, Inc. et al
10
11   HEARING re Pre-trial Conference
12
13   HEARING re Motion to hold the directors personally liable
14
15   HEARING re Joinder to motion by David Stephenson
16
17   HEARING re Objection of the Official Committee of Unsecured
18   Creditors to proofs of claim nos. 11206, 11209 and 11213
19
20   HEARING re Motion for an equity committee
21
22   HEARING re Joinder to motion by David Stephenson
23
24   HEARING re Motions by Alah Shehadeh
25   Transcribed by:  Sonya Ledanski Hyde

---

Page 4

1    A P P E A R A N C E S :
2
3    KIRKLAND & ELLIS LLP
4        Attorneys for the Debtors
5        601 Lexington Avenue
6        New York, NY 10022
7
8    BY:  CHRISTINE OKIKE
9         MIKE SLADE
10
11   SECURITIES AND EXCHANGE COMMISSION
12       Attorneys for the Securities and Exchange Commission
13       950 East Paces Ferry Road, N.E., Suite 900
14       Atlanta, GA 30326
15
16   BY:  WILLIAM MATTHEW UPTEGROVE
17
18   SECURITIES AND EXCHANGE COMMISSION
19       Attorneys for the Securities and Exchange Commission
20       100 F Street, NE
21       Washington, DC 20549
22
23   BY:  THERESE SCHEUER
24
25

---

Page 5

1    UNITED STATES DEPARTMENT OF JUSTICE
2        Attorneys for the U.S. Trustee
3        One Bowling Greet, Room 534
4        New York, NY 10004
5
6    BY:  RICHARD C. MORRISSEY
7
8    TEXAS OFFICE OF ATTORNEY GENERAL
9        Attorneys for TX State Securities
10       Board TX Dept. of Banking
11       300 W. 15th Street
12       Austin, TX 78701
13
14   BY:  ABIGAIL RYAN
15
16   NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES
17       Attorneys for the New York State Department
18       One State Street, 20th Floor
19       New York, NY 10004
20
21   BY:  JASON DAVID ST. JOHN
22
23
24
25

## Page 6

```
 1  UNITED STATES DEPARTMENT OF JUSTICE
 2       Attorneys for the U.S. Trustee
 3       Alexander Hamilton Custom House
 4       New York, NY 10004
 5
 6  BY:  MARK BRUH
 7
 8  QUINN EMANUEL URQUHART SULLIVAN HEARING OFFICER PARIS
 9       Attorneys for Special Committee
10       51 Madison Avenue
11       New York, NY 10010
12
13  BY:  SUSHEEL KIRPALANI
14
15  MCDERMOTT, WILL & EMERY
16       Attorneys for Special Committee
17       One Vanderbilt Avenue
18       New York, NY 10017
19
20  BY:  JOHN CALANDRA
21
22  TRACY HENDERSHOTT
23       Pro Se Creditor
24
25
```

## Page 8

```
 1              I N D E X
 2
 3  WITNESSES:       DIRECT:  CROSS:   REDIRECT: RECROSS:
 4
 5  MARK RENZI     53
 6                          70, 88
 7                          90, 101
 8                          112, 129
 9                          141, 154
10                          159, 189
11                          204, 212
12
13  TIM POHL       221
14                          238, 246
15                          248, 254
16                          279, 280
17                          297, 311
18                          312, 313
19
20  EXHIBITS:                              PAGE:
21  12  Order Scheduling Hearing with Disclosure
22      Statement, Docket 861                78
23  13  Disclosure Statement, Docket 863     78
24
25
```

WITNESSES: MARK RENZI 53, 70, 88, 90, 101, 112, 129, 141, 154, 159, 189, 204, 212; TIM POHL 221, 238, 246, 248, 254, 279, 280, 297, 311, 312, 313
EXHIBITS: 12 Order Scheduling Hearing with Disclosure Statement, Docket 861 — 78; 13 Disclosure Statement, Docket 863 — 78

## Page 7

```
 1  MICHELLE DIVITA
 2       Pro Se Creditor
 3
 4  GINA DIRESTA
 5       Pro Se Creditor
 6
 7  JON WARREN
 8       Pro Se Creditor
 9
10  DANIEL NEWSOM
11       Pro Se Creditor
12
13  ALAH SHEHADEH
14       Pro Se Creditor
15
16  SETH JONES
17       Pro Se Creditor
18
19  STACEY COWEN
20       Pro Se Creditor
21
22
23
24
25
```

A-1065

## Page 9

```
 1            P R O C E E D I N G S
 2       THE COURT:  Sorry for the delay.
 3       MS. OKIKE:  Good morning, Your Honor.  Christine
 4  Okike of Kirkland & Ellis on behalf of the Debtors.
 5       THE COURT:  Good morning.
 6       MS. OKIKE:  Your Honor, I'm pleased to be before
 7  you on behalf of Voyager seeking confirmation of its Chapter
 8  11 plan.  Just as a matter of process, Your Honor, with the
 9  Court's permission, I'd like to lay out how we'd like to
10  proceed today.
11       We propose starting with plan confirmation,
12  followed by the various motions filed by pro se creditors,
13  and Your Honor, in terms of the combined hearing I'd like to
14  make a few opening remarks if you permit me and will save
15  time for both the legal argument after presenting evidence.
16       THE COURT:  Okay.
17       MS. OKIKE:  After opening remarks, I propose then
18  to move to the evidence.  We would seek to admit the four
19  declarations we filed in support of confirmation of the plan
20  and will offer up the witnesses for cross and then we would
21  move into argument if that's okay with Your Honor.
22       THE COURT:  Okay.  I have a number of questions
23  for the parties and the objectors before we have evidence,
24  just to clarify what it is we are going to need evidence on
25  so that we're -- make sure that to the extent we need
```

1   evidence, we get it.  I also think before we do anything

2   else, I do have a pending motion for me to recuse myself.  I

3   ought to deal with that first, I think.

4         MS. OKIKE:  Understood, Your Honor.

5         THE COURT:  Is Mr. Shehadeh on the phone?

6         All right.  He doesn't appear to be on the phone.

7   I've reviewed the motion which essentially says somewhat

8   correctly as a legal matter that if I have some reason that

9   gives rise to bias or lack of impartiality on my part that I

10  should recuse myself.  I don't disagree with that legal

11  principle, but I don't believe that I have anything that

12  amounts to bias or a lack of impartiality in dealing with

13  this matter.

14        I understand Mr. Shehadeh is unhappy with one or

15  maybe more of my prior rulings in the case, but that's not

16  an indication of bias or lack of impartiality.  So I'll deny

17  the motion to recuse myself and we can proceed with the rest

18  of the hearing.

19        MS. OKIKE:  Thank you, Your Honor.  Your Honor,

20  I'd just like to highlight a few points at the outset.  Your

21  Honor, the plan has garnered overwhelming support from all

22  of the voting classes.  Customers voted to approve the plan

23  with 97 percent in number or 59,183 customers out of 61,300

24  customers voting and 98 percent in amount representing

25  approximately 541 million out of 552 million of those

1   actually voting.

2        And the plan has the support of the Committee of

3   Unsecured Creditors.  General Unsecured Creditors also voted

4   overwhelmingly to accept the plan with approximately 75

5   percent in number and 100 percent in amount of OpCo general

6   unsecured claims, approximately 80 percent in number and 100

7   percent in amount of HoldCo general unsecured claims and

8   approximately 90 percent in number and 100 percent in amount

9   of TopCo general unsecured claims actually voting, voting in

10  favor.

11        Your Honor, the estimated recoveries are detailed

12  in the disclosure statement which was based off of crypto

13  prices as of December 19th, 2022, and the value of the

14  Debtors' crypto portfolio has increased significantly since

15  that time.  As of February 27th, we anticipate that

16  customers will receive an estimated 73 percent recovery

17  under the sale transaction before accounting for any

18  recoveries on account of valuable claims that will remain

19  with the estate including claims against 3AC, Alameda, and

20  FTX.

21        THE COURT:  And if Alameda and FTX were to succeed

22  on their preference, what would the recovery be?

23        MS. OKIKE:  Your Honor, if Alameda, FTX were to

24  succeed on their preference, the recovery would be reduced,

25  I believe to 48 percent under the sale transaction.

A-1066

1        THE COURT:  Am I remembering right that that's --

2        MS. OKIKE:  And Your Honor, that --

3        THE COURT:  That's higher than what you projected

4   as the recovery originally --

5        MS. OKIKE:  We projected 51 percent under the

6   disclosure statement.

7        THE COURT:  Okay.

8        MS. OKIKE:  We also obviously have cross claims

9   against Alameda and release --

10        THE COURT:  Right.

11        MS. OKIKE:  -- substantial amount of collateral in

12  connection with the repayment of those loans, and so we

13  don't believe the full amount, even if they were successful,

14  would be an administrative claim.

15        THE COURT:  I understand.  Okay, sorry, I

16  interrupted you.

17        MS. OKIKE:  No.  So Your Honor, there's almost

18  $1.4 billion of value that is proposed to be distributed

19  under the Debtors' plan and there is much at stake for the

20  company and their customers today.  Your Honor, our

21  understanding for Binance.US is that over 167,000 customers

22  which represent approximately 75 percent of the value on the

23  Debtors' platform have already signed up for the Binance.US

24  platform, representing approximately 1.2 billion in customer

25  claims.

1        Your Honor, we understand there has been a lot of

2   frustration expressed by a handful of customers, but having

3   lived with the company through this process, I can tell you

4   that the management team and employees have steadfastly

5   sought to do right by customers throughout these cases.

6   Your Honor, I won't recite the past but suffice it to say

7   that the Debtors were poised to exit Chapter 11 and

8   distribute value to stakeholders in early December, just

9   five months after commencing these cases, before FTX's

10  catastrophic collapse.

11        While we were shocked to witness FTX's collapse

12  and to subsequently learn that FTX appears to have been a

13  massive fraud, the Debtors and their advisors quickly

14  pivoted to evaluate alternative third-party transactions as

15  well as the liquidation transaction whereby the Debtors

16  would distribute crypto and cash to creditors on their own.

17        We spent about a month negotiating with parties

18  who expressed interest in the Debtors' assets and ultimately

19  determined that the bid put forth by BAM Trading Services

20  Inc. or Biance.US represented the best path forward to

21  maximize value.  Your Honor, the Debtors' value the sale

22  transaction as of February 27th at approximately $1.363

23  billion, which is comprised of $1.34 billion of

24  cryptocurrency on the Debtors' platform plus an additional

25  $20 million of up-front consideration paid by Binance.US.

1    Your Honor, the Debtors believe that the sale
2  transaction provides the most value currently available to
3  the Debtors' assets and ultimately their stakeholders and
4  the fastest route to distributing such value to customers.
5  The sale transaction also provides the most tax efficient
6  path forward as Binance.US will enable users to access 100
7  percent of cryptocurrency coins on the Debtors' platform.
8    It includes the reimbursement by Binance.US of up
9  to 15 million of the Debtors' expenses in certain
10  circumstances and provides a 10 million reverse termination
11  fee payable to the Debtors by Binance.US to compensate the
12  Debtors' estates in the event they cannot consummate the
13  transaction.  The sale transaction also provides for certain
14  other protections which are designed to minimize risk and to
15  protect customer distributions.
16    Your Honor, the sale transaction will effectuate
17  the expeditious sale of the Debtors' customer accounts to
18  Binance.US, provide a meaningful in-kind recovery to
19  creditors on the shortest timeline practical, and allow for
20  an efficient resolution to these Chapter 11 cases.
21  Following consummations of the sale transaction, the plan
22  provides for the orderly winddown of the debtor's estates.
23  Importantly, Your Honor, the plan allows the Debtors to
24  toggle to the liquidation transaction if the Debtors
25  determine in their business judgment that the sale

1  transaction no longer is the best option.
2    Your Honor, the plan is a significant achievement.
3  It consensually resolves a number of highly complex issues
4  in a manner that is overwhelmingly supported by the voting
5  classes.  The plan is in the best interests of the Debtors'
6  estates, is the best alternative for stakeholders, and
7  should be confirmed.
8    Your Honor, we believe we have resolved the
9  objections of the FTC, the Ad Hoc Group of Equity Holders,
10  and the Bank of New York Mellon.  Only eight customers out
11  of more than one million and whose claims in aggregate total
12  approximately 500,000, objected to the plan and we will
13  address those objections in turn, but our view is that they
14  do not present obstacles to confirmation.
15    The remaining objections, Your Honor, are the SEC,
16  New York, Texas, New Jersey, and the U.S. Trustee.  Your
17  Honor, it's pretty unusual in my experience to have
18  objectors that are not going to put forth any evidence.  We
19  have a number of governmental entities -- the SEC, New York,
20  Texas, and New Jersey -- that have been complaining about
21  Binance.US and the sale transaction since the conditional
22  disclosure statement hearing back in January, but they have
23  taken no discovery and put forth no evidence in support of
24  their statements.
25    Uncontroverted evidence will be submitted today

1  that the sale transaction or liquidation transaction if
2  applicable is in the best interests of the estate; that
3  creditors will receive more under the plan in either the
4  sale transaction or the liquidation transaction than in a
5  Chapter 7 liquidation; that customers in supported
6  jurisdictions and unsupported jurisdictions are receiving
7  equal treatment; and that the Debtors' releases are a sound
8  exercise of their business judgment; and importantly, Your
9  Honor, that the plan is feasible.
10    You'll have the testimony of Mr. Mark Renzi, a
11  managing director of Berkeley Research Group and financial
12  advisor to the Debtors regarding the primary confirmation
13  requirements for the plan, the Debtors' liquidation
14  analysis, the plan's feasibility, and the limitations,
15  risks, and costs with endeavoring to make in-kind
16  distributions to customers in unsupported jurisdictions.
17    The Debtors will put forth the testimony of Mr.
18  Brian Tichenor, a managing director of Moelis and Company
19  who will speak to the Debtors' sale process, the sale
20  transaction and liquidation transaction, and that the plan
21  was proposed in good faith.
22    The Debtors will offer in evidence the testimony
23  of Mr. Timothy Pohl, independent director and member of the
24  special committee of the board of Voyager Digital LLC,
25  regarding the special committee investigation, the special

1  committee's conclusions, and the D&O settlement and in
2  support of the Debtor releases.  And the Debtors will also
3  offer into testimony, the testimony of Mr. -- sorry -- Ms.
4  Leticia Sanchez, a director at Stretto, who will speak to
5  the voting report.
6    Your Honor, while we expect some of the objectors
7  to cross the witnesses, there's absolutely no evidence in
8  support of their objections.  So what are they asking the
9  Court to do?  They're asking you to pick apart the plan
10  including the sale transaction to say let's just modify some
11  parts they don't like and we'll go with the rest of them.
12  But that's not the plan the Debtors are prosecuting.  The
13  Debtors have exclusivity.
14    We've proposed this plan in good faith and it has
15  been resoundingly accepted by creditors and the objectors
16  can't pull out specific parts they don't like, especially in
17  this case where we have a highly complex transaction that
18  will need to be executed in either the sale transaction or
19  the liquidation transaction scenarios.
20    Your Honor, we'll have much more legal arguments
21  at the back at the end of the hearing, but wanted to just
22  provide these preliminary comments.
23    THE COURT:  Okay.  Can I just ask for some
24  clarifications of some things before I ask some other
25  questions?  I see that you filed stipulations with FTX and

Page 18

1  Alameda and also last night, a stipulation with various
2  governmental entities.  Are approvals of those contemplated
3  today or at a different time and are they conditions to
4  confirmation or not?
5      MS. OKIKE:  Your Honor, they -- we are not seeking
6  approval of either of those today.  The stipulation with the
7  governmental entities is purely consensual.  They are
8  agreeing to two things.  They're agreeing, one, at the --
9  their claims that they had to the extent that they are
10 allowed at the OpCo entity, will be subordinated to those
11 general unsecured creditors at that entity and also account
12 holders.  And they're also agreeing that the claims that
13 they filed at the Top entity and the HoldCo entity, to the
14 extent that they are allowed and they receive a recovery on
15 account of those claims, will be contributed to the benefit
16 customers.
17     THE COURT:  Isn't that gifting or a Jevic issue to
18 contribute them only to that particular class, resulting in
19 different recoveries for that class and the general
20 unsecureds?
21     MS. OKIKE:  Your Honor, they're entitled to those
22 recoveries and I think they're entitled post effective date
23 to give the recoveries to whoever they would like to.
24     THE COURT:  Second Circuit says no.  It says no
25 gifting, doesn't it?  Says if it's given up for the benefit

Page 19

1  of the estate, it's got to be distributed in accordance with
2  the bankruptcy priorities.  If you think otherwise, just
3  alerting you to --  I'm not going to rule on it today, but
4  you need to address that as an issue for me.
5      MS. OKIKE:  Understood, Your Honor.
6      THE COURT:  Okay.  So the -- I saw that there's an
7  amendment to the asset purchase agreement to preserve more
8  preference claims and also as I understand it to make clear
9  that Vermont is not going to be treated as an unsupported
10 jurisdiction; is that correct?
11     MS. OKIKE:  That's correct, Your Honor.  We have
12 reached an agreement with Vermont and we are hopeful that
13 there may be other states as well of the remaining
14 unsupported states who sign on to that, but Vermont will not
15 be considered an unsupported jurisdiction.
16     THE COURT:  You continue to treat Texas as having
17 objected, but I thought from reading the Texas submission
18 that they thought that you didn't need any more regulatory
19 approval to do the -- at least the additional distributions
20 that you contemplate.
21     MS. OKIKE:  Your Honor, that's not exactly true.
22 In Texas, they believe that stable coins are securities and
23 so they would, I believe to the extent that stable coins
24 were traded, which would potentially happen to the extent
25 that people receive distributions, they consider that to be

Page 20

1  a violation.  And so, although they have said you can make
2  the distributions, there's not the ability, my understanding
3  is on the Binance.US platform, to restrict trading to
4  specific types of cryptocurrency and so there is not the
5  ability to effectuate what Texas was requesting.
6      Although we're still in discussions with them and
7  hopefully to get to a conceptual resolution similar to
8  Vermont, it's going to require a more creative solution than
9  what they had proposed.
10     THE COURT:  And where does Hawaii stand in all of
11 this?  They were unsupported jurisdiction.  I haven't heard
12 anything from them.
13     MS. OKIKE:  Your Honor, our understanding is that
14 Hawaii, there have been productive discussions with Hawaii
15 and they are likely to follow Vermont.  They were waiting to
16 kind of, my understanding, is to see the resolution with
17 Vermont, but we anticipate and I know Binance can speak to
18 this a little bit better.  We anticipate that they will sign
19 on to that same structure.
20     THE COURT:  Okay.  And where do things stand as to
21 how the VGX token will be treated?
22     MS. OKIKE:  So Your Honor, the VGX token will be
23 treated like all of our coins on the Debtors' platform.
24 Those holders will be entitled to their pro rata
25 distribution of VGX which they will be able to, you know,

Page 21

1  withdraw from the Binance platform.  Binance.US has agreed
2  to submit the VGX token through it's, you know, internal
3  processes to see if it's approved to be listed on the
4  exchange.  We obviously don't know what the outcome of that
5  will be, but just like any other customer, VGX holders will
6  receive their pro rate distribution, will be able to remove
7  that distribution from the platform.
8      THE COURT:  So if I -- and I always want to double
9  check my understanding of how this works.  Customers' claims
10 are based on values of tokens as of the filing date.
11     MS. OKIKE:  Correct.
12     THE COURT:  Customers' distributions will be in
13 kind, but based on current dollar values of the various
14 coins.
15     MS. OKIKE:  Correct.
16     THE COURT:  And so that everybody -- what
17 everybody receives may be in different form, will be
18 calculated as being the same proportion of their prepetition
19 claim.  So how will VGX be valued for purposes of
20 distribution?
21     MS. OKIKE:  It will be valued the same as all
22 other coins.  So it has a price.  It's traded.
23     THE COURT:  What is the current VGX price?
24     MS. OKIKE:  Thirty-three cents, Your Honor.
25     THE COURT:  And if Binance does not -- what's

A-1068

1  that?

2      MS. OKIKE:  Thirty-nine cents, Your Honor.

3  Apologies.

4      THE COURT:  It's all right.  If Binance does not

5  do what you hope it does to allow for the trading of VGX on

6  its platform, what happens to VGX?

7      MS. OKIKE:  Yes.  So there are smart contracts,

8  Your Honor, which underline the token and is really what

9  provides utility to the token.  Those are not being sold to

10 Binance.US in the transaction.  We are actively speaking

11 with third parties who are interested in purchasing the

12 smart contracts and I anticipate we likely will have a

13 transaction at some point for somebody who intends to

14 provide utility to the token going forward.

15      And so the value of the VGX token post-closing

16 will really be, you know, determined by the utility of the

17 token.  I will say, you know, some of this stuff isn't

18 intuitive.  I mean, we've seen huge rises in the price of

19 VGX over the past month or so, so you know, utility or no,

20 we don't really know what the price will be going forward.

21      THE COURT:  Okay.  I see there are changes that

22 have been made over the last week or so.  Winddown entity

23 has been changed to the winddown Debtor.  You'll have a plan

24 administrator now, and I see the winddown Debtor is actually

25 going to be HoldCo, not OpCo?

1      MS. OKIKE:  That's correct, Your Honor.  I mean,

2  these are changes that are really designed to preserve tax

3  attributes and make sure that the structure is as tax

4  efficient as possible.  It's not designed to kind of change

5  the rights of any creditors with respect to distributions or

6  with respect to the intercompany claims disputes that are

7  unresolved.

8      THE COURT:  Okay.

9      MS. OKIKE:  And Your Honor, I didn't answer your

10 question with respect to FTX Alameda.  We're not going

11 forward with that today.  We filed that motion, I believe

12 it's -- don't know the date it's set for hearing, but in

13 accordance with the rules, we provided the appropriate

14 notice.  We don't believe that's a bar to confirmation.  It

15 really just deals with the value of distributions under the

16 plan.

17      THE COURT:  Okay.  All right.  Thank you very much

18 for those clarifications.  Before we actually get to

19 evidence, I just have some questions for some of the

20 objectors, okay?

21      MS. OKIKE:  Yes, Your Honor.

22      THE COURT:  I want to start with the SEC.  Are

23 they here?

24      MR. WARREN:  Your Honor, this is Jon Warren, pro

25 se creditor.  Had a quick question for you.

1      THE COURT:  Go ahead.  What is your question?  I'm

2  sorry, whoever just said they wanted to ask a question, what

3  is your question?

4      Okay.  We'll go back to my questions for the SEC.

5  You are?

6      MR. UPTEGROVE:  Good morning, Your Honor.  William

7  Uptegrove on behalf of the United States Securities and

8  Exchange Commission and with me is my colleague Therese

9  Scheuer.

10      THE COURT:  Good morning.  You've submitted an

11 objection that has a couple of parts and one part is that

12 you think that the contemplated transfers of

13 cryptocurrencies by Voyager may be illegal.  I'm sort of

14 unaccustomed to getting objections that something may be

15 wrong as opposed to either is or isn't.  So what exactly is

16 your position here?  Are you saying that it is wrong or that

17 you don't know?

18      MR. UPTEGROVE:  We're saying, Your Honor, that

19 there are risks inherent in transactions in any crypto asset

20 transactions.  There are fact specific issues that go into

21 that.  They're highly complex.  And those risks are always

22 going to be apparent.  On the issue of the securities laws,

23 the SEC is not taking a position on whether any of the

24 transactions in the plan are violative of the federal

25 security laws.  We can't take a position at this point.

1      The SEC is a deliberative body, Your Honor and its

2  processes a nonpublic one by federal law.  And that process

3  is protected by a number of statutes.  Just because private

4  litigation --

5      THE COURT:  Deliberative is one thing.  Absent is

6  another.  I mean, how long has Voyager been around?  How

7  long has it been selling the tokens that it's been selling?

8  How long has Binance been around?  Come here and tell me

9  that you don't have any idea, but that I should stop

10 everybody in their tracks because you might have an issue

11 that you haven't gotten around to looking at; it's kind of a

12 weird objection, isn't it?

13      MR. UPTEGROVE:  I don't think so, Your Honor.  I

14 think that this happens.  There's also the CFIUS review,

15 which is something similar, Your Honor.  Do all regulatory

16 bodies have to stop everything they're doing when a private

17 party enters into a lawsuit or files a bankruptcy plan and

18 have to come to Court --

19      THE COURT:  Well, it's hardly the bankruptcy

20 that's triggered your potential review of this, isn't it?

21 You're claiming that there might be things going on here for

22 years that may be in violation of the securities laws.

23 Deliberative is one thing.  What have you done?  Have you

24 looked at any of this?  You're not willing to take a

25 position on any of it?

1    MR. UPTEGROVE:  No, Your Honor, we're not taking
2  any position on whether or not any transaction -- there are
3  lots of transactions.  There's the rebalancing transactions
4  and there's the sale transactions and then there's going to
5  be transactions after that.  They all have, I think -- I
6  don't recall the exact number, but there's something like
7  over 100 cryptocurrencies or crypto assets, I believe on the
8  -- were on the Voyager exchange.
9        All of those have different attributes, they all
10  have to be viewed independently.  And so whether something
11  is a security or not is a complex issue.  There's no facts
12  before the Court today about any of those issues, nor does
13  there need to be because it's not, you know, whether or
14  something is a compliant, whether the plan or transactions
15  contemplated in the plan are compliant with non-bankruptcy
16  law is not the issue that needs to be decided today.  At
17  least the SEC doesn't need to provide a position.  It's the
18  -- and disclose its deliberative process in an open Court.
19        The issue today is whether or not the plan is
20  confirmable.  That's a burden that the Debtor has and we at
21  the very least seek full disclosure about possible risks
22  attendant to the transactions contemplated under the plan.
23        THE COURT:  But you've also argued that the Debtor
24  has to somehow prove a negative here, has to prove that
25  every one of the transactions, every one of the

1  cryptocurrencies that it might be selling do not involve
2  transactions in securities with no guidance from you at all
3  as to what might constitute a security, which coins they
4  have to do that proof on, why you think any of them are
5  securities, and no indication at all of what legal or
6  factual issues the testimony and argument today ought to
7  address.  How is that a proper objection?
8        MR. UPTEGROVE:  Again, Your Honor, we are raising
9  the issues.  There are risks attendant to the transactions
10  in the plan.  We are in no position to be able to provide
11  the facts you just talked about or issue an advisory opinion
12  on whether or not any particular transaction complies with
13  the security laws.
14        THE COURT:  I'm not asking for your -- an advisory
15  opinion.  I'm asking you to either object or not object.
16  What you've said is not really an objection.  It's sort of
17  like, hey, Judge, we don't know, so you shouldn't do
18  anything.  That's essentially what you've said.
19        MR. UPTEGROVE:  And it's incumbent upon the
20  Debtors to explain and disclose the potential risks of what
21  would happen.
22        THE COURT:  You know, when I have a regulator
23  who's charged with protecting investors, they either think
24  there's an issue or there's not.  I expect them to come in
25  and tell me there is or there isn't.  I don't expect them to

1  come in here and say the Debtor should prove the impossible.
2        The Debtor should somehow, without any guidance
3  from you as to what issues you think the Debtor needs to
4  prove, the Debtor should somehow prove that nothing that's
5  going on here raises an issue under the securities laws
6  without even a contention by anybody in the room, or at
7  least not from you, that what the Debtor is doing does
8  violate the securities laws.  I just don't get how that's
9  proper or how you would expect anybody to be able to comply
10  with what you're asking.
11        What is it you -- how is the Debtor supposed to do
12  what you're asking them to do?  Are they supposed to give me
13  a tutorial on all aspects of every coin that -- in which the
14  Debtors -- that the Debtors might be selling here and try to
15  think about every single possible argument you might make as
16  to each individual coin, even though you don't have
17  arguments about those coins?  Is that what you're asking us
18  to do today?
19        MR. UPTEGROVE:  No, Your Honor, but we do believe
20  there should be more disclosure than there is in the current
21  disclosure statement and plan.
22        THE COURT:  There is disclosure about regulatory
23  risks, you know, and so, I don't know, you haven't been
24  specific.  All you've said vaguely is that there might be an
25  issue.  Well, that's pretty much what the Debtor said.  I

1  don't know how they can be any more specific when you're
2  standing here and you're not willing to be any more
3  specific.
4        MR. UPTEGROVE:  Your Honor, again, we can't take a
5  position on whether or not a specific transaction is
6  violative of the security laws.  As we said, there may be
7  risks.  There are risks for sure and there may be violations
8  of the securities laws.  It's just not something that we
9  believe is, you know, we need to opine on here.
10        THE COURT:  But you've --
11        MR. UPTEGROVE:  The burden is not on us.
12        THE COURT:  But you have not just raised this as a
13  disclosure issue.  You have said that this somehow affects
14  the feasibility of the plan and that I should deny
15  confirmation.  I should deny confirmation essentially
16  because you might have some unspecified issue about which
17  you cannot take any position today.  That's essentially what
18  you've asked me to do.  How does that make sense?
19        MR. UPTEGROVE:  We've also said the same thing
20  about the CFIUS review is that's another thing that's out
21  there that is very much like the potential violation of the
22  securities laws that could impact the plan, the consummation
23  of the plan.  There's no disclosure about what will happen
24  if there's a negative -- I have not seen disclosure, what
25  would happen if the plan closed or the -- excuse me, the

Page 30

1  deal closed and there was a subsequent negative finding by
2  CFIUS. I think it's a similar thing.
3          THE COURT:  I don't think it's similar at all.
4  CFIUS review is triggered by this specific transaction.
5  Your objection is based on stuff Voyager has been doing for
6  years and stuff that Binance has been doing for years.  I
7  mean, are you standing here telling me that the SEC is going
8  to challenge whether the Debtor is selling securities?
9          MR. UPTEGROVE:  Not today, Your Honor, but there's
10 --
11         THE COURT:  Are you telling me that you're going
12 to challenge whether Binance is acting as a securities
13 broker?
14         MR. UPTEGROVE:  Your Honor, with respect to
15 Voyager, the Voyager entities, we've disclosed that there is
16 an ongoing investigation involving Voyager.  So that's an
17 issue that has yet to be determined.  Again, we're a
18 deliberative body.  There's no reason, no law that would
19 require us to -- in fact, there's laws to the contrary that
20 you know, that's a nonpublic process.
21         And as to other entities, you know, that's just
22 not before the Court.  That's not one of the issues that
23 needs to be, you know, that the government has the burden to
24 show.
25         THE COURT:  Well, but you've said in your papers,

Page 31

1  it's an issue that has to be proved.  And yet at the same
2  time, you want to just say the government takes no position.
3          MR. UPTEGROVE:  Your Honor, we're not in a
4  position to -- you said earlier that, you know, what could
5  the Debtor say.  They could say all types of things to prove
6  or to show that notwithstanding whether there is a violation
7  or there is not, that the plan is feasible.  You could put
8  on evidence about how you would exactly do it, what
9  witnesses and what those witnesses would say and what
10 exhibits.  I cannot tell you that's not the SEC's role.
11 That's the role of the Debtor to come in and say, Your
12 Honor, this is the test for feasibility.
13         On the one hand, if there's no action by the SEC
14 in the future, then there's no action by the SEC in the
15 future.  If there is one, that would be the possible
16 ramifications and notwithstanding that, the plan is
17 feasible.
18         THE COURT: The argument about whether transactions
19 in particular cryptocurrencies are transactions in
20 securities, are you making that argument only as to the
21 rebalancing trades or as to the distributions that the
22 Debtor would make under the plan?
23         MR. UPTEGROVE:  I think that that's to be
24 determined and any transaction in an asset that is a
25 security, you know, would fall under the ambit of the

Page 32

1  securities laws.
2          THE COURT:  Why wouldn't Section 1145 of the
3  Bankruptcy Code apply to the distributions contemplated
4  under the plan?
5          MR. UPTEGROVE:  I don't think that Debtor is
6  invoking 1145.  I don't think it would be -- they're not
7  issuances.  I don't believe 1145 applies, Your Honor.
8          THE COURT:  You don't think any of these are --
9  the Debtor would be the issuer of the security?
10         MR. UPTEGROVE:  I don't think they are.  No, Your
11 Honor.  I think these are --
12         THE COURT:  But in your footnote, that's exactly
13 what you suggested as to VGX.  My colleague, Therese Scheuer
14 may want to address that.
15         MS. SCHEUER:  Good morning, Your Honor.  For the
16 record, Therese Scheuer for the Securities and Exchange
17 Commission.  Your Honor, I don't believe the Debtors are
18 seeking 1145 treatment for any of the distributions for the
19 rebalancing.  It has not been cited in their papers and it
20 has not been briefed, to my knowledge.
21         THE COURT:  Well, do the Debtors have to invoke
22 it?  Doesn't it just automatically apply?
23         MS. SCHEUER:  There has to be showing it is a
24 limited exemption from registration and there are particular
25 requirements that must be met.

Page 33

1          THE COURT:  Well, that's exactly the argument you
2  made, that VGX was somehow an unregistered security of the
3  Debtors.  So why wouldn't 1145 apply to that?
4          MS. SCHEUER:  Your Honor, it hasn't been briefed
5  and I don't believe that ----
6          THE COURT:  What hasn't been briefed?
7          MS. SCHEUER:  The 1145 issue has not been briefed.
8  It's not -- I don't believe it's ripe for discussion today
9  and I don't believe the Debtors included in their papers.
10         THE COURT:  All right.  As to whether Binance is
11 operating as a securities broker, are you saying that in
12 performing the transactions contemplated by this plan,
13 Binance might be operating as a securities broker or are you
14 saying that it might be engaged in other activities that
15 make it a securities broker?
16         MR. UPTEGROVE:  Your Honor, other than what we
17 said in our papers, we're not in position to expound upon
18 what a particular entity, you know, may or may not have done
19 and what the consequences legally are regarding that
20 conduct.
21         THE COURT:  Even if Binance were engaged in some
22 other activity in some other context that arguably made it a
23 securities broker, why would that affect its ability to do
24 what we're contemplating here?
25         MR. UPTEGROVE:  You know, as a hypothetical, Your

A-1071

Page 34

1    Honor, if it were found to be a unregistered exchange, there
2    would be consequences to -- I'm not familiar with all the
3    consequences, but it would -- you know, potentially there's
4    registration.  I mean, there's -- and I don't know the
5    answer to that because I'm -- although I work for the SEC, I
6    am not an expert in that area.  I think that the Debtor has
7    hired legions of lawyers and they probably do have experts
8    in that area and they could address the issue as if, Binance
9    worst case scenario, Binance is found to be a unregistered
10   exchange, these would be the consequences and it wouldn't
11   have an impact on the plan.
12        THE COURT:  Those people would just be opining
13   about what you would likely do and what you would likely
14   insist on.  How can they know more than you do about that?
15        MR. UPTEGROVE:  I don't think it's a matter of
16   knowing, Your Honor.  It is facts and circumstances and I
17   mean, I would think, you would do the same thing -- and you
18   know, the tax realm is, you know, the Debtor makes
19   determinations about tax issues and then, you know, post
20   plan, the IRS or a Court may have different views than the
21   Debtor, but that doesn't preclude the Debtor to the extent
22   there is an issue that relates to the code or confirmation
23   of addressing potential tax issues.  We just addressed tax
24   issues --
25        MR. SHEHADEH:  Judge Wiles, I'm here to ask

Page 35

1    (indiscernible), Your Honor.
2        THE COURT:  Who was talking there?
3        MR. SHEHADEH:  I believe, Your Honor, you
4    addressed me at 10:01.  I was having technical issues.  Now
5    I'm able to speak.
6        THE COURT:  Okay, but just wait.  We're in the
7    middle of something else at the moment, okay?  All right,
8    we're talking to the attorney for the SEC.  So you couched
9    these objections in terms of feasibility.  Feasibility is
10   just a shorthand way of referring to the provisions of
11   Section 1129(a)(11) which requires a showing that the plan
12   is not likely to be followed by the liquidation or the need
13   for further financial reorganization of the Debtor unless
14   such liquidation or reorganization is proposed in the plan.
15        So in this case, there is a toggle feature in the
16   plan under which the Debtors will switch to another approach
17   if the Binance deal can't close within four months.  So even
18   if you're right about all your objections and you surprise
19   us all with regulatory actions that after confirming a deal,
20   we suddenly can't close by -- that wouldn't actually be a
21   feasibility issue, would it?  It would just mean the Debtor
22   would talk to the other plan.
23        MR. UPTEGROVE:  It may, Your Honor, but I think
24   there would still need to be at this juncture disclosure
25   about the inherent risks of the transaction.  And to the

Page 36

1    extend -- and these issues would not go away.  Obviously
2    that's the point I just made, but as to feasibility, you
3    know, except to the extent there were parts of the self-
4    degradation plan that were, you know, potentially violative
5    of the law and the --
6        THE COURT:  Well, on disclosure, I read -- reread
7    the disclosure statement and it does say that there are
8    risks that we don't know what's going to happen with
9    regulation, that there is increasing regulation that could
10   affect the ability to close the deal.  I don't see how I
11   could in hindsight, say that the Debtors would be to be more
12   specific about those risks given what you're telling me
13   today.
14        MR. UPTEGROVE:  It also may be the case, Your
15   Honor, that the plans confirm, you know, in a hypothetical
16   world, plan is confirmed, the deal closes, and then, you
17   know, again, we're not in a position to just to say this is
18   hypothetical, but there's some action by the SEC or
19   another regulator or government body that has some impact
20   that would -- so the toggles over feature is over.
21        They've toggled -- it toggles to the restructuring
22   plan and then some action happens that requires the, you
23   know, an additional reorganization and additional
24   liquidation because of the place the Debtor finds itself.
25   So the toggle, you know, I'm not saying that -- I think part

Page 37

1    of our point is, it's not as if this all goes away at
2    confirmation.  These are things that will continue and they
3    may continue after the toggle feature is no longer an
4    option.
5        THE COURT:  Well, if the toggle feature is no
6    longer an option, it would only mean that the Binance deal
7    had already closed.  So how does any of that affect the
8    feasibility of the plan if something were to come up at a
9    later stage?
10        MR. UPTEGROVE:  I think at the very least, it
11   would have ramifications for creditors.  And I think the
12   test is -- maybe I'm misremembering it -- but it's that,
13   that under 1129, that for feasibility that the restructuring
14   will not be followed by, you know a further need for
15   liquidation.  That could still happen after the closing.
16        THE COURT:  Of this Debtor?
17        MR. UPTEGROVE:  Potentially, if --
18        THE COURT:  This debtor will have already
19   liquidated.  Okay.  You also asked about whether the
20   disclosure statement has sufficient information about
21   Binance's controls, custody arrangements, and finances.  The
22   SEC, the U.S. Trustee, and New York all made similar
23   arguments in that regard.  And you argued that you think we
24   need to know if third parties have access to the keys, what
25   safeguards there are to stop assets from being transferred

1  off the Binance.US platform, and a declaration from Binance
2  about its internal controls.  Are the Debtors going to offer
3  evidence on any of these points today?  Yes?
4      MR. UPTEGROVE:  We intend to, Your Honor, yes.
5      THE COURT:  Do you have any evidence on these
6  points that you want -- or plan to offer today?
7      MR. SLADE:  No, Your Honor, but it's not our
8  burden.
9      THE COURT:  You know, maybe not, but it's a
10 disclosure issue and I'm absolutely shocked, I have to say,
11 that a regulator would come in and say, I'm charged with
12 regulatory authority over these things.  These are reasons
13 that I have concerns because they're within my regulatory
14 jurisdiction, but I've done nothing.  I have nothing to
15 offer to you except questions, and my excuse for that is
16 that it's somebody else's burden in the context of
17 confirmation.  That's incredible.  Absolutely incredible.
18     So I'll hear whatever evidence the Debtor has, but
19 you know, I get the feeling that this objection has been
20 made as a kind of cover yourself, so you can say later that
21 well see, we raised these issues, but you haven't really.
22 You've done nothing.  You know, I'm trying to do the right
23 thing here.  I would like to do the right thing.  I don't
24 want to subject customers to any risks.  They've already
25 been through a bankruptcy.  I don't want to put them through

1  any more issues.
2      But to stand here and tell me, Judge, you know,
3  I'm not going to tell you what we're going to do, but it's
4  your job and the Debtors' job to kind of guess and to make
5  predictions, and you know, you better be right about it;
6  that's really not helpful.
7      Okay.  All right.  So I'll hear whatever evidence
8  we have on that.  I have to say that the disclosure
9  objections on this point, I'll hear argument later, but they
10 don't really strike me as really disclosure issues.  They
11 strike me as substantive objections kind of masquerading as
12 disclosure issues.  They are more in the lines of not so
13 much that the Debtor knows something that the Debtor didn't
14 reveal as that well, the Debtor should be getting more
15 information from Binance and should be getting more control
16 information from Binance, and then should be disclosing it.
17     Well, that's really not so much an issue about the
18 disclosures the Debtors have made as a question of, should
19 the Debtors be doing more in the interests of customers
20 before we go forward with the transaction.  So I'll hear
21 what people have to say about it.  I'm concerned about these
22 points, too.  Anybody who's been following what's happening
23 in this industry, who sees what happened with FTX, who sees
24 the examiner's report about what was going on in Celsius,
25 you have to be worried.

1      Okay?  I understand the concerns, but at the same
2  time, I'm in a position where we don't usually assume that
3  buyers are bad actors.  We don't usually assume that people
4  are bad just because other people in an industry are bad.
5  So if there are reasons to be concerned here and worried, I
6  need to know specifics.  So kind of telling me, gosh,
7  there's lots of problems in this industry, so you better
8  figure it out, Judge, without offering any help, is really
9  disappointing.
10     Okay.  So as to the United States Trustee, I just
11 want to make -- thank you.  As to the United States Trustee,
12 you had an objection on disclosure about how the
13 cryptocurrencies will be held before they're distributed.
14 The Debtors, I thought we had resolved this when I -- at the
15 time we approved the asset purchase agreement and the
16 Debtors have made responses at Pages 78 through 79 with
17 their memorandum in support of confirmation.  Does that
18 answer your questions or do we need anything further on
19 that?
20     MR. MORRISSEY:  Your Honor, Richard Morrissey for
21 the U.S. Trustee, and before I begin, it's nice to see Your
22 Honor in person after three years.  The U.S. Trustee's
23 objection generally had to do with disclosure in the
24 disclosure statement itself so that the creditors could be
25 fully informed about what they were signing onto with the

1  Binance transaction.
2      One of those aspects as Your Honor mentioned had
3  to do with the protection of the cryptocurrency.  What the
4  disclosure statement said was essentially, it's protected.
5  They -- I believe there was a link to a website and the
6  creditors were invited to sort of look it up.  And the
7  Debtors did more than that.  They also did their due
8  diligence.  Mr. Tichenor's declaration filed the other day
9  went into the fact that they had done their due diligence
10 and I believe the Committee did due diligence as well.
11     But the information should have been, the U.S.
12 Trustee believes, should have been in the disclosure
13 statement itself so that they could evaluate it.  And we
14 have a contrast, Your Honor, between this and what Voyager
15 itself did in terms of describing the measures it took to
16 protect the cryptocurrency.
17     As Your Honor will recall undoubtedly I know
18 counsel for the Debtor will definitely recall, we had a long
19 cash management process.  A lot of time elapsed between the
20 time the motion was originally filed and the time we finally
21 got a final order on that, but the logjam was cleared by the
22 declaration submitted by Voyager describing exactly what it
23 was that the -- that Voyager was doing to protect the
24 cryptocurrency.
25     And then the Committee, for its part, filed a

Page 42

1  statement basically supporting what they did.  That stands
2  in marked contrast to what the disclosure statement did.  So
3  I don't know what's going to be put forth today, Your Honor,
4  on that and other disclosure issues but our argument was
5  simply that if the creditors were going to be fully informed
6  what it was that they were signing up for by voting in favor
7  of the plan, there should have been more disclosure right
8  there in the disclosure statement.
9          Your Honor, I know this is a little apart from the
10 question and I can bring this up later if you want, just to
11 add -- just a comment about the voting and the effect of
12 certain things on recovery.  If you'd like to hear it now,
13 it's about one or two sentences on each thing.
14         THE COURT:  About the voting?
15         MR. MORRISSEY:  Yes.  Your Honor, as Ms. Okike
16 said, the voting was 97 percent number, et cetera, voted yes
17 and that is true and that is also what is relevant in
18 determining whether there is sufficient voting in favor of a
19 plan for a plan to be confirmed.  But to put the matter in
20 some perspective, I believe -- and Ms. Okike can correct me
21 if I'm wrong on this, but of the eligible creditors only 6
22 percent of them voted.  So it's a small segment, but again,
23 I understand of course, that under the Bankruptcy Code, the
24 97 percent number is the relevant number.
25         The other issue, Your Honor, has to do with what

212-267-6868          Veritext Legal Solutions          516-608-2400
                      www.veritext.com

Page 43

1  may affect recoveries.  I believe Ms. Okike explained how
2  the disposition of the Alameda issue may affect recoveries,
3  but I believe there's something else which is intercompany
4  transactions.  And we have counsel here on that, not only
5  Ms. Okike but Mr. Kirpalani as well and the result of the
6  litigation concerning the intercompany transactions, I
7  believe, can affect the distributions to creditors under the
8  plan as well.
9          I don't know the numbers.  Perhaps Ms. Okike does,
10 but I just wanted to point those things out to the Court.
11         THE COURT:  Okay.
12         MR. MORRISSEY:  Anything further, Your Honor?
13         THE COURT:  Not at this stage.  I may have
14 questions for you later.
15         MR. MORRISSEY:  Thank you, Your Honor.
16         THE COURT:  All right.  I think we have an idea of
17 what we need to do with the evidence, so unless there's
18 further points that people want to raise before we go to the
19 witnesses, we'll take the evidentiary submissions.
20         MS. RYAN:  Your Honor, this is Abigail Ryan with
21 the Texas Attorney General's Office.  If I may be heard
22 briefly?
23         THE COURT:  Yes.
24         MS. RYAN:  Thank you, Your Honor.  Again for the
25 record, Abigail Ryan with the Texas Attorney General's

212-267-6868          Veritext Legal Solutions          516-608-2400
                      www.veritext.com

Page 44

1  Office on behalf of the Texas State Securities Board and the
2  Texas Department of Banking.  Your Honor, we are continuing
3  to work with the Debtor and Binance to see if we can find a
4  way that Texas citizens will not be treated as a
5  nonconsenting jurisdiction.  We're not there yet.  We are
6  continuing those discussions in good faith and we'll
7  continue to do so.
8          Before we get started though, one thing I wanted
9  to clarify is that the language that has been inserted at
10 Paragraph 141 through 142, we are not in agreement with that
11 language, Your Honor, the State of Texas isn't, but we are
12 continuing through this hearing to discuss language that
13 could be agreeable.  I just wanted Your Honor to be aware of
14 that.  Thank you, Your Honor.
15         THE COURT:  Paragraphs 142 of what, the
16 confirmation order?  Is that what you're talking about?
17         MS. RYAN:  Yes.  Yes, Your Honor, the confirmation
18 order.
19         THE COURT:  Okay.  Well, as I've said many times,
20 I tried to read everything, but I didn't get to the
21 confirmation order because I ran out of gas.  I did read
22 everything else, but --
23         MS. RYAN:  I understand running out of gas, Your
24 Honor.  And again, we'll continue to discuss this language
25 with the Debtor throughout the hearing and hopefully we'll

212-267-6868          Veritext Legal Solutions          516-608-2400
                      www.veritext.com

Page 45

1  reach an agreement, but that's the status with Texas as of
2  right now.
3          THE COURT:  All right, thank you.
4          MS. RYAN:  Thank you.
5          MR. SLADE:  Good morning, Your Honor.  Mike Slade,
6  Kirkland & Ellis, for the Debtors.  We filed our witness and
7  exhibit list at Docket No. 1129 because we thought it would
8  make it easier for people to follow the hearing and all of
9  the exhibits that might be used are on the docket as well.
10         Our first witness just to get just out of the way,
11 I would just like to offer our voting declaration, which is
12 the declaration of Letty Sanchez, Exhibit 4 on our witness
13 list.  It's also on the docket at Docket No. 1127 and I
14 would offer that declaration into evidence and Ms. Sanchez
15 is here and available to cross examine.
16         THE COURT:  This is the amended declaration?
17         MR. SLADE:  That's correct, Your Honor.
18         THE COURT:  All right.  Are there any objections
19 to the admission of the amended voting declaration into
20 evidence?  Does anyone wish to cross examine the declarant
21 as to the substance of that declaration?  Okay.
22         MR. NEWSOM:  I would, Your Honor.  Can I elaborate
23 more on that amended, whatever, declaration?  What is that
24 basically saying?
25         THE COURT:  I couldn't understand what you just

212-267-6868          Veritext Legal Solutions          516-608-2400
                      www.veritext.com

1   said, I'm sorry.

2          MR. NEWSOM:  Can they elaborate more on that, like

3   what is that explain, they're doing for us.

4          THE COURT:  This is the declaration as to what the

5   ballot results were, how many people voted in favor of the

6   plan, how many people voted against the plan.

7          MR. NEWSOM:  What about when -- what about the

8   people who didn't vote?  Is that -- the people that didn't

9   vote, is that considered a yes in favor of it if they didn't

10  vote at all or --

11         THE COURT:  Under the Bankruptcy Code, the plan is

12  deemed to be accepted if it is accepted by certain

13  percentage of the people who actually vote one way or the

14  other.  Okay?  So we only look at the people who actually

15  voted for or against, and if among those people, the plan

16  was accepted by the requisite percentages in number and

17  amount, then the plan is deemed to be accepted by that

18  class.  Okay?  So the fact that some people don't vote at

19  all under the Bankruptcy Code is a fact that's ignored.

20  Okay?

21         MR. NEWSOM:  I don't find that to be -- I don't

22  find that to be fair voting, Your Honor.

23         THE COURT:  Well --

24         MR. NEWSOM:  -- the plan have to do -- what did

25  the plan have to do -- the opt-out release and what does it

1   have to do with releasing third parties from any type of,

2   like, you know, charges or anything that would come about

3   later on?

4          THE COURT:  Well, it actually has nothing to do --

5          MR. NEWSOM:  Why --

6          THE COURT:  It has nothing to do with the opt-out,

7   with the opt-in release.  If somebody didn't vote, they're

8   not releasing their own claims unless they have separately

9   affirmatively elected to do so.  And as to whether this way

10  of doing the voting is fair, I'm afraid you'll have to take

11  that up with Congress.  It's not something I have any

12  control over.  It's a very clear provision in the Bankruptcy

13  Code itself.

14         MR. NEWSOM:  Are you going to (indiscernible) once

15  the plan, a voting plan (indiscernible)?

16         THE COURT:  I'm sorry?

17         MR. NEWSOM:  Why was there a plan when FTX

18  (indiscernible) and if that didn't go through, why was there

19  a winddown effect at that time?

20         THE COURT:  Well, that's not really -- right now,

21  you know, right now we're not just kind of opening the floor

22  to general question.  Right now, the question is whether

23  there's any objection to the admission of the declaration as

24  to what the voting results were.  Okay?  extra.  I'm sorry.

25  Well, is there a plan when they're -- and go through, wasn't

1   winddown in effect at that time?  That's not really right

2   now, you know, right now we --

3          MR. NEWSOM:  Yeah, I would like to see a report if

4   they can revise a report as who voted yes and who voted no

5   and who didn't vote, if that's possible.

6          THE COURT:  You want to see by name who voted?

7          MR. NEWSOM:  I mean, they can redact that

8   information.  They can say creditor one, creditor two,

9   creditor three, yes, no, yes, no (indiscernible).

10         THE COURT:  It's actually already on --

11         MR. NEWSOM:  (indiscernible).

12         THE COURT:  It's already on file on the public

13  docket.  There's a lengthy attachment --

14         MR. NEWSOM:  Yeah, which was done by the Debtors.

15  Which was done by the Debtor, we know we don't trust,

16  because, you know.

17         THE COURT:  Okay.  All right.  I've heard your

18  objection.  I'll admit the declaration into evidence.  Is

19  there any cross examination of the declarant that anybody

20  wishes to do?  Okay.  Do you have other evidence from that

21  witness that you wish to offer?

22         (Declaration of Leticia Sanchez entered into

23  evidence)

24         MR. SLADE:  No, Your Honor.

25         THE COURT:  Okay.  Very good.

1          MR. SLADE:  Your Honor, our next witness, we would

2   call Mark Renzi.  He's the financial advisor to the Debtors.

3   His declaration is Exhibit 1 on our witness list and we

4   would offer that.  It's also on the docket at Docket No. 111

5   -- it's on the docket at 1119.  We would offer that.  Mr.

6   Renzi is here and available for cross examination.

7          THE COURT:  All right.  Are there any objection to

8   the admission of Mr. Renzi's declaration into evidence?  All

9   right.

10         MR. HENDERSHOTT:  Your Honor, Tracy Hendershott,

11  Your Honor, pro se creditor.  Is there any way we can get a

12  continuation to be able to review all of these declarations?

13  There's literally hundreds of pages of documents that were

14  just submitted within 48 hours, unlike the professional

15  organizations, us creditors do not have an army of lawyers

16  to review all of this stuff and I thought the standards were

17  that we needed a week before any hearing of submission of

18  any type of documentation for us to digest, review, and

19  actually formulate questions and whether that's with

20  testimony or against the filings themselves.

21         MR. NEWSOM:  I'm in support of that.

22         THE COURT:  All right.

23         MR. HENDERSHOTT:  This has been actually a trend,

24  Your Honor.  Excuse me.  Sorry.  It's hard without visuals

25  of us being in person, but I don't intentionally mean

Page 50

1  interrupt in any means, but this has actually been a trend
2  throughout this entire case starting right with the first
3  plan and disclosure meeting where the Debtors in Possession
4  submit almost 1,000 pages the day before.  There's no way
5  that us as pro se creditors are able to digest in any
6  form whatsoever.  And that continues to this very day.
7        THE COURT:  Counsel?
8        MR. NEWSOM:  (indiscernible).
9        MR. SLADE:  Your Honor, we did file Mr. Renzi's
10 declaration two days ago along with our reply, consistent
11 with the deadlines that were set by the Court on Tuesday and
12 if Mr. Renzi's declaration weren't admitted, we would be
13 calling him to testify and he would say the same things that
14 are in his declaration.  So I don't think that's an
15 objection to the admission of the actual document, so we
16 would ask Your Honor to overrule the objection and admit the
17 declaration.  And any questions they can ask of Mr. Renzi on
18 cross examination.
19       MR. HENDERSHOTT:  Your Honor, I disagree.  I've
20 had absolutely no time or ability within the 48 hours of
21 being flooded with, you know, numerous submissions to be
22 able to review and even intelligently ask a question.  I
23 guess the question I'm asking, is there not a standard that
24 one week before the hearing is the cutoff for submission of
25 documentation to be discussed at that hearing?

Page 51

1        THE COURT:  No, there isn't.  And most of the --
2  most of these declarations were filed in response to the
3  objections that were filed only a week before the hearing.
4        MR. HENDERSHOTT:  Right, so there's no ability for
5  us to be able to review them and digest them and, you know,
6  be able to have a valid exchange of questions and answers
7  during this hearing.  Again, we do not have an army of
8  professional lawyers to digest all these multiple
9  submissions.  It puts the credits at a disadvantage and I'm
10 sure that's part of the strategy.
11       MR. NEWSOM:  I agree.  I'm in support of that
12 objection.
13       THE COURT:  Okay.  True.  Okay.  Why don't you put
14 Mr. Renzi on the stand, but you know, an awful lot of what's
15 in his declaration is about compliance with various
16 provisions of the Bankruptcy Code that is pretty obvious on
17 its face and that hasn't been contested.  Don't really think
18 we need further evidence on that.  So if there's points that
19 you wish to argue with Mr. Renzi based on disputed issues,
20 objected issues, let's offer that.
21       As to other points, to the extent that his
22 declaration is just a kind of confirmation of compliance
23 with provisions of the code that are not in dispute, I will
24 admit it on those points.  But to the extent that is
25 anything in his declaration that deals with any of the

Page 52

1  objected matters, let's just go ahead and do that live.
2  Okay?
3        MR. SLADE:  Happy to give it a shot, Your Honor.
4  I think one of the struggles as Your Honor experienced with
5  the two objectors that you spoke to, it's not entirely clear
6  what disputed issues are, but we will certainly give it a
7  shot.
8        THE COURT:  Okay, so the declaration is admitted
9  as to compliance with various provisions of the Bankruptcy
10 Code that haven't been contested and to the extent that Mr.
11 Renzi has any testimony to offer on subjects of -- to which
12 objections have been posed, we'll hear that testimony.
13 Okay?
14       MR. NEWSOM:  Your Honor, Dan Newsom, pro se
15 creditor.  If you want to hear objections (indiscernible)
16 right now or are we doing that at a later time?
17       THE COURT:  I'm sorry?  Well, the objections --
18       MR. NEWSOM:  Are you wanting to hear --
19       THE COURT:  Objections have been filed.  We're
20 taking evidence now.  Mr. Renzi is about to testify.
21       MR. NEWSOM:  Okay.
22       THE COURT:  Okay?  Mr. Renzi, do you swear that
23 the testimony you are about to give will be the truth, the
24 whole truth, and nothing but the truth, so help you God?
25       THE WITNESS:  Yes.

Page 53

1        THE COURT:  All right.  State your full name for
2  the record.
3        THE WITNESS:  Mark Anthony Renzi.
4        THE COURT:  Thank you.  You may sit.
5        MR. SLADE:  Your Honor, may I approach the witness
6  --
7        THE COURT:  Yes.  You don't need permission.  You
8  can go ahead.
9        DIRECT EXAMINATION OF MARK RENZI
10 BY MR. SLADE:
11 Q   Good morning, Mr. Renzi.
12 A   Good morning.
13 Q   Can you tell the Court and the folks on the phone what
14 you do and what your role is for the Debtors?
15 A   So Mark Renzi.  I'm a financial advisor to the Debtors.
16 I lead our financial institutions group at BRG.  I've been
17 working with the company since the beginning of this
18 bankruptcy process.
19 Q   Okay.  I want to try to hit the, what I understand to
20 be contested issues as directed by the Court.  The first one
21 I want to talk about is feasibility.  Okay?  Can you just
22 tell the Court what the plan does?
23 A   Yep.  The plan demonstrates that, number one, that we
24 have gone out and solicited all of our customers to vote on
25 the plan.  It's -- demonstrates that it's in the best

Page 54

1  interests of creditors and it demonstrates that we have
2  overwhelming support based on my understanding that was just
3  admitted in terms of -- from Stretto.
4  Q    Okay, can you just describe generally what are the
5  transactions that are contemplated by the plan?
6  A    The transaction contemplated by the plan is the sale of
7  the assets to Binance.US and effectively doing that, you
8  know, in short order by April.  And that has been a
9  maximizing value transaction that we've worked through with
10 the company and the Unsecured Creditors Committee.
11 Q    And if the transaction with Binance does not close,
12 what happens under the plan?
13 A    Under the plan, there's a provision for a toggle and
14 that toggle into liquidation.  And that has been heavily
15 negotiated and it is a provision in case there are any
16 contingencies.  And most importantly, what I think the
17 toggle does is it helps expedite any process to get
18 cryptocurrency and assets back to customers.
19 Q    Okay.  So let's take each one of those in turn.  I want
20 to start with the Binance transaction.  What role has your
21 team played in diligencing the Binance transaction?
22 A    You know, our team has worked alongside with the
23 Debtors, our investment bank Moelis, and the company to make
24 sure that we understand how the transaction works.  We've
25 worked specifically with Binance and their counsel to make

Page 55

1  sure that we had an opportunity to diligence how it would
2  go, how it would work, and then we also solicited third-
3  party information, made sure we had incredibly good detail
4  about the markets in cryptocurrency to make sure that this
5  transaction made sense.
6  Q    Okay.  And based on your review, do you believe the
7  transaction with Binance makes sense?
8  A    I do.
9  Q    Sitting here, based on what you know today, do you have
10 any reservations about the Binance transaction?
11        MR. SHEHADEH:  Objection.
12        THE COURT:  What is the objection?
13        MR. SHEHADEH:  I object that the plan makes no
14 sense, Your Honor.  It's not a better plan.  There was no
15 toggle liquidation in the beginning when there was
16 supposedly a bidding war.
17        THE COURT:  Okay.
18        MR. SHEHADEH:  -- between FTX and other companies.
19        THE COURT:  All right, let me --
20        MR. SHEHADEH:  If that -- if they want the best
21 interest in the creditors, they should've just released our
22 money when the FTX bid didn't go through.  They would've
23 saved millions and millions of dollars --
24        THE COURT:  Let me --
25        MR. SHEHADEH:  -- on counsel --

Page 56

1        THE COURT:  Let me interrupt --
2        MR. SHEHADEH:  -- third parties.
3        THE COURT:  Let me interrupt you, please.  Who is
4  making the objection?  Whenever you speak, you need to
5  identify yourselves or we won't have a record.  Who is
6  making the --MR. SHEHADEH:  I'm sorry, Your Honor.  Alah
7  Shehadeh.  Alah Shehadeh for the record, pro se creditor.
8        THE COURT:  Just to be clear, when the witness is
9  testifying, you can object on evidentiary grounds, right, if
10 there's some reason under the rules of evidence why there's
11 something wrong.  But the fact that you disagree with what
12 the witness says is not a ground for objection.  That's a
13 ground for argument at the end of the day.  It's not a
14 ground for objection to the witness's testimony.  Okay?
15        MR. SHEHADEH:  Well, I'm objecting, Your Honor,
16 and there's facts behind my objection.  It's not just my
17 opinion.
18        THE COURT:  But, okay, you'll have your chance to
19 make your argument and if you have evidence you want to
20 offer, to offer it.  But to object to the witness' testimony
21 is really something you can only do on evidentiary grounds.
22 If the Debtor disagrees with you, they're entitled to put on
23 their case and you can put your case on later, but it's not
24 a ground to object to their evidence just that you disagree
25 with it.  Okay?  Go ahead.

Page 57

1        MR. SLADE:  Thank you, Your Honor.
2        THE COURT:  The objection is overruled.
3        MR. SLADE:  Thank you.
4  BY MR. SLADE:
5  Q    Please describe for the Court why you're comfortable
6  going forward with the Binance transaction based on what we
7  know today?
8  A    I'm comfortable with this transaction because number
9  one, our team BRG has spent a significant amount of time
10 diligencing this transaction.  Number two, Moelis has got
11 the same, they've diligenced this transaction extensively.
12 Number three, the advisors Kirkland & Ellis has also
13 diligenced a tremendous amount.  Number four, FTI Consulting
14 has also diligenced this transaction and then pressure
15 tested this and they represent the Unsecured Creditor
16 Committee and McDermott, Will and Emery has also done the
17 same.  So with the objectivity of counterparties that are
18 protecting the customers and with the objectivity of
19 independent parties that are representing the Debtors, I
20 believe based on everything that I've seen that this is a
21 fair plan and it's been well documented.
22 Q    So you heard a couple of the regulators before you got
23 on the stand testify about hypothetical potential regulatory
24 options.  Are you aware of those?
25 A    I am.  I've actually written about some of the

1  regulations in cryptocurrency.

2  Q    Okay.  And in spite of those, do you still believe this

3  is in the best interests of the estate to go forward sitting

4  here today?

5  A    Yes, I do.

6  Q    Can you describe why?

7  A    I think cryptocurrencies is an evolving asset class.

8  The regulatory overlay is still developing.  I heard some of

9  the remarks that were made earlier in the Court here, but

10  there's nothing that I understand based on advice from and

11  counsel that precludes this transaction from going through.

12  Q    Okay.  Now I want to move to the toggle transaction.

13  Why is that part of the plan?

14  A    I think the -- what we're trying to do, the Debtors,

15  the company, as well as its advisors, is to make sure that

16  to the extent that there's any reason that we're

17  uncomfortable with the transaction being consummated with

18  Binance.US, we have optionality to go convert it into a

19  toggle plan.  And most importantly, it provides a path to

20  get crypto back to its customers as quickly as possible.

21  And we believe that that's very important.

22  Q    Does the company currently have personnel on hand to do

23  the work needed for the toggle transaction if we decide to

24  toggle?

25  A    Yes, it does.

1  Q    Okay. And can you just describe for the Court what will

2  happen if we have to toggle to the toggle transaction?

3  A    I mean, if we have to toggle from the Binance

4  transaction, the company is prepared and its personnel are

5  prepared to execute on the transaction to distribute

6  cryptocurrency to customers.  It's important to do this.  It

7  would be unfortunate because it would be a little less in

8  proceeds as I'm testifying here, but nonetheless, we have

9  the ability to do it and the personnel's ready to do it and

10  a plan to do it, if we had to.

11  Q    Mr. Renzi, is the only reason to believe that if the

12  plan is confirmed, it's likely to be followed by further

13  liquidation or reorganization of the Debtors?

14  A    Do you mind asking that question again?

15  Q    Sure.  Is there any reason to believe that if this plan

16  is confirmed there's going to be a likelihood of a need to

17  further reorganize or liquidate the Debtors --

18  A    No.

19  Q    -- in a way other than is described in the plan?

20  A    No.  I think the way it's described in the plan is

21  appropriate.

22  Q    Thank you.

23         MR. SLADE:  Your Honor, a clarification for you.

24  Do you view the liquidation analysis best interest test as a

25  matter that's in dispute and I need to inquire the witness

1  about?

2         THE COURT:  Is the State of Texas still raising a

3  best interests issue or have they been satisfied on that

4  point?  Is the -- are the state's attorneys on the phone?

5  Is anybody on the phone --

6         MS. RYAN:  Your Honor?

7         THE COURT:  Thank you.

8         MS. RYAN:  Your Honor, I apologize.  This is Mrs.

9  Ryan with the State of Texas.  I was having problems getting

10  unmuted.  Could you repeat your question, Your Honor?

11         THE COURT:  The question was, does -- Texas had

12  raised an issue about whether under the disclosure

13  statement, liquidation was a better option than the plan,

14  which is essentially a question of best interests as we call

15  it under the Bankruptcy Code.  I understand the Debtors'

16  response was that if the -- if an Alameda or other event

17  changes the plan recoveries, it would have the same

18  proportionate effect on Chapter 7 recoveries.

19         My question is, do you still have an objection on

20  that point?  Do we need any evidence on it or have you been

21  satisfied?

22         MS. RYAN:  Your Honor, I do still have some

23  questions on that point to get some clarification.  And so

24  when the time is appropriate, I can ask those.

25         THE COURT:  Okay, why don't you go ahead, put your

1  best interests case on.

2         MR. SLADE:  Sure, Your Honor.

3  BY MR. SLADE:

4  Q    Mr. Renzi -- and I want to talk about the best interest

5  test and liquidation analysis that your team did, okay?

6  A    Sure.

7  Q    You just describe for the Court what you did to

8  evaluate the plan versus a hypothetical Chapter 7

9  liquidation?

10  A    So number one, the declaration is quite extensive on

11  this, but I'll do the short version.  Essentially, what we

12  did is evaluate all of the assets that we have, so the

13  coins, and make sure that we understood, you know, what kind

14  of proceeds we could get for rebalancing the portfolio.  We

15  looked at that systematically.  We looked at with, you

16  know, being able to test and call market participants in the

17  market and understand how to monetize these assets to

18  rebalance, to make distributions in kind.

19         That is a complicated process based on the way the

20  markets work in cryptocurrency.  And so, having the ability

21  to do that is very important in the plan for the Binance

22  plan.  If we have to do it for the toggle, it would -- we

23  also considered that under the toggle and both of those are

24  key for the plan.  And then we evaluated how those proceeds

25  will flow through the waterfall of creditors, you know,

Page 62

1  through the priority waterfall, and then down to account
2  holders.  And so -- and then we juxtaposed that analysis,
3  that those two analyses against the liquidation.  In a
4  liquidation, we believe that the ability to monetize these
5  assets is a little bit more problematic because these
6  markets are particularly complicated.
7      There are unsupported coins and monetizing unsupported
8  coins quickly is likely to have a very heavy discount.  And
9  because of those factors, we believe that the proceeds that
10 we get under an immediate liquidation under a Chapter 7
11 would yield lower recoveries for customers.  So I think in
12 general, to summarize at a high level that the plan has
13 higher recoveries for all three entities, legal entities,
14 versus a liquidation, a Chapter 7 liquidation, and that
15 satisfies the best interests of creditors test.
16 Q    Is that true for all creditors?
17 A    Yes.
18 Q    Does it doesn't matter whether or not FTX prevails in
19 its litigation that it has initiated against the Debtors?
20 Does that make a difference for purposes of liquidation
21 analysis?
22 A    No.
23 Q    I want to turn now to the unsupported jurisdictions.
24 What does the plan provide with respect to the 4 out of 50
25 states that have not licensed Binance.US?

Page 63

1  A    I was under the impression now it's three, but wanted
2  to confirm that, Your Honor.
3  Q    So what does the plan provide for those customers?
4  A    So the plan provides for a period of time for the three
5  states that remain to be able to have distributions in kind
6  for customers.  I think effectively all customers are
7  treated on a pari passu basis with equal footing and they
8  will all get the same amount of recovery based on their
9  class.  So that's the most important thing.  And regardless
10 of state.  However, there are some technicalities within the
11 states, three states that I'm aware of, that I don't really
12 fully understand the technicalities within those states, but
13 I understand that there's some problems for distribution.
14 However, there's a six-month hold period, you know, to
15 address that, to provide enough time for the states to get
16 comfortable with distributions to customers.
17 Q    Just so we're clear, do the customers in the
18 unsupported jurisdictions get the same recovery as the
19 customers in the supported jurisdictions?
20 A    Yes, they do.
21 Q    Okay.  Can you describe for the Court, whether it's
22 possible for Voyager to facilitate distributions in kind to
23 creditors in the unsupported jurisdictions and do the
24 Binance transaction at the same time?
25 A    I mean, the Binance transaction effectively sells the

Page 64

1  entire platform over the Binance, so in order for Voyager to
2  distribute to the three remaining states, they would have to
3  do it manually.  In my opinion, 120,000 customers with over,
4  I believe, it's 106 coins, is incredibly problematic and
5  fraught with -- to do it manually.  So I would be very
6  concerned if that was the path that we would have to take.
7  Q    Can you just describe for the Court what some of the
8  risks would be?
9  A    The risks, I mean, when you have a very well-developed
10 platform such as Binance.US, they have the ability to
11 understand, you know, KYC and AML issues to make sure that
12 there's a good record keeping.  That platform can be -- you
13 know, track all of that very well.  I think a manual process
14 is very labor intensive.  I don't think it's easy to check,
15 KYC and AML issues for making distributions.  Those are some
16 of the issues that I would have if it had to be done
17 manually.
18     MR. SHEHADEH:  Your Honor, I'd like to object to
19 that because if you look at Binance's asset shuffling, it's
20 very similar to FTX and this is by (indiscernible), Your
21 Honor.  Summarizing Binance's, ongoing lies and deception
22 with the (indiscernible) financial transparency, comingling
23 customers' funds, (indiscernible) assets.  So you wanted to
24 (indiscernible), then they have liquidity issues and then
25 they file for bankruptcy.  Then what happens next?  Is that

Page 65

1  the best interest in the creditors?
2      THE COURT:  I --
3      MR. SHEHADEH:  I feel like if (indiscernible)
4  really have the best interest in the creditors, the moment -
5  - first of all, they wouldn't even have filed Chapter 11 --
6      THE COURT:  Mr. Shehadeh --
7      MR. SHEHADEH:  -- because they want --
8      THE COURT:  Mr. Shehadeh --
9      MR. SHEHADEH:  -- organization plan --
10     THE COURT:  Stop, please.
11     MR. SHEHADEH:  -- had no plan to reorganize the to
12 reorganize the company.  They want to sell it.
13     THE COURT:  Please.  Please stop.
14     MR. SHEHADEH:  They want to liquidate it and milk
15 as much money --
16     THE COURT:  Please stop for a moment.  Stop for a
17 moment, please.  You need to understand, disagreeing with
18 the witness' conclusion is not a ground to interrupt the
19 witness' testimony.  You have your own arguments, you may
20 have your own evidence, but that's not a basis on which to
21 interrupt the witness' testimony.  It is not a proper
22 objection to what the witness has said.  If you have
23 questions of the witness, then you can ask them when the
24 direct examination is finished.  If you have evidence, you
25 will have a chance to offer it after the Debtors have

Page 66

1  finished their case, but I know you're not a lawyer, but
2  please listen to me.  You cannot interrupt a witness'
3  testimony or object to it on the ground that you disagree
4  with it.  That is not a proper objection.  Okay?  It is only
5  a proper objection if there's something wrong under the
6  rules of evidence with what is being offered.  And if you
7  disagree, that's a point either for argument or for cross
8  examination or for the presentation of your own evidence.
9  Okay?
10            MR. SHEHADEH:  Yes, Your Honor, I understand that
11  but I'm not arguing on it.  I'm just stating the facts.  I
12  objected to the fact that the witness is saying that that is
13  the best --
14            THE COURT:  That is arguing.
15            MR. SHEHADEH:  -- thing for the creditors --
16            THE COURT:  Stating what you believe are contrary
17  facts is argument.  So you have to wait.  Okay?  That's not
18  a basis to interrupt --
19            MR. SHEHADEH:  It's not what I believe --
20            THE COURT:  -- this witness' testimony.
21            MR. SHEHADEH:  -- are facts, what I understand.
22            THE COURT:  Okay.  Please don't interrupt the
23  witness' testimony and -- with that kind of issue again,
24  okay?  All right.  Had you finished your prior answer?
25            THE WITNESS:  Yes, Your Honor.  Thank you.

Page 67

1            THE COURT:  Okay.
2  BY MR. SLADE:
3  Q    Just a few more questions, Mr. Renzi.  I want to talk
4  about the remaining personnel at the company.  Okay?  Can
5  you describe the role of the remaining personnel at Voyager
6  in executing on either the sale to Binance or the toggle
7  transaction?
8  A    The remaining personnel have, you know, in-depth
9  knowledge of cryptocurrency markets, how the operations
10  work, how to do things, you know, within the constructs of
11  legal entities that they have, and they're experts within
12  Voyager.  So they'll help facilitate rebalancing, which is a
13  major transaction to get done and it is very, very
14  complicated.  They'll also help with, you know, making sure
15  the records are maintained properly and any other things
16  that are required by the trust.
17  Q    What would be the impact on for -- just as an example,
18  the security risks to these transactions if the employees
19  were to leave?
20  A    I would be very concerned if the employees had to
21  leave.  They were -- have been protecting these assets
22  during the bankruptcy case.  They understand how to address
23  security issues and they have intimate knowledge of how to
24  transact within the cryptocurrency marketplace.
25  Q    So can you just describe for the Court like some of the

Page 68

1  risks involved in these transactions from a security
2  perspective for the customers?
3  A    Well, rebalancing is very -- is complicated.  So making
4  sure you have the right counterparties, making sure that
5  they can transfer money in and out within accounts in an
6  appropriate fashion is imperative.  I believe that those are
7  among the things that they're doing to address risks.
8  Q    And how about the actual transaction where we're
9  transferring the money either to Binance in the Binance deal
10  or directly to customers in the toggle?
11  A    Absolutely.  The transaction and distribution of funds
12  or coins in kind is incredibly important to get done.  I
13  think you can't reverse a wire in crypto.  It's what you
14  distribute to a wallet.  It's permanent, and undoing that
15  is, to the best of my knowledge, I don't think you can undo
16  a mistake.  And in a bank context, you can reverse a wire,
17  as -- by way of example.
18  Q    And can you describe for the Court whether the risks
19  are higher or lower of those transactions, if the employees
20  that are still at the company leave?
21  A    My opinion is much higher if the employees at the
22  company leave.  They're experts in the space.  I believe
23  that it's hard to find people like them.  I think if it was
24  to be someone independent, by way of a Chapter 7 Trustee, I
25  think it would be much more complicated and obviously, in my

Page 69

1  expert opinion, I believe it would cost -- it would be not
2  value maximizing under those scenarios.
3  Q    Okay.  That's actually the last topic I wanted to
4  cover, which is the possibility of the appointment of a
5  Trustee.  Do you believe an appointment of a Trustee would
6  be good or bad for creditors?
7  A    It would be bad.
8  Q    Can you describe why?
9  A    I think the most important thing we've heard from some
10  of the customers on the phone is to get their cryptocurrency
11  back.  So timing is very important.  We believe that if
12  there was a Trustee, it would extend the timeline for
13  customers to get their cryptocurrency back.
14       We also believe that there's a higher probability of a
15  conversion to a seven, and right now, we already have 97
16  percent of customers voting in favor of this plan.  And then
17  lastly, we've been doing this in a transparent and
18  collaborative way with the Unsecured Creditors Committee and
19  advisors.  So I'm not -- really don't understand, other than
20  the downside of appointing a Trustee.
21            MR. SLADE:  Thank you, Your Honor.  Pass the
22  witness.
23            THE COURT:  All right.  Is there anybody in the
24  room -- start with the people who are present in the room --
25  who wishes to cross examine Mr. Renzi?

Page 70

1    CROSS EXAMINATION OF MARK RENZI
2  BY MS. SCHEUER:
3    Q    Good morning, Mr. Renzi.  For the record, Therese
4  Scheuer for the Securities and Exchange Commission.
5    A    Morning.
6    Q    Mr. Renzi, what are market constraints?
7    A    I think simply put, and I know this is a newer asset
8  class, but simply put, market constraints really mean by way
9  of example, Bitcoin and ETH have a very deep market trading
10  volume.  And there are others that have, you know, a large
11  market cap.  But there are a number of less common, more
12  obscure coins that don't have as much of market depth.
13       And so as I in my decoration, I used to be -- I used to
14  be a trader a long, long time ago and understand markets
15  very well.  And if you are selling coins that don't have a
16  lot of market depth, there's a tremendous amount of concern
17  that it will move in the market.  I think Bitcoin and ETH
18  have a much larger market, so by way of example, it's harder
19  to move that market unless there's very large blocks, but
20  that's the general concept of -- that you were asking about.
21    Q    Thank you.  And I'm going to paraphrase, but I think
22  Paragraph 76 of your declaration provides that a mass sale
23  of coins in illiquid markets is expected to move the market
24  significantly.  Do you agree with that?
25    A    Yes, I agree with that.

Page 72

1  issue is that there are unsupported coins.  Unsupported
2  coins are much easier to address if you're distributing them
3  in kind versus trying to liquidate those coins.  We went to
4  market makers to understand what that would look like if we
5  had to transact quickly and were given rates of decrease,
6  you know, in the market.  And then then lastly, I'll say my
7  expert opinion from having to trade derivatives, if you try
8  to move trading derivatives quickly, people will generally
9  try to take advantage of that and then it will be a much
10  worse outcome.
11    Q    Okay.  Are you familiar with the stipulation that
12  Voyager recently filed with the FTX debtors?
13    A    I'm familiar, but I would like a refresher if somebody
14  has a copy of that for me.
15    Q    This stipulation regarding FTX's preference actions.
16  Does that refresh your recollection at all that Ms. Okike
17  mentioned at the beginning of the hearing?
18    A    Yes.
19    Q    Broad brush, what is your understanding of what
20  settlement provides?
21         MR. SLADE:  I'll object to the relevance of this
22  question.
23         THE COURT:  Well, I don't know if it's relevant or
24  not.  It seems to be not what this witness is testifying
25  about.  Is there a different witness that you plan to offer

Page 71

1    Q    Okay. And in a Chapter 7 case, you assume that a
2  Chapter 7 Trustee would liquidate coins immediately, which
3  would move the market lower and your declaration provides it
4  would reduce distributions by 20 to 26 percent; is that
5  correct?
6    A    Yes.  That's correct.
7    Q    But the market depth constraints were not as
8  significant for a sale or toggle plan, correct?
9    A    That's correct.
10    Q    And why was that?
11    A    Well, under -- number one, you know, having the ability
12  to rebalance with time, you know, maximizes value and that's
13  important.  I think to the -- and we also have verified that
14  if we had to do this quickly, there'll be tremendous
15  pressure on the market.  So I think if you're going into a
16  liquidation, straight liquidation, without a prescribed
17  plan, so a Chapter 7 liquidation, there'd be a tremendous
18  amount of pressure on the market, and that's also validated
19  by market makers in the industry, Moelis, BRG, and also in
20  consultation with the UCC advisors.
21    Q    And are those -- are the market constraints what
22  accounts for the difference in recoveries and the different
23  scenarios, the sale toggle, the liquidation?  Is that the
24  primary difference?
25    A    That is a primary difference.  I mean, I think the

Page 73

1  on the -- as to the FTX stipulation?
2         MR. SLADE:  That's not up for today, so no.
3         MS. SCHEUER:  Your Honor, I don't plan to question
4  in depth regarding that stipulation. It just goes to the
5  effect that might have on distributions.
6         THE COURT:  The stipulation or the underlying
7  claim.
8         MS. SCHEUER:  The stipulation.
9         THE COURT:  You can answer to the extent you know.
10  BY MS. SCHEUER:
11    A    I think that I'd like to look at the continent before I
12  answer you in depth, but in general, I understand that if we
13  have to reserve more funds for FTX Alameda, that it would
14  apply across all scenarios equally, so it would reduce
15  recoveries equally in general.  But that's --
16    Q    Is your understanding that four -- over $400 million
17  would be set aside in connection with those preference
18  actions?  Is that --
19    A    Under a hypothetical scenario, yes.  It would have to
20  be set aside, but I don't -- I can't opine as to how, why.
21  And I just understand the math.
22    Q    Is that your understanding of what the general
23  settlement currently provides?  That --
24    A    I understand --
25    Q    -- $400 million would be set aside.

Page 74

1  A  -- 400-plus million.  Yes.  Sorry.  Sorry to interrupt

2  you.

3  Q  That's quite all right.  I'm sorry if I was talking

4  over you.  But that 400 million, 445 million, would that be

5  set aside in coins or is it being set aside in cash?

6  A  Your Honor, I'm not sure I know the answer to that.

7  Q  If it had, if $445 million worth of coins had to be

8  liquidated now and set aside in cash, would there be market

9  depth constraints in liquidating those coins?

10  A  I mean, I think the same issue applies.  If you -- to

11  the extent that you had to set aside funds, we would work

12  with the Unsecured Creditors Committee and also the company

13  and our advisors to find out what's the optimal way to set

14  aside funds so that we don't have the market constraint

15  issues that I described earlier.  But we had to set aside

16  them, it would certainly be a significant amount of money.

17  And if we have to liquidate coins, it's subject to all of

18  the issues that I just formerly testified to.

19  Q  And the 445 million is almost half of the coins on the

20  value of the coins on the Debtors' platform?  Is that right?

21  A  The value has gone up, so it's a little less than half

22  now.

23  Q  Okay.  And what steps would you take to mitigate

24  against those market depth constraints?

25  MR. SLADE:  Your Honor, I would object.  I'm just

Page 75

1  having a hard time connecting any of these questions to the

2  SEC's objection.

3  MS. SCHEUER:  Our Paragraph 7 of the SEC's

4  objections noted that creditors and stakeholders are

5  entitled to know what the sale transaction provides.

6  They're entitled to know the benefit of the sale transaction

7  versus the toggle or a liquidation.  I'm paraphrasing.

8  THE COURT:  This isn't really a feature of the

9  sale transaction.  The -- you know, the Bankruptcy Code says

10  that administrative claims have to be paid in full.  The FTX

11  preference, Alameda preference claim is asserted as an

12  administrative claim.  The only way you can comply with the

13  Bankruptcy Code requirement is to reserve the amount that's

14  in dispute until such time as the claim is resolved.  I

15  think, no matter what, that the Debtors are selling coins to

16  Binance and holding cash -- but you can correct me if I'm

17  wrong -- but that Binance will be, whether it's -- whether

18  Binance -- anything that Binance will not be distributing

19  directly to customers as their original distributions is my

20  understanding, is being converted to cash; is that right?

21  I'll ask the Debtors.

22  MS. OKIKE:  That's correct, Your Honor.

23  THE COURT:  Okay.  I think that's been stated in

24  the plan.  So what's been held in reserve, am I right, is

25  just cash?

Page 76

1  MS. OKIKE:  Yes.

2  THE COURT:  Okay.

3  BY MS. SCHEUER:

4  Q  Mr. Renzi, was part of your assumption that 450 million

5  would be converted into cash immediately or --

6  A  I --

7  Q  Your assumptions in the sale toggle or liquidation

8  analyses, did you assume that 455 million would be converted

9  into cash immediately?

10  A  I don't think my declaration addresses the 455 -- 445

11  million.

12  Q  But your declaration does provide that if you had to

13  liquidate those coins immediately it would be a significant

14  depreciation in a Chapter 7 case between 20 to 26 percent

15  for liquidating all of the coins; is that correct?

16  A  Your Honor, I don't follow the -- I don't understand

17  the question.

18  THE COURT:  Explain --

19  MR. SHEHADEH:  I don't think (indiscernible)

20  question was clear.

21  THE COURT:  How -- explain how the value of the

22  coins is being determined under the Binance deal.

23  THE WITNESS:  Well, the issue that we're getting

24  at is a math issue.  So if we have to do it under any

25  circumstance, it's going to affect them all equally.  So to

Page 77

1  the extent that you have to do it under a Binance plan or a

2  toggle plan or even a liquidation plan, it still

3  demonstrates that the plan, under a Binance plan or a toggle

4  plan, is still better than a Chapter 7.  So to the extent

5  that it's just simple math, to the extent that you have to

6  liquidate a portion, into cash immediately, it's going to

7  affect all plans relatively equally in terms of the math.

8  It's -- it'll be -- it'll decrease the recoveries overall.

9  THE COURT:  Ms. Okike, under the Binance deal, is

10  there a particular date as of which the values of the coins

11  will be measured?

12  MS. OKIKE:  The value of the coins?

13  THE COURT:  Yes.

14  MS. OKIKE:  Yes, Your Honor.

15  THE COURT:  And what is that date?

16  We're going to take a ten-minute break while you

17  figure that out.  I thought I remembered that under the

18  Binance deal, the value of the coins would be determined as

19  of market prices on a particular date.  In other words, they

20  wouldn't just be whatever they happen to be actually sold at

21  when the transfers happened.

22  MS. OKIKE:  Yes, Your Honor.

23  THE COURT:  It would be fixed based on other

24  market terms.

25  MS. OKIKE:  So it's no later than the date that is

1  one business day prior to the closing.

2          THE COURT:  Okay.  All right.

3          MS. OKIKE:  It's a moving target.

4          THE COURT:  So in other words, they'll be based on

5  a market that will be -- that won't be affected by these

6  particular coin transfers.

7          MS. OKIKE:  Correct.

8          THE COURT:  It'll be fixed at that market price.

9          MS. OKIKE:  Correct.

10          THE COURT:  All rights.  Let's just take ten

11  minutes, okay?  We are in recess for ten minutes.

12          (Recess)

13          THE COURT:  Please be seated.  By the way, I'm not

14  sure that the disclosure statement is officially in

15  evidence.  I think it ought to be.

16          MR. SLADE:  Yes.  Your Honor, we move to -- we

17  offer Exhibit 12 and 13 off of our exhibit list, which are

18  the order scheduling the hearing with the disclosure

19  statement and the actual disclosure statement.  Those are at

20  Dockets No. 861 and 863.

21          THE COURT:  I'll admit those into evidence.  So

22  they need to be in evidence, because that's what some of the

23  objections are addressed.  Please proceed.

24          (Exhibits 12 and 13 entered into evidence)

25          MS. SCHEUER:  Thank you, Your Honor.  For the

1  record, Therese Scheuer for the Securities and Exchange

2  Commission.

3  BY MS. SCHEUER:

4  Q    Hello again, Mr. Renzi.  Mr. Renzi, just before the

5  break, I think we heard that the value of coins would be

6  fixed two days prior to the closing of that, correct?

7  A    I believe so, yes.

8  Q    And when will closing occur?

9  A    I think that it's -- I understand it's a moving, a

10  little bit of a moving target, but sometime in April

11  hopefully.

12  Q    So could the -- could liquidating $445 million worth of

13  coins affect the value of coins when they're fixed at that

14  date?

15  MR. SLADE:  Your Honor, I would object to relevance, and

16  it's also outside the scope.

17  THE COURT:  You can answer.  I'll overrule the objection.

18  You can answer.

19  BY MS. SCHEUER:

20  A    You mind asking again?  Thank you.

21  Q    Sure.  So could liquidating the $445 million worth of

22  coins in connection with the FTX settlement, could

23  liquidating that amount of coins affect the value of the

24  coins when they're fixed two days prior to closing?

25          THE COURT:  Can I just make sure I understand?

1  Are you asking him if they will be liquidated before the

2  closing or are you asking him, would it have such a effect?

3          MS. SCHEUER:  Would it have such an effect.

4          THE COURT:  If it happened.

5  BY MS. SCHEUER:

6  A    I think the goal is to do as much rebalancing as

7  possible, you know, before closing.  So to the extent that

8  that's done, it -- the answer is, it depends.  I mean, if

9  you're not able to do a sufficient amount of rebalancing

10  between now and then and then you have to do immediately,

11  then it's certainly very problematic but right now, we're

12  trying to avoid having that problem.

13  Q    So is liquidating $445 million worth of coin, that

14  would be -- that's part of your rebalancing transaction?

15  A    I believe it is part.  It's part of it.  we're trying

16  to rebalance.  We're rebalancing every day, throughout the

17  day, right now.

18  Q    And so you're trying to balance as much as you can

19  prior to closing; is that correct?

20  A    We're trying to rebalance as much as we can prior to

21  closing.

22  Q    I think your --

23  A    And hopefully, we'll be -- we'll meet that goal.

24  Q    I think your prior testimony was that the major delta

25  between the sale transaction and a Chapter 7 liquidation or

1  the toggle transaction but primarily the Chapter 7

2  liquidation was having to sell all of those coins by April

3  18th; is that correct?

4  A    Well, the issue is, and I think I spell it out in my

5  declaration, is if we have to convert, there's a period of

6  time that you have to convert and it will take more time to

7  address any issues that the Chapter 7 Trustee would have and

8  monetize into cash to the extent that we have it.  And then

9  furthermore, there are unsupported coins that aren't going

10  to be able to be addressed easily in a Chapter 7.

11  Q    But your prior testimony was that the market depth

12  constraints were the -- I think the significant reason for

13  the difference between the sale transaction and the Chapter

14  7 transaction because in Chapter 7, you assumed the Trustee

15  would liquidate the coins immediately by April 18th.

16  A    To the extent that, I mean, if any of the rebalancing

17  hasn't been done or we have to monetize any other coins and

18  convert it into cash, there is going to be a significant

19  amount of issues in terms of market constraints and it will

20  lower recovery.

21  Q    Do you -- is it your view that liquidating $445 million

22  worth of coins now would it impact the liquidation analysis

23  that we've set forth?

24  A    If you have to liquidate coins immediately, right now,

25  it will decrease the amount of recoveries across all

1  scenarios.

2  Q    But in the sale transaction, your assumption was that

3  they would all be liquidated immediately.  So isn't the

4  impact really on the sale transaction or the toggle in

5  decreasing the recovery so that the delta between the sale

6  and Chapter 7 is much smaller than is in your liquidation

7  analysis?

8  A    I don't think you stated my testimony correctly.

9  Q    How so?

10 A    You just said, I think what -- number one, I think you

11 had made a statement.  I'm not sure I follow all of your

12 statement, but I think the issue is that, you know, under a

13 transaction, a sale, you're maximizing value.  You are

14 rebalancing these coins.  You are getting proceeds from the

15 Binance transaction and there's less of a market discount

16 because you're doing it in an orderly fashion.

17     To the extent that you don't do it in an orderly

18 fashion and it has to convert, it's left to people that are

19 less familiar with cryptocurrencies.  There's going to be a

20 diminution in value.

21 Q    Okay.  All right, I think we can move on.  Thank you.

22 Mr. Renzi, how do you assess the impact of pending

23 regulatory actions and investigations?  Did you assess what

24 that impact would be on investor recovery or could be on

25 investor recovery?  Was that included in your analysis?

1  A    I discussed any regulatory issues with counsel, make

2  sure that I understood them.

3  Q    Was that modeled in your analysis, included in your

4  numbers?

5  A    It is included.

6  Q    How so?

7  A    There -- to my understanding and actually in the

8  discussion earlier today in Court, there are issues that are

9  still unresolved by regulators.  And so as far as I know,

10 everything that we're doing in terms of rebalancing has been

11 improved -- approved by the Court to do so.  And we're

12 following the Court rules and what's been approved to do by

13 the Court.

14     And we've done that in a transparent fashion with the

15 approval of the UCC and their advisors and I don't think

16 that that speaks to your question in terms of how that is

17 addressed from a regulatory environment that's evolving and

18 we're trying to comply with whatever -- all the rules that

19 we -- have been set out for us by this Court.

20 Q    But there was no kind of risk or a some kind of

21 percentage in your numbers that could -- that kind of covers

22 regulatory risks?

23 A    No.

24 Q    Whether CFIUS approves the transaction impacts whether

25 stakeholders get paid; is that right?

1  A    I think -- are you asking -- I don't understand the

2  question.  Are you asking if CFIUS prevents the transaction?

3  Q    Mm hmm.

4  A    Yes, there -- we would have to go into a toggle plan.

5  Q    And what happens if CFIUS decided to deny approval

6  after the sale had closed?  What would happen to investors?

7  A    I would defer to counsel.

8  Q    But that wasn't included in your numbers, your

9  estimates?

10 A    If we need to toggle, we have the provision to toggle

11 into a toggle liquidation plan.

12 Q    But if CFIUS denies approval after closing, the toggle

13 plan is no longer possible.  That wasn't included in your

14 numbers; is that correct?

15 A    I don't think there's any numerical quantification of

16 --

17 Q    Okay.

18 A    -- CFIUS.

19 Q    Okay.  Why do you think this is a good deal for

20 investors?

21 A    This deal is -- satisfies the best interest test.  It's

22 approved by 97 percent of our customers.  It is maximizing

23 value, as proven by the analysis that's provided in my

24 declaration.  Those are among the most -- the reasons.

25 Q    It is approved by 97 percent of your customers --

1      MR. SHEHADEH:  I'm going to object to that,

2  please.  It's approved 97 percent of the customers at a

3  certain level.  (indiscernible) based on how much money each

4  creditor has, so that's 97 percent of maybe like the top

5  five creditors (indiscernible) on the plan.

6      THE COURT:  Okay, who is speaking right now?

7      MR. SHEHADEH:  Alah Shehadeh, Your Honor, for the

8  record.

9      THE COURT:  Mr. Shehadeh, you cannot interrupt

10 questions and answers to argue over the answer.  Okay?  You

11 can only speak when it is your turn to question a witness or

12 when it is your turn to offer evidence or if you have an

13 objection that is based on a rule of evidence as to the form

14 of a question.  I've said this now, I think, three times.

15 You cannot interrupt just to disagree with the witness.  It

16 is not appropriate and you have to stop doing it, okay?

17     Please proceed, counsel.

18     THE WITNESS:  Your Honor, I'm happy to rephrase my

19 statement.

20 BY MS. SCHEUER:

21 A    So of the people voting, 97 have voted in favor.

22 Q    Thank you.  So of the 6 percent voting, 97 percent of

23 those 6 percent.  Is that --

24 A    I just want to say, of -- I think my testimony stands

25 on its face.

Page 86

1  Q    Thank you, Mr. Renzi.  Wouldn't account holders be just
2  as well off if they could get their -- if they could get
3  coins back into their own wallets without this uncertainty?
4  A    I'm sorry, can you repeat the question, please?
5  Q    Wouldn't account holders be just as well off if they
6  could get coins back into their own wallets without this
7  uncertainty?
8  A    I believe that this transaction provides incremental
9  value for customers and is overwhelmingly voted in favor and
10 the customers that are voting believe this, too.  So I
11 believe that what we're doing is value maximizing.
12 Q    And that incremental value is that the 20 million
13 that's being paid by Binance?
14 A    It's at least 20 million, for sure, but also we believe
15 that the amount of recoveries is going to be higher based on
16 the construct of the Binance plan.
17 Q    Mr. Renzi, I just have a couple of questions left.
18 What is the Debtors' current cash position?
19 A    Your Honor, can I ask one of my associates the current
20 cash position?
21 THE COURT:  Do you know what it is?
22 THE WITNESS:  I don't have it in front of me.
23 THE COURT:  Do you have a range, rough approximation?
24 MR. SLADE:  I apologize.  I didn't hear the question.
25 THE COURT:  What is the Debtors' current cash position?

Page 87

1  BY MS. SCHEUER:
2  Q    Do you have a ball park, Mr. Renzi, more or less than
3  10 million?
4  A    It's more than 10 million.
5  Q    More than 10 million.  More than 20 million?
6  A    It -- they have more than $20 million of cash.
7  Q    More than 40 million?
8  A    Yes, they have more than $40 million of cash.
9  Q    And what will that cash be used for under the plan?
10 A    It's spelled out in the plan in terms of, to the extent
11 that administrative costs need to be paid and priority costs
12 need to be paid, the cash will be used to be paying
13 administrative and priority claims.
14 Q    What is the amount of professional fees that remain
15 outstanding?
16 A    I don't have that in front of me.
17 Q    Will the money that Binance is providing as part of the
18 transaction, will that 20 million go to professional fees?
19 A    The 20 million will -- is fungible and goes into the
20 entire estate so --
21 Q    So it could go to professional fees?
22 A    I view the cash as fungible for the estate.
23 Q    Okay.  Would it -- is there any provisions that it
24 would, the $20 million that's being paid would go to account
25 holders?

Page 88

1  A    I think I answered the question.  It's fungible --
2  Q    Okay.
3  A    -- for the estate.
4  Q    Okay.  All right.  Thank you, Mr. Renzi.  I have no
5  more questions.
6  THE COURT:  All right, is there anybody else in
7  the courtroom who has questions for Mr. Renzi?
8  MR. SHEHADEH:  Your Honor -- yes, I have
9  questions, Your Honor.
10 THE COURT:  No, you -- let me deal with the people
11 who are present in the courtroom first, okay?  Counsel, who
12 -- you are?
13 MR. ST. JOHN:  Yes, Your Honor.  For the record,
14 Jason St. John on behalf of the New York State Department of
15 Financial Services.
16 THE COURT:  Okay.
17 CROSS EXAMINATION OF MARK RENZI
18 BY MR. ST. JOHN:
19 Q    Morning, Mr. Renzi.  Just a few questions.
20 A    Good morning.  Afternoon.
21 Q    You're correct.  Good afternoon.  If I understood your
22 direct testimony correctly, Voyager currently has the
23 personnel to toggle to the liquidation plan under the plan,
24 correct?
25 A    Do you mind bringing the microphone up?

Page 89

1  Q    I apologize.
2  A    Yeah, thank you.
3  Q    If I understood your direct testimony correctly,
4  Voyager has the personnel and ability to toggle to
5  liquidation under the plan, correct?
6  A    They have the ability to execute under a  Binance plan
7  and a toggle plan.
8  Q    Okay.  And under a toggle plan, cryptocurrency will be
9  returned to account holders, correct?
10 A    Yes.
11 Q    Okay.  Should the sale transaction go forward,
12 customers in supported jurisdictions have the option to
13 become customers of Binance.US; is that correct?
14 A    Yes.
15 Q    Okay.  And if a person in a supported jurisdiction
16 chooses not to become a customer of Binance.US, their claims
17 will be liquidated and paid out in cash three months after
18 closing; is that correct?
19 A    Believe so.
20 Q    Okay.  And if an account holder in an unsupported
21 jurisdiction -- let me rephrase.  An account holder in
22 unsupported jurisdiction in the circumstances Binance.US
23 does not attain licensure, has to wait for six months after
24 closing for their claims to be liquidated, correct?
25 A    Yes.  To the extent that there are unsupported states

1 and that it does not -- and then Binance is not able to get

2 the supported states to work with customers, it'll take

3 another six months.

4 Q   Okay.  And that additional time is so that Binance.US

5 has the opportunity to become licensed in unsupported

6 jurisdictions?

7 A   Yes.  I think they do have the opportunity to become

8 licensed in unsupported jurisdictions.

9        MR. ST. JOHN:  That's all.  Thank you, Your Honor.

10        MR. BRUH:  Your Honor, Mark Bruh for the United

11 States Trustee.  While we didn't formally object to a

12 liquidation, I would like to ask the witness a few questions

13 if the Court would allow.

14        THE COURT:  Go ahead.

15        MR. BRUH:  Thank you.

16        CROSS EXAMINATION OF MARK RENZI

17 BY MR. BRUH:

18 Q   Mr. Renzi, my name is Mark Bruh.  I'm an attorney for

19 the United States Trustee and I just have a few questions

20 regarding liquidation, specifically Chapter 7 analysis from

21 your affidavit and declaration that's admitted into

22 evidence.  But before I start that, I just wanted to ask a

23 background question, kind of pivot -- I guess piggybacking

24 on the question from Ms. Scheuer and the SEC.  You said the

25 cash position of the Debtors is in excess of $40 million; is

1 that right?

2 A   I did.

3 Q   Okay.  Do you know how the crypto holdings are broken

4 down by the Debtor as of today?

5 A   In terms of the coin balances?

6 Q   Or for example, when the plan was submitted, there was

7 -- it said there was about $1.1 billion of assets, not

8 including the infusion from Binance, and today we heard that

9 it's about 1.34 billion, so there's been an increase because

10 there's cryptocurrency and it's gone up in value.

11 A   Yes.

12 Q   Do you know how much stable coin the Debtors hold today

13 that's pegged one to one with the U.S. dollar?

14 A   I have supporting schedule, not in front of me, but I

15 would have to refer to that schedule.

16 Q   Can you refer to it?  Was it attached to your

17 declaration?

18 A   I don't believe it was attached to my declaration.

19 Q   Do you know how much Bitcoin the Debtors are holding

20 today?

21 A   I believe it's over 8,000 Bitcoin, but --

22 Q   Eight thousand.  Okay.  And do you know how much

23 Ethereum they're holding today?

24 A   I don't have that in front of me.

25 Q   Okay.  And then the rest --

1 A   The issue, Your Honor, is that we're rebalancing coins

2 every day.  And so to the extent that those have been

3 rebalanced, I don't have those numbers in front of me.

4 Q   Okay.

5 A   But it's happening --

6 Q   The -- my questions were going to the FTX settlement

7 because it's my understanding under the proposed settlement

8 which hasn't been approved by the Court yet that $445

9 million worth of crypto would be converted to fiat currency.

10 And do you know which crypto will be converted?

11        MR. SLADE:  Your Honor, I object again.  This is

12 not in front of the Court.  I don't see how this is

13 relevant.

14        THE COURT:  Can I -- there's an awful lot of

15 confusion reflected in the questions here.  Let me just --

16 let me just ask something.  As I understand the Binance

17 deal, all of the Debtors' cryptocurrency will be transferred

18 to Binance.  It will be designated -- or there will be

19 designations as to what will be distributed to customers.

20 But other than what is distributed to customers, it'll just

21 be bought by Binance; is that correct?

22        MS. OKIKE:  Your Honor, the plan is actually set

23 up that crypto will only move to Binance as customers sign

24 up for --

25        THE COURT:  As and when they need it.  Okay.

1        MS. OKIKE:  So it will transfer on a weekly basis

2 for the customers that have signed up during, you know, the

3 prior week.

4        THE COURT:  And what crypto that the Debtors hold

5 that is not necessary or not part of those initial

6 distributions to customers?

7        MS. OKIKE:  The Debtors will continue to hold that

8 cryptocurrency as customers sign up and it'll be transferred

9 on a weekly basis.

10        THE COURT:  But I thought I understood that, you

11 know, the Debtors will make initial distributions.  There

12 are all kinds of reserves that need to be established, so

13 people will get their initial distributions.  I thought

14 otherwise, the Debtors were liquidating their cryptocurrency

15 holdings; is that right?

16        MS. OKIKE:  Your Honor, we will be liquidating,

17 but we have the opportunity for customers in supported

18 jurisdictions, they have three months post closure to sign

19 up.  If they don't want to sign up for the Binance platform

20 at that time, their distributions are liquidated into cash.

21 They'll be sent back to the company and the company will

22 make those distributions.  Same for customers in unsupported

23 jurisdictions.  We're hopeful, again, that approvals are

24 reached, you know, five or six months, but if they're not,

25 that cash will be liquidated either by --

1    THE COURT:  So whatever cash you need to set up

2  this reserve for FTX Alameda will be obtained by market

3  liquidations or by sale to Binance?

4    MS. OKIKE:  Market liquidations, Your Honor, and

5  Binance may be a counterparty to that.

6    THE COURT:  Okay.

7    MS. OKIKE:  But over time.  We've already

8  obviously begun the rebalancing exercise and we are doing it

9  with the understanding that we are going to likely have to

10  hold back 445 million, given the asserted administrative

11  priority claim.

12    THE COURT:  But when you say that the Debtor has

13  1.3 billion of cryptocurrencies and that the Binance deal is

14  therefore 1.32, from what you're telling me now, Binance

15  isn't buying all of that.

16    MS. OKIKE:  They're not purchasing crypto, yes,

17  Your Honor.  The crypto -- they're really serving as a

18  distribution agent for customers under the plan.  They are

19  providing incremental value both in terms of the up-front

20  cash consideration as well as the expense reimbursement and

21  the transaction structure really provides over 100 million

22  of incremental value than the toggle transaction because of

23  the feasibility of --

24    THE COURT:  Yeah, I understand the arguments about

25  why it results in more, but it's just -- so in other words,

1  Binance is not buying all of your crypto.  Some of it will

2  be liquidated in the market.

3    MS. OKIKE:  Correct.  We actually don't view them

4  as buying the crypto.  We view them as a distribution agent

5  who's facilitating distribution under the plan through their

6  platform.

7    THE COURT:  So the only thing they will take

8  custody of is what they distribute to people who become

9  customers --

10    MS. OKIKE:  Correct.

11    THE COURT:  -- or if in the market you sell them

12  something?

13    MS. OKIKE:  Correct.

14    THE COURT:  Okay.

15  BY MR. BRUH:

16  Q    My concern with the -- talking about FTX was that the

17  conversion to fiat currency, if that's going to happen

18  sooner than later, the settlement is approved, would then

19  your 2 percent projection of transaction fees under a -- for

20  the sale of cryptocurrency, would that be affected by that

21  transaction?

22  A    I don't think the 2 percent would be affected, no.  I

23  think it's just the estimate for the friction cost to

24  transact in cryptocurrency.

25  Q    Now, isn't it -- doesn't transactions of USDC, aren't

1  those transaction fees de minimis?

2  A    They are.  That's on average, 2 percent.

3  Q    But so --

4  A    They -- sorry.  It's on average 2 percent from my

5  testimony, but you're right, for stable coin, it is less.

6  Q    So that's what I was getting at was trying to figure

7  out, because I haven't really seen the coin report as to how

8  much the Debtors' holding is in USDS as opposed to Bitcoin,

9  which I understand has a higher transaction cost, or

10  Ethereum and piggybacking on that, the liquidation under the

11  FTX deal or the transaction, we don't know what coins are

12  going to be sold to convert the crypto to fiat currency; is

13  that right?

14  A    I mean, it depends on what scenario we're under, but I

15  think one thing to just clean up is that there is the 2

16  percent friction cost, but then there's a market depth

17  issue, so --

18  Q    Right.

19  A    The market depth issue and speed also matter.  So to

20  the extent you have to move and liquidate, you know,

21  crypto quickly, you're going to have issues in terms of the

22  market depth, even in Bitcoin and Ethereum.

23  Q    And is that the 20 percent number that you had in

24  Paragraph 88 of your declaration?

25  A    I can't speak to exact paragraph because it's not in

1  front of me --

2  Q    Right.

3  A    -- if I had that, but I -- yes, there are discounts, I

4  because of those issues in terms of market depth.  So I'm

5  sure you're referencing the right paragraphs.

6  Q    I mean, I don't have it in front me, but --

7  A    But nonetheless, around --

8  Q    But it's the 20 percent number.

9  A    There's a 20 percent and then a 26 percent.

10  Q    Right.  And does that take into account, because on

11  September 2nd of 2022, Bitcoin was trading at about, just

12  under 20,000 and today it's trading in excess of 23,000.  So

13  is that 20 percent number still accurate?

14  A    It is and more importantly is that it wasn't just done

15  by -- it wasn't done in aggregate.  It was done by coin and

16  then it was done with market makers and Moelis and the UCC

17  advisors to make sure that we had the appropriate

18  comprehensive set of information to make sure that we

19  understood what would happen relative to market depth and

20  moving coin quickly or slowly in a rebalancing transaction.

21  So it was very well informed, well analyzed, you know, not

22  only with the advisors here but also with market

23  participants that are market makers.

24  Q    What is your basis that a Chapter 7 Trustee cannot make

25  in-kind distributions to creditors if the case is converted?

1    A    Basis is based on discussions with counsel and that the
2    understanding is that in my assumptions that would need to
3    be done quicker and that in-kind distributions would be
4    quite challenging.  You know, if a U.S. Trustee -- excuse
5    me, if a Chapter 7 Trustee was to do that.
6    Q    So for Chapter 11, if -- strike that.  If the Debtor
7    toggles to a liquidation, the Binance deal doesn't go
8    through and the Debtor has to make distributions to its
9    customer base, can Voyager do that or will it have to go out
10   to a third party platform to make those distributions?
11   A    Under what scenario?  I'm sorry.
12   Q    Under liquidation, if the Binance deal doesn't go
13   through.
14   A    So under a toggle plan --
15   Q    Right.
16   A    -- you can use the Voyager platform to make
17   distributions.
18   Q    So Voyager would have to be restarted and then it would
19   start making distributions to its customer base; is that
20   right?
21   A    Yes.  It would -- they would make distributions.
22   Q    And it's your opinion that under a conversion to
23   Chapter 7, a Chapter 7 Trustee doesn't have a platform to
24   make these distributions, so there would be some sort of
25   costs associated with it; is that right?

1    A    There is a cost associated with it.  There -- we
2    believe that also it's a timing issue, too.
3    Q    Can you explain the timing issue to me a little more,
4    elaborate on that?
5    A    My understanding is you have to set a new bar date.
6    You have to restart part of the process.  It would take
7    quite a bit of time to effectively get cryptocurrency to
8    clients.  And then, furthermore, I would be very concerned
9    about the employees under a Chapter 7 plan if they would be
10   participants in a Chapter 7 plan.
11   Q    Yeah.  Okay.  There's -- but a Chapter 7 Trustee can
12   make interim distributions to creditors, right?
13   A    Yes.  I believe so.  But they would -- if we had to
14   make distributions it would be in cash, is my understanding.
15   Q    But there's no -- what is your -- what is that based on
16   that it has to be in cash?  Why can't a Chapter 7 Trustee
17   make in-kind distributions on an interim basis to the
18   customers?
19   A    You can't deposit cryptocurrency into a bank account.
20   Q    Correct.
21   A    That's why.
22   Q    But it's being held --
23        MR. SHEHADEH:  (indiscernible).
24        THE COURT:  Don't interrupt.  I'm tired of telling
25   you.  Do not interrupt.  All right?

1        MR. SHEHADEH:  (indiscernible).
2        THE COURT:  Don't speak over the witness.  Don't
3    interrupt just because you disagree.  I'm tired of giving
4    you the same warning.  Go ahead, Mr. Bruh.
5        MR. BRUH:  Thank you, Your Honor.
6    BY MR. BRUH:
7    Q    And I understand that, because the crypto today is not
8    being held in a bank account; isn't that right?
9        THE COURT:  Mr. Bruh, Section 704(a) of the
10   Bankruptcy Code says "the Trustee shall collect and reduce
11   to money, property of the estate."  Are you saying that's
12   not what the Trustee has to do in the Chapter 7 case?
13       MR. BRUH:  No, Your Honor.
14       THE COURT:  Then what's the point of these
15   questions?
16       MR. BRUH:  Okay, I'll move on, Your Honor.
17       THE COURT:  Go ahead.
18   BY MR. BRUH:
19   Q    I guess my last question to you is what's your
20   experience in Chapter 7 bankruptcies?
21   A    Limited.
22   Q    Okay.
23       MR. BRUH:  I have no further questions, Your
24   Honor.
25       THE COURT:  Okay.  Anybody else in the courtroom

1    who wishes to cross examine the witness?  Okay.  Is there
2    anybody on the line who wishes to cross examine the witness?
3        MS. RYAN:  Good afternoon, Your Honor.  This is
4    Abigail Ryan with the State of Texas and I have some
5    questions for the witness.
6        THE COURT:  Okay, Ms. Ryan, please proceed.
7        MS. RYAN:  Thank you, Your Honor.
8             CROSS EXAMINATION OF MARK RENZI
9    BY MS. RYAN:
10   Q    Good afternoon, Mr. Renzi.  I'm going to kind of shift
11   to a more basic question for you.  You're aware that Alameda
12   has a loan facility claim for $75 million, right?
13   A    I am.
14   Q    And is it the Debtors' plan to subordinate that claim?
15   A    Yes.
16   Q    And do you have an estimated likelihood of success that
17   it will be subordinated?
18       MR. SLADE:  Your Honor, I object.  That's not
19   relevant.  It's also outside the scope of this witness'
20   testimony.
21       THE COURT:  I'm not sure how this ties into your
22   objection or as to the issues, Ms. Ryan.  Could you explain
23   to me where you're going with this?
24       MS. RYAN:  Absolutely, Your Honor.  My objection
25   is that the account holders weren't given enough disclosures

Page 102

1  as to the percentage that their recovery could drop down to
2  in different situations. Mr. Renzi in his affidavit
3  testified that his numbers are based upon the Debtors
4  getting the $75 million at Alameda loan facility
5  subordinated, but there's no mention in his declaration what
6  the numbers would be under the Binance plan or toggle plan -
7  -
8          THE COURT:  Okay.
9          MS. RYAN:  -- if they weren't successful in
10 subordinating.
11         THE COURT:  Do you know the answer, Mr. Renzi?
12         THE WITNESS:  It would be the amount of recovery
13 on the $75 million, the percentage recovery there, and then
14 it would dilute the rest of the claims pool.  I'd have to
15 spend a little bit of time running that number.
16         THE COURT:  Ms. Ryan, are you asking the witness
17 what would happen if the loan was not subordinated at the
18 holding company and TopCo level or are you asking him what
19 would happen if the operating company were found to be
20 liable on the loan?
21         MS. RYAN:  Well, they'll be -- I have two
22 questions, Your Honor.  One is, as to the --
23         THE COURT:  You do understand --
24         MS. RYAN:  -- subordination of the loan facility
25         THE COURT:  You do understand, don't you, that

Page 103

1  under the terms of the loan documents, the named borrower is
2  not the operating company where the customers are.  Alameda
3  has asserted that the named company, that the operating
4  company should be liable.  So are you asking what would
5  happen if the operating company were found liable on that
6  loan or are you asking about what would happen at the parent
7  company levels, because subordination at the parent company
8  levels really doesn't mean anything for the recoveries of
9  the customers.
10         MS. RYAN:  So I'll explain this in a different way
11 and maybe you'll see where I'm going, Your Honor.
12         THE COURT:  Okay.
13         MS. RYAN:  In the disclosure statement on Page 55,
14 it states that recovery for both account holders' claims and
15 OpCo General Unsecured Claims would be reduced to
16 approximately 24 percent from 51 percent under the sale
17 transaction if the Alameda loan facility claim is not
18 subordinated and Alameda prevails in its alleged preference
19 claim.
20         And so they're asserting in the disclosure
21 statement that both would have an effect on distribution.
22 And so what I'm wondering is, that was not mentioned in Mr.
23 Renzi's declaration, but it is something that creditors have
24 the right to know.  What would happen to the recovery if
25 one, as they say, the subordination isn't successful; and

Page 104

1  two, this $445 million preference claim, Alameda wins on.
2          THE COURT:  But you just told me that creditors
3  were entitled to know it, but didn't you just read the
4  answer from the disclosure statement?
5          MS. RYAN:  So one would think that would be the
6  answer, Your Honor; however, the disclosure statement and
7  the affidavit submitted by Mr. Renzi, they kind of conflict
8  in this regard.  Under a Chapter 7 in the disclosure
9  statement, the creditors would actually do better than the
10 toggle plan and that's not discussed in Mr. Renzi's
11 affidavit that under the toggle plan if the two Alameda
12 issues were successful in Alameda's favor, toggle plan, sale
13 plan both, it's going to drop to 24 to 26 percent, depending
14 on which paragraph you read in the disclosure statement.
15         THE COURT: Aren't you assuming that the Alameda
16 issues only affect recoveries under the Chapter 11 plan and
17 would not also affect recoveries under a Chapter 7
18 liquidation?
19         MS. RYAN:  No, Your Honor.  I think it would
20 affect recoveries under a Chapter 7 liquidation, too.  And
21 so what I would like Mr. Renzi to explain to me is if
22 Alameda is successful on both of those counts as they set
23 out in the disclosure statement, what percentage of recovery
24 or range -- because I know we have moving parts here --
25 would account holders receive under the Binance plan, under

Page 105

1  the toggle plan, and under a plan of liquidation, because
2  it's not clear from the disclosure statement or Mr. Renzi's
3  affidavit.
4          THE COURT:  Do you know the answer, Mr. Renzi?
5          THE WITNESS:  Your Honor, it would take some time
6  to do that, but it would decrease the recovery across all
7  scenarios but still under the plan and under the toggle
8  plan, it would still be greater than under a liquidation
9  scenario.
10 BY MS. RYAN:
11 Q    Mr. Renzi, in the disclosure statement itself, it
12 specifically says on Page 55 under Item B, the Alameda loan,
13 that underneath the toggle transaction and in the Chapter 11
14 cases, the recoveries would be reduced to approximately 24
15 percent.  And likewise, in the disclosure statement, it says
16 that under Chapter 7, the possible return would be a 35 to
17 39 percent.  So doesn't that show that a Chapter 7 would
18 actually be more beneficial than the toggle plan for the
19 sale?
20         THE COURT:  You can answer the question.  Go
21 ahead.
22 BY MS. RYAN:
23 A    Yeah.  So number on, I don't follow your math.  It's
24 just -- it's very simple.  You can't just pick and choose
25 whether or not -- it only works whether or not the 75

Page 106

1  million is subordinated only in the liquid -- under the
2  Binance plan and then not in the liquidation.  I mean, I
3  think you have to use it uniformly, in my expert opinion,
4  across all plans.
5  Q   I agree with you.
6  A   So the issue --
7  Q   I completely agree with you.
8          THE COURT:  Does the 39 --
9  BY MS. RYAN:
10 Q   But in the disclosure statement --
11         THE COURT:  Does the 39 percent number that was
12 quoted by counsel assume that there is no Alameda claim in a
13 Chapter 7 liquidation?
14         THE WITNESS:  In my declaration, it highlights and
15 if I could have my declaration, that'd be great so I can
16 answer you directly, Your Honor.  It highlights the
17 recoveries you have under a subordination of the $75 million
18 claim.
19         THE COURT:  Okay.
20         THE WITNESS:  Under all four --
21 BY MS. RYAN:
22 Q   And does your affidavit include a scenario if Alameda's
23 $445 million preference claim is successful?
24 A   It would further -- it would be a further reduction,
25 yes, under all four scenarios.

Page 107

1  Q   But is that in your affidavit?  Did you discuss the
2  $445 million preference claim?
3  A   I'm testifying to that now.
4  Q   Okay, so it wasn't in your affidavit, right?
5          THE COURT:  Ms. Ryan -- Ms. Ryan, just, I'm
6  confused by all this because isn't this basic mathematics
7  that if you calculate percentage recoveries in three
8  scenarios and you conclude certain amounts and then you
9  calculate what the percentages would be if you add
10 additional unsecured claim amounts in each of the same three
11 scenarios, as long as you're doing apples to apples
12 comparison, you still find out that the -- if under the
13 original calculation, the Binance came out highest, it still
14 would.  If the toggle came in second, it still would.  And
15 if the Chapter 7 calculation came in third, it still would.
16         That's just indisputable.
17         MS. RYAN:  Your Honor, I agree.
18         THE COURT:  It's indisputable mathematics.
19         MS. RYAN:  It is simple.  It's very simple
20 mathematics.  However, this information wasn't presented to
21 any of the creditors in the disclosure statement and this is
22 something that I believe should have been disclosed so that
23 they can have a fair reading of these percentages and what
24 could possibly happen.  When reading the disclosure
25 statement, you know, and specifically in the Paragraph 55,

Page 108

1  it makes it look like the toggle plan would be worse than
2  the Chapter 7 and I don't believe there was adequate
3  information in Mr. Rensi's affidavit to show, okay, let's do
4  the math.  If Alameda's successful, how much do they all
5  decrease by?  And I think that that should have been
6  disclosed and it's not.
7          THE COURT:  Are you saying that you think
8  customers were misled into thinking that the Chapter 11 plan
9  was a bad deal?  I mean, 97 percent of them voted in favor
10 of it.
11         MS. RYAN:  I'm saying --
12         MR. SHEHADEH:  Yes.
13         MS. RYAN:  Your Honor, I'm saying that I don't
14 believe they were given adequate information as to what
15 would happen if this Alameda $75 million loan facility claim
16 and the preference claim of $445 million was successful in
17 Alameda's favor and what that would look like for them.
18         I believe that regardless of whether it's
19 stretched out across Binance plan, toggle plan, liquidation
20 plan is that we all decrease by that amount, meaning the
21 Binance plan would still be higher under simple math; they
22 still should have been given those numbers because, yes, the
23 disclosure statement is a bit misleading when you read a
24 portion of it and it says under the Chapter 7 scenarios,
25 you'll get 34 to 39 percent back, but if Alameda is

Page 109

1  successful under the plan and under the toggle, you're only
2  going to get 24 percent back.  And in another section, it
3  says 26 percent back.  I don't think that our accountholders
4  have actual numbers that they can hang their hat on.
5          THE COURT:  Okay.  So do we need more evidence on
6  this point or is the rest of that for argument as to whether
7  the disclosure was sufficient?
8          MS. RYAN:  Your Honor, I would appreciate, if
9  there is more evidence, I think the percentages would be
10 very helpful in that regard.  The witness doesn't -- witness
11 said he'd have to sit down and try to figure them all out.
12 So it's not something that he actually has right now.  So it
13 wasn't in the disclosure statement.  It's not something we
14 have available at the moment.
15         So I'm not sure what other evidence -- we can save
16 it (indiscernible) Your Honor.
17         THE COURT:  I'm sorry --
18         MS. RYAN:  We can save it for argument, Your
19 Honor, and I'll change my subject of questioning.
20         THE COURT:  Okay.
21         MS. RYAN:  Thank you.
22 BY MS. RYAN:
23 Q   So when you were determining if the Binance deal, Mr.
24 Renzi, was in the best interests of the creditors, did you
25 read the Binance terms of use?

A-1090

Page 110

1   A    Members of my team did.
2   Q    And were you made aware, since it's your team, of the
3   possibility that the accountholder's information can be
4   stored anywhere in the world that Binance.US sees fit?
5        MR. SLADE:  Your Honor, I object.  That assumes
6   facts not in evidence.
7        THE COURT:  All right.  I guess that's right,
8   technically.  I don't have the Binance terms of use on file.
9   Is there a dispute as to what they say?
10        MR. SLADE:  Actually --
11        MS. RYAN:  I can re-ask --
12        MR. SLADE:  -- a problem.
13        MS. RYAN:  I can re-ask that question, Your Honor.
14   BY MS. RYAN:
15   Q    So under -- the terms of use were ready by people on
16   your team, correct?
17   A    Yes, I believe so.
18   Q    And did they bring any concerns to your attention
19   regarding those terms of use?
20   A    They're not lawyers.  I think they just brought up the
21   fact that to the extent that the Binance plan does not work,
22   we have a toggle plan, and if the terms of use become so
23   problematic as you're highlighting, we do have an option to
24   go to the toggle plan.
25   Q    And are you an expert in regulatory issues?

Page 111

1   A    No.  I'm not.
2   Q    Did you have anyone on your team who was reviewing the
3   terms of use that was an expert in regulatory issues?
4   A    No.
5   Q    Do you know under the Binance plan, is it possible for
6   Binance to make a one-time distribution to creditors?
7   A    I understand that the Binance plan that those weekly
8   distributions to -- through the Binance platform and to the
9   extent that someone elects to have an account with them and
10   they would like to take the crypto off the exchange, that
11   would be the methodology for -- to do that.
12   Q    Okay.  And so it's my understanding the six-month
13   waiting period for the nonconsenting jurisdictions is to
14   give Binance the ability to get licensed in those
15   jurisdictions; is that right?
16   A    Yes, that's my understanding.
17   Q    And do you know or do you have knowledge that Binance
18   has yet to file a request for licensure with the Texas State
19   Securities Board or the Department of Banking?
20   A    My understanding is they're working with your
21   jurisdiction.  I don't know the extent, where that lies
22   right now.
23   Q    And are you aware that it is virtually impossible for a
24   license to be approved, whether it be for Binance or anyone
25   else with the Securities Board or the Department of Banking

Page 112

1   in a six-month period?
2        MR. SLADE:  Your Honor, I object.  That assumes
3   facts not in evidence.
4        THE COURT:  Well, the question was, do you know
5   that to be a fact.  Do you?  Do you have any idea?
6        THE WITNESS:  No.
7        THE COURT:  Okay.
8        MS. RYAN:  Okay, Your Honor, I will pass the
9   witness.  Thank you very much.
10        THE COURT:  Okay.  There anybody else on the line
11   who wishes to cross examine the witness?
12        MR. SHEHADEH:  I'd like to cross examine, Your
13   Honor.
14        THE COURT:  Okay.  Is that Mr. Shehadeh?
15        MR. SHEHADEH:  Yes, Your Honor.
16        THE COURT:  Okay, go ahead.
17        MR. SHEHADEH:  Your Honor, I'd just like to ask
18   him about the plan.
19        CROSS EXAMINATION OF MARK RENZI
20   BY MR. SHEHADEH:
21   Q    When they made that deal with FTX, like (indiscernible)
22   go through or why wasn't there a toggle done then?  There
23   would've been more return for the creditors.  And I see that
24   both sides have disclosed critical information
25   (indiscernible) the voting and they said in an email that

Page 113

1   was sent out to customers, they said that if we agree with
2   the deal, we would get a higher return than we would if we
3   did the toggle down effect, which was defective.  Don't you
4   agree?  Because (indiscernible) not true.
5        MR. SLADE:  Your Honor, it's a compound question -
6   -
7        MR. SHEHADEH:  And what is --
8        THE COURT:  Let's break your question down.  Let's
9   break your question down.  I think you asked, why was there
10   no toggle at the time of the FTX deal?
11        MR. SHEHADEH:  Yes.
12        MR. SLADE:  Your Honor, I would object to
13   relevance.
14        THE COURT:  Well, go -- let's go ahead.
15        THE WITNESS:  Happy to answer, Your Honor.
16   BY MR. SHEHADEH:
17   A    So number one, we -- when we were initially, you know,
18   the initial --
19   Q    When you say we, who are you referring to?
20        THE COURT:  Don't interrupt, please.  Let the
21   witness talk.  Go ahead.
22        THE COURT:  Thank you.
23   BY MR. SHEHADEH:
24   A    When we initially were analyzing the transaction with
25   FPs, we worked in consultation with a number of people

1  including the Unsecured Creditors Committee advisors, the
2  company, the Moelis and the rest of the advisors and we all
3  agreed as well as did many of the states and other -- in
4  congress believed that FTX was a viable entity.
5  Unfortunately, what's been proven to all of us on the Wall
6  Street Journal every day is that it was a fraud.
7         So our belief at the time, based on the information
8  that we had that FTX was a viable transaction, it was vetted
9  by multiple parties, both the Unsecured Creditors Committee
10  advisors and the company advisors, in terms of the
11  transaction and the toggle plan was not needed.
12        However, based on the facts that we saw unfold over the
13  past few months, we believe that we don't want to see
14  another issue where to the extent that we are uncomfortable
15  with the transaction with Binance for whatever reason, that
16  our main objective was to get crypto back to our customers
17  as quickly as possible, and thus a toggle plan was warranted
18  to make sure that we could do that.
19  Q   So to get the crypto back to customers as fast as
20  possible, wouldn't it have just made more sense to just open
21  up the exchange and allow customers to (indiscernible) their
22  crypto off the platform?  Isn't that the whole reason behind
23  the Chapter 11 organization?  You guys, (indiscernible) the
24  company so you guys would've filed Chapter 7, then Chapter
25  11.  And the money that you guys (indiscernible) to Coinbase

1  every day, what is going on with that money?  What is that
2  money used for?
3         THE COURT:  Okay, you have to ask one question at
4  a time, Mr. Shehadeh.
5  BY MR. SHEHADEH:
6  A   Mr. Shehadeh, I think there are a number of assumptions
7  that you would have to make that -- where you would be
8  correct.  So the assumption would be, is that there was no
9  bankruptcy laws, and that we could just take assets and move
10  them as quickly as possible.  The issue with that assumption
11  is number one, you have to make sure that you're doing
12  things in a fair, transparent way and that is well
13  documented.
14        There is a process of checks and balances in our Court
15  system, in the Bankruptcy Court system.  That's imperative
16  and that is to make sure that the company is working through
17  to maximize value in consultation with the Unsecured
18  Creditors Committee and that all customers have the ability
19  to vote for this.  And unfortunately --
20  Q   (indiscernible).
21        THE COURT:  Don't interrupt the answer, please.
22  Go ahead.
23  BY MR. SHEHADEH:
24  A   Unfortunately, the construct that you have provided
25  does not provide the provision for voting, nor does it

1  comply with the laws of this country.  So I'm trying to do
2  that.
3  Q   Object.  There's no relevance.  We're talking
4  Bankruptcy Court.  We're not talking about laws of this
5  country.  If you want to talk about laws of this country
6  then everybody in Voyager would be charged with criminal
7  charges right now.  So let's not really get into that right
8  there.  Anyway, back to my point.
9         Like I said, you guys made a public statement stating
10  that assets were fine, the company was fine, and they are
11  still operable.  Five days later, the company filed for
12  bankruptcy. (indiscernible).  So instead, you guys
13  (indiscernible) find somebody to buy the company, which is
14  not reorganization, but so when the FTX deal didn't go
15  through, there was a bidding war and I quote -- and this is
16  on Forbes and you can look it up, on Wall Street, there was
17  a bidding war for Voyager and there was a good faith deposit
18  from each one of these companies that wanted to buy Voyager.
19  Where is the good faith deposit and why wasn't it sold to
20  second-highest bidder?
21        And if that didn't work out, why wasn't there a
22  winddown or whatever you guys call it done then?  Why was is
23  more months of delegation, litigation, and moving
24  (indiscernible) going to pay Moelis and Kirkland exorbitant
25  fees, that I might add, because they didn't charge Celsius

1  the same fees that they were charging us.  Well, we're not
2  going to get into that.  It's a whole other subject.  But I
3  just want to know, toggle down now with the Binance deal.
4         MR. SLADE:  Your Honor --
5  BY MR. SLADE:
6  Q   And the SEC objected to.  Go ahead.
7         MR. SLADE:  Your Honor, I object.  To the extent
8  what was a question, he already answered.
9         THE COURT:  I think he --
10        MR. SHEHADEH:  That was a completely different
11  question.  He can answer it.
12        THE COURT:  I think the only question I heard
13  there was why was there not a toggle deal, but also why was
14  there not a backup bidder at the time of FTX.  I don't think
15  he asked about the backup bidder at the time of FTX before,
16  so you can answer that question.
17  BY MR. SHEHADEH:
18  A   We tried to have a backup bidder during the transaction
19  and we were not successful in having one that we could turn
20  to right away.
21  Q   So the whole bidding war, that was just all media
22  propaganda?  That was a lie?
23  A   Your Honor, I don't know how to answer that question.
24  It's talking about --
25        MR. SLADE:  It's talking about -- it assumes facts

A-1092

Page 118

1  not in evidence again.
2        THE COURT:  So you --
3        MR. SHEHADEH:  You don't know how to answer a lot
4  of questions.
5        THE COURT:  The question is, is the reason why you
6  didn't have a backup bidder, that there wasn't anybody else
7  interested and that the statements that there were other
8  people who were bidding was a lie.
9        THE WITNESS:  The statements that I understand are
10  not a lie, Your Honor.
11        THE COURT:  Okay.
12  BY MR. SHEHADEH:
13  Q    (indiscernible) when FTX bidded for Voyager, only FTX
14  submitted a bid for Voyager?
15  A    No, I'm not saying that.
16  Q    Okay, then.  So there obviously was other bidders.  Do
17  you have the name of those other companies
18  A    Your Honor, is that a question for me, Your Honor?
19        THE COURT:  Mr. Shehadeh, he said there were other
20  bidders.  He said they didn't have one who was willing to be
21  --
22        MR. SHEHADEH:  Right, which just proves that he
23  just lied and contradicted himself.
24  BY MR. SHEHADEH:
25  Q    But anyway, can you name me the other bidders, sir,

Page 119

1  please?  Do you know?
2  A    Binance was one of the other bidders.
3  Q    So Binance was another bidder.  Let's include all the
4  other companies.  Binance was -- when we seen that FTX, they
5  (indiscernible) with you guys, was wasn't the deal sent to
6  Binance?  And on top of that, why was Binance's deal and
7  incentive lower than what it what it would have been to
8  Celsius?  Because Binance (indiscernible) Celsius' people a
9  $50 incentive.  We didn't get nothing like that.
10  A    Your Honor --
11  Q    So if FTX fell through, why would (indiscernible).
12        THE COURT:  I don't understand where --
13        MR. SHEHADEH:  That's my question.
14        THE COURT:  I don't understand.  You know, you've
15  got to stop making speeches and just ask questions, Mr.
16  Shehadeh.  We're trying to give you an awful lot of leeway
17  because I know you're not an attorney, but there are rules
18  to how this proceeding goes.  It is not time for you to just
19  make argument or complaints, particularly about things in
20  the past that aren't really in front of us today.
21        MR. SHEHADEH:  I understand that, Your Honor, and
22  I apologize.  You're right.  I'm not attorney, Your Honor,
23  but what I'm stating is simple fact and creditors deserve
24  answer so.  My money is not a toy to be played with.  And
25  this is different situation.  We're not dealing with fiat

Page 120

1  here, we're dealing with crypto.  You know, it's a different
2  situation than giving regular money.
3        THE COURT:  You have to ask --
4        MR. SHEHADEH:  (indiscernible).
5        THE COURT:  You -- let me finish.  You have to ask
6  questions on matters that relate to what's actually in front
7  of me today.  It's not an open mic.  It's not a town hall.
8  It's not a gripe session.  It's not a radio call in-show for
9  sports news or crypto news.  It's not a forum for everybody
10  to air every complaint they have --
11        MR. SHEHADEH:  Yes, I understand that, Your Honor.
12        THE COURT:  -- about everything that's happened in
13  the past.
14        MR. SHEHADEH:  It's not a podcast, it's not
15  (indiscernible).  I understand that.
16        THE COURT:  Okay, so we have --
17        MR. SHEHADEH:  I'm asking a question, Your Honor,
18  I just want an answer to.
19        THE COURT:  We have issues in front of us today
20  that don't include why things weren't -- you know, things
21  that weren't done at the time of FTX.  Those -- I don't see
22  how that's at all relevant to any of the issues.
23        MR. SHEHADEH:  Well, the relevance today, Your
24  Honor, which I'm saying is because had they just did that
25  before, there would've been more money for the creditors.

Page 121

1  We would've never had that clawback and I don't even see how
2  there is a clawback when we give Alameda $650 million loan.
3  Isn't that the whole reason why we went into bankruptcy,
4  because they defaulted on that loan?  So how do we owe them
5  $455 million?  That's my question.
6        THE COURT:  We are where we are.  So how does any
7  of that have anything, any bearing on what we ought to do
8  today?
9        MR. SHEHADEH:  I'm sorry, can you repeat that,
10  please?
11        THE COURT:  I said, we are where we are.  We can't
12  undo the past, so how do your questions on those points
13  other than you're being angry about them, how do they have
14  any bearing on what we ought to do?
15        MR. SHEHADEH:  Yes, Your Honor.  I'm very angry
16  because I have had over $100,000 in Voyager and they want to
17  give me back 12,000, 13,000 (indiscernible).  And my
18  portfolio balance, let's say 18, 19, 25 (indiscernible).  So
19  what happened to that extra money?  Does that make any
20  sense?  I give -- Your Honor, I give you -- you want to buy
21  a hot dog and I give you a hamburger.
22        THE COURT:  You have to ask questions.
23        MR. SHEHADEH:  (indiscernible).
24        THE COURT:  You have to ask questions that are
25  focused on the transactions and proposals that are in front

1  of us today.  Okay?  I know you're angry about these things,
2  but I don't know how many times I can explain to you that
3  you have to calm down about them and focus on --
4      MR. SHEHADEH:  I understand that, Your Honor.
5      THE COURT:  -- what we're trying --
6      MR. SHEHADEH:  I understand --
7      THE COURT:  You also have to -- you also have to
8  not interrupt me when I'm speaking to you.  Okay?  That's a
9  cardinal rule.
10     MR. SHEHADEH:  Your Honor, last time --
11     THE COURT:  Stop.
12     MR. SHEHADEH:  -- allow me to speak and you cut me
13  off the courtroom --
14     THE COURT:  Stop it, stop it, stop it, until I am
15  finished.  All right!  My patience is wearing thin with you,
16  Mr. Shehadeh.  You are not listening to me.  You want to
17  conduct the hearing in the manner that you want to conduct
18  it.  You have to listen to me.  There are issues in front of
19  us today that I am trying to give you the chance to address
20  and I am bending over backwards to tolerate multiple
21  interruptions and refusals to abide by my instructions.
22     But you have to listen to my instructions.  You
23  have to abide by them.  It's a Court proceeding.  I cannot
24  let you hijack it to deal with other gripes that you have
25  about the past.  You must understand that and you must

1  accept it and you must calm down and listen to my
2  instructions.  And if you have questions, please ask
3  questions about the merits of what we are trying to do today
4  and whether it makes sense to do this today.  But all your
5  complaints about other things that happened in the past, I
6  can't change those things.  They don't affect what we're
7  doing today.  You have to focus on what we're doing today.
8  And if you have objections to what we're doing today, you
9  have to ask to the extent you want evidence and then you
10 have to make objections and arguments based on what we're
11 doing today.  But there's an order in which these things
12 have to be done.  I can't let you continue to just interrupt
13 the proceedings with gripes about the past.  That's not what
14 we're here to do today.  It's not what the business of the
15 Court is today.  All right?  Do you understand that?
16     MR. SHEHADEH:  I understand that, Your Honor.
17     THE COURT:  Can you follow --
18     MR. SHEHADEH:  So can you explain to me --
19     THE COURT:  Can you follow those --
20     MR. SHEHADEH:  -- what the business of the Court
21 is?
22     THE COURT:  Will you -- can you follow those
23 instructions?  Are you capable of following them?
24     MR. SHEHADEH:  Yes.  Yes, I am, Your Honor.
25     THE COURT:  All right.  Then if you have a

1  question for the witness about what we're dealing with
2  today, please ask it.
3  BY MR. SHEHADEH:
4  Q   Okay.  Back to with the FTX and (indiscernible).  Why
5  wasn't Binance considered a valid backup bidder when FTX
6  deal didn't go through and when that didn't go through, why
7  was there not a winddown then?  (indiscernible) that answer.
8      THE COURT:  Go ahead.
9  BY MR. SHEHADEH:
10 A   They didn't agree to be a backup bidder.
11 Q   I'm sorry?
12 A   Binance did not agree to be a backup bidder.
13     MR. SHEHADEH:  Your Honor, did you hear what he
14 just said?
15     THE COURT:  Yes.  He said back in the time of the
16 FTX deal, Binance did not agree to be a backup bidder.
17 BY MR. SHEHADEH:
18 Q   So if I'm dealing on something and I was bidder one and
19 then he decided not to, wouldn't I be the next step in mind
20 to be a bidder?  So if they didn't want to be a backup
21 bidder, that does not make any sense.
22 A   I don't understand the rationale for -- Binance is an
23 organization that's well advised.  They can make their own
24 decisions.  The process for auctioning the assets was well
25 documented and marketed by Moelis.  There are multiple

1  participants and it was done in a fair and transparent way,
2  and when you're trying to sell the business to, at that
3  point in time, FTX was the highest bidder, it was done with
4  a number of representatives from the Unsecured Creditors
5  Committee, their advisors, as well as the company and the
6  company's advisors.  So it was done completely transparent
7  in my opinion.
8  Q   Again, like Judge Wiles said, we're not here about
9  opinions.  We're here about facts.  So what facts do you
10 have on that?
11 A   I believe what I said is a fact.
12 Q   In your opinion.  We're not here for your belief, sir,
13 we're here for facts.  You have any documentation that shows
14 that?
15 A   Your Honor, I --
16 Q   (indiscernible).
17 A   Your Honor, I participated directly in the auction.  I
18 can state for a fact that what I said is true.
19 Q   Is there any type of information stating about the
20 purchase agreement and what terms it was?
21     MR. SLADE:  Your Honor, I object.  He answered
22 this question.
23     THE COURT:  Sustained.  Sustained.  We've spent
24 enough time on the -- on last fall.  We're here to talk
25 about the deal that's in front of us today.  So the

Page 126

```
1   objection is sustained.  MR. SHEHADEH:  Which is what, Your
2   Honor?  Can you explain?
3           THE COURT:  The objection is that questions about
4   what happened at the time of the FTX deal had nothing to do
5   with what we're doing here today and so they are irrelevant
6   to our proceedings.
7           MR. SHEHADEH:  I understand.
8           THE COURT:  So I have sustained the objection to
9   your question.
10          MR. SHEHADEH:  Okay.  So what are we talking about
11  today, this hearing?  What does this hearing pertaining to?
12          THE COURT:  The hearing today is whether we
13  confirm the plan that is currently proposed, which is to
14  sell to Binance and in the event that transaction won't go
15  through, to toggle to the toggle plan under which Voyager
16  will to the extent it can distribute assets.  Although the
17  testimony so far is that it -- there are certain kinds of
18  coins that I guess could be distributed through Binance that
19  Voyager would not be able to transfer.
20          The question is whether we are going to confirm
21  that plan.  That's the issue we have today.
22          MR. SHEHADEH:  Okay, I understand that, Your
23  Honor.
24          MR. SHEHADEH:  Binance has liquidity some and they
25  become (indiscernible) Your Honor.
```

Page 127

```
1           THE COURT:  I'm sorry, I couldn't understand you.
2           MR. SHEHADEH:  In case that Binance does become --
3   has liquidity issues and then goes bankrupt or files for
4   Chapter 11 or whatever, and then what happens?
5           THE COURT:  Then you'd be -- then if you elect to
6   become a Binance customer and Binance goes into bankruptcy,
7   then you would be in another bankruptcy proceeding.  But --
8           MR. SHEHADEH:  So is that in the best interest of
9   the creditors, you think, Your Honor?
10          THE COURT:  Well, I'm not -- you know, I'm not the
11  one to answer your questions.  I'm the one top hear argument
12  and to make a decision, but so far, most of the people who
13  have actually taken the time to vote, have voted in favor of
14  this.  I understand, you know --
15          MR. SHEHADEH:  Yes, but --
16          THE COURT:  I understand your questions but, you
17  know, I don't know if Binance is in -- you and a few other
18  people and to some extent the regulators have sort of said,
19  well, gosh, we have questions.  But I'm looking for some
20  evidence.  I don't want to do anything that's going to hurt
21  customers.  I want to do what's best for customers.  I think
22  if the Debtors had reason to believe Binance was going to go
23  into bankruptcy, they wouldn't want to do business with
24  Binance.  Nobody wants to do that.
25          MR. SHEHADEH:  (indiscernible) FTX.
```

Page 128

```
1           THE COURT:  The question is, what evidence do we
2   have on any of these points?  The proposal --
3           MR. SHEHADEH:  I mean --
4           THE COURT:  It's not up to me.
5           MR. SHEHADEH:  -- there's plenty of evidence, Your
6   Honor.
7           THE COURT:  It's not up to me to formulate a plan.
8   I have a proposed plan in front of me that proposes the sale
9   to Binance and most of the people who will be affected by
10  that have voted in favor of it.  So you don't like it, but
11  the question is, is there evidence --
12          MR. SHEHADEH:  (indiscernible) Your Honor, you
13  know what I mean?
14          THE COURT:  What's that?
15          MR. SHEHADEH:  Robbed of their hard earned money.
16          THE COURT:  Okay, do you have questions about --
17  for this witness on these subjects?
18          MR. SHEHADEH:  I'll pass the witness, Your Honor.
19          THE COURT:  Okay.
20          MR. SHEHADEH:  There's other people
21  (indiscernible).
22          THE COURT:  Thank you.  Is there anybody else on
23  the phone who wishes to cross examine the witness?
24          MS. DIRESTA:  Hi, Your Honor, I would.  Can you
25  hear me?
```

Page 129

```
1           THE COURT:  Who is it?
2           MS. DIRESTA:  My name is Gina DiResta.  Can you
3   hear me?
4           THE COURT:  I can, but who do you represent?
5           MS. DIRESTA:  I am a pro se creditor.  I represent
6   myself.
7           THE COURT:  Okay.
8           MS. DIRESTA:  So, before I ask the witness the
9   question, just so you know because I do a good amount of the
10  creditors that's on this call, I received some text messages
11  saying that we can't really hear you well.  So if you maybe
12  -- I don't know whether the mic is positioned, so we do have
13  a hard time hearing you, just so you know.
14          THE COURT:  Okay.
15          MS. DIRESTA:  And then as for my question for the
16  witness.
17          CROSS EXAMINATION OF MARK RENZI
18  BY MS. DIRESTA:
19  Q   For the people -- for the creditors who do not want to
20  move over to Binance in order to get their assets and they
21  would rather just wait out their three months and get
22  liquidated, would those creditors' KYC information still be
23  transferred over to Binance?
24  A   I don't know the answer to that specific question for
25  KYC information.  I believe that if you're going to open an
```

A-1095

Page 130

1    account at Binance, then they will make sure that you comply
2    with KYC as AML.
3        Q   Yes, but my question isn't if I'm going to open an
4    account with Binance because that makes sense.  You would
5    need the KYC information.  My question was, if I do not want
6    to open an account with Binance and I want to wait the
7    three-month period and get cash out, which is an option,
8    will my KYC information still be transferred over to
9    Binance.
10           MR. SLADE:  Your Honor, I object.  He already said
11   he didn't know, but the -- I'm not -- didn't get this
12   creditor's name, but I don't think she filed an objection.
13           THE COURT:  That's okay. I'm going to hear her.  I
14   think as I understand --
15           MS. DIRESTA:  No, I did not.
16           THE COURT:  -- the submissions -- if I understand
17   the submissions that were made, the information would be
18   transferred to Binance; isn't that right?
19           MS. OKIKE:  Yes, that's correct, Your Honor.
20           THE COURT:  Okay.  Even if --
21   BY MS. DIRESTA:
22       Q   Is that information --
23           THE COURT:  Even if this customer doesn't want
24   anything to do with Binance, Binance would get her
25   information?

Page 131

1            MS. OKIKE:  Correct, Your Honor.
2            THE COURT:  Okay.
3    BY MS. DIRESTA:
4        Q   And is that information provided in the disclosure
5    statement?
6            MS. OKIKE:  Your Honor, we can check it.  It's in
7    the APA but we'll double check.  We did send out our
8    customer migration protocol which sort of laid this all out.
9            THE COURT:  I believe it is, if that's your
10   question.  You may not have seen it or not, but I believe it
11   is.
12   BY MS. DIRESTA:
13       Q   Okay, and then if we're getting cashed out, the
14   creditors want to get cashed out, what would be the process
15   for that?  And to be more specific, could it be a situation
16   where we would just get a check directly from Voyager or is
17   it a situation where all of my assets would still then
18   technically go to Binance, my crypto assets would go to
19   Binance, then they convert that to cash and then send that
20   back over to Voyager and then I get a check from Voyager or
21   I get a check from Binance?  Like, how would that exactly
22   work?
23           THE COURT: To your knowledge the answer?
24           THE WITNESS:  I think I know most of it, but there
25   was a lot of if this then that.

Page 132

1    BY MS. DIRESTA:
2        A   So I believe that if you elect to go over to Binance,
3    we already discussed how that would work.  I think your
4    question is if you don't.  I believe that the funds stay at
5    Voyager and you get cashed out at Voyager, if that's what
6    you elect to do.  And then the way it's transmitted, I
7    believe you can do an ACH or a check, but I would need to
8    confirm that.
9        Q   Okay.  So it would be simply everything would stay at
10   Voyager and then a check would get cut to me directly from
11   Voyager. There would be no transfer of assets to Binance;
12   however, there will be a transfer of my KYC information
13   regardless to Binance.  Is that correct?
14       A   I think I was just informed by counsel that yes, the
15   KYC information will be at -- they'll be provided to
16   Binance, but under the scenario that you're highlighting, I
17   think, you know, Binance would not be the distribution agent
18   in that case that (indiscernible).
19       Q   Okay.  So my next question is the UCC held a Twitter
20   Spaces Town Hall on November 4th.  And during that town
21   hall, the subject matter was the FTX deal because FTX had
22   not gone bankrupt yet.  And during that town hall, someone
23   had asked a question about the percentage of distribution
24   that people were going to get and I can't remember who on
25   the panel answered the question.  I think it was someone

Page 133

1    from FTI, but they basically said that for every $20 million
2    dollars that FTX was giving Voyager as part of the sale, for
3    every $20 million, it only equated to about 1 percent of the
4    creditors' recovery.  So with that information, since
5    Binance is only offering $20 million, which is way less than
6    what FTX was offering, then doesn't the same logic hold true
7    that we're only getting about 1 percent additional recovery
8    with the Binance deal?
9        A   Roughly.  Yes.  You're correct.  And it's -- but it is,
10   $20 million is a significant amount of money in general, but
11   there is a large claim pool so that just gets to the math
12   that you're highlighting.  But I --
13       Q   Okay --
14       A   -- can't speak for FTI, but I can speak to the math.
15       Q   Okay.  So then earlier in the hearing, someone asked
16   you the question of the $20 million that Binance is
17   offering.  Is that all going to be going to the creditors or
18   would some of that be spent on some administrative cost, and
19   you didn't really answer the question.  You just said that
20   the cash is, you know, fungible, which means it can really
21   go anywhere, right?  Like there's no guarantee that all of
22   that cash is going to go to the creditors.  So even if all
23   of the cash did go to the creditors, it's only 1 percent of
24   our recovery and if, say, only $10 million of it goes to the
25   creditors because the other $10 million is spent elsewhere,

1  then that drops down to like 0.5 percent or maybe none of it
2  goes to us and it drops down to 0 percent.
3     So I set this up to ask this question.  How is it then
4  that the Binance deal is actually a better option than the
5  toggle option, when the lawyers are constantly saying that
6  you guys are trying to get the most amount of recovery in
7  the shortest period of time, when the recovery seems to be
8  the same with the Binance deal and the toggle option and
9  then the shortest period of time is the toggle option?  So
10  how is the Binance deal better than toggle option, given
11  everything I just laid out?
12     MR. SLADE:  Your Honor, I object.  That was a
13  speech, not a question and he answered it when it was asked
14  the first time.
15     THE COURT:  Well, I'll sustain the objection, in
16  part, because the -- there's a false premise in the
17  question, which is that whether if $20 million more is paid
18  by Binance, that it's not really $20 million more.  Whatever
19  the professional fees are, whatever other expenses there are
20  of the estate, they have to be paid and they have to be paid
21  if there's a toggle deal or if there's a Binance deal.  It
22  actually makes no sense to ask where the $20 million will
23  go, because all of the expenses will be the same but in the
24  Binance transaction, there will be $20 million more.
25     Now I understand that you don't think that that's

1  much in terms of how -- as a percentage matter it affects
2  recoveries.  That I understand.  But the premise of your
3  question that somehow it will be used for some other
4  expenses and therefore not available, well, money is
5  fungible.  Those expenses have to be paid from somewhere.
6  Necessarily, if there's $20 million more, then there's $20
7  million more for creditors.  There's no other way to do the
8  math.
9     Now, if you want to ask him, why are we doing this
10  just for a 1 percent increase in creditor recoveries, that's
11  fine.  Go ahead and ask him that.
12     MS. DIRESTA:  Okay.  Thank you, Your Honor.
13  BY MS. DIRESTA:
14  Q   So why are we going through all of this struggle and
15  spending all of this time and money for a 1 percent recovery
16  to creditors when the toggle option is obviously faster and
17  almost equivalent?
18  A   So 1 percent is $20 million, as you already just
19  generally agreed on.  I think that's number one.  Number
20  two, Binance supports all of these coins, so there are
21  roughly 35 coins that are unsupported and our concern is
22  that in an unsupported format that you're going to get, you
23  will get to the best of my knowledge and market experts, you
24  will get less money.  So to the extent that you can
25  effectuate this transaction, $20 million in my opinion is --

1  and I understand that percent is not a significant number, 1
2  percent, but it is higher.  It is better.  And $20 million
3  in general is a lot of money.  And then furthermore, the
4  support of the coins is very important.  So those are two
5  reasons, at least two reasons.
6  Q   Okay, you're saying the support of the coins and I'm
7  kind of confused because my understanding is with the toggle
8  option, is just the Voyager app opens up and then people can
9  attach their wallet and withdraw their crypto and then now
10  it's theirs.  They have it.  It's been distributed to them
11  or if they choose to cash out, then they can, you know, get
12  the cash.
13     So how is that not a better option than going through
14  all this trouble of, you know, moving over to Binance,
15  especially when someone else said, I can't remember if it
16  was someone at Kirkland just earlier in this hearing that
17  Binance is essentially just a distribution agent.  Why can't
18  Voyager act as its own distribution agent with the toggle
19  option and just open up the app, let people plug in their
20  wallets so that they don't lose their coins or if they want
21  to cash out, give them that option?  Why can't we do that?
22     THE COURT:  You can answer.
23  BY MS. DIRESTA:
24  A   Yeah, you're asking my opinion on which one is better.
25  The Binance transaction is better than the toggle plan.  The

1  toggle plan is a contingency plan.
2     THE COURT:  I think the question was, the coins
3  that will be made available through the Binance plan.  Can't
4  they all, all of them, be made available through the toggle
5  plan?  And if that's right, why don't we just do the toggle
6  plan?  I think that -- you think you said they can't --
7     MS. DIRESTA:  Thank you, Your Honor.
8     THE COURT:  -- you need to explain what you mean
9  when you talk about unsupported coins --
10     THE WITNESS:  My --
11     THE COURT:  -- and what the difference would be in
12  the in-kind distributions that you could do under the toggle
13  plan versus the Binance plan.
14     THE WITNESS:  Yes.  Thank you, Your Honor.  So my
15  understanding is that there are 35 coins that are
16  unsupported that do create problems for distribution through
17  the Voyager platform.  So that's the first answer.  And then
18  secondly, I think the question is, you know, why are we
19  doing this.  I think the answer is that it is mathematically
20  better and I think we had that discussion earlier.
21     THE COURT:  What do you mean when you say they're
22  unsupported?
23     THE WITNESS:  My understanding is that on the
24  Voyager platform, you have issues in terms of distribution
25  and support of 35 coins.  It's just what's been represented

1  to me in terms of distribution and I think the benefit of
2  the Binance plan is that all coins are supported.  And not
3  all coins are -- it's not as if they're all on one universal
4  exchange.  It's, there are multiple exchanges.  So there's
5  some exchanges where some coins are more obscure and
6  unfortunately, it would not be equal footing to the extent
7  that one customer who is pari passu with another customer
8  but has different coins may be adversely affected.
9             THE COURT:  So in other words, under the Binance
10 deal, people who want in-kind distributions can get them no
11 matter what their coins are.  Under the toggle deal, there
12 are certain kinds of coins you would not be able to do an
13 in-kind transfer on?
14            THE WITNESS:  That's right, Your Honor.
15            THE COURT:  Okay.
16 BY MS. DIRESTA:
17 Q    Okay, so as a follow-up question to the unsupported
18 coins on Voyager, I'm sure, given all of the developers that
19 not only Voyager has or that, you know, out there in the
20 industry, that there is a very simple way to make this
21 unsupported crypto become supported, because if Binance is
22 doing it, right, they have the capability to do it, then I'm
23 sure Voyager should be able to have the capability of doing
24 it.  So why doesn't Voyager just support the unsupported
25 coins?  What is the problem there?  Why can't we do that?

1  A    Your Honor, this -- I'm sorry, this doesn't just
2  magically happen.  You'd have to have developers.  You'd
3  have to spend more time.  You'd have to figure out a
4  methodology that everybody would agree to, to do that, and
5  in my opinion, that delay is -- will further delay
6  distribution to unsecured creditors.
7  Q    Is there a way for us creditors or for you guys to
8  provide exactly what those steps would be and how long it
9  would take to make something unsupported become supported?
10 A    I'm sure I (indiscernible).
11            THE COURT:  Are you capable of answering that
12 question or would somebody else has to answer?
13            THE WITNESS:  I'm not capable of answering all the
14 technical abilities to change from supported to unsupported
15 coins, but I have a general understanding that it will take
16 some time, effort, and money.
17 BY MS. DIRESTA:
18 Q    And the thing about those vague answers is that, like,
19 anybody can give a vague answer and I'm just supposed to be
20 satisfied with it and trust you on that, but I would really
21 like to see the evidence laid out, you know, kind of like
22 how crypto has white paper that lays out the plan of how
23 it's going to function, how it's going to work.  So I'd like
24 to see what that plan is and what the timeframe is and how
25 much it's supposedly going to cost to see if what you guys

1  are saying is accurate.
2             MR. SLADE:  Your Honor --
3  BY MS. DIRESTA:
4  Q    So is there a way for us to get information like that?
5             MR. SLADE:  Your Honor, I object.  That's not a
6  question.  And every creditor had the option to take
7  discovery and did not.
8             THE COURT:  Well, let me ask you, are you planning
9  to offer any testimony from anybody else that can explain in
10 more detail what the problems are in terms of the
11 unsupported coins?  It is after all, one of the bases on
12 which you kind of touted the Binance deal as being better.
13            MR. SLADE:  So we have one other witness that
14 could probably speak to that in some degree, but it's a, I
15 mean, it's a highly complicated process and it's probably
16 different by coin.  There's 35 separate coins, so I don't
17 think we have anybody here today that can explain for each
18 of the 35 coins what would have to happen for the Voyager
19 platform to support it.
20            THE COURT:  All right.  Well, we'll see what your
21 other witnesses can do, but it sounds like this witness has
22 exhausted his own technical ability to explain the issue.
23 Am I right about that?
24            THE WITNESS:  Yes, Your Honor.
25            THE COURT:  Okay.

1             THE WITNESS:  Thank you, Your Honor.  I'm done.
2             THE COURT:  Okay.  Anybody else on the phone?
3             MS. DIVITA:  Good afternoon --
4             MAN 1:  Your Honor -- ladies first.
5             MS. DIVITA:  Thank you.  Good afternoon, Your
6  Honor.  This is Michelle DiVita and like to ask some
7  questions related to some trustee comments made by the
8  witness.
9             THE COURT:  Okay.
10            CROSS EXAMINATION OF MARK RENZI
11 BY MS. DIVITA:
12 Q    First question, did your due diligence related to the
13 Binance transaction include any data privacy considerations?
14 A    I do not personally conduct any data privacy due
15 diligence.
16 Q    Are you aware that there is a provision for Binance to
17 purchase customer selfies from Voyager?
18 A    Could you ask the question again, please?  Thank you.
19 Q    Yeah.  So as part of the Binance transaction, there's a
20 specific provision that allows Binance to also purchase
21 customers' selfies so something, you know, take a picture of
22 your face.  That is explicitly enumerated in the purchase
23 agreement.  Were you aware that that was a component when
24 you conducted your due diligence?
25 A    I knew that Binance was trying to acquire you know, the

Page 142

1  possibility of having new customers that they would have a
2  good experience on that platform and that that hopefully the
3  customers would elect to go over the platform and that there
4  were conditions in doing that.  So, yes, I'm generally aware
5  of it.
6  Q    Okay, but you did not identify any risk as part of the
7  transfer of customer biometric data, correct?
8  A    My understanding is that it's laid out in, you know, in
9  the documents that have been presented here and I can't
10  speak to whether or not it was biometric or not.  I just
11  can't.
12  Q    So generally, the -- your analysis in terms of whether
13  or not the plan of reorganization is a better option for
14  creditors versus a liquidation plan, does that analysis or
15  that model does not contemplate any data privacy risk for
16  customers, correct?
17  A    I think the analysis stands on its face and it's been
18  voted by 97 percent of customers that did vote, that they
19  accept the terms and conditions of the plan.  And then
20  furthermore, I'm not a data security expert.  So I, you
21  know, I can't speak to any questions about that.
22  Q    Okay.  You mentioned the 97 percent of customers that
23  did vote.  Based on just your professional experience, 6
24  percent -- is a 6 percent voter turnout for a large customer
25  class typical?

Page 143

1  A    I can tell you that 97 percent is a very high
2  percentage of voting in favor of a plan in something as
3  complicated as this.  And since this is the first large
4  cryptocurrency case in this country, you know, 6 percent
5  turnout is what it is on its face.  I would have liked to
6  see a larger turnout but people all have the ability to turn
7  out.
8  Q    Do you think or do you have any thoughts in terms of
9  why, believe someone previously mentioned 175K customers
10  have opted in to use the Binance platform; whereas, think
11  only like 60,000 voted in favor of the plan?
12  A    I don't understand.  I can't understand -- I don't
13  understand your question.  Can you say it again?  It's not
14  very clear what --
15  Q    Yeah.
16  A    -- asking.
17         THE COURT:  She says it sounds like more people --
18         MS. DIVITA:  So --
19         THE COURT:  More people signed up for the Binance
20  platform than actually voted on the plan.  Can you explain
21  why that might be?
22         THE WITNESS:  More people -- Your Honor, could you
23  -- I just don't follow.
24         THE COURT:  Based on the numbers Ms. Okike said at
25  the beginning of the hearing about the number of customers

Page 144

1  who signed up already in the Binance plan, she says it
2  sounds like more people have done that than have actually
3  voted on the plan.  Do you have any idea why that would be?
4         THE WITNESS:  No.
5  BY MS. DIVITA:
6  Q    Okay.  So it sounds like maybe more than 6 percent of
7  customers are interested in, you know, doing this Binance
8  transaction, but when you say a majority of customers have
9  voted in support of plan that contemplates the discrepancy
10  between the number of customers who signed up versus those
11  that have voted.
12  A    Well, I think --
13  Q    Right?
14  A    I think people have the ability to elect to vote or to
15  not to vote and in our country, I believe that's one of our
16  rights.  So -- and you know, to the extent that somebody
17  didn't vote but elects to go to Binance that seems to make -
18  - that makes sense from a math perspective.  So if you don't
19  vote and you want to go to Binance, that can be
20  mathematically true.  So I see no logic flaw there.
21  Q    Okay.  So in terms of customers that aren't signing up
22  for this Binance, then and there's about 700,000 people in
23  (indiscernible), is that (indiscernible) roughly correct?
24  THE COURT:  She's asking you if there are something like
25  700,000 customers who have not yet signed up for Binance.

Page 145

1  BY MS. DIVITA:
2  A    I believe there's a period of time in which customers
3  can continue to sign up, but the numbers obviously will
4  continue to change over the coming weeks.
5  Q    So as of today, then, assuming those customers don't
6  sign up or sign up and some sort of gathered basis, at least
7  -- what's the minimum timeframe that those 700,000 customers
8  could receive a distribution if they did not opt in or sign
9  up for Binance?
10  A    The minimum amount of time to come over, is the
11  question?
12  Q    Sorry, for the cash distribution from Voyager.
13         THE COURT:  I'm sorry, we're having trouble
14  hearing you clearly enough to understand the question.
15         MS. DIVITA:  I know, I'm sorry.  One second.  Is
16  this better?
17         THE COURT:  Try again.
18         MS. DIVITA:  Is this better?
19         THE COURT:  I won't know until you try the
20  question again.
21         THE WITNESS:  And slower, please.
22         MS. DIVITA:  Okay --
23         THE COURT:  Maybe a little slower.
24         MS. DIVITA:  I'm sorry.
25  BY MS. DIVITA:

Page 146

1  Q    So this is in the context of the timeline of creditor
2  customer recovery.  If 700,000 people today have not signed
3  up for Binance and I understand that they have three months
4  to sign up, assuming no one signed up for those 700
5  customers, what is the soonest they can receive a cash
6  distribution from Voyager in time?
7  A    The difference in time?  I believe that the Binance,
8  the Binance plan is the most expedient way for distribution
9  to customers, if you elect to go to Binance.  I think the
10 toggle will take longer, but hopefully not much longer.
11      THE COURT:  I think she's saying --
12 BY MS. DIVITA:
13 Q    So if you elect to go to Binance.
14      THE COURT:  I think she's asking if you don't sign
15 up for Binance, when do you get your cash?
16 BY MS. DIVITA:
17 A    I believe it's before June under a toggle plan, so --
18 but in a Binance transaction, hopefully it's effective, goes
19 effective in the middle of April.
20 Q    So is there a way to opt out of the Binance plan?  So
21 for example, I'm not signing up for Binance.  If I -- so I
22 have three months to sign up.  I know that I don't want to
23 sign up.  Am I receiving a distribution three months from
24 April or is it -- is there an option for me to receive a
25 distribution sooner?

Page 147

1  A    I believe the timing is before June, so -- the exact
2  amount of time, I don't have in front of me.
3  Q    I'm just trying to get to, you know, extending the
4  timeline for creditors when we have 700 creditors that
5  aren't opting in to a expedited timeline.  And this is in
6  comparison between the plan of reorganization and the
7  liquidation.
8  A    Your Honor --
9       THE COURT:  I'm not sure that's a question.  Let
10 me ask Ms. DiVita, what exactly is your question?
11      MS. DIVITA:  I am just trying to clarify the
12 timing.  So, one of the assumptions in why this plan of
13 reorganization is preferable for creditors is because it
14 expedites the timeline for recovery.  But based on the
15 numbers as they are presented today, it sounds like this 175
16 (indiscernible) people, that's not a large portion and
17 doesn't necessarily support the contention that a majority
18 of creditors are looking at or interested in an expedited
19 timeline.  And to just kind of further maybe drill down on
20 that point.  But I don't know --
21      THE COURT:  So, if I understand the question for
22 the witness, it is if customers who don't want to go to
23 Finance have to wait three months to get cash, is that
24 longer than it would take to get cash if we didn't have a
25 plan?

Page 148

1       MS. DIVITA:  That is well said.  That is my
2  question.
3       THE COURT:  In other words, if you converted to
4  Chapter 7, would people get cash sooner than what they would
5  get -- sooner than three months?
6  BY MS. DIVITA:
7  A    I think the issue if you convert to a Chapter 7 is not
8  -- number one, I think it does take longer than the Binance
9  plan.  Number two is that if you immediately -- and as Your
10 Honor read (indiscernible), if you have to distribute in
11 cash, that really will have issues in terms of the current
12 market and it will have a significantly lower recovery.
13      So, it's an issue of timing and overall recovery.  So,
14 I am certain that if you have to monetize obscure
15 cryptocurrency assets quickly, that the performance on that
16 recovery is going to be significantly diminished and in some
17 cases, you know, over 50 percent reduction.  And that's from
18 market makers.
19      So, the concern is that as you think through all
20 customers being treated equally, ones that have more obscure
21 cryptocurrency certainly bear the brunt of (indiscernible)
22 transactions, monetization.
23 Q    Got it.  That's actually very helpful and kind of
24 segues me into my next question.  So, you're saying that the
25 rebalancing approach is the same under the Binance

Page 149

1  transaction and the Chapter 7 liquidation with the trustee?
2  A    No.
3  Q    Okay, so it's different.
4  A    I'm not saying that.  I'm saying that the rebalancing
5  is optimizing what's going on in the market right now,
6  trying to do it in the least disruptive way.  That is what
7  we're doing right now.  I think under a liquidation, Chapter
8  7 liquidation, the timeline to monetize those assets has to
9  be quicker to monetize that and you will have a
10 significantly lower recovery.
11 Q    Because --
12 A    Because you have to convert into cash.
13 Q    Got it.  So, you're talking about the marketability of
14 the assets.
15 A    Right.  I mean, bitcoin has --
16 Q    Okay.
17 A    Sorry.  Go ahead.
18 Q    Oh no, go ahead.
19 A    As we testified earlier and as a fact, Bitcoin has a
20 much deeper market in market (indiscernible) second largest
21 market (indiscernible), my understanding, for
22 cryptocurrencies.
23 Q    So, I guess I don't exactly follow how marketability
24 differs between Binance and liquidation.  Is it because
25 Binance is just getting a transfer of these more volatile or

1    less widely held cryptocurrencies?

2           THE COURT:  I think what the witness has said is

3    that under the rebalancing approach, the Debtors can spread

4    transactions over time to avoid the kinds of immediate

5    impacts on the market that you would have if you had to sell

6    everything all at once.  Is that right?

7           THE WITNESS:  Yes, Your Honor.

8    BY MS. DIVITA:

9    Q    Okay, that is very helpful.  So, then in terms of the I

10   guess sale or rebalancing act, couldn't -- I guess since the

11   assets aren't one to one, like this is an exercise that

12   could have been started well before the Binance transaction,

13   correct?  And the marketability risk isn't specific to

14   Binance, kind of been known from the beginning, right?

15   A    Well, I can't answer all of your questions the same

16   way.  So, the first question is could we do it during the

17   pendency of the case.  We receive not authorized to do it.  It

18   took some time to get authorized.  There are certain

19   protocols to do it.  There are safety procedures that needed

20   to be done.  We have to make sure that we are in compliance

21   with the APA.  So, rebalancing is a very regimented process

22   to be the least disruptive that we can be to the marketplace

23   to monetize assets in a way where you can receive those

24   coins in kind and then be the least disruptive to the

25   marketplace.  So, that process is ongoing.  And you're

1    right, it is not created to be one to one.  There are some

2    coins that we have too much of them and we will sell them,

3    and then we will buy other coins to rebalance the entire

4    portfolio.

5    Q    Got it.  So, the rebalancing is not -- it's required

6    for both -- I guess both methods.  But one has to be

7    effectuated quicker?

8    A    I'm not sure of the exact question.  But I think

9    rebalancing is important because for, among other things

10   that I've heard on the town halls is that receiving, pulling

11   in kind is one of the preferences of the majority of

12   customers instead of cash because it might have adverse tax

13   consequences.  And I don't know what those numbers would be,

14   but that's been expressed by multiple customers.  And we

15   designed the plan in concert with the unsecured creditors'

16   committee advisors to make sure that we were thinking about

17   issues such as that to make sure we can do distribution in

18   kind to the best of our ability.  And that's what the

19   Binance plan calls for.  And it supports all the coins.

20   Q    So, that --

21   A    So, it's not just one factor for this plan.

22   Q    Yeah.

23   A    The plan is to try to do the best.  One is to do the

24   best in terms of maximising value.  It's at least $20

25   million better just on the face of it.  The execution is

1    even better in terms of the recovery because of the way it's

2    being done, which is being done in a very regimented process

3    and to be the least disruptive for the market.

4    Q    Got it.  So, the tax benefits under a distribution in

5    kind offsets any really purchaser or buyer risk I guess kind

6    of in -- so there are securities risks, there are regulatory

7    risks, you know, as we've seen from the FTX transaction.

8    There's liquidity risk.  And so, you're saying that the

9    preference of customers to get their cryptocurrency in kind,

10   which is predominantly driven by a tax benefit -- which I

11   don't know what -- we'll say 35 percent -- that offsets any

12   quantified risks, transaction risks?

13   A    I wouldn't characterize my testimony as I understand

14   everybody's tax basis.  All I can say is that there is a

15   preference for crypto in kind and that does have the

16   advantageous aspect for some that have a tax basis that

17   would prefer to receive it in kind.  There are, as you

18   pointed out, over 700,000 customers.  I can't speak for all

19   of them, but we have taken into consideration the issues

20   that have been brought before us, and the preference is in

21   kind.  That's one.

22           And then two, because of market conditions, if we had

23   to liquidate all crypto in due cash, we think that the

24   recovery levels would be significantly lower, at least 20

25   percent lower, because of the items that I've already

1    testified to.

2    Q    Okay.  This is my last question then.

3    A    If you can understand, like, you're not flooding the

4    market with coins if you rebalance it.

5    Q    Right.

6    A    You're selling all into cash, you're flooding the

7    market with more coins.

8    Q    Got it.  So, you have to flood the market under Chapter

9    7.

10          So, then I guess this is my last question.  In terms of

11   -- you mentioned that when you did your quantification, your

12   accounting for all these various marketability, rebalancing,

13   et cetera, but you also mentioned that this analysis didn't

14   include any quantification of data privacy risks.  Did it

15   include any other adjustments for risks such as securities,

16   solvency, anything like that in your calculation?

17   A    I think I already testified to that in terms of

18   regulatory bodies and that risk.  That's not been quantified

19   mathematically, but it's described that obviously there are

20   -- you know, the regiment for regulation for cryptocurrency

21   continues to be worked on right now by governmental

22   agencies.  So, it's hard for me to opine on that because I

23   don't know the outcome and I don't think many do know the

24   outcome at this point.

25   Q    So, risks inherent to a cryptocurrency transaction were

1  not quantified even though they don't exist in a liquidation
2  context?  But only -- I guess they do, but only in a bad
3  way.  And that's because you're flooding the market.
4  A  (indiscernible).  My testimony stands on its face.  I
5  can't -- the way you described things, I was confused
6  by it, honestly.
7  Q  Okay, that's fine.  I'm done.  Yeah.  Thank you.
8        THE COURT:  All right.  Is there anybody else --
9        MS. WALL:  Hi, this is Jennifer Wall.
10       THE COURT:  Who is it?
11       MS. WALL:  This is Jennifer Wall.  I am a creditor
12 and wish to speak.
13       THE COURT:  Okay.
14       MS. WALL:  May I speak, Judge Wiles?
15       THE COURT:  Yes.  You can ask questions.
16       MS. WALL:  Okay.  Thank you very much.
17           CROSS-EXAMINATION OF MARK RENZI
18 BY MS. WALL:
19 Q  I have heard about the in-kind and that is the
20 majority for the base of the Voyager creditors.  However, I
21 am in the state of Texas and I want my claims to be in kind,
22 but Binance does not support Texas and I have not heard from
23 Texas if it's allowed.  And what I have gleaned is that
24 (indiscernible) probably won't be allowed.
25     So, from a toggle perspective, wouldn't it be better

1  their coins off of Voyager.
2        Another question that I have -- and I didn't know
3  if you've been speaking or testifying -- you made somewhat
4  of I think an absolute statement as saying that by going
5  with Binance, it's the most efficient and everybody receives
6  their coins in kind (indiscernible) or their cash, but you
7  just said that it's going to be six months for Texas
8  residents and the other three unsupported states to
9  potentially get their money back or their coins.  And the
10 odds of giving all of the regulations (indiscernible) not
11 only from a national perspective but also from a state
12 perspective, I kind of see that highly unlikely.  So, I
13 guess I'm just saying that I don't think that you're really
14 speaking in the four states that are not going to be
15 supported by Binance.  I don't believe I'll really be
16 equally represented here.  Okay.  Sorry about that.
17       THE COURT:  Okay.  That's not really a question.
18 That's more an argument.  And we --
19       MS. WALL:  Okay.
20       THE COURT:  We'll have argument at a different
21 point in the proceeding.  Right now --
22       MS. WALL:  Oh, sorry about that.
23       THE COURT:  Okay.
24 BY MS. WALL:
25 Q  Okay.  My other question will my KYC information be

1  for those individuals that are in the state of Texas and the
2  other three non-supported states to be able to receive their
3  coins in kind through the toggle perspective and not have
4  that tax issue being cashed out?
5  A  Number one, I think that there is a period of time for
6  Binance to get the proper authorization to distribute in
7  kind.  I believe that's up to six months.  So, -- and
8  hopefully there will be a quick resolution to that.  But I
9  can't speak to the regulatory authorities in Texas in
10 regards to allowing Binance to do that for you in Texas.
11 A  Okay.  (indiscernible).
12       THE COURT:  Would Voyager -- would Voyager itself
13 be under the same restrictions as Binance in Texas in terms
14 of the ability to distribute to customers?
15       THE WITNESS:  (indiscernible).
16       THE COURT:  Okay.
17       MS. WALL:  Okay.  I appreciate that statement,
18 Your Honor.  Thank you for that.  Because that is another
19 question I've had, is why can't, for those states that are
20 not supported -- and I understand that there were issues
21 late in the game, if you will, with Voyager that none of us
22 -- none of the residents in Texas knew about.  We thought
23 all the license was there.  And now we're being penalized.
24 It would be appreciative if the State of Texas and Voyager
25 could come to an agreement to allow those customers to get

1  sent to Binance even though I'm in Texas?
2  A  I'm not sure, Your Honor.
3        THE COURT:  The witness doesn't know the answer.
4        MS. WALL:  Okay.  So, can that be (indiscernible)?
5        THE COURT:  So, what?
6        MS. WALL:  Could that be -- can that be verified,
7  if my KYC information will be sent to Binance?  Because I
8  would prefer if we're not allowed to use Binance, that that
9  type of information not be sent to Binance.
10       MR. SLADE:  We'll answer her question, Your Honor.
11 We'll get to the answer.
12       THE COURT:  What is the answer?
13       MS. OKIKE:  Your Honor, all customer information
14 is transferred to Binance under the purchase agreement.
15 Under the customer agreement, we do have the right
16 (indiscernible) customer information.  And that's what we're
17 relying on with respect to that transfer.
18       UNIDENTIFIED SPEAKER:  Isn't that Delaware,
19 California data privacy code with consumers --
20       THE COURT:  Whoever is -- you can make your
21 arguments later, but don't interrupt witness testimony with
22 argument.  Okay?
23 BY MS. WALL:
24 Q  Okay.  So, my last question.  So, what I'm hearing is
25 that that will be verified, or that is what's going to

Page 158

1  happen.  My personal information will be sent to a company
2  that I will not be able to transact with.  Is that correct?
3       MR. SLADE:  Just to clarify, the APA provides that
4  that information will be provided to the extent permissible
5  under applicable law.  That's Docket Number 835 if you look
6  at Page 16.  That's that part of the APA.
7       MS. WALL:  Okay.  And my last question -- and
8  thank you very much for the time to speak today.
9  BY MS. WALL:
10  Q   My last question is from the tax perspective, for all
11  of us that have invested X amount of money and we're
12  certainly not getting that out, are we going to be able to
13  use those amounts for a tax loss over the coming years?
14  A   I'm not an expert in tax basis, and it's hard for me to
15  answer that for all of the customers.
16  Q   Is there a way that that question can be taken back and
17  looked at?  Because I am hearing different things of yes, we
18  will be, no, we won't.  And if there's anything -- and
19  realizing that through Judge Wiles' statement, this is the
20  first cryptocurrency case, so it would be nice to know that
21  we're -- victims of what has occurred, and we would
22  not be able to use this as a tax loss would be the second
23  impact on us.
24       THE COURT: There are disclosures in the disclosure
25  statement about tax issues.  But in the end, the taxing

Page 159

1  authorities will take their own positions on these things,
2  and the Debtors aren't really in a position to kind of make
3  any assurances or guarantees as to how any individual
4  customer's taxes will work, I'm afraid.
5       MS. WALL:  Well, those are all my questions.
6  Thank you very much.
7       THE COURT:  We're nearing our lunch break.  We
8  probably passed on.  I would have preferred a lunch break.
9  Is there anybody else on the phone that has questions that
10  have not already been asked of this witness?
11       MR. HENDERSHOTT:  I do, Your Honor.
12       THE COURT:  Who was that?
13       MR. HENDERSHOTT:  Tracy Hendershott, pro se
14  creditor.
15       THE COURT:  Okay.  Go ahead, Mr. Hendershott.
16       MR. HENDERSHOTT:  Thank you.
17            CROSS-EXAMINATION OF MARK RENZI
18  BY MR. HENDERSHOTT:
19  Q   Mr. Renzi, I thank you for this time.  I know this is
20  quite painful for all of us (indiscernible).  So, I do want
21  to extend my gratitude.
22       But when we first started, I had missed what your role
23  is and who you work for.
24  A   I lead BRG in financial advising for the company.
25  Q   All right.  Thank you, sir.  So, your testimony is

Page 160

1  (indiscernible) that the Binance is the best deal here for
2  the creditors.  And some of these questions of the risks of
3  pushing all of the creditors over to Binance have not been
4  answered to my satisfaction.  Has anyone evaluated whether
5  Binance comingles all user funds, which was significant
6  because of why we're all suffering currently under the
7  Voyager model of the same action.
8  A   I believe they have the ability to (indiscernible) the
9  assets and then also rehypothecate assets.  Yes.
10  Q   So, all user funds, are they individualized to where
11  the users have ownership of it, or are they comingled in the
12  same manner that Voyager did?
13       MR. SLADE:  I'll object for lack of foundation,
14  Your Honor.
15       THE COURT:  Overruled.  Do you know the answer to
16  the question?
17       MR. HENDERSHOTT:  Well, they should --
18       THE COURT:  The objection is overruled.  Do you
19  know the answer to the question?
20  BY MR. HENDERSHOTT:
21  A   I believe that the funds are going to be in effect a
22  custody -- you know when they're transferred over into
23  custody.  But to the ability -- to the extent that there is
24  a wallet that's a broader wallet, I suspect it could be
25  comingled in a broader wallet, but still in the custody

Page 161

1  perspective.  I don't know -- I don't think it's going to be
2  in individual wallets (indiscernible).
3       CLERK:  Judge, I believe the parties are falling
4  off the line.  I believe Mr. Hendershott will probably call
5  back if you want to conclude with the witnesses before you
6  take the break.
7       THE COURT:  We've reached out four-hour time limit
8  on Court Solutions.  Well, that's a good time to take a
9  lunch break then.  And we'll resume at 2:40.  Okay?
10       UNIDENTIFIED SPEAKER:  Why won't you guys let the
11  --
12       (Recess)
13       THE COURT:  All right, please be seated.  Mr.
14  Renzi, please retake the stand.  You are still under oath.
15  Do you understand that?
16       THE WITNESS: yes.
17       THE COURT:  Okay.  I believe before the automated
18  telephone system cut you off, Mr. Hendershott, I believe you
19  were in the middle of asking your questions.
20       MR. HENDERSHOTT:  Yes, sir.  Thank you.  And I was
21  glad to hear it was automated.  (indiscernible) that got
22  booted out, but (indiscernible) clarified that for me, so I
23  was happy to hear that.  Hope everyone had a good lunch.
24  BY MR. HENDERSHOTT:
25  Q   So, picking up, Mr. Renzi.  When we left off, we were

1 talking about your beliefs and testimony about Binance as
2 (indiscernible) for all of us creditors. And by the way,
3 are you perchance a creditor yourself, Mr. Renzi?
4 A   No.
5 Q   Yeah. I mean, that's frustrating when we keep getting
6 told over and over again by others (indiscernible). But I'm
7 glad that (indiscernible) pick your brain and utilize your
8 expertise here. But let's move along.
9      So, we ended with the comingling of user funds that put
10 us in this precarious situation right now with Voyager  just
11 exactly over at Binance. I'm asking (indiscernible)
12 questions that differentiate between Binance and Voyager in
13 (indiscernible) environment. And with Binance, my
14 understanding is the sole shareholder of Binance U.S. is
15 Binance Global. Is that your understanding as well?
16 A   It's my understanding.
17 Q   Yeah. So, if you were to take any legal action against
18 the parent company, the holding company, my understanding is
19 Binance refuses to give any global domicile to be able to
20 initiate any legal action against. Is that your
21 understanding doing your due diligence as well?
22 A   I'm not an expert on their legal structure.
23 Q   So if you wanted to write a letter then just
24 congratulating (indiscernible) on this acquisition. Is
25 there a legal headquarters or domicile that you would have

1 identified during your due diligence that you would --
2 that's the parent company?
3 A   I know that we've met with individuals from Binance, at
4 least my team, in New York City. Or Binance --
5 Q   That would be Binance U.S. I'm assuming. Yeah. I'm
6 talking about the parent company, the single shareholder,
7 the parent company.
8 A   I have not met with the parent company of Binance U.S.,
9 no.
10 Q   So, I didn't ask if you met with them. I asked where
11 would you send any type of legal or just pleasantry
12 communication to the parent company for their global
13 domicile address.
14 A   I don't know. I would ask. Happy to look it up.
15 Q   That's concerning. One, that the creditors have
16 expended significant funds on their due diligence, and two,
17 that you are sitting here testifying to Judge Wiles and the
18 rest of us that this is the best solution for us.
19      MR. SLADE: Your Honor, I would object. Can we
20 just have questions and not speeches?
21      THE COURT: Objection sustained. Just ask
22 questions, Mr. Hendershott.
23 BY MR. HENDERSHOTT:
24 Q   Okay, moving on. So, that puts us in a worse scenario
25 than Voyager, which actually does have a domicile address

1 where we can take legal (indiscernible).
2      How about comingling the funds between the affiliates,
3 between Binance U.S. and the global affiliate, which I
4 believe has even been confirmed by (indiscernible) publicly
5 and stated that was in the past, but they have better
6 controls in place now. Are you aware of that, sir?
7 A   I believe they're separate legal entities. I can't
8 speak to all of the innerworkings of Binance between its
9 legal entities.
10 Q   So, during your due diligence, you never came up with
11 any discussions about comingling between the U.S. entity and
12 the global entity that has no legal address?
13 A   I don't agree with your statement that they have no
14 legal address. I just don't know the legal address. But
15 I'm sure you can find it.
16 Q   I would have hoped that you would have done that
17 previous to this call in due diligence. But I'm asking
18 about the comingling of funds between the U.S. --
19      THE COURT: Mr. Hendershott. Mr. Hendershott.
20 Mr. Hendershott.
21      MR. HENDERSHOTT: yes.
22      THE COURT: You've got to stop making comments
23 after the answers. Just ask questions and get answers.
24 Okay? You can make your arguments later.
25      MR. HENDERSHOTT: Sure. Can we also have the

1 witness just answer the questions instead of putting his
2 comments in?
3      THE COURT: I think the witness has been fine.
4 So, just ask your questions and the witness will answer your
5 questions.
6      MR. HENDERSHOTT: Okay.
7 BY MR. HENDERSHOTT:
8 Q   So, again, I haven't received an answer. The
9 comingling of funds between the U.S. entity and the global
10 entity.
11 A   I don't know if they are comingling funds between the
12 U.S. entity and global entity.
13 Q   That did not arise in your due diligence efforts?
14 A   We have discussed many things with many different
15 people. I am not the sole person doing due diligence on
16 Binance.
17 Q   But you are the leader and the chosen representative to
18 answer our questions. Moving on.
19      No declarations --
20      THE COURT: Mr. Hendershott. Mr. Hendershott.
21 Stop making comments after the witness testifies. Ask
22 questions and just get answers. Okay?
23      MR. HENDERSHOTT: Okay. Sorry, sir.
24 BY MR. HENDERSHOTT:
25 Q   So, moving on. No declarations have been

Page 166

1  (indiscernible) practices, which we already heard from the
2  State of Texas.  We've already seen several, numerous
3  agencies state this as their concerns of Binance.  And we
4  also heard from the attorney general's office in Texas that
5  Binance hasn't even attempted to file any type of
6  documentation highlighting their internal controls or
7  practices.
8      In your due diligence, sir, have you been able to
9  identify the internal controls and practices of Binance?
10     MR. SLADE:  Your Honor, I object to numerous parts
11 of the preface of that question (indiscernible).  No facts
12 in evidence to support those.
13     THE COURT:  Well, let me also ask --
14     MR. HENDERSHOTT:  We have the attorney general
15 (indiscernible).  Can you maybe clarify with her?
16     THE COURT:  No.  I want you to not interrupt me
17 when I'm speaking.
18     MR. HENDERSHOTT:  I'm sorry, sir.
19     THE COURT:  Let me ask the Debtor's counsel.  In
20 terms of due diligence, is this your primary or your only
21 witness on this point?
22     MR. SLADE:  No, Your Honor.  Mr. Tichenor will
23 also be testifying about due diligence.
24     THE COURT:  Okay.
25     MR. SLADE:  They serve different roles.  Mr.

Page 167

1  Tichenor is the investment banker.  Mr. Renzi is the manager
2  advisory.  They work together.
3      THE COURT:  Okay.  So, Mr. Hendershott, when you
4  ask a question, it's not proper to kind of first make an
5  argument and then ask your question.  It's not proper to
6  kind of state what you believe to be facts and then ask a
7  different question.  Just ask questions.  Okay?  Ask him
8  what he knows and what he did.  And if you think it was
9  deficient --
10     MR. HENDERSHOTT:  Sure.  I'll --
11     THE COURT:  If you think it was deficient later,
12 you can make arguments about what you think is deficient.
13 You can ask him what he found out and what he checked and
14 what he knows.
15     MR. HENDERSHOTT:  Okay.  Thank you, sir.  Thank
16 you for the guidance.
17 BY MR. HENDERSHOTT:
18 Q   Okay.  Going back to why Binance is better than Voyager
19 question.  So, the next one, no financial auditors for the
20 parent company, is that your understanding as well, sir?
21 A   I have not reviewed financial audited statements.
22 Q   Is that because Binance has no financial auditors?
23 A   I can't answer the question, Your Honor.  I think they
24 have auditors.  I just don't know specifically.  They have
25 accounting functions for sure.

Page 168

1      MR. HENDERSHOTT:  Can I ask follow-up questions
2  for that, Your Honor?
3      THE COURT:  You can ask follow-up questions.
4  BY MR. HENDERSHOTT:
5  Q   Mr. Renzi, I find your statement that you think they
6  have auditors as defective and concerning, that you are
7  sitting her unequivocally testifying that Binance is the
8  best solution for us, but you think that they might have
9  financial auditors, which is --
10     THE COURT:  Okay.  That's not a follow-up
11 question.  That's a follow-up argument.  Please try to keep
12 the difference in mind.  Ask him what he knows.  If you
13 don't like what he knows or if you don't think he's done
14 enough, you can argue about it later.  But just ask him what
15 he knows and what he did.
16     MR. HENDERSHOTT:  Okay.  Thank you, sir.
17 BY MR. HENDERSHOTT:
18 Q   So, Binance.  How about USD dollar banking relationship
19 for onboarding and offboarding of fiat?  Is Binance global,
20 parent company, sole shareholder of Binance U.S.
21 (indiscernible) that relationship currently?
22     THE COURT:  Do you understand the question?
23     THE WITNESS:  I -- I don't know the answer.
24     MR. HENDERSHOTT:  Should I move on or is this
25 going to be the response for all the questions with Binance?

Page 169

1      THE COURT:  I don't know how to predict that.
2      MR. HENDERSHOTT:  Okay, well how about just one
3  last one.
4  BY MR. HENDERSHOTT:
5  Q   You are aware, Mr. Renzi, that Binance is actually
6  paying (indiscernible) for the various national -- possibly
7  with some states, I'm not clear on that one.  Certainly, at
8  the national level for regulatory noncompliance settlements.
9  A   If the question is am I aware that they're trying to be
10 in compliance with state regulations, I think that they are
11 trying.  And to the extent that there's anything that's
12 deficient, I'm sure they're going to try to cure that.  But
13 to be specific about it, I don't know specifically any state
14 fines that they're addressing right now.  I'm sure that it's
15 an ongoing thing in all cryptocurrency to make sure that
16 they're addressing any new (indiscernible).
17 Q   Okay.  So, you're sure that they are collaborating with
18 state regulatory agencies.  Were you in the courtroom or
19 available when the attorney generals of Texas stated that
20 they have taken no action of filing regulatory
21 documentation?
22 A   Well, in discussions with the company and their
23 advisors, my understanding is that Binance is trying to
24 cooperate to the best of their ability.  I was not in the
25 courtroom in regards to what they heard in the Texas

1  courtroom that you referenced.  But I believe they --
2  Q   (indiscernible).
3  A   -- were operating as a company in the United States
4  appropriately.
5  Q   I was talking about this courtroom, sir.  Earlier when
6  the Texas attorney general's representative clarified
7  (indiscernible) they had not filed any documentation with
8  Texas.  In the courtroom, did you hear that portion of the
9  trial?
10 A   I didn't hear his question, Your Honor.
11        THE COURT:  He's asking if you heard the question
12 asked by the Texas attorney, which question asserted that
13 Binance had not made any filings in Texas.
14        THE WITNESS:  No.
15 BY MR. HENDERSHOTT:
16 Q   Okay.  So, after identifying probably six very
17 significant regulatory concerns of noncompliance worse than
18 with Voyager, all of those questions I asked you previously,
19 Voyager could comply with, yes.  Six of them Binance could
20 not.  Can you please reiterate again why you feel Binance is
21 a safe and the best methodology to be pushing all of those
22 creditors into?
23        MR. SLADE:  Again, I object.  That's a speech and
24 it assumes facts not in evidence.
25        THE COURT:  Just answer the question.  Why you

1  think Binance is the safe and better alternative?
2  BY MR. HENDERSHOTT:
3  A   I believe that Binance provides the maximum recovery.
4  The Binance transaction provides the maximum recovery to all
5  unsecured creditors.  In the event that recovery or we
6  have any doubts in Binance, we have the ability to toggle.
7  And then (indiscernible) is the second-best option that we
8  have.  So, to the extent that there's a disagreement in
9  construct, I believe that the construct that's set up
10 maximizes recovery for unsecured creditors as demonstrated
11 in my declaration and provides optionality to the extent
12 that there are concerns.
13 Q   Okay.  So, still you believe Binance is the best
14 solution for creditors is your testimony, is that correct?
15 A   I just testified, Your Honor.
16 Q   Yeah.  Okay.  Moving on.  Yes, sir?
17 A   I was coughing.  Excuse me.
18        THE COURT:  Go ahead, Mr. Hendershott.
19 BY MR. HENDERSHOTT:
20 Q   Moving on.  Earlier, there's been fairly extensive
21 conversations about the backup bidding process
22 (indiscernible).  You stated that Binance at the FTX round
23 was a backup bidder that they had no interest to be a backup
24 bidder.  You did not clarify how many other bidders were
25 there.  And we respect NDAs, we don't need to know their

1  names.  But I think just a numerical number would be
2  beneficial.  And the follow-up question is did each one of
3  the backup bidders refuse to be -- did each one of the other
4  bidders beyond FTX and Binance, did they all refuse to be
5  backup bidders?
6        MR. SLADE:  Your Honor, I'm going to object to
7  relevance.  It's not relevant to what's before the Court
8  today.
9        THE COURT:  Well, I agree.  But go ahead and
10 answer the question.  Did all of the other bidders decline
11 to be backup bidders?
12        THE WITNESS:  I knew that FTX was the best bid and
13 that we did not have a backup bidder and that we had an
14 extensive auction.  I believe it was over a week.  It may
15 have been up to two weeks for someone to come in as a backup
16 bidder.  But we did not achieve that.  So, FTX was the
17 highest bid at that point in time.
18 BY MR. HENDERSHOTT:
19 Q   Yes.  And (indiscernible).  I was curious about all the
20 other bidders that participated in that auction.  Did all of
21 them refuse to be a backup bidder?
22 A   I think I answered the question.
23        THE COURT:  I think you did answer the question.
24        MR. HENDERSHOTT:  I'm sorry, Your Honor, I didn't
25 hear the answer.  I heard that FTX was the number one

1  bidder. I didn't hear that all the bidders refused to be a
2  backup bidder.  Because that's a critical element, Your
3  Honor.  You approved the bidding plan.  The backup bidder
4  was included from the beginning, that would have shaved six
5  months off this trial, probably hundreds of millions of
6  dollars if it was (indiscernible).  And Your Honor --
7        THE COURT:  Stop.
8        MR. HENDERSHOTT:  -- a person that's been involved
9  in the (indiscernible) would have been --
10        THE COURT:  Just stop.  Whether you think that's
11 true or whether it is true makes no difference to what we're
12 doing here today.  Right?  They didn't have a backup bidder
13 --
14        MR. HENDERSHOTT:  It was --
15        THE COURT:  Let me finish.  Whether that was right
16 or wrong doesn't change the situation we are standing in
17 today and doesn't change in one iota the question of whether
18 we should or shouldn't confirm the plan that is currently in
19 front of us.
20        Today is not about recriminations for plans,
21 different plans that maybe could have been pursued in the
22 past.  I don't know what you think is accomplished by any of
23 that, but I promise you it's nothing.  You might be upset,
24 but it doesn't have any bearing at all, none, on what we
25 should to today.  They could have made the worst mistake --

1        MR. HENDERSHOTT:  (indiscernible).

2        THE COURT:  They could have made the worst mistake

3 in the history of bidding to have picked FTX and/or not to

4 have had a toggle plan at that time, but it doesn't matter.

5 I can't change the past.  Nobody can.  We are where we are.

6 And so, your fixated anchor on these points is of no help.

7 Okay?  You've got to move on and you've got to address the

8 issues that we're dealing with today.

9        MR. HENDERSHOTT:  From that perspective, Your

10 Honor, just to respond to you.  I believe it is relevant.  I

11 believe there is no accountability for their actions is your

12 proposal, that we ignore everything that happened in the

13 past.  I mean, there was material damages to the creditor

14 class because they failed to follow the bid plan.  It's

15 standard practice.  And there is a monetary value that can

16 be associated with it.  As well as there should be some

17 accountability for their failure to follow it.

18        THE COURT:  There is no issue in front of me

19 today, none, about whether they did something in the past

20 that caused damage for which they should be held

21 accountable.  Absolutely that is not an issue in front of me

22 today.  It's just simply not.

23        Now, if you want to say that there's some

24 dishonesty as opposed to a mistake and that it somehow means

25 that even at this stage of the proceedings I should appoint

1 a trustee, that's fine.  But I know you're not lawyers, but

2 you have to understand every court hearing is not an open

3 invitation for you to ask for every single thing that you

4 might want without a pending motion, without justification,

5 and without evidence.  It is not how a court hearing works.

6 We have specific motions in front of me today.  And the

7 primary one is for confirmation of a plan that has been

8 accepted by the voting classes.  If there is an objection to

9 that confirmation that is based on the criteria I need to

10 consider in the bankruptcy code, I am more than willing to

11 hear it.  But I promise you, recriminations over the FTX

12 negotiations last fall have zero to do -- zero -- with

13 whether or not this particular plan should be confirmed.

14        If you want to argue that they made a mistake

15 before, therefore I should assume that they're making a

16 mistake again, you can make that argument.  But just beating

17 up the witness about why he didn't have a backup bidder is

18 pointless.  Do you under?

19        MR. HENDERSHOTT:  I hear you, Your Honor.  But you

20 do have an objection or a motion in front of you from the

21 creditors explicitly stating that for cause removal for

22 fraud, dishonesty, and competence and gross management.  I

23 believe establishing the sequence of incompetence, gross

24 mismanagement, potentially fraud and dishonesty right from

25 the very beginning for this date is part of the objection

1 that you have sitting in front of you that's on the agenda

2 for today.

3        THE COURT:  He's testified -- he's testified that

4 they didn't have a backup bidder.  You want to ask him that

5 same question ten times.  You're accomplishing nothing.

6 They didn't have a backup bidder, and they didn't have a

7 toggle plan at the time of FTX.  You can ask him that same

8 question a hundred times, and it's the same thing.  You're

9 not showing me anything that's relevant to anything I need

10 to do today.

11        MR. HENDERSHOTT:  Yes, Your Honor.  I understand.

12 Moving on.

13 BY MR. HENDERSHOTT:

14 Q   So, again, for the various reasons, that, Mr. Renzi,

15 you highlighted whether Binance is the best bid, you called

16 out that KYC would be required for a liquidation for the

17 release of tokens to the individual creditors and that would

18 only be possible by going through (indiscernible)

19 organization like Binance.  So, my question for you, sir, is

20 Voyager has KYC has -- has already been mentioned on this

21 trial.  People are concerned about it being shared with

22 Binance.  And so, every single creditor -- so could you

23 expand on where is the challenge of Voyager with the

24 preexisting KYC?

25        MR. SLADE:  Your Honor, I object.  I don't

1 understand the question.  I don't know how the witness

2 could.

3        THE COURT:  I understand the question.  He's

4 talked about the provisions in the witness's prior

5 declaration that talked about KYC issues and why the Debtor

6 isn't equipped to pursue them.  And he's asking you why not.

7 So, go ahead.

8 BY MR. HENDERSHOTT:

9 A   Effectively the transaction with Binance is -- they're

10 paying us for those transactions.  It's over $20 million.

11 So, in order to do that, they want to make sure that they

12 have the ability to do, you know, KYC information and make

13 sure there isn't any money laundering or making sure that

14 things are done appropriately.

15        So, in terms of Voyager, Voyager, if we have to go to

16 the toggle plan does have the ability to distribute some of

17 the (indiscernible).  However, not all.  And I think I

18 testified to that.  And I do think that they have a

19 tremendous amount of information about their customers.

20 Q   So, just so I am clear, Voyager has full KYC

21 documentation that would allow them to liquidate and return

22 assets directly back to customers?

23 A   I believe they have --

24 Q   Is that correct?

25 A   I'm not a hundred percent certain, but I believe they

1  have -- I believe they have a significant amount of
2  information.
3      Q    Okay.  I must have misheard you earlier when you said
4  that was an obstacle then.  So, that's great to know they
5  have the ability to do that.
6          Next question.  You -- sorry?
7      A    I think -- I want to make sure we're clear because I
8  don't want to recharacterize my testimony.  I think what I'm
9  saying is that we have the ability to move to a toggle plan.
10  However, there are -- the Binance plan, there's a hundred
11  percent support on coins.  The toggle plan, we obviously
12  have some unsupported coins.
13      Q    So, I'm curious on that.  When you say unsupported,
14  Voyager was never an exchange.  So, Voyager bought coins
15  from true exchanges.  What is the obstacle again?  I heard a
16  statement earlier that all of this programming and
17  complexity involved with it, they already had the
18  programming to receive the code, to buy the coins from the
19  exchange, to allocate that to the client base.  And forgive
20  my ignorance, I don't understand why it is challenging to
21  then take those digital keys and coins and put them back to
22  the exchange that they bought them from.
23      A    They have to invest time and money to make sure that
24  those coins are supported.  And that is not one of the
25  things that's contemplated right now.

1      Q    Supported by the exchange that they bought them from?
2      A    For them to make distributions in those coins.
3      Q    I'm not saying distributions back to the customers.
4  I'm saying about (indiscernible) from.  I recall that you
5  said that that was a significant obstacle for the
6  liquidation process.  And I'm confused on why.  The bottom,
7  it's one way, from the exchange to Voyager.  Why isn't it
8  not possible for it to go back from Voyager to the exchange?
9      A    So, the distribution would be made to customers, not to
10  an exchange, correct?
11      Q    We're talking about a liquidation.  You said that's why
12  (indiscernible) liquidate (indiscernible).  I'm sorry, go
13  on.
14      A    I don't know what the question is.  I'm sorry.
15      Q    We're talking about a liquidation.  You said that that
16  was problematic because there is (indiscernible) for the
17  coins to be liquidated.
18          MR. SLADE:  Yeah, I object, Your Honor.  I think
19  it's --
20          THE COURT:  The question is if Voyager was -- if
21  people were able to buy these coins in the first place
22  through Voyager, why can't they be put in their names by
23  Voyager?
24          THE WITNESS:  The issue, Your Honor, is that
25  distribution of these coins by Voyager, they have 35 that

1  are unsupported.  So, in order to address them, they would
2  have to liquidate them.
3          And so, because we understand that customers would
4  prefer to have coins in kind, this is an issue.  Binance
5  wants all the coins.
6          THE COURT:  And I guess the problem is we're
7  having some trouble understanding what being unsupported
8  means.
9          THE WITNESS:  The issue is for the company; they
10  cannot make those distributions in kind for those 35
11  unsupported ones.  That's the simple version of it.
12          THE COURT:  Okay.
13          THE WITNESS:  The technical repercussions are
14  beyond what I can testify here today.
15          THE COURT:  Okay.
16  BY MR. HENDERSHOTT:
17      Q    Thank you for that clarification.  That was helpful.
18  But just so I understand, you can liquidate them as part of
19  a rebalancing to U.S. dollars.  And so, is that occurring
20  actually right now with the $445 million liquidation that's
21  ongoing?  These coins are being liquidated to dollars?
22      A    The company is rebalancing coins now.  And to the
23  extent that they need to set aside funds (indiscernible) for
24  cash, they will be doing so.
25      Q    And as a liquidator (indiscernible) unsecured --

1  unsupported claims?
2      A    I am not -- I don't think so.
3      Q    Okay.  All right.  So, talking about the liquidation,
4  you said that the problem of the toggle -- or actually
5  Chapter 7 liquidation is the risk of collapsing the market.
6  You indicate that a trustee would try to dump the entire
7  treasury within a day or two, which I have never heard Judge
8  Wiles or anyone say that that would be the plan going
9  forward.  So, I'm very curious why your strong belief is a
10  liquidation would collapse the global market of any coin,
11  even one with less market liquidity than bitcoin or
12  Ethereum.  And I am curious (indiscernible) a coin that is
13  on Voyager that you would collapse the global market by
14  doing a thoughtful and strategic liquidation over a period
15  of say two months.
16      A    I never testified that this would collapse the global
17  market of cryptocurrencies, Your Honor.
18      Q    On a specific topic, sir.  You said that it would
19  collapse it down in I believe 30 -- I've heard 26 percent, I
20  believe.  I heard 35 percent.  But that would be the
21  slippage damage caused by a liquidation or a trustee coming
22  in and liquidating because the global market for that
23  specific coin could not handle the influx of Voyager's
24  volume.  So, I'm curious, called out by name, but this is
25  not effective for bitcoin or Ethereum.  I am curious if you

Page 182

1  can identify a coin where this would collapse a given market
2  in that specific coin.
3          MR. SLADE:  Your Honor, I object again.  We're
4  hearing speeches, not questions.
5          THE COURT:  Can you identify a particular coin for
6  which the market would suffer the effects that you had
7  previously discussed?
8  BY MR. HENDERSHOTT:
9  A    There are a number of coins that -- like Shiba Inu that
10  coin, VGX, if you had to just sell it all immediately into
11  cash, these coins don't have the deep market, and that's an
12  issue.  Those are the examples.
13  Q    Thank you, Sir.  Shiba -- can you tell me how much
14  --
15  A    I would say to you I never testified that it would
16  collapse the market.  What's important to understand is that
17  the market liquidity is a differentiator.  And because
18  bitcoin and eth have a significant amount more market cap
19  and liquidity, it's easier to sell those coins and sell or
20  buy those coins.  So, the more obscure coins are difficult
21  to monetize quickly.
22  Q    That's what I'm questioning if you could give examples.
23  And you gave Sheba as an example of that.  Do you know what
24  the global market cap is for Shiba Inu?
25  A    I don't have that in front of me.

Page 183

1  Q    I have it open.  You know whether I can introduce this
2  right now and it -- I have it open right now.  It's 6.7
3  billion.  So, is the volume that Voyager has, even if you
4  liquidated it in a matter of days versus doing it
5  responsibly, or the months, would the volume of Voyager
6  Shiba Inu collapse or significantly drive down the price
7  point of $6.7 billion market cap?
8          THE WITNESS:  So, how did I testify before, Your
9  Honor?  A number of these coins may have significantly
10  larger market caps.  By way of example, Bitcoin has a
11  significantly larger market cap.  Same with eth.  The issue
12  that we're bringing up is that this is not just my opinion,
13  this is the opinion of market makers that, you know, deal
14  with these coins day in and day out.  They may have a high
15  market cap, but it's hard to trade them.  And those are
16  issues that we've seen throughout in cryptocurrency.  And
17  the issue that you have is that if you have to liquidate
18  coins quickly, even more obscure coins, that it will move
19  the market.  It will not collapse the market, hopefully will
20  not collapse the market, but it will move the market
21  (indiscernible).  That's not only -- that's diligence that's
22  been done by myself, it's been done by their investment
23  banker, Moelis, it's been done by the unsecured creditor
24  committee advisors.
25          And so, when we talk about the discount to

Page 184

1  monetizing collateral that's harder to -- that has a smaller
2  market cap than the two biggest ones that we've discussed,
3  yes, that's absolutely true.  Not only from the -- but more
4  than a dozen advisors and market participants have validated
5  this information.
6          THE COURT:  In terms of the one you identified.
7  Not VGX, the other one.  Shiba...
8          THE WITNESS:  There are many -- there's 106 coins,
9  Your Honor.
10          THE COURT:  What is the volume that Voyager holds,
11  and are you aware of any statistics as to what the ordinary
12  trading volume is as to that?
13          THE WITNESS:  I have a chart.  It's not in front
14  of me.  So, I could answer that, Your Honor, if I can get
15  the chart.
16          THE COURT:  Any objection to him consulting his
17  chart?
18          MR. HENDERSHOTT:  None from me, sir.
19          THE COURT:  Well, let's go ahead.
20          MR. SLADE:  Your Honor, (indiscernible) print a
21  copy.
22          THE COURT:  And if he has any idea what the
23  ordinary trading...
24          MR. SLADE:  Apologize, Your Honor.  We're trying
25  to --

Page 185

1          THE COURT:  I understand.
2          MR. SLADE:  Your Honor, could I have a five-minute
3  recess to find the right files?
4          THE COURT:  Okay.  We'll take five minutes.
5          (Recess)
6          THE COURT:  All right, please be seated.
7          Mr. Renzi, you are still under oath.  Have you had
8  a chance to look up the answer of the question?
9          THE WITNESS:  I have, Your Honor.  Thank you for
10  the five minutes.
11          So, other examples besides VGX of issues in terms
12  of relative market cap and trading issues, BET would be an
13  example, (indiscernible) would be an example, BTT would be
14  an example.  STMX would be an example.  CKB would be an
15  example, DGB.  Those are other examples, to answer Mr.
16  Hendershott's question directly (indiscernible).
17          THE COURT:  And as to Shiba, have you been able to
18  figure out what does Voyager hold and how does that compare
19  to ordinary trading volumes?
20          THE WITNESS:  I think Mr. Hendershott is right,
21  there is still an issue in terms of relative volume.  But I
22  am looking at the number of claims that's $93 million that I
23  have in this schedule on a dollarized basis.  And so, Shiba
24  is less of an issue than the other ones that I just
25  mentioned.

Page 186

```
1          THE COURT:  Okay.
2          THE WITNESS:  But still an issue.
3          THE COURT:  Okay.
4   BY MR. HENDERSHOTT:
5   Q   So, what's the daily trading volume for Shiba against
6   the Voyager $93 million Shiba -- assets under management for
7   Shiba specifically?
8   A   I don't have daily.  I have seven-day average, $243
9   million is their seven-day average volume.
10  Q   Right, average per day.  So, a quarter of a billion
11  dollars traded with only $93 million on voyager, that could
12  be distributed over the course of a month or two.  So, did I
13  mishear earlier when you said that the reason why a trustee
14  could not handle this is because it would collapse or reduce
15  --
16         THE COURT:  Are you saying that what Voyager has
17  is more than a third what the average daily trading volume
18  is?
19         MR. HENDERSHOTT:  That's correct.  $93 million
20  total.  I'm sorry, I'm not sure who that question was for.
21         THE WITNESS:  To answer your question, Your Honor,
22  they have a claim of $93 million.  And the position is $70
23  million approximately.  And the average daily trading seven-
24  day average volume is $243 million.  And so, I am not saying
25  that this would collapse the market.  I am saying that they
```

Page 187

```
1   will move the market.  Especially if it needs to be done
2   quickly.
3   BY MR. HENDERSHOTT:
4   Q   So, that's -- and thank you for that.  I don't see how
5   $93 million spread out over a month or two can move the
6   market when it's doing a quarter of a billion every day.
7   But I keep hearing that if you have to do it quickly -- am I
8   missing something that a trustee being appointed would have
9   to liquidate everything in a day or two?  Did they not have
10  the same courtesy to be able to distribute this over the
11  course of a month or two like we're doing with the
12  rebalancing right now?
13         MR. SLADE:  Your Honor, I object.  That's a
14  speech, and it was already asked and answered by this
15  witness.
16         THE COURT:  Yeah.  We've covered this, Mr.
17  Hendershott.
18         UNIDENTIFIED SPEAKER:  That's not an objection.
19         MR. HENDERSHOTT:  I don't remember the answer.  He
20  just (indiscernible) that I would have to be done quickly.
21  And I am questioning why he keeps making that statement.
22  There's nothing that would have to instill a two-day
23  liquidation with the assignment of a trustee.
24         MR. SLADE:  (indiscernible).
25         THE COURT:  Yeah.  What he said, you know, a
```

Page 188

```
1   trustee would a statutory obligation to convert to cash.  I
2   don't know of any trustee that would sit around and take
3   market risk and try to figure out how to time those kinds of
4   sales.  And what the witness has basically said is that he
5   thinks that the kind of imperative that a trustee would face
6   to sell would be very different from the sort of being able
7   to do it as you think fit in the rebalancing exercise in
8   that there would therefore be a much stronger market effect
9   if were in Chapter 7 than in Chapter 11.  That's what I
10  understand that he's testified to so far.
11         THE WITNESS:  Your Honor, I just (indiscernible).
12  Thank you.
13         MR. HENDERSHOTT:  Great.  Thank you.  And thank
14  you, Mr. Renzi.  I will cede the podium.  Thank you, sir.
15         THE COURT:  Okay.  Is there anybody else on the
16  phone that wishes to cross-examine the witness?
17         CLERK:  Your Honor, there's no one else on the
18  phone (indiscernible).
19         MR. LOREN:  I would like to (indiscernible), Your
20  Honor.
21         THE COURT:  Who is speaking now on the phone?
22         MR. LOREN:  This is John Loren, pro se creditor.
23  Can you hear me?
24         THE COURT:  What was your name again?
25         MR. LOREN:  John Loren.
```

Page 189

```
1          THE COURT:  Okay, Mr. Loren.
2          CROSS-EXAMINATION OF MARK RENZI
3   BY MR. LOREN:
4   Q   To the witness (indiscernible) rebalancing the
5   portfolio, that a big selloff would (indiscernible) the
6   market lower.  Did you do any research on the VGX token?
7          THE COURT:  What is it you want to know about the
8   BTX did you say?
9          MR. LOREN:  VGX token.  I'm curious what analysis
10  was done on that in regards to the rebalancing of the
11  portfolio.
12         THE WITNESS:  Could I just confirm that he said V
13  as in Victor, G as in good, X as in x-ray?  Is that correct?
14         MR. LOREN:  Correct.  VGX Voyager token.
15         THE WITNESS:  Yes, we have done research on the
16  VGX token.  We have been careful to make sure that we have
17  been opportunistic in selling some of the token in terms of
18  the rebalance.  The amount of holdings is relatively
19  significant relative to the market cap for VGX with the
20  company.  And so, yes, the answer is yes.
21         MR. LOREN:  What percentage of VGX is currently
22  locked on the Voyager app?
23         THE WITNESS:  Your Honor, I have a procedural
24  question in terms of being discrete about rebalancing versus
25  answering this question.  Because I'm afraid that it will
```

1  have an effect on the market.  So, I'm --
2        MR. SLADE:  Let me object to the relevance of
3  (indiscernible).
4        THE COURT:  I had trouble hearing the question.
5  What was it exactly?
6        MR. LOREN:  My question is what is the rough
7  percentage of VGX on the Voyager app.
8        MR. SLADE:  Yeah.  I object, Your Honor.  It's not
9  relevant.  I'm worried that he might be asking questions
10  that (indiscernible) rather than get information that's
11  relevant to this --
12        THE COURT:  Okay.  I will sustain the objection.
13  BY MR. LOREN:
14  Q     So, this is exactly why I wanted to ask the question.
15  Let's say roughly 80 percent of VGX is locked on the app.  I
16  would to know your price analysis of VGX when 80 percent of
17  this token gets locked all at once on Binance.
18        MR. SLADE:  Yeah.  I have the same objection.
19        THE COURT:  Yeah.  Objection sustained.
20  BY MR. LOREN:
21  Q     (indiscernible) the price of VGX would plummet to zero.
22  How would you combat this?
23  A     Your Honor, the whole idea of rebalancing is to do it
24  in a way that is opportunistic and make sure that the
25  trading is done in an appropriate manner and also consistent

1  with the APA.  And so, what we're trying to do is spread out
2  trading at times that are opportunities so that we don't
3  flood the market, as this gentleman is highlighting.  And we
4  are trying to do that in a way that is being transparent
5  with the Unsecured Creditors' Committee and believe that our
6  methodology is working thus far.
7  Q     So, aside from the -- aside from rebalancing, I am
8  referring to once the VGX token, which I believe that's
9  roughly 80 percent of VGX currently locked on the app, then
10  80 percent of supply is released to (indiscernible) Binance,
11  what will happen to the price?  One could easily determine
12  there would be a bloodbath and the price would plummet to
13  zero.  How is that fair in regards to the recent 80 percent
14  of the market (indiscernible) at once?
15  A     We're rebalancing.  We're not releasing all of the
16  coins into the market.  So, what's important is we're
17  distributing -- let me -- just let me finish for a second.
18  We are trying to rebalance to the right proportionality so
19  we don't have to sell it all down and then we can provide it
20  and return it in kind.
21        So, to the extent that we were under a scenario of a
22  liquidation, I actually a hundred percent agree with you
23  that it would be a very challenging situation in terms of
24  recovery if you had to sell it all immediately or in very
25  short order into cash.  But we are not doing that because we

1  have a plan.  The plan does highlight a rebalancing
2  transaction, and that rebalancing will eliminate the concern
3  that you exactly have in my opinion.
4  Q     So, that may help during the rebalancing portion.  But
5  once the tokens VGX has sent to Binance and users have
6  access to their VGX tokens, 80 percent of supply being
7  released at once is going to plummet the price.  We are
8  given a claim that (indiscernible) but we won't be able to
9  actually get that (indiscernible) value from VGX
10  (indiscernible).  Reason being is, like I said, it would be
11  a bloodbath.  It would be a huge selloff even mention that
12  if you do have a big selloff, the price will tank.  So, what
13  would be used to combat this selloff?
14        MR. SLADE:  Your Honor, I object to the extent
15  that was the question he just answered.
16        THE COURT:  I don't think so.  As I understand the
17  question, the question is will VGX in the real world have
18  the value that's being ascribed to it for distribution
19  purposes.
20        THE WITNESS:  Your Honor, I understand the
21  question.  I think the ultimate decision of each account
22  holder is up to each account holder.  So, each accountholder
23  decides as soon as they have access to VGX and they just
24  want to sell it, yes, I suspect it will go down more than it
25  would otherwise go down.  However, I think that some of the

1  -- I think the customers are sophisticated.  They understand
2  that this would move markets significantly.  And we'll take
3  that into consideration before deciding all at once to sell
4  down their assets and do it in a timely fashion.  Just as,
5  for example, if you have an unusual commodity, I think that
6  you would look to try to address it in the market in the
7  right way and not just sell it down immediately.  So, there
8  are scenarios that if everybody was coordinated and all
9  agreed to sell at once, I think you're right.  It would
10  massively reduce the value of VGX in total.  But that's a
11  coordinated effort.  And I don't see that happening
12  initially, but it's possible.
13  BY MR. LOREN:
14  Q     I do not believe that at all.  80 percent supply being
15  released into the market in a single day.  You know what
16  will happen.  People will sell.  (indiscernible).
17        THE COURT:  Mr. Loren, I'll have to tell you the
18  same thing I've been telling other people.  I know you're
19  not an attorney, but cross-examination is for the purpose of
20  asking questions, not stating your opinion, not arguing with
21  the witness.  For purposes of asking questions and eliciting
22  evidence.  Okay?
23        MR. LOREN:  Thank you for that, Your Honor.
24  BY MR. LOREN:
25  Q     My next question relates to Binance. During your

Page 194

1  research in due diligence, what would you find on how
2  Binance is more credible than FTX.  As we know, FTX is a
3  fraudulent company.  So, why is Binance more credible?  What
4  was your research?
5  A    Binance is one of the largest exchanges in the U.S.
6  They also try to hold one-for-one reserves on their
7  exchange.  They have a tremendous amount of volume and
8  capacity on their exchange.  And then lastly, one thing that
9  I feel is confirmatory diligence that 97 percent of
10  customers that have voted also believe that this transaction
11  makes the most sense for them.  So, besides our own
12  diligence that has been done by Moelis and BRG and the
13  company as well as by the unsecured creditors' advisors, we
14  believe that this is a value-maximizing transaction with a
15  company that is one of the largest players if not the
16  largest player in the U.S.
17      And to the extent that we feel as if -- that there are
18  issues that arise between now and closing, we have the
19  option to move into a toggle plan.
20  Q    You state that Binance have good recordkeeping.  Can
21  you tell us what research you completed in order to come to
22  this conclusion?
23  A    My team as well as the Moelis team had the opportunity
24  to interview Binance and its management team as well as its
25  advisors to go through a number of concerns that they had as

Page 195

1  well as the Unsecured Creditors' Committee advisors.  And
2  those diligence meetings did not deter having this hearing
3  today with the current trajectory that we're on.
4  Q    Great.  Did you do the same meetings with FTX?
5      MR. SLADE:  Your Honor, can I object?  This
6  inquiry is about the past.  It's not relevant.
7      THE COURT:  Overruled.
8      MR. LOREN:  It's very relevant.
9      THE COURT:  The objection was overruled.  The
10  witness can answer the question.
11  BY MR. LOREN:
12  A    We did due diligence on FTX.  As we all know, FTX is a
13  fraud.  They defrauded not only millions of customers, but
14  also a number of regulatory bodies in the United States.
15  They were vetted by the same constituents.  We believe that
16  we're fortunate that we did not get wrapped up in that
17  transaction and we believe that this transaction with
18  Binance is significantly better.
19  Q    If you did the same due diligence with FTX in these
20  meetings, why would we trust you and say that you are
21  credible when you had the same meetings with Binance?
22  What's the difference?
23  A    We didn't do the same diligence.  We did more diligence
24  on Binance.  And the reason being is that we are more
25  informed about the issues about FTX.  Every day we all are.

Page 196

1  And we continue to learn from the issues that FTX had.  And
2  that is part of the questions that we had are addressed by
3  the meetings that we had even this week in terms of our
4  diligence in regards to Binance.  So, the diligence was more
5  rigorous.
6  Q    Okay.  So, you believe that Binance (indiscernible)
7  solvent company (indiscernible) analysis and research.  What
8  happens when we transfer our claims over and Binance goes
9  kaput, they go bankrupt?  What's the next step?
10      MR. SLADE:  I'll object.  It's a hypothetical
11  question that assumes facts not in evidence.
12      THE COURT:  Do you know the answer?
13  BY MR. LOREN:
14  A    I think you're asking if to the extent that unforeseen
15  circumstances occur and Binance goes bankrupt?  Is that
16  correct?  Is that what you're asking of me?
17  Q    That's correct.  I am referring to claw backs, et
18  cetera.  What would happen with our claims is Binance goes
19  under?
20  A    I do not have full access to all the financials of
21  Binance to answer your question completely.  But you would
22  be an unsecured creditor or a creditor of the Binance estate
23  to the extent that there was a bankruptcy of Binance.  But I
24  don't know if you would be unsecured or secured depending on
25  what you elect to do during the hypothetical period between

Page 197

1  when you become a customer and when that hypothetical
2  bankruptcy could occur.
3  Q    Okay.  I'm curious if there's any way to get any claw
4  back protection from Voyager funds being transferred to
5  Binance if Binance goes under.
6      THE COURT:  What was the question?
7  BY MR. LOREN:
8  Q    Do we have any claw back protections if let's say we
9  transfer the money from Voyager to Binance.  Binance then
10  goes bankrupt, and then (indiscernible) money from Binance.
11  Would Binance be able to claw back our funds or can we have
12  protection from Voyager-specific funds?
13      THE COURT:  The modifications to the sale
14  agreement that were made in January after I raised some of
15  these very same issues and the order that I entered that
16  approved the sale agreement are very clear that until such
17  time as the distributions are made to the customers, Binance
18  will hold anything that it holds strictly in trust.  It will
19  not be considered Binance's property.
20      Once a customer keeps items in its account -- and
21  I think the customer is going to be in whatever boat other
22  Binance customers are going to be in.  But for purposes of
23  the initial distributions, we I believe changed the terms of
24  the deal to make it clear that nothing would get stuck.  So,
25  if you want your crypto and you withdraw it from Binance

A-1112

Page 198

1   right after it's distributed to you, my understanding -- and
2   I'll ask the Debtors and the Binance people here to correct
3   me if that's wrong.  But my understanding is that it would
4   never be considered property of Binance and that it would
5   have been distributed to you by Binance solely in its
6   capacity as a distribution agent and couldn't get stuck in a
7   Binance bankruptcy.  Is that right?
8           THE WITNESS:  Yes, Your Honor.
9           THE COURT:  And is there -- did we set it up so
10  that there's a period of time within which customers can
11  make those withdrawals before we have any issues?  I can't
12  recall.
13          MS. OKIKE:  Your Honor, the way the plan -- sorry,
14  the transaction works is we will send crypt to Binance on a
15  weekly basis as customers sign off.  That crypto has to be
16  put in the customer's account within five business days.
17  And upon that time, they can immediately withdraw
18  (indiscernible).
19          THE COURT:  And did we put in the trust provisions
20  and the custody provisions that that custody arrangement
21  lasts up until a certain amount of time after items are put
22  into customer's accounts so that customers who want to take
23  it out right away will know that they're not at risk from
24  doing so?
25          MS. OKIKE:  Sorry.  I couldn't hear the last part,

212-267-6868          Veritext Legal Solutions          516-608-2400
                       www.veritext.com

---

Page 199

1   Your Honor.
2           THE COURT:  I don't want there to be an argument
3   that the trust relationship or the custody relationship
4   ended the nanosecond that something hit an account and
5   before a customer actually meaningfully could withdraw it.
6   So, it seems to me that provision about custody and trust
7   needs to be in effect for some period of time after it's
8   nominally credited to a customer's account so that if there
9   is a customer out there who wants to take it out right away,
10  that customer can do it without being told that, contrary to
11  our expectations, they've been made potentially an unsecured
12  creditor of Binance.
13          MS. OKIKE:  Understood, Your Honor.  I don't
14  believe that we addressed timing with respect to that, but
15  we can of course discuss with Binance (indiscernible).
16          THE COURT:  Okay.
17          MR. LOREN:  That is all my questions.  Thank you
18  for your time.
19          THE COURT:  Thank you.
20          MR. LOREN:  Thank you for your time.
21          THE COURT:  Thank you.  Is there anybody else on
22  the phone who wishes to question the witness?
23          MR. SHEHADEH:  I would like to, Your Honor.  I
24  just want to know why (indiscernible) open up the Voyager
25  app and release that crypt from there.  Binance -- whenever

212-267-6868          Veritext Legal Solutions          516-608-2400
                       www.veritext.com

---

Page 200

1   you want to put money or crypto to Binance (indiscernible) -
2   - this is Alah Shehadeh for the record, Your Honor.
3           THE COURT:  Who is speaking?
4           MR. SHEHADEH:  Any time you put money or crypto to
5   Binance --
6           THE COURT:  Who is speaking now?
7           MR. SHEHADEH:  Alah Shehadeh.
8           THE COURT:  No, you've asked your questions.  I'm
9   sorry.  You've had your chance.
10          Is there anybody who hasn't already done so --
11          MR. SHEHADEH:  I'm asking another question.
12          THE COURT:  You --
13          MR. SHEHADEH:  Your Honor, I wrote you a letter
14  about this.  You have to allow me to speak.  I want to ask a
15  question.  I am a pro se creditor.  I want to ask a
16  question.
17          THE COURT:  You've asked --
18          MR. SHEHADEH:  You were answering a question for a
19  witness and you were not allowing them to answer.  You were
20  answering for them.
21          THE COURT:  You've --
22          MR. SHEHADEH:  I'm asking a simple question.  How
23  is --
24          THE COURT:  You've had -- Mr. Shehadeh, be quiet.
25          MR. SHEHADEH:  (indiscernible).

212-267-6868          Veritext Legal Solutions          516-608-2400
                       www.veritext.com

---

Page 201

1           THE COURT:  Be quiet.  Be quiet.  Be quiet.
2           MR. SHEHADEH:  Why are you (indiscernible) our
3   money?
4           THE COURT:  Lorraine, cut him off.
5           MR. SHEHADEH:  (indiscernible)
6           THE COURT:  Cut him off.
7           MR. SHEHADEH:  (indiscernible) steal our money.
8   We've got to pay a fee --
9           THE COURT:  Lorraine, cut him off.
10          MR. SHEHADEH:  -- to transfer our money out of
11  there.
12          THE COURT:  Cut him off.  You've lost your right
13  to participate.  You're not listening.  Cut him off.
14          MR. SHEHADEH:  (indiscernible) questions.  You're
15  answering the questions for the witness.  You are not for
16  the creditor.  You are helping yourself.  None of you are.
17          THE COURT:  Lorraine, cut him off.
18          MR. SHEHADEH:  (indiscernible).  It's a crime.
19  It's a crime.  You guys are committing fraud.
20          THE COURT:  We are going to adjourn until Mr.
21  Shehadeh is not only excluded, but barred from rejoining.
22  You have forfeited any right to participate in this
23  proceeding both by your contemptuous conduct and your
24  refusal to listen to ordinary court rules and the fact that
25  you continue to desire to treat this as a podium for you to

212-267-6868          Veritext Legal Solutions          516-608-2400
                       www.veritext.com

1  scream about your grievances instead of to participate in
2  the court hearing.  You are barred from participating.  We
3  will resume when you are excluded.
4       (Recess)
5       THE COURT:  All right.  We will resume.  I would
6  like to let any other accountholders on the phone know it
7  appears that Mr. Shehadeh, even after we cut him off, may
8  have been speaking through somebody else's line.  He is
9  barred.  If you let him speak through your line, you will be
10 barred as well.  And you are under my direct instruction not
11 to allow him to speak indirectly through your line.  Is that
12 understood?  Okay.
13      Now, is there anybody on the phone who hasn't
14 already questioned the witness who would like to question
15 the witness?
16      MR. JONES:  Yes, Your Honor.  Seth Jones.
17      THE COURT:  Who is this?
18      MR. JONES:  Seth Jones.
19      THE COURT:  Seth Jones?  Okay.
20      MR. JONES:  I have a question.  Earlier, the
21 witness said that the toggle wasn't needed in the FTX deal.
22 But contrary to that, UCC said that FTX wouldn't allow
23 (indiscernible).  So, which is it?
24      THE WITNESS:  I couldn't hear the question.
25      THE COURT:  I'm afraid I couldn't hear you clearly

1  enough.  You said that the UCC earlier --
2       MR. JONES:  The toggle.  You said the toggle
3  wasn't needed for the FTX deal, but the UCC said that FTX
4  would allow them to add the toggle to the plan.
5       THE WITNESS:  I understand.
6       THE COURT:  Okay.
7       MR. JONES:  So, which is it?
8       THE WITNESS:  Sir, let me try to paraphrase your
9  question.  You're asking -- and just if you could tell me if
10 I've got it right.  You're asking if we had a toggle plan
11 when there was the FTX initial bid.  Is that correct?
12      MR. JONES:  No, yeah.  You said that -- earlier
13 you said that the toggle wasn't needed in the FTX deal
14 because FTX was a vibrant company.  But the UCC in the court
15 documents said that FTX wouldn't allow them to add the
16 toggle to the plan.
17      THE WITNESS:  I think at that point in time, we
18 believed that the FTX deal was appropriate.  We did not have
19 a toggle; I think as you correctly stated.  I think -- and
20 what we've learned from that situation and the fraud that
21 FTX has perpetrated upon you and all of us and many other
22 citizens, we made sure that there's a toggle to address the
23 fact that there wasn't a toggle.
24      MR. JONES:  I understand.  But UCC wanted the
25 toggle.  But the UCC said that they wanted the toggle, but

1  they weren't allowed to have it.  So, I mean, which is it?
2       MR. SLADE:  Your Honor, I object to the relevance
3  of that.
4       THE COURT:  Well, I am not sure what statement by
5  the UCC are you referring to, Mr. Jones?
6       MR. JONES:  UCC said that FTX, they wanted to have
7  a toggle, a backup toggle.  And FTX refused to allow them to
8  have a toggle in the first APA of FTX.
9       MS. OKIKE:  Your Honor, I'm happy to answer the
10 question.
11      THE COURT:  Yeah, go ahead, Ms. Okike.
12      MS. OKIKE:  So, it is correct that we requested a
13 toggle from the FTX plan, and FTX refused.  And it was
14 removed from (indiscernible).
15      THE COURT:  Thank you.  I just wanted to clarify
16 that.
17      THE COURT:  Okay.
18      MR. JONES:  Thank you.
19      CROSS-EXAMINATION OF MARK RENZI
20 BY MR. JONES:
21 Q   Next question.  (indiscernible) detailed investigation
22 by Forbes has raised significant questions about the
23 management and custody of customer assets at Binance.  Can
24 you address those concerns?
25      MR. SLADE:  I object.  It assumes facts not in

1  evidence.  I'm not sure what he's talking to.
2       THE COURT:  Are you aware of the Forbes article
3  about Binance and do you have any knowledge about any of the
4  issues that are raised there?
5       THE WITNESS:  I have not read the Forbes article.
6  BY MR. JONES:
7  Q   (indiscernible) there's a lot of them that -- coming
8  out just like with FTX raising significant concerns
9  (indiscernible).  I just wanted to -- the due diligence you
10 did in the Binance deal (indiscernible) the FTX deal.
11 A   Yeah.  We've spent more time doing due diligence on
12 Binance, including this week.  We met with the company
13 and its advisors to make sure that a number of the questions
14 have been addressed to the best of our ability.  We've also
15 been in coordination with the UCC advisors to make sure that
16 all of their questions were addressed.  They were also
17 present in those meetings and we believe that we have a
18 construct in hand and in place to address the fact that if
19 the Binance deal does not work, we have a toggle plan.  So,
20 yes, we feel as if the diligence has been more robust, it's
21 been ongoing.  I believe that it occurred this week, earlier
22 this week, on top of other days prior to this week.  And we
23 believe that it's been more robust than what it was with
24 FTX.
25 Q   You said that Binance holds a one-to-one ratio of

1 coins, but you also said the same thing about FTX saying
2 that they held one-to-one assets in coins.  So, how do we
3 know it was not (indiscernible) deal?
4 A   I don't think I testified that FTX holds one-to-one.
5 Q   I got confused with the (indiscernible).  Sorry about
6 that.
7 A   No problem.  No problem.
8 Q   All right.  That's all my questions for now.  Thank
9 you.
10         THE COURT:  All right.  Thank you.  Anybody else
11 on the phone?
12         UNIDENTIFIED SPEAKER:  Yes, Your Honor, I have a
13 few questions.
14         THE COURT:  Who is this?
15         UNIDENTIFIED SPEAKER:  This Andre (indiscernible),
16 pro se creditor.
17         THE COURT:  Okay.  Please proceed.
18         UNIDENTIFIED SPEAKER:  So, can you -- Mr. Renzi,
19 can you tell me again once again what the estimated recovery
20 would be if the Binance deal does go through, the
21 percentage?
22         THE WITNESS:  Excuse me.  The estimated recovery
23 for the Binance deal I believe in my declaration is
24 approximately 50 percent as of the 12/18 prices that are
25 represented in my declaration.  I know --

1         UNIDENTIFIED SPEAKER:  Okay.  And if the deal
2 doesn't go through?
3         THE WITNESS:  I also know that the prices have
4 appreciated in your favor and that the recovery levels are
5 in the 70 percent range.  I've been on the stand most of the
6 day, so I am not sure what's happening in the markets, but I
7 think it's roughly in the 70 percent range now.
8         UNIDENTIFIED SPEAKER:  Okay.  So, in December --
9 as of December 18th, it was roughly 50 percent.  But you're
10 saying as of today it's potentially roughly 70 percent?
11         THE WITNESS:  In the seventies, that's correct.
12         UNIDENTIFIED SPEAKER:  Is that correct?
13         THE WITNESS:  Yes.
14         UNIDENTIFIED SPEAKER:  Okay.  And if the deal
15 doesn't go through, what would the recovery percentage be?
16 Or is it the same?
17         THE WITNESS:  So, I can -- so I can -- I'm happy
18 to do it, I would like to grab my declaration just so I can
19 remind myself of my chart if you would give me a second.
20         THE COURT:  You have to clarify the question.  Are
21 you asking what would happen if we did the toggle plan
22 instead of the Binance deal, or are you asking what would
23 happen if we had no plan and went to Chapter 7?
24         UNIDENTIFIED SPEAKER:  No, if we went to the
25 toggle plan, what would the recovery percentage be.  Yeah.

1         THE WITNESS:  Just once second.  I'll turn to it.
2         UNIDENTIFIED SPEAKER:  Okay.
3         THE WITNESS:  So, again, my declaration -- I'll
4 just go left to right if that's okay, if it helps you.  I
5 look at accountholder claims and recovery under the Binance
6 plan, it's roughly 50 percent.  Under the toggle plan it's
7 roughly 45 percent.  In the high case scenario and in a
8 liquidation, it's 38 percent.  In the low case scenario,
9 it's 35 percent.  Hopefully, that answers your question.
10         UNIDENTIFIED SPEAKER:  Okay.  Thank you for that.
11         THE WITNESS:  Hopefully, that answers your
12 question.
13         UNIDENTIFIED SPEAKER:  Yeah, it does.  And now
14 earlier you had mentioned an issue with unsupported coins.
15 If I understand right, why Voyager couldn't just distribute
16 whatever assets are remaining because of these unsupported
17 coins.  What percentage of the total crypto assets are in
18 unsupported coins?
19         THE WITNESS:  I believe I -- if you give me one
20 second, I have it also in my declaration.  So, sir, on
21 Paragraph 120 -- I'll just read this to you in case we don't
22 have it.  There are technical limitations that would prevent
23 the Debtors from making in-kind distributions on certain
24 types of cryptocurrency on the Debtor's platform.  There are
25 35 cryptocurrency tokens for approximately 17 percent of the

1 debtor's cryptocurrency portfolio based on equivalent USD
2 value.  Hopefully, that answers it.  That is Paragraph 120.
3 BY UNIDENTIFIED SPEAKER:
4 Q   I'm sorry, so that's 70 percent of the (indiscernible)
5 on these unsupported coins?
6 A   No, you probably misheard me.  It's 17, one, seven.
7 Seventeen.
8 Q   Seventeen.
9 A   Yes.
10 Q   Seventeen percent.  Okay.  Okay.  So, roughly 83
11 percent --
12 A   Yeah.  Let me just do the numbers one more time to be
13 helpful.  So, it's 35 coins.  And the USD representation of
14 that is 17 percent overall.  So, it's obviously -- those
15 coins are of lower overall value, but it's still 17 percent,
16 which is meaningful.  That's Paragraph 120 if you're looking
17 for it.
18 Q   Right.  Roughly -- let's just say $200 million out of
19 the $1.3 billion, right?
20 A   Mm-hmm.
21 Q   Okay.  The majority of crypto assets could be returned
22 to the Voyager platforms if need be.
23 A   Yes.  And I think that's right.  And that's certainly a
24 majority, especially if you do the math if there's -- let's
25 just keep it simple.  If there's a hundred coins, it's 65 --

Page 210

1  you know, 65 percent.  Or if you do it on a dollar-weighted
2  basis, you're right, it's 83 percent as of the time that
3  this analysis was done, which was around 12/18.  That
4  proportionately should be roughly the same.  So, you're
5  absolutely right.  They can do most of it on a proportionate
6  basis or on a dollar proportion basis also.
7      Q   Okay, great.  Great.  And if I understand right
8  (indiscernible) with the Binance deal, the assets would be
9  basically placed in a trust, in some kind of trust.  And
10  Binance would just essentially be the distribution medium
11  for us to get our funds back.  Is that correct?
12     A   I think you said that well.
13     Q   Okay.  Okay.  So, is there really any risk then -- I
14  mean, what -- maybe I'm not thinking about this correctly,
15  but what is the risk then of going to Binance if our assets
16  will be held in trust and they're just going to just be the
17  distribution medium.  Is it really just post...
18     A   Yeah.  You were hearing from my testimony that we
19  acknowledge that some have different views of risk than
20  others.  That's the first premise.  The second premise is
21  that we try to take into consideration some due diligence
22  and make sure that we understood the bid, we think that
23  Binance is the highest and best value, and that to the
24  extent that we feel uncomfortable with that transaction in
25  any way, we have a toggle.  But to your question

Page 211

1  specifically, I think you may have a different risk
2  tolerance than others obviously based on my testimony today
3  and questions today.  Others perhaps don't see it the same
4  way you do.  But nonetheless, we think the way -- the
5  construct and process that we've laid out could get
6  cryptocurrency back in kind.  We think it is very well
7  thought out, and we have a toggle plan if the Binance plan
8  doesn't work.  Hopefully, I answer your question.
9      Q   Yeah.  And just to be clear, I'm definitely not in
10  support or not in support.  I'm just trying to understand
11  what the actual risk is, where is my risk by going to the
12  Binance deal.  And from what I'm seeing, if all our assets
13  are being (indiscernible) in a trust okay, which will not be
14  Binance property and, you know, we'll have a period of time,
15  as the Judge was saying earlier, there's not going to be an
16  a-ha after they transfer our funds to the Binance
17  (indiscernible), well, now it's ours or now, you know,
18  whatever.  So, if there's no risk and they're just a
19  distribution mechanism, then really -- again I might be
20  seeing this wrong.  Maybe the risk is contained, I guess.  I
21  might have just answered my own question.  No problem.
22         One last question.  In your due diligence with Binance,
23  have you seen their books?  Has anyone really dug into their
24  books?
25     A   We've reviewed numerous documents with the company.  I

Page 212

1  know that members of my team were on site with their
2  advisors and some of the company members.  And I believe
3  that they've gone through a number of books and records to
4  make sure that we're comfortable.
5         And furthermore, because there's checks and balance,
6  the unsecured creditors' committee advisors also were preset
7  at that meeting.  So, it's not just the Debtor's advisors,
8  but it's also your representatives were also in the room,
9  too.
10     Q   Okay.  That doesn't hold much value anyway.  Okay.
11  That is all my questions.  Thank you.
12     A   Thank you.
13         THE COURT:  Okay.  Is there anybody else on the
14  telephone who wishes to cross-examine the witness?  All
15  right.  Committee counsel?
16         MR. KIRPALANI:  Yes, Your Honor.  Thank you.
17             CROSS-EXAMINATION OF MARK RENZI
18  BY MR. KIRPALANI:
19     Q   Mr. Renzi, good afternoon.  So, you testified that you
20  conducted diligence on Binance, correct?
21     A   Yes, my team has.
22     Q   And in connection with that diligence, Binance made a
23  number of representations to you and others?
24     A   Yes, they ha.
25     Q   And do you recall the question from one of the

Page 213

1  questions about the comingling of cryptocurrency?
2      A   I did.
3      Q   And didn't Binance represent to you and other
4  professionals that Binance U.S. segregates customer crypto
5  from Binance U.S.'s cryptocurrency?
6      A   I believe so.  I checked my notes.  I believe that's
7  right.
8      Q   Okay.  There were a series of questions about the
9  relationship between Binance U.S. and Binance Global.  Do
10  you recall that?
11     A   I do.
12     Q   The purchasing entity here is BAM Trading Services
13  Inc., DBA Binance U.S.  Isn't that right?
14     A   Yes.
15     Q   And they are a Delaware corporation?
16     A   I believe they're a Delaware corporation.
17     Q   And in connection with the diligence that you did and
18  the other professionals, did you look into the financial
19  capabilities of BAM Trading Services Inc., DBA Binance U.S.?
20     A   We reviewed numerous documents about their books and
21  records.
22     Q   Based on the diligence of BAM Trading Service Inc., DBA
23  Binance U.S. on their finances, are you comfortable that
24  they have the financial wherewithal to close?
25     A   As of today, yes.

Page 214

1   Q    Another representation made to you by Binance was that
2   only employees of Binance U.S., not Binance Global, are able
3   to move or withdraw customer cryptocurrency over Binance
4   U.S.'s platform?  Isn't that right?
5   A    I believe it's only Binance U.S. employees.
6   Q    Okay.
7   A    Correct.
8   Q    There was a question asked to you about the difference
9   between how Binance U.S. holds customer crypto versus how
10  Voyager held customer crypto.  Do you remember that?
11  A    I do.
12  Q    Another representation made to you was that Binance
13  U.S. does not lend or rehypothecate customer crypto.  Do you
14  remember that?
15  A    I do.
16  Q    There were some comparisons being drawn between the
17  deal with FTX and the deal with Binance.  Do you recall
18  those questions?
19  A    There were many.
20  Q    One of the protections that was put in place in the
21  Binance deal is that customer crypto go through Binance over
22  time.  Is that right?
23  A    Yes.  Over -- in succession and over weeks.
24  Q    In succession.  And so, customer crypto will only go to
25  Binance U.S. once that customer has (indiscernible) with

Page 215

1   Binance U.S.  Isn't that right?
2   A    That's my understanding.
3   Q    And that limits the time period that customer crypto
4   will be on Binance U.S. if they choose to get
5   (indiscernible).  Isn't that right?
6   A    Yes.
7   Q    So, what protections does that give?  Why is that more
8   protectorate of customer crypto than the FTX deal?
9   A    Well, the FTX deal is going to be transferred quickly
10  and in bulk.  This is over time and more protective, make
11  sure that it's done ratably and slowly to determine if there
12  are any problems as we are doing it.  So, I think it's much
13  more conservative than the way we are approaching it.
14  Q    So, to put it plainly, all the crypto doesn't go to
15  Binance U.S. right away, right?
16  A    Correct.
17  Q    It goes on a weekly basis and only for those customers
18  that have onboarded with Binance U.S., right?
19  A    Correct.
20  Q    So, if something were to happen with Binance U.S., it's
21  only the customer crypto that went over (indiscernible),
22  isn't that right?
23  A    That's right.
24  Q    You submitted a declaration in support of the plan
25  which includes this Binance deal

Page 216

1   A    Yes.
2   Q    Based on the diligence that you've done to date, are
3   you still supportive of the Binance deal?
4   A    Yes, I am.
5            MR. KIRPALANI:  I pass the witness, Your Honor.
6            THE COURT:  All right.  Any redirect by the
7   Debtors?
8            MR. SLADE:  No, Your Honor.
9            THE COURT:  Okay.  Just briefly, Mr. Renzi, you
10  just said that you -- that Binance represented that it
11  doesn't lend or rehypothecate.  Maybe I misheard you, but I
12  thought you said earlier in your testimony that they do
13  rehypothecate?
14           THE WITNESS:  Yes, Your Honor.  I think I was
15  mistaken.  I went back and checked my notes.  They do not
16  rehypothecate.  They hold it one for one.  I think that's a
17  correction.
18           THE COURT:  Okay.  Now, in some of the objections,
19  there have been questions about specific matters.  One was
20  whether you have any knowledge of safeguards that exist to
21  stop assets from being transferred off the Binance U.S.
22  platform, I assume at the direction of the parent or
23  somebody else.  What safeguards are in place to prevent that
24  from happening to your knowledge?
25           THE WITNESS:  Your Honor, do you mean Binance

Page 217

1   itself or just from the customer perspective?  Which
2   perspective?  Sorry.
3            THE COURT:  Well, I know you said that they
4   represented to you that only the U.S. employees have access
5   to the keys.  What procedures are safeguards are in place to
6   prevent the parent from telling the U.S. employees to just
7   transfer things off to the parent?
8            THE WITNESS:  I believe they are separate legal
9   entities with separate management teams that they
10  specifically hold them differently.  I can't anticipate if
11  there's malfeasance.  But to my understanding, they will try
12  to do everything they can to protect it.  But I can't
13  survive how far an entity might redirect a U.S. entity.
14           THE COURT:  Is that a possibility you discussed
15  with them or did you get any assurances from them on that
16  point?
17           THE WITNESS:  Other than what I've already
18  represented, they said that they wouldn't.  But I don't know
19  any other procedures that they have in place to do that.
20           THE COURT:  This might be more of a question for
21  Mr. Tichenor.  But in his declaration, he says as part of
22  the due diligence that in response to news reports about the
23  transfers of $400 million to Merit Peak Limited, that the
24  Debtors have done supplemental due diligence.  And it was a
25  little vague about what questions were asked and what the

Page 218

1   answers were and whether that loop has really been closed or
2   whether it's still a point of discussion.  Do you have any
3   knowledge of that?
4           THE WITNESS:  I would defer to Mr. Tichenor on
5   that subject, Your Honor.
6           THE COURT:  I'm sure he appreciates that.
7           THE WITNESS:  I spent quite a lot of time with you
8   this afternoon, Your Honor.
9           THE COURT:  Okay.  Let's (indiscernible) next.
10  All right.  Thank you very much.  You are excused.
11          All right.  It is 4:30.  Do you want to begin with
12  another witness or continue tomorrow?
13          MR. SLADE:  We would like to try to finish.  I
14  think our next witness, Mr. Kirpalani (indiscernible).
15          MR. KIRPALANI:  Good afternoon, Your Honor.
16  Susheel Kirpalani for Quinn Emanuel on behalf of the
17  Debtors.  And more specifically speaking through the special
18  committee of independent directors of Voyager Digital LLC.
19          The next witness that we'd like to call is Mr.
20  Timothy Pohl, who is one of the two independent directors of
21  Voyager Digital LLC.  Mr. Pohl, who doesn't live in New
22  York, just has some restrictions on his availability
23  tomorrow.  And so, we would like to attempt to get his
24  testimony done today if that's at all possible.
25          THE COURT:  We can try, but my guess is we're not

Page 220

1           THE COURT:  Mr. Pohl, do you swear that the
2   testimony you are about to give will be the truth, the whole
3   truth, and nothing but the truth, so help you God?
4           MR. POHL:  I do.
5           THE COURT:  State your full name for the record,
6   please.
7           MR. POHL:  Timothy Pohl.
8           THE COURT:  All right.  Counsel, please proceed.
9           MR. KIRPALANI:  Thank you, Your Honor.  Your
10  Honor, we filed -- it's Exhibit 3 for the trial record
11  today, the Declaration of Timothy Pohl, as his direct
12  testimony.  It's Docket Number 1111.  I understand the prior
13  declaration received objections as to being admitted as
14  direct.  We would like to ask for this witness that his
15  declaration be deemed admitted for his direct.  He is
16  available for cross-examination.  And in particular, I would
17  like to point out that much of his direct testimony relates
18  to the special committee's independent investigation and
19  report which has been on the docket since February 14th,
20  2023 for all parties in interest to review.  And to my
21  knowledge, no specific objections at confirmation related to
22  any of the particular findings therein.  But he is here and
23  available to answer cross-examination.  But I will proceed
24  any way Your Honor thinks appropriate.
25          THE COURT:  On the first stance, are there any

Page 219

1   going to be able to.  I mean, he's testifying about the
2   releases, right?
3           MR. KIRPALANI:  The estate releases, yes.
4           THE COURT:  Yeah.  I suspect based on how many
5   questions we had on Mr. Renzi's issues, that we're probably
6   going to have a lot on Mr. Pohl's issues, too.
7           MR. KIRPALANI:  Can I confer with co-counsel?
8           THE COURT:  Sure.
9           MR. KIRPALANI:  Thank you.
10          MR. SLADE:  Your Honor, just briefly, if we were
11  to continue, how long would Your Honor be prepared to go
12  today?
13          THE COURT:  I haven't asked the court staff how
14  long they are set up to go.  I mean, it's usually not an
15  issue for me.  I don't know if you have any issue.  You're
16  okay?  Certainly, we could go -- you're all right, Danny?
17  Certainly, we can go to 6:00 or a little later.  I mean, I
18  don't have any personal issue.
19          MR. KIRPALANI:  Yeah, we'd like to plow ahead,
20  Your Honor, if possible.
21          THE COURT:  Okay.  Let's do what we can do.
22          MR. KIRPALANI:  Thank you, Your Honor.  Again, for
23  the record, Susheel Kirpalani of Quinn Emanuel on behalf of
24  the Debtors.  We would like to call Timothy Pohl to the
25  witness stand.

A-1118

Page 221

1   objections to the admission of Mr. Pohl's declaration into
2   evidence?  All right.
3           Anybody who desires it will have an opportunity to
4   cross-examine him.  But there are no objections, so his
5   declaration is admitted into evidence.
6           MR. KIRPALANI:  Thank you, Your Honor.
7           DIRECT EXAMINATION OF TIMOTHY POHL
8   BY MR. KIRPALANI:
9   Q    Mr. Pohl, I will just ask you briefly.  Have you had a
10  chance to review your declaration since it was filed two
11  days ago?
12  A    I have.
13  Q    Do you have any changes that you would make to the
14  declaration?
15  A    No.
16  Q    Okay.
17          MR. KIRPALANI:  We have nothing further on direct,
18  Your Honor.
19          THE COURT:  All right.  Is there anybody in the
20  courtroom who wishes to cross-examine Mr. Pohl?
21          Hang on a second.  I'll get to the telephone
22  people in a minute.  I just want to start with the people
23  who are here in the courtroom.  Is there anybody here in the
24  courtroom who wishes to cross-examine Mr. Pohl?  Okay.  How
25  about on the telephone?  Is there anybody on the telephone

Page 222

1  that wishes to ask questions of Mr. Pohl?

2         MR. HENDERSHOTT:  Your Honor, this is Tracy

3  Hendershott, pro se creditor.  Again, Your Honor, I haven't

4  even seen this submission, so hard to ask questions.  Can we

5  get a summary of it from him verbally?  Is that possible?

6         THE COURT:  Sure.

7         MR. KIRPALANI:  Absolutely, Mr. Hendershott.  This

8  is Susheel Kirpalani from Quinn Emanuel.  And we will

9  definitely give a summary of his testimony and then we can

10 pass the witness to the extent you've got questions.

11        MR. HENDERSHOTT:  (Indiscernible) --

12 BY MR. KIRPALANI:

13 Q    Very briefly, Mr. Pohl, can you describe your

14 background and experience for the Court?

15 A    Sure.  I've been in restructuring business for a little

16 over 30 years.  I started as an attorney at Jones Day where

17 I had been an associate for about seven years and then

18 became a lawyer at Skadden Arps in 1999 where I stayed until

19 2008.  By the time I left, I was the co-head of Skadden's

20 worldwide restructuring practice.  In 2008, I left to become

21 a managing partner at Lazard Freres where I was an

22 investment banker in restructuring for the next decade.  I

23 retired from Lazard in the summer of -- or the fall of 2019.

24 And I have been doing a variety of things ever since,

25 including sitting on some boards of distressed companies as

Page 223

1  an independent director.

2  Q    Thinking about boards of distressed companies that

3  you've sat on, are any of those companies, companies that

4  Kirkland & Ellis has been counsel to?

5  A    Voyager is the only company I have been asked by

6  Kirkland and nominated by Kirkland to be a director on.  I

7  was asked in one other instance to be a director by

8  creditors.  Kirkland represented the company.

9  Q    Okay.  And what about my firm, Quinn Emanuel?  Have we

10 represented you as an independent director in any other

11 engagements?

12 A    (Indiscernible).

13 Q    Do you have any connections with any potential party

14 that you've been investigating in the course of your duties

15 as a member of the independent special committee here?

16 A    No.

17 Q    How did you come to serve on the board of Voyager

18 Digital LLC and can you tell us when that happened?

19 A    I think fight before the July 4th (indiscernible)

20 called me and asked me if I would be interested in being an

21 independent director, and specifically being on the special

22 committee that was going to be charged with conducting an

23 internal investigation (indiscernible) conducting.  I said

24 that I would.  (indiscernible) that's the only time I have

25 been asked by Kirkland to be on a board (indiscernible).

Page 224

1  Q    Are there any other members of the special committee at

2  Voyager Digital LLC?

3  A    Yes.  Ms. Jill Frizzley is the other (indiscernible).

4  Q    Did you know Ms. Frizzley before serving on the board

5  with her?

6  A    I do of her.  She was an attorney for I want to say

7  around 20 years.  I know by the end I think at Weil Gotshal.

8  Or maybe the whole time.  I'm not sure.  I'm not I've had --

9  I've cross paths with her from time to time, but I didn't

10 know (indiscernible).

11 Q    Did you ever serve on a board with her before?

12 A    No.

13 Q    In your review, how did the board function?  Well,

14 poorly, acrimony, consensus?

15 A    Well, I mean, the two of us were the two independent

16 directors at Voyager LLC.  You know, we were there for a

17 particular purpose, which was to conduct this investigation.

18 We hired counsel and we moved on from there.

19 Q    Okay.  And what did you consider the primary role for

20 the special committee?

21 A    Our primary role was to investigate historical

22 transactions, really mostly about the -- the real impetus

23 for the special committee I think was to look into the

24 lending practices around the (indiscernible) capital loans

25 that the company made.  But as part of that, we looked at

Page 225

1  (indiscernible) transactions and regulatory issues, we

2  looked at the company's lending practices, the company's

3  risk management practices.  We sort of looked at everything

4  to determine (indiscernible) with the assistance of counsel

5  of course to whether or not there were any viable causes of

6  action owned by the estate.

7         We specifically did not look at and were not charged

8  with looking at individual causes of action, customer causes

9  of action, regulatory causes of action, but estate-only

10 causes of action arising out of historical transactions and

11 practices.

12 Q    Did the special committee consult with the statutory

13 unsecured creditors' committed in the course of its work?

14 A    We did extensively.  One of the first things that we

15 determined, particularly in light of the nature of the

16 company's balance sheet with the creditors were and there

17 was a creditor's committee, and that they were going to

18 conduct their own investigation as it were.  There was no

19 reason not to be completely cooperative and hand-in-glove

20 with them in that exercise, and that's what we set out to

21 do.

22 Q    And you said there was no reason not to be cooperative

23 with them.  Was there a reason to be cooperative with them

24 in your view?

25 A    Yeah.  They're the primary fiduciary constituent

1  representing really the only real creditor class in this
2  case.
3  Q   So, did you consider their views important to you?
4  A   Very important.
5  Q   What did the special committee do in terms of an
6  investigation?  You hear that word investigation, what does
7  it actually mean?
8  A   So, the first thing you do of course is hire counsel.
9  And we hired you.  And we then set out to -- I just call it
10  discovery phase where we talked about the types of
11  information that we would like to review and to have you
12  review from the Debtor.  And so, there were a series of --
13  I'm doing this from memory, but 25 or 30 separate
14  information requests that were (indiscernible) over the
15  course of the investigation asking for documents.  There
16  were phone conversations and then there were a series of
17  interviews that were conducted.  I think there were 12
18  separate interviews that people conducted of company
19  officers and employees.  And that was how we conducted the
20  investigation.
21  Q   And did the special committee have any financial
22  advisor available to it?
23  A   We didn't hire our own, but we were -- we had complete
24  access to BRG and Mr. Renzi and his whole team.  And we in
25  fact availed ourselves of that and we had information

1  sessions, Ms. Frizzley and myself with you, in order to
2  understand things better things that we didn't understand.
3  I think (indiscernible) at the beginning of the case we were
4  crypto neophytes.  So, we had a lot to learn.  So, we
5  availed ourselves as that.  And I (indiscernible) as well
6  separate and apart from Ms. Frizzley and myself.  We
7  certainly had access to Kirkland & Ellis (indiscernible) any
8  conversations as part of the investigation.
9  Q   Did the special committee's investigation culminate in
10  any written report?
11  A   There was a written report.  So, the investigation
12  lasted approximately two months.  I think it was July and
13  August.  A little longer than two months.  And in early fall
14  your firm prepared a draft.  We reviewed it, we discussed
15  it, and I think the culmination of that work was a -- I want
16  to say about a 60-page, single spaced report that was
17  finalized I think it was in early October if I remember
18  right.  That was the report.
19  Q   And just so that we have it in the record, to your
20  knowledge was that report filed publicly on the docket in a
21  redacted form?
22  A   It was.  Not at that time, but it was filed I think in
23  redacted form I want to say in February.  Does that sound
24  right?
25  Q   Docket Number 1000, yes.  And what was the ultimate

1  conclusion of the special committee as to whether the estate
2  had any causes of action against insiders of Voyager?
3  A   Our ultimate conclusion was that there may be
4  cognizable claims for breaches of fiduciary duty to care
5  against two of the company's senior officers, Mr. Ehrlich
6  and Mr. Psaropoulos.
7  Q   And what did the special committee do with those
8  findings or with that conclusion?
9  A   Well, we did a number of things.  So, first of all, I
10  think our conclusion was that there may be cognizable causes
11  of action, non-frivolous causes of action.  That's not the
12  same thing as concluding that there would be -- that they
13  were wonderful causes of action or slam-dunk winning causes
14  of action, but cognizable causes of action that -- number
15  one.   Number two, we concluded that they would be pretty
16  hard to prosecute successfully, which we talk about.  And
17  three, we spent some time determining whether or not those
18  two individuals had the financial wherewithal to pay
19  significant judgement.  And then number four, we were sort
20  of very cognizant of the fact that this director and officer
21  liability insurance that remains intact and is staying and
22  could be available to satisfy potential judgements or
23  (indiscernible).
24      So, with all of those things in mind, we thought that
25  the best course of action and judgement was to see if we

1  could put together a settlement that would include
2  protecting the D&O policy for the benefit of the creditors
3  to the best of our ability as well as to obtain some
4  monetary judgement from the monetary contribution from those
5  two potential parties.  Keeping in mind, you know, what
6  their financial wherewithal was.
7  Q   You said a lot there.  But rather than me home in on
8  each element of your testimony, perhaps I can ask you to
9  just summarize the terms of the settlement reached with Mr.
10  Ehrlich and Mr. Psaropoulos.  And if you need to refer to
11  your declaration, it is in evidence.  You can do that.  And
12  then perhaps we can pass the witness in the interest of
13  time.
14      THE COURT:  Let me just ask.  Somebody on the
15  telephone, we've got some noise coming over your line.
16  Please mute yourselves unless you are asking questions or
17  unless you have an evidentiary objection to a question.
18  Okay?  Thanks.
19  BY MR. KIRPALANI:
20  A   Let me do the easy parts first (indiscernible) there's
21  some more complicated legal parts which I might refer to my
22  declaration to make sure I say it right.  But in essence,
23  the settlement -- let's do them one at a time.
24      With respect to Mr. Ehrlich, the settlement is for him
25  to pay to the estate -- he had received a bonus prior to

Page 230

1   filing the bankruptcy (indiscernible) the filing of the
2   bankruptcy. He receive a bonus in the ordinary course of
3   business in our view of about $1.9 million. And he paid
4   taxes on that. So, his net bonus net of taxes was
5   approximately $1.12 or $1.13 million. And we as part of our
6   settlement negotiated for him to return those funds, all of
7   them, to the estate, as well as to have the ability to, if
8   it's available, if there is a tax refund that is applicable
9   to the unwinding of that bonus, if you will, then the estate
10  would get the benefit of that as well.
11      That amount of money was a pretty significant amount of
12  money relative to what his ability to pay. But that's what
13  we got from him as part of the settlement.
14  Q   And let me just interrupt you there. You said it was a
15  pretty significant part relative to his ability to pay. How
16  do you know what his ability to pay was?
17  A   So, before we were willing to consider what settlement
18  we would be willing to support, we asked -- we required that
19  there be disclosure of his personal financial assets and
20  liabilities and we required that those be provided under
21  oath, if you will. There was both a -- I don't think it was
22  an affidavit, but there was a sworn statement. And then he
23  was deposed.
24  Q   Thank you. And were there any other elements to the
25  Ehrlich settlement before we move on?

Page 231

1   A   Yes. A couple. And now it gets a little harder to
2   describe (indiscernible). So, (indiscernible)
3   subordinating. He has rights to indemnification for the
4   company if he is sued -- I just want to back up for a
5   second. The estate's claims against those two individuals
6   are not being released. So, part of the settlement was that
7   those claims are not released so that the claims against
8   them can continue to be prosecuted. And to the extent that
9   there's a judgment or a settlement, the estate can look to
10  the D&O coverage with respect to (indiscernible).
11      On top of -- but as a result of monetary payment, there
12  is no more recourse against his personal assets. And the
13  reason I said it that way is because he has the right to be
14  (indiscernible) for both and (indiscernible) and he also has
15  the right (indiscernible). And he also has the right to be
16  indemnified for defense costs, which (indiscernible).
17      So, with respect to the settlement indemnification
18  rights, he has waived his rights essentially to receive
19  indemnification from the estate.
20      The next thing if we're going to do it person-by-
21  person, there's a little bit of complexity around the
22  insurance policies. So, I think it's probably easier just
23  to go and stay with the monetary pieces between the two
24  people and then talk about the insurance.
25  Q   Sure.

A-1121

Page 232

1   A   To me it's easier to think about it that way. And then
2   with respect to Mr. Psaropoulos, where I think we thought
3   that the relative strength of the claims were different and
4   not exactly the same -- still not frivolous. We had a
5   similar approach. We insisted on gaining information under
6   oath and through depositions about his personal financial
7   situation. And the settlement with him is that he is -- has
8   some crypto on the exchange. Right? So, he is essentially
9   subordinating 50 percent of his rights to receive whatever
10  he would receive under the plan as -- that's how he is
11  contributing financially. That value of that is
12  approximately -- I think the last time we calculated fell at
13  $60,000. And then he is also waiving his rights to
14  indemnification (indiscernible). And then there is both
15  of them the more complicated piece with respect to the
16  (indiscernible) insurance policy.
17  Q   Okay. You mentioned that the estate was not actually
18  releasing the claims against them, but just agreeing not to
19  seek recourse against their personal assets beyond what they
20  were contributing. Did I get that correct?
21  A   You did.
22  Q   What about customers who have claims against the Debtor
23  or claims that they believe they have against individuals?
24  Are those being released under the settlement that we
25  reached with them?

Page 233

1   A   They're not being released. So, the only releases
2   (indiscernible) that are being released under the plan are
3   (indiscernible). The only releases with respect to them are
4   releases of estate causes of action. So, individual
5   customers who believe that they have claims against either
6   of them or any other officer and director, those claims are
7   not being released. Same with (indiscernible). They're not
8   released.
9   Q   Do you recall there was a time in the internal
10  investigation when you became aware of an insurance policy
11  that was obtained by the debtors shortly before the filing?
12  A   Yes.
13  Q   And what was your reaction to learning that
14  information?
15  A   Here's what we learned. So, the company had a policy
16  or a number of policies that essentially amounted to
17  (indiscernible). Shortly before (indiscernible) filing,
18  getting ready for the filing, the company procured a second
19  policy as part of a larger improvement in their overall D&O
20  insurance situation. So, what we came to learn was that the
21  company paid -- I think it was around $15 million for a
22  basket of goodies. One of those goodies, but not the only
23  goody, was another $10 million called the (indiscernible)
24  policy, another $10 million of D&O coverage. So, ten plus
25  ten is 20. That wasn't the only thing that the company

1  obtained in exchange for that.

2  Q    Do you recall what else the company obtained?

3  A    I do.  The company also obtained six-year tail coverage

4  under both policies.  So, the original $10 million policy

5  and (indiscernible) purchased and I think, though I'm not a

6  hundred percent sure, but I don't think they had the

7  contractual right -- they had to negotiate with the

8  insurance carrier to obtain six years of tail coverage under

9  both policies, and there was money associated obtaining that

10  benefit.

11      And then the other was the original policy was as I

12  understand it excluded coverage for customer and regulatory

13  claims.  Those exclusions were removed from both the

14  original policies and they did not apply to the new policy.

15  And so, those were all the things that happened at once for

16  a sum of fifteen-point-something-million dollars.

17  Q    Despite that, it sounds like from your testimony there

18  was a basket, to use your phrase, of goodies, meaning

19  benefits to the debtor.  Is that what you mean when you say

20  that?

21  A    Yes.

22  Q    Okay.  Despite that, did you have a reaction given your

23  experience as a restructuring professional as to whether the

24  transfers to the insurance company on the eve of filing

25  might be avoidable for the benefit of the estate?

1  A    I do.

2  Q    Why do you think that it is?

3  A    Well, we conducted a pretty thorough investigation.  We

4  looked at the company's risk management practices around --

5  particularly around (indiscernible).  We concluded that

6  there were risk management practices in place.  They were

7  not perfect.  They were a work in progress at that phase and

8  time.  But there was some level of diligence done.  There

9  were decisions made for reasons that made sense.  There was

10  an absence, a notable absence of any indicia of self-

11  dealing, improper motives.  There was nothing in it for

12  these executives other than their genuine belief that making

13  those loans was good for the company.  They were investors.

14  They had currency on the platform.  Didn't find any of the

15  red flags that you sometimes find in other types of

16  situations.  And so, whether or not there were breach of

17  duty of care claims based on criticism of the depth and the

18  detail around the risk management practices and how they

19  went into business with (indiscernible).  We thought there

20  were some good facts and there were some bad facts.  And

21  under the law as I remember it and as I have certainly been

22  reeducated by counsel, really you would have to find for

23  there to be a breach in duty of care.  That's a gross

24  negligence standard.  You would have to find that they were

25  grossly negligent (indiscernible), grossly negligent in

1  A    I think one of the things that stuck out to us was that

2  it appeared that despite the way I just described it, it

3  appeared in the paperwork as it was reported to us that the

4  $10 million new (indiscernible) policy cost the company $10

5  million.  Whether that's the (indiscernible) described or

6  not, (indiscernible) of the greater sum that was paid for

7  the basket of goodies in some sense I think the insurance

8  company (indiscernible) sort of the thought behind it is $10

9  million of new coverage for $10 million.  I don't know

10  whether that's accurate or not.  But when we observed that,

11  our reaction to that was, huh, that seems unusual and

12  (indiscernible) there could be a fraudulent conveyance claim

13  against the insurance company for whether or not they

14  provided the estate with (indiscernible) in exchange for the

15  $10 million that they received.

16  Q    Did you do anything with that thought, that it may be

17  an avoidable transaction?

18  A    We did.  As part of the overall settlement, we

19  preserved that cause of action, did not release

20  (indiscernible) and that cause of action, along with the

21  causes of action against the two individuals, are being

22  transferred to (indiscernible).

23  Q    Okay.  Do you have a view as to whether the settlement

24  reached with Mr. Ehrlich and Mr. Psaropoulos is in the best

25  interest of the estate?

1  probably going about doing the things that I just talked

2  about and making decisions (indiscernible).

3      And while we thought that there were colorable claims,

4  we thought that there were also pretty colorable

5  counterpoints.  So, when we coupled that with the fact that

6  you can't get water from a stone.  If you see somebody

7  (indiscernible) anybody can sue anybody for anything.  They

8  not only might not win, but they're not going to have

9  anything to give you if you do win.  And we looked at their

10  financial assets, and we thought that (indiscernible) in our

11  business judgment and in the best interest of the estate

12  would be negotiate the best deal that we could from them,

13  obtain some positive value, and really maintain the source

14  of recovery that is (indiscernible), which is the $20

15  million (indiscernible).  And so, we thought that taking all

16  that into account, that that was extremely beneficial for

17  the estate and we were -- we felt good about our business

18  judgement.  Not that we relied on the judgment of others,

19  but it supported our belief that that was a good settlement

20  under the circumstances that the creditor's committee

21  reached the same conclusion.

22      MR. KIRPALANI:  I have nothing further, Your

23  Honor, for the witness.

24      THE COURT:  Okay.  Anybody in the courtroom who

25  now wishes to question the witness?  Yes?

1    UNIDENTIFIED SPEAKER:  Your Honor, I have only one
2  question.
3    THE COURT:  You have one behind you who I
4  acknowledged first there.
5    MS. COWEN:  I am Stacey Cowen.  I am a creditor.
6  (indiscernible).  I am an investor.  I have had 177,000
7  shares of Voyager that I bought from 2020 until May of 2022
8  that at high was three-and-a-half million.  Now it's zero.
9  And I -- you know, followed investor relations, press
10 releases, interviewed Mr. Ehrlich, had correspondence with
11 Mr. Ehrlich in text about the company.  And I actually had a
12 question.  I guess when was he paid off that bonus and when
13 was that additional insurance taken out?
14    CROSS-EXAMINATION OF TIMOTHY POHL
15 BY MS. COWEN:
16 A    So, I think I can refresh my recollection and give you
17 exact dates if you want.  But I believe that the bonus was
18 in February of 2022, before there was any lending made to
19 (indiscernible), by the way.
20 Q    Okay.
21 A    And then the insurance policy was procured in July of
22 2022, right before the filing.  The additional insurance.
23 Q    Okay.  And (indiscernible) correspondence.  I didn't
24 say what the texts were, but (indiscernible).  I said, "Is
25 Voyager in trouble?  I have almost all my savings and my

1  kids' wrapped up in your company.  And since the equity
2  (indiscernible) customer assets".
3    He writes back, "Who said we were in trouble?"
4    I said, "It's just the stock has been down so much and
5  that's been blocked by Celsius while that stuff is going
6  on".
7    He said, "Every fin-tech company that's public is
8  getting slaughtered in the market".
9    And I said, "Totally aware.  Just wanted to make sure,
10 again.  I have my entire retirement savings gone at this
11 point".
12    And then June 22nd, when the (indiscernible) Capital
13 news came out, Voyager Digital (indiscernible) the article.
14 (indiscernible).  He writes, "Nope".
15    I say, "Great.  Thanks".  And that's June 22nd, right
16 before the bankruptcy was filed.
17    Not just me.  Other equity investors relied on
18 (indiscernible) about (indiscernible) and adding stocks to
19 the platform about the (indiscernible) to uplift in terms of
20 price.  You know, so it wasn't just (indiscernible) Capital
21 (indiscernible) falling it was, you know, additional
22 information that was being transmitted by the CEO saying
23 that the company was healthy.  And that's why I held on.
24 So, I think there is some personal liability for the
25 executives of the company.

1    And also, I have a question about the equity, whether
2  the intercompany claims that are in question at Topco, if
3  there's going to be an independent committee that is going
4  to be appointed to oversee that.  It's not related to either
5  management, the group here.  There's going to be someone
6  independent to look at these intercompany claims and see if
7  the equity holders can get an answer --
8    THE COURT:  Okay.  That's quite a mouthful, and
9  it's -- a lot of it's not really a question, I guess.
10   MS. COWEN:  Well, intercompany I guess
11 (indiscernible).
12   THE COURT:  It's okay.
13   MR. SLADE:  Your Honor, we would be happy to
14 answer her questions.
15   THE COURT:  Yeah.  As I understand it, the first
16 part of your question relates to your personal
17 communications and communications Mr. Ehrlich may have had
18 with others that you think were misleading.  And that
19 perhaps gave rise to liability to you or to other investors.
20 It's important, and I think there's been a lot of confusion
21 about this, none of those claims are affected by this plan.
22 Your claims against the Debtor had to be asserted in a proof
23 of claim, but if you have claims against individuals who
24 allegedly committed fraud, the only way they would be
25 affected is if you voluntarily executed the opt-in form to

1  agree to give those releases.  Otherwise -- and somebody
2  correct me on the Debtor's side if I'm misstating this --
3  otherwise, your claims against him if you have claims
4  against him are totally unaffected.  Totally left in place.
5  Okay?  I did want to make sure you understand that.
6    MR. SLADE:  That's correct, Your Honor.  Unless
7  they (indiscernible).
8    THE COURT:  Right.
9    MS. COWEN:  That's assuming I have money to pay
10 legal fees if (indiscernible).
11    THE COURT:  I understand.  One of the unfortunate
12 things as a bankruptcy judge is I am accustomed to seeing
13 people who have suffered financial losses.  Sometimes people
14 who can endure the, and sometimes not.  And we can't always
15 do anything about it.  And I do sympathize with your
16 situation, I really do.  But if you have a claim, I can at
17 least assure you that that hasn't been extinguished by the
18 bankruptcy.  The stock may turn out to be worthless.
19 There's nothing I can do to resurrect that.
20    MS. COWEN:  Will there be that independent
21 committee for the intercompany claims that are --
22    THE COURT:  On the intercompany, this may not be
23 the witness, but let's let the Debtor answer your question.
24    MR. SLADE:  Yes.  We could direct you to the
25 lawyers who are representing the Topco individually after

1  this hearing.

2        MS. COWEN:  Okay.  It would be an independent, not

3  part of the committee --

4        MR. SLADE:  There is a different independent

5  director at the Topco who is not Mr. Pohl.  And he has

6  separate counsel.

7        THE COURT:  So, in other words, the intercompany

8  issues will be debated.  They will be followed by an

9  independent director at Topco.  And I believe, if I read

10  correctly the latest amended version of the plan that was

11  filed, there is an agreement that even if there's a

12  settlement of intercompany issues, if it's over a certain

13  dollar amount, that it has to be presented to me for

14  approval, at which time if Topco doesn't like it, it can

15  object.

16        MS. COWEN:  And would the equity be subordinated

17  to claims let's say of all the estates, $60 billion or

18  whatever it ends up being, by all the estates that are

19  claiming --

20        THE COURT:  I am afraid that would be the case.

21  Because their claims, whether subordinated or not -- first

22  of all, to the extent that they have claims against the

23  subsidiaries, they would have to be paid before any of the

24  subsidiaries could pay any money up to their equity owners.

25  So, any claims against opco and holdco would have to be paid

1  before any of their money went up to, by way of dividend

2  anyway, up to Topco.  Now, Topco may have, if it wins on the

3  intercompany claims, they just have direct recoveries.  And

4  then if the regulators have valid claims against Topco,

5  those would have to be paid before equity could be paid

6  because creditor claims have to come first.  I don't know if

7  they have -- one way or the other if they have any claims

8  against Topco, to tell you the truth.

9        MS. COWEN:  I have another question.  Market

10  Rebellion, did they receive any payments or ability to

11  exercise any options right before the bankruptcy?  Were they

12  able to get any money out of their deal with them?  Market

13  Rebellion is the company that is going to list stocks on

14  their platform in addition to crypto and they never

15  delivered on that, and they said starting at the beginning

16  of 2022 that was going to happen.  Is there any exercising

17  of any (indiscernible) options, anything like that with

18  Market Rebellion before the bankruptcy was filed that could

19  be clawed back?

20        MR. SLADE:  I believe the answer is no, but I

21  would be happy to talk to you about that after the hearing.

22        THE COURT:  Okay.

23        MS. COWEN:  (indiscernible) others.  And my last

24  question was Particle Foundation.  All of the executives of

25  Voyager are also on Particle Foundation, which bought a 12-

1  and-a-half-million-dollar (indiscernible) before bankruptcy

2  as well that they then sold another 12-and-a-half-million-

3  dollars in the form of NFTs.  All of the executives are

4  still part of Particle Foundation.  Is there any ability to

5  claw back any of that in terms of either the artwork,

6  priceless artwork I see, Love Is In The Air, or the NFT sale

7  commissions that (indiscernible), Steve Ehrlich, all those

8  people that are on the board of Particle Foundation

9  Collective.  It's a non-profit.

10        MR. SLADE:  Well, I'm not sure this is going to

11  answer your question, but I can tell you that we looked at

12  Mr. Ehrlich's assets, what he owns that was available.  And

13  none of that was there.

14        MS. COWEN:  The assets you looked at, were they

15  U.S. bank statements, were they blockchain?  Because

16  obviously someone could (indiscernible) blockchain and

17  (indiscernible) that's not in a U.S. bank statement.

18        MR. SLADE:  All I can say is that he testified

19  under oath essentially that what we saw was all that he had.

20        MS. COWEN:  What happened to his $30 million of

21  stock that he sold less than a year ago?

22        MR. SLADE:  Most of it was not his.  Family,

23  friends.  Not his.

24        MS. COWEN:  Okay.  But Madoff, they clawed back

25  from family, friends.  I mean, that's a way to...

1        MR. SLADE:  We looked at whether or not as a legal

2  matter there was any basis to, and there wasn't any.

3        MS. COWEN:  Okay.  And May 12th when he texted me

4  about -- you know, I said all my assets are tied up, you

5  know, is there anything to worry about.  He said no.  I

6  think within a day of that, Francine Ehrlich took out a home

7  equity loan and bought a $2.3 million property in Nashville

8  in her name.  It's a bankruptcy homestead protected state.

9  I don't know if you looked into that.

10        MR. SLADE:  We know she had some of her own

11  assets, yes.  And we asked whether or not there was any

12  legal way to pull those into his -- you know, for settlement

13  purposes or (indiscernible) settlement if that would be

14  available to (indiscernible) and the legal answer was no.

15        MS. COWEN:  Okay.  Even though the timing happened

16  to correspond with the bankruptcy right after that?

17        MR. SLADE:  (indiscernible).

18        MS. COWEN:  Okay.  I would be curious about Market

19  Rebellion, because (indiscernible).  So, that's all.  Thank

20  you.

21        THE COURT:  All right.  You're very welcome.  Yes.

22        MS. CALANDRA:  Thank you, Your Honor.  John

23  Calandra from McDermott Will & Emery on behalf of the

24  Committee, Your Honor.

25        CROSS-EXAMINATION OF TIMOTHY POHL

Page 246

```
 1   BY MR. CALANDRA:
 2   Q    Mr. Pohl, I just have one question.  It's been a long
 3   day.  I just wanted to clarify something you said about the
 4   scope of the investigation.  I think -- I believe you said
 5   that you investigated the estate's claims that it may have,
 6   but I wanted to be clear that that was against only the
 7   insiders, not against anyone and everyone.
 8   A    Correct.
 9        MR. CALANDRA:  No further questions, Your Honor.
10        THE COURT:  Who do you mean by insiders?
11        THE WITNESS:  Officers and directors.
12        THE COURT:  Okay.
13        THE WITNESS:  I'm thinking to myself whether there
14   were (indiscernible), but I can't think of any.
15        THE COURT:  All right.  Anybody else in the
16   courtroom who wants to question the witness?
17        Is there anybody on the telephone --
18        UNIDENTIFIED SPEAKER:  Your Honor, I am a pro se
19   creditor.
20        THE COURT:  Yes.  What is your name?
21        UNIDENTIFIED SPEAKER:  My name is (indiscernible).
22   I had a couple of questions for the witness regarding Mr.
23   Psaropoulos.
24        THE COURT:  Okay, please proceed.
25   BY UNIDENTIFIED SPEAKER:
```

Page 247

```
 1   Q    I heard in your earlier testimony that half of his
 2   claim on Voyager he was contributing is worth roughly
 3   $60,000.  I also noticed in the filing that his net worth is
 4   redacted.  Just for the creditors, could we know how much
 5   money is there, so we know there's nothing to pursue or give
 6   us a ballpark figure for that net worth for Mr. Psaropoulos?
 7        MR. KIRPALANI:  I would just caution the witness
 8   that we do have a confidentiality obligation with respect to
 9   Mr. Psaropoulos and his counsel.  You can answer the
10   question with that instruction.
11   BY UNIDENTIFIED SPEAKER:
12   A    Sure.  I'll try to follow that.  He does have some
13   other assets.  He has a house.  He has some money in a 401K
14   plan.  And he has some money in a bank account.  They are
15   not what I would describe as significant amounts of money
16   (indiscernible).  And certainly not anywhere close to what
17   is available under the D&O policies.  Not remotely close.
18   And so, when we thought about settling -- and nobody settles
19   by giving up every single penny that they have -- we did not
20   -- he had one house.  I was about to say we didn't -- we
21   thought it was not -- we would never get settlement offer
22   going after a person's house.  If a person had owned 14
23   houses, that would be different.  But he owned one house,
24   owns one house.
25        So, we looked at his house, we looked at his value.
```

Page 248

```
 1   There was nothing significant there.  We looked at how much
 2   he has in his bank accounts.  There was nothing significant
 3   there.  He has a retirement account that's relatively
 4   modest.  And so, there wasn't a lot to get.  And so, if you
 5   didn't settle and you sued him and you won, you would be
 6   depleting (indiscernible) entitled to have the D&O policy
 7   advance his costs to defend himself.  It eats into the $20
 8   million policy.  He has the right to be indemnified if you
 9   settle the one, you have that claim against the company.
10   And when we put all of that together, we thought let's
11   preserve the D&O policy assets, let's get the dollars that
12   he can afford to pay without it being in his interest to
13   fight it.  And that's how we thought about the settlement
14   with -- really with both of them.  But they had different
15   financial profiles, so we didn't reach the same outcome.
16   Q    Thank you.  No further questions.
17        THE COURT:  Okay.  Anybody else on the telephone
18   who has questions for Mr. Pohl?
19        MR. HENDERSHOTT:  Yes, Your Honor.  Thank you.
20   It's Tracy Hendershott, pro se creditor.
21        THE COURT:  Okay.  Go ahead, Mr. Hendershott.
22        MR. HENDERSHOTT:  Thank you, sir.
23        CROSS-EXAMINATION OF TIMOTHY POHL
24   BY MR. HENDERSHOTT:
25   Q    Mr. Pohl, I appreciate your time.  I especially
```

Page 249

```
 1   appreciate you and counsel from Quinn Emanuel of starting
 2   off with the nice summary.  That was very helpful.
 3        Your focus was exclusively -- I believe you stated with
 4   (indiscernible) activity and series of events leading up to
 5   that loan.  Did I hear that correctly?
 6   A    No, not quite.  It wasn't our exclusive focus.  I think
 7   when this case started, everybody understood that that was a
 8   big part of what had gone wrong here.  And so, that was at
 9   the top of everybody's mind that ought to be looked --
10   Q    Okay.  A primary focus.  So, what I'm asking is not
11   necessarily whether you have a lot of details of how that
12   whole sequence of events went.  I'm curious if you are aware
13   of whether the executives of Voyager were personally aware
14   of the collapse of 3AC specifically if they were notified by
15   3AC that the founders were on the run, nonresponsive, and
16   were recommended to immediately call back all of the loans.
17   A    Yes, I am.  In fact, we spent a lot of time staring at
18   the timeline of the events, culminating in a -- I am doing
19   this from memory without refreshing my recollection.  I
20   think that was in mid-June.  It was around the 13th or 14th
21   or 12th, one of those dates where they were told for the
22   first time that they've got to try to recall the loans.  And
23   that it was because they were on the run, the 3AC founders.
24   Q    So, in the filing of the investigation that the UCC
25   counsel performed, it does state June 14th.  So, that
```

1  recollects with your memory as well it sounds like.

2  A    Good.  I'm glad to hear that.

3  Q    And at that -- or also in the filing from the UCC

4  counsel, they state Mr. Psaropoulos, Mr. Ehrlich were in

5  direct communication with 3AC.  That's when they were told

6  the founders are on the run.  I think in quotes here it says

7  they are (indiscernible) and the suggestion is that you

8  recall of its loans immediately.  And the testimony in your

9  investigation (indiscernible) states Mr. Psaropoulos and Mr.

10 Ehrlich (indiscernible) to that knowledge.  Does that

11 correlate with your memory?

12 A    It does.

13 Q    Great.  Also, did you look at any of the communications

14 that was released?  I know we just heard the other creditors

15 saying how they have materially false statements coming from

16 their executives.  Was that part of your investigation on

17 the larger scale specifically with press releases

18 (indiscernible) on a large-scale basis?

19 A    Well, you broke up there a little bit, so I missed some

20 of those words, but I think I get the gist, which is -- and

21 again, so we had counsel review -- ask for and then review -

22 - as I said, there were 30 information requests.  I'm sure

23 it included all communications that were relevant to this.

24 There were, I don't know about, 10,000, 11,000 documents,

25 40,000 pages that were reviewed, something like that.  You

1  know, Ms. Frizzley and myself didn't manually review those

2  ourselves.  We had counsel review that and write a report

3  for us and flag issues for us that they thought were worth

4  flagging.  I can't -- (indiscernible) specific communication

5  one by one that I can tell you for sure was looked at.

6  Q    Would you say that you looked at all of the press

7  releases which, you know, very significant loss distribution

8  intended to (indiscernible) customers?

9  A    Yes.

10 Q    So, do you recall that there was a press release on the

11 very same day that the executives of Voyager found out that

12 basically there was (indiscernible) fifty percent of their

13 assets under management at the time, by being directly

14 (indiscernible) by 3AC, that the very same day they released

15 the press release -- and I can I quote this to you, or do

16 you recall it?

17 A    You can quote it to me.

18 Q    So, one sentence on this press release specifically

19 attributed to Mr. Ehrlich, chief executive officer and

20 founder.  And I quote, "The company is well-capitalized and

21 in a good position to weather this market cycle and protect

22 customer assets."

23      On the very same day, they were notified by 3AC

24 basically that they were headed towards bankruptcy.  Do you

25 recall investigating that press release as part of the

1  larger investigation?

2  A    I recall knowing that there was (indiscernible).

3  Q    And so, release of that information on the exact same

4  day that they notified that we're headed towards the path of

5  bankruptcy, would you quantify that as materially false?

6       MR. KIRPALANI:  I'm going to object, Your Honor.

7  It calls for a legal conclusion.

8       THE COURT:  that's true.  It does.  Sustained.

9       MR. HENDERSHOTT:  We can't get the opinion of the

10 lead director for the investigation what their consideration

11 of facts?  He talked earlier that he didn't feel that the

12 actions (indiscernible), so I think it's relevant to

13 understand his --

14      THE COURT:  Just let me be clear.  The exact words

15 you used called for a legal opinion.  You can ask him if he

16 considered that it gave rise to any claims on behalf of the

17 company and if so, how he evaluated and whether he pursued

18 them.

19 BY MR. HENDERSHOTT:

20 Q    Okay.  So, Mr. Pohl, did this action give rise to

21 claims against the company that would warrant actions

22 (indiscernible) --

23 A    I think not.  Right?  I think whether or not they were

24 false at the time they were made, highly unclear.  Things

25 were moving very, very quickly.  3AC turned out to be a

1  gigantic fraud.  Nobody understood, appreciated.  And with

2  the benefit of hindsight, things were moving with extreme

3  rapidity.  They were doing the best they could.  Did they

4  (indiscernible) --

5  Q    But just to clarify, you said you thought they were not

6  false?

7  A    No.  I said I don't know whether they were false at the

8  time that they were made.  I don't know.  But what I do know

9  is --

10 Q    You thought that press release was not false?

11 A    I said I don't know if it was false at the time that it

12 was made.  But what I do know is that whether or not --

13 Q    So, --

14 A    Could I finish?

15      THE COURT:  You have to let him finish, Mr.

16 Hendershott.

17 BY MR. HENDERSHOTT:

18 A    What I do know is that whether or not there is an

19 estate cause of action or breach of a fiduciary duty in the

20 middle of a crisis --

21 Q    Hello?

22 A    Yes.  Can you hear me?  Okay.  We're trying to, at a

23 time when we believed that things were going to be

24 relatively controllable.  Turned out to be wrong about that;

25 doesn't mean he didn't feel it.  You know, did that rise

1  to gross negligence or bad faith, sufficient to give rise to
2  an estate cause of action for a breach of his fiduciary
3  duties?  We didn't think so.  A claim that you could
4  prosecute and win?  We didn't think so.
5         THE COURT:  Are you still there, Mr. Hendershott?
6         MR. JONES:  Your Honor, I think Tracy fell off the
7  line.
8         THE COURT:  What happened?
9         MR. JONES:  Seth Jones here.  Tracy got
10 disconnected somehow, I think, but can I ask a few questions
11 until he gets back?
12        THE COURT:  Sure.
13        CROSS-EXAMINATION OF TIMOTHY POHL
14 BY MR. JONES:
15 Q   I have a question.  Is taking out a $10 million
16 insurance policy the day before filing for bankruptcy
17 standard practice?
18 A   Actually, it is.  It depends on, you know, whether it's
19 standard practice or not -- let me answer it this way, every
20 case is different.  Depending on what the current company's
21 state of their D&O insurance is, it is not at all uncommon
22 headed into a restructuring to need to bulk up -- sometimes
23 that means obtaining new insurance, sometimes it means
24 adding to insurance that you have, but to end up -- and it
25 costs money to do this if you need to do it -- to have a

1  said before was that they did a number of things with
2  respect to their insurance; that was only a part of the
3  package.  And the officers and directors were doing that on
4  the advice of counsel and they're entitled to rely on that,
5  so they did.  It's not uncommon.  It was expensive.
6         And again, whether or not if you thought an
7  officer or director did something wrong by approving it,
8  they still -- I'll use the same phrase again -- you still
9  can't get blood from a stone.  They did not have the
10 financial wherewithal personally to pay a significant
11 judgment, so we preserved the ability to go after for these
12 things the party that does have the financial wherewithal to
13 pay a significant judgment, which is the insurance
14 companies, including with respect to that $10 million that
15 was paid.
16 Q   What about loaning out 208 million three days before
17 the platform froze while the platform had a cap on
18 withdrawal limits; is that standard practice?
19 A   I don't know what you're talking about.
20 Q   The Alameda loan, 50,000 Ethereum and 6500 Bitcoin was
21 loaned out on June 27 and the 28th to Alameda and the
22 platform froze on July 1st.  And obviously we had a big hole
23 already, so they give out 208 million just to freeze the
24 platform on July 1st.
25 A   Well, if you're asking me about loans that they made to

1  complement of insurance coverage for your officers and
2  directors who you need to be willing to stay with the
3  company in the bankruptcy proceeding, as well as to attract
4  independent directors, such as myself, to be willing to get
5  involved in a distressed situation, so it is very common to
6  obtain policies.
7  Q   Okay.  But as the judge has said before, it was
8  basically an escrow of this fee because it's a $10 million
9  policy just to pay out $10 million.  So, where's the benefit
10 for the creditors?
11 A   I think what you're saying -- again, it was hard to
12 hear -- is that there seems something odd on the surface
13 about paying $10 million for $10 million of coverage.  We
14 agree with that if that's the right way to describe it.  We
15 agree with that, which is why we preserved the ability to go
16 after the insurance company for doing -- to see if we can
17 recover, the estate can recover the $10 million that was
18 paid from the party that got the money, the insurance
19 company.
20        Whether there's a good claim there or not, it
21 seemed to us it was a good enough potential --
22 Q   But that's not ethical to do what they did.  It's for a
23 $10 million payout, but $10 million of creditor money on the
24 board; is that not ethical?
25 A   Well, I think they didn't only do that.  So, what I

1  Alameda in the month of June, Alameda at that time was
2  certainly not believed to be -- it wasn't Three Arrows.  It
3  was not believed to have any financial distress.  It was
4  viewed everywhere in the marketplace as an excellent
5  counterparty.  Everybody wanted to do business with Alameda
6  and the company, Voyager, made money for its customers by
7  making its loans; it was an integral part of its business.
8  Q   I understand, but --
9  A   So that was -- look, in hindsight, the fact that
10 Alameda turned out to be Alameda, you know, hindsight is
11 20/20, nobody at the time that those loans were made thought
12 that there was anything wrong with making money and being
13 paid -- by being paid for loaning assets to Alameda.  That
14 was not the --
15 Q   Is that the right thing to do when you have a goal, you
16 know, so you give out 208 million and then you close down
17 the shop three days later.  That money could have gone to
18 other customers or made the hole smaller in hindsight.
19 Obviously, you have issues.  Why are you lending out $208
20 million after you just lost 650 million on an
21 uncollateralized loan?  Is that not lack of due diligence or
22 what, negligence, anything?
23 A   Well, it wasn't a lack of due diligence with respect to
24 the counterparty in that transaction.
25 Q   If they would have held onto that money, maybe they

A-1127

Page 258

1  could keep going longer, right, the business?
2  A    Well, again, if Alameda was a creditworthy
3  counterparty, then they were obligated to pay you back that
4  money with interest.  That was a business to pay --
5  Q    Yeah, and that would have paid back --
6  A    That was a core part of the business that Voyager was
7  in.  So, if your questioning is suggesting that once the
8  Three Arrows situation unfolded that the only thing Voyager
9  should have done was shut down its business and if they did
10  anything short of that, they were somehow doing the wrong
11  thing, I guess I would have to say we wouldn't agree with
12  that.
13  Q    I mean, but they knew how much they were going through.
14  They blew through that 35 million that quickly, right, so
15  what happened in those three days; did they have a bad bank
16  run or what?
17        MR. KIRPALANI:  Objection, Your Honor.  I think
18  this question has been asked and answered.
19        THE COURT:  I'll let him go just this one.
20        THE WITNESS:  I'm not sure what the question is.
21        THE COURT:  I'm not sure either.  What exactly are
22  you asking, Mr. Jones?  There was a loan you say on the
23  27th.
24        MR. JONES:  It's a --
25        THE COURT:  A loan is not a gift, right?  A loan

Page 259

1  is not a gift.  A loan --
2        MR. JONES:  Right, right, right.
3        THE COURT:  So, what issue --
4        MR. JONES:  They already knew that -- they knew
5  they had a $650 million hole on June 18th.
6        THE COURT:  Right.
7        MR. JONES:  So, they had a big hole and they
8  decided, oh, let's keep lending out money with an unstable
9  market, maybe they would have helped the business to go a
10  little longer instead of giving away $208 million to FTX.
11        THE COURT:  Mr. Pohl, did you examine that
12  transaction and did you and the special committee reach any
13  conclusions about it, whether the company had any claims
14  based on?
15        THE WITNESS:  We looked at all of the transactions
16  and we did not believe that there were any viable claims
17  with respect to that transaction.
18        THE COURT:  Why in respect to this -- was the loan
19  repaid?  Is this the loan that's the subject of the
20  preference action now?
21        THE WITNESS:  This loan ultimately, in fact, was
22  repaid, number one.  And again, number two, at that time,
23  even after we filed for bankruptcy, there was no indication
24  at that time that Alameda and FTX were anything other than
25  completely credible.  In fact, that was so much the case,

Page 260

1  that we entered into a sales transaction with them, which
2  was the plan that was originally filed.  The whole world was
3  defrauded by FTX and Alameda blowing up and nobody
4  understood it and I think people still don't understand it.
5        But certainly, in June of 2022, trying to stay in
6  business in the business that you were in, making a loan to
7  what everybody believed was a completely credible as a
8  party.  And then, in fact, actually having loan repaid, in
9  fact, and you made interest in the meantime certainly didn't
10  suggest to us that there was anything inappropriate about
11  that transaction.
12        THE COURT:  Okay.
13  BY MR. JONES:
14  Q    Steve Ehrlich said that pre-bankruptcy, they had one
15  offer proposal, but it was too low of a -- a lowball offer
16  to swallow, so to speak.  Can you speak on that one offer?
17  A    I think what -- again, our job was to look to see if we
18  thought there were estate causes of action against insiders.
19  The observation that you just made, which we're aware of, is
20  consistent with appreciating that there were no improper
21  motives here; they were on the same side.  They believed
22  that the business was able to be rehabilitated and they did
23  not have contrary interests that would give rise to sort of,
24  you know, violation of their duty of loyalty, which is in
25  legal terms, what you're sort of getting at; it was an

Page 261

1  indicia of just the opposite.  They were believers that the
2  company was healthy and had value, so much so and they were
3  stockholders, that they did not pursue a transaction that
4  I'm sure today everybody wishes had happened.  It wasn't
5  really a transaction; it was an offer, but you get my point.
6  Q    Can you tell me how fast they blew through that $35
7  million from FTX?
8  A    I don't recall, as I sit here, when they got it back.
9  I know that when we filed the case, there was discussion
10  about that was the plan was to go get those monies back and
11  eventually they were gotten back.
12  Q    I mean FTX gave it to Voyager.  Now it's subordinated,
13  right, the plan?
14        MR. KIRPALANI:  I'm sorry.  Is the question --
15  just one clarification.  Is the question asking about money
16  that FTX loaned to Voyager or that assets that Voyager
17  loaned to FTX?
18        MR. JONES:  FTX gave it to Voyager.
19        MR. KIRPALANI:  And what's the question with
20  respect to the $75 million?
21  BY MR. JONES:
22  Q    75 million.  I believe they're, what, allowed to claim
23  that once a month; was it 500 million originally.  FTX told
24  them you can only send, what, 75 million a month?
25  A    Well, I'm trying if I'm following your question.  We

A-1128

Page 262

1  were certainly aware that FTX had agreed to loan money to
2  Voyager in installments.  I don't remember as I sit here
3  today what the rules were.  They couldn't borrow it all at
4  once.  They borrowed what they were allowed to borrow, which
5  was the initial 75 million, and then I don't think they were
6  ever allowed under the terms of that loan to borrow anymore,
7  but that's what they borrowed.
8      MR. JONES:  That's all I have.  Thank you.
9      THE COURT:  Mr. Hendershott, are you back on the
10  line?
11      MR. HENDERSHOTT:  I am, sir, thank you.  I've been
12  having a little bit of technical challenges.  Appreciate
13  (sound drops).  Hello?
14      THE COURT:  Yes, we're here.  You may proceed.
15  You may ask your questions.
16      MR. HENDERSHOTT:  All right, thank you.
17      CROSS-EXAMINATION OF TIMOTHY POHL (CONT.)
18  BY MR. HENDERSHOTT:
19  Q   So, thank you, Mr. Pohl, for letting me jump back in
20  here.  Before I got disconnected, we were talking about the
21  press release with the statement that the company is well
22  capitalized in a good position to weather the market cycle
23  and I couldn't understand if you were saying that that was
24  false or not.
25  A   I don't know whether it was false or not.

Page 263

1  Q   You do not.
2  A   No.  At the time the statement was made, I don't really
3  know if it was false.  I don't know what -- more
4  importantly, I don't know whether he thought it was false.
5  Q   Did we not just clarify on the same day that 3AC
6  notified them that their founders were on the run and it's
7  really bad and we have to recall our loans?  I'm struggling
8  to understand the dichotomy of the facts here.  You're
9  agreeing that both are coming to a conclusion that you think
10  that it might be truthful.
11  A   All I'm saying is the loans to 3AC were not the only
12  loans that they had.  They had a credit facility with
13  Alameda.  They have a lot of other -- that was one part of
14  their business, it was significant, but what was happening
15  with 3AC was evolving in real time.  Nobody completely
16  understood it other than with the benefit of hindsight, and
17  he was I think in good faith trying to keep things as calm
18  as possible and figure out what to do next, that's all.
19  Q   So $1 billion hole from 3AC is you feel there was other
20  root causes for the bankruptcy?
21      MR. KIRPALANI:  Objection.  Lacks foundation with
22  that $1 billion reference.
23      THE COURT:  Not really.  I think I can't count the
24  number of papers I've read about this $1 billion hole.
25      THE WITNESS:  I think we all think that the loss

Page 264

1  of $650 million to 3AC was the precipitating event for the
2  bankruptcy, but it precipitated people wanting to withdraw,
3  they had to raise the gets.  It set off a chain reaction
4  that ultimately led to the bankruptcy, I think that's right.
5  BY MR. HENDERSHOTT:
6  Q   Okay.  (Indiscernible) thank you for the clarification.
7  So, at one point did the executives at Voyager know
8  definitively they were filing bankruptcy?
9  A   You know, I'm not a hundred percent sure.  We were
10  appointed on the eve of the filing or the day before the
11  filing, so certainly by then they knew because we were
12  appointed as part of the filing process.  How many days
13  before that, it was a foregone conclusion; I could only
14  speculate.
15  Q   You can only speculate.  There was no review of
16  internal communications?  You know, I would assume that that
17  was a critical element you identify as part of a thorough
18  investigation.
19  A   I mean, not really.  The exact date that they --
20      THE COURT:  Mr. Hendershott, let me just interrupt
21  to explain something here.  What the witness was charged
22  with doing was figuring out if the estate -- in other words,
23  Voyager itself -- had claims to pursue against officers and
24  directors.
25      Your claims are all about whether the officers and

Page 265

1  directors issues public statements that were misleading to
2  customers or to investors, in which case the injured parties
3  would have been the customers or investors, not Voyager
4  itself, in which case it wouldn't be a claim belonging to
5  the estate; it would be a claim belonging to the account
6  holders and the investors.
7      So, when you're asking this witness whether he
8  thought these events, you know, were problems and the
9  witness is trying to I think tell you he's trying to
10  evaluate whether the estate had anything to pursue on those
11  points.  Do you understand the difference there?
12      MR. HENDERSHOTT:  I do, but I'm still a little
13  confused.  Would you be the one that determines whether it's
14  gross mismanagement, fraud, dishonesty, because the witness
15  is actually throwing out legal terms and I thought that that
16  was the point of his investigation is to determine causes of
17  action that results in potential claw backs or penalties.
18      I'm confused, Your Honor.  I'm not sure who
19  determines whether these actions are material faults,
20  whether there is harm, whether there's dishonesty.  Is that
21  you, sir, Judge?
22      THE COURT:  Well, let me just -- I only rule on
23  lawsuits and motions that are in front of me.  I don't have
24  any free reigning authority to just make rulings on things
25  that aren't actually brought properly in front of me.

1    But as to whether false statements were made about

2  Voyager's financial condition, it's hard for me to see how

3  that would give rise to a claim by Voyager against its own

4  officers because Voyager wouldn't be the injured party;

5  arguably, it would be the perpetrator through its officers.

6    So, what kinds of claims Voyager might have is if

7  there were things that were done recklessly, carelessly, in

8  breach of fiduciary duty that injured Voyager itself, okay?

9    MR. HENDERSHOTT:  Correct.

10    THE COURT:  Not so much whether there was anything

11  wrong of any kind that was done with respect to any human

12  being, but rather whether Voyager, either by virtue of the

13  bankruptcy laws or other state law, had rights of its own to

14  pursue, and if it did, whether they should be pursued or

15  resolved.

16    So, claims based on misrepresentations about

17  financial statements would not ordinarily, and I doubt them,

18  be thought of as claims that belonged to Voyager to be

19  evaluated by Voyager or investigated by Voyager really.

20    If customers, creditors, you know, account holders

21  think that they were misled as to the financial statements,

22  then they may or may not have claims based on that.  If they

23  wish to assert such claims against Voyager itself, it should

24  have been part of the proofs of claim.  If they think they

25  have claims against the officers, I can't express any

1  opinion about whether they are or are not valid, but they

2  probably wouldn't be in my court because I'm a bankruptcy

3  court and they would probably be in some other court against

4  the other individuals.

5    There's nothing about the bankruptcy process or

6  the fact that the estate is evaluating its claims they would

7  really bring here the issue of whether somebody defrauded

8  you about the financial condition, for example.  Does that

9  help?

10    MR. HENDERSHOTT:  It sounds very -- you know, a

11  huge disparity in favor of the Debtors.  But, yes, thank

12  you for the clarification.

13  BY MR. HENDERSHOTT:

14  Q    Okay, Mr. (indiscernible) very long.  So, can you share

15  who is currently on your board and when were they appointed

16  to their board position?

17  A    Well, there's more than one board, right.  At the

18  Voyager LLC, which is the board that I'm on which is the

19  operating company, it's myself, it is Jill Frizzley, and I

20  think we're the only -- oh, and Steve Ehrlich I think is

21  also a board member, but he's not a member of the special

22  committee, so there are three board members at Voyager LLC,

23  the operating company.

24  Q    Are you the chairman of that board?

25  A    I'm not even sure we have a chairman.  It's really not

1  a relevant concept.  We have three members of the board: two

2  of us are independent and we're newly appointed and we're

3  two of the three members of that board.

4  Q    And is this standard procedure that the person that's

5  being investigated for their actions would actually be the

6  board member that you are a member of with no leadership?

7  A    Well, all powers to investigate and dispose of, through

8  settlement or release or otherwise, of Voyager LLC causes of

9  action against any officer or director, including Mr.

10  Ehrlich, would delegate it to the special committee that he

11  is not on.  So, he doesn't have any authority over, even as

12  a board member, over the subject matter that we're talking

13  about, not even the little authority that he would have if

14  it wasn't delegated and the two of us as independents could

15  outvote him two to one on any topic.  So, he doesn't have

16  any authority as a board member over the subject matter that

17  we're discussing.

18  Q    Interesting, thank you.  So, who appointed you to this

19  special committee and this board?

20  A    I think Miss Frizzley and myself were recommended to

21  the full board of the parent company by Kirkland & Ellis.

22  We were interviewed by -- I can't say the whole parent

23  company board, but I remember being interviewed by some

24  people.  And then we were -- and I don't think we were the

25  only people who were interviewed, not that I know that for

1  sure but that's not common -- and then we were selected.

2  So, the board of the parent company advised by

3  recommendations from their advisors recommended us.

4  Q    And that would be the (indiscernible) of the holding

5  company; is that correct?

6  A    I think it was the board of the holding company, that's

7  right, and I couldn't remember, unless my recollection was

8  refreshed, the name of every member of that board.

9  Q    And who's the chairman of the holding company?

10  A    I want to say I think it's Mr. Ehrlich, but I'm not 100

11  percent sure.  It's really, the reason I'm not 100 percent

12  sure is that it's really not relevant to what we did.

13  Q    And relevant to me, sir.

14  A    No, I know.  I'm just explaining why I don't know the

15  answer off the top of my head.

16  Q    So the holding company chairman of the board created

17  and hired you specifically to investigate itself.  And who

18  paid for your services, sir?

19  A    Voyager LLC.

20  Q    Pardon?

21  A    Voyager LLC, the company of the board that I'm on.

22  Q    I got it.  Just for my knowledge, per chance, you know,

23  Steve Ehrlich sign your check and paid for your services?

24  A    I don't think he signs my check.  Actually, I don't get

25  a check; I get an ACH, so I don't know.  I do know that

1  everything that we do --

2  Q   So as chairman of the board -- go ahead.

3  A   No, no, go ahead.

4  Q   I was going to say as chairman of the board, he would

5  be -- ultimately, so he selected you.  The investigation of

6  (indiscernible), he's the one that compensates you, as he

7  does all board members.  Am I understanding this correct?

8  A   Again --

9        MR. KIRPALANI:  Objection.  Mischaracterizes

10  the...

11        THE WITNESS:  Yeah.  The company pays us --

12        THE COURT:  He can answer.

13        THE WITNESS:  -- like everybody else.

14        THE COURT:  The company pays.  You're not saying

15  Mr. Ehrlich paid out of his own pocket, are you, Mr.

16  Hendershott?

17        MR. HENDERSHOTT:  No, no.  I said he has the final

18  authority to compensate all board members, including Mr.

19  Pohl, and there's no one above the board or Mr. Ehrlich as

20  chairman of the board that would compensate the board if

21  it's not a treasurer that's compensated.

22        THE COURT:  He's chairman of the board; he's not

23  God.

24        MR. HENDERSHOTT:  He's chairman of the board

25  that's making that decision.

1        THE COURT:  You know, Mr. Hendershott, he's

2  chairman of the board; he's not God.  It's not like he

3  doesn't answer to anybody else.  He answers to the rest of

4  the board.

5        MR. HENDERSHOTT:  And that's a good question.

6  BY MR. HENDERSHOTT:

7  Q   So when I first asked you, Mr. Pohl, who are the

8  members of the board, I was referring to the holding company

9  board.  Could you just -- do you know all the members of the

10  board?

11  A   Not off the top of my head, no.  You'd have to refresh

12  my rec-- -- it's public information.  You'd have to refresh

13  my recollection.  I didn't report -- I don't report to the

14  holding company board, so that's not why it's not relevant

15  information to me.  I don't report to them.  Nothing that I

16  was tasked with doing is sort of in their purview.  I don't

17  believe that they actually have the power to fire me,

18  although some days, I wish they would; that's a joke.  And

19  so, that's why it's not really relevant, which is why I

20  don't remember all the names of all the people on that

21  board.

22  Q   Could you just say how many members are on the holding

23  company board?

24  A   Nine, is it up to?  There's an independent director at

25  the holding company also.  Is it eight, nine members in

1  total, something like that, seven?  Again, you'd have to

2  refresh my recollection.

3  Q   So, yeah, typically, it's an odd number.  I'm not sure,

4  so that's why I'm asking.  But I have been made aware that

5  six weeks before filing bankruptcy, there was significant

6  revision to the holding company boards by Mr. Ehrlich, the

7  chairman, replacing and appointing board members and I

8  believe even expanding it at that point.  Are you aware of

9  that significant transition?

10  A   No.

11  Q   Okay.  All right, so do you know -- and I believe you

12  already covered (indiscernible) and forgive me, I did lose

13  connection for a while.  So, you said that the $15 million,

14  there was a basket of other services that out of that

15  carveout of the $15 million, there was a dollar-for-dollar

16  transfer 24 hours before filing bankruptcy.  Then the

17  potential recovery for the creditors, there was an exclusive

18  legal defense policy for the officers.  Did I hear that

19  correct?

20  A   Not quite, that's not quite what I said.  I think there

21  was $15 some odd million dollars paid for a combination of

22  things.  One of those things was an incremental $10 million

23  D&O policy.  Whether or not one would characterize that $10

24  million policy as having been paid for with 10 million of

25  the $15 million dollar for dollar is probably a matter

1  that's going to get litigated.  But because it could be

2  characterized that way, we identified that there is a

3  potential fraudulent conveyance claim against the insurer

4  and we preserved it.

5  Q   I'm sorry.  Preserve it means what?

6  A   It means that the winddown estate for the benefit of

7  creditors has the right to sue the D&O carrier who received

8  the $10 million to return that $10 million on -- I'll do

9  this at a super plain English level -- on the theory that

10  the company, Voyager, didn't really get any benefit from

11  paying $10 million for a $10 million policy.  I'm not

12  opining as to whether that's a meritorious claim or not, but

13  that's the type of claim that, in some form or fashion,

14  might have merit and has not been released under the plan.

15  Q   Okay.  Thank you for that clarification.  Speaking

16  about releases, are you part of the decision making to grant

17  releases to all of the executives, officers, and employees

18  of Voyager?

19  A   No, we weren't part of the decision making.  What we

20  did was make our own business judgment as to whether

21  there was anything inappropriate about those releases.  As a

22  result of all of the things that we investigated and with

23  respect to, as I've testified, with respect to Mr. Ehrlich

24  and Mr. Psaropoulos, we were not comfortable with them being

25  released from certain claims and causes of action as a

Page 274

1  result of our investigation, and so we preserved those
2  claims.  We preserved the ability for the winddown estate to
3  sue them for those things.  We limited the recovery to the
4  D&O policy, and we settled with the two of them by having
5  them actually pay into the estate as part of the
6  (indiscernible).  We did not find --
7  Q   So you did make the decision on releases.
8  A   We did not find that there were any other Voyager
9  company estate causes of action that had any merit against
10 other officers and directors, and so, we support the
11 releases with respect to other people.  And I would note
12 that there was an important estate benefit from obtaining
13 those releases, which is that those parties have, at least
14 the senior officers, have rights to be indemnified and they
15 have rights to be reimbursed if they are sued from the D&O
16 policies which would deplete them.
17         So, the idea that we wanted to preserve the $20
18 million potential D&O recovery for the claims that we
19 thought did have merit and not see that potential pool of
20 assets that could be settled going forward or litigated to
21 conclusion depleted by having other officers and directors
22 against whom frivolous claims could be brought have the
23 right to deplete that by having their expenses reimbursed.
24 So, in the cost-benefit analysis of the package
25 because we didn't think that there were good claims against

Page 275

1  the other officers and directors and because we wanted to
2  preserve the maximum amount of the D&O policy to be
3  available for where the claims might be good; that's why we
4  supported them.
5  Q   Okay.  So going back to the $20 million D&O policy, the
6  $10 million was taken from the creditor recovery pool 24
7  hours before filing bankruptcy.  Could you share what the
8  cost was for the previous historical $10 million that
9  preceded that one; is that  dollar for dollar?  You don't
10 know.
11 A   I don't know, but I doubt it.
12 Q   Right.  What would be standard in that (indiscernible)
13 experience?
14 A   I'm not an insurance expert, but D&O insurance is
15 expensive.  I don't know how long those policies were in
16 place.  I think it's actually not one policy, it's a number
17 of policies, so I don't know the answer.
18 Q   Would you assume that were dollar for dollar?
19 Typically, with insurance in my experience, you get a higher
20 potential payout when the claims or the --
21 A   Yes.
22 Q   -- fees that you incur?
23 A   I would assume that they were not dollar for dollar,
24 which is why the later one that could be construed as dollar
25 for dollar is one that raised a red flag to us, so I agree

Page 276

1  with you.
2  Q   So we're keeping faith in that one as a benefit, but
3  your perspective is that was not taken from the credit
4  recovery pool inappropriately?
5  A   Well, I don't know, but I know that the ability to
6  probably get it back from the only person that has the
7  wherewithal to give it back has been preserved.  And I also
8  know that the officers and directors who, when the board
9  approved spending the money to get that policy, they were
10 doing so on the advice of counsel.
11 Q   Okay.  All right, well, thank you, sir.  One last
12 question.  Going back to the person that's being
13 investigated being the chairman of the board that selects
14 you and ultimately is responsible for your compensation, how
15 do you as a professional -- and thank you for being one --
16 how do you as a professional distance yourself from the
17 influence of the individual that is financially supporting
18 you?
19 A   I think that's a fair question honestly.  I'm
20 completely distanced from it.  So maybe you -- so, look,
21 I've been retired for the last three or four years, right?
22 I don't get paid a significant sum of money relative to the
23 amount of money that I made when I was working to take on
24 these assignments, not even close, number one.
25         Number two, I am independent.  I don't have any

Page 277

1  relationship with any of these people.  I didn't work at
2  Kirkland & Ellis.  I didn't work at any of these other
3  firms.  None of these people used to work for me.  They
4  don't put me on their boards of directors.  This is the one
5  and only time I've ever been put on a board or recommended
6  to be put on a board by this law firm.  I had never heard of
7  any of these people before.  I had never heard of Voyager
8  before.  I could barely spell Bitcoin before.
9          So, I am completely independent and it doesn't
10 really make much difference to me, you know, whether or not
11 I find that they did something wrong or whether I find that
12 they didn't do anything wrong.  I don't have any skin in the
13 game.  I don't have any stake.  I am as independent as it --
14 I don't know how you could be more independent than that, at
15 least as I understand what the word independent means.
16         The can't fire me.  I guess they could fire me,
17 but they'd probably have to deal with the judge.  So once
18 this process begins and you form a special committee and you
19 retain people who are, in fact, independent and you set out
20 to have a special committee investigation, I suppose if Mr.
21 Ehrlich -- not that he would ever do this -- but if he
22 wanted to, if he didn't like where it was going and he tried
23 to fire, you know, the people who are investigating him, I
24 think that probably wouldn't come out that way; that's not
25 how it works.

Page 278

```
1   Q    So, you know, we would hope not.  Absolutely, that's
2   how it works.  So, is it possible that by you having, you
3   know, a reputation in this small niche market that you're
4   providing being hired by the person that's being
5   investigated and binding releases and a lot of other, you
6   know, kind of softball penalties for the investigation,
7   would that not put you in kind of a higher echelon of
8   getting hired by the next bankruptcy CEO who's being
9   investigated; would there be a financial incentive?
10  A    I'm not sure I understand your question, although I'll
11  resist the temptation that I think you're insinuating
12  something.
13  Q    Well, I'm asking, you know, just in this small niche
14  market that you're in of being an independent investigator,
15  wouldn't a favorable outcome of prohibiting releases and
16  findings, would that be favorable for your next assignment?
17  A    I'm not in a niche market.  This is the only
18  investigation that I have ever done as an independent
19  director.  I did some -- I led some when I was a lawyer and
20  I was involved in some when I was a banker, but I'm not out
21  there looking for board seats.  People call me from time to
22  time and if I think I can help and it interests me for
23  whatever perverse reason, sometimes I say yes because I can
24  only play so much golf, but I don't -- I'm not thinking
25  about the next deal.  I'm not in the business of doing
```

Page 279

```
1   investigations.
2   Q    Got it, great, and I certainly didn't mean to assume
3   anything.  I'm just trying to learn more about, you know,
4   all these case rules I've never been exposed to.
5           MR. HENDERSHOTT:  So, thank you, sir, for your
6   time and I can cede the podium.  Thank you.
7           THE COURT:  Very good.  Anybody else on the phone
8   who wishes to cross-examine Mr. Pohl?
9           MAN 1:  I have one question.
10          CROSS-EXAMINATION OF TIMOTHY POHL
11  BY MAN 1:
12  Q    For the avoidance of doubt, I know you sort of
13  clarified this earlier, Mr. Pohl, but when you state
14  insiders were the primary focus of your investigation, that
15  does not include business partners such as Market Rebellion?
16  A    No, it does not.
17          MAN 1:  Okay, thank you.
18          THE COURT:  Anybody else?
19          MS. DIVITA:  This is Michelle DiVita.  I have some
20  questions as well.
21          THE COURT:  I'm sorry, who was it again?
22          MS. DIVITA:  Michelle DiVita.
23          THE COURT:  Okay, Ms. DiVita.
24          MS. DIVITA:  Sorry, take it off speakerphone.
25          THE COURT:  Go ahead.
```

Page 280

```
1           MS. DIVITA:  Okay.
2           CROSS-EXAMINATION OF TIMOTHY POHL
3   BY MS. DIVITA:
4   Q    My first question here is, do you mind clarifying who
5   exactly was responsible for conducting the financial review
6   portion of the special committee's investigation?  I believe
7   you mentioned there was no financial advisor appointed.
8   A    Well, no.  I think when the special committee hired
9   expert outside, they did the primary legwork factually with
10  respect the factual underpinnings of our conclusions; that's
11  the meat of the investigation.  We did not retain, and we
12  don't think we needed to retain, a financial advisor to
13  assist us.
14          If we had financial advisor type questions about
15  the business or about something historical that was sort of
16  beyond the purview of what lawyers could answer or were
17  qualified to answer, we from time to time availed ourselves
18  of the Debtors' professional financial advisors at BRG.
19  There wasn't really a lot of that.  The only thing financial
20  with respect to our investigation per se was, you know,
21  looking at the financial information of Mr. Ehrlich and Mr.
22  Psaropoulos, which we did, and we didn't need a lot of
23  financial expertise to understand the information that they
24  provided to us.
25  Q    Okay.  So, you didn't see anything at least unique in
```

Page 281

```
1   the financial statements that would have independently
2   warranted an expert beyond outside counsel or professionals
3   already retained by the Debtor, correct?
4   A    No, we did not.
5   Q    And then does the Debtors' current financial advisor
6   have experience in cryptocurrency advising and/or the
7   banking industry?
8   A    Yes, they do.
9   Q    So you mentioned that the financial investigation was
10  submitted to the statements provided by the CEO and COO.  Do
11  you mind clarifying why financial or counterparty exposure
12  is not part of a financial review?
13  A    Not sure I'm following your question.  The company --
14  we were investigating the company's practices around the
15  loans and related activities that they were undertaking, and
16  so we certainly obtained information from the company about
17  the analyses that they did at the time that they made loans
18  and decided to enter into business relationships with the
19  parties that they entered into their relationships with.  We
20  didn't need independent financial advisors to understand
21  what that information was that they provided to us.
22  Q    Okay.  So, to clarify then, you were examining the
23  initial loan agreement, not necessarily the viability or
24  risk management related to subsequent term sheets provided
25  thereafter.
```

Page 282

1    A    We were looking into whether we thought that the
2  totality of the diligence that they performed before
3  deciding whether to make loans to Three Arrows Capital,
4  whether there was anything sufficiently unusual about how
5  they went about their business that it was so widely off the
6  mark that it would give rise to a claim that satisfied the
7  legal requirement for a breach of fiduciary duty claim,
8  which is very strict, very high.
9    Q    Got it.  So, you did or did not find a breach of
10  fiduciary claim then related to the 3AC loan?
11    A    We found that there might be a claim that has merit
12  related to the risk management practices around that
13  transaction, and we preserved the claim for the benefit of
14  the estate.  We limited who the estate could get money from
15  to, number one, the $20 million of officer and director D&O
16  coverage and, two, we settled the exposure, the personal
17  exposure, of Mr. Ehrlich and Mr. Psaropoulos by entering
18  into settlements with them where they paid some money.
19        So, the claims against them are preserved, they're
20  not released, they can be sued.  And, if that lawsuit has
21  merit, which it might, it certainly is a non-frivolous legal
22  theory based on the facts and the law as we analyzed it in
23  our business judgment and if the winddown estate, which is
24  going to own the right to prosecute that litigation, they
25  can do what they want with it.  They can sue them, they can

Page 283

1  settle with the D&O carriers, and they can get paid either
2  through settlement or by litigating and winning if they do
3  from the officer and director liability carriers up to $20
4  million, minus however much is depleted defending the
5  lawsuit.
6    Q    Okay.
7    A    And as to the individual, while they will be sued, they
8  have already will have paid in settlement the amounts of
9  money that I went through before.
10    Q    Got it.  So then was there anything unique about the
11  3AC due diligence?  It was my understanding that it was the
12  risk management policies in general that allowed or maybe
13  warranted this potentially colorable claims.
14    A    Yeah, there were a few things about 3AC that were, I
15  think in our judgment, a little lax relative to other
16  counterparties.  There were some things that, in our
17  judgment -- by the way, the officers and directors wouldn't
18  agree with this, but that's why their claims that we're
19  preserving -- we did think that there were some specific
20  things or the absences of some specific things around the
21  decision to make loans to Three Arrows Capital that were
22  different than the decisions to make loans to other parties
23  that they made loans to, less diligence.
24    Q    Was that, like -- okay.
25    A    Less diligence and less of the diligence that we would

Page 284

1  have expected.
2    Q    I'm sorry, can you repeat that?
3    A    Less diligence and less of the kind of diligence that
4  we would have expected.
5    Q    So what information was provided then that gave you
6  confidence that the Debtors would heighten its standard of
7  due diligence in its administration or management of the
8  estate during bankruptcy?
9    A    I'm sorry.  I didn't hear the last part of what you
10  said.
11    Q    So what additional I guess, like, change gave you
12  confidence that the amount of due diligence performed after
13  3AC would not give rise to another breach of duty of care in
14  the Debtors' management or directors' and officers'
15  management of the Debtors' estate in bankruptcy?
16    A    I still am not following your question.  You analyzed
17  specific transactions that they did to see if there's
18  anything actionable as a result of them.  They did the Three
19  Arrows transactions between March and May of 2022, the world
20  blew up in June, and they were in bankruptcy by July.  There
21  weren't -- right, so things happened very quickly.  Those
22  transactions weren't in 2021 or 2020; they were in March,
23  April, and May of 2022, and this company was in bankruptcy
24  by the time fireworks were over on July Fourth.
25    Q    So I guess what additional information provided in the

Page 285

1  special committee's report gave you confidence that, you
2  know, things were good in March when, you know, this lax due
3  diligence occurred that when things are, you know, under
4  pressure, the Debtors and their directors and officers would
5  be able to perform adequate due diligence in the
6  administration and management of the bankruptcy proceeding?
7    A    Well, again, I'm going to try my best to answer that
8  question as I can understand it.  We're not investigating
9  generically whether or not they have risk management
10  practices that were good.  What we're investigating is
11  whether there were transactions that they did that they
12  shouldn't have done because their risk management practices
13  were deficient in some way.
14        So, it's not a theory -- you have to have a thing
15  that they did that they shouldn't have done that blew up in
16  their face, to use a colloquialism, that you're looking
17  into.  What were the circumstances around that and as a
18  result of what they did or didn't do in a specific area,
19  transaction that damaged the company, whether or not you
20  think that they breached their fiduciary duties.
21    Q    Got it.  So, a company that is in the business of, you
22  know, taking customers' deposits and, you know, managing
23  this -- we'll call it an offering or I don't know if that's
24  the right word, but this kind of business relationship here.
25  And you're saying that business that could -- you were

Page 286

1  only looking at transactions rather than the business
2  activity as a whole, correct?  I just want to make sure I'm
3  following.
4  A    I think so.  Again, it's hard to really understand the
5  question, but we were not evaluating the business as a
6  whole.  We were evaluating whether anybody did anything
7  wrong with respect to the transactions that didn't work out
8  for the company.
9  Q    Got it.  So, is it normal in your (indiscernible)
10  experience to have a single transaction take down a
11  multibillion-dollar company?
12  A    Well, having 25 percent of your assets that were on
13  loan that you thought that you could get back any time, you
14  know, having that suddenly not be true because you were
15  defrauded in the context of the industry having its own
16  macro issues, for lack of a better way to say it, those are
17  the types of circumstances that put companies in bankruptcy
18  in lots of industries; that's what happens.  You don't just
19  find yourself in bankruptcy.  Something precipitous often
20  happens that leads to a chain of events that puts you in a
21  position where you end up bankrupt.
22  Q    And precipitous then doesn't include the I guess
23  counterparty or financial risk management of the Debtors,
24  correct?
25  A    I'm not sure I'm following what your question is.

Page 287

1  Q    So if a 25 percent, you know, of -- that's what this
2  transaction represents of the Debtors' assets?  What you're
3  saying is that the reason that a 25 percent transaction
4  could justify a bankruptcy filing can only occur because of
5  some, like, outside source, not because of how the Debtor
6  has managed its internal financial affairs to address
7  adequately counterparty risk and loans and things like that.
8  A    I don't know if I'm saying that.  I'm saying that if
9  they had loaned 25 percent of their assets to Warren
10  Buffett, we all wouldn't be here.  I'm not trying to be
11  glib.
12  Q    Got it.  Okay, that's helpful.
13  A    I'm trying to make the point that it's because of what
14  happened to the counterparty that we're here.  And the
15  question is whether they should have been in business with
16  the counterparty and the other question is whether, as they
17  went into business with the counterparty, did they do
18  anything so grossly unusual or inappropriate that those
19  individuals who participated in that have personal
20  liability; that's the question.
21  Q    Okay.  That actually is very helpful for me to
22  understand, so I like your Warren Buffett example.  In the
23  case of -- I don't know how to phrase this.  I'll skip that
24  question for now.
25         So, you only identified, or I guess at least in

Page 288

1  the filing, only the CEO and COO were identified as parties
2  responsible for entering into this 3AC loan; is that
3  correct?
4  A    They were the decision makers and it was really
5  predominantly the CEO.
6  Q    Okay.  And since your investigation didn't look into
7  the general risk management policies, nothing, there was no
8  red flag there that, you know, two people, only two people
9  had decision-making authority in this matter.
10  A    No, I didn't say that.  That's a good question.  We
11  looked at the whole risk management process, all the people
12  that were involved, as I said, I think much earlier now,
13  today.  We conducted a dozen interviews, not two interviews.
14  We interviewed everybody, almost everybody in the group of
15  people that they called the risk management committee that
16  in some way touched the thinking around or the vetting of a
17  potential counterparty.
18         But the way that their process worked, the buck
19  stopped with two people and really mostly the CEO, and they
20  were the only ones that had real authority.  They were the
21  only ones that made decisions.  There were no votes taken by
22  any larger group.  There was just information provided and
23  the terms and conditions of the actual loans that were made,
24  as opposed to the decision that it's okay to enter into
25  loans with the counterparty conceptually.

Page 289

1         Once the group decided, okay, we're going to do
2  business with counterparty X, how much money to lend and on
3  what terms was the decision, that information didn't even
4  make it to the rest of the group that those things were
5  decided and only decided by Mr. Ehrlich and, to a lesser
6  degree, Mr. Psaropoulos.  And that's why we believe that
7  they are the two people against whom there are cognizable
8  potential claims, not the other people.
9  Q    Got it.  So, if the CEO or COO, it sounds like they
10  kind of really managed the counterparty exposure, financial
11  element of this, would the estate have any claims against
12  either of those two for making statements that were not
13  consistent with the company's risk management policies?  So
14  maybe -- here's an example -- if an officer is representing
15  that a company's financial exposure, counterparty exposure,
16  is X, but in reality it's Y, the estate wouldn't have any --
17  that's not a cause of action or is it?
18  A    Well, again, you're giving me sort of a hypothetical.
19  But again, we didn't -- we looked at all of the facts and we
20  did not think that there was anything in those facts that
21  gave rise to an estate, as opposed to an individual
22  customer, an estate, a company cause of action against
23  officers and directors.
24         Now, if an individual customer thinks that they
25  were misled in some way, whatever that way is, and they

Page 290

1  think that they have a claim against an officer or director
2  for whatever they think the basis is of that claim, we
3  didn't investigate that and, most importantly, it's not
4  released under this plan.  Those claims are free to be
5  brought.
6  Q    Okay, and then just a few more.  So, is this
7  profitability analysis for a director and officer conduct
8  claims, like, typical in bankruptcy?
9  A    I don't even know what that means.  Profitability --
10  Q    So when you're examining the personal assets of the CEO
11  and COO --
12  A    I'm sorry, now I understand.
13  Q    -- you know, is that typical?
14  A    I'm sorry, now I -- I think what you mean is was it
15  typical for us to have looked at whether -- I'll use Mr.
16  Ehrlich as an example.  Is it typical for us to have looked
17  at whether -- at his personal financial situation; is that
18  your question?
19  Q    Yes, exactly.
20  A    Okay.  Well, I would say -- let me rephrase your
21  question for you because it's a good point and we did look
22  at it and we looked at it for a reason.  We looked at it
23  because we were trying to, in our business judgment, obtain
24  the best possible result for the estate that we could as a
25  legal and as a practical matter.  And so, while on the one

Page 291

1  hand we thought that there might be good claims against him
2  for the reasons I've articulated, and while it's true it's
3  America, anybody can sue anybody for anything, it doesn't
4  mean you can get something from somebody even if you win;
5  they have to have something to get.
6       So, we wanted to know what there was to get from
7  them so that we could figure out what would be, in light of
8  that, a good settlement.  And so, a settlement from him for
9  $10 would not have been a good settlement; he had more to
10  give than that.  A settlement from suing him, not settling,
11  a settlement where you got a million dollars from him, we
12  thought was a good settlement because you could sue him for
13  $10 million but he doesn't have $10 million, he doesn't have
14  $5 million.
15       So, we were trying to assess, doing the best that
16  we could -- we didn't have any reason to want to do anything
17  other than that -- we didn't have to settle with him.  We
18  thought it was a good idea to settle with him on the terms
19  that we settled for in part because we looked at what does
20  he have to give and it wasn't very much.  So, we got, in
21  relation to that, what we thought was a reasonable and a
22  fair amount, better than getting nothing from him,
23  especially when coupled with we didn't actually have to
24  release him so that we could go after the $20 million pool
25  of money that's potentially available from the D&O carrier.

Page 292

1       So, if you're settling with somebody -- I'm
2  rephrasing your question -- is it typical in a bankruptcy to
3  look at every individual officer and director's personal
4  assets?  No.  If you're trying to figure out what a good
5  settlement is from an individual, that's probably something
6  you want to look at, and so we did.
7  Q    Got it.  As part of that settlement analysis or I think
8  part of the justification of agreeing to a settlement at all
9  with someone who doesn't have any assets, it's this
10  indemnification and D&O insurance policy issue, right?
11  Like, those are the two kind of reasons that a settlement
12  was favorable in this instance?
13  A    Yeah.  I think to answer to your question is we
14  reasoned that the D&O policy was a bigger pool of money by a
15  lot than the pool of money that these individuals had.  We
16  preserved it 100 percent, and we got from them what we
17  thought was a reason- -- in our judgment, in our business
18  judgment, that's what it was based on the facts and
19  uncovered all the facts, including about what they're worth,
20  we thought that that was a good settlement for the benefit
21  of the creditors, which are really the customers.  Better
22  than the alternative, which is not to settle with them, not
23  to get the money, and not be able to get anything from them
24  anyhow if you could win litigation that if it was brought is
25  going to be hard to win anyhow because the standards are

Page 293

1  tough.
2  Q    Yeah.  So then for this D&O insurance piece, especially
3  a Side A policy, the premium, that's a risk calculation,
4  right?  It sounds like the premium on that Side A policy was
5  $10 million and then the payout max -- I don't know if it's
6  a maximum -- was also $10 million, correct?
7  A    We didn't make any -- we didn't write the policy.
8  We're not the insurers.  I'm not sure I know what your
9  question is.  Insurance companies --
10  Q    Did you review the policy?
11  A    -- decide what they'll charge for the coverage that
12  they offer.
13  Q    Correct.  And so, insurance companies, they're charging
14  for risk, correct?  That's my understanding.
15  A    Well, I don't know what goes into their calculation.  I
16  mean, conceptually, that's what they're doing, but it's not
17  a simple business.
18  Q    Oh, I'm well aware.  So, this would at least imply that
19  the person it's insuring is risky enough to justify a 100
20  percent premium amount.  Is that a reasonable statement to
21  you?
22  A    No, I really don't know what they were thinking.
23  Q    I mean, because the insurers are probably coming out
24  ahead of you if there isn't much risk if your premium is 100
25  percent the policy amount.  I think you previously mentioned

Page 294

1  that, you know, it was counsel's recommendation to enter
2  into this policy. But in terms of, like, special or
3  investigation, there wasn't any additional, you know,
4  inquiry into why this amount equaled the payout. Like, it's
5  a weird insurance term, right? You don't buy insurance for
6  the same amount or you pay a premium for the same amount a
7  policy is. So, I guess clarifying that there was not any
8  additional investigation there, right, into why the CEO
9  or...
10  A    Well, again, the investigation was -- investigation is
11  a strange word for that. We understand what the facts were.
12  We preserved the ability to go try to get that money back
13  from the only party that has the ability to pay that money
14  back and we thought it was important to preserve that. We
15  found that. Nobody came to us and said, hey, good idea,
16  don't you want to make sure we can go after the insurance
17  policy, you know, on a fraudulent conveyance claim for the
18  $10 million because something seems odd, you know, all this
19  money was paid for that much coverage.
20        We flagged that issue because we uncovered it --
21  not uncovered, no one was hiding it from us. We read all
22  the documents, we asked for information, we talked to
23  people, and we said, just like you just said, huh, that
24  seems unusual. We're not going to let that just go away.
25  We're going to make sure that it gets preserved so that it

Page 295

1  could potentially be unwound if legally there's a basis to
2  do that, and we suspect that there might be.
3        Now, sure, the insurance company doesn't think so,
4  and I'm sure other people don't think so, but we've
5  preserved it. We didn't litigate it to conclusion, we
6  didn't let it go; we preserved it. I would preserve it for
7  the same -- based on the same observation that you are
8  making.
9  Q    Okay. So, did you identify any colorable claim from
10  the D&O insurer that may justify avoiding paying out any
11  insurance claims?
12  A    Are you asking me whether we think that the D&O carrier
13  has any basis to deny coverage; is that what you're asking
14  me?
15  Q    Correct, yes.
16  A    I don't. I'm not aware of any, but it wasn't -- we
17  certainly investigate that, but nothing that we did
18  investigate stands out as a red flag.
19  Q    Got it. One more question. Alameda was an insider
20  shortly before it canceled shares I think a few weeks, maybe
21  a few days leading up to bankruptcy. Is there a reason that
22  were excluded from the investigation as insiders?
23  A    I don't understand your question. Who is --
24  Q    So Alameda --
25        THE COURT: Who? Oh, Alameda.

Page 296

1        MS. DIVITA: Yes.
2        THE WITNESS: I'm sorry, ask me that -- what are
3  you asking me? That's just because it's hard to hear.
4  BY MS. DIVITA:
5  Q    Oh, sorry. They were an insider based on the number of
6  shares they held shortly before bankruptcy and the canceled
7  a certain subset of those shares and no longer, I think at
8  least Canadian public filing standards, qualified as an
9  insider shareholder. Is there a reason that Alameda, who
10  was a shareholder -- or I'm sorry -- insider shortly before
11  bankruptcy was not included in the investigation of other
12  insiders?
13  A    Yeah. I mean, whether they're an insider or not, I'm
14  not 100 percent sure. But assuming that they are, it never
15  occurred to us that they would ever be released, so we
16  didn't need to investigate them; there's no release for
17  Alameda. We were investigating officers and directors
18  because of the possibility that releases would be proposed
19  and we would be asked about whether or not we thought that
20  was appropriate. There was never any idea that Alameda
21  would be released from anything, so there was nothing to
22  investigate. The estate can sue Alameda until the cows come
23  home if they want to.
24        MS. DIVITA: Okay, that's all I have. Thank you.
25        THE COURT: Okay.

Page 297

1        ANDRE: I'm sorry, Your Honor. I have some
2  questions too.
3        THE COURT: Who is that?
4        ANDRE: This is Andre (indiscernible), pro se
5  creditor.
6        THE COURT: Okay.
7        CROSS-EXAMINATION OF TIMOTHY POHL
8  BY ANDRE:
9  Q    Okay. Mr. Pohl, your committee was basically tasked to
10  investigate the company's policies to see if they did their
11  -- investigate the company's practices on their due
12  diligence. In your opinion, did they perform sufficient due
13  diligence against 3AC?
14  A    No.
15  Q    And what would -- why not?
16  A    Well, I think they did conduct some due diligence.
17  They had a process. They did have a series of phone calls.
18  They asked for certain information and they got some of the
19  information they asked for, but not all of it. They were
20  aware importantly that there was another company that was
21  making loans to 3AC that was known to have a very rigorous
22  due diligence process of their own, so they took comfort in
23  the fact that --
24        ANDRE: I'm sorry. There's some background noise.
25  I can't hear you.

A-1137

1    THE COURT:  Somebody else has got an open
2  telephone line; they need to mute it.
3    THE WITNESS:  Okay.  So, they got a whole bunch of
4  different kinds of information in different ways.  They
5  conducted interviews.  They asked for certain information.
6  They got some public information.  They had knowledge of
7  other companies --
8  BY ANDRE:
9    Q    Did they investigate the --
10   A    Can I --
11   Q    I'm sorry.  Did they investigate the company's books?
12   A    That's what I'm -- let me answer --
13     THE COURT:  Who is speaking?  Who asked that
14  question?
15     ANDRE:  I'm sorry.
16     THE COURT:  Who asked that question?
17     ANDRE:  Oh, I did.  Andre (indiscernible).
18     THE COURT:  Okay.  You got to let the witness
19  finish.  You can't interrupt him.
20     THE WITNESS:  So, they did a whole number of
21  things, including asking for financial statements from Three
22  Arrows.  They did not get financial statements from Three
23  Arrows in the conventional sense.  They got a very short
24  what's called an NAV statement, it was signed, that said
25  from Three Arrows that they had a net asset value in the

1  They had a series of interviews.  They looked at -- let me
2  finish.
3    Q    Series of phone calls with who?
4    A    People at --
5    Q    Be more specific please.
6    A    People at Three Arrows, including one of the two
7  founders.
8    Q    Okay.
9    A    So they conducted interviews.  They looked at the
10  documents that they were provided.  They looked at public
11  information.  They knew that --
12   Q    What documents were those?
13   A    They knew that there were other people doing business
14  that had their own rigorous -- their own due diligence
15  processes which were believed to be rigorous.  Three Arrows
16  Capital at the time they did business with them was a
17  marketplace darling, much like Alameda.  There was -- we
18  weren't the only -- Voyager wasn't the only company doing
19  business with Three Arrows, just the opposite.  All of those
20  things in total combined was the diligence they did.  They
21  did that diligence over a roughly a one-month period.
22   Q    This is, like, more like pseudo due diligence because
23  at the very least, they didn't look at the company's books,
24  they didn't look at their financial statements.  They didn't
25  ensure that they were capitalized.

1  multiple, multiple billions of dollars.  That was part of
2  the group of things that they relied upon, not the only
3  thing, but it was part of it.  It was not very robust.  We
4  did not think that that was very sufficient.  That was one
5  of the things that we thought was deficient.
6    But it wasn't the only thing that they relied
7  upon, so we can't sort of point only to one factor.  We
8  reviewed what they did, what they looked at, and we did not
9  think that it was as robust as it should have been.  And
10  that's why we did not believe that -- that's why we did
11  believe and do believe that there are potential claims for
12  violation of the duty of care against the two individuals
13  that ultimately decided to make those loans anyhow.
14     Now it's not a clearcut winner.  They did do some
15  due diligence.  Other people were doing business.  It's not
16  even clear that, even if they had done better -- in my view,
17  better due diligence, that the answer would have been any
18  different.  They were defrauded.  They were defrauded, they
19  were being lied to.
20  BY ANDRE:
21   Q    Yes, I'm sorry.  So, what other due diligence did they
22  do then?
23   A    I just described it.
24   Q    Exactly, like, what other?
25   A    I just described it.  They had a series of phone calls.

1    A    They did -- all I can say is they did the diligence
2  they did and we did not find that the result of that
3  diligence was so robust that there was no potential claim.
4  That's why we preserve the claims and entered into the
5  settlements that we did.
6    Q    And you believe that that was after the risk
7  management...
8    A    I think I just said the opposite.
9    Q    Okay.  Well, that's what I'm actually getting to, is
10  that you have a company here that has, let's just say, 1.3
11  billion in assets that are ready and willing to lend out
12  half of their business to another party because they told
13  them we have 3.7 billion of net assets that you can go in
14  with, you can do business with us.  What I'm trying to get
15  here is that I think this is just more than, oh yeah, we
16  found some negligence.  We found that, you know, they didn't
17  really do less diligence; they didn't do any diligence,
18  yeah?
19   A    What's the question?
20   Q    Is that the -- that's the question.  It sounds like
21  they didn't do any diligence and you're saying they did some
22  diligence.
23   A    I just described the diligence.
24   Q    And the --
25   A    I just described the diligence.

Page 302

```
1    Q    Right.  But ultimately, these actions caused the
2    downfall of the entire company.  In one month, it caused 3.5
3    million customers, you know -- all right, I'm going to move
4    on from that.
5         What was Stephen Ehrlich's net worth or what did
6    Stephen Ehrlich have?  You said, oh, he didn't have much.
7    What did he have?
8    A    I'm a little handicapped by confidentiality agreement,
9    so I'll try to answer it, again, the way I answered it
10   before.  He has a house; he has some money in a retirement
11   account and he had some money in a bank account.  Can I --
12   Q    This is Stephen Ehrlich's?
13   A    Yes.  I'm answering your question, yes.
14   Q    Okay.
15   A    The house, he had some money in a retirement account,
16   and he had some money in a bank account.  The lion's share
17   of the money in the bank account he's giving back to us.
18   The retirement account was smaller and the value of the
19   house I think is smaller too.  It's right around the same.
20   I can't remember the exact...
21   Q    And that --
22   A    So we did not take his house.  If we had insisted on
23   taking his house and his IRA, there would have been no
24   settlement because he would not have agreed to it.
25   Q    Okay.  And what did you recover from Mr. Ehrlich?
```

Page 304

```
1    of time, did you consider whether these individuals lived in
2    community property states, such that their wives assets
3    might be available to satisfy a judgment against them
4    because there was references to that earlier too.
5         THE WITNESS:  So, let me start with him and then
6    I'll go to his community property so that it's clear.  Try
7    it again, maybe I wasn't clear.  I think you can think about
8    what he has in three buckets: he has a house, that's one
9    bucket; he has some money in a retirement account, that's
10   the second bucket; and then he had some money in his bank
11   account.
12        We have most of the money from his bank account
13   coming back to us, the estate.  We did not get his house and
14   we did not get his retirement account.  If we had insisted
15   on either of those two things, there would be no settlement
16   and we would not have had the $1.125 million.
17        With respect to his wife -- with respect to his
18   wife, his wife has assets.  We looked at legally whether or
19   not if he were sued, would there be an ability to get at his
20   wife's assets, and the legal answer in the state that he
21   lives in or that she lives in is no, there is no legal
22   recourse to her assets.  So, it may be the amount of her
23   assets are not relevant because there's no way to get to
24   them.  We looked.
25   BY ANDRE:
```

Page 303

```
1    A    $1.25 or $1.125, one of those two numbers, $1.125
2    million plus, to the extent that as a result of giving us
3    that money, he is entitled to a refund from the IRS, which
4    he might be, we get that also.
5    Q    Okay.  And then from Mr. Psaropoulos, what -- again, so
6    can you answer, does Stephen Ehrlich have a network of more
7    than 5 million?
8    A    No.
9    Q    No, you can't answer or no, he doesn't.
10   A    No, he doesn't.
11   Q    Does he have a net worth of more than a million?
12        MR. KIRPALANI:  I'm just going to object, Your
13   Honor, on the basis of confidentiality and I don't want my
14   witness to be sued for violating a confidentiality
15   agreement.  I think he's answered the questions about this
16   and the scope of the assets.
17        THE COURT:  Is there anything else?
18        ANDRE:  I'm trying to --
19        THE COURT:  Is there anything else you can say
20   about the range of Mr. Ehrlich's net worth within the limits
21   of your confidentiality agreement?  I presume it was over a
22   million or he wouldn't have paid a million.
23        MR. KIRPALANI:  Yes.  I think you can -- I think
24   you've tried, but please, Mr. Pohl.  And please also answer
25   because it was referred to earlier and just in the interest
```

Page 305

```
1    Q    And that they would be Connecticut?
2    A    I think he's Connecticut, right.  I might confuse
3    between the two of them who lives where, but one of them is
4    Connecticut, and that was legally --
5    Q    And the house is -- and this house of his is in
6    Greenwich?
7    A    I don't know where his house is.
8        MR. KIRPALANI:  Your Honor, I'm advised -- sorry
9    to interrupt the question, but if I could just try to
10   clarify something -- advised by counsel to the creditors'
11   committee that filed on the Docket 112-1 was the committee's
12   own report where it was disclosed that Mr. Ehrlich reported
13   his net worth as approximately $2.57 million.  Mr.
14   Psaropoulos declined to allow his net worth to be disclosed,
15   so that's the number.
16        THE WITNESS:  Okay.  I didn't know that.  I knew
17   what the number was; I didn't know it had been disclosed.
18   So, I think you can see that we did settle with him for a
19   very significant percentage of his net worth and,
20   importantly, the net worth of his that we did not obtain is
21   not the same; it's in different categories, it's a house and
22   it's a retirement account.
23        ANDRE:  I'm sorry (indiscernible).  Say it again.
24        THE WITNESS:  I didn't understand --
25        ANDRE:  Can you hear me?
```

Page 306

1    THE WITNESS:  Yeah.  Say that again please?

2    ANDRE:  Just saying I got dropped from the call,

3    so I'm letting you know that I'm back on.

4    THE COURT:  Oh, all right.  Well, I don't know if

5    you were on, but Mr. Kirpalani pointed out that it's been

6    previously revealed in a filing on the docket that Mr.

7    Ehrlich's reported net worth was $2.75 million.

8    MR. KIRPALANI:  $2.57.

9    THE COURT:  $2.57, excuse me.  I'm getting

10   dyslexic as I get tired.  And that the witness then said he

11   believed that they had settled for a significant percentage

12   of the total net worth and for most of the cash that was had

13   and that he considered it a good settlement in light of the

14   fact that he couldn't get at -- or unlikely to get at the

15   house and the IRA.

16   THE WITNESS:  Okay.  I also said that we did look

17   at his wife's assets.  We were trying to -- we were looking

18   to get everything that we could reasonably get, and we

19   concluded based on legal advice that we would be unable to

20   get to his wife's assets.  If someone didn't settle and sued

21   and won -- a lot of ifs there -- but if you didn't settle

22   and you sued and you won, could you get at her assets?  No,

23   you couldn't.

24   BY ANDRE:

25   Q    Right, okay.  I don't want to deflect too much from the

Page 307

1    main course here.  What were the -- how much did you recover

2    from Mr. Psaropoulos?

3    A    Much less.  Mr. Psaropoulos is subordinating his right

4    to 50 percent of his crypto assets, but not in the Voyager--

5    Q    Right, okay.

6    A    So the value is about, at the time that we calculated

7    it -- and I know the price is moved every day, but the day

8    that we calculated it, it's worth about $60,000; it's not

9    nearly as much.  His net worth is significantly less, number

10   one, and number two, he was not as culpable.  We thought the

11   claims against him were weaker because it was really Mr.

12   Ehrlich who was the decider with respect to making the loans

13   to Three Arrows and in what amounts, so the strength of the

14   claims wasn't the same.

15   Q    So if I can just synthesize this correctly.  Stephen

16   Ehrlich's and Evan Psaropoulos, the main culprits in

17   decision making, you know, with regard to the loan to Three

18   Arrows, which ultimately brought down the company and caused

19   a lot of harm to all of Voyager's customers.  And your

20   committee, instead of going after everything that they had

21   and basically potentially making them poor, you agreed to

22   settle on a smaller amount because maybe that was better

23   than getting nothing.  Does that sound about right?

24   A    No, I wouldn't describe it that way.  I think we

25   thought that it was better than not settling.  Again, I

Page 308

1    don't want to be misconstrued.  The fact that there may be

2    claims against them is not the same thing as saying that

3    those are slam dunk winners; they're not slam dunk winners,

4    legally, they're not slam dunk winners.  There's a lot of

5    uncertainty about whether you could sue them and succeed,

6    and so, that had to be factored into account.

7    And our goal wasn't to make them poor.  The goal

8    was to get the most for the estate that we reasonably could

9    under the circumstances and that's what we did.

10   Q    Well, by my comment of making them poor, I mean taking

11   everything they have from them and putting it into the

12   estate so that all the other creditors can at least get a

13   little bit more.  And, quite frankly, I mean, they should

14   have nothing after their decision.

15   One last question.  If you do not opt in --

16   THE COURT:  Did you look at exemptions available

17   under Connecticut law?

18   THE WITNESS:  You mean on the marital property,

19   Your Honor?

20   THE COURT:  On the house and on the IRA or in the

21   event that Mr. Ehrlich declared his own bankruptcy?

22   THE WITNESS:  No.  We were really focused on her

23   property because it was more.  And when we -- the house and

24   the IRA, again, those amounts were smaller even comb-- -- you

25   know, were not as significant as the cash.  So, you know, in

Page 309

1    negotiating, when we could get the cash and get almost all

2    of the cash, we thought relative it was total assets that

3    was a fair deal compared to not settling at all and suing

4    them and maybe getting nothing.

5    And we knew that -- no, we just didn't know, it

6    was a settlement, it was a negotiations, but that he was not

7    going to agree to give up his house and his IRA.

8    Fortunately, the values of those things was not so

9    significant that it made just getting at the cash not a good

10   deal, all in.  It made it a good deal.  It was still a good

11   deal all in.

12   BY ANDRE:

13   Q    Okay.  I have actually two more questions.  One was if

14   you do not opt-in to the finance deal, then you -- or

15   rather, if you do opt-in to the finance deal, then you

16   basically give up any rights to sue Mr. Ehrlich, yeah?

17   MR. KIRPALANI:  Objection.  Exceeds the scope of

18   direct.  But if you understand, if you know the answer to

19   this question.

20   THE WITNESS:  Are you asking me about under the

21   plan if somebody opts-in to the finance, if they keep their

22   asset --

23   BY ANDRE:

24   Q    Right, they give up their rights to sue?

25   A    If they keep their asset on the finance --

Page 310

1    THE COURT:  No.  My understanding is if you voted
2 in favor of the plan or if you executed an affirmative opt-
3 in to the releases, you would --
4    THE WITNESS:  Just an affirmative opt-in, even for
5 people who voted yes?
6    THE COURT:  I thought you were binding people who
7 voted -- so people who voted for the plan are not bound by
8 the releases, okay.
9    THE WITNESS:  Of the individual claims.
10    THE COURT:  Okay.  It's just they're only -- okay,
11 so the only people who have released claims are people who
12 have affirmatively opted in.  That's people who checked the
13 opt-in box on a ballot, not people who elect to become
14 finance customers.
15 BY ANDRE:
16    Q    So on the Voyager app, when it asks you do you want to
17 transfer your data now and opt-in, that has nothing to do
18 with giving up your rights to sue them personally or does
19 that?
20    A    That's correct.
21    ANDRE:   Okay.  I don't have any more questions.
22 Thank you.
23    THE COURT:  Okay.  Anybody else on the phone?
24    MS. DIRESTA:  Hi, Your Honor.  This is Gina
25 DiResta again, and I have a question for the witness.

Page 311

1    THE COURT:  Okay.
2    CROSS-EXAMINATION OF TIMOTHY POHL
3 BY MS. DIRESTA:
4    Q    Hi, Mr. Pohl.  I heard a bunch of rumors that Voyager
5 employees and even some of the customers were supposedly
6 tipped off that the Voyager platform was going to get shut
7 down and told to take their assets off the platform before
8 it got shut down.  Did you do any kind of investigations
9 along these lines?
10    A    I am not aware that we saw anything consistent with
11 that.
12    Q    Did you hear any kind of rumors around those lines at
13 least?
14    A    No, I'm not -- I for sure did not hear any rumors and
15 no one else has told me that they heard those rumors either.
16    Q    Okay.  Because it's actually, like, a lot of people say
17 it and, like, then, you know, it doesn't necessarily mean
18 it's true, but a lot of people have been spreading that on
19 different social media platforms.  So, I didn't know if it's
20 something that -- I'm surprised you haven't heard of it just
21 because it's, like, rampant out there, and then I wanted to
22 know if you guys did any kind of investigation along those
23 lines.
24    And since you guys didn't do any investigations
25 and I just now got to your attention that there were a lot

Page 312

1 of rumors about it, is there a way to investigate that after
2 the fact?  I know you guys have already done your
3 investigation, but is there a way to do that now?
4    A    I don't think we would be investigating social media
5 rumors, but...
6    MS. DIRESTA:  Okay, thank you.  That's all.
7    THE COURT:  Okay.
8    MR. LOREN:  Your Honor, this is John Loren, pro se
9 day creditor.  Can you hear me?
10    THE COURT:  I can.
11    CROSS-EXAMINATION OF TIMOTHY POHL
12 BY MR. LOREN:
13    Q    For the witness, I was curious if you investigated any
14 of Steve's, like, shell companies, holdings, and/or trusts?
15    A    Well, we requested and received sworn statements where
16 he was required to disclose to us all of his assets and then
17 he was deposed, so he would have been required to disclose
18 those things to us and there was no disclosure of any other
19 assets other than the ones we've talked about.
20    Q    So if Steve Ehrlich votes, owns, or has a participation
21 in shell companies, holdings, or trusts and he told me that
22 he didn't, that's something we can potentially investigate.
23 Am I hearing that correctly?
24    A    I guess.  If you're asking what the legal ramifications
25 are of it were to turn out that he lied in his sworn

Page 313

1 testimony to us, I'll defer to the lawyer to answer that
2 question, but I'm sure there would be some.
3    Q    Wonderful, okay.  And then there's a new article that
4 came out, basically there's a new fund coming out in Tampa,
5 Florida, and Steve Ehrlich is actually one of the employees
6 or, I guess, one of the partners in this fund; it's called
7 Druid.  Have you heard anything about this?
8    A    I have not.
9    MR. LOREN:  Okay.  That's all I have.  Thank you.
10    THE COURT:  Okay.  Anybody else?  Okay.
11    MAN 3:  Your Honor, could I (indiscernible), one
12 of the creditors (indiscernible) because I'm not in this
13 because I came in a bit late.
14    CROSS-EXAMINATION OF TIMOTHY POHL
15 BY MAN 3:
16    Q    (Indiscernible).  What is the timeframe out and do we
17 know the limits; is that a weekly limit of withdrawals from
18 the balance (indiscernible) implementing to distribute daily
19 without leaving the market to suffer?  How is that
20 (indiscernible); is that two-month timetable so it fully
21 distribute or a shorter timeframe?
22    THE COURT:  Okay.  That's not an appropriate
23 question at this time.  We're in the middle of taking
24 evidence, so the issue is whether you have a question about
25 the subject of this witness's testimony.  We'll be resuming

Page 314

1   tomorrow and you can get clarification of your issues then.
2   In fact, you could probably also talk to the Debtors
3   overnight and get a clarification.  Okay?
4        MAN 3:  Thank you.
5        THE COURT:  Anybody else with questions for this
6   witness?  All right, the witness is excused and we'll
7   adjourn for the evening.  We'll resume tomorrow at 10:00.
8        MAN 4:  (Indiscernible), Your Honor?
9        THE COURT:  Yes.  Did you have questions for the
10  witness?
11       MAN 4:  No.
12       THE COURT:  Okay.  Yes.
13       MR. UPTEGROVE:  William Uptegrove on behalf of the
14  United States Securities and Exchange Commission.  Your
15  Honor, today's hearing went longer than we anticipated and
16  neither Miss Scheuer or I made accommodations for tonight
17  and we have travel arrangements back out of state.  We'd
18  like to request to participate in tomorrow's hearing through
19  Court Solutions.
20       THE COURT:  All right.  I'll grant that request.
21       MR. UPTEGROVE:  And just one --
22       THE COURT:  You have no evidence to offer, right?
23       MR. UPTEGROVE:  No, Your Honor.  And just one
24  other logistical point is that we should be able to make --
25  just to confirm, we should be able to make same day Court

Page 315

1   Solution arrangements tomorrow?
2        THE COURT:  I sure understand you can, and if you
3   have any difficulties, speak to our chamber staff and I'm
4   sure we can give you the assistance you need.  Thank you.
5        All right, we'll see everybody tomorrow.
6        (Whereupon these proceedings were concluded at
7   6:53 PM)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 316

1                I N D E X
2
3                RULINGS
4                              Page      Line
5   Motion to Recuse, DENIED        10        16
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 317

1          C E R T I F I C A T I O N
2
3      I, Sonya Ledanski Hyde, certified that the foregoing
4                              record of the proceedings.
5
6
7
8   Sonya Ledanski Hyde
9
10
11
12
13
14
15
16
17
18
19
20  Veritext Legal Solutions
21  330 Old Country Road
22  Suite 300
23  Mineola, NY 11501
24
25  Date:  March 6, 2023

A-1142

**&**
& 4:3 6:15 9:4
45:6 57:12
223:4 227:7
245:23 268:21
277:2

**0**
0 134:2
0.5 134:1

**1**
1 49:3 133:3,7
133:23 135:10
135:15,18
136:1 141:4
263:19,22,24
279:9,11,17
1,000 50:4
1.1 91:7
1.12 230:5
1.125 303:1,1
304:16
1.13 230:5
1.2 12:24
1.25 303:1
1.3 94:13
209:19 301:10
1.32 94:14
1.34 1:23 91:9
1.363 13:22
1.4 12:18
1.9 230:3
10 14:10 87:3,4
87:5 133:24,25
233:23,24
234:4 235:4,4
235:8,9,15

254:15 255:8,9
255:13,13,17
255:23,23
256:14 272:22
272:23,24
273:8,8,11,11
275:6,8 291:9
291:13,13
293:5,6 294:18
316:5
10,000 250:24
100 4:20 11:5,6
11:8 14:6 26:7
94:21 269:10
269:11 292:16
293:19,24
296:14
100,000 121:16
1000 227:25
10004 2:3 5:4
5:19 6:4
10010 6:11
10017 6:18
10022 4:6
101 8:7
106 64:4 184:8
10:00 314:7
10:01 35:4
11 9:8 13:7
14:20 35:11
65:5 98:6
104:16 105:13
108:8 114:23
114:25 127:4
188:9
11,000 250:24

111 49:4
1111 220:12
1119 49:5
112 1:8
112-1 305:11
11206 3:18
11209 3:18
11213 3:18
1127 45:13
1129 35:11
37:13 45:7
1145 32:2,6,7
32:18 33:3,7
11501 317:23
12 8:21 78:17
78:24 226:17
243:25 244:2
12,000 121:17
12/18 206:24
210:3
120 208:21
209:2,16
120,000 64:3
12151 317:5
129 8:8
12th 245:3
249:21
13 8:23 78:17
78:24
13,000 121:17
13th 249:20
14 247:22
141 8:9 44:10
142 44:10,15
14th 220:19
249:20,25

15 14:9 233:21
272:13,15,21
272:25
154 8:9
159 8:10
16 158:6 316:5
167,000 12:21
17 208:25
209:6,14,15
175 147:15
175k 143:9
177,000 238:6
18 121:18
189 8:10
18th 81:3,15
207:9 259:5
19 121:18
1999 222:18
19th 11:13
1st 256:22,24

---

144:6 317:25
6.7 183:2,7
60 227:16
242:17
60,000 143:11
232:13 247:3
307:8
601 4:5
61,300 10:23
65 209:25
210:1
650 121:2
257:20 259:5
264:1
6500 256:20
6:00 219:17
6:53 315:7

**7**
7 16:5 60:18
61:8 62:10,14
68:24 71:1,2
71:17 75:3
76:14 77:4
80:25 81:1,7
81:10,14,14
82:6 90:20
97:24 98:5,23
98:23 99:9,10
99:11,16
100:12,20
104:8,17,20
105:16,17
106:13 107:15
108:2,24
114:24 148:4,7
149:1,8 153:9
181:5 188:9

207:23
70 86:16 262:2
207:5,7,10
209:4
700 146:4
232:13 243:3
307:8
700,000 144:22
144:25 145:7
146:2 152:18
704 100:9
73 11:16
75 11:4 12:22
101:12 102:4
102:13 105:25
106:17 108:15
261:20,22,24
262:5
76 70:22
78 8:22,23
78701 5:12
79 40:16

**8**
8,000 91:21
80 11:6 190:15
190:16 191:9
191:10,13
192:6 193:14
83 209:10
210:2
835 158:5
861 8:22 78:20
863 8:23 78:20
88 8:6 96:24

**9**
90 8:7 11:8
900 4:13
93 185:22
186:6,11,19,22
187:5
950 4:13
97 10:23 42:16
42:24 69:15
84:22,25 85:2
85:4,21,22
108:9 142:18
142:22 143:1
194:9
98 10:24
9:58 2:6

**a**
abide 122:21
122:23
abigail 5:14
43:20,25 101:4
abilities 139:14
ability 20:2,5
33:23 36:10
50:20 51:4
59:9 61:20
62:4 64:10
71:11 89:4,6
111:14 115:18
140:22 143:6
144:14 151:18
155:14 160:8
160:23 169:24
171:6 177:12
177:16 178:5,9
205:14 229:3

230:7,12,15,16
243:10 244:4
255:15 256:11
274:2 276:5
294:12,13
304:19
able 20:25 21:6
27:10 28:9
35:5 49:12
50:5,22 51:5,6
61:16 63:5
80:9 81:10
90:1 126:19
138:12,23
155:2 158:2,12
158:22 162:19
166:8 179:21
185:17 187:10
188:6 192:8
197:1 214:2
219:1 243:12
260:22 285:5
292:23 314:24
314:25
above 270:19
absence 236:10
236:10
absences
283:20
absent 25:5
absolute 156:4
absolutely 17:7
38:10,17 50:20
68:11 101:24
174:21 184:3
210:5 222:7
278:1

---

135:6,6,18,25
136:2 151:24
152:24 177:10
224:7 233:25
237:14 248:7
274:17 275:5
282:15 283:3
291:24
20,000 97:12
20/20 257:11
200 209:18
2008 221:19,20
2019 222:23
2020 238:7
284:22
2021 284:22
2022 11:13
97:11 238:7,18
238:22 243:16
260:5 284:19
284:23
2023 2:5
220:20 317:25
204 8:11
20549 4:21
208 256:16,23
257:16,19
259:10
20th 5:18
212 8:11
22-01133 1:4
3:1
22-01170 1:16
3:7
22-10943 1:3
221 8:13

22nd 229:12,15
23,000 97:12
238 3:14
24 103:16
104:13 105:14
109:2 272:16
275:6
243 186:8,24
246 8:14
248 8:15
25 121:18
226:13 286:12
287:1,3,9
254 8:15
26 71:4 76:14
97:9 104:13
109:3 181:19
27 256:21
279 8:16
27th 11:15
13:22 258:23
280 8:16
28th 256:21
297 8:17
2:40 161:9
2nd 97:11

**3**
3 220:10
313:11,15
314:4
3.5 302:2
3.7 301:13
30 181:19
226:12 226:13
244:20 250:22
300 5:11
317:22

30326 4:14
311 8:17
312 8:18
313 8:18
330 317:21
34 108:25
35 105:16
135:21 137:15
137:25 140:16
140:18 152:11
179:25 180:10
181:20 208:9
208:25 209:13
258:14 261:6
38 208:8
39 105:17
106:8,11
108:25
3ac 11:19
249:14,15,23
250:5 251:14
251:23 252:25
263:5,11,15,19
264:1 282:10
283:11,14
284:13 288:2
297:13,21

**4**
4 45:12 62:24
314:8,11
40 87:7,8 90:25
91:20 208:6
232:9 307:4
400 73:16,25
74:1,4 217:23
401k 247:13
445 74:4,7,19
76:10 79:12,21

80:13 81:21
92:8 94:10
104:1 106:23
107:2 108:16
180:20
45 208:7
450 76:4
455 76:8,10
121:5
48 11:25 49:14
50:20
4:30 218:11
4th 312:20
223:19

**5**
5 291:14 303:7
50 62:24 119:9
148:17 206:24
207:9 208:6
232:9 307:4,22
50,000 256:20
500 261:23
500,000 15:12
51 6:10 12:5
103:16
53 8:5
534 5:3
541 10:25
55 103:13
105:12 107:25
552 10:25
59,183 10:23

**6**
6 42:21 85:22
85:23 142:23
142:24 143:4

---

accept 11:4
123:1 142:19
accepted 17:15
46:12,12,16,17
175:8
access 14:6
37:24 192:6,23
196:20 217:4
226:24 227:7
accommodat...
314:16
accomplished
173:22
accomplishing
176:5
accordance
19:1 23:13
account 11:18
18:11,15 62:1
86:1,5 87:24
89:9,20,21
97:10 99:19
100:8 101:25
103:14 104:25
111:9 130:1,4
130:6 192:21
192:22 197:20
198:16 199:4,8
237:16 247:14
248:3 265:5
266:20 302:11
302:11,15,16
302:17,18
304:9,11,12,14
305:22 308:6
accountability
174:11,17

accountable
174:21
accountholder
192:22 208:5
accounthold...
110:3
accountholders
109:3 202:6
accounting
11:17 153:12
167:25
accounts 14:17
68:5 71:22
268:9 273:25
274:9 289:17
289:22
accurate 97:13
140:1 235:10
317:4
accustomed
241:12
ach 132:7
269:25
achieve 172:16
achievement
15:2
acknowledge
210:19
acknowledged
238:4
acquire 141:25
acquisition
162:24
acrimony
224:14
act 136:18
150:10
acting 30:12

action 31:13,14
36:18,22 160:7
162:17,20
169:20 225:6,8
225:9,9,10
228:2,11,11,13
228:14,14,25
233:4 235:19
235:20,21
252:20 253:19
254:2 259:20
260:18 265:17
268:9 273:25
274:9 289:17
289:22
actionable
284:18
actions 35:19
72:15 73:18
82:23 174:11
252:12,21
265:19 268:5
302:1
actively 22:10
activities 33:14
281:15
activity 33:22
249:4 286:2
actors 40:3
actual 50:15
68:8 78:19
109:4 211:11
288:23
actually 11:1,9
22:24 23:18
35:20 46:13,14
47:4 48:10

49:19,23 50:1
57:25 69:3
77:20 83:7
92:22 95:3
104:9 105:18
109:12 110:10
120:6 127:13
134:4,22
143:20 144:2
148:23 163:25
169:5 180:20
181:4 191:22
192:9 199:5
226:7 232:17
238:11 254:18
260:8 265:15
265:25 268:5
269:24 271:17
274:5 275:16
287:21 291:23
301:9 309:13
311:16 313:5
ad 1:18 3:7
15:9
add 42:11
107:9 116:25
203:4,15
adding 229:18
254:24
addition
243:14
additional
13:24 19:19
36:23,23 90:4
107:10 133:7
238:13,22
239:21 284:11

**[additional - agree]**     Page 5

284:25 294:3,8
address  15:13
19:4 27:7
32:14 34:8
63:15 67:22
68:7 72:2 81:7
122:19 163:13
163:25 164:12
164:14,14
174:7 180:1
193:6 203:22
204:24 205:18
287:6
addressed
34:23 35:4
78:23 81:10
83:17 196:2
190:14 205:14
205:16
addresses
76:10
addressing
34:23 169:14
169:16
adequate  108:2
108:14 285:5
adequately
287:7
adjourn
201:20 314:7
adjustments
153:15
administration
284:7 285:6
administrative
12:14 75:10,12
87:11,13 94:10

133:18
administrator
22:24
admission
45:19 47:23
49:8 50:15
221:1
admit  9:18
48:18 50:16
51:24 78:21
90:21 220:13
220:15 221:5
adv  1:4,16
advance  248:7
advantage  72:9
advantageous
152:16
adversary  3:1
3:7
adverse  151:12
adversely
138:8
advice  58:10
256:4 276:10
306:19
advised  124:23
269:2 305:8,10
advising
159:24 281:6
advisor  16:12
49:2 53:15
226:22 280:7
280:12,14
281:5

advisors  13:13
57:12 58:15
69:19 71:20
74:13 83:15
97:17,22 114:1
114:2,10,10
125:5,6 151:16
169:23 183:24
184:4 194:13
194:25 195:1
205:13,15
212:2,6,7
269:3 280:18
281:20
advisory  27:11
27:14 167:2
affairs  287:6
affect  33:23
36:10 37:7
43:1,2,7 76:25
77:7 79:13,23
104:16,17,20
123:6
affected  78:5
95:20,22 128:9
138:8 240:21
240:25
affects  29:13
135:1
affidavit  90:21
102:2 104:7,11
105:3 106:22
107:1,4 108:3
230:22
affiliate  164:3
affiliates  164:2

affirmative
310:2,4
affirmatively
47:9 310:12
afford  248:12
afraid  47:10
159:4 189:25
202:25 242:20
afternoon
88:20,21 101:3
101:10 141:3,5
212:19 218:8
218:15
agencies
153:22 166:3
169:18
agenda  176:1
age  181:8
95:4 132:17
136:17,18
198:6
aggregate
15:11 97:15
ago  50:10
70:14 221:11
244:21
agree  51:11
70:24,25 106:5
106:7 107:17
113:1,4 124:10
124:12,16
139:4 164:13
172:9 191:22
241:1 255:14
255:15 258:11
275:25 283:18
309:7

**[andre - appreciating]**     Page 7

298:8,15,17,17
299:20 303:18
304:25 305:23
305:25 306:2
306:24 309:12
309:23 310:15
310:21
angry  121:13
121:15 122:1
answer  23:9
34:5 40:18
66:24 73:9,12
74:6 79:17,18
80:8 85:10
102:11 104:4,6
105:4,20
106:16 113:15
115:21 117:11
117:16,23
118:3 119:24
120:18 124:7
127:11 129:24
131:23 133:19
136:22 137:17
137:19 139:12
139:19 150:15
157:3,10,11,12
158:15 160:15
160:19 165:1,4
165:8,18
167:23 168:23
170:25 172:10
172:23,25
184:14 185:8
185:15 186:21
187:19 189:20
195:10 196:12

196:21 200:19
204:9 211:8
220:23 240:7
240:14 241:23
243:20 244:11
245:14 247:9
254:19 269:15
270:12 271:3
275:17 280:16
280:17 285:7
292:13 298:12
299:17 302:9
303:6,9,24
304:20 309:18
313:1
answered  88:1
117:8 125:21
132:25 134:13
160:4 172:22
187:14 192:15
211:21 258:18
302:9 303:15
answering
139:11,13
189:25 200:18
200:20 201:15
302:13
answers  51:6
85:10 139:18
164:23,23
165:22 208:9
208:11 209:2
218:1 271:3
anthony  53:3
anticipate
11:15 20:17,18
22:12 217:10

anticipated
314:15
anybody  28:6
28:9 39:22
48:19 60:5
69:23 88:6
100:25 101:2
112:10 118:6
128:22 139:19
140:9,17 141:2
154:8 159:9
188:15 199:21
200:10 202:13
206:10 212:13
221:3,19,23,25
237:7,7,24
246:15,17
248:17 271:3
279:7,18 286:6
291:3,3 310:23
313:10 314:5
anymore  262:6
anyway  116:8
118:25 212:10
243:2
apa  131:7
150:21 158:3,6
191:1 204:8
apart  17:9 42:9
227:6
apologies  22:3
apologize  60:8
86:24 89:1
119:22 184:24
app  136:8,19
189:22 190:7
190:15 191:9

199:25 310:16
apparent  24:22
appear  10:6
appeared
235:2,3
appears  13:12
202:7
apples  107:11
107:11
applicable  16:2
158:5 230:8
applies  32:7
74:10
apply  32:3,22
33:3 73:14
234:14
appoint  174:25
appointed
187:8 240:4
264:10,12
267:15 268:2
268:18 280:7
appointing
69:20 272:7
appointment
69:4,5
appreciate
109:8 155:17
248:25 249:1
262:12
appreciated
207:4 253:1
appreciates
218:6
appreciating
260:20

**[agreeable - andre]**     Page 6

agreeable
44:13
agreed  21:1
114:3 135:19
193:9 262:1
302:24 307:21
agreeing  18:8
18:8,12 232:18
263:9 292:8
agreement
19:7,12 40:15
44:10 45:1
125:20 141:23
155:25 157:14
157:15 197:14
197:16 242:11
281:23 302:8
303:15,21
ahead  24:1
52:1 53:8
56:25 60:25
90:14 100:4,17
105:21 112:16
113:14,21
115:22 117:6
124:8 135:11
149:17,18
159:15 171:18
172:9 177:7
184:19 204:11
219:19 248:21
270:2,3 279:25
293:24
air  120:10
244:6
al  1:22 3:9

alah  3:24 7:13
56:6,7 85:7
200:2,7
alameda  11:19
11:21,23 12:9
18:1 23:10
43:2 60:16
73:13 75:11
94:2 101:11
102:4 103:2,17
103:18 104:1
104:11,15,22
105:12 106:12
108:15,25
121:2 256:20
256:21 257:1,1
257:5,10,10,13
258:2 259:24
alameda's
104:12 106:22
108:4,17
alerting  19:3
alexander  6:3
alleged  103:18
allegedly
240:24
allocate  178:19
allow  14:19
22:5 90:13
114:21 122:12
155:25 177:21
200:14 202:11
202:22 203:4

203:15 204:7
305:14
allowed  18:10
18:14 154:23
154:24 157:8
204:1 261:22
262:4,6 283:12
allowing
155:10 200:19
allows  14:23
141:20
alongside
54:22
alternative  3:3
13:14 15:6
171:1 292:22
ambit  31:25
amended  45:16
45:19,23
242:10
amendment
19:7
america  291:3
aml  64:11,15
130:2
amount  10:24
11:5,7,8 12:11
12:13 46:17
57:9,13 63:8
70:16 71:18
74:16 75:13
79:23 80:9
81:19,25 86:15
87:14 102:12
108:20 129:9
133:10 134:6
134:10 147:2

158:11 177:19
178:1 182:18
194:7 198:21
230:11,11
242:13 275:2
276:23 284:12
291:22 293:20
293:25 294:4,6
294:6 304:22
307:22
amounted
233:16
amounts  10:12
107:8,10
analyses  62:3
76:8 281:17
analysis  16:14
59:24 61:5
62:2,21 81:22
82:7,25 83:3
84:23 90:20
142:12,14,17
153:13 189:9
190:16 196:7
203:14 274:24
290:7 292:7
analyzed  97:21
282:22 284:16
analyzing
113:24
anchor  174:6
andre  206:15
297:1,4,4,8,24

**[appreciative - asserted]**     Page 8

appreciative
155:24
approach
35:16 53:5
148:25 150:3
232:5
approaching
215:13
appropriate
23:13 59:21
60:24 68:6
85:16 97:17
190:25 203:18
220:24 296:20
313:22
appropriately
170:4 177:14
approval  18:6
19:19 83:15
84:5,12 242:14
approvals  18:2
93:23
approve  10:22
approved  21:3
40:15 83:11,12
84:22,25 85:2
92:8 95:18
111:24 173:3
197:16 276:9
approves  83:24
approving
256:7
approximately
10:25 11:4,6,8
12:22,24 13:22
15:12 103:16
105:14 186:23

206:24 208:25
227:12 230:5
232:12 305:13
approximation
86:23
april  54:8
79:10 81:2,15
146:19,24
284:23
area  34:6,8
285:18
arguably  33:22
266:5
argue  51:19
85:10 168:14
175:14
argued  26:23
37:23
arguing  66:11
66:14 193:20
argument  9:15
9:21 27:6
28:15 31:18,20
33:1 39:9 42:4
56:13,19 66:7
66:17 109:6,18
119:19 127:11
156:18,20
157:22 167:5
168:11 175:16
180:23 191:7,7
195:12,13
296:3 298:21
309:20 312:24
arguments
17:20 28:17
37:23 65:19
94:24 123:10
157:21 164:24
167:12

arising  225:10
army  49:15
51:7
arps  222:18
arrangement
198:20
arrangements
37:21 314:17
315:1
arrows  257:2
258:8 282:3
283:21 284:19
298:22,23,25
307:13,18
article  205:2,5
239:13 313:3
articulated
291:2
artwork  244:5
244:6
ascribed
192:18
aside  73:17,20
73:25 74:5,5,8
74:11,14,15
180:23 191:7,7
asked  39:18
37:19 113:9
117:15 132:23
133:15 134:13
159:10 163:10
170:12,18
187:14 200:8
200:17 214:8
217:25 219:13
223:5,7,20,25

230:18 245:11
258:18 271:7
294:22 296:19
297:18,19
298:5,13,16
asking  17:8,9
27:14,15 28:10
28:12,17 50:23
59:14 70:20
79:20 80:1,2
84:1,2 102:16
102:18 103:4,6
120:17 136:24
143:16 144:24
146:14 161:19
162:11 164:17
170:11 177:6
190:9 193:20
193:21 196:14
196:16 200:11
200:22 203:9
203:10 207:21
207:22 226:15
229:16 249:10
256:25 258:22
261:15 265:7
272:4 278:13
295:12,13
296:3 298:21
309:20 312:24
asks  310:16
aspect  152:16
aspects  28:13
41:2
assert  256:24
asserted  75:11
94:10 103:3

[asserted - available]                                                    Page 9

| | | | |
|---|---|---|---|
| 170:12 240:22 | 274:20 286:12 | 146:4 163:5 | **attract** 255:3 |
| **asserting** | 287:2,9 290:10 | 241:9 296:14 | **attributed** |
| 103:20 | 292:4,9 301:11 | **assumption** | 251:19 |
| **assess** 82:22,23 | 301:13 303:16 | 76:4 82:2 | **attributes** 23:3 |
| 291:15 | 304:2,18,20,22 | 115:8,10 | 26:9 |
| **asset** 19:7 | 304:23 306:17 | **assumptions** | **auction** 125:17 |
| 24:19 31:24 | 306:20,22 | 76:7 98:2 | 172:14,20 |
| 40:15 58:7 | 307:4 309:2 | 115:6 147:12 | **auctioning** |
| 64:19 70:7 | 311:7 312:16 | **assurances** | 124:24 |
| 298:25 309:22 | 312:19 | 159:3 217:15 | **audited** 167:21 |
| 309:25 | **assignment** | **assure** 241:17 | **auditors** |
| **assets** 13:18 | 187:23 278:16 | **atlanta** 4:14 | 167:19,22,24 |
| 14:3 26:7 | **assignments** | **attach** 136:9 | 168:6,9 |
| 37:25 54:7,18 | 276:24 | **attached** 91:16 | **august** 207:13 |
| 61:12,17 62:5 | **assist** 280:13 | 91:18 | **austin** 5:12 |
| 64:23 67:21 | **assistance** | **attachment** | **authorities** |
| 91:7 115:9 | 225:4 315:4 | 48:13 | 155:9 159:1 |
| 116:10 124:24 | **associate** | **attain** 89:23 | **authority** |
| 126:16 129:20 | 222:17 | **attempt** 218:23 | 38:12 265:24 |
| 131:17,18 | **associated** | **attempted** | 268:11,13,16 |
| 132:11 148:15 | 98:25 99:1 | 166:5 | 270:18 288:9 |
| 149:8,14 | 174:16 234:9 | **attendant** | 288:20 |
| 150:11,23 | **associates** | 26:22 27:9 | **authorization** |
| 160:9,9 177:22 | 86:19 | **attention** | 155:6 |
| 186:6 193:4 | **assume** 40:2,3 | 110:18 311:25 | **authorized** |
| 204:23 206:2 | 71:1 76:8 | **attorney** 5:8 | 150:17,18 |
| 208:16,17 | 106:12 175:15 | 35:8 43:21,25 | **automated** |
| 209:21 210:8 | 216:22 264:16 | 90:18 119:17 | 161:17,21 |
| 210:15 211:12 | 275:18,23 | 119:22 166:4 | **automatic** 3:3 |
| 216:21 230:19 | 279:2 | 166:14 169:19 | **automatically** |
| 231:12 232:19 | **assumed** 81:14 | 170:6,12 | 32:22 |
| 237:10 239:2 | **assumes** 110:5 | 193:19 222:16 | **availability** |
| 244:12,14 | 112:2 117:25 | 224:6 | 218:22 |
| 245:4,11 | 170:24 196:11 | **attorneys** 4:4 | **available** 14:2 |
| 247:13 248:11 | 204:25 | 4:12,19 5:2,9 | 45:15 49:6 |
| 251:13,22 | **assuming** | 5:17 6:2,9,16 | 109:14 135:4 |
| 257:13 261:16 | 104:15 145:5 | 60:4 | 137:3,4 169:19 |

[available - bankruptcy]                                                  Page 10

| | | | |
|---|---|---|---|
| 220:16,23 | **b** | 118:6 124:5,10 | **banking** 5:10 |
| 226:22 228:22 | **b** 2:21 105:12 | 124:12,16,20 | 44:2 111:19,25 |
| 230:8 244:12 | **back** 15:22 | 171:21,23,23 | 168:18 281:7 |
| 245:14 247:17 | 17:21 24:4 | 172:3,5,11,13 | **bankrupt** |
| 275:3 291:25 | 54:18 58:20 | 172:15,21 | 127:3 132:22 |
| 304:3 308:16 | 69:11,13 86:3 | 173:2,3,12 | 196:9,15 |
| **availed** 226:25 | 86:6 93:21 | 175:17 176:4,6 | 197:10 286:21 |
| 227:5 280:17 | 94:10 108:25 | 204:7 | **bankruptcies** |
| **avenue** 4:5 | 109:2,3 114:16 | **backwards** | 100:20 |
| 6:10,17 | 114:19 116:8 | 122:20 | **bankruptcy** |
| **average** 96:2,4 | 121:17 124:4 | **bad** 40:3,4,4 | 1:1 2:1,23 19:2 |
| 186:8,9,10,17 | 124:15 131:20 | 69:6,7 108:9 | 25:17,19 26:15 |
| 186:23,24 | 156:9 158:16 | 154:2 236:20 | 32:3 38:25 |
| **avoid** 80:12 | 161:5 167:18 | 254:1 258:15 | 42:23 46:11,19 |
| 150:4 | 177:22 178:21 | 263:7 | 47:12 51:16 |
| **avoidable** | 179:3,8 197:4 | **balance** 80:18 | 52:9 53:18 |
| 234:25 235:17 | 197:8,11 | 121:18 212:5 | 60:15 64:25 |
| **avoidance** | 210:11 211:6 | 225:16 313:18 | 67:22 75:9,13 |
| 279:12 | 216:15 231:4 | **balances** 91:5 | 100:10 115:9 |
| **avoiding** | 239:3 243:19 | 115:14 | 115:15 116:4 |
| 295:10 | 244:5,24 | **ball** 87:2 | 116:12 121:3 |
| **aware** 44:13 | 249:16 254:11 | **ballot** 46:5 | 127:6,7,23 |
| 57:24 63:11 | 258:3,5 261:8 | 310:13 | 175:10 196:23 |
| 101:11 110:2 | 261:10,11 | **ballpark** 247:6 | 197:2 198:7 |
| 111:23 141:16 | 262:9,19 275:5 | **bam** 13:19 | 230:1,2 239:16 |
| 141:23 142:4 | 276:6,7,12 | 213:12,19,22 | 241:12,18 |
| 164:6 169:5,9 | 286:13 294:12 | **bank** 15:10 | 243:11,18 |
| 184:11 205:2 | 294:14 302:17 | 54:23 68:16 | 244:1 245:8,16 |
| 233:10 239:9 | 304:13 306:3 | 99:19 100:8 | 251:24 252:5 |
| 249:12,13 | 314:17 | 244:15,17 | 254:16 255:3 |
| 260:19 262:1 | **background** | 247:14 248:2 | 259:23 260:14 |
| 272:4,8 293:18 | 90:23 222:14 | 258:15 302:11 | 263:20 264:2,4 |
| 295:16 297:20 | 297:24 | 302:16,17 | 264:8 266:13 |
| 311:10 | **backs** 196:17 | 304:10,12 | 267:2,5 272:5 |
| **awful** 51:14 | 265:17 | **banker** 167:1 | 272:16 275:7 |
| 92:14 119:16 | **backup** 117:14 | 183:23 222:22 | 278:8 284:8,15 |
| | 117:15,18 | 278:20,23 | 284:20,23 |

[bankruptcy - bending]                                                    Page 11

| | | | |
|---|---|---|---|
| 285:6 286:17 | 251:12,24 | **belief** 114:7 | 171:13 172:14 |
| 286:19 287:4 | 255:8 297:9 | 125:12 181:9 | 174:10,11 |
| 290:8 292:2 | 307:21 309:16 | 236:12 237:19 | 175:23 177:23 |
| 295:21 296:6 | 313:4 | **beliefs** 162:1 | 177:25 178:1 |
| 296:11 308:21 | **basis** 63:7 | **believe** 10:11 | 181:19,20 |
| **bar** 23:14 99:5 | 65:20 66:18 | 11:25 12:13 | 191:5,8 193:14 |
| **barely** 277:8 | 93:1,9 97:24 | 14:1 15:8 | 194:10,14 |
| **barred** 201:21 | 98:1 99:17 | 19:22,23 23:11 | 195:15,17 |
| 202:2,9,10 | 145:6 152:14 | 23:14 26:7 | 196:6 197:23 |
| **base** 98:9,19 | 152:16 158:14 | 28:19 29:9 | 199:14 205:17 |
| 154:20 178:19 | 185:23 198:15 | 32:7,17 33:5,8 | 205:21,23 |
| **based** 11:12 | 210:2,6,6 | 33:9 35:3 41:15 | 206:23 208:19 |
| 21:10,13 30:5 | 215:17 245:2 | 41:10 42:20 | 212:2 213:6,6 |
| 51:19 54:2 | 250:18 290:2 | 43:1,3,7 55:6 | 213:16 214:5 |
| 55:6,9 57:6,20 | 295:1,13 | 57:20 58:2,21 | 217:8 232:23 |
| 58:10 61:19 | 303:13 | 59:11,15 62:4 | 235:3 238:17 |
| 63:8 77:23 | **basket** 233:22 | 62:9 64:4 | 242:9 243:20 |
| 78:4 85:3,13 | 234:18 235:7 | 66:16,19 68:6 | 246:4 249:1 |
| 86:15 98:1 | 272:14 | 68:22 69:1,5 | 253:25 259:16 |
| 99:15 102:3 | **bear** 148:21 | 69:11,14 79:7 | 261:22 271:17 |
| 114:7,12 | **bearing** 121:7 | 80:15 86:8,10 | 272:8,11 280:6 |
| 123:10 142:23 | 121:14 173:24 | 86:11,14 89:19 | 289:6 299:10 |
| 143:24 147:14 | **beating** 175:16 | 91:18,21 99:2 | 299:11,11 |
| 175:9 209:1 | **beginning** | 99:13 107:22 | 301:6 |
| 211:2 213:22 | 53:17 55:15 | 108:2,14,18 | **believed** 114:4 |
| 216:2 219:4 | 72:17 143:25 | 110:17 114:13 | 203:18 253:23 |
| 236:17 259:14 | 150:14 173:4 | 125:11 127:22 | 257:2,3 260:7 |
| 266:16,22 | 175:25 227:3 | 129:25 131:9 | 260:21 300:15 |
| 282:22 292:18 | 243:15 | 131:10 132:2,4 | 306:11 |
| 295:7 296:5 | **begins** 277:18 | 132:7 143:9 | **believers** 261:1 |
| 306:19 | **begun** 94:8 | 144:15 145:2 | **believes** 41:12 |
| **bases** 140:11 | **behalf** 9:4,7 | 146:7,17 147:1 | **belonged** |
| **basic** 101:11 | 24:7 44:1 | 155:7 156:15 | 266:18 |
| 107:6 | 88:14 218:16 | 160:8,21 161:3 | **belonging** |
| **basically** 42:1 | 219:23 245:23 | 161:4,17,18 | 265:4,5 |
| 45:24 133:1 | 252:16 314:13 | 164:4,7 167:6 | **bending** |
| 188:4 210:9 | | 170:1 171:3,9 | 122:20 |

[beneficial - binance]                                                    Page 12

| | | | |
|---|---|---|---|
| **beneficial** | **bet** 185:12 | 173:1,2,3,12 | 59:3 61:21 |
| 105:18 172:2 | 237:16 | 175:17 176:4,6 | 63:24,25 64:1 |
| 237:16 | **better** 20:18 | **bidders** 118:16 | 67:6 68:9,9 |
| **benefit** 18:15 | 39:5 40:7 | 118:20,25 | 75:16,17,18,18 |
| 18:25 75:6 | 55:14 60:13 | 119:2 171:24 | 76:22 77:1,3,9 |
| 138:1 152:10 | 77:4 104:9 | 172:3,4,5,10 | 77:18 82:15 |
| 229:2 230:10 | 134:4,10 136:2 | 172:11,20 | 86:13,16 87:17 |
| 234:10,25 | 136:13,24,25 | 173:1 | 89:6 90:1 91:8 |
| 253:2 255:9 | 137:20 140:12 | **bidding** 55:16 | 92:16,18,21,23 |
| 263:16 273:6 | 142:13 145:16 | 116:15,17 | 93:19 94:3,5 |
| 273:10 274:12 | 145:18 151:25 | 117:21 118:8 | 94:13,14 95:1 |
| 274:24 276:2 | 152:1 154:25 | 117:21 173:3 | 98:7,12 102:6 |
| 282:13 292:20 | 164:5 167:18 | 174:3 | 104:25 106:2 |
| **benefits** 152:4 | 171:1 195:18 | **big** 189:5 | 107:13 108:19 |
| 234:19 | 227:2 286:16 | 192:12 249:8 | 108:21 109:23 |
| **berkeley** 16:11 | 291:22 292:21 | 256:22 259:7 | 109:25 110:8 |
| **best** 13:20 15:1 | 299:16,17 | 307:22,25 | 110:21 111:5,6 |
| 15:5,6 16:2 | 307:22,25 | **beyond** 172:4 | 111:7,8,14,17 |
| 53:25 55:20 | **beyond** 172:4 | 180:14 232:19 | 111:24 114:15 |
| 58:3 59:24 | 180:14 232:19 | 280:16 281:2 | 117:3 119:2,3 |
| 60:3,14 61:1,4 | 280:16 281:2 | **biance.us** | 119:4,6,8 |
| 62:15 65:1,4 | **biance.us** | 91:7,9 94:13 | 124:5,12,16,22 |
| 66:13 68:15 | 91:7,9 94:13 | 183:3,7 186:10 | 126:14,18,24 |
| 84:21 109:24 | 183:3,7 186:10 | 187:6 209:19 | 127:2,6,6,17 |
| 127:8,21 | 187:6 209:19 | 242:17 263:19 | 127:22,24 |
| 135:23 151:18 | 242:17 263:19 | 263:22,24 | 128:9 129:20 |
| 151:23,24 | 263:22,24 | 301:11,13 | 129:23 130:1,4 |
| 160:1 163:18 | 301:11,13 | **billions** 299:1 | 131:19,21 |
| 168:8 169:24 | **bidden** 116:20 | 21:1,1,25 22:4 | 132:1,1,13,16 |
| 170:21 171:7 | **bidder** 116:20 | 25:8 30:6,12 | 132:17 133:5,8 |
| 176:15 205:14 | 117:14,15,18 | 33:10,13,21 | 133:16 134:4,8 |
| 210:23 228:25 | 118:6 119:3 | 34:8,9 35:17 | 134:10,18,21 |
| 229:3 235:24 | 124:5,10,12,16 | 39:15,16 41:1 | 134:24 135:20 |
| 237:11,12 | 124:18,20,21 | 44:3 54:11,20 | 136:14,17,25 |
| 253:3 285:7 | 125:3 171:23 | 54:21,25 55:7 | 137:3,13 138:2 |
| 290:24 291:15 | 172:16,21 | 55:10 57:6 | |

| | | | |
|---|---|---|---|
| 138:9,21 | 196:4,6,8,15 | **binance.us.** | 267:18,21,22 |
| 140:12 141:13 | 196:18,21,22 | 13:25 | 267:24 268:1,3 |
| 141:16,19,20 | 196:23 197:5,5 | **binding** 278:5 | 268:6,12,16,19 |
| 141:25 143:10 | 197:9,9,10,11 | 310:6 | 268:21,23 |
| 143:19 144:1,7 | 197:17,22,25 | **biometric** | 269:2,6,8,16 |
| 144:17,19,22 | 198:2,4,5,7,14 | 142:7,10 | 269:21 270:2,4 |
| 144:25 145:9 | 199:12,15,25 | **bit** 20:18 62:5 | 270:7,18,19,20 |
| 146:3,7,8,9,13 | 200:1,5 204:23 | 79:10 99:7 | 270:20,22,24 |
| 146:15,18,20 | 205:3,10,12,19 | 102:15 108:23 | 271:2,4,8,9,10 |
| 146:21 148:8 | 205:25 206:20 | 231:21 250:19 | 271:14,21,23 |
| 148:25 149:24 | 206:23 207:22 | 262:12 308:13 | 272:7 276:8,13 |
| 149:25 150:12 | 208:5 210:8,10 | 313:13 | 277:5,6 278:21 |
| 150:14 151:19 | 210:15,23 | **bitcoin** 70:9,17 | **boards** 222:25 |
| 154:22 155:6 | 211:7,12,14,16 | 91:19,21 96:8 | 223:2 272:6 |
| 155:10,13 | 211:22 212:20 | 96:22 97:11 | 277:4 |
| 156:5,15 157:1 | 212:22 213:3,4 | 149:15,19 | **boat** 197:21 |
| 157:7,8,9,14 | 213:5,9,9,13 | 181:11,25 | **bodies** 25:16 |
| 160:1,3,5 | 213:19,23 | 182:18 183:10 | 153:18 195:14 |
| 162:1,11,12,13 | 214:1,2,3,5,9 | 256:20 277:8 | **body** 25:1 |
| 162:14,15,19 | 214:12,17,21 | **blew** 258:14 | 30:18 36:19 |
| 163:3,4,5,8 | 214:21,25 | 261:6 284:20 | **bonus** 229:25 |
| 164:3,8 165:16 | 215:1,4,15,18 | 285:15 | 230:2,4,9 |
| 166:3,5,9 | 215:20,25 | **blockchain** | 238:12,17 |
| 167:18,22 | 216:3,10,21,25 | 244:15,16 | **books** 211:23 |
| 168:7,18,19,20 | **binance's** | **blocked** 239:5 | 211:24 212:3 |
| 168:25 169:5 | 37:21 64:19,21 | **blocks** 70:19 | 213:20 298:11 |
| 169:23 170:13 | 119:6 197:19 | **blood** 256:9 | 300:23 |
| 170:19,20 | **binance.us** | **bloodbath** | **booted** 161:22 |
| 171:1,3,4,6,13 | 12:21,23 14:6 | 191:12 192:11 | **borrow** 262:3 |
| 171:22 172:4 | 14:8,11,18 | **blowing** 260:3 | 262:4,6 |
| 176:15,19,22 | 15:21 20:3 | **board** 5:10 | **borrowed** |
| 177:9 178:10 | 21:1 22:10 | 16:24 44:1 | 262:4,7 |
| 180:4 190:17 | 38:1 54:7 | 111:19,25 | **borrower** |
| 191:10 192:5 | 58:18 62:25 | 223:17,25 | 103:1 |
| 193:25 194:2,3 | 64:10 89:13,16 | 224:4,11,13 | **bottom** 179:6 |
| 194:5,20,24 | 89:22 90:4 | 244:8 255:24 | **bought** 92:21 |
| 195:18,21,24 | 110:4 | 267:16,15,17 | 178:14,22 |

| | | | |
|---|---|---|---|
| **capacity** 194:8 | 242:20 249:7 | **cause** 175:21 | 298:5 |
| 198:6 | 254:20 259:25 | 235:19,20 | **certainly** 52:6 |
| **capital** 224:24 | 261:9 265:2,4 | 253:19 254:2 | 74:16 80:11 |
| 239:12,20 | 279:4 287:23 | 289:17,22 | 148:21 158:12 |
| 282:3 283:21 | **cases** 13:5,9 | **caused** 174:20 | 169:7 209:23 |
| 300:16 | 14:20 105:14 | 181:21 302:1,2 | 219:16,17 |
| **capitalized** | 148:17 | 307:18 | 227:7 236:21 |
| 251:20 262:22 | **cash** 13:16 | **causes** 225:5,8 | 247:16 257:2 |
| 300:25 | 41:19 74:5,8 | 225:8,9,10 | 260:5,9 262:1 |
| **caps** 183:10 | 75:16,20,25 | 228:2,10,11,13 | 264:11 279:2 |
| **cardinal** 122:9 | 76:5,9 77:6 | 228:13,14 | 281:16 282:21 |
| **care** 228:4 | 81:8,18 86:18 | 233:4 235:21 | 295:17 |
| 236:17,23 | 86:20,25 87:6 | 260:18 263:20 | **certified** 317:3 |
| 284:13 299:12 | 87:8,9,12,22 | 265:16 268:8 | **cetera** 42:16 |
| **careful** 189:16 | 89:17 90:25 | 273:25 274:9 | 153:13 196:18 |
| **carelessly** | 93:20,25 94:1 | **caution** 247:7 | **cfius** 25:14 |
| 266:7 | 94:20 99:14,16 | 279:6 | 29:20 30:2,4 |
| **carrier** 234:8 | 130:7 131:19 | **cede** 188:14 | 83:24 84:2,5 |
| 273:7 291:25 | 133:20,22,23 | **celsius** 39:24 | 84:12,18 |
| 295:12 | 136:11,12,21 | 116:25 119:8,8 | **chain** 264:3 |
| **carriers** 283:1 | 145:12 146:5 | 239:5 | 286:20 |
| 283:3 | 146:15 147:23 | **cents** 21:24 | **chairman** |
| **carveout** | 147:24 148:4 | 22:2 | 267:24,25 |
| 272:15 | 148:11 149:12 | **ceo** 239:22 | 269:9,16 270:2 |
| **case** 1:3,4,16 | 151:12 152:23 | 278:8 281:10 | 270:4,20,22,24 |
| 10:15 17:17 | 153:6 156:6 | 288:1,5,19 | 271:2 272:7 |
| 34:9 35:15 | 180:24 182:11 | 289:9 290:10 | 276:13 |
| 36:14 50:2 | 188:1 191:25 | 294:8 | **challenge** 30:8 |
| 54:15 56:23,23 | 306:12 308:25 | **certain** 3:4 | 30:12 176:23 |
| 61:1 66:1 | 309:1,2,9 | 14:9,13 42:12 | **challenges** |
| 67:22 71:1 | **cashed** 131:13 | 46:12 85:3 | 262:12 |
| 76:14 97:25 | 131:14 132:5 | 107:8 126:17 | **challenging** |
| 100:12 127:2 | 155:4 | 138:12 148:14 | 98:4 178:20 |
| 132:18 143:4 | **catastrophic** | 150:18 177:25 | 191:23 |
| 150:17 158:20 | 13:10 | 198:21 208:23 | **chamber** 315:3 |
| 208:7,8,21 | **categories** | 242:12 273:25 | **chance** 56:18 |
| 226:2 227:3 | 305:21 | 296:7 297:18 | 65:25 122:19 |

| | | | |
|---|---|---|---|
| 179:1 238:7 | **broken** 91:3 | 257:5,7 258:1 | 293:15 |
| 243:25 245:7 | **broker** 30:13 | 258:4,6,9 | **california** |
| **bound** 310:7 | 33:11,13,15,23 | 259:9 260:6,6 | 157:19 |
| **bowling** 2:2 | **brought** | 260:22 263:14 | **call** 49:2 60:14 |
| 5:3 | 110:20 152:20 | 273:20 278:25 | 61:16 116:22 |
| **box** 310:13 | 265:25 274:22 | 279:15 280:15 | 120:8 129:10 |
| **brain** 162:7 | 290:5 292:24 | 281:18 282:5 | 161:4 164:17 |
| 236:23 253:19 | 307:18 | 282:23 285:21 | 218:19 219:24 |
| 254:2 266:8 | **bruh** 6:6 90:10 | 285:24,25 | 226:9 249:16 |
| 282:7,9 284:13 | 90:10,15,17,18 | 286:1,5 287:15 | 278:21 285:23 |
| **breached** | 95:15 100:4,5 | 287:17 289:2 | 306:2 |
| 285:20 | 100:6,9,13,16 | 290:23 292:17 | **called** 176:15 |
| **breaches** 228:4 | 100:18,23 | 293:17 299:15 | 181:24 223:20 |
| **break** 77:16 | **brunt** 148:21 | 300:13,16,19 | 233:23 252:15 |
| 79:5 113:8,9 | **brush** 72:19 | 301:12,14 | 288:15 298:24 |
| 159:7,8 161:6 | **btt** 185:13 | 116:13,18 | 313:6 |
| 161:9 | **btx** 189:8 | 121:20 151:3 | **calling** 50:13 |
| **brg** 53:16 57:9 | **buck** 288:18 | 178:18 179:21 | **calls** 151:19 |
| 71:19 159:24 | **bucket** 304:9 | 182:20 294:5 | 252:7 297:17 |
| 194:12 226:24 | 304:10 | **buyer** 152:5 | 299:25 300:3 |
| 280:18 | **buckets** 304:8 | **buyers** 40:3 | **calm** 122:3 |
| **brian** 16:18 | **buffett** 287:10 | **buying** 94:15 | 123:1 263:17 |
| **briefed** 32:20 | 287:22 | 95:1,4 | **canadian** 296:8 |
| 33:4,6,7 | **bulk** 215:10 | | **canceled** |
| **briefly** 43:22 | 254:22 | **c** | 295:20 296:6 |
| 216:9 219:10 | **bunch** 298:3 | **c** 4:1 5:6 9:1 | **cap** 70:11 |
| 221:9 222:13 | 311:4 | 317:1,1 | 182:18,24 |
| **bring** 42:10 | **burden** 26:20 | **calandra** 6:20 | 183:7,11,15 |
| 110:18 267:7 | 29:11 30:23 | 245:22,23 | 184:2 185:12 |
| **bringing** 88:25 | 38:8,16 | 246:1,9 | 189:19 256:17 |
| 183:12 | **business** 14:25 | **calculate** 107:7 | 256:19 |
| **broad** 72:19 | 16:8 78:1 | 107:9 | **cape** 185:20 |
| **broader** | 123:14,20 | **calculated** | 242:19 |
| 160:24,25 | 125:2 127:23 | 21:18 232:12 | **capabilities** |
| **broke** 250:19 | 198:16 222:15 | 307:6,8 | 213:19 |
| | 230:3 236:19 | **calculation** | **capability** |
| | 237:11,17 | 107:13,15 | 138:22,23 |
| | | 153:16 293:3 | **capable** 123:23 |
| | | | 139:11,13 |

| | | | |
|---|---|---|---|
| 185:8 200:9 | **characterized** | 89:22 196:15 | 47:8 75:10 |
| 221:10 269:22 | 273:2 | 237:20 285:17 | 87:13 89:16,24 |
| **change** 23:4 | **charge** 116:25 | 286:17 308:9 | 102:14 103:14 |
| 109:19 123:6 | 293:11 | **cited** 32:19 | 103:15 154:21 |
| 139:14 145:4 | **charged** 27:23 | **citizens** 44:4 | 181:1 185:22 |
| 173:16,17 | 38:11 116:6 | 203:22 | 196:8,18 208:5 |
| 174:5 284:11 | 223:22 225:7 | **city** 163:4 | 228:4 231:5,7 |
| **changed** 22:23 | 264:21 | **ckb** 185:14 | 231:7 232:3,18 |
| 197:23 | **charges** 47:2 | **claim** 3:18 | 232:22,23 |
| **changes** 22:21 | 116:7 | 12:14 21:19 | 233:5,6 234:13 |
| 23:2 60:17 | **charging** 117:1 | 73:7 75:11,12 | 236:17 237:3 |
| 221:13 | 293:13 | 75:14 94:11 | 240:6,21,22 |
| **chapter** 9:7 | **chart** 184:13 | 102:11,14 | 240:23 241:3,3 |
| 13:7 14:20 | 184:15,17 | 103:17,19 | 241:21 242:17 |
| 16:5 60:18 | 207:19 | 104:1 106:12 | 242:21,22,25 |
| 61:8 62:10,14 | **check** 21:9 | 106:18,23 | 243:3,4,6,7 |
| 65:5 68:24 | 64:14 131:6,7 | 107:2,10 | 246:5 252:16 |
| 71:1,2,17 | 131:16,20,21 | 108:15,16 | 252:21 259:13 |
| 76:14 77:4 | 132:7,10 | 133:11 186:22 | 259:16 264:23 |
| 80:25 81:1,7 | 269:23,24,25 | 192:8 235:12 | 264:25 266:6 |
| 81:10,13,14 | **checked** | 240:24 241:16 | 266:16,18,22 |
| 82:6 90:20 | 167:13 213:6 | 247:2 248:9 | 266:23,25 |
| 97:24 98:5,6 | 216:15 310:12 | 254:3 255:20 | 267:6 273:25 |
| 98:23,23 99:9 | **checks** 115:14 | 261:22 265:4,5 | 274:2,18,22,25 |
| 99:10,11,16 | 212:5 | 266:3,24 273:3 | 275:3,20 |
| 100:12,20 | **chief** 251:19 | 273:12,13 | 282:19 283:13 |
| 104:8,16,17,20 | 104:8,16,17 | 282:6,7,10,11 | 283:18 289:8 |
| 105:13,16,17 | 136:11 215:4 | 282:13 290:1,2 | 289:11 290:4,8 |
| 106:13 107:15 | **choose** 105:24 | 291:7 295:9 | 291:1 295:11 |
| 108:2,8,24 | 136:11 215:4 | 301:3 | 299:11 301:14 |
| 114:23,24,24 | **chooses** 89:16 | **christine** 4:8 | 307:11,14 |
| 127:4 148:4,7 | **chosen** 165:17 | 9:3 | 308:2 310:9,11 |
| 149:1,7 153:8 | **circuit** 18:3 | **claims** 11:6,7,9 | **clarification** |
| 181:5 188:9,9 | 213:6 | 242:19 | 59:23 60:23 |
| 207:23 | **circumstance** | **claims** 11:6,7,9 | 180:17 261:15 |
| **characterize** | 76:25 | 11:18,19 12:8 | 264:6 267:12 |
| 152:13 272:23 | **circumstances** | 12:25 15:11 | 273:15 314:1,3 |
| | 14:10 34:16 | 18:9,12,15 | |
| | | 19:8 21:9 23:6 | |

**[clarifications - colloquialism]**   Page 17

clarifications
  17:24 23:18
clarified
  161:22 170:6
  279:13
clarify  9:24
  44:9 147:11
  158:3 166:15
  171:24 204:15
  207:20 246:3
  253:5 263:5
  281:22 305:10
clarifying
  280:4 281:11
  294:7
class  18:18,19
  46:18 58:7
  63:9 70:8
  142:25 174:14
  226:1
classes  10:22
  15:5 175:8
claw  196:17
  197:3,8,11
  244:5 265:17
clawback
  121:1,2
clawed  243:19
  244:24
clean  96:15
clear  19:8
  47:12 52:5
  56:8 63:17
  76:20 105:2
  143:14 169:7
  177:20 178:7
  197:16,24

211:9 246:6
252:14 299:16
304:6,7
clearcut
  299:14
cleared  41:21
clearly  145:14
  202:25
clerk  161:3
  188:17
client  178:19
clients  99:8
close  35:17,20
  36:10 54:11
  213:24 247:16
  247:17 257:16
  276:24
closed  29:25
  30:1 37:7 84:6
  218:1
closes  36:16
closing  22:15
  37:15 78:1
  79:6,8,24 80:2
  80:7,19,21
  84:12 89:18,24
  194:11
closure  93:18
  34:22 42:23
  46:11,19 47:13
  51:16,23 52:10
  60:15 75:9,13
  100:10 157:19
  175:10 178:18
cognizable
  228:4,10,14

289:7
cognizant
  228:20
coin  28:13,16
  78:6 80:13
  91:5,12 96:5,7
  97:15,20
  140:16 181:10
  181:12,18,23
  182:1,2,5,10
coinbase
  114:25
coins  14:7
  19:22,23 20:23
  21:14,22 27:3
  28:17 61:13
  62:7,8 64:4
  68:12 70:12,15
  70:23 71:2
  72:1,2,3 74:5,7
  74:9,17,19,20
  75:15 76:13,15
  76:22 77:10,12
  77:18 79:5,13
  79:13,22,23,24
  81:2,9,15,17
  81:22,24 82:14
  86:3,6 92:1
  96:11 126:18
  135:20,21
  136:4,6,20
  137:2,9,15,25
  138:2,3,5,8,11
  138:12,18,25
  139:15 140:11
  140:16,18
  150:24 151:2,3

151:19 153:4,7
  155:3 156:1,6
  156:9 178:11
  178:12,14,18
  178:21,24
  179:2,17,21,25
  180:4,5,21,22
  182:9,11,19,20
  182:20 183:9
  183:14,18,18
  184:8 191:16
  206:1,2 208:14
  208:17,18
  209:5,13,15,25
  217:16 218:13
  225:19 259:25
  260:7 263:15
  276:20 277:9
  286:15 15:3
collaborating
  169:17
collaborative
  69:18
collapse  13:10
  13:11 181:10
  181:13,16,19
  182:1,16 183:6
  183:19,20
  186:14,25
  249:14
collapsing
  181:5
collateral
  12:11 184:1
colleague  24:8
  32:13
collect  100:10
collective
  244:9
colloquialism
  285:16

212-267-6868          Veritext Legal Solutions          516-608-2400
                      www.veritext.com

**[company - confidence]**   Page 19

272:6 273:10
274:9 281:13
281:16 284:23
285:19,21
286:8,11
289:22 295:3
297:20 300:18
301:10 302:2
307:18
company's
  125:6 225:2,2
  225:16 228:5
  236:4 254:20
  281:14 289:13
  289:15 297:10
  297:11 298:11
  300:23
compare
  185:18
compared
  309:3
comparison
  107:12 147:6
comparisons
  214:16
compensate
  14:11 270:18
  270:20
compensated
  270:21
compensates
  270:6
compensation
  276:14
competence
  175:22

complaining
  15:20
complaint
  120:10
complaints
  119:19 123:5
complement
  255:1
complete
  226:23
completed
  194:21
completely
  106:7 117:10
  125:6 196:21
  225:19 259:25
  260:7 263:15
  276:20 277:9
  complete  15:3
comply  28:9
  75:12 83:18
  116:1 130:1

170:19
component
  141:23
compound
  113:5
comprehensive
  97:18
comprised
  13:23
concept  70:20
  268:1
conceptual
  20:7
conceptually
  288:25 293:16
concern  70:16
  95:16 135:21
  148:19 192:2
concerned
  39:21 40:5
  64:6 67:20
  99:8 176:21
concerning
  43:6 163:15
  168:6
concerns  38:13
  40:1 110:18
  166:3 170:17
  171:12 194:25
  204:24 205:8
concert  151:15
conclude  107:8
  161:5
concluded
  228:15 236:5
  306:19 315:6

concluding
  228:12
conclusion
  65:18 194:22
  228:1,3,8,10
  237:21 252:7
  263:9 264:13
  274:21 295:5
conclusions
  17:1 259:13
  280:10
condition
  266:2 267:8
conditional
  15:21
conditions  18:3
  142:4,19
  152:22 288:23
  322:2
conduct  33:20
  122:17,17
  141:14 201:23
  224:17 225:18
  290:7 297:16
conducted
  141:24 212:20
  226:17,18,19
  236:3 288:13
  298:5 300:9
conducting
  223:22,23
  280:5
confer  219:7
conference
  3:11
confidence
  284:6,12 285:1

212-267-6868          Veritext Legal Solutions          516-608-2400
                      www.veritext.com

**[colorable - company]**   Page 18

colorable
  237:3,4 283:13
  295:9
comb  308:24
combat  190:22
  192:13
combination
  272:21
combined  9:13
  300:20
come  25:8,18
  27:24 28:1
  31:11 37:8
  38:11 47:2
  145:10 155:25
  172:15 194:21
  223:17 243:6
  277:24 296:22
comfort  297:22
comfortable
  57:5,8 63:16
  212:4 213:23
  273:24
coming  145:4
  158:13 181:21
  205:7 229:15
  250:15 263:9
  293:23 304:13
  313:4
comingled
  160:11,25
comingles
  160:5
comingling
  64:22 162:9
  164:2,11,18
  165:9,11 213:1

commencing
  13:9
comment
  42:11 308:10
comments
  17:22 141:7
  164:22 165:2
  165:21
commission
  4:11,13,18,19
  24:8 32:17
  70:4 79:2
  314:14
commissions
  244:7
committed
  225:13 240:24
committee
  3:17,20 6:9,16
  11:2 16:24,25
  41:10,25 54:10
  57:16 69:18
  74:12 114:1,9
  115:18 125:5
  151:16 183:24
  191:5 195:1
  212:6,15
  218:18 223:15
  223:22 224:1
  224:20,23
  225:12,17
  226:5,21 228:1
  228:7 237:20
  240:3 241:21
  242:3 245:24
  259:12 267:22
  268:10,19

277:18,20
  280:8 288:15
  297:9 305:11
  307:20
committee's
  17:1 220:18
  227:9 280:6
  285:1 305:11
committing
  201:19
commodity
  193:5
common  70:11
  183:20
  255:5 269:1
communicati...
  163:12 250:5
  251:4
communicati...
  240:17,17
  250:13,23
  264:16
community
  304:2,6
companies
  55:18 116:18
  118:17 119:4
  222:25 223:2,3
  223:3 256:14
  286:17 293:9
  312:14,21
company  12:20
  13:3 16:18
  53:17 54:10,23
  58:15,22 59:4
  65:12 67:4
  268:20,22 74:12

93:21,21
  102:18,19
  103:2,3,4,5,7,7
  114:2,10,24
  115:16 116:10
  116:11,13
  125:5 158:1
  159:24 162:18
  162:18 163:2,6
  163:7,8,12
  167:20 168:20
  169:22 170:3
  180:9,22
  189:20 194:3
  194:13,15
  196:7 203:14
  205:12 211:25
  212:2 223:5,8
  224:25 226:18
  236:14 246:5
  246:12 262:21
  267:19,23
  268:21,23
  269:2,5,6,9,16
  269:21 270:11
  270:14 271:8
  271:14,23,25

212-267-6868          Veritext Legal Solutions          516-608-2400
                      www.veritext.com

**[confidentiality - contingency]**   Page 20

confidentiality
  247:8 302:8
  303:13,14,21
confirm  36:15
  63:2 126:13,20
  132:8 173:18
  189:12 314:25
confirmable
  26:20
confirmation
  9:7,11,19
  15:14 16:12
  18:4 23:14
  40:17 44:16,17
  44:21 51:22
  175:7,9 220:21
confirmatory
  194:9
confirmed  15:7
  36:16 42:19
  59:12,16 164:4
  175:13
confirming
  35:19
conflict  104:7
confuse  305:2
confused  107:6
  136:7 154:5
  179:6 260:5
  265:13,18
confusion
  92:15 240:20
congratulating
  162:24

congress  47:11
  114:4
connecticut
  305:1,2,4
  308:17
connecting
  75:1
connection
  12:12 73:17
  79:22 212:22
  213:17 272:13
connections
  223:13
consensual
  18:7
consensually
  15:3
consensus
  224:14
consequences
  33:19 34:2,3
  34:10 151:13
conservative
  215:13
consider  19:25
  175:10 224:19
  226:3 230:17
  304:1
consideration
  13:25 94:20
  152:19 193:3
  210:21 252:10
considerations
  141:13
considered
  19:15 46:9
  61:23 124:5

197:19 198:4
  252:16 306:13
consistent
  50:10 190:25
  260:20 289:13
  311:10
constantly
  134:5
constituent
  225:25
constituents
  195:15
constitute  27:3
constraint
  74:14
constraints
  70:6,8 71:7,21
  74:9,24 81:12
  81:19
construct
  86:16 115:24
  171:9,9 205:18
  211:5
construed
  275:24
consult  225:12
consultation
  71:20 113:25
  115:17
consulting
  57:13 184:16
consumers
  157:19
consummate
  14:12

consummated
  58:17
consummation
  29:22
consummati...
  14:21
cont  262:17
contained
  211:20
contemplate
  19:20 142:15
contemplated
  18:2 24:12
  26:15,22 32:3
  33:12 54:5,6
  178:25
contemplates
  144:9
contemplating
  33:24
contemptuous
  201:23
contention
  28:6 147:17
contested
  51:17 52:10
  53:20
context  33:1
  38:16 68:16
  146:1 154:2
  286:15
continent
  73:11
contingencies
  54:16
contingency
  137:1

212-267-6868          Veritext Legal Solutions          516-608-2400
                      www.veritext.com

| | | | |
|---|---|---|---|
| **continuation** | **controls** 37:21 | **core** 258:6 | **correction** |
| 49:12 | 38:2 164:6 | **corporation** | 216:17 |
| **continue** 19:16 | 166:6,9 | 213:15,16 | **correctly** 10:8 |
| 37:2,3 44:7,24 | **conventional** | **correct** 19:10 | 82:8 88:22 |
| 93:7 123:12 | 298:23 | 19:11 21:11,15 | 89:3 203:19 |
| 145:3,4 196:1 | **conversations** | 23:1 42:20 | 210:14 242:10 |
| 201:25 218:12 | 171:21 226:16 | 45:17 71:5,6,8 | 249:5 307:15 |
| 219:11 231:8 | **conversion** | 71:9 75:16,22 | 312:23 |
| **continues** 50:6 | 69:15 95:17 | 76:15 78:7,9 | **correlate** |
| 153:21 | 98:22 | 79:6 80:19 | 250:11 |
| **continuing** | **convert** 58:18 | 81:3 84:14 | **correspond** |
| 44:2,6,12 | 81:5,6,18 | 88:21,24 89:5 | 245:16 |
| **contracts** 22:7 | 82:18 96:12 | 89:9,13,18,24 | **corresponde...** |
| 22:12 | 131:19 148:7 | 92:21 95:3,10 | 238:10,23 |
| **contractual** | 149:12 188:1 | 95:13 99:20 | **cost** 69:1 95:23 |
| 234:7 | **converted** | 110:16 115:8 | 96:9,16 99:1 |
| **contradicted** | 75:20 76:5,8 | 130:19 131:1 | 133:18 139:25 |
| 118:23 | 92:9,10 97:25 | 132:13 133:9 | 235:4 274:24 |
| **contrary** 30:19 | 148:3 | 142:7,16 | 275:8 |
| 66:16 199:10 | **conveyance** | 144:23 150:13 | **costs** 16:15 |
| 202:22 260:23 | 235:12 273:3 | 158:2 171:14 | 87:11,11 98:25 |
| **contrast** 41:14 | 294:17 | 177:24 179:10 | 231:16 248:7 |
| 42:2 | **coo** 281:10 | 186:19 189:13 | 254:25 |
| **contribute** | 288:1 289:9 | 189:14 196:16 | **couched** 35:8 |
| 18:18 | 290:11 | 196:17 198:2 | **coughing** |
| **contributed** | **cooperate** | 203:11 204:12 | 171:17 |
| 18:15 | 169:24 | 207:11,12 | **counsel** 41:18 |
| **contributing** | **cooperative** | 210:11 212:20 | 43:4 50:7 |
| 232:11,20 | 225:19,22,23 | 214:7 215:16 | 54:25 55:25 |
| 247:2 | **coordinated** | 215:19 232:20 | 58:11 83:1 |
| **contribution** | 193:8,11 | 241:2,6 246:8 | 84:7 85:17 |
| 229:4 | **coordination** | 266:9 269:5 | 88:11 98:1 |
| **control** 39:15 | 205:15 | 270:7 272:19 | 106:12 132:14 |
| 47:12 | **copy** 72:14 | 281:3 286:2,24 | 166:19 212:15 |
| **controllable** | 184:21 | 288:3 293:6,15 | 219:7 220:8 |
| 253:24 | | 293:14 295:15 | 223:4 224:18 |
| | | 310:20 | 225:4 226:8 |

| | | | |
|---|---|---|---|
| 236:22 242:6 | 12:1,3,7,10,15 | 65:10,13,16 | 120:19 121:6 |
| 247:9 249:1,25 | 17:9,23 18:17 | 66:14,16,20,22 | 121:11,22,24 |
| 250:4,21 251:2 | 18:24 19:6,16 | 67:1,25 68:18 | 122:5,7,11,14 |
| 256:4 276:10 | 20:10,20 21:8 | 69:23 72:23 | 122:23 123:15 |
| 281:2 305:10 | 21:12,16,23,25 | 73:6,9 75:8,23 | 123:17,19,20 |
| **counsel's** 294:1 | 22:4,21 23:8 | 76:2,18,21 | 123:22,25 |
| **count** 263:23 | 23:17,22 24:1 | 77:9,13,15,23 | 124:8,15 |
| **counterparties** | 24:10 25:5,18 | 78:2,4,8,10,13 | 125:23 126:3,8 |
| 57:17 68:4 | 25:19 26:12,18 | 78:21 79:17,25 | 126:12 127:1,5 |
| 283:16 | 26:23 27:14,22 | 80:4 83:8,11 | 127:10,16 |
| **counterparty** | 28:22 29:10,12 | 83:12,13,19 | 128:1,4,7,14 |
| 94:5 257:5,24 | 30:3,11,22,25 | 85:6,9 86:21 | 128:16,19,22 |
| 258:3 281:11 | 31:18 32:2,8 | 86:23,25 88:6 | 129:1,4,7,14 |
| 286:23 287:7 | 32:12,21 33:1 | 88:10,16 90:13 | 130:13,16,20 |
| 287:14,16,17 | 33:6,10,21 | 90:14 92:8,12 | 130:23 131:2,9 |
| 288:17,25 | 34:12,20 35:2 | 92:14,25 93:4 | 131:23 134:15 |
| 289:2,10,15 | 35:6 36:6 37:5 | 93:10 94:1,6 | 136:22 137:2,8 |
| **counterpoints** | 37:16,18 38:5 | 94:12,24 95:7 | 137:11,21 |
| 237:5 | 38:9 42:14 | 95:11,14 99:24 | 138:9,15 |
| **country** 116:1 | 43:10,11,13,16 | 100:2,9,14,17 | 139:11 140:8 |
| 116:5,5 143:4 | 43:23 44:15,19 | 100:25 101:6 | 140:20,25 |
| 144:15 317:21 | 45:3,16,18,25 | 101:21 102:8 | 141:2,9 143:17 |
| **counts** 104:22 | 46:4,11,23 | 102:11,16,23 | 143:19,24 |
| **couple** 24:11 | 47:4,6,16,20 | 102:25 103:12 | 144:24 145:13 |
| 57:22 86:17 | 48:6,10,12,17 | 104:2,15 105:4 | 145:17,19,23 |
| 231:1 246:22 | 48:25 49:7,22 | 105:20 106:8 | 146:11,14 |
| **coupled** 237:5 | 50:7,11 51:1 | 106:11,19 | 147:9,21 148:3 |
| 291:23 | 51:13 52:8,17 | 107:5,18 108:7 | 150:2 154:8,10 |
| **course** 42:23 | 52:19,22 53:1 | 109:5,17,20 | 154:13,15 |
| 186:12 187:11 | 53:4,7,13,20 | 110:7 112:4,7 | 155:12,16 |
| 199:15 223:14 | 53:22 55:12,17 | 112:10,14,16 | 156:17,20,23 |
| 225:5,13 226:8 | 55:19,24 56:1 | 113:8,14,20,22 | 157:3,5,12,20 |
| 226:15 228:25 | 56:3,8,18 57:2 | 113:3,14,15,21 | 158:24 159:7 |
| 230:2 307:1 | 57:5 58:9 59:1 | 116:4 117:9,12 | 159:12,15 |
| **court** 1:1 2:1 | 60:2,7,11,25 | 118:2,5,11,19 | 160:15,18 |
| 9:2,5,16,22 | 61:7 63:21 | 119:12,14 | 161:7,8,13,17 |
| 10:5 11:21 | 64:7 65:2,6,8 | 119:25 3,5,12,16 | 163:21 164:19 |

| | | | |
|---|---|---|---|
| 164:22 165:3 | 216:6,9,18 | 313:10,22 | **creative** 20:8 |
| 165:20 166:13 | 217:3,14,20 | 314:5,9,12,19 | **credible** 194:2 |
| 166:16,19,24 | 218:6,9,25 | 314:20,22,25 | 194:3 195:21 |
| 167:3,11 168:3 | 219:4,8,13,13 | 315:2 | 259:25 260:7 |
| 168:10,22 | 219:21 220:1,5 | **court's** 9:9 | **credit** 263:12 |
| 169:1 170:11 | 220:8,25 | **courtesy** | 276:3 |
| 170:25 171:18 | 221:19 222:6 | 187:10 | **credited** 199:8 |
| 172:7,9,23 | 222:14 229:14 | **courtroom** | **creditor** 6:23 |
| 173:7,10,15 | 237:24 238:3 | 88:7,11 100:25 | 7:2,5,8,11,14 |
| 174:2,18 175:2 | 240:8,12,15 | 122:13 169:18 | 7:17,20 23:25 |
| 175:5 176:3 | 241:8,11,22 | 169:25 170:1,5 | 48:8,8,9 49:11 |
| 177:3 179:20 | 242:7,20 | 170:8 221:20 | 52:15 56:7 |
| 180:6,12,15 | 243:22 245:21 | 221:23,24 | 57:15 85:4 |
| 182:5 184:6,10 | 246:10,12,15 | 237:24 246:16 | 129:5 135:10 |
| 184:16,19,22 | 246:20,24 | 248:17,21 | 140:6 146:1 |
| 185:1,4,6,17 | 248:17,21 | 252:8,14 | 154:11 159:14 |
| 186:1,3,16 | 252:8,14 | 253:15 254:5,8 | 162:3 174:13 |
| 187:16,25 | 253:15 254:5,8 | 254:12 258:19 | 176:22 183:23 |
| 188:15,21,24 | 254:12 258:19 | 258:21,25 | 188:22 196:22 |
| 189:1,7 190:4 | 258:21,25 | 259:3,6,11,18 | 196:22 199:12 |
| 190:12,19 | 259:3,6,11,18 | 260:12 262:9 | 200:15 201:16 |
| 192:16 193:17 | 260:12 262:9 | 262:14 263:23 | 206:16 222:3 |
| 195:7,9 196:12 | 262:14 263:23 | 264:20 265:22 | 226:1 238:5 |
| 197:6,13 198:9 | 264:20 265:22 | 266:10 267:2,3 | 243:6 246:19 |
| 198:19 199:2 | 266:10 267:2,3 | 267:3 270:12 | 248:20 255:23 |
| 199:16,19,21 | 267:3 270:12 | 270:14,22 | 275:6 297:5 |
| 200:3,6,8,12 | 270:14,22 | 271:1 279:7,18 | 312:9 |
| 200:17,21,24 | 271:1 279:7,18 | 279:21,23,25 | **creditor's** |
| 201:1,4,6,9,12 | 279:21,23,25 | 281:20 242:2 | 130:12 225:17 |
| 201:17,20,24 | 295:25 296:25 | 242:16 243:9 | 237:20 |
| 202:2,5,17,19 | 297:3,6 298:1 | 243:23 244:14 | **creditors** 3:18 |
| 202:25 203:6 | 298:13,16,18 | 244:20,24 | 9:12 11:3,3 |
| 203:14 204:4 | 303:17,19 | 245:3,15,18 | 13:16 14:19 |
| 204:11,17 | 306:4,9 308:16 | 269:16 | 16:3 17:15 |
| 205:2 206:10 | 308:20 310:1,6 | | 18:11 23:5 |
| 206:14,17 | 310:10,23 | | 37:11 40:24 |
| 207:20 212:13 | 311:1 312:7,10 | | 41:6 42:5,21 |

| | | | |
|---|---|---|---|
| 43:7 49:15 | **creditworthy** | **crypto** 11:12 | 95:24 99:7,19 |
| 50:5 54:1,10 | 258:2 | 11:14 13:16 | 143:4 148:15 |
| 55:21 61:25 | **crime** 201:18 | 24:19 26:7 | 148:21 152:9 |
| 62:15,16 63:23 | 201:19 | 58:20 68:13 | 153:20,25 |
| 65:1,4 66:15 | **criminal** 116:6 | 91:3 92:9,10 | 158:20 169:15 |
| 69:6,18 74:12 | **crisis** 253:20 | 92:23 93:4 | 183:16 208:24 |
| 75:4 85:5 | **criteria** 175:9 | 94:16,17 95:1 | 208:25 209:1 |
| 97:25 99:12 | **critical** 112:24 | 95:4 96:12,21 | 211:6 213:1,5 |
| 103:23 104:2,9 | 173:2 264:17 | 100:7 111:10 | 214:3 281:6 |
| 107:21 109:24 | **criticism** | 114:16,19,22 | **culminate** |
| 111:6 112:23 | 236:17 | 120:1,9 131:18 | 227:9 |
| 114:1,9 115:18 | **cross** 8:3 9:20 | 130:18 132:15 | **culminating** |
| 119:23 120:25 | 12:8 17:7 | 139:22 152:15 | 249:18 |
| 125:4 127:9 | 45:15,20 48:19 | 152:23 197:25 | **culmination** |
| 129:10,19,22 | 49:6 50:18 | 198:15 200:1,4 | 227:15 |
| 131:14 133:4 | 66:7 69:25 | 208:17 209:21 | **culpable** |
| 133:17,22,23 | 70:1 88:17 | 213:4 214:9,10 | 307:10 |
| 133:25 135:7 | 90:16 101:1,2 | 214:13,21,24 | **culprits** 307:16 |
| 135:16 139:6,7 | 101:8 112:11 | 215:3,8,14,21 | **cure** 169:12 |
| 142:14 147:4,4 | 112:12,19 | 227:4 232:8 | **curious** 172:19 |
| 147:13,18 | 128:23 129:17 | 243:14 307:4 | 178:13 181:9 |
| 151:15 154:20 | 141:10 154:17 | **cryptocurren...** | 181:12,24,25 |
| 160:2,3 162:2 | 159:17 188:16 | 24:13 26:7 | 189:9 197:3 |
| 163:15 170:22 | 189:2 193:19 | 27:1 31:19 | 245:18 249:12 |
| 171:5,10,14 | 204:19 212:14 | 40:13 58:7 | 312:13 |
| 175:21 176:17 | 212:17 220:16 | 62:19 164:3 | **currency** 92:9 |
| 191:5 194:13 | 220:23 221:4 | 149:22 150:1 | 95:17 96:12 |
| 195:1 212:6 | 221:20,24 | 181:17 | 236:14 |
| 223:8 225:13 | 224:9 238:14 | **cryptocurrency** | **current** 21:13 |
| 225:16 229:2 | 245:25 248:23 | 13:24 14:7 | 21:23 28:20 |
| 247:4 250:14 | 254:13 262:17 | 20:4 41:3,16 | 86:18,19,25 |
| 255:10 266:20 | 279:8,10 280:2 | 41:24 54:18 | 148:11 195:3 |
| 272:17 273:7 | 297:7 311:2 | 55:4 58:1 59:6 | 254:20 281:5 |
| 292:21 305:10 | 312:11 313:14 | 61:20 67:9,24 | **currently** 14:2 |
| 308:12 313:12 | **crypt** 198:14 | 69:10,13 89:8 | 58:22 73:23 |
| **credits** 51:9 | 199:25 | 91:10 92:17 | 88:22 126:13 |
| | | 94:13,14 95:20 | 160:6 168:21 |

173:18 189:21
191:9 267:15
custody 37:21
95:8 160:22,23
160:25 198:20
198:20 199:3,6
204:23
custom 6:3
customer
12:24 14:15,17
21:5 89:16
98:9,19 127:6
130:23 131:8
138:7,7 141:17
142:7,24 146:2
157:13,15,16
197:1,20,21
199:5,9,10
204:23 213:4
214:3,9,10,13
214:21,24,25
215:3,8,21
217:1 225:8
234:12 239:2
251:22 289:22
289:24
customer's
159:4 198:16
198:22 199:8
customers
10:22,23,24
11:16 12:20,21
13:2,5 14:4
15:10 16:5,16
18:16 21:9,12
38:24 39:19
53:24 54:18

57:18 58:20
59:6 62:11
63:3,6,6,16,17
63:19 64:3,23
68:2,10 69:10
69:13,16 75:19
84:22,25 85:2
86:9,10 89:12
89:13 90:2
92:19,20,23
93:2,6,8,17,22
94:18 95:9
99:18 103:2,9
108:8 113:1
114:16,19,21
115:18 127:21
121:21 141:21
142:1,3,16,18
142:22 143:9
143:25 144:7,8
144:10,21,25
145:2,5,7
146:5,9 147:22
148:20 151:12
151:14 152:9
152:18 155:14
155:25 158:15
177:19,22
179:3,9 180:3
193:1 194:10
195:13 197:17
197:22 198:10
198:15,22
215:17 232:22
233:5 251:8
257:6,18 265:2
265:3 266:20

285:22 292:21
302:3 307:19
310:14 311:5
cut 122:12
132:10 161:18
201:4,6,9,12
201:13,17
202:7
cutoff 50:24
cycle 251:21
262:22

**d**

**d** 8:1 9:1 316:1
**d&o** 17:1
229:2 231:10
233:19,24
247:17 248:6
248:11 254:21
272:23 273:7
274:4,15,18
275:2,5,14
282:15 283:1
291:25 292:10
292:14 293:2
295:10,12
**daily** 186:5,8
186:17,23
313:18
**damage** 174:20
181:21
**damaged**
285:19
**damages**
174:13
**dan** 52:14
**daniel** 7:10

**danny** 219:16
**darling** 300:17
**data** 141:13,14
142:7,15,20
153:14 157:19
310:17
**date** 18:22
21:10 23:12
77:10,15,19,25
79:14 99:5
175:25 216:2
264:19 317:25
**dates** 238:17
249:21
**david** 3:15,22
5:21
**day** 41:8 50:4,6
56:13 78:1
80:16,17 92:2
114:6 115:1
181:7 183:14
183:14 186:8:9
186:10,24
187:6,9,22
193:15 195:25
207:6 222:16
245:6 246:3
251:11,14,23
252:4 254:16
263:5 264:10
307:7,7 312:9
314:25
**days** 50:10
79:6,24 116:11
183:4 198:16
205:22 221:11
256:16 257:17

71:3 76:10,12
81:5 84:24
90:21 91:17,18
96:24 102:5
103:23 106:14
106:15 171:11
177:5 206:23
206:25 207:18
208:3,20
215:24 217:21
220:11,13,15
221:1,5,10,14
229:11,22
**declarations**
9:19 49:12
51:2 165:19,25
222:9
**decline** 172:10
**declined**
305:14
**decoration**
70:13
**decrease** 72:5
77:8 81:25
105:6 108:5,20
**decreasing**
82:5
**deemed** 46:12
46:17 220:15
**deep** 70:9
182:11
**deeper** 149:20
**defaulted**
121:4
**defective** 113:3
168:6

**defend** 248:7
**defendant** 1:14
**defendants**
1:23
**defending**
283:4
**defense** 231:16
272:18
**defer** 84:7
218:4 313:1
**deficient** 167:9
167:11,12
169:12 285:13
299:5
**definitely**
41:18 211:9
222:9
**definitively**
264:8
**deflect** 306:25
**defrauded**
195:13 260:3
267:7 286:15
299:18,18
**degradation**
36:4
**degree** 140:14
289:6
**delaware**
157:18 213:15
213:16
**delay** 9:2 139:5
139:5
**delegate**
268:10
**delegated**
268:14

**delegation**
116:23
**deliberative**
25:1,5,23
26:18 30:18
**delivered**
243:15
**delta** 80:24
82:5
**demonstrated**
171:10
**demonstrates**
53:23,25 54:1
77:3
**denied** 316:5
**denies** 84:12
**deny** 10:16
29:14,15 84:5
295:13
**department**
5:1,16,17 6:1
44:2 88:14
111:19,25
**depending**
104:13 196:24
254:20
**depends** 80:8
96:14 254:18
**deplete** 274:16
274:23
**depleted**
274:21 283:4
**depleting**
248:6
**deposed**
230:23 312:17

**deposit** 99:19
116:17,19
**depositions**
232:6
**deposits**
285:22
**depreciation**
76:14
**dept** 5:10
**depth** 67:8
70:12,16 71:7
73:4,12 74:9
74:24 81:11
96:16,19,22
97:4,19 236:17
**derivatives**
72:7,8
**describe** 54:4
57:5 58:6 59:1
61:7 63:21
64:7 67:5,25
68:18 69:8
222:13 231:2
247:15 255:14
307:24
**described**
59:19,20 74:15
153:19 154:5
235:2,5 299:23
299:25 301:23
301:25
**describing**
41:15,22
**deserve** 119:23
**designated**
92:18

258:15 264:12
271:18 295:21
**dba** 213:13,19
213:22
**dc** 4:21
**de** 3:2 96:1
**deadlines**
50:11
**deal** 10:3 30:1
35:17,19 36:10
36:16 37:6
68:9 76:22
77:9,18 84:19
84:21 88:10
92:17 94:13
96:11 98:7,12
108:9 109:23
112:21 113:2
113:10 116:14
117:3,13 119:5
119:6 122:24
124:6,16
125:25 126:4
132:21 133:8
134:4,8,10,21
134:21 138:10
138:11 140:12
160:1 183:13
197:24 202:21
203:3,13,18
205:10,10,19
206:3,20,23
207:1,14,22
210:8 211:12
214:17,17,21
215:8,9,25
216:3 237:12

243:12 277:17
278:25 309:3
309:10,10,11
309:14,15
**dealing** 10:12
119:25 120:1
124:1,18 174:8
236:11
**deals** 23:15
51:25
**debated** 242:8
**debtor** 1:8 17:2
22:23,24 26:20
26:23 28:1,2,3
28:4,7,11,25
30:8 31:5,11
31:22 32:5,9
34:6,18,21,21
35:13,21 36:24
37:16,18 38:18
39:13,13,14
41:18 44:3,25
48:15 56:22
91:4 94:12
98:6,8 177:5
226:12 232:22
234:19 240:22
241:23 281:13
287:5
**debtor's** 14:22
166:19 208:24
209:1 212:7
241:2
**debtors** 3:5 4:4
9:4 11:14
12:19,23 13:7
13:13,15,18,21

13:24 14:1,3,7
14:9,11,12,17
14:23,24 15:5
16:7,12,13,17
16:19,22 17:2
17:12,13 20:23
27:20 28:14,14
32:17,21 33:3
33:9 35:16
36:11 38:2
39:4,18,19
40:14,16 41:7
45:6 48:14
49:2 50:3
53:14,15 54:23
57:19 58:14
59:13,17 60:15
62:19 65:25
72:12 74:20
75:15,21 86:18
86:25 90:25
91:12,19 92:17
93:4,7,11,14
96:8 101:14
102:3 127:22
150:3 159:2
198:2 208:23
216:7 217:24
218:17 219:24
231:14 267:11
280:18 281:5
284:6,14,15
285:4 286:23
287:2 314:2
**decade** 222:22
**december**

207:8,9
**deception**
64:21
**decide** 58:23
293:11
**decided** 26:16
84:5 124:19
259:8 281:18
289:1,5,5
299:13
**decider** 307:12
**decides** 192:23
**deciding** 193:3
282:3
**decision**
127:12 192:21
270:25 273:16
273:19 274:7
283:21 288:4,9
288:24 289:3
307:17 308:14
**decisions**
124:24 236:9
237:2 283:22
288:21
**declarant**
45:20 48:19
**declaration**
38:1 41:8,22
45:11,12,14,16
45:19,21,23
46:4 47:23
48:18,22 49:3
49:8 50:10,12
50:14,17 51:15
51:22,25 52:8
61:10 70:21

**designations**
92:19
**designed** 14:14
23:2,4 151:15
**desire** 221:25
**desires** 221:3
**desousa** 1:13
**despite** 234:17
234:22 235:7
**detail** 55:3
140:10 236:18
**detailed** 11:11
204:21
**details** 249:11
**deter** 195:2
**determinations**
34:19
**determine**
14:25 191:11
215:11 225:4
265:16
**determined**
13:19 22:16
30:17 31:24
76:22 77:18
225:15
**determines**
265:13,19
**determining**
42:18 109:23
228:17
**developed** 64:9
**developers**
138:18 139:2
**developing**
58:8

**dgb** 185:15
**dichotomy**
263:8
**difference**
62:20 71:22,24
71:25 81:13
137:11 146:7
168:12 173:11
195:22 214:8
265:11 277:10
**different** 18:3
18:19 21:17
26:9 34:20
71:22 72:25
102:2 103:10
117:10 119:25
120:1 138:8
140:16 149:3
156:20 158:17
165:14 166:25
167:7 173:21
188:6 210:19
211:1 232:3
242:4 247:23
248:14 254:20
283:22 298:4,4
299:18 305:21
311:19
**differentiate**
162:12
**differentiator**
182:17
**differently**
217:10
**differs** 119:22
**difficult** 182:20

**difficulties**
315:3
**digest** 49:18
50:5 51:5,8
**digital** 1:7,10
1:19,22 3:2,9
16:24 178:21
218:18,21
223:18 224:2
239:13
**diligence** 41:8
41:9,10 55:1
141:12,15,24
162:21 163:1
163:16 164:10
164:17 165:13
165:15 166:8
166:20,23
183:21 194:1,9
194:12 195:2
195:12,19,23
195:23 196:4,4
205:9,11,20
210:21 211:22
211:20,22
213:17,22
216:2 217:22
217:24 236:8
239:11
**diligenced**
257:21,23
282:2 283:11
283:23,25,25
284:3,3,7,12
285:3,5 297:12
297:13,16,22
299:15,17,21
300:14,20,21
300:22 301:1,3

301:17,17,21
301:22,23,25
**diligently**
57:11,13,14
**diligencing**
54:21 57:10
**dilute** 102:14
**diminished**
148:16
**diminution**
82:20
**direct** 8:3 53:9
65:24 88:22
89:3 302:10
220:11,14,15
220:17 221:7
221:17 241:24
243:3 250:5
309:18
**directed** 53:20
**direction**
216:22
**directly** 68:10
75:19 106:16
125:17 131:16
132:10 177:22
185:16 251:13
**director** 16:11
16:18,23 17:4
223:1,6,7,10
223:21 228:20
233:6 242:5,9
252:10 256:7
268:9 271:24
278:19 282:15
283:3 290:1,7

**[director's - distribution]**  Page 29

director's 292:3
directors 3:5
3:13 218:18,20
224:16 246:11
255:2,4 256:3
264:24 265:1
274:10,21
275:1 276:8
277:4 283:17
284:14 285:4
289:23 296:17
diresta 7:4
128:24 129:2,2
129:5,8,15,18
130:15,21
131:3,12 132:1
135:12,13
136:23 137:7
138:16 139:17
140:3 310:24
310:25 311:3
312:6
disadvantage 51:9
disagree 10:10
50:19 56:11,24
66:3,7 85:15
100:3
disagreeing 65:17
disagreement 171:8
disagrees 56:22
disappointing 40:9

disclose 26:18
27:20 312:16
312:17
disclosed 30:15
107:22 108:6
112:24 305:12
305:14,17
disclosing 39:16
disclosure 8:21
8:23 11:12
12:6 15:22
26:21 28:20,21
28:22 29:13,23
29:24 35:24
36:6,7 37:20
38:10 39:8,10
39:12 40:12,23
40:24 41:4,12
42:2,4,7,8 50:3
60:12 78:14,18
78:19 103:13
103:20 104:4,6
104:8,14,23
105:2,11,15
106:10 107:21
107:24 108:23
109:7,13 131:4
158:24 230:19
312:18
disclosures
39:18 101:25
158:24
disconnected
254:10 262:20
discount 62:8
82:15 183:25

discounts 97:3
discovery
15:23 140:7
226:10
discrepancy 144:9
discrete 189:24
discuss 44:12
44:24 107:1
199:15
discussed
50:25 83:1
104:10 132:3
165:14 182:7
184:2 217:14
227:14
discussing 268:17
discussion 33:8
83:8 137:20
218:2 261:9
discussions
20:6,14 44:6
98:1 164:11
169:22
dishonesty
174:24 175:22
175:24 265:14
265:20
disparity 267:11
dispose 268:7
disposition 43:2
dispute 51:23
59:25 75:14
110:9

disputed 51:19
52:6
disputes 23:6
disruptive
149:6 150:22
150:24 152:3
distance 276:16
distanced 276:20
distress 257:3
distressed
222:25 223:2
255:5
distribute 13:8
13:16 59:5
64:2 68:14
95:8 126:16
148:10 155:6
155:14 177:16
187:10 208:15
313:18,21
distributed
12:18 19:1
40:13 92:19,20
126:18 136:10
186:12 198:1,5
distributing
14:4 72:2
75:18 191:17
distribution
20:25 21:6,7
21:20 63:13
68:11 94:18
95:4,5 103:21
111:6 132:17
132:23 136:17

**[due - employees]**  Page 31

217:24 257:21
257:23 283:11
284:7,12 285:2
285:5 297:11
297:12,16,22
299:15,17,21
300:14,22
dug 211:23
dump 181:6
dunk 223:13
308:3,3,4
duties 223:14
254:3 285:20
duty 228:4
236:17,23
253:19 260:24
266:8 282:7
284:13 299:12
dyslexic 306:10
**e**
e 2:21,21,22
4:1,1 8:1 9:1,1
316:1 317:1
earlier 31:4
58:9 74:15
83:8 133:15
136:16 137:20
149:19 170:5
171:20 178:3
178:16 186:13
202:20 203:1
203:12 205:21
208:14 211:15
216:12 247:1
252:11 279:13
288:12 303:25
304:4

early 13:8
227:13,17
earned 128:15
easier 45:8
72:2 182:19
231:22 232:1
easily 81:10
191:11
east 4:13
easy 64:14
229:20
eats 248:7
echelon 278:7
ecro 2:25
effect 42:11
47:19 48:1
60:18 73:5
90:2,3 103:21
113:3 160:21
188:8 190:1
199:7
effective 18:22
146:18,19
181:25
effectively 54:7
63:6,25 99:7
177:9
effects 182:6
effectuate
14:16 20:5
135:25
effectuated
151:7
efficient 14:5
14:20 23:4
156:5

effort 139:16
193:11
efforts 165:13
ehrlich 228:5
229:10,24
230:25 235:24
238:10,11
240:17 244:7
245:6 250:4,10
251:19 260:14
267:20 268:10
269:10,23
270:15,19
272:6 273:23
277:21 280:21
282:17 289:5
290:16 302:6
302:25 303:6
305:12 307:12
308:21 309:16
312:20 313:15
ehrlich's
244:12 302:5
302:12 303:20
306:7 307:16
eight 15:10
91:22 271:25
either 16:3
17:18 18:6
24:15 27:15,23
66:7 67:6 68:9
93:25 233:5
240:4 244:5
258:21 266:12
283:1 289:12
304:15 311:15

elaborate
45:22 46:2
99:4
elapsed 41:19
elect 127:5
132:2,6 142:3
144:14 146:9
146:13 196:25
310:13
elected 47:9
elects 111:9
144:17
element 173:2
289:11
elements
230:24
eliciting 193:21
eligible 42:21
eliminate
192:2
ellis 4:3 9:4
45:6 57:12
223:4 227:7
268:21 277:2
else's 38:16
202:8
email 112:25
emanuel 6:8
218:16 219:23
222:8 223:9
249:1
emery 6:15
57:16 245:23
employees 13:4
67:18,20 68:19
68:21 99:9

**[distribution - due]**  Page 30

136:18 137:16
137:24 138:1
139:6 145:8,12
146:6,8,23,25
151:17 152:4
179:9,25
192:18 198:6
210:10,17
211:19 251:7
distributions
14:15 16:16
19:19,25 20:2
21:12 23:5,15
31:21 32:3,18
43:7 61:18
63:5,16,22
64:15 71:4
73:5 75:19
93:6,11,13,20
93:22 97:25
98:3,8,10,17
98:19,21,24
99:12,14,17
111:8 137:12
138:10 179:2,3
180:10 197:17
197:23 208:23
district 1:2
dividend 243:1
divita 7:1
141:3,5,6,11
143:18 144:5
145:1,15,18,22
145:24,25
146:12,16
147:10,11
148:1,6 150:8

279:19,19,22
279:22,23,24
280:1,3 296:1
296:4,24
docket 8:22,23
45:7,9,13,13
48:13 49:4,4,5
158:5 220:12
220:19 227:20
227:25 305:11
306:6
dockets 78:20
document
50:15
documentation
49:18 50:25
125:13 166:6
169:21 170:7
177:21
documented
57:21 115:13
124:25
documents
49:13 103:1
142:9 203:15
211:25 213:20
226:15 250:24
294:22 300:10
300:12
dog 121:21
doing 25:16
28:7 30:5,6
39:19 41:23
46:3 47:10
52:16 54:7
68:7 69:17
82:16 83:10

85:16 86:11
94:8 107:11
115:11 123:7,7
123:8,11 126:5
135:9 137:19
138:22,23
142:4 144:7
149:7 162:21
165:15 173:12
180:24 181:14
183:4 187:6,11
191:25 198:24
205:11 215:12
222:24 226:13
237:1 249:18
253:3 255:16
256:3 258:10
264:22 271:16
276:10 278:25
291:15 293:16
299:15 300:13
300:18
dollar 21:13
91:13 168:18
210:1,6 242:13
244:1 272:15
272:15,25,25
275:9,9,18,18
275:23,23,24
275:25 286:11
dollars 55:23
133:2 173:6
180:19,21
186:11 234:16
211:22 217:22

272:21 291:11
299:1
domicile
162:19,25
163:13,25
double 21:8
131:7
doubt 266:17
275:11 279:12
doubts 171:6
downfall 302:2
downside
69:20
dozen 184:4
288:13
draft 227:14
drawn 214:16
drill 147:19
drive 183:6
driven 152:10
drop 102:1
104:13
dropped 306:2
drops 134:1,2
262:13
druid 313:7
due 41:7,9,10
141:12,14,24
152:23 162:21
163:16 164:1
165:13,15
166:8,20,23
194:1 195:12
195:19 205:9
205:11 210:21
211:22 217:22

**[employees - event]**  Page 32

214:2,5 217:4
217:6 226:19
273:17 311:5
313:5
enable 14:6
endeavoring
16:15
ended 162:9
199:4
ends 242:18
endure 241:14
engaged 33:14
33:21
engagements
223:11
english 273:9
enjoining 3:4
ensure 300:5
enter 281:18
288:24 294:1
entered 48:22
78:24 197:15
260:1 281:19
301:4
entering
282:17 288:2
enters 25:17
entire 50:2
64:1 87:20
151:3 181:6
239:10 302:2
entirely 52:5
entities 15:19
18:2,7 30:15
30:21 62:13,13
67:11 164:7,9
217:9

entitled 18:21
18:22 20:24
273:5
enumerated
33:21
environment
83:17 162:13
equal 16:7 63:7
138:6
equaled 294:4
equally 73:14
73:15 76:25
77:7 148:20
156:16
equated 133:3
equipped
177:6
equity 1:18 3:8
3:20 15:9
239:1,17 240:1
240:7 242:16
242:24 243:5
245:7
equivalent
135:17 209:1
234:25 235:14
235:25 237:11
237:17 253:19
254:2 255:17
260:18 264:22
265:5,10 267:6
273:6 274:2,5
274:9,12
282:14,14,23
284:8,15
289:11,16,21
289:22 290:24
296:22 304:13

187:1 209:24
248:25 291:23
293:2
essence 229:22
essentially 10:7
27:18 29:15,17
41:4 60:14
61:11 136:17
210:10 231:18
232:8 233:16
244:19
established
93:12
establishing
175:23
estate 11:19
16:2 19:1 58:3
87:20,22 88:3
100:11 134:20
196:22 219:3
225:6,9 228:1

308:8,12
estate's 231:5
246:5
estates 14:12
14:22 15:6
242:17,18
estimate 95:23
estimated
11:11,16
101:16 206:19
206:22
estimates 84:9
1:12 3:9
42:16 153:13
196:17
eth 70:9,17
182:18 183:11
ethereum
91:23 96:10,22
181:12,25
256:20
ethical 255:22
255:24
evaluate 13:14
41:13 61:8,12
265:10
evaluated
61:24 160:4
252:17 266:19
evaluating
267:6 286:5,6
evan 307:16
eve 234:24
264:10
evening 314:7
event 14:12
60:16 126:14

---

**[event - execution]**  Page 33

264:1 308:21
events 249:4
249:12,18
265:8 286:20
eventually
261:11
everybody
21:16,17 25:10
116:6 120:9
139:4 156:5
193:8 249:7
257:5 260:7
261:4 270:13
288:14,14
315:5
everybody's
152:14 249:9
evidence 9:15
9:18,23,24
10:1 15:18,23
15:25 16:22
17:7 23:19
31:8 38:3,5,18
39:7 43:17
45:14,20 48:18
48:20,23 49:8
51:18 52:20
56:10,19,24
60:20 65:20,24
66:6,8 78:15
78:21,22,24
85:12,13 90:22
109:5,9,15
110:6 112:3
118:1 123:9
127:20 128:1,5
128:11 139:21
166:12 170:24
175:5 193:22
196:11 205:1
221:2,5 229:11
313:24 314:22
evidentiary
43:19 56:9,21
229:17
evolving 58:7
83:17 263:15
exact 26:6
96:25 147:1
151:8 238:17
252:3,14
264:19 302:20
exactly 19:21
24:15 31:8
32:12 33:1
41:22 131:21
139:8 147:10
149:23 162:11
190:5,14 192:3
232:4 258:21
280:5 290:19
299:24
examination
48:19 49:6
50:18 53:9
65:24 66:8
70:1 88:17
90:16 101:8
112:19 129:17
141:10 154:17
159:17 189:2
193:19 204:19
212:17 220:16
220:23 221:7
238:14 245:25
248:23 254:13
262:17 279:10
280:2 297:7
311:2 312:11
313:14
examine 45:15
45:20 69:25
101:1,2 112:11
188:16 212:14
221:4,20,24
259:11 279:8
examiner's
39:24
examining
281:22 290:10
example 67:17
68:17 70:9,18
91:6 146:21
182:23 183:10
185:13,13,14
185:14,15
193:5 267:8
287:22 289:14
290:16
examples
182:12,22
185:11,15
exceeds 309:17
excellent 257:4
except 36:3
38:15
excess 90:25
97:12
exchange 4:11
4:12,18,19
21:4 24:8 26:8
32:16 34:1,10
51:6 70:4 79:1
111:10 114:21
138:4 178:14
178:19,22
179:1,7,8,10
194:7,8 232:8
234:1 235:14
314:14
exchanges
138:4,5 178:15
194:5
excluded
201:21 202:3
234:12 295:22
exclusions
234:13
exclusive 249:6
272:17
exclusively
249:3
exclusivity
17:13
excuse 29:25
38:15 49:24
98:4 171:17
206:22 306:9
excused 218:10
314:6
execute 59:5
89:6
executed 17:18
240:25 310:2
executing 67:6
execution
151:25

---

**[facilitate - figure]**  Page 35

facilitate 63:22
67:12
facilitating
95:5
facility 101:12
102:4,24
103:17 108:15
263:12
fact 24:20
30:19 41:9
46:18,19 56:11
66:12 110:21
112:5 119:23
125:11,18
149:19 201:24
203:23 205:18
226:25 228:20
237:5 249:17
257:9 259:21
259:25 260:8,9
267:6 277:19
297:23 306:14
308:1 312:2
314:2
factor 151:21
299:7
factored 30:8
factors 62:9
facts 26:11
27:11 34:16
56:16 66:11,17
66:21 110:16
112:3 114:12
117:25 125:9,9
125:13 166:11
167:6 170:24
196:11 204:25
236:20,20
252:11 263:8
282:22 289:19
289:20 292:18
292:19 294:11
factual 27:6
280:10
factually 280:9
failed 174:14
failure 174:17
fair 46:22
47:10 57:21
107:23 115:12
125:1 191:13
276:19 291:22
309:3
fairly 171:20
faith 166:21
17:14 44:6
116:17,19
254:1 263:17
276:2
fall 31:25
125:24 175:12
222:23 227:13
falling 161:3
239:21
false 134:16
250:15 252:5
252:24 253:6,7
253:10,11
262:24,25
263:3,4 266:1
familiar 34:2
72:11,13 82:19
227:23 238:18
family 244:22
244:25
far 83:9 126:17
127:12 188:10
191:6 217:13
fashion 68:6
82:16,18 83:14
193:4 273:13
fast 114:19
261:6
faster 135:16
fastest 14:4
faults 265:19
favor 11:10
42:6,18 46:5,9
69:16 85:21
86:9 104:12
108:9,17
127:13 128:10
143:2,11 207:4
267:11 310:2
favorable
278:15,16
292:12
feasibility
16:14 29:14
31:12 35:9,9
35:21 36:2
37:8,13 53:21
94:23
feasible 16:9
31:7,17
feature 35:15
36:20 37:3,5
75:8
february 11:15
109:11 139:3
185:18 188:3
247:6 263:18
291:7 292:4
federal 24:24
25:2
fee 14:11 201:8
255:8
feel 65:3
170:20 194:9
194:17 205:20
210:24 252:11
263:19
feeling 38:17
fees 87:14,18
87:21 95:19
96:1 116:25
117:1 134:19
241:10 275:22
fell 119:11
232:12 254:6
254:23 277:17
ferry 4:13
fair 92:9 95:17
96:12 119:25
168:19
fiduciary
225:25 228:4
253:19 254:2
266:8 282:7,10
285:20
fifteen 234:16
fifty 251:12
fight 223:19
248:13
figure 40:8
77:17 96:6

---

**[executive - face]**  Page 34

executive
251:19
executives
236:12 239:25
243:24 244:3
249:13 250:16
251:11 264:7
273:17
exemption
32:24
exemptions
308:16
exercise 16:8
94:3 150:11
188:7 225:20
243:11
exercising
243:16
exhausted
140:22
exhibit 45:7,12
49:3 78:17,17
220:10
exhibits 8:20
31:10 45:9
78:24
exist 154:1
216:20
exit 13:7
exorbitant
116:24
expand 176:23
expanding
272:8
expect 17:6
27:24,25 28:9
expectations
199:11
expected 70:23
284:1,4
expedient
146:8
expedite 54:17
expedited
147:5,18
expedites
147:14
expeditious
14:17
expended
163:16
expense 94:20
expenses 14:9
134:19,23
135:4,5 274:23
expensive
256:5 275:15
experience
15:17 100:20
142:2,23
222:14 234:23
275:13,19
281:6 286:10
experienced
52:4
expert 34:6
69:1 72:7
106:3 110:25
111:3 142:20
158:14 162:22
275:14 280:9
281:2
expertise 162:8
280:23
experts 34:7
67:11 68:22
135:23
explain 27:20
46:3 76:18,21
99:3 101:22
103:10 104:21
122:2 123:18
126:2 137:8
140:9,17,22
143:20 264:21
explained 43:1
explaining
269:14
explicitly
141:22 175:21
exposed 279:4
exposure
210:24 222:10
231:8 242:22
303:2
expound 33:17
express 266:25
expressed 13:2
13:18 151:14
extend 3:2 36:1
69:12 159:21
extending
147:3
extensive 61:10
171:20 172:14
extensively
57:11 225:14
extent 9:25
18:9,14 19:23
19:24 34:21
36:3 51:21,24
52:10 58:16
73:9 74:11
77:1,4,5 80:7
81:8,16 82:17
87:10 89:25
92:2 96:20
110:21 111:9
111:21 114:14
117:7 123:9
126:16 127:18
135:24 138:6
144:16 158:4
160:23 169:11
171:5,8,11
180:23 191:21
192:14 194:17
196:14,23

**f**

f 2:21 4:20
317:1
face 51:17
85:25 141:22
142:17 143:5
151:25 154:4
188:5 285:16

---

**[figuring - focus]**  Page 36

figuring
264:22
file 48:12 50:9
64:25 110:8
111:18 166:5
filed 9:12,19
17:25 18:13
23:11 41:8,20
41:25 45:6
51:2,3 52:19
65:5 72:12
114:24 116:11
130:12 170:7
220:10 221:10
227:20,22
239:16 242:11
243:18 259:23
260:2 261:9
305:11
files 25:17
127:3 185:3
filing 21:10
169:20 230:1,1
233:11,17,18
234:24 238:22
247:3 249:24
250:3 254:16
264:8,10,11,12
272:5,16 275:7
287:4 288:1
296:8 306:6
filings 49:20
170:13
fin 239:7
final 41:21
270:17
finalized
227:17
finally 41:20
finance 147:23
309:14,15,21
309:25 310:14
finances 37:21
213:23
financial 5:16
16:11 35:13
49:2 53:15,16
64:22 88:15
159:24 167:19
167:21,22
168:9 213:18
213:24 226:21
228:18 229:6
230:19 232:6
237:10 241:13
248:15 256:10
256:12 257:3
266:2,17,21
267:8 278:9
280:5,7,12,14
280:18,19,21
280:23 281:1,5
281:9,11,12,20
286:23 287:6
289:10,15
290:17 298:21
298:22 300:24
financially
232:11 276:17
financials
134:14 137:17
141:4,12 143:3
150:16 158:20
74:13 107:12
116:13 164:15
168:5 185:3
194:1 236:14
236:15,22,24
274:6,8 277:11
277:11 282:9
286:19 301:2
finding 30:1
findings
220:22 228:8
278:16
finds 36:24
fine 116:10,10
135:11 154:7
165:3 175:1
fines 169:14
finish 120:5
173:15 191:17
218:13 253:14
253:15 298:19
300:2
finished 65:24
66:1,24 122:15
fire 271:17
277:16,16,23
fireworks
284:24
firm 223:9
227:14 277:6
firms 277:3
first 10:3 45:10
50:2 53:20
65:5 88:11
159:22 167:4
179:21 204:8
210:20 220:25
225:14 226:8
228:9 229:20
238:4 240:15
242:21 243:6
249:22 271:7
280:4
fit 110:4 188:7
five 13:9 85:3
93:24 116:11
185:2,4,10
198:16 291:10
fixated 174:6
fixed 77:23
78:8 79:6,13
79:24
flag 251:3
275:25 288:8
295:18
flagged 294:20
flagging 251:4
flags 236:15
flaw 144:20
flood 153:8
191:3
flooded 50:21
flooding 153:3
153:6 154:3
floor 5:18
47:21
florida 313:5
flow 61:25
focus 122:3
123:7 249:3,6
249:10 279:14

## [focused - ftx]   Page 37

| | | | |
|---|---|---|---|
| focused 121:25 | 227:21,23 | four 9:18 35:17 | 97:1,6 119:20 |
| 308:22 | 240:25 244:3 | 57:13 73:16 | 120:6,19 |
| folks 53:13 | 273:13 277:18 | 106:20,25 | 121:25 122:18 |
| follow 20:15 | formally 90:11 | 156:14 161:7 | 125:25 128:8 |
| 45:8 76:16 | format 135:22 | 228:19 276:21 | 147:2 173:19 |
| 82:11 105:23 | formerly 74:18 | fourth 284:24 | 174:18,21 |
| 123:17,19,22 | formulate | fps 113:25 | 175:6,20 176:1 |
| 138:17 143:23 | 49:19 128:7 | francine 245:6 | 182:25 184:13 |
| 149:23 168:1,3 | forth 13:19 | frankly 308:13 | 265:23,25 |
| 168:10,11 | 15:18,23 16:17 | fraud 13:13 | froze 256:17 |
| 172:2 174:14 | 42:3 81:23 | 114:6 175:22 | 256:22 |
| 174:17 247:12 | fortunate | 175:24 195:13 | frustrating |
| followed 9:12 | 195:16 | 201:19 203:20 | 162:5 |
| 35:12 37:14 | fortunately | 240:24 253:1 | frustration |
| 59:12 238:9 | 309:8 | 265:14 | 13:2 |
| 242:8 | forum 120:9 | fraudulent | ftc 15:9 |
| following | forward 13:20 | 194:3 235:12 | fti 57:13 133:1 |
| 14:21 39:22 | 14:6 22:14,20 | 273:3 294:17 | 133:14 |
| 83:12 123:23 | 23:11 39:20 | fraught 64:5 | ftx 11:20,21,23 |
| 261:25 281:13 | 57:6 58:3 | free 265:24 | 13:12 17:25 |
| 284:16 286:3 | 89:11 181:9 | 290:4 | 23:10 39:23 |
| 286:25 | 274:20 | freeze 256:23 | 47:17 55:18,22 |
| footing 63:7 | found 34:1,9 | freres 222:21 | 62:18 64:20 |
| 138:6 | 102:19 103:5 | friction 95:23 | 72:12 73:1,13 |
| footnote 32:12 | 167:13 251:11 | 96:16 | 75:10 79:22 |
| forbes 116:16 | 282:11 294:15 | friends 244:23 | 92:6 94:2 |
| 204:22 205:2,5 | 301:16,16 | 244:25 | 95:16 96:11 |
| foregoing | foundation | frivolous | 112:21 113:10 |
| 317:3 | 160:13 243:24 | 228:11 232:4 | 114:4,8 116:14 |
| foregone | 243:25 244:4,8 | 274:22 282:21 | 117:14,15 |
| 264:13 | 263:21 | frizzley 224:3,4 | 118:13,13 |
| forfeited | founder 251:20 | 227:1,6 251:1 | 119:4,11 |
| 201:22 | founders | 267:19 268:20 | 120:21 124:4,5 |
| forgive 178:19 | 249:15,23 | front 13:25 | 124:16 125:3 |
| 272:12 | 250:6 263:6 | 86:22 87:16 | 126:4 127:25 |
| form 21:17 | 300:7 | 91:14,24 92:3 | 132:21,21 |
| 50:6 85:13 | | 92:12 94:19 | 133:2,6 152:7 |

## [gleaned - good]   Page 39

| | | | |
|---|---|---|---|
| gleaned 154:23 | 179:8,12 | 42:3,5 47:14 | 243:16 244:10 |
| glib 287:11 | 184:19 192:24 | 57:6 58:11 | 247:22 252:6 |
| global 162:15 | 192:25 194:25 | 59:16 70:21 | 253:23 258:1 |
| 162:19 163:12 | 196:9 204:11 | 71:15 76:25 | 258:13 270:4 |
| 164:3,12 165:9 | 206:20 207:2 | 77:6,16 81:9 | 273:1 274:20 |
| 165:12 168:19 | 207:15 208:4 | 81:18 82:19 | 275:5 276:12 |
| 181:10,13,16 | 214:21,24 | 85:1 86:15 | 277:22 282:24 |
| 181:22 182:24 | 215:14 219:11 | 92:6 94:9 | 285:7 289:1 |
| 213:9 214:2 | 219:14,16,17 | 95:17 96:12,21 | 292:25 294:24 |
| glove 225:19 | 231:23 248:21 | 101:10,23 | 294:25 302:3 |
| go 17:11 24:1,4 | 255:15 256:11 | 103:11 104:13 | 303:12 307:20 |
| 24:20 36:1 | 258:19 259:9 | 109:2 115:1 | 309:7 311:6 |
| 39:20 43:18 | 261:10 270:2,3 | 116:24 117:2 | golf 278:24 |
| 47:18,25 52:1 | 279:25 291:24 | 126:20 127:20 | good 9:3,5 |
| 53:8 55:2,22 | 294:12,16,24 | 127:22 129:25 | 16:21 17:14 |
| 56:25 58:3,18 | 295:6 301:13 | 130:3,13 | 24:6,10 32:15 |
| 60:25 84:4 | 304:6 | 132:24 133:17 | 44:6 45:5 |
| 62:21 88:12 | goal 80:6,23 | 133:17,22 | 48:25 53:11,12 |
| 89:11 90:14 | 257:15 308:7,7 | 135:14,22 | 55:3 64:12 |
| 98:7,9,12 | goat 52:24 | 136:13 139:23 | 69:6 70:3 |
| 100:4,17 | 220:3 270:23 | 139:23,25 | 84:19 88:20,21 |
| 105:20 110:24 | 271:2 | 148:16 149:5 | 101:3,10 |
| 112:16,22 | goes 37:1 73:4 | 156:4,7,14 | 116:17,19 |
| 113:14,14,21 | 87:19 119:18 | 157:25 158:12 | 129:9 141:3,5 |
| 115:22 116:14 | 127:3,6 133:24 | 160:21 161:1 | 142:2 161:8,23 |
| 117:6 124:6,6 | 134:2 146:18 | 167:18 168:25 | 189:13 194:20 |
| 124:8 126:14 | 196:8,15,18 | 169:12 172:6 | 212:19 218:15 |
| 127:22 131:18 | 197:5,10 | 176:18 181:8 | 236:13,20 |
| 131:18 132:7 | 215:17 293:15 | 192:7 197:21 | 237:17,19 |
| 133:21,22,23 | going 9:24 | 197:22 201:20 | 250:2 251:21 |
| 134:23 135:11 | 15:18 19:3,9 | 210:15,16 | 255:20,21 |
| 142:3 144:17 | 20:8 22:14,20 | 211:11,15 | 262:22 263:17 |
| 144:19 146:9 | 22:25 23:10 | 215:9 219:1,6 | 271:5 274:25 |
| 146:13 147:22 | 24:22 25:21 | 223:22 225:17 | 275:3 279:7 |
| 149:17,18 | 26:4 28:5 30:7 | 231:20 237:1,8 | 285:2,10 |
| 159:15 171:18 | 30:11 36:8 | 239:5 240:3,3 | 288:10 290:21 |
| 172:9 177:7,15 | 38:2 39:3,3,24 | 240:5 243:13 | 291:1,8,9,12 |

## [ftx - glad]   Page 38

| | | | |
|---|---|---|---|
| 171:22 172:4 | 162:9 163:16 | 73:12,15,22 | gist 250:20 |
| 172:12,16,25 | 164:2,18 165:9 | 103:15 133:10 | give 18:23 |
| 174:3 175:11 | 165:11 180:23 | 136:3 139:15 | 28:12 52:3,6 |
| 176:7 194:2,2 | 197:4,11,12 | 166:14 283:12 | 52:23 111:14 |
| 195:4,12,12,19 | 210:11 211:16 | 288:7 | 119:16 121:2 |
| 195:25 196:1 | 230:6 | general's 43:21 | 121:17,20,20 |
| 202:21,22 | fungible 87:19 | 43:25 166:4 | 121:21 122:19 |
| 203:3,3,11,13 | 87:22 88:1 | 170:6 | 136:21 139:19 |
| 203:14,15,18 | 133:20 135:5 | generally | 162:19 182:22 |
| 203:21 204:6,7 | further 35:13 | 40:23 54:4 | 207:19 208:19 |
| 204:8,13,13 | 37:14 40:18 | 72:8 135:19 | 215:7 220:2 |
| 205:8,10,24 | 43:12,18 51:18 | 142:4,12 | 227:19 220:7 |
| 206:1,4 214:17 | 59:12,17 | generals | 238:16 241:1 |
| 215:8,9 259:10 | 100:23 106:24 | 169:19 | 247:5 252:20 |
| 259:24 260:3 | 106:24 139:5 | generically | 254:1 256:23 |
| 261:7,12,16,17 | 147:19 221:17 | 285:9 | 257:16 260:23 |
| 261:18,23 | 237:22 246:9 | gentleman | 266:3 276:7 |
| 262:1 | 248:16 | 191:3 | 282:6 284:13 |
| ftx's 13:9,11 | furthermore | genuine 236:12 | 291:20 309:7 |
| 72:15 | 81:9 99:8 | 270:24 309:7 | 315:6 |
| full 12:13 | 136:3 142:20 | 309:16,24 | given 1:18 3:8 |
| 26:21 53:1 | 212:5 | 315:4 | 15:9 16:11 |
| 75:10 177:20 | future 31:14 | given 18:25 | 53:16 240:5 |
| 196:20 220:5 | 31:15 | 36:12 72:5 | 288:14,22 |
| 268:21 | | 94:10 101:25 | 289:1,4 299:2 |
| fully 40:25 | **g** | 108:14,22 | guarantee |
| 42:5 63:12 | g 9:1 189:13 | 134:10 138:18 | 133:21 |
| 313:20 | ga 4:14 | 182:1 192:8 | guarantees |
| function | gaining 232:5 | 234:22 | 159:3 |
| 139:23 224:13 | game 155:21 | gives 10:9 | guess 39:4 |
| functions | 277:13 | giving 100:3 | 50:23 90:23 |
| 167:25 | garnered 10:21 | 120:2 133:2 | 100:19 110:7 |
| fund 313:4,6 | gas 44:21,23 | 156:10 247:19 | 126:18 149:23 |
| funds 64:23 | gathered 145:6 | 259:10 289:18 | 150:10,10 |
| 68:11 73:13 | general 5:8 | 302:17 303:2 | 151:6 152:5 |
| 74:11,14 132:4 | 11:3,5,7,9 | 310:18 | 153:10 154:2 |
| 160:5,10,21 | 18:11,19 47:22 | gina 7:4 129:2 | glad 161:21 |
| | 62:12 70:20 | 310:24 | 162:7 250:2 |

## [good - hard]   Page 40

| | | | |
|---|---|---|---|
| 291:18 292:4 | gripe 120:8 | guidance 27:2 | 97:19 102:17 |
| 292:20 294:15 | gripes 122:24 | 28:2 167:16 | 102:19 103:5,6 |
| 306:13 309:9 | 123:13 | guys 114:23,24 | 103:24 107:24 |
| 309:10,10 | gross 175:22 | 114:25 116:9 | 108:15 139:2 |
| goodies 233:22 | 175:23 236:23 | 116:12,22 | 140:18 158:1 |
| 233:22 234:18 | 254:1 265:14 | 119:5 134:6 | 191:11 193:16 |
| 235:7 | grossly 236:25 | 139:7,25 | 196:18 207:21 |
| goody 233:23 | 236:25 287:18 | 161:10 201:19 | 207:23 215:20 |
| gosh 40:6 | ground 56:12 | 311:22,24 | 243:16 |
| 127:19 | 56:13,14,24 | 312:2 | happened |
| gotshal 224:7 | 65:18 66:3 | | 39:23 77:21 |
| gotten 25:11 | grounds 56:9 | **h** | 80:4 120:12 |
| 261:11 | 56:16 | ha 211:16 | 121:19 123:5 |
| government | group 1:18 3:8 | 212:24 | 126:4 174:12 |
| 30:23 31:2 | 15:9 16:11 | half 74:19,21 | 223:18 234:15 |
| 36:19 | 53:16 240:5 | 238:8 244:1,2 | 244:20 245:15 |
| governmental | 288:14,22 | 247:1 301:12 | 254:8 258:15 |
| 15:19 18:2,7 | 289:1,4 299:2 | hall 120:7 | 261:4 284:21 |
| 153:21 | guarantee | 132:20,21,22 | 287:14 |
| grab 207:18 | 133:21 | halls 151:10 | happening |
| grant 273:16 | guarantees | hamburger | 39:22 92:5 |
| 314:20 | 159:3 | 121:21 | 193:11 207:6 |
| gratitude | guess 39:4 | hamilton 6:3 | 216:24 263:14 |
| 159:21 | 50:23 90:23 | hand 31:13 | happens 22:6 |
| great 106:15 | 100:19 110:7 | 58:22 205:18 | 25:14 36:22 |
| 178:4 188:13 | 126:18 149:23 | 225:19 291:1 | 54:12 64:25 |
| 195:4 210:7,7 | 150:10,10 | handful 15:21 | 84:5 127:4 |
| 239:15 250:13 | 151:6 152:5 | handicapped | 196:8 286:18 |
| 279:2 | 153:10 154:2 | 302:8 | 286:20 |
| greater 105:8 | 156:13 180:6 | handle 181:23 | happy 52:3 |
| 235:6 | 211:20 218:25 | 186:14 | 85:18 113:15 |
| green 2:2 | 238:12 240:9 | hang 109:4 | 161:23 163:14 |
| greenwich | 240:10 258:11 | 221:21 | 204:9 207:17 |
| 305:6 | 277:16 284:11 | happen 19:24 | 240:13 243:21 |
| greet 5:3 | 284:25 286:22 | 27:21 29:23,25 | hard 49:24 |
| grievances | 287:25 294:7 | 36:8 37:15 | 68:23 75:1 |
| 202:1 | 312:24 313:16 | 59:2 77:20 | 128:15 129:13 |
| | | 84:6 95:17 | |

153:22 158:14
183:15 222:4
228:16 255:11
266:2 286:4
292:25 296:3
harder 70:18
184:1 231:1
harm 265:20
307:19
hat 109:4
hawaii 20:10
20:14,14
head 222:19
269:15 271:11
headed 251:24
252:4 254:22
headquarters
162:25
healthy 239:23
261:2
hear 38:18
39:7,9,20
42:12 52:12,15
52:18 86:24
124:13 127:11
128:25 129:3
129:11 130:13
161:21,23
170:8,10
172:25 173:1
175:11,19
188:23 198:25
202:24,25
226:6 249:5
250:2 253:22
255:12 272:18
284:9 296:3

297:25 305:25
311:12,14
312:9
heard 20:11
43:21 48:17
57:22 58:8
69:9 79:5 91:8
117:12 151:10
154:19,22
166:1,4 169:25
170:11 172:25
178:15 181:7
181:19,20
247:1 250:14
277:6,7 311:4
311:15,20
313:7
hearing 3:1,7
3:11,13,15,17
3:20,22,24 6:8
8:21 9:13
10:18 15:22
17:21 23:12
44:12,25 45:8
49:17 50:24,25
51:3,7 72:17
78:18 122:17
126:11,11,12
129:13 133:15
136:16 143:25
145:14 157:24
158:17 175:2,5
182:4 187:7
190:4 195:2
202:2 210:18
242:1 243:21
312:23 314:15

314:18
heavily 54:14
heavy 62:8
heighten 284:6
held 40:13
75:24 99:22
100:8 132:19
150:1 174:20
206:2 210:16
214:10 239:23
257:25 296:6
hello 79:4
253:21 262:13
help 40:8 52:24
67:12,14 174:6
192:4 220:3
267:9 278:22
helped 39:6
100:10 148:23
150:9 180:17
209:13 249:2
287:12,21
helping 201:16
helps 54:17
208:4
hendershott
6:22 49:10,10
49:23 50:19
51:4 159:11,13
159:13,15,16
159:18 160:17
160:20 161:4
161:18,20,24
164:19,19,20
211:21,25

165:6,7,20,20
165:23,24
166:14,18
167:3,10,15,17
168:1,4,16,17
168:24 169:2,4
170:15 171:2
171:18,19
172:18,24
173:8,14 174:1
174:9 175:19
176:11,13
177:8 180:16
182:8 184:18
185:20 186:4
186:19 187:3
187:17,19
188:13 222:2,3
222:7,11
248:19,20,21
248:22,24
252:9,19
253:16,17
254:5 262:9,11
262:16,18
264:5,20
265:12 266:9
267:10,13
270:16,17,24
271:1,5,6
279:5
hendershott's
185:16
hey 27:17
294:15
hi 128:24 154:9
310:24 311:4

110:5,13 112:2
112:8,13,15,17
113:5,12,15
117:4,7,23
118:10,18,18
119:10,21,22
120:11,17,24
121:15,20
122:4,10
123:16,24
124:13 125:15
125:17,21
126:2,23,25
127:9 128:6,12
128:18,24
130:10,19
131:1,6 134:12
135:12 137:7
137:14 138:14
139:1 140:2,5
140:24 141:1,4
141:6 143:22
147:8 148:10
150:7 155:18
157:2,10,13
159:11 160:14
163:19 166:10
166:22 167:23
168:2 170:10
171:15 172:6
172:24 173:3,6
174:10 175:19
176:11,25
179:18,24
181:17 182:3
183:9 184:9,14
184:20,24

185:2,9 186:21
187:13 188:11
188:17,20
189:23 190:8
190:23 192:14
192:20 193:23
195:5 198:8,13
199:1,13,23
200:2,13
202:16 204:2,9
206:12 212:16
216:5,8,14,25
218:5,8,15
219:10,11,20
219:22 220:9
220:10,24
221:6,18 222:2
222:3 237:23
238:1 240:13
241:6 245:22
245:24 246:9
246:18 248:19
252:6 254:6
258:17 265:18
297:1 303:13
305:8 308:19
310:24 312:8
313:11 314:8
314:15,23
hope 22:5
161:23 278:1
hoped 164:16
hopeful 19:12
93:23
hopefully 20:7
44:25 79:11
80:23 142:2

146:10,18
155:8 183:19
208:9,11 209:2
211:8
hot 121:21
hour 161:7
hours 49:14
50:20 272:16
275:7
house 6:3
247:13,20,22
247:23,24,25
302:10,15,19
302:22,23
304:8,13 305:5
305:5,7,21
306:15 308:20
308:23 309:7
houses 247:23
huge 22:18
192:11 267:11
huh 235:11
294:23
human 266:11
hundred 176:8
177:25 178:10
191:22 209:25
234:6 264:9
hundreds
49:13 173:5
hurt 127:20
hyde 3:25
317:3,8
hypothetical
33:25 36:15,18
57:23 61:8
73:19 196:10

196:25 197:1
289:18

i

idea 25:9 43:16
112:5 144:3
184:22 190:23
274:17 291:18
294:15 296:20
identified
163:1 184:6
273:2 287:25
288:1
identify 56:5
142:6 166:9
182:1,5 264:17
295:9
identifying
170:16
ifs 306:21
ignorance
178:20
ignore 174:12
ignored 46:19
illegal 24:13
illiquid 70:23
immediate
62:10 150:4
immediately
71:2 76:5,9,13
77:6 80:10
81:15,24 82:3
148:9 182:10
191:24 193:7
198:17 249:16
250:8
impact 29:22
34:11 36:19

hiding 294:21
high 62:12
143:1 183:14
208:7 238:8
282:8
higher 12:3
62:13 68:19,21
69:14 86:15
96:9 108:21
113:2 136:2
275:19 278:7
highest 107:13
116:20 125:3
172:17 210:23
highlight 10:20
192:1
highlighted
176:15
highlighting
110:23 132:16
133:12 166:6
191:3
highlights
106:14,16
highly 15:3
17:17 24:21
140:15 156:12
252:24
hijack 122:24
hindsight
36:11 253:2
257:9,10,18
263:16
hire 226:8,23
hired 34:7
224:18 226:9
269:17 278:4,8

280:8
historical
224:21 225:10
275:8 280:15
history 174:3
hit 53:19 199:4
hmm 84:3
209:20
hoc 1:18 3:7
15:9
hold 3:13
63:14 91:12
93:4,7 94:10
133:6 185:18
194:6 197:18
212:10 216:16
217:10
holdco 11:7
18:13 22:25
242:25
holder 89:20
89:21 192:22
192:22
holders 1:18
3:8 15:9 18:12
20:24 21:5
62:2 86:1,5
87:25 89:9
91:25 101:20
104:25 240:7
265:6 266:20
holding 75:16
91:19,23 96:8
102:18 162:18
269:4,6,9,16
271:8,14,22,25
272:6

holdings 1:7,10
1:22 3:2,9 91:3
93:15 189:18
312:14,21
holds 184:10
197:18 205:25
206:4 214:9
hole 256:22
257:18 259:5,7
263:19,24
home 229:7
245:6 296:23
homestead
245:8
hon 2:22
honestly 154:6
276:19
honor 9:3,6,8
9:13,21 10:4
10:19,19,21
11:11,23 12:2
12:17,20 13:1
13:6,21 14:1
14:16,23 15:2
15:8,15,17
16:9 17:6,20
18:5,21 19:5
19:11,21 20:13
20:22 21:4
22:2,8 23:1,9
23:21,24 24:16
24:18 25:1,13
25:15 26:1
27:8 28:19
29:4 30:9,14
31:3,12 32:7
32:11,15,17

33:4,16 34:1
34:16 35:1,3
35:23 36:15
38:4,7 40:20
40:22 41:2,14
41:17 42:3,9
42:15,25 43:12
43:15,20,24
44:2,11,13,14
44:17,24 45:5
45:17,22 46:22
48:24 49:1,10
49:11,24 50:9
50:16,19 52:3
52:4,14 53:5
55:14 56:6,15
57:1 59:23
60:6,8,10,22
61:2 63:2
64:18,21 66:10
66:25 69:21
73:3 74:6,25
75:22 76:16
77:14,22 78:16
78:25 79:15
85:7,18 86:19
88:8,9,13 90:9
90:10 92:1,11
92:22 93:16
94:4,17 100:5
100:13,16,24
101:3,7,18,24
102:22 103:11
104:6,19 105:5
106:16 107:17
108:13 109:8
109:16,19

67:17 81:22
82:4,22,24
158:23
impacts 83:24
150:5
impartiality
10:9,12,16
imperative
68:6 115:15
188:5
impetus 224:22
implementing
313:18
imply 293:18
important
58:21 59:6
61:21 63:9
68:12 69:9,11
71:13 136:4
151:9 182:16
191:16 226:3,4
240:20 274:12
294:14
importantly
14:23 16:8
54:16 58:19
97:14 263:4
290:3 297:20
305:20
impossible
28:1 111:23
impression
63:1
improper
236:11 260:20
improved
83:11

improvement
233:19
inappropriate
260:10 273:21
287:18
inappropriat...
276:4
incentive 119:7
119:9 278:9
include 106:22
119:3 120:20
incomplete
141:13 153:14
153:15 229:1
279:15 286:22
included 33:9
82:25 83:3,5
84:8,13 173:4
250:23 296:11
includes 14:8
215:25
including
11:19 17:10
91:8 114:1
205:12 222:25
256:14 268:9
270:18 292:19
298:21 300:6
incompetence
175:23
increase 91:9
135:10
increased
11:14
increasing 36:9
incredible
38:17,17

incredibly 55:3
64:4 68:12
incremental
86:8,12 94:19
94:22 272:22
incumbent
27:19
incur 275:22
indemnificat...
231:3,17,19
232:14 292:10
indemnified
231:16 248:8
274:14
independent
16:23 57:19
68:24 218:18
218:20 220:18
223:1,10,15,21
224:15 240:3,6
241:20 242:2,4
242:9 255:4
268:2 271:24
276:25 277:9
277:13,14,15
277:19 278:14
278:18 281:20
independently
26:10 281:1
independents
268:14
indicate 181:6
indication
10:16 27:5
259:23
indicia 236:10
261:1

indirectly
202:11
indiscernible
35:1 47:14,15
47:18 48:9,11
50:8 52:15
64:20,22,23,24
65:3 76:19
85:3,5 99:23
100:1 109:16
112:21,25
113:4 114:21
114:23,25
115:20 116:12
116:13,24
118:13 119:5,8
119:11 120:4
120:15 121:17
121:18,23
124:4,7 125:16
126:25 127:25
128:12,21
132:18 139:10
144:23,23
147:16 148:10
148:21 149:20
149:21 154:4
154:24 155:11
155:15 156:6
156:10 157:4
157:16 159:20
160:1,8 161:2
161:21,22
162:2,6,7,11
162:13,24
164:1,4 166:1
166:11,15

| | | | |
|---|---|---|---|
| 168:21 169:6 | 231:10,14,14 | **individual** | 131:4 132:12 |
| 169:16 170:2,7 | 231:15,16 | 28:16 159:3 | 132:15 133:4 |
| 171:7,22 | 232:14,16 | 161:2 176:17 | 140:4 156:25 |
| 172:19 173:6,9 | 233:2,3,7,17 | 225:8 233:4 | 157:7,9,13,16 |
| 174:1 176:18 | 233:17,23 | 276:17 283:7 | 158:1,4 177:12 |
| 177:17 179:4 | 234:5 235:4,5 | 289:21,24 | 177:19 178:2 |
| 179:12,12,16 | 235:6,8,12,14 | 292:3,5 310:9 | 184:5 190:10 |
| 180:23,25 | 235:20,22 | **individualized** | 226:11,14,25 |
| 181:12 183:21 | 236:5,19,25 | 160:10 | 225:5 233:14 |
| 184:20 185:13 | 237:2,7,10,14 | **individually** | 239:22 250:22 |
| 185:16 187:20 | 237:15 238:6 | 241:25 | 252:3 271:12 |
| 187:24 188:11 | 238:19,23,24 | **individuals** | 271:15 280:21 |
| 188:18,19 | 239:2,12,13,14 | 155:1 163:3 | 280:23 281:16 |
| 189:4,5 190:3 | 239:18,18,19 | 228:18 231:5 | 281:21 284:5 |
| 190:10,21 | 239:20,21 | 232:23 235:21 | 284:25 288:22 |
| 191:10,14 | 240:11 241:7 | 240:23 267:4 | 289:3 294:22 |
| 192:8,9,10 | 241:10 243:17 | 287:19 292:15 | 297:18,19 |
| 194:16 196:6,7 | 243:23 244:1,7 | 299:12 304:1 | 298:4,5,6 |
| 197:10 198:18 | 244:16,17 | **industries** | 300:11 |
| 199:15,24 | 245:13,14,17 | 286:18 | **informed** |
| 200:1,25 201:2 | 245:19 246:14 | **industry** 39:23 | 40:25 42:5 |
| 201:5,7,14,18 | 246:21 247:16 | 40:4,7 71:19 | 97:21 132:14 |
| 202:23 204:14 | 248:6 249:4 | 138:20 281:7 | 195:25 |
| 204:21 205:7,9 | 250:7,9,10,18 | 286:15 | **infusion** 91:8 |
| 205:10 206:3,5 | 251:4,8,12,14 | **influence** | **inherent** 24:19 |
| 206:15 209:4 | 252:2,12,22 | 276:17 | 35:25 153:25 |
| 210:8 211:13 | 253:4 264:6 | **influx** 181:23 | **initial** 93:5,11 |
| 211:17 214:25 | 267:14 269:4 | **information** | 93:13 113:18 |
| 215:5,21 218:9 | 270:6 272:12 | 37:20 39:15,16 | 197:23 203:11 |
| 218:14 222:11 | 274:6 275:12 | 41:11 48:8 | 262:5 281:23 |
| 223:12,19,23 | 286:9 297:4 | 55:3 97:18 | **initially** 113:17 |
| 223:24,25 | 298:17 305:23 | 107:20 108:3 | 113:24 193:12 |
| 224:3,10,24 | 313:11,12,16 | 108:14 110:3 | **initiate** 162:20 |
| 225:1,4 226:14 | 313:18,20 | 112:24 114:7 | **initiated** 62:19 |
| 227:3,5,7 | 314:8 | 125:19 129:22 | **injunctive** 3:3 |
| 228:23 229:20 | **indisputable** | 129:25 130:5,8 | **injured** 265:2 |
| 230:1 231:2,2 | 107:16,18 | 137:17,22,25 | 266:4,8 |

| | | | |
|---|---|---|---|
| 204:21 220:18 | **invoking** 32:6 | 182:12 183:11 | 257:19 265:1 |
| 223:23 224:17 | **involve** 27:1 | 183:17 185:21 | 286:16 314:1 |
| 225:18 226:6,6 | **involved** 68:1 | 185:24 186:2 | **it'll** 77:8,8 78:8 |
| 226:15,20 | 173:8 178:17 | 208:14 219:15 | 90:2 92:20 |
| 227:8,9,11 | 255:5 278:20 | 219:15,18 | 93:8 |
| 233:10 236:3 | 288:12 | 259:3 261:7 | **item** 105:12 |
| 246:4 249:24 | **involving** | 292:10 294:20 | **items** 152:25 |
| 250:9,16 252:1 | 30:16 | 313:24 | 197:20 198:21 |
| 252:10 264:18 | **iota** 173:17 | **issuer** 32:9 | |
| 265:16 270:5 | **ira** 302:23 | **issues** 15:3 | **j** |
| 274:1 277:20 | 306:15 308:20 | 24:20 26:12 | **january** 15:22 |
| 278:6,18 | 308:24 309:7 | 27:6,9 28:3 | 197:14 |
| 279:14 280:6 | **irrelevant** | 30:22 34:19,23 | **jason** 5:21 |
| 280:11,20 | 126:5 | 34:24 35:4 | 88:14 |
| 281:9 288:6 | **irs** 34:20 303:3 | 36:1 38:21 | **jennifer** 154:9 |
| 294:3,8,10,10 | **issuances** 32:7 | 39:11,10,12 | 154:11 |
| 295:22 296:11 | **issue** 18:17 | 42:4 51:19,20 | **jersey** 15:16,20 |
| 311:22 312:3 | 19:4 24:22 | 52:6 58:7 | **jevic** 18:17 |
| **investigations** | 25:10 26:11,16 | 64:11,15,16,24 | **jill** 224:3 |
| 82:23 279:1 | 26:19 27:11,24 | 67:23 74:15,18 | 267:19 |
| 311:8,24 | 28:5,25 29:13 | 81:7,19 83:1,8 | **job** 39:4,4 |
| **investigator** | 29:16 30:17 | 96:21 97:4 | 260:17 |
| 278:14 | 31:1 33:7 34:8 | 101:22 104:12 | **john** 5:21 6:20 |
| **investment** | 34:22 35:21 | 104:16 110:25 | 88:13,14,18 |
| 54:23 167:1 | 38:10 39:17 | 111:3 120:19 | 90:9 188:22,25 |
| 183:22 222:22 | 42:25 43:2 | 120:22 122:18 | 245:22 312:8 |
| **investor** 82:24 | 60:3,12 66:23 | 127:3 137:24 | **joinder** 3:15,22 |
| 82:25 238:6,9 | 72:1 74:10 | 148:11 151:17 | **joke** 271:18 |
| **investors** 27:23 | 76:23,24 81:4 | 152:19 155:20 | **jon** 7:7 23:24 |
| 84:6,20 236:13 | 82:12 92:1 | 158:25 174:8 | **jonathan** 5:2 |
| 239:17 240:19 | 96:17,19 99:2 | 177:5 183:16 | **jones** 7:16 |
| 265:2,3,6 | 99:3 106:6 | 185:11,12 | 202:16,16,18 |
| **invitation** | 114:14 115:10 | 194:18 195:25 | 202:18,19,20 |
| 175:3 | 126:21 140:22 | 196:1 197:15 | 203:2,7,12,24 |
| **invited** 41:6 | 148:7,13 155:4 | 198:11 205:4 | 204:5,6,15,18 |
| **invoke** 32:21 | 174:18,21 | 219:5,6 225:1 | 204:20 205:6 |
| | 179:24 180:4,9 | 242:8,12 251:3 | 254:9,14 |

| | | | |
|---|---|---|---|
| **innerworkings** | 254:24 255:1 | 258:4 260:9 | **interviewed** |
| 164:8 | 255:16,18 | 303:25 | 238:10 268:22 |
| **inquire** 59:25 | 256:2,13 | **interested** | 268:23,25 |
| **inquiry** 195:6 | 275:14,14,19 | 22:11 118:7 | 288:14 |
| 294:4 | 292:10 293:2,9 | 144:7 147:18 | **interviews** |
| **inserted** 44:9 | 293:13 294:5,5 | 223:20 | 226:17,18 |
| **insider** 295:19 | 294:16 295:3 | **interesting** | 288:13,13 |
| 296:5,9,10,13 | 295:11 | 268:18 | 298:5 300:1,9 |
| **insiders** 228:2 | **insurer** 273:3 | **interests** 15:5 | **intimate** 67:23 |
| 246:7,10 | 295:10 | 16:23 39:19 | **introduce** |
| 260:18 279:14 | **insurers** 293:8 | 54:1 58:3 60:3 | 183:1 |
| 295:22 296:12 | 293:23 | 60:14 61:1 | **intuitive** 22:18 |
| **insinuating** | **insuring** | 62:15 109:24 | 182:9,24 |
| 278:11 | 293:19 | 260:23 278:22 | 183:6 |
| **insist** 34:14 | **intact** 228:21 | **interim** 99:12 | **invest** 178:23 |
| **insisted** 232:5 | **integral** 257:7 | 99:17 | **invested** |
| 302:22 304:14 | **intelligently** | **internal** 21:2 | 158:11 |
| **installments** | 50:22 | 38:2 166:6,9 | **investigate** |
| 262:2 | **intend** 38:4 | 223:23 233:9 | 224:21 268:7 |
| **instance** 223:7 | **intended** 251:8 | 264:16 287:6 | 269:17 290:3 |
| 292:12 | **intends** 22:13 | **interrupt** 50:1 | 295:17,18 |
| **instill** 187:22 | **intensive** 64:14 | 56:1,3 65:18 | 296:16,22 |
| **institutions** | **intentionally** | 65:21 66:2,18 | 297:10,11 |
| 53:16 | 49:25 | 66:22 74:1 | 298:9,11 312:1 |
| **instruction** | **intercompany** | 85:9,15 99:24 | 312:22 |
| 202:10 247:10 | 23:6 43:3,6 | 99:25 100:3 | **investigated** |
| **instructions** | 240:2,6,10 | 113:20 115:21 | 246:5 266:19 |
| 122:21,22 | 241:21,22 | 122:8 123:12 | 268:5 273:22 |
| 123:2,23 | 242:7,12 243:3 | 157:21 264:14 | 276:13 278:5,9 |
| **insurance** | **interest** 1:18 | 230:14 264:20 | 312:13 |
| 228:21 231:22 | 3:8 13:18 | 290:19 305:9 | **investigating** |
| 231:24 232:16 | 55:21 59:24 | **interrupted** | 223:14 251:25 |
| 233:10,20 | 61:4 65:1,4 | 12:16 | 277:23 281:14 |
| 234:8,24 235:7 | 84:21 127:8 | **interruptions** | 285:8,10 |
| 235:13 238:13 | 171:23 220:20 | 122:21 | 296:17 312:4 |
| 238:21,22 | 229:12 235:25 | **interview** | **investigation** |
| 254:16,21,23 | 237:11 248:12 | 194:24 | 16:25 30:16 |

| | | | |
|---|---|---|---|
| 258:12,24 | 249:25 256:21 | **kids** 239:1 | **kirkland** 4:3 |
| 259:2,4,7 | 257:1 259:5 | **kind** 14:18 | 9:4 45:6 57:12 |
| 260:13 261:18 | 260:5 284:20 | 16:15 20:16 | 116:24 136:16 |
| 261:21 262:8 | **jurisdiction** | 21:13 23:4 | 223:4,6,6,8,25 |
| **journal** 114:6 | 19:10,15 20:11 | 25:11 38:20 | 227:7 268:21 |
| **judge** 2:23 | 38:14 44:5 | 39:4,11 40:6 | 277:2 |
| 27:17 34:25 | 89:15,21,22 | 47:21 51:22 | **kirpalani** 6:13 |
| 39:2 40:8 | 111:21 | 61:13,18 63:5 | 43:5 212:16,18 |
| 125:8 154:14 | **jurisdictions** | 63:22 66:23 | 216:5 218:14 |
| 158:19 161:3 | 16:6,6,16 | 68:12 72:3 | 218:15,16 |
| 163:17 181:7 | 62:23 63:18,19 | 83:20,20,21 | 219:3,7,9,19 |
| 211:15 241:12 | 63:23 89:12 | 90:23 97:25 | 219:22,23 |
| 255:7 265:21 | 90:6,8 93:18 | 98:3 99:17 | 220:9 221:6,8 |
| 277:17 | 93:23 111:13 | 100:10 104:7 | 221:17 222:7,8 |
| **judgement** | 111:15 | 136:7 137:12 | 222:12 229:19 |
| 228:19,25 | **justice** 5:1 6:1 | 138:10,13 | 237:22 247:7 |
| 229:4 237:18 | 110:8 | 139:21 140:12 | 252:6 258:17 |
| **judgements** | **justification** | 147:19 148:23 | 261:14,19 |
| 228:22 | 175:4 292:8 | 150:14,24 | 263:21 270:9 |
| **judgment** | **justify** 287:4 | 151:11,18 | 303:12,23 |
| 14:25 16:8 | 293:19 295:10 | 152:5,5,9,15 | 305:8 306:5,8 |
| 231:9 237:11 | **juxtaposed** | 152:17,21 | 309:17 |
| 237:18 256:11 | 62:2 | 154:19,21 | **knew** 141:25 |
| 256:13 273:20 | **k** | 155:3,7 156:6 | 155:22 172:12 |
| 282:23 283:15 | **kaput** 196:9 | 156:12 159:2 | 258:13 259:4,4 |
| 283:17 290:23 | **keep** 162:5 | 167:4,6 180:4 | 264:11 300:11 |
| 292:17,18 | 168:11 187:7 | 180:10 188:5 | 300:13 305:16 |
| 304:3 | 209:25 258:1 | 190:20 208:23 | 309:5 |
| **july** 223:19 | 259:8 263:17 | 210:9 211:6 | **know** 20:17,25 |
| 227:12 238:21 | 309:21,25 | 266:11 278:6,7 | 21:2,4 22:16 |
| 256:22,24 | **keeping** 64:12 | 284:3 285:24 | 22:17,19,20 |
| 284:20,24 | 229:5 276:2 | 289:10 292:11 | 23:12 24:17 |
| **jump** 262:19 | **keeps** 187:21 | 311:8,12,22 | 26:13 27:17,22 |
| **juncture** 35:24 | 197:20 | **kinds** 93:12 | 28:23,23 29:1 |
| **june** 146:17 | **key** 61:24 | | 29:9 30:20,21 |
| 147:1 139:12 | **keys** 37:24 | 126:17 138:12 | 30:23 31:4,25 |
| 239:15 249:20 | 178:21 217:5 | 150:4 188:3 | 33:18,25 34:3 |
| | | 266:6 298:4 | |

## Page 49

**[know - laid]**

| | | | |
|---|---|---|---|
| 34:4,14,18,18 | 130:11 131:24 | 224:10,16 | 308:25 309:5 |
| 34:19 36:3,4,8 | 132:17 133:20 | 229:5 230:16 | 309:18 311:17 |
| 36:15,17,23,25 | 136:11,14 | 235:9 238:9 | 311:19,22 |
| 37:14,24 38:9 | 137:18 138:19 | 239:20,21 | 312:2 313:17 |
| 38:19,22 39:2 | 139:21 141:21 | 243:6 245:4,5 | **knowing** 34:16 |
| 39:5 40:6 | 141:25 142:8 | 245:9,10,12 | 252:2 |
| 41:17 42:3,9 | 142:21 143:4 | 247:4,5 250:14 | **knowledge** |
| 43:9 47:2,21 | 144:7,16 | 250:24 251:1,7 | 32:20 67:9,23 |
| 48:2,15,16 | 145:15,19 | 253:7,8,8,11 | 68:15 111:17 |
| 50:21 51:5,14 | 146:22 147:3 | 253:12,18,25 | 131:23 135:23 |
| 54:8,22 55:9 | 147:20 148:17 | 254:18 256:19 | 205:3 216:20 |
| 57:7 61:13,16 | 151:13 152:7 | 257:10,16 | 216:24 218:3 |
| 61:25 63:14 | 152:11 153:20 | 260:24 261:9 | 220:21 227:20 |
| 64:11,13 66:1 | 153:23,23 | 262:25 263:3,3 | 250:10 269:22 |
| 67:8,10,14 | 156:2 157:3 | 263:4 264:7,9 | 298:6 |
| 70:7,10 71:11 | 158:20 159:19 | 264:16 265:8 | **known** 150:14 |
| 71:12 72:6,23 | 160:15,19,22 | 266:20 267:10 | 297:21 |
| 73:9 74:6 75:5 | 161:1 163:3,14 | 268:25 269:14 | **knows** 39:13 |
| 75:6,9 80:7 | 164:14 165:11 | 269:14,22,25 | 167:8,14 |
| 82:12 83:9 | 167:24 168:23 | 269:25 271:1,9 | 168:12,13,15 |
| 86:21 91:3,12 | 169:1,13 | 272:11 275:10 | **kyc** 64:11,15 |
| 91:19,22 92:10 | 171:25 173:22 | 275:11,15,17 | 129:22,25 |
| 93:2,11,24 | 175:1 177:1,12 | 276:5,5,8 | 130:2,5,8 |
| 96:11,20 97:21 | 178:4 179:14 | 277:10,14,23 | 132:12,15 |
| 98:4 102:11 | 182:23 183:1 | 278:1,3,6,13 | 156:25 157:7 |
| 103:24 104:3 | 183:13 187:25 | 279:3,12 | 176:16,20,24 |
| 104:24 105:4 | 188:2 189:7 | 280:20 285:2,2 | 177:5,12,20 |
| 107:25 111:5 | 190:16 193:15 | 285:3,22,22,23 | |
| 111:17,21 | 193:18 194:2 | 286:14 287:1,8 | **l** |
| 112:4 113:17 | 195:12 196:12 | 287:23 288:8 | **labor** 64:14 |
| 117:3,23 118:3 | 196:24 198:23 | 290:9,13 291:6 | **lack** 10:9,12,16 |
| 119:1,14,17 | 199:24 202:6 | 293:5,8,15,22 | 160:13 257:21 |
| 120:1,20 122:1 | 206:3,25 207:3 | 294:1,3,17,18 | 257:23 286:16 |
| 122:2 127:10 | 210:1 211:14 | 301:16 302:3 | **lacks** 263:21 |
| 127:14,17,17 | 211:17 212:1 | 305:7,16,17 | **ladies** 141:4 |
| 128:13 129:9 | 217:3,18 | 306:3,4 307:7 | **laid** 131:8 |
| 129:12,13,24 | 219:15 224:4,7 | 307:17 308:25 | 134:11 139:21 |
| | | | 142:8 211:5 |

## Page 51

**[liked - loaning]**

| | | | |
|---|---|---|---|
| **liked** 143:5 | 187:9 | 180:20 181:3,5 | 231:21 250:19 |
| **likelihood** | **liquidated** | 181:10,14,21 | 259:10 262:12 |
| 59:16 101:16 | 37:19 74:8 | 187:23 191:22 | 265:12 268:13 |
| **likely** 20:15 | 80:1 82:3 | 208:8 | 283:15 302:8 |
| 22:12 34:13,13 | 89:17,24 93:20 | **liquidations** | 308:13 |
| 35:12 59:12 | 93:25 95:2 | 94:3,4 | **live** 52:1 |
| 62:8 94:9 | 129:22 179:17 | **liquidator** | 218:21 |
| **likewise** 105:15 | 180:21 183:4 | 180:25 | **lived** 13:3 |
| **limit** 161:7 | **liquidating** | **liquidity** 64:24 | 304:1 |
| 313:17 | 74:9 76:15 | 126:24 127:3 | **lives** 304:21,21 |
| **limitations** | 79:12,21,23 | 152:8 181:11 | 305:3 |
| 16:14 208:22 | 80:13 81:21 | 182:17,19 | **llc** 16:24 |
| 100:21 217:23 | 93:14,16 | **list** 45:7,13 | 218:18,21 |
| 274:3 282:14 | 181:22 | 49:3 78:17 | 223:18 224:2 |
| **limits** 215:3 | **liquidation** | 243:13 | 224:16 267:18 |
| 256:18 303:20 | 13:15 14:24 | **listed** 21:3 | 267:22 268:8 |
| 313:17 | 16:1,4,5,13,20 | **listen** 66:2 | 269:19,21 |
| **line** 101:2 | 17:19 35:12,14 | 117:19 150:24 | **llp** 4:3 |
| 112:10 161:4 | 36:24 37:15 | 123:1 201:24 | **loan** 101:12 |
| 202:8,9,11 | 54:14 55:15 | **listening** | 102:4,17,20,24 |
| 229:15 254:7 | 59:13,24 60:13 | 122:16 201:13 | 103:1,6,17 |
| 262:10 298:2 | 61:5,9 62:3,4 | **literally** 49:13 | 105:12 108:15 |
| 316:4 | 62:10,14,14,20 | **litigate** 295:5 | 121:2,4 245:7 |
| **lines** 39:12 | 71:16,16,17,23 | **litigated** 273:1 | 249:5 256:20 |
| 311:9,12,23 | 75:7 76:7 77:2 | 274:20 | 257:21 258:22 |
| **link** 41:5 | 80:25 81:2,22 | **litigating** 283:2 | 258:25,25 |
| **lion's** 302:16 | 82:6 84:11 | **litigation** 3:1 | 259:1,18,19,21 |
| **liquid** 106:1 | 88:23 89:5 | 25:4 43:6 | 260:6,8 262:1 |
| **liquidate** 59:17 | 90:12,20 96:10 | 62:19 116:23 | 262:6 281:23 |
| 65:14 71:2 | 98:7,12 104:18 | 282:24 292:24 | 282:10 286:13 |
| 72:3 74:17 | 104:20 105:1,8 | **little** 20:18 | 288:5 307:17 |
| 76:13 77:6 | 106:2,13 | 42:9 59:7 62:5 | **loaned** 256:21 |
| 81:15,24 96:20 | 108:19 142:14 | 74:21 79:10 | 261:16,17 |
| 152:23 177:21 | 147:7 149:1,7 | 99:3 102:15 | 287:9 |
| 179:12 180:2 | 149:8,24 154:1 | 145:23 217:25 | **loaning** 256:16 |
| 180:18 183:17 | 176:16 179:6 | 219:17 222:15 | 257:13 |
| | 179:11,15 | 223:13 231:1 | |

## Page 50

**[language - light]**

| | | | |
|---|---|---|---|
| **language** 44:9 | **lawsuits** | **ledanski** 3:25 | **lesser** 289:5 |
| 44:11,12,24 | 265:23 | 317:3,8 | **leticia** 17:4 |
| **large** 70:10,19 | **lawyer** 66:1 | **leeway** 119:16 | 48:22 |
| 133:11 142:24 | 222:18 278:19 | **left** 82:18 | **letter** 162:23 |
| 143:3 147:16 | 313:1 | 86:17 161:25 | 200:13 |
| 250:18 | **lawyers** 34:7 | 208:4 222:19 | **letting** 262:19 |
| **larger** 70:18 | 49:15 51:8 | 222:20 241:4 | 306:3 |
| 143:6 183:10 | 110:20 134:5 | **legal** 9:15 10:8 | **letty** 45:12 |
| 183:11 233:19 | 175:1 241:25 | 10:10 17:20 | **level** 62:12 |
| 250:17 252:1 | 280:16 | 27:5 62:13 | 85:3 102:18 |
| 288:22 | **lax** 283:15 | 67:11 162:17 | 169:8 236:8 |
| **largest** 149:20 | 285:2 | 162:20,22,25 | 273:9 |
| 194:5,15,16 | **lay** 9:9 | 163:11 164:1,7 | **levels** 103:7,8 |
| **lasted** 227:12 | **lays** 139:22 | 164:9,12,14,14 | 152:24 207:4 |
| **lastly** 69:17 | **lazard** 222:21 | 217:8 229:21 | **lexington** 4:5 |
| 72:6 194:8 | 222:23 | 241:10 245:1 | **liabilities** |
| **lasts** 198:21 | **lead** 53:16 | 245:12,14 | 230:20 |
| **late** 155:21 | 159:24 252:10 | 252:7,15 | **liability** 228:21 |
| 313:13 | **leader** 165:17 | 260:25 265:15 | 239:24 240:19 |
| **latest** 242:10 | **leadership** | 272:18 282:7 | 283:3 287:20 |
| **laundering** | 268:6 | 282:21 290:25 | **liable** 3:13 |
| 177:13 | **leading** 249:4 | 304:20,21 | 102:20 103:4,5 |
| **law** 25:2 26:16 | 295:21 | 306:19 312:24 | **license** 111:24 |
| 30:18 36:5 | **leads** 286:20 | 317:20 | 155:23 |
| 158:5 236:21 | **learn** 13:12 | **legally** 33:19 | **licensed** 62:25 |
| 266:13 277:6 | 196:1 227:4 | 295:1 304:18 | 90:5,8 111:14 |
| 282:22 308:17 | 233:20 279:3 | 305:4 308:4 | **licensure** 89:23 |
| **laws** 24:22,25 | **learned** 203:20 | **legions** 34:7 | 111:18 |
| 25:22 27:13 | 233:15 | **legwork** 280:9 | **lie** 117:22 |
| 28:5,8 29:6,8 | **learning** | **lend** 24:13 | 118:8,10 |
| 29:22 30:19 | 233:13 | 216:11 289:2 | **lied** 118:23 |
| 32:1 115:9 | **leave** 67:19,21 | 301:11 | 299:19 312:25 |
| 116:1,4,5 | 68:20,22 | **lending** 224:24 | **lies** 64:21 |
| 266:13 | **leaving** 313:19 | 225:2 238:18 | 111:21 |
| **lawsuit** 25:17 | **led** 264:4 | 257:19 259:8 | **light** 225:15 |
| 282:20 283:5 | 278:19 | **lengthy** 48:13 | 291:7 306:13 |

## Page 52

**[loans - made]**

| | | | |
|---|---|---|---|
| **loans** 12:12 | 163:14 185:8 | 190:6,13,20 | **lower** 62:11 |
| 224:24 236:13 | 193:6 208:5 | 193:13,17,23 | 68:19 71:3 |
| 249:16,22 | 213:18 224:23 | 193:24 195:8 | 81:20 119:7 |
| 250:8 256:25 | 225:7 231:9 | 195:11 196:13 | 148:12 149:10 |
| 257:7,11 263:7 | 240:6 250:13 | 197:7 199:17 | 152:24,25 |
| 263:11,12 | 257:9 260:17 | 199:20 312:8,8 | 189:6 209:15 |
| 281:15,17 | 276:20 288:6 | 312:12 313:9 | **loyalty** 260:24 |
| 282:3 283:21 | 290:21 292:3,6 | **lorraine** 201:4 | **lunch** 159:7,8 |
| 288:22,23 | 300:23,24 | 201:9,17 | 161:9,23 |
| 287:7 288:23 | 306:16 308:16 | **lose** 136:20 | |
| 288:25 297:21 | **looked** 25:24 | 272:12 | **m** |
| 299:13 307:12 | 61:15,15 | **loss** 158:13,22 | **macro** 286:16 |
| **locked** 189:22 | 158:17 224:25 | 251:7 263:25 | **made** 22:22 |
| 190:15,17 | 225:2,3 236:4 | **losses** 241:13 | 33:2,22 36:2 |
| 191:9 | 237:9 244:11 | **lost** 201:12 | 37:22 38:20 |
| **logic** 133:6 | 244:14 245:1,9 | 257:20 | 39:18 40:16 |
| 144:20 | 247:25,25 | **lot** 13:1 41:19 | 55:3,5 58:9 |
| **logical** | 248:1 249:9 | 51:14 70:16 | 82:11 110:2 |
| 314:24 | 251:5,6 259:15 | 92:14 118:3 | 112:21 114:20 |
| **logjam** 41:21 | 288:11 289:19 | 119:16 131:25 | 116:9 130:17 |
| **long** 25:6,7,8 | 290:15,16,22 | 136:3 205:7 | 137:3,4 141:7 |
| 41:18 70:14,14 | 293:15 300:24 | 218:7 219:6 | 156:3 170:13 |
| 107:11 139:8 | 304:24 | 227:4 229:7 | 173:25 174:2 |
| 219:11,14 | **looking** 25:11 | 240:9,20 248:4 | 175:14 179:9 |
| 246:2 267:14 | 127:19 147:18 | 249:11,17 | 197:14,17 |
| 275:15 | 185:22 209:16 | 263:13 278:5 | 199:11 203:22 |
| **longer** 15:1 | 225:8 278:21 | 280:19,22 | 212:22 214:1 |
| 37:3,6 84:13 | 280:21 282:1 | 292:15 306:21 | 214:12 224:25 |
| 146:10,10 | 285:16 286:1 | 307:19 308:4 | 236:9,9 238:18 |
| 147:24 148:8 | 306:17 | 311:16,18,25 | 252:24 253:8 |
| 227:13 258:1 | **loop** 218:1 | **lots** 26:3 40:7 | 253:12 256:25 |
| 259:10 296:7 | **loren** 188:19 | 286:18 | 257:6,11,18 |
| 314:15 | 188:22,22,25 | **love** 244:21 | 260:9,19 263:2 |
| **look** 41:6 46:14 | 188:25 189:1,3 | **low** 208:8 | 266:1 272:4 |
| 64:19 72:4 | 189:9,14,21 | 260:3 | 276:23 281:17 |
| 73:11 108:1,17 | | **lowball** 260:15 | 283:23 288:21 |
| 116:16 158:5 | | | 288:23 309:9 |
| | | | 309:10 314:16 |

**[madison - market]** — Page 53

madison 6:10
madoff 244:24
magically 139:2
main 114:16 307:1,16
maintain 237:13
maintained 67:15
major 67:13 80:24
majority 144:8 147:17 151:11 154:20 209:21 209:24
make 9:14,25 16:15 19:8 20:1 23:3 28:15 29:18 31:22 33:15 39:4 40:11 45:8 54:23,25 55:4 56:19 58:15 61:13,18 62:20 64:11 79:25 83:1 93:11,22 97:17 97:18,24 98:8 98:10,16,21,24 99:12,14,17 111:6 114:18 115:7,11,16 119:19 121:19 123:10 124:21 124:23 127:12 130:1 138:20 139:9 144:17 150:20 151:16 151:17 157:20 159:2 164:24 167:4,12 169:15 175:16 177:11,12 178:7,23 179:2 180:10 189:16 190:24 197:24 198:11 205:13 205:15 210:22 212:4 215:10 221:13 229:22 239:9 241:5 265:24 273:20 274:7 277:10 282:3 283:21 283:22 286:2 287:13 289:4 293:7 294:16 294:25 299:13 308:7 314:24 314:25
makers 71:19 72:4 97:16,23 148:18 183:13 288:4
makes 34:18 55:7,13 108:1 123:4 130:4 134:22 144:18 173:11 194:11
making 31:20 56:4,6 64:15 67:14 68:3,4 98:19 119:15 164:22 165:21 175:15 177:13 187:21 208:23 236:12 237:2 257:7,12 260:6 270:25 273:16 273:19 288:9 289:12 295:8 297:21 307:12 307:17,21 308:10
malfeasance 217:11 279:9,11,17 313:11,15 314:4,8,11
managed 287:6 285:20 289:10
management 13:4 41:19 175:22 186:6 194:24 204:23 217:9 225:3 236:4,6,18 240:5 251:13 281:24 282:12 283:12 284:7 284:14,15 285:6,9,12 286:23 288:7 288:11,15 289:13 301:7
manner 15:4 122:17 160:12 190:25
manual 64:13
manually 64:3 64:5,17 251:1
march 2:5 284:19,22 285:2 317:25
marital 308:18
mark 6:6 8:5 16:10 49:2 53:3,9,15 70:1 88:17 90:10,16 90:18 101:8 112:19 129:17 141:10 154:17 159:17 189:2 204:19 212:17 282:6
marked 42:2
market 61:16 61:17 70:6,8,9 70:11,12,16,17 70:18,19,23 71:3,7,15,18 71:19,21 72:4 72:6 74:8,14 74:24 77:19,24 78:5,8 81:11 81:19 82:15 94:2,4 95:2,11 96:16,19,22 97:4,16,19,22 97:23 135:23 148:12,18 149:5,20,20,21

---

**[members - mismanagement]** — Page 55

224:1 267:22 268:1,3 270:7 270:18 271:8,9 271:22,25 272:7
memorandum 40:17
memory 226:13 249:19 250:1,11
mention 102:5 192:11
mentioned 41:2 72:17 103:22 142:22 143:9 153:11 153:13 176:20 185:25 208:14 232:17 280:7 281:9 293:25
merit 217:23 273:14 274:9 274:19 282:11 282:21
meritorious 273:12
merits 123:3
messages 129:10
met 32:25 163:3,8,10 205:12
methodology 111:11 139:4 170:21 191:6
methods 151:6
mew 1:3,4,16 3:1,7
mic 120:7 129:12
michael 2:22
michelle 7:1 141:6 279:19 279:22
mid 249:20
middle 35:7 146:19 161:19 253:20 313:23
migration 131:8
mike 4:9 45:5
milk 65:14
million 10:25 10:25 13:25 14:9,10 15:11 73:16,25 74:1 74:4,4,7,19 76:4,8,11 79:12,21 80:13 81:21 86:12,14 87:3,4,5,5,6,7 134:17,18,22 134:24 135:6,7 135:18,25 136:2 151:25 177:10 180:20 185:22 186:6,9 186:11,19,22 186:23,24 187:5 209:18 217:23 230:3,5 233:21,23,24 234:4,16 235:4 235:5,9,9,15 237:15 238:8 244:1,2,20 245:7 248:8 254:15 255:8,9 255:13,13,17 255:23,23 256:14,16,23 257:16,20,20 258:14 259:5 259:10 261:7 261:20,22,23 264:1 272:13 272:15,21,22 272:24,24,25 273:8,8,11,11 274:18 275:5,6 275:8 282:15 283:4 291:11 291:13,13,14 291:24 293:5,6 294:18 302:3 303:2,7,11,22 303:22 304:16
305:13 306:7
millions 55:23 55:23 173:5 195:13
mind 59:14 79:20 88:25 124:19 168:12 228:24 229:5 249:9 280:4 281:11
mineola 317:23
minimis 96:1
minimize 14:14
minimum 145:7,10
minus 283:4
minute 77:16 185:2 221:22
minutes 78:11 78:11 185:4,10
mischaracter- 270:9
misconstrued 308:1
mishear 186:13
misheard 178:3 209:6 216:11
misleading 108:23 240:18 265:1
misled 108:8 266:21 289:25
mismanage... 175:24 265:14

---

**[market - members]** — Page 54

150:5 152:3,22 153:4,7,8 154:3 181:5,10 181:11,13,17 181:22 182:1,6 182:11,16,17 182:18,24 183:7,10,11,13 183:15,19,19 183:20,20 184:2,4 185:12 186:25 187:1,6 188:3,8 189:6 189:19 190:1 191:3,14,16 193:6,15 239:8 243:9,12,18 245:18 251:21 259:9 262:22 278:3,14,17 279:15 313:19
marketability 149:13,23 150:13 153:12
marketed 124:25
marketplace 67:24 150:22 150:25 257:4 300:17
markets 55:4 61:20 62:6 67:9 70:14,23 193:2 207:6
masquerading 39:11
mass 70:22
massive 13:13
massively 193:10
material 174:13 265:19
materially 250:15 252:5
math 73:21 76:24 77:5,7 105:23 108:4 108:21 133:11 133:14 135:8 144:18 209:24
mathematica... 137:19 144:20 153:19
mathematics 107:6,18,20
matter 1:6 9:8 10:8,13 34:15 42:19 59:25 62:18 75:15 96:19 132:21 135:1 138:11 174:13 204:1 245:2 268:12 268:16 272:25 288:9 290:25
matters 52:1 120:6 216:19
matthew 4:16
max 293:5
maximize 213:21 115:17
maximizes 71:12 171:10
maximizing 54:9 69:2 82:13 84:22 86:11 151:24 194:14
maximum 171:3,4 275:2 293:6
mcdermott 6:15 57:16 245:23
mean 22:18 23:1 25:6 30:7 34:4,17 35:21 37:6 48:7 49:25 59:3 63:25 64:9 70:8 71:25 74:10 80:8 81:16 96:14 97:6 103:8 106:2 108:9 128:3,13 137:8 137:21 140:15 149:15 162:5 174:13 204:1 210:14 216:25 219:1,14,17 224:15 226:7 234:19 244:25 246:10 253:25 258:13 261:12 264:19 279:2 290:14 291:4 293:16,23 296:13 308:10
311:17
meaning 108:20 234:18
meaningful 14:18 209:16
meaningfully 199:5
means 50:1 133:20 174:24 180:8 254:23 254:23 273:5,6 277:15 290:9
measured 77:11
measures 41:15
meat 280:11
mechanism 211:19
media 17:21 311:19 312:4
medium 210:10,17
meet 80:23
meeting 50:3 212:7
meetings 195:2 195:4,20,21 196:3 305:17
mellon 15:10
member 16:23 223:15 267:21 267:21 268:6,6 268:12,16 269:8
members 110:1 126:2,12

---

**[misremembering - multiple]** — Page 56

misremembe... 37:12
misrepresent... 266:16
missed 159:22 250:19
missing 187:8
misstating 241:2
mistake 68:16 173:25 174:2 174:24 175:14 175:16
mistaken 216:15
mitigate 74:23
mm 84:3 209:20
model 142:15 160:7
modeled 83:3
modest 248:4
modifications 197:13
modify 17:10
moelis 16:18 54:23 57:10 71:19 97:16 114:2 116:24 124:25 183:23 194:12,23
moment 35:7 65:4,16,17 109:14
monetary 174:15 229:4,4 231:11,23
monetization 148:22
monetize 61:17 62:4 81:8,17 148:14 149:8,9 150:23 182:21
monetizing 62:7 184:1
money 55:22 65:15 68:5,9 74:16 85:3 87:17 100:11 114:25 115:1,2 119:24 120:2 120:25 121:19 128:15 133:10 135:4,15,24 136:3 139:16 156:9 158:11 177:13 178:23 200:4 201:3,7 201:10 230:11 230:12 234:9 241:9 242:24 243:1,12 247:5 247:13,14,15 254:25 255:18 255:23 257:6 257:12,17,25 258:4 259:8 261:15 262:1 276:9,22,23 282:14,18 283:9 289:2 291:25 292:14 292:15,23
294:12,13,19 302:10,11,15 302:16,17 303:3 304:9,10 304:12
monies 261:10
month 13:17 22:19 63:14 111:12 112:1 130:7 186:12 187:5,11 257:1 261:23,24 300:21 302:2 313:20
months 13:9 35:17 89:17,23 90:3 93:18,24 114:13 116:23 129:21 146:3 146:22,23 147:23 148:5 155:7 156:7 170:5,8 88:19 88:20
morning 9:3,8 24:6,10 32:15 45:5 53:11,12 70:3,5 88:19 88:20
morrissey 5:6
175:4,20 316:5
motions 3:24 9:12 175:6 265:23
motives 236:11 260:21
mouthful 240:8
move 9:18,21 58:12 70:17,19 70:23 71:3 72:8 78:16 82:21 92:23 96:20 100:16 115:9 129:20 162:8 168:24 174:7 178:9 183:18,20 187:1,5 193:2 194:19 214:3 230:25 302:3
moved 224:18 307:7
moving 78:3 79:9,10 97:20 104:24 116:23 136:14 163:24 165:18,25 171:16,20 176:12 252:25 253:2
multibillion 286:11
multiple 51:8 114:9 122:20 124:25 138:4 151:14 299:1,1

| | | | |
|---|---|---|---|
| **mute** 229:16 | 43:17 51:18 | **negotiations** | 47:14,17 48:3 |
| 298:2 | 53:7 56:4 | 175:12 309:6 | 48:7,11,14 |
| **n** | 59:16,25 60:20 | **neither** 314:16 | 49:21 50:8 |
| **n** 4:1 8:1 9:1 | 65:17 78:22 | **neophytes** | 51:11 52:14,14 |
| 316:1 317:1 | 84:10 87:11,12 | 227:4 | 52:18,21 |
| **n.e.** 4:13 | 92:25 93:12 | **net** 230:4,4 | **nft** 244:6 |
| **name** 48:6 53:1 | 94:1 98:2 | 247:3,6 298:25 | **nfts** 244:3 |
| 90:18 118:17 | 109:5 130:5 | 301:13 302:5 | **nice** 40:21 |
| 118:25 129:2 | 132:7 137:8 | 303:11,20 | 158:20 249:2 |
| 130:12 181:24 | 171:25 175:9 | 305:13,14,19 | **niche** 278:3,13 |
| 188:24 220:5 | 176:9 180:23 | 305:20 306:7 | 278:17 |
| 245:8 246:20 | 209:22 229:10 | 306:12 307:9 | **night** 18:1 |
| 246:21 269:8 | 254:22,25 | **network** 303:6 | **nine** 22:2 |
| **named** 103:1,3 | 255:2 280:22 | **never** 121:1 | 271:24,25 |
| **names** 172:1 | 281:20 296:16 | 164:10 178:14 | **noise** 229:15 |
| 179:22 271:20 | 298:2 315:4 | 181:7,16 | 297:24 |
| **nanosecond** | **needed** 49:17 | 182:15 198:4 | **nominally** |
| 199:4 | 58:23 114:11 | 244:17 271:24 | 199:8 |
| **nashville** 245:7 | 150:19 202:21 | 277:6,7 279:4 | **nominated** |
| **national** | 203:3,13 | 296:14,20 | 223:6 |
| 156:11 169:6,8 | 280:12 | **new** 1:2 2:3 4:6 | **non** 26:15 |
| **nature** 225:15 | **needs** 26:16 | 5:4,16,17,19 | 155:2 228:11 |
| **nav** 298:24 | 28:3 30:23 | 6:4,11,18 | 244:9 282:21 |
| **ndas** 171:25 | 187:1 199:7 | 15:10,16,16,19 | **noncomplian...** |
| **ne** 4:20 | **negative** 26:24 | 15:20 37:22 | 169:8 170:17 |
| **nearing** 159:7 | 29:24 30:1 | 88:14 99:5 | **nonconsenting** |
| **nearly** 307:9 | **negligence** | 142:1 163:4 | 44:5 111:13 |
| **necessarily** | 236:24 254:1 | 169:16 218:21 | **nonpublic** 25:2 |
| 135:6 147:17 | 257:22 301:16 | 234:14 235:4,9 | 30:20 |
| 249:11 281:23 | **negligent** | 254:23 313:3,4 | **nonresponsive** |
| 311:17 | 236:25,25 | **newer** 70:7 | 249:15 |
| **necessary** 93:5 | **negotiate** 234:7 | **newly** 268:2 | **nope** 239:14 |
| **need** 9:24,25 | 237:12 | **news** 120:9,9 | **normal** 286:9 |
| 17:18 19:4,18 | **negotiated** | 217:22 239:13 | **nos** 3:18 |
| 26:13,17 29:9 | 54:15 230:6 | **newsom** 7:10 | **notable** 236:10 |
| 35:12,24 37:14 | **negotiating** | 45:22 46:2,7 | **note** 274:11 |
| 37:24 40:6,18 | 13:17 309:1 | 46:21,24 47:5 | |

| | | | |
|---|---|---|---|
| **noted** 75:4 | 263:24 272:3 | 117:7 125:21 | 195:9 229:17 |
| **notes** 213:6 | 275:16 276:24 | 130:10 134:12 | 258:17 263:21 |
| 216:15 | 276:25 282:15 | 140:5 160:13 | 270:9 309:17 |
| **notice** 23:14 | 296:5 298:20 | 163:19 166:10 | **objections** 15:9 |
| **noticed** 247:3 | 305:15,17 | 170:23 172:6 | 15:13,15 17:8 |
| **notified** 249:14 | 307:9,10 | 176:25 179:18 | 24:14 35:9,18 |
| 251:23 252:4 | **numbers** 43:9 | 182:3 187:13 | 39:9,11 45:18 |
| 263:6 | 83:4,21 84:8 | 190:2,8 192:14 | 51:3 52:12,15 |
| **notwithstand...** | 84:14 92:3 | 195:5 196:10 | 52:17,19 75:4 |
| 31:6,16 | 102:3,6 108:22 | 204:2,25 | 78:23 123:8,10 |
| **november** | 109:4 143:24 | 242:15 252:6 | 216:18 220:13 |
| 132:20 | 145:3 147:15 | 303:12 | 220:21 221:1,4 |
| **number** 9:22 | 151:13 309:12 | **objected** 15:12 | **objective** |
| 10:23 11:5,6,8 | 303:1 | 19:17 51:20 | 114:16 |
| 15:3,19 25:3 | **numerical** | 52:1 66:12 | **objectivity** |
| 26:6 42:16,24 | 84:15 172:1 | 117:6 | 57:17,18 |
| 42:24 46:16 | **numerous** | **objecting** | **objectors** 9:23 |
| 53:23 57:8,10 | 50:21 166:2,10 | 56:15 | 15:18 17:6,15 |
| 57:12,13 61:10 | 211:25 213:20 | **objection** 3:17 | 23:20 52:5 |
| 70:11 71:11 | **ny** 2:3 4:6 5:4 | 24:11 25:12 | **obligated** |
| 82:10 96:23 | 5:19 6:4,11,18 | 27:7,16 30:5 | 258:3 |
| 97:8,13 102:15 | 317:23 | 38:19 40:12,23 | **obligation** |
| 105:23 106:11 | **o** | 47:23 48:18 | 188:1 247:8 |
| 113:17,25 | **o** 2:21 9:1 | 49:7 50:15,16 | **obscure** 70:12 |
| 115:6,11 125:4 | 317:1 | 51:12 55:11,12 | 138:5 148:14 |
| 135:19,19 | **oath** 161:14 | 56:4,12,14,16 | 148:20 182:20 |
| 136:1 143:25 | 185:7 230:21 | 57:2 60:19 | 183:18 |
| 144:10 148:8,9 | 232:6 244:19 | 65:22 66:4,5 | **observation** |
| 155:5 158:5 | **object** 27:15,15 | 75:2 79:17 | 260:19 295:7 |
| 172:1,25 182:9 | 55:13 56:9,20 | 85:13 101:22 | **observed** |
| 183:9 194:25 | 56:24 64:18 | 101:24 126:1,3 | 235:10 |
| 195:14 205:13 | 66:3 72:21 | 126:8 130:12 | **obstacle** 178:4 |
| 212:3,23 | 74:25 79:15 | 134:15 160:18 | 178:15 179:5 |
| 220:12 227:25 | 85:1 90:11 | 163:21 175:8 | **obstacles** 15:14 |
| 228:9,14,15,19 | 92:11 101:18 | 175:20,25 | **obtain** 229:3 |
| 233:16 256:1 | 110:5 112:2 | 184:16 187:18 | 234:8 237:13 |
| 259:22,22 | 113:12 116:3 | 190:12,18,19 | 255:6 290:23 |

| | | | |
|---|---|---|---|
| 305:20 | 65:25 72:25 | 295:25 296:5 | 101:1,6 102:8 |
| **obtained** 94:2 | 78:17 85:12 | 298:17 301:15 | 103:12 106:19 |
| 233:11 234:1,2 | 140:9 247:21 | 302:6 306:4 | 107:4 108:3 |
| 234:3 281:16 | 260:15,15,16 | **okay** 9:16,21 | 109:5,20 |
| **obtaining** | 261:5 293:12 | 9:22 12:7,15 | 111:12 112:7,8 |
| 234:9 254:23 | 314:22 | 17:23 19:6 | 112:10,14,16 |
| 274:12 | **offered** 66:6 | 20:20 22:21 | 115:3 118:11 |
| **obvious** 51:16 | **offering** 40:8 | 23:8,17,20 | 118:16 120:16 |
| **obviously** 12:8 | 133:5,6,17 | 24:4 35:6,7 | 122:1,8 124:4 |
| 21:4 36:1 | 285:23 | 37:19 39:7 | 126:10,22 |
| 68:25 94:8 | **office** 5:8 43:21 | 40:1,10 43:11 | 128:16,19 |
| 118:16 135:16 | 44:1 166:4 | 44:19 45:21 | 129:7,14 |
| 145:3 153:19 | **officer** 6:8 | 46:14,18,20 | 130:13,20 |
| 178:11 209:14 | 228:20 233:6 | 47:24 48:17,22 | 131:2,13 132:9 |
| 211:2 244:16 | 251:19 256:7 | 48:25 51:13,13 | 132:19 133:13 |
| 256:22 257:19 | 268:9 282:15 | 52:2,8,13,21 | 133:15 135:12 |
| **occur** 79:8 | 283:3 289:14 | 52:22 53:19,21 | 136:6 138:15 |
| 196:15 197:2 | 290:1,7 292:3 | 54:4,19 55:6 | 138:24 141:12 |
| 287:4 | **officers** 3:5 | 55:17 56:14,18 | 141:24 142:6 |
| **occurred** | 226:19 228:5 | 56:25 58:2,12 | 142:22 144:6 |
| 158:21 205:21 | 246:11 255:1 | 59:1 60:25 | 144:21 145:22 |
| 285:3 296:15 | 256:3 264:23 | 61:5 63:21 | 149:3,16 150:9 |
| **occurring** | 264:25 266:4,5 | 66:4,9,17,22 | 153:2 154:7,13 |
| 180:19 | 266:25 272:18 | 66:24 67:1,4 | 154:16 155:11 |
| **october** 227:17 | 273:17 274:10 | 69:3 71:1 | 155:16,17 |
| **odd** 255:12 | 274:14,21 | 72:11 74:23 | 156:16,17,19 |
| 272:3,21 | 275:1 276:8 | 75:23 76:2 | 156:23,25 |
| 294:18 | 283:17 284:14 | 78:2,11 82:21 | 157:4,22,24 |
| **odds** 156:10 | 285:4 289:23 | 84:17,19 85:6 | 158:2 159:15 |
| **offboarding** | 296:17 | 85:10,16 87:23 | 161:9,17 |
| 168:19 | **official** 3:17 | 88:2,4,11,16 | 163:24 164:24 |
| **offer** 9:20 | 168:19 | 89:8,11,15,20 | 165:6,22,23 |
| 16:22 17:3 | **officially** 78:14 | 90:4 91:3,22 | 166:24 167:3,7 |
| 38:2,6,15 | **offsets** 152:5 | 91:25 92:4,25 | 167:15,18 |
| 45:11,14 48:21 | 152:11 | 94:6 95:14 | 168:10,16 |
| 49:4,5 51:20 | **oh** 149:18 | 99:11 100:16 | 169:2,17 |
| 52:11 56:20,20 | 156:22 259:8 | 100:22 | 170:16 171:13 |
| | 267:20 293:18 | | |

| | | | |
|---|---|---|---|
| 171:16 174:7 | 279:17,23 | 95:13 130:19 | **opening** 9:14 |
| 178:3 180:12 | 280:1,25 | 131:1,6 143:24 | 9:17 47:21 |
| 180:15 181:3 | 281:22 283:6 | 157:13 198:13 | **opens** 136:8 |
| 185:4 186:1,3 | 283:24 287:12 | 198:25 199:13 | **operable** |
| 188:15 189:1 | 287:21 288:6 | 204:9,11,12 | 116:11 |
| 190:12 193:22 | 288:24 289:1 | **old** 317:21 | **operating** |
| 196:6 197:3 | 290:6,20 295:9 | **onboarded** | 33:11,13 |
| 199:16 202:12 | 296:24,25 | 215:18 | 102:19 103:2,3 |
| 202:19 203:6 | 297:6,9 298:3 | **onboarding** | 103:5 170:3 |
| 204:17 206:17 | 298:18 300:8 | 168:19 | 267:19,23 |
| 207:1,8,14 | 301:9 302:14 | **once** 47:14 | **operations** |
| 208:2,4,10 | 302:25 303:5 | 150:6 190:17 | 67:9 |
| 209:10,10,21 | 305:16 306:16 | 191:8,14 192:5 | **opine** 29:9 |
| 210:7,13,13 | 306:25 307:5 | 192:7 193:3,9 | 73:20 153:22 |
| 211:13 212:10 | 309:13 310:8 | 197:20 206:19 | **opining** 34:12 |
| 212:10,13 | 310:10,10,21 | 208:1 214:25 | 273:12 |
| 213:8 214:6 | 310:23 311:1 | 234:15 258:7 | **opinion** 27:11 |
| 216:9,18 218:9 | 311:16 312:6,7 | 261:23 262:4 | 27:15 56:17 |
| 219:16,21 | 313:3,9,10,10 | 277:17 289:1 | 64:3 68:21 |
| 221:16,24 | 313:22 314:3 | **ones** 148:20 | 69:1 72:7 |
| 223:9 224:19 | 314:12 | 180:1 184:2 | 98:22 106:3 |
| 229:18 232:17 | **okike** 4:8 9:3,4 | 185:24 288:20 | 125:7,12 |
| 234:22 235:23 | 9:6,17 10:4,19 | 288:21 312:19 | 135:25 136:24 |
| 237:24 238:20 | 11:23 12:2,5,8 | **ongoing** 30:16 | 139:5 183:12 |
| 238:23 240:8 | 12:11,17 18:5 | 64:21 150:25 | 183:13 192:3 |
| 240:12 241:5 | 18:21 19:5,11 | 169:15 180:21 | 193:20 252:9 |
| 242:2 243:22 | 19:21 20:13,22 | 205:21 | 252:15 267:1 |
| 244:24 245:3 | 22:2,7,23,19 | **opco** 11:5 | 297:12 |
| 245:15,18 | 22:23 23:1,9 | 18:10 22:25 | **opinions** 125:9 |
| 246:12,24 | 23:21 42:15,20 | 103:15 242:25 | **opportunistic** |
| 248:17,21 | 43:1,5,9 72:16 | **open** 26:18 | 189:17 190:24 |
| 249:10 252:20 | 75:22 76:1 | 114:20 120:7 | **opportunities** |
| 253:22 255:7 | 77:9,12,14,22 | 129:25 130:3,6 | 191:2 |
| 260:12 264:6 | 77:25 78:3,7,9 | 136:19 175:2 | **opportunity** |
| 272:11 273:15 | 93:16 94:4,7 | 183:1,2 199:24 | 55:1 90:5,7 |
| 275:5 276:11 | 94:16 95:3,10 | 298:1 | 93:17 194:23 |
| | | | 221:3 |

## [opposed - papers]   Page 61

opposed 24:15
 96:8 174:24
 288:24 289:21
opposite 261:1
 300:19 301:8
opt 46:25 47:6
 47:7 145:8
 146:20 240:25
 308:15 309:14
 309:15 310:2,4
 310:13,17
opted 143:10
 310:12
optimal 74:13
optimizing
 149:5
opting 147:5
option 15:1
 37:4,6 60:13
 89:12 110:23
 130:7 134:4,5
 134:8,9,10
 135:16 136:8
 136:13,19,21
 140:6 142:13
 146:24 171:7
 194:19
optionality
 58:18 171:11
options 57:24
 243:11,17
opts 309:21
order 8:21
 41:21 44:16,18
 44:21 54:8
 64:1 78:18
 123:11 129:20

177:11 180:1
191:25 194:21
197:15 227:1
orderly 14:22
 82:16,17
ordinarily
 266:17
ordinary
 184:11,23
 185:19 201:24
 230:2
organization
 65:9 114:23
 124:23 176:19
organizations
 6:9
original 75:19
 107:13 234:4
 234:11,14
originally 12:4
 41:20 260:2
 261:23
ought 10:3
 27:6 78:15
 121:7,14 249:9
outcome 21:4
 72:10 153:23
 153:24 248:15
 278:15
outset 10:20
outside 79:16
 101:19 280:9
 281:2 287:5
outstanding
 87:15
outvote 268:15

overall 77:8
 148:13 309:14
 209:15 233:19
 235:18
overlay 58:8
overnight
 314:3
overrule 50:16
 79:17
overruled 57:2
 160:15,18
 195:7,9
oversee 240:4
overwhelming
 10:21 54:2
overwhelmin...
 11:4 15:4 86:9
owe 121:6
 13:16 47:8
 65:19,20 66:8
 86:3,6 124:23
 136:18 140:22
 159:1 194:11
 211:21 225:18
 226:23 245:10
 266:3,13
 270:15 273:20
 282:24 286:15
 297:22 300:14
 300:14 305:12
 308:21
owned 225:6
 247:22,23
owners 242:24
ownership
 160:11

owns 244:12
 247:24 312:20

**p**
p 4:1,1 9:1
paces 4:13
package 256:3
 274:24
page 8:20
 103:13 105:12
 158:6 227:16
 316:4
pages 40:16
 49:13 50:4
 250:25
paid 13:25
 75:10 83:25
 86:13 87:11,12
 87:24 89:17
 134:17,20,20
 135:5 230:3
 233:21 235:6
 238:12 242:23
 242:25 243:5,5
 255:18 256:15
 257:13,13
 258:5 269:18
 269:23 270:15
 272:21,24
 276:22 282:18
 283:1,8 294:19
 303:22
painful 159:20
panel 132:25
paper 139:22
papers 30:25
 32:19 33:9,17
 263:24

## [paperwork - penalties]   Page 62

paperwork
 235:3
paragraph
 44:10 70:22
 75:3 96:24,25
 104:14 107:25
 208:21 209:2
 209:16
paragraphs
 44:15 97:5
paraphrase
 70:21 203:8
paraphrasing
 75:7
pardon 269:20
parent 103:6,7
 162:18 163:2,6
 163:7,8,12
 167:20 168:20
 216:22 217:6,7
 268:21,22
 269:2
pari 63:7 138:7
paris 6:8
park 87:2
part 10:9 24:11
 36:25 41:25
 51:10 58:13
 76:4 80:14,15
 80:15 87:17
 93:5 99:6
 133:2 134:16
 141:19 142:6
 158:6 175:25
 180:18 196:2
 198:25 217:21
 224:25 227:8

230:5,13,15
231:6 233:19
235:18 240:16
242:3 244:4
249:8 250:16
251:25 256:2
257:7 258:6
263:13 264:12
264:17 266:24
273:16,19
274:5 281:12
284:9 291:19
292:7,8 299:1
299:3
participants
 61:16 97:23
 99:10 125:1
 184:4
participate
 201:13,22
 202:1 314:18
participated
 125:17 172:20
 287:19
participating
 202:2
participation
 312:20
particle 243:24
 243:25 244:4,8
particular
 18:18 27:12
 31:19 32:24
 33:18 77:10,19
 78:6 175:13
 182:5 220:16
 220:22 224:17

particularly
 62:6 119:19
 225:15 236:15
parties 9:23
 13:17 22:11
 37:24 47:1
 56:2 57:19
 114:9 161:3
 220:20 229:5
 265:2 274:13
 281:19 283:22
 288:1
partner 222:21
partners
 279:15 313:6
parts 17:11,16
 24:11 36:3
 104:24 166:10
 229:20,21
party 13:14
 25:17 55:3
 98:10 223:13
 255:18 256:12
 294:13 301:12
pass 69:21
 112:8 128:18
 216:5 222:10
 229:12
passed 159:8
 275:20 293:5
passes 63:7
past 13:6 22:19
 114:13 119:20
 120:13 121:12
 122:25 123:5
 123:13 164:5

173:22 174:5
174:13,19
195:6
path 13:20
 14:6 58:19
 64:6 252:4
paths 224:9
patience
 122:15
pay 116:24
 201:8 228:18
 229:25 230:12
 230:15,16
 241:9 242:24
 248:12 255:9
 256:10,13
 258:3,4 274:5
 294:6,13
payable 14:11
paying 87:12
 169:6 177:10
 255:13 273:11
 295:10
payment
 231:11
payments
 243:10
payout 255:23
 275:20 293:5
 374:14
pays 230:11,14
peak 217:23
pegged 91:13
penalized
 155:23
penalties
 265:17 278:6

## [pendency - personally]   Page 63

pendency
 150:17
pending 3:4
 10:2 82:22
 175:4
penny 247:11
people 19:25
 34:12 39:21
 40:3,4 43:18
 45:8 46:5,6,8,8
 46:13,14,15,18
 68:23 69:24
 72:8 82:18
 85:21 88:10
 93:13 95:8
 110:15 113:25
 118:8 119:8
 127:12,18
 128:9,20
 129:19 132:24
 136:8,19
 138:10 143:6
 143:17,19,22
 144:2,14,22
 146:2 147:16
 148:4 165:15
 176:21 179:21
 193:16,18
 198:2 221:22
 221:22 226:18
 231:24 241:13
 241:13 244:8
 260:4 264:2
 268:24,25
 271:20 274:11
 277:1,3,7,19
 277:23 278:21

207:5,7,9,10
208:6,7,8,9,20
209:4,10,11,14
209:15 210:1,2
232:9 234:6
251:12 264:9
269:11,11
281:18
286:12 287:1,3
287:9 292:16
293:20,25
296:14 307:4
312:5,22 14:7
percent 10:23
 10:24 11:5,6,8
 11:7,8,16,25
 12:5,22 14:7
 42:16,22,24
 69:16 71:4
 76:14 84:22,25
 85:2,4,22,22
 85:23 95:19,22
 96:2,4,16,23
 97:8,9,9,13
percentage
 46:13 83:21
 102:1,13
 104:23 107:7
 132:23 135:1
 143:2 189:21
 190:7 206:21
 207:15,25
 208:17 305:19
 306:11
percentages
 46:16 107:9,23
 109:9
perchance
 162:3
perfect 236:7
perform 285:5
 297:12
performance
 148:15
performed
 249:25 282:2
 284:12
performing
 33:12

period 63:4,14
 81:5 111:13
 112:1 130:7
 134:7,9 145:2
 155:5 181:14
 196:25 198:10
 199:7 211:14
 215:3 300:21
permanent
 68:14
permissible
 158:4
permission 9:9
 53:7
permit 9:14
perpetrated
 203:21
perpetrator
 266:5
person 40:22
 49:25 89:15
 165:15 173:8
 231:20,21
 247:22 268:4
 276:6,12 278:4
 293:19
person's
 247:22
personal 158:1
 219:18 230:19
 231:12 232:6
 232:19 239:24
 240:16 282:16
 287:19 290:10
 290:17 292:3
personally
 3:13 141:14

## [personally - platform]   Page 64

249:13 256:10
310:18
personnel
 58:22 59:4
 67:4,5,8 88:23
 89:4
personnel's
 59:9
perspective
 42:20 68:2
 144:18 154:25
 155:3 156:11
 156:12 158:10
 161:1 174:9
 217:1,2 276:3
pertaining
 126:11
perverse
 278:23
phase 226:10
 236:7
phone 10:5,6
 53:13 60:4,5
 69:10 128:23
 141:2 159:9
 188:16,18,21
 199:22 202:6
 202:13 206:11
 226:16 279:7
 297:17 299:25
 300:3 310:23
phrase 234:18
 256:8 287:23
pick 17:9
 105:24 162:7
picked 174:3

picking 161:25
picture 141:21
piece 232:15
 293:2
pieces 231:23
piggybacking
 90:23 96:10
pivot 90:23
pivoted 13:14
place 36:24
 164:6 179:21
 205:18 214:20
 216:23 217:5
 217:19 236:6
 241:4 275:16
placed 210:9
 72:25 73:3
plain 273:9
plainly 215:14
plaintiff 1:11
 1:20
plan 8,9,11,19
 10:21,22 11:2
 11:4 12:19
 14:21,23 15:2
 15:5,12 16:3,9
 16:13,20 17:9
 17:12,14 22:23
 23:16 24:24
 25:17 26:14,15
 26:19,22 27:10
 28:21 29:14,22
 29:23,25 31:7
 31:16,22 32:4
 33:12 34:11,20
 35:11,14,16,22
 36:4,16,22
 37:8 38:6 42:7

42:19,19 43:8
 46:6,6,11,15
 46:17,24,25
 47:15,15,17,25
 50:3 53:22,23
 53:25 54:5,6
 54:12,13 55:13
 55:14 57:21
 58:13,19 59:10
 59:12,15,19,20
 60:13,17 61:8
 61:21,22,24
 62:13,24 63:3
 63:4 65:9,11
 69:16 71:8,17
 72:25 73:3
 75:24 77:1,2,2
 77:3,3,4 84:4
 84:11,13 85:5
 86:16 87:9,10
 88:23,23 89:5
 89:6,7,8 91:6
 92:22 94:18
 95:5 98:14
 99:9,10 101:14
 102:6,6 104:10
 104:11,12,13
 104:16,25
 105:1,7,8,18
 106:2 108:1,8
 108:19,19,20
 108:21 109:1
 110:21,22,24
 111:5,7 112:18
 114:11,17
 126:13,15,21
 128:7,8 136:25

137:1,1,3,5,6
137:13,13
138:2 139:22
139:24 142:13
142:14,19
143:2,11,20
144:1,3,9
146:8,17,20
147:6,12,25
148:9 151:15
151:19,21,23
173:3,18 174:4
174:14 175:7
175:13 176:7
177:16 178:9
178:10,11
181:8 192:1,1
194:19 198:13
203:4,10,16
204:13 205:19
207:21,23,25
208:6,6 211:7
211:7 215:24
232:10 233:2
240:21 242:10
247:14 260:2
261:10,13
273:14 290:4
309:21 310:2,7
plan's 16:14
planning 140:8
plans 36:15
 77:7 106:4
 173:20,21
platform 12:23
 12:24 13:24
 14:7 20:3,23

21:1,7 22:6
38:1 64:1,10
64:12 74:20
93:19 95:6
98:10,16,23
111:8 114:22
137:17,24
140:19 142:2,3
143:10,20
208:24 214:4
216:22 236:14
239:19 243:14
256:17,17,22
256:24 311:6,7
**platforms**
209:22 311:19
**play** 278:24
**played** 54:21
119:24
**player** 194:16
**players** 194:15
**pleasantry**
163:11
**please** 56:3
57:5 65:10,13
65:13,16,17
66:22,22 78:13
78:23 85:2,17
86:4 101:6
113:20 115:21
119:1 121:10
123:2 124:2
141:18 145:21
161:13,14
168:11 170:20
185:6 206:17
220:6,8 229:16

246:24 300:5
303:24,24
306:1
**pleased** 9:6
**plenty** 128:5
**plow** 219:19
**plug** 136:19
**plummet**
190:21 191:12
192:7
**plus** 13:24 74:1
233:24 303:2
**pm** 315:7
**pocket** 270:15
**podcast** 120:14
**podium** 188:14
201:25 279:6
**pohl** 8:13
16:23 218:20
218:21 219:24
220:1,4,7,7,11
221:7,9,20,24
222:1,13
238:14 242:5
245:25 246:2
248:18,23,25
252:20 254:13
259:11 262:17
262:19 270:19
271:7 279:8,10
279:13 280:2
297:7,9 303:24
311:2,4 312:11
313:14
**pohl's** 219:6
221:1

**point** 22:13
24:25 36:2
37:1 39:9
43:10 60:4,20
60:23 66:7
100:14 109:6
116:8 125:3
147:20 153:24
156:21 166:21
172:17 183:7
203:17 217:16
218:2 220:17
234:16 239:11
261:5 264:7
265:16 272:8
287:13 290:21
299:7 314:24
**pointed** 152:18
306:5
**pointless**
175:18
**points** 10:20
38:3,6 39:22
43:18 51:18,21
51:24 121:12
128:2 174:6
265:11
**poised** 13:7
**policies** 231:22
233:16 234:4,9
234:14 247:17
255:6 274:16
275:15,17
283:12 288:7
289:13 297:10
**policy** 229:2
232:16 233:10

233:15,19,24
234:4,11,14
235:4 238:21
248:6,8,11
254:16 255:9
272:18,23,24
273:11 274:4
275:2,5,16
276:9 292:10
292:14 293:3,4
293:7,10,25
294:2,7,17
**pool** 102:14
133:11 274:19
275:6 276:4
291:24 292:14
292:15
**poor** 307:21
308:7,10
**poorly** 224:14
**portfolio** 11:14
61:14 121:18
151:4 189:5,11
209:1
**portion** 77:6
108:24 147:16
170:8 192:4
280:6
**posed** 52:12
**position** 24:16
24:23,25 25:25
26:2,17 27:10
29:5,17 31:2,4
33:17 36:17
40:2 86:18,20
86:25 90:25
159:2 186:22

**presume**
303:21
**pretty** 15:17
28:25 51:16
228:15 230:11
230:15 236:3
237:4
**prevails** 62:18
103:18
**prevent** 208:22
216:23 217:6
**prevents** 84:2
**previous**
164:17 275:8
**previously**
143:9 170:18
182:7 293:25
306:6
**price** 21:22,23
22:18,20 78:8
183:6 190:16
190:21 191:11
191:12 192:7
192:12 239:20
307:7
**priceless** 244:6
**prices** 11:13
77:19 206:24
207:3
**primarily** 81:1
**primary** 16:12
71:24,25
166:20 175:7
224:19,21
225:25 249:10
279:14 280:9

**principle** 10:11
**print** 184:20
**prior** 10:15
66:24 78:1
79:6,24 80:19
80:20,24 81:11
93:3 177:4
205:22 220:12
229:25
**priorities** 19:2
216:23 217:6
**priority** 62:1
87:11,13 94:11
**privacy** 141:13
141:14 142:15
153:14 157:19
**private** 25:3,16
pro 6:23 7:2,5
7:8,11,14,17
7:20 9:12
20:24 21:6
23:24 49:11
50:5 52:14
56:7 129:5
159:13 188:22
200:15 206:16
222:3 246:18
248:20 297:4
312:8
**probability**
69:14
**probably** 34:7
140:14,15
154:24 159:8
161:4 170:16
173:5 209:6
219:5 231:22
237:1 267:2,3

272:25 276:6
277:17,24
292:5 293:23
314:2
**problem** 80:12
110:12 138:25
180:6 181:4
206:7,7 211:21
**problematic**
62:5 64:4
80:11 110:23
179:16
**problems** 40:7
60:9 63:13
137:16 140:10
215:12 265:8
**procedural**
189:23
**procedure**
268:4
**procedures**
150:19 217:5
217:19
**proceed** 9:10
10:17 78:23
85:17 101:6
206:17 220:8
220:23 246:24
262:14
**proceeding** 3:1
3:7 119:18
122:23 127:7
156:21 201:23
255:3 285:6
**proceedings**
123:13 126:6
174:25 315:6

317:4
**proceeds** 59:8
61:14,24 62:9
82:14
**process** 9:8
13:3 16:19
25:2 26:18
30:20 41:19
53:18 54:17
61:19 64:13
99:6 115:14
124:24 131:14
140:15 150:21
150:25 152:2
171:21 179:6
211:5 264:12
267:5 277:18
288:11,18
297:17,22
**processes** 21:3
25:2 300:15
**procured**
233:18 238:21
**productive**
20:14
**professional**
49:14 51:8
87:14,18,21
134:19 142:23
234:23 276:15
276:16 280:18
**professionals**
213:4,18 281:2
**profiles** 248:15
**profit** 244:9
**profitability**
290:7,9

251:21 262:22
267:16 286:21
**positioned**
129:12
**positions** 159:1
**positive** 237:13
**possession** 50:3
**possibility** 69:4
110:3 142:1
217:14 296:18
**possible** 23:4
26:21 28:15
58:20 63:22
80:7 84:13
105:16 111:5
114:17,20
115:10 176:18
179:8 193:12
218:24 219:20
222:5 263:18
278:2 290:24
**possibly**
107:24 169:6
**post** 18:22
22:15 34:19
93:18 210:17
**potential** 25:20
27:20 29:21
34:23 57:23
223:13 228:22
229:5 255:21
265:17 272:17
273:3 274:18
274:19 275:20
288:17 289:8
299:11 301:3

**potentially**
19:24 34:3
36:4 37:17
156:9 175:24
199:11 207:10
283:13 291:25
295:1 307:21
312:22
**power** 271:17
**powers** 268:7
**practical** 14:19
290:25
**practice**
174:15 222:20
254:17,19
256:18
**practices** 166:1
166:7,9 224:24
225:2,3,11
236:4,6,18
281:14 282:12
285:10,12
297:11
**pre** 3:11
260:14
**precarious**
162:10
**preceded** 275:9
**precipitated**
264:2
**precipitating**
264:1
**precipitous**
286:19,22
**preclude** 34:21
**precludes**
58:11

**predict** 169:1
**predictions**
39:5
**predominantly**
152:10 288:5
**preexisting**
176:24
**preface** 166:11
**prefer** 152:17
157:8 180:4
**preferable**
147:13
**preference**
11:22,24 19:8
72:15 73:17
75:11,11
103:18 104:1
106:23 107:2
108:16 152:9
152:15,20
259:20
**preferences**
151:11
**preferred**
159:8
**preliminary**
17:22
**premise** 134:16
135:2 210:20
210:20
**premium**
293:3,4,20,24
294:6
**prepared** 59:4
59:5 219:11
227:14

**prepetition**
21:18
**prescribed**
71:16
**present** 15:14
69:24 88:11
205:17
**presentation**
66:8
**presented**
107:20 142:9
147:15 242:13
**preserve** 19:7
23:2 248:11
273:5 274:17
275:2 294:14
295:6 301:4
**preserved**
235:19 255:15
256:11 273:4
274:1,2 276:7
283:23
292:16 294:12
294:25 295:5,6
**preserving**
283:19
**preset** 212:6
**press** 238:9
250:17 251:6
251:10,15,18
251:25 253:10
262:21
**pressure** 57:14
71:15,18 285:4

**programming**
178:16,18
**progress** 236:7
**prohibiting**
278:15
**projected** 12:3
12:5
**projection**
95:19
**promise**
173:23 175:11
**proof** 27:4
240:22
**proofs** 3:18
266:24
**propaganda**
117:22
**proper** 27:7
28:9 65:21
66:4,5 155:6
167:4,5
**properly** 67:15
265:25
**property**
100:11 197:19
198:4 211:14
245:7 304:2,6
308:18,23
**proportion**
21:18 210:6
**proportionality**
191:18
**proportionate**
60:18 210:5
**proportionat...**
210:4

**proposal** 128:2
174:12 260:15
**proposals**
121:25
**propose** 9:11
9:17
**proposed**
12:18 16:21
17:14 20:9
35:14 92:7
126:13 128:8
296:18
**proposes** 128:8
**prosecute**
238:16 254:4
282:24
**prosecuted**
231:8
**prosecuting**
17:12
**prosecution**
3:4
235:14 230:20
281:10,21,24
284:5,25
288:22 300:10
**protect** 14:15
41:16,23
217:12 251:21
284:5,25
288:22 300:10
**protected** 25:3
41:4 245:8
**protecting**
22:9 58:19
64:7,21 72:2
71:3 72:20
73:23 75:5
86:8 94:21
158:3 171:3,4
171:11
**protective**
215:10

**protectorate**
215:8
**protocol** 131:8
**protocols**
150:19
**prove** 26:24,24
28:1,4,4 31:5
**proved** 31:1
**proven** 84:23
114:5
**proves** 118:22
**provide** 14:18
17:22 22:14
26:17 27:10
62:24 63:3,15
76:12 115:25
139:8 191:19
**provided** 23:13
84:23 115:24
131:4 132:15
158:4 230:20
235:14 280:24
281:10,21,24
284:5,25
288:22 300:10
**provides** 14:2
14:5,10,13,22
22:9 58:19
63:4 70:22
71:3 72:20
73:23 75:5
86:8 94:21
158:3 171:3,4
171:11
**providing**
87:17 94:19
278:4

**provision**
47:12 54:13,15
84:10 115:25
141:16,20
199:6
**provisions**
35:10 51:16,23
52:9 87:23
177:4 198:19
198:20
**psaropoulos**
228:6 229:10
232:2 235:24
246:23 247:6,9
250:4,9 273:24
280:22 282:17
289:6 303:5
305:14 307:2,3
307:16
**pseudo** 300:22
**public** 48:12
116:9 239:7
265:1 271:12
296:8 298:6
300:10
**publicly** 164:4
227:20
**pull** 117:16
245:12
**pulling** 151:10
**purchase** 19:7
40:15 125:20
141:17,20,22
157:14
**purchased**
234:5

## [purchaser - question]  Page 69

purchaser
152:5
purchasing
22:11 94:16
213:12
purely 18:7
purpose
193:19 224:17
purposes 21:19
62:20 192:19
193:21 197:22
245:13
pursue 177:6
247:5 261:3
264:23 265:10
266:14
pursued
173:21 252:17
266:14
purview
271:16 280:16
pushing 160:3
170:21
put 13:19
15:18,23 16:17
31:7 38:25
42:3,19 51:13
56:22,23 60:25
70:7,8 162:9
178:21 179:22
198:16,19,21
200:1,4 214:20
215:14 229:1
248:10 277:4,5
277:6 278:7
286:17

puts 51:9
163:24 286:20
putting 165:1
308:11

**q**

qualified
280:17 296:8
quantification
84:15 153:11
153:14
quantified
152:12 153:18
154:1
quantify 252:5
quarter 186:10
187:6
question 23:10
23:25 24:1,2,3
39:18 42:10
47:22,22 50:22
50:23 59:14
60:10,11,14,19
72:22 73:3
76:17,20 83:16
84:7 85:11,14
86:4,24 88:1
90:23,24
100:19 101:11
105:20 110:13
112:4 113:5,8
113:9 115:3
117:8,11,12,16
117:23 118:5
118:18 119:13
120:17 121:5
124:1 125:22
126:9,20 128:1

128:11 129:9
129:15,24
130:3,5 131:10
132:4,19,23,25
133:16,19
134:3,13,17
135:3 137:2,18
138:17 139:12
140:6 141:12
141:18 143:13
145:11,14,20
147:9,10,21
148:2,24
150:16 151:8
153:2,10
155:19 156:2
156:17,25
157:10,24
158:7,10,16
160:16,19
166:11 167:4,5
167:7,19,23
168:11,22
169:9 170:10
170:11,12,25
172:2,10,22,23
173:17 176:5,8
176:19 177:1,3
178:6 179:14
179:20 185:8
185:16 186:20
186:21 189:24
189:25 190:4,6
190:14 192:15
192:17,17,21
193:25 195:10
196:11,21

197:6 199:22
200:11,15,16
200:18,22
202:14,20,24
203:9 204:10
204:21 207:20
208:9,12
210:25 211:8
211:21,22
212:25 214:8
217:20 229:17
237:25 238:2
238:12 240:1,2
240:9,16
241:23 243:9
243:24 244:11
246:2,16
247:10 254:15
258:18,20
261:14,15,19
261:25 271:5
276:12,19
278:10 279:9
280:4 281:13
284:16 285:8
286:5,25
287:15,16,20
287:24 288:10
290:18,21
292:2,13 293:9
295:19,23
298:14,16
301:19,20
302:13 305:9
308:15 309:19
310:25 313:2
313:23,24

## [questioned - really]  Page 70

questioned
202:14
questioning
109:19 182:22
187:21 258:7
questions 9:22
17:25 23:19
24:4 38:15
40:18 43:14
49:19 50:17
51:6 60:23
65:23 67:3
75:1 85:10
86:17 88:5,7,9
88:19 90:12,19
92:6,15 100:15
100:23 101:5
102:22 118:4
119:15 120:6
121:12,22,24
123:2,3 126:3
127:11,16,19
128:16 141:7
142:21 150:15
154:15 159:5,9
160:2 161:19
162:12 163:20
163:22 164:23
165:1,4,5,18
165:22 167:7
168:1,3,25
170:18 182:4
190:9 193:20
193:21 196:2
199:17 200:8
201:14,15
204:22 205:13

205:16 206:8
206:13 211:3
212:11 213:1,8
214:18 216:19
217:25 219:5
222:1,4,10
229:16 240:14
246:9,22
248:16,18
254:10 262:15
279:20 280:14
297:2 303:15
309:13 310:21
314:5,9
quick 23:25
155:8
quicker 98:3
149:9 151:7
quickly 13:13
58:20 62:8
71:14 72:5,8
96:21 97:20
114:17 115:10
148:15 182:21
183:18 187:2,7
187:20 215:9
252:25 258:14
284:21
quiet 200:24
201:1,1,1
quinn 6:8
218:16 219:23
222:8 223:9
249:1
quit 61:10
74:3 98:4 99:7
159:20 218:7

240:8 249:6
272:20,20
308:13
quote 116:15
251:15,17,20
quoted 106:12
quotes 250:6

**r**

r 2:21 4:1 9:1
317:1
radio 120:8
raise 43:18
264:3
raised 29:12
38:21 60:12
197:14 204:22
205:4 275:25
raises 28:5
raising 27:8
60:2 205:8
ramifications
31:16 37:11
312:24
rampant
311:21
ran 44:21
range 86:23
104:24 207:5,7
303:20
rapidity 253:3
rata 20:24
ratably 215:11
rate 21:6
rates 72:5
rather 129:21
190:10 229:7
266:12 286:1

309:15
ratio 205:25
rationale
124:22
ray 189:13
reach 45:1
248:15 259:12
reached 19:12
93:24 161:7
229:9 232:25
235:24 237:21
reaction
233:13 234:22
235:11 264:3
read 36:6
44:20,21 104:3
104:14 108:23
109:25 148:10
205:5 208:21
242:9 263:24
294:21
reading 19:17
107:23,24
ready 59:9
110:15 233:18
301:11
real 192:17
224:22 226:1
263:15 288:20
reality 289:16
realizing
158:19
really 22:8,16
22:20 23:2,15
27:16 38:21
39:6,10,10,17
40:8 47:20

## [really - recourse]  Page 71

48:1 51:17
56:21 63:11
65:4 69:19
70:8 75:8 82:4
94:17,21 96:7
296:9
103:8 116:7
119:20 129:11
133:19,20
134:18 139:20
148:11 152:5
156:13,15,17
159:2 210:13
210:17 211:19
211:23 218:1
224:22 226:1
236:22 237:13
240:9 241:16
248:14 261:5
263:2,7,23
264:19 266:19
267:7,25
269:11,12
271:19 273:10
277:10 280:19
286:4 288:4,19
289:10 292:21
293:22 301:17
307:11 308:22

225:22,23
231:13 269:11
278:23 287:3
290:22 291:16
292:17 295:21
296:9
reasonable
291:21 293:20
reasonably
306:18 308:8
reasoned
292:14
reasons 38:12
40:5 84:24
136:5,5 176:14
236:9 291:2
292:11
rebalance
61:18 71:12
80:16,20 151:3
153:4 189:18
191:18
rebalanced
92:3
rebalancing
26:3 31:21
32:19 61:14
67:12 68:3
realm 34:18
80:6,9,14,16
81:16 82:14
83:10 92:1
94:8 97:20
148:25 149:4
150:3,10,21
151:5,9 153:12
180:19,22
187:12 188:7

189:4,10,24
190:23 191:7
191:15 192:1,2
192:4
rebellion
243:10,13,18
245:19 279:15
rec 271:12
recall 26:6
41:17,18 179:4
198:12 212:25
213:10 214:17
233:9 234:2
249:22 250:8
251:10,16,25
252:2 261:8
263:7
receive 11:16
16:3 18:14
19:25 21:6
104:25 145:8
146:5,24
150:23 152:17
155:2 178:18
230:2 231:18
232:9,10
243:10
received
129:10 165:8
220:13 229:25
235:15 273:7
312:15
receives 21:17
156:5
receiving 1:16
146:23 151:10

recent 191:13
recently 72:17
recess 78:11,12
161:12 185:3,5
202:4
recharacterize
178:8
recite 13:19
recklessly
266:7
recollection
72:16 238:16
249:19 269:7
271:13 272:2
recollects
231:25
recommenda...
294:1
recommenda...
269:3
recommended
249:16 268:20
269:3 277:5
record 32:16
43:25 53:2
56:5,7 64:12
70:3 79:1 85:8
88:13 200:2
219:23 220:5
220:10 227:19
317:4
recordkeeping
194:20
records 67:15
212:3 213:21
recourse
231:12 232:19

## [recourse - reigning]  Page 72

304:22
recover 255:17
255:17 302:25
307:1
recoveries
11:11,18 18:19
18:22,23 43:1
43:2 60:17,18
62:11,13 71:22
73:15 77:8
81:25 86:15
103:8 104:16
104:17,20
105:14 106:17
107:7 135:2,10
243:3
recovery 11:16
11:22,24 12:4
14:18 18:14
42:12 63:8,18
81:20 82:5,24
82:25 102:1,12
102:13 103:14
103:24 104:23
105:6 133:4,7
133:24 134:6,7
135:15 146:2
147:14 148:12
148:13,16
149:10 152:1
152:24 171:3,4
171:5,10
191:24 206:19
206:22 207:4
207:15,25
208:5 237:14
272:17 274:3

274:18 275:6
276:4
recriminations
173:20 175:11
recross 8:3
recuse 10:2,10
10:17 316:5
red 236:15
275:25 288:8
295:18
redact 48:7
redacted
227:21,23
247:4
redirect 8:3
216:6 217:13
reduce 71:4
73:14 100:10
186:14 193:10
reduced 11:24
103:15 105:14
reduction
106:24 148:17
reeducated
236:22
refer 91:15,16
229:10,21
reference
16:12,25 33:19
72:15 73:4
113:18 132:1,9
90:20 110:19
246:22
regardless 63:9
108:18 132:13
regards 155:10
169:25 189:10
191:13 196:4

referring 35:10
113:19 191:8
196:17 204:5
271:8
reflected 52:1
refresh 72:16
238:16 271:11
271:12 272:2
refreshed
269:8
refresher
72:13
refreshing
249:19
refund 230:8
303:3
refusal 201:24
refusals 122:21
refuse 172:3,4
172:21
refused 173:1
204:7,13
refuses 162:19
regard 37:23
104:8 109:10
307:17
regarding
16:12,25 33:19
72:15 73:4
113:18 132:1,9
referenced
170:1
references
304:4
referencing
97:5
referred
303:25

regiment
153:20
regimented
150:21 152:2
registration
32:24 34:4
regular 120:2
regulation 36:9
36:9 153:20
regulations
58:1 156:10
169:10
regulator
27:22 36:19
38:11
regulators
57:22 83:9
127:18 243:4
regulatory
19:18 25:15
28:22 35:19
38:12,13 57:23
58:8 82:23
83:1,17,22
110:25 111:3
152:6 153:18
155:9 169:8,18
115:9 225:1,9
234:12
rehabilitated
260:22
rehypothecate
160:9 214:13
216:11,13,16
reigning
265:24

**Page 73**

reimbursed
274:15,23
reimbursement
14:8 94:20
reiterate
170:20
rejoining
201:21
relate 120:6
related 141:7
141:12 220:21
240:4 281:15
281:24 282:10
282:12
relates 34:22
193:25 220:17
240:16
relation 291:21
relations 238:9
relationship
168:18,21
199:3,3 213:9
277:1 285:24
relationships
281:18,19
relative 97:19
185:12,21
189:19 230:12
230:15 232:3
276:22 283:15
309:2
relatively 77:7
189:18 248:3
253:24
release 12:9
46:25 47:7
176:17 199:25

235:19 251:10
251:15,18,25
252:3 253:10
262:21 268:8
291:24 296:16
released 55:21
191:10 192:7
193:15 231:6,7
232:24 233:1,2
233:7,8 250:14
251:14 273:14
273:25 282:20
290:4 296:15
296:21 310:11
releases 16:7
17:2 219:2,3
233:1,3,4
238:10 241:1
250:17 251:7
273:16,17,21
274:7,11,13
278:5,15
296:18 310:3,8
releasing 47:1
47:8 191:15
232:18
relevance
72:21 79:15
113:13 116:3
120:23 172:7
190:2 204:2
relevant 42:17
42:24 72:23
92:13 101:19
120:22 172:7
174:10 176:9
190:9,11 195:6

195:8 250:23
252:12 268:1
269:12,13
271:14,19
304:23
relied 237:18
239:17 299:2,6
relief 3:3
rely 256:4
relying 157:17
remain 11:18
63:5 87:14
remaining
15:15 19:13
62:4 67:4,5,8
208:16
remains
102:11 104:7
104:21 105:4
105:11 109:24
112:19 129:17
141:10 154:17
159:17,19
161:14,25
162:3 167:1
168:5 169:5
176:14 185:7
188:14 189:2
204:19 206:18
212:17,19
216:9 226:24
renzi's 49:8
50:9,12 103:23
104:10 105:2
108:3 219:5

remove 21:6
removed
204:14 234:13
renzi 8:5 16:10
49:2,6 50:17
51:14,19 52:11
52:20,22 53:3
53:9,11,15
59:11 61:4
67:3 69:25
70:1,3,6 76:4
79:4,4 82:22
86:1,17 87:2
88:4,7,17,19
90:16,18 101:8
101:10 102:2
102:11 104:7
104:21 105:4
105:11 109:24
129:17 129:17
141:10 154:17
159:17,19
161:14,25
162:3 167:1
168:5 169:5
176:14 185:7
188:14 189:2
204:19 206:18
212:17,19
216:9 226:24
renzi's 49:8
50:9,12 103:23
104:10 105:2
108:3 219:5
reorganization
35:13,14 36:23
59:13 116:14

**Page 75**

resulting 18:18
results 46:5
47:24 94:25
265:17
resume 161:9
202:3,5 314:7
resuming
313:25
resurrect
241:19
retain 277:19
280:11,12
retained 281:3
retake 161:14
retired 222:23
276:21
retirement
239:10 248:3
302:10,15,18
304:9,14
305:22
return 105:16
112:23 113:2
177:21 191:20
230:6 273:8
returned 89:9
209:21
reveal 39:14
revealed 306:6
reverse 14:10
68:13,16
review 25:14
25:20 29:20
30:4 49:12,16
49:18 50:22
51:5 55:6
220:20 221:10

224:13 226:11
226:12 250:21
250:21 251:1,2
264:15 280:5
281:12 293:10
reviewed 10:7
110:7,7 111:15
111:22 116:7,7
117:20 118:22
119:22 122:15
123:15,25
130:18 133:21
137:5 138:14
138:22 140:20
140:23 144:13
149:5,7,15
150:6,14 151:1
153:5,21 154:8
156:21 157:15
159:25 161:13
162:10 169:14
173:12,15
175:24 178:25
180:20 181:3
183:2,2 185:3
185:6,20
186:10 187:12
191:18 193:7,9
198:1,7,23
199:9 201:12
201:22 202:5
203:10 206:8
208:15 209:18
209:19,23
210:2,5,7
212:15 213:7
213:13 214:4

97:2,5,10
98:15,20,25
99:12,25 100:8
101:12 103:24
107:4 109:12
110:7,7 111:15
111:22 116:7,7
117:20 118:22
119:22 122:15
123:15,25
130:18 133:21
137:5 138:14
138:22 140:20
140:23 144:13
149:5,7,15
150:6,14 151:1
153:5,21 154:8
156:21 157:15
159:25 161:13
162:10 169:14
173:12,15
175:24 178:25
180:20 181:3
183:2,2 185:3
185:6,20
186:10 187:12
191:18 193:7,9
198:1,7,23
199:9 201:12
201:22 202:5
203:10 206:8
208:15 209:18
209:19,23
210:2,5,7
212:15 213:7
213:13 214:4

214:22 215:1,5
215:15,15,18
215:22,23
216:6 218:10
218:11 219:2
219:16 220:8
221:2,19
227:18,24
229:22 231:13
231:15,15
232:8 234:7
238:22 239:15
241:8 243:11
245:16,21
246:15 248:8
252:23 255:14
257:15 258:1
258:14,25
259:2,2,2,6
261:13 262:16
264:4 267:17
269:7 272:11
273:7 274:23
275:12 276:11
276:21 282:24
284:21 285:24
292:10 293:4
294:5,8 302:1
302:3,19 305:2
306:4,25 307:3
307:5,23
309:24 314:6
314:20,22
315:5
rights 23:5
78:10 144:16
231:3,18,18

**Page 74**

142:13 147:6
147:13
reorganize
59:17 65:11,12
repaid 259:19
259:22 260:8
repayment
12:12
repeat 60:10
86:4 121:9
284:2
repercussions
180:13
rephrase 85:18
89:21 290:20
rephrasing
292:2
replacing
272:7
reply 50:10
report 17:5
39:24 48:3,4
96:7 220:19
227:10,11,16
227:18,20
251:2 271:13
271:13,15
285:1 305:12
reported 235:3
305:12 306:7
reports 217:22
represent
12:22 57:15
129:4,5 213:3
representation
209:13 214:1
214:12

representations
222:13
representative
165:17 170:6
representatives
125:4 212:8
represented
13:20 137:25
156:16 206:25
216:10 217:4
217:18 223:8
223:10
representing
10:24 12:24
57:19 226:1
241:25 289:14
represents
287:2
reputation
278:3
request 111:18
314:18,20
requested
204:12 312:15
requesting
20:5
requests
226:14 250:22
require 20:8
30:19
required 67:16
151:5 176:16
230:18,20
312:16,17
requirement
75:13 282:7

requirements
16:13 32:25
273:23 274:11
36:22
requisite 46:16
reread 36:6
research 16:11
189:6,15 194:1
194:4,21 196:7
reservations
55:10
reserve 73:13
75:13,24 94:2
reserves 93:12
194:6
residents
155:22 156:8
resist 278:11
resolution
14:20 20:7,16
155:8
resolved 15:8
40:14 75:14
266:15
resolves 15:3
resoundingly
17:15
respect 23:5,6
23:10 30:14
62:24 157:17
171:25 199:14
229:24 231:10
231:17 232:2
232:15 233:3
247:8 256:2,14
257:23 259:17
259:18 261:20

266:11 273:23
273:23 274:11
280:10,20
286:7 304:17
304:17 307:12
respond
174:10
response 51:2
60:16 168:25
217:22
responses
40:16
responsible
276:14 280:5
288:2
responsibly
183:5
rest 10:17
17:11 91:25
102:14 109:6
114:2 163:18
271:3 289:4
restart 99:6
restarted 98:18
restrict 20:3
restrictions
155:13 218:22
restructuring
36:21 37:13
220:15,20,22
234:23 254:22
result 43:5
231:11 273:22
274:1 284:18
285:18 290:24
301:2 303:2

**Page 76**

232:9,13
266:13 274:14
274:15 309:16
309:24 310:18
rigorous 196:5
297:21 300:14
300:15
ripe 33:8
rise 10:9
240:19 252:16
252:20 253:25
254:1 260:23
266:3 282:6
284:13 289:21
rises 22:18
risk 14:14
83:20 142:6,15
150:13 152:5,8
153:18 181:5
188:3 198:23
210:13,15,19
211:1,11,11,18
211:20 225:3
236:4,6,18
281:24 282:12
283:12 285:9
285:12 286:23
287:7 288:7,11
288:15 289:13
293:3,14,24
301:6
risks 16:15
24:19,21 26:21
27:9,20 28:23
29:7,7 35:25
36:8,12 38:24
64:8,9 67:18

68:1,7,18
83:22 152:6,7
152:12,12
153:14,15,25
160:2
risky 293:19
road 4:13
317:21
robbed 128:15
robust 205:20
205:23 299:3,9
301:3
role 31:10,11
53:14 54:20
67:5 159:22
224:19,21
roles 166:25
room 5:3 28:6
69:24,24 212:8
root 263:20
rough 86:23
190:6
roughly 133:9
135:21 144:23
190:15 191:9
207:7,9,10
208:6,7 209:10
209:18 210:4
247:2 300:21
round 171:22
route 14:4
rule 19:3 85:13
122:9 265:22
rules 23:13
56:10 66:6
83:12,18
119:17 201:24

262:3 279:4
rulings 10:15
265:24 316:3
rumors 311:4
311:12,14,15
312:1,5
run 249:15,23
250:6 258:16
263:6
running 44:23
102:15
ryan 5:14
43:20,20,24,25
44:17,23 45:4
60:6,8,9,22
101:2,4,6,7
101:22,24
102:9,16,21,24
103:10,13
104:5,19
105:10,22
106:9,21 107:5
107:5,17,19
108:11,13
109:8,18,21,22
110:11,13,14
112:8
s
s 4:1 9:1
safe 170:21
171:1
safeguards
37:25 216:20
216:23 217:5
safety 150:19
sale 11:17,25
13:21 14:1,5

14:13,16,17,21
14:25 15:21
16:1,4,19,19
17:10,18 26:4
54:6 67:6
70:22 71:8,23
75:5,6,9 76:7
80:25 81:13
82:2,4,5,13
84:6 89:11
94:3 95:20
103:16 104:12
105:19 128:8
133:2 150:10
197:13,16
244:6
sales 188:4
260:1
sanchez 17:4
45:12,14 48:22
sat 223:3
satisfaction
160:4
satisfied 60:3
60:21 139:20
282:6
satisfies 62:15
84:21
satisfy 228:22
304:3
save 9:14
109:15,18
saved 55:23
savings 238:25
239:10
saw 19:6
114:12 244:19

| | | | |
|---|---|---|---|
| 311:10 | **scenarios** | **seated** 78:13 | 152:6 153:15 |
| **saying** 24:16 | 17:19 69:2 | **seats** 278:21 | 314:14 |
| 24:18 33:11,14 | 71:23 73:14 | **sec** 15:15,19 | **security** 24:25 |
| 36:25 45:24 | 82:1 105:7 | 23:22 24:4,23 | 26:11 27:3,13 |
| 66:12 100:11 | 106:25 107:8 | 25:1 26:17 | 29:6 31:25 |
| 108:7,11,13 | 107:11 108:24 | 30:7 31:13,14 | 32:9 33:2 |
| 118:15 120:24 | 193:8 | 34:5 35:8 | 67:18,23 68:1 |
| 129:11 134:5 | **schedule** 91:14 | 36:18 37:22 | 142:20 |
| 136:6 140:1 | 91:15 185:23 | 90:24 117:6 | **see** 17:25 20:16 |
| 146:11 148:24 | **scheduling** | **sec's** 31:10 | 21:3 22:21,24 |
| 149:4,4 152:8 | 8:21 78:18 | 75:2,3 | 36:10 38:21 |
| 156:4,13 178:9 | **scheuer** 4:23 | **second** 18:24 | 40:21 44:3 |
| 179:3,4 186:16 | 24:9 32:13,15 | 107:14 116:20 | 48:3,6 92:12 |
| 186:24,25 | 32:16,23 33:4 | 145:15 149:20 | 103:11 112:23 |
| 206:1 207:10 | 33:7 70:2,4 | 158:22 171:7 | 114:13 120:21 |
| 211:15 239:22 | 73:3,8,10 75:3 | 191:17 207:19 | 121:1 139:21 |
| 250:15 255:11 | 76:3 78:25 | 208:1,20 | 139:24,25 |
| 262:23 263:11 | 79:1,3,19 80:3 | 210:20 221:21 | 140:20 143:6 |
| 270:14 285:25 | 80:5 85:20 | 231:5 233:18 | 140:20 156:12 |
| 287:3,8,8 | 87:1 90:24 | 304:10 | 187:4 193:11 |
| 301:21 306:2 | 314:16 | **secondly** | 211:3 228:25 |
| 308:2 | **scope** 79:16 | 137:18 | 237:6 240:6 |
| **says** 10:7 18:24 | 101:19 246:4 | **section** 32:2 | 260:17 266:2 |
| 18:24,25 56:12 | 303:16 309:17 | 35:11 100:9 | 274:19 280:25 |
| 75:9 100:10 | **scream** 202:1 | 109:2 | 284:17 297:10 |
| 105:12,15 | **se** 6:23 7:2,5,8 | **secured** 196:24 | 305:18 315:5 |
| 108:24 109:3 | 7:11,14,17,20 | **securities** 4:11 | **seeing** 211:12 |
| 143:17 144:1 | 9:12 23:25 | 4:12,18,19 5:9 | 211:20 241:12 |
| 217:21 250:6 | 49:11 50:5 | 19:22 24:7,22 | 242:15 |
| **scale** 250:17,18 | 52:14 56:7 | 25:22 27:2,5 | **seek** 9:18 26:21 |
| **scenario** 34:9 | 129:5 159:13 | 28:5,8 29:8,22 | 232:19 |
| 73:19 96:14 | 188:22 200:15 | 30:8,12 31:20 | **seeking** 9:7 |
| 98:11 105:9 | 206:16 222:3 | 32:1,16 33:11 | 18:5 32:18 |
| 106:22 132:16 | 246:18 248:20 | 33:13,15,23 | **seemed** 255:21 |
| 163:24 191:21 | 280:20 297:4 | 44:1 70:4 79:1 | **seems** 72:24 |
| 208:7,8 | 312:8 | 111:19,25 | 134:7 144:17 |
| | | | 199:6 235:11 |

| | | | |
|---|---|---|---|
| **shareholder** | 126:1,7,10,22 | 108:3 120:8 | 305:19 306:11 |
| 162:14 163:6 | 126:24 127:2,8 | **showing** 32:23 | 308:25 309:9 |
| 168:20 296:9 | 127:15,25 | 35:11 176:9 | **significantly** |
| 296:10 | 128:3,5,12,15 | **shows** 125:13 | 11:14 70:24 |
| **shares** 238:7 | 128:18,20 | 126:3 | 148:12,16 |
| 295:20 296:6,7 | 199:23 200:2,4 | **shuffling** 64:19 | 149:10 152:24 |
| **shaved** 173:4 | 200:7,7,11,13 | **shut** 258:9 | 183:6,9,11 |
| **sheba** 182:3 | 200:18,22,24 | 311:6,8 | 193:2 195:18 |
| **sheet** 225:16 | 200:25 201:2,5 | **side** 241:2 | 307:9 |
| **sheets** 281:24 | 201:7,10,14,18 | 260:21 293:3,4 | **signing** 40:25 |
| **shehadeh** 3:24 | 201:21 202:7 | **sides** 112:24 | 42:6 144:21 |
| 7:13 10:5,14 | **shell** 312:14,21 | **sign** 19:14 | 146:21 |
| 34:25 35:3 | **shiba** 182:9,13 | 20:18 92:23 | **signs** 269:24 |
| 55:11,13,18,20 | 182:24 183:6 | 93:8,18,19 | **similar** 20:7 |
| 55:25 56:2,6,7 | 184:7 185:17 | 145:3,6,6,8 | 25:15 30:2,3 |
| 56:7,15 64:18 | 185:23 186:5,6 | 146:4,14,22,23 | 37:22 64:20 |
| 65:3,6,7,8,9,11 | 186:7 | 198:15 269:23 | 232:5 |
| 65:14 66:10,15 | **shift** 101:10 | **signature** | **simple** 77:5 |
| 66:19,21 76:19 | **signed** 12:23 | 12:13 | 105:24 107:19 |
| 85:1,7,7,9 88:8 | 93:2 143:19 | 144:1,10,25 | 119:23 138:20 |
| 99:23 100:1 | **shop** 257:17 | 146:2,4 298:24 | 180:11 200:22 |
| 108:12 112:12 | **short** 54:8 | **significant** | 209:25 293:17 |
| 112:14,15,17 | 61:11 191:25 | 15:2 57:9 71:8 | **simply** 42:5 |
| 112:20 113:7 | 258:10 298:23 | 74:16 76:13 | 70:7,8 132:9 |
| 113:11,16,23 | **shorter** 313:21 | 81:12,18 | 174:22 |
| 115:4,5,6,23 | **shortest** 14:19 | 133:10 136:1 | **single** 28:15 |
| 117:5,10,17 | 134:7,9 | 160:5 163:16 | 163:6 175:3 |
| 118:3,12,19,22 | **shorthand** | 170:17 178:1 | 176:22 193:15 |
| 118:24 119:13 | 35:10 | 179:5 182:18 | 227:16 247:19 |
| 119:16,21 | **shortly** 233:11 | 189:19 204:22 | 286:10 |
| 120:4,11,14,17 | 233:17 295:20 | 205:8 228:19 | **sir** 118:25 |
| 120:23 121:9 | 296:6,10 | 230:11,15 | 125:12 159:25 |
| 121:15,23 | **shot** 52:3,7 | 247:15 248:1,2 | 161:20 164:6 |
| 122:4,6,10,12 | **should've** | 251:7 256:10 | 165:23 166:8 |
| 122:16 123:16 | 55:21 | 256:13 263:14 | 166:18 167:15 |
| 123:18,20,24 | **show** 30:24 | 272:5,9 276:22 | 167:20 168:16 |
| 124:3,9,13,17 | 31:6 105:17 | | |

| | | | |
|---|---|---|---|
| 255:12 294:18 | **sells** 63:25 | **serve** 166:25 | 79:22 92:6,7 |
| 294:24 | **send** 131:7,19 | 223:17 224:11 | 95:18 229:1,9 |
| **seen** 22:18 | 163:11 198:14 | **service** 213:22 | 229:23,24 |
| 29:24 57:20 | 261:24 | **services** 5:16 | 230:6,13,17,25 |
| 96:7 119:4 | **senior** 228:5 | 13:19 88:15 | 231:6,9,17 |
| 131:10 152:7 | 274:14 | 213:12,19 | 232:7,24 |
| 166:2 183:16 | **sense** 29:18 | 269:18,23 | 235:18,23 |
| 211:23 222:4 | 55:5,7,14 | 272:14 | 237:19 242:12 |
| **sees** 39:23,23 | 114:20 121:20 | **serving** 94:17 | 245:12,13 |
| 110:4 | 123:4 124:21 | 224:4 | 247:21 248:13 |
| **segment** 42:22 | 130:4 134:22 | **session** 120:8 | 268:8 283:2,8 |
| **segregates** | 144:18 194:11 | **sessions** 227:1 | 291:8,8,9,10 |
| 213:4 | 235:7 236:9 | **set** 23:12 50:11 | 291:11,12 |
| **segues** 148:24 | 298:23 | 73:17,20,25 | 292:5,7,8,11 |
| **selected** 269:1 | **sent** 93:21 | 74:5,5,8,11,13 | 292:20 302:24 |
| 270:5 | 113:1 119:5 | 74:15 81:23 | 304:15 306:13 |
| **selects** 276:13 | 157:1,7,9 | 83:19 92:22 | 309:6 |
| **self** 36:3 | 158:1 192:5 | 94:1 97:18 | **settlements** |
| 236:10 | **sentence** | 99:5 104:22 | 169:8 282:18 |
| **selfies** 141:17 | 251:18 | 134:3 171:9 | 301:5 |
| 141:21 | **sentences** | 180:23 198:9 | **settles** 247:18 |
| **sell** 65:12 81:2 | 42:13 | 219:14 225:20 | **settling** 247:18 |
| 95:11 125:2 | **separate** | 226:9 264:3 | 291:10 292:1 |
| 126:14 150:5 | 140:16 164:7 | 277:19 | 307:25 309:3 |
| 151:2 182:10 | 217:8,9 226:13 | **seth** 7:16 | **seven** 69:15 |
| 182:19,19 | 226:18 227:6 | 202:16,18,19 | 186:8,9,23 |
| 188:6 191:19 | 242:6 | 254:9 | 209:6 222:17 |
| 191:24 192:24 | **separately** 47:8 | **settle** 248:5,9 | 272:1 |
| 193:3,7,9,16 | **september** | 283:1 291:17 | **seventeen** |
| **selling** 25:7,7 | 97:11 | 291:18 292:22 | 209:7,8,10 |
| 27:1 28:14 | **sequence** | 305:18 306:20 | **seventies** |
| 30:8 70:15 | 175:23 249:12 | 306:21 307:22 | 207:11 |
| 75:15 153:6 | **series** 213:8 | **settled** 274:4 | **several** 166:2 |
| 189:17 | 226:12,16 | 274:20 282:16 | **share** 267:14 |
| 192:11,12,13 | 249:4 297:17 | 291:19 306:11 | 275:7 302:16 |
| | 299:25 300:1,3 | **settlement** 17:1 | **shared** 176:21 |
| | | 77:20 73:23 | |

| | | | |
|---|---|---|---|
| 170:5 171:16 | **skin** 277:12 | **slam** 228:13 | **somebody** |
| 176:19 181:18 | **skip** 287:23 | 308:3,3,4 | 22:13 38:16 |
| 182:13 184:18 | **slade** 4:9 38:7 | **slaughtered** | 47:7 72:13 |
| 188:14 203:8 | 45:5,5,17 | 239:8 | 116:13 139:12 |
| 208:20 248:22 | 48:24 49:1 | **slippage** | 144:16 202:8 |
| 262:11 265:21 | 50:9 52:3 53:5 | 181:21 | 216:23 229:14 |
| 269:13,18 | 53:10 57:1,3,4 | **slower** 145:21 | 237:6 241:1 |
| 276:11 279:5 | 59:23 61:2,3 | 145:23 | 267:7 291:4 |
| **sit** 53:4 109:11 | 67:2 69:21 | **slowly** 97:20 | 292:1 298:1 |
| 188:2 261:8 | 72:21 73:2 | 215:11 | 309:21 |
| 262:2 | 74:25 78:16 | **small** 42:22 | **somewhat** 10:7 |
| **site** 212:1 | 92:11 101:18 | 278:3,13 | 156:3 |
| **sitting** 55:9 | 110:5,10,12 | **smaller** 82:6 | **sonya** 3:25 |
| 58:3 163:17 | 112:2 113:5,12 | 184:1 257:18 | 317:3,8 |
| 168:7 176:1 | 117:4,7,25 | 302:18,19 | **soon** 192:23 |
| 222:25 | 125:21 130:10 | 307:22 308:24 | **sooner** 95:18 |
| **situation** | 134:12 140:2,5 | **smart** 22:7,12 | 146:25 148:4,5 |
| 119:25 120:2 | 140:13 157:10 | **social** 311:19 | **soonest** 146:5 |
| 131:15,17 | 158:3 160:13 | 312:4 | **sophisticated** |
| 162:10 173:16 | 163:19 166:10 | **softball** 176:9 | 193:1 |
| 191:23 203:20 | 166:22,25 | **sold** 22:9 77:20 | **sorry** 9:2 12:15 |
| 232:7 233:20 | 170:23 172:6 | 96:12 116:19 | 17:3 24:2 46:1 |
| 241:16 255:5 | 176:25 179:18 | 244:2,21 | 47:16,24 49:24 |
| 258:8 290:17 | 182:3 184:20 | **sole** 162:14 | 52:17 56:6 |
| **situations** | 184:24 185:2 | 165:15 168:20 | 74:1,1,3 86:4 |
| 102:2 236:16 | 187:13,24 | **solely** 198:5 | 96:4 98:11 |
| **six** 63:14 89:23 | 190:2,8,18 | **solicited** 53:24 | 109:17 121:9 |
| 90:3 93:24 | 192:14 195:5 | 55:2 | 124:11 127:1 |
| 111:12 112:1 | 196:10 204:2 | **solution** 20:8 | 139:1 145:12 |
| 155:7 156:7 | 204:25 216:8 | 163:18 168:8 | 145:13,15,24 |
| 170:16,19 | 218:13 219:10 | 171:14 315:1 | 149:17 156:16 |
| 173:4 234:3,8 | 240:13 241:6 | **solutions** 161:8 | 156:22 165:23 |
| 272:5 | | 314:19 317:20 | 166:18 172:24 |
| **skadden** | 241:24 242:4 | **solvency** | 178:6 179:12 |
| 222:18 | 243:20 244:10 | 153:16 | 179:14 186:20 |
| **skadden's** | 244:18,22 | **solvent** 196:7 | 198:13,25 |
| 222:19 | 245:1,10,17 | | 200:9 206:5 |

## [sorry - stakeholders]    Page 81

209:4 217:2
261:14 273:5
279:21,24
284:2,9 290:12
290:14 296:2,5
296:10 297:1
297:24 298:11
298:15 299:21
305:8,23
**sort** 24:13
27:16 41:6
98:24 127:18
131:8 145:6
188:6 225:3
228:19 235:8
260:23,25
271:16 279:12
260:15 289:18
299:7
**sought** 13:5
**sound** 16:7
227:23 262:13
307:23
**sounds** 140:21
143:17 144:2,6
147:15 234:17
250:1 267:10
289:9 293:4
301:20
**source** 237:13
287:5
**sousa** 3:2
**southern** 1:2
**space** 68:22
**spaced** 227:16
**spaces** 132:20

**speak** 16:19
17:4 20:17
35:5 56:4
85:11 96:25
100:2 122:12
133:14,14
140:14 142:10
142:21 152:18
154:12,14
155:9 158:8
164:8 200:14
202:9,11
260:16,16
315:3
**speaker** 157:18
161:10 187:18
206:12,15,18
207:1,8,12,14
207:24 208:2
208:10,13
209:3 238:1
246:18,21,25
247:11
**speakerphone**
279:24
**speaking** 22:10
85:6 122:8
156:3,14
166:17 188:21
200:3,6 202:8
218:17 273:15
298:13
**speaks** 83:16
**special** 6:9,16
16:24,25,25
218:17 220:18
223:15,21

224:1,20,23
225:12 226:5
226:21 227:9
228:1,7 259:12
267:21 268:10
268:19 277:18
277:20 280:6,8
285:1 294:2
**specific** 17:16
20:4 24:20
28:24 29:1,3,5
30:4 36:12
129:24 131:15
141:20 150:13
169:13 175:6
181:18,23
182:2 197:12
216:19 220:21
251:4 283:19
283:20 284:17
285:18 300:5
**specifically**
54:25 90:20
105:12 107:25
167:24 169:13
186:7 211:1
217:10 218:17
223:21 225:7
249:14 250:17
251:18 269:17
**specifics** 40:6
**speculate**
264:14,15
**speech** 134:13
170:23 187:14
119:15 163:20

182:4
**speed** 96:19
**spell** 81:4
277:8
**spelled** 87:10
**spend** 102:15
139:3
**spending**
135:15 276:9
**spent** 13:17
57:9 125:23
133:18,25
205:11 218:7
228:17 249:17
**spite** 58:2
**spoke** 52:5
**sports** 120:9
**spread** 150:3
187:5 191:1
**spreading**
31:1:18
**st** 5:21 88:13
88:14,18 90:9
**stable** 19:22,23
91:12 96:5
**stacey** 7:19
238:5
**staff** 219:13
315:3
**stage** 37:9
43:13 174:25
**stake** 12:19
277:13
**stakeholders**
13:8 14:3 15:6
75:4 83:25

## [stop - summarizing]    Page 83

122:14,14,14
164:22 165:21
173:7,10
216:21
**stopped** 288:19
**stored** 110:4
**straight** 71:16
**strange** 294:11
**strategic**
181:14
**strategy** 51:10
**street** 4:20
5:11,18 114:6
116:16
**strength** 232:3
307:13
**stretched**
108:19
**stretto** 17:4
54:3
**strict** 282:8
**strictly** 197:18
**strike** 39:10,11
98:6
**strong** 181:9
**stronger** 188:8
**structure**
20:19 23:3
94:21 162:22
**struggle**
135:14
**struggles** 52:4
**struggling**
263:7
**stuck** 197:24
198:6 235:1

**stuff** 22:17
30:5,6 49:16
239:5
**subject** 38:24
74:17 109:19
117:2 132:21
218:5 259:19
268:12,16
313:25
**subjects** 52:11
128:17
**submission**
19:17 49:17
50:24 222:4
**submissions**
43:19 50:21
51:9 130:16,17
**submit** 21:2
50:4
**submitted**
15:25 24:10
41:22 49:14
91:6 104:7
118:14 215:24
281:10
**subordinate**
101:4
**subordinated**
18:10 101:17
102:5,17
103:18 106:1
242:16,21
261:12
**subordinating**
102:10 231:3
232:9 307:3

**subordination**
102:24 103:7
103:25 106:17
**subsequent**
30:1 281:24
**subsequently**
13:12
**subset** 296:7
**subsidiaries**
242:23,24
**substance**
45:21
**substantial**
12:11
**substantive**
39:11
**succeed** 11:21
11:24 308:5
**success** 101:16
**successful**
12:13 102:9
103:25 104:12
104:22 106:23
108:4,16 109:1
117:19
**successfully**
228:16
**succession**
214:23,24
**suddenly** 35:20
286:14
**sue** 237:7
273:7 274:3
282:25 291:3
291:12 296:22
308:5 309:16
309:24 310:18

**sued** 231:4
248:5 274:15
282:20 283:7
303:14 304:19
306:20,22
**suffer** 182:6
313:19
**suffered**
241:13
**suffering** 160:6
**suffice** 13:6
**sufficient**
37:20 42:18
80:9 109:7
254:1 297:12
299:4
**sufficiently**
282:4
**suggest** 260:10
**suggested**
32:13
**suggesting**
258:7
**suggestion**
250:7
**suing** 291:10
309:3
**suite** 4:13
317:22
**sullivan** 6:8
**sum** 234:16
235:6 276:22
**summarize**
62:12 229:9
**summarizing**
64:21

## [stance - stop]    Page 82

**stance** 220:25
**stand** 20:10,20
39:2 51:14
57:23 161:14
207:5 219:25
**standard** 50:23
174:15 236:24
254:17,19
256:18 268:4
275:12 284:6
**standards**
49:16 292:25
296:8
**standing** 29:2
30:7 173:16
**stands** 42:1
85:24 142:17
154:4 295:18
249:1
**staring** 249:17
**start** 23:22
54:20 69:24
90:22 98:19
221:22 304:5
**started** 44:8
150:12 159:22
222:16 249:7
**starting** 9:11
50:2 243:15
249:1
**state** 5:9,16,17
5:18 44:1,11
53:1 60:2,9
63:10 88:14
101:4 111:18
125:18 154:21
155:1,24
151:11 166:2,3

167:6 169:10
169:13,18
194:20 220:5
245:8 249:25
250:4 254:21
266:13 279:13
304:20 314:17
**state's** 60:4
**stated** 75:23
312:15
**states** 1:2 1
5:1 6:1 19:13
19:14 24:7
40:10,11 62:25
63:5,11,11,12
63:15 64:2
89:25 90:2,11
90:19 103:14
114:3 155:2,19
156:8,14 169:7
170:3 195:14
250:9 304:2
314:14
**stating** 66:11
66:16 116:9
119:23 125:19
175:21 193:20
**statistics**
184:11
**status** 45:1
131:5 155:17
154:6 158:19
158:25 164:13
168:5 178:16
187:21 204:4
230:22 244:17
262:21 263:2
293:20 298:24

**statements**
15:24 118:7,9
167:21 244:15
250:15 265:1
266:1,17,21
281:1,10
289:12 298:21
298:22 300:24
312:15
**states** 1:2:1
5:1 6:1 19:13
19:14 24:7
40:10,11 62:25
**stationed** 8:22
8:23 11:12
12:6 15:22
28:21 36:7
37:20 40:24
41:4,13 42:1,2
42:8 60:13
78:14,19,19
82:11,12 85:19
103:13,21
104:6,9,14
104:23 105:2
105:11,15
106:10 107:21
107:25 108:23
109:13 116:9
131:5 155:17
156:4 158:19
158:25 164:13
168:5 178:16
187:21 204:4
230:22 244:17
262:21 263:2
293:20 298:24

**staying** 228:21
**steadfastly**
13:4
**steal** 201:7
**step** 124:19
196:9
**stephen** 302:5
302:6,12 303:6
307:15
**stephenson**
3:15,22
**steps** 74:23
139:8
**steve** 244:7
260:14 267:20
269:23 312:20
313:5
**steve's** 312:14
**stipulation**
18:1,6 72:11
72:15 73:1,4,6
73:8
**stipulations**
17:25
**stmx** 185:14
**stock** 239:4
241:18 244:21
**stockholders**
261:3
**stocks** 239:18
243:13
**stone** 237:6
256:9
**stop** 25:9,16
37:25 65:10,13
65:16,16 85:16
119:15 122:11

## [summary - taken]    Page 84

**summary**
222:5,9 249:2
**summer**
222:23
**super** 273:9
**supplemental**
217:24
**supply** 191:10
192:6 193:14
**support** 9:19
10:21 11:2
15:23 17:2,8
40:17 49:21
51:11 54:2
136:4,6 137:25
138:24 140:19
144:9 147:17
154:22 166:12
178:11 211:10
211:10 215:24
230:18 274:10
**supported** 15:4
16:5 63:19
89:12,15 90:2
93:17 138:2,21
139:9,14 155:2
155:20 156:15
178:24 179:1
237:19 275:4
**supporting**
42:1 91:14
276:17
**supportive**
216:3
**supports**
135:20 151:19

**suppose** 277:20
**supposed**
28:11,12
139:19
**supposedly**
55:16 139:25
311:5
**sure** 9:25 23:3
29:7 51:10
54:24 55:1,3,4
58:15 59:15
61:2,6,13
64:11 67:14
68:4,4 74:6
74:18 79:21,25
82:11 83:2
86:14 97:5,17
97:18 101:21
109:15 114:18
115:11,16
130:1 138:18
138:23 139:10
147:9 150:20
151:8,16,17
157:2 164:15
164:25 167:10
167:25 169:12
169:14,15,17
177:11,13,13
178:7,23
186:20 189:16
190:24 203:22
204:4 205:1,17
205:15 207:6
210:22 212:4
215:11 218:6
219:8 222:6,15

**224:8 229:22**
231:25 234:6
239:9 241:5
244:10 247:12
250:22 251:5
254:12 258:20
258:21 261:4
264:9 265:18
267:25 269:1
269:11,12
272:3 278:10
281:13 286:2
286:25 293:8
294:16,25
295:3,4 296:14
311:14 313:2
315:2,4
**surface** 255:12
**surprise** 35:18
**surprised**
311:20
**survive** 217:13
254:20
**susheel** 6:13
218:16 219:23
222:8
**suspect** 160:24
192:24 219:4
295:2
**sustain** 134:15
190:12
**sustained**
125:23,23
126:1,8 163:21
190:19 252:8
**swallow** 260:16
**swear** 52:22
220:1

**switch** 35:16
**sworn** 230:22
312:15,25
**sympathize**
241:15
**synthesize**
307:15
**system** 115:15
115:15 161:18
**systematically**
61:15

| | t |
|---|---|

**t** 317:1,1
**tail** 234:3,8
**take** 24:25
25:24 29:4,17
43:19 47:10
54:9 64:6
72:9 74:23
77:16 78:10
81:6 90:2 95:7
97:10 99:6
105:5 111:10
115:9 139:9,15
140:6 141:21
146:10 147:24
148:8 159:1
161:6,8 162:17
164:1 178:21
185:4 188:2
193:2 198:22
199:9 210:21
276:23 279:24
286:10 302:22
311:7
**taken** 15:23
127:13 152:19

| | | | |
|---|---|---|---|
| 158:16 169:20 | 158:25 230:8 | **telling** 30:7,11 | 239:19 244:5 |
| 238:13 275:6 | **taxes** 159:4 | 36:12 40:6 | 260:25 262:6 |
| 276:3 288:21 | 230:4,4 | 94:14 99:24 | 265:15 288:23 |
| **takes** 31:2 | **taxing** 158:25 | 193:18 217:6 | 289:3 291:18 |
| **talk** 35:22 | **team** 13:4 | **temptation** | 294:2 |
| 53:21 61:4 | 54:21,22 57:9 | 278:11 | **test** 31:12 |
| 67:3 113:21 | 61:5 110:1,2 | **ten** 77:16 78:10 | 37:12 59:24 |
| 116:5 125:24 | 110:16 111:2 | 78:11 176:5 | 61:5,16 62:15 |
| 137:9 183:25 | 163:4 194:23 | 233:24,25 | 84:21 |
| 228:16 231:24 | 194:23,24 | **term** 281:24 | **tested** 57:15 |
| 243:21 314:2 | 212:1,21 | 294:5 | **testified** 74:18 |
| **talked** 27:11 | 226:24 | **termination** | 102:3 149:19 |
| 177:4,5 226:10 | **teams** 217:9 | 14:10 | 153:1,17 |
| 237:1 252:11 | **tech** 239:7 | **terms** 9:13 | 171:15 176:3,3 |
| 294:22 312:19 | **technical** 35:4 | 35:9 41:15 | 177:18 181:16 |
| **talking** 35:2,8 | 139:14 140:22 | 54:3 77:7,24 | 182:15 188:10 |
| 44:16 74:3 | 180:13 208:22 | 81:19 83:10,16 | 206:4 212:19 |
| 95:16 116:3,4 | 262:12 | 87:10 91:5 | 224:18 273:23 |
| 117:24,25 | **technicalities** | 94:19 96:21 | **testifies** 165:21 |
| 126:10 149:13 | 63:10,12 | 97:4 103:1 | **testify** 50:13 |
| 162:1 163:6 | **technically** | 109:25 110:8 | 52:20 57:23 |
| 170:5 179:11 | 110:8 131:18 | 110:15,19,22 | 180:14 183:8 |
| 179:15 181:3 | **telephone** | 111:3 114:10 | **testifying** 56:9 |
| 205:1 256:19 | 161:18 212:14 | 125:20 135:1 | 59:8 72:24 |
| 262:20 268:12 | 221:21,25,25 | 137:24 138:1 | 107:3 156:3 |
| **tampa** 313:4 | 229:15 246:17 | 140:10 142:12 | 163:17 166:23 |
| **tank** 192:12 | 248:17 298:2 | 142:19 143:8 | 168:7 219:1 |
| **target** 78:3 | **tell** 13:3 25:8 | 144:21 148:11 | **testimony** |
| 79:10 | 27:25 31:10 | 150:9 151:24 | 16:10,17,22 |
| **tasked** 271:16 | 39:2,3 53:13 | 152:1 153:10 | 17:3,3 27:6 |
| 297:9 | 53:22 143:1 | 153:17 155:13 | 49:20 52:11,12 |
| **tax** 14:5 23:2,3 | 182:13 193:17 | 166:20 177:15 | 52:23 56:14,20 |
| 34:18,19,23,23 | 194:21 203:9 | 184:6 185:11 | 65:19,21 66:3 |
| 151:12 152:4 | 206:19 223:18 | 185:21 189:17 | 66:20,23 80:24 |
| 152:10,14,16 | 243:8 244:11 | 189:24 191:23 | 81:11 82:8 |
| 155:4 158:10 | 251:5 261:6 | 196:3 197:23 | 85:24 88:22 |
| 158:13,14,22 | 265:9 | 226:5 229:9 | 89:3 96:5 |

| | | | |
|---|---|---|---|
| 74:10 75:15,23 | 177:17,18 | 268:24 269:6 | **thought** 19:17 |
| 76:10,19 78:15 | 178:7,8 179:18 | 269:10,24 | 19:18 40:14 |
| 79:5,9 80:6,22 | 181:2 185:20 | 272:20 274:25 | 45:7 49:16 |
| 80:24 81:4,12 | 188:7 192:16 | 275:16 276:19 | 77:17 93:10,13 |
| 82:8,10,10,12 | 192:21,25 | 277:24 278:11 | 155:22 211:7 |
| 82:21 83:15 | 193:1,5,9 | 278:22 280:8 | 216:12 228:24 |
| 84:1,15,19 | 196:14 197:21 | 280:12 283:15 | 232:2 235:8,16 |
| 85:14,24 88:1 | 203:17,19,19 | 283:19 285:20 | 236:19 237:3,4 |
| 90:7 95:22,23 | 206:4 207:7 | 286:4 288:12 | 237:10,15 |
| 96:15 104:5,19 | 209:23 210:12 | 289:20 290:1,2 | 247:18,21 |
| 106:3 108:5,7 | 210:22 211:1,4 | 290:14 292:7 | 248:10,13 |
| 109:3,9 110:20 | 211:6 215:12 | 292:13 293:25 | 251:3 253:5,10 |
| 113:9 115:6 | 216:14,16 | 295:3,4,12,20 | 256:6 257:11 |
| 117:9,12,14 | 218:14 223:19 | 296:7 297:16 | 260:18 263:4 |
| 127:9,21 | 224:7,23 | 299:4,9 301:8 | 265:8,15 |
| 130:12,14 | 226:17 227:3 | 301:15 302:19 | 266:18 274:19 |
| 131:24 132:3 | 227:12,15,17 | 303:15,23,23 | 282:1 286:13 |
| 132:11,14 | 227:22 228:10 | 304:7,7 305:2 | 291:1,12,18,21 |
| 134:25 135:19 | 230:21 231:22 | 305:18 307:24 | 292:17,20 |
| 137:2,6,6,18 | 232:1,2,12 | 312:4 | 294:14 296:19 |
| 137:19,20 | 233:21 234:5,6 | **thinking** 108:8 | 299:5 307:10 |
| 138:1 140:17 | 235:1,7 236:2 | 151:16 210:14 | 307:25 309:2 |
| 142:17 143:8 | 238:16 239:24 | 223:2 246:13 | 310:6 |
| 143:10 144:12 | 240:18,20 | 278:24 288:16 | **thoughtful** |
| 144:14 146:9 | 245:6 246:4,14 | 293:22 | 181:14 |
| 146:11,14 | 249:6,20 250:6 | **thinks** 188:5 | **thoughts** 143:8 |
| 148:7,8,19 | 250:20 252:12 | 220:24 289:24 | **thousand** |
| 149:7 150:2 | 252:23,23 | **third** 13:14 | 91:22 |
| 151:8 152:23 | 254:3,4,6,10 | 22:11 37:24 | **three** 21:24 |
| 153:17,23 | 255:11,25 | 47:1 55:2 56:2 | 40:22 48:9 |
| 155:5 156:4,13 | 258:17 260:4 | 98:10 107:15 | 57:12 62:13 |
| 161:1 165:3 | 260:17 262:5 | 186:17 | 63:1,4,11 64:2 |
| 167:8,11,12,23 | 263:9,17,23,25 | **thirty** 21:24 | 85:14 89:17 |
| 168:5,8,13 | 263:25 264:4 | 22:2 | 93:18 107:7,10 |
| 169:10 171:1 | 265:9 266:21 | **thorough** | 129:21 130:7 |
| 172:1,22,23 | 266:24 267:20 | 236:3 264:17 | 146:3,22,23 |
| 173:10,22 | 267:20 268:20 | | 147:23 148:5 |

| | | | |
|---|---|---|---|
| 101:20 126:17 | 82:21 85:22 | **that'd** 106:15 | 178:25 217:7 |
| 140:9 152:13 | 86:1 88:4 89:2 | **theirs** 136:10 | 222:24 225:14 |
| 154:4 157:21 | 90:9,15 100:5 | **theory** 273:9 | 227:2,2 228:9 |
| 159:25 162:1 | 101:7 109:21 | 282:22 285:14 | 228:24 234:15 |
| 171:14 178:8 | 112:9 113:22 | **therese** 4:23 | 235:1 237:1 |
| 210:18 211:2 | 128:22 135:12 | 24:8 32:13,16 | 241:12 252:24 |
| 216:12 218:24 | 137:7,14 141:1 | 70:3 79:1 | 253:2,23 256:1 |
| 220:2,12,17 | 141:5,18 154:7 | **thin** 122:15 | 256:12 263:17 |
| 222:9 229:8 | 154:16 155:18 | **thing** 25:5,23 | 265:24 266:7 |
| 234:17 247:1 | 158:8 159:6,16 | 29:19,20 30:2 | 272:22,22 |
| 250:8 313:1,25 | 159:19,25 | 34:17 38:23,23 | 273:22 274:3 |
| **texas** 5:8 15:16 | 161:20 167:15 | 42:13 44:8 | 283:14,16,20 |
| 15:20 19:16,17 | 167:15 168:16 | 63:9 66:15 | 283:20 284:21 |
| 19:22 20:5 | 180:17 182:13 | 69:9 95:7 | 285:2,3 287:7 |
| 37:22 43:21,25 | 185:9 187:4 | 96:15 139:18 | 289:4 298:21 |
| 44:1,2,4,11 | 188:12,13,13 | 169:15 175:3 | 299:2,5 300:20 |
| 45:1 60:2,9,11 | 188:14 193:23 | 176:8 193:18 | 304:15 309:8 |
| 101:4 111:18 | 199:17,19,20 | 194:8 206:1 | 312:18 |
| 154:21,22,23 | 199:21 204:15 | 226:8 228:12 | **think** 10:1,3 |
| 155:1,9,10,13 | 204:18 206:8 | 231:20 233:25 | 18:22 19:2 |
| 155:22,24 | 206:10 208:10 | 257:15 258:8 | 24:12 25:13,14 |
| 156:7 157:1 | 212:11,12,16 | 258:11 280:19 | 26:5 27:4,23 |
| 166:2,4 169:19 | 218:10 219:9 | 285:14 299:3,6 | 28:3,15 30:2,3 |
| 169:25 170:6,8 | 219:22 220:9 | 308:2 | 31:23 32:5,6,8 |
| 170:12,13 | 221:6 230:24 | **things** 17:24 | 32:10,11 34:6 |
| **text** 129:10 | 245:19,22 | 18:8 20:20 | 34:15,17 35:23 |
| 238:11 | 248:16,19,22 | 25:21 31:5 | 36:25 37:10,11 |
| **texted** 245:3 | 262:8,11,16,19 | 37:2 38:12 | 37:23 43:16 |
| **texts** 238:24 | 264:6 267:11 | 42:12 43:10 | 50:14 51:17 |
| **thank** 10:19 | 268:18 273:15 | 50:13 67:10,15 | 52:4 54:16 |
| 23:17 40:11 | 276:11,15 | 68:7 115:12 | 58:7,14 59:20 |
| 43:15,24 44:14 | 279:5,6,17 | 119:19 120:20 | 62:11 63:6 |
| 45:3,4 53:4 | 296:24 310:22 | 120:20 122:1 | 64:13,14 68:13 |
| 57:1,3 59:22 | 312:6 313:9 | 123:5,6,11 | 68:15,23,25 |
| 60:7 66:25 | 314:4 315:4 | 151:9 154:5 | 69:9 70:7,17 |
| 69:21 70:21 | **thanks** 229:18 | 158:17 159:1 | 70:21 71:13,15 |
| 78:25 79:20 | 239:15 | 166:14 177:14 | 71:25 73:11 |

| | | | |
|---|---|---|---|
| 155:2 156:25 | 119:18 120:21 | 284:24 286:13 | 28:18 29:17 |
| 228:17 238:8 | 122:10 124:15 | 300:16 304:1 | 30:9 33:8 |
| 256:16 257:2 | 125:3,24 126:4 | 307:6 313:23 | 36:13 38:3,6 |
| 257:17 258:8 | 127:13 129:13 | **timeframe** | 42:3 55:9 57:7 |
| 258:15 267:22 | 134:7,9,14 | 139:24 145:7 | 58:4 73:2 83:8 |
| 268:1,3 276:21 | 135:15 139:3 | 313:16,21 | 91:4,8,12,20 |
| 282:3 283:21 | 139:16 145:2 | **timeline** 14:19 | 91:23 97:12 |
| 284:18 298:21 | 145:10 146:7 | 69:12 146:1 | 100:7 119:20 |
| 298:22,25 | 147:2 150:4,18 | 147:4,5,14,19 | 120:7,19,23 |
| 300:6,15,19 | 155:5 158:8 | 149:8 249:18 | 121:8 122:1,19 |
| 304:8 307:13 | 159:19 161:7,8 | **timely** 193:4 | 123:3,4,7,7,8 |
| 307:17 | 172:17 174:4 | **times** 44:19 | 123:11,14,15 |
| **throwing** | 176:7 178:23 | 85:14 122:2 | 124:2 125:25 |
| 265:15 | 188:3 197:17 | 176:5,8 191:2 | 126:5,11,12,21 |
| **tichenor** 16:18 | 198:10,17,21 | **timetable** | 140:17 145:5 |
| 166:22 167:1 | 199:7,18,20 | 313:20 | 146:2 147:15 |
| 217:21 218:4 | 200:4 203:17 | **timing** 69:11 | 158:8 172:8 |
| **tichenor's** 41:8 | 205:11 209:12 | 99:2,3 147:1 | 173:12,17,20 |
| **tied** 245:4 | 210:2 211:14 | 147:12 148:13 | 173:25 174:8 |
| **ties** 101:21 | 214:22 215:3 | 199:14 245:15 | 174:19,22 |
| **tim** 8:13 | 215:10 218:7 | **timothy** 16:23 | 175:6 176:2,10 |
| **time** 9:15 | 222:19 223:24 | 218:20 219:24 | 180:14 195:3 |
| 11:15 18:3 | 224:8,9,9 | 220:7,11 221:7 | 207:10 211:2,3 |
| 31:2 40:2,15 | 227:22 228:17 | 238:14 245:25 | 213:25 218:24 |
| 41:19,20,20 | 229:13,23 | 248:23 254:13 | 219:12 220:11 |
| 47:19 48:1 | 232:12 233:9 | 262:17 279:10 | 261:4 262:3 |
| 50:20 52:16 | 236:8 242:14 | 280:2 297:7 | 288:13 |
| 57:9 60:24 | 248:25 249:17 | 311:2 312:11 | **today's** 314:15 |
| 63:4,15,24 | 249:22 251:13 | 313:14 | **together** 167:2 |
| 70:14 71:12 | 252:24 253:8 | **tipped** 311:6 | 229:1 248:10 |
| 75:1,14 81:6,6 | 253:11,23 | **tired** 90:24 | **toggle** 14:24 |
| 90:4 93:20 | 257:1,11 | 100:3 306:10 | 35:15 36:25 |
| 94:7 99:7 | 259:22,24 | **today** 9:10 | 37:3,5 54:13 |
| 102:15 105:5 | 263:2,15 277:5 | 12:20 15:25 | 54:14,17 55:15 |
| 111:6 113:10 | 278:21,22 | 18:3,6 19:3 | 58:12,19,23,24 |
| 114:7 115:4 | 279:6 280:17 | 23:11 26:12,16 | 59:2,2,3 61:22 |
| 117:14,15 | 280:17 281:17 | 26:19 27:6 | 61:23 67:6 |

68:10 71:8,23
75:7 76:7 77:2
77:3 81:1 82:4
84:4,10,10,11
84:12 88:23
89:4,7,8 94:22
98:14 102:6
104:10,11,12
105:1,7,13,18
107:14 108:1
108:19 109:1
110:22,24
112:22 113:3
113:10 114:11
114:17 117:3
117:13 126:15
126:15 134:5,8
135:2,6,13,10
135:16 136:7
136:18,25
137:1,4,5,12
138:11 146:10
146:17 154:25
155:3 171:6
174:4 176:7
177:16 178:9
178:11 181:4
194:19 202:21
203:2,2,4,10
203:13,6,10
203:22,23,25
203:25 204:7,7
204:8,13
205:19 207:21
207:25 208:6
210:25 211:7

**toggled** 36:21
**toggles** 36:20
36:21 98:7
**token** 20:21,22
21:2 22:8,9,14
22:15,17 189:6
189:9,14,16,17
190:17 191:8
**tokens** 21:10
192:5,6 208:25
**told** 104:2
162:6 199:10
249:21 250:5
261:23 301:12
311:7,15
312:21
**tolerance**
211:2
**tolerate** 122:20
**tomorrow**
218:12,23
314:1,7 315:1
315:5
**tomorrow's**
314:18
**tonight** 314:16
**took** 41:15
150:18 245:6
297:22
**top** 18:13 85:4
119:6 127:11
205:22 231:11
249:9 269:15
271:11
**topco** 11:9
102:18 240:2

241:25 242:5,9
242:14 243:2,2
243:4,8
**topic** 69:3
268:15
**total** 15:11
186:20 193:10
208:17 272:1
300:20 306:12
309:2
**totality** 282:2
**totally** 239:9
241:4,4
**touched** 288:16
**tough** 293:1
**touted** 140:12
**towards**
251:24 252:4
**town** 120:7
132:20,20,22
151:10
**toy** 119:24
**track** 64:13
**tracks** 25:10
**tracy** 6:22
49:10 159:13
222:2 248:20
254:6,9
**trade** 72:7
183:15
**traded** 19:21
21:22 186:11
**trader** 70:14
**trades** 31:21
**trading** 13:19
271:11
20:3 22:5 70:9
72:8 97:11,12

184:12,23
185:12,19
186:5,17,23
190:25 191:2
213:12,19,22
**trajectory**
195:3
**transact** 67:24
72:5 95:24
158:2
**transaction**
11:17,25 13:15
13:22 14:2,5
14:13,13,16,21
14:24 15:1,21
16:1,1,4,4,20
16:20 17:10,17
17:19 22:10
18:15 18:20
22:13 26:2
27:12 29:5
30:4 31:24
35:25 39:20
41:1 54:6,9,11
54:20,21,24
55:5,7,10 57:6
57:8,10,11,14
58:11,12,17,23
59:2,4,5 63:24
63:25 67:7,13
68:8,11 75:5,6
75:9 80:14,25
81:1,13,14
82:2,4,13,15
83:24 84:2
86:8 87:18
89:11 94:21,22
95:19,21 96:1

---

247:12 249:22
285:7 294:12
302:9 304:6
305:9
**trying** 38:22
58:14 72:3
80:12,15,18,20
83:18 96:6
116:1 119:16
122:5,19 123:3
125:2 134:6
141:25 147:3
147:11 149:6
169:9,11,23
184:24 191:1,4
191:18 211:10
253:22 260:5
261:25 263:17
265:9,9 279:3
287:10,13
290:23 291:15
292:4 301:14
303:18 306:17
**tuesday** 50:11
**turn** 15:13
54:19 62:23
85:11,12
117:19 143:6
208:1 241:18
312:25
**turned** 252:25
253:24 257:10
**turnout** 142:24
143:5,6
**tutorial** 28:13
**twitter** 132:19

**two** 18:8 42:13
44:8 50:10
52:5 57:10
62:3 79:6,24
102:21 104:1
104:11 135:20
136:4,5 148:9
152:22 163:16
172:15 181:7
181:15 184:2
186:12 187:5,9
187:11,22
218:20 221:10
224:15,15
227:12,13
228:5,15,18
229:5 231:5,23
235:21 259:22
268:1,3,14,15
274:4 276:25
282:16 288:8,8
288:13,19
289:7,12
292:11 299:12
300:6 303:1
304:15 305:3
307:10 309:13
313:20
**tx** 5:9,10,12
**type** 47:1 49:18
125:19 157:9
163:11 166:5
273:13 280:14
**types** 20:4 31:5
208:24 226:10
236:15 286:17

**typical** 142:25
290:8,13,15,16
292:2
**typically** 272:3
275:19

**u**
**u.s** 2:23 5:2
6:2 15:16
37:22 40:21,22
41:11 91:13
98:4 162:14
163:5,8 164:3
164:11,18
165:9,12
168:20 180:19
194:5,16 213:4
213:9,13,19,23
214:2,5,9,13
214:25 215:1,4
215:15,18,20
216:21 217:4,6
217:13 244:15
244:17
**u.s.'s** 213:5
214:4
**ucc** 71:20
83:15 97:16
132:19 202:22
203:1,3,14,24
203:25 204:5,6
205:15 249:24
250:3
**ultimate**
192:21 227:25
228:3
**ultimately**
13:18 14:3

259:21 264:4
270:5 276:14
299:13 302:1
307:18
**unable** 306:19
**unaccustomed**
24:14
**unaffected**
241:4
**uncertainty**
86:3,7 308:5
**unclear** 252:24
**uncollaterali...**
257:21
**uncomfortable**
58:17 114:14
210:24
**uncommon**
251:24 256:5
**uncontroverted**
15:25
**uncovered**
292:19 294:20
294:21
**under** 11:17,25
12:5,19 16:3
23:15 26:22
28:5 31:22,25
37:13 42:23
43:7 46:11,19
54:12,13 56:10
60:12,15 61:23
62:10,10 63:1
66:5 69:2
71:11 73:19
76:22,24 77:1

---

96:9,11 97:20
103:17 105:13
113:24 114:8
114:11,15
117:18 126:14
134:24 135:25
136:25 141:13
141:19 144:8
146:18 149:1
150:12 152:7
152:12 153:25
171:4 177:9
192:2 194:10
195:17 198:14
210:24 235:17
257:24 259:12
259:17 260:1
260:1 261:3,5
282:13 285:19
286:10 287:2,3
**transactions**
13:14 14:19,20
24:24 26:3,3,4
26:5,14,22,25
27:2,9 31:18
31:19 33:12
43:4,6 54:5
67:18 68:1,19
95:25 121:25
148:22 150:4
177:10 224:22
225:1,10
259:15 284:17
284:19,22
285:11 286:1,7

**transcribed**
3:25
**transcript**
317:4
**transfer** 68:5
93:1 126:19
132:11,12
138:13 142:7
149:25 157:17
196:8 197:9
201:10 211:16
217:7 272:16
310:17
**transferred**
37:25 92:17
93:8 129:23
130:8,18
157:14 160:22
197:4 215:9
216:21 235:22
**transferring**
68:9
**transfers** 24:12
77:21 78:6
217:23 234:24
**transition**
272:9
**transmitted**
132:6 239:22
**transparency**
64:22
**transparent**
69:17 83:14
115:12 125:1,6
191:4
**travel** 314:17

**treasurer**
270:21
**treasury** 181:7
**treat** 19:16
201:25
**treated** 19:9
20:21,23 44:4
63:7 148:20
**treatment** 16:7
32:18
**tremendous**
57:13 70:16
71:14,17
177:19 194:7
**trend** 49:23
50:1
**trial** 3:11 170:9
173:5 176:21
220:10
**tried** 44:20
117:18 277:22
303:24
**trigger** 5:2 6:2
**triggered**
25:20 30:4
**trouble** 136:14
145:13 180:7
190:4 238:25
239:3
**true** 19:21
42:17 51:13
62:16 113:4
125:18 133:6
144:20 173:11
173:11 178:15
184:3 252:8
286:14 291:2
311:18 317:4

**trust** 48:15
67:16 139:20
195:20 197:18
198:19 199:3,6
210:9,9,16
211:13
**trustee** 5:2 6:2
15:16 37:22
40:10,11,21
41:12 68:24
69:5,5,12,20
71:2 81:7,14
90:11,19 97:24
98:4,5,23
99:11,16
100:10,12
141:7 149:1
175:1 181:6,21
186:13 187:8
187:23 188:1,2
188:5
**trustee's** 40:22
**trusts** 312:14
312:21
**truth** 52:23,24
52:24 220:2,3
220:3 243:8
**truthful** 263:10
**try** 28:14 53:19
72:7,9 109:11
145:17,19
154:2 72:19
54:2 72:19
73:16,22 75:20
83:7 92:7 94:9
98:2 99:5,14
115:24 138:6

---

77:3,9,17
82:12 87:9
88:23 89:5,6,8
92:7 94:18
95:5,19 96:10
96:14 97:12
98:11,12,14,22
99:9 102:6
103:1,16 104:8
104:11,16,17
104:20,25,25
105:1,7,8,12
105:16 106:1
106:17,20,25
107:12 108:21
108:24 109:1,1
110:15 111:5
116:15 132:16
137:12 138:9
138:11 146:17
148:25 149:7
150:3 152:4
153:8 155:13
157:14,15
158:5 160:6
161:14 175:18
185:7 186:6
191:21 196:19
197:5 202:10
208:5,6 230:20
232:5,10,24
233:2 234:4,8
236:21 237:20
244:19 247:17
251:13 262:6
273:14 285:3
290:4 308:9,17

309:20
**underline** 22:8
**underlying**
73:6
**underneath**
105:13
**underpinnings**
280:10
**understand**
10:14 12:15
13:1 19:8 40:1
42:23 44:23
45:25 53:19
54:24 58:10
60:15 61:17
63:12,13 64:11
65:17 66:10,21
67:22 69:19
70:14 72:4
73:12,21,24
78:16 79:9,25
84:1 92:16
94:24 96:9
100:7 102:23
102:25 111:7
118:9 119:12
119:14,21
120:11,15
122:4,6,25
123:15,16
124:22 126:7
126:22 127:1
127:14,16
130:14,16
134:25 135:2
136:1 143:12
143:12,13

145:14 146:3
147:21 152:13
153:3 155:20
161:15 168:22
175:2 176:11
177:1,3 178:20
180:3,18
182:16 185:1
188:10 192:16
192:20 193:1
203:5,24
208:15 210:7
211:10 220:12
227:2,2 234:12
240:15 241:5
241:11 252:13
257:8 260:4
262:23 263:8
265:11 277:15
278:10 280:23
281:20 285:8
286:4 287:22
290:12 294:11
295:23 305:24
309:18 315:2
**understanding**
12:21 20:2,13
20:16 21:9
54:2 72:19
73:16,22 75:20

162:18,21
167:20 169:23
180:7 198:1,3
215:2 217:11
270:7 283:11
293:14 310:1
**understood**
10:4 19:5
61:13 83:2
88:21 89:3
93:10 97:19
119:3 103:12
192:20 293:20
210:22 249:7
253:1 260:4
263:16
**undertaking**
281:15
**undo** 68:15
121:12
**undoing** 68:14
**undoubtedly**
41:17
**unequivocally**
168:7
**unfold** 114:12
**unfolded** 258:8
**unforeseen**
196:14
**unfortunate**
59:7 241:11
**unfortunately**
114:5 115:19
115:24 138:6
**unhappy** 10:14
**unidentified**
157:18 161:10
187:18 206:12

| | | | |
|---|---|---|---|
| 206:15,18 | unsecureds | 29:4,11,19 | **v** |
| 207:1,8,12,14 | 18:20 | 30:9,14 31:3 | |
| 207:24 208:2 | **unspecified** | 31:23 32:5,10 | v  1:12,21 3:2,9 |
| 208:10,13 | 29:16 | 33:16,25 34:15 | 189:12 |
| 209:3 238:1 | **unstable**  259:8 | 35:23 36:14 | **vague**  139:18 |
| 246:18,21,25 | **unsupported** | 37:10,17 38:4 | 139:19 217:25 |
| 247:11 | 16:6,16 19:9 | 314:13,13,21 | **vaguely**  28:24 |
| **uniformly** | 19:14,15 20:11 | 314:23 | **valid**  51:6 |
| 106:3 | 62:7,7,23 | **urquhart**  6:8 | 124:5 243:4 |
| **unique**  280:25 | 63:18,23 72:1 | 168:18 | 267:1 |
| 283:10 | 72:1 81:9 | 209:1,13 | **validated** |
| **united**  1:1 2:1 | 89:20,22,25 | **usdc**  95:25 | 71:18 184:4 |
| 5:1 6:1 24:7 | 90:5,8 93:22 | **usds**  96:8 | **valuable**  11:18 |
| 40:10,11 90:10 | 135:21,22 | **use**  98:16 | **value**  11:13 |
| 90:19 170:3 | 137:9,16,22 | 106:3 109:25 | 12:18,22 13:8 |
| 195:14 314:14 | 138:17,21,24 | 110:8,15,19,22 | 13:21,21 14:2 |
| **universal** | 139:9,14 | 111:3 143:10 | 14:4 22:15 |
| 138:3 | 140:11 156:8 | 157:8 158:13 | 23:15 54:9 |
| **unmuted**  60:10 | 178:12,13 | 158:22 234:18 | 69:2 71:12 |
| **unregistered** | 180:1,7,11 | 256:8 285:16 | 74:20,21 76:21 |
| 33:2 34:1,9 | 181:1 208:14 | 290:15 | 79:13,23 82:13 |
| **unresolved** | 208:16,18 | **used**  45:9 | 82:20 84:23 |
| 23:7 83:9 | 209:5 | 70:13,13 87:9 | 86:9,11,12 |
| **unsecured**  3:17 | **unusual**  15:17 | 87:12 115:2 | 91:10 94:19,22 |
| 11:3,3,6,7,9 | 193:5 235:11 | 135:3 192:13 | 115:17 151:24 |
| 18:11 54:10 | 282:4 287:18 | 252:15 277:3 | 174:15 192:9 |
| 57:15 69:18 | 294:24 | **user**  160:5,10 | 192:18 193:10 |
| 74:12 103:15 | **unwinding** | 162:9 | 194:14 209:2 |
| 107:10 114:1,9 | 230:9 | **users**  14:6 | 209:15 210:23 |
| 115:17 125:4 | **unwound** | 160:11 192:5 | 212:10 232:11 |
| 139:6 151:15 | 295:1 | **usually**  40:2,3 | 237:13 247:25 |
| 171:5,10 | **uplift**  239:19 | 219:14 | 261:2 298:25 |
| 180:25 183:23 | **upset**  173:23 | **utility**  22:9,14 | 302:18 307:6 |
| 191:5 194:13 | **uptegrove**  4:16 | 22:16,19 | **valued**  21:19 |
| 195:1 196:22 | 24:6,7,18 | **utilize**  162:7 | 21:21 |
| 196:24 199:11 | 25:13 26:1 | | **values**  21:10 |
| 212:6 225:13 | 27:8,19 28:19 | | 21:13 77:10 |

| | | | |
|---|---|---|---|
| 189:14,22 | **waiving**  232:13 | 154:21 159:20 | **war**  55:16 |
| 190:7 197:4,9 | **wall**  114:5 | 161:5 166:16 | 116:15,17 |
| 197:12 199:24 | 116:16 154:9,9 | 174:23 175:4 | 117:21 |
| 208:15 209:22 | 154:11,11,14 | 175:14 176:4 | **warning**  100:4 |
| 214:10 218:18 | 154:16,18 | 177:11 178:7,8 | **warrant** |
| 218:21 223:5 | 155:17 156:19 | 189:7 192:24 | 252:21 |
| 223:17 224:2 | 156:22,24 | 197:25 198:22 | **warranted** |
| 224:16 228:2 | 157:4,6,23 | 199:2,24 200:1 | 114:17 281:2 |
| 238:7,25 | 158:7,9 159:5 | 200:14,15 | 283:13 |
| 239:13 243:25 | **wallet**  68:14 | 218:11 221:22 | **warren**  7:7 |
| 247:2 249:13 | 136:9 160:24 | 224:6 227:15 | 23:24,24 287:9 |
| 251:11 257:6 | 160:24,25 | 227:23 231:4 | 287:22 |
| 258:6,8 261:12 | **wallets**  86:3,6 | 238:17 241:5 | **washington** |
| 261:16,16,18 | 136:20 161:2 | 269:10 282:25 | 4:21 |
| 262:2 264:7,23 | **want**  21:8 | 286:2 291:16 | **water**  237:6 |
| 265:3 266:3,4 | 23:22 31:2 | 292:6 294:16 | **waterfall**  61:25 |
| 266:6,8,12,18 | 32:14 38:6,24 | 296:23 303:13 | 62:1 |
| 266:19,19,23 | 38:25 40:11 | 306:25 308:1 | **way**  35:10 44:4 |
| 267:18,22 | 42:10 43:18 | 310:16 | 45:10 46:13 |
| 268:8 269:19 | 48:6 52:15 | **wanted**  17:21 | 47:9 49:11 |
| 269:21 273:10 | 53:19,21 54:19 | 24:2 43:10 | 50:4 59:19,20 |
| 273:18 274:8 | 55:20 56:19 | 44:8,13 63:1 | 61:19 68:17,24 |
| 277:7 300:18 | 58:12 61:4 | 64:23 69:3 | 69:18 70:8,18 |
| 307:4 310:16 | 62:23 65:7,12 | 90:22 116:18 | 74:13 75:12 |
| 311:4,6 | 65:14 67:3 | 162:23 190:14 | 78:13 103:10 |
| **voyager's** | 85:24 93:19 | 203:24,25 | 115:12 125:1 |
| 181:23 266:2 | 114:13 116:5 | 204:6,15 205:9 | 132:6 133:5 |
| 307:19 | 117:3 120:18 | 239:9 246:3,6 | 135:7 138:20 |
| | 121:16,20 | 257:5 274:17 | 139:7 140:4 |
| **w** | 122:16,17 | 275:1 277:22 | 146:8,20 149:6 |
| **w**  5:11 | 123:9 124:20 | 291:6 311:21 | 150:16,23 |
| **wait**  35:6 66:17 | 127:20,21,23 | **wanting**  52:18 | 152:1 154:3,5 |
| 89:23 129:21 | 129:19 130:5,6 | 264:2 | 158:16 162:2 |
| 130:6 147:23 | 130:23 131:14 | **wants**  127:24 | 179:7 183:10 |
| **waiting**  20:15 | 135:9 136:20 | 180:5 199:9 | 190:24 191:4 |
| 111:13 | 138:10 144:19 | 246:16 | 193:7 197:3 |
| **waived**  231:18 | 146:22 147:22 | | 198:13 210:25 |

| | | | |
|---|---|---|---|
| 309:8 | 191:8,9 192:5 | 185:21 186:5,9 | **voy**  3:9 |
| **vanderbilt** | 192:6,9,17,23 | 186:17,24 | **voyager**  1:7,10 |
| 6:17 | 193:10 | 194:3 | 1:18,19,22 3:1 |
| **variety**  222:24 | **viability** | **volumes** | 3:9 9:7 16:24 |
| **various**  9:12 | 281:23 | 185:19 | 24:13 25:6 |
| 18:1 21:13 | **viable**  114:4,8 | **voluntarily** | 26:8 30:5,15 |
| 51:15 52:9 | 225:5 259:16 | 240:25 | 30:15,16 41:14 |
| 153:12 169:6 | **vibrant**  203:14 | **vote**  46:8,9,10 | 41:22,23 63:22 |
| 176:14 | **victims**  158:21 | 46:13,18 47:7 | 64:1 67:5,12 |
| **verbally**  222:5 | **victor**  189:13 | 48:5 53:24 | 72:12 88:22 |
| **verified**  71:13 | **view**  15:13 | 115:19 127:13 | 89:4 98:9,16 |
| 157:6,25 | 59:24 81:21 | 142:18,23 | 98:18 116:6,17 |
| **vermont**  19:9 | 87:22 95:3,4 | 144:14,15,17 | 116:18 118:13 |
| 19:12,14 20:8 | 225:24 230:3 | 144:19 | 118:14 120:16 |
| 20:15,17 | 235:23 299:16 | **voted**  10:22 | 126:15,19 |
| **version**  61:11 | **viewed**  26:10 | 11:3 42:16,22 | 131:16,20,20 |
| 180:11 242:10 | 257:4 | 46:5,6,15 48:4 | 132:5,5,10,11 |
| **versus**  61:8 | **views**  34:20 | 48:4,6 85:21 | 133:2 136:8,18 |
| 62:14 72:3 | 210:19 226:3 | 86:9 108:19 | 137:17,24 |
| 75:7 137:13 | **violate**  28:8 | 127:13 128:10 | 138:18,19,23 |
| 142:14 144:10 | **violating** | 142:18 143:11 | 138:24 140:18 |
| 183:4 189:24 | 303:14 | 143:20 144:3,9 | 141:17 145:12 |
| 214:9 | **violation**  20:1 | 144:11 194:10 | 146:6 154:20 |
| **vetted**  114:8 | 25:22 29:21 | 310:1,5,7,7 | 155:12,12,21 |
| 195:15 | 299:12 | **voter**  142:24 | 155:24 156:1 |
| **vetting**  288:16 | **violations**  29:7 | **votes**  288:21 | 160:7,12 |
| **vgx**  20:21,22 | **violative**  24:24 | 312:20 | 162:10,12 |
| 20:25 21:2,5 | 29:6 36:4 | **voting**  10:22 | 163:25 167:18 |
| 21:19,23 22:5 | **virtually** | 11:11,9,9 | 170:18,19 |
| 22:6,15,19 | 111:23 | 15:4 17:5 42:6 | 176:20,23 |
| 32:13 33:2 | **virtue**  266:12 | 45:11,19 46:22 | 177:15,15,20 |
| 182:10 184:7 | **visuals**  49:24 | 47:10,15,24 | 178:14,14 |
| 185:11 189:6,9 | **volatile**  149:25 | 69:16 85:21,22 | 179:7,8,20,22 |
| 189:14,16,19 | **volume**  70:10 | 86:10 112:25 | 181:13 183:3,5 |
| 189:21 190:7 | 181:24 183:3,5 | 115:25 143:2 | 184:18 185:8 |
| 190:15,16,21 | 184:10,12 | 175:8 | 186:6,11,16 |

| | | | |
|---|---|---|---|
| 211:4,4 215:13 | 172:14 196:3 | 154:14 158:19 | 279:8 |
| 220:24 231:13 | 205:12,21,22 | 163:17 181:8 | **withdraw**  21:1 |
| 232:1 235:2 | 205:22 | **william**  4:16 | 136:9 197:25 |
| 238:19 240:24 | **weekly**  93:1,9 | 24:6 314:13 | 198:17 199:5 |
| 243:1,7 244:25 | 111:7 198:15 | **willing**  25:24 | 214:3 264:2 |
| 245:12 254:19 | 215:17 313:17 | 29:2 118:20 | **withdrawal** |
| 255:14 273:2 | **weeks**  145:4 | 175:10 230:17 | 256:18 |
| 277:24 283:17 | 172:15 214:23 | 230:18 255:2,4 | **withdrawals** |
| 285:13 286:16 | 272:5 295:20 | 301:11 | 198:11 313:17 |
| 288:16,18 | **weighted**  210:1 | **win**  237:8,9 | **witness**  13:11 |
| 289:25,25 | **weil**  224:7 | 254:4 291:4 | 45:6,10,12 |
| 302:9 304:23 | **weird**  25:12 | 292:24,25 | 48:21 49:1,3 |
| 307:24 312:1,3 | 294:5 | **winddown** | 52:25 53:3,5 |
| **ways**  298:4 | **welcome** | 14:22 22:22,23 | 56:8,12,20 |
| **we've**  17:14 | 245:21 | 22:24 47:19 | 59:25 65:18,19 |
| 22:18 29:19 | **went**  41:9 72:3 | 48:1 116:22 | 65:21,22,23 |
| 30:15 54:9,24 | 121:3 207:23 | 124:7 273:6 | 66:2,12,20,23 |
| 69:9,17 81:23 | 207:24 215:21 | 274:2 282:23 | 66:25 69:22 |
| 83:14 94:7 | 216:15 236:19 | **winner**  299:14 | 72:24,25 76:23 |
| 125:23 152:7 | 243:1 249:12 | **winners**  308:3 | 85:11,15,18 |
| 161:7 163:3 | 282:5 283:9 | 308:3,4 | 86:22 90:12 |
| 166:2 183:16 | 287:17 314:15 | **winning** | 100:2 101:1,2 |
| 184:2 187:16 | **whatsoever** | 228:13 283:2 | 101:5,19 |
| 201:8 203:20 | 50:6 | **wins**  104:1 | 102:12,16 |
| 205:11,14 | **wherewithal** | 243:2 | 105:5 106:14 |
| 211:5,25 | 213:24 228:18 | **wire**  68:13,16 | 106:20 109:10 |
| 229:15 295:4 | 229:6 256:10 | **wish**  45:20 | 109:10 112:6,9 |
| 312:19 | 256:12 276:7 | 48:21 51:19 | 112:11 113:15 |
| **weaker**  307:11 | **white**  139:22 | 154:12 266:23 | 113:21 118:9 |
| **wearing** | **widely**  150:1 | 271:18 | 124:1 128:17 |
| 122:15 | 282:5 | **wishes**  48:20 | 128:18,23 |
| **weather** | **wife**  304:17,18 | 69:25 101:1,2 | 129:8,16 |
| 251:21 262:22 | 304:18 | 112:11 128:23 | 131:24 137:10 |
| **website**  41:5 | **wife's**  304:20 | 188:16 199:22 | 137:14,23 |
| **week**  22:22 | 306:17,20 | 212:14 221:20 | 138:14 139:13 |
| 49:17 50:24 | **wiles**  2:22 | 221:24 222:1 | 140:13,21,24 |
| 51:3 93:3 | 34:25 125:8 | 237:25 261:4 | 141:1,8 143:22 |

| | | | |
|---|---|---|---|
| 144:4 145:21 | 265:7,9,14 | 131:22 132:3 | 303:20 305:13 |
| 147:22 150:2,7 | 270:11,13 | 139:23 159:4 | 305:14,19,20 |
| 155:15 157:3 | 296:2 298:3,18 | 159:23 167:2 | 306:7,12 307:8 |
| 157:21 159:10 | 298:20 303:14 | 205:19 211:8 | 307:9 |
| 161:16 165:1,3 | 304:5 305:16 | 225:13 227:15 | **worthless** |
| 165:4,21 | 305:24 306:1 | 236:7 277:1,2 | 241:18 |
| 166:21 168:23 | 306:10,16 | 277:3 286:7 | **would've** 55:22 |
| 170:14 172:12 | 308:18,22 | **worked** 54:9 | 112:23 114:24 |
| 175:17 177:1 | 309:20 310:4,9 | 54:22,25 | 120:25 121:1 |
| 179:24 180:9 | 310:25 312:13 | 113:25 153:21 | **wrapped** |
| 180:13 183:8 | 314:6,6,10 | 288:18 | 195:16 239:1 |
| 184:8,13 185:9 | **witness's** 56:14 | **working** 53:17 | **write** 162:23 |
| 185:20 186:2 | 177:4 313:25 | 111:20 115:16 | 251:2 293:7 |
| 186:21 187:15 | **witnesses** 8:3 | 191:6 276:23 | **writes** 239:3,14 |
| 188:4,11,16 | 9:20 17:7 31:9 | **works** 21:9 | 227:10,11 |
| 189:4,12,15,23 | 31:9 43:19 | 54:24 105:25 | **written** 57:25 |
| 192:20 193:21 | 140:21 161:5 | 175:5 198:14 | **wrong** 24:15 |
| 195:10 198:8 | **wives** 304:2 | 277:25 278:2 | 24:16 42:21 |
| 199:22 200:19 | **won** 248:5 | **world** 36:16 | 56:11 66:5 |
| 201:15 202:14 | 306:21,22 | 110:4 192:17 | 75:17 173:16 |
| 202:15,21,24 | **wonderful** | 260:2 284:19 | 198:3 211:20 |
| 203:5,8,17 | 228:13 313:3 | **worldwide** | 249:8 253:24 |
| 205:5 206:22 | **wondering** | 222:20 | 256:7 257:12 |
| 207:3,11,13,17 | 103:22 | **worried** 39:25 | 258:10 266:11 |
| 208:1,3,11,19 | **word** 226:6 | 40:5 190:9 | 277:11,12 |
| 212:14 216:5 | 277:15 285:24 | **worry** 245:5 | 286:7 |
| 216:14,25 | 294:11 | **worse** 72:10 | **wrote** 200:13 |
| 217:8,17 218:4 | **words** 77:19 | 108:1 163:24 | |
| 218:7,12,14,19 | 78:4 94:25 | 170:17 | **x** |
| 219:25 220:14 | 138:9 148:3 | **worst** 34:9 | **x** 1:5,9,15,17 |
| 222:10 229:12 | 242:7 250:20 | 173:25 174:2 | 1:24 8:1 |
| 237:23,25 | 252:14 264:22 | **worth** 74:7 | 158:11 189:13 |
| 241:23 246:11 | **work** 34:5 44:3 | 79:12,21 80:13 | 189:13 289:2 |
| 246:13,16,22 | 55:2 58:23 | 81:22 92:9 | 289:16 316:1 |
| 247:7 258:20 | 61:20 67:10 | 247:2,3,6 | **y** |
| 259:15,21 | 74:11 90:2 | 251:3 292:19 | **y** 289:16 |
| 263:25 264:21 | 110:21 116:21 | 302:5 303:11 | |

| | |
|---|---|
| **yeah** 48:3,14 | **z** |
| 89:2 94:24 | **zero** 175:12,12 |
| 99:11 105:23 | 190:21 191:13 |
| 136:24 141:19 | 238:8 |
| 143:15 151:22 | |
| 154:7 162:5,17 | |
| 163:5 171:16 | |
| 179:18 187:16 | |
| 187:25 190:8 | |
| 190:18,19 | |
| 203:12 204:11 | |
| 205:11 207:25 | |
| 208:13 209:12 | |
| 210:18 211:9 | |
| 219:4,19 | |
| 225:25 240:15 | |
| 258:5 270:11 | |
| 272:3 283:14 | |
| 292:13 293:2 | |
| 296:13 301:15 | |
| 301:18 306:1 | |
| 309:16 | |
| **year** 234:3 | |
| 244:21 | |
| **years** 25:22 | |
| 30:6,6 40:22 | |
| 158:13 222:16 | |
| 222:17 224:7 | |
| 234:8 276:21 | |
| **yep** 53:23 | |
| **yield** 62:11 | |
| **york** 1:2 2:3 | |
| 4:6 5:4,16,17 | |
| 5:19 6:4,11,18 | |
| 15:10,16,19 | |
| 37:22 88:14 | |
| 163:4 218:22 | |

A-1167

```
                                                        Page 1

 1    UNITED STATES BANKRUPTCY COURT

 2    SOUTHERN DISTRICT OF NEW YORK

 3    Case No. 22-10943-mew

 4    - - - - - - - - - - - - - - - - - - - - - - - - - -x

 5    In the Matter of:

 6    VOYAGER DIGITAL HOLDINGS,

 7              Debtor.

 8    - - - - - - - - - - - - - - - - - - - - - - - - - -x

 9    Adv. Case No. 22-01133-mew

10    - - - - - - - - - - - - - - - - - - - - - - - - - -x

11    VOYAGER DIGITAL HOLDINGS, INC.,

12                    Plaintiff,

13              v.

14    DESOUSA,

15                    Defendant.

16    - - - - - - - - - - - - - - - - - - - - - - - - - -x

17    Adv. Case No. 22-01170-mew

18    - - - - - - - - - - - - - - - - - - - - - - - - - -x

19    THE AD HOC GROUP OF EQUITY INTEREST HOLDERS OF VOYAGER OF

20    VOYAGER DIGITAL LTD.,

21                    Plaintiff,

22              v.

23    VOYAGER DIGITAL HOLDINGS, INC., et al.,

24                    Defendants.

25    - - - - - - - - - - - - - - - - - - - - - - - - - -x
```

Page 2

```
 1            United States Bankruptcy Court
 2            One Bowling Green
 3            New York, NY  10004
 4
 5            March 3, 2023
 6            10:08 AM
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21    B E F O R E :
22    HON MICHAEL E. WILES
23    U.S. BANKRUPTCY JUDGE
24
25    ECRO:  F. FERGUSON
```

Page 4

```
 1  HEARING re Motion by Tracy Hendershott to convert case to
 2  chapter 7
 3  Objection filed
 4
 5  HEARING re Motions by Alah Shehadeh
 6  Objection filed
 7
 8  HEARING re Objection of the Official Committee of Unsecured
 9  Creditors to proofs of claim nos. 11206, 11209 and 11213
10
11  HEARING re Combined hearing RE: to consider approval of the
12  disclosure statement and confirmation of the chapter 11 plan
13  Objections filed
14
15
16
17
18
19
20
21
22
23
24
25  Transcribed by:  Sonya Ledanski Hyde
```

Page 3

```
 1  HEARING re Adversary proceeding: 22-01133-mew Voyager
 2  Digital Holdings, Inc. v. De Sousa Motion to extend
 3  automatic stay or, in the alternative, for injunctive relief
 4  enjoining prosecution of certain pending litigation against
 5  the debtors, directors and officers
 6
 7  HEARING re Adversary proceeding: 22-01170-mew The Ad Hoc
 8  Group of Equity Interest Holders of Voy v. Voyager Digital
 9  Holdings, Inc. et al
10  Pre-trial Conference
11
12  HEARING re Motion to hold the directors personally liable
13
14  HEARING re Joinder to motion by David Stephenson
15
16  HEARING re Motion for an equity committee
17
18  HEARING re Joinder to motion by David Stephenson
19
20  HEARING re Motion by Michelle D. DiVita to appoint a chapter
21  11 trustee
22  Objections filed
23
24
25
```

Page 5

```
 1  A P P E A R A N C E S :
 2
 3  LATHAM & WATKINS
 4      Attorneys for Binance.US
 5      1271 Avenue of the Americas
 6      New York, NY 10020
 7
 8  BY:  ADAM J. GOLDBERG
 9      ROBERT J. MALIONEK
10
11  KIRKLAND & ELLIS LLP
12      Attorneys for the Debtors
13      601 Lexington Avenue
14      New York, NY 10022
15
16  BY:  CHRISTINE OKIKE
17      MIKE SLADE
18
19  SECURITIES AND EXCHANGE COMMISSION
20      Attorneys for the Securities and Exchange Commission
21      950 East Paces Ferry Road, N.E., Suite 900
22      Atlanta, GA 30326
23
24  BY:  WILLIAM MATTHEW UPTEGROVE
25
```

A-1169

```
1   TEXAS OFFICE OF ATTORNEY GENERAL
2        Attorneys for TX State Securities
3        Board TX Dept. of Banking
4        300 W. 15th Street
5        Austin, TX 78701
6
7   BY:  ABIGAIL RYAN
8
9   UNITED STATES DEPARTMENT OF JUSTICE
10       Attorneys for the U.S. Trustee
11       Alexander Hamilton Custom House
12       New York, NY 10004
13
14  BY:  MARK BRUH
15
16  MCDERMOTT, WILL & EMERY
17       Attorneys for Special Committee
18       One Vanderbilt Avenue
19       New York, NY 10017
20
21  BY:  JOHN CALANDRA
22       JOSEPH (JOE) B. EVANS
23       DARREN AZMAN
24
25
```

```
1                        I N D E X
2
3   WITNESSES:        DIRECT:   CROSS:   REDIRECT: RECROSS:
4   BRIAN TICHENOR       24      41/99/111
5                               115/146
6   PAUL HAGE          233      247
7
8
9   EXHIBITS:                              PAGE:
10  Exhibit 6                               22
11  Exhibit 7                               22
12  Exhibit 8                               22
13  Exhibit 9                               22
14  Exhibit 11                              22
15  Exhibit 15                              22
16  Exhibit 16                              22
17  Exhibit 20                              22
18  Exhibit 21                              22
19  Exhibit 22                              22
20  Exhibit 23                              22
21  Exhibit 1109-2                         236
22
23
24
25
```

```
1   Kilpatrick Townsend & Stockton LLP
2        Attorneys for Ad Hoc Group of Equity Interest Holders
3        1114 Avenue of the Americas
4        New York, NY 10036
5
6   BY:  DAVID M. POSNER
7
8   TRACY HENDERSHOTT
9        Pro Se Creditor
10
11  ANDREW RIZK
12       Pro Se Creditor
13
14  GINA DiRESTA
15       Pro Se Creditor
16
17  DANIEL NEWSOM
18       Pro Se Creditor
19
20  SETH JONES
21       Pro Se Creditor
22
23  LISA TREVINO
24       Pro Se Creditor
25
```

A-1170

```
1                    P R O C E E D I N G S
2        THE COURT:  Please be seated.  All right, are we
3   ready to continue?
4        MR. SLADE:  Yes, Your Honor.
5        THE COURT:  Let me just log into my computer
6   screen.  We'll be all set.
7        MR. SLADE:  Sure.
8        THE COURT:  Okay.  Can I ask a question about the
9   evidentiary presentations?
10       MR. SLADE:  Certainly.
11       THE COURT:  A number of the objections have
12  criticized the selection of the proposed plan administrator.
13  Do you have any witnesses who are going to address that?
14       MR. SLADE:  We do intend to introduce his resume
15  into evidence, and that was one of the things I was going to
16  cover right now.
17       THE COURT:  All right.  And do you anticipate any
18  testimony from anybody from Binance?
19       MR. SLADE:  We do not.
20       THE COURT:  So --
21       MR. SLADE:  We have asked them to provide a
22  witness, and they declined.
23       THE COURT:  That seems odd, doesn't it?
24       MR. SLADE:  Not in my experience, Your Honor.  I
25  mean, I've done a lot of these where the buyer, we ask the
```

Page 10

1  buyer to testify and the buyer declines to testify.  So in
2  that respect -- I mean, this is an unusual case which is why
3  we made the request, but I understand the question.  We
4  asked it as well.
5        THE COURT:  Well, I have a host of objections
6  asking me, based on what's happened in the industry in
7  general, to try to be careful about Binance and about how it
8  treats customers and how it segregates customer payments,
9  and essentially you're asking me to rely entirely on unsworn
10  hearsay on those points.
11        MR. SLADE:  We are going to -- Mr. Tichenor is
12  going to testify about the additional diligence that we did
13  and --
14        THE COURT:  But in the end, his diligence is
15  largely hearsay, right?  It's what Binance tells him.
16        MR. SLADE:  Is it largely hearsay.  We have some
17  evidence, some of which was provided confidentially that I
18  would want to confirm that I'm allowed to disclose.
19        THE COURT:  Yeah.
20        MR. SLADE:  But I understand Your Honor's
21  questions and concerns and we are asking the same questions.
22        THE COURT:  Okay.  I had mentioned yesterday, and
23  these are things for you to discuss with Binance because
24  they're things I'm thinking about and maybe there are issues
25  that are easy modifications that would make points go away,

Page 11

1  but I had mentioned the length of the custody trust
2  relationship to make sure that it continues until somebody's
3  had an actual meaningful opportunity to withdraw their
4  crypto, if that's what they choose to do.
5        I'm still unclear in the unsupported
6  jurisdictions, if somebody does not want to be a Binance
7  customer, do they have to wait six months or can they get
8  cash in three months like people in other states can get?
9        MR. GOLDBERG:  Your Honor, Adam Goldberg of Latham
10  and Watkins on behalf of Binance.US.  The terms of the deal
11  are that customers in unsupported jurisdictions would be --
12  their cryptocurrency would be held by the Debtors for six
13  months from the closing date until there is a solution with
14  any of the unsupported jurisdictions.  As I think Your Honor
15  is aware, Binance.US, the Debtors, and the State of Vermont
16  have reached an agreement on the terms of distributions to
17  Vermonters and we're working earnestly to achieve similar
18  resolutions with other unsupported jurisdictions and I'm
19  hopeful we'll be able to do so.
20        THE COURT:  I understand the reasons why the
21  parties say that as to people who want crypto in-kind
22  distributions, why you can't do it in violation of law, why
23  you want six months try to work it out.  I understand all
24  that.  But as to people in the unsupported jurisdictions, if
25  I'm using the correct phrase here, who don't want in-kind

Page 12

1  distributions and don't want to be Binance customers, why do
2  they have to wait six months?  Why can't they get the same
3  three-month treatment that people in other states get?
4        MR. GOLDBERG:  Well, Your Honor, essentially the
5  business deal that was struck between Binance and the Debtor
6  --
7        THE COURT:  I don't care what the business deal
8  is.  From the bankruptcy point of view, why can't they have
9  the same terms as people in other states?  Why, just because
10  I live in Texas, if I am absolutely sure that I don't want
11  to be a Binance customer, why can't I do the same thing as
12  somebody who's in Ohio and just get cashed out in three
13  months?  Why do I have to wait six months?
14        MR. GOLDBERG:  The objective with that provision,
15  Your Honor, is to attempt to reach a solution that complies
16  with applicable regulations to permit distributions in kind,
17  which is the goal of creditors.
18        THE COURT:  But if I don't want an in-kind
19  distribution, I live in Texas and I say I'd rather get my
20  cash in three months, I don't want in-kind distributions,
21  why do I have to wait six months?
22        MR. GOLDBERG:  Well, Your Honor, the -- Binance's
23  transactions to acquire all of the customers onto the
24  platform and serve as distribution agent to --
25        THE COURT:  But you know you're not acquiring all

Page 13

1  of the customers in Ohio.  You know, those people don't have
2  to go to Binance.  They have a right to just be cashed out
3  in three months if that's what they want.  So if I'm in
4  Texas and I similarly don't want to be a Binance customer,
5  why don't I get the exact same opportunity?  I don't
6  understand it.
7        MR. GOLDBERG:  Essentially the goal there was to
8  align the terms for all other customers which was to provide
9  custom -- Binance with the ability to acquire all of the
10  customers and deliver the crypto to customers as quickly as
11  possible for those who want to be part of the Binance
12  platform.  That transaction enabled the Debtors to receive
13  the maximum amount of value available for Binance to benefit
14  the estate as a whole and --
15        THE COURT:  You know -- but look.  I understand
16  that you want to give everybody a chance to get in-kind
17  distributions.  I understand that you want on behalf of
18  Binance to get customers if you can.  But obviously, we
19  can't force customers to go to you.  And as to customers in
20  48 states, you have recognized that they don't have to open
21  Binance accounts and if they don't, within three months,
22  that they get cash distributions.
23        My question is, why can't somebody in Texas, New
24  York, Vermont, Hawaii, whatever your unsupported
25  jurisdictions still are, why can't they say in that same

Page 14

1  three-month period, I don't want to go to Binance?  This --
2  you know, why do you get longer to try to convince them to
3  be Binance customers than you get with respect to people in
4  Ohio?  Don't get it.
5        MR. GOLDBERG:  Well --
6        THE COURT:  Why can't they have the affirmative
7  right to tell you, I don't want this, I want my cash, so
8  that I can have -- so that I can have the same rights that
9  somebody in Ohio has?  I can't give them the same rights to
10  in-kind distributions because there are state laws in
11  effect.  I understand that.  I can give them the same right
12  to get cash distributions as the same time as people in
13  other states have and I'm having a lot of trouble
14  understanding why I'm not -- why I shouldn't do that, in
15  fact, why I'm not required to do that.
16        MR. GOLDBERG:  I understand Your Honor's point.  I
17  think our position there is, Your Honor, that the creditors
18  do have the same opportunity to recover value from the
19  estate as quickly as possible in accordance with applicable
20  law and that part of the value proposition that is
21  benefiting the estate and that was voted on by creditors, is
22  to provide that opportunity for Binance, the Debtors, and
23  each of the unsupported jurisdictions to seek to achieve a
24  resolution that enables distributions to customers within
25  that time period.  And once the resolutions occur, as was

Page 16

1  hard?
2        WOMAN 1:  Your Honor, we just got a notification
3  that people on the phone can't hear.
4        THE COURT:  My microphone is supposedly on, I
5  think.  Can anybody hear me now?
6        MAN 1:  We have the same as you, Your Honor.
7  (indiscernible) the whole Court Solutions system is not --
8  is down.
9        THE COURT:  Is down?
10        MAN 1:  For this hearing.  (indiscernible) certain
11  hearings (indiscernible).
12        THE COURT:  I see.  So it's not this microphone.
13  It's Court Solutions.  Great.  I don't want to have to
14  repeat all this.
15        MR. GOLDBERG:  I hear you loud and clear, Your
16  Honor.
17        MAN 1:  (indiscernible).
18        THE COURT:  Yeah, would you -- thanks.
19        AUTOMATED VOICE:  Thank you.  Your personal
20  identification number has been accepted.  Welcome to your
21  telephonic courtroom.  Your line is live.  To access the
22  Court Solutions advanced call features, go to Court-
23  Solutions.com and open the hearing dashboard.  You are
24  entering the courtroom.
25        THE COURT:  I apologize for those who were

Page 15

1  the case with Vermont, the -- those states will no longer be
2  considered a unsupported jurisdiction.
3        THE COURT:  That's fine.  And I have no problem
4  with your trying to work that out, but you may not be able
5  to work it out.  You've got, at least New York seems to be
6  an obstacle for you.  So my -- I'm left with this problem,
7  right, that I understand all your explanations about how you
8  can't change the past.  You can't give yourself a regulatory
9  approval that you don't have.  You can't distribute crypto
10  in kind in New York like you can elsewhere because New York
11  says you can't.
12        I understand all that, but none of that explains
13  why you can't give New York customers the same right to a
14  cash distribution in three months as you give to people in
15  other states.  There's no explanation for that other than, I
16  suppose, your desire to market Binance to people in New
17  York.  But why people in New York then have to take an extra
18  three months than people in Ohio if they don't want to go to
19  Binance is a mystery to me.
20        It's easily solvable.  All you have to say is that
21  people -- customers can tell you if they elect not to go to
22  Binance.  You don't have to wait this three months.  They
23  should be able to just make an election not to go Binance
24  and if they do that, they get their cash distribution in the
25  three-month period that you've specified.  Why is that so

Page 17

1  unknowingly to me kind of bounced off the call here with the
2  Court Solutions connection going down.  I don't know how
3  much you heard and didn't hear.  Does anybody here have any
4  idea when the connection stopped?
5        WOMAN 1:  We lost four minutes and 20 seconds.
6        THE COURT:  Thanks.  Okay.  Unfortunately, I can't
7  rewind in my head that precise amount of time.  I was asking
8  some questions about the evidence that's going to come in
9  today.  You probably heard that.  And then I was identifying
10  -- in the process of identifying three issues that I would
11  like the Debtors to be discussing with Binance because they
12  seem to me to be relatively small changes in the
13  arrangements here that might go a long way to eliminating
14  some of the objections.
15        The first was that I have previously said in the
16  order approving the Binance agreement that any assets
17  transferred to Binance were absolutely held by Binance
18  nominally only and were held in trust and in custody for
19  either the Debtors or the customers until the distributions
20  were completed.  I had said that in the order that we
21  entered that approved the Binance transactions subject to
22  this hearing.
23        But I also yesterday indicated that it seemed to
24  me that maybe we ought to make clear that that custody
25  provision continues for -- I'll let people tell me -- a

1   reasonable time so that we don't find that we've sort of had
2   it end instantaneously upon the crediting to a customer's
3   account so that if somebody actually wants to make a
4   withdrawal, which was the whole point, somebody wants to
5   actually make a withdrawal without having subjected
6   themselves to undue risk, they can actually do so.
7        Doesn't have to be a real long period of time, but
8   it shouldn't be a second and it shouldn't be a minute.  It
9   should be something that's meaningful so that people can
10  actually act to get what they want within this time period
11  that this custody and trust provision applies.
12       Another issue I was raising here is that I still
13  will hear argument of course, from the states and the
14  unsupported jurisdictions about whether there is unfair
15  discrimination, but I do understand at least the contrary
16  argument that as to in-kind distributions, we can't change
17  the past.  We can't undo the failure to have regulatory
18  approvals and we can't do what regulations in different
19  jurisdictions do not allow us to do.
20       And you know, the only way to have equal treatment
21  as a result of that is to make 48 states wait just because
22  we can't do everything in all 52 states, which seems like a
23  not very perfect solution.  But at the same time, it seems
24  to me that the whole program is set up so that people in 48
25  states who do not want to be Binance customers get cashed

1   out in three months; whereas, people in the unsupported
2   states have to wait six months even -- not just because
3   we're trying to solve the ability to give them crypto, but
4   even if they don't want in-kind distributions, even if they
5   would prefer to be cashed out, they nevertheless still have
6   to wait six months.
7        And I don't -- I am having a lot more trouble
8   understanding a proper basis for that different treatment.
9   And I'm suggesting that perhaps the agreement could easily
10  be changed so that if somebody in the unsupported
11  jurisdictions simply makes an election in a form that the
12  parties can designate, that they too can get their cash
13  within three months.  I think that would go a very long way
14  towards resolving the arguments about unequal treatment of
15  the creditors and of the customers.
16       And the other provision I wanted to address that
17  came up a lot yesterday was the transfer of customer
18  information.  And I understand the argument about the
19  Debtors' rights to sell the information.  I understand that
20  at least part of what's going on here is an effort to give
21  Binance the chance to market itself to customers.  I
22  understand that.  And I understand for that reason that you
23  want -- I certainly understand why you want to contact
24  information with the customers' email addresses, addresses,
25  so you can try to convince them to be part of your platform.

1        But do you need to transfer all information that
2   you have about a customer, all of the know your customer and
3   other data you have, bank account records and whatever
4   information it amounts to, do you need to transfer all of
5   that up front?  Isn't it easy, relatively, to modify this so
6   that that information, other than the contact information,
7   only gets transferred when the customer elects to be a
8   Binance customer?
9        Is there any reason why Binance needs all of that
10  other information for people who don't elect to be Binance
11  customers?  Isn't it a little safer and better protection
12  for those customers if we do the transfer of that kind of
13  data in stages and in pieces?  I'm not asking you to give me
14  a definitive answer.  I'm just suggesting to you that these
15  are things that seem relatively easy to change to me.  They
16  may not be as perfect as you would like, but they don't
17  really seem to me to have an impact on your business deal
18  and they'll go a long way towards addressing a lot of the
19  concerns that people have expressed.  Okay?
20       MR. GOLDBERG:  Thank you, Your Honor.  I hear you
21  loud and clear on those issues and we'll work with my
22  clients to --
23       THE COURT:  Great.
24       MR. GOLDBERG:  -- endeavor to respond.  I would --
25  I can definitively answer the first question, however --

1        THE COURT:  Yeah.
2        MR. GOLDBERG:  -- which was we included language
3   in the confirmation order which is at the end of Paragraph
4   99 to make clear that the -- any cryptocurrency that is
5   delivered to Binance remains property of the Debtors and
6   remains property of the customers to which those coins
7   should be allocated.  And we are happy to include any
8   language that provides comfort on that issue.
9        THE COURT:  Very good.
10       MR. GOLDBERG:  That is absolutely the intent.
11       THE COURT:  Very good.  I appreciate that.  Thank
12  you.
13       MR. GOLDBERG:  Thank you, Your Honor.
14       MR. SLADE:  Good morning, Your Honor.
15       THE COURT:  Good morning.
16       MR. SLADE:  Mike Slade for the Debtors.  Before --
17  we have one more witness, but I want to offer a number of
18  the, what I'm hoping will be noncontroversial exhibits into
19  evidence first.  Is that okay?
20       THE COURT:  Yes.  Please.
21       MR. SLADE:  First, I would like to offer Docket
22  No. 1125, which is the most recent version of the plan of
23  reorganization.
24       THE COURT:  All right.  It seems to me I have to
25  have that in evidence as it's what we're debating today, so

A-1173

1   I will admit that into evidence.

2          MR. SLADE:  And then from our exhibit list, which

3   was filed at Docket No. 1129, I first want to offer the

4   exhibits related to the purchase agreements so that's

5   Exhibits 7, 6, 8, and 9, Docket No. 248, 748, 775, and 835.

6   And those are the asset purchase agreement and the first

7   amendment and the notice of successful bidder and also

8   Exhibit 11, Docket No. 860, which is, Your Honor, order

9   approving our entry into the asset purchase agreement.

10          THE COURT:  All right.  I think I can take

11   judicial notice of those documents and I will do so and they

12   are admitted into evidence.

13          (Exhibits 6, 7, 8, 9, 11 entered into evidence)

14          MR. SLADE:  Thank you.  I would like to offer the

15   plan supplement documents, so that again, off of our exhibit

16   list, Exhibit 15, 16, and 20 through 23.  Those are Docket

17   Nos. 943, 951, 986, 1006, 1035, and 1115.

18          THE COURT:  Once again, these are documents for

19   which approval is being sought.  I can take judicial notice

20   of them and I do so.  They are in evidence for this

21   proceeding.

22          (Exhibits 15, 16, 20 through 23 entered into

23   evidence)

24          MR. SLADE:  Thank you, Your Honor.  I offer the

25   customer agreement, which is Exhibit 19, also Docket No.

1   1074 at Pages 16 through 55.

2          THE COURT:  This is -- okay.  That's not a

3   document that's presented for my approval.  Is there

4   somebody who can verify that that's the true and correct

5   copy of the customer agreement?

6          MR. SLADE:  I can ask Mr. Tichenor who's our last

7   witness.

8          THE COURT:  Okay.

9          MR. SLADE:  Sure.  And the other document I

10   mentioned earlier, Docket No. 1109-2, which is the resume of

11   proposed plan administrator.

12          THE COURT:  Somebody's going to need to testify

13   and verify that, I think.

14          MR. SLADE:  Fair enough.  We'll --

15          THE COURT:  Okay.

16          MR. SLADE:  -- work with the Committee and figure

17   that out.

18          THE COURT:  Great.  Thanks.

19          MR. SLADE:  And our last witness, Your Honor, is

20   Mr. Tichenor.

21          THE COURT:  Mr. Tichenor, do you swear that the

22   testimony you're about to give will be the truth, the whole

23   truth, and nothing but the truth so help you God?

24          THE WITNESS:  I do, Your Honor.

25          THE COURT:  Thank you.  State your full name for

1   the record, please.

2          THE WITNESS:  Brian Tichenor.

3          THE COURT:  All right.  Counsel, you may proceed.

4          MR. SLADE:  Thank you, Your Honor.

5          DIRECT EXAMINATION OF BRIAN TICHENOR

6   BY MR. SLADE:

7   Q    Just to finish this up quickly, I'm handing you a copy

8   of what is Exhibit 19 which was also on the docket at Docket

9   1074 at Pages 16 to 55.  That's the Voyager customer

10   agreement.  Are you familiar with that document, Mr.

11   Tichenor?

12   A    In a limited capacity, yes.

13   Q    Have you reviewed it before?

14   A    Yes.

15   Q    And have you served as investment banker to the Debtors

16   since the petition date?

17   A    I have.

18          MR. SLADE:  Your Honor, I offer Exhibit 19.

19          THE COURT:  All right, is there any objection or

20   any desire to voir dire the witnesses to that exhibit?

21   Okay.  The exhibit is admitted.

22          (Exhibit 19 entered into evidence)

23          MR. SLADE:  Thank you, Your Honor.  I do have some

24   supplemental direct for Mr. Tichenor, but before I get

25   there, I would like to offer his declaration which is on the

1   docket at Docket No. 1113.  It's also Exhibit 3 on our

2   exhibit list which was, again, back at 1129.

3          THE COURT:  Are there any objections to the

4   admission of Mr. Tichenor's declaration into evidence?  All

5   right.  Anybody will have the right to cross examine him.

6   The declaration is admitted.

7          (Declaration of Brian Tichenor entered into

8   evidence)

9          MR. SLADE:  Thank you.

10   BY MR. SLADE:

11   Q    Okay.  Mr. Tichenor, I want to get into a number of the

12   issues that we talked about during the hearing yesterday.

13   First, I think you heard it, some of the regulators and some

14   customers have expressed concerns and reservations about

15   Binance.US; would you agree?

16   A    I would.

17   Q    Now, I want to discuss exactly why the Debtors decided

18   to go through the complexity of having a Binance deal as

19   plan A and the toggle as plan B.  Okay?

20   A    Okay.

21   Q    How much value leakage would there be if the Debtors

22   decide to exercise their fiduciary out and move away from

23   Binance towards the toggle plan?

24   A    We would estimate that the differential would be $100

25   million, approximately.

Page 26

1  Q   Can you describe for the Court what the $100 million of
2  value leakage consists of?
3  A   So of the $100 million of value leakage, 20 million of
4  that would relate to the differential from the purchase
5  price perspective relating to Binance's upfront purchase
6  price consideration of $20 million.  The remaining $80
7  million relates primarily to value leakage associated with
8  two components.
9      One would be estimated incremental value reduction
10  associated with VGX token and the lack of support from
11  Binance.US perspective and inability to potentially create
12  additional value for that token.  That is a relatively small
13  component of the estimated $80 million.  The remaining
14  component relates to additional discounts that would likely
15  be associated with the liquidation of the 35 unsupported
16  tokens on Voyager platform.
17  Q   Okay.  I want to provide the Court with some more
18  detail on that than we received yesterday.  So there was
19  discussion about what it meant for there to be 35
20  unsupported coins.  Can you describe for the Court what that
21  means?
22  A   Yeah.  So the unsupported coins -- and again, this is
23  based on my understanding and discussions with the
24  management team of Voyager is that there are 35 tokens for
25  which the company's Bedrock code which is the foundation for

Page 27

1  which the company uses in order to facilitate the withdrawal
2  and transfer of cryptocurrencies for customers, does not
3  support the protocols for those 35 tokens.  So there's not a
4  an ability for that Bedrock code to be used in order to be
5  able to execute and facilitate the withdrawal of those
6  tokens into customers' wallets.
7      Historically, the company has never offered an ability
8  to withdraw those 35 tokens.  They've always been done on a
9  basis whereby a customer would use cash on the platform to
10  acquire the token.  Voyager would, through market maker
11  arrangements, acquire the token from market makers.  It
12  would hold them in its own wallets and then to the extent of
13  a customer sought to withdraw, they would need to sell those
14  tokens into cash and the subsequent trade would occur on the
15  other end.
16      In addition to that, there are limitations from, for
17  example, an AML and KYC perspective that also enable the
18  ability for Voyager to appropriately comply with AML and KYT
19  procedures around the withdrawal of tokens and they utilize
20  third-party providers such as chain analysis to verify the
21  party and wallet address that that token is being sent to.
22  That functionality is not integrated into the platform
23  related to those 35 as well.
24  Q   Can you describe for us what KYT is?
25  A   Yeah, so it's a -- and I believe it's know your

Page 28

1  transfer.  It might be transaction, so I apologize if I have
2  that backwards.  But generally, when people think of AML and
3  KYC, it relates to an onboarding process.  KYT relates to
4  the sending of funds and so what that really ultimately
5  relates to is that the party, which is sending the funds, in
6  this case Voyager, knows the counterparty on the other end
7  of that transaction.
8      And the primary purpose of that is to make sure that
9  you're complying with federal regulations related to, for
10  example, not sending funds to North Korean wallets or
11  Iranian wallets.  And so generally, what happens for
12  cryptocurrency platforms, given the ecosystem more broadly
13  and the ability to easily transfer funds to third-party
14  wallets is that there's a list of blacklisted wallets
15  effectively, through FinCEN for example, that publishes
16  that.
17      And so what these third party providers do is they
18  allow Voyager to make sure that they are not sending crypto
19  to parties that are banned in the United States from an AML
20  and KYC perspective.  So it allows them to continue to
21  comply with federal law relating to the transfer of funds.
22  Q   And is what you were saying that the -- with respect to
23  the unsupported coins, Voyager doesn't have the services in
24  place to do the KYT process?
25  A   That is my understanding, and in part that relates to

Page 29

1  the functionality of those third-party providers.  Not all
2  of them support all of the tokens.  So there are inherently
3  limitations around that and we understand that there are
4  limitations with the primary third-party verification
5  provider for those tokens that Voyager uses.  They don't --
6  they are not supported.
7  Q   So one of the customers asked us yesterday, what would
8  be necessary for Voyager to develop the internal capability
9  to be able to support the 35 unsupported tokens?
10  A   So based on my discussions with management, my
11  understanding is that it would require developers to be
12  brought in in order to rewrite a large portion of the
13  Bedrock code to enable that system to be able to support
14  from a protocol perspective the actual ability to facilitate
15  those withdrawals.
16      It would also require the company to engage with other
17  third-party providers related to KYT wallet verification,
18  onboard those, integrate those into its platform.
19  Generally, my understanding is that it would take about 6 to
20  9 months -- this is what's been described to me -- to revise
21  the Bedrock code per protocol.  I do imagine that some of
22  that could be done in parallel, but we do understand it to
23  be a lengthy process.
24      And what is not surprising in our minds, given the fact
25  that you would, you know, generally for a code update like

Page 30

```
1    that want to do things like verifications and test
2    transactions, so it is -- we understand to be a very lengthy
3    and likely expensive procedure in order to be able to do
4    that.
5    Q    Okay.  Can you give us an order of magnitude of the
6    additional cost?
7    A    I would imagine that it would likely be in easily the
8    single-digit millions, if not tens of millions.  I don't
9    have a specific number, though.
10   Q    So given this, in your opinion, is it realistic
11   if Voyager were to toggle to plan B and do the self-
12   liquidation for Voyager to also develop the capabilities to
13   distribute the 35 currently unsupported coins directly to
14   customers?
15   A    I do not.  I believe that the cost and time delay would
16   not merit the decision to pursue that.
17   Q    Okay, so what happens to the 35 unsupported coins in
18   the toggle scenario?
19   A    In the toggle scenario, the Debtor would in its best
20   efforts seek to liquidate those coins into cash and it would
21   liquidate those coins into cash using best efforts in order
22   to minimize any potential value leakage associated with it,
23   but it would likely involve the sale of that coin into the
24   market or via block trade transactions with third-party OTC
25   market makers.
```

Page 31

```
1    Q    And has the company gone out and gotten quotes for what
2    it would receive for those 35 unsupported tokens in that
3    scenario?
4    A    It has  We spoke with multiple market makers when
5    evaluating the toggle scenario in order to validate what we
6    believed appropriate discounts would ultimately be relating
7    to those tokens.
8    Q    And what were the quotes that you got?
9    A    They were very large.  In many instances, they were 50
10   percent plus and we did speak with what we believe to be a
11   number of the largest market makers in both the traditional
12   finance as well as crypto market making capacity.  In some
13   instances, they do both.  But we did seek and receive quotes
14   from multiple parties.
15   Q    Just so we're clear, you're talking about a 50 percent
16   discount?
17   A    Fifty percent discount relative to the current prices,
18   yes.
19   Q    Okay.  So is the potential $100 million in leakage
20   caused by a potential toggle the reason that the Debtors
21   have the Binance transaction as option A?
22   A    Yes, among other things.
23   Q    Okay.  Has Voyager decided definitively today that it
24   will close the Binance transaction?
25   A    No.
```

Page 32

```
1    Q    When will that decision be made?
2    A    It would likely be made at a time three to four weeks
3    from approval of the plan in advance of a closing.  We would
4    confer with our board of directors from an advisory
5    perspective.  The advisors would also work together with the
6    UCC in consultation to make a determination and
7    recommendation on which path to ultimately move forward
8    with.
9    Q    Okay.  And I just want to be absolutely clear to all
10   the customers that are listening on the phone.  Are you
11   ready, sitting here today, to tell the Court and customers
12   that for sure, if the Court confirms the plan, we're going
13   to be selling to Binance?
14   A    Do you mind repeating the question again?  Sorry.
15   Q    Sure.  I want -- sorry, maybe it was even unclear.  I
16   just want to be absolutely clear for all the people that are
17   listening.  Okay?  Are you sitting here today telling the
18   Court and all of these customers that if the plan is
19   confirmed, we're going to be selling to Binance?
20   A    No.
21        THE COURT:  Just to be clear, Mr. Tichenor, that's
22   the current intent, but you have the right to change your
23   mind; is that essentially what you're saying?
24        THE WITNESS:  What I'm saying, Your Honor, is that
25   we are continuing to do due diligence on Binance.  At this
```

Page 33

```
1    point in time, we would feel comfortable with the toggle
2    scenario.  That obviously is a path that the Debtor has an
3    ability to fully control.  But we do continue to do work
4    around Binance and there are, you know, for example,
5    allegations that are occurring in real time as early as this
6    morning that we continue to evaluate.  We would continue to
7    evaluate in advance of any closing.
8    BY MR. SLADE:
9    Q    Okay.  So I want to step back and just describe for the
10   Court the diligence that you've done.  And so can you just
11   describe for the Court what diligence have you done on
12   Binance.US?
13   A    Yeah, so as outlined in my declaration, we have
14   reviewed audited financial statements from their 2021 audit.
15   We reviewed interim unaudited financial statements.  We
16   reviewed their available liquidity.  We reviewed various
17   party services agreements.  We've reviewed their AML and KYC
18   procedures.  We've had multiple discussions with them
19   relating to --
20        THE COURT:  Slow down and repeat all those things.
21        THE WITNESS:  Yes.
22        THE COURT:  The 2021 audited financials, 2022
23   unaudited, did you say?
24        THE WITNESS:  Yes, that's correct, Your Honor.
25        THE COURT:  What else?
```

Page 34

1     THE WITNESS:  We also reviewed their available
2  funds and liquidity including a proof of funds.
3     THE COURT:  Okay.
4     THE WITNESS:  We reviewed related party services
5  agreements.
6     THE COURT:  Okay.
7     THE WITNESS:  We have reviewed their wallet
8  infrastructure.  We had discussions with them relating to
9  that.  And by saying reviewed, we have had discussions
10  relating to their wallet infrastructure and representations
11  have been made to us about it.
12     THE COURT:  Okay.
13     THE WITNESS:  Additionally, we reviewed their AML
14  and KYC procedures and manuals.
15     THE COURT:  Okay.
16     THE WITNESS:  Their money transmitter licensing
17  status.
18     THE COURT:  Okay.
19     THE WITNESS:  Business plans that they had
20  submitted to selected states in connection with MTL
21  approvals.
22     THE COURT:  Okay.
23     THE WITNESS:  Additionally, above and beyond that,
24  we have reviewed information independently relating to some
25  of their public wallets and we continue to have discussions

Page 35

1  with them relating to a range of factors around risks
2  associated with Binance.US as a potential counterparty.
3     THE COURT:  Thank you.
4  BY MR. SLADE:
5     Q   Can you tell the Court just approximately how many
6  meetings and phone calls you have doing diligence about
7  Binance.US?
8     A   It would be dozens over a multi-month period.
9     Q   You said you reviewed proof of funds.  What was that
10  specifically that you received from them?
11     A   We received a bank statement from them.
12     Q   This -- you mentioned you got audited financial
13  statements from 2021.  This also came up in hearing
14  yesterday.  Do you know if Binance has an auditor?
15     A   They've made representations to us that they do have a
16  new auditor.  Yes.
17     Q   Okay.  This also came up yesterday.  Does Binance to
18  your knowledge have a fiat banking relationship?
19     A   Yes.
20     Q   Okay.  So I want to ask you this question for your
21  understanding based on the diligence you've done of
22  Binance.US, okay?  It's a series of questions with that
23  premise.  Okay?  Does Binance.US maintain digital assets on
24  a one-to-one reserve basis?
25     A   Yes.

Page 36

1     Q   Does Binance.US hold customer assets solely in a
2  custodial capacity?
3     A   Yes.
4     Q   Who can move and transfer crypto assets away from the
5  Binance.US platform?
6     A   Only Binance.com -- excuse me, Binance.US employees.
7     Q   Got it.  All right.  Does Binance.US lend or
8  rehypothecate customer asset?
9     A   No.
10     Q   Have you seen Binance.US organizational charts?
11     A   I have.
12     Q   Where is Binance.US incorporated?
13     A   In Delaware with a headquarters in Palo Alto.
14     Q   Who owns Binance.US?
15     A   We understand it to be 20 percent owned by Series A
16  seen investors and 80 percent owned through an ultimate
17  owner CZ.
18     Q   Do you have an understanding of Binance.US' security
19  protocols?
20     A   Yes.
21     Q   Can you just describe that as a high level for the
22  Court?
23     A   Yes.  So we reviewed security protocols relating to
24  documents that were provided to us, for example, relating to
25  their ISO 27001 standards which relate to general IT

Page 37

1  security protocols.  We also reviewed a third-party audit
2  relating to SOC 2 compliance, which relates to protection of
3  underlying customer funds from an IT security perspective.
4  And then from a wallet infrastructure perspective, we've had
5  multiple discussions with them relating to where, for
6  example, private keys are stored, the ability to move funds,
7  who has authorization to be able to move funds, how
8  transfers work.  So we've had a number of discussions with
9  them relating to that.
10     Q   Okay.  And the Court asked this question yesterday.  I
11  just want to pose it directly to you.  Are their safeguards
12  to prevent crypto from being taken off the Binance.US
13  platform?
14     A   That is my understanding, yes.
15     Q   Okay.  Do you understand where the keys to crypto at
16  Binance.US are held?
17     A   I do.
18     Q   And what can you say publicly about that?
19     A   So we are bound by confidentiality.  We do take some of
20  the key elements very seriously relating to privacy concerns
21  around that.  We understand the keys to be held at
22  enterprise grade cloud storage facilities that in -- for the
23  majority of those keys are at a level that would meet
24  military grade standards.
25     Q   Are you familiar with the facilities at which these

A-1177

1 keys are held?

2 A   I'm aware of the facilities, yes.

3 Q   Okay, just so we're clear, have you visited that?

4 A   I have not.

5 Q   All right.  So all that said, are there aspects of

6 Binance.US' business that you are still doing diligence on?

7 A   Yes.

8 Q   What are the issues you continue to track?

9 A   So for example, you know, as I think we outlined in our

10 -- in the declaration, we have had discussions with

11 Binance.US as early as Wednesday.  There was a large meeting

12 with both Moelis and various other advisors relating to

13 Binance.US' relationship with Merit Peak and allegations

14 that were made relating to a Reuters article that was

15 published.

16     For example, our understanding based on information

17 that was provided to us relating to that, we don't believe

18 that for example, there was any comingling of customer

19 funds.  So for example, we understood that deposits relative

20 to withdrawals were effectively on one-for-one basis and so

21 therefore there wasn't any inappropriate withdrawals of

22 underlying customer funds.  But that is an item, for

23 example, that we continue to do due diligence on.

24 Q   Okay.  Are there any other items you're tracking?

25 A   Yes.  So after the hearing yesterday, we became aware

1 of a letter that was sent to Binance.US and CZ from three

2 senators including Elizabeth Warren relating to allegations

3 that, you know, would largely seemed to reflect articles

4 from Reuters.  That said, this came out last night and we

5 are actively engaging in and having discussions and we had

6 discussions minutes leading up to the hearing this morning

7 with Binance around that and we'll continue to have

8 discussions with them post this hearing relating to that.

9 Q   And speaking of this morning, did you see CZ's tweet

10 from this morning?

11 A   I did.

12 Q   All right.  What was your reaction?

13     THE COURT:  Somebody tell me what it is.

14     MR. SLADE:  We can provide it to the Court.  There

15 were -- there are --

16     THE COURT:  -- the witness first, tell me what it

17 is.

18     MR. SLADE:  Sure.

19     THE COURT:  Tell me his reaction.

20     MR. SLADE:  I apologize.

21     THE COURT:  His reaction's going to mean nothing

22 to me if I don't know what it was.

23     MR. SLADE:  Totally fair, Your Honor.

24 BY MR. SLADE:

25 Q   Just describe the tweet for the Court.

1 A   I don't recall the exact words that were used, but CZ

2 had tweeted in a reply to an article relating to this exact

3 hearing around the Voyager, Binance.US transaction what

4 seemed to be concerns around potentially pulling out of

5 either the U.S. or the transaction more broadly.

6 Q   Okay.  And was there a follow-up tweet?

7 A   There was.  That's my understanding, yes.

8 Q   And what was the follow-up tweet?

9 A   That they were still very interested in moving forward

10 with the deal as is and that the tweet didn't relate to the

11 specific transaction.

12 Q   Okay.  So just so we're clear, Mr. Tichenor, if the

13 Court confirms the plan, how will the decision be made

14 between closing of the -- between either closing the Binance

15 transaction or toggling to the self-liquidation option?

16 A   So the decision will be made among the advisors

17 ultimately making a recommendation, and that would include

18 Moelis, Kirkland, BRG on the Debtors' side having a

19 discussion ultimately with the board of directors and the

20 special committee to determine which appropriate path would

21 be made on a go-forward basis.  We would make that

22 recommendation in consultation with the UCC and its various

23 advisors including McDermott and FTI.  And ultimately, the

24 determination would likely be made relative to whether it

25 was the appropriate path on a risk adjusted basis to

1 continue to move forward with.

2 Q   Okay.  Well, wherever we are, Mr. Tichenor, why not

3 just toggle now, given what you are talking about, the

4 concerns of the regulators and the Merit Peak issue and the

5 issues you're still dealing with and the media reports and

6 congressional letters and the tweets?  Why not just toggle

7 now?

8 A   Because based on our analysis, the Binance transaction

9 potentially provides up to an incremental $100 million of

10 additional value for customers which we view as being

11 material.  In addition, you know, we do believe that it's

12 like a potentially faster path for customers being able to

13 recover funds as well, just given logistical and operational

14 elements of executing on a self-liquidating toggle.

15     MR. SLADE:  That's all, Your Honor.  Thank you.

16 Pass the witness.

17     THE COURT:  All right.  Is there anybody here in

18 the courtroom who wishes to cross examine Mr. Tichenor?

19     MR. BRUH:  Your Honor.

20     THE COURT:  Yes, Mr. Bruh.

21     MR. BRUH:  Thank you.  Mark Bruh for the United

22 States Trustee.

23     CROSS EXAMINATION OF BRIAN TICHENOR

24 BY MR. BRUH:

25 Q   Good morning, Mr. Tichenor.  I just have a couple of

Page 42

1  quick questions for you.  You spoke about the letter by the
2  three U.S. senators to Changpeng Zhao -- CZ, that is -- and
3  Binance.US and you kind of gave a broad brush as to what
4  that letter is about.  Isn't it correct that the letter
5  deals with respect to potential sanctions evasion, money
6  laundering, and unlicensed money transmission?
7  A    I don't recall the exact specifics.  I apologize.  We
8  were reading this very late last night.  But that's my
9  understanding, yes.
10  Q    Okay.  And did you or your team look into this at all,
11  those issues?
12  A    We looked into a number of issues as I think I outlined
13  relating to Binance.US' specific AML and KYC procedures.
14  For example, we have had multiple discussions with them.  We
15  have performed extensive diligence in part relating to a lot
16  of the allegations that were outlined in various Reuters
17  articles, but I can't speak to, for example, elements of
18  Binance.com as a counterparty.  That would not be within our
19  scope of diligence.
20  Q    Today, you spoke about that the -- in the event the
21  Debtors toggle, that the plan -- the sale to Binance, it
22  would be $100 million difference; is that right?
23  A    That was the estimate, yes.
24  Q    Yes.  But yesterday, Mr. Renzi testified that the $20
25  million infusion by Binance would only be about a 1 percent

Page 44

1  remaining 80 million, my recollection was that approximately
2  20 million of that was relating to an estimated incremental
3  reduction in value associated with VGX as a specific token
4  with the remaining portion of that being 60 million relating
5  to liquidity discounts associated with the full liquidation
6  of 35 tokens which cannot be returned to customers on an in-
7  kind basis through the Voyager platform.
8       MR. BRUH:  Okay.  I have no further questions.
9  Thank you.
10       THE COURT:  Anybody else who's here who wishes to
11  cross examine Mr. Tichenor?
12       MR. EVANS:  Your Honor, Joe Evans from the UCC.
13  If possible, if the creditors on the line have questions,
14  I'd like them to go first so we can follow up, or we can go
15  now if you prefer.
16       THE COURT:  All right, well before we go to the
17  people on the line, is there anybody other than the
18  Committee who has questions that they wish to ask.
19       MR. UPTEGROVE:  Yes, Your Honor.
20       THE COURT:  Hang on one second.  We have not quite
21  --
22       MR. UPTEGROVE:  Yes, Your Honor.
23       THE COURT:  -- the telephone yet.  Anybody else
24  here in the courtroom?  All right, anybody on the telephone
25  who wishes to ask questions?

Page 43

1  increase to customers and then -- isn't that right?
2  A    That's my recollection, Mr. Renzi's testimony
3  yesterday, yes.
4  Q    And then he further testified based upon certain
5  questions by the pro se customers than in actuality, that 1
6  percent would be less when you take into account the
7  administrative costs incurred by the estate; isn't that
8  right?
9       MR. SLADE:  Your Honor, I would object.  I don't
10  think that's what he said.
11       THE COURT:  I don't think it is either, so I'll
12  sustain the objection.
13  BY MR. BRUH:
14  Q    Can you just explain how you come to the $100 million
15  number as opposed to the 1 percent number for me?
16       MR. SLADE:  I object.  I don't think those are the
17  same things.  You can answer the question.
18  BY MR. BRUH:
19  A    Yesh, so as I think I previously stated, the components
20  of the $100 million -- approximate, again, $100 million
21  differential because it does move in real time --
22  Q    I understand.
23  A    -- were that it was $20 million relating to the up-
24  front purchase price consideration with the remaining 80
25  million, so out of 100, you know, less the 20, of the

Page 45

1       MR. UPTEGROVE:  Yes, Your Honor.  William
2  Uptegrove on behalf of the United States Securities and
3  Exchange Commission.
4       THE COURT:  Okay.
5       CROSS EXAMINATION OF BRIAN TICHENOR
6  BY MR. UPTEGROVE:
7  Q    Good morning, Mr. Tichenor.  I'd like to ask you some
8  questions about the safeguards for protecting customer
9  assets once those assets have been transferred to the
10  Binance.US platform.  You've already testified some about
11  that.  What specific role did you have in the Debtors' due
12  diligence of Binance.US?
13  A    So I'm an investment banker to Voyager and my specific
14  involvement was participation in various discussions and
15  meetings with Binance.US relating to the diligence.  I was
16  also involved in, for example, preparation of diligence
17  questions in connection with that work.
18  Q    Anything else?
19  A    I'm not sure I follow the question.
20  Q    Any other part -- with respect to your role, is there
21  anything else that you did in connection with the due
22  diligence of Binance.US?
23  A    I believe we outlined the work that we had done
24  previously.  You know, we've had multiple discussions with
25  them.  No.  I mean, I think I stated previously the work

1  that we have performed.

2  Q    Presumably it was part of a team.  Who overall was

3  responsible for conducting the Debtors' due diligence?

4  A    It would be -- I am a member of our team at Moelis.

5  I'm one of several individuals, so it would include myself

6  and many others that are also on the Moelis team in addition

7  to myself.  It also included K&E, for example, as counsel to

8  the Debtor.  It included BRG who is the financial advisor to

9  the Debtor.  You know, we have done this diligence in

10  connection with the UCC's advisors, for example.

11       So as I mentioned, I think previously, for example, the

12  Merit Peak review that we had on Wednesday, I was unable to

13  physically participate in that.  We did have representatives

14  from Moelis at that meeting, but it included representatives

15  from all of the firms that I listed, including, you know,

16  the UCC's advisors.  So it's not just a Moelis-specific

17  diligence effort.

18  Q    Is there anybody on the Moelis team that has a

19  background in crypto asset security?

20  A    In which context?  From a legal perspective?  I'm

21  sorry.  I don't follow the nature of the question.

22  Q    No, in a technical capacity.  So you know, whether or

23  not the crypto assets are safely custodied on the platform

24  and access issues and keys all of that stuff, in a technical

25  way.  Is there somebody on the Moelis team that had that

1  type of expertise?

2  A    We have individuals on the team that for example, focus

3  specifically on the cryptocurrency sector.  That is an

4  industry group that from a firm perspective we do coverage

5  work on.  But to be clear, Moelis is an investment bank.  We

6  are not a consultancy group relating to, for example, you

7  know, what would be appropriate from an IT or custody

8  protocol perspective.  We don't do code reviews, for

9  example.  We do work that is in line with what scope and

10  services investment bankers typically perform.

11  Q    So the answer is no?

12  A    Yeah, I would say the answer would be no.

13  Q    Is there anyone else on the Debtors' due diligence team

14  that has that type of technical expertise?

15  A    Not to my knowledge.

16  Q    With respect to the nature of the wallet infrastructure

17  and safeguards, did you personally review any specific

18  documents?

19  A    I personally reviewed, I would say, several documents.

20  The two documents that I think I previously mentioned, which

21  were the ISO 27001 certificate and audit report.  That's a

22  certification that's performed by a third-party firm.  We

23  also reviewed their SOC 2 compliance report.  Additionally,

24  too, we did receive sworn statements from company officers

25  relating to a number of these elements from a consideration

1  perspective that we would view as being critical and kind of

2  foundational from a safeguard perspective.

3  Q    I'm sorry, said there was the ISO certificate and then

4  what was the next thing that you reviewed?

5  A    A SOC 2 audit.

6  Q    That like sock, like you put on your feet?

7  A    It's S as in Sam, O as in orange, and C as in car.

8  Q    And then, so is the ISO certificate, the SOC 2

9  compliance, there was an audit, too, right, a third-party

10  audit?

11  A    We did.  We reviewed their third-party 2021 audit --

12  audited financials.

13  Q    So the third-party audit was of financials.  Was there

14  an audit done of the internal controls and safeguards over

15  crypto assets?

16  A    I don't recall personally reviewing any documents

17  relating to, for example, like an internal control report.

18  I do know we received representations relating to, you know,

19  internal controls and procedures, you know, being in line

20  with leading industry standards, for example, but I didn't

21  personally review any documents related to that, no.

22  Q    So just to be clear, when you say that you reviewed a

23  third-party audit, you're talking about the audit of the

24  financials:  balance sheet, income statement, statement of

25  cash flows?

1  A    So when I was speaking of the audits, there were three

2  types of audits.  One would be the financial audit, which is

3  one that you would be referring to.  Additionally, the ISO

4  and SOC 2 reports are both technically audits.  They're

5  audits from a information security perspective and they are

6  performed by third-party firms.

7  Q    Got you.  So that leads to my next question.  Can you

8  elaborate a little bit more about what ISO is, who performs

9  it, what it entails, what the steps are, and what would be -

10  - well, break that down.  First, who conducted the ISO

11  audit?

12  A    I don't recall the exact firm.

13  Q    Do you recall whether it's a household name or somebody

14  you'd have to google?

15  A    It was not a name that I'm familiar with, but I'm not

16  as familiar with reviewing ISO audits generally speaking, so

17  I can't speak to the nature of whether that's a well-known

18  firm, for example, that performs that type of audit.

19  Q    Do you have a sense of their technical capacity and

20  certification and experience in this area?

21  A    I think I answered that.  I can't speak to that.

22  Q    Do you know whether it has two employees or two hundred

23  employees?

24  A    I don't recall.

25  Q    What was the main finding of the ISO report?

Page 50

1   A   That they were in compliance with the ISO 27001

2   standards which I understand to relate to ISO being a third-

3   party International Standards Organization and my

4   understanding -- and again, this is -- you know, we are

5   investment bankers.  This is outside of our normal scope of

6   services.  My understanding is that they were in compliance

7   with these standards which relate primarily to IT security

8   protocols and best practices, procedures.

9   Q   Yeah.  I'm a lawyer, so if someone gave me a ISO

10  certificate, I wouldn't know, you know, heads or tails of

11  it.  Who did -- so I understand, who did the Debtor give it

12  to that -- let me rephrase that.  Who on the Debtors' team

13  reviewed the ISO certificate that had adequate industry and

14  technical expertise to opine on whether it was a sufficient

15  and adequate review of the Binance security protocols?

16  A   I don't believe that there was any -- I don't know the

17  answer.

18  Q   So as far as you know, no one with adequate knowledge

19  on the Debtors' team reviewed ISO report?

20  A   I can't speak to, for example, whether there was an

21  individual at BRG, which would be appropriate, you know,

22  from that perspective.  But from the Moelis perspective, I

23  can speak to what I know from us as a firm.

24  Q   What does this SOC 2 -- is it a report?

25  A   It's similar to a compliance certificate from a third-

Page 51

1   party auditor relating to their compliance with SOC 2

2   standards.

3   Q   How is it different than the ISO certificate?

4   A   My understanding is that ISO is a separate

5   organization.  SOC, I believe, relates to ISCPA standards

6   relating to the privacy or the custody and protection of

7   customer privacy information as a financial services banker.

8   For example, did this something that typically comes up in

9   the context of M&A transactions when dealing with financial

10  services organizations that deal with the protection of

11  customer PII.

12      It's -- my understanding is it's an industry and

13  worldwide recognised standard relating to the protection of

14  customer PII and the safeguarding of such.

15  Q   You might have said it there and I apologize, but are

16  there differences between the ISO and SOC 2 reports or

17  certification?

18  A   I believe there are.

19  Q   What are they?

20  A   Excuse me, I didn't hear that.

21      THE COURT:  What are they?

22  BY MR. UPTEGROVE:

23  A   Oh, what are they?  My recollection is that one relates

24  to general IT security protocols and standards.  The other

25  relates specifically to safeguards relating to the

Page 52

1   protection of customer PII specifically.

2   Q   What was the conclusion of the SOC 2 report?

3   A   That they met the standards.

4   Q   Were there any exceptions?

5   A   I don't recall.

6   Q   (indiscernible).  How long is the SOC 2 report?

7   A   I don't recall.  I read it a couple weeks ago.

8   Q   Two pages, 200 pages?

9   A   I don't know.  I don't recall it being --

10  Q   Who on the Debtor --

11  A   -- two pages.  I remember it being longer than that,

12  but I don't know how long.

13  Q   Do you remember how long it took you to review it?

14  A   I read it an afternoon.  I don't recall it being 200

15  pages.  I don't recall it being two pages.

16  Q   You read it in an afternoon, as you read it during the

17  afternoon or you read it, it took you (audio drops)

18  afternoon?

19  A   I read it during an afternoon.

20  Q   Was there anyone on the Debtors' team who reviewed the

21  SOC 2 report that had adequate technical experience and

22  expertise to verify what was in the report?

23  A   I can't speak to that, and candidly, I don't even think

24  as an investment banker I would be in a position to

25  determine who even would be, given my knowledge of, you

Page 53

1   know, these reports and industry standards.

2   Q   You mentioned previously in your testimony that there

3   were multiple discussions with people at Binance, correct?

4   A   Correct.

5   Q   And those discussions touched on the issues of asset

6   security and wallet infrastructure, right?

7   A   That's correct.

8   Q   And did those discussions involve people on the

9   Debtors' side other than Moelis people?

10  A   I believe so.  I don't --

11  Q   Who were those people?

12  A   -- specifically.  I believe BRG --

13  Q   -- a financial -- was that a financial advisor, right?

14  I'm sorry.

15  A   Go ahead.  I know I recall at least one discussion that

16  involved K&E.  We also had discussions with, for example,

17  management relating to, you know, what we learned during

18  those discussions to determine at least in their judgment

19  whether or not what was being presented to us made sense and

20  met industry standards, for example.

21  Q   And in those discussions with people from management

22  and other advisors to the Debtor, was there anyone in those

23  meetings who had adequate technical expertise and experience

24  to opine or ask questions about the SOC 2 or ISO

25  certificates or reports?

## Page 54

1  THE COURT:  That's the third or fourth time you
2  vaguely asked about people with adequate technical
3  experience.  I'm going to stop it because I don't know what
4  it means.  You know, presumably you get an audited report
5  from somebody who has adequate technical experience, so what
6  are you asking?  Did you have another auditor review this
7  audit?  Or are you saying, you know, like did you have
8  another financial auditor review the financial audited
9  statements?  So I don't really know what you're asking.  So
10  you've got to be more clear, because otherwise it's not
11  helpful to me.
12  MR. UPTEGROVE:  Understood.
13  BY MR. UPTEGROVE:
14  Q  Mr. Tichenor, you had previously testified that there
15  was -- strike that.  So when there was discussions among
16  management and the Debtors' advisors regarding crypto asset
17  security and wallet infrastructure issues, how many of those
18  meetings have there been?  Let me rephrase that.  Sorry,
19  strike that.  How many meetings have there been regarding
20  issues of asset security and wallet infrastructure at
21  Binance.US --
22  A  I would say --
23  Q  -- among the Debtor and its advisors?
24  A  Numerous.  I can't give you an exact number, but it's
25  something that in light of everything going on from a market

## Page 55

1  perspective was top of mind for us from a diligence
2  perspective.
3  Q  From the Debtors' perspective, who is typically present
4  at those meetings (audio drops) typical?
5  MR. SLADE:  Your Honor, can I lodge a brief
6  objection?  I guess I'm concerned that these questions are
7  not being asked as being relevant to this proceeding, as
8  opposed to additional proceedings that the questioner is
9  anticipating bringing later.  Seems -- this seems
10  irrelevant.
11  THE COURT:  Overruled.  You can answer.
12  BY MR. UPTEGROVE:
13  A  My -- excuse me, do you mind repeating the question
14  again?
15  Q  Sure.  Just to the extent there was a typical
16  representation, what was the typical representation on the
17  Debtors' side for the meetings relating to discussions on
18  crypto assets, security, and wallet infrastructure?
19  A  Generally, I believe it involved myself, others from
20  Moelis, and then in certain instances, other advisors that
21  have been advising both the Debtor and the UCC.  And I know
22  we've had discussions with the UCC for -- the UCC's
23  advisors, for example, relating to these dynamics.  We also
24  had discussions with our board of directors relating to this
25  and presented findings under confidentiality relating to

## Page 56

1  what we had learned during those discussions and discussions
2  with our board.
3  Q  At those discussions, was there anyone that you would
4  term a technical expert on issues of wallet infrastructure
5  or the security of crypto assets?
6  A  There would be members from, for example, the Voyager
7  management team that operate a crypto exchange and would be
8  familiar with those.
9  Q  What about the advisors?
10  A  If you're asking if we had any specific technical
11  advisors relating to these dynamics that focus specifically
12  on code reviews or technical elements, we did not hire an
13  additional external advisor relating to that, no.  Or the
14  Debtor did not engage on.
15  Q  And you said -- I'm sorry.
16  A  If that's the question that you're asking.
17  Q  When you say, who were the Voyager management people
18  you're referring to in this instance?
19  A  So for example, the CEO Steve Ehrlich.
20  Q  Anyone else?
21  A  I'm sure that there were others on those meetings.  I
22  don't recall specifically, at any specific instance.
23  Q  Do you happen to know whether Mr. Ehrlich has technical
24  expertise in wallet infrastructure and crypto asset
25  security?

## Page 57

1  A  I think he's familiar with what our industry protocols
2  and standards, which was the basis for the discussion
3  largely relating to the ability of any single individual,
4  for example, to move funds or how structurally, for example,
5  like a hot wallet/cold wallet structure would work.
6  Q  Was Moelis engaged by the Debtor to assess the
7  safeguards Binance.US has in place for crypto assets?
8  A  No.
9  Q  In Paragraph 23 of your declaration, you state Moelis
10  is not a technical expert on matters relating to the
11  appropriateness of information security or other custody
12  protocols.  Can you explain what you mean by that?
13  A  Moelis is a investment bank.  The work that we
14  generally perform is consistent with investment banks.  It
15  relates to financial analysis.  It relates to the financial
16  capacity generally of the counterparty.  It would relate to
17  valuation, for example, but as an investment bank, we are
18  not technical experts in the sense of a third-party
19  consultancy group, for example, that oftentimes, you know,
20  we'll see engaged in certain situations M&A situations that
21  we'll perform, for example, technical reviews.  That's not
22  inside of the scope of services of Moelis and I don't
23  pretend to be an expert on a code review, for example.
24  Q  Did anyone at Moelis conduct any assessment or audit of
25  the safeguards Binance.US has in place over customer crypto

1   assets?

2   A    I think I just answered that question.  I -- you know,

3   as an investment bank, look, we sought to perform

4   incremental reviews on things that we believed would be

5   important from a counterparty perspective.  We sought to get

6   assurances from the counterparty relating to such, including

7   sworn statements around those facts.  But, you know, I

8   wouldn't characterize anybody at Moelis as being an expert

9   in that sense.  It's not what we do as a firm.

10  Q    Are you familiar with something called Binance.com?

11  A    I am.

12  Q    What's the relationship between Binance.US and

13  Binance.com?

14  A    My understanding is, and representations have been made

15  to us, are that there are several commercial agreements

16  between the two entities and that they share a common UBL in

17  CZ.

18  Q    Does anyone -- I think you testified about this, but I

19  just want to make it clear.  Does anyone from Binance.com or

20  its affiliates have access to the wallets or keys of

21  Binance.US customers?

22  A    What's been represented to us is that only Binance.US

23  employees are able to move or transfer crypto and that

24  Binance.com employees don't have the ability to access keys.

25  Q    A famous President once said, "Trust but verify."  Or I

1   should say, a President famously said once, "Trust but

2   verify."  What did -- what if anything did Moelis do to

3   verify those representations?

4   A    We had discussions with them.  We've had numerous

5   discussions with them.  We sought to get sworn statements

6   relating to that.  You know, but again, like we don't do,

7   for example, like a code review as I think Mr. Slade

8   mentioned.  You know, we didn't visit on site, for example,

9   the enterprise storage facility that the keys are hosted at.

10  We sought to get assurances above and beyond typically what

11  we would do in a transaction like this, perform counterparty

12  due indulgence, but it would be difficult for me to even say

13  how to perform a independent verification the way that

14  you're describing.

15  Q    I think you previously testified that it's your

16  understanding that Binance.com or affiliates of Binance.US

17  do not have the ability to transfer crypto assets on the

18  Binance.US platform; is that right?

19  A    Yes, I believe they don't have the ability to move or

20  transfer funds.  That's my understanding.

21  Q    Did Moelis or the Debtor do anything to verify that

22  other than getting representation?

23  A    Are you asking if we did like tests, for example, or

24  internal reviews?  I'm not sure I understand the nature --

25  Q    Any -- just anything.  Just anything other than

1   representations.

2   A    We sought to get representations.  That was the work

3   that we did.

4   Q    There was an earlier purchase agreement in this case

5   with FTX, correct?

6   A    There was.

7   Q    And you stated in your declaration that FTX and its

8   affiliates unexpectedly collapsed shortly after the Court

9   approved the purchase agreement; is that right?

10  A    That's correct.

11  Q    What did you mean by unexpected there?

12  A    I believe everybody found the FTX bankruptcy to be

13  unexpected.  It occurred over a very short period of time

14  and it subsequently turned out to be, from what we

15  understand, a fraud of historical proportions.

16  Q    The Debtors conducted due diligence in connection with

17  the FTX transaction, correct?

18        MR. SLADE:  Your Honor, can I object?  Again, this

19  is not relevant.  This is the past and not relevant to

20  what's happening today.

21        THE COURT:  I'll allow it.  Go ahead.

22  BY MR. UPTEGROVE:

23  A    So we conducted diligence that is traditional in nature

24  relating to entering into a transaction in a bankruptcy

25  proceeding that includes, for example, reviews of their

1   ability and financial capacity to be able to close a

2   transaction.  We had multiple discussions with management.

3   We received assurances from their advisors including their

4   counsel, S&C.  We were aware and listened to, for example,

5   testimony that their CEO made in front of Congressional

6   hearings attesting to the fact that they safeguarded assets

7   and that customers have rights and title to assets.  We

8   reviewed, for example, their terms of service related to

9   such.  So, you know, that was the nature of diligence that

10  we performed.  And we were aware of many of the investors

11  that were in their business as well and had discussions with

12  them about FTX.

13  Q    As part of its due diligence, did the Debtor identify

14  any of the problems that ultimately led to FTX's, as you

15  characterized it, collapse?

16        MR. SLADE:  Your Honor, I'll object.  That's not

17  relevant here.

18        THE COURT:  I'll allow it.

19  BY MR. UPTEGROVE:

20  A    So generally speaking, to the extent that somebody is

21  performing a fraud that, let's say, is $50 million, there's

22  a balance sheet gap of something of that size, that's

23  something that can be, you know, oftentimes potentially a

24  failure from a diligence perspective.  As we understand it,

25  the balance sheet hole and that of funds relating to FTX is

1  close to $9 billion.  The only way to perpetuate a fraud of

2  that scale is through widespread and consistent failure from

3  a primary perspective to provide false statements and

4  assurances.  You can't perpetuate fraud of that scale just

5  by you know, a one-off issue, for example.  It inherently

6  has to be widespread.

7  Q    So the answer is no.

8  A    In that instance, no.  Yeah.

9  Q    What if anything has the Debtor done -- the Debtors

10  done differently during the due diligence in the Binance.US

11  transaction?

12  A    So in light of what happened with FTX and generally,

13  what was going on with the industry more broadly and

14  concerns relating to any counterparty -- and to be clear,

15  this isn't just a Binance.US specific issue.  This related

16  to work that we were performing on various parties that

17  sought to engage with the Debtor post the collapse of FTX

18  around a potential transaction.  We sought to review their

19  financial capacity and ability to operate as an ongoing

20  business.

21       We asked some questions around the nature of their

22  operations and assurances that they had previously given to

23  us around the fact that they hold, for example, reserves

24  only on one-for-one basis.  We asked for additional

25  verification relating to the fact that they don't

1  rehypothecate any assets.  We looked at their website.  We

2  asked numerous questions.

3       We performed multiple, multiple meetings and diligence

4  sessions with them to understand and seek to understand

5  facts around the way that they operate their business to

6  identify areas that we understood to have caused issues in

7  other crypto-related bankruptcy situations and that tend to

8  be cause for you know, these types of failures.

9  Q    So I'm not clear, Mr. Tichenor.  Did you not look at

10  the website and have multiple meetings in the FTX

11  transaction?  What's different -- let me let you answer that

12  question, sorry.  I'll rephrase it.  Strike that.  So the

13  Debtors not have some of those things like meetings and

14  review websites in the FTX transaction?

15  A    We did.  I would characterize the scope of the

16  diligence as being broader in this instance.  We, you know,

17  had multiple meetings with them.  We -- and we had multiple

18  meetings with FTX as well, right?  But I would just

19  characterize the breadth and duration and scope of the

20  diligence as being much higher.

21  Q    How so?

22  A    So we asked for walk throughs, for example, of wallet

23  infrastructure relating to how assets are custodied and, you

24  know, seeking additional assurances.  We sought a sworn

25  statement from the company relating to this.  We didn't do

1  that in FTX.

2  Q    That's what I'm looking for.  So you got in the context

3  of Binance.US, you got sworn statements from Binance.US

4  personnel; is that right?

5  A    That's correct.

6  Q    You didn't previously do that in FTX.  That right?

7  A    That's correct and that's uncommon in the context of

8  any M&A or restructuring related situation to get those

9  types of sworn statements.  Be highly --

10  Q    What other --

11  A    -- unusual.

12  Q    Understood.  Other than that, what other specific steps

13  did the Debtor take that it didn't previously take in the

14  FTX transaction?

15  A    I think the other incremental steps that we took were

16  to ensure from, for example, an APA perspective that to the

17  extent that there were transfers of crypto that we were

18  ensuring that customers, for example, were already signed up

19  to the Binance.US platform.  They would already be customers

20  of it.  You know, we were not planning to, for example,

21  transfer the crypto in a manner and you know, the

22  protections that were built in around this, to ensure that

23  to the extent there was, you know, widescale fraud, for

24  example, that was being perpetuated that the Debtor itself

25  wasn't exposed on that interim basis in a way that it would

1  have been in the FTX transaction.

2  Q    Any other, you called them incremental steps that the

3  Debtor took in connection with the due diligence of

4  Binance.US that it didn't take with FTX?

5  A    I -- we've discussed a lot of them.  I don't recall

6  anything else.  I'm sure there was.  I just don't recall

7  anything else off the top of my head.

8  Q    So slightly pivoting to a related subject, in Paragraph

9  32 of your declaration, you discuss certain supplemental

10  diligence and I think you sort of seem to -- well, you

11  touched on it a little bit today.  When did the supplemental

12  due diligence begin?

13  A    I would characterize the -- so do you mind, I'm going

14  to turn to this.  This relates to the Merit Peak work.

15  Q    Okay.

16  A    Is that the right paragraph?

17       THE COURT:  Yes.

18  BY MR. UPTEGROVE:

19  Q    All right, I don't -- turn to it.  Paragraph -- it's

20  Paragraph 32.

21  A    So yes, I'm looking at that now.  So the supplemental

22  due diligence related to, you know, upon the publication of

23  the Reuters article relating to, you know, a perceived

24  relationship between Merit Peak and Binance, in particular

25  Binance.com and CZ and Binance.US, upon seeing that, we

Page 66

1 reached out to Binance.US and its advisors.  We scheduled
2 diligence conversations to engage with them and a better
3 understanding of the nature of the allegations, as I think
4 outlined -- and that included multiple telephonic and Zoom
5 meetings as well as in person meetings relating to reviews
6 of trade data.
7      And to be clear, this was not a -- just a Moelis set of
8 supplemental diligence.  This included meetings of Moelis,
9 Kirkland, BRG, FTI, McDermott all participated in to review
10 enhanced documentation around the nature of the relationship
11 and in particular with regards to the allegations that were
12 made, you know, the concern would be that to the extent that
13 there was a withdrawal of, for example, customer funds that
14 would obviously be very concerning from the Debtors'
15 perspective.
16      And so the diligence that we performed and information
17 that we received, you know, largely seemed to indicate that
18 the flow of funds relating to these transactions were on
19 offsetting basis.  So in this context, it would be, you
20 know, a market maker depositing value on a platform and then
21 withdrawing cash on the back end.  We understand that to be
22 in the typical scope of what market makers do.  But I want
23 to be clear, this isn't a -- you know, we're not done with
24 our diligence on this.  We continue to do diligence.  We had
25 a meeting with them Wednesday and had the hearing Thursday.

Page 67

1      We'll continue to have discussions with them and as I
2 think I said, we have a plan that allows for a toggle
3 approach.  We will not -- we will confer and seek to review
4 and make sure that parties are comfortable prior to
5 executing any transaction and to the extent that we're not,
6 we would seek to execute the toggle that the plan allows
7 for.
8 Q    When did that Merit Peak article come out?  Do you
9 remember roughly?
10 A    I don't.  I think it was February 16th, is what it
11 seems to be.
12 Q    The -- what's dubbed in your declaration as the
13 supplemental due diligence would have started February 16th
14 or shortly thereafter?
15 A    Yeah, as it relates to the specific item, that's
16 correct.
17 Q    Was there something else that -- was there other
18 ongoing due diligence at that time?
19 A    We were performing and can continue to have
20 conversations with Binance over the course of -- from when
21 we began in discussions with them post the collapse of FTX
22 through as early as I think 9:55 this morning.
23 Q    As of February 16th, or thereabouts -- or excuse me,
24 let me rephrase that.  Before February 16th, what was left
25 in regard to the due diligence in the -- for the Binance

Page 68

1 transaction?
2 A    Are you asking, is there specific open due diligence
3 items prior to February 16th?  I'm not sure I understand --
4 Q    Correct.
5 A    I don't recall specifics.  I know that there were, I
6 just don't recall specific items.
7 Q    Regarding the supplemental -- excuse me, the
8 supplemental due diligence that's now ongoing, what's the
9 scope of that due diligence?
10 A    I think it would largely relate to, for example, you
11 know, continued work relating to the Merit Peak allegations.
12 We need to receive, I think we're still waiting on the
13 audited year-end financial statements, for example.  We will
14 continue to and are seeking to have a discussion with the
15 company relating to the letter that was put forward
16 yesterday by the three senators.
17      We will need to have additional discussions relating to
18 the tweets that were put out this morning by CZ and we will
19 continue to evaluate various articles and news publications.
20 And you know, any allegations that remain with -- to the
21 extent that there are additional allegations, we'll continue
22 to make sure that we get assurances relating to any
23 allegations that are made around the nature of the
24 operations.  And then I think we would also seek --
25 Q    What about current ongoing due diligence --

Page 69

1 A    -- to do kind of bring-down due diligence session ahead
2 of any closing.
3 Q    I'm sorry, what is a bring-down due diligence or
4 whatever -- what'd you call it?
5 A    A bring-down due diligence.  So this is oftentimes an
6 analysis that is done in connection with, for example,
7 public M&A transaction or a general M&A transaction where
8 the advisors will have a discussion with the counterparty
9 relating to assurances of a range of factors, for example.
10      So oftentimes the bring-down due diligence will include
11 basically a update and verification of prior diligence
12 assurances that have been made by the counterparty to assure
13 that they are currently still in compliance with that.  So
14 for example, oftentimes a bring-down due diligence session
15 will seek to get assurances from a counterparty relating to
16 the fact that they're not having any issues relating to
17 being a going concerns from their auditor.  That's a very
18 common bring-down due diligence item.
19 Q    Does the current diligence include a review of
20 procedures and controls relating to the security and custody
21 of crypto asset?
22 A    I think we've answered that question.
23 Q    I'm sorry, I apologize.  I missed it.  Could you answer
24 the question?
25 A    So I think we'll continue to perform work relating to

1   the nature and protocols that Binance.US uses relating to

2   the custody and wallet infrastructure, to the extent that's

3   the question, and we would seek assurances in advance of any

4   close relating to such, even prior sworn statements that we

5   received.

6   Q    Could the current diligence impact the date of the

7   closing?

8   A    Excuse me, I wasn't able to hear you.

9   Q    Could the current due diligence impact the date of the

10  closing?

11  A    Absolutely.

12  Q    How so?

13  A    We -- so as I think we mentioned, we would anticipate

14  closing probably in the range of three to four weeks from

15  approval of the plan.  There's still work that needs to be

16  done from the Debtors' perspective in order to be able to

17  prepare for the closing of the transaction, that includes

18  its ability to, for example, meet the requirements under the

19  rebalancing ratio and work that needs to be done around

20  that.  There's operational work that would still need to be

21  done from an integration and transfer perspective.

22     So there's a lot of work that obviously needs to be

23  performed in advance of a closing.  So that's not something

24  that would occur immediately.  We plan to continue to

25  perform due diligence in advance of a closing and to the

1   extent that there were issues that were raised in -- prior

2   to that period, in advance of closing that caused concern,

3   we would have two options.  We would either -- and we would

4   do this in consultation with the UCC, to be clear.  This

5   would not be just a Moelis decision.

6     We would confer with our board of directors.  We would

7   confer with various professionals.  We would confer with the

8   UCC and advisors.  And to the extent that parties felt that

9   it was worth, for example, delaying a close by a week to

10  understand whether or not it made sense to run down and get

11  assurances relating to any new issues that arose during that

12  period, we would evaluate that relative to the self-

13  liquidating transaction and whether it would make sense to

14  pivot towards a toggle in that instance.

15  Q    In the case that the Debtor had to pivot to the toggle,

16  what would be the consequences for customers and creditors?

17  A    So the consequences in that instance, as I think we

18  outlined in the declaration, are that there would be an

19  estimated reduction of value of approximately $100 million.

20  Additionally, in that instance, it would likely result in a

21  delay relating to the implementation of such a plan.  So

22  operationally, there's just some additional work that would

23  ultimately need to be done before the platform would be in a

24  position to be able to reopen and make sure that we had all

25  of that work in place.

1     Additionally, the other consequence would really be

2   around the ability for certain creditors to receive in-kind

3   distributions relating to the 35 tokens that are

4   unsupported, and so there may be, for example, adverse tax

5   consequences associated with those 35 coins which would need

6   to be returned in cash as opposed to on an in-kind basis.

7   Q    Turning back to your declaration, in Paragraph 42, you

8   state that you're not in a position to vouch for the bona

9   fides of Binance.US.  What did you mean by that?

10  A    So what I mean by that is that we have received

11  assurances from Binance.US.  We've received sworn testimony

12  from them.  But you know, as an organization, for example,

13  we're don't do forensic audits from a detailed books and

14  records perspective, right.  To the extent -- and I think

15  what we were getting at is to the extent that they were

16  perpetuating a fraud, I don't think we would be in a

17  position to be able to say such.

18  Q    At the end of that paragraph, you state, "And if events

19  since May 2022 have taught us anything, it is that the

20  benefits of having a decentralized and largely unregulated

21  cryptocurrency business are counterbalanced by the

22  challenges in identifying and preventing fraud."  What did

23  you mean by that?

24  A    So what I meant by that is specifically as it relates

25  to items like what happened with FTX.  So from a

1   decentralized perspective with regards to cryptocurrencies,

2   one of the benefits is the ability to track and validate

3   transactions as they occur on the blockchain.  It's -- the

4   primary use case for it is that you see exactly what is

5   occurring from a transfer perspective and it's public and

6   anybody can see that.

7     That said, you know, with the emergency of additional

8   exchanges and the way that, for example, omnibus wallets

9   work and inherently have to work in a lot of ways on these

10  exchanges, you know, it's difficult to see what activity is

11  occurring within the exchange itself and you, know, I would

12  also say the industry itself is evolving in real time in a

13  lot of ways.  So, you know, for example there aren't really

14  clear industry standards relating to what appropriate due

15  diligence is for these types of businesses.

16     Federal regulators haven't put forward views and we do

17  understand that they are coming out in real time and we do

18  follow this, but you know, there is not a set of legal

19  standards, for example, that firms need to operate in that

20  operate in the space around, for example, like federal

21  banking, safety, and soundness standards.  It's not a

22  concept that you, know, we would be able to rely on.  So

23  that presents unique challenges when diligencing any

24  business in the cryptocurrency ecosystem, whether that's

25  Binance.US or any other party, just given the lack of

A-1186

Page 74

1  standards and how new the ecosystem itself generally is.
2  Q   Why should the Court confirm the plan before the
3  Debtors finish ongoing due diligence?
4  A   So the plan allows for an option for the Debtor to be
5  able to pivot to a toggle transaction to the extent that
6  that's in the best interest.  The Debtors would take that
7  very seriously, as I think I said at the beginning.  You
8  know, at this point, I wouldn't say, you know, we are fully
9  in a position to say that we would move forward with
10 Binance.US.
11     We're still continuing to perform due diligence.  We
12 take the allegations in public information that's out there
13 very seriously and this is not a decision that we would take
14 lightly.  We would continue to perform work and up until the
15 point where we push a button to try and close, we would
16 continue to perform work in the best of our abilities around
17 those dynamics.
18 Q   Are there any external constraints that are causing the
19 Debtor to need to confirm the plan now as opposed to waiting
20 to see if everything works out in due diligence?
21 A   So as it stands now, we have a plan that has
22 overwhelming support from creditors who are looking to get
23 their cryptocurrency back as expeditiously as possible.  You
24 know, I understand and I'm not a lawyer.  My understanding
25 is that to the extent that we were to, for example, delay a

Page 75

1  plan confirmation, irrespective of whether it's a toggle
2  plan or not, it would further delay the ability of these
3  customers to be able to receive their funds.  It would have
4  incremental costs associated with it.
5     And in our minds, you know, this provides for that
6  optionality and the decision would be made, and again, not
7  just by Moelis, but by the -- a range of parties ultimately,
8  in their judgment around the ability to feel comfortable
9  moving forward under those facts and circumstances.  So we
10 have a plan that we believe is confirmable today.  It has
11 overwhelming support of creditors.
12    It allows for a backup option and that's a critical
13 component.  That was something that we attempted to
14 negotiate for in FTX and were ultimately blocked.  It was a
15 very contentious negotiation.  So we believe, you know,
16 those safeguards are critical to this plan and the ability
17 to move it forward as is.
18 Q   I don't think that answered my question.  Are there any
19 external factors that necessitate the Debtor confirming the
20 plan on the current timeline?
21    MR. SLADE:  Your Honor, I object.  He just
22 answered it, to the extent he didn't it's because the
23 question is vague.
24    THE COURT:  I'll allow the question.  Go ahead.
25 BY MR. UPTEGROVE:

Page 76

1  A   So do you mind repeating that again?  I apologize,
2  because I may not follow it.
3    THE COURT:  He's asking --
4  BY MR. UPTEGROVE:
5  Q   Sure.  Are there --
6    THE COURT:  -- is there anything forcing the
7  confirmation to happen on the current timeline?  Are there
8  any external factors; why do it now?  That's what he's
9  asking.
10 BY MR. UPTEGROVE:
11 A   I think that's a legal question.  I'm not sure I'd be
12 in a position to answer it.  I'm not an expert on how plan
13 confirmation worked in timing of such.  You know, we have a
14 plan today that we believe is, in my mind, has overwhelming
15 support and we would seek to you, know, get it approved to
16 allow for these options.
17 Q   There's no issue of the Debtor running out of money in
18 the next three or four weeks?
19 A   Given the rebalancing transactions that have occurred
20 to date, I don't believe that there would be any monetary
21 constraints.  You know, that -- it does result in a real
22 cost, though, to creditors from a potential recovery
23 perspective to the extent there are delays.  It was a very
24 important point from our perspective to be able to try and
25 move a case forward, to be able to move and allow for

Page 77

1  distributions of funds back to creditors as quickly as
2  possible.  It's been a very key consideration from our
3  perspective, from the onset of the bankruptcy proceedings.
4  Q   What would cost be -- delay it?
5  A   So I don't know the exact answer.  I think it would
6  depend on the facts and circumstances of how long the delay
7  is.  I'm generally aware of what the cost is from the estate
8  perspective, kind of approximately $10 million dollars a
9  month, but I can't speak to the exact specifics based on the
10 nature of the questions.  And I think it would also depend
11 on, you know, if the concern is, how long would it take to
12 ultimately feel comfortable with Binance before moving
13 forward, I think it depends on what happens at that future
14 point in time.  Like, it's in part asking about a future
15 unknown, depending on what information is learned or what
16 happens over that time period.
17 Q   But you haven't done any analysis to determine the
18 exact cost of two-week delay, a three-week delay, a four-
19 week delay?
20 A   I think a multi-week delay, as I mentioned, it's, you
21 know, from an estate perspective, it's approximately $10
22 million a month.  I can't speak to, you know, specifics
23 based on that analysis.  I'd have to -- I'd have to run the
24 numbers, to be candid.  I don't know.
25 Q   That's the question.  You didn't run the numbers.

Page 78

1  A   I -- so we've run analysis relating to this specific
2  plan.  You're asking about a hypothetical scenario that I'm
3  not in a position to be able to answer right now.
4  Q   Are you aware of any covenants that would be breached
5  or be noncompliant with if the Debtor didn't close on the
6  current timeline?
7  A   So I would need to review the specifics in the APA.  I
8  do know that there are outside dates, for example.  I know
9  that there are, you know, requirements from the Debtors'
10 perspective to be able to try to and move expeditiously.  I
11 don't recall the exact dates, though, based on the specifics
12 of the APA.
13      THE COURT:  Can I just ask, counsel must know
14 this.  There is a requirement that the Debtors move as
15 expeditiously as they reasonably can to get confirmation,
16 isn't there?
17      MR. SLADE:  Yes, there's a milestone specifically
18 of March 6th for entry of the confirmation order.  That's
19 Monday.  That's Section --
20      MR. UPTEGROVE:  What happens if --
21      MR. SLADE:  That's Section 8.1(i)(iv) of Exhibit
22 9.
23      THE COURT:  That's a requirement that in Binance -
24 - does the deal end automatically or Binance has the right
25 to terminate if that's not --

Page 79

1      MS. OKIKE:  Right to terminate.
2      MR. SLADE:  That's it.  correct.  Right to --
3      MS. OKIKE:  Right to terminate.
4      THE COURT:  Binance has the right to terminate if
5  that isn't done?
6      MS. OKIKE:  And I believe it triggers their
7  expense reimbursement.  Yes --
8      MR. UPTEGROVE:  May I proceed, Your Honor?
9      MS. OKIKE:  It does trigger their expense --
10      THE COURT:  Go ahead.  Continue with your
11 questions, please.
12      MR. UPTEGROVE:  Thank you, Your Honor.
13 BY MR. UPTEGROVE:
14 Q   Mr. Tichenor, I'm going to move on to a new subject
15 which is user withdrawals and customer access.  Under the
16 plan and APA, when will users to be able to access their
17 assets?  My understanding is that users will be able to
18 access their assets?
19 A   My understanding is that users would be able to access
20 their assets upon signing up and going through KYC
21 procedures to become a customer of Binance.US.  Upon closing
22 and in subsequent one-week intervals, you would transfer
23 as users migrate and sign up.  Upon crypto having been
24 transferred, I believe the APA requires that it be deposited
25 into customers' accounts within a five-day period and as, I

Page 80

1  think, previously discussed in the hearings, the APA does
2  provide for the crypto to be treated in a trust and custody
3  relationship upon its transfer to Binance.US in -- during
4  each of those interval periods.
5  Q   You mentioned the KYC requirements.  Are there any
6  other steps that users need to take to access their assets
7  on Binance platform?
8  A   I don't know.
9  Q   Is there anywhere users can go to read about what they
10 need to do to access their assets?
11 A   I believe it's outlined in the customer migration
12 protocol and I know that there have been communications that
13 the Debtor has sent to creditors, but I can't speak to the
14 specifics of those.
15 Q   Do you know if there's a place right now, if creditors
16 on the line, that you could tell them where they need to go
17 to find that information?
18 A   I don't recall.
19 Q   Under Section 6.12 of the APA, if users do not satisfy
20 certain requirements within three months, then Binance.US
21 can convert those users acquired coins into U.S. dollars at
22 the then then prevailing rate; is that right?
23 A   I don't have the APA in front of me, but what you're
24 describing is -- sounds consistent with my understanding of
25 how that works.

Page 81

1  Q   Would somebody would be able to give you a copy, just
2  because I have a couple questions about that.  It might be
3  helpful to have it in front of you as we talk.
4      MR. SLADE:  You want the amendments of the
5  original APA?
6      MR. UPTEGROVE:  The original.
7      THE COURT:  You can give him that, but we're going
8  to take a ten-minute recess at the moment, and then you can
9  continue your questions after our ten minutes.
10      (Recess)
11      THE COURT:  Please be seated.  Okay.  Does the SEC
12 wish to continue with its cross examination?
13      MR. UPTEGROVE:  Yes, Your Honor.  Thank you.
14 BY MR. UPTEGROVE:
15 Q   Mr. Tichenor, I believe we left off speaking about the
16 APA, in particular Section 6.12 of the APA which I think
17 provides if users do not satisfy certain requirements within
18 three months, then Binance.US can convert the user's
19 acquired coins into U.S. dollars at the then prevailing
20 rate.  Is that correct?
21 A   That's correct.
22 Q   What happens to the value of the users accounts if the
23 price of the crypto assets in those accounts declines during
24 the three-month period?
25 A   So the way that the plan works is that the distribution

Page 82

1    is effectively made at the time of closing, which relates to
2    the amount of crypto that a customer would get under their
3    pro rata share relative to the rebalancing ratio and the
4    size of the initial distribution versus their claims on a
5    prepetition basis.  So in this instance, we would view the
6    distribution as effectively having occurred at the time of
7    closing of a transaction, regardless of whether that
8    customer is ultimately migrated to the Binance.US platform.
9    And so whether the period is after the three-month period or
10   even any period post the rebalancing date, those users are
11   exposed to potential fluctuations in the price of
12   cryptocurrencies to the extent that they wish to monetize
13   them.
14   Q    How will creditors learn about the closing when it
15   happens?
16   A    So I believe under the customer migration protocol
17   that's addressed.  We actually have some outstanding
18   questions around that relating to whether or not there would
19   be, for example, like an automatic email that would be sent
20   to customers through the Binance.US platform once the crypto
21   has been deposited into the account.  It's currently an
22   outstanding question.
23   Q    If Binance.US were to send a notice out, would that
24   also apply to creditors or users who haven't yet registered
25   on the Binance.US platform?

Page 84

1    Q    Yes.
2    A    so --
3    Q    Yes.
4    A    My understanding is that to the extent that CFIUS
5    blocks a transaction prior to closing, we would be unable to
6    close with Binance.US and in that instance, presumably, we
7    would pivot to a self-liquidating toggle scenario at that
8    point.
9    Q    What happens if it denies the approval after closing?
10   A    I don't know the answer to that.  That's a legal
11   question.
12   Q    You haven't been party to conversations in which that's
13   been discussed?
14   A    CFIUS is a very technical legal element.  I'm not a
15   CFIUS expert.
16   Q    So then you wouldn't know the impact on creditors if
17   CFIUS was to deny approval of the transaction after closing?
18   A    I do not.
19   Q    Are you familiar with the term user asset migration
20   date as it's used in the APA?
21   A    I may need to refamiliarize myself.  Do you mind?
22   Q    Sure.  I think -- it is on Page 85 of the document.
23   It's four U's and it refers back to user migration
24   preparation on a previous page.  You see that?
25   A    I see that.

Page 83

1    A    I don't know.
2    Q    If there's something else that, material event happened
3    during the course of post-closing or you know, through
4    closing, before closing, if there's a material event that
5    happened, is there a way to communicate that to creditors?
6    A    I don't know.
7    Q    The Committee on Foreign Investments in the United
8    States, AKA CFIUS, is conducting a review of the Binance
9    transaction.  Is that right?
10   A    That's my understanding.
11   Q    And the review remains ongoing?
12   A    That's my understanding.
13   Q    Does the Debtor know what the outcome of that review
14   will be?
15   A    I personally do not know.
16   Q    What if CFIUS denies approval of the Binance
17   transaction?  What would happen?
18        MR. SLADE:  Your Honor, I object.  That calls for
19   a legal conclusion.
20        THE COURT:  Well, do you know the answer to the
21   question?
22   BY MR. UPTEGROVE:
23   A    To the -- I guess the question would be, to the extent
24   that CFIUS blocks the transaction prior to closing?  Is that
25   correct?

Page 85

1    Q    Can you explain what the user asset migration date does
2    in connection with the APA?
3        THE COURT:  What does this have to do with any
4    objection that's been filed?  I mean, you're asking him an
5    awful lot of questions and taking up a lot of our time to
6    get information that if you'd read the documents on file,
7    you'd already know the answers to.  So what is the point of
8    this?
9        MR. UPTEGROVE:  The point is, I think it's
10   Paragraph 7 of our objection, is what economic benefit this
11   has, the transaction has to creditors and this issue goes to
12   whether or not there's an economic benefit for the creditors
13   at the timing of the transaction when people will be -- the
14   assets will be available, when they won't be available,
15   whether people will be paid, how they will be paid.
16        THE COURT:  But we've already had testimony and
17   we've already had descriptions in the disclosure statement
18   that we'll have a closing.  There'll be a migration.  When
19   people are ready on the Binance platform, they get
20   distributions.  If they're not ready within three months,
21   they get cash.  What else do you need?  What do you want him
22   to try to pinpoint it to nanosecond?
23        MR. UPTEGROVE:  I'm not at all clear that's the
24   case, Your Honor.  If you -- so the question is, all I
25   really wanted to know from him is what -- I don't understand

Page 86

1   it, Your Honor, but the user asset migration date, I've
2   heard a lot of people talk about the five days.  I don't
3   understand how this -- I have read it, Your Honor, and I
4   haven't understood how this user asset migration date
5   corresponds to the five day and the rollout, the weekly
6   rollout.
7           And so all I wanted to get from this witness is
8   how if at all does this asset migration date impact the
9   user's ability to withdraw and what's already been on --
10  people have testified about.
11          MR. SLADE:  Your Honor, perhaps I could --
12          MR. UPTEGROVE:  That's all I want to do.
13          MR. SLADE:  We would've been happy to field
14  questions about this from the SEC had they asked us before
15  this hearing.  If they look at the amendment, that
16  definition, user asset migration date actually has been
17  deleted and it's been replaced by a separate definition
18  called asset migration date which describes it in some
19  detail.  So if you look at the exhibits that are online that
20  we uploaded, you'll be able to answer that question.  I'm
21  not sure if the witness can.
22          MR. UPTEGROVE:  That's helpful.  Thank you.  So we
23  can move on.
24  BY MR. UPTEGROVE:
25  Q    Mr. Tichenor, are you familiar with the terms of use

Page 87

1   for the Binance.US trading platform?
2   A    The terms of use?  Excuse me, I just couldn't hear you.
3   Q    Yes.  Yes, the terms of use for the Binance.US trading
4   platform.
5   A    I'm broadly familiar with it.  We -- I have read it.
6   That's an item, too, where you know, we're discussed that in
7   connection with counsel which is better situated to be able
8   to opine on any legal matters associated with terms of use
9   than I would be.  But yes, I have read it.
10  Q    Are you aware that pursuant to the trading portion of
11  the terms of use, Binance.US in its sole and absolute
12  discretion may halt trading or restrict access to the
13  trading platform?
14  A    I don't recall that specific provision.
15  Q    So you wouldn't recall, you don't know if there's
16  anything in the APA that would limit that discretion?
17  A    I don't recall.  I know in the APA we have protections,
18  for example, to the extent that there is a halting of
19  trading on the Binance.US platform, that it allows the
20  Debtor to, for example, not send funds or provides the
21  liquidating trust, I believe, the option to not use them for
22  purposes of distributions.  And broadly speaking, and again,
23  I don't recall the exact specific sections.
24          I recall that there was discussion around, for example,
25  you know, halting of trading and concerns that would have.

Page 88

1   I think obviously to the extent that there was a halting of
2   trading, that would be a material event from the debtor's
3   perspective in determining whether or not it would send
4   funds to Binance.US.
5   Q    I guess the question was, since you're -- you don't
6   recall that specific provision in the terms of use, you're
7   not aware of any specific provision that would limit the
8   discretion or halting trading or access to the platform?
9   A    I'm not.
10  Q    Different subject --
11  A    I would say that, look, that is something that we
12  track.  If we were aware that there was halting of trading
13  on the platform, as I said, that would be a very material
14  concern from Debtors' perspective with their willingness to
15  move forward with this counterparty.
16  Q    Are you going to track it after the deal closes?
17  A    I -- prior to each subsequent distribution, I believe
18  that there will be parties that will be looking at that,
19  yes.  I mean, it -- and by the way, that's not just Moelis.
20  That would be the liquidating trustee who would be executing
21  transfers, management team.  There's, you know, each bulk
22  transfer that occurs is not a simple process.  It's manual
23  in a lot of ways.  And so, you know, there's an expectation
24  of in-depth material coordination between the Debtor and
25  Binance.US post any closing in order to, again, continue to

Page 89

1   migrate on the weekly basis.
2           And so to the extent that parties were aware, for
3   example, of a halting of trading prior to any of those
4   subsequent migrations, I would be -- I would highly, highly
5   doubt that parties would move forward with continuing to
6   transfer subsequent funds in that instance, for example.
7   But look, it's a fact and circumstance specific, too, so.
8   Q    Just to be clear, so if after the closing, there's a,
9   you know, shortly after the closing, there's a run on the
10  bank so to speak, and Binance in its discretion halts
11  trading, what if anything could the Debtors do?
12  A    Well, I think at that point -- and I think there are a
13  couple of points in there, to be clear.
14          One, one of the important elements, you know, from the
15  Debtors' perspective when performing the diligence was
16  assurances, for example, around the fact that they have one-
17  to-one reserves.  And so one of the things that we had
18  thought about was, you know, the ability to, for example,
19  support a run on the bank.  Theoretically can't have a run
20  on the bank for a business that's only has one-for-one, you
21  know, kind of -- I'll call it, acts as like a cashbox to a
22  degree, right, in custody capacity like that.  So that was
23  an important element.
24          Two, you know, there could be reasons that are
25  explainable that I can't think of right now relating to why

1  there could be theoretically a justification for halting of
2  training that would still justify people feeling comfortable
3  moving forward.  You know, if there was a technical glitch
4  with a cloud provider that resulted in an issue that was
5  only temporary for a very short period of time.  Like there
6  are countless hypotheticals I that can't necessarily speak
7  to, but to the extent there was a halting of trading, it
8  would be a very important element for purposes of the Debtor
9  at that point.
10      And I think that would they continue to transfer funds
11  over?  In all likelihood no, if there was a real concern
12  around what the basis for that was, and that's a pretty low
13  threshold for what that concern level would ultimately be to
14  the extent you're talking about something as severe as a
15  halting of trading on a platform.
16  Q    Switching gears a little bit, if Binance.US was
17  determined to operate as an unregistered securities
18  exchange, what impact would that have on the Voyager
19  customers who moved over from the Binance -- or excuse me,
20  yeah, the Voyager customers who moved over from to the
21  Binance platform?
22      MR. SLADE:  Your Honor, I object.  That calls for
23  a legal conclusion.
24      THE COURT:  Do you have any ability to answer that
25  question?

1      THE WITNESS:  I do not.
2      THE COURT:  Okay.
3  BY MR. UPTEGROVE:
4  Q    Mr. Tichenor, can you go to paragraph -- or Section 4.7
5  of the APA, please?
6  A    Is this -- this is the nonamended version?  No
7  litigation?
8  Q    Yeah.  Is there an amended portion of this?
9  A    No, I'm just making sure I'm referencing the right
10  exhibit.
11  Q    Do you see that provision?
12  A    The knowledge qualifier?
13  Q    Well, just to make sure we're looking at the same
14  thing, on my 4.7 it says, "No litigation.  There are no
15  actions pending or to the knowledge of purchaser threatened
16  against or affecting purchaser that will materially and
17  adversely affect purchaser's performance under this
18  agreement or purchaser's ability to consummate the
19  transaction."  Are we looking at the same thing?
20  A    I see that paragraph, yes.
21  Q    During the course of due diligence, has Binance
22  disclosed to the Debtors or have the Debtors learned of any
23  material or any actions pending against Binance.US?
24  A    To the extent the question relates to -- excuse me.  To
25  the extent the question relates to whether or not the Debtor

1  asked whether or not, for example, there are pending
2  litigations or investigations relating to Binance.US, the
3  answer to that is yes.  We did ask.  We had a number of
4  conversations relating to various pending investigations for
5  the -- relating to the purchaser.  If that's the extent of
6  the question.
7  Q    What did they disclose?
8      MR. SLADE:  Your Honor, I object.  This is not
9  relevant and it seems like --
10      THE COURT:  Overruled.
11  BY MR. UPTEGROVE:
12  A    So they disclosed that there were investigations
13  ongoing from several various federal agencies.  They
14  disclosed to us that they had provided, for example, written
15  documentation to those the parties relating to requests and
16  inquiries made in connection with those investigations.  We
17  were not aware of any actions that were ongoing relating to
18  Binance.US, but I can't speak for anything beyond that.  I'm
19  not aware of any, you know, pending for example, lawsuits
20  against Binance.US by a federal agency./
21  Q    With respect to the government investigations, what did
22  they disclose?
23  A    That was subject to confidentiality.  I'm not sure I
24  can discuss that.  I mean they -- I think I tried to mention
25  what I could, which was that they provided us information

1  relating to the nature of the injuries.  They provided us
2  disclosure.  And these were discussions that we had, that we
3  participated in with multiple sets of counsel including
4  Binance.US' counsel on various matters.  We're aware that
5  they had provided information to various agencies in
6  connection with those requests.  And that's what we're aware
7  of.
8  Q    So your understanding is that the identity of the
9  governmental agencies investigating Binance.US is covered by
10  a confidentiality agreement?
11  A    I'm aware of various federal agencies doing
12  investigations.  I -- speaking to every single one of them
13  right now, trying to recall them off the top of my head, I
14  have difficulty, but I'm aware of some major financial
15  agencies such as, you know, the SEC and other parties that I
16  think are public information around the nature
17  investigations, you know, and when we deal with financial
18  companies, generally speaking, it's not uncommon for us to
19  see situations where, you know, there are various inquiries
20  that various federal regulators and state regulators may
21  make in connection with parties that they regulate.
22  Q    You said that they disclosed that the SEC had an
23  investigation relating to Binance?
24  A    They did.
25  Q    What did they say?

Page 94

1  A    That they had received requests relating to information
2  on relationships, for example, with third parties and
3  certain affiliates.
4  Q    Anything else?
5  A    I don't recall.  That conversation took place a while -
6  - long enough ago that I just don't recall the exact
7  specifics.  I'd have to reference my notes.
8  Q    When did it happen?
9  A    Probably in -- I would say it was -- I know it was
10 prior to the signing of the APA and I think we've had some
11 continued ongoing discussions with them relating to these
12 members.  It's not a static element, but I just don't recall
13 the exact dates.
14 Q    So you knew prior to entering into the APA that there
15 was investigation by the SEC of Binance?
16 A    We were aware that they had requested information and
17 that they -- that there was an investigation, yes.
18 Q    Have they updated you on the status of the
19 investigation?
20 A    I don't believe probably within the last couple weeks,
21 but I just don't recall, candidly.
22 Q    The Debtor, do the Debtors view that, those
23 governmental investigations as important matters?
24 A    We did.
25 Q    Did the Debtor understand the nature of the

Page 95

1  governmental investigation?
2  A    We understood the nature of what the requests related
3  to.  We asked questions relating to -- and follow-up
4  questions relating to the nature of what the inquiries were,
5  what information was provided, what the status of those
6  pending discussions were, whether or not there were follow-
7  up requests, for example, compliance.  So we asked a number
8  of questions relating to any -- relating to those
9  investigations and proceedings, yes.
10 Q    Did Binance.US share any documentation with the Debtors
11 concerning those governmental investigations?
12 A    They may have with counsel.  It's highly unusual for
13 investment bankers to ever receive information relating to
14 communications between a regulator and a counterparty.
15 Worked on a number of financial institution related
16 situations and generally those reviews being privileged, so
17 it's highly atypical for us to see primary documents
18 relating to those investigations, as non-lawyers.
19 Q    How did those -- understood.  How did those
20 investigations relate to the Debtors' ongoing due diligence?
21 Is that anything that the Debtors are considering?
22 A    Yeah, we -- yes.  We would obviously consider any
23 changes relating to ongoing investigations that we became
24 aware of from a federal agency as material facts potentially
25 in assessing the counterparty and the risks associated with

Page 96

1  moving forward with them.  As we evaluate -- to the extent
2  that we moved forward with the plan, we got approval for it,
3  and prior to closing we were evaluating the risk adjusted
4  elements of moving forward with a transaction with
5  Binance.US relative to the tradeoff and the costs associated
6  with self-liquidating toggle.  That would be one of the
7  potential considerations.  Absolutely.  If there was a
8  material change, for example, that would obviously be a
9  consideration.  It's very hard to say what that will look
10 like in three to four weeks.
11 Q    At any time since the entry into the APA has Binance.US
12 informed the Debtor that there's been some material change
13 in any of the government regulatory investigation?
14 A    Not to my knowledge, but counsel may have participated
15 in calls that I wasn't on.
16 Q    What if anything have the Debtors disclosed about any
17 of the investigations that it has learned during the course
18 of due diligence?
19 A    Do you mind repeating the question?
20 Q    Yes.  What if anything have the Debtors disclosed about
21 the government investigations that it has learned about
22 during the diligence?
23 A    I don't recall what the disclosure in the plan
24 disclosure statement is relating to any of that.
25 Q    Do you think that the status of government

Page 97

1  investigations is a relevant consideration for creditors in
2  voting on the plan?
3         MR. SLADE:  Your Honor, I would object.  Lack of
4  foundation.
5         THE COURT:  He can answer.
6  BY MR. UPTEGROVE:
7  A    To the extent that I think it would depend on what the
8  nature of those investigations are and whether or not those
9  relate to, for example, normal course investigations or
10 they're criminal proceeding investigations, for example,
11 against the company, I think it's a bit of a question that
12 depends a lot on the nature of what the facts and
13 circumstances are.  I think it's hard to say in the absence
14 of -- it's a very broad question.
15 Q    Do you believe that the Debtors have disclosed all
16 material facts to creditors about ongoing investigations and
17 litigation?
18        MR. SLADE:  Yeah, Your Honor, I object.  That --
19 his opinion on that is not relevant and also the SEC did not
20 object on this basis.
21        THE COURT:  Well, it would be troubling if his
22 opinion was no, but, you know, he's obviously not being
23 asked as a lawyer or as an ultimate fact finder, but do you
24 think the Debtors have failed to comply with their
25 disclosure obligations?

Page 98

1    THE WITNESS:  I hope that the Debtors have not
2  failed to comply with disclosure obligations, Your Honor.
3  We have spent countless hours working with counsel to make
4  sure that, you know, we're properly disclosing key
5  considerations related to the plan.  Again, it's a very long
6  document and so for me to reference a very specific element
7  of it in a very specific question, I just don't recall the
8  specifics of it, but yes, I mean, I believe that the Debtors
9  have sought to disclose important information in connection
10  with the plan.  And I don't think --
11    MR. UPTEGROVE:  That's all the questions I have.
12    THE WITNESS:  -- we would be here today looking
13  for approval on that basis, to the extent that we felt like
14  there were any deficiencies.
15    MR. UPTEGROVE:   Thank you, Mr. Tichenor.  That's
16  all I have.  Thank you.
17    THE COURT:  All right.  Is there anybody else on
18  the telephone who would like to cross examine --
19    MS. RYAN:  Yes.
20    THE COURT:  Okay.
21    MS. RYAN:  Good afternoon, Your Honor.  This is
22  Abigail Ryan with the State of Texas Attorney General's
23  Office on behalf of the State Securities Board and the Texas
24  Department of Banking.
25    CROSS EXAMINATION OF BRIAN TICHENOR

Page 99

1  BY MS. RYAN:
2  Q   Good afternoon, Mr. Tichenor.  And one thing, I've
3  heard your name said Tichenor and Tichenor.  What is the
4  correct pronunciation?
5  A   It's Tichenor.  Thank you.
6  Q   Okay.  That's important.
7  A   A lot of times, people say Tichenor which is not a --
8  Q   Thank you for letting me know.  Names are important.
9  So good afternoon, Mr. Tichenor.  I just have a few (audio
10  drops) and I want to clear up a couple of things.  In your
11  declaration that was filed, it stated that if you went to
12  the toggle plan, Binance would help in liquidating the
13  coins, but earlier you testified Voyager would liquidate it?
14  who would be liquidating it under the toggle plan?
15  A   Liquidation of the 35 unsupported coins?
16  Q   Just all the coins.  So if somebody else is doing the
17  35 and somebody else is doing the remainder who are those
18  companies?
19  A   Well, I don't believe that there would be any other
20  companies that would do the remainder.  I think -- are you
21  referring to, like, a seven situation where there would be
22  like --
23  Q   Oh, no.  I can be more clear.  Under the toggle plan
24  who liquidates the 35 coins?
25  A   Who what?

Page 100

1  Q   Who would liquidate 35 coins --
2  A   Yeah.
3  Q   -- that aren't supported?
4  A   Look, I think that is a -- it's an unknown at this
5  point.  As I was saying, I think the Debtor would seek to
6  maximize value for the estate in connection with any
7  transactions that would occur on those coins.  It
8  would be at the Debtors' discretion.
9    THE COURT:  There's a bit of confusion built into
10  the question when you ask who would liquidate.  Are you
11  asking who would decide how to sell and to whom or are you
12  asking to whom coins would be sold?  There's a difference.
13    MS. RYAN:  I'm asking who would do the selling.
14    THE COURT:  Okay.  So would voyager do the selling
15  or would it ask somebody else to do it?
16    THE WITNESS:  Yeah, so -- and I think this relates
17  more broadly to the rebalancing transactions.  We have
18  worked hand-in-hand with the UCC in connection with the
19  rebalancing transaction and have been in full agreement with
20  them to date around the nature of various third-party
21  proposals that we received, for example.  And I mention this
22  because it's broadly consistent with how a liquidation of
23  those 35 coins would ultimately work, is that it would be in
24  consultation with the UCC.  We would in all likelihood, is
25  the Debtor would seek to get third-party potential

Page 101

1  proposals.  It may seek to liquidate them itself using its
2  existing smart order router or third party systems that it
3  has access to.  So I don't know the full answer yet.  I
4  think it would depend on the specific facts and
5  circumstances of the situation and what the collective
6  agreement was between both parties to move forward on that
7  basis.
8    THE COURT:  But there's no plan to say --
9    MS. RYAN:  Okay, so --
10    THE COURT:  There's no -- for example, you're not
11  planning in the event of the toggle plan to say, here
12  Binance, here's all our crypto, sell it for us?
13    THE WITNESS:  Absolutely not, Your Honor.  Yeah.
14    THE COURT:  Okay.  That's what I think the
15  implication of the question was.  got it.
16    MS. RYAN:  Thank you, Your Honor.  That was
17  exactly right.
18  BY MS. RYAN:
19  Q   So in Paragraph 37 of your declaration it says that the
20  asset purchase agreement provides that in the event Debtors
21  pivot to a liquidation transaction, Binance.US will provide
22  certain services to facilitate the liquidation transaction
23  to ensure the Debtors can rely on the Binance.US platform to
24  minimize leakage with cybersecurity risks when returning
25  cryptocurrency to creditors.  So in the toggle transaction,

A-1193

Page 102

1  what are these services that Binance.US would provide?
2  A    So I think what they have indicated is that they would
3  be helpful in supporting services and facilitating and
4  assisting in the transaction to the extent that it was
5  possible.  I think the specifics around what exact services
6  they would provide, we haven't fully fleshed out in
7  connection with them and I think that is, in our minds an
8  add-on, right.  It's not something that we necessarily have
9  to do.  It would be that they would offer services
10 potentially to the Debtor, but it doesn't mean that the
11 Debtor has to use those services.
12 Q    Under the toggle transaction, would all (audio drops)?
13 A    Sorry, I -- you were breaking up there.  I apologize.
14      THE COURT:  Somebody is bumping against a
15 microphone.  I don't know who it is, but anybody who's not
16 actually asking questions right now, please mute your line.
17 Please go ahead, Ms. Ryan.
18      MS. RYAN:  Thank you.  Can you hear me better now?
19      THE COURT:  Yes, we can.
20      MS. RYAN:  Thank you.
21 BY MS. RYAN:
22 Q    So it's my understanding under the toggle transaction,
23 all Bitcoin would be sold and reduced to U.S. dollars; is
24 that right?
25 A    Under the toggle transaction?  No.  I don't believe

Page 104

1  relative to what people may think of as a liquidation in the
2  context of a Chapter 7 liquidation which is, insofar as in
3  that instance, the majority of cryptocurrencies being the
4  non-35 tokens that are unsupported from being distributed in
5  kind would be distributed in kind.
6      So it's the same construct from a rebalancing
7  perspective except the difference is that for the 35 that we
8  can't distribute back, we need to distribute cash to those
9  creditors instead on an equivalent value basis under the
10 same construct.  But the concept is still the same with
11 regards to the way the rebalancing would work, so for
12 example, for example, BTC is not liquidated.  ETH is not
13 liquidated.  SHIB is not liquidated.  Anything that is a
14 supported token would not be liquidated.  It would be
15 rebalanced under the construct of the plan in a similar
16 manner to Binance, the Binance.US deal.
17 Q    That was really helpful.  Thank you for that
18 explanation.  So it sounds like under the toggle
19 transaction, unsupported jurisdiction customers could
20 actually move theirs off and into a third-party wallet; is
21 that right?
22 A    That would be correct, yes.  I believe -- to the extent
23 --
24 Q    Okay.
25 A    -- they're allowed to (indiscernible) for Voyager as a

Page 103

1  that's the way the toggle transaction would work.
2  Q    Can you explain to me how it would work?
3  A    Yeah.  So the toggle transaction is in many ways
4  analogous to a transaction with Binance.US, but it has
5  certain key differences and considerations and I would
6  characterize those as being really relating to the fact that
7  there are 35 tokens, for example, that cannot be distributed
8  back to customers on an in-kind basis through the Voyager
9  platform given the technical limitations that I think we
10 discussed at the beginning of my testimony.  And I'd be
11 happy to discuss those further.
12      The other difference is that it would occur through the
13 Voyager platform and would only be made available for
14 withdraws over a limited period of time such that customers
15 would have an ability to access and transfer that crypto
16 from Voyager to a third party or a third-party digital
17 wallet or self-custody wallet, for example.  And then after
18 a certain period of time, the platform would liquidate
19 whatever had not been moved.
20      It would use the cash proceeds from those liquidations
21 to distribute funds and then would effectively, you know,
22 shut down for all intents and purposes.  But those are the
23 key differences.  And so when you think about a liquidation
24 transaction in this context, there is a big and materially
25 key difference between a self-liquidating toggle transaction

Page 105

1  platform, yes.
2  Q    Right.  That -- fair enough.  So under -- making the
3  decision as to whether you go with Binance or do the toggle
4  transaction, is that a unilateral decision on behalf of the
5  Debtor?
6  A    So I believe it would be a decision that ultimately
7  would be made by the board of directors of the Debtor, but
8  it would be in consultation and discussion with, for
9  example, the UCC and, you know, presumably the advisors
10 would be providing a recommendation for example, to the
11 board.  But it would ultimately, I believe, be a decision of
12 the board of the Debtor.
13 Q    Okay, thank you.  Moving to the audited financials from
14 2021, were you able to get any audited financials from 2020?
15 A    I believe their audit covered two years, but I just
16 don't recall.  I apologize.
17 Q    That's okay.  Do you remember who the auditing firm was
18 that did their financials?
19 A    I do.
20 Q    Who are they?
21 A    I believe we're subject to confidentiality, but it's a
22 large known audit firm in the techs ecosystem.  I mean, I
23 can answer it to the extent --
24 Q    Okay.  Do you know -- I'm sorry, I didn't catch that
25 last part.

Page 106

1    A    I was saying, I could answer that to the extent the
2    judge wanted me to, but we were subject to confidentiality.
3    Q    Okay.
4    A    I don't know if Binance is okay with that.
5    Q    I understand.  Do you know if Binance currently has an
6    accounting auditing firm?
7    A    Yes, they made a representation to us that they have a
8    new auditor and we understood that their relationship with
9    their prior auditor, that they had been in the process of
10   transitioning to a new auditor in advance of the collapse of
11   FTX.  So the change in auditor was not something that was
12   specifically triggered, for example, by that -- as we
13   understand it, was not triggered by that audit firm, for
14   example, seeking to terminate them.  It was a mutually
15   agreed decision where Binance.US was seeking to transition
16   to a new auditor.
17   Q    Okay, thank you.  When reviewing their audit, their
18   books, their records, did you review whether Binance has
19   made loans to any other cryptocurrency companies?
20   A    So one of the key considerations that we looked at, and
21   again, the audited financials that we reviewed related to
22   Binance.US.  I want to be clear on that.  One of the items
23   that we reviewed was an overview of the assets as outlined
24   in the audit relating to -- which, you know, is where loans
25   to third parties would ultimately show up, we were not aware

Page 107

1    of any loans based on that audit review that had been made
2    to third parties.
3         That was an important element from our perspective in
4    understanding, you know, the dynamic around whether or not
5    they had an ability to, for example, you know, rehypothecate
6    crypto for, you know, for example.
7         THE COURT:  You just said third parties.  What
8    about affiliates?
9    BY MS. RYAN:
10   Q    Did you see if loans made to -- I'm sorry.
11        THE WITNESS:  To affiliates?  That would include
12   affiliates as well, Your Honor.
13        THE COURT:  I'm sorry, Ms. Ryan.  I kind of spoke
14   over you because I wanted to ask a question before I forgot
15   as time went on.  He had said third parties and I asked if
16   that included affiliates.  And he said, yes.
17        THE WITNESS:  I would say more broadly, Your
18   Honor, it included all loans that would be made to -- it was
19   a big concern of ours in light of, obviously, what's
20   happened in ecosystem.
21        THE COURT:  Thanks.  Thanks for the clarification.
22   I'm sorry --
23        MS. RYAN:  That was going to be my next question,
24   Your Honor, so thank you.
25        THE COURT:  Okay.

Page 108

1    BY MS. RYAN:
2    Q    So I know that the gentleman with SEC was asking about
3    reviewing Binance legal matters and things and I understand
4    that's not your wheelhouse.  Who does review them to decide
5    whether a legal matter is material?
6    A    You know, we have active discussions with the counsel,
7    with our counsel K&E -- or the Debtors' counsel, excuse me,
8    which is Kirkland.  I know that they're in active dialog
9    with the UCC's counsel, which is McDermott, for example.
10   There's active dialog with the company which also has
11   independent counsel and it would also include, I think,
12   discussions with Binance's U.S. counsel, so I mean, there's
13   a lot of professionals.  Our lawyers that have been engaged
14   by various parties in the situation and I'd say to date
15   people have worked in a very collaborative manner.
16   Q    Thank you.  How did you verify that -- and I'm going to
17   get this wrong.  I am not an expert in crypto by any
18   stretch, but how did you verify the one-to-one ability of
19   Binance, to (indiscernible) the coins?
20   A    That's a great question.  So we did look at, for
21   example, wallet -- a list of wallets that was provided to us
22   from the company and looked at, you know, balances in those
23   wallets.  We then compared them to our understanding of what
24   had been disclosed in the financial statements.  To say that
25   we did a thorough, you know, for example, like a proof of

Page 109

1    reserves on Binance.US' reserve ratio, though, you know,
2    that is well beyond the scope of what a firm like Moelis
3    performs.
4         There are generally third party auditors, for example,
5    that perform those types of scopes of service.  One thing
6    that we did look at, though, and was an important
7    consideration is that that dynamic is discussed and
8    disclosed in their audited financials and treatment of
9    customer crypto in the audited financials, the structure is
10   such that it was determined to be a custody relationship,
11   that there was no, you know, rehypothecation, for example,
12   and those elements.
13        And then on top of that, excuse me, we did receive
14   obviously sworn statements from Binance, and this wasn't an
15   area where it is -- it was a key consideration for us, so as
16   part of diligence, for example, we would ask for information
17   on a primary, a document basis.  We would ask questions in
18   different ways in order to make sure that we understood and
19   didn't have inconsistencies with what information was
20   provided to us.  But I would say, you know, look, we did not
21   do a, for example, like a proof of reserves to the extent
22   that's the nature of the question.
23   Q    No, that's a perfect answer.  Thank you.  Did -- in
24   reviewing the financial documents, were you able to tell
25   what Binance entity actually keeps custody of U.S.

Page 110

```
1   customers' electronic wallets?
2   A    My recollection -- I don't recall.
3   Q    Are you aware that in 2019 it was a Binance Cayman
4   Island company that purportedly held the electronic wallets
5   for U.S. customers?
6   A    I'm not aware of that, no.
7   Q    Do you know if Binance.US has the technical
8   infrastructure to run its business without dependence on
9   Binance.com?
10  A    It has been represented to us that they would.  Our
11  understanding of the way that they operate is that there are
12  certain commercial services and licensing ingredients, for
13  example, relating to technology that they license from
14  Binance.com, but you know, similar to -- and again, this is
15  my understanding, right?
16       Similar to, for example, if I were to receive a copy of
17  Windows, I may not need to be able to rely on Microsoft as a
18  firm continuing to operate.  So my understanding is that the
19  services that are provided by Binance.com are limited to
20  functions that would allow Binance.US to continue to operate
21  to the extent that Binance.com no longer existed.  That was
22  something that we specifically asked about during our
23  diligence.
24  Q    Okay.  So for instance, if Binance.com technical
25  infrastructure were to crash, Binance.US would not be
```

Page 111

```
1   affected?
2   A    So that is a representation that has been made to us.
3   It was a question that we asked.  It was an important
4   element.  I can't specifically represent whether or not
5   there's some piece of code that results in a callback
6   function to a server that's -- there's a lot of elements
7   that could cause that to be the case.  What has been
8   represented to us is that it's not, and that's as much as I
9   can say.
10  Q    Okay.  When you say it's been represented to you, in
11  what manner was it represented?  Was it orally, in writing?
12  A    Both.  We've had multiple calls.  We've had in-person
13  meetings.  We've had physical document reviews.  Received
14  sworn statements around items like this.
15       MS. RYAN:  Thank (indiscernible) finished.  I pass
16  the witness.  Have a good afternoon.
17       THE WITNESS:  Thank you.  You, too.
18       THE COURT:  Thank you, Ms. Ryan.  Is there anybody
19  else on the phone who would like to cross examine the
20  witness?
21       MR. NEWSOM:  Yes, Your Honor.  Dan Newsom, pro se
22  creditor.  Just a few questions.
23       THE COURT:  Okay.
24            CROSS EXAMINATION OF BRIAN TICHENOR
25  BY MR. NEWSOM:
```

Page 112

```
1   Q    Mr. Tichenor, good afternoon.  You stated that a toggle
2   would diminish the value or the return of value on VGX.  You
3   also stated that Binance doesn't intend to create value for
4   VGX.  Can you explain why there's a difference in the value
5   of VGX in a toggle versus a sale?
6   A    Yeah.  So the difference was relating to the fact that
7   Binance.US was agreeing to seek to try to list the token on
8   their platform.  Our view, and again in discussion with
9   various people at the company around VGX and other, you know
10  -- who are more familiar with specifics around, for example,
11  specific cryptocurrency assets, the view was that the
12  ability to create value and utility, for example, relating
13  to a sale of the smart contracts in that instance, was
14  likely greater to the extent that the token was listed.
15       There was a perception of support for it on a go-
16  forward basis, but it was an estimate and you know, what we
17  would say is that ultimately, I don't think that would
18  change the conclusion, which is an important element.  We
19  would still view under those facts and circumstances if that
20  element was normalized between those two, that the Binance
21  plan still provides for potentially higher recovery value.
22       But you know, it was an important element for us to
23  also include relative to this, you know, self-liquidation.
24  But I wouldn't say it was a determining factor, if that's
25  part of the question.
```

Page 113

```
1   Q    Thank you.  Would a toggle transaction not also
2   contemplates the sale of VGX smart contracts?
3   A    It likely would, yes.
4   Q    So in your opinion, in either case, the value or
5   utility of VGX is ultimately dependent on the sale of the
6   smart contract?
7   A    In part.  I think the likelihood of finding a, for
8   example, high quality party that is seeking to get, you
9   know, the -- has an interest in the smart contract
10  utility on a go-forward basis, one of the factors that we
11  understand based on discussions with, you know, the parties
12  that we've engaged with is the forums that that smart
13  contract is listed on, a lot of the value from their
14  perspective in a number of ways, if somebody was to take
15  over that smart contract and seek to turn it into more of
16  utility on a go-forward basis, is in part reliant on the
17  fact that VGX is a known commodity for all intents and
18  purposes.
19       It's out there.  It's listed on a number of exchanges.
20  It trades.  People know it from the case.  And so that has
21  value for people.  And so part of the view I think was that
22  to the extent that a party like Binance.US listed it, one,
23  it shows support from this plan and two, the likelihood of
24  attracting that type of party is arguably better in that
25  circumstance.  But again, I do want to be clear that the
```

Page 114

1  calculation around VGX was not the determining factor in the
2  comparison.
3  Q   Sure.  Understood.  So when will we know whether
4  Binance.US intends to list VGX or not?
5  A   I can't speak to what their internal review process
6  looks like, unfortunately.
7        MR. NEWSOM:  Okay.  No further questions, Your
8  Honor.
9        THE COURT:  Thank you.  Is there anybody else on
10 the phone who wishes to cross examine the witness?
11       MR. HENDERSHOTT:  Yes, Your Honor.  Tracy
12 Hendershott, pro se creditor.  Ladies first.  Is that Gina?
13 Gina?  Okay, I guess I'll go, with Your Honor's permission.
14       MS. DiRESTA:  I was trying to unmute.  You want to
15 go, Tracy?  I don't mind.
16       MR. HENDERSHOTT:  Yeah, sure.
17       THE COURT:  Let me ask you --
18       MR. HENDERSHOTT:  With Your Honor's permission.
19       THE COURT:  Let me ask.  We're pretty much at our
20 lunchtime.  Do you have -- how many questions do you have?
21       MR. HENDERSHOTT:  I'm sorry, Your Honor, you were
22 breaking up.  You said something about lunchtime?
23       THE COURT:  We're pretty much at our lunchtime,
24 but how many questions do you have, do you think?
25       MR. HENDERSHOTT:  I have eight questions

Page 115

1  currently, but depending on the answers, it may extend.
2        THE COURT:  Eight questions.  Let's do your eight
3  questions.
4        MR. HENDERSHOTT:  Okay.  Thank you, sir.
5        CROSS EXAMINATION OF BRIAN TICHENOR
6  BY MR. HENDERSHOTT:
7  Q   Good afternoon, Mr. Tichenor.  I'm a pro se creditor in
8  this case.  I'd like to go back to -- thank you.  I'd like
9  to go back to your opening statements when you highlighted
10 obstacles and called out that this was one of the rationale
11 of why the Binance deal is better than the toggle or even a
12 liquidation.  And I just want to confirm, did I hear you
13 correctly that in relation to the liquidation, the illiquid
14 coins would result up to a 50 percent slippage commission
15 structure; is that correct?
16 A   Yeah, it would be up to.  The analysis was done on a
17 coin-by-coin basis and it was based on a number of factors.
18 So it was -- and I would call it an educated estimate that
19 was done in connection with management and individuals at
20 the company that, you know, have experience in trading
21 crypto currencies.  We solicited as I think I mentioned
22 multiple proposals from various different OTC market makers,
23 for example, and collected all of those facts together in
24 determining and working, you know, collaboratively again,
25 you know, not just Moelis, BRG, the company management,

Page 116

1  others, in assessing what those discounts could be.  I
2  mentioned the 50 percent number in that I would have to go
3  back, but I don't believe the estimate for purposes of the
4  discount was exactly 50 percent on those coins.  I do recall
5  that we received a number of bids, though, that were at 50
6  percent, if not greater.
7  Q   So -- and I guess that's where my confusion is, and so
8  do I recall correctly that you said 100 million would be the
9  slippage for the process of liquidation in total due to
10 these illiquid coins?
11 A   In total, yes.  I think the estimate for those specific
12 coins, if I'm not mistaken, is like 60 million specifically.
13 I'd have to check --
14 Q   Okay --
15 A   -- the numbers, though.
16 Q   Okay, so you're saying the slippage is 50 million, not
17 100 million?
18 A   Correct.  The 100 million also includes foregone
19 proceeds that we would receive from Binance.US to the extent
20 that we didn't close with them, which is, you know,
21 obviously the purchase price and then I think I mentioned
22 the VGX element.
23 Q   Okay, but let's stick with the liquidation.  $60
24 million of damage due to slippage because of the illiquid
25 nature of 35 coins; is that your statement?

Page 117

1  A   That's my recollection of the numbers, yes.
2  Q   Okay.  Thank you, sir.  So this is where my confusion
3  is.  The day before the Debtors turned off access to our
4  investments or even today, you know, go to Coinbase, go to
5  Binance, I go anywhere, I can make a $5 million transaction
6  at a 5 percent commission.  So I'm struggling to understand
7  how, Moelis, you know, the rainmaker, dealmaker, why are you
8  being faced with 50 percent haircut when I can make a $5 to
9  $10 million transaction with a 5 percent commission rate?
10 A   So I think even to the extent that we're talking about
11 a $5 million trade, I think, you know, what happened last
12 night is a good example of what market depth means within
13 crypto, in the cryptocurrency space.  We saw a very
14 precipitous drop in the price of Bitcoin and all other --
15 all coins as a result of what I understood based on what
16 I've seen publicly, to be relatively small trading volume in
17 Bitcoin.
18       It's -- you know, just even training a $5 million block
19 of Bitcoin is very, very different than the estate trying to
20 liquidate a large portion if not a majority portion in some
21 instances of very illiquid tokens.  And liquidity has a lot
22 of different elements to it.  It can be trading volume
23 that's being reported, but ultimately, you know, as we think
24 about market depth, it really relates more to, you know,
25 what the marginal buyers are at various prices.

A-1197

Page 118

1 And so to the extent you have in some instances,
2 highly, highly concentrated ownership in some of these
3 tokens, the ability to be able to trade out of those and
4 find marginal buyers in certain instances can be very
5 difficult.
6 THE COURT: The 50 percent or up to 50 percent
7 you're talking about is not a commission. It's what you
8 think --
9 THE WITNESS: Correct --
10 THE COURT: -- the effect would be on what people
11 are willing to pay?
12 THE WITNESS: That's exactly right, Your Honor.
13 We -- there were no -- there would not be a condition, for
14 example, on the block trade. It's already embedded.
15 They're taking the risk in that instance. When the estate
16 does transactions, it uses a range of exchanges, for
17 example, OTC desk, if it were to just sell into the market
18 on its own over a long period of time and the transaction
19 fees on that -- and that's similar to we're doing on the
20 rebalancing. We've negotiated very, very low fees, on a fee
21 basis. To the extent you're talking about a commission, so
22 in comparison to like a 5 percent commission, you know, for
23 illiquid tokens it's, you know, sub 25 basis points.
24 BY MR. HENDERSHOTT:
25 Q    Could you give us an example, because yesterday and the

Page 119

1 same conversation came up with (indiscernible) BRG, the
2 example that was presented yesterday which I've heard you
3 contradict today was Shiba Inu as one of the illiquid coins,
4 but earlier today in your testimony, you highlighted the
5 Shiba Inu is not illiquid.
6 A    So --
7 Q    Is that correct?
8 A    I don't believe that's what I said. I said that Shiba
9 Inu was a supported token, I believe.
10 Q    Okay. So could you give us an example of a token where
11 we would expect this 50 percent haircut due to, you know,
12 this liquidation process?
13 A    So from what I understand, and again, this is not just
14 (indiscernible). This is based on, you know, discussions
15 with a lot of parties analyzing a range of these factors. A
16 couple examples would be BTT, VET, and StormX, all of which
17 would fit in that category.
18 Q    Thank you. And can you tell me what the value of BTT,
19 VET, and StormX is on Voyager currently as part of your
20 estate, the total assets for those particular coins?
21 A    I don't have the specific numbers in front of me. I
22 know they're in the tens of millions each.
23 Q    Each or total?
24 A    No, each. And to be clear, the 35
25 Q    Okay. (indiscernible) exercise --

Page 120

1 A    Sorry. The 35 tokens that we were talking about, you
2 know, as Mr. Renzi put in his declaration, they represent
3 around 17 percent of the total assets on the platform today.
4 They do represent a number of tokens that happen to be more
5 illiquid. The large, well-known tokens like Bitcoin and
6 Ethereum or USDC, for example, are all supported. The 35,
7 based on the distribution, happen to fit in a bit of an odd,
8 sweet spot between being sizeable from a dollar value
9 perspective, but also being illiquid.
10 Q    Okay. If there is a decision made to go to the toggle
11 and any of the estate assets are being sold at a 50 percent
12 discount, would any of the creditors have the first
13 opportunity to buy such discounted assets at that discount
14 price?
15 A    Theoretically, they would have an ability to buy
16 anything that they want in the market. You know, the estate
17 --
18 Q    No, no. The market's not offering the 50 percent.
19 A    Well, there's a big difference, though, between buying
20 a small trade at a 50 percent discount and buying a very
21 large block trade for tens of millions or hundreds of
22 millions of dollars at those levels, so if there are
23 creditors that would like to have discussion around multi-
24 hundred million dollar block trades, I think we'd be happy
25 to have those conversations.

Page 121

1 Q    But we're not talking about hundreds of millions,
2 right? You said only 17 percent of the total value across
3 all 35 coins, (indiscernible) 75 -- 17 percent.
4 A    Seventeen percent across all of the crypto currency of
5 the estate. It's across 1.2 to 1.3 billion.
6 Q    So it's about 130 million, divided by 35 coins? Thank
7 you, sir. You also brought up as an example the illiquidity
8 caused the volatility that we experienced in the overall
9 market last night. Would you associate that with some event
10 of illiquidity or more of the revelation of the Congress
11 issuing the letter that they did last night to Binance
12 raising, you know, significant red flag?
13 A    I can't --
14 Q    It would be more credible for --
15 A    I can't speak to exactly what drove the decline in the
16 market last night. The point that I was trying to highlight
17 is that within these markets and a big reason why you see
18 these big discounts in certain coins is that cryptocurrency
19 markets have historically been more volatile than what we
20 see in a lot of traditional markets, and these are markets
21 where you have a -- the largest token being Bitcoin with a
22 multi-hundred billion dollar market cap that trades tens of
23 billions of dollars a day that declined very material amount
24 of value in the course of minutes, and so, you know, as
25 market makers, for example, are looking at doing block

Page 122

1  trades and quoting risk, for example, that's risk that they

2  then assume and they price for that.

3      And so you know, what they're pricing for in large part

4  -- and again, you know, what you see in a lot of instances

5  is there's higher beta, for example, between these illiquid

6  tokens relative to something like a Bitcoin.  And so what

7  they're trying to work through is a dynamic of not being in

8  a position where, you know, they may acquire a block trade

9  and it could be down 20 percent after they've acquired it,

10  as a result of the trade.

11      And so that's part of what, you know, we've seen when

12  pricing these and to be clear, this is why we reached out to

13  multiple parties with very significant financial capacity to

14  be able to execute on these types of transactions.  We did

15  not reach out to just regular parties.  We reached out what

16  we understood based on discussions with people in the space,

17  to be, you know, some of the largest participants in this

18  ecosystem for doing these types of transactions.  And we

19  received multiple ones --

20  Q   So, thank you, sir --

21  A   -- which also, you know, they weren't aware of what was

22  going on.  They weren't talking to each other

23  (indiscernible) companies.

24  Q   Thank you.  You keep referring to the danger in

25  slippage of block trades going back to the (indiscernible)

Page 123

1  just because we went through these numbers yesterday, I

2  believe the number was 91 million of SS for that particular

3  coin currently (indiscernible) Voyager.  And you are tasked

4  with either liquidating, rebalancing or liquidation, you

5  know, action for this case.

6      Would you market the whole $91 million as one block or

7  would you break it out, you know, 10, 20 different

8  transactions over a defined period of time?

9  A   So I don't want to speak to specifics of exactly how

10  the estate is currently executing the transactions related

11  to the rebalancing, in part because what we don't want to do

12  is telegraph at this hearing anything that may adversely

13  impact creditor returns from parties who may be listening in

14  and trying to front run any of those transactions.

15      What I can tell you is that the Debtors and their

16  advisors -- and again, this is multiple advisors, not just

17  Moelis -- as well as the UCC's advisors in this instance,

18  M3, have been in complete coordination around the nature of

19  the transactions, the forum that we're doing them in, the

20  way that they are being executed, and it is being done in a

21  manner that allows for, you know, an attempt to obfuscate as

22  much as possible the nature of the trades that the Debtor is

23  doing in order to try and maximize value.

24      And it is doing it over, you know, what we're trying to

25  do is over a long enough period of time and this is why the

Page 124

1  Debtor has been executing these trades upon, you know,

2  getting the ability to do such from the judge, over a long

3  period of time to try and minimize any of that negative

4  impact it may have on prices.

5  Q   Yes, that sounds absolutely prudent to me.  And so I

6  guess when you are taking such a thorough process of

7  breaking it out to where it does not move the market on any

8  given day or any given exchange, I still struggle to

9  understand how you come up with a 50 percent loss on that

10  transaction.

11  A   So to be clear, you know as I was saying, we do

12  obfuscate trades and there are tokens that from what we

13  understand and what's been communicated to us, you know, the

14  levels that they're trading at today and what would be

15  required may already be pushing down prices potentially in

16  some of those, and so, you know, there would be a concern.

17      There's a big difference between doing, for example,

18  you know, a million-dollar or $2 million trade on any one of

19  those tokens versus trying to be in a position where, you

20  know -- and so in that instance, let's say you moved from,

21  you know owning -- and these are all purely hypotheticals,

22  right?  If, to the extent that the state owned 40 percent of

23  an individual token and it needed to own 30 percent post

24  rebalancing, that means it needs to sell 10 percent interest

25  over potentially a multi-week period.

Page 125

1      To the extent that needs to go from 40 to 0, that's a

2  very different transaction.  And in some instances, that's,

3  you know, what the estate is dealing with.  Again, you know,

4  these are hypotheticals but it's the basis for the analysis

5  that was being done.

6  Q   Okay, thanks for that.  And -- sorry.  I like to move

7  on to the other obstacle which is a new term for me.  In

8  instead of KYC, it was KYT for the transaction.  You said

9  that that prohibited, you know, the toggle or at least was

10  an obstacle to the toggle and would require liquidation of

11  all of these illiquid coins on Voyager.  And (audio drops)

12  option or what was the other option there?

13  A   So there were two primary issues.  One is, the platform

14  itself, the code base, doesn't work to be able to distribute

15  those token in kind.  And so, you know, to the extent that

16  you're familiar with different protocols and coins, right,

17  every coin is a little bit different and not all of them are

18  ERC-20s, right, and so in this instance, we have 35 tokens.

19  The code itself, the code base, does not have an ability to

20  distribute those tokens through the Bedrock code, which is

21  my understanding of how they -- they're able to distribute

22  those tokens back to the customers.  It doesn't support

23  them.

24      And so it would require a rewrite of the code base,

25  with subsequent upgrades to be able to bring on additional

Page 126

1  protocols to allow those tokens to be withdrawn.  So that's
2  one leg of the issue.  The second leg of the issue is the
3  KYT issue, which relates to the ability to actually validate
4  the party and the wallet address that you're sending funds
5  to and that has two elements to it.
6        One relates to, for example, the inability to
7  distribute those 35 tokens.  The other also in part relates
8  to potentially unsupported jurisdictions and the ability to,
9  for example, return coins if the company didn't have a
10 platform to be able to return coins through.
11 Q    So two elements.  You said the technical foundation,
12 Bedrock and then the other one is, you know, the other
13 controls of understanding where the transaction is
14 occurring.  And let's start with the first one, Bedrock.
15 Has anyone reached out to actually the originators, the
16 developers, the designers of Bedrock, which would be the
17 Ethos organization to be able to overcome this obstacle?
18 A    The company has developers.  It has acquired the
19 Bedrock code.  It has maintained it.  The people that we
20 talked were the management team of the company that operates
21 the code base today.  This was made -- this was based on
22 representations that were made us, you know, by them and,
23 you know, our understanding is it would take some time to
24 potentially allow for that, to do those upgrades.  And on a
25 prudent basis --

Page 128

1  have because there was a follow-on impact.  So this would be
2  something where to the extent that the company were to do an
3  upgrade on the code base like that, to allow for support of
4  additional tokens, it's not something that I think people
5  would take lightly in this specific instance.
6  Q    Yes, security concerns, but still I haven't heard an
7  answer to my question if anyone reached out to the
8  developers (audio drops).
9        MR. SLADE:  I object.  Lack of foundation.
10       THE COURT:  Overruled.  Go ahead.
11 BY MR. HENDERSHOTT:
12 A    I'm not aware of the company having reached out to the
13 original developers of the code base that the company
14 currently maintains.
15 Q    Okay.  Thank you.  And then the second part of your
16 obstacle (indiscernible) was having to know the recipient of
17 the wallet.  So I can go, the day before they blocked my
18 access, I can go in and transfer any of the supported coins
19 to my wallet.  It's a single address.  It doesn't vary as a
20 wallet address based on the coin.
21       So I'm not clear on how the Debtors in Possession can
22 actually buy the asset, put -- transfer it to their wallet,
23 and then find a third party when I enter a sell order,
24 transfer that asset to a other third wallet, or that they've
25 already validated the KYT for me whenever I want to do any

Page 127

1  Q    Yeah --
2  A    -- to the extent that you're upgrading code base that
3  relates to a distribution, potentially, of a billion
4  dollars, I don't think that anybody would take a code
5  upgrade lightly as the extent that it could have, for
6  example, negative impacts.  I mean, with debugging and you
7  never know what the follow-on impact could be, right?
8  Q    So I'm not clear.  Is the (audio drops) who made
9  the code or is the challenge that the engineers who made
10 Bedrock refuse to collaborate with (audio drops) in
11 possession?
12 A    That feels very leading.  I don't think I said anything
13 about the developer is not willing to work on it.  I was
14 making a statement around what we understood the timeline to
15 be for implementing that and what I was trying -- and I
16 apologize if I wasn't clear on this.  What I was getting at
17 was more that implementing a code upgrade in the context of
18 the situation that we're in and the negative impacts that
19 getting that wrong could have, mean that the Debtor would
20 want to make sure that it's being very thoughtful.
21       The last thing that we would want, given the fact that
22 this a, you know, final distribution for all intents and
23 purposes for certain parties, would be in a situation where
24 somebody put in a bug and all of a sudden a creditor
25 received five times the amount of coins that they should

Page 129

1  of the supported wallets.  So can you highlight where the
2  obstacle is there?
3  A    Yeah, it's a good question.  So that the company has
4  historically operated, and this was the basis for why the --
5  again, this is my understanding.  I can't, you know, purport
6  to have done a code review on this -- is that for those
7  unsupported tokens that can't be withdrawn and have never
8  been able to be withdrawn, the issue is that, and the way
9  that the company historically worked is that it works with
10 OTC market makers, for example, to do all sorts of
11 transactions, right?
12       And so the -- what would occur if you were to try and
13 buy one of these unsupported tokens historically would be
14 that you would put cash fiat into your account.  You would
15 seek to buy that token.  Voyager would have quoted you a
16 price for where that transaction would occur at.  Voyager
17 then through it's smart order router would do a trade with a
18 market maker on the other side.
19       They would do daily settlements at the end of the day
20 to actually settle dollar funds relative to coin, with the
21 coin in those instances for those unsupported wallets -- for
22 those unsupported tokens being transferred from a white
23 listed OTC market maker wallet to Voyager's wallet that is
24 held on fire blocks in that instance.  So because they are
25 transacting with a white labeled OTC market maker with a

Page 130

1  known wallet address, the trades are only occurring between
2  a handful of parties.  The token, the coin transfer in those
3  instances is only between a limited subset of wallets and it
4  occurs once a day, effectively.  It's not occurring on an
5  ongoing basis.
6  Q    Right.
7  A    So when you're removing coins, what the Bedrock code is
8  doing is -- and again, my understanding is that it's
9  validating every single transaction as it's happening in
10 small amounts and it has to be automated to do that, given
11 the number of customers and the number of coins that it
12 supports.  There would be no way to do that manually.
13 Q    Got it.
14 A    Yeah.
15 Q    So it's Bedrock that is the limitation?  It's not
16 really about knowing --
17 A    No, I wouldn't --
18 Q    -- confirmation of the wallet because they've already -
19 - excuse me, sir, if they've already validated my wallet
20 address when they transferred the coin in Ethereum.
21 A    That -- so that's not my understanding.  My
22 understanding is that -- and I know, I understand this to be
23 the case, right.  Not every wallet supports every type of
24 token, right?  If I have an Exodus wallet, it doesn't
25 support every type of token.  If I -- Binance doesn't

Page 131

1  support -- or excuse me, Coinbase support every type of
2  token, right?  So to say that you could just transfer to any
3  wallet, you know, I don't believe that to be the case, based
4  on my knowledge of how cryptocurrency works.
5       And my understanding as has been represented to me is
6  that a number of these tokens, for example, the third-party
7  provider that the company uses for that KYT validation on
8  the wallet that the funds are being transferred to does not
9  support all of those tokens, and so that party has to run
10 its own set of procedures.  It's a third-party service
11 provider.  I can't represent what those look like, but at
12 least what has been told to me is that they do not support
13 all of those tokens.
14      And so what it would require is potentially then
15 integrating new third parties that do this or other systems.
16 I don't know what that would ultimately look like but, you
17 know, I would imagine, for example, doing an API upgrade to
18 allow for a multi-party API authentication check between a
19 new third party that's being integrated for these purposes,
20 it's not a small task.  At a minimum, I imagine it would
21 take months.
22 Q    Yes, we've had nine months and so that -- would have
23 fit into the schedule.  So thank you.  If I can move on, I
24 know we want to move on to lunch break here.  So just some
25 block and tackle type questions about your role as an

Page 132

1  investment banker.  What was the guiding document that you
2  were obligated to follow for, you know, the auction process?
3  A    I'm not sure I follow.  Are you talking about the bid
4  order or the auction procedures?
5  Q    Yeah, the bidding (indiscernible).  This was a real
6  guiding document that you had to follow that was approved by
7  the Court.
8  A    Yes.  There were -- and I apologize for forgetting the
9  exact name of the documents, but there were procedures that
10 were filed with the Court relating to bidding procedures in
11 -- and the auction procedures in connection with the
12 auction.
13 Q    And when we have that guidance document approved by the
14 Court, did that dictate the terms of the action or are
15 bidders allowed to dictate their own terms in the auction?
16 A    Auctions can be very complicated and so while the bid
17 procedures outline what a qualified bid would ultimately be,
18 it doesn't mean that parties that participate in the auction
19 will follow necessarily, all of those rules.  The fact that
20 they may not follow all those rules does not necessarily
21 preclude us from potentially selecting the highest
22 alternative to the extent that that's the one that presents
23 itself.  It's -- to a degree, there is a judgment call.
24 Q    Right.  Well, I mean, how far can you deviate from what
25 the Court approved bidding plan is?  Of course, there's some

Page 133

1  judgment.  The Court approved the bidding plan intentionally
2  to protect the process, protect the estate; is that correct?
3  A    I don't recall the exact specifics of the -- of what
4  was allowed under the bid procedures, but I would imagine
5  that it provides for that type of flexibility.  I just don't
6  know.  I don't know.
7  Q    (indiscernible) the bid process?
8  A    Yes, but this occurred months ago.
9  Q    Okay.  And so as part of the bidding plan approved by
10 the Court, was a backup bidder element, you know, standard
11 in that plan or not?
12      MR. SLADE:  Your Honor, I object.  This is not
13 relevant.  We discussed this yesterday.
14      THE COURT:  I'll allow --
15      MR. HENDERSHOTT:  Yesterday, Your Honor, BRG could
16 --
17      THE COURT:  I'll allow a few questions on it.  Go
18 ahead.
19 BY MR. HENDERSHOTT:
20 A    So the --
21      MR. HENDERSHOTT:  Thank you, sir.
22 BY MR. HENDERSHOTT:
23 A    -- bid procedures did my recollection is that the bid
24 procedures did require qualified bids to act as a backup
25 bidder to the extent that they were to be viewed as a

1  qualified bid.  That's my recollection.
2  Q    And so can you share with us who overrode that
3  critical, pretty standard -- well, first of all, isn't that
4  a standard element of an auction bidding process?
5  A    It's something that is often asked for.  It's not
6  always actually abided by.
7  Q    We just -- as Mr. Slade just said, we did discuss this
8  yesterday but we couldn't get confirmation.  We were told
9  that Binance refused to comply with the bidding plan.  We
10 couldn't get confirmation on the other four bidders.  Do you
11 have a better recollection of the FTX auction and the four
12 other bidders, what their refusal or acceptance as a backup
13 bidder was?
14 A    At the end of the auction, there was no party that was
15 willing to be a backup bidder that conformed with the
16 requirements of an order entry.  So there was no ability to
17 --
18 Q    So --
19 A    -- appoint a backup bidder at the end of the auction.
20 Q    Being professionals in a corporate auction
21 (indiscernible) activity which I've sat across your team
22 many times, is there an attempt for a backup bidder to
23 introduce competitive tension to ensure that the best bid
24 and the most efficient bidding process is concluded with the
25 first round of bidding and the competitive tension forcing

1  each bidder to give the best offer at the first round of
2  bidding?
3  A    It's one of many factors.  The reason we ran an eleven-
4  day auction which is unprecedented as far as auctions occur
5  was to maximize that competitive tension and I can at least
6  represent from the beginning of where the auction started to
7  the value that was ascribed to the winning bid, it was
8  increased in many multiples on a dollar value basis.  We ran
9  a, you know, in our judgment, a very competitive, long, hard
10 auction option to try and drive as much value as possible.
11 Q    Well, I'm confused, though, because if compliance with
12 the written plan was actually followed, the original bid of
13 Binance was 50 million would have returned more creditor
14 value than the follow-on bidding cycle of 20 million.  Do
15 you see that history, sir?
16     MR. SLADE:  Your Honor, I object.  This is not
17 relevant.
18     THE COURT:  Go ahead and explain.
19     MR. HENDERSHOTT:  It is relevant, sir and --
20     THE COURT:  No, no, no, no -- I've overruled the
21 objection.  I'm ask -- I'm telling the witness to go ahead
22 and explain just what happened.  Why did we have a
23 backup bid from Binance at that time?  Did they --
24     THE WITNESS:  We did not have a backup bid from
25 Binance at that time because their final bid included a

1  provision to the extent that they were a backup bidder, that
2  would have required an expense reimbursement that did not
3  conform with the bid procedures.  And so they were not
4  selected as a backup bidder at that time because it was not
5  a bid that confirmed with a ability to actually enter to the
6  extent that we were to select them.  In hindsight, we wish
7  that we had them as a backup bidder and had paid for it, of
8  course, and in light of what happened with FTX, of course,
9  we wish that we weren't in this situation.
10     THE COURT:  So in other words, they said to you,
11 were not willing to make a qualified bid.  We'll make a bid
12 on different terms.
13     THE WITNESS:  And we want to be paid.  Basically,
14 they said that they want to be paid to be a backup bidder
15 which is not something that is standard in the auction
16 process.
17     THE COURT:  Right.  So they gave you the option to
18 seek a variation from the bid terms and try to entice you
19 with a deal, but it wasn't actually something that you had
20 the ability to accept and make them an automatic backup
21 bidder; is that right?
22     THE WITNESS:  That's correct, Your Honor.
23     THE COURT:  Okay.  Does that explain things, Mr.
24 Hendershott?
25     MR. HENDERSHOTT:  It does, thank you.  Thank you

1  both for that.
2  BY MR. HENDERSHOTT:
3  Q    So what I'm hearing then is there's no qualified
4  bidders, backup bidders, at the FTX round.
5  A    Well --
6  Q    Is that correct?
7  A    I think there's a difference -- I mean, obviously, the
8  bid that we accepted we viewed as being a qualified bid
9  because we ultimately entered it, but it was viewed as the
10 highest and best at that point in time, based on facts and
11 circumstances at that point in time.
12 Q    But not in compliance with the bid plan.
13 A    Excuse me, I couldn't hear that.
14 Q    Is that correct?
15 A    I'm sorry, I --
16 Q    Bids were not in compliance -- yeah, not in compliance
17 with the bid plan which calls for backup bids.
18 A    Well, if that were the case, we wouldn't have an
19 auction at all.
20 Q    Right, because there was no qualified bidders according
21 to the bid plan.  Then would that logically then lead the
22 discussion to go into the toggle option at that point when
23 there is no qualified bidders?
24 A    Well -- and again, I want to be clear.  When, you know,
25 the focus is very much on the backup bid right now.  We went

Page 138

```
1   into an auction.  We had received bids.  They had
2   qualifications relating to parties acting as backup bidders
3   or not.  I can represent that this was a very much discussed
4   topic at the auction.  Again, we ran an eleven-day auction.
5   It was not something that was missed by parties.  The view
6   was, you know, while people were expressly unwilling to do
7   this despite every attempt from the Debtor to try and
8   actually get also a party to act as a backup bidder and we
9   tried a number of different strategies in order to try and
10  have that happen.
11       We ultimately drove the price up.  We, you know, had
12  the situation that we did, which was we appointed FTX based
13  on the facts and circumstances at the time, the nature of
14  their bid, and decided to move forward with that and did not
15  have any other parties that were backup bids because they
16  would have required, for example, the expensive
17  reimbursement.
18       So we were unable to select one.  But with that said,
19  said because of the dynamics at the auction and the
20  competitive tension, again, we drove up the purchase price
21  at that auction multiple, multiple times over where the
22  auction value started at.
23  Q    Okay.  I mean, (indiscernible).  I appreciate that
24  clarification, the insight.  Again, block and tackle, how is
25  the contract between the Debtor in Possession and yourselves
```

Page 140

```
1   A    I believe our fee declines by a million dollars.  It's
2   a $12 million to an $11 million fee.
3   Q    Okay, so 12 million if a purchaser is achieved, $11
4   million if we go to a toggle.
5   A    That would be my understanding, yes.
6   Q    Okay.  So -- and thank you for that.  So is there an
7   estimate -- there's only $1 million difference there, so --
8   and I'm not saying what the outcome is going to be, but with
9   the monthly retainer fees and the transaction fees
10  cumulatively, do you just have a round estimate of what the
11  total value of your contract is going to be with the Debtors
12  in Possession?
13  A    I apologize.  I don't off the top of my head.
14  Q    Well, you know, we can start with 12 and 11 then, as a
15  base.  Is there -- can you share what the monthly retainer
16  is?
17  A    I don't recall what the monthly retainer fee is.  I
18  don't.  I know --
19  Q    Is there other transaction --
20  A    Excuse me?
21  Q    Is there other transaction fees besides the 11 or 12
22  million?
23  A    Not transaction success based fees.  My recollection of
24  our engagement letter, which is tradition and, look, was
25  negotiated on arm's length basis as well with the UCC and,
```

Page 139

```
1   structured, you know, from a -- is the payment and
2   compensation a time and materials or is it a event-based
3   payment structure?
4   A    I believe our engagement letter is publicly filed, so
5   it depends.  We have a --
6   Q    I --
7   A    From Moelis' perspective, we have a monthly retainer
8   fee that we are paid and then there are different types of
9   transaction-based fees.
10  Q    Okay.  So I guess I'll be more specific.  I've heard,
11  and I don't recall reading your specific contract that the
12  transaction is a combination of an acquisition
13  (indiscernible) $12 million payout; is that correct?
14  A    In a sale transaction?  I --
15  Q    Yes, for a transaction payout --
16  A    I believe that's correct.
17  Q    Okay, thank you.  Is that transaction payout still in
18  effect if the Binance deal does not go through and we move
19  to a toggle?
20  A    There is a, I believe, a different feature, to the
21  extent that that would occur, be a restructuring
22  transaction.
23  Q    And forgive me for having you repeat.  You said it was
24  public information, could you just share with me what that
25  alternative transaction structure is?
```

A-1203

Page 141

```
1   you know, other parties, is traditional and market based for
2   situations like this.  And typically, you know, in this
3   instance, the, for example, oftentimes fees are negotiated
4   relating to things like DIP facilities or an ability to
5   raise equity capital.  Obviously, in this instance, none of
6   those transactions would contemplate that.
7   Q    Safe to say it's 15 million cumulative?
8   A    That feels high based on the number of months and
9   crediting features, but I -- again, I don't have our
10  engagement letter in front of me so I apologize.  Like,
11  speaking to the exact numbers, I just can't.  I can't speak
12  to that.
13  Q    So the reason why I'm asking is you presented that the
14  Binance deal is the best one for the creditor class because
15  of the guaranteed $20 million payout and (audio drops)
16  another $80 million (audio drops) value.  But (audio drops)
17  $20 million if $60 million of that is going from the
18  wallets, including my calculations that's a 75 percent cost.
19       You know, on ROI I'm receiving 20 million.  I've
20  (indiscernible) frequently.  I never recall paying 75
21  compensation for any deal we engaged in and I'm curious.  Can
22  you tell me what, you know, percentage-wise, how frequently
23  your clients ever accepting a 75 percent cost to any deal
24  they negotiate with you?
25       THE COURT:  I will -- I see an objection coming
```

Page 142

1 and I'll overrule it. You completely misstated his

2 testimony, Mr. Hendershott.

3      MR. HENDERSHOTT: I'm sorry, I misstated it?

4      THE COURT: Yes, you did.

5      MR. HENDERSHOTT: Okay, can -- help me if you

6 would, $20 million payout from Binance is --

7      THE COURT: You've misstated it to suggest that

8 the $20 million goes entirely to his fee as though that fee

9 wouldn't otherwise be there anyway, which is wrong. Okay?

10 You've suggested that --

11      MR. HENDERSHOTT: No --

12      THE COURT: -- there's only a $5 million

13 incremental value which is flatly contrary to what he's

14 testified. His fee is there, whether there's that $20

15 million or not. It's a $1 million difference, is what he

16 testified to. So if you go to the toggle, his fee is $1

17 million less. So if you go to the Binance deal, essentially

18 what he's testified to is since his fee would be slightly

19 higher, there'd be a $99 million advantage instead of $100

20 million. That's what he's testified to.

21      MR. HENDERSHOTT: Okay. Thank you for the

22 clarification, sir. Thank you, Mr. Tichenor. I cede the

23 podium.

24      THE COURT: Okay, before we have any other

25 questions, we'll take our luncheon break and we'll resume at

Page 143

1 2:45.

2      (Recess)

3      THE COURT: Before we continue with the witness

4 examination, I have a question for the Debtors' attorneys

5 and for Binance's attorneys. We've had an awful lot of

6 questions about due diligence matters and about Binance's

7 practices in certain regards and it sounds like from what

8 the witness is saying, Binance has been willing to give

9 sworn statements to the Debtors on some of these points, but

10 I don't have them. I don't have any declaration. I have no

11 Binance witness. I don't even have copies of what Binance

12 has given to the Debtors.

13      What would be so hard about filing a declaration

14 on behalf of Binance that simply says that that with respect

15 to customers, Binance maintains assets on a one-to-one ratio

16 with respect to customer deposits and intends to continue to

17 do so; that it keeps customer cryptocurrency in separate

18 wallets segregated from other cryptocurrencies, that it does

19 not lend or rehypothecate customers' cryptocurrencies; that

20 no one outside Binance.US has access to the keys for the

21 customer wallets; and that Binance.US intends or its current

22 practice and its intended future practice is to transfer or

23 use customer cryptocurrency only as directed by the

24 customers themselves?

25      I mean, I've had repeated testimony that that's

Page 144

1 how it's done, that Binance has said that's how it's done.

2 That's what everybody here seems to want to have some

3 verification of. What's so hard about putting that in a

4 declaration and filing it?

5      MR. SLADE: So Your Honor, Mike Slade for the

6 Debtors. Obviously, that's up to Binance. It would be

7 great if they did that. In our discussions, I mean -- and I

8 think some of the cross examination has borne that out that

9 I think if their witness was -- were to swear to this, were

10 to be subject to cross examination, which would be as broad

11 in scope as some of the cross examination that has occurred

12 during the past couple of days --

13      THE COURT: Well, you know, I've allowed an awful

14 lot of questions and I think that the kind of questions and

15 torment that the witnesses have gone through would probably

16 scare anybody off on willing to say anything, but I'm not

17 asking for that. I'm just asking for a sworn declaration

18 for what presently is just hearsay, something I can rely on

19 that is by way of verifying what they have already told the

20 Debtors.

21      MR. SLADE: We understand the request.

22      MR. GOLDBERG: Your Honor, Adam Goldberg of Latham

23 and Watkins on behalf of Binance.US. So may I just ask Your

24 Honor a question? Because I understand that -- I'm just

25 confused as to whether it's just a statement to the Court

Page 145

1 for the Court's benefit or whether the -- whoever the

2 declarant, would be exposed to cross examination?

3      THE COURT: I'm not anticipating cross

4 examination, I'm just, for my own comfort, asking for a

5 sworn statement to verify what has already been told to the

6 Debtors.

7      MR. GOLDBERG: Thank you for that clarification,

8 Your Honor. Please allow me to consult with my client.

9      THE COURT: Okay.

10      MR. GOLDBERG: Thank you.

11      THE COURT: All right. It would give -- it would

12 help me a lot because I'm -- it's odd. It strikes me as

13 extremely odd to have so many questions raised about

14 relatively straightforward business practices and to have

15 nothing but hearsay and no Binance witness or a kind of

16 verification at all, seems odd to me.

17      MR. SLADE: Completely at their request, Your

18 Honor. We made it prior to hearing and I think the

19 reluctance is for the reason that I stated, that you never

20 know how broad the cross examination would get.

21      THE COURT: Right. Okay. All right, back to Mr.

22 Tichenor. Is there anybody else on the phone now who wishes

23 to cross examine?

24      MR. RIZK: I do, Your Honor.

25      THE COURT: Who is this?

A-1204

Page 146

1    MR. RIZK:  My name is Andrew Rizk.  I'm a
2  creditor.
3    THE COURT:  Okay, please proceed.
4    MR. RIZK:  Okay, I just got two -- I just have two
5  really quick questions.
6    CROSS EXAMINATION OF BRIAN TICHENOR
7  BY MR. RIZK:
8  Q    One, you know, if you were in kind of our shoes as a
9  creditor and had the knowledge that you have of this
10  potential sale transaction, what would be your personal
11  concerns or fears, if any, of this going through?
12  A    I think, you know, things that we believe and
13  understand the creditors care about are items -- you know,
14  threefold, I would say.  One, you know, we understood from
15  the onset of the case that speed and the ability to return
16  funds to people as quickly as possible was paramount.  It
17  was a focus that we had.  It was very much -- I think we
18  were aligned with the UCC around that.  We sought to do
19  everything possible from the very, very beginning of this
20  case to try and do that.
21    Unfortunately, obviously, there were things that
22  happened with FTX that set that back, but we do understand
23  speed is an important dynamic.  I think, you know, our
24  understanding is that the ability to get in-kind recoveries
25  is very important.  There are people that have very low tax

Page 147

1  bases, for example, in these assets and we do understand the
2  nature of a lot of the underlying.  They bought the crypto
3  with the understanding that that was what they were going to
4  get back.
5    I personally would think if I -- I'm a customer of E-
6  trade, right, and if I had a share of GE and there was a
7  problem with E-trade, I wouldn't want something different
8  than that back.  That's, you know, what I thought was mine
9  at that point in time.  And so, you know, we are trying to
10  do that in the contours of the Bankruptcy Code and I think
11  the other thing in it was recovery value.  We've -- you
12  know, I personally listen to a lot of Twitter spaces
13  including the UCC's ones.
14    I listen to a lot of the other ones.  You know, we
15  follow social media channels like -- you know, we do
16  understand and hear from creditors that people have faced
17  pain associated with this situation.   This has not been
18  easy for people.  And we do care about trying to maximize
19  value and that's something that we've been focused on.  And
20  that's part of the reason why we're presenting these two
21  options.
22    We believe one of them potentially provides for a
23  higher recovery value, but we understand that there may be
24  potential risks associated with that relative to a self-
25  liquidation.  But what we did not do during this was run a

Page 148

1  long process and try and restart everything upon the failure
2  of FTX.  We engaged immediately in discussions with people
3  that we knew were aware.  We had additional inbounds.  We
4  ran that down as fast as possible and we -- I would say too,
5  I don't believe that the timeline that we're working off of
6  is any different than what would have happened if we had
7  also chosen to potentially pivot to a self-liquidating
8  toggle post that collapse.
9    There was a lot of work that was even done post that,
10  around what self-liquidations could even look like with all
11  these factors in mind.  So, look, to me, those were things
12  that I think, you know, I would be thinking about and I
13  appreciate, too, the counterparty elements are going to be
14  important, which is why we have also tried to engage in
15  diligence on the nature of the counterparty asking
16  questions, asking important questions around safety and
17  soundness.  Those are all things that I would imagine
18  creditors care about in this situation.
19  Q    Right.  So you mentioned the potential, you know, with
20  this, with the sale, the potential sale, there's potential
21  risks.  You know, just from a layman, not really
22  understanding all the lingo in the disclosure statement,
23  what are some of those risks with the sale transaction?
24  A    Look, I think --
25  Q    In your opinion.

Page 149

1  A    -- that's the basis for a lot of the discussions that
2  we're hearing today.  I think that the primary risk would be
3  around comfort levels with moving forward with the
4  counterparty and having sufficient diligence being completed
5  that on a risk-adjusted basis, the value associated moving
6  forward with the sale relative to pursuing the self-
7  liquidating toggle is ultimately worth it.
8    And that's something that, you know, that decision
9  isn't going to be made today, but will be several weeks from
10  now and is not something that I think we would take lightly.
11  I think there will be a lot of consultation with the UCC,
12  other advisors that are involved in this process, and
13  obviously, ultimately, the board of directors of Voyager
14  Digital LLC.
15  Q    That's understood.  Thank you for that response.  The
16  last question I have, I wasn't understanding yesterday when
17  I was listening in, so the 73 percent recovery that was
18  mentioned on the call would be the potential recovery if the
19  sale goes through, but Alameda is not successful in clawing
20  back whatever they're trying to claw back.  But if they are
21  if they are successful, I heard 24, 26, 48 percent.  What is
22  it?  What's that going to be if they're successful in
23  clawing back the 400 million or 75 million or combined or
24  whatever it is they're trying to claw?
25  A    Yeah, and I apologize, because I don't remember the

A-1205

Page 150

1   exact number that was quoted at the hearing yesterday and I
2   apologize for that.  My recollection is that it's in the
3   mid-40s.  I want -- believe it was 44 percent, I'm not
4   mistaken.
5   Q    So if they're successful with that -- I saw online
6   initially it was 26 percent, but --
7   A    Yeah.
8   Q    -- I think you guys liquidated or gave some money back
9   during your selloffs, recent selloffs.  So that 24 percent
10   is now -- so if this sale goes through as a creditor, worst
11   case I'm getting 48 percent of my money, best case I'm
12   getting 73 percent?
13   A    Well, so there are a number of factors, right?  And so
14   I think one of the big differences is that in the initial
15   disclosure statement as people were looking at the
16   recoveries and the basis for that mid-twenties number which,
17   you know, we did see and I followed that closely on Twitter,
18   for example, because I know it's been quoted a lot.  The
19   basis for that is based on the 1.002 billion of estimated
20   crypto value owned by Voyager based on -- I believe it's a
21   30-day market average on December 18th.
22       And so from a market value perspective what has
23   happened is that the price of cryptocurrency fortunately has
24   increased quite a bit over the period.  And so when we look
25   at the recoveries today, those are based on current market

Page 151

1   prices as well.  That mid-40 is now adjusted real time as
2   well leading up to ultimately a distribution.  We don't
3   really know what that number is ultimately going to be
4   because the prices used for determining those values will be
5   based on future market prices that we don't have yet.  So it
6   could move up, it could move down.  It depends on what
7   happens with crypto.
8   Q    Okay.  But as of yesterday, whatever it was when we
9   were talking, it was worst-case 44, best case 73?
10   A    Those numbers sound correct.  But again, I don't have
11   the exact numbers in front of me.
12   Q    Yeah, that's fine.  I'm just trying to understand.  I
13   saw the formula and I get how it's calculated.  And then I
14   think that's pretty much the questions that I had.  Thank
15   you for your time.  Thank you, Your Honor, for letting me
16   speak.
17       THE COURT:  Just to make sure -- thanks.  Just to
18   make sure everybody who is listening understands Mr.
19   Tichenor, we're not saying that the initial distributions,
20   the first distributions would be 73 percent.  There have to
21   be reserves while these issues are discussed so that the
22   first distributions would be more in line with what the
23   minimums are that we've been talking about, right?
24       THE WITNESS:  That's absolutely correct, Your
25   Honor.  And so the way that it would work under the plan is

Page 152

1   based on the proposed settlement with FTX around these
2   matters would be that of the crypto broadly speaking that
3   the estate has, it would need to sell effectively an
4   additional 445 million in volume to cash holdbacks to
5   potentially deal with FTX-related clawback issues.  To the
6   extent the estate succeeds on that basis, those funds then
7   would be subsequently distributed on a cash basis and we
8   could discuss if there was a new accounting ability to do
9   that.  But I think the operating plan would be that it would
10   be a cash -- future cash distribution to creditors of that
11   value.  So you should think of it as that mid-40s under any
12   scenario is likely what's going to be distributed up front.
13   Again, dependent on market movement.  And then there would
14   be a subsequent cash distribution to the extent the estate
15   wins around those ultimate points.
16       THE COURT:  Thank you.  All right.  Is there
17   anyone else on the phone who would like to ask questions of
18   Mr. Tichenor?
19       MS. DIRESTA:  Yes, Your Honor.  My name is Gina
20   DiResta.  I am a pro se creditor.  I would like to speak.
21       THE COURT:  Yes.  Do you have questions or are
22   you...
23       MS. DIRESTA:  Yes, yes.  I'm sorry, I'm just
24   pulling up my notes.
25   BY MS. DIRESTA:

Page 153

1   Q    So yesterday when the BRG gentleman was the witness, I
2   had asked him some questions and he said something different
3   from this witness today.  I am a creditor who does not want
4   to open a Binance account and I just want to get cashed out.
5   And I also don't want my KYC or any other kind of
6   information to go to Binance.  But unfortunately, yesterday
7   it was said that I don't have a choice in that, that all of
8   my information is going to go to Binance anyway.
9       But then I had asked if I'm getting cashed out, does
10   that mean that I am just -- that -- will my assets get
11   transferred to Binance and then Binance cashes it out and
12   then gives it back to Voyager and then Voyager cuts me a
13   check?
14       And the BRG gentleman said that my assets would stay at
15   Voyager and then Voyager would cash me out and then I would
16   get a check that way.  But then today when you were being
17   asked a question, you said the opposite.  You said that my
18   assets would get transferred to Binance nonetheless and then
19   they would cash out my assets and I'm assuming then give it
20   back to Voyager and then they cut me a check, which just
21   seems so time-consuming and ridiculous.  I just don't
22   understand why I can't just keep my private information, all
23   of my KYC, my banking information, my driver's license
24   picture, all that stuff.  I don't see why that has to be
25   transferred to Binance.  I don't see why my assets have to

1  be transferred to Binance if I just want to get cashed out
2  and I want absolutely nothing to do with Binance.
3  A   I appreciate the concern.  The terms that we negotiated
4  in the APA with Binance were ultimately that they deeply
5  cared about the ability to potentially market to customers
6  is the primary consideration from their perspective.  There
7  were a number of items within the APA that were hard fought.
8  There is no situation ever from an M&A negotiation
9  perspective where you get everything that you want.  So
10  there were tradeoffs that were made.  And so under the
11  proposal and terms of service that Voyager has, it has an
12  ability to sell customer information.  That was critically
13  important we understood from a value perspective for
14  Binance.  Do I wish we could potentially have something
15  different?  Of course.  But this was the deal that we
16  ultimately negotiated and agreed on with them that provides
17  for both of those elements.  The estate has the ability to
18  sell the information under the terms of service.  It was
19  something that they were seeking, and that was the deal that
20  ultimately -- you know, we felt like this was a value-
21  maximizing potential alternative that would provide for
22  enhanced recoveries.  And those were some of the tradeoffs
23  that we had to make.
24  Q   So then for me, what is the process since, like I said,
25  everything is going to Binance whether I want it to or not.

1  Do I just sit around for three months and then after the
2  three-month period Binance cashes me out?  And then who
3  sends me the check?  Or do I have to do anything to express
4  that I want to be cashed out?
5  A   On your last point first, maybe I'll address that.  I
6  don't know the answer to whether or not you have to do
7  anything to be cashed out or not.  I would have to review
8  how that's contemplated under the plan.  I imagine that
9  there's a mechanism that wouldn't require you to necessarily
10  do anything.  But I do want to be honest, I don't know the
11  answer to that.  So I would recommend reviewing the plan.  I
12  think there's a customer migration protocol that's been
13  published.  So I would look at the Stretto website for
14  additional information on that.
15      With regards to the mechanics of how the crypto
16  transfers would work in the instance that a customer chooses
17  not to migrate.  So -- and maybe I'll start with how the
18  migration works for customers that do sign up.
19      So if a customer does sign up, they would go through
20  KYC procedures on Binance.US  Upon that customer being
21  validated as a Voyager customer, Voyager at closing or at a
22  period thereafter, at least one week, Binance.US would
23  transfer that user's crypto associated with that account to
24  Binance, who would then distribute that to the customer's
25  account directly.  So at that point, you know, inherently

1  you would have been a Binance.US customer prior to any of
2  the funds being transferred to Binance.US associated with
3  your account.
4      To the extent you choose not to and you don't want to
5  migrate, you don't open an account, the crypto associated
6  with that does not leave Voyager for that three-month
7  period.  Voyager will continue to hold that crypto on fire
8  blocks in its other third-party services or exchanges to the
9  extent that's the case.  It will not migrate to Binance.
10  And at the end of the three-month period for those parties
11  that are in supported jurisdictions under the existing APA
12  or proposed plan, the way that that would work is that user
13  base's crypto would then transfer to Binance and would be --
14  Binance would ultimately sell that crypto on behalf of the
15  Debtor effectively and then transfer back the cash proceeds
16  associated with it.
17      And then Voyager would ultimately cut checks.  I can't
18  speak to the party that would be acting in that regard.  I
19  just don't know.
20  Q   Okay.  Got it.  So my next question.  So on March 1st
21  the U.S. Senate Office, they issued a letter addressed to
22  both Binance and Binance.US.  And I'm just going to read one
23  sentence from that letter.  And it says, "Binance now faces
24  investigations into criminal sanctions evasion, money
25  laundering conspiracy, unlicensed money transmission,

1  questions about its financial health and increased scrutiny
2  over its intentionally-opaque corporate structure.  So
3  within that letter -- so that's -- you know, that's pretty
4  heavy allegations.  And in that letter, they asked for a
5  bunch of production of documents with a deadline of March
6  16th, which is just about two weeks away.  So let's say
7  March 16th comes and Binance does not provide those
8  documents.  How does that affect the Voyager deal?
9  A   So the letter was news to use yesterday, too.  So after
10  I left the courtroom yesterday, we found out about it last
11  night.  Obviously in light of that, there were a number of
12  discussions in the evening as well as this morning.
13      To be clear, we are still digesting that as well.  It's
14  new information from our perspective.  Look, I think it
15  relates to statements that we had made this morning around -
16  - you know at this point in time, are we ready to move
17  forward with Binance?  No.  There is still incremental due
18  diligence that would need to be done in order for us
19  ultimately to feel comfortable moving forward on that basis.
20      The plan now, which has the support of 97 percent of
21  the creditors, provides for this backup option, which we
22  think is greatly important.  And so ultimately that
23  determination around whether or not we'll move forward with
24  them is likely to be several weeks down the road.  I in my
25  personal view don't see a scenario where we likely would be

A-1207

Page 158

1 able to close ahead of the 16th.  And so would that
2 potentially be a factor and it goes into our decision?  Of
3 course it would.  But there is additional work that we need
4 to do.  We plan on having conversations with them.  We had a
5 conversation with them this morning about it.  But there is
6 more work to do there.  And at this point in time, I'm not
7 in a position to say exactly how that is going to play out
8 at a future point.  But I can tell you we're going to do
9 work.  I know the other parties that are advisors in this
10 case are going to continue to do work as well.  We'll work
11 in consultation with the UCC and ultimately it will be a
12 recommendation and a determination by the Board at that
13 point in time, which is likely to be after the 16th.
14 Q   Okay.  And then assuming that -- I heard said earlier
15 that if an order isn't entered into by Monday, which is
16 March 6th, that Binance can pull out of the deal and it
17 triggers the reimbursements.  I don't understand what that
18 is.  Can you explain that to me?
19 A   I'm not as familiar with the specifics of that.  I
20 would have to ask counsel on the exact timing.
21    THE COURT:  Can one of the Debtor's counsel just
22 explain that provision to deal with that question?
23    MS. OKIKE:  Yes.  So there is what's known as a
24 milestone in the APA and it requires us to have the order
25 confirming the plan entered and approved by the Court by

Page 160

1 saying, that that's one of the benefits of the Binance deal,
2 that with the toggle option, there are 25 unsupported
3 tokens.  And if Voyager went through the time and effort to
4 make them supported, it would take six to nine months and,
5 you know, cost millions of dollars.  And if it was
6 liquidated instead of becoming supported, if it was
7 liquidated, then it's like we're moving about $60 million,
8 about $100 million loss that you were talking about earlier
9 with the toggle option.
10    But instead of cashing it out, if Binance is offering
11 to help with the toggle option and they have the ability to
12 deal with the unsupported coins, couldn't they then just
13 help out with that portion?
14 A   So that's not something that we have specifically
15 discussed with them.  So I would have to ask around their
16 willingness or desire to do something like that.
17 Additionally, candidly, I think we'd have to do some
18 additional work on our side to understand what the financial
19 implications and operational logistics of that kind of
20 construct would ultimately look like.  The plan construct
21 that we put forward was relating to either we feel
22 comfortable with Binance as a counterparty and we would
23 potentially pursue a deal with them in the context of that
24 being a value-maximizing solution and we don't.  To the
25 extent that we don't, to me it would on the surface feel

Page 159

1 March 6th.  To clarify one of my prior statements, taking a
2 look at it over the break, it's unclear whether that
3 actually -- the failure of the entry of an order by that
4 date would trigger the expense reimbursement.  There is a
5 requirement under the APA to have that order entered by
6 Monday.
7    MS. DIRESTA:  And can you explain to me what it
8 means by expense reimbursements?
9    MS. OKIKE:  Yes.  So there is a provision in the
10 APA which was approved when we got authority to enter into
11 the APA which provides for reimbursement of Binance's
12 expenses up to $5 million in certain circumstances where the
13 APA is terminated.
14    MS. DIRESTA:  Okay.  Thank you.
15 BY MS. DIRESTA:
16 Q   So now back to Mr. Tichenor.  Earlier I think I heard
17 you correctly, so correct me if I'm wrong.  But it seemed
18 like you said when the topic was about the toggle plan, it
19 seemed like you said Binance offered their services to help
20 with the Toggle plan.  Is that correct?
21 A   They have agreed to offer services to assist in the
22 toggle plan.  That's correct.
23 Q   Okay.  So if that's the case, then instead of -- if we
24 do the Binance deal, then all of the coins and tokens are --
25 can be transferred, right?  That's what everyone keeps

Page 161

1 potentially a little unfair to those customers to say, well,
2 for those 35 unsupported coins, we're uncomfortable moving
3 forward with that counterparty to do the X, Y, and Z factors
4 for everybody else.  But for you, you have to.  You know,
5 that to me also feels like an unfair tradeoff or unfair
6 treatment potentially of those customers relative to
7 everybody.  To me, it's more of probably a binary decision.
8 Either there's enhanced recoveries or there are not enhanced
9 recoveries.
10 Q   Okay.  I understand your point.  But is it something
11 that you guys would look into?  And not even just Binance.
12 Because, you know, there might be other exchanges out there
13 who would support those 35 unsupported coins.  Would you at
14 least look into that option as well?
15 A   I can take this back and have a discussion internally
16 around that.  I would have to --
17 Q   Okay.  Okay, great.  Thank you.  Okay.  Give me a
18 second as I go through my notes here.
19    During your due diligence with Binance, did you guys --
20 did Binance provide documentation showing both assets and
21 liabilities?
22 A   So we reviewed the -- excuse me?
23 Q   I didn't say anything.
24 A   Okay.  Apologies.  I thought I heard something.  So
25 during our due diligence with Binance, we reviewed the

Page 162

1  audited and unaudited financial statements which would
2  include both their assets and their liabilities from a BAM
3  Trading Services perspective.  One thing to note is because
4  of the way that they treat their customer crypto, for
5  example, for audited financial statements, the way that it
6  works is that to the extent that you view something as a
7  custody relationship let's say, to the extent that you don't
8  view yourself as having ownership rights over underlying
9  crypto as an example, right?  The audit standards would say
10 that that is not property of that business and so therefore
11 those assets don't get consolidated in.  That said, they are
12 disclosed via footnotes.  And so to the extent the question
13 relates really to one element from a reserve perspective on
14 crypto, that's not something that would be disclosed as a
15 separate set of information, audited financial statements.
16 And I'm not aware of the standards requiring that.  But we
17 did review the assets and liabilities of the business as
18 (indiscernible).
19 Q   Okay.  My next question is earlier in this hearing, the
20 SEC was asking a bunch of questions.  And the first line of
21 questions was about the due diligence that you guys did with
22 the crypto security protocols and all the different meetings
23 that you guys had, the wallets and the transfers and all
24 that stuff.  And when he was asking who all was part of the
25 meeting, you said that people at Moelis and some of the

Page 163

1  attorneys and other advisors were there.  And when he asked
2  who from Voyager attended, the only name you provided was
3  the CEO's name, Steve Ehrlich.  Can you remember any other
4  employees from Voyager attending those cryptosecurity
5  protocol meetings?
6  A   Well, I want to be clear.  I want to make sure from
7  Steve's perspective with regards to attending the meetings.
8  I would have to go back -- I don't know if he attended the
9  meetings directly.  It's not uncommon, right?  And from a
10 confidentiality perspective it would not be uncommon for
11 something where a counterparty relating to something with
12 this level of potential concern would want to limit it to a
13 professionalized-only basis.  And so oftentimes what that
14 means is that it's limited just to parties that operate in -
15 - and if you're familiar with -- like this is part of our
16 core business, is maintaining confidentiality.
17     And so what I want to be clear on is we had discussions
18 with the management team around information that we learned
19 around those discussions.  We've had discussions with a
20 number of parties.  You know, as I said, the company -- we
21 discussed at the board level, we discussed it with other
22 professionals.  We compared it to how we understand other
23 organizations to work.  So it's not like this is just
24 something we're -- you know, we left it at that level.  We
25 went out and compared that to how we understand other crypto

Page 164

1  businesses and plans to operate and be able to compare that
2  and say, look, is this standard?  Do they feel like they
3  have more (indiscernible) or less (indiscernible), right?
4  There's dynamics there too that we wanted to make sure we
5  were also independently checking and verifying beyond
6  discussion with management and the consortium of
7  professionals involved in this situation.
8  Q   Okay.  Because during the SEC's lines of questioning,
9  it seemed like they were trying to determine if you guys
10 basically had any crypto experts that was able to verify
11 all of the information that Binance was giving you.
12 Because, you know, he was asking questions like, you know,
13 what is this certificate versus that certificate and how do
14 you know that, you know, it's good and that kind of stuff.
15 And he was kind of asking kind of the same stuff I'm
16 wondering too.  If you guys had crypto experts, and you said
17 you guys didn't hire any crypto experts.  So I'm just
18 wondering, like, who really reviewed all of the
19 cryptosecurity protocols if you guys didn't hire any
20 experts.  And let's say the chief technology officer of
21 Voyager was not a part of the meeting, was able to like that.
22 A   So it's a good question.  What I would say is we -- and
23 to be clear too, we did this work as an investment bank and
24 this is generally well outside the scope of things that are
25 covered from a diligence perspective that we do.  But, you

Page 165

1  know, we sought to try to confirm these elements because it
2  was important to us from a counterparty due diligence
3  perspective to be able to say that we were doing the work.
4  We've continued to have conversations with them around these
5  elements.  There are generally a lot of concerns that people
6  have around sharing of this type of information too from a
7  security perspective.  And I say this because even to the
8  extent that we did hire let's say a third party firm, it's
9  not clear to me that they -- that the counterparty would
10 have necessarily allowed for a third party to have done an
11 independent code review and on-site forensic diligence
12 session and, you know, potentially a multi-month process in
13 order to be able to verify all of those elements.  That's
14 highly, highly atypical in these types of situations from a
15 transaction perspective.  But in addition to that, it does -
16 - and we do understand this to be the case -- does create
17 potential security concerns for them.  They do operate a
18 business on a day-to-day basis, and the more people that you
19 let under the tent around what those security protocols look
20 like, the more risk that that potentially presents to them
21 as an organization.  So what we did do and sought to do is
22 also seek sworn assurances around these statements from
23 executives at the company where we at least would be able to
24 rely on that as an enhanced level relative to even just
25 statements that they're making on calls or Zoom, or even

1  based on documents that they may have received.  It's just a
2  heightened standard.  And so that was something that was
3  also very, very important from our perspective to be able to
4  get.
5       THE COURT:  Just to interrupt you for a second.
6  The ISO and SOC 2 documents that you had described, those
7  are not Binance people telling you things.  Those are
8  outside people reviewing what Binance does and telling you
9  that it complies with certain standards, right?
10      THE WITNESS:  That is correct, yes.  For the SOC 2
11 and the ISO statements, that's correct.
12      THE COURT:  And Binance paid those people to do
13 those reviews, but those reviews were provided to you.
14      THE WITNESS:  And they were provided to us by
15 Binance.  So...
16      THE COURT:  Yeah.
17      THE WITNESS:  Yeah.
18      THE COURT:  But the reviews themselves are by
19 other people certifying that they've looked at it and it
20 complies with whatever the standards are that
21 (indiscernible) described.
22      THE WITNESS:  With standards and -- like, I think
23 beyond those, I haven't received the report, but we've been
24 told that they also comply with PCI, DSS standards, which
25 relate to requirements under credit card transfers and

1  what's needed.  So I mentioned those two because those are
2  the two reports that we received.  But I am --
3       THE COURT:  Okay.
4       THE WITNESS:  I've at least been told that there
5  are additional standards above and beyond that.
6       THE COURT:  Very Good.  Sorry to interrupt your
7  questions.  I just -- sometimes I have to interrupt or I'll
8  never remember all my own questions at the end.  Please
9  proceed.
10 BY MS. DIRESTA:
11      Q    Did you have anything else to add, Mr. Tichenor?
12      A    I don't believe so on those points.  Hopefully I
13 answered your questions.
14      Q    Okay.  Okay.  And then earlier someone was asking how
15 much you guys were going to get.  So I believe you confirmed
16 that if you guys make a sale, you would get $12 million.
17 But if it's the toggle option, you guys get the $11 million.
18 Is that correct?
19      A    That is correct.
20      Q    What do you guys get if it's a Chapter 7 liquidation?
21      A    I would need to go through.  I believe it's still
22 covered under -- I don't know the answer.  I would have to
23 go back through our engagement letter.
24      Q    Okay.  Yesterday the BRG witness confirmed for me that
25 for every $20 million in recovery, it pretty much only

1  equates to one percent of recovery for the creditors.  So
2  with the toggle option, you said we would leave about $100
3  million.  So that equals about five percent recovery lost.
4  Is that correct considering what the BRG value confirmed
5  with the math?
6       A    That's correct.
7       Q    So yesterday the percentage that was given was as of
8  February 27th, the recovery would be 73 percent if the
9  Alameda loan -- I'm sorry, Alameda clawback does not go
10 through.  If the Alameda clawback does go through, then that
11 73 percent gets reduced to 38 percent.  So assuming the
12 clawback does not go through with the 73 percent, we would
13 lose five percent with the toggle option, making it about 68
14 percent as of the date of yesterday if we did the toggle
15 option approximately, right?
16      A    So based on those numbers, my recollection is it's a
17 five to six percent differential between the two.  So
18 between the plan option with Binance relative to a self-
19 liquidation of recoveries.
20      Q    Okay.  Give me one second.
21      A    And to your point yesterday, it's beginning to think of
22 the recoveries associated with Alameda as either succeeding
23 or not succeeding.  So it's a parallel shift depending on
24 ultimately what happens.
25      Q    Okay.  So jumping to my last question.  I don't really

1  want to spend a lot of time on, you know, asking you too
2  many questions about the past.  But I know that I and
3  several creditors are curious, did you guys entertain bids -
4  - because it seemed like you guys attempted to entertain
5  bids that were heavy cash up front bids versus long-term
6  plans even if they weren't heavy cash upfront.  But in say a
7  year or two, in the long term, the creditors would be able
8  to recover like a hundred percent of their assets because
9  the company let's say providing the long-term plan, you
10 know, maybe they're getting, like, 60 percent of our assets
11 now, but then they provide incentives to stay on the
12 platform because they're actually saving the Voyager app
13 versus killing it, they're actually saving VGX versus it
14 dying off.  It's saving all of these things.  And then they
15 have all these upsides so that in say a year or two, we
16 would have made whole.  Did you guys, one, have those kinds
17 of bids, and two, did you seriously entertain them?
18      A    We had a range of different types of proposals.  We did
19 receive certain proposals including, for example, equity
20 components to them.  But I want to be clear, with proposals
21 that also included equity components, it wasn't like in that
22 instance the parties were getting a hundred percent of the
23 equity in that business.  Right?  And I think that's
24 something that sometimes may be missed.
25      And so the short answer is yes, we did entertain

1  proposals like that.  We evaluated them.  We evaluated a
2  number of different types and forms of proposals.  We had
3  some with earnouts, we had some with up-front cash
4  considerations.  We had some with trading credits.  You
5  know, every form and flavor.
6      And so one of the things that we did -- and again, in
7  agreement and in consultation also with the UCC and their
8  advisors around this is you, know, sought to evaluate and
9  compare those.  And one of the things that doesn't always
10 necessarily come up is as we were evaluating those, we were
11 also factoring in dynamics of counterparty risk and
12 feasibility as well.  You know, if you're establishing a new
13 newco, for example and we were to transfer all the assets
14 over there, we wouldn't want to be in a situation where that
15 business wasn't appropriately capitalized, right?  And so
16 one of the things relating to that is that, well, people may
17 think I would have an ability to, for example, participate
18 in potential upside of the platform, you know, we also
19 evaluated what does that platform look like, what are the
20 business lines associated with that, do you think that that
21 would be compliant from a regulatory perspective in light of
22 what's going on with the underlying industry.  What is their
23 business plan associated with it?  We didn't want to do a
24 transaction with a party we didn't think necessarily had
25 fully fleshed out and thought through all of the really

1  Q  Okay.  And earlier when you were answering a question
2  regarding backup bids, was I correct in hearing that you
3  said that there weren't any other companies -- so we
4  determined that Binance was the second-highest bid, but they
5  did not want to be considered a backup bidder.  But say the
6  third-highest bidder and so on, were they asked to be a
7  backup bidder and they also refused?
8  A  That's correct.
9  Q  I was trying to understand how you were answering that
10 question.
11 A  You are correct.  And there were extensive negotiations
12 around these exact points at the auction.  This is one why
13 we had an 11-day auction in part because of these exact
14 types of dynamics.  But that's correct.  There was no party
15 that was willing to be a backup bidder.
16 Q  Okay.  So you did ask, and they all refused is what
17 you're saying.
18 A  Yes, correct.  And I want to be clear on the Binance
19 one, there was a contingency that would not have qualified
20 them to be a backup bidder.  So you had a backup bidder
21 proposal, but it would require the estate paying an expense
22 associated with that that was not approved under bid order
23 and is highly, highly atypical.  And so it was not accepted
24 as a backup bid at that point.
25 Q  Yeah.  And I guess --

1  critical dynamics of overhead, staffing, employees.  There's
2  a lot of factors, right?  Do they have an exchange that they
3  operate, do they not?
4      And so we took all of that, we evaluated it.  We sought
5  to place value on equity components, for example, in
6  valuating bids.  You know, the firm, we have a structure
7  around what that looks like.  But these are things that we
8  thought through.  They were key considerations.  There were
9  very long debates and discussions around it.  And ultimately
10 the plan that we put forward was one that was focused on
11 what we thought was a value-maximizing proposal that
12 provided the best outcome for people that also didn't take
13 money out of their pockets either, right?  And that's what I
14 was getting at with the capitalization element, is to the
15 extent that let's say we have a billion of crypto, we needed
16 to hold back, I don't know, $150 million in order to
17 capitalize that entity, that's money that you don't receive
18 today.  Right?  And you would get in the equity and
19 hopefully that succeeds.  But there's always a risk that it
20 doesn't.  And so these were all things that we thought long
21 and hard and had very extensive debates with our board
22 about, we had very extensive debates with the advisors
23 about.
24     So to answer your question in a longwinded way, we were
25 not dismissive of anything that came forward.

1  A  that was the only one that was --
2  Q  Okay, now you confused me by saying that's the only one
3  that was available.
4  A  Well, to the extent that --
5  Q  I thought we just --
6  A  So to the extent that the Debtor would have tried to
7  have accepted that backup bid or plan, there would have been
8  additional proceedings relating to trying to pay an expense
9  reimbursement, for example, that was not approved.  And as I
10 said, it is highly, highly atypical to that type of a
11 feature.  So at that point in time based on the facts and
12 circumstances, we didn't seek to try and move forward on
13 that basis.
14 Q  Oh, okay.  I think I understand what you're saying.
15 What you're saying is let's just say five, we asked five of
16 the bidders do you want to be a backup bidder.  All of them
17 said no except for Binance.  Binance said yes, but only
18 contingent upon if you pay us to be a backup bidder.  And
19 you guys are like no, we don't want to do that.  And so
20 that's why they were not chosen to be a backup bidder.  Is
21 that correct, how I understand --
22 A  That is a fair characterization, yes.
23 Q  Okay.
24 A  And the number of parties is a little off, but yes,
25 that's a fair characterization.

1  Q.    Yeah.  I just threw an easy number out there.  Okay.
2  I'm just looking at my notes real quick to make sure I got
3  all my questions.  I think I do.  Okay, yes.  Thank you.  I'm
4  done.
5         THE COURT:  Thank you very much.  Is there anybody
6  else on the phone who desires to cross-examine the witness?
7         All right.  Did the Committee have questions --
8         MR. JONES:  Yes.  Seth Jones.
9         THE COURT:  I'm sorry, who is that?
10        MR. JONES:  Seth Jones.  I have a few questions.
11        THE COURT:  All right.  Go ahead, Mr. Jones.
12  BY MR. JONES:
13  Q.    So you negotiated a $12 million contract with Voyager.
14  What value did you expect to bring back to the estate in the
15  bankruptcy process?
16  A.    I'm sorry, could you repeat that?  I wasn't able to
17  hear this voice.
18  Q.    When you negotiated a $12 million contract with
19  Voyager, what value did you expect to bring back to the
20  estate in this bankruptcy process?
21  A.    We negotiated what we viewed was an arms length fee.  I
22  know that there were also discussions with the UCC around
23  that.  We looked at comparable situations.
24        You know, I think one thing to remember here too,
25  right, is that there's upfront consideration and there's

1  also value in other forms.  Right?  And so when we think of
2  the value pot, we understand that there is a view around the
3  upfront consideration from the purchase price perspective
4  being, you know, in this case $20 million.  But there's --
5  it's not really a $20 million purchase.  And I think the way
6  that we have always viewed this is that it's a billion-
7  point-sero-two-two -- it's 1.022 billion from a
8  consideration perspective because we have to figure out what
9  to do with the crypto and we have to figure out how to
10  operate the business and we have to figure out how to
11  maximize value.  And so we ran a gauntlet of different
12  scenarios and processes and ran everything down in order to
13  try and make sure that we were maximizing value.
14        Because for example, you know, you could see a
15  situation where somebody would say, well, why don't I just
16  do a block trade on the crypto portfolio and run it like a
17  Chapter 7 liquidating trustee would.  Well, you know, we had
18  discussions with market makers who actually literally
19  participated in some of the U.S. Marshal auctions relating
20  to liquidations of crypto portfolios that they received in
21  connection with seized assets, for example, like Silk Road.
22  And they gave us views on where the discounts were that they
23  participated in those deals.  And so we ran down everything
24  and tried to run down various structures, various proposals.
25        Obviously I think in light of what happened with FTX,

1  obviously things changed and there was a lot that evolved
2  over the course of this case.  Would I have, in hindsight
3  looking back in June, expected that in the interim, FTX was
4  the second-largest exchange and an individual would get in
5  front of congress and testify to the nature of the business
6  to collapse?  No.  But, you know, we sought to maximize
7  value throughout.  And again, I think the foregone value in
8  a lot of ways is also what we think is a really important
9  element to the plan.  It's been a very key consideration
10  from our perspective.
11  Q.    (indiscernible) granted permission to start rebalancing
12  the coin from January 10th.  One of the professionals I
13  believe was BRG during the first APA disclosure hearing.
14  But they estimated it would cost $30 million in slippage
15  fees and one month to rebalance the portfolio.  And they
16  said they planned on starting in early February.  Why has
17  this process not started right away to start breaking down
18  the liquid assets into smaller blocks and not disrupt the
19  markets?
20  A.    So we have sought to not disrupt the market.  We wanted
21  to make sure that we were fully coordinated with the UCC on
22  what the options were going to be for purposes of
23  rebalancing.  We engaged with carious market makers, we
24  solicited a number of different proposals.  We compared
25  those.  We have obligations even under the APA relating to

1  (indiscernible) that Binance had negotiated for in
2  connection with some of those transactions.
3         And to be clear, the fees that are being paid from a
4  commission perspective are in our minds likely to be very,
5  very low here.  And I say that in the sense that based on
6  the way that we are doing the rebalancing, based on the way
7  that the trades are occurring, you know, they are likely to
8  be in the very, very, very low single digits from a
9  commission --
10  Q.    So single digits?  This slippage is not going to be $30
11  million?
12  A.    If we have to pivot to, for example, a toggle plan,
13  they could be more based on the liquidation of the
14  alternative -- or the unsupported coins to the extent they
15  need to be done in block trades.  The strategy that the
16  Debtor is pursuing right now is one that we believe would
17  reduce the level of commissions and would optimize around
18  the outcome to try to limit any movements that the
19  transactions would ultimately have on the market itself.
20  Q.    So is that inaccurate, the $30 million?
21  A.    Excuse me?
22  Q.    Is it -- was the number -- is the $30 million
23  inaccurate?
24  A.    So I think the $30 million was initially for and may
25  have been a bit of a misrepresentation.  I think that that

Page 178

1   was meant to not be necessarily commissions.  It was meant
2   to include other elements --
3   Q    Slippage fees.
4   A    Excuse me?
5   Q    I said slippage fees.
6   A    Yeah, that's right.  And slippage is different than
7   commissions though.
8   Q    Slippage fee for illiquid coin.  (indiscernible).  No,
9   it's not including commission.  (indiscernible) my slippage
10  fees (indiscernible) illiquid assets.
11  A    Yes.  And slippage is different than commission,
12  right?  And so when I talk --
13  Q    Yeah, absolutely.
14  A    Yeah.  And so when -- you know, I believe the numbers
15  that were reported yesterday had been based on just the
16  market prices in all crypto to the extent that effectively
17  let's say the rebalancing has already occurred, right?  It
18  hasn't fully completed yet, but there's still --
19  Q    Yeah.  I'm not talking about the (indiscernible).  I'm
20  talking about how much will it cost in slippage fees.  Is it
21  $30 million?
22  A    Well, we don't know what the slippage is ultimately
23  going to be.  It's a bit of a -- the one difficulty with
24  slippage is that it's kind of a counterfactual, right, in
25  the sense that there's no way to measure the impact of just

Page 179

1   slippage in the sales of any individual token relative to
2   broader price movements in the underlying market.  And so
3   what we try to do is by doing the transactions over a
4   prolonged period of time and being very careful and managed
5   in how much individual trades are occurring in given day and
6   any given token, in any given market at any given exchange
7   is to make sure that by doing it over such a long period,
8   our view is that it is likely to inherently limit any
9   ability of individual trades to likely have an impact.  But
10  it's an unknown.  It's --
11  Q    So one month was inaccurate too.  Are you saying?
12  A    No, I'm not saying that it's an inaccurate statement.
13  I am saying that it's an estimate, and there continue to be
14  estimates around figures relating to unknowns based on where
15  the market is moving.  Just like the recovery is an
16  estimate.  We do not know ultimately what the value would be
17  of the portfolio at the time that the rebalancing finishes.
18  The percentage recoveries are still going to move.  They're
19  going to move based on --
20  Q    Absolutely.
21  A    -- (indiscernible) that we know happened last night.
22  Q    Absolutely.  All right.  You talk about $135 million in
23  the 35 unsupported coins.  Is that number before or after
24  the 445 million holdback in FTX and the $135 million
25  winddown trust that has to be liquidated into U.S. dollars,

Page 180

1   which is, what $580 million, that those 35 coins will be
2   paid out in pro rata, the difference.
3   A    I'm sorry, do you mind repeating that?
4   Q    (indiscernible).
5   A    I just couldn't hear you.  Do you mind repeating that?
6   Q    You talked about the 135 million in the 35 unsupported
7   coins.  Is that number before or after you have to liquidate
8   the $445 million FTX holdback and the $135 million winddown
9   that has to be liquidated to U.S. dollars?
10  A    Yeah, I think I understand your question.  I don't know
11  the answer to that.  I would have to check the exact
12  figures.  I understand the nature of your question.  I don't
13  know the specific answer.
14  Q    So it could be a lot less to liquidate you're saying
15  (indiscernible).
16  A    I don't -- look, I don't believe so, but I don't know
17  the answer.  I would have to check.
18  Q    You talked about maximizing value.  Why have the
19  partners been forced into a high stakes casino in this
20  volatile market instead of giving their assets back
21  immediately?  Waiting nine months.  Creditors have lost the
22  right to appreciation of a specific asset they originally
23  invested in.
24  A    So I think --
25  Q    I believe it was a lie (indiscernible) was wiling to

Page 181

1   help you out with that.
2   A    Sorry, are you talking about in July or at the FTX
3   proposal?
4   Q    Yeah, or any time.  Yeah.
5   A    Well, I think in hindsight we're pretty happy that we
6   didn't go forward with FTX in July.
7   Q    Well, absolutely.  But that's not decision-making
8   correctly, obviously.
9   A    At the time --
10  Q    You want to talk about hindsight, what about the
11  Binance deal?  Are we going to be saying the same thing in
12  the future?
13       MR. SLADE:  Your Honor, object.  We're getting
14  speeches, not questions.
15       THE COURT:  I'm sorry, Mr. Jones.  I'm not sure
16  what your question is.
17       MR. JONES:  He wants to talk about hindsight
18  saying thank god we didn't (indiscernible) the FTX deal or
19  didn't (indiscernible).  But now he wants to talk about
20  Binance is okay.  Are we going to be saying the same thing
21  in the future?
22       THE COURT:  Well, okay.  I can sense from your
23  tone and from your question that you have your own point of
24  view of that situation.  But remember, please, what we're
25  doing right now is we're taking evidence.  We're asking

1  questions of the witness about the proposals that are in

2  front of us. So let's try to focus on that. Okay? Do you

3  have another question for this witness?

4      MR. JONES: No, that's it for now. I appreciate

5  it, Judge. Thank you.

6      MS. TREVINO: I have a question.

7      THE COURT: All right. Who is this? I'm sorry?

8      MS. TREVINO: My name is Lisa Trevino. I am pro

9  se. I have a few questions, please.

10      THE COURT: Yes, please. Go ahead.

11  BY MS. TREVINO:

12  Q    Mr. Tichenor, I just have a few questions for you,

13  please. And then maybe one follow-up depending on your

14  answer.

15      What happens if the part two of the claims that we

16  received from Stretto, the email, the claims email, what

17  happens if the part two of the claims amount are found to be

18  inaccurate in any way? How would those affect recovery

19  rates?

20  A    I don't know exactly what the part two claims are.

21  Q    Okay. So just to clarify, the Judge, before this

22  hearing that started yesterday, the last hearing, he

23  discussed that specifically. I asked the Judge this and he

24  said part one is for voting and part two is --

25      THE COURT: Oh, I think I know what you mean. You

1  mean the objections to the substance of the claims. Yeah.

2  The percentage results are based on the Debtor's estimates

3  of where that will turn out. If the allowed claims are

4  higher than the Debtor estimates, then the recovery

5  percentages will go down. But that will be true

6  proportionally no matter what we do. Right? Because it

7  will just be -- the allowed claims will be the same as they

8  would be in Chapter 7 as they would be under a toggle plan,

9  as they would be under a Binance proposal.

10      MS. TREVINO: Okay. So I guess the follow-up

11  question to that, Your Honor, would be are there any other

12  situations or any other than what has been discussed over

13  the past two days that would affect the recovery rates that

14  we have not heard?

15  BY MS. TREVINO:

16  A    That's a good question. There are factors potentially

17  from timing perspectives. I mean, it's always very

18  difficult to know exactly what's going to happen in the

19  future. I think we tried to outline the key elements. And

20  I think probably the biggest one is just volatility in

21  cryptocurrency prices. Effectively the estate

22  (indiscernible) a very large pool of cryptocurrency. We are

23  seeking to distribute that obviously in kind and do the

24  rebalancing trades in connection with that. But it creates

25  volatility in recoveries and it's a large part of why, for

1  example, we are aware of the mid-20 percent numbers that

2  are being quoted relative to where we are now in light of --

3  you know, to the extent that the Alameda claims end up being

4  valid. And so I think that's probably the biggest one. But

5  in truth, I don't entirely know. But in some instances, I

6  would say probably time is going to be the biggest one. So,

7  for example, to the extent that we continue to perform due

8  diligence moving forward, end up selecting to move to a

9  toggle, and it's several weeks from now. And then if

10  operationally things weren't in place to be able to properly

11  execute it, it may result in a delay. But that to me is

12  probably the biggest one if I were to think of

13  (indiscernible) outside the crypto portfolio value. But,

14  look, it's tough to know. It's an unknown, right?

15  Q    Okay. My second question would go to Mr. Tichenor.

16  What is your opinion specifically, like we asked the other

17  witnesses yesterday, your own opinion of the 445 million

18  clawback (indiscernible), do you feel that this is a right

19  and just situation?

20      MR. SLADE: Your Honor, I would object.

21      THE COURT: Yeah. First of all, that's a legal

22  question. Second, I'm not sure that it's in anybody's

23  interest to ask the Debtors officially in sworn testimony

24  whether they think their litigation adversary is going to

25  win or lose. They probably will want to continue to put

1  forward the strongest defense that they can without being

2  put to that kind of testimony under oath any more than

3  Alameda would want to testify as to what it thinks its risks

4  are. So I think I'll have to sustain the objection to that

5  question. I hope you understand why.

6      MS. TREVINO: I do. Thank you very much, Your

7  Honor.

8      THE COURT: All right.

9      MS. TREVINO: That's all for now from me.

10      MS. RYAN: Your Honor, I may. This is Ms. Ryan

11  from the State of Texas. I have one question that I just

12  thought of.

13      THE COURT: I think you -- I think you had your

14  chance. But does anybody object to Ms. Ryan asking another

15  question?

16      MR. SLADE: If it's just one, it's okay, Your

17  Honor.

18      THE COURT: Okay. You've got permission to do

19  just one, so choose it carefully.

20      MS. RYAN: Thank you. I will.

21  BY MS. RYAN:

22  Q    Mr. Tichenor, in doing due diligence into Binance, did

23  you come across any company agreement between Binance.US and

24  Binance.com that could affect Binance.US's performance?

25  A    And by performance -- so I just want to make sure I

Page 186

1  understand the question.  We reviewed the agreements between
2  them that we were of the commercial agreements in nature.
3  You know, I can always think of hypotheticals that could
4  impact things.  But we did review the nature of those
5  agreements and the ability, for example, of -- and we asked
6  this question very point blank, the ability of Binance.US to
7  continue to operate as a standalone business to the extent
8  that Binance.com didn't exist.
9      Q    Thank you.  That was all.
10          THE COURT:  Okay.  Anybody else on the phone who
11  has questions for Mr. Tichenor?  All right.
12          Does the Committee counsel have questions?
13          MR. EVANS:  Yes, Your Honor.  This is Joseph Evans
14  from McDermott Emery on behalf of the committee of unsecured
15  creditors.
16  BY MR. EVANS:
17      Q    Good afternoon, Mr. Tichenor.
18      A    Good afternoon.
19      Q    There's been a lot of discussion today about whether
20  the Binance deal closes.  Do you recall that?
21      A    I do.
22      Q    And you referred to something called a fiduciary out.
23      A    I hope I did.
24      Q    What's a fiduciary out?
25      A    So a fiduciary out is that as structure of the APA, we

Page 187

1  have an agreement to move forward with Binance.US to
2  consummate a transaction.  A fiduciary out allows for the
3  Debtor, to the extent that there is a proposal, even in the
4  interim prior to any closing, to evaluate and potentially
5  move forward with that party to the extent that that
6  transaction is viewed as being higher or otherwise better
7  than the existing Binance.US deal.
8      So up until the point where the transaction closes, you
9  could theoretically still move forward with a different
10  alternative?
11      Q    Suppose there wasn't another alternative.  But suppose
12  you found out something bad about Binance that made the
13  Debtors uncomfortable with the deal.  Is there a method by
14  which the Debtors could not close the deal?
15      A    We would exercise the fiduciary out and pivot to the
16  self-liquidating toggle at that point because on that basis,
17  the Debtor would argue that on a risk-adjusted basis, that
18  transaction would be higher or otherwise better than the
19  Binance.US transaction.
20      Q    Only if whatever was found out about Binance rose to
21  the level that the professionals and the Debtors believed it
22  was in their fiduciary capacity to not go forward with the
23  deal.  Is that right?
24      A    I believe we have quite a bit of flexibility around
25  ultimately what that would look like and the business

Page 188

1  judgement of the Debtor to make that kind of determination.
2      Q    Okay.  And are you familiar with the amended APA?
3      A    I am.
4      Q    Okay.  You don't recall what 8.1(g) says I'm sure.
5      A    I don't recall specifically 81.(g).
6      Q    Do you happen to have it in front of you?  I have a
7  copy here.
8      A    Is it Exhibit 9?
9          MR. EVANS:  Your Honor, to refresh the witness's
10  recollection, I would like a copy of the amended APA.  It's
11  Document Number 835.
12          THE COURT:  Go right ahead.
13          MR. SLADE:  It's Exhibit 9.
14  BY MR. EVANS:
15      A    Which specific provision?
16      Q    This is the second blue tab.  It is 8.1(g).
17      A    8.1(g).  Yeah.
18      Q    So if you turn to the page right before it, which is
19  Page 63 of the contract.  Article 8 is labeled Termination.
20  Do you see that?
21      A    Yes.
22      Q    Okay.  And it says this agreement may be terminated
23  only in accordance with this Section 8.1  Do you see that?
24      A    I do.
25      Q    Turn to the next page, subsection G.  It states, "By

Page 189

1  written notice from seller to purchaser, which may be
2  revocable in the sole discretion of seller by written notice
3  of seller to purchaser within five business days of seller
4  or the board of directors or similar governing body of
5  seller determine in good faith and after consultation with
6  legal and other advisors that proceeding with the
7  transactions or failing to terminate this agreement will be
8  inconsistent with its or such persons or body's fiduciary
9  duties.  Do you see that?
10      A    I do.
11      Q    And is that the fiduciary out that you were
12  referencing?
13      A    That is.
14      Q    Okay.  You can put it down for now.  There was a lot of
15  discussion today about the diligence that Moelis and other
16  professionals performed on Binance.US.  Isn't that right?
17      A    There has been a little bit, yeah.
18      Q    And there was also some discussions about
19  representations made by Binance.US to you and the other
20  professionals.  Isn't that right?
21      A    That's correct.
22      Q    And you did other due diligence, but in part you relied
23  on some of those representations, didn't you?
24      A    Absolutely.
25      Q    Okay.  One of those representations was that Binance.US

A-1215

Page 190

1    holds the digital assets deposited by its customers on
2    Binance.US's platform solely in a custodial capacity and on
3    a one-to-one reserve basis.  Do you remember that?
4    A    I do.
5    Q    What's a one-to-one reserve basis?
6    A    So a one-to-one reserve basis is that to the extent
7    that have one bitcoin due to a customer, they had one
8    bitcoin that was held in custody on the platform.  So
9    effectively you could never have a quote, unquote, run on
10   the bank because effectively all that would happen is people
11   would just withdraw the crypto.  It would be very similar to
12   if a bank only had cash and the parties were seeking to
13   withdraw all the cash.
14   Q    And so if Binance is stating to you that crypto was not
15   held on the one-to-one reserve basis, would that materially
16   change -- if it was false, would that materially change your
17   opinion on whether this transaction should go forward?
18   A    To the extent it was lower, absolutely.  If it were
19   higher and for some reason they chose to overcapitalize
20   customers' accounts, I'd feel pretty good about that.  But
21   to the extent that it was lower, absolutely.  It would
22   materially impact our view.
23   Q    And there were some discussions yesterday about, well,
24   how is Binance.US holding crypto any different than Voyager
25   did.  If you know, did Voyager hold crypto on a one-to-one

Page 191

1    reserve basis?
2    A    Not to my knowledge.  Or they rehypothecated it and
3    that's why we're in the situation that we're in today.
4    Q    Let's talk about that word, rehypothecate, for a
5    second.  What's rehypothecate?
6    A    So rehypothecation is the ability to take collateral
7    that a party may have posted on a platform.  It's very
8    common in the traditional securities sense where if you have
9    a margin account at an equity trading platform,
10   rehypothecation is the ability to use those funds and to be
11   able to lend them out to somebody that is seeking to borrow
12   them.
13        So in the sense of Voyager, as people think about their
14   crypto, it's why all of the crypto is property of the
15   estate, is so that they can rehypothecate it and lend it to
16   other parties.
17   Q    And it's your understanding based on representations
18   made to you on diligence you performed that Binance.US does
19   not rehypothecate customer crypto.  Isn't that right?
20   A    That's correct.
21   Q    And just to be clear, that means Binance.US does not
22   lend customer crypto to anyone.
23   A    That is my understanding.
24   Q    No lending, no staking, nothing.  Right?
25   A    So customers I understand can elect to stake through

Page 192

1    the Binance platform under their terms of service subject to
2    their staking provisions.  But from the lending perspective,
3    to be clear, yes, my understanding is they expressly
4    prohibit that.
5    Q    Okay.  There was some discussion today and yesterday
6    about BAM Trading Service Inc., DBA Binance.US, the Delaware
7    Corp., versus Binance what's known as Binance Global.  Do you
8    remember that?
9    A    I do.
10   Q    The purchaser is the U.S. entity, BAM Trading Services.
11   Isn't that right?
12   A    That's correct.
13   Q    When you were evaluating the ability to close the
14   transaction, were you evaluating the finances of BAM Trading
15   Services Inc, or were you evaluating the finances of the
16   overall Binance?
17   A    We were evaluating the finances of BAM Trading Services
18   Inc., which is a standalone business as we understand it
19   separate and apart and away from Binance Global, which is a
20   separate company from our understanding.
21   Q    When you reviewed the audited financial statements and
22   the unaudited financial statements of BAM Trading Services
23   Inc., those were BAM Trading Services Inc. only, not --
24   A    That's correct.
25   Q    And there was some discussion about the corporate

Page 193

1    structure.  Is Binance global the sole shareholder of BAM
2    Trading Services Inc.?
3    A    No.  And it is opposite of representations that have
4    been made to us based on our understanding of the
5    organization chart and ownership interests of the business.
6    Q    Let me just make sure -- because the representations I
7    didn't get.  So what you're saying is Binance Global is not
8    the sole shareholder of BAM Trading Service Inc., right?
9    A    Correct.
10   Q    Okay.  But in determining whether BAM Trading Services
11   Inc. had the financial capability to close, you didn't just
12   take their word for it, right?  You looked at information?
13   A    We did.  We requested a proof of funds, which is a bank
14   statement that they provided from their bank.  And we even
15   reviewed the nature of the bank to make sure that we felt
16   comfortable with that.
17   Q    So you actually looked at a bank account statement that
18   said we have enough cash to close?
19   A    We did.
20   Q    Who is Changpeng Zhao?
21   A    He is the founder of Binance.com and he is the UBO of
22   both Binance Global as well as Binance.US.
23   Q    Okay.  There were some questions about the ability of
24   Binance Global to make decisions concerning the customer
25   assets held at BAM Trading Services Inc., Binance.US.  Do

Page 194

1  you recall those questions?
2  A   I do.
3  Q   There was representation made to you, was there not,
4  that only employees of Binance.US., not Binance Global, are
5  able to move or withdraw customer crypto from Binance.US's
6  platform.  Do you remember that representation?
7  A   I do.
8  Q   Now, when they made that representation, you also asked
9  some follow-up questions about this representation, didn't
10 you?
11 A   Of course we did.
12 Q   And it was over the course of multiple sessions, right?
13 A   Many, many sessions.
14 Q   And did you ask, for example, does CZ have the power to
15 take customer crypto out of BAM Trading Services Inc?
16 A   We did.
17 Q   And what was the response?
18 A   No.
19 Q   Separate from the responses, you've viewed policies,
20 procedures, and protocols?  Have you asked questions about
21 how the information security works?
22 A   We did.
23 Q   Did anything in your view call into question whether CZ
24 had the power to take customer crypto from Binance.US and
25 move it to Binance Global?

Page 195

1  A   We were always concerned about the ability of somebody
2  that was associated with Binance Global to be able to remove
3  crypto out or assets from Binance.US..  And it came up in
4  multiple discussions.
5  Q   So you were concerned as it was a topic of diligence,
6  correct?
7  A   Yes.
8  Q   When you do all this diligence and you did these
9  interviews and you reviewed the policies, did you see
10 anything that indicated to you that CZ had the power to take
11 customer crypto out of BAM Trading Services Inc. and move it
12 over to Binance Global?
13 A   No.  And if anything, what we understand to be the case
14 is that no individual has an ability to move -- no specific
15 individual can move crypto out.
16 Q   Okay.  There was a couple of questions -- and let me
17 just ask the same question for Binance Global generally
18 based on your review of the policies and procedures, your
19 interviews.  Do you have any reason to believe that Binance
20 Global can direct Binance.US to take customer crypto out of
21 Binance.US and send it to Binance Global?
22 A   Based on the representations that were made to us, I
23 have no basis to believe that's the case.
24 Q   Earlier today, the SEC raised some questions about
25 security protocols and how you know stuff like what you just

Page 196

1  said.  Do you recall that?
2  A   I do.
3  Q   Okay.  So along with the policies and procedures, you
4  also received two security reports from independent third
5  parties.  Isn't that right?
6  A   That's correct.
7  Q   And I just want to clarify the record because there was
8  a question that was asked to you by the SEC, and it was --
9  there was a bunch of questions.  But one of the things you
10 said was when you sought to get representations, that was
11 the work that we did.  That wasn't all the work that you
12 guys did, right?
13 A   No, that's correct.  We did more work than just seeking
14 to get representations.
15 Q   Okay.  Like, for example, you reviewed the security
16 report from December of 2022, isn't that right?
17 A   I did.
18 Q   And you reviewed another security report from June 1st,
19 2022.
20 A   That's correct.
21 Q   and those reports were all issued by independent third
22 parties, not  Binance.  Isn't that right?
23 A   That's correct.
24 Q   On February 16th, 2023, there was an article issued by
25 Reuters about Binance concerning an entity called Merit

Page 197

1  Peak.  Do you remember that media report?
2  A   I do.
3  Q   And in that media report, there was an allegation that
4  $400 million was withdrawn from a bank account at Binance.US
5  to Merit Peak.  Do you remember that?
6  A   I do.
7  Q   When you saw that article, what did you do?
8  A   We immediately reached out to Binance.US to ask them
9  about the nature of the article, to immediately schedule
10 diligence discussions.  And I believe the next day we were
11 beginning to have conversations with them about it.
12 Q   And it wasn't just Moelis, right?
13 A   Not just Moelis, yeah.
14 Q   It was Moelis and a variety of other professionals that
15 were asking.  Each of them had different questions, right?
16 A   That's correct, yeah.  I mean, I know for a fact on
17 that specific item, it did involve Moelis, it involved
18 Kirkland, McDermott, FTI, BRG.  All of the advisors.
19 Q   In connection with I'll call it the Merit Peak
20 diligence, there were a number of meetings with Binance
21 executives, wasn't there?
22 A   There have been, yes.
23 Q   And document requests?
24 A   Yes.
25 Q   And ultimately there was an in-person meeting the day

Page 198

1  before the first hearing where two Binance executives went
2  through all the Merit Peak information.  Isn't that right?
3  A    That's my understanding.  I wasn't in attendance at the
4  meeting.
5  Q    You didn't attend, but people on your team did attend.
6  A    Correct.  There were individuals from Moelis who
7  attended, yes.
8  Q    And in that meeting based on what you know from your
9  team, transaction data was shown to us.
10  A    That's my understanding, yes.
11  Q    And there was analysis done of deposits versus
12  withdrawals.  Isn't that right?
13  A    That's my understanding, yes.
14  Q    And there were representations by Binance that
15  everything that they showed us was accurate.  Is that right?
16  A    That would be an important one, yes.
17  Q    Okay.  And there were three critical representations in
18  my view, but also you have to say.  One, Merit Peak --
19         THE COURT:  Counsel, there haven't been any
20  objections, but I think just the form of that question
21  without going further I am going to have an objection to.
22         MR. EVANS:  Okay.  I'll ask this -- withdrawn.
23  Sorry, Your Honor.
24  BY MR. EVANS:
25  Q    Did Binance represent that Merit Peak did not withdraw

Page 199

1  customer fiat or crypto?
2  A    They did.
3  Q    Did Binance represent that Merit Peak nor any other
4  market maker had the ability to withdraw customer fiat or
5  crypto from the Binance.US platform?
6  A    They did.
7  Q    Did Binance represent that Merit Peak no longer
8  conducts any activity at Binance.US?
9  A    They did.
10  Q    There were some questions raised about FTX, the FTX
11  deal versus Binance.  Do you recall those?
12  A    I do.
13  Q    When the Binance deal was getting negotiated, it was
14  substantially different than what it is now, isn't it?
15  A    It evolved over many, many months.  Yes.
16  Q    Okay.  And in fact at first the deal was all of the
17  customer crypto would go over to Binance.US and they would
18  hold it until the customer was on board with Binance.US and
19  then get released to them.  Isn't that right?
20  A    That's correct.
21  Q    Okay.  And the committee and other professionals
22  objected and pushed for a different way to distribute the
23  assets.  Isn't that right?
24  A    That's my recollection, yes.
25  Q    And so the plan now is that once customers get

Page 200

1  onboarded with Binance.US, crypto gets released on a weekly
2  basis.  Isn't that right?
3  A    That's correct.  So my understanding is that a customer
4  would have to be a customer of Binance.US  They would have
5  signed up.  They would have done their KYC.  At that point
6  in time, on a weekly basis crypto would be transferred in
7  bulk transactions.  And part of that is to also minimize
8  friction costs.  We're aware of things like gas fees, for
9  example, that could occur on a one-off basis.  And so upon
10  that customer signing up, they are allocated crypto on a
11  weekly batch, would be transferred over, and then
12  subsequently deposited into their account.
13  Q    Why is that safer for customers than the original deal
14  that was proposed?
15  A    It's safer for the customers that choose not to migrate
16  to Binance.US, for example, or who have yet to establish
17  accounts.  And so in the context of let's say a bankruptcy
18  to the extent there was fraud or theft of funds, for
19  example, and there were issues that we were unaware of or
20  unable to diligence, in that instance, the customers would
21  have signed up for the account.  We probably have the
22  ability to monitor or we planned to monitor the transactions
23  as they were coming.  But it limits the Debtor as the estate
24  and their exposure to a counterparty until the point where
25  the sale should have occurred and the transfer should have

Page 201

1  occurred and they are a customer of that entity.
2  Q    Is that because customers want to withdraw their crypto
3  from Binance as quickly as possible, that customer's crypto
4  is only exposed to Binance for a short period of time?
5  A    In part, yes.  Yeah.
6  Q    You became aware of the letter issued by a couple of
7  congresspeople in the United States Senate.
8  A    Three senators, yes.
9  Q    Three senators.  That's right.  When did you become
10  aware of that?
11  A    Late last night, around 10:00.
12  Q    And you've read it I presume?
13  A    I have.
14  Q    Okay.  Would you describe the diligence on this senate
15  letter as ongoing?
16  A    I would.
17  Q    Did you talk to Binance about the senator letter?
18  A    We spoke this morning with them.  Not just Moelis, but
19  all of the professionals in the case.
20         THE COURT:  Does anyone want to put that letter in
21  evidence so that we have some context about what all this
22  testimony is about?
23         MR. SLADE:  Certainly, Your Honor.  We would offer
24  the letter as Exhibit 25.
25         MR. EVANS:  Your Honor, I have a hard copy for you

1   if you're interested.

2          MR. SLADE:  Obviously, Your Honor, not for the

3   truth of any of the matters asserted.

4          THE COURT:  Obviously not for the truth of what's

5   asserted, but just to put in context what the testimony has

6   been about.

7          MR. BRUH:  Your Honor, Mark Bruh for the United

8   States Trustee.  Could we just get some clarification?  Is

9   this the Committee's witness or is this the Debtor's

10  witness?  Because the line of questioning seems a bit

11  leading to us.

12         THE COURT:  It's the Debtor's witness.

13         MR. BRUH:  Okay.

14         THE COURT:  If you have objections to questions,

15  just speak up.  Can I see this senate letter that we've

16  introduced?

17         MR. EVANS:  Yes, Your Honor.  May I approach?

18         THE COURT:  Yes.

19  BY MR. EVANS:

20  Q    Based on your conversations with Binance this morning,

21  is your understanding that they're willing to provide more

22  diligence concerning this letter?

23  A    They have represented that they are willing to continue

24  to engage in diligence relating to allegations in the

25  letter.

1   Q    Okay.  And if they don't have responses that are in

2   your view sufficient concerning these allegations, would

3   that be one of the things that may factor into your decision

4   to say, well, maybe we should execute our fiduciary out?

5   A    There were a number of documents that would ultimately

6   determine our ability -- or in the determination to exercise

7   the fiduciary out.  There are very serious allegations that

8   are being made in that letter that obviously caused concern

9   from our perspectives that would need to be addressed.  And

10  to the extent that we don't feel like they are sufficiently

11  addressed, it would be one of many factors that would go

12  into a determination to assess on a risk-adjusted basis

13  whether or not that is a transaction that is worth pursuing

14  and moving forward with or exercising the toggle, which the

15  plan allows for.

16  Q    Along with the United States Senate letter, there was

17  another development this morning, wasn't there?

18  A    There was.

19  Q    What was that?

20  A    CZ, Changpeng Zhao, who is the UBO of both Binance.US

21  as well as Binance Global, sent a tweet this morning as a

22  reply to another tweet relating to the Voyager Binance deal

23  that seemed to have referenced the SEC.  It appeared based

24  on that tweet that they may have been pulling out of the

25  deal.  And obviously that is extremely concerning.

1   Q    And the tweet said maybe we should pull out.  Isn't

2   that right?

3   A    That's -- I didn't remember the exact words, but that's

4   my recollection, yes.

5   Q    And it was a link to an article about the SEC's

6   argument yesterday at this hearing.  Isn't that right?

7   A    I believe so.  There was a lot happening this morning,

8   and I've been on the stand for quite a while today.  So yes,

9   that's my recollection.

10  Q    And then there was a call this morning, wasn't there?

11  A    Yes.  There were several calls this morning.

12  Q    And during that call, a text message was read to you,

13  wasn't it?

14  A    There was a text message that was read to me by a

15  Binance.US representative around their interests and still

16  moving forward with the transaction.  We also had another

17  call with the Binance CEO directly this morning in advance

18  of the hearing relating to the same tweets and making sure

19  that we have assurances from him as well prior to walking

20  into the courtroom today around that interest.

21  Q    The text message that was read during the call was from

22  Binance.US's CEO, Brian Shroder, wasn't it?

23  A    That's correct.

24  Q    And the text message said, "We are not going anywhere.

25  Binance.US is committed to completing this deal."  Is that

1   correct?

2   A    That's my recollection, yes.  And that's consistent

3   with the statements that he then subsequently made to us

4   directly on another conversation involving all of the

5   professionals.

6   Q    So there was a text message, then there was a phone

7   call.  And during the phone call, Brian said what?

8   A    So there were two things.  So we had a conversation

9   with individuals at -- an individual, excuse me, at

10  Binance.US who had in the first instance read a -- I think

11  it was either a Slack message or a text message from the

12  CEO.  We then subsequently had a conversation directly with

13  the CEO, Brian Shroder, given the fact that we wanted to

14  speak directly about it versus hearsay from one of his

15  employees.

16  Q    And when you spoke to Brian Schroder, did he say the

17  same thing, that we are not going anywhere, Binance.US is

18  committed to completing this deal?

19  A    He did.

20  Q    And was there a request for a sworn statement or

21  appearance or someone from Binance to say something about

22  this statement?

23  A    My recollection is yes, there was a lot of discussion

24  this morning, yes.

25  Q    Right before this hearing, there was another tweet,

1  wasn't there?

2  A    That's my understanding.  I was about to get on the

3  stand when it came out.

4  Q    Based on your understanding, if you know.  You might

5  now know.  But if you know.  CZ tweets, "We are still in

6  support of the deal and helping returning funds to users as

7  quickly as possible if allowed to do so."

8  A    That's my understanding of the tweet.

9  Q    So these representations made to you by Binance.US in

10  connection with one-to-one reserve basis asset segregation,

11  the inability of assets to be -- customer assets be moved

12  off the Binance.US platform at the direction of others,

13  statements like they want to go forward with the deal,

14  notwithstanding the CZ tweet.  In part you're relying on

15  those in coming to your recommendations about this plan,

16  aren't you?

17  A    Those are statements that are important for us for

18  recommending moving forward with the plan.  But I do want to

19  be clear as I said at the beginning of my testimony, there

20  is still outstanding diligence.  I mean, to be very clear,

21  we would not say that we are in a position to necessarily

22  until we would feel comfortable around the nature of all the

23  diligence and the additional allegations.  Are those facts

24  helpful?  Of course they are.  And the representations that

25  were made to us by them were critical and even signing an

1  ADA with them in the first instance.  So they will be

2  critical factors to the extent that we do choose to move

3  forward with Binance.  And again, there is still work to be

4  done.  And that decision will not be made for several weeks

5  and would not be made just by Moelis, to be clear.

6  Q    Is it fair to say that you still have questions that

7  need answers until you're comfortable supporting --

8  A    Absolutely.  That said, the plan provides for these

9  options and the plan provides for options, which we think is

10  critically important.  And our understanding that it has the

11  resounding support of creditors both on the voting as well

12  as the number of individuals that we understand who have

13  already pre-emptively signed up for Binance.US, and we're

14  going to try and get their distributions, which we view as

15  kind of a quasi vote of support, but...

16  Q    Along with the representations made to you either

17  orally, in writing, or during meetings, there are also

18  certain representations that are built directly into the

19  asset purchase agreement, aren't there?

20  A    There are.

21  Q    Okay.  And deciding and evaluating whether the asset

22  purchase agreement is a good idea or a bad idea, those

23  representations are important to you, aren't they?

24  A    They are important.  And I would say during the

25  negotiation and discussions with Binance around the APA, we

1  requested and required that there were additional

2  representations that are uncommon in the context of normal

3  APAs around the nature of the operations and their business,

4  that these are not things that people normally rep to in

5  APAs, but were critically important for us during those

6  discussions.

7  Q    So I have a pretty basic question.  You have a lot of

8  questions for Binance, still need answers.  So do some other

9  professionals.  Why do you support the plan with all these

10  ambiguities?

11  A    So I support the plan with the ambiguities because it

12  provides us optionality and a path to potentially maximizing

13  value for creditors.  We view this as providing two options

14  at this point in time.  There's plan A which would be an

15  ability to continue to move forward with the Binance.US

16  transaction at a future date and time based on additional

17  work that still needs to be done.  And as we said, the

18  Debtor is not in a position still to be able to close even

19  if it wanted to tomorrow.  There's still rebalancing trades

20  that need to occur over a multi-week period.  Like,

21  logistically it just will not happen for multiple weeks.  So

22  it provides for that option, which we believe provides for

23  potentially higher recoveries, and it also provides for a

24  self-liquidating toggle, which, while a lower recover is

25  obviously an option that the Debtor could control and

1  exercise on its own.  So it's the ability to have an

2  embedded backup plan in connection with the highest and best

3  offer with an embedded backup plan which is the basis for us

4  feeling comfortable to move forward.

5  Q    Let's talk really, really quickly about benefits to

6  customers.  You said that the Binance deal gives about $100

7  million more value than the toggle.  Isn't that right?

8  Something like that?

9  A    That's correct, yeah.

10  Q    What are those -- where does that increase come from?

11  THE COURT:  We've done this two or three times

12  already.  Are you about -- are you trying to elicit some

13  error in the prior testimony?

14  MR. EVANS:  No.  I'll do it a different way then.

15  BY MR. EVANS:

16  Q    You say in your declaration that the sales transaction

17  provides the highest value currently available under the

18  circumstances to the Debtor's creditors.

19  A    I believe that's what my declaration says, yes.

20  Q    Okay.  Based on the numbers, do you still believe that

21  today?

22  A    So I believe that based on he numbers, it would provide

23  the highest path.  But I would say that absent clearing

24  sufficient diligence to feel comfortable moving forward with

25  that counterparty, that's what we think of as a threshold

Page 210

1  matter.

2         MR. EVANS:  I have nothing further.

3         THE COURT:  Okay.  The United States Trustee?

4         MR. MORRISSEY:  Yes, Your Honor.

5         THE COURT:  Actually, let's just take five

6  minutes.  Okay?

7         MR. SLADE:  I'm sorry.  You guys already

8  questioned the witness.

9         MR. MORRISSEY:  Your Honor, I stand for two

10  things.  One is I want, without objection of course, the

11  opportunity to ask one question, plus perhaps a couple of

12  follow ups, of the witness.  And based on something the

13  witness just said a few minutes ago.  And also, I had a

14  question, Your Honor, about the declaration that you asked

15  for just after the break.

16         THE COURT:  You have a question for me about the

17  declaration I asked for?

18         MR. MORRISSEY:  Well, obviously with inviting

19  comments from others as well.  What I wanted to do --

20         THE COURT:  During our break, why don't you talk

21  to the Debtor's counsel about the questions you want to ask

22  and see if they object.  Because you have already had a

23  chance at the witness.  Okay?

24         MR. MORRISSEY:  Thank you, Your Honor.

25         (Recess)

Page 211

1         THE COURT:  Please be seated.  I think the

2  official court rule is that I'm not supposed to have this

3  coffee in the courtroom.  So you are ordered not to rat me

4  out.

5         MR. SLADE:  Your Honor, I did give Mr. Morrissey

6  at least my permission, if he has yours, to ask his one

7  question.

8         THE COURT:  Go ahead, Mr. Morrissey.

9         MR. MORRISSEY:  Thank you, Your Honor.

10  BY MR. MORRISSEY:

11  Q    Good afternoon, Mr. Tichenor.  Richard Morrissey for

12  the U.S. Trustee.  As I said before the break, I just have

13  one question for you.  You had an exchange with counsel for

14  the committee a little while ago about the back and forth

15  with social media about people at Binance

16  threatening to back out and saying no, we're not backing

17  out.  Do you recall that?

18  A    I do.

19  Q    Is it your understanding that Binance Global, or CZ

20  himself, either has the power to decide the fate of this

21  deal at all?

22  A    That's a great question.  It's one that we asked this

23  morning.  I don't think we've actually come to a full

24  conclusion on that at this point in time.  Where is the

25  chairman of that entity, I don't know.  But I imagine that

A-1221

Page 212

1  statements along those lines -- I don't know actually is the

2  answer.

3  Q    Thank you.

4         MR. MORRISSEY:  Your Honor, that's my only

5  question for the witness.

6         THE COURT:  Okay.

7         MR. MORRISSEY:  I didn't know if you wanted to

8  take my request or recommendation for the declaration that

9  Your Honor discussed just after the previous break.

10         THE COURT:  What is your suggestion?

11         MR. MORRISSEY:  Your Honor, as you will recall,

12  you gave a list of statements that should appear in the

13  declaration.  And I have a request or recommendation that

14  one be added to it.  I discussed it with Mr. Slade.

15         THE COURT:  Is the Binance counsel here?

16         MR. SLADE:  They are not, Your Honor.  I explained

17  to Mr. Morrissey that what they had asked their client for

18  authority to make public was in the existing document that

19  was already a sworn statement.  So I'm not sure whether

20  adding it -- what happens.

21         THE COURT:  does the existing document cover the

22  five points that I mentioned?

23         MR. SLADE:  I believe it does, Your Honor.

24         THE COURT:  What is the additional point you were

25  going to ask about, Mr. Morrissey?

Page 213

1         MR. MORRISSEY:  Your Honor, it's actually related

2  to one of Your Honor's points.  One of Your Honor's points

3  was that crypto could be transferred only as directed by

4  customers.

5         THE COURT:  Yeah.

6         MR. MORRISSEY:  What I was going to suggest, Your

7  Honor, was a statement as to whether Binance Global has the

8  power to take customer crypto out of Binance, out of

9  Binance.US and transfer it to BAM Trading.

10         MS. OKIKE:  That's addressed in the...

11         THE COURT:  Isn't that covered by saying nobody

12  outside of Binance.US can access the customer crypto?

13         MR. MORRISSEY:  Your Honor, I think that would.  I

14  didn't hear -- I guess I didn't hear Your Honor say

15  Binance.US when you said that.

16         THE COURT:  Yeah.

17         MR. MORRISSEY:  That's fine.  And again, as Ms.

18  Okike just said, perhaps that's already in the pre-existing

19  statement.  Thank you, Your Honor.

20         THE COURT:  All right, thank you.

21         Any other questions?  I think we've -- yes?

22         MR. SLADE:  I have no more questions for the

23  witness, Your Honor.  Thank you.

24         MR. GOLDBERG:  Your Honor, Adam Goldberg of Latham

25  and Watkins on behalf of Binance.US  I do have one question

1  for the witness, and I would like to request a chambers
2  conference regarding Your Honor's request for a statement
3  from Binance.US
4       THE COURT:  I'm not inclined to have a chambers
5  conference I don't think without a really special, good
6  reason.  There are so many people interested in this
7  proceeding.  Is there really nothing we can talk about on
8  the record?
9       MR. GOLDBERG:  As I think Your Honor is aware,
10  this is a sensitive issue.  This is a matter that the SEC is
11  actively looking at as we've seen in this proceeding.  And I
12  think the SEC would be welcome to join in this chambers
13  conference with other parties or a sidebar conversation.
14  But that would be our request, Your Honor.
15       THE COURT:  But it's not just the SEC, right?
16  Everybody on the telephone is interested in this.  The
17  questions you want to raise with me, you can't do that in a
18  public proceeding?  I don't understand.
19       MR. GOLDBERG:  We will do so, Your Honor, if
20  that's what's required.  We would request it be discussed in
21  confidence.
22       THE COURT:  Yeah, I don't think I can do that.
23  You know, we are in the middle of a court hearing.  So I
24  asked for something in public, so I'm not sure -- my
25  proceedings are supposed to be public.  Occasionally if

1  there's a settlement issue or something and everybody who is
2  affected by it is present, then I understand having a
3  chambers conference.  But I don't think we have that
4  situation here.
5       MR. GOLDBERG:  Yes, Your Honor.  I think the idea
6  of a chambers conference was to have -- explain our
7  rationale for our proposal and how to address the
8  certificate that you've requested and then come on the
9  record and discuss it.
10       MR. UPTEGROVE:  Your Honor, William Uptegrove with
11  the SEC.  May I be heard?
12       THE COURT:  Yeah.
13       MR. UPTEGROVE:  Thank you, Your Honor.  I only
14  raised my hand because we actually have a similar request
15  that wanted to make of Your Honor.  And if I may have a
16  moment to sort of update you on what we've been working on
17  and issues we wanted to update you about.  Because it goes
18  along with counsel for Binance's request.
19       THE COURT:  You wanted to update me privately on
20  what you've been working on?
21       MR. UPTEGROVE:  Oh no, no, Your Honor.  I wanted
22  to update you publicly right now.  And it relates to a
23  similar type of issue as was just being discussed.  What I'm
24  going to say -- I am proposing to put this on the record,
25  Your Honor.

1       THE COURT:  I see.
2       MR. MALIONEK:  Good afternoon, Your Honor.  Robert
3  Malionek of Latham & Watkins, sorry to double team, for
4  Binance.US.
5       I think because of what counsel for the SEC is
6  raising right now, we had anticipated exactly that and the
7  need for that not to go onto the record.  We wanted to be
8  able to talk about what we think is the solution to the
9  question that you asked, Your Honor, which is that there
10  have been references to representations that have been made
11  by Binance.US.  We would like for those to be able to --
12  they've already been put into an officer's certificate.  Mr.
13  Tichenor has already talked about the fact that the Debtors
14  and the professionals have relied on it.  The UCC has asked
15  questions about it.  And we simply want to be able to put
16  that into the record, but we want to be able to discuss that
17  with Your Honor first.  And I think the issues that counsel
18  for the SEC want to raise before the SEC raises it as part
19  of the proceedings.
20       So we would invite them into the chambers
21  conference, but we do believe that we actually would need
22  that for purposes of security.
23       THE COURT:  But is that an evidentiary issue that
24  you wish to discuss with me?
25       MR. MALIONEK:  Yes, it is.

1       THE COURT:  This seems highly irregular.  You
2  know, if there is an evidentiary issue and I need to rule on
3  it by only hearing from a few of the parties, then I will do
4  so.  But I really don't want to have any presentations of
5  facts at all, or argument at all, or explanations at all.
6  I'll just hear the evidentiary issue.  That's the only thing
7  that I can think of that it would be appropriate to step
8  aside separately for.
9       And who are you suggesting being included in this?
10  The SEC...
11       MR. MALIONEK:  The Committee, the Debtors.
12       THE COURT:  U.S. Trustee?
13       MR. MALIONEK:  U.S. Trustee.  And yes, Your Honor,
14  we would simply outline for you our proposal to deal with
15  the evidentiary issue.  And then we would expect that
16  afterwards we would come back into the courtroom so that,
17  Your Honor, we could make public what your determination is
18  from the sidebar discussion.  In other words, we don't
19  want to hide anything from the public, we simply want to be
20  able to explain the rationale for it in chambers.
21       MR. MORRISSEY:  Your Honor, Richard Morrissey for
22  the U.S. Trustee.  I would just raise a general objection on
23  the record for the reasons Your Honor already stated.  But
24  obviously if Your Honor rules, we would be happy to
25  participate.  Thank you.

1    MS. RYAN:  Your Honor, this is Ms. Ryan from the
2  State of Texas.  We join in that objection.
3    UNIDENTIFIED SPEAKER:  Your Honor, Kevin
4  (indiscernible) on behalf of New York (indiscernible).  As
5  do we.
6    THE COURT:  Okay.  I've got --
7    MR. UPTEGROVE:  Your Honor.
8    THE COURT:  Yeah.
9    MR. UPTEGROVE:  William Uptegrove for the SEC.
10  Irrespective of whether or not you were to grant Binance's
11  request -- if I may, I was already going to address an issue
12  that I mentioned, which was first, I just want to apologize
13  for any frustration Your Honor had yesterday with our
14  position.  We heard your concern.  We --
15    THE COURT:  Hang on one second.  Are we finished
16  with the witness?  Yes?
17    MR. SLADE:  Yes, Your Honor.
18    THE COURT:  Okay.  Did you have a question for
19  him?
20    MR. GOLDBERG:  I had one question.  And I think
21  depending upon Your Honor's ruling regarding our proposal,
22  it may be helpful to have the witness on the stand.
23    THE COURT:  Well, let's finish with him subject to
24  recall if we need to deal with whatever this other issue is.
25  Okay?

1    MR. GOLDBERG:  Okay.  Thank you, Your Honor.
2    THE COURT:  Do you have a question with him in
3  that context?
4    MR. GOLDBERG:  Yes.
5    THE COURT:  Go ahead.
6  BY MR. GOLDBERG:
7  Q    Mr. Tichenor, you testified that the sale transaction
8  would be roughly $100 million better for the estate than the
9  toggle.  Does that $100 million include any potential tax
10  benefits or savings that customers may receive by virtue of
11  an in-kind distribution?
12  A    No, it does not.
13  Q    Thank you.
14    MR. GOLDBERG:  That's all, Your Honor.
15    THE COURT:  Okay.  All right.  Thank you, Mr.
16  Tichenor, you are excused.
17    There's so much mystery here that it is difficult
18  for me to figure out if I have any proper grounds to have a
19  separate conference when I have objections that are pending
20  to the idea of having a separate conference.
21    MR. UPTEGROVE:  Your Honor, William Uptegrove for
22  the SEC.  If I may just continue with what I see as sort of
23  a completely separate request.
24    MR. MALIONEK:  Your Honor, Robert Malionek again.
25  I do not want to be in the habit of cutting off another

1  counsel while they're in the middle of speaking about
2  something.  My only concern is that, you know, I'm not sure
3  since we're in the phase of the trial where we're putting on
4  evidence, is counsel for the SEC ready to put on evidence or
5  call a witness?  Because otherwise, if it's to give a speech
6  or to give an update or anything along those lines, I'm not
7  sure that this is the proper time to do that.  That's part
8  of why we want to able to have the conference, Your Honor.
9    MR. UPTEGROVE:  Your Honor, I simply have a simple
10  request.  If I can just have a minute to make a request.
11    THE COURT:  Okay.
12    MR. UPTEGROVE:  I'm not going to make a speech.
13  I'm not going to make an argument.
14    THE COURT:  Okay.  Go ahead.
15    MR. UPTEGROVE:  So Your Honor had concerns
16  yesterday about the SEC's position.  We would like to be
17  able to address them.  And I'm not going to go into that to
18  address it.  I'm going to propose how we think that might be
19  able to be addressed, at least as best as we can address it
20  under the circumstances.
21    As I indicated yesterday, unlike other parties,
22  there are statutory restrictions on our ability to share
23  non-public information.  As I'm sure Your Honor can
24  appreciate, there are also other practical considerations as
25  well.  We do, however, want to do our best to address the

1  concerns being raised.
2    What we would request is that when it's convenient
3  for the Court -- I think Binance would like to do it right
4  now for us because the timing is not important -- either
5  later today or Monday -- if the Court would like to do it
6  now, that is fine.  Whenever it's convenient for Your Honor
7  and the other parties, we would request that we be allowed
8  to have an in-camera conference with the Debtors, Binance,
9  and the U.S. Trustee.  And we'll defer to the Debtors and
10  Binance with regard to whether the Committee should attend.
11  We would prefer to do it on our part, the SEC,
12  telephonically.  But if the hearing is continued to Monday,
13  we're willing to come to New York and be there Monday
14  morning for the in-camera conference.
15    And what we would like to do there is to be able
16  to address the concern you raised and the grounds for doing
17  that are that we are statutorily limited to what we do in
18  public.  There are issues with us disclosing things in
19  public.  And we might be able to address some of your
20  concerns in-camera, and then hopefully that's an acceptable
21  way to move forward.
22    MR. SLADE:  Your Honor, Mike Slade for the
23  Debtors.  We object to that.  Okay?  If the SEC wants to put
24  on evidence, they can put on evidence.  This is a continual,
25  frustrating issue for us.  We don't want the SEC to have the

Page 222

1  opportunity to go to chambers and tell Your Honor something
2  that they're not actually willing to put in evidence and,
3  you know, perhaps that would influence the result.  That's
4  our concern.  So we object.
5       MR. AZMAN:  Your Honor, Darren Azman for the
6  Committee.  To the extent there is an in-camera conference,
7  obviously the Committee would like to participate.  I don't
8  believe the gentleman from the SEC invited us.  But I would
9  like to be invited, obviously.
10       MR. MALIONEK:  Your Honor, Robert Malionek, if I
11  may.  I know you're taking notes.  If I may add on.
12       It seems like we may have some joint support for a
13  request to have this chambers conference with you.  From our
14  perspective, it's only for purposes of explaining an
15  evidentiary issue and how to resolve it so that there's
16  perhaps one additional question for Mr. Tichenor that we
17  could ask and then put something into the record for Your
18  Honor.  We just want to be able to explain what it is.  I
19  think it's -- if the SEC wants to be able to participate in
20  that, we welcome that and welcome obviously the UCC and the
21  Trustee, Debtors to join as well.
22       THE COURT:  Well, if the purpose of a conference
23  is to give me information that might address questions I
24  have raised regarding this transaction and to influence how
25  I might decide things, it seems very awkward and unusual to

Page 224

1  evidence before you, Your Honor, that you asked for.  But
2  there are issues that we need to be able to speak to you in
3  private about, Your Honor.
4       We don't agree with the SEC that they should be
5  able to come back into chambers and put in evidence behind
6  the scenes.  We don't think that that's appropriate.
7       MR. UPTEGROVE:  Your Honor, William Uptegrove for
8  the record.
9       THE COURT:  Just before --
10       MR. UPTEGROVE:  We're not proposing to -- I just
11  want to be clear.
12       THE COURT:  Go ahead.
13       MR. UPTEGROVE:  I'm sorry.
14       THE COURT:  No, go ahead.
15       MR. UPTEGROVE:  I'm sorry, Your Honor.  So we just
16  wanted to be clear about what the proposal is.  Because
17  everyone has said -- not everyone, but the objectors have
18  said that we were proposing to put in evidence.  That's not
19  the case.  What we wanted to do is you had specific
20  questions that related to the impossibility because the SEC
21  wouldn't take a position, it wouldn't give you guidelines
22  about what the SEC thought.  So it's not really argument.
23  I'm not going to -- what we would propose is actually
24  relatively brief.  If we have authority to provide the Court
25  with information, our strong preference is that we would do

Page 223

1  suggest that that be done in private.  It's an evidentiary
2  proceeding.  There are times when evidence involves trade
3  secrets or other reasons why it cannot be disclosed
4  publicly, but those are very rare.  And this is a peculiar
5  situation, because usually if that's the case, I have some
6  indication, some evidentiary indication of what it is that
7  is going to be offered so that I can decide whether it's
8  something that is so sensitive that it can be considered as
9  evidence, but people can -- some people otherwise can be
10  excluded.  It seems particularly hard for me to say that it
11  can be considered in evidence and not only can the public be
12  excluded, but even people who are other objectors on similar
13  grounds could be excluded.  That bothers me immensely.  And
14  at least some of those people, including the state
15  regulators, have issued their objections.
16       So having expressed that concern, what can you say
17  to me?
18       MR. MALIONEK:  Your Honor, Robert Malionek again
19  just because so many people have been talking, I want to
20  make sure I'm clear for the record.  W absolutely agree,
21  Your Honor, and join in the objection of the Debtors that
22  the chambers conference should not be a place to offer
23  evidence.  That's not what we're asking for.  This is to
24  explain the evidentiary basis for how we're going to get
25  through one rule of evidence that will allow us to put the

Page 225

1  it in a way that is narrowly-tailored as possible.  And the
2  other parties may actually want that.
3       But the point is we are not trying to put on
4  argument.  It's not going to be an argument that we're
5  intending to make.  We're not trying to put on any evidence.
6  But we wanted to answer Your Honor's questions because Your
7  Honor had what I would characterize as understandable
8  frustration that, you know, that we couched things in May
9  and wanted a little more certainty.  And so we were
10  proposing to provide you with the best answers that we can.
11  And doing it in-camera would be highly preferential.
12       MR. MALIONEK:  Your Honor, I'm confused.  Because
13  counsel for the SEC spoke up just now while we're in the
14  middle of putting on evidence, or hopefully towards the tail
15  end of putting on evidence, to say that they wanted to
16  provide you with some information and an update on what
17  they're working on.  I think those are direct quotes.  That
18  sounds like evidence.  That's not what we want to get into,
19  Your Honor, in a chambers conference.
20       We spoke up because we want to be able to -- it's
21  not put on evidence, but we do want to explain the rationale
22  for our argument regarding an evidentiary issue so that we
23  can ask one further question of the witness.  That's all.
24       MR. AZMAN:  Your Honor, Darren Azman for the
25  Committee again.  I don't know what we're talking about.  I

A-1224

## Page 226

1  really don't.  And I don't know whether to object or not.
2  It sounds like there's sensitive information that Binance
3  and there's sensitive information that the SEC has.  But I
4  have a lot of concerns.  You've heard all the creditors in
5  the past two days raising issues with the lack of
6  transparency in this case.  So I would have concerns about
7  that.  But I want to be respectful of whatever it is that
8  they don't want to talk about in court.
9          And so perhaps one solution is we could have an
10 in-camera conference to talk about whether a discussion
11 should be held in-camera or not because I don't know what
12 they're talking about.
13         MR. MALIONEK:  That sounds like a fine solution.
14 We're not trying to hide evidence or information.  We simply
15 have that evidentiary and legal argument to make, Your
16 Honor.
17         UNIDENTIFIED SPEAKER:  Your Honor, pro se
18 creditor.  Would like to be involved in that discussion.
19         THE COURT:  I think the suggestion is that I have
20 a conference just to address the issue of whether it's
21 appropriate not to allow you to be in on that discussion.
22         I can in my head imagine things that you would
23 want to discuss and reveal to me that you would not want to
24 put on the public record and that also may not have any
25 bearing on this proceeding.  I have no idea if that's what

## Page 227

1  this is about or whether there's some other reason why you
2  are concerned.
3          I think what I can -- the best I can do if I'm
4  being told that there is good reason and not an evidentiary
5  submission to have a private discussion just of the issue of
6  whether other information should be submitted in private,
7  that I can do that.  But if in the course of that anybody
8  says anything that I think needs to be on the public record,
9  I'm putting it on the public record.  And you ought to be on
10 notice of that.
11         MR. MALIONEK:  Yes, Your Honor.  We understand.
12 We do think there is good reason.
13         THE COURT:  All right.
14         MR. UPTEGROVE:  William Uptegrove for the SEC.
15 Understood, Your Honor.
16         THE COURT:  Okay.  So now how do we do this?
17 We've got the SEC by telephone.  I guess the U.S. Trustee,
18 the Committee, Binance, the Debtor, come with me to my
19 chambers and we'll -- what's the number we can reach you at
20 at the SEC?
21         MR. UPTEGROVE:  404 -- well, actually -- yeah, we
22 can do that.  404-842-5765.
23         THE COURT:  Five seven what?
24         MR. UPTEGROVE:  Six-five.
25         THE COURT:  Is that a direct to where you are?

## Page 228

1          MR. UPTEGROVE:  It is.
2          THE COURT:  Okay.
3          MR. UPTEGROVE:  I'll have to get off the line
4  though and --
5          THE COURT:  Okay.
6          UNIDENTIFIED SPEAKER:  Your Honor?
7          THE COURT:  Yeah.
8          UNIDENTIFIED SPEAKER:  Your Honor, (indiscernible)
9  New York (indiscernible).  Is there a reason that can be
10 articulated as to why (indiscernible) cannot attend the
11 chambers conference?
12         THE COURT:  Well, you know, I guess that's what
13 I'm going to be told, that apparently I have to be told in
14 private.  That's one of the issues that I'll ask about.
15 Okay?
16         (Recess)
17         THE COURT:  -- worry or misapprehension about what
18 happened in our private little conference right now, I am
19 going to say what happened.
20         There were two issues, neither of which were
21 evidentiary.  One was that Binance is willing to free the
22 Debtors from their confidentiality limitations and is to
23 allow the Debtors to submit the sworn statements that
24 Binance has previously given to the Debtors and I think was
25 concerned as to whether that amounted to a tendering by

## Page 229

1  Binance of a witness, which I don't believe it does.  I
2  don't think anybody here has subpoenaed a Binance witness or
3  called a Binance witness.  And so if the Debtors want to
4  offer those certificates, I would appreciate it.  That's the
5  first issue that was discussed.
6          The second issue was that the SEC wished to try to
7  answer questions that I had posed at the beginning of the
8  hearing as to what the SEC's position is on some of these
9  issues.  But I gather that in the first instance they were
10 asked to find out if they could tell that to me separately
11 rather than in public.  I responded that I am not
12 comfortable hearing that explanation in private.  This is a
13 public court proceeding.  I made very public what my
14 questions were.  The SEC has made objections.  Other people
15 have made objections.  Anything that further explains the
16 basis for the SEC's position it seems to me is something
17 that everybody is entitled to hear.  So if the SEC has an
18 explanation, I ask that that be put on the public record and
19 not done privately.  Okay?
20         So don't think we're officially closed the
21 evidentiary record, but I do have quite a bit of authority
22 over the order of proceedings.  And so if the SEC wishes to
23 make a clarifying statement as to its position, I welcome
24 them to do so.
25         MR. UPTEGROVE:  Thank you, Your Honor.  William

Page 230

1  Uptegrove for the United States Securities and Exchange
2  Commission.  Again, Your Honor, just to be clear, when Your
3  Honor raised the issue yesterday, we went back internally
4  within the SEC and worked as diligently as possible all
5  throughout the SEC to try our best to answer your questions.
6  And I have been authorized to provide the following
7  additional information.  I don't think it satisfies all of
8  your questions, but under the circumstances, this is what I
9  have authority to provide.
10       So, Your Honor, this is a complicated situation,
11  in part because seeking relief against a defunct entity is
12  often not productive and given the nature of our enforcement
13  investigation, which are non-public.  Additionally opinions
14  of the staff do not reflect the views of the Commission,
15  which has not taken a position with respect to Voyager or
16  Binance.  With that being said, the staff believes based
17  solely on the facts and circumstances currently known to the
18  staff that the offering and sale of BGX tokens have the
19  attributes of a securities transaction -- securities
20  transactions.  Staff also believes that Binance.US is
21  operating an unregistered security exchange in the United
22  States.  The Commission has not made any determination on
23  either of these issues.  The staff beliefs do not represent
24  the position of the Commission.  And that's all I wanted to
25  provide, Your Honor.  Thank you.

Page 231

1       MR. MALIONEK:  Your Honor, Robert Malionek.  My
2  understanding -- correct me if I'm wrong -- was that there
3  would be no information or evidence that would be offered.
4  That sounded to me to be different than what my
5  understanding was anyway.  And so we would move to strike.
6       THE COURT:  It's not evidence.  Right?  It's a
7  statement of position.  Yesterday, the SEC said that it
8  wasn't taking a position one way or the other.  Today, it's
9  saying that the staff is informing me of what it believes,
10  but that the Commission as a whole is still taking no
11  position.  That just essentially tells me what a contention
12  is.  Okay?
13       So at least I know that the SEC isn't just saying
14  maybe, that it's saying it thinks that there are issues.
15  But I still don't have evidence and I still don't have very
16  much clarity as to exactly why they think there are issues
17  or how they would affect this transaction.  But I guess I
18  appreciate the limited clarification you have been able to
19  provide.  Okay?
20       Is there any other evidence that anybody wishes to
21  offer?  To turn back to the evidentiary record.
22       MS. RYAN:  Your Honor, this is Ms. Ryan from
23  Texas.  The statements or affidavits being submitted by
24  Binance, we would object to those as hearsay.  And once they
25  are submitted, will they be available to everyone, I

Page 232

1  suppose, all the interested parties?
2       THE COURT:  Well, I'll ask them to be put on the
3  public record.  But I think they're being offered by way of
4  explaining the Debtor's due diligence, in which case they're
5  not hearsay, they're evidence of things that the Debtors
6  looked at and relied upon.
7       MR. SLADE:  Your Honor, Mike Slade for the
8  Debtors.  We would offer the Binance officer certificate
9  that Mr. Tichenor testified to extensively as Debtor's
10  Exhibit 26.  And if you admit it, we will put it on the
11  public docket tonight.  Or maybe tomorrow.
12       THE COURT:  Do you have them here, by the way?
13       MR. SLADE:  I do have -- yes.  We have one copy
14  with a one underline on it.
15       THE COURT:  Well, just put it on the docket and
16  I'll download it from there.
17       MR. SLADE:  Yes, sir.  We will.
18       THE COURT:  So to the extent there's a hearsay
19  objection, I overrule it.
20       MR. SLADE:  Thank you, Your Honor.  The Debtors do
21  not have any more witnesses.
22       THE COURT:  What about the objections we have as
23  to the selection of the plan administrator.  Is anybody
24  going to address that?
25       MR. SLADE:  Yes, Your Honor.  The Committee is

Page 233

1  going to put on a witness, right, or whenever Your Honor
2  would like, to testify about that.
3       THE COURT:  Let's go there.
4       MR. CALANDRA:  Your Honor, John Calandra from
5  McDermott Will & Emery on behalf of the Committee.  We would
6  like to call Paul Hage, who would be plan administrator,
7  Your Honor.
8       THE COURT:  Okay.
9       Mr. Hage, do you promise and swear that the
10  testimony you are about to give will be the truth, the whole
11  truth, and nothing but the truth, so help you God?
12       MR. HAGE:  I do.
13       THE COURT:  State your full name for the record,
14  please.
15       MR. HAGE:  Paul Robert Hage.
16       THE COURT:  Okay.  Please proceed, Counsel.
17       MR. CALANDRA:  Thank you.
18       DIRECT EXAMINATION OF PAUL HAGE
19  BY MR. CALANDRA:
20  Q  Mr. Hage, what is your current occupation and
21  employment?
22  A  I am a partner and co-chair of the bankruptcy and
23  restructuring group at Taft, Stettinius & Hollister.  And I
24  am based in Detroit, Michigan.
25  Q  And how large is your firm, Taft?

Page 234

1   A    Taft has roughly 850 attorneys, located primarily in
2   the Midwest.
3   Q    Where are you admitted, sir?
4   A    I am admitted in the state of Michigan, the Eastern and
5   Western District of Michigan District and Bankruptcy Courts,
6   the Sixth Circuit Court of Appeals, and the United States
7   Supreme Court.
8   Q    Okay. You are aware that the Committee has selected you
9   to serve as plan administrator of the winddown entity
10  pending the Court's approval?
11  A    I am.
12  Q    And you are willing to do so?
13  A    I am.
14  Q    Can you briefly describe for us your background?  Let's
15  just quickly start with your education and then we'll move
16  on.
17  A    Sure.  I graduated with a bachelor's degree from
18  Michigan State University.  I have a law degree from Loyola
19  University Chicago.  And I have a master's of laws, or an
20  LLM degree, in bankruptcy law from St. John's University
21  School of Law here in New York.
22       Additionally, during law school, I interned with the
23  Honorable George Steeh, a U.S. district court judge in the
24  Eastern District of Michigan, and with the Honorable
25  Elizabeth Stong, United States Bankruptcy Court Judge from

Page 235

1   the Eastern District of New York.
2   Q    And what did you do after graduation and you got your
3   LLM, what was your employment?
4   A    So upon graduating from St. John's, I moved back to
5   Michigan, which is where I grew up.  And I have a bankruptcy
6   attorney.  It's substantially all that I do is practice
7   bankruptcy law for the last 16 or 17 years.  My practice
8   primarily consists of representing unsecured creditors and
9   creditors' committees and post-confirmation fiduciaries, be
10  it a liquidating trustee type position or Chapter 7
11  bankruptcy trustees.
12  Q    And now you are the co-head of the bankruptcy practice
13  at your firm?
14  A    I am co-chair of the bankruptcy practice at Taft, yes.
15       MR. CALANDRA:  Your Honor, may I approach the
16  witness?  I would like to hand him his resume.
17       THE COURT:  Yes.  You don't need permission to
18  approach the witness.
19       MR. CALANDRA:  Would Your Honor like a copy?
20       THE COURT:  Yes, please.  Thank you.
21  BY MR. CALANDRA:
22  Q    Okay.  I've showed you what is on the docket for the
23  record as Docket Number 1109-2.  Do you have that in front
24  of you, sir?
25  A    I do.

Page 236

1   Q    Okay.
2   A    I see I'm wearing the exact same tie in this picture
3   that I am wearing today.
4   Q    That's good.  You're frugal.  What is the document,
5   sir, that is 1109-2?
6   A    The document is my resume.
7   Q    Okay.  Did you prepare this document?
8   A    I did.
9   Q    Is it a true and correct copy of your resume, sir?
10  A    It is.
11       MR. CALANDRA:  Your Honor, we would like to move
12  the admission of this document into evidence as 1109-2.
13       THE COURT:  Any objections?  All right, the
14  Exhibit is admitted.
15       (Exhibit 1109-2 entered into evidence)
16  BY MR. CALANDRA:
17  Q    Let's just take a quick look.  We're not going to spend
18  too much time on this, but I have a few questions about your
19  resume that I'd like to elicit testimony on.  Let's start
20  with -- I see you say that you've been twice selected by the
21  Sixth Circuit Court of Appeals for a finalist for bankruptcy
22  judgeship.  Could you explain that a little bit?
23  A    Sure.  Those people who know me know that my career
24  goal is to be a federal bankruptcy judge.
25       THE COURT:  Has this hearing changed your mind?

Page 237

1   BY MR. CALANDRA:
2   A    It has not.  This is what I do.  And so I have applied
3   on a few occasions from fairly early on my career to be a
4   judge.  It's a pretty rigorous application process.  There
5   is an expansive application that asks just about every type
6   of question about somebody's professional experience and
7   also their character.  And I have applied and gone through
8   that process a couple of times in the Sixth Circuit.  It's
9   done differently in each judicial circuit.
10       But in the Sixth Circuit, the Sixth Circuit Court of
11  Appeals appoints a merit selection panel consisting of
12  members of the local bar to conduct interviews and an
13  initial background check of each candidate.  And then
14  there's a fairly fulsome interview process that is
15  conducted.  From that process, the merit selection panel
16  recommends to the Court of Appeals three to five finalists
17  for the position.  Usually it's three to five.  I'm not sure
18  it's a hard and fast rule, but that's normally what they do.
19  And I have twice been selected as a finalist, in 2018 and
20  more recently in 2021.
21       As a finalist then, there is additional sort of
22  interview and background process and the interview with
23  judges on the Sixth Circuit Court of Appeals.  I've done
24  that twice.
25  Q    Okay.  Thank you for the explanation.  You also said

1  that you were co-director of the Conrad Duberstein National
2  Bankruptcy Moot Court Competition.  Is that why you're in
3  town this week?
4  A    That is actually why I'm in town this week, is that I
5  run the -- it's the bankruptcy court competition.  It's run
6  in conjunction with the American Bankruptcy Institute in St.
7  John's University School of Law.  I help to run it.  I serve
8  as a judge at the competition and I write the problem.  And
9  I've done that with a judge in Grand Rapids for the last six
10 years.
11 Q    That's great.  Let's just focus a little bit on your
12 professional associations and memberships, starting with the
13 American Bankruptcy Institute.  For those who are on the
14 phone who are not aware of that, can you explain what that
15 is?
16 A    Sure.  The American Bankruptcy Institute I think is the
17 largest organization of bankruptcy and insolvency
18 professionals and judges in the country.  I think it's a
19 highly -- it's a well-recognized organization.  I've been
20 very involved with it since even before starting practice,
21 writing articles, speaking at conferences, attending
22 conferences.
23       In 2019, I was selected to be a member of the ABI's
24 board of directors, and I have served in that capacity for
25 the last three or four years.  In 2022, I was selected from

1  the Board to be the ABI secretary and a member of its
2  executive committee.  So it's an organization that I'm very
3  active with.
4  Q    Okay.  And I see your professional associations span a
5  couple of pages, and there are maybe about 20.  And I don't
6  want to spend the time to go through that, but I was -- it
7  did catch my attention the American College of Bankruptcy
8  fellow.  Could you explain that?
9  A    Yeah.  The American College of Bankruptcy is an
10 honorary organization that recognizes people who have done a
11 lot and are held in high character, high regard, have done a
12 lot in the bankruptcy community.  A high standard of
13 practice and focused on sort of the right types of things.
14 And I was honored to be selected as a fellow last year.
15 Q    On the top of Page 3, it lists honors and awards.  And
16 you have a number of them.  They all relate to bankruptcy.
17 Am I right?
18 A    That's correct.  Again, 99 percent of my practice
19 really is bankruptcy law.
20 Q    And then under books, it seems that you're an author or
21 co-author of six books relating to bankruptcy.
22 A    That's correct.
23 Q    And publications goes on from Page 3 to Page 4, Page 5,
24 Page 6, Page 7, to the top of Page 8.  Am I correct?
25 A    That's correct.

1  Q    Largely on what subjects?
2  A    I do a lot of writing.
3  Q    On what subjects?
4  A    Entirely on bankruptcy law.
5  Q    Okay.  And then if I'm correct, your speaking
6  engagements go on from pages 8, pages 9, and pages 10,
7  largely on bankruptcy subjects?
8  A    Exclusively on bankruptcy subjects, yes.
9  Q    Okay.
10 A    Or other insolvency-type issues.
11 Q    I know you said you're here this week because of the
12 Duberstein Bankruptcy Moot Court.  But were you in court
13 yesterday?
14 A    I was.
15 Q    Okay.
16 A    And to clarify, given the importance of these hearings,
17 I likely would have been here anyway.  Perhaps
18 telephonically, but certainly I recognize the importance of
19 these hearings.
20 Q    Have you been involved at all in any connection in the
21 Voyager bankruptcy since it started?
22 A    I have.
23 Q    Okay.
24 A    I represent Jason Raznick.
25 Q    And who is that?

1  A    Jason Raznick is the chair of the Creditors' Committee.
2  Q    Okay.  And what have you been doing in terms of your
3  representation of him related to Voyager?
4  A    In my capacity representing him, I have been actively
5  involved with the Creditors' Committee.  The Committee
6  communicates regularly as throughout this case, meets
7  weekly, frequently more often than weekly to discuss the
8  very difficult issues in this case.  And I have participated
9  in not all, but probably the majority of those calls over
10 the last seven months.  I have reviewed the pleadings in the
11 case.  So I am very familiar with the case and have
12 participated in that capacity.
13 Q    For those who are on the phone who might be wondering,
14 when did you first meet Mr. Raznick, when would that be?
15 A    I was first introduced to Mr. Raznick in July of 2022,
16 shortly after the commencement of these bankruptcy cases.
17 Q    So prior to the commencement of these bankruptcy cases,
18 you did not know him?
19 A    I did not.
20 Q    Have you actually ever met him in person?
21 A    I have not actually met Mr. Raznick in person.  We've
22 talked regularly of course on the phone and on Zoom.  In
23 2022, that's a lot of how we communicate.
24 Q    Okay.  And how did you come to meet Mr. Raznick and
25 work with him?

Page 242

1  A   Right.  Well, Mr. Raznick was one of the largest retail
2  customers in this case.  His brother is a partner at my law
3  firm.  And so when the bankruptcy case was commenced and he
4  needed bankruptcy counsel, he was referred to me.
5  Q   As the co-head of bankruptcy practice for your firm?
6  A   That's correct.
7  Q   What about McDermott Will & Emery?  Have we ever worked
8  together, McDermott Will & Emery and you?
9  A   I have not worked with McDermott Will & Emery prior to
10 this case.
11 Q   Okay.  And when was the first time you ever met Mr.
12 Azman?
13 A   In person, yesterday.  We have been on Zoom many, many
14 times.
15 Q   What about me?  When was the first time we met?
16 A   Same.
17 Q   Okay.  And you said you've attended the committee
18 meetings.  Is that right?
19 A   Yes.  And attended many of the hearings in this case as
20 well.
21 Q   Approximately how many committee meetings have you
22 attended?
23 A   I would estimate maybe 30.  As I said, there's weekly
24 committee calls that have been held to talk about the very
25 difficult issues in this case.  And at different points,

Page 243

1  they may be more frequently than weekly.  So I would say 30
2  or 40 meetings maybe.
3  Q   Do you feel you are familiar with the Committee's work
4  in the matters in this case?
5  A   Very.
6  Q   Okay.  Do you think that will help you should you be
7  appointed as plan administrator?
8  A   I do.  There's a lot to get up to speed with here, and
9  I'm up to speed with a lot of it already.
10 Q   Is there in place any recusal process should in the
11 future you have any conflict of any kind?  What happens
12 then?  What is the process under the plan as you understand
13 it?
14 A   There is.  At my request, there is a provision in the
15 plan administrator agreement that is in one of the plan
16 supplements that contemplates that in the event there is any
17 potential conflict of interest that might arise, that I
18 would recuse myself from that matter.  And of course as an
19 attorney and as a fiduciary, I take issues of conflicts of
20 interest and ethical responsibilities very, very seriously.
21    And so in the event that I or anybody else involved
22 with the plan -- because there's a Plan Administrator
23 Oversight Committee.  If I or any of the members of the Plan
24 Administrator Oversight Committee believed that there was a
25 potential conflict of interest there, then I would recuse

Page 244

1  myself from that under that provision of the plan
2  administrator agreement and one of the three members of the
3  oversight committee would serve as the plan administrator in
4  that capacity.  To be clear, I'm not aware of any conflicts
5  that might exist, but that's a protective measure that is a
6  common thing that I see in fiduciary agreements like this,
7  liquidating trust agreements, to address issues.  Because
8  you just never know what's going to come up down the road.
9  Q   Understood.  And my question was only prophylactic.  Is
10 Mr. Raznick on the Oversight Committee?
11 A   He is not.
12 Q   Now, did you attend the meeting -- I'm going to ask a
13 series of questions because I know there's an objection that
14 related to Mr. Raznick.  And I think the allegation was
15 that, quote, "Mr. Ehrlich may have influenced Mr. Raznick's
16 decisions to not pursue third party causes of action more
17 decisively, and the UCC chair, that he may have influenced
18 other UCC members to do the same."
19    Now, were you at the committee meeting on October 16th,
20 2022 where the vote was taken to support the settlement, the
21 D&O settlement?
22 A   I was.
23 Q   Okay.  Did Mr. Raznick speak out in favor of that
24 settlement at that meeting or against it?
25 A   He aggressively opposed at that time.

Page 245

1  Q   Did he vote for the settlement?
2  A   He was the last committee member to vote, and he
3  abstained.
4  Q   Okay.  So to the extent there's an allegation that he
5  was influencing folks on the Committee to support the
6  settlement, what have you to say about that?
7  A   That is absolutely not true to my knowledge.
8  Q   Okay.  One last question.  What -- can you describe to
9  the Court, what is your experience in dealing with post-
10 confirmation fiduciaries?
11 A   Substantial.  It's a substantial part of my practice.
12 I have on many occasions represented, as I noted earlier,
13 post-confirmation in Chapter 11 cases, liquidating trustee-
14 type fiduciaries.  I have also on multiple occasions
15 represented Chapter 7 trustees.  And frequently the role in
16 those cases has been very similar to the role here.  It is
17 investigating and pursuing causes of action for the benefit
18 usually of unsecured creditors.  Causes of action like the
19 causes of action that can and should be investigated here,
20 claims involving breaches of fiduciary duties, claims
21 against insurance companies, fraudulent transfer-type
22 claims, the types of things that you determined that was
23 used earlier today, the blocking and talking of sort of
24 bankruptcy post-confirmation litigation.  I am very, very
25 familiar with that law.  I am very, very familiar with the

Page 246

```
1   different wrinkles, the legal issues that come up with those
2   cases, the defenses that are asserted.  I've negotiated with
3   insurance companies before.  It's what I do.
4   Q    Okay.
5             MR. CALANDRA:  Your Honor, I have no further
6   questions.
7             THE COURT:  All right.  Any cross-examination of
8   Mr. Hage?  First start with anybody in the room who has a
9   question.  I see we have one taker.
10            MR. POSNER:  Your Honor, for the record, David
11  Posner from Patrick Townsend, Kilpatrick, Townsend &
12  Stockton.  I am counsel for the Ad Hoc Group of Equity
13  Interest Holders of Voyager Digital Limited.
14            So for the record, I am not objecting the
15  appointment of Mr. Hage as the plan administrator.  We did
16  have objections to the plan, which we have resolved, Your
17  Honor.  But subsequent to the resolution of them, when the
18  second amended plan was filed and when the third amended
19  plan was filed, there was some language in that plan which
20  concerned us, which I've been here for the last two days
21  hoping to address with the Court.  That's more in the nature
22  of argument.
23            Now that Mr. Hage is on the stand, I have some
24  questions for him that are relevant to that language in the
25  plan that concerns us.  So if I might, I would like to ask
```

Page 247

```
1   him a couple of questions.
2             THE COURT:  Go ahead.
3             MR. POSNER:  Okay.  Thank you.
4                  CROSS EXAMINATION OF PAUL HAGE
5   BY MR. POSNER:
6   Q    Mr. Hage, you testified just before that you were
7   actively involved in the Committee and all the meetings and
8   the deliberations, correct?
9   A    I wouldn't say all of the deliberations, but
10  substantially all, yes.
11  Q    You actively participated in committee meetings,
12  correct?
13  A    I did.
14  Q    And so you are generally familiar with the issues in
15  the Debtor's Chapter 11 cases from the perspective of the
16  Committee?
17  A    I am.
18  Q    Are you familiar with --
19  A    And from the perspective of other parties based on the
20  pleadings and the arguments made in the case.  I am very
21  familiar with all of the issues.
22  Q    Thank you.
23  A    Well, many of the issues.
24  Q    Have you reviewed the plan? In particular the second-
25  amended plan or the third amended plan?  I know they were
```

Page 248

```
1   both filed within the last two or three days.
2   Q    I have reviewed various versions of the plan, including
3   I believe the most recent version that's on file.  It's
4   hard, as it has been amended.  But yes, I am generally
5   familiar with the concepts with respect to the plan.
6   Q    There's sections in the plan that deal with the
7   appointment of the plan administrator, correct?
8   A    There are.
9   Q    And you probably don't have the plan in front of you.
10  I unfortunately don't have a third amended plan with me, but
11  I do have the second amended plan.  And the provisions with
12  respect to the -- I need my glasses to read it.  Docket
13  Entry 1117 is the Second Amended Plan.  And the provision
14  dealing with the appointment of a plan administrator start
15  at Page 36.  Are you familiar with those provisions of the
16  plan generally?
17            MR. CALANDRA:  Your Honor, may I object?  If
18  you're going to ask him questions about something that
19  changed, are you representing there are no changes to this?
20            MR. POSNER:  I haven't compared the Third Amended
21  and the Second Amended.  I don't think these provisions
22  changed.
23            MR. CALANDRA:  Why don't you give him the Third
24  Amended so that we're asking him about the plan that's
25  before the Court?
```

Page 249

```
1             MR. POSNER:  I don't have the Third Amended with
2   me.
3             THE COURT:  Why don't we first cut out and excise
4   all the beginning of the question and just ask him if he's
5   familiar with the provisions of the plan regarding the
6   selection of a plan administrator.
7             Are you?
8             THE WITNESS:  I am.
9             THE COURT:  Okay.
10            MR. CALANDRA:  Your Honor, I don't mind a little
11  latitude, but this is well outside the scope of my direct.
12            THE COURT:  It's okay.  Unless you want me to
13  recall the witness again later, we will do it all now.
14  BY MR. POSNER:
15  Q    So you're generally familiar with the provisions with
16  respect to the appointment of a plan administrator?
17  A    Generally, yes.
18  Q    And there's a laundry list in the plan that's entitled
19  responsibilities of the plan administrator, correct?
20  A    That's correct.
21  Q    And there's one winddown debtor for all of the
22  entities, correct?
23  A    I believe that is correct, yes.
24  Q    And so you would be the plan administrator for all of
25  the debtor entities, correct?
```

Page 250

1   A    I believe that is correct.  That is my understanding.

2   Q    And some of the responsibilities of a plan

3   administrator, or one of the responsibilities of a plan

4   administrator, it's in 5C, is appointing an independent

5   director at each debtor to act as a fiduciary for such

6   debtor entity in connection with the resolution of

7   intercompany claims.

8   A    Well, let me just say it would be helpful to have that

9   document to look at.

10  Q    Okay.

11  A    I can't confirm what says.  But I will say in the

12  interest of trying to shortcut this, that I am familiar that

13  that is a provision in the plan.

14  Q    Okay.

15  A    I don't have the specific language or any -- you know,

16  I know that's one of the...

17  Q    But you're familiar with the provision that empowers

18  the plan administrator to --

19  A    I am generally familiar with the powers of the plan

20  administrator, yes.

21  Q    To appoint independent -- an independent director at

22  each debtor entity?

23  A    Correct, yes.

24  Q    Are you familiar that there is a dispute involving

25  intercompany claims in the debtor's bankruptcy cases?

Page 251

1   A    I am.

2   Q    And what's your knowledge of that dispute?

3   A    That a dispute exists on that and that my understanding

4   is at a very high level that the settlement that has been

5   reached, subject to the revision I think that you just

6   mentioned at the beginning of your questioning, is that

7   those issues will be addressed going forward.

8   Q    Okay.  So it's your understanding that the intercompany

9   claim dispute hasn't been resolved, that it's going to be

10  resolved at some later date.

11  A    Well, let me just say that -- yeah, that is my

12  understanding.  I am not yet the plan administrator.  I have

13  not been involved in negotiations about those issues.  But

14  generally speaking, I have -- from what I have been able to

15  glean from reading from the documents, that is my

16  understanding, yes.

17  Q    You are aware that there are currently independent

18  directors at each one of the Debtor entities?

19  A    Certainly.

20  Q    Are you aware that there has been ongoing discussions

21  and negotiations among the independent directors at the

22  debtor entities regarding the intercompany claims?

23  A    I don't have any specific knowledge about that.  It

24  would surprise me if there weren't ongoing discussions.

25  Because, as I noted earlier, I know this has been an issue

Page 252

1   in the case that you've prosecuted on behalf of your

2   clients.

3   Q    Are you familiar with the Debtor's schedules and

4   statements?

5   A    I read them months ago.

6   Q    Okay.  Are you aware that when the schedules and

7   statements were initially filed, they listed the

8   intercompany claims as not disputed or contention they're

9   unliquidated?

10          MR. SLADE:  Your Honor, I would object.  This is

11  not relevant.

12          THE COURT:  Are we litigating the merits now?

13          MR. POSNER:  No, I'm just...

14          MR. SLADE:  I think we are, Your Honor.

15          THE COURT:  What's the point of that?

16          MR. POSNER:  I was just asking if he was familiar

17  with it.

18          THE COURT:  Why?

19          MR. POSNER:  Because, Your Honor, two nights ago

20  they amended the schedules to change that.  And he is going

21  to be the plan administrator, and presumably he is going to

22  end up dealing with -- potentially dealing with those

23  issues.

24          THE COURT:  So what?

25          MR. POSNER:  Well, because he is going to be the

Page 253

1   plan administrator for all of the entities.  What I wanted

2   to ask him was should the intercompany disputes continue, is

3   he going to handle them or is he going to recuse himself and

4   allow independent directors that he is going to appoint

5   handle them?

6          THE COURT:  Well, you can ask him that.  What does

7   that have to do with the schedules?

8          MR. POSNER:  It doesn't.  I was just trying to lay

9   a foundation to see if he was familiar with the topic, Your

10  Honor.

11  BY MR. POSNER:

12  Q    So, Mr. Hage, you are going to be the plan

13  administrator for all the Debtor entities. The intercompany

14  claims have to be resolved.  You're going to appoint

15  independent directors.  Is it going to be the independent

16  directors who are going to handle that since as the plan

17  administrator for all of the entities, you couldn't

18  represent all of the entities in a dispute over intercompany

19  claims, correct?

20  A    So what I would say to that is that that's an issue

21  that I have not investigated yet, as again, I am not yet the

22  plan administrator.  And so it would be an issue that I

23  would look at with professionals.  As all fiduciaries do,

24  they rely on the advice of professionals.  It's something we

25  would look at and make a determination at that time.  But I

1  am not prepared to make any statements here today about how
2  any future litigation would be dealt with, nor do I think
3  that would be appropriate.
4  Q   Okay.  But you would agree as the plan administrator
5  for all the entities that there was a dispute amongst the
6  entities, you couldn't be on both sides of the dispute.
7         MR. SLADE:  Your Honor, I object.  That is not an
8  appropriate question for this proceeding.
9         MR. AZMAN:  Your Honor, the Committee agrees.
10  This is highly inappropriate.  He's trying to box the
11  witness in a future role where he hasn't even been approved
12  to be a plan administrator.  I don't understand what the
13  line of questioning is designed to get at given what the
14  purpose of this hearing is.
15         THE COURT:  Well, I understand.  But it seems to
16  me that it's focused more on an objection to a plan
17  provision rather than to the qualifications of this
18  individual to serve as the plan administrator.  And it's not
19  clear to me that we even have a plan objection or that the
20  witness's opinion on that subject means anything.  It's my
21  opinion about whether it's appropriate or not.  So do you
22  really need to pursue that?
23         MR. POSNER:  I don't, Your Honor.
24         THE COURT:  Okay.
25         MR. POSNER:  I don't have any more questions for

1  the witness then, Your Honor.
2         THE COURT:  Thank you.  Is there anybody else here
3  who wishes to cross-examine this witness?
4         How about anybody on the telephone?  Does anybody
5  wish to cross-examine Mr. Hage?
6         Yes, Your Honor.  I am a pro se creditor.  My name
7  is (indiscernible).
8         THE COURT:  Okay.  Please proceed.
9  BY UNIDENTIFIED SPEAKER:
10  Q   Hi, Mr. Hage.  I just want to make sure I heard you
11  correctly.  Did you say that Jason Raznick's brother works
12  at your law firm?
13  A   I did.  That is correct.
14  Q   Okay.  And so I just want to confirm, is his name Brian
15  Raznick?
16  A   Yes.
17  Q   Okay.  How is it -- because one of the things that I
18  know within my -- you know, amongst us creditors, because we
19  all are part of a community and we all talk pretty much on a
20  daily basis.  And I know that one of the biggest themes or
21  concerns in this case has been this person knows this
22  person, this person does this person a favor, and everyone
23  is just, you know, kind of scratching each other's backs.
24         You are the attorney for Jason Raznick.  His brother
25  works at your law firm.  You've been dealing with McDermott,

1  and now you are nominated to be the administrator for the
2  winddown entity.  How does none of all of that constitute
3  some kind of conflict of interest?
4  A   As I said earlier, I take attorney ethical rules
5  regarding conflicts of interest very seriously.  I don't
6  believe there is any conflict of interest here.  I was not -
7  - I pitched for this position to serve as the plan
8  administrator.  The Creditors' Committee, which consists of
9  seven retail customers, each of whom have their own very
10  strong opinions about this case, the history of the Debtors.
11  And not all on the same page.  And I pitched amongst
12  multiple candidates for this role and was selected
13  unanimously to serve.  I have at my own insistence asked
14  that in the plan administrator agreement which would govern
15  my conduct going forward, the provision that I mentioned
16  earlier that would require me to recuse myself if I or any
17  member of the Plan Administrator Oversight Committee
18  believed that there was any potential conflict of interest,
19  that's what we would do.  Of course all of my conduct in
20  that capacity is subject to the supervision of the
21  bankruptcy judge.
22         And in terms of Mr. Raznick and McDermott Will & Emery,
23  as noted in the questioning that was asked to me, I don't
24  have any -- I am not beholden to them.  I don't have a long-
25  term relationship with them.  My relationship has been

1  exclusively in the context of this case.
2  Q   Okay.  So I just want to make sure I heard you
3  correctly.  Are you saying that all seven members of the UCC
4  voted to have you be the administrator of the winddown
5  entity?
6  A   Well, to be clear, because I was one of multiple people
7  who had applied for the job, so to speak, I was not present
8  for the deliberations.  That is my understanding though, is
9  that that's how it turned out.  That was the way the vote
10  came out.
11  Q   Okay.  Because I thought I heard you say unanimously,
12  you were voted unanimously.  So I guess I took that to mean
13  that every member, all seven members voted for you.  Is
14  there a way to find out how many members voted to have you
15  and how many members did not?
16  A   I'm not sure I can answer that question.  Again, I
17  wasn't present for the vote.  That is my understanding of
18  how the vote turned out.
19         UNIDENTIFIED SPEAKER:  Your Honor, would someone
20  at McDermott be able to answer that question since they
21  represent the UCC?
22         MR. AZMAN:  We're happy to look back at the
23  minutes to confirm.  I don't remember off the top of my head
24  if it was unanimous.  It was certainly the majority.  That
25  was the vote.

1    THE WITNESS:  Well, that's what I was going to

2  add.

3    MR. AZMAN:  I'm also not testifying to

4  (indiscernible).

5  BY MR. POSNER:

6  A    If it was -- it may -- I believe it was a unanimous

7  vote to my understanding.  But in any event, it was a

8  majority of the vote because I was the person elected and

9  identified in the plan.

10  Q    Yeah, I understand that.  I guess I'm just trying to --

11  like, it's just if it's unanimous meaning all seven, then

12  that makes me think, wow, like, they all don't see any

13  conflict of interest in having you?  But if say, you know,

14  two or three, because four would be the majority, you know,

15  objected to it, then at least I see that there are people

16  there -- you know, the UCC members who represent us

17  creditors, that they are along the same lines of thinking

18  that I am, that how does this not seem like they have a

19  conflict?  It's like Jason Raznick's brother is a partner at

20  your law firm.  So he needed a lawyer.  He goes to his

21  brother, who works at your law firm.  And then you are the

22  one representing Jason.  Jason is the chair of the UCC.  The

23  UCC is represented by McDermott.  And there was already a

24  lot of talk about how Jason knew Steve Ehrlich and knew Sam

25  Bankman-Fried and, you know, we're all friends and we're all

1  buddies and we're all just, you know, handing each other

2  money.  And we're all just keeping it in this tight-knit

3  circle.  You know, I just don't see how that -- people are

4  benefiting from people knowing each other .  And that's what

5  I mean.  It's like one person scratches the other person's

6  back and we're all in cahoots, which a lot of us creditors

7  feel like we were never properly represented and that the

8  money expenditures and the decisions that have been made

9  throughout this entire case have been completely against us

10  because it's part of the boys club of let's scratch each

11  other's backs.  Do you see where I'm getting?

12    THE COURT:  Yeah.  It's not a question.

13    MR. SLADE:  I object.  That was argument.  The

14  facts are in evidence.  And I object.  That was not a

15  question.

16    MR. CALANDRA:  I join, Your Honor.

17    THE COURT:  To the extent that there's a question

18  in there, I think it is for you to explain, Mr. Hage.  Do

19  you think that your partner's connection with -- as being a

20  brother of Mr. Raznick and the fact that that led to your

21  appointment gives rise to a conflict in the performance of

22  your duties as plan administrator?  And if you don't think

23  it does, please explain why it does not.

24    THE WITNESS:  I do not think it does.  First of

25  all, the plan administrator is Paul Hage, not my law firm,

1  not Jason Raznick.  As I noted, I do not have a long-term

2  relationship with Jason Raznick.

3    The theories alleged -- raised in some of the

4  objections about the relationship between Mr. Raznick and

5  Mr. Ehrlich, as I noted earlier, are not accurate.  He

6  argued against the proposed releases initially that are now

7  incorporated into the plan.  And while it is true that there

8  was a professional and maybe a friendly even relationship

9  that existed between Mr. Raznick and Mr. Ehrlich prior to

10  the bk filing, Mr. Raznick was one of the largest retail

11  customers in this case.  That's why he was appointed to the

12  Creditors' Committee by the Office of the United States

13  Trustee.  And any cordial relationship that existed

14  previously with Mr. Ehrlich certainly ended at the point

15  where Mr. Raznick's significant funds were locked up, just

16  like all the retail customers.  His goal and my goal

17  throughout this case has been singular; to get creditors,

18  retail customers, as much of their money back as possible as

19  soon as possible.

20    UNIDENTIFIED SPEAKER:  So the person, anyone at

21  McDermott, would it be possible for you guys, whenever you

22  get a chance, to send out a tweet from the official Voyager

23  UCC account letting us know -- obviously you do not have to

24  divulge who it is, but -- and know you guys have given

25  numbers before -- but letting us know how many members voted

1  yes and how many members voted no of Mr. Hage.

2    MR. AZMAN:  This is Darren Azman from McDermott

3  for the Committee.  I'll just tell you right now.  I have

4  the minutes from the meeting.  And again, this is not

5  evidence.  I wouldn't be able to introduce it through this

6  witness because he was not there.

7    There are -- just a moment.  There are four

8  individual committee members who voted to appoint Mr. Hage

9  as the plan administrator.  And at the time we thought it

10  would be a liquidating trustee, but same role.  There are

11  three individuals -- we had discussed -- just a moment, Your

12  Honor.

13    I just wanted to make sure we weren't waiving any

14  attorney-client privilege.

15    There are three committee members who voted to

16  appoint two co-trustees together.  Mr. Hage would have been

17  one.  And so I don't know whether you would call that

18  unanimous or not, but that's what the vote was.  Again, four

19  that voted to appoint Mr. Hage only, three who voted to

20  appoint two co-trustees, one of whom would be Mr. Hage.

21    UNIDENTIFIED SPEAKER:  Okay.  I just want to make

22  sure I understand this correctly.  So four people just voted

23  for Mr. Hage and then three people voted for Mr. Hage plus

24  one other person to be co-trustees with Mr. Hage?

25    MR. AZMAN:  Yes.

Page 262

1  UNIDENTIFIED SPEAKER:  Okay.  And since it's four
2  against three -- so I can see why it's unanimous in the
3  sense that all seven said Mr. Hage.  But three of the seven
4  at least wanted a secondary person almost an oversight,
5  someone to check over Mr. Hage to make sure that he's doing
6  his job properly.  So there's a tiebreaker there because
7  it's four against three.  Would you be allowed to say if one
8  of the people that's on the four side was Jason Rasnick,
9  giving an advantage to just having Mr. Hage by himself
10  versus having the co-trustee, of having that oversight over
11  Mr. Hage?
12  THE COURT:  I don't think that's -- first, I don't
13  think it's a question for the witness.  But also, I didn't
14  hear the Committee counsel say that three people wanted an
15  additional person as an oversight of Mr. Hage.  They just
16  said that they thought that there should be two trustees
17  instead of one.
18  UNIDENTIFIED SPEAKER:  You're right, Your Honor.
19  He didn't use the word oversight.  I am interpreting it that
20  way, that that might have been the intention --
21  MR. AZMAN:  Let me further clarify.  I'm just
22  reading the minutes more closely.  Just to be clear, of the
23  three who said Mr. Hage plus one -- and I did not say that
24  they would be in an oversight role.  There's two co-
25  trustees.  Of those three, one voted for Mr. Hage to appoint

Page 263

1  Mr. Hage with potentially one more trustee depending on the
2  total price.  I don't -- yeah.  That's just what the minutes
3  reflect.  That's all.
4  THE WITNESS:  Well, and let me add to that.  I
5  know that that was part of the consideration in that it is
6  no secret that the professional fees have been significant
7  in this case.  It's a complex case and it's been
8  professional-intensive.  And I do believe that a factor that
9  the Creditors' Committee considered was the expense of
10  having multiple trustees.  It is not uncommon to have
11  multiple trustees.  It's also not uncommon to have a single
12  trustee.  It is not uncommon to -- in fact, I would say in my
13  experience representing committees and trusts, it is not at
14  all uncommon for the Committee to negotiate as part of the
15  Chapter 11 case that there will be a post-confirmation
16  trustee.  And it is not uncommon for the selection of that
17  trustee to be done by the creditors' committee, and it is
18  not uncommon even for members of the creditors' committee to
19  serve in that capacity.  And so that is all part of the
20  deliberation that went into this.  One of my selling points,
21  because I'm very mindful of the professional fees and that
22  every dollar that is spent is a dollar that's not available
23  for customers, is my rate, and that I am located in Michigan
24  and not in New York.  And therefore, my rate is
25  substantially less than New York rates.  And I'm sure that

A-1234

Page 264

1  that was part of the consideration that was given by the
2  Committee.
3  UNIDENTIFIED SPEAKER:  And to my question, would
4  we be allowed to know which way Jason Rasnick voted?
5  MR. AZMAN:  Is that a question for the witness or
6  --
7  THE COURT:  I think it's a question to you as
8  counsel, not to the witness.  Because you're the only one
9  that has the information.
10  MR. AZMAN:  Sure.  Mr. Rasnick voted for Mr. Hage
11  only.
12  UNIDENTIFIED SPEAKER:  So Jason Rasnick voted so
13  that Mr. Hage got all of the business versus it being split
14  with somebody else is kind of how I see that.  Okay.
15  Other than asking questions, it's not like I
16  really have any power in this case.  But I do for the record
17  want to state that I object to Mr. Hage.  Nothing against
18  him personally.  I'm sure he does his job well.  But
19  considering everything that has surrounded this -- that has
20  been -- this case being surrounded by so much non-
21  transparency and just, like I already said, the whole let's
22  scratch each other's backs and let's do each other favors.
23  So for the record, I object to Mr. Hage being a plan
24  administrator and I would prefer that someone else be
25  chosen.

Page 265

1  THE COURT:  Okay, I understand that.  Do you have
2  any more questions for Mr. Hage?
3  UNIDENTIFIED SPEAKER:  No.  Thank you so much,
4  Your Honor.
5  THE COURT:  Okay.  Anybody else who wishes to
6  question Mr. Hage?
7  MR. NEWSOM:  Your Honor, this is Dan Newsom, pro
8  se creditor.
9  THE COURT:  Okay.  Please proceed, Mr. Newsom.
10  BY MR. NEWSOM:
11  Q  Good evening, Mr. Hage.  In your representation of Mr.
12  Rasnick, did you advise him on how to act in the best
13  interest of creditors (indiscernible)?
14  MR. CALANDRA:  Your Honor, I am going to object
15  that we're invading the client privilege here.  I don't mind
16  him just answering yes or no, but any further than that, I
17  would object.
18  THE COURT:  It seems to me you can answer yes or
19  no to that question without breaching the privilege.
20  BY MR. NEWSOM:
21  A  Yes.
22  Q  Did you unofficially advise other members of the UCC on
23  (indiscernible) during the meetings?
24  MR. CALANDRA:  Objection.  Don't even understand
25  what unofficially means.

## Page 266

1   THE COURT:  I don't, either.  Objection sustained.
2   BY MR. NEWSOM:
3   Q   Do you agree that one of the roles of the UCC is to
4   monitor fees (indiscernible) bankruptcy (indiscernible)?
5   A   I'm sorry.  I am having a hard time hearing the
6   question.
7   THE COURT:  Do you agree that one of the roles of
8   the UCC is to monitor fees was the question.
9   BY MR. NEWSOM:
10  A   I do.
11  Q   I believe in one of the objections, Mr. Raznick stated
12  he has no control over fees.  Did you advise him not to
13  raise objections or concerns to the fees?
14  MR. CALANDRA:  Now we're getting into the
15  privilege, Your Honor.  I object.
16  THE COURT:  Did you have any non-privileged
17  communications with Mr. Raznick on that subject?
18  THE WITNESS:  No.
19  THE COURT:  Okay.
20  THE WITNESS:  Not that I recall.
21  THE COURT:  All right.  The privilege belongs to
22  Mr. Raznick.  I can't let the witness violate his
23  professional obligations and testify about matters that are
24  privileged.
25  MR. NEWSOM:  Understood.

## Page 267

1   BY MR. NEWSOM:
2   Q   If I might ask, what was the final result of the vote
3   in the meeting regarding the settlement?
4   A   I'm very sorry.  I -- could you ask the question again?
5   THE COURT:  What was the final vote on the motion
6   to approve the settlement?  The one that you said Mr.
7   Raznick opposed.
8   BY MR. NEWSOM:
9   A   I believe it was four in favor of not objecting to the
10  settlement, two who were voting in favor of objecting to the
11  settlement, and one, Mr. Raznick, who abstained.
12  Q   To the best of your belief, that abstention did not
13  affect the outcome, correct?
14  MR. CALANDRA:  I'm sorry, I didn't hear the
15  question.
16  THE COURT:  The abstention then did not affect the
17  outcome of the vote.  Is that right?
18  BY MR. NEWSOM:
19  A   That is correct.  Mr. Raznick voted last.  And at that
20  point, the outcome of the vote had been determined.
21  Q   Okay.  And I'm not sure if this is attorney-client
22  privilege, but I'll ask and allow the Court to decide.
23  (indiscernible) corporation have any holdings on the
24  platform that were withdrawn within the 90 days prior to the
25  petition?

## Page 268

1   MR. CALANDRA:  I'm sorry, I didn't even hear the
2   question.  Could you repeat the question, please?
3   THE COURT:  It was something about whether there
4   was somebody who had withdrawals in the 90 days before the
5   petition.
6   MR. SLADE:  (indiscernible) money on the platform
7   that was withdrawn within the 90 days.
8   BY MR. NEWSOM:
9   A   I do not know.
10  Q   Did Mr. Raznick have any holdings that were withdrawn
11  in that same timeframe?
12  A   I believe he did, although I don't know the amounts or
13  dates.  He wasn't treated any differently than any other
14  retail customer in that regard.
15  Q   Has the Committee -- strike that.  It's your
16  representation Mr. Raznick prevents you from advising the
17  Committee to contemplate pursuing insider clawbacks or other
18  preferential clawbacks of those with insider knowledge?
19  MR. CALANDRA:  Objection.  I'm not sure if he's --
20  was advising the Committee.  He was advising Mr. Raznick.
21  THE COURT:  What was the question?
22  BY MR. NEWSOM:
23  Q   I'll rephrase.  It's your representation that Mr.
24  Raznick prevents you from advising him to contemplate
25  pursuing insider clawbacks for those within insider

## Page 269

1   knowledge?
2   THE COURT:  Did your representation of Mr. Raznick
3   prevent you from advising the Committee?  Is that what your
4   question was?
5   MR. NEWSOM:  Mr. Raznick specifically.
6   THE COURT:  Mr. Raznick specifically.
7   MR. AZMAN:  Objection.  Mr. Raznick wouldn't have
8   the ability to pursue.  I think it's a misunderstanding of
9   the function of the Committee and Mr. Raznick's role, Your
10  Honor.  I think the witness can answer because I think he
11  understands.
12  BY MR. NEWSOM:
13  A   I'm sorry, I don't understand the question.
14  Q   I believe the objection -- the question sort of was
15  answered.  So at this point I will pass the stand.
16  THE COURT:  Okay.  Anybody else on the phone who
17  wishes to question Mr. Hage?
18  MR. HENDERSHOTT:  Yes, Your Honor.  Tracy
19  Hendershott, pro se creditor.
20  THE COURT:  Okay.
21  MR. HENDERSHOTT:  Thank you.
22  BY MR. HENDERSHOTT:
23  Q   Good evening, Mr. Hage.
24  A   Good evening.
25  Q   Sorry?

1    THE COURT:  He said good evening.

2  BY MR. HENDERSHOTT:

3  Q    You can hear me fine?

4  A    I can.

5  Q    Yes, thank you.  Excellent.  So just to clarify, you

6  know, the creditors have filed the objection.  It's not

7  necessarily against you, Mr. Hage.  We don't even know you.

8  Our objection is overall the conduct of this trial what we

9  feel is the inappropriate status of Chapter 11.  We feel

10 that there's fraud and dishonesty (indiscernible) gross

11 mismanagement.  We feel that when the Texas Attorney

12 Generals brought this up back in October as well as

13 creditors bringing it up in January, this case should have

14 been converted to a Chapter 7.

15    You've extensively highlighted your credentials and

16 expertise in bankruptcy.  Textbooks, articles, education,

17 experience.  I'm curious if you could share with us your

18 beliefs on the status of this case remaining in Chapter 11

19 when numerous cases and United States Code (indiscernible)

20 United States Trustee that the primary role of Chapter 11 is

21 to (indiscernible) comprehensive reorganization according to

22 the United States Code (indiscernible), one of the paramount

23 objectives of a Chapter 11 is reorganization, iso to

24 rehabilitate, none of that which is happening in this trial.

25    So I'm curious, as the plan administrator going

1  forward, what is your viewpoint on the status of whether

2  this should have been Chapter 7 or Chapter 11.

3    MR. CALANDRA:  Your Honor, I object to this

4  question.  It's not even relevant what his view is on this.

5    THE COURT:  Do you reall that object?

6    MR. HENDERSHOTT:  It's going to be (indiscernible)

7  as we ask follow-on questions.  You know, his methodology,

8  his pursuit of clawbacks, releases, communication style

9  (indiscernible) appointed to the role of administration.

10    THE COURT:  I actually don't think it has anything

11 to do with those points, but I will allow him to answer the

12 question.

13 BY MR. HENDERSHOTT:

14 A    It was a long question, but what I would say is that

15 Chapter 11 of the Bankruptcy Code is used to reorganize

16 businesses, it's frequently used to sell businesses, and it

17 can be used to liquidate businesses.  The purpose and the

18 goal of every Chapter 11 case is to maximize value for the

19 benefit of creditors.

20    In this case, I believe that the plan that is before

21 the Court is the best method of what I've been aiming to

22 achieve throughout this case, which is to get the most

23 amount of money back to creditors as soon as possible.

24    And in terms of -- there was some reference to claims

25 and causes of action.  That is the work that continues to be

1  done.  Again, with an eye towards maximizing the return to

2  all creditors.

3  Q    Thank you for that response and insight.  So let's talk

4  about the specifics of when you (indiscernible) to get

5  appointed as the administrator (indiscernible).  Clawbacks

6  (indiscernible) just recently after voting was completed,

7  unfortunately.  The claw backs proposed for retail clients,

8  customers, creditors only with a limit of 20 days between

9  the point of petition (indiscernible).  My understanding is

10 that for retail customers, the standard clawback period is

11 90 days with one year for insiders.  As a potential

12 administrator on a go-forward basis, are you abiding by that

13 20-day limitation only for retail customers, no clawbacks

14 for insiders?

15    THE COURT:  What is this 20-day period?

16    MR. AZMAN:  Your Honor, Mr. Hendershott is

17 referring to an amendment to the APA that was filed I think

18 a few days ago.  What I think Mr. Hendershott -- I'm going

19 to try to help Mr. Hendershott with the question here.  What

20 Mr. Hendershott may not realize is that -- yeah.  What Mr.

21 Hendershott may not realize is that as part of the

22 transaction with Binance, Binance specifically negotiated to

23 acquire all claims that the estate has against customers.

24 Of course the idea being that they're basically buying

25 Voyager's customers.  They don't want the estate to turn

1  around and sue the customers they just bought.  Very common

2  in bankruptcy.

3    We have, however, a provision in the APA that

4  allowed the Committee to go to Binance and show them certain

5  transactions that we would request that they allow to be

6  carved out so that they could be preserved for the benefit

7  of creditors.  They had no obligation to agree if we came to

8  them.  But we did to go them with certain criteria.  And

9  there were really two criteria that we came to them with.

10 One was former customers who were not creditors as of the

11 petition date.  And the idea behind carving those customer

12 claims out is that they're not creditors.  They don't even

13 have an opportunity to vote on the plan, by the way.  But

14 there should be no reason that Binance would care if the

15 estate were to investigate and pursue former customers who

16 do not move over to Binance, nor could they.  Because,

17 again, they don't have anything on the platform.

18    There are 32,000 customers that fall into that

19 bucket.  We call them former customers.  Binance agreed to

20 amend the APA in that manner.  In addition to that -- and

21 it's approximately 32,000.  I think it's like 32,800 or so.

22    In addition to that, the second criteria -- and

23 there were 92 creditors that satisfied the second criteria.

24 Essentially what we were looking for were indicia of

25 customers who may have had advanced notice of the freeze or

Page 274

1   the withdrawal limits that were getting ready to be imposed
2   on customers and thus got their money out before others did.
3   And that is what we went to Binance with.  And we thought
4   that that would be justifiable to Binance, and it was.  And
5   I don't think that they would have accepted anything else
6   for the reasons that I stated earlier.
7           Mr. Hage, as counsel to Mr. Raznick, has nothing
8   to do with whether that negotiation ended up in the place it
9   did, of course.  Mr. Raznick will have to live with whatever
10  the plan and the APA say, and that is where is before Your
11  Honor.  I hope that's helpful, and I'm sorry to bring an
12  argument to this, but I thought it would be helpful to
13  clarify for Mr. Hendershott.
14          MR. HENDERSHOTT:  I do appreciate that, Mr. Azman.
15  So the question is --
16          THE COURT:  Hang on, Mr. Hendershott.  We've got
17  to -- because of the timing, we have to probably terminate
18  and re-log in.  Is that it, Jackie?  Does everybody need to
19  dial back in or do you just need to do it?
20          CLERK:  No, I just need to do it.  That's all.
21          THE COURT:  We'll take five minutes.
22          (Recess)
23          THE COURT:  All right.  Please be seated.  I think
24  we've reconnected to Court Solutions.  It is quarter to
25  seven.  I would say that -- I'm not sure everybody

Page 275

1   appreciates it, but in light of the number of pro se people
2   who are interested, I have been much more lenient than usual
3   in terms of the questions I have allowed.  I have tried to
4   do that to try to make sure that everybody feels like
5   they've had their questions addressed, even if not totally
6   to their satisfaction, even where we've frequently strayed
7   off the issues that are actually before us today.  But given
8   how late it already is, I will just make a plea that we
9   focus on what's left of relevance to Mr. Hage himself, which
10  is whether he has any conflicts of interest and whether he
11  is appropriate for the choice as plan administrator.
12          So, Mr. Hendershott, I think you were asking
13  questions.  Would you like to continue?
14          MR. HENDERSHOTT:  Yes, Your Honor.  Thank you.
15  BY MR. HENDERSHOTT:
16  Q   So, Mr. Hage, we left off on clawbacks, which is going
17  to be a primary role of your position.  Is that correct?
18  A   Did you say clawbacks?
19  Q   That's correct.
20  A   I wouldn't characterize that as the primary role here.
21  As Mr. Azman noted, the Committee was able to negotiate to
22  retain some of the -- by clawbacks I assume you mean
23  bankruptcy preference actions -- was able to negotiate that
24  some of those be preserved.  But, look, there's a wide
25  variety of potential claims and causes of action that may

Page 276

1   exist here.  I think that the primary focus in this case has
2   been on specifically trying to exercise, execute a
3   transaction quickly that would get money back to creditors.
4   And so other than as necessary and appropriate for purposes
5   of dealing with the release issues that are in the plan, I
6   would say a comprehensive investigation of all of the
7   potential claims and causes of action that may be pursued by
8   me as the plan administrator has not yet been conducted.
9   But it will be conducted.  And if we conclude that there is
10  merit to those claims and that there are collectable
11  entities that are pursued such that it's a good use of
12  creditors' money to pursue them, we will pursue them.
13  Q   That's great.  (indiscernible).  Under the current
14  manner of clawbacks, instead of the standard 90 day for
15  retail and one year for insiders -- and Mr. Azman can
16  correct me if I'm wrong.  My understanding is it's 20 days
17  for retail, a defined subset that Mr. Azman clearly
18  articulated, and zero clawbacks for insiders.  Am I
19  misunderstanding that?
20          THE COURT:  I think if I understand it correct,
21  it's 90 days unless somebody has become a Binance customer,
22  in which case part of the sale agreement and the exchange
23  for the $20 million and other consideration was that claims
24  against that person would be released except that the
25  release would not apply as to those persons if they had

Page 277

1   advance knowledge of the closing of the platform and if they
2   withdrew within -- that's where the 20 days comes in.  Am I
3   right about that?
4           MR. AZMAN:  Yeah.  I don't remember the exact
5   number of days.  It might be 20 days.  But yes, exactly what
6   you said, Your Honor.
7           THE COURT:  Okay.  And is there any proposed
8   limitation of the one-year insider preference period?  Not
9   that I recall.
10          MR. SLADE:  I'm sorry, what was the question?
11          THE COURT:  Is there any proposed limitation of
12  the one-year insider preference period?
13          MR. SLADE:  No, but if they're covered by the
14  release -- that was --
15          THE COURT:  Okay.  I see.  That's right.  Yes.
16  There is in the sense that they're released.  That's right.
17  Okay.
18          MR. HENDERSHOTT:  So I'm correct.  It was zero
19  clawbacks for insiders, 20 days for retail.
20          THE COURT:  No.  No, that's not -- when you say 20
21  days for retail, 90 days for retail unless you are customer
22  who has gone to Binance, in which case the claim preference
23  clawback claims are released except that those people will
24  not be released if they knew about the closing of the
25  platform in advance and made withdrawals within the 20 days

1  before the platform was closed down.  Have I stated that

2  correctly, Counsel?

3      MR. AZMAN:  The only slight clarification is it's

4  not that they knew about it, because we don't know yet if

5  they knew about it.  They're being preserved based on

6  indicia that we've developed, and they will be investigated.

7  They may not even be pursued.  This is nothing about whether

8  or not --

9      THE COURT:  so It's 90 days for retail unless

10  you're a Binance -- become a Binance customer, in which case

11  it may be narrower.  Okay?

12      MR. HENDERSHOTT:  Okay.

13  BY MR. HENDERSHOTT:

14  Q    So, Mr. Hage, I've spoken to numerous bankruptcy

15  lawyers.  This is the first time I've ever heard of any

16  retail being clawed back and no action taken -- that's the

17  other for the insiders.  And actually, the law extends the

18  timeline for insiders specifically because they have more

19  responsibility, more insight, more knowledge than the

20  typical retail customer.  So can you justify how all

21  insiders are let off the hook from this very painful process

22  (indiscernible)?

23      THE COURT:  I'm sorry, Mr. Hendershott, that's not

24  Mr. Hage's decision.  That's a provision of the plan.  And I

25  will hear your argument as to whether that should happen.

1  That's a function of the releases that have been proposed.

2  But whoever is -- if I confirm the plan, whoever turns out

3  to be the plan administrator will live with whatever the

4  terms of the plan are.  It's not going to be that person's

5  decision as to whether those insiders were already released

6  or were not already released.  That's an issue that's

7  separate from anything that Mr. Hage would have any possible

8  control over.  It will either have happened because the

9  releases are approved, or it won't happen because the

10  releases won't be approved, and you can make your arguments

11  when we talk about releases later.  But it really has

12  nothing to do with what Mr. Hage is going to do.  He'll have

13  to live with whatever --

14      MR. HENDERSHOTT:  (indiscernible).

15      THE WITNESS:  Whatever claims or --

16      MR. HENDERSHOTT:  (indiscernible).

17      THE WITNESS:  (indiscernible) assigned to the

18  trust, I will investigate and pursue as any proper fiduciary

19  would do.

20  BY MR. HENDERSHOTT:

21  Q    Great.  (indiscernible).  I'm not an expert by any

22  means.  I thought you had more autonomy to make those

23  decisions.

24      So as the plan administrator, once it's approved by

25  Judge Wiles, do you have the ability to make amendments to

1  it after the windown trust entity is in effect?

2      THE COURT:  Make amendments to what?

3      MR. HENDERSHOTT:  The plan that you just mentioned

4  he has to comply with after your ruling, which

5  (indiscernible) of the plan (indiscernible) couple of days.

6  I'm curious if the administrator is authorized to continue

7  revising the plans post conclusion of the case and during

8  the lifespan, which could be years, of the windown entity.

9      THE COURT:  There are specific code provisions

10  that apply to request to modify a plan after it has been

11  confirmed.  It is not impossible, but you have to satisfy

12  certain standards and you have to come back to me to get

13  approval to make those modifications.  So I don't know if

14  that answers your question, Mr. Hendershott.  But again,

15  whatever powers there are in general are really not

16  functions of this plan or of what's been proposed to

17  delegate to Mr. Hage.

18      MR. HENDERSHOTT:  I feel that you've answered my

19  question.  There is a process (indiscernible) potentially by

20  the administrator, but it's a court internal process of

21  amendments.  Is that correct?

22      THE COURT:  Yes, there is.  There is a provision

23  in the Code --

24      MR. HENDERSHOTT:  Thank you, sir.

25      THE COURT:  Well, let me actually check that.

1  Maybe I just misquoted it.  There is a provision for changes

2  to a time after confirmation and before substantial

3  consummation.  Okay?  In other words, if something changes

4  between the substantial consummation of the -- the

5  confirmation and substantial consummation, it can be

6  changed.  And I don't want --

7      MR. HENDERSHOTT:  Okay.  And then after that, Your

8  Honor, there's no ability to amend?

9      THE COURT:  Well, at some point it's done and

10  there's nothing to amend.  I really -- you know, I can't

11  give you legal advice, and that's about as far as I can talk

12  to you about just -- you know, I'm not going to give you a

13  treatise on plan amendments, unfortunately.  I can't.  I'm

14  not allowed.

15      MR. HENDERSHOTT:  Sure.  I understand.

16  BY MR. HENDERSHOTT:

17  Q    Okay.  So, Mr. Hage, releases.  Currently every single

18  entity that's touched this case, from the Debtors

19  (indiscernible) officers, employees, every single

20  professional, everyone except for the creditors are

21  receiving releases in this case.  Can you (indiscernible)

22  that this is appropriate, especially under the recent

23  rulings of Purdue and even the Supreme Court just came out

24  with a ruling last week (indiscernible).  Is that

25  appropriate in your opinion?

A-1238

Page 282

1    MR. SLADE:  I object Your Honor.  I don't know how
2  the witness is supposed to answer that question.
3    THE COURT:  He's not the one -- he is not the one
4  proposing the releases.  Do you understand that?
5    MR. HENDERSHOTT:  He provided consult to the
6  chairman of the UCC (indiscernible).  Am I wrong?
7    MR. SLADE:  That is privileged, Your Honor.
8    THE COURT:  Well, he can't testify about advice he
9  gave to Mr. Raznick.
10    MR. HENDERSHOTT:  I'm not asking for his
11  discussion with Mr. Raznick.  I'm asking for his opinion.
12    MR. AZMAN:  I don't even know that he did
13  (indiscernible).
14    THE COURT:  Yeah.  I will sustain the objection.
15  BY MR. HENDERSHOTT:
16  Q    Okay.  Moving on.  There was a lot of discussion, Mr.
17  Hage, about your experience, and it was very impressive.
18  (indiscernible) and may have just missed it, is your
19  experience in this particular role as a plan administrator.
20  Could you -- forgive me if you have to repeat it.  But could
21  you expand on that, please?
22  A    I have not personally served as a plan administrator
23  before.  I have on multiple cases represented post-
24  confirmation fiduciaries.  So I am very -- it's a
25  significant part of my practice.  And so I am very familiar

Page 283

1  with the duties that exist for post-confirmation
2  fiduciaries, the legal issues that come up with the types of
3  claims and causes of action that are frequently pursued and
4  I expect will be investigated here in the process.
5  Q    Okay.  So I didn't miss it.  There is no direct
6  experience as a plan administrator before.  And you
7  (indiscernible) about being a bankruptcy judge.  I don't
8  know if that was purely (indiscernible) or maybe a
9  combination of both.  But would being a plan administrator
10  be on the pathway for you to achieve being a bankruptcy
11  judge (indiscernible)?
12  A    I think when bankruptcy judges are selected, that the
13  respective court of appeals looks at a variety of factors.
14  An applicant's professional experience, an applicant's
15  personal integrity, his reputation within the community,
16  both locally and beyond that.  His empathy, his or her
17  empathy for creditors, his judicial temperament.  These are
18  all things they look at in deciding who to select for a
19  judgeship.  And so in terms of relevant experience, I think
20  that having experience serving as a fiduciary would probably
21  be something that a court would look at and view as a
22  positive thing so long as the fiduciary acted as a
23  fiduciary, which certainly is my intention.
24  Q    That makes sense.  So (indiscernible) the motivation
25  (indiscernible).  That's a very admirable path that you're

Page 284

1  on (indiscernible).  But my only concern is this is the
2  first major crypto bankruptcy.  It's a mega case.  The first
3  thought that comes to my mind, Mr. Hage, is maybe your first
4  role as plan administrator could be on a less-complex,
5  smaller size, not with all the novel complexity that is
6  found in this case.
7    MR. AZMAN:  Is that a question?
8    THE COURT:  Yes, it's a question.
9    MR. HENDERSHOTT:  It is a question.
10    THE COURT:  What do you think?
11  BY MR. HENDERSHOTT:
12  A    I would say that because the plan contemplates a
13  transaction where much of the crypto assets will be
14  transferred prior to my taking the position, I think that
15  crypto, while an important part of this case, in many ways
16  the role of the plan administrator will be similar to the
17  role of the plan administrator in every Chapter 11 case,
18  which is to investigate and pursue causes of action.  And
19  there aren't a lot of cryptocurrency in bankruptcy experts
20  in the world because this is a very fairly new experience
21  with the crypto bankruptcy cases that have been filed over
22  the last eight months.  I would say that I have quite a bit
23  of knowledge and experience about the intersection of
24  cryptocurrency and bankruptcy as a result of my involvement
25  in these cases.

Page 285

1  Q    Interesting.  You talk about the (indiscernible) with
2  the previous creditor.  Have you seen the objection to the
3  motion for approval of the plan that was submitted with the
4  survey results, that was submitted to them through a third
5  party, independent, SurveyMonkey, about the creditor class
6  satisfaction with the representation, the letter of
7  communication that was provided from your client to the
8  creditor class?
9    MR. CALANDRA:  It's not in evidence, Your Honor.
10    THE COURT:  I'm sorry?
11    MR. CALANDRA:  The survey results are not in
12  evidence.  They're hearsay.
13    THE COURT:  The only question so far is --
14    MR. HENDERSHOTT:  They are in evidence.
15    THE COURT:  The objection --
16    MR. HENDERSHOTT:  You submitted them --
17    THE COURT:  The objection is overruled.  You've
18  asked him if he's seen them.  I'll let him testify.
19  BY MR. HENDERSHOTT:
20  A    I did read that objection, as I've tried to read all of
21  the objections to the plan that have been filed.
22  Q    And did you see that 97 percent of the creditors that
23  responded voted that the UCC representation has been a
24  failure to the creditor class?
25  A    I remember the survey.  I don't remember the details of

1 the survey.

2 Q   Okay.  And so it's on the docket.  It's document number

3 161.  And if you trust me, I can read the results to you.

4 It's 97 percent of the creditors responding perception of

5 failure of UCC representation.  94 percent of the creditors

6 responding Jason Raznick in his role as UCC chairman failed

7 the creditor class.

8      You were directly responsible for providing guidance to

9 Mr. Raznick as that chairman of the UCC committee.  Do you

10 find these findings concerning, significant?  Is there any

11 lessons learned (indiscernible) your own behavior and

12 engagement between yourself as administrator and the

13 creditors that you would take away from these survey results

14 on a go-forward basis?

15 A   What I take from those results is that there is a group

16 of creditors in this case who are dissatisfied with the

17 committee representation.  I will say that -- I was not the

18 committee.  I did not represent the committee.  I

19 represented a member of the committee.  But I know that in

20 terms of communications with creditors, there were I believe

21 four town halls that the committee professionals -- I was

22 not one of them -- participated in and answered questions

23 for lengthy periods of time from creditors in the case.  I

24 know that they have maintained a Twitter link to provide

25 updates on the case.  And I believe that this committee

1 tried very hard to communicate as much as possible when you

2 have a creditor body of this size.  But I was not personally

3 involved in those discussions.

4 Q   Well, that's my concern.  So I'm not hearing that you

5 would do anything different.  And actually, as part of the

6 objection, (indiscernible).  Pardon?

7      THE COURT:  What was the question?

8      MR. HENDERSHOTT:  Can you hear me?

9      THE COURT:  We can hear you.  But what was the

10 question?

11      MR. HENDERSHOTT:  I haven't finished asking it

12 yet.  Proceed?

13      THE COURT:  If you have a question, proceed.  Yes.

14 BY MR. HENDERSHOTT:

15 Q   Yes.  So as part of that same objection, Mr. Hage,

16 (indiscernible) with the creditors that your direct

17 communication expressly stating that it was not the

18 responsibility of the UCC to communicate.  And that is a

19 direct result (indiscernible) to the 90-plus precent

20 dissatisfaction rate.  So it's very concerning to hear that

21 you wouldn't change anything and that you feel that the

22 level of communication (indiscernible) in this case.

23 (indiscernible) and I will pass on the podium at this point.

24 Thank you, Mr. Hage, for your time.

25      THE COURT:  Okay.  Are there any other questions

1 for Mr. Hage?

2      MR. JONES:  Seth Jones, pro se, Your Honor.

3      THE COURT:  Okay, Mr. Jones.

4      MR. JONES:  I've got some questions.

5 BY MR. JONES:

6 Q   Jason Raznick in the past has said that he had to hire

7 a (indiscernible) lawyer before the UCC professionals were

8 hired.  How much work did you do for the UCC members

9 (indiscernible) in this case?

10      THE COURT:  Can you answer that question?

11      MR. AZMAN:  Could I -- I'm not sure I heard.

12      THE COURT:  The question was how much work did you

13 do for Mr. Raznick before McDermott was hired to --

14      MR. JONES:  No, no  the group.  By the group.

15      THE COURT:  I'm sorry?

16      MR. JONES:  By the group.

17      MR. AZMAN:  He didn't represent the Committee.

18      THE COURT:  He didn't represent the Committee, so

19 I'm not sure what your question is.

20      MR. JONES:  No.  Jason Raznick in the past has

21 said that he hired a personal lawyer which helped

22 (indiscernible) that a lot of work had to go in to figure

23 things out.  How much work was he involved with the other

24 members of the UCC before McDermott was hired?

25      THE COURT:  Were you -- were you involved in any

1 work with the other members of the Committee before

2 McDermott was hired?

3      THE WITNESS:  I was.

4      THE COURT:  Okay.

5 BY MR. JONES:

6 A   I met -- I spoke with Mr. Raznick for the first time

7 sometime in mid-July.  I believe the creditors' committee

8 selected McDermott in late July.  It is common in the -- I

9 don't remember exactly the date when the creditors'

10 committee was formed, but it was sometime in the middle

11 there.  It is not uncommon when there are appointed for them

12 to have their attorneys participate in that process.  That

13 was I think particularly important in this case because,

14 whereas in many cases the creditors' committee consists of

15 usually seven trade creditors, some of whom have familiarity

16 with the bankruptcy process.

17      In this case, the diverse committee that was appointed

18 by the Office of the United States Trustee consisted all of

19 retail customers of Voyager who, to my knowledge, none of

20 whom -- no, I believe actually one of them may have served

21 on a creditors' committee before, but most of them had no

22 experience with the bankruptcy process at all.

23      And so as an attorney representing one of the members

24 of the Committee for that week or so period before McDermott

25 was hired as the counsel for the Committee, I took efforts

1 to help organize the Committee in terms of helping to deal
2 with a deluge of pitch packages that Committee members
3 received and coming up with an organized process of
4 identifying who we wanted to interview, who they wanted to
5 interview, and who they -- not me -- wanted to select.
6 Q   Do you think in that week process, that gave you a leg-
7 up on getting appointed by the winddown trust?
8 A   No.
9 Q   How many applied and how many interviewed for the
10 winddown trust?
11 A   I cannot speak to how many applied.  I believe that the
12 Creditors' Committee interviewed three individuals.  I say
13 that because it was in a pleading, I believe, that the
14 Committee filed.  But I don't know how many people expressed
15 interest in it.
16 Q   what is the voting procedures for the UCC when voting?
17 Is it one-by-one or is it a blind vote or what?
18 A   As is customary for creditors' committees -- and I have
19 a lot of experience working with creditors' committees, as
20 do many of the other attorneys in the room here, it is -- I
21 have never seen a committee where it wasn't true that each
22 committee member -- again, it's usually seven members --
23 each committee member gets one vote.  No one member's vote
24 carries more weight than any other committee member.  The
25 chair does not have veto power or a more weighted vote.

1 It's not done proportionate based on the size of a
2 creditors' claim.  Each of the usually seven members gets
3 one vote, and it's majority rule with the exception that to
4 the extent there is any sort of conflict issue that comes
5 up, that somebody recuses themselves.
6 Q   What was the voting procedures when they vote?
7 A   What was the voting procedures?
8 Q   Yeah, how did the voting procedures work?  Is it a one-
9 by-one vote?
10 A   Yes.  Well, I've seen it done different ways.  Usually
11 committee meetings are going to be run by the professionals
12 for the committee.  In this case, that would be McDermott
13 and FTI.  When an issue is presented for a vote, each
14 creditor votes.  And usually they just roll through the
15 roster, vote yea or nay.
16 Q   So one by one.
17 A   That's correct.
18 Q   Okay.  So -- all right.  Why didn't Jason Raznick vote
19 no if he claimed that (indiscernible).  You said abstain is
20 the same method as voting no.
21        THE COURT:  I think there were two questions
22 there.  Which one do you want to ask?
23 BY MR. JONES:
24 Q   Okay.  Do you think abstaining is the same method as
25 voting no?

1        THE COURT:  Was abstaining the same as voting no?
2 Is that what you are asking?
3        MR. JONES:  Abstain.  Abstaining.
4        THE COURT:  Yeah.
5        MR. JONES:  Abstaining to a vote.
6 BY MR. JONES:
7 A   I know that at the time Mr. Raznick voted, the decision
8 had already been determined because the requisite majority
9 of committee members had already voted not to object to the
10 settlement.  Why Mr. Raznick -- and this was a heavily
11 debating thing.  This was not an easy decision.  It was not
12 an easy decision for any of the committee members.  It was
13 heavily debated and deliberated on.  Because those committee
14 members are all retail customers, just like you, sir.  And
15 those -- so anyway, he was the last to vote.  The decision
16 had already been made at that point.  And why he abstained
17 as -- instead of simply voting no or joining the pack, I
18 can't answer that.  Joining the majority I should say.
19 Q   When did the vote take place to appoint a plan
20 administrator?
21 A   I don't recall the exact date, but I would -- I think
22 it was probably in late October or early November.
23 Q   You said this is a complex case.  Do you think one
24 trustee should have the power to control $135 million
25 (indiscernible) recovering a billion dollars?

1 A   Well, keep in mind that there is a three-person plan
2 administrator governing board.  There is one plan
3 administrator.  And the plan administrator in this case will
4 need to and will -- I will hire competent, experienced,
5 capable professionals to help fulfill that duty.  So yes, I
6 do think it's good, it's sufficient.
7        And the alternative of having multiple trustees just
8 means more professional fees, which at the end of the day
9 will eat away at the recovery for customers and creditors.
10 All creditors, not just customers.
11 Q   Is this true?  The plan administrator shall have the
12 exclusive right, power, and interest to review, reconcile,
13 enforce, elect, compromise, settle, or elect not to pursue
14 the vested actions -- causes of actions, including, without
15 limitation, FTX, Alameda, and JAC?
16 A   There are provisions that deal with the plan
17 administrator's authority.  And there's a generally broad
18 provision like that.  There are some caveats to that I
19 believe where the amount at issue is subject to above a
20 certain threshold.  I don't remember what those thresholds
21 are.  But generally that's right.  The plan administrator is
22 a fiduciary whose job is to decide which claims to pursue or
23 not to pursue, when to settle or not to settle, when to
24 litigate or not to litigate.  And of course any fiduciary
25 would do that based on discussing and deliberating with the

1  professionals who that fiduciary has retained.  And of

2  course in this case, like most cases, because there is a

3  trust or plan administrator governing board, in consultation

4  with them as well.

5       And in some cases, settlements are frequently done by

6  filing a motion with the bankruptcy court for approval of

7  settlements.  And so in some cases, that may be something

8  that we would do as well.

9  Q   Thank you for your time.  I appreciate it.

10 A   You're welcome.

11 Q   That's all.

12      THE COURT:  All right.  Is there anybody else on

13 the phone who wishes to cross-examine Mr. Hage?  Okay.

14      In that case, is there anybody here, any redirect

15 for the Debtors or any -- excuse me, examination by the

16 Debtors?

17      MR. SLADE:  No, Your Honor.  Thank you.

18      THE COURT:  No?  Redirect by the Committee?

19      MR. CALANDRA:  No, Your Honor.

20      THE COURT:  Mr. Hage, just very briefly.  If you

21 uncovered circumstances that called -- that you thought

22 suggested that you ought to criticize the work that the

23 prior committee had done or that McDermott Will & Emery had

24 done, would you feel any hesitation or limitation on your

25 ability to make those criticisms?

1       THE WITNESS:  No.

2       THE COURT:  If you had to object to a claim by Mr.

3  Raznick, would you have the ability to do that, or would you

4  need to have conflicts counsel?

5       THE WITNESS:  I think if there was an objection to

6  a claim of Mr. Raznick -- and that is precisely the reason

7  that I requested that there be that conflict provision

8  there, because ethically I don't think that that would be

9  something I could or should do.

10      THE COURT:  Somebody else would handle that then.

11      THE WITNESS:  That's correct.

12      THE COURT:  So any decision about his proof of

13 claim or about preference actions against him, somebody else

14 would decide?

15      THE WITNESS:  Absolutely.

16      THE COURT:  Okay.  All right.  You are excused.

17 Thank you very much.

18      THE WITNESS:  Thank you, Your Honor.

19      MR. SLADE:  I know it's late, Your Honor.  Mike

20 Slade for the Debtors.  Before we close the evidentiary

21 record, there was just one thing that the Debtors wanted to

22 tell the Court.

23      I think we're just kind of struggling with what to

24 do with what the SEC said, you know, an hour or two ago.

25 You know, after years of doing nothing, now we have a

1  statement that the SEC staff thinks maybe the VGX token is a

2  security.  It's kind of irrelevant because it's like

3  Kirkland & Ellis saying something, our client is not

4  allowing us to say it on behalf of our client.  So I'm not

5  sure how relevant it is, but it may have an impact on what

6  the Debtors need to do with our plan.  And I think we need

7  some time to think about it.  Just as an example.  We might

8  need to amend the plan to add an 1145 exclusion into it if

9  the SEC might take this position.

10      And so what I would ask Your Honor to do is leave

11 the evidentiary record open to allow us to do that if we

12 decide that the debtors want to amend the plan.  And, Your

13 Honor --

14      THE COURT:  We can reopen the evidentiary record

15 if the plan is amended.  Would that serve your purpose?  Do

16 we need to leave it open at this stage?

17      MR. SLADE:  I would ask that you leave it open,

18 because I'm just not sure how we're going to handle it.

19      THE COURT:  All right.

20      MR. SLADE:  I mean, in some respects the position

21 they took this afternoon was even weirder than the kind of

22 nothingburger that they gave the Court yesterday.  So I just

23 don't know what to do with it.  But I do know that the

24 Debtor professionals and the committee professionals need to

25 talk about it.

1       THE COURT:  Okay.  On timing.  We're not going to

2  have argument tonight because it's already 7:20.  And I

3  would like to be able to understand the arguments,

4  participate in them.  Monday I am committed to judge one of

5  the quarterfinal rounds at the moot court competition that

6  Mr. Hage has organized.  So that would make it difficult for

7  us to continue on Monday, unless you wanted to start

8  argument on Monday afternoon.  Or we can resume Tuesday.

9       But in either event, I would think that you're

10 going to have to have agreement by Binance to move that

11 milestone about the entry of the confirmation order.

12 Because I won't have enough time to hear argument even if we

13 do it on Monday and to make sure that we get something

14 entered even if I were to rule that way.

15      MR. GOLDBERG:  Your Honor, Adam Goldberg.  I'm

16 asking my client right now.

17      THE COURT:  Okay.

18      MR. SLADE:  Mr. Azman was mentioning he may have a

19 scheduling conflict.  If we can work it out, does the Court

20 have availability on Wednesday?

21      MR. AZMAN:  Well, actually, I don't think it works

22 for Debtors.  So don't -- are we going to be in-person for

23 argument?  I guess that's the question I had.  Is there any

24 --

25      THE COURT:  I would prefer that, yeah.  Tuesday I

Page 298

1  have some hearings at 10:00 that should not take an
2  extraordinary amount of time.  And I have the rest of the
3  day Tuesday.  On Monday, I cannot remember what time my
4  round starts at St. John's.  I just don't remember.  But I
5  would only have -- whatever time I could give back here, I
6  would only have a few hours in the afternoon.
7       MR. SLADE:  As long as we can get relief from the
8  milestone, that --
9       THE COURT:  Resuming Tuesday would be best.
10      CLERK:  Your Honor, if we start on Tuesday, it
11 would have to be Tuesday at 11:00 a.m.  And I would ask that
12 the parties -- is this going to be Court Solutions or is it
13 going to be a hybrid hearing?
14      THE COURT:  It will be the same way we've done the
15 hearing itself.
16      CLERK:  I would ask those parties who are going to
17 participate through Court Solutions to please register your
18 appearance before the hearing and register at 11:00 a.m.
19 Please don't make all different times.  Today I have to
20 download 15 participation lists.
21      THE COURT:  Okay.  But let's make sure that that
22 is our time before we ask everybody to do that.  We've still
23 got a lot of shuffling in the courtroom here.
24      MR. SLADE:  Sorry, Your Honor, just reviewing
25 schedules.

Page 299

1       THE COURT:  I understand.
2       UNIDENTIFIED SPEAKER:  Your Honor, while that's
3  happening in the background, may I just speak for a minute
4  to thank you?
5       THE COURT:  Well, I'll never turn anybody down who
6  wants to do that.
7       UNIDENTIFIED SPEAKER:  So I have 15 years of legal
8  experience, and I've been in a lot of courtrooms.  And so
9  I've seen a lot of judges.  And this whole confirmation
10 hearing is the first time I've actually participated in a
11 hearing.  And lo and behold (indiscernible).  But there have
12 been other creditors who have participated in the hearing,
13 and there has been mixed reviews.  Some people saying, you
14 know, you seem like a good judge, some people saying that
15 they would prefer a different judge.
16      But I just want to say from what I've seen, you,
17 compared to other judges I've seen in my lifetime, are
18 actually very patient, very understanding, very helpful, and
19 very accommodating of us creditors.  And I just want to say
20 that I really do appreciate that, and I hope you have a
21 great weekend, and I will see you Tuesday.
22      THE COURT:  Thank you.  On that patient,
23 understanding, and helpful stuff, can I get you to send that
24 to my son?
25      UNIDENTIFIED SPEAKER:  (indiscernible).

Page 300

1       MR. SLADE:  Your Honor, the preference of the
2  parties is Monday afternoon if you can accommodate.
3       THE COURT:  Sorry?
4       MR. SLADE:  The preference of the parties, if you
5  can accommodate, is Monday afternoon.
6       THE COURT:  Okay.  We'll never finish Monday
7  afternoon, you realize that.  Okay.  We'll --
8       MR. AZMAN:  Your Honor, I think the parties
9  collectively have scheduling conflict basically for the rest
10 of the week next week.
11      THE COURT:  We will resume on Monday at -- Mr.
12 Hage, what time are the quarterfinal rounds?  Do you have
13 any idea what my schedule is on Monday?
14      MR. HAGE:  I don't.  I think you're right.  I
15 think that the judges in the Eastern District and the
16 Southern District of New York are right after lunch.  But I
17 also know that you (indiscernible) St. John's, they could be
18 moved to the morning though.
19      THE COURT:  Well, is it just after lunch or just
20 before lunch?  I can't -- I thought it was just before
21 lunch, but I could be wrong.
22      MR. HAGE:  I don't have -- I'm not involved -- for
23 the record, I'm not involved in the selection
24 (indiscernible).
25      THE COURT:  Everybody is going to have to wait

Page 301

1  while I call up my schedule here.
2       MR. HAGE:  The first round (indiscernible) and
3  then (indiscernible).
4       THE COURT:  Yeah, I know it's the second round.  I
5  just can't remember if it's before or after lunch.  I
6  thought it was just before lunch.
7       MS. TREVINO:  Your Honor?
8       THE COURT:  Yeah.
9       MS. TREVINO:  This is Lisa Trevino, pro se
10 creditor.  I just wanted to quickly ask you something.  I
11 reached out to Kirkland & Ellis from our last hearing, not
12 this confirmation hearing.  And I still don't have the
13 information that I had asked for.  And it is the third, and
14 we have to get our information done by the 16th.  Apparently
15 that's 13 days away.  And seeing that I've been on these
16 confirmation hearings, I will have to work (indiscernible).
17 I am trying to get an answer on when I'm going to get that
18 information.  I've sent emails, calls.  I've spoken only
19 with one person.  The gentleman called me back
20 (indiscernible).  He said they were going to go back to
21 Voyager to get that information.
22      MS. SMITH:  Your Honor, this is Allison Smith at
23 Kirkland.  I actually corresponded with Mr. Trevino this
24 week and did relay to her that Voyager is pulling that data
25 and would send it as soon as they have it available and

Page 302

```
1   offered to set up a call to walk through it with her.  So
2   it's all in process and we are trying to get to her as
3   quickly as possible.
4          MR. TREVINO:  I understand.  But what I'm trying
5   to say is 13 days is not going to be enough time.  And
6   that's going to be an issue.  And, Your Honor, I would
7   really ask that you would move that back seeing that I have
8   asked for this information for quite some time and there is
9   a problem with my claim and I am really asking you to do
10  that, to move it back a little bit.
11         THE COURT:  Let me just ask you.  Work with the
12  Debtors.  See what information you get.  If for some reason
13  you need an extension of the deadline, you can ask then for
14  an extension of the deadline.  But let's first just see if
15  they can get you information and see if it requires anything
16  else at that point.  Okay?
17         MS. TREVINO:  I think I missed what you said, sir.
18  It was too low.  I couldn't heave you very well.  I'm sorry.
19         THE COURT:  What I was saying was just talk to the
20  Debtors.  Get the information when they have it.  If you
21  find at that point that you need an extension, you can ask
22  for it.  But let's take it a step at a time.  First get the
23  information and then see how much of an issue there is and
24  whether we really need any more time.  Okay?
25         MS. TREVINO:  Okay, Your Honor.  I appreciate
```

Page 303

```
1   that.  I will be updating you.  Thank you very much.
2          THE COURT:  All right.  I've finally gotten to my
3   schedule.  And I am completely wrong.  I am not judging the
4   quarterfinal round, I am judging the semi-final round, which
5   starts at 1:00 on Monday and ends sometime around 3:00 or
6   3:15.
7          MR. HAGE:  I suspect that if you contacted the
8   (indiscernible), they could reschedule you for morning or
9   find a substitute.
10         THE COURT:  Well, they might.  But it's already
11  7:30 on Friday.  How are they going to do that?
12         MR. HAGE:  I can make a call (indiscernible).  I
13  know, for example, that there (indiscernible) who has
14  volunteered to do a fill-in if necessary.  And I suspect
15  that there are other judges in the preliminary round session
16  who would be willing to switch to make the accommodation.
17         THE COURT:  Well, if it's a fill-in, then I can
18  just give you the entire day.  And with apologies to St.
19  John's and the Duberstein competition just let myself be
20  replaced.  Are you sure you have a replacement?
21         MR. HAGE:  (indiscernible).
22         THE COURT:  All right.  In that case, we will
23  resume Monday at 10:00.
24         So notwithstanding what Lorraine said earlier, if
25  you're calling in for Court Solutions, Monday at 10:00.  Not
```

Page 304

```
1   a different time Monday.  10:00 Monday.  Okay?
2          UNIDENTIFIED SPEAKER:  Your Honor, I intend to
3   argue, but I have to travel to Ohio for another matter on
4   Tuesday morning.  So can I do it by telephone?
5          THE COURT:  Yes, you may.
6          UNIDENTIFIED SPEAKER:  Thank you.
7          THE COURT:  All right.  Anything else before we
8   adjourn for the day?  Okay.  Thank you very much.
9          (Whereupon these proceedings were concluded at
10  7:31 PM)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 305

```
1              C E R T I F I C A T I O N
2
3      I, Sonya Ledanski Hyde, certified that the foregoing
4   transcript is a true and accurate record of the proceedings.
5
6
7      Sonya V. Ledanski Hyde
8      Sonya Ledanski Hyde
9
10
11
12
13
14
15
16
17
18
19
20  Veritext Legal Solutions
21  330 Old Country Road
22  Suite 300
23  Mineola, NY 11501
24
25  Date:  March 8, 2023
```

A-1244

**&**
& 5:3,11 6:16
7:1 216:3
233:5,23 242:7
242:8,9 246:11
256:22 294:23
296:3 301:11

**0**
0 125:1

**1**
1 16:2,6,10,17
17:5 42:25
43:5,15 140:7
142:15,16
1,002 150:19
1,022 175:7
1.2 121:5
1.3 121:5
10 77:8,21
117:9 123:7
124:24 240:6
100 25:24 26:1
26:3 31:19
41:9 42:22
43:14,20,20,25
71:19 116:8,17
116:18 142:19
160:8 168:2
209:6 219:8,9
10004 2:3 6:12
10017 6:19
10020 5:6
10022 5:14
10036 7:4
1006 22:17

1035 22:17
1074 23:1 24:9
10:00 201:11
298:1 303:23
303:25 304:1
10:08 2:6
10th 176:12
11 3:21 4:12
8:14 22:8,13
140:2,3,14,21
167:17 172:13
245:13 247:15
263:15 270:9
270:18,20,23
271:2,15,18
284:17
1109-2 8:21
210:13 235:23
236:5,12,15
1113 25:1
1114 7:3
1115 22:17
1117 248:13
11206 4:9
11209 4:9
11213 4:9
1125 21:22
1129 22:3 25:2
1145 296:8
115/146 8:5
11501 305:23
11:00 298:11
298:18
12 139:13
140:2,3,14,21
167:16 174:13
174:18

12151 305:7
1271 5:5
13 301:15
302:5
130 121:6
135 179:22,24
180:6,8 292:24
15 8:15 22:16
22:22 141:7
298:20 299:7
150 171:16
15th 6:4
16 8:16 22:16
22:22 23:1
24:9 235:7
161 286:3
16th 67:10,13
67:23,24 68:3
157:6,7 158:1
158:13 196:24
164:20 196:14
17 120:3 121:2
121:3 235:7
18th 150:21
19 22:25 24:8
24:18,22
1:00 303:5
1st 156:20
196:18

**2**
2 37:2 47:23
48:5,8 49:4
50:24 51:1,16
52:2,6,21
53:24 124:18
166:6,10

20 8:17 17:5
22:16,22 26:3
26:6 36:15
42:24 43:23,25
44:2 122:9
123:7 135:14
141:15,17,19
142:6,8,14
167:25 175:4,5
184:1 239:5
272:8,13,15
276:16,23
277:2,5,19,20
277:22,25
200 52:8,14
2018 237:19
2019 110:3
238:23
2020 105:14
2021 33:14,22
35:13 48:11
105:14 237:20
2022 33:22
72:19 196:16
196:19 238:25
241:15,23
244:20
2023 2:5
196:24 305:25
20s 125:18
21 8:18
22 8:10,11,12
8:13,14,15,16
8:17,18,19,19
22-01133 1:9
3:1

22-01170 1:17
3:7
22-10943 1:3
23 8:20 22:16
22:22 57:9
233 8:6
236 8:21
24 8:4 149:21
150:9
247 8:6
248 22:5
25 118:23
160:2 201:24
26 149:21
150:6 232:10
27001 36:25
47:21 50:1
27th 168:8
2:45 143:1

**3**
3 2:5 25:1
239:15,23
30 124:23
150:21 176:14
177:10,20,22
177:24 178:21
242:23 243:1
300 6:4 305:22
30326 5:22
32 65:9,20
32,000 273:18
273:21
32,800 273:21
330 305:21
35 26:15,19,24
27:3,8,23 29:9
30:13,17 31:2

44:6 72:3,5
99:15,17,24
100:1,23 103:7
104:4,7 116:25
119:24 120:1,6
121:3,6 125:18
126:7 161:2,13
179:23 180:1,6
36 248:15
37 101:19
38 168:11
3:00 303:5
3:15 303:6
3ac 303:8

**4**
4 239:23
4.7 91:4,14
40 124:22
125:1 151:1
243:2
400 149:23
197:4
404 227:21
404-842-5765
227:22
40s 150:3
152:11
41/99/111 8:4
42 72:7
44 150:3 151:9
445 152:4
179:24 180:8
184:17
48 13:20 18:21
18:24 149:21
150:11

**5**
5 117:5,6,8,9
117:11,18
118:22 142:12
159:12 239:23
50 31:9,15
61:21 115:14
116:2,4,5,16
117:8 118:6,6
119:11 120:11
120:18,20
124:9 135:13
52 18:22
55 23:1 24:9
580 180:1
5c 250:4

**6**
6 8:10 22:5,13
29:19 239:24
6.12 80:19
81:16
60 44:4 116:12
116:23 141:17
160:7 169:10
601 5:13
63 188:19
68 168:13
6th 78:18
158:16 159:1

**7**
7 4:2 8:11 22:5
22:13 85:10
104:2 167:20
175:17 183:8
235:10 239:24
245:15 270:14

271:2
73 149:17
150:12 151:9
151:20 168:8
168:11,12
748 22:2
75 121:3
141:18,20,23
149:23
775 22:5
78701 6:5
7:20 297:2
7:30 303:11
7:31 304:10

**8**
8 8:12 22:5,13
188:19 239:24
240:6 305:25
8.1 78:21 188:4
188:16,17,23
80 26:6,13
36:16 43:24
44:1 141:16
81 188:5
835 22:5
850 234:1
860 22:8

**9**
9 8:13 22:5,13
29:20 62:1
78:22 188:8,13
240:6
90 267:24
268:4,7 272:11

276:14,21
277:21 278:9
287:19
900 5:21
91 123:2,6
92 273:23
94 286:5
943 22:17
950 5:21
951 22:17
97 157:20
285:22 286:4
986 22:17
99 21:4 142:19
239:18
9:55 67:22

**a**
a.m. 298:11,18
abi 239:1
abided 134:6
abiding 272:12
abigail 6:7
98:22
abilities 74:16
ability 13:9
19:3 27:4,7,18
28:13 29:14
33:3 37:6 57:3
58:24 59:17,19
61:1 62:19
70:18 72:2
73:2 75:2,8,16
86:9 89:18
90:24 91:18
103:15 107:5
108:18 112:12
118:3 120:15

caa:2 125:19
126:3,8 134:16
136:5,20 141:4
146:15,24
152:8 154:5,12
154:17 160:11
170:17 179:9
186:5,6 191:6
191:10 192:13
193:23 195:1
195:14 199:4
200:22 203:6
208:15 209:1
220:22 269:8
279:25 281:8
294:25 295:3
abi's 238:23
able 11:19 15:4
15:23 27:5
29:9,13 30:3
37:7 41:12
58:23 61:1
70:8,16 71:24
72:17 73:22
74:5 75:3
76:24,25 78:3
78:10 79:16,17
79:19 81:1
86:20 87:7
105:14 109:24
110:17 118:3
122:14 125:14
125:21,25
126:10,17
129:8 158:1
164:1,10 165:3
165:13,23

166:3 169:7
174:16 184:10
191:11 194:5
195:2 208:18
216:8,11,15,16
217:20 220:8
220:17,19
221:15,19
222:18,19
224:2,5 225:20
231:18 251:14
257:20 261:5
275:21,23
297:3
above 34:23
59:10 167:5
293:19
absence 97:13
absent 209:23
absolute 87:11
absolutely
12:10 17:17
21:10 32:9,16
70:11 96:7
101:13 124:5
151:24 154:2
179:20
179:22 181:7
189:24 190:18
190:21 207:8
223:20 245:7
295:15
abstain 291:19
292:3
abstained
245:3 267:11
292:16

abstaining
291:24 292:1,3
292:5
abstention
267:12,16
accept 136:20
acceptable
221:20
acceptance
134:12
accepted 16:20
137:8 172:23
173:7 274:5
accepting
141:23
access 16:21
46:24 58:20,24
79:15,16,18,19
80:6,10 87:12
88:8 101:3
103:15 117:3
128:18 143:20
213:12
accommodate
300:2,5
accommod...
299:19
accommodat...
303:16
accordance
14:19 188:23
account 18:3
20:3 43:6
82:21 129:14
153:4 155:23
155:25 156:3,5
191:9 193:17

197:4 200:12
200:21 260:23
accounting
106:6 152:8
accounts 13:21
79:25 81:22,23
190:20 200:17
accurate
198:15 260:5
305:4
achieve 11:17
14:23 271:22
283:10
achieved 140:3
acquire 12:23
13:9 27:10,11
122:8 272:23
acquired 80:21
81:19 122:9
126:18
acquiring
12:25
acquisition
139:12
act 18:10
133:24 138:8
250:5 265:12
acted 283:22
acting 138:2
156:18
action 123:5
132:14 244:16
245:17,18,19
271:10 275:25
276:7 278:16
283:3 284:18

actions 91:15
91:23 92:17
275:23 293:14
293:14 295:13
active 108:6,8
108:10 239:3
actively 39:5
214:11 241:4
247:7,11
activity 73:10
134:21 199:8
acts 89:21
actual 11:3
29:14
actuality 43:5
actually 18:3,5
18:6,10 82:17
86:16 102:16
104:20 109:25
126:3,15
128:22 129:20
134:6 135:12
136:5,19 138:8
159:3 169:12
169:13 175:18
193:17 210:5
211:23 212:1
213:1 215:14
216:21 222:2
224:23 225:2
227:21 238:4
241:20,21
271:10 275:7
278:17 280:25
287:5 289:20
297:21 299:10
299:18 301:23

ad 1:19 3:7 7:2
246:12
ada 207:1
adam 5:8 11:9
144:22 213:24
297:15
add 102:8
167:11 222:11
258:2 263:4
296:8
added 212:14
adding 212:20
addition 27:16
41:11 46:6
165:15 273:20
273:22
additional
10:12 26:12,14
30:6 41:10
55:8 56:13
62:24 63:24
68:17,21 71:22
73:7 125:25
128:4 148:3
152:4 155:14
158:3 160:18
167:5 173:8
206:23 208:1
208:16 212:24
222:16 230:7
237:21 262:15
additionally
34:13,23 47:23
49:3 71:20
72:1 160:17
230:13 234:22

address 9:13
19:16 27:21
128:20 130:1
130:20 155:5
215:7 218:11
220:17,18,19
220:25 221:16
221:19 222:23
226:20 232:24
244:7 246:21
addressed
82:17 156:21
203:9,11
213:10 220:19
251:7 275:5
addresses
19:24,24
addressing
20:18
adequate
50:13,15,18
52:21 53:23
54:2,5
adjourn 304:8
adjusted 40:25
96:3 149:5
151:1 187:17
203:12
administration
271:9
administrative
43:7
administrator
9:12 23:11
232:23 233:6
234:9 243:7,15

| | | | |
|---|---|---|---|
| 243:22,24 | 277:1,25 | **affected** 111:1 | **agreed** 106:15 |
| 244:2,3 246:15 | **advanced** | 215:2 | 154:16 159:21 |
| 248:7,14 249:6 | 16:22 273:25 | **affecting** 91:16 | 273:19 |
| 249:16,19,24 | **advantage** | **affidavits** | **agreeing** 112:7 |
| 250:3,4,18,20 | 142:19 262:9 | 231:23 | **agreement** |
| 251:12 252:21 | **adversary** 3:1 | **affiliates** 58:20 | 11:16 17:16 |
| 253:1,13,17,22 | 3:7 184:24 | 59:16 60:8 | 19:9 22:6,9,25 |
| 254:4,12,18 | **adverse** 72:4 | 94:3 107:8,11 | 23:5 24:10 |
| 256:1,8,14,17 | **adversely** | 107:12,16 | 60:4,9 91:18 |
| 257:4 259:22 | 91:17 123:12 | **affirmative** | 93:10 100:19 |
| 259:25 261:9 | **advice** 253:24 | 14:6 | 101:6,20 170:7 |
| 264:24 270:25 | 281:11 282:8 | **afternoon** | 185:23 187:1 |
| 272:5,12 | **advise** 265:12 | 52:14,16,17,18 | 188:22 189:7 |
| 275:11 276:8 | 265:22 266:12 | 52:19 98:21 | 207:19,22 |
| 279:3,24 280:6 | **advising** 55:21 | 99:2,9 111:16 | 243:15 244:2 |
| 280:20 282:19 | 268:16,20,20 | 112:1 115:7 | 256:14 276:22 |
| 282:22 283:6,9 | 268:24 269:3 | 186:17,18 | 297:10 |
| 284:4,16,17 | **advisor** 46:8 | 211:11 216:2 | **agreements** |
| 286:12 292:20 | 53:13 56:13 | 296:21 297:8 | 22:4 33:17 |
| 293:2,3,3,11 | **advisors** 32:5 | 298:6 300:2,5 | 34:5 58:15 |
| 293:21 294:3 | 38:12 40:16,23 | 300:7 | 186:1,2,5 |
| **administrator's** | 46:10,16 53:22 | **agencies** 92:13 | 244:6,7 |
| 293:17 | 54:16,23 55:20 | 93:5,9,11,15 | **agrees** 254:9 |
| **admirable** | 55:23 56:9,11 | **agency** 92:20 | **ahead** 53:15 |
| 283:25 | 61:3 66:1 69:8 | 95:24 | 60:21 69:1 |
| **admission** 25:4 | 71:8 105:9 | **agent** 12:24 | 75:24 79:10 |
| 236:12 | 123:16,16,17 | **aggressively** | 102:17 128:10 |
| **admit** 22:1 | 149:12 158:9 | 244:25 | 133:18 135:18 |
| 232:10 | 163:1 170:8 | **ago** 52:7 94:6 | 135:21 158:1 |
| **admitted** 22:12 | 171:22 189:6 | 133:8 210:13 | 174:11 182:10 |
| 24:21 25:6 | 197:18 | 211:14 252:5 | 188:12 211:8 |
| 234:3,4 236:14 | **advisory** 32:4 | 252:19 272:18 | 219:5 220:14 |
| **adv** 1:9,17 | **affect** 91:17 | 295:24 | 224:12,14 |
| **advance** 32:3 | 157:8 182:18 | **agree** 25:15 | 247:2 |
| 33:7 70:3,23 | 183:13 185:24 | 223:20 224:4 | **aiming** 271:21 |
| 70:25 71:2 | 231:17 267:13 | 254:4 266:3,7 | **aka** 83:8 |
| 106:10 204:17 | 267:16 | 273:16 | |

| | | | |
|---|---|---|---|
| 41:17 44:10,17 | **apas** 208:3,5 | **appoint** 3:20 | 254:3,8,21 |
| 44:23,24 46:18 | **api** 131:17,18 | 134:19 250:21 | 275:11 276:4 |
| 58:8 73:6 | **apologies** | 253:4,14 261:3 | 281:22,25 |
| 98:17 102:15 | 161:24 303:18 | 261:16,19,20 | **appropriately** |
| 111:18 114:9 | **apologize** | 262:25 292:19 | 27:18 170:15 |
| 127:4 144:16 | 16:25 28:1 | **appointed** | 57:11 |
| 145:22 174:5 | 39:20 42:7 | 138:12 243:7 | **approval** 4:11 |
| 185:14 186:10 | 51:15 69:23 | 260:11 271:9 | 15:9 22:19 |
| 227:7 229:2 | 76:1 102:13 | 272:5 289:11 | 23:3 32:3 |
| 231:20 232:23 | 105:16 127:16 | 289:17 290:7 | 70:15 83:16 |
| 243:21 246:8 | 132:8 140:13 | **appointing** | 84:9,17 96:2 |
| 255:2,4,4 | 141:10 149:25 | 250:4 | 98:13 234:10 |
| 265:5 269:16 | 150:2 218:12 | **appointment** | 280:13 285:3 |
| 294:12,14 | **app** 169:12 | 246:15 248:7 | 294:6 |
| 299:5 | **apparently** | 248:14 249:16 | **approvals** |
| **anybody's** | 228:13 301:14 | 259:21 | 18:18 34:21 |
| 184:22 | **appeals** 234:6 | **appoints** | 237:11 |
| **anyway** 142:9 | 153:8 231:5 | 236:21 237:11 | **approve** 267:6 |
| 153:8 231:5 | 240:17 292:15 | 237:16,23 | **approved** |
| 240:17 292:15 | 283:13 | 283:13 | 17:21 60:9 |
| **apa** 64:16 78:7 | **appear** 212:12 | **appreciate** | 76:15 132:6,13 |
| 78:12 79:16,24 | **appearance** | 21:11 138:23 | 132:25 133:1,9 |
| 80:1,19,23 | 205:21 298:18 | 172:20 184:8 | 158:25 159:10 |
| 81:5,16,16 | **appeared** | 182:4 220:24 | 172:22 173:9 |
| 84:20 85:2 | 203:23 | 229:4 231:18 | 254:11 279:9 |
| 87:16,17 91:5 | **applicable** | 274:14 294:9 | 279:10,24 |
| 94:10,14 96:11 | 12:16 14:19 | 299:20 302:25 | **approving** |
| 154:4,7 156:11 | **applicant's** | **appreciates** | 17:16 22:9 |
| 158:24 159:5 | 283:14,14 | 275:1 | **approximate** |
| 159:10,11,13 | **application** | **appreciation** | 43:20 |
| 176:13,25 | 237:4,5 | 180:22 | **approximately** |
| 186:25 188:2 | **applied** 237:2 | **approach** 67:3 | 25:25 35:5 |
| 188:10 207:25 | 237:7 257:7 | 202:17 235:15 | 44:1 71:19 |
| 272:17 273:3 | 290:9,11 | 235:18 | 77:8,21 168:15 |
| 273:20 274:10 | **applies** 18:11 | **appropriate** | 242:21 273:21 |
| **apart** 192:19 | **apply** 82:24 | 31:6 40:20,25 | **area** 49:20 |
| | 276:25 280:10 | 47:7 50:21 | 109:15 |
| | | 73:14 217:7 | |
| | | 224:6 226:21 | |

| | | | |
|---|---|---|---|
| **al** 1:23 3:9 | **allowed** 10:18 | **amendments** | 76:12 77:5 |
| **alah** 4:5 | 104:25 132:15 | 81:4 279:25 | 78:3 83:20 |
| **alameda** | 133:4 144:13 | 280:2,21 | 84:10 86:20 |
| 149:19 168:9,9 | 165:10 183:3,7 | 281:13 | 90:24 92:3 |
| 168:10,22 | 206:7 221:7 | **american** | 97:5 101:3 |
| 184:3 185:3 | 262:7 264:4 | 238:6,13,16 | 105:23 106:1 |
| 293:15 | 273:4 275:3 | 239:7,9 | 109:23 128:7 |
| **alexander** 6:11 | 281:14 | **americas** 5:5 | 155:6,11 |
| **align** 13:8 | **allowing** 296:4 | 7:3 | 167:22 169:25 |
| **aligned** 146:18 | **allows** 28:20 | **aml** 27:17,18 | 171:24 180:11 |
| **allegation** | 67:2,6 74:4 | 28:2,19 33:17 | 180:13,17 |
| 197:3 244:14 | 75:12 87:19 | 34:13 42:13 | 182:14 212:2 |
| 245:4 | 123:21 187:2 | | 225:6 229:7 |
| **allegations** | 203:15 | **amount** 13:13 | 236:15 237:14 |
| 33:5 38:13 | **alternative** 3:3 | 17:7 82:2 | 257:20 265:18 |
| 39:2 42:16 | 132:22 139:25 | 121:23 127:25 | 269:10 271:11 |
| 66:3,11 68:11 | 154:21 177:14 | 182:17 271:23 | 282:2 288:10 |
| 68:20,21,23 | 187:10,11 | 293:19 298:2 | 292:18 301:17 |
| 74:12 157:4 | 293:7 | **amounted** | |
| 202:24 203:2,7 | **alto** 36:13 | 228:25 | **answered** |
| 206:23 | **ambiguities** | **amounts** 20:4 | 49:21 58:2 |
| **alleged** 260:3 | 208:10,11 | 130:10 268:12 | 69:22 75:18,22 |
| **allison** 301:22 | **amend** 273:20 | **analogous** | 167:13 269:15 |
| **allocated** 21:7 | 281:8,10 296:8 | 103:4 | 280:18 286:22 |
| 200:10 | 296:12 | **analysis** 27:20 | **answering** |
| **allow** 18:19 | **amended** 91:8 | 41:8 57:15 | 172:1,9 265:16 |
| 28:18 60:21 | 188:2,10 | 69:6 77:17,23 | **answers** 85:7 |
| 61:18 75:24 | 244:15,18 | 78:1 115:16 | 115:1 207:7 |
| 76:16,25 | 247:25,25 | 125:4 198:11 | 208:8 225:10 |
| 110:20 126:1 | 248:4,10,11,13 | **analyzing** | 280:14 |
| 126:24 128:3 | 248:20,21,24 | 119:15 | **anticipate** 9:17 |
| 131:18 133:14 | 249:1 252:20 | **andrew** 7:11 | 70:13 |
| 133:17 145:8 | 296:15 | 146:1 | **answer** 20:14 |
| 223:25 226:21 | **amendment** | **answer** 20:14 | 216:6 |
| 228:23 253:4 | 22:7 86:15 | 20:25 43:17 | **anticipating** |
| 267:22 271:11 | 272:17 | 47:11,12 50:17 | 55:9 145:3 |
| 273:5 296:11 | | 55:11 62:7 | **anybody** 9:18 |
| | | 63:11 69:23 | 16:5 17:3 25:5 |

| | | | |
|---|---|---|---|
| **areas** 63:6 | **ascribed** 135:7 | 169:1 181:25 | 85:14 106:23 |
| **aren't** 206:16 | **aside** 217:8 | 185:14 197:15 | 112:11 119:20 |
| 207:19,23 | **asked** 9:21 | 223:23 248:24 | 120:3,11,13 |
| 284:19 | 10:4 29:7 | 252:16 264:15 | 143:15 147:1 |
| **arguably** | 37:10 54:2 | 275:12 282:10 | 153:10,14,18 |
| 113:24 | 55:7 62:21,24 | 282:11 287:11 | 153:19,25 |
| **argue** 187:17 | 63:2,22 86:14 | 292:2 297:16 | 161:20 162:2 |
| 304:3 | 92:1 95:3,7 | 302:9 | 162:11,17 |
| **argued** 260:6 | 97:23 107:15 | **asks** 237:5 | 169:8,10 |
| **argument** | 108:9 153:2,9 | **aspects** 38:5 | 170:13 175:21 |
| 18:13,16 19:18 | 134:5 153:2,9 | **asserted** 202:3 | 176:18 178:10 |
| 204:6 217:5 | 153:17 157:4 | 202:5 246:2 | 180:20 190:1 |
| 220:13 224:22 | 162:1 172:6 | **assess** 57:6 | 193:25 195:3 |
| 225:4,4,22 | 173:15 182:23 | 203:12 | 199:23 206:11 |
| 226:15 246:22 | 184:16 186:5 | **assessing** 95:25 | 206:11 284:13 |
| 259:13 274:12 | 194:8,20 196:8 | 116:1 | **assigned** |
| 278:25 297:2,8 | 210:14,17 | **assessment** | 279:17 |
| 297:12,23 | 211:22 212:17 | 57:24 | **assist** 159:21 |
| **arguments** | 214:24 216:9 | **asset** 22:6,9 | **assisting** 102:4 |
| 19:14 247:20 | 216:14 224:1 | 36:8 46:19 | **associate** 121:9 |
| 279:10 297:3 | 229:10 256:13 | 53:5 54:16,20 | **associated** 26:7 |
| **arm's** 140:25 | 256:23 285:18 | 56:24 69:21 | 26:10,15 30:22 |
| **arms** 174:21 | 301:13 302:8 | 84:19 85:1 | 35:2 44:3,5 |
| **arose** 71:11 | **asking** 10:6 | 86:1,4,8,16,18 | 72:5 75:4 87:8 |
| **arrangements** | 10:21 17:7 | 101:20 128:22 | 95:25 96:5 |
| 17:13 27:11 | 20:13 54:6,9 | 128:24 180:22 | 147:17,24 |
| **article** 38:14 | 18:17 19:23 | 206:10 207:19 | 149:5 155:23 |
| 40:2 65:23 | 67:8 148:19 | 208:8 | 156:2,5,16 |
| 67:8 188:19 | 196:24 197:7,9 | **assets** 17:16 | 168:22 170:20 |
| 196:24 197:7,9 | 204:5 | 35:23 36:1,4 | 170:23 172:22 |
| 204:5 | 100:13 102:16 | 45:9,9 46:23 | 195:2 |
| **articles** 39:3 | 108:2 141:13 | 48:15 55:18 | **associations** |
| 42:17 68:19 | 144:17,17 | 56:5 57:7 58:1 | 238:12 239:4 |
| 238:21 270:16 | 145:4 148:15 | 59:17 61:6,7 | **assume** 122:2 |
| **articulated** | 148:16 162:20 | 63:1,23 79:17 | 275:22 |
| 228:10 276:18 | 162:24 164:12 | 79:18,20 80:6 | **assuming** |
| | 164:15 167:14 | 80:10 81:23 | 153:19 158:14 |

## [assuming - azman] — Page 9

168:11
assurances
58:6 59:10
61:3 62:4,22
63:24 68:22
69:9,12,15
70:3 71:11
72:11 89:16
165:22 204:19
assure 69:12
atlanta 5:22
attempt 12:15
123:21 134:22
138:7
attempted
75:13 169:4
attend 198:5,5
221:10 228:10
244:12
attendance
198:3
attended 163:2
163:8 198:7
242:17,19,22
attending
163:4,7 238:21
attention 239:7
attesting 61:6
attorney 6:1
98:22 235:6
243:19 255:24
256:4 261:14
267:21 270:11
289:23
attorneys 5:4
5:12,20 6:2,10
6:17 7:2 143:4

143:5 163:1
234:1 289:12
290:20
attracting
113:24
attributes
230:19
atypical 95:17
165:14 172:23
173:10
auction 132:2
132:4,11,12,15
132:18 134:4
134:11,14,19
134:20 135:4,6
135:10 136:15
137:19 138:1,4
138:4,19,21,22
172:12,13
auctions
132:16 135:4
175:19
audio 52:17
55:4 99:9
102:12 125:11
127:8,10 128:8
141:15,16,16
audit 33:14
37:1 47:21
48:5,9,10,11
48:13,14,23,23
49:2,11,18
54:7 57:24
55:15,22
106:13,17,24
107:1 162:9

audited 33:14
33:22 35:12
48:12 54:4,8
68:13 105:13
105:14 106:21
109:8,9 162:1
162:5,15
192:21
auditing
105:17 106:6
auditor 35:14
35:16 51:1
54:6,8 69:17
106:8,9,10,11
106:16
auditors 109:4
audits 49:1,2,4
49:5,16 72:13
austin 6:5
authentication
110:18
author 239:20
239:21
authority
159:10 212:18
224:24 229:21
230:9 293:17
authorization
37:7
authorized
230:6 280:6
automated
16:19 130:10
automatic 3:3
82:19 136:20
automatically
78:24

autonomy
279:22
availability
297:20
available 13:13
33:16 34:1
85:14,14
103:13 173:3
209:17 231:25
263:22 301:25
avenue 5:5,13
6:18 7:3
average 150:21
awards 289:1
aware 11:15
38:2,25 61:4
61:10 77:7
78:4 87:10
88:7,12 89:9
92:17,19 93:4
93:6,11,14
94:16 95:24
106:25 110:3,6
122:21 128:12
148:3 162:16
184:1 200:8
201:6,10 214:9
234:8 238:14
244:4 251:17
251:20 252:6
awful 85:5
143:5 144:13
awkward
222:25
azman 6:23
222:5,5 225:24
225:24 242:12

## [azman - based] — Page 10

254:9 257:22
258:3 261:2,2
261:25 262:21
264:5,10 269:7
272:16 274:14
275:21 276:15
276:17 277:4
278:3 282:12
284:7 288:11
288:17 297:18
297:21 300:8
b
b 2:21 6:22
25:19 30:11
bachelor's
234:17
back 25:2 33:9
66:21 72:7
74:23 77:1
84:23 103:8
104:8 115:8,9
116:3 122:25
125:22 145:21
146:22 147:4,8
149:20,20,23
150:8 153:12
153:20 156:15
159:16 161:15
163:8 167:23
171:16 174:14
174:19 176:3
180:20 211:14
211:16 217:16
224:5 230:3
231:21 235:4
257:22 259:6
260:18 270:12

271:23 274:19
276:3 278:16
280:12 298:5
301:19,20
302:7,10
background
46:19 234:14
237:13,22
299:3
backing
211:16
backs 255:23
259:11 264:22
272:7
backup 75:12
133:10,24
134:12,15,19
134:22 135:23
135:24 136:1,4
136:7,14,20
137:4,17,25
138:2,8,15
157:21 172:2,5
172:7,15,20,20
172:24 173:7
173:16,18,20
209:2,3
backwards
28:2
bad 187:12
207:22
balance 48:24
61:22,25
balances
108:22
bam 162:2
192:6,10,14,17

192:22,23
193:1,8,10,25
194:15 195:11
213:9
bank 20:3
35:11 47:5
57:13,17 58:3
89:10,19,20
164:23 167:25
190:12 193:13
193:14,15,17
197:4
banker 24:15
45:13 51:7
52:24 132:1
bankers 47:10
50:5 95:13
banking 6:3
35:18 73:21
98:24 153:23
bankman
258:25
bankruptcy
1:1 2:1,23 12:8
60:12,24 63:7
77:3 147:10
174:15,20
200:17 233:22
234:5,20,25
235:14 236:21
236:24 238:2,5
238:6,13,16,17
239:7,9,12,16
239:19,21
240:17 241:16

241:17 242:3,4
242:5 245:24
250:25 256:21
266:4 270:16
271:15 273:2
275:23 278:14
283:7,10,12
284:2,19,21,24
289:16,22
294:6
banks 57:14
banned 28:19
bar 237:12
base 125:14,19
125:24 126:21
127:2 128:3,13
140:15
based 10:6
26:23 29:10
35:21 38:16
41:8 43:4 77:9
77:23 78:11
107:1 113:11
115:17 117:15
119:14 120:7
122:16 126:21
128:20 131:3
137:10 138:12
139:2 140:23
150:20,25
151:5 152:1
166:1 168:16
172:18 173:17
173:17 177:1
181:11,20

## [based - better] — Page 11

193:4 195:18
195:22 198:8
202:20 203:23
206:4 208:16
209:20
210:12 230:16
233:24 247:19
278:5 291:1
293:25
bases 147:1
base's 156:13
basic 208:7
basically 69:11
136:13 164:10
272:24 300:9
basis 19:8 27:9
35:24 38:20
40:21,25 44:7
57:2 62:24
64:25 66:19
72:6 82:5 89:1
90:12 97:20
98:13 101:7
103:8 104:9
109:17 112:16
113:10,16
115:17 118:21
118:23 125:4
126:25 129:4
130:5 135:8
140:25 149:1,5
150:16,19
152:6,7 157:19
163:13 165:18
173:13 187:16
187:17 190:3,5
190:6,15 191:1

195:23 200:2,6
200:9 203:12
206:10 209:3
223:24 229:16
255:20 272:12
286:14
batch 200:11
bearing 226:25
becoming
160:6
59:19 60:12
75:10,15 76:14
76:20 79:6,24
80:11 81:15
82:16 87:21
88:17 94:20
97:15 98:8
99:19 102:25
104:22 105:6
105:11,15,21
116:3 119:8,9
123:2 131:3
139:4,16,20
140:1 146:12
147:22 148:5
150:3,20
167:12,15,21
176:13 177:16
178:14 180:16
185:20 187:24
195:19,23
196:4
197:10 204:7
208:22 209:19
209:20,22
212:23 216:21
222:8 229:1
248:3 249:23
250:1 256:6

belief 267:12
beliefs 230:23
270:18
believe 27:25
30:15 31:10
38:17 41:11
45:23 50:16
51:5,18 53:10
53:12 55:19
behalf 11:10
behavior
286:11
behold 299:11
beholden
256:24

258:6 263:8
266:1 267:9
268:12 269:14
271:20 286:20
286:25 289:7
289:20 290:11
290:13 293:19
believed 31:6
58:4 187:21
believes 230:16
230:20 231:9
belongs 266:21
benefit 13:13
85:10,12 145:1
245:17 271:19
273:6
benefiting
14:21 259:4
benefits 72:20
73:2 160:1
209:5 219:10
best 30:19,21
50:8 74:6,16
134:23 135:1
137:10 141:14
150:11 151:9
171:12 209:2
220:19,25
225:10 227:3
230:5 265:12
267:12 271:21
298:9
beta 122:5
better 20:11
66:2 87:7
102:18 113:24

## [better - binance.com] — Page 12

115:11 134:11
187:6,18 219:8
beyond 34:23
59:10 92:18
109:2 164:5
166:23 167:5
283:16
bgx 230:18
bid 132:3,16
132:17 133:4,7
133:23,23
134:1,23 135:7
135:12,23,24
135:25 136:3,5
136:11,11,18
137:8,8,12,17
137:21,25
138:14 172:4
172:22,24
173:7
bidder 22:7
133:10,25
134:13,15,19
134:22 135:1
136:1,4,7,14
136:21 138:8
172:5,6,7,15
172:20,20
173:1,6,18,20
bidders 132:15
134:10,12
137:4,4,20,23
138:2 173:16
bidding 132:5
132:10,25
133:1,9 134:4
134:9,24,25

135:2,14
135:23 137:16
bids 116:5
134:24 137:16
137:17 138:1
138:15 169:3,5
169:5,17 171:6
172:2
big 103:24
107:19 120:19
121:17,18
109:14,25
110:3 112:3,20
184:4,6,12
255:20
billion 62:1
121:5,22 127:3
150:19 171:15
175:6,7 292:25
143:11,11,14
143:15 144:1,6
145:15 153:4,6
153:8,11,11,18
153:25 154:1,2
154:4,14,25
155:2,24 156:9
156:13,14,22
156:23 157:7
157:17 158:16
159:19,24
160:1,10,22
161:11,19,20
161:25 164:11
166:7,8,12,15
168:18 172:4
172:18 173:17
173:17 177:1
179:1,9

67:20,25 77:12
78:23,24 79:4
80:7 83:8,16
85:19 89:10
90:19,21 91:21
93:23 94:15
99:12 101:12
104:16 105:3
106:4,5,18
108:3,19
109:14,25
110:3 112:3,20
184:4,6,12
255:20
big 103:24
134:9 135:13
135:23,25
billion 62:1
121:5,22 127:3
150:19 171:15
175:6,7 292:25
billions 121:23
143:11,11,14
143:15 144:1,6
145:15 153:4,6
153:8,11,11,18
153:25 154:1,2
154:4,14,25
155:2,24 156:9
156:13,14,22
156:23 157:7
157:17 158:16
159:19,24
160:1,10,22
161:11,19,20
161:25 164:11
166:7,8,12,15
168:18 172:4
172:18 173:17
173:17 177:1
181:11,20

183:9 185:22
186:20 187:12
187:20 190:14
192:1,7,16,19
193:1,7,22,24
194:4,25 195:2
195:12,17,19
195:21 196:22
196:25 197:20
198:1,14,25
201:3,4,17
202:20 203:21
203:23 204:17
205:21 207:3
207:25 208:8
209:6 211:15
211:19 212:15
213:7,8 221:3
221:8,10 226:2
227:18 228:21
228:24 229:1,2
229:3 230:16
231:24 232:8
272:22,22
273:4,14,16,19
274:3,4 276:21
277:22 278:10
278:10 297:10
binance's
1:22:22 26:5
108:12 143:5,6
binance.com
36:6 42:18
58:10,13,19,24
59:16 65:25
110:9,14,19,21
111:20

## [binance.com - brg]  Page 13

110:24 185:24 186:8 193:21
**binance.us** 5:4 11:15 25:15 26:11 33:12 35:2,7,22,23 36:1,5,6,7,10 36:12,14,18 37:12,16 38:6 38:11,13 39:1 40:3 42:3,13 45:10,12,15,22 54:21 57:7,25 58:12,21,22 59:16,18 62:10 62:15 64:3,3 64:19 65:4,25 66:1 70:1 73:25 80:3,20 81:18 82:8,20 82:23,25 84:6 87:1,3,11,19 88:25 90:16 91:23 92:2,18 92:20 93:4,9 95:10 96:5,11 101:21,23 102:1 103:4 104:16 106:15 109:1 110:7,20 110:25 112:7 113:22 114:4 116:19 143:20 143:21 155:20 155:22 156:1,2 185:23 186:6 187:1,7,19 189:19,25 190:24 191:18 191:21 192:6 194:24 195:20 195:21 197:4,8 199:5,8,17,18 200:1,4,16 203:20 204:15 204:25 205:10 205:17 206:9 206:12 207:13 208:15 213:9 213:12,15,25 214:3 230:20
**binance.us.** 11:10 72:9,11 74:10 79:21 88:4 106:22 144:23 156:22 189:16 193:22 193:25 194:4 216:4,11
**binance.us..** 195:3
**binance.us's** 185:24 190:2 194:5 204:22
**binance's** 159:11 215:18 218:10
**binary** 161:7
**bit** 49:8 65:11 90:16 97:11 100:9 120:7 125:17 150:24 177:25 178:23 187:24 189:17 202:10 229:21 236:22 238:11 284:22 302:10
**bitcoin** 102:23 117:14,17,19 120:5 121:21 122:6 190:7,8
**bk** 260:10
**blacklisted** 28:14
**blank** 186:6
**blind** 290:17
**block** 30:24 117:18 118:14 120:21,24 121:25 122:8 122:25 123:6 131:25 138:24 175:16 177:15
**blockchain** 73:3
**blocked** 75:14 128:17
**blocking** 245:23
**blocks** 83:24 84:5 129:24 156:8 176:18
**blue** 188:16
**board** 6:3 32:4 40:19 55:24 56:7 71:6 98:23 105:7,11 105:12 149:13 158:12 163:21 171:21 189:4 199:18 238:24 239:1 293:2 294:3
**body** 189:4 287:2
**body's** 189:8
**bona** 72:8
**books** 72:13 106:18 239:20 239:21
**borne** 144:8
**borrow** 191:11
**bothers** 223:13
**bought** 147:2 273:1
**bounced** 17:1
**bound** 37:19
**bowling** 2:2
**box** 254:10
**boys** 259:10
**breached** 78:4
**breaches** 245:20
**breaching** 265:19
**breadth** 63:19
**break** 49:10 123:7 131:24 142:25 159:2 210:15,20 211:12 212:9
**breaking** 102:13 114:22 124:7 176:17
**brg** 40:18 46:8 50:21 53:12 66:9 115:25 119:1 133:15

## [brg - capabilities]  Page 14

153:1,14 167:24 168:4 176:13 197:18
**brian** 8:4 24:2 24:5 25:7 41:23 45:5 98:25 111:24 115:5 146:6 204:22 205:7 205:13,16 255:14
**brief** 55:5 224:24
**briefly** 234:14 294:20
**bring** 69:1,3,5 69:10,14,18 125:25 174:14 174:19 274:11
**bringing** 55:9 270:13
**broad** 42:3 97:14 144:10 145:20 293:17
**broader** 63:16 179:2
**broadly** 28:12 40:5 62:13 87:5,22 100:17 100:22 107:17 152:2
**brother** 242:2 255:11,24 258:19,21 259:20
**brought** 29:12 121:7 270:12
**bruh** 6:14 41:19,20,21,21 41:24 43:13,18 44:8 202:7,7 202:13
**brush** 42:3
**btc** 104:12
**btt** 119:16,18
**buddies** 259:1
**bug** 127:24
**built** 64:22 100:9 207:18
**bulk** 88:21 200:7
**bumping** 102:14
**bunch** 157:5 162:20 196:9
**business** 12:5,7 20:17 34:19 38:6 61:11 62:20 63:5 72:21 73:24 89:20 110:8 145:14 162:10 162:17 163:16 165:18 169:23 170:15,20,23 175:10 176:5 186:7 187:25 189:3 192:18 193:5 208:3 264:13
**businesses** 73:15 164:1 271:16,16,17
**button** 74:15
**buy** 120:13,15 128:22 129:13
**buyer** 9:25 10:1,1
**buyers** 117:25 118:4
**buying** 120:19 120:20 272:24

**c**

**c** 5:1 9:1 48:7 305:1,1
**cahoots** 259:6
**calandra** 6:21 233:4,4,17,19 235:15,19,21 236:11,16 237:1 246:5 248:17,23 249:10 259:16 265:14,24 266:14 267:14 268:1,19 271:3 285:9,11 294:19
**calculated** 151:13
**calculation** 114:1
**calculations** 141:18
**call** 16:22 17:1 69:4 89:21 115:18 132:23 149:18 194:23 197:19 204:10 204:12,17,21 205:7,7 220:5 233:6 261:17 273:19 301:1 302:1 303:12
**callback** 11:5
**called** 58:10 65:2 86:18 115:10 186:22 196:25 229:3 294:21 301:19
**calling** 303:25
**calls** 35:6 83:18 90:22 96:15 111:12 137:17 165:25 204:11 241:9 242:24 301:18
**camera** 221:8 221:12,20 222:6 225:11 226:10,11
**candid** 77:24
**candidate** 237:13
**candidates** 256:12
**candidly** 52:23 94:21 160:17
**can't** 153:22 156:17 214:17 250:11 266:22 281:10,13 282:8 292:18 300:20 301:5
**cap** 121:22
**capabilities** 30:12

## [capability - certainly]  Page 15

**capability** 29:8 193:11
**capable** 293:5
**capacity** 24:12 31:12 36:2 46:22 49:19 57:16 61:1 62:19 89:22 122:13 187:22 190:2 238:24 241:4,12 244:4 256:20 263:19
**capital** 141:5
**capitalization** 171:14
**capitalize** 171:17
**capitalized** 170:15
**car** 48:7
**card** 166:25
**care** 12:7 146:13 147:18 148:18 273:14
**cared** 154:5
**career** 236:23 237:3
**careful** 10:7 179:4
**carefully** 185:19
**carious** 176:23
**carries** 290:24
**carved** 273:6
**carving** 273:11
**case** 1:3,9,17 4:1 10:2 15:1 28:6 60:4 71:15 73:4 76:25 85:24 111:7 113:4,20 115:8 123:5 130:23 131:3 137:18 146:15 146:20 150:11 150:11 151:9,9 156:9 158:10 159:23 165:16 175:4 176:2 195:13,23 201:19 223:5 224:19 226:6 232:4 241:6,8 241:11,11 242:25 243:4 247:20 252:1 255:21 256:10 257:1 259:9 260:11,17 263:7,7,15 264:16,20 270:13,18 271:18,20,22 276:1,22 277:22 278:10 280:7 281:18 281:21 284:2,6 284:15,17 286:16,23,25 287:22 288:9 289:13,17 291:12 292:23 293:3 294:2,14
**cases** 241:16 241:17 245:13 245:16 246:2 247:15 250:25 270:19 282:23 284:21,25 289:14 294:2,5 294:7
**cash** 11:8 12:20 13:22 14:7,12 15:14 15:24 19:12 27:9,14 30:20 30:21 48:25 66:21 72:6 85:21 103:20 104:8 129:14 152:4,7,10,10 152:14 153:15 153:19 156:15 169:5,6 170:3 190:12,13 193:18
**cashbox** 89:21
**cashed** 12:12 13:2 18:25 19:5 153:4,9 141:5 155:4,7 155:2
**cashing** 160:10
**casino** 180:19
**catch** 105:24 239:7
**category** 119:17
**cause** 63:8 111:7
**caused** 31:20 63:6 71:2 121:8 203:8
**causes** 244:16 245:17,18,19 271:25 275:25 276:7 283:3 284:18 293:14
**causing** 74:18
**caveats** 293:18
**cayman** 110:3
**cede** 142:22
**ceo** 56:19 61:5 204:17,22 205:12,13
**ceo's** 163:3
**certain** 3:4 16:10 43:4 55:20 57:20 65:9 72:2 80:20 81:17 94:3 101:22 103:5,18 110:12 118:4 121:18 127:23 143:7 159:12 166:9 169:19 207:18 273:4,8 280:12 293:20
**certainly** 9:10 19:23 201:23 240:18 251:19 257:24 260:14 283:23

## [certainty - class]  Page 16

**certainty** 225:9
**certificate** 47:21 48:3,8 50:10,13,25 51:3 164:13,13 215:8 216:12 232:8
**certificates** 53:25 229:4
**certification** 47:22 49:20 51:17
**certified** 305:3
**certifying** 166:19
**cfius** 83:8,16 83:24 84:4,14 84:15,17
**chain** 27:20
**chair** 233:22 235:14 241:1 244:17 258:22 290:25
**chairman** 211:25 282:6 286:6,9
**challenge** 127:9
**challenges** 72:22 73:23
**chambers** 214:1,4,12 215:3,6 216:20 217:20 222:1 222:13 223:22 224:5 225:19 227:19 228:11
**chance** 13:16 19:21 185:14 210:23 260:22
**change** 15:8 18:16 20:15 32:22 96:8,12 106:11 112:18 190:16,16 252:20 287:21
**changed** 19:10 176:1 236:25 248:19,22 281:6
**changes** 17:12 95:23 248:19 281:1,3
**changpeng** 42:2 193:20 203:20
**channels** 147:15
**chapter** 3:20 4:2,12 104:2 167:20 175:17 183:8 235:10 245:13,15 247:15 263:15 270:9,14,18,20 270:23 271:2,2 271:15,18 284:17
**character** 237:7 239:11
**characterizat...** 173:22,25
**characterize** 58:8 63:15,19 65:13 103:6 225:7 275:20
**characterized** 61:15
**chart** 193:5
**charts** 36:10
**check** 116:13 131:18 153:13 153:16,20 155:3 180:11 180:17 237:13 282:5 280:25
**checking** 164:5
**checks** 156:17
**chicago** 234:19
**chief** 164:20
**choice** 153:7 275:11
**choose** 11:4 156:4 185:19 200:15 207:2
**chooses** 155:14
**chose** 190:19
**chosen** 148:7 173:20 264:25
**christine** 156:17
**circle** 259:3
**circuit** 234:6 236:23 237:8,9 237:10,10,23
**circumstance** 89:7 113:25
**circumstances** 75:9 77:6 97:13 101:15 112:19 137:11 138:13 159:12 173:12 209:18 220:20 230:8 230:17 294:21
**claim** 4:9 251:9 277:22 291:2 295:2,6,13 302:9
**claimed** 291:19
**claims** 82:4 182:15,16,17 182:20 183:1,3 183:7 184:3 245:20,21,22 250:7,25 251:22 252:8 253:14,19 271:24 272:23 273:12 275:25 276:7,10,23 277:23 279:15 283:3 293:22
**clarification** 107:21 138:24 142:22 145:7 202:8 231:18 278:3
**clarify** 159:1 121:21 196:7 240:16 262:21 270:5 274:13
**clarifying** 229:23
**clarity** 231:16
**class** 141:14 285:5,8,24 286:7

**[claw - collective]** — Page 17

claw 149:20,24
272:7
clawback
152:5 168:9,10
168:12 184:18
272:10 277:23
clawbacks
268:17,18,25
271:8 272:5,13
275:16,18,22
276:14,18
277:19
clawed 278:16
clawing 149:19
149:23
clear 16:15
17:24 20:21
21:4 31:15
32:9,16,21
38:3 40:12
47:5 48:22
54:10 58:19
62:14 63:9
66:7,23 71:4
73:14 85:23
89:8,13 99:10
99:23 106:22
113:25 119:24
122:12 124:11
127:8,16
128:21 137:24
157:13 163:6
163:17 164:23
165:9 169:20
172:18 177:3
191:21 192:3
206:19,20

207:5 223:20
224:11,16
230:2 244:4
254:19 257:6
262:22
clearing
209:23
clearly 276:17
clerk 274:20
client 145:8
212:17 261:14
265:15 267:21
285:7 296:3,4
297:16
clients 20:22
141:23 252:2
272:7
close 31:24
61:1 62:1 70:4
71:9 74:15
78:5 84:6
116:20 158:1
187:14 192:13
193:11,18
208:18 295:20
closed 229:20
278:1
closely 150:17
262:22
closes 88:16
186:20 187:8
closing 11:13
32:3 33:7
40:14,14 69:2
70:7,10,14,17
70:23,25 71:2

79:21 82:1,7
82:14 83:3,4,4
83:24 84:5,9
84:17 85:18
88:25 89:8,9
96:3 155:21
187:4 277:1,24
cloud 37:22
90:4
club 259:10
code 26:25
27:4 29:13,21
29:25 47:8
56:12 57:23
59:7 111:5
125:14,19,19
125:20,24
126:19,21
127:2,4,9,17
128:3,13 129:6
130:7 147:10
165:11 270:19
270:22 271:15
280:9,23
coffee 211:3
coin 30:23
115:17,17
123:3 125:17
128:20 129:20
129:21 130:2
130:20 176:12
178:8
coinbase 117:4
131:1
coins 21:6
26:20,22 28:23
30:13,17,20,21

72:5 80:21
81:19 99:13,15
99:16,24 100:1
100:7,12,23
108:19 115:14
116:4,10,12,25
117:15 119:3
119:20 121:3,6
121:18 125:11
125:16 126:9
126:10 127:25
128:18 130:7
130:11 159:24
160:12 161:2
161:13 177:14
179:23 180:1,7
cold 57:5
collaborate
127:10
collaborative
108:15
collaboratively
115:24
collapse 61:15
62:17 67:21
106:10 148:8
176:6
collapsed 60:8
collateral
191:6
collectable
276:10
collected
115:23
collective
101:5

**[collectively - compare]** — Page 18

collectively
300:9
college 239:7,9
combination
139:12 283:9
combined 4:11
149:23
come 17:8
43:14 67:8
124:9 170:10
185:23 209:10
211:23 215:8
217:16 221:13
224:5 227:18
241:24 244:8
246:1 280:12
283:2
comes 51:8
157:7 277:2
284:3 291:4
comfort 21:8
145:4 149:3
comfortable
33:1 67:4 75:8
77:12 90:2
157:19 160:22
193:16 206:22
207:7 209:4,24
229:12
coming 73:17
141:25 200:23
206:15 290:3
comingling
38:18
commenced
242:3

commencem...
241:16,17
comments
210:19
commercial
58:15 110:12
186:2
commission
5:19,20 45:3
115:14 117:6,9
118:7,21,22
177:4,9 178:9
178:11 230:2
230:14,22,24
231:10
commissions
177:17 178:1,7
committed
240:25 205:18
297:4
committee
3:16 4:8 6:17
23:16 40:20
44:18 83:7
174:7 186:12
186:14 199:21
211:14 217:11
221:10 222:6,7
225:25 227:18
232:25 233:5
234:8 239:2
241:1,5,5
242:17,21,24
243:23,24
244:3,10,19
245:2,5 247:7
247:11,16

254:9 256:8,17
260:12 261:3,8
261:15 262:14
263:9,14,17,18
264:2 268:15
268:17,20
269:3,9 273:4
275:21 286:9
286:17,18,18
286:19,21,25
288:17,18
289:1,7,10,14
289:25 290:1,2
290:12,14,21
290:22,23,24
291:11,12
292:9,12,13
294:18,23
296:24
committees
235:9 263:13
290:18,19
committee's
202:9 243:3
commodity
113:17
common 58:16
69:18 191:8
244:6 273:1
289:8
communicate
83:5 241:23
287:1,18
communicated
124:13

communicates
241:6
communicati...
271:8 285:7
287:17,22
communicati...
80:12 95:14
266:17 286:20
community
239:12 255:19
283:15
company
93:18 99:18,20
106:19 122:23
172:3 245:21
246:3
company 27:1
27:7 29:16
31:1 47:24
63:25 68:15
97:11 108:10
108:22 110:4
112:9 115:20
115:25 126:9
126:18,20
128:2,12,13
129:3,9 131:7
192:20
company's
26:25
comparable
174:23
compare 164:1
170:9

**[compared - confirmation]** — Page 19

compared
108:23 163:22
163:25 176:24
248:20 299:17
comparison
114:2 118:22
compensation
139:2 141:21
competent
293:4
competition
238:2,5,8
297:5 303:19
competitive
134:23,25
135:5,9 138:20
complete
169:20,21
171:5
completed
17:20 149:4
178:18 272:6
completely
142:1 145:17
219:23 259:9
303:3
completing
204:25 205:18
complex 263:7
284:4 292:23
complexity
25:18 284:5
compliance
37:2 47:23
48:9 50:1,6,25
51:1 69:13
95:7 135:11
137:12,16,16

compliant
170:21
complicated
132:16 230:10
complies 12:15
166:9,20
comply 27:18
28:21 97:24
98:2 134:9
166:24 280:4
complying
28:9
component
26:13,14 75:13
components
26:8 43:19
165:5,17
220:15 221:1
221:20 226:4,6
246:25 255:21
266:13
comprehensive
270:21 276:6
compromise
293:13
computer 9:5
concentrated
118:2
concept 73:22
104:10
concepts 248:5
concern 66:12
71:2 77:11
88:14 90:11,13
107:19 124:16
256:19 270:8
concerned
49:10 60:16,23
237:15 276:8,9

concerned 55:6
195:1,5 227:2
228:25 246:20
concerning
66:14 95:11
193:24 196:25
202:22 203:2
203:25 286:10
287:20
concerns 10:21
20:19 25:14
37:20 40:4
41:4 62:14
69:17 87:25
128:6 146:11
165:5,17
220:15 221:1
221:20 226:4,6
246:25 255:21
266:13
conclude 276:9
concluded
134:24 304:9
conclusion
52:2 83:19
90:23 112:18
211:24 280:7
condition
118:13
conduct 57:24
237:12 256:15
256:19 270:8
conducted
49:10 60:16,23
237:15 276:8,9
conducting
46:3 83:8

conducts 199:8
confer 32:4
67:3 71:6,7,7
conference
3:10 214:2,5
214:13 215:3,6
216:21 217:18
219:19,20
220:8 221:8,14
222:6,13,22
223:22 225:19
226:10,20
228:1,18
conferences
238:21,22
confidence
214:21
confidentiality
37:19 55:25
92:23 93:10
105:21 106:2
163:10,16
228:22
confidentially
10:17
confirm 10:18
74:2,19 115:12
165:1 250:11
255:14 257:23
279:2
confirmable
75:10
confirmation
4:12 21:3 75:1
76:7,13 78:15
78:18 130:18
134:8,10 235:9

**[confirmation - contingent]** — Page 20

245:10,13,24
263:15 281:2,5
282:24 283:1
297:11 299:9
301:12,16
confirmed
32:19 136:5
167:15,24
168:4 280:11
confirming
75:19 158:25
confirms 32:12
40:13
conflict 243:11
243:17,25
256:3,6,18
258:13,19
259:21 291:4
295:7 297:19
300:9
conflicts
243:19 244:4
256:5 275:10
295:4
conform 136:3
conformed
134:15
confused
135:11 144:25
173:2 225:12
confusion
100:9 116:7
117:2
congress
121:10 176:5
congressional
41:6 61:5

congresspeo...
201:7
conjunction
238:6
connection
17:2,4 34:20
45:17,21 46:10
60:16 65:3
69:6 85:2 87:7
92:16 93:6,21
98:9 100:6,18
102:7 115:19
132:11 175:21
177:2 183:24
197:19 206:10
209:2 240:20
250:6 259:19
conrad 238:1
consequence
72:1
consequences
71:16,17 72:5
256:5 275:10
consider 4:11
95:22
consideration
26:6 43:24
47:25 77:2
96:9 97:1
consideration
68:20 116:20
174:25 175:4,8
175:25 208:7
264:1 276:23
considerations
96:7 98:5
103:5 106:20
170:4 171:8
220:24

considered
15:2 172:5
223:8,11 263:9
considering
95:21 168:4
264:19
consisted
289:18
consistent
57:14 62:2
80:24 100:22
205:2
consisting
237:11
consists 26:2
235:8 256:8
289:14
consolidated
162:11
consortium
164:6
conspiracy
156:25
constitute
256:2
constraints
74:18 76:21
construct
104:6,10,15
160:20,20
consult 145:8
282:5
consultancy
47:6 57:19
consultation
32:6 40:22
74:3 100:24

105:8 149:11
158:11 170:7
189:5 294:3
consuming
153:21
consummate
91:18 187:2
consummation
281:3,4,5
contact 19:23
20:6
contacted
303:7
contemplate
141:6 268:17
268:24
contemplated
155:8
contemplates
113:2 243:15
284:12
contention
231:11 252:8
contentious
75:15
context 46:20
51:9 64:2,7
66:19 103:24
104:2 127:17
160:23 200:17
201:21 202:5
208:2 219:3
257:1
contingency
172:19
contingent
173:18

| | | | |
|---|---|---|---|
| continual | contradict | 201:25 232:13 | 209:9 231:2 |
| 221:24 | 119:3 | 235:19 236:9 | 236:9 239:18 |
| continue  9:3 | contrary  18:15 | cordial  260:13 | 239:22,24,25 |
| 28:20 33:3,6,6 | 142:13 | core  163:16 | 240:5 242:6 |
| 34:25 38:8,23 | control  33:3 | corp  192:7 | 247:8,12 248:7 |
| 39:7 41:1 | 48:17 208:25 | corporate | 249:19,20,22 |
| 66:24 67:1,19 | 266:12 279:8 | 134:20 157:2 | 249:23,25 |
| 68:14,19,21 | 292:24 | 192:25 | 250:1,23 |
| 69:25 70:24 | controls  48:14 | corporation | 253:19 255:13 |
| 74:14,16 79:10 | 48:19 69:20 | 267:23 | 267:13,19 |
| 81:9,12 88:25 | 126:13 | correct  11:25 | 275:17,19 |
| 90:10 110:20 | convenient | 23:4 33:24 | 276:16,20 |
| 143:3,16 156:7 | 221:2,6 | 42:4 53:3,4,7 | 277:18 280:21 |
| 158:10 179:13 | conversation | 60:5,10,17 | 291:17 295:11 |
| 184:7,25 186:7 | 94:5 119:1 | 64:5,7 67:16 | correctly |
| 202:23 208:15 | 158:5 205:4,8 | 68:4 79:2 | 115:13 116:8 |
| 219:22 253:2 | 205:12 214:13 | 81:20,21 83:25 | 159:17 181:8 |
| 275:13 280:6 | conversations | 99:4 104:22 | 251:11 257:3 |
| 297:7 | 66:2 67:20 | 115:15 116:18 | 261:22 278:2 |
| continued | 84:12 92:4 | 118:9 119:7 | corresponded |
| 68:11 94:11 | 120:25 158:4 | 133:2 136:22 | 301:23 |
| 165:4 221:12 | 165:4 197:11 | 137:6,14 | corresponds |
| continues  11:2 | 202:20 | 139:13,16 | 86:5 |
| 17:25 271:25 | convert  4:1 | 151:10,24 | cost  30:6,15 |
| continuing | 80:21 81:18 | 159:17,20,22 | 76:22 77:4,7 |
| 32:25 74:11 | converted | 166:10,11 | 77:18 141:18 |
| 89:5 110:18 | 270:14 | 167:18,19 | 141:23 160:5 |
| contours | convince  14:2 | 168:4,6 172:2 | 176:14 178:20 |
| 147:10 | 19:25 | 172:8,11,14,18 | costs  43:7 75:4 |
| contract  113:6 | coordinated | 173:21 189:21 | 96:5 200:8 |
| 113:9,13,15 | 176:21 | 191:20 192:12 | couched  225:8 |
| 138:25 139:11 | coordination | 192:24 193:9 | couldn't |
| 140:11 174:13 | 88:24 123:18 | 195:6 196:6,13 | 160:12 180:5 |
| 174:18 188:19 | copies  143:11 | 196:20,23 | 253:17 254:6 |
| contracts | copy  23:5 24:7 | 197:16 198:6 | 302:18 |
| 112:13 113:2 | 81:1 110:16 | 199:20 200:3 | counsel  24:3 |
| | 188:7,10 | 204:23 205:1 | 46:7 61:4 |

| | | | |
|---|---|---|---|
| 78:13 87:7 | 89:13 94:20 | 33:11,20,22,25 | 152:16,21 |
| 93:3,4 95:12 | 99:10 119:16 | 34:3,6,12,15 | 158:21,25 |
| 96:14 98:3 | 144:12 195:16 | 34:18,22 35:3 | 166:5,12,16,18 |
| 108:6,7,7,9,11 | 201:6 210:11 | 35:5 36:22 | 167:3,6 174:5 |
| 108:12 158:20 | 237:8 239:5 | 37:10 39:13,14 | 174:9,11 |
| 158:21 186:12 | 247:1 280:5 | 39:16,19,21,25 | 181:15,22 |
| 198:19 210:21 | course  18:13 | 40:13 41:17,20 | 182:7,10,25 |
| 211:13 212:15 | 67:20 83:3 | 43:11 44:10,16 | 184:21 185:8 |
| 215:18 216:5 | 91:21 96:17 | 44:20,23 45:4 | 185:13,18 |
| 216:17 220:1,4 | 97:9 121:24 | 51:21 54:1 | 186:10 188:12 |
| 223:13 233:16 | 132:25 136:8,8 | 55:11 60:8,21 | 198:19 201:20 |
| 242:4 246:12 | 154:15 158:3 | 61:18 65:17 | 202:4,12,14,18 |
| 262:14 264:8 | 176:2 194:11 | 74:2 75:24 | 209:11 210:3,5 |
| 274:7 278:2 | 194:12 206:24 | 76:3,6 78:13 | 210:16,20 |
| 289:25 295:4 | 210:10 227:7 | 78:23 79:4,10 | 211:1,2,8 |
| counterbalan... | 241:22 243:18 | 81:7,11 83:20 | 212:6,10,15,21 |
| 72:21 | 256:19 272:24 | 85:3,16 90:24 | 212:24 213:5 |
| counterfactual | 274:9 293:24 | 91:2 92:10 | 213:11,16,20 |
| 178:24 | 294:2 | 97:5,21 98:17 | 214:4,15,22,23 |
| counterparty | court  1:1 2:1 | 98:20 100:9,14 | 215:12,19 |
| 28:6 35:2 | 9:2,5,8,11,17 | 101:8,10,14 | 216:1,23 217:1 |
| 42:18 57:16 | 9:20,23 10:5 | 102:14,19 | 217:12 218:6,8 |
| 58:5,6 59:11 | 10:14,19,22 | 107:7,13,21,25 | 218:15,18,23 |
| 62:14 69:8,12 | 11:20 12:7,18 | 111:18,23 | 219:2,5,15 |
| 69:15 88:15 | 12:25 13:15 | 114:9,17,19,23 | 220:11,14 |
| 95:14,25 | 14:6 15:3 16:4 | 115:2 118:6,10 | 221:3,5 222:22 |
| 148:13,15 | 16:7,9,12,13 | 128:10 132:7 | 224:9,12,14,24 |
| 149:4 160:22 | 16:18,22,22,25 | 132:10,14,25 | 226:8,19 |
| 161:3 163:11 | 17:2,6,20,23 | 133:1,10,14,17 | 227:13,16,23 |
| 165:2,9 170:11 | 21:1,9,11,15 | 135:18,20 | 227:25 228:2,5 |
| 200:24 209:25 | 21:20,24 22:10 | 136:10,17,23 | 228:7,12,17 |
| countless  90:6 | 22:18 23:2,8 | 141:25 142:4,7 | 229:13 231:6 |
| 98:3 | 23:12,15,18,21 | 142:12,24 | 232:2,12,15,18 |
| country  238:18 | 23:25 24:3,19 | 143:3 144:13 | 232:22 233:3,8 |
| 305:21 | 25:3 26:1,17 | 144:25 145:3,9 | 233:13,16 |
| couple  41:25 | 26:20 32:11,12 | 145:11,21,25 | 234:6,7,23,25 |
| 52:7 81:2 | 32:18,21 33:10 | 146:3 151:17 | 235:17,20 |

**A-1250**

| | | | |
|---|---|---|---|
| 236:13,21,25 | 295:2,10,12,16 | credentials | 209:18 226:4 |
| 237:10,16,23 | 295:22 296:14 | 270:15 | 235:8 245:18 |
| 238:2,5 240:12 | 296:19,22 | credible | 255:18 258:17 |
| 240:12 245:9 | 297:1,5,17,19 | 121:14 | 259:6 260:17 |
| 246:7,21 247:2 | 297:25 298:9 | credit  166:25 | 265:13 270:6 |
| 248:25 249:3,9 | 298:12,14,17 | crediting  18:2 | 270:13 271:19 |
| 249:12 252:12 | 298:21 299:1,5 | 141:9 | 271:23 272:2,8 |
| 252:15,18,24 | 299:22 300:3,6 | creditor  7:9,12 | 273:7,10,12,23 |
| 253:6 254:15 | 300:11,19,25 | 7:15,18,21,24 | 276:3 281:20 |
| 254:24 255:2,8 | 301:4,8 302:11 | 111:22 114:12 | 283:17 285:22 |
| 259:12,17 | 302:19 303:2 | 115:7 123:13 | 286:4,5,13,16 |
| 262:12 264:7 | 303:10,17,22 | 127:24 135:13 | 286:20,23 |
| 265:1,5,9,18 | 303:25 304:5,7 | 141:14 146:2,9 | 287:16 289:15 |
| 266:1,7,16,19 | court's  145:1 | 150:10 152:20 | 293:9,10 |
| 266:21 267:5 | courtroom | 153:3 226:18 | 299:12,19 |
| 267:16,22 | 16:21,24 41:18 | 255:6 265:8 | creditors' |
| 268:3,21 269:2 | 44:24 157:10 | 269:19 285:2,5 | 235:9 241:1,5 |
| 269:6,16,20 | 204:20 211:3 | 285:8,24 286:7 | 256:8 260:12 |
| 270:1 271:5,10 | 217:16 298:23 | 287:2 291:14 | 263:9,17,18 |
| 271:21 272:15 | courtrooms | 301:10 | 276:12 289:7,9 |
| 274:16,21,23 | 299:8 | creditors  4:9 | 289:14,21 |
| 274:24 276:20 | courts  234:5 | 12:17 14:17,21 | 290:12,18,19 |
| 277:7,11,15,20 | court's  234:10 | 19:15 44:13 | 291:2 |
| 278:9,23 280:2 | 15:19 41:6 | 71:16 72:2 | credits  170:4 |
| 280:9,20,22,25 | covenants  78:4 | 74:22 75:11 | criminal  97:10 |
| 281:9,23 282:3 | cover  9:16 | 76:22 77:1 | 156:24 |
| 282:8,14 | 212:21 | 80:13,15 82:14 | criteria  273:8 |
| 283:13,21 | coverage  47:4 | 82:24 83:5 | 273:9,22,23 |
| 284:8,10 | covered  93:9 | 84:16 85:11,12 | critical  48:1 |
| 285:10,13,15 | 105:15 164:25 | 97:1,16 101:25 | 75:12,16 134:3 |
| 285:17 287:7,9 | 167:22 213:11 | 104:9 120:12 | 171:1 198:17 |
| 287:13,25 | 277:13 | 120:23 146:13 | 206:25 207:2 |
| 288:3,10,12,15 | crash  110:25 | 146:15 147:16 | critically |
| 288:18,25 | create  26:11 | 147:16 148:18 | 154:12 207:10 |
| 289:4 291:21 | 112:3,12 | 152:10 157:21 | 209:7 |
| 292:1,4 294:6 | 165:16 | 168:1 169:3,7 | criticisms |
| 294:12,18,20 | creates  183:24 | 180:21 186:15 | 294:25 |
| | | 207:11 208:13 | |

| | | | |
|---|---|---|---|
| criticize  294:22 | 171:15 175:9 | currencies | 20:2,2,7,8 |
| criticized  9:12 | 175:16,20 | 115:21 | 22:25 23:5 |
| cross  8:3 25:5 | 178:16 184:13 | currency  121:4 | 24:9 27:9,13 |
| 41:18,23 44:11 | 190:11,14,24 | current  31:17 | 36:1,8 37:3 |
| 45:5 81:12 | 190:25 191:14 | 32:22 68:25 | 38:18,22 45:8 |
| 98:18,25 | 191:14,19,22 | 69:19 70:6,9 | 51:7,11,14 |
| 111:19,24 | 194:5,15,24 | 75:20 76:7 | 52:1 57:25 |
| 114:10 115:5 | 195:3,11,15,20 | 78:6 143:21 | 66:13 79:15,21 |
| 144:8,10,11 | 199:1,5,17 | 150:25 233:20 | 80:11 82:2,8 |
| 145:2,3,20,23 | 200:1,6,10 | 276:13 | 82:16 109:9 |
| 146:6 174:6 | 201:2,3 213:3 | currently | 143:16,17,21 |
| 246:7 247:4 | 213:8,12 284:2 | 30:13 69:13 | 143:23 147:5 |
| 255:3,5 294:13 | 284:13,15,21 | 82:21 106:5 | 154:12 155:12 |
| crypto  11:4,21 | cryptocurren... | 115:1 119:19 | 155:16,19,20 |
| 13:10 15:9 | 27:2 73:1 | 123:3,10 | 155:21 156:1 |
| 19:3 28:18 | 82:12 104:3 | 128:14 209:17 | 162:4 190:7 |
| 31:12 36:4 | 143:18,19 | 230:17 251:17 | 191:19,22 |
| 37:12,15 46:19 | cryptocurrency | 281:17 | 193:24 194:5 |
| 46:23 48:15 | 11:12 21:4 | custodial  36:2 | 194:15,24 |
| 54:16 55:18 | 28:12 47:3 | 190:2 | 195:11,20 |
| 56:5,7,24 57:7 | 72:21 73:24 | custodied | 199:1,4,17,18 |
| 57:25 58:23 | 74:23 101:25 | 46:23 63:23 | 200:3,4,10 |
| 59:17 63:7 | 106:19 112:11 | custody  11:1 | 201:1 206:11 |
| 64:17,21 69:21 | 117:13 121:18 | 17:18,24 18:11 | 213:8,12 |
| 79:22,23 80:2 | 131:4 143:17 | 47:7 51:6 | 268:14 273:11 |
| 81:23 82:2,20 | 143:23 150:23 | 57:11 69:20 | 276:21 277:21 |
| 101:12 103:15 | 183:21,22 | 70:2 80:2 | 278:10,20 |
| 107:6 108:17 | 284:19,24 | 89:22 103:17 | customer's |
| 109:9 115:21 | cryptosecurity | 109:10,25 | 18:2 |
| 117:13 121:4 | 163:4 164:19 | 162:7 190:8 | customers  10:8 |
| 147:2 150:20 | cumulative | 164:1 165:21 | 11:11 12:1,23 |
| 151:7 152:2 | 141:7 | custom  6:11 | 13:1,8,10,10 |
| 155:15,23 | cumulatively | 13:9 | 13:18,19,19 |
| 156:5,7,13,14 | 140:10 | customary | 14:3,24 15:13 |
| 162:4,9,14,22 | curious  11:21 | 290:18 | 15:21 17:19 |
| 163:25 164:10 | 169:3 270:17 | customer  10:8 | 18:25 19:15,21 |
| 164:16,17 | 270:25 280:6 | 11:7 12:11 | 19:24 20:11,12 |
| | | 13:4 19:17 | |

21:6 25:14
27:2,6 29:7
30:14 32:10,11
32:18 41:10,12
43:1,5 44:6
58:21 61:7
64:18,19 71:16
75:3 79:25
82:20 90:19,20
103:8,14
104:19 110:1,5
125:22 130:11
143:15,19,24
154:5 155:18
161:1,6 190:1
191:25 199:25
200:13,15,20
201:2 209:6
213:4 219:10
242:2 256:9
260:11,16,18
263:23 272:8
272:10,13,23
272:25 273:1
273:10,15,18
273:19,25
274:2 289:19
292:14 293:9
293:10
**customers'**
190:20
**customer's**
155:24 201:3
**cut** 153:20
156:17 249:3
**cuts** 153:12

**cutting** 219:25
**cybersecurity**
101:24
**cycle** 135:14
**cz** 36:17 39:1
40:1 42:2
58:17 65:25
68:18 194:14
194:23 195:10
203:20 206:5
206:14 211:19
**cz's** 39:9

**d**
**d** 3:20 8:1 9:1
**d&o** 244:21
**daily** 129:19
255:20
**damage** 116:24
**dan** 111:21
265:7
**danger** 122:24
**daniel** 7:17
**darren** 6:23
222:5 225:24
261:2
**dashboard**
16:23
**data** 20:3,13
66:6 198:9
301:24
**date** 11:13
24:16 70:6,9
76:20 82:10
84:20 85:1
86:1,4,8,16,18
100:20 108:14
159:4 168:14

208:16 251:10
273:11 289:9
292:21 305:25
**dates** 78:8,11
94:13 268:13
**david** 3:14,18
7:6 246:10
**day** 79:25 86:5
117:3 121:23
124:8 128:17
129:19 130:4
135:4 138:4
150:21 165:18
165:18 172:13
179:5 197:10
197:25 272:13
272:15 276:14
293:8 298:3
303:18 304:8
**days** 46:2
144:12 183:13
189:3 226:5
246:20 248:1
267:24 268:4,7
272:8,11,18
276:16,21
277:2,5,5,19
277:21,21,25
278:9 280:5
301:15 302:5
**dba** 192:6
**de** 3:2
**deadline** 157:5
302:13,14
**deal** 11:10 12:5
12:7 20:17
25:18 40:10

51:10 78:24
88:16 93:17
104:16 115:11
136:19 139:18
141:14,21,23
142:17 152:5
154:15,19
157:8 158:16
158:22 159:24
160:1,12,23
181:11,18
186:20 187:7
187:13,14,23
199:11,13,16
200:13 203:22
203:25 204:25
205:18 206:6
206:13 209:6
211:21 217:14
218:24 248:6
290:1 293:16
**dealing** 41:5
51:9 125:3
245:9 248:14
252:22,22
255:25 276:5
**dealmaker**
117:7
**deals** 42:5
175:23
**dealt** 254:2
**debated**
292:11,13
**debates** 171:9
171:21,22
**debating** 21:25

---

234:18,20
**delaware**
36:13 192:6
**delay** 30:15
71:21 74:25
75:2 77:4,6,18
77:18,19,20
184:11
**delaying** 71:9
**delays** 76:23
**delegate**
280:17
**deleted** 86:17
**deliberated**
292:13
**deliberating**
293:25
**deliberation**
263:20
**deliberations**
247:8,9 257:8
**deliver** 13:10
**delivered** 21:5
**deluge** 290:2
**denies** 83:16
84:9
**deny** 84:17
**department**
6:9 98:24
**depend** 77:6,10
97:7 101:4
**dependence**
110:8
**dependent**
113:5 152:13
**depending**
77:15 115:1

**desires** 174:6
**desk** 118:17
**desousa** 1:14
**despite** 138:7
151:6
**detail** 26:18
86:19
**detailed** 72:13
**details** 285:25
**determination**
32:6 40:24
157:23 158:12
188:1 203:6,12
217:17 230:22
253:25
**determine**
40:20 52:25
53:18 77:17
164:9 189:5
203:6
**determined**
90:17 109:10
172:4 245:22
267:20 292:8
**determining**
88:3 112:24
114:1 115:24
151:4 193:10
**detroit** 233:24
**develop** 29:8
30:12
**developed**
278:6
**developer**
127:13
**developers**
29:11 126:16
126:18 128:8

128:13
**developing**
203:17
**deviate** 132:24
**dial** 274:19
**dialog** 108:8,10
**dictate** 132:14
132:15
**didn't** 161:23
164:17,19
170:23,24
171:12 173:12
181:6,18,19
186:8 189:23
193:7,11 194:9
198:5 204:3
212:7 213:14
213:14 262:13
262:19 267:14
268:1 283:5
288:17,18
291:18
**difference**
42:22 100:12
103:12,25
104:7 112:4,6
120:19 124:17
137:7 140:7
142:15 180:2
**differences**
51:16 103:5,23
150:14
**different** 18:18
19:8 51:3
63:11 88:10
109:18 115:22
117:19,22

---

**debtor** 1:7 12:5
30:19 33:2
46:8,9 50:11
52:10 53:22
54:23 55:21
56:14 57:6
59:21 61:13
62:9,17 64:13
64:24 65:3
71:15 74:4,19
75:19 76:17
78:5 80:13
83:13 87:20
88:24 90:8
91:25 94:22,25
96:12 100:5,25
102:10,11
105:5,7,12
123:22 124:1
127:19 138:7
138:25 156:15
173:6 177:16
183:4 187:3,17
188:1 200:23
208:18,25
227:18 249:21
249:25 250:5,6
250:22 251:18
251:22 253:13
296:24
**debtor's** 88:2
**debtors** 3:5
5:12 11:12,15
13:12 14:22
17:11,19 19:19
21:5,16 24:15
25:17,21 31:20

40:18 42:21
45:11 46:3
47:13 50:12,19
52:20 53:9
54:16 55:3,17
60:16 62:9
63:13 66:14
70:16 74:3,6
78:9,14 88:14
89:11,15 91:22
91:22 94:22
95:10,20,21
96:16,20 97:15
97:24 98:1,8
100:8 101:20
101:23 108:7
117:3 123:15
128:21 140:11
143:4,9,12
144:6,20 145:6
148:23 187:13
187:14,21
216:13 217:11
221:8,9,23
221:22 223:21
228:22,23,24
229:3 232:5,8
232:20 256:10
281:18 294:15
294:16 295:20
295:21 296:6
296:12 297:22
302:12,20
209:18 210:21

232:4,9 247:15
250:25 252:3
**debugging**
127:6
**december**
150:21 196:16
**decentralized**
72:20 73:1
**decide** 25:22
100:11 108:4
211:20 222:25
223:7 267:22
**decided** 25:17
31:23 138:14
**deciding**
207:21 283:18
**decision** 30:16
32:1 40:13,16
71:5 74:13
75:6 105:3,4,6
105:11 106:15
120:10 149:8
158:2 161:7
181:7 203:3
207:4 278:24
279:5 292:7,11
292:12,15
292:12
**decisions**
193:24 244:16
259:8 279:23
**decisively**
244:17
**declarant**
209:18 210:21

**declaration**
24:25 25:4,6,7
33:13 38:10
57:9 60:7 65:9
67:12 71:18
72:7 99:11
101:19 120:2
143:10,13
144:4,17
209:16,19
210:14,17
212:8,13
**decline** 121:15
**declined** 9:22
121:23
**declines** 10:1
81:23 140:1
**deeply** 154:4
**defendant** 1:15
**defendants**
1:24
**defense** 185:1
**defenses** 246:2
**defer** 221:9
**deficiencies**
98:14
**defined** 123:8
276:17
**definition**
86:16,17
**definitive**
20:14
**definitively**
20:25 31:23
**defunct** 230:11
**degree** 89:22
132:23 234:17

---

123:7 125:2,16
125:17 136:12
138:9 139:8,20
147:7 148:6
153:2 154:15
162:22 169:18
170:2 175:11
176:24 178:6
178:11 187:9
190:24 197:15
199:14,22
209:14 231:4
242:25 246:1
287:5 291:10
298:19 299:15
304:1
**differential**
25:24 26:4
43:21 168:17
**differently**
62:10 135:15
237:9 268:13
**difficult** 59:12
73:10 118:5
183:18 219:17
188:1 200:23
208:18,25
227:18 249:21
249:25 297:6
**difficulty**
93:14 178:23
**digesting**
157:13
**digit** 30:8
**digital** 1:6,11
1:20,23 3:2,8
35:23 103:16
149:14 190:1
246:13

**digits** 177:8,10
**diligence** 10:12
10:14 32:25
33:10,11 35:6
35:21 38:6,23
42:15,19 45:12
45:15,16,22
46:3,9,17
47:13 55:1
60:16,23 61:9
61:13,24 62:10
63:3,16,20
65:3,10,11,22
66:2,8,16,24
66:24 67:13,18
67:25 68:2,8,9
68:25 69:1,3,5
69:19 70:6,9
70:25 73:15
74:3,11,20
89:15 91:21
95:20 96:18,22
109:16 110:23
143:6 148:15
149:4 157:18
161:19,25
162:21 164:25
165:2,11 184:8
189:22 191:18
192:22 193:25
195:5,8 197:10
197:20 200:20
201:14 202:22
202:24 206:20
206:23 209:24
232:4

**diligencing**
73:23
**diligently**
230:4
**diminish** 112:2
**dip** 141:4
**dire** 24:20
**direct** 8:3 24:5
24:24 195:20
225:17 227:25
233:18 249:11
283:5 287:16
287:19
**directed**
143:23 213:3
**direction**
206:12
**directly** 30:13
37:11 155:25
163:9 204:17
205:4,12,14
207:18 286:8
**director** 238:1
250:5,21
**directors** 3:5
3:12 32:4
40:19 55:24
71:6 105:7
149:3 189:4
238:24 251:18
251:21 253:4
253:15,16
**diresta** 7:14
114:14 152:19
152:20,23,25
159:7,14,15
167:10

**disclose** 10:18
92:7,22 98:9
93:22
92:12,14 93:22
96:16,20 97:15
108:24 109:8
162:12,14
223:3
**disclosing** 98:4
221:18
**disclosure** 4:12
85:17 93:2
96:23,24 97:25
98:2 148:22
150:15 176:13
189:2
**discount** 31:16
31:17 116:4
120:12,13,20
**discounted**
120:13
**discounts**
26:14 31:6
44:5 116:1
121:18 175:22
**discretion**
87:12,16 88:8
89:10 100:8
189:2
**discrimination**
18:15
**discuss** 10:23
25:17 65:9
92:24 103:11
134:7 152:8
215:9 216:16
216:24 226:23
241:7

| | | | |
|---|---|---|---|
| discussed 65:5 | 67:21 68:17 | 152:7,12 | 132:1,6,13 |
| 80:1 84:13 | 93:2 94:11 | distribution | 188:11 197:23 |
| 87:6 103:10 | 95:6 108:6,12 | 12:19,24 15:14 | 212:18,21 |
| 109:7 133:13 | 113:11 119:14 | 15:24 81:25 | 236:4,6,7,12 |
| 138:3 151:21 | 122:16 144:7 | 82:4,6 88:17 | 250:9 286:2 |
| 160:15 163:21 | 148:2 149:1 | 120:7 127:3,22 | documentation |
| 163:21 182:23 | 157:12 163:17 | 151:2 152:10 | 66:10 92:15 |
| 183:12 212:9 | 163:19,19 | 152:14 219:11 | 95:10 161:20 |
| 212:14 214:20 | 171:9 174:22 | distributions | documents |
| 215:23 229:5 | 175:18 189:18 | 11:16,22 12:1 | 22:11,15,18 |
| 261:11 | 190:23 195:4 | 12:16,20 13:17 | 36:24 47:18,19 |
| discussing | 197:10 207:25 | 13:22 14:10,12 | 47:20 48:16,21 |
| 17:11 293:25 | 208:6 251:20 | 14:24 17:19 | 85:6 95:17 |
| discussion | 251:24 287:3 | 18:16 19:4 | 109:24 132:9 |
| 26:19 40:19 | dishonesty | 72:3 77:1 | 157:5,8 166:1 |
| 53:15 57:2 | 270:10 | 85:20 87:22 | 166:6 203:5 |
| 68:14 69:8 | dismissive | 151:19,20,22 | 251:15 |
| 87:24 105:8 | 171:25 | 207:14 | doesn't 170:9 |
| 112:8 120:23 | dispute 250:24 | district 1:2 | 171:20 253:8 |
| 137:22 161:15 | 251:2,3,9 | 234:5,5,23,24 | doing 35:6 |
| 164:6 186:19 | 253:18 254:5,6 | 235:1 300:15 | 38:6 93:11 |
| 189:15 192:5 | disputed 252:8 | 300:16 | 99:16,17 |
| 192:25 205:23 | disputes 253:2 | diverse 289:17 | 118:19 121:25 |
| 226:10,18,21 | disrupt 176:18 | divided 121:6 | 122:18 123:19 |
| 227:5 282:11 | 176:20 | divita 3:20 | 123:23,24 |
| 282:16 | dissatisfaction | divulge 260:24 | 124:17 130:8 |
| discussions | 287:20 | docket 21:21 | 131:17 165:3 |
| 26:23 29:10 | dissatisfied | 22:3,5,8,16,25 | 177:6 179:3,7 |
| 33:18 34:8,9 | 286:16 | 23:10 24:8,8 | 181:25 185:22 |
| 34:25 37:5,8 | distribute 15:9 | 25:1,1 232:11 | 221:16 225:11 |
| 38:10 39:5,6,8 | 30:13 103:21 | 232:15 235:22 | 241:2 262:5 |
| 42:14 45:14,24 | 104:8,8 125:14 | 235:23 248:12 | 295:25 |
| 53:3,5,8,16,18 | 125:20,21 | 286:2 | dollar 120:8,24 |
| 53:21 54:15 | 126:7 155:24 | document 23:3 | 121:22 124:18 |
| 55:17,22,24 | 183:23 199:22 | 23:9 24:10 | 129:20 135:8 |
| 56:1,1,3 59:4,5 | distributed | 84:22 98:6 | 263:22,22 |
| 61:2,11 67:1 | 103:7 104:4,5 | 109:17 111:13 | |

| | | | |
|---|---|---|---|
| eat 293:9 | 123:4 160:21 | elicit 209:12 | enables 14:24 |
| economic | 161:8 168:22 | 236:19 | endeavor |
| 85:10,12 | 171:13 205:11 | eliminating | 20:24 |
| ecosystem | 207:16 211:20 | 17:13 | ended 260:14 |
| 28:12 73:24 | 221:4 230:23 | elizabeth 39:2 | 274:8 |
| 74:1 105:22 | 266:1 279:8 | 234:25 | ends 303:5 |
| 107:20 122:18 | 297:9 | ellis 5:11 296:3 | enforce 293:13 |
| ecro 2:25 | elaborate 49:8 | 301:11 | enforcement |
| educated | elect 15:21 | email 19:24 | 230:12 |
| 115:18 | 20:10 191:25 | 82:19 182:16 | engage 39:16 |
| education | 293:13,13 | 182:16 | 56:14 62:17 |
| 234:15 270:16 | elected 258:8 | emails 301:18 | 66:2 148:14 |
| effect 14:11 | election 15:23 | embedded | 202:24 |
| 118:10 139:18 | 19:11 | 118:14 209:2,3 | engaged 57:6 |
| 280:1 | electronic | emergency | 57:20 108:13 |
| effectively | 110:1,4 | 73:7 | 113:12 141:21 |
| 28:15 38:20 | elects 20:7 | emery 6:16 | 148:2 176:23 |
| 62:13 103:21 | element 84:14 | 186:14 233:5 | engagement |
| 130:4 152:3 | 89:23 90:8 | 242:7,8,9 | 139:4 140:24 |
| 156:15 178:16 | 94:12 98:6 | 256:22 294:23 | 141:10 167:23 |
| 183:21 190:9 | 107:3 111:4 | empathy | 286:12 |
| 190:10 | 112:18,20,22 | 283:16,17 | engagements |
| efficient | 116:22 133:10 | employees 36:6 | 240:6 |
| 134:24 | 134:4 162:13 | 49:22,23 58:23 | engaging 39:5 |
| effort 19:20 | 171:14 176:9 | 58:24 163:4 | engineers |
| 46:17 160:3 | elements 37:20 | 171:1 194:4 | 127:9 |
| efforts 30:20 | 41:14 42:17 | 205:15 281:19 | enhanced |
| 30:21 289:25 | 47:25 56:12 | employment | 66:10 154:22 |
| ehrlich 56:19 | 89:14 96:4 | 233:21 235:3 | 161:8,8 165:24 |
| 56:23 163:3 | 109:12 111:6 | empowers | enjoining 3:4 |
| 244:15 258:24 | 117:22 126:5 | 250:17 | ensure 64:16 |
| 260:5,9,14 | 126:11 148:13 | emptively | 64:22 101:23 |
| eight 114:25 | 154:17 165:1,5 | 207:13 | 134:23 |
| 115:2,2 284:22 | 165:13,22 | enable 27:17 | ensuring 64:18 |
| either 17:19 | 178:2 183:19 | 29:13 | entails 49:9 |
| 40:5,14 43:11 | eleven 135:3 | enabled 13:12 | enter 128:23 |
| 71:3 113:4 | 138:4 | | 136:5 159:10 |

| | | | |
|---|---|---|---|
| dollars 77:8 | 250:15 251:23 | drove 121:15 | dynamics |
| 80:21 81:19 | 254:12,23,25 | 138:11,20 | 55:23 56:11 |
| 102:23 120:22 | 256:5,23,24 | dss 166:24 | 74:17 138:19 |
| 121:23 127:4 | 257:23 258:12 | dubbed 67:12 | 164:4 170:11 |
| 140:1 160:5 | 259:3,22 | duberstein | 171:1 172:14 |
| 179:25 180:9 | 261:17 262:12 | 238:1 240:12 | |
| 292:25 | 262:12 263:2 | 303:19 | e |
| don't 151:2,5 | 265:15,24 | due 32:25 | e 2:21,21,22 |
| 151:10 153:5,7 | 266:1 268:12 | 38:23 45:11,21 | 5:1,1 8:1 9:1,1 |
| 153:21,24,25 | 269:13 270:7 | 46:3 47:13 | 147:5,7 305:1 |
| 155:6,10 156:4 | 271:10 272:25 | 59:12 60:16 | earlier 23:10 |
| 156:5,19 | 273:12,17 | 61:13 62:10 | 60:4 99:13 |
| 157:25 158:17 | 274:5 277:4 | 65:3,12,22 | 119:4 158:14 |
| 160:24,25 | 278:4 280:13 | 67:13,18,25 | 159:16 160:8 |
| 162:7,11 163:8 | 281:6 282:1,12 | 68:2,8,9,25 | 162:19 167:14 |
| 167:12,22 | 283:7 285:25 | 69:1,3,5,10,14 | 172:1 195:24 |
| 168:25 171:16 | 289:9 290:14 | 69:18 70:9,25 | 245:12,23 |
| 171:17 173:19 | 292:21 293:20 | 73:14 74:3,11 | 251:25 256:4 |
| 175:15 178:22 | 295:8 296:23 | 74:20 91:21 | 256:16 260:5 |
| 180:10,12,16 | 297:21,22 | 95:20 96:18 | 274:6 303:24 |
| 180:16,16 | 298:4,19 | 116:9,24 | early 33:5 |
| 182:20 184:5 | 300:14,22 | 119:11 143:6 | 38:11 67:22 |
| 188:4,5 203:1 | 301:12 | 157:17 161:19 | 176:16 237:3 |
| 203:10 210:20 | double 216:3 | 161:25 162:21 | 292:22 |
| 211:23,25 | doubt 89:5 | 165:2 184:7 | earnestly |
| 212:1 214:5,18 | download | 185:22 189:22 | 11:17 |
| 214:22 215:3 | 232:16 298:20 | 190:7 232:4 | earnouts 170:3 |
| 217:4,18 | dozens 35:9 | duration 63:19 | easily 15:20 |
| 221:25 222:7 | drive 135:10 | duties 189:9 | 19:9 28:13 |
| 224:4,6 225:25 | driver's | 245:20 259:22 | 30:7 |
| 226:1,1,8,11 | 153:23 | 281:2 | east 5:21 |
| 229:1,2,20 | drop 117:14 | duty 293:5 | eastern 234:4 |
| 230:7 231:15 | drops 52:17 | dying 169:14 | 234:24 235:1 |
| 231:15 235:17 | 55:4 99:10 | dynamic 107:4 | 300:15 |
| 239:5 248:9,10 | 102:12 125:11 | 109:7 122:7 | easy 10:25 20:5 |
| 248:21,23 | 127:8,10 128:8 | 146:23 | 20:15 147:18 |
| 249:1,3,10 | 141:15,16,16 | | 174:1 292:11 |
| | | | 292:12 |

| | | | |
|---|---|---|---|
| entered 17:21 | equal 18:20 | estimate 25:24 | 201:25 202:17 |
| 22:13,22 24:22 | equals 168:3 | 42:23 112:16 | 202:19 209:14 |
| 25:7 137:9 | equates 168:1 | 115:18 116:3 | 209:15 210:2 |
| 158:15,25 | equity 1:19 3:8 | 116:11 140:7 | evasion 42:5 |
| 159:5 236:15 | 3:16 7:2 141:5 | 140:10 179:13 | 156:24 |
| 297:14 | 169:19,21,23 | 179:16 242:23 | evening 157:12 |
| entering 16:24 | 171:5,18 191:9 | estimated 26:9 | 265:11 269:23 |
| 60:24 94:14 | 246:12 | 26:13 44:2 | 269:24 270:1 |
| enterprise | equivalent | 71:19 150:19 | event 42:20 |
| 37:22 59:9 | 104:9 | 176:14 | 83:2,4 88:2 |
| entertain | erc 125:18 | estimates | 101:11,20 |
| 169:3,4,17,25 | error 209:13 | 179:14 183:2,4 | 124:5 221:20 |
| entice 136:18 | especially | et 1:23 3:9 | 243:16,21 |
| entire 259:9 | 281:22 | eth 104:12 | 258:7 297:9 |
| 303:18 | essentially | ethereum | events 72:18 |
| entirely 10:9 | 10:9 12:4 13:7 | 120:6 130:20 | everybody |
| 142:8 184:5 | 32:23 142:17 | ethical 243:20 | 13:16 60:12 |
| 240:4 | 231:11 273:24 | 256:4 | 144:2 151:18 |
| entities 58:16 | establish | ethically 295:8 | 161:4,7 214:16 |
| 249:22,25 | 200:16 | ethos 126:17 | 215:1 229:17 |
| 251:18,22 | establishing | evaluate 33:6,7 | 274:18,25 |
| 253:1,13,17,18 | 170:12 | 68:19 71:12 | 275:4 298:22 |
| 254:5,6 276:11 | estate 13:14 | 96:1 170:8 | 300:25 |
| entitled 229:17 | 14:19,21 43:7 | 187:4 | evidence 9:15 |
| 249:18 | 77:7,21 100:6 | evaluated | 10:17 17:8 |
| entity 109:25 | 117:19 118:15 | 170:1,1,19 | 21:19,25 22:1 |
| 171:17 192:10 | 119:20 120:11 | 171:4 | 22:12,13,20,23 |
| 196:25 201:1 | 120:16 121:5 | evaluating | 28:20 30:1 |
| 211:25 230:11 | 123:10 125:3 | 31:5 96:3 | 181:25 201:11 |
| 234:9 250:6,22 | 132:2 152:3,6 | 100:10 192:13 | 220:4,4 221:24 |
| 256:2 257:5 | 152:14 154:17 | 192:14,15,17 | 221:24 222:2 |
| 280:1,8 281:18 | 172:21 174:14 | 207:21 | 223:2,9,11,23 |
| entry 22:9 | 174:20 183:21 | evans 6:22 | 223:25 224:1,5 |
| 78:18 96:11 | 191:15 200:23 | 44:12,12 | 224:18 225:5 |
| 134:11 234:9 | 219:8 272:23 | 186:13,13,16 | 225:14,15,18 |
| 248:13 297:11 | 272:25 273:15 | 188:9,14 | 225:21 226:14 |
| | | 198:22,24 | 231:3,6,15,20 |



**[evidence - excuse]** Page 33

| | | | |
|---|---|---|---|
| 232:5 236:12 | examination | 74:25 78:8 | excellent 270:5 |
| 236:15 259:14 | 24:5 41:23 | 82:19 87:18,20 | except 104:7 |
| 261:5 285:9,12 | 45:5 81:12 | 87:24 89:3,6 | 173:17 276:24 |
| 285:14 | 98:25 111:24 | 89:16,18 92:1 | 277:23 281:20 |
| evidentiary 9:9 | 115:5 143:4 | 92:14,19 94:2 | exception |
| 216:23 217:2,6 | 144:8,10,11 | 95:7 96:8 97:9 | 291:3 |
| 217:15 222:15 | 145:2,4,20 | 97:10 100:21 | exceptions |
| 223:1,6,24 | 146:6 233:18 | 101:10 103:7 | 52:4 |
| 225:22 226:15 | 246:7 247:4 | 103:17 104:12 | exchange 5:19 |
| 227:4 228:21 | 294:15 | 104:12 105:9 | 5:20 45:3 56:7 |
| 229:21 231:21 | examine 25:5 | 105:10 106:12 | 73:11 90:18 |
| 295:20 296:11 | 41:18 44:11 | 106:14 107:5,6 | 124:8 171:2 |
| 296:14 | 98:18 111:19 | 108:9,21,25 | 176:4 179:6 |
| evolved 176:1 | 114:10 145:23 | 109:4,11,16,21 | 211:13 230:1 |
| 199:15 | 174:6 255:3,5 | 110:13,16 | 230:21 276:22 |
| evolving 73:12 | 294:13 | 112:10,12 | exchanges 73:8 |
| exact 13:5 40:1 | example 27:17 | 113:8 115:23 | 73:10 113:19 |
| 40:2 42:17 | 28:10,15 33:4 | 117:12 118:14 | 118:10 156:8 |
| 49:12 54:24 | 36:24 37:6 | 118:17,25 | 161:12 |
| 77:5,9,18 | 38:9,16,18,19 | 119:2,10 120:6 | excise 249:3 |
| 78:11 87:23 | 38:23 42:14,17 | 121:7,25 122:1 | excluded |
| 94:6,13 102:5 | 45:16 46:7,10 | 122:5 124:17 | 223:10,12,13 |
| 132:9 133:3 | 46:11 47:2,6,9 | 126:6,9 127:6 | exclusion |
| 141:11 150:1 | 48:17,20 49:18 | 129:10 131:6 | 296:8 |
| 151:11 158:20 | 50:20 51:8 | 131:17 138:16 | exclusive |
| 172:12,13 | 53:16,20 55:23 | 141:3 147:1 | 293:12 |
| 180:1 204:3 | 56:6,19 57:4,4 | 150:18 162:5,9 | exclusively |
| 236:2 277:4 | 57:17,19,21,23 | 169:19 170:13 | 240:8 257:1 |
| 292:21 | 59:7,8,23 | 170:17 171:5 | excuse 36:6 |
| exactly 25:17 | 60:25 61:4,8 | 173:9 175:14 | 51:20 55:13 |
| 73:4 101:17 | 62:5,23 63:22 | 175:21 177:12 | 67:23 68:7 |
| 116:4 118:12 | 64:16,18,20,24 | 184:1,7 186:5 | 70:8 87:2 |
| 121:15 123:9 | 66:13 68:10,13 | 194:14 196:15 | 90:19 91:24 |
| 158:7 182:20 | 69:6,9,14 | 200:9,16,19 | 108:7 109:13 |
| 183:18 216:6 | 70:18 71:9 | 296:7 303:13 | 130:19 131:1 |
| 231:16 277:5 | 72:4,12 73:8 | | 137:13 140:20 |
| 289:9 | 73:13,19,20 | examples | 161:22 177:21 |
| | | 19:16 | |

**[excuse - extent]** Page 34

| | | | |
|---|---|---|---|
| 178:4 205:9 | exhibits 8:9 | 52:21 53:23 | explaining |
| 294:15 | 21:18 22:4,5 | 54:3,5 115:20 | 222:14 232:4 |
| excused 219:16 | 22:13,22 86:19 | 237:6 245:9 | explains 15:12 |
| 295:16 | exist 186:8 | 263:13 270:17 | 229:15 |
| execute 27:5 | 244:5 276:1 | 282:17,19 | explanation |
| 67:6 122:14 | 283:1 | 283:6,14,19,20 | 15:15 104:18 |
| 184:11 203:4 | existed 110:21 | 284:20,23 | 229:12,18 |
| 276:2 | 260:9,13 | 289:22 290:19 | 237:25 |
| executed | existing 101:2 | 299:8 | explanations |
| 123:20 | 156:11 187:7 | experienced | 15:7 217:5 |
| executing | 212:18,21 | 121:8 293:4 | exposed 64:25 |
| 41:14 67:5 | 213:18 | expert 16:4 | 82:11 145:2 |
| 88:20 123:10 | exists 251:3 | 57:10,23 58:8 | 201:4 |
| 124:1 | exodus 130:24 | 76:12 84:15 | exposure |
| executive | expand 282:21 | 108:17 279:21 | 200:24 |
| 239:2 | expansive | expertise 47:1 | express 155:3 |
| executives | 237:5 | 47:14 50:14 | expressed |
| 165:23 197:21 | expect 119:11 | 52:22 53:23 | 20:19 25:14 |
| 198:1 | 174:14,19 | 56:24 270:16 | 223:16 290:14 |
| exercise 25:22 | 217:15 283:4 | experts 57:18 | expressly |
| 119:25 187:15 | expectation | 164:10,16,17 | 138:6 192:3 |
| 203:6 209:1 | 88:23 | 164:20 284:19 | 287:17 |
| 276:2 | expected 176:3 | explain 43:14 | extend 3:2 |
| exercising | expeditiously | 57:12 85:1 | 115:1 |
| 203:14 | 74:23 78:10,15 | 103:2 112:4 | extends 278:17 |
| exhibit 8:10,11 | expenditures | 135:18,22 | extension |
| 8:12,13,14,15 | 259:8 | 136:23 158:18 | 302:13,14,21 |
| 8:16,17,18,19 | expense 79:7,9 | 158:22 159:7 | extensive |
| 8:20,21 222:8 | 136:2 159:4,8 | 215:6 217:20 | 42:15 171:21 |
| 22:15,16,25 | 172:21 173:8 | 222:18 223:24 | 171:22 172:11 |
| 24:8,18,20,21 | 263:9 | 225:21 236:22 | extensively |
| 24:22 25:1,2 | expenses | 238:14 239:8 | 232:9 270:15 |
| 78:21 91:10 | 159:12 | 259:18,23 | extent 27:12 |
| 188:8,13 | expensive 30:3 | explainable | 55:15 61:20 |
| 201:24 232:10 | 138:16 | 89:25 | 64:17,23 66:12 |
| 236:14,15 | experience | explained | 86:10 302:21 |
| | 9:24 49:20 | 212:16 | 303:9 |

**[extent - federal]** Page 35

| | | | |
|---|---|---|---|
| 72:14,15 74:5 | extremely | 150:13 161:3 | 188:2 241:11 |
| 74:25 75:22 | 145:13 203:25 | 171:2 183:16 | 243:3 245:25 |
| 76:23 82:12 | eye 272:1 | 203:11 207:2 | 245:25 247:14 |
| 83:23 84:4 | | 283:13 | 247:18,21 |
| 87:18 88:1 | **f** | facts 58:7 63:5 | 248:5,15 249:5 |
| 89:2 90:7,14 | **f** 2:21,25 305:1 | 75:9 77:6 | 249:15 250:12 |
| 91:24,25 92:5 | faced 117:8 | 95:24 97:12,16 | 250:17,19,24 |
| 96:1 97:7 | faces 156:23 | 101:4 112:19 | 252:3,16 253:9 |
| 98:13 102:4 | facilitate 27:1 | 115:23 137:10 | 282:25 |
| 104:22 105:23 | 27:5 29:14 | 138:13 173:11 | familiarity |
| 106:1 109:21 | 101:22 | 206:23 217:5 | 289:15 |
| 110:21 112:14 | facilitating | 230:17 259:14 | famous 58:25 |
| 113:22 116:19 | 102:3 | failed 97:24 | famously 59:1 |
| 117:10 118:1 | facilities 37:22 | 98:2 286:6 | far 50:18 |
| 118:21 124:22 | 37:25 38:2 | failing 189:7 | 132:24 135:4 |
| 125:1,15 127:2 | 141:4 | failure 18:17 | 281:11 285:13 |
| 127:5 128:2 | facility 59:9 | 61:24 62:2 | fast 148:4 |
| 132:23 133:25 | fact 14:15 | 148:1 159:13 | 237:18 |
| 136:1,6 139:21 | 29:24 61:6 | 285:24 286:5 | faster 41:12 |
| 152:6,14 156:4 | 62:23,25 69:16 | failures 63:8 | fat 211:20 |
| 156:9 160:25 | 89:7,16 97:23 | fair 23:14 | favor 244:23 |
| 162:6,7,12 | 103:6 112:6 | 39:23 105:2 | 255:22 267:9 |
| 165:8 171:15 | 113:17 127:21 | 173:22,25 | 267:10 |
| 173:4,6 177:14 | 132:19 197:16 | 207:6 | favors 264:22 |
| 178:16 184:3,7 | 199:16 205:13 | fairly 237:3,14 | fears 146:11 |
| 186:7 187:3,5 | 216:13 259:20 | 284:20 | feasibility |
| 190:6,18,21 | 263:12 | faith 289:5 | 170:12 |
| 200:18 203:10 | factor 112:24 | fall 273:18 | feature 139:20 |
| 207:2 222:6 | 114:1 158:2 | false 62:3 | 173:11 |
| 232:18 245:4 | 203:3 263:8 | 190:16 | features 16:22 |
| 259:17 291:4 | factoring | familiar 21:10 | 141:9 |
| external 56:13 | 170:11 | 37:25 49:15,16 | february 67:10 |
| 74:18 75:19 | factors 35:1 | 56:8 57:1 | 67:13,23,24 |
| 76:8 | 69:9 75:19 | 58:10 84:19 | 68:3 168:8 |
| extra 15:17 | 76:8 113:10 | 86:25 87:5 | 176:16 196:24 |
| extraordinary | 115:17 119:15 | 112:10 125:16 | 196:24 |
| 298:2 | 135:3 148:11 | 158:19 163:15 | federal 28:9,21 |
| | | | 73:16,20 92:13 |

**[federal - first]** Page 36

| | | | |
|---|---|---|---|
| 92:20 93:11,20 | ferry 5:21 | 294:6 | finder 97:23 |
| 95:24 236:24 | fiat 35:18 | fill 303:14,17 | finding 49:25 |
| fee 118:20 | 129:14 199:1,4 | final 127:22 | 113:7 |
| 139:8 140:1,2 | fides 72:9 | 135:25 267:2,5 | findings 55:25 |
| 140:17 142:8,8 | fiduciaries | 303:4 | 286:10 |
| 142:14,16,18 | 235:9 245:10 | finalist 236:21 | fine 15:3 |
| 174:21 178:8 | 245:14 253:23 | 237:19,21 | 151:12 213:17 |
| feel 33:1 75:8 | 282:24 283:2 | finalists 237:16 | 221:6 226:13 |
| 77:12 157:19 | fiduciary | finally 303:2 | 270:3 |
| 160:21,25 | 25:22 186:22 | finance 31:12 | finish 24:7 |
| 164:2 184:18 | 186:24,25 | finances | 74:3 218:23 |
| 190:20 203:10 | 187:2,15,22 | 192:14,15,17 | 300:6 |
| 206:22 209:24 | 189:8,11 203:4 | financial 33:14 | finished |
| 243:3 259:7 | 203:7 243:19 | 33:15 35:12 | 111:15 218:15 |
| 270:9,9,11 | 244:6 245:20 | 46:8 49:2 51:7 | 287:11 |
| 280:18 287:21 | 250:5 279:18 | 51:9 53:13,13 | finishes 179:17 |
| 294:24 | 283:20,22,23 | 54:8,8 57:15 | fire 129:24 |
| feeling 90:2 | 293:22,24 | 57:15 61:1 | 156:7 |
| 209:4 | 294:1 | 62:19 68:13 | firm 47:4,22 |
| feels 127:12 | field 86:13 | 93:14,17 95:15 | 49:12,18 50:23 |
| 141:8 161:5 | fifty 31:17 | 108:24 109:24 | 58:9 105:17,22 |
| 275:4 | figure 23:16 | 122:13 157:1 | 106:6,13 109:2 |
| fees 118:19,20 | 175:8,9,10 | 160:18 162:1,5 | 110:18 165:8 |
| 139:9 140:9,9 | 219:18 288:22 | 162:15 192:21 | 171:6 233:25 |
| 140:21,23 | 243:20 | 192:22 193:11 | 235:13 242:3,5 |
| 141:3 176:15 | figures 179:14 | financials | 255:12,25 |
| 177:3 178:3,5 | 180:12 | 33:22 48:12,13 | 258:20,21 |
| 178:10,20 | file 85:6 248:3 | 48:24 105:13 | 259:25 |
| 200:8 263:6,21 | filed 3:22 4:3,6 | 105:14,18 | firms 46:15 |
| 266:4,8,12,13 | 4:13 22:3 85:4 | 106:21 109:8,9 | 49:6 73:19 |
| 293:8 | 99:11 132:10 | find 18:1 80:17 | first 17:15 |
| feet 48:6 | 139:4 246:18 | 118:4 128:23 | 20:25 21:19,21 |
| fellow 39:9,14 | 246:19 248:1 | 229:10 257:14 | 22:3,6 25:13 |
| felt 71:8 98:13 | 252:7 270:6 | 286:10 302:21 | 39:16 44:14 |
| 154:20 193:15 | 272:17 284:21 | 303:9 | 49:10 114:12 |
| ferguson 2:25 | 285:21 290:14 | | 120:12 126:14 |
| | filing 143:13 | | 134:3,25 135:1 |
| | 144:4 260:10 | | |

## [first - free] — Page 37

151:20,22
155:5 162:20
176:13 184:21
198:1 199:16
205:10 207:1
216:17 218:12
229:5,9 241:14
241:15 242:11
242:15 246:8
249:3 259:24
262:12 278:15
284:2,2,3
289:6 299:10
301:2 302:14
302:22
**fit** 119:17
120:7 131:23
**five** 79:25 86:2
86:5 127:25
168:3,13,17
173:15,15
189:3 210:5
212:22 227:23
227:24 237:16
237:17 274:21
**flag** 121:12
**flatly** 142:13
**flavor** 170:5
**fleshed** 102:6
170:25
**flexibility**
133:5 187:24
**flow** 66:18
**flows** 48:25
**fluctuations**
82:11

**focus** 47:2
56:11 137:25
146:17 182:2
238:11 275:9
276:1
**focused** 147:19
171:10 239:13
254:16
**folks** 245:5
**follow** 40:6,8
44:14 45:19
46:21 73:18
76:2 95:3,6
127:7 128:1
132:2,3,6,19
132:20 135:14
147:15 182:13
183:10 194:9
210:12 271:7
**followed**
135:12 150:17
**following**
230:6
**footnotes**
162:12
**force** 13:19
**forced** 180:19
**forcing** 76:6
134:25
**foregoing**
305:3
**foregone**
116:18 176:7
**foreign** 83:7
**forensic** 72:13
165:11

**forgetting**
132:8
**forgive** 139:23
282:20
**forgot** 107:14
**form** 19:11
170:5 198:20
**formed** 289:10
**former** 273:10
273:15,19
**forms** 170:2
175:1
**formula**
151:13
**forth** 211:14
**fortunately**
150:23
**forum** 123:19
**forums** 113:12
**forward** 32:7
40:9,21 41:1
68:15 73:16
74:9 75:9,17
76:25 77:13
88:15 89:5
90:3 96:1,2,4
101:6 112:16
113:10,16
138:14 149:3,6
157:17,19,23
160:21 161:3
171:10,25
173:12 181:6
184:8 185:1
187:1,5,9,22
190:17 203:14
204:16 206:13

206:18 207:3
208:15 209:4
209:24 221:21
251:7 256:15
271:1 272:12
286:14
**fought** 154:7
**found** 60:12
157:10 187:12
187:12,20
284:6
**foundation**
26:25 97:4
126:11 128:9
253:9
**foundational**
48:2
**founder**
193:21
**four** 17:5 32:2
70:14 76:18
77:18 84:23
96:10 134:10
134:11 238:25
258:14 261:7
261:18,22
262:1,7,8
267:9 286:21
**fourth** 54:1
**fraud** 60:15
61:21 62:1,4
64:23 72:16,22
200:18 270:10
**fraudulent**
245:21
**free** 228:21

## [freeze - give] — Page 38

**freeze** 273:25
**frequently**
141:20,22
241:7 243:1
245:15 271:16
275:6 283:3
294:5
**friction** 200:8
**friday** 303:11
**fried** 258:25
**friendly** 260:8
**friends** 258:25
**front** 20:5
43:24 61:5
80:23 81:3
119:21 123:14
141:10 151:11
152:12 169:5
170:3 176:5
182:1 188:6
235:23 248:9
**frugal** 236:4
**frustrating**
221:25
**frustration**
218:13 225:8
**fti** 40:23 66:9
197:18 291:13
**ftx** 60:5,7,12
60:17 61:12,25
62:12,17 63:10
63:14,18 64:1
64:6,14 65:1,4
67:21 72:25
75:14 106:11
134:11 136:8
137:4 138:12

146:22 148:2
152:1,5 175:25
176:3 179:24
180:8 181:2,6
181:18 199:10
199:10 293:15
**ftx's** 61:14
**fulfill** 293:5
**full** 23:25 44:5
100:19 101:3
211:23 233:13
**fully** 33:3 74:8
102:6 170:25
176:21 178:18
**fulsome** 237:14
**function** 111:6
269:9 279:1
**functionality**
27:22 29:1
**functions**
110:20 280:16
**funds** 28:4,5
28:10,13,21
32:15 39:19
37:3,6,7 38:19
38:22 41:13
57:4 59:20
51:24 69:7
217:22 280:15
**general's** 98:22
**generally** 28:2
28:11 29:19,25
49:16 55:19
57:14,16 61:20
62:12 74:1
77:7 93:18
95:16 109:4

**further** 43:4
44:8 75:2
103:11 114:7
198:21 210:2
225:23 229:15
246:5 262:21
265:16
**future** 77:13
77:14 143:22
151:5 152:10
158:23 181:13
181:20 183:19
208:16 243:11
254:2,11

### g

**g** 9:1 188:4,5
188:16,17,25
**ga** 5:22
**gap** 61:22
**gas** 200:8
**gather** 229:9
**gauntlet**
175:11
**ge** 147:6
**gears** 90:16
**general** 6:1
10:7 36:25
51:24 69:7
217:22 280:15
**general's** 98:22

**generals**
270:12
**gentleman**
108:2 153:1,14
222:8 301:19
**george** 234:23
**getting** 59:22
72:15 124:2
127:16,19
150:11,12
153:9 169:10
169:22 171:14
181:13 199:13
259:11 266:14
274:1 290:7
**gina** 7:14
114:12,13
152:19
**give** 13:16 14:9
14:11 15:8,13
15:14 19:3,20
20:13 23:22
30:5 50:11
54:24 81:1,7
118:25 119:10
135:1 143:8
145:11 153:19
161:17 168:20
211:5 220:5,6
222:23 224:21
233:10 248:23

## [give - good] — Page 39

281:11,12
298:5 303:18
**given** 28:12
29:24 30:10
41:3,13 52:25
62:22 73:25
76:19 103:9
124:8,8 127:21
130:10 143:12
168:7 179:5,6
179:6,6 205:13
228:24 230:12
240:16 254:13
260:24 264:1
275:7
**gives** 153:12
209:6 259:21
**giving** 164:11
180:20 262:9
**glasses** 248:12
**glean** 251:15
**glitch** 90:3
**global** 192:7,19
193:1,7,22,24
194:4,25 195:2
195:12,17,20
195:21 203:21
211:19 213:7
**go** 10:25 13:2
13:19 14:1
15:18,21,23
16:22 17:13
19:13 20:18
25:18 40:21
44:14,14,16
53:15 60:21
75:24 79:10

80:9,16 91:4
102:17 105:3
112:15 113:10
113:16 114:13
114:15 115:8,9
116:2 117:4,4
117:5 120:10
125:1 128:10
128:17,18
133:17 135:18
135:21 137:22
139:18 140:4
142:6,17
153:6,8 155:19
161:18 163:8
167:21,23
168:9,10,12
174:11 181:16
182:10 183:5
184:15 187:22
188:12 190:17
199:17 203:11
206:13 211:8
216:7 219:5
220:14,17
222:1 224:12
224:14 233:3
239:6 240:6
242:7 272:12
273:4,8 286:14
288:22 301:20
307:14 212:25
**god** 23:23
181:18 233:11

**goes** 85:11
142:8 149:19
150:10 158:2
215:17 239:23
258:20
**going** 9:13,15
10:11,12 17:2
17:8 19:20
23:12 32:12,19
39:21 54:3,25
62:13 65:13
69:17 79:14,20
81:7 88:16
107:23 108:16
122:22,25
140:8,11
141:17 146:11
147:3 148:13
149:9,22 151:3
152:12 153:8
154:25 156:22
158:7,8,10
167:15 170:22
176:22 177:10
178:23 179:18
179:19 181:11
181:20 183:18
184:6,24
198:21,21
204:24 205:17
207:14 212:25
213:6 215:24
218:11 220:12
220:13,17,18
223:7,24
224:23 225:4
228:13,19

232:24 233:1
236:17 244:8
244:12 248:18
251:7,9 252:20
252:21,25
253:3,3,4,12
253:14,15,16
256:15 258:1
265:14 270:25
271:6 272:18
275:16 279:4
279:12 281:12
291:11 296:18
297:1,10,22
298:12,13,16
300:25 301:17
301:20 302:5,6
303:11
**goldberg** 5:8
11:9,9 12:4,14
12:22 13:7
14:5,16 16:15
20:20,24 21:2
21:10,13
144:22,22
145:7,10
213:24,24
214:9,19 215:5
218:20 219:1,4
219:6,14
297:15,15
**good** 21:9,11
21:14,15 41:25
45:7 98:21
99:2,9 111:16
112:1 115:7
117:12 129:3

## [good - happened] — Page 40

164:14,22
167:6 183:16
186:17,18
189:5 190:20
207:22 211:11
214:5 216:2
227:4,12 236:4
265:11 269:23
269:24 270:1
276:11 293:6
299:14
**google** 49:14
**gotten** 31:1
303:2
**govern** 256:14
**governing**
189:4 293:2
294:3
**government**
92:21 96:13,21
96:25
**governmental**
93:9 94:23
95:1,11
**grade** 37:22,24
**graduated**
234:17
**graduating**
235:4
**graduation**
235:2
**grand** 238:9
**grant** 218:10
**granted** 176:11
**great** 16:13
20:23 23:18
108:20 144:7

161:17 211:22
238:11 276:13
279:21 299:21
**greater** 112:14
116:6
**greatly** 157:22
**green** 2:2
**grew** 235:5
**gross** 270:10
**grounds**
219:18 221:16
223:13
233:18,20
246:8,15,23
253:12 258:10
297:23
**guess** 55:6
83:23 88:5
114:13 116:7
124:6 139:10
172:25 183:10
213:14 227:17
228:12 231:17
257:12 258:10
297:23
**guidance**
132:13 286:8
**guidelines**
224:21
**guiding** 132:1
132:6
**guys** 130:8
161:11,19
162:21,23

164:9,16,17,19
167:15,16,17
167:20 169:3,4
169:16 173:19
196:12 210:7
260:21,24

### h

**habit** 219:25
**hage** 8:6 233:6
233:9,12,15,15
233:18,20
248:6,15,23
247:4,6 253:12
255:5,10
259:18,25
261:1,8,16,19
261:20,23,23
261:24 262:3,5
262:9,11,15,23
262:25 263:1
264:10,13,17
264:23 265:2,6
265:11 269:17
269:23 270:7
274:7 275:9,16
278:14 279:7
279:12 280:17
281:17 282:17
284:3 287:15
287:24 288:1
294:13,20
297:6 300:12
300:14,22
301:2 303:7,12
303:21
**hage's** 278:24

**haircut** 117:8
119:11
**halls** 286:21
**halt** 87:12
**halting** 87:18
87:25 88:1,8
88:12 89:3
90:1,7,15
**halts** 89:10
**hamilton** 6:11
**hand** 100:18
100:18 215:14
235:16
**handful** 130:2
**handing** 24:7
259:1
**handle** 253:3,5
253:16 295:10
296:18
**hang** 44:20
218:15 274:16
**happen** 56:23
76:7 83:17
94:8 120:4,7
138:10 183:18
188:6 190:10
208:21 278:25
279:9
**happened** 10:6
62:12 72:25
83:2,5 107:20
117:11 135:22
136:8 146:22
148:6 150:23
175:25 179:21
228:18,19
279:8

## [happening - hendershott]  Page 41

**happening** 60:20 130:9 204:7 270:24 299:3
**happens** 28:11 30:17 77:13,16 78:20 81:22 82:15 84:9 151:7 168:24 182:15,17 212:20 243:11
**happy** 21:7 86:13 103:11 120:24 181:5 217:24 257:22
**hard** 16:1 96:9 97:13 135:9 143:13 144:3 154:7 171:21 201:25 223:10 237:18 248:4 266:5 287:1
**hasn't** 178:18 251:9 254:11
**haven't** 166:23 198:19 248:20 287:11
**hawaii** 13:24
**head** 17:7 65:7 93:13 140:13 226:22 235:12 242:5 257:23
**headquarters** 36:13
**heads** 50:10
**health** 157:1
**hear** 16:3,5,15 17:3 18:13 20:20 51:20 70:8 87:2 102:18 115:12 137:13 147:16 174:17 180:5 213:14,14 217:6 229:17 262:14 267:14 268:1 270:3 278:25 287:8,9 287:20 297:12
**heard** 17:3,9 25:13 86:2 99:3 119:2 128:6 139:10 149:21 158:14 159:16 161:24 183:14 215:11 218:14 226:4 255:10 257:2 257:11 278:15 288:11
**hearing** 3:1,7 3:12,14,16,18 3:20 4:1,5,8,11 4:11 16:10,23 17:22 25:12 35:13 38:25 39:6,8 40:3 66:25 86:15 123:12 137:3 145:18 149:2 150:1 162:19 172:2 176:13 182:22,22
**hearings** 16:11 61:6 80:1 240:16,19 242:19 298:1 301:16
**hearsay** 10:10 10:15,16 144:18 145:15 205:14 231:24 232:5,18 285:12
**heave** 302:18
**heavily** 292:10 292:13
**heavy** 157:4 169:5,6
**heightened** 166:2
**held** 11:12 17:17,18 37:16 37:21 38:1 110:4 129:24 190:8,15 193:25 226:11 239:11 242:24
**help** 23:23 99:12 142:5 145:12 159:19 160:11,13 181:1 233:11 238:7 243:6 272:19 290:1 293:5
**helped** 288:21
**helpful** 54:11 81:3 86:22 102:3 104:17 206:24 218:22 250:8 274:11 274:12 299:18 299:23
**helping** 206:6 290:1
**hendershott** 4:1 7:8 114:11 114:12,16,18 114:21,25 115:4,6 118:24 118:11 133:15 133:19,21,22 135:19 136:24 136:25 137:2 142:2,3,5,11 142:21 269:18 269:19,21,22 270:2 271:6,13 272:16,18,19 275:12,14,15 277:18 278:12 278:13,23 279:14,16,20 280:3,14,18,24 281:7,15,16

## [honor - inaccurate]  Page 43

254:23 255:1,6 257:19 259:16 261:12 262:18 265:4,7,14 266:15 269:10 269:18 271:3 272:16 274:11 275:14 277:6 281:8 282:1,7 285:9 288:2 294:17,19 295:18,19 296:10,13 297:15 298:10 298:24 299:2 300:1,8 301:7 301:22 302:6 302:25 304:2
**honor's** 10:20 14:16 114:13 114:18
**honorable** 234:23,24
**honorary** 239:10
**honored** 239:14
**honors** 239:15
**honor's** 213:2 213:2 214:2 218:21 225:6
**hook** 278:21
**hope** 98:1 185:5 186:23 274:11 299:20
**hopeful** 11:19
**hopefully** 167:12 171:19 221:20 225:14
**hoping** 21:18 246:21
**host** 16:5
**hosted** 59:9
**hot** 57:5
**hour** 295:24
**hours** 98:3 298:6
**house** 6:11
**household** 49:13
**hundred** 49:22 120:24 121:22 169:8,22
**hundreds** 133:4 148:17 155:8 211:25 226:22
**hybrid** 298:13
**hyde** 4:25 305:3,8
**hypothetical** 78:2
**hypotheticals** 90:6 124:21 125:4 186:3

**i**
**idea** 17:4 207:22,22 215:5 219:20 226:25 272:24 273:11 300:13
**identification** 16:20
**identified** 258:9
**identify** 61:13 63:6
**identifying** 17:9,10 72:22 290:4
**identity** 93:8
**illiquid** 115:13 116:10,24 117:21 118:23 119:3,5 120:5 120:9 122:5 125:11 178:8 178:10
**illiquidity** 121:7,10
**imagine** 29:21 30:7 131:17,20 133:4 148:17 155:8 211:25 226:22
**immediately** 70:24 148:2 180:21 197:8,9
**immensely** 223:13
**impact** 20:17 70:6,9 84:16 86:8 90:18 123:13 124:4 127:7 128:1 178:25 179:9 186:4 190:22 296:5
**impacts** 127:6 127:18
**implementati-** 71:21
**implementing** 127:15,17
**implication** 101:15
**implications** 160:19
**importance** 240:16,18
**important** 58:5 76:24 89:14,23 90:8 94:23 98:9 99:6,8 107:3 109:6 111:3 112:18 112:22 146:23 146:25 148:14 148:16 154:13 157:22 165:2 166:3 176:8 198:16 206:17 207:10,23,24 208:5 221:4 284:15 289:13
**imposed** 274:1
**impossibility** 224:20
**impossible** 280:11
**impressive** 282:17
**inability** 26:11 126:6 206:11
**inaccurate** 177:20,23 179:11,12 182:18

## [hendershott - honor]  Page 42

282:5,10,15 284:9,11 285:14,16,19 287:8,11,14
**hesitation** 294:24
**he'll** 279:12
**he's** 249:4 254:10 262:5 268:19 282:3 285:18
**hi** 255:10
**hide** 217:19 226:14
**high** 36:21 113:8 141:8 180:19 239:11 239:11 251:4
**higher** 63:20 112:21 122:5 142:19 147:23 183:4 187:6,18 190:19 208:23
**highest** 132:21 137:10 172:4,6 209:2,17,23
**highlight** 121:16 129:1
**highlighted** 115:9 119:4 270:15
**highly** 64:9 89:4,4 95:12 95:17 118:2,2 165:14,14 172:23,23 173:10,10
217:1 225:11 238:19 254:10
**hindsight** 136:6 176:2
**hire** 56:12 164:17,19 165:8 288:6 293:4
**hired** 288:8,13 288:21,24 289:2,25
**historical** 60:15
**historically** 27:7 121:19 129:4,9,13
**history** 256:10
**hoc** 1:19 3:7 7:2 246:12
**hold** 3:12 27:12 36:1 62:23 156:7 171:16 190:25 199:18
**holdback** 179:24 180:8
**holdbacks** 152:4
**holders** 1:19 3:8 7:2 246:13
**holding** 190:24
**holdings** 1:6,11 1:23 3:2,9 252:23 268:10
**holds** 190:1
**hole** 61:25
**hollister** 233:23
**hon** 2:22
**honest** 155:10
**honor** 9:4,24 11:9,14 12:4 12:15,22 14:17 16:2,6,16 20:20 21:13,14 22:8,24 23:19 23:24 24:4,18 24:23 32:24 33:24 39:23 41:15,19 43:9 44:12,19,22 45:1 55:5 60:18 61:16 75:21 79:8,12 81:13 83:18 85:24 86:1,3 86:11 90:22 92:8 97:3,18 98:2,21 101:13 101:16 107:12 107:18,24 111:21 114:8 114:11,21 118:12 133:12 133:15 135:16 136:22 144:5 144:22,24 145:8,18,24 145:15,25 152:19 181:13 183:11 184:20 253:10 254:7,9
186:13 188:9 198:23 201:23 201:25 202:2,7 202:17 210:4,9 210:14,24 211:5,9 212:4 212:9,11,16,23 213:1,7,13,14 213:19,23,24 214:9,14,19 215:5,10,13,15 215:21,25 216:2,9,17 217:13,17,21 217:23,24 218:1,3,7,13 218:17 219:1 219:14,21,24 220:8,9,15,23 221:6,22 222:1 222:5,10,18 223:18,21 224:1,3,7,15 225:7,12,19,24 226:16,17 227:11,15 228:6,8 229:25 230:2,3,10,25 231:1,22 232:7 232:20,25 233:3,14,7 235:15,19 236:11 246:5 246:10,17 248:17 249:10 252:10,14,19 253:10 254:7,9

## [inappropriate - information]  Page 44

**inappropriate** 38:21 254:10 270:9
**inbounds** 148:3
**incentives** 169:11
**inclined** 214:4
**include** 21:7 40:17 46:5 69:10,19 107:11 108:11 112:23 162:2 178:2 219:9
**included** 21:2 46:7,8,14 66:4 66:8 107:16,18 135:25 169:21 217:9
**includes** 60:25 70:17 116:18
**including** 34:2 39:2 40:23 46:15 58:6 61:3 93:3 141:18 147:13 169:19 178:9 223:14 248:2 293:14
**income** 48:24 278:6
**inconsistencies** 109:19
**inconsistent** 189:8
**incorporated** 36:12 260:7
**increase** 43:1 209:10
**increased** 135:8 150:24 157:1
**incremental** 26:9 41:9 44:2 58:4 64:15 65:2 75:4 142:13 157:17
**incurred** 43:7
**independent** 228:8,9,10 255:7 258:4 265:13,23 266:4,4 267:23 268:6 270:10 270:19,21,22 271:6,9 272:4 272:5,6,9 276:13 278:22 279:14,16,17 279:21 280:5 280:19 281:19 281:21,24 282:6,13,18 282:21 285:4
**independently** 34:24 164:5
**indicate** 66:17
**indicated** 17:23 102:2 195:10 220:21
**indication** 223:6,6
**indicia** 273:24 293:14
**indiscernible** 16:7,10,11,17 52:6 104:25 108:19 111:15 119:1,14,25 121:3 122:23 122:25 123:3 128:16 132:5
133:7 134:21 138:23 139:13 141:20 162:18 164:3,3 166:21 176:11 177:1 178:8,9,10,19 179:21 180:4 180:15,25 181:18,19 183:22 184:13 184:18 218:4,4 255:7 258:4 265:13,23 266:4,4 267:23 268:6 270:10 270:19,21,22 271:6,9 272:4 272:5,6,9 276:13 278:22 279:14,16,17 279:21 280:5 280:19 281:21,24 283:7,8,11,24 283:25 284:1 285:1 286:11 287:6,16,19,22 288:22 291:19 292:25 299:11 299:25 300:17 300:24 301:2,3 301:16,20 303:8,12,13,21 128:16 132:5
**individual** 50:21 57:3 124:23 176:4 179:1,5,9 195:14,15 205:9 254:18 261:8
**individuals** 46:5 47:2 115:19 198:6 205:9 207:12 261:11 290:12
**indulgence** 59:12
**industry** 10:6 47:4 48:20 50:13 51:12 53:1,20 57:1 62:13 73:12,14 170:22
**influence** 222:3,24
**influenced** 244:15,17
**influencing** 245:5
**information** 19:18,19,24 20:1,4,6,6,10 34:24 38:16 49:5 51:7 57:11 66:16 74:12 77:15 80:17 85:6 92:25 93:5,16 94:1,16 95:5 95:13 98:9

**[information - international]** — Page 45

109:16,19
139:24 153:6,8
153:22,23
154:12,18
155:14 157:14
162:15 163:18
164:11 165:6
193:12 194:21
198:2 220:23
222:23 224:25
225:16 226:2,3
226:14 227:6
230:7 231:3
264:9 301:13
301:14,18,21
302:8,12,15,20
302:23
**informed**
96:12
**informing**
231:9
**infrastructure**
34:8,10 37:4
47:16 53:6
54:17,20 55:18
56:4,24 63:23
70:2 110:8,25
**infusion** 42:25
**ingredients**
110:12
**inherently**
29:2 62:5 73:9
155:25 179:8
**initial** 82:4
150:14 151:19
237:13

**initially** 150:6
177:24 252:7
260:6
**injunctive** 3:3
**injuries** 93:1
**inquiries** 92:16
93:19 95:4
**inside** 57:22
**insider** 268:17
268:18,25,25
277:8,12
**insiders** 272:11
272:14 276:15
276:18 277:19
278:17,18,21
279:5
**insight** 138:24
272:3 278:19
**insistence**
256:13
**insofar** 104:2
**insolvency**
238:17 240:10
**instance** 56:18
56:22 62:8
63:16 71:14,17
71:20 82:5
84:6 89:6
104:3 110:24
112:13 118:15
123:17 124:20
125:18 128:5
129:24 141:3,5
155:16 169:22
200:20 205:10
207:1 229:9

**instances** 31:9
31:13 55:20
117:21 118:1,4
122:4 125:2
129:21 130:3
184:5
**instantaneou-**
18:2
**institute** 238:6
238:13,16
**institution**
95:15
**insurance**
245:21 246:3
**integrate** 29:18
**integrated**
27:22 131:19
**integrating**
131:15
**integration**
70:21
**integrity**
283:15
**intend** 9:14
112:3 304:2
**intended**
143:22
**intending**
225:5
**intends** 114:4
143:16,21
**intensive** 263:8
**intent** 21:10
32:22
**intention**
262:20 283:23

**intentionally**
133:1 157:2
**intents** 103:22
113:17 127:22
**intercompany**
250:7,25 251:8
251:22 252:8
253:2,13,18
**interest** 1:19
3:8 7:2 74:6
113:9 124:24
184:23 204:20
243:17,20,25
246:13 250:12
256:3,5,6,18
258:13 265:13
275:10 290:15
293:12
**interested** 40:9
202:1 214:6,16
232:1 275:2
**interesting**
285:1
**interests** 193:5
204:15
**interim** 33:15
64:25 176:3
187:4
**internal** 29:8
48:14,17,19
59:24 114:5
280:20
**internally**
161:15 230:3
**international**
50:3

---

**[interned - issues]** — Page 46

**interned**
234:22
**interpreting**
262:19
**interrupt**
166:5 167:6,7
**intersection**
284:23
**interval** 80:4
**intervals** 79:22
**interview**
156:24
237:14,22,22
290:4,5
**interviewed**
290:9,12
**interviews**
195:9,19
237:12
**introduce** 9:14
134:23 261:5
**introduced**
202:16 241:15
**inu** 119:3,5,9
**invading**
265:15
**invested**
180:23
**investigate**
273:15 279:18
284:18
**investigated**
245:19 253:21
278:6 283:4
**investigating**
93:9 245:17
**investigation**
93:23 94:15,17

94:19 95:1
96:13 230:13
276:6
**investigations**
92:2,4,12,16
92:21 93:12,17
94:23 95:9,11
95:18,20,23
96:17,21 97:1
97:8,9,10,16
156:24
**investment**
24:15 45:13
47:5,10 50:5
52:24 57:13,14
57:17 58:3
95:13 132:1
164:23
**investments**
83:7 117:4
**investors** 36:16
61:10
**invite** 216:20
**invited** 222:8,9
**inviting** 210:18
**involve** 30:23
53:8 197:17
**involved** 45:15
53:16 55:19
149:12 164:7
197:17 226:18
270:23

**involvement**
45:14 284:24
**involves** 223:2
**involving**
205:4 245:20
250:24
**iranian** 28:11
**irregular** 217:1
**irrelevant**
55:10 296:2
**irrespective**
75:1 218:10
**is0** 36:25
**iscpa** 51:5
**island** 110:4
**isn't** 158:15
189:16,20
191:19 192:11
196:5,16,22
198:2,12
199:14,19,23
200:2 204:1,6
209:7 213:11
231:13
**iso** 47:21 48:3
48:8 49:3,8,10
49:16,25 50:1
50:2,9,13,19
53:4,4,16
53:24 166:6,11
270:23
**issue** 18:12
21:8 41:4 62:5
62:15 76:17
85:11 90:4
126:2,2,3
129:18 214:10

215:1,23
216:23 217:2,6
217:15 218:11
218:24 221:25
222:15 225:22
226:20 227:5
229:5,6 230:3
251:25 253:20
253:22 279:6
291:4,13
293:19 302:6
302:23
**issued** 156:21
196:21,24
201:6 223:15
**issues** 10:24
17:10 20:21
25:12 38:8
41:5 42:11,12
46:24 53:5
54:17,20 56:4
63:6 69:16
71:1,11 125:13
151:21 152:5
200:19 215:17
216:17 221:18
224:2 226:5
228:14,20
229:9 230:23
231:1,14,16
240:10 241:8
242:25 243:19
244:7 246:1
247:14,21,23
251:7,13
252:23 275:7
276:5 283:2

---

**[issuing - jason]** — Page 47

**issuing** 121:11
**item** 38:22
67:15 69:18
87:6 197:17
**items** 38:24
68:3,6 72:25
106:22 111:14
146:13 154:7
**it's** 150:18,20
151:13 157:13
159:2 160:7
161:7 163:9,14
163:23 164:14
164:22 165:8
166:1 167:17
167:20,21
168:16,21,23
169:14 175:5,6
175:7 176:9
178:9,23,24
179:10,10,12
179:13 183:17
183:25 184:9
184:14,14,22
185:16,16
188:10,13
191:7,14,17
200:15 202:12
209:1 211:22
213:1 214:15
220:5 221:2,6
222:14,19
223:1,7 224:22
225:4,20
226:20 231:6,6
231:8,14 235:6
237:4,8,17

238:5,18,19
239:2 245:11
246:3 248:3
249:12 250:4
251:8,9 253:24
254:16,18,20
254:21 258:11
258:11,19
259:5,10,12
262:1,2,7,13
263:7,7,11
264:7,15
268:15,23
269:8 270:6
271:4,6,16
273:21,21
276:11,16,21
278:3,9 279:4
279:24 280:20
281:9 282:24
282:8 285:9
286:2,2,4
287:20 290:22
291:1,3 293:6
293:6 295:19
296:2,2 297:2
301:4,5 303:10
303:17
**iv** 78:21
**i'd** 190:20
236:19
**i'll** 155:5,17
167:7 185:4
197:19 198:22
209:14 217:6
228:3,14 232:2
232:16 261:3

267:22 268:23
285:18 299:5
**i'm** 150:11,11
151:12 152:23
152:23 153:9
153:19 156:22
158:6,19
159:17 162:16
164:15,17
168:9 174:2,3
174:9,16
178:19,19
179:12 180:3
181:15,15
182:7 184:22
188:4 210:7
211:2 212:19
214:4,24
215:23 220:2,6
220:12,13,17
220:18,23
223:20 224:13
224:15,23
225:12 227:3,9
228:13 231:2
236:2 237:17
238:4 239:2
240:5 243:9
244:4,12
252:13 257:16
258:3,10
259:11 262:21
263:21,25
264:18 266:5
267:4,14,21
268:1,19
269:13 270:17

270:25 272:18
274:11,25
276:16 277:10
277:18 278:23
279:21 280:6
281:12,13
282:10,11
285:10 287:4
288:1,1,15,19
296:4,18
297:15 300:22
300:23 301:17
302:4,18
**i've** 167:4
204:8 218:6
235:22 237:23
238:9,19 246:2
246:25 258:1
278:14,15
285:20 288:4
291:10 299:8,9
299:10,16,17
301:15,18,18
303:2

**j**

**j** 5:8,9
**jackie** 274:18
**january**
176:12 270:13
**jason** 240:24
241:1 255:11
255:24 258:19
258:22,22,24
260:1,2 262:8
264:4,12 286:6
288:6,20
291:18

---

**[job - know]** — Page 48

**job** 257:7
262:6 264:18
293:22
**joe** 6:22 44:12
**john** 6:21
233:4
**john's** 234:20
235:4 238:7
298:4 300:17
303:19
**join** 214:12
218:2 22:21
223:21 259:16
**joinder** 3:14,18
**joining** 292:17
292:18
**joint** 222:12
**jones** 7:20
174:8,8,10,10
174:11,12
181:15,17
182:4 288:2,2
288:3,4,5,14
288:16,20
289:5 291:23
292:3,5,6
**joseph** 6:22
186:13
**judge** 243:2
182:5,21,23
234:23,25
236:24 237:4
238:8,9 256:21
279:25 283:7
283:11 297:4
299:14,15

**judgement**
188:1
**judges** 237:23
238:18 283:12
299:9,17
300:15 303:15
**judgeship**
236:22 283:19
**judging** 303:3
303:4
**judgment**
53:18 75:8
132:23 133:1
135:9
**judicial** 22:11
22:19 237:9
283:17
**july** 181:2,6
241:15 289:7,8
**jumping**
168:25
**june** 176:3
196:18
**jurisdiction**
15:2 104:19
**jurisdictions**
11:6,11,14,18
11:24 13:25
12:23 18:14,19
19:11 126:8
156:11
**justice** 6:9
**justifiable**
274:4
**justification**
90:1

**justify** 90:2
278:20

**k**

**k&e** 46:7 53:16
108:7
**keep** 122:24
153:22 293:1
**keeping** 259:2
**keeps** 109:25
143:17 159:25
**kevin** 218:3
**key** 37:20 77:2
98:4 103:5,23
103:25 106:20
109:15 171:8
176:9 183:19
**keys** 37:6,15,21
37:23 38:1
46:24 58:20,24
59:9 143:20
**killing** 169:13
**kilpatrick** 7:7
246:11
**kind** 11:21,25
12:16,18,20
13:16 14:10
15:10 17:1
18:16 19:4
20:12 42:3
44:7 48:1 69:1
72:2,6 77:8
89:21 103:8
104:5,5 107:13
125:15 144:14
145:15 146:8
146:24 152:5
160:19 164:14

164:15,15
178:24 183:23
185:2 188:1
207:15 219:11
243:11 255:23
256:3 264:14
295:23 296:2
296:21
**kinds** 169:16
**kirkland** 5:11
40:18 66:9
108:8 197:18
206:3 301:11
301:23
**knew** 94:14
148:3 258:24
258:24 277:24
278:4,5
**knit** 259:2
**know** 12:25
13:1,15 14:2
17:2 18:20
20:2 27:25
29:25 33:4
35:14 38:9
39:3,22 41:11
43:25 45:24
46:9,15,22
47:7 48:18,18
48:19 49:22
50:4,10,10,16
50:18,21,23
52:9,12 53:1
53:15,17 54:3
54:4,7,9 55:21
56:23 57:19
58:2,7 59:6,8

61:9,23 62:5
63:8,16,24
64:20,21,23
65:22,23 66:12
66:17,20,23
68:5,11,20
72:12 73:7,10
73:11,13,18,22
74:8,8,24 75:5
75:15 76:13,15
76:21 77:5,11
77:21,22,24
78:8,8,9,13
80:8,12,15
83:1,3,6,13,15
83:20 84:10,16
85:7,25 87:6
87:15,17,25
88:21,23 89:9
89:14,18,21,24
90:3 92:19
93:15,17,19
94:9 97:22
98:4 99:8
101:3 102:15
103:21 105:9
105:24 106:4,5
106:24 107:4,5
107:6 108:2,6
108:8,22,25
109:1,11,20
110:7,14 112:9
112:16,22,23
113:9,11,20
114:3 115:20
115:24,25
116:20 117:4,7

117:11,18,23
117:24 118:22
118:23 119:11
119:14,22
120:2,16
121:12,24
122:3,4,8,11
122:17,21
123:5,7,21,24
124:1,11,13,16
124:18,20,21
125:3,3,9,15
126:12,22,23
127:7,22
128:16 129:5
130:22 131:3
131:16,17,24
132:2 133:6,6
133:10 135:9
137:24 138:6
138:11 139:1
140:14,18
141:1,2,19,22
144:13 145:20
146:8,12,13,14
146:23 147:8,9
147:12,14,15
148:12,19,21
149:8 150:17
150:18 151:3
154:20 155:6
155:10,25
156:19 157:3
157:16 158:9
160:5 161:4,12
163:8,20,24
164:12,12,14

164:14 165:1
165:12 167:22
169:1,2,10
170:5,8,12,18
171:6,16
174:22,24
175:4,14,17
176:6 177:7
178:14,22
179:16,21
180:10,13,16
182:20,25
183:18 184:3,5
184:14 186:3
190:25 195:25
197:16 198:8
206:4,5,5
211:25 212:1,7
214:23 217:2
220:2 222:3,11
225:8,25 226:1
226:11 228:12
231:13 236:23
236:23 240:11
241:18 244:8
244:13 247:25
250:15,16
251:25 255:18
255:18,20,23
258:13,14,16
258:25 259:1,3
260:23,24,25
261:17 263:5
264:4 268:9,12
270:6,7 271:7
281:10,12

282:1,12 283:8
286:19,24
290:14 292:7
295:19,24,25
296:23,23
299:14 300:17
301:4 303:13

**knowing**
130:16 259:4

**knowledge**
35:18 47:15
50:18 52:25
91:12,15 96:14
131:4 146:9
191:2 245:7
251:2,23
268:18 269:1
277:1 278:19
284:23 289:19

**known** 49:17
105:22 113:17
120:5 130:1
158:23 192:7
230:17

**knows** 28:6
255:21

**korean** 28:10

**kyc** 27:17 28:3
28:20 33:17
34:14 42:13
79:20 80:5
125:8 153:5,23
155:20 200:5

**kyt** 27:18,24
28:3,24 29:17
125:8 126:3
128:25 131:7

---

**licensing** 34:16
110:12
**lie** 180:25
**lifespan** 280:8
**lifetime** 299:17
**light** 54:25
62:12 107:19
136:8 157:11
170:21 175:25
184:2 275:1
**lightly** 74:14
127:5 128:5
149:10
**likelihood**
90:11 100:24
113:7,23
**likely** 26:14
30:3,7,23 32:2
40:24 71:20
112:14 113:3
152:12 157:24
157:25 158:13
177:4,7 179:8
179:9 240:17
**limit** 87:16
88:7 163:12
177:18 179:8
272:8
**limitation**
130:15 272:13
277:8,11
293:15 294:24
**limitations**
27:16 29:3,4
103:9 228:22
**limited** 24:12
103:14 110:19

130:3 163:14
221:17 231:18
246:13
**limits** 200:23
274:1
**line** 16:21
44:13,17 47:9
48:19 80:16
102:16 151:22
162:20 202:10
228:3 254:13
**lines** 164:8
170:20 212:1
220:6 258:17
**lingo** 148:22
**link** 204:5
286:24
**liquidations**
49:3
**liquidation**
103:20 148:10
175:20
**liquidity** 33:16
34:2 44:5
**liquidly** 131:6
**lisa** 7:23 182:8
301:9
**list** 22:2,16
25:2 28:14
108:21 112:7
114:4 212:12
249:18
**listed** 46:15
112:14 113:13
113:19,22
129:23 252:7
**listen** 147:12
147:14

148:7 149:7
175:17 187:16
208:24 235:10
244:7 245:13
261:10
**liquidation**
26:15 30:12
40:15 44:5
99:15 100:22
101:21,22
112:23 115:12
116:23 119:12
123:4 125:10
147:25 167:20
168:19 177:13
**liquidity** 33:16
34:2 44:5
**lisa** 7:23 182:8
301:9
**list** 22:2,16
25:2 28:14
108:21 112:7
114:4 212:12
249:18
**listed** 46:15
112:14 113:13
113:19,22
129:23 252:7
**listen** 147:12
147:14

**listened** 61:4
**listening** 32:10
32:17 123:13
149:17 151:18
**lists** 239:15
298:20
**literally** 175:18
**litigate** 293:21
293:24
**litigating**
252:12
**litigation** 91:7,14 97:17
184:24 245:24
254:2
**litigations** 92:2
**little** 20:11
49:8 65:11
90:16 125:17
161:1 173:24
189:17 211:14
225:9 228:18
236:22 238:11
249:10 302:10
**live** 12:10,19
16:21 274:9
279:3,13
**llc** 149:14
**llm** 234:20
235:3
**llp** 5:11 7:1
**lo** 299:11
**loan** 168:9
**loans** 106:19
106:24 107:1
107:10,18

---

**l**

**labeled** 129:25
188:19
**lack** 26:10
73:25 97:3
128:9 226:5
**ladies** 114:12
**language** 21:2
21:8 246:19,24
250:15
**large** 29:12
31:9 38:11
105:22 117:20
120:5,21 122:3
183:22,25
233:25
**largely** 10:15
10:16 39:3
57:3 66:17
68:10 72:20
240:1,7
**largest** 31:11
121:21 122:17
176:4 238:17
242:1 260:10
**late** 42:8
201:11 275:8
289:8 292:22
295:19
**latham** 5:3
11:9 144:22
213:24 216:3
**latitude** 249:11
**laundering**
42:6 156:25
**laundry**
249:18

**law** 11:22
14:20 28:21
234:18,20,21
234:22 235:7
238:7 239:19
240:4 242:2
245:25 255:12
255:25 258:20
258:21 259:25
278:17
**laws** 14:10
234:19
**lawsuits** 92:19
**lawyer** 50:9
74:24 97:23
258:20 288:7
288:21
**lawyers** 95:18
108:13 278:15
**lay** 253:8
**layman** 148:21
**lead** 137:21
**leading** 39:6
48:20 127:12
151:22 202:11
**leads** 49:7
**leakage** 25:21
26:2,3,7 30:22
31:19 101:24
**lean** 82:14
**learned** 53:17
56:1 77:15
91:22 96:17,21
163:18 286:11
**leave** 156:6
168:2 296:10
296:16,17

**led** 61:14
259:20
**ledanski** 4:25
305:3,8
**left** 15:6 67:24
81:15 157:10
163:24 275:9
275:16
**leg** 126:2,2
290:6
**legal** 46:20
73:18 76:11
83:19 84:10,14
87:8 90:23
108:3,5 184:21
189:6 226:15
246:1 281:11
283:2 299:7
305:20
**lend** 36:7
143:19 191:11
191:15,22
**lending** 191:24
192:2
**length** 1:1
140:25 174:21
**lengthy** 29:23
30:2 286:23
**lenient** 275:2
**lessons** 286:11
**letter** 39:1 42:1
42:4,4 48:15
121:11 139:4
140:24 141:10
156:21,23
157:3,4,9
167:23 201:6

201:15,17,20
201:24 202:15
202:22,25
203:8,16 285:6
**letters** 41:6
**letting** 99:8
**levels** 120:22
260:25
**let's** 157:6
162:7 164:20
165:8 169:9
171:15 173:15
178:17 182:2
191:4 200:17
209:5 210:5
218:23 233:3
234:14 236:17
236:19 238:11
259:10 264:21
282:17 302:14
302:22
**level** 36:21
37:23 90:13
163:12,21,24
165:24 177:17
187:21 251:4
287:22
**levels** 120:22
124:14 149:3
**lexington** 5:13
**liabilities**
161:21 162:2
162:17
**liable** 3:12
**license** 110:13
153:23

---

**local** 237:12
**locally** 283:16
**located** 234:1
263:23
**locked** 260:15
**lodge** 55:5
**log** 9:5 274:18
**logically**
137:21
**logistical** 41:13
**logistically**
208:21
**logistics**
160:19
**long** 17:13 18:7
19:13 20:18
52:6,12,13
77:6,11 94:6
98:5 118:18
123:25 124:2
135:9 148:1
169:5,7,9
171:9,20 179:7
256:24 260:1
271:14 283:22
298:7
**longer** 14:2
15:1 52:11
110:21 199:7
**longwinded**
171:24
**look** 13:15
42:10 58:3
63:9 86:15,19
88:11 89:7
96:9 100:4
108:20 109:6

109:20 131:11
131:16 140:24
148:10,11,24
150:24 155:13
157:14 159:2
160:20 161:11
161:14 164:2
165:19 170:19
180:16 184:14
187:25 236:17
250:9 253:23
253:25 257:22
275:24 283:18
283:21
**looked** 42:12
63:1 106:20
108:22 166:19
174:23 193:12
193:17 232:6
**looking** 64:2
65:21 74:22
88:18 91:13,19
98:12 121:25
150:15 174:2
176:3 214:11
273:24
**looks** 114:6
171:7 283:13
**lorraine**
303:24
**low** 90:12
118:20 146:25
177:5,8 302:18
**lower** 190:18
190:21 208:24
**loyola** 234:18
**lunch** 131:24
300:16,19,20

**lot** 9:25 14:13
19:7,17 20:18
42:15 65:5
70:22 73:9,13
85:5,5 86:2
88:23 97:12
99:7 108:13
111:6 113:13
117:21 119:15
121:20 122:4
143:5 144:14
145:12 147:2
147:12,14
148:9 149:11
150:18 165:5
169:1 171:2
176:1,8 180:14
186:19 189:14
204:7 205:23
208:7 226:4
239:11,12
240:2 241:23
243:8,9 258:24
259:6 282:16
284:19 288:22
290:19 298:23
299:8,9
**loud** 16:15
20:21
**loyal** 9:9
**lose** 168:13
184:25
**loss** 124:9
160:8
**lost** 17:5 168:3
180:21

300:21 301:5,6
**luncheon**
142:25
**lunchtime**
114:20,22,23

**m**

**m** 7:6
**m&a** 51:9
57:20 64:8
69:7,7 154:8
**m3** 123:18
**made** 10:3 32:1
32:2 34:11
35:15 38:14
40:13,16,21,24
53:19 58:14
61:5 66:12
68:23 69:12
71:10 75:6
82:1 92:16
103:13 105:7
106:7,19 107:1
107:10,18
111:2 120:10
126:21,22
127:9 145:18
149:9 154:10
157:15 169:16
187:12 189:19
191:18 193:4
194:3,8 195:22
203:8 205:3
206:9,25 207:4
207:5,16
216:10 229:13
229:14,15
230:22 247:20

| | | | |
|---|---|---|---|
| 259:8 277:25 | 188:1 193:6,15 | 223:18,18 | 121:16,22,25 |
| 292:16 | 193:24 212:18 | 225:12 226:13 | 123:6 124:7 |
| **magnitude** | 215:15 217:17 | 227:11 231:1,1 | 129:10,18,23 |
| 30:5 | 220:10,12,13 | **man**  16:6,10,17 | 129:25 141:1 |
| **main**  49:25 | 223:20 225:5 | **managed**  179:4 | 150:21,22,25 |
| **maintain**  35:23 | 226:15 229:23 | **management** | 151:5 152:13 |
| **maintained** | 253:25 254:1 | 26:24 29:10 | 154:5 175:18 |
| 126:19 286:24 | 255:10 257:2 | 53:17,21 54:16 | 176:20,23 |
| **maintaining** | 261:13,21 | 56:7,17 61:2 | 177:19 178:16 |
| 163:16 | 262:5 275:4,8 | 88:21 115:19 | 179:2,6,15 |
| **maintains** | 279:10,22,25 | 115:25 126:20 | 180:20 199:4 |
| 128:14 143:15 | 280:2,13 | 163:18 164:6 | **market's** |
| **major**  93:14 | 294:25 297:6 | **manner**  64:21 | 120:18 |
| 284:2 | 297:13 298:19 | 104:16 108:15 | **markets** |
| **majority**  37:23 | 298:21 303:12 | 111:11 123:21 | 121:17,19,20 |
| 104:3 117:20 | 303:16 | 273:20 276:14 | 121:20 176:19 |
| 241:9 257:24 | **maker**  27:10 | **manual**  88:22 | **marshal** |
| 258:8,14 291:3 | 66:20 129:18 | **manually** | 175:19 |
| 292:8,18 | 129:23,25 | 130:12 | **master's** |
| **make**  10:25 | 199:4 | **manuals**  34:14 | 234:19 |
| 11:2 15:23 | **makers**  27:11 | **march**  2:5 | **material**  44:11 |
| 17:24 18:3,5 | 30:25 31:4,11 | 78:18 156:20 | 83:2,4 88:2,13 |
| 18:21 21:4 | 66:22 115:22 | 157:5,7 158:16 | 88:24 91:23 |
| 28:8,18 32:6 | 121:25 129:10 | 159:1 305:25 | 95:24 96:8,12 |
| 40:21 58:19 | 175:18 176:23 | **margin**  191:9 | 97:16 108:5 |
| 67:4 68:22 | **makes**  19:11 | **marginal** | 121:23 |
| 71:13,24 91:13 | 258:12 283:24 | 117:25 118:4 | **materially** |
| 93:21 98:3 | **making**  31:12 | **mark**  6:14 | 91:16 103:24 |
| 109:18 117:5,8 | 40:17 91:9 | 41:21 202:7 | 190:15,16,22 |
| 127:20 136:11 | 105:2 127:14 | **market**  15:16 | **materials** |
| 136:11,20 | 165:25 168:13 | 19:21 27:10,11 | 139:2 |
| 151:17,18 | 181:7 204:18 | 30:24,25 31:4 | **math**  168:5 |
| 154:23 160:4 | **malionek**  5:9 | 31:11,12 54:25 | **matter**  1:5 |
| 163:6 164:4 | 216:2,3,25 | 66:20,22 | 108:5 183:6 |
| 167:16 174:2 | 217:11,13 | 115:22 117:12 | 210:1 214:10 |
| 175:13 176:21 | 219:24,24 | 117:24 118:17 | 243:18 304:3 |
| 179:7 185:25 | 222:10,10 | 120:16 121:9 | |

| | | | |
|---|---|---|---|
| **met**  52:3 53:20 | 155:12,18 | 175:4,5 176:14 | **minutes**  17:5 |
| 241:20,21 | **migrations** | 177:11,20,22 | 39:6 81:9 |
| 242:11,15 | 89:4 | 177:24 178:21 | 121:24 210:6 |
| 289:6 | **mike**  5:17 | 179:22,24,24 | 210:13 257:23 |
| **method**  187:13 | 21:16 144:5 | 180:1,6,8,8 | 261:4 262:22 |
| 271:21 291:20 | 221:22 232:7 | 184:17 197:4 | 263:2 274:21 |
| 291:24 | 295:19 | 209:7 219:8,9 | **misapprehen...** |
| **methodology** | **milestone** | 276:23 292:24 | 228:17 |
| 271:7 | 78:17 158:24 | **millions**  30:8,8 | **mismanagem...** |
| **mew**  1:3,9,17 | 297:11 298:8 | 119:22 120:21 | 270:11 |
| 3:1,7 | 297:11 298:8 | 120:22 121:1 | **misquoted** |
| **michael**  2:22 | **military**  37:24 | 160:5 | 281:1 |
| **michelle**  3:20 | **million**  25:25 | **mind**  32:14,23 | **misrepresent...** |
| **michigan** | 26:1,3,3,6,7,13 | 55:1,13 65:13 | 177:25 |
| 233:24 234:4,5 | 31:19 41:9 | 76:1,14 84:21 | **missed**  69:23 |
| 234:18,24 | 42:22,25 43:14 | 96:19 114:15 | 130:8 169:24 |
| 235:5 263:23 | 43:20,20,23,25 | 148:11 180:3,5 | 282:18 302:17 |
| **microphone** | 44:1,2,4 61:21 | 226:25 249:10 | **misstated** |
| 16:4,12 102:15 | 71:19 77:8,22 | 236:25 284:3 | 142:1,3,7 |
| **microsoft** | 116:18,24 | 293:1 | **mistaken** |
| 110:17 | 117:5,9,11,18 | **mindful** | 116:12 150:4 |
| **mid**  150:3,16 | 120:24 121:6 | 263:21 | **misundersta...** |
| 151:1 152:11 | 123:2,6 124:18 | **minds**  29:24 | 269:8 276:19 |
| 184:1 289:7 | 124:18 135:13 | 75:5 102:7 | **mixed**  299:13 |
| **middle**  214:23 | 135:14 139:13 | 177:4 | **modifications** |
| 220:1 225:14 | 140:1,2,2,3,4,7 | **mine**  147:8 | 10:25 280:13 |
| 289:10 | 140:22 141:7 | **mineola**  305:23 | **modify**  20:5 |
| **midwest**  234:2 | 141:15,16,17 | **minimize** | 280:10 |
| **migrate**  79:23 | 141:17,19 | 30:22 101:24 | **moelis**  38:12 |
| 89:1 155:17 | 142:6,8,12,15 | 124:3 200:7 | 40:18 46:4,6 |
| 156:5,9 200:15 | 142:15,17,19 | **minimum** | 46:14,16,18,25 |
| **migrated**  82:8 | 142:20 149:23 | 131:20 | 47:5 50:22 |
| **migration** | 149:23 152:4 | **minimums** | 53:9 55:20 |
| 80:11 82:16 | 159:12 160:7,8 | 151:23 | 57:6,9,13,22 |
| 84:19,23 85:1 | 167:16,17,25 | **minute**  18:8 | 57:24 58:8 |
| 85:18 86:1,4,8 | 168:3 171:16 | 81:8 220:10 | 59:2,21 66:7,8 |
| 86:16,18 | 174:13,18 | 299:3 | 71:5 75:7 |

| | | | |
|---|---|---|---|
| **matters**  57:10 | 102:10 105:22 | 162:25 197:25 | **memberships** |
| 87:8 93:4 | 108:12 127:6 | 198:4,8 244:12 | 238:12 |
| 94:23 108:3 | 127:19 132:18 | 244:19,24 | **member's** |
| 143:6 152:2 | 132:24 137:7 | 261:4 267:3 | 290:23 |
| 202:3 243:4 | 138:23 143:25 | **meetings**  35:6 | **mention**  92:24 |
| 266:23 | 144:7 153:10 | 45:15 53:23 | 100:21 |
| **matthew**  5:24 | 182:25 183:1 | 54:18,19 55:4 | **mentioned** |
| **maximize** | 183:17 197:16 | 55:17 56:21 | 10:22 11:1 |
| 100:6 123:23 | 206:20 257:12 | 63:3,10,13,17 | 23:10 35:12 |
| 135:5 147:18 | 259:5 275:22 | 63:18 66:5,5,8 | 46:11 47:20 |
| 175:11 176:6 | 296:20 | 111:13 162:22 | 53:2 59:8 |
| 271:18 | **meaning** | 163:5,7,9 | 70:13 77:20 |
| **maximizing** | 258:11 | 164:21 197:20 | 80:5 115:21 |
| 154:21 160:24 | **meaningful** | 207:17 242:18 | 116:2,21 |
| 171:11 175:13 | 11:3 18:9 | 242:21 243:2 | 148:19 149:18 |
| 180:18 208:12 | **means**  26:21 | 247:7,11 | 167:1 212:22 |
| 272:1 | 54:4 117:12 | 265:23 291:11 | 218:12 251:6 |
| **maximum** | 124:24 159:8 | **meets**  241:6 | 256:15 280:3 |
| 13:13 | 163:14 191:21 | **mega**  284:2 | **mentioning** |
| **mcdermott** | 254:20 265:25 | **member**  46:4 | 297:18 |
| 6:16 40:23 | 279:22 293:8 | 238:23 239:1 | **merit**  30:16 |
| 66:9 108:9 | **meant**  26:19 | 245:2 256:17 | 38:13 41:4 |
| 186:14 197:18 | 72:24 178:1,1 | 257:13 286:19 | 46:12 65:14,24 |
| 233:5 242:7,8 | **measure** | 290:22,23,24 | 67:8 68:11 |
| 242:9 255:25 | 178:25 244:5 | **members**  56:6 | 196:25 197:5 |
| 256:22 257:20 | **mechanics** | 94:12 237:12 | 197:19 198:2 |
| 258:23 260:21 | 155:15 | 243:23 244:2 | 198:18,25 |
| 261:2 288:13 | **mechanism** | 244:18 257:3 | 199:3,7 237:11 |
| 288:24 289:2,8 | 155:9 | 257:13,14,15 | 237:15 276:10 |
| 289:24 291:12 | **media**  41:5 | 258:16 260:25 | **merits**  252:12 |
| 294:23 | 147:15 197:1,3 | 261:1,8,15 | **message** |
| **mean**  9:25 10:2 | 211:15 | 263:18 265:22 | 204:12,14,21 |
| 39:21 45:25 | **meet**  37:23 | 288:8,24 289:1 | 204:24 205:6 |
| 57:12 60:11 | 70:18 241:14 | 289:23 290:2 | 205:11,11 |
| 72:9,10,23 | 241:24 | 290:22 291:2 | **messages** |
| 85:4 88:19 | **meeting**  38:11 | 292:9,12,14 | 211:15 |
| 92:24 98:8 | 46:14 66:25 | | |

| | | | |
|---|---|---|---|
| 88:19 109:2 | 165:12 176:15 | 212:11,17,25 | **moved**  90:19 |
| 115:25 117:7 | 179:11 | 213:1,6,13,17 | 90:20 96:2 |
| 123:17 139:7 | **monthly**  139:7 | 217:21,21 | 103:19 124:20 |
| 162:25 189:15 | 140:9,15,17 | **motion**  3:2,12 | 206:11 235:4 |
| 197:12,13,14 | **months**  11:7,8 | 3:14,16,18,20 | 300:18 |
| 197:17 198:6 | 11:13,23 12:2 | 4:1 267:5 | **movement** |
| 201:18 207:5 | 12:13,13,20,21 | 285:3 294:6 | 152:13 |
| **moment**  81:8 | 13:3,21 15:14 | **motions**  4:5 | **movements** |
| 215:16 261:7 | 15:18,22 19:1 | **motivation** | 177:18 179:2 |
| 261:11 | 19:2,6,13 | 283:24 | **moving**  40:9 |
| **monday**  78:19 | 29:20 80:20 | **move**  25:22 | 75:9 77:12 |
| 158:15 159:6 | 81:18 85:20 | 32:7 36:4 37:6 | 90:3 96:1,4 |
| 221:5,12,13 | 131:21,22 | 37:7 41:1 | 105:13 149:3,5 |
| 297:4,7,8,13 | 133:8 141:8 | 43:21 57:4 | 157:19 160:7 |
| 298:3 300:2,5 | 155:1 160:4 | 58:23 59:19 | 161:2 179:15 |
| 300:6,11,13 | 180:21 199:15 | 74:9 75:17 | 184:8 203:14 |
| 303:5,23,25 | 241:10 252:5 | 76:25,25 78:10 | 204:16 206:18 |
| 304:1,1 | 284:22 | 78:14 79:14 | 209:24 282:16 |
| **monetary** | **moot**  238:2 | 86:23 88:15 | **mtl**  34:20 |
| 76:20 | 240:12 297:5 | 89:5 101:6 | **multi**  35:8 |
| **monetize**  82:12 | **morning**  21:14 | 104:20 124:7 | 77:20 120:23 |
| **money**  34:16 | 21:15 33:6 | 125:6 131:23 | 121:22 124:25 |
| 42:5,6 76:17 | 39:6,9,10 | 131:24 138:14 | 131:18 165:12 |
| 150:8,11 | 41:25 45:7 | 139:18 151:6,6,8 | 208:20 |
| 156:24,25 | 67:22 68:18 | 157:16,23 | **multiple**  31:4 |
| 171:13,17 | 157:12,15 | 173:12 179:18 | 31:14 33:18 |
| 259:2,8 260:18 | 158:5 201:18 | 179:19 184:8 | 37:5 42:14 |
| 268:6 271:23 | 202:20 203:17 | 187:1,5,9 | 45:24 53:3 |
| 274:2 276:3,12 | 203:20 204:5 | 194:5,25 | 61:2 63:3,3,10 |
| **monitor** | 204:10,11,17 | 195:11,14,15 | 63:17,17 66:4 |
| 200:22,22 | 205:24 211:23 | 207:2 208:15 | 93:3 111:12 |
| 266:4,8 | 221:14 300:18 | 209:4 221:21 | 115:22 122:13 |
| **month**  12:1 | 303:8 304:4 | 231:5 234:15 | 122:19 123:16 |
| 14:1 15:25 | **morrissey** | 236:11 273:16 | 138:21,21 |
| 35:8 77:9,22 | 210:4,9,18,24 | 297:10 302:7 | 194:12 195:4 |
| 81:24 82:9 | 211:5,8,9,10 | 302:10 | 208:21 245:14 |
| 155:2 156:6,10 | 211:11 212:4,7 | | 256:12 257:6 |

**[multiple - nine]**  Page 57

263:10,11
282:23 293:7
**multiples**
135:8
**mute** 102:16
**mutually**
106:14
**mystery** 15:19
219:17

**n**
**n** 5:1 8:1 9:1
305:1
**n.e.** 5:21
**name** 23:25
49:13,15 99:3
132:9 146:1
152:19 163:2,3
182:8 233:13
255:6,14
**names** 99:8
**nanosecond**
85:22
**narrower**
278:11
**narrowly**
225:1
**national** 238:1
**nature** 46:21
47:16 49:17
59:24 60:23
61:9 62:21
66:3,10 68:23
70:17 71:10
93:1,16 94:25
95:2,4 97:8,12
100:20 109:22
116:25 123:18
123:22 138:13
147:2 148:15
176:5 180:12
186:2,4 193:15
197:9 206:22
208:3 230:12
246:21
**nay** 291:15
**necessarily**
90:6 102:8
132:19,20
155:9 165:10
170:10,24
178:1 206:21
270:7
**necessary** 29:8
276:4 303:14
**necessitate**
75:19
**need** 20:1,4
23:12 27:13
68:12,17 70:20
71:23 72:5
73:19 74:19
78:7 80:6,10
80:16 84:21
85:21 100:7
104:8 110:17
152:3 157:18
158:3 167:21
177:15 203:9
207:7 208:8,20
216:7,21 217:2
218:24 224:2
235:17 248:12
254:22 274:18
274:19,20
293:4 295:4
296:6,6,8,16
296:24 302:13
302:21,24
**needed** 124:23
167:1 171:15
242:4 258:20
**needs** 20:9
70:15,19,22
124:24 125:1
208:17 227:8
**negative** 124:3
127:6,18
**negotiate**
75:14 141:24
263:14 275:21
275:23
**negotiated**
118:20 140:25
141:3 154:3,16
174:13,18,21
177:1 199:13
246:2 272:22
**negotiation**
75:15 154:8
207:25 274:8
**negotiations**
172:11 251:13
251:21
**neither** 228:20
**never** 27:7
127:7 129:7
141:20 145:19
167:8 190:9
244:8 259:7
290:21 299:5
300:6
**nevertheless**
19:5
**new** 1:2 2:3 5:6
5:14 6:12,19
7:4 13:23 15:5
15:10,10,13,16
15:17 35:16
71:11 74:1
79:14 106:8,10
106:16 125:7
131:15,19
152:8 157:14
170:12 218:4
221:13 228:9
234:21 235:1
263:24,25
284:20 300:16
**news** 68:19
157:9
**newsom** 7:17
111:21,21,25
114:7 265:7,7
265:9,10,20
266:2,9,25
267:1,8,18
268:8,22 269:5
269:12
**nigh** 239:12
**night** 39:4 42:8
117:12 121:9
121:11,16
157:11 179:21
201:11
**nights** 252:19
**nine** 131:22
160:4 180:21

**[obstacle - okay]**  Page 59

**obstacle** 15:6
125:7,10
126:17 128:16
129:2
**obstacles**
115:10
**obviously**
13:18 33:2
66:14 70:22
88:1 95:22
96:8 97:22
107:19 109:14
116:21 137:7
141:5 144:6
146:21 149:13
157:11 175:25
176:1 181:8
183:23 202:2,4
203:8,25
208:25 210:18
217:24 222:7,9
222:20 260:23
**occasionally**
214:25
**occasions**
237:3 245:12
245:14
**occupation**
233:20
**occur** 14:25
27:14 70:24
73:3 100:7
103:12 129:12
129:16 135:4
139:21 200:9
208:20
**occurred** 60:13
76:19 82:6
133:8 144:11
178:17 200:25
201:1
**occurring** 33:5
73:5,11 126:14
130:1,4 177:7
179:5
**occurs** 88:22
130:4
**october** 244:19
270:12 292:22
**odd** 9:23 120:7
145:12,13,16
157:11 175:25
176:1 181:8
**offer** 21:17,21
22:3,14,24
24:18,25 102:9
135:1 159:21
201:23 209:3
223:22 229:4
231:21 232:8
**offered** 75:1
159:19 223:7
231:3 232:3
302:1
**offering**
120:18 160:10
230:18
**office** 6:1 98:23
156:21 260:12
289:18
**officer** 164:20
232:8
**officers** 3:5
47:24 281:19
**officer's**
216:12
**official** 4:8
211:2 260:22
**officially**
184:23 229:20
**offsetting**
66:19
**oftentimes**
57:19 61:23
69:5,10,14
141:3 163:13
215:21
**oh** 51:23 99:23
173:14 182:25
215:21
**ohio** 12:12 13:1
14:4,9 15:18
304:3
**okay** 9:8 10:22
17:6 20:19
21:19 23:2,8
23:15 24:21
25:11,19,20
26:17 30:5,10
30:17 31:19,23
32:9,17 33:9
34:3,6,12,15
34:18,22 35:17
35:20,22,23
37:10,15 38:3
38:24 40:6,12
41:2 42:10
44:8 45:4
65:15 81:11
91:2 98:20
99:6 100:14
101:9,14
104:24 105:13
105:17,24
106:3,4,17
107:25 110:24
111:10,23
114:7,13 115:4
116:14,16,23
117:2 119:10
119:25 120:10
125:6 128:15
133:9 136:23
138:23 139:10
139:17 140:3,6
142:5,9,21,24
145:9,21 146:3
146:4 151:8
156:20 158:14
159:14,23
161:10,17,17
161:17,24
162:19 164:8
167:3,14,14,24
168:20,25
172:1,16 173:2
173:14,23
174:1,3 181:20
181:22 182:2
182:21 183:10
184:15 185:16
185:18 186:10
188:2,4,22
189:14,25
192:5 193:10
193:23 195:16
196:3,15
198:17,22
199:16,21

**[nominally - obligations]**  Page 58

**nominally**
17:18
**nominated**
256:1
**non** 95:18
104:4 220:23
230:13 264:20
266:16
**nonamended**
91:6
**noncompliant**
78:5
**noncontrove...**
21:18
**normal** 50:5
97:9 208:2
**normalized**
112:20
**normally** 208:4
237:18
**north** 28:10
**nos** 4:9 22:17
**note** 162:3
**noted** 245:12
251:25 256:23
260:1,5 275:21
**notes** 94:7
152:24 161:18
174:2 222:11
**nothingburger**
296:22
**notice** 22:7,11
22:19 82:23
189:1,2 227:10
273:25
**notification**
16:2
**notwithstand...**
206:14 303:24
**novel** 284:5
**november**
292:22
**number** 9:11
16:20 21:17
25:11 30:9
31:11 37:8
42:12 43:15,15
47:25 54:24
92:3 95:7,15
113:14,19
115:17 116:2,5
120:4 123:2
130:1,11,11
131:6 138:9
141:8 150:1,13
150:16 151:3
154:7 157:11
163:20 170:2
173:24 174:1
176:24 177:22
179:23 180:7
188:11 197:20
203:5 207:12
227:19 235:23
239:16 275:1
277:5 286:2
**numbers** 77:24
77:25 116:15
117:1 119:21
123:1 141:11
151:10,11
168:16 178:14
184:1 209:20
209:22 260:25
**numerous**
54:24 59:4
63:2 270:19
278:14
**ny** 2:3 5:6,14
6:12,19 7:4
305:23

**o**
**o** 2:21 9:1 48:7
305:1
**oath** 185:2
**obfuscate**
123:21 124:12
**object** 43:9,16
60:18 61:16
75:21 83:18
90:22 92:8
97:3,18,20
128:9 133:12
135:16 181:13
184:20 185:14
210:22 221:23
222:4 226:1
231:24 248:17
252:10 254:7
259:13,14
264:17,23
265:14,17
266:15 271:3,5
282:1 292:9
295:2
**objected**
199:22 258:15
**objecting**
246:14 267:9
267:10
**objection** 4:3,6
4:8 24:19
43:12 55:6
85:4,10 135:21
141:25 185:4
198:21 210:10
217:22 218:2
223:21 232:19
244:13 254:16
254:19 265:24
266:1 268:19
266:13 270:6
270:8 282:14
285:2,15,17,20
287:6,15 295:5
**objections** 3:22
4:13 9:11 10:5
17:14 25:3
183:1 198:20
202:14 219:19
223:15 229:14
229:15 232:22
236:13 246:16
260:4 266:11
266:13 285:21
**objective** 12:14
**objectives**
270:23
**objectors**
223:12 224:17
**obligated**
132:2
**obligation**
273:7
**obligations**
97:25 98:2
176:25 266:23

**[okay - order]**  Page 60

201:14 202:13
202:1 207:21
209:20 210:3,6
210:23 212:6
218:6,18,25
219:1,15
220:11,14
221:23 227:16
228:2,5,15
229:19 231:12
231:19 233:8
233:16 234:8
235:22 236:1,7
237:25 239:4
240:5,9,15,23
241:2,24
242:11,17
243:6 244:23
245:4,8 246:4
247:3 249:9,12
250:10,14
251:8 252:6
254:4,24 255:8
255:14,17
257:2,11
261:21 262:1
264:14 265:1,5
265:9 266:19
267:21 269:16
269:20 277:7
277:15,17
278:11,12
281:3,7,17
282:16 283:5
286:2 289:4
291:18,24
294:13 295:16
297:1,17
298:21 300:6,7
302:16,24,25
304:1,8
**oikke** 5:16 79:1
79:3,6,9
158:23 159:9
213:10,18
**old** 305:21
**omnibus** 73:8
**onboard** 29:18
**onboarded**
200:1
**onboarding**
28:3
**once** 14:25
22:18 45:9
58:25 59:1
82:20 130:4
199:25 231:24
279:24
**ones** 122:19
147:13,14
**ongoing** 62:19
67:18 68:8,25
74:3 83:11
92:13,17 94:11
130:5 201:15
251:20,24
**online** 86:19
150:5
**onset** 77:3
146:15
**opaque** 157:2
**open** 13:20
16:23 68:2
153:4 156:5
296:11,16,17
**opening** 115:9
**operate** 56:7
62:19 63:5
73:19,20 90:17
110:11,18,20
163:14 164:1
165:17 171:3
175:10 186:7
**operated** 129:4
**operates**
126:20
**operating**
152:9 230:21
**operational**
41:13 70:20
160:19
**operationally**
71:22 184:10
**operations**
62:22 68:24
208:3
**opine** 50:14
53:24 87:8
**opinion** 30:10
97:19,22 113:4
148:25 184:16
184:17 190:17
254:20,21
281:25 282:11
**opinions**
230:13 256:10
**opportunity**
11:3 13:5
14:18,22
120:13 210:11
222:1 273:13
**opposed** 43:15
55:8 72:6
74:19 244:25
267:7
**opposite**
153:17 193:3
**optimize**
177:17
**option** 31:21
40:15 74:4
75:12 87:21
125:12,12
135:10 136:17
137:22 157:21
160:2,9,11
161:14 167:17
168:2,13,15,18
208:22,25
**optionality**
75:6 208:12
**options** 71:3
76:16 147:21
176:22 207:9,9
208:13
**orally** 111:11
207:17
**orange** 48:7
**order** 17:16,20
21:3 22:8 27:1
27:4 29:12
30:3,5,21 31:5
70:16 78:18
88:25 101:2
109:18 123:23

128:23 129:17
132:4 134:16
138:9 157:18
158:15,24
159:3,5 165:13
171:16 172:22
175:12 229:22
297:11
**ordered** 211:3
**organization**
50:3 51:5
72:12 126:17
165:21 193:5
238:17,19
239:2,10
**organizational**
36:10
**organizations**
51:10 163:23
**organize** 290:1
**organized**
290:3 297:6
**original** 81:5,6
128:13 135:12
200:13
**originally**
180:22
**originate** 127:8
**originators**
126:15
**otc** 30:24
115:22 118:17
129:10,23,25
**other's** 255:23
259:11 264:22
**ought** 17:24
227:9 294:22

**outcome** 83:13
140:8 171:12
177:18 267:13
267:17,20
**outline** 132:17
183:19 217:14
**outlined** 33:13
38:9 42:12,16
45:23 66:4
71:18 80:11
106:23
**outside** 50:5
78:8 143:20
164:24 166:8
184:13 213:12
249:11
**outstanding**
82:17,22
206:20
**overall** 46:2
121:8 192:16
270:8
**overcapitalize**
190:19
**overcome**
126:17
**overhead**
171:1
**overrode** 134:2
**overrule** 142:1
232:19
**overruled**
55:11 92:10
128:10 135:20
285:17
**oversight**
243:23,24

244:3,10
256:17 262:4
262:10,15,19
262:24
**overview**
106:23
**overwhelming**
74:22 75:11
76:14
**own** 27:12
118:18 124:23
131:10 132:15
145:4 167:8
181:23 184:17
209:1 256:9,13
286:11
**owned** 36:15
36:16 124:22
150:20
**owner** 36:17
**ownership**
118:2 162:8
193:5
**owning** 124:21
**owns** 36:11

**p**
**p** 5:1,19:1
**paces** 5:21
**pack** 292:17
**packages** 290:2
**page** 8:9 84:22
84:24 188:18
188:19,25
239:15,23,23
239:23,24,24
239:24 248:15
256:11

**pages** 23:1
24:9 52:8,8,11
52:15,15 239:5
240:6,6,6
**paid** 85:15,15
136:7,13,14
139:8 166:12
177:3 180:2
**pain** 147:17
**painful** 278:21
**palo** 36:13
**panel** 237:11
237:15
**paragraph**
21:3 57:9 65:8
65:16,19,20
72:7,18 85:10
91:4,20 101:19
**parallel** 29:22
168:23
**paramount**
146:16 270:22
**pardon** 287:6
**part** 13:11
14:20 19:20,25
28:25 42:15
45:20 46:2
61:13 77:14
105:25 109:16
112:25 113:7
113:16,21
119:19 122:3
122:11 123:11
126:7 128:15
133:9 147:20
162:24 163:15
164:21 172:13

112:9 113:20
113:21 118:10
122:16 126:19
128:4 138:6
146:16,25
147:16,18
148:2 150:15
162:25 165:5
165:18 166:7,8
166:12,19
170:16 171:12
190:10 191:13
198:5 208:4
211:15 214:6
223:9,9,12,14
223:19 229:14
236:23 239:10
257:18 258:15
259:3,4 261:22
261:23 262:8
262:14 275:1
277:23 290:14
299:13,14
**perceived**
65:23
**percent** 31:10
31:15,17 36:15
36:16 42:25
43:6,15 115:14
116:2,4,6
117:6,8,9
118:6,6,22
119:11 120:3
120:11,18,20
121:2,3,4
122:9 124:9,22
124:23,24

141:18,23
149:17,21
150:3,6,9,11
150:12 151:20
157:20 168:1,3
168:8,11,11,12
168:13,14,17
169:8,10,22
184:1 239:18
285:22 286:4,5
**percentage**
141:22 168:7
179:18 183:2
**percentages**
183:5
**perception**
112:15 286:4
**perfect** 18:23
20:16 109:23
**perform** 47:10
57:14,21 58:3
59:11,13 69:25
70:25 74:11,14
74:16 109:5
184:7
**performance**
91:17 185:24
185:25 259:21
**performed**
42:15 46:1
47:22 49:6
61:10 63:3
66:16 70:23
189:16 191:18
**performing**
61:21 62:16
67:19 89:15

**performs** 49:8
49:18 109:3
**period** 14:1,25
15:25 18:7,10
35:8 60:13
71:2,12 77:16
79:25 81:24
82:9,9,10 90:5
103:14,18
118:18 123:8
123:25 124:3
124:25 150:24
155:2,22 156:7
212:10,15
277:8,12
279:4
**periods** 90:4
286:23
**permission**
114:13,18
176:11 185:18
211:6 235:17
**permit** 12:16
72:3
**perpetuate**
62:1,4
**perpetuated**
64:24
**perpetuating**
72:16
**person** 66:5
111:12 197:25
241:20,21
242:13 255:21
255:22,22,22
258:8 259:5

260:20 261:24
262:4,15
276:24 293:1
297:22 301:19
**personal** 16:19
146:10 157:25
283:15 288:21
**personally**
3:12 47:17,19
48:16,21 83:15
147:5,12
264:18 282:22
287:2
**personnel** 64:4
**persons** 189:8
276:25
**person's** 259:5
279:4
**perspective**
26:5,11 27:17
28:20 29:14
32:5 37:3,4
46:20 47:4,8
48:1,2 49:5
50:22,22 55:1
55:2,3 58:5
61:24 62:3
64:16 66:15
70:16,21 72:14
73:1,5 76:23
76:24 77:3,8
77:21 78:10
88:3,14 89:15
104:7 107:3
113:14 120:9
139:7 150:22
154:6,9,13

182:15,17,20
182:24,24
183:25 189:22
200:7 201:5
206:14 216:18
220:7 221:11
230:11 245:11
255:19 259:10
263:5,14,19
264:1 272:21
276:22 282:25
284:15 287:5
287:15
**participants**
122:17
**participate**
46:13 132:18
170:17 217:25
222:7,19
289:12 297:4
298:17
**participated**
66:9 93:3
96:14 175:19
175:23 241:8
241:12 247:11
286:22 299:10
299:12
**particular**
45:14 298:20
**particularly**
223:10 289:13

**parties** 11:21
19:12 28:19
31:14 62:16
67:4 71:8 75:7
88:18 89:2,5
92:15 93:15,21
94:2 101:6
106:25 107:2,7
107:15 108:14
113:11 119:15
122:13,15
123:13 127:23
130:2 131:15
132:18 138:2,5
138:15 141:1
156:10 158:9
163:14,20
169:22 173:24
190:12 191:16
196:5,22
214:13 217:3
220:21 221:7
225:2 232:1
247:19 298:12
298:16 300:2,4
300:8
**partner** 233:22
242:2 258:19
**partners**
180:19
**partner's**
259:19
**party** 27:20,21
28:5,13,17
29:1,4,17
30:24 33:17
34:4 37:1

47:22 48:9,11
48:13,23 49:6
50:3 51:1
57:18 73:25
84:12 100:20
100:25 101:2
103:16,16
104:20 109:4
113:8,22,24
126:4 128:23
131:6,9,10,18
131:19 134:14
138:8 156:8,18
165:8,10
170:24 172:14
187:5 191:7
244:16 285:5
287:23
**pass** 41:16
111:15 269:15
287:23
**past** 15:8 18:17
60:19 144:12
169:2 183:13
226:5 288:6,20
**path** 32:7 33:2
40:20,25 41:12
208:12 209:23
283:25
**pathway**
283:10
**patient** 299:18
299:22
**patrick** 246:11
**paul** 8:6 233:6

**pay** 118:11
173:8,18
**paying** 141:20
172:21
**payment** 139:1
139:3
**payments** 10:8
104:20 109:4
113:8,22,24
141:15 142:6
**pci** 166:24
**peak** 38:13
41:4 46:12
65:14,24 67:8
68:11 197:1,5
197:19 198:2
198:18,25
199:3,7
**peculiar** 223:4
**pending** 3:4
91:15,23 92:1
92:4,19 95:6
219:19 234:10
**people** 11:8,21
11:24 12:3,9
13:1 14:3,12
15:14,16,17,18
15:21 16:3
17:25 18:9,24
19:1 20:10,19
28:2 32:16
44:17 53:3,8,9
53:11,21 54:2
56:17 85:13,15
85:19 86:2,10
90:2 99:7
104:1 108:15

157:14 162:3
162:13 163:7
163:10 164:25
165:3,7,15
166:3 170:21
175:3,8 176:10
177:4 192:2
222:14 247:15
247:19
**perspectives**
183:17 203:9
**petition** 24:16
267:25 268:5
272:9 273:11
**phase** 220:3
**phone** 16:3
32:10 35:6
111:19 114:10
145:22 152:17
174:6 186:10
205:6,7 238:14
241:13,22
269:16 294:13
**phrase** 11:25
**physical**
111:13
**physically**
46:13
**picture** 153:24
236:2
**piece** 111:5
**pieces** 20:13
**pii** 5:11,14
52:1
**pinpoint** 85:22
**pitch** 290:2

**pitched** 256:7
256:11
**pivot** 71:14,15
74:5 84:7
101:21 148:7
177:12 187:15
**pivoting** 65:8
**place** 28:24
57:7,25 71:25
81:18 199:25
171:5 184:10
274:8 292:19
**plaintiff** 1:12
1:21
**plan** 4:12 9:12
21:22 22:15
23:11 25:19,19
25:23 30:11
32:3,12,18
40:13 42:21
67:2,6 70:15
70:24 71:21
74:2,4,19,21
75:12 76:12,14
78:2 79:16
81:25 96:2,23
97:2 98:5,10
99:12,14,23
101:8,11
104:15 112:21
113:23 132:25
133:1,9,11
134:9 135:12
137:12,17,21
151:25 152:19

155:8,11
156:12 157:20
158:4,25
159:18,20,22
160:20 168:18
169:9 170:23
171:10 173:7
176:9 177:12
183:8 199:25
203:15 206:15
206:18 207:8,9
208:9,11,14
209:2,3 232:23
233:6 234:9
243:7,12,15,15
243:22,22,23
244:1,3 246:15
246:19,25
247:24,25,25
248:2,5,6,7,9
248:10,11,13
248:14,16,24
249:5,6,16,18
249:19,24
250:2,3,13,18
250:19 251:12
252:21 253:1
253:12,16,22
254:4,12,16,18
254:19 256:17
256:14,17
258:9 259:22
261:9 264:23
270:25 271:20
273:13 274:10

275:11 276:5,8
278:24 279:2,3
279:4,24 280:3
280:5,10,16
281:13 282:19
282:22 283:6,9
284:4,12,16,17
285:3,21
292:19 293:1,2
293:3,11,16,21
294:3 296:6,8
296:12,15
**planned**
176:16 200:22
**planning** 64:20
101:11
**plans** 34:19
164:1 169:6
280:7
**platform** 12:24
13:12 19:25
26:16 27:9,22
29:18 36:5
37:13 44:7
45:10 46:23
59:18 64:19
66:20 71:23
80:7 82:8,20
88:8,13 90:15
90:21 101:23
103:9,13,18
105:1 112:8
120:3 125:13
126:10 169:12
170:18,19

**[platform - potentially]**  Page 65

190:2,8 191:7
191:9 192:1
194:6 199:5
206:12 267:24
268:6 273:17
277:1,25 278:1
**platforms**
28:12
**play** 158:7
**plea** 275:8
**pleading**
290:13
**pleadings**
241:10 247:20
**please** 9:2
21:20 24:1
79:11 81:11
91:5 102:16,17
145:8 146:3
167:8 181:24
182:9,10,13
211:1 233:14
233:16 235:20
255:8 259:23
265:9 268:2
274:23 282:21
298:17,19
**plus** 31:10
210:11 261:23
262:23 287:19
**pm** 304:10
**pockets** 171:13
**podium** 142:23
287:23
**point** 12:8
14:16 18:4
33:1 74:8,15

76:24 77:14
84:8 85:7,9
89:12 90:9
100:5 121:16
137:10,11,22
147:9 155:5,25
157:16 158:6,8
158:13 161:10
168:21 172:24
173:11 175:7
181:23 186:6
187:8,16 200:5
200:24 208:14
211:24 212:24
222:5 252:15
260:14 267:20
269:15 272:9
281:9 287:23
292:16 302:16
302:21
**points** 10:10,25
89:13 118:23
143:9 152:15
167:12 172:12
212:22 213:2,2
242:25 263:20
271:11
**policies** 194:19
195:9,18 196:3
**pool** 183:22
**portfolio**
175:16 176:15
179:17 184:13
**portfolios**
175:20
**portion** 9:12
44:4 87:10

91:8 117:20,20
160:13
**pose** 37:11
**posed** 229:7
**position** 14:17
52:24 71:24
72:8,17 74:9
76:12 78:3
122:8 124:19
158:7 206:21
208:18 218:14
220:16 224:21
229:8,16,23
230:15,24
231:7,8,11
235:10 237:17
256:7 275:17
284:14 296:9
296:20
**positive** 283:22
**posner** 7:6
246:10,11
247:3,5 248:20
249:1,14
252:13,16,19
252:25 253:8
253:11 254:23
254:25 258:5
**possession**
127:11 128:21
138:25 140:12
**possible** 13:11
14:19 44:13
74:23 77:2
102:5 123:22
135:10 146:16
146:19 148:4

201:3 206:7
225:1 230:4
260:18,19,21
271:23 279:7
287:1 302:3
**post** 39:8 62:17
67:21 82:10
83:3 88:25
124:23 148:8,9
235:9 245:9,13
245:24 263:15
280:7 282:23
283:1
**posted** 191:7
**pot** 175:2
**potential** 30:22
31:19,20 35:2
62:18 65:18
76:22 82:11
96:7 100:25
146:10 147:24
148:19,20,20
149:18 154:21
163:12 165:17
170:18 219:9
243:17,25
256:18 272:11
275:25 276:7
**potentially**
26:11 40:4
41:9,12 61:23
95:24 102:10
112:21 124:15
124:25 126:8
126:24 127:3
131:14 132:21
147:22 148:7

**[potentially - private]**  Page 66

152:5 154:5,14
158:2 160:23
161:1,6 165:12
165:20 183:16
187:4 208:12
208:23 252:22
263:1 280:19
**power** 194:14
194:24 195:10
211:20 213:8
264:16 290:25
292:24 293:12
**powers** 250:19
280:15
**practical**
220:24
**practice**
143:22,22
235:6,7,12,14
238:20 239:13
239:18 242:5
245:11 282:25
**practices** 50:8
143:7 145:14
**pre** 3:10
207:13 213:18
**precipitous**
117:14
**precise** 17:7
**precisely** 295:6
**preclude**
132:21
**prefer** 19:5
44:15 221:11
264:24 297:25
299:15

**preference**
224:25 275:23
277:8,12,22
295:13 300:1,4
**preferential**
225:11 268:18
**preliminary**
303:15
**premise** 35:23
45:16 84:24
**preparation**
45:16 84:24
**prepare** 70:17
236:7
**prepared**
254:1
**prepetition**
82:5
**present** 55:3
215:2 257:7,17
**presentations**
9:9 217:4
**presented** 23:3
53:19 55:25
119:2 141:13
291:13
**presenting**
147:20
**presently**
144:18
**presents** 73:23
132:22 165:20
**preserved**
273:6 275:24
278:5
**president**
58:25 59:1

**presumably**
46:2 54:4 84:6
105:9 252:21
**presume**
201:12
**pretend** 57:23
**pretty** 90:12
114:19,23
134:3 151:14
157:3 167:25
181:5 190:20
208:7 237:4
255:19
**prevailing**
80:22 81:19
**prevent** 37:12
269:3
**preventing**
72:22
**prevents**
268:16,24
**previous** 84:24
212:9 285:2
**previously**
17:15 43:19
45:24,25 46:11
47:20 53:2
54:14 59:15
62:22 64:6,13
80:1 228:24
260:14
**price** 26:5,6
43:24 81:23
82:11 116:21
117:14 120:14
122:2 129:16
228:14,18

150:23 175:3
179:2 263:2
**prices** 31:17
117:25 124:4
124:15 151:1,4
151:5 178:16
183:21
**pricing** 122:3
122:12
**primarily** 26:7
50:7 234:1
**primary** 28:8
29:4 62:3 73:4
95:17 109:17
125:13 149:2
154:6 270:20
275:17,20
276:1
**prior** 67:4 68:3
69:11 70:4
71:1 83:24
84:5 88:17
89:3 94:10,14
96:3 106:9
145:18 156:1
159:1 187:4
204:19 209:13
217:16
**privacy** 37:20
51:6,7
**private** 37:6
153:22 223:1
224:3 227:5,6
228:14,18

**[private - proposal]**  Page 67

229:12
**privately**
215:19 229:19
**privilege**
261:14 265:15
265:19 266:15
266:21 267:22
**privileged**
95:16 266:16
266:24 282:7
**pro** 7:9,12,15
7:18,21,24
43:5 82:3
111:21 114:12
115:7 152:20
180:2 182:8
226:17 255:6
265:7 269:19
275:1 288:2
301:9
**probably** 17:9
70:14 94:9,20
144:15 161:7
183:20 184:4,6
184:12,25
200:21 241:9
248:9 274:17
283:20 292:22
**problem** 15:3,6
147:7 238:8
302:9
**problems**
61:14
**procedure** 30:3
**procedures**
27:19 33:18
34:14 42:13

48:19 50:8
69:20 79:21
131:10 132:4,9
132:10,11,17
133:4,23,24
136:3 155:20
194:20 195:18
196:3 290:16
291:6,7,8
**proceed** 24:3
79:8 146:3
167:9 233:16
255:8 265:9
287:12,13
**proceeding** 3:1
3:7 22:21 55:7
60:25 97:10
189:6 214:7,11
214:18 223:2
226:25 229:13
254:8
**proceedings**
55:8 77:3 95:9
173:8 214:25
216:19 229:22
304:9 305:4
**proceeds**
103:20 116:19
156:15
**process** 17:10
28:3,24 29:23
88:22 106:9
114:5 116:9
119:12 124:6
132:2 133:2,7
134:4,24
136:16 148:1

149:12 154:24
165:12 174:15
174:20 176:17
237:4,8,14,15
237:22 243:10
243:12 278:21
280:19,20
283:4 289:12
289:16,22
290:3,6 302:2
**processes**
175:12
**production**
155:24
287:12,13
**productive**
230:12
**professional**
237:6 238:12
239:4 260:8
263:6,8,21
266:23 281:20
283:14 293:8
**professionali...**
163:13
**professionals**
71:7 108:13
134:20 163:22
164:7 176:12
187:21 189:16
189:20 197:14
199:21 201:19
205:5 208:9
216:14 238:18
253:23,24
286:21 288:7
291:11 293:5
294:1 296:24

296:24
**program** 18:24
**prohibit** 192:4
**prohibited**
125:9
**prolonged**
179:4
**promise** 233:9
**pronunciation**
99:4
**proof** 34:2 35:9
108:25 109:21
193:13 295:12
**proofs** 4:9
**proper** 19:8
219:18 220:7
279:18
**properly** 98:4
184:10 259:7
262:6
**property** 21:5
21:6 162:10
191:14
**prophylactic**
244:9
**proportionally**
183:6
**proportionate**
291:1
**proportions**
60:15
**proposal**
154:11 171:11
172:21 181:13
183:9 187:3
215:7 217:14
218:21 224:16

**[proposals - purdue]**  Page 68

**proposals**
100:21 101:1
115:22 169:18
169:19,20
170:1,2 175:24
176:24 182:1
**propose**
220:18 224:23
**proposed** 9:12
23:11 152:1
156:12 200:14
260:6 272:7
277:7,11 279:1
280:16
**proposing**
215:24 224:10
224:18 225:10
282:4
**proposition**
14:20
**prosecuted**
252:1
**prosecution**
3:4
**protect** 133:2,2
**protecting**
45:8
**protection**
20:11 37:2
51:6,10,13
52:1
**protections**
64:22 87:17
**protective**
244:5
**protocol** 29:14
29:21 47:8

80:12 82:16
155:12 163:5
**protocols** 27:3
36:19,23 37:1
50:8,15 51:24
57:1,12 70:1
125:16 126:1
162:22 164:19
165:19 194:20
195:25
**provide** 9:21
13:8 14:22
26:17 39:14
62:3 80:2
101:21 102:1,6
154:21 157:7
161:20 169:11
202:21 209:22
224:24 225:10
225:16 230:6,9
230:25 231:19
286:24
**provided** 10:17
36:24 38:17
92:14,25 93:1
93:5 95:5
108:21 109:20
110:19 163:2
166:13,14
171:12 193:14
282:5 285:7
**provider** 29:5
90:4 131:7,11
**providers**
27:20 28:17
29:1,17

**provides** 21:8
41:9 75:5
81:17 87:20
101:20 112:21
133:5 147:22
154:16 157:21
159:11 207:8,9
208:12,22,22
208:23 209:17
**providing**
105:10 169:9
208:13 286:8
**provision**
12:14 17:25
18:11 19:16
87:14 88:6,7
91:11 136:1
158:22 159:9
188:15 243:14
244:1 248:13
250:13,17
254:17 256:15
273:3 278:24
280:22 281:1
293:18 295:7
**provisions**
192:2 248:11
248:15,21
249:5,15 280:9
293:16
**prudent** 124:5
126:25
**public** 34:25
69:7 73:5
74:12 93:16
139:24 212:18
214:18,24,25

217:17,19
220:23 221:18
221:19 223:11
226:24 227:8,9
229:11,13,13
229:18 230:13
232:3,11
**publication**
65:22
**publications**
68:19 239:23
**publicly** 37:18
117:16 139:4
215:22 223:4
**published**
38:15 155:13
**publishes**
28:15
**pull** 158:16
204:1
**pulling** 40:4
152:24 203:24
301:24
**purchase** 22:4
22:6,9 26:4,5
43:24 60:4,9
101:20 116:21
138:20 175:3,5
207:19,22
**purchaser**
91:15,16 92:5
140:3 189:1,3
192:10
**purchaser's**
91:17,18
**purdue** 281:23

[purely - questions]                                    Page 69

purely  124:21
283:8
purport  129:5
purportedly
110:4
purpose  28:8
222:22 254:14
271:17 296:15
purposes  87:22
90:8 103:22
113:18 116:3
127:23 131:19
176:22 216:22
222:14 276:4
pursuant
87:10
pursue  30:16
160:23 244:16
254:22 269:8
273:15 276:12
276:12 279:18
284:18 293:13
293:22,23
pursued  276:7
276:11 278:7
283:3
pursuing  149:6
177:16 203:13
245:17 268:17
268:25
pursuit  271:8
push  74:15
pushed  199:22
pushing
124:15
put  48:6 68:15
68:18 73:16

120:2 127:24
128:22 129:14
160:21 171:10
184:25 185:2
189:14 201:20
202:5 215:24
216:12,15
220:4 221:23
221:24 222:2
222:17 223:25
224:5,18 225:3
225:5,21
226:24 229:18
232:2,10,15
233:1
putting  144:3
220:3 225:14
225:15 227:9

q
qualifications
138:2 254:17
qualified
132:17 133:24
134:1 136:11
137:3,8,20,23
172:19
qualifier  91:12
quality  113:8
quarter  274:24
quarterfinal
297:5 300:12
303:4
quasi  207:15
question  9:8
10:3 13:23
20:25 32:14
35:20 37:10

43:17 45:19
46:21 49:7
55:13 56:16
58:2 63:12
69:22,24 70:3
75:18,23,24
76:11 77:25
82:22 83:21,23
84:11 85:24
86:20 88:5
90:25 91:24,25
92:6 96:19
97:11,14 98:7
100:10 101:15
107:14,23
108:20 109:22
111:3 112:25
128:7 129:3
143:4 144:24
149:16 153:17
156:20 158:22
162:12,19
164:22 168:25
171:24 172:1
172:10 180:10
180:12 181:16
181:23 182:3,6
183:11,16
184:15,22
185:5,11,15
186:1,6 194:23
195:17 196:8
198:20 208:7
210:11,14,16
211:7,13,22
212:5 213:25
216:9 218:18

218:20 219:2
222:16 225:23
237:6 244:9
245:8 246:9
249:4 254:8
256:16,20
259:12,15,17
262:13 264:3,5
264:7 265:6,19
266:6,8 267:4
267:15 268:2,2
268:21 269:4
269:13,14,17
271:4,12,14
272:19 274:15
277:10 280:14
280:19 282:2
284:7,8,9
285:13 287:7
287:10,13
288:10,12,19
297:23
questioned
210:8
questioner
55:8
questioning
164:8 202:10
251:6 254:13
256:23
questions
10:21,21 17:8
35:22 42:1
43:5 44:8,13
45:17 53:24
55:6 62:21

[read - reconnected]                                    Page 71

285:20 286:3
reading  42:8
139:11 251:15
262:22
ready  9:3
32:11 85:19,20
157:16 220:4
274:1
real  18:7 33:5
43:21 73:12,17
76:21 90:11
132:5 151:1
174:2
realistic  30:10
realize  272:20
272:21 300:7
really  20:17
73:13 85:25
103:6 104:17
117:24 130:16
146:5 148:21
151:3 162:13
164:18 168:25
170:25 175:5
176:8 209:5,5
214:5,7 217:4
224:22 226:1
239:19 254:22
264:16 271:5
273:9 279:11
280:15 281:10
299:20 302:7,9
302:24
reason  19:22
20:9 31:20
121:17 135:3

141:13 145:19
147:20 190:19
195:19 214:6
227:1,4,12
228:9 273:14
295:6 302:12

reasonable
18:1
reasonably
78:15
reasons  11:20
89:24 217:23
223:3 274:6
rebalance
176:15
rebalanced
104:15
rebalancing
70:19 76:19
82:3,10 100:17
100:19 104:6
104:11 118:20
123:4,11
124:24 176:11
176:23 177:6
178:17 179:17
183:24 208:19
recall  40:1
42:7 48:16
49:12,13,24
52:5,7,9,14,15
53:15 56:22
65:5,6 68:5,6
78:11 80:18
87:14,15,17,23
87:24 88:6
93:13 94:5,6

94:12,21 96:23
98:7 105:16
110:2 116:4,8
133:3 139:11
140:17 141:20
186:20 188:4,5
194:1 196:1
199:11 211:17
212:11 218:24
249:13 266:20
277:9 292:21

receive  13:12
31:2,13 47:24
68:12 72:2
75:3 95:13
109:13 110:16
116:19 169:19
171:17 219:10
received  26:18
35:10,11 48:18
61:3 66:17
70:5 72:10,11
94:1 100:21
111:13 116:5
122:19 127:25
138:1 166:1,23
167:2 175:20
182:16 196:4
290:3
receiving
141:19 281:21
recent  21:22
150:9 248:3
281:22
recently
237:20 272:6

recess  81:8,10
143:2 210:25
228:16 274:22
recipient
128:16
recognize
240:18
recognized
13:20 51:13
238:19
recognizes
239:10
recollection
43:2 44:1
51:23 110:2
117:1 133:23
134:1,11
140:23 150:2
168:16 188:10
199:24 204:4,9
205:2,23
recommend
155:11
recommenda...
32:7 40:17,22
105:10 158:12
212:8,13
recommenda...
206:15
recommending
206:18
recommends
237:16
reconcile
293:12
reconnected
274:24

[questions - read]                                    Page 70

63:2 77:10
79:11 81:2,9
82:18 85:5
86:14 95:3,4,8
98:11 102:16
109:17 111:22
114:7,20,24,25
115:2,3 131:25
133:17 142:25
143:6 144:14
144:14 145:13
146:5 148:16
148:16 151:14
152:17,21
153:2 157:1
162:20,21
164:12 167:7,8
167:13 169:2
174:3,7,10
181:14 182:1,9
182:12 186:11
186:12 193:23
194:1,9,20
195:16,24
196:9 197:15
199:10 202:14
207:6 208:8
210:21 213:21
213:22 214:17
216:15 222:23
224:20 225:6
229:7,14 230:5
230:8 236:18
244:13 246:6
246:24 247:1
248:18 254:25
264:15 265:2

271:7 275:3,5
275:13 286:22
287:25 288:4
291:21
quick  42:1
146:5 174:2
236:17
quickly  13:10
14:19 24:7
77:1 146:16
201:3 206:7
209:5 234:15
276:3 301:10
302:3
quite  44:20
150:24 187:24
204:8 229:21
284:22 302:8
quote  190:9
244:15
quoted  129:15
150:1,18 184:2
quotes  31:1,8
31:13 225:17
quoting  122:1

r
r  2:21 5:1 9:1
305:1
rainmaker
117:7
raise  141:5
214:17 216:18
217:22 266:13
raised  71:1
145:13 195:24
199:10 215:14
221:1,16

222:24 230:3
260:3
raises  216:18
raising  18:12
121:12 216:6
226:5
ran  135:3,8
138:4 148:4
175:11,12,23
range  35:1
69:9 70:14
75:7 118:16
119:15 169:18
rapids  238:9
rare  223:4
rat  211:3
rata  82:3 180:2
rate  80:22
81:20 117:9
263:23,24
287:20
rates  182:19
183:13 263:25
rather  12:19
229:11 254:17
ratio  70:19
82:3 109:1
143:15
rationale
39:21
read  52:7,14
52:16,16,17,19
80:9 85:6 86:3
87:5,9 156:22
201:12 204:12
204:14,21
205:10 248:12
252:5 285:20

260:1,2,4,9,10
262:8 264:4,10
264:12 265:12
266:11,17,22
267:7,11,19
268:10,16,20
268:24 269:2,5
269:6,7 274:7
274:9 282:9,11
286:6,9 288:6
288:13,20
289:6 291:18
292:7,10 295:3
295:6
raznick's
244:15 255:11
258:19 260:15
269:9
reach  12:15
122:15 227:19
reached  11:16
66:1 122:12,15
126:15 128:7
128:12 197:8
251:5 301:11
reaction  39:12
39:19
reaction's
39:21
reactions
39:21
read  52:7,14
52:16,16,17,19
80:9 85:6 86:3
87:5,9 156:22
201:12 204:12
204:14,21
205:10 248:12
252:5 285:20

107:5 143:19
191:4,5,15,19
rehypothecat...
191:2
rehypothecat...
109:11 191:6
191:10
reimbursement
79:7 136:2
138:17 159:4
159:11 173:9
reimburseme...
158:17 159:8
relate  26:4
36:25 40:10
50:2,7 57:16
68:10 95:20
97:9 166:25
239:16
related  22:4
27:23 28:9
29:17 34:4
48:21 61:8
62:15 63:7
64:8 65:8,22
95:2,15 98:5
106:21 123:10
152:5 213:1
220:24 241:3
244:14
relates  26:7,14
28:3,3,5,25
37:2 51:5,23
51:25 57:15,15
65:14 67:15
72:24 82:1
91:24,25

[record - relates]                                    Page 72

record  24:1
196:7 214:8
215:9,24 216:7
216:16 217:23
222:17 223:20
224:8 226:24
227:8,9 229:18
229:21 231:21
232:3 233:13
235:23 246:10
246:14 264:16
264:23 295:21
296:11,14
300:23 305:4
records  20:3
72:14 106:18
recover  14:18
41:13 169:8
208:24
recoveries
146:24 150:16
150:25 154:22
161:8,9 168:19
168:22 179:18
183:25 208:23
recovering
292:25
recovery  76:22
112:21 147:11
147:23 149:17
149:18 167:25
168:1,3,8
179:15 182:18
183:4,13 293:9
recross  8:3
recusal  243:10

recuse  243:18
243:25 253:3
256:16
recuses  291:5
red  121:12
redirect  8:3
294:14,18
reduce  177:17
reduced
102:23 168:11
reduction  26:9
44:3 71:19
redamiliarize
84:21
reference  94:7
98:6 271:24
referenced
203:23
references
216:10
referencing
91:9 189:12
referred
186:22 242:4
referring  49:3
56:18 99:21
122:24 272:17
refers  84:23
reflect  39:3
230:14 263:3
refresh  188:9
refusal  134:12
refuse  127:10
refused  134:9
172:7,16
regard  67:25
156:18 221:10

239:11 268:14
regarding
54:16,19 68:7
172:2 214:2
218:21 222:24
225:22 249:5
251:22 256:5
267:3
regardless  42:7
regards  66:11
73:1 104:11
143:7 155:15
163:7
register  298:17
298:18
registered
82:24
regular  122:15
regularly
241:6,22
regulate  93:21
regulations
12:16 18:18
28:9
regulator
95:14
regulators
25:13 41:4
73:16 93:20,20
223:15
regulatory
15:8 18:17
96:13 170:21
rehabilitate
270:24
rehypothecate
36:8 63:1

**[relates - repeating]**                     Page 73

| | | | |
|---|---|---|---|
| 100:16 117:24 | 132:10 138:2 | 277:23,24 | **remember** |
| 126:3,6,7 | 141:4 160:21 | 279:5,6 | 52:11,13 67:9 |
| 127:3 157:15 | 163:11 170:16 | **releases** 260:6 | 105:17 149:25 |
| 162:13 215:22 | 173:8 175:19 | 271:8 279:1,9 | 163:3 167:8 |
| **relating** 26:5 | 176:25 179:14 | 279:10,11 | 174:24 181:24 |
| 28:21 31:6 | 202:24 203:22 | 281:17,21 | 190:3 192:8 |
| 33:19 34:8,10 | 204:18 239:21 | 282:4 | 194:6 197:1,5 |
| 34:24 35:1 | **relation** 115:13 | **relevance** | 204:3 257:23 |
| 36:23,24 37:2 | **relationship** | 275:9 | 277:4 285:25 |
| 37:5,9,20 | 11:2 35:18 | **relevant** 55:7 | 285:25 289:9 |
| 38:12,14,17 | 38:13 58:12 | 60:19,19 61:17 | 293:20 298:3,4 |
| 39:2,8 40:2,24 | 65:24 66:10 | 92:9 97:1,19 | 301:5 |
| 42:13,15 43:23 | 80:3 106:8 | 133:13 135:17 | **remove** 195:2 |
| 44:2,4 45:15 | 109:10 162:7 | 135:19 246:24 | **removing** |
| 47:6,25 48:17 | 256:25,25 | 252:11 271:4 | 130:7 |
| 48:18 51:1,6 | 260:2,4,8,13 | 283:19 296:5 | **renzi** 42:24 |
| 51:13,25 53:17 | **reliant** 113:16 | 120:2 |
| 55:17,23,24,25 | **relied** 189:2 | **renzi's** 43:2 |
| 56:11,13 57:3 | **relative** 31:17 | 216:14 232:6 | **reopen** 71:24 |
| 57:10 58:6 | 38:19 71:12 | **relief** 3:3 | 296:14 |
| 59:6 60:24 | 82:3 96:5 | 230:11 298:7 | **reorganization** |
| 61:25 62:14,25 | 104:1 112:23 | **reluctance** | 21:23 270:21 |
| 63:23,25 65:23 | 122:6 129:20 | 145:19 | 270:23 |
| 66:5,18 68:11 | 147:24 149:6 | **rely** 10:9 73:22 | **reorganize** |
| 68:15,17,22 | 161:6 165:24 | 101:23 110:17 | 271:15 |
| 69:9,15,16,20 | 168:18 179:1 | 144:18 165:24 | **rep** 208:4 |
| 69:25 70:1,4 | 184:2 | 253:24 | **repeat** 16:14 |
| 71:11,21 72:3 | **relatively** | **relying** 206:14 | 33:20 139:23 |
| 73:14 78:1 | 17:12 20:5,15 | **remain** 68:20 | 174:16 268:2 |
| 82:18 89:25 | 26:12 117:16 | **remainder** | 282:20 |
| 92:2,4,5,15,17 | 145:14 224:24 | 99:17,20 | **repeated** |
| 93:1,23 94:1 | **relay** 301:24 | **remaining** 26:6 | 143:25 |
| 94:11 95:3,4,8 | **release** 276:5 | 26:13 43:24 | **repeating** |
| 95:8,13,18,23 | 276:25 277:14 | 44:1,4 270:18 | 32:14 55:13 |
| 96:24 103:6 | **released** | **remains** 21:5,6 | 76:1 96:19 |
| 106:24 110:13 | 199:19 200:1 | 83:11 | 180:3,5 |
| 112:6,12 | 276:24 277:16 | | |

**[responding - right]**                     Page 75

| | | | |
|---|---|---|---|
| **responding** | 300:11 303:23 | 78:7 83:8,11 | **revision** 251:5 |
| 286:4,6 | **resuming** | 83:13 106:18 | **revocable** |
| **response** | 298:9 | 107:1 108:4 | 189:2 |
| 149:15 194:17 | **retail** 242:1 | 114:5 129:6 | **rewind** 17:7 |
| 272:3 | 256:9 260:10 | 155:7 162:17 | **rewrite** 29:12 |
| **responses** | 260:16,18 | 165:11 186:4 | 125:24 |
| 194:19 203:1 | 268:14 272:7 | 195:18 293:12 | **richard** 211:11 |
| **responsibiliti...** | 272:10,13 | **reviewed** 24:13 | 217:21 |
| 243:20 249:19 | 276:15,17 | 33:14,15,16,16 | **ridiculous** |
| 250:2,3 | 277:19,21,21 | 33:17 34:1,4,7 | 153:21 |
| **responsibility** | 278:9,16,20 | 34:9,13,24 | **right** 9:2,16,17 |
| 278:19 287:18 | 289:19 292:14 | 35:9 36:23 | 10:15 13:2 |
| **responsible** | **retain** 275:22 | 37:1 47:19,23 | 14:7,11 15:7 |
| 46:3 286:8 | **retained** 294:1 | 48:4,11,22 | 15:13 21:24 |
| **rest** 298:2 | **retainer** 139:7 | 50:13,19 52:20 | 22:10 24:3,19 |
| 300:9 | 140:9,15,17 | 61:8 106:21,23 | 25:5,5 32:22 |
| **restart** 148:1 | **return** 112:2 | 161:22,25 | 36:7 38:5 |
| **restrict** 87:12 | 126:10 | 164:18 186:1 | 39:12 41:17 |
| **restrictions** | 146:15 272:1 | 192:21 193:15 | 42:22 43:1,8 |
| 220:22 | **returned** 44:6 | 195:9 196:15 | 44:16,24 48:9 |
| **restructuring** | 72:6 135:13 | 196:18 241:10 | 53:6,13 59:18 |
| 64:8 139:21 | **returning** | 247:24 248:2 | 60:9 63:18 |
| 233:23 | 101:24 206:6 | **reviewing** | 64:4,6 65:16 |
| **result** 18:21 | **returns** 123:13 | 48:16 49:16 | 65:19 72:14 |
| 71:20 76:21 | **reuters** 38:14 | 106:17 108:3 | 78:3,24 79:1,2 |
| 115:14 117:15 | 39:4 42:16 | 109:24 155:11 | 79:3,4 80:15 |
| 122:10 184:11 | 65:23 196:25 | 166:8 298:24 | 80:22 83:9 |
| 222:3 267:2 | **reveal** 226:23 | **reviews** 47:8 | 89:22,25 91:9 |
| 284:24 287:19 | **revelation** | 56:12 57:21 | 93:13 98:17 |
| **resulted** 90:4 | 121:10 | 58:4 59:24 | 101:17 102:8 |
| **results** 111:5 | **review** 46:12 | 60:25 66:5 | 102:16,24 |
| 183:2 285:4,11 | 47:17 48:21 | 95:16 111:13 | 104:21 105:2 |
| 286:3,13,15 | 50:15 52:13 | 166:13,13,18 | 110:15 118:12 |
| **resume** 9:14 | 54:6,8 57:23 | 299:13 | 121:2 124:22 |
| 23:10 142:25 | 59:7 62:18 | **revise** 29:20 | 125:16,18 |
| 235:16 236:6,9 | 63:14 66:9 | 151:7 | 127:7 129:11 |
| 236:19 297:8 | 67:3 69:19 | **revising** 280:7 | 130:6,23,24 |

**[rephrase - responded]**                     Page 74

| | | | |
|---|---|---|---|
| **rephrase** 50:12 | 269:2 285:6,23 | 215:14,18 | **reserve** 35:24 |
| 54:18 63:12 | 286:5,17 | 218:11 219:23 | 109:1 162:13 |
| 67:24 268:23 | **representations** | 220:10,10 | 190:3,5,6,15 |
| **replaced** 86:17 | 34:10 35:15 | 221:2,7 222:13 | 191:1 206:10 |
| 303:20 | 48:18 58:14 | 243:14 273:5 | **reserves** 62:23 |
| **replacement** | 59:3 60:1,2 | 280:10 | 89:17 109:1,21 |
| 303:20 | 122:6 189:19 | **requested** | 151:21 |
| **reply** 40:2 | 189:23,25 | 94:16 193:13 | **resolution** |
| 203:22 | 191:17 193:3,6 | 208:1 215:8 | 14:24 246:17 |
| **report** 47:21 | 195:22 196:10 | 295:7 | 250:6 |
| 47:23 48:17 | 196:14 198:14 | **requests** 92:15 | **resolutions** |
| 49:25 50:19,24 | 198:17 206:9 | 93:6 94:1 95:2 | 11:18 14:25 |
| 52:2,6,21,22 | 206:24 207:16 | 95:7 197:23 | 246:16 222:15 |
| 54:4 166:23 | 207:18,23 | **require** 29:11 | **resolved** |
| 196:16,18 | 208:2 216:10 | 29:16 125:10 | 246:16 251:9 |
| 197:1,3 | **representative** | 125:24 131:14 | 251:10 253:14 |
| **reported** | 204:15 | 133:24 155:9 | **resolving** |
| 117:23 178:15 | **representatives** | 172:21 256:16 | 19:14 |
| **reports** 41:5 | 46:13,14 | **required** 14:15 | **resounding** |
| 49:4 51:16 | **represented** | 124:15 136:2 | 207:11 |
| 53:1,25 167:2 | 58:22 110:10 | 138:16 208:1 | **respect** 10:2 |
| 196:4,21 | 111:8,10,11 | 214:20 | 14:3 28:22 |
| **represent** | 131:5 202:23 | **requirement** | 42:5 45:20 |
| 111:4 120:2,4 | 245:12,15 | 78:14,23 159:5 | 47:16 92:21 |
| 131:11 135:6 | 258:23 259:7 | **requirements** | 143:14,16 |
| 138:3 198:25 | 282:23 286:19 | 70:18 78:9 | 230:15 248:5 |
| 199:3,7 230:23 | **representing** | 80:5,20 81:17 | 248:12 249:16 |
| 247:24 253:18 | 235:8 241:4 | 134:16 166:25 | **respectful** |
| 257:21 258:16 | 248:19 258:22 | **requires** 79:24 | 226:7 |
| 286:18 288:17 | 263:13 289:23 | 158:24 302:15 | **respective** |
| 288:18 | **reputation** | **requiring** | 283:13 |
| **representation** | 283:15 | 162:16 | **respects** |
| 55:16,16 59:2 | **request** 10:3 | **requisite** 292:8 | 296:20 |
| 106:7 111:2 | 144:21 145:17 | **reschedule** | **respond** 20:24 |
| 194:3,6,8,9 | 205:20 212:8 | 303:8 | **responded** |
| 241:3 265:11 | 212:13 214:1,2 | **reservations** | 229:11 285:23 |
| 268:16,23 | 214:14,20 | 25:14 | |

**[right - safeguards]**                     Page 76

| | | | |
|---|---|---|---|
| 131:2 132:24 | 233:1 236:13 | 231:1 233:15 | **ruling** 218:21 |
| 136:17,21 | 239:13,17 | **roi** 141:19 | 280:4 281:24 |
| 137:20,25 | 242:1,18 246:7 | **role** 45:11,20 | **rulings** 281:23 |
| 145:11,21,21 | 261:3 262:18 | 131:25 245:15 | **run** 71:10 |
| 147:6 148:19 | 266:21 267:17 | 245:16 254:11 | 77:23,25 78:1 |
| 150:13 151:23 | 274:23 277:3 | 256:12 261:10 | 89:9,19,19 |
| 152:16 159:25 | 277:15,16 | 262:24 269:9 | 110:8 123:14 |
| 162:9 163:9 | 291:18 293:12 | 270:20 271:9 | 131:9 147:25 |
| 164:3 166:9 | 293:21 294:12 | 275:17,20 | 175:16,24 |
| 168:15 169:23 | 295:16 296:19 | 282:19 284:4 | 190:9 238:5,5 |
| 170:15 171:2 | 297:16 300:14 | 284:16,17 | 238:7 291:11 |
| 171:13,18 | 300:16 303:2 | 286:6 | **running** 76:17 |
| 174:7,11,25 | 303:22 304:7 | **roles** 266:3,7 | **ryan** 6:7 98:19 |
| 175:1 176:17 | **rights** 14:8,9 | **roll** 291:14 | 98:21,22 99:1 |
| 177:16 178:6 | 19:19 61:7 | **rollout** 86:5,6 | 100:13 101:9 |
| 178:12,17,24 | 162:8 | **room** 246:8 | 101:16,18 |
| 179:22 180:22 | **rigorous** 237:4 | 290:20 | 102:17,18,20 |
| 181:25 182:7 | **rise** 259:21 | **rose** 187:20 | 102:21 107:9 |
| 183:6 184:14 | **risk** 18:6 40:25 | **roster** 291:15 | 107:13,23 |
| 184:18 185:8 | 96:3 118:15 | **roughly** 6:9 | 108:1 111:15 |
| 186:11 187:23 | 122:1,1 149:2 | 219:8 234:1 | 111:18 185:10 |
| 188:12,18 | 149:5 165:20 | **round** 134:25 | 185:10,14,20 |
| 189:16,20 | 170:11 171:19 | 135:1 137:4 | 185:21 218:1,1 |
| 191:19,24 | 187:17 203:12 | 140:10 298:4 | 231:22,22 |
| 192:11 193:8 | **risks** 35:1 | 301:2,4 303:4 | |
| 193:12 194:12 | 95:25 101:24 | 303:4,15 | **s** |
| 196:5,12,16,22 | 147:24 148:21 | **rounds** 297:5 | **s** 5:1 9:1 48:7 |
| 197:12,15 | 148:23 185:3 | 300:12 | **s&c** 61:4 |
| 198:2,12,15 | **risk** 7:11 | **router** 101:2 | **safe** 141:7 |
| 199:19,23 | 145:24 146:1,1 | 129:17 | **safeguard** 48:2 |
| 200:2 201:9 | 146:4,7 | **rule** 211:2 | **safeguarded** |
| 204:2,6 205:25 | **road** 5:21 | 217:2 223:25 | 61:6 |
| 209:7 213:20 | 157:24 175:21 | 237:18 291:3 | **safeguarding** |
| 214:15 215:22 | 244:8 305:21 | 297:14 | 51:14 |
| 216:6 219:15 | **robert** 5:9 | **rules** 132:19,20 | **safeguards** |
| 221:3 227:13 | 216:2 219:24 | 217:24 256:4 | 37:11 45:8 |
| 228:18 231:6 | 222:10 223:18 | | 47:17 48:14 |
| | | | 51:25 57:7,25 |

## [safeguards - section]  Page 77

| | | | |
|---|---|---|---|
| 75:16 | 54:7 100:5 | 253:7 298:25 | 196:8 203:23 |
| **safely** 46:23 | 106:1 116:16 | **scheduling** | 214:10,12,15 |
| **safer** 20:11 | 124:11 140:8 | 297:19 300:9 | 215:11 216:5 |
| 200:13,15 | 143:8 151:19 | **school** 234:21 | 216:18,18 |
| **safety** 73:21 | 160:1 172:17 | 234:22 238:7 | 217:10 218:9 |
| 148:16 | 173:2,14,15 | **schroder** | 219:22 220:4 |
| **sale** 30:23 | 179:11,12,13 | 205:16 | 221:11,23,25 |
| 42:21 112:5,13 | 180:14 181:11 | **scope** 42:19 | 222:8,19 224:4 |
| 113:2,5 139:14 | 181:18,20 | 47:9 50:5 | 224:20,22 |
| 146:10 148:20 | 193:7 211:16 | 57:22 63:15,19 | 225:13 226:3 |
| 148:20,23 | 213:11 231:9 | 66:22 68:9 | 227:14,17,20 |
| 149:6,19 | 231:13,14 | 109:2 144:11 | 230:4,5 231:7 |
| 150:10 167:16 | 257:3 296:3 | 164:24 249:11 | 231:13 295:24 |
| 200:25 219:7 | 299:13,14 | **scopes** 109:5 | 296:1,9 |
| 230:18 276:22 | 302:19 | **scratch** 259:10 | **second** 18:8 |
| **sales** 179:1 | **says** 15:11 | 264:22 | 44:20 126:2 |
| 209:16 | 91:14 101:19 | **scratches** | 128:15 161:18 |
| **sam** 48:7 | 143:14 156:23 | 259:5 | 166:5 168:20 |
| 258:24 | 188:4,22 | **scratching** | 172:4 176:4 |
| **sanctions** 42:5 | 209:19 227:8 | 255:23 | 184:15,22 |
| 156:24 | 250:11 | **screen** 9:6 | 188:16 191:5 |
| **sat** 134:21 | **scale** 62:2,4 | **scrutiny** 157:1 | 218:15 229:6 |
| **satisfaction** | **scare** 144:16 | **se** 7:9,12,15,18 | 246:18 247:24 |
| 275:6 285:6 | **scenario** 30:18 | 7:21,24 43:5 | 248:11,13,21 |
| **satisfied** | 30:19 31:3,5 | 111:21 114:12 | 273:22,23 |
| 273:23 | 33:2 78:2 84:7 | 115:7 152:20 | 301:4 |
| **satisfies** 230:7 | 92:12 157:25 | 182:9 226:17 | **secondary** |
| **satisfy** 80:19 | **scenarios** | 255:6 265:8 | 262:4 |
| 81:17 280:11 | 175:12 | 269:19 275:1 | **seconds** 17:5 |
| **saving** 169:12 | **scenes** 224:6 | 288:2 301:9 | **secret** 263:6 |
| 169:13,14 | **schedule** | **seated** 9:2 | **secretary** |
| **savings** 219:10 | 131:23 197:9 | 81:11 211:1 | 239:1 |
| **saw** 117:13 | 300:13 301:1 | 274:23 | **secrets** 223:3 |
| 150:5 151:13 | 303:3 | **sec** 81:11 86:14 | **section** 78:19 |
| 197:7 | **scheduled** 66:1 | 93:15,22 94:15 | 78:21 80:19 |
| **saying** 58:22 | **schedules** | 97:19 108:2 | 81:16 91:4 |
| 32:23,24 34:9 | 252:3,6,20 | 92:10 195:24 | |

## [section - sends]  Page 78

| | | | |
|---|---|---|---|
| 188:23 | 189:9 195:9 | **seems** 9:23 | **self** 30:11 |
| **sections** 87:23 | 202:15 210:22 | 15:5 18:22,23 | 40:15 41:14 |
| 248:6 | 216:1 219:22 | 21:24 55:9,9 | 71:12 84:7 |
| **sector** 47:3 | 236:2,20 239:4 | 67:11 92:9 | 96:6 103:17,25 |
| **securities** 5:19 | 244:6 246:9 | 144:2 145:16 | 112:23 147:24 |
| 5:20 6:2 45:2 | 253:9 258:12 | 153:21 202:10 | 148:7,10 149:6 |
| 90:17 98:23 | 258:15 259:3 | 217:1 222:12 | 168:18 187:16 |
| 191:8 230:1,19 | 259:11 262:2 | 222:25 223:10 | 208:24 |
| 230:19 | 264:14 277:15 | 229:16 239:20 | **sell** 19:19 |
| **security** 36:18 | 285:22 299:21 | 254:15 265:18 | 27:13 100:11 |
| 36:23 37:1,3 | 302:12,14,15 | 266:9 30:16,10 | 101:12 118:17 |
| 40:14 45:9 | 302:23 | 117:16 122:11 | 124:24 128:23 |
| 50:7,15 51:24 | **seeing** 65:25 | 214:11 285:2 | 152:3 154:12 |
| 53:6 54:17,20 | 301:15 302:7 | 285:18 290:21 | 154:18 156:14 |
| 55:18 56:5,25 | **seek** 14:23 | 291:10 299:9 | 271:16 |
| 57:11 69:20 | 30:20 31:13 | 299:16,17 | **seller** 189:1,2,3 |
| 128:6 162:22 | 43:3 67:3,6 | **segregated** | 189:3,5 |
| 165:7,17,19 | 68:24 69:15 | 143:18 | **selling** 32:13 |
| 194:21 195:25 | 70:3 76:15 | **segregates** 10:8 | 32:19 100:13 |
| 196:4,15,18 | 100:5,25 101:1 | **segregation** | 100:14 263:20 |
| 216:22 230:21 | 112:7 113:15 | 206:10 | **selloffs** 150:9,9 |
| 296:2 | 129:15 136:18 | **seized** 175:21 | **semi** 303:4 |
| **sec's** 164:8 | 165:22 173:12 | **select** 136:6 | **senate** 156:21 |
| 204:5 220:16 | **seeking** 63:24 | 138:18 283:18 | 201:7,14 |
| 229:8,16 | 68:14 106:14 | 290:5 | 202:15 203:16 |
| **see** 16:12 39:9 | 106:15 113:8 | **selected** 34:20 | **senator** 201:17 |
| 57:20 73:4,6 | 154:19 183:23 | 136:4 234:8 | **senators** 39:2 |
| 73:10 74:20 | 190:12 191:11 | 236:20 237:19 | 42:2 68:16 |
| 84:24,25 91:11 | 196:13 230:11 | 238:23,25 | 201:8,9 |
| 91:20 93:19 | **seem** 17:12 | 239:14 256:12 | **send** 82:23 |
| 95:17 107:10 | 20:15,17 65:10 | 283:12 289:8 | 87:20 88:3 |
| 121:17,20 | 258:18 299:14 | **selecting** | 195:21 260:22 |
| 122:4 135:15 | **seemed** 17:23 | 132:21 184:8 | 299:23 301:25 |
| 141:25 150:17 | 39:3 40:4 | **selection** 9:12 | **sending** 28:4,5 |
| 153:24,25 | 66:17 159:17 | 232:23 237:11 | 28:10,18 126:4 |
| 157:25 175:14 | 159:19 164:9 | 237:15 249:6 | **sends** 155:3 |
| 188:20,23 | 169:4 203:23 | 243:16 300:23 | |

## [sense - signing]  Page 79

| | | | |
|---|---|---|---|
| **sense** 49:19 | **server** 111:6 | 292:10 | **shortcut** |
| 53:19 57:18 | **service** 61:8 | **settlements** | 250:12 |
| 58:9 71:10,13 | 109:5 131:10 | 129:19 294:5,7 | **shortly** 60:8 |
| 177:5 178:25 | 154:11,18 | **seven** 99:21 | 67:14 89:9 |
| 181:22 191:8 | 192:1,6 193:8 | 227:23 241:10 | 241:16 |
| 191:13 262:3 | **services** 28:23 | 256:9 257:3,13 | **show** 106:25 |
| 277:16 283:24 | 33:17 34:4 | 258:11 262:3,3 | 273:4 |
| **sensitive** | 47:10 50:6 | 274:25 289:15 | **showed** 198:15 |
| 214:10 223:8 | 51:7,10 57:22 | 290:22 291:2 | 235:22 |
| 226:2,3 | 101:22 102:1,3 | **seventeen** | **showing** |
| **sent** 27:21 39:1 | 102:5,9,11 | 121:4 | 161:20 |
| 80:13 82:19 | 110:12,19 | **several** 45:7 | **shown** 198:9 |
| 203:21 301:18 | 156:8 159:19 | 47:19 58:15 | **shows** 113:23 |
| **sentence** | 159:21 162:3 | 92:13 149:9 | **shroder** 204:22 |
| 156:23 | 192:10,15,17 | 157:24 169:3 | 205:13 |
| **separate** 51:4 | 192:22,23 | 184:9 204:11 | **shuffling** |
| 86:17 143:17 | 193:2,10,25 | 207:4 | 298:23 |
| 162:15 192:19 | 194:15 195:11 | **severe** 90:14 | **shut** 103:22 |
| 192:20 194:19 | **seth** 7:20 174:8 | 283:2 58:16 | **side** 44:18 53:9 |
| 219:19,20,23 | 174:10 288:2 | 82:3 95:10 | 55:17 129:18 |
| 279:7 | **sets** 93:3 | 134:2 139:24 | 160:18 262:8 |
| **separately** | **settle** 129:20 | 140:15 147:6 | **sidebar** 214:13 |
| 217:8 229:10 | 293:13,23,23 | 220:22 270:17 | 217:18 |
| **series** 35:22 | **settlement** | **shareholder** | **sides** 254:6 |
| 36:15 244:13 | 152:1 215:1 | 193:1,8 | **sign** 79:23 |
| **serious** 203:7 | 244:20,21,24 | **sharing** 165:6 | 155:18,19 |
| **seriously** 37:20 | 245:1,6 251:4 | **sheet** 48:24 | **signature** |
| 74:7,13 169:17 | 267:3,6,10,11 | 61:22,25 | 305:7 |
| 243:20 256:5 | | **shehadeh** 4:5 | **signed** 64:18 |
| **serve** 12:24 | | **shib** 104:13 | 200:5,21 |
| 234:9 238:7 | | **shiba** 119:3,5,8 | 207:13 |
| 244:3 254:18 | | **shift** 168:23 | **significant** |
| 256:7,13 | | **shoes** 146:8 | 121:12 122:13 |
| 263:19 296:15 | | **short** 60:13 | 260:15 263:6 |
| **served** 24:15 | | 90:5 169:25 | 282:25 286:10 |
| 238:24 282:22 | | 201:4 | **signing** 79:20 |
| 289:20 | | | 94:10 200:10 |

## [signing - sole]  Page 80

| | | | |
|---|---|---|---|
| 206:25 | **sitting** 32:11 | 22:1,14,24 | **slight** 278:3 |
| **silk** 175:21 | 32:17 | 23:6,9,14,16 | **slightly** 65:8 |
| **similar** 11:17 | **situated** 87:7 | 23:19 24:4,6 | 142:18 |
| 50:25 104:15 | **situation** 64:8 | 24:18,23 25:9 | **slippage** |
| 110:14,16 | 99:21 101:5 | 25:10 33:8 | 115:14 116:9 |
| 118:19 189:4 | 108:14 127:18 | 35:4 39:14,18 | 116:16,24 |
| 190:11 215:14 | 127:23 136:9 | 39:20,23,24 | 122:25 176:14 |
| 215:23 223:12 | 138:12 147:17 | 41:15 43:9,16 | 177:10 178:3,5 |
| 245:16 284:16 | 148:18 154:8 | 55:5 59:7 | 178:6,8,9,11 |
| **similarly** 13:4 | 164:7 170:14 | 60:18 61:16 | 178:20,22,24 |
| **simple** 80:22 | 175:15 181:24 | 75:21 78:17,21 | 179:1 |
| 220:9 | 184:19 191:3 | 79:2 81:4 | **slow** 33:20 |
| **simply** 19:11 | 215:4 223:5 | 83:18 86:11,13 | **small** 17:12 |
| 143:14 216:15 | 230:10 | 88:22 90:22 | 26:12 117:16 |
| 217:14,19 | **situations** | 97:3,18 | 120:20 130:10 |
| 220:9 226:14 | 57:20,20 63:7 | **sixth** 234:6 | 131:20 |
| 292:17 | 93:19 95:16 | **size** 61:22 82:4 | **smaller** 176:18 |
| **single** 30:8 | 135:16 144:5,5 | 284:5 287:2 | 284:5 |
| 57:3 93:12 | 141:2 165:14 | 291:1 | **smart** 101:2 |
| 128:19 130:9 | 174:23 183:12 | **sizeable** 120:8 | 112:13 113:2,6 |
| 177:8,10 | **six** 1:17,12,23 | 277:13 282:1,7 | 113:9,12,15 |
| 263:11 281:17 | 12:2,13,21 | 294:17 295:19 | 129:17 |
| 281:19 | 19:2,6 168:17 | **slack** 205:11 | **smith** 301:22 |
| **singular** | 227:24 212:14,16,23 | **slade** 5:17 9:4 | 301:22 |
| 260:17 | 213:22 218:17 | 9:7,10,14,19 | **soc** 37:2 47:23 |
| **sir** 115:4 117:2 | 221:22,22 | 9:21,24 10:11 | 48:5,8 49:4 |
| 121:7 122:20 | 232:7,7,13,17 | 10:16,20 21:14 | 50:24 51:1,5 |
| 130:19 133:21 | 232:20,25 | 21:16,16,21 | 51:16 52:2,6 |
| 135:15,19 | 252:10,14 | | 52:21 53:24 |
| 142:22 232:17 | 254:7 259:13 | | 166:6,10 |
| 234:3 235:24 | 268:6 277:10 | | **social** 147:15 |
| 236:5,9 280:24 | 277:13 282:1,7 | | 211:15 |
| 292:14 302:17 | 294:17 295:19 | | **sock** 48:6 |
| | 295:20 296:17 | | **sold** 100:12 |
| | 296:20 297:18 | | 102:23 120:11 |
| | 298:7,24 300:1 | | **sole** 87:11 |
| | 300:4 | | 189:2 193:1,8 |

**[solely - specifically]**                         Page 81

solely 36:1
  190:2 230:17
solicited
  115:21 176:24
solution 11:13
  12:15 18:23
  160:24 216:8
  226:9,13
solutions 16:7
  16:13,22 17:2
  274:24 298:12
  298:17 303:25
  305:20
solutions.com
  16:23
solvable 15:20
solve 19:3
somebody 11:6
  12:12 13:23
  14:9 18:3,4
  19:10 23:4
  39:13 46:25
  49:13 54:5
  61:20 81:1
  99:16,17
  100:15 102:14
  113:14 127:24
  175:15 191:11
  195:1 264:14
  268:4 276:21
  291:5 295:10
  295:13
somebody's
  11:2 23:12
somebody's
  237:6

son 299:24
sonya 4:25
  305:3,8
soon 260:19
  271:23 301:25
sorry 32:14,15
  46:21 48:3
  53:14 54:18
  56:15 63:12
  69:3,23 102:13
  105:24 107:10
  107:13,22
  114:21 120:1
  125:6 137:15
  142:3 152:23
  167:6 168:9
  174:9,16 180:3
  181:2,15 182:7
  198:23 210:7
  216:3 224:13
  224:15 266:5
  267:4,14 268:1
  269:13,25
  274:11 277:10
  278:23 285:10
  288:15 298:24
  300:3 302:18
sort 18:1 65:10
  215:16 219:22
  237:21 239:13
  245:23 269:14
  291:4
sorts 129:10
sought 22:19
  27:13 58:3,5
  59:5,10 60:2
  62:17,18 63:24

98:9 146:18
  165:1,21 170:8
  171:4 176:6,20
  196:10
sound 151:10
sounded 231:4
soundness
  73:21 148:17
sounds 80:24
  104:18 124:5
  143:7 225:18
  226:2,13
sousa 3:2
southern 1:2
  300:16
space 73:20
  117:13 122:16
  181:2,15 182:7
spaces 147:12
span 239:4
speak 31:10
  42:17 49:17,21
  50:20,23 52:23
  77:9,22 80:13
  89:10 90:6
  92:18 114:5
  121:15 123:9
  141:11 151:16
  152:20 156:18
  202:15 205:14
  224:2 244:23
  257:7 290:11
  299:3
speaker 218:3
  226:17 228:6,8
  255:9 257:19
  260:20 261:21
  262:1,18 264:3

264:12 265:3
  299:2,7,25
  304:2,6
speaking 39:9
  49:1,16 61:20
  81:15 87:22
  93:12,18
  141:11 152:2
  220:1 238:21
  240:5 251:14
special 6:17
  40:20 214:5
specific 30:9
  40:11 42:13
  44:3 45:11,13
  46:16 47:17
  56:10,22 62:15
  64:12 67:15
  68:2,6 78:1
  87:14,23 88:6
  88:7 89:7 98:6
  98:7 101:4
  112:11 116:11
  119:21 128:5
  139:10,11
  180:13,22
  188:15 195:14
  197:17 224:19
  250:15 251:23
  280:9
specifically
  35:10 47:3
  51:25 52:1
  53:12 56:11,22
  72:24 78:17
  106:12 110:22
  111:4 116:12

**[statutory - supplemental]**                     Page 83

statutory
  220:22
stay 3:3 153:14
  169:11
steeh 234:23
step 33:9 217:7
  302:22
stephenson
  3:14,18
steps 49:9
  64:12,15 65:2
  80:6
stettinius
  233:23
steve 56:19
  163:3 258:24
steve's 163:7
stick 116:23
stockton 7:1
  246:12
stong 234:25
stop 54:3
stopped 17:4
storage 37:22
  59:9
stored 37:6
stormx 119:16
  119:19
straightforw...
  145:14
strategies
  138:9
strategy
  177:15
strayed 275:6
street 6:4

stretch 108:18
stretto 155:13
  182:16
strike 54:15,19
  63:12 231:5
  268:15
strikes 145:12
strong 224:25
  256:10
strongest
  185:1
struck 12:5
structurally
  57:4
structure 57:5
  109:9 115:15
  139:3,25 157:2
  171:6 186:25
  193:1
structured
  139:1
structures
  175:24
struggle 124:8
struggling
  117:6 295:23
stuff 46:24
  153:24 162:24
  164:14,15,21
  195:25 299:23
style 271:8
sub 118:23
subject 17:21
  65:8 79:14
  88:10 92:23
  105:21 106:2
  144:10 192:1

218:23 251:5
  254:20 256:20
  266:17 293:19
subjected 18:5
subjects 240:1
  240:3,7,8
submission
  227:5
submit 228:23
submitted
  34:20 227:6
  231:23,25
  285:3,4,16
subpoenaed
  229:2
subsection
  188:25
subsequent
  27:14 79:22
  88:17 89:4,6
  125:25 152:14
  246:17
subsequently
  60:14 152:7
  200:12 205:3
  205:12
subset 130:3
  276:17
substance
  183:1
substantial
  245:11,11
  281:2,4,5
substantially
  199:14 235:6
  247:10 263:25

substitute
  303:9
succeeding
  168:22,23
succeeds 152:6
  171:19
success 140:23
successful 22:7
  149:19,21,22
  150:5
sudden 127:24
sue 273:1
sufficient
  50:14 149:4
  203:2 209:24
  293:6
sufficiently
  203:10
suggest 142:7
  213:6 223:1
suggested
  142:10 294:22
suggesting
  19:9 20:14
  217:9
suggestion
  212:10 226:19
suite 5:21
  305:22
supervision
  256:20
supplement
  22:15
supplemental
  24:24 65:9,11
  65:21 66:8
  67:13 68:7,8

**[specifically - statutorily]**                    Page 82

160:14 182:23
  184:16 188:5
  269:5,6 272:22
  276:2 278:18
specifics 42:7
  68:5 77:9,22
  78:7,11 80:14
  94:7 98:8
  102:5 112:10
  123:9 133:3
  158:19 272:4
specified 15:25
speech 220:5
  220:12
speeches
  181:14
speed 146:15
  146:23 243:8,9
spend 169:1
  236:17 239:6
spent 98:3
  263:22
split 264:13
spoke 31:4
  42:1,20 107:13
  201:18 205:16
  225:13,20
  289:6
spoken 278:14
  301:18
spot 120:8
ss 123:2
st 234:20 235:4
  238:6 298:4
  300:17 303:18
staff 230:14,16
  230:18,20,23

231:9 296:1
staffing 171:1
stage 296:16
stages 20:13
stake 191:25
stakes 180:19
staking 191:24
  192:2
stand 204:8
  206:3 210:9
  218:22 246:23
  269:15
standalone
  186:7 192:18
standard 51:13
  133:10 134:3,4
  136:15 164:2
  166:2 239:12
  272:10 276:14
standards
  36:25 37:24
  48:20 50:2,3,7
  51:2,5,24 52:3
  53:1,20 57:2
  73:14,19,21
  74:1 162:9,16
  166:9,20,22,24
  167:5 280:12
stands 74:21
start 126:14
  140:14 155:17
  176:11,17
  234:15 236:19
  246:8 248:14
  297:7 298:10
started 67:13
  135:6 138:22

176:17 182:22
  240:21
starting 176:16
  238:12,20
starts 298:4
  303:5
state 6:2 11:15
  14:10 23:25
  57:9 72:8,18
  93:20 98:22,23
  124:22 185:11
  218:2 223:14
  233:13 234:4
  234:18 264:17
stated 43:19
  45:25 60:7
  99:11 112:1,3
  145:19 217:23
  266:11 274:6
  278:1
statement 4:12
  35:11 48:24,24
  63:25 85:17
  96:24 116:25
  127:14 144:25
  145:5 148:22
  150:15 179:12
  193:14,17
  205:20,22
  212:19 213:7
  213:19 214:2
  229:23 231:7
  296:1
statements
  33:14,13 35:13
  47:24 54:9
  58:2 59:5 62:3

64:3,9 68:13
  70:4 108:24
  109:14 111:14
  115:9 143:9
  157:15 159:1
  162:1,5,15
  165:25 166:11
  192:21,22
  205:3 206:13
  206:17 212:1
  212:12 228:23
  231:23 252:4,7
  254:1
states 1:1 2:1
  6:9 11:8 12:3,9
  13:20 14:13
  15:1,15 18:13
  18:21,22,25
  19:2 28:19
  34:20 41:22
  45:2 83:8
  188:25 201:7
  202:8 203:16
  212:9 228:23
statʼ 94:12
stating 190:14
  287:17
status 34:17
  94:18 95:5
  96:25 270:9,18
  271:1
statutorily
  221:17

**[supplements - taker]**                           Page 84

supplements
  243:16
support 26:10
  27:3 29:2,9,13
  74:22 75:11
  76:15 89:19
  112:15 113:23
  125:22 128:3
  130:25 131:1,1
  131:9,12
  157:20 161:13
  206:6 207:11
  207:15 208:9
  208:11 222:12
  244:20 245:5
supported 29:6
  100:3 104:14
  119:9 120:6
  128:18 129:1
  156:11 160:4,6
supporting
  102:3 207:7
supports
  130:12,23
suppose 15:16
  187:11,11
  232:1
supposed
  211:2 214:25
  282:2
supposedly
  16:4
supreme 234:7
  281:23
sure 9:7 11:2
  12:10 23:9
  28:8,18 32:12

32:15 39:18
  45:19 55:15
  56:21 59:24
  65:6 67:4 68:3
  68:22 71:24
  76:5,11 84:22
  86:21 91:9,13
  92:23 98:4
  109:18 114:3
  114:16 127:20
  132:3 151:17
  151:18 163:6
  164:4 174:2
  175:13 176:21
  179:7 181:15
  184:22 185:25
  188:4 193:6,15
  204:18 212:19
  214:24 220:2,7
  220:23 223:20
  234:17 236:23
  237:17 238:16
  255:10 257:2
  257:16 261:13
  261:22 262:5
  263:25 264:10
  264:18 267:21
  268:19 274:25
  275:4 281:15
  288:11,19
  296:5,18
  297:13 298:21
  303:20
surface 160:25
surprise
  251:24

surprising
  29:24
surrounded
  264:19,20
survey 285:4
  285:11,25
  286:1,13
surveymonkey
  285:5
suspect 303:7
  303:14
sustain 43:12
  185:4 282:14
sustained
  266:1
swear 23:21
  144:9 233:9
sweet 120:8
switch 303:16
switching
  90:16
sworn 47:24
  58:7 59:5
  63:24 64:3,9
  70:4 72:11
  109:14 111:14
  143:9 144:17
  145:5 165:22
  184:23 205:20
  212:19 228:23
system 16:7
  29:13
systems 101:2
  13:15

**t**

t 305:1,1
tab 188:16
tackle 131:25
  138:24
taft 233:23,25
  234:1 235:14
tail 225:14
tailored 225:1
tails 50:10
take 15:17
  22:10,19 29:19
  37:19 43:6
  64:13,13 65:4
  74:6,12,13
  77:11 80:6
  81:8 113:14
  126:23 127:4
  128:5 131:21
  142:25 149:10
  160:4 161:15
  171:12 191:6
  193:12 194:15
  194:24 195:10
  195:20 210:5
  212:8 213:8
  224:21 236:17
  243:19 256:4
  274:21 286:13
  286:15 292:19
  296:9 298:1
  302:22
taken 37:12
  230:15 244:20
  278:16
taker 246:9

| | | | |
|---|---|---|---|
| **talk** 81:3 86:2 | 134:21 163:18 | **telling** 32:17 | 154:3,11,18 |
| 178:12 179:22 | 198:5,9 216:3 | 135:21 166:7,8 | 192:1 241:2 |
| 181:10,17,19 | **technical** 46:22 | **tells** 10:15 | 256:22 271:24 |
| 191:4 201:17 | 46:24 47:14 | 231:11 | 275:3 279:4 |
| 209:5 210:20 | 49:19 50:14 | **temperament** | 283:19 286:20 |
| 214:7 216:8 | 52:21 53:23 | 283:17 | 290:1 |
| 226:8,10 | 54:2,5 56:4,10 | **temporary** | **test** 30:1 |
| 242:24 255:19 | 56:12,23 57:10 | 90:5 | **testified** 42:24 |
| 258:24 272:3 | 57:18,21 84:14 | **ten** 81:8,9 | 43:4 45:10 |
| 279:11 281:11 | 90:3 103:9 | **tend** 63:7 | 54:14 58:18 |
| 285:1 296:25 | 110:7,24 | **tendering** | 59:15 86:10 |
| 302:19 | 126:11 | 228:25 | 99:13 142:14 |
| **talked** 25:12 | **technically** | **tens** 30:8 | 142:16,18,20 |
| 126:20 180:6 | 49:4 | 119:22 120:21 | 219:7 232:9 |
| 180:18 216:13 | **technology** | 121:22 | 247:6 |
| 241:22 | 110:13 164:20 | **tension** 134:23 | **testify** 10:1,1 |
| **talking** 31:15 | **techs** 105:22 | 134:25 135:5 | 10:12 23:12 |
| 41:3 48:23 | **telegraph** | 138:20 | 176:5 185:3 |
| 90:14 117:10 | 123:12 | **tent** 165:19 | 233:2 266:23 |
| 118:7,21 120:1 | **telephone** | **term** 56:4 | 282:8 285:18 |
| 121:1 122:22 | 44:23,24 98:18 | 84:19 125:7 | **testifying** |
| 132:3 151:9,23 | 214:16 227:17 | 169:5,7,9 | 258:3 |
| 160:8 178:19 | 255:4 304:4 | 256:25 260:1 | **testimony** 9:18 |
| 178:20 181:2 | **telephonic** | **terminate** | 23:22 43:2 |
| 223:19 225:25 | 16:21 66:4 | 78:25 79:1,3,4 | 53:2 61:5 |
| 226:12 245:23 | **telephonically** | 106:14 189:7 | 72:11 85:16 |
| **task** 131:20 | 221:12 240:18 | 274:17 | 103:10 119:4 |
| **tasked** 123:3 | **tell** 14:7 15:21 | **terminated** | 142:2 143:25 |
| **taught** 72:19 | 17:25 32:11 | 159:13 188:22 | 184:23 185:2 |
| **tax** 72:4 146:25 | 35:9 39:13,16 | **termination** | 201:22 202:5 |
| 219:9 | 39:19 80:16 | 188:19 | 206:19 209:13 |
| **team** 26:24 | 109:24 119:18 | **terms** 11:10,16 | 233:10 236:19 |
| 42:10 46:2,4,6 | 123:15 141:22 | 12:9 13:8 61:8 | **tests** 59:23 |
| 46:18,25 47:2 | 158:8 222:1 | 86:25 87:2,3,8 | **texas** 6:1 12:10 |
| 47:13 50:12,19 | 229:10 261:3 | 87:11 88:6 | 12:19 13:4,23 |
| 52:20 56:7 | 295:22 | 132:14,15 | 98:22,23 |
| 88:21 126:20 | | 185:11 218:2 | |

| | | | |
|---|---|---|---|
| 179:18 202:21 | 225:8 226:22 | 115:21 116:11 | 221:3 222:19 |
| 220:1 222:2 | 232:5 239:13 | 116:21 117:10 | 224:6 225:17 |
| 225:17 226:12 | 245:22 255:17 | 117:11,23 | 226:19 227:3,8 |
| 232:3,4,5 | 283:18 288:23 | 118:8 120:24 | 227:12 228:24 |
| 252:8 272:24 | **think** 11:14 | 127:4,12 128:4 | 229:2,20 230:7 |
| 273:12 277:13 | 14:17 16:5 | 137:7 144:8,9 | 231:16 232:3 |
| 277:16 278:5 | 19:13 22:10 | 144:14 145:18 | 238:16,18 |
| 285:12 | 23:13 25:13 | 146:12,17,23 | 243:6 244:14 |
| **they've** 166:19 | 28:2 38:9 | 147:5,10 | 248:21 251:5 |
| 216:12 275:5 | 42:12 43:10,11 | 148:12,24 | 252:14 254:2 |
| **thing** 12:11 | 43:16,19 45:25 | 149:2,10,11 | 258:12 259:18 |
| 48:4 91:14,19 | 46:11 47:20 | 150:8,14 | 259:19,22,24 |
| 99:2 109:5 | 49:21 52:23 | 151:14 152:9 | 262:12,13 |
| 127:21 147:11 | 57:1 58:2,18 | 152:11 155:12 | 264:7 269:8,10 |
| 162:3 174:24 | 59:7,15 64:15 | 157:14,22 | 269:10 271:10 |
| 181:11,20 | 65:10 66:3 | 159:16 160:17 | 272:17,18 |
| 205:17 217:6 | 67:2,10,22 | 166:22 168:21 | 273:21 274:5 |
| 221:3 222:23 | 68:10,12,24 | 169:23 170:17 | 274:23 275:12 |
| 292:11 295:21 | 69:22,25 70:13 | 170:20,24 | 276:1,20 |
| **things** 9:15 | 71:17 72:14,16 | 173:14 174:3 | 283:12,19 |
| 10:23,24 20:15 | 74:7 75:18 | 174:24 175:1,5 | 284:10,14 |
| 30:1 31:22 | 76:11 77:5,10 | 175:25 176:7,8 | 289:13 290:6 |
| 33:20 43:17 | 77:13,20 80:1 | 177:24,25 | 291:21,24 |
| 58:4 63:13 | 81:16 84:22 | 180:10,24 | 292:21,23 |
| 89:17 99:10 | 85:9 88:1 | 181:5 182:25 | 293:6 295:5,8 |
| 108:3 136:23 | 89:12,12,25 | 183:19,20 | 295:23 296:6,7 |
| 141:4 146:12 | 90:10 92:24 | 184:4,12,24 | 297:9,21 300:8 |
| 146:21 148:11 | 93:16 94:10 | 185:4,13,13 | 300:14,15 |
| 148:17 164:24 | 96:25 97:7,11 | 186:3 191:13 | 302:17 |
| 166:7 169:14 | 97:13,24 98:10 | 198:20 205:10 | **thinking** 10:24 |
| 170:6,9,16 | 99:20 100:4,5 | 207:9 209:25 | 148:12 258:17 |
| 171:7,20 176:1 | 100:16 101:4 | 211:1,23 | **thinks** 185:3 |
| 184:10 186:4 | 101:14 102:2,5 | 213:13,21 | 231:14 296:1 |
| 196:9 200:8 | 102:7 103:9,23 | 214:5,9,12,22 | **third** 27:20 |
| 203:3 205:8 | 104:1 108:11 | 215:3,5 216:5 | 28:13,17 29:1 |
| 208:4 210:10 | 112:17 113:7 | 216:8,17 217:7 | 29:4,17 30:24 |
| 221:18 222:25 | 113:21 114:24 | 218:20 220:18 | 37:1 47:22 |

| | | | |
|---|---|---|---|
| 231:23 270:11 | 213:20,23 | 196:6,13,20,23 | 281:11,18 |
| **text** 204:12,14 | 215:13 217:25 | 197:16 198:3 | 283:25 287:4 |
| 204:21,24 | 219:1,13,15 | 198:10,13 | 291:17 293:21 |
| 205:6,11 | 229:25 230:25 | 199:20,24 | 294:11 295:11 |
| **textbooks** | 232:20 233:17 | 200:3 201:9 | 297:23 299:2 |
| 270:16 | 235:20 237:25 | 204:3,3,9,23 | 301:15 302:6 |
| **thank** 16:19 | 247:3,22 255:2 | 205:2,2 206:7 | **theft** 61:25 |
| 20:20 21:11,13 | 265:3 269:21 | 206:8 209:9,19 | 200:18 |
| 22:14,24 23:25 | 270:5 272:3 | 209:25 211:22 | **theirs** 104:20 |
| 24:4,23 25:9 | 275:14 280:24 | 212:4 213:10 | **themes** 255:20 |
| 35:3 41:15,21 | 287:24 294:9 | 213:17,18 | **theoretically** |
| 44:9 79:12 | 294:17 295:17 | 214:20 217:6 | 89:19 90:1 |
| 81:13 86:22 | 295:18 299:4 | 219:14 220:7 | 120:15 187:9 |
| 98:15,16 99:5 | 299:22 303:1 | 221:20 222:3 | **theories** 260:3 |
| 99:8 101:16 | 304:6,8 | 223:5,23 224:6 | **thereabouts** |
| 102:18,20 | **thanks** 16:18 | 224:18 225:18 | 67:23 |
| 104:17 105:13 | 17:6 23:18 | 225:23 226:25 | **there's** 155:9 |
| 106:17 107:24 | 107:21,21 | 228:12,14 | 155:12 161:8 |
| 108:16 109:23 | 125:6 151:17 | 229:4 230:24 | 164:4 171:1,19 |
| 111:15,17,18 | 151:14,24 | 236:4 237:18 | 174:25,25 |
| 113:1 114:9 | 155:8,12 156:9 | 238:11 239:18 | 175:4 178:18 |
| 115:4,8 117:2 | 155:7,3 159:22 | 239:22,25 | 178:25 186:19 |
| 119:18 121:6 | 159:23,25 | 241:23 242:6 | 208:14,19 |
| 122:20,24 | 160:1,14 | 244:5 246:21 | 215:1 219:17 |
| 128:15 131:23 | 162:14 165:13 | 248:3,24 | 222:15 226:2,3 |
| 133:21 136:25 | 166:11 168:6 | 249:18,20 | 227:1 232:18 |
| 136:25 139:17 | 169:23 171:13 | 250:16 253:20 | 237:14 242:23 |
| 140:6 142:21 | 171:17 172:8 | 256:19 257:9 | 243:8,22 |
| 142:22 145:7 | 172:14 173:2 | 258:1 259:4 | 244:13 245:4 |
| 145:10 149:15 | 173:20,25 | 260:11 261:18 | 248:6 249:18 |
| 151:14,15 | 178:6 181:7 | 262:8,12,12,3 | 249:21 259:17 |
| 152:16 159:14 | 182:4 183:16 | 263:3,22 | 262:6,24 |
| 161:17 174:3,5 | 184:4,21 185:9 | 274:11,20 | 270:10 275:24 |
| 181:18 182:5 | 189:21 191:3 | 275:19 276:13 | 281:8,10 |
| 185:6,20 186:9 | 191:20 192:12 | 277:2,15,16,20 | 293:17 |
| 210:24 211:9 | 192:24 195:23 | 278:16,23,24 | **they're** 165:25 |
| 212:3 213:19 | | 169:10,12,13 | |

| | | | |
|---|---|---|---|
| 48:9,11,13,23 | **three** 11:8 12:3 | 41:23,25 44:11 | 137:10,11 |
| 49:6 50:2,25 | 12:12,20 13:3 | 45:5,7 54:14 | 138:13 139:2 |
| 54:1 57:18 | 13:21 14:1 | 63:9 79:14 | 147:9 151:1,15 |
| 94:2 100:20,25 | 15:14,18,22,25 | 81:15 86:25 | 153:21 157:16 |
| 101:2 103:16 | 17:10 19:1,13 | 91:4 98:15,25 | 158:6,13 160:3 |
| 103:16 104:20 | 32:2 39:1 42:2 | 99:2,3,3,5,7,9 | 169:1 173:11 |
| 106:25 107:2,7 | 49:1 68:16 | 111:24 112:1 | 179:4,17 181:4 |
| 107:15 109:4 | 70:14 76:18 | 115:5,7 142:22 | 181:9 184:6 |
| 128:23,24 | 77:18 80:20 | 145:22 146:6 | 200:6 201:4 |
| 131:6,10,15,19 | 81:18,24 82:9 | 151:19 152:18 | 208:14,16 |
| 156:8 165:8,10 | 85:20 96:10 | 159:16 167:11 | 211:24 220:7 |
| 172:6 196:4,21 | 155:1,2 156:6 | 182:12 184:15 | 236:18 239:6 |
| 244:16 246:14 | 156:10 198:17 | 185:22 186:11 | 242:11,15 |
| 247:25 248:10 | 201:8,9 209:11 | 186:17 211:11 | 244:25 253:25 |
| 248:20,23 | 237:16,17 | 216:13 219:7 | 261:9 266:5 |
| 249:1 285:4 | 238:25 244:2 | 219:16 222:16 | 278:15 281:2 |
| 301:13 | 248:1 258:14 | 232:9 | 286:23 287:24 |
| **thorough** | 261:11,15,19 | **tichenor's** 25:4 | 289:6 292:7 |
| 108:25 124:6 | 261:23 262:2,3 | **tie** 236:2 | 294:9 296:7 |
| **thought** 89:18 | 262:7,14,23,25 | **tiebreaker** | 297:12 298:2,13 |
| 147:8 161:24 | 290:12 293:1 | 262:6 | 298:5,22 |
| 170:25 171:8 | **threefold** | **tight** 259:2 | 299:10 300:12 |
| 171:11,20 | 146:14 | **time** 14:12,25 | 302:5,8,22,24 |
| 173:5 185:12 | **threshold** | 17:7 18:1,7,10 | 304:1 |
| 224:22 257:11 | 90:13 209:25 | 18:23 30:15 | **timeframe** |
| 261:9 262:16 | 293:20 | 32:2 33:1,5 | 268:11 |
| 274:3,12 | **thresholds** | 43:21 54:1 | **timeline** 75:20 |
| 279:22 284:3 | 293:20 | 60:13 67:18 | 76:7 78:6 |
| 294:21 300:20 | **threw** 174:1 | 73:12,17 77:14 | 127:14 148:5 |
| 301:6 | **throughs** 63:22 | 77:16 82:1,6 | 278:18 |
| **thoughtful** | **thursday** 66:25 | 85:5 90:5 | **times** 99:7 |
| 127:20 | **tichenor** 8:4 | 96:11 103:14 | 127:25 134:22 |
| **threatened** | 10:11 23:6,20 | 103:18 107:15 | 138:21 209:11 |
| 91:15 | 23:21 24:2,5 | 118:18 123:8 | 223:2 237:8 |
| **threatening** | 24:11,24 25:7 | 123:25 124:3 | 242:14 298:19 |
| 211:16 | 25:11 32:21 | 126:23 135:23 | **timing** 76:13 |
| | 40:12 41:2,18 | 135:25 136:4 | 85:13 158:20 |

| | | | |
|---|---|---|---|
| 183:17 221:4 | 115:11 120:10 | 131:6,9,13 | **towards** 19:14 |
| 274:17 297:1 | 125:9,10 | 159:24 160:3 | 20:18 25:23 |
| **title** 61:7 | 137:22 139:19 | 230:18 | 71:14 225:14 |
| **today** 17:9 | 140:4 142:16 | **told** 131:12 | 272:1 |
| 21:25 31:23 | 148:8 149:7 | 134:8 144:19 | **town** 238:3,4 |
| 32:11,17 42:20 | 159:18,20,22 | 145:5 166:24 | 286:21 |
| 60:20 65:11 | 160:2,9,11 | 167:4 227:4 | **townsend** 7:1 |
| 75:10 76:14 | 167:17 168:2 | 228:13,13 | 246:11,11 |
| 98:12 117:4 | 168:13,14 | **tomorrow** | **track** 38:8 73:2 |
| 119:3,4 120:3 | 177:12 183:8 | 208:19 232:11 | 88:12,16 |
| 124:14 126:21 | 184:9 187:16 | **tone** 181:23 | **tracking** 38:24 |
| 149:2,9 150:25 | 203:14 208:24 | **tonight** 232:11 | **tracy** 4:1 7:8 |
| 153:3,16 | 209:7 219:9 | 297:2 | 114:11,15 |
| 171:18 186:19 | **toggling** 40:15 | **took** 52:13,17 | 269:18 |
| 189:15 191:3 | **token** 26:10,12 | 64:15 65:3 | **trade** 27:14 |
| 192:5 195:24 | 27:10,11,21 | 94:5 171:4 | 30:24 66:6 |
| 204:8,20 | 44:3 104:14 | 257:12 289:25 | 117:11 118:3 |
| 209:21 221:5 | 112:7,14 119:9 | 296:21 | 117:16 120:20 |
| 231:8 236:3 | 119:10 121:21 | **top** 55:1 65:7 | 120:21 122:8 |
| 245:23 254:1 | 124:23 125:15 | 93:13 109:13 | 122:10 124:18 |
| 275:7 298:19 | 129:15 130:2 | 140:13 239:15 | 129:17 147:6,7 |
| **together** 32:5 | 130:24,25 | 239:24 257:23 | 175:16 223:2 |
| 115:23 242:8 | 131:2 179:1,6 | **topic** 138:4 | 289:15 |
| 261:16 | 296:1 | 159:18 195:5 | **tradeoff** 96:5 |
| **toggle** 25:19,23 | **tokens** 26:16 | 253:9 | 161:5 |
| 30:11,18,19 | 26:24 27:3,6,8 | **torment** | **tradeoffs** |
| 31:5,20 33:1 | 27:14,19 29:2 | 144:15 | 154:10,22 |
| 41:3,6,14 | 29:5,9 31:2,7 | **total** 116:9,11 | **trades** 113:20 |
| 42:21 67:2,6 | 44:6 72:3 | 119:20,23 | 120:24 121:22 |
| 71:14,15 74:5 | 103:7 104:4 | 120:3 121:2 | 122:1,25 |
| 75:1 84:7 96:6 | 117:21 118:3 | 140:11 263:2 | 123:22 124:1 |
| 99:12,14,23 | 118:23 120:1,4 | **totally** 39:23 | 124:12 130:1 |
| 101:11,25 | 120:5 122:6 | 275:5 | 177:7,15 179:5 |
| 102:12,22,25 | 124:12,19 | **touched** 53:5 | 179:9 183:24 |
| 103:1,3,25 | 125:18,20,22 | 65:11 281:18 | 208:19 |
| 104:18 105:3 | 126:1,7 128:4 | **tough** 184:14 | **trading** 87:1,3 |
| 112:1,5 113:1 | 129:7,13,22 | | 87:10,12,13,19 |

| | | | |
|---|---|---|---|
| **true** 23:4 183:5 | **try** 10:7 11:23 | 299:5 | 210:9 226:5 |
| 236:9 245:7 | 14:2 19:25 | **turned** 60:14 | 228:20 246:20 |
| 260:7 290:21 | 74:15 76:24 | 117:3 257:9,18 | 248:1 252:19 |
| 293:11 305:4 | 78:10 85:22 | **turning** 72:7 | 258:14 261:16 |
| **trust** 11:1 | 112:7 123:23 | **turns** 279:2 | 261:20 262:16 |
| 17:18 18:11 | 124:3 129:12 | **tweet** 39:9,25 | 262:24 267:10 |
| 58:25 59:1 | 135:10 136:18 | 40:6,8,10 | 273:9 291:21 |
| 80:2 87:21 | 138:7,9 146:20 | 203:21,22,24 | 295:24 |
| 179:25 244:7 | 148:1 165:1 | 204:1 205:25 | **tx** 6:2,3,5 |
| 279:18 280:1 | 173:12 175:13 | 206:8,14 | **type** 47:1,14 |
| 286:3 290:7,10 | 177:18 179:3 | 260:22 | 49:18 113:24 |
| 294:3 | 182:2 207:14 | **tweeted** 40:2 | 130:23,25 |
| **trustee** 3:21 | 229:6 230:5 | **tweets** 41:6 | 131:1,25 133:5 |
| 6:10 41:22 | 272:19 275:4 | 68:18 204:18 | 165:6 173:10 |
| 88:20 175:17 | **trying** 15:4 | 206:5 | 215:23 235:10 |
| 202:8 210:3 | 19:3 93:13 | **twenties** | 237:5 240:10 |
| 211:12 217:12 | 114:14 117:19 | 150:16 | 245:14,21 |
| 212:16 222:7 | 121:16 122:7 | **twice** 236:20 | **types** 49:2 63:8 |
| 221:9 222:21 | 123:14,24 | 237:19,24 | 64:9 73:15 |
| 227:17 235:10 | 124:19 127:15 | **twitter** 147:12 | 109:5 122:14 |
| 245:13 260:13 | 147:9,18 | 150:17 286:24 | 122:18 139:8 |
| 261:10 262:10 | 149:20,24 | **two** 26:8 47:20 | 165:14 169:18 |
| 270:20 289:18 | 151:12 164:9 | 49:22,22 52:8 | 170:7 172:14 |
| 292:24 | 172:9 173:8 | 52:11,15 58:16 | 239:13 245:22 |
| **trustees** 235:11 | 209:12 225:3,5 | 71:3 77:18 | 283:2 |
| 245:15 261:16 | 226:14 250:12 | 89:24 105:15 | **typical** 55:4,15 |
| 261:20,24 | 253:8 254:10 | 112:20 113:23 | 55:16 66:22 |
| 262:16,25 | 258:10 276:2 | 125:13 126:5 | 278:20 |
| 263:10,11 | 301:17 302:2,4 | 126:11 146:4,4 | **typically** 47:10 |
| 293:7 | 297:25 298:3,9 | 147:20 157:6 | 51:8 55:3 |
| **trusts** 263:13 | 298:10,11 | 167:1,2 168:17 | 59:10 141:2 |
| **truth** 23:22,23 | 299:21 304:4 | 169:7,15,17 | **u** |
| 23:23 184:5 | 313:15 183:3 | 175:7,7 182:15 | **u.s.** 2:23 6:10 |
| 202:3,4 233:10 | 188:18,25 | 182:17,20,24 | 40:5 42:2 |
| 233:11,11 | 231:21 272:25 | 183:13 196:4 | 80:21 81:19 |
| | | 198:1 205:8 | 102:23 108:12 |
| | | 208:13 209:11 | 109:25 110:5 |

| | | | |
|---|---|---|---|
| 87:25 88:2,8 | 102:4,12,22,25 | **transcript** | **transmitter** |
| 88:12 89:3,11 | 103:1,3,4,24 | 305:4 | 34:16 |
| 90:7,15 115:20 | 103:25 104:19 | **transfer** 19:17 | **transparency** |
| 117:16,22 | 105:4 113:1 | 20:1,4,12 27:2 | 226:6 264:21 |
| 124:14 162:3 | 117:5,9 118:18 | 28:1,13,21 | **travel** 304:3 |
| 170:4 191:9 | 124:10 125:2,8 | 36:4 58:23 | **treat** 162:4 |
| 192:6,10,14,17 | 126:13 129:16 | 59:17,20 64:21 | **treated** 80:2 |
| 192:22,23 | 130:9 139:9,12 | 70:21 73:5 | 268:13 |
| 193:2,8,10,25 | 139:14,15,17 | 79:22 80:3 | **treatise** 281:13 |
| 194:15 195:11 | 139:22,25 | 88:22 89:6 | **treatment** 12:3 |
| 213:9 | 140:9,19,21,23 | 90:10 103:15 | 18:20 19:8,14 |
| **tradition** | 146:10 148:23 | 128:18,22,24 | 109:8 161:6 |
| 140:24 | 165:15 170:24 | 130:2 131:2 | **treats** 10:8 |
| **traditional** | 187:2,6,8,18 | 143:22 155:23 | **trevino** 7:23 |
| 31:11 60:23 | 187:19 190:17 | 156:13,15 | 182:6,8,8,11 |
| 121:20 141:1 | 192:14 198:9 | 170:13 200:25 | 183:10,15 |
| 191:8 | 203:13 204:16 | 213:9 245:21 | 185:6,9 301:7 |
| **training** 90:2 | 208:16 209:16 | **transferred** | 301:9,9,23 |
| 117:18 | 219:7 222:24 | 17:17 20:7 | 302:4,17,25 |
| **transacting** | 230:19 231:17 | 45:9 79:24 | **trial** 3:10 220:3 |
| 129:25 | 272:22 276:3 | 129:22 130:20 | 270:8,24 |
| **transaction** | 284:13 | 131:8 153:11 | **tried** 92:24 |
| 13:12 28:1,7 | **transactions** | 153:18,25 | 138:9 148:14 |
| 31:21,24 40:3 | 12:23 17:21 | 154:1 156:2 | 173:6 175:24 |
| 40:5,11,15 | 30:2,24 51:9 | 159:25 200:6 | 183:19 275:3 |
| 41:8 59:11 | 66:18 73:3 | 200:11 213:3 | 285:20 287:1 |
| 60:17,24 61:2 | 76:19 100:7,17 | 284:14 | **trigger** 79:9 |
| 62:11,18 63:11 | 118:16 122:14 | **transfers** 37:8 | 159:4 |
| 63:14 64:14 | 122:18 123:8 | 64:17 88:21 | **triggered** |
| 65:1 67:5 68:1 | 123:10,14,19 | 129:24 142:16 | 106:12,13 |
| 69:7,7 70:17 | 129:11 141:6 | 155:16 162:23 | **triggers** 79:6 |
| 71:13 74:5 | 177:2,19 179:3 | 166:25 | 158:17 |
| 82:7 83:9,17 | 189:7 200:7,22 | **transition** | **trouble** 14:13 |
| 83:24 84:5,17 | 230:20 273:5 | 106:15 | 19:7 |
| 85:11,13 91:19 | **transcribed** | **transitioning** | **troubling** |
| 96:4 100:19 | 4:25 | 106:10 | 97:21 |
| 101:21,22,25 | | **transmission** | |
| | | 4:2 156:25 | |

| | | | |
|---|---|---|---|
| 156:21 175:19 | 82:8 90:13 | 163:9,10 208:2 | 19:18,19,22,22 |
| 179:25 180:9 | 100:23 105:6 | 263:10,11,12 | 19:23 29:3,22 |
| 192:10 211:12 | 105:11 106:25 | 263:14,16,18 | 30:2 36:15 |
| 217:12,13,22 | 112:17 113:5 | 289:11 | 37:15,21 43:22 |
| 221:9 227:17 | 117:23 131:16 | **uncovered** | 50:2,11 59:24 |
| 234:23 | 132:17 137:9 | 294:21 | 60:15 61:24 |
| **ubl** 58:16 | 138:11 149:7 | **under** 55:25 | 63:4,4 66:21 |
| **ubo** 193:21 | 149:13 151:2,3 | 70:18 75:9 | 68:3 71:10 |
| 203:20 | 154:4,16,20 | 79:15 80:19 | 73:17 74:24 |
| **ucc** 32:6 40:22 | 156:14,17 | 82:2,16 91:17 | 85:25 86:3 |
| 44:12 55:21,22 | 157:19,22 | 99:14,23 | 94:25 106:5,13 |
| 71:4,8 100:18 | 158:11 160:20 | 102:12,22,25 | 108:3 113:11 |
| 100:24 105:9 | 168:24 171:9 | 104:9,15,18 | 117:6 119:13 |
| 140:25 146:18 | 177:19 178:22 | 105:2 112:19 | 124:9,13 |
| 149:11 158:11 | 179:16 187:25 | 133:4 151:25 | 130:22 144:21 |
| 170:7 174:22 | 197:25 203:5 | 152:11 154:10 | 144:24 146:13 |
| 176:21 216:14 | 212:20 244:17 | 154:18 155:8 | 146:22 147:1 |
| 222:20 244:17 | 84:5 138:18 | 156:11 159:5 | 147:16,23 |
| 244:18 257:3 | 200:20 | 165:19 166:25 | 151:12 153:22 |
| 257:21 258:16 | **unanimous** | 167:22 172:12 | 158:17 160:18 |
| 258:22,23 | 257:24 258:6 | 176:25 183:8,9 | 161:10 163:22 |
| 260:23 265:22 | 258:11 261:18 | 185:2 192:1 | 163:25 165:16 |
| 266:3,8 282:6 | 262:2 | 209:17 220:20 | 172:9 173:14 |
| 285:23 286:5,6 | **unanimously** | 230:8 239:20 | 173:21 175:2 |
| 286:9 287:18 | 256:13 257:11 | 243:12 244:1 | 180:10,12 |
| 288:7,8,24 | 257:12 | 276:13 281:22 | 185:5 186:1 |
| 290:16 | **unaudited** | 285:6 | 191:25 192:18 |
| **ucc's** 46:10,16 | 33:15,23 162:1 | **underline** | 195:13 207:12 |
| 55:22 108:9 | 192:22 | 114:20 | 218:4 219:25 |
| 123:17 147:13 | **unaware** | **underlying** | 227:11 243:12 |
| **ultimate** 36:16 | 200:19 | 37:3 38:22 | 254:12,15 |
| 97:23 152:15 | **unclear** 11:5 | 147:2 162:8 | 258:10 261:22 |
| **ultimately** 28:4 | 32:15 159:2 | 170:22 179:2 | 262:8 268:23 |
| 31:6 32:7 | **uncomfortable** | **understand** | 265:1,24 |
| 40:17,19,23 | 161:2 187:13 | 10:3,20 11:20 | 269:13 276:20 |
| 61:14 71:23 | **uncommon** | 11:23 13:6,15 | 281:15 282:4 |
| 75:7,14 77:12 | 64:7 93:18 | 13:17 14:11,16 | 297:3 299:1 |
| | | 15:7,12 18:15 | 302:4 |

**[understandable - upgrading]** Page 93

**understandable** 225:7
**understanding** 14:14 19:8 26:23 28:25 29:11,19 35:21 36:18 37:14 38:16 40:7 42:9 50:4,6 51:4,12 58:14 59:16,20 66:3 74:24 79:17,19 80:24 83:10,12 84:4 93:8 102:22 107:4 108:23 110:11 110:15,18 125:21 126:13 126:23 129:5 130:8,21,22 131:5 140:5 146:24 147:3 148:22 149:16 191:17,23 192:3,20 193:4 198:3,10,13 200:3 202:21 206:2,4,8 207:10 211:19 231:2,5 250:1 251:3,8,12,16 257:8,17 258:7 272:9 276:16 299:18,23
**understands** 151:18 269:11

**understood** 38:19 54:12 63:6 64:12 86:4 95:2,19 106:8 109:18 114:3 117:15 122:16 127:14 146:14 149:15 154:13 227:15 244:9 266:25
**undo** 18:17
**undue** 18:6
**unequal** 19:14
**unexpected** 60:11,13
**unexpectedly** 60:8
**unfair** 18:14 161:1,5,5
**unfortunately** 17:6 114:6 146:21 153:6 248:10 272:7 281:13
**unidentified** 218:3 226:17 228:6,8 255:9 257:19 260:20 261:21 262:1 262:18 264:3 264:12 265:3 299:2,7,25 304:2,6
**unilateral** 105:4
**unique** 73:23

**united** 1:1 2:1 6:9 28:19 41:21 45:2 83:7 201:7 202:7 203:16 210:3 230:1,21 234:6,25 260:12 270:19 270:20,22 289:18
**university** 234:18,19,20 238:7
**unknowingly** 17:1
**unknown** 77:15 100:4 179:10 184:14
**unknowns** 179:14
**unlicensed** 42:6 156:25
**unliquidated** 252:9
**unmute** 114:14
**unofficially** 265:22,25
**unprecedented** 135:4
**unquote** 190:9
**unregistered** 90:17 230:21
**unregulated** 72:20
**unsecured** 4:8 186:14 235:8 245:18

**unsupported** 11:5,11,14,18 11:24 13:24 14:23 15:2 18:14 19:1,10 26:15,20,22 28:23 29:9 30:13,17 31:2 72:4 99:15 104:4,19 126:8 129:7,13,21,22 160:2,12 161:2 161:13 177:14 179:23 180:6
**unsworn** 10:9
**unusual** 10:2 222:25
**unwilling** 138:6
**update** 29:25 69:11 215:16 215:17,19,22 220:6 225:16
**updated** 94:18
**updates** 286:25
**updating** 303:1
**upfront** 26:5 169:6 174:25 175:3
**upgrade** 127:5 127:17 128:3 131:17
**upgrades** 125:25 126:24
**upgrading** 127:2

**[uploaded - veritext]** Page 94

**uploaded** 86:20
**ups** 210:12
**upside** 170:18
**upsides** 169:15
**uptegrove** 5:24 44:19,22 45:1 45:2,6 51:22 54:12,13 55:12 60:22 61:19 65:18 75:25 76:4,10 78:20 79:8,12,13 81:6,13,14 83:22 85:9,23 86:12,22,24 91:3 92:11 97:6 98:11,15 215:10,10,13 215:21 218:7,9 218:9 219:21 219:21 220:9 220:12,15 224:7,7,10,13 224:15 227:14 227:14,21,24 228:1,3 229:25 230:1
**usdc** 120:6
**use** 27:9 73:4 86:25 87:2,3,8 87:11,21 88:6 102:11 103:20 143:23 157:9 191:10 262:19 276:11

**used** 27:4 40:1 84:20 151:4 245:23 271:15 271:16,17
**user** 79:15 84:19,23 85:1 86:1,4,16 156:12
**user's** 81:18 86:9
**users** 79:16,17 79:19,23 80:6 80:9,19,21 81:17,22 82:10 82:24 206:6
**user's** 155:23
**uses** 27:1 29:5 70:1 118:16 131:7
**using** 11:25 30:21 101:1
**usual** 275:2
**usually** 223:5 237:17 245:18 289:15 290:22 291:2,10,14
**utility** 112:12 113:5,10,16
**utilize** 27:19

**v**
**v** 1:13,22 3:2,8 57:11
**vague** 75:23
**vaguely** 54:2
**valid** 184:4
**validate** 31:5 73:2 126:3

**validated** 128:25 130:19 155:21
**validating** 130:9
**validation** 131:7
**valuating** 171:6
**value** 13:13 14:18,20 25:21 26:2,3,7,9,12 30:22 41:10 44:3 66:20 71:19 81:22 100:6 104:9 112:2,2,3,4,12 112:21 113:4 113:13,21 119:18 120:8 121:2,24 123:23 135:7,8 135:10,14 138:22 140:11 141:16 142:13 147:11,19,23 149:5 150:20 150:22 152:1,11 154:13,20 160:24 168:4 171:5,11 174:14,19 175:1,2,11,13 176:7,7 179:16 180:18 184:13

208:13 209:7 209:17 271:18
**values** 151:4
**vanderbilt** 6:18
**variation** 136:18
**variety** 197:14 275:25 283:13
**various** 33:16 38:12 40:22 42:16 45:14 62:16 68:19 71:7 92:4,13 93:4,5,11,19 93:20 100:20 108:14 112:9 115:22 117:25 175:24,24 248:2
**vary** 128:19
**verification** 29:4,17 59:13 62:25 69:11 144:3 145:16
**verifications** 30:1
**verify** 23:4,13 27:20 52:22 58:25 59:2,3 59:21 108:16 108:18 145:5 164:10 165:13
**verifying** 144:19 164:5
**veritext** 305:20

**[vermont - wallet]** Page 95

**vermont** 11:15 13:24 15:1
**vermonters** 11:17
**version** 21:22 91:6 248:3
**versions** 248:2
**versus** 82:4 112:5 124:19 164:13 169:5 169:13,13 192:7 198:11 199:11 205:14 262:10 264:13
**vested** 293:14
**vet** 119:16,19
**veto** 290:25
**vgx** 26:10 44:3 112:2,4,5,9 113:2,5,17 114:1,4 116:22 169:13 296:1
**view** 12:9 41:10 48:1 82:5 94:22 112:8,11,19 113:21 138:5 157:25 162:6,8 175:2 179:8 181:24 190:22 194:23 198:18 203:2 207:14 208:13 271:4 283:21
**viewed** 133:25 137:8,9 174:21 175:6 187:6

194:19
**viewpoint** 271:1
**views** 175:22 230:14
**violate** 266:22
**violation** 11:22
**virtue** 219:10
**visit** 59:8
**visited** 38:3
**voice** 16:19 174:17
**voir** 24:20
**volatile** 121:19 180:20
**volatility** 121:8 183:20,25
**volume** 117:16 117:22 152:4
**volunteered** 303:14
**vote** 207:15 244:20 245:1,2 257:9,17,18,25 258:7,8 261:18 267:2,5,17,20 273:13 290:17 290:23,23,25 291:3,6,9,13 291:5,15,19
**voted** 14:21 257:4,12,13,14 260:25 261:1,8 261:15,19,19 261:22,23 262:25 264:4

264:10,12 267:19 285:23 292:7,9
**votes** 291:14
**voting** 97:2 182:24 207:11 267:10 272:6 290:16,16 291:6,7,8,20 292:17
**vouch** 72:8
**voy** 3:8
**voyager** 1:6,11 1:19,20,23 3:1 3:8 24:9 26:16 26:24 27:10,18 28:6,18,23 29:5,8 30:11 30:12 31:23 40:3 44:7 45:13 56:6,17 90:18,20 99:13 100:14 103:8 103:13,16 104:25 119:19 123:3 125:11 129:15,16 149:13 150:20 153:12,12,15 153:15,20 154:11 155:21 155:21 156:6,7 156:17 157:8 160:3 163:2,4 164:21 169:12 174:13,19

190:24,25 191:13 203:22 230:15 240:21 241:3 246:13 260:22 289:19 301:21,24
**voyager's** 129:23
**voyager's** 272:25

**w**
**w** 6:4 223:20
**wait** 11:7 12:2 12:13,21 15:22 18:21 19:2,6 300:25
**waiting** 68:12 74:19 180:21
**waiving** 261:13
**walk** 63:22 302:1
**walking** 204:19
**wallet** 27:21 34:7,10 37:4 47:16 53:6 54:17,20 55:18 56:4,24 57:5,5 63:22 70:2 103:17,17 104:20 108:21 126:4 128:17 128:19,20,22 128:24 129:23 129:23 130:1 130:18,19,23 130:24 131:3,8

**[wallets - week]** Page 96

**wallets** 27:6,12 28:10,11,14,14 34:25 58:20 73:8 108:21,23 110:1,4 129:1 129:21 130:3 141:18 143:18 143:21 162:23
**want** 10:18 11:6,21,23,25 12:1,10,18,20 13:3,4,11,16 13:17 14:1,7,7 15:18 16:13 18:10,25 19:4 19:23,23 21:17 22:3 25:11,17 26:17 30:1 32:9,15,16 33:9 35:20 37:11 58:19 66:22 81:4 85:21 86:12 99:10 106:22 113:25 114:14 115:12 120:16 123:9,11 127:20,21 128:25 131:24 136:13,14 137:24 144:2 147:7 150:3 153:3,4,5 154:1,2,9,25 155:4,10 156:4 163:6,6,12,17 169:1,20

170:14,23 172:5,18 173:16,19 181:10 184:25 185:3,25 196:7 201:2,20 206:13,18 210:10,21 214:17 216:15 216:16,18 217:4,19,19 218:21 219:25 220:8,25 221:25 222:18 223:19 224:11 225:2,18,20,21 226:7,8,23,23 229:3 239:6 249:12 255:10 255:14 257:2 261:21 264:17 272:25 281:6 291:22 296:12 299:16,16,19
**wanted** 19:16 85:25 86:7 106:2 107:14 110:11 123:20 129:8 130:1,12 144:19 151:25 153:16 156:12 162:4,5 171:24 175:5 177:6,6 224:16,19 225:6,9,15 230:24 253:1 261:13 262:4 262:14 290:4,4

290:5 295:21 290:7 301:10
**wants** 18:3,4 181:17,19 221:23 222:19 299:6
**warren** 39:2
**wasn't** 169:21 170:15 174:16 187:11 196:11 197:12,21 198:3 203:17 204:10,13,22 206:1 231:8 257:17 268:13 290:21
**watkins** 5:3 11:10 144:23 213:25 216:3
**way** 17:13 18:20 19:13 20:18 46:25 59:13 62:1 63:5 64:25 73:8 81:25 83:5 88:19
**wearing** 236:2 236:3
**website** 63:1 63:10 155:13
**websites** 63:14
**wednesday** 38:11 46:12 265:20,297:10
**week** 7:19 77:18,18,19,20 79:22 124:25 155:22 238:3,4 240:11 281:24 289:24 290:6 300:10 300:10 301:24

257:9,14 262:20 264:4 273:13 297:14 298:14
**ways** 73:15 88:23 103:3 109:18 113:14 176:8 284:15 291:10
**we've** 18:1 33:17,18 37:4 37:8 45:24 55:22 59:4 65:5 69:22 72:11 78:1 85:16,17 94:10 111:12,12,13 113:12 118:20 122:11 131:22 143:5 147:11 147:19

| | | | |
|---|---|---|---|
| weekend | 161:2 163:24 | white 129:22 | wise 141:22 |
| 299:21 | 181:5,13,24,25 | 129:25 | wish 44:18 |
| weekly 86:5 | 181:25 191:3,3 | wide 275:24 | 81:12 82:12 |
| 89:1 200:1,6 | 200:8 207:13 | widescale | 136:6,9 154:14 |
| 200:11 241:7,7 | 211:16 220:3,3 | 64:23 | 216:24 255:5 |
| 242:23 243:1 | 221:13 223:23 | widespread | wished 229:6 |
| weeks 32:2 | 223:24 224:10 | 62:2,6 | wishes 41:18 |
| 52:7 70:14 | 225:4,5,13,25 | wiles 2:22 | 44:10,25 |
| 76:18 94:20 | 226:14 229:20 | 279:25 | 114:10 145:22 |
| 96:10 149:9 | 236:17 248:24 | wiling 180:25 | 229:22 231:20 |
| 157:6,24 184:9 | 257:22 258:25 | william 5:24 | 255:3 265:5 |
| 207:4 208:21 | 259:6 265:15 | 45:1 215:10 | 269:17 294:13 |
| weight 290:24 | 266:14 295:23 | 218:9 219:21 | withdraw 11:3 |
| weighted | 296:18 297:1 | 224:7 227:14 | 27:8,13 86:9 |
| 290:25 | we've 151:23 | 229:25 | 190:11,13 |
| weirder 296:21 | 163:19 165:4 | willing 118:11 | 194:5 198:25 |
| welcome 16:20 | 166:23 202:15 | 127:13 134:15 | 199:4 201:2 |
| 214:12 222:20 | 209:11 211:23 | 136:11 143:8 | withdrawal |
| 222:20 229:23 | 213:21 214:11 | 144:16 172:15 | 18:4,5 27:1,5 |
| 294:10 | 215:16 227:17 | 202:21,23 | 27:19 66:13 |
| went 99:11 | 241:21 274:16 | 221:13 222:2 | 274:1 |
| 107:15 123:1 | 274:24 275:6 | 228:21 234:12 | withdrawals |
| 137:25 160:3 | 278:6 298:14 | 303:16 | 29:15 38:20,21 |
| 163:25 198:1 | 298:22 | willingness | 79:15 198:12 |
| 230:3 263:20 | what'd 69:4 | 88:14 160:16 | 268:4 277:25 |
| 274:3 | what's 152:12 | win 184:25 | withdrawing |
| weren't 169:6 | 158:23 167:1 | winddown | 66:21 |
| 172:3 184:10 | 170:22 183:18 | 179:25 180:8 | withdrawn |
| 251:24 261:13 | 186:24 190:5 | 234:9 249:21 | 126:1 129:7,8 |
| western 234:5 | 191:5 192:7 | 256:2 257:4 | 197:4 198:22 |
| we'd 160:17 | 204:2 214:20 | 280:1,8 290:7 | 267:24 268:7 |
| we'll 157:23 | 227:19 244:8 | 290:10 | 268:10 |
| 158:10 221:9 | 251:2 252:15 | windows | withdraws |
| 227:19 234:15 | 275:9 280:16 | 110:17 | 103:14 |
| 274:21 300:6,7 | wheelhouse | winning 135:7 | withdrew |
| we're 151:19 | 108:4 | wins 152:15 | 277:2 |
| 158:8 160:7 | | | |

| | | | |
|---|---|---|---|
| 115:16 127:1 | 35:14,17 37:10 | 262:18 264:8 | |
| 129:3 130:14 | 38:25 42:24 | 278:10 283:25 | |
| 132:5 137:16 | 43:3 68:16 | 294:10 297:9 | |
| 149:25 150:7 | 118:25 119:2 | 300:14 303:25 | |
| 151:12 166:16 | 123:1 133:13 | you've 185:18 | |
| 166:17 172:25 | 133:15 134:8 | 194:19 201:12 | |
| 174:1 178:6,13 | 149:16 150:1 | 215:8,20 226:4 | |
| 178:14,19 | 151:8 153:1,6 | 236:20 242:17 | |
| 180:10 181:4,4 | 157:9,10 | 252:1 255:25 | |
| 183:1 184:21 | 167:24 168:7 | 270:15 280:18 | |
| 188:17 189:17 | 168:14,21 | 285:17 | |
| 197:13,16 | 178:15 182:22 | | |
| 201:5 209:9 | 184:17 190:23 | z | |
| 213:5,16 | 192:5 204:6 | z 161:3 | |
| 214:22 215:12 | 218:13 220:16 | zero 175:7 | |
| 218:8 227:21 | 220:21 230:3 | 276:18 277:18 | |
| 228:7 239:9 | 231:7 240:13 | zhao 42:2 | |
| 251:11 258:10 | 242:13 296:22 | 193:20 203:20 | |
| 259:12 263:2 | york 1:2 2:3 | zoom 66:4 | |
| 272:20 277:4 | 5:6,14 6:12,19 | 165:25 241:22 | |
| 282:14 291:8 | 7:4 13:24 15:5 | 242:13 | |
| 292:4 297:25 | 15:10,10,13,17 | | |
| 301:4,8 | 15:17 218:4 | | |
| year 68:13 | 221:13 228:9 | | |
| 169:7,15 | 234:21 235:1 | | |
| 239:14 272:11 | 263:24,25 | | |
| 276:15 277:8 | 300:16 | | |
| 277:12 | you're 163:15 | | |
| years 105:15 | 170:12 172:17 | | |
| 235:7 238:10 | 173:14,15 | | |
| 238:25 280:8 | 180:14 193:7 | | |
| 295:25 299:7 | 202:1 206:14 | | |
| yesh 43:19 | 207:7 222:11 | | |
| yesterday | 236:4 238:2 | | |
| 10:22 17:23 | 239:20 240:11 | | |
| 19:17 25:12 | 248:18 249:15 | | |
| 26:18 29:7 | 250:17 253:14 | | |

| | | | |
|---|---|---|---|
| witness 9:22 | 289:3 295:1,5 | 158:3,6,9,10 | would've 86:13 |
| 21:17 23:7,19 | 295:11,15,18 | 158:10 160:18 | wouldn't 155:9 |
| 23:24 24:2 | witnesses 8:3 | 163:23 164:23 | 170:14 224:21 |
| 32:24 33:21,24 | 9:13 24:20 | 165:3 196:11 | 224:21 247:9 |
| 34:1,4,7,13,16 | 144:15 184:17 | 196:11,13 | 261:5 269:7 |
| 34:19,23 39:16 | 232:21 | 207:3 208:17 | 275:20 287:21 |
| 41:16 86:7,21 | witness's 188:9 | 241:25 243:3 | wow 258:12 |
| 91:1 98:1,12 | 254:20 | 271:25 288:8 | wrinkles 246:1 |
| 100:16 101:13 | woman 16:2 | 288:12,22,23 | write 238:8 |
| 107:11,17 | 17:5 | 289:1 291:8 | writing 111:11 |
| 111:16,17,20 | wondering | 294:22 297:19 | 207:17 238:21 |
| 114:10 118:9 | 164:16,18 | 301:16 302:11 | 240:2 |
| 118:12 135:21 | 241:13 | worked 76:13 | written 92:14 |
| 135:24 136:13 | won't 279:9,10 | 95:15 100:18 | 135:12 189:1,2 |
| 136:22 143:3,8 | 297:12 | 108:15 129:9 | wrong 108:17 |
| 143:11 144:9 | word 191:4 | 230:4 242:7,9 | 127:19 142:9 |
| 145:15 151:24 | 193:12 262:19 | working 11:17 | 159:17 231:2 |
| 153:1,3 166:10 | words 40:1 | 98:3 115:24 | 276:16 282:6 |
| 166:14,17,22 | 136:10 204:3 | 148:5 215:16 | 300:21 303:3 |
| 167:4,24 174:6 | 217:18 281:3 | 215:20 225:17 | |
| 182:1,3 202:9 | 290:19 | 290:19 | x |
| 202:10,12 | works 74:20 | | x 1:4,8,10,16 |
| 210:8,12,13,23 | 23:16 32:5 | 80:25 81:25 | 1:18,25 8:1 |
| 212:5 213:23 | 33:3 37:8 | 129:9 131:4 | 161:3 |
| 214:1 218:16 | 45:17,23,25 | 155:18 162:6 | |
| 218:22 220:5 | 47:5,9 57:5,13 | 194:21 255:11 | y |
| 225:23 229:1,2 | 60:2 62:16 | 255:25 258:21 | y 161:3 |
| 229:3 233:1 | 65:14 68:11 | 297:21 | yea 291:15 |
| 235:16,18 | 69:25 70:15,19 | world 284:20 | yeah 10:19 |
| 249:8,13 | 70:20,22 71:22 | worldwide | 16:18 21:1 |
| 254:11 255:1,3 | 71:25 73:9,9 | 51:13 | 26:22 27:25 |
| 258:1 259:24 | 74:14,16 | worry 228:17 | 33:13 47:12 |
| 261:6 262:13 | 100:23 103:1,2 | worst 150:10 | 50:9 62:8 |
| 263:4 264:5,8 | 104:11 122:7 | 151:9 | 67:15 90:20 |
| 266:18,20,22 | 125:14 127:13 | worth 71:9 | 91:8 95:22 |
| 269:10 279:15 | 148:9 151:25 | 149:7 203:13 | 97:18 100:21,26 |
| 279:17 282:2 | 155:16 156:12 | | 101:13 103:3 |
| | | | 112:6 114:16 |

A-1269

```
                                                     Page 1

 1    UNITED STATES BANKRUPTCY COURT

 2    SOUTHERN DISTRICT OF NEW YORK

 3    - - - - - - - - - - - - - - - x

 4    In the Matter of:

 5

 6    VOYAGER DIGITAL HOLDINGS, INC.,    Case No. 22-10943 (MEW)

 7

 8             Debtor.

 9    - - - - - - - - - - - - - - - - - - - - - - - - - x

10    VOYAGER DIGITAL HOLDINGS, INC.,

11                    Plaintiff,

12           v.                    Adv. Case No. 22-01133 (MEW)

13    DESOUSA,

14                    Defendant.

15    - - - - - - - - - - - - - - - - - - - - - - - - - x

16      THE AD HOC GROUP OF EQUITY INTEREST

17    HOLDERS OF VOY,

18                    Plaintiff,

19           v.                    Adv. Case No. 22-01170 (MEW)

20    VOYAGER DIGITAL HOLDINGS, INC.,

21    ET AL.,

22                    Defendants.

23    - - - - - - - - - - - - - - - - - - - - - - - - - x

24

25
```

Page 2

```
 1                    U.S. Bankruptcy Court
 2                    One Bowling Green
 3                    New York, New York 10004
 4
 5                    Monday, March 6, 2023
 6                    10:13 AM
 7
 8   B E F O R E :
 9   HON. MICHAEL WILES
10   U.S. BANKRUPTCY JUDGE
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1   A P P E A R A N C E S :
 2
 3   KATTEN MUCHIN ROSEMAN, LLP
 4        Attorneys for the Debtor
 5        575 Madison Avenue
 6        New York, NY 10022
 7
 8   BY:  STEVEN REISMAN, ESQ.
 9        SHAYA ROCHESTER, ESQ.
10
11   UNITED STATES ATTORNEY'S OFFICE
12        Attorney for the United States of America
13        86 Chambers Street
14        3rd Floor
15        New York, NY 10007
16
17   BY:  JEAN-DAVID BARNEA, ESQ.
18
19   WACHTEL, LIPTON, ROSEN & KATZ
20        Attorney for Metropolitan Commercial Bank
21        51 W. 52nd Street
22        New York, NY 10019
23
24   BY:  ANGELA HERRING, ESQ.
25
```

Page 3

```
 1   HEARING Re: To reconsider approval of the disclosure
 2   statement and confirmation of the Chapter 11 plan
 3
 4   HEARING Re: Motion by Michelle D. DiVita to appoint a
 5   Chapter 11 trustee
 6
 7   HEARING Re: Motion by Tracy Hendershott to convert case to
 8   Chapter 7
 9
10   HEARING Re: Motions by Alah Shehadeh
11
12   HEARING Re: Motion for an equity committee and to hold the
13   directors personally liable
14
15   HEARING Re: Objection to the Official Committee of Unsecured
16   Creditors to proofs of claim nos. 11206, 11209, and 11213
17
18   HEARING Re: Adv. Pro. 22-01133-mew.  Motion to extend
19   automatic stay or, in the alternative, for injunctive relief
20   enjoining prosecution of certain pending litigation against
21   the debtors, directors, and officers
22
23   HEARING Re: Adv. Pro. 22-01170-mew. Pre-trial conference.
24   Transcribed by:  Jamie Gallagher, Sheila Orms, Tracey
25   Williams, Sherri Brach, and Cathy Kleinbart
```

A-1271

Page 5

```
 1   FEDERAL TRADE COMMISSION
 2        Attorney for Federal Trade Commission
 3        600 Pennsylvania Avenue, NW
 4        Washington, DC 20580
 5
 6   BY:  KATHERINE JOHNSON, ESQ.
 7
 8   UNITED STATES SECURITIES AND EXCHANGE COMMISSION
 9        Attorney for the U.S. Securities and Exchange
10        Commission
11        100 F Street, NE
12        Washington, DC 20549
13
14   BY:  THERESE SCHEUER, ESQ.
15
16   UNITED STATES SECURITIES AND EXCHANGE COMMISSION
17        Attorney for the U.S. Securities and Exchange
18        Commission
19        950 E Paces Ferry Road, NE
20        Atlanta, GA 30326
21
22   BY:  WILLIAM UPTEGROVE, ESQ.
23
24
25
```

Page 6

1    JAFFE RAITT HEUER & WEISS, PC

2         Attorney for Jason Raznick

3         27777 Franklin Road

4         Southfield, MI 48034

5

6    BY:  PAUL HAGE, ESQ.

7

8    SULLIVAN & CROMWELL, LLP

9         Attorney for FTX Trading Ltd. And its affiliates

10        125 Broad Street

11        New York, NY 10004

12

13   BY:  BENJAMIN BELLER, ESQ.

14

15   ARENTFOX SCHIFF LLP

16        Attorneys for Voyager Digital Holdings

17        1301 Avenue of the Americas

18        42nd Floor

19        New York, NY 10019

20

21   BY:  JEFF GLEIT, ESQ.

22        BRETT GOODMAN, ESQ.

23

24

25

Page 7

1    NATIONAL ASSOCIATION OF ATTORNEYS GENERAL

2         Attorney for the States

3         1850 M St., NW

4         12th Floor

5         Washington, DC 20036

6

7    BY:  KAREN CORDRY, ESQ.

8

9    RUSKIN MOSCOU FALTISCHEK, P.C.

10        Attorney for Usio, Inc.; FiCentive, Inc.

11        1425 RXR Plaza

12        Uniondale, NY 11556

13

14   BY:  SHERYL GIUGLIANO, ESQ.

15

16   YOUNG CONAWAY STARGATT & TAYLOR, LLP

17        Attorneys for the Committee Counsel in FTX Bankruptcy

18        Rodney Square

19        Wilmington, DE 19801

20

21   BY:  MATTHEW LUNN, ESQ.

22        ROBERT POPPITI, JR., ESQ.

23

24

25

Page 8

1    OFFICE OF THE ATTORNEY GENERAL OF TEXAS

2         Attorney for TX State Securities Board & TX Dept. of

3         Banking

4         P.O. Box 12548

5         Austin, TX 78711

6

7    BY:  ABIGAIL RYAN, ESQ.

8

9    WINTHROP & WEINSTINE, P.A.

10        Attorney for N/A

11        225 South 6th Street

12        Minneapolis, MN 55402

13

14   BY:  MICHELLE DIVITA, ESQ.

15

16   QUINN EMANUEL URQUHART & SULLIVAN, LLP

17        Attorneys for Voyager Digital, LLC Special Committee

18        51 Madison Avenue

19        New York, NY 10010

20

21   BY:  KATHERINE SCHERLING, ESQ.

22        SUSHEEL KIRPALANI, ESQ.

23

24

25

Page 9

1    LATHAM & WATKINS, LLP

2         Attorneys for BAM Trading Services Inc. d/b/a

3         Binance.US

4         885 3rd Avenue

5         New York, NY 10022

6

7    BY:  NACIF TAOUSSE, ESQ.

8         ADAM GOLDBERG, ESQ.

9

10   PULMAN, CAPPUCCIO, & PULLEN, LLP

11        Attorney for USIO, Inc. and FiCentive, Inc.

12        2161 N.W. Military Highway

13        Suite 400

14        San Antonio, TX 78213

15

16   BY:  RANDALL PULMAN, ESQ.

17

18   MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP

19        Attorney for the New Jersey Bureau of Securities

20        1300 Mount Kemble Avenue

21        Morristown, NJ 07962

22

23   BY:  VIRGINIA SHEA, ESQ.

24

25

A-1272

```
                                              Page 10
 1   MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP
 2        Attorney for the New Jersey Bureau of Securities
 3        570 Broad Street
 4        Newark, NJ 07102
 5
 6   BY:  JEFFREY BERNSTEIN, ESQ.
 7
 8   KIRKLAND & ELLIS LLP
 9        Attorneys for Voyager Digital Holdings, LLC, et al.
10        601 Lexington Avenue
11        New York, NY 10022
12
13   BY:  EVAN SWAGER, ESQ.
14        CHRISTINE OKIKE, ESQ.
15        ALLYSON SMITH, ESQ.
16
17   KIRKLAND & ELLIS LLP
18        Attorney for Voyager Digital Holdings, LLC, et al.
19        300 North LaSalle
20        Chicago, IL 60654
21
22   BY:  MICHAEL SLADE, ESQ.
23
24
25
```

```
                                              Page 11
 1   KILPATRICK TOWNSEND & STOCKTON LLP
 2        Attorney for Ad Hoc Group of Equity Interest Holders
 3        1114 Avenue of the Americas
 4        New York, NY 10036
 5
 6   BY:  DAVID POSNER, ESQ.
 7
 8   KILPATRICK TOWNSEND & STOCKTON LLP
 9        Attorney for Ad Hoc Group of Equity Interest Holders
10        1100 Peachtree Street NE
11        Atlanta, GA 30309
12
13   BY:  PAUL ROSENBLATT, ESQ.
14
15   KILPATRICK TOWNSEND & STOCKTON LLP
16        Attorney for Ad Hoc Group of Equity Interest Holders
17        The Grace Building
18        New York, GA 10036
19
20   BY:  KELLY MOYNIHAN, ESQ.
21
22
23
24
25
```

```
                                              Page 12
 1   OFFICE OF THE U.S. TRUSTEE
 2        Attorney for the United States Trustee
 3        201 Varick Street
 4        New York, NY 10014
 5
 6   BY:  LINDA RIFFKIN, ESQ.
 7
 8   OFFICE OF THE U.S. TRUSTEE
 9        Attorney for the United States Trustee
10        One Bowling Green
11        Suite 534
12        New York, NY 10004
13
14   BY:  RICHARD MORRISSEY, ESQ.
15
16   MCDERMOTT WILL & EMERY
17        Attorneys for Official Committee of Unsecured Creditors
18        of Voyager Digital Holdings, Inc., et al.
19        2501 North Harwood Street
20        Dallas, TX 75201
21
22   BY:  CHARLES COWDEN, ESQ.
23        CHARLES GIBBS, ESQ.
24
25
```

```
                                              Page 13
 1   MCDERMOTT WILL & EMERY
 2        Attorney for Official Committee of Unsecured Creditors
 3        of Voyager Digital Holdings, Inc., et al.
 4        1180 Peachtree Street, NE
 5        Atlanta, GA 30309
 6
 7   BY:  DANIEL SIMON, ESQ.
 8
 9   MCDERMOTT WILL & EMERY
10        Attorneys for Official Committee of Unsecured Creditors
11        One Vanderbilt Avenue
12        New York, NY 10017
13
14   BY:  JOSEPH EVANS, ESQ.
15        DARREN AZMAN, ESQ.
16
17   UNITED STATES ATTORNEY'S OFFICE
18        Attorney for the United States of America
19        86 Chambers Street
20        New York, NY 10007
21
22   BY:  LAWRENCE FOGELMAN, ESQ.
23
24
25
```

A-1273

Page 14

```
 1   VERMONT DEPARTMENT OF FINANCIAL REGULATION
 2        Attorney for Vermont DFR
 3        89 Main Street
 4        Montpelier, VT 05620
 5
 6   BY:  JENNIFER ROOD, ESQ.
 7
 8   NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES
 9        Attorney
10        One State Street
11        New York, NY 10004
12
13   BY:  JASON ST. JOHN, ESQ.
14
15   ALSO APPEARING:
16        TRACY HENDERSHOTT, PRO SE
17        GINA DIRESTA, PRO SE
18        JENNIFER WALL, PRO SE
19        DAN NEWSOM, PRO SE
20        MARSHALL MENDELL, PRO SE
21        LISA PROVINO
22        SETH JONES
23        JON WARREN
24        ANDREW RIZK
25        ARTHUR JONES
```

Page 15

```
 1        LISA DAGNOLI
 2        DAN LAWRENCE
 3        JASON RAZNICK
 4        ANDRES LUCERO
 5        BRAD RAWE
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 16

```
 1              P R O C E E D I N G S
 2        THE COURT:  Please be seated.  All right.  And
 3   we're ready to continue on the Voyager case.
 4        MR. SLADE:  Yes, Your Honor.  Good morning.
 5        THE COURT:  Good morning.
 6        MR. SLADE:  Mike Slade for the Debtors.  I hope
 7   you had a good weekend.  We have a couple of updates for the
 8   Court.  First is that Your Honor had made three requests of
 9   Binance at the beginning of the confirmation hearing.  And
10   Binance has agreed to make the changes for the first two.
11        First, we added language to the plan, clarifying
12   that cryptocurrency that is sent to Binance for customers
13   will always be held in trust by Binance.  So I think what
14   Your Honor had said --
15        THE COURT:  For all time.
16        MR. SLADE:  For all time.  Your Honor wanted to
17   make that clear, and there's additional language now.  This
18   is in the revised plan that was filed at Docket No. 1138 at
19   Article 4(c) on page 31.  And so I think it makes it
20   abundantly clear, and hopefully the Court will agree.
21        Second, Your Honor had asked with respect to the
22   unsupported jurisdictions that Binance give a cash out
23   option to all customers after three months in parallel with
24   the option given to, Your Honor used the example of
25   customers in Ohio, and Binance has agreed to that.  That
```

Page 17

```
 1   appears in language that is in the new plan Article
 2   C(3)(c)(i)(A) on page 23 of the plan.  And so those two
 3   issues should be resolved.
 4        Your Honor had also asked them whether it was
 5   possible to segregate customer data.  That, we were not able
 6   to convince them to change for Binance.  They could explain
 7   this to you whenever Your Honor would like, but it's an
 8   economic issue for them.  One of the things they bought of
 9   the transaction was customer data, which Voyager had the
10   right to sell under Voyager's customer agreement and privacy
11   policy.  So two out of the three changes were made, and the
12   revised plan was filed at Docket No. 1138.  And I would
13   offer that into evidence.
14        THE COURT:  What is the problem on the data
15   transfer?
16        MR. GOLDBERG:  Your Honor, Adam Goldberg of Latham
17   Watkins on behalf of Binance.US.  Thank you for the
18   opportunity to address the Court on this issue.
19        Essentially, Your Honor, the data transfer is from
20   Binance.US's perspective a core economic element to the
21   deal.  This is a retail case, and in the retail world,
22   getting a customer in the door is everything.  And so what
23   this --
24        THE COURT:  Well, I thought what I said the other
25   day was that I didn't mind the transfer of the customers'
```

1   contact information, that it was just the remainder, the

2   customers' bank account, social security number, things like

3   that that would be transferred only after a customer had

4   elected to become a customer of Binance.  So what's wrong

5   with that?

6       MR. GOLDBERG:  So on those issues, that data

7   remains valuable to Binance.US, regardless of whether the

8   customer joins.

9       THE COURT:  How?

10      MR. GOLDBERG:  Well, it can be valuable if the

11   customer ever joins the platform in the future.  As Your

12   Honor is well aware, over the last year we've seen

13   tremendous volatility in the crypto markets.  People can

14   choose to exit the market and maybe come back in the

15   future.  And having that information reduces the cost

16   materially of onboarding a customer by having their KYC

17   information on hand already.

18       On this point, I think, Your Honor, it's important

19   to note that the Voyager privacy policy squarely provides

20   the ability of Voyager to transfer this data in connection

21   with the transaction to sell its assets, expressly including

22   a bankruptcy case.

23       THE COURT:  Is there any reason you want it, other

24   than potentially to make onboarding easier in the future?

25      MR. GOLDBERG:  Your Honor, that's the primary

1   information that's been accumulated here by Voyager.

2       I'm not convinced that just the possibility that

3   some customer will change his mind in the future and elect

4   to become a Binance customer is good enough reason to send

5   everybody's -- all of everybody's sensitive information to

6   Binance, even people who may not want to be Binance

7   customers.

8       MR. GOLDBERG:  Your Honor, I should add Binance

9   provides the ability for any customer to delete their

10   accounts and their data.  If a customer joins the Binance

11   platform and clears their assets out of that account, they

12   can then delete their account and their data on Binance.

13       This goes to the fundamental point, Your Honor,

14   Binance.US wants the opportunity to have customers

15   experience the platform.

16       THE COURT:  If I require the wind down trustee, or

17   it should be the wind down plan administrator.  I'm sorry,

18   the terms have been changing so much that I'm having trouble

19   using the right one.  If I require the plan administrator to

20   keep custody of the customer data, so that if you do have

21   somebody who changes their mind in the future, it can be

22   immediately transferred to you by that customer.  Why

23   doesn't that solve your issue?

24      MR. GOLDBERG:  Well, that requires additional

25   resources on Binance.US's part, as well as materially

1   reason.  It is a valuable data.  It reduces the cost of

2   onboarding.  And it was part of the purchase price

3   agreement, and I think that that is a core part of why the

4   transaction was agreed at this pricing level.

5       I think Mr. Tichner (ph) testified that Binance.US

6   was asked to modify these terms and that this was an

7   economic point that affected the purchase price.  So we

8   would respectfully request that Your Honor approve that part

9   of the transaction as part of the confirmation as a whole if

10   Your Honor is so inclined on the basis of the 97 percent

11   class acceptance of the transaction that evidences the

12   interest of the estate and the will of the majority behind

13   this transaction, Your Honor.

14       THE COURT:  I have to tell you, I'm not entirely

15   convinced.

16      MR. GOLDBERG:  I understand that parties have

17   raised issues with this aspect of the deal.  No one has

18   submitted any law or evidence contrary to the legal position

19   that the -- each --

20       THE COURT:  Well, just because you can do

21   something doesn't mean you should.  Right?  There's got to

22   be a business -- good business reason for it.

23       People, especially these days, are entitled to

24   have concerns about their sensitive financial and personal

25   information, particularly given the nature of the

1   impacting, you know, administrative expenses of the case --

2       THE COURT:  Why does it require additional

3   resources on your part?

4      MR. GOLDBERG:  Well, I think rather than having a

5   bulk data transfer, it would require additional data

6   transfers as and when people elect in the future.  The

7   ability of having that data, and having someone be able to

8   clear their account and trade very quickly is of economic

9   value to Binance.US.  They would not have agreed on this

10   purchase price without these terms.  Mr. Tichner testified

11   to that and that was uncontroverted, Your Honor.

12       THE COURT:  I don't remember him testifying to

13   that specifically.  And I certainly don't have testimony

14   from Binance on that point.  So you're saying customers can

15   elect to erase data and get rid of their accounts, right?

16      MR. GOLDBERG:  Yes.

17      THE COURT:  So why shouldn't a customer have the

18   right to opt out of this data transfer and say that you

19   don't get their information?

20      MR. GOLDBERG:  Well, that's a great question and

21   that goes exactly to the retail nature of this case, is that

22   Binance.US negotiated for the opportunity to have customers

23   experience the platform.  Because it's one thing to say I

24   don't want anything to do with Binance.US, it's another

25   thing to experience the platform and decide after you have

Page 22

1  the opportunity to take a look at it.

2          Getting the customer in the door is the value of

3  this deal, and that's the core fundamental economic

4  proposition.

5          THE COURT:  Nobody is going to be in the door

6  unless they elect and sign Binance's various -- whoever's on

7  the phone, stop talking.  Mute yourself.  I'm having a

8  question with counsel here, please.

9          Customers have to go through other procedures

10  before they -- it's not like they're automatically --

11  without doing anything else, customers of Binance, right?

12          MR. GOLDBERG:  That's right, Your Honor.  The

13  customer has to accept the Binance.US terms.

14          THE COURT:  And if they don't, nothing happens.

15  So I'm still stumped here.  Why shouldn't a customer be

16  allowed to say, I don't want you to have my data?

17          MR. GOLDBERG:  Well, each customer agreed in their

18  contract with Voyager, Your Honor, that Voyager had their

19  data and could sell that data as part of a transaction.

20          THE COURT:  But I already said, just because you

21  legally can do something doesn't mean you should.

22          MR. GOLDBERG:  I understand, Your Honor.  The

23  reason -- the equitable reason that we should do this

24  transaction is because all customers benefit with payment of

25  money into the estate from these terms, and they would not

Page 23

1  have agreed -- Binance.US would not have agreed on these

2  economic terms without acquiring all of this data.

3          THE COURT:  And what if I were to just say that

4  anybody who hasn't become a Binance customer within six

5  months, you're required to delete their data?

6          MR. GOLDBERG:  So I don't know, Your Honor.  I'd

7  have to consult with my client.  I don't think that that

8  would be part of the deal, and I believe that they would

9  seek economic adjustments to the transaction.

10          THE COURT:  All right.  You should talk to your

11  client and find a solution to this because I'm having

12  problems with it.  Okay?

13          MR. GOLDBERG:  Thank you, Your Honor.

14          MR. SLADE:  Thank you, Your Honor.  Again, Mike

15  Slade for the Debtors.

16          As I told you when we last left on Friday night,

17  the Debtors regrouped over the weekend to try to assess what

18  to do in light of the SEC's position.  The other amendments

19  that were made to the plan that was filed yesterday relate

20  to the 1145 exemption.  To the extent --

21          THE COURT:  Do you seriously think that filing a

22  proposed order on Friday that has new injunctive terms is

23  compliance with due process with the procedures for seeking

24  an injunction?

25          MR. SLADE:  I don't perceive us as being --

Page 24

1  seeking new -- a new injunction, Your Honor.

2          THE COURT:  You've added to your proposed order

3  brand new injunctions that would broadly ban the federal and

4  state governments from contending that an of your

5  transactions -- restructuring transactions are illegal or in

6  violation of any state or federal regulation of any kind,

7  and that would ban them from suing any person involved in

8  the transactions to stop them in any way, or to hold them

9  liable in any way.

10          You didn't seek such thing.  In fact, just the

11  opposite of what you sought and what your original order

12  said.  How is that an appropriate way to seek an injunction?

13          MR. SLADE:  I guess that's not our interpretation

14  of what we're seeking.  And if we need to adjust the

15  language, we can.  What the Debtors are trying to do is, you

16  know, create a transaction and once we implement that

17  transaction in good faith, assure that we are not going to

18  be, you know, come after -- after the fact, after Your Honor

19  has approved the transaction.

20          To us, it's aligned with the common exculpation

21  terms that are in, you know, nearly every plan.

22          THE COURT:  Not really.  I don't think I've ever

23  issued an order in connection with plan confirmation that

24  says that if a regulator thinks there's a problem, the

25  regulator can't stop.

Page 25

1          MR. SLADE:  We're not saying that, Your Honor.  If

2  --

3          THE COURT:  Sure, you did.  That's exactly what

4  your proposed order says.

5          MR. SLADE:  So we certainly can work on the

6  language.  What our position is, is that if the SEC were --

7  let's say, as an example, the plan is confirmed, and then

8  two weeks later, Cepheus says we want to block the

9  transaction.  We're not saying that Cepheus doesn't have the

10  power to do that.  They do.  What we're saying is that our

11  efforts to implement the order that Your Honor would approve

12  today, that --

13          THE COURT:  What if two weeks from today, the SEC

14  wants to accuse Binance of being an unregistered

15  broker/dealer and to shut its operations until such time as

16  it files registration?

17          MR. SLADE:  Same thing.

18          THE COURT:  They can do that.

19          MR. SLADE:  They can do that.

20          THE COURT:  It didn't look to me like they could

21  do it from reading your order.

22          MR. SLADE:  Well, what we are trying to accomplish

23  is that -- what we are doing to effectuate the plan, until

24  and unless they change the rules, okay, they can't come back

25  to us and say retroactively, you are violating the rules,

1  even though all you were doing is honoring and trying to

2  effectuate a court order to return cryptocurrency to

3  customers.  That is not -- that is not a fair outcome.

4       THE COURT:  Let me put it differently.  Are you

5  saying that you don't want individuals who are doing what I

6  have given them permission to do, to be subject to

7  penalties?

8       MR. SLADE:  Correct.

9       THE COURT:  So you're not trying to stop anybody

10  from doing what they can -- what their regulatory authority

11  would otherwise permit them to do?

12      MR. SLADE:  Correct.

13      THE COURT:  Simply saying that if I authorized

14  them based on the evidence in front of me, they shouldn't be

15  penalized based on a regulator later saying, by the way, I

16  didn't tell you at the time, but this was wrongful.

17      MR. SLADE:  Correct, Your Honor.  And I'll just --

18  as an example, Your Honor authorized us to start the

19  rebalancing when Your Honor approved the APA a month or so

20  ago.  Then we see in there a filing that they think that

21  might violate the securities laws.  It doesn't make any

22  sense for us to come and propose a plan, and for us to get

23  approved and start implementing it because we want to return

24  cryptocurrency to customers as soon as possible, and then

25  for the regulators to come at us after the fact that said,

1  oh, yeah, remember those super vague rules?  They meant that

2  was illegal.  That is not what's supposed to happen here.

3       THE COURT:  A number of governmental entities

4  who've objected to your language, if all of the language is

5  -- if we change it to clarify, the only thing that it's

6  doing is saying that the people who have done what I have

7  authorized them to do are not liable for having done so, do

8  you have a problem with that?

9       MR. SLADE:  That's fine, Your Honor.

10      THE COURT:  Let me ask -- I assume that the SEC

11  and the other agencies who would object to this language are

12  on the phone, although I haven't looked at the list.  Are

13  they there?

14      MS. RYAN:  Good morning, Your Honor.  This is

15  Abigail Ryan with the State of Texas.  And we did object to

16  the language.  Were changes to clarify that language are

17  fine.  I think that very helpful because we read that

18  language as you did, to be very broad.

19      The only other portions that are objectionable are

20  the references back to paragraph 97 and 99 in the plan, and

21  to the exculpation provision.  I mean, 97 and 99 in the

22  proposed order, and exculpation provision in the plan.

23      That basically guts any type of regulatory

24  enforcement as it excludes us from bringing any type of

25  case.  They're injunction provisions, Your Honor.  And so if

1  we could have those three things removed, our objection to

2  that language would be taken care of.

3       THE COURT:  All right.  We'll get to the

4  exculpation a little later, but I was more focused on the

5  new language that was proposed, and just what it was trying

6  to get at and what the proper scope of it would be.

7       How about the SEC or the Justice Department?  The

8  other people who weighed in on this.  With that

9  clarification, do you have an objection?

10      MS. SCHEUER:  Your Honor, Therese Scheuer from the

11  U.S. Securities and Exchange Commission.

12      Your Honor, I think we would need to see the

13  precise language that the Debtors are proposing.  I would

14  note that, you know, we have objected to confirmation on the

15  plan because there are risks that, you know, the

16  transactions may violate the security (indiscernible -

17  10:25:44).  And to somehow, you know, be enjoining us

18  because -- in the face of our highlighting these regulatory

19  concerns is -- you know, Section 523(a)(19) (indiscernible -

20  10:26:06) prohibits -- excuse me, Your Honor, prohibits the

21  discharge of securities (indiscernible - 10:26:13)

22  violations in individual bankruptcy cases.

23      So I'm just unclear about precisely what the

24  Debtors are seeking with this revised language.

25      THE COURT:  I think what they're saying is -- you

1  know, at this point, the SEC hasn't actually taken a

2  position.  It's sort of indicated to me in what I can only

3  describe as conclusory terms that there might be an issue as

4  to the VGX token.  But I think all the Debtors are saying is

5  that, look, if based on the evidence that I have today, I

6  authorized the Debtors to do certain things, then the people

7  who do what I say that they can do shouldn't be penalized or

8  in hindsight subjected to penalties for allegedly having

9  violated laws and regulations that the applicable regulators

10  haven't stood up in front of me and said affirmatively that

11  they're being violated.  That's just not fair.

12      You know, I understand, and nobody's trying to

13  stop you from making arguments as to whether something's

14  illegal, but if you want to penalize the people who will

15  actually do what they're proposing to do, and that I may

16  authorize them to do, you ought to be speaking up and taking

17  a more affirmative position today and not just showing up

18  later and say, got you.  You know?  We didn't give you any

19  reason to think that what you were doing, you know, was

20  going to be punished, but you know, now we've decided to do

21  so.

22      I mean, that's just -- how is anybody supposed to

23  do anything in the world if they have that hanging over

24  their heads?

25      MS. SCHEUER:  Your Honor, it's not in every case

1  that we raise these kinds of concerns.  The SEC has objected
2  to plan confirmation.  We objected at the disclosure
3  statement phase.  We objected to the motion to approve the
4  sale.  The Debtors here are seeking to immunize themselves
5  and third parties.  And they're -- I mean, the language that
6  they have in now, and I understand, you know, that it's --
7  they may be changing it, but it would allow them to make
8  securities laws and other violations in connection with
9  their restructuring transactions.
10         They're asking Your Honor for permission to
11 violate the securities laws to give them essentially a blank
12 check.  We've raised concerns regarding the sale.  We filed
13 an objection to the sale and disclosure statement.  The
14 parties have been on notice that there are regulatory
15 concerns here and they've proceeded at their own risk.
16         I think that we would have to analyze the -- you
17 know, any revised language (indiscernible - 10:29:10) if we
18 could get comfortable with it.
19         THE COURT:  The parties who are in front of me are
20 entitled to know whether they can proceed or not.  If you
21 want to reserve the right to try to stop them and enjoin
22 what they're doing, if and when you eventually make up your
23 minds about this stuff, then I'm not going to stop you from
24 doing that.
25         But are you seriously telling me that without

1  taking a position on the issue at all, and only telling me
2  what the potential issue might be in a limited sense, that I
3  should leave a sword hanging over the heads of anybody who's
4  going to do this transaction, and tell them that although
5  I'm approving it, by the way, you might get -- you know, be
6  the subject of an enforcement action, and subject to
7  whatever penalties the securities laws might impose on you,
8  that it's okay with me, but, you know, you'd be crazy if you
9  did anything because you have no idea what the government
10 might do.
11         How can a bankruptcy case or any court proceeding
12 function with that kind of suggestion?
13         MS. SCHEUER:  If Your Honor is suggesting language
14 that is (indiscernible - 10:30:37) with 1125(e).
15         THE COURT:  I mean, look, if you want to do it a
16 different way, I'll tell you -- I'll compel you to come
17 forward with your evidence.  And I will hold against you as
18 a matter of collateral estoppel and res judicata if you
19 don't come forward with it.  Okay?
20         So there's no way that I'm going to approve a
21 transaction that essentially says to the business people
22 involved here, go ahead.  Go forth.  Subject yourself to
23 penalties.  Okay?
24         I'm trying to leave you the ability to do what
25 your regulatory authority compels you to do, but just in a

1  way that doesn't, in hindsight, come back and unfairly
2  punish the people who may do what I authorized them to do.
3  If that's not good enough for you, then we'll have a full-
4  blown litigation today about whether this is legal or not,
5  and I'll make findings on it today.  And they will bind you.
6         And I cannot imagine that you want that.  Okay?
7         So all the Debtors are suggesting is that when we
8  have no clear contention that anything is in violation of
9  law, quite the opposite.  We have the regulatory agencies
10 sort of -- practically deliberately avoiding taking a
11 position on the issue.  That when I authorize it to go
12 forward and, in fact, order that it go forward by my
13 approval, that those people who are doing what I have
14 authorized are not subject to penalties or liabilities for
15 having done so.  That's standard exculpation that I've done
16 in a lot of bankruptcy cases.
17         So I would hope you would agree to that because
18 the alternative is we just have to open up the hearing.
19 Because the one thing I'm not going to do is basically say,
20 go forward, but take your chances.  That's not fair.  It's
21 absolutely not fair.  I don't know anybody in this case who
22 would or should go forward with that kind of risk hanging
23 over their heads.
24         So the language that I've approved in other cases,
25 I don't have it memorized, but in the Aegean (ph) case, I

1  said that parties were exculpated from liability for
2  entering into and performing under agreements and
3  transactions that have been approved by the Court.  Okay?
4         And I think all the Debtors are saying is, you
5  know, it's just like personal liability of the people
6  involved.  We're not trying to stop you from saying that as
7  a regulatory matter, something should be stopped.  It's just
8  if you come in later and say, you know, we didn't tell you
9  at the time, but that was illegal and you're subject to this
10 fine and penalty.  That's what it's meant to focus on.
11         MR. SLADE:  Your Honor, the language we were
12 looking at over the weekend was from Aegean and also from
13 the Fairway case that Honor had.
14         THE COURT:  Mr. Morrissey?
15         MR. MORRISSEY:  Your Honor, very quickly.  Richard
16 Morrissey for the U.S. Trustee.  Good morning, Your Honor.
17         I just -- just for a point of clarification
18 regarding what Your Honor just said, coupled with what Your
19 Honor said a few moments ago about when we're going to deal
20 with the exculpation issues in general, I'm perfectly
21 prepared to wait for that.
22         But one of the issues we had was who generally is
23 covered by the exculpation provision, not just what actions
24 are covered.  And I can defer that, but one of the issues we
25 have is that the distribution agent is included in the

Page 34

1  exculpation provision.  As a matter of fact, something was

2  just added to Article 6 of the plan, stating that rather

3  specifically, and I just didn't know when Your Honor wanted

4  to deal with that issue.  But I'd be happy to wait if that's

5  Your Honor's preference.

6         THE COURT:  Let's wait.

7         MR. MORRISSEY:  Thank you.

8         THE COURT:  All right.  Does the SEC need time to

9  --

10        MR. BARNEA:  Good morning, Your Honor.  I'm sorry.

11  Can you hear me over the telephone?

12        THE COURT:  Who's speaking?

13        MR. BARNEA:  This is J.B. Barnea from the U.S.

14  Attorney's Office.  We filed a limited objection to the last

15  proposed approval order last week, and then we saw the

16  revised language last night.  If it would be possible for

17  the government to be heard as well.

18        THE COURT:  Yes.

19        MR. BARNEA:  So our concerns are somewhat

20  different, although overlapping with those of the other

21  governmental entities that Your Honor just heard from.  We

22  cannot agree to an order that broadly immunizes all

23  participants, including non-debtors, from all possible

24  liabilities to all possible government authorities in

25  connection with implementing, you know, a variety of

Page 35

1  transactions.

2        Transactions may incur taxable income.  They would

3  then have to be responsible for those texts -- for the

4  resulting payment of tax.  And if there's a disagreement,

5  the IRS has to be free to go after them.  People might

6  commit fraud in some ways, civil or criminal, in engaging in

7  transactions.  The government has to be free to pursue that

8  fraud.  People may violate all -- any number of rules or

9  regulations.  We understand that the Court is prepared to

10  approve a transaction.  It seems that way.  And that's fine.

11        And in the event that --

12        THE COURT:  Nobody is trying to deal with any of

13  those things.  Here's the issue.  Under Section 1142(a) of

14  the Bankruptcy Code, the Debtor and any entity organized or

15  to be organized for the purpose of carrying out a plan,

16  shall carry out the plan.  Okay?

17        There is an affirmative statutory obligation once

18  I confirm a plan for the plan to be carried out.  Now,

19  nobody has been willing to come forward and to actually have

20  a litigation in front of me today on the question of whether

21  anything that the plan would require the Debtor or the

22  winddown Debtor to do is actually illegal.

23        And if I confirm the plan, those people will have

24  a positive obligation under the Bankruptcy Code to do what

25  the plan contemplates.  So for anybody to suggest that they

Page 36

1  should both have a positive obligation to do those things,

2  and be subject to punishment under different statutes for

3  doing exactly what they are obligated by my order and the

4  Bankruptcy Code to do, makes no sense.  Okay?

5        So if somebody thinks that what the individuals,

6  what the Debtors are going to be doing is illegal, they

7  should be speaking up.  Okay?  We are not going to bar

8  people from enjoining things.  All we're saying is that

9  people shouldn't be subject to punishments.

10        If the SEC wants to step in and say Binance should

11  not be allowed to go forward because it's operating as an

12  unregistered dealer, I don't think anybody is stopping them.

13  If the SEC wants to try to enjoin the distribution of VGX, I

14  don't think we're trying to -- well, maybe we're trying to

15  stop that, depending on the 1145 issue that I haven't heard

16  yet.  But not by this language we're not.

17        All we're saying is in the context of exculpation,

18  you know, that there are people here who are going to be

19  ordered by me to do these things when I confirm the plan.

20  And that should carry with it an exemption from legal

21  liability for doing what they are, in effect, ordering them to

22  do.  Unless you want to step forward and tell me why I

23  shouldn't order them to do it.  And so far, nobody's been

24  willing to do that.

25        Telling me people on notice.  First of all,

Page 37

1  nobody's on notice of anything here.  I have a hard time

2  understanding just what basis it is for the limited things

3  that you told me the other day.  And I certainly, if I were

4  one of the individuals who had an obligation to carry out

5  this plan, I wouldn't feel very comfortable that I knew

6  exactly what risks I was taking.

7        MR. BARNEA:  Your Honor, the government -- putting

8  aside -- the parts of the government that

9  I represent right now, as opposed to the SEC or any other

10  office that may be separately represented in this case,

11  don't have any current sense that any specific transaction

12  is itself illegal.  But that does not mean that someone may

13  not in executing those transactions violate some rule or

14  regulation, or incur a tax liability, or do something else

15  that may expose them to some kind of liability to the

16  government.  And that is --

17        THE COURT:  That's fine.

18        MR. BARNEA:  -- what we are trying to protect

19  against.

20        THE COURT:  They may vary from what they're

21  compelled to do under the plan, and may engage in who knows

22  what the mind can invent that might go wrong.  And nobody's

23  trying to say that people are freed from that.  They may

24  commit tax fraud.  They may lie.  They may do all kinds of

25  things, but the question is, you know, if I'm approving a

1    plan that authorizes a distribution to VGX, a pointed

2    example, and by my confirmation of that plan, the Debtors

3    are under a statutory obligation to distribute VGX in the

4    way that the plan contemplates.

5           For somebody to come in and say, you people who

6    did that are subject to fines under the securities laws,

7    even though you had no choice once I ordered it, would be

8    rather absurd, wouldn't it?

9           MR. BARNEA:  Well, to the extend that the Court is

10   providing exculpation as allowed under 1125(e), I think

11   that's uncontroversial.  If the question is if the Court is

12   going beyond that, that is a separate question.

13          THE COURT:  Well, I already issued a decision in

14   Aegean about what I think about exculpation, and that I

15   think that I do have the power, and it is absolutely

16   appropriate for me to say that if people engage in

17   transactions that I approve, after notice and a hearing,

18   they shouldn't be liable for having done so.  That makes

19   perfect sense to me.

20          Otherwise, I'm in effect having a meaningless

21   confirmation hearing, and leaving you with a regulatory veto

22   of what I'm doing.  And you may have veto to the extent --

23          MR. BARNEA:  Well, another way to put it is Your

24   Honor is authorizing parties to do something and they are --

25   those actions are subject to the normal rules and laws that

1    all actions in the world are subject to.

2           THE COURT:  But you didn't listen to what I said.

3    When I confirm a plan, I'm not just giving somebody an

4    option.  I'm not telling them that it's okay with me, and

5    they just take their chances.  Under the statute, once I

6    confirm the plan, there is an affirmative obligation to do

7    what the plan contemplates.  It's not an option.  Okay?

8           The people who are involved here are required to

9    go forward.  So it's not like I'm saying, well, it's okay

10   with me if you want to take that risk.  That's not what it

11   -- that's not what confirmation amounts to.

12          MR. BARNEA:  I understand Your Honor's position.

13   The government respectfully disagrees, and we would like to

14   see any final language to which we may well still have

15   objections before this matter is resolved.

16          THE COURT:  You can certainly see final language,

17   and I'll ask the Debtors to dig out from the Aegean case,

18   and try to propose some language that's more consistent with

19   that.

20          What about this 1145 issue?  You know, I don't

21   really have any indication at the moment of who is contended

22   to be the issuer of any cryptocurrency that might constitute

23   a security.  There was a reference to VGX, and my guess

24   would be that the contention would be that Voyager was the

25   issuer or is the issuer of VGX.  But I don't -- haven't

1    heard any contention that Voyager is the issuer of Bitcoin,

2    for example, which would -- and I have -- while I won't

3    contend that I understand all of the arguments about the

4    commodity and securities laws here, I would have trouble

5    understanding an argument that Voyager was the issuer.

6           So you've proposed that I find that everything is

7    exempt under 1145.  But under 1145, to the extent that the

8    plan includes the offer or sale of a security of an issuer

9    other than the Debtor, that there's an exemption only if the

10   issuer of such security is required to file reports under

11   Section 13 or 15(d) of the Securities Exchange Act of 1934.

12   And in -- okay.  I -- just I'll stop right there.

13          You're not prepared to tell me that you have

14   identified an issuer of all of these cryptocurrencies and to

15   show that they are in compliance with that provision so that

16   1145 applies to them, are you?

17          MR. SLADE:  We included the language because the

18   SEC had said that VGX may be a security, and to the extent

19   they ultimately come to that conclusion, it would be likely

20   that Voyager was the issuer.  So that's what we were talking

21   about when we included the 1145 language.

22          THE COURT:  Yeah, but the language you've proposed

23   said all of your transactions, all of your cryptocurrency

24   transfers are exempt under Section 1145.  Nice try, but I

25   mean, you plainly can't satisfy that requirement, can you?

1           MR. SLADE:  We understand Your Honor's point.  We

2    were talking about VGX.  Who knows what the SEC is going to

3    say tomorrow.

4           THE COURT:  All right.  So you want to say that to

5    the extent that VGX is intended to be a security issued by

6    the Debtor, that it's subject to 1145?  I don't know.  Maybe

7    they have some theory that it's a security issued by

8    somebody else.

9           MR. SLADE:  I don't know what their theory is.

10   They won't tell us.

11          THE COURT:  But I can't apply 1145 if it's their

12   -- that's their theory, because you can't show me that the

13   issuer, if it's somebody else, just complied with those

14   other requirements.  Right?

15          MR. SLADE:  Well, I'm not sure if I can or can't,

16   to be honest.  I would have to check with other folks that

17   know more about the token than me.

18          THE COURT:  If the issuer were somebody other than

19   Voyager, you'd have to show me that the issuer had filed --

20   had been required to file the reports under Section 13 or

21   15(d) of the Securities Exchange Act of 1934.  How would you

22   do that?

23          MR. SLADE:  I don't know.

24          THE COURT:  Yeah.  So to the extent you say that

25   Voyager is the issuer of VGX, you're asking for the

Page 42

1    application of 1145.

2         MR. SLADE:  Correct.

3         THE COURT:  And I saw the SEC's supplemental

4    objection, where they say that you just haven't made the

5    showings that you need to, and I think to the extent that,

6    as I have said, the extent that you wanted to seek the

7    application of 1145 to every cryptocurrency that you are

8    transferring, I think the SEC is entirely right.  You

9    haven't and I don't think can make such showings.

10        But as to VGX, is there an -- what's the objection

11   as to the application of 1145?

12        MS. SCHEUER:  Your Honor, Therese Scheuer for the

13   Securities and Exchange Commission.

14        THE COURT:  Yeah.

15        MS. SCHEUER:  Your Honor, I will just begin by

16   noting that these provisions were added to the plan and

17   confirmation order overnight.  We had conjured and knew the

18   Debtors arguments, to the extent they have any, with respect

19   to VGX, and to discuss with other divisions, including the

20   Division of Corporation Finance.  It is their role to review

21   these types of transactions.

22        If it's acceptable to the Court, we would request

23   permission to make a written submission following argument

24   on these issues, and any specific questions that Your Honor

25   may have regarding 1145.

Page 43

1         THE COURT:  Well, I raised the 1145 issue, and I'm

2    not sure I -- I'm not sure it's something that the Debtors

3    have to affirmatively invoke in their plan, is it?

4         MS. SCHEUER:  Well, Your Honor, the Debtors have

5    the legal burden of demonstrating that 1145 of the Code or

6    4(a)(2) are available exemptions for them.  And they've

7    provided no argument.

8         I am prepared to, you know, go forward with an

9    argument today, but I think as -- you know, to the extent

10   Your Honor has an additional specific question --

11        THE COURT:  Well, I think the Debtor's initial

12   position is probably that VGX is not a security.  So that's

13   probably why they didn't mention 1145.  And I think what

14   they're saying is, hey, if you think otherwise, and this is

15   the question I had for you the other day, if you think

16   otherwise, the SEC, why wouldn't Section 1145(a) be

17   applicable?

18        And you're in the same boat you were the other

19   day, where you keep telling me it's the Debtor's burden.

20   It's the Debtor's burden.  What is it that you think the

21   Debtor needs to prove that the Debtor hasn't shown in that

22   case?

23        If VGX is a security issued by the Debtor, what

24   more do you think the Debtor needs to show to me in order to

25   be entitled to Section 1145 as to the distribution of VGX

Page 44

1    under the terms of the plan?

2         MS. SCHEUER:  Your Honor, (indiscernible -

3    10:50:23) that 1145 is not available for the proposed

4    transaction because the crypto assets, including VGX, being

5    purchased and sold were not in exchange for claims.  In the

6    rebalancing exercise, (indiscernible - 10:50:39)

7    distribution of securities for which there is no Securities

8    Act exemption.

9         For VGX, the rebalancing exercise appears to

10   involve within market purchases and sales that are not in

11   exchange for claims against the Debtor.

12        THE COURT:  But when the --

13        MS. SCHEUER:  So there's --

14        THE COURT:  When the Debtors turn over VGX to

15   Binance for credit to customers' accounts, how is that not a

16   distribution on a claim?

17        MS. SCHEUER:  Your Honor, I don't think you can

18   separate out that piece of the distribution from how it got

19   there.  And it got there through the rebalancing transaction

20   or the rebalancing exercise.

21        THE COURT:  Well, the Debtor have held VGX for a

22   long time.  Right?  I suspect that if the Debtors have done

23   anything, they've probably reduced how much VGX -- I don't

24   -- I have no idea what -- how the rebalancing worked.  But

25   let's just focus on that, you know, to leave aside the

Page 45

1    rebalancing.  Let's just focus on the distributions.  Okay?

2         When the Debtors --

3         MS. SCHEUER:  Your Honor --

4         THE COURT:  -- deliver things to Binance --

5         MS. SCHEUER:  I don't think the Debtor --

6         THE COURT:  Obviously, when the --

7         MS. SCHEUER:  I don't think the Debtors were --

8         THE COURT:  Obviously, when the Debtors give VGX

9    to Binance for credit to customer accounts, that is a

10   distribution on a claim.

11        MS. SCHEUER:  My understanding, Your Honor, is

12   that VGX is subject to the rebalancing exercise.  It is not

13   -- the Debtors aren't engaging in a rebalancing of VGX.

14        THE COURT:  But when the Debtors take the VGX that

15   they have and give it to Binance for credit to a customer's

16   account, that act is plainly in distribution on a claim,

17   isn't it?

18        MS. SCHEUER:  Your Honor, I don't think that you

19   can separate that fact out from how it got there.  And it

20   got there through the rebalancing transaction -- the

21   rebalancing exercise.

22        THE COURT:  So you're saying -- I understand that

23   you're saying that the rebalancing may have been

24   unauthorized transactions in securities.  And I'm -- I

25   understand that you don't want to give up that argument, but

1  I'm trying to focus on, you know, they are different things,

2  whether you complained about how the Debtors got them or

3  not.

4          When the Debtor has turned VGX over to customers,

5  as the plan contemplates, that plainly is a distribution on

6  a claim, right?

7          MS. SCHEUER:  Again, Your Honor -- I understand

8  Your Honor's position, but I don't think that you can --

9  (indiscernible - 10:53:35) position is that you cannot

10  separate the transaction out into those pieces.  You have to

11  look at how VGX got there.

12          And as part of the rebalancing, you know, it

13  appears that Voyager is conducting a distribution of VGX to

14  Binance or any other party that's acting as a broker of

15  trades on behalf of Voyager in the rebalancing exercise.

16          Neither 1145 nor any exemption for that matter,

17  including 4(a)(2) is available for Debtors that are

18  conducting distributions.  Nor is it available for

19  underwriters involved in such distribution.

20          THE COURT:  Who is the underwriter here?

21          MS. SCHEUER:  Potentially Binance.

22          THE COURT:  How is Binance an underwriter here?

23          MS. SCHEUER:  It could potentially be Binance or

24  any other party acting as a broker of trade on behalf of

25  Binance -- or Voyager in the rebalancing exercise.

1          THE COURT:  Is that --

2          MS. SCHEUER:  And if Your Honor would like further

3  detail on that, we would request permission to submit a

4  written submission.

5          THE COURT:  Do you think any broker is an

6  underwriter?

7          MS. SCHEUER:  In the rebalancing transaction,

8  Binance or potentially any other party acting as a broker of

9  trades on behalf of Voyager in that transaction may be

10  acting as an underwriter.

11          MR. SLADE:  Your Honor, briefly.  Just to respond

12  to the SEC's request for more time, I mean we provided them

13  all the information they requested about VGX in 2021.  Since

14  the bankruptcy, we have responded to numerous information

15  requests from the SEC.  I was on weekly calls with the SEC

16  to make sure we were satisfying their information --

17          THE COURT:  You didn't ask for a specific 1145

18  finding until you -- until after I raised the issue on

19  Thursday, and then you mentioned that you might on Friday

20  night.  And then you did over the weekend.

21          MR. SLADE:  Well, the SEC didn't tell us that they

22  even thought anything might be a security until Friday

23  afternoon, after refusing to take a position the day before.

24  So --

25          THE COURT:  But I'm not going to rule without

1  giving them a chance to be heard.  I'm not going to give

2  them a long time to be heard because they have had some

3  notice.  But if they want to make a submission, I'm going to

4  let them make it.  And we're going to have to fix our timing

5  here, because either that or you drop your request as to the

6  VGX finding, because they're entitled to let me know what

7  their position is.

8          MR. SLADE:  Okay.  We also have a milestone for

9  today that Binance has not --

10          THE COURT:  That's what I'm saying.  You better

11  change it or you better drop the VGX, because we're not

12  going to do both.  I'm not going to overrule the SEC's

13  objection without letting them be heard, and do all that

14  today just to meet your milestone.  The issue has come up

15  too late.

16          So I will require them to make a submission.  I'll

17  require it by tomorrow.  I'll rule promptly.  But you're

18  going to have to get relief from your milestone.  I'm not

19  going to let your milestone be used to squeeze a party on an

20  issue that only came up effectively for sure over the

21  weekend.  Okay?

22          MR. SLADE:  The other thing I want --

23          THE COURT:  I think it was reversible error for me

24  to do so, which wouldn't serve any of your purposes.

25          MR. SLADE:  I'm not sure about that, but I

1  understand Your Honor's point.  The one other thing I just

2  wanted to make sure that there was no ambiguity about,

3  pursuant to Your Honor's order that you entered, approving

4  our entry into the APA, the Debtors have been doing the

5  rebalancing.  We have been selling VGX.  And so I didn't

6  want Your Honor to be under any other impression, because

7  that has been happening, as Your Honor authorized us to do.

8          THE COURT:  I understand that.  No, I do

9  understand that.

10          MR. SLADE:  Okay.

11          THE COURT:  Right.

12          MR. SLADE:  I was actually just standing up to

13  complete the evidentiary record, and I was going to hand the

14  podium to my colleague to do argument.  So I guess, Your

15  Honor, I would offer the revised plan that was filed, which

16  was Docket 1138.  And we did file a supplemental declaration

17  from Mr. Renzi to explain that as Docket No. 1139.  And I

18  would offer those.  And Mr. Renzi is here.

19          THE COURT:  But I didn't see any supporting facts

20  in Mr. Renzi's declaration.  It was just the explanation of

21  why you're seeking it.

22          MR. SLADE:  Supporting facts for?

23          THE COURT:  For anything.  Whether VGX is a

24  security, whether you're the issuer, whether it's proper to

25  issue relief as to anything other than VGX.  All I see is a

Page 50

1  statement that -- an explanation that you're trying to
2  modify your plan, and that an argument is still -- it's not
3  really a declaration with any facts.  It's not testimony.
4  It's an argument.
5      MR. SLADE:  Okay.  Mr. Renzi did discuss in the
6  declaration why we were making the change, what the change
7  was, and the fact that the Debtors don't believe VGX is a
8  security, and that we have an opinion letter from a
9  nationally recognized law firm supporting that view.  I
10 mean, those are certainly facts.
11     THE COURT:  Are you preparing to offer that
12 opinion letter into evidence?
13     MR. SLADE:  I'm not.  I don't have authority to do
14 that.
15     THE COURT:  Well, then telling me there's an
16 opinion letter is just hearsay.
17     MS. SLADE:  Not to the extent that it's offered to
18 show that the Debtors are relying on that fact to take a
19 position.
20     THE COURT:  What -- why do I care what they're
21 relying on to take a position?  What does that tell me?
22     MR. SLADE:  I think it explains why the Debtors
23 are making this proposal in the plan.
24     THE COURT:  I don't think I need any further
25 explanation.  I know why you're seeking the approval, right?

Page 51

1  It's pretty obvious why you're seeking it.  It's a question
2  of whether you're entitled to it.
3      MR. SLADE:  Okay.  I guess I'm -- where would Your
4  Honor propose to go from here?  I'm not sure.
5      THE COURT:  Well, if you want the -- first of all,
6  I'm not going to give you a ruling on anything other than
7  VGX.  And I'm not going to give you a ruling on anything
8  other than VGX insofar as you allegedly are the issuer of
9  VGX.  As to whether I give you a ruling on that, I'm going
10 to let the SEC make a submission by no later than tomorrow
11 morning.  And I will review it and consider it, and we
12 either get relief from your milestone as to the entry of a
13 confirmation order, or you'll have to drop the 1145 issue as
14 to VGX.  I can't do both.
15     MR. SLADE:  Okay.  Can we take a recess and talk
16 about that, Your Honor?
17     THE COURT:  Yeah.  We'll take ten minutes.
18     (Recessed at 11:01 a.m.; reconvened at 11:16 a.m.)
19     THE COURT:  Please be seated.  Yes?
20     MR. SLADE:  Thank you, Your Honor, we appreciate
21 the opportunity to discuss it and, you know, collectively,
22 we've come to the conclusion that as long as we get the
23 exculpation in the form that the Court has approved in
24 previous cases and we get confirmation that it's going to
25 apply to the rebalancing that has taken place pursuant to

Page 52

1  the Court's order, that we won't need the 1145 exception,
2  and so we would be prepared to remove it.
3      And so what I would propose is we just proceed to
4  arguments on the confirmation issues under the premise that
5  we are going to proceed with the plan that does not include
6  the 1145 exception.
7      THE COURT:  Okay.
8      MR. SLADE:  And I would cede the podium to Ms.
9  Okike to do that.
10     MS. OKIKE:  Good morning, Your Honor.
11     THE COURT:  By the way, let me -- the debtors have
12 closed their case, is there any other party that has
13 evidence they wish to offer?
14     (No verbal response)
15     THE COURT:  Okay, I'll consider the evidentiary
16 record closed then.
17     MS. OKIKE:  Good morning, Your Honor, Christine
18 Okike of Kirkland & Ellis on behalf of the debtors.
19     Your Honor, in terms of argument, I would propose
20 to address each of the issues raised by the objectors,
21 followed by opportunity for the committee and the purchaser
22 to weigh in, if they so choose, followed by each of the
23 objectors, just in terms of proceeding in a way that makes
24 sense.  Does that work for Your Honor?
25     THE COURT:  I think so, but it may make sense to

Page 53

1  take issue by issue rather than kind of have you run through
2  your position on all --
3      MS. OKIKE:  Yes, correct --
4      THE COURT:  -- 20 issues.
5      MS. OKIKE:  -- that's what I was proposing.
6      THE COURT:  Okay, good.
7      MS. OKIKE:  So, Your Honor, I'm going to start
8  with feasibility.  A number of the objections go to the
9  feasibility of the plan.
10     We believe the plan is feasible.  It provides for
11 either the sale transaction or the liquidation transaction,
12 as applicable, as determined by the debtors to be in the
13 best interests of their estates.
14     Your Honor, with respect to the sale transaction,
15 a number of the objectors question Binance.US's financial
16 wherewithal and the security of the crypto to be transferred
17 to Binance.US.
18     Your Honor, based on our due diligence and
19 representations made by Binance.US, as highlighted in Mr.
20 Tischner's testimony, we believe that Binance.US has the
21 financial wherewithal to close the sale transaction.
22     Under the sale transaction, Binance.US would not
23 be required to pay the debtors the value of the
24 cryptocurrency on the Voyager platform to consummate the
25 transaction; rather, Binance.US will only be obligated to

1  pay up to 35 million in consideration to the debtors.  We
2  have performed due diligence on Binance.US and Binance.US's
3  financials show that it has ample cash on hand to pay the
4  debtors up to 35 million in cash.
5          In addition, the risk of a run on the bank, which
6  has befallen some of the other companies in the industry, is
7  minimized by what we understand to be Binance.US's business
8  model.  Our understanding, based on sworn statements by
9  Binance.US, is that Binance.US maintains a hundred percent
10  reserves for all of its customers' digital assets.  That
11  means that if a customer has deposited one bitcoin with
12  Binance.US, Binance.US holds one bitcoin on account of such
13  customer.  And, importantly, Your Honor, our understanding
14  is that Binance.US does not engage in any lending.
15          Based on what we know, even if all of Binance.US's
16  customers withdrew all of their assets, Binance.US would
17  still have the financial wherewithal to consummate the
18  proposed transaction.
19          Although the debtors will transfer substantially
20  all of the cryptocurrency on the debtors' platform to
21  Binance.US, assuming the vast majority of customers
22  onboard onto their platform, Binance.US is essentially
23  serving as a distribution agent of that cryptocurrency to
24  accountholders in accordance with the plan.
25          Your Honor, the objectors also question the

1  security of the crypto to be distributed to customers once
2  transferred to the Binance.US platform.  Your Honor, based
3  on our due diligence and sworn statements made by Binance.US
4  to the debtors, we understand that Binance.US holds digital
5  assets of its customers solely in a custodial capacity and
6  on a one-to-one reserve basis.  Binance.US segregates
7  customer assets from Binance.US's digital assets on its
8  general ledger.  Only employees of Binance.US are able to
9  move customer assets from the platform.  Binance.US does not
10  lend or re-hypothecate customer assets.
11          Binance.US has the technical expertise, required
12  licenses, other than in the unsupported jurisdictions, and
13  existing infrastructure to perform its obligations under the
14  asset purchase agreement, including with respect to the
15  onboarding and making distributions to customers.
16          Binance.US maintains information security
17  protocols, policies, procedures, and standards consistent
18  with leading industry standards, which are reviewed by
19  multiple independent auditors and which Binance.US believes
20  are adequate to ensure the safeguarding of customer assets
21  and customer personally-identifiable information.
22          Your Honor, notwithstanding Binance.US's
23  representations, we believe the structure of the sale
24  transaction is designed to minimize risk, which also goes to
25  feasibility.  These protections include, first, all of the

1  debtors' cryptocurrency will not transfer to Binance.US at
2  closing; rather, cryptocurrency and cash will be transferred
3  to Binance.US following closing on a weekly basis as
4  accountholders and OpCo general unsecured creditors complete
5  Binance.US's onboarding requirements.
6          Second, Binance.US has to make any cryptocurrency
7  and cash transferred to it by the debtors available to those
8  accountholders and holders of OpCo general unsecured claims
9  that have completed the onboarding requirements within five
10  business days of receipt, and to use commercially-reasonable
11  efforts to do it in 48 hours following receipt.
12          Third, accountholders and holders of OpCo general
13  unsecured claims will retain all right, title, and interest
14  in the distributions made to them on the Binance.US
15  platform.
16          Fourth, cryptocurrency will be held by Binance.US
17  solely in a custodial capacity in trust for the benefit of
18  accountholders with no time limitation.
19          Fifth, cash transferred to Binance.US for further
20  distribution to accountholders or OpCo general unsecured
21  creditors will at all times until transferred to such
22  creditor be held solely in a third party bank account of an
23  FDIC-insured financial institution solely for the benefit of
24  such creditors.
25          Sixth, Binance.US will not pledge, re-pledge,

1  hypothecate, re-hypothecate, invest, sell, lend, stake,
2  transfer, or use any of the cryptocurrency to be distributed
3  to accountholders for any period of time and without
4  retaining a like amount of cryptocurrency, except as may
5  otherwise be directed by such creditors.
6          Your Honor, the debtors believe these protections
7  significantly reduce the risks associated with the sale
8  transaction and the transfer of cryptocurrency to Binance.US
9  to facilitate distributions to creditors.
10          Your Honor, you may be wondering why we are still
11  considering the sale transaction given the numerous rumors
12  regarding Binance.US and, Your Honor, the simple answer is
13  that the sale transaction maximises the value of the
14  debtors' estates.
15          As Mr. Tischner testified, based on our estimates,
16  the sale transaction will provide over a hundred million of
17  value compared to the liquidation transaction due to, among
18  other things, the costs of restarting the platform and
19  liquidating 20 percent of the unsupported tokens that cannot
20  be withdrawn in kind.  Your Honor, the debtors believe --
21          THE COURT:  What happens under the -- remind me,
22  under the Binance deal, what happens if I confirm it and
23  before closing the SEC gets an injunction against Binance
24  doing business?
25          MS. OKIKE:  Your Honor, at that point, we would

Page 58

1 proceed with the liquidation transaction.

2     THE COURT: What happens with your Binance deal,

3 is it terminated? Who has what obligation to whom?

4     MS. OKIKE: I would have to look at the specific

5 termination provisions. We do have a fiduciary out, so we

6 can always exercise that, but there are certain regulatory

7 actions which allow us to terminate the agreement without

8 exercising the fiduciary out.

9     THE COURT: And, if that happens, does one party

10 owe any money to the other for termination, for expenses,

11 for forfeiting of deposits, any of that kind of thing?

12     MS. OKIKE: It's very fact specific, Your Honor.

13 There are certain circumstances -- if we were to exercise

14 the fiduciary out in the absence of a purchase or a default,

15 it's likely that their expense reimbursement would be

16 triggered, but if there's a regulatory action, there's -- a

17 lot of those provisions were explicitly included in the APA

18 as to not trigger the expense reimbursement.

19     THE COURT: Okay. And are there circumstances

20 where Binance would give up a deposit or anything like that?

21     MS. OKIKE: Yes, Your Honor.

22     (Pause)

23     MS. OKIKE: So, Your Honor, with respect to the

24 good faith deposit, if Binance were to terminate the APA, in

25 the absence of a seller breach, we would be entitled to

Page 59

1 good faith deposit.

2     THE COURT: Okay. Okay, please go forward.

3     MS. OKIKE: So, Your Honor, we believe that the

4 sale transaction, to the extent that it can be consummated

5 and is in the best interests of the estates, is the most

6 value-maximizing option available to the debtors today, but

7 we recognize that this is a volatile industry and

8 circumstances change every day and, for that reason, we

9 included a toggle to the liquidation transaction whereby the

10 debtors would distribute cryptocurrency and cash to

11 creditors on their own if the debtors determine in their

12 business judgment now and closing that the sale

13 transaction is no longer the highest or otherwise best

14 option.

15     So, Your Honor, we believe that the plan is

16 feasible whether we move forward with the sale transaction

17 or the liquidation transactions.

18     THE COURT: Okay.

19     MS. OKIKE: Would you like to hear from other

20 parties on feasibility before --

21     THE COURT: Yes. I think the SEC is the primary

22 objector who raised the feasibility; do they wish to be

23 heard?

24     (Pause)

25     THE COURT: Is the SEC on the phone?

Page 60

1     MS. SCHEUER: Yes, Your Honor. My apologies, my

2 phone was muted. Therese Scheuer for the Securities and

3 Exchange Commission. And, Your Honor, I should have said it

4 earlier, but thank you for allowing us to participate in the

5 hearing today telephonically.

6     Your Honor, there's a lot -- going to some of the

7 points that Ms. Okike raised, there's a lack of credible

8 evidence demonstrating that customer assets are secure on

9 the Binance platform. No one from Binance testified and the

10 only evidence submitted about Binance are declarations and

11 testimony from Voyager's professionals.

12     Mr. Tischner admitted that his team doesn't have

13 expertise regarding the safety of crypto assets or security

14 protocols. He also testified that the debtors haven't hired

15 any expert to assist it in the review of the representations

16 made by purchaser.

17     Given the specific circumstances of this case,

18 Your Honor, that's concerning. And, as Your Honor has

19 observed, most of the assurances about the safety of assets

20 are based on hearsay. There were apparently some third

21 party reviews of the buyer's security protocols, but the

22 debtors haven't offered an adequate description or details

23 about those reports of evidence. Although there is an

24 officer certificate filed from Binance, it was not admitted

25 for evidentiary purposes and there was no opportunity for

Page 61

1 cross-examination of the declarant --

2     THE COURT: What provision of --

3     MS. SCHEUER: -- and the debtor's professional --

4     THE COURT: -- Section 1129 of the Bankruptcy Code

5 are you invoking and do you think wasn't complied with by

6 not having a Binance witness testify or by not having an

7 outside security consultant look at the security protocols?

8 Just what is it about that that you think means that I

9 shouldn't confirm the plan or can't confirm the plan?

10     MS. SCHEUER: Your Honor, we acknowledge that this

11 is a liquidating debtor. The debtor is transferring its

12 assets and its customers to a buyer and I think making it,

13 for practical purposes, a successor, as discussed at the

14 last hearing, the staff believes Binance.US is operating an

15 unregistered securities exchange in the United States.

16 Binance.US and those seeking to trade on Binance.US may be

17 impacted by ongoing regulatory investigations, as previously

18 discussed with the Court. Given these issues, it could be

19 faced with highly challenging legal and practical issues,

20 and Your Honor is well aware of what effect a business

21 failure can have on a crypto platform.

22     THE COURT: But, you know, it doesn't sound like

23 there's a specific Code provision that you can point to that

24 suggests that I needed to actually have Binance testify

25 about its security protocols, for example, or that the

Page 62

1  debtors needed to have an independent expert.  You're kind
2  of picking away at what the debtors did in due diligence to
3  try to criticize it, but in terms of whether there should be
4  a sale to Binance, whether that makes sense as a business
5  matter, I think, under the applicable Second Circuit
6  authorities, my job and the limit of my authority is to
7  determine whether the debtors have exercised a reasonable
8  business judgment -- not a guarantee, but a reasonable
9  business judgment; not even the judgment that I would have
10  made, not even the judgment that another reasonable person
11  might have made, but a reasonable business judgment.
12       So on some of these points that you're complaining
13  about, you're really saying that you disagree; you would
14  have hired an outside security consultant and not just
15  accepted the audits that the debtors received.  You would
16  have wanted a witness by Binance, although you didn't
17  subpoena a witness from Binance and nobody else did either.
18       But at the same time, while you criticize the
19  assurances and the value of the assurances that the debtors
20  got, nobody here has offered any -- and I mean any --
21  admissible evidence that anything of any kind is going on at
22  Binance that is wrong, that it is mistreating -- misusing
23  customer assets, that customers who go to Binance will be
24  unsafe, that it is not doing what it represented in its
25  sworn statement that it does in terms of the handling of

Page 63

1  customers, that its security protocols are faulty, zero.  I
2  have absolutely nothing on that point.
3       So criticizing, you know, just how strong the
4  assurances are that the debtors have received, how does that
5  get me to the point of saying that, as a matter of business
6  judgment that the debtors -- no reasonable person could
7  decide to go forward with this deal?
8       MS. SCHEUER:  Your Honor, I think it goes to both
9  the adequacy of disclosures -- and this is the final -- the
10  hearing on final approval of the disclosure statement -- and
11  also feasibility of the plan under 1129(a)(11) --
12       THE COURT:  Well, under 1129 --
13       MS. SCHEUER:  -- Your Honor --
14       THE COURT:  -- feasibility under 1129(a)(11) just
15  means that the confirmation of the plan won't be followed by
16  a further reorganization or a liquidation unless a
17  liquidation is contemplated in the plan.
18       So I already pointed out --
19       MS. SCHEUER:  Yes.
20       THE COURT:  -- even if everything goes wrong as to
21  Binance and it drops out of the deal, we have a toggle plan.
22  So I don't see how confirmation of the plan would create an
23  issue under 1129(a)(11).
24       MS. SCHEUER:  Your Honor, I think, after the deal
25  closes, the toggle becomes unavailable.  That's my

Page 64

1  understanding from the debtors, they can correct me --
2       THE COURT:  Yeah, I don't --
3       MS. SCHEUER:  -- if that is not --
4       THE COURT:  -- I don't think that's right.  And,
5  you know, my job, under 1129(a)(11), is to confirm unless it
6  is likely that there's going to be a further reorganization
7  or liquidation, the only evidence I have is that it's not
8  likely.
9       I mean, I'm as worried as anybody else.  I'm the
10  one who's probably going to be blamed if anything does go
11  wrong here.  But, you know, I'm a Judge; I'm not a
12  regulator, I'm not an investigator, I have -- not only do I
13  have no independent information on any of these points, as a
14  matter of judicial ethics, I'm barred from having
15  information on any of these points.  I can only consider the
16  evidence that the parties have brought in front of me.
17       I am aware of scores of hearsay allegations and
18  conclusory arguments that, gosh, aren't we worried, maybe
19  Binance is another FTX, but I have absolutely -- and I mean
20  absolutely -- zero, zero evidence that any of that is true.
21       So, given my role, given what I'm supposed to do
22  here, how could I possibly say that the risks of Binance
23  here are so great that the debtors could not reasonably make
24  the choice that they are making?  How could I possibly
25  conclude that based on the actual evidence that I have,

Page 65

1  particularly when you like to make hints and suggestions,
2  but you haven't offered me anything?
3       You know, you criticized the review of the
4  security protocols.  I don't have any reason -- so far as I
5  know, you don't have any reason -- to doubt the security
6  protocols that Binance uses, at least you haven't elected to
7  clue me in on any.
8       So, you know, all these little kind of nits and
9  gnats criticisms, how do they amount -- how do they get you
10  to the point of saying that the debtor's business judgment
11  has been wrongfully exercised here and no reasonable person
12  could want to do this?
13       MS. SCHEUER:  Your Honor, I think the issues that
14  we're raising can also be looked under 1125 and whether the
15  debtors have provided adequate information about risk and
16  how it could affect customers who transfer to the Binance
17  platform.
18       THE COURT:  Well, the debtors told customers that
19  they understood that Binance holds assets in custody, they
20  told customers that they understand that Binance holds
21  assets in a one-to-one ratio, so that -- and that it doesn't
22  lend or re-hypothecate.  They told customers that they are
23  satisfied that Binance has the financial resources to
24  complete this deal.  Okay?
25       Now, you've called this a disclosure issue.  I

A-1286

1  said at the beginning and I'll repeat it:  this is a
2  substantive objection masquerading as a disclosure issue.
3       The debtors have made clear that as questions come
4  up, as newspaper articles appear, they have and will
5  continue to ask questions of Binance.  That doesn't mean
6  that every single time they have a conversation with Binance
7  we have to stop, redo the disclosure statement, and start
8  this entire process over again.
9       We would never get anywhere if we had to do that
10 and it would be peculiar because, you know -- well, I'm
11 certainly not going to tell the debtors that they have to
12 stop doing their due diligence at the risk of having to redo
13 their disclosure statement.  Maybe they haven't done as many
14 things in due diligence as you think they should have done
15 or you don't like the degree of assurances that they've
16 gotten, those aren't disclosure issues.  Those are
17 substantive criticisms of the due diligence, there's no --
18 the debtors haven't changed their conclusions that they
19 offered in the disclosure statement.
20      And, you know, you're just saying that you wanted
21 more, that's all, that you think that the debtors should do
22 more before they do this deal.  I don't think those are
23 disclosure issues, I think those are questions of business
24 judgment.  The debtors -- I just don't see where, you know,
25 for example, the fact that the debtors looked at an

1  independent audit of security protocols and didn't
2  commission their own, I don't see that that's a disclosure
3  issue in the slightest.
4       And as to the risk of --
5       MS. SCHEUER:  Your Honor --
6       THE COURT:  -- as to the risk of regulatory
7  actions, the debtors did say that it's a highly uncertain
8  regulatory environment.  There are several places in the
9  disclosure statement they said they couldn't predict what
10 regulators would do.  Regulators may decide to take action;
11 it's an extremely uncertain environment, they don't know
12 what people might do.
13      So you can't even tell me what you're going to do,
14 so what was the debtor supposed to say other than what they
15 actually said?
16      MS. SCHEUER:  Your Honor, the debtors didn't
17 include how distributions to accountholders and their
18 ability to trade could be affected by regulatory
19 investigations and potential regulatory actions if they're
20 successful.  You know, Mr. Raznick testified that those
21 risks he didn't take into account in putting together his
22 liquidation analysis.  These are all disclosure issues that
23 could have informed how creditors vote on the plan --
24      THE COURT:  Well --
25      MS. SCHEUER:  -- because the numbers --

1       THE COURT:  -- as to how --
2       MS. SCHEUER:  -- as presented --
3       THE COURT:  -- as to how this could affect the
4  ability to trade at Binance, for example, I asked you --
5  your colleague, actually, was standing at the podium on
6  Thursday -- if the SEC were to take action contending that
7  Binance needs to register as a broker/dealer, would that
8  mean that all Binance activities would have to stop, or
9  would it just mean that the particular activities that
10 required registration would have to stop, but that other
11 activities could continue, and your answer was you don't
12 know.
13      So now you're telling me that the debtors should
14 have made a prediction on this point and should have
15 disclosed to their customers exactly what would happen in
16 this situation when you yourself couldn't answer the
17 question.  So how does that make sense?
18      (Pause)
19      THE COURT:  Do you have an answer?
20      MS. SCHEUER:  To clarify, I think, you know,
21 subject to all of the caveats that were stated at the last
22 hearing, you know, as to that point, Your Honor, the staff
23 believes that, you know, based solely on the facts and
24 circumstances known to the staff that they previously
25 stated, that Binance.US is operating an unregistered

1  securities exchange in the United States, and Binance.US and
2  those seeking to trade on Binance.US may be impacted by
3  ongoing regulatory investigations and could be faced with
4  highly challenging legal and practical issues.
5       THE COURT:  Well, did you say that to anybody
6  publicly before last Friday?  And, if not, how are you
7  contending that the debtor should have disclosed it in the
8  disclosure statement that they circulated in January?
9       MS. SCHEUER:  I think the regulatory risks were
10 known to the parties -- could have been disclosed by the
11 parties involved.
12      THE COURT:  I'm sorry, I couldn't understand what
13 you said; could you repeat it?
14      MS. SCHEUER:  Regulatory risks could have been
15 disclosed by the parties involved.
16      THE COURT:  They did disclose.  They said they
17 didn't know what regulators might do.
18      (Pause)
19      THE COURT:  Are you saying they should have
20 somehow anticipated the exact statement that you wound up
21 making this past Friday.  They should have read your mind
22 and known six weeks in advance that you were going to take
23 that position?
24      MS. SCHEUER:  Your Honor, it could have been
25 modeled from -- in numbers that were provided in the

Page 70

1   liquidation analysis or, you know, further risk factors or
2   caveats added to make clear that distributions could be
3   affected by those risk factors.
4           THE COURT:  I think they did that.  They said they
5   don't know what's going to happen with regulators; that the
6   regulators might take action that might influence or impede
7   the completion of the distributions that are contemplated.
8   I don't know what more they could have said.
9           Okay.  I think the disclosures on these points
10  were sufficient and the criticisms --
11          MS. SCHEUER:  Understood, Your Honor.
12          THE COURT:  -- the criticisms of individual due
13  diligence points are just substantive attacks, not
14  disclosure issues.  And I don't think that this goes to
15  feasibility in the sense that term is used in the Bankruptcy
16  Code.  There could be regulatory issues here, but the
17  debtors, I think, have tried not to eliminate that
18  possibility, you know, that maybe could have taken a
19  different approach and required you to put your proof on,
20  but nobody has tried to do that.  They've tried to give you
21  your regulatory freedom to the extent that it makes some
22  sense here, but all they can do in that regard is say, look,
23  there are risks that people might interfere, regulators
24  might interfere, we can't guarantee what will happen.
25          But, you know, the only alternative to saying

Page 71

1   something like that in this regulatory environment would be
2   to sit around for I have no idea how long and do nothing,
3   and wait until Congress and the competing regulatory
4   authorities sort out amongst themselves just who has what
5   authority over what aspects of this business and what kind
6   of authority they have.  I have no idea how long that's
7   going to take and we can't do that in bankruptcy.  The
8   Bankruptcy Code doesn't contemplate an endless period of
9   time, things have to be done.  We have creditors who are
10  waiting and who, in the midst of all this uncertainty, have
11  no access to property in which they've invested, in some
12  case, their life savings.
13          So we have to take some kind of action, we have to
14  do something, and we can't just put everything on pause just
15  because we don't know for sure how the regulators will
16  eventually make up their minds on points that they seem to
17  have been debating for years.  Okay?
18          I just don't think that that's really a disclosure
19  point here and I don't think it's a reason to criticize
20  business judgment.  Things need to be done, the world needs
21  to move.
22          Okay, let's move -- I think the U.S. Trustee had
23  objections also on the disclosures about Binance and its
24  controls.  Are you satisfied or do you have additional
25  points to make?

Page 72

1           MR. MORRISSEY:  Your Honor, if I may, I do have
2   additional points.
3           THE COURT:  Okay.
4           MR. MORRISSEY:  Your Honor, good morning, Richard
5   Morrissey for the U.S. Trustee.  Although I do have
6   additional points to make, there will be some overlap
7   regarding disclosure and feasibility.
8           At the January 10th hearing on the debtor's
9   motions to enter into the asset purchase agreement with
10  Binance and for conditional approval of the debtor's amended
11  disclosure statement, we pointed out that in the wake of the
12  collapse of Voyager's prior deal with FTX that the creditors
13  wanted to know as much as possible about the new purchaser
14  as they could, not least to be assured that the painful FTX
15  experience would not be repeated in this case.
16          The creditors had reason to be especially
17  sensitive about the Binance transaction as Voyager was to
18  share their personal information, personal information that
19  Voyager worked so hard to protect at the beginning of these
20  cases with Binance.
21          Voyager's customers had questions.  How stable is
22  Binance?  Was the proposed purchaser in the crosshairs of
23  any government investigations?  Would any intercompany
24  transactions at Binance impact the customers'
25  cryptocurrency?  Was Binance.US truly independent of

Page 73

1   Binance.com or Binance.Global?
2           As the Court has heard over the first two days of
3   this hearing, Voyager's customers still have such questions.
4           Now, to be sure, Your Honor -- and I'm talking
5   about the disclosure statement here -- if they looked hard
6   enough in various portions of the amended disclosure
7   statement, the customers could find answers to certain other
8   questions such as how their recoveries would be affected if,
9   for example, the litigation with respect to Voyager's
10  intercompany transactions went one way or another, or if
11  Alameda's claim against the debtors were allowed or
12  disallowed.  They could also find --
13          THE COURT:  You know, you're standing here telling
14  me that customers found the disclosures on these points
15  inadequate, I don't have a single customer who's taken that
16  position.
17          MR. MORRISSEY:  Your Honor, I apologize if that's
18  what it seems that I said --
19          THE COURT:  That's what you just said.
20          MR. MORRISSEY:  -- that's not what I was trying to
21  say.
22          THE COURT:  You just said that this is all stuff
23  that customers wanted to know, and that might be what you
24  think, but not a single customer has filed an objection on
25  that ground, not a single one, as far as I know.

Page 74

1    MR. MORRISSEY:  Okay.  Your Honor, my point is

2 what is and what is not in the disclosure statement for any

3 parties in interest to discover.

4    One example, Your Honor, is that the customers

5 could find a description of Voyager's security protocol,

6 both in the amended disclosure statement and in the

7 declaration that was filed in connection with the debtor's

8 cash management motion.

9    THE COURT:  I'm sorry, what is it, you think

10 Voyager should have disclosed its own security protocol?

11    MR. MORRISSEY:  Well, no, Your Honor.  As a matter

12 of fact, I'm saying that Voyager did.  Voyager gave a

13 description in the disclosure statement regarding its own

14 security protocol, it did not give a description of

15 Binance's security protocol.  And I'll get into that in just

16 a moment, if I may, Your Honor.  The --

17    THE COURT:  Didn't they say that Binance

18 maintained wallets at Amazon Web Services located in two

19 jurisdictions and didn't they talk about various

20 certifications that Binance had provided as to its

21 compliance with a number of different security standards?

22    MR. MORRISSEY:  That was discussed, Your Honor, in

23 a combination of the declarations submitted shortly before

24 the hearing --

25    THE COURT:  I'm pretty sure it was in the

Page 75

1 disclosure statement.

2    MS. OKIKE:  Yeah, it's in the disclosure

3 statement, Your Honor, it's Article 5(b)(1)(B).

4    THE COURT:  I reread the disclosure statement in

5 preparation for this hearing and I remember seeing it there.

6    MR. MORRISSEY:  But, Your Honor, what the debtor

7 provided here in the disclosure statement was assurances

8 about Binance.  The disclosure statement was very

9 informative about Voyager's history both before and during

10 the pendency of the cases.  It said a lot about where the

11 customers have been, but very little about where they've

12 been invited to go.

13    Your Honor, in a conventional sale -- and the

14 final approval of the sale is up for today as well, as it's

15 part of the plan, assets are exchanged for proceeds and the

16 latter has a reasonably equivalent value to the former.

17 Here, the 20 million or the maximum 35 million amount to far

18 less than the value of the assets.

19    The vast bulk of the sale involves the transfer of

20 the crypto held by Voyager to the Binance.US platform.

21 Although the crypto goes to Binance.US, the debtor's due

22 diligence cannot follow the crypto to Binance.US.  Once the

23 crypto has been transferred, the matter is out of Voyager's

24 hands.  Voyager's control of the asset is limited to either

25 the 20 or the 35 million, or whatever number in between may

Page 76

1 eventuate.

2    The debtors assure the parties that Binance has

3 the wherewithal to consummate the asset purchase agreement,

4 but there's precious little information about Binance.US in

5 the disclosure statement to back up that assurance.  Now, we

6 did hear testimony regarding that.

7    Also, as far as the mechanisms to protect the

8 cryptocurrency, we heard that from Voyager's witnesses and,

9 as Your Honor pointed out, there's something about that in

10 the disclosure statement --

11    THE COURT:  Well, here -- what you just said is

12 really not so much an argument that there was a lack of

13 disclosure, but that there was -- they didn't kind of

14 incorporate all their declarations into the disclosure

15 statement itself to give a full explanation of all the

16 homework that they had done and intended to do that

17 supported the conclusions that they had reached --

18    MR. MORRISSEY:  No --

19    THE COURT:  -- that's not really a disclosure.

20    MR. MORRISSEY:  Well, except that --

21    THE COURT:  When does anybody ever do that in a

22 disclosure statement?

23    MR. MORRISSEY:  Well, the -- a lot of the

24 information contained in the declarations and disclosed in

25 the live testimony should have been in the disclosure

Page 77

1 statement before the ballots went out, so that the people

2 voting could make a more informed decision as to what they

3 were voting on.

4    And, Your Honor, I'd like to interject one point.

5 It's been repeated many times over the last two days and

6 even in the press about the fact that 97 percent of the

7 creditors supported the plan and they had overwhelming

8 support among the creditors.  As I said the other day, Your

9 Honor, six percent of the creditors voted on the plan; I

10 don't know why the 94 percent did not, but the overwhelming

11 majority of the creditors did not.

12    Having said that, Your Honor, I do concede, as I

13 did the other day, that what Your Honor has to consider in

14 terms of whether there's adequate support is in fact the

15 votes that were actually cast, not the ones that were not

16 cast.  So we understand that, but I just want to make sure

17 that everyone is clear that there is not an overwhelming

18 support for the plan among the entire creditor body.

19    THE COURT:  By the same token, I heard a couple of

20 customers complain about Binance and say they didn't want to

21 go to Binance, only a few.  So, out of the thousands of

22 customers who voted and the, what, million customers that

23 exist, I have less than a handful of customers who objected

24 to the proposal of having the debtor deal with Binance here,

25 recognizing that we've also tried to set it up so that

Page 78

1  customers who don't want to have Binance accounts don't have
2  to have Binance accounts and are free to elect not to have
3  that; right?
4       MR. MORRISSEY:  Yes, Your Honor, and there's also
5  the toggle to the other plan, which we do recognize.
6       THE COURT:  So nobody is forced to be a Binance
7  customer who doesn't want to be a Binance customer.
8       MR. MORRISSEY:  That is correct, Your Honor.
9       MS. PROVINO:  (Indiscernible) --
10       THE COURT:  Who is speaking?
11       MS. PROVINO:  I'm sorry.  This is Lisa Provino,
12  pro se.  I just wanted to support something that Mr.
13  Morrissey is saying that is quite --
14       UNIDENTIFIED SPEAKER:  (Indiscernible) --
15       MS. PROVINO:  -- which is quite important.  I
16  found yesterday that -- and the reason -- this is on his
17  first comment about us not commenting on some of the
18  documents, Your Honor, there have been documents on Stretto
19  that have been deleted.  Please note for the record that
20  Docs. 66, 70, 149, 219, 187, 184, 165, 359, 380, 381, 382,
21  497 (indiscernible) 607, 359, and 1049 documents have been
22  deleted from Stretto.
23       So it has been very challenging for us, as we have
24  mentioned multiple times, to keep up, but it's even worse
25  when the documents have been deleted.  And so, if they have

Page 79

1  been deleted and we have not been able to respond, I want
2  for the Court to know that it's unfair, and we did support
3  what -- excuse me -- what Mr. Morrissey has just stated.
4       THE COURT:  Okay.
5       MS. PROVINO:  So --
6       THE COURT:  You're not --
7       MS. PROVINO:  -- meaning that (indiscernible) --
8       THE COURT:  You did get the disclosure statement;
9  right?
10       MS. PROVINO:  No, not the one that -- which one
11  are you talking about, sir?  The one that you mentioned that
12  we didn't respond to that Richard Morrissey just brought up.
13  Which disclosure statement are you speaking of?  As I
14  mentioned, there were multiple documents --
15       THE COURT:  There is no --
16       MS. PROVINO:  -- deleted off of Stretto and I'm
17  very upset about that.
18       THE COURT:  There was a large disclosure statement
19  submitted in connection with the request for confirmation of
20  the plan.
21       MR. MORRISSEY:  Your Honor, if it may help, I do
22  remember one ECF document number for the amended disclosure
23  statement, I believe that's the one we objected to, it was
24  Document Number 863 on the docket and I hope that is still
25  there.

Page 80

1       THE COURT:  But it didn't have to be, it was --
2       MS. PROVINO:  That one --
3       THE COURT:  -- it was mailed out, right, Ms.
4  Okike?
5       MS. PROVINO:  I went through -- and then I wanted
6  to mention something else as well.
7       THE COURT:  Well, you should have gotten a big
8  document in the mail.
9       MS. PROVINO:  Sir, I did not.  I have gotten
10  nothing in the mail.
11       MS. OKIKE:  Email, email.
12       THE COURT:  Email, excuse me, in the email.
13       MS. PROVINO:  On Document 863?  I'm sorry, which
14  are you speaking of?  Please clarify for me.
15       THE COURT:  The disclosure statement that we're
16  talking about should have been sent to you by email in
17  approximately mid-January.
18       MS. OKIKE:  Along with a ballot --
19       MS. PROVINO:  No, I did not receive it.
20       MS. OKIKE:  -- for you to exercise your vote.
21       THE COURT:  Along with a ballot.
22       MS. PROVINO:  No, if you remember, this goes to
23  the point -- another point of Mr. Morrissey that 94 percent
24  of the people didn't vote.  May I comment again that 3506
25  people were blocked from voting?  Yes, I understand that we

Page 81

1  got an email about the ballot, but, if you remember
2  correctly, there were several of us that had complained.
3       And we went to extreme lengths, we did call Mr.
4  Morrissey, as well as many other regulatory bodies that we
5  possibly could, in addition to the debtor.  So I just want
6  to see things for the record because --
7       THE COURT:  Let me ask you to hold -- let me ask
8  you to hold on those complaints while we just finish with
9  Mr. Morrissey's comments about the disclosures.  Okay?  And
10  then we'll come back to you.
11       MS. PROVINO:  That's fine, but I just wanted you
12  to know about we support what he just said and I need you to
13  know that, sir, that's all --
14       THE COURT:  I understand.
15       MS. PROVINO:  -- and especially about the
16  documents, I'm very upset about that as well.
17       THE COURT:  Okay.  Go ahead.
18       MR. MORRISSEY:  Thank you, Your Honor.
19       (Pause)
20       MS. OKIKE:  Your Honor, just to address that
21  point.  We understand from Stretto that the docket numbers
22  referenced were removed because they included customer PII.
23       MS. PROVINO:  But that was never mentioned to us
24  at all, so we could have at least downloaded those.
25       (Background noise)

A-1290

Page 82

1      THE COURT:  All right, a lot of people have open
2  lines.  Please mute your line unless you have permission to
3  speak.  Okay?
4      MR. MORRISSEY:  Thank you, Your Honor.
5      Your Honor, although Voyager's history and actions
6  are well described in the disclosure statement, when it
7  comes to information about Binance.US, the disclosure
8  statement is more of a statement of assurance.
9      The debtors have said that the objectors have not
10  produced any evidence to counter their assurances about
11  Binance, but it is not the objectors' obligation to make
12  disclosures about Binance, it is the debtors' job to do so
13  and it's a job that the debtors have not done.
14      THE COURT:  What should they have said?
15      MR. MORRISSEY:  Your Honor, they had a lot of
16  communications between the debtors on one side, and perhaps
17  the committee on the same side, and Binance on the other and
18  they got a lot of assurances from them.
19      Again, I understand that these are restructuring
20  professionals and not specifically crypto experts, but they
21  got the assurances from them, including the fact that there
22  are third parties, independent third parties who have
23  reviewed the security protocols.  But the information they
24  got from them was walled off from the creditor body because
25  there was not -- the substance of the information was not in

Page 83

1  the disclosure statement.
2      THE COURT:  What information did they get, the
3  substance of which was not in the disclosure statement?
4      MR. MORRISSEY:  They were -- they got assurances,
5  Your Honor, they got assurances that they had the financial
6  wherewithal to --
7      THE COURT:  That's in the disclosure statement.
8      MR. MORRISSEY:  That they did have the
9  wherewithal?
10      THE COURT:  Yeah.
11      MR. MORRISSEY:  Yes, it was a -- it was a small
12  comment.
13      And just to put it in perspective, Your Honor,
14  Binance itself, there were three pages out of the 98 in the
15  disclosure statement dedicated to Binance.  This plan, Your
16  Honor, is all about Binance, a lot more than it's about
17  Voyager.  It's all about what Binance can do holding and
18  protecting the assets on the platform because Voyager, as I
19  said earlier, is transferring the bulk of the assets to
20  Binance.
21      One last point, if I may make, about due
22  diligence, Your Honor.  We learned that the debtor's
23  restructuring professionals had reviewed the information
24  that they received from Binance, but because they were not
25  crypto experts, they -- meaning the debtors themselves,

Page 84

1  their restructuring professionals -- were unable to make an
2  independent determination regarding the security protocols.
3  They got a showing, they were satisfied with the showing,
4  obviously, but they didn't make their own determination.
5      And that's why I said, Your Honor, this is more of
6  a statement of assurances than a disclosure statement and
7  that's where I think that the debtors fell short.
8      Your Honor, there are other issues that we have,
9  but, again, I'll defer to other parties and take those on
10  later, such as releases, exculpations, et cetera.
11      THE COURT:  Right.
12      MR. MORRISSEY:  Thank you, Your Honor.
13      MR. GOLDBERG:  Your Honor, if I may be heard?
14  Adam Goldberg of Latham & Watkins on behalf of Binance.US.
15  I'd like to respond quickly to one point that Mr. Morrissey
16  made about the voting and the questions Your Honor has about
17  who voted and why.
18      I was doing some math, looking at the voting
19  declaration, which is at Docket Number 1127, to think about
20  that, and what it shows is that $541 million of claimed
21  value voted in favor of the plan out of the customer class,
22  which in the disclosure statement is estimated at 1.763
23  billion.  By my math, that's a little over $9,000 per claim
24  of the people who voted in favor.  There was only 10 million
25  in claims that voted against the plan and by my math that

Page 85

1  was a little over 5,000 per claim who voted against.  The
2  remaining over 900,000 people who did not vote, the
3  remaining claims pool, would be about $1900 per claim.
4      And so what that math shows, Your Honor, is that
5  the people with the greatest interest in this estate voted
6  in favor of the plan.
7      And, Your Honor, this plan, my client's goal, the
8  debtor's goal, as I understand it, is to deliver
9  cryptocurrency to customers as quickly as possible, and
10  that's why we believe that the customers voted
11  overwhelmingly in favor and those with the greatest
12  interests did so.
13      Thank you, Your Honor.
14      MR. HENDERSHOTT:  Your Honor, this is Tracy
15  Hendershott, pro se creditor, may I approach the podium?
16      THE COURT:  In a minute, Mr. Hendershott.  We've
17  got the committee counsel already standing here ready to
18  argue, so we'll hear the committee counsel first.
19      MR. HENDERSHOTT:  Thank you, sir.
20      MR. EVANS:  Your Honor, Joseph Evans from
21  McDermott Will & Emery on behalf of the committee.  I'd like
22  to share a few points and I'll try not to repeat things that
23  have already been said.  We think it's important for the
24  creditors to know what the committee's role has been and
25  what we've done in connection with this deal.

Page 86

1     The committee supports the plan.  According to the

2     experts, the Binance deal will give customers incremental

3     value of $100 million.

4          Based on the substantial diligence that we've done

5     concerning the Binance deal, the information provided and

6     the representations made by Binance, the committee supports

7     a plan which includes the Binance deal and the opportunity

8     to toggle.  We believe that it's the best available option

9     to get the most crypto back as quickly as possible.

10         One reason why the committee supports the plan is

11    because of the significant protections that the committee

12    negotiated for and obtained in the APA.  For example, the

13    Binance.US deal initially contemplated transferring all

14    Voyager crypto to Binance.US before Voyager creditors

15    onboarded with Binance.US.  This would mean that Binance

16    customers' crypto would have been exposed to Binance.US

17    risks for a period of time before they were able to

18    withdrawal.  The committee refused that deal.

19         The committee negotiated for and Binance agreed to

20    have customer crypto transferred on a weekly basis only

21    after customers are onboarded with Binance.  So, if they

22    choose to withdraw and not be Binance customers, the

23    exposure to Binance will only be for a matter of days.

24         Those provisions are contained in Section 2.4 of

25    the APA.

Page 87

1     There are also provisions that we negotiated for

2     that made clear that when Voyager customer crypto goes to

3     Binance that Voyager customer crypto remains property of the

4     estate until the customers have the ability to withdraw.

5     And there is also the fiduciary out, which has been the

6     subject of a lot of the testimony, though, before Your

7     Honor.

8          The second reason why the committee became

9     comfortable with the Binance deal was because of the

10    significant amount of due diligence conducted by the

11    committee, the debtors and their professionals.

12         The committee interviewed Binance.US executives on

13    these issues on seven separate occasions.  And, as this

14    Court heard from experts from BRG and Moelis, the Binance

15    deal is the best available deal for creditors.  So the

16    committee supports a plan which includes the Binance deal.

17         There was a number of representations that we've

18    all heard that were important.  The crypto is held on a one-

19    to-one reserve basis; the company segregates the company's

20    assets from customer assets; CZ, Binance.Global, anyone

21    outside of Binance.US cannot take customer crypto out of

22    Binance.US; and the company does not lend or re-hypothecate

23    the customer assets.

24         There were also a number of press releases,

25    Tweets, congressional letters.  We've also diligenced those,

Page 88

1     that diligence is ongoing.

2          With respect to one important report from Reuters

3     on February 16th, 2023, we've done diligence and we were

4     assured that; one, Merit Peak does not withdraw a customer

5     fee out of crypto; Merit Peak nor any other market maker had

6     the ability to withdraw a customer fee out of crypto; and

7     Merit Peak no longer conducts any activity at Binance.US.

8          And we'd like to take a moment to speak about the

9     SEC's position.  With respect to the SEC, the SEC staff

10    statements on Thursday, Friday, and this morning do not

11    change the committee's position.  We were particularly

12    unmoved by the SEC staff statement this morning that we are,

13    quote, "on notice" of some unspecified regulatory violation;

14    we are not.

15         On Friday, the SEC attempted to clarify its

16    position with respect to its objection.  In its

17    clarification, they said on four separate occasions that

18    these were statements of the staff and not the Commission.

19         Why does that matter?  Well, for one thing, the

20    staff cannot bring lawsuits without approval from the

21    Commission.  The staff cannot initiate an administrative

22    proceeding without Commissioner approval.

23         In a statement from then-Chairman Jay Clayton, he

24    stated that, quote, "The Commission's long-standing position

25    is that all staff statements are nonbinding and create no

Page 89

1     enforceable legal rights or obligations of the Commission or

2     other parties."

3          In short, this statement from the SEC staff about

4     what they believe is not something that we can meaningfully

5     consider when weighing against $100 million of customer

6     value.

7          The staff stated that the VGX, quote, "has the

8     attributes of a securities transaction."  So even the staff

9     is not willing to say that VGX is a security.

10         With respect to Binance, they say that Binance.US

11    is operating as an unregistered securities exchange.  Well,

12    what does that mean?  You could be operating an unregistered

13    securities exchange because one token that you're selling is

14    a security, there's ten tokens that you're selling as a

15    security, there's a hundred tokens that you're selling as a

16    security.  We don't know what they're thinking and they're

17    not willing to tell us.

18         Let's say, for example, they think BUSD stablecoin

19    is a security.  Okay.  There was a statement a few weeks ago

20    from Paxos indicating that they were being investigated for

21    BUSD.  Okay.  The committee and its professionals, the

22    debtors and its professionals, did not consider the Treasury

23    and BUSD in connection with their valuation of whether

24    Binance.US can close the deal; they have enough cash in the

25    bank to do so.

1       When you look at the recent actions against crypto
2   exchanges and settlements, on January 19th, the SEC settled
3   charges with Nexo for $22.5 million; on February 9th, the
4   SEC settled with Kraken for $30 million. Those amounts,
5   even multiples of those amounts, would not impact
6   Binance.US's ability to close the deal based on the
7   diligence we've performed.
8       The SEC's stated purpose is to protect investors.
9   The SEC's refusal to take a firm position here stands to
10  harm retail investors.  The SEC staff is asking the Court,
11  the UCC, and the debtors to eradicate $100 million of
12  creditor recovery based on a position that the staff members
13  cannot even get the Commission to support.  They are saying
14  we are on notice that there may be a regulatory violation.
15      From where I sit, the SEC staff statement appears
16  to be designed to intimidate the professionals and the
17  fiduciaries to refuse to go forward with the plan, hoping
18  that we will be afraid of having a decision called into
19  question and we will choose to instead erase over $100
20  million of customer recovery.  We are not going to do that.
21      We have had one goal from the outset of this case:
22  get as much crypto back to customers as quickly as possible.
23  The SEC's refusal to take a firm position does not alter
24  that goal.  The committee supports the plan.
25          THE COURT:  All right.  Thank you.

1           Mr. Hendershott, it's your turn.
2           MR. HENDERSHOTT:  Yes, sir, thank you.  I just
3   want to tag onto Mr. Morrissey as a representative of DOJ
4   and address comments that you've made, as well as we've
5   heard throughout this entire trial comments from counsel to
6   the debtors-in-possession that by not hearing from a
7   plethora of creditors that means agreement with what is
8   going on.
9           I understand the counsel for the debtors, they're
10  being paid to advance their agenda and that's why they would
11  promote that false narrative, but I know, Your Honor, I
12  don't believe you have an agenda.  And I just want to call
13  out that it's an undue burden, you know, to expect creditors
14  to miss work, you know, spend all of their nights and
15  weekends, you know, reading thousands of documents.
16          The Department of Justice is the voice of
17  creditors here.  Every single objection and motion that the
18  Department of Justice has pushed throughout this trial,
19  starting with trying to object to the KERP, which actually
20  had 2,000 creditors documented as going against it, and that
21  information was held from me, Your Honor, when you
22  specifically asked what is the creditor perspective of that.
23          They also try to protect us with data privacy
24  ombudsmen.  And you've heard the handful of creditors that
25  have sacrificed their work relationships and they're

1   attending these meetings at personal sacrifice.
2           Everyone is in agreement with the Department of
3   Justice and it's unfair to state that if thousands of
4   creditors do not invest the time for every nuance of this
5   trial that he does not speak on our behalf.  And I just
6   wanted to call that out to your attention for your
7   consideration.
8           THE COURT:  Okay.  Just to make clear, Mr.
9   Hendershott, today there are substantive issues that I -- as
10  to whether the plan complies with the requirements of the
11  Bankruptcy Code and, of course, I'll hear everybody's
12  testimony about that.  There's also the issue for the final
13  approval of the disclosure statement and my comments about
14  not having a creditor complaint about the disclosure
15  statement I think reflected the fact that the information
16  that Mr. Morrissey says should have been in that lengthy
17  document, but wasn't, I said I hadn't gotten any complaints
18  from creditors to that effect.
19          Now, what you just said really is to the effect
20  that creditors shouldn't have to read all of that, but that
21  doesn't really support Mr. Morrissey's objection because
22  what Mr. Morrissey is saying is that you should have read
23  all of it and that there should have been even more in it
24  for you to read, which seems different from what you just
25  said to me.

1           MR. HENDERSHOTT:  I apologize, sir, if I misspoke,
2   but that was not my intent.  I never intended to say
3   creditors should not have read the disclosure statement.  I
4   was certainly -- my intent was to call out that I wished
5   more credence of Mr. Morrissey and his department
6   representing and speaking on behalf of the creditors was
7   taken into consideration.
8           Thank you.
9           MS. PROVINO:  Exactly.  This is Lisa Provino, pro
10  se again, I support that last statement.  And we are reading
11  the documents, Your Honor, that's why I brought up the
12  deletion of the Stretto documents just for the record.
13          THE COURT:  Okay.
14          MS. RYAN:  Your Honor, this is Ms. Ryan with the
15  Texas Attorney General's Office.  We did have a disclosure
16  statement objection and if I may address it now?
17          THE COURT:  Yes.
18          MS. RYAN:  So, in reading the disclosure
19  statement, the information pertinent to customers was not
20  easily laid out for the consumers to see and digest.  And
21  one particular segment of the information that was buried is
22  these Alameda claims and what will happen to the customers,
23  the consumers if the debtor is not successful in fighting
24  these claims.
25          And I don't think any of the creditors objected to

Page 94

1    that because they didn't see it, it wasn't there.  It was
2    hard to tease out.
3            And so, in that regard --
4            THE COURT:  The information --
5            MS. RYAN:  Yes, sir.
6            THE COURT:  -- the information about the effect of
7    the Alameda's claims that you say should have been in the
8    disclosure statement, you cite that information and it comes
9    from the disclosure statement.  The very information that
10   you say should have been in the disclosure statement is
11   information you took from the disclosure statement.
12           MS. RYAN:  You're right, Your Honor.  My point is
13   it was buried in this disclosure statement.
14           When we're working with this many consumers -- I
15   do lots of work for consumer protection in bankruptcy --
16   generally, we make those things easy to read and easy to
17   find and in this disclosure statement they just aren't.  In
18   fact, on the page that I would assume most consumers would
19   look at, there is no reference to the drastic cut of the
20   returns --
21           THE COURT:  I don't --
22           MS. RYAN:  -- if Alameda is successful.
23           THE COURT:  -- I don't agree with you.  You know,
24   there are so many things that the Bankruptcy Code requires
25   to be in and practice requires to be in disclosure

Page 95

1    statement, and then so many additional things that the
2    debtor added because of objections and criticisms and
3    comments that were received in January, that to say that all
4    of that somehow should have been done in an easily-read-and-
5    digestible form, you can't do it, you just can't.
6    Disclosure statements necessarily are long; they necessarily
7    have things in different sections.  You can't take
8    everything that every individual thinks is important and put
9    it on page 1 because there's 180 pages of things that
10   everybody would want to be on page 1.  You just can't do it.
11           It is in there and I'm not going to say that it
12   was inadequate just because you don't think it had as much
13   highlighting or was as easy to find as you think it should
14   have been.
15           MS. RYAN:  Your Honor, I understand your point and
16   I still object.  I do believe that that should have been
17   highlighted better for the consumers and it wasn't.  And I
18   think an effect of that lack of -- that lack of highlighting
19   for the consumers is the fact we have no idea of what a
20   bottom return number would be, it's been quoted in the
21   disclosure statement as low as 24 percent, it's been quoted
22   in testimony as high as 48 percent.
23           The consumers have really no understanding of the
24   bottom of their return and I think the disclosure statement
25   was also very inadequate in that manner.

Page 96

1            THE COURT:  Well, because some of the
2    distributions will be in the form of cryptocurrencies and
3    because cryptocurrency values can fluctuate quite widely,
4    there is no practical ability to be extremely precise in
5    what people will actually get, but the debtors did offer an
6    analysis in the liquidation analysis of specifically what
7    recoveries would be under the financial transactions, what
8    recoveries would be if they toggled to the other plan, and
9    what recoveries would be if instead they were to be under
10   Chapter 7.
11           And they did that, frankly, I think, as precisely
12   as circumstances permitted.  Given the nature of this
13   business, given the nature of some of the uncertainties, and
14   given the nature of the assets, I don't know how anybody
15   could have been any more precise than they were.
16           MS. RYAN:  Your Honor, I believe they could have
17   added one more column that said recoveries if Alameda is
18   successful, and that would have given an estimated bottom
19   number and that was not disclosed.
20           THE COURT:  But it's in a footnote on the same
21   page, isn't it?
22           MS. RYAN:  Your Honor, it is -- the footnote on
23   that page does not tell us any type of percentage and it
24   doesn't actually point to the consumers' claims or
25   accountholders' claims, it's in a general section at the

Page 97

1    top.  And so I don't think that it was meaningful for the
2    accountholders.
3            THE COURT:  By the way, I know you were heard when
4    we considered the initial approval of the disclosure
5    statement in January, did you raise this issue then?
6            MS. RYAN:  Honestly, Your Honor, I don't remember.
7            THE COURT:  Okay.
8            MS. PROVINO:  What date was that?  I can check.
9    This is Lisa Provino.  I wrote notes.
10           THE COURT:  In January, I don't remember the date.
11           MR. MORRISSEY:  Your Honor, Richard Morrissey for
12   the U.S. Trustee.  Actually, I raised the issue and a
13   footnote was added, and my questions or comments were very
14   similar to Ms. Ryan's that they were hidden in -- certain
15   things were hidden in different parts of the disclosure
16   statement at the time.  I don't remember, however, whether
17   Ms. Ryan chimed in.
18           THE COURT:  But we discussed it and the change we
19   made is what I approved, right?
20           MR. MORRISSEY:  Yes, Your Honor.
21           THE COURT:  I don't think anybody complained that
22   the change we made didn't adequately address the objection.
23           MR. MORRISSEY:  Your Honor, there's another aspect
24   of that as well.  The intercompany transfers, the litigation
25   on that, will also affect possibly the distribution.

1    THE COURT:  One at a time.

2    MR. MORRISSEY:  Yes.

3    THE COURT:  So, in terms of the Alameda, you know,

4  I vaguely remember some issues coming up and we put this

5  information in specifically to address them, and my

6  understanding is that that took care of the objection and

7  that there -- you know, to say now that it just wasn't

8  highlighted or was in the wrong place, I don't think that's

9  sufficient for me to find that the disclosure statement was

10  inadequate.  Okay?

11    MS. RYAN:  Okay, Your Honor.  I had one other

12  issue that I wanted to raise now and then when we come to

13  the releases and exculpation issue, I'll save my arguments

14  for then.

15    Texas does have concerns with the security on

16  Binance's side and we believe that Texas is an unsupported

17  jurisdiction whose customers can't go over to Binance right

18  now.  Their personally identifiable information should not

19  be transferred to Binance.

20    I understand Binance bought the customer list and

21  so information such as emails, so they can market once they

22  are licensed in Texas, that's fine, that should go over, but

23  bank accounts and other personally identifiable information

24  transferring I think is not appropriate in this case.

25    THE COURT:  Okay.

1  and, whether it was Binance.US or Binance.com, it was a

2  requirement to be licensed in Texas and they refused to do

3  so.

4    Likewise, in the documents uploaded to support the

5  Binance due diligence done, no mention of Binance.US's

6  wherewithal is mentioned in there, none.  All we have is

7  hearsay testimony or testimony that they relied upon X, Y,

8  Z, and we've never seen X, Y, Z.  And so we actually are

9  very concerned with Binance's financials as there's very

10  little to no information in the record about it.

11    And that's all of my argument for now, Your Honor.

12    THE COURT:  If Binance doesn't have the 20 million

13  or 35 million or whatever it's supposed to pay at closing,

14  then the deal will be done, right?

15    MS. RYAN:  Correct.

16    THE COURT:  So --

17    MS. RYAN:  Well, that --

18    THE COURT:  -- what do we need to --

19    MS. RYAN:  -- my -- Your Honor, my big concern is

20  -- you know, 25 or 30 million, they can probably pay that, I

21  haven't seen any proof that they could -- my concern is, six

22  weeks after the sale closes Binance ends up in bankruptcy

23  and all of the accountholders that transferred over are once

24  again in this same position.

25    We don't have evidence that Binance won't end up

1    MS. RYAN:  And then, finally, on the feasibility

2  of the plan, Texas is concerned with the lack of information

3  on Binance's wherewithal.  Binance abandoned their

4  Department of Banking license application after a year for

5  failure to give us financial information that was necessary.

6  Binance's documents --

7    THE COURT:  Wasn't that --

8    MS. RYAN:  -- that were just filed --

9    THE COURT:  -- wasn't that a refusal -- in Texas,

10  wasn't that a refusal to give you financial statements of

11  its parent company, isn't that what led to the --

12    MS. RYAN:  Your Honor, I would need to go back and

13  look at the abandonment letter.  Regardless, it is a

14  qualification to be licensed in Texas and they would not

15  provide us the information.

16    THE COURT:  But --

17    MS. RYAN:  Secondarily, the --

18    MS. RYAN:  -- as I recall -- as I recall your

19  prior submissions on this point, Binance.US gave you and was

20  willing to answer your questions about its finances, but

21  declined to give you information about the finances of its

22  parent company; right?

23    MS. RYAN:  I again would have to go back and

24  review the documents, but the point is Binance doesn't want

25  to disclose financial information when regulators require it

1  in a liquidation like FTX did, Your Honor.  We don't have

2  evidence as to their financials --

3    THE COURT:  We don't have any --

4    MS. RYAN:  -- to make sure they won't.

5    THE COURT:  We don't have any evidence that they

6  will, do we?

7    MS. RYAN:  Your Honor, it's the debtor's burden to

8  prove that Binance is -- that it is a good business judgment

9  to sell to Binance and right now I don't see anything that

10  proves Binance isn't going to end up in bankruptcy too

11  because we have no financial information.

12    THE COURT:  But when you say you don't see enough

13  to prove it, you're just saying that you wouldn't make the

14  same judgment.  You don't trust --

15    MS. RYAN:  No, I don't --

16    THE COURT:  -- the evidence that the debtors have

17  relied on?

18    MS. RYAN:  No, that's correct because the debtors

19  haven't shown us what they relied on for financial

20  information.  They've testified as to hearsay and they've

21  testified that they relied on some documents, which nobody

22  has ever seen except them.  And so, no, I don't trust that

23  evidence, Your Honor.

24    THE COURT:  Okay.  Anything else --

25    MS. RYAN:  Thank you.

1    THE COURT:  -- Ms. Ryan?

2    MS. RYAN:  Not at this time, Your Honor.  I will

3  reserve some argument for the releases and exculpation

4  provisions.  Thank you.

5    MR. GOLDBERG:  Your Honor, Adam Goldberg of Latham

6  & Watkins on behalf of Binance.US, if I may respond to a few

7  points.

8    First, on the personal information point, we are

9  working on coming back to Your Honor on that issue, but I

10  think, generally speaking, this is a fundamental and core

11  aspect of the deal that is the basis for the economic

12  transaction embedded in the $20 million purchase price.

13    On the point of the abandonment of the application

14  as Texas asserts, Binance.US completely disagrees with that

15  characterization.  In Binance.US's view, they made every

16  effort to provide financial information that was requested

17  of Texas to them.  Texas found that that was not sufficient

18  and deemed the application withdrawn.  Binance is working on

19  providing -- on filing a new application, which we expect to

20  be done as soon as possible.

21    And Binance.US continues to make every effort to

22  work with the State of Texas to resolve its issues to make

23  it -- take it out of the category of being an unsupported

24  jurisdiction, as we have done with Vermont.

25    On the question of feasibility and Binance's

1  financial wherewithal to perform the transaction, I think

2  Your Honor has correctly found that the question of

3  feasibility is -- that is not a question of feasibility

4  in this case; it is a question of the debtor's business

5  judgment.  Binance.US provided bank statements to the

6  debtors as the basis for their business judgment.  The State

7  of Texas, if they distrusted that information and the

8  debtor's diligence, had every opportunity to conduct

9  discovery on Binance.US and they did not do so.

10    In our view, the debtor's business judgment is

11  correct in this case because the Binance.US transaction does

12  what we have set out to do from day one of our involvement

13  in this process going back to last year and that is deliver

14  cryptocurrency to customers as quickly as possible.

15    Thank you, Your Honor.

16    THE COURT:  All right.  Anything --

17    MS. DIRESTA:  Your Honor, I'm a pro se creditor,

18  am I allowed to speak to the security issues that have been

19  brought up thus far or do I have to wait for a different

20  time?

21    THE COURT:  Go ahead.  Who is this?

22    MS. DIRESTA:  I am Gina DiResta; I'm a pro se

23  creditor.  And I read the Binance officer's certificate and

24  one of the things -- or a couple of things that -- let me

25  just go to it -- a couple of the things that they mention,

1  for example, is like it says only employees of the company

2  are able to -- this is number 5 -- only employees of the

3  company are able to move or withdraw the customer assets

4  from the company's platform.

5    So there's that portion about my assets and then I

6  think it's number 8 where they talk about access to my

7  personal identifiable information.  It doesn't say anything

8  about whether my assets or my personal information is in the

9  U.S., like is it being, you know, held here in the U.S., or

10  is it being possibly held say like in China or something

11  like that?

12    So that does concern me that it doesn't say

13  anything like that.

14    And the other concern that I have is it says, you

15  know, only the company's employees or in the security

16  section it says only the authorized person, but, you know,

17  there are a lot of companies that kind of comingle their

18  employees.  So there's nothing in there that says absolutely

19  no one at Binance.com, which is the global (indiscernible)

20  has access to any of my funds or personal information at

21  Binance.US.

22    So those things I find concerning from a security

23  perspective.

24    THE COURT:  All right.  Who wishes to address that

25  objection?

1    MR. GOLDBERG:  Your Honor, Adam Goldberg of Latham

2  & Watkins on behalf of Binance.US.

3    We are -- I think we have provided ample diligence

4  to the debtors on these issues that evidences the security

5  of the information and currency, cryptocurrency that is held

6  by Binance.US.  I am working with my client in order to be

7  in a position to respond to the Court directly about where

8  data is held, which would be in accordance with the

9  Binance.US privacy policy, which is available online on the

10  Binance platform.

11    THE COURT:  What does the privacy policy say about

12  where information is held?

13    MR. GOLDBERG:  I'm working on that right now, Your

14  Honor.

15    THE COURT:  Okay.

16    MR. GOLDBERG:  I can understand --

17    MS. DIRESTA:  And I'm sorry, just --

18    MR. GOLDBERG:  -- that is held in the United

19  States, Your Honor.

20    THE COURT:  Okay.

21    MS. DIRESTA:  What is held in the U.S.?  Is it my

22  personal information or also my crypto assets?

23    MR. GOLDBERG:  The response I just received is

24  that I understand personal data is held in the United

25  States.  Cryptocurrency is held in the United States and in

1 Japan.  So it's disclosed in the disclosure statement.

2     MS. DIRESTA:  And what about, you know, the

3 terminology of the company's employees and, you know, let's

4 just use CZ as an example.  CZ might be right now an

5 employee of Binance.com, but who's to say that at some point

6 he doesn't be considered an employee of Binance.US, and so

7 then he has access to my stuff.  And now, you know, then

8 Binance.com and Binance.US aren't independent like they

9 claim they are.

10     THE COURT:  Is CZ an employee of Binance.US and

11 does he have access to transfer customer assets off the

12 Binance.US platform?

13     MR. GOLDBERG:  Your Honor, CZ is the ultimate

14 beneficial owner in majority of Binance.US, not the

15 exclusive owner.  I can't get into the security protocols in

16 detail in an open proceeding for security reasons.  But my

17 understanding is that one individual would not be able to

18 cause the transfer of customer funds off of the U.S.

19 platform.

20     MS. DIRESTA:  But my question isn't how many

21 individuals can cause a transfer.  My question is can

22 Binance.com employees at some point then be considered

23 Binance.US employees, and therefore, someone like CZ now has

24 access to not just my crypto, but my personal information,

25 when they're supposed to be completely independent.

1     To me, independent means no employee of

2 Binance.com ever touches anything to do with Binance.US.

3     MR. GOLDBERG:  Your Honor, I can report to the

4 Court that CZ is not an employee and has no access to

5 personal information of customers or cryptocurrency of

6 customers on the Binance.US platform.  I think in terms of

7 the details of the division between Binance.US and

8 Binance.com, they are separate companies.  Binance.com does

9 not own Binance.US.  They are separate legal entities with

10 separate governance structures.  And I think the Debtor's

11 diligence should suffice to satisfy the statutory

12 requirements for their business judgment to go forward with

13 this deal.

14     MS. DIRESTA:  But the only person -- the only

15 employee you addressed is CZ because I gave him as an

16 example.  But what about all of the other employees, that no

17 Binance.com employees have access to Binance.US assets and

18 customer information; is that correct?  That no employees

19 whatsoever, not just CZ.

20     MR. AZMAN:  Your Honor, Darren Azman for the

21 committee.

22     While Mr. Goldberg looks for it, I think one thing

23 to remind the Court, at least as it relates to crypto and

24 creditors on the phone is, and this is by design, right, the

25 customers have two options here.  They can go (indiscernible

1 - 12:42:38).  And even if they do go with Binance, they can

2 pull their crypto off the platform immediately.  The

3 second that it's distributed and hits their account.

4     MR. GOLDBERG:  Your Honor, I would say two things.

5 One, the officer certificate which has been filed in the

6 Court, it says that only employees of the company are able

7 to move or withdraw customer assets from the company's

8 platform.

9     In addition to Mr. Azman's points, no one is

10 required to sign up to the Binance.US platform.  If they

11 don't want to be a Binance.US customer, they can have their

12 crypto liquidated and receive cash.

13     THE COURT:  The question was are there employees

14 of Binance.US who have access to the cryptocurrencies and

15 the power to move it, who are also officers or employees of

16 Binance.com?

17     MR. GOLDBERG:  Your Honor, my understanding is

18 that that is not the case.

19     THE COURT:  Okay.

20     MR. GOLDBERG:  In terms -- I assume Your Honor

21 meant that there would be officers of Binance.com who could

22 move assets, I believe you may have misspoken.  You said

23 Binance.US officers.

24     THE COURT:  Well, what I meant was, are there

25 people who do have that power because they are employees of

1 Binance.US, who are also officers or employees of

2 Binance.com?

3     MR. GOLDBERG:  Your Honor, I understand my

4 client's listening in and reports no.

5     THE COURT:  Okay.

6     MR. GOLDBERG:  Thank you, Your Honor.

7     MS. DIRESTA:  Did I hear him correctly, Your

8 Honor?  He said no employees of Binance.com has access to

9 anything in  -- with Binance.US?

10     THE COURT:  I believe that is what he said.  He

11 said that the people who are employees at Binance.US, who

12 have access to and the ability to transfer cryptocurrency,

13 are not officers or employees of Binance.com.

14     MR. GOLDBERG:  That's correct, Your Honor.

15     MS. DIRESTA:  Okay.  And then to the point that

16 the UCC just made about how customers can go to Binance and

17 immediately remove their assets, I understand that.  But my

18 personal information still ends up with Binance.  So I do

19 still have that concern, regardless of whether I can remove

20 my assets immediately.  And also, what system does

21 Binance.US share with Binance.com?  Because I think the

22 comingling of systems is not safe and secure.  Whether

23 that's regarding my crypto assets or my personal

24 information.

25     THE COURT:  Well, I'm not sure, you know, we're

Page 110

1   past the evidentiary stage.  We're addressing objections
2   that have actually been made.  On this particular point, did
3   you make an objection about this?  How does this relate to
4   one of the objections that's actually been made?
5       MS. DIRESTA:  Just related to security issues, and
6   that was being talked about right now.
7       THE COURT:  And it's -- you want to know what
8   contract arrangements Binance.com and Binance.US may have?
9       MS. DIRESTA:  What systems do they share?  Because
10  it's -- let's say they share a system that then, you know,
11  can make them get access to my crypto or my personal
12  information, you know, even if it's not intentional or
13  inadvertently.  I just don't know how secure that is, if
14  they might be sharing systems.
15      THE COURT:  I'll give Binance a chance to give you
16  a quick answer to that, but I think we've strayed -- we have
17  so much to accomplish today in terms of the objections that
18  have actually been filed, and I think that strays into new
19  territory, to tell you the truth.
20      MR. GOLDBERG:  Your Honor, Adam Goldberg of Latham
21  & Watkins on behalf of Binance.US, again.
22      I think I would make a couple of points.  One is,
23  I'll refer to the officer's certificate, which has been
24  filed with the Court that makes clear that the company, that
25  is Binance.US's relationship with Binance.com, is limited to

Page 111

1   the common ultimate beneficial owner and three commercial
2   agreements that the company previously disclosed to the
3   sellers' advisors.  On a professionals' eyes only and
4   confidential basis in connection with the sellers' diligence
5   related to the purchase agreement.
6       Those matters are confidential, proprietary, and
7   would be harmful to the market insecurity to be disclosed.
8   I would believe that the Debtor's diligence, as well as the
9   committee's diligence, have taken a deep dive on these
10  issues.  I think this has become extremely apparent from all
11  of these proceedings.  The level of diligence conducted on a
12  buyer of assets in this proceeding has been extraordinary
13  and well beyond the norm.
14      It is, from my experience, much more than would
15  typically be conducted on a seller of assets.  And so I
16  would invite the Debtors and the creditors committee to
17  express any concerns that they have about these issues.  I
18  understand their diligence continues to be ongoing, as they
19  have testified, but that they are satisfied at present.
20      And finally, I would make the point, Your Honor,
21  that if anyone individually feels uncomfortable, no one is
22  required to sign up to Binance.com and have their assets on
23  -- excuse me, Binance.US and have their assets on the
24  Binance.US platform.  We are merely making the platform
25  available to achieve distributions of cryptocurrency to

Page 112

1   customers that elect to receive it in that manner.
2       THE COURT:  Okay.
3       MR. GOLDBERG:  Thank you, Your Honor.
4       MS. DIRESTA:  Your Honor, they just keep bringing
5   up the whole crypto asset portion that I don't have to stay
6   on the platform, but my personal information does stay with
7   them, whether I want to open an account or not.  So of
8   course I had security concerns about -- and as you stated in
9   the very beginning of the hearing, why can't they just
10  simply have my email address if they want to market to me?
11  Why do they have to have my bank account, my -- a copy of
12  the photo of my driver's license, my biometric information,
13  and all of those other things.
14      You know, I'm -- for me, I'm already uncomfortable
15  for them having my email, but now they have all these other
16  things, so they keep saying, well, you know, you can sign up
17  and then immediately remove your assets.  That's my asset.
18  But you know what's more important to me is my personal
19  identifying information, especially when identity fraud and
20  hacking is very rampant nowadays.  I value that more than
21  thousands of dollars on a platform.
22      THE COURT:  Okay.  My understanding is they can't
23  distribute the crypto to you unless you become a customer,
24  and that you can't become a customer without them having to
25  know your customer and other information about you.

Page 113

1       I also understand from what they've said to day
2   that any customer has the option of telling Binance at any
3   time, not only to close an account but to delete all that
4   customer's personal information.
5       I can't make it any better than that.  I can't
6   order or suggest to Binance that it make distributions to
7   you without know your customer information and anti-money
8   laundering information, because I would probably be
9   directing Binance to do something that's illegal.  I can't
10  do that.
11      MS. DIRESTA:  And I understand that.  I just, like
12  I said, don't understand why they -- if I do not want to
13  open an account at all, why they can't just keep my email,
14  but leave the rest.  And I don't understand why I have to --
15  because earlier it was stated I would literally have to sign
16  up for a Binance account --
17      THE COURT:  That's an issue --
18      MS. DIRESTA:  -- and then request them to delete
19  it.
20      THE COURT:  That's the same issue that I have
21  raised as to why they need personal information of people
22  who don't want to open accounts.  And I think we're still
23  waiting to hear a definitive answer on what we can do about
24  that.  Okay?
25      MS. DIRESTA:  Okay.  Thank you so much, Your

A-1298

Page 114

1 Honor, for allowing me to speak.
2 THE COURT: Okay.
3 MR. EVANS: Your Honor, Joseph Evans from the
4 committee.
5 Just one thing. There was a question as to
6 inviting us to talk if we weren't satisfied with the
7 diligence (indiscernible - 12:51:41). I want to make clear
8 that the diligence process continues.
9 THE COURT: I understand. All right.
10 It's lunchtime. I think we're going to break
11 until 1:40 for lunch. And then we'll continue the argument.
12 Do we have any relief from the inflexible milestone, which
13 is beginning to look like quite a burden on the Court
14 because I not only have a lot of issues to rule on and a
15 decision to prepare (indiscernible - 12:52:17) but also the
16 extremely lengthy order to go through and mark up.
17 So do we have any relief from the proposed
18 milestone that that all be done by today?
19 MR. GOLDBERG: Your Honor, Adam Goldberg of Latham
20 & Watkins on behalf of Binance.US. That question has been
21 asked of our client. We do not have an agreement on
22 extension of the milestone at this time.
23 Time is of the essence on this transaction.
24 It may be of the essence, but you know
25 you've got an old man as a judge who can only do so much so

Page 115

1 quickly. So --
2 MR. GOLDBERG: We're grateful for your attention
3 and efforts, Your Honor, and all the time you've made
4 available for us. We'll be speaking to my client at lunch.
5 THE COURT: Okay. Please convey to them my strong
6 urging that they extend that milestone until tomorrow.
7 MR. GOLDBERG: Thank you, Your Honor.
8 (Recessed at 12:53 p.m.; reconvened at 1:40 p.m.)
9 THE COURT: Please be seated.
10 MS. OKIKE: Good afternoon, Your Honor. Christine
11 Okike of Kirkland and Ellis on behalf of the debtors.
12 Your Honor, we would propose to move next to the
13 unfair discrimination arguments.
14 THE COURT: Okay.
15 MS. OKIKE: So, Your Honor, Binance.US and the
16 debtors have had productive conversations with the
17 unsupported jurisdictions to date. As we noted, we've
18 reached a deal with Vermont which will allow customers in
19 that state to receive in kind distributions. And we're
20 committed to continuing to work with the other three states
21 to try to come up with solutions that will allow customers
22 in their states to also receive in kind distributions.
23 We have also made revisions the plan to allow
24 customers in unsupported jurisdictions who do not want to
25 sign up for the Binance.US platform to elect not to and to

Page 116

1 receive cash distributions on the same timeline as customers
2 in the supported jurisdictions.
3 Your Honor, New York and Texas allege that the
4 plan unfairly discriminates against account holders in their
5 states by potentially delaying their recoveries relative to
6 account holders in supported jurisdictions and by providing
7 that they will receive their distributions in cash instead
8 of crypto if Binance.US does not get the necessary
9 regulatory approvals.
10 Your Honor, we took a look at the voting results
11 to see what New York and Texas customers want. And 95.68
12 percent of Texas customers that voted, voted in favor of the
13 plan and 96.28 percent of New York customers that voted,
14 voted in favor of the plan.
15 We also confirmed that none of the customers that
16 filed objections are located in New York or Texas based on
17 our most recent contact information that the debtors have
18 for them.
19 Your Honor, while we're hopeful that we will reach
20 agreements with all the unsupported states, the plan as
21 amended does not unfairly discriminate --
22 THE COURT: Did you say none of the objectors or
23 none of the negative votes?
24 MS. OKIKE: None of the objectors based off of our
25 books and records including the ones who had -- did not file

Page 117

1 objections, but have raised concerns during the hearing are
2 located in New York and Texas. I do recall there was one --
3 THE COURT: There was somebody --
4 MS. OKIKE: -- woman --
5 THE COURT: -- who identified herself as --
6 MS. OKIKE: -- who identified --
7 THE COURT: -- from Texas.
8 MS. OKIKE: -- herself as Texas. We don't have
9 her listed as Texas --
10 THE COURT: Okay.
11 MS. OKIKE: -- but she may have moved.
12 THE COURT: Okay.
13 MS. OKIKE: So, Your Honor, while we'll hope -- we
14 are hopeful that we will reach agreements with all the
15 unsupported states, we do not believe that the plan unfairly
16 discriminates against account holders in unsupported
17 jurisdictions.
18 THE COURT: How is that -- what is the deal you
19 reached with Vermont and why is that not good enough for all
20 of the states?
21 MS. OKIKE: Your Honor, we hope that that deal is
22 good enough for all the states. It was reached very
23 recently. I think we filed it the night before the
24 confirmation hearing. My understanding is that Hawaii is
25 likely to also sign onto that deal. But, unfortunately, New

Page 118

1  York did not really engage with us on any constructive
2  solutions. We have had conversations with Texas that have
3  been productive, but I think they will require potentially a
4  more creative solution than Vermont given --
5       THE COURT: The Texas submission, I was a little
6  befuddled because the Texas submission said, I think, that
7  other than with respect to stablecoins they don't think you
8  need any licenses to do what you want to do and that even as
9  to stablecoins, if I remember right, they thought you could
10 make the initial distributions. It's just that Binance
11 couldn't continue to trade them without some --
12      MS. OKIKE: Correct, Your Honor.
13      THE COURT: -- further approvals.
14      MS. OKIKE: And my understanding is that
15 Binance.US's existing infrastructure does not allow them to
16 turn off trading for specific coins.
17      THE COURT: I see.
18      MS. OKIKE: So Texas, if -- to the extent we are
19 able to reach a resolution will require a more creative
20 solution.
21      MS. WALL: Judge Wiles, this is Jennifer Wall and I was
22 the one that spoke up last week. I am a resident of Texas.
23 I have been a resident of Texas for 43 years.
24      THE COURT: Okay. Thank you, Ms. Wall.
25      MS. WALL: Thank you.

Page 119

1       THE COURT: Okay. Go ahead, Ms. Okike.
2       MS. OKIKE: So, Your Honor, our view is that all
3  account holders regardless of where they reside are going to
4  have their claims dollarized as of the petition date and are
5  going to receive the same pro rata recovery based on all
6  account holder claims.
7       Your Honor, we don't dispute that the ability of
8  customers in the unsupported jurisdictions to access their
9  recovery and the form of that recovery may be different from
10 customers in supported jurisdictions. But any difference in
11 the outcome for account holders in New York, Texas or any
12 other unsupported jurisdiction is of the unsupported
13 jurisdiction's own making.
14      The unsupported jurisdictions can, as the other 47
15 states have, provide a way for their constituents to receive
16 distributions in kind. And the fact that they have not does
17 not mean that the plan unfairly discriminates against
18 customers in those --
19      THE COURT: Well, that's --
20      MS. OKIKE: -- states.
21      THE COURT: -- putting it a little pejoratively,
22 isn't it? You make it sound like the jurisdictions are
23 acting out of spite or laziness or who knows what else.
24 It's really a question of they have different regulatory
25 requirements and you can only do what your existing licenses

Page 120

1  permit you to do, isn't that what it is?
2       MS. OKIKE: That's correct, Your Honor. But they
3  can't have it both ways. They can't ask us to comply with
4  regulations that don't permit us to make in kind
5  distributions and also act -- ask for their customers to
6  receive in kind distributions.
7       THE COURT: Right. As I understand it, the -- now
8  that you've equalized the ability to get cash distributions,
9  essentially what you've said is people who want in kind can
10 get it from Binance and they can get it as soon as they are
11 able to become Binance customers in compliance with the laws
12 of the jurisdiction -- the state where they reside.
13      MS. OKIKE: Correct.
14      THE COURT: And in some states that's more of a
15 problem than in others.
16      MS. OKIKE: Correct.
17      THE COURT: Okay. Is somebody here representing
18 New York?
19      My --
20      MR. ST. JOHN: Good afternoon, Your Honor.
21      THE COURT: You know, my question for plan
22 purposes is whether the plan creates a discrimination, but
23 it sounds to me like the debtors and Binance would be more
24 than happy to distribute to New York customers exactly the
25 same way they do everywhere else, and that the only thing

Page 121

1  standing in the way of that is New York's regulations and
2  the status of licenses in New York state.
3       Why is that an impermissible discrimination by the
4  plan?
5       MR. ST. JOHN: Good afternoon, Your Honor. Jason
6  St. John for -- on behalf of the New York State Department
7  of Financial Services.
8       To answer your question, there are still two
9  differences between what a New Yorker today or frankly six
10 months post-closing is going to be able to achieve and the
11 same account holder in New Jersey or, you know, any of the
12 other 48 or the other states that are supported
13 jurisdictions.
14      One, there's still no possibility of, you know,
15 crypto in kind recovery and, two, to the timeline, the last
16 possible date for an account holder in the supported
17 jurisdictions to receive the dollarized value in cash of
18 their claim is three months post-closing. And for New York,
19 that date is still six months post-closing even under the
20 amended plan.
21      We want to note, of course, that, you know, the
22 amendments that, you know, Your Honor encouraged on Friday
23 and that the debtors of Binance --
24      THE COURT: It was only -- it's only six months if
25 there's a New York customer who would prefer to wait and see

A-1300

Page 122

1  if they can become a Binance customer, right?

2          MR. ST. JOHN:  Yes, Your Honor.  But part of the

3  basis of our objection is that the option of a in kind

4  recovery due to, you know, Binance licensure six months

5  post-closing isn't a realistic scenario.  So the option

6  that's being given to those account holders isn't a

7  realistic one grounded in fact.

8          You know, we haven't heard anything other than a

9  -- you know, of statements in the reply memorandum of law

10 and statements in the plan that they will try for licensure

11 to show that that is actually a realistic possibility.

12         So the idea of holding off on recovery for New

13 Yorkers until, you know, possibly six months post-closing

14 for those who, you know, have perhaps failed to elect to

15 receive their recovery in cash still prevents an instance of

16 unfair discrimination in that point.  It's not a realistic

17 option.

18         THE COURT:  Well, there's a difference between

19 saying it's not a realistic option and that it's an unfair

20 discrimination.  Nobody's -- no customer is forced to wait

21 the six months.  They -- if they want their crypto in kind

22 and want to take their chances on being a Binance customer,

23 they can make that choice, take their chances whether

24 Binance gets the approvals or not.

25         But I don't -- I just don't see how this is -- you

Page 123

1  know, they're trying to do what they can do consistent with

2  what the regulatory restrictions are.  You know, in your

3  papers you said it's their own fault if they don't already

4  have the approvals.  That doesn't mean that the plan is

5  creating a discrimination.  Maybe it means that the past has

6  created a discrimination, but it doesn't mean that the plan

7  is -- we can only deal with the situation as it exists.

8          MR. ST. JOHN:  Uh-huh.

9          THE COURT:  And I think you would be the first one

10 to admit that they cannot do in New York right away what

11 they're proposing to do for Ohio customers.

12         MR. ST. JOHN:  That's absolutely correct.

13         THE COURT:  I presume you're not suggesting that

14 we should deny all residents of all other states the right

15 to get crypto currency distributions.

16         MR. ST. JOHN:  Absolutely not, Your Honor.  Our

17 objection is --

18         THE COURT:  That's --

19         MR. ST. JOHN:  -- focused on New Yorkers.

20         THE COURT:  -- the only way I can think of to make

21 it equal.  There's no other way to do it unless we make

22 everybody wait until whenever the regulatory process drags

23 out or unless we deny everybody in the country the

24 opportunity to get something just because New York customers

25 can't get it.

Page 124

1          Is there any other way to make it equal in the way

2  that you suggest?

3          MR. ST. JOHN:  Well, one, I think, immediate and

4  relatively easy adjustment would be rather than three months

5  post-closing being the date by which New Yorkers may elect

6  to receive cash, as it is with the supported jurisdictions

7  simply have that be the date in which they will receive a

8  dollarized value of their claim.

9          THE COURT:  Well, but your complaint is about

10 equal -- by the way, it's phrased as unfair discrimination

11 which I think as a bankruptcy matter is the wrong term

12 because I don't need a cram down as to this class.  I have

13 an acceptance by this class.  I think your real argument is

14 whether all members of the class are being treated the same.

15         MR. ST. JOHN:  Yes, Your Honor.  I apologize.

16         THE COURT:  And even that standard is they have to

17 be treated the same unless they elect otherwise.  So if a

18 New York customer elects not to cash out and to wait to see

19 if he or she can get crypto currency in kind from Binance,

20 how does that violate the requirements of the code?

21         MR. ST. JOHN:  Right.

22         The difference in timeline is, you know, again, as

23 we've alleged unequal treatment within a class.  The --

24 while case law certainly does allow, as Your Honor's pointed

25 out and the debtors pointed out in their reply memorandum of

Page 125

1  law, differences in either type of consideration or even

2  timeline on distribution for reasons, we would allege there

3  hasn't really been a reason here.  The debtors have and

4  Binance have held out the hope of licensure or negotiation

5  within that six-month time frame.  They -- you know, they

6  haven't really produced any evidence to show that the idea

7  or the, you know, perspective being --

8          THE COURT:  But, you know, what if they had said

9  customers in New York have to wait a year and a half.  That

10 would correspond to your regulatory timeline maybe, but it

11 seems to me that would be worse for New York customers

12         MR. ST. JOHN:  We would be making the same

13 objection, Your Honor, of trying to you, know, get quicker

14 recovery for New York account holders.  But perhaps I'm

15 missing your point.

16         THE COURT:  So you don't want any New York

17 customers to have the right to wait to see if Binance can

18 get approval?

19         MR. ST. JOHN:  Yes, Your Honor.  That's one way of

20 putting it.  We could also perhaps phrase it as, you know,

21 we don't think that the debtors and Binance have shown

22 through the plan or the supplemental materials that that's a

23 realistic option for New York account holders such that --

24         THE COURT:  Why can't New York account holders

25 make that decision for themselves?

Page 126

1       MR. ST. JOHN:  Even if they were, Your Honor, it
2   is still an extra three months away from the latest possible
3   account holder in Ohio or New Jersey or a supporting
4   jurisdiction.
5       THE COURT:  But they can -- you know, it's only if
6   they so elect, right?
7       MR. ST. JOHN:  Yes, Your Honor.  Although, if I
8   may respond.  You know, given the number of creditors who
9   voted on the current plan, there may be reason to suspect
10  that, you know, creditors may not -- may miss a -- you know,
11  an election that's been given to them by the debtors to
12  receive their cash, you know, value and then at that point
13  their recovery would be delayed by --
14      THE COURT:  All right.  But it's not --
15      MR. ST. JOHN:  -- three months.
16      THE COURT:  -- unequal treatment under the plan if
17  people pay no attention and fail to take advantage of the
18  rights that they're given.  There's only --
19      MR. ST. JOHN:  it is.
20      THE COURT:  There's only so much I can do.  You
21  know, when you have this many people involved, is somebody
22  going to sleep on their rights, ignore things, fail to make
23  claims.  All kinds of things can happen.  There's only so
24  much I can do.
25      MR. ST. JOHN:  Of course, Your Honor.

Page 127

1       THE COURT:  Right.  And so if people have the
2   right to cash out at exactly the same time, that's the
3   feature that worried me because it did seem to be in the
4   parties' control and it did seem to be a difference that I
5   was having trouble thinking of a justification for.
6       But --
7       MR. ST. JOHN:  And we appreciate the parties
8   reaching, you know --
9       THE COURT:  Yeah.  But the --
10      MR. ST. JOHN:  -- an amendment (sic) on that
11  point.
12      THE COURT:  -- ability to -- but they cannot do --
13  they cannot give crypto, so you're saying that equal
14  treatment would mean cashing them out even if they don't
15  want to be cashed out, even if they would prefer to wait to
16  see if they might still get in kind distributions.  How is
17  that the same treatment?
18      MR. ST. JOHN:  Your Honor, again, so we are the
19  licensing entity.  You know, as the debtors have pointed
20  out, that's, you know, seemingly, you know, holding up this
21  in kind distribution.  And we're objecting on the grounds
22  that we don't think that option or that -- to New Yorkers to
23  wait to see if there will be in kind distributions is one
24  that's grounded in fact or a realistic scenario even six
25  months post-closing.

Page 128

1       THE COURT:  Why does this take so long?
2       MR. ST. JOHN:  Your Honor, New York is a pretty
3   strict virtual currency licensing regime.
4       THE COURT:  That just tells me that it takes long.
5   (Laughter)
6       THE COURT:  Why does it -- what does that mean?
7   What has to be done and why does that take so long?
8       MR. ST. JOHN:  Your Honor, there's a number of
9   requirements that go into virtual, you know, currency
10  licensing regime.  You know, showing reserve requirements,
11  of course meeting certain cyber security regulations and
12  showings.  You know, as Your Honor likely knows, you know,
13  complying with regulatory requirements can certainly just
14  take a while, which is sometimes at odds with the bankruptcy
15  goal of returning accounts or, you know, or accounts or
16  claims to creditors as quickly as possible.
17      And so in this case we do have a conflict here.
18  But New York as the licensing entity can simply waive its
19  licensing requirements to allow Binance to make that
20  distribution.
21      THE COURT:  And what about the Vermont solution,
22  why doesn't that work for New York?
23      MR. ST. JOHN:  Of course, Your Honor.
24      From my understanding, but I will defer to the
25  debtors and to Binance if I misunderstand it, the Vermont

Page 129

1   solution is a full trading account that limits staking and
2   has a sunset date which is not -- that's essentially
3   granting licensure to Binance for those New York account
4   holders if it allows full trading.  That's not a, from our
5   view, a particularly limited account that would or a limited
6   licensure that would be a possible negotiation for us.
7       Of course, I defer to the debtors and Binance if
8   I've misstated that deal.
9       THE COURT:  I'm sorry.
10      MR. ST. JOHN:  I would defer to the debtors and
11  Binance if I have misunderstood the deal with Vermont.
12      THE COURT:  Well, I think any difference in
13  treatment that results here is the result of regulatory
14  constraints.  And the particular differences that you
15  complained about, which is the ability to get crypto
16  currency, is that is -- that would not be solved by the
17  solution that you suggested, which is just forcing everybody
18  to get cashed out in three months whether they want to or
19  not.  It seems to me that forcing that decision on everybody
20  actually would create more of a differentiation.
21      As long as Binance is trying to get licensed in
22  New York, and so long as people in New York would prefer to
23  take their chances and possibly get their crypto in kind, it
24  seems to me that the debtor's proposal actually goes further
25  in the way of kind of providing the same opportunities, as

Page 130

1  least as far as they can in light of regulatory constraints.
2       And I don't think your proposed solution is really
3  an answer.  I think your solution would make it worse.
4       MR. ST. JOHN:  Okay.  Yes, Your Honor.  You know,
5  as our objection noted, you know, the objection was on two
6  points, both distribution of, you know, crypto in kind and
7  the timeline.  It seems like Your Honor has already answered
8  the timeline point.
9       On crypto in kind, again, the distribution
10 couldn't -- you know, right now would not happen through
11 Binance for regulatory reasons.  You know, obviously under
12 the toggle it would happen through Voyager.  It seems as
13 though, you know, it is still possible for Voyager to
14 execute the toggle.
15      THE COURT:  Well, but if they do the Binance deal,
16 they will have sold their platform.  They won't be able to
17 do anything.  They won't -- they couldn't transfer crypto
18 anymore than I could, I don't think.
19      MR. ST. JOHN:  They would still be effecting
20 transfers to --
21      THE COURT:  Well, probably they could do it better
22 than I could.
23      (Laughter)
24      THE COURT:  I think anybody in the room could
25 probably do it better than I could, but.

Page 131

1       MR. ST. JOHN:  Yes, Your Honor.
2       They would still be effecting transfers to
3  Binance, of course, and we recognize that's a different
4  scenario than transferring to account holders themselves.
5       THE COURT:  Yeah.  Okay.
6       MR. ST. JOHN:  Thank you, Your Honor.
7       THE COURT:  Does Texas have anything in addition
8  that they want to add on this issue?
9       MS. RYAN:  Yes, Your Honor.  For the record this
10 is Abigail Ryan with the Office of the Texas Attorney
11 General on behalf of the State Securities Board and the
12 Texas Department of Banking.
13      I was happy to see the change that our citizens
14 can get a cash out option as early as three months to be
15 aligned with supported jurisdictions' account holders that
16 choose not to go to Binance.  I think that makes it a more
17 fair plan in that regard.
18      And while we would love to see our citizens get
19 their crypto back, at this point due to the set up of our
20 regulatory (indiscernible) here in Texas, that's not an
21 option.
22      However, we have been in conversations with
23 Binance and the debtors and we are looking to do some sort
24 of an agreement like Vermont, but as Ms. Okike said, it will
25 have to be a little different based upon our rules here.

Page 132

1  The trading of the stablecoin, the ability to stake, those
2  things we can't agree to.  But if Binance can find a way to
3  do a withdrawal only account, I think that's something that
4  we definitely could consider and we will move forward in
5  these discussions in hopes that we can come to an agreement.
6       THE COURT:  Okay.
7       MS. RYAN:  I will say that from a Texas resident,
8  that is wonderful news for all the residents in Texas.  So
9  thank you very much for (indiscernible) that.
10      MS. WALL:  Thank you.  Absolutely.
11      And if you have any questions, Your Honor, I'm
12 happy to answer them.
13      THE COURT:  No.  It sounds like as long as we've
14 made the cash out option that you understand that there's
15 only so much that can be done in terms of making crypto
16 available in kind and that it's not really a bankruptcy
17 issue at that point.
18      And I -- to the extent you can work it out with
19 the parties, I encourage you to do so and hope you are able
20 to do so.
21      MS. RYAN:  Thank you, Your Honor.  Me, too.
22      THE COURT:  All right.  Is there anybody else that
23 wants to be heard on the, what I will call the unequal
24 treatment or unfair discrimination argument?
25      MR. NEWSOM:  Your Honor, this is Dan Newsom, pro

Page 133

1  se creditor.  I did file an objection as it relates to the
2  plan for VGX, specifically Section 1123(a)(4) in terms of
3  unequal treatment for VGX account holders.
4       THE COURT:  Yeah.  I saw your objection, but I was
5  having a little trouble understanding just what you think is
6  unequal about the treatment.
7       MR. NEWSOM:  Well, I would be happy to expound on
8  that, Your Honor.
9       I believe -- first it's important to state that in
10 the event that the smart contract is not sold, it's
11 important for Your Honor to understand that VGX has no
12 underlying technology or utilities, and in the event that
13 it's not sold, even the treasury statement states that VGX
14 may decline in value and may have no value post confirmation
15 of the plan.
16      So as it relates to discriminatory treatment, I
17 bought VGX prior to petition date.  I bought a crypto
18 currency that had utility, had value from the described
19 organization which by their accounts had a straight road
20 trajectory.
21      Following the petition, in the event that the
22 smart contract is not sold, I would be receiving something
23 in kind that is not what I bought prior to petition where
24 other creditors in the same class are going to get back
25 their pro rata share of crypto currency that not

1   fundamentally changed.

2         So in terms of opportunity for recovery, I believe

3   that in the event that the smart contract is not sold, the

4   VGX account holders would be discriminated against unfairly.

5         THE COURT:  What are the smart contracts and how

6   did they tie in with VGX, and would you say it's otherwise

7   -- otherwise there's no underlying contract?

8         Ms. Okike, can you explain all that to me in terms

9   a fourth grader would understand?

10        MS. OKIKE:  Sure.

11        Your Honor, so my understanding is that the smart

12   contracts determine the utility of the token, so the value

13   of the token.  And different entities could use the smart

14   contracts to generate utility for the token.

15        We are not selling the smart contacts (sic) in

16   connection with the Binance.US transaction.  Binance.US has

17   agreed to submit VGX for listing, to go through the process

18   of listing the token on the exchange.  It's not currently

19   listed.  And we are actively marketing the smart contracts

20   that underline the token.

21        Our hope is that we are able to sell the smart

22   contracts to a third party which will allow the token to

23   continue to have utility going forward.

24        Your Honor, in our view VGX is no different than

25   other tokens that don't have utility like Bitcoin or

1   Dogecoin, and the value will fluctuate depending on a number

2   of different factors.  And from our perspective we don't

3   believe that there's unequal treatment with respect to VGX

4   because --

5        THE COURT:  VGX is on a blockchain transfer of the

6   same kind of ways that either Bitcoin or other --

7        MS. OKIKE:  Correct.

8        THE COURT:  Okay.  So it may not be as attractive

9   to people as Bitcoin, but it's just another coin in that

10   respect.

11        But these smart contracts that -- what exactly are

12   they and how do they support or generate value to VGX?

13        MS. OKIKE:  Your Honor, I may need to ask Mr.

14   Tishner (phonetic) to help on the technical aspects with

15   respect to that.

16        MR. AZMAN:  Your Honor, if you would like Mr.

17   Evans can probably provide us the technical information --

18        THE COURT:  That's fine.

19        MR. AZMAN:  -- rather than calling a witness.

20        MR. EVANS:  Joseph Evans, McDermott Will & Emery

21   on behalf of the committee.

22        Your Honor, each token has a smart contract.  That

23   smart contract dictates how a token will work.  And so what

24   the token is worth, if there are any rewards for staking the

25   token, for example, but as a technical underpinning for each

1   token VGX is what's called an ERC20 token.  That means that

2   it's traded on the Thorium blockchain, like many other

3   tokens, but it has its own smart contract that governs how

4   transactions will work and what the token can be used for.

5        There's a little bit of a difference between

6   utility and smart contract.  Utility is what the token is

7   used for, meaning can I buy things with it, can I pay

8   transaction fees with it, can I use it to join a group, for

9   example.

10        But the smart contract is the technical software

11   that permits it to work.  And so what's being marketed is

12   the sale of that smart contract so a third party can use,

13   possibly withdraw the smart contract and initiate a new one

14   to allow for other usages of VGX.

15        THE COURT:  Okay.  Thank you.

16        And if nobody buys the smart contract, how could

17   anybody use VGX?

18        MR. EVANS:  Well, the smart contract is public.

19   It's out in the world.  And so VGX can still be traded and

20   used.  It's just -- there will be no entity behind it really

21   making improvements or trying to figure out how to use it in

22   a meaningful way.

23        And so I think what the concern is, is that

24   without any entity really using and promoting the VGX smart

25   contract, the value of VGX will decline and the amount of

1   entities actually using it for something other than

2   speculation would decline.

3        THE COURT:  Do all crypto currencies have backing

4   of that kind and smart contracts of that kind?

5        MR. EVANS:  Yes.

6        THE COURT:  So Bitcoin, for example?

7        MR. EVANS:  Well, Bitcoin is a separate

8   blockchain, so Bitcoin is a blockchain that only -- that the

9   Bitcoin token is on.  Ethereum, for example, is another

10   blockchain and there are a variety of other tokens that are

11   offshoots of the Ethereum blockchain.  Those are called

12   ERC20 compliant.  Those each have their own smart contracts.

13        THE COURT:  Okay.  I'm pretty sure I would not

14   pass a test on this subject, but I think I understand.

15        (Laughter)

16        MR. EVANS:  Thank you, Your Honor.

17        MR. AZMAN:  Your Honor, I think what you're -- you

18   were getting at just now is that the risk of the VGX token

19   potentially not being worth anything is a risk that you

20   might have with any other token that's being distributed

21   such that if Bitcoin were to collapse tomorrow, you could

22   potentially make the same argument.

23        But I don't think that that is unfair or

24   discriminatory treatment.

25        THE COURT:  Well, I think in fairness to the

1  objection, what he's saying is VGX may have a much higher
2  chance of cratering than Bitcoin does.
3       Is that essentially what you're saying?
4       MR. NEWSOM:  Thank you, Your Honor.
5       I would actually go further to state that VGX
6  uniquely is singularly impacted by the actions or inactions
7  of the debtors.  And (indiscernible) that VGX has
8  (indiscernible) utility in the event that its smart contract
9  is not sold to an entity other than speculation is very
10  misleading, Your Honor.  No one's going to be able to sell
11  VGX as -- or use it as a currency, use it in any way.  It's
12  literally just an ERC20 branch -- excuse me -- branch chain
13  (sic).
14       What -- you can -- anybody can just create a chain
15  off of the ERC20 token and the smart contract allows VGX to
16  be (indiscernible) into infinity.  That precipitates the
17  drop in value even further.
18       So I -- there's really, really no value for VGX
19  other than (indiscernible) speculation -- I'm sorry -- I
20  said (indiscernible) in the court, Your Honor, but that's
21  what this might become.  And the chance that it has any
22  value at all if the debtors do not smell the smart contract
23  is nearly guaranteed.
24       THE COURT:  And what is the solution that you
25  suggest?  Are you saying that --

1       MR. NEWSOM:  The specific relief for -- I'm sorry.
2  Go ahead.
3       THE COURT:  Yeah.  Are you saying the debtor
4  shouldn't distribute VGX to people who had it?
5       MR. NEWSOM:  I'm saying that in the event that
6  they don't smell the smart contract, they've admitted that
7  they remain hopeful that they can.  However, I think that
8  the FTC's unique statements from the last couple of days'
9  hearings might add additional barriers to that.
10       But in the event that they don't smell the smart
11  contract, that they allow VGX holders to -- or I guess
12  rather they liquidate VGX position and distribute it in
13  UFC (sic) rather than giving it to them in kind so then have
14  to work with (indiscernible) digital code and instead
15  receive their pro rata share of UFC at the same algorithm
16  that all the other second class creditors are receiving.
17       THE COURT:  Of course, you and other holders of
18  VGX, if you don't want VGX, have the right to just get cash
19  for all your cryptocurrencies.  You just don't have the
20  right to kind of do that on a coin by coin basis, right?
21       MR. NEWSOM:  That is correct.  If I -- I had
22  multiple positions, Your Honor, but I did have a large VGX
23  position.  And if I wanted to take all of those positions in
24  cash, I would have to take all of them in cash, not just
25  VGX.

1       THE COURT:  Right.
2       Well, I'm not sure how as a practical matter it
3  would be possible for the debtors to do the re-balancings
4  and calculations that they would need to do if they were
5  going to give people a sort of coin by coin decision-making
6  opportunity as to whether as to that particular coin they
7  wanted cash or the coin.  I just -- what I do understand
8  about this, it seems to me that the task would be just about
9  impossible.
10       MR. NEWSOM:  Your Honor, I do think that it would
11  probably be an undue burden to a lot of the, you know, the
12  individual choices or cryptos to be liquidated either in
13  cash or in kind.  That probably would become plus.  However,
14  Voyager is -- or the VGX token is unique in that Voyager
15  actually has direct control over its stake.  And in the
16  event that it does not take the necessary steps
17  (indiscernible) smart contract, they are in -- they are
18  materially impacting the opportunity for recovery of VGX
19  account holders.
20       Further complicating the matter, Your Honor, is
21  that Voyager holds in my estimation somewhere in 35 million
22  plus of their own VGX tokens.  And if they go to liquidate
23  that on the open market, that further drops the price of the
24  token and therefore the opportunity of recovery for
25  creditors.

1       There's a lot that Voyager can't control about the
2  outcome of the recovery for creditor.  And I think it is
3  unique and deserves a special carveout in the disclosure
4  statement and the plan in the event that they don't sell the
5  smart contract.  They have a responsibility to the creditors
6  (indiscernible).
7       THE COURT:  What's the debtor's response?
8       MS. OKIKE:  Your Honor, from the debtor's
9  perspective, I agree with -- and, apologies, I don't
10  remember the gentleman's name.  I agree that the debtor's --
11       THE COURT:  It's Mr. Newsom.
12       MS. OKIKE:  Mr. Newsom.
13       I agree with Mr. Newsom that the debtors do have
14  more control with respect to VGX just given that it's a
15  token obviously that is issued by Voyager.  We have every
16  intention of doing what we can to make sure that there is
17  utility going forward.  But the reality is, is that we are
18  either consummating a sale transaction or a liquidating
19  transaction and winding down.
20       And so while the plan provides for all account
21  holders to receive the same recovery, same pro rata recovery
22  based off of values of the tokens at a particular point in
23  time, there is the risk of, you know, a material decrease in
24  value of VGX to the extent that there is no utility going
25  forward.  And we acknowledge that.  I'm not sure what the

Page 142

1  solution is.  I think from our perspective we do still
2  believe that creditors are being treated equally because
3  we're determining the value at a specific point in time.
4  Customers are receiving distributions.  They're able to cash
5  them out immediately if they so choose.
6       THE COURT:  When customers get in kind
7  distributions, if I had VGX in my account, am I going to get
8  more VGX than I ever held in the past or --
9       MS. OKIKE:  No.
10      THE COURT:  Okay.  So it's not like my entire --
11  I'm going to be a poor customer who gets an entire
12  distribution in the form of VGX or anything like that.
13      MS. OKIKE:  No.
14      THE COURT:  Okay.  Unless V --
15      MS. OKIKE:  And so what we are doing --
16      THE COURT:  Unless VGX is the only thing that I
17  ever owned.
18      MS. OKIKE:  Correct.
19      What we are doing in the rebalancing is making
20  sure that people get their pro rata recoveries in the same
21  form.
22      THE COURT:  Does anybody have any idea of how
23  likely it is that VGX will continue to have value?  I mean,
24  I -- somebody -- I asked somebody the other day what the
25  current value is and they told me and I forget, but it was

Page 143

1  relatively low.
2       MS. OKIKE:  I think it was 30, 36 cents, 33 cents.
3  We can check.  I believe it was in the 30 cents.
4       But, Your Honor --
5       MR. NEWSOM:  Your Honor, it's currently 39 cents,
6  but I -- it is important to understand that the majority of
7  the (indiscernible) is locked up on the platform and that
8  number can be manipulated, I suppose, easily by market
9  forces.
10      Furthermore, my cost average was close to $2.00.
11  And so, I mean, I -- it's -- I mean, 39 cents is relative to
12  the average cost of VGX to take on a (indiscernible)
13  position, but I don't think that we can clearly state that
14  because VGX has increased in value since we filed the
15  petition that it will continue to do so.  In fact, if we
16  remove the smart contract -- or don't sell the smart
17  contract, there's no value.  It's (indiscernible) a
18  guarantee that it goes to zero and the opportunity for
19  recovery is essentially lost, zero.
20      MS. OKIKE:  Your Honor, I think the reality is we
21  just don't know.  Everyone knows Voyager is in bankruptcy
22  and VGX has been rising.  So there's no real explanation for
23  why VGX is rising, but it has.  And I don't think we know
24  how it will trade post-closing.  And I think that's --
25      MR. NEWSOM:  I think we can read --

Page 144

1       MS. OKIKE:  -- the same --
2       MR. NEWSOM:  Excuse me.
3       MS. OKIKE:  I'm sorry.
4       MR. NEWSOM:  I'm sorry.  Go ahead.
5       MS. OKIKE:  No.  No.  go ahead.
6       MR. NEWSOM:  I was just saying that I think we can
7  reasonably assume that it's risen in price because of the
8  speculatory nature of in the event the smart contract sold.
9  Also, the elements that (indiscernible) more is locked up
10  and you can move the price easily and therefore manipulate
11  the market to make money off of (indiscernible) trading.
12      I think that those elements will not exist going
13  forward post-consummation of the deal and the failure to
14  sell the smart contract.
15      MR. AZMAN:  Your Honor, Darren Azman for the
16  committee.
17      Just a practical thought.  And I think what the
18  gentleman on the phone is suggesting that he would like to
19  have happen is for the estate to liquidate VGX and
20  distribute cash.  I think that's what I'm hearing.
21      But if the estate were to do that, that in and of
22  itself would have the same effect on the price of VGX.  It
23  would probably crater.  So whether the VGX is liquidated in
24  the hands of customers immediately after they receive it or
25  whether it is liquidated today, it's --

Page 145

1       THE COURT:  I think as I understand the objection
2  it's not that so much.  It's that Mr. Newsom thinks that the
3  current market value for VGX is much more elusory than the
4  current market value for other coins, and that treating it
5  as an item that actually has a value of 39 cents as of the
6  date of distribution is unrealistic and has the effect of
7  reducing his recovery because there's, unlike other coins,
8  there's much greater risk that the real value of VGX is
9  zero.
10      I think that's -- does that correctly sum up your
11  objection, Mr. Newsom?
12      MR. NEWSOM:  Yes, Your Honor.  That's a pretty
13  fair characterization.
14      MR. AZMAN:  I'm not sure how we fix that.
15      MS. OKIKE:  Your Honor, but just to -- further
16  counterargument, I mean, if we are able to sell the utility,
17  the smart contracts underlying the token, and the value
18  rises, I mean --
19      THE COURT:  He might get more.
20      MS. OKIKE:  Exactly.
21      THE COURT:  Right.
22      MR. NEWSOM:  And to be clear, I'm not asking that
23  the debtors do not continue to pursue the sale of the smart
24  contract.  I do think it is more unlikely since the FTC has
25  stated that some of their staff believe it has elements of

1 the security streams action.

2 However, I remain hopeful that the ultimate buyer

3 would be a high quality buyer that intends to comply with

4 all regulatory (indiscernible).  But I think that's probably

5 unlikely, and hope is not a strategy here and where we fail

6 to do that we are materially impacted.

7 I would state that the difference between

8 liquidating as part of the estate and distributing

9 (indiscernible) pro rata share in cash to VGX account

10 holders is different than giving them in kind VGX

11 distributions and then allowing them to sell it on the open

12 market.  I do think that's -- it -- I think it's -- it

13 needed to be pointed out to Mr. Azman's point that there is

14 a difference in those two things.

15 THE COURT:  But assuming we can't give customers

16 the right to make a coin by coin election, because I just

17 don't think that would be practical, what other solution do

18 we have, Mr. Newsom?  You most certainly, and everybody

19 else, have the right to take cash instead of any

20 cryptocurrencies.  I'm not sure that there's any

21 intermediate approach that is practical.

22 Do you -- what is it you see --

23 MR. NEWSOM:  It would need -- I'm sorry.

24 THE COURT:  Go ahead.  What would you suggest?

25 MR. NEWSOM:  Well, do we need a coin by coin

1 solution here or should we just specifically carve out these

2 -- well, let me rephrase that.

3 Should we amend the disclosure statement and the

4 plan which is already singled out for VGX.  It would just be

5 more thorough or thoughtful, rather, in the event that the

6 smart contract is not sold and a plan as a result of that.

7 VGX is already singled out in the plan and the disclosure

8 statement.  I'm just asking that we be a little bit more

9 thorough and thoughtful about how that opportunity for

10 recovery is more equal to those VGX account holders.

11 THE COURT:  Given the amount of VGX the debtor

12 holds at that current market price, what does that translate

13 to in terms of value?

14 MR. NEWSOM:  I believe it's between 10 and 20

15 million based off of Mr. Tishner's testimony and that's

16 probably in line with what I believe they had in 35 million

17 to 40 million tokens (indiscernible) in the estate.  But I

18 -- correct me if I'm wrong.

19 THE COURT:  And we have some people scurrying

20 around the room getting an answer to the question, so.

21 MR. SLADE:  Your Honor, I apologize.  Mike Slade

22 for the debtors.

23 If we disclose the information it's going to move

24 the market.  That's the concern.

25 THE COURT:  Oh, you -- it's not public how much

1 you hold at the moment?

2 MR. SLADE:  No.

3 THE COURT:  Okay.

4 Is it fair to say it is a relatively small

5 component of the total value that will be distributed?

6 MR. NEWSOM:  Your Honor, I believe 30 percent of

7 accounts held some amount of VGX.  I believe it's the third

8 largest holding on the platform.

9 THE COURT:  Well, that's different in terms of,

10 you know, measuring the value of what's being distributed.

11 MS. OKIKE:  I would say it's relatively small

12 compared to the overall value of the portfolio.

13 THE COURT:  The problem, Mr. Newsom, is it seems

14 to me you yourself would not want the debtors to just give

15 up on VGX.  You kind of want them to, I don't know what,

16 wait, see if they can sell the smart contract before they

17 distribute VGX.  I'm not sure we have that option at the

18 moment, to tell you the truth.

19 So what are we supposed to do?

20 MR. NEWSOM:  I think that's part of the problem,

21 Your Honor, is that we don't know the fate of VGX.  We don't

22 know that Binance.US is in (indiscernible).  We don't know

23 that they'll sell the smart contracts.  We think -- I think

24 personally that it's probably unlikely given the FTC's

25 statements.

1 So I think in the event that the smart contract is

2 not sold, since VGX already has its specific clause carved

3 out for it and what happens to it, we amend that clause to

4 ensure protection and (indiscernible) treatment for those

5 VGX account holders.

6 If the value of the estate is relative -- if it's

7 relatively small in terms of dollarized value to the estate,

8 I don't think there's a large impact on the creditor body at

9 large.  It seems like a simple thing to ask and it would

10 ensure protection while also allowing the debtors to

11 continue to pursue the sale of the smart contract.  I think

12 -- it sounds simple to me, and if I'm wrong please correct

13 me, but I think the ask is simple and the solution is

14 simple.

15 THE COURT:  I'm not sure the solution is that

16 simple.  You know, if the debtors hold VGX until they see if

17 they sell the smart contract, the prices may change.  The

18 debtors will have allocated things to other customers.  They

19 won't necessarily have the ability to make up the

20 difference.  These are all calculations that have to be done

21 at one time to make sure that the value is based on the date

22 of calculation or at least equal.  That's what the

23 bankruptcy code commands.

24 So I'm not sure we can hold VGX aside without

25 making it impossible to do the all -- do all of the

1 calculations.

2     MR. NEWSOM:  That's a fair point, Your Honor.  And

3 I think that we should consider that we've had nine months

4 to sell the smart contact and we have yet to do it, and I do

5 think the FTC adds a wrinkle to it now.  And so perhaps

6 putting a time frame on which steps should be done, and in

7 the event that it's not done say in the next three or four

8 weeks, whenever the pro rata calculations are determined, we

9 make the decision to liquidate VGX at the USD value pro rata

10 share equal to (indiscernible) class creditors.

11     THE COURT:  Is there any time frame for the sale

12 of the smart contract?

13     MS. OKIKE:  Your Honor, we have some parties that

14 are interested.  They've been meeting with the company and

15 the creditors' committee as well.  But we haven't made an

16 actual determination as to a specific buyer.

17     THE COURT:  Okay.  But is it fair to say that it's

18 not a hopeless prospect for VGX?  There's some people who

19 are at least indicating interest in buying the contract?

20     MS. OKIKE:  That's correct, Your Honor.

21     We have some holders of VGX who are interested in

22 providing utility for the token going forward and have

23 offered various solutions.

24     THE COURT:  I see.

25     Does that change your feeling, Mr. Newsom?

1     MR. NEWSOM:  I think it's the same simply because

2 it -- we have no confirmation that that will indeed happen.

3 And I would wonder if these individuals that are interested

4 in purchasing the smart contract and providing utility for

5 VGX, are they aware of the FTC statements in the last two

6 days that VGX has elements of a securities transaction.  I

7 think that's a barrier there.

8     MS. OKIKE:  I think, Your Honor, the only

9 alternative would be to sell all of the VGX at the time that

10 we do the distribution and, you know, have those dollars be

11 distributed in exchange.

12     THE COURT:  And how would all the other customers

13 who at the moment aren't expecting that as part of the plan,

14 how would they feel about that?

15     MS. OKIKE:  That's why -- I mean, I don't think

16 it's necessarily a viable solution.  I don't know if we

17 could do it on a customer by customer basis.  It seems

18 overly burdensome.

19     THE COURT:  Okay.  Is there anybody else who would

20 like to be heard on this question?

21     Okay.  Technically, as a matter of equal

22 treatment, the VGX coin is being treated just like all the

23 other coins and the amount that holders will receive is

24 being calculated in exactly the same manner.

25     I think the real objection here is not so much

1 whether there is equal treatment as whether the calculations

2 are skewed and, therefore, the recoveries are actually

3 different because the VGX value might be elusory.

4     And I don't think anybody's suggesting that it

5 actually is elusory, certainly not at its current value of

6 39 cents, or that it is necessarily going to be elusory,

7 just that it might turn out to be elusory.

8     But the value is already fairly low.  It seems to

9 reflect the fact that people don't know just what utility

10 it's going to have.  And I don't think I have enough

11 evidence in front of me to say that it is worthless to the

12 point of being inappropriate to be taken into account as an

13 item od distributive value.

14     And nor do I have enough reason to believe that

15 it's so hopeless that I should kind of require it to just be

16 excluded from the entire set of calculations.  And I don't

17 know how to do the kind of in between that you're suggesting

18 without making the calculations of the plan impossible.

19     So unless somebody has a better mathematical

20 solution for me than I'm thinking of, I just don't think

21 what you want, Mr. Newsom, is something that I can grant.

22     MR. NEWSOM:  Your Honor, I certainly respect your

23 decision.  But I will state that I think that if we were to

24 ask the debtors or the professionals if they were to receive

25 their salary in VGX based off the current plans or future --

1 likely future, they would all quickly refuse.  I think that

2 there's a high likelihood that this is elusory.  It's not a

3 guarantee.

4     THE COURT:  Okay.

5     MR. MENDELL:  Your Honor --

6     THE COURT:  Yes.

7     MR. MENDELL:  -- this is Marshall Mendell, pro se

8 creditor.  I just want to add that I am a very large VGX

9 holder, maybe the largest, and so this is a position which

10 is very important to me as it is to Mr. Newsom and many

11 other creditors who I know personally who also have large

12 stakes in VGX.

13     And I'm wondering if it's possible to please ask

14 the debtor what is the hold up in securing the transaction

15 if we've already had a couple of transactions with FTX and

16 Binance that were kind of put together.  But it appears that

17 a utility for the VGX token is taking longer.

18     MS. OKIKE:  Your Honor, I think at the time that

19 we were negotiating the various transactions, there was a

20 question as to, at least in the first transaction, whether

21 FTX was going to acquire VGX.  We did not want to proceed

22 with selling obviously the smart contracts given that it

23 might have been included in the sale.

24     With respect to Binance, again, we're hopeful that

25 the token is withstood on the exchange.

Page 154

1      That being said, until the sale transaction is
2  approved, we weren't really seeking to sell off piecemeal
3  assets.  So, you know, we are working towards this, but I
4  will confess it hasn't been, you know, the primary focus
5  just given the larger transaction that we were, you know,
6  diligently trying to execute.
7          THE COURT:  Historically, what did VGX trade at?
8          MS. OKIKE:  So the all time high was $12.54.
9      (Pause)
10         MS. OKIKE:  24 cents as of the petition date.
11         THE COURT:  Don't I have to assume that the 39
12  cent market value is the market's calculation of the
13  likelihoods here and the option value, I suppose, associated
14  with VGX?
15         You know, there are options that sell that based
16  on current market conditions are way out of the money, but
17  they have value.  For heaven's sake, even companies that
18  have announced bankruptcy, sometimes their stock still sells
19  for a price when it's hard to see any realistic likelihood
20  that the stock will have any value, but it's option value.
21         And we distribute options sometimes in bankruptcy that
22  are way out of the money, but they're deemed to be items of
23  value precisely for that reason, because there's a chance
24  that they may come into value.
25         So I guess unless you have evidence that the 39

Page 155

1  cents is not a fair calculation of the option value of the
2  VGX, I'm not really in a position to say that giving that
3  kind of value to VGX would be unfair to the people who are
4  going to receive VGX.
5          MR. MENDELL:  Your Honor, I have a secondary
6  question.
7          Is 22 cents or whatever the buyout number, is that
8  a worst case scenario for our recovery on VGX, please?
9          THE COURT:  22 cents?  I don't know what you meant
10  by 22 cents.
11         MR. MENDELL:  I think that that might be the
12  number of the Chapter 11 date back to, what is it, June 5th
13  or July 1st, something like that --
14         THE COURT:  Oh --
15         MR. MENDELL:  -- the --
16         THE COURT:  The testimony --
17         MR. MENDELL:  -- (indiscernible) --
18         THE COURT:  The testimony based on the current or
19  based on last Wednesday or Thursday's values, I thought that
20  the testimony was that the minimum recovery would be in the
21  40-something range with an upside up to maybe 73 or so if
22  things go right on various contingencies.
23         Did I remember that right?
24         MR. MENDELL:  Your Honor, I think that's the -- I
25  think that may have to do with market value, but there is a

Page 156

1  -- on our Voyager app we have a particular maximum recovery.
2          MS. OKIKE:  I don't think it's the maximum
3  recovery.  I think you're seeing your claim dollarized as of
4  the petition date based off of the price as of the petition
5  date.
6          MR. MENDELL:  Yes.  You're right.  Thank you for
7  clarifying.
8          So can you please answer, is there a minimum
9  recovery for VGX holders on each token, please?
10         MS. OKIKE:  No.  There's not a minimum account --
11  sorry -- there's not a minimum amount.  It will depend on a
12  number of factors, but we anticipate, you know, a 48 percent
13  to potentially in the 70 percent recovery on account of, you
14  know, the claims that you have against the company,
15  including VGX.
16         THE COURT:  So the way the calculations work, the
17  dollar amount of your claim is based on the dollar value of
18  your account as of the petition date.
19         Everybody will get the same percentage of that
20  dollar amount in either cash or crypto currencies.  But
21  people -- in terms of which crypto currencies they get, that
22  will -- there will be some effort to match that to what your
23  prior holdings were so that hopefully there will be fewer
24  tax consequences, though no guarantee that that will be the
25  case.  So --

Page 157

1          MR. MENDELL:  And if that applies to VGX, that
2  would be somewhat satisfactory to me given all things
3  considered.  So I think that would be good.
4          THE COURT:  Yeah.  What it would mean as to VGX
5  would be, you know, if you had a $10,000 allowed claim as of
6  the petition date and if the initial distribution was going
7  to be 40 cents, just to make the math easier in my head, you
8  would get a package of things that has a value as of the
9  calculation date of 40 cents.  Some of that would be made up
10  of VGX based on whatever VGX's price was as of that date.
11  Some of that might be made up of other coins if you held
12  other coins.
13         Is that fair, Ms. Okike?
14         MS. OKIKE:  Correct.
15         THE COURT:  Okay.
16         MR. MENDELL:  Thank you.  Thank you very much,
17  Your Honor, for the clarification.
18         I have nothing --
19         MR. NEWSOM:  Your Honor --
20         MR. MENDELL:  -- further.
21         MR. NEWSOM:  -- I'm sorry to spend so much time
22  here.  I know we're all very busy.  But I would like to go
23  back to your point with regards to proof to the elusory
24  value of VGX currently.
25         It is hard to state since the debtors refused

A-1309

1  to reveal their position on VGX how much of VGX tokens are
2  currently locked up and what the remainder is available on
3  the open market.
4          But suffice it to say that it is a very low
5  percentage of the overall available tokens and, as such, the
6  trade -- the token can be manipulated easily.  And we know
7  with several efforts from anonymous groups on social media
8  sites or otherwise that have attempted to pump the VGX
9  price.  They've even pumped it up to 92 cents and there is
10 some residual value left as people have been sort of left in
11 the wake of the pump and dump scheme.
12         So I -- Your Honor, there's multiple factors here
13 that are currently holding the value of VGX and none of them
14 would remain in place in the event that the smart contract
15 is not sold.
16         THE COURT:  What evidence do I have of that?  See,
17 that's the problem.  I don't have evidence.  I have rumors
18 or suspicions, but I don't have evidence.
19         MR. NEWSOM:  I have to admit, Your Honor, in my
20 lack of legal experience I did not frame the argument in
21 terms of the value being elusory, but instead equitable.
22 And I did not think it would be necessary to go down this
23 route because it seems to me that the debtors are aware,
24 given their disclosure statement, that the value of VGX may
25 have no value for its consummation if the smart contract is

1  not sold.
2          That by itself seems like indiscriminatory
3  treatment --
4          THE COURT:  It may --
5          MR. NEWSOM:  -- in the event -- in terms of
6  (indiscernible) recovery.
7          THE COURT:  It may have no value.  We usually
8  think of things that have some reported market value as the
9  market reflecting what their value is.  It's what willing
10 people are willing to transact at.
11         What you've now said to me is that based on
12 trading volumes or perhaps people's desire to manipulate the
13 price, maybe that market is not a true market, but is
14 manipulated.  But that's something that I would need
15 evidence to reach that conclusion and I don't have any.  So
16 much of this --
17         MR. NEWSOM:  I would be happy to provide it, but I
18 don't know how much time we have.  But --
19         THE COURT:  Well, we've already closed the
20 evidentiary record.
21         MR. NEWSOM:  I'll make one final plea, Your Honor,
22 and then defer to your good judgment.
23         In Mr. Tishner's testimony he stated this.  He
24 said, if I were an eTrade customer and I bought shares in GE
25 and eTrade got into trouble, then I would be upset if I

1  received something other than what I originally bought in
2  return.
3          That is what's happening here, Your Honor.  I am
4  not receiving back what I bought in return in the event that
5  the VGX smart contract is not sold.  I believe that there
6  are elements of this plan that are discriminatory based on
7  opportunities for recovery, whereas -- and this is important
8  -- other coin type actual utility have the ability to be
9  traded, sold -- I'm sorry -- used as a currency.  VGX will
10 have none of that.  And all of the value that is ascribed to
11 it right now is speculatory in nature.
12         And when we flood the market with the VGX tokens,
13 it will only go to zero.  I don't believe there is any
14 chance whatsoever for the value of VGX to go up beyond what
15 it is at today in the event the smart contract is not sold
16 and the market is flooded with the number of coins held on
17 the Voyager platform.
18         THE COURT:  Okay.  All right.
19         Thank you, Mr. Newsom.
20         Is there anybody else who wants to be heard on
21 unequal treatment or unfair discrimination objections?
22         Okay.
23         MS. OKIKE:  Okay, Your Honor.  I think we'll move
24 to the liquidation analysis next.
25         THE COURT:  Why don't we do the releases?

1          MS. OKIKE:  Releases?
2          THE COURT:  While I have the energy for it.
3          MS. OKIKE:  Sorry.
4          THE COURT:  While I have the energy for it.
5          MS. OKIKE:  Okay.  Great.
6          (Laughter)
7          MS. OKIKE:  Okay.  So, Your Honor, we had a number
8  of objections to the third party release.  As a threshold
9  matter, the plan does not propose a non-consensual third
10 party release.  Any third party's direct claims against non-
11 debtors, to the extent such direct claims exist, are not
12 released unless such third party affirmatively consents,
13 which would be reflected in opting into the third party
14 release that was included on the ballots and in the notices
15 of non-voting status.
16         Your Honor, holders of claims in interest could
17 also affirmatively elect to contribute their direct claims
18 against third parties unaffiliated with the debtors to the
19 extent they have any to the winddown debtor, and the
20 winddown debtor will be vested with authority to pursue
21 those claims.
22         Your Honor, we did have a number of parties who
23 chose to affirmatively consent to the third party release
24 and to contribute their direct claims to the winddown
25 debtor.

1    Specifically, 65 percent or 40,112 claimants in

2  the voting classes opted into the third party release, and

3  85 percent or 726 of claimants in the non-voting classes

4  opted into the third party release.

5    52 percent or 31,878 claimants in the voting

6  classes chose to contribute their direct claims to the

7  winddown debtor, and 90 percent or 765 credits in the non-

8  voting classes contributed their claims to the winddown

9  debtor.

10    Your Honor, courts routinely approve consensual

11  third party releases to be included in a plan.  Here, again,

12  the release is entirely consensual.  We have not imposed a

13  release on holders of claims that voted in favor of the

14  plan.  And so we believe that the third party release, to

15  the extent that a creditor affirmatively opted in should be

16  approved.

17    THE COURT:  All right.  I -- it seemed to me from

18  a lot of the objections that there was a misunderstanding of

19  who the releasing parties would be and the extent to which

20  creditors and regulatory bodies, governmental entities were

21  having releases of their own claims hoisted (sic) on them,

22  that certainly is an issue that is a hot issue in many

23  bankruptcy cases.  But it's not really one here.  There are

24  no non-consensual third party releases here.

25    So as to the releases being granted by non-debtors

1  here, is there anybody who still has an objection that they

2  need me to consider?

3    MS. DAGNOLI:  Judge --

4    THE COURT:  Yes.

5    MS. DAGNOLI:  This is Lisa Dagnoli.  I just want

6  to understand what you're saying.

7    Are you saying the third party releases include

8  the executives of Voyager and the CEO or we're not speaking

9  about that?

10    THE COURT:  Well, you mean as beneficiaries of the

11  releases?

12    MS. DAGNOLI:  I don't really know the difference,

13  I'm just going to be honest.

14    THE COURT:  In any release, there is a person who

15  grants the release and there's a person in whose favor the

16  release is granted.

17    MS. DAGNOLI:  So the important point here is that

18  the only people granting releases, other than the debtors

19  themselves of the debtor's own claims, the only people

20  granting releases are people who have voluntarily agreed to

21  do so.  Nobody's being forced to do so.

22    So if you, for example, Ms. Dagnoli, owned a

23  direct, personal claim against Mr. Ehrlich, there is nothing

24  in what we're doing today that would purport to release that

25  claim or terminate that claim.

1    The debtors have their own claims.  We'll get to

2  that in a minute because the debtors have proposed to

3  release their claims, and that may be of concern to people

4  who have derivative interests and the value of the debtor's

5  claims.  But in terms of claims that belong directly to

6  third parties, nobody is being enforced to release anything.

7  They're just volunteering.  And there was disclosure as to

8  who the people would be who would benefit from that release

9  and a certain number of people have elected to go ahead and

10  provide it.

11    MS. DAGNOLI:  Okay.  I'm sorry.  Then I was going

12  to speak on not having liability releases for the executors,

13  and that's not what you're speaking about.  So I'm sorry.

14    THE COURT:  Yeah.  Just to be clear, if a customer

15  has elected to grant the proposed release, then that

16  customer's claim against those executives has been

17  voluntarily released.

18    But the theory of the Bankruptcy Code is, you

19  know, that's something that was asked and granted

20  consensually by that particular creditor.  That creditor can

21  make up his or her own mind as to whether to grant that

22  release or not and elected to do it.

23    I, quite frankly, would have no authority to tell

24  them no, that they can't.  The case law in the Second

25  Circuit is quite clear that creditors can consent to

1  releases and, in fact, here the debtors are much more narrow

2  than has been approved in other cases.  In many other cases,

3  simply voting in favor of the plan is deemed to be a consent

4  to the releases.

5    We don't have that here.  People who voted for the

6  plan are not deemed to have consent to releases unless they

7  separately and explicitly and affirmatively opted into them.

8  So they are about as voluntary --

9    MS. DAGNOLI:  Okay.

10    THE COURT:  They're about as voluntary here as

11  they could be.

12    MS. DAGNOLI:  Okay.  I just wanted to go on the

13  record to say that I don't want to have any releases of

14  liability for fraud or, you know, negligence or anything

15  like that for the executives of Voyager or the CEO.  And I

16  don't know where that would be put in, but that's what I

17  wanted to say.

18    Thank you, sir.

19    THE COURT:  Okay.  Well --

20    MR. NEWSOM:  Your Honor, this is --

21    THE COURT:  -- to the extent --

22    MR. NEWSOM:  -- Dan Newsom, pro se --

23    THE COURT:  -- to the extent --

24    MR. NEWSOM:  -- creditor again --

25    THE COURT:  -- to the extent, Ms. Dagnoli, that

Page 166

1  you're objecting to somebody else giving up their direct
2  claim of fraud against Mr. Ehrlich, I'm not sure you have
3  standing to object to that.  They've done it.  They've
4  agreed to it.  They made their own decision.  It's not my
5  job or yours or anybody else's to tell them they shouldn't
6  have done it or that they can't do it.  They've done it.
7        You certainly are entitled to be heard on whether
8  the debtors can or should release their own claims, but to
9  the extent, you know, somebody -- an account holder had a
10  claim or a shareholder had a claim of fraud and elected to
11  release it, well, that's what they're entitled to do.  If
12  they don't want to pursue it, they don't have to.  Okay.
13        MR. NEWSOM:  Your Honor, this is Dan Newsom.  This
14  is also in one of my specific requests for relief.
15        I would say -- and, again, I want to be brief out
16  of respect for time.  I would say this, and I do understand
17  the difference between my direct claim as a creditor and
18  whether I opted in or not.
19        But as it relates to the releases of the estate,
20  they are overly broad.  The investigation by the special
21  committee and the UCC's counsel were limited in scope.
22  They've admitted that they focused primarily around the
23  details of the (indiscernible).  They did not investigate
24  the concerns raised by the FTC for, you know, misleading
25  fraudulent or (indiscernible) false claims, FDIC for

Page 167

1  fraudulent claims.  They did not investigate securities
2  fraud.  They did not examine third parties that the estate
3  may have viable claims against that are currently being
4  released under the plan, such as (indiscernible), for
5  example, and out of an arrangement to produce an equities
6  platform that they did not follow through with.  In fact, in
7  this own bankruptcy proceeding (indiscernible) platform was
8  in its infancy stage and Voyager routinely touted that as
9  something that was coming soon, as early as the first half
10  of 2022 or second half of 2022.
11        My point being they're releasing valuable claims
12  from the estate where we might have derivative claims, but
13  they could be more successfully pursued by the estate.  And
14  I think they don't see any reason for it.  It's not
15  necessary to effectuate the transaction, and we've been
16  given no consideration or the estate's been given no
17  consideration (indiscernible) creditors.
18        THE COURT:  Okay.
19        MR. NEWSOM:  I don't think they belong.
20        THE COURT:  Just before we -- we'll come back to
21  that in a second, but I just want to see if there's anybody
22  else who wants to be heard on the releases by third parties
23  by people other than the debtors and the estate.
24        Is there anybody else who wants to be heard?
25        MS. DIRESTA:  Hi, Your Honor.

Page 168

1        THE COURT:  Yeah.
2        MS. DIRESTA:  Yeah, Your Honor.  It's Gina DiResta
3  again, pro se creditor.
4        One of the problems I have with the releases --
5  and I agree with you.  I do not care how anybody votes on
6  the release.  That is every individual's choice.
7        But what I do care about is that people understand what
8  they're voting on.  And the verbiage in that third party
9  release is so confusing that even I, with my 15 years of
10  legal experience and drafting 70 documents and contracts,
11  when I first read that release, I literally was like, wait,
12  what, and I had to read it multiple times slowly to really
13  understand what I was doing.
14        And other people in -- within the Voyager investor
15  community, because I am very active online and having talked
16  with a lot of different people or reading a lot of comments
17  that are out there, so many people said they did not
18  understand what they read.  They were confused.  They didn't
19  know how to vote.
20        There are people who literally voted and then
21  would get in like Twitter spaces or would message on social
22  media and say, hey, I checked off this box, that means I'm
23  saying -- I'm agreeing to getting my claims, right, that
24  means I'm going to get my money back.  Like they -- like so
25  many people have different interpretations of the verbiage

Page 169

1  of that release to say that all 65 percent of people
2  who voted for it obviously agree with it.  There's a lot of
3  people who didn't even understand what they're voting for.
4        And I think that was like one of the biggest
5  issues that I found from people and it's -- I mean, they
6  were like, I don't know what I'm voting for.  And then for
7  them to, well, accidentally (indiscernible), I checked the
8  box.  I didn't know what I was doing.
9        The secondary problem is they did not even know
10  that they could change their vote.  The UCC has never made
11  it clear to creditors that they actually had the option of
12  changing their votes by simply going through the voting
13  process all over again.  So a lot of people felt stuck.
14  They're like, oops, oh, well, kind of an attitude.  And they
15  literally like wrote that online or verbally said that in
16  these Twitter spaces.
17        So that's the thing that I would like to argue is
18  I feel like the verbiage was confusing and kind of
19  deceptive, and people really didn't understand what they
20  were voting for.
21        THE COURT:  Well, under the bankruptcy rules when
22  a release is being sought, it's got to be highlighted.  And
23  somebody remember me -- remind me what the rule number is.
24  I -- does it require that you quote the provision
25  specifically?

1        MS. OKIKE:  I think it has to be bolded and
2  highlighted.
3        (Pause)
4        THE COURT:  I think it's Rule 3016(c) as to
5  injunctions, but isn't there a similar provision as to
6  release?
7        Well, in any event, the ballots that were approved
8  here and the description of the releases were the subject of
9  motions that were considered in January.  And they were
10  approved by me after people had a chance to be heard as to
11  whether they were sufficient or not.  They are in line with
12  the same kinds of information and same kinds of texts that
13  we've given to people in other cases.
14        You know, there's a constant push and pull in
15  bankruptcy between, on the one hand people will say it's not
16  simple enough and in plain English I can't understand it,
17  and then on the other hand if you try to do something in
18  simple and plain English you get complaints that you haven't
19  been clear enough as to the full details.
20        We can't do it both ways.  And so we try to make
21  sure that the full information is there so that people can
22  see it.  If anybody thought that they were doing anything
23  other than granting a release, I'm not sure how they could
24  have been confused unless they simply didn't read because it
25  says, you're granting a release.  It says you don't have to.

1  You're doing it voluntarily, but you're granting a release.
2        So I'm not going to back and say that this whole
3  process has to stop and is no good because of the way the
4  releases were presented.  I think they were presented
5  fairly.
6        Okay.  So I think we should move onto the releases
7  by the debtors.  And, you know, there's some validity to
8  what Mr. Newsom has just said.  You've proposed very broad
9  releases and at least one specific settlement in the form of
10  the deal with the -- Mr. Psaropoulos and Mr. Ehrlich.
11        But the testimony by Mr. Pohl was that his
12  committee looked at potential claims against insiders, not
13  even being very clear about who that was.
14        I know that the debtors in their statement of
15  financial affairs defined insiders as people who had actual
16  authority over the disposition of assets of the debtor,
17  which means a relatively narrow group.  And yet you've
18  proposed very broad releases as to professional persons, all
19  persons who were employed by the debtors during the course
20  of the case.  These are releases that would go beyond
21  insiders as I read them.  It would cover members of the
22  creditors' committee who certainly are not debtor insiders
23  as that term is used.
24        The description of the claims that are being
25  released are -- I detected no efforts to kind of confine it

1  to what the independent committee had actually looked at.
2  Rather, just the very terms of the release suggest that
3  somebody sat down and tried to make it as indisputably broad
4  and all encompassing as was humanly possible.
5        It would appear to cover preference claims, for
6  example, so that customers who weren't employees would be
7  subject to preference claims, but committee members and
8  employees would not, even if they had made similar
9  withdrawals from their accounts.  And in terms of whether
10  there's justification of that, I didn't hear a peep of
11  evidence to support it.
12        So how can I, based on the record that I have, how
13  can I support the breadth of the releases that you've
14  proposed?
15        MS. OKIKE:  Your Honor, may I confer with our co-
16  counsel for one moment?
17        (Pause)
18        MR. GOLDBERG:  Your Honor, pardon me for
19  interrupting.
20        THE COURT:  Yes.
21        MR. GOLDBERG:  May I be excused to continue
22  discussions with my client about the issues we've --
23        THE COURT:  Yes.  Please --
24        MR. GOLDBERG:  Thank you.
25        THE COURT:  -- go ahead.

1        (Pause)
2        THE COURT:  We'll break for ten minutes while you
3  have your discussions.  Okay.
4        (Recessed at 3:06 p.m.; reconvened at 3:23 p.m.)
5        THE COURT:  Okay.  Are we ready to continue?
6        MR. KIRPALANI:  Yes, Your Honor, thank you.  For
7  the record Susheel Kirpalani from Quinn Emmanuel Urquhart &
8  Sullivan on behalf of the special committee of the debtors,
9  Voyager LLC to be precise.
10        Judge, I want to tell you what we did do as well
11  as what I understood Mr. Pohl's testimony to be about
12  insiders.  Mr. Pohl didn't equate his definition of insiders
13  with anything in the statement of financial affairs
14  definition that determine insiders under the Bankruptcy
15  Code, which is how he meant it and used it, is directors and
16  officers.
17        And I can tell you what we did do, and I can also
18  give you some comfort on the direct -- on the scope of the
19  released parties under Section 136 of the plan, definition
20  136 of the plan.
21        First just to get it out of the way, the reference
22  to committee members being released from preference
23  liability, that's not how the plan works.  The defined term
24  released parties means, and I'm quoting from it,
25  collectively in each case in its capacity as such, and then

1   it refers to the committee and each of the members thereof.

2       So a member of a committee, his capacity as such

3   is incapable of receiving preference, because all of that

4   activity happened post-petition.  So just to give customers

5   comfort, nobody who sat on the creditor's committee is in

6   the release of potential preference liability.  If there was

7   any (indiscernible) committee.

8       We did not look at potential exposure of committee

9   members because we on behalf of the special committee we're

10   not releasing them.  It's not true that the only focus of

11   the special committee's work was to look at the 3AC loan.

12   We did look at the statements that were made to the FDIC.

13   We did look at the statements that were made to customers

14   generally and press releases that were made generally and

15   Mr. Pohl did explain that in his testimony.

16       But those do not give rise to causes of action in

17   favor of the debtor.  If the debtor had misled the

18   customers, in order to obtain more assets to grow the

19   business, that does not create a cause of action that the

20   debtor has against the officer or director for pursuing that

21   strategy.

22       It may give rise to a cause of action in favor of

23   a customer who received, for example, a text message from

24   Mr. Ehrlich or an equity holder who received a text message

25   or an e-mail from Mr. Ehrlich, of course, we're not

1   releasing that.  That belongs to those individuals and we

2   take that very seriously.

3       With respect to the preferences that have been

4   mentioned on behalf of directors and officers we did look at

5   transfers made to directors and officers.  They're detailed

6   in the statement of financial affairs.  And we did note

7   there were two bonus payments.  We looked into them, they

8   were not preferential, they were ordinary course of

9   business, but we still got a reversal of Mr. Ehrlich's bonus

10   as part of the consideration for the overall settlement.

11       THE COURT:  But the schedules listing payments to

12   insiders only listed dollar payments and not account

13   withdrawals.

14       MR. KIRPALANI:  Thank you, Your Honor, I'm coming

15   to that.

16       THE COURT:  Whereas it seems quite clear from the

17   position the debtor has taken about who owned the property

18   that account withdrawals are preferences or might be

19   preferences anyway.

20       MR. KIRPALANI:  That's true, Your Honor, and we

21   did look at potential preference liability of directors and

22   officers for withdrawing their crypto assets off the

23   platform.  There were no such withdrawals within the 90 days

24   prior to bankruptcy.

25       Now, of course, we know that insiders as defined

1   in the Bankruptcy Code does a look back period of one year,

2   not 90 days and we did look at withdrawals of crypto assets

3   off the platform beyond 90 days up to one year.

4       There were a handful of withdrawals beyond the 90

5   day period, but those same individuals also put more assets

6   on the platform during the 90 day period, did not give any -

7   - give rise to any suggestion of any impropriety or

8   favoritism or they knew something the market didn't.

9       At the time of those withdrawals the market

10   capitalization for Voyager was over $700 million.  And so

11   the notion that the estate should expend funds to try to get

12   what would have amounted to $500,000 worth of transfers, to

13   try to prove insolvency during the period in the end of

14   March and early April, that is beyond the 90 day period with

15   that, but within the one year period just seems cost

16   prohibitive and not a wise use of resources.  And so that's

17   the rationale why directors and officers --

18       THE COURT:  Why can't the plan administrator make

19   that decision?  What do you need a release for?  If it's

20   just a question of whether a claim is worth pursuing and not

21   something you're getting any consideration for, why are you

22   granting the release?

23       MR. KIRPALANI:  Well, it is the business judgment

24   of the special committee to grant the releases that were

25   proposed in the plan and --

1       THE COURT:  And my question is why.

2       MR. KIRPALANI:  These individuals served post

3   bankruptcy, I want to be very clear about that, Your Honor.

4   There is no director or officer or employee, for that

5   matter, that's getting a release that didn't serve the

6   estates post bankruptcy.

7       There are directors and officers that were not

8   part of this organization on the commencement of Chapter 11,

9   they are not getting releases.  They are not defined as a

10   released party.

11       And when this company filed part and parcel of

12   encouraging folks to stay aboard, work with the debtors,

13   maximize value for customers, was that releases were going

14   to be proposed and if they were appropriate, meaning that

15   there was no wrong doing or no viable causes of action

16   against them, then it would be set up for both by creditors

17   to see if that plan was confirmable and if it was approved.

18       THE COURT:  I have no evidence of that.

19       MR. KIRPALANI:  You don't have evidence that the

20   plan was sent up for --

21       THE COURT:  No, I have no evidence that these

22   employees were told that releases would be sought in

23   exchange for their continued service.  I have zero evidence

24   of that.

25       MR. KIRPALANI:  Mr. Renzi (ph), I believe in his

1   declaration --

2           THE COURT:  I also don't have any disclosure to

3   anybody of just what potential claims are being given up in

4   exchange for that, just what withdrawals they might have

5   made.  I have conclusory remarks about it today, I have

6   nothing.  I have a suggestion that releasing them from

7   preference claims that have never been described were

8   somehow part of the deal about which I have no evidence.

9           MR. KIRPALANI:  I believe Mr. Renzi (ph) testified

10  of the importance of the employee base for this organization

11  and for keeping this sale process together.  And that is in

12  his declaration and it was part of his live testimony as

13  well.

14          I don't -- I think you're correct, Your Honor,

15  that there was no specific mention by Mr. Renzi or Mr. Pohl

16  or Mr. Tiffner (ph) that employee X was told, if you stick

17  around, you know, it'll be worth it, you'll be able to

18  obtain global peace from this bankruptcy in exchange for

19  your hard work and your efforts, but I think it is --

20          THE COURT:  What about the scope of the release,

21  which seems, you know?  The release has provisions in it

22  like anything that you ever did that has any bearing on any

23  claim that anybody ever had against the debtor you're

24  released from.  Your investigation didn't go that far,

25  right?

1           MR. KIRPALANI:  That's true, Your Honor.

2           THE COURT:  So why give a release of that breadth?

3   Seems like a gift, a throwaway.  Somebody decided we're

4   going to make this as broad as possible, kind of untethered

5   by any actual investigation or review that had been done.

6           MR. KIRPALANI:  I can't stand here before you and

7   tell you that we looked at every employee and what they did

8   to everybody in every way, but over the course of --

9           THE COURT:  That's literally, if you read through

10  the release, I mean, I'm not sure I've ever read a release

11  that has as many terms as this one, to kind of try to round

12  out the corners of just how the broad release is.  And

13  there's no way, I don't care how broad your charter was,

14  there's no way you could have investigated all of those

15  things.

16          And certainly, in terms of evidence that these are

17  reasonable, that they're actual claims, or that there's been

18  actual consideration by the company of the risks and rewards

19  or pursuing claims on these things, no, there isn't.

20  There's just an effort to make the releases as broad as

21  possible, that's not enough.

22          I'm supposed to -- I may be required to some

23  extent to defer to the company's judgment as long as it's

24  reasonable, and so long as the other standards make sense,

25  but implies that a judgment has been made.  And the only

1   judgment made here was, let's free the employees.  I don't

2   see any investigation of the full amount of claims for which

3   people are supposed to be getting releases, it's just not

4   there.

5           MR. KIRPALANI:  And we did look at the directors

6   and officers, Your Honor.

7           THE COURT:  Yeah, I understand.

8           MR. KIRPALANI:  Respectfully --

9           THE COURT:  That's a different matter.  You did

10  look at the directors and officers.  I don't know that I can

11  free them from preference claims because I don't have any

12  information about that, but I know you did look at the 3AC

13  loans, but let's just stick with the other releases.

14          I just -- you know, if I'd had some evidence maybe

15  it would've come out differently, but I just don't have it.

16  I think we have to carve them back.  That's not to say that

17  the plan administrator has to sue these people for

18  preferences, for example.  The plan administrator can decide

19  whether it makes sense or not.  But I certainly don't have

20  evidence that would allow me to say that it is so clearly

21  without sense, that it should just be released.

22          MR. KIRPALANI:  I understand, Your Honor.

23          THE COURT:  Okay.

24          MR. KIRPALANI:  Do you want me to continue with my

25  argument about the directors and officers' releases?

1           THE COURT:  Go ahead, yes.

2           MR. KIRPALANI:  So as Your Honor just covered I

3   believe with Ms. Okike, there is no -- I want to talk for a

4   moment what's not being released, to try to alleviate any

5   kind of tension that may exist.

6           There are no non-consensual third party releases.

7   Customers, creditors and regulators will retain their rights

8   to sue under they have permanently opted in to releases of

9   their own.  Their rights to sue people, if any, exist are

10  not impaired by the settlement and by the releases by the

11  estate on the plan.

12          And I wanted to emphasize that, because Mr. Pohl

13  last week was asked questions by customers that really

14  related to non-estate claims, including some of the things I

15  mentioned earlier about statements made to the market,

16  statements made to securities holders, statements made to

17  customers through e-mails, through text messages, through

18  press releases.

19          To the extent, anyone has a direct cause of action

20  and I'm not saying they do, to the extent that they do

21  against individuals, those claims are not released.  To the

22  extent they have claims against the debtor, those claims are

23  not released except as part of the discharge and release

24  that will be receiving a dividend pursuant to the plan.

25          Second, the estate that I mentioned, is not

1    releasing former officers, former directors, or former

2    employees, who did not serve the Chapter 11 estate at all.

3              Third, the estate is not released Mr. Ehrlich or

4    Mr. Psaropoulos from the breach of fiduciary duty of care

5    claims relating to their decision to make the 3AC loans.

6    The issue is one of recourse but not on releasing the claim

7    itself.

8              As Mr. Pohl testified, the special committee

9    determined after a comprehensive investigation that was done

10   hand in hand with the statutory creditor's committee that

11   these breach of fiduciary duty claims are colorable,

12   cognizable and they should be released.

13             Fourth, the estate is not releasing Alameda or the

14   insurance company that received millions of dollars on the

15   eve of bankruptcy or any other third parties for anything.

16   All of those claims are being retained pursuant to Section

17   1123(b)(3) of the Bankruptcy Code by the plan administrator

18   and will be prosecuted or not based on that individual's

19   cost benefit analysis.

20             So while we determined that the estate may have

21   cognizable claims against Mr. Ehrlich and Mr. Psaropoulos,

22   the special committee decided in their business judgment

23   acting independent of any connection whatsoever with the

24   board members, the officers being investigated, counsel for

25   the debtors, to pursue a settlement with respect to these

1    individuals personally assets.

2              THE COURT:  So as to Mr. Ehrlich and Mr.

3    Psaropoulos, did I pronounce that correctly?

4              MR. KIRPALANI:  Yep.

5              THE COURT:  You've proposed an actual settlement

6    that includes a release and I do understand if you want to

7    settle claims against a party it's often part of the

8    discussion that there be a release.  But you've preserved

9    certain claims as to the insurance and 3AC, but you've

10   released all others against not only Mr. Ehrlich and Mr.

11   Psaropoulos, but all other officers and directors, not as

12   part of a settlement with them or any demonstrable or

13   identified consideration from them, but just a release.

14             MR. KIRPALANI:  The demonstrative -- the

15   demonstrated consideration was to prevent dissipation of the

16   potential distributions of other customers by having

17   indemnification claims filed by those officers and directors

18   for frivolous claims that would have been brought.

19             There was concerted effort and investigation into

20   all of the directors and officers in connection not just

21   with the 3AC loan, but in potential with all of the

22   historical transactions, at least of a magnitude that

23   requires spending time to look into them, as well as press

24   releases, messaging by the company, et cetera, to see are

25   there any claims against these individuals.  Because all of

1    them have indemnity obligations from the company.  All of

2    them were exculpated and indemnified pursuant to the

3    operating agreement of the company.

4              And the sea suite (ph) level managers even had

5    separate indemnification agreements from the company that

6    would become more general unsecured claims.  As well as the

7    fact that all of those individuals would also tap into the

8    D&O insurance, which is what we desperately are trying to

9    preserve.

10             And we're happy that today there's still the full

11   $20 million of coverage available for the plan

12   administrative to attempt to negotiate at least a decent

13   settlement from, if not fully litigated against the carrier

14   and the individuals, Mr. Psaropoulos and Mr. Ehrlich because

15   they are the ones where the buck stopped.  They were the

16   ones who had potential liability.

17             THE COURT:  Who was in the officer and director

18   group that you looked at besides Mr. Ehrlich and Mr.

19   Psaropoulos?

20             MR. KIRPALANI:  All of them.  The chairman, Mr.

21   Philip Atan (ph), Ryan Wooley (ph), I remember because I

22   remember he's specifically not a director or an officer, but

23   he's a senior member of management, might be considered an

24   insider.

25             Dave Brosgol, general counsel, Gerard Hanshe as

1    well, just going off my memory.  Let me take a closer look

2    here.  Ashwin Prithipaul, the chief financial officer,

3    Marshall Jensen, Pam Kramer (ph), Stephen Ehrlich I

4    mentioned already and Evan Psaropoulos I mentioned already.

5              Misha Milani (ph) -- one second, Your Honor.

6    Yeah, Mr. Slater (ph) reminds me it were the individuals

7    that were interviewed, the 12 individuals that were

8    interviewed, who we interviewed for any potential wrongdoing

9    and they were all disclosed in the disclosure statement by

10   name.

11             THE COURT:  Okay.

12             MR. KIRPALANI:  So as I was saying, Your Honor,

13   the special committee decided to pursue potential settlement

14   discussions with Mr. Ehrlich and Mr. Psaropoulos in the hope

15   that we could accomplish a few goals.  First, get whatever

16   personal assets are liquid and get it all from these

17   individuals, that we can get consensually.

18             Assuming it was a sizeable chunk from what

19   otherwise we could collect, it might be worth pursuing that.

20   That was goal number one.

21             Goal number two, minimize or get the waiver of

22   claims by those individuals against the estate because

23   that's currency that they could trade, that they could get.

24   And third, preserve the D&O coverage to the extent possible

25   and specifically with respect to that bizarre eve of

Page 186

1  bankruptcy side A policy, could we get them to agree not to
2  look to that policy, until after the plan administrative has
3  had its day in court or a conference room to negotiate with
4  the D&O carriers, and we get them to, Your Honor.
5       So the -- all three of those goals were met by the
6  special committee.  Significant to Mr. Pohl's analysis was
7  that there was no evidence of self dealing, in connection
8  with making the loans to 3AC.  These officers would have
9  been entitled or would be entitled to business judgment --
10 the business judgment rule shield of liability.
11      Also, as Mr. Pohl mentioned, Voyager Digital's
12 operating agreement gave these individuals broad exculpation
13 and they enjoyed broad indemnification rights that were
14 provided by separate contracts with the debtors.
15      Mr. Pohl testified in his rule book they didn't
16 conduct sufficient due diligence on making the 3AC loans.
17 But if the special committee pursued litigation, he
18 explained that we would need to prove that the acts and
19 omissions were not just negligent, but they were grossly
20 negligent and there was no evidence of willful misconduct.
21      Could they have been grossly negligent?
22 Potentially, yes, potentially.  There is a gray area between
23 willful misconduct -- I'm sorry, between gross negligence
24 and negligence.  But what we've determined and what Mr. Pohl
25 testified is that both of these men had a keen interest in

Page 188

1  actually been weighed.  You offered me the evidence and I
2  understand what the company standards are and the limits of
3  my authority as to what I can do as to that.  And I really
4  want to set that settlement aside and just make sure that
5  the rest of the releases make sense.
6       As to the other members of the trove who you've
7  interviewed, you said that the reason for the releases that
8  it prevents a frivolous depletion by the assertion of claims
9  that might be subject to indemnity.  Well, but these are the
10 debtor's claims.  So who's going to make a frivolous
11 assertion of claims on behalf of the debtors?
12      MR. KIRPALANI:  Well, I mean the charge for the
13 special committee was to determine whether there are any
14 non-frivolous claims to be brought.  So they made that
15 determination and determined that there are no non-frivolous
16 things that could be brought, and so therefore, the releases
17 of those individuals is --
18      THE COURT:  But I think we've also made clear that
19 you did not and could not possibly have looked into claims
20 relating to all of the kinds of things that are covered by
21 that release.
22      MR. KIRPALANI:  We looked at the -- obviously the
23 3AC loan was a primary focus as Mr. Pohl testified and it
24 was.  It is the reason this company wound up in bankruptcy.
25 As for disclosure to customers, dealings with the FDIC,

Page 187

1  the success of Voyager.  If Voyager did well, they did well.
2  If Voyager failed, so too would their careers and their
3  personal investments kept on the platform, as well as their
4  equity investments.
5       Even if a plaintiff could prove that their acts
6  and omissions were grossly negligent, the plaintiff would
7  still need to prove that it's that gross negligence that
8  caused the losses to the company, when by all acts and by all
9  indications and as Mr. Pohl testified, his view, the estate
10 was defrauded by 3AC and its founders.
11      And even if the plaintiff could surpass those
12 hurdles and obtain the judgment against those individuals,
13 after undoubtedly incurring significant costs and expenses,
14 Mr. Ehrlich and Mr. Psaropoulos simply did not have the
15 personal assets that satisfied any significant judgment.
16      And Mr. Pohl testified that we did look at their
17 (indiscernible) assets and the states in which they lived to
18 see are these community property estates and they are not.
19      So after doing all that, we still weren't prepared
20 to let them walk for nothing, so we decided --
21      THE COURT:  No, I understand the case as to the
22 settlement with Mr. Ehrlich and Mr. Psaropoulos and I
23 understand that that's the one that's going to bother some
24 of the customers the most, but I do understand that it has
25 been looked at, it has actually been considered, it has

Page 189

1  dealings with regulators, we did look at all of those as
2  well, as to whether the estate, the company would have a
3  cause of action against its own officer, its own director
4  under the terms of the operating agreement, there's no such
5  claim for those types of conduct.
6       THE COURT:  Okay.  Let me say that as to the
7  proposed settlement with Mr. Ehrlich and Mr. Psaropoulos,
8  the standards that I am obligated to apply are for me to
9  assess whether it is in the range of reasonableness, based
10 on likelihood of success, possibility of recovery, et
11 cetera, I do think that the evidence that you have given me
12 which while the conclusion has been disagreed with, the
13 actual evidence has not been controverted.
14      I think that supports the settlement and I'm sure
15 that's going to be an enormous disappointment to many of the
16 account holders on the phone, but I think that the evidence
17 is going to compel me to that conclusion.
18      I'm much less convinced, the scope of the releases
19 as to the other insiders and certainly not at all convinced
20 as to the scope of the releases as to people who may not
21 have even been the subject of your investigation.  Let me
22 hear from the U.S. Trustee because they had objections on
23 this point.
24      MR. KIRPALANI:  Thank you.
25      THE COURT:  Thank you.

**Page 190**

1    MR. MORRISSEY:  Thank you, Your Honor, good
2  afternoon.  Richard Morrissey for the U.S. Trustee.
3    Just so it's clear, Your Honor is talking about
4  debtor releases, they're all third party releases, they
5  cover --
6    THE COURT:  Third party releases were voluntary,
7  they cover what they cover.  I'm not undoing any of those.
8    MR. MORRISSEY:  Okay.  Your Honor, the releases in
9  the Chapter 11 cases can be brought, but there's a limit as
10  to how broad they can be.  And the -- as Your Honor has
11  stated here, it covers a lot of ground and too much ground.
12  And there was not consideration given in exchange for some
13  of those releases and I'm speaking specifically of retained
14  professionals, for example, who are covered by the way by
15  exculpation, which we'll be talking about later.  And also
16  all the employees of the debtor.
17    So I believe, Your Honor, that the releasees
18  should be circumscribed as pretty much in line what Your
19  Honor just said.
20    Your Honor, there's a lot of overlap between the
21  exculpation provisions and the release provision.  I can
22  certainly wait to discuss the issues we have there.  But,
23  Your Honor, on the third party releases, just one point I
24  wanted to make.
25    The debtors have agreed to leave something from

**Page 191**

1  the third --
2    THE COURT:  Okay.
3    MR. MORRISSEY:  -- released party and that would
4  be the wind down debtor, because we believe, Your Honor,
5  that releases should not be applied prospectively.  And we
6  do believe that only the people who have been involved in
7  the case between the petition date and the effective date --
8    THE COURT:  Okay.
9    MR. MORRISSEY:  -- should be covered.
10    So with that, Your Honor, I'll -- I guess I'll
11  wait until exculpation.
12    THE COURT:  Well, let's do it together, to the
13  extent that you're complaining about releases of
14  professionals, or I suppose, committee members.  I do think
15  the exculpation here, the provision was too broad as -- at
16  least as set forth in what I've seen.  I don't know, I
17  haven't gotten through all the different iterations of the
18  confirmation order that you've submitted, but you know what
19  I did in the Aegean case, which was narrower and are you
20  suggesting more than that here, and if so, why?
21    MR. MORRISSEY:  The answer to that is, no, Your
22  Honor.  We -- as a matter of fact we --
23    THE COURT:  I'm sorry, I was asking them.
24    MR. MORRISSEY:  Oh.
25    THE COURT:  That's all right.

**Page 192**

1    MS. OKIKE:  No, Your Honor, we tried to be
2  consistent with Aegean, but if we weren't successful in that
3  we're happy to (indiscernible).
4    THE COURT:  Okay.  What I read in the plan seemed
5  much broader than what I had done in Aegean.
6    MR. MORRISSEY:  Your Honor, would you like me to
7  allow Ms. Okike to respond?
8    THE COURT:  To that question only, yeah, but stay
9  where you are at the podium and I'll hear you.
10    MS. OKIKE:  Your Honor, we tried to limit it to,
11  you know, transactions and orders that Your Honor has
12  approved in connection with, you know, various negotiating,
13  executing, implementing transactions in connection with
14  these Chapter 11 cases.  That was our intention.
15    THE COURT:  Okay.  I don't know, maybe I'm
16  remembering something wrong, but I thought when I looked at
17  it that the exculpation language was significantly broader
18  than what I had done in Aegean.
19    MR. MORRISSEY:  Your Honor, we thought so too and
20  as a matter of fact, we actually came to an agreement that
21  debtor's counsel on certain parts of that exculpation
22  provision.
23    THE COURT:  Okay.
24    MR. MORRISSEY:  And I think that should narrow the
25  issue --

**Page 193**

1    THE COURT:  Very good.
2    MR. MORRISSEY:  -- before Your Honor.
3    THE COURT:  So is there any remaining issue on the
4  exculpation?
5    MR. MORRISSEY:  There is some.
6    THE COURT:  Okay.
7    MR. MORRISSEY:  Not nearly as much as there was
8  originally.
9    THE COURT:  All right.
10    MR. MORRISSEY:  (indiscernible) that, Your Honor.
11    Your Honor, I already mentioned the professionals
12  being on the list of both released parties and exculpated
13  parties.
14    THE COURT:  Yeah.
15    MR. MORRISSEY:  We don't have a problem with them
16  being on the list of exculpated parties.  I just wanted to
17  make that clear.  The plan also provided for not only
18  prospective releases to entities that didn't exist or
19  individuals, but also the exculpation provision does the
20  same thing.
21    The -- we had an issue that we did resolve, Your
22  Honor, regarding the special committee since Mr. Kirpalani
23  just spoke, I figured I'd raise that first.
24    The special committee itself was actually -- I'm
25  sorry, not committee, the special committee investigation

A-1318

1  itself was among the exculpated parties.  And in response to
2  the U.S. concern about that, debtors proposed that the Court
3  -- if the Court approves the settlement or transaction, to
4  use Your Honor's language, the parties to that settlement or
5  transaction so that the investigation itself can be part of
6  the exculpation provision.
7       So I think we have an agreement on that, Your
8  Honor, as long as its tied to the Aegean standard of the
9  Court approved settlement or transaction.
10       THE COURT:  Okay.
11       MR. MORRISSEY:  The debtors have also agreed that
12  to add a provision that nothing in the plan shall limit the
13  liability of professionals to their clients, pursuant to New
14  York comp codes and regulations, Rule 1.8(h).  It's
15  basically the idea --
16       THE COURT:  I'm familiar with that --
17       MR. MORRISSEY:  -- (indiscernible) professionals.
18       THE COURT:  I understand it.
19       MR. MORRISSEY:  So the -- one issue we have
20  regarding exculpation is that we still have, is that the
21  distribution agent which is the same finance, is listed
22  among the exculpated parties.  This we believe is an
23  improper perspective release and effectively shields the
24  distribution agent from future, which is to sale post sale,
25  post effective date conduct.

1       And we would ask that the distribution agent be
2  stricken unless the Court wants to apply the Aegean standard
3  to narrow that release for the distribution agent, related
4  to carrying out the Court's orders.
5       I can -- I was going to go on to other issues but
6  I can stop now and allow counsel to respond.
7       THE COURT:  Well, I'll hear from the debtor's
8  counsel on the proposed exculpation or releases as to the
9  distribution agent.
10       MS. OKIKE:  Your Honor, with respect to the
11  distribution agent, the distribution agent is going to be
12  taking certain actions in connection with effectuating the
13  transactions that Your Honor is approving under the plan.
14  And we think particularly in this case, you know, dealing
15  with some of the comments by the governmental entities they
16  should be protected as, you know, in the capacity when
17  they're acting as a distribution agent under the plan.  It
18  essentially (indiscernible) that Your Honor has approved.
19       We know that you approved something similar in the
20  Fairway case and we tried to model that in the plan as well.
21  We think it's appropriate in this case, given that the
22  distribution agent is a fiduciary acting on behalf of the
23  debtors, in connection with consummating the transactions
24  under the plan.
25       THE COURT:  Okay.  Have you shared that language

1  with Mr. Morrissey?  Is there a continued objection to it?
2       MS. OKIKE:  I think this -- I don't want to speak
3  for Mr. Morrissey, but I think he categorically opposes an
4  entity that doesn't come into effect until after the
5  effective date from receiving an exculpation.  And I think
6  we just have a disagreement given the rule that the
7  distribution agent will play, in addition prior to the
8  effective date and getting ready to actually effectuate the
9  transactions.
10       MR. MORRISSEY:  Your Honor, Richard Morrissey
11  again for the U.S. Trustee.  To be candid, Your Honor, I
12  don't remember exactly what the language of the Fairway
13  provision was, because (indiscernible) in fact provided to
14  us a while ago.
15       All I can go by, Your Honor, what I'm reading here
16  in the (indiscernible) as far as whether it's being
17  exculpated and who is exculpated.  This is not an estate
18  fiduciary that's being exculpated here, the distribution
19  agent.  We do recognize as Ms. Okike said, there's certain
20  things that the -- that finance or the distribution which it
21  has to do in order to carry out the plan.  But the --
22       THE COURT:  Yes, they do it --
23       MR. MORRISSEY:  -- exculpation goes beyond that.
24       THE COURT:  They do it -- well, in what way are
25  they not a fiduciary under my order, they receive these

1  assets in trust and they distribute them in trust, so how
2  are they not a fiduciary?
3       MR. MORRISSEY:  Well, Your Honor, they're
4  (indiscernible) to the extent that they are fiduciaries
5  (indiscernible) where the exculpation is not.
6       THE COURT:  Well, I don't have the problem if you
7  want to -- yeah, I'm not going to give him exculpations for
8  anything that they do, right.  For heaven sakes, if they
9  steal assets, I'm not exculpating them from that.  But in
10  performance of the tasks that I have approved and the
11  faithful performance of the duties or of the agreements that
12  I have approved, why should they be liable?  And the same
13  thing I said this morning, you know, they're going to have -
14  - once I order them to do these things, they're going to
15  have a statutory obligation to do them, right.
16       MR. MORRISSEY:  Yes, Your Honor, but not
17  everything that they do is going to be within the Court's
18  purview.  So if there's signed agreements, for example,
19  things like that --
20       THE COURT:  Surely you can come up with language
21  that makes clear that all we're really doing is saying
22  they're exculpated to the extent that they faithfully
23  perform and execute the transactions that I have approved an
24  the duties that I have assigned to them, right?  If that's
25  not the perfect language, you should surely can come up with

1 some.

2 MR. MORRISSEY:  We will do that.  Thank you, Your

3 Honor.

4 Your Honor, the next issue --

5 THE COURT:  Before we go to the next issue, just

6 hang on one second.  Just one second.

7 Before we go to the next issue, where do we stand

8 on the one that is nearest and dearest to my heart, which is

9 whether I have to do a confirmation order by this evening?

10 MR. GOLDBERG:  Your Honor, I think we have someone

11 --

12 THE COURT:  Just wait, please.

13 MR. GOLDBERG:  We had some ongoing discussions

14 that we had with the debtor and the committee regarding Your

15 Honor's request on that point as well.  And so the next

16 break I'll speak with them and hopefully (indiscernible).

17 THE COURT:  Okay.  Whoever was speaking on the

18 line.  Who was it?

19 MR. BARNEA:  Sorry, this is J.D. Barnea from the

20 U.S. Attorney's Office.  I spoke earlier this morning about

21 the exculpation clause.

22 THE COURT:  Right.

23 MR. BARNEA:  I just wanted to note for the record

24 our continued objection to this entire enterprise and to

25 note that in the initial proposed order that would have

1 approved the plan in this case, it would have carved out the

2 government from the exculpation provision, it was only the

3 revised proposed order that was proposed for the first time

4 on the morning, on Thursday morning at the beginning of the

5 confirmation hearing that purported to undo the appropriate

6 carve out for the government from the exculpation clause.

7 That is why we objected that same day and the

8 letter that I sent.  And that's why in our letter we asked

9 for an opportunity to fully brief the issue of whether

10 exculpation is appropriate in this case as against the

11 government.

12 We understand, Your Honor, that you've decided the

13 Aegean case, a decision that we don't necessarily agree with

14 on the government's side, but we wanted an opportunity to

15 submit fully our arguments as to why an exculpation as

16 against the government is inconsistent with any number of

17 constitutional provisions that's been consistent with the

18 Bankruptcy Code, it's been consistent with the District

19 Court's decision in the Perdue case and in many other

20 provisions that we could explain if we were permitted to

21 submit a full brief.

22 Again, time prevented us from doing so, although

23 we're working on as we speak and are prepared to submit one

24 perhaps even this afternoon or tomorrow, but we didn't want

25 to lose the opportunity to object and to preserve our

1 appellate rights if necessary to the perspective exculpation

2 of debtors and non-debtors as to many tasks that may or may

3 not violate all sorts of obligations they may have to the

4 government and others.

5 And so we just wanted to put that on the record.

6 We understand, Your Honor, that the Court has already spoken

7 a little bit to that this morning, but we really would like

8 the opportunity to submit our arguments in writing, before

9 the Court enters any final order.

10 We also don't -- haven't seen any final order yet.

11 We understand that they're going to be working on that, so

12 we'd like the opportunity to see that language before it's

13 approved by the Court and to submit our written objections

14 to it.

15 THE COURT:  Okay.

16 MR. MORRISSEY:  Your Honor, just to add what

17 counsel had just said.  I thought it would be helpful to

18 point out to Your Honor where the new language appears,

19 because it's not actually with the exculpation language

20 itself.  It's separate.  And I hesitate to say the most

21 recent version of the plan, I think this is.  It's Article

22 6, provisions governing distributions, Subsection B, which

23 is called power -- rights and powers of distribution agent.

24 And then Subparagraph 1, powers of the

25 distribution agent, the debtors added a paragraph and I

1 believe that's what Mr. Barnea was referring to.

2 THE COURT:  Okay.

3 MR. MORRISSEY:  Your Honor, I was going to

4 continue.  I didn't know if anyone else wanted to comment on

5 the exculpation regarding the distribution agent.

6 THE COURT:  Go ahead.

7 MR. UPTEGROVE:  Your Honor, William Uptegrove on

8 behalf of the United States Securities & Exchange

9 Commission, if I may.

10 THE COURT:  Yes.

11 MR. UPTEGROVE:  Your Honor, I don't have any

12 further argument on the issue of exculpation per se, but did

13 want to clarify a couple of points, I think including the

14 provision of the plan that the U.S. Trustee was just

15 mentioning.

16 So I understand that the Court wants to

17 (indiscernible) the exculpation language consistent with its

18 standard language particularly used in the Aegean case.  We

19 just wanted to confirm that the portions of the three

20 paragraphs in our objection filed this morning will be

21 stricken as inconsistent with, you know, the Aegean standard

22 and will be applicable law that Your Honor discussed this

23 morning.

24 THE COURT:  I don't have --

25 UNIDENTIFIED:  Your Honor --

Page 202

1    THE COURT:  I don't have all that language in
2  front of me, but I think that's right.
3    MR. UPTEGROVE:  And I think -- I don't have the
4  full plan in front of me, but I think the U.S. Trustee, I
5  think that it's -- we're talking about the same provision.
6  I see it here on page 69 and 70 of the PDF of 158 of Docket
7  No. 1138.  There's a -- there's similar language to what
8  we've been (indiscernible) confirmation.  It's a little
9  different, so I don't know if that's the same provision but
10 it reads something to the effect and extent that any
11 cryptocurrency is deemed to be a security of the SEC or any
12 governmental unit.
13    And then it goes on to talk about good faith and
14 no liability for any -- various acts, including distribution
15 of cryptocurrency.  That in addition to the Aegean language
16 that Your Honor talked about, so I just wanted to make sure
17 that that would be something that wouldn't be, you know,
18 included and applied in the order, it's over and above
19 (indiscernible) of the Aegean standard.
20    MR. BARNEA:  Your Honor, this is J.D. Barnea again
21 from the U.S. Attorney's Office.  I just wanted to read to
22 the Court the specifics, most problematic language that's in
23 paragraph 142 and 143 of the proposed -- the latest version
24 of the proposed confirmation order, which in our view, goes
25 well beyond even what this Court allowed in Aegean, and is

Page 204

1  well beyond Aegean even to the extent that Aegean is the
2  appropriate standard here --
3    THE COURT:  I'm not going to do -- I'm not going
4  to do anything of that scope.  On the other hand, as I said
5  earlier, whatever I approve and confirm, there are
6  individuals who will have a statutory obligation to do it.
7  The regulators have had the chance, but have declined the
8  chance to suggest or to show me that any of these
9  transactions are illegal or should not go forward.  It just
10 suggested that there might be issues, but have not taken an
11 official position.
12    To me you ought to be and will be estopped through
13 the exculpation provision from contending that the
14 individuals who carry out their statutory obligations to
15 implement the deal that I approve are personally liable in
16 any way for doing so.  That doesn't mean that you can't go
17 after them if they violate tax laws.  It doesn't mean you
18 can't go after them if they act unfaithfully, et cetera.
19    It does mean to be a hundred percent clear that I
20 am not going to sit here and say that you can say nothing to
21 me, deliberately remain silent as to whether this is a
22 problem and actually is a problem in your view, only to come
23 back after I direct debtors, for example, to distribute VGX
24 and say that the people who did so violated the securities
25 laws and may be criminally or civilly punished individually

Page 203

1  totally improper in many respects.
2    It says, provided further that the United States,
3  the state, and their agencies may not and will not allege
4  that the restructuring transactions are a violation of any
5  rules or regulations enforced by the United States, the
6  state, or any of their agencies, nor will they bring a claim
7  against any person, extremely broadly defined, on account of
8  their -- on account of or relating to the restructuring
9  transactions.
10    This language, if approved in the final order,
11 could potentially make it so that if someone incurs a tax
12 liability in the restructuring transaction, the IRS cannot
13 assess that tax.  If someone commits a crime in implementing
14 the restructuring transaction, they can't be prosecuted for
15 it.
16    If they commit a fraud, they can't be prosecuted
17 or civilly charged with that.  If they violated the
18 securities rules, or if they violate an environmental rule,
19 or any other possible governmental action that relates in
20 any way to the restructuring transactions of which no one
21 even knows what those things might be, this language would
22 enjoin and tie the hands of the United States and the states
23 and all of their agencies from ever claiming so, simply
24 because, you know, they relate in some way to transactions
25 contemplated by a plan of reorganization, not -- that goes

Page 205

1  for having done so.
2    That to me is something I will not tolerate and
3  will not allow.  You've had your chance if that's what you
4  think to make that argument.  And I won't subject
5  individuals under the compulsion of my own order, my own
6  confirmation order to do things that will subject them to
7  potential liabilities.  It's just not appropriate in the
8  slightest.  Okay?
9    MR. BARNEA:  So it's the Court's position and we
10 respectfully request the opportunity to submit a brief
11 setting forth our argument in more detail before the Court
12 enters any confirmation.
13    THE COURT:  Go ahead, but hurry up.
14    MR. GOLDBERG:  Your Honor, I just wanted to
15 clarify for the record.  We refer individuals, we don't mean
16 just (indiscernible) persons but also legal entities in
17 their roles (indiscernible).
18    THE COURT:  Correct.  And I'm just saying, you
19 know, I'm not saying that they can't be stopped, that people
20 can't preserve their injunctive rights.  That's fine.  But,
21 you know, to kind of purposefully stay on the sidelines and
22 take no position on the issue and then come in and say that
23 what people are under court order to do, they're now
24 personally or they're not subject to penalties for, that's
25 just doesn't make any sense to me, not in the slightest.

Page 206

1    MR. UPTEGROVE:  Your Honor, William Uptegrove for
2  the SEC.  Just to go back to our point, we understand your
3  position.  We just for the purpose of clarity to make sure
4  that the final order reflects what I think you've said,
5  paragraph -- again paragraphs -- the U.S. Attorney's Office
6  just talked about two of the three paragraphs that are cited
7  in our objections, so 142 and 143 are the paragraphs the
8  U.S. Attorney's Office mentioned and those are two of the
9  three in our objection.
10    The third one is SEC specific injunction.  And so
11  I think those were the problematic language Your Honor
12  talked about this morning, that you weren't going to be --
13  you weren't going to enter.  So we just wanted to confirm so
14  that when we talk to the debtors afterwards, we're all on
15  the same page about what the language is and isn't.
16    I think that language should be stricken.  I think
17  that's what Your Honor said earlier.  I just wanted to make
18  sure that we're all talking about the same thing, one.  And
19  then two, there is some sort of I would think similar
20  language in the plan I mentioned about good faith and things
21  of that that go above and beyond Aegean, and just want to
22  make sure that things like that, you know, finding no
23  liability per se isn't what Your Honor has in mind.
24    THE COURT:  I guess --
25    MS. RYAN:  Your Honor, this is Ms. Ryan --

Page 207

1    THE COURT:  -- until we see the final language we
2  don't know, but I think -- I hope the concept is clear.
3  Let's just see if we can get the wordsmithing down.
4    MR. JONES:  Your Honor, Seth Jones, pro se.
5    THE COURT:  Yeah.
6    MR. JONES:  A quick question.  The SEC has taken a
7  stance that (indiscernible) XRP is a security, that's
8  currently in the middle of a trial.  Is that not violating
9  security laws (indiscernible) XRP on the (indiscernible)
10  platform?
11    THE COURT:  Well, there's no ruling at trial,
12  right?
13    MR. JONES:  Okay.  But you keep talking about
14  taking a stance on (indiscernible), they took a stance on
15  XLT (ph), right, I just want to clarify that.
16    THE COURT:  I don't think the SEC has even
17  suggested that what Voyager's going to be doing with XRP is
18  a violation of the securities laws, although that's just
19  something they haven't revealed.  They haven't said that.
20    MR. JONES:  All right.  Thank you, sir.
21    MS. RYAN:  Your Honor, this is Ms. Ryan from the
22  State of Texas.  If I may be heard regarding the releases?
23    THE COURT:  Sure.
24    MS. RYAN:  Thank you, Your Honor.  The State has
25  objected and agrees on the same grounds that you've heard.

Page 208

1  Additionally, paragraph 143 of the proposed order I think
2  the newest version is Docket 1140.  It contains language
3  that references back to paragraph 97 and 99 of the proposed
4  order.  And those paragraphs are very broad releases for the
5  purchaser.  And again, we find that broad release
6  objectionable.  Once the purchaser purchases the property,
7  they're going to have to comply with law, just as, you know,
8  any purchaser, buyer or even debtor in possession would have
9  to.  And so we also object to that addition, in addition to
10  what you've already heard.
11    THE COURT:  Which paragraphs in particular of
12  which?
13    MS. RYAN:  In particular, it's 97 and 99, Your
14  Honor.  And 99 particularly the breath of it is concerning
15  to me.
16    THE COURT:  Which version --
17    MS. RYAN:  97 --
18    THE COURT:  Which version of the confirmation
19  order to make sure I look at the right paragraphs?
20    MS. RYAN:  At Docket 1140, Your Honor.
21    THE COURT:  1140?
22    MS. RYAN:  Yes, sir.
23    THE COURT:  Okay.  I don't have that right in
24  front of me, but we'll -- I think the best thing to do on
25  all of these provisions is to see what language we come up

Page 209

1  with and then see if there are further objections.  Okay?
2    MS. RYAN:  Yes, Your Honor.
3    MS. OKIKE:  Your Honor, I will just say we have
4  been negotiating back and forth with the various
5  governmental entities on these various provisions.  And the
6  proviso which appears in all of the paragraphs was what we
7  added to try to get at what Your Honor said in terms of the
8  exculpated parties not being personally liable, in terms of
9  taking actions that Your Honor approves or may approve under
10  the plan.
11    I totally understand we probably could have done
12  that a little bit better, but that is what we're trying to
13  get at.  The second thing we're trying to get at is that we
14  don't believe any language in here should somehow preclude
15  the governmental agencies from having complied with the bar
16  date order.
17    So, for instance, the SEC did not file a claim
18  against the debtors.  And we don't think that there should
19  be anything in this order that somehow insinuates that
20  they're now entitled to file (indiscernible) proof of claim.
21    THE COURT:  I haven't heard anything being said
22  that would entitle them to do that, but.
23    MS. OKIKE:  But we have a specific proviso here,
24  Your Honor, that they're objecting to that says nothing in
25  this confirmation order or the plan shall modify in any

Page 210

1  respect the relief previously granted in the bar date order.
2  And they're explicitly objecting to that proviso and they
3  did not file a proof of claim.
4        THE COURT:  I think --
5        MR. UPTEGROVE:  Your Honor --
6        THE COURT:  I thought they were objecting to -- I
7  thought the objection was a different proviso.  What's the
8  objection to that one?
9        MR. UPTEGROVE:  Your Honor, William Uptegrove on
10  behalf of the United States Securities & Exchange
11  Commission.  There's room on filing a proof of claim and
12  untimely proofs of claims.  I don't think there needs to be
13  a provision in the confirmation order specifically singling
14  out, you know, the government bar date and our proving
15  claim, one.
16        And two, there's additional language in here that,
17  let me just find it.  So it says -- so I think this is -- I
18  think it's the second to last or maybe to last version of
19  the confirmation order, paragraph 142 in our objection.
20  It's quoted, provided however that nothing in this
21  confirmation order or the plan shall modify in any respects
22  the relief previously granted in the bar date order, just to
23  point out that parenthetically that don't need another order
24  to say what's already in a prior order.
25        But, no person or entity including the United

Page 211

1  States, the state, or any other agencies can seek or receive
2  a direct or indirect distribution of any property of the
3  debtor's estate unless they filed a proof of claim prior to
4  the government bar date.
5        Again, there's already rules in the Code and the
6  bankruptcy rules for this.  And a big problem with it is the
7  language, the indirect language.  Your Honor, I have
8  absolutely no idea what that means.  And it could mean all
9  types of things in hindsight, and it's just an unmuted
10  provision that potentially does enjoin something that we
11  otherwise could do by saying we can't indirectly
12  (indiscernible) that language, indirect, you know, seek
13  (indiscernible) a direct or indirect distribution of
14  property of the debtor's estate.  It's -- in our view, it's
15  not a needed provision.  It has ambiguous language that
16  could be read at some point could somehow impair our police
17  and regulatory powers and we think that's improper.
18        MS. OKIKE:  Your Honor, the reason we have the
19  proviso is because the provision that they requested that we
20  add, says nothing in this confirmation order or the plan
21  shall (indiscernible) release by the United States of any
22  claim arising under, and all these different things, or
23  enjoin them from bringing a claim against the released
24  parties, which includes the debtors.
25        And so we think you need a proviso in light of the

Page 212

1  fact that we have a bar date order and the SEC did not file
2  a proof of claim.
3        THE COURT:  All right.  I will --
4        MR. UPTEGROVE:  Your Honor, it's a liquidating
5  debtor, it doesn't get a discharge.
6        THE COURT:  I will --
7        MS. OKIKE:  It's not a discharge.
8        THE COURT:  I will look at the proviso and modify
9  it appropriately.  If I can't do so, I shouldn't have this
10  job, but we don't need any further argument about that.
11        MR. GOLDBERG:  Your Honor, Adam Goldberg on Latham
12  & Watkins on behalf of Finance U.S.  Just very quickly to
13  the frame issue raised by the State of Texas on paragraphs
14  97 and 99.
15        From our perspective, that language is intended to
16  implement the free and clear nature of the asset sales and
17  to protect the purchaser and the acquired assets from claims
18  and interests that could be brought against those assets and
19  the debtors -- in the hands of the debtor's estate.
20        THE COURT:  Right.
21        MR. GOLDBERG:  Thank you, Your Honor.
22        THE COURT:  That just means you're not liable,
23  taking on liability for liabilities of the debtor.
24        MR. GOLDBERG:  Correct.
25        THE COURT:  It doesn't mean that you're freed from

Page 213

1  any of your own liabilities.
2        MR. GOLDBERG:  That's exactly right, Your Honor.
3        THE COURT:  Yeah.
4        MR. GOLDBERG:  And we (indiscernible) to protect
5  the purchaser of liability is protect against action against
6  the acquired assets.  Thank you.
7        THE COURT:  Okay.
8        MS. RYAN:  Your Honor, this is Ms. Ryan.  I think
9  that's the spirit of those two paragraphs.  I do think that
10  they're overly broad, but I'm happy to work with counsel to
11  find wording that we can all live with.
12        THE COURT:  Okay.
13        MR. MORRISSEY:  Your Honor, Richard Morrissey for
14  the U.S. Trustee, shall I continue?
15        THE COURT:  Go ahead.
16        MR. MORRISSEY:  Okay.  Your Honor, the next issue
17  on the subject of exculpation covers certain definitive
18  documents.  That is a defined term.  It's paragraph 60 of
19  the plan.  We have no objection, Your Honor, to the
20  inclusion of certain of these documents listed, in the
21  context of exculpation such as the disclosure statement and
22  the plan and confirmation order, for example.
23        But we did raise objections to the inclusion of
24  certain other documents.  And, Your Honor, the debtors have
25  agreed to take out a couple of those exceptions from the

Page 214

1    exculpation provision.
2              THE COURT:  Right.
3              MR. MORRISSEY:  One is listed in the declaration
4    as subsection G as in George.  The management transition
5    plan which is something that's going to be happening later
6    on.  And also subsection H which is any new material
7    employment consulting or similar agreements entered to
8    between the (indiscernible) any of the debtor's employees if
9    any.
10             So those we agreed to.  There's one thing that we
11   didn't quite come up with an agreement on, but I believe we
12   can agree right here and now, as a matter of fact counsel
13   and I discussed this before Your Honor took the bench this
14   morning.
15             Subsection K of that definition has a catch all to
16   basically account for anything that is missed in the prior
17   subparagraphs.  And it covers all kinds of documents, deeds,
18   agreements by filing notification to pleadings,
19   certificates, orders, letters, instruments and the list goes
20   on and on.
21             Your Honor, the catch all provision we believe
22   should be expressly limited post petition, pre-effective
23   date, that time period.  And the U.S. Trustee would also go
24   along with this language provided that all of the definitive
25   documents in the catch all paragraph are within the Court's

Page 215

1    purview.
2              In other words, we don't object to the language so
3    long as the Court will (indiscernible) those documents.  Now
4    then counsel can tell me if I have that correct.
5              MS. OKIKE:  Yes, I think subject to the agreement
6    on language.
7              THE COURT:  Okay.
8              MR. MORRISSEY:  Okay.  Your Honor, while I'm here,
9    I resolved a couple of other issues unrelated to
10   exculpation.  I can certainly let the Court know later or
11   now, it's not that long, it's up to the Court.
12             THE COURT:  Let's get the good news now.
13             MR. MORRISSEY:  Okay.  And, Your Honor, I should
14   say also that the parties have been very cooperative
15   throughout this process in striving to reach certain
16   understanding.
17             The amended disclosure statement, Your Honor, does
18   disclose both the management transition plan and an employee
19   transition plan, but it --
20             THE COURT:  You resolved it by saying I'm not
21   specifically approving them, yes.
22             MR. MORRISSEY:  Correct.
23             THE COURT:  Okay.
24             MR. MORRISSEY:  Thank you, Your Honor.  The debtor
25   has agreed to that.

Page 216

1              The amended plan provided that all proofs of claim
2    were to be considered objective and disputed without further
3    action --
4              THE COURT:  Right, that's changed.  I saw that
5    change.  I saw the change to delete the requirement that
6    only -- the provision that said that only the plan
7    administrator could object.
8              MR. MORRISSEY:  Correct.
9              THE COURT:  And I saw that they addressed your
10   concern about how late claims would be treated and made
11   clear that they're not automatically gone.  They're gone
12   subject to my approval that they're gone.
13             MR. MORRISSEY:  Yes, and Your Honor has officially
14   stolen my thunder.  And therefore, I have nothing further.
15   Thank you, Your Honor.
16             THE COURT:  Okay.  All right.
17             MR. KIRPALANI:  Your Honor, if I may?
18             THE COURT:  Yeah.
19             MR. KIRPALANI:  Susheel Kirpalani from Quinn
20   Emmanuel.  I just wanted to come back to you on the issue of
21   the releases, the insiders, the justification for why
22   insiders who aren't actually paying anything should be
23   getting a release.  And the individuals as we mentioned and
24   as Mr. Pohl testified with whom the buck stopped were the
25   CEO and COO, Mr. Ehrlich and Mr. Psaropoulos.  In all of the

Page 217

1    negotiations with them, it was always the understanding that
2    this is a package D&O settlement for the insiders and it's
3    for a reason.
4              Every one of those subordinate officers would
5    otherwise be pointing the finger and potential cross claim
6    against those two, because those are the individuals with
7    whom the buck stops.
8              And so I think it is -- it's not going to be a
9    faithful implementation of the settlement, the so-called D&O
10   settlement if individuals who could then claim --
11             THE COURT:  That explains why you want to release
12   them of liability as to the 3AC problem.
13             MR. KIRPALANI:  Well, if I may, Your Honor, on
14   that point I anticipated you asking me that.  In paragraph
15   10 of Mr. Pohl's declaration it's clear what the
16   investigation entailed.  It's more than just the loans of
17   3AC.  It was Voyage -- all of Voyager's loans to third
18   parties, the diligence performed in connection with all of
19   those loans, the formation and function of the risk
20   committee, Voyager's staking of customer cryptocurrency
21   assets, Voyager's regulatory compliance, Voyager's
22   communications with the public, Voyager's prepetition
23   payments to insiders and certain third parties, and other
24   aspects that's referring to the insurance company, Your
25   Honor, and other aspects of Voyager LLC's business.

1  While I understand we didn't take on a wholesale
2  investigation of what payments might have been paid to
3  employees generally.  I will come to that in a moment.
4  Certainly with respect to the insiders, I think if the
5  releases could have least tracked the language of the
6  testimony that we had of what was investigated, I think that
7  would be acceptable.
8  THE COURT:  Read that language to me again,
9  please.
10  MR. KIRPALANI:  Yes, Your Honor.  Voyager's loans
11  to third parties, with a particular focus on the couple of
12  loans to 3AC, the diligence performed in connection with
13  those loans, the formation and function of Voyager LLC's
14  risk committee, Voyager LLC's staking of customer
15  cryptocurrency assets, Voyager LLC's regulatory compliance,
16  Voyager LLC's communications with the public, Voyager LLC's
17  prepetition payments to insiders and certain third parties
18  and other aspects of Voyager LLC's business, the last one,
19  you know, I think is probably too vague to be meaningful.
20  The specific individuals were also listed in
21  paragraph 13 of Mr. Pohl's declaration.  I did miss a couple
22  when I was trying to do it from memory.
23  And with respect to the employees broadly, Your
24  Honor, although it wasn't the focus of the special premise
25  or of Mr. Pohl's work and his testimony, it was the focus of

1  Mr. Rensi's testimony in paragraphs 114 and 115 of his
2  declaration, which is at Docket 1119.  Mr. Slade pointed
3  that out to me.
4  THE COURT:  His declaration was admitted only to
5  the extent that it dealt with uncontroverted aspects of the
6  Bankruptcy Code.
7  MR. SLADE:  That's correct, Your Honor.  He did
8  testify on those particular points, I think that's what you
9  directed us to do on -- and I think what Mr. Kirpalani
10  (indiscernible) it.
11  MR. KIRPALANI:  In his testimony, Your Honor, he
12  did specify that the debtor's releases of potential debtor
13  claims for the individuals who searched faithfully during
14  the post petition process, including all of the employees
15  which are defined as the Voyager released employees, that
16  those releases were critical to keeping the band together,
17  to ensuring maximum value for the estate and the customers,
18  this has not been (indiscernible) of these people.  And
19  there is record evidence on that.  And so we would continue
20  to urge the releases of those employees.
21  THE COURT:  I'll go back to my notes and look for
22  that.
23  MR. KIRPALANI:  Thank you.
24  MR. SLADE:  Your Honor, I would add that Mr.
25  Rensi's testimony on that point was in the context of the

1  feasibility of the plan, that these folks are necessary in
2  either direction, whether we sell (indiscernible) and
3  frankly particularly if we do the (indiscernible)
4  liquidation.  The feasibility of that is tied to the --
5  these individuals continuing to perform their services.
6  THE COURT:  Okay.  What else do we have, Ms.
7  Okike?
8  MS. OKIKE:  Your Honor, there were some objections
9  that we are impermissibly seeking a discharge, who obviously
10  are not entitled a discharge, and we included a provision in
11  the confirmation order to that effect.
12  I believe we need to consult with counsel Debias
13  (ph) on the customer data, so that we can come back on that
14  point.
15  Your Honor, we also had an objection, I believe,
16  with respect to dollarization.  This was by Mr. Schupato
17  (ph) who argued that customers were entitled to the return
18  of cryptocurrency on the debtor's platform and that their
19  claim should not be (indiscernible) as of the petition date.
20  We continue to take the position that
21  cryptocurrency on the platform is property of the estate and
22  dollarization is required under Section 502(b) of the
23  Bankruptcy Code.
24  Your Honor, with respect to the liquidation
25  analysis, I think Mr. Renzi's testimony made clear that

1  under either the sale transaction or the liquidation
2  transaction, creditors will receive at least as equal if not
3  greater recoveries.  We believe that he testified that the
4  impact of a forced liquidation would result in materially
5  lower recovery values for cryptocurrency in a Chapter 7.  We
6  believe we've satisfied the best interest tests.  And there
7  was a handful of objections on that which we're happy to
8  address.
9  THE COURT:  I don't think I need any further
10  argument on that, I understand the evidence.  You know --
11  MS. OKIKE:  Oh, sorry.
12  THE COURT:  -- one thing that troubles me, you're
13  supposed to identify the people who will serve as directors.
14  MS. OKIKE:  Oh, correct, Your Honor, I --
15  THE COURT:  The original plan said that well,
16  you're just going to have a trustee, you're not going to
17  have directors so you don't have to do it.  But you've
18  modified your plan now to say that there will be independent
19  directors who will be pursuing the intercompany issues.
20  Don't you have to say who they are?  Doesn't the Code
21  require that?
22  MS. OKIKE:  Yes, Your Honor, we agree that we do
23  need to disclose who those parties are.  We would like to be
24  able to work with the plan administrator with respect to
25  that.

1  Ideally I think in the debtor's view it would be
2  the independent directors that are currently serving, but I
3  think there was a desire to have a conversation with the
4  plan administrator, as to who would continue to serve in
5  those roles.
6  We do agree that we need an independent director
7  at all three entities, given the complex within the entities
8  with respect to intercompany claims.  And we would identify
9  those persons, you know, prior to the plan going effective.
10  I guess we could provide an opportunity for --
11  THE COURT:  See that's the problem I think people
12  may not have been paying attention to, but 1129(a)(5)(A)(i)
13  says you have to disclose it as a condition to
14  confirmation.
15  MS. OKIKE:  Understood, Your Honor.
16  THE COURT:  I didn't write that, but I'm required
17  to abide by it, so I think you have to come up with the
18  names.
19  MS. OKIKE:  Your Honor, if we could confer with
20  the committee during the break on that.  We understand that
21  we do need to disclose the identities and we'd just like to
22  have a conversation with them.
23  THE COURT:  Okay.  Two relatively minor points
24  that I noticed.  There may be others in the proposed order,
25  but in the plan and disclosure statement, you say that

1  professional fees will be subject to review through the
2  confirmation date, it's kind of a specific distinction
3  between the confirmation date and the effective date in that
4  regard.  I think I'm required to approve the reasonableness
5  of all fees through the effective date of the plan.  So you
6  need to change that.
7  MS. OKIKE:  Understood, Your Honor.
8  THE COURT:  There are provisions in the plan
9  administrator agreement and in the plan that effectively say
10  that if you get a letter or a communication or a
11  distribution that's returned to some undeliverable that you
12  don't have to do anything to try to find that customer.
13  Almost every plan I see has that provision, and so far as I
14  know I've never approved it.  So --
15  MS. OKIKE:  Okay.
16  THE COURT:  -- I'm sure you can see whatever
17  language in prior cases you've had with me, that I require
18  you make reasonable efforts to find people.  I don't think
19  it's right --
20  MS. OKIKE:  Yes, Your Honor.
21  THE COURT:  -- just because one letter is returned
22  that they forfeit their distributions.
23  And then look at the various insurance provisions
24  of your proposed order, because the -- a number of them,
25  there are five or six of them that essentially require the

1  debtors to honor, keep in place, not change any of their
2  insurance policies.  I don't understand how that's
3  consistent with potentially going after this $10 million
4  insurance policy that was bought shortly before the filing
5  of the case.  It seems like it would directly order you not
6  to do so and to keep that policy in place.  You need to look
7  at that language.
8  MS. OKIKE:  Will do.
9  THE COURT:  It's probably just form language you
10  took from something else, but it doesn't match what you're
11  trying to do in this case.
12  MS. OKIKE:  Understood, thank you, Your Honor.
13  THE COURT:  Is there any argument as to the
14  confirmation of the plan of reorganization?
15  MS. MOYNIHAN:  Your Honor?
16  THE COURT:  Yes, who is that?
17  MS. MOYNIHAN:  Kelly Moynihan, Kilpatrick Townsend
18  & Stockton, counsel for the ad hoc group of equity interest
19  holders of Voyager Digital Limited.
20  We did want to be heard briefly related to an
21  issue that you just addressed about the post effective
22  dates, independent directors and the plan administrator.  I
23  can do them now or whenever else you would prefer.
24  THE COURT:  Well, there's no time like the
25  present.

1  MS. MOYNIHAN:  Thank you, Your Honor.  As Mr.
2  Posner from my firm noted on Friday while we've resolved our
3  filed objections to the plan, subsequent to those
4  resolutions, there have bene certain developments that are
5  concerning to our client on -- as I'll explain it, I think
6  the confirmed can be equally resolved.
7  As the Court is aware Voyager Digital Limited,
8  commonly referred to TopCo and (indiscernible) a publicly
9  traded on the Toronto stock exchange, the ad hoc group is
10  comprised of shareholders who are parties to a class action
11  of defrauded equity holders and common stock holders.
12  Our clients have asserted that there are
13  approximately $230 million of intercompany claims due from
14  OpCo and SoldCo to TopCo that are dollars in allowable
15  claims, which should result in a distribution to TopCo
16  equity interest holders.
17  Late last year, we commenced an adversary
18  proceeding for declaration of the intercompany claims are
19  valid and allowable, based upon among other things, the
20  debtor's own statements and schedules, which listed those
21  intercompany claims as allowable and did not mark them as
22  disputed, unliquidated or contingent.
23  On the eve of this confirmation hearing that
24  changed a little bit, which I will explain.  As the Court's
25  aware the debtors have asserted in the various iterations of

1  the disclosure statement that the intercompany claims should
2  be subordinated, and then ultimately substantially all of
3  the intercompany claims should be recharacterized.
4        After engaging in expensive dialogue with debtor's
5  counsel, as well as document discovery, approximately two or
6  so months ago the debtor's counsel advised that they had
7  determined that the debtors couldn't resolve the
8  intercompany claims, but rather than independent directors
9  of each of the debtors would investigate and analyze the
10 intercompany claims and engaged in negotiation to resolve
11 those claims and determine to what extent, if any, they
12 should be recharacterized.
13       Over the last six weeks the ad hoc group has had
14 several meetings with TopCo's independent director counsel
15 Katten Muchin.  The ad hoc group believes that the Katten
16 independent director Mr. Ray has been thoughtfully,
17 carefully and robustly advocating on behalf of creditors and
18 interest holders at TopCo with respect to the intercompany
19 claims issue.
20       Despite what the debtors and other parties had
21 hoped, the issues surrounding the intercompany claims have
22 not been resolved prior to this hearing.  And as a result,
23 all of the parties' rights including the ad hoc groups have
24 been preserved under the plan and the intercompany issues
25 we've resolved post confirmation part of the winddown debtor

1  activities.
2        We understand as of this hearing that TopCo and
3  OpCo are still engaged in the dialogue over the intercompany
4  claims and that no resolution has been reached yet.
5        There's been some very recent developments in the
6  case, we believe that there should be a separate plan
7  administrator appointed for TopCo.  For example, the FTX
8  stipulation which I'll discuss in a minute was filed just
9  now before confirmation objections were due.  The government
10 security stipulation was filed on February 27th.  The
11 debtors filed the amended plan, which included a number of
12 changes, including that the current independent director
13 would be discharged upon the effective date, or we one wind
14 down debtor with one plan administrator appointed by the
15 committee for all of the debtor entities.
16       The oversight committee will be comprised solely
17 of members from the creditor's committee and the plan
18 administrator will direct new independent directors of each
19 debtor entity.
20       Last Wednesday HoldCo amended its schedule to
21 reflect the intercompany claims are now disputed, contingent
22 and unliquidated.  And last Wednesday evening finance
23 circulated an e-mail to customers that stated among other
24 things, that their recoveries assumed -- intercompany claims
25 would be recharacterized and that the (indiscernible) claims

1  would be subordinated to customer claims.
2        Having the committee appoint the plan
3  administrator and have the oversight committee be made up of
4  solely creditor committee members means that there's real no
5  advocate for the interest of creditors and interest holders
6  at TopCo post (indiscernible) date, allowing members of the
7  committee to appoint the new confirmation independent --
8  post confirmation independent director at TopCo should be
9  problematic.
10       The committee's goals in this case has been clear
11 and obvious, that's to maximize values to the claims of the
12 customers at OpCo which comes with a cost to TopCo as
13 interest holders.  This has been evidenced in a number of
14 ways.
15       First, the debtor's stipulation with Alameda and
16 the committee we think is very telling.  The stipulation
17 allows -- provides that FTX will waive its $75 million claim
18 against the debtors or assign its claims to OpCo at the
19 debtor's option.
20       The ad hoc group certainly questions
21 (indiscernible) object to assigning the loan claims to OpCo
22 (indiscernible) have tried to assert the guarantee claims
23 for the 75 million against TopCo.
24       Further, in the event that the particular tactic
25 doesn't work and there is value for TopCo's equity interest

1  holders, the stipulation further allows FTX to assign any
2  recoveries received from its TopCo equity interest to OpCo
3  at the debtor's option.
4        Second, as I previously noted, the $230 million in
5  intercompany claims have not been resolved yet.  While there
6  are current independent directors appointed at each debtor
7  that are attempting to negotiate a resolution of those
8  claims --
9        THE COURT:  Can I interrupt?
10       MS. MOYNIHAN:  -- upon the effective date --
11       THE COURT:  Can I interrupt you?
12       MS. MOYNIHAN:  Sure.
13       THE COURT:  Can I interrupt you?
14       MS. MOYNIHAN:  Uh-huh, yes.
15       THE COURT:  You're not telling me anything new,
16 with very few exceptions, you're not telling me anything I
17 didn't already know.  But I thought your issues had been
18 resolved.  I'm --
19       MS. MOYNIHAN:  I'm --
20       THE COURT:  -- very unclear as to what has
21 happened to unresolve them.
22       MS. MOYNIHAN:  I think the changes to the plan in
23 the last week were concerning.  Our concern is that there
24 isn't going to be an independent party who zealously
25 advocated for what's best at TopCo.

Page 230

1    We understand as Mr. Hague (ph) testified that if
2    there is a conflict that arises, whether we will, or
3    position conflict a member of the oversight committee will
4    presume the plan administrator's duties with respect to that
5    conflict.  Our position is that the plan administrator is
6    being appointed by the creditor's committee.  The oversight
7    committee is being appointed by the creditor's committee.
8    The creditor's committee has made its goals in this case
9    pretty apparent and our concern is that there won't be some
10   independent director appointed by TopCo that really truly
11   represents TopCo's interest.  It's being chosen by the plan
12   administrator or essentially the creditor's committee.
13        We would like a truly independent person to be
14   appointed to represent TopCo post effective date, who can
15   hire their own counsel.  The ad hoc group is certainly
16   willing to select an independent plan administrator to act
17   for TopCo and would be willing to consult with that plan
18   administrator.
19        Alternatively, Your Honor, given how diligently
20   and deliberately and apparently aggressively Mr. Ray has
21   been in discharging his duties as independent director of
22   TopCo, the ad hoc group would be satisfied with Mr. Ray
23   continuing in that position post-effective date and
24   continuing to retain his counsel Katten on his behalf.  And
25   we would like for him to be granted with authority to handle

Page 231

1    the matters that are issue here, including intercompany
2    claims, the Alameda guarantee claim and the government
3    claims asserted against TopCo.
4        THE COURT:  What were the matters you wanted --
5    the intercompany claims and what other matters?
6        MS. MOYNIHAN:  The Alameda guarantee --
7        THE COURT:  Alameda.
8        MS. MOYNIHAN:  -- claim.  We ask in the event
9    under the FTX Alameda stipulation that OpCo retains those
10   claims to (indiscernible) against TopCo, as well as the
11   government claims that have been filed against TopCo.
12        The ad hoc group did not believe those are valid
13   claims against TopCo and does intend to object to those
14   claims.  So we would like to have authority to address those
15   as well on behalf of TopCo because -- they're certainly at
16   issue between our clients and any recovery.
17        MR. ASMAN:  Your Honor, Darren Asman from
18   (indiscernible) for the committee.
19        Your Honor asked what has changed since the
20   objection deadline of the plan, and there's nothing that has
21   changed.  In fact, the only thing that's changed is that
22   protections have been added in response to some of the
23   concerns raised by equity.
24        This is the first time this -- even outside of
25   this court that we're hearing of a request for a separate

Page 232

1    plan administrator.  So I would object to this objection
2    just as untimely, but more substantively just to address the
3    concerns that were raised by Mr. Bosner and the ad hoc
4    equity group.  We agree that with the intercompany claims
5    are resolved, there will be an independent director in
6    place.  That's an independent director who will hold
7    fiduciary duties to that entity.  That is exactly the
8    current system that's in place right now at the company and
9    it's a system that we are carrying forward through post
10   confirmation.
11        I think the odd part about this request --
12        THE COURT:  Will it be the same director or no?
13        MR. ASMAN:  Well, that's a subject for discussion
14   that we want to talk about outside.  It's not something
15   we've thought about, to be quite frank.  We've been focused
16   on confirmation.  The plan administrator agreement gives the
17   plan administrator the authority to put independent
18   directors in.  Somebody has to have the authority to remove
19   them, they just can't be in there in perpetuity and that
20   again is the system that's in place right now.  The
21   independent directors could be removed today.
22        THE COURT:  Why is the authority limited to the
23   intercompany issues, as opposed to more generally issues
24   where there are conflicts between the debtors?  For example,
25   that provision in the Alameda loan clearly there's a

Page 233

1    conflict between the different debtors.
2        MR. ASMAN:  Your Honor, again, this is the first
3    we're hearing this from the ad hoc group.  I don't have a
4    good answer on the spot right now, it was just raised a few
5    minutes ago and it's something we can certainly consider.
6        THE COURT:  Yeah, but surely it had to be obvious
7    to you that that's a matter -- that's a provision about
8    which the different entities would have to produce.
9        MR. ASMAN:  Maybe.  I think it depends on --
10        THE COURT:  Maybe?  I think there have been prior
11   objections to your suggestion that it would work that way if
12   I remember right.  You were suggesting something similar to
13   that at the time of the FTX deal and you got an explicit
14   objection.
15        MR. ASMAN:  Correct.  But I think if the
16   intercompany claim is resolved in a way such that there's
17   nothing (indiscernible) up to TopCo it's resolved.  I guess
18   what you're suggesting Your Honor is if at least until that
19   is resolved, or if it is resolved in a way where
20   (indiscernible).  I hear your point, I'm not saying it's not
21   an issue.  I'm just saying we haven't considered it.
22        But one thing I want to make really clear, the odd
23   part about this request is it's not really equity that
24   should even have a say in this.  It's creditors at TopCo.
25   Equity here has a nearly insurmountable obstacle to getting

Page 234

1  a recovery in this case and it's for good reason, because
2  they're equity.
3          The first, Your Honor, they have to somehow
4  convince this Court and more than $200 million of capital
5  contributions from one affiliate to another are somehow not
6  equity, that's step one.  Second --
7          THE COURT:  They were a focused debt, weren't
8  they?
9          MR. ASMAN:  Correct, Your Honor.
10         THE COURT:  Okay.
11         MR. ASMAN:  I will not stray too far afield from
12 why that's not the debt, but understood.  Second, they have
13 to knock out the $75 million Alameda claim that comes ahead
14 of equity.  Third, they have to knock out more than $40
15 million of claims by governmental entities against TopCo.
16 And then fourth, and probably most importantly, even after
17 all of that, there's around $10 million of general unsecured
18 claims at TopCo, non-government claims, not Alameda claims,
19 just unsecured claims.  And there's 2 and a half million
20 dollars at HoldCo.
21         I don't see why it would be -- there's been no
22 demonstration yet that there's going to be sufficient flow
23 of cash that's going to satisfy any of those claims at all,
24 let alone in full.
25         THE COURT:  Well, whether we're doing this for

Page 235

1  equity or creditors there obviously has to be an independent
2  party at TopCo to handle issues as to which TopCo's
3  interests differ from the interests of other debtors.
4          MR. ASMAN:  I agree with that, Your Honor.  That's
5  the role of the independent director.
6          THE COURT:  So let's make sure it isn't so
7  explicitly cabined to the intercompany issues and it's more
8  broad as to issues where there's a conflict.
9          MR. ASMAN:  Understood.
10         THE COURT:  And then let's disclose who it is and
11 hopefully that'll make everybody happy and we won't have a
12 further issue.
13         MR. ASMAN:  Thank you, Your Honor.
14         THE COURT:  Okay.  Any other objections or
15 arguments as to confirmation of the plan?
16         MR. UPTEGROVE:  Your Honor, William Uptegrove for
17 the SEC.  Just not an argument, but a further clarification
18 from this morning is the Section 1145 I believe is being
19 dropped from the plan if I heard it correctly on the phone.
20 So I just wanted to make sure we no longer needed to put in
21 our submission tomorrow.
22         THE COURT:  I understand the debtor is not seeking
23 anything -- any specific findings one way or the other about
24 it, 1145; is that right?
25         MS. OKIKE:  Correct.

Page 236

1          THE COURT:  That's correct.
2          MR. UPTEGROVE:  Thank you, Your Honor.
3          MR. HENDERSHOTT:  Your Honor, this is Tracy
4  Hendershott, pro se, creditor.
5          THE COURT:  Yes, Mr. Hendershott.
6          MR. HENDERSHOTT:  You're saying any other
7  objections?  Does that include our request for a trustee for
8  creditor request to invoke our rights under Code 1112(a) and
9  (b) as well as Bankruptcy Code 1104(a)(1) for the findings
10 of or at least the evaluation of -- for the findings of
11 fraud, dishonesty, incompetence, gross management?
12         THE COURT:  We can move to that unless there are
13 other points that people want to make on the confirmation
14 issue itself.
15         MS. OKIKE:  Your Honor --
16         MR. HENDERSHOTT:  Very good.
17         MS. OKIKE:  -- the last point we just wanted to
18 note there were some objections to the plan administrator.
19 We believe he's (indiscernible) serving the role, he's an
20 experienced bankruptcy professional who's intimately
21 familiar with the debtors and their estates.
22         He testified that he doesn't believe that his
23 prior representation of the committees here would impede his
24 ability to serve as plan administrator and that he would
25 recuse himself in the benefit of any conflicts.  And the

Page 237

1  plan administrator agreement provides for the same.  So we
2  believe he should be appointed.
3          THE COURT:  Okay.
4          MR. HERNDERSHOTT:  Your Honor, Tracy Hendershott
5  again.  I offered to submit that change from yesterday, you
6  know, it's well intended and certainly does have credentials
7  in the space.  Mr. Hague has not a single day of experience
8  as administrator.  In addition Mr. Hague was providing
9  counsel to the UCC chairman, you know, approving these, you
10 know, very extensive, broad reaching, overreaching
11 discharges, you know, that you called out yourself, this
12 gives us great concern that we are going to have the maximum
13 potential of -- for recovery due to the winddown activity
14 afterwards.
15         You know, the creditors, Your Honor, are looking
16 for a mystery (indiscernible), you know, a shark that can
17 try to increase the 24 percent return that we're talking
18 about now closer, you know, as high as possible.
19         We need an individual that is experienced,
20 aggressive, and is, you know, knowing the (indiscernible) of
21 Mr. Ray that's assigned to the FTX case.  We have seen none
22 of that behavior yet exhibited by Mr. Hague in his guidance
23 or (indiscernible) UCC and, you know, we stand with our
24 objections from yesterday.  Thank you.
25         THE COURT:  Anybody else want to be heard about

A-1329

1  Mr. Hague's appointment?

2         MR. NEWSOM:  Your Honor?

3         THE COURT:  Go ahead.

4         MR. NEWSOM:  Your Honor, this is Dan Newsom for

5  (indiscernible) as well.  I will second Mr. Hendershott's

6  arguments and state that my position hasn't changed as well

7  and no offense to Mr. Hague, it seems like he has a lot of

8  experience in estates and (indiscernible) is even desirable.

9  However, I would note that the debtors spared no expense as

10 it relates to hiring their counsel and now we're being asked

11 to do I guess pinch our pennies when it comes to appointing

12 the plan administrator.

13        And, Your Honor, frankly, you know, while the

14 conflict of interests aren't as strong as, you know, we

15 might have led to believe or might have believed ourselves,

16 it is the matter of effectiveness.  And in terms of the

17 ability of the Court to appoint an independent plan

18 administrator, creditors would receive maximum confidence

19 that their best interests are heart, versus what we've seen

20 so far in terms of effectiveness from the UCC and by

21 extension Mr. Hague.

22        THE COURT:  Anybody else?

23        UNIDENTIFIED:  Your Honor (indiscernible).  Sorry.

24 Ladies first.

25        MS. DIRESTA:  Go ahead, Seth.

1         UNIDENTIFIED:  Your Honor, the plan administrator

2  is ultimately the most important role for creditors in this

3  bankruptcy.  As you know, they can decide if they want to go

4  after someone or not.  Why are we now penny pinching

5  (indiscernible) law firm from Detroit, Michigan only because

6  his clients was elected as a chairperson on the UCC when a

7  dozen other professional agencies that have been hired in

8  this case are all (indiscernible) recognized (indiscernible)

9  firms.

10        Creditors don't want (indiscernible) as Mr. Hague

11 said was his goal.  We want to be made whole.  We've

12 suffered enough.  This is not the time for on the job

13 training.  Creditors (indiscernible) the best recovery

14 possible.  We deserve a (indiscernible) or a (indiscernible)

15 ticker type plan administrator that has zero connections of

16 Voyager, zero (indiscernible) interest and is only looking

17 to bring the hammer down.  Thank you, Your Honor.

18        THE COURT:  Okay.  Mr. Asman?

19        MR. ASMAN:  Your Honor --

20        MS. DIRESTA:  Hi, Your Honor.

21        THE COURT:  Oh, who was that?

22        MS. DIRESTA:  Oh, this is Gina DiResta, Your

23 Honor.  And I agree with my fellow creditors.  We are

24 against having Mr. Hague be the plan administrator.  The UCC

25 voted to have him be the plan administrator and we don't

1  agree with the UCC judgment, because what we found most of

2  the time in this entire case is I think the UCC has only

3  objected to like maybe two things, but otherwise, they have

4  pretty much just gone along to get along with the debtors.

5         And so we feel that we need an independent party,

6  so it's just not the credentials of Mr. Hague and not having

7  the experience and us wanting a more experience who's really

8  going to fight for us, but someone who has to know fresh

9  eyes, no conflict of interest, who can really come in and

10 fight for us.  Like I said, the UCC we feel has not done a

11 good job in representing us and in fighting for us.

12        I mean, even if you just look at the list of

13 objections, the (indiscernible) objections with, you know,

14 the court documents has only been, you know -- that's it,

15 you know, like go along to get along.

16        So having someone independent, having someone with

17 proper credentials to really fight for us is what we need,

18 Your Honor.  And you're really our last hope when it comes

19 to this, so I hope that you will help us in some way.  Thank

20 you.

21        MR. ASMAN:  Your Honor, again Darren Asman from

22 McDermott Wilhelm for the committee.  Your Honor, Mr. Hague

23 is going to be tasked with an important role that we expect

24 is going to last through the years.  Specifically he's going

25 to be responsible for pursuing a number of bad actors,

1  investigating potential claims, and ultimately I hope

2  recovering a lot more for creditors to bring them closer to

3  whole.

4         Mr. Hague, will also, of course, be responsible

5  for a number of administrative functions that are typical of

6  post confirmation trust tax returns affecting future

7  distributions and objecting to claims among others.

8         Your Honor, the committee was given discretion to

9  select a plan administrator in consultation with the

10 debtors.  This is common in Chapter 11 cases, as you know,

11 particularly in a case like this, where the only real

12 constituents are unsecured creditors.

13        The committee took this process seriously at the

14 recommendation of professionals.  They interviewed three

15 different candidates for the role, including Mr. Hague.  The

16 committee voted for Mr. Hague to serve in this role, and

17 again, this is a committee of seven creditors of whom -- all

18 whom lost their personal assets on Voyager's platform and

19 there are seven creditors who the U.S. Trustee felt could

20 best adequately represent the entire creditor body at their

21 significant (indiscernible) a process that we were not a

22 part of, of course.

23        The plan and disclosure statement made clear to

24 creditors that the committee would be sluffing if its plan

25 administrator.  And on February 15th, the debtors filed a

1  second plan supplement, it's Docket No. 1006 which
2  identifies Mr. Hague as the plan administrator.
3       Importantly as Your Honor's order required, this
4  identification was made one week prior to the voting
5  deadline which was on February 22nd.  The purpose of this
6  disclosure, of course, was to ensure that creditors are
7  aware of not only the process for selecting a plan
8  administrator, but ultimately who that plan administrator
9  would be when casting a vote on the plan.
10      More than 60,000 creditors voted on the plan with
11  an aggregate dollar value of more than $550 million.  Your
12  Honor, one of the creditors asked the witness on Friday,
13  Thursday, I'm losing track of the days now, whether it was
14  unusual that only 60,000 creditors voted.  I wasn't on the
15  stand at the time, but I thought about that question quite a
16  bit on the weekend, and my answer is that actually the
17  number is really high.  60,000 people took time to fill out
18  a ballot and then while it may not be a high percentage in
19  number, it's still a big number and it suggests a lot of
20  creditors are watching this case closely and fully
21  understand what's going on.
22      Your Honor already knows this, but just as a
23  reminder, the creditors who voted, 97 percent in number
24  accepted, 98 percent in dollar amount, for $541,000 in
25  dollars, voted to accept the plan.  And again, that is all

1  with the understanding that the committee would be selecting
2  a plan administrator and later that it would be Mr. Hague.
3       You have objections in front of you from a few
4  creditors to the selection of Mr. Hague as the plan
5  administrator.  The aggregate claims of these creditors is
6  around $500,000.  Your Honor, we submit that the objections
7  are without merit and simply represent the preference by a
8  few creditors that someone other than Mr. Hague serve as the
9  plan administrator.
10      And out of 60,000 creditors who voted on the plan,
11  it's not all that surprising that we have objections to many
12  different aspects of the plan, including this one.
13      Your Honor, in its simplest terms, the objection
14  rests on a notion that Mr. Resnick, the chair of the
15  committee is too friendly with Mr. Ehrlich or was too
16  friendly and has acted as a committee member in a manner
17  that is somehow contrary to creditor interests --
18      THE COURT:  That's what the written objections
19  were, but what I've heard today is that they don't think Mr.
20  Hague is as -- I'll put it this way, as much out for blood
21  as they would like.
22      MR. ASMAN:  I don't think there's anything in
23  evidence that says he's not up for blood or that he doesn't
24  have the experience to do that.  No questions were asked
25  about that.  And I don't know that that's a confirmation

1  requirement under 1129.  That's not.
2      THE COURT:  Not in so many words anyway.
3      MR. ASMAN:  Your Honor, unless you have any
4  questions, I'll stop there, thank you.
5      THE COURT:  Okay.  Does the U.S. Trustee have a
6  position about Mr. Hague's appointment?
7      MR. MORRISSEY:  Your Honor, Richard Morrissey for
8  the U.S. Trustee.  The U.S. Trustee raised no objection
9  about it, as the U.S. Trustee has no position on the
10  committee's choice of Mr. Hague.  Unless the Court has any
11  questions for me.
12      THE COURT:  No, that's fine.  I just wanted to
13  know.
14      MR. MORRISSEY:  Thank you, Your Honor.
15      THE COURT:  All right.  I'll take those points
16  under advisement.  What else do we need to -- we need to
17  cover the trustee motion.  Is there anything else on
18  confirmation that we need to cover?
19      MS. OKIKE:  I don't believe so, Your Honor.
20      THE COURT:  Okay.  I have a host of rulings to
21  make on the objections.  And a host of open points that
22  still need to be addressed.  And a 78-page confirmation
23  order that I have many changes to make to.  None of that is
24  going to happen tonight.  It's already 5:10.  I can't see
25  myself finishing all that.

1      MR. GOLDBERG:  Thank you, Your Honor,
2  (indiscernible) this.  We're very grateful for all the time
3  you've given us, Your Honor, completely understand the
4  situation.  We have been working throughout the day in an
5  effort to resolve Your Honor's requests and customer data
6  point and just as we months ago sent a proposal to the
7  debtors and perhaps we could have a recess to go over that
8  and all have the opportunity to speak to and the committee
9  and then come back to you.
10      THE COURT:  Yeah, is my health and schedule
11  contingent on that?  You're not going to give me a break
12  from your milestone until you work that out?
13      MR. GOLDBERG:  My client, Your Honor, you know, is
14  putting a tremendous amount of resources to this case.
15  We've been the subject of a wide array of accusations
16  without any evidence brought to bear and we are very focused
17  on bringing these proceedings to a successful conclusion as
18  quickly as possible.
19      We would very much like to resolve the customer
20  data issue as part of the extension of (indiscernible) with
21  Your Honor's permission.
22      THE COURT:  Certainly I'll let you talk to them.
23  Mr. Hendershott, on your trustee motion, if I confirm a
24  plan, a trustee is sort of pointless, isn't it?
25      MR. HERNDERSHOTT:  Yes, sir, that's why we're

1  hoping to have your consideration to (indiscernible) before
2  you confirm the plan.  We understand that under Bankruptcy
3  Code 1112 there is a lot of leeway that Congress has given
4  for you (indiscernible).  But, you know, admittedly it's
5  limited our understanding, we're not experts, but we believe
6  that (indiscernible) Congress' intent for 1104(a)(1), there
7  really is no leeway.  It doesn't say and, or, should, could,
8  it says the trustee shall be appointed if any of the for
9  cause criteria is found.  And those are fraud, dishonesty,
10 incompetence, or gross mismanagement.
11        THE COURT:  Well, if you -- actually you've got
12 that slightly wrong.  What the case law says is that --
13        MR. HENDERSHOTT:  Okay.
14        THE COURT:  -- I should appoint a trustee for
15 cause which may include various things.  The case law does
16 not say that I must appoint a trustee no matter what the
17 other circumstances are in any instance where I think there
18 was any kind of fraud.  The case law is actually to the
19 opposite.  It actually says that I have considerable
20 discretion in deciding what constitutes cause, and whether
21 allegations of particular kinds in the context of an
22 individual case constitute cause.
23        And one of the factors it seems to me here as to
24 whether it's cause for a trustee is, by the time we got a
25 trustee in place, we'll already have a plan administrator in

1  place.  We're on the verge of confirmation.  It doesn't
2  really -- if I confirm the plan, it doesn't make any sense.
3  Now if I don't confirm the plan, then I have to consider it.
4  But it seems to me I have trouble thinking of anything that
5  would constitute cause at this stage of game to appoint a
6  trustee when we're right on the verge of plan confirmation.
7        MR. HENDERSHOTT:  Well, I appreciate your
8  interpretation of that, you know, and I read the Court shall
9  order the appointment of a trustee, I didn't really see the
10 flexibility.  But I do know Congress has given you, the
11 bankruptcy court (indiscernible) the judge, the jury and,
12 you know, the executioner.  So I don't profess to be an
13 expert.
14        What I do know, sir, is that this was brought up -
15 - you know, this would've made more sense.  This would've
16 made more sense back in August to have this discussion.
17 This would've made more sense back in October of last year
18 when Nexus (indiscernible) you know, brought this up.
19        Unfortunately during that time period is I
20 (indiscernible) for me personally, I was in a Category 5
21 hurricane.  I lost September, October, November to the end
22 of December for any type of communication, but as soon as I
23 was able to reconnect on January 9th, 10th I think was my
24 initial letter that I brought this up at that point.
25        And that was a letter, and I understand it wasn't

1  a motion, and -- but I do want the Court to understand we
2  were told by the chairman of the UCC to write you letters.
3  And that was false advice until you clarified that for us,
4  that we had to try to put it in a motion, then that's the
5  next step that we did.
6        Then other creditors have done that as well.  They
7  were pushed off until this late stage for discussion.  So
8  while the timeliness is not perfect, I think Congress
9  specifically said that any point before confirmation
10 intentionally.  I don't think that was an accident.
11        THE COURT:  I -- certainly --
12        MR. HENDERSHOTT:  (indiscernible)
13        THE COURT:  The Code would permit me to do it, but
14 I still have to decide whether there's cause to do it.  And
15 I just --
16        MR. HENDERSHOTT:  Right.
17        THE COURT:  It just seems inconsistent to me with
18 where we are on the confirmation hearing.  Maybe not
19 inconsistent if we don't confirm a plan, but if I do confirm
20 a plan it just doesn't seem to me to make much sense, right.
21        MR. HENDERSHOTT:  Well, if there truly is fraud,
22 Your Honor, then there is significant benefit to the
23 creditors.  And again, this is why this would've been
24 beneficial to have it actually addressed a long time ago.
25        You know, we're all guaranteed to take a

1  significant financial hit.  And we are limited to a $3,000
2  you know year write off for the tens or hundreds of
3  thousands, whatever the case may be.  You know, if someone
4  has $100,000 loss, this is going to take, you know, end of
5  their natural lifetime.  And if there's a case of fraud, if
6  you find that there clearly is a foundation of fraud, that
7  changes for the creditors --
8        THE COURT:  What do you think --
9        MR. HENDERSHOTT:  -- (indiscernible) financial
10 damages that --
11        THE COURT:  What is it you think would happen if
12 right now I said, I want a trustee.  What is it do you think
13 would be the consequence?  What would result?
14        MR. HENDERSHOTT:  I believe we would be classified
15 at the federal level as victims of fraud, given a
16 significant abilities to take this damages earlier and not
17 parse (indiscernible) amount for the next 30, 40 years
18 (indiscernible) of 3,000.
19        THE COURT:  Well, you know what --
20        MR. HENDERSHOTT:  (indiscernible)
21        THE COURT:  -- let me just disabuse you of that
22 notion.  You know, treating you victims of a fraud just
23 makes you a creditor.  It doesn't give you any different
24 status or any different kind of claim than the ones you have
25 just by virtue of being an account holder.

Page 250

1   MR. HENDERSHOTT:  No, not for claims, for IRS
2   purposes, it's (indiscernible).  I apologize for not
3   clarifying that.
4       THE COURT:  Okay.
5       MR. HENDERSHOTT:  Right now, we can't even write
6   off the damages that have been caused by the actions of
7   their debtors in possession.
8       THE COURT:  But the appointment of a trustee -- I
9   don't think the appointment of a trustee automatically gives
10  you any right to claim that you're a fraud victim.
11      MR. HENDERSHOTT:  No, you wouldn't appoint a
12  trustee, Your Honor, unless you found fraud.  If you found
13  cause, one of them being fraud, then you would appoint the
14  trustee and we would also get the benefit to actually be
15  able to have some tax, significant tax consequences for the
16  financial harm that's been occurred to us.
17      We understand.  You said numerous times, Your
18  Honor, the path of the (indiscernible), we know you're not
19  going to go back, you know, over the last nine months and
20  change any rulings, but again, 1104(a)(1) states, any time
21  before confirmation.  They specifically open it up from this
22  very point in time to have justice served and an evaluation
23  performed, and the defraud, dishonesty, incompetence, or
24  gross mismanagement has occurred.  We've never been given
25  that opportunity throughout this last nine months to have it

Page 251

1   really made on that.
2       At least the creditors that submitted this, that's
3   what we're asking for.  We want you to evaluate the motion
4   that we submitted with all of the different events and
5   evidence that we submitted.  Our impression, Your Honor, is
6   that cause occurred, fraud occurred, dishonesty occurred,
7   incompetence and gross mismanagement occurred, but no one
8   cares what we think.  We've elected you to give us your
9   ruling if you agree with that or not.
10      THE COURT:  Okay.  Who else wants to be heard?
11      MS. PROVINO:  Your Honor?
12      THE COURT:  Yes.
13      MS. PROVINO:  This is Lisa Provino, pro se
14  creditor.  Is there another option for that tax credit that
15  Tracy Hendershott has discussed?  Because if not, then I
16  would be supportive of that particular motion that he's
17  talking about at the moment, unless you could talk about
18  something else that we would be able to do a write off.
19      THE COURT:  I don't have --
20      MS. PROVINO:  I probably would (indiscernible).
21      THE COURT:  I don't know about this tax write off
22  or what it is that you would need to show to tell you the
23  truth but it seems to me I would be very dubious about the
24  idea that anything that could be labeled as fraud would
25  automatically give you rise to claim all of your losses as

Page 252

1   tax losses.  Because frauds come in many different forms and
2   they have many different victims and I would expect that it
3   -- you wouldn't get a tax benefit unless if I were to find
4   that there was something about your whole course of dealing,
5   your individual courses of dealing with Voyager was a fraud
6   that you were induced to buy cryptocurrencies that you
7   didn't want to buy that, I don't know, all kinds of things
8   that I don't even have allegations to that effect.
9       MR. HENDERSHOTT:  Sir, Tracy Hendershott again.
10  Specifically it's IRS Revenue ruling 2009-9 that allows us
11  to be able to take a credit for fraud, financial fraud, but
12  it has to be declared, it just can't be self-proclaimed.
13  And I think it exists in this case and that's what we're
14  asking for you to rule on.
15      THE COURT:  Okay.  But then here's my problem.  I
16  have no evidence.  I have a lot of allegations and letters
17  of fraud, but I have no evidence.
18      MR. HENDERSHOTT:  It's about 20 pages that we
19  submitted on Document 1061, Your Honor.
20      THE COURT:  There's no --
21      MR. HENDERSHOTT:  There's been a mountain of
22  paperwork.
23      THE COURT:  But --
24      MR. HENDERSHOTT:  Sorry?
25      THE COURT:  But unless it -- unless I have

Page 253

1   testimony from people as to what they actually did, right,
2   you know, just kind of hearsay reports or complaints about
3   specific things without a hearing from the witnesses to tell
4   me whether it actually happened, and why it actually
5   happened, and what the intent was behind it, I don't have a
6   record on which I could find fraud.
7       You understand in order to find fraud I have to
8   actually find that somebody had an intent to commit fraud,
9   right.
10      MR. HENDERSHOTT:  Well, I don't know if I agree
11  with that, you know, civil laws the burden of proof is much
12  less than the criminal law.  We don't have to find beyond a
13  reasonable doubt.  And civil law is more likely than not;
14  isn't that correct?
15      THE COURT:  Well, that part is true as to what the
16  burden of proof is but -- or the level of proof but the
17  element of fraud, one of the elements of fraud is intent.
18  Something -- and actually in many states, fraud requires
19  proof by clear and convincing evidence, not by a
20  preponderance of the evidence, which is a standard in
21  between the criminal standard and the ordinary civil
22  standard.  I'm still waiting for somebody to be precise
23  enough to tell me where exactly in between, but I guess we
24  know it when we see it.
25      But fraud is definitely -- you know, intent is an

Page 254

1   element of a fraud claim.  So I don't -- nobody's taken
2   testimony of Mr. Ehrlich on these points.  Nobody's asked
3   him.  I really don't have an evidentiary record from which I
4   could find fraud.
5          You know, I'm concerned by the things you've
6   raised, I don't want to make you think that I'm sweeping
7   them under the rug and I really haven't had -- nobody's
8   really even addressed half of them in response.  So I don't
9   want you to think that I'm by any means giving anybody a
10  pass on anything that's happened in this case or with
11  Voyager in general.  I am not.
12         I am concerned by the things that you've
13  mentioned, but sitting here right today, I can only make
14  rulings based on evidence.  And to the extent you would like
15  me today to rule that people at Voyager committed fraud, I
16  would require evidence of their actual intent and I don't
17  have it.  I just don't have it.
18         MS. PROVINO:  Your Honor, Lisa Provino, pro se,
19  I'm sorry, Tracy, were you going to talk?
20         MR. HENDERSHOTT:  Yes, just one second, Lisa.
21         MS. PROVINO:  You're welcome.
22         MR. HENDERSHOTT:  So, Your Honor, you make a good
23  point and this goes back to our earlier conversation.  You
24  know, you said despite -- or no one has submitted evidence.
25  This is our concern with the representation that we received

Page 256

1   the IRS, yes.  Is my recollection, but I'm not an expert on
2   IRS Code, but I do think it's specifically for fraud.
3          But talking about fraud, Your Honor, if I may.
4   Again, we're not experts, so again, what is fraud,
5   especially in a civil case versus a criminal case.  I go to
6   Black Law Dictionary, I don't need to insult you, sir, but
7   I'd like to read it.  It says nothing about intent.  Not in
8   a court of equity Lex Law states probably includes all acts,
9   omissions, concealment which involve a breach of legal or
10  equitable duty, (indiscernible) or competence and are
11  injurious to another or by which an undue and unconscious
12  advantage is taken of another.  There's not one word about
13  intent in there.  It's about fraudulently committing acts
14  that causes damage to another.
15         THE COURT:  Well, fraud means fraudulently doing
16  something that's kind of a tautology there.  I will tell you
17  that fraud in almost every context I know requires proof of
18  intent.  If any of the lawyers in the room think I'm wrong
19  about that, speak up please.  But nobody is doing so.  It's
20  kind of -- it's a basic.  What can I say.
21         MR. HERNDERSHOTT:  Okay.  So Black's Law is not
22  correct.
23         THE COURT:  I'm sorry?
24         MR. HENDERSHOTT:  So the definition in Black Law
25  for a court of equity is not correct.

Page 255

1   from the UCC.  And the recent (indiscernible) selecting Mr.
2   Hague going forward.  We have been frustrated with the lack
3   of what we consider obvious.  We don't know the legal
4   procedures.  I -- we thought that the documents that we
5   submitted, we worked so hard on finding all of the financial
6   reports, I mean literally a week's worth of effort that
7   weren't even into the court record was evidence submission.
8          Now, you're saying it's not.  You know, our UCC
9   should have been doing this.  But they didn't.  And now they
10  pick the business partner of the brother of the chairman of
11  the UCC who, Your Honor, we feel the next step after Mr.
12  Hague is selected, he's going to then pick Jason Resnick's
13  brother to be his personal legal representation.  I mean,
14  the conflict of interest just never ends and the lack of
15  representation that we've had as creditors has been almost
16  as frustrating as the loss of the financial (indiscernible).
17         Your Honor, my understanding is fraud, it's not
18  the only one for cause, it's dishonesty, simpler than fraud.
19  It's incompetence, it's gross mismanagement, any of these
20  quality as for cause.
21         THE COURT:  But none of those --
22         MR. HENDERSHOTT:  And during --
23         THE COURT:  But none of those get what you wanted
24  under your revenue ruling, right?
25         MR. HENDERSHOTT:  I think it's just fraud under

Page 257

1          THE COURT:  I don't know what the context was, I'm
2   just telling you fraud, in my understanding, requires proof
3   of intent.  That's been something I've understood my entire
4   legal career.  Every time I've litigated a fraud claim, any
5   time I've ruled on a fraud claim, intent has been element of
6   the offense.
7          I am not aware of -- I'm aware of some things like
8   fraudulent transfers, where people use the word, and it
9   really isn't fraud, it's kind of a misnomer, but when you're
10  talking about actual fraud of the kind that's addressed in
11  Section 1104 that requires intent.
12         Let me hear from --
13         MR. HENDERSHOTT:  Okay.  So are you making your
14  ruling now, no fraud, no dishonesty, no incompetence, no
15  risk management, or is this the discussion and your ruling
16  comes later?
17         THE COURT:  Well I'm going to hear from the debtor
18  first.
19         MR. HENDERSHOTT:  Okay.  Thank you, sir.
20         THE CLERK:  Your Honor, we're coming on the four
21  hour mark.
22         THE COURT:  Okay.  Why doesn't everybody relog in
23  on the telephone and then we'll finish, okay.
24         (Recessed at 5:28 p.m.; reconvened at 5:44 p.m.)
25         THE CLERK:  Your Honor, would you like me to --

A-1334

Page 258

1	THE COURT:  Yeah.  Why don't you go get them.

2	MR. GOLDBERG:  Good afternoon, Your Honor. Adam

3	Goldberg for the record on behalf of Binance.US.  We're

4	having some just ongoing dialog about the issues in an

5	effort to resolve things for Your Honor.  I think if you

6	could give us another 15 minutes, we should be able to

7	report back.

8	THE COURT:  Well, I've lost patience with my

9	request that you agree to change the milestone, and I don't

10	appreciate you holding that up while you try to resolve

11	other issues.  It is 100 percent clear, including based on

12	the exculpation that you and others would want, that we're

13	not going to get there today because I have to give the

14	Government a chance to file its response either this

15	afternoon or tomorrow.

16	It's 100 percent clear, since it is already quarter

17	to 6:00 that I cannot organize my thoughts, issue a ruling

18	on the disputed points, and go through the 78-page

19	confirmation order to get something done by midnight.  So

20	tell me that you either extend it, or we'll stop.  And I'm

21	tired of being toyed with on that point.  Okay?  I want an

22	answer.

23	MR. GOLDBERG:  Very well, Your Honor.  May I have

24	five minutes to call my client?

25	THE COURT:  Yes.

Page 259

1	MR. GOLDBERG:  Thank you.

2	MS. PROVINO:  Your Honor?

3	THE COURT:  Yeah.

4	MS. PROVINO:  This is Lisa Provino.  May I speak,

5	or I'm not allowed to speak yet?

6	THE COURT:  I think we should wait for the, in

7	fairness the Binance lawyer who's gone out to call his

8	client.  Let's wait for him to come back, okay?  He has a --

9	MS. PROVINO:  I appreciate that, sir.

10	THE COURT:  He has a right to hear what you --

11	MS. PROVINO:  No.  That's fine.  I just don't want

12	you to forget me.  Thank you.

13	THE COURT:  How could I do that?

14	MS. PROVINO:  I would hope that you won't.

15	(Pause)

16	THE COURT:  Yes?

17	MR. GOLDBERG:  For the record, Adam Goldberg from

18	Lantham and Watkins on behalf of Binance.US.

19	Thank you for bearing with us, Your Honor.  This

20	has been a long process, and we appreciate everyone's

21	efforts towards it.  Binance.US consents to an extension of

22	the milestone for entry of the confirmation order due

23	tomorrow at 5:00 p.m., and we expect to be working with the

24	Debtors and the committee to respond to Your Honor on the

25	customer data point in the meantime, and hope to have a

Page 260

1	proposed resolution in the morning, if not tonight.

2	THE COURT:  Okay.  All right.  Let's get back to

3	the trustee motion then.  There was a creditor on the phone

4	who wished to be heard?

5	MS. PROVINO:  Yes, sir.  Myself, Lisa Provino, and

6	my husband is here as well, Scott Provino.

7	So what -- we have a few questions for you, Your

8	Honor, please.  So we did, just while we were waiting, we

9	looked up the IRS Ruling 2009-9 and 2009-14, both of which

10	do say that we would -- we definitely need it to be declared

11	either a Ponzi, or a criminally fraudulent investment of

12	some sort in order for us to be able to write off these

13	significant losses that --

14	THE COURT:  Yeah.  I was curious about --

15	MS. PROVINO:  -- most of the --

16	THE COURT:  I was curious about moving 2009-9, and

17	I looked it up, and it deals with Ponzi schemes.

18	A Ponzi scheme is quite different from what

19	anything that's been alleged here.  You know, in a Ponzi

20	scheme, people are lied to about what their money is being

21	used for.  I don't think anybody here has alleged that they

22	weren't actually submitting money for the purposes of

23	investing in cryptocurrencies, or that Voyager wasn't

24	actually buying cryptocurrencies, or that their account

25	statements were fictitious, or any of the kinds of things

Page 261

1	that would be characteristic of a Ponzi scheme.

2	And the reason for that particular ruling was that

3	you have to show that your loss is essentially a theft, that

4	the Ponzi scheme perpetrator has stolen, not just that you

5	didn't get all of your recoveries and that things went bad.

6	I didn't get a chance to look at the other ruling, but I

7	can't imagine anything that's been alleged, let alone any

8	evidence that I've offered, that would support a Ponzi

9	scheme finding in this case.  Mind you --

10	MS. PROVINO:  Well, that's my next --

11	THE COURT:  -- there are some people who allege

12	that cryptocurrencies, themselves, are Ponzi schemes because

13	they don't believe that cryptocurrencies are real, but

14	nobody here has asked me to rule that.

15	MS. PROVINO:  Correct, Your Honor.  So well, I

16	guess where we -- at least where we particularly stand, as

17	we have received phone calls all weekend here.  There have

18	been calls from people that said that even their money got

19	stolen through the Voyager platform, some Nigerian -- and

20	I'm not exactly sure how, but I was trying to understand the

21	details.

22	But my question to you, Your Honor, is going back

23	to those five points of criminal intent where it says -- I'm

24	just going to say they're points, 2, 3, and 4, which we

25	looked up on the internet, the defendant possesses

1  knowledge, the statement is untrue, false statement intended
2  to deceive the intended victims, intended victim justifiably
3  relies in the statement, and that is what I have received
4  phone calls for this past weekend.
5       So my question to you, Your Honor, is because I
6  don't know if a pro seer can actually subpoena somebody.  If
7  there is a way, please tell me.  I will -- we will do that.
8  I guess it's a little late, but we just need to know if we
9  can.
10      And secondly, if we have an opportunity to prove
11  off the fraud and possibly put some witnesses on the stand.
12  Again, I know we're pro se, but please take this into
13  consideration because we have had significant losses, and I
14  honestly am begging you right now to please be openminded to
15  this.
16      THE COURT:  Yeah.  Did any of you who want to do,
17  did you file proofs of claim alleging that you were victims
18  of fraud?
19      MS. PROVINO:  I'm sorry, sir.  Could you explain
20  specifically what you're asking now?
21      THE COURT:  Yeah.
22      MS. PROVINO:  You mean, the claim that they didn't
23  allow me to -- for voting purposes claims, and then I had to
24  fight for that?  Which claim are you speaking of, sir?
25      THE COURT:  Well, you know, the Debtor filed

1  schedules of people that thought that had -- you know,
2  accountholders, who would have thought their claims were.
3  Anybody who thought they had other claims should have filed
4  a proof of claim form.  So if you thought you were a fraud
5  victim, not just that you were an accountholder who just
6  happened to be owed money, but a fraud victim, you should
7  have filed a proof of claim saying that you believed you
8  were a fraud victim.
9       So to the extent that you did that, then you can
10  get a litigation.  You can get a ruling and a litigation of
11  your claim as to whether you were a fraud victim.  But if
12  you didn't, then being on the eve of confirmation, I don't
13  know how you're going to get that, at least in this
14  particular context, at least from me.  You would have to sue
15  the perpetrators of the fraud, who you think defrauded you,
16  and get a ruling in that context.
17      MS. PROVINO:  Well, lesson's learned.  These are
18  life lessons.  Is there a way, though, Your Honor, for pro
19  seers to subpoena someone?  Could you answer that for me,
20  please?
21      THE COURT:  Well --
22      MS. PROVINO:  Or do we need a (indiscernible -
23  5:57:37) for that.
24      THE COURT:  Yeah.  I'm not supposed to give you
25  legal advice.  I'm just supposed to rule on things.  There

1  are procedures in the Code for subpoenaing people.  Usually,
2  if you want to subpoena somebody in connection with a motion
3  that's actually pending, you have to issue the subpoena in
4  accordance with requirements in the rules and have it served
5  on the recipient, and if there isn't a particular proceeding
6  pending for which the testimony is sought, you'd need
7  permission to issue a subpoena under Rule 2004.  That's
8  about as much as I, as the judge, should be giving you
9  advice about, okay?
10      MS. PROVINO:  That's fair.  I appreciate that.
11  I'll go back to the (indiscernible - 5:58:25) rules,
12  bankruptcy sections.  I've looked over, just it's a lot to
13  digest.  So I'll go back to that section.  You said Rule
14  2004, right, 2-0-0-4?
15      THE COURT:  That's the Rule if you don't have
16  something -- a motion pending to which the testimony really
17  relates.  If you have a contested matter or an adversary
18  proceeding where it's relevant, then the Bankruptcy Rule
19  is -- hang on one second.  Rule 9016, which simply
20  incorporates Rule 45 of the Federal Rules of Civil
21  Procedure.
22      MS. PROVINO:  And I will review that.  Thank you,
23  sir.
24      THE COURT:  Okay.
25      MS. PROVINO:  The only other question I have -- and

1  I'm sorry for the multiple questions here -- but in terms of
2  the for cause, if you will, if the Debtors are removed and
3  all the releases are voided, does that mean that we can't
4  still go on the Ponzi scheme issue?
5       THE COURT:  If the --
6       MS. PROVINO:  Or is that, like you said, you have
7  to sue them for fraud?
8       THE COURT:  I missed a part of your question.  If
9  what happens?
10      MS. PROVINO:  Oh, I'm sorry.  If the Debtors are
11  removed and their releases are voided, would that be a for
12  cause for the Ponzi scheme or it basically goes back to what
13  you had said before?
14      THE COURT:  I'm not sure I understand the question.
15  If the Debtors are what and the releases are voided?
16      MS. PROVINO:  If the Debtors are removed from the
17  releases.  You know how we've been talking all afternoon
18  about the releases?  So if they're just voided out, does
19  that mean we can't go after them for cause for the fraud,
20  for the Ponzi scheme?  I mean, we're concerned about tax
21  consequences.
22      THE COURT:  Well, when you say them, if you want to
23  go after individuals and you believe you have a fraud claim,
24  there's nothing in what we're doing here that would stop you
25  from doing that.  If you want to make a fraud claim against

Page 266

1  the Debtors, it should have been in a proof of claim, and if

2  it was not --

3        MS. PROVINO:  And when would that have been done,

4  by 10/3, or is that a different date, sir?

5        THE COURT:  I think that was -- I'm getting a lot

6  of headshakes, yes, back last October.  So if it's not in a

7  proof claim --

8        MS. PROVINO:  But --

9        THE COURT:  If it was not in a proof of claim, you

10  would need to amend a claim that you filed or get permission

11  to file a late claim, and there are rules that govern that,

12  too.  I don't know what else to say.

13        MR. AZMAN:  Your Honor?

14        THE COURT:  Mr. Azman.

15        MR. AZMAN:  Darren Azman for the Committee.  If I

16  could just speak to Ms. Provino?

17        Ms. Provino, if there are things that we can do to

18  mitigate tax consequences or tax liabilities for what is

19  really going to be the bulk of the creditor body, that's

20  certainly something that either the committee or when the

21  plan goes effective, the plan administrator is happy to

22  consider.  I think what I would suggest is that it's not

23  necessarily something that needs to be decided today.

24        Certainly, somebody can come back to the Court and

25  file a motion seeking some type of declaratory judgment

Page 267

1  relief to contend that whatever this was it was.  And

2  whether it satisfies that tax provision, I don't know, but

3  that's certainly something that if it benefits the entire

4  creditor body, I'm sure that the plan administrator would

5  certainly want to consider.

6        MS. PROVINO:  Mr. Azman, I want to truly appreciate

7  you mentioning that.  I feel that that is what we need to

8  do, and I won't belabor this, but at the moment, I just

9  wanted to say thank you for that.  And thank you, Your

10  Honor, for allowing me to speak on this matter because it

11  does significantly affect us.

12        THE COURT:  Okay.

13        MS. PROVINO:  Thank you so much.

14        THE COURT:  Okay.  Let me hear from the Debtor on

15  this issue then.

16        MS. SMITH:  Thank you, Your Honor.  Allyson Smith,

17  Kirkland & Ellis, on behalf of the Debtors.

18        I'm sure you saw we did file an objection to these

19  motions.  That objection raised a number of the same points

20  that Your Honor has already --

21        THE COURT:  It didn't really address the charges.

22  It sort of gave them the back of your hand.

23        MS. SMITH:  Well, there's really no evidence or

24  anything other than just kind of assumptions and conclusory

25  statements.

Page 268

1        THE COURT:  That's true, but I would have expected

2  a little more explanation.  It seemed odd to me to just have

3  none.

4        MS. SMITH:  I mean, I think we -- you know, we have

5  the special report out, we've done extensive disclosures and

6  conversations about the special committee's investigation.

7  I think from our view, they were unfounded statements that

8  didn't necessarily warrant giving any weight to.

9        THE COURT:  Okay.

10        MS. SMITH:  I did want to reiterate that the

11  Debtor's position has not changed.  There is no cause to

12  appoint a trustee under 1104(a)(1), and despite statements

13  that the movants say otherwise, any appointment to do so

14  would not be in the best interest of creditors, particularly

15  at this stage of the cases.  We're on day three of a

16  confirmation hearing, seeking authority to proceed with

17  implementation of the plan.  The plan overwhelmingly is

18  supported by voting creditors, and proceed with

19  distributions to customers.

20        These cases have obviously been difficult, and I do

21  understand the frustrations of customers, but no party has

22  offered any actual evidence of finding of fraud, and to

23  appoint a trustee at this point in time would essentially

24  put parties back at day one rather than accomplishing what

25  we understand customers' role is to be, the efficient return

Page 269

1  of assets and conclusion to this process.

2        And lastly, but importantly, I did want to

3  highlight that also appointment of a trustee or conversion

4  to a Chapter 7 is an APA termination event.

5        THE COURT:  Okay.  All right.  Is there anything

6  else?  Any other motions or any other issues that we need to

7  address today?

8        MS. SMITH:  No, Your Honor.

9        MS. DIRESTA:  Your Honor?

10        THE COURT:  Yeah.

11        MS. DIRESTA:  Your Honor, this is a pro se

12  creditor.  I have a question.

13        THE COURT:  Yes.  What is your name?

14        MS. DIRESTA:  My name is Gina DiResta.

15        THE COURT:  Okay.

16        MS. DIRESTA:  And I was not at the hearing when a

17  fee examiner was requested, but I heard through fellow

18  creditors that it was approved.  And so I wanted to confirm

19  with you that was indeed approved because I was also told

20  that there was no orders filed if that was approved.

21        THE COURT:  What I ruled at the time was while I'm

22  not a giant fan of fee examiners, and I just want

23  somebody who was going to redo work that the U.S. Trustee

24  had already done or do what unfortunately my past experience

25  has been in the case of some fee examiners, which is simply

Page 270

1  try to blackmail fee reductions from Debtors.  And I asked
2  if the Debtors and the U.S. Trustee and the committee could
3  discuss and see if they could agree on something that would
4  work within that parameter, and I think they've been
5  discussing it.  Nobody has gotten back to me to say that
6  they can't reach an agreement, but it does seem to be taking
7  some time.
8       MS. DIRESTA:  Okay.  Thank you for the
9  clarification, Your Honor.
10      THE COURT:  I was in private practice once and
11  actually had a fee examiner say to us after raising a few
12  issues that look, all I want is five percent.  I don't care
13  how.  And I will never appoint anybody who does that.
14  That's just wrong.
15      MR. MORRISSEY:  Your Honor, Richard Morrissey for
16  the U.S. Trustee.
17      Actually, to add one party to the conversation in
18  addition to the committee and the Debtors, counsel, we also
19  circulated names to Mr. Kirpalani, if he's still here, but
20  because he had objected to the fee examiner as well.  So we
21  did pick someone, and I think I advised Your Honor at the
22  hearing on the Paul Hastings retention application that Lori
23  Lapin Jones was the person that had been --
24      THE COURT:  That's right.  You know, I forgot
25  entirely that you had said that.  I apologize.

Page 271

1       MR. MORRISSEY:  But the creditor on the phone is
2  correct, we have not yet submitted a proposed order.  Quite
3  frankly, Your Honor, the confirmation hearing has been all-
4  consuming, but as soon as --
5       THE COURT:  That's something you don't have to tell
6  me.
7       MR. MORRISSEY:  -- possible after it's over -- yes.
8  Thank you, Your Honor.
9       THE COURT:  All right.  Any other issues for today?
10      MR. WARREN:  Your Honor, this is pro se creditor
11  Jon Warren.  Can you hear me?
12      THE COURT:  I can.
13      MR. WARREN:  All right.  I had one quick question
14  to you, is there a way that we can request the transaction
15  history, including withdrawals of Voyager insiders and board
16  of directors?
17      THE COURT:  You would have had to make a discovery
18  request for that information, and Voyager would have had the
19  opportunity to object if it thought it was improper.  It
20  would be -- I can't say anymore than that.  I can't tell you
21  how to do it.  I can't give rulings and things that aren't
22  in front of me.  It's just not something I'm allowed to do
23  as the judge, okay?
24      MR. WARREN:  Thank you for the information.
25      THE COURT:  All right.  Anything else?  All

Page 272

1  right --
2       MS. DIVITA:  Your Honor, I'm sorry.  I was
3  struggling to get off mute, but this is Michelle DiVita.
4  I'm a pro se creditor, and I also filed a motion in regards
5  to appointing a trustee.
6       THE COURT:  Yes?
7       MS. DIVITA:  I just wanted to make maybe a few
8  quick clarifying statements, but I think this plan as it's
9  contemplated today does give the Debtors -- still, they
10  retain a great deal of business judgment, particularly in
11  regards to risk management and things of that nature.  I
12  will say that I was maybe surprised earlier when there was a
13  discussion surrounding the confirmation order and exactly
14  what conduct the special committee investigated.  It was my
15  understanding that that was a very limited investigation and
16  only pertained to the (indiscernible - 6:10:23).
17      And so I was surprised to hear that it also
18  included things such as wagers, communications to the
19  public, and then also decisions to extend loans beyond
20  (indiscernible - 6:10:32), particularly in regard to those
21  transactions that occurred shortly before bankruptcy and the
22  filing thereafter.
23      I just kind of maybe wanted to provide some context
24  in terms of why I filed a trustee motion.
25      Really, if the Court (indiscernible - 6:10:52) in

Page 273

1  the sense that it seeks to give creditors their money back
2  as quickly as possible, and that was really kind of the
3  premise of the FTX transaction.
4       I, you know, kind of bit my tongue back in October.
5  I think that I maybe I'm a little more risk-averse than
6  other people on the phone, and that's why my claim is much
7  lower just because I chose to diversify my cryptocurrency
8  holding.
9       But I will just say that I was a little surprised,
10  maybe back when the UTC filed one of their first objections
11  to say that really no wrongdoing outside of this 3AC loan
12  had occurred, and really my frustration stems from things I
13  found in the financial statements and just kind of this
14  general sense from the Debtors that, you know, these were
15  very experienced finance professionals, and, you know, they
16  had fees beyond cryptocurrency and asset management and
17  things of that nature.  And so kind of having to rely on
18  this very limited investigative report, just thinking, let's
19  get to plan to confirmation.
20      Now, today, it seems like we've had more time.
21  There is more that could be investigated, and it hasn't
22  been.  So really an examiner motion isn't appropriate, but
23  I think that between the conduct leading up to the
24  bankruptcy, combined with, you know, this assurance that the
25  FTX transaction will be great, all in light of the fact

Page 274

1  that -- you know, Alameda was an insider shortly before the
2  filing of bankruptcy petition, not to mention, I think that
3  under United States law, they're still technically
4  considered an insider. It's just really this combination of
5  factors that really made me to distrust the debtors, and I
6  know a lot of the creditors on the phone maybe agree with
7  that assertion as well.
8        And so I certainly don't want to -- I do not envy
9  the position that you are in, whatsoever. I certainly do
10  not have admittable evidence to any of these factors. I,
11  personally, have spent a lot of time on this matter, and I
12  don't have a ton of time to dedicate to it in the future,
13  but really just trying to rely on the deference of the
14  bankruptcy professionals, and you, yourself, Your Honor, to
15  make a decision, and as we confirm this plan, with maybe
16  that context in mind.
17        And I think as you've heard from these pro se
18  creditors, we aren't bankruptcy professionals. We're not
19  experts here, and we don't know I think the procedural part
20  of things I've seen has at least, for me, personally, have
21  one of the biggest learning curves.
22        THE COURT: Right.
23        MS. DIVITA: These are just things that I really --
24  the purpose of my motion was to just kind of paint that in a
25  context of distrust and their kind of (indiscernible -

Page 275

1  6:13:42) today or what actions that have led us to where we
2  are today. That's all I have to say, Your Honor. Thank
3  you.
4        THE COURT: Okay. In terms of just to correct one
5  thing you said --
6        MS. DIVITA: Yes.
7        THE COURT: When you said you were frustrated that
8  the committee found that there was nothing wrong, other than
9  the 3AC loan, I need to make clear, the special committee's
10  job really was to figure out what claims belonging to the
11  Debtor and the estate could be pursued, okay?
12        You mentioned specifically financial statements.
13  I, personally, have no idea if there was anything wrong with
14  the financial statements or not or whether there was any
15  fraud and whether that injured anybody. But if a customer
16  or a shareholder was injured by a misstatement of financial
17  condition, that's not a claim that would belong to the
18  debtors. That's a claim that would belong to the customers.
19  Okay?
20        And the debtors have no ability or right, let alone
21  ability, to pursue it for customers, nor does the committee.
22  The committee's job is to pursue creditors' interest not
23  with respect to individual claims, but as to the conduct of
24  the case, how the business will be handled, et cetera.
25        So I know probably many of you think that you're

Page 276

1  frustrated because neither the debtors, nor the special
2  committed, nor the unsecured creditors committee championed
3  your cause on allegations about, for example, whether
4  Voyager was on the brink of bankruptcy, but that's not
5  really their job. I know you may have assumed it's their
6  job, but it's not.
7        Those are claims that belong to you individually
8  that if you believe you have them, you need to pursue. And
9  they're not being released. Nobody is purporting to release
10  them, nobody is purporting to express any view about whether
11  they're right wrong, but I just -- I hope -- I've tried many
12  times throughout the hearing here -- and it's resulted in
13  extending the hearing quite a bit -- to give you, all of
14  you, a lot of leeway as to the questions you can ask and to
15  try to explain things because I think it's important that
16  people understand and feel that their questions have been
17  heard and that the process is open and that they understand
18  it as much as possible, but I still think that on that
19  particular point, there's still some confusion, okay?
20        MS. DIVITA: Yes. And I'm sorry, Your Honor. I
21  was referring to the creditor committee's findings. I don't
22  think that that changes your statements by any means, but
23  just to clarify that point, and say subsequently, had it
24  been asked to customers to contribute their direct claims to
25  a wind-down or to the trust that would then prosecute those

Page 277

1  claims so.
2        There were direct claims at least contemplating in
3  the beginning, and I think that the unsecured creditors
4  committee also previously referenced --
5        THE COURT: Okay.
6        MS. DIVITA: -- but only 60,000 people here have
7  voted. So that's maybe a clarifying point. And I think
8  that we're relying on these professionals to meet those
9  assertions in regard to those direct claims and/or other
10  claims.
11        THE COURT: Okay.
12        MS. DIVITA: That's all. Thank you, Your Honor.
13        THE COURT: All right. Is there anybody else who
14  wants to be heard? Okay.
15        I'm going to close the argument record then. I'll
16  reserve decision. I have a lot of homework and prep to do
17  to make rulings on these motions and to review the proposed
18  order. It sounds like people are still reviewing, and I'm
19  trying to decide on certain provisions.
20        Whatever is the version of the order that was sent
21  to us this afternoon, I am going to work on. So if you make
22  changes, make sure you are very clear as to which specific
23  provisions they relate to so I don't get lost in looking at
24  them tomorrow. But I will be working and making my own
25  adjustments to kind of editorial provisions, and I may have

Page 278

1   other questions for you as I review the full scope of the

2   extended order.

3          And perhaps we should resume at 2 o'clock tomorrow,

4   at which point, I will read my rulings into the record and

5   ask any remaining questions that I have about the order.

6   Okay.  Does that work?

7          MR. SLADE:  Very good, Your Honor, thank you.

8          THE COURT:  Okay.

9          MR. GOLDBERG:  Your Honor, would you like us in

10  person or by phone?

11         THE COURT:  Let's do it by person for sure as to

12  the Debtors, Binance, and the committee.  Anybody else who

13  want to be over here in person can be here in person, but

14  has permission to be on the phone.  Okay?  I think the rest

15  of you, it's useful to have you in one place if an issue

16  comes up because you're already here, you can discuss it,

17  and we can resolve it more quickly.  When you're on the

18  phone, it takes forever.  Okay?

19         UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

20       (Whereupon, the proceedings were concluded at 6:19

21  p.m.)

22

23

24

25

---

Page 280

1

              CERTIFICATION

2

3          I, Sheila Orms, certify that the certify

4   that the foregoing is a correct transcript from the

5   official electronic sound recording of the proceedings

6   in the above-entitled matter.

7

8

9   _____

10

11

12

13

14

15  Dated:  March 9, 2023

16

17

18

19

20

21

22

23

24

25

---

Page 279

1              I N D E X

2          W I T N E S S E S

3   WITNESS          BY              PAGE

4   None.

5

6          R U L I N G S

7   ITEM                             PAGE

8   None.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

[& - 1934]                                        Page 1

**&**
& 4:19 6:1,8
  7:16 8:2,9,16
  9:1,10,18 10:1
  10:8,17 11:1,8
  11:15 12:16
  13:1,9 52:18
  84:14 85:21
  102:6 105:2
  110:21 114:20
  135:20 173:7
  201:8 210:10
  212:12 224:18
  267:17

**0**
05620  14:4
07102  10:4
07962  9:21

**1**
1  75:3 95:9,10
  200:24 236:9
  246:6 250:20
  268:12
1.763  84:22
1.8  194:14
10  84:24
  147:14 217:15
  224:3 234:17
10,000  157:5
10/3  266:4
100  5:11 86:3
  89:5 90:11,19
  258:11,16
100,000  249:4
10004  2:3 6:11
  12:12 14:11

10007  4:15
  13:20
10010  8:19
10014  12:4
10017  13:12
10019  4:22
  6:19
10022  4:6 9:5
  10:11
10036  11:4,18
1006  242:1
1049  78:21
1061  252:19
10:13  2:6
10:25:44  28:17
10:26:06  28:20
10:26:13  28:21
10:29:10  30:17
10:30:37  31:14
10:50:23  44:3
10:50:39  44:6
10:53:35  46:9
10th  72:8
  247:23
11  3:2,5 63:11
  63:14,23 64:5
  155:12 177:8
  182:2 190:9
  192:14 241:10
1100  11:10
1104  236:9
  246:6 250:20
  257:11 268:12
1112  236:8
  246:3
1114  11:3

1119  219:2
11206  3:16
11209  3:16
11213  3:16
1123  133:2
  182:17
1125  31:14
  38:10 65:14
1127  84:19
1129  61:4
  63:11,12,14,23
  64:5 222:12
  244:1
1138  16:18
  17:12 49:16
  202:7
1139  49:17
114  219:1
1140  208:2,20
  208:21
1142  35:13
1145  23:20
  36:15 39:20
  40:7,7,16,21
  40:24 41:6,11
  42:1,7,11,25
  43:1,5,13,16
  43:25 44:3
  46:16 47:17
  51:13 52:1,6
  235:18,24
115  219:1
1156  7:12
1180  13:4
11:01  51:18
11:16  51:18

12  185:7
12.54.  154:8
12151  280:8
125  6:10
12548  8:4
12:42:38  108:1
12:51:41  114:7
12:52:17
  114:15
12:53  115:8
12th  7:4
13  40:11 41:20
  218:21
1300  9:20
1301  6:17
136  173:19,20
142  202:23
  206:7 210:19
1425  7:11
143  202:23
  206:7 208:1
149  78:20
15  40:11 41:21
  168:9 258:6
158  202:6
15th  241:25
165  78:20
16th  88:3
180  95:9
184  78:20
1850  7:3
187  78:20
19  28:19
1900  85:3
1934  40:11
  41:21

19801  7:19
19th  90:2
1:40  114:11
  115:8
1st  155:13

**2**

2  43:6 46:17
  234:19 261:24
  278:3
2,000  91:20
2-0-0-4  264:14
2.00.  143:10
2.4  86:24
20  53:4 57:19
  75:17,25
  100:12 102:12
  147:14 184:11
  252:18
200  234:4
20036  71:5
2004  264:7,14
2009-14  260:9
2009-9  252:10
201  12:3
2021  47:13
2022  167:10,10
2023  2:5 88:3
  280:15
20549  5:12
20580  5:4
2161  9:12
219  78:20
22  155:7,9,10
22-01133  1:12
  3:18

22-01170  1:19
  3:23
22-10943  1:6
22.5  90:3
225  8:11
22nd  242:5
23  17:2
230  225:13
  229:4
24  95:21
  154:10 237:17
25  100:20
2501  12:19
27777  6:3
27th  227:10

**3**

3  17:2 182:17
  261:24
3,000  249:1,18
30  90:4 100:20
  143:2,3 148:6
  249:17
300  10:19
3016  170:4
30309  11:11
  13:5
30326  5:20
31  16:19
31,878  162:5
33  143:2
35  54:1,4 75:17
  75:25 100:13
  140:21 147:16
3506  80:24
359  78:20,21
36  143:2

380  78:20
381  78:20
382  78:20
39  143:5,11
  145:5 152:6
  154:11,25
3:06  173:4
3:23  173:4
3ac  174:11
  180:12 182:5
  183:9,21 186:8
  186:16 187:10
  188:23 217:12
  217:17 218:12
  273:11 275:9
3rd  4:14 9:4

**4**

4  16:19 43:6
  46:17 133:2
  261:24
40  147:17
  155:21 157:7,9
  234:14 249:17
40,112  162:1
400  9:13
42nd  6:18
43  118:23
45  264:20
47  119:14
48  56:11 95:22
  121:12 156:12
48034  6:4
497  78:21

**5**

5  75:3 104:2
  222:12 247:20

5,000  85:1
500,000  176:12
  243:6
502  220:22
51  4:21 8:18
52  162:5
523  28:19
52nd  4:21
534  12:1
541  84:20
541,000  242:24
550  242:11
55402  8:12
570  10:3
575  4:5
5:00  259:23
5:10  244:24
5:38  28:13
5:44  257:24
5:57:37  263:23
5:58:25  264:11
5th  155:12

**6**

6  2:5 34:2
  200:22
60  213:18
60,000  242:10
  242:14,17
  243:10 277:6
600  5:3
601  10:10
60654  10:20
607  78:21
65  162:1 169:1
66  78:20
69  202:6

146:9 147:10
149:5 152:12
156:10,13,18
166:9 175:12
175:18 189:16
203:7,8 214:16
249:25 260:24
accountholder
  263:5
accountholders
  54:24 56:4,8
  56:12,18,20
  57:3 67:17
  96:25 97:2
  100:23 263:2
accounts  20:10
  21:15 44:15
  45:9 78:1,2
  98:23 113:22
  128:15,15
  133:19 148:7
  172:9
accumulated
  20:1
accusations
  245:15
accuse  25:14
achieve  111:25
  121:10
acknowledge
  61:10 141:25
acquire  153:21
acquired
  212:17 213:6
acquiring  23:2
act  40:11 41:21
  44:8 45:16

120:5 204:18
230:16
acted  243:16
acting  46:14,24
  47:8,10 119:23
  182:23 195:17
  195:22
action  31:6
  58:16 67:10
  68:6 70:6
  71:13 146:1
  174:16,19,22
  177:15 181:19
  189:3 203:19
  213:5 216:3
  270:1
actions  33:23
  38:25 39:1
  58:7 67:7,19
  82:5 90:1
  138:6 195:12
  209:9 250:6
  275:1
active  168:15
actively  134:19
activities  68:8
  270:11,17
activity  88:7
  174:4 237:13
actors  240:25
  226:15
acts  186:18
  187:5,8 202:14
  256:8,13
actual  64:25
  150:16 160:8
  171:15 179:5
  179:17,18

183:5 189:13
254:16 257:10
268:22
actually  29:1
  29:15 35:19,22
  49:12 61:24
  67:15 68:5
  77:15 91:19
  96:5,24 97:12
  100:8 110:2,4
  110:18 122:11
  129:20,24
  137:1 138:5
  140:15 145:5
  152:2,5 169:11
  172:1 187:25
  188:1 192:20
  193:24 196:8
  200:19 204:22
  216:22 242:16
  246:11,18,19
  248:24 250:14
  253:1,4,4,8,18
  260:22,24
  262:6 264:3
  270:11,17
ad  1:16 11:2,9
  11:16 224:18
  225:9 226:13
  226:15,23
  228:20 230:15
  230:22 231:12
  232:3 233:3
adam  9:8
addressed
  107:15 216:9
  224:21 244:22

212:11 258:2
259:17
add  20:8 131:8
  139:9 153:8
  194:12 200:16
  211:20 219:24
  270:17
added  16:11
  24:2 34:2
  42:16 70:2
  95:2 96:17
  97:13 200:25
  209:7 231:22
addition  54:5
  81:5 108:9
  131:7 196:7
  202:15 208:9,9
  237:8 270:18
additional
  16:17 20:24
  21:2,5 43:10
  71:24 72:2,6
  95:1 139:9
  210:16
additionally
  208:1
address  17:18
  52:20 81:20
  91:4 93:16
  97:22 98:5
  104:24 112:10
  221:8 231:14
  232:2 267:21
  269:7
addressed
  107:15 216:9
  224:21 244:22

6:00  258:17
6:10:23  272:16
6:10:32  272:20
6:10:52  272:25
6:13:42  275:1
6th  8:11

**7**

7  3:8 96:10
  221:5 269:4
70  78:20
  156:13 168:10
  202:6
700  176:10
726  162:3
73  155:21
75  228:17,23
  234:13
75201  12:20
765  162:7
78  244:22
  258:18
78213  9:14
78711  8:5

**8**

8  104:6
85  162:3
86  4:13 13:19
863  79:24
  80:13
885  9:4
89  14:3

**9**

9  280:15
9,000  84:23
90  162:7
  175:23 176:2,3

176:4,6,14
900,000  85:2
9016  264:19
92  158:9
94  77:10 80:23
95.68  116:11
950  5:19
96.28  116:13
97  19:10 27:20
  27:21 77:6
  208:3,13,17
  212:14 242:23
98  83:14
  242:24
99  27:20,21
  208:3,13,14
  212:14
9th  90:3
  247:23

**a**

a.m.  51:18,18
abandoned
  99:3
abandonment
  99:13 102:13
abide  222:17
abigail  8:7
  27:15 131:10
abilities  249:16
ability  18:20
  20:9 21:7
  31:24 67:18
  68:4 87:4 88:6
  90:6 96:4
  109:12 119:7
  120:8 127:12
  129:15 132:1

149:19 160:8
236:24 238:17
275:20,21
able  17:5 21:7
  55:8 79:1
  86:17 104:2,3
  106:17 108:6
  118:19 120:11
  121:10 130:16
  132:19 134:21
  138:10 142:14
  145:16 178:17
  221:24 247:23
  250:15 251:18
  252:11 258:6
  260:12
aboard  177:12
above  202:18
  206:21 280:6
absence  58:14
  58:25
absolutely
  32:21 38:15
  63:2 64:19,20
  104:18 123:12
  123:16 132:10
  211:8
absurd  38:8
abundantly
  16:20
accept  22:13
  242:25
acceptable
  42:22 218:7
acceptance
  19:11 124:13

accepted  62:15
242:24
access  71:11
  104:6,20 106:7
  106:11,24
  107:4,17
  108:14 109:8
  109:12 110:11
  119:8
accident
  248:10
accidentally
  169:7
accomplish
  25:22 110:17
  185:15
accomplishing
  268:24
accordance
  54:24 105:8
  264:4
account  18:2
  20:11,12 21:8
  45:16 54:12
  56:22 67:21
  108:3 112:7,11
  113:3,13,16
  116:4,6 117:16
  119:3,6,11
  121:11,16
  122:6 125:14
  125:23,24
  126:3 129:1,3
  129:5 131:4,15
  132:3 133:3
  134:4 140:19
  141:20 142:7

248:24 254:8
257:10
addressing
110:1
adds  150:5
adequacy  63:9
adequate
  55:20 60:22
  65:15 77:14
adequately
  97:22 241:20
adjust  24:14
adjustment
  124:4
adjustments
  23:9 277:25
administrative
  21:1 88:21
  184:12 186:2
  241:5
administrator
  20:17,19
  176:18 180:17
  180:18 182:17
  216:7 221:24
  222:4 223:9
  224:22 227:7
  227:14,18
  228:3 230:5,12
  230:16,18
  232:1,16,17
  236:18,24
  237:1,8 238:12
  238:18 239:1
  239:15,24,25
  241:9,25 242:2
  242:8,8 243:2

243:5,9 246:25
266:21 267:4
administrator's
  230:4
admissible
  62:21
admit  123:10
  158:19
admittable
  274:10
admitted  60:12
  204:4 139:6
adv  1:12,19
  3:18,23
advance  69:22
  91:10
advantage
  126:17 256:12
adversary
  225:17 264:17
advice  248:3
  263:25 264:9
advised  226:6
  270:21
advisement
  244:16
advisors  111:3
  120:21 258:5
advocate  228:5
advocated
  229:25
advocating
  226:17
aegean  32:25
  33:12 38:14

39:17 191:19
192:2,5,18
194:8 195:2
199:13 201:18
201:21 202:15
202:19,25
204:1,1 206:21
affairs  171:15
  173:13 175:6
affect  65:16
  68:3 97:25
  267:11
affected  19:7
  67:18 70:3
  73:8
affecting  211:6
affiliate  234:5
affiliates  6:9
affirmative
  29:17 35:17
  39:6
affirmatively
  29:10 43:3
  161:12,17,23
  162:15 165:7
afield  231:11
afraid  90:18
afternoon
  47:23 115:10
  120:21 125:5
  232:4 235:4
  241:20 253:10
  258:2,5
  265:17 277:21
agencies  27:11
  32:9 203:3,6
  203:23 209:15
  211:1 239:7

agenda  91:10
91:12
agent  33:25
  54:23 194:21
  194:24 195:1,3
  195:9,11,11,17
  195:22 196:7
  196:19 200:23
  200:25 201:5
aggregate
  242:11 243:5
aggressive
  237:20
aggressively
  230:20
ago  26:20
  33:19 89:19
  196:14 226:6
  233:5 245:6
  248:24
agree  16:20
  32:17 34:22
  94:23 132:2
  141:9,10,13
  168:5 169:2
  186:1 199:13
  214:12 221:22
  226:12 234:9
  235:4 239:23
  240:1 251:9
  253:10 258:9
  270:3 274:6
agreed  16:10
  16:25 19:4
  21:9 22:17
  23:1,1 86:19
  134:17 163:20

**[agreed - answer]** — Page 6

166:4 190:25
194:11 213:25
214:10 215:25
**agreeing**
168:23
**agreement**
17:10 19:3
55:14 58:7
72:9 76:3 91:7
92:2 111:5
114:21 131:24
132:5 184:3
186:12 189:4
192:20 194:7
214:11 215:5
223:9 232:16
237:1 270:6
**agreements**
33:2 111:2
116:20 117:14
184:5 197:11
197:18 214:7
214:18
**agrees** 207:25
**ahead** 31:22
81:17 103:21
119:1 139:2
144:4,5 146:24
164:9 172:25
181:1 201:6
205:13 213:15
234:13 238:3
238:25
**al** 1:21 10:9,18
12:18 13:3
**alah** 3:10

**alameda** 93:22
94:22 96:17
98:3 182:13
228:15 231:2,6
231:7,9 232:25
234:13,18
274:1
**alameda's**
73:11 94:7
**algorithm**
139:15
**aligned** 24:20
131:15
**allegations**
64:17 246:21
252:8,16 276:3
**allege** 116:3
125:2 203:3
261:11
**alleged** 124:23
260:19,21
261:7
**allegedly** 29:8
51:8
**alleging** 262:17
**alleviate** 181:4
**allocated**
149:18
**allow** 30:7 58:7
115:18,21,23
118:15 124:24
128:19 134:22
136:14 139:11
180:20 192:7
195:6 205:3
262:23

**allowable**
225:14,19,21
**allowed** 22:16
36:11 38:10
73:11 103:18
157:5 202:25
259:5 271:22
**allowing** 60:4
114:1 146:11
149:10 228:6
267:10
**allows** 129:4
138:15 228:17
229:1 252:10
267:16
**alter** 90:23
**alternative**
3:19 32:18
70:25 151:9
**alternatively**
230:19
**amazon** 74:18
**ambiguity** 49:2
**ambiguous**
211:15
**amend** 147:3
149:3 266:10
**amended** 72:10
73:6 74:6
79:22 116:21
121:20 215:17
216:1 227:1
227:20
**amendment**
127:10

**amendments**
23:18 121:22
**america** 4:12
13:18
**americas** 6:17
11:3
**amount** 57:4
65:9 75:17
87:10 136:25
147:11 148:7
151:23 156:11
156:17,20
180:2 242:24
245:14 249:17
**amounted**
176:12
**amounts** 39:11
90:4,5
**ample** 105:3
**analysis** 67:22
70:1 96:6,6
160:24 182:19
186:6 220:25
**analyze** 30:16
226:9
**andres** 15:4
**andrew** 14:24
**angela** 4:24
**announced**
154:18
**anonymous**
158:7
**answer** 57:12
68:11,16,19
99:20 110:16
113:23 121:8

**[answer - approximately]** — Page 7

130:3 132:12
147:20 156:8
191:21 233:4
242:16 258:22
263:19
**answered**
130:7
**answers** 73:7
**anti** 113:7
**anticipate**
156:12
**anticipated**
69:20 217:14
**antonio** 9:14
**anybody** 23:4
26:9 29:22
31:3 32:21
35:25 36:12
64:9 69:5
76:21 96:14
97:21 130:24
132:22 136:17
138:14 142:22
151:19 160:20
163:1 166:5
167:21,24
168:5 170:22
178:3,23
237:25 238:22
254:9 260:21
263:3 270:13
275:15 277:13
278:12
**anybody's**
152:4
**anymore**
130:18 271:20

**anyway** 175:19
244:2
**apa** 26:19 49:4
58:17,24 86:12
86:25 269:4
**apologies** 60:1
141:9
**apologize**
73:17 93:1
124:15 147:21
250:2 270:25
**app** 156:1
**apparent**
111:10 230:9
**apparently**
60:20 230:20
**appear** 66:4
172:5
**appearing**
14:15
**appears** 17:1
44:9 46:13
90:15 153:16
200:18 209:6
**appellate**
200:1
**applicable**
42:1,7,11 99:4
102:13,18,19
270:22
**applied** 191:5
202:18

**applies** 40:16
157:1
**apply** 41:11
51:25 189:8
195:2
**appoint** 3:4
228:2,7 238:17
246:14,16
247:5 250:11
250:13 268:12
268:23 270:13
**appointed**
227:7,14 229:6
230:6,7,10,14
237:2 246:8
**appointing**
238:11 272:5
**appointment**
238:1 244:6
247:9 250:8,9
268:13 269:3
**appreciate**
51:20 127:7
247:7 258:10
259:9,20
264:10 267:6
**approach**
70:19 85:15
146:21
**appropriate**
24:12 38:16
98:24 177:14
195:21 199:5
199:10 204:2
205:7 273:22
**appropriately**
212:9

**approval** 3:1
32:13 34:15
50:25 63:10
72:10 75:14
88:20,22 92:13
97:4 125:18
216:12
**approvals**
116:9 118:13
122:24 123:4
**approve** 19:8
25:11 30:3
31:20 35:10
38:17 162:10
204:5,15 209:9
223:4
**approved**
24:19 26:19,23
32:24 33:3
51:23 97:19
154:2 162:16
165:2 170:7,10
177:17 192:12
194:9 195:18
195:19 197:10
197:12,23
199:1 200:13
203:10 223:14
226:19,18,20
223:4
**approves**
194:3 209:9
**approving**
31:5 37:25
49:3 195:13
215:21 237:9
**approximately**
80:17 225:13

**[approximately - atan]** — Page 8

226:5
**april** 176:14
**area** 186:22
**arentfox** 6:15
**argue** 85:18
169:17
**argued** 220:17
**argument** 40:5
42:23 43:7,9
45:25 49:14
50:2,4 52:19
76:12 100:11
102:3 114:11
124:13 132:24
137:22 158:20
180:25 201:12
205:4,11
212:10 221:10
224:13 235:17
277:15
**arguments**
29:13 40:3
42:18 52:4
64:18 98:13
115:13 199:15
200:8 235:15
238:6
**arises** 230:2
**arising** 211:22
**arrangement**
167:5
**arrangements**
110:8
**array** 245:15
**arthur** 14:25
**article** 16:19
17:1 34:2 75:3

200:21
**articles** 66:4
**ascribed**
160:10
**ashwin** 185:2
**aside** 37:8
44:25 149:24
188:4
**asked** 16:21
17:4 19:6 68:4
91:22 114:21
139:23 238:10
242:12 243:24
254:2 261:14
270:1 276:24
**asking** 30:10
41:25 90:10
145:22 147:8
191:23 217:14
251:3 252:14
262:20
**asman** 231:17
231:17 232:13
233:2,9,15
234:9,11 235:4
235:9,13
239:18,19
240:21,21
243:22 244:3
**aspect** 19:17
97:23 102:11
**aspects** 71:5
135:14 217:24
217:25 218:18
219:5 243:12

**assert** 228:22
**asserted**
225:12,25
231:3
**assertion** 188:8
188:11 274:7
**assertions**
277:9
**asserts** 102:14
**assess** 23:17
189:9 203:13
**asset** 55:14
72:9 75:24
76:3 112:5,17
212:16 273:16
**assets** 18:21
20:11 44:4
54:10,16 55:5
55:7,7,9,10,20
60:8,13,19
61:12 62:23
65:19,21 75:15
75:18 83:18,19
87:20,20,23
96:14 104:3,5
104:8 105:22
106:11 107:17
108:7,22
109:17,20,23
111:12,15,22
111:23 112:17
154:3 171:16
174:18 175:22
176:2,5 183:1
185:16 187:15
187:17 197:1,9
212:17,18

213:6 217:21
218:15 241:18
269:1
**assign** 228:18
229:1
**assigned**
197:24 237:21
**assigning**
228:21
**assist** 60:15
**associated** 57:7
154:13
**association** 7:1
**assume** 27:10
94:18 108:20
144:7 154:11
**assumed**
227:24 276:5
**assuming**
54:21 146:15
185:18
**assumptions**
267:24
**assurance** 76:5
82:8 273:24
**assurances**
60:19 62:19,19
63:4 66:15
75:7 82:10,18
82:21 83:4,5
84:6
**assure** 24:17
76:2
**assured** 72:14
88:4
**atan** 184:21

**[atlanta - bankruptcy]** — Page 9

**atlanta** 5:20
11:11 13:5
**attacks** 70:13
**attempt** 184:12
**attempted**
88:15 158:8
**attempting**
229:7
**attending** 92:1
**attention** 92:6
115:2 126:17
222:12
**attitude** 169:14
**attorney** 4:12
4:20 5:2,9,17
6:2,9 7:2,10
8:1,2,10 9:11
9:19 10:2,18
11:2,9,16 12:2
12:9 13:2,18
14:2,9 93:15
131:10
**attorney's** 4:11
13:17 34:14
198:20 202:21
206:5,8
**attorneys** 4:4
6:16 7:1,17
8:17 9:2 10:9
12:17 13:10
**attractive**
135:8
**attributes** 89:8
**audit** 67:1
**auditors** 55:19
**audits** 62:15

**august** 247:16
**austin** 8:5
**authorities**
34:24 62:6
71:4
**authority**
26:10 31:25
50:13 62:6
71:5,6 161:20
164:23 171:16
188:3 230:25
231:14 232:17
232:18,22
268:16
**authorize**
29:16 32:11
**authorized**
26:13,18 27:7
29:6 32:2,14
49:7 104:16
**authorizes**
38:1
**authorizing**
38:24
**automatic** 3:19
**automatically**
22:10 216:11
250:9 251:25
**available** 43:6
44:3 46:17,18
56:7 59:6 86:8
87:15 105:9
111:25 115:4
132:16 158:2,5
184:11
**avenue** 4:5 5:3
6:17 8:18 9:4

9:20 10:10
11:3 13:11
**average** 143:10
143:12
**averse** 257:5
**avoiding** 32:10
**aware** 18:12
61:20 64:17
151:5 158:23
225:7,25 242:7
257:7,7
**azman** 13:15
107:20,20
135:16,19
137:17 144:15
144:15 145:14
266:13,14,15
266:15 267:6
**azman's** 108:9
146:13
**b**
**b** 2:8 9:2 75:3,3
182:17 200:22
220:22 236:9
**back** 18:14
25:24 27:20
32:1 76:5
81:10 86:9
90:22 99:12,23
102:9 103:13
131:19 133:24
155:12 157:23
160:4 167:20
168:24 171:2
176:1 180:16
204:23 206:2
208:3 209:4

216:20 219:21
220:13 245:9
247:16,17
250:19 254:23
258:7 259:9
260:2 261:22
264:11,13
265:12 266:6
266:24 267:22
268:24 270:5
273:1,4,10
**background**
81:25
**backing** 137:3
**bad** 240:25
261:5
**balancings**
140:3
**ballets** 161:14
**ballot** 80:18,21
81:1 242:18
**ballots** 77:1
170:7
**bam** 9:2
**ban** 24:3,7
**band** 219:16
**bank** 4:20 18:2
54:5 56:22
89:25 98:23
103:5 112:11
**banking** 8:3
99:4 131:12
**bankruptcy**
1:2 2:1,10 7:17
18:22 28:22
31:11 32:16
35:14,24 36:4

47:14 61:4
70:15 71:7,8
92:11 94:15,24
100:22 101:10
124:11 128:14
132:16 143:21
149:23 154:18
154:21 162:23
164:18 167:7
169:21 170:15
173:14 175:24
176:1 177:3,6
178:18 182:15
182:17 186:1
188:24 199:18
211:6 219:6
220:23 236:9
236:20 239:3
246:2 247:11
264:12,18
272:21 273:24
274:2,14,18
276:4
bar 36:7
209:15 210:1
210:14,22
211:4 212:1
barnea 4:17
34:10,13,13,19
37:7,18 38:9
38:23 39:12
198:19,19,23
201:1 202:20
202:20 205:9
barred 64:14
barrier 151:7

barriers 139:9
base 178:10
based 26:14,15
29:5 53:18
54:8,15 55:2
57:15 60:20
64:25 68:23
86:4 90:6,12
116:16,24
119:5 131:25
141:22 147:15
149:21 152:25
154:15 155:18
155:19 156:4
156:17 157:10
159:11 160:6
172:12 182:18
189:9 225:19
254:14 258:11
basic 256:20
basically 27:23
32:19 194:15
214:16 265:12
basis 19:10
37:2 55:6 56:3
86:20 87:19
102:11 103:6
111:4 122:3
139:20 151:17
142:25 165:17
bear 245:16
bearing 178:22
259:19
befallen 54:6
befuddled
118:6
begging 262:14

beginning 16:9
66:1 72:19
112:9 114:13
199:4 277:3
behalf 17:17
46:15,24 47:9
52:18 84:14
85:21 92:5
93:6 102:6
105:2 110:21
114:20 115:11
121:6 131:11
135:21 173:8
174:9 175:4
188:11 195:22
201:8 210:10
212:12 226:17
230:24 231:15
258:3 259:18
267:17
belabor 267:8
believe 23:8
50:7 53:10,20
55:23 57:6,20
59:3,15 79:21
85:10 86:8
89:4 91:12
95:16 96:16
98:16 108:22
109:10 111:8
117:15 133:9
134:2 135:3
142:1 143:3
145:25 147:14
147:16 148:6,7

152:14 160:5
160:13 162:14
177:25 178:9
181:3 190:17
191:4,6 194:22
201:1 209:14
214:11,21
220:12,15
221:3,6 227:6
231:12 235:18
236:19,22
237:2 238:15
244:19 246:5
249:14 261:13
265:23 276:8
believed
238:15 263:7
believes 55:19
61:14 68:23
226:15
beller 6:13
belong 164:5
167:19 275:17
275:18 276:7
belonging
275:10
belongs 175:1
bench 214:13
bene 225:4
beneficial
106:14 111:1
248:24
beneficiaries
163:10
benefit 22:24
56:17,23 164:8
182:19 236:25

bit 136:5 147:8
200:7 209:12
225:24 242:16
273:4 276:13
bitcoin 40:1
54:11,12
134:25 135:6,9
137:6,7,8,9,21
138:2
bizarre 185:25
black 256:6,24
black's 256:21
blackmail
270:1
blamed 64:10
blank 30:11
block 25:8
blockchain
135:5 136:2
137:8,8,10,11
blocked 80:25
blood 243:20
243:23
blown 32:4
board 8:2
131:11 182:24
271:15
boat 43:18
bodies 81:4
162:20
body 77:18
82:24 149:8
241:20 266:19
267:4
bolded 170:1
bonus 175:7,9

book 186:15
books 116:25
bosner 232:3
bother 187:23
bottom 95:20
95:24 96:18
bought 17:8
98:20 133:17
133:17,23
159:24 160:1,4
224:4
bowling 2:2
12:10
box 8:4 168:22
169:8
brach 3:25
brad 15:5
branch 138:12
138:12
brand 24:3
breach 58:25
182:4,11 256:9
breadth
172:13 179:2
break 114:10
173:2 198:16
222:20 245:11
breath 208:14
brett 6:22
brg 87:14
brief 166:15
199:9,21
205:10
briefly 47:11
224:20
building 11:17
bulk 21:5
75:19 83:19

241:2
bringing 27:24
112:4 211:23
245:17
brink 276:4
broad 6:10
10:3 27:18
166:20 171:8
171:18 172:3
179:4,12,13,20
186:12,13
190:10 191:15
208:4,5 213:10
235:8 237:10
broader 192:5
192:17
broadly 24:3
34:22 203:7
218:23
broker 25:15
46:14,24 47:5
47:8 68:7
brosgol 184:25
brother 255:10
255:13
brought 64:16
79:12 93:11
103:19 183:18
188:14,16
190:9 212:18
245:16 247:14
247:18,24
buck 184:15
216:24 217:7
building 11:17
224:20
bring 88:20
203:6 239:17

266:19
burden 43:5,19
43:20 91:13
101:7 114:13
140:11 253:11
253:16
burdensome
151:18
bureau 9:19
10:2
buried 93:21
94:13
busd 89:18,21
89:23
business 19:22
19:22 31:21
54:7 56:10
57:24 59:12
61:20 62:4,8,9
62:11 63:5
65:10 66:23
71:5,20 96:13
101:8 103:4,6
103:10 107:12
174:19 175:9
176:23 182:22
186:9,10
217:25 218:18
255:10 272:10
275:24
busy 157:22
buy 136:7
252:6,7
buyer 61:12
111:12 146:2,3
150:16 208:8

248:22 250:14
252:3
benefits 267:3
benjamin 6:13
bernstein 10:6
best 53:13 59:5
59:13 86:8
87:15 208:24
221:6 229:25
238:19 239:13
241:20 268:14
betler 48:10,11
95:17 113:5
130:21,25
152:19 209:12
beyond 38:12
111:13 160:14
171:20 176:3,4
176:14 196:23
202:25 204:1
206:21 253:12
272:19 273:16
big 80:7 100:19
211:6 242:19
biggest 169:4
274:21
billion 84:23
binance 16:9
16:10,12,13,22
16:25 17:6
18:4 20:4,6,6,8
20:10,12 21:14
22:11 23:4
25:14 36:10
44:15 45:4,9
45:15 46:14,21
46:22,23,25

47:8 48:9
57:22,23 58:2
58:20,24 60:9
60:9,10,24
61:6,24 62:4
62:16,17,22,23
63:21 64:19,22
65:6,16,19,20
65:23 66:5,6
68:4,7,8 71:23
72:10,17,20,22
72:24 74:17,20
75:8 76:2
77:20,21,24
78:1,2,6,7
82:11,12,17
83:14,15,16,17
83:20,24 86:2
86:5,6,7,19,21
86:22,23 87:3
87:9,14,16
89:10 98:17,19
98:20 99:3,24
100:5,12,22,25
101:8,9,10
102:18 103:23
105:10 108:1
109:16,18
110:15 113:2,6
113:9,16
118:10 120:10
120:11,23
121:23 122:1,4
122:22,24
124:19 125:4
125:17,21
128:19,25

129:3,7,11,21
130:11,15
131:3,16,23
132:2 153:16
153:24 259:7
259:18 278:12
binance's 22:6
74:15 98:16
99:3,6 100:9
102:25
binance.com
73:1 100:1
104:19 106:5,8
106:22 107:2,8
107:8,17
108:16,21
109:2,8,21
110:8,25
111:22
binance.com.
100:13
binance.global
73:1 87:20
binance.us 9:3
18:7 19:5
20:14 21:22,24
22:13 23:1
53:19,20,22,25
54:2,9,9,12,12
54:14,16,21,22
55:11,16,19
56:1,3,6,14,16
56:19,25 57:8
57:12 61:14,16
61:16 68:25
biometric
112:12

75:20,21 76:4
82:7 86:13,14
86:16 87:12,21
87:22 89:10,24
99:19 100:1
102:6,14,21
103:5,9,11
105:9 106:6,8
106:10,12,14
106:23 107:6,7
107:17 108:10
108:11,14,23
109:1,9,11,21
110:8,21
111:23,24
115:11,25
116:8 134:16
134:16 148:22
259:21
binance.us's
17:20 20:25
53:15 54:2,7
54:15 55:7,22
56:5 90:6
100:5 102:15
110:25 118:15
binance.us.
17:17 21:9
53:17 75:22
84:13 84:14,15
84:18 86:15
105:2,6 107:2
107:9 114:20
258:3
bind 32:5
biometric
112:12

buyer's 60:21
buying 150:19
260:24
buyout 155:7
buys 136:16

**c**

c 4:1 16:1,19
17:2,2 170:4
cabined 235:7
calculated
151:24
calculation
149:22 154:12
155:1 157:9
calculations
140:4 149:20
150:1,8 152:1
152:16,18
156:16
call 81:3 91:12
92:6 93:4
132:23 258:24
259:7
called 65:25
90:18 136:1
137:11 200:23
217:9 237:11
calling 135:19
calls 47:15
261:17,18
262:4
candid 196:11
candidates
241:15
capacity 55:5
56:17 173:25
174:2 195:16

capital 234:4
capitalization
176:10
cappuccio 9:10
care 28:2 50:20
98:6 168:5,7
179:13 182:4
270:12
career 257:4
careers 187:2
carefully
226:17
cares 251:8
carpenter 9:18
10:1
carried 35:18
carrier 184:13
carriers 186:4
carry 35:16
36:20 37:4
196:21 204:14
carrying 35:15
195:4 232:9
carve 147:1
180:16 199:6
carved 149:2
199:1
carveout 141:3
case 1:6,12,19
3:7 16:3 17:21
18:22 21:1,21
27:25 29:25
31:11 32:21,25
33:13 37:10
39:17 43:22
52:12 60:17
71:12 72:15

90:21 98:24
103:4,11
108:18 124:24
128:17 155:8
156:25 164:24
171:20 173:25
187:21 191:7
191:19 195:14
195:20,21
199:1,10,13,19
201:18 224:5
224:11 227:6
228:10 230:8
234:1 237:21
239:8 240:2
241:11 242:20
245:14 246:12
246:15,18,22
249:3,5 252:13
254:10 256:5,5
261:9 269:25
275:24
cases 28:22
32:16,24 51:24
72:20 75:10
162:23 165:2,2
170:13 190:9
192:14 223:17
241:10 268:15
268:20
cash 16:22
54:3,4 56:2,7
56:19 59:10
74:8 89:24
108:12 116:1,7
120:8 121:17
121:25 124:6

124:18 126:12
127:2 131:14
132:14 139:18
139:24,24
140:7,13 142:4
144:20 146:9
146:19 156:20
234:23
cashed 127:15
129:18
cashing 127:14
casting 242:9
catch 214:15
214:21,25
categorically
196:3
category
102:23 247:20
cathy 3:25
cause 106:18
106:21 174:19
174:22 181:19
189:3 246:9,15
246:20,22,24
247:5 248:14
250:13 251:6
255:18,20
265:2,12,19
268:1 276:3
caused 187:8
250:6
causes 174:16
177:15 256:14
caveats 68:21
70:2

## Page 14

| | | | |
|---|---|---|---|
| cede 52:8 | certificate | 129:23 | charged |
| cent 154:12 | 60:24 103:23 | change 17:6 | 203:17 |
| cents 143:2,2,3 | 108:5 110:23 | 20:3 25:24 | charges 90:3 |
| 143:5,11 145:5 | certificates | 27:5 48:11 | 267:21 |
| 152:6 154:10 | 214:19 | 50:6,6 59:8 | charles 12:22 |
| 155:1,7,9,10 | certification | 88:11 97:18,22 | 12:23 |
| 157:7,9 158:9 | 280:1 | 131:13 149:17 | charter 179:13 |
| ceo 163:8 | certifications | 150:25 169:10 | check 30:12 |
| 165:15 216:25 | 74:20 | 216:5,5 223:6 | 41:16 97:8 |
| cepheus 25:8,9 | certify 280:3,3 | 224:1 237:5 | 143:3 |
| certain 3:20 | cetera 84:10 | 250:20 258:9 | checked |
| 29:6 58:6,13 | 183:24 189:11 | changed 66:18 | 168:22 169:7 |
| 73:7 97:14 | 204:18 275:24 | 134:1 216:4 | chicago 10:20 |
| 128:11 164:9 | chain 138:12 | 225:24 231:19 | chief 18:5,7 |
| 183:9 192:21 | 138:14 | 231:21,21 | chimed 97:17 |
| 195:12 196:19 | chair 243:14 | 238:6 268:11 | china 104:10 |
| 213:17,20,24 | chairman | changes 16:10 | choice 38:7 |
| 215:15 217:23 | 88:23 184:20 | 17:11 20:21 | 64:24 122:23 |
| 218:17 225:4 | 237:9 248:2 | 27:16 227:12 | 168:6 244:10 |
| 277:19 | 255:10 | 229:22 244:23 | choices 140:12 |
| certainly 21:13 | chairperson | 249:7 276:22 | choose 18:14 |
| 25:5 37:3 | 239:6 | 277:22 | 52:22 86:22 |
| 39:16 50:10 | challenging | changing | 90:19 131:16 |
| 66:11 93:4 | 61:19 69:4 | 20:18 30:7 | 142:5 |
| 124:24 128:13 | 78:23 | 169:12 | chose 161:23 |
| 146:18 152:5 | chambers 4:13 | chapter 3:2,5,8 | 162:6 273:7 |
| 152:22 162:22 | 13:19 | 96:10 155:12 | chosen 230:11 |
| 166:7 171:22 | championed | 177:8 182:2 | christine 10:14 |
| 179:16 180:19 | 276:2 | 190:9 192:14 | 52:17 115:10 |
| 189:19 190:22 | chance 48:1 | 221:5 241:10 | chunk 185:18 |
| 215:10 218:4 | 110:15 138:2 | 269:4 | circuit 62:5 |
| 228:20 230:15 | 138:21 154:23 | characteristic | 164:25 |
| 231:15 233:5 | 160:14 170:10 | 261:1 | circulated 69:8 |
| 237:6 245:22 | 204:7,8 205:3 | characterizat... | 227:23 270:19 |
| 248:11 266:20 | 258:14 261:6 | 102:15 145:13 | circumscribed |
| 266:24 267:3,5 | chances 32:20 | charge 188:12 | 190:18 |
| 274:8,9 | 39:5 122:22,23 | | |

## Page 16

| | | | |
|---|---|---|---|
| client's 85:7 | codes 194:14 | 98:12 115:21 | commenting |
| 109:4 | cognizable | 132:5 154:24 | 78:17 |
| clients 194:13 | 182:12,21 | 167:20 180:15 | comments 81:9 |
| 225:12 231:16 | coin 135:9 | 196:4 197:20 | 91:4,5 92:13 |
| 239:6 | 139:20,20 | 197:25 204:22 | 95:3 97:13 |
| close 53:21 | 140:5,5,6,7 | 205:22 208:25 | 168:16 195:15 |
| 89:24 90:6 | 146:16,16,25 | 214:11 216:20 | commercial |
| 113:3 143:10 | 146:25 151:22 | 218:3 220:13 | 4:20 111:1 |
| 277:15 | 160:8 | 222:17 240:9 | commercially |
| closed 52:12,16 | coins 118:16 | 245:9 252:1 | 16:10 |
| 159:19 | 145:4,7 151:23 | 259:8 266:24 | commission |
| closely 242:7 | 157:11,12 | comes 82:7 | 5:1,2,8,10,16 |
| closer 185:1 | 160:16 | 94:8 228:12 | 5:18 28:11 |
| 237:18 241:2 | collapse 72:12 | 234:13 238:11 | 42:13 60:3 |
| closes 63:25 | 137:21 | 240:18 257:16 | 67:2 88:18,21 |
| 100:22 | collateral | 278:16 | 89:1 90:13 |
| closing 56:2,3 | 31:18 | comfort 173:18 | 201:9 210:11 |
| 57:23 59:12 | colleague | 174:7 | commission's |
| 100:13 121:10 | 49:14 68:5 | comfortable | 88:24 |
| 121:18,19 | collect 185:19 | 30:18 37:5 | commissioner |
| 122:5,13 124:5 | collectively | 87:9 | 88:22 |
| 127:25 143:24 | 51:21 173:25 | coming 98:4 | commit 35:6 |
| clue 65:7 | colorable | 102:9 167:9 | 37:24 203:16 |
| code 35:14,24 | 182:11 | 175:14 257:20 | 253:8 |
| 36:4 43:5 61:4 | column 96:17 | 283:8 | commits |
| 61:23 70:16 | combination | comingle | 203:13 |
| 71:8 92:11 | 74:23 274:4 | 104:17 | committed |
| 94:24 124:20 | combined | comingling | 115:20 254:15 |
| 139:14 149:23 | 273:24 | 109:22 | 276:2 |
| 164:18 173:15 | come 18:14 | commands | committee |
| 176:1 182:17 | 24:18 25:24 | 149:23 | 3:12,15 7:17 |
| 199:18 211:5 | 26:22,25 31:16 | commenced | 8:17 12:17 |
| 219:6 220:23 | 31:19 32:1 | 225:17 | 13:2,10 52:21 |
| 221:20 236:8,9 | 33:8 35:19 | commencem... | 82:17 85:17,18 |
| 246:3 248:13 | 38:5 40:19 | 177:8 | 85:21 86:1,6 |
| 256:2 264:1 | 48:14 51:22 | comment | 86:10,11,18,19 |
| | 66:3 81:10 | 78:17 80:24 | 87:8,11,12,16 |
| | | 83:12 201:4 | |

## Page 15

| | | | |
|---|---|---|---|
| circumstances | 263:4,7,11 | 225:13,15,18 | 150:10 225:10 |
| 58:13,19 59:8 | 265:23,25 | 225:21 226:1,3 | classes 162:2,3 |
| 60:17 68:24 | 266:1,7,9,10 | 226:8,10,11,19 | 162:6,8 |
| 96:12 246:17 | 266:11 273:6 | 226:21 227:4 | classified |
| cite 94:8 | 275:17,18 | 227:21,24,25 | 249:14 |
| cited 206:6 | claimants | 228:1,11,18,21 | clause 149:2,3 |
| citizens 131:13 | 162:1,3,5 | 228:22 229:5,8 | 198:21 199:6 |
| 131:18 | claimed 84:20 | 231:2,3,5,10 | clayton 88:23 |
| civil 35:6 | claiming | 231:11,13,14 | clear 16:17,20 |
| 253:11,13,21 | 20:23 | 232:4 234:15 | 21:8 32:8 66:3 |
| 256:5 264:20 | claims 44:5,11 | 234:18,18,18 | 70:2 77:17 |
| civilly 203:17 | 56:8,13 84:25 | 234:19,23 | 87:2 92:8 |
| 204:25 | 85:3 93:22,24 | 241:1,7 243:5 | 110:4 114:7 |
| claim 3:16 | 94:7 96:24,25 | 250:1 262:23 | 145:22 164:14 |
| 44:16 45:10,16 | 119:4,6 126:23 | 263:2,3 275:10 | 164:25 169:11 |
| 46:6 73:11 | 128:16 156:14 | 275:23 276:7 | 170:19 171:13 |
| 84:23 85:1,3 | 161:10,11,16 | 276:24 277:1,2 | 175:16 177:3 |
| 106:9 121:18 | 161:17,21,24 | 277:9,10 | 188:18 190:3 |
| 124:8 156:3,17 | 162:6,8,13,21 | clarification | 193:17 197:21 |
| 157:5 163:23 | 163:19 164:1,3 | 28:9 33:17 | 204:19 207:2 |
| 163:25,25 | 164:5,5 166:8 | 88:17 157:17 | 212:16 216:11 |
| 164:16 166:2 | 166:25 167:1,3 | 235:17 270:9 | 217:15 220:25 |
| 166:10,10,17 | 167:11,12 | clarified 248:3 | 228:10 233:22 |
| 176:20 178:23 | 168:23 171:12 | clarify 27:5,16 | 241:23 253:19 |
| 182:6 189:5 | 171:24 172:5,7 | 68:20 80:14 | 258:11,16 |
| 203:6 209:17 | 178:3,7 179:17 | 88:15 201:13 | 275:9 277:22 |
| 209:20 210:3 | 179:19 180:2 | 205:15 207:15 | clearly 143:13 |
| 210:11,15 | 180:11 181:14 | 276:23 | 149:6 154:14 |
| 211:3,22,23 | 181:21,22,22 | clarifying | 155:6 158:14 |
| 212:2 216:1 | 182:5,11,16,21 | 16:11 156:7 | 234:6 |
| 217:5,10 | 183:7,9,17,18 | 250:3 272:8 | clears 20:11 |
| 220:19 228:17 | 183:25 184:6 | 277:7 | clerk 257:20 |
| 231:2,8 233:16 | 185:22 188:8 | clarity 206:3 | 257:25 |
| 234:13 249:24 | 188:10,11,14 | class 19:11 | client 23:7,11 |
| 250:10 251:25 | 188:19 210:12 | 84:21 124:12 | 105:6 114:21 |
| 254:1 257:4,5 | 212:17 216:10 | 124:13,14,23 | 115:4 172:22 |
| 262:17,22,24 | 219:13 222:8 | 234:13 139:16 | 225:5 245:13 |
| | | | 258:24 259:8 |

## Page 17

| | | | |
|---|---|---|---|
| 89:21 90:24 | committees | compared | compliant |
| 107:21 111:16 | 236:23 | 57:17 148:12 | 137:12 |
| 114:4 135:21 | committing | compel 31:16 | complicating |
| 144:16 150:15 | 256:13 | 189:17 | 140:20 |
| 166:21 171:12 | commodity | compelled | complied 41:13 |
| 171:22 172:1,7 | 40:4 | 37:21 | 61:5 209:15 |
| 173:8,22 174:1 | common 24:20 | compels 31:25 | complies 92:10 |
| 174:2,5,7,8,9 | 111:1 225:11 | competence | comply 120:3 |
| 176:24 182:8 | 241:10 | 256:10 | 146:3 208:7 |
| 182:10,22 | commonly | competing | complying |
| 185:13 186:6 | 225:8 | 71:3 | 128:13 |
| 186:17 188:13 | communicati... | complain | component |
| 191:14 193:22 | 223:10 247:22 | 77:20 | 148:5 |
| 193:24,25,25 | communicati... | complained | comprehensive |
| 198:14 217:20 | 82:16 217:22 | 46:2 81:2 | 182:9 |
| 218:14,24 | 218:16 272:18 | 97:21 129:15 | comprised |
| 222:20 227:15 | community | complaining | 225:10 227:16 |
| 227:16,17 | 168:15 187:18 | 62:12 191:13 | compulsion |
| 228:2,3,4,7,16 | comp 194:14 | complaint | 205:5 |
| 230:3,6,7,7,8 | companies | 92:14 124:9 | conaway 7:16 |
| 230:12 231:18 | 54:6 104:17 | complaints | concealment |
| 240:22 241:8 | 107:8 154:17 | 81:8 92:17 | 256:9 |
| 241:13,16,17 | company 87:19 | 170:18 253:2 | concede 77:12 |
| 241:24 243:1 | 87:22 99:11,22 | complete 49:13 | concept 207:2 |
| 243:15,16 | 104:1,3 108:6 | 56:4 65:24 | concern 100:19 |
| 245:8 259:24 | 110:24 111:2 | completed 56:9 | 100:21 104:12 |
| 266:15,20 | 150:14 156:14 | completely | 104:14 109:19 |
| 270:2,18 | 177:11 179:18 | 102:14 106:25 | 136:23 147:24 |
| 272:14 275:8 | 182:14 183:24 | 245:3 | 163:4 194:2 |
| 275:21 276:2 | 184:1,3,5 | completion | 216:10 229:23 |
| 277:4 278:12 | 188:2,24 189:2 | 70:7 | 230:9 237:12 |
| committee's | 217:24 232:8 | complex 222:7 | 254:25 |
| 85:24 88:11 | company's | compliance | concerned 99:2 |
| 111:9 174:11 | 87:19 104:4,15 | 23:23 40:15 | 100:9 254:5,12 |
| 228:10 240:18 | 106:3 108:7 | 74:21 120:11 | 265:20 |
| 268:6 275:9,22 | 179:23 | 217:21 218:15 | concerning |
| 276:21 | | | 60:18 86:5 |

[concerning - consider]                                        Page 18

104:22 208:14
225:5 229:23
concerns 19:24
28:19 30:1,12
30:15 34:19
98:15 111:17
112:8 117:1
166:24 231:23
232:3
concerted
183:19
conclude 64:25
concluded
278:20
conclusion
40:19 51:22
159:15 189:12
189:17 245:17
269:1
conclusions
66:18 76:17
conclusory
29:3 64:18
178:5 267:24
condition
222:13 275:17
conditional
72:10
conditions
154:16
conduct 103:8
186:16 189:5
194:25 272:14
273:23 275:23
conducted
87:10 111:11
111:15

conducting
46:13,18
conducts 88:7
confer 172:15
222:19
conference
3:23 186:3
confess 154:4
confidence
238:18
confidential
111:4,6
confine 171:25
confirm 35:18
35:23 36:19
39:3,6 57:22
61:9,9 64:5
201:19 204:5
206:13 245:23
246:2 247:2,3
248:19,19
269:18 274:15
confirmable
177:17
confirmation
3:2 16:9 19:9
24:23 28:14
30:2 38:2,21
39:11 42:17
51:13,24 52:4
63:15,22 79:19
117:24 133:14
151:2 191:18
198:9 199:5
202:8,24 205:6
205:12 208:18
209:25 210:13

210:19,21
211:20 213:22
220:11 222:14
223:2,3 224:14
225:23 226:25
227:9 228:7,8
232:10,16
235:15 236:13
241:6 243:25
244:18,22
247:1,6 248:9
248:18 250:21
258:19 259:22
263:12 268:16
271:3 272:13
273:19
confirmed 25:7
116:15 125:6
conflict 128:17
230:2,3,5
233:1 235:8
238:14 240:9
255:14
conflicts
232:24 236:25
confused
168:18 170:24
confusing
168:9 169:18
confusion
276:19

conjured 42:17
connection
18:20 24:23
30:8 34:25
74:7 79:19
85:25 89:23
111:4 134:16
182:23 183:20
186:7 192:12
192:13 195:12
195:23 217:18
218:12 264:2
connections
239:15
consensual
161:9 162:10
162:12,24
181:6
consensually
164:20 185:17
consent 161:23
164:25 165:3,6
consents
161:12 259:21
consequence
249:13
consequences
156:24 250:15
265:21 266:18
consider 51:11
52:15 64:15
77:13 89:5,22
132:4 150:3
163:2 233:5
247:3 255:3
266:22 267:5

[considerable - contracts]                                     Page 19

considerable
246:19
consideration
54:1 92:7 93:7
125:1 167:16
167:17 175:10
176:21 179:18
183:13,15
190:12 246:1
262:13
considered
97:4 106:6,22
157:3 170:9
184:23 187:25
216:2 233:21
274:4
considering
57:11
consistent
39:18 55:17
123:1 192:2
199:17,18
201:17 224:3
constant
170:14
constituents
119:15 241:12
constitute
39:22 246:22
247:5
constitutes
246:20
constitutional
199:17
constraints
129:14 130:1

constructive
118:1
consult 23:7
220:12 230:17
consultant
61:7 62:14
consultation
241:9
consulting
214:7
consumer
94:15
consumers
93:20,23 94:14
94:18 95:17,19
95:23 96:24
consuming
271:4
consummate
53:24 54:17
76:3
consummated
59:4
consummating
141:18 195:23
consummation
144:13 158:25
contact 18:1
116:17 150:4
contacts
134:15
contained
76:24 86:24
contains 208:2
contemplate
71:8

contemplated
63:17 70:7
86:13 203:25
272:9
contemplates
35:25 38:4
39:7 46:5
contemplating
277:2
contend 40:3
267:1
contended
39:21
contending
24:4 68:6 69:7
204:13
contention
32:8 39:24
40:1
contested
264:17
context 36:17
213:21 219:25
246:21 256:17
257:1 263:14
263:16 272:23
274:16,25
contingencies
155:22
contingent
225:22 227:21
245:11
continue 16:3
66:5 68:11
114:11 118:11
134:23 142:23
145:13 145:23

149:11 172:21
173:5 180:24
201:4 213:14
219:19 220:20
222:4
continued
177:23 196:1
198:24
continues
102:21 111:18
114:8
continuing
115:20 220:5
230:23,24
contract 22:18
110:8 133:10
133:22 134:3,7
135:22,23
136:3,6,10,12
136:13,16,18
136:25 138:8
138:15,22
139:6,11
140:17 141:5
143:16,17
144:8,14
145:24 147:6
148:16 149:1
149:11,17
150:12,19
151:4 158:14
158:25 160:5
160:15
contracts
134:5,12,14,19
134:22 135:11
137:4,12

[contracts - court]                                            Page 20

145:17 148:23
153:22 168:10
186:14
contrary 19:18
243:17
contribute
161:17,24
162:6 276:24
contributed
162:8
contributions
234:5
control 75:24
127:4 140:15
141:1,14
controls 71:24
controverted
189:13
conventional
75:13
conversation
66:6 222:3,22
254:23 270:17
conversations
115:16 118:2
131:22 268:6
conversion
269:3
convert 3:7
convey 115:5
convince 17:6
234:4
convinced
19:15 20:2
189:18,19
convincing
253:19

coo 216:25
cooperative
215:14
copy 112:11
cordry 7:7
core 17:20 19:3
22:3 102:10
corners 179:12
corporation
42:20
correct 26:8,12
26:17 42:2
53:3 64:1 78:8
100:15 101:18
103:11 107:18
109:14 118:12
120:2,13,16
123:12 135:7
138:10 270:18
139:21 142:18
147:18 149:12
150:20 157:14
178:14 205:18
212:24 215:4
215:22 216:8
219:7 221:14
233:15 234:9
235:25 236:1
256:25 261:15
271:2 275:4
280:4
correctly 81:2
103:2 109:7
145:10 183:3
235:19
correspond
125:10

cost 18:15 19:1
143:10,12
176:15 182:19
228:12
costs 57:18
187:13
counsel 7:17
22:8 85:17,18
91:5,9 166:21
182:14 184:25
192:21 213:10
214:22 218:18
224:18 226:5,6
238:10 270:18
counter 82:10
counterargu...
145:16
country 123:23
couple 16:7
77:19 103:24
103:25 110:22
139:8 153:15
201:13 213:25
215:9 218:11
218:21
coupled 33:18
course 92:11
112:8 121:21
126:25 128:11
128:23 129:7
131:3 139:17
175:8,25 179:8

241:4,22 242:6
252:4
courses 252:5
court 1:1 2:1
16:2,5,8,15,20
17:14,18,24
18:9,23 19:14
19:20 20:16
21:2,12,17
22:5,14,20
23:3,10,21
24:2,22 25:3
25:13,18,20
26:2,4,9,13
27:3,10 28:3
28:25 30:19
31:11,15 33:3
33:14 34:6,8
34:12,18 35:9
35:12 37:17,20
38:9,11,13
39:2,16 40:22
41:4,11,18,24
42:3,14,22
43:1,11 44:12
44:14,21 45:4
45:6,8,14,22
46:20,22 47:1
47:5,17,25
50:11,15,20,24
51:5,17,19,23
52:7,11,15,25
53:4,6 57:21
58:2,9,19 59:2
59:18,21,25

[court - court]                                                Page 21

61:2,4,18,22
63:12,14,20
64:2,4 65:18
67:6,24 68:1,3
68:19 69:5,12
69:16,19 70:4
70:12 72:3
73:2,13,19,22
74:9,17,25
75:4 76:11,19
76:21 77:19
78:6,10 79:2,4
79:6,8,15,18
80:1,3,7,12,15
80:21 81:7,14
81:17 82:1,14
83:2,7,10
84:11 85:16
87:14 90:10,25
92:8 93:13,17
94:4,6,21,23
96:1,20 97:3,7
97:10,18,21
98:1,3,25 99:7
99:9,16,18
100:12,16,18
101:3,5,12,16
101:24 102:1
103:16,21
104:24 105:7
105:11,15,20
106:10 107:4
107:23 108:6
108:13,19,24
109:5,10,25
110:7,15,24
112:2,22

113:17,20
114:2,9,13,24
115:5,9,14
116:22 117:3,5
117:7,10,12,18
118:5,13,17,24
119:1,19,21
120:7,14,17,21
121:24 122:18
123:9,13,18,20
124:9,16 125:8
125:16,24
126:5,14,16,20
127:1,9,12
128:1,4,6,21
129:9,12
130:15,21,24
131:5,7 132:6
132:13,22
133:4 134:5
135:5,8,18
136:15 137:3,6
137:13,25
138:20,24
139:3,17 140:1
141:7,11 142:6
142:10,14,16
143:23 144:1
145:19,21
146:15,24
147:11,19,25
148:3,9,13
149:15 150:11
150:17,24
151:12,19
153:4,6 154:7
154:11 155:19

155:14,16,18
156:16 157:4
157:15 158:16
159:4,7,19
160:18,25
161:2,4 162:17
163:4,10,14
164:14 165:10
165:19,21,23
165:25 167:18
167:20 168:1
169:21 170:4
171:23,24,25
172:20,23,25
173:2,5 175:11
175:16 176:18
177:1,18,21
178:2,20 179:2
179:9 180:7,9
180:23 181:1
182:18 183:1
185:11 186:3
187:21 188:18
189:6,25 190:6
191:2,8,12,23
192:15,23
193:1,3,6,9,14
194:2,3,9,10
194:16,18
195:2,7,25
196:22,24
197:6,20 198:5
198:12,17,22
200:6,9,13,15
201:2,6,10,16
201:24 202:1
202:22,25

204:3 205:11
205:13,18,23
206:24 207:1,5
207:11,16,23
208:11,16,18
208:21,23
209:21 210:4,6
212:3,6,8,20
212:22,25
213:3,7,12,15
214:2 215:3,7
215:10,11,12
215:20,23
216:4,9,16,18
217:11 218:8
219:4,21 220:6
221:9,12,15
222:11,16,23
223:8,16,21
224:9,13,16,24
225:7 229:9,11
229:13,15,20
231:4,7,25
232:12,22
233:6,10 234:4
234:7,10,25
235:6,10,14,22
237:3,25 238:9
238:17,22
239:18,21
240:14 243:18
244:2,5,10,12
244:15,20
245:10,22
246:11,14
247:8,11 248:1

248:11,13,17
249:8,11,19,21
250:4,8 251:10
251:12,19,21
252:15,20,23
252:25 253:15
255:7,21,23
256:8,15,23,25
257:1,17,22
258:1,8,25
259:3,6,10,13
259:16 260:2
260:14,16
261:11 262:16
262:21,25
263:21,24
264:15,24
265:5,8,14,22
266:5,9,14,24
267:12,14,21
268:1,9 269:5
269:10,13,15
269:21 270:10
270:24 271:5,9
271:12,17,25
272:6,25
274:22 275:4,7
277:5,11,13
278:8,11
court's 52:1
195:4 197:17
199:19 205:9
214:25 225:24
courts 162:10
cover 171:21
172:5 190:5,7
190:7 244:17

244:18
coverage
184:11 185:24
covered 33:23
33:24 181:2
188:20 190:14
191:9
covers 190:11
213:17 214:17
cowden 12:22
cram 124:12
crater 144:23
cratering
138:2
crazy 31:8
create 24:16
63:22 88:25
129:20 138:14
174:19
created 123:6
creates 120:22
creating 123:5
creative 118:4
118:19
credence 93:5
credentials
237:6 240:6,17
credible 60:7
credit 44:15
45:9,15 251:14
252:11
creditor 56:22
77:18 82:24
85:15 90:12
91:22 92:14
103:17,23
133:1 141:2

149:8 153:8
162:15 164:20
164:20 165:24
166:17 168:3
228:4 236:4,8
241:20 243:17
249:23 251:14
260:3 266:19
267:4 269:12
271:1,10 272:4
276:21
creditor's
174:5 182:10
227:17 230:6,7
230:8,12
creditors 3:16
12:17 13:2,10
56:4,21,24
57:5,9 59:11
67:23 71:9
72:12,16 77:7
77:8,9,11
85:24 86:14
87:15 91:7,13
91:17,20,24
92:4,18,20
93:3,6,25
107:24 111:16
126:8,10
128:16 133:24
139:16 140:25
141:5 142:2
150:10,15
153:11 162:20
164:25 167:17
169:11 171:22
177:16 181:7

221:2 226:17
228:5 233:24
235:1 237:15
238:18 239:2
239:10,13,23
241:2,12,17,19
241:24 242:6
242:10,12,14
242:20,23
243:4,5,8,10
248:6,23 249:7
251:2 255:15
268:14,18
269:18 273:1
274:6,18
275:22 276:2
277:3
credits 162:7
crime 203:13
criminal 35:6
253:12,21
256:5 261:23
criminally
204:25 260:11
criteria 246:9
critical 219:16
criticisms 65:9
66:17 70:10,12
95:2
criticize 62:3
62:18 71:19
criticized 65:3
criticizing 63:3
cromwell 6:8
cross 61:1
217:5

---

188:25 219:17
220:17 227:23
228:12 268:19
225:18,21
276:24
cut 94:19
cyber 128:11
cz 87:20 106:4
106:4,10,13,23
107:4,15,19

d

d 3:4 9:2 16:1
40:11 41:21
279:1
d&o 184:8
185:24 186:4
217:2,9
dagnoli 15:1
163:3,5,5,12
163:17,22
164:11 165:9
165:12,25
dallas 12:20
damage 256:14
damages
249:10,16
250:6
dan 14:19 15:2
132:25 165:22
166:13 238:4
daniel 13:7
darren 13:15
107:20 144:15
231:17 240:21
266:15

data 17:5,9,14
17:19 18:6,20
19:1 20:10,12
20:20 21:5,5,7
21:15,18 22:16
22:19,19 23:2
23:5 91:23
105:8,24
220:13 245:5
245:20 259:25
date 97:8,10
115:17 119:4
121:16,19
124:5,7 129:2
133:17 145:6
149:21 154:10
155:12 156:4,5
156:16 157:6,9
157:10 191:7,7
194:25 196:5,8
209:16 210:1
210:14,22
211:4 212:1
214:23 220:19
223:2,3,3,5
227:13 228:6
229:10 230:14
230:23 266:4
dated 280:15
dates 224:22
dave 184:25
david 4:17
11:6
day 17:25 37:3
43:15,19 47:23
59:8 77:8,13
103:12 113:1

142:24 176:5,6
176:14 186:3
199:7 237:7
245:4 268:15
268:24
days 19:23
56:10 73:2
77:5 86:23
139:8 151:6
175:23 176:2,3
242:13
dc 5:4,12 7:5
de 7:19
deadline
231:20 242:5
deal 17:21
19:17 22:3
23:8 33:19
34:4 35:12
57:22 58:2
63:7,21,24
65:24 66:22
72:12 77:24
85:25 86:2,5,7
86:13,18 87:9
87:15,15,16
89:24 90:6
100:14 102:11
107:13 115:18
117:18,21,25
123:7 129:8,11
130:15 144:13
171:10 178:8
204:15 233:13
272:10
dealer 25:15
36:12 68:7

dealing 186:7
195:14 252:4,5
dealings
188:25 189:1
deals 260:17
dealt 219:5
dearest 198:8
debating 71:17
debias 220:12
debt 234:7,12
debtor 1:8 4:4
35:14,21,22
40:9 41:6
43:21,21,23,24
44:11,21 45:5
46:4 61:11,11
67:14 69:7
75:6 77:24
81:5 93:23
95:2 139:3
147:11 153:14
161:19,20,25
162:7,9 171:16
171:22 174:17
174:17,20
175:17 178:23
181:22 190:4
190:16 191:4
198:14 208:8
212:5,23
215:24 219:12
226:25 227:14
227:15,19
229:6 235:22
257:17 262:25
267:14 275:11

---

crosshairs
72:22
crypto 18:13
44:4 53:16
55:1 60:13
61:21 75:20,21
75:22,23 82:20
83:25 86:9,14
86:16,20 87:2
87:3,18,21
88:5,6 90:1,22
105:22 106:24
107:23 108:2
108:12 109:23
110:11 112:5
112:23 116:8
121:15 122:21
123:15 124:19
127:13 129:15
129:23 130:6,9
130:17 131:19
132:15 133:17
133:25 137:3
156:20,21
175:22 176:2
cryptocurren...
40:14 96:2
108:14 139:19
146:20 252:6
260:23,24
261:12,13
cryptocurrency
16:12 26:2,24
39:22 40:23
42:7 53:24
54:20,23 56:1
56:2,6,16 57:2

57:4,8 59:10
72:25 76:8
85:9 96:3
103:14 105:5
105:25 107:5
109:12 111:25
202:11,15
217:20 218:15
220:18,21
221:5 273:7,16
cryptos 140:12
curious 260:14
260:16
currencies
137:3 156:20
156:21
currency 105:5
123:15 124:19
128:9 129:16
133:18,25
138:11 160:9
185:23
current 37:11
126:9 142:25
145:3,4 147:12
152:5,25
154:16 155:18
227:12 229:6
232:8
currently
134:18 143:5
157:24 158:2
158:13 167:3
207:8 222:2
curves 274:21
custodial 55:5
56:17

custody 20:20
65:19
customer 17:5
17:9,10,22
18:3,4,8,11,16
20:3,4,9,10,20
20:22 21:17
22:2,13,15,17
23:4 45:9
54:11,13 55:7
55:9,10,20,21
60:8 62:23
73:15,24 78:7
78:7 81:22
84:21 86:20
87:2,3,20,21
87:23 88:4,6
89:5 90:20
98:20 104:3
106:11,18
107:18 108:7
108:11 112:23
112:24,25
113:2,7 121:25
122:1,20,22
124:18 142:11
151:17,17
159:24 164:14
174:23 217:20
218:14 220:13
223:12 228:1
245:5,19
259:25 275:15
customer's
45:15 113:4
164:16

customers
16:12,23,25
17:25 18:2
20:7,14 21:14
21:22 22:9,11
22:24 26:3,24
44:15 46:4
54:10,16,21
55:1,5,15
61:12 62:23
63:1 65:16,18
65:20,22 68:15
72:21,24 73:3
73:7,14,23
74:4 75:11
77:20,22,22,23
78:1 85:9,10
86:2,16,21,22
87:4 90:22
93:19,22 98:17
103:14 107:5,6
107:25 109:16
109:25 109:16
112:1 115:18
115:21,24
116:1,11,12,13
116:15 119:8
119:10,18
120:5,11,24
123:11,21
125:9,11,17
125:9,11,17
174:4,13,18
177:13 181:7
181:13,17
183:16 187:24

---

debtor's 43:11
43:19,20 61:3
65:10 72:8,10
74:7 75:21
83:22 85:8
101:7 103:4,8
103:10 107:10
111:8 129:24
141:7,8,10
163:19 164:4
188:10 192:21
195:7 211:3,14
212:19,19
214:8 219:12
220:18 222:1
225:20 226:4,6
228:15,19
229:3 268:11
debtors 3:21
16:6 23:15,17
24:15 28:13,24
29:4,6 30:4
32:7 33:4
34:23 36:6
38:2 39:17
42:18 43:2,4
44:14,22 45:2
45:7,8,13,14
46:2,17 49:4
50:7,18,22
52:11,18 53:12
53:23 54:1,4
54:19,20 55:4
56:1,7 57:6,14
57:20 59:6,10
59:11 60:14,22
62:1,2,7,15,19

63:4,6 64:1,23
65:15,18 66:3
66:11,18,21,24
66:25 67:7,16
68:13 70:17
73:11 76:2
82:9,12,13,16
83:25 84:7
87:11 89:22
90:11 91:6,9
96:5 101:16,18
103:6 105:4
111:16 115:11
115:16 116:17
120:23 121:23
124:25 125:3
125:21 126:11
127:19 128:25
129:7,10
131:23 138:7
138:22 140:3
141:13 145:23
147:22 148:14
149:10,16,18
152:24 157:25
158:23 161:11
161:18 162:25
163:18 164:1,2
165:1 166:8
167:23 171:7
171:14,19
173:8 177:12
182:25 186:14
188:11 190:25
194:2,11
195:23 200:2,2
200:25 204:23

206:14 209:18
211:24 213:24
224:1 225:25
226:7,9,20
227:11 228:18
232:24 233:1
235:3 236:21
238:9 240:4
241:10,25
245:7 250:7
259:24 265:2
265:10,15,16
266:1 267:17
270:1,2,18
272:9 273:14
274:5 275:18
275:20 276:1
278:12
deceive 262:2
december
247:22
decent 184:12
deceptive
169:19
decide 21:25
63:7 67:10
180:18 239:3
248:14 277:19
decided 29:2
179:3 182:22
185:13 187:20
199:12 266:23
deciding
246:20
decision 38:13
77:2 90:18
114:15 125:25

129:19 140:5
150:9 152:23
166:4 176:19
182:5 199:13
199:19 274:15
277:16
decisions
272:19
declarant 61:1
declaration
49:16,20 50:3
50:6 74:7
84:19 178:1,12
214:3 217:15
218:21 219:2,4
225:18
declarations
60:10 74:23
76:14,24
declaratory
266:25
declared
252:12 260:10
decline 133:14
136:25 137:2
declined 99:21
204:7
decrease
141:23
dedicate
274:12
dedicated
83:15
deeds 214:17
deemed 102:18
154:22 165:3,6
202:11

**[deep - different]** — Page 26

deep 111:9
default 58:14
defendant 1:14
  261:25
defendants
  1:22
defer 33:24
  84:9 128:24
  129:7,10
  159:22 179:23
deference
  274:13
defined 171:15
  173:23 175:25
  177:9 203:7
  213:18 219:15
definitely 136:22
  260:10
definition
  173:12,14,19
  214:15 256:24
definitive
  113:23 213:17
  214:24
defraud
  250:23
defrauded
  187:10 225:11
  263:15
degree 66:15
delayed 126:13
delaying 116:5
delete 20:9,12
  23:5 113:3,18
  216:5

deleted 78:19
  78:22,25 79:1
  79:16
deletion 93:12
deliberately
  32:10 204:21
  230:20
deliver 45:4
  85:8 103:13
demonstrable
  183:12
demonstrated
  183:15
demonstrating
  43:5 60:8
demonstration
  234:22
demonstrative
  183:14
deny 123:14,23
department
  14:1,8 28:7
  91:16,18 92:2
  93:5 99:4
  121:6 131:12
depend 156:11
depending
  36:15 135:1
depends 233:9
depletion
  188:8
deposit 58:20
  58:24 59:1
deposited
  54:11
deposits 58:11

dept 8:2
derivative
  164:4 167:12
describe 29:3
described 82:6
  133:18 178:7
description
  60:22 74:5,13
  74:14 170:8
  171:24
deserve 239:14
deserves 141:3
design 107:24
designed 55:24
  90:16
desirable
  238:8
desire 159:12
  222:3
desousa 1:13
desperately
  184:8
despite 226:20
  254:24 268:12
detail 47:3
  106:16 205:11
detailed 175:5
details 60:22
  107:7 166:23
  170:19 261:21
detected
  171:25
determination
  84:2,4 150:16
  188:15
determine
  59:11 62:7

134:12 173:14
188:13 226:11
determined
  53:12 150:8
  182:9,20
  186:24 188:15
  226:7
determining
  142:3
detroit 239:5
deutsch 9:18
  10:1
developments
  225:4 227:5
dfr 14:2
dialog 258:4
dialogue 226:4
  227:3
dictates 135:23
dictionary
  256:6
differ 235:3
difference
  119:10 122:18
  124:22 127:4
  129:12 136:5
  146:7,14
  149:20 163:12
  166:17
differences
  121:9 125:1
  129:14
different 31:16
  34:20 36:2
  46:1 70:19
  74:21 92:24
  95:7 97:15

---

**[different - disclosure]** — Page 27

103:19 119:9
119:24 131:3
131:25 134:13
134:24 135:2
146:10 148:9
152:3 168:16
168:25 180:9
191:17 202:9
210:7 211:22
233:1,8 241:15
243:12 249:23
249:24 251:4
252:1,2 260:18
266:4
differentiation
  129:20
differently
  26:4 180:15
difficult
  268:20
dig 39:17
digest 93:20
  264:13
digestible 95:5
digital 1:6,10
  1:20 6:16 8:17
  10:9,18 12:18
  13:3 54:10
  55:4,7 139:14
  224:19 225:7
digital's
  186:11
diligence 53:18
  54:2 55:3 62:2
  66:12,14,17
  70:13 75:22
  83:22 86:4

87:10 88:1,3
90:7 100:5
103:8 105:3
107:11 111:4,8
111:9,11,18
217:18 218:12
diligenced
  87:25
diligently
  154:6 230:19
direct 140:15
  161:10,11,17
  161:24 162:6
  163:23 166:1
  166:17 173:18
  181:19 204:23
  211:2,13
  227:18 276:24
  277:2,9
directed 57:5
  219:9
directing 113:9
direction 220:2
directly 105:7
  164:5 224:5
director
  174:20 177:4
  184:17,22
  189:3 222:6
  226:14,16
  227:12 228:8
  230:10,21
  232:5,6,12
  235:5
directors 3:13
  3:21 173:15

175:4,5,21
176:17 177:7
180:5,10,25
182:1 183:11
183:17,20
221:13,17,19
222:2 224:22
226:8 227:18
229:6 232:18
232:21 271:16
disclose 69:16
  103:17,22,22
  105:17,21
  106:2,20
  107:14 109:7
  109:15 110:5,9
  112:4 113:11
  113:18,25
  167:25 168:2,2
  238:25 239:20
  239:22,22
  269:9,11,14,14
  269:16 270:8
disabuse
  249:21
disagree 62:13
disagreed
  189:12
disagreement
  35:4 196:6
disagrees
  39:13 102:14
disallowed
  73:12
disappointm...
  189:15

discharge
  28:21 181:23
  212:5,7 220:9
  220:10
discharged
  227:13
discharges
  237:11
discharging
  230:21
disclose 69:16
  99:25 147:23
  215:18 221:23
  222:21 235:10
disclosed 68:15
  69:7,10,15
  74:10 76:24
  96:19 106:1
  111:2,7 185:9
  222:13
disclosure 3:1
  30:2,13 63:10
  65:25 66:2,7
  66:13,16,19,23
  67:2,9,22 69:8
  70:14 71:18
  72:7,11 73:5,6
  74:2,6,13 75:1
  76:10,13,14,19
  76:22,25 79:8
  79:13,18,22
  80:15 82:6,7
  83:1,3,7,15
  84:6,22 92:13
  92:14 93:3,15
  93:18 94:8,9

---

**[disclosure - document]** — Page 28

94:10,11,13,17
94:25 95:6,21
95:24 97:4,15
98:9 106:1
141:3 147:3,7
158:24 164:7
178:2 185:9
188:25 213:21
215:17 222:25
226:1 241:23
242:6
disclosures
  63:9 70:9
  71:23 73:14
  81:9 82:12
  268:5
discover 74:3
discovery
  103:9 226:5
  271:17
discretion
  241:8 246:20
discriminate
  116:21
discriminated
  134:4
discriminates
  116:4 117:16
  119:17
discrimination
  115:13 120:22
  121:3 122:16
  122:20 123:5,6
  124:10 132:24
  160:21
discriminatory
  133:16 137:24

160:6
discuss 42:19
  50:5 51:21
  190:22 227:8
  270:3 278:16
discussed
  61:13,18 74:22
  97:18 201:22
  214:13 251:15
discussing
  270:5
discussion
  183:8 232:13
  247:16 248:7
  257:15 272:13
discussions
  132:5 172:22
  173:3 185:14
  198:13
dishonesty
  236:11 246:9
  250:23 251:6
  255:18 257:14
disposition
  171:16
dispute 119:7
disputed 216:2
  225:22 227:21
  258:18
dissipation
  183:15
distinction
  223:2
distribute 38:3
  59:10 112:23
  120:24 139:4
  139:12 144:20

148:17 154:21
197:1 204:23
distributed
  55:1 57:2
  108:3 137:20
  148:5,10
  151:11
distributing
  146:8
distribution
  33:25 36:13
  38:1 43:25
  44:7,16,18
  45:10,16 46:5
  46:13,19 54:23
  56:20 97:25
  125:2 127:21
  128:20 130:9,2
  142:12 145:6
  151:10 157:6
  194:21,24
  195:1,3,9,11
  195:11,17,22
  196:7,18,20
  200:23,25
  201:5 202:14
  211:2,13
  223:11 225:15
distributions
  45:1 46:18
  55:15 56:14
  57:9 67:17
  70:2,7 96:2
  111:25 113:6
  115:19,22
  116:1,7 118:10
  116:19 120:5,6

120:8 123:15
127:16,23
142:4,7 146:11
163:16 200:22
223:22 241:7
268:19
distributive
  152:13
district 1:2
  199:18
distrust 274:5
  274:25
distrusted
  103:7
dive 111:9
diversify 273:7
dividend
  181:24
division 42:20
  107:7
divisions 42:19
divita 3:4 8:14
docket 16:18
  17:12 49:16,17
  79:24 81:21
  84:19 202:6
  208:2,20 219:2
  242:1
docs 78:20
document
  79:22,24 80:8
  80:13 92:17
  226:5 252:19

---

**[documented - efforts]** — Page 29

documented
  91:20
documents
  78:18,18,21,25
  79:14 81:16
  91:15 93:11,12
  99:6,24 100:4
  101:21 168:10
  213:18,20,24
  214:17,25
  215:3 240:14
  242:12,15
dogecoin 135:1
doing 22:11
  25:23 26:1,5
  26:10 27:6
  29:19 30:22,24
  32:13 36:3,6
  36:21 38:22
  49:4 57:24
  62:24 66:12
  84:18 141:16
  142:15,19
  163:24 168:13
  169:8 170:22
  171:1 177:15
  187:19 197:21
  199:22 204:16
  207:17 234:25
  255:9 256:15
  256:19 265:24
  265:25
doj 91:3
dollar 156:17
  156:17,20
  175:12 242:11
  242:24

dollarization
  220:16,22
dollarized
  119:4 121:17
  124:8 149:7
  156:3
dollars 112:21
  151:10 182:14
  225:14 234:20
  242:25
door 17:22
  6:25
doubt 65:5
  253:13
downloaded
  81:24
dozen 239:7
drafting
  168:10
drags 123:22
drastic 94:19
driver's 112:12
drop 48:5,11
  51:13 138:17
dropped
  235:19
drops 63:21
  140:23
dubious
  251:23
due 23:23
  53:18 54:2
  55:3 57:17
  62:2 66:12,14
  66:17 70:12
  75:21 83:21
  87:10 100:5

122:4 131:19
186:16 225:13
227:9 237:13
259:22
dump 158:11
duties 197:11
  197:24 230:4
  230:21 232:7
duty 182:4,11
  256:10

**e**

e 2:8,8 4:1,1
  5:19 16:1,1
  31:14 38:10
  174:25 181:17
  227:23 279:1,2
  279:2
earlier 60:4
  83:19 113:15
  181:15 198:20
  204:5 206:17
  249:16 254:23
  272:12
early 131:14
  167:9 176:14
easier 18:24
  157:7
easily 93:20
  95:4 143:8
  144:10 158:6
easy 94:16,16
  95:13 124:4
ecf 79:22
economic 17:8
  17:20 19:7
  21:8 22:3 23:2
  23:9 102:11

editorial
  277:25
effect 36:21
  38:20 61:20
  92:18,19 94:6
  95:18 144:22
  145:6 196:4
  202:10 220:11
  252:8
effecting
  130:19 131:2
effective 191:7
  194:25 196:5,8
  214:22 222:9
  223:3,5 224:21
  227:13 229:10
  230:14,23
  266:21
effectively
  48:20 194:23
  223:9
effectiveness
  238:16,20
effectuate
  25:23 26:2
  167:15 196:8
effectuating
  195:12
efficient
  268:25
effort 102:16
  102:21 156:22
  171:25 179:20
  183:19 245:5
  255:6 258:5
efforts 25:11
  56:11 115:3

| | | | |
|---|---|---|---|
| 158:7 178:19 | elects 124:18 | 107:1,4,15 | 118:1 |
| 223:18 259:21 | element 17:20 | 177:4 178:10 | engaged |
| ehrlich 163:23 | 253:17 254:1 | 178:16 179:7 | 226:10 227:3 |
| 166:2 171:10 | 257:5 | 215:18 | engaging 35:6 |
| 174:24,25 | elements 144:9 | employees 55:8 | 45:13 226:4 |
| 182:3,21 183:2 | 144:12 145:25 | 104:1,2,15,18 | english 170:16 |
| 183:10 184:14 | 151:6 160:6 | 106:3,22,23 | 170:18 |
| 184:18 185:3 | 253:17 | 107:16,17,18 | enjoin 30:21 |
| 185:14 187:14 | eliminate | 108:6,13,15,25 | 36:13 203:22 |
| 187:22 189:7 | 70:17 | 109:1,8,11,13 | 211:10,23 |
| 216:25 243:15 | ellis 10:8,17 | 172:6,8 177:22 | enjoining 3:20 |
| 254:2 | 52:18 115:11 | 180:1 182:2 | 28:17 36:8 |
| ehrlich's 175:9 | 267:17 | 190:16 214:8 | enjoyed 186:13 |
| either 48:5 | else's 166:5 | 218:3,23 | enormous |
| 51:12 53:11 | elusory 145:3 | 219:14,15,20 | 189:15 |
| 62:17 75:24 | 152:3,5,6,7 | employment | ensure 55:20 |
| 125:1 135:6 | 152:3 157:23 | 214:7 | 149:4,10 242:6 |
| 140:12 141:18 | 158:21 | encompassing | ensuring |
| 156:20 220:2 | email 80:11,11 | 172:4 | 219:17 |
| 221:1 258:14 | 80:12,12,16 | encourage | entailed |
| 258:20 260:11 | 81:1 112:10,15 | 132:19 | 217:16 |
| 266:20 | 113:13 | encouraged | enter 72:9 |
| elect 20:3 21:6 | emails 98:21 | 121:22 | 206:13 |
| 21:15 22:6 | emanuel 8:16 | encouraging | entered 49:3 |
| 78:2 112:1 | embedded | 177:12 | 214:7 |
| 115:25 122:14 | 102:12 | endless 71:8 | entering 33:2 |
| 124:5,17 126:6 | emery 12:16 | ends 100:22 | enterprise |
| 161:17 | 13:1,9 85:21 | 109:18 255:14 | 198:24 |
| elected 18:4 | 135:20 | energy 161:2,4 | enters 200:9 |
| 65:6 164:9,15 | emmanuel | enforceable | 205:12 |
| 164:22 166:10 | 173:7 216:20 | 89:1 | entire 66:8 |
| 239:6 251:8 | emphasize | enforced 164:6 | 77:18 91:5 |
| election 126:11 | 181:12 | 203:5 | 142:10,11 |
| 146:16 | employed | enforcement | 152:16 198:24 |
| electronic | 171:19 | 27:24 31:6 | 240:2 241:20 |
| 280:5 | employee | engage 37:21 | 257:3 267:3 |
| | 106:5,6,10 | 38:16 54:14 | |

| | | | |
|---|---|---|---|
| entirely 19:14 | 221:2 | 7:14,21,22 8:7 | estimated |
| 42:8 162:12 | equalized | 8:14,21,22 9:7 | 84:22 96:18 |
| 270:25 | 120:8 | 9:8,16,23 10:6 | estimates |
| entities 27:3 | equally 142:2 | 10:13,14,15,22 | 57:15 |
| 34:21 107:9 | 225:6 | 11:6,13,20 | estimation |
| 134:13 137:1 | equate 173:12 | 12:6,14,22,23 | 140:21 |
| 162:20 193:18 | equitable | 13:7,14,15,22 | estopped |
| 195:15 205:16 | 22:23 158:21 | 14:6,13 | 204:12 |
| 209:5 222:7,7 | 256:10 | essence 114:23 | estoppel 31:18 |
| 227:15 233:8 | equities 167:5 | 114:24 | et 1:21 10:9,18 |
| 234:15 | equity 1:16 | essentially | 12:18 13:3 |
| entitle 209:22 | 3:12 11:2,9,16 | 17:19 30:11 | 84:10 183:24 |
| entitled 19:23 | 174:24 187:4 | 31:21 54:22 | 189:10 204:18 |
| 30:20 43:25 | 224:18 225:11 | 120:9 129:2 | 275:24 |
| 48:6 51:2 | 225:16 228:25 | 138:3 143:19 | ethereum |
| 58:25 166:7,11 | 229:2 231:23 | 195:18 223:25 | 137:9,11 |
| 186:9,9 209:20 | 232:4 233:23 | 230:12 261:3 | ethics 64:14 |
| 220:10,17 | 233:25 234:2,6 | 268:23 | etrade 159:24 |
| 280:6 | 234:14 235:1 | estate 19:12 | 159:25 |
| entity 35:14 | 256:8,25 | 22:25 85:5 | evaluate 251:3 |
| 127:19 128:18 | equivalent | 87:4 144:19,21 | evaluation |
| 136:20,24 | 75:16 | 146:8 147:17 | 236:10 250:22 |
| 138:9 196:4 | eradicate | 149:6,7 166:19 | evan 10:13 |
| 210:25 227:19 | 90:19 | 167:2,12,13,23 | 185:4 |
| 232:7 | erase 21:15 | 176:11 181:11 | evans 13:14 |
| entry 49:4 | erc20 136:1 | 181:14,25 | 85:20,20 114:3 |
| 51:12 259:22 | 137:12 138:12 | 182:2,3,13,20 | 114:3 135:17 |
| environment | 138:15 | 185:22 187:8,9 | 135:20,20 |
| 67:8,11 71:1 | error 48:23 | 189:2 196:17 | 136:18 137:5,7 |
| environmental | specially | 211:3,14 | 137:16 |
| 203:18 | 19:23 72:16 | eve 182:15 | eve 182:15 |
| envy 274:8 | 81:15 112:19 | 219:17 146:8 | 185:25 225:23 |
| equal 123:21 | 256:5 | 220:21 275:11 | 263:12 |
| 124:1,10 | esq 4:8,9,17,24 | estate's 167:16 | evening 198:9 |
| 127:13 147:10 | 5:6,14,22 6:6 | estates 53:13 | 227:22 |
| 149:22 150:10 | 6:13,21,22 7:7 | 57:14 59:5 | event 35:11 |
| 151:21 152:1 | | 177:6 187:18 | 133:10,12,21 |

| | | | |
|---|---|---|---|
| 134:3 138:8 | 177:23 178:8 | 270:20 273:22 | exchanged |
| 139:5,10 | 179:16 180:14 | examiners | 75:15 |
| 140:16 141:4 | 180:20 186:7 | 269:22,25 | exchanges 90:2 |
| 144:8 147:5 | 186:20 188:1 | example 16:24 | excluded |
| 149:1 150:7 | 189:11,13,16 | 25:7 26:18 | 152:16 |
| 158:14 159:5 | 219:19 221:10 | 38:2 40:2 | excludes 27:24 |
| 160:4,15 170:7 | 243:23 245:16 | 61:25 66:25 | exclusive |
| 228:24 231:8 | 251:5 252:16 | 68:4 73:9 74:4 | 106:15 |
| 269:4 | 252:17 253:19 | 86:12 89:18 | exculpated |
| events 251:4 | 253:20 254:14 | 104:1 106:4 | 33:1 184:2 |
| eventually | 254:16,24 | 107:16 135:25 | 193:12,16 |
| 30:22 71:16 | 255:7 261:8 | 136:9 137:6,9 | 194:1,22 |
| eventuate 76:1 | 267:23 268:22 | 163:22 167:5 | 196:17,17,18 |
| everybody | 274:10 | 172:6 174:23 | 197:22 209:8 |
| 95:10 123:22 | evidenced | 180:18 190:14 | exculpating |
| 123:23 129:17 | 228:13 | 197:18 204:23 | 197:9 |
| 129:19 146:18 | evidences | 213:22 227:7 | exculpation |
| 156:19 179:8 | 19:11 105:4 | 232:24 276:3 | 24:20 27:21,22 |
| 235:11 257:22 | evidentiary | except 57:4 | 28:4 32:15 |
| everybody's | 49:13 52:15 | 76:20 101:22 | 33:20,23 34:1 |
| 20:5,9 92:1 | 60:25 110:1 | 181:23 | 36:17 38:10,14 |
| everyone's | 159:20 254:3 | exception 52:1 | 51:23 98:13 |
| 259:20 | exact 69:20 | 52:6 | 102:3 186:12 |
| evidence 17:13 | exactly 21:21 | exceptions | 190:15,21 |
| 19:18 26:14 | 25:3 36:3 37:6 | 213:25 229:16 | 191:11,15 |
| 29:5 31:17 | 68:15 93:9 | exchange 5:8,9 | 192:17,21 |
| 50:12 52:13 | 120:24 127:2 | 5:16,17 28:11 | 193:4,19 194:6 |
| 60:8,10,23 | 135:11 145:20 | 40:11 41:21 | 194:20 195:8 |
| 62:21 64:7,16 | 151:24 196:12 | 42:13 44:5,11 | 196:5,23 197:5 |
| 64:20,25 82:10 | 213:2 232:7 | 60:3 61:15 | 198:21 199:2,6 |
| 100:25 101:2,5 | 253:23 261:20 | 69:1 89:11,13 | 199:10,15 |
| 101:16,23 | 272:13 | 134:18 151:11 | 200:1,19 201:5 |
| 125:6 152:11 | examination | 213:17 | 201:12,17 |
| 154:25 158:16 | 61:1 | 178:4,18 | 204:13 213:17 |
| 158:17,18 | examine 167:2 | 190:12 201:8 | 213:21 214:1 |
| 159:15 172:11 | examiner | 210:10 225:9 | 215:10 258:12 |
| 177:18,19,21 | 269:17 270:11 | | |

| | | | |
|---|---|---|---|
| exculpations | existing 55:13 | explain 17:6 | extent 23:20 |
| 84:10 197:7 | 118:15 119:25 | 49:17 134:8 | 38:22 40:7,18 |
| excuse 28:20 | exists 123:7 | 174:15 199:20 | 41:5,24 42:5,6 |
| 79:3 80:12 | 252:13 | 225:5,24 | 42:18 43:9 |
| 111:23 138:12 | exit 18:14 | 262:19 276:15 | 50:17 59:4 |
| 144:2 | expect 91:13 | explained | 70:21 118:18 |
| excused 172:21 | 102:19 240:23 | 186:18 | 132:18 141:24 |
| execute 130:14 | 252:2 259:23 | explains 50:22 | 161:11,19 |
| 154:6 197:23 | expected 268:1 | 217:11 | 162:15,19 |
| executing | expecting | explanation | 165:21,23,25 |
| 37:13 192:13 | 151:13 | 49:20 50:1,25 | 166:9 179:23 |
| executioner | expend 176:11 | 76:15 143:22 | 181:19,20,22 |
| 247:12 | expense 58:15 | 268:2 | 185:24 191:15 |
| executives | 58:18 238:9 | explicit 233:13 | 197:4,22 |
| 87:12 163:8 | expenses 21:1 | explicitly | 202:10 204:1 |
| 164:16 165:15 | 58:10 187:13 | 58:17 165:7 | 219:5 226:11 |
| executors | expensive | 210:2 235:7 | 254:14 263:9 |
| 164:12 | 226:4 | expose 37:15 | extra 126:2 |
| exempt 40:7,24 | experience | exposed 86:16 | extraordinary |
| exemption | 20:15 21:23,25 | exposure 86:23 | 111:12 |
| 23:20 36:20 | 72:15 111:14 | 174:8 | extreme 81:3 |
| 40:9 44:8 | 158:20 168:10 | expound 133:7 | extremely |
| 46:16 | 237:7 238:8 | express 111:17 | 67:11 96:4 |
| exemptions | 240:7,7 243:24 | 276:10 | 111:10 114:16 |
| 43:6 | 269:24 | expressly | 203:7 |
| exercise 44:6,9 | experienced | 18:21 214:22 | eyes 111:13 |
| 44:20 45:12,21 | 236:20 237:19 | extend 3:18 | 240:9 |
| 46:15,25 58:6 | 273:15 | 38:9 115:6 | f |
| 58:13 80:20 | expert 60:15 | extended 278:2 | f 2:8 5:11 |
| exercised 62:7 | 62:1 247:13 | extending | face 28:18 |
| 65:11 | 256:1 | 276:13 | faced 61:19 |
| exercising 58:8 | expertise 55:11 | extension | 69:3 |
| exhibited | 60:13 | 114:22 238:21 | facilitate 57:9 |
| 237:22 | experts 82:20 | 245:20 259:21 | fact 24:10,18 |
| exist 77:23 | 83:25 86:2 | extensive | 26:25 32:12 |
| 144:12 161:11 | 87:14 246:5 | 237:10 268:5 | 34:1 45:19 |
| 181:5,9 193:18 | 256:4 274:19 | | 50:7,18 58:12 |

66:25 74:12
77:6,14 82:21
92:15 94:18
95:19 119:16
122:7 127:24
143:15 152:9
165:1 167:6
184:7 191:22
192:20 196:13
212:1 214:12
231:21 273:25
**factors** 70:1,3
135:2 156:12
158:12 246:23
274:5,10
**facts** 49:19,22
50:3,10 68:23
**fail** 126:17,22
146:5
**failed** 122:14
187:2
**failure** 61:21
99:5 144:13
**fair** 26:3 29:11
32:20,21
131:17 145:13
148:4 150:2,17
155:1 157:13
264:10
**fairly** 152:8
171:5
**fairness** 137:25
259:7
**fairway** 33:13
195:20 196:12
**faith** 24:17
58:24 59:1

202:13 206:20
**faithful** 197:11
217:9
**faithfully**
197:22 219:13
**false** 91:11
166:25 248:3
262:1
**faltischek** 7:9
**familiar**
194:16 236:21
**fan** 269:22
**far** 36:23 65:4
73:25 75:17
76:7 103:19
130:1 178:24
196:16 223:13
234:11 238:20
**fate** 148:21
**fault** 123:3
**faulty** 63:1
**favor** 84:21,24
85:6,11 116:12
116:14 162:13
163:15 165:3
174:17,22
**favoritism**
176:8
**fdic** 56:23
166:25 174:12
188:25
**feasibility** 53:8
53:9 55:25
59:20,22 63:11
63:14 70:15
72:7 99:1
102:25 103:3,3

220:1,4
**feasible** 53:10
59:16
**feature** 127:3
**february** 88:3
90:3 227:10
241:25 242:5
**federal** 5:1,2
24:3,6 249:15
264:20
**fee** 88:5,6
269:17,22,25
270:1,11,20
**feel** 37:5
151:14 169:18
240:5,10
255:11 267:7
276:16
**feeling** 150:25
**feels** 111:21
**fees** 136:8
223:1,5 273:16
**fell** 84:7
**fellow** 239:23
269:17
**felt** 169:13
241:19
**ferry** 5:19
**fewer** 156:2
**ficentive** 7:10
9:11
**fictitious**
260:25
**fiduciaries**
90:17 197:4
**fiduciary** 58:5

182:4,11
195:22 196:18
196:25 197:2
232:7
**fifth** 56:19
**fight** 240:8,10
240:17 262:24
**fighting** 93:23
240:11
**figure** 136:21
275:10
**figured** 193:23
**file** 40:10 41:20
49:16 116:25
133:1 209:17
209:20 210:3
212:1 258:14
212:5 264:3,7
266:25 267:18
**filed** 16:18
17:12 23:19
30:12 34:14
41:19 49:15
60:24 73:24
74:7 99:8
108:5 110:18
110:24 116:16
117:23 143:14
177:11 183:17
201:20 211:3
225:3 227:8,10
231:9 233:13
237:21 273:3
273:25

---

**files** 25:16
**filing** 23:21
26:20 102:19
210:11 214:18
224:4 272:22
274:2
**fill** 242:17
**final** 39:14,16
63:9,10 75:14
92:12 159:21
200:9,10
203:10 206:4
207:1
**finally** 99:1
111:20
**finance** 42:20
194:21 196:20
212:12 227:22
273:15
**finances** 99:20
99:21
**financial** 14:1
14:8 19:24
53:15,21 54:17
56:23 65:23
83:5 96:7 99:5
99:10,25
101:11,19
102:16 103:1
121:7 171:15
173:13 175:6
185:2 249:1,9
250:16 252:11
255:5,16
273:13 275:12
275:14,16

**financials** 54:3
100:9 101:2
**find** 23:11 40:6
73:7,12 74:5
94:17 95:13
98:9 104:22
132:2 208:5
210:17 213:11
223:12,18
249:6 252:3
253:6,7,8,12
254:4
**finding** 47:18
48:6 206:22
255:5 261:9
268:22
**findings** 32:5
235:23 236:9
236:10 276:21
**fine** 27:9,17
33:10 35:10
37:17 81:11
98:22 135:18
205:20 244:12
259:11
**fines** 38:6
**finger** 217:5
**finish** 81:8
257:23
**finishing**
244:25
**firm** 50:9 90:9
90:23 225:2
239:5
**firms** 239:9
**first** 16:8,10,11
36:25 51:5

55:25 73:2
78:17 85:18
102:8 123:9
133:9 153:20
167:9 168:11
173:21 185:15
193:23 199:3
228:15 231:24
233:2 234:3
238:24 257:18
273:10
**five** 56:9
223:25 258:24
261:23 270:12
**flood** 160:12
**flooded** 160:16
**floor** 4:14 6:18
7:4
**flow** 234:22
135:1
**fluctuate** 96:3
**focus** 33:10
44:25 45:1
46:1 154:4
174:10 188:23
218:11,24,25
245:16
**focused** 28:4
123:19 166:22
232:15 234:7
245:16
**fogelman**
13:22
**folks** 41:16
221:17

**follow** 75:22
167:6
**followed** 52:21
52:22 63:15
**following**
42:23 56:3,11
133:21
**footnote** 96:20
96:22 97:13
**forced** 78:6
122:20 163:21
221:4
**forces** 143:9
**forcing** 129:17
129:19
**foregoing**
280:4
**forever** 278:18
**forfeit** 223:22
**forfeiting**
58:11
**forget** 142:25
259:12
**forgot** 270:24
**form** 51:23
95:5 96:2
119:9 142:12
142:21 171:9
224:9 263:4
**formation**
217:19 218:13
**former** 75:16
182:1,1,1
**forms** 252:1
**forth** 31:22
191:16 205:11
209:4

---

**forward** 31:17
31:19 32:12,12
32:20,22 35:19
36:11,22 39:9
43:8 59:2,16
63:7 90:17
107:12 132:4
134:23 141:17
141:25 144:13
150:22 204:9
232:9 255:2
**found** 73:14
78:16 102:17
103:2 169:5
240:1 246:9
250:12,12
273:13 275:8
**foundation**
249:6
**founders**
187:10
**four** 88:17
150:7 257:20
**fourth** 56:16
134:9 182:13
234:16
**frame** 125:5
150:6,11
158:20 212:13
**frank** 232:15
**franklin** 6:3
**frankly** 96:11
121:9 164:23
220:3 238:13
271:3
**fraud** 35:6,8
37:24 112:19

165:14 166:2
166:10 167:2
203:16 236:11
246:9,18
248:21 249:5,6
249:15,22
250:10,12,13
251:6,24 252:5
252:1,11,17
253:6,7,8,17
253:17,18,25
254:1,4,15
255:17,18,25
256:2,3,4,15
256:17 257:2,4
257:5,9,10,14
262:11,18
263:4,6,8,11
263:15 265:7
265:19,23,25
268:22 275:15
**frauds** 252:1
**fraudulent**
166:25 167:1
257:8 260:11
**fraudulently**
256:13,15
**free** 35:5,7
78:2 180:1,11
212:16
**freed** 37:23
212:25
**freedom** 70:21
231:9 233:13
**fresh** 240:8
**friday** 23:16,22
47:19,22 69:6
69:21 88:10,15

121:22 225:2
242:12
**friendly**
243:15,16
**frivolous**
183:18 188:8
188:10,14,15
**front** 26:14
29:10 30:19
35:20 64:16
152:11 202:2,4
208:24 243:3
271:22
**frustrated**
255:2 275:7
276:1
**frustrating**
255:16
**frustration**
273:12
**frustrations**
268:21
**ftc** 145:24
150:5 151:5
166:24
**ftc's** 139:8
148:24
**ftx** 6:9 7:17
64:19 72:12,14
101:1 153:15
153:21 227:7
228:17 229:1
231:9 233:13
235:12,17
**furthermore**
143:10
**future** 18:11
18:15,24 20:3
152:25 153:1

170:21 180:2
184:10 199:21
202:4 234:24
278:1
**fully** 184:13
199:9,15
242:20
**function** 31:12
217:19 218:13
**functions**
241:5
**fundamental**
20:13 22:3
102:10
**fundamentally**
134:1
**funds** 104:20
106:18 176:11
**further** 47:2
50:24 56:19
63:16 64:6
70:1 118:13
129:24 138:5
138:17 140:20
140:23 145:15
157:20 201:12
203:2 209:1
212:10 216:2
216:14 221:9
228:24 229:1
235:12,17

---

194:24 241:6
274:12

266:5
**giant** 269:22
**gibbs** 12:23

**g**

**g** 16:1 214:4
279:6
**ga** 5:20 11:11
11:18 13:5
**gallagher** 3:24
**game** 247:5
**ge** 159:24
**general** 7:1 8:1
33:20 55:8
56:4,8,12,20
96:25 131:11
184:6,25
234:17 254:11
273:14
**general's** 93:15
**generally**
33:22 94:16
102:10 174:14
174:14 218:3
232:23
**generate**
134:14 135:12
**gentleman**
144:18
**gentleman's**
141:10
**george** 214:4
**gerard** 184:25
**getting** 17:22
22:2 137:18
147:20 168:23
176:21 177:5,9
180:3 196:8
216:23 233:25

158:24 167:16
167:16 170:13
178:3 189:11
190:12 195:21
196:6 222:7
230:19 241:8
245:3 246:3
247:10 249:15
250:24
**gina** 14:17
103:22 168:2
239:22 269:14
**giugliano** 7:14
**give** 16:22
29:18 30:11
45:8,15,25
37:20 51:6,7,9
58:20 70:20
74:14 76:15
86:2 99:5,10
99:21 110:15
110:15 127:13
140:5 146:15
148:14 173:18
174:4,16,22
176:6,7 179:2
197:7 245:11
249:23 251:8
251:25 258:6
258:13 263:24
271:21 272:9
273:1 276:13
**given** 16:24
19:25 26:6
57:11 60:17
61:18 64:21,21
96:12,13,14,18
118:4 122:6
126:8,11,18
141:14 147:11
148:24 153:22
154:5 157:2

139:2 140:22
144:4,5 146:24
155:22 157:22
158:22 160:13
160:14 164:9
165:12 171:20
172:25 178:24
181:1 195:5
196:15 198:5,7
201:6 204:9,16
204:18 205:13
206:2,21
213:15 214:23
219:21 238:3
238:25 239:3
240:15 245:7
250:19 256:5
258:1,11
264:11,13
265:4,23
22:9 31:22
**gives** 232:16
237:12 250:9
**giving** 39:3
48:1 139:13
146:10 155:2
166:1 254:9
264:8 268:8
**gleit** 6:21
**global** 104:19
178:18
**gnats** 65:9
**go** 22:9 31:22
32:20,22 31:12
32:20,22 35:11
36:11 41:17
99:12 103:25
103:25 107:25
108:1 109:16
114:16 116:13
128:9 131:16
134:17 138:5
202:13,24
203:25 214:19
254:23 265:12
266:21

**going** 22:5
24:17 29:20
30:23 31:4,20
32:19 33:19
36:6,7,18
38:12 41:2
47:25 48:1,3,4
48:12,12,18,19
49:13 51:6,7,9
51:24 52:5
53:7 60:6
62:21 64:6,10
66:11 67:13
69:22 70:5
71:7 90:20
91:8,20 95:11
101:10 103:13
114:10 119:3,5
121:10 126:22
133:24 134:23
138:10 140:5
141:17,24
142:7,11
144:12 147:23
150:22 152:6
152:10 153:21
155:4 157:6
163:13 164:11
168:24 169:12
171:2 177:13
179:4 185:1
187:23 188:10
189:15,17
195:5,11 197:7
197:13,14,17
200:11 201:3
204:3,3,20

206:12,13
207:17 208:7
214:5 217:8
221:16,16
222:9 224:3
229:24 234:22
234:23 237:12
240:8,23,24,24
242:21 244:24
245:11 249:4
250:19 254:19
255:2,12
257:17 258:13
261:22,24
263:13 266:19
269:23 277:15
277:21
**goldberg** 9:8
17:16,16 18:6
18:10,25 19:16
20:8,24 21:4
21:16,20 22:12
22:17,22 23:6
23:13 84:13,14
102:5,5 105:1
105:1,13,16,18
105:23 106:13
107:3,22 108:4
108:17,20
109:3,6,14
110:20,20
112:3 114:19
114:19 115:2,7
117:18,21,24
198:10,13
205:14 212:11
212:11,21,24

213:2,4 245:1
245:13 258:2,3
258:23 259:1
259:17,17
278:9
**good** 16:4,5,7
19:22 20:4
24:17 27:14
32:3 33:16
34:10 52:10,17
53:6 58:24
59:1 72:4
101:8 115:10
117:19,22
120:20 121:5
157:3 159:22
171:3 190:1
193:1 202:13
206:20 215:12
233:4 234:1
236:16 240:11
254:22 258:2
278:7
**goodman** 6:22
163:16 164:19
210:1,22
230:25
**gosh** 64:15
**gotten** 66:16
80:7,9 92:17
191:17 270:5
**govern** 266:11
**governance**
107:10
**governing**
200:22
**government**
31:9 34:17,24
35:7 37:7,8,8
37:16 39:13

72:23 199:2,6
199:11,16
200:4 210:14
211:4 227:9
231:2,11
234:18 258:14
**government's**
199:14
**governmental**
27:3 34:21
162:20 195:15
202:12 203:19
209:5,15
234:15
**governments**
24:4
**governs** 136:3
**grace** 114:7
**grader** 134:9
**grant** 152:21
164:15,21
176:24
**granted** 162:25
163:16 164:19
210:1,22
230:25
**granting** 129:3
163:18,20
170:23,25
171:1 176:22
**grants** 163:15
245:2
**grateful** 115:2
245:2
**gray** 186:22
**great** 21:20
64:23 161:5
237:12 272:10

---

273:25
**greater** 145:8
221:3
**greatest** 85:5
85:11
**green** 2:2
12:10
**gross** 186:23
187:7 236:11
246:10 250:24
251:7 255:19
**grossly** 186:19
186:21 187:6
**ground** 73:25
190:11,11
**grounded**
122:7 127:24
**grounds**
127:21 207:25
**group** 1:16
11:2,9,16
136:8 171:17
184:18 224:18
225:9 226:13
226:15 228:20
230:15,22
231:12 232:4
233:3
**groups** 158:7
226:23
**grow** 174:18
**guarantee** 62:8
70:24 143:18
153:3 156:24
228:22 231:2,6
**guaranteed**
138:23 248:25

**guess** 24:13
39:23 49:14
51:3 139:11
154:25 191:10
206:24 222:10
223:17 238:11
253:23 261:16
262:8
**guidance**
237:22
**guts** 27:23

### h

**h** 194:14 214:6
**hacking**
112:20
**hage** 6:6
**hague** 230:1
237:7,8,22
238:7,21
239:10,24
240:6,22 241:4
241:15,16
242:2 243:2,4
243:8,20
244:10 255:2
255:12
**hague's** 238:1
244:6
**half** 125:9
167:9,10
234:19 254:8
**hammer**
239:17
**hand** 18:17
49:13 54:3
170:15,17
182:10,10

204:4 267:22
**handful** 77:23
91:24 176:4
221:7
**handle** 230:25
235:2
**handled**
275:24
**handling** 62:25
**hands** 75:24
144:24 203:22
212:19
**hang** 198:6
264:19
**hanging** 29:23
31:3 32:22
**hanshe** 184:25
**happen** 27:2
68:15 70:5,24
93:22 126:23
130:10,12
144:19 151:2
244:24 249:11
**happened**
174:4 229:21
253:4,5 254:10
263:6
**happening**
49:7 160:3
214:5
**happens** 22:14
57:21,22 58:2
58:9 149:3
265:9
**happy** 34:4
120:24 131:13
122:12 133:7

159:17 184:10
192:3 213:10
221:7 235:11
266:21
**hard** 37:1
72:19 73:5
94:2 154:19
157:25 178:19
255:5
**harm** 90:10
250:16
**harmful** 111:7
**harwood** 12:19
**hastings**
270:22
**hawaii** 117:24
**head** 157:7
**heads** 29:24
31:3 32:23
**headshakes**
266:6
**health** 245:10
**hear** 34:11
59:19 76:6
85:18 92:11
109:7 113:23
172:10 189:22
192:9 195:7
233:20 257:12
257:17 259:10
259:20 260:1
**heard** 34:17,21
36:15 40:1
48:1,2,13
59:23 73:2
76:8 77:19

---

84:13 87:14,18
91:5,24 97:3
122:8 132:23
151:20 160:20
166:7 167:22
167:24 170:10
207:22,25
208:10 209:21
224:20 235:19
237:25 243:19
251:10 260:4
269:17 274:17
276:17 277:14
**hearing** 3:1,4,7
3:10,12,15,18
3:23 16:9
32:18 38:17,21
60:5 61:14
63:10 68:22
72:8 73:3
74:24 75:5
91:6 112:9
117:1,24
144:20 199:5
225:23 226:22
227:2 231:25
233:3 248:18
253:3 268:16
269:16 270:22
271:3 276:12
276:13
**hearings** 139:9
**hearsay** 50:16
60:20 64:17
100:7 101:20
253:2

**heart** 198:8
238:19
**heaven** 197:8
**heaven's**
154:17
**held** 16:13
44:21 56:16,22
75:20 87:18
91:21 104:9,10
105:5,8,12,18
105:21,24,25
125:4 142:8
148:7 157:11
160:16
**help** 79:21
135:14 240:19
**helpful** 27:17
200:17
**hendershott**
3:7 14:16
85:14,15,16,19
91:1,2 92:9
93:1 236:3,4,5
236:6,16 237:4
245:23 246:13
247:7 248:12
248:16,21
249:9,14,20
250:1,5,11
251:15 252:9,9
252:18,21,24
253:10 254:20
254:22 255:22
255:25 256:24
257:13,19
**hendershott's**
238:5

**herndershott**
237:4 245:25
256:21
**herring** 4:24
**hesitate** 200:20
**heuer** 6:1
**hey** 43:14
168:22
**hi** 167:25
239:20
**hidden** 97:14
97:15
**high** 95:22
146:3 153:2
154:8 237:18
242:17,18
**higher** 138:1
**highest** 59:13
**highlight** 269:3
**highlighted**
53:19 95:17
98:8 169:22
170:2
**highlighting**
28:18 95:13,18
**highly** 61:19
67:7 69:4
**highway** 9:12
**hindsight** 29:8
32:1 211:9
**hints** 65:1
**hire** 230:15
**hired** 60:14
62:14 239:7
**hiring** 238:10
**historical**
183:22

**historically**
154:7
**history** 75:9
82:5 271:15
**hit** 249:1
**hits** 108:3
**hoc** 1:16 11:2,9
11:16 224:18
225:9 226:13
226:15,23
228:20 230:15
230:22 231:12
232:3 233:3
**hoisted** 162:21
**hold** 3:12 24:8
31:17 81:7,8
148:1 149:16
149:24 153:14
232:6
**holdco** 227:20
234:20
**holder** 119:6
121:11,16
126:3 153:9
166:9 174:24
249:25
**holders** 1:17
11:2,9,16 56:8
56:12 116:4,6
117:16 119:3
119:11 122:6
125:14,23,24
129:4 131:4,15
133:3 134:4
139:11,17
140:19 141:21
146:10 147:10

---

149:5 150:21
151:23 156:9
161:16 162:13
181:16 189:16
224:19 225:11
225:11,16
226:18 228:5
228:13 229:1
**holding** 83:17
11:2,9,16
122:12 127:20
148:8 158:13
258:10 273:8
**holdings** 1:6,10
1:20 6:16 10:9
10:18 12:18
13:3 156:23
**holds** 54:12
55:4 65:19,20
140:21 147:12
**homework**
76:16 277:16
**hon** 2:9
**honest** 41:16
163:13
**honestly** 97:6
262:14
**honor** 16:4,8
16:14,16,21,24
17:4,7,16,19
18:12,18,25
19:8,10,13
20:8,13 21:11
22:12,18,22
23:6,13,14
24:1,18 25:1
25:11 26:17,18
26:19 27:9,14

27:25 28:10,12
28:20 29:25
30:10 31:13
33:11,13,15,16
33:18,19 34:3
34:10,21 37:7
38:24 42:12,15
42:24 43:4,10
45:11,18 46:7
47:2,11 49:6,7
47:20 108:4
51:20 52:10,17
52:19,24 53:7
53:14,18 54:13
54:25 55:2,22
57:25 58:12,21
58:23 59:3,15
60:1,3,6,18
67:25 68:12
69:24 70:11
72:1,4 73:4,17
74:1,4,11,16
74:22 75:3,6
75:13 76:9
77:4,9,12,13
78:4,8,18
79:21 81:18,20
82:4,5,15 83:5
83:13,16,22
84:5,8,12,13
84:16 85:4,7
85:13,14,20
87:7 91:11,21

93:11,14 94:12
95:15 96:16,22
97:6,11,20,23
98:11 99:12
100:11,19
101:1,7,23
102:2,5,9
103:2,15,17
105:1,14,19
106:13 107:3
107:20 108:4
109:3,6,8,14
110:20 111:20
112:3,4 114:1
114:3,19 115:3
115:7,10,12,15
116:3,10,19
117:13,21
118:12 119:2,7
120:2,20 121:5
121:22 122:2
123:16 124:15
125:13,19
126:1,7,25
127:18 128:2,8
128:12,23
130:4,7 131:1
131:6,9 132:11
132:21,25
133:8,11
134:11,24
135:13,16,22
137:16,17
138:4,10,20
139:22 140:10
140:20 141:8

143:4,5,20
144:15 145:12
145:15 147:21
148:6,21 150:2
150:13,20
151:8 152:22
153:5,18 155:5
155:24 157:17
157:19 158:12
158:19 159:21
160:3,23 161:7
161:16,22
162:10 165:20
166:13 167:25
168:2 172:15
172:18 173:6
175:14,20
177:3 178:14
179:1 180:6,22
181:2 185:5,12
186:4 190:1,3
190:8,10,17,19
190:20,23
191:4,10,22
192:1,6,10,11
192:19 193:2
193:10,11,22
194:8 195:10
195:13,18
196:10,11,15
196:21,24,25
197:3,16 198:3
198:4,10
199:12 200:6
200:16,18
201:3,7,11,22
201:25 202:16
202:20 205:14

## [honor - immediately]   Page 42

206:1,11,17,23
206:25 207:4
207:21,24
208:14,20
209:2,3,7,9,24
210:5,9 211:7
211:18 212:4
212:11,21
213:2,8,13,16
213:19,24
214:13,21
215:8,13,17,24
216:13,15,17
217:13,25
218:10,24
219:7,11,24
220:8,15,24
221:14,22
222:15,19
223:7,20 224:1
224:12,15
225:1 230:19
231:17,19
233:2,18 234:3
234:9 235:4,13
235:16 236:2,3
236:15 237:4
237:15 238:2,4
238:13,23
239:1,17,19,20
239:23 240:18
240:21,22
241:8 242:12
242:22 243:6
243:13 244:3,7
244:14,19
245:1,3,13

248:22 250:12
250:18 251:5
251:11 252:19
254:18,22
255:11,17
256:3 257:20
257:25 258:2,5
258:23 259:2
259:19,24
260:8 261:15
261:22 262:5
267:10,16,20
269:8,9,11
270:9,15,21
271:3,8,10
272:2 274:14
275:2 276:20
277:12 278:7,9
278:19
**honor's** 34:5
39:12 41:1
46:8 49:1,3
124:24 194:4
198:15 242:3
245:5,21
**honoring** 26:1
**hope** 16:6
32:17 79:24
717:13,21
125:4 132:19
134:21 146:5
185:14 207:2
240:18,19
241:1 259:14
259:25 276:11

**hoped** 226:21
**hopeful** 116:19
117:14 139:7
146:2 153:24
**hopefully**
16:20 156:23
198:16 235:11
**hopeless**
150:18 152:15
**hopes** 132:5
**hoping** 90:17
246:1
**host** 244:20,21
**hot** 162:22
**hour** 257:21
**hours** 56:11
**huh** 123:8
229:14
**humanly** 172:4
**hundred** 54:9
57:16 89:15
204:19
**hundreds**
249:2
**hurdles** 187:12
**hurricane**
247:21
**hurry** 205:13
**husband** 260:6
**hypothecate**
55:10 57:1,1
65:22 87:22
**i**
**idea** 31:9 44:24
71:2,6 95:19
122:12 125:6
142:22 194:15

211:8 251:24
275:13
**ideally** 222:1
**identifiable**
55:21 98:18,23
104:7
**identification**
242:4
**identified**
40:14 117:5,6
183:13
**identifies**
242:2
**identify** 221:13
222:8
**identifying**
112:19
**identities**
222:21
**identity** 112:19
**ignore** 126:22
**il** 10:20
**illegal** 24:5
27:2 29:14
33:9 35:22
36:6 37:12
113:9 204:9
**imagine** 32:6
261:7
**immediate**
124:3
**immediately**
20:22 108:2
109:17,20
112:17 142:5
144:24

## [indication - injunction]   Page 44

**indication**
39:21
**indications**
187:9
**indirect** 211:2
211:7,12,13
**indirectly**
211:11
**indiscernible**
28:16,19,21
30:17 31:14
44:2,6 46:9
78:9,14,21
79:7 104:19
107:25 114:7
114:15 131:20
132:9 138:7,8
138:16,19,20
139:14 140:17
141:6 143:7,12
143:17 144:9
144:11 146:4,9
147:17 148:22
149:4 150:10
155:17 159:6
166:23,25
167:4,7,17
169:7 174:7
187:17 192:3
193:10 194:17
195:18 196:13
196:16 197:4,5
198:16 201:17
202:8,19
205:16,17
207:7,9,9,14
209:20 211:12

211:13,21
213:4 214:8
215:3 219:10
219:18 220:2,3
220:19 225:8
227:25 228:6
228:21,22
231:10,18
233:17,20
236:19 237:16
237:20,23
238:5,8,23
239:5,8,8,10
239:13,14,14
241:21 245:2
245:20 246:1,4
246:24 247:11
247:18,20
248:12 249:9
249:17,18,20
250:2,18
251:20 255:1
255:16 256:10
263:22 264:11
272:16,20,25
274:25
**indiscriminat...**
159:2
**indisputably**
172:3
**individual**
28:22 70:12
95:8 106:17
140:12 237:19
246:22 252:5
275:23

**individual's**
168:6 182:18
**individually**
111:21 204:25
276:7
**individuals**
26:5 36:5 37:4
106:21 151:3
175:1 176:5
177:2 181:21
183:1,25 184:7
184:14 185:6,7
185:17,22
186:12 187:12
188:17 193:19
204:6,14 205:5
205:15 216:23
217:6,10
218:20 219:13
220:5 265:23
**induced** 252:6
**industry** 54:6
55:18 59:7
**infancy** 167:8
**infinity** 138:16
**inflexible**
114:12
**influence** 70:6
**information**
18:1,15,17
19:25 20:1,5
21:19 47:13,14
47:16 55:16,25
72:18,18 76:4
76:24 82:7,23
82:25 83:2,23

86:5 91:21
92:15 93:19,21
94:4,6,8,9,11
98:5,18,21,23
99:2,5,15,21
99:25 100:10
101:11,20
102:8,16 103:7
104:7,8,20
106:24 107:5
107:18 109:18
109:24 110:12
112:6,12,19,25
113:4,7,8,21
116:17 135:17
147:23 170:12
170:21 180:12
171:18,24
**informative**
75:9
**informed**
67:23 77:2
**infrastructure**
55:13 118:15
**initial** 43:11
97:4 118:10
157:6 198:25
247:24
**initially** 86:13
**initiate** 88:21
136:13
**injunction**
23:24 24:1,12
27:25 57:23
206:10

## [immunize - indicating]   Page 43

**immunize** 30:4
**immunizes**
34:22
**impact** 72:24
90:5 149:8
221:4
**impacted**
61:17 69:2
138:6 146:6
**impacting** 21:1
140:18
**impair** 211:16
**impaired**
181:10
**impede** 70:6
236:23
**impermissible**
121:3
**impermissibly**
220:9
**implement**
24:16 25:11
204:15 212:16
**implementati...**
217:9 268:17
**implementing**
26:23 34:25
192:13 203:13
**implies** 179:25
**importance**
178:10
**important**
18:18 78:15
85:23 87:18
88:2 95:8
112:18 133:9
133:11 143:6

153:10 160:7
163:17 239:2
240:23 276:15
**importantly**
54:13 234:16
242:3 269:2
**impose** 31:7
**imposed**
162:12
**impossible**
140:9 149:25
152:18
**impression**
49:6 251:5
**improper**
194:23 203:1
211:17 271:19
**impropriety**
176:7
**improvements**
136:21
**inactions** 138:6
**inadequate**
73:15 95:12,25
98:10
**inadvertently**
110:13
**inappropriate**
152:12
**incapable**
174:3
**inclined** 19:10
**include** 52:5
55:25 67:17
163:7 236:7
246:15

**included** 33:25
40:17,21 58:17
59:9 81:22
153:23 161:14
162:11 202:18
220:10 227:11
272:18
**includes** 40:8
86:7 87:16
183:6 211:24
256:8
**including**
18:21 34:23
42:19 44:4
46:17 55:14
82:21 116:25
156:15 181:14
201:13 202:14
210:25 219:14
226:23 227:12
231:1 241:15
243:12 258:11
271:15
**inclusion**
213:20,23
**income** 35:2
**incompetence**
236:11 246:10
250:23 251:7
255:19 257:14
**inconsistent**
199:16 201:21
248:17,19
**incorporate**
76:14
**incorporates**
264:20

**increase**
237:17
**increased**
143:14
**incremental**
86:2
**incur** 35:2
37:14
**incurring**
187:13
**incurs** 203:11
**indemnificati...**
183:17 184:5
186:13
**indemnified**
184:2
**indemnity**
184:1 188:9
**independent**
55:19 62:1
64:13 67:1
72:25 82:22
84:2 106:8,25
107:1 172:1
182:23 221:18
222:2,6 224:22
226:8,14,16
227:12,18
228:7,8 229:6
229:24 230:10
230:13,16,21
232:5,6,17,21
235:1,5 238:17
240:5,16
**indicated** 29:2
**indicating**
89:20 150:19

## [injunctions - investment]   Page 45

**injunctions**
24:3 170:5
**injunctive** 3:19
23:22 205:20
**injured** 275:15
275:16
**injurious**
256:11
**insecurity**
111:7
**insider** 184:24
274:1,4
**insiders** 171:12
171:15,21,22
173:12,12,14
175:12,25
189:19 216:21
216:22 217:2
217:23 218:4
218:17 271:15
**insinuates**
209:19
**insofar** 51:8
**insolvency**
176:13
**instance**
122:15 209:17
246:17
**institution**
56:23
**instruments**
214:19
**insult** 256:6
**insurance**
182:14 183:9
184:8 217:24
223:23 224:2,4

**insured** 56:23
**insurmounta...**
233:25
**intend** 231:13
**intended** 41:5
76:16 93:2
212:15 237:6
262:1,2,2
**intends** 146:3
**intent** 93:2,4
246:6 253:5,8
274:12
**interchange**
254:16 256:7
256:13,18
257:3,5,11
261:23
**intention**
141:16 192:14
**intentional**
110:12
**intentionally**
248:10
**intercompany**
72:23 73:10
97:24 221:19
222:8 225:13
225:18,21
226:1,3,8,10
226:18,21,24
227:3,21,24
228:19 229:8
229:5 231:1,5
232:4,23
233:16 235:7
74:3 85:5

150:19 161:16
186:25 221:6
224:18 225:16
226:18 228:5,5
228:13,25
229:2 230:11
239:16 240:9
255:14 268:14
275:22
**interested**
150:14,21
151:3
**interests** 53:13
59:5 85:12
164:4 212:18
235:3,3 238:14
238:19 243:17
**interfere** 70:23
70:24
**interject** 77:4
**intermediate**
146:21
**internet**
261:25
**interpretation**
24:13 247:8
**interpretations**
168:25
**interrupt**
229:9,11,13
**interrupting**
172:19
**interviewed**
87:12 185:7,8
185:8 188:7
241:14

**intimately**
236:20
**intimidate**
90:16
**invent** 37:22
**invest** 57:1
92:4
**invested** 71:11
226:9
**investigate**
166:23 167:1
226:9
**investigated**
89:20 179:14
182:24 218:6
272:14 273:21
**investigating**
241:1
**investigation**
166:20 178:24
179:5 180:2
182:9 183:19
189:21 193:25
194:5 217:16
218:2 268:6
272:15
**investigations**
61:17 67:19
69:3 72:23
**investigative**
273:18
**investigator**
64:12
**investing**
260:23
**investment**
260:11

**investments**
187:3,4
**investor**
168:14
**investors** 90:8
90:10
**invite** 111:16
**invited** 75:12
**inviting** 114:6
**invoke** 43:3
236:8
**invoking** 61:5
**involve** 44:10
256:9
**involved** 24:7
31:22 33:6
39:8 46:19
69:11,15
126:21 191:6
**involvement**
103:12
**involves** 75:19
**irs** 35:5 203:12
250:1 252:10
256:1,2 260:9
**issue** 17:8,18
20:23 29:3
31:1,2 32:11
34:4 35:13
36:15 39:20
43:1 47:18
48:14,20 49:25
51:13 53:1,1
63:23 65:25
66:2 67:3
92:12 97:5,12
98:12,13 102:9

113:17,20
131:8 132:17
162:22,22
182:6 192:25
193:3,21
194:19 198:4,5
198:7 199:9
201:12 205:22
212:13 213:16
216:20 224:21
226:19 231:1
231:16 233:21
235:12 236:14
245:20 258:17
264:3,7 265:4
267:15 278:15
**issued** 24:23
38:13 41:5,7
43:23 141:15
**issuer** 39:22,25
39:25 40:1,5,8
40:10,14,20
41:13,18,19,25
49:24 51:8
**issues** 17:3
18:6 19:17
33:20,22,24
42:24 52:4,20
53:4 61:18,19
65:13 66:16,23
67:22 69:4
70:14,16 84:8
87:13 92:9
98:4 102:22
103:18 105:14
110:5 111:10
111:17 114:14

169:5 172:22
190:22 195:5
204:10 215:9
221:19 226:21
226:24 229:17
232:23,23
235:2,7,8
258:4,11 269:6
270:12 271:9
**it'll** 178:17
**item** 145:5
152:13 279:7
**items** 154:22
**iterations**
191:17 225:25
**i'm** 163:13

**j**

**j.b.** 34:13
**j.d.** 198:19
202:20
**jaffe** 6:1
**jamie** 3:24
**january** 69:8
72:8 80:17
90:2 95:3 97:5
97:10 170:9
247:23
**japan** 106:1
**jason** 6:2 14:13
15:3 121:5
255:12
**jay** 88:23
**jean** 4:17
**jeff** 6:21
**jeffrey** 10:6
**jennifer** 14:6
14:18 118:21

**jensen** 185:3
**jersey** 9:19
10:2 121:11
126:3
**job** 62:6 64:5
82:12,13 166:5
212:10 239:12
240:11 275:10
275:22 276:5,6
**john** 14:13
120:20 121:5,6
122:2 123:8,12
123:16,19
124:3,15,21
125:12,19
126:1,7,15,19
126:25 127:7
127:18 128:12
128:2,8,23
129:10 130:4
130:19 131:1,6
**johnson** 5:6
**join** 136:8
**joins** 18:8,11
20:10
**jon** 14:23
271:11
**jones** 14:22,25
207:4,4,6,13
207:20 270:23
**joseph** 13:14
85:20 114:3
135:20
**jr** 7:22
**judge** 2:10
64:11 114:25
118:21 163:3

77:10 79:2
81:12,13 85:24
89:16 91:11,13
91:14,15 94:23
96:14 97:3
98:3,7 100:20
104:9,15,16
106:2,3,7
109:25 110:7
110:10,12,13
112:14,16,18
112:25 113:7
114:24 120:21
121:11,14,21
121:22 122:4,8
122:9,13,14
123:1,2 124:22
125:5,7,8,13
125:20 126:5,8
126:10,10,12
126:21 127:8
127:19,20,20
128:9,10,12,13
128:18 130:4,5
130:6,10,11,13
140:11 141:23
143:21,23
148:10,15,21
148:22,22
149:16 151:10
151:16 152:9
152:17 153:11
154:3,4,5,15
155:9 156:12
156:14 157:5
157:22 158:6
159:18 163:12

164:19 165:14
165:16 166:9
166:24 168:19
169:6,8,9
170:14 171:7
171:14 175:25
178:17,21
180:10,12,14
191:16,18
192:11,12,15
195:14,16,19
197:13 201:4
201:21 202:9
202:17 203:24
205:19,21
206:22 207:2
208:7 210:14
211:12 215:10
218:19 221:10
222:9 223:14
229:17 237:6,9
237:10,11,15
237:16,18,20
237:23 238:13
238:14 239:3
240:8,13,14,15
241:10 243:25
244:13 245:13
246:4 247:8,10
247:12,14,15
247:18 248:25
249:2,3,4,19
249:22 250:18
250:19 251:21
252:7 253:2,10
253:11,24,25
254:5,24 255:3

255:8 256:17
257:1 260:19
262:6,8,12,25
263:1,13
265:17 266:12
267:2 268:4
270:24 273:4
273:14,15,24
274:1,6,19
275:25 276:5

**knowing**
237:20
**knowledge**
262:1
**known** 68:24
69:10,22
**knows** 37:21
41:2 119:23
128:12 143:21
203:21 242:22
**kraken** 90:4
**kramer** 185:3
**kyc** 18:16

**l**

**l** 279:6
**labeled** 251:24
**lack** 60:7 76:12
95:18,18 99:2
158:20 255:2
255:14
**ladies** 238:24
**laid** 93:20
**language** 16:11
16:17 17:1
24:15 25:6
27:4,4,11,16
27:16,18 28:2

28:5,13,24
30:5,17 31:13
32:24 33:11
34:16 36:16
39:14,16,18
40:17,21,22
192:17 194:4
195:25 196:12
197:20,25
200:12,18,19
201:17,18
202:1,7,15,22
203:10,21
206:11,15,16
206:20 207:1
208:2,25
209:14 210:16
211:7,12,15
212:13 214:24
215:2,6 218:5
218:8 223:17
224:7,9
**lantham**
259:18
**lapin** 270:23
**large** 79:18
139:22 149:8,9
153:8,11
**larger** 154:5
**largest** 148:8
153:9
**lasalle** 10:19
**lastly** 269:2
**late** 48:15
216:10 225:17
248:7 262:8
266:11

173:10 247:11
264:8 271:23
**judgment**
59:12 62:8,9,9
62:10,11 63:6
65:10 66:24
71:20 101:8,14
103:5,6,10
107:12 159:22
176:23 179:23
179:25 180:1
182:22 186:9
186:10 187:12
187:15 240:1
266:25 272:10
**judicata** 31:18
**judicial** 64:14
**july** 155:13
**june** 155:12
**jurisdiction**
98:17 102:24
119:12 120:12
126:4
**jurisdiction's**
119:13
**jurisdictions**
16:22 55:12
74:19 115:17
115:24 116:2,6
117:17 119:8
119:10,14,22
121:13,17
124:6 131:15
**jury** 247:11
**justice** 28:7
91:16,18 92:12
250:22

**justifiably**
262:2
**justification**
127:5 172:10
216:21

**k**

**k** 214:15
**karen** 7:7
**katherine** 5:6
8:21
**katten** 4:3
226:15,15
230:24
**katz** 4:19
**keen** 186:25
**keep** 20:20
43:19 78:24
112:4,16
113:13 207:13
224:1,6
**keeping** 178:11
219:16
**kelly** 11:20
224:17
**kemble** 9:20
**kept** 187:3
**kerp** 91:19
**kilpatrick** 11:1
11:8,15 224:17
**kind** 24:6
31:12 32:22
37:15 53:1
57:20 58:11
62:1,21 65:8
71:5,13 76:13
104:17 115:19
115:22 119:16

120:4,6,9
121:15 122:3
122:21 124:19
127:16,21,23
129:23,25
130:6,9 132:16
133:23 135:6
137:4,4 139:13
139:20 140:13
142:6 146:10
148:15 152:15
152:17 153:16
155:3 169:14
169:18 171:25
179:4,11 181:5
205:21 223:2
246:18 249:24
253:2 256:16
256:20 257:9
257:10 267:24
272:23 273:2,4
273:13,17
274:24,25
277:25
**kinds** 30:1
37:24 126:23
170:12,12
182:20 214:17
246:21 252:7
260:25
**kirkland** 10:8
10:17 52:18
115:11 267:17
**kirpalani** 8:22
173:6,7 175:14
175:20 176:23
177:2,19,25

178:9 179:1,6
180:5,8,22,24
181:2 183:4,14
184:20 185:12
188:12,22
189:24 193:22
216:17,19,19
217:13 218:10
219:9,11,23
270:19
**kleinbart** 3:25
**knew** 37:5
42:17 176:8
**knock** 234:13
234:14
**know** 21:1 23:6
24:16,18,21
28:14,15,17,19
29:1,12,18,19
29:20 30:6,17
30:20 31:5,8
32:21 33:5,8
34:3,25 36:18
37:25 39:20
43:6,12,17,22

**latest** 126:2
202:23
**latham** 9:1
17:16 84:14
102:5 105:1
110:20 114:19
212:11
**laughter** 128:5
130:23 137:15
161:6
**laundering**
113:8
**law** 19:18 32:9
50:9 122:9
124:24 125:1
164:24 201:22
208:7 239:5
246:12,15,18
253:12,13
256:6,8,21,24
274:3
**lawrence** 13:22
15:2
**laws** 26:21
29:9 30:8,11
31:7 38:6,25
40:4 120:11
204:17,25
207:9,18
253:11
**lawsuits** 88:20
**lawyer** 259:7
**lawyers** 256:18
**laziness** 119:23
**leading** 55:18
273:23

**learned** 83:22
263:17
**learning**
274:21
**leave** 31:3,24
44:25 113:14
190:25
**leaving** 38:21
**led** 99:11
238:15 275:1
**ledger** 55:8
**leeway** 246:3,7
276:14
**left** 23:16
158:10,10
**legal** 19:18
32:4 36:20
43:5 61:19
69:4 89:1
107:9 158:20
168:10 205:16
202:14 203:12
206:23 212:23
213:5 217:12
**legally** 22:21
**lend** 55:10 57:1
65:22 87:22
**lending** 54:14
**lengths** 81:3
**lengthy** 92:16
114:16
**lesson's** 263:17
**lessons** 263:18
**letter** 50:8,12
50:16 99:13
199:8,8 223:10
223:21 247:24
247:25

**letters** 87:25
214:19 248:2
252:16
**letting** 48:13
**level** 19:4
111:11 184:4
242:15 253:16
**lex** 256:8
**lexington**
10:10
**liabilities**
32:14 34:24
205:7 212:23
213:1 266:18
**liability** 33:1,5
36:21 37:14,15
164:12 165:14
173:23 174:6
175:21 184:16
186:10 194:13
202:14 203:12
206:23 212:23
213:5 217:12
**liable** 3:13 24:9
27:7 38:18
197:12 204:15
209:8 212:22
**licensed** 98:22
99:14 100:2
129:21
**licenses** 55:12
118:8 119:25
121:2
**licensing**
127:19 128:3

128:10,18,19
**licensure** 122:4
122:10 125:4
129:3,6
**lie** 37:20
**lied** 260:20
**life** 71:12
263:18
**lifetime** 249:5
**light** 23:18
130:1 211:25
273:25
**likelihood**
153:2 154:19
189:10
**likelihoods**
154:13
**likely** 40:19
58:15 64:6,8
117:25 128:12
142:23 153:1
253:13
**likewise** 100:4
**limit** 62:6
190:9 192:10
194:12
**limitation**
56:18
**limited** 31:2
14:14 37:2
75:24 110:25
129:5,5 166:21
214:22 224:19
225:7 232:22
246:5 249:1
272:15 273:18

## Page 50

| | | | |
|---|---|---|---|
| limits 129:1 | listed 117:9 | 218:16,16,18 | 116:10 174:8 |
| 188:2 | 134:19 175:12 | llp 4:3 6:8,15 | 174:11,12,13 |
| linda 12:6 | 194:21 213:20 | 7:16 8:16 9:1 | 175:4,21 176:1 |
| line 82:2 | 214:3 218:20 | 9:10,18 10:1,8 | 176:2 180:5,10 |
| 147:16 170:11 | 225:20 | 10:17 11:1,8 | 180:12 183:23 |
| 190:18 198:18 | listen 39:2 | 11:15 | 185:1 186:2 |
| lines 82:2 | listening 109:4 | loan 174:11 | 187:16 189:1 |
| lipton 4:19 | listing 134:17 | 183:21 188:23 | 208:19 212:8 |
| liquid 185:16 | 134:18 175:11 | 228:21 232:25 | 219:21 223:23 |
| liquidate | literally 113:15 | 273:11 275:9 | 224:6 240:12 |
| 139:12 140:22 | 138:12 168:11 | loans 180:13 | 261:6 270:12 |
| 144:19 150:9 | 168:20 169:15 | 182:5 186:8,16 | looked 57:21 |
| liquidated | 179:9 255:6 | 217:16,17,19 | 65:14 66:25 |
| 108:12 140:12 | litigated | 218:10,12,13 | 73:5 171:12 |
| 144:23,25 | 184:13 257:4 | 272:19 | 172:1 175:7 |
| liquidating | litigation 3:20 | located 74:18 | 179:7 184:18 |
| 57:19 61:11 | 32:4 35:20 | 116:16 117:2 | 187:25 188:19 |
| 141:18 146:8 | 73:9 97:24 | locked 143:7 | 242:3 266:19 |
| 212:4 | 186:17 263:10 | 144:9 158:2 | 260:9,17 |
| liquidation | 263:10 | long 44:22 48:2 | 261:25 264:12 |
| 53:11 57:17 | little 28:4 65:8 | 51:22 71:2,6 | looking 33:12 |
| 58:1 59:9,17 | 75:11 76:4 | 88:24 95:6 | 84:18 131:23 |
| 63:16,17 64:7 | 84:23 85:1 | 128:1,4,7 | 237:15 239:16 |
| 67:22 70:1 | 100:10 118:5 | 129:21,22 | 277:23 |
| 96:6 101:1 | 119:21 131:25 | 132:13 179:23 | looks 107:22 |
| 160:24 220:4 | 133:5 136:5 | 179:24 194:8 | 199:4 |
| 220:24 221:1,4 | 147:8 200:7 | 215:3,11 | lori 189:12 |
| lisa 14:21 15:1 | 202:8 209:12 | 248:24 259:20 | lose 199:25 |
| 78:11 93:9 | 225:24 262:8 | longer 59:13 | losing 242:13 |
| 97:9 163:5 | 268:2 273:5,9 | 88:7 153:17 | loss 249:4 |
| 251:13 254:18 | live 76:25 | 235:20 | 255:16 261:3 |
| 254:20 259:4 | 178:12 213:11 | look 22:1 25:20 | losses 187:8 |
| 260:5 | lived 187:17 | 29:5 31:15 | 251:25 252:1 |
| list 27:12 98:20 | llc 8:17 10:9,18 | 46:11 58:4 | 260:13 262:13 |
| 193:12,16 | 61:7 70:22 | 61:17 70:22 | lost 143:19 |
| 214:19 240:12 | llc's 217:25 | 90:1 94:19 | |
| | 218:13,14,15 | 99:13 114:13 | |

## Page 51

| | | | |
|---|---|---|---|
| lot 32:16 58:17 | 87:2 91:4 | 30:7,22 32:5 | 236:13 244:21 |
| 60:6 75:10 | 97:19,22 | 42:9,23 47:16 | 244:23 247:2 |
| 76:23 82:1,15 | 102:15 109:16 | 48:3,4,16 49:2 | 248:20 254:6 |
| 82:18 83:16 | 110:2,4 115:3 | 51:10 52:25 | 254:13,22 |
| 87:6 104:17 | 115:23 132:14 | 56:6 64:23 | 265:25 271:17 |
| 114:14 140:11 | 150:15 157:9 | 65:1 68:17 | 272:7 274:15 |
| 141:1 162:18 | 157:11 166:4 | 70:2 71:16,25 | 275:9 277:17 |
| 168:16,16 | 169:10 172:8 | 72:6 77:2,16 | 277:21,22 |
| 169:2,13 | 174:12,13,14 | 82:11 83:21 | maker 88:5 |
| 190:11,20 | 175:5 178:5 | 84:1,4 92:8 | makes 16:19 |
| 238:7 241:2 | 179:25 180:1 | 94:16 101:4,13 | 36:4 38:18 |
| 242:19 246:3 | 181:15,16,16 | 102:21,22 | 52:23 62:4 |
| 252:16 264:12 | 188:14,18 | 110:3,11,22 | 70:21 110:24 |
| 266:5 274:6,11 | 216:10 220:25 | 111:20 113:5,6 | 131:16 180:19 |
| 276:14 277:16 | 228:3 230:8 | 114:7 118:10 | 197:21 249:23 |
| lots 94:15 | 239:11 241:23 | 119:22 120:4 | making 29:13 |
| love 131:18 | 242:4 247:15 | 122:23 123:20 | 50:6,23 55:15 |
| low 95:21 | 247:16,17 | 123:21 124:1 | 61:12 64:24 |
| 143:1 152:8 | 251:1 274:5 | 125:25 126:22 | 69:21 111:24 |
| 158:4 | madison 4:5 | 128:19 130:3 | 119:13 125:12 |
| lower 221:5 | 8:18 | 137:22 141:16 | 132:15 136:21 |
| 273:7 | magnitude | 144:11 146:16 | 140:5 142:19 |
| lucero 15:4 | 183:22 | 149:19,21 | 149:25 152:18 |
| lunch 114:11 | mail 80:8,10 | 150:9 157:7 | 186:8,16 |
| 115:4 | 174:25 227:23 | 159:21 164:21 | 257:13 277:24 |
| lunchtime | mailed 80:3 | 170:20 172:3 | man 114:25 |
| 114:10 | mails 181:17 | 176:18 179:4 | management |
| lunn 7:21 | main 14:3 | 179:20,24 | 74:8 184:23 |
| | maintained | 182:5 188:4,5 | 214:4 215:18 |
| **m** | 74:18 | 188:10 190:24 | 236:11 257:15 |
| m 7:3 | maintains 54:9 | 193:17 202:16 | 272:11 273:16 |
| made 16:8 | 55:16 | 203:11 205:4 | managers |
| 17:11 23:19 | majority 19:12 | 205:25 206:3 | 184:4 |
| 42:4 53:19 | 54:21 77:11 | 206:17,22 | manipulate |
| 55:3 56:14 | 106:14 143:6 | 208:19 223:18 | 144:10 159:12 |
| 60:16 62:10,11 | make 16:10,17 | 233:22 235:6 | manipulated |
| 66:3 68:14 | 18:24 26:21 | 236:7 | 143:8 158:6 |
| 84:16 86:6 | | | |

## Page 52

| | | | |
|---|---|---|---|
| 159:14 | 140:18 146:6 | 238:18 | meaningfully |
| manner 95:25 | 221:4 | mcdermott | 89:4 |
| 112:1 151:24 | materials | 12:16 13:1,9 | meaningless |
| 243:16 | 125:22 | 85:21 135:20 | 38:20 |
| march 2:5 | math 84:18,23 | 240:22 | means 54:11 |
| 176:14 280:15 | 84:25 85:4 | mcelroy 9:18 | 61:8 63:15 |
| mark 114:16 | 157:7 | 10:1 | 91:7 107:1 |
| 225:21 257:21 | mathematical | mean 19:21 | 123:5 136:1 |
| market 18:14 | 152:19 | 22:21 27:21 | 168:22,24 |
| 44:10 88:5 | matter 1:1 | 29:22 30:5 | 171:17 173:24 |
| 98:21 111:7 | 31:18 33:7 | 31:15 37:12 | 211:8 212:22 |
| 112:10 140:23 | 34:1 39:15 | 40:25 47:12 | 228:4 254:9 |
| 143:8 144:11 | 46:16 62:5 | 50:10 62:20 | 256:15 276:22 |
| 145:3,4 146:12 | 63:5 64:14 | 64:9,19 66:5 | meant 27:1 |
| 147:12,24 | 74:11 75:23 | 68:8,9 86:15 | 33:10 108:21 |
| 154:12,16 | 86:23 88:19 | 89:12 119:17 | 108:24 155:9 |
| 155:25 158:3 | 124:11 140:2 | 123:4,6 127:14 | 173:15 |
| 159:8,9,13,13 | 140:20 151:21 | 128:6 142:23 | measuring |
| 160:12,16 | 161:9 177:5 | 143:11,11 | 148:10 |
| 176:8,9 181:15 | 180:9 191:22 | 145:16,18 | mechanisms |
| market's | 192:20 214:12 | 151:15 157:4 | 76:7 |
| 154:12 | 233:7 238:16 | 163:10 169:5 | media 158:7 |
| marketed | 246:16 264:17 | 179:10 188:12 | 168:22 |
| 136:11 | 267:10 274:11 | 204:16,17,19 | meet 48:14 |
| marketing | 280:6 | 205:15 211:8 | 277:8 |
| 134:19 | matters 111:6 | 212:25 240:12 | meeting 128:11 |
| markets 18:13 | 231:1,4,5 | 255:6,13 | 150:14 |
| marshall 14:20 | matthew 7:21 | 262:22 265:3 | meetings 92:1 |
| 153:7 185:3 | maximize | 265:19,20 | 226:14 |
| masquerading | 177:13 228:11 | 268:4 | member 174:2 |
| 66:2 | maximizes | meaning 79:7 | 184:23 230:3 |
| match 156:22 | 57:13 | 83:25 136:7 | 243:16 |
| 224:10 | maximizing | 177:14 | members |
| material | 59:6 | meaningful | 90:12 124:14 |
| 141:23 214:6 | maximum | 97:1 136:22 | 171:21 172:7 |
| materially | 75:17 156:1,2 | 218:19 | 173:22 174:1,9 |
| 18:16 20:25 | 219:17 237:12 | | 182:24 188:6 |

## Page 53

| | | | |
|---|---|---|---|
| 191:14 227:17 | messaging | 147:15,16,17 | misled 174:20 |
| 228:4,6 | 183:24 | 176:10 184:11 | mismanagem... |
| memorandum | met 186:5 | 224:3 225:13 | 246:10 250:24 |
| 122:9 124:25 | metropolitan | 228:17,23 | 251:7 255:19 |
| memorized | 4:20 | 229:4 234:4,13 | misnomer |
| 32:25 | mew 1:6,12,19 | 234:15,17,19 | 257:9 |
| memory 185:1 | 3:18,23 | 242:11 | missed 214:16 |
| 218:22 | mi 6:4 | millions | 265:8 |
| men 186:25 | michael 2:9 | 182:14 | missing 125:15 |
| mendell 14:20 | 10:22 | mind 17:25 | misspoke 93:1 |
| 153:5,7,7 | michelle 3:4 | 20:3,21 37:22 | misspoken |
| 155:5,11,15,17 | 8:14 272:3 | 69:21 164:21 | 108:22 |
| 155:24 156:6 | michigan | 206:23 261:9 | misstated |
| 157:1,16,20 | 259:5 | 274:16 | 139:8 |
| mention 43:13 | mid 80:17 | minds 30:23 | misstatement |
| 80:6 100:5 | middle 207:8 | 71:16 | 275:16 |
| 103:25 178:15 | midnight | minimize | mistreating |
| 274:2 | 258:19 | 55:24 185:21 | 62:22 |
| mentioned | midst 71:10 | minimized | misunderstand |
| 47:19 78:24 | mike 16:6 | 54:7 | 128:25 |
| 79:11,14 81:23 | 23:14 147:21 | minimum | misundersta... |
| 100:6 175:4 | milani 185:5 | 155:20 156:8 | 162:18 |
| 181:15,25 | milestone 48:8 | 156:10,11 | misunderstood |
| 185:4,4 186:11 | 48:14,18,19 | minneapolis | 129:11 |
| 193:11 206:8 | 51:12 114:12 | 8:12 | misusing 62:22 |
| 206:20 216:23 | 114:18,22 | minor 122:2 | mitigate |
| 254:13 275:12 | 115:6 245:12 | minute 85:16 | 266:18 |
| mentioning | 258:9 259:22 | 164:2 227:8 | model 54:8 |
| 201:15 267:7 | million 54:1,4 | minutes 51:17 | 195:20 |
| merely 111:24 | 57:16 75:17,17 | model 5:8 | modeled 69:25 |
| merit 88:4,5,7 | 75:25 77:22 | misconduct | modified |
| 243:7 | 84:20,24 86:3 | 186:20,23 | 221:18 |
| message | 89:5 90:3,4,11 | misha 185:5 | modify 19:6 |
| 168:21 174:23 | 174:24 | misleading | 50:2 209:25 |
| 174:24 | 90:20 100:12 | 138:10 166:24 | 210:21 212:8 |
| messages | 100:13,20 | | |
| 181:17 | 102:12 140:21 | | |

**[moelis - nature]** Page 54

moelis 87:14
moment 39:21
  74:16 88:8
  148:1,18
  151:13 172:16
  181:4 218:3
  251:17 267:8
moments 33:19
monday 2:5
money 22:25
  58:10 113:7
  144:11 154:16
  154:22 168:24
  260:20,22
  261:18 263:6
  273:1
month 26:19
  125:5
months 16:23
  23:5 121:10,18
  121:19,24
  122:4,13,21
  124:4 126:2,15
  127:25 129:18
  131:14 150:3
  226:6 245:6
  250:19,25
montpelier
  14:4
morning 16:4
  16:5 27:14
  33:16 34:10
  51:11 52:10,17
  72:4 88:10,12
  197:13 198:20
  199:4,4 200:7
  201:20,23

206:12 214:14
235:18 260:1
morrissey
  12:14 33:14,15
  33:16 34:7
  72:1,4,5 73:17
  73:20 74:1,11
  74:22 75:6
  76:18,20,23
  78:4,8,13 79:3
  79:12,21 80:23
  81:4,18 82:4
  82:15 83:4,8
  83:11 84:12,15
  91:3 92:16,22
  93:5 97:11,11
  97:20,23 98:2
  190:1,2,8
  191:3,9,21,24
  192:6,19,24
  193:2,5,7,10
  193:15 194:11
  194:17,19
  196:1,3,10,10
  196:23 197:3
  197:16 198:2
  200:16 201:3
  213:13,13,16
  214:3 215:8,13
  215:22,24
  216:8,13 244:7
  244:7,14
  270:15,15
  271:1,7
morrissey's
  91:9 92:21

morristown
  9:21
moscou 7:9
motion 3:4,7
  3:12,18 30:3
  74:8 91:17
  244:17 245:23
  248:1,4 251:3
  251:16 260:3
  264:2,16
  266:25 272:4
  272:24 273:22
  274:24
motions 3:10
  72:9 170:9
  267:19 269:6
  277:17
mount 9:20
mountain
  252:21
movants
  268:13
move 55:9
  59:16 71:21,22
  104:3 108:7,15
  108:22 115:12
  132:4 144:10
  147:23 160:23
  171:6 236:12
moved 117:11
moving 260:16
moynihan
  11:20 224:15
  224:17,17
  225:1 229:10
  229:12,14,19
  229:22 231:6,8

muchin 4:3
  226:15
multiple 55:19
  78:24 79:14
  139:22 158:12
  168:12 265:1
multiples 90:5
mulvaney 9:18
  10:1
mute 22:7 82:2
  272:3
muted 60:2
mystery
  237:16

**n**

n 4:1 8:10 16:1
  279:1,2,6
n.w. 9:12
nacif 9:7
name 141:10
  185:10 269:13
  269:14
names 222:18
  270:19
narrative
  91:11
narrow 165:1
  171:17 192:24
  195:3
narrower
  191:19
national 7:1
nationally 50:9
natural 249:5
nature 19:25
  21:21 96:12,13
  96:14 144:8

**[nj - obligation]** Page 56

nj 9:21 10:4
nobody's 29:12
  36:23 37:1,22
  122:20 163:21
  254:1,2,7
noise 81:25
non 34:23
  161:9,10,15
  162:3,7,24,25
  181:6,14
  188:14,15
  200:2 234:18
nonbinding
  88:25
norm 111:13
normal 38:25
north 10:19
  12:19
nos 3:16
note 18:19
  28:14 78:19
  121:21 175:6
  198:23,25
  236:18 238:9
noted 115:17
  130:5 225:2
  229:4
notes 97:9
  219:21
notice 30:14
  36:25 37:1
  38:17 48:3
  88:13 90:14
noticed 222:24
notices 161:14
notification
  214:18

noting 42:16
notion 176:11
  243:14 249:22
notwithstand...
  55:22
november
  247:21
nowadays
  112:20
nuance 92:4
number 18:2
  27:3 35:8 53:8
  53:15 74:21
  75:25 79:22,24
  84:19 87:17,24
  95:20 96:19
  104:2,6 126:8
  128:13 132:6
  143:8 155:7,12
  156:12 160:16
  161:7,22 164:9
  169:23 185:20
  185:21 199:16
  223:24 227:11
  228:13 240:25
  241:5 242:17
  242:19,19,23
  267:19
numbers 67:25
  69:25 81:21
numerous
  47:14 57:11
  250:17
nw 5:3 7:3
ny 44:15,22
  6:11,19 7:12
  8:19 9:5 10:11

11:4 12:4,12
13:12,20 14:11

**o**

o 2:8 16:1
o'clock 278:3
object 27:11,15
  91:19 95:16
  166:3 199:25
  208:9 215:2
  216:7 228:21
  231:13 232:1
  271:19
objected 27:4
  28:14 30:11,23
  77:23 79:23
  93:25 199:7
  207:25 240:3
  270:20
objecting
  127:21 166:1
  209:24 210:2,6
  241:7
objection 3:15
  28:1,9 30:13
  34:14 42:4,10
  48:13 66:2
  73:24 88:16
  91:17 92:21
  93:16 97:22
  98:6 104:25
  110:3 122:3
  123:17 125:13
  130:5,5 133:1
  133:4 138:1
  145:1,11
  151:25 163:1
  196:1 198:24

201:20 206:9
210:7,8,19
213:19 220:15
231:20 232:1
233:14 243:13
234:8 267:18
267:19
objectionable
  27:19 208:6
objections
  39:15 53:8
  71:23 95:2
  110:1,4,17
  116:16 117:1
  160:21 161:8
  162:18 189:22
  200:13 206:7
  200:23 213:21
  220:8 221:7
  225:3 227:9
  233:11 235:14
  236:7,18
  237:24 240:13
  240:13 243:3,6
  243:11,18
  244:21 273:10
objective 216:2
objector 59:22
objectors
  52:20,23 53:15
  54:25 82:9,11
  116:22,24
obligated 36:3
  53:25 189:8
obligation
  35:17,24 36:1
  37:4 38:3 39:6

**[nature - nits]** Page 55

160:11 212:16
272:11 273:17
ne 5:11,19
  11:10 13:4
nearest 198:8
nearly 24:21
  138:23 193:7
  233:25
necessarily
  95:6,6 149:19
  151:16 152:6
  199:13 266:23
  268:8
necessary 99:5
  116:8 140:16
  158:22 167:15
  200:1 220:1
need 24:14
  28:12 34:8
  42:5 50:24
  52:1 71:20
  81:12 99:12
  100:18 113:21
  118:8 124:12
  135:13 140:4
  146:23,25
  159:14 163:2
  176:19 186:18
  187:7 210:23
  211:25 212:10
  220:12 221:9
  221:23 222:6
  224:6 237:19
  240:5,17
  244:16,16,18
  244:22 251:22

256:6 260:10
260:10 262:8
263:22 264:6
266:10 267:7
269:6 275:9
276:8
needed 61:24
  62:1 146:13
  211:15 235:20
needs 43:21,24
  68:7 71:20
  210:12 266:23
negative
  116:23
negligence
  165:14 186:23
  186:24 187:7
negligent
  186:19,20,21
  187:6
negotiate
  184:12 186:3
  229:7
negotiated
  21:22 86:12,19
  87:1
negotiating
  153:19 192:12
  209:4
negotiation
  125:4 129:5
  226:10
negotiations
  217:1
neither 46:16
  276:1

never 66:9
  81:23 93:2
  100:8 169:10
  178:7 223:14
  250:24 255:14
  270:13
new 1:2 3,3,3
  4:6,15,22 6:11
  6:19 8:19 9:5
  9:19 10:2,11
  11:4,18 12:4
  12:12 13:12,20
  14:8,11 17:1
  23:22 24:1,1,3
  28:5 72:13
  102:19 110:18
  116:3,11,13,16
  117:2,25
  119:11 120:18
  120:24 121:1,2
  121:6,9,11,18
  121:25 122:12
  123:10,19,24
  124:5,18 125:9
  125:11,14,16
  125:23,24
  126:3 127:22
  128:2,18,22
  129:23,23,22
  136:13 194:13
  200:18 214:6
  227:18 228:7
  229:15
newark 10:4
newest 208:2
news 132:8

newsom 14:19
  132:25,25
  133:7 138:4
  139:1,5,21
  140:10 141:11
  141:12,13
  143:5,25 144:2
  144:4,6 145:2
  145:11,12,22
  146:18,23,25
  147:14 148:6
  148:13,20
  150:2,25 151:1
  152:21,22
  153:10 157:19
  157:21 158:19
  159:5,17,21
  160:19 165:20
  165:22,22,24
  166:13,13
  167:19 171:8
  238:2,4,4
newspaper
  66:4
nexo 90:3
nexus 247:18
nice 40:24
nigerian
  261:19
night 23:16
  34:16 47:20
  117:23
nights 91:14
nine 150:3
  250:19,25
nits 65:8

**[obligation - okay]** Page 57

58:3 82:11
197:15 204:6
obligations
  55:13 89:1
  184:1 200:3
  204:14
observed 60:19
obstacle
  233:25
obtain 174:18
  178:18 187:12
obtained 86:12
obvious 51:1
  228:11 233:6
  255:3
obviously 45:6
  45:8 84:4
  130:11 141:15
  153:22 169:2
  188:22 220:9
  235:1 268:20
occasions
  87:13 88:17
occurred
  250:16,24
  251:6,6,6,7
  272:21 273:12
october 247:17
  247:21 266:6
  273:4
od 152:13
odd 232:11
  233:22 268:2
odds 128:14
offense 238:7
  257:6

offer 17:13
  40:8 49:15,18
  50:11 52:13
  96:5
offered 50:17
  60:22 62:20
  65:2 66:19
  150:23 188:1
  237:5 261:8
  268:22
office 4:11 8:1
  12:1,8 13:17
  34:14 37:10
  93:15 131:10
  198:20 202:21
  206:5,8
officer 60:24
  108:5 174:20
  177:4 184:17
  182:22 220:9
  189:3
officer's
  103:23 110:23
officers 3:21
  108:15,21,23
  109:1,13
  173:16 175:4,5
  175:22 176:17
  177:7 180:6,10
  180:25 182:1
  182:24 183:11
  183:17,20
  186:8 217:4
official 3:15
  12:17 13:2,10
  204:11 280:5

officially
  216:13
offshoots
  137:11
oh 27:1 147:25
  155:14 169:14
  191:24 221:11
  221:14 239:21
  239:22 265:10
ohio 16:25
  123:11 126:3
okay 23:12
  25:24 31:8,19
  31:23 32:6
  33:3 35:16
  36:4,7 39:4,7,9
  40:12 45:1
  48:8,21 49:10
  50:5 51:3,15
  52:7,15 53:6
  58:19 59:2,2
  59:18 65:24
  70:9 71:17,22
  72:3 74:1 79:4
  81:9,17 82:3
  89:19,21 92:8
  93:13 97:7
  98:10,11,25
  101:24 105:15
  105:20 108:19
  109:5,15 112:2
  112:22 113:24
  113:25 114:2
  115:5,14
  117:10,12
  118:24 119:1
  120:17 130:4

131:5 132:6
135:8 136:15
137:13 142:10
142:14 148:3
150:17 151:19
151:21 153:4
157:15 160:18
160:22,23
161:5,7 164:11
165:9,12,19
166:12 167:18
171:6 173:3,5
180:23 185:11
189:6 190:8
191:2,8 192:4
192:15,23
193:6 194:10
195:25 198:17
200:15 201:2
205:8 207:13
208:23 209:1
213:7,12,16
215:7,8,13,23
216:16 220:6
222:23 223:15
234:10 235:14
237:3 239:18
244:5,5,8
246:13 250:4
251:10 252:15
256:21 257:13
257:19,22,23
258:21 259:8
260:2 264:9,24
267:12,14
268:9 269:5,15
270:8 271:23

275:4,11,19
276:19 277:5
277:11,14
278:6,8,14,18
**okike** 10:14
52:9,10,17,18
53:3,5,7 57:25
58:4,12,21,23
59:3,19 60:7
75:2 80:4,11
80:18,20 81:20
115:10,11,15
116:24 117:4,6
117:8,11,13,21
118:12,14,18
119:1,2,20
120:2,13,16
131:24 134:8
134:10 135:7
135:13 141:8
141:12 142:9
142:13,15,18
143:2,20 144:1
144:3,5 145:15
145:20 148:11
150:13,20
151:8,15
153:18 154:8
154:10 156:2
156:10 157:13
157:14 160:23
161:1,3,5,7
170:1 172:15
181:3 192:1,7
192:10 195:10
196:2,19 209:3
209:23 211:18

212:7 215:5
220:7,8 221:11
221:14,22
222:15,19
223:7,15,20
224:8,12
235:25 236:15
236:17 244:19
**old** 114:25
**ombudsmen**
91:24
**omissions**
186:19 187:6
256:9
**onboard** 54:22
86:15,21
**onboarding**
18:16,24 19:2
55:15 56:5,9
**once** 24:16
35:17 38:7
39:5 55:1
75:22 98:21
100:23 197:14
208:6 270:10
**one's** 138:10
**ones** 77:15
116:25 184:15
184:16 249:24
**ongoing** 61:17
69:3 88:1
111:18 198:13
258:4
**online** 105:9
168:15 169:15

**oops** 169:14
**opco** 56:4,8,12
56:20 225:14
227:3 228:12
228:18,21
229:2 231:9
**open** 32:18
82:1 106:16
112:7 113:13
113:22 140:23
146:11 158:3
244:21 250:21
276:17
**openminded**
262:14
**operating**
36:11 61:14
68:25 89:11,12
184:3 186:12
189:4
**operations**
25:15
**opinion** 50:8
50:12,16
**opportunities**
129:25 160:7
**opportunity**
17:18 20:14
21:22 22:1
51:21 52:21
60:25 86:7
103:8 123:24
134:2 140:6,18
140:24 143:18
147:9 199:9,14
199:25 200:8
200:12 205:10

222:10 245:8
250:25 262:10
271:19
**opposed** 37:9
232:23
**opposes** 196:3
**opposite** 24:11
32:9 246:19
**opt** 21:18
**opted** 162:2,4
162:15 165:7
166:18 181:8
**opting** 161:13
**option** 16:23
16:24 39:4,7
59:6,14 86:8
113:2 122:3,5
122:17,19
125:23 127:22
131:14,21
132:14 148:17
154:13,20
155:1 169:11
228:19 229:3
251:14
**options** 107:25
154:15,21
**order** 23:22
24:2,11,23
25:4,11,21
26:2 27:22
32:12 34:15,22
36:3,23 42:17
43:24 49:3
51:13 52:1
105:6 113:6
114:16 174:18

148:20 151:13
175:10 177:8
177:11 178:8
178:12 181:23
183:7,12 194:5
226:25 232:11
233:23 241:22
245:20 253:15
265:8 274:19
**participants**
34:23
**participate**
60:4
**particular** 68:9
93:21 110:2
129:14 140:6
141:22 156:1
164:20 208:11
208:13 218:11
219:8 228:24
246:21 251:16
261:2 263:14
264:5 276:19
**particularly**
19:25 65:1
88:11 129:5
195:14 201:18
208:14 220:3
241:11 261:16
268:14 272:10
272:20
**parties** 19:16
30:5,14,19
33:1 38:24
59:20 64:16
69:10,11,15
74:3 76:2

82:22,23 84:9
89:2 127:4,7
132:19 150:13
161:18,22
162:19 164:6
167:2,22
173:19,24
182:15 193:12
193:13,16
194:1,4,22
209:8 211:24
215:14 217:18
217:23 218:11
218:17 221:23
225:10 226:20
226:23 268:24
**partner** 255:10
**parts** 37:8
97:15 192:21
**party** 46:14,24
47:8 48:19
52:12 56:22
58:9 60:21
134:22 136:12
161:8,10,12,13
161:23 162:2,4
162:11,14,24
163:7 168:8
177:10 181:6
183:7 190:4,6
190:23 191:3
229:24 235:2
240:5 268:21
270:17
**party's** 161:10
**pass** 137:14
254:10

**past** 69:21
110:1 123:5
142:8 262:4
269:24
**path** 250:18
**patience** 258:8
**paul** 6:6 11:13
270:22
**pause** 58:22
59:24 68:18
69:18 71:14
81:19 154:9
170:3 172:17
173:1 259:15
**paxos** 89:20
**pay** 53:23 54:1
54:3 100:13,20
126:17 136:7
**paying** 216:22
222:12
**payment** 22:24
35:4
**payments**
175:7,11,12
217:23 218:2
218:17
**pc** 6:1
**pdf** 202:6
**peace** 178:18
**peachtree**
11:10 13:4
**peak** 88:4,5,7
**peculiar** 65:10
**peep** 172:10
**pejoratively**
119:21

**penalize** 29:14
**penalized**
26:15 29:7
**penalties** 26:7
29:8 31:7,23
32:14 205:24
**penalty** 33:10
**pendency**
75:10
**pending** 5:20
264:3,6,16
**pennies** 238:11
**pennsylvania**
5:3
**penny** 239:4
**people** 18:13
19:23 20:6
21:6 27:6 28:8
29:6,14 31:21
32:2,13 33:5
35:5,8,23 36:8
36:9,18,25
37:23 38:5,16
39:8 67:12
70:23 77:1
80:24,25 82:1
84:24 85:2,5
96:5 108:25
109:11 113:21
120:9 126:17
126:21 127:1
129:22 135:9
139:4 140:5
142:20 147:19
150:18 152:9
155:3 156:21
158:10 159:10

191:18 196:21
196:25 197:14
198:9,25 199:3
200:9,10
202:18,24
203:10 205:5,6
205:23 206:4
208:1,4,19
209:16,19,25
210:1,13,19,21
210:22,23,24
211:20 212:1
213:22 220:11
222:24 223:24
224:5 242:3
244:23 247:9
253:7 258:19
259:22 260:12
271:2 272:13
277:18,20
278:2,5
**ordered** 36:19
38:7
**ordering** 36:21
**orders** 192:11
195:4 214:19
269:20
**ordinary** 175:8
253:21
**organization**
133:19 177:8
178:10
**organize**
258:17
**organized**
35:14,15

**original** 24:11
221:15
**originally**
160:1 193:8
**orms** 3:24
280:3
**ought** 29:16
204:12
**outcome** 26:3
119:11 141:2
**outset** 90:21
**outside** 61:7
62:14 87:21
231:24 232:14
273:11
**overall** 148:12
158:5 175:10
**overlap** 72:6
190:20
**overlapping**
34:20
**overly** 151:18
166:20 213:10
**overnight**
42:17
**overreaching**
237:10
**overrule** 48:12
**oversight**
227:16 228:3
230:3,6
**overwhelming**
77:7,10,17
**overwhelmin...**
85:11 268:17
**owe** 58:10

**owed** 263:6
**own** 30:15
59:11 67:2
74:10,13 84:4
107:9 119:13
123:1 136:3
137:12 140:22
162:21 163:19
164:1,21 166:4
166:8 167:7
181:9 189:3,3
205:5,5 213:1
225:20 230:15
277:24
**owned** 142:17
163:22 175:17
**owner** 106:14
106:15 111:1

**p**
**p** 4:1,1 16:1
**p.a.** 8:9
**p.c.** 7:9
**p.m.** 115:8,8
173:4,4 257:24
257:24 259:23
278:21
**p.o.** 8:4
**paces** 5:19
**package** 158:8
217:2
**page** 16:19
17:2 94:18
95:9,10 96:21
96:23 202:6
206:15 244:22
258:18 279:3,7

**pages** 83:14
95:9 252:18
153:5 242:18
218:2
**painful** 72:14
**paint** 274:24
**pam** 185:3
**papers** 123:3
**paperwork**
252:22
**paragraph**
27:20 200:25
202:23 206:5
208:1,3 210:19
213:18 214:25
217:14 218:21
**paragraphs**
201:20 206:5,6
206:7 208:4,11
208:19 209:6
212:13 213:9
219:1
**parallel** 16:23
**parameter**
270:4
**parcel** 177:11
**pardon** 172:18
**parent** 99:11
99:22
**parenthetically**
210:23
**parse** 249:17
**part** 19:2,3,8,9
20:25 21:3
22:19 23:8
46:12 75:15
122:2 146:8

163:18,19,20
164:3,8,9
165:5 167:23
168:7,14,16,17
168:20,25
169:1,3,5,13
169:19 170:10
170:13,15,21
171:15 180:3
180:17 181:9
189:20 191:6
204:24 205:19
205:23 219:18
221:13 222:11
223:18 236:13
242:17 253:1
254:15 257:8
260:20 261:11
261:18 263:1
264:1 273:6
276:16 277:6
277:18
**people's**
159:12
**perceive** 23:25
**percent** 19:10
54:9 57:19
77:6,9,10
80:23 95:21,22
116:12,13
148:6 156:12
156:13 162:1,3
162:5,7 169:1
204:19 237:17
242:23,24
258:11,16
270:12

**percentage**
96:23 156:19
158:5 242:18
**perdue** 199:19
**perfect** 38:19
197:25 248:8
**perfectly** 33:20
**perform** 55:13
103:1 197:23
220:5
**performance**
197:10,11
**performed**
54:2 90:7
217:18 218:2
250:23
**performing**
33:2
**period** 57:3
71:8 86:17
176:1,5,6,13
176:14,15
214:23 247:19
217:18
**permanently**
181:8
**permission**
26:6 30:10
42:23 47:3
82:2 245:21
264:7 266:10
278:14
**permit** 26:11
120:1,4 248:13
**permits** 136:11
**permitted**
96:12 199:20

**perpetrator**
261:4
**perpetrators**
263:15
**perpetuity**
232:19
**person** 24:7
62:10 63:6
65:11 104:16
107:14 163:14
163:15 203:7
210:25 230:13
270:23 278:10
278:11,13,13
**personal** 19:24
33:5 72:18,18
250:23
**personally**
3:13 55:21
98:18,23
148:24 153:11
183:1 204:15
205:24 209:8
247:20 274:11
274:20 275:13
**persons** 171:18
171:19 205:16

**perpetrator**
222:9
**perspective**
17:20 83:13
91:22 104:23
125:7 135:2
141:9 142:1
194:23 200:1
212:15
**pertained**
272:16
**pertinent**
93:19
**petition** 119:4
133:17,21,23
143:15 154:10
156:4,4,18
157:6 174:4
191:7 214:22
219:14 220:19
274:2
**ph** 19:5 32:25
177:25 178:9
178:16 184:4
184:21,21
185:3,5,6
207:15 220:13
220:17 230:1
**phase** 30:3
**philip** 184:21
**phone** 22:7
27:12 59:25
60:2 107:24
144:18 189:16
235:19 260:3
261:17 262:4
271:1 273:6
274:6 278:10

## [phone - please]  Page 62

278:14,18
phonetic
135:14
photo 112:12
phrase 125:20
phrased
124:10
pick 255:10,12
270:21
picking 62:2
piece 44:18
piecemeal
154:2
pieces 46:10
pii 81:22
pinch 238:11
pinching 239:4
place 51:15
98:8 158:14
224:1,6 232:6
232:8,20
246:25 247:1
278:15
places 67:8
plain 170:16
170:18
plainly 40:25
45:16 46:5
plaintiff 1:11
1:18 187:5,6
187:11
plan 3:2 16:11
16:18 17:1,2
17:12 20:17,19
23:19 24:21,23
25:7,23 26:22
27:20,22 28:15

30:2 34:2
35:15,16,18,18
35:21,23,25
36:19 37:5,21
38:1,2,4 39:3,6
39:7 40:8
42:16 43:3
44:1 46:5
49:15 50:2,23
52:5 53:9,10
54:24 59:15
61:9,9 63:11
63:15,17,21,22
67:23 75:15
77:7,9,18 78:5
79:20 83:15
84:21,25 85:6
85:7 86:1,7,10
87:16 90:17,24
92:10 96:8
99:2 115:23
116:4,13,14,20
117:15 119:17
120:21,22
121:4,20
122:10 123:4,6
125:22 126:9
126:16 131:17
133:2,15 141:4
141:20 147:4,6
147:7 151:13
152:18 160:6
161:9 162:11
162:14 165:3,6
167:4 173:19
173:20,23
176:18,25

177:17,20
180:17,18
181:11,24
182:17 184:11
186:2 192:4
193:17 194:12
195:13,17,20
195:24 196:21
199:1 200:21
201:14 202:4
203:25 206:20
209:10,25
210:21 211:20
213:19,22
214:5 215:18
215:19 216:1,6
220:1 221:15
222:4,9,25
223:5,8,9,13
224:14,22
225:3 226:24
227:6,11,14,17
228:2 229:22
230:4,5,11,16
230:17 231:20
232:1,16,17
235:15,19
236:18,24
237:1 238:12
238:17 239:1
239:15,24,25
241:9,23,24
242:1,2,7,8,9
242:10,25
243:2,4,9,10
243:12 245:24

246:2,25 247:2
247:3,6 248:19
248:20 266:21
266:21 267:4
268:17,17
272:8 273:19
274:15
plans 152:25
platform 18:11
20:11,15 21:23
21:25 53:24
54:20,22 55:2
55:9 56:15
57:18 60:9
61:21 65:17
75:20 83:18
104:4 105:10
106:11 107:3
107:6 108:2,8
108:10 111:24
111:24 112:6
112:21 115:25
130:16 143:7
148:8 160:17
167:6,7 175:23
176:3,6 187:3
207:10 220:18
220:21 241:18
261:19
play 196:7
plaza 7:11
plea 159:21
pleadings
214:18
please 16:2
22:8 51:19
59:2 78:19

## [please - possible]  Page 63

80:14 82:2
115:5,9 149:12
153:13 155:8
156:8,9 172:23
198:12 218:9
256:19 260:8
262:7,12,14
263:20
pledge 56:25
56:25
plethora 91:7
plus 140:13,22
podium 49:14
52:8 68:5
85:15 192:9
pohl 171:11
173:12 174:15
178:15 181:12
182:8 186:11
186:15,24
187:9,16
188:23 216:24
pohl's 173:11
186:6 217:15
218:21,25
point 18:18
63:18 72:11
19:7 20:13
21:14 29:1
33:17 41:1
49:1 57:25
61:23 63:2,5
65:10 68:14,22
71:19 74:1
77:4 80:23,23
81:21 83:21
84:15 94:12
95:15 96:24

99:19,24 102:8
102:13 106:5
106:22 109:15
110:2 111:20
122:16 125:15
126:12 127:11
130:8 131:19
132:17 141:22
142:3 146:13
150:2 152:12
157:23 163:17
167:11 189:23
190:23 198:15
200:18 206:2
210:23 211:16
217:14 219:25
220:14 233:20
236:17 245:6
247:24 248:9
250:22 254:23
258:21 259:25
268:23 276:19
276:23 277:7
278:4
pointed 38:1
63:18 72:11
76:9 124:24,25
127:19 146:13
219:2
pointing 217:5
pointless
245:24
points 60:7
62:6 64:13,15
70:9,13 71:16
71:25 72:2,6
73:14 85:22

102:7 108:9
110:22 130:6
201:13 219:8
222:23 236:13
244:15,21
254:2 258:18
261:23,24
267:19
police 211:16
policies 55:17
224:2
policy 17:11
18:19 105:9,11
186:1,2 224:4
224:6
ponzi 260:11
260:17,18,19
261:1,4,8,12
265:4,12,20
pool 85:3
poor 142:11
poppiti 7:22
portfolio
148:12
portion 104:5
112:5
portions 27:19
73:6 201:19
position 19:18
23:18 25:6
29:2,17 31:1
32:11 39:12
43:12 46:8,9
47:23 48:7
50:19,21 53:2
69:23 73:16
88:9,11,16,24

90:9,12,23
100:24 105:7
139:12,23
143:13 153:9
155:2 158:1
175:17 204:11
205:9,22 206:3
220:20 230:3,5
230:23 238:6
244:6,9 268:11
274:9
positions
139:22,23
positive 35:24
36:1
posner 11:6
225:2
possesses
261:25
possession
91:6 208:8
250:7
possibility 20:2
70:18 121:14
122:11 189:10
possible 17:5
26:24 34:16,23
34:24 72:13
35:9 86:9
90:22 102:20
103:14 121:16
126:2 128:16
129:6 130:13
140:3 153:13
172:4 179:4,21
185:24 203:19
237:18 239:14

## [possible - prior]  Page 64

245:18 271:7
273:2 276:18
possibly 64:22
64:24 81:5
97:25 104:10
122:13 129:23
136:13 188:19
262:11
post 121:10,18
121:19 122:5
122:13 124:5
127:25 133:14
143:24 144:13
174:4 177:2,6
194:24,25
214:22 219:14
224:21 226:25
224:23 230:14
230:23 232:9
241:6
potential 31:2
67:19 171:12
174:6,8 175:21
178:3 183:16
183:21 184:16
185:8,13 205:7
217:5 219:12
237:13 241:1
potentially
18:24 46:21,23
47:8 116:5
118:3 137:19
137:22 156:13
186:22,22
203:11 211:10
224:3

power 25:10
38:15 108:15
108:25 200:23
powers 200:23
200:24 211:17
practical 61:13
61:19 69:4
96:4 140:2
144:17 146:17
146:21
practically
32:10
practice 94:25
99:23 133:14
143:24 144:13
174:4 177:2,6
pre 3:23
214:22
precious 76:4
224:21 226:25
precipitates
138:16
precise 28:13
96:4,15 173:9
253:22
precisely 28:23
96:11 154:23
preclude
209:14
predict 67:9
prediction
68:14
prefer 121:25
127:15 129:22
224:23
preference
34:5 172:5,7
173:22 174:3,6
175:21 178:7
180:11 243:7

preferences
175:3,18,19
180:18
preferential
175:8
premise 52:4
273:3
prep 277:16
preparation
75:5
prepare 114:15
prepared
33:21 35:9
40:13 43:8
52:2 187:19
199:23
preparing
50:11
prepetition
217:22 218:17
preponderance
253:20
present 111:19
224:25
presented 68:2
171:4,4
preserve 184:9
185:24 199:25
205:20
preserved
183:8 226:24
press 77:6
87:24 174:14
181:18 183:23
presume
123:13 230:4

pretty 51:1
74:25 128:2
137:13 145:12
190:18 230:9
240:4
prevent 183:15
prevented
199:22
prevents
122:15 188:8
previous 51:24
previously
61:17 68:24
111:2 210:1,22
229:4 277:4
price 19:2,7
21:10 102:12
140:23 144:7
144:10,22
147:12 154:19
156:4 157:10
158:9 159:13
prices 19:17
pricing 19:4
primarily
166:22
primary 18:25
59:21 154:4
188:23
prior 72:12
99:19 133:17
133:23 156:23
175:24 196:7
210:24 211:3
216:14 222:9
223:17 226:22
233:10 236:23

## [prior - proposed]  Page 65

242:4
prithipaul
185:2
privacy 17:10
18:19 91:23
105:9,11
private 270:10
pro 3:18,23
14:16,17,18,19
14:20 78:12
85:15 93:9
103:17,22
119:5 132:25
133:25 139:15
141:21 142:20
146:9 150:8,9
153:7 165:22
168:3 207:4
236:4 251:13
254:18 262:6
262:12 263:18
269:11 271:10
272:4 274:17
probably
43:12,13 44:23
64:10 100:20
113:8 130:21
130:25 135:17
140:11,13
144:23 146:4
147:16 148:24
209:11 218:19
224:9 234:16
251:20 256:8
275:25
problem 17:14
24:24 27:8

120:15 148:13
148:20 158:17
169:9 193:15
197:6 204:22
204:22 211:6
217:12 222:11
252:15
problematic
202:22 206:11
228:9
problems
23:12 168:4
procedural
274:19
procedure
264:21
procedures
22:9 23:23
55:17 255:4
264:1
proceed 30:20
52:3,5 58:1
153:21 268:16
268:18
proceeded
30:15
proceeding
31:11 52:23
88:22 106:16
111:12 167:7
225:18 264:5
264:18
proceedings
111:11 245:17
278:20 280:5
proceeds 75:15

process 23:23
66:8 103:13
114:8 123:22
134:17 169:13
171:3 178:11
215:15 219:14
241:13,21
242:7 259:20
269:1 276:17
proclaimed
252:12
produce 167:5
233:8
produced
82:10 125:6
productive
115:16 118:3
profess 247:12
professional
61:3 171:18
223:1 236:20
239:7
professionals
60:11 82:20
83:23 84:1
87:11 89:21,22
90:16 111:3
152:24 190:14
191:14 193:11
194:13,17
241:14 273:15
274:14,18
277:8
prohibitive
176:16
prohibits
28:20,20

promote 91:11
promoting
136:24
promptly
48:17
pronounce
183:3
proof 70:19
100:21 157:23
209:20 210:3
210:11 211:3
223:12 253:11
253:16,16,19
256:17 257:2
263:4,7 266:1
266:7,9
proofs 3:16
210:12 216:1
262:17
proper 28:6
49:24 240:17
property 71:11
87:3 175:17
187:18 208:6
211:2,14
220:21
proposal 50:23
77:24 129:24
245:6
propose 26:22
39:18 51:4
52:3,19 115:12
161:9
proposed
23:22 24:2
25:4 27:22
28:5 34:15

**[proposed - pull]**                              Page 66

40:6,22 44:3
54:18 72:22
114:17 130:2
164:2,15 171:8
171:18 172:14
176:25 177:14
183:5 189:7
194:2 195:8
198:25 199:3,3
202:23,24
208:1,3 222:24
223:24 260:1
271:2 277:17
**proposing**
28:13 29:15
53:5 123:11
**proposition**
22:4
**proprietary**
111:6
**prosecute**
276:25
**prosecuted**
182:18 203:14
203:16
**prosecution**
3:20
**prospect**
150:18
**prospective**
193:18
**prospectively**
191:5
**protect** 37:18
72:19 76:7
90:8 91:23
212:17 213:4,5

**protected**
195:16
**protecting**
83:18
**protection**
94:15 149:4,10
**protections**
55:25 57:6
86:11 231:22
**protocol** 74:5
74:10,14,15
**protocols**
55:17 60:14,21
61:7,25 63:1
65:4,6 67:1
82:23 84:2
106:15
**prove** 43:21
101:8,13
176:13 186:18
187:5,7 262:10
**proves** 101:10
**provide** 57:16
99:15 102:16
119:15 135:17
159:17 164:10
222:10 272:23
**provided** 43:7
47:12 65:15
69:25 74:20
75:7 86:5
103:5 105:3
186:14 193:17
196:13 203:2
210:20 214:24
216:1

**provides** 18:19
20:9 53:10
141:20 228:17
237:1
**providing**
38:10 102:19
116:6 129:25
150:22 151:4
237:8
**proving** 210:14
**provino** 14:21
78:9,11,11,15
79:5,7,10,16
80:2,5,9,13,19
80:22 81:11,15
81:23 93:9,9
97:8,9 251:11
251:13,13,20
254:18,18,21
259:2,4,4,9,11
259:14 260:5,5
260:6,15
261:10,15
262:19,22
263:17,22
264:10,22,25
265:6,10,16
266:3,8,16,17
267:6,13
**provision**
27:21,22 33:23
34:1 40:15
61:2,23 169:24
170:5 190:21
191:15 192:22
193:19 194:6
194:12 196:13

199:2 201:14
202:5,9 204:13
210:13 211:10
211:15,19
214:1,21 216:6
220:10 223:13
232:25 233:7
267:2
**provisions**
27:25 42:16
58:5,17 86:24
87:1 102:4
178:21 190:21
199:17,20
200:22 208:25
209:5 223:8,23
277:19,23,25
233:22,23
**psaropoulos**
171:10 182:4
182:21 183:3
183:11 184:14
184:19 185:4
185:14 187:14
187:22 189:7
216:25
**public** 136:18
145:25 271:22
218:16 272:19
**publicly** 69:6
225:8
**pull** 108:2
170:14

**[raised - receive]**                              Page 68

47:18 52:20
59:22 60:7
97:12 113:21
117:1 166:24
212:13 231:23
232:3 233:4
244:8 254:6
267:19
**raising** 65:14
270:11
**raitt** 6:1
**rampant**
112:20
**randall** 9:16
**range** 155:21
189:9
**rata** 119:5
133:25 139:15
141:21 142:20
146:9 150:8,9
**rather** 21:4
34:2 38:8 53:1
53:25 56:2
124:4 135:19
139:12,13
147:5 172:2
226:8 268:24
**ratio** 65:21
**rationale**
176:17
**rawe** 15:15
**ray** 226:16
230:20,22
237:21
**raznick** 6:2
15:3 67:20

**reach** 116:19
117:14 118:19
159:15 215:15
270:6
**reached** 76:17
115:18 117:19
117:22 227:4
**reaching** 127:8
237:10
**read** 27:17
69:21 92:20,22
92:24 93:3
94:16 95:4
103:23 143:25
168:11,12,18
170:24 171:21
179:9,10 192:4
202:21 211:16
218:8 247:8
256:7 278:4
**reading** 25:21
91:15 93:10,18
168:16 196:15
**reads** 202:10
**ready** 16:3
85:17 173:5
196:8
**real** 126:13
143:22 145:8
151:25 228:4
241:11 261:13
**realistic** 122:5
122:7,11,16,19
125:23 127:24
154:19
**reality** 141:17
143:20

**really** 24:22
39:21 50:3
62:13 71:18
76:12,19 92:19
92:21 95:23
118:1 119:24
125:3,6 130:2
132:16 136:20
136:24 138:18
138:18 154:2
155:2 162:23
163:12 168:12
169:19 181:13
188:3 197:21
200:7 230:10
233:22,23
240:7,9,17,18
242:17 246:7
247:2,9 251:1
254:3,7,8
257:9 264:16
266:19 267:21
267:23 272:25
273:2,11,12,22
274:4,5,13,23
275:10 276:5
**reason** 18:23
19:1,22 20:4
22:23,23 29:19
59:8 65:4,5
71:19 72:16
78:16 86:10
87:8 125:3
126:9 152:14
152:3 167:14
211:18 217:3

234:1 261:2
**reasonable**
56:10 62:7,8
62:10,11 63:6
65:11 179:17
179:24 223:18
253:13
**reasonableness**
189:9 223:4
**reasonably**
64:23 75:16
144:7
**reasons** 106:16
125:2 130:11
**rebalancing**
26:19 44:6,9
44:19,20,24
45:1,1,12,13,20
45:21,23 46:12
46:15,25 47:7
49:5 51:25
142:19
**recall** 99:18,18
117:2
**receipt** 56:10
56:11
**receive** 80:19
108:12 112:1
115:19,22
116:1,7 119:5
119:15 120:6
121:17 122:15
124:6,7 126:12
139:15 141:21
144:24 151:23
152:24 155:4
196:25 211:1

**[pullen - raised]**                              Page 67

**pullen** 9:10
**pulman** 9:10
9:16
**pump** 158:8,11
**pumped** 158:9
**punish** 32:2
**punished**
29:20 204:25
**punishment**
36:2
**punishments**
36:9
**purchase** 19:2
19:7 21:10
55:14 58:14
72:9 76:3
102:12 111:5
**purchased**
44:5
**purchaser**
52:21 60:16
72:13,22 208:5
208:6,8 212:17
213:5
**purchases**
44:10 208:6
**purchasing**
151:4
**purport**
163:24
**purported**
199:5
**purporting**
276:9,10
**purpose** 35:15
90:8 206:3
242:5 274:24

**purposefully**
205:21
**purposes** 48:24
60:25 61:13
120:22 250:2
260:22 262:23
**pursuant** 49:5
51:25 181:24
182:16 184:2
194:13
**pursue** 35:7
145:23 149:11
161:20 166:12
182:25 185:13
275:21,22
276:8
**pursued**
167:13 186:17
275:11
**pursuing**
174:20 176:20
179:19 185:19
221:19 240:25
**purview**
197:18 215:1
**push** 170:14
**pushed** 91:18
248:7
**put** 26:4 38:23
70:19 71:14
83:13 95:8
98:4 153:16
165:16 176:5
200:5 232:17
235:20 243:20
248:4 262:11
268:24

**putting** 37:7
67:21 119:21
125:20 150:6
245:14

**q**

**qualification**
99:14
**quality** 146:3
255:20
**quarter** 258:16
**question** 21:20
22:8 35:20
37:25 38:11,12
43:10,15 51:1
53:15 54:25
68:17 90:19
102:25 103:2,3
103:4 106:20
106:21 108:13
114:5,20
119:24 120:21
121:8 147:20
151:20 153:20
155:6 176:20
177:1 192:8
207:6 242:15
261:22 262:5
264:25 265:8
265:14 269:12
271:13
**questions**
42:24 66:3,5
66:23 72:21
73:3,8 84:16
97:13 99:20
132:11 181:13
228:20 243:24

244:4,11 260:7
265:1 276:14
276:16 278:1,5
**quick** 110:16
207:6 271:13
272:8
**quicker** 125:13
**quickly** 21:8
33:15 84:15
85:9 86:9
90:22 103:14
112:1 128:16
153:1 212:12
245:18 273:2
278:17
**quinn** 8:16
173:7 216:19
**quite** 32:9
78:13,15 96:3
114:13 164:23
164:25 175:16
214:11 232:15
242:15 260:18
271:2 276:13
**quote** 88:13,24
89:7 169:24
**quoted** 95:20
95:21 210:20
**quoting** 173:24

**r**

**r** 2:8 4:1 16:1
279:6
**raise** 30:1 97:5
98:12 193:23
213:23
**raised** 19:17
30:12 43:1

**[receive - regrouped]**                              Page 69

221:2 238:18
**received** 62:15
63:4 83:24
95:3 105:23
160:1 174:23
174:24 182:14
229:2 254:25
261:17 262:3
**receiving**
133:22 139:16
142:4 160:4
174:3 181:24
196:5
**recent** 90:1
116:17 200:21
227:5 255:1
**recently**
117:23
**recess** 51:15
245:7
**recessed** 51:18
115:8 173:4
257:24
**recharacteriz...**
226:3,12
227:25
**recipient** 264:5
**recognize** 59:7
78:5 131:3
196:19
**recognized**
50:9 239:8
**recognizing**
77:25
**recollection**
256:1

**recommenda...**
241:14
**reconnect**
247:23
**reconsider** 3:1
**reconvened**
51:18 115:8
173:4 257:24
**record** 49:13
52:16 78:19
81:6 93:12
100:10 131:9
150:20 165:13
172:12 173:7
198:23 200:5
205:15 219:19
253:6 254:3
255:7 258:3
259:17 277:15
278:4
**recording**
280:5
**records** 116:25
**recourse** 182:6
**recoveries** 73:8
96:7,8,9,17
116:5 142:20
152:2 221:3
224:24 229:2
261:5
**recovering**
241:2
**recovery** 90:12
90:20 119:5,9
119:9 121:15
122:4,12,15
125:14 126:13

134:2 140:18
140:24 141:2
141:21,21
143:19 145:7
147:10 155:8
155:20 156:1,3
156:9,13 159:6
160:7 189:10
221:5 231:16
234:1 237:13
239:13
**recuse** 236:15
**redo** 66:7,12
269:23
**reduce** 57:7
269:2
**reduced** 44:23
**reduces** 18:15
19:1
**reducing** 145:7
**reductions**
270:1
**refer** 110:23
205:15
**reference**
39:23 94:19
173:21
**referenced**
81:22 277:4
**references**
27:20 208:3
**referred** 225:8
**referring** 201:1
217:24 276:21
**refers** 174:1
227:21

**reflected** 92:15
161:13
**reflecting**
159:9
**reflects** 206:4
**refusal** 90:9,23
99:9,10
**refuse** 90:17
153:1
**refused** 86:18
100:2 157:25
**refusing** 47:23
**regard** 70:22
94:3 131:17
223:4 272:20
277:9
**regarding**
30:12 33:18
42:25 57:12
60:13 72:7
74:13 76:6
84:2 109:23
193:22 194:20
198:14 201:5
207:22
**regardless** 18:7
99:13 109:19
91:23
**regards** 157:23
272:4,11
**regime** 128:3
128:10
**register** 68:7
**registration**
25:16 68:10
**regrouped**
23:17

| | | | |
|---|---|---|---|
| **regulation** | **reimbursement** | 170:23,25 | 174:14 176:24 |
| 14:1 24:6 | 58:15,18 | 171:1 172:2 | 177:9,13,22 |
| 37:14 | **reisman** 4:8 | 174:6 176:19 | 179:20 180:3 |
| **regulations** | reiterate | 176:22 177:5 | 180:13,25 |
| 29:9 35:9 | 268:10 | 178:20,21 | 181:6,8,10,18 |
| 120:4 121:1 | **relate** 23:19 | 179:2,10,10,12 | 183:24 188:5,7 |
| 128:11 194:14 | 110:3 203:24 | 181:23 183:6,8 | 188:16 189:18 |
| 203:5 | 277:23 | 183:13 188:21 | 189:20 190:4,4 |
| **regulator** | related 110:5 | 190:21 194:23 | 190:6,8,13,23 |
| 24:24,25 26:15 | 111:5 181:14 | 195:3 208:5 | 191:5,13 |
| 64:12 | 195:3 224:20 | 211:21 216:23 | 193:18 195:8 |
| **regulators** | relates 107:23 | 217:11 276:9 | 207:22 208:4 |
| 26:25 29:9 | 133:1,16 | **released** | 216:21 218:5 |
| 67:10,10 69:17 | 166:19 203:19 | 161:12 164:17 | 219:12,16,20 |
| 70:5,6,23 | 238:10 264:17 | 167:4 171:25 | 265:3,11,15,17 |
| 71:15 99:25 | **relating** 182:5 | 173:19,22,24 | 265:18 |
| 181:7 189:1 | 188:20 203:8 | 177:10 178:24 | **releasing** |
| 204:7 | **relationship** | 180:21 181:4 | 162:9 167:11 |
| **regulatory** | 110:25 | 181:21,23 | 174:10 175:11 |
| 26:10 27:23 | **relationships** | 182:3,12 | 178:6 182:1,6 |
| 28:18 30:14 | 91:25 | 183:10 191:3 | 182:13 |
| 31:25 32:9 | **relative** 116:5 | 193:12 211:23 | **relevant** |
| 33:7 38:21 | 143:11 149:6 | 219:15 276:9 | 264:18 |
| 58:6,16 61:17 | **relatively** | **releasees** | **relied** 100:7 |
| 67:6,8,18,19 | 124:4 143:1 | 190:17 | 101:17,19,21 |
| 69:3,9,14 | 148:4,11 149:7 | **releases** 84:10 | **relief** 3:19 |
| 70:16,21 71:1 | 171:17 222:23 | 87:24 98:13 | 48:18 49:25 |
| 71:3 81:4 | **release** 161:8 | 102:3 160:25 | 51:12 114:12 |
| 88:13 90:14 | 161:10,14,23 | 161:1 162:11 | 114:17 139:1 |
| 116:9 119:24 | 162:2,4,12,13 | 162:21,24,25 | 166:14 210:1 |
| 123:2,22 | 162:14 163:14 | 163:7,11,18,20 | 210:22 267:1 |
| 125:10 128:13 | 163:15,16,24 | 164:12 165:1,4 | **relies** 262:3 |
| 129:13 130:1 | 164:3,6,8,15 | 165:6,13 | **relinquish** |
| 130:11 131:20 | 164:22 166:8 | 166:19 167:22 | 274:13 |
| 146:4 162:20 | 166:11 168:6,9 | 168:4 170:8 | 274:13 |
| 211:17 217:21 | 168:11 169:1 | 171:4,6,9,18 | **relying** 50:18 |
| 218:15 | 169:22 170:6 | 171:20 172:13 | 50:21 277:8 |

| | | | |
|---|---|---|---|
| 226:10 245:5 | 126:8 192:7 | **retain** 56:13 | reviewed 55:18 |
| 245:19 258:5 | 195:6 259:24 | 181:7 230:24 | 82:23 83:23 |
| 258:10 278:17 | **responded** | 272:10 | **reviewing** |
| **resolved** 17:3 | 47:14 | **retained** | 277:18 |
| 39:15 215:9,20 | **response** 52:14 | 182:16 190:13 | reviews 60:21 |
| 225:2,6 226:22 | 105:23 141:7 | **retaining** 57:4 | **revised** 16:18 |
| 226:25 229:5 | 194:1 231:22 | retains 231:9 | 17:12 28:24 |
| 229:18 232:5 | 254:8 258:14 | **retention** | 30:17 34:16 |
| 233:16,17,19 | **responsibility** | 270:22 | 49:15 199:3 |
| 233:19 | 141:5 | **retroactively** | **revisions** |
| **resources** | **responsible** | 25:25 | 115:23 |
| 20:25 21:3 | 35:3 240:25 | **return** 26:2,23 | **rewards** |
| 65:23 176:16 | 241:4 | 95:20,24 160:2 | 135:24 179:18 |
| 245:14 | **rest** 113:14 | 160:4 220:17 | **richard** 12:14 |
| **respect** 16:21 | 188:5 278:14 | 237:17 268:25 | 33:15 72:4 |
| 42:18 53:14 | **restarting** | **returned** | 79:12 97:11 |
| 55:14 58:23 | 57:18 | 223:11,21 | 190:2 196:10 |
| 73:9 88:2,9,16 | **restrictions** | **returning** | 213:13 244:7 |
| 89:10 118:7 | 123:2 | 128:15 | 270:15 |
| 135:3,10,15 | **restructuring** | **returns** 94:20 | **rid** 21:15 |
| 141:14 152:22 | 24:5 30:9 | 241:6 | **riffkin** 12:6 |
| 153:24 166:16 | 82:19 83:23 | **reuters** 88:2 | **right** 16:2 |
| 175:3 182:25 | 84:1 203:4,8 | **reveal** 158:1 | 17:10 19:21 |
| 185:25 195:10 | 203:12,14,20 | **revealed** | 20:19 21:15,18 |
| 210:1 218:4,23 | **rests** 243:14 | 207:19 | 22:11,12 23:10 |
| 220:16,24 | **result** 129:13 | **revenue** 252:10 | 28:3 30:21 |
| 221:24 222:8 | 147:6 221:4 | 255:24 | 34:8 37:9 |
| 226:18 230:4 | 225:15 226:22 | **reversal** 175:9 | 40:12 41:4,14 |
| 275:23 | 249:13 | **reversible** | 42:8 44:22 |
| **respectfully** | **resulted** | 48:23 | 46:6 49:11 |
| 19:8 39:13 | 276:12 | **review** 42:20 | 50:25 56:13 |
| 180:8 205:10 | **resulting** 35:4 | 51:11 60:15 | 64:4 78:3 79:9 |
| **respects** 203:1 | **results** 116:10 | 65:3 99:24 | 80:3 82:1 |
| 210:21 | 129:13 | 179:5 223:1 | 84:11 90:25 |
| **respond** 47:11 | **resume** 278:3 | 264:22 277:17 | 94:12 97:19 |
| 79:1,12 84:15 | **retail** 17:21,21 | 278:1 | 98:17 99:22 |
| 102:6 105:7 | 21:21 90:10 | | 100:14 101:9 |

| | | | |
|---|---|---|---|
| **remain** 139:7 | 178:9,15 | **representing** | **requirements** |
| 146:2 158:14 | **renzi's** 49:20 | 93:6 120:17 | 41:14 56:5,9 |
| 204:21 | 219:1,25 | 240:11 | 92:10 107:12 |
| **remainder** | 220:25 | **represents** | 119:25 124:20 |
| 18:1 158:2 | **reorganization** | 230:11 | 128:9,10,13,19 |
| **remaining** 85:2 | 63:16 64:6 | **request** 19:8 | 264:4 |
| 85:3 193:3 | 203:25 224:14 | 42:22 47:3,12 | **requires** 20:24 |
| 278:5 | **repeat** 66:1 | 48:5 79:19 | 94:24,25 |
| **remains** 18:7 | 69:13 85:22 | 113:18 198:15 | 183:23 253:18 |
| 87:3 | **repeated** 72:15 | 205:10 231:25 | 256:17 257:2 |
| **remarks** 178:5 | 77:5 | 232:11 233:23 | 257:11 |
| **remember** | **rephrase** 14:22 | 236:7,8 258:9 | **reread** 75:4 |
| 21:1,2 27:1 | **reply** 122:9 | 271:14,18 | **res** 31:18 |
| 75:5 79:22 | 124:25 | **requested** | **reserve** 30:21 |
| 80:22 81:1 | **report** 88:2 | 47:13 102:16 | 55:6 87:19 |
| 97:6,10,16 | 107:3 258:7 | 211:19 269:17 | 102:3 128:10 |
| 98:4 118:9 | 268:5 273:18 | **requests** 16:8 | 277:16 |
| 141:10 155:23 | **reported** 159:7 | 47:15 166:14 | **reserves** 54:10 |
| 169:23 184:21 | 238:7,14 | 245:5 | **reside** 119:3 |
| 184:22 196:12 | **reports** 40:10 | **require** 20:16 | 120:12 |
| 233:12 | 41:20 60:23 | 20:19 21:2,5 | **resident** |
| **remembering** | 109:4 253:2 | 35:21 48:16,17 | 118:22,23 |
| 192:16 | 255:6 | 99:25 118:3,19 | 132:7 |
| **remind** 57:21 | **represent** 37:9 | 152:15 169:24 | **residents** |
| 107:23 169:23 | 230:14 241:20 | 221:21 223:17 | 123:14 132:8 |
| **reminder** | 243:7 | 223:25 254:16 | **residual** |
| 242:23 | **representation** | **required** 23:5 | 158:10 |
| **reminds** 185:6 | 236:23 254:25 | 39:8 40:10 | **resnick** 243:14 |
| **remove** 52:2 | 255:13,15,19 | 41:20 53:23 | **resnick's** |
| 109:17,19 | **representations** | 55:11 68:10 | 255:12 |
| 112:17 143:16 | 53:19 55:23 | 70:19 108:10 | **resolution** |
| 232:18 | 60:15 86:6 | 111:22 179:22 | 118:19 227:4 |
| **removed** 28:1 | 87:17 | 220:22 222:16 | 229:7 260:1 |
| 81:22 232:21 | **representative** | 223:4 242:3 | **resolutions** |
| 265:2,11,16 | 91:3 | **requirement** | 225:4 |
| **renzi** 49:17,18 | **represented** | 40:25 100:2 | **resolve** 102:22 |
| 50:5 177:25 | 37:10 62:24 | 242:15 | 193:21 226:7 |

| | | | |
|---|---|---|---|
| 103:16 104:24 | 275:20 276:11 | **rodney** 7:18 | 169:21 203:5 |
| 105:13 106:4 | 277:13 | **role** 42:20 | 203:18 211:5,6 |
| 107:24 110:6 | **rights** 89:1 | 64:21 85:24 | 264:4,11,20 |
| 114:9 118:9 | 126:18,22 | 235:5 236:19 | 266:11 |
| 120:7 122:1 | 181:7,9 186:13 | 239:2 240:23 | **ruling** 51:6,7,9 |
| 123:10,14 | 200:1,23 | 241:15,16 | 207:11 251:9 |
| 124:21 125:17 | 205:20 226:23 | 268:25 | 252:10 255:24 |
| 126:6,14 127:1 | 236:8 | **roles** 205:17 | 257:14,15 |
| 127:2 130:10 | **rise** 174:16,22 | 222:5 | 258:17 260:9 |
| 132:22 139:18 | 176:7 251:25 | **rood** 14:6 | 261:2,6 263:10 |
| 139:20,20 | **risen** 144:7 | **room** 130:24 | 263:16 |
| 140:1 145:21 | **rises** 145:18 | 147:20 186:3 | **rulings** 244:20 |
| 146:16,19 | **rising** 143:22 | 210:11 256:18 | 250:20 254:14 |
| 155:22,23 | 143:23 | 256:19 | 271:21 277:17 |
| 156:6 160:11 | **risk** 30:15 | **rosen** 4:19 | 278:4 |
| 160:18 162:17 | 32:22 39:10 | **rosenblatt** | **rumors** 57:11 |
| 168:23 178:25 | 54:5 55:24 | 11:13 | 158:17 |
| 191:25 193:9 | 65:15 66:12 | **round** 179:11 | **run** 53:1 54:7 |
| 197:8,15,24 | 67:4,6 70:1,3 | **route** 158:23 | **ruskin** 7:9 |
| 198:22 202:2 | 137:18,19 | **routinely** | **rxr** 7:11 |
| 207:12,15,20 | 141:23 145:8 | 162:10 167:8 | **ryan** 8:7 27:14 |
| 208:19,23 | 217:19 218:14 | **rug** 254:7 | 27:15 93:14,14 |
| 212:3,20 213:2 | 257:15 272:11 | **rule** 37:13 | 93:18 94:5,12 |
| 214:2,12 216:4 | 273:5 | 47:25 48:17 | 94:22 95:15 |
| 216:16 223:19 | **risks** 28:15 | 114:14 169:23 | 96:16,22 97:6 |
| 232:8,20 233:4 | 37:6 57:7 | 170:4 186:10 | 97:17 98:11 |
| 233:12 235:24 | 64:22 67:21 | 186:15 194:14 | 99:1,8,12,17 |
| 244:15 247:6 | 69:9,14 70:23 | 196:6 203:18 | 99:23 100:15 |
| 248:16,20 | 86:17 179:18 | 252:14 254:15 | 107:1,19 |
| 249:12 250:5 | **risk** 14:24 | 260:11 | 101:4,7,15,18 |
| 250:10 253:1,9 | **road** 5:19 6:3 | 264:7,13,15,18 | 101:25 102:1,2 |
| 254:13 255:24 | 133:19 | 264:19,20 | 131:9,10 |
| 259:10 262:2 | **robert** 7:22 | **ruled** 257:5 | 132:10,21 |
| 262:14 264:14 | **robustly** | 269:21 | 184:21 206:25 |
| 269:5 270:24 | 226:17 | **rules** 25:24,25 | 206:25 207:21 |
| 271:9,13,25 | **rochester** 4:9 | 27:1 35:8 | 207:21,24 |
| 272:1 274:22 | | 38:25 131:25 | 208:13,17,20 |

208:22 209:2
213:8,8
**ryan's** 97:14

**s**

**s** 4:1 16:1
279:2,2,2,6
**sacrifice** 92:1
**sacrificed**
91:25
**safe** 109:22
**safeguarding**
55:20
**safety** 60:13,19
**sake** 154:17
**sakes** 197:8
**salary** 152:25
**sale** 30:4,12,13
40:8 53:11,14
53:21,22 55:23
57:7,11,13,16
59:4,12,16
62:4 75:13,14
75:19 100:22
116:12 141:18
145:23 149:11
150:11 153:23
154:1 178:11
194:24,24
221:1
**sales** 44:10
212:16
**san** 9:14
**sat** 172:3 174:5
**satisfactory**
157:2
**satisfied** 65:23
71:24 84:3

111:19 114:6
187:15 221:6
230:22
**satisfies** 267:2
**satisfy** 40:25
107:11 234:23
**satisfying**
47:16
**save** 98:13
**savings** 71:12
**saw** 34:15 42:3
133:4 216:4,5
216:9 267:18
**saying** 21:14
25:1,9,10 26:5
26:13,15 27:6
28:25 29:4
33:4,6 36:8,17
39:9 43:14
45:22,23 48:10
62:13 63:5
65:10 66:20
69:19 70:25
74:12 78:13
90:13 92:22
101:13 112:16
122:19 127:13
138:1,3,25
139:3,5 144:6
163:6,7 168:23
181:20 185:12
197:21 205:18
205:19 211:11
215:20 233:20
233:21 236:6
255:8 263:7

**says** 24:24 25:4
25:8 31:21
92:16 104:1,14
104:16,18
108:6 170:25
170:25 203:2
209:24 210:17
211:20 222:13
243:23 246:8
246:12,19
256:7 261:23
**scenario** 122:5
127:24 131:4
155:8
**schedule**
227:20 245:10
**schedules**
175:11 225:20
263:1
**scheme** 158:11
260:18,20
261:1,4,9
265:4,12,20
**schemes**
260:17 261:12
**scherling** 8:21
**scheuer** 5:14
28:10,10 29:25
31:13 42:12,12
42:15 43:4
44:2,13,17
45:3,5,7,11,18
46:7,21,23
47:2,7 60:1,2
61:3,10 63:8
63:13,19,24
64:3 65:13

67:5,16,25
68:2,20 69:9
69:14,24 70:11
**schiff** 6:15
**schupato**
220:16
**scope** 28:6
166:21 173:18
178:20 189:18
189:20 204:4
278:1
**scores** 64:17
**scott** 260:6
**scurrying**
147:19
**se** 14:16,17,18
14:19,20 78:12
85:15 93:10
103:17,22
133:1 153:7
165:22 168:3
201:12 206:23
207:4 236:4
251:13 254:18
262:12 269:11
271:10 272:4
274:17
**sea** 184:4
**searched**
219:13
**seated** 16:2
51:19 115:9
**sec** 25:6,13
27:10 28:7
29:1 30:1 34:8
36:10,13 37:9
40:18 41:2

---

**seers** 263:19
**segment** 93:21
**segregate** 17:5
**segregates** 55:6
87:19
**select** 230:16
241:9
**selected** 255:12
**selecting** 242:7
243:1 255:1
**selection** 243:4
**self** 186:7
252:12
**sell** 17:10
18:21 22:19
57:1 101:9
134:21 138:10
141:4 143:16
144:14 145:16
146:11 148:16
148:23 149:17
150:4 151:9
154:2,15 220:2
**seller** 58:25
111:15
**sellers** 111:3,4
**selling** 49:5
89:13,14,15
134:15 153:22
**sells** 154:18
**send** 20:4
**senior** 184:23
**sense** 26:22
31:2 36:4
37:11 38:19
52:24,25 62:4
68:17 70:15,22

179:24 180:19
180:21 188:5
205:25 247:2
247:15,16,17
248:20 273:1
273:14
**sensitive** 19:24
20:5 72:17
**sent** 16:12
80:16 177:20
199:8 245:6
277:20
**separate** 38:12
44:18 45:19
46:10 87:13
88:17 107:8,9
107:10 137:7
134:5 186:14
200:20 227:6
231:25
**separately**
37:10 165:7
**september**
247:21
**seriously** 32:25
30:25 175:2
241:13
**serve** 48:24
177:5 182:2
221:13 222:4
236:24 241:16
243:8
**served** 177:2
250:22 264:4
**service** 177:23
**services** 9:2
14:8 74:18

121:7 220:5
**serving** 54:23
222:2 236:19
**set** 77:25
103:12 131:19
152:16 177:16
188:4 191:16
**seth** 14:22
207:4 238:25
**setting** 205:11
**settle** 183:7
**settled** 90:2,4
**settlement**
171:9 175:10
181:10 182:25
183:5,12
184:13 185:13
187:22 188:4
189:7,14 194:3
194:4,9 217:2
217:9,10
**settlements**
90:2
**seven** 87:13
241:17,19
**several** 67:8
81:2 158:7
226:14
**share** 72:18
85:22 109:21
110:9,10
133:25 139:15
146:9 150:10
**shared** 195:25
**shareholder**
166:10 275:16

**shareholders**
225:10
**shares** 159:24
**sharing** 110:14
**shark** 237:16
**shaya** 4:9
**shea** 9:23
**shehadeh** 3:10
**sheila** 3:24
280:3
**sherri** 3:25
**sheryl** 7:14
**shield** 186:10
**shields** 194:23
**short** 84:7 89:3
**shortly** 74:23
224:4 272:21
274:1
**shouldn't**
212:9
**show** 40:15
41:12,19 43:24
50:18 54:3
122:11 125:6
204:8 251:22
261:3
**showing** 29:17
84:3,3 128:10
**showings** 42:5
42:9 128:12
**shown** 43:21
101:19 125:21
**shows** 84:20
85:4
**shut** 25:15
**sic** 127:10
134:15 138:13

---

42:8 43:16
47:15,15,21
51:10 57:23
59:21,25 68:6
88:9,9,12,15
89:3 90:2,4,10
90:15 202:11
206:2,10 207:6
207:16 209:17
212:1 235:17
**sec's** 23:18
42:3 47:12
48:12 88:9
90:8,9,23
**second** 16:21
56:6 62:5 87:8
108:3 139:16
164:24 167:10
167:21 181:25
185:5 198:6,6
209:13 210:18
229:4 234:6,12
238:5 242:1
254:20 264:19
**secondarily**
99:17
**secondary**
155:5 169:9
**secondly**
262:10
**section** 28:19
35:13 40:11,24
41:20 43:16,25
61:4 86:24
96:25 104:16
133:2 173:19
182:16 220:22

235:18 257:11
264:13
**sections** 95:7
264:12
**secure** 60:8
109:22 110:13
**securing**
153:14
**securities** 5:8,9
5:16,17 8:2
9:19 10:2
26:21 28:11,21
30:8,11 31:7
38:6 40:4,11
41:21 42:13
44:7,7 45:24
62:1 61:15
69:1 89:8,11
89:13 131:11
151:6 167:1
181:16 201:8
203:18 204:24
207:18 210:10
**security** 18:7
28:16 39:23
40:8,10,18
41:5,7 43:12
43:23 47:22
205:23 209:1
221:11 223:13
223:16 234:21
244:24 247:9
253:24 270:3
**seeing** 75:5
156:3
**seek** 23:9 24:10
24:12 42:6
89:9,14,15,16

89:19 98:15
103:18 104:15
104:22 105:4
106:15,16
110:5 112:8
128:11 146:1
202:11 207:7,9
227:10
**see** 26:20 28:12
39:14,16 49:19
49:25 63:22
66:24 67:2
81:6 93:20
94:1 101:9,12
116:11 118:17
121:25 122:25
124:18 125:17
126:16,23
131:13,18
146:22 148:16
149:16 150:24
154:19 158:16
167:14,21
170:22 177:17
180:2 183:24
187:18 200:12
202:6 207:1,3
204:24 247:9
232:23 234:21
253:24 270:3
244:24 247:9
253:24 270:3
100:8,21
101:22 191:16
200:10 237:21
**seer** 262:6

**seeking** 23:23
24:1,14 28:24
30:4 49:21
50:25 51:1
61:16 69:2
154:2 220:9
235:22 266:25
268:16
**seeks** 23:11
**seem** 71:16
127:3,4 248:20
270:6
**seemed** 162:17
192:4 268:2
**seemingly**
127:20
**seems** 35:10
73:18 92:24
125:11 129:19
129:24 130:7
130:12 140:8
148:13 149:9
151:17 152:8
158:23 159:2
175:16 176:15
178:21 179:3
224:5 238:7
246:23 247:4
248:17 251:23
273:20
**seen** 18:12

---

139:13 162:21
**side** 82:16,17
98:16 186:1
199:14
**sidelines**
205:21
**sign** 22:6
108:10 111:22
112:16 113:15
115:25 117:25
**signature**
280:8
**signed** 197:18
**significant**
86:11 87:10
186:6 187:13
187:15 241:21
248:22 249:1
249:16 250:15
260:13 262:13
**significantly**
57:7 192:17
267:11
**silent** 204:21
**similar** 97:14
170:5 172:8
195:19 202:7
206:19 214:7
233:12
**simon** 13:7
**simon** 57:12
149:9,12,13,14
149:16 170:16
170:18
**simpler** 255:18
**simplest**
243:13

**simply** 26:13
112:10 124:7
128:18 151:1
165:3 169:12
170:24 187:14
203:23 243:7
264:19 269:25
**single** 66:6
73:15,24,25
91:17 237:7
**singled** 147:4,7
**singling** 210:13
**singularly**
138:6
**sir** 79:11 80:9
81:13 85:19
91:2 93:1 94:5
165:18 207:20
208:22 245:25
247:14 252:9
**sit** 71:2 90:15
204:20
**sites** 158:8
**sitting** 254:13
**situation** 68:16
123:7 245:4
**six** 33:4 69:22
77:9 100:21
121:9,19,24
122:4,13,21
125:5 127:24
136:3,6,10,12
136:13,16,18
136:24 137:4

**sixth** 56:25
**sizeable** 185:18
**skewed** 152:2
**slade** 10:22
16:4,6,6,16
23:14,15,25
24:13 25:1,5
25:17,19,22
26:8,12,17
27:9 33:11
40:17 41:1,9
41:15,23 42:2
47:11,21 48:8
48:22,25 49:10
49:12,22 50:5
51:3,15,20
52:8 147:21,21
148:2 219:2,7
219:24 278:7
**slater** 185:6
**sleep** 126:12
**slightest** 67:3
205:8,25
**slightly** 246:12
**slowly** 168:12
**sluffing** 241:24
**small** 83:11
144:11 149:7
**smart** 133:10
133:22 134:3,5
134:11,13,15
134:19,21
135:11,22,23
136:3,6,10,12
136:13,16,18
136:24 137:4

**sixth** (cont.) 137:12 138:8
138:15,22
139:6,10
140:17 141:5
143:16,16
144:8,14
145:17,23
147:6 148:16
148:23 149:1
149:11,17
150:4,12 151:4
153:22 158:14
158:25 160:5
160:15
**smell** 138:22
139:6,10
**smith** 10:15
267:16,16,23
268:4,10 269:8
**social** 18:2
158:7 168:21
**software**
136:10
**sold** 44:5
130:16 133:10
133:13,22
134:3 138:9
**soldco** 225:14
**solely** 55:5
56:17,22,23
68:23 227:16
228:4

**[solution - st]**      Page 78

| | | | |
|---|---|---|---|
| solution 23:11 | 129:9 138:19 | 164:12 196:2 | 277:22 |
| 118:4,20 | 139:1 144:3,4 | 198:16 199:23 | **specifically** |
| 128:21 129:1 | 146:23 156:11 | 245:8 256:19 | 21:13 34:3 |
| 129:17 130:2,3 | 157:21 160:9 | 259:4,5 266:16 | 82:20 91:22 |
| 138:24 142:1 | 161:3 164:11 | 267:10 | 96:6 98:5 |
| 146:17 147:1 | 164:13 186:23 | **speaker** 78:14 | 133:2 147:1 |
| 149:13,15 | 191:23 193:25 | 278:19 | 162:1 169:25 |
| 151:16 152:20 | 198:19 221:11 | **speaking** 29:16 | 184:22 185:25 |
| **solutions** | 238:23 252:24 | 34:12 36:7 | 190:13 210:13 |
| 115:21 118:2 | 254:19 256:23 | 78:10 79:13 | 215:21 240:24 |
| 150:23 | 262:19 265:1 | 80:14 93:6 | 248:9 250:21 |
| **solve** 20:23 | 265:10 272:2 | 102:10 115:4 | 252:10 256:2 |
| **solved** 129:16 | 276:20 | 163:8 164:13 | 262:20 275:12 |
| **somebody** | **sort** 29:2 32:10 | 190:13 198:17 | **specifics** |
| 20:21 36:5 | 71:4 131:23 | 262:24 | 202:22 |
| 38:5 39:3 41:8 | 140:5 158:10 | **special** 8:17 | **specify** 219:12 |
| 41:13,18 117:3 | 206:19 245:24 | 141:3 166:20 | **speculation** |
| 136:17 142:1 | 260:12 267:22 | 173:8 174:9,11 | 137:2 138:9,19 |
| 142:24,24 | **sorts** 200:3 | 176:24 182:8 | **speculatory** |
| 152:19 166:1,9 | **sought** 24:11 | 182:22 185:13 | 144:8 169:11 |
| 169:23 172:3 | 169:22 177:22 | 186:6,17 | **speed** 91:14 |
| 179:3 232:18 | 264:6 | 188:13 193:22 | 157:21 |
| 253:8,22 262:6 | **sound** 61:22 | 193:24,25 | **spending** |
| 264:2 266:24 | 119:22 280:5 | 218:24 268:5,6 | 183:23 |
| 269:23 | **sounds** 120:23 | 272:14 275:9 | **spent** 274:11 |
| **something's** | 132:13 149:12 | 276:1 | **spirit** 213:9 |
| 29:13 | 277:18 | **specific** 37:11 | **spite** 119:23 |
| **somewhat** | **south** 8:11 | 42:24 43:10 | **spoke** 118:22 |
| 34:19 157:2 | **southern** 1:2 | 47:17 58:4,12 | 193:23 198:20 |
| **soon** 26:24 | **southfield** 6:4 | 60:17 61:23 | **spoken** 200:6 |
| 102:20 120:10 | **space** 237:7 | 118:16 139:1 | **spot** 233:4 |
| 167:9 247:22 | **spaces** 168:21 | 142:3 149:2 | **square** 7:18 |
| 271:4 | 169:16 | 150:16 166:14 | **squarely** 18:19 |
| **sorry** 20:17 | **spared** 238:9 | 171:9 178:15 | **squeeze** 48:19 |
| 34:10 69:12 | **speak** 82:3 | 206:10 209:23 | **st** 7:3 11:13 |
| 74:9 78:11 | 88:8 92:5 | 218:20 223:2 | 120:20 121:5,6 |
| 80:13 105:17 | 103:18 114:1 | 235:23 253:3 | 122:2 123:8,12 |

*Veritext Legal Solutions*
*www.veritext.com*

212-267-6868      516-608-2400

**[stems - sue]**      Page 80

| | | | |
|---|---|---|---|
| **stems** 273:12 | **strategy** 146:5 | 170:8 172:7 | **subpoena** |
| **step** 36:10,22 | 174:21 | 188:9 189:21 | 62:17 262:6 |
| 234:6 248:5 | **stray** 234:11 | 205:4,6,24 | 263:19 264:2,3 |
| 255:11 | **strayed** 110:18 | 213:17 215:5 | 264:7 |
| **stephen** 185:3 | **strays** 110:18 | 216:12 223:1 | **subpoenaing** |
| **steps** 140:16 | **streams** 146:1 | 232:13 245:15 | 264:1 |
| 150:6 | **street** 4:13,21 | 264:1 | **subsection** |
| **steven** 4:8 | 5:11 6:10 8:11 | **subjected** 30:8 | 200:22 214:4,6 |
| **stick** 178:16 | 10:3 11:10 | **submission** | 214:15 |
| 180:13 | 12:3,19 13:4 | 42:23 47:4 | **subsequent** |
| **stipulation** | 13:19 14:3,10 | 48:3,16 51:10 | 225:3 |
| 227:8,10 | 228:15,16 | 118:5,6 235:21 | **subsequently** |
| 228:15,16 | 229:1 231:9 | 255:7 | 276:23 |
| 229:1 231:9 | **stock** 154:18 | **submissions** | **substance** |
| **stock** 154:18 | 154:20 225:9 | 99:19 | 82:25 83:3 |
| 154:20 225:9 | 225:11 | **submit** 47:3 | **substantial** |
| 225:11 | **stockton** 11:1,8 | 134:17 199:15 | 86:4 |
| **stockton** 11:1,8 | 11:15 224:18 | 199:21,23 | **substantially** |
| 11:15 224:18 | **stolen** 216:14 | 200:8,13 | 54:19 226:2 |
| **stolen** 216:14 | 261:4,19 | 205:10 237:5 | **substantive** |
| 261:4,19 | **stood** 29:10 | 243:6 | 66:2,17 70:13 |
| **stood** 29:10 | **stop** 22:7 24:8 | **submitted** | 92:9 |
| **stop** 22:7 24:8 | 24:25 26:9 | 19:18 60:10 | **substantively** |
| 24:25 26:9 | 29:13 30:21,23 | 74:23 79:19 | 232:2 |
| 29:13 30:21,23 | 33:6 36:15 | 191:18 251:2,4 | **success** 187:1 |
| 33:6 36:15 | 40:12 66:7,12 | 251:5 252:19 | 189:10 |
| 40:12 66:7,12 | 68:8,10 171:3 | 254:24 255:5 | **successful** |
| 68:8,10 171:3 | 195:6 244:4 | 271:2 | 67:20 93:23 |
| 195:6 244:4 | 258:20 265:24 | **submitting** | 94:22 96:18 |
| 258:20 265:24 | **stopped** 33:7 | 260:22 | 192:2 245:17 |
| **stopped** 33:7 | 184:15 205:19 | **subordinate** | **successfully** |
| 184:15 205:19 | 216:24 | 217:4 | 167:13 |
| 216:24 | **stopping** 36:12 | **subordinated** | **successor** |
| **stopping** 36:12 | **stops** 217:7 | 226:2 228:1 | 61:13 |
| **stops** 217:7 | **straight** 133:19 | **subparagraph** | **sue** 180:17 |
| **straight** 133:19 | | 200:24 | 181:8,9 263:14 |
| | | **subparagraphs** | 265:7 |
| | | 214:17 | |

*Veritext Legal Solutions*
*www.veritext.com*

212-267-6868      516-608-2400

**[st - steal]**      Page 79

| | | | |
|---|---|---|---|
| 123:16,19 | 195:2 201:18 | 62:25 63:10 | 268:6 278:7 |
| 124:3,15,21 | 201:21 202:19 | 66:7,13,19 | 268:12 272:8 |
| 125:12,19 | 204:2 253:20 | 67:9 69:8,20 | 273:13 275:12 |
| 126:1,7,15,19 | 253:21,22 | 72:11 73:5,7 | 275:14 276:22 |
| 126:25 127:7 | **standards** | 74:2,6,13 75:1 | **states** 1:1 4:11 |
| 127:10,18 | 55:17,18 74:21 | 75:3,4,7,8 76:5 | 4:12 5:8,16 7:2 |
| 128:2,8,23 | 179:24 188:2 | 76:10,15,22 | 12:2,9 13:17 |
| 129:10 130:4 | 189:8 | 77:1 79:8,13 | 13:18 61:15 |
| 130:19 131:1,6 | **standing** 49:12 | 79:18,23 80:15 | 69:1 105:19,25 |
| **stable** 72:21 | 68:5 73:13 | 82:6,8,8 83:1,3 | 105:25 115:20 |
| **stablecoin** | 85:17 88:24 | 83:7,15 84:6,6 | 115:22 116:5 |
| 89:18 132:1 | 121:1 166:3 | 84:22 88:12,23 | 116:20 117:15 |
| **stablecoins** | 121:6 131:24 | 89:3,19 90:15 | 117:20,22 |
| 118:7,9 | stands 90:9 | 117:20 265:18 | 119:15,20 |
| **staff** 61:14 | stargatt 7:16 | 119:15,20 | 120:14 121:12 |
| 68:22,24 88:9 | start 26:18,23 | 93:10,16,19 | 123:14 133:13 |
| 88:12,18,20,21 | 53:7 66:7 | 94:8,9,10,11 | 187:17 201:8 |
| 88:25 89:3,7,8 | starting 91:19 | 94:13,17 95:1 | 203:2,5,22,22 |
| 90:10,12,15 | state 8:2 14:8 | 95:21,24 97:5 | 210:10 211:1 |
| 145:25 | 14:10 24:4,6 | 97:16 98:9 | 211:21 250:20 |
| **stage** 110:1 | 27:15 92:3 | 106:1 133:13 | 253:18 256:8 |
| 167:8 247:5 | 102:22 103:6 | 141:4 147:3,8 | 274:3 |
| 248:7 268:15 | 115:19 120:12 | 158:24 171:14 | **stating** 34:2 |
| **stake** 57:1 | 121:2,6 131:11 | 173:13 175:6 | **status** 121:2 |
| 132:1 140:15 | 133:9 138:5 | 185:9 213:21 | 161:15 249:24 |
| **stakes** 153:12 | 143:13 146:7 | 215:17 222:25 | **statute** 39:5 |
| **staking** 129:1 | 152:23 157:25 | 226:1 241:23 | **statutes** 36:2 |
| 135:24 217:20 | 203:3,6 207:22 | 262:1,1,3 | **statutory** |
| 218:14 | 207:24 211:1 | **statements** | 35:17 38:3 |
| **stance** 207:7 | 212:13 238:6 | 54:8 55:23 | 107:11 182:10 |
| 207:14,14 | stated 68:21,25 | 88:10,18,25 | 197:15 204:6 |
| **stand** 179:6 | 79:3 88:24 | 95:6 99:10 | 204:14 |
| 198:7 237:23 | 89:7 90:8 | 103:5 122:9,10 | **stay** 3:19 112:5 |
| 242:15 261:16 | 112:8 113:15 | 139:8 148:25 | 112:6 177:12 |
| 262:11 | 145:25 159:23 | 151:5 174:12 | 192:8 205:21 |
| **standard** 32:15 | 190:11 227:23 | 174:13 181:15 | 214:8 |
| 124:16 194:8 | **statement** 3:2 | 181:16,16 | **steal** 197:9 |
| | 30:3,13 50:11 | 225:20 260:25 | |

*Veritext Legal Solutions*
*www.veritext.com*

212-267-6868      516-608-2400

**[suffered - take]**      Page 81

| | | | |
|---|---|---|---|
| **suffered** | **super** 27:1 | **sure** 25:3 41:15 | **suspicions** |
| 239:12 | **supplement** | 43:2,2 47:16 | 158:18 |
| **suffice** 107:11 | 242:1 | 48:20,25 49:2 | **swager** 10:13 |
| 158:4 | **supplemental** | 51:4 71:15 | **sweeping** |
| **sufficient** | 42:3 49:16 | 73:4 74:25 | 254:6 |
| 70:10 98:9 | 125:22 | 77:16 101:4 | **sword** 31:3 |
| 102:17 170:11 | **support** 77:8 | 109:25 134:10 | **sworn** 54:8 |
| 186:16 234:22 | 77:14,18 78:12 | 137:13 140:2 | 55:3 62:25 |
| **suggest** 35:25 | 79:2 81:12 | 141:16,25 | **system** 109:20 |
| 113:6 124:2 | 90:13 92:21 | 142:20 145:14 | 110:10 232:8,9 |
| 138:25 146:24 | 93:10 100:4 | 146:20 148:17 | 232:20 |
| 172:2 204:8 | 135:12 172:11 | 149:23 172:11 | **systems** 109:22 |
| 266:22 | 172:13 261:8 | 166:2 170:21 | 110:7 |
| **suggested** | **supported** | 170:23 179:10 | |
| 129:17 204:10 | 76:17 77:7 | 188:4 189:14 | **t** |
| 207:17 | 116:2,6 119:10 | 202:16 206:3 | **t** 279:2 |
| **suggesting** | 121:12,16 | 206:18,22 | **tactic** 228:24 |
| 31:13 32:7 | 124:6 131:15 | 207:23 208:19 | **tag** 91:3 |
| 123:13 144:18 | 268:18 | 223:16 229:12 | **take** 22:1 32:20 |
| 152:4,17 | **supporting** | 235:6,20 | 39:5,10 45:14 |
| 191:20 233:12 | 49:19,22 50:9 | 261:20 265:14 | 47:23 50:18,21 |
| 233:18 | 126:3 | 267:4,18 | 51:15,17 53:1 |
| **suggestion** | **supportive** | 277:22 278:11 | 67:10,21 68:6 |
| 31:12 176:7 | 251:16 | **surely** 197:20 | 69:22 70:6 |
| 178:6 233:11 | **supports** 86:1 | 197:25 233:6 | 71:7,13 84:9 |
| **suggestions** | 86:6,10 87:16 | **surpass** 187:11 | 87:21 88:8 |
| 65:1 | 90:24 189:14 | **surprised** | 90:9,23 95:7 |
| **suggests** 61:24 | **suppose** 143:8 | 272:12,17 | 102:23 122:22 |
| 242:19 | 154:13 191:14 | 273:9 | 122:23 126:17 |
| **suing** 24:7 | **supposed** 27:2 | **surprising** | 128:1,7,14 |
| **suite** 9:13 | 29:22 64:21 | 243:11 | 129:23 139:23 |
| 12:11 184:4 | 67:14 100:13 | **surrounding** | 139:24 140:16 |
| **sullivan** 6:8 | 106:25 148:19 | 226:21 272:13 | 143:12 146:19 |
| 8:16 173:8 | 179:22 180:3 | **susheel** 8:22 | 175:2 185:1 |
| **sum** 145:10 | 221:13 263:24 | 173:7 216:19 | 205:22 213:25 |
| **sunset** 129:2 | 263:25 | **suspect** 44:22 | 218:1 220:20 |
| | | 126:9 | 244:15 248:25 |
| | | | 249:4,16 |

*Veritext Legal Solutions*
*www.veritext.com*

212-267-6868      516-608-2400

**[take - testimony]** — Page 82

```
252:11 262:12        tax  35:4 37:14       262:7 271:5,20       159:5 164:5
taken  28:2            37:24 156:24        telling  30:25        172:2,9 179:11
  29:1 51:25          203:11,13             31:1 36:25           179:16 189:4
  70:18 73:15         204:17 241:6          39:4 43:19           209:7,8 238:16
  93:7 111:9          250:15,15             50:15 68:13          238:20 243:13
  152:12 175:17       251:14,21             73:13 113:2          265:1 272:24
  204:10 207:6        252:1,3 265:20        228:16 229:15        275:4
  254:1 256:12        266:18,18             229:16 257:2       territory
takes  128:4          267:2               tells  128:4           110:19
  278:18            taxable  35:2         ten  51:17 89:14     test  137:14
talk  23:10         taylor  7:16            173:2              testified  19:5
  51:15 74:19       team  60:12           tens  249:2            21:10 57:15
  104:6 114:6       tease  94:2           tension  181:5         60:9,14 67:20
  181:3 202:13      technical  55:11      term  70:15            101:20,21
  206:14 232:14       135:14,17,25          124:11 171:23       111:19 178:9
  245:22 251:17       136:10               173:23 213:18        182:8 186:15
  254:19            technically           terminate  58:7        186:25 187:9
talked  110:6         151:21 274:3          58:24 163:25        187:10 188:23
  168:15 202:16     technology            terminated            216:24 231:3
  206:6,12            133:12                58:3                 230:1 236:22
talking  22:7       telephone            termination          testify  61:6,24
  40:20 41:2          34:11 257:23          58:5,10 269:4        219:8
  73:4 79:11        telephonically        terminology         testifying
  80:16 190:3,15      60:5                  106:3                21:12
  202:5 206:18      tell  19:14 26:16     terms  19:6          testimony
  207:13 237:17       31:4,16 33:8          20:18 21:10          21:13 50:3
  251:17 256:3        36:22 40:13          22:13,25 23:2        53:20 60:11
  257:10 265:17       41:10 47:21          23:22 24:21          76:6,25 87:6
taousse  9:7          50:21 66:11          29:3 44:1            92:12 95:22
tap  184:7            67:13 89:17          52:19,23 62:3        100:7,7 147:15
task  140:8          96:23 110:19          62:25 77:14          155:16,18,20
tasked  240:23       148:18 164:23         98:3 107:6           159:23 171:11
tasks  197:10        166:5 173:10          108:20 110:17        173:11 174:15
  200:2              173:17 179:7          132:15 133:2         178:12 218:6
tautology            215:4 251:22          134:2,8 147:13       218:25 219:1
  256:16            253:3,23              148:9 149:7          219:11,25
                    256:16 258:20          156:21 158:21        220:25 253:1
```

**[testimony - think]** — Page 83

```
254:2 264:6,16       173:6 175:14        233:22 275:5         21:4 23:7,21
tests  221:6          189:24,25          things  17:8          24:22 26:20
texas  8:1 27:15      190:1 198:2          18:2 28:1 29:6      27:17 28:12,25
  93:15 98:15,16      207:20,24            35:13 36:1,8        29:4,19 30:16
  98:22 99:2,9       212:21 213:6         36:19 37:2,25       33:4 36:12,14
  99:14 100:2        215:24 216:15        45:4 46:1           38:10,14,15
  102:14,17,17       219:23 224:12        57:18 66:14         42:5,8,9 43:9
  102:22 103:7       225:1 235:13         71:9,20 81:6        43:11,13,14,15
  116:3,11,12,16     236:2 237:24         85:22 94:16,24      43:20,24 44:17
  117:2,7,8,9        239:17 240:19        95:1,7,9 97:15      45:5,7,18 46:8
  118:2,5,6,18       244:4,14 245:1       103:24,24,25       47:5 48:23
  118:22,23          257:19 259:1         104:22 108:4       50:22,24 52:25
  119:11 131:7       259:12,19           112:13,16          59:21 61:5,8
  131:10,12,20       264:22 267:9,9      126:22,23          61:12 62:5
  132:7,8 207:22     267:13,16           132:2 136:7        63:8,24 64:4
  212:13             270:8 271:8,24       146:14 149:18      65:13 66:14,21
text  174:23,24      275:2 277:12         155:22 157:2,8     66:22,23 68:20
  181:17             278:7,19            159:8 179:15       69:9 70:4,9,14
texts  35:3         theft  261:3         179:19 181:14      70:17 71:18,19
  170:12            theory  41:7,9       188:16,20          71:22 73:24
thank  17:17         41:12 164:18        196:20 197:14      74:9 84:7,19
  23:13,14 34:7     thereof  174:1       197:19 203:21      85:23 89:18
  51:20 60:4        therese  5:14        205:6 206:20       92:15 93:25
  81:18 82:4         28:10 42:12         206:22 211:9       95:12,13,18,24
  84:12 85:13,19     60:2                211:22 225:19      96:11 97:1,21
  90:25 91:2        thing  21:23,25      227:24 240:3       98:8,24 102:10
  93:8 101:25        24:10 25:17         246:15 252:7       103:1 104:6
  102:4 103:15       27:5 32:19          253:3 254:5,12     105:3 107:6,10
  109:6 112:3        48:22 49:1          255:7 258:5        107:22 109:21
  113:25 115:7       58:11 88:19         260:25 261:5       110:16,18,22
  118:24,25          107:22 114:5        263:25 266:17      110:23 113:3
  131:6 132:9,10     120:25 142:16       271:21 272:11      118:3,6,7
  132:21 136:15      149:9 169:17        272:18 273:12      123:9,20 124:3
  137:16 138:4       193:20 197:13       273:17 274:20      124:11,13
  156:6 157:16       206:18 208:24       274:23 276:15      125:21 127:22
  157:16 160:19      209:13 214:10      think  16:13,19      129:12 130:2,3
  165:18 172:24      221:12 231:21       18:18 19:3,5
```

**[think - time]** — Page 84

```
130:18,24            208:24 209:18       third  30:5          92:3 112:21
131:16 132:13        210:4,12,17,18       56:12,22 60:20      249:3
133:5 136:23         211:17,25            82:22,22          three  16:8,23
137:14,17,23         213:8,9 215:5        134:22 136:12      17:11 28:1
137:25 139:7         217:8 218:4,6        148:7 161:8,9      83:14 111:1
140:10 141:2         218:19 219:8,9       161:10,12,13       115:20 121:18
142:1 143:2,13       220:25 221:9         161:18,23          124:4 126:2,15
143:20,23,24         222:1,3,11,17        162:2,4,11,14      129:18 131:14
143:25 144:6         223:4,18 225:5       162:24 163:7       150:7 186:5
144:12,17,20         228:16 229:22        164:6 167:2,22     201:19 206:6,9
145:1,10,24          232:11 233:9         168:8 181:6        222:7 241:14
146:4,12,12,17       233:10,15            182:3,15           268:15
148:20,23,23         240:2 243:19         185:24 190:4,6    threshold
149:1,8,11,13        243:22 246:17        190:23 191:1       161:8
150:3,5 151:1        247:23 248:8         206:10 217:17     throwaway
151:7,8,15,25        248:10 249:9         217:23 218:11      179:3
152:4,10,20,23       249:11,12            218:17 234:14     thunder
153:6 154:1          250:9 251:8         thorium  136:2      216:14
155:11,24,25         252:13 254:6,9       216:14            thursday  47:19
156:2,3 157:3        255:25 256:2        thorough            68:6 88:10
158:22 159:8         256:18 258:5         147:5,9            199:4 242:13
160:23 167:14        259:6 260:21        thought  17:24     thursday's
167:19 169:4         263:15 266:5         47:22 118:9        155:19
170:1,4 171:4        266:22 268:4,7       144:17 155:19     tichner  19:5
171:6 178:14         270:4,21 272:8       160:22 192:16      21:10
178:19 180:16        273:5,23 274:2       192:19 200:17     ticker  239:15
188:18 189:11        274:17,19            210:6,7 229:17    tie  134:6
189:14,16            275:25 276:15        232:15 242:15      203:22
191:14 192:24        276:18,22            255:4 263:1,2     tied  194:8
194:7 195:14         277:3,7 278:14       263:3,4 271:19     220:4
195:21 196:2,3      thinking  89:16      thoughtful        tiffner  19:19
196:5 198:10         127:5 152:20         147:5,9           time  16:15,16
200:21 201:13        247:4 273:18        thoughtfully       25:15 26:16
202:2,3,4,5         thinks  24:24         226:16             33:9 34:8 37:1
205:4 206:4,11       36:5 95:8           thoughts            44:22 47:12
206:16,16,19         145:2                258:17             48:2 56:18
207:2,16 208:1                           thousands          57:3 62:18
                                          96:8
```

**[time - trade]** — Page 85

```
66:6 71:9            tired  258:21       135:25 136:1,1       topco  225:8,14
86:17 92:4          tischner  57:15      136:4,6 137:9       225:15 226:18
97:16 98:1           60:12               137:18,20          227:2,7 228:6
102:2 103:20        tischner's          138:15 140:14       228:8,12,23
113:3 114:22         53:20               140:24 141:15      229:2,25
114:23 115:3        tisher  135:14       145:17 150:22      230:10,14,17
125:5 127:2         tisher's            153:17,25          230:22 231:3
141:23 142:3         147:15 159:23       156:9 158:6        231:10,11,13
149:21 150:6        title  56:13        tokens  57:19       233:24 234:15
150:11 151:9        today  25:12,13      89:14,15           234:18 235:2
153:18 154:8         29:5,17 32:4,5      134:25 136:3       topco's  226:14
157:21 159:18        35:20 43:9          137:10 140:22      227:15 228:25
166:16 176:9         48:9,14 59:6        141:22 147:17      235:2
183:23 199:3         60:5 75:14          149:25 154:17      toronto  225:9
199:22 214:23        92:9 110:17         156:1,5 160:12     total  148:5
224:24 231:24        114:18 121:9       told  23:16 37:3    totally  203:1
233:13 239:12        144:25 160:15       65:18,20,22        209:11
240:2 242:15         163:24 178:5        142:25 177:22      touches  107:2
242:17 245:2         184:10 232:21       178:16 248:2       touted  167:8
246:24 247:19        243:19 254:13       269:19             towards  154:3
248:24 250:20        254:15 258:13      tolerate  205:2      259:21
250:22 257:4,5       266:23 269:7       tomorrow  41:3      townsend  11:1
268:23 269:21        271:9 272:9         48:17 51:10         11:8,15 224:17
270:7 273:20         273:20 275:1,2      115:6 137:21       toyed  258:21
274:11,12           together  67:21      199:24 235:21      tracey  3:24
timeline  116:1      153:16 178:11       258:15 259:23      track  242:13
121:15 124:22        191:12 219:16       277:24 278:3       tracked  218:5
125:2,10 130:7      toggle  59:9        ton  274:12         tracy  3:7 14:16
130:8                273:4              tongue  273:4        85:14 236:3
timeliness          token  29:4         tonight  244:24      237:4 251:15
248:8                41:17 77:19         260:1               252:9 254:19
times  56:21         89:13 134:12       took  94:11         trade  5:1,2
77:5 78:24           134:13,14,18        98:6 116:10        21:8 46:24
168:12 250:17        134:20,22           207:14 241:3       61:16 67:18
276:12               135:22,23,24        224:10 241:13      68:4 69:2
timing  48:4                             242:17             118:11 143:24
                                        top  97:1
```

**[trade - trustee]**   Page 86

| | | | |
|---|---|---|---|
| 154:7 158:6 | 153:14,20 | 75:23 86:20 | **tried** 70:17,20 |
| 185:23 | 154:1,5 167:15 | 98:19 100:23 | 70:20 77:25 |
| **traded** 136:2 | 194:3,5,9 | **transferring** | 172:3 192:1,10 |
| 136:19 160:9 | 203:12,14 | 42:8 61:11 | 195:20 228:22 |
| 225:9 | 221:1,2 271:14 | 83:19 86:13 | 276:11 |
| **trades** 46:15 | 273:3,25 | 98:24 131:4 | **trigger** 58:18 |
| 47:9 | **transactions** | **transfers** 21:6 | **triggered** |
| **trading** 6:9 9:2 | 24:5,5,8 28:16 | 40:24 97:24 | 58:16 |
| 118:16 129:1,4 | 30:9 33:3 35:1 | 130:20 131:2 | **trouble** 20:18 |
| 132:1 144:11 | 35:2,7 37:13 | 175:5 176:12 | 40:4 127:5 |
| 159:12 | 38:17 40:23 | 257:8 | 133:5 159:25 |
| **training** | 42:21 45:24 | **transition** | 247:4 |
| 239:13 | 59:17 72:24 | 214:4 215:18 | **troubles** |
| **trajectory** | 73:10 96:7 | 215:19 | 221:12 |
| 133:20 | 136:4 153:15 | **translate** | **trove** 188:6 |
| **transact** | 153:19 183:22 | 147:12 | **true** 64:20 |
| 159:10 | 192:11,13 | **treasury** 89:22 | 159:13 174:10 |
| **transaction** | 195:13,23 | 133:13 | 175:23 181:19 |
| 17:9 18:21 | 196:9 197:23 | **treated** 124:14 | 253:15 268:1 |
| 19:4,9,11,13 | 203:4,9,20,24 | 124:17 142:2 | 275:22 |
| 22:19,24 23:9 | 204:9 272:21 | 151:22 216:10 | 230:10,13 |
| 24:16,17,19 | **transcribed** | **treating** 145:4 | 248:21 267:6 |
| 25:9 31:4,21 | 3:24 | 249:22 | **trust** 16:13 |
| 35:10 37:11 | **transcript** | **treatment** | 56:17 101:14 |
| 44:4,19 45:20 | 280:4 | 124:23 126:16 | 101:22 197:1,1 |
| 46:10 47:7,9 | **transfer** 17:15 | 127:14,17 | 241:6 276:25 |
| 53:11,11,14,21 | 17:19,25 18:20 | 129:13 132:24 | **trustee** 3:5 |
| 53:22,25 54:18 | 21:5,18 54:19 | 133:3,6,16 | 12:1,2,8,9 |
| 55:24 57:8,11 | 56:1 57:2,8 | 135:3 137:24 | 20:16 33:16 |
| 57:13,16,17 | 65:16 75:19 | 149:4 151:22 | 71:22 72:5 |
| 58:1 59:4,9,13 | 106:11,18,21 | 152:1 159:3 | 97:12 189:22 |
| 59:16 72:17 | 109:12 130:17 | 160:21 | 190:2 196:11 |
| 89:8 102:12 | 135:5 | **tremendous** | 201:14 202:4 |
| 103:1,11 | **transferred** | 18:13 245:14 | 213:14 214:23 |
| 114:23 134:16 | 18:3 20:22 | **trial** 3:23 91:5 | 221:16 236:7 |
| 136:8 141:18 | 53:16 55:2 | 91:18 92:5 | 241:19 244:5,8 |
| 141:19 151:6 | 56:2,7,19,21 | 207:8,11 | 244:8,9,17 |

**[under - unsecured]**   Page 88

| | | | |
|---|---|---|---|
| 211:22 220:22 | 169:3,19 | **underwriter** | **uniondale** 7:12 |
| 221:1 226:24 | 170:16 180:7 | 46:20,22 47:6 | **unique** 139:8 |
| 231:9 236:8 | 180:22 183:6 | 47:10 | 140:14 141:3 |
| 244:1,16 246:2 | 187:21,23,24 | **underwriters** | **uniquely** 138:6 |
| 254:7 255:24 | 188:2 194:18 | 46:19 | **unit** 202:12 |
| 255:25 264:7 | 199:12 200:6 | **undo** 199:5 | **united** 1:1 4:11 |
| 268:12 274:3 | 200:11 201:16 | **undoing** 190:7 | 4:12 5:8,16 |
| **underline** | 206:2 209:11 | **undoubtedly** | 12:2,9 13:17 |
| 134:20 | 218:1 221:10 | 187:13 | 13:18 61:15 |
| **underlying** | 222:20 224:2 | **undue** 91:13 | 69:1 105:18,24 |
| 133:12 134:7 | 227:2 230:1 | 140:11 256:11 | 105:25 201:8 |
| 145:17 | 235:22 242:21 | **unequal** | 203:2,5,22 |
| **underpinning** | 245:3 246:2 | 124:23 126:16 | 210:10,25 |
| 135:25 | 247:25 248:1 | 132:23 133:3,6 | 211:21 274:3 |
| **understand** | 250:17 253:7 | 135:3 160:21 | **unliquidated** |
| 19:16 22:22 | 261:20 265:14 | **unfair** 79:2 | 225:22 227:22 |
| 29:12 30:6 | 268:21,25 | 92:3 115:13 | **unmoved** |
| 35:9 39:12 | 276:6,17 | 122:16,19 | 88:12 |
| 40:3 41:1 | **understanding** | 124:10 132:24 | **unnamed** 211:9 |
| 45:22,25 46:7 | 37:2 40:5 | 137:23 155:3 | **unrealistic** |
| 49:1,8,9 54:7 | 45:11 54:8,13 | 160:21 | 145:6 |
| 55:4 65:20 | 64:1 95:23 | **unfairly** 32:1 | **unregistered** |
| 69:12 77:16 | 98:6 106:17 | 116:4,21 | 25:14 36:12 |
| 80:25 81:14,21 | 108:17 112:22 | 117:15 119:17 | 61:15 68:25 |
| 82:19 85:8 | 117:24 118:14 | 134:4 | 89:11,12 |
| 91:9 95:15 | 128:24 133:5 | **unfaithfully** | **unrelated** |
| 98:20 105:16 | 134:11 215:16 | 204:18 | 215:9 |
| 105:24 109:3 | 217:1 243:1 | **unfortunately** | **unresolve** |
| 109:17 111:18 | 246:5 255:17 | 117:25 247:19 | 229:21 |
| 113:1,11,12,14 | 257:2 272:15 | 269:24 | **unsafe** 62:24 |
| 114:9 120:7 | **understood** | **unfounded** | **unsecured** 3:15 |
| 132:14 133:11 | 65:19 70:11 | 268:7 | 12:17 13:2,10 |
| 134:9 137:14 | 173:11 222:15 | **unidentifed** | 56:4,8,13,20 |
| 140:7 143:6 | 223:7 224:12 | 239:1 | 184:6 234:17 |
| 145:1 163:6 | 234:12 235:9 | **unidentified** | 234:19 241:12 |
| 166:16 168:7 | 257:3 | 78:14 201:25 | 276:2 277:3 |
| 168:13,18 | | 228:23 278:19 | |

212-267-6868                 Veritext Legal Solutions                516-608-2400
                                 www.veritext.com

**[trustee - under]**   Page 87

| | | | |
|---|---|---|---|
| 245:23,24 | 274:13 277:19 | 72:5 97:12 | **uncertain** 67:7 |
| 246:8,14,16,24 | **turn** 44:14 | 104:9,9 105:21 | 67:11 |
| 246:25 247:6,9 | 91:1 118:16 | 106:18 189:22 | **uncertainties** |
| 249:12 250:8,9 | 152:7 | 190:2 194:2 | 96:13 |
| 250:12,14 | **turned** 46:4 | 196:11 198:20 | **uncertainty** |
| 260:3 268:12 | **tweets** 87:25 | 201:14 202:4 | 71:10 |
| 268:23 269:3 | **twitter** 168:21 | 202:21 206:5,8 | **unclear** 28:23 |
| 269:23 270:2 | 169:16 | 212:12 213:14 | 229:20 |
| 270:16 272:5 | **two** 16:10 17:2 | 214:23 241:19 | **uncomfortable** |
| 272:24 | 17:11 25:8,13 | 244:5,8,8,9 | 111:21 112:14 |
| **truth** 110:19 | 73:2 74:18 | 269:23 270:2 | **unconscious** |
| 148:18 251:23 | 77:5 107:25 | 270:16 | 256:11 |
| **try** 23:17 30:21 | 108:4 121:8,15 | **ucc** 90:11 | **uncontrovers...** |
| 36:13 39:18 | 130:5 146:14 | 109:16 169:10 | 38:11 |
| 40:24 62:3 | 151:5 175:7 | 237:9,23 | **uncontrovert...** |
| 85:22 91:23 | 185:21 206:6,8 | 238:20 239:6 | 21:11 219:5 |
| 115:21 122:10 | 206:19 210:16 | 239:24 240:1,2 | **undeliverable** |
| 170:17,20 | 213:9 217:6 | 240:10 248:2 | 223:11 |
| 176:11,13 | 222:23 226:5 | 255:1,8,11 | **under** 17:10 |
| 179:11 181:4 | 240:3 | 33:2 35:13,24 | 33:2 35:13,24 |
| 209:7 223:12 | **tx** 8:2,2,5 9:14 | 36:2 37:21 | |
| 237:17 248:4 | 12:20 | 38:3,6,10 39:5 | |
| 258:10 270:1 | **type** 27:23,24 | 40:7,7,10,24 | |
| 276:15 | 96:23 125:1 | 41:20 44:1 | |
| **trying** 24:15 | 160:8 239:15 | 49:6 52:4 | |
| 25:22 26:1,9 | 247:22 266:25 | 53:22 55:13 | |
| 28:5 29:12 | **types** 42:21 | 57:21,22 62:5 | |
| 31:24 33:6 | 189:5 211:9 | 63:11,12,14,23 | |
| 35:12 36:14,14 | **typical** 241:5 | 64:5 65:14 | |
| 37:18,23 46:1 | **typically** | 96:7,9 121:19 | |
| 50:1 73:20 | 111:15 | 124:16 130:11 | |
| 91:19 123:1 | **u** | 167:4 169:21 | |
| 125:13 129:21 | **u** 279:6 | 173:14,19 | |
| 136:21 154:6 | **u.s.** 2:1,10 5:9 | 181:8 189:4 | |
| 184:8 209:12 | 5:17 12:1,8 | 195:13,17,24 | |
| 209:13 218:22 | 28:11 33:16 | 196:25 205:5 | |
| 224:11 261:20 | 34:13 71:12 | 63:25 | 205:23 209:9 |

**[unspecified - vgx]**   Page 89

| | | | |
|---|---|---|---|
| **unspecified** | 138:11,11 | 167:11 | 221:5 228:11 |
| 88:13 | 176:16 194:4 | **valuation** | **vanderbilt** |
| **unsupported** | 257:8 | 89:23 | 13:11 |
| 16:22 55:12 | **used** 16:24 | **value** 21:9 22:2 | **varick** 12:3 |
| 57:19 98:16 | 48:19 70:15 | 53:23 57:13,17 | **variety** 34:25 |
| 102:23 115:17 | 136:4,7,20 | 59:6 62:19 | 137:10 |
| 115:24 116:20 | 160:9 171:23 | 75:16,18 84:21 | **various** 22:6 |
| 117:15,16 | 173:15 201:18 | 86:3 89:6 | 73:6 74:19 |
| 119:8,12,12,14 | 260:21 | 112:20 121:17 | 150:23 153:19 |
| **untethered** | **useful** 278:15 | 124:8 126:12 | 155:22 192:12 |
| 179:4 | **uses** 65:6 | 133:14,14,18 | 202:23 209:4,5 |
| **untimely** | **using** 20:19 | 134:12 135:1 | 223:23 225:25 |
| 210:12 232:2 | 136:24 137:1 | 135:12 136:25 | 246:15 |
| **untrue** 262:1 | **usio** 7:10 9:11 | 138:17,18,22 | **vary** 37:20 |
| **unusual** | **usually** 159:7 | 141:24 142:3 | **vast** 54:21 |
| 242:14 | 264:1 | 142:23,25 | 75:19 |
| **updates** 16:7 | **utc** 273:10 | 143:14,17 | **verbal** 52:14 |
| **uploaded** | **utilities** 133:12 | 145:3,4,5,8,17 | **verbally** |
| 100:4 | **utility** 133:18 | 147:13 148:5 | 169:15 |
| **upset** 79:17 | 134:12,14,23 | 148:10,12 | **verbiage** 168:8 |
| 81:16 159:25 | 134:25 136:6,6 | 149:6,7,21 | 168:25 169:18 |
| **upside** 155:21 | 138:8 141:17 | 150:9 152:3,5 | **verge** 247:1,6 |
| **uptegrove** 5:22 | 141:24 145:16 | 152:8,13 | **vermont** 14:1,2 |
| 201:7,7,11 | 150:22 151:4 | 154:12,13,17 | 102:24 115:18 |
| 202:3 206:1,1 | 152:9 153:17 | 154:20,20,23 | 117:19 118:4 |
| 210:5,9,9 | 160:8 | 154:24 155:1,3 | 128:21,25 |
| 212:4 235:16 | **v** | 155:25 156:17 | 129:11 131:24 |
| 235:16 236:2 | **v** 1:12,19 | 157:8,24 | **version** 200:21 |
| **urge** 219:20 | 142:14 | 158:10,13,21 | 202:23 208:2 |
| **urging** 115:6 | **vague** 27:1 | 158:24,25 | 208:16,18 |
| **urquhart** 8:16 | 218:19 | 159:7,8,9 | 210:18 277:20 |
| 173:7 | **vaguely** 98:4 | 160:10,14 | **versus** 238:19 |
| **usages** 136:14 | **valid** 225:19 | 164:4 177:13 | 256:5 |
| **usd** 150:9 | 231:12 | 219:17 228:25 | **vested** 161:20 |
| **use** 56:10 57:2 | **validity** 171:7 | 242:11 | **veto** 38:21,22 |
| 106:4 134:13 | **valuable** 18:7 | **values** 96:3 | **vgx** 29:4 36:13 |
| 136:8,12,17,21 | 18:10 19:1 | 141:22 155:19 | 38:1,3 39:23 |

212-267-6868                 Veritext Legal Solutions                516-608-2400
                                 www.veritext.com

39:25 40:18
41:2,5,25
42:10,19 43:12
43:23,25 44:4
44:9,14,21,23
45:8,12,13,14
46:4,11,13
47:13 48:6,11
49:5,23,25
50:7 51:7,8,9
51:14 89:7,9
133:2,3,11,13
133:17 134:4,6
134:17,24
135:3,5,12
136:1,14,17,19
136:24,25
137:18 138:1,5
138:7,11,15,18
139:4,11,12,18
139:18,22,25
140:14,18,22
141:14,24
142:7,8,12,16
142:23 143:12
143:14,22,23
144:19,22,23
145:3,8 146:9
146:10 147:4,7
147:10,11
148:7,15,17,21
149:2,5,16,24
150:9,18,21
151:5,6,9,22
152:3,25 153:8
153:12,17,21
154:7,14 155:2
155:3,4,8
156:9,15 157:1
157:4,10,24
158:1,1,8,13
158:24 160:5,9
160:12,14
240:23
**vgx's** 157:10
**viable** 151:16
167:3 177:15
**victim** 250:10
262:2 263:5,6
263:8,11
**victims** 249:15
249:22 252:2
262:2,17
**view** 50:9
102:15 103:10
119:2 129:5
134:24 187:9
202:24 204:22
211:14 222:1
268:7 276:10
**violate** 26:21
28:16 30:11
35:8 37:13
124:20 200:3
203:18 204:17
**violated** 29:9
29:11 203:17
204:24
**violating** 25:25
207:8
**violation** 24:6
32:8 88:13
90:14 203:4
207:18

**violations**
28:22 30:8
**virginia** 9:23
**virtual** 128:3,9
**virtue** 249:25
**voice** 91:14
**voided** 265:3
265:11,15,18
**volatile** 59:7
**volatility** 18:13
**volumes**
159:12
**voluntarily**
163:20 164:17
171:1
**voluntary**
165:8,10 190:6
**volunteering**
164:7
**vote** 67:23
80:20,24 85:2
168:19 169:10
242:9
**voted** 77:9,22
84:17,21,24,25
85:1,5,10
116:12,12,13
116:14 126:9
162:13 165:5
168:20 169:2
239:25 241:16
242:10,14,23
242:25 243:10
277:7
**votes** 77:15
116:23 168:5
169:12

**voting** 77:2,3
80:25 84:16,18
116:10 161:15
162:2,3,5,8
165:3 168:8
169:3,6,12,20
242:4 262:23
268:18
**voy** 1:17
**voyage** 217:17
**voyager** 1:6,10
1:20 6:16 8:17
10:9,18 12:18
13:3 16:3 17:9
18:19,20 20:1
22:18,18 39:24
40:1,5,20
41:12,25 46:13
46:15,25 47:9
53:24 72:17,19
74:10,12,12
75:20 83:17,18
86:14,14,15
87:2,3 130:12
130:13 140:14
140:14,21
141:1,15
143:21 156:1
160:17 163:8
165:15 167:8
168:14 173:9
176:10 186:11
187:1,1,2
217:25 218:13
218:14,15,16
218:16,18
219:15 224:19

225:7 239:16
252:5 254:11
254:15 260:23
261:19 271:15
271:18 276:4
**voyager's**
17:10 60:11
72:12,21 73:3
73:9 74:5 75:9
75:23,24 76:8
82:5 207:17
217:17,20,21
217:21,22
218:10 241:18
**vt** 14:4

**w**

**w** 4:21 279:2
**wachtel** 4:19
**wagers** 272:18
**wait** 33:21
34:4,6 71:3
103:19 121:25
122:20 123:22
124:18 125:9
125:17 127:15
127:23 148:16
168:11 190:22
191:11 198:12
259:6,8
**waiting** 71:10
113:23 253:22
260:8
**waive** 128:18
228:17
**waiver** 185:21
**wake** 72:11
158:11

**walk** 187:20
**wall** 14:18
118:21,21,24
118:25 132:7
**walled** 82:24
**wallets** 74:18
**want** 18:23
26:0 21:24
22:16 25:8
26:5,23 29:14
30:21 31:15
32:6 36:22
39:10 41:4
45:25 48:3,22
49:6 51:5
65:12 77:16,20
78:1,7 79:1
81:5 91:3,12
95:10 99:24
108:11 110:7
112:7,10
113:12,22
114:7 115:24
116:11 118:8
120:9 121:21
122:21,22
125:16 127:15
129:18 131:8
139:18 148:14
148:15 152:21
153:8,21 163:5
165:13 166:12
166:15 167:21
173:10 177:3
180:24 181:3
183:6 188:4
196:2 197:7

199:24 201:13
206:21 207:15
217:11 224:20
232:14 233:22
236:13 237:25
239:3,10,11
248:1 249:12
251:3 252:7
254:6,9 258:12
258:21 259:11
262:16 264:2
265:22,25
267:5,6 268:10
269:2,22
270:12 274:8
278:13
**wanted** 16:16
34:3 42:6 49:2
62:16 66:20
72:13 73:23
78:12 80:5
81:11 92:6
98:12 139:23
140:7 165:12
165:17 181:12
190:24 193:16
198:23 199:14
200:5 201:4,19
202:16,21
205:14 206:13
206:17 216:20
231:4 235:20
236:17 244:12
255:23 267:9
269:18 272:7
272:23

**wanting** 240:7
**wants** 20:14
25:14 36:10,13
132:23 160:20
167:22,24
195:2 201:16
251:10 277:14
**warrant** 268:8
**warren** 14:23
271:10,11,13
271:24
**washington**
5:4,12 7:5
**watching**
242:20
**watkins** 9:1
17:17 84:14
102:6 105:2
110:21 114:20
212:12 259:18
**way** 24:8,9,12
26:15 31:5,16
31:20 32:1
35:10 38:4,23
52:11,23 73:10
97:3 119:15
120:25 121:1
123:20,21
124:1,1,10
125:19 129:25
132:2 136:22
138:11 154:16
154:22 156:16
171:3 173:21
179:8,13,14
190:14 196:24
203:20,24

204:16 233:11
233:16,19
235:23 240:19
262:9,20 263:7
263:18 271:14
**ways** 35:6
120:3 135:6
170:20 228:14
**we've** 18:12
29:20 30:12
51:22 77:25
85:16,25 86:4
87:17,25 88:3
90:7 91:4
100:8 110:16
115:17 124:23
132:13 150:3
153:15 159:19
167:15 170:13
177:22 186:24
188:18 202:8
221:6 225:2
226:25 232:15
232:15 238:19
239:11 245:15
250:24 251:8
255:15 265:17
268:5 273:20
**web** 74:18
**wednesday**
155:19 227:20
227:22
**week** 34:15
118:22 181:13
229:23 242:4
**week's** 255:6

**weekend** 16:7
23:17 33:12
47:20 48:21
242:16 261:17
262:4
**weekends**
91:15
**weekly** 47:15
56:3 86:20
**weeks** 25:8,13
69:22 89:19
100:22 150:8
226:13
**weigh** 52:22
**weighed** 28:8
188:1
**weighing** 89:5
**weight** 268:8
**weinstine** 8:9
**weiss** 6:1
**welcome**
254:21
**went** 73:10
77:1 80:5 81:3
261:5
**whatsoever**
107:19 160:14
182:23 274:9
**wherewithal**
53:16,21 54:17
76:3 83:6,9
99:3 100:6
103:1
**who've** 27:4
**whoever's** 22:6
**wholesale**
218:1

**wide** 245:15
**widely** 96:3
**wiles** 2:9
118:21
**wilhelm**
240:22
**willful** 186:20
186:23
**william** 5:22
201:7 206:1
210:9 235:16
**williams** 3:25
**willing** 35:19
36:24 89:9,17
99:20 159:9,10
230:16,17
**wilmington**
7:19
**wind** 20:16,17
191:4 227:13
276:25
**winddown**
35:22 161:19
161:20,24
162:7,8 226:25
237:13
**winding**
141:19
**winthrop** 3:6
**wise** 176:16
**wish** 52:13
59:22
**wished** 33:4
260:4
**wishes** 104:24
**withdraw**
86:22 87:4

88:4,6 104:3
108:7 136:13
**withdrawal**
86:18 132:3
**withdrawals**
172:9 175:13
175:18,23
176:2,4,9
178:4 271:15
**withdrawing**
175:22
**withdrawn**
57:20 102:18
54:16
**withstood**
153:25
**witness** 61:6
62:16,17
135:19 242:12
279:3
**witnesses** 76:8
253:3 262:11
**woman** 117:4
**wonder** 151:3
**wonderful**
132:8
**wondering**
57:10 153:13
**wooley** 184:21
**word** 256:12
257:8
**wording**
213:11
**words** 215:2
244:2

**wordsmithing**
207:3
**work** 25:5
52:24 91:14,25
94:15 102:22
115:20 128:22
118:13 135:23
136:4,11
139:14 156:16
174:11 177:12
178:19 213:10
218:25 221:24
228:25 233:11
245:12 269:23
270:4 277:21
278:6
**worked** 44:24
72:19 255:5
**working** 94:14
102:9,18 105:6
105:13 154:3
199:23 200:11
245:4 259:23
277:24
**works** 173:23
**world** 17:21
29:23 39:1
71:20 136:19
**worried** 64:9
64:18 127:3
**worse** 78:24
125:11 130:3
**worst** 155:8
**worth** 135:24
137:19 176:12
176:20 178:17
185:19 255:6

**worthless**
152:11
**would've**
180:15 247:15
247:15,17
248:23
**wound** 69:20
188:24
**wrinkle** 150:5
**write** 222:16
248:2 249:7
250:5 251:18
251:21 260:12
**writing** 200:8
**written** 42:23
47:4 200:13
243:18
**wrong** 18:4
37:22 62:22
63:20 64:11
98:8 124:11
147:18 149:12
177:15 192:16
246:12 256:18
270:14 275:8
275:13 276:11
**wrongdoing**
185:8 273:11
**wrongful**
26:16
**wrongfully**
65:11
**wrote** 97:9
169:15

| **x** | |
|---|---|
| **x** 1:3,9,15,23 | |
| 100:7,8 178:16 | |
| 279:1 | |
| **xlt** 207:15 | |
| **xrp** 207:7,9,17 | |
| **y** | |
| **y** 100:7,8 | |
| **yeah** 27:1 | |
| 40:22 41:24 | |
| 42:14 51:17 | |
| 64:2 75:2 | |
| 83:10 127:9 | |
| 131:5 133:4 | |
| 139:3 157:4 | |
| 164:14 168:1,2 | |
| 180:7 185:6 | |
| 192:8 193:14 | |
| 197:7 207:5 | |
| 213:3 216:18 | |
| 233:6 245:10 | |
| 258:1 259:3 | |
| 260:14 262:16 | |
| 262:21 263:24 | |
| 269:10 | |
| **year** 182:11 | |
| 99:4 103:13 | |
| 125:9 176:1,3 | |
| 176:15 225:17 | |
| 247:17 249:2 | |
| **years** 71:17 | |
| 118:23 168:9 | |
| 240:24 249:17 | |
| **yep** 183:4 | |
| **yesterday** | |
| 23:19 78:16 | |

237:5,24
**york** 1:2:3,3
4:6,15,22 6:11
6:19 8:19 9:5
10:11 11:14,18
12:4,12 13:12
13:20 14:8,11
116:3,11,13,16
117:2 118:1
119:11 120:18
120:24 121:2,6
121:18,25
123:10,24
124:18 125:9
125:11,14,16
125:23,24
128:2,18,22
129:3,22,22
194:14
**york's** 121:1
**yorker** 121:9
**yorkers** 122:13
123:19 124:5
127:22
**young** 7:16

**z**
**z** 100:8,8
**zealously**
229:24
**zero** 63:1 64:20
64:20 143:18
143:19 145:9
160:13 177:23
239:15,16

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 22-10943-mew

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   VOYAGER DIGITAL HOLDINGS,

8

9          Debtor.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11                  United States Bankruptcy Court

12                  One Bowling Green

13                  New York, NY  10004

14

15                  March 7, 2023

16                  2:10 PM

17

18

19

20

21  B E F O R E :

22  HON MICHAEL E. WILES

23  U.S. BANKRUPTCY JUDGE

24

25  ECRO:  F. FERGUSON

Page 2

1    HEARING re Court reading decision into the record.
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25    Transcribed by:  Sonya Ledanski Hyde

Page 4

1    UNITED STATES DEPARTMENT OF JUSTICE
2        Attorneys for the U.S. Trustee
3        Alexander Hamilton Custom House
4        New York, NY 10004
5
6    BY:  PETER M. ARONOFF
7        RICHARD C. MORRISSEY
8
9    SECURITIES AND EXCHANGE COMMISSION
10        Attorneys for the Securities and Exchange Commission
11        100 F Street, NE
12        Washington, DC 20549
13
14    BY:  THERESE SCHEUER
15
16    NATIONAL ASSOCIATION OF ATTORNEYS GENERAL
17        Attorneys for States
18        1850 M St NW, 12th Floor
19        Washington, DC, 20036
20
21    BY:  KAREN CORDRY
22
23
24
25

Page 3

1    A P P E A R A N C E S :
2
3    LATHAM & WATKINS
4        Attorneys for Binance.US
5        1271 Avenue of the Americas
6        New York, NY 10020
7
8    BY:  ADAM J. GOLDBERG
9
10    QUINN EMANUEL URQUHART SULLIVAN HEARING OFFICER PARIS
11        Attorneys for Special Committee
12        51 Madison Avenue
13        New York, NY 10010
14
15    BY:  SUSHEEL KIRPALANI
16
17    KIRKLAND & ELLIS LLP
18        Attorneys for the Debtors
19        601 Lexington Avenue
20        New York, NY 10022
21
22    BY:  CHRISTINE OKIKE
23        MIKE SLADE
24
25

A-1365

Page 5

1    UNITED STATES ATTORNEY'S OFFICE
2        Attorneys for United States of America
3        86 Chambers Street, 3rd Floor
4        New York, NY 10007
5
6    BY:  JEAN-DAVID BARNEA
7
8    MCDERMOTT, WILL & EMERY
9        Attorneys for Special Committee
10        One Vanderbilt Avenue
11        New York, NY 10017
12
13    BY:  DARREN AZMAN
14
15    KILPATRICK TOWNSEND & STOCKTON LLP
16        Attorneys for Ad Hoc Group of Equity Interest Holders
17        1114 Avenue of the Americas
18        New York, NY 10036
19
20    BY:  KELLY MOYNIHAN
21
22    TRACY HENDERSHOTT
23        Pro Se Creditor
24
25

1   JOHN LOREN
2        Pro Se Creditor
3
4   GINA DiRESTA
5        Pro Se Creditor
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

1            P R O C E E D I N G S
2        THE COURT:  All right.  We're here for the
3   resumption and hopefully completion of our confirmation
4   hearing in the Voyager case.  There were a few open issues.
5   Number one, I see that the names of the independent
6   directors have been filed and disclosed.
7        MS. OKIKE:  Correct, Your Honor.
8        THE COURT:  Is the representative of the Ad Hoc
9   Equity Committee on the phone?
10        MS. MOYNIHAN:  Yes, Your Honor.  Kelly Moynihan
11   from Patrick Townsend.
12        THE COURT:  Are you pleased with the selection?
13   Do you have any further objection to the people who've been
14   selected and named?
15        MS. MOYNIHAN:  No, Your Honor.  No further
16   objection.  Thank you.
17        THE COURT:  Very good.  We had also left open a
18   question of just how we were going to treat customer data
19   and the transfers of data, particularly for customers who
20   hadn't yet and may not ever become finance customers.  Have
21   we reached any agreements or resolutions of that point?
22        MS. OKIKE:  Yes, Your Honor.  Christine Okike of
23   Kirkland and Ellis on behalf of the Debtors.  I will read
24   into the record the proposed resolution.  So there will be a
25   two-week period for customers to opt out of transferring

---

1   selfies uploaded, identifications, or bank statements, and
2   bank account information.  Any opted-out information would
3   not be acquired by the purchaser in the transaction, and
4   that notice will be provided by the Debtors at the Debtors'
5   expense.  The expense reimbursement start date for the
6   Debtors, which was to begin on March 18, 2000 --
7        THE COURT:  Wait a minute.  Selfies?  I couldn't
8   write fast enough.
9        MS. OKIKE:  Selfies, uploaded IDs.  So driver's
10   licenses, passports, other forms of identification.
11        THE COURT:  Okay.
12        MS. OKIKE:  Bank statements, and bank account
13   information.
14        THE COURT:  Okay.
15        MS. OKIKE:  The expense reimbursement provision
16   for the Debtor --
17        THE COURT:  Social Security numbers?
18        MAN 1:  Your Honor, that would be required
19   (indiscernible).
20        THE COURT:  Why?  Just help me.
21        MAN 1:  That is, along with names and addresses,
22   an important part of identifying and establishing the basis
23   for new customer chats should anyone elect to join the
24   platform in the future.
25        THE COURT:  But I cannot imagine a piece of

---

1   information more quickly and easily given to you if a
2   customer wants to do that than their Social Security number.
3   Why you need that in advance I'm having trouble
4   understanding.
5        MAN 1:  There's a couple of reasons, Your Honor.
6   You know, I think -- and really this, if I may explain all
7   of these issues?
8        THE COURT:  Yeah.
9        MAN 1:  I think there's -- the customer data, just
10   to set the context, Your Honor, is really at the heart of
11   the transaction for Binance.US.  When we agreed to pay the
12   $20 million purchase price, we didn't know how many
13   customers would agree to join the Binance.US platform.  And
14   so the value of each individual customer's future actions on
15   the platform are as unknown.  The only known commodity that
16   Voyager has to sell is the data, and that was at the heart
17   of the deal.
18        So the information has, I think, three main value
19   sources to Binance.US as a technology company that
20   fundamentally depends upon data.  One is the ability to
21   simply reach out to a customer and market to them.  Second,
22   the information is valuable because whenever a customer
23   onboards to the Binance.US platform -- and they may not do
24   that today.  They may do that well down the road.  The
25   cryptocurrency markets are extremely volatile, as we all

A-1366

Page 10

1  know.  There's bear markets like we're in now, and there's
2  bull markets.  And when there's a bull market, many people
3  join the platform that may not have had any intention to do
4  so in the bear market.
5          Having the KYC information mitigates the actual
6  monetary cost that Binance.US would have to pay
7  affirmatively to conduct the KYC each time someone joins.
8  And so having the Social Security number and other
9  information that is not part of this excluded information
10 that Ms. Okike mentioned would be valuable to avoid that
11 actual cash expense to Binance.US.
12         Third, as a technology company that uses data to
13 enable and empower its operations, even if someone doesn't
14 join the platform, the data that Voyager has about their
15 past activities is very valuable in enabling Binance.US to
16 market and conduct and enhance its operations going forward.
17 So that is the source of the value for the transaction --
18         THE COURT:  What does somebody's Social Security
19 number have to do with that third point you just mentioned?
20         MAN 1:  Well, it enables part of the modern
21 marketing process, right?  That -- as Your Honor knows,
22 right, we've received tons of emails, tons of direct mail.
23 That's -- we throw it all out.  We delete it.  But when
24 there's more targeted marketing that can go someone based on
25 knowledge of their circumstances and past transaction

Page 11

1  history, that maximizes the ability to get someone in the
2  door for a retail operation.
3          THE COURT:  If somebody has already opted out of
4  selfies, uploaded IDs, bank statements, and bank account,
5  you would need that information if they later wanted to open
6  an account, right?
7          MAN 1:  Not necessarily, Your Honor.  The first
8  level of KYC that applies to most customers does not require
9  that information.
10         THE COURT:  You don't require that information
11 yourself before the account can actually be up and
12 functioning?
13         MAN 1:  My understanding is that not all of that
14 information is required in all cases.  The --
15         THE COURT:  And why is -- you know, if Voyager
16 sent other information to you, why does the absence of a
17 Social Security number disable the -- you know, your
18 customer data in the way you've kind of suggested to me?  I
19 don't understand that.
20         MAN 1:  Well, my understanding is that when a new
21 customer joins, they would be providing their Social
22 Security number at that time.  And then Binance.US has to
23 pay a third party provider to conduct the KYC in order to
24 run the check on that person.
25         THE COURT:  Okay, but -- so -- but you seem to

Page 12

1  have suggested that the KYC information that you've gotten
2  from the Debtors would somehow not be very good without the
3  Social Security number.  Or are you saying you're actually
4  going to do -- use the Social Security numbers in advance to
5  do KYC checks on everybody who might in the future become a
6  customer?
7          MAN 1:  Your Honor, my understanding from
8  discussions with my client, and obviously there's a number
9  of technical details here, is that, you know, Voyager's
10 already done KYC checks on all of their customers of course,
11 right?  And so part of this transaction is to acquire that
12 information and have the KYC platform for all of these
13 customers in place, and that's a very valuable part of the
14 transaction alone.
15         THE COURT:  Okay.  So whatever this information
16 is, Voyager gives it to you.  Can it be given to you without
17 the Social Security number?  Because it seems to me if
18 somebody wants to be a customer -- if somebody elects not to
19 let you have the Social Security number and then changes
20 their mind, all you do is plug that into what you have.  Or
21 if, as you say, you want to go out and hire somebody to do
22 an additional check, you would have -- you're certainly not
23 going to be put at any great delay because somebody can give
24 you the Social Security number in an instant.
25         MAN 1:  Well, Your Honor, if I may actually

Page 13

1  express my personal experience, about a year ago when crypto
2  markets were pretty hot before all of this, I actually tried
3  to open an account.  And I started doing it, and then I got
4  busy and gave up because it took time and effort to go
5  through.  And I think part of the benefit of having this
6  information in place at Binance.US is that it allows
7  instantaneous KYC checks that have already been, you know,
8  pre-done by Voyager and can be relied upon to some extent as
9  well as avoiding the cost of a third-party service.  And so
10 --
11         THE COURT:  But what I'm not understanding and
12 you're not helping me with is you can have everything all
13 set up, customer name, address, all that information that
14 Voyager gives you.  But the only thing if somebody elects
15 within your two-week period not to let you have the Social
16 Security number, all they would have to do is plug that
17 remaining bit of information into the stuff that you have.
18 I absolutely fail to understand why you need that
19 information in advance.
20         MAN 1:  Well --
21         THE COURT:  It's information that a lot of people
22 regard as very sensitive.
23         MAN 1:  The -- that -- in completing the KYC check
24 would come at cash expense to Binance.US.  In addition, the
25 delay that it takes and requirement for someone to go ahead

Page 14

1  and enter their Social Security number and then run that
2  check, even if it's done relatively quickly, that delay,
3  that extra step could leave to slippage and breakage in a
4  colloquial sense and lose a customer.
5       THE COURT:  Let me try it this way.  If somebody
6  has not given you this other information and you have their
7  Social Security number, then they decide they want to be a
8  customer, and they tell you that, do you have an additional
9  know-your-customer check that you have to do at that time?
10      MAN 1:  My understanding is that if we acquired
11  all of the information with the exclusion of the information
12  we've agreed to leave behind, we would have the KYC
13  information in place for Voyager customers.
14      THE COURT:  So you'd have it in place.  So if you
15  get all of that same information except for the Social
16  Security number, and then somebody wants to be a customer,
17  why do you have to do anything other than plug in the Social
18  Security number?  You keep telling me you have to do a new
19  know-your-customer check.  I don't understand that.  If you
20  have all the other information just not the Social Security
21  number, what's the big deal?
22      MAN 1:  I don't know if that would require a new
23  expense.  It would certainly involve requiring additional
24  information from the customer, an additional step in the
25  process, and that could lose customers.  And that's part of

Page 15

1  the value for the Binance of the ease of getting people in
2  the door in this transaction.
3       THE COURT:  Adding their Social Security number
4  would chase them away.  I remind you that, you know, I'm
5  mindful these are people who only are the people who have
6  opted out of letting you have that information in the first
7  place and who might've changed their minds and come back.
8  Do you think they're going to be scared away because they
9  have to enter a Social Security number?  That seems
10 ridiculous.  Doesn't it?  I'm trying to understand, but I'm
11 not.  You want the information, but I am absolutely at a
12 loss as to why you need it and why it would involve any
13 other expense to you.  Please help me because maybe I'm just
14 not understanding --
15      MAN 1:  I think --
16      THE COURT:  -- how this works.  But what you're
17 telling me doesn't help me at all.
18      MAN 1:  Well, my understanding is it is relevant
19 to the second category of expenses, the ease of bringing
20 someone onto the system.  In addition to that, it is
21 relevant to the third category of value.
22      THE COURT:  But in terms of the ease, if you have
23 all the other information, the difference in ease is whether
24 somebody's Social Security number is already there or
25 whether they have to type in nine digits.  For crying out

Page 16

1  loud, that's nothing.  That's absolutely nothing, right?
2  And if what you're saying is, well, that's going to chase
3  away people who have already in the first instance decided
4  they don't want Binance to have their information but have
5  later changed their minds, that seems preposterous to me.
6       MAN 1:  The third category of information, Your
7  Honor, is the data analytics part.  And whether or not
8  someone joins the platform, the data that Voyager has about
9  their transaction history, and I know Social Security number
10 would be relevant to that, will empower Binance.US' data
11 analytics programs to enhance its own operations and
12 maximize its own profitability.
13      THE COURT:  How?  Help me with that.  What does
14 having the Social Security number allow you to do in terms
15 of that kind of data marketing that you couldn't do without
16 the number if you have all the other information about the
17 customer's name and past history, etcetera?
18      MAN 1:  I think that specific question, Your
19 Honor, to be fair, is a level of detail I'd have to speak to
20 my client about.
21      THE COURT:  Okay.  I think -- I'm not convinced
22 that you need the Social Security numbers, and you're going
23 to have to convince me.  Because we are here, based on your
24 proposal, only talking about whoever would affirmatively opt
25 out of these arrangements.  And I -- as I said yesterday, I

Page 17

1  understand that there are some legitimate reasons why you
2  want to have some information, and certainly some contact
3  information, etcetera.  But that doesn't necessarily mean
4  there is good reason for you to have every bit of sensitive
5  information about a customer at once, particularly if a
6  customer objects and may not want to be a Binance customer.
7  And so I am trying to balance those two.  And I understand
8  you push back on some of this information, but as to the
9  Social Security numbers, what you've told me so far is
10 pretty unconvincing.  Okay.
11      MAN 1:  Okay.  Well, what I'd suggest, Your Honor,
12 is we can proceed to address the other issues and I'll --
13      THE COURT:  Okay.
14      MAN 1:  -- confer with my client.  Thank you.
15      THE COURT:  Very good.  Is it too much to hope
16 that you might have had discussions with the governmental
17 authorities on the exculpation disputes and resolved them?
18      MS. OKIKE:  Your Honor, that is too much to hope.
19 We have had discussions.
20      THE COURT:  Hope springs eternal.
21      MS. OKIKE:  Your Honor, I would like to read the
22 rest of the agreement with respect to the customer
23 information just --
24      THE COURT:  I'm sorry.  Go ahead.
25      MS. OKIKE:  -- on the record because it does

Page 18

1  change certain provisions in the APA.  But then I'm happy to
2  address the exculpation.  So the expense reimbursement start
3  date for the seller will be moved back from March 18, 2023
4  to April 1, 2023.  If --
5        THE COURT:  Okay.
6        MS. OKIKE:  -- the purchaser is ready to close by
7  April 1, 2023, assuming the closing conditions are satisfied
8  or waived by them, and Voyager is not, including because
9  Voyager declines to waive any closing conditions other than
10  breaches or defaults by the purchaser, then Voyager will
11  cease to have the expense reimbursement protection.
12        THE COURT:  Okay.
13        MS. OKIKE:  And the last point is that both
14  parties acknowledge that the closing condition relating to
15  entry and finalization of the APA order, so the prior order
16  of Your Honor authorizing entry into the APA has been
17  satisfied.  And to its knowledge, there is no breach of the
18  APA by the other party as of the date of the confirmation
19  order.
20        THE COURT:  Okay.
21        MS. OKIKE:  So Your Honor, with respect to the
22  exculpation, we have provided language to the various
23  governmental entities.  Honestly, I'm not sure where the
24  various entities stand.  I believe Texas may be okay with
25  the proviso that we are proposing with respect to the

Page 19

1  provisions in the confirmation order related to the
2  governmental entities.  And that proviso basically says
3  provided further, and it goes through all the things that
4  the order is not doing in terms of enjoining governmental
5  entities.  And then says provided further that nothing in
6  this paragraph shall limit the exculpation of the exculpated
7  parties set forth in -- and then we put the exculpation into
8  the confirmation order.  So it's as set forth in Paragraphs
9  61 to 62 of this order.
10        THE COURT:  Let me read for you and for the
11  government my own proposal, all right?  I have to note I
12  believe is narrower than the original plan proposed to which
13  none of these governmental entities objected.  I propose to
14  say the following.  To the fullest extent permissible under
15  applicable law, and without affecting or limiting either the
16  Debtor release or the third-party releases, and except as
17  otherwise specified in the plan, no exculpated parties shall
18  have or incur, and each exculpated party is hereby
19  exculpated from any liability for damages based on the
20  negotiation, execution, and implementation of any
21  transactions approved by the Court.  That's the standard
22  language we have that essentially says Creditors,
23  shareholders, you can't sue saying somebody did something
24  stupid when I've already made a decision that they haven't.
25        In addition, this is back to the language I

Page 20

1  propose, the plan contemplates certain rebalancing
2  transactions and the completion of distributions of
3  cryptocurrencies to Creditors.  The exculpated parties shall
4  have no liability for and are exculpated from any claim for
5  fines, penalties, or damages based on their execution and
6  completion of the rebalancing transactions and the
7  distributions of cryptocurrencies to Creditors in the manner
8  provided in the plan.  For the avoidance of doubt, the
9  foregoing paragraph reflects the fact that confirmation of
10  the plan requires the exculpated parties to engage in
11  certain conduct, and the fact that no regulatory authority
12  has taken the position during the confirmation hearing that
13  such conduct would violate applicable laws or regulations.
14        Nothing in this provision shall limit in any way
15  the powers of any governmental unit to contend that any
16  rebalancing transaction should be stopped or prevented, or
17  that any other action contemplated by the plan should be
18  enjoined or prevented from proceeding further.  Nor does
19  anything in this provision limit the enforcement of any
20  future regulatory or court order that requires that such
21  activities either cease or be modified or limit the
22  penalties that may be applicable if such a future regulatory
23  or court order is issued.
24        Similarly, nothing herein shall limit the
25  authority of the Committee on foreign investment of the

Page 21

1  United States to bar any of the contemplated transactions.
2  Nor does anything in this provision alter the terms of the
3  plan regarding the compliance of the purchaser with the
4  applicable laws in the unsupported jurisdictions before
5  distributions of cryptocurrencies occur in those unsupported
6  jurisdictions.
7        I think the language that I have just read is
8  fairly narrow.  And what it essentially says is, you know,
9  I've got a plan in front of me.  One of the things I'm
10  supposed to consider is whether it's proposed in a means
11  that is in compliance with law.  I have a bunch of people,
12  governmental authorities, who've done nothing except hint
13  that maybe there's some issue, but nothing else.  Nobody
14  else made any other opposition.
15        And if and when I confirm the plan, people will be
16  obligated to do what the plan says.  They won't have a
17  choice.  And I think for a variety of reasons that I can say
18  and that I can go into, they're entitled to the protection
19  that I've just said and entitled to know that when they do
20  what I compel them to do in between the time I do so and up
21  until the time somebody else tells them they can't, they
22  aren't going to be subject to some ex-post facto argument
23  that, hey, we didn't tell you at the time even though we
24  could've.
25        We didn't even make up our minds at the time, but

1  guess what?  You're liable for penalties, and that court
2  order wasn't just approval of a plan.  It was a sentence
3  that you, with -- under no volition of your own, would have
4  to do something that was going to subject you to some
5  liability.  I think that would be an absurd situation for
6  anybody to be in, and I think that language is perfectly
7  appropriate under the applicable authorities.
8        Do the governmental authorities on the phone
9  object to the language I just read?
10       WOMAN 1:  Your Honor, this **(Indiscernible) from
11 the State of Texas.  I think that language is excellent.
12 And subject to the deletion that's in paragraphs where we
13 tried to craft such eloquent wording but didn't, I am fine
14 with that wording.  Thank you.
15       THE COURT:  Okay.
16       MR. BARNEA:  Your Honor, this is J.D. Barnea from
17 the U.S. Attorney's Office.  We were not able to get all of
18 that language down.  There may still be some concerns we
19 have with it, but it's certainly an improvement over what
20 we've seen, especially if it's combined with deleting the
21 injunctive language that was in the proposed order
22 previously.  However, we still may have some concerns about
23 it.  I think we would need to see it written.  If there's
24 any way to send it around in writing, we'd appreciate the
25 opportunity to take a look -- a closer look.

1        MS. CORDRY:  And Your Honor, this is Karen Cordry.
2  I represent a number of other states.  We did not formally
3  speak up yesterday because it seemed like the issues were
4  being raised by other folks.  I think the language you have
5  there seems very appropriate.  And I would note that this
6  all came up with a proviso that was only introduced on March
7  3rd before the -- on March 2nd before the SEC said anything.
8  So we think what you have there does go a very long way
9  towards dealing with our concerns while also protecting the
10 (indiscernible) efforts of the people on the -- you know,
11 who can try to put this plan together.
12       I don't think any of us meant to try to bring
13 those kind of damages and so forth.  So if those assurances
14 are helpful, I think that's -- I think the language seems
15 fine.  Again, sort of like the United States, I look --
16 didn't actually get every bit of it down, but it sounded
17 appropriate as I was listening to it.
18       THE COURT:  All right.
19       MR. SLADE:  Your Honor, I have one thing.
20       THE COURT:  Go ahead.
21       MR. SLADE:  I apologize.  Mike Slade for the
22 Debtors.
23       THE COURT:  Yep.
24       MR. SLADE:  There was one sentence towards the end
25 there where you said nothing limits the penalties that can

1  be imposed.  I assume what you meant is if there's a future
2  decision by the government that tells -- gives us rules --
3        THE COURT:  Yeah, and if there's a --
4        MR. SLADE:  -- and if we violate those rules --
5        THE COURT:  If there's an order saying stop doing
6  this and you violate that order, I'm not exculpating you
7  from that.
8        MR. SLADE:  That's right, but they can impose
9  penalties for the work that we did in reliance on the order
10 before they --
11       THE COURT:  Exactly.
12       MR. SLADE:  -- made their decision.
13       THE COURT:  Exactly.
14       MR. SLADE:  Okay.  We're on the same page.  Thank
15 you, Your Honor.
16       MR. AZMAN:  Your Honor, Darren Azman for the
17 Committee.  I just have three minor comments.  I don't mean
18 nick the language.  I just wanted to clarify something --
19       THE COURT:  Well --
20       MR. AZMAN:  -- given the importance of the issues.
21       THE COURT:  -- we don't -- you know, everybody
22 wants to look at (indiscernible) so let me just say that's
23 what -- I proposed something along those lines recognizing
24 that there may be little tweaks.  But I think that
25 everybody's got the substance of it.

1        MR. AZMAN:  I'll keep my comment to just one point
2  then --
3        THE COURT:  Okay.
4        MR. AZMAN:  -- just to make sure it's clear.  So
5  you mentioned that the exculpated parties could not be
6  liable for fines, penalties, or damages.  I think it needs
7  to be more broader.  It needs to be any civil or criminal
8  liability.  I don't think fines, penalties, or damages
9  necessarily includes somebody going to jail over it.
10       THE COURT:  Okay.
11       MR. BARNEA:  Your Honor, this is J.D. Barnea
12 again.  It would certainly not be appropriate for this Court
13 to enjoin a criminal prosecution of any person for any
14 reason.
15       THE COURT:  Well, if what you're saying is that
16 having sat on the sidelines and said nothing to me to
17 indicate that there's anything illegal about what these
18 people are going to do, that you want to reserve the right
19 to put somebody in jail for doing a rebalancing transaction
20 that they will have no choice but to do under the order that
21 I entered, then I disagree with you.  I think the very
22 suggestion offends me to no end.  I can't believe that you
23 would even take the position in front of me that you should
24 have that right.  It's preposterous.  It's absolutely
25 preposterous.  If you think something's that illegal, speak

Page 26

1   up, but don't dare tell me that you kind of want to reserve
2   that right to do that to somebody.  Go ahead, Mr. Azman.
3       MR. AZMAN:  Your Honor, this is not about hiding
4   in the wings and hoping to arrest someone upon them taking
5   some action.  This is about the authority of a bankruptcy
6   court to tell a criminal prosecutor that he's not allowed to
7   do his job.  We are not -- there is no intention here to
8   ensnare people.  We're not aware of anything specific that
9   would be in that direction.  It's simply that it's not
10  appropriate for any court or any bankruptcy court to declare
11  that someone is free from criminal prosecution.
12      If they commit a crime, they shall get prosecuted
13  for it.  If they have a defense that they were acting in
14  reliance on a court order, that may well be an excellent
15  defense, and perhaps that would be a reason not to prosecute
16  them.  But there's no authority that this court has to order
17  a criminal prosecutor not to prosecute someone.
18      THE COURT:  It's a defense to the extent that I
19  say it's a defense, and that's what I'm doing.  You know, I
20  read the Government's paper, which essentially acknowledges
21  that courts have held that people are entitled to qualified
22  immunity for doing what they're approved to do, and
23  especially what they're ordered to do under a court order.
24  But to suggest that I should allow --
25      MR. AZMAN:  Absolutely as an affirmative defense

Page 27

1   in an enforcement proceeding, but not as a pre-determined
2   bar by a bankruptcy court.
3       THE COURT:  Okay.  Please don't interrupt me in
4   the middle of a sentence.
5       MR. AZMAN:  I'm sorry about that, Your Honor.
6       THE COURT:  What I was trying to say is the
7   suggestion that I should be silent and just leave it for
8   somebody else to decide whether my order has any such
9   qualified effect, or what I myself intend my order to have
10  as its effect, and what I'm telling people to do is
11  ridiculous.  People who will have to do what my order will
12  compel them to do are entitled to know, okay?  And they're
13  entitled to clarity.
14      And some other court who doesn't know bankruptcy
15  is entitled to know what I think people are being compelled
16  to do, and what I think I am authorizing them to do, and
17  what I am in effect, at least on an interim basis until
18  somebody actually steps in and gets an order otherwise, I'm
19  in effect saying by confirming this plan it is okay for you
20  to do this, okay?  And none of you have stepped forward to
21  say otherwise.
22      So people are -- I think I'm the one that ought to
23  be defining that, not some future court.  And leaving it to
24  some future court in complete uncertainty, I don't know how
25  a bankruptcy case could function.  And your arguments that I

Page 28

1   can't do this are belied completely by the fact that there
2   are literally thousands, thousands of confirmed bankruptcy
3   plans that have done exactly this with no objection by you.
4   You know, you've gotten yourselves all stirred up because
5   the Debtors overreached in what they wanted.  And now you
6   want to object to completely ordinary, reasonable provisions
7   that are well-based in authority to which you haven't
8   objected to any of the other bankruptcy cases that I have
9   ever handled.  So I think your position's preposterous.  Go
10  ahead, Mr. Morrissey.
11      MR. MORRISSEY:  Good afternoon, Your Honor.
12  Richard Morrissey for the U.S. Trustee.  The U.S. Trustee
13  will certainly review the Court's language and hopefully we
14  can come to an understanding.  I just wanted to make two
15  points, Your Honor, about what the Debtors are seeking here
16  with respect to exculpation.  And again, I hope the language
17  that Your Honor just read to us will be consistent with our
18  view.
19      The U.S. Trustee believes that the exculpation
20  provision as written in the plan in these cases is
21  different from the corresponding provision in the
22  (Indiscernible).  As a factual matter, my understanding,
23  Your Honor, is that there weren't regulatory actions
24  pending.  And in addition, there were no temporal problems,
25  which is to say that parties in interest were not worried

Page 29

1   about what exculpated parties might do in the future outside
2   of the Court's purview.  And I think I raised this point
3   yesterday.  So we think it was a broader release.  And Your
4   Honor, another issue is -- that I did not raise --
5       MAN 2:  (Indiscernible) --
6       MR. MORRISSEY:  -- yesterday has to do with --
7       MAN 2:  -- (indiscernible).  You did.
8       THE COURT:  Who's talking -- whoever's talking on
9   the phone needs to mute themselves because you're -- and
10  wait until it's your turn to speak, okay?
11      MR. MORRISSEY:  Thank you, Your Honor -- has to do
12  with actions taken upon it by some counsel, which I think
13  Your Honor used the word "defense" in speaking to Mr. Barnea
14  before.  I think that is certainly an affirmative defense in
15  a future proceeding, but it's an issue as to whether that
16  should be part of the ruling here.
17      THE COURT:  All right.  I'm not purporting in any
18  way to modify to the extent to which reliance on the advice
19  of counsel is or is not a defense for anybody.  I'm simply
20  saying that it's quite abundantly clear to everybody that
21  the plan here contemplates rebalancing transactions and
22  distributions of cryptocurrencies.  Any governmental
23  authority that thinks that those activities are illegal
24  anyway is on notice of them and has had a full opportunity
25  to come in and tell me why they are illegal, the Bankruptcy

1  Code says I shouldn't confirm it if the plan is proposed by
2  any means that would violate any law.
3       I absolutely have been and made clear from the
4  beginning that I was ready to consider any actual objections
5  that there was a violation of law.  I don't have any.  I
6  have hints that somebody might think, for reasons that I
7  couldn't quite explain completely, that the two aspects or
8  one aspect of the sale of VGX and perhaps something to do
9  with Binance.US' business operations might raise regulatory
10 issues, but no idea if that means that the transaction
11 cannot be actually accomplished.
12      And therefore, based on the actual record in front
13 of me, no reason at all to think that what the plan calls
14 for people to do would be illegal.  And so when I make that
15 determination and then any fact by confirming the plan leave
16 people with no authority but to do those things that I have
17 in effect found are okay, I think it's preposterous to
18 suggest that somebody -- people who do it would be
19 personally liable.
20      You know, the alternative is to tell the
21 Government you had your chance, you didn't speak up.  You
22 know, this is what the Debtors were trying to do last week.
23 Therefore, forever shut up, there's nothing illegal about
24 this.  I'm not going to do that.  I have no intention of
25 doing that.  That to me would overstep what is reasonable

1  here.
2       I wish, if the regulators had a problem, that they
3  would've spoken up before me because I have absolutely no
4  desire to set anybody on a course that raises any regulatory
5  concerns.  But for whatever reason, the governmental
6  entities either were unwilling or unable to voice their
7  opposition on those points.  So if something happens, if
8  they unlock their regulatory brakes and figure out that they
9  have some objection, they can try to stop what's going on,
10 I'm not going to prevent them from doing that.  But the idea
11 that they should also then be able to come in and claim any
12 kind of liability for the people who have done what I've
13 ordered them to do and the Government took no action to stop
14 it just seems utterly ridiculous to me.  Okay?
15      MR. MORRISSEY:  Thank you, Your Honor.
16      MS. CORDRY:  Your Honor, this is Karen Cordry
17 again.  If I could just say very quickly one point here
18 which is that a typical exculpation provision does include
19 in there in the language that the Debtor had written in
20 another claim that we're exculpated from all of those sorts
21 of causes of action.  Unless there's a determination of
22 actual fraud, willful misconduct, or gross negligence, which
23 indicates that it's possible to have the basic transaction
24 be approved, but they have some aspect of its being carried
25 out constitute one of those provisions.

1       And I think -- and I'm not trying to speak for the
2  United States, but my sense is that that may be the kind of
3  concern that is floating around there, is that the -- that's
4  still -- I mean, it's not like we have been sitting here
5  getting notices of every transaction that goes through in
6  terms of the rebalancing and so forth.  I have known
7  basically from the terms that the overall rebalancing was
8  illegal, but it is possible.  And I think if we use the term
9  "possible" that somebody could do something illegal in the
10 context of that overall approved process.  So I think that's
11 sort of what's floating around out there.
12      THE COURT:  Yeah.  You know, I don't have a
13 problem.  I don't think anybody has a problem with that.
14 Okay?
15      MS. CORDRY:  Yep.  So I think that's kind of where
16 there was still the concern about.
17      THE COURT:  Okay.  All right.  Everybody's going
18 to want to see the language and make little tweaks.  I don't
19 -- I'm not in a position to be able to give it to everybody.
20 I have one copy, which is the copy that I have for the
21 purpose of making my decision right now.
22      MR. MORRISSEY:  Your Honor, Richard Morrissey once
23 again for the U.S. Trustee.  I was going to raise an issue
24 that's separate and apart from confirmation.  I don't know
25 if you wanted me to raise it now or wait until later in the

1  -- later today.
2       THE COURT:  Well, I have a lengthy decision to
3  dictate into the record, and last I heard I had a 5:00
4  deadline.  Where do we stand on the 5:00 issue?
5       MAN 3:  Your Honor, I haven't spoken with my
6  client about it and whether we need more time than that.  I
7  hope not.
8       THE COURT:  We obviously are going to -- because
9  people are going to have to see, if nothing else, the other
10 revisions that I have already told you I want to make to the
11 confirmation order and this particular language.  The idea
12 that I can announce my decision and have an order in the
13 next two hours and ten minutes is just not going to happen.
14      MAN 3:  We'd like to keep things moving along, but
15 what would Your Honor suggest?
16      THE COURT:  I would suggest that people are going
17 to want to -- once I finish my decision, which is going to
18 take a while, people are going to want to see the order, and
19 that you should extend it until 3:00 tomorrow.  Okay.
20      MAN 3:  Let me request that from my client.  In
21 the meantime, we could suggest perhaps sending the language
22 around to the parties via email to the Debtors.
23      THE COURT:  I don't know if anybody --
24      WOMAN 2:  Your Honor, when the attorney for
25 Binance speaks, he has to go near a microphone.  Otherwise

A-1372

1   the people in Court Solutions can't hear him.

2          THE COURT:  I don't think anybody has the language

3   I just read except for me because I wrote it out for myself

4   here.  I don't -- it's not in anything else I've given to

5   anybody else, so...

6          MAN 3:  Correct.

7          THE COURT:  Okay.

8          MAN 3:  Thank you, Your Honor.  All right.

9          MR. MORRISSEY:  Your Honor, the issue I was going

10  to raise just so it's not a mystery to the Court and the

11  parties has to do with Rule 3020.  The version I have of the

12  proposed order, it's Paragraph 118, Waiver of Stay.  Your

13  Honor, the U.S. Trustee would oppose the waiver of the stay.

14  We think that the 14-day stay should be part of the order,

15  and that Rule 20 should be abided by.  Thank you, Your

16  Honor.

17         THE COURT:  All right.  I understand the

18  Government's position.  When is -- if I don't enter a stay,

19  when is the effective date likely to occur at the earliest?

20         MR. GOLDBERG:  Your Honor, Adam Goldberg for

21  Binance.US.  We would be working to bring the plan effective

22  as quickly as possible.

23         THE COURT:  Okay.

24         MR. GOLDBERG:  I'd (indiscernible) for the Debtors

25  for anything else.

1          MS. OKIKE:  Yes, Your Honor.  I think -- Christine

2   Okike for Kirkland and Ellis.  We agree with that.  I do

3   think it's going to take, you know, some time, but we will

4   be working expeditiously to effectuate the plan.

5          MR. KIRPALANI:  Good afternoon, Your Honor.

6   Susheel Kirpalani from Quinn Emanuel on behalf of the

7   Special Committee of the Debtors.  I just wanted to let the

8   Court know, I'm sure you have your own way of wanting to

9   announce things, but I wanted to confirm that Your Honor is

10  aware, and if not I wanted to make Your Honor and all

11  interested parties aware, that we have scaled back the

12  releases.

13         THE COURT:  I saw.

14         MR. KIRPALANI:  And I've got even some additional

15  line item nits to further scale it back because there were

16  things in there --

17         THE COURT:  Okay.

18         MR. KIRPALANI:  -- that I missed.  And so I could

19  read those changes into the record, or I could do it any

20  way you'd like.

21         THE COURT:  We'll final -- I saw an in-concept

22  approve of what you've done, and we'll get the wordsmithing

23  done as we enter the order.

24         MR. KIRPALANI:  Okay.  Thank you, Your Honor.

25         THE COURT:  Okay.  All right.  I want to announce

1   my decision with respect --

2          MS. SCHEUER:  Your Honor, if I may just have one

3   moment.  I'm sorry, Your Honor.  Therese Scheuer for the

4   SEC.  Your Honor, the SEC would also like to request the

5   opportunity to review the changes to the order and Your

6   Honor's proposed -- Your Honor's --

7          THE COURT:  Understood.

8          MS. SCHEUER:  -- exculpation language.

9          THE COURT:  Understood.

10         MS. SCHEUER:  Thank you, Your Honor.

11         THE COURT:  Of course.  I understand.  All right.

12  We are here to consider the proposed confirmation of the

13  plan of reorganization of the Voyager Debtors, and also to

14  consider some other motions that have been filed by

15  Creditors.  The plan contemplates a transaction that is

16  subject to some strict deadlines, so I'm going to dictate my

17  findings and conclusions into the record so that our timing

18  does not unintentionally trigger any termination rights on

19  the part of the proposed purchaser in the pending

20  transaction.

21         I'm asking the Debtors to have a transcript of my

22  rulings prepared as promptly as possible and to be submitted

23  to chambers in Word format.  The decision that I dictate

24  today will explain my rulings and my findings, and we will

25  endeavor to enter an order as soon as we can, reasonably can

1   based on the rulings and findings.  But once we receive the

2   transcript, we will correct spelling, citations, inadvertent

3   errors, and places where I may misspeak or where I may find

4   that I was less clear than I would have liked during the

5   course of my dictation.  And that corrected decision will be

6   entered as the actual official decision of the Court.

7          We had a lengthy hearing that began on Thursday,

8   March 2 and continued through yesterday, Monday, March 6,

9   and to some extent has continued for another hour's worth of

10  argument today.  We have had an unusually large number of

11  participants in the hearing, including a large number of pro

12  se parties who are Voyager accountholders.

13         I want to pause and thank the pro se parties for

14  their participation and for the unusual amount of work and

15  energy that they have put into following this case in

16  comparison to how relatively smaller creditors tend to treat

17  other cases that I have handled.  I appreciate that they are

18  not attorneys, and that they have labored under some

19  significant disadvantages as a result.  I tried wherever

20  possible over the course of the hearing to give the pro se

21  parties the chance to ask their questions even if at times

22  we may have strayed somewhat from the issues that are

23  strictly before the Court in this particular hearing.

24         Unfortunately, I did have to exclude one pro se

25  party who refused to abide by my instructions and who was

1  disrespectful in his conduct.  But the pro se participants
2  clearly have made a very significant effort to be helpful
3  and to follow and to abide by the rules as I explained them,
4  and I greatly appreciate the fact that they did so.
5      The primary issue before me in this hearing is the
6  Debtors' request for a final approval of their Disclosure
7  Statement and confirmation of their proposed Plan of
8  Reorganization.  The plan, as I said, generally speaking
9  provides for a sale of customer accounts to Binance.US,
10  although accountholders can elect not to become customers of
11  Binance.US.  The plan also includes a backup option in the
12  event that the proposed deal with Binance.US does not close
13  or otherwise has stopped from being completed.
14      The Debtors have argued that the proposed deal
15  with Binance.US -- by the way, if I inadvertently say
16  "Binance", I mean "Binance.US" whenever I make my comments
17  here -- that the proposed deal with Binance.US will maximize
18  the ability to make distributions to accountholders in the
19  form of cryptocurrencies rather than cash.  This may have
20  tax benefits to the accountholders, although the tax issues
21  apparently are not completely clear, and nobody has
22  presented evidence to me or made legal submissions to me
23  about the tax issues or tax benefits.
24      The Debtors have also argued that the proposed
25  deal with Binance.US would permit more cryptocurrencies to

1  be distributed in-kind than any of the available
2  alternatives would provide.  They have further argued that
3  the Binance.US deal would limit the amounts of
4  cryptocurrency sales that the Debtors would have to make,
5  and thereby would reduce the extent to which sales by the
6  Debtors might adversely affect market prices, particularly
7  in the case of cryptocurrencies where normal trading volumes
8  are not so robust as others.
9      The objections have focused on many things.  Some
10  objections have raised relatively common bankruptcy issues,
11  such as objections to some of the releases that the Debtors
12  have proposed.  Other objections are focused more
13  specifically on regulatory issues or on the wisdom of
14  potential dealings with Binance.US.
15      Let me say at the outset and as background to my
16  rulings that I cannot think of another case I have had that
17  comes before me in quite a setting like this one does.  I'm
18  aware that there are some people who question the very
19  concept of cryptocurrencies and the whole idea of
20  cryptocurrency investment and trading.  I note that no party
21  in this case has taken such a position, and it's not for me
22  to decide whether any particular investments are good ideas
23  or not.  But it certainly provides an unusual backdrop to
24  this bankruptcy case.
25      I also am aware that Voyager operated and

1  Binance.US currently operates in a regulatory environment
2  that can best be described as highly uncertain.  There are
3  firms that operate as cryptocurrency brokers or exchanges
4  and have done so for several years without being subject to
5  clearer and well-defined regulatory requirements.  The
6  regulators themselves cannot seem to agree as to whether
7  cryptocurrencies are commodities, they may be subject to
8  regulation by the CFTC, or whether they are securities that
9  are subject to securities laws, or neither, or may in some
10  cases one or the other, or even necessarily on what criteria
11  should be applied in making a decision.
12      This uncertainty has persisted despite the fact
13  that the cryptocurrency exchanges have been around for a
14  number of years.  The current regulatory environment can
15  only be characterized as uncertain, but the future
16  regulatory environment can only be characterized as, in my
17  mind, virtually unknowable.  There have been differing
18  proposals in congress to adopt different types of regulatory
19  regimes for cryptocurrency trading.
20      Meanwhile, the SEC has filed some actions against
21  particular firms and with regard to particular
22  cryptocurrencies, and those actions suggest that perhaps a
23  wider regulatory assault may be forthcoming.  The CFTC seems
24  to have announced some positions that may be at odds with
25  the SEC's views.  But just how this will all sort itself

1  out, how the pending actions relating to cryptocurrencies
2  will be decided, and just what future regulatory actions
3  might involve, or how they will affect individual firms or
4  the industry as a whole is very much unclear.
5      Complicating things further is the fact that
6  Voyager operated and Binance.US continues to operate in an
7  industry that has been the subject of some severe financial
8  shocks over the past year.  Many firms were adversely
9  affected by the loan defaults of Three Arrows, including
10  Voyager itself.  The Three Arrows' defaults led to several
11  bankruptcy filings across the country.  The more recent and
12  sudden collapse of FTX has reverberated even more throughout
13  the industry and has also led to some financial problems at
14  other firms.
15      Perhaps most worrisome for me are revelations of
16  apparent misbehavior and misuse of customer assets at some
17  firms.  I certainly do not have all of the evidence as to
18  what happened at FTX, and we will all have to wait until
19  judgments can be entered in that case before we are sure
20  exactly what happened.  However, public statements by the
21  persons currently handling the bankruptcy of FTX have so far
22  indicated that there was an enormous disparity between the
23  way that FTX actually operated and the way it actually used
24  customer assets as opposed to what it had represented to its
25  customers.

1    I'm also aware of the examiner's report about the
2  business conducted at Celsius and how the actual behavior
3  and custody of customer assets at that firm may have
4  differed from public statements as to how customer assets
5  were being treated and custodied.  Once again, I certainly
6  do not have all the evidence as to what actually happened in
7  Celsius, and we'll have to see what further developments
8  there are in that case.  But the examiner's report certainly
9  raised the prospect of a disparity during the way that
10  particular firm actually operated and the representations it
11  made to its customers about how assets were handled.
12    Perhaps to some degree, those kinds of events and
13  the fact that regulatory regimes have been so unclear go
14  hand in hand with each other.  That I don't know for sure.
15  In this particular case, some accountholders and some other
16  parties have referred me to newspapers, or magazine
17  articles, or to a recent letter sent by a group of U.S.
18  senators all raising questions and accusations about how
19  Binance.US does business and how its affiliated companies do
20  business.
21    Despite the questions that have been raised in
22  this regard, however, I have to note that I have been
23  offered absolutely no, I mean literally zero, no actual
24  admissible evidence that would support an accusation that
25  Binance.US is misusing customer assets or is engaged in any

1  misbehavior of any kind at all.  Instead, I am in the
2  absolute unenviable position of having to make a ruling
3  about the proposed transaction in the face of hearsay
4  accusations of potential wrongdoing in an industry where
5  other firms have apparently engaged in real wrongdoing.
6    Knowing that many people are raising questions,
7  and certainly with no desire to put anybody's futures at
8  stake, but with little or more accurately no evidence as to
9  whether there was any good basis at all for any of the
10  questions that have been raised about Binance.US.  So with
11  those observations to put things into context, let me turn
12  to some of the actual objections that have been filed.
13    The first one that I will address is the objection
14  filed by the Securities and Exchange Commission.  The SEC
15  has argued in its written objection that the Debtors cannot
16  prove the feasibility of their proposed plan for two
17  reasons.  First, the SEC argued that in its view the Debtors
18  had the burden to prove that the Debtors' own purchases and
19  sales of cryptocurrencies would not constitute illegal
20  purchases and sales of securities.
21    The objection did not take the position that any
22  particular cryptocurrencies are securities or otherwise
23  explain how or why the Debtors' activities, including their
24  rebalancing activities, might be illegal, although their
25  written objection did contain a vague footnote suggesting

1  that the VTX token was one as to which some unspecified
2  issue might exist.
3    The SEC also suggested that the Debtors should be
4  required to prove that Binance.US is not operating as a
5  securities broker without registering as such.  Once again,
6  the SEC did not actually take the position that Binance.US
7  is operating as an unregistered and unlicensed securities
8  broker.  Instead, it just suggested the Debtors had the
9  burden to prove the negative without offering any evidence
10  or even any reasons to think that Binance.US actually was
11  doing anything for which it required further SEC
12  registrations.
13    I questioned the SEC about these objections at the
14  outset of this hearing, and to some extent I rebuked the SEC
15  attorneys for the vagueness of their submission, although in
16  fairness to them, I think they were just the messengers and
17  not necessarily the architects of the message that they were
18  sent to deliver to me.  Although the SEC contended that the
19  Debtors somehow how to prove a negative, that is that the
20  Debtors were not violating securities laws and that
21  Binance.US is not violating registration requirements for
22  brokers.
23    Once again, the SEC confirmed that it was not
24  affirmatively contending that the Debtors were doing
25  anything wrong, nor that Binance.US was doing anything

1  wrong.  Nor did the SEC have any guidance to offer to any of
2  us to suggest what it was that the Debtors allegedly were
3  supposed to prove with respect to these issues, or how the
4  Debtors could possibly prove what the SEC wanted them to
5  prove without receiving any explanation at all from the SEC
6  and suggest why the Debtors' activities or Binance.US'
7  operations might raise legal issues.
8    Near the end of the hearing on Friday, the SEC
9  asked to provide clarification of the SEC's legal position.
10  It initially asked if it could state its position only to me
11  on an in-camera basis, but I denied that request and ruled
12  that, to the extent the SEC wanted to say something further
13  about its objection, it ought to be stated in the public
14  forum where all interested parties could hear and understand
15  the SEC's position.
16    The SEC representatives then said the following on
17  the record.  First, we were told that the SEC staff believes
18  that the VGX token has aspects of a security, but that the
19  Commission itself has not taken any position on that
20  subject.  Second, we were told that the SEC staff believes
21  that Binance.US is operating as a securities exchange
22  without registering as such.  Once again, the Commission
23  itself has not taken any position on that subject.
24    Although the SEC offered these clarifications as
25  to what the SEC staff apparently believes, it emphasized

A-1375

1    that only the Commission may take a formal position on
2    behalf of the SEC, and that the views of the staff did not
3    necessarily constitute or certainly did not constitute the
4    official views of the SEC.  Furthermore, although the SEC
5    had obtained clearance to reveal the staff's contentions,
6    the SEC confirmed that it was not authorized and did not
7    intend to provide any evidence on these issues or even any
8    further explanation as to the bases for whatever beliefs the
9    SEC staff may have.
10        So to the extent that the SEC nevertheless
11   contends that these issues are bars to the confirmation of
12   the Debtors' plan, I am forced to disagree.  In the first
13   place, I reject the contention that the Court and the
14   Debtors somehow were supposed to figure out for themselves
15   just what it is that the SEC might argue about the VGX
16   token, or about particular activities in which Binance.US
17   might be engaged, as well as the reasons why those matters
18   might have raised securities issues, and then somehow to
19   offer evidence and legal argument to rebut them.
20        This bankruptcy case has been pending since July
21   2022.  Customers and Creditors have been denied access to
22   their assets for many months, and they deserve to have a
23   resolution of this case.  Bankruptcy cases also are very
24   expensive, and each and every delay means that
25   administrative expenses eat away at the recoveries that

1    Creditors may eventually receive.
2        I have a proposed Plan of Reorganization in front
3    of me, and I have an obligation to make a ruling now as to
4    whether it can be confirmed.  I cannot simply put the entire
5    case in an indeterminate and expensive deep freeze while
6    regulators figure out whether they do or do not think there
7    is any problem with the transactions that are being
8    proposed.
9        As I said at the outset of the hearing, if a
10   regulator believes there is a legal issue with respect to
11   something that is proposed in front of me, I am more than
12   anxious to hear an explanation and to consider that issue.
13   I have no desire to approve anything that raises legal
14   issues.  But I expect a regulator not only to tell me that
15   it has an actual objection if there is a legal issue, but
16   also to tell me what the issue is and why it is an issue,
17   that the other parties may address it and so that I may make
18   a proper and well-considered ruling on the point.
19        Here, I don't know how any party could possibly be
20   expected to address the SEC's comments with the limited
21   guidance that the SEC has provided.  The SEC has not
22   explained by the VGX token in its mind should be regarded as
23   a security or what aspects of a security it thinks it has
24   leaving me only to guess as to what the arguments might have
25   been.

1    Similarly, the SEC did not explain why it thought
2    Binance.US might be operating as a securities broker.  I do
3    not know, for example, if there is one specific
4    cryptocurrency token that may have been traded by Binance.US
5    and that the SEC thinks was a security for which the
6    relevant remedy might simply be to stop trading in that
7    token, or whether the SEC has different theories.  If we
8    were to try to address the issues, we would have to guess
9    just what the issues were and would not even have any idea
10   if we were even discussing the right points.
11        I understand and appreciate that the SEC is
12   limited in what it can say about potential enforcement
13   actions, but I cannot conclude from this record that an
14   enforcement action is even likely, let alone whether it is
15   meritorious, or even the bases for any of the issues that an
16   enforcement action might raise.
17        I also cannot determine, even if an action were
18   meritorious, whether it would affect the transactions that I
19   am being asked to approve.  On this very point, for example,
20   I asked the SEC's counsel at the outset of this hearing to
21   explain what the consequences would be if Binance.US were to
22   be found to have been acting as a non-registered
23   broker/dealer.  I asked if that would just mean that
24   Binance.US might have to stop certain activities while it
25   pursued a license, or if it would be that Binance.US would

1    have to shut down all of its activities.  The SEC said it
2    could not answer the question.
3        Notwithstanding that statement, the SEC took the
4    position yesterday that the Debtor's disclosure statement
5    allegedly was deficient because it did not more specifically
6    predict and describe what the results of a regulatory action
7    against Binance.US might be.  As I said yesterday, I do not
8    know how the Debtors could've been expected to be more
9    specific about that question when the SEC itself told me it
10   could not answer the question.
11        In addition, the SEC's argument on these points
12   has all been phrased in terms of whether the Debtors can
13   prove the feasibility of their proposed plan.  Feasibility
14   in bankruptcy parlance is a shorthand reference to the
15   provisions of Section 1129(a)(11) of the Bankruptcy Code,
16   which states that in order to confirm a plan, a court must
17   find that the confirmation "is not likely to be followed by
18   the liquidation or the need for further financial
19   reorganization of the Debtor or any successor to the Debtor
20   under the plan unless such liquidation or reorganization is
21   proposed in the plan."
22        Here the only issues the SEC has raised are, A,
23   whether one specific token, VGX's, is a security; and B,
24   whether Binance.US needs to register as a securities broker.
25   There is no reason why these issues affect feasibility of

A-1376

Page 50

1  the kind that is discussed in Section 1129(a)(11).  As I've
2  said, the SEC has been aware that the VGX token for some
3  time it has not even reached a conclusion of its own as to
4  whether it is a security, let alone taken any action to stop
5  trading in the token.
6          In addition, even if there are problems with the
7  sale or distribution of VGX, there's no reason why, to my
8  knowledge, why that should interfere or impede or affect the
9  remainder of what the Debtors are proposing.  Similarly,
10  even if Binance.US were to be told to stop its business
11  entirely, the Debtors' plan in this case provides that what
12  the parties have called a toggle option under which the
13  Binance.US deal could be stopped and the Debtors would
14  instead make distributions to the extent they could without
15  using Binance.US.
16          There would have to be some practical changes as a
17  result, and the recoveries that accountholders would receive
18  would likely diminish, but the plan itself includes the
19  toggle option.  So there's no reason to think that the
20  issues that the SEC has raised as to Binance.US would mean
21  that the plan couldn't proceed or that it would need a
22  further liquidation or reorganization of the kind that is
23  not already contemplated by the plan.  For that reason, the
24  issues raised by the SEC do not really go to the feasibility
25  of the plan as that term is used in Section 1129(a)(11) of

Page 51

1  the Bankruptcy Code.
2          I appreciate that the SEC made some effort to tell
3  me something about what the staff is thinking, but in the
4  end it did not support the highly conditional objection that
5  the SEC filed.  This is a court.  One of the requirements
6  for confirmation of plan is that the plan has been proposed
7  in good faith and not by any means forbidden by law.
8  Obviously, I have no intention of approving anything that is
9  illegal.  As I said during the hearing, and I think I may be
10  repeating myself now, I expect that if a regulator believes
11  that what is being proposed in a plan would violate any
12  applicable statute or regulation, that the regulator will
13  bring that to my attention so the issue can be resolved.
14          The SEC and all other government agencies have had
15  a full and fair opportunity to object here if they believe
16  that the rebalancing transactions that are being proposed or
17  the distributions of cryptocurrencies that are being
18  contemplated are illegal in any way.  Or if they're in
19  violative of any statute, rule or regulation, they have not
20  actually made any objection on those grounds.  They have
21  only vaguely hinted at issues that have not even been
22  described in a manner that would permit the Court or the
23  parties to address them.
24          I have to make decisions based on actual
25  admissible evidence.  I have no evidence here from the SEC

Page 52

1  or any other party that could support a contention that
2  Voyager is purchasing or selling any token that should be
3  considered to be an unregistered security, or that
4  Binance.US is engaged in any activity for which it is
5  required to register as a broker dealer.
6          I therefore reject and overrule any contention
7  that the transactions contemplated by the plan would be
8  illegal, and any suggestion that for regulatory reasons the
9  Debtors would be unable to complete their proposed
10  liquidation.  The Debtors have offered evidence that
11  Binance.US has the operational and financial capability to
12  perform its obligations and have not been given any evidence
13  to suggest that Binance.US could not legally perform those
14  obligations.
15          For similar reasons, I reject the contentions by
16  the SEC and others to the effect that the Debtors allegedly
17  did not offer sufficient disclosure about potential
18  regulatory risks.  The disclosure statement that was
19  distributed included specific disclosures about regulatory
20  issues faced in so-called unsupported jurisdictions where
21  Binance.US does not have certain regulatory licenses.
22          It also stated that the Debtors' business is
23  subject to an extensive and highly evolving regulatory
24  landscape that involves significant uncertainties, that it
25  is possible that governmental bodies might disagree as to

Page 53

1  whether particular laws or regulations are applicable to the
2  Debtors or to the contemplated transactions, that the
3  Debtors could not predict whether regulators would take the
4  position that additional regulatory approvals are required
5  for the completion of the contemplated transactions, and
6  could not guarantee that there would not be regulatory
7  issues.
8          The disclosure statement also stated generally
9  that consummation of the transactions might depend on
10  obtaining approvals of some governmental units, and that
11  failure to obtain those approvals could prevent or impose
12  limitations or restrictions on the consummation of the
13  transactions contemplated by the plan.
14          Voyager also disclosed all of the regulatory
15  inquiries it had received from federal and state
16  authorities, and nobody has contended to the contrary.
17  Although I note that none of those inquiries related to the
18  two issues that the SEC said that its staff has concerns
19  about.  The disclosure statement disclosed a subpoena from
20  the SEC that Voyager had received in January 2022 relating
21  to the Voyager rewards program and apparently to questions
22  about whether Voyager needed to register as an investment
23  company.
24          The disclosure statement revealed that the SEC had
25  made a follow-up request for some financial statement

Page 54

1   information and other internal documentation in July 2022,
2   and that the CFTC had made inquiries and sent a subpoena in
3   August and September 2022.  And other state and federal
4   inquiries are also described.
5        I do not believe that the disclosure statement,
6   which was circulated in January 2023, needed to be any more
7   specific than that, than what it said, particularly with
8   regard to issues that SEC itself did not identify until
9   March 2023, and that the SEC itself has not been able to
10  explain in anything other than an extremely conclusory form.
11       A number of questions have also been raised about
12  the extent to which accountholders would be protected if
13  they were to become customers of Binance.US.  These
14  objections have been posed by the SEC, the Office of the
15  United States Trustee, the State of Texas, and the State of
16  New York.  Nobody suggests that the Debtors had information
17  that they were hiding from anyone or that the Debtors had
18  and failed to disclose.  Nobody has contended that the
19  Debtors made any misrepresentations as to the Debtors' own
20  conclusions about Binance.US.
21       Instead, the objecting parties have suggested that
22  the Debtors should have obtained or should obtain different
23  or more complete or better assurances from Binance.US as to
24  how it handles and will handle customer assets, and then
25  have argued that the prior disclosures supposedly were

Page 55

1   inadequate because they did not already anticipate or
2   include the results of these additional discussions or
3   assurances that the objecting parties think the Debtors
4   should obtain.
5        Although these objections have been framed as
6   complaints about the disclosures that were included in the
7   disclosure statement, I do not believe that is an accurate
8   way to characterize them.  As I said during the hearing, it
9   is more accurate to say that these are substantive questions
10  masquerading as disclosure issues.  They are substantive
11  complaints about what the Debtors have done or should be
12  doing to assure themselves of a lack of problems before the
13  transaction closes rather than proper objections to the
14  disclosures that the Debtors already made.
15       The Debtors have made clear that their due
16  diligence as to Binance.US does business is a constant
17  ongoing project, and that the Debtors will continue to ask
18  questions and to seek assurances as issues are raised.  We
19  would all be horrified if the Debtors did not do so.  It is
20  simply wrong for various parties to suggest that the January
21  23, 2023 disclosure statement was somehow inadequate because
22  it did not describe all of the follow-up consultations that
23  had not yet taken place, or all of the follow-up assurances
24  that had not yet been received by the Debtors.
25       If I were to impose such a standard, it would

Page 56

1   mean, in effect, that the Debtors would have to stop their
2   due diligence inquiries once a disclosure statement had been
3   approved for fear that the prior disclosures would
4   immediately be rendered deficient and that the entire
5   expensive process would have to start over again to bring
6   everything forward to what the Debtors had more recently
7   discovered.  That would be an absurd result.
8        I do not find anything deficient in what the
9   disclosure statement actually said.  First, the disclosure
10  statement revealed that cryptocurrencies would be
11  transferred to Binance.US only as and when they were to be
12  distributed to customers, and that until such time as the
13  distributions were completed, Binance.US would receive and
14  hold the cryptocurrencies "solely in a custodial capacity in
15  trust and solely for the benefit of accountholders who each
16  open an account on the Binance.US platform."
17       Second, Pages 34 to 36 of the disclosure statement
18  revealed that the Debtors had sought and obtained various
19  assurances from Binance.US, including that Binance.US had
20  the financial resources to complete the proposed
21  transaction, that Binance.US maintains 100 percent reserves
22  for its customers' digital assets, and had substantial
23  capital remaining even if all customers were to withdraw all
24  of their digital assets, that Binance.US does not lend any
25  of its customers' assets or offer margin products on its

Page 57

1   platform, that customer assets transferred to Binance.US
2   would be held by Binance.US pursuant to its standard digital
3   asset wallet infrastructure, which is stored on Amazon Web
4   Services servers located in Northern Virginia and Tokyo, and
5   that Binance.US has various security protocols in place to
6   ensure the safe storage of customer assets, and that those
7   security protocols have achieved various third-party expert
8   certifications attesting to their compliance with industry
9   standards.
10       During the hearing, the Debtors also described
11  other requests for information that they had made and other
12  assurances they had sought.  That included testimony that
13  Binance.US had been asked to provide and had provided a
14  sworn statement as to certain of its business practices.  At
15  my request, the Debtors obtained the consent of Binance.US
16  to offer that sworn certificate as evidence of the diligence
17  the Debtors had conducted and as evidence of the bases for
18  the conclusions the Debtors had reached.
19       The certificate was admitted into evidence and
20  filed on the docket so that all parties could see it.  It is
21  dated February 28, 2023, and it states that Binance.US holds
22  digital assets deposited by its customers solely in a
23  custodial capacity and on a one-to-one reserve basis, that
24  Binance.US segregates the customer assets from the company's
25  digital assets on its general ledger, that only employees of

Page 58

1  Binance.US are able to move or withdraw customer assets,
2  that Binance.US does not lend or rehypothecate customer
3  assets, and that Binance.US maintains security protocols and
4  procedures that are reviewed by independent parties, and
5  that comply with various applicable standards.
6          This evidence does not satisfy everyone.  It's
7  apparent that there are some objectors who are worried about
8  news reports and who would prefer to have nothing to do with
9  Binance.US.  During cross-examination, more than a few
10 objectors pointed out that FTX had also made representations
11 to the Debtors, and that those statements turned out to be
12 false.  Though in fairness, the witnesses have testified
13 that they have ramped up their investigations and increased
14 the information and assurances that they have sought from
15 Binance.US in light of what happened with FTX.
16         I do not mean to cast dispersions on Binance.US
17 when I say this, but it is of course true that in the end we
18 can never be 100 percent sure that a representation is true
19 and correct even when made under oath.  At the same time,
20 however, we do not usually presume that people are lying and
21 we certainly do not usually presume that buyers are
22 dishonest, particularly absence of any evidence suggesting
23 that they actually are.
24         My role as the bankruptcy judge is, in the first
25 instance here, to determine whether the proposed plan

Page 59

1  complies with the provisions of the bankruptcy code itself.
2  As to the business details and the business wisdom of the
3  arrangement, and as to the selection of the proposed
4  purchaser, my role is more limited.  So long as the
5  provisions of the plan comply with the bankruptcy code
6  requirements, my authority is limited to a determination of
7  whether the Debtor's desire to do this particular
8  transaction is within the scope of the Debtors' reasonable
9  business judgment.  See In re Borders Group, Inc., 453 B.R.
10 477, 482 (Bankr. S.D.N.Y. 2011) and cases cited therein.
11         Furthermore, as I've said several times, in
12 considering that issue, I am required to make decisions
13 based on the evidence that is submitted to me.  I understand
14 the point of view of the skeptics here.  Given what has
15 happened in this industry, I cannot help but be worried
16 myself about how any firm might handle customer assets in
17 this business.  But the plan fact of the matter is that I
18 have been given absolutely no admissible evidence, literally
19 none, that would support a conclusion that Binance.US will
20 misuse customer assets or that it cannot be trusted.  The
21 evidence that is actually before me requires me to conclude
22 that the Debtors are exercising reasonable business judgment
23 in electing to proceed with the transaction.
24         I'm going to continue in a moment, but we're going
25 to take a brief break while I give my throat a brief rest.

Page 60

1  (Recess)
2          THE COURT:  Please be seated.  All right.  I had
3  just explained why I believe that the evidence requires me
4  to conclude that the Debtors are exercising reasonable
5  business judgement in electing to proceed with the
6  transaction.
7          That does not mean that I thought that every
8  detail of the proposed transaction was necessary or even
9  appropriate.  During the course of the hearing, I asked the
10 Debtors and Binance U.S. to consider certain changes to the
11 terms of their proposed arrangement that I believed would
12 not affect the primary business terms but that would help to
13 address other concerns and questions that had been raised.
14         First, after our hearing in January, the Binance
15 U.S. deal was clarified to say, and my order entered in
16 January clearly says that from the time when assets are
17 transferred to Binance U.S. until the time they are
18 distributed to accountholders, Binance U.S. would be acting
19 as a distribution agent for Voyager.  Accordingly, during
20 that time, Binance U.S. would only be a nominal owner of the
21 assets.  They would not have any beneficial interest in the
22 assets during that distribution period, and instead, the
23 assets would be held strictly in trust for and in a custody
24 arrangement for either the debtors or the accountholders
25 respectively.  Binance U.S. has also previously confirmed

Page 61

1  that customers may immediately withdraw assets from Binance
2  U.S. if they choose to do so.
3          During the hearing, I suggested that it might make
4  sense if what I have referred to as the distribution period,
5  the period during which Binance is deemed to have no
6  beneficial interest in the assets, were to continue for some
7  time after a customer's account is credited so that
8  customers who wanted to make immediate withdrawals could do
9  so without sacrificing any of the protections that the
10 provisions of the order might provide to them in that
11 regard.
12         Binance U.S. has not only agreed to that suggested
13 change, I think the parties have gone further.  They have
14 agreed with the Debtor to include language in the plan
15 documents to the effect that the assets transferred to
16 Binance by Voyager, if I'm reading it correct, will always
17 be held in strict trust and in custody for customers and
18 that Binance will not have beneficial interest of those
19 assets.  That language now appears in Article 4, Section C
20 of the plan.
21         Second, I asked that the parties consider a change
22 to the proposed treatment of accountholders who live in what
23 the parties have called unsupported jurisdictions, which are
24 four states in which Binance does not have the licenses
25 necessary to distribute cryptocurrencies to customers.  I

Page 62

1    noted that under the parties' contract, customers in other
2    states who do not become customers of Binance U.S. or who
3    would just prefer cash distributions for other reasons will
4    be given cash distributions at the end of a three-month
5    period.  I understand and will address below the issues that
6    have been raised regarding the fact that customers in most
7    states will be able to receive distributions in the form of
8    cryptocurrencies whereas customers in the unsupported
9    jurisdictions will have to wait six months to see if Binance
10   U.S. can obtain the needed approvals and will only be able
11   to get cash distributions if Binance U.S. cannot get such
12   approvals.
13          The question that I raised with the parties,
14   however, is as to accountholders in unsupported
15   jurisdictions who do not want to become Binance U.S.
16   customers and who would prefer to take a cash distribution.
17   Customers in most states can get -- excuse me.  Under the
18   original proposal, customers in most states could get such
19   cash distributions after three months.  And so I raised the
20   question as to why customers in unsupported jurisdictions
21   should not have that same opportunity.  I suggested that it
22   could be made available by giving customers a simple opt-out
23   form by which they could elect to take cash distributions
24   and thereby would be entitled to them at the completion of
25   the same three-month period.  Binance U.S. agreed to this

Page 64

1    contact information in the first instance with the
2    limitation of the transfer of other more sensitive
3    information about bank accounts, social security numbers, et
4    cetera, to such time as a particular customer actually
5    elects to be a Binance U.S. customer.
6           And in response to my concerns, the parties have
7    tentatively agreed that customers will have a two-week opt-
8    out period in which time they would be able to notify the
9    parties and to opt out of any transfer of any selfies or
10   uploaded IDs or bank statements or bank account information,
11   thereby giving them the chance to prevent the transfer of
12   that information to Binance.
13          In my mind, there's still one open issue, which is
14   as to the transfer of social security numbers and whether
15   customers within that same two-week opt-out period should
16   have the right to prevent the transfer of their social
17   security numbers automatically to Binance U.S.
18          Binance U.S. has suggested to me that somehow this
19   information is important to making it -- putting Binance
20   U.S. into a position where it could readily open a customer
21   account if a customer wishes to do so.  But I don't really
22   understand if Binance has all the other information just how
23   hard it would be for a customer at that time simply to enter
24   a social security number.  Yes.
25          MR. GOLDBERG:  Your Honor, I can provide

Page 63

1    proposed change and the change has been incorporated in the
2    plan documents.
3           Third, I know that the parties' agreement includes
4    provisions requiring the transfer of customer data from
5    Voyager to Binance U.S.  Voyager has argued that its
6    customer arrangements permit the transfer of that data.  No
7    party has offered me any contrary evidence or contention.
8           Under the parties' agreement as I understand it,
9    the only customer data that has been transferred so far is
10   as to customers who have already made elections to be
11   customers of Binance U.S.  However, if there is an approval
12   of the transaction, there would be a wholesale transfer to
13   Binance U.S. of all remaining customer data, which would
14   mean that Binance U.S. would receive all customer data for
15   all Voyager customers even if those customers elect not to
16   do business with Binance U.S.
17          I asked whether these terms could be modified to
18   provide further protections with regard to the sensitive
19   customer information of customers who might choose not to be
20   Binance customers and who may not wish Binance U.S. to have
21   their information.
22          I recognize that one of the things that Binance
23   U.S. is buying here is the right to market itself to
24   Voyager's customers.  I asked, however, whether the transfer
25   of customer data to Binance could be limited to customer

Page 65

1    additional information on this point now or at any other
2    time.
3           THE COURT:  Go ahead.
4           MR. GOLDBERG:  Thank you, Your Honor.  I apologize
5    for interrupting, but I thought this was a good time.
6           For the record, Adam Goldberg of Latham & Watkins
7    on behalf of Binance U.S.
8           I've consulted with my client on this issue and
9    can provide additional details of why the social security
10   numbers are of great value to this transaction.
11          There are essentially two levels of KYC checks
12   pursuant to the FinCEN CIP rule, that is the Financial
13   Crimes Enforcement Network, which is a Bureau of the
14   Department of Treasury Customer Identification Program.
15          The first level is basic KYC, and that requires a
16   name, date of birth, address and social security number.
17   The second is advanced.  And that requires selfies,
18   identification documents, and other document uploads.
19   Binance U.S. has agreed to forego the transfer of the
20   information that goes to the advanced KYC, which is of
21   higher long-term value, but is prepared to do so based on
22   Your Honor's comments.
23          The social security networks allow Binance U.S. to
24   clear all of Voyager's customers through the basic level one
25   KYC at no additional cost.  And that KYC clearance would

A-1380

Page 66

1  remain in place forever, indefinitely, under the current
2  regulations.
3      If we don't have that information, the KYC data
4  that would be otherwise acquired, not including social
5  security numbers as Your Honor has requested, that would
6  become stale and would eventually require, should a customer
7  later elect to join the Binance U.S. platform, for example
8  at a time of a bull run in the crypto markets and they
9  change their mind, the cost at present could be up to $20
10  per customer.  And recall there are a million customers in
11  this case, perhaps without coincidence, of the alignment of
12  those figures.
13      So without the social security numbers, Binance
14  U.S. would essentially be acquiring a mailing list for
15  customer marketing, which is of far inferior value relative
16  to the ability to pre-clear for KYC.  So we respectfully
17  submit, Your Honor, that the transfer of social security
18  numbers is permitted under the policy and that that transfer
19  is supported by the Debtor's business judgement, the value
20  to the estate, and the overwhelming creditor vote.
21      THE COURT:  Thank you.  That's very helpful.  But
22  I think you said at an earlier time during the hearing that
23  if a customer has a Binance account and closes it, that the
24  customer can elect to have Binance wipe out all of the data
25  it has for that customer.  Is that right?

Page 67

1      MR. GOLDBERG:  Yes.  That's right, Your Honor.
2  There are a few requirements, such as that there is no
3  pending trades on the account.  But yes, the customer can
4  delete their account.
5      THE COURT:  So what about for people who haven't
6  become Binance customers?  Do they have an equivalent point
7  at which they can ask you to wipe out the information that
8  you have on them?
9      MR. GOLDBERG:  They would have to -- under the
10  current system, they would have to join, create an account,
11  and then they could delete that account.
12      THE COURT:  Seems like an odd step to require
13  people to go through.  Is there some point at which -- I
14  understand you want a marketing period.  Isn't there some
15  point at which you can say that those people who haven't
16  joined you in six months can have the same option to tell
17  you to delete their information as somebody who had already
18  joined you would have?
19      MR. GOLDBERG:  Your Honor, I completely understand
20  your logic here.  And it has some resonance.  But I think
21  the context of this deal is really from a retail
22  perspective.  We want the ability to welcome a customer at
23  any time.  And that's the value of this transaction.  We
24  want a customer to be able to come into the store and see
25  the platform.  And if they want to delete themselves after

Page 68

1  that, they are welcome to do so.  And that's the business
2  agreement that was reached among the parties.
3      So they could join the platform, never buy or sell
4  anything, and then cancel out and tell you to get rid of the
5  information.
6      MR. GOLDBERG:  That's right, Your Honor.
7      THE COURT:  All right.  Thanks.  I appreciate the
8  explanation.
9      MR. GOLDBERG:  Thank you.
10      THE COURT:  All right.  To get back to my
11  decision, I have raised issues about the information that
12  would be transferred and as to abilities of any customers to
13  control the information that's been transferred.  Binance
14  U.S. has agreed that there will be a two-week period during
15  which customers can opt out of the transfer of selfies,
16  uploaded IDs, bank statements, and bank account information.
17  I have raised the question about the transfer of social
18  security numbers and Binance has now given me a better
19  explanation of why it wants that information.
20      I have a lingering concern that, as I just said to
21  counsel, the testimony is that customers who actually open
22  Binance accounts can close them immediately and can
23  immediately tell Binance to dispose of all the information
24  that Binance has obtained about them, whereas customers who
25  don't open accounts can only exercise that right if they

Page 69

1  first go through the process of opening account and never
2  even putting anything in it and then giving that same
3  direction to Binance.  I'm still not a thousand percent
4  convinced that there isn't some way to give Binance the
5  marketing opportunity it wants here while eventually making
6  it easier for customers to have their data expunged, whether
7  at the end of a six-month period or some other period.  And
8  I will leave open the possibility of such a provision in the
9  final order and just ask Binance, since I have only just
10  this very instant raised this question, if it will yet take
11  that additional question from the pestering judge back to
12  its client and find out if there's something we can do.
13  Okay?
14      MR. GOLDBERG:  Thank you, Your Honor.
15      THE COURT:  By the way, do we have confirmation
16  that we don't have a 5:00 deadline?  Because at this pace, I
17  won't even be finished with my decision by then.
18      MR. GOLDBERG:  Your Honor, Binance U.S. agrees to
19  your request of 3:00 p.m. tomorrow.
20      THE COURT:  Thank you very much.  All right.
21      I think that these proposed modifications, subject
22  to answering that one issue that I have just left, clears up
23  many of the objections and issues that came up during the
24  hearing.  There are still some other issues that I will now
25  proceed to discuss.

1    The Office of the United States Trustee raised
2  some other objections to the disclosure statement.  One
3  objection was their contention that the disclosure statement
4  was not clear as to who would hold cryptocurrencies and in
5  what capacities.  I actually think the disclosure statement
6  was clear on that point.  It said, as I noted above, that
7  cryptocurrencies would only be transferred to Binance U.S.
8  as and when they would be distributed to accountholders,
9  that until the distributions were complete, Binance U.S.
10 would only have a nominal and not a beneficial interest in
11 the assets to be transferred, and that all such assets would
12 be held in custody and in trust either for the Debtor's or
13 for the account holders as applicable.
14    I believe that these disclosures were sufficient.
15 And, as I have described above, the parties have actually
16 agreed to additional language to provide further assurances
17 to customers in this regard.
18    The SEC complained that the Debtors did not
19 disclose or that there are meaningful economic benefits to
20 the Binance U.S. transaction apart from the $20 million that
21 Binance would pay -- Binance U.S. would pay in excess of the
22 cryptocurrencies being transferred.  I am going to overrule
23 this objection.
24    The liquidation analysis that was attached to the
25 disclosure statement included projections as to what

1  creditors' recoveries would be under the Binance U.S.
2  proposal, under the alternative toggle proposal, and under a
3  Chapter 7 liquidation.  It stated that for various reasons
4  that were explained in the footnotes, the Debtors believe
5  that the Binance proposal would make approximately $90
6  million more available for distribution, resulting in
7  approximately five percent greater recoveries for creditors
8  when compared to the toggle option and about a 14 percent
9  increase when compared to a possible Chapter 7 liquidation.
10 I think those calculations were sufficient to disclose what
11 the Debtors believed as to the benefits of the Binance U.S.
12 proposal.
13    Now, during the hearing, there were many questions
14 about these calculations.  The Debtors testified that their
15 current estimates are that the Binance deal will produce
16 approximately $100 million more in distributable assets than
17 the so-called toggle plan would provide.  The Debtors
18 explained the assumptions that underlie those calculations,
19 and of course many of them are based on assumptions of what
20 might happen in the market under certain conditions, and
21 therefore they are not guarantees by any means.  But I did
22 find the explanations and testimony to be reasonable and
23 credible.  And I note that no contrary evidence was
24 presented.
25    The State of Texas contended that the disclosure

1  statement was insufficient because it did not make
2  sufficient disclosures about certain features of the Binance
3  U.S. terms of use.  However, I note that the disclosure
4  statement contains many direct links to those terms of use
5  and all of the arguments about provisions that Texas
6  believes customer should know about are taken directly from
7  the terms of use to which the customers were directed.  This
8  is not an argument about actual disclosures and about actual
9  information available to customers so much as it is a
10 contention made in hindsight that the Debtors should have
11 put greater emphasis on particular provisions that Texas at
12 this stage thinks are important and that the Debtor should
13 have highlighted them somehow more prominently in the
14 disclosure statement instead of making available by
15 referring customers to the places where they could be found.
16    I do not find this to be a reason to reject the
17 disclosure statement or a basis on which to decide that the
18 disclosure statement was not adequate and sufficient.  I
19 must note that the State of Texas reviewed the proposed
20 disclosure statement before I gave preliminary approval to
21 it in January 2023 and that the State of Texas filed some
22 objections and comments at that time and that in those
23 objections, Texas did not ask for any further disclosures
24 about the Binance U.S. terms of use.  That just supports my
25 conclusion that this is not really a complaint about

1  something that was material and that had to be disclosed or
2  highlighted so much as it is a kind of belated decision by
3  one party that maybe something could have been given greater
4  emphasis.  But if I were to apply that standard to every
5  disclosure statement that I ever see, I'm not sure any of
6  them would ever pass.
7    Texas has also complained that the disclosure
8  statement allegedly did not disclose the potential effects
9  that a preference lawsuit by Alameda could have on creditor
10 recoveries.  However, the figures quoted in the objection as
11 to how much recoveries would be affected were taken from
12 Exhibit C to the disclosure statement itself, at Page 198 of
13 140, ECF Document 863.
14    During argument, Texas contended that the
15 information was too hard to find, but I note that the
16 information was added to the disclosure statement after
17 there was discussion of the point in January 2023.  And at
18 that time, I approved the addition of the information at
19 exactly the place where it ultimately appears.  To my
20 recollection, no party complained at that time that it
21 should be placed elsewhere.
22    Texas has also complained that the disclosures
23 about creditors' recoveries -- complained in its written
24 objection, I should say, that the disclosures about
25 creditors' recoveries might suggest that recoveries under

1  the plan could be less than they would be in a Chapter 7
2  liquidation.  I don't think Texas is actually continuing to
3  press this objection.  But just for completeness in the
4  record, I will describe it and describe the reasons why I
5  think it has been withdrawn.
6       The problem with the written objection is that it
7  was based on an apples to oranges comparison.  More
8  specifically, Texas compared what the plan recoveries would
9  be if Alameda has a very large, $400 million administrative
10 claim against the estate compared to what the Chapter 7
11 recoveries would be if Alameda does not have such a claim.
12      The truth, however, is that  if Alameda has a
13 large administrative claim, it would have the same claim in
14 both the Chapter 7 liquidation contexts and would
15 have the same proportionate impact on the recoveries in both
16 contexts.  So it therefore would not affect the Debtor's
17 conclusion that the plan recoveries will be better than
18 recoveries in Chapter 7 would be.
19      A number of parties have also objected to the
20 releases that have been proposed in the plan.  Some of these
21 objections are based on misconceptions as to exactly how the
22 releases work.  Just to be clear, the Debtors have proposed
23 to release some claims that the Debtors themselves otherwise
24 would be able to pursue or that the estate would be able to
25 pursue.  Some other parties, Binance U.S. itself for

1  example, and the Debtor's officers and directors, have
2  agreed to release claims that they might own against the
3  Debtors and a long list of other parties.
4       In addition, creditors were given the opportunity,
5  and shareholders, to elect to grant releases, or in
6  bankruptcy terms, to opt in to releases if they chose to do
7  so.  However, the forms that were sent to creditors made
8  clear that nobody was obligated to opt in and that the
9  choice was strictly voluntary.
10      Many bankruptcy plans provide and there is case
11 authority for the proposition that an affirmative vote in
12 favor of a plan is itself a consent to the grant of releases
13 that are set forth in the plan.  But the plan in this case
14 does not say that.  Instead, the plan here provides that no
15 creditor or shareholder has released any claims that are
16 owned by that person or entity unless that person has
17 affirmatively granted such a release by executing the opt-
18 out release form.
19      I believe that this disposes of the objection
20 filed by the Federal Trade Commission and quote relevant
21 portions of the objections posed by the United States
22 Trustee and by certain customers, including Mr. Newsom and
23 Warren, Mr. Hendershott, Mr. Jones, and Mr. (indiscernible).
24 They objected to the approval of non-consensual third-party
25 releases, but there are no non consensual third-party

1  releases here.  There is a separate issue regarding the
2  exculpation provisions of the plan that I will discuss in a
3  moment, but there are no non-consensual third-party
4  releases.
5       There are also challenges to some of the
6  settlements and releases of the Debtor's own claims that are
7  included in the plan.  The United States Trustee filed an
8  objection stating that the released party and releasing
9  party definitions should not include the winddown debtors.
10 My understanding is that change has been made and that
11 this particular objection is moot.
12      The Debtors have also proposed a settlement of
13 claims against the Debtors' CEO, Mr. Ehrlich, and a former
14 chief financial officer, Mr. Psaropoulos.  The Debtors
15 offered evidence that two independent directors had been in
16 charge of the investigation of claims against certain
17 insiders, that the special committee hired outside counsel,
18 the Quinn Emanuel firm, to assist in that investigation,
19 that the special committee had concluded that the only
20 claims against insiders that were worth pursuing were claims
21 against Mr. Ehrlich and Mr. Psaropoulos relating to the
22 Three Arrows loans, that the special committee further
23 concluded that those claims would be subject to various
24 defenses and that the Debtors did not believe and that the
25 directors, excuse me, did not believe that the claims were

1  slam dunks, that the committee had investigated -- special
2  committee had investigated the officers' resources and that
3  the proposed settlements would provide for payments that
4  represent a significant portion of the officers' available
5  assets, that the Debtors would release other claims against
6  the two officer but would not actually release claims
7  relating to the Three Arrows loans and instead would only
8  agree that any further recoveries on the Debtor's claims as
9  to those loans would come from insurance proceeds and not
10 from the individual assets of the settling defendants.
11      The Debtors also reserve their rights to undo a
12 transaction by which Voyager allegedly paid as much as $10
13 million just before its bankruptcy filing for an additional
14 $10 million of director and officer liability coverage.
15      When considering a settlement such as this, the
16 applicable Second Circuit authority makes clear that my role
17 is to determine whether the Debtors' decision to settle was
18 a reasonable one after considering a number of factors.
19      In this case, consistent with the applicable
20 caselaw, I have considered the nature of the claims that
21 would have been asserted, the legal defenses that could have
22 been asserted, including the business judgement defense, the
23 testimony about additional defenses that could have been
24 asserted under the terms of certain exculpatory language in
25 the Debtor's bylaws or other governing documents, the

1  benefits of the proposed settlement, testimony that the
2  settlement was the result of arm's length bargaining, the
3  testimony about the size of the settlement payments in
4  relation to the settling parties' resources, the fact that
5  the settlements preserve the Debtor's rights to pursue the
6  Three Arrows claim further, though further recoveries on
7  such claims would be limited to insurance proceeds, the
8  competency and experience of the counsel retained by the
9  special committee, and the support for the settlement by the
10 official committee of unsecured creditors.  See Iridium
11 Operating LLC v. Official Committee of Unsecured Creditors
12 (In re Iridium Operating LLC), 478 F.3d 452, 462 (2d Cir.
13 2007), citations omitted.
14        I conclude after considering the relevant factors
15 that the settlement with Mr. Ehrlich and Mr. Psaropoulos is
16 a reasonable one and should be approved.  I understand that
17 this is very disappointing to some of the pro se parties who
18 have appeared, a number of whom expressed a strong
19 resentment towards the two settling parties and who
20 expressed a strong desire to pursue them more vigorously and
21 to demand a higher percentage of their net worth as a part
22 of any settlement.  I sympathize with their frustrations,
23 but the only actual evidence I have on these relevant points
24 is the evidence that I have described.  And I am forced to
25 conclude from that evidence that the settlement is in fact a

1  reasonable one.
2        The releases that the Debtors proposed to give
3  were not limited to the releases to be granted as part of
4  the settlement with Mr. Ehrlich and Mr. Psaropoulos.
5  Instead, the Debtors also proposed to grant broad release of
6  claims that the debtors might have against a number of other
7  parties.  The parties who would be the beneficiaries of
8  those releases included the Official Committee of Unsecured
9  Creditors and its members together with a long list of
10 released professionals which appeared to include all of the
11 law firms and other advisors in these cases, plus all
12 "released Voyager employees", a term which was defined as
13 "all directors, officers, and persons employed by each of
14 the Debtors and their affiliates serving in such capacity on
15 or after the petition date but before the effective date."
16        The scope of the releases that the Debtors
17 proposed to give to such persons was extremely broad.  The
18 releases proposed to free all released parties from all
19 cause of action, known or unknown, that the Debtors could
20 have asserted in their own right "or on behalf of the holder
21 of any claim."  I really do not understand this latter
22 phrase at all.  If it is somehow intended to mean that a
23 third party's own claim would be released on the theory that
24 the Debtor somehow could have asserted it in some kind of
25 representative capacity, it is too vague and excessive and I

1  won't allow it.
2        The plan also proposed to release all of the
3  released parties from any claim of any kind that the Debtors
4  might have against those released parties.  And the phrase
5  goes on and on.  "Based on or relating to or in any manner
6  arising from in whole or in part the Debtors...their capital
7  structure, the purchase, sale, or rescission of the purchase
8  or sale of any security of the Debtors, the subject matter
9  of or the transactions giving rise to any claim or interest
10 that is treated in the plan, the business or contractual
11 arrangements between any debtor and any released party, the
12 Debtor's out-of-court restructuring efforts, intercompany
13 transactions between or among a debtor and another debtor,
14 or upon any other act or omission, transaction, agreement,
15 event, or other occurrence related to the Debtors taking
16 place on or before the effective date but with an exclusion
17 for actual fraud, willful misconduct, or gross negligence."
18        The evidence before me, however, did not suggest
19 that the Debtors or the special committee had done any
20 investigation or made any careful consideration of all of
21 the types of claims that would be covered by this sweeping
22 language.  I believe Mr. Kirpalani acknowledged that much
23 during oral argument yesterday.
24        As I said yesterday, this is not a release that is
25 tailored to claims that have actually been renewed and

1  passed by the Debtor.  Instead, it is a release that is
2  deliberately as broad and all-encompassing as possible
3  untethered to any actual review of many of the claims that
4  would be subject to the release.
5        I therefore do not believe that the evidence
6  before me justifies and warrants the full scope of those
7  releases as they were proposed, that the Debtors have since
8  proposed to modify the terms of the proposed releases so
9  that they will be limited to new defined term language
10 matters that the special committee actually investigated.  I
11 may have to look at some of that language myself and will
12 possibly have tweaks to it in the final confirmation order.
13 But in concept, I think that complies with the comments that
14 I made yesterday or my rulings today and that it will be
15 acceptable.
16        I want to pause to reemphasize a point that came
17 up several times during the hearing.  A number of
18 accountholders or shareholders complained during the hearing
19 that they felt that they had been misled as to Voyager's
20 financial condition.  If a customer or shareholder believes
21 he or she was misled or that he or she took actions that he
22 or she otherwise would not have taken and suffered damages
23 as a result based on any claim of misrepresentation of
24 Voyager's financial condition, claims based on those
25 injuries would belong to the customers or shareholders.

1  They would not belong to the Debtors or the estate.

2          The Debtor's proposed releases would release

3  claims that the Debtors were injured due to mismanagement or

4  bad decisions by officers or employees.  The claims for

5  injuries directly suffered by customers or shareholders,

6  injuries that were not just derivative of injuries directly

7  suffered by the Debtors are not affected.

8          The Office of the United States Trustee also

9  objected to the scope of the proposed exculpation provision

10  in the plan.  Broadly speaking, that provision states that

11  certain parties do not have liability for certain

12  transactions and actions that occurred during the course of

13  the bankruptcy case or that will occur in the implementation

14  of a confirmed plan.

15          It is routine that bankruptcy plans contain

16  provisions that state that fiduciaries and other parties do

17  not incur liability by having engaged in transactions that

18  the court has approved and having taken actions that the

19  court has directed them to take.

20          In this case, the version of the plan that was

21  circulated to creditors and other parties-in-interest in

22  January, Docket Number 852, included a proposed exculpation

23  provision that was fairly broad.  It stated in relevant part

24  that exculpated parties would have no liability or anything

25  they had done during the course of the bankruptcy cases that

1  -- or anything that they would do in the course of

2  administering the plan and further stated that they would be

3  deemed to be in compliance with all applicable laws

4  regarding not only the solicitation of votes, but the

5  distribution of considerations pursuant to the plan.  And

6  therefore, an account of those distributions would not be

7  liable at any time for violation of any applicable law,

8  rule, or regulation governing the solicitation of

9  acceptances or rejections of the plan or such distributions

10  made pursuant to the plan.

11          I have previously issued a decision as to what I

12  regard as the proper scope of an exculpation provision and

13  the legal justifications for it.  See In re Aegean Marine

14  Petroleum Network Inc., 599 B.R. 717 (Bankr. S.D.N.Y. 2019).

15          As I noted in Aegean, exculpation provisions are

16  to some extent based on the theory that court-supervised

17  fiduciaries are entitled to qualified immunity for their

18  actions.  However, a proper exculpation provision is also a

19  protection for court-supervised and court-approved

20  transactions.  As I noted there, parties should not be

21  liable for doing things that a court authorizes them to do

22  and that a court decides are reasonable and appropriate

23  things to do and in many instances that a court may direct

24  them to do.  See e.g. Airadigm Communications Inc. v. FFDD

25  (In re Airadigm Communications Inc.), 519 F.3d 640, 655-657

1  (7th Cir. 2008) approving a plan provision that exculpated

2  an entity that funded a plan from liability arising out of

3  or in connection with the confirmation of a plan, except for

4  willful misconduct.

5          In re Granite Broadcasting Corp., 369 B.R. 120,

6  139 (Bankr. S.D.N.Y 2007), approving an exculpation

7  provision that was limited to conduct during the bankruptcy

8  case and noting that the effect of the provision is to

9  require that any claims in connection with the bankruptcy

10  case be raised in the case and not saved for future

11  litigation.

12          My reasoning in the Aegean case has been approved

13  and adopted by other courts in other cases.  See e.g. In re

14  Latam Airlines Group S.A., 2022 Bankr. LEXIS 1725 (Bankr.

15  S.D.N.Y. June 18, 2022), In re In re Murray Metallurgical

16  Coal Holdings, 623 B.R. 444 (Bankr. S.D. Ohio 2021).  Such

17  provisions are proper to protect those who are authorized

18  and who may be directed by the confirmation of a plan to

19  carry out the terms of the plan.  See In re Ditech Holding

20  Corp., 2021 Bankr. LEXIS 2274 (Bankr. S.D.N.Y Aug. 20,

21  2021).

22          In this case, the Debtors and the United States

23  Trustee apparently had discussions, and my understanding is

24  that they had tentatively agreed that the proposed

25  exculpation language in the plan and confirmation order

1  would be scaled back to be more in the lines of what I

2  ordered in the Aegean case.  This became a much bigger

3  issue, however, when at the end of last week, the Debtors

4  filed revisions to their proposed confirmation order that

5  included a number of paragraphs and additions to paragraphs

6  that could have been read as barring all federal and state

7  governmental entities and any other parties at any time from

8  making any assertion of any kind that the Debtors, Binance

9  U.S. or their representatives had done anything of any kind

10  that violates any federal or state law or regulation.

11          It is not my intention to approve anything of that

12  breadth, and I believe I made that clear as soon as the

13  issue came up yesterday.

14          As we discussed the issue yesterday, however, the

15  parties circled back to the proposed exculpation provisions.

16  And certain governmental entities who previously had taken

17  no position whatsoever and made no objection whatsoever to

18  the original exculpation provisions suddenly took the

19  position that as a matter of law, no exculpation provision

20  of any kind can be granted insofar as it would relate to any

21  federal or state statute or regulation.

22          As somebody put it during argument yesterday, the

23  government's position was that any officers or directors or

24  entities who will implement a confirmed plan just have to

25  take their chances as to whether the government might

Page 86

1 contend that what they're doing is illegal and even as to

2 whether the government might seek to punish them for doing

3 not only what I had authorized, but what I had directed them

4 to do as a matter of the confirmed plan.

5         Frankly, I think this position by the government

6 is wholly unreasonable and is based on a serious

7 misunderstanding of just what it means when a court confirms

8 a plan of reorganization and the legal reasons for the

9 exculpation.

10        The approval of a plan of reorganization does not

11 just give a debtor an option to proceed with what the plan

12 provides.  Instead, Section 1142(a)(1) of the Bankruptcy

13 Code states that "The debtor and any entity organized or to

14 be organized for the purpose of carrying out the plan shall

15 carry out the plan and shall comply with any orders of the

16 court."  11 U.S. Code § 1142(a)(1).

17        Section 1142 thereby imposes an affirmative

18 statutory obligation on the debtors, other entities, and

19 their personnel to do what the plan contemplates.  In

20 effect, the confirmation order acts as a court order that

21 the plan be carried out.  In this case, confirmation of the

22 plan will require the debtors, Binance U.S. and their

23 respective personnel and representatives, to complete the

24 rebalancing transactions that the plan contemplates and to

25 make the distributions of cryptocurrencies that the plan

Page 87

1 contemplates.  Once in confirm the plan, they will have no

2 choice but to do so.

3        Here, all of the relevant governmental entities

4 have been on notice of the proposed transactions.  They had

5 every opportunity to tell me if they believed that anything

6 contemplated by the plan would violate any applicable

7 statue, rule, or regulation.  Four states have taken the

8 position that Binance U.S. cannot open customer accounts in

9 those states without additional approvals, and the plan

10 specifically takes account of those objections and that

11 fact.  No other regulators have contended during the

12 confirmation hearing that there is anything illegal in what

13 the plan contemplates.  As noted above, the SEC has hinted

14 vaguely that it thinks there might be issues with the

15 Debtor's sales of VGX and/or with some unspecified aspect of

16 Binance U.S.'s business.  But the SEC has explicitly stopped

17 short of contending that anything actually is illegal and

18 has repeatedly declined to offer evidence or to take a more

19 firm position on these points.

20        In short, what the government is requesting is

21 that I enter a confirmation order that will have the effect

22 under Section 1142 of the Code of compelling employees,

23 officers, professionals, and entities to do the rebalancing

24 transactions that the plan contemplates and to make the

25 distributions that the plan requires while in the view of

A-1386

Page 88

1 the government those same people and entities might then be

2 liable for fines, sanctions, damages, or other liabilities

3 just for doing what my confirmation order affirmatively

4 obligates them to do.  And the government contends that this

5 daunting prospect of future liability should hang over the

6 heads of the parties and their personnel even though the

7 government itself has had every opportunity to identify any

8 legal issues that are posed by the transactions and is not

9 prepared today to say that there is anything wrongful about

10 what we are currently contemplating.

11        That position is absurd.  If the government really

12 wants to litigate the legality of the proposed transaction,

13 it has been free to do so and should have done so during

14 this hearing.  Similarly, if the government truly wishes for

15 me to make a decision today as to whether the transactions

16 are or are not legal and to make that binding, then I will

17 do so.  But if I have to do that based on the evidence that

18 has actually been offered to me and if I were to have to

19 make that decision today, I would have no choice but to

20 conclude that the transactions are perfectly legal because

21 nobody has offered any evidence to the contrary to me.

22 We're not attempting to do that to the government, although

23 I think maybe the Debtors were attempting to do that by the

24 proposals they made at the end of last week.

25        We're not trying to restrict the SEC or any other

Page 89

1 governmental entity's ability to argue in the future that

2 the transactions that we are authorizing and directing

3 should be stopped or prevented from going further for

4 regulatory reasons of any kind.

5        However, it is entirely appropriate that I ensure

6 that in the meantime, that the people and entities who will

7 be directed and required by my confirmation order to

8 complete the transactions contemplated by the plan will not

9 themselves face liability for having already done things

10 that I required them to do and that the government elected

11 not to challenge at the time that requirement was imposed.

12        I do agree that a modification of the original

13 exculpation provision is appropriate, and I am prepared to

14 hold that the exculpation provision should be modified to

15 say something along the lines of the following, recognizing

16 that there will be some inevitable further wordsmithing and

17 that the proposed order will reflect that wordsmithing.

18 What I have in mind is language to the following effect.

19        To the fullest extent permissible under applicable

20 law and without affecting or limiting either the debtor

21 release or the third-party release and except as otherwise

22 specified in the plan, no exculpated party shall have or

23 incur and each exculpated party is hereby exculpated from

24 any liability for damages based on the negotiation,

25 execution, and implementation of any transactions approved

Page 90

1  by the Bankruptcy Court.  That's the standard part of the
2  language that essentially just says that if you have pursued
3  a transaction that I have approved, you can't be sued later
4  by somebody saying it was unreasonable.  Any claims about
5  the reasonableness of the transaction should have been made
6  to me.
7          The proposed language would continue, in addition,
8  the plan contemplates certain rebalancing transactions and
9  the completion of distributions of cryptocurrencies to
10 creditors.  The exculpated party shall have no liability for
11 and are exculpated from any claim for fines, penalties,
12 damages, or other liabilities based on their execution and
13 completion of the rebalancing transaction and the
14 distributions of cryptocurrencies to creditors in the manner
15 provided in the plan.
16         For the avoidance of doubt, the foregoing
17 paragraph reflects the fact that the confirmation of the
18 plan requires the exculpated parties to engage in certain
19 conduct and the fact that no regulatory authority has taken
20 the position during the confirmation hearing that such
21 conduct actually would violate applicable laws or
22 regulations.  Nothing in this provision shall limit in any
23 way the powers of any governmental unit to contend that any
24 rebalancing transaction should be stopped or prevented or
25 that any other action contemplated by the plan should be

Page 91

1  enjoined or prevented from proceeding further, nor does
2  anything in this provision limit the enforcement of any
3  future regulatory or court order that requires that such
4  activities either cease or be modified, nor does anything
5  limit the penalties that might be applicable if such a
6  future regulatory order is issued and violated.  Similarly,
7  nothing herein shall limit the authority of the committee on
8  foreign investment of the United States to bar any of the
9  contemplated transactions, nor does anything in this
10 provision alter the terms of the plan regarding the
11 compliance of the purchaser with applicable laws in the
12 unsupported jurisdictions before distributions of
13 cryptocurrencies occur in those unsupported jurisdictions.
14         This morning when this language was discussed,
15 somebody asked if we could add a typical exclusion for
16 liabilities that reflect actual fraud or willful misconduct.
17 I don't think anybody objects to the addition of such an
18 exclusion.
19         As I understand it, the government has argued that
20 even an exculpation provision of this kind somehow amounts
21 to a third party release that offends the principles set
22 forth in Judge McMahon's decision in the Purdue Pharma case
23 or that it otherwise represents an impermissible effort to
24 interfere with the discretion of regulatory authorities or
25 otherwise exceeds my jurisdiction.

Page 92

1          I think most of the arguments that the government
2  has made in that regard are complete red herrings.  They
3  pose reasons and explanations and legal justifications for
4  what I am doing that are absolutely not the actual legal
5  justifications for what I am doing and then rebut those
6  irrelevant purported legal justifications.
7          The actual authorities on which I have relied,
8  including my own Aegean decision and the decisions that I
9  cited in there are not even discussed in the objections and
10 supplemental submissions that the government authorities
11 made to me.
12         I am not barring the government from trying to
13 stop transactions from occurring.  I am not barring any
14 regulatory contention at all.  I am simply saying that when
15 the government has declined to argue that the rebalancing
16 transaction that the plan contemplates are legal and/or the
17 government has declined to argue that the distributions of
18 cryptocurrencies to creditors that the plan contemplates,
19 either through Binance, or by Voyager if the so-called
20 toggle plan is pursued, are illegal in any way, that
21 individuals who entities who upon confirmation will be
22 required to engage in those activities are entitled to know
23 that I am not thereby sentencing them to an ex post facto
24 contention or finding that they have unknowingly and
25 unwittingly and involuntarily incurred statutory or

Page 93

1  regulatory liabilities for doing what I have ordered that
2  they can do and what my confirmation order compels them to
3  do.  That is fully consistent with ordinary bankruptcy
4  practice with the authorities that I have cited above and
5  with basic principles of equity and estoppel.  It is a fair
6  and proper consequence of the government's own unwillingness
7  or inability to challenge the legality of the contemplated
8  transactions during the hearing that I have held and of the
9  fact that I am entering an order that as a statutory matter
10 not only approves those transactions, but actually requires
11 them to be carried out.
12         I note that the government itself has conceded in
13 the supplemental papers that it filed that many courts have
14 considered participants in bankruptcy proceedings to be
15 protected by a species of qualified immunity for undertaking
16 transactions specifically approved by the bankruptcy court.
17 I think that in effect that is all that I am doing here.
18 And I am not by any means preventing the enforcement of any
19 law or regulation.  Also, I am not stopping any regulatory
20 body from stepping in and attempting to enjoin any act or
21 transaction on any applicable regulatory ground.  If the SEC
22 or any other party believes tomorrow that it has grounds to
23 go to court to enjoin further steps in the completion of
24 this transaction, it is entitled to do so.  I am not barring
25 any such thing.  I am simply saying that if we get six weeks

A-1387

1 down the road and then the SEC decides to take action, that
2 in fairness to the people who have spent six weeks doing
3 what I have compelled them to do, those people cannot have
4 liabilities and sanctions and penalties imposed upon them.
5         I also have a suggestion by the government both
6 today and in the papers that I should simply say nothing
7 about these issues and that if somebody is entitled to
8 immunity of any kind for doing what I have ordered them to
9 do, well, they can just raise that sometime in the future in
10 some other regulatory context and we can just guess as to
11 whether another court might agree with me or whether another
12 court might agree that I even intended to grant such freedom
13 to such people and that otherwise those people should just
14 be left at risk as to what a future court might decide.
15         I don't see how that makes any sense at all.  If
16 the whole idea here is that I am directing something that
17 gives rise to qualified immunity, I should be the one that
18 says what the scope of that immunity is.  Not only does it
19 make sense for me as the court that's making the order to
20 give that guidance and to make that decision, the people who
21 are actually going to be required to do what I am compelling
22 are entitled to know that that's what I am doing, and they
23 are entitled to know that when they do what I have told them
24 to do, it is not subject to the risk that, as I said, that
25 they are being involuntarily sentenced to some sanctions for

1 having done so.  So in that respect, I think the
2 government's suggestion is completely off-base.
3         I also note that the government has taken very --
4 have made very broad-ranged accusations that somehow this is
5 completely beyond my jurisdiction and completely unusual and
6 completely beyond my authority.  I think it's completely
7 within my authority for the reasons that I have cited.  And
8 I also note that that contention by the government is belied
9 by the literally thousands of confirmed bankruptcy plans
10 over the past more than 20 years I am sure that have
11 included similar exculpation provisions without any
12 complaint whatsoever by any of these same governmental
13 authorities.  In fact, I have approved similar provisions in
14 my time as a bankruptcy judge and recall no objections to
15 them of the kind that the governmental authorities have
16 raised over the past two days.
17         I also have an objection by the State of New York
18 to the effect that the plan allegedly provides for an unfair
19 discrimination in the treatment of New York customers as
20 opposed to customers in other states.  The State of Texas
21 has made a similar objection.  It appears though that the
22 Debtors and Binance U.S. have resolved a similar issue as to
23 Vermont and possibly as to Hawaii.  In any event, the State
24 of Hawaii has not pressed any objection before me during
25 this hearing.  The gist of the New York objection is that

1 customers in 48 states where Binance has the required
2 licenses may receive cryptocurrency distributions relatively
3 quickly but that Binance and the Debtors cannot legally do
4 the same thing in New York.  Accordingly, customers in New
5 York would have to wait until such time as Binance may
6 obtain the necessary approvals in New York.  Under the plan,
7 if such approvals are not obtained within six months, the
8 New York customers will receive cash distributions instead
9 of distributions that include cryptocurrencies.
10         Curiously, although the State of New York and the
11 State of Texas have filed objections, it does not appear
12 that a single New Yorker accountholder has objected on this
13 ground, and perhaps only one Texas accountholder.  This
14 perhaps raises a standing issue as to the State of New York,
15 but I do not believe I need to consider that question
16 because I believe that in any event, the objection does not
17 have merit.
18         New York has asserted that the plan unfairly
19 discriminates between customers in New York and customers in
20 other states.  Unfair discrimination technically is not
21 really the right way to describe the objection.  Section
22 1129(b) of the Bankruptcy Code provides that a plan may be
23 confirmed even if not all classes have voted to accept it so
24 long as certain conditions are met.  One of those conditions
25 is that the plan does not discriminate unfairly with respect

1 to each class of claim or interest that is impaired under
2 and has not accepted the plan.  Here, the relevant class is
3 Class Three, which is made up of accountholders.  That class
4 has overwhelmingly voted to accept the plan.
5         I think what the state regulators really mean to
6 argue is that the plan allegedly does not provide the same
7 treatment to all members of Class Three as is required by
8 Section 1123(a)(4) of the Bankruptcy Code.
9         I think there may have been a basis for this
10 objection insofar as it related to the treatment of
11 accountholders who chose not to receive cryptocurrencies and
12 who instead wished to take cash distributions.  The plan as
13 proposed would have allowed most customers to receive cash
14 once three months had passed and they had not affirmatively
15 elected to be customers of Binance.  Customers in the
16 unsupported jurisdictions, however, would have had to wait
17 six months while Binance tried to work things out with
18 regulators even if they did not want to be Binance U.S.
19 customers and even if they wanted cash.  Binance, however,
20 as I have noted, has agreed to change this provision and now
21 the treatment of creditors who want cash is exactly the same
22 in all states.
23         I do not otherwise believe that the objection is
24 correct.  It is quite clear that the Debtors and Binance
25 U.S. would like to make in-kind distributions to all

1  customers in all states.  It is not the terms of the plan

2  that prevent the Debtors and Binance from doing so, it is

3  the different regulatory requirements and licenses in the

4  different states that account for any different treatment

5  that may occur.  Or to put it another way, the plan provides

6  in essence that the Debtors will make in-kind distributions

7  to customers as soon as they become customers of Binance and

8  as soon as the applicable rules and regulations in a given

9  state permit such distributions.

10          However, we are not free to ignore the fact that

11  in certain states, that cannot be accomplished as readily as

12  in others.  That does not mean that the plan is providing

13  for different treatment of different customers, it just

14  means that the plan itself does not have the power to sweep

15  away the different regulations that apply in different

16  states and does not have the power to grant licenses to

17  Voyager and/or Binance that they do not already have.

18          Every customer's initial distribution rights will

19  be determined on the effective date -- excuse me, on the

20  same date.  The different regulatory regimes in different

21  states may mean that some customers receive distributions on

22  different dates or in different forms, but the Debtors

23  cannot do anything about that.  The only solution to the

24  problem New York has raised would be to force everyone in

25  the entire country to delay their distributions until such

1  time as the necessary approvals are in place, if ever, to

2  make distributions to New York customers.  That would not

3  make any sense and it is not required by any provision of

4  the Bankruptcy Code, and the State of New York acknowledged

5  during argument yesterday that it is not requesting such a

6  result.

7          At one point I believe one of the unsupported

8  jurisdictions argued that cryptocurrency prices can vary

9  over time so the value of the consideration that customers

10  receive may be different when the customers actually receive

11  it.  But that often happens under bankruptcy plans.

12          In the American Airlines case, for example,

13  creditors were entitled to receive stock as distributions on

14  their allowed claims.  There were many disputed claims,

15  however.  And the people who held those claims only received

16  stock as and when their claims were allowed.

17          In the Meantime, the stock price changed,

18  sometimes very significantly.  But there was no way for the

19  debtors to control for those price changes and no practical

20  way for any debtor to ensure that the stock that was

21  reserved and later distributed would have the same value on

22  every distribution date.  The creditors received the same

23  amounts of stock, which is all that the Bankruptcy Code

24  required, and as a practical matter, the only thing that the

25  bankruptcy could require when property other than cash is

1  being distributed.

2          Similarly here, the Debtors cannot solve for the

3  fact that cryptocurrency prices inevitably will fluctuate.

4  The distributions that are calculated for creditors will be

5  done on the same day and on the same basis.  However, some

6  creditors will have disputed claims and will not receive

7  distributions until disputes are resolved.  Other creditors

8  may face delays due to regulatory issues or simply due to

9  delays in their own submission and processing of paperwork

10  needed to open the Binance account.  It is just inevitable

11  that some customers will actually receive distributions on

12  different dates and that market values on those dates may

13  fluctuate, but that does not amount to an unequal treatment

14  proposed by the plan.  I therefore overrule the objections

15  as to the plan's treatment of customers in unsupported

16  jurisdictions.

17          There were also objections that were filed as to

18  the identity of the proposed plan administrator, Mr. Paul

19  Hage.  Many of the objections suggested that the job should

20  not go to anyone associated with the Official Committee of

21  Unsecured Creditors or their individual members apparently

22  because a number of accountholders are not happy with the

23  Committee's decisions and its work.

24          Mr. Hage testified about his qualifications and

25  answered questions about his work in this case and also

1  whether he has any conflicts of interest that would prevent

2  him from serving as the plan administrator.  He testified

3  that he was the personal attorney to an individual who was a

4  member of the Unsecured Creditors' Committee and that at the

5  outset of the case he gave some advice to committee members

6  as to how they could organize the process by which they

7  selected a law firm to act as counsel to the committee.

8          A number of customers postulated that the

9  individual who Mr. Hage represented was a close friend of

10  Mr. Ehrlich, the CEO of the Debtors, and that this had

11  improperly influenced the Unsecured Creditors' Committee in

12  considering the settlement with Mr. Ehrlich that is embodied

13  in the plan.

14          However, Mr. Hage testified credibly that the

15  relevant committee member was a large customer of Voyager

16  whose friendly relationship with Mr. Ehrlich ended when

17  Voyager shut down its platform.  Mr. Hage further testified

18  that the relevant committee member actually spoke out

19  against the proposed settlement when this was presented for

20  the committees' review and that he ultimately abstained from

21  voting after the votes of other committee members had

22  already made clear that the creditors' committee approved of

23  the settlement terms.

24          I do not believe that the evidence supports the

25  contention that Mr. Hage's limited connections to this

Page 102

1 committee member gave rise to conflicts of interest or that
2 in the real world they would affect his work.
3       There were objections as to whether Mr. Hage
4 should be appointed because he has never been a plan
5 administrator before.  Anybody who has extensive experience
6 in the bankruptcy world and has represented both debtors and
7 creditors is qualified to do the work that a plan
8 administrator in a case such as this will be required to
9 perform.  And Mr. Hage absolutely has those qualifications
10 in spaces.
11      There were also expressions of concerns by some
12 pro se investors that I can only say amount to a desire to
13 have more of a pit bull as a plan administrator, someone who
14 will be absolutely more aggressive and satisfy the desires
15 of some people for more aggressive treatment of the people
16 who ran Voyager and more aggressive pursuit of potential
17 litigation claims.
18      I understand what's behind that attitude.  It does
19 not actually in the real world translate into what makes for
20 an effective plan administrator, or in my personal
21 experience, what makes for an effective litigator.  People
22 who aren't lawyers sometimes think that it is the snarliest
23 and nastiest people who are the most effective litigators.
24 People who actually do litigation and certainly judges know
25 that those are often the people who are the least effective

Page 103

1 litigators.  They are the most annoying and they may satisfy
2 clients' desires to inflict pain on an adversary, but by all
3 means they are absolutely not necessarily the most
4 effective.  So I don't think that particular criticism of
5 Mr. Hage is well-taken and I find that he is qualified for
6 the work and that his appointment is reasonable.
7       An ad hoc group of equity securityholders objected
8 to the way the plan described the treatment of intercompany
9 claims.  I was under the impression that had been resolved
10 until yesterday.  Some additional questions were raised.  I
11 won't go into those in detail because the Debtors have now
12 agreed and have disclosed the names of the people who will
13 serve as independent directors of each of the separate
14 debtor estates, and it is clear that if there is a conflict
15 of interest between those estates, that the independent
16 directors will have the right to appear and be heard on any
17 issue involving where such a conflict exists.  And I
18 understand that those provisions had been included in the
19 plan documents and that this objection is resolved.
20      A lot of other objections have been resolved and
21 don't need to be discussed in detail here.  The amended
22 plan, as requested by the U.S. Trustee, has deleted
23 provisions deeming all claims to be objected to.  The
24 proposal that the winddown debtor would have the sole
25 authority to object to claims has been deleted.  Provisions

Page 104

1 regarding the treatment of late claims have been modified to
2 make clear that they will be disallowed only as I so order.
3 Some Alameda FTX had at one point had objections, but it has
4 dropped its objections.
5       The Bank of New York had an absolutely curious
6 objection based on the odd fact that somebody apparently
7 purported recently to transfer some real property to
8 Voyager's name and Bank of New York has a mortgage lien on
9 that property.  That one was relatively easy to dispense
10 with, and the confirmation order will provide Voyager is not
11 claiming any ownership or interest in that property and that
12 the automatic stay is no bar to the Bank of New York doing
13 whatever it needs to do to enforce its mortgage.
14      I had previously indicated yesterday that I
15 thought that the plan needed to be modified to say that --
16 to delete the provisions that said that the plan
17 administrator and the Debtor do not have responsibility to
18 try to locate people for whom checks or other communications
19 were returned as undeliverable.  Those provisions have been
20 changed and I am satisfied with those changes.
21      I also said that the proposed provisions regarding
22 professional fees had to be modified to make clear that
23 their fees and their compliance with the provisions of the
24 Bankruptcy Code have to continue through the effective date,
25 not just through the confirmation date.  I haven't actually

Page 105

1 seen if those changes have been made, but I cannot imagine
2 that they are controversial at all.
3       Finally, there are a few other objections that
4 were made but that I do not believe had merit.  One owner of
5 the VGX token argued that owners of VGX are being unfairly
6 discriminated against.  This is based primarily on the fact
7 that there is no guarantee that the VGX token will continue
8 to be traded in a meaningful way and argues that a guarantee
9 that the VGX token will continue to have much if any value.
10      I note that under the terms of the plan, the
11 amount of the allowed claims that customers have based on
12 their VGX holdings will be based on the value that VGX had
13 on the date that the cases were commenced and not based on
14 its current value.
15      However, to the extent that some of the customers'
16 distributions will be in the form of VGX, the values of
17 those distributions will be based on the value that VGX has
18 on a specified date in advance of the actual distributions.
19      The goal is to try, if possible, to make some in-
20 kind distributions if they can be made, thereby possibly
21 reducing tax consequences.  But we have no guarantee that
22 will work from a tax perspective.
23      I do not believe the Debtors are in a position to
24 guarantee that VGX will continue to be traded any more than
25 the Debtors can guarantee that any of the other coins that

A-1390

Page 106

1 will be distributed will continue to be traded.  Similarly,
2 the Debtors can make no guarantees about what will happen to
3 the future values of any of the coins.  Those are all things
4 that will depend on market forces.
5          Customers who elect to receive in-kind
6 distributions instead of cash distributions will receive VGX
7 if they previously owned some VGX.  But I don't think this
8 amounts to a deferential treatment or an improper
9 discrimination in violation of any code requirements.
10         The gist of the suggestion I think yesterday was
11 that it is okay to treat other cryptocurrencies as having
12 values based upon their market prices, but that somehow the
13 market prices of VGX are actually illusory.  Ordinarily, the
14 market price of an asset represents the market's assessment
15 of the potential risk and rewards associated with that
16 asset.  Even when a stock or other marketable item may
17 appear to have little future prospect of value, it may
18 nevertheless carry an option value based on the possibility
19 that circumstances will occur that will lead to future
20 values.  Those option values or other market values are real
21 values in the absence of proof to the contrary.  And I
22 certainly understand the objectors' worries about VGX, but I
23 have no contrary proof here or nothing that would allow me
24 essentially to say that the VGX token should be excluded
25 from the distribution process and treated just as though it

Page 107

1 didn't exist and just as though its value was a nullity.
2          I have one objection to the effect that the plan
3 does not provide for a recovery for the holders of equity at
4 the ultimate holding company level.  In fact, the plan makes
5 clear that those equity holders will be entitled to
6 distributions if that ultimate holding company has assets
7 once it pays its own creditors in full, although the current
8 predictions are that that will not happen.
9          I believe I have addressed all of the objections
10 that have been filed.  And for the reasons stated, I have
11 overruled the remaining objections.  I therefore will
12 confirm the plan subject to the changes that I have
13 described.
14         As to the confirmation order, there are a number
15 of provisions that seem to me to be superfluous or
16 repetitive or otherwise unnecessary, or in a few instances
17 improper.  And I have made substantial revisions to the
18 proposed confirmation order.  And this morning, without
19 making any changes that would suggest how I would rule here,
20 I gave a form of confirmation order to the Debtors that
21 showed those other changes that I would require in the event
22 I were to confirm the plan.  There are a lot of questions
23 and a lot of things that are in the draft order that may not
24 necessarily work in light of other provisions that I
25 understand are in the plan, but I'm not going to try to

Page 108

1 address those now.  We will over the course of the next day
2 or so try to work out the terms of the final confirmation
3 order and any of those remaining issues will be resolved in
4 that process.
5          Is there anything else that anybody thinks I need
6 to address in the course of this decision on the
7 confirmation?
8          MR. ARONOFF:  Your Honor, this is Peter Aronoff
9 from the U.S. Attorney's Office for the Southern District of
10 New York.
11         We had filed a letter around midday today
12 requesting that the Court modify the provision in the
13 confirmation order regarding the 14-day default stay
14 (indiscernible).  I know other parties have also raised
15 that.  I just wanted to (indiscernible).
16         THE COURT:  I suspect that's why Mr. Morrissey is
17 also standing up.  I'm not going to give you the 14-day
18 stay, but I'm not going to force some poor district judge to
19 live with the kind of schedule I've been living with over
20 the last five days.  And so I will give you a -- if we enter
21 an order tomorrow, I will stay its effect until Monday.
22         MR. ARONOFF:  Understood, Your Honor.
23         THE COURT:  Before I say that I'm going to do
24 that, is that going to violate some term of the Binance U.S.
25 deal?

Page 109

1          MR. SLADE:  That's why I was looking at Mr.
2 Goldberg.
3          MR. GOLDBERG:  Your Honor, Adam Goldberg with
4 Latham & Watkins.  Binance U.S.'s goal is to complete this
5 transaction as quickly as possible.  If I could have two
6 minutes to confer with the Debtors, we could see if that's
7 an issue.
8          THE COURT:  Okay.
9          MR. GOLDBERG:  Your Honor, that would -- we are
10 okay with that provision.  Thank you.
11         THE COURT:  Okay, thank you.  All right.  I do
12 have another issue, but do you have a point on the
13 confirmation itself, Mr. Morrissey?
14         MR. MORRISSEY:  Your Honor, on the stay issue,
15 frankly, Your Honor, I have to get back to the U.S. Trustee
16 regarding whether Monday is okay.  The issue obviously is,
17 as I'm sure the people here are aware, is whether we would
18 need to request a stay pending appeal.  We would all like to
19 avoid that scenario.  But I have to find out whether the
20 extension until Monday will put that issue to bed, at least
21 for now.  Thank you, Your Honor.
22         THE COURT:  All right.  Okay.  I also have before
23 me a motion to appoint a trustee or motions to --
24         MS. DIRESTA:  Your Honor, can I ask a question
25 about the customer data?

A-1391

Page 110

1    THE COURT:  Let me finish this first.  Okay?

2    MS. DIRESTA:  Okay, thank you.

3    THE COURT:  But promise I won't forget you.

4         I have a motion to appoint a trustee or motions to

5    appoint a trustee and/or to remove the Unsecured Creditors'

6    Committee members and replace its advisors.

7         The Code provides that I may appoint a trustee for

8    cause at any time before the confirmation of the plan, of

9    course based on my decision that we are now less than a day

10   away from the entry of an order confirming a plan.  There is

11   no way, even if I were to order the appointment of a

12   trustee, that one would be in place before the whole issue

13   would be moot, as the confirmation order will have been

14   entered.  I know that's frustrating for the people who have

15   raised the motion, but I also think that while the motion

16   makes a lot of accusations that actually have not really

17   been answered by the Debtors, at this late stage in the case

18   and right during the middle of the confirmation process, I

19   can't see how the issues that were raised were of a kind

20   that would provide cause to interrupt that process and to

21   throw everything back into disarray.  It just wouldn't have

22   made sense to me if for reasons I said yesterday I didn't

23   really think that there was cause at this stage of the case.

24        I also have two motions for returns of assets that

25   essentially argue that customers should be allowed to take

Page 111

1    out everything that was in their accounts and shouldn't be

2    given only partial distributions as the plan contemplates.

3    I simply cannot allow that.  No bankruptcy case could allow

4    that.  If one customer started doing that, it would just

5    mean that the next customer would get less.  And the whole

6    point of the Bankruptcy Code is to make sure that everybody

7    gets equal distributions.  And since there's not enough to

8    go around here, nobody can get everything that was in their

9    accounts.  That's simply a basic matter of bankruptcy.  So I

10   will deny those objections.

11        And you had a question about the customer

12   information?  On the phone?  I'm surprised I don't already -

13   -

14        MS. DIRESTA:  Yes.  Thank you, Your Honor.

15        THE COURT:  I'm surprised I don't already

16   recognize your names or your voices, but I'm afraid I don't.

17        MS. DIRESTA:  Gina DiResta, Your Honor.

18        THE COURT:  Yes.

19        MS. DIRESTA:  So I wanted to ask, my home address,

20   is that part of the level one or level two KYC that was

21   being mentioned?

22        THE COURT:  Do you know the answer?

23        MS. DIRESTA:  Because I want to know if my home

24   address is going to stay with Binance or not.

25        MR. GOLDBERG:  Adam Goldberg of Latham & Watkins

Page 112

1    on behalf of Binance U.S., Your Honor.  Home addresses would

2    be part of level one data that would be transferred.

3         THE COURT:  I'm sure that's level one.

4         MS. DIRESTA:  Okay.  And then what about the

5    biometric?  You didn't mention that.

6         MR. GOLDBERG:  Could you specify what you mean?

7         MS. DIRESTA:  When you have to hold the phone to

8    your face and it does this biometric configuration of your

9    face and captures your data and it stores all of that.

10        MR. GOLDBERG:  I mean, I would think that's part

11   of the selfies that would be available.  So customers will

12   be entitled to opt out of the transfer of that data to

13   Binance U.S.

14        THE COURT:  Your phone recognizes your face.

15   That's just on your phone, isn't it?

16        MR. SLADE:  Yeah.  I think the biometrics is an

17   Apple function, not --

18        MS. DIRESTA:  No, it gets sent.

19        THE COURT:  It gets sent?  That's news to me.

20        MS. DIRESTA:  Yeah, the biometric information does

21   get sent to the company.

22        MR. GOLDBERG:  Your Honor, we have agreed that we

23   are not acquiring selfies or this data for customers that

24   opt out.

25        THE COURT:  Do you mind adding biometric data to

Page 113

1    what you're agreeing to exclude?

2         MR. GOLDBERG:  Yes, Your Honor.

3         THE COURT:  Okay.  So they will exclude that.

4         MS. DIRESTA:  Okay.  And with regard to the social

5    security information.  And the attorney for Binance was

6    saying that it would be costly and it would cost $20 per

7    customer and there's a million customers.  I just want to

8    address the math on that.  On paper, there's about 1 million

9    customers of Voyager.  I believe there's about 700,000

10   accounts that have under $100.  And I believe there's about

11   400,000 accounts that are under $10.  So those are kind of

12   more like (indiscernible) accounts.  And you can kind of see

13   that with how many people actually participated in voting,

14   which is under 62,000 people.  And then supposedly 175,000

15   people have already opened accounts.  There are only 2,117

16   people who voted no to the plan like I did.  So if you

17   assume that in a two-week opt-out period that all 2,117

18   people were to opt out, that only equates to $32,340 that

19   Binance would have to pay if you pretend that all of those

20   people decide to turn around and open an account.  So I just

21   (indiscernible) company that deals in billions of dollars,

22   that that's a lot of money and that that would break them.

23   And if they think it will, I'm happy to pay the $20 to

24   reinstate all of my KYC information for level one in the

25   event I ever lose my mind and decide to open a Binance

Page 114

1  account.  But I just don't think when you look at it
2  mathematically there's justification for holding the social
3  security number.  I just don't think it's justified based on
4  the math.
5          THE COURT:  Can you take that back to your client,
6  Mr. Goldberg?
7          MR. GOLDBERG:  Your Honor, Adam Goldberg from
8  Latham & Watkins on behalf of Binance U.S.  I will of course
9  take that back to your client, but I fully expect the answer
10 will be we are not making any changes to the deal that has
11 been proposed and that is supported by 97 percent of
12 customers voting.
13         MS. DIRESTA:  Thank you for allowing me to speak,
14 Your Honor.
15         THE COURT:  Okay.
16         MR. LOREN:  Your Honor, this is John Loren, pro se
17 creditor.  I have a few questions regarding Binance.
18         THE COURT:  Just hang on.  Hang on one second, Mr.
19 Loren.
20         Mr. Goldberg, I've given you a lot of these things
21 to take back.  In the real world, I don't know how many
22 people will take advantage of this election that I am making
23 available and just what effect it would be or especially
24 what effect it would be if, as the customer just suggested,
25 people who made the election and then wanted to be Binance

Page 115

1  customers would have to pay you the $20 that you say it
2  would cost.  I understand you don't want to do this and
3  wouldn't want to do this if, you know, it would mean 700,000
4  potential customers are going to leave you.  I find it hard
5  to believe that that's really what we're talking about here.
6  And it certainly makes me more comfortable if customers have
7  the right to stop their social security information.  So
8  just keep that in mind and talk to your client as a
9  practical matter about whether it's really so important that
10 they want to make me try to figure out what I have to do
11 here and whether it's a small enough issue that they could
12 just do what I've asked.  Okay?
13         MR. GOLDBERG:  I understand, Your Honor.  Just to
14 give you some insight onto this issue, we sought to
15 negotiate a way to leave behind all of this data with the
16 Debtor.  It would require a meaningful price modification
17 per customer that opted out.  And the Debtors flatly
18 rejected that.  Understandably.  This is I think in the end
19 therefore an issue of business judgement of the Debtors in
20 selling their assets.  Thank you, Your Honor.
21         THE COURT:  Thank you.  All right.  Mr. Loren, you
22 had a question.
23         MR. LOREN:  That is correct, Your Honor.  Thank
24 you for your time.  I have two questions in regards to the
25 Binance withdrawal process.  There are fees to withdraw

Page 116

1  crypto from Binance.  Will that fee be waived for Voyager
2  users or are we expected to pay Binance to withdraw?
3          THE COURT:  Does anybody here know?
4          MR. GOLDBERG:  Your Honor, I don't know.  I think
5  all of that would be disclosed on the Binance U.S. website.
6          THE COURT:  I don't think any of the attorneys
7  here know the answer to your question.
8          MR. LOREN:  Okay.  I am on the Binance website,
9  and there are fees to withdraw.  So (indiscernible) pay
10 Binance to get our money.  The second question is in regards
11 to the daily withdrawal limit.  I believe there's a limit of
12 $5,000 U.S. Dollars per day to withdraw from Binance.  Will
13 that be waived for Voyager users?  Will my claim take a
14 month to get my money out of Binance?
15         MR. GOLDBERG:  Your Honor, Adam Goldberg with
16 Latham & Watkins on behalf of Binance U.S.
17         I am being told that the limit depends upon the
18 level of KYC that a customer complies with.  So if they
19 achieve the KYC two level with the additional document
20 uploads, then there would be different withdrawal limits.
21 But I would expect all of this information is available
22 through Binance U.S. website and customer service inquiries.
23         MR. LOREN:  Got it.  Because the website I see is
24 showing $5,000 withdrawal per day.  And that's going to take
25 me a month to get my money.  And I have to pay them to get

Page 117

1  my money, too.  It's very sad.
2          THE COURT:  Let me ask you to -- I certainly have
3  no ability to answer this question or to deal with it.  This
4  is a practical question.  Let me ask you to get in touch or
5  ask the Debtor's counsel to get in touch with you and see if
6  they can facilitate putting you in touch with somebody who
7  can give you a very precise answer to your questions.  Okay?
8          MR. LOREN:  Okay.  Thank you for your time.
9          THE COURT:  All right.  Anything else?
10         MR. SLADE:  Not from us, Your Honor.  Thank you
11 very much.
12         THE COURT:  All right.  Yes.
13         MR. ARONOFF:  Your Honor, it's Peter Aronoff from
14 the U.S. Attorney's Office again.  I'm trying to run some
15 things down here, talking with several people.
16         Just returning to the question of the stay.  You
17 know, we were obviously trying to move as quickly as
18 possible to try to make a decision about whether to seek an
19 appeal.  That would require some coordination from the
20 government.  And this is an issue that from my perspective
21 only arose just within the last few days.  And so we're now
22 -- we're moving as quickly as we can, but it takes time.
23         I believe this is a situation where having a
24 little more time on the stay now will lessen the need for
25 emergency applications when it's possible wouldn't be

1    necessary if we just have an extra few days.  And so I would
2    ask that the Court --
3           THE COURT:  Listen, you discuss that with the
4    parties if you can work that out with the parties.  If you
5    can convince them that there's some prospect that you're not
6    actually going to pursue the issue, you can look at it
7    further.  I don't know, maybe you can work something out
8    with them.  But in the first instance, do that.  Okay?
9           MR. ARONOFF:  Okay.  Thank you, Your Honor.
10          THE COURT:  All right.  Your judge is very tired
11   and he's going to --
12          MR. HENDERSHOTT:  Your Honor.
13          THE COURT:  Yes.
14          MR. HENDERSHOTT:  Your Honor, Tracy Hendershott,
15   pro se creditor.  One question and one comment if I may.
16          THE COURT:  Yes.
17          MR. HENDERSHOTT:  The question is actually for pro
18   se creditor Lisa Trevino, who has had to focus on her day
19   job today.  And she asked me to just put into the record if
20   there was any follow-up with her action to getting data back
21   that she requested from the Debtors.  Your Honor, once this
22   confirmation is done today, she wasn't sure if she was able
23   to engage with you any further to follow up on that.  So I
24   committed to her I would ask that in the hearing on her
25   behalf.

1           MS. OKIKE:  Your Honor, Christine Okike on behalf
2    of Kirkland & Ellis.  We will provide her with the data.
3    And if she needs an extension of the deadline with respect
4    to the merit objection, we'll allow for that.
5           THE COURT:  Very good.
6           MR. HENDERSHOTT:  Thank you.  I will relay that to
7    her.  Thank you both.
8           And then just one comment.  I did want to clarify,
9    Your Honor, your interpretation of our request for having a
10   third party (indiscernible) -- I'm drawing a blank.  I'm
11   tired.  We're all tried -- for the winddown trustee.  We
12   weren't looking for a snarling bit pull, Your Honor.  We
13   were looking for effectiveness.  You've seen the UCC go
14   along with every single exception and (indiscernible) all
15   along we just didn't have confidence that there would be a
16   level of (indiscernible), which is different.  Effectiveness
17   is different than a snarling pit bull.  I just wanted to
18   clarify that.
19          THE COURT:  All right.
20          MR. HENDERSHOTT:  Thank you, Your Honor.
21          THE COURT:  Well, if that's true, maybe I'll
22   delete that part of my discussion and commentary from the
23   final version of the decision.
24          MR. HENDERSHOTT:  Thank you, Judge.
25          THE COURT:  I thought I understood it differently.

1    But thank you for the clarification.
2           MS. OKIKE:  Your Honor, on behalf of the Debtors,
3    we just want to thank you for taking extensive time to
4    really help us navigate through very complex and challenging
5    issues.  So we really appreciate it.
6           THE COURT:  okay.
7           MR. GOLDBERG:  Gratitude to Your Honor and all of
8    your staff and chambers.  Thank you.  The Committee thanks
9    you as well.
10          THE COURT:  Thank you all for your submissions,
11   and we are adjourned.
12          (Whereupon these proceedings were concluded at
13   5:14 PM)
14
15
16
17
18
19
20
21
22
23
24
25

1                    I N D E X
2
3                    RULINGS
4                              Page      Line
5    Amended Plan Confirmed       107       12
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



CERTIFICATION

I, Sonya Ledanski Hyde, certified that the foregoing transcript is a true and accurate record of the proceedings.

Sonya M. Ledanski Hyde

Sonya Ledanski Hyde

Veritext Legal Solutions
330 Old Country Road
Suite 300
Mineola, NY 11501

Date: March 10, 2023

**a**
**abide** 37:25 38:3
**abided** 34:15
**abilities** 68:12
**ability** 9:20 11:1 38:18 66:16 67:22 89:1 117:3
**able** 22:17 31:11 32:19 54:9 58:1 62:7 62:10 64:8 67:24 74:24,24 118:22
**above** 70:6,15 87:13 93:4
**absence** 11:16 58:22 106:21
**absolute** 43:2
**absolutely** 13:18 15:11 16:1 25:24 26:25 30:3 31:3 42:23 59:18 92:4 102:9,14 103:3 104:5
**abstained** 101:20
**absurd** 22:5 56:7 88:11
**abundantly** 29:20
**accept** 96:23 97:4
**acceptable** 81:15
**acceptances** 83:9
**accepted** 97:2
**access** 46:21
**accomplished** 30:11 98:11
**account** 8:2,12 11:4,6,11 13:3 56:16 61:7 64:10,21 66:23 67:3,4,10,11 68:16 69:1 70:13 83:6 87:10 98:4 100:10 113:20 114:1
**accountholder** 96:12,13
**accountholders** 37:12 38:10,18 38:20 42:15 50:17 54:12 56:15 60:18,24 61:22 62:14 70:8 81:18 97:3,11 100:22
**accounts** 38:9 64:3 68:22,25 87:8 111:1,9 113:10,11,12 113:15
**accurate** 55:7 55:9 122:4
**accurately** 43:8
**accusation** 42:24
**accusations** 42:18 43:4 95:4 110:16
**achieve** 116:19
**achieved** 57:7
**acknowledge** 18:14
**acknowledged** 80:22 99:4
**acknowledges** 26:20
**acquire** 12:11
**acquired** 8:3 14:10 66:4
**acquiring** 66:14 112:23
**act** 80:14 93:20 101:7
**acting** 26:13 48:22 60:18
**action** 20:17 26:5 31:13,21 48:14,16,17 49:6 50:4 79:19 90:25 94:1 118:20
**actions** 9:14 28:23 29:12 40:20,22 41:1 41:2 48:13 81:21 82:12,18 83:18
**activities** 10:15 20:21 29:23 43:23,24 45:6 46:16 48:24 49:1 91:4 92:22
**activity** 52:4
**acts** 86:20
**actual** 10:5,11 30:4,12 31:22 37:6 42:2,23 43:12 47:15 51:24 72:8,8 78:23 80:17 81:3 91:16 92:4,7 105:18
**actually** 11:11 12:3,25 13:2 23:16 27:18 30:11 41:23,23 42:6,10 44:6 44:10 51:20 56:9 58:23 59:21 64:4 68:21 70:5,15 74:2 77:6 80:25 81:10 87:17 88:18 90:21 93:10 94:21 99:10 100:11 101:18 102:19,24 104:25 106:13 110:16 113:13 118:6,17
**ad** 5:16 7:8 103:7
**adam** 3:8 34:20 65:6 109:3 111:25

**&**
**&** 3:3,17 5:8,15 65:6 109:4 111:25 114:8 116:16 119:2
**1**
**1** 8:18,21 9:5,9 10:20 11:7,13 11:20 12:7,25 13:20,23 14:10 14:22 15:15,18 16:6,18 17:11 17:14 18:4,7 22:10 86:12,16 113:8
**10** 77:12,14 113:11 122:25
**100** 4:11 56:21 58:18 71:16 113:10
**10004** 1:13 4:4
**10007** 5:4
**10010** 3:13
**10017** 5:11
**10020** 3:6
**10022** 3:20
**10036** 5:18
**107** 121:5
**11** 49:15 50:1 50:25 86:16
**1114** 5:17
**1123** 97:8
**1129** 49:15 50:1,25 96:22
**1142** 86:12,16 86:17 87:22
**11501** 122:23
**118** 34:12
**12** 121:5
**120** 84:5
**12151** 122:6
**1271** 3:5
**12th** 4:18
**139** 84:6
**14** 34:14 71:8 108:13,17
**140** 73:13
**1725** 84:14
**175,000** 113:14
**18** 8:6 18:3 84:15
**1850** 4:18
**198** 73:12
**2**
**2** 29:5,7 33:24 37:8
**2,117** 113:15 113:17
**20** 9:12 34:15 66:9 70:20 84:20 95:10 113:6,23 115:1
**2000** 8:6
**20036** 4:19
**2007** 78:13 84:6
**2008** 84:1
**2011** 59:10
**2019** 83:14
**2021** 84:16,20 84:21
**2022** 46:21 53:20 54:1,3 84:14,15
**2023** 1:15 18:3 18:4,7 54:6,9 55:21 57:21 72:21 73:17 122:25
**20549** 4:12
**22-10943** 1:3
**2274** 84:20
**23** 55:21
**28** 57:21
**2:10** 1:16
**2d** 78:12
**2nd** 23:7
**3**
**3** 33:5,14,20 34:6,8
**300** 122:22
**3020** 34:11
**32,340** 113:18
**330** 122:21
**34** 56:17
**36** 56:17
**369** 84:5
**3:00** 33:19 69:19
**3rd** 5:3 23:7
**4**
**4** 61:19 97:8
**400** 74:9
**400,000** 113:11
**444** 84:16
**452** 78:12
**453** 59:9
**462** 78:12
**477** 59:10
**478** 78:12
**48** 96:1
**482** 59:10
**5**
**5,000** 116:12 116:24
**51** 3:12
**519** 83:25
**599** 83:14
**5:14** 120:13
**6**
**6** 37:8
**601** 3:19
**61** 19:9
**62** 19:9
**62,000** 113:14
**623** 84:16
**640** 83:25
**655-657** 83:25
**7**
**7** 1:15 71:3,9 74:1,10,14,18
**700,000** 113:9 115:3
**717** 83:14
**7th** 84:1
**8**
**852** 82:22
**86** 5:3
**863** 73:13
**9**
**90** 71:5
**97** 114:11

114:7 116:15
**add** 91:15
**added** 73:16
**adding** 15:3 112:25
**addition** 13:24 15:20 19:25 28:24 49:11 50:6 73:18 75:4 90:7 91:17
**additional** 12:22 14:8,23 14:24 35:14 53:4 55:2 65:1 65:9,25 69:11 70:16 77:13,23 87:9 103:10 116:19
**additions** 85:5
**address** 13:13 17:12 18:2 43:13 47:17,20 48:8 51:23 60:13 62:5 65:16 108:1,6 111:19,24 113:8
**addressed** 107:9
**addresses** 8:21 112:1
**adequate** 72:18
**adjourned** 120:11
**administering** 83:2
**administrative** 46:25 74:9,13
**administrator** 100:18 101:2 102:5,8,13,20 104:17
**admissible** 42:24 51:25 59:18
**admitted** 57:19
**adopt** 40:18
**adopted** 84:13
**advance** 9:3 12:4 13:19 105:18
**advanced** 65:17,20
**advantage** 114:22
**adversary** 103:2
**adversely** 39:6 41:8
**advice** 29:18 101:5
**advisors** 79:11 110:6
**aegean** 83:13 83:15 84:12 85:2 92:8
**affect** 39:6 41:3 48:18 49:25 50:8 60:12 74:16 102:2
**affected** 41:9 73:11 82:7
**affecting** 19:15 89:20
**affiliated** 42:19
**affiliates** 79:14
**affirmative** 26:25 29:14 75:11 86:17
**affirmatively** 10:7 16:24 44:24 75:17 88:3 97:14
**afraid** 111:16
**afternoon** 28:11 35:5
**agencies** 51:14
**agent** 60:19
**aggressive** 102:14,15,16
**ago** 13:1
**agree** 9:13 35:2 40:6 77:8 89:12 94:11,12
**agreed** 9:11 14:12 61:12,14 62:25 64:7 65:19 68:14 70:16 75:2 84:24 97:20 103:12 112:22
**agreeing** 113:1
**agreement** 17:22 63:3,8 68:2 80:14
**agreements** 7:21
**agrees** 69:18
**ahead** 13:25 17:24 23:20 26:2 28:10 65:3
**airadigm** 83:24 83:25
**airlines** 84:14 99:12
**alameda** 73:9 74:9,11,12 104:3
**alexander** 4:3
**alignment** 66:11
**allegedly** 45:2 49:5 52:16 73:8 77:12 95:18 97:6
**allow** 16:14 26:24 65:23 80:1 106:23 111:3,3 119:4
**allowed** 26:6 97:13 99:14,16 105:11 110:25
**allowing** 114:13
**allows** 13:6
**alter** 21:2 91:10
**alternative** 30:20 71:2
**alternatives** 39:2
**amazon** 57:3
**amended** 103:21 121:5

## [america - aronoff]  Page 4

```
america  5:2            anyway  29:24          applied  40:11         89:25 90:3
american                apa  18:1,15,16        applies  11:8          93:16 95:13
  99:12                   18:18                apply  73:4            101:22
americas  3:5           apart  32:24           98:15                  approves  93:10
  5:17                   70:20                  appoint  109:23        approving  51:8
amount  37:14           apologize              110:4,5,7              84:1,6
  100:13 102:12           23:21 65:4           appointed              approximately
  105:11                 apparent  41:16        102:4                  71:5,7,16
amounts  39:3             58:7                  appointment            april  18:4,7
  91:20 99:23           apparent  38:21 43:5    103:6 110:11          architects
  106:8                  appeal  109:18         appreciate             44:17
analysis  70:24           117:19                22:24 37:17          aren't  21:22
analytics  16:7         appear  96:11           38:4 48:11            102:22
  16:11                  103:16 106:17         51:2 68:7             argue  46:15
announce                appeared               120:5                  89:1 92:15,17
  33:12 35:9,25          78:18 79:10           appropriate            97:6 110:25
announced              appears  61:19          22:7 23:5,17          argued  38:14
  40:24                  73:19 95:21           25:12 26:10           38:24 39:2
annoying               apple  112:17           60:9 83:22            43:15,17 54:25
  103:1                 apples  74:7           89:5,13               63:5 91:19
answer  49:2,10        applicable             approval  22:2        99:8 105:5
  111:22 114:9          19:15 20:13,22        38:6 63:11            argument
  116:7 117:3,7         21:4 22:7             72:20 75:24            21:22 37:10
answered               applicable             86:10                  46:19 49:11
  100:25 110:17         51:12 53:1            approvals  53:4        72:8 73:14
answering              58:5 70:13             53:10,11 62:10         80:23 85:22
  69:22                 77:16,19 83:3         62:12 87:9             99:5
anticipate  55:1       83:7 87:6             96:6,7 99:1            arguments
anxious  47:12          85:11                 approve  35:22          27:25 47:24
anybody  22:6          applications           47:13 48:19           72:5 92:1
  29:19 31:4            117:25                85:11                  arising  80:6,8
  32:13 33:23                                  approved              arm's  78:2
  34:2,5 91:17                                 19:21 26:22           aronoff  4:6
  102:5 108:5                                  31:24 32:10           108:8,8,22
  116:3                                        56:3 73:18            117:13,13
anybody's  43:7                                78:16 82:18           118:9
                                               83:19 84:12
```

## [bank - binance]  Page 6

```
bank  8:1,2,12         base  95:2             behavior  42:2        best  40:2
  8:12 11:4,4          based  10:24           belated  73:2         better  54:23
  64:3,10,10            16:23 19:19           belied  28:1          68:18 74:17
  68:16,16 104:5        20:5 28:7             95:8                  beyond  95:5,6
  104:8,12              30:12 37:1            beliefs  46:8         big  14:21
  bankr  59:10          51:24 59:13           believe  18:24       bigger  85:2
  83:14 84:6,14         65:21 71:19           19:12 25:22          billions  113:21
  84:14,16,20,20        74:7,21 80:5          51:15 54:5           binance  15:7
  bankruptcy           81:23,24 83:16         55:7 60:3             16:4 17:6
  1:1,11,23 26:5        86:6 88:17            70:14 71:4            33:25 38:16
  26:10 27:2,14         89:24 90:12           75:19 76:24,25        60:10,14,17,18
  27:25 28:2,8          104:6 105:6,11        80:22 81:5           61:5,12,16,18
  29:25 39:10,24        105:12,13,17          85:12 96:15,16        61:24 62:2,9
  41:11,21 46:20        106:12,18             97:23 99:7           62:11,15,25
  46:23 49:14,15        110:9 114:3           101:24 105:4         63:5,11,13,14
  51:1 58:24           bases  46:8            105:23 107:9         63:16,20,20,22
  59:1,5 75:6,10        48:15 57:17           113:9,10 115:5       63:25 64:5,12
  77:13 82:13,15       basic  31:23           116:11 117:23        63:8 64:17,18,19,22
  82:25 84:7,9          65:15,24 93:5         believed  60:11       65:7,19,23
  86:12 90:1           119:9                  71:11 87:5           66:7,13,23,24
  93:3,14,16           basically  19:2        believes  28:19       67:6 68:13,18
  95:9,14 96:22        32:7                   45:17,20,25          68:22,23,24
  97:8 99:4,11         basis  8:22            47:10 51:10          69:3,4,9,18
  99:23,25 102:6        27:17 43:9            72:6 81:20           70:7,9,20,21
  104:24 111:3,6        45:11 57:23           93:22                70:21 71:1,5
  111:9                 72:17 97:9            belong  81:25         71:11,15 72:2
  bar  21:1 27:2        100:5                 82:1                  72:24 74:25
  91:8 104:12          bear  10:1,4           beneficial           85:8 86:22
  bargaining           bed  109:20            60:21 61:6,18        87:8,16 92:19
  78:2                 began  37:7            70:10                92:22 96:1,3,3
  barnea  5:6          beginning  30:4        beneficiaries        97:15,17,18,19
  22:16,16 25:11        25:11 29:13           79:7                  97:24 98:2,7
  25:11 29:13          behalf  7:23           benefit  13:5        98:17 100:10
  barring  85:6         35:6 46:2 65:7        56:15                108:24 109:4
  92:12,13 93:24        79:20 112:1           benefits  38:20      111:24 112:1
  bars  46:11           114:8 116:16          38:23 70:19          112:13 113:5
                        118:25 119:1          72:11 78:1
                        120:2
```

## [arose - balance]  Page 5

```
arose  117:21          attorneys  3:4         112:11 114:23
arrangement             57:1,6,22,24         116:21
  59:3 60:11,24         57:25 58:1,3          avenue  3:5,12
arrangements           59:16,20 60:16         3:19 5:10,17
  16:25 63:6            60:21,22,23           avoid  10:10
  80:11                 61:1,6,15,19          109:19
arrest  26:4           70:11,11 71:16         avoidance  20:8
arrows  41:9            77:5,10 107:6         90:16
  76:22 77:7           110:24 115:20         avoiding  13:9
  78:6                 assist  76:18          aware  26:8
arrows'  41:10         associated             35:10,11 39:18
article  61:19          100:20 106:15         39:25 42:1
articles  42:17         227:8 53:16           50:2 109:17
asked  45:9,10          91:24 92:7,10         azmun  5:13
  48:19,20,23           93:4 95:13,15         24:16,16,20
  57:13 60:9           assume  24:1           25:1,4 26:2,3
  61:21 63:17,24       113:17                 26:25 27:5
  91:15 115:12         assuming  18:7
  118:19               assumptions                b
asking  36:21           105:18
aspect  30:8           assurance              b  1:21 49:23
  31:24 87:15           105:8                  96:22
aspects  30:7          assurances             b.r.  59:9 83:14
  45:18 47:23           23:13 54:23           84:5,16
assault  40:23          55:3,18,23            back  15:7 17:8
asserted  77:21        56:19 57:12            18:3 19:25
  77:22,24 79:20        58:14 70:16           35:11,15 68:10
  79:24 96:18          assure  55:12          69:11 85:1,15
assertion  85:8        attached  70:24        109:15 110:21
assessment             attempting             114:5,9,21
  106:14                88:22,23 93:20        118:20
asset  57:3            attention  51:13       backdrop
  106:14,16            attesting  57:8         39:23
assets  41:16,24       attitude  102:18       background
  42:3,4,11,25         attorney  33:24         39:15
  46:22 54:24          101:3 113:5            backup  38:11
  56:22,24,25          attorney's  5:1        bad  82:4
                        117:14                balance  17:7
```

## [binance - cash]  Page 7

```
113:19,25             biometrics            119:17                capability
114:8,17,25             112:16               bunch  21:11          52:11
115:25 116:1,2         birth  65:16          burden  43:18        capacities  70:5
116:5,8,10,12          bit  13:17 17:4       44:9                 capacity  56:14
116:14,16,22           23:16 119:12          bureau  65:13        57:23 79:14,25
binance.us  3:4        blank  119:10         business  30:9       capital  56:23
  9:13,19,23           bodies  52:25         42:2,19,20          80:6
  10:6,15 11:22        body  93:20           50:10 52:22         captures  112:9
  13:6 16:10           30:9 38:9,12          55:16 57:14         careful  80:20
  30:9 38:9,12         38:15,16,17,25        59:2,2,9,17,22      carried  31:24
  38:15,16,17,25       39:3 40:1 41:6        60:5,12 63:16        86:21 93:11
  39:3 40:1 41:6       42:19,25 44:4        66:19 68:1           carry  44:4
  42:19,25 44:4        44:6,10,21,25        77:22 80:10          86:15 106:18
  45:21 46:16          45:21 46:16          87:16 115:19         carrying  86:14
  48:2,4,21,24         48:24 49:7,24        busy  13:4            case  1:3 7:4
  48:25 49:7,24        50:13 51:13          buy  68:3            27:25 37:15
  50:10,13,20          52:4,11,13,21        buyers  58:21        39:7,16,21,24
  52:4,11,13,21        54:23 55:16          buying  63:23        41:19 42:8,15
  54:25 55:16          56:11,13,16,19       bylaws  77:25        46:20,23 47:5
  56:11,13,16,19       56:19,24 57:1              c               50:11 66:11
  57:1,2,5,13,15       57:1,2,5,13,15                            75:10,13 77:19
  57:21,24 58:1        57:21,24 58:1        c  3:1 4:7 7:1       82:13,20 84:8
  58:2,3,15,16         58:2,3,15,16         61:19 73:12          84:10,10,12,22
  59:19                broadcasting         122:1,1             85:2 86:21
binance.us.            84:5                  calculated          91:22 99:12
  9:11 10:11           broader  25:7        100:4               100:25 101:5
  13:24 34:21          29:3                  calculations        102:8 110:17
  38:11 39:14          broadly  82:10        71:10,14,18        110:23 111:3
  43:10 50:15          broker  44:5,8        71:17 92:19        caseload  77:20
  54:13,20 58:9        48:2,23 49:24        called  50:12        cases  11:14
binance.us'            52:5                  52:20 61:23        28:8,20 37:17
  45:6                 brokers  40:3         71:17 92:19        40:10 46:23
binding  88:16         44:22                 calls  30:13       59:10 79:11
biometric              bull  10:2,2         camera  45:11       82:25 84:13
  112:5,8,20,25        66:8 102:13          cancel  68:4        105:13
                                            can't  19:23        cash  10:11
                                            21:21 25:22        13:24 38:19
                                            28:1 34:1 90:3
                                            110:19
```

## [cash - clear] — Page 8

62:3,4,11,16
62:19,23 96:8
97:12,13,19,21
99:25 106:6
**cast** 58:16
**category** 15:19
15:21 16:6
**cause** 79:19
110:8,20,23
**causes** 31:21
**cease** 18:11
20:21 91:4
**celsius** 42:2,7
**ceo** 76:13
101:10
**certain** 18:1
20:1,11 48:24
52:21 57:14
60:10 71:20
72:2 75:22
76:16 77:24
82:11,11 85:16
90:8,18 96:24
98:11
**certainly** 12:22
14:23 17:2
22:19 25:12
28:13 29:14
39:23 41:17
42:5,8 43:7
46:3 58:21
102:24 106:22
115:6 117:2
**certificate**
57:16,19
**certifications**
57:8

**certified** 122:3
**cetera** 64:4
**cftc** 40:8,23
54:2
**challenge**
89:11 93:7
**challenges** 76:5
**challenging**
120:4
**chambers** 5:3
36:23 120:8
**chance** 30:21
37:21 64:11
**chances** 85:25
**change** 18:1
61:13,21 63:1
63:1 66:9
76:10 97:20
**changed** 15:7
16:5 99:17
104:20
**changes** 12:19
35:19 36:5
50:16 60:10
99:19 104:20
105:1 107:12
107:19,21
114:10
**chapter** 71:3,9
74:1,10,14,18
**characterize**
55:8
**characterized**
40:15,16
**charge** 76:16
**chase** 15:4 16:2

**chats** 8:23
**check** 11:24
12:22 13:23
14:2,9,19
**checks** 12:5,10
13:7 65:11
104:18
**chief** 76:14
**choice** 21:17
25:20 75:9
87:2 88:19
**choose** 61:2
63:19
**chose** 75:6
97:11
**christine** 3:22
7:22 35:1
119:1
**cip** 65:12
**cir** 78:12 84:1
**circled** 85:15
**circuit** 77:16
**circulated** 54:6
82:21
**circumstances**
10:25 106:19
**citations** 37:2
78:13
**cited** 59:10
92:9 93:4 95:7
**civil** 25:7
**claim** 20:4
31:11,20 74:10
74:11,13,13
78:6 79:21,23
80:3,9 81:23
90:11 97:1

116:13
**claiming**
104:11
**claims** 74:23
75:2,15 76:6
76:13,16,20,20
76:23,25 77:5
77:6,8,20 78:7
79:6 80:21,25
81:3,24 82:3,4
84:9 90:4
99:14,14,15,16
100:6 102:17
103:9,23,25
104:1 105:11
**clarification**
45:9 120:1
**clarifications**
45:24
**clarified** 60:15
**clarify** 24:18
119:8,18
**clarity** 27:13
**class** 97:1,2,3,3
97:7
**classes** 96:23
**clear** 25:4
29:20 30:3
37:4 38:21
55:15 65:24
66:16 70:4,6
74:22 75:8
77:16 85:12
97:24 101:22
103:14 104:2
104:22 107:5

## [concept - contends] — Page 10

**concept** 35:21
39:19 81:13
**concern** 32:3
32:16 68:20
**concerns** 22:18
22:22 23:9
31:5 53:18
60:13 64:6
102:11
**conclude** 48:13
59:21 60:4
78:14,25 88:20
**concluded**
76:19,23
120:12
**conclusion**
50:3 59:19
72:25 74:17
**conclusions**
36:17 54:20
57:18
**conclusory**
54:10
**condition**
18:14 81:20,24
**conditional**
51:4
**conditions** 18:7
18:9 71:20
96:24,24
**conduct** 10:7
10:16 11:23
20:11,13 38:1
84:7 90:19,21
**conducted** 42:2
57:17

**confer** 17:14
109:6
**confidence**
119:15
**configuration**
112:8
**confirm** 21:15
30:1 35:9
49:16 87:1
102:11
**confirmation**
7:3 18:18 19:1
19:8 20:9,12
32:24 33:11
36:12 38:7
46:11 49:17
51:6 69:15
81:12 84:3,18
84:25 85:4
86:20,21 87:12
87:21 88:3
89:7 90:17,20
92:21 93:2
104:10,25
107:14,18,20
108:2,7,13
109:13 110:8
110:13,18
118:22
**confirmed** 28:2
52:3 77:20 93:14
**confirming**
27:19 30:15

110:10
**confirms** 86:7
**conflict** 103:14
103:17
**conflicts** 101:1
102:1
**congress** 40:18
**connection**
84:3,9
**connections**
101:25
**consensual**
75:24,25 76:2
**consent** 57:15
75:12
**consequence**
93:6
**consequences**
48:21 105:21
**consider** 21:10
30:4 36:12,14
47:12 60:10
61:21 96:15
**consideration**
80:20 99:9
**considerations**
83:5
**considered**
41:18 52:3
77:20 93:14
**considering**
59:12 77:15,18
78:14 101:12
**consistent**
28:17 77:19
93:3

**constant** 55:16
31:25 43:19
46:3,3
**consulted** 65:8
**consummation**
53:9,12
**contact** 17:2
64:1
**contain** 43:25
82:15
**contains** 72:4
**contemplated**
20:17 21:1
50:23 51:18
52:7 53:2,5,13
87:6 89:8
90:25 91:9
93:7
**contemplates**
20:1 29:21
36:15 86:19,24
87:1,13,24
90:8 92:16,18
111:2
**contemplating**
88:10
**contend** 20:15
86:1 90:23
**contended**
44:18 53:16
54:18 71:25
73:14 87:11
**contending**
44:24 87:17
**contends** 46:11
88:4

## [clearance - conceded] — Page 9

**clearance** 46:5
65:25
**clearer** 40:5
**clearly** 38:2
60:16
**clears** 69:22
**client** 12:8
16:20 17:14
33:6,20 65:8
69:12 114:5,9
115:8
**clients'** 103:2
**close** 18:6
38:12 68:22
101:9
**closer** 22:25
**closes** 55:13
66:23
**closing** 18:7,9
18:14
**coal** 84:16
**code** 30:1
49:15 51:1
59:1,5 86:13
86:16 87:22
96:22 97:8
99:4,23 104:24
106:9 110:7
111:6
**coincidence**
66:11
**coins** 105:25
106:3
**collapse** 41:12
**colloquial** 14:4
**combined**
22:20

**come** 13:24
15:7 28:14
29:25 31:11
67:24 77:9
**comes** 39:17
**comfortable**
115:6
**commenced**
105:13
**comment** 25:1
118:15 119:8
**commentary**
119:22
**comments**
24:17 38:16
47:20 65:22
72:22 81:13
**commission**
4:9,10 43:14
45:19,22 46:1
75:20
**commit** 26:12
**committed**
118:24
**committee**
3:11 5:9 7:9
20:25 24:17
35:7 76:17,19
76:22 77:1,2
78:9,10,11
79:8 80:19
81:10 91:7
100:20 101:4,5
101:7,11,15,18
101:21,22
102:1 110:6
120:8

**committees'**
101:20
**committee's**
100:23
**commodities**
40:7
**commodity**
9:15
**common** 39:10
83:24,25
104:18
**companies**
42:19
**company** 9:19
10:12 53:23
107:4,6 112:21
113:21
**company's**
57:24
**compared** 71:8
71:9 74:8,10
**comparison**
37:16 74:7
**compel** 21:20
27:12
**compelled**
27:15 94:3
**compelling**
41:5
**compels** 93:2
**competency**
78:8
**complained**
70:18 73:7,20
73:22,23 81:18

**complaint**
72:25 95:12
**complaints**
55:6,11
**complete** 27:24
52:9 54:23
56:20 70:9
86:23 89:8
92:2 109:4
**completed**
38:13 56:13
**completely**
28:1,6 30:7
38:21 67:19
95:2,5,5,6,6
**completeness**
74:3
**completing**
13:23
**completion** 7:3
20:2,6 53:5
62:24 90:9,13
93:23
**complex** 120:4
**compliance**
21:3,11 57:8
83:3 91:11
104:23
**complicating**
41:5
**complies** 59:1
81:13 116:18
**comply** 58:5
59:5 86:15
**conceded**
93:12

## [contention - creditors] — Page 11

**contention**
46:13 52:1,6
63:7 70:3
72:10 92:14,24
95:8 101:25
**contentions**
46:5 52:15
**context** 9:10
32:10 43:11
67:21 94:10
**contexts** 74:14
74:16
**continue** 55:17
59:24 61:6
90:7 104:24
105:7,9,24
106:1
**continued** 37:8
37:9
**continues** 41:6
**continuing**
74:2
**contract** 62:1
**contractual**
80:10
**contrary** 53:16
63:7 71:23
88:21 106:21
106:23
**control** 68:13
99:19
**controversial**
105:2
**conversations**
55:22
**convince** 16:23
118:5

**convinced**
16:21 69:4
**coordination**
117:19
**copy** 32:20,20
2:1 7:2,8,12,17
23:1,1 31:16
31:16 32:15
**corp** 84:5,20
**correct** 7:7
34:6 37:2
58:19 61:16
97:24 115:23
**corrected** 37:5
**corresponding**
28:21
**cost** 10:6 13:9
65:25 66:9
113:6 115:2
**costly** 113:6
**couldn't** 8:7
16:15 30:7
50:21
**could've** 21:24
49:8
**counsel** 29:12
29:19 48:20
68:21 76:17
78:8 101:7
**couple** 9:5
**course** 12:10
31:4 36:11
37:5,20 58:17
60:9 71:19

82:12,25 83:1
108:1,6 110:9
114:8
**court** 1:1,11
2:1 7:2,8,12,17
8:7,11,14,17
10:18 11:3,10
11:15,25 12:15
13:11,21 14:5
14:14 15:3,16
15:22 16:13,21
17:13,15,20,24
18:5,12,20
19:10,21 20:20
20:23 22:1,15
23:18,20,23
24:3,5,11,13
24:19,21 25:3
25:10,12,15
26:6,10,10,14
26:16,18,23
27:2,3,6,14,23
27:24 29:8,17
32:12,17 33:2
33:8,16,23
34:1,2,7,10,17
34:23 35:8,13
35:17,21,25
36:7,9,11 37:6
37:23 46:13
49:16 51:5,22
60:2 65:3
66:21 67:5,12
68:7,10 69:15
69:20 80:12
82:18,19 83:16

83:19,19,21,22
83:23 86:7,16
86:20 90:1
91:3 93:16,23
94:11,12,14,19
108:12,16,23
109:8,11,22
110:1,3 111:15
111:18,22
112:3,14,19,25
113:3 114:5,15
114:18 115:21
116:3,6 117:2
117:9,12 118:2
118:3,10,13,16
119:5,19,21,25
120:6,10
**courts** 26:21
84:13 93:13
**court's** 28:13
29:2
**coverage** 77:14
**covered** 80:21
**craft** 22:13
**create** 67:10
**credible** 71:23
**credibly**
101:14
**credited** 61:7
**creditor** 5:23
6:2,5 66:20
73:9 75:15
114:17 118:15
118:18
**creditors** 17:2
20:3,7 36:15
37:16 46:21

**[creditors - david]**                    Page 12

```
47:1 71:7 75:4        48:4 96:2 99:8        101:15 109:25        customer's
75:7 78:10,11         100:3                 111:4,5,11           9:14 16:17
79:9 82:21            curious 104:5         113:7 114:24         61:7 98:18
90:10,14 92:18        curiously             115:17 116:18                d
97:21 99:13,22        96:10                 116:22               d 7:1 121:1
100:4,6,7,21          current 40:14         customers 7:19       daily 116:11
102:7 107:7           66:1 67:10            7:20,25 9:13         damages 19:19
creditors' 71:1       71:15 105:14          11:8 12:10,13        20:5 23:13
73:23,25 101:4        107:7                 14:13,25 38:10       25:6,8 81:22
101:11,22             currently 40:1        41:25 42:11          88:2 89:24
110:5                 41:21 88:10           46:21 54:13          90:12
crime 26:12           custodial 56:14       56:12,23 57:22       dare 26:1
crimes 65:13          57:23                 61:1,8,17,25         darren 5:13
criminal 25:7         custodied 42:5        62:1,2,6,8,16        24:16
25:13 26:6,11         custody 42:3          62:17,18,20,22       data 7:18,19
26:17                 60:23 61:17           63:10,11,15,15       9:9,16,20
criteria 40:10        70:12                 63:19,20,24          10:12,14 11:18
criticism 103:4       custom 4:3            64:7,15 65:24        16:7,8,10,15
cross 58:9            customer 7:18         66:10 67:6           63:4,6,9,13,14
crying 15:25          8:23 9:2,9,21         72:7,9,15            63:25 66:3,24
crypto 13:1           9:22 11:18,21         75:22 81:25          69:6 109:25
66:8 116:1            12:6,18 13:13         82:5 95:19,20        112:2,9,12,23
cryptocurren...       14:4,8,9,16,19        96:1,4,8,19,19       112:25 115:15
20:3,7 21:5           14:24 17:5,6,6        97:13,15,15,19       118:20 119:2
29:22 38:19,25        17:22 38:9            98:1,7,7,13,21       date 8:5 18:3
39:7,19 40:7          41:16,24 42:3         99:2,9,10            18:18 34:19
40:22 41:1            42:4,25 54:24         100:11,15            65:16 79:15,15
43:19,22 51:17        57:1,6,24 58:1        101:8 105:11         80:16 98:19,20
56:10,14 61:25        58:2 59:16,20         106:5 110:25         99:22 104:24
62:8 70:4,7,22        63:4,6,9,13,14        112:11,23            104:25 105:13
86:25 90:9,14         64:4,5,20,21          113:7,9 114:12       105:18 122:25
91:13 92:18           64:23 65:14          115:1,4,6            dated 57:21
96:9 97:11            66:6,10,15,23         customers'           dates 98:22
106:11                66:24,25 67:3         56:22,25             100:12,12
cryptocurrency        67:22,24 72:6        65:15                 daunting 88:5
9:25 39:4,20          81:20 87:8                                 david 5:6
40:3,13,19
```

**[deleted - discrimination]**                    Page 14

```
deleted 103:22        detail 16:19          digital 1:7          disappointing
103:25                60:8 103:11,21        56:22,24 57:2        78:17
deleting 22:20        details 12:9          57:22,25             disarray
deletion 22:12        59:2 65:9             digits 15:25         110:21
deliberately          determination         diligence 55:16      disclose 54:18
81:2                  30:15 31:21           56:2 57:16           79:19 71:10
deliver 44:18         59:6                  diminish 50:18       73:8
demand 78:21          determine             direct 10:22         disclosed 7:6
denied 45:11          48:17 58:25           72:4 83:23           53:14,19 73:1
46:21                 77:17                 directed 72:7        103:12 116:5
deny 111:10           determined            82:19 84:18          disclosure 38:6
department            27:1 98:19            86:3 89:7            49:4 52:17,18
4:1 65:14             developments          directing 89:2       53:8,19,24
depend 53:9           42:7                  94:16                54:5 55:7,10
106:4                 dictate 33:3          direction 26:9       55:21 56:2,9,9
depends 9:20          36:16,23             69:3                  56:17 70:2,3,5
116:17                dictation 37:5        directly 72:6        70:25 71:25
deposited             didn't 9:12           director 77:14       72:3,14,17,18
57:22                 21:23,25 22:13        directors 7:6        72:20 73:5,7
derivative 82:6       23:16 30:21           75:1 76:15,25        73:12,16
describe 49:6         107:1 110:22          79:13 85:23          disclosures
55:22 74:4,4          112:5 119:15          103:13,16            52:19 54:25
96:21                 differed 42:4         diresta 6:4          55:6,14 56:3
described 40:2        difference            109:24 110:2         56:10 70:14 72:2,8
51:22 54:4            15:23                 111:14,17,17         72:23 73:22,24
57:10 70:15           different 28:21       111:19,23           discovered
78:24 103:8           40:18 48:7            112:4,7,18,20       56:7
107:13                54:22 98:3,4,4        113:4 114:13         discretion
deserve 46:22         98:13,13,15,15        disable 11:17        91:24
desire 31:4           98:20,20,22,22        disadvantages        discriminate
43:7 47:13            99:10 100:12          37:19                96:25
59:7 78:20            116:20 119:16         disagree 25:21       discriminated
102:12                119:17                46:12 52:25          105:6
desires 102:14        differently           disallowed          discriminates
103:2                 119:25                104:2                96:19
despite 40:12         differing 40:17                            discrimination
42:21                                                            95:19 96:20
```

**[day - delete]**                    Page 13

```
day 34:14             23:22 28:5,15        15:17,19              declare 26:10
100:5 108:1,13        30:22 33:22          118:21 120:2         declined 87:18
108:17 110:9          34:24 35:7           debtors' 8:4          92:15,17
116:12,24             36:13,21 38:14       38:6 43:18,23        declines 18:9
118:18                38:24 39:4,6         45:6 46:12           deemed 61:5
days 95:16            39:11 43:15,17       52:22 54:19           83:3
108:20 117:21         44:3,8,19,20         76:13 77:17          deeming
118:1                 44:24 45:2,4         debtor's 66:19        103:23
dc 4:12,19           46:14 49:8,12         70:12 74:16          deep 47:5
deadline 33:4         50:9,11,13           75:1 76:6 77:8       default 108:13
69:16 119:3           52:9,10,16           77:25 78:5           defaults 18:10
deadlines             53:2,3 54:16         80:12 82:2           41:9,10
36:16                 54:17,19,22          87:15 117:5          defendants
deal 9:17 14:21       55:3,11,14,15        decide 14:7          77:10
38:12,14,17,25        55:17,19,24          27:8 39:22           defense 26:13
39:3 50:13            56:1,6,18            72:17 94:14          26:15,18,19,25
60:15 67:21           57:10,15,17,18       113:20,25            29:13,14,19
71:15 108:25          58:11 59:8,22        decided 16:3         77:22
114:10 117:3          60:4,10,24           41:2                 defenses 76:24
dealer 48:23          70:18 71:4,11        decides 83:22        77:21,23
52:5                  71:14,17 72:10       94:1                 deferential
dealing 23:9          74:22,23 75:3        decision 2:1         106:8
dealings 39:14        76:9,12,14,24        19:24 24:2,12        deficient 49:5
deals 113:21          77:5,11 79:2,5       32:21 33:2,12        56:4,8
debtor 1:9 8:16       79:6,14,16,19        33:17 36:1,23        defined 40:5
19:16 31:19           80:3,6,8,15,19       37:5,6 40:11         79:12 81:9
49:19,19 61:14        81:7 82:1,3,7        68:11 69:17          defining 27:23
72:12 79:24           84:22 85:3,8         73:2 77:17           definitions
80:11,13,13           86:18,22 88:23       83:11 88:15,19       76:9
81:11 86:11,13        95:22 96:3           91:22 92:8           degree 42:12
89:20 99:20           97:24 98:2,6         94:20 108:6          delay 12:23
103:14,24             98:22 99:19          110:9 117:18         13:25 14:2
104:17 115:16         100:2 101:10         119:23               46:24 98:25
debtor's 49:4         102:6 103:11         decisions 51:24      delays 100:8,9
59:7                  105:23,25            59:12 82:4           delete 10:23
debtors 3:18          106:2 107:20         92:8 100:23          67:4,11,17,25
7:23 8:4,6 12:2       109:6 110:17                              104:16 119:22
```

**[discrimination - effective]**                    Page 15

```
106:9                 distribution          doesn't 10:13        driver's 8:9
discuss 69:25         50:7 60:19,22         15:10,17 17:3        dropped 104:4
76:2 118:3            61:4 62:16            27:14                due 55:15 56:2
discussed 50:1        71:6 83:5             doing 13:3           82:3 100:8,8
85:14 91:14           98:18 99:22           19:4 24:5           dunks 77:1
92:9 103:21           106:25                25:19 26:19,22            e
discussing            distributions         30:25 31:10         e 1:21,21,22
48:10                 20:2,7 21:5           44:11,24,25         3:1,1 7:1,1
discussion            29:22 38:18           55:12 83:21         121:1 122:1
73:17 119:22          50:14 51:17           86:1,2 88:3         e.g. 83:24
discussions           56:13 62:3,4,7       92:4,5 93:1,17       84:13
12:8 17:16,19         62:11,19,23          94:2,8,22 98:2       earlier 66:22
55:2 84:23            70:9 83:6,9          104:12 111:4         earliest 34:19
dishonest             86:25 87:25          dollars 113:21       ease 15:1,19,22
58:22                 90:9,14 91:12         116:12              15:23
disparity 41:22       97:12,25 98:6         don't 10:19,19       easier 69:6
42:9                  98:9,21,25           14:19 16:4           easily 9:1
dispense 104:9        99:2,13 100:4        23:12 24:17,21       easy 104:9
dispersions           100:7,11             25:8 26:1 27:3       eat 46:25
58:16                 105:16,17,18         30:5 32:12,13        ecf 73:13
dispose 68:23         105:20 106:6,6       32:18 33:23          economic
disposes 75:19        107:6 111:2,7        34:2,4,18            70:19
disputed 99:14        district 1:2          64:21 66:3          ecro 1:25
100:6                 108:9,18             68:25 69:16          effect 27:9,10
disputes 17:17        ditch 84:19          74:2 91:17           27:17,19 30:17
100:7                 docket 57:20          94:15 103:4,21      52:16 56:1
disrespectful         82:22                106:7 111:12         61:15 84:8
38:1                  document             111:15,16           86:20 87:21
distributable         65:18 73:13          114:1,3,21          89:18 93:17
71:16                 116:19               115:2 116:4,6       95:18 107:2
distribute            documentation        118:7                108:21 114:23
61:25                 54:1                  door 11:2 15:12      114:24
distributed           documents            doubt 20:8          effective 34:19
39:1 52:19            61:15 63:2            90:16                34:21 79:15
56:12 60:18           65:18 77:25          draft 107:23         80:16 98:19
70:8 99:21            103:19                drawing             102:20,21,23
100:1 106:1                                119:10               102:25 103:4
```

104:24
effectiveness 119:13,16
effects 73:8
effectuate 35:4
effort 13:4 38:2 51:2 91:23
efforts 23:10 80:12
ehrlich 76:13 76:21 78:15 79:4 101:10,12 101:16
either 19:15 20:21 31:6 60:24 70:12 89:20 91:4 92:19
elect 8:23 38:10 62:23 63:15 66:7,24 75:5 106:5
elected 89:10 97:15
electing 59:23 60:5
election 114:22 114:25
elections 63:10
elects 12:18 13:14 64:5
ellis 3:17 7:23 35:2 119:2
eloquent 22:13
email 33:22

emails 10:22
emanuel 3:10 35:6 76:18
embodied 101:12
emergency 117:25
emery 5:8
emphasis 72:11 73:4
emphasized 45:25
employed 79:13
employees 57:25 79:12 82:4 87:22
empower 10:13 16:10
enable 10:13
enables 10:20
enabling 10:15
encompassing 81:2
endeavor 36:25
ended 101:16
energy 37:15
enforce 104:13
enforcement 20:19 27:1 48:12,14,16 65:13 91:2 93:18
engage 20:10 90:18 92:22 118:23

engaged 42:25 43:5 46:17 52:4 82:17
enhance 10:16 16:11
enjoin 25:13 93:20,23
enjoined 20:18 91:1
enjoining 19:4
enormous 41:22
ensnare 26:8
ensure 57:6 89:5 99:20
enter 14:1 15:9 34:18 35:23 36:25 64:23 37:21 108:20
entered 25:21 37:6 41:19 60:15 110:14
entering 93:9
entire 47:4 56:4 98:25
entirely 50:11 89:5
entities 18:23 18:24 19:2,5 19:13 31:6 86:18 87:3,23 88:1 89:6 92:21
entitled 21:18 21:19 26:21 27:12,13,15

62:24 83:17 92:22 93:24 94:7,22,23 99:13 107:5 112:12
entity 75:16 84:2 86:13
entity's 89:1
entry 18:15,16 110:10
environment 40:1,14,16
equal 111:7
equates 113:18
equity 5:16 7:9 93:5 103:7 107:3,5
equivalent 67:6
ernre 37:3
especially 22:20 26:23 114:23
essence 98:6
essentially 19:22 21:8 26:20 65:11 66:14 90:2 106:24 110:25
establishing 8:22
estate 66:20 74:10,24 82:1
estates 103:14 103:15
estimates 71:15

extent 13:8 19:14 26:18 29:18 37:9 39:5 44:14 45:12 46:10 50:14 54:12 83:16 89:19 105:15
extra 14:3 118:1
extremely 9:25 54:10 79:17

f

f 1:21,25 4:11 122:1
f.3d 78:12 83:25
face 43:3 89:9 100:8 112:8,9 112:14
faced 52:20
facilitate 117:6
fact 20:9,11 28:1 30:15 38:4 40:12 41:15 42:13 59:17 62:6 78:4,25 87:11 90:17,19 93:9 95:13 98:10 100:3 104:6 105:6 107:4
facto 21:22 92:23
factors 77:18 78:14

factual 28:22
fail 13:18
failed 54:18
failure 53:11
fair 16:19 51:15 93:5
fairly 21:8 82:23
fairness 44:16 58:12 94:2
faith 51:7
false 58:12
far 17:9 41:21 63:9 66:15
fast 8:8
favor 75:12
fear 56:3
feasibility 43:16 49:13,13 49:25 50:24
features 72:2
february 57:21
federal 53:15 54:3 75:20 85:6,10,21 76:14 81:20,24
fee 116:1
fees 104:22,23 115:25 116:9
felt 81:19
ferguson 1:25
ffdd 83:24
fiduciaries 82:16 83:17
figure 31:8 46:14 47:6 115:10

figures 66:12 73:10
filed 7:6 36:14 40:20 43:12,14 51:5 57:20 72:21 75:20 76:7 85:4 93:13 96:11 100:17 107:10 108:11
filing 77:13
filings 41:11
final 35:21 38:6 69:9 81:12 108:2 119:23
finalization 18:15
finally 105:3
finance 7:20
financial 41:7 41:13 49:18 52:11 53:25 56:20 65:12 76:14 81:20,24
fincen 65:12
find 37:3 49:17 56:8 69:12 71:22 72:16 73:15 103:5 109:19 115:4
finding 92:24
findings 36:17 36:24 37:1
fine 22:13 23:15

fines 20:5 25:6 25:8 88:2 90:11
finish 33:17 110:1
finished 69:17
firm 42:3,10 59:16 76:18 87:19 101:7
firms 40:3,21 41:3,8,14,17 43:5 79:11
first 11:7 15:6 16:3 43:13,17 45:17 46:12 56:9 58:24 60:14 64:1 65:15 69:1 110:1 118:8
flatly 115:17
floating 32:3 32:11
floor 4:18 5:3
fluctuate 100:3 100:13
focus 118:18
focused 39:9 39:12
folks 23:4
follow 38:3 53:25 55:22,23 118:20,23
followed 49:17
following 19:14 37:15

estoppel 93:5
et 64:3
etcetera 16:17 17:3
eternal 17:20
event 38:12 80:15 95:23 96:16 107:21 113:25
events 42:12
eventually 47:1 66:6 69:5
everybody's 24:25 32:17
evidence 38:22 41:17 42:6,24 43:8 44:9 46:7 46:19 51:25,25 52:10,12 57:16 57:17,19 58:6 58:22 59:13,18 59:21 60:3 63:7 71:23 76:15 78:23,24 78:25 80:18 81:5 87:18 88:17,21 101:24
evolving 52:23
ex 21:22 92:23
exactly 24:11 24:13 28:3 41:20 73:19

74:21 97:21
examination 58:9
examiner's 42:3
example 48:3 48:19 66:7 75:1 99:12
exceeds 91:25
excellent 22:11 26:14
except 14:15 19:16 21:12 34:3 84:3 89:21
exception 119:14
excess 70:21
excessive 79:25
exchange 4:9 4:10 43:14 45:21
exchanges 40:3 40:13
exclude 37:24 113:1,3
excluded 10:9 106:24
exclusion 14:11 80:16 91:15,18
exculpated 19:6,17,18,19 20:3,4,10 25:5 29:1 31:20 82:24 84:1 89:22,23,23

90:10,11,18
exculpating 24:6
exculpation 17:17 18:2,22 19:6,7 28:16 28:19 31:18 36:8 76:2 82:9 82:22 83:12,15 83:18 84:6,25 85:15,18,19 86:9 89:13,14 91:20 95:11
exculpatory 77:24
excuse 62:17 76:25 98:19
executing 75:17
execution 19:20 20:5 89:25 90:12
exercise 68:25
exercising 59:22 60:4
exhibit 73:12
exist 44:2 107:1
exists 103:17
expect 47:14 51:10 114:9 116:21
expected 47:20 49:8 116:2
expeditiously 35:4

expense 8:5,5 8:15 10:11 13:24 14:23 15:13 18:2,11
expenses 15:19 46:25
expensive 46:24 47:5 56:5
experience 13:1 78:8 102:5,21
expert 57:7
explain 9:6 30:7 36:24 43:23 48:1,21 54:10
explained 38:3 47:22 60:3 71:4,18
explanation 45:5 46:8 47:12 68:8,19
explanations 71:22 92:3
explicitly 87:16
express 13:1
expressed 78:18,20
expressions 102:11
expunged 69:6
extend 33:19
extension 109:20 119:3
extensive 52:23 102:5 119:23

45:16 89:15,18
footnote 43:25
footnotes 71:4
forbidden 51:7
force 98:24 108:18
forced 46:12 78:24
forces 106:4
forego 65:19
foregoing 20:9 90:16 122:3
foreign 20:25 91:8
forever 30:23 66:1
forget 110:3
form 38:19 54:10 62:7,23 75:18 105:16 107:20
formal 46:1
formally 23:2
format 36:23
former 76:13
forms 8:10 75:7 98:22
forth 19:7,8 23:13 32:6 75:13 91:22
forthcoming 40:23
forum 45:14
forward 10:16 27:20 56:6
found 30:17 48:22 72:15

four 61:24 87:7
framed 55:5
frankly 86:5 109:15
fraud 31:22 80:17 91:16
free 26:11 79:18 88:13 98:10
freedom 94:12
freeze 47:5
friday 45:8
friend 101:9
friendly 101:16
front 21:9 25:23 30:12 47:2,11
frustrating 110:14
frustrations 78:22
ftx 41:12,18,21 41:23 58:10,15 104:3
full 29:24 51:15 81:6 107:7
fully 19:14 89:19
fully 93:3 114:9
function 27:25 112:17
functioning 11:12
fundamentally 9:20

funded 84:2
further 7:13,15 19:3,5 20:18 35:15 39:2 41:5 42:7 44:11 45:12 46:8 49:18 50:22 61:13 63:18 70:16 72:23 76:22 77:8 78:6,6 83:2 89:3,16 91:1 93:23 101:17 118:7 118:23
furthermore 46:4 59:11
future 8:24 9:14 12:5 20:20,22 24:1 27:23,24 29:1 29:15 40:15 41:2 84:10 88:5 89:1 91:3 91:6 94:9,14 106:3,17,19
futures 43:7

g

g 7:1
general 4:16 57:25
generally 38:8 53:8
getting 15:1 32:5 118:20
gina 6:4 111:17

gist 95:25 106:10
give 12:23 32:19 37:20 59:25 69:4 79:2,17 86:11 94:20 108:17 108:20 115:14 117:7
given 9:1 12:16 14:6 24:20 34:4 52:12 59:14,18 62:4 68:18 73:3 75:4 98:8 111:2 114:20
gives 12:16 13:14 24:2 94:17
giving 62:22 64:11 69:2 80:9
go 10:24 12:21 13:4,25 17:24 21:18 23:8,20 26:22,23 29:8 33:25 42:13 50:24 65:3 67:13 69:1 93:23 100:20 103:11 111:8 119:13
goal 105:19 109:4
goes 19:3 32:5 65:20 80:5

going 7:18
10:16 12:4,23
15:8 16:2,22
21:22 22:4
25:9,18 30:24
31:9,10 32:17
32:33 33:8,9
33:13,16,17,18
34:9 35:3
36:16 59:24,24
70:22 89:3
94:21 107:25
108:17,18,23
108:24 111:24
115:4 116:24
118:6,11
goldberg 3:8
34:20,20,24
64:25 65:4,6
67:1,9,19 68:6
68:9 69:14,18
109:2,3,3,9
111:25,25
112:6,10,22
113:2 114:6,7
114:7,20
115:13 116:4
116:15,15
120:7
good 7:17 12:2
17:4,15 28:11
35:5 39:22
43:9 51:7 65:5
119:5
gotten 12:1
28:4

governing
77:25 83:8
government
19:11 24:2
30:21 31:13
51:14 85:25
86:2,5 87:20
88:1,4,7,11,14
88:22 89:10
91:19 92:1,10
92:12,15,17
93:12 94:5
95:3,8 117:20
governmental
17:16 18:23
19:2,4,13
20:15 21:12
22:8 29:22
31:5 52:25
53:10 85:7,16
87:3 89:1
90:23 95:12,15
government's
26:20 34:18
85:23 93:6
95:2
granite 84:5
grant 75:5,12
79:5 94:12
98:16
granted 75:17
79:3 85:20
gratitude
120:7
great 12:21
65:10

greater 71:7
72:11 73:3
greatly 38:4
green 1:12
gross 31:22
80:17
ground 93:21
96:13
grounds 51:20
93:22
group 5:16
42:17 59:9
84:14 103:7
guarantee 53:6
105:7,21,24,25
guarantees
71:21 106:2
guess 22:1
47:24 48:8
94:10
guidance 45:1
47:21 94:20

h

hadn't 7:20
hage 100:19,24
101:9,14,17
102:3,9 103:5
hage's 101:25
hamilton 4:3
hand 42:14,14
handle 54:24
59:16
handled 28:9
37:17 42:11
handles 54:24
handling 41:21

hang 88:5
114:18,18
happen 33:13
71:20 106:2
107:8
happened
41:18,20 42:6
58:15 59:15
happens 31:7
99:11
happy 18:1
100:22 113:23
hard 64:23
73:15 115:4
haven't 19:24
28:7 33:5 67:5
67:15 104:25
hawaii 95:23
95:24
heads 88:6
hear 34:1
45:14 47:12
heard 33:3
103:16
hearing 2:1
3:10 7:4 20:12
37:7,11,20,23
38:5 44:14
45:8 47:9
48:20 51:9
55:8 57:10
60:9,14 61:3
66:22 69:24
71:13 81:17,18
87:12 88:14
90:20 93:8
95:25 118:24

impermissible
91:23
implement
85:24
implementati-
19:20 82:13
89:25
importance
24:20
important 8:22
64:19 72:12
115:9
impose 24:8
53:11 55:25
imposed 24:1
89:11 94:4
imposes 86:17
impression
89:19
improper
106:8 107:17
improperly
101:11
improvement
22:19
inability 93:7
inadequate
55:1,21
inadvertent
37:2
inadvertently
38:15
include 31:18
55:2 61:14
76:9 79:10
96:9

included 52:19
55:6 57:12
70:25 76:7
79:8 82:22
85:5 95:11
103:18
includes 25:9
38:11 50:18
63:3
including 18:8
37:11 41:9
43:23 56:19
66:4 75:22
77:22 92:8
incorporated
63:1
increase 71:9
increased
58:13
incur 19:18
82:17 89:23
incurred 92:25
indefinitely
66:1
independent
7:5 58:4 76:15
103:13,15
indeterminate
47:5
indicate 25:17
indicated
41:22 104:14
indicates 31:23
indiscernible
8:19 22:10
23:10 24:22
28:22 29:5,7

34:24 75:23
108:14,15
113:12,21
116:9 119:10
119:14,16
individual 9:4
41:3 77:10
100:21 101:3,9
individuals
92:21
industry 41:4,7
41:13 43:4
57:8 59:15
inevitable
89:16 100:10
inevitably
100:3
inferior 66:15
inflict 103:2
influenced
101:11
information
8:2,2,13 9:1,18
9:22 10:5,9,9
11:5,9,10,14
11:16 12:1,12
12:15 13:6,13
13:17,19,21
14:6,11,11,13
14:15,20,24
15:6,11,23
16:4,6,16 17:2
17:3,5,8,23
54:1,16 57:11
58:14 63:19,21
64:1,3,10,12
81:25 82:4

65:20 66:3
67:7,17 68:5
68:11,13,16,19
68:23 72:9
73:15,16,18
84:12 112:20
113:5,24 115:7
116:21
infrastructure
57:3
initial 98:18
initially 45:10
injunctive
22:21
injured 82:3
injuries 81:25
82:5,6,6
inquiries 53:15
53:17 54:2,4
56:2 116:22
insiders 76:17
76:20
insight 115:14
insofar 85:20
97:10
instance 16:3
58:25 64:1
118:8
instances 83:23
107:16
instant 12:24
69:10
instantaneous
13:7
instructions
37:25

hearsay 43:3
heart 9:10,16
held 26:21 57:2
60:23 61:17
70:12 93:8
99:15
help 8:20 15:13
15:17 16:13
59:15 60:12
120:4
helpful 23:14
38:2 66:21
helping 13:12
hendershott
5:22 75:23
118:12,14,14
118:17 119:6
119:20,24
herrings 92:2
hey 21:23
he's 26:6
118:11
hiding 26:3
54:17
higher 65:21
78:21
highlighted
72:13 73:2
highly 40:2
51:4 52:23
hindsight
72:10
hint 21:12
hinted 51:21
87:13
hints 30:6

hire 12:21
hired 76:17
history 11:1
16:9,17
hoc 5:16 7:8
103:7
hold 56:14
70:4 89:14
112:7
holder 79:20
holders 5:16
70:13 107:3,5
holding 84:19
holdings 1:7
84:16 105:12
holds 57:21
home 111:19
111:23 112:1
hon 1:22
honestly 18:23
honor 7:7,10
7:15,22 8:18
9:5,10 10:21
11:7 12:7,25
16:7,19 17:11
17:18,21 18:16
18:21 22:10,16
23:1,19 24:15
24:16 25:11
26:3 27:5
28:11,15,17,23
29:4,11,13
31:15,16 32:22
33:5,15,24
34:8,9,13,16
34:20 35:1,5,9

35:10,24 36:2
36:3,4,10
64:25 65:4
66:5,17 67:1
67:19 68:6
69:14,18 108:8
108:22 109:3,9
109:14,15,21
109:24 111:14
111:17 112:1
112:22 113:2
114:7,14,16
115:13,20,23
116:4,15
117:10,13
118:9,12,14,21
119:1,9,12,20
120:2,7
honor's 36:6,6
65:22
hope 17:15,18
17:20 28:16
33:7
hopefully 7:3
28:13
hoping 26:4
horrified 55:19
hot 13:2
hours 33:13
hour's 37:9
house 4:3
hyde 2:25
122:3,8

i

idea 30:10
31:10 33:11
39:19 48:9

94:16
ideas 39:22
identification
8:10 65:14,18
identifications
8:1
identify 54:8
88:7
identifying
8:22
identity 100:18
ids 89:11:4
64:10 68:16
ignore 98:10
illegal 25:17,25
29:23,25 30:14
30:23 32:8,9
43:19,24 51:9
51:18 52:8
86:1 87:12,17
92:20
illusory 106:13
imagine 8:25
105:1
immediate
61:8
immediately
56:4 61:1
68:22,23
immunity
26:23 83:17
93:15 94:8,17
94:18
impact 74:15
impaired 97:1
impede 50:9

insufficient
72:1
insurance 77:9
78:7
intend 27:9
46:7
intended 79:22
94:12
intention 10:3
26:7 30:24
51:8 85:11
intercompany
80:12 103:8
interest 5:16
28:25 60:21
61:6,18 70:10
80:9 82:21
97:1 101:1
102:1 103:15
104:11
interested
35:11 45:14
interfere 50:8
91:24
interim 27:17
internal 54:1
interpretation
119:9
interrupt 27:3
110:20
interrupting
65:5
introduced
23:6
investigated
77:1,2 81:10

investigation
76:16,18 80:20
58:13
investigations
83:11 91:6
58:13
investment
20:25 39:20
53:22 91:8
investments
39:22
investors
102:12
involuntarily
92:25 94:25
involve 14:23
15:12 41:3
involves 52:24
involving
69:23,24 87:14
88:8 94:7
iridium 78:10
78:12
irrelevant 92:6
isn't 67:14
69:4 112:15
issue 21:13
29:4,15 32:23
33:4 34:9 38:5
55:24,24 26:9
26:9,18,19
29:10,15,20
istael 30:17 31:23
64:13 65:8
34:12 35:3
39:21 58:6
95:6 114:3
115:9,11 117:1
117:13,25

117:20 118:6
issued 20:23
83:11 91:6
issues 7:4 9:7
17:12 23:3
24:20 30:10
37:22 38:20,23
39:10,13 45:3
45:7 46:7,11
46:18 47:14
48:8,9,15
49:22,25 50:20
50:24 51:21
62:5 68:11
69:23,24 87:14
88:8 94:7
100:8 108:3
110:19 120:5
item 35:15
106:16
it's 13:21 14:2
19:8 21:10
22:19,20 25:4
25:24,24 26:9
26:9,18,19
29:10,15,20
30:17 31:23
32:4 34:4,10
34:12 35:3
39:21 58:6
95:6 114:3
115:9,11 117:1
117:13,25
119:10

i'll 17:12 25:1
119:21
i'm 9:3 13:11
15:4,10,10,13
16:21 17:24
18:1,23 21:9
24:6 26:19
27:5,10,18,22
29:17,19 30:24
31:10 32:1,19
35:8 36:3,16
36:21 39:17
42:1 59:24
61:16 69:3
73:5 107:25
108:17,18,23
109:17 111:12
111:15,16
112:3 113:23
117:14 119:10
119:10
i've 19:24 21:9
21:19 31:12
34:4 35:14
50:1 59:11
65:8 108:19
114:20 115:12

j

j 3:8
j.d. 22:16
25:11
jail 25:9,19
january 53:20
54:6 55:20
60:14,16 72:21
73:17 82:22

jean 5:6
job 26:7
  100:19 118:19
john 6:1
  114:16
join 8:23 9:13
  10:3,14 66:7
  67:10 68:3
joined 67:16
  67:18
joins 10:7
  11:21 16:8
jones 75:23
judge 1:23
  58:24 69:11
  91:22 95:14
  108:18 118:10
  119:24
judgement
  60:5 66:19
  77:22 115:19
judges 102:24
judgment 59:9
  59:22
judgments
  41:19
july 46:20 54:1
june 84:15
jurisdiction
  91:25 95:5
jurisdictions
  21:4,6 52:20
  61:23 62:9,15
  62:20 91:12,13
  97:16 99:8
  100:16

justice 4:1
justification
  114:2
justifications
  83:13 92:3,5,6
justified 114:3
justifies 81:6

k

karen 4:21
  23:1 31:16
keep 14:18
  25:1 33:14
  115:8
kelly 5:20 7:10
kilpatrick 5:15
kind 11:18
  16:15 23:13
  26:1 31:12
  32:2,15 39:1
  43:1 50:1,22
  73:2 79:24
  80:3 85:8,9,20
  89:4 91:20
  94:8 95:15
  97:25 98:6
  105:20 106:5
  108:19 110:19
  113:11,12
kinds 42:12
kirkland 3:17
  7:23 35:2
  119:2
kirpalani 3:15
  35:5,6,14,18
  35:24 80:22
know 9:6,12
  10:1 11:15,17

12:9 13:7 14:9
  14:19,22 15:4
  16:9 21:8,19
  23:10 24:21
  26:19 27:12,14
  27:15,24 28:4
  30:20,22 32:12
  32:24 33:23
  35:3,8 42:14
  47:19 48:3
  49:8 63:3 72:6
  92:22 94:22,23
  102:24 108:14
  110:14 111:22
  111:23 114:21
  115:3 116:3,4
  116:7 117:17
  118:7
knowing 43:6
knowledge
  10:25 18:17
  50:8
known 9:15
  32:6 79:19
knows 10:21
kyc 10:5,7 11:8
  11:23 12:1,5
  12:10,12 13:7
  13:23 14:12
  65:11,15,20,25
  65:25 66:3,16
  111:20 113:24
  116:18,19

l

labored 37:18
lack 55:12

landscape
  52:24
language 18:22
  19:22,25 21:7
  22:6,9,11,18
  22:21 23:4,14
  24:18 28:13,16
  31:19 32:18
  33:11,21 34:2
  36:8 61:14,19
  70:16 77:24
  80:22 81:9,11
  84:25 89:18
  90:2,7 91:14
large 37:10,11
late 104:1
  110:17
latam 84:14
late 104:1
  110:17
latham 3:3
  65:6 109:4
  111:25 114:8
  116:16
law 19:15
  21:11 30:2,5
  51:7 79:11
  83:7 85:10,19
  89:20 93:19
  101:7
laws 20:13
  21:4 40:9
  44:20 53:1
  83:3 90:21
  91:11
lawsuit 73:9
lawyers 102:22

53:25 54:2,19
  55:14,15 57:11
  58:10,19 62:22
  63:10 72:10
  75:7 76:10
  80:20 81:14
  83:10 85:12,17
  88:24 90:5
  92:2,11 95:4
  95:21 97:3
  101:22 105:1,4
  105:20 107:17
  110:22 114:25
  117:18
makes 77:16
  94:15 102:19
  102:21 107:4
  110:16 115:6
making 32:21
  40:11 64:19
  69:5 72:14
  85:8 94:19
  107:19 114:10
  114:22
man 8:18,21
  9:5,9 10:20
  11:7,13,20
  12:7,25 13:20
  13:23 14:10,22
  15:15,18 16:6
  16:18 17:11,14
  29:5,7 33:5,14
  33:20 34:6,8
  43:19 44:21
  51:22 80:5
  90:14
march 1:15 8:6
  18:3 23:6,7
  37:8,8 54:9
  122:25
margin 56:25
marine 83:13
market 9:21
  10:2,4,16 39:6
  63:23 71:20
  100:12 106:4
  106:12,13,14
  106:20
marketable
  106:16

marketing
  10:21,24 16:15
  66:15 67:14
  69:5
markets 9:25
  10:1,2 13:2
  66:8
market's
  106:14
masquerading
  55:10
material 73:1
math 113:8
  114:4
mathematica...
  114:2
matter 1:5
  28:22 59:17
  80:8 85:19
  86:3 93:9,9
  99:24 111:9
  115:9
matters 46:17
  81:10
maximize
  16:12 38:17
maximizes
  11:1
mcdermott 5:8
mcmahon's
  91:22
mean 17:3
  24:17 32:4
  38:16 42:23
  48:23 50:20
  56:1 58:16
  60:7 63:14

79:22 97:5
  98:12,21 111:5
  112:6,10 115:3
  115:16
meaningful
  70:19 105:8
  115:16
means 21:10
  30:2,10 46:24
  51:7 71:21
  86:7 93:18
  98:14 103:3
meant 23:12
  24:1
member 101:4
  101:15,18
  102:1
members 79:9
  97:7 100:21
  101:5,21 110:6
mention 112:5
mentioned
  10:10,19 25:5
  111:21
merit 96:17
  105:4 119:4
meritorious
  48:15,18
message 44:17
messengers
  44:16
met 96:24
metallurgical
  84:15
mew 1:3
michael 1:22
microphone
  33:25

lead 106:19
leave 14:3,12
  27:7 30:15
  69:8 115:4,15
leaving 27:23
  47:24
led 41:10,13
ledanski 2:25
  122:3,8
ledger 57:25
left 7:17 69:22
  94:14
legal 38:22
  45:7,9 46:19
  47:10,13,15
  77:21 83:13
  86:8 88:8,16
  88:20 92:3,4,6
  92:16 122:20
legality 88:12
  93:7
legally 52:13
  96:3
legitimate 17:1
lend 56:24 58:2
length 78:2
lengthy 33:2
  37:7
lessen 117:24
letter 42:17
  108:11
letting 15:6
level 11:8
  16:19 65:15,24
  107:4 111:20
  111:20 112:2,3
  113:24 116:18

116:19 119:16
levels 65:11
lexington 3:19
lexis 84:14,20
liabilities 88:2
  90:12 91:16
  93:1 94:4
liability 19:19
  20:4 22:5 25:8
  31:12 77:14
  82:11,17,24
  84:2 88:5 89:9
  89:24 90:10
liable 22:1 25:6
  30:19 83:7,21
  88:2
license 48:25
licenses 8:10
  52:21 61:24
  96:2 98:3,16
  79:9
lien 104:8
light 58:15
  107:24
liked 37:4
likely 34:19
limit 19:6
  20:14,19,21,24
  39:3 90:22
  91:2,5,7
  116:11,11,17
limitation 64:2
limitations
  112:23
limited 47:20
  48:12 59:4,6

63:25 78:7
  79:3 81:9 84:7
  101:25
limiting 19:15
  89:20
limits 23:25
  116:20
line 35:15
  121:4
lines 24:23
  85:1 89:15
lingering 68:20
links 72:4
liquidation
  49:18,20 50:22
  52:10 70:24
  71:3,9 74:2,14
  79:9
lisa 118:18
list 66:14 75:3
  79:9
listen 18:3
listening 23:17
literally 28:2
  42:23 59:18
  95:9
litigate 88:12
litigation 84:11
  102:17,24
litigators
  102:23 103:1
little 24:24
  32:18 43:8
  106:17 117:24
live 61:22
  105:3

living 106:19
llc 78:11,12
llp 3:17 5:15
loan 41:9
loans 76:22
  77:7,9
locate 104:18
located 57:4
logic 67:20
long 23:8 59:4
  65:21 75:3
  79:9 96:24
look 22:25,25
  23:15 24:22
  81:11 114:1
  118:6
looking 109:1
  119:12,13
loren 6:1
  114:16,16,19
  115:21,23
  116:8,23 117:8
lose 14:4,25
  113:25
loss 15:12
lot 13:21
  103:20 107:22
  107:23 110:16
  113:22 114:20
loud 16:1
lying 58:20

m

m 4:6,18
made 19:24
  21:14 24:12
  30:3 38:22,22
  42:11 51:2,20

midday 108:11
middle 27:4
  110:18
might've 15:7
mike 3:23
  23:21
million 9:12
  66:10 70:20
  71:6,16 74:9
  77:13,14 113:7
  113:8
mind 12:20
  40:17 47:22
  64:13 66:9
  89:18 112:25
  113:25 115:8
mindful 15:5
minds 15:7
  16:5 21:25
mineola 122:23
minor 24:17
minute 8:7
minutes 33:13
  109:6
misbehavior
  41:16 43:1
misconcepti...
  74:21
misconduct
  31:22 80:17
  84:4 91:16
misled 81:19
  81:21
mismanage...
  82:3
misrepresent...
  81:23

misrepresent...
  54:19
missed 35:18
misspeak 37:3
misundersta...
  86:7
misuse 41:16
  59:20
misusing 42:23
mitigates 10:5
modern 10:20
modification
  89:12 115:16
modifications
  69:21
modified 20:21
  63:17 89:14
  91:4 104:1,15
  104:22
modify 29:18
  81:8 108:12
moment 36:3
  59:24 76:3
monday 37:8
  108:21 109:16
  109:20
monetary 10:6
money 113:22
  116:10,14,25
  117:1
month 62:4,25
  69:7 116:14,25
  months 46:22
  62:9,19 67:16
  96:7 97:14,17
moot 76:11
  110:13

morning 91:14
  107:18
morrissey 4:7
  28:10,11,12
  29:6,11 31:15
  32:22,22 34:9
  108:16 109:13
  109:14
mortgage
  104:8,13
motion 109:23
  110:4,15,15
  117:24
motions 36:14
  109:23 110:4
  110:24
move 58:1
  117:17
moved 18:3
moving 33:14
  117:22
moynihan 5:20
  7:10,10,15
murray 84:15
mute 29:9
mystery 34:10

n

n 3:1 7:1 121:1
  122:1
name 13:13
  16:17 65:16
  104:8
named 7:14
names 7:5 8:21
  103:12 111:16
narrow 21:8
narrower
  19:12

nastiest 102:23
national 4:16
nature 77:20
navigate 120:4
ne 4:11
near 33:25
  45:8
necessarily
  11:7 17:3 25:9
  40:10 44:17
  46:3 103:3
  107:24
necessary 60:8
  61:25 96:6
  99:1 118:1
need 9:3 11:5
  13:18 15:12
  16:22 22:23
  33:6 49:18
  50:2 96:15
  103:21 108:5
  109:18 117:24
needed 53:22
  54:6 62:10
  100:10 104:15
needs 25:6,7
  29:9 49:24
  104:13 119:3
negative 44:9
  44:19
negligence
  31:22 80:17
negotiate
  115:15
negotiation
  19:20 89:24

**[neither - obviously]**                          Page 28

neither 40:9
net 78:21
network 65:13
83:14
networks
65:23
never 58:18
68:3 69:11
102:4
nevertheless
46:10 106:18
new 1:2,13 3:6
3:13,20 4:4 5:4
5:11,18 8:23
11:20 14:18,22
54:16 81:9
95:17,19,25
96:4,4,6,8,10
96:12,14,18,19
98:24 99:2,4
104:5,8,12
108:10
news 58:8
112:19
newsom 75:22
newspapers
42:16
nick 24:18
nine 15:25
nits 35:15
nominal 60:20
70:10
non 48:22
75:24,25 76:3
normal 39:7
northern 57:4

note 19:11 23:5
39:20 42:22
53:17 71:23
72:3,19 73:15
93:12 95:3,8
105:10
noted 62:1
70:6 83:15,20
87:13 97:20
notice 8:4
29:24 87:4
notices 32:5
notify 64:8
noting 84:8
notwithstand...
49:3
nullity 107:1
number 7:5
9:2 10:8,19
11:17,22 12:3
12:8,17,19,24
13:16 14:1,7
14:16,18,21
15:3,9,24 16:9
16:14,16 23:2
70:23 73:10,24
74:3,6 75:19
76:8,11 85:17
95:17,21,24,25
96:16,21 97:10
97:23 103:19
104:6 107:2
119:4
objections 30:4
39:9,10,11,12
43:12 44:13
54:14 55:5,13
69:23 70:2

66:5,13,18
68:18
nw 4:18
ny 1:13 3:6,13
3:20 4:4 5:4,11
5:18 122:3

**o**

o 1:21 7:1
122:1
oath 58:19
object 22:9
28:6 51:15
103:25
objected 19:13
28:8 74:19
75:24 82:9
96:12 103:7,23
objecting
54:21 55:3
objection 7:13
7:16 28:3 31:9
43:13,15,21,25
45:13 47:15
51:4,20 70:3
70:23 73:10,24
74:3,6 75:19
76:8,11 85:17
95:17,21,24,25
96:16,21 97:10
97:23 103:19
104:6 107:2
119:4

72:22,23 74:21
75:21 87:10
92:9 95:14
96:11 100:14
100:17,19
102:3 103:20
104:3,4 105:3
107:9,11
111:10
objectors 58:7
58:10
objectors'
106:22
objects 17:6
91:17
obligated
21:16 75:8
obligates 88:4
obligation 47:3
86:18
obligations
52:12,14
observations
43:11
obtain 53:11
54:22 55:4
62:10 96:6
obtained 46:5
54:22 56:18
57:15 68:24
96:7
obtaining
53:10
obviously 12:8
33:8 51:8
109:16 117:17

**[ordinarily - pay]**                          Page 30

ordinarily
106:13
ordinary 28:6
93:3
organize 101:6
organized
86:13,14
original 19:12
62:18 85:18
89:12
ought 27:22
45:13
outset 39:15
44:14 47:9
48:20 101:5
outside 29:1
76:17
overall 32:7,10
overreached
28:5
overrule 52:6
70:22 100:14
overruled
107:11
overstep 30:25
overwhelming
66:20
overwhelmin...
97:4
own 16:11,12
19:11 22:3
35:8 43:18
50:3 54:19
75:2 76:6
79:20,23 92:8
93:6 100:9
107:7

owned 75:16
106:7
owner 60:20
105:4
owners 105:5
ownership
104:11

**p**

p 3:1,1 7:1
p.m. 6:19
pace 69:16
page 24:14
73:12 121:4
pages 56:17
paid 77:12
pain 103:2
paper 26:20
113:8
papers 93:13
94:6
paperwork
100:9
paragraph
19:6 20:9
34:12 90:17
paragraphs
19:8 22:12
85:5,5
paris 3:10
parlance 49:14
part 8:22 10:9
10:20 12:11,13
13:5 14:25
16:7 29:16
34:14 36:19
78:21 79:3
80:6 82:23

90:1 111:20
112:2,10
119:22
partial 111:2
participants
37:11 38:1
93:14
participated
113:13
participation
37:14
particular
33:11 37:23
39:22 40:21,21
42:10,15 43:22
46:16 53:1
59:7 64:4
72:11 76:11
103:4
particularly
7:19 17:5 39:6
54:7 58:22
parties 18:14
19:7,17 20:3
20:10 25:5
28:25 29:1
33:22 34:11
35:11 37:12,13
37:21 42:16
45:14 47:17
50:12 51:23
54:21 55:3,20
57:20 58:4
61:13,21,23
62:13 64:6,9
68:2 70:15
74:19,25 75:3

78:17,19 79:7
79:7,18 80:3,4
82:11,16,21,24
83:20 85:7,15
88:6 90:18
108:14 118:4,4
parties' 62:1
63:3,8 78:4
party 11:23
13:9 18:18
19:16,18 37:25
39:20 47:19
52:1 57:7 63:7
73:3,20 75:24
75:25 76:3,8,9
80:11 89:21,22
89:23 90:10
91:21 93:22
101:8
party's 79:23
pass 73:6
passed 81:1
97:14
passports 8:10
past 10:15,25
16:17 41:8
95:10,16
patrick 7:11
paul 100:18
pause 37:13
81:16
pay 9:11 10:6
11:23 70:21,21
113:19,21
115:1 116:2,9
116:25

**[occur - orders]**                          Page 29

occur 21:5
34:19 82:13
91:13 98:5
106:19
occurred 82:12
occurrence
80:15
occurring
92:13
odd 67:12
104:6
odds 40:24
offends 25:22
91:21
offer 45:1
46:19 52:17
56:25 57:16
87:18
offered 42:23
45:24 52:10
63:7 76:15
88:18,21
offering 44:9
office 5:1 22:17
54:14 70:1
82:8 108:9
117:14
officer 3:10
76:14 77:6,14
officers 75:1
79:13 82:4
85:23 87:23
officers' 77:2,4
official 37:6
46:4 78:10,11
79:8 100:20

ohio 84:16
okay 8:11,14
11:25 12:15
16:21 17:10,11
17:13 18:5,12
18:20,24 22:15
24:14 25:3,10
27:3,12,19,20
29:10 30:17
31:14 32:14,17
33:19 34:7,23
35:17,24,25
69:13 106:11
109:8,10,11,16
109:22 110:1,2
112:4 113:3,4
114:15 115:12
116:8 117:7,8
118:8,9 120:6
okike 3:22 7:7
7:22,22 8:9,12
8:15 10:10
17:18,21,25
18:6,13,21
35:1,2 119:1,1
120:2
old 122:21
omission 80:14
omitted 78:13
onboards 9:23
once 17:5
32:22 33:17
37:1 42:5 44:5
44:23 45:22
56:2 87:1
97:14 107:7
118:21

ongoing 55:17
open 7:4,17
11:5 13:3
56:16 64:13,20
68:21,25 69:8
87:8 100:10
113:20,25
opened 113:15
opening 69:1
operate 40:3
41:6
operated 39:25
41:6,23 42:10
operates 40:1
operating 44:4
44:7 45:21
48:2 78:11,12
operation 11:2
operational
52:11
operations
10:13,16 16:11
30:9 45:7
opportunity
22:25 29:24
36:5 51:15
62:21 69:5
75:4 87:5 88:7
opose 34:13
opposed 41:24
95:20
opposition
21:14 31:7
opt 7:25 16:24
62:22 64:7,9
64:15 68:15
75:6,8,17

112:12,24
113:17,18
opted 8:2 11:3
15:6 115:17
option 38:11
50:12,19 67:16
71:8 86:11
106:18,20
oral 80:23
oranges 74:7
order 11:23
18:15,15,19
19:1,4,8,9
20:20,23 22:2
22:21 24:5,6,9
25:20 26:14,16
26:23 27:8,9
27:11,18 33:11
33:12,18 34:12
34:14 35:23
36:5,25 49:16
39:18 43:6
50:18,21,23,25
50:20 65:11
69:9 81:12
84:25 85:4
86:20,20 87:21
88:3 89:7,17
91:3,6 93:2,9
94:19 104:2,10
107:14,18,20
107:23 108:3
108:13,21
110:10,11,13
ordered 26:23
31:13 85:2
93:1 94:8
orders 86:15

**[payments - platform]**                          Page 31

payments 77:3
78:3
pays 107:7
penalties 20:5
20:22 22:1
23:25 24:9
25:6,8 90:11
91:5 94:4
pending 28:24
36:19 41:1
46:20 67:3
109:18
people 7:13
10:2 13:21
15:1,5,5 16:3
21:11,15 23:10
25:18 26:8,21
27:10,11,15,22
30:14,16,18
31:12 33:9,16
33:18 34:1
39:18 43:6
58:20 67:5,13
67:15 88:1
89:6 94:2,3,13
94:13,20 99:15
102:15,15,21
102:23,24,25
103:12 104:18
109:17 110:14
113:13,14,15
113:16,18,20
114:22,25
117:15
percent 56:21
58:18 69:3
71:7,8 114:11

percentage
78:21
perfectly 22:6
88:20
perform 52:12
52:13 102:9
period 7:25
13:15 60:22
61:4,5 62:5,25
64:8,15 67:14
68:14 69:7,7
113:17
permissible
19:14 89:19
permit 38:25
51:22 63:6
98:9
permitted
66:18
persisted 40:12
person 11:24
25:13 75:16,16
personal 13:1
101:3 102:20
personally
30:19
personnel
86:19,23 88:6
persons 41:21
79:13,17
perspective
67:22 105:22
117:20
pestering
69:11
peter 4:6 108:8
117:13

petition 79:15
petroleum
83:14
pharma 91:22
phone 7:9 22:8
29:9 111:12
112:7,14,15
phrase 79:22
80:4
phrased 49:12
piece 8:25
pit 102:13
119:17
place 12:13
13:6 14:13,14
15:7 46:13
55:23 57:5
66:1 73:19
80:16 99:1
110:12
placed 73:21
places 37:3
72:15
plan 19:12,17
20:1,8,10,17
21:3,9,15,16
22:2 23:11
27:19 28:20
29:21 30:1,13
30:15 34:21
103:10 107:22
107:12,22,25
110:8,10 111:2
113:16 121:5
plans 28:3
75:10 82:15
95:9 99:11
plan's 100:15
platform 8:24
9:13,15,23

53:13 58:25
59:5,17 61:14
61:20 63:2
71:17 74:1,8
74:14,17,20
75:12,13,13,14
76:2,7 80:2,10
82:10,14,20
83:2,5,9,10
84:1,2,3,18,19
84:25 85:24
86:4,8,10,11
86:14,15,19,21
86:22,24,25
87:1,6,9,13,24
87:25 89:8,22
90:8,15,18,25
91:10 92:16,18
92:20 95:18
96:6,18,22,25
97:2,4,6,12
98:1,5,12,14
100:14,18
101:2,13 102:4
102:7,13,20
103:8,19,22
104:15,16
105:10 107:2,4
107:12,22,25
108:8,10 111:2
113:16 121:5

**[platform - problems]**                                   Page 32

10:3,14 12:12
16:8 56:16
57:1 66:7
67:25 68:3
101:17
please  15:13
27:3 60:2
pleased  7:12
plug  12:20
13:16 14:17
plus  79:11
120:13
pm  1:16
point  7:21
10:19 18:13
25:1 29:2
31:17 47:18
48:19 59:14
65:1 67:6,13
67:10 70:6
73:17 81:16
99:7 104:3
109:12 111:6
pointed  58:10
points  28:15
31:7 48:10
49:11 78:23
87:19
policy  66:18
poor  108:18
portion  77:4
portions  75:21
pose  92:3
posed  54:14
75:21 88:8
position  20:12
25:23 32:19

34:18 39:21
43:2,21 44:6
45:9,10,15,19
45:23 46:1
49:4 53:4
64:20 85:17,19
85:23 86:5
87:8,19 88:11
90:20 105:23
positions  40:24
position's  28:9
possibility  69:8
106:18
possible  3:21
32:8,9 34:22
36:22 37:20
52:25 71:9
81:2 105:19
109:5 117:18
117:25
possibly  45:4
47:19 81:12
95:23 105:20
post  21:22
29:17
postulated
101:8
potential  39:14
43:4 48:12
52:17 73:8
102:16 106:15
115:4
power  98:14
98:16
powers  20:15
90:23

practical  50:16
99:19,24 115:9
117:4
practice  93:4
practices  57:14
pre  13:8 27:1
66:16
precise  117:7
predict  49:6
53:3
predictions
107:8
prefer  58:8
62:3,16
preference
73:9
preliminary
72:20
prepared
36:22 65:21
88:9 89:13
preposterous
16:5 25:24,25
28:9 30:17
present  66:9
presented
38:22 71:24
101:19
preserve  78:5
press  74:3
pressed  95:24
presume  58:20
58:21
pretend  113:19
pretty  13:2
17:10

prevent  31:10
53:11 64:11,16
98:2 101:11
prevented
20:16,18 89:3
90:24 91:1
preventing
93:18
previously
22:22 60:25
83:11 85:16
104:14 106:7
price  9:12
99:17,19
106:14 115:16
prices  39:6
99:8 100:3
106:12,13
primarily
105:6
primary  38:5
60:12
principles
91:21 93:5
54:25 56:3
pro  5:23 6:2,5
37:11,13,20,24
38:1 78:17
102:12 114:16
118:15,17
problem  31:2
32:13,13 47:7
74:6 98:24
problems
28:24 31:25
41:13 50:6

**[provisions - really]**                                   Page 34

provisions  18:1
19:1 28:6
49:15 59:1,5
61:10 63:4
72:5,11 76:2
82:16 83:15
84:17 85:15,18
95:11,13
103:18,23,25
104:16,19,21
104:23 107:15
107:24
proviso  18:25
19:2 23:6
psaropoulos
76:14,21 78:15
79:4
public  41:20
42:4 45:13
pull  119:12
punish  86:2
purchase  9:12
80:7,7
purchaser  8:3
18:6,10 21:3
36:19 59:4
91:11
purchases
43:18,20
purchasing
52:2
purdue  91:22
purported  92:6
104:7
purporting
29:17

purpose  32:21
86:14
pursuant  57:2
65:12 83:5,10
pursue  74:24
74:25 78:5,20
118:6
pursued  48:25
90:2 92:20
pursuing  76:20
pursuit  102:16
purview  29:2
push  17:8
put  12:23 19:7
23:11 25:19
37:15 43:7,11
47:4 72:11
82:25 98:5
109:20 118:19
putting  64:19
69:2 117:6

**q**

qualifications
100:24 102:9
qualified  26:21
27:9 83:17
93:15 94:17
102:7 103:5
question  7:18
16:18 39:18
49:2,9,10
62:13,20 68:17
69:10,11 96:15
109:24 111:11
115:22 116:7
116:10 117:3,4
117:16 118:15

118:17
questioned
44:13
questions
37:21 42:18,21
43:6,10 53:21
54:11 55:9,18
60:13 71:13
100:25 103:10
107:22 114:17
115:24 117:7
quickly  9:1
14:2 31:17
34:22 96:3
109:5 117:17
117:22
quinn  3:10
quite  29:20
30:7 39:17
97:24
quote  75:20
quoted  73:10

**r**

r  1:21 3:1 7:1
122:1
raise  29:4 30:9
32:23,25 34:10
45:7 48:16
94:9
raised  23:4
29:2 39:10
42:9,21 43:10
46:18 49:22
50:20,24 54:11
55:18 60:13
62:6,13,19

68:11,17 69:10
70:1 84:10
95:16 98:24
103:10 108:14
110:15,19
raises  31:4
47:13 96:14
raising  42:18
43:6
ramped  5:17
ran  102:16
ranged  95:4
rather  38:19
55:13
reach  9:21
reached  7:21
50:3 57:18
63:2
read  7:23
17:21 19:10
21:7 22:9
26:20 28:17
34:3 35:19
85:6
readily  64:20
98:11
reading  2:1
61:16
ready  18:6
30:4
real  43:5 102:2
102:19 104:7
106:20 114:21
really  9:6,10
50:24 64:21
67:21 72:25
79:21 88:11

**[problems - provision]**                                   Page 33

55:12
procedures
58:4
proceed  17:12
50:21 59:23
60:5 69:25
86:11
proceeding
20:18 27:1
29:15 91:1
proceedings
93:14 120:12
122:4
proceeds  77:9
78:7
process  10:21
14:25 32:10
56:5 69:1
101:6 106:25
108:4 110:18
110:20 115:25
processing
100:9
produce  71:15
products  56:25
professional
104:22
professionals
79:10 87:23
profitability
16:12
program  53:21
65:14
programs
16:11
project  55:17

projections
70:25
prominently
72:13
promise  110:3
promptly
36:22
proof  106:21
106:23
proper  47:18
55:13 83:12,18
84:17 93:6
property  99:25
104:7,9,11
proportionate
74:15
proposal  16:24
19:11 62:18
71:2,2,5,12
103:24
proposals
40:18 88:24
propose  19:13
20:1
proposed  7:24
19:12 21:10
22:21 24:23
30:1 34:12
36:6,12,19
38:7,12,14,17
38:24 39:12
43:3,16 47:2,8
47:11 49:13,21
51:6,11,16
52:9 56:20
58:25 59:3
60:8,11 61:22

63:1 69:21
72:19 74:20,22
76:12 77:3
78:1 79:2,5,17
79:18 80:2
81:7,8,8 82:2,9
82:22 84:24
85:4,15 87:4
88:12 89:17
90:7 97:13
100:14,18
101:19 104:21
107:18 114:11
proposing
18:25 50:9
proposition
75:11
prosecute
26:15,17
prosecuted
26:12
prosecution
25:13 26:11
prosecutor
26:6,17
prospect  42:9
88:5 106:17
118:5
protect  84:17
protected
54:12 93:15
protecting  23:9
protection
18:11 21:18
83:19
protections
61:9 83:19

protocols  57:5
57:7 58:3
prove  43:16,18
44:4,9,19 45:3
45:4,5 49:13
provide  39:2
45:9 46:7
57:13 61:10
63:18 64:25
65:9 70:16
71:17 75:10
77:3 97:6
104:10 107:3
110:20 119:2
provided  8:4
18:22 19:3,5
20:8 47:21
57:13 90:15
provider  11:23
provides  38:9
39:23 50:11
75:14 86:12
95:18 96:22
98:5 110:7
providing
11:21 98:12
provision  8:15
20:14,19 21:2
28:20,21 31:18
69:8 82:9,10
82:23 83:12,18
84:1,7,8 85:19
89:13,14 90:22
91:2,10,20
92:10,13,16,24
98:13 106:8
108:12 109:10

**[really - regulatory]**                                   Page 35

96:21 97:5
110:16,23
115:5,9 120:4
120:5
reason  17:4
25:14 26:15
30:13 31:5
49:25 50:7,19
50:23 72:16
reasonable
28:6 30:25
59:8,22 60:4
71:22 77:18
78:16 79:1
83:22 103:6
reasonableness
90:5
reasonably
36:25
reasoning
84:12
reasons  9:5
17:1 21:17
30:6 43:17
44:10 46:17
52:8,15 62:3
71:3 74:4 86:8
89:4 92:3 95:7
107:10 110:22
rebalancing
20:1,6,16
25:19 29:21
32:6,7 43:24
51:16 86:24
87:23 90:8,13
90:24 92:15

rebuked  44:14
rebut  46:19
92:5
recall  66:10
95:14
receive  37:1
47:1 50:17
56:13 62:7
63:14 96:2,8
97:11,13 98:21
99:10,10,13
100:6,11 106:5
106:6
received  10:22
53:15,20 55:24
99:15,22
receiving  45:5
recent  41:11
42:17
recently  56:6
104:7
recess  60:1
recognize
63:22 111:16
recognizes
112:14
recognizing
24:23 89:15
recollection
73:20
record  2:1 7:24
17:25 30:12
33:3 35:19
36:17 45:17
48:13 65:6
74:4 118:19
122:4

recoveries
46:25 50:17
71:1,7 73:10
73:11,23,25,25
74:8,11,15,17
74:18 77:8
78:6
recovery  107:3
red  92:2
reduce  39:5
reducing
105:21
reemphasize
81:16
reference
49:14
referred  42:16
61:4
referring  72:15
91:16
reflect  89:17
91:16
reflects  20:9
90:17
refused  35:25
regard  13:22
40:21 42:22
54:8 61:11
63:18 70:17
83:12 92:2
113:4
regarded  47:22
regarding  21:3
62:6 76:1 83:4
91:10 104:1,21
108:13 109:16
114:17

regards  115:24
116:10
regimes  40:19
42:13 98:20
register  49:2
52:5 53:22
registered
48:22
registering
44:5 45:22
registration
44:21
registrations
44:12
regulation  40:8
51:12,19 83:8
85:10,21 87:7
93:19
regulations
20:13 53:1
66:2 90:22
98:8,15
regulator
47:10,14 51:10
51:12
regulators  31:2
40:6 47:6 53:3
54:8 61:11
63:18 70:17
83:12 92:2
113:4
regulatory
20:11,20,22
28:23 30:9
31:4,8 39:13
40:1,5,14,16
40:18,23 41:2
42:13 49:6
52:8,18,19,21
52:23 53:4,6

**[regulatory - reserve]**                   Page 36

| | | | |
|---|---|---|---|
| 53:14 89:4 | 80:2,24 81:1,4 | renewed 80:25 | requesting |
| 90:19 91:3,6 | 82:2 89:21,21 | reorganization | 87:20 99:5 |
| 91:24 92:14 | 91:21 | 36:13 38:8 | 108:12 |
| 93:1,19,21 | released 75:15 | 47:2 49:19,20 | requests 57:11 |
| 94:10 98:3,20 | 76:8 79:10,12 | 50:22 86:8,10 | require 11:8 |
| 100:8 | 79:18,23 80:3 | repeatedly | 11:10 14:22 |
| rehypothecate | 80:4,11 | 87:18 | 66:6 67:12 |
| 58:2 | releases 19:16 | repeating | 84:9 86:22 |
| reimbursement | 35:12 39:11 | 51:10 | 99:25 107:21 |
| 8:5,15 18:2,11 | 74:20,22 75:5 | repetitive | 115:16 117:19 |
| reinstate | 75:6,12,25 | 107:16 | required 8:18 |
| 113:24 | 76:1,4,6 79:2,3 | replace 110:6 | 11:14 44:4,11 |
| reject 46:13 | 79:8,16,18 | report 42:1,8 | 52:5 53:4 |
| 52:6,15 72:16 | 81:7,8 82:2 | reports 58:8 | 59:12 89:7,10 |
| rejected | releasing 76:8 | represent 23:2 | 92:22 94:21 |
| 115:18 | relevant 15:18 | 77:4 | 96:1 97:7 99:3 |
| rejections 83:9 | 15:21 16:10 | representation | 99:24 102:8 |
| relate 85:20 | 48:6 75:20 | 58:18 | requirement |
| relied 9:11 | 78:14,23 82:23 | representations | 13:25 89:11 |
| 53:17 80:15 | 87:3 97:2 | 42:10 58:10 | requirements |
| 97:10 | 101:15,18 | representative | 40:5 44:21 |
| relating 18:14 | reliance 24:9 | 7:8 79:25 | 51:5 59:6 67:2 |
| 41:1 53:20 | 26:14 29:18 | representatives | 98:3 106:9 |
| 76:21 77:7 | relied 13:8 | 45:16 85:9 | requires 20:10 |
| 80:5 | 92:7 | 86:23 | 20:20 59:21 |
| relation 78:4 | remain 66:1 | represented | 60:3 65:15,17 |
| relationship | remainder | 41:24 101:9 | 87:25 90:18 |
| 101:16 | 50:9 | 102:6 | 91:3 93:10 |
| relative 66:15 | remaining | represents | requiring |
| relatively 14:2 | 13:17 56:23 | 91:23 106:14 | 14:23 63:4 |
| 37:16 39:10 | 63:13 107:11 | rescission 80:7 | rescission 80:7 |
| 96:2 104:9 | 108:3 | resentment | resentment |
| relay 119:6 | remedy 48:6 | 78:19 | 78:19 |
| release 19:16 | remind 15:4 | reserve 25:18 | reserve 25:18 |
| 29:3 74:23 | remove 110:5 | 26:1 57:23 | 26:1 57:23 |
| 75:2,17,18 | rendered 56:4 | 77:11 | 77:11 |
| 77:5,6 79:5 | | requested 66:5 | |
| | | 103:22 118:21 | |

**[saying - serious]**                   Page 38

| | | | |
|---|---|---|---|
| saying 12:3 | 46:6,9,10,15 | 57:7 58:3 64:3 | selected 7:14 |
| 16:2 19:23 | 47:21,21 48:1 | 64:14,17,24 | 101:7 |
| 24:5 25:15 | 48:5,7,11 49:1 | 65:9,16,23 | selection 7:12 |
| 27:19 29:20 | 49:3,9,22 50:2 | 66:5,13,17 | 59:3 |
| 90:4 92:14 | 50:20,24 51:2 | 68:18 80:8 | selfies 8:1,7,9 |
| 93:25 113:6 | 51:5,14,25 | 113:5 114:3 | 11:4 64:9 |
| says 19:2,5,22 | 52:16 53:18,20 | 115:7 | 65:17 68:15 |
| 21:8,16 30:1 | 53:24 54:8,9 | securityhold... | 112:11,23 |
| 60:16 90:2 | 54:14 70:18 | 103:7 | sell 9:16 68:3 |
| 94:18 | 87:13,16 88:25 | sec's 40:25 | seller 18:3 |
| scale 35:15 | 93:21 94:1 | 45:9,15 47:20 | selling 52:2 |
| scaled 35:11 | second 9:21 | 48:20 49:11 | 115:20 |
| 85:1 | 15:19 45:20 | see 7:5 22:23 | senators 42:18 |
| scared 15:8 | 56:17 61:21 | 32:18 33:9,18 | send 22:24 |
| scenario | 65:17 77:16 | 42:7 57:20 | sending 33:21 |
| 109:19 | 114:18 116:10 | 59:9 62:9 | sense 14:4 32:2 |
| schedule | section 49:15 | 67:24 73:5 | 61:4 94:15,19 |
| 108:19 | 50:1,25 61:19 | 78:10 83:13,24 | 99:3 110:22 |
| scheuer 4:14 | 86:12,17 87:22 | 84:11,19 94:15 | sensitive 13:22 |
| 36:2,3,8,10 | 96:21 97:8 | 109:6 110:19 | 17:4 63:18 |
| scope 59:8 | securities 4:9 | 113:12 116:23 | 64:2 |
| 79:16 81:6 | 4:10 40:8,9 | 117:5 | sent 11:16 |
| 82:9 83:12 | 43:14,20,22 | seek 55:18 86:2 | 42:17 44:18 |
| 94:18 | 44:5,7,20 | 117:18 | 54:2 75:7 |
| se 5:23 6:2,5 | 45:21 46:18 | seeking 28:15 | 112:18,19,21 |
| 37:12,13,20,24 | 48:2 49:24 | seem 11:25 | sentence 22:2 |
| 38:1 78:17 | security 8:17 | 40:6 107:15 | 23:24 27:4 |
| 102:12 114:16 | 9:2 10:8,18 | seemed 23:3 | sentenced |
| 118:15,18 | 11:17,22 12:3 | seems 22:17 | 94:25 |
| seated 60:2 | 12:4,17,19,24 | 15:9 16:5 23:5 | sentencing |
| sec 23:7 36:4,4 | 13:16 14:1,7 | 23:14 31:14 | 92:23 |
| 40:20 43:14,17 | 14:16,18,20 | 40:23 67:12 | separate 32:24 |
| 44:3,6,11,13 | 15:3,9,24 16:9 | seen 22:20 | 76:1 103:13 |
| 44:14,18,23 | 16:14,22 17:9 | 105:1 119:13 | september |
| 45:1,4,5,8,12 | 45:18 47:23,23 | segregates | 54:3 |
| 45:16,17,20,24 | 48:5 49:23 | 57:24 | serious 86:6 |
| 45:25 46:2,4,4 | 50:4 52:3 57:5 | | |

**[reserved - saw]**                   Page 37

| | | | |
|---|---|---|---|
| reserved 99:21 | result 37:19 | 31:14 | 107:19 |
| reserves 56:21 | 50:17 56:7 | right 7:2 10:21 | ruled 45:11 |
| resolution 7:24 | 78:2 81:3 | 10:22 11:6 | rules 24:2,4 |
| 46:23 | 99:6 | 12:11 16:1 | 38:3 98:8 |
| resolutions | resulting 71:6 | 19:11 23:18 | ruling 19:16 |
| 7:21 | results 49:6 | 24:8 25:18,24 | 43:2 47:3,18 |
| resolved 17:17 | 55:2 | 26:2 29:17 | rulings 36:22 |
| 51:13 95:22 | resumption 7:3 | 32:17,21 34:8 | 36:24 37:1 |
| 100:7 103:9,19 | retail 11:2 | 34:17 35:25 | 39:16 81:14 |
| 103:20 108:3 | 67:21 | 36:11 48:10 | 121:3 |
| resonance | retained 78:8 | 60:2 63:23 | run 11:24 14:1 |
| 67:20 | returned | 64:14 66:25 | 66:8 117:14 |
| resources | 104:19 | 67:1 68:6,7,10 | **s** |
| 56:20 77:2 | returning | 68:25 69:20 | s 3:1 7:1 |
| 78:4 | 117:16 | 79:20 96:21 | s.a. 84:14 |
| respect 17:22 | returns 110:24 | 103:16 109:11 | s.d. 84:16 |
| 18:21,25 28:16 | reveal 46:5 | 109:22 110:18 | s.d.n.y 84:6,20 |
| 36:1 45:3 | revealed 53:24 | 115:7,21 117:9 | s.d.n.y. 59:10 |
| 47:10 95:1 | 56:10,18 | 117:12 118:10 | 83:14 84:15 |
| 96:25 119:3 | revelations | 119:19 | sacrificing |
| respectfully | 41:15 | rights 36:18 | 61:9 |
| 66:16 | reverberated | 77:11 78:5 | sad 117:1 |
| respective | 41:12 | 98:18 | safe 57:6 |
| 86:23 | review 28:13 | rise 80:9 94:17 | sale 30:8 38:9 |
| respectively | 36:5 81:3 | 102:1 | 50:7 80:7,8 |
| 60:25 | 101:20 | risk 94:14,24 | sales 39:4,5 |
| response 64:6 | reviewed 58:4 | 106:15 | 43:19,20 87:15 |
| responsibility | 72:19 | risks 52:18 | sanctions 88:2 |
| 104:17 | revisions 33:10 | road 9:24 94:1 | 94:4,25 |
| rest 17:22 | 85:4 107:17 | 122:21 | sat 25:16 |
| 59:25 | rewards 53:21 | robust 39:8 | satisfied 18:7 |
| restrict 88:25 | 106:15 | role 58:24 59:4 | 77:16 |
| restrictions | richard 4:7 | 77:16 | satisfy 58:6 |
| 53:12 | 28:12 32:22 | routine 82:15 | 102:14 103:1 |
| restructuring | rid 68:4 | rule 34:11,15 | saved 84:10 |
| 80:12 | ridiculous | 51:19 65:12 | saw 35:13,21 |
| | 15:10 27:11 | 96:23 | |

**[serve - spaces]**                   Page 39

| | | | |
|---|---|---|---|
| serve 103:13 | showed 107:21 | size 78:3 | solve 100:2 |
| servers 57:4 | showing | skeptics 59:14 | somebody 11:3 |
| service 13:9 | 116:24 | slade 3:23 | 12:18,18,21,23 |
| 116:22 | shut 30:23 49:1 | 23:19,21,21,24 | 13:14 14:5,16 |
| services 57:4 | 101:17 | 24:4,8,12,14 | 19:23 21:21 |
| serving 79:14 | sidelines 25:16 | 109:1 112:16 | 25:9,19 26:2 |
| 101:2 | signature | 117:10 | 27:8,18 30:6 |
| set 9:10 13:13 | 122:6 | slam 77:1 | 30:18 32:9 |
| 19:7,8 31:4 | significant | slippage 14:3 | 67:17 85:22 |
| 75:13 91:21 | 37:19 38:2 | small 115:11 | 90:4 91:15 |
| setting 39:17 | 52:24 77:4 | smaller 37:16 | 94:7 104:6 |
| settle 77:17 | significantly | snarliest | 117:6 |
| settlement | 99:18 | 102:22 | somebody's |
| 76:12 77:15 | silent 27:7 | snarling | 10:18 15:24 |
| 78:1,2,3,9,15 | similar 52:15 | 119:12,17 | something's |
| 78:22,25 79:4 | 95:11,13,21,22 | social 8:17 9:2 | 25:25 |
| 101:12,19,23 | similarly 20:24 | 10:8,18 11:17 | somewhat |
| settlements | 48:1 50:9 | 11:21 12:3,4 | 37:22 |
| 76:6 77:3 78:5 | 88:14 91:6 | 12:17,19,24 | sonya 2:25 |
| settling 77:10 | 100:2 106:1 | 13:15 14:1,7 | 122:3,8 |
| 78:4,19 | simple 62:22 | 14:15,17,20 | soon 36:25 |
| several 40:4 | simply 9:21 | 15:3,9,24 16:9 | 85:12 98:7,8 |
| 41:10 59:11 | 26:9 29:19 | 16:14,22 17:9 | sorry 17:24 |
| 81:17 117:15 | 47:4 48:6 | 64:3,14,16,24 | 27:5 36:3 |
| severe 41:7 | 55:20 64:23 | 65:9,16,23 | sort 23:15 |
| shareholder | 92:14 93:25 | 66:4,13,17 | 32:11 40:25 |
| 75:15 81:20 | 94:6 100:8 | 68:17 113:4 | sorts 31:20 |
| shareholders | 111:3,9 | 114:2 115:7 | sought 56:18 |
| 19:23 75:5 | single 96:12 | sole 103:24 | 57:12 58:14 |
| 81:18,25 82:5 | 119:14 | solely 56:14,15 | 115:14 |
| shocks 41:8 | sitting 32:4 | 57:22 | sounded 23:16 |
| short 87:17,20 | situation 22:5 | solicitation | source 10:17 |
| shorthand | 123:8 | 83:4,8 | sources 9:19 |
| 49:14 | six 62:9 67:16 | solution 98:23 | southern 1:2 |
| shouldn't 30:1 | 69:7 93:25 | solutions 34:1 | 108:9 |
| 111:1 | 94:2 96:7 | 122:20 | spaces 102:10 |
| | 97:17 | | |

## [speak - subject]

speak 16:19
23:3 25:25
29:10 30:21
32:1 114:13
speaking 29:13
38:8 82:10
speaks 33:25
special 3:11
5:9 35:7 76:17
76:19,22 77:1
78:9 80:19
81:10
species 93:15
specific 16:18
26:8 48:3 49:9
49:23 52:19
54:7
specifically
39:13 49:5
74:8 87:10
93:16
specified 19:17
89:22 105:18
specify 112:6
spelling 37:2
spent 94:2
spoke 101:18
spoken 31:3
33:5
springs 17:20
st 4:18
staff 45:17,20
45:25 46:2,9
51:3 53:18
120:8
staff's 46:5

stage 72:12
110:17,23
stake 43:8
stale 66:6
stand 18:24
33:4
standard 19:21
55:25 57:2
73:4 90:1
standards 57:9
58:5
standing 96:14
108:17
start 8:5 18:2
56:5
started 1:3
111:4
state 22:11
45:10 53:15
54:3,15,15
71:25 72:19,21
82:16 85:6,10
85:21 95:17,20
95:23 96:10,11
96:14 97:5
98:9 99:4
stated 45:13
52:22 53:8
71:3 82:23
82:3 107:10
statement 38:7
49:3,4 52:18
53:8,19,24,25
54:5 55:7,21
56:2,9,10,17
57:14 70:2,3,5
70:25 72:1,4

stepped 27:20
stepping 93:20
steps 27:18
93:23
stirred 28:4
stock 99:13,16
99:17,20,23
106:16
stockton 5:15
stop 24:5 31:9
31:13 48:6,24
50:4,10 56:1
92:13 115:7
stopped 20:16
38:13 50:13
87:16 89:3
90:24
stopping 93:19
storage 57:6
store 67:24
stored 57:3
stores 112:9
strayed 37:22
street 4:11 5:3
strict 36:16
61:17
strictly 37:23
60:23 75:9
strong 78:18
78:20
structure 80:7
stuff 13:17
stupid 19:24
subject 21:22
22:4,12 36:16
40:4,7,9 41:7
45:20,23 52:23

72:14,17,18,20
73:5,8,12,16
statements 8:1
8:12 11:14
41:20 42:4
58:11 64:10
68:16
states 1:1,11
4:1,17 5:1,2
21:1 23:2,15
32:2 49:16
54:15 57:21
61:24 62:2,7
62:17,18 70:1
75:21 76:7
82:8,10 84:22
86:13 87:7,9
91:8 95:20
96:1,20 97:22
98:1,4,11,16
98:21
stating 76:8
statue 87:7
statute 51:12
51:19 85:21
statutory 86:18
92:25 93:9
stay 34:12,13
34:14,18
104:12 108:13
108:18,21
109:14,18
111:24 117:16
117:24
step 14:3,24
67:12

Veritext Legal Solutions
www.veritext.com

212-267-6868                                          516-608-2400

## [subject - terms]

69:21 76:23
80:8 81:4
94:24 107:12
submission
44:15 100:9
submissions
38:22 92:10
120:10
submit 66:17
submitted
36:22 59:13
subpoena
53:19 54:2
substance
24:25
substantial
56:22 107:17
substantive
55:9,10
successor
49:19
sudden 41:12
suddenly 85:18
sue 19:23
sued 90:3
suffered 81:22
82:5,7
sufficient
52:17 70:14
71:10 72:2,18
suggest 17:11
26:24 30:18
33:15,16,21
40:22 45:2,6
52:13 55:20
73:25 80:18
107:19

suggested
11:18 12:1
44:3,8 54:21
61:3,12 62:21
64:18 100:19
11:24
suggesting
43:25 58:22
suggestion
25:22 27:7
52:8 94:5 95:2
106:10
suggests 54:16
suite 122:22
sullivan 3:10
superfluous
107:15
supervised
83:16,19
supplemental
92:10 93:13
support 42:24
54:1 52:1
59:19 78:9
supported
66:19 114:11
supports 72:24
101:24
supposed
21:10 45:3
46:14
supposedly
54:25 113:14
sure 18:23 25:4
35:8 41:19
42:14 58:18
73:5 95:10

109:17 111:6
112:3 118:22
surprised
11:12,15
susheel 3:15
35:6
suspect 108:16
sweep 98:14
sweeping 80:21
sworn 57:14,16
sympathize
78:22
system 15:20
67:10

### t

t 122:1,1
tailored 80:25
take 22:25
25:23 33:18
35:3 43:21
44:6 46:1 53:3
59:25 62:16,23
69:10 82:19
85:25 87:18
94:1 97:12
110:25 114:5,9
114:21,22
116:13,24
taken 20:12
29:12 39:21
45:19,23 50:4
55:23 72:6
73:11 81:22
82:18 85:16
87:7 90:19

takes 13:25
87:10 117:22
talk 115:8
talking 16:24
29:8,8 115:5
117:15
targeted 10:24
15:17 27:10
tax 38:20,20,23
38:23 105:21
105:22
technical 12:9
technically
96:20
technology
9:19 10:12
tell 14:8 21:23
26:1,6 29:25
30:20 47:14,16
51:2 67:16
68:4,23 87:5
telling 14:18
15:7 27:10
tells 21:21 24:2
temporal 28:24
ten 33:13
tend 37:16
tentatively
64:7 84:24
term 32:8
50:25 65:21
79:12 81:9
108:24
termination
36:18
terms 15:22
16:14 19:4
21:2 32:6,7

Veritext Legal Solutions
www.veritext.com

212-267-6868                      516-608-2400

## [terms - time]

49:12 60:11,12
63:17 72:3,4,7
72:24 75:6
77:24 81:8
84:19 91:10
98:1 101:23
105:10 108:2
testified 58:12
71:14 100:24
101:2,14,17
testimony
57:12 68:21
71:22 77:23
78:1,3
texas 18:24
22:11 54:15
71:25 72:5,11
72:19,21,23
73:7,14,22
74:2,8 95:20
96:11,13
thank 7:16
17:14 22:14
24:14 29:11
31:15 34:8,15
35:24 36:10
37:13 65:4
66:21 68:9
69:14,20
109:10,11,21
110:2 111:14
114:13 115:20
115:21,23
117:8,10 118:9
119:6,7,20,24
120:1,3,8,10

thanks 68:7
120:8
that's 10:23
12:13 14:25
16:1,1,2 19:21
22:12 23:14
24:8,22 26:19
32:3,10,15,24
66:21 67:1,23
68:1,6,13 90:1
97:17 106:3
94:19,22
108:16 109:1,6
110:14 111:9
112:3,10,15,19
113:22 115:5
116:24 119:21
theories 48:7
theory 79:23
83:16
therese 4:14
36:3
there's 9:5,9
10:1,1,2,24
12:8 21:13
22:23 24:1,3,5
25:17 26:16
30:23 31:21
50:7,19 64:13
69:12 111:7
113:7,8,9,10
114:2 116:11
118:5
they're 15:8
21:18 26:22,23
27:12 51:18
86:1

thing 13:14
23:19 93:25
96:4 99:24
things 19:3
21:9 30:16
33:14 35:9,16
39:9 41:5
43:11 63:22
83:21,23 89:9
97:17 106:3
third 10:12,19
11:23 13:9
15:21 16:6
19:16 57:7
63:3 75:24,25
76:3 79:23
89:21 91:21
91:10
thought 48:1
66:7 65:5
104:15 119:25
thousand 69:3
thousands 28:2
28:2 95:9
three 9:18
24:17 41:9,10
62:4,19,25
76:22 77:7
78:6 97:3,7,14
90:19 51:9
55:3 61:13
66:22 67:20
69:21 70:5
71:10 74:2,5
81:13 86:5
88:23 91:17
92:1 93:17
95:1,6 97:5,9
102:22 103:4

106:7,10
110:15,23
112:10,16
113:23 114:1,3
115:18 116:4,6
thinking 51:3
thinks 29:23
47:23 48:5
72:12 87:14
108:5
throat 59:25
throw 10:23
110:21
thursday 37:7
time 10:7
11:22 13:4
14:9 21:20,21
21:23,25 33:6

Veritext Legal Solutions
www.veritext.com

212-267-6868                      516-608-2400

## [time - trustee]

35:3 50:3
56:12 58:19
60:16,17,20
61:7 64:4,8,23
65:2,5 66:8,22
67:23 72:2
73:18,20 83:7
85:7 89:11
95:14 96:5
99:1,9 110:8
115:24 117:8
117:22,24
120:3
times 37:21
59:11 81:17
timing 36:17
tired 118:10
119:11
today 9:24
33:1 36:24
37:10 81:14
88:9,15,19
94:6 108:11
118:19,22
together 23:11
79:9
toggle 50:12,19
71:2,8,17
token 44:1
45:18 46:16
47:22 48:4,7
49:23 50:2,5
52:2 105:5,7,9
106:24
tokyo 57:4

told 17:9 33:10
45:17,20 49:9
50:10 94:23
116:17
tomorrow
33:19 69:19
93:22 108:21
tons 10:22,22
took 13:4
31:13 49:3
81:21 85:18
touch 117:4,5,6
towards 23:9
23:24 78:19
townsend 5:15
7:11
tracy 5:22
118:14
trade 75:20
traded 48:4
105:8,24 106:1
trades 67:3
trading 39:7
39:20 40:19
48:6 50:5
transaction 8:3
9:11 10:17,25
12:11,14 15:2
transferred
56:11 57:1
60:17 61:15
63:9 68:12,13
70:7,11,22
112:2
transferring
7:25
transfers 7:19

88:12 90:3,5
90:13,24 92:16
93:21,24 109:5
transactions
19:21 20:2,6
21:1 29:21
47:7 48:18
51:16 52:7
53:2,5,9,13
80:9,13 82:12
82:17 83:20
86:24 87:4,24
88:8,15,20
89:2,8,25 90:8
91:9 92:13
93:8,10,16
transcribed
2:25
transcript
36:21 37:2
122:4
transfer 63:4,6
63:12,24 64:2
64:9,11,14,16
65:19 66:17,18
68:15,17 104:7
112:12

translate
102:19
treasury 65:14
treat 7:18
37:16 106:11
treated 42:5
80:10 106:25
treatment
61:22 95:19
97:7,10,21
98:4,13 100:13
100:15 102:15
103:8 104:1
106:8
trevino 118:18
tried 13:2
22:13 37:19
97:17 119:11
trigger 36:18
trouble 9:3
true 58:17,18
119:21 122:4
truly 88:14
trust 56:15
60:23 61:17
70:12
trusted 59:20
trustee 4:2
28:12,12,19
32:23 34:13
54:15 70:1
75:22 76:7
82:8 84:23
103:22 109:15
109:23 110:4,5
110:7,12
119:11

Veritext Legal Solutions
www.veritext.com

212-267-6868                      516-608-2400

**[truth - unknowingly]**                                        Page 44

truth  74:12
try  14:5 23:11
  23:12 31:9
  48:8 104:18
  105:19 107:25
  108:2 115:10
  117:18
trying  15:10
  17:7 27:6
  30:22 32:1
  88:25 92:12
  117:14,17
turn  29:10
  43:11 113:20
turned  58:11
tweaks  24:24
  32:18 81:12
two  7:25 13:15
  17:7 28:14
  30:7 33:13
  43:16 53:18
  64:7,15 65:11
  68:14 76:15
  77:6 78:19
  95:16 109:5
  110:24 111:20
  113:17 115:24
  116:19
type  15:25
types  40:18
  80:21
typical  31:18
  91:15

**u**

u.s.  1:23 4:2
  22:17 28:12,12
  28:19 32:23

34:13 42:17
  60:10,15,17,18
  60:20,25 61:2
  61:12 62:2,10
  62:11,15,25
  63:5,11,13,14
  63:16,20,23
  64:5,17,18,20
  66:7,14 68:14
  69:18 70:7,9
  70:20,21 71:1
  71:11 72:3,24
  74:25 85:9
  86:16,22 87:8
  95:22 97:18,25
  103:22 108:9
  108:24 109:15
  112:1,13 114:8
  116:5,12,16,22
  117:14
u.s.'s  87:16
  109:4
ucc  119:13
ultimate  107:4
  107:6
ultimately
  73:19 101:20
unable  31:6
  52:9
uncertain  40:2
  40:15
uncertainties
  52:24
uncertainty
  27:24 40:12

unclear  41:4
  42:13
unconvincing
  17:10
undeliverable
  104:19
under  19:14
  22:3,7 25:20
  26:23 37:18
  49:20 50:12
  58:19 62:1,17
  63:8 66:1,18
  67:9 71:1,2,2
  71:20 73:25
  77:24 87:22
  89:19 96:6
  97:1 99:11
  103:9 105:10
  113:10,11,14
  underlie  71:18
understand
  11:19 13:18
  14:19 15:10
  17:1,7 34:17
  36:11 45:14
  48:11 59:13
  62:5 63:8
  64:22 67:14,19
  78:16 79:21
  91:19 102:18
  103:18 106:22
  107:25 115:2
  115:13
understanda...
  115:18
understanding
  9:4 11:13,20

12:7 13:11
  14:10 15:14,18
  28:14,22 76:10
  84:23
understood
  36:7,9 108:22
  119:25
undertaking
  93:15
undo  77:11
unenviable
  43:2
unequal
  100:13
unfair  95:18
  96:20
unfairly  96:18
  96:25 105:5
unfortunately
  37:24
unintentionally
  36:18
unit  20:15
  90:23
united  1:1,11
  4:1 5:1,2 21:1
  23:15 32:2
  54:15 70:1
  75:21 76:7
  82:8 84:22
  91:8
units  53:10
unknowable
  40:17
unknowingly
  92:24

212-267-6868        Veritext Legal Solutions        516-608-2400
                    www.veritext.com

**[vtx - working]**                                        Page 46

vtx  44:1

**w**

wait  8:7 29:10
  32:25 41:18
  62:9 96:5
  97:16
waive  18:9
waived  18:8
  116:1,13
waiver  34:12
  34:13
wallet  57:3
want  12:21
  14:7 15:11
  16:4 17:2,6
  25:18 26:1
  28:6 32:18
  33:10,17,18
  35:25 37:13
  62:15 67:14,22
  67:24,25 81:16
  97:18,21
  111:23 113:7
  115:2,3,10
  119:8 120:3
wanted  11:5
  24:18 28:5,14
  32:25 35:7,9
  35:10 45:4,12
  61:8 97:19
  108:15 111:9
  114:25 119:17
wanting  35:8
wants  9:2
  12:18 14:16
  24:22 68:19
  69:5 88:12

warrants  81:6
warren  75:23
washington
  4:12,19
wasn't  22:2
  118:22
watkins  3:3
  65:6 109:4
  111:25 114:8
  114:10 115:5
  117:21,22
  119:11
we've  10:22
  14:10 12:2,20
whatsoever
  85:17,17 95:12
what's  14:21
  31:9 32:11
  102:18
whoever's  29:8
wholesale
  63:12
wholly  86:6
who's  29:8
who've  7:13
  21:12
wider  40:23
wiles  1:22
willful  31:22
  80:17 84:4
  91:16
winddown
  76:9 103:24
  119:11
wings  26:4
wipe  66:24
  67:7
wisdom  39:13
  59:2
wish  31:2
  63:20

we'll  35:21,22
  42:7 119:4
we're  7:2 10:1
  24:14 26:8
  31:20 59:24
  88:22,25 115:5
  117:21,22
  119:11
we've  10:22
  14:10 12:2,20
whatsoever
  85:17,17 95:12
what's  14:21
  31:9 32:11
  102:18
whoever's  29:8
wholesale
  63:12
wholly  86:6
who's  29:8
who've  7:13
  21:12
wider  40:23
wiles  1:22
willful  31:22
  80:17 84:4
  91:16
winddown
  76:9 103:24
  119:11
wings  26:4
wipe  66:24
  67:7
wisdom  39:13
  59:2
wish  31:2
  63:20

wished  97:12
wishes  64:21
  88:14
withdraw
  56:23 58:1
  61:1 115:25
  116:2,9,12
withdrawal
  115:25 116:11
  116:20,24
withdrawals
  61:8
withdrawn
  74:5
witnesses
  58:12
woman  22:10
  22:25
won't  21:16
  91:10 99:17
  101:20 107:1
word  29:13
  36:23
wording  22:13
  22:14
wordsmithing
  35:22 89:16,17
work  24:9
  37:14 74:22
  97:17 100:23
  100:25 102:2,7
  103:6 105:22
  107:24 108:2
  118:4,7
working  34:21
  35:4

212-267-6868        Veritext Legal Solutions        516-608-2400
                    www.veritext.com

**[unknown - voyager's]**                                        Page 45

unknown  9:15
  79:19
unlicensed
  44:7
unlock  31:8
unnecessary
  107:16
unreasonable
  86:6 90:4
unregistered
  44:7 52:3
unsecured
  78:10,11 79:8
  100:21 101:4
  101:11 110:5
unspecified
  44:1 87:15
unsupported
  21:4,5 52:20
  61:23 62:8,14
  62:20 91:12,13
  97:16 99:7
  100:15
untethered
  81:3
unusual  37:14
  39:23 95:5
unusually
  37:10
unwilling  31:6
unwillingness
  93:6
unwittingly
  92:25
uploaded  8:1,9
  11:4 64:10
  68:16

uploads  65:18
  116:20
urquhart  3:10
use  12:4 32:8
  72:3,4,7,24
used  29:13
  41:23 50:25
users  116:2,13
uses  10:12
using  50:15
usually  58:20
  58:21
utterly  31:14

**v**

v  78:11 83:24
vague  43:25
  79:25
vaguely  51:21
  87:14
vagueness
  44:15
valuable  9:22
  10:10,15 12:13
value  9:14,18
  10:17 15:1,21
  65:10,21 66:15
  66:19 67:23
  99:9,21 105:9
  105:12,14,17
  106:17,18
  107:1
values  100:12
  105:16 106:3
  106:12,20,20
  106:20,21
vanderbilt
  5:10

variety  21:17
various  18:22
  18:24 55:20
  56:18 57:5,7
  58:5 71:3
  76:23
vary  99:8
veritext  122:20
vermont  95:23
version  34:11
  82:20 119:23
vgx  30:8 45:18
  46:15 47:22
  50:2,7 87:15
  105:5,5,7,9,12
  105:12,16,17
  105:24 106:6,7
  106:13,22,24
vgx's  49:23
view  28:18
  43:17 59:14
  87:25
views  40:25
  46:2,4
vigorously
  78:20
violate  20:13
  24:4,6 30:2
  51:11 87:6
  90:21 108:24
violated  91:6
violates  85:10
violating  44:20
  44:21
violation  30:5
  83:7 106:9

violative  51:19
virginia  57:4
virtually  40:17
voice  31:6
voices  111:16
volatile  9:25
volition  22:3
volumes  39:7
voluntary  75:9
vote  66:20
  75:11
voted  96:23
  97:4 113:16
votes  83:4
  101:21
voting  101:21
  113:13 114:12
voyager  1:7
  7:4 9:16 10:14
  11:15 12:16
  13:8,14 14:13
  16:8 18:8,9,10
  36:13 37:12
  39:25 41:6,10
  52:2 53:14,20
  53:21,22 60:19
  61:16 63:5,5
  63:15 77:12
  98:17 101:15
  101:17 102:16
  104:10 113:9
  116:1,13
voyager's  12:9
  63:24 65:24
  81:19,24 104:8

212-267-6868        Veritext Legal Solutions        516-608-2400
                    www.veritext.com

**[works - zero]**                                        Page 47

works  15:16
world  102:2,6
  102:19 114:21
worried  28:25
  58:7 59:15
worries  106:22
worrisome
  41:15
worth  37:9
  76:20 78:21
wouldn't
  110:21 115:3
  117:25
would've  31:3
write  8:8
writing  22:24
written  22:23
  28:20 31:19
  43:15,25 73:23
  74:6
wrong  44:25
  45:1 55:20
wrongdoing
  43:4,5
wrongful  88:9
wrote  34:3

**x**

x  1:4,10 121:1

**y**

yeah  9:8 24:3
  32:12 112:16
  112:20
year  13:1 41:8
years  40:4,14
  95:10

yep  23:23
  32:15
yesterday
  16:25 23:3
  29:3,6 37:8
  49:4,7 80:23
  80:24 81:14
  85:13,14,22
  99:5 103:10
  104:14 106:10
  110:22
york  1:2,13 3:6
  3:13,20 4:4 5:4
  5:11,18 54:16
  95:17,19,25
  96:4,5,6,8,10
  96:14,18,19
  98:24 99:2,4
  104:5,8,12
  108:10
yorker  96:12
you'd  1:16
  35:20
you're  12:3,22
  13:12 15:16
  16:2,22 22:1
  25:15 29:9
  113:1 118:5
you've  11:18
  12:1 17:9 28:4
  35:22 119:13

**z**

zero  42:23

212-267-6868        Veritext Legal Solutions        516-608-2400
                    www.veritext.com