23-cv-02171

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

In re Voyager Digital Holdings, Inc., et al., Debtors

United States of America, et al., Appellants,

v.

Voyager Digital Holdings, Inc., et al., Appellees.

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## REPLY BRIEF FOR THE APPELLANTS

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
LAWRENCE H. FOGELMAN
JEAN-DAVID BARNEA
PETER ARONOFF
Assistant United States Attorneys

United States Attorney's Office
Southern District of New York
86 Chambers Street, Third Floor
New York, NY 10007

WILLIAM K. HARRINGTON
United States Trustee, Region 2
LINDA A. RIFFKIN
Assistant United States Trustee

Department of Justice
Office of the United States Trustee
One Bowling Green
New York, NY 10004

RAMONA D. ELLIOTT
Deputy Director/General Counsel
P. MATTHEW SUTKO
Associate General Counsel
BETH A. LEVENE
ANDREW BEYER
FREDERICK GASTON HALL
Trial Attorneys

Department of Justice
Executive Office for United States Trustees
441 G Street, N.W., Suite 6150
Washington, DC 20530

## TABLE OF CONTENTS

Page

ARGUMENT ...........................................................................................................1

I.   The Bankruptcy Court Lacked Statutory Authority to Approve the
     Exculpation Provision....................................................................................1

II.  The Exculpation Provision Is Broader and More Pernicious than
     Appellees Acknowledge ...............................................................................11

III. The Case Law Does Not Support the Overly Broad Exculpation
     Provision ......................................................................................................17

IV.  Appellees' Policy Arguments Do Not Justify the Exculpation Provision ....25

CONCLUSION ....................................................................................................27

CERTIFICATE OF COMPLIANCE ..................................................................29

# TABLE OF AUTHORITIES

Page(s)

Cases

*Blixseth v. Credit Suisse,*
    961 F.3d 1074 (9th Cir. 2020) ................................................................... 20, 21

*Burns v. Reed,*
    500 U.S. 478 (1991) ...................................................................................23

*Bush v. Rauch,*
    38 F.3d 842 (6th Cir. 1994) ........................................................................23

*Chevron Corp. v. Donziger,*
    833 F.3d 74 (2d Cir. 2016) ..........................................................................10

*Custis v. United States,*
    511 U.S. 485 (1994) ...................................................................................28

*Czyzewski v. Jevic Holding Corp.,*
    580 U.S. 451 (2017) .....................................................................................3

*FDIC v. Meyer,*
    510 U.S. 471 (1994) .....................................................................................8

*Gross v. Rell,*
    695 F.3d 211 (2d Cir. 2012) ........................................................................23

*In re Aegean Marine Petroleum Network, Inc.,*
    599 B.R. 717 (Bankr S.D.N.Y. 2019) ...........................................................24

*In re Airadigm Communications, Inc.,*
    519 F.3d 640 (7th Cir. 2008) ......................................................................18

*In re Dairy Mart Convenience Stores, Inc.,*
    351 F.3d 86 (2d Cir. 2003) ...................................................................... 5. 18

*In re DBSD N. Am., Inc.,*
    419 B.R. 179 (Bankr. S.D.N.Y. 2009) ...........................................................20

*In re Highland Cap. Mgmt., LP,*
    48 F.4th 419 (5th Cir. 2022) .................................................................. 20, 21

*In re LATAM Airlines Grp. S.A.*,
  No. 20-11254, 2022 WL 2206829 (Bankr. S.D.N.Y. June 18, 2022) ................24

*In re Metromedia Fiber Network, Inc.*,
  416 F.3d 136 (2d Cir. 2005).............................................................................5

*In re Platinum-Beechwood Litig.*,
  18 Civ. 6658 (JSR), 2019 WL 4411886 (S.D.N.Y. Aug 21, 2019)....................16

*In re PWS Holding Corp.*,
  228 F.3d 224 (3d Cir. 2000)................................................................ 20, 21, 22

*In re Seaside Eng'g & Surveying, Inc.*,
  780 F.3d 1070 (11th Cir. 2015) .........................................................................22

*Lane v. Pena*,
  518 U.S. 187 (1996)...........................................................................................8

*Law v. Siegel*,
  571 U.S. 415 (2014)................................................................................. 3, 4, 18

*Library of Congress v. Shaw*,
  478 U.S. 310 (1986)...........................................................................................8

*New Hampshire v. Maine*,
  532 U.S. 742 (2001)...................................................................................... 9, 10

*Norwest Bank Worthington v. Ahlers*,
  485 U.S. 197 (1988)...........................................................................................2

*Quintel Corp., N.V. v. Citibank, N.A.*,
  596 F. Supp. 797 (S.D.N.Y. 1984) ....................................................................16

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
  566 U.S. 639 (2012)................................................................................. 3, 4, 18

*Terebesi v. Torreso*,
  764 F.3d 217 (2d Cir. 2014)...............................................................................24

*Travelers Indemnity Co. v. Bailey*,
  557 U.S. 137 (2009) ..................................................................................... 7, 16

*United States v. Nixon,*
  418 U.S. 683 (1974)................................................................................16

*United States v. Sec. Indus. Bank,*
  459 U.S. 70 (1982)..................................................................................7

Statutes and Rules

11 U.S.C. § 105 ................................................................................... 5, 18

11 U.S.C. § 349(b) .................................................................................3

11 U.S.C. § 1103(c) ...................................................................... 21, 22, 23

11 U.S.C. § 1125(e) ........................................................................ *passim*

18 U.S.C. § 3613 ...................................................................................8

Fed. R. Bankr. P. 8015(g) ................................................................... 29

**ARGUMENT**

**I.    The Bankruptcy Court Lacked Statutory Authority to Approve the Exculpation Provision**

As the Government's opening brief explained, the bankruptcy court lacked statutory authority to approve the Exculpation Provision. Only one provision of the Bankruptcy Code expressly authorizes a court to release anyone from civil or criminal liability arising post-petition for violating federal law. *See* Gov't Br. 20-30. And that provision, 11 U.S.C. § 1125(e), is far more limited than the broad immunity for potentially illegal actions that the bankruptcy court conferred. *See* Gov't Br. 20-23. Congress's decision to provide for exculpation only in one narrow context related to soliciting plan votes underscores that it did not intend to do so in any other context—particularly not in this one. *See id.* at 23-29; *see also id.* at 29-30 (discussing other Code provisions reinforcing this conclusion). Nor can the bankruptcy court's breathtaking assertion of power be sustained even assuming that the Code was silent on this question. The serious constitutional issues raised by the court's statutory interpretation militate against adopting it. *See id.* at 31-35. The bankruptcy court's order confirming the Exculpation Provision should therefore be vacated.

Appellees do not seriously dispute that no provision of the Bankruptcy Code expressly authorized the bankruptcy court to approve the Exculpation Provision. Indeed, Appellees do not contest that Section 1125(e)—the sole provision setting

forth post-petition conduct for which a person "is not liable"—does not supply the

necessary authority. Congress clearly knew how to enact such limitations on

liability and did not do so except in Section 1125(e). *See Custis v. United States*,

511 U.S. 485, 492 (1994) (specific provision authorizing procedure "shows that

when Congress intended to authorize" such procedure "it knew how to do so," and

its "omission of similar language" in other statutory provisions "indicates that it

did not intend" to authorize that procedure in a different context).

Since no specific statutory provision authorizes exculpation, Appellees

instead cite general provisions governing bankruptcy courts' equitable authority.

Debtors' Br. 18-19 (relying on Section 1123(b)(6) for the proposition that a plan

may contain "any other appropriate provision not inconsistent with the applicable

provisions of the Code," and Section 105 which addresses residual equitable

power). But these general grants of equitable authority may "only be exercised

within the confines of the" Bankruptcy Code. *Norwest Bank Worthington v.

Ahlers*, 485 U.S. 197, 206 (1988). They do not allow bankruptcy courts "to create

substantive rights that are otherwise unavailable under applicable law, or constitute

a roving commission to do equity." *In re Dairy Mart Convenience Stores, Inc.*, 351

F.3d 86, 92 (2d Cir. 2003) (quotation marks omitted). They certainly do not

authorize bankruptcy courts to confirm an exculpation clause representing "a major

departure" from the text, structure, and purposes of the Code, as the Supreme

2

Court has repeatedly held. *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 465 (2017); *see Law v. Siegel*, 571 U.S. 415, 424 (2014) ("The Code's meticulous—not to say mind-numbingly detailed—enumeration of exemptions and exceptions to those exemptions confirms that courts are not authorized to create additional exceptions."); *accord RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645-46 (2012).

These cases foreclose Appellees' argument that, unless the Bankruptcy Code specifically prohibits it, a bankruptcy court may do whatever it deems necessary to ensure that a plan of reorganization is confirmed or succeeds. The Supreme Court most recently rejected that argument in *Jevic*. There, to effectuate a settlement, a bankruptcy court entered a "structured dismissal" order, dismissing a bankruptcy case on the condition that the estate distribute its assets in a manner that prioritized general unsecured creditors over certain mid-priority creditors (who would have been entitled to statutory priority over the general unsecured creditors had the bankruptcy court approved a plan of reorganization or liquidation). 580 U.S. at 454.

While the debtors defended the dismissal order with reference to bankruptcy courts' broad authority to condition dismissal orders on particular distribution mechanisms, *id.* at 457; *see* 11 U.S.C. § 349(b), and emphasized that the Code "does not explicitly state what priority rules—if any—apply to a distribution" upon

dismissal, *Jevic*, 580 U.S. at 457, the Court rejected all of debtors' arguments. It acknowledged that, by its terms, the Bankruptcy Code's priority system applies only to Chapter 7 liquidations and Chapter 11 reorganizations, but explained that the priority system "has long been considered fundamental to the Bankruptcy Code's operation." *Id.* at 465. The Court thus held that there needed to be "some affirmative indication of intent" before a court could conclude that "Congress actually meant to make structured dismissals a backdoor means to achieve the exact kind of nonconsensual priority-violating final distributions" that are not permissible in Chapter 7 liquidations and Chapter 11 reorganizations. *Id.*

The Supreme Court reached the same conclusion in *Law*. There, a bankruptcy trustee obtained an order "surcharging" a debtor's homestead exemption as a sanction on the debtor for committing fraud. 571 U.S. at 419-20. The surcharge made "those funds available to defray . . . attorney's fees." *Id.* The Bankruptcy Code does not expressly state that bankruptcy courts lack discretion to surcharge a homestead exemption as an equitable remedy for a debtor's misconduct. But the Court inferred that no such discretion existed given the Code's "carefully calibrated exceptions and limitations." *Id.* at 424. In other words, the Court held that the surcharge order was unlawful because the bankruptcy court's exercise of discretion contravened the Code's structure and purposes, notwithstanding the absence of an explicit prohibition. *See also RadLAX*, 566 U.S.

at 643 (overturning bankruptcy court order that forbade secured creditor from credit-bidding on assets because one Code provision permits such bidding and a court thus lacks the discretion to forbid it, even when operating under a different provision).

Taken together, these holdings confirm that a bankruptcy court cannot rely on general grants of residual authority to reach outcomes incompatible with the structure and purposes of the Code. If Appellees' contrary view were correct, each of these cases would have come out the other way.

In any event, none of the cited statutes supports Appellees' arguments even on their own terms. Section 105 expressly limits the authority it confers to "order[s] . . . necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Any "power that a judge enjoys under § 105 must" therefore "derive ultimately from some other provision of the Bankruptcy Code." Douglas G. Baird, *Elements of Bankruptcy* 6 (6th ed. 2014); *accord* 2 *Collier on Bankruptcy* ¶ 105.01[1] (16th ed. 2023) ("[The text of § 105(a)] suggests that an exercise of section 105 power be tied to another Bankruptcy Code section and not merely to a general bankruptcy concept or objective."). If "no provision of the Bankruptcy Code may be successfully invoked . . . , section 105(a) affords . . . no independent relief." *Dairy Mart*, 351 F.3d at 92; *accord In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142 (2d Cir. 2005).

And as explained above, there is no statutory authority for exculpation beyond Section 1125(e).

The other statutes cited by Appellees provide no basis for exculpation. While Section 1129(a)(3) provides that a "court shall confirm a plan only if . . . [t]he plan has been proposed in good faith and not by any means forbidden by law," this is a limitation on the bankruptcy court's authority, not an expansion of it. It does not permit an order barring the Government from enforcing the law. Rather, it speaks only to when a bankruptcy court may or may not confirm a plan.[1] Moreover, a bankruptcy court is not required to survey every conceivable regulation that might affect a plan before confirming it. Gov't Br. 28-29. Likewise, Section 1142(a) requires that "the debtor and any entity organized or to be organized for the purpose of carrying out the plan shall carry out the plan and shall comply with any orders of the court." But this provision does not permit a bankruptcy court to affirmatively bar the Government from pursuing its police and regulatory powers. And, as discussed *infra* at 11-17, the Exculpation Provision applies to far more than merely complying with court orders.

---

[1] Debtors are wrong that the government "conceded in the Second Circuit that § 1129(a) also authorizes exculpation provisions." Debtors' Br. 30 n.5. The government pointed out that the language of that provision cannot support the exculpation clause in this case, Gov't Br. 27-30; nothing in the government's papers agreed that the statute could authorize any other kind of exculpation.

Debtors attempt to bootstrap exculpation onto Section 1142(a) through a policy argument that it would be unfair for the Government to pursue "court-ordered individuals for court-ordered conduct." Debtors' Br. 3. But it was Debtors who negotiated the plan. *See id.* at 4 ("'debtor and creditors try to negotiate a plan that will govern the distribution of valuable assets from the debtor's estate'" (quoting *Jevic*, 580 U.S. at 455)). Debtors worked out a business deal with Binance.US, and voluntarily asked the Court to approve it. If Debtors felt the transaction had too many legal risks, they could have proposed a different one.

In sum, Appellees' statutory arguments rely on provisions that are at most ambiguous. Interpreting these general provisions to allow exculpation not only ignores the Supreme Court's guidance, but also violates the canon of constitutional avoidance. The Government has raised several serious constitutional concerns stemming from Appellees' statutory interpretation. Gov't Br. 31-35. At a minimum, where there is "substantial doubt whether" the bankruptcy court's interpretation of its statutory authority comports with the Constitution, this Court should not adopt an interpretation that raises constitutional concerns absent express statutory language. *United States v. Sec. Indus. Bank*, 459 U.S. 70, 78, 82 (1982).

The bankruptcy court's order is especially anomalous as it extends even to criminal misconduct and to conduct that has not yet occurred. Article I bankruptcy judges have no power whatsoever over criminal matters. *Travelers Indemnity Co.*

*v. Bailey*, 557 U.S. 137, 153 n.6 (2009) (bankruptcy court's decision "to conduct a criminal trial" would be "plainly beyond [its] jurisdiction" (quotation marks omitted)); *cf.* 18 U.S.C. § 3613 (preventing bankruptcy courts from discharging criminal fines). Since bankruptcy judges may not hear criminal cases, Congress could not have intended—by statutory silence, no less—to authorize bankruptcy courts to extinguish such cases before they are brought and before the predicate conduct has even occurred.

The Code's silence imposes a further barrier to applying the exculpation provision to the Government: absent unequivocal statutory language, the Government retains its sovereign immunity. *FDIC v. Meyer*, 510 U.S. 471, 475 (1994). Although Section 106 of the Code refers to Sections 105 and 1142 as statutes where sovereign immunity is abrogated, neither of those statutes expressly permits exculpation against the Government. But waivers of sovereign immunity must be clear and unequivocal, *Lane v. Pena*, 518 U.S. 187, 192 (1996), and must be strictly applied against the claimant, *Library of Congress v. Shaw*, 478 U.S. 310, 314, 318-21 (1986). There is no clear and equivocal waiver of the Government's sovereign immunity that would allow exculpation. Without an applicable waiver, the bankruptcy court had no jurisdiction to enter any exculpation order that limited the Government's authority.

Appellees misinterpret this sovereign immunity point by noting that there is no lawsuit pending against the Government. Debtors' Br. 44. But even without such a suit, the bankruptcy court purported to exert its jurisdiction over the United States by barring it from enforcing the law and rendering the Exculpated Parties not liable to the Government. No waiver of sovereign immunity permitted the court to impose that consequence on the Government.

Finally, Voyager's argument that the Government is judicially estopped from making these arguments is meritless. Debtors' Br. 26. To be judicially estopped, "a party's later position must be clearly inconsistent with its earlier position"; the party must have "succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled"; and the party must "derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001) (quotation marks omitted).

Nothing about the Government's position is "clearly inconsistent" with its prior assertions—to the contrary, its position has not changed. The U.S. Trustee argued to the bankruptcy court that a prior, much narrower, version of the

exculpation clause[2] was overbroad *inter alia* because it "inappropriately expands the scope of the relevant statute, section 1125(e) of the Bankruptcy Code." ER718 (Dkt. 1085 at 18). It then argued, "[a]lternatively, the [then-narrower] exculpation provision should be limited, . . . to bar only 'claims against the exculpated parties based on the negotiation, execution, and implementation of agreements and transactions that were approved by the Court.'" *Id*. Voyager ignores the U.S. Trustee's primary argument and insists that it "succeeded" because the bankruptcy court adopted part of its second, alternative position, while simultaneously expanding the Exculpation Provision to include, *inter alia*, future conduct. Moreover, the United States (separately from the U.S. Trustee) objected to the Exculpation Provision and raised all of the arguments now asserted on appeal. ER858-59 (Dkt. 1132); ER860-93 (Dkt. 1144). This cannot support the necessary elements of judicial estoppel: that a party has asserted "contradictory" arguments such that courts have been "misled." *New Hampshire*, 532 U.S. at 749 (quotation marks omitted); *see Chevron Corp. v. Donziger*, 833 F.3d 74, 128 (2d Cir. 2016) (requiring that "the risk of inconsistent results with its impact on judicial integrity is certain").

---

[2] Among other things, the first paragraph of this prior exculpation clause was expressly limited to post-petition causes of action arising "*prior to the Effective Date*." ER 449 (emphasis added).

## II.     The Exculpation Provision Is Broader and More Pernicious than Appellees Acknowledge

Debtors and the UCC downplay the Exculpation Provision's breadth, and in particular, its restraint on the Government's police and regulatory powers, while admitting that the provision would ensure that Exculpated Parties will "not bear criminal or civil liability for taking the court-approved steps necessary to implement the plan." Debtors' Br. 24 (emphasis omitted); *see also* UCC Br. at 21 (arguing that Exculpation Provision "extinguishes liability on the merits"). Indeed, the bankruptcy court concluded that because the Government did not challenge the legality of the proposed transactions before the Plan was confirmed, it should be barred from civilly or criminally prosecuting the Exculpated Parties for their future conduct. Dist. Ct. Dkt. 5, Ex. D, at 25:15-26:2 (ER903-04), Confirmation Order at 7-8 (ER1056-57), Confirmation Decision at 13 (ER1191). The plain language of the Exculpation Provision demonstrates its breadth.

Specifically, the Exculpation Provision provides that "to the fullest extent permissible under applicable law," "no Exculpated Party shall have or incur, and each Exculpated Party is hereby exculpated from, any liability for damages based on the negotiation, execution and implementation of any transactions or actions approved by the Bankruptcy Court," unless that liability is based on "actual fraud, willful misconduct, or gross negligence." Confirmation Order at 7 (ER1056). This plainly applies to future conduct that will not be supervised by the bankruptcy

11

court. Indeed, the Plan broadly defines the future Restructuring Transactions that

will be part of implementing the Plan as:

> those mergers, amalgamations, consolidations, reorganizations,
> arrangements, continuances, restructurings, transfers, conversions,
> dispositions, liquidations, dissolutions, or other corporate transactions
> that the Debtors and the Committee jointly determine to be necessary
> to implement the transactions described in this Plan, as described in
> more detail in Article IV.B herein and the Restructuring Transactions
> Memorandum.

Plan at 13-14 (ER1121-22). The Plan thus gives the parties broad discretion to

figure it out—to "jointly determine" what they deem "necessary" in this regard—

while foreclosing future liability for whatever decisions they make. *Id.*; *see also id.*

at 30 (ER1138). Other actions necessary to implement the Plan are also left open

for further negotiations. Dkt. 835 at 58 (ER225) (discussing development of a

"mutually agreed upon integration plan"). In other words, the court granted a broad

exculpation for conduct that has mostly not yet occurred, and for which the parties

have broad discretion to later determine how to proceed, while under no court

supervision.

But the Exculpation Provision is even broader with respect to certain

actions. It additionally exculpates—with no exception for actual fraud, willful

misconduct, or gross negligence—"any claim for fines, penalties, damages, or

other liabilities based on [the Exculpated Parties'] execution and completion of the

rebalancing transactions and the distribution of cryptocurrencies to creditors in the

manner provided in the Plan." Order at 8 (ER1057). But the distribution of cryptocurrencies to customers, for example, is not a single, simple transaction. As explained in the Plan and the APA, such distribution entails the transfer of customers' personal data, Dkt. 835 at 54-55 (ER221-22); the negotiation of agreements and development of plans, *id*. at 56, 58 (ER223, 225); the crediting of users' accounts with various cryptocurrencies from various sources, including Binance.US or its affiliates,[3] *id*. at 62 (ER229); and the sale of cryptocurrencies to distribute cash to certain customers, *id*. at 63-64 (ER230-31). The bankruptcy court thus fully exculpated the Exculpated Parties for these and other transactions—including but not limited to criminal and civil liability for fraud—though they have mostly not yet happened and will take place without court supervision and in the discretion of the parties implementing them.

While the bankruptcy court permitted the Government to later attempt to enjoin any transactions it concluded were illegal, it precluded the Government from pursuing civil or criminal remedies relating to these transactions for any violations that occur before they are enjoined. Confirmation Order at 8 (ER1057). But the Government is not required to enjoin illegal conduct before bringing a

---

[3] Some of those affiliates have been sued by the CFTC for, among other things, inadequate know-your-customer rules designed to prevent money laundering. *See* Complaint, *CFTC v. Zhao, et al.*, No. 23-cv-01887 (N.D. Ill. Mar. 27, 2023).

prosecution, and there is no reason the bankruptcy court can require it here. Relatedly, the order rewrites statutes of limitation that generally give the Government years after conduct has occurred to prosecute wrongdoing, and instead provided the Government approximately four months to assert its claims (including for conduct that has not happened yet) or suffer exculpation. And finally, the Government's ability to attempt to stop transactions is cold comfort given the speed of these transactions; and it is no comfort at all to private parties who lack even that nominal preservation of rights against the Exculpated Parties. Some of these transactions have already occurred, and the rest will likely occur promptly. Indeed, Debtors intend to consummate these transactions immediately, and have already begun the rebalancing transactions.[4] Thus, even if such relief were sufficient, it is not credible for Debtors to claim that "the government can freely step in and attempt to stop" conduct that will conclude quickly. Debtors Br. 2; UCC Br. 2.

---

[4] *See* Dist. Ct. Dkt. 5, Ex. E, at 34:24-35:1 ("Our position is once [the bankruptcy court] gives us authority to go forward with the transaction, we're going to do that."); Debtors' Appx. A-1369 (Mar. 7, 2023 Hearing Transcript, 18:6-19) (Debtors' counsel observing that "the purchaser is ready to close by April 1, 2023"); Debtors' Appx. A-1282 (Mar. 6, 2023 Transcript (Debtor's Counsel, Page 49, Lines 1-7)) ("The one other thing I just wanted to make sure that there was no ambiguity about, pursuant to your Honor's order that you entered, approving our entry into the APA, the Debtors have been doing the rebalancing. We have been selling VGX. And so I didn't want your Honor to be under any other impression, because this has been happening, as your Honor authorized us to do.").

There is thus nothing modest or narrow about the bankruptcy court's abrogation of the Government's right to exercise its police and regulatory authority. Government investigations of potential wrongdoing in any area, including cryptocurrency, take time, and involve the development of complex factual records. Investigations almost always occur *after* wrongdoing has taken place, and it is rare for the Government to identify and prevent a civil or criminal violation before it happens or for a party to obtain an advance determination on the legality of its anticipated conduct.

Debtors try to minimize the breadth and scope of the Exculpation Provision by claiming it does not release any claims by the Government, but "only establishes the standard of care for individuals executing the plan at the bankruptcy court's express direction." Debtors' Br. 31; *see id.* at 50. As an initial matter, that interpretation ignores the provision pertaining to "rebalancing transactions" and "distribution of cryptocurrencies," which does not include a carve-out for actual fraud, willful misconduct, or gross negligence—and thus releases all possible claims relating to those transactions, irrespective of any standard of care.

Regardless, the bankruptcy court cannot rewrite federal statutes and regulations and cherry-pick which ones may be enforced based on its preferred standard of liability. Under the Constitution, Congress enacts laws, and the Executive Branch has the "exclusive authority and absolute discretion to decide

whether to prosecute a case" under them. *United States v. Nixon*, 418 U.S. 683,

693 (1974). Nothing in the Bankruptcy Code allows a bankruptcy court to dictate

the "standard of care" applicable to the Government's enforcement of federal law.[5]

The UCC's attempt to limit the scope of the Exculpation Provision fails in

light of that provision's plain language. The UCC insists that exculpation applies

only if the transactions are "*inherently* unlawful," or liability is "premised on a

theory that the transactions *themselves* are unlawful by their nature." UCC Br. 15,

18. But there is no such limiting language in the Exculpation Provision. While the

UCC claims the bankruptcy court made oral statements supporting this reading to

which this Court should "defer[]," *id.* at 19-20, court orders are not interpreted this

way. "[W]here the plain terms of a court order unambiguously apply . . . they are

entitled to their effect." *Bailey*, 557 U.S. at 150-51.

Moreover, it is impossible to disassociate the "transactions *themselves*" from

the steps undertaken to complete them—they are one and the same. Any

transaction is the sum of the parts necessary to conduct it.  Indeed, as noted above,

the relevant transactions are complex and involve multiple steps, are not fully

---

[5] Indeed, this "standard of care" appears to derive from outside of bankruptcy law
with no application to the Government. *See, e.g.*, *In re Platinum-Beechwood Litig.*,
18 Civ. 6658 (JSR), 2019 WL 4411886, at * 4 (S.D.N.Y. Aug 21, 2019)
(discussing investment management agreement that prohibited indemnification
based on fraud, gross negligence, or willful misconduct); *Quintel Corp., N.V. v.
Citibank, N.A.*, 596 F. Supp. 797, 800-801 (S.D.N.Y. 1984) (citing indemnification
clause with this standard in acquisition agreement).

defined, are subject to later negotiation and agreement by the parties, and will be implemented without judicial supervision. Accordingly, the UCC's argument fails to minimize the Exculpation Provision's substantial curtailment of the Government's rights.

### III. The Case Law Does Not Support the Overly Broad Exculpation Provision

While Appellees argue the Exculpation Provision contains run-of-the mill language that many courts have approved, they point to no cases where the Government was barred from exercising its police and regulatory powers by an exculpation provision, much less decisions considering and rejecting the arguments raised in this appeal.[6]

---

[6] Voyager's string cite of unpublished bankruptcy court orders, Debtors' Br. 22 n.3, is not persuasive because those cases do not address the arguments the Government makes here. Moreover, those orders show just how extraordinarily broad this Exculpation Provision is. Most are limited by express reference to section 1125(e), are expressly limited to pre-effective date conduct, and/or include a governmental or criminal conduct carve-out. *See, e.g.*, Order Confirming Chapter 11 Plan of Reorganization ¶ 35, Plan at 40, *In re Lakeland Tours, LLC*, No. 20-11647 (JLG) (Bankr. S.D.N.Y. Sept. 15, 2020) [Docket No. 191 and 191-1] (limited to pre-effective date conduct and by reference to section 1125(e)); Order Confirming Plan of Liquidation, Ex. A, Plan, Art. IX.F, *In re United Retail Group, Inc.*, No 12-10405 (SMB) (Bankr. S.D.N.Y. Sept. 18, 2012) [Dkt. No. 776] (limited to pre-effective date conduct and by reference to section 1125(e) and including criminal conduct carve-out); Order Confirming Chapter 11 Plan of Reorganization, Ex. A, Plan, Art. IX.D, *In re Fullbeauty Brands Holdings Corp.*, No. 19-22185 (RDD) (Bankr. S.D.N.Y. Feb. 5, 2019) [Dkt. No. 39] (limited to pre-effective date conduct and by reference to section 1125(e)); Order Confirming Chapter 11 Plan of Reorganization, Ex. 1, Plan, Art. VIII.E, *In re Cenveo, Inc.*, No.

The only case Appellees cite where an exculpation clause applied to a government agency is *In re Airadigm Communications, Inc.*, 519 F.3d 640, 655 (7th Cir. 2008). Debtors' Br. 28-29; UCC Br. 28-29. But *Airadigm* provides no shelter for the broad Exculpation Provision here for three reasons. First, subsequent Supreme Court decisions undermine its foundation. *Airadigm* relied, in part, on 11 U.S.C. § 105 to approve exculpation, 519 F.3d at 657, but the Supreme Court's later narrow reading of section 105(a) in *Law*, 571 U.S. at 420-23, and the Second Circuit's holding in *Dairy Mart*, 351 F.3d at 92 (holding that Section 105 is not a source of standalone statutory authority), cast considerable doubt on that conclusion. As discussed above, other subsequent Supreme Court cases have been consistently hostile to expanding bankruptcy courts' authority beyond that expressly stated in the Code. *See, e.g.*, *Jevic*, 580 U.S. at 465; *RadLAX*, 566 U.S. at 645-46, 649; *see* Gov't Br. at 22-27.

Second, this Exculpation Provision lacks many of the limitations of the relatively narrow provision in *Airadigm*, which only covered conduct "'arising out

---

18-22178 (RDD) (Bankr. S.D.N.Y. Aug. 21, 2018) [Dkt. No. 685] (including governmental unit carve-out); Order Confirming Chapter 11 Plan of Reorganization ¶ 141, *In re Sbarro LLC*, No. 14-10557 (MG) (Bankr. S.D.N.Y. May 19, 2014) [Dkt. No. 238] (limited to pre-effective date conduct). Further, none received appellate review and many were entered on an expedited basis. *E.g., In re Fullbeauty Brands Holdings Corp.*, No. 19-22185 (RDD) [Dkt. Nos. 1, 39] (confirmation order entered two days after the case was filed).

of or in connection with' the reorganization itself" and exculpated a single party, a lender. 519 F.3d at 657 (quoting the plan). It did not exculpate a long list of parties for broad and ill-defined future transactions, but rather was "narrow" and "tailored." *Id.* Although the Seventh Circuit held that the bankruptcy court could limit potential claims by the FCC in its capacity as a financial creditor of the bankruptcy estate, the court took pains to explain that it was not interfering with the agency's *regulatory* powers over the telecommunications licenses at issue. *Id.* (the exculpation clause "is subject to the other provisions of the plan, including one that expressly preserves the FCC's regulatory powers with respect to the licenses. Therefore, [the lender] cannot use this limitation as a way of skirting the FCC's regulations regarding the use, possession, or transfer of the licenses."). Conversely, as discussed above, the Exculpation Provision here goes well beyond limiting the actions of the Government as a financial creditor, and would interfere with its exercise of police and regulatory powers.

And third, the *Airadigm* court did not consider, much less reject, the statutory and constitutional arguments raised here.

Nor do other cases cited by Appellees support the overly broad Exculpation Provision, even if a bankruptcy court had authority to grant limited exculpation. Contrary to Appellees' arguments, those courts that permit some exculpation normally tailor such clauses to their justification. Courts allowing exculpation cite

the desire of "settling parties . . . to engage in the give-and-take of the bankruptcy proceeding without fear of subsequent litigation over any potentially negligent actions in those proceedings." *Blixseth v. Credit Suisse*, 961 F.3d 1074, 1083-84 (9th Cir. 2020). That is, exculpation purportedly protects commercial bankruptcy participants from each other in light of the "highly litigious nature of Chapter 11 bankruptcy proceedings," and prevents relitigation of issues resolved in the case. *Id.* at 1084; *see In re DBSD N. Am., Inc.*, 419 B.R. 179, 217 (Bankr. S.D.N.Y. 2009) ("Exculpation provisions are frequently included in chapter 11 plans, because stakeholders all too often blame others for failures to get the recoveries they desire; seek vengeance against other parties; or simply wish to second guess the decisionmakers in the chapter 11 case."); *In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000).

Thus, exculpation is generally temporally limited to "acts committed during the process of developing and confirming a Chapter 11 plan." *Blixseth*, 961 F.3d at 1083. It "covers only parties 'closely involved' in drafting the Plan," such as the debtor and unsecured creditors committee. *Id.* at 1082; *In re Highland Cap. Mgmt., LP*, 48 F.4th 419, 437 (5th Cir. 2022) ("exculpation in a Chapter 11 reorganization plan [must] be limited to the debtor, the creditors' committee and its members for conduct within the scope of their duties, and the trustees within the scope of their duties" (citation omitted)). And the protection it provides is limited to claims of

simple negligence, and "does not release parties from willful misconduct or gross negligence." *Blixseth*, 961 F.3d 1081-82 (quotation marks omitted).

Here, the Exculpation Provision exceeds each of these limits. It includes parties other than the debtor, trustee, and creditors' committee (and their respective professionals), including parties such as the Wind-Down Debtor and Plan Administrator that will not even come into existence until after the Effective Date, and non-fiduciaries of the estate such as Binance.US and the Independent Directors; it covers conduct that will take place after the effective date of the Plan, in the broad discretion of the parties, and without judicial supervision. And its fraud and gross negligence exception does not apply to the rebalancing transactions or the cryptocurrency distributions. Order at 8 (ER1057).

In addition to preventing sour-grapes litigation among the participants in the bankruptcy process, exculpation clauses are sometimes justified with reference to common-law immunity doctrines that some courts recognize as applying to certain bankruptcy participants. For example, some courts recognize "a limited qualified immunity to bankruptcy trustees unless they act with gross negligence." *Highland Cap.*, 48 F.4th at 437. Some courts also recognize a "limited qualified immunity to creditors' committee members for actions within the scope of their statutory duties," based on 11 U.S.C. § 1103(c). *Id.*; *accord PWS*, 228 F.3d at 246. Because the latter type of immunity "limits liability of a committee to willful misconduct or

ultra vires acts," the Third Circuit has authorized an exculpation provision that

merely "sets forth the appropriate standard for liability that would apply to actions

against the committee members and the entities that provided services to the

Committee in the event that they were sued for their participation in the

reorganization." *PWS*, 228 F.3d at 246-47. And it contrasted what it considered

proper exculpation that "sets forth the applicable standard of liability under

§ 1103(c)," with an impermissible release that "eliminat[ed] [liability] altogether"

for an exculpated party. *Id.* at 247.[7]

 Contrary to Appellees' arguments, *see* Debtors' Br. 22-23; UCC Br. 32-33,

such immunity principles are not nearly so broad as to justify the Exculpation

Provision. While the Second Circuit noted that "[b]ankruptcy trustees are generally

---

[7] Voyager also cites *In re Seaside Eng'g & Surveying, Inc.*, 780 F.3d 1070, 1076 (11th Cir. 2015), which approved an exculpation provision protecting only the debtor and the reorganized debtor against claims by creditors or other parties-in-interest relating to conduct in the bankruptcy case, with an exception for claims sounding in fraud, gross negligence, or willful misconduct. Debtors' Br. 19-20. That court considered exculpation under the doctrine of involuntary third-party release, and approved it because it satisfied the factors that court used to justify such releases, which include whether "[t]here is an identity of interests between the debtor and the third party"; the released non-debtor "has contributed substantial assets to the reorganization"; "the reorganization hinges" on a release for the debtor; and "[t]he plan provides a mechanism to pay for all, or substantially all," of the affected classes. 780 F.3d at 1079 (quotation marks omitted). Those factors would not justify the exculpation here, and Appellees have affirmatively disclaimed that exculpation should be treated as a third-party release. Debtors' Br. 30.

immune to the extent that they are acting with the approval of the court," and enjoy a quasi-judicial immunity based on their unique role, it went on to hold that court-appointed conservators do not enjoy such immunity. *Gross v. Rell*, 695 F.3d 211, 216 (2d Cir. 2012). The court justified its narrow holding based on the Supreme Court's instruction that courts should be "'quite sparing in [their] recognition of absolute immunity' and that [they] are not 'to extend it any further than its justification would warrant.'" *Id.* (quoting *Burns v. Reed*, 500 U.S. 478, 487 (1991)). The separate immunity that some courts recognize for creditors' committees relies on 11 U.S.C. § 1103(c), which specifically discusses such committees' fiduciary duties, and thus cannot be expanded to other parties.

The UCC acknowledges (UCC Br. 33) that quasi-judicial immunity protects only "non-judicial officers who perform 'quasi-judicial' duties," or "act[] as an arm of the court"—such as a probate court administrator who implemented a court order assigning a juvenile offender to a particular detention facility. *Bush v. Rauch*, 38 F.3d 842, 847 (6th Cir. 1994). But Appellees would improperly broaden this doctrine to anyone who merely follows a court order—a category that includes any party to a lawsuit resolved via a settlement agreement that is so-ordered by a court. Debtors' Br. 23; UCC Br. 32.[8]

---

[8] The bankruptcy court cases that Appellees cite, Debtors' Br. 23; UCC Br. 32, for the dubious proposition that anyone who merely "perform[s] actions required by a

Moreover, although Appellees conflate them, Debtors' Br. 40-41; UCC Br. 21-22, there are important distinctions between an immunity defense and an *ex ante* exculpation from liability. The scope and applicability of immunity (or other affirmative defense) that a party may have are properly decided by the court in which that party raises that defense, not in advance by a court wishing to protect parties before it from future liabilities. A subsequent court can review the claims against the party, evaluate the assertion of the defense in light of evidence or alleged facts, and decide whether any defense applies and to what extent it protects against the claims at issue. A court authorizing a bankruptcy transaction has no authority to decide in advance what immunity or other defenses its participants ought to have in a potential future lawsuit.

By analogy, a law enforcement officer seeking court approval of a search warrant may be entitled to qualified immunity in the event he commits a tort in the course of executing that warrant to the extent his actions are objectively reasonable, *see Terebesi v. Torreso*, 764 F.3d 217, 232-33 (2d Cir. 2014), but the court approving the warrant cannot set forth the conditions under which he may be

---

court-approved plan" is entitled to quasi-judicial immunity, were either authored by the bankruptcy judge in this case, *In re Aegean Marine Petroleum Network, Inc.*, 599 B.R. 717, 721 (Bankr S.D.N.Y. 2019), or rely on his decision, *In re LATAM Airlines Grp. S.A.*, No. 20-11254, 2022 WL 2206829, at *50 (Bankr. S.D.N.Y. June 18, 2022) (quoting *Aegean*, 599 B.R. at 721).

sued for such torts or what liability he may have in such suits. Rather, if he is sued, the court hearing that suit will appropriately evaluate his qualified immunity in the relevant circumstances. The same should be true with regard to any party's liability arising from the transactions contemplated in the Plan.

## IV.   Appellees' Policy Arguments Do Not Justify the Exculpation Provision

Finally, Debtors claim that without exculpation, "capable and experienced" professionals would have "little incentive to offer their services" in developing and effectuating bankruptcy plans, Debtors' Br. 5, thus purportedly justifying exculpation as a policy matter. Even if such policy considerations were relevant, Debtors offer no evidence to support their conclusory assertion, which contradicts observed reality and common sense. Complex financial transactions involving cryptocurrency occur routinely outside of bankruptcy, where there is no court-imposed release against the Government or anyone else. It strains credulity for Debtors to argue that no professionals would assist in similar financial transactions that happen to be part of bankruptcy plans. Indeed, the Government is often carved out of exculpation provisions in bankruptcy plans, but this has not deterred qualified professionals from bankruptcy work.[9]

---

[9] When the Government is actively involved in large bankruptcy cases, it is often carved out from exculpation clauses at its request. *See, e.g.*, Plan § 10.21(a)(ii), *In re Purdue Pharma, L.P.*, 19-23649 (RDD) (Bankr. S.D.N.Y. Sept. 2, 2021) [Dkt. No. 3726]; Confirmation Order ¶ 39, *In re Ditech Holding Corp.*, 19-10412 (JLG)

Debtors' claim that professionals would have "little incentive" to participate in a bankruptcy proceeding without exculpation (Debtors Br. at 5) likewise cannot be squared with the record in these and other large Chapter 11 cases. Sophisticated counsel and advisors regularly bill millions of dollars in professional fees—with no guarantee that they will be exculpated, certainly not against the Government.[10] It is hard to believe that such incentives would not be sufficient to attract capable professionals if carte blanche against Government enforcement were not also on offer.

Debtors also claim that the Government's "aggressively targeting the cryptocurrency industry, including persons and entities related in some ways to Binance" justifies the exculpation provision here. Debtors' Br. 25. To the contrary, the Government's enforcement efforts in this area, which has been rife with fraud, make exculpation even more problematic. "Outright fraud, scams, and theft in

_____

(Bankr. S.D.N.Y. Sep. 26, 2019) [Dkt. No. 1404]; Confirmation Order ¶ 41, *In re Sears Holding Corp.*, 18-23538 (Bankr. S.D.N.Y. Oct. 15, 2019) [Dkt. No. 5370]. This includes at least one recent case, *Cenveo*, which Debtors mistakenly claim (Debtors' Br. 22 n.3) did not include such a carve-out. *See* Confirmation Order ¶ 117, *In re Cenveo, Inc.*, 18-22178 (RDD) (Bankr. S.D.N.Y. Aug. 21, 2018) [Dkt. No. 685] (excluding governmental units from exculpation provisions except as provided by section 1125(e) or the discharge of debtors' prepetition debts).

[10] For example, in this case, the estate has been billed more than $59 million for tens of thousands of hours of work by various professionals in fewer than eight months. Dkt. 1308, at 3, 94 of 916; Dkt. 1304, at 2 of 428; Dkt. 1307, at 10-11 of 728; Dkt. 1291, at 2-3 of 168.

digital asset markets are on the rise: according to FBI statistics, reported monetary losses from digital asset scams were nearly 600 percent higher in 2021 than the year before."[11] The Government has been critically involved in the efforts to identify and prosecute frauds and abuse that involve cryptocurrency. No bankruptcy court should prevent the Government from enforcing the law in this sensitive area.

## CONCLUSION

This Court should strike the Exculpation Provision from the Plan and Confirmation Order and remand this case to the Bankruptcy Court for further proceedings.

Dated: April 18, 2023
      New York, New York

                                        DAMIAN WILLIAMS
                                        United States Attorney
                                        Southern District of New York

                                        By: */s/* Lawrence H. Fogelman
                                        LAWRENCE H. FOGELMAN
                                        JEAN-DAVID BARNEA
                                        PETER ARONOFF
                                        Assistant United States Attorneys
                                        86 Chambers Street, 3rd Floor
                                        New York, New York 10007
                                        Tel.: (212) 637-2800
                                        Lawrence.Fogelman@usdoj.gov
                                        Jean-David.Barnea@usdoj.gov

---

[11] https://www.whitehouse.gov/briefing-room/statements-releases/2022/09/16/fact-sheet-white-house-releases-first-ever-comprehensive-framework-for-responsible-development-of-digital-assets/

27

Peter.Aronoff@usdoj.gov

By: /s/ Beth A. Levene
WILLIAM K. HARRINGTON
United States Trustee, Region 2
LINDA A. RIFFKIN
Assistant United States Trustee
RICHARD C. MORRISSEY
MARK BRUH
Trial Attorneys
U.S. Department of Justice
Office of the United States Trustee—
NY Office
Alexander Hamilton Custom House
One Bowling Green, Room 534
New York, New York 10004-1408
Tel.: (212) 510-0500

RAMONA D. ELLIOTT
Deputy Director/General Counsel
P. MATTHEW SUTKO
Associate General Counsel
BETH A. LEVENE
ANDREW BEYER
FREDERICK GASTON HALL
Trial Attorneys
Department of Justice
Executive Office for United States
Trustees
441 G Street, N.W., Suite 6150
Washington, DC 20530

## CERTIFICATE OF COMPLIANCE

I, Lawrence H. Fogelman, counsel of record for Appellants, certify that this brief was prepared using Microsoft Word, and that this processing program has been applied to include all text other than what Fed. R. Bankr. P. 8015(g) allows to be excluded in preparing the following word count. I further certify that this brief contains 6491 words.

By:   /s/ Lawrence H. Fogelman
Lawrence H. Fogelman
Assistant United States Attorney