UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

In re VOYAGER DIGITAL HOLDINGS, INC., et al.,

Debtors,

Chapter 11
Case No. 22-10943-MEW
(Jointly Administered)

-------------------------------------------------------------------x

UNITED STATES OF AMERICA, et al.,

Appellants,

-v-

No. 23-CV-2171-LTS

VOYAGER DIGITAL HOLDINGS, INC., et al.,

Appellees.

OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF VOYAGER DIGITAL HOLDINGS, INC. and PLAN ADMINISTRATOR MICHAEL WYSE,

Intervenors.[1]

-------------------------------------------------------------------x

KIRKLAND & ELLIS LLP
By: George W. Hicks, Jr.
1301 Pennsylvania Avenue, NW
Washington, DC 20004

-and-

KIRKLAND & ELLIS LLP
By: Lamina E. Bowen
Christine Ada Okike
Christopher Marcus
Joshua Sussberg
Aaron L. Nielson
601 Lexington Avenue
New York, NY 10022

U.S. DEPARTMENT OF JUSTICE, OFFICE OF THE U.S. TRUSTEE
By: Beth Ann Levene
Andrew Beyer
441 G Street, N.W., Suite 6150
Washington, DC 20530

-and-

U.S. DEPARTMENT OF JUSTICE, OFFICE OF THE U.S. TRUSTEE
By: Linda A. Riffkin
201 Varick St, Room 1006
New York, NY 10014

---

1 The Clerk of Court is directed to change the case caption to the above, in order to reflect the intervention of the Plan Administrator. (Docket entry no. 100.)

KIRKLAND & ELLIS LLP
By: Richard U.S. Howell
300 North LaSalle Street
Chicago, IL 60654

*Attorneys for Appellees Voyager Digital Holdings, Inc. and Its Affiliated Debtors*

-and-

OFFICE OF THE U.S. ATTORNEY for the Southern District of N.Y.
By: Jean-David Barnea
Lawrence Heath Fogelman
Peter Max Aronoff
86 Chambers Street
New York, NY 10007

*Attorneys for Appellants United States of America and the United States Trustee for Region 2*

MCDERMOTT WILL & SCHULTE LLP
By: Paul Whitfield Hughes, III
Andrew Lyons-Berg
500 North Capitol Street, NW
Washington, DC 20001

-and-

MCDERMOTT WILL & SCHULTE LLP
By: Darren Todd Azman
Joseph B. Evans
One Vanderbilt Avenue
New York, NY 10017

*Attorneys for Intervenors Official Committee of Unsecured Creditors and Plan Administrator Michael Wyse*

LAURA TAYLOR SWAIN, CHIEF UNITED STATES DISTRICT JUDGE

OPINION AND ORDER

Pending before the Court is the appeal of the United States of America and the United States Trustee for Region 2 (collectively, the "Government" or "Appellants") of the "Corrected and Amended Order (I) Approving the Second Amended Disclosure Statement and (II) Confirming the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code,"[2] issued by the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") on March 10, 2023, in the Chapter 11 case captioned In re Voyager Digital Holdings, Inc., No. 22-10943-MEW (Bankr. S.D.N.Y.).[3] Voyager, No. 22-10943-MEW (Bankr. S.D.N.Y. Mar. 10, 2023), Dkt. No. ("Bankr. docket entry no.") 1166 ("Confirmation Order"). Opposing the appeal are appellees Voyager Digital Holdings, Inc. and its affiliated debtors (collectively, "Voyager," "Debtors," or "Appellees"), and intervening in support of Appellees are the Official Committee of Unsecured Creditors ("Committee of Unsecured Creditors") and the Plan Administrator Michael Wyse (along with the Committee of Unsecured Creditors, the "Intervenors"). This Court has appellate jurisdiction under 28 U.S.C. section 158(a)(1).

The Court has reviewed carefully the parties' submissions. (Docket entry no. 59 ("Appellants Br."); docket entry no. 60 ("Appellants App'x"); docket entry no. 66 ("Intervenors

---

2 Title 11 of the United States Code (the "Bankruptcy Code" or the "Code").

3 Appellants appended, to their notice of appeal, the Bankruptcy Court's March 8, 2023 "Amended Order (I) Approving the Second Amended Disclosure Statement and (II) Confirming the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code." (Docket entry no. 1-1.) The March 10, 2023 corrected order is substantively identical to the March 8, 2023 order. (Compare Bankr. docket entry no. 1159, with Bankr. docket entry no. 1166.)

Br."); docket entry no. 67 ("Appellees Br."); docket entry no. 67-1 ("Appellees App'x"); docket entry no. 70 ("Appellants Reply Br."); docket entry no. 87 ("Appellees & Intervenors Supp. Br."); docket entry no. 88 ("Appellants Supp. Br.").) In addition, the Court considered carefully the parties' oral arguments. (Docket entry no. 101 ("Oral Arg. Tr.").) For the following reasons, the Bankruptcy Court's Confirmation Order is vacated, and the matter is remanded for further proceedings consistent with this Opinion and Order.

## I. Background

The following summary of relevant facts is drawn from the parties' papers, the record (docket entry no. 60 ("Appellants App'x"); docket entry no. 67-1 ("Appellees App'x")), and filings in the Chapter 11 bankruptcy petition filed by Voyager in the case captioned In re Voyager Digital Holdings, Inc., No. 22-10943-MEW (Bankr. S.D.N.Y.). See Anderson v. Rochester-Genesee Reg'l Transp. Auth., 337 F.3d 201, 205 n.4 (2d Cir. 2003) (collecting cases holding that courts may take judicial notice of court records in related proceedings). Further background can be found in the Court's Opinion & Order regarding the Government's motion for a stay pending appeal of the Bankruptcy Court's Confirmation Order. (Docket entry no. 53, also available at In re Voyager Digital Holdings, Inc., No. 23-CV-02171-JHR, 2023 WL 2731737, at *1 (S.D.N.Y. Apr. 1, 2023).)

### A. The Confirmed Bankruptcy Plan

Voyager is a cryptocurrency firm that filed its Chapter 11 bankruptcy petition on July 5, 2022. (Bankr. docket entry no. 1.) Under the Chapter 11 plan confirmed by the Bankruptcy Court on March 8, 2023 (the "Confirmed Plan" or "Plan"), Voyager agreed to sell its assets to Binance.US under an Asset Purchase Agreement, whereupon Binance.US would receive the cryptocurrency on Voyager's platform and then distribute that cryptocurrency to

Voyager's customers. (Bankr. docket entry no. 1166-1 ("Confirmed Plan") at 34-36; Bankr. docket entry no. 863 ("Second Am. Disclosure Stmt.") at 16-17, 42-46.)[4] The Plan provided that, if the Binance.US sale could not be completed, Voyager could "toggle" to liquidate its assets and then distribute its cryptocurrency to its customers.[5] (Confirmed Plan at 35-36; Second Am. Disclosure Stmt. at 29.)

In both the sale and liquidation scenarios, the Plan required "rebalancing" transactions prior to the distribution of cryptocurrency to Voyager's customers, in order "to effectuate *pro rata* in-kind distributions of the Distributable Cryptocurrency to Account Holders." (Second Am. Disclosure Stmt. at 39.) The rebalancing transactions would be "conducted to ensure that the aggregate value (in U.S. Dollars) for each type of Cryptocurrency coin or token held by the Debtors as a percentage of the aggregate value (in U.S. Dollars) of such type of Cryptocurrency coin or token that was on deposit with the Debtors as of the Petition Date . . . is consistent across the Debtors' Cryptocurrency portfolio to process and initiate in-kind distributions." (Id.) These rebalancing transactions were necessary because Voyager had a deficiency of certain cryptocurrency coins and because of the fluctuation in cryptocurrency prices after Voyager filed its petition. (Id. at 39-40.) The rebalancing transactions would consist of "a series of transactions that would result in the buying and selling of Cryptocurrency coins until the Rebalancing Ratio is consistent for each type of Cryptocurrency coin or token held by the Debtors." (Id. at 39.) Finally, in conducting the sale or liquidation, Voyager or Binance.US could operate and transact business "without supervision or approval" of the Bankruptcy Court. (Confirmed Plan at 35-36.)

---

4 Pincites to docket entries refer to ECF-designated pages.

5 Voyager toggled to liquidation after Binance.US was indicted for violating the Bank Secrecy Act. (Docket entry no. 85, at 3 n.2.)

The confirmed Chapter 11 plan includes an exculpation provision (the "Exculpation Provision") that purports to protect certain "Exculpated Parties" from liability for effectuating the Confirmed Plan, including engaging in rebalancing transactions and distributing cryptocurrency to customers. In full, the Exculpation Provision provides[6]:

> Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor release or the third-party release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby exculpated from, any liability for damages based on the negotiation, execution and implementation of any transactions or actions approved by the Bankruptcy Court in the Chapter 11 Cases, except for Causes of Action related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence; provided that nothing in the Plan shall limit the liability of professionals to their clients pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8 Rule 1.8(h)(1) (2009).
>
> The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes.
>
> In addition, the Plan contemplates certain rebalancing transactions and the completion of distributions of cryptocurrencies to creditors. The Exculpated Parties shall have no liability for, and are exculpated from, any claim for fines, penalties, damages, or other liabilities based on their execution and completion of the rebalancing transactions and the distribution of cryptocurrencies to creditors in the manner provided in the Plan.
>
> For the avoidance of doubt, the foregoing paragraph reflects the fact that Confirmation of the Plan requires the Exculpated Parties to engage in certain rebalancing transactions and distributions of cryptocurrencies and the fact that no regulatory authority has taken the position during the Combined Hearing that such conduct would violate applicable laws or regulations. Nothing in this provision shall limit in any way the powers of any Governmental Unit to contend that any rebalancing transaction should be stopped or prevented, or that any other action contemplated by the Plan should be enjoined or prevented from proceeding further. Nor does

---

6 The Bankruptcy Court struck Voyager's originally proposed exculpation provision in its entirety and replaced it with the quoted language. In re Voyager Digital Holdings, Inc., No. 23-CV-02171-JHR, 2023 WL 2731737, at *2-5 (S.D.N.Y. Apr. 1, 2023).

> anything in this provision limit the enforcement of any future regulatory or court order that requires that such activities either cease or be modified, or limit the penalties that may be applicable if such a future regulatory or court order is issued and is violated. Similarly, nothing herein shall limit the authority of the Committee on Foreign Investment of the United States to bar any of the contemplated transactions. Nor does anything in this provision alter the terms of the Plan regarding the compliance of the Purchaser with applicable laws in the Unsupported Jurisdictions before distributions of cryptocurrency occur in those Unsupported Jurisdictions.

(Confirmation Order at 7-8, ¶¶ 97-99.) "Exculpated Parties," as used in the foregoing provision, "means, collectively, and in each case in its capacity as such: (a) each of the Debtors; (b) the Committee [of Unsecured Creditors], and each of the members thereof, solely in their capacity as such; (c) each of the Released Professionals; (d) each of the Released Voyager Employees; (e) the Plan Administrator; and (f) the Distribution Agent." (Confirmed Plan § I.A.77.)

In its decision confirming the Plan, the Bankruptcy Court explained that "confirmation of the Plan will require the Debtors and their respective personnel and representatives . . . to complete the rebalancing transactions that the Plan contemplates and to make the distributions of cryptocurrencies that the Plan contemplates. . . . Once I confirm the Plan, the relevant parties will have no choice but to do so." (Bankr. docket entry no. 1170 ("Confirmation Decision") at 34, <u>also available at</u> <u>In re Voyager Digital Holdings, Inc.</u>, 649 B.R. 111, 134 (Bankr. S.D.N.Y. 2023).) Thus, the court continued, the first paragraph of the Exculpation Provision "states that parties are exculpated from liability for things that I authorized during the course of the bankruptcy case, with an explicit exclusion for fraud, willful misconduct or gross negligence." (Bankr. docket entry no. 1190 ("Stay Decision") at 7, <u>also available at</u> <u>In re Voyager Digital Holdings, Inc.</u>, No. 22-10943-MEW, 2023 WL 2531538, at *4 (Bankr. S.D.N.Y. Mar. 15, 2023).) "The second paragraph of the exculpation language just implements the terms of section 1125(e) of the Bankruptcy Code . . . ." (<u>Id.</u>) Finally, the last

two paragraphs "are specifically limited to the fact that the parties must buy and sell cryptocurrencies as part of the portfolio rebalancing that the plan requires, and must distribute cryptocurrencies to customers." (Id. at 8.) "The point [of those two paragraphs] is to protect the parties from belated allegations that those very activities are somehow violative of law and that parties should be penalized just for doing what I have ordered them to do." (Id.) The last paragraph also provides that the Government may "try[] to stop transactions from occurring," and that if the Government is successful in obtaining a court order to that effect, the penalties for violating the order are not limited by exculpation. (Confirmation Decision at 38 ("If the SEC or any other party believes tomorrow that it has grounds to go to court to enjoin further steps in the completion of the contemplated transactions, it is entitled to do so.").)

The Confirmation Order approving the Plan includes the following additional language regarding the Exculpation Provision (the "Governmental Units Provision")[7]:

> **Governmental Units.** Except as set forth in the Exculpation Provisions set forth in the Plan (including sections VI.B.1 and VIII.C of the Plan) and in this Confirmation Order, nothing in this Confirmation Order or the Plan shall release or restrict any claim by the United States, the States or any of their agencies of any claim arising under the Internal Revenue Code, the environmental laws or any civil or criminal laws of the United States or the States, or under any rules or regulations enforced by the United States, the States or any of their agencies against the Released Parties, nor shall anything in the Confirmation Order or the Plan enjoin the United States or the States from bringing any claim, suit, action or other proceedings against the Released Parties for any liability for any claim, suit or action arising under the Internal Revenue Code, the environmental laws or any civil or criminal laws of the United States or the States, or under any rules or regulations enforced by the United States, the States or any of their agencies, nor shall anything in the Confirmation Order or the Plan exculpate any such party from any liability to the United States, the States or any of their agencies, arising under the Internal Revenue Code, the environmental laws or any civil or criminal laws of the United States or the States, or under any rules or regulations enforced by the United States,

[7] The Bankruptcy Court modified Voyager's proposed language. See In re Voyager Digital Holdings, Inc., 2023 WL 2731737, at *2-5.

> the States or any of their agencies; provided, however, that nothing in this Confirmation Order or the Plan shall modify in any respect the relief previously granted in the Bar Date Order.
>
> Except as set forth in the exculpation provisions set forth in the Plan (including sections VI.B.1 and VIII.C of the Plan) and in this Confirmation Order, nothing in this Confirmation Order, the Disclosure Statement, the Plan, or the Asset Purchase Agreement releases, precludes, or enjoins: (i) any liability to any governmental unit as defined in 11 U.S.C. § 101(27) ("Governmental Unit") that is not a "claim" as defined in 11 U.S.C. § 101(5) ("Claim"); (ii) any Claim of a Governmental Unit arising on or after the Effective Date; or (iii) any liability to a Governmental Unit on the part of any non-Debtor (except to the extent set forth in paragraphs 49 and 56 herein); *provided*, however, that nothing in this Confirmation Order or the Plan shall modify in any respect the relief previously granted in the Bar Date Order.

(Confirmation Order ¶¶ 101-02.)

The Bankruptcy Court explained that the Exculpation Provision "does not bar the Government from trying to stop transactions from occurring, and does not bar any regulatory contention in that regard." (Confirmation Decision at 38.) The Bankruptcy Court emphasized, "I have not 'enjoined' the Government's exercises of police and regulatory powers, I have not 'prospectively immunized' the parties from enforcement actions, and I have not barred regulatory actions to stop the contemplated transactions." (Stay Decision at 13.) According to the Bankruptcy Court, the Government had a "full and fair opportunity to argue to me that the proposed transactions [contemplated by the Plan] are illegal in any way and have not made any such contentions." (Confirmation Decision at 36.) Thus, "if we get six weeks down the road and then the SEC decides to take action, the people who have spent six weeks doing what I have ordered them to do will not be held liable on an *ex post* facto basis for having followed my order in the interim." (Id. at 38.)

B. Prior Proceedings

Following the Bankruptcy Court's entry of the March 8, 2023 order confirming the plan, the Government filed an appeal on March 14, 2023. (Docket entry no. 1.) Along with the appeal, the Government filed an emergency motion with this Court for a stay pending appeal (docket entry no. 3), which the Court granted on March 27, 2023 (docket entry no. 45). A written decision explaining the Court's reasoning was issued on April 1, 2023 (docket entry no. 53) and, that same day, Voyager filed an interlocutory appeal of the Court's stay order (docket entry no. 54).

On April 20, 2023, the Court entered an order approving the parties' stipulation that "[o]nly the Exculpation Provisions—but not the remainder of the Plan or the Confirmation Order—shall be stayed pending this Appeal." (Docket entry no. 72.) On May 2, 2023, the Second Circuit dismissed Voyager's interlocutory appeal for lack of jurisdiction. (Docket entry no. 73.) This appeal from the Confirmation Order was reassigned to the undersigned on April 28, 2025 (docket entry no. 82), and oral argument was held on June 23, 2026 (docket entry no. 101).

## II. Discussion

"Generally in bankruptcy appeals, the district court reviews the bankruptcy court's factual findings for clear error and its conclusions of law de novo." In re Charter Commc'ns, Inc., 691 F.3d 476, 482-83 (2d Cir. 2012). A finding of fact is clearly erroneous if the court is "left with the definite and firm conviction that a mistake has been committed." In re Manville Forest Prods. Corp., 896 F.2d 1384, 1388 (2d Cir. 1990) (quoting United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948)).

The Court begins by considering whether the Supreme Court's recent decision Harrington v. Purdue Pharma L. P., 603 U.S. 204 (2024), which held that nonconsensual third-party releases are not authorized in bankruptcy proceedings, dictates the outcome of this appeal. Because the Exculpation Provision differs in material respects from a nonconsensual third-party release, the Court turns to an examination of what, if any, authority empowered the Bankruptcy Court to enter the Exculpation Provision. First, the Court addresses whether the Exculpation Provision is authorized by a specific statutory provision of the Bankruptcy Code. In support of the Exculpation Provision, Appellees and Intervenors point to sections 105(a), 1123(b)(6), 1129(a)(3), 1142(a), and 1142(b) of the Bankruptcy Code. None of those provisions, however, specifically grants the Bankruptcy Court broad, sweeping power to prospectively immunize persons, entities, and future transactions whose identities and details are not, and could not at the time the Exculpation Provision was approved, have been part of the record before the Bankruptcy Court. The only colorable argument for such authority comes from section 1142(b) of the Bankruptcy Code, but doctrinal and constitutional considerations militate against such a broad reading of section 1142(b). Second, the Court examines whether the Exculpation Provision is sustainable as an invocation or an application of the common law doctrine of quasi-judicial immunity, which protects those who enforce or execute judicial orders. Appellees and Intervenors contend that the Exculpation Provision merely augments quasi-judicial immunity, but the Exculpation Provision goes far beyond the traditional bounds of that doctrine—the Exculpation Provision provides ex ante immunization of future conduct, while quasi-judicial immunity only operates as an affirmative defense that is raised after the fact. Furthermore, unlike quasi-judicial immunity, the Exculpation Provision purports to apply in the criminal law context. Because the Exculpation Provision is not justified by the Code or the

doctrine of quasi-judicial immunity, the Court vacates the Bankruptcy Court's Confirmation Order and remands the case for further proceedings consistent with this Opinion and Order. The Court's reasoning is detailed more fully in the following pages.

A. Whether the Exculpation Provision Is a Prohibited Nonconsensual Third-Party Release

To begin, the Court considers whether the Supreme Court's recent decision in Purdue Pharma dictates the outcome of this appeal. In that case, Purdue Pharma had "filed for bankruptcy after facing a wave of litigation for its role in the opioid epidemic." Purdue Pharma, 603 U.S. at 209. As part of the company's confirmed bankruptcy plan, Purdue Pharma's long-time owners, the Sackler family, agreed "to return to Purdue's bankruptcy estate $4.325 billion of the $11 billion they had withdrawn from the company in recent years." Id. at 211. In exchange, the plan granted the Sackler family a release of all "current" and "future" "opioid-related claims against the family," as well as an injunction "forever stay[ing], restrain[ing,] and enjoin[ing]" claims against the family. Id. at 211-12. Both of the provisions operated "without the consent of those affected [i.e., the opioid victims]." Id. at 215.

The narrow issue before the Supreme Court was whether the nonconsensual release and injunction (i.e., a "nonconsensual third-party release") were lawful under the Bankruptcy Code. Id. at 227 ("[c]onfining [itself] to the question presented"). To address this question, the Court considered whether the approved plan was authorized by section 1123(b) of the Code, which provides that a bankruptcy plan "may" contain certain provisions, including those that (1) "impair or leave unimpaired any class of claims, secured or unsecured, or of interests"; (2) "provide for the assumption, rejection, or assignment of any executory contract or unexpired lease of the debtor not previously rejected under [section 365]"; (3) "provide for—(A) the settlement or adjustment of any claim or interest belonging to the debtor or to the estate; or (B) the retention and enforcement by the debtor, by the trustee, or by a representative of the

estate appointed for such purpose, of any such claim or interest"; (4) "provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests"; and (5) "modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims." Id. at 215-16 (quoting 11 U.S.C. § 1123(b)(1)-(5)). The final provision of section 1123(b)—subsection (6)—is a "catchall," providing that a bankruptcy plan "may" "include any other appropriate provision not inconsistent with the applicable provisions of this title." Id. at 216 (quoting 11 U.S.C. § 1123(b)(6)).

In Purdue Pharma, the proponents of the bankruptcy plan argued that the nonconsensual third-party release was authorized by the catchall provision, but the Supreme Court disagreed. Applying the ejusdem generis canon, the Supreme Court held that section 1123(b)(6) must be interpreted "in light of its surrounding context and read to 'embrace only objects similar in nature' to the specific examples preceding it [in subsections (b)(1) through (b)(5)]." Id. at 217 (quoting Epic Sys. Corp. v. Lewis, 584 U.S. 497, 512 (2018)). According to the Court, because subsections (b)(1) through (b)(5) all "concern *the debtor*—its rights and responsibilities, and its relationship with its creditors," subsection (b)(6) could not be used "to discharge the debts of a nondebtor without the consent of affected nondebtor claimants." Id. at 218 (emphasis in original). This interpretation of section 1123(b)(6), the Supreme Court explained, was further buttressed by the statutory scheme of the Code. "Generally, . . . the bankruptcy code reserves this benefit," a release from debts and an injunction against future efforts to collect upon those debts, "to 'the debtor'—the entity that files for bankruptcy." Id. at 221 (quoting 11 U.S.C. § 1141(d)(1)(A) and citing 11 U.S.C. §§ 524(e), 727(a)-(b)). To receive

the benefit of releases and injunctive relief, "the [C]ode generally requires the debtor to come forward with virtually all its assets," id. (citing 11 U.S.C. §§ 541(a)(1), 548), and the obtained benefit is not "unbounded," id. (citing 11 U.S.C. §§ 523(a)(2), (4), (6), 1411(a)). A nonconsensual third-party release, like the one in the Purdue Pharma plan, "transgresses all these limits." Id. at 222 (explaining that "the Sacklers seek to pay less than the code ordinarily requires and receive more than it normally permits"). Finally, the Court recognized that the Code, in section 524(g), "*does* authorize courts to enjoin claims against third parties without their consent" for asbestos-related bankruptcies. Id. (emphasis in original) (citing 11 U.S.C. § 524(g)). Because the Code "does so in only [this] *one* context," the Court found it "all the more unlikely that § 1123(b)(6) is best read to afford courts that same authority in *every* context." Id. (emphasis in original). The Supreme Court therefore struck down the "nonconsensual third-party release" that "extinguish[es] without their consent claims held by nondebtors (here, the opioid victims) against other nondebtors (here, the Sacklers)." Id. at 220-21.

The threshold issue before this Court is whether the Exculpation Provision is cut from the same cloth as the nonconsensual third-party release that was examined in Purdue Pharma. In the Court's view, it is not. While the Exculpation Provision bears a superficial resemblance to the nonconsensual third-party release in Purdue Pharma, it is fundamentally different. The Exculpation Provision does not wholesale discharge all claims that could be raised against a nondebtor. Rather, the Exculpation Provision merely purports to relieve persons implementing the Plan from liability for specific types of actions taken at the direction of the Bankruptcy Court, and it does so only when those actions are consistent with the standard of conduct prescribed by the Exculpation Provision (i.e., actions that do not constitute actual fraud,

willful misconduct, or gross negligence). See Blixseth v. Credit Suisse, 961 F.3d 1074, 1083-84 (9th Cir. 2020) (permitting an exculpation provision despite Ninth Circuit case law prohibiting nonconsensual third-party releases, and distinguishing an exculpation provision "releas[ing] . . . participants in the plan development and approval process for actions taken during those processes" from "sweeping nondebtor releases from creditors' claims"); In re Airadigm Commc'ns, Inc., 519 F.3d 640, 657 (7th Cir. 2008) (noting that an exculpation provision does not provide "blanket immunity"); In re PWS Holding Corp., 228 F.3d 224, 247 (3d Cir. 2000) (holding that an exculpation provision "sets forth the applicable standard of liability . . . rather than eliminating it altogether"). Indeed, this distinction is crystallized by the Exculpation Provision's narrow focus on conduct taken pursuant to the Plan, as opposed to the nonconsensual third-party release in Purdue Pharma, which broadly released nondebtors from liability for their own conduct that was not otherwise implicated by the debtor's petition for relief or proceedings thereon.

Nor does the Exculpation Provision confer any unwarranted benefit upon a nondebtor that would disrupt the central "bargain" of bankruptcy. See Purdue Pharma, 603 U.S. at 209 (describing bankruptcy as a "simple bargain" where "[a] debtor can win a discharge of its debts if it proceeds with honesty and places virtually all its assets on the table for its creditors"). Unlike the Sackler family in Purdue Pharma, the Exculpated Parties are not receiving the "benefits of a Chapter 11 discharge usually reserved for debtors." Id. at 215. Instead, the Exculpation Provision before the Court involves a different sort of bargain—one where the debtor and those implementing the plan adhere to court-ordered provisions that are intended to facilitate relief for the debtor, in exchange for protection from liability for actions taken in adherence with those very provisions approved by the court. The Exculpation Provision does not

give third parties protection from liability for prior conduct unrelated to implementation of the Plan. Thus, unlike a third-party release granted to a nondebtor, the Exculpation Provision does not disrupt the fundamental assets-for-discharge exchange underlying bankruptcy relief. See McAlary v. Cash Cloud Inc., No. 23-CV-01424-GMN, 2025 WL 2206176, at *5 (D. Nev. Aug. 4, 2025) ("The exculpation clause at issue here does not extend the benefits of a Chapter 11 discharge to nondebtors; rather, it exculpates participants in the Plan approval process for actions relating to that process.").[8]

Because of the material differences between the Exculpation Provision and the nonconsensual third-party release invalidated by the Supreme Court, Purdue Pharma's condemnation of nonconsensual third-party releases does not compel this Court's rejection of the Exculpation Provision.[9]

B. Whether the Exculpation Provision Is Authorized by the Bankruptcy Code

Next, the Court turns to whether the Exculpation Provision is lawful under the Bankruptcy Code. Explicit Code authorization is required; the Supreme Court has warned against judicial expansion of bankruptcy courts' authority beyond that expressly conferred by the

---

8 In fact, the confirmed plan at issue in Purdue Pharma had a separate exculpation provision, which went unchallenged during the confirmation proceeding and was not analyzed by the bankruptcy court or the reviewing courts. See generally In re Purdue Pharma L.P., 633 B.R. 53 (Bankr. S.D.N.Y. 2021) (confirmation ruling); In re Purdue Pharma L.P., No. 19-23649-RDD (Bankr. S.D.N.Y.), Docket entry no. 3787, at 91 (exculpation provision in confirmation order), Docket entry no. 3726 § 10.12 (exculpation provision in confirmed plan). Nor did the Purdue Pharma majority discuss or even mention exculpation clauses, a notable omission given that the four-Justice dissent observed that "bankruptcy courts routinely approve exculpation clauses under § 1123(b)(6)" because "[w]ithout such exculpation clauses, 'competent professionals would be deterred from engaging in the bankruptcy process, which would undermine the main purpose of chapter 11—achieving a successful restructuring.'" Purdue Pharma, 603 U.S. at 264-65 (Kavanaugh, J. dissenting).

9 That said, Purdue Pharma's analysis of the scope of sections 105(a) and 1123(b)(6) is controlling. See infra pp. 18-19.

Code. See, e.g., Czyzewski v. Jevic Holding Corp., 580 U.S. 451, 465 (2017) ("[W]e would expect to see some affirmative indication of intent if Congress actually meant to make structured dismissals a backdoor means to achieve the exact kind of nonconsensual priority-violating final distributions that the Code prohibits in Chapter 7 liquidations and Chapter 11 plans."); Law v. Siegel, 571 U.S. 415, 421 (2014) ("'[W]hatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of' the Bankruptcy Code." (quoting Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 206 (1988))); RadLAX Gateway Hotel, LLC v. Amalgamated Bank, 566 U.S. 639, 649 (2012) ("The Bankruptcy Code standardizes an expansive (and sometimes unruly) area of law, and it is our obligation to interpret the Code clearly and predictably using well established principles of statutory construction."). Appellees and Intervenors contend that the Exculpation Provision is authorized by sections 105(a), 1123(b)(6), 1129(a)(3), 1142(a), and 1142(b) of the Bankruptcy Code, but, as explained below, the Court is not persuaded by their arguments.[10]

---

10 To the extent that other courts have approved exculpation provisions similar to the one here, those cases are unpersuasive because they fail to articulate a statutory basis for exculpation that would be viable here. See, e.g., Matter of Highland Cap. Mgmt., L.P., 48 F.4th 419, 435-38 (5th Cir. 2022) (citing no statutory basis for exculpating the trustee and debtor, and citing section 1103(c) to support exculpation of the creditors' committee); Blixseth v. Credit Suisse, 961 F.3d 1074, 1081-85 (9th Cir. 2020) (citing sections 105(a) and 1123(a) as authority for exculpation of the debtor's largest creditor); In re Seaside Eng'g & Surveying, Inc., 780 F.3d 1070, 1076-81 (11th Cir. 2015) (citing section 105(a) in exculpating key employees of the reorganized entity); In re Pac. Lumber Co., 584 F.3d 229, 251-53 (5th Cir. 2009) (citing section 1103(c) to exculpate the creditors' committee); In re Airadigm Commc'ns, Inc., 519 F.3d 640, 655-57 (7th Cir. 2008) (citing sections 105(a) and 1123(b)(6)) to exculpate a third-party financer, who "would provide the requisite financing, which was itself essential to the reorganization"); In re PWS Holding Corp., 228 F.3d 224, 245-47 (3d Cir. 2000) (failing to cite any statutory basis for exculpating the debtor and professionals who provide services to the debtor, and citing section 1103(c) to exculpate the creditors' committee and entities that provide services to the committee). First, as discussed supra pp. 16-17, explicit statutory authorization in the Code is required. Thus, Highland Capital and PWS, which failed to articulate a statutory basis, are unpersuasive. Blixseth, Seaside, and Airadigm relied on

i. Section 105(a)

Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." Second Circuit case law is clear that section 105(a) cannot stand alone in authorizing a bankruptcy court's actions, and the Supreme Court cited this principle with approval in Purdue Pharma. 603 U.S. at 216 n.2 ("As the Second Circuit recognized, however, '§ 105(a) alone cannot justify' the imposition of nonconsensual third-party releases because it serves only to 'carry out' authorities expressly conferred elsewhere in the code." (quoting In re Purdue Pharma L.P., 69 F.4th 45, 73 (2d Cir. 2023))). The language of section 105(a) "suggests that an exercise of section 105 power be tied to another Bankruptcy Code section and not merely to a general bankruptcy concept or objective." In re Dairy Mart Convenience Stores, Inc., 351 F.3d 86, 92 (2d Cir. 2003). Thus, Appellees and Intervenors must show that another Code section authorizes the Exculpation Provision, and they offer four alternative candidates: sections 1123(b)(6), 1129(a)(3), 1142(a), and 1142(b).

ii. Section 1123(b)(6)

Section 1123(b)(6) provides that a bankruptcy plan "may" "include any other appropriate provision not inconsistent with the applicable provisions of this title." In Purdue Pharma, the Supreme Court held that provisions enacted under the authority of section

---

sections 105(a) and 1123(b)(6), either in combination or alone, but for the reasons discussed infra pp. 18-19, those provisions do not provide support for prospective exculpation. Blixseth also relied on section 1123(a), but Blixseth fails to thoroughly explain how section 1123(a) justifies exculpation, and it is not readily apparent how that provision can suffice as authority. Finally, Pacific Lumber and PWS relied on section 1103(c) to authorize exculpation of creditors' committees, but that rationale does not apply here insofar as the Exculpation Provision encompasses a much larger group of Exculpated Parties than just the creditors' committees.

1123(b)(6) must "concern the *debtor*—its rights and responsibilities, and its relationship with its creditors." 603 U.S. at 218. Seizing upon this language, Appellees and Intervenors contend that the Exculpation Provision "*does* 'concern the debtor . . . and its relationship with its creditors'" because the Exculpated Parties "are immunized only for carrying out the transactions necessary for the debtor to repay its creditors."[11] (Appellees & Intervenors Supp. Br. at 13 (quoting Purdue Pharma, 603 U.S. at 218).) That interpretation, however, misreads the Exculpation Provision and Purdue Pharma. In Purdue Pharma, the Supreme Court majority rejected the dissent's contention that nonconsensual third-party releases were valid because they served the salutary policy goal of addressing the debtor's liabilities in the context of "collective-action problems that plague mass-tort bankruptcies." Purdue Pharma, 603 U.S. at 240 (Kavanaugh, J. dissenting); id. at 220 (majority opinion) (rejecting the dissent's argument and commenting that "bankruptcy law" does not "provide[] a . . . roving commission to resolve all such problems that happen its way"). For substantially the same reason, the Exculpation Provision cannot be justified under section 1123(b)(6) by the argument that it merely facilitates the debtor's ability to obtain bankruptcy relief.

iii. Section 1129(a)(3)

Section 1129(a)(3) provides that "[t]he court shall confirm a plan only if . . . [t]he plan has been proposed in good faith and not by any means forbidden by law." Appellees and Intervenors contend that the Government failed to specifically identify any illegalities in the proposed plan during the confirmation proceeding and that the Bankruptcy Court found that the requirement of section 1129(a)(3) had been met. This finding under section 1129(a)(3),

---

[11] Appellees' and Intervenors' argument here evolved following the Supreme Court's decision in Purdue Pharma. (Compare Appellees Br. at 11-12, 25, 40-42 & n.7, and Intervenors Br. at 31-32, with Appellees & Intervenors Supp. Br. at 12-13.)

according to Appellees and Intervenors, is sufficient to establish the legality of the Exculpation Provision. (See Appellees Br. at 25, 32, 42; Intervenors Br. at 46-48.) There are several flaws with this argument, however.

To begin, section 1129(a)(3) does not grant the Bankruptcy Court any affirmative powers; rather, it operates as a constraint on the Bankruptcy Court's ability to confirm a plan. Furthermore, section 1129(a)(3) only "directs courts to look only to the proposal of a plan, not the terms of the plan." Garvin v. Cook Invs. NW, SPNWY, LLC, 922 F.3d 1031, 1035 (9th Cir. 2019) (citing Irving Tanning Co. v. Me. Superintendent of Ins., 496 B.R. 644, 660 (B.A.P. 1st Cir. 2013)); Irving Tanning, 496 B.R. at 660 ("Section 1129(a)(3) focuses not on the terms of the plan and its means of implementation but on the manner in which the plan 'has been *proposed*.'" (emphasis in original)). Thus, section 1129(a)(3) does not require a bankruptcy court to act as "an ombudsman without portfolio, gratuitously seeking out possible 'illegalities' in every plan." Garvin, 922 F.3d at 1036 (quoting In re Food City, Inc., 110 B.R. 808, 812 (Bankr. W.D. Tex. 1990)). Indeed, "confirmation of a plan does not insulate debtors from prosecution for criminal activity, even if that activity is part of the plan itself." Id. (citing Food City, 110 B.R. at 812). Section 1129(a)(3), therefore, does not provide authority validating the Exculpation Provision.

iv. Section 1142(a)

Section 1142(a) provides that, "[n]otwithstanding any otherwise applicable nonbankruptcy law, rule, or regulation relating to financial condition, the debtor and any entity organized or to be organized for the purpose of carrying out the plan shall carry out the plan and shall comply with any orders of the court." Appellees and Intervenors contend that, because section 1142(a) requires plan participants to carry out the plan without regard to otherwise applicable nonbankruptcy law, it is necessary and appropriate under section 105(a) to include an exculpation provision to insulate participants in such plan implementation. (Appellees Br. at

25-26, 40-41 & n.7; Intervenors Br. at 33-34.) The Bankruptcy Court adopted a version of this reasoning,[12] explaining that it was empowered to approve the Exculpation Provision because section 1142(a) "imposes an affirmative, statutory obligation on the debtors, other entities and their personnel to do what the plan contemplates." (Confirmation Decision at 33.)

These interpretations of section 1142(a), however, neglect to consider the statute's limiting phrase "relating to financial condition," which expressly cabins its preemptive force. Thus, for example, section 1142(a) operates to preempt nonbankruptcy law, but "only to the extent that such [nonbankruptcy] law 'relat[es] to financial condition.'" Pac. Gas & Elec. Co. v. California ex rel. Cal. Dep't of Toxic Substances Control, 350 F.3d 932, 937 (9th Cir. 2003). Accordingly, insofar as section 1142(a) imposes an affirmative, statutory obligation on parties involved in the implementation of a plan, it does not speak to the relationship between plan obligations and nonbankruptcy laws, rules, or regulations that do not relate to financial condition. The Exculpation Provision, which purports (with limited exceptions) to protect Exculpated Parties from "any liability for damages based on the negotiation, execution and implementation of any transactions or actions approved by the Bankruptcy Court in the Chapter 11 Cases" and "any claim for fines, penalties, damages, or other liabilities based on their execution and completion of the rebalancing transactions and the distribution of cryptocurrencies to creditors in the manner provided in the Plan," goes far beyond the scope of any protection afforded by the plain text of section 1142(a).

To save their interpretation of section 1142(a), Intervenors argue that the "relating to financial condition" proviso applies only to a "regulation," under the last antecedent rule.

---

12 The Bankruptcy Court did not invoke section 105(a). (See Confirmation Decision at 30-40.)

(Oral Arg. Tr. at 35-36.) "Under that rule, 'a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows.'" Facebook, Inc. v. Duguid, 592 U.S. 395, 404 (2021) (quoting Barnhart v. Thomas, 540 U.S. 20, 26 (2003)). But, where "the modifying clause appears after an integrated list," the last antecedent rule does not apply. Id. Here, the list of "law, rule, or regulation" is an integrated unit, acting as a unified whole to be modified in tandem. See id. at 403 (describing "store or produce telephone numbers to be called" as a "concise, integrated clause" and refusing to apply the last antecedent rule); United States v. Bass, 404 U.S. 336, 341 (1971) (refusing to apply the last antecedent rule to "receives, possesses, or transports in commerce or affecting commerce"). Indeed, this reading is reinforced by the fact that the "[n]otwithstanding any otherwise applicable nonbankruptcy" phrase in the beginning of the statute applies to all three items in the list. This is not a situation where applying the modifier to all three items in the list would "'stretch the modifier too far' by asking it to qualify a remote or otherwise disconnected phrase." Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund, 583 U.S. 416, 440 (2018) (quoting Jama v. Immigr. & Customs Enf't, 543 U.S. 335, 342 (2005)); Lockhart v. United States, 577 U.S. 347, 351 (2016) (applying the last antecedent rule "where it takes more than a little mental energy to process" a statute's component parts, "making it a heavy lift to carry the modifier across them all").

Thus, the last antecedent rule does not apply. See In re Fed.-Mogul Glob. Inc., 684 F.3d 355, 372 n.25 (3d Cir. 2012) (rejecting application of last antecedent rule to limit constraining impact of "relating to financial condition" phrase to term "regulation" in section 1142(a)). Instead, the series-qualifier canon applies. That interpretive rule provides that, "[w]hen there is a straightforward, parallel construction that involves all nouns or verbs in a series, a modifier at the end of the list [(here, 'relating to financial condition')] normally applies

to the entire series [(here, the list of 'law, rule, or regulation')]." Facebook, 592 U.S. at 403-04 (citation and internal quotations omitted). Section 1142(a) thus neither affirmatively authorizes the Exculpation Clause nor speaks to general issues of liability under nonbankruptcy law for actions taken to implement a plan.

v. Section 1142(b)

Section 1142(b) provides that "[t]he court may direct the debtor and any other necessary party to execute or deliver or to join in the execution or delivery of any instrument required to effect a transfer of property dealt with by a confirmed plan, and to perform any other act, including the satisfaction of any lien, that is necessary for the consummation of the plan." While the language of section 1142(b), standing alone, does not imply any restriction on the types of actions a bankruptcy court is empowered to direct as necessary for plan consummation, it does not speak to the relationship of such directions to nonbankruptcy law. Nor does section 1142(b) explicitly empower a bankruptcy court to proactively insulate parties from exposure to consequences under nonbankruptcy law, even if those consequences were the result of complying with the court's directions.

Courts and commentators have rejected the notion that section 1142(b) can properly be used to override at least certain types of nonbankruptcy laws. For example, "[c]ourts should not use section 1142(b) to authorize the debtor to avoid a law or regulatory requirement regarding public health and safety." 8 Collier on Bankruptcy ¶ 1142.03[2] (16th ed. 2026) (citing In re Baker & Drake, Inc., No. 92-CV-0107-HDM, 1992 WL 682764, at *3 (D. Nev. Oct. 22, 1992), aff'd, 35 F.3d 1348 (9th Cir. 1994); Montgomery County v. Barwood, Inc., 422 B.R. 40, 45 (D. Md. 2009)). In Baker & Drake, the bankruptcy court approved a plan that would have required the debtor taxi company to hire drivers as independent contractors, in contravention of a state law that required drivers to be hired and monitored as employees. 35 F.3d at 1350. The

bankruptcy court held that the plan was lawful because bankruptcy law preempted the contrary state law, but the District Court for the District of Nevada and the Ninth Circuit disagreed. Id. at 1352-54. Extrapolating from two Supreme Court cases, the Ninth Circuit held that "federal bankruptcy preemption is more likely (1) where a state statute facially or purposefully carves an exception out of the Bankruptcy Code, or (2) where a state statute is concerned with economic regulation rather than with protecting the public health and safety." Id. at 1353 (citing Perez v. Campbell, 402 U.S. 637 (1971); Midlantic Nat'l Bank v. N.J. Dep't of Env't Prot., 474 U.S. 494 (1986)). Because the state law at issue in Baker & Drake did not fall under either of these two exceptions, the approved plan provision was invalid. Likewise, in Barwood, the District Court for the District of Maryland reversed the confirmation of a bankruptcy plan that would have required the debtor taxi company to transfer taxi licenses to individual drivers, in violation of a state law that limited such license transfers. 422 B.R. at 43. According to the court in Barwood, the Code "does not preempt otherwise applicable nonbankruptcy laws that are concerned with protecting public health, safety, and welfare." Id. at 47 (citing Baker & Drake at 1348; Midlantic, 474 U.S. at 507). Finally, in Midlantic, the bankruptcy trustee sought to abandon, pursuant to 11 U.S.C. section 554(a), properties that contained thousands of gallons of toxic chemicals. 474 U.S. at 497-99. State and local authorities objected, arguing that the abandonment would violate state and federal environmental laws. Id. at 498. While the bankruptcy court had authorized the abandonment, the Supreme Court held that "[n]either the Court nor Congress has granted a trustee in bankruptcy powers that would lend support to a right to abandon property in contravention of state or local laws designed to protect public health or safety." Id. at 502. Together, these decisions show that bankruptcy law does not give debtors, trustees, and other plan participants "*carte blanche* to ignore nonbankruptcy law." Id.; see also

O'Loghlin v. County of Orange, 229 F.3d 871, 875 (9th Cir. 2000) ("A suit for illegal conduct occurring after discharge threatens neither the letter nor the spirit of the bankruptcy laws. A 'fresh start' means only that; it does not mean a continuing licence to violate the law."); In re CMC Heartland Partners, 966 F.2d 1143, 1146 (7th Cir. 1992) ("Having been a debtor in bankruptcy does not authorize a firm to operate a nuisance today or otherwise excuse it from complying with laws of general application." (citations omitted)).

Similarly, there is no authority imbuing the Bankruptcy Court with authority to immunize criminal conduct. Generally, "equity will not interfere with the criminal processes." Zemel v. Rusk, 381 U.S. 1, 19 (1965). Indeed, a bankruptcy court lacks any subject matter jurisdiction over criminal matters whatsoever. See, e.g., Travelers Indem. Co. v. Bailey, 557 U.S. 137, 153 n.6 (2009) (stating that a bankruptcy court's decision "to conduct a criminal trial" would be "plainly beyond [its] jurisdiction" (quotation marks omitted)); In re Grabis, No. 13-10669-JLG, 2020 WL 7346467, at *12 n.71 (Bankr. S.D.N.Y. Dec. 11, 2020) ("The Court lacks subject matter jurisdiction to enforce state or federal criminal laws.").

These principles are also embodied in the text of the Code, which expressly protects the Government's police and regulatory powers during and after a bankruptcy case. For example, 11 U.S.C. section 362(b) provides that the filing of a Chapter 11 petition does not operate as an automatic stay of "the commencement of a criminal action or proceeding against the debtor" or "the commencement or continuation of an action or proceeding by a governmental unit or any organization exercising authority under the [Chemical Weapons Convention] to enforce such governmental unit's or organization's police and regulatory power." 11 U.S.C. § 362(b)(1), (4). Similarly, 28 U.S.C. section 959(b) provides that a trustee or debtor-in-possession "shall manage and operate the property in his possession . . . according to the

requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof." See also In re Am. Coastal Energy Inc., 399 B.R. 805, 810 (Bankr. S.D. Tex. 2009) ("Bankrupt debtors are no different from any citizen in that they must comply with state and federal laws." (citing 28 U.S.C. § 959(b))). Lastly, 11 U.S.C. section 523(a)(19) excepts from discharge debts resulting from violations of federal securities laws and other laws, and 11 U.S.C. section 1141(d)(6) provides that corporate debtors are not discharged from certain governmental debts.

Here, the Bankruptcy Court recognized that nonbankruptcy laws concerning the types of cryptocurrency transactions contemplated by the Confirmed Plan were at best unclear. Thus, the Bankruptcy Court sought to forestall any potential problems with an advance declaration exculpating the persons involved from liability and criminal culpability for such transactions. To the extent that Appellees and Intervenors rely on section 1142(b) for the proposition that a bankruptcy court, by authorizing and directing implementation action, necessarily preempts all possible resort to nonbankruptcy law regulation and remedies, their fundamental premise is flawed—section 1142(b) carries no such power. Appellees' and Intervenors' further extrapolation in the form of the Exculpation Provision is likewise unsupported by section 1142(b).

Finally, the broad interpretation of section 1142(b) proffered by Appellees and Intervenors implicates several constitutional issues. Because there is "substantial doubt whether" their interpretation "comports" with the Constitution, the Court should not adopt it absent "a clear expression of Congress' intent." United States v. Sec. Indus. Bank, 459 U.S. 70, 78, 82 (1982) (quoting NLRB. v. Cath. Bishop of Chi., 440 U.S. 490, 507 (1979)). First, by authorizing the Exculpation Provision, the Bankruptcy Court may have improperly arrogated to itself the

powers of the Legislative and Executive Branches. Statutes of limitation enacted by Congress allow the Executive Branch to prosecute wrongdoing for some period of time after allegedly offending conduct has occurred. Under the Exculpation Provision, however, the Government is barred from prosecuting conduct that has already occurred. Instead, the Government may only "contend that any rebalancing transaction should be stopped or prevented, or that any other action contemplated by the Plan [but not yet completed] should be enjoined or prevented from proceeding further." (Confirmation Order at 7-8, ¶¶ 97-99.) The Exculpation Provision thus potentially intrudes upon the Executive Branch's "exclusive authority and absolute discretion to decide whether to prosecute a case." United States v. Nixon, 418 U.S. 683, 693 (1974).

Similarly, the Exculpation Provision imposes a standard of liability (actual fraud, willful misconduct, and gross negligence) that may purport to preempt standards enacted by Congress in federal statutes and regulations. See City of Milwaukee v. Illinois, 451 U.S. 304, 317 (1981) ("'[W]e start with the assumption' that it is for Congress, not federal courts, to articulate the appropriate standards to be applied as a matter of federal law."). The Legislative Branch enacts liability standards that regulate conduct and statutes of limitations that determine how long the Government has to evaluate whether wrongdoing has occurred and to take action. The Executive Branch, working within the confines of the statutes enacted by the Legislative Branch, determines whether to bring actions. And the Judicial Branch holds trials and renders decisions in concrete disputes arising in such actions. The Exculpation Provision threatens to disrupt this careful balance.

These separation of powers principles are further embodied in the Article III limitations on the powers of the Judicial Branch. See Raines v. Byrd, 521 U.S. 811, 820 (1997) ("[T]he law of [Article] III standing is built on a single basic idea—the idea of separation of

powers." (quoting Allen v. Wright, 468 U.S. 737, 752 (1984))). To bring a pre-enforcement challenge, a plaintiff must demonstrate "sufficiently imminent" enforcement. Susan B. Anthony List v. Driehaus, 573 U.S. 149, 159 (2014). Unless that harm is "certainly impending," a plaintiff lacks standing. Clapper v. Amnesty Int'l USA, 568 U.S. 398, 416 (2013). The Exculpation Provision, however, is a judicial order purporting to determine the liability of the Exculpated Parties in the absence of any imminent threat of enforcement. It immunizes conduct that has not yet occurred. (See Oral Arg. Tr. at 4-5 (discussing future transactions).) Furthermore, the Exculpated Parties have broad discretion to determine how to proceed with such conduct, at a future time and with no active court supervision.[13] The Judicial Branch is empowered to adjudicate only "Cases" and "Controversies." A judicial order resolving the issue of liability for future transactions, including transactions that may even involve parties that have not been before this Court or the Bankruptcy Court, threatens to exceed Article III's boundaries. See Lewis v. Cont'l Bank Corp., 494 U.S. 472, 477 (1990) (noting that federal courts may not "decide questions that cannot affect the rights of litigants in the case before them" or give "opinion[s] advising what the law would be upon a hypothetical state of facts" (quoting North Carolina v. Rice, 404 U.S. 244, 246 (1990))); see also In Matter of Motors Liquidation Co., 829 F.3d 135, 168 (2d Cir. 2016) (Article III "limitations apply to bankruptcy courts.").

Second, the Exculpation Provision threatens to violate the due process rights of transaction counterparties to the Exculpated Parties. "[A]s plaintiffs," these counterparties have

---

13 For example, "Restructuring Transactions," which are transactions that the Debtors are required to effectuate under the Confirmed Plan, include "corporate transactions that the Debtors and the Committee jointly determine to be necessary to implement the transactions described in this Plan." (Confirmed Plan § I.A.141; see Confirmation Order ¶ 46 (providing that "the applicable Debtors will take any action as may be necessary or advisable to effectuate the Restructuring Transactions described in the Plan").)

a right under the Fifth Amendment to "attempt[] to redress grievances." Logan v. Zimmerman Brush Co., 455 U.S. 422, 429 (1982). The Exculpation Provision, however, precludes these counterparties from bringing claims against the Exculpated Parties and does so without giving the counterparties any opportunity to object, or even notice. Indeed, these counterparties were largely unknown as of the time of the Confirmation Order and may still be unknown prior to the completion of the transactions contemplated by the Confirmed Plan. In their opposition, Appellees and Intervenors contend that the Government lacks standing to raise the rights of these third parties (Intervenors Br. at 50-51), but the United States Trustee, which is an Appellant here, "may raise and may appear and be heard on any issue in any case or proceeding under [Title 11]," 11 U.S.C. § 307. "[T]he U.S. trustees are responsible for 'protecting the public interest and ensuring that bankruptcy cases are conducted according to law.'" In re Zarnel, 619 F.3d 156, 162 (2d Cir. 2010) (quoting In re Revco D.S., Inc., 898 F.2d 498, 499 (6th Cir. 1990)). Because these future transaction counterparties are unable to raise their due process rights themselves, the U.S. Trustee may do so for them. See W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP, 549 F.3d 100, 109 (2d Cir. 2008) (allowing third-party standing "where the plaintiff can demonstrate (1) a close relationship to the injured party and (2) a barrier to the injured party's ability to assert its own interests").

Likewise, the Government did not have an opportunity to be heard on specific claims that it could bring in the future, because the Exculpation Provision immunizes conduct that has not yet occurred and that the Exculpated Parties have broad discretion to design and execute without court supervision. The Government concedes that "governmental entities have no right to due process under the Fifth Amendment's due process clause." (Appellants Br. at

43).[14] Nonetheless, under "a basic principle of justice," the Government has "a reasonable opportunity to be heard [prior to] judicial denial of [its] claimed rights." City of New York v. N.Y., New Haven & Hartford Ry. Co., 344 U.S. 293, 297 (1953); see In re Scott Cable Commc'ns, Inc., 259 B.R. 536, 544 (D. Conn. 2001) (analyzing the Government's rights by analogy to due process rights guaranteed by the Fifth Amendment). The Exculpation Provision potentially runs afoul of these principles.

Finally, the Exculpation Provision potentially intrudes upon the United States' sovereign immunity. Appellees and Intervenors dispute the applicability of sovereign immunity, arguing that no lawsuit is being brought against the United States. (Appellees Br. at 51-52; Intervenors Br. at 51-52.) But the Exculpation Provision effectively awards relief against the United States by protecting the Exculpated Parties from future legal action by the Government, purporting to constrain power that the United States and its instrumentalities would otherwise have in their sovereign capacities. See Hassay v. VA Health Care S.F., No. 18-CV-04934-TSH, 2018 WL 4676955, at *2 (N.D. Cal. Sept. 26, 2018) ("[N]o court has jurisdiction to award relief against the United States or a federal agency unless the requested relief is expressly and unequivocally authorized by federal statute." (citing United States v. Sherwood, 312 U.S. 584, 586-87 (1941))). Without an express waiver of sovereign immunity identified by the Bankruptcy Court or any party to this appeal, it is at best questionable whether the Bankruptcy Court or this Court would even have jurisdiction to approve the Exculpation Provision insofar as it constrains federal governmental authority.

---

14 See South Carolina v. Katzenbach, 383 U.S. 301, 323 (1966) ("The word 'person' in the context of the Due Process Clause of the Fifth Amendment cannot, by any reasonable mode of interpretation, be expanded to encompass the States of the Union."); United States v. Cardinal Mine Supply, Inc., 916 F.2d 1087, 1089 & n.3 (6th Cir. 1990) ("[T]he United States appropriately concedes that it has no right to due process.").

Congress has waived the United States' sovereign immunity in bankruptcy proceedings only in three limited circumstances: "(1) where the substantive authority for the cause of action arises from the Bankruptcy Code itself; (2) for compulsory counterclaims against government claims; and (3) for permissive counterclaims capped by a set-off limitation." McGuire v. United States, 550 F.3d 903, 912-13 (9th Cir. 2008) (citing 11 U.S.C. § 106). Appellees and Intervenors contend that the first exception, as codified in 11 U.S.C. section 106(a), applies. (Intervenors Br. at 52.) That statute enumerates several specific provisions of the Code for which the United States' sovereign immunity is waived, including section 1142(b). Nothing in section 1142(b), however, specifically authorizes orders constraining law enforcement authority or evinces an "unequivocal expression" of Congress' intent to waive the United States' sovereign immunity. Lane v. Pena, 518 U.S. 187, 192 (1996) (quoting United States v. Nordic Vill., Inc., 503 U. S. 30, 34 (1992)). The Court is particularly mindful in this regard because "a waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign." Id.

* * *

The Exculpation Provision is unlawful because it is not specifically authorized by any provision of the Bankruptcy Code. Although Appellees and Intervenors make arguably colorable arguments for section 1142(b) as a viable source of authority, the doctrinal and constitutional considerations discussed above militate against Appellees' and Intervenors' broad reading of section 1142(b).

C. Whether the Exculpation Provision is a Proper Application of Quasi-Judicial Immunity

Finally, Appellees and Intervenors contend that the Exculpation Provision is "an application of quasi-judicial immunity." (Intervenors Br. at 37.) They contend that the Exculpation Provision "merely serves as judicial confirmation of the backdrop principles of

immunity that shield individuals from liability for performing court orders." (Id. at 43.) The Exculpation Provision, however, exceeds the traditional contours of quasi-judicial immunity. Rather than functioning as an affirmative defense to a claim for liability based on action taken pursuant to court authorization or direction, the Exculpation Provision preemptively purports to immunize conduct that has not yet even occurred. It also purports to apply in the criminal law context, unlike quasi-judicial immunity. Accordingly, the Exculpation Provision cannot be justified as merely a form or application of quasi-judicial immunity.

"Few doctrines were more solidly established at common law than the immunity of judges from liability for damages for acts committed within their judicial jurisdiction." Cleavinger v. Saxner, 474 U.S. 193, 199 (1985) (quoting Pierson v. Ray, 386 U.S. 547, 553-54 (1967)). An extension of judicial immunity is quasi-judicial immunity, which provides immunity to "certain others who perform functions closely associated with the judicial process." Id. at 200. Courts have applied quasi-judicial immunity to protect (1) "those who make discretionary judgments 'functional[ly] comparab[le]' to judges, such as prosecutors and grand jurors"; (2) "those who 'perform a somewhat different function in the trial process but whose participation . . . is equally indispensable,' such as witnesses"; and (3) "those who serve as 'arms of the court, . . . fulfill[ing] a quasi-judicial role at the court's request,' such as guardians ad litem or court-appointed doctors." Russell v. Richardson, 905 F.3d 239, 247 (3d Cir. 2018) (quoting Imbler v. Pachtman, 424 U.S. 409, 423 n.20 (1976); Briscoe v. LaHue, 460 U.S. 325, 345-46 (1983); Hughes v. Long, 242 F.3d 121, 126 (3d Cir. 2001)). Included in this last category are those "enforcing or executing a court order," because doing so "is intrinsically associated with a judicial proceeding." Bush v. Rauch, 38 F.3d 842, 847 (6th Cir. 1994). Faced with a court order directing them to take a controversial action, a party may be forced to choose

between disregarding the judge's directive and facing contempt charges, or risking being haled into court for complying with the order. The absence of quasi-judicial immunity in such circumstances would undermine regularity and confidence in judicial determinations. See id. at 848 ("It does not seem logical to grant immunity to a judge in making a judicial determination and then hold the official enforcing or relying on that determination liable for failing to question the judge's findings. This would result in the official second-guessing the judge who is primarily responsible for interpreting and applying the law."); Valdez v. City of Denver, 878 F.2d 1285, 1289 (10th Cir. 1989) (stating that officials "must not be required to act as pseudo-appellate courts scrutinizing the orders of judges"); Kermit Constr. Corp. v. Banco Credito Y Ahorro Ponceno, 547 F.2d 1, 3 (1st Cir. 1976) (noting the "unfairness of sparing the judge who gives an order while punishing the [party] who obeys it").

Courts have applied quasi-judicial immunity in a broad range of contexts. The general rule emerging from these cases is that a party acting pursuant to, and within the scope of,[15] a valid[16] judicial order is entitled to immunity. See, e.g., Gross v. Rell, 695 F.3d 211, 216-17 (2d Cir. 2012) (court-appointed conservator, to the extent acting with authorization or

---

15 "Quasi-judicial immunity extends only to the acts authorized by court order, i.e., to the execution of a court order, and not to the manner in which it is executed." Richardson, 905 F.3d at 250 (holding that quasi-judicial immunity did not apply where law enforcement used excessive force in enforcing a judicial order); see also Coleman v. Dunlap, 695 F.3d 650, 653-54 (7th Cir. 2012) ("[O]nly the ends of the order—not the means used to execute the order—are protected by an order to sell (unless the order directs the [people acting] to use specific means)" (citing Richman v. Sheahan, 270 F.3d 430, 437 (7th Cir. 2001))).

16 Courts have held that the judicial order need only be "facially valid." See Roland v. Phillips, 19 F.3d 552, 556 (11th Cir. 1994) ("When 'we have a writ which is fair on its face, issued from a court which had jurisdiction both of the parties and of the subject-matter of the suit in which it was issued, and which was issued in the regular course of judicial proceeding by that court, and which the officer of the court in whose hands it was placed is bound to obey,' the implementing officer is protected in executing the court's mandate." (quoting Matthews v. Densmore, 109 U.S. 216, 218 (1883))).

approval of probate court orders); Bradford Audio Corp. v. Pious, 392 F.2d 67, 72-73 (2d Cir. 1968) (same); Mandola v. County of Nassau, 222 F. Supp. 3d 203, 214-16 (E.D.N.Y. 2016) (sheriffs executing court-ordered arrest warrant); Kermit, 547 F.2d at 3 (court-appointed receiver enforcing court order); Lockhart v. Hoenstine, 411 F.2d 455, 460 (3d Cir. 1969) (court clerk obeying court order); Fowler v. Alexander, 478 F.2d 694, 696 (4th Cir. 1973) (sheriff and jailor who confined plaintiff pursuant to judicial order); Tarter v. Hury, 646 F.2d 1010, 1013 (5th Cir. 1981) (court clerk obeying court order); Bush, 38 F.3d at 847-48 (probate court administrator acting pursuant to court order); Henry v. Farmer City State Bank, 808 F.2d 1228, 1238-40 (7th Cir. 1986) (sheriff who seized and sold plaintiff's property pursuant to court order); Tymiak v. Omodt, 676 F.2d 306, 308 (8th Cir. 1982) (sheriff who evicted plaintiff from home in compliance with court order); Coverdell v. Dep't of Soc. & Health Servs., State of Wash., 834 F.2d 758, 764-65 (9th Cir. 1987) (social worker's apprehension of a child pursuant to court order); T & W Inv. Co. v. Kurtz, 588 F.2d 801, 802-03 (10th Cir. 1978) (court-appointed receiver enforcing court order); Roland v. Phillips, 19 F.3d 552, 556-57 (11th Cir. 1994) (law enforcement officials enforcing temporary restraining order and subsequent telephonic incarceratory order).

Immunity is also well-recognized in the bankruptcy context. For instance, bankruptcy trustees are entitled to quasi-judicial immunity, to the extent that they are acting within the scope of their duties and the authorization of the bankruptcy court, and to the extent that they are not acting willfully or grossly negligently in violation of the law. See, e.g., Gross, 695 F.3d at 216 ("Bankruptcy trustees are generally immune to the extent that they are acting with the approval of the court."); United States v. Hemmen, 51 F.3d 883, 891 (9th Cir. 1995) ("As a general matter, bankruptcy trustees enjoy broad immunity from suit when acting within

the scope of their authority and pursuant to court order. Trustees are not immune, however, for intentional or negligent violation of duties imposed by law."); Gregory v. United States, 942 F.2d 1498, 1500 (10th Cir. 1991) (bankruptcy trustee enjoys immunity when executing "facially valid judicial orders"); Bennett v. Williams, 892 F.2d 822, 823 (9th Cir. 1989) ("Bankruptcy trustees are entitled to broad immunity from suit when acting within the scope of their authority and pursuant to court order."); Boullion v. McClanahan, 639 F.2d 213, 214 (5th Cir. 1981) (The trustee "as an arm of the Court, [who] sought and obtained court approval of his actions, . . . is entitled to derived immunity."); Mathis v. Philadelphia Elec. Co., 644 F. App'x 113, 116 (3d Cir. 2016) (The trustee "was operating as an officer of the Bankruptcy Court in carrying out its order and is thus immune from suit."). This qualified immunity also extends to "court appointed officers who represent the estate [who] are the functional equivalent of a trustee" and "court approved attorneys for the trustee." In re Harris, 590 F.3d 730, 742 (9th Cir. 2009) (immunizing unsecured creditor of the estate, as well as the creditor's attorneys, who prosecuted a fraudulent conveyance claim against the debtor).

Similarly, members of creditors' committees are entitled to quasi-judicial immunity for actions within the scope of their duties and court-ordered authority, to the extent they are not acting willfully or grossly negligently in violation of the law. See, e.g., Pan Am Corp. v. Delta Air Lines, Inc., 175 B.R. 438, 514 (S.D.N.Y. 1994) ("[A]n official committee such as the Creditors Committee enjoys a qualified immunity that . . . extends to conduct within the scope of the committee's statutory or court-ordered authority," except for "willful misconduct" or "ultra vires activity."); Luedke v. Delta Air Lines, Inc., 159 B.R. 385, 392-93 (S.D.N.Y. 1993) ("[T]he qualified immunity of creditors' committees and their members . . . must be limited to actions taken within the scope of the committee's authority as conferred by

statute or the court and may not extend to 'willful misconduct' of the committee or its members."); In re Tucker Freight Lines, Inc., 62 B.R. 213, 218 (Bankr. W.D. Mich. 1986) ("The Bankruptcy Code confers a limited immunity upon those serving its ends."). Courts have held that committees' quasi-judicial immunity impliedly derives from section 1103(c),[17] which vests committees with enumerated powers and impliedly imposes upon them a fiduciary duty to the creditors they represent. See, e.g., Pan Am, 175 B.R. at 514; Luedke, 159 B.R. at 392-93; Tucker Freight, 62 B.R. at 216.

In each of the cases cited above, quasi-judicial immunity was applied as an affirmative defense that was raised in a lawsuit filed after the conduct at issue had occurred. See, e.g., Mordkofsky v. Calabresi, 159 F. App'x 938, 939 (11th Cir. 2005) ("[J]udicial immunity is an affirmative defense and does not divest the court of subject matter jurisdiction."). The Exculpation Provision, by contrast, preemptively purports to immunize conduct before it has even occurred. There are critical distinctions between an ex post quasi-judicial immunity defense and an ex ante exculpation from liability. (See Oral Arg. Tr. at 47 (Intervenors asserting that "[t]he existence of the exculpation clause creates a distinct defense [from quasi-judicial immunity]").) In the well-recognized ex post sphere, the scope and applicability of quasi-judicial immunity is determined by the court in which the defense is raised, not in advance

---

17 That statute reads: "A committee appointed under section 1102 of this title may— (1) consult with the trustee or debtor in possession concerning the administration of the case; (2) investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan; (3) participate in the formulation of a plan, advise those represented by such committee of such committee's determinations as to any plan formulated, and collect and file with the court acceptances or rejections of a plan; (4) request the appointment of a trustee or examiner under section 1104 of this title; and (5) perform such other services as are in the interest of those represented." 11 U.S.C. § 1103(c).

by a court wishing to protect parties before it from future liabilities. Indeed, the immunity defense is often highly context- and fact-dependent. See, e.g., Zellner v. Summerlin, 494 F.3d 344, 368 (2d Cir. 2007) ("[B]ecause qualified immunity is an affirmative defense, it is incumbent upon the defendant to plead, and adequately develop, a qualified immunity defense during pretrial proceedings so that the trial court can determine . . . which facts material to the qualified immunity defense must be presented to the jury . . . ." (emphasis omitted) (quoting Blissett v. Coughlin, 66 F.3d 531, 538 (2d Cir. 1995))); Stewart v. Lattanzi, 832 F.2d 12, 13 (2d Cir. 1987) ("Some factual inquiry must be made to determine whether the duties . . . were judicial or prosecutorial in nature entitling them, or any of them, to absolute immunity."). By analogy, a law enforcement officer seeking court approval of a search warrant may be entitled to qualified immunity for actions taken in the course of executing that warrant, see Terebesi v. Torreso, 764 F.3d 217, 230-33 (2d Cir. 2014), but the court approving the warrant does not set forth the conditions under which the officer may be sued or what liability the officer may have in such suits. Rather, if the officer is sued, the court hearing that suit will appropriately evaluate a qualified immunity defense in the relevant circumstances. Appellees and Intervenors fail to address this analytical gap and do not identify any persuasive authority specifically approving prospective grants of quasi-judicial immunity for future actions.[18] (See Intervenors Br. 37-43; Appellees Br. 29-30.)

---

18 Highland Capital appears to rely on quasi-judicial immunity to approve exculpation for trustees. 48 F.4th at 437 (citing In re Smyth, 207 F.3d 758, 762 (5th Cir. 2000)). Setting aside the fact that the Highland Capital court did not cite any statutory authority for exculpation, see supra note 10, or whether quasi-judicial immunity can independently support exculpation without statutory authorization, the Highland Capital court did not analyze the critical differences between ex ante exculpation and ex post immunity. That case is therefore unpersuasive.

Moreover, it appears that only a single federal appellate court has stated that judicial immunity can even apply in the criminal context—and it did so in dicta, ultimately rejecting the doctrine as applied to the defendant because, even assuming that judicial immunity could protect the defendant commissioner against a criminal prosecution, it would only apply to "erroneous judicial acts [d]one in good faith." Braatelien v. United States, 147 F.2d 888, 895 (8th Cir. 1945) (finding that the defendant had "act[ed] fraudulently or corruptly"). Indeed, another federal appellate court rejected, albeit in dicta, the notion that judicial immunity could apply in the criminal context at all. See In re Kendall, 712 F.3d 814, 822 n.4 (3d Cir. 2013) ("[W]hile '[f]ew doctrines were more solidly established at common law than the immunity of judges from liability for damages for acts committed within their judicial jurisdiction,' the same was not true for contempt or criminal liability. . . . With no support in history, law, or logic, we cannot extend judicial immunity to criminal contempt." (citations omitted)). The Exculpation Provision purports to immunize Exculpated Parties from criminal responsibility, again exceeding recognized boundaries of the doctrine of quasi-judicial immunity.

Thus, the Exculpation Provision cannot be justified as a form or an application of quasi-judicial immunity because it exceeds the recognized contours of that doctrine. Unlike quasi-judicial immunity, the Exculpation Provision offers ex ante immunization for conduct that has not yet occurred, and it purports to operate in the criminal context.

## III. Conclusion

While the concerns that animated the Bankruptcy Court to approve the Exculpation Provision are not baseless, the Bankruptcy Court lacked the authority to grant the prospective protection against liability and criminal responsibility it purports to establish, nor did the Bankruptcy Court have authority to constrain the future exercises of governmental

prosecutorial or regulatory authority in connection with the implementation of the Confirmed Plan. Nothing in the Bankruptcy Code or the doctrine of quasi-judicial immunity empowered the Bankruptcy Code to approve the Exculpation Provision. Accordingly, the Bankruptcy Court's Confirmation Order is vacated to the extent it approved the Exculpation Provision, and the matter is remanded for further proceedings consistent with this Opinion and Order. The Clerk of the Court is directed to enter judgment accordingly and to close this case.

SO ORDERED.

Dated: New York, New York
August 4, 2026

/s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
Chief United States District Judge